the administrative segregation unit at CMF.  Caseload inmates in administrative

segregation numbered 121, up from 98 in the preceding monitoring round.

      In January 2006, positions for 1.5 psychiatrists, six psychologists and two psych

social workers were vacant.  In addition, one permanent psychiatrist was on leave in anticipation

of retirement and another was expected to go on medical leave shortly.  Contract clinicians

covered 0.75 of the vacant psychiatrist positions, leaving 1.75 psychiatric positions functionally

vacant.  Contractors covered only about half of the institution's vacant case manager positions,

raising caseloads among remaining case managers in the general population 3CMS program

nearly 200 inmates.  The number of allocated psych tech positions rose to four, but one of the

psych techs continued to be absent on military leave and a second was temporarily assigned to

medical records for the duration of an ongoing investigative inquiry, leaving just two psych techs

to cover three administrative segregation facilities.

      By January 2006, CSP/Solano housed 1,543 3CMS inmates, up 184

inmates, or 14 percent, over the July 2005 census.  The population exceeded the

institution's 3CMS capacity of 1,199 inmates by 29 percent or 344 inmates.  The census

of inmates in administrative segregation remained high through the remainder of the

monitoring period.  In January 2006, 125 caseload inmates were in three administrative

segregation units.

      During the monitoring round, the institution was able to correct the

deficiencies in the heating, ventilation and air conditioning (HVAC) system that shut

down or limited the operations of its MHCB unit in the CTC throughout 2005.  By early

October, the CTC was physically operational, although the population of the unit was

limited to admissions from CSP/Solano as the unit prepared for its licensing inspection in

the late fall.   The institution received a provisional CTC license in mid-December 2005

from the Department of Health Services (DHS), at which point the unit was reopened to

local and outside mental health and medical admissions.  The renovated CTC contained

16 licensed beds, including nine designated for mental health patients and seven for

medical patients; four of the latter could also accommodate mental health patients.

The refurbished CTC contained limited video monitoring capability.  A

camera in the nursing station monitored one cell, which was a respiratory isolation room

used to house medical, not MHCB, inmates.  Reportedly, all of the rooms in the CTC

were wired for video monitoring, but monitoring equipment had not been installed.  Staff

reported that the existing camera had never been used to monitor suicidal inmates.

Issues Resolved:

Five-day clinical follow-up was provided by clinicians to suicidal inmates
discharged from the MHCB.

EOP inmates were transferred within 60 days.

Changes in medication were accompanied by a documented rationale.

Paroling inmates received a supply of medications.

Case management notes written in UHRs contained adequate clinical
information.

Quality Management:

Quality assurance efforts progressed slowly.  Mental health quality

assurance meetings were documented, and reports were regularly submitted to the

governing body.  The evolution of mental health QITs, which were small in size and

often lacked custody representation, remained protracted.  The formerly moribund QIT

on treatment plans was reactivated by a change in leadership. Mental health staff seemed knowledgeable about the results of quality assurance audits.

A QIT established to examine lengthy pill lines functioned as intended, but the problem it documented was not fully resolved. Although the QIT recommended a change in pill-line procedures, the monitor found that pill-line waits continued to last as long as one to two hours. Meanwhile, the same QIT broadened its scope to address problems of medication continuity. Custody staff participating on the QIT took the lead in helping to devise a strategy to improve medication continuity during intra-institutional transfers.

The suicide prevention committee remained largely stagnant. Although the composition of the committee was consistent with requirements, attendance at meetings was poor. Attendance records indicated that no custody staff participated in one meeting, and only one suicide prevention committee meeting included as many as three custody representatives. Neither RNs nor MTAs attended two meetings. The committee appeared to be going through the motions with little substantive discussion or action focused on its goal of preventing suicides in the institution. It monitored only a few key targets and rarely identified problems, examined procedures or recommended changes.

Little had been done to implement the peer review process at CSP/Solano. Staff reported that a meeting was held in December 2005 to discuss the development of peer review.

Accuracy of the MHTS improved greatly. Staff reported that the MHTS increasingly contained valid information and allowed them to track their caseloads and make timely contacts. Supervisors were confident that audits based on the MHTS were accurate. Office technicians were proficient at entering data and generating a variety of

reports. The MHTS was not used to track referrals, leaving the institution with no way to determine whether responses to referrals were timely.

Medication Management:

Medication management remained generally erratic. Paroling inmates received a supply of medication. After the possibility of opening a second pill window during peak periods to shorten pill lines was ruled out due to a lack of sufficient RNs or MTAs to staff it, a pill-line procedure was developed that called for sequential controlled releases of 30 to 40 inmates each to limit pill-line waits to thirty minutes. This new approach had not yet been audited.

A shortage of staff to administer medications and the lack of allocated positions for correctional officers to supervise medication administration were cited by staff as obstacles to improved medication delivery. The institution reported that it had no budgeted positions for correctional officers to supervise pill lines or serve as escorts to medical or mental health appointments. Custody staff needed to be taken from housing units or other programs to supervise pill lines.

Problems with DOT-administered medication persisted. Psychiatrists specified DOT in selected cases, but due to a glitch in the pharmacy's software, reported in the preceding monitoring round, all orders written by psychiatrists had DOT printed on the label. The institution lacked a procedure for administering DOT in the general population. MTAs considered all DOT orders to be the equivalent of nurse-administered medications. Written policy listed DOT and nursing-administered separately but combined them in instructions for administering medications cell-to-cell and in pill lines. No procedures for DOT were spelled out. Inmates in administrative segregation with

DOT orders were not taken out of their cells to be observed while receiving their medications.

Review of a sample of UHRs indicated that medication continuity improved for inmates on arrival in the facility. Similarly, continuity of medications improved for inmates discharged from the MHCB. No information was available on continuity following other intra-institutional transfers.

Problems with the handling of medication orders persisted. Inmates and staff reported that it often took four to seven days for an ordered medication to reach an inmate. Some inmates also reported receiving the wrong medication, as well as occasions when ordered medications were unavailable. The monitor's review of records confirmed these reports. Review of UHRs also revealed common gaps of two to three days between the writing of an order and the generation of a MAR. A second gap of two to three days between the printing of a MAR and actual administration of the order was also common.

Responses to reports of non-compliance with medications apparently were overshadowed by demands associated with the implementation of Plata requirements. Mental health staff received some medication non-compliance referrals but did not receive referrals in all cases of medication non-compliance. Review of UHRs indicated that some written referrals elicited a response within one to two weeks. Others did not result in any contact at all.

Staff did not know whether any inmates in the institution had current Keyhea orders. Keyhea injunctions were not sought when clinically warranted.

In January 2006, the institution reported that just two inmates in CSP/Solano were prescribed HS medications.

Mental Health Assessments for the Disciplinary Process:

CSP/Solano was compliant with procedures for the preparation of mental health assessments for caseload inmates charged with disciplinary infractions.  Logs of disciplinary actions in which assessments were generated were maintained.  Thirteen staff members, including lieutenants, sergeants, psychologists and MTAs were certified to provide training on mental health assessments in the disciplinary process.   Eighty-three staff members at CSP/Solano received training on the assessment process in 2003 and 2004.

During the first six months of 2005, 1,927 RVRs were issued at CSP/Solano.  Of these, 371 (19 percent) were written for 3CMS inmates and three for EOP inmates.  The MHSDS caseload represented 22.7 percent of the CSP/Solano total inmate population.  Mental health staff completed evaluations for two of the three cases involving EOP inmates and 27 of the 371 cases (seven percent) involving 3CMS inmates.  Eleven cases had been adjudicated.  Mental health assessments found that mental illness influenced the behavior of just four of the evaluated caseload inmates.  In three of those four cases, the senior hearing officer dismissed or reduced the charges.  Dispositions were unavailable in the remaining 16 cases.  Twelve cases were pending, two inmates were transferred or released prior to adjudication, and information in the log on the other two cases was incomplete.  A review limited to three C-files confirmed that RVR protocols were followed in the reviewed cases.

<u>Transfers:</u>

EOP inmates continued to be transferred within 60 days. CSP/Solano made no referrals to DMH intermediate care programs. Access to acute care in the APP/DMH at CMF remained adequate. Two logs of referrals to DMH contained contradictory information. Approximately 12 referrals to acute care were made during the first six months of 2005. Two were rejected and ten resulted in transfers to an acute care bed. The average time between a referral and transfer was approximately six days, and, in all cases but one, transfer occurred within 72 hours of acceptance.

