eight recreational therapist positions and 13 of 35 psych tech positions were vacant. All four senior psych tech positions were vacant. There was a chronic vacancy rate of 21 percent in the ranks of office techs and office assistants. The office manager position was vacant.

Half of 20.5 RN positions and all 4.75 supervisory nurse positions were vacant. The pharmacist position was vacant. The sole pharmacy tech position was filled. A medical secretary position was filled. Six of 12 positions in medical records were vacant. Staff reported a four-week backlog of filing.

Two new developments had an impact on the operations of CSP/Corcoran. Facility III, formerly a Level IV yard, was converted to a Level III SNY. Caseload inmates were excluded from that yard. All caseload inmates formerly housed there were slated for transfer to other prisons. Second, an OHU opened in September 2005. The OHU reportedly was to be used only for medical treatment.

The institution continued to supervise and monitor the use of force by custody staff. In 2005 there was a slight reduction in the use of force, with most of the reduction occurring in the general population. In 2004 force was used in 380 of 618 documented incidents, a rate of 65 percent. Force was used in 336 of 600, 56 percent, of incidents from January 1 through November 30, 2005. A modest downward trend in the frequency with which force was employed against caseload inmates was sustained. In 2004, 221 of 380 incidents, 58 percent, in which force was used involved caseload inmates. During the first six months of 2005, 97 of 191, 51 percent, use-of-force incidents involved caseload inmates. During the second half of 2005, the rate decreased

to 48 percent, with 69 of 145 use-of-force incidents from July 1 through November 30, 2005 involving caseload inmates.

The majority of use-of-force incidents that involved caseload inmates occurred in administrative segregation, the SHU and protective housing units. From April through November 2005, 61 percent of use-of-force incidents in those locations involved caseload inmates. Caseload inmates comprised roughly 32 percent of the population in these units. Most incidents involved 3CMS inmates. From August through November 2005, nine of 53 use-of-force incidents involved EOP inmates.

Issue Resolved:

HS medication was ordered and administered appropriately.

Quality Management:

The institution-wide quality management committee was co-chaired by the warden and the health care manager. Meetings were well attended by high ranking custody staff. Quality management was viewed as a useful tool to monitor operations, identify problems and develop solutions. The mental health quality management subcommittee met biweekly, but staff turnover took a toll on attendance at meetings. Activities of the subcommittee were documented in minutes. The subcommittee reported regularly to the institutional quality management committee. Most members of the mental health staff participated in at least one QIT. Their experiences reportedly were positive. The results of quality management audits were generally disseminated to staff.

The suicide prevention committee met monthly and kept minutes. Attendance at meetings ranged from seven to 17 participants. Mental health staff, RNs, psych techs and the Keyhea coordinator regularly attended meetings. Few custody staff

actually assigned to yards attended; custody presence was largely restricted to staff who held institutional administrative positions. Facility captains from the SHU and administrative segregation units were rarely present at meetings.

In lieu of the June meeting, four or five hour-long training sessions were held on each yard. Suicide risk factors in administrative segregation were discussed at the October meeting. The committee recommended that all clinicians in administrative segregation receive enhanced training on signs and symptoms of risk. A discussion of the barriers to cultural acceptance of mental health intervention in administrative segregation and training or other interventions needed to overcome such barriers was deferred to the following month.

The committee did not routinely receive incident reports of self-injuries and suicide attempts. Systems issues raised as new business often went unmentioned in subsequent meetings. The committee did not review multiple admissions or other aspects of crisis bed operations. A separate QIT addressed five-day follow-up, but its work was completed in September. The committee was alert to salient issues, disseminated communications from DCHCS and fulfilled parts of its mission, but it lacked focus and follow-through on institution-wide suicide prevention strategies.

Audits of medication management improved during the monitoring period. The mental health subcommittee chartered 16 QITs, an uncommonly large number. Several completed their work during the monitoring period, forwarded recommendations and were slated to disband. Documentation of QIT activities was often lacking; minutes were located for only five teams. Staff reported concerns about the integration of QIT

documentation with <u>Plata</u> requirements. Psychology and social work continued peer review, while psychiatry began conducting peer review.

The MHTS was vital to quality management activities. Case managers used it to track inmates on their caseloads. The system also tracked expiring medication orders. The results of MHTS audits typically showed higher compliance rates than did audits of medical records. Discrepancies between the results of audits based on MHTS and UHRs were examined by staff. Irregularities in documentation by treatment providers and data entry errors into the MHTS contributed to the lack of concordance.

<u>Medication Management:</u>

Sustained attention to medication management brought improvement in a number of areas. One problem was resolved and a second needed improved auditing and sustained compliance to reach resolution. HS medication was administered appropriately. According to an audit done by staff, 183 inmates had HS orders. Observation by a supervisor found that HS medications were administered after 8 p.m. Monthly observations by supervisors found that nurses followed DOT procedures when administering medication to roughly 200 inmates in the SHU. DOT orders were written on a case-by-case basis, while certain medication was automatically administered DOT. Problems with DOT will be resolved during the next monitoring period if compliance is sustained.

Medical staff conducted regularly scheduled audits, and sample sizes were typically adequate. An audit of medication continuity sampled roughly 15 percent of inmates who arrived with current orders for psychotropic medication and found that 80 to 90 percent received their first dose of medication within 24 hours. Efforts to improve

medication continuity during intra-institutional transfers were also promising. In April, May and June, staff audits found that no doses of medication were missed when inmates were transferred within the institution. In August, four inmates who were moved did not receive medication for two to five days. A remedy was devised and implemented. Rather than relying solely on custody staff to move MARs when inmates were transferred, staff created a back-up system. Staff audits of 12 cases in September and October found no missed doses. The institution needed to monitor the new procedures.

Efforts to address non-compliance grew more strategic during the monitoring period. Audits consistently sampled ten to 15 percent of relevant cases. The number of referrals for non-compliance grew, as did the frequency with which psychiatrists followed-up. Monthly audits of MARs found that 61 to 88 percent of UHRs contained a MAR for the previous month. No signed refusal forms were found in a sample of 23 cases in which medication was discontinued.

Building on these results, staff modified daily practices and audits. In April and May fewer than half of inmates who were non-compliant were referred to mental health. Follow-up by psychiatry occurred less often. In September and October, 60 and 70 percent, respectively, of non-compliant inmates were referred. Half were seen by a psychiatrist who documented a response to non-compliance.

Improved auditing by the medical department revealed deficiencies in the monitoring of the blood levels of inmates on mood-stabilizing medications. Deficiencies were attributed to the use of contract psychiatrists on weekends and lapses in documentation. A QIT on labs was chartered in August 2005.

The problem of discharge medications for paroled inmates was resolved during the preceding monitoring period. The pharmacy continued to maintain a list of inmates who received a supply of medications when they paroled.

The Keyhea coordinator position was vacant throughout the monitoring period. Staff reported that 58 inmates had Keyhea orders and reported that petitions to renew orders were initiated when warranted. No information was available on whether new Keyhea orders were initiated when warranted.

<u>Mental Health Assessments for the Disciplinary Process:</u>

Two overlapping snapshots indicated that the number of RVRs issued to caseload inmates held steady, as did the frequency with which caseload inmates were referred for a mental health assessment. The proportion of RVRs incurred by caseload inmates ranged from 18 to 25 percent during the first seven months of 2005. From January 1 through May 31, 2005, 980 RVRs were written. Caseload inmates represented about 23 percent of the overall institutional population and accounted for 178 RVRs or 18 percent of all RVRs. From April through July 31, 2005, 1,016 RVRs were issued. Caseload inmates accounted for 253 or 25 percent of all RVRs. Just over 40 percent of the caseload inmates who incurred RVRs were referred for a mental health assessment. Most of the inmates referred were treated at the EOP level of care. Those 3CMS inmates who were referred were housed in administrative segregation or the SHU. Only a handful of caseload inmates in general population elicited a referral. Mental illness was determined to be influential in 40 percent of the cases in which referrals were made.

Staff continued to audit adherence to RVR requirements as well as the quality of mental health and custody components. On the whole, policy was followed,

156

but there were significant lapses in a few cases. Recurrent similar lapses suggested that not all staff understood or willingly carried out RVR policy changes regarding mentally ill inmates.

Documentation by hearing officers improved during the first quarter of 2005. Staff reported that on-the-job training and progressive discipline were used in an effort to implement the policy fully. By June, documentation by hearing officers improved significantly.

CSP/Corcoran referred 58 cases involving caseload inmates to the district attorney between January 12 and September 12, 2005. Nearly three times as many, 158 cases, were eligible. The district attorney rejected 54 cases. The four cases selected for prosecution involved 3CMS inmates.

Transfers:

Demand for acute care was virtually unchanged. Access to acute care continued to be good but untimely. The institution's log of referrals was complete. Delayed referrals and violations of transfer timelines slowed access. On average 11 days elapsed between a referral and transfer.

From February 15 to August 29, 2005, 62 inmates were referred to APP/DMH at CMF for acute care. Of the 57 inmates transferred to DMH for acute care, 52 were moved within 72 hours of a bed assignment. Five transfers took longer. In 12 cases, staff took a week or longer to prepare and submit a referral. One inmate was paroled prior to transfer; another had medical problems that precluded transfer to DMH. Three referrals were pending.

Access to intermediate care was adequate in high priority cases but poor for routine referrals. From January 20 to September 7, 2005, staff made 43 referrals to intermediate inpatient care in DMH. Ten referrals resulted in transfer. Of the remaining 33 cases, seven were rejected but redirected and eventually transferred to acute care; four referrals were withdrawn; three inmates were transferred to another prison during the referral process; and one inmate paroled while the referral was underway. Sixteen inmates were accepted and put on a wait list. Of the 16 inmates pending transfer, seven had been waiting longer than 150 days, and 13 had been waiting longer than 90 days. Two referrals were also pending. In six cases, staff took one to three months to generate and submit SVPP referrals.

Inmates referred for intermediate inpatient DMH care fell into two groups, high priority and routine. Those who were in an MHCB, a PSU or an EOP administrative segregation hub unit were high priority. Four high priority cases were referred and transferred in 22 to 35 days. Six routine cases took 61 to 147 days to transfer.

Psych and return protocols were followed for the most part. UHRs contained discharge summaries from DMH. Faxed cover sheets with contact information and return chronos were not in UHRs. Staff reported that temporary Keyhea orders were sometimes inexplicably dropped during DMH stays. Treatment continuity was generally adequate when inmates returned from DMH, although some serious lapses occurred. One SHU inmate, who had been on the wait list for intermediate care for six weeks, was sent to DMH due to suicidal ideation. He was discharged from APP one day after he arrived. The discharge summary described him as being well known to staff and having a disorder that was primarily Axis II. It also acknowledged his history of suicide attempts

and his low tolerance for frustration. He was discharged with a GAF of 40 but without a recommended level of care. No bus screening recorded his return to CSP/Corcoran, and he was not seen by a case manager for ten days. An IDTT meeting was held nearly five weeks after his return. In another case an inmate admitted to the MHCB unit soon after his return to CSP/Corcoran did not have an IDTT meeting in the EOP for nearly three months.

Referrals to crisis beds were made as clinically warranted. This problem will be resolved during the next monitoring round if compliance is sustained. Access to crisis beds was unimpeded. Roughly ten percent of referrals to crisis beds were rejected. Staff needed to do a better job of completing suicide risk assessment checklists when inmates were not admitted. Staff reported that inmates on suicide watch were rarely observed one to one. Nearly all watches were observations made at 15 minute intervals.

The average length of stay for the 432 inmates admitted to the MHCB unit between March 16 and June 30, 2005 was eight days. Twenty percent of those stays exceeded ten days. Only six percent, 27 stays, exceeded ten days for clinical reasons. DMH referrals accounted for 38 of the extended stays, while inmates returned to NKSP accounted for 15 others. Administrative delays accounted for five. The monitor's review of selected cases with long administrative stays found that it took, on average, 4.3 days to move those inmates. It often took longer to move EOP inmates back to administrative segregation at CSP/Corcoran than to transfer inmates to DMH.

Thirty-three inmates were admitted to the MHCB unit three or more times. Nearly half of them were referred to DMH, while referral was considered in the remaining cases.

At the time of the monitor's July visit, 30 crisis bed patients were in the MHCB unit, which was licensed for 24. NKSP inmates in need of crisis care were treated at CSP/Corcoran on a priority basis, while the CTC in NKSP was undergoing much delayed renovation. Staff reported that the MHCB census ranged from 13 to 30 during the monitoring period. Earlier improvements in the quality of treatment in the MHCB were not fully sustained due to lack of staff and the high volume of admissions. In one IDTT meeting that was otherwise of good quality, the monitor's expert noted a lack of urgency in the discussion of suicide risk and a decision about whether to initiate a suicide watch.

Psychiatry staffing in the MHCB unit was maintained by diverting psychiatrists from other areas and the use of contractors to make daily rounds. Coverage of the MHCB by contractors, who worked only on weekends, was fraught with problems. Mental health staff used two treatment modules to make a total of 158 confidential out-of-cell contacts in the MHCB unit. Psychiatry contacts and IDTT meetings were held out of cell in a confidential setting. Recreation and other therapeutic activities, formerly held out of cell, were discontinued when a recreational therapist resigned.

When crisis beds were filled, MHCB inmates occupied medical beds. In some instances medical patients were moved to community hospitals to make room for psychiatric patients. No inmates were placed in holding areas within or outside of the CTC. Five medical cells were modified for psychiatric use. During the monitor's July visit, ten MHCB inmates were in medical beds. Staff reported that it was standard practice to move more stable crisis bed inmates to medical beds to make room for new

admissions.  Medical beds used for MHCB overflow were not staffed in accordance with licensure requirements.

The use of restraints was excessive in duration in some instances.  In May an inmate was restrained for 48 hours.  Documentation of restraint use was sometimes deficient.  The seclusion component of the restraint and seclusion policy was also incorrect and outdated.

The CTC had video monitors in the medical wing and in a security area of the nursing station of that wing.  MHCB overflow inmates were sometimes housed in the medical wing, but they were not placed in cells equipped with cameras.  Inmates on suicide watch were not monitored by video.

Records of treatment in the MHCB were excluded from UHRs by local practice.  In two cases reviewed by the monitor, inmates were admitted to the MHCB shortly after they returned from DMH.  Treating clinicians did not necessarily have access to that information.  Staff planned to change the practice.

CSP/Corcoran improved its processing of EOP inmates with SHU terms. More timely processing, however, did not result in more transfers to a PSU.  After a new policy required correctional counselors to forward an endorsement chrono to the CSR within one day of the imposition of a SHU term, endorsement took longer than 30 days in four cases.  Administrative errors made at CSP/Corcoran slowed processing in two of these cases.  Four of 61 EOP inmates with SHU terms were transferred to a PSU between March 16 and August 25, 2005.  The time between endorsement and transfer in those four cases ranged from 49 to 84 days.  Twenty-three cases were pending at the time of the September monitoring visit.  Six inmates had been endorsed and were awaiting transfer.

One had been waiting over three months, while the other two had been waiting six to eight weeks. The longest pending cases were those of the most severely mentally ill inmates. Processing was interrupted by transfers to crisis beds and acute care.

Over 50 percent of EOP inmates with SHU terms became ineligible for transfer to a PSU before their transfer occurred. In 17 cases, the duration of the SHU term elapsed. The level of care changed from EOP to 3CMS in ten cases. Five inmates awaiting transfer paroled.

Other CAP Issues:

a.  Partial Compliance

Weekly contacts with EOP inmates did not always occur as required. MHTS reports indicated that 80 percent of weekly contacts were made with EOP inmates in the general population. During one five-month period, EOP inmates in administrative segregation were seen weekly 86 to 97 percent of the time for an overall compliance rate of 93 percent. EOP inmates in administrative segregation were offered nine to 11 hours of group treatment and received 8 to 10 hours.

According to MHTS data that spanned a five-month period, 3CMS inmates in all locations, SHU, administrative segregation and general population, were seen quarterly 88 to 98 percent of the time. Different results were obtained when audits relied upon UHR entries. Staff audited 40 UHRs and found that 65 percent of 3CMS inmates were seen quarterly.

Case managers saw 3CMS inmates in administrative segregation weekly 90 percent of the time. Staff estimated that roughly half of contacts occurred out of cell.

The space in which out-of-cell contacts were held did not afford inmates visual privacy from other inmates housed on the unit.

Timely screening of inmates placed in administrative segregation improved but did not reach compliance. Inmates were screened within 72 hours of placement in six of ten reviewed cases. Screening was conducted within one week in three cases. In one case the inmate was not screened for 18 days.

The SHU housed approximately 500 3CMS inmates. Escort teams facilitated access to care in the SHU. Psych techs made weekly rounds on caseload inmates. The number of inmates who needed to be seen on rounds and the conditions under which rounds were conducted posed logistical challenges. A QIT was chartered in June 2005 to address those problems. A new operations procedure was introduced in October. Rounds were conducted on non-caseload inmates at least once every other week. The procedure specified that rounds would be made during normal waking hours and that verbal interaction was required. Institutional audits of rounds done between August 1 and December 10, 2005 found that rounds on caseload inmates were completed 99 percent of the time. During the first month of the new procedure, rounds of non-caseload inmates were completed 90 percent of the time.

Rounds of caseload inmates were documented in two ways. Psych techs signed in and out of the unit, noting that the reason for the visit was to conduct rounds. Rounds were also documented weekly on the 114 form and in the UHR of each caseload inmate. Rounds of caseload inmates were observed by the monitor's expert in December. Psych techs engaged each inmate in conversation. Staff reported that the proximity of escort officers varied. In some instances the presence of an escort officer in close

proximity to psych techs may have had a chilling effect. Psych techs distributed orientation pamphlets, prepared by DCHCS, to inmates on rounds, access to mental health staff and correctional counselors.

The monitor's review of a small number of SHU cases found that case management contacts often did not meet program guide requirements. Many were made in the context of ICC meetings. Medical records contained no documentation of case management contacts in two cases. In one case a case manager took 12 days to see a caseload inmate referred by a psych tech. In another case an inmate was seen cell-front for one quarterly contact and in the context of an ICC meeting for the next. It was not unusual for inmates to be seen more often by psychiatrists than by case managers.

Group treatment initiated in February 2005 was sustained, although only a small number of inmates in SHU had access to group treatment. Seven short-term groups met for four or five sessions each. Three more were scheduled to begin in September.

About 270 3CMS inmates were in general population. Roughly 25 to 30 inmates were enrolled in a total of three groups. The time-limited groups met a maximum of six sessions.

Facts on the handling and auditing of referrals were scarce. MHTS tallies may not have included all pertinent cases or reflected time frames for referrals and contacts accurately. Available information indicated that routine referrals to psychiatrists resulted in contacts within an average of six days. Routine referrals to mental health resulted in contacts within 12 days. Surprisingly, staff continued to report that no urgent referrals were made to psychiatry.

The heat plan was not fully implemented. CSP/Corcoran recorded seven Stage II heat alerts during the first three weeks of July. During that time ten housing units failed to log temperatures at least once. Logs of two units were missing seven to eight entries. Staff reported that cooling measures were carried out. Two thermometers showing different temperatures were relied on as a basis for log entries in some housing units. Temperatures most often were measured either in control booths or dayrooms, although cells were often warmer than dayrooms. Inmates in general population had heat cards, but those in administrative segregation or SHU sometimes did not. Some inmates reported that heat recalls were easily avoided or optional.

b. Non-Compliance

Data on initial contacts and treatment plans was sparse and contradictory, and routine audits were often disrupted by changes in staffing. Available information indicated that fewer than half of newly arrived EOP or 3CMS inmates were seen in a timely manner. Psychiatrists and correctional counselors attended fewer than half of IDTT meetings held for new inmates. According to UHR audits, treatment plans were written promptly about half the time. According to MHTS reports, IDTTs met and updated treatment plans were prepared in a timely manner 92 to 98 percent of the time across all locations at both levels of care. In contrast, UHR audits found a 50 to 70-percent success rate. The composition of treatment teams remained deficient.

Case managers did not have sufficient advance notice of ICC/UCC hearings to retrieve UHRs and provide relevant clinical information to the committees.

Medical records remained problematic. A staff audit of 120 UHRs found that 16 percent contained records of the wrong inmate. Over half of reviewed charts had

documents filed in the wrong section of the record. A QIT made recommendations to improve access to records and accuracy of filing. A large-scale reorganization was to be completed by the end of January 2006.

Sustained supervisory attention and more collaboration between medical records staff and mental health staff resulted in better concordance between UHRs and MHTS. An audit of 162 records found an overall concordance rate of 85 percent over a three-month period. The MHTS recorded more contacts and IDTT meetings than were documented in UHRs. Concordance rates for case manager and psychiatric contacts were higher at 87 and 96 percent, respectively, in contrast to IDTT documentation, which was about 60 percent.

Institutional Summary:

The inability to retain mental health managers or recruit staff to fill even one of 51.25 newly allocated positions drove CSP/Corcoran's vacancy rate to 59 percent. Nonetheless improvements were made in some areas. A modest downward trend in the frequency with which force was used against caseload inmates was sustained.

Quality management continued to be a useful tool to monitor and remedy problems. Staff turnover took a toll on mental health quality management activities. Attendance at meetings fell, and some audits were either less useful or not conducted. A large proportion of the mental health staff participated in quality management and was informed about the results of audits. The MHTS remained a vital part of quality management activities. Audits that relied on the MHTS yielded higher compliance rates than record reviews. Psychology, social work and psychiatry engaged in peer review.

The suicide committee needed to examine its composition and attendance in light of the unique characteristics of the institution. It also needed to re-examine its mandate, expand its agenda to cover all required topics each month and focus on the identification of systemic issues in CSP/Corcoran's suicide prevention effort.

Medication management improved. One problem, with HS medications, was resolved, and a second, with DOT procedures, came close to compliance. The quality of audits of medication continuity and non-compliance improved throughout the monitoring period. By the end of the monitoring period, medication continuity was nearly always sustained for newly arrived inmates and those who were relocated within the institution. Non-compliance with medication was under-reported and did not always elicit a mental health contact, but improvement was noted at the end of the year. Staff believed that the Keyhea process was working well, but the position of Keyhea coordinator remained vacant for over six months.

RVR policy regarding mentally ill inmates was followed on the whole, but significant lapses, both clinical and custodial in nature, occurred. By June, documentation by hearing officers improved markedly. CSP/Corcoran referred roughly one third of eligible cases involving caseload inmates to the district attorney. The district attorney elected to prosecute four.

Access to DMH/APP was adequate. A higher proportion of inmates who were referred for acute care received it, and transfer logs were improved. Delayed referrals and violations of transfer timelines slowed access. Access to intermediate care at DMH was good in high priority cases but poor for routine referrals. After a slow start,

staff completed referrals promptly. Inmates on a wait list typically remained there for three to five months. The condition of some deteriorated further as they waited.

Use of the MHCB and records of its operations continued to improve. Referrals to the MHCB were made as clinically warranted, bringing that problem into compliance. The volume of admissions to the MHCB was high. Adequate psychiatry coverage was maintained by short changing other areas. Medical beds were frequently used for overflow. The length of stay was overlong in 20 percent of admissions. Staff was attentive to cases of multiple admission and appropriately considered referral to a higher level of care. The use of restraints needed improvement, and inmates on suicide watch were not monitored by video camera.

CSP/Corcoran improved its processing of EOP inmates with SHU terms, although more timely processing did not result in more transfers to a PSU. The most severely mentally ill inmates were often the most likely to have protracted processing.

The institution still had difficulty making weekly contacts with EOP inmates. The rate at which EOP contacts were made was higher in administrative segregation than in general population. Group hours for EOP inmates in administrative segregation fell just short of the target of ten per week. Case management contacts with caseload inmates in administrative segregation were held out of cell roughly half the time.

Access to mental health treatment in the SHU was facilitated by escort officers. Psych techs began making rounds of non-caseload inmates by November. In some instances communication was negatively affected by the close proximity of escort officers. Group treatment was offered to a small number of inmates in SHU and in

general population.   Conditions under which case managers met with caseload inmates in the SHU were poor.

The timeliness of contacts with newly arrived caseload inmates was inadequate, and IDTT meetings were often untimely and attended by a less than full complement of staff.  Annual IDTTs were also deficient in composition.  Case managers did not have sufficient advance notice of ICC/UCC meetings to provide relevant clinical information to the committee.  Medical records remained problematic but were subject to a new initiative.  Documents were misfiled and missing.  The backlog of loose filing remained around four weeks.

CSP/Corcoran fell short of its goals in quality management, medication management and transferring inmates to higher levels of care and to PSUs.  Better record keeping and improved processing clarified the distinction between delays that were within the control of the institution and those that were not.  Delays in transfers to intermediate care and PSUs were mostly remedied at the institutional level.  The provision of quality mental health treatment continued to be stymied by myriad internal barriers.  Nearly every major mental health area, including but not limited to case management contacts, IDTT meetings, timely contacts, documentation and treatment planning, needed improvement.  The number of gains made, however, and the preservation of prior gains was significant, particularly given the substantial challenges presented by staffing shortages.

### California Substance Abuse Treatment Facility (CSATF)
November 29, 2005 – December 2, 2005

Despite intensive recruitment and retention efforts, CSATF lost roughly a third of its mental health staff between October 2004 and August 2005.  During the

monitoring period the size of the mental health caseload rose to 1,180, the level at which

it stood in August 2003 when the population was capped. During the previous

monitoring period, the mental health caseload was reduced to just less than a thousand by

central office fiat. In 2005, the official MHSDS capacity was increased by 50 to 1,049.

Concomitant increases in staffing were allocated. CSATF gained positions for a half-

time psychologist, a full-time office tech and a full-time psych tech.

In December 2005, 25 percent, or 9.5 of 38.5 mental health positions,

were vacant. Positions for two psychiatrists, two psych social workers and 4.5

psychologists were vacant. Just one of eight allocated psych tech positions was vacant.

A senior psychologist was slated to transfer to another prison in the near future, leaving

one of the facility's two senior psychology positions vacant. Two case managers were on

leave in the weeks preceding the monitoring visit and had yet to return. The sole

recreational therapist position was filled, as were all 5.5 office tech positions.

Despite their success in obtaining contractors to cover vacant mental

health positions, the administration was concerned about the retention of their permanent

staff. Contractors covered 8.4 of the 9.5 vacant positions. All vacant psychiatrist

positions were covered by contractors. Medication management was provided via

telemedicine to a small number of caseload inmates, who were residents of the substance

abuse program. Contract psychologists covered all but 1.4 vacant positions. Contracted

psych social workers covered 1.5 of 2.0 vacancies. Caseloads were high, ranging in size

from 138 to 165. Three case manager positions were allocated to treat 96 caseload

inmates housed in administrative segregation. One staff psychologist and two contracted

case managers covered administrative segregation and a second overflow unit.

170

Auxiliary staffing was in dire straits with the exception of the pharmacy. Shortages of nurses and MTAs ran at about 45 percent. Nearly all of the 18.73 vacant MTA positions, however, were covered by contractual staff. Only about half of 23.2 RN vacancies were covered with contracted services. Seven of nine pharmacy positions were filled; vacancies were fully covered by contractors. The medical records section was fully staffed, but one full-time staff member, whose position was covered by a contractor, was out on long-term leave.

Issues Resolved:

Newly arrived inmates were seen by psychiatrists in a timely manner.

A reasonable number of MHSDS inmates (approximately 150) had orders for HS medications, which were administered after 8 p.m.

Group treatment was provided to caseload inmates housed in the general population.

Quality Management:

Quality management continued to mature during the monitoring period. The governing body and the institutional health care quality management committee met as required. An intensive effort focused on maintaining medication continuity when inmates were re-located within the institution was particularly effective. The effort involved weekly meetings of custody administrators and healthcare staff and represented a model for collaborative problem solving.

The mental health quality management subcommittee met twice weekly, chartered QITs, received reports of audits and reported regularly to the overall health care committee. Meetings were well attended, and minutes were informative. Four QITs chartered by the mental health quality management subcommittee were underway during

the monitoring period. QITs addressed treatment in the MHCB, stabilization of 3CMS inmates in one particular unit, the mental health referral process and access to treatment space. Two of these QITs completed their tasks and were disbanded during the monitoring period.

Audits of core components of mental health treatment were completed on schedule. Staff routinely audited initial contacts with new arrivals, timely treatment planning, compliance with IDTT meeting requirements, including attendance by correctional counselors with central files, and several mental health requirements pertaining to inmates in administrative segregation.

A small institutional audit of the accuracy of MHTS data found that case manager contacts documented in UHRs were omitted from the MHTS 12 percent of the time, while 22 percent of documented psychiatric contacts were not recorded in the MHTS. Data entry into the MHTS was reportedly an impediment to greater accuracy.

Mental health staff members were well informed about the results of quality assurance audits. Peer review, still not initiated in the institution, remained a topic of discussion with DCHCS in Sacramento.

The suicide prevention committee typically met monthly but did not appear to be particularly effective. Minutes were kept, but prior and current discussions often melded without resolution. Meetings were poorly attended by custody staff. The committee's standing agenda covered most required topics, but the committee devoted inadequate attention to key issues and did not regularly follow-up old business as needed.

It was unclear how or whether the committee reviewed all self-injuries and suicide attempts. A 60-day pilot effort to examine these events found problems but failed

to identify a strategy for responding to the specific problems identified. CSATF staff was scheduled to participate in a system-wide video training session on the relationship between heightened stressors and the risk of suicide at the end of August, but nothing in the committee's minutes reflected that the training actually occurred or demonstrated that any guidance acquired in the session was disseminated to other mental health clinicians. The committee did identify a problem with five-day clinical follow-up of inmates discharged from the MHCB to administrative segregation and its overflow unit involving the housing of suicidal discharged inmates in temporary quarters before being returned to their permanent housing. Records of five-day follow-up were sometimes lost in the shuffle, a problem not captured in routine audits of five-day follow-up. The committee needed to do a better job of compiling information and formulating an approach to suicide prevention tailored to the needs of the institution.

A suicide completed in May 2005 generated a correctional action plan focused on a single system-wide issue, but no local remedy was suggested. The systemic issue raised was whether newly arriving inmates in an institution, who were confined in locked orientation units, needed additional mental health care beyond that currently provided.

Medication Management:

Health care staff audited practices associated with medication management under the auspices of the institution's quality management committee. CSATF continued to do a good job of sustaining medication continuity when inmates arrived at the institution but was less successful when inmates were relocated within the prison. A responsive QIT helped reduce interruptions in medications resulting from

internal relocations to eight percent by the end of 2005.  That represented a marked

improvement over the previous six months, when as many as a third of all inmates

transferred within the institution experienced interruptions in the receipt of their

medications.

Earlier improvement in the handling of medication non-compliance was not

sustained.  Staff reliably documented missed and refused doses on MARs but did not

regularly refer all cases of medication non-compliance to mental health staff when

warranted.  Only about half of non-compliant inmates were referred to mental health.

Lapses were remedied for a short period of time through intensive supervision.  The

extremely high vacancy rate among nurses and MTAs was cited as a significant

impediment to compliance.

Institutional audits found that MARs were legible and filed in UHRs.

Medical records were usually complete and well organized.  Loose documents were filed

in UHRs within five to seven days.  Institutional audits found that documents were

occasionally filed in the wrong section of the chart.  A review by the monitor's expert of

a small sample of UHRs found that medication continuity was not always sustained on

arrival and mental health documentation of intake processing and initial MARs were

sometimes missing from charts.

Although over two hundred inmates had orders for DOT medication, the

institution could not generate a list of inmates with DOT orders.  Observations conducted

by supervisors indicated that DOT and nurse administered medication procedures were

followed.

Five inmates had current or pending Keyhea orders. Staff reported that renewals were sought when clinically indicated. A list of inmates with Keyhea orders was circulated to each yard clinic to inform staff that an order for involuntary administration of medication was in effect.

Compliance with the delivery of parole medications improved significantly. Institutional audits indicated that a thirty-day supply of medication was usually given to inmates who left on parole. Discharge medications were sent to R&R by the pharmacy in all cases, but in a few instances the medication was not delivered to the inmate. Roughly twenty to twenty-five inmates were released monthly. The largest number of misses in any one month was four. If this rate of compliance is sustained during the next monitoring period, the problem will be resolved.

Mental Health Assessments for the Disciplinary Process:

Records on mental health assessments for the disciplinary process improved, and logs of disciplinary charges were integrated across yards to yield institutional tallies. Staff audited the process to monitor quality of documentation and to determine whether referrals to mental health were made in all cases where they were warranted, but found little overall improvement in the assessment process. The impact of mental health assessments continued to be limited.

From May 1 to October 31, 2005, 1,792 RVRs were issued, of which 331 (18 percent) involved caseload inmates. Unlike most other institutions with a large mental health caseload, the number of RVRs written for caseload inmates in CSATF was not disproportionally large. On the other hand, just nine cases (three percent) were referred for a mental health evaluation. In five of the nine cases, mental health

evaluations reported that the inmates' behavior was influenced by mental illness. In one case a 20-month SHU term for battery on staff was imposed despite a finding that the inmate who spat on an officer was being treated for severe seizure activity in the ICU of a community hospital. The DA declined to prosecute.

The monitor's review of a small number of C-files found that hearing officers accurately documented levels of care and the results of mental health evaluations. In addition, cases not referred to mental health were specifically characterized as not meeting the criteria for bizarre and/or uncharacteristic behavior. A staff audit identified some documentation deficiencies. Late in 2005, hearing officers were provided with additional training to improve their documentation of mental health input. In an audit of seven cases, staff found only one documented consideration of mental health findings during the hearing. Documentation indicating that dispositions were affected by mental health input was present in just two of the seven audited cases. Captains in each yard audited 162 cases where no mental health evaluation was requested. Forty-five of the cases involved caseload inmates. The decision not to refer the RVR to mental health was deemed appropriate in all cases. Interviewed mental health staff expressed different opinions. Many believed that a three-percent referral rate was probably appropriate, but a minority believed that behavior resulting from mania or psychosis did not always appear uncharacteristic to custody staff and, on rare occasions, might not trigger a referral for a mental health evaluation.

From April 1 to October 31, 2005, 298 inmates were involved in behavior requiring the generation of incident reports, of whom 42 (14 percent) were caseload inmates. Sixty-four percent (27) of the incidents involving caseload inmates resulted in

referrals to the district attorney. Nine were associated with indecent exposure. The DA rejected all but one of the 18 cases decided by the end of October 2005. Decisions were pending in the remaining nine cases. The only case picked up for prosecution involved repeated indecent exposure.

CSATF implemented its new sexual misconduct protocol in early July 2005. All RVRs involving indecent exposure were referred to the DA. Mental health staff reportedly adhered to departmental policy on the screening, diagnosis, and treatment of inmates charged with sexual misconduct. Staff not unreasonably expressed concerns about their ability to intervene as clinically warranted in the absence of specialized training. According to tracking information provided by the institution, 25 RVRs for indecent exposure were issued from July 1 to November 30, 2005. Fifteen involved caseload inmates; ten did not. All inmates were screened by mental health. One person was evaluated and diagnosed with exhibitionism. His case was reviewed by a treatment team and he was seen for weekly treatment sessions.

Transfers:

Movement of inmates needing a transfer to more intensive levels of treatment slowed during the monitoring period. Acutely ill inmates remained in crisis beds longer. Four Level III or IV inmates, who needed to go elsewhere for EOP treatment, remained at CSATF over 90 days. On average, CSATF housed six EOP inmates. Four were in the facility at the time of the monitor's visit. One was 25 days overdue for transfer to an administrative segregation EOP hub unit. From May 10 to November 30, 2005, seven inmates were transferred to EOP administrative segregation hubs. All but two were moved within 30 days. One waited for transfer for 55 days; in

the second case, transfer took 70 days. These delays were reportedly due to a lack of beds elsewhere.

Three general population EOP inmates were awaiting transfers to EOP institutions at the time of the monitor's visit. None had been waiting longer than 60 days. During the prior six months, nine inmates were transferred to EOPs in Level III and IV institutions. Five of the nine were transferred within 60 days. Four transfers took significantly longer, with lapses from referral to transfer ranging from 94 to 177 days.

Problems with access to crisis beds intensified. This once resolved issue slipped further out of compliance. Thirty-one percent of stays in the MHCB exceeded ten days. Despite excessive lengths of stay, the institution did not use temporary holding cells located outside of the CTC. Rather, safety and observation cells within the CTC were used. Roughly 80 percent of inmates staying longer than ten days were retained for clinical reasons.

Twelve inmates were referred and transferred to APP/DMH at CMF for acute care between May 1 and October 31, 2005. Referral data indicated that an average of 12 days elapsed between a MHCB admission and the inmate's referral to APP/DMH. Another week typically elapsed between the referral and actual transfer to APP/DMH. Delays occurred in moving clinically discharged inmates from the MHCB unit. In 27 cases, administrative delays exceeded three days. Fourteen of these 27 inmates needed administrative segregation beds at CSATF. In ten cases, inmates remained in the MHCB for 14 days or longer after their clinical discharge.

Other CAP Issues:

    a.  Partial Compliance

Although the problem of timely initial assessments by psychiatrists was earlier resolved, newly arriving inmates were no longer always seen for initial mental health interviews within five days.

The IDTT process improved during the monitoring period and nearly reached compliance across the board.  Poor attendance by correctional counselors in certain general population locations, coupled with clinical vacancies and high caseloads, reduced the overall success rate to just below 90 percent.  Timely IDTT meetings for newly arriving general population inmates occurred 90 percent of the time, while annual updates were timely in 85 to 89 percent of audited cases.  The timeliness of IDTT meetings in administrative segregation for both initial meetings and quarterly reviews ranged from 89 to 100 percent.

Staff management of referrals to mental health improved as methods for collecting referrals from far-flung yards became more effective.  Referrals were triaged by supervisors, and office techs issued responsive ducats soon after the referrals were received by mental health.  Audits of the promptness with which referrals of varying levels of urgency elicited a clinical response were incomplete.  The MHTS was unable to record and report on all relevant indicators.

Developments involving treatment in the MHCB were notable.  Due to the work of a QIT, clinicians were able to engage regularly in confidential contacts with MHCB inmates.  A major obstacle to the provision of recreation therapy was also identified, and a remedy for its removal appeared imminent.  Psychiatrists saw newly

arrived inmates in a timely manner; group treatment was provided in the general

population; and HS orders were written and administered appropriately. IDTT meetings

were timely and usually attended by a full interdisciplinary team. On the other hand,

while the local restraint and seclusion policy conformed with departmental policy, its

implementation was erratic. The restraint log showed that up to three inmates monthly

were placed in restraints, some for several days at a time. Mattresses were not provided

to inmates in safety cells.

Institutional summary:

   Turnover was a major problem for mental health staff at CSATF, with the

vacancy rate among nurses and MTAs approaching 45 percent regularly. The institution,

unlike neighboring CSP/Corcoran, was regularly able to cover vacancies in most

disciplines with contractors.

   CSATF's recently accelerating pace toward compliance slackened

somewhat during the monitoring period. While most past gains were preserved, progress

in the four areas of focus during the monitoring round was variable. Quality

management, an area where CSATF has been consistently strong, continued to mature.

The institution's collaborative quality management process depended on a constant

stream of audit data on key indicators. High level custody, medical and mental health

staff were actively involved. The mental health staff was well informed about quality

management, but peer review remained inert. The suicide prevention committee was not

proactive enough, and its meetings were not well attended by custody staff.

   In medication management, CSATF continued to sustain medication

continuity when inmates arrived at the institution but had problems doing so when

inmates were relocated within the prison.  Earlier significant improvement in responses to

medication non-compliance slowed, reportedly due to high vacancy rates among nurses

and MTAs.  The institution's use of DOT medication, HS orders and Keyhea orders

appeared to be appropriate.  Parole medications were provided much more regularly to

exiting inmates.

Little change occurred in disciplinary adjudications involving the most

seriously mentally ill inmates.  Staff devoted time and effort to auditing compliance in

the area of mental health and discipline and documentation of mental health input by

hearing officers improved somewhat, but the impact of mental health input remained

limited.

Transfers of inmates in need of higher levels of care slowed.  Management

of the use of MHCBs was ineffective; too many stays exceeded ten days in length.  Both

clinical and administrative factors contributed to the problem.  Referrals to APP/DMH

were not always made early enough, and administrative delays in the discharge of

clinically cleared inmates wasted precious MHCBs.  Treatment in the MHCB improved

substantially.

Progress overall at CSATF stalled a bit, but past successes were largely

maintained, some CAP items were resolved and the institution's management of mental

health quality continued to expand.

### Pleasant Valley State Prison (PVSP)
October 6, 2005 – October 7, 2005

At the time of the monitor's visit, PVSP was entirely dependent on

contracted psychiatric services.  Existing allocated positions for a chief psychiatrist and

2.5 staff psychiatrists were vacant, and 2.5 additionally allocated staff psychiatrist

positions resulting from the recent passage of the FY2005/06 budget had not yet been established at the facility.  Meanwhile, the institution used a core group of six experienced contractors to cover all of its psychiatric vacancies.  The institution also had openings for four psychologists, a half-time psych social worker, a psych tech and an office tech.  The institution was concerned about the potential impact on staffing of the recent opening of DMH's nearby Coalinga State Hospital (CSH).  PVSP reportedly lost several mental health staff members to CSH and anticipated difficulty, given present CDCR rates of compensation, filling existing vacancies, as well as any additional positions that might be allocated.

The institution's caseload capacity remained at 1199, but 1,514 3CMS inmates were housed in the institution at the time of the monitor's visit.  A Level IV sensitive needs yard (SNY) was activated at PVSP during the monitoring period. According to staff, the unit consumed a disproportionate share of mental health resources and was impacting negatively on mental health programs elsewhere in the facility.  At the same time, the 3CMS administrative segregation population increased to as many as 150 inmates, placing additional pressure on mental health services.

Despite the problems, the mental health program at PVSP was well managed and provided caseload inmates with required treatment services.

Quality Management:

The quality assurance process functioned well at PVSP.  The institution used both chart reviews and data from the MHTS to assess compliance.  Staff reported that the concordance rate between MHTS data and information in inmates' UHRs was over 90 percent, a report confirmed by the monitor's chart reviews.

<u>Medication Management:</u>

Most medication management issues were resolved in earlier monitoring rounds. Institutional audits confirmed continuing compliance with medication continuity for newly arriving inmates and inmates changing housing locations, the provision of parole medications upon discharge from the facility and laboratory testing for inmates on mood-stabilizing medications.

Follow-up to medication non-compliance was not always timely. From September 2004 to September 2005, 115 inmates were referred to mental health for medication non-compliance. It took an average of 11.12 working days from the time of the referral until an evaluation was conducted, considerably higher than the institution's goal of seven days. Referrals were received by mental health within an average of 3.65 days of their submission.

Some inmates complained that their medications had been reordered or changed without psychiatric contacts. Inmates and staff also complained of long pill lines, resulting in increased medication non-compliance. The institution had agreed to charter a QIT to study this issue, including the implementation of DOT procedures during pill lines.

The provision of HS medications was a continuing problem. Only seven inmates were prescribed HS medications during the entire monitoring period, quite a low number given the large caseload population of some 1,500 inmates. Resistance by MTAs to psychiatrists' prescriptions of HS medications reportedly was a significant part of the problem.

Keyhea orders were sought for seven inmates during the monitoring period, but all seven were transferred prior to completion of the Keyhea hearing process. No inmate with a Keyhea order was at PVSP at the time of the monitoring visit.

Mental Health Assessments for the Disciplinary Process:

The RVR tracking log improved during the monitoring period. The log recorded the dates that mental health assessments were requested and completed. The log still did not include the name of the clinician assigned to prepare the assessment nor did it record the hearing officer's consideration of the assessment.

From October 2004 to August 2005, 97 mental health assessments were completed for 97 inmates involved in disciplinary proceedings, including 81 3CMS inmates, 13 EOP inmates and three general population inmates; the institution did not provide the overall total of RVRs written on all MHSDS inmates. The institution undertook to address problems, noted during the preceding monitoring round, with the issuing of RVRs for self-mutilation, suicidal gestures and medication non-compliance.

Mental health input was beginning to show an impact on the outcome of disciplinary proceedings. A QIT examined 32 of the 97 mental health assessments completed during the monitoring period and found that mental health input was considered by hearing officers in just over half of the cases. Charges were reduced or dismissed in some of those cases.

It was unclear whether PVSP had an agreement with the district attorney's office for the referral of inmates' RVRs. Moreover, the institution did not provide the monitor with referral data in a useful format that permitted the tracking of the status and timeliness of referrals.

Transfers:

Transfers to higher levels of care were generally made in a timely manner. During the monitoring period, 59 inmates were transferred to EOP programs, 48 of whom were transferred in compliance with the 60-day time line. Of the remaining 11 inmates, eight were transferred to a Level IV SNY with EOP housing, available only at MCSP. The average delay involved in these reportedly difficult transfers was three and a quarter months. At least two inmates transferred to an EOP general population or administrative segregation programs were returned to PVSP after their level of care was reduced to 3CMS.

Transfers to DMH slowed somewhat during the monitoring period, but most transfers were made in a timely manner. Fifteen referrals were made to DMH during the monitoring period. Transfers took between three and 85 days with an average of 23 days elapsing between the referral and actual transfer, compared with an average of 10.8 days during the preceding monitoring period.

Video monitoring was used to observe inmates transferred to the MHCB unit on suicide watch. Six MHCB cells were equipped with video cameras. A correctional officer stationed in a cubicle within the MHCB dayroom could monitor all six cells on three screens. All suicide watches were conducted by video monitoring; no correctional officer was stationed in front of inmates' cells for suicide watches. The physical observation of inmates on suicide precautions was not conducted by video monitoring, but by nursing staff, who checked inmates every 15 minutes. A notebook in the officer's station contained post orders as well as descriptions of the suicide prevention program and the operation of the video equipment.

Other CAP Issues:

    a.  Partial Compliance

    The timeliness of clinical intake assessments improved, but was still a problem in some cases. Institutional data indicated that, during the nine months preceding the monitor's visit, 76 percent of assessments were completed within seven days as required. The number of timely assessments rose to 91 percent during the three months just prior to the monitoring visit.

    PVSP implemented an updated heat plan in January 2005. The monitor reviewed the temperature logs for seven housing units and the monthly summary reports for the period from June through August 2005 and found no record of any day with temperatures above 90 degrees. Lists of inmates on heat-sensitive medications were distributed daily to the housing units.

    PVSP conducted CPR training for its employees during September and October 2005; additional training was planned. The monitor's spot check of this issue found that all but one untrained correctional officer had a mouth shield.

Institutional Summary:

    PVSP had a number of mental health vacancies, particularly among psychiatric staff, but managed to cover vacancies with contracted staff. Vacancy problems were compounded by the rising caseload population and the recent activation of a Level IV SNY within the institution.

    With respect to the four areas of focus in the monitoring round, quality assurance at PVSP was on track and most medication management problems had been corrected, except for HS medications and the timeliness of follow-up to medication non-

compliance.  Transfers to higher levels of care generally occurred in a timely fashion, although EOP inmates in need of placement in a SNY encountered some delays.  The RVR tacking log improved, but some items of information were still missing.  Mental health input was not consistently considered by hearing officers, although some hearing officers were taking assessments into account in reaching their dispositions.

PVSP had resolved all but one CAP issue, the timeliness of clinical intake assessments, which showed some slight improvement.  In addition, there was some concern because a few inmates transferred to EOP programs elsewhere were returned to PVSP at a lower level of care.  Overall, PVSP was in compliance with its CAP and the requirements of the program guides.

### Avenal State Prison (ASP)
October 3, 2005 – October 5, 2005

The MHSDS at ASP was in a state of crisis.  Despite the many deficiencies noted in the monitor's previous reports, CDCR increased the institution's caseload capacity from 899 to 1099 inmates and opened a large sensitive needs yard (SNY) at the facility. These changes, combined with ASP's historical staffing difficulties, impacted adversely on the institution's already faltering mental health program.

Psychiatric staffing continued to be a serious problem at ASP.  Although ASP was allocated additional mental health positions to staff its increased MHSDS population, the institution was unable to recruit any permanent psychiatrists during the monitoring period.  As a result, all 3.5 of ASP's psychiatric positions were vacant.  In addition, positions for six psychologists, a psych tech, a half-time psych nurse and 1.5 officer techs were vacant.  The institution's remote location remained a significant obstacle to the recruitment and retention of clinical staff that was compounded by a lack

of office space and support services needed to attract qualified clinicians. These

problems were recently exacerbated by the opening of DMH's Coalinga State Hospital

nearby which offered clinical prospects higher salaries and considerably better working

conditions. Even with these advantages, DMH was having a difficult time recruiting

clinicians for its Coalinga facility.

Three part-time contract clinicians covered anywhere from one to 2.2 of

the vacant psychiatrist positions per month. ASP also utilized some telemedicine but not

nearly enough to cover the mental health needs of the institution, even in combination

with contracted services. Moreover, one contract psychiatrist, who regularly worked the

equivalent of a quarter-time position, was expected to leave ASP at the end of October,

reducing psychiatric coverage even further. Contract clinicians covered 2.5 of the six

unfilled psychologist positions.

Quality Management:

ASP continued to struggle with the development of an effective quality

assurance process. The mental health quality management subcommittee was scheduled

to meet twice monthly, but the institution acknowledged that several meetings were

cancelled or rescheduled. Minutes for meetings were sometimes incomplete or

unavailable. A review of the existing minutes indicated that psychiatrists rarely attended

meetings, while representatives from other disciplines often failed to participate because

of scheduling conflicts.

The institution failed to develop important subcommittees, such as a

suicide prevention committee, and did not charter much needed QITs during the

monitoring period. Staff reported that several subcommittees and QITs met, but no

documentation of these meetings was available. Reference to a QIT progress report on the use of C-files at IDTT meetings indicated that the team's business was conducted solely by telephone. Although the institution indicated its intent to revitalize the QIT process, attendance expanding staffing deficiencies consistently prevented effective participation by key staff members.

ASP had not yet developed accurate tools for measuring its compliance with most CAP and program guide requirements. The few audits conducted during the monitoring period were methodologically flawed. The institutional MHTS was unreliable and could not generate sufficient data regularly to assess the institution's performance. Instead, ASP reportedly relied largely on chart reviews to determine the degree of its compliance in many categories. Yet, only 80 chart reviews were completed during the entire monitoring period, despite a caseload of more than 1,100 inmates, and many of the charts selected were irrelevant to the specific issues under review, meaning that most of the institution's audits were based on small and unrepresentative samples. No peer review was underway at ASP.

Medication Management:

Continuity of medication remained problematic for inmates on arrival and changes in intra-institutional housing. The institution's status report, while not entirely reliable, indicated that only 62 percent of inmates received their medication within 24 hours of their arrival at the facility during the last three months of 2005. Although medication continuity for inmates moved elsewhere within the institution was an ongoing problem, no audit of the issue was conducted during the monitoring period.

Continuity of medication at renewal worsened. There were problems with medications expiring, and some medications were renewed without clinical contacts. In a September 29, 2005 memorandum, the acting chief medical officer indicated his intent to refill medication orders without personally evaluating inmates, an admittedly sub-optimal practice, in order to avoid medication expirations. At the time of the monitoring visit, psych techs and MTAs reportedly were writing medication orders for physicians' signatures, again to avoid lapses on renewal.

Follow-up to medication non-compliance was poor. According to the institution's status report, no process was in place for dealing with medication non-compliant inmates. Pursuant to a written nursing policy, the number of referrals for non-compliance or medication refusals reportedly increased, but the institution indicated that it lacked sufficient psychiatric staff to address repeated instances of non-compliance in a timely manner.

The institution did not know whether inmates in administrative segregation received their medications after prescription changes because no QIT or methodologically sound audit of the issue was conducted.

No inmates in ASP were on a Keyhea order at the time of the monitor's visit, although the monitor's expert encountered inmates during the visit for whom involuntary medication seemed clinically indicated. No adequate audit of the issue had been conducted.

The institution did not provide inmates with HS medications.

Problems were noted with respect to obtaining informed medication consent forms, monitoring and documenting the review of MARs and addressing medication errors.

Mental Health Assessments for the Disciplinary Process:

The mental health assessment log had been improved by including information on inmates' level of care, but the log still did not record the outcome of hearings involving mental health assessments. The institution indicated the missing information on outcomes would be added.

During the preceding monitoring period, the institution's mental health assessment records were so disorganized that ASP was unable to determine whether any assessments had been completed for caseload inmates involved in disciplinary proceedings. By contrast, for the period from December 1, 2004 to September 14 2005, the institution was able to report that "approximately" 486 RVRs were issued to caseload inmates and 25 mental health assessments were completed.

The monitor reviewed ten of the RVRs for which mental health assessments were completed and concluded that hearing officers did not consistently address mental health input in their findings or always consider the assessments in their dispositions. Pursuant to institutional policy, hearing officers usually listed the evidence, including mental health assessments, presented at the hearings. In one case where the inmate was mistakenly identified as a non-caseload inmate, the hearing officer recognized that the inmate was in the EOP program and ordered a rehearing, during which the inmate was found guilty but no forfeiture of credit was assessed.

ASP had an agreement with the district attorney's office, establishing guidelines for the referral of criminal complaints. From January through September 2005, ASP referred a total of 48 cases, of which 17 were accepted for prosecution, 20 were declined and 11 were pending at the time of the monitor's visit. The institution, however, kept no data on how many or which of these referrals involved MHSDS caseload inmates.

Transfers:

MHCB transfers remained problematic. The increased caseload population, including those with sensitive needs, gave rise to an increased number of cases requiring crisis intervention. Inmates referred to MHCB units elsewhere were not always accepted in a timely manner because the availability of beds in the department's MHCB units was often untimely. As a result, ASP resumed once again and inappropriately the use of its OHU as a MHCB unit for extended periods. The monitor also found instances of inmates admitted to the OHU multiple times without being referred to a higher level of care.

Six single cells in the OHU, three of them in the general population area of the unit and three in the administrative segregation section of the OHU, were equipped to allow video monitoring of inmates on suicide watch or suicide precautions. Each cell had two cameras monitored by a correctional officer located behind a gate in the administrative segregation area of the OHU. The correctional officer was able to switch the monitor from room to room or observe up to six rooms simultaneously. A second video monitor was located in the nursing station within the OHU, but no staff member there was assigned specific monitoring duties; clinicians there might observe the monitor, controlled by the

192

correctional officer in the administrative segregation area of the unit, from time to time.  The monitoring of inmates on suicide watch was conducted entirely by video; no correctional officers were posted outside suicide-watch cells for one-on-one observation.  Similarly, 15-minute checks for inmates on suicide precautions were conducted by video only and documented by the officer watching the video monitor.

   Transfers to EOP were sometimes untimely.  According to the institution, although 80 percent of EOP inmates were transferred within 60 days during the period from January 1 through August 15, 2005, ten inmates remained in ASP longer than the specified timeframe.  No expedited transfers within 30 days occurred during the same period.  The lack of EOP beds throughout the state was cited as the principle barrier to more consistently timely transfers.  While awaiting transfer, all inmates in ASP referred to an EOP level of care were housed in the OHU, violating policy on the role of OHUs and filling beds needed by other inmates.

   ASP no longer referred or transferred inmates to DMH programs.  No transfers to any DMH program had occurred for more than two years.  That development, at least in theory, was not necessarily alarming.  In theory, inmates in need of crisis care would be transferred within 24 hours to a MHCB unit elsewhere, where a subsequent transfer to a DMH level of care, if needed, would be effected, while inmates in need of a higher level of care than currently available in ASP, which theoretically housed only inmates needing a 3CMS level of care, would be transferred within 30 or 60 days to another institution with an EOP.  The greatly expanded caseload in the facility, the recent establishment of a SNY and more limited and frequently untimely access to MHCB units and EOP programs elsewhere, all combined effectively to torpedo this theoretical

organizational structure for levels of care. Not surprisingly, the monitor's experts found in interviews and chart reviews of 3CMS inmates at ASP, numerous examples of inmates in need of higher levels of care, including DMH programs.

Other CAP Issues:

a. Partial Compliance

ASP continued to have difficulty providing all inmates with timely initial mental health assessments. The percentage of timely assessments declined over the preceding two monitoring periods from 92 to 84 percent. The large influx of SNY inmates during the current monitoring period, coupled with clinical staffing shortages, restricted further the institution's ability to complete the required assessments within specified timeframes. The exact degree of non-compliance was unclear because the institutional audit on this issue was methodologically unsound.

No new data was available on the timeliness of initial treatment plans, an unresolved CAP item that experienced some slippage during the preceding monitoring period. The institution did not audit this issue during the monitoring period.

The monitor's review of MHTS inmate histories during the preceding monitoring period showed an improvement in the frequency of case management contacts with EOP inmates. The institution did not, however, provide a reliable audit confirming continuing compliance on this issue during the monitoring period.

b. Non-Compliance

Psychiatric participation in treatment planning remained poor; psychiatrists still did not participate regularly in IDTT meetings. The institution had yet to conduct an audit regarding the attendance of correctional counselors at IDTT meetings.

IDTT meetings were no longer conducted regularly for inmates in the OHU, nor were treatment plans consistently prepared for this population. This issue, resolved in an earlier monitoring round, emerged again due to the shortage of psychiatric staffing.

Timely psychiatric contacts for arriving inmates, another issue previously resolved, also suffered from staffing shortages. According to the institution, the large number of SNY arrivals made it impossible for the institution's limited contingent of contract psychiatrists to meet program guide requirements in this area.

Little group therapy was provided to 3CMS inmates. The influx of SNY inmates and other housing changes forced the cancellation of three operating groups prior to their completion. According to the status report, the institution ran just three 3CMS groups as of mid-September 2005.

Psychiatric staffing shortages also impacted on the institution's ability to identify decompensating inmates in administrative segregation, another issue previously resolved. The institution failed to conduct any reliable audit of this issue.

The MHTS remained, according to staff, unreliable. The institution still had not audited the rate of concordance between UHRs and data in the MHTS.

Other Issues:

In a memorandum from the warden, dated September 13, 2005, ASP announced the immediate implementation of the department's CPR policy. Pursuant to the policy, several CPR training classes were conducted. All custody officers were issued CPR mouth shields, and cut-down kits reportedly were placed in all housing units.

ASP undertook to implement the department's sexual misconduct policy

during the monitoring period. Documents showed that training was conducted from June

through September 2005, and the institution certified that all staff had been trained in the

new policy. IDTT meetings for four or five sexual misconduct cases were conducted,

and the inmates were identified as exhibitionists. A clinician was assigned to complete a

comprehensive evaluation of these inmates, but the institution indicated that it lacked

clinicians sufficiently experienced to provide treatment following a positive evaluation.

Institutional Summary:

      ASP's mental health program continued to decline. Little was accomplished

to improve already identified deficiencies; areas of earlier progress remained stalled; and

some previously resolved issues again became problematic. Many of institution's

problems stemmed from population increases combined with severe staffing shortages,

particularly among psychiatrists. No new CAP issues were resolved during the monitoring

period.

      Among issues of focus, quality assurance stagnated and the institution's

capacity for auditing its performance waned further. As a result, little data was available to

assess compliance in unresolved areas or confirm continuing compliance with program

guide requirements already met. Medication management suffered significantly as a result

of inadequate psychiatric staffing. Continuity of medication and medication renewals,

follow-up to medication non-compliance, provision of HS medications, utilization of the

Keyhea process, the acquisition of informed medication consent forms and the monitoring

of MARs were all deficient.

      The preceding compliance report recommended that the defendants be

required to undertake emergency measures to address the crippling shortage of

psychiatrists in ASP. Plans for delivering these emergency responses are still winding

their way through the bureaucratic labyrinth and offer little prospect for remedying ASP's

staffing woes until deep into 2006, if then. It may be time for the defendants to place

ASP in the same category with its desert institutions and reduce drastically its MHSDS

caseload in this remote facility.

### Service Area F

Service Area F includes <u>Salinas Valley State Prison (SVSP)</u> and the

<u>California Training Facility (CTF).</u>

### Salinas Valley State Prison (SVSP)
August 8- August 9, 2005
November 1- November 4, 2005
January 17- January 18, 2006

During the monitoring period, the vacancy rate among permanent mental

health staff at SVSP remained relatively constant at roughly 40 percent. The long-vacant

chief psychiatrist position was filled, as were two senior psychologist positions and the

position of chief psychologist. Of eight staff psychiatrist positions, 6.5 were vacant. The

institution did a commendable job of procuring contract staff to cover vacancies in all

disciplines. Contractors filled the equivalent of 4.5 staff psychiatrist vacancies.

Similarly, a combination of contractors and interns covered nearly all of six vacant

psychologist positions; contract psych social workers covered both psych social worker

vacancies; contract psych techs filled all but two vacant psych tech positions; and two

licensed vocational nurses covered nearly all of 2.5 recreational therapist vacancies. All

six allocated office tech positions were filled, but one was diverted to the medical

department.

SVSP requested ten additional case manager positions early in 2005. Administrators reported that six case manager positions were diverted to SVSP from other institutions, and four clinicians were identified who wanted lateral transfers. In August, central office instructed SVSP to hire contractors to cover the positions while the necessary paperwork was completed. Roughly one month later, the transfer process was halted. Administrators and staff continued to insist that too few case manager positions had been provided.

Auxiliary staffing improved. The vacancy rate among MTA positions dropped from 75 to 48 percent. Thirteen of 25 allocated MTA positions were filled, while all 12 vacant positions were covered by contractors. Both senior MTA positions were filled. The institution's allocation of RNs was increased by 10.5 positions to 35.1, but only 13 positions were filled, leaving 28.1 vacancies. The equivalent of 26 positions was covered by contractors, effectively reducing the vacancy rate to five percent. Both senior RN positions and a public health nurse position were filled.

One in three inmates at SVSP was on the mental health caseload in January 2006. The size of the 3CMS caseload grew from 1,044 in April 2005 to 1,183 in January 2006. The EOP had 230 participants, with 41 of them in administrative segregation. In January, 139 3CMS inmates were housed in administrative segregation. Due to the conversion of a second yard at the facility into a sensitive needs yard (SNY), the number of inmates with sensitive custody needs treated at the 3CMS level of care at SVSP nearly doubled to 741 in January. In addition, two housing units previously used for administrative segregation were emptied because they were needed for use by DMH for an inpatient intermediate care program.

Access to treatment was a problem. A 25-percent vacancy rate among custody staff during most of the monitoring period and the conversion of the second yard to SNY status required a substantial realignment of daily operations in the institution and directly affected access to mental health treatment. The vacancy rate among correctional officers was reduced to 4.9 percent by January, but 61 correctional officers were expected to be redeployed to KVSP in February for a limited 60-day period. One result was that, due to a lack of custody escort officers, group treatment for 3CMS inmates was rarely held anywhere in the institution, and many hours of treatment were lost in the EOP due to disrupted daily routines. Finally, staff predicted that the planned May 2006 closure of the general population EOP would be accompanied by resignations, leaves and transfers among clinicians.

Conversion of the second SNY generated a large influx of caseload inmates within a short period of time and eliminated all but one general population yard, driving up the number of inmates needing to be transferred elsewhere. The only remaining non-SNY yard at SVSP was described by staff as one of the toughest yards in all of CDCR. This meant that any inmate experiencing a problem in that yard had to wait months in administrative segregation for a transfer to another institution or to be reclassified as SNY to gain access to a different SVSP yard.

Typically at SVSP and elsewhere in CDCR, such problems were handled by moving inmates between intra-institutional yards. Since that was no longer an option at SVSP, a transitional unit was established to permit routine programming while the necessary paperwork for transfers was processed. Half of the inmates in the transitional unit were caseload inmates. Some had only recently been released from an EOP level of

care only to find that they could no longer program in a general population yard at SVSP. Moreover, access to programming and treatment in the transitional unit was no better than in administrative segregation; even the dayroom was unavailable. Although conditions were nearly as restrictive as those in an administrative segregation unit, these newly downgraded 3CMS caseload inmates were scheduled to be seen only quarterly by case managers, rather than weekly. Scheduling conflicts, physical space limitations and *ad hoc* cancellations attributed to staff shortages or diversions undermined the purpose of the unit.

Issues Resolved:

> HS medications were ordered and administered after 8 p.m.
>
> IDTT meetings were held in a timely manner for 3CMS inmates housed in the general population.
>
> Individualized treatment plans were written for caseload inmates in administrative segregation.
>
> MHTS accurately tracked 3CMS case manager contacts.

Quality Management:

Quality management functioned well in many respects, driving the development of healthcare delivery procedures and providing an additional supervisory tool. A large number of useful audits were conducted on a regular basis, the results of which were communicated to staff. The healthcare quality management committee continued to meet weekly, as did its subcommittee for mental health quality management. The mental health quality management committee provided weekly reports to the healthcare quality management committee. For the first time, the capacity of the institution's MHTS to track referrals was used systematically, although it was not yet