fully employed.  In its early use, the system was able to capture data on a subset of referrals, but not all referrals.

QITs chartered by the mental health quality management committee generally focused on CAP items but did not always function as intended.  QIT charters did not contain all of the elements specified in quality assurance protocols used by the department.  Methodology, aggregation of data, analyses and proposed remedies were often absent.  Monthly chart reviews were conducted, and results were forwarded to DCHCS.

After a programming error was corrected in late 2005, the MHTS proved more useful to QITs and supervisors who audited program indicators weekly.  The results of quality assurance and supervisory audits were communicated to mental health staff individually and during staff meetings.  Supervisors found the quality assurance mechanism helpful in identifying problems as they arose.  Psychologists and social workers engaged in peer review, and psychologists also held case conferences and trained interns.  Reports of peer review activities were forwarded to the institution's clinical performance enhancement and review committee.  Psychiatrists did not meet as a group for peer review because there was only one staff psychiatrist in the institution, plus the chief psychiatrist.

Medication Management:

Medication management continued to improve.  The presence of more MTAs and RNs made an impact, as did the institution's ability to procure contract psychiatrists.  Improvements in tracking and auditing made during the preceding monitoring period resulted in more timely administration of medication.  An August audit

found that 96 percent of newly arrived inmates received their medications without interruptions, while continuity following intra-institutional transfers reached 100 percent. Other audits conducted across a broader stretch of time found more modest gains. The latter indicated that from 15 to 26 percent of inmates arriving with current medication orders from another CDCR prison experienced an initial gap in excess of 24 hours. For inmates moving between locations within the prison, gaps longer than 24 hours occurred 12 to 30 percent of the time, although continuity of medication for inmates discharged from the MHCB improved. Institutional audits found that medication continuity for those inmates was sustained at 90 to 100 percent from May through August. Problems with the processing of medication orders were apparent in institutional audit results that showed 13 to 28 percent of orders for changes in medication took longer than 24 hours to fill.

There were problems particularly with the renewal of medication orders. Some 27 percent of medication orders lapsed inadvertently on the yard with the worst performance in renewing expiring medication orders. Institutional audits found that approximately 20 percent of orders for psychotropic medication were renewed without patient contact. In a move endorsed by DCHCS, SVSP staff for a time were authorized to write psychotropic medication orders for as long as 180 days. An institutional audit found that 25 to 30 percent of changes in a medication regimen were not explained by a documented rationale.

Late in the monitoring period, an innovative method was adopted for notifying mental health staff of changes in the location of caseload inmates. Staff

reported that the new method immediately resulted in improved medication continuity and more timely case management contacts for inmates transferred within the facility.

Referrals for non-compliance were made and noted on MARs. Mental health staff received referrals and usually made contact with inmates. No audits were conducted to determine whether all non-compliant inmates were actually referred to mental health.

The institution did not maintain a list of inmates on DOT medications. Reportedly, DOT was the practice for the delivery of psychotropic medications to all general population EOP inmates. Staff reported that DOT and nurse-administered procedures were observed periodically by supervisors. Supervisors also audited MARs weekly. Administrators reported that medication errors were tracked, but apparently no mechanism existed for following up on reported errors.

MARs were filed more often in inmates' UHRs. MARs contained patterns of blanks; some were illegible. No-shows and refusals were noted on MARs. The old MAR form remained in use, a practice attributed to limitations in the pharmacy. SVSP revised and improved its informed medication consent form. An institutional audit found informed medication consent forms missing for approximately 30 percent of reviewed medication orders.

Beginning in April 2005, SVSP maintained a log of inmates with current medication orders who left on parole. The log reflected receipt and refusal of discharge medications. The completeness of the list of paroling inmates was assumed but had not been audited.

Compliance with requirements for laboratory blood-work remained poor. Tracking records for Keyhea orders improved, but the process itself was flawed. Thirty-six inmates had current Keyhea orders, but the absence of a DOT list meant that inmates at a 3CMS level of care with a Keyhea order could easily be missed by personnel distributing medications. Two Keyhea petitions, moreover, lapsed during the monitoring period because the coordinator overlooked them. A single psychiatrist based in the MHCB unit provided all Keyhea-related testimony. His decisions and testimony were in some cases contrary to that of the treatment team, reportedly because he relied heavily on subjective information rather than a review of records and the treatment team's findings and treatment approaches.

Mental Health Assessments for the Disciplinary Process:

SVSP continued to compile logs and gather necessary information on RVRs written for caseload inmates. While some improvements occurred, significant omissions in documentation and practice remained. Roughly 2,500 RVRs were issued during the first nine months of 2005. Approximately 1,839 were issued between January 1 and June 30, with caseload inmates incurring 493, or 26.8 percent, of the violations. Mental health assessments were requested in 155 of these cases. Although the distribution between 3CMS and EOP inmates among the assessments completed was not tracked, the data suggested that 3CMS inmates were being referred for mental health assessments more often than in the past. In a subset of RVRs for August and September, 446 RVRs were issued, 200 of which involved caseload inmates. EOP and MHCB inmates accounted for 75 of the 200 RVRs, while 125 were issued to 3CMS inmates. Mental health assessments were requested in 15 of the 125 RVRs (12 percent) for 3CMS

inmates. In four cases involving EOP inmates, the monitor found that the adjudication process was completed without the absence of an assessment being noted.

Mental health assessments were not always completed in a timely manner. Most assessments provided relevant information in understandable lay language. Mental health factors were found to be influential in fewer than half of the assessed cases. Most assessments offered information about or recommendations for the sanctions that might be imposed and sometimes discussed the likely effect of different sanctions on the inmate. The monitor's review of a sample of ten RVRs found that the hearing officer documented the presence of a mental health assessment but did not describe its impact on the disposition in two cases.

SVSP encouraged staff to refer all caseload inmates charged with sexual misconduct for a mental health assessment. During the first six months of 2005, 41 RVRs were issued for sexual misconduct. Eighteen were issued in the D-Yard, where all EOP inmates and caseload inmates in administrative segregation were housed. In all but four cases, mental health assessments were requested. The institution implemented its directives on the handling of inmate sexual misconduct in the middle of July but did not then begin to compile information on completed mental health screenings. Staff reported that all cases were screened, but none was found to warrant further examination. The monitor's review of five cases of indecent exposure found that the inmates in four were screened, although two of the screenings did not occur within 72 hours of the incident. In August or September, the institution reissued and reheard an RVR for indecent exposure because a mental health assessment had not been requested.

SVSP referred 76 cases involving caseload inmates to the local DA during the first six months of 2005. Sixty of the cases involved 3CMS inmates; sixteen, EOP inmates. Over half of the cases (37) involved sexual misconduct. The overall number of DA referrals, as well as the number of referred sexual misconduct offenses, was among the highest out of any CDCR institution.

Transfers:

MHCB records were well organized and fairly complete. The institution maintained three computerized logs of preadmission evaluations, admissions, length of stays and dispositions, plus a manual nursing log of admissions and discharges. Minor discrepancies occurred among the records, but together they portrayed a consistent overall picture of operations in the MHCB. The CTC at SVSP had 24 licensed beds, half of which were allocated for the MHCB unit. In November 2005, staff reported that up to 14 beds were available for MHCB inmates. By January 2006, the MHCB capacity was reduced to 12, reportedly because two beds needed to be reserved for the observation of inmates discharged from safety cells, although one would assume that more often than not these inmates were also on the MHSDS caseload.

According to one log, 290 inmates were admitted to the MHCB unit between April 1 and November 5, 2005. The length of stays ranged from one to 30 days. Roughly 25 percent of stays lasted ten days or longer. Eight inmates had three or more admissions each. During this seven-month period, 139 bed-days were lost because inmates, who no longer clinically needed of a crisis bed, were not moved elsewhere promptly.

Despite repeated clarifications, misconceptions among both clinical and

custody staff in the MHCB unit led to some troubling practices, including the use of in-floor toilets and the failure to provide mattresses and safety smocks or blankets to inmates in CTC safety cells. An erroneous assumption existed that once an inmate was housed in a safety cell, he had to remain there for 72 hours. Inmates reportedly attended IDTT meetings dressed only in undergarments.

Staff reported that eight cells in the mental health portion of the CTC were equipped with video-monitoring cameras. Two other cells directly across from the nursing station also had cameras. The cameras reportedly had been installed in diagonally opposite corners to avoid blind spots. Staff asserted that video monitoring was used only to supplement one-to-one human observation during suicide watches. SVSP was also considering installing cameras in its two safety cells.

During the monitoring period, over 150 inmates clinically referred to a MHCB were not admitted to the MHCB unit because of a lack of available beds. The institution used several alternatives to house these inmates for whom no MHCBs were available. A combination of four holding cells and waiting rooms located in the CTC were used first. When these were occupied or otherwise unavailable, inmates were placed outside of the CTC in BPT interview rooms. There were two BPT interview rooms on each yard for a total of eight. The next alternative was "dry" holding cells located in a visiting area on each yard, which lacked toilets or running water. As a last resort, inmates were placed in one of three holding cells located next to the CTC. Those holding cells, known among inmates and staff as "cages," were two-square-foot mesh enclosures without a seat. Logs indicated that these cells were rarely used for inmates awaiting a MHCB bed, and institutional policy limited their use to four-hour stretches.

Also, bag lunches, rather than hot food, were provided to inmates in these alternative locations awaiting a crisis bed.

The staff compiled a record of the use of the alternative housing locations throughout the institution. During a five-month period spanning August 10, 2005 through January 12, 2006, the alternatives were used to house 153 referrals to an unavailable MHCB. The log did not record time of day of each placement, and the length of stays was measured simply by dates. About half of the admissions to the alternatives, 74, were for one day or less. Fifty admissions spanned two days; 20 spanned three to five days; one was eight days in duration. Staff reported that inmates who never reached a crisis bed were followed-up as if they had been admitted to the MHCB. Suicide risk assessment checklists were completed. Five-day follow-up was done as clinically warranted.

Access to DMH acute care was adequate. During the period from July 1 to October 31, 2005, the institution generated 16 referrals to the APP/DMH at CMF. All referrals were accepted and resulted in transfers. In August, DMH reportedly stopped informing the institution promptly of decisions to accept referrals. Instead, decisions on acceptance were communicated to the institution only when beds became available. Consequently, the referral log did not record different dates for acceptance and the assignment of a bed number. According to the log, the average delay between referral and transfer was 7.3 days. All but one of the transfers were completed within 72 hours of the simultaneous acceptance and receipt of a bed number. In eight of the 16 cases referred cases, SVSP clinicians waited longer than ten days to refer the inmate for DMH acute care.

Access to the DMH intermediate inpatient care program in SVSP, the SVPP, continued to be slow in most cases. After identifying the need for intermediate care, it took, on average, four months to effect the transfer of an inmate to the program. During the monitoring period, the institution generated 26 referrals to SVPP. Thirteen were accepted and resulted in transfer. Staff took more than a month, 35 days on average, to prepare and submit SVPP referrals. The average lapse between referral and transfer was 82 days, ranging from eight to 176 days.

MHCB staff reported that the institution was not always apprised of inmates returning from APP/DMH. Discharge summaries were not always received via fax by the contact person at SVSP in advance of an inmate's return. UHRs belonging to inmates discharged from DMH/APP usually contained discharge summaries.

In January 2006, several MHCB beds were occupied by inmates awaiting admission to the SVPP. Staff also reported that several inmates discharged from the SVPP were awaiting their return to SVSP. A planned exchange had not yet taken place. The result was the utter misuse of SVPP beds and SVSP MHCBs.

Other CAP Issues:

a. Partial Compliance

Tracking of referrals by staff and inmates improved as a pilot program involving a better method for tracking referrals was implemented. Distinctions between routine and urgent referrals were not yet tracked accurately by MHTS, nor had the referral mechanism matured sufficiently to capture all referrals.

Treatment plans were usually updated annually for 3CMS inmates housed in the general population. IDTT meetings held there were attended regularly by a full

team. Due to staffing shortages, meetings were attended by a psychiatrist, but only rarely by the treating psychiatrist for the inmate being reviewed. Medical records and C-files typically were present. Full compliance was not achieved because one case manager's annual reviews were untimely.

Case managers did not meet with caseload inmates in administrative segregation weekly or as often as clinically warranted due largely to clinical staffing shortages. Caseloads sizes for clinicians in administrative segregation ranged from 35 to 52 for both the EOP and 3CMS levels of care, despite court, program guide and departmental policy requirements limiting EOP administrative segregation caseloads to nine inmates. Progress notes indicated that case managers were familiar with inmates on their caseloads. Severely ill inmates in administrative segregation were identified and referred for more intensive treatment when warranted. Documentation of psych tech rounds was not filed in UHRs for a period of time. Once discovered, the omission was remedied. IDTT meetings held for caseload inmates housed in administrative segregation were inconsistent with program guide requirements and did not precede ICC meetings. The initial IDTT meeting was not attended by a full team, nor was there sufficient time before the initial IDTT to develop an individualized formulation of treatment needs and plans. The staff's reasonable solution to the problem included an initial truncated IDTT held in advance of the ICC meeting followed within two weeks by a meeting attended by a full team. Treatment plans were individualized. The holding cells used for EOP treatment sessions in administrative segregation were problematic. The arrangement of the cells, the physical characteristics of some cells, poor sightlines, glare and high levels of ambient noise undermined groups that relied on videos and discussion. Inmates who

attended group treatment did not wear outer garments, while those participating in ICC hearings and IDTT meetings or going out to yard wore outer garments borrowed from a common stockpile.

The amount of treatment delivered in the general population EOP declined. Mental health staff compiled detailed information on missed mental health contacts and their causes. As many as 30 percent of EOP inmates were not seen weekly in July and August 2005. In May, June and September only eight, 13, and 11 percent, respectively, of weekly individual appointments with EOP inmates were missed.

b. Non-Compliance

Ten hours of structured therapeutic activities were not provided weekly to participants in the general population EOP. Programming was too frequently cancelled by irregular institutional routines and shortages of clinicians. The amount of group treatment provided to 3CMS inmates was also inadequate. Due to lockdowns, rolling lockdowns, modified program days and cancellations, few group sessions actually met. Weekly case manager contacts were not made with 3CMS inmates housed in administrative segregation.

Psychiatric coverage was erratic as psychiatrists were deployed throughout the institution to meet the most pressing demands of the day. Inmates regularly were seen by different psychiatrists. The quality of psychiatric input in IDTT meetings was compromised accordingly, as was continuity of care. Inmates reported that changes in medication at times seemed arbitrary.

Inmates in administrative segregation who needed more intensive treatment or higher levels of care were identified and transferred, albeit sometimes slowly, but clinical contacts with caseload inmates in administrative segregation were often untimely and the provision of structured therapeutic activities for EOP administrative segregation inmates was inadequate.

The immediate challenge for SVSP was to sustain routine institutional operations while bringing in enough clinical staff to recover lost ground. Some problems were clearly within SVSP's capacity to resolve quickly, such as providing basic necessities like mattresses and a blanket or sheet to MHCB inmates on suicide watch and proper clothing to caseload inmates in administrative segregation. Many others were related to the revisions occurring in the institution's mission within a rapidly changing CDCR.

## California Training Facility, Soledad (CTF)
Paper Review

Positions for a psychologist and two psych techs were vacant but were amply covered by case manager contractors. A few auxiliary staff positions were vacant, specifically one pharmacy position and one medical records position. In addition, one pharmacy employee was on leave. Contractors covered 1.5 of the vacant pharmacy positions.

CTF's clinical staff had been stable for some time, but one personnel change during the monitoring period diminished at least temporarily the institution's auditing abilities. The staff psychologist responsible for conducting CTF's audits over the past three years retired in May 2005. After his departure, responsibility for quality assurance process was shared between a newly hired psychologist and a psych tech, but

214

the psych tech was expected shortly to transfer elsewhere and the psychologist wanted to return to clinical work on a part-time basis. The institution was, therefore, again looking for someone to coordinate its quality assurance process.

Issues Resolved:

> EOP inmates received weekly case management contacts.
>
> Signed informed medication consent forms were consistently obtained from inmates and filed in UHRs.
>
> Psychiatrists no longer renewed medication orders without inmate contact.
>
> Inmates received good psychiatric follow-up after medications were initiated or changed.
>
> Clinicians were aware of and responded to medication side effects.
>
> Medications generally were not changed without a rationale.
>
> Psychiatric responses to referrals were timely.
>
> IDTT meetings were consistently held before discharging inmates from the OHU.

Quality Management:

The quality assurance process at CTF deteriorated during the latter half of the monitoring period after the institution's long-time compliance coordinator retired, as noted above. Auditing of most CAP items ceased, and the institution was unable to confirm compliance with many medication management practices. The institution was seeking a permanent replacement but, in the interim, quality assurance efforts at CTF struggled.

The suicide prevention committee met monthly from March through October 2005, and minutes of the meetings were maintained. The composition of the committee was good, and discussions typically usually included a review of suicide

attempts, suicide precautions and suicide watches that occurred in the institution. The minutes, however, did not provide a complete record of suicide attempts.

Medication Management:

Problems with medication continuity on arrival were considered resolved in the preceding monitoring report, but compliance recently declined. An institutional audit of 185 charts of inmates arriving at CTF with valid orders for psychotropic medications found that only 71 percent received their prescribed medications in a timely manner. Medication continuity for inmates changing housing locations was not a problem at CTF because all inmates, regardless of their housing unit, received their medications at one of two adjacent indoor pill windows. No information was provided with respect to continuity of medication on the renewal of medication orders, although audits conducted during the preceding monitoring round showed timely medication renewals.

A QIT was chartered to address problems noted during the preceding monitoring period with medication non-compliance. New procedures were established to strengthen follow-up, but no audits had been conducted to assess implementation.

CTF continued to provide adequate laboratory testing of inmates on mood-stabilizing medications. An institutional audit of 88 inmates found that blood tests were timely ordered, drawn, returned and reviewed for roughly 88 percent of the audited inmates. This issue will be resolved if compliance continues at this level.

According to an institutional list, 235 inmates were paroled from CTF with current orders for psychotropic medications during the monitoring period. The institution had a reasonable process in place for ensuring that paroling inmates received a

216

30-day supply of these medications, but no proof was submitted to show that inmates consistently received the appropriate medications upon parole.

Some progress had been made in providing inmates with HS medications. CTF began again to order HS medications as of August 1, 2005, and procedures reportedly were established as of that date for the distribution of HS medications after 8:00 p.m. According to the MHTS, HS medications were prescribed for 59 inmates. The institution, however, did not provide documentation to confirm that the medications were actually distributed after 8:00 p.m.

Little change occurred in the monitoring of medication errors. Procedures for reporting medication errors were in place, but it was unclear whether the low number of reported mistakes accurately reflected the actual error rate at CTF. A medication error report covering the preceding ten months listed just ten errors.

Psychotropic medications were almost always nurse-administered, but an occasional inmate was designated to receive his medications DOT. One inmate was so designated in November 2005. DOT inmates reportedly received their medications at the regular pill window. When DOT inmates failed to show up at the pill window, they were tracked down and escorted by the DOT nurse to the pill window. The institution failed to provide a description of the process by which DOT was prescribed or offer proof of DOT practices with regard to inmates on DOT orders.

No inmates in CTF were on Keyhea orders during the monitoring period, nor were any Keyhea orders initiated.

Mental Health Assessments for the Disciplinary Process:

     MHSDS inmates received a disproportionate number of disciplinary infractions. Caseload inmates made up 25 percent of the inmate population at CTF but received 38 percent of RVRs written from November 1, 2004 to October 31, 2005. About ten percent of MHSDS inmates who received infractions, or 26 inmates, were referred for mental health assessments. Clinicians concluded that mental illness influenced the inmates' behavior in ten of the 26 cases.

     Hearing officers did not appear to take mental health input into account in most situations; they documented consideration of mental health or modified dispositions in only three cases. Additional training for hearing officers was needed.

     The monitor did not review the quality of mental health assessments as the institution did not provide copies of these documents.

Transfers:

     The timeliness of EOP transfers worsened due to the state-wide shortage of EOP beds. CTF transferred 35 EOP inmates to appropriate programs during the monitoring period. Transfers took longer than 60 days to accomplish in 11 instances; of these 11 inmates, four were transferred with 70 days, five were transferred within 80 days and two, within 90 days.

     Access to OHU care did not appear to be a problem at CTF. On the other hand, lengths of stay in the OHU, which rarely exceeded 72 hours during the preceding monitoring period, slipped slightly. There were 146 admissions to CTF's OHU during the monitoring period. Although the information provided to the monitor did not indicate the number of stays that exceeded timelines, data on the median length of stays for each

month suggested that a substantial number of stays lasted longer than 72 hours in at least five months. Complete OHU admission data was needed to assess lengths of stay fully.

In the absence of complete OHU admission data, it was also difficult to assess accurately access to MHCB treatment. The OHU admission log did not record referral dates, and the copy of the log submitted to the monitor as part of the paper review was cropped short, cutting off admission dates. During a ten-month period, CTF transferred only nine inmates to MHCB units. It appeared that access to the MHCB at nearby SVSP was limited, and CTF instead sent inmates to MHCB units elsewhere in CDCR, including units in CSP/Corcoran, CSP/Sac and PVSP.

Although most inmates in need of a higher level of care were still sent either to EOP programs or to MHCB units elsewhere, CTF referred three inmates directly to ASH during the monitoring period. All three inmates were accepted and transferred in a timely manner. The institution did not refer any inmates to DMH's other programs.

Other CAP Issues:

a. Partial Compliance

The quality of treatment plans could not be fully assessed. Institutional audits found that 89 to 100 percent of treatment plans were individualized and completed in a timely manner. The institution, however, did not provide the raw data underlying the audit or a description of the audit methodology. Moreover, minutes from a May staff meeting noted an increasing problem with generic treatment plans that necessitated further monitoring.

CTF continued to have problems providing timely mental health screenings for non-caseload inmates transferred to administrative segregation. Staff did

not appear familiar with the department's current policy requiring that all non-caseload inmates receive a mental health screening within 72 hours of placement in administrative segregation. Institutional audits assessed compliance based on an outdated standard requiring mental health screenings for non-caseload inmates without a mental health screening within the past year. Even applying this looser standard, an institutional audit found that only 66 percent of 116 reviewed non-caseload inmates in administrative segregation had received a mental health screening within the past year.

Problems with clinical follow-up for suicidal inmates discharged from the OHU were resolved during the preceding monitoring period and remained compliant. Custody follow-up also became compliant during the preceding monitoring period. The institution needed only to show sustained performance during this monitoring period to resolve the issue, but apparently no audit of compliance with this requirement this issue was conducted.

b. Non-Compliance

The frequency of IDTT meetings for 3CMS inmates, an issue resolved during the 13th monitoring round, was once again a problem. Institutional audits early in the monitoring period found that 86 percent of 258 inmates received a timely annual IDTT meeting; but the rate of compliance dropped to 77 percent later in the period. Other audits indicated that 70 percent of 265 newly arrived inmates received an initial IDTT meeting within 14 days of arrival, but again the compliance rate fell to 30 percent later in the monitoring period.

The bus screening process worsened. An institutional audit of 242 charts of inmates arriving at CTF found that just 64 percent contained bus screening forms

properly completed on the day of arrival. Inadequate office space was cited as one of the obstacles to compliance in this area.

Institutional Summary:

CTF had the benefit of stable staffing among its case managers and clinical contractors as well as steady mental health leadership. Quality assurance efforts, however, suffered a setback due to a key personnel change. As a result, many issues were not audited late in the monitoring period. Earlier completed audits, however, confirmed sustained compliance in several areas resulting in the resolution of eight new issues. Continuing non-compliance or slippage was noted in some other areas, and the status of several issues could not be assessed due to the lack of sufficient data provided in the paper review.

Several medication management issues could not be evaluated because of inadequate auditing, including medication continuity on renewal, parole medications, medication errors and DOT. Improvement in laboratory testing and HS medications was confirmed, while medication continuity on arrival and follow-up to medication non-compliance remained troubled. Among transfer issues, access to the OHU and MHCB treatment were difficult to evaluate because the institution provided incomplete data. The timeliness of EOP transfers and lengths of stay in the OHU worsened. Finally, CTF still had not implemented fully the mental health assessment component of its disciplinary process. Hearing officers did not appear always take mental health input into account in rendering their dispositions.

As to remaining CAP issues, slippage was noted in the timely processing of newly arriving inmates. Initial IDTT meetings, too, were often untimely, and bus

221

screenings were inconsistently completed.  Mental health screenings for non-caseload

inmates entering administrative segregation were often delayed.  Despite these slippages,

CTF seemed to sustain compliance in most areas and was able to resolve numerous

outstanding CAP deficiencies.  CTF should continue to be monitored via paper review,

but needs to revive its quality assurance process and provide better proof of its practices.

**Service Area G**

Service Area G includes the California Men's Colony (CMC), Wasco

State Prison (WSP) and North Kern State Prison (NKSP).

**California Men's Colony (CMC)**
November 21, 2005 – November 22, 2005

CMC had a 12 percent mental health staffing vacancy rate among 93.5

allocated positions. Positions for 1.75 psychiatrists, a half-time senior psychologist

specialist, 4.5 psychologists, a psych social worker and three recreation therapists were

vacant.  Contract clinicians covered roughly 63 percent of the unfilled positions, seven of

which were in the EOP program.

Among auxiliary staff, 30 of 53 MTA positions were vacant, as was one of

five senior MTA positions; another senior MTA was on long-term sick leave.  Other

auxiliary staff vacancies included 4.9 medical transcribers, two health records techs, one

office tech and three office assistants.  Among 68 allocated RN positions in CMC, an

extraordinary 39 (57 percent) were vacant.

The capacity for the institution's EOP program increased from 530 to 580

beds in early September 2005.  Additional mental health positions were allocated to

accommodate the increase, including three case managers, a psych tech and an office

222

tech, but none of these positions had even been established at the time of the monitor's visit.

Quality Management:

The quality assurance process, which was organized in accordance with the state's hospital licensing laws, continued to function well. The institution's interdisciplinary quality assurance mental health committee was significantly reorganized after August 2005 and began to meet bimonthly instead of monthly.

CMC had five mental health QITs underway during the monitoring period. The QITs focused attention on a number of issues, including the provision of structured therapeutic out-of-cell activities, intake procedures and mental health treatment in administrative segregation. The institution, moreover, continued to conduct methodologically sound and effective audits, both for QITs and the measurement of institutional performance generally.

Peer review was conducted among psychiatrists, psychologists and psych social workers. All clinicians were evaluated as part of the peer review process at least every two years. In addition, chart reviews were conducted through the peer review process, although not on a monthly basis; psych social workers met bimonthly and recently began reviewing charts, while psychologists met once in the past year to review randomly selected charts.

Medication Management:

Continuity of medication on arrival remained adequate. Procedures were reportedly in place for referring inmates arriving on psychotropic medications to mental health for evaluation. Pursuant to local procedures, arriving inmates who claimed

without proof to be on medication reportedly were referred to the physician on duty, but implementation of this procedure was not documented. According to an institutional audit, only one of 54 surveyed inmates waited longer than 24 hours for a first dose of medication.

Medication continuity for inmates changing housing locations also remained satisfactory. Progress was noted with respect to transfers to administrative segregation. An institutional audit of medication delivery for inmates placed in administrative segregation in February indicated only 57 percent of inmates received their medications in a timely manner, and instances of incomplete documentation or gaps in medication during the first 24 hours of placements were common. Eight months later, an October audit found significant improvement, with 87 percent of inmates receiving their medications without interruption.

CMC had a system in place to address continuity of medication on renewal. The institution indicated that it reviewed 64 inmate files and found no lapses in medication due to the expiration of a medication order. Inmates reportedly were seen prior to their medication renewal dates, but no data was provided to confirm clinical contacts. According to the institution, 14-day medication continuance orders were rarely used.

The definition of medication non-compliance was broadened during the monitoring period. Follow-up to medication non-compliance, however, suffered from the lack of sufficient nursing staff. Procedures for follow-up were in place, but MARs were not always reviewed on time, particularly when designated nurses were either ill or on vacation.

CMC had a procedure in place for handling medication errors. Consistent with this, medication error reports were completed and reviewed. The institution did not, however, have a method for determining what percentage of medication errors remained unreported. In 2005, no medication errors causing significant adverse effects to caseload inmates were reported.

CMC did not track the timeliness of psychiatric responses to staff and inmate referrals. Urgent referrals were required to be seen within one day and routine referrals within one week, but no data was available to determine whether these timelines were being met.

Parole medications reportedly were still provided to inmates on discharge, and a log of refusals and retuned medications was maintained by the pharmacy. The institution audited the list of paroling inmates and found it to be accurate. Documentation of parole medications was not filed in inmates' UHRs.

HS medications were still prescribed for only a few inmates. CMC had still not developed a plan to administer HS medications whenever clinically indicated. The problem was compounded by a recent custody decision to close all yards by 8:30pm, which meant that yards began shutting down at 8:15pm. According to the institution, Keyhea orders were still prescribed for inmates in need of such medications and reviewed in a timely manner.

DOT medications were not administered at CMC due primarily to the nursing shortage. Instead, inmates were reportedly prescribed a liquid form of medication or administered crushed medications. Nurse administered medications were reportedly still observed and supervised on a periodic basis. The institutional pharmacy

management information system remained primitive, and plans for replacing the system, noted in the preceding monitoring period, were not implemented.

Most pill lines functioned smoothly and expeditiously. A well designed institutional study conducted on two quads found that 90 percent of the 2,351 inmates in ten different pill lines waited less than 20 minutes for their medications.

MARs were not generally filed in UHRs in a timely manner. Filing delays of 30 to 60 days were common. Refusals and no-shows were still documented on the forms, but the legibility of the forms had not improved, and it was difficult to differentiate among multiple entries.

In contrast, informed medication consent forms were generally filed in inmates' charts. An institutional audit in August 2003 reviewed 232 charts and found a total of 435 medications requiring consent forms. The study found completed informed consent forms for psychotropic medications in most cases; only two of 11 psychiatric caseloads showed less that 90 percent compliance with program requirements in this area.

Mental Health Assessments for the Disciplinary Process:

In addition to providing an inmate's name, number and level of care, RVR logs included the date a mental health assessment was requested, the date the assessment was due, the date it was completed and the name of the clinician conducting the assessment. The logs also tracked the nature of the violations, whether mental illness was found to be a factor in evaluated inmates' behavior and hearing officers' dispositions. CMC reported that it tracked 98 percent of all RVR mental health assessments.

From October 2004 through October 2005, 525 RVRs were issued to EOP inmates and 1,140 issued to 3CMS inmates. According to the institution, mental health

assessments were completed for all of the EOP inmates, for 166 of the 3CMS inmates and for 16 general population inmates. With one exception, clinicians other than inmates' case managers completed all mental health assessments.

Hearing officers appeared to take mental health input into consideration. Based on the tracking system, the institution reported that clinicians found that mental illness contributed to inmates' behavior in 48 percent of the assessed cases. Of these cases, hearing officers indicated that clinical findings were influential in 83 percent of their dispositions; hearing officers either dismissed charges or mitigated penalties in a majority of these cases. Of the 15 RVRs reviewed by the monitor, clinicians found mental illness was a contributing factor in five instances; hearing officers mitigated penalties in three of the five cases.

CMC maintained a log that adequately tracked referrals to the district attorney's office. From January through October 2005, 49 incidents involving caseload inmates were referred to the district attorney, of which 31 were rejected, ten were pending a decision and five were accepted. Staff reported that CMC had reached an agreement during the monitoring period with the district attorney's officer establishing standards for referrals.

Transfers:

Data on transfers to higher levels of care was limited. CMC provided information on transfers from mid-September through October 2005, but there was no reliable and verifiable information on referrals, acceptances and transfers to DMH facilities, including ASH, for any prior period. The institution planned to develop a QIT aimed as implementing an effective tracking system.

MHCB transfers were extremely problematic for CMC. Access to MHCB treatment declined sharply in March 2005. In July, the institution reportedly was unable to place even one inmate in a MHCB unit. According to the institution, most inmates in need of MHCB care remained in the OHU until stable and returned to their housing unit without ever receiving a MHCB placement. CMC was supposed to use ASH acute care beds for its MHCB inmates, but access reportedly was limited during most of the monitoring period due to ASH's reluctance to admit inmates with personality disorders and concerns about inmates on administrative segregation status. In September 2005, ASH and CMC began a collaborative effort to expedite the admission process. ASH sent a clinician to CMC at least weekly to join a team reviewing inmates in the OHU for crisis bed admission. From September 19 through November 2, 95 inmates were reviewed pursuant to this joint effort. Of these, 32 inmates, or 33.6 percent, were accepted by ASH and 29 were actually transferred; 54 inmates were rejected, and referrals of nine were rescinded.

The OHU functioned well and provided an array of services, but remained an inadequate substitute for an MHCB unit. The OHU was generally full because of the problems with access to *bona fide* MHCB care. As a result, lengths of stay in the OHU often exceeded three days. From April 1 through September 30, 2005, 419 of 989 admissions to the OHU involved a length of stay longer than three days. Roughly nine percent of these admissions lasted more than two weeks, and the stays of six exceeded 60 days. In addition, problems persisted with multiple admissions to the OHU. During the three-month period from September through the first three weeks of November, 39 inmates were admitted three or more times to the OHU. Of 20 inmates with four

admissions during this period, 17 were transferred to higher levels of care. From April through September 2005, 184 inmates had two or more admissions to the unit.

The institution reported that transfers to intermediate care beds at ASH were timely, and that transfers to DMH/CMF generally occurred quickly. In contrast, inmates transferred to DMH/SVPP usually waited months.

Transfers to PSUs were also delayed. From January through September 2005, 27 inmates were transferred from CMC to PSUs. These inmates consistently spent a significant period of time in administrative segregation prior to transfer.

Other CAP Issues:

    a. Partial Compliance

The amount of scheduled structured therapeutic activities afforded general population EOP inmates improved significantly. During the monitoring period, CMC opened a new mental health building that included additional EOP treatment space and new office space. The institution also redirected 3CMS recreational therapy resources to serve the EOP population. According to the institution, EOP inmates were offered an average of 11.65 hours of treatment and received 6.39 hours during the period from February 14 to May 1, 2005. During the period from August 1 through September 4, 2005, inmates were offered on average 14.39 hours of treatment and received 9.55 hours. The institution's efforts to increase activities for participants in EOP included the use of selected inmates as recreational therapist aides. The use of inmates to provide direct treatment services to EOP inmates, even if supervised by mental health staff, was inappropriate. The institution equally inappropriately used selected inmates to locate non-participating inmates and encourage them to attend scheduled group activities. For

this issue to be resolved, CMC needed to maintain their compliance without relying on the use of inmate aides. EOP inmates continued to be seen on a weekly basis by their case managers.

During the monitoring period, the institution significantly reduced the number of unmotivated or treatment-resistant inmates in the EOP program. Enforcement of the A1A policy, which required inmates to join in programming in order to earn day-for-day credit, helped to increase the level of participation. A pilot program initiated during the preceding monitoring period to encourage greater inmate participation was endorsed as a successful concept by the QIT studying the problem. As a result, an expanded transition program for unmotivated or treatment-resistant inmates was initiated on May 9, 2005. At the time of the monitor's visit, 11 inmates had been referred to the program, most of whom were attending group therapy sessions regularly. One participant attended only intermittently, while three still did not participate at all.

The MHTS improved further during the monitoring report. According to the institution's status report, additional computer equipment and data entry personnel were acquired. An institutional concordance study reportedly found that the MHTS was consistent with entries in inmates' UHRs more than 90 percent of the time. The MHTS also was used to generate a number of different reports and track a wide range of information, including case management contacts, IDTT meetings, MH-2 data, treatment hours and missed appointments. Despite assertions that inmates were not allowed access to confidential information, the monitor's expert personally observed two inmates inappropriately using the MHTS, which included medical records, for scheduling

purposes. This issue was nearing resolution and can likely be resolved once inmates no longer have access to the system.

      b. Non-Compliance

Little improvement occurred in the treatment afforded EOP inmates in administrative segregation. During the monitoring period, therapy groups were separated by level of care, which reportedly resulted in EOP inmates being offered more than ten hours of structured therapeutic activities per week. Data provided by the institution, however, reflected a decline in the total amount of structured out-of-cell activities offered to EOP inmates from 350 hours a week to 280 hours, in part due to the competing needs of the 3CMS administrative segregation program. Actual participation of administrative segregation EOP inmates in group therapy remained low, averaging only about four hours per week. The institution made a number of modifications to the EOP program in administrative segregation to increase attendance, including the provision of jackets for inmates who had to cross the yard in cold weather to participate in group activities and moving morning group therapy sessions to a later time for inmates who were groggy from their medications. Despite the efforts, inmate participation remained a serious problem.

A QIT established to determine the cause(s) of administrative segregation EOP inmates' low participation in groups identified a number of challenging environmental and custody factors, the most critical of which may have been inadequate programming space. The therapeutic modules used in the gymnasium for group activities were actually security holding cells, which were too small for programming and offered no audio privacy. Indoor recreation was substituted for outdoor recreation because of the

lack of walk-alone cells in the yard, although the institution reportedly planned to construct walk-alone cages in the yard to remedy the problem. Office space was insufficient to provide safe and confidential out-of-cell clinical contacts. The lack of adequate office space, when combined with staffing shortages, meant that an increasing number of case management contacts occurred at cell front during the monitoring period, particularly when case managers were on vacation or sick leave. CMC had been promised a double-wide trailer to provide additional programming and office space for the administrative segregation hub unit, but the trailer was never delivered, despite increases in the hub unit population. On the positive side, psych tech rounds continued to be conducted regularly, and inmates newly arrived in administrative segregation were seen promptly both individually and in IDTT meetings.

CMC reported that it had implemented CDCR's heat policy, but admitted that it had not filed required heat reports with the department. As a result, the monitor was unable to verify compliance with heat requirements. This issue, once resolved, needs continued monitoring.

Among other issues considered during the monitoring round unrelated to the institutional CAP, CMC provided CPR training to custody officers on October 24, 2005. A class list confirmed attendance by 770 officers. The institution expected to complete all required training by early December 2005. The monitor's spot check of 15 recently trained officers found only one officer without a mouth shield.

CMC also began local implementation of the department's new policy on exhibitionism and public masturbation. Seven inmates received initial assessments under the policy. Six other sexual misconduct RVRs had also been issued, but the screening

process was still incomplete at the time of the monitor's visit. One case of exhibitionism had been diagnosed; the inmate had been evaluated, referred to DMH and was scheduled for transfer during the week of the monitoring visit. The institution acknowledged that it had not yet determined how to implement the treatment portion of the new policy, since no local staff had any specialized training in handling exhibitionism.

There was no video monitoring equipment installed in the institution's hospital or OHU.

Institutional Summary:

CMC had a moderate amount of clinical vacancies that were partially covered by contract services. Auxiliary staff was more severely strained. Shortages among RNs and MTAs were quite high and indirectly impacted substantially on some aspects of mental health services.

Among the four issues of focus in this round, the institution's quality assurance process continued to make substantial progress. The mental health committee met regularly, QITs were operating and peer review had been implemented in all of the mental health clinical disciplines. Mental health input into the disciplinary process was also functioning well. CMC maintained adequate logs that tracked RVRs, and hearing officers appeared to take mental health input into account in reaching their determinations.

CMC did not have reliable data on transfers to higher levels of care, except for the most recent months, but it was clear that the institution had serious problems with access to MHCB treatment and PSU care during the monitoring period. Transfers to intermediate care at ASH and to DMH/CMF appeared timely, while transfers

to DMH/SVPP were often delayed. Lengths of stay in the OHU were often excessive, and a significant number of inmates had repeated admissions to the unit without referrals to more intensive levels of mental health treatment.

CMC did not comply with all medication management requirements. Continuity of medication on arrival, housing changes and renewals were good; parole medications were provided to inmates discharged from the institution; pill lines were operating well; and medication consent forms were usually filed in inmates' charts. Follow-up to medication non-compliance, as well as the administration of DOT and HS medications, all suffered from insufficient nursing staff. In addition, problems persisted with the timeliness and legibility of MARs.

CMC had only a few unresolved CAP items remaining. Progress was steady in providing structured therapeutic activities to general population EOP inmates, reducing the percentage of unmotivated or treatment-resistant inmates in the EOP program and implementing the MHTS. On the other hand, the institution was having difficulty providing adequate treatment to EOP inmates in administrative segregation due largely to a lack of adequate programming and office space and still did not track the timeliness of psychiatric responses to inmate and staff referrals. Some serious slippage in the institution's heat plan was another concern.

Overall, CMC continued to operate its mental health program well and improve performance in most areas. A couple of remaining issues could be resolved, if the institution were to cease involving inmates in the provision of mental health services. Other issues, like MHCB transfers and EOP programming, required greater local efforts and departmental support.

234

## Wasco State Prison (WSP)
February 16, 2006 – February 17, 2006

Mental health staffing emerged as a major problem at WSP during the monitoring period. A number of clinicians resigned to work at nearby DMH and other CDCR facilities, leaving WSP with a mental health staff vacancy rate of 28.2 percent. Positions for a chief psychiatrist, a senior psychiatrist, five staff psychiatrists, a chief psychologist, a senior psychologist, 5.5 staff psychologists, a psych social worker, a recreational therapist, a psychometrist and a half-time office tech were all vacant. One result was increased caseloads for case managers, ranging from 115 to 130 inmates. WSP also had a shortage of MTAs; only 20 of 31 allocated MTA positions were filled.

Over the past few years, WSP has been able to retain a stable group of clinicians and rarely needed to obtain contracted services. The recent increase of staffing vacancies, however, forced the institution to acquire contract clinicians. Contract psychiatrists filled the equivalent of just two full-time positions but, at the time of the monitor's visit, they were the primary providers of psychiatric care in the institution. WSP needed to assess whether contract clinicians were receiving adequate supervision. Five of the MTA vacancies were also covered by contractors.

The mission of WSP shifted somewhat during the monitoring period. A portion of the mainline was converted in an overflow reception center, reducing the general population 3CMS program by approximately 50 percent. Overall, however, the MHSDS population rose to 1,423 inmates, far in excess of the institution's stated capacity of 1,049 inmates. The number of caseload inmates in administrative segregation increased to 56 and, while WSP lacked any EOP resources, 90 EOP inmates were in the institution at the time of the monitor's visit.

<u>Issue Resolved:</u>

> Medical records were organized and documents were no longer missing or misfiled in UHRs.

<u>Quality Management:</u>

WSP's quality management committee met monthly from March through December 2005. Minutes of the meetings reflected meaningful efforts to address mental health issues. The institution also had an active mental health subcommittee, which met monthly from February through December 2005.

The mental health subcommittee chartered several QITs to study critical issues, including DOT, laboratory testing and mental health treatment in the administrative segregation overflow unit. Ongoing staffing shortages and increased workloads, however, caused the QIT process to suffer, particularly with respect to the frequency of team meetings, minutes and follow-up.

Chart reviews were conducted through the institution's auditing process. A number of different issues affecting the CTC, general population programs and administrative segregation were examined in this manner. The results of chart reviews were reportedly shared with the staff by supervisors through meetings and memoranda. The monitor compared 20 UHRs to inmate histories from the MHTS and found a concordance rate higher than 90 percent.

Peer review, conducted regularly for psychiatrists and psychologists over the last several years, was discontinued due to staff turnover. Psychiatry peer review was suspended in December 2005, while psychology peer review ended in August 2005.

<u>Medication Management:</u>

WSP still used the same local operating policy for medication management in effect during the preceding monitoring period. While otherwise helpful, the policy did not cover laboratory testing or informed medication consent forms.

Continuity of medication on arrival improved during the monitoring period. An institutional audit of 90 UHRs in December 2005 found that 22 of 25 surveyed inmates arriving on medications received prescriptions on arrival, and 21 of the 22 inmates received their first dose of medication within 24 hours. The institution had no written policies on inmates who arrived with unverified claims of medication, and no documentation reflected that this issue had been addressed by the institution.

Medication continuity for inmates changing housing locations improved slightly but was still poor. The institution's December 2005 audit reviewed 78 housing moves and found medication interruptions in 45 percent of them, compared with 56 percent during the preceding monitoring period. Staffing shortages appeared to be a significant impediment to compliance in this area. In addition, custody staff did not consistently provide clinical staff with copies of housing change forms.

Continuity of medication on renewal also slipped during the monitoring period, but most medication orders were still renewed prior to expiration. An institutional audit for the period from September 1 through November 30, 2005 found that 90 percent of 109 reviewed medication orders were renewed without interruption.

Follow-up to medication non-compliance remained inadequate. Institutional audits indicated that inmates were not consistently referred to mental health following repeated instances of medication non-compliance. Moreover, due to staffing

shortages, referred inmates were rarely seen by a clinician within seven days as required. An institutional audit from September 1 through November 30, 2005 found 78 referrals for non-compliance, of which only 18 were seen by a clinician within seven days. According to MHTS data, the average time from the date of a referral to the date of an appointment during the monitoring period was 17.1 days.

WSP continued to provide paroling inmates with a 30-day supply of medication upon discharge. The pharmacy retained parole medication forms documenting caseload inmates who were offered and received or rejected discharge medications. The institution, however, did not file these forms in inmates' UHRs.

Nothing changed with regard to laboratory testing for inmates on mood-stabilizing medications. WSP still made no attempt to track whether laboratory tests were ordered for all inmates on mood-stabilizing medications or whether test results were returned in a timely manner. Similarly, no audits assessed whether psychiatrists reviewed laboratory test results or made adjustments in medications in response to abnormal results.

In the preceding monitoring period, the institution's medication policy did not distinguish between DOT and nurse administered medications; all medications at WSP were nurse administered. Nothing seemed to change during the current monitoring period. No list of inmates with medications to be delivered via DOT was generated in the facility. Monitoring of the delivery of DOT and nurse administered medications reportedly was conducted via a medication management audit, which, during the first two months of 2006, reported no problems. Inmates suspected of cheeking or other forms of

non-compliance reportedly were referred to mental health, but WSP did not track such referrals.

Inmates in need of involuntary medication were generally transferred to a higher level of care as soon as possible. Since February 2005, just three inmates were on Keyhea orders while in WSP. At the time of the monitor's visit, one inmate had a Keyhea order for involuntary medication. There was no record of any Keyhea order having expired inadvertently.

HS medications still were not provided at WSP, and deliveries of medication did not occur after 8:00 p.m. The final pill line of the day occurred between 2:00 and 3:00 p.m.

The institution's system for completing and compiling medication errors continued to function well. Medication error reports were reviewed monthly or more frequently at meetings of the pharmacy services committee. Minutes of the meetings reflected good discussion of medication errors, but recommendations were not consistently documented.

WSP began using the new MAR forms during the monitoring period, but no-shows and refusals were not consistently documented. Institutional audits for January and February 2006 indicated that only about 72 percent of no-shows and 91 percent of refusals were documented in inmates' MARs. The institution provided MTAs with training on procedures for documenting the new MARs, but MTA vacancies complicated compliance. On the other hand, MARs were more consistently filed in inmates' charts in a timely manner.

Fewer informed medication consent forms were found in inmates' charts during the monitoring period. Institutional audits for December 2005 looked at 138 UHRs and found that only 61.6 percent contained signed medication consent forms. Resurgence of this problem was attributed in part to the increased use of contract psychiatrists to cover permanent staffing vacancies.

Mental Health Assessments for the Disciplinary Process:

Disciplinary logs showed that MHSDS inmates, who represented roughly a quarter of the total WSP population, received 19.8 percent of all RVRs written in the institution from March 1 through December 31, 2005. Between February 2, 2005 and January 6, 2006, 126 mental health assessments were completed, including 63 for EOP inmates, 60 for 3CMS inmates and three for MHCB inmates. WSP did not conduct any audits to determine whether inmates exhibiting bizarre or unusual characteristics were appropriately referred for mental health assessments. Nor did the institution conduct any audits to determine whether clinicians consistently interviewed inmates and reviewed their UHRs and C-files in preparing assessments. Moreover, no effort was made to assess the quality of information provided in mental health assessments or determine whether hearing officers considered mental health input in reaching their dispositions.

The department's new sexual misconduct policy reportedly went into effect at WSP on January 17, 2005. By the time of the monitor's visit, the institution had completed four initial screening evaluations and three IDTT meetings pursuant to the policy. No instances of exhibitionism had as yet been diagnosed. WSP had not yet implemented the custody component of the Pelican Bay model. The institution also

reported that it lacked clinicians with the expertise required to provide the treatment specified in the department's policy.

Transfers:

The institution took steps earlier to address delays in access to care. Clinicians met monthly to identify and discuss inmates who might require referral to intermediate or acute DMH care. These meetings were suspended from November 2005 through January 2006, but reportedly resumed in February 2006.

Inmates were generally transferred to DMH in a timely manner. Of 66 inmates identified as needing a higher level of care during the monitoring period, 15 were referred and accepted for the APP/DMH at CMF, 14 of whom were actually transferred. These inmates, on average, waited 16 days for transfer, with individual waits ranging from three to 27 days. Among the other 66 inmates identified with a need for more intensive treatment, 12 were referred to DHM/CMF and SVPP for intermediate care; one was referred to ASH; ten were referred to EOP programs; and the remainder were eventually deemed clinically to have been stabilized at their current levels of care. Inmates in need of higher levels of care were often housed in the MHCB unit while waiting for transfer, sometimes forcing WSP to house other local inmates in need of crisis care in alternative housing. Length of stays in the MHCB unit for December 2005 and January 2006 for inmates transferring to DMH averaged 20.5 days.

The timely transfer of reception center inmates remained problematic. As of February 16, 2006, 74 EOP inmates were in the reception center at WSP. According to an institutional audit, 43 percent of these inmates had been in the reception center for more than 60 days, while nine inmates had been there for more than five months; three

more recent additions had lengthy histories of MHCB admissions. The monitor reviewed the UHRs of six EOP inmates in reception; none of the charts contained current treatment plans. EOP inmates in reception generally received weekly case management contacts. The provision of weekly clinical contact for so many EOP inmates for such lengthy periods of time was a severe drain on the institution's limited staffing resources.

The timeliness of EOP administrative segregation transfers continued to suffer from the shortage of beds in hub administrative segregation units. According to institutional data, 68 EOP inmates were housed in the administrative segregation unit during the preceding 12 months. Only 27 of these inmates were transferred within the 30-day deadline; another 24 inmates were transferred within 60 days. At the time of the monitor's visit, seven EOP inmates had been in the administrative segregation unit over 60 days.

The quality of video monitoring equipment in the CTC was acceptable. There were two monitors in the nurses' station, one of which displayed four rooms simultaneously on a split screen, while the other showed a full-screen view of one of the four rooms. The images were in color and generally well defined, although the detail was limited on the split screen view. Blind spots existed in all four of the cells due to the angle of camera placements. WSP used video monitoring as a supplement to one-on-one monitoring for inmates on suicide watch. Inmates on suicide watch continued to be observed at cell front by correctional officers.

Other CAP Issues:

      a.  Partial Compliance

IDTT meetings were generally held in a timely manner, with most of the required staff in attendance.  Psychiatrists, however, often were not present at IDTT meetings.

The monitor's limited review of ten charts found some slippage in the completion and quality of treatment plans, issues that were previously resolved.  Of the ten charts reviewed, only five contained a current MH-2, while just two of the five completed treatment plans were individualized; consideration of group therapy was mentioned in just three treatment plans.

While the composition of the suicide prevention committee, and the frequency with which the committee met, worsened during the preceding monitoring period, WSP managed to rectify these problems during the current monitoring period.  The committee resumed meeting monthly and included both medical and mental health staff, as well as custody representatives.  This issue will be resolved if compliance remains at this level for another monitoring period.  Similarly, problems with the documentation of suicide watch/precautions improved.  Institutional data showed that three inmates were placed on suicide watch/precautions during the monitoring period.  Institutional audits of all three inmates' records, confirmed by the monitor's review of the two most recent records, found that suicide watch/precautions documentation was generally legible and complete.  This issue, too, will be resolved if compliance continues during the next monitoring period.

Problems with the frequency of case management contacts with EOP

243

inmates were resolved earlier.  Between 95 and 100 percent of EOP inmates received weekly case management contacts through November 2005.  Thereafter, the frequency of contacts slipped a bit due to serious staff shortages.  Absent further deterioration, the issue will remain resolved.

b.  Non-Compliance

The provision of group therapy for 3CMS inmates decreased from three groups totaling 45 inmates in May 2004 to one group of 12 inmates with five 3CMS and seven non-caseload inmates in January 2005.  Even this one group was discontinued in May 2005, when the clinician leader was transferred to the POC.  Another group was started in May and operated through August 2005, but this group too was discontinued when its leader transferred to another CDCR facility.  Staffing shortages reduced the likelihood of developing new groups; only one case manager was assigned to the more than 100 inmates in the general population 3CMS program.

Staffing shortages severely compromised the institution's ability to provide timely psychiatric responses to inmate referrals.  According to an institutional audit of 90 charts for the period from September through November 2005, there were 78 mental health referrals for medication non-compliance.  Only 18 inmates, or 23 percent of the number referred, were seen within seven days of the last missed dose.

Follow-up monitoring for suicidal inmates discharged from the MHCB unit remained unchanged.  Clinical follow-up was provided regularly, but custody follow-up was inconsistent.  An institutional audit indicated that among 198 suicidal inmates discharged from the MHCB unit between February 23, 2005 and January 4,

2006, five-day clinical follow-up was provided to 99 percent of those discharged, while custody checks were documented for only 21 percent.

Access to confidential interview space for clinical contacts in the administrative segregation unit continued to be a problem. Clinical contacts occurred in a room with a correctional officer present. Reportedly, no other space was available.

The timeliness of mental health screenings and evaluations in reception declined during the monitoring period due largely to case manager vacancies. At the time of the monitor's visit, approximately 144 inmates were overdue for a mental health screening and as many as 540 referred inmates were awaiting mental health evaluations. The institution also had a problem providing quarterly case management contacts for reception center 3CMS inmates. According to data from the MHTS, only 50.2 percent of 3CMS inmates in reception received 90-day contacts.

WSP conducted CPR training on the day of the monitor's visit for all correctional officers, except those on long-term sick leave. The monitor interviewed 14 correctional officers and found that all of them had mouth guards on their persons. A memorandum from the warden ordered supervisors to conduct daily mouth guard checks.

Institutional Summary:

WSP lost ground during the monitoring period. Staffing shortages and increased caseloads impacted negatively on most areas of focus, as well as several remaining unresolved CAP items. Quality management efforts lagged due to the staffing shortages, particularly with respect to QITs and peer review. The quality management committee and the mental health subcommittee, however, remained active, and chart reviews were conducted through the auditing process.

Some aspects of medication management showed progress, including medication continuity for arriving inmates, parole medications, medication errors, involuntary medications and MARs. On the other hand, WSP's system for the delivery of medication still had some significant deficiencies, including problems with the continuity of medication for inmates on changes in housing location and renewal, follow-up to medication non-compliance, HS medications and the acquisition of informed medication consent forms. WSP also needed to audit laboratory testing issues for inmates on mood-stabilizing medications and straighten out its messy implementation of DOT and nurse administered medications.

Transfers to DMH were generally timely, but there were significant delays in the transfer of EOP inmates. VSPW's reliance on the use of its own OHU to stabilize inmates in crisis in combination with its underutilization of CCWF's MHCB unit created both directly and indirectly deleterious effects, including unnecessarily lengthy stays in the OHU. The institution's failure to audit mental health input into the disciplinary process made it difficult to evaluate the assessment process and its impact on the outcome of disciplinary hearings.

Problems with the suicide prevention committee were corrected during this monitoring period, but other outstanding CAP issues deteriorated. Slippage was noted in the provision of group therapy to 3CMS inmates, the completion and quality of treatment plans and the timeliness of psychiatric responses to mental health referrals. In addition, the institution failed to meet applicable timeframes for conducting mental health screenings and evaluations in the reception center or provide consistent custody follow-up for suicidal inmates discharged from the OHU or CCWF's MHCB unit. Psychiatric

attendance at IDTT meetings and access to confidential interview space in administrative segregation continued to be deficient.

Overall, WSP's staffing woes badly stalled progress toward compliance. The institution needed to increase its hiring efforts and work to regain what it lost during the current monitoring period.

### North Kern State Prison (NKSP)
December 19, 2005 – December 20, 2005

Positions for a senior supervising psychiatrist, a staff psychiatrist, a half-time recreational therapist, three mental health nurses and 2.5 office techs were vacant. The institution had recently been allocated additional positions for 2.5 psychiatrists and four psychologists. Contract services more than covered the clinical vacancies. Psychiatric coverage, however, was provided by five to eight different contractors, compromising continuity of treatment. The institution also suffered from a lack of psychiatric supervision, which was a problem for contract clinicians, particularly for those who generally worked on weekends.

NKSP was also troubled by auxiliary staff vacancies in its pharmacy and the medical records section. The institution was allocated three pharmacist positions, all of which were vacant and covered by contractors. It appeared that the current pharmacy allocation was insufficient to meet the demands of the increasing mental health population, particularly on weekends. Staffing shortages among medical records personnel included three medical records technicians, while two other medical records employees were on long-term disability leave. Among other auxiliary staff, positions for 2.8 nurses, three MTAs and a clinical laboratory tech were vacant. The RN vacancies were covered by registry staff.

NKSP experienced facility-wide overcrowding. The EOP population almost doubled during the monitoring period, and 53 EOP inmates, all but one of them in reception, were awaiting transfer at the time of the monitor's visit. The number of reception center inmates also increased significantly during the monitoring period, and the institution began to house inmates in gymnasiums and dayrooms.

Issues Resolved:

The mental health quality assurance subcommittee was functioning well.

Peer review had been effectively implemented.

Quality Management:

The institution's overall healthcare quality management committee was not functioning, but NKSP's local governing body and its mental health subcommittee met monthly with rare exceptions and maintained minutes of their meetings. The composition of the mental health subcommittee was interdisciplinary, and minutes of subcommittee meetings reflected meaningful efforts to address service delivery problems. The suicide prevention committee also met monthly and included mandated and recommended participants.

Seven QITs were operating during the monitoring period, including QITs on referral responses, medication refusals, laboratory testing and some aspects of the RVR process. In general, the QITs progressed slowly and, with one limited exception, did not appear to engage in significant problem solving. On the other hand, NKSP audited compliance with requirements in every major service area each month. It was unclear whether the results of audits were shared broadly with the mental health staff.

Peer review for psychiatrists, psychologists and psych social workers continued to function adequately.

NKSP did not use the MHTS to its fullest extent. Staff monitored the MHTS monthly for concordance with charts and produced a number of different reliable and helpful reports. Despite this, significant data problems were apparent in a few areas, especially with respect to the priority transfer process. In addition, due in part to staffing turnover, clerical staff was not trained to handle all standard MHTS functions, like the automatic scheduling of appointments.

Medication Management:

The institution finalized its local medication management policy in early October. The policy appeared to conform to departmental procedures, but some issues, such as laboratory testing and medication informed consent forms, were not addressed in either local or departmental policies.

Continuity of medication for inmates arriving at the institution was good. An institutional audit for the period from June 1 to October 31, 2005 found that medications were ordered within eight hours of arrival for 81 percent of new inmates and that ordered medications were received in a timely manner by 86 percent of newly arriving inmates. Procedures remained in place for handling arriving inmates who claimed without proof that they were on medications.

Continuity of medication for inmates changing housing locations also improved, but required further monitoring. An institutional audit showed that 86 percent of inmates from June 1 through October 31, 2005 received their medications in a timely

manner after moving to different housing units.  Staff reported some medication lapses after inmates were discharged from the MHCB unit.

Continuity of medication at the time of renewal declined during the monitoring period from 92 to 76 percent.  The monitor's chart review revealed gaps in medication on renewal lasting seven to ten days.  It appeared that MTAs were erratic in reporting upcoming expirations.  Renewal continuity was also compromised by psychiatric vacancies, the use of poorly supervised contract clinicians and clerical staff's inability to operate the MHTS's automatic ducating system.  A QIT was established to study this issue.

Psychiatric responses to medication non-compliance improved, but still were not compliant.  During the preceding monitoring period, the response rate was extremely poor.  Institutional data provided to the monitor for the current monitoring period indicated that 66 percent of 254 inmates received a response within seven days of referral and another 11 percent received a response a day later.  Refusal forms were filed in inmates' charts.  No audit had been conducted to determine whether MTAs were referring all non-compliant inmates.

Appropriate MARs were in use at NKSP, and the legibility of completed MARs improved.  An institutional audit for the period from June 1 through October 31, 2005 found that 86 percent of the MARs entries were legible and contemporaneous.  The same audit showed that MARs were filed in 85 percent of inmates' charts.

Once again, NKSP did not audit the provision of laboratory testing for inmates on mood-stabilizing medications.  The institution did, however, have a system in