place for notifying psychiatrists of laboratory results. Clinicians reported that they received timely notification of test results.

Parole medications were provided to most inmates discharged from the facility, although some inmates still missed their medications. The institution maintained a log of paroled MHSDS inmates who were offered and received or rejected discharge medications. According to this log, 115 caseload inmates were paroled from NKSP during the six months preceding the monitor's visit. Fourteen of these inmates left the institution before receiving their medications. No refusals were documented. Information on parole medications was not filed in inmates' UHRs.

The Keyhea process appeared to work well at NKSP. Inmates arriving on Keyhea orders or placed on Keyhea orders while at NKSP were reportedly monitored and transferred to a high level of care. According to the institutional logs, only one inmate had a Keyhea order during the monitoring period, and no inmate was on a Keyhea order at the time of the monitor's visit. During the monitoring visit, the monitor found no inmates who appeared to be in need of involuntary medication.

All psychotropic medications were administered DOT at NKSP; no distinction was made between DOT and nurse administered medication. There was only one overdose during the monitoring period and no suspected incidents of cheeking.

HS medications were not generally prescribed, even when clinically indicated. Only five inmates at NKSP were prescribed HS medication. All five of these inmates were housed in the B-3 unit of the reception center where evening medications were administered after 8:00pm. None of the inmates housed in A-yard on the mainline

were prescribed HS medications, although many were receiving sedating medications that normally called for HS administration.

NKSP had a system in place for dealing with medication errors. During the monitoring period, 21 documented medication errors occurred. A review of the error reports indicated that clinical follow-up was provided when appropriate.

Informed medication consent forms were generally filed in inmates' charts. An institutional audit for the period from June 1 to October 31, 2005 indicated that informed consent was obtained 92 percent of the time. The monitor's limited chart review, however, found that consent forms were current in only about half of reviewed cases.

Mental Health Assessments for the Disciplinary Process:

Institutional disciplinary logs improved during the monitoring period. The logs now tracked all required RVR information. Data for the period from June 1 through October 30, 2005 showed that 150 RVRs were issued to caseload inmates, constituting 26.6 percent of all RVRs written during the period in the institution. There were 20 mental health assessments completed for caseload inmates charged with disciplinary infractions during the monitoring period, including eight for EOP inmates, 11 for 3CMS inmates and one for a general population inmate.

Some problems with the mental health assessment process for caseload inmates charged with disciplinary infractions persisted. Institutional audits revealed that mental health assessments were not always completed as required for all EOP inmates. Assessment requests often were received in an untimely manner, and 65 percent of assessments were not completed within the required time frame. Documents indicated

that 73 percent of clinicians conducted their assessment interviews in a non-confidential

setting.  While just 82 percent of RVRs reported the inmates' correct level of care, it

appeared that decisions not to refer non-EOP inmates for mental health assessments were,

for the most part, correctly made.  The monitor reviewed 35 randomly selected RVRs for

3CMS and general population inmates who were not referred for assessments and found

no indication of bizarre or unusual characteristics in the charging correctional officers'

descriptions of the incidents.  An institutional audit reviewed a large number of such

cases and agreed with the initial determinations in all but five cases.

Hearing officers often failed to document their consideration of mental

health input.  During the monitoring period, an institutional audit indicated that 25

percent of hearing officers did not incorporate mental health input into their findings,

compared with 15 percent during the preceding monitoring period.  Similarly, 50 percent

of hearing officers failed to document even their consideration of mental health input in

their dispositions, compared with 31 percent during the previous monitoring period.

NKSP's referral agreement with the local district attorney's office expired

in 2003.  Institutional data indicated that 21 incidents involving caseload inmates were

referred to the district attorney's office from February 22, 2004 to November 19, 2005.

Only two of the referrals were accepted for prosecution; five other referrals were declined

and 14 were still pending at the time of the monitor's visit.

NKSP began implementation of the department's new sexual misconduct

policy over the summer of 2005.  A process for evaluating sexual misconduct was

developed and related training was conducted in July and again in October.  The

institution's evaluation process required the scheduling of an IDTT meeting within 48

hours of reported sexual misconduct to determine whether a more comprehensive

evaluation was needed.  Thereafter, a second IDTT meeting was required to diagnose

exhibitionism.  To date, only one inmate had been diagnosed with exhibitionism under

the new policy.  The sexual misconduct log listed 11 other inmates who were involved in

the evaluation process, but the log reportedly failed to list all inmates who had received

RVRs for sexual misconduct.  The institution reported that none of its clinicians had the

expertise required to provide treatment for exhibitionism.

<u>Transfers:</u>

The timeliness of EOP transfers remained a problem.  Institutional data

was not entirely reliable, but it appeared that 199 EOP referrals were made during the

monitoring period.  The records did not distinguish between reception center and

mainline EOP inmates, but just one general population inmate was in the institution at the

time of the monitor's visit.  According to the institution's status report, 57.7 percent of

EOP transfers were completed within the specified time frames during the six months

preceding the monitor's visit.  Classification data reviewed by the monitor indicated that

40 percent of reception center EOP inmates were transferred or paroled as required

within 60 days; the longest delay was seven months.

Delays were evident both before and after endorsement.  From late

September through early November, a number of already endorsed inmates had to be

redirected to other institutions, suggesting that bed space pressures contributed to the

mounting EOP population in NKSP.  EOP inmates were generally afforded appropriate

treatment while waiting for transfer.  An institutional chart audit indicated that more than

90 percent of EOP inmates were seen weekly by a clinician while awaiting transfer,

although the monitor's review of MHTS case histories found a lower compliance rate of 82 percent. An EOP coordinator had been appointed recently to address the timeliness of EOP transfers. The institution also began holding weekly meetings of high level staff recently to review pending EOP cases. To date, the group had identified one EOP inmate in need of immediate transfer.

The length of stays of 3CMS inmates in the reception center, which were not excessive in the past, became similarly problematic. Among 44 3CMS reception center inmates in NKSP at the time of the monitor's visit, 25 percent had been awaiting transfer longer than 90 days. Record-keeping on this issue was so poor it was difficult to determine the timeliness of transfers during the monitoring period, but monthly staff audits appeared to show a pattern of increasing delays in the second half of the year.

The MHCB unit at NKSP reopened during the monitoring period and length of stay problems, which had been resolved in the past, resurfaced. In the six weeks that the unit was open prior to the monitor's visit, there were 24 admissions. According to institutional logs, nine of these admissions exceeded the targeted ten-day stay. The longest stays generally involved inmates referred to DMH; DMH referrals were often initiated late, after the inmates had already been in the MHCB unit 11 to 17 days. The longest stay in the unit was 34 days. During most of the monitoring period, the MHCB unit was closed and the institution used two wet cells in the CTC, three cells in reception and two contraband watch cells for inmates in need of MHCB treatment. Inmates in these cells were reportedly placed on one-to-one custody watch and seen daily by a psychiatrist. Although no logs were available regarding the use of these alternative cells, staff reported that the length of stays were often as long as three days. Since the

MHCB unit reopened, it was still common for one or two inmates to be housed in alternative cells, but inmates reportedly stayed in them for less than a day.

The timeliness of transfers to CMF/DMH was also a problem. In the last six months of 2005, there were 37 transfers to CMF/DMH. These transfers generally took two to three weeks, with the longest transfer taking 43 days. During this same period, there were no referrals to ASH and just one referral to SVPP, which took three and a half months to complete. Three inmates were returned to NKSP from DMH during the monitoring period. Their charts showed no sign of instability.

The institution was in the process of revising its video monitoring policy to eliminate acknowledged ambiguities. Post orders for CTC correctional officers did not provide guidance on the issue, and staff reported limited on-the-job training. Six of the ten MHCB unit cells were equipped for video monitoring. Four of the cells were monitored by correctional officers in a security area, while nursing staff monitored the other cells on a separate monitor in the nursing station. Video monitoring was not used for inmates placed on suicide watch. Rather, inmates on suicide watch were placed on one-to-one observation with a correctional officer, while video monitoring was used primarily for supplemental monitoring of inmates in the MHCB unit.

Other CAP Issues:

a. Partial Compliance

Clinical responses to staff and inmate referrals were erratic. The institution made good use of the MHTS to follow up requests for psychiatric services and kept relatively accurate track of the timeliness of responses at different levels of urgency. The institution inappropriately calculated the response time from just the last of multiple

referrals to the time of appointment. Data for the six months preceding the monitor's visit showed that psychiatric staff responded to an average of 91 emergency referrals per month. Of these emergency referrals, 97 percent were seen by a psychiatrist in a timely manner. Other referrals waited up to eight days to be seen, and some were not seen at all.

The data indicated that a substantial number of clinical referrals apparently never received a response, while urgent referrals sometimes waited weeks. There were 45 urgent referrals on average per month; of these, 28 percent were seen within one day, 13 percent apparently were never seen at all and the rest were seen within two to 65 days, with frequent delays of more than ten days. There were 488 routine referrals on average per month; 72 percent of these were seen within a week, 18 percent apparently were not seen and the rest, involving almost 600 inmates, were seen within eight to 78 days. There were far fewer inmate self-referrals than staff referrals, and all of the former were treated as routine referrals.

The composition of IDTT meetings for 3CMS inmates deteriorated during the monitoring period. Staff acknowledged that psychiatrists were rarely present for 3CMS IDTT meetings, particularly for those held in the general population. Chart reviews by the monitor's expert found that psychiatrists attended 61 percent of IDTT meetings for 3CMS inmates in administrative segregation. Attendance by classification staff also declined earlier in the monitoring period, but later rose to over 90 percent. Monthly audits showed that initial and yearly IDTT meetings continued to be held in a timely manner.

Although all CAP items involving reception functions at NKSP were resolved earlier, institutional audits showed slippage in some areas during the monitoring

period. Audits indicated that 35 to 53 percent of mental health screenings and evaluations were untimely. Institutional audits also indicated that clinicians sought inmates' prior mental health records less than half the time, although there was an improvement in the last month before the monitor's visit. On the other hand, 3CMS inmates still received quarterly case management contacts, and group therapy was provided to 3CMS inmates.

Problems with clinical follow-up of suicidal inmates discharged from an MHCB unit lagged somewhat during the monitoring period. According to institutional logs, 91 percent of suicidal inmates discharged from the MHCB unit received five-day clinical follow-up. Follow-up, however, started more than a day after discharge for 16 percent of tracked inmates, suggesting that compliance with policies on clinical follow-up might actually have been 76 percent.

The institution provided CPR training to 858 custody officers during the monitoring period. Spot checks by the monitor showed that, despite this training, not all officers carried mouth pieces on their persons as required.

b. Non-Compliance

Vacancies in the medical records department led to increased filing backlogs and renewed problems with misfilings. Supervisory staff reported that charts were available for clinical contacts approximately 50 to 75 percent of the time; line staff estimated that charts were available for only 20 to 50 percent of scheduled appointments.

Institutional Summary:

NKSP had few mental health vacancies, and contract services adequately covered all clinical openings. The lack of psychiatric supervision was the institution's

most important clinical staffing issue; continuity of treatment suffered from the large number of contract clinicians who worked without adequate clinical supervision. Auxiliary staff vacancies in the pharmacy and medical records department impacted negatively on the provision of mental health services.

Among the four issues that were the focus for this round of monitoring, quality management showed the most improvement. Two quality management issues were resolved, and peer review continued to function well. The institution needed to address the QIT process more aggressively and train sufficient staff to operate the MHTS.

Medication management also progressed in a number of areas. Medication continuity on arrival and housing changes was routine, a medication management policy had been adopted and informed medication consent forms were generally present in inmates' UHRs. In addition, adequate systems were in place for parole medications, medication errors, laboratory work for inmates on mood-stabilizing medications and Keyhea orders for inmates in need of involuntary medications. Most MARs were legible and filed in the inmates' charts. On the other hand, medication expirations had increased; problems with follow-up to medication non-compliance continued for a significant percentage of caseload inmates; and HS medications were not prescribed.

Institutional disciplinary logs had improved, but the RVR process still had some problems. Requests for mental health assessments were not always received in a timely manner; a significant percentage of assessments were not completed within required time frames; hearing officers did not always document mental health input in

their findings or dispositions; and clinical interviews for the assessments were not generally conducted in a confidential environment.

Transfer delays were also apparent at all classification levels examined by the monitor. The timeliness of EOP transfers and transfers to APP/DMH at CMF was still a problem. Length of stays for 3CMS inmates in the reception center and for inmates in the MHCB unit was problematic.

In regard to its CAP items, the institution continued to struggle with clinical responses to referrals, psychiatric participation in IDTT meetings, timely mental health screenings and evaluations in the reception center and filing backlogs. Some slippage was also noted with respect to clinical follow-up of suicidal inmates discharged from a MHCB unit.

During the monitoring period, NKSP was plagued by increasing demands for mental health services but blessed with relatively full mental health staffing. The institution needed better clinical supervision, especially of its large contingent of contract psychiatrists. Some problems, such as more timely transfers to higher levels of care, were beyond the institution's capacity to fix, but continuing CAP deficiencies needed to be more aggressively addressed and redressed.

## Service Area H

This service area includes <u>California State Prison, Los Angeles County</u> <u>(CSP/LAC)</u> and the <u>California Correctional Institute (CCI)</u>.

### California State Prison, Los Angeles County (CSP/LAC)
September 26-28, 2005
December 5, 2005

In an otherwise positive mental health staffing picture, vacancies among psychiatrists increased during the monitoring period. As of September, the functional vacancy rate among psychiatrists, after factoring in contractual hours, climbed to 28 percent, up from 16 percent during the preceding monitoring period. Over half (5.5) of nine staff psychiatrist positions were vacant, with contractors covering the equivalent of 2.5 staff psychiatrist positions. Positions for a chief and a senior psychiatrist were both filled by full time staff.

Among 26 case managers, positions for five psychologists and a psych social worker were vacant, but all of them were covered by contracted staff. The chief psychologist had recently resigned, and the position remained vacant in September. Staff psychologists rotated as acting chief.

Three of four recreational therapist positions were vacant, but two of the positions were covered by contractors. A senior psych tech and 13 of 14 psych tech positions were filled. The sole vacant psych tech position was covered by contracted staff. Eight of nine office tech positions were filled, as was the office tech supervisory position. The vacant office tech position was covered by contracted staff.

Issues Resolved:

HS medications were ordered as needed for inmates on the mental health caseload.

261

Medications were routinely provided to caseload inmates who paroled.

Quality Management:

CSP/LAC's relatively embryonic quality management system progressed only slightly during the monitoring period. Mental health staff visited two other CDCR prisons to assess and understand their successful quality assurance activities. The only notable resulting change in CSP/LAC's mental health quality management during the monitoring period was the initiation of peer review among all categories of clinicians, including psychiatrists, psychologists and psych social workers. Peer review meetings of psychologists were sparsely attended, while peer review among psych social workers was not well documented.

The governing body continued to meet quarterly. In June the governing body received a report on the shortage of crisis beds. Minutes reflected that local operating procedures addressing the shortfall of CTC beds were revised to eliminate a provision allowing suicide watches in holding cells.

The mental health quality management committee met monthly but forwarded few reports to its oversight committee in 2005. Few staff other than supervisors were involved in quality management or informed about the results of audits. Custody staff rarely attended committee meetings. Five QITs were in progress but they did not function as intended. QIT activities needed better documentation.

Suicide prevention committee meetings were well attended by mental health and custody representatives, but other significant participants missed all or most meetings. The activities of the committee were well documented and covered essential items. Information about suicide prevention was disseminated via teleconferences and

on-the-job training through collaborative efforts by mental health and custody staff. The suicide prevention committee paid insufficient attention to custody observations of suicidal inmates discharged from crisis beds or higher levels of care.

Medication Management:

Medication management benefited from sustained collaboration among medical, mental health and custody staffs. The institution effectively provided medications to 90 percent of inmates released on parole. Omissions were attributed to incomplete or outdated lists. Improvements occurred in handling medication non-compliance, continuity of medications and the procurement of informed medication consent forms, but more work was needed in all three areas. The facility also resumed the appropriate ordering and distribution of HS medication during the monitoring period.

Non-compliance with medications was more frequently reported to mental health in a timely manner. The improvement, attributed to better training and supervision, was reflected in institutional audits. While inmates referred for non-compliance were subsequently seen relatively quickly by psychiatrists, MTAs did not always make referrals when warranted.

Medication orders were filled routinely the day after they were written. Institutional audits found that in 2005 informed medication consent forms were filed in 81 to 93 percent of audited charts.

Problems with the timely renewal of medication orders persisted despite efforts of a QIT chartered to address the issue. Software used by the pharmacy did not distinguish discontinued from expired orders. While institutional audits found few problems with expirations, staff's attempts to prevent orders from expiring by writing

orders in excess of 90 days went unaddressed.  Interviewed inmates reported that their orders predictably ran out every 90 days, resulting in lapses in medication administration.

Medication continuity was maintained for 80 percent of arriving inmates. To improve medication continuity during intra-institutional transfers a new practice required that nurses stamp inmate movement sheets.  Early results appeared promising, but no audits had yet been conducted to confirm the effects of the new practice.

Previously resolved problems with heat-sensitive psychotropic medications and Keyhea orders re-emerged.  Interviewed inmates reported they were not informed about the possible risks posed by certain psychotropic medications and exposure to high heat.  Some had heat cards, but others did not.  Recent large scale transfers of inmates in and out of the institution may have contributed to the lapses.

Twenty-four Keyhea cases were either initiated or renewed in 2005. Twelve petitions did not result in an order because they were dropped, denied or the inmate was transferred before a decision was reached.  The Keyhea coordinator maintained two lists of Keyhea cases that overlapped but were not identical. Management of the Keyhea process needed further improvement.

Mental Health Assessments for the Disciplinary Process:

CSP/LAC continued to maintain a comprehensive log of RVRs and mental health assessments. The log was useful in conducting audits and identifying problems. Inmates continued to type final RVRs despite the obvious breaches of confidentiality involved in the practice.

The volume of disciplinary proceedings slowed dispositions and drove up the number of inmates in administrative segregation.  There were not enough walk-alone

yards to accommodate the number of inmates in administrative segregation on walk-alone status. The number of referrals made to the local DA increased fivefold during the monitoring period. The number of RVRs written in the EOP increased. The quality of mental health assessments done for disciplinary purposes declined as did the frequency with which segregated inmates had ICC meetings.

During the monitoring period, 150 EOP inmates received RVRs and mental health assessments. Sanctions were mitigated in nine percent (13) based on the mental health assessment. During the monitoring period, mental health assessments were prepared for 29 3CMS inmates (two percent of the 1,439 RVRs written for 3CMS inmates) and five non-caseload inmates. This represented a modest improvement over the preceding monitoring period when no 3CMS or non-caseload inmates were referred for assessments. An audit completed by staff in August examined whether bizarre, unusual or uncharacteristic behavior was being under-identified by senior hearing officers. The audit found no problems.

An audit in early 2005 found somewhat improved mental health assessments and better documentation by hearing officers in the findings and disposition sections of the RVR. The audit indicated that 39 percent of reviewed assessments were incomplete, while 21 percent were not expressed in lay terms. Deficiencies were attributed to untrained clinicians completing assessments. Three additional training sessions were conducted, and untrained clinicians were prohibited from performing assessments. An audit of 29 cases in August found improvements in quality. Eighty-six percent of the reviewed assessments were complete, and suitably lay language was used

in 93 percent. Problems with timeliness and the documentation of outcomes persisted in 17 percent of the reviewed assessments.

The monitor's review of a large sample of RVRs of EOP inmates found that senior hearing officers apparently understood the purpose of the mental health assessment and usually documented their consideration of the assessments. In some cases information provided by mental health was not noted, and the disposition was in conflict with the assessment. Some problems were found with the quality of mental health assessments; not all were complete. Assessments sometimes contained information that was not particularly useful, and several failed to document interviews with inmates. Staff reported growing pressure from some correctional staff to write assessments in a particular way.

The large number of RVRs, combined with the high proportion of caseload inmates charged, reportedly slowed the processing of RVRs. Anecdotal reports pointed to several associated problems. ICC meetings were pushed back to 120-day intervals for a time but were held every 30 days by the time of the monitor's September visit. One correctional counselor reportedly had over 200 RVR cases to process at a given time.

A markedly increased number of cases were referred to the district attorney during the monitoring period. Disciplinary charges involving 46 EOP and 58 3CMS inmates were referred for possible prosecution, compared with a total of just 20 referrals of charges involving caseload inmates during the preceding monitoring period. One consequence of the increase was a rise in the number and lengths of stay of caseload inmates in administrative segregation.

Three RVRs were written for self-injurious behavior during the monitoring period. Contrary to CDCR policy, no mental health evaluation was requested prior to writing up the charge in any of the three instances. An extremely high number of RVRs were posted in the EOP unit for disrespect towards staff, obstructing peace officers and violations of grooming standards. A number of these RVRs involved inmates identified during the unidentified needs assessment (UNA) as requiring a higher level of care. Among the assessments reviewed by the monitor, clinicians in two argued strongly for the assessed inmate's guilt. Two other assessments of "troublesome" inmates with personality disorders raised questions about the clinical objectivity of the assessors.

Several interviewed EOP participants reported to the monitor that correctional officers provoked inmates who were severely mentally ill, ignored requests for help, goaded inmates into injuring themselves and physically abused inmates. A small number of inmates exhibited signs consistent with emotional trauma when recounting such mistreatment. See, for example, Exhibit M, Case Review 8.

Transfers:

Tracking of referrals and transfers to higher levels of care improved. Logs were complete except for the one used to track transfers to a PSU, which omitted some essential milestones. Referrals to DMH for acute care occurred on average within four days of an inmate's arrival in the MHCB unit. Of 23 referrals to DMH/APP at CMF, 20 were accepted, three were rescinded and none was rejected. Discharge summaries from DMH were rarely found in the medical records of inmates who were treated and returned.

Acceptances and transfers to DMH/APP slowed significantly during the monitoring period. Acceptance took on average 34.5 days with a range of eight to sixty

days. During the preceding monitoring period, the average was nine days, which, in turn, was a substantial increase over the two to three days reported during the 14th round of monitoring. Bed numbers were assigned on the day of acceptance in all but two cases. In the two exceptions, bed numbers were supplied within one and three days of clinical acceptances. The average time to transfer was 2.5 days. The average included one transfer that took seven days.

From January through September 2005, CSP/LAC initiated 39 referrals to intermediate DMH care at SVPP. No referrals were made to ASH. Twenty-three referrals were triggered by UNA reviews. Most of the UNA cases were reviewed via a monthly IDTT meeting, but few received any augmented treatment. Some inmates reviewed during the UNA, who were recommended for referrals to higher levels of care, subsequently received treatment that was less than adequate. See, for example, Exhibit M, Case Reviews 1, 3, 6 and 9. Inadequacies included a lack of monthly psychiatry contacts, a failure to consider involuntary medication when apparently appropriate, a high proportion of cell-front contacts and unresponsive, fragmented and delayed treatment and treatment plans that omitted essential elements.

Referral packets were not completed expeditiously. One inmate recommended in the UNA for referral to intermediate DMH care was finally referred to an intermediate level of DMH care nearly six months after the UNA recommendation was made. Another inmate recommended for referral in the UNA was not referred because clinical staff believed that a change in his housing would be disruptive. The inmate appeared no less in need of an intermediate level of DMH care when seen by the monitor's expert nine months later. On average, it took ten weeks, with a range of one to

24 weeks, to complete a referral to DMH/SVPP programs. A total of 34 packets were submitted. Five more were being completed at the time of the monitor's September visit. Three referrals were rejected, six were rescinded and one inmate was paroled before gaining admission. Only two of the referrals actually resulted in transfers to SVPP. One inmate admitted to SVPP was returned to CSP/LAC after a seven-month stay; he was stabilized on a non-formulary antipsychotic medication and returned with orders to remain on it. Due to a series of errors and omissions after his return, the medication was not available to him for two months following his return.

Recognizing the delays and realizing the need for improvement, a new local operating procedure on referrals was promulgated in September. The procedure described the steps in identifying referrals and assigned responsibility to specific individuals for performing each step. Staff planned to audit the process. DMH's requirement that the sending institution hold Vitek hearings for inmates who refused acute or intermediate care was reported by staff as a serious impediment to timely referrals. A newly appointed CCII was expected to facilitate future Vitek hearings.

Seven inmates had three or more stays in the MHCB during the six months preceding the monitor's September visit. Two were referred to DMH; one was transferred and the other remained on a wait list for intermediate care. Records of treatment in the MHCB unit were often missing from discharged inmates' UHRs. No systematic quantitative data on the shortage of crisis beds was available on site.

During the monitoring period there were 14 transfers to a PSU. Little information on the dates of ICC referrals, endorsements or transfers for these inmates was available. In the three cases where data was available, delays between referral and

endorsement averaged two weeks, while the interval between endorsement and transfer averaged 37 days. Seven inmates were awaiting transfer to a PSU in September. Available information showed that two of these were originally referred in March, two in May and one in August.

Other CAP Issues:

a. Partial Compliance

The number of hours of treatment offered to EOP inmates in the general population fell below ten per week due to cancellations of group treatment and an idiosyncratic method of counting supervised recreation time that inflated hours. Quarterly IDTT meetings were held regularly for caseload inmates in administrative segregation, but correctional counselors and C-files were not always present. EOP inmates in administrative segregation were offered ten hours of scheduled structured therapeutic activities weekly. An effort to streamline the escort process by compressing all ten hours of group activities offered to any individual within two days resulted in too much in-cell time during the other five days. A shortage of yard space restricted out-of-cell time even further. At the time of the monitor's December visit, structured therapeutic activities for EOP inmates in administrative segregation had been redistributed throughout the week. Inmates reported they were able to get out of their cells five or six days each week.

b. Non-Compliance

CSP/LAC remained unable to screen new admissions to administrative segregation reliably. Ten of 38 UHRs reviewed by the monitor did not contain mental health screenings associated with placement in administrative segregation. Among the

remaining 28 screenings, three resulted in referrals for follow-up, which actually

occurred in two.  A note in the third inmate's chart indicated that he was not seen because

he had been removed from administrative segregation.  A month later he was readmitted

to administrative segregation, but he was not screened pursuant to this second admission

nor was he seen by mental health staff following-up the referral from the positive

screening on his first admission.

Institutional Summary:

          The functional vacancy rate for psychiatry rose from 16 to 28 percent

during the monitoring period.  Other clinical categories were fully staffed or covered by

contractors.

          Medication management remained a problem overall, although

collaborative improvement efforts among disciplines contributed.  Areas showing

progress included HS medications, acquisition of informed medication consent forms,

parole medications and referrals for medication non-compliance.  Follow-up to non-

compliance, timely renewal of medication orders and continuity of medication on intra-

institutional moves showed some improvement but remained problematic.  Distribution

of heat cards and tracking of Keyhea orders, previously resolved issues, re-emerged as

problems.

          Progress in quality assurance was flat during the monitoring period except

that all three clinical disciplines were engaged in peer review.  Meetings of the suicide

prevention committee were not well attended, but the rump committee worked well.

With regard to transfers, the tracking of referrals to higher levels of care improved

significantly.  Staff, however, took too long to complete referral packets for intermediate

care.  Access to inpatient DMH programs, both acute and intermediate, was poor.  The

wait for access to acute DMH care stretched beyond 30 days, while clinical acceptance

for intermediate care resulted in placements on a wait-list but rarely in an actual transfer

to SVPP.   Once a bed became available, CSP/LAC transported the inmate promptly.

MHCB beds also were not always available when needed.

The quality of mental health assessments in the disciplinary process varied

from unacceptable to adequate during the monitoring period.  Audits and supplemental

training sessions were conducted to improve the quality of assessments, but more needed

to be done.  The handling of RVRs for self-injurious behavior consistently violated

applicable CDCR policy.   Inmate clerks inappropriately continued to be used to type

RVR documents.  The volume of RVRs and DA referrals of caseload inmates increased

significantly.

In September, inmates reported acts of physical aggression, intimidation

and verbal humiliation by correctional officers in EOP buildings and administrative

segregation.  Between the September and December, similar reports from interviewed

general population EOP inmates declined, but remained widespread in administrative

segregation. In addition to allegations of maltreatment of mentally ill inmates, EOP

inmates in administrative segregation reported that correctional officers applied OC spray

with little or no justification and failed often to decontaminate sprayed inmates or

document the use of OC.

### California Correctional Institution (CCI)
November 7, 2005 – November 9, 2005

CCI had vacancies for a senior psychiatrist, 3.5 psychiatrists, a senior

psychologist and 8.34 psychologists.  Contract clinicians and interns covered all but one

vacant psychiatrist positions and all but 0.34 of vacant psychologist positions. CCI continued to have difficulty recruiting and retaining permanent mental health staff due, in part, to the remoteness of its location. The institution reported a 50-percent turnover among psychologists during the past year. CCI continued to have continuity of care problems related to these permanent staffing vacancies.

CCI's mental health caseload capacity was recently increased from 1,199 to 1,349 inmates. The total number of MHSDS inmates at CCI at the time of the monitor's visit was 1,374 inmates, including 38 EOP inmates. Those numbers represented approximately 24 percent of the total inmate population at CCI. Additional staff positions had been allocated to the institution to support the increased caseload population, but administrators complained that it generally took a year before funding for augmented staff became available and, in the interim, staff levels were insufficient to provide adequate mental health services to all caseload inmates.

The institution also had difficulty recruiting and retaining auxiliary staff. Positions for 9.81 RNs and 13 MTAs were vacant. In addition, two nurses and one MTA were on extended leave. Contractors covered all of the nursing vacancies, but only four of the MTA openings.

<u>Issues Resolved:</u>

Clinical intake assessments were completed in a timely manner.

Initial treatment plans were also completed within specified time frames.

Inmates were provided with parole medications upon discharge from the institution.

Quality Management:

CCI continued to make progress in implementing its quality assurance process. The quality management committee was required by institutional policy to meet twice monthly, but it generally met weekly and regularly kept minutes of its meetings. Due to staffing vacancies, however, no psychiatrist attended these meetings. The mental health subcommittee had been meeting biweekly for many months.

A number of QITs were active at CCI during the monitoring period covering all unresolved CAP items. The reporting format used by QITs to describe their methodologies, results and corrective plans continued to improve, although methodological problems with some audits persisted, particularly with medication management audits.

Chart reviews were conducted routinely, and staff was usually informed of results. Psychiatrists still met for weekly peer review, but no minutes were maintained of the meetings. Psychologists and psych social workers met together for peer review on a monthly basis. Minutes from these meetings indicated that peer review activities were primarily focused on reviewing UHRs for the presence or absence of specified criteria.

The MHTS was, according to the institution's status report, used extensively at CCI to produce weekly management reports, to track case manager contacts and to ducat inmates for arrival contacts, but there were still some inaccuracies in the system. During the preceding monitoring round, an institutional concordance study found a five-percent discrepancy rate between the MHTS and UHR data. Another concordance study, completed in September 2005, found a slightly lower concordance rate of 93.1 percent. Due to these inaccuracies, the institution did not use the MHTS to

conduct its quality management audits, which were administered manually. The accuracy of some printouts and reports reportedly improved in recent months.

Medication Management:

Some aspects of medication management continued to present problems. The shortage of psychiatric staffing and methodologically flawed audits, especially in relation to continuity of medication issues, made it hard to implement departmental policy requirements. The institution was in the process of revising its local operating practices for the delivery of medications at the time of the monitor's visit. Specifically, CCI was changing from a bulk administration process to a more individualized medication packet system. The changeover was expected to be completed in January 2006.

Medication continuity for arriving inmates appeared to be functioning reasonably well. The institution had procedures in place for providing medication to inmates arriving with prescriptions from other CDC institutions, as well as those without proof they were on medication. Medication continuity for inmates changing housing locations remained problematic. Much of the problem was attributed to the failure of correctional officers to follow local procedures for the use of the form designed to notify impacted departments of internal relocations. Similarly, continuity at the time of medication renewals was erratic. Inmates awaiting renewals were not always scheduled for appointments with, or seen by, prescribing psychiatrists within the 14-day prescription extension period. Institutional audits in all of these areas were methodologically flawed, yielding a wide range of inconsistent and unreliable data.

The timeliness of follow-up to medication non-compliance was troublesome. Non-compliant inmates were not consistently seen by mental health within seven days of referral. Filing backlogs made it difficult to assess the degree of compliance accurately, but institutional audits for October 2005 indicated that just 60 percent of non-compliant inmates were referred in some housing levels and from zero to 70 percent of referrals were seen in a timely manner. Timely psychiatric follow-up to medication changes was also problematic. A flawed institutional audit showed that only 54 percent of inmates were seen within two weeks of their prescription changes. Psychiatric staffing shortages were largely responsible for these delays.

CCI continued to maintain a parole medication log, showing that parole medications were generally provided to inmates discharged from the institution. Quarterly audits for the period form January through September 2005 showed that between 88.3 and 94 percent of paroling inmates received a 30-day supply of medications. During the same period, a minimum of 97.3 percent of inmates received pre-parole counseling.

Significant progress occurred in the ordering of laboratory tests for inmates on mood-stabilizing medications, but test results were not always returned and filed in inmates' UHRs in a timely manner. Moreover, the institution did not audit whether prescribing clinicians made appropriate adjustments to inmates' medications in response to test results. The monitor's expert recommended reviewing and possibly revising existing protocols for laboratory testing.

CCI lacked any process for distinguishing between DOT and nurse administered medications, and no central record was kept of inmates receiving DOT. All

276

inmates in administrative segregation reportedly were administered their medications via DOT procedures, even though DOT was not formally ordered for many of them. Implementation of DOT procedures, as well as those for nurse administered medications, were periodically observed and supervised.

CCI reported that local management of the Keyhea process improved during the monitoring period. The institution historically had problems tracking inmates who arrived on Keyhea orders due to deficiencies in the department's centralized list of inmates with active Keyhea orders. New protocols for the screening of charts by RNs were introduced in July 2005, and staff was trained on how to conduct the screening. As a result, the institution indicated it was able to track arriving Keyhea inmates much more accurately. Renewals were reportedly sought in a timely fashion.

At least 20 percent of inmates on psychotropic medications were receiving their medications on a HS basis. Few inmates in locked-down housing units, however, received HS medications.

Medication errors were under-reported at CCI, particularly with respect to missed medications that, pursuant to policy, should have been considered medication errors. According to medication error reports, only five instances of missed medications occurred during July and August 2005, none of which involved mental health inmates. In contrast, an institutional study for the period from June 20 to July 20, 2005 found 245 missed doses, few of which apparently generated medication error reports.

Nothing changed during the monitoring period with respect to the use of MARs. CCI still did not use the new MAR form, but entries were legible and the forms

were filed routinely in inmates' UHRs. Supervisors continued to review MARs approximately twice a month.

CCI reported that informed medication consent forms were obtained from inmates on psychotropic medications and filed in inmates' charts.

Mental Health Assessments for the Disciplinary Process:

The RVR data collection process at CCI was largely unreliable. Methods for collecting data differed from housing yard to housing yard, and many logbook entries were inexplicably voided. Computerized information was frequently inconsistent with data in the manual logs. Mental health assessment logs were more accurate; a comparison of the assessment log and completed RVRs indicated a reliable level of congruence.

From January through September 2005, 99 mental health assessments were completed, 22 of them for EOP inmates. Clinicians were not assigned to complete assessments for inmates on their own caseloads. The monitor's expert reviewed 20 completed assessments and found that, while assessments were clearly written in lay terms, they rarely recommended mitigating punishment. Clinicians and hearing officers appeared to have a fundamental misunderstanding of the purpose of mental health recommendations. Further training on mental health input and mitigation standards was needed.

Hearing officers generally noted clinicians' conclusions, but did not always document the relation of mental health input to their dispositions. According to an institutional status report in June 2005, hearing officers referred to the completed mental health assessments in 29 of 32 cases.

CCI had an agreement with the district attorney's office about inmates referred for criminal charges. Both parties reportedly continued to honor the agreement, although it formally expired in July 2004. CCI tracked referrals only of EOP administrative segregation inmates. Institutional data showed that between January and October 2005, infractions involving 30 EOP administrative segregation inmates were referred to the district attorney. Nineteen of these referrals were declined, four were still pending and seven were in various stages of evaluation by the district attorney's office.

Transfers:

The number of EOP transfers delayed beyond required timelines declined somewhat during the monitoring period. According to institutional data, the average number of delayed EOP transfers in 2005 was 12.25; in September 2005, the average was down to 8.5. The institutional audit did not, however, indicate the range in the length of delays experienced by inmates.

The timeliness of transfers of EOP inmates in administrative segregation deteriorated. EOP inmates more frequently remained beyond 60 days in CCI's administrative segregation unit due to the shortage of beds in EOP administrative segregation hub units. Reportedly, the institution also had difficulty in transferring 3CMS inmates identified as needing an EOP level of care into EOP programs at other institutions. CCI did not provide any information on accelerated transfers to EOP placements of inmates based on clinical determinations.

CCI had serious problems with access to MHCB units, due to the system-wide shortage of crisis beds during the monitoring period. Staff indicated that the number of MHCB transfers decreased from an average of ten to 15 per month to only two

279

or three a month. From November 2004 to November 2005, 60 OHU inmates were placed on the MHCB waiting list; 35 of these inmates were removed from the waiting list because they either improved or were paroled; only eight of the 60 inmates actually transferred to a MHCB unit. CCI drafted, but had not yet signed, a local operating procedure to regulate the placement of inmates awaiting MHCB transfer for whom no beds were available.

There continued to be some inmates with extended lengths of stay in the OHU. From November 2004 to November 2005, there were 362 admissions to the OHU. Of these, 33 admissions remained longer than three days, with lengths of stay ranging from four to 20 days. During this same period, nine inmates had more than three admissions to the OHU.

CCI had access to DMH, primarily through CMF, although delays continued to interfere with the transfer of some inmates. There were 22 inmates referred to DMH from CCI during 2005. At the time of the monitor's visit, only four of these inmates remained at CCI. Two were never transferred to DMH; another was accepted at DMH within 14 days of his referral, but was hospitalized at a local area hospital for medical reasons at the time of his acceptance; and the last was just being transferred within 15 days of his referral.

Psych and return procedures were usually, but not always, followed. The institution was reportedly notified in advance of inmates returning from DMH, although some inmates returned without prior notice. Similarly, discharge summaries were generally, but not always, received for returning inmates.

Other CAP Issues:

a.  Partial Compliance

Group therapy for 3CMS inmates was limited at CCI due to space constraints and staffing shortages. There were several groups operating at CCI, but the monitor received conflicting data about the exact number of groups offered.

The confidentiality of case management contacts, a problem resolved earlier everywhere except in administrative segregation, reappeared. Case managers did not always meet with inmates in confidential settings due to the lack of private interview space. A shortage of escort officers also contributed to the problem, particularly in the lockdown units. Out-of-cell contacts in administrative segregation were often conducted in holding cells in open dayrooms.

Suicide prevention follow-up declined slightly during the monitoring period. Clinicians provided five-day follow-up for 90.91 percent of inmates discharged from MHCB units and the OHU. In September 2005, compliance slipped to 87 percent. Two follow-up entries in May and June 2005 were found to have been falsified.

Heat passes were reportedly distributed to most inmates on heat-sensitive medication, but not all inmates appeared to have them. The results of spot checks in June and July 2005 were erratic. MTAs at some pill lines asked to see inmates' heat passes and issued passes to inmates without them, while other MTAs neither asked to see inmates' passes nor carried a supply of heat passes to distribute. An institutional audit of 25 inmates on psychotropic medications found that all but two had heat passes.

b.  Non-Compliance

Psychiatric attendance at IDTT meetings worsened.  An institutional audit in October 2005 showed that psychiatrists attended less than five percent of IDTT meetings on most yards.  Earlier audits in June and August 2005 reflected higher attendance rates on some yards.  The monitor's expert reviewed the treatment plans of several inmates and found that they were often generic.

Problems with the timeliness of psychiatric responses to inmate and staff referrals were resolved during the ninth monitoring round, but no updated information was available on continuing compliance in this area.  The institution used the MHTS to track referrals, but until recently the system did not have the capacity to monitor timeframes.

The institution was unable to audit range of motion practices in the OHU for inmates placed in restraints.  Documentation on the provision of range of motion to inmates in restraints was filed in inmates' UHRs on their discharge, so no records on the issue were retained in the OHU.  Often such inmates were transferred to a MHCB unit elsewhere along with their records, leaving the facility with no way to audit compliance.  An earlier recommendation suggested the development of a restraint log that documented range of motion practices, but the institution failed to respond.  Two inmates were placed in restraints in the CCI OHU in October 2005.

Although problems with incomplete mental health files were earlier resolved, filing backlogs again presented a major problem for the institution.  CCI had large piles of loose filings that intermittently waxed and waned.  As a result, clinicians often did not have inmates' complete records available to them at the time of contact,

compromising the delivery of proper mental health care. Delays in moving charts and occasionally lost charts further impinged on mental health services. Filing problems also made it difficult to conduct reliable audits of a number of important medication management issues.

CCI had implemented the department's new sexual misconduct policy. Institutional data indicated that 19 inmates received RVRs for sexual misconduct since the new policy went into effect. Of those 19 inmates, clinicians had assessed 14 inmates by the time of the monitor's visit, diagnosing three of them with exhibitionism; two of the three inmates were in the MHCB unit. According to the institution, there were no clinicians at CCI with sufficient expertise to treat this problem, and no related departmental training had yet occurred.

During the monitoring period, CCI completed CPR training, including training on the use of mouth shields, for many correctional officers. The institution expected to provide training for the 150 officers not yet trained by the beginning of December 2005. The monitor conducted spot checks with a small sample of correctional officers and found that not all of them carried mouth guards as required by departmental policy. Some of the encountered correctional officers did not understand the connection between CPR and use of the mouth guards.

Eight cells at CCI were equipped with video monitoring equipment. One correctional officer was able to monitor up to six cells simultaneously. The resolution of the monitor screens was adequate.

Institutional Summary:

CCI had a significant number of psychiatrist and psychologist vacancies among permanent positions, but was consistently able to cover most clinical vacancies with contracted providers. Reliance on contract psychiatrists caused problems particularly in consistent medication practices and fully staffed IDTT meetings.

Of the four areas of focus during the monitoring period, quality assurance maintained earlier progress and demonstrated some continuing improvement. The quality management committee and the mental health subcommittee met regularly; a number of QITs were active; chart reviews were conducted regularly; and peer review seemed firmly established. Some lingering inaccuracies in the institution's MHTS limited the facility's capacity to conduct audits in some areas.

Unreliable RVR data hindered evaluation of the mental health assessments in the disciplinary process, although available data on the actual assessments was considered accurate. Assessments were written clearly, but clinicians consistently refrained from recommending any mitigation of punishment in appropriate cases.

Faulty institutional audits also made it difficult to assess compliance with medication management requirements. Progress continued in maintaining medication continuity on arrival, providing parole medications, tracking inmates on Keyhea orders, ordering laboratory tests for inmates on mood-stabilizing medication, providing HS medications and obtaining and filing informed medication consent forms. Problems persisted with the continuity of medication for inmates changing housing locations and on the renewal of medication orders, follow-up to medication non-compliance and

medication changes, the timeliness of laboratory test results, the delivery of DOT and nurse administered medications and the consistent accuracy of medication error reports.

The timeliness of EOP transfers improved marginally, but problems expanded with transfers to other levels of mental health care. EOP administrative segregation inmates frequently waited longer than 60 days for transfers to a hub unit, and the system-wide shortage of MHCB beds resulted in fewer and less timely transfers and longer stays in the OHU. Access to DMH was delayed for some inmates, but psych and return procedures reportedly were followed in most instances.

Relative to its CAP, the institution made some favorable progress during the monitoring period, while resolving three deficiencies. The institution offered limited group therapy to eligible 3CMS inmates, while the shortage of escort officers and inadequate confidential space for case manager contacts seriously compromised clinical communication. Suicide prevention follow-up decreased slightly, and some inmates lacked required heat passes. Problems persisted with filing backlogs. The absence of available documentation of range of motion practices during involuntary restraints of inmates prevented any assessment of compliance with program guide requirements in this regard.

## Service Area I

Service Area I includes the California Institution for Men (CIM) and the

California Rehabilitation Center (CRC).

### California Institution for Men (CIM)
October 5, 2005 – October 7, 2005
January 31, 2006

In October 2005, CIM had 13 allocated supervisory and staff psychiatrist

positions. One staff psychiatrist position had been re-directed to DCHCS in Sacramento,

but all 12 remaining positions were filled by permanent employees and one contractor.

Among 33.5 line and supervisory case manager positions reported as allocated by the

institution, all but one were filled by permanent employees and one full-time contract

psychologist. The department's statistics on CIM staffing indicated that the facility's

allocation of line and supervisory case manager positions in October 2005 was 36.9. One

supervisory psychologist position was undergoing reclassification to a line position, but

this still left a difference of 2.4 case manger positions between the department's

accounting and the institution's. CIM reported four allocated and filled psych tech

positions, while the department's figures showed 5.9 allocated psych tech positions. Two

of three allocated positions for recreational therapists were filled, while the third was

being converted to a case manager position. There were no vacancies among RN,

medical transcriber and MTA positions. CIM's mental health staffing appeared relatively

adequate, but was offset by substantial caseload growth.

The MHSDS caseload census in CIM in October 2005 included 1,452

inmates, 194 of them at the EOP level of care. Between December 2004 and October

2005, the overall MHSDS caseload population grew by nearly 30 percent. In mid-2005,

286

caseload numbers in administrative segregation and EOP experienced a substantial surge. In July, the facility reported an EOP population of over 200, compared with an earlier average of 115; in August, the caseload population in administrative segregation rose to 101, compared with an earlier average of 52. In January 2006, the monitor found some, but not much, change in caseload numbers. The EOP count averaged roughly 180 inmates from October through January, and the overall population count in administrative segregation ranged from 130 to 150 during the same period. In January, 37 EOP inmates were housed in administrative segregation.

During the monitor's October visit, CIM administrators reported that no additional mental health staff had been allocated to match the escalating population despite institutional pleas for more positions. In January, the facility reported that it had received an allocation of positions for 2.25 case managers and a psychiatrist, but these were temporary contract positions for its MHCB unit and an anticipated increase in reception activities. The net result of all this was considerable erosion of gains in the provision of improved mental health treatment and care reported in the preceding monitoring round.

Issues Resolved:

Meetings between psychiatrists and inmates were held in a private setting.

Quality Management:

The institutional health care quality management committee met weekly. Meetings were well attended and chaired by the warden. Minutes of the meetings were complete but often contained repetitive boilerplate language, while consideration of some subcommittee reports, including one on timely transfers of MHSDS inmates, were

deferred repeatedly. The committee also discussed suicides and serious self-inflicted injuries.

The mental health quality management committee met monthly. Well-kept minutes indicated that attendance was good and participants routinely discussed relevant issues. A list of remedies generated by the Office of the Inspector General in its report on the 2004 stabbing of a correctional officer at CIM served as a focal point for many quality assurance activities, including the production of new local operating policies and audits. Among other subjects, the new procedures addressed involuntary medications, DMH referrals, treatment services in administrative segregation and peer review.

The suicide prevention subcommittee held monthly meetings that were reasonably well-documented. Custody staff and psychiatrists rarely attended meetings, while RNs and MTAs attended them only occasionally. Meetings were typically attended by the same three or four mental health clinicians, who consistently failed to identify problems, examine current practices or record improvements. Eight serious incidents involving self-injuries and two suicides occurred in CIM in 2005. Greater and more interdisciplinary suicide prevention efforts needed to be undertaken in CIM.

Several QITs chartered during the monitoring period had a positive impact in developing new local operating policies, standard procedures and training. QITs on access to mental health crisis beds, RVRs and initial mental health screenings included representatives from all relevant disciplines and locations, maintained coherent records and worked as intended. Some other QITs met rarely, lacked focus and had little impact. Mental health staff reported that they received feedback regularly on the results of quality

assurance audits. They also cited pressing clinical duties to justify their reluctance to serve on QITs.

For the first time, all three clinical disciplines were conducting regular peer review. Reviews were completed on schedule and addressed meaningful issues. The process was well organized and documented, and the results were reported regularly to DCHCS.

Medication Management:

Medication management remained problematic. Flawed audits helped to obscure the extent of problems with medication management. Interviewed staff and inmates indicated that medication orders often went astray after being written. Inmates with current orders experienced interruptions in their medications when they changed locations, and gaps between the expiration and renewal of medication orders were common. No reliable system was available to schedule appointments before orders expired. Non-compliance with medications did not routinely elicit a response. Psychiatrists who evaluated new admissions in reception reported that they no longer had access to records of current medication orders that accompanied inmates arriving from county jails.

MARs remained difficult to read and were not filed in UHRs in a timely fashion. In a new development, staff reported that supervisors reviewed MARs weekly. An institutional audit of informed medication consent forms found a drop in compliance from over 80 percent to 57 percent.

Medication errors were still reported to the directors of nursing and pharmacy. The pharmacist continued to aggregate errors and forward a summary to the health care quality assurance committee. Staff reported that the pharmacy at CIM continued to provide paroled inmates with a supply of medication and maintained records of the distribution of parole medications in each yard. The institution reportedly mailed medication to inmates who left without it.

Eight percent of the mental health caseload had orders for HS medication. A new local operating procedure was adopted on Keyhea orders. The Keyhea coordinator reported that the system for identifying newly arrived inmates with active Keyhea orders was generally accurate but failed to identify those inmates whose Keyhea orders were due to expire within 30 or fewer days after their arrival. Several Keyhea petitions were lost due to technical and logistical issues.

Mental Health Assessments for the Disciplinary Process:

CIM conducted an effective QIT on the disciplinary process for mentally ill inmates. Despite joint retraining of custodial and clinical staff early in 2005, the number of cases in which the reporting employee deemed a 3CMS inmate's behavior to be bizarre, unusual, or uncharacteristic remained low. C- files and medical records were not always reviewed by mental health staff completing assessments due to a lack of availability.

The institution conducted two audits, one pre-and one post-training. Prior to the training, many deficiencies were found in both the clinical and custodial components of RVRs. The second audit focused on the intelligibility of mental health assessments and whether dispositions by hearing officers took those assessments into

account.  The second audit found, and the monitor's review confirmed, that mental health assessments were complete, and hearing officers noted the assessments in their findings and dispositions.  In several cases penalties were mitigated based on the mental health assessment.

Documentation related to the disciplinary process for mentally ill inmates needed further improvement.  The QIT found that disciplinary logs were missing information about the level of care of caseload inmates.  Reporting employees occasionally supplied clinical information such as "the inmate is not taking psychotropic medication" or "the inmate's behavior did not appear to be influenced by his mental illness."  Canned language was used in the documentation of supervisors' reviews of RVR packets.  Three inmates received RVRs for self-mutilation, and CDCR requirements related to disciplinary charges for self-mutilation were not followed.

Transfers:

CIM has been unable to comply consistently with transfer timelines.  Less than half of EOP inmates in administrative segregation were removed to a hub institution within 30 days.  Only 59 percent of general population EOP inmates moved through the reception center within 60 days.  Clinically based expedited processing for selected inmates did not occur.  Stays of five months or longer were common. Inmates at the 3CMS level of care fared no better; six caseload inmates reviewed in a small sample had been in the reception center from six months to one year.  During the monitoring period, a concerted effort spawned by a QIT to track and expedite transfers of EOP inmates fell flat. The administration at CIM recognized that the institution could not comply with

transfer timelines for a variety of reasons.  As a result, the warden requested headquarters to establish a fully staffed EOP at CIM.

The MHCB lacked adequate resources to meet the demand for treatment. Inmates in need of a crisis bed when none was available were kept in holding cells, a practice deplored by MHCB mental health staff.  Although licensed for just 18 crisis beds, the number of psychiatric patients in crisis beds in the GACH reached 44 a few days before the monitor's October visit.  A QIT on access to MHCB beds chaired by an associate warden was chartered.

The number of referrals to DMH tripled during the monitoring period. Internal procedural obstacles had long impeded the flow of referrals to DMH.  At the direction of the Office of the Inspector General, a new local operating procedure for DMH referrals was adopted early in 2005. The new procedure provided detailed guidance on how to identify patients in need a higher level of care and make referrals.  Timeline requirements were included.  Staff reported the new process worked well, although classification data necessary for referrals was not always available in a timely manner and sometimes delayed the completion of referral packets.  When the procedure was first introduced classification staff agreed to provide information within two to three days. That goal was met for a few months.  During the latter half of 2005, however, it sometimes took as long as ten to 12 days to obtain required classification information. Classification staff reported that the major cause of the delay was lack of human resources.

CIM reported that the average time from referral to transfer to DMH increased from 21.5 to 27 days.  When exceptionally long delays, attributable to factors

such as the need to conduct a Vitek hearing, were excluded from the calculation, the average time to transfer was 19 days. Most referrals to DMH were accepted; 93 of 115 referrals resulted in transfers to DMH. Thirteen referrals were rejected. Three were rescinded due to parole dates. Six inmates were awaiting transfer at the time of the monitor's visit.

There were 1,507 admissions to the MHCB from mid-October 2004 through September 2005. CIM did not track the average daily census of the MHCB. The average length of stay was six days. Eight percent of stays exceeded ten days in length; the average length of stay for that eight percent was 20.4 days. Of 109 patients who stayed longer than ten days, 61 were referred to DMH. Of 166 patients who were admitted more than three times within a six-month period, 51 were referred to DMH.

Access to the 25 acute care beds operated by DMH at ASH for MHCB referrals was stymied. Most CIM inmates transferred for acute care went to the APP/DMH at CMF. The monitor's expert found that MHCB clinicians did not always refer inmates to DMH programs as clinically warranted. In one case (see Exhibit N, Case Review 1), a young suicidal inmate was not referred because his diagnoses were primarily on Axis II. In another case of multiple MHCB admissions (See Exhibit N, Case Review 3), staff rescinded a referral to DMH. An inmate with a rapidly cycling mood disorder was discharged and readmitted to the MHCB. He was referred to DMH. When he appeared to do better for a short time, the referral was withdrawn only to be reinstated a few days later.

Staff at CIM reported that the referral process for patients in need of a MHCB at ASH was as onerous as making a referral to any other level of DMH care; staff at ASH handled these MHCB referrals no differently than any other referral.

In addition to overcrowding, several factors impeded the provision of appropriate mental health treatment in the MHCB. Cooperation among mental health, health care and custody staff was poor. The physical plant was unsanitary. Smeared feces reportedly were not removed but were left for weeks by order of custody staff. Mental health staff did not have ready access to patients. SRA checklists were not always completed when warranted, and some that were completed omitted salient factors. Examiners rarely specified a category of risk in conjunction with the assessment. UHRs of patients discharged from the MHCB rarely contained copies of inpatient records.

Routine tasks were not carried out consistently in the MHCB. Earlier in 2005, fifteen-minute checks were performed for hours on a dead inmate before his death was discovered. Staff reported that plumbing problems often resulted in denial of showers. They also reported that food and water were sometimes withheld by custody staff in the MHCB unit as a punitive measure. Contrary to doctors' orders, psychiatric patients were not permitted to have clothing routinely allowed other GACH patients. Patients were left standing in holding cells not equipped with a bench seat longer than four hours.

CIM submitted a proposal to DCHCS to open an OHU in a housing area in the central facility. Staff at CIM expressed frustration that the proposal had elicited no response. They said that they planned to open an OHU in the absence of authorization.

<u>Other CAP Issues:</u>

      a.  Compliance

All three mental health disciplines engaged in peer review.

      b.  Partial Compliance

Responses to urgent mental health referrals generally occurred within one to two days.  CIM did not track routine referrals.

Clinical contacts in the MHCB were typically made at cell-front.  Inmates were not allowed to use the yard despite efforts to increase out-of-cell time through a QIT.

In administrative segregation, medical records were nearly always available to mental health staff, and audits conducted on required contacts were sound. Roughly 80 percent of caseload inmates in administrative segregation were identified within 24 hours of placement.  Initial IDTT meetings were held prior to the ICC hearing 86 percent of time.  Psych tech made rounds daily.  Staff concentrated on lowering the refusal rate for out-of-cell case management contacts and succeeded in halving it.  A period of consistent compliance with weekly out-of-cell case management contacts was realized early in 2005, when the average daily caseload population was around 50.  As the census rose, compliance fell.  Additional staff was redirected to administrative segregation, but constraints on inmate movement remained a limiting factor.  Institutional audits found that prior to the population increases, 83 percent of inmates received weekly case management contacts.  Almost all visits, 73 percent, took place out of cells.  After

the census reached 90, compliance with weekly case management contact requirements dropped to 70 percent; 56 percent occurred out of cells.

Psychiatric follow-up of reception center inmates improved. Large MHTS audits spanning months found overall compliance rates of 87 to 90 percent. The recent relocation of caseload inmates to CIM's east and west facilities lowered compliance rates to 72 percent and 79 percent, respectively, while the central facility sustained a compliance rate of 97 percent. Staff believed that the depressed rates during the transition would rebound.

Staff reported that about half of mentally ill parolees with the highest needs did not come to the attention of TCMP case workers in time to receive discharge planning or to apply for SSI. CIM mental health staff continued to provide discharge planning for at-risk inmates. Review of UHRs found that case managers frequently discussed discharge plans with inmates. Supervisory staff believed discharge planning was done in almost all cases, but clinicians reported that they did not always have advance notice of release dates.

The backlog of loose filing in medical records averaged approximately 50 inches, roughly equivalent to a nine-day lag. Institutional audits spanning three months found that 70 percent of requested medical records were provided to mental health staff in the central facility as compared to 91 percent at the minimum support facility.

The MHTS was not useful for many reception center functions. A QIT was chartered to promote more efficient the use of the MHTS. During the monitoring period, CIM staff did make better use of the MHTS. A supervisory office services position was created to improve the MHTS, but no qualified candidate was found to fill

it.  Staff submitted tracking forms daily, and data entries were made promptly.  MHTS

reports were used for some quality assurance audits and management purposes.

Technical support for the MHTS was inadequate.  The electronic scanner needed to score

the 31-question mental health screening forms was inoperable for over a year.  A new

scanner arrived in September 2005, but two weeks later it had still not been programmed

by the institution's computer expert.  LAN hookups to enable supervisory staff real time

access to mental health program performance indicators were anticipated.

     b.  Non-Compliance

     CIM remained unable to transfer 3CMS inmates from the reception center

within the required timeframe.  Due to competing demands, clinicians no longer provided

increased case management contacts with 3CMS inmates deemed to be at-risk.   Nor

were they able to sustain the practice of making contact with all 3CMS inmates who

remained at CIM longer than 90 days.

     Some additional problems, not related to the institution's CAP, were noted

during the monitor's October visit.   The institution no longer complied with some critical

provisions of the heat plan.  Air conditioning in the GACH reportedly failed for some two

weeks during the summer when outdoor temperatures reached 99 degrees.  Staff reported

that inmates housed in some MHCB cells were not provided with water during the shut-

down.  The institution did not routinely track and document Stage II and Stage III heat

alerts.  Monthly summaries of heat alerts had not been sent to headquarters for over one

year.  Staff in one housing unit reported that a heat-related incident occurred during

summer, but did not know whether a report had been submitted as required.  The

monitor's review of the GACH emergency room log found annotated cases on complaints

of dehydration due to vomiting, inmates who passed out, complaints of numbness and reported shortness of breath during July, August and September. Many housing units either did not have thermometers in the unit or had thermometers located in inappropriate locations. In the west facility thermometers were located in offices used by correctional officers, cooled with fans, who staffed the unit. No thermometers were located at the back of the units where inmates lived. Staff reported that during Stage III alerts in August medical rounds were made, but no documentation of those rounds was produced.

CIM had more inmates than beds. The best efforts of staff were defeated by the magnitude of the problem. Due to overcrowding, inmates were housed in holding tanks in corridors for days at a time. The overtaxed plumbing system failed on multiple occasions. Inmates did not have access to showers on a regular basis.

A promising change undertaken to improve access to treatment for EOP inmates collapsed within weeks. Custody and mental health staff collaborated on a plan to move most EOP inmates from the central facility to the east facility to capitalize on the better housing and access to treatment traditionally available in the east facility. Shortly thereafter due to over-crowding, non-caseload inmates were housed dormitory-style in the day rooms of the units where EOP inmates were now concentrated. Clinicians' offices opened off the day rooms. By October clinicians in the east facility reported unanimously that visual privacy was impossible and limited the ability to interview inmates safely and confidentially. In addition, a number of disturbances occurred at CIM during the monitoring period, the most recent one within two weeks of the monitor's October visit. Safety concerns voiced by mental health staff were valid.

Institutional Summary

A rise in the census of the institution left some inmates sleeping in corridors without beds or access to showers and toilets, overtaxed plumbing, undermined orderly operation of the institution and compromised the safety of staff. Difficulties faced by the institution also impeded severely the provision of necessary mental health services as access to treatment declined. The heat plan, to a considerable extent, had simply fallen by the wayside. General conditions in the MHCB were unacceptably poor. The suicide prevention committee fell short of fulfilling its mandate.

Vacancies among allocated mental health positions were few, but allocated staff lagged behind substantial general population and caseload increases. Deteriorating physical conditions and increasing custody problems throughout the facility reduced further the effective deployment of available mental health staff.

Among the four issues of focus, improvement was realized in quality assurance efforts and mental health assessments in the RVR process. The mental health quality assurance committee was close to functioning as intended. The last hurdles to full implementation were more timely and complete coordination with the overall health care quality management committee, greater consistency in the quality of its QITs and better participation of mental health staff members in the work of QITs. CIM conducted an especially effective QIT on mental health assessments in the disciplinary process and continued to progress in this area.

Medication management did not progress. Audits of medication management were flawed and uninformative. Medication orders were lost, expired or failed to follow inmates relocated within the institution. On the other hand, a reasonable

299

number of inmates were provided with HS medication and medication packages were effectively delivered to paroling inmates.

Access to higher levels of care remained particularly problematic. The MHCB was overloaded and poorly run. To meet the need for more crisis beds, CIM planned to open, apparently *sua sponte*, an OHU in a housing unit located in its central facility. Referrals to DMH were no longer slowed by CIM's cumbersome internal review process, often criticized by the monitor, but access to DMH beds continued to be impeded by both internal and external factors. MHCB staff did not make all clinically warranted referrals. Classification information required to complete referral packets was not routinely available in a timely manner. The DMH requirement that CIM conduct its own Vitek proceedings delayed some transfers. Inadequate communication between ASH and CIM impeded sharply the institution's ability to transfer inmates in need of a MHCB level of care to ASH.

Relative to CIM's CAP, one issue was resolved during the monitoring period, and progress occurred in some other areas, although some earlier gains also deteriorated. Psychiatrists met with inmates in a private setting. Psychiatric follow-up of reception center inmates improved but faltered later in the monitoring period. Improvements in certain aspects of MHCB treatment made during the 15th monitoring period vanished as conditions in the GACH worsened. Case management contacts occurred weekly in administrative segregation, and the refusal rate was cut in half. Those two achievements, however, did not survive steady increases in the size of the administrative segregation MHSDS caseload census. While clinicians' access to the medical records of inmates in administrative segregation improved, access to records