Nine patients returned to CSP/Solano from DMH from October 1, 2004 through March 31, 2005. The medical records of three were available for review during the monitor's July visit. All three contained a discharge summary from DMH; none appeared to have been faxed. Staff at CSP/Solano reported that they were not contacted by clinical staff at DMH about imminent discharges nor did they receive discharge summaries via fax. Classifications staff at DMH contacted custody staff at CSP/Solano about patients returning from APP/DMH.

<u>Other CAP Issues:</u>

a. Partial Compliance:

Case management contacts occurred quarterly. A MHTS audit reported a 90 to 95-percent compliance rate. The monitor's review of UHRs also found a high rate of compliance. The institution's UHR audit found 79-percent compliance. The lower rate was attributed to filing deficits. The problem will be resolved during the next monitoring round if compliance is sustained.

Treatment space for individual contacts improved. The assignment to clinical staff of offices in the buildings that housed caseload inmates reportedly improved access to treatment. The supply of desks and telephones in non-treatment offices was adequate and reportedly improved staff productivity.

Psychiatric contacts occurred at least quarterly, but inmates were most often seen by different psychiatrists. Inmates reported that psychiatrists typically did not know them and seldom discussed side effects or medication changes with inmates. Changes in medication were accompanied by a documented rationale with the exception of those initiated by one or two contract psychiatrists, whose notes rarely included a rationale.

An institutional audit found that blood levels of inmates on mood stabilizers were monitored appropriately. The audit, however, did not include one of the three commonly prescribed mood stabilizers; neither did it seek to determine whether all orders resulted in blood being drawn and whether lab work was completed in a timely manner. Psychiatrists sometimes reordered lab tests weeks later after being unable to locate results from the original order.

The quality of treatment plans varied. While some were individualized, others were cursory and lacked relevance to the particular inmate. IDTT meetings were not routinely attended by a correctional counselor. According to an institutional audit, group treatment was considered in IDTT meetings about half the time.

CSP/Solano still lacked an established time and place in which group therapy could be held. Mental health staff reported that the delivery of group therapy had a lower priority than other elements of the 3CMS program. Fewer than two dozen

inmates were enrolled in the three mental health treatment groups that were operational in August 2005. A number of caseload inmates were enrolled in the substance abuse program, where they received group treatment related to their problems with addictive substances.

Mental health clinicians who ran group sessions negotiated for space on an *ad hoc* basis. A recent QIT found that group space was available in all yards but failed to look at the broader issue of meaningful access to existing space. Although the Warden reportedly resolved the problem of inadequate treatment space over two years ago, access to the designated space eroded because it was not occupied consistently for mental health purposes.

Prompted by weeks of excessive temperatures and several Stage II heat alerts, the monitor reviewed compliance with the institution's heat plan in July. A spot check found only partial compliance. Indoor temperatures were monitored in all housing units, including dorms and buildings that typically did not house inmates on heat-risk medications. Housing units had lists of heat-risk inmates that appeared to be accurate and current. Temperature logs were not kept consistently in all buildings, however. In some instances, temperatures were not logged for entire watches or days. The institution did not always adhere to Stage II heat alert protocols, which required the distribution of ice and increased access to showers whenever indoor temperatures reached 90 degrees. Rather than initiate Stage II heat alerts in dorms, which typically housed only a handful of inmates on heat-risk medications, the institution temporarily sent these inmates from their dorms to various air conditioned locations, such as the central control complexes in each yard. This seemed like a sensible alternative, provided the inmates were not

returned to the dorms until indoor temperatures fell below 90 degrees. Finally, temperatures were usually taken in second-tier cells but often not in those cells on the west side of buildings that were likely to be the hottest in the late afternoon. The monitor indicated at the end of the July monitoring visit that another visit would occur in six months to review the institution's responses to these deficiencies.

In January, the monitor reviewed entries from housing activity logs in units without air conditioning for August 6 through August 11, 2005, when documented inside temperatures exceeded 90 degrees, and found that heat alerts were sometimes, but not always, recorded. Housing activity logs in both units, moreover, rarely documented the distribution of cold water and ice or special access to showers. It was unclear whether the lack of documentation reflected poor record keeping or a failure to initiate cooling measures during stage II heat alerts.

b. Non-Compliance

Too many newly arrived 3CMS inmates were missed during standard intake procedures and were not seen for an initial mental health contact within five days. Referrals to mental health were not tracked, and response times to referrals were unknown, but responses in excess of 14 days appeared to be common. About half of EOP inmates awaiting transfer were seen weekly.

Restraints were used excessively in the MHCB unit. CSP/Solano needed to review its procedures for the use of restraints and examine possible alternative therapies in order to decrease the duration of individual applications of restraints. The restraint log indicated that six incidents during the monitoring period involved the use of

restraints for 21.5 to 51 hours.  In half of those instances, the time in restraints exceeded 40 hours.

Despite some improvements, medical records remained problematic.  Staff reported that psychiatrists frequently saw patients without medical records, while case managers did so slightly less often.  Staff reported that clinical documents they completed and put in loose filing were subsequently missing from UHRs.  Records of MHCB treatment were not filed in UHRs for many months, putting treating clinicians at a disadvantage, particularly when they were unaware that the inmate had recently been in crisis.  Case managers reported that they did not always bring UHRs with them when they saw patients, a practice that generated more loose filing.  The pile of unfiled material was four feet high in July, which represented a dramatic improvement over piles encountered in earlier monitoring visits and was accomplished through the use of considerable overtime.  One consequence of the backlog was that audits based on UHR reviews typically found lower rates of compliance than those based on MHTS reports.

Psych tech rounds and case management contacts in administrative segregation were not audited by the institution.  The monitor's review of a limited number of UHRs found that some psych tech rounds and case management contacts were missed and many case manager contacts occurred at cell-front.  Only one of three allocated psych techs was working full-time as of July 2005, a problem that, according to staff reports, caused missed mental health screenings and evaluations, as well as daily rounds in administrative segregation.

Six months later, the monitor found that just two psych techs were available to conduct daily rounds on 354 administrative segregation inmates and

111

document rounds on 125 caseload inmates. An institutional audit of isolation logs confirmed missed rounds that were attributed to an inability to cover unexpected absences. During December 2005, for example, daily rounds apparently were not completed on four days in Building 9 and five days in Buildings 10 and 11. On two or three other days, inmate names were checked, but documentation of psych tech rounds and in/out signatures was missing. The institution reported that it expected its vacant psych tech position to be filled in February 2006.

CSP/Solano had provided CPR training to 92 percent of its 584 correctional officers. Additional training was scheduled for a few individuals, but 41 correctional officers were unavailable for training because they were either on leave or on temporary assignment to other institutions. Mouth guards were issued to officers in accordance with revised CRCD policies.

Institutional Summary:

The institution made better use of contractors to cover vacant permanent clinical positions during the monitoring period, but caseloads for 3CMS case managers remained excessively high. Among the issues of focus in the 16th monitoring round, quality assurance efforts progressed only marginally, and CSP/Solano was still struggling to develop a consistently meaningful institutional infrastructure for the review and management of the quality of the mental health treatment provided to its caseload inmates. The suicide prevention committee was largely ineffective and, despite preliminary discussions, peer review was still not underway. The institution's MHTS improved significantly and regularly supported auditing efforts, although its potential for tracking referrals was as yet untapped.

Medication management problems persisted with the DOT administration of medications, the delivery of HS medications, untimely responses to medication non-compliance, the tracking of Keyhea orders, and the prompt delivery of ordered medications and execution of all ordered laboratory work-ups. One QIT generated some as yet procedural improvements in pill lines, and parole medications were beginning to be provided routinely. Continuity of medications on arrival and transfers from the MHCB unit was adequate, and changes in medication were accompanied more regularly by a documented rationale.

EOP inmates were transferred within required timeframes, and the institution's access to APP/DMH at CMF was adequate. Mental health assessments for RVRs involving caseload inmates were prepared appropriately, but did not have much impact overall.

CSP/Solano was able to resolve five CAP issues during the monitoring period and enjoyed progress on some other pending deficiencies, including five-day clinical follow-up of suicidal inmates discharged from higher levels of care, the documentation of case management contacts and the provision of quarterly 3CMS case management contacts. Continuing problems included untimely evaluations of newly arriving caseload inmates; erratic custody follow-up of suicidal inmates returned from higher levels of care; declining group treatment for 3CMS inmates; irregular participation of correctional counselors in IDTT meetings; and missed weekly contacts with EOP inmates awaiting transfer. Inmates were too rarely seen by the same psychiatrist, and clinicians' access to medical records remained a problem.

Some backsliding occurred in two areas previously resolved. Psych tech rounding for an expanding administrative segregation population slackened, and the institution's heat plan was inconsistently applied. The most welcome development during the monitoring period was completion of the much-delayed renovation of the institution's CTC, which received a provisional DHS license in December 2005 and became fully operational shortly thereafter.

**California State Prison at San Quentin (SQ)**
July 6, 2005 – July 8, 2005
November 10, 2005

In July 2005, SQ had vacant positions for a chief psychiatrist, 3.5 staff psychiatrists, 5.5 psychologists, a psych social worker and a half-time office tech. By November, all but two of institution's seven psych tech positions were also vacant. SQ employed a consistent group of contractors, most of whom worked full-time and covered nearly all vacant clinical positions, but staff morale seemed low.

Vacancies among auxiliary staff were also problematic. In July, there were vacancies among 15.6 of 28.4 allocated RN and 20.06 of 45.29 MTA positions. Half of the positions allocated for medical records, as well as all 5.64 medical transcriber positions were vacant. Among clerical positions, 5.59 were vacant. Staff continued to report vacancy rates of approximately 50 percent in November for both RNs and MTAs. Contractors were employed to cover at least some of these vacancies, but it was difficult to determine with any accuracy the amount of contract coverage utilized.

SQ continued to suffer from significant turnover in its leadership across the board, including custody, medical and mental health. Seventy percent of the facility's leadership positions were filled in the three months preceding the monitor's November

visit, often with personnel new to the facility and unfamiliar with its operations. Many of these appointments were temporary, including an acting chief psychiatrist, an acting chief psychologist, an acting health care manager, an acting director of nursing and an acting warden. Further changes, planned to take effect after the monitor's November visit, were expected to leave SQ without a chief psychologist. Not surprisingly, the constant change in leadership undermined the effective coordination, long-term planning and supervision needed to provide mental health services to the inmate population.

SQ reduced its reception center population by a few hundred inmates early in the monitoring period, and a similar reduction was expected in January 2006.

Quality Management:

The quality management committee met weekly, but fewer than half its members were generally in attendance. While the committee confronted some service delivery problems, other relevant issues, such as medication management, were not addressed. The mental health subcommittee also met weekly. Representatives from each mental health discipline attended the meetings regularly, but representatives from custody did not. According to the subcommittee's minutes, meetings focused primarily on audit results and spent little time on solving problems.

In November, 11 QITs were at various stages of development. Six of the QITs demonstrated some limited effort to identify and resolve problems; two others performed audits only; and three showed little evidence of any activity in recent months. The quality of QIT progress summaries varied. Many did not include a statement of the problem, the methodology used, the conclusions reached or the corrective actions planned, although some improvement with respect to methodology was noted in the

115

months preceding the monitor's November visit. A QIT chartered to review the MHTS was particularly good, bringing together representatives from various departments to consider and implement remedies. Some QITs, on the other hand, appeared to have been prematurely terminated. Audits were routinely conducted, but the results were not always shared with the mental health staff. There continued to be methodological problems with many audits, especially among those related to medication management.

Peer review for psychiatrists, psychologists and psych social workers was underway. Quarterly meetings were held at which charts were reviewed for the presence or absence of documentation. Peer review meetings rarely addressed quality of care issues.

Data from the MHTS and handwritten logs often conflicted to such an extent that much of the institution's mental health information was unreliable and often incomplete. Some progress, nevertheless, had been made using the MHTS to track inmate activities, and much of the supporting data used in updating the status of CAP issues was drawn from the MHTS. Program supervisors, however, did not appear to use the system for management purposes. The institution reportedly was in the process of updating the system.

Medication Management:

At the time of the monitor's July visit, SQ was in the process of revising its medication delivery procedures and reorganizing its medication management system. The reorganization was intended to improve staff efficiency and increase the timeliness of medication administration by redirecting staff to areas of greatest need, creating new pills lines, extending pharmacy hours and redefining responsibilities for psych techs,

nurses, MTAs and supervisors. By November, the reorganization was complete and a pilot project to establish the new medication distribution procedures was underway. The institution reported that the reorganization had resulted in better continuity of care, but no audit to confirm the report had yet been conducted. While the reorganization constituted important progress, it was clear that medication management for inmates on psychotropic medications remained problematic at SQ. Audits of medication management issues were generally unreliable, making it difficult to assess compliance adequately.

Pending full implementation of the reorganization, medication continuity remained largely unchanged during the monitoring period. Newly arriving inmates reportedly received their medications within 24 to 72 hours. Staff continued to report interruptions in medications for a small number of inmates following changes in their housing locations. By November, the institution felt it had identified the causes for these interruptions and was about to introduce procedures used successfully in another CDCR institution. Three-day gaps in medication continuity were also common at the time of renewal. Appointments reportedly were scheduled with clinicians prior to renewal dates for most, but not all, inmates, but no audit of this issue had been conducted.

Follow-up to medication non-compliance was inadequately tracked and audited. Some available data indicated that inmates referred for medication non-compliance were generally seen by a clinician within 6.5 to 11.7 days. Audits were not performed, however, to determine whether all medication non-compliant inmates were routinely identified and referred to mental health.

Similarly, the institution's auditing of the provision of laboratory testing for inmates on mood-stabilizing medications was inadequate. An institutional audit for

117

February through April 2005 found that laboratory blood work was completed for 85
percent of the inmates studied. Completed laboratory tests were found in 70 percent of
surveyed inmates' charts. The audit, however, was limited; it looked at laboratory testing
for only a subset of specific mood-stabilizing medications and did not determine the
timeliness of testing results or whether the results were actually reviewed and followed-
up appropriately by clinicians ordering the testing. Peer review minutes indicated that
psychiatric follow-up to abnormal test results was poor. By November, the institution
had conducted a more narrowly focused audit, which found that just over 50 percent of
laboratory tests were drawn within 30 days of the initial order for testing.

The provision of medications to paroling inmates continued to improve.
The institutional status report indicated that 98 percent of paroling inmates received a 30-
day supply of medication upon discharge. The monitor's review of the parole medication
log confirmed the high level of compliance. TCMP clinicians continued to provide pre-
release planning, but no attempt had been made by the institution to determine whether
TCMP contacts occurred as planned.

Problems with DOT continued in the adjustment center, where solid cell
doors impeded the observation of inmates while they were ingesting their medications.
In July, the institution's status report indicated that nursing supervisors observed a
sample of ten inmates receiving DOT medications each month from November 2004 to
May 2005 and found no problems with established DOT procedures. In the absence of a
list of inmates on DOT at the time of these audits, it was unclear how the supervising
RNs knew which inmates required DOT. By November, although some further work on

the issue had been undertaken and the institution was in the process of designing a more effective audit tool, more work needed to be done.

HS medications were prescribed for a large number of inmates. Staff reported that all evening medications were administered after 8:00 p.m. An institutional audit found that staff members responsible for distributing HS medication consistently signed in for medication delivery at 7:30 p.m. or later.

SQ continued to track inmates coming into the institution on Keyhea orders. At the time of monitor's July visit, six inmates in the institution had active Keyhea orders. Staff reported that Keyhea orders were now being initiated at SQ. Renewals reportedly were sought in a timely manner, but one inmate with a Keyhea order was not properly identified as needing involuntary medications, and his order was allowed to expire.

The monitor reviewed the institution's policy and procedures on medication errors and found it adequate. Completed medication error reports were compiled by the institution for the July visit, which documented just seven medication errors in the preceding ten months. In November, institutional records reflected a troubling number of reports of inmates receiving the wrong medications.

Informed medication consent forms were reportedly filed in inmates' UHRs. The monitor's chart reviews confirmed the presence of written consent forms, although some of the forms were found to be generic.

Mental Health Assessments for the Disciplinary Process:

Caseload inmates received 21 percent of all the disciplinary infractions issued during this monitoring period. As of July, 20 percent of the total SQ population

119

was included in the MHSDS caseload. Custody requested mental health assessments in roughly a quarter of RVRs written for caseload inmates. In SQ, clinicians conducted a preliminary review of the custody requests and rejected a significant number. The nature of the review and the criteria applied for this intermediate level of review, not included in departmental policy, were unclear. The monitor's expert reviewed the RVRs and charts of ten inmates, for whom custody requests for an assessment were rejected at this level of review, and concluded that the decisions to reject seemed reasonable. By July, 47 inmates had received mental health assessments during the monitoring period.

The clinical assessment process, which appeared to function well during the preceding monitoring round, showed signs of slippage. An institutional audit found instances of EOP inmates for whom a staff assistant was not appointed and assessments that were completed without interviewing the accused inmate. Both the institutional audit and the monitor's review of RVRs and assessments indicated that the quality of the assessments declined. Assessments contained more jargon and fact-finding and were less clinically helpful. Clinicians, however, did conclude that mental illness was a factor in 80 percent of EOP assessments and 23 percent of 3CMS assessments.

Mental health input appeared to have some impact on disciplinary decisions. Custody logs show a significant number of not guilty findings, reduced charges and lesser penalties in disciplinary cases involving MHSDS inmates. Hearing officers mitigated the penalties in half of the cases where clinicians concluded that mental illness was a factor.

SQ had an agreement on referrals for prosecution with the local DA's office that had been in effect for more than a year, but the parties had difficulty adhering to the time limits imposed in the agreement. Although the agreement specified short deadlines

for reaching decisions, the timeliness of the handling of cases deteriorated. Referrals often took one to two months to initiate, and about half of the cases referred remained open for as long as seven months. The number of referrals during 2005 fell to just ten, half of which the DA decided to prosecute.

One RVR for self-injurious behavior was written during the monitoring period. While clinical staff did not follow procedures established to determine the appropriateness of an RVR for self-injurious behavior, a clinician did see the accused inmate and made a reasonable determination that the inmate did not exhibit suicidal intent.

Transfers:

Between the monitor's July and November visits, SQ made an effort to develop and maintain an adequate tracking record of referrals to higher levels of mental health care. The resulting documentation requirements, while more accurate, were often duplicative and unnecessarily time-consuming.

SQ continued to have serious problems with access to MHCB units. MHCB referrals increased for the second consecutive monitoring period, reaching 99 inmates by July. More than half of these referrals, however, were rescinded, often within the first three days; 18 referrals were rescinded after the inmates had awaited transfer for five to 16 days. Some of the inmates later had multiple admissions to the SQ OHU. At least 15 percent of MHCB referrals were initiated too late to meet the transfer deadline of 72 hours after admission to the OHU. Several inmates were referred only after four to nine OHU admissions or after several weeks in the OHU.

The timeliness of transfers also continued to decline early in the monitoring period, although delays apparently were shorter by November. In July,

institutional data indicated that it generally took from one to 16 days for a MHCB unit elsewhere in CDCR to accept referred SQ inmates, with the longest acceptance taking 24 days. By the November visit, most acceptances were delayed fewer days, with 16 days being the longest delay. Transportation was usually timely. About 40 percent of inmates waiting for transfer were housed in an OHU overflow unit. The number of inmates awaiting transfers rose so high in May 2005, SQ had to house some inmates in need of crisis care in its Bayside unit, a protected housing unit. While MHCB access remained difficult throughout the monitoring period, it improved somewhat after June. Assessment of this issue was complicated by the fact that referral logs did not consistently distinguish between MHCB and DMH referrals.

As a result of the MHCB access problems, the OHU at SQ was increasingly treated like a *de facto* MHCB unit. At the time of the July monitoring visit, more than 20 percent of the inmates admitted to the OHU remained beyond the three-day time limit. Lengths of stay ranged from one week to two months. Some of the inmates with the longest stays were never referred to a higher level of care. Other inmates were retained in the OHU for days after their MHCB referral was rescinded. Thirty-six inmates had multiple admissions to the OHU. While the majority of these inmates were admitted three to six times, a significant number of inmates had from seven to 12 OHU admissions. A number of inmates discharged from the OHU were readmitted the same or next day, in effect extending their lengths of stay. The worst case involved an inmate who was admitted, discharged and readmitted the same or next day 11 times in five weeks, almost continuously from September 15 through October 3 and again from October 12 through October 26, 2005, when he was first referred to a higher level of care.

Lengthy OHU stays and multiple admissions to the unit were, in part, the result of a system-wide shortage of MHCB beds, but the problems were exacerbated by local practices. SQ, for example, permitted several inmates in need of acute DMH care to be discharged from the OHU to their housing unit pending transfer to APP/DMF at CMF to make room for other inmates in the OHU. By November, the institution had revised its OHU operating procedures and reduced the length of stays. The longest OHU stays for the period from June through October 2005 were about 26 days.

Problems with the treatment afforded inmates in the OHU were also a serious concern. Institutional logs indicated that about 30 percent of clinical contacts occurred in a confidential setting, and almost all clinical contacts on weekends occurred at cell-front. IDTT meetings, which were held in the OHU prior to July, essentially ceased thereafter. Only three IDDT meetings occurred in the OHU in the five months preceding the monitor's November visit. Custody staff did not make scheduled rounds in the unit as expected, and available documentation on custody rounds showed lengthy gaps. At least half of reviewed charts showed significant gaps in both nursing and custody checks. No evidence was provided that clinicians, throughout this difficult period in the OHU, increased efforts to refer inmates to higher levels of care or provide this group of inmates with additional treatment planning or treatment.

Over one period of two and a half months, 16 inmates were placed in restraints in the OHU. One-on-one observation reportedly was provided for restrained inmates, but forms documenting observations were not always filed in UHRs and, if filed, were often hard to locate.

The timeliness of reception center transfers improved for EOP inmates, but worsened for 3CMS inmates. Although MHTS data was unavailable for transfers from the reception center, classification printouts in July indicated that 41 EOP transfers occurred during the early part of the monitoring period, 71 percent of which were completed timely. The longest transfer delay for an EOP inmate was five and a half months. In July, 82 EOP inmates were awaiting transfer, 21 percent of whom had been waiting beyond the 60-day timeline. The longest delay among this group was 11 months. The number of completed EOP transfers dropped to five a month by November, most of which occurred in a timely fashion. SQ was unable to maintain accurate data on the timeliness of movement for the 178 3CMS inmates transferred during the monitoring period. Of the 513 3CMS inmates awaiting transfer in July, 35 percent had been waiting longer than 90 days. The 3CMS inmate retained the longest in reception had been awaiting transfer for almost two years.

The time from referral to endorsement was generally reasonable for EOP inmates. Among EOP inmates awaiting transfer in July, almost all were endorsed for transfer within two months. By way of contrast, the endorsement of most inmates for 3CMS inmates in reception took from six weeks to four months. Post-endorsement delays suggested that the pressure for bed space had increased at all levels of care, but particularly for 3CMS inmates slated for placement in a sensitive needs yard (SNY). Documents indicated that the institution began to identify inmates needing accelerated transfers just prior to the monitor's November visit.

The quality of local DMH transfer logs declined, making it impossible to determine with certainty how many inmates were referred to DMH during the monitoring

period, although it appeared that referrals to DMH were underutilized at SQ.

Institutional data in July suggested that ten referrals were made to DMH early in the

monitoring period. By November, staff reported 24 transfers. Referrals were often

untimely. It generally took SQ from three to 38 days to initiate a referral, but the

monitor's expert found a number of inmates housed in the OHU for one to three months

before being referred. The time it took DMH to issue a bed number fell from one to two

weeks at the beginning of the monitoring period to three or four days by November.

Transportation was usually timely, with some rare exceptions taking up to eight days.

The total time, then, from referral to transfer, ranged from three to 26 days, excluding

those inmates whose referrals were rescinded after longer waits. All of these inmates

apparently were transferred to APP/DMH at CMF.

       The documentation suggested that some other inmates might have been

transferred to DMH intermediate care, but, if so, it was unclear from the available

materials. The failure to make referrals to intermediate inpatient care in DMH occurred

despite the continued presence in the facility of inmates identified in the UNA as

requiring such referrals. Available data on acute transfers also suggested that some

inmates in need of intermediate care were inappropriately referred to acute care facilities,

impeding access for those actually in need of acute care. Staff indicated that psych and

return procedures were generally followed by DMH, but the monitor did not have an

opportunity to verify this information.

       SQ referred only one inmate to a PSU in 2005. It took five months for the

inmate to be endorsed. Since then, the inmate had been waiting three and a half months

for a bed.

At the time of the July monitoring visit, five video camera watch rooms were in use on the west side of the OHU, which were monitored in an officers' station at one end of the corridor. Two months before the November monitoring visit, the institution added six cells with video cameras and a second officers' monitoring station on the east side of the OHU. The video equipment on the east side had a higher quality resolution than the equipment on the west side, but flooring problems and grates that covered windows and air vents compromised the safety of the east side rooms. All suicide watches were reportedly conducted via camera; no officers were posted at the inmates' door for one-to-one observations, except for inmates in restraints who were also monitored by camera. Documentation of video monitoring rounds was maintained in a number of different locations, making video monitoring practices confusing and difficult to assess.

Other CAP Issues:

a. Partial Compliance

The frequency of case management contacts for EOP inmates in administrative segregation declined somewhat as of the monitor's July visit. The monitor's review of inmate histories indicated that most EOP inmates received weekly case management contacts, with some occasional misses. Roughly 20 percent of EOP inmates experienced delays of multiple weeks in contacts upon admission to the administrative segregation unit. The portion of EOP administrative segregation inmates seen out-of-cell, while still inadequate, rose slightly to approximately two-thirds. Data from the November monitor's visit claimed nearly 100 percent compliance with weekly EOP case management visits, while only 72 percent of 3CMS inmates were seen weekly. The percentage of out-of-cell contacts dropped to 54 percent for EOP and most 3CMS

inmates, but was even lower for 3CMS condemned inmates. The low rate of out-of-cell contacts was attributed principally to the lack of sufficient escort officers.

The timeliness of IDTT meetings in administrative segregation worsened during the monitoring period. Institutional audits of the issue were methodologically flawed and based on conflicting data. The monitor reviewed a sample of inmate histories and charts and found that less than half of initial IDTT meetings were held in a timely manner. Some newly arrived inmates did not receive an IDTT meeting for weeks or even months. The timeliness of annual updates was better, with two-third of inmates receiving an IDTT meeting within a year. Inmate participation in IDTT meetings varied from 15 to 80 percent during the only three months of 2005 when such information was tracked.

Little changed during the monitoring period with respect to the provision of clinical and custody follow-up for suicidal inmates returned from a MHCB unit elsewhere or discharged from the OHU. Suicidal inmates regularly received five-day clinical follow-up after discharge from the OHU or a MHCB unit, although some slippage was noted during the monitor's November visit. Custody checks, however, were still highly erratic. An institutional audit of 19 inmates for the second quarter of 2005 showed just ten-percent compliance with custody checks.

SQ had long-standing problems with missing, misfiled or out-of-sequence documents that interfered with clinicians' ability to use UHRs effectively for treatment and/or auditing. Despite intermittent periods of improvement, the poor condition of medical records made it difficult for the monitor to assess compliance in many areas, as was true during most recent monitoring rounds. The institution reported that a retired annuitant had been hired to help conduct a large-scale chart clean-up, but the monitor still

found missing documents, disordered charts and clinical notes indicating that charts had been unavailable when needed. In addition, the institution began filing OHU charts in inmates' progress notes, making it very difficult to follow the course of inmates' treatment.

Psychiatric responses to inmate and staff referrals worsened. A QIT progress report found that the number of inmates seen in response to referrals improved, but the percentage of inmates seen in a timely manner decreased from 75 to 67 percent for inmate self-referrals and from 80 to 66 percent for staff referrals. The data relied on in this study, however, was unreliable, and the actual percentage of inmates seen in a timely manner was likely to have been even lower. The standard of timeliness employed by the QIT, 13 days from the receipt of referral, moreover, was unreasonably long. According to quality assurance documents in July, about 28 percent of referrals were never seen; by November, 135 referrals remained unanswered. The monitor's review of inmate histories also revealed a significant problem with the transmission of referrals. According to inmate histories for administrative segregation inmates, 18 percent of 159 referrals took three or more days to reach the mental health department, with the longest delays taking up to three weeks. Most inmates were seen within two weeks, but 23 percent of inmates experienced delays seven weeks or longer or were not seen at all. SQ staff abandoned a previously functioning triage system, resulting in delays in responses to urgent and emergent referrals as well. An institutional audit of reception center charts showed that no emergency referrals were seen in a timely manner, while almost half of urgent referrals were not seen within 24 hours.

Institutional audits documented substantial problems with the timely provision of several mental health services in the previously well-functioning 3CMS mainline program.

The provision of structured therapeutic activities to EOP inmates in administrative segregation worsened.  The administration withdrew third watch correctional officers and stopped providing services on weekends.  The monitor reviewed a sample of inmate histories from one of the administrative segregation yards and found that on average inmates were offered between 3.5 and eight hours of structured therapeutic activities per week; only one inmate was offered more than ten hours.  Most inmates actually received between three and six hours of therapy.  Even these figures were suspect because therapeutic recreation, i.e., yard activities supervised by a recreational or other therapist, which accounted for a significant number of the structured therapeutic activities reported by the institution as offered to inmates, were not actually supervised or run by a therapist at all and were not a legitimate therapeutic activity.  According to the monitor's expert, the amount of therapeutic time available to EOP inmates in administrative segregation was compromised by space limitations, staffing shortages, lack of structured activities in the yard and inadequate equipment.

These findings contradicted the institution's June 15, 2005 assessment, which indicated that EOP inmates in administrative segregation were offered an average of 10.2 hours of scheduled structured therapeutic activities weekly throughout the monitoring period.  The monitor, however, found that the institution's assessment overstated the hours of structured therapeutic hours offered and regularly included "potential/hypothetical" offerings rather than actual offerings per week.  Moreover, in

129

reporting weekly offerings, staff failed to distinguish between refusals to participate and cancellations due to a lack of available clinical or custody staff to conduct scheduled activities.

The timeliness of mental health screenings for inmates newly admitted to the administrative segregation unit slipped.  Through May 2005, the institution screened inmates within 72 hours of their initial ICC hearing, which generally occurred within ten days of an inmate's arrival in administrative segregation.  It was not until June 2005 that the facility began to provide initial screenings within 72 hours of an inmate's placement in administrative segregation.  No institutional data on compliance with this standard was available during the July visit.  The monitor's extremely limited review of charts of inmates in administrative segregation found erratic compliance with the recently applied standard.

Institutional Summary:

SQ had numerous mental health and auxiliary staff vacancies.  Although most of the vacancies among permanent staff were covered by contractors, the reliance on contracted personnel, especially in view of the vacancies in mental health and custody leadership positions during the same period, continued to impact adversely on SQ's ability to provide treatment services to MHSDS inmates.

Of the four areas of focus during the monitoring round, the institution's quality assurance process faired reasonably well.  The quality management committee and the mental health subcommittee met regularly, and the number of QITs increased, although some of these teams were inactive.  Peer review was underway for all of the mental health disciplines, but participants needed to look beyond chart reviews to

meaningful assessments of quality of care. MHTS data was unreliable, and many of the institutional audits were methodologically flawed, making it difficult to assess accurately the institution's level of compliance with various applicable requirements. Tracking records improved somewhat between the first and second monitoring visits.

Clinical input into the disciplinary process when MHSDS inmates were involved faltered, due largely to a deterioration in the quality of clinical assessments. Hearing officers, nonetheless, appeared to take mental health assessments into account in a number of cases.

Medication management remained a serious problem for SQ, although the exact dimensions of the problem were hard to quantify given the chronic inaccuracy of institutional data. Continuity remained relatively unchanged in regard to gaps in medication on arrival, at the time of the renewal of medication orders and, to a lesser extent, on changes in housing locations. Improvement was noted in the provision of HS and parole medications, the management of Keyhea orders and the acquisition of informed medication consent forms. DOT procedures and the medication error process, however, continued to be inadequate. The institution also needed to conduct competent and complete audits of follow-up to medication non-compliance and laboratory testing.

A persistent shortage of bed space at all levels of care throughout CDCR and DMH generated frequent transfer delays. SQ had continuing serious problems with access to a MHCB level of treatment. As a result, inmates remained in the institution's OHU for extended periods of time and/or had multiple admissions to the OHU. The inability to place inmates with a need for a MHCB in an appropriate setting led to a return to SQ's earlier and unacceptable use of its OHU as an ersatz MHCB unit in

violation of the mandates of <u>Coleman</u> and <u>Budd</u> and the department's Program Guide. Not surprisingly, treatment in the OHU also worsened.

The timeliness of reception center transfers improved for EOP inmates, but slipped further for 3CMS inmates. The institution failed to utilize DMH programs fully. Referrals were made only to DMH's acute care program at CMF; no referrals were made to any DMH intermediate inpatient program, even though inmates at SQ met the criteria for such treatment.

No new CAP issues were resolved during this monitoring period, and little progress was noted in addressing remaining CAP items. The provision of services for caseload inmates in administrative segregation was particularly inadequate; the frequency of case management contacts with EOP administrative segregation inmates declined and the institution, despite representations to the contrary, did not offer nearly enough structured therapeutic activities. IDTT meetings and mental health screenings in administrative segregation were often untimely. Psychiatric responses to inmate and staff referrals remained slow; custody checks for suicidal inmates released from MHCB units elsewhere and SQ's OHU were erratic; and poor record keeping continued to interfere with inmate care. Overall, SQ continued to lose ground in its struggle to provide adequate mental health services.

### Deuel Vocational Institution (DVI)
September 29, 2005 – September 30, 2005

Staffing at DVI worsened slightly during the monitoring period. Positions for 1.5 psychiatrists, a chief psychologist, two staff psychologists and two psych social workers were vacant. Almost all of these clinical vacancies had been open for a year or more. The vacancy rate among case managers was 25 percent and, while caseloads were

generally under 100, too few case managers were available to provide required mental health services to EOP and 3CMS inmates in administrative segregation. The institution had received recently allocations for a senior psychiatrist, four psychologists and a psych tech, which made the need for a chief psychologist even more compelling.

Three to five regular contract clinicians covered about three-quarters of the case manager vacancies. A stable group of four contract psychiatrists provided coverage of all psychiatric vacancies during the five months preceding the monitor's visit.

A substantial number of auxiliary staff positions were vacant except in the pharmacy, which was fully staffed. Approximately one-third of nursing and medical records positions were vacant. Although institutional records indicated that ten of 24 MTA positions were vacant, staff reported that only nine permanent MTAs were actually present in the institution. Contractors covered all of the nursing vacancies and almost all of the MTA and medical records vacancies.

The mainline population declined by half during the monitoring period, but the reception center population continued to increase, and overcrowding remained a substantial problem. Caseload inmates were housed on corridors in five units of the reception center.

Issues Resolved:

There was good mental health input at ICC hearings.

The quality of treatment plans was good, and most plans were individualized.

Quality Management:

Little change occurred during the monitoring period with respect to the quality assurance process at DVI. Key committees met erratically. The healthcare quality management committee, for example, reportedly met once a month or more, but minutes of the meetings suggested that the committee did not meet during the three months preceding the monitor's visit. While the composition of the committee was appropriately interdisciplinary, discussions of mental health topics were limited. The mental health subcommittee, on the other hand, typically consisted of a small group of case managers without much participation by medical, classification or custody staff. Although the subcommittee met only six times in the 11 months preceding the monitor's visit, minutes showed thorough discussions of mental health issues, with frequent reviews of CAP-based audits.

Eight QITs were operating at the time of the monitor's visit, but few were chartered during the monitoring period. QITs covered a wide range of mental health issues, but discussions often ended after one or two meetings without any evidence of problem analysis or remediation. QITs on medication issues excluded nurses, MTAs and psych techs. Some other QITs, formed to implement new requirements, engaged in effective problem-solving. Only one QIT had completed an audit, although the methodology employed was unclear.

Chart reviews were still conducted monthly, but no peer review was conducted. DVI made excellent use of its MHTS.

Medication Management:

        The institution's operating procedure for medication management was revised and improved during the monitoring period. The new procedure addressed some of the problems noted in earlier monitoring rounds and was more consistent with departmental policy. Despite the progress, HS medications went unaddressed in the new procedure, and the existing practice of locating inmates who failed to attend pill lines was deleted from the revised procedure.

        Medication continuity on arrival remained problematic, but DVI made a significant effort to address this problem. An institutional audit of 31 charts found that 95 percent of inmates arriving with verified medications received prescriptions timely, but only 56 percent of the inmates received their actual medications within 24 hours. An excellent new operational procedure was designed to correct continuity problems for inmates arriving on verified medications, as well as those arriving without proof of medication. The institution also began operating the pharmacy during a limited number of evening hours to expedite medication delivery.

        The status of medication continuity for inmates changing housing locations was uncertain. The only institutional audit of this issue was based on a review of just nine charts, five of which indicated that the sampled inmates received their medications without interruption after changing housing areas. The rate of compliance was a little higher but still low, at 79 percent, for inmates returning from the OHU or a MHCB unit. Continuity of medication at the time of renewal was unclear. Institutional audits reflected compliance, but their methodology was uncertain, and the sample size may have been too small to be representative. The monitor found that renewal orders

were generally written in a timely manner, but medications were not always delivered timely.

Follow-up to medication non-compliance was erratic. An institutional audit of 48 charts showed that 75 percent of inmates who refused their medications were referred to mental health. The monitor observed some referrals being made, but did not systematically review the issue. Psychiatric responses to referrals for medication non-compliance were problematic. The institutional audit, based on only three charts, was useless.

Laboratory testing improved, but it was unclear whether laboratory tests were ordered and conducted for all inmates who needed them. DVI addressed some problems identified by the monitor in the preceding round of review. In particular, the institution's procedure no longer allowed office techs to bypass the need for a psychiatrist's order and generate request slips to draw blood. Instead, the institution developed a nursing protocol signed by the chief psychiatrist authorizing laboratory tests. Extremely well designed audits allowed the institution to monitor the provision of laboratory tests for inmates on various medications at different intervals. One such audit in September 2005 found that start-up laboratory tests were appropriately completed for 70 to 83 percent of inmates on mood stabilizers, anti-psychotics and anti-depressants, while annual testing was conducted for roughly the same percentage of inmates on anti-psychotics and anti-depressants. Laboratory results generally took less than a week to return. The chief psychiatrist reviewed and triaged all test results, but treating psychiatrists did not always respond in a timely manner to abnormal results. The monitor's expert reviewed the charts of eight inmates on mood stabilizers who had

abnormal test results and found no response in three cases and an inadequate response in another.  Laboratory results were not always filed in inmates' UHRs; no results were present in three of the eight charts reviewed by the expert.

DVI seemed to have a system for providing parole medications to inmates discharged from the institution; the institution had also developed a good auditing tool for determining whether inmates received their medications.  Recent audits, the results of which were confirmed by the monitor's review, indicated that discharge medications were received by 90 percent of paroling inmates.  While the audit results were promising, they only covered a two-week period.  Institutional audits did not address the need for pre-release planning.

Practices involving medication errors did not seem to improve.  The institution had good policies in place for detecting, classifying and analyzing medication errors, but the system did not appear to be utilized regularly.  Only seven medication errors were processed throughout 2005.

DOT was poorly implemented.  Although the monitor's expert found evidence of at least two instances a month of medication hoarding, only two inmates in the whole institution were on DOT orders.

Despite the silence of the revised medication policy on the issue, the provision of HS medications improved significantly.  The institution began a pilot program in the Y-Dorm, providing a HS pill line at 8:00 p.m.  Auxiliary staffing shortages apparently limited the institution's ability to expand the program.  The number of inmates on HS medications declined over the few months preceding the monitor's visit

from 192 to either 107 or 147, due reportedly to fluctuations in the reception center population.

DVI continued to have problems with obtaining informed medication consent forms for psychotropic medications. Institutional audits found signed consent forms in only 25 of 60 reviewed charts. MARs were poorly maintained. An institutional audit of 45 charts found that only about 25 percent were legible and complete.

Mental Health Assessments for the Disciplinary Process:

The number of disciplinary infractions written for caseload inmates was proportional to the percentage of MHSDS inmates in the population, or slightly less. A substantial number of inmates were referred for mental health assessments in connection with the disciplinary process, including 58 EOP inmates, 19 3CMS inmates and one inmate from general population; approximately 11 percent of the 3CMS inmates who received 115 disciplinary infractions were referred for assessments. It was not clear whether any inmates exhibiting bizarre or uncharacteristic behavior were overlooked. Caseload inmates made up a significant portion, 35 percent, of the administrative segregation population.

Procedures employed at DVI for preparing mental health assessments were excellent. Mental health assessments were generally completed by clinicians other than accused inmates' case managers. Case managers reportedly reviewed both the inmates' UHRs and C-files; the monitor found progress notes confirming such case management reviews in a number of cases. The monitor reviewed mental health assessments for 14 inmates and found the narratives to be reasonably clear. Of these 14 assessments, clinicians determined that mental illness was not a factor in the inmates'

behavior in nine cases; this determination seemed problematic in three cases where the monitor found some evidence of mental illness that may have been ignored.

The institution began tracking hearing officers' decisions during the monitoring period. Institutional audits showed that just 30 percent of hearing officers responded specifically to mental health input in reaching their decisions. The monitor, however, found a number of instances in which mental health input appeared to have affected the penalties imposed by hearing officers, particularly with respect to EOP inmates. Approximately 60 percent of EOP cases, where mental illness was thought to be a factor in the inmate's behavior, resulted in a penalty reduction or dismissal. In only three cases involving 3CMS inmates did mental illness appear to be a factor, and penalties were reduced in just one of these cases. A few RVRs were written for self-injurious behavior, but in each instance the hearing officer changed or reduced the charges based on mental health input.

Referrals of RVRs involving MHSDS inmates to the district attorney's office were vastly disproportional to the percentage of caseload inmates in the population. Mental health caseload inmates accounted for 54 percent of all cases referred to the district attorney from DVI. A total of 61 caseload inmates were referred, including 18 EOP inmates. The district attorney accepted 24 of these cases for prosecution, eight involving EOP inmates. The number of referrals accepted seemed high in comparison to other CDCR institutions. Referrals were generally made in a timely manner, with 80 percent of referrals occurring within two weeks and the rest within two months. The district attorney's office generally made its decision expeditiously within a month, but about a quarter of the decisions took longer, with the longest taking five months.

<u>Transfers:</u>

   The timeliness of EOP transfers declined, although a majority of transfers still occurred within required time limits. According to the monitor's analysis of the MHTS, 159 EOP inmates were either transferred to EOP programs or paroled prior to their transfers. About 70 percent of these inmates were transferred within required time frames, as compared with 86 percent during the preceding monitoring period. The vast majority of the transfers occurred within five months, with the longest case taking eight months. Some delays appeared to have been related inappropriately to the processing of disciplinary infractions and district attorney referrals. Inmates' out-to-court status, sensitive housing needs and changes in classification or level of care were also responsible for delaying some transfers.

   In contrast, the timeliness of 3CMS transfers improved. Approximately 86 percent of 3CMS inmates were either transferred or paroled within 90 days. Almost all 3CMS inmates were transferred within six months, with the longest transfer taking ten months.

   EOP administrative segregation inmates were not generally transferred to hub units as required within 60 days or within 30 days when clinically indicated. According to institutional data, 82 percent of such EOP inmates remained in administrative segregation beyond timeframes, with half of the inmates staying longer than 60 days; the longest stay was four and a half months. At the time of the monitor's visit, six EOP inmates and 24 3CMS inmates had been in the unit longer than 90 days.

   Treatment for EOP inmates awaiting transfer was usually adequate, although it did not always meet departmental requirements. There were 41 EOP inmates

in the reception center at the time of the monitor's visit. The monitor reviewed data for about half of these inmates and found that more than half of the inmates received weekly case management contacts; three inmates had substantial gaps in contacts. Committee meeting minutes, however, indicated that most case management contacts occurred at cell front. Staff reported providing two hours of group therapy a week to all EOP inmates, but the inmate histories reviewed by the monitor did not document therapy groups.

The institution developed a routine for identifying EOP inmates in need of accelerated transfers. Although lists of such inmates were regularly communicated to the classification staff, the process for expediting inmate transfers appeared ineffective, as most of these inmates remained at DVI beyond the 60-day time limit.

The quality of treatment services for caseload inmates in administrative segregation deteriorated. The monitor reviewed the charts for almost all EOP inmates and six 3CMS inmates in the administrative segregation unit and found that more than a third did not receive weekly clinical contacts; some inmates had gaps of multiple weeks in contacts, and one EOP inmate appeared to have received no contacts. Documentation of IDTT meetings was erratic. About one-quarter of the reviewed charts contained no evidence of initial IDTT meetings, while about half had no evidence of annual IDTT updates. Documentation in another quarter of the reviewed charts showed delays ranging from a few days to a month. Psychiatric follow-up was adequate, with most inmates seen at required intervals and about 63 percent of inmates seen more frequently.

DVI did not maintain data on the lengths of stay in the OHU. By drawing on a number of different institutional documents, however, some of which were slightly inconsistent, the monitor was able to compile some information on the issue. Lengths of

stay in the OHU increased during the monitoring period, often exceeding required timelines. According to the institution's inpatient aging report, 897 inmates were admitted to the OHU during the monitoring period, of which 25 percent remained in the unit beyond three days. While the majority of these inmates remained in the OHU only a day or two beyond the three-day limit, at least nine inmates remained in the unit much longer, up to four weeks. A significant number of inmates also had multiple admissions to the OHU, including 94 inmates with three or more and up to 16 OHU admissions, within the preceding six months. At least 45 of these inmates had multiple, consecutive OHU admissions that added up to stays well beyond three days. Only a small portion of inmates with extended stays, ten to 15 percent, were delayed while awaiting transfer to a MHCB unit.

The number of inmates with extended stays in the OHU, who were not referred to a higher level of care, also increased substantially during the monitoring period. Taken together, this data suggested that the OHU was operated as a *de facto* MHCB unit for a significant number of inmates. As a result, the OHU census was often high. OHU overflow, when necessary, was housed in a section of the administrative segregation unit and not in holding cells. OHU inmates in administrative segregation were placed on direct observation conducted by a correctional officer.

The number of MHCB referrals declined substantially during the monitoring period. The MHCB log indicated that roughly half of all referrals accepted for transfer during the six preceding months were rescinded prior to actual transfer. The timeliness of referrals was also a problem. Only 45 percent of referrals were completed within the applicable 48-hour timeframe. Inmates typically waited an extra day to a week

for transfer, but about one-quarter of referred inmates waited up to two weeks for transfer. Lack of available MHCB bed space was part of the problem, but referrals for OHU inmates were often initiated late, with some inmates remaining in the OHU up to a month before being referred. Transfer logs also showed that a substantial portion of inmates remained in MHCB units elsewhere beyond the ten-day time limit, which, in turn, diminished access for inmates in need of an MHCB.

Staff indicated that a large number of inmates were returned from MHCB units in an unstable condition, but there was conflicting information on this issue. Meeting minutes earlier in the year confirmed staff reports, indicating that returning inmates were often sent to the OHU for further stabilization or sent back to a MHCB unit. The monitor, however, did not receive any data supporting this audit. In contrast, data from a later audit found that all inmates were stable on their return and none was readmitted to the OHU or transferred again to a MHCB unit. It was difficult to reconcile the information from these two sources. Minutes of one quality assurance meeting further reported that 87 percent of EOP inmates sent to MHCB units were returned at a 3CMS level of care and had to be reinstated as EOP inmates by DVI staff. Contrary to department policy, at least 37 EOP inmates were returned from MHCB units to DVI, even though the institution did not have an EOP program.

No progress occurred with respect to DMH referrals. According to staff, no referrals to DMH occurred during the monitoring period, but population figures suggested that two DVI inmates were in a DMH program. The UNA study had identified three inmates at DVI in need of transfer to a higher level of care. Two of these inmates were thought to require an intermediate level of DMH care and one, an acute level of

care, but none of the three was referred to DMH. Institutional minutes reflected a mistaken belief on the part of DVI staff that reception center inmates could not be sent to DMH acute care.

The timeliness of PSU transfers was unclear. According to information provided by the institution, two inmates were referred to a PSU. The time to endorsement was reasonable for both inmates, but available institutional materials did not reflect whether the inmates had been transferred.

Other CAP Issues:

a. Partial Compliance

The timeliness of clinical responses to inmate referrals improved, although a significant percentage of inmates still did not receive a timely response. The MHTS referral report contained several design flaws that rendered it unreliable. The monitor's review of inmate histories revealed referral response times ranging from two days to six weeks. Response times for EOP inmates, however, were significantly better, with a large portion of inmates seen the same or next day and 82 percent seen within a week. A few EOP inmates were not seen for an extended time, and a handful received no response. Cancelled or missed appointments were generally rescheduled within a week with case managers and between two to four weeks with psychiatrists. The institution began logging and tracking emergency referrals during the monitoring period, but the data did not include information on the timeliness of responses.

Slow but substantial progress in upgrading safety conditions in the OHU occurred during the monitoring period. The OHU, which used to consist of four quiet cells, was expanded to include ten regular cells, all of which were being retrofitted for

mental health purposes.  One cell had been completely retrofitted and was apparently safe

for housing suicidal inmates.  Safety modifications had also been made to two of the four

quiet cells and were planned for the other two cells.  Seven OHU cells were equipped

with video cameras.  Video monitors were placed in the correctional officers' station and,

as back-up, in the nurses' station.  The resolution of the monitor and the field of vision of

the video cameras were good.  The operating procedure for video monitoring was

outdated, having been last revised in June of 2003, when only two quiet cells were

equipped with cameras.  Post orders on monitoring dated back to 2002.  During the

preceding year, reportedly only four inmates on suicide watch were monitored by means

of video cameras.

       Treatment practices in administrative segregation, an issue resolved in the

past, showed some slippage.  Not all inmates admitted to administrative segregation

received a timely mental health screening.  Inmate histories revealed some administrative

segregation inmates who were not screened until several weeks after admission to the

unit.  In addition, the frequency of case management contacts declined and, according to

an institutional audit, psych tech rounds also suffered some, with inmates being seen only

six days a week.

       The timeliness of mental health screenings and evaluations for reception

center inmates was generally adequate, but some improvement was needed.  An

institutional audit of inmates arriving in April showed that the percentage of untimely

screenings increased from ten to 18 percent.  On the other hand, the audit indicated that

94.5 percent of evaluations were timely.  It was unclear whether the data from this one-

month audit was representative of the whole monitoring period.

The timelines of initial assessments and IDTT meetings for caseload inmates transferred into DVI's general population 3CMS varied. An institutional ten-chart audit in August 2005 showed timely MH-2s, MH-4s and IDTTs for 80 to 100 percent of arriving inmates, while relevant minutes from a committee meeting reported much worse performance, 40 to 80 percent, based on an earlier audit that was not available for the monitor's review. The monitor reviewed a large sample of inmate charts and histories and found that about 25 percent of inmates had no MH-2s or MH-4s at all.

The interdisciplinary composition of the suicide prevention committee weakened somewhat during the monitoring period. The composition of the committee was still relatively broad, but only two of the required custody representatives attended meetings. The committee met nine times during the preceding year. Discussions covered a range of suicide-related topics, as well as general management issues.

DVI continued to have a problem with follow-up custody monitoring of suicidal inmates discharged from MHCB units. Institutional audits, verified by the monitor's study, showed that DVI provided five-day clinical follow-up for all discharged inmates. In contrast, institutional audits indicated that custody follow-up occurred 40 percent of the time on the first watch and 50 percent of the time on the third watch, although follow-up occurred 90 percent of the time on the second watch.

Problems with the filing of medical records persisted. An institutional audit in June 2005 found that the filing backlog was still reasonable, with only five inches of unfiled documents, compared with three inches during the preceding monitoring period. The audit, however, did not include reception center filing, which continued to contribute to lengthy delays in compiling inmates' records. The monitor also reviewed a number of

146

charts where documents were substantially out of order. Clinicians' access to inmates' medical records also remained erratic. A September institutional audit found that inmate charts were unavailable for 30 percent of clinical contacts.

There were continuing problems with implementation of the heat plan during the summer of 2005. Lists of inmates on heat-sensitive medications were appropriately distributed each week. Committee minutes indicated that mental health staff regularly generated a list of inmates on heat-sensitive medications who were inappropriately housed. On the other hand, heat logs indicated that temperatures were not always monitored in the housing units, particularly at night. There were frequent Stage-2 heat alerts throughout the summer. No Stage-3 alerts occurred from April through June and in August, but seven Stage-3 alerts occurred in July. As in the past, MTA rounds were not always documented during Stage-3 alerts.

b. Non-Compliance

Problems continued with psychiatric attendance at IDTT meetings. An institutional audit of IDTT meetings for general population 3CMS inmates found that psychiatrists participated in only 70 percent of IDTT meetings. Custody staff, on the other hand, was generally present. An audit of IDTT meetings in administrative segregation contained too small a sample to be representative, but psychiatric participation in the sampled meetings was rare.

No group therapy was provided for general population 3CMS inmates.

Institutional Summary:

Mental health programs at DVI were well-designed and managed. Audit tools were particularly effective, and staff's use of the MHTS was quite sophisticated. A

number of vacancies existed among mental health and auxiliary staff, but most openings were covered by contractors. The institution's reception center population continued to increase, and overcrowding was a growing problem.

Performance in the four areas of focus for the round was inconsistent. Some aspects of quality assurance improved, while others remained erratic or poor. With regard to medication management, progress was noted in the institution's newly revised operating procedure, HS medications, medication continuity for new arrivals, laboratory testing and parole medications. On the other hand, problems persisted with medication continuity for intra-facility transfers, medication errors, DOT and the acquisition of informed medication consent forms. Little information was available on medication continuity on the renewal of medication orders, medication non-compliance and Keyhea practices.

Access to higher levels of care varied. The timeliness of EOP transfers declined in reception and administrative segregation, but 3CMS inmates were transferred out of reception more expeditiously. DVI also developed a system for identifying inmates in need of accelerated transfers, and the treatment provided to EOP inmates awaiting transfers was generally good. In contrast, lengths of stay increased in the OHU; MHCB referrals declined; referrals to DMH were extremely rare; the timeliness of PSU transfers was uncertain; and treatment services in administrative segregation declined.

DVI's approach to the disciplining of caseload inmates appeared mixed. While the percentage of RVRs written for caseload inmates was not excessive, the number of referrals to the district attorney of caseload inmates was disproportionally high, as was the number of caseload inmates in the institution's administrative

segregation unit.  Mental health aspects of RVR procedures were well developed, and mental health input appeared to have some impact on hearing officers' decisions.

With regard to other CAP issues, the quality of treatment plans was good; the timeliness of clinical responses to inmate referrals improved; the provision of clinical follow-up of suicidal inmates returning from a MHCB was adequate; safety conditions in OHU cells were upgraded; and the timeliness of mental health screenings and evaluations in reception was generally adequate.  Problems continued with the provision of group therapy for general population 3CMS inmates, psychiatric attendance at IDTT meetings, the composition of the suicide prevention committee, custody follow-up for suicidal inmates, the filing of medical records and the heat plan.

Overall, DVI had good systems in place, but implementation of a number of elements of the mental health program was incomplete.

### Service Area E

This service area includes California State Prison, Corcoran (CSP/Corcoran), the California Substance Abuse Treatment Facility (CSATF), Pleasant Valley State Prison (PVSP) and Avenal State Prison (ASP).

### California State Prison, Corcoran (CSP/Corcoran)
May 3, 2005
July 27, 2005-July 28, 2005
September 13, 2005-September 15, 2005
December 15, 2005-December 16, 2005

The allocation of 51.25 new positions in September represented a 65 - percent increase in staffing at CSP/Corcoran.  None of the newly established positions had been filled by December, pushing the institution's vacancy rate to an alarming 59 percent.  Just 14 percent of the vacancies were covered by contractual staff.  Few

candidates were identified for the permanent positions. Staff reported that two candidates, one psychiatrist and one psychologist, lost interest during the protracted hiring process.

Setting aside these newly allocated positions and the 14 positions associated with the now abandoned plan to expand the MHCB, CSP/Corcoran had 89.8 positions. The vacancy rate for those positions was 35 percent in July 2005. All mental health supervisors and managers left during the monitoring period. Staff members who remained had higher rates of absenteeism and were often out on medical leave. Staff attributed both the increased absenteeism and medical leaves to the temporary redirection of supervisors to other prisons, notably nearby KVSP, and the strain of filling in behind the absent supervisors. The associate warden for healthcare and the health care manager intensified their levels of participation in mental health matters.

In December 2005, the chief psychiatrist and senior psychiatrist positions remained vacant. A net loss in compensation due to uncompensated on-call duty was cited as an impediment to filling the position of chief psychiatrist. Fourteen staff psychiatry positions were allocated, of which 9.5 were vacant. Contractors covered the equivalent of four of these positions, but contract psychiatrists worked only on weekends.

The chief psychologist resigned in September 2005, leaving that position vacant. It was filled by an acting chief in December. One of three senior psychologist positions and 30 of 41 staff psychologist positions were vacant. Eight vacant staff psychologist positions were covered by contractors. Among psych social workers, 6.5 of 11.5 staff positions and two of three supervising psych social worker positions were vacant. Contractors covered 1.5 of the vacant psych social worker positions. Seven of