elsewhere was inconsistent. Some inmates in need of intensive aftercare received little

discharge planning simply because clinicians and TCMP case workers were not notified

of pending discharge dates. The filing backlog in medical records increased. Staff made

more use of the MHTS, but systemic problems abounded. CIM was consistently unable

to comply with required timelines for the movement of caseload inmates from the

reception center to appropriate treatment levels and programs elsewhere.

On the whole, CIM had a poor monitoring period and needed badly either

an infusion of additional staff or reduced caseload numbers to begin again to move

forward toward compliance with its CAP and the requirements of the revised Program

Guide.

## California Rehabilitation Center (CRC)
December 6, 2005 - December 7, 2005

A reconfiguration of its mental health staffing left CRC short of

psychiatric resources. The psychiatric allocation, reduced in 2004 from 3.5 to 1.5

positions, was restored to 2.5. From January through June 2005, the institution relied

heavily on contractors. During the second half of the year, a full-time senior supervising

psychiatrist and a full-time staff psychiatrist filled two positions leaving a half-time

position vacant. The amount of coverage provided by contracting psychiatrists from June

through December was negligible. Whether the allocation was sufficient to meet the

demands of CRC was questionable. Psychiatrists were unable to participate meaningfully

in activities that went beyond individual patient contact, such as attending IDTT meetings

and participating in quality assurance efforts. Psychiatric treatment provided in the OHU

was erratic. The senior supervising psychiatrist exerted little influence in the

development of DOT and HS procedures, suicide prevention efforts, or other medication management issues germane to psychiatric treatment.

One of ten full-time psychology positions was vacant as was the sole psych social work position, leaving two of 11 case manager positions vacant. Both positions had been vacant since July 2005. The sole senior supervising psychology position was filled as was the sole psych tech position. Of six allocated office tech positions only a half-time position was vacant, but the functional staffing level was not as high as the numbers indicated. The office tech allocated for the Clark program was vacant, and mental health office techs covered the vacant Clark position.

Fourteen MTA positions plus a senior MTA position were allocated. The senior position and 11 MTA positions were filled. The remaining three MTA positions were not actually vacant, but the individuals in them were on long-term leave. All three were covered by limited-term employees. Twenty nursing positions plus two senior RN positions were allocated. Fifteen staff RN positions were filled, as were both senior RN positions. Of the remaining five, two were vacant and three were occupied by individuals out on leave. Two of the five empty nursing positions were covered by registry staff. The pharmacy was fully covered by a combination of staff and contractors.

<u>Issues Resolved:</u>

Psychiatry follow-up was timely, and changes in medication were accompanied by a documented rationale.

CRC followed requirements when disciplining mentally ill inmates.

Quality Management:

Quality management continued apace at CRC. The board of governors met monthly. The chief deputy warden, associate wardens and the chief medical officer sat on the board. The institution-wide quality management committee met monthly, as did the mental health quality management committee and the suicide prevention committee. Meetings of all three committees were documented. Quality assurance processes at CRC appeared to address important mental health issues such as ducating and pill lines. Recently two QITs were formed to once again address pill lines. Members of the mental health staff were integrally involved with those teams.

Peer review was in place for psychologists; meetings were held weekly. Peer review for other disciplines was impractical due to the small numbers of practitioners in each.

Medication Management:

The restoration of a full time psychiatry position had a salutary effect on psychiatry practices as demonstrated in the resolution of a CAP problem with timely follow-up and rationales for regimen changes. During the first half of 2005, when CRC relied almost exclusively on contractual psychiatrists, timeliness was problematic. During the second half of 2005 caseloads for psychiatrists reached 500. Psychiatric duties extended to the OHU, which occasionally housed acutely psychotic or suicidal inmates. Not surprisingly, psychiatric staff reported difficulty striking a balance between quality and quantity in their work. Psychiatrists had little time to attend IDTT meetings, participate in quality management, or evaluate and treat inmates admitted to the OHU. Psychiatry was ineffective in making a positive impact on systems issues associated with

medication management. For instance, MTAs crushed Wellbutrin on an as needed basis rather than relying upon a physician's order or the direction of local operating procedures. While the senior MTA advocated the practice and believed it solved a systems problem, the senior supervising psychiatrist had no input regarding this practice.

According to institutional audits, continuity of medication for newly arrived male inmates was 94 percent while that for females was 84 percent. The problem of medication continuity on arrival may be ripe for resolution if compliance is sustained. Medication continuity was unaffected by changes in location within the institution because there was only one pill line for each sex.

The MHTS mechanism used to identify expiring medication orders and schedule appointments to renew them continued to work well. Staff audits found that informed consent was nearly always obtained and documented. The monitor's review of a small sample of UHRs was consistent with that finding. That problem will be resolved if compliance is sustained. CRC continued to dispense a supply of medication to inmates who were paroled.

Non-compliance with medication remained problematic for male inmates. A QIT formed in 2004 to address the issue made no impact. At the end of 2005, the institution could not demonstrate that staff regularly observed pill lines during the monitoring period. The length and timing of the morning pill line was long cited as contributing to the high rate of medication non-compliance. Ten to 20 percent of inmates on psychotropic medication were referred monthly for non-compliance.

Mental health staff tracked non-compliance exhaustively and made contact with each inmate referred. The referral mechanism used by MTAs, however, was

atypical. MARs were not annotated to record refusals, no-shows, or referrals for non-compliance.

Incomplete and missing MARs were a problem. Many MARs were missing from UHRs. Others were largely blank with no indication of what occurred. Staff reported that MARs generated by the pharmacy did not always reach their destination.

There were deficits in medication management with regard to DOT and HS orders. The institution neither maintained a centralized list of inmates with DOT orders nor had a written policy on HS orders. Psychiatric staff was led to believe that there were no inmates at CRC who needed HS orders.

There were no audits of whether laboratory tests associated with the use of mood stabilizers were obtained and reviewed as needed.

None of the inmates at CRC had current Keyhea orders.

<u>Mental Health Assessments for the Disciplinary Process:</u>

During the monitoring period the institution succeeded in bringing its practices into conformance with departmental policy. All lieutenants and captains were retrained in the RVR requirements in sessions taught jointly by custodial and mental health staff. CRC maintained a comprehensive log of disciplinary infractions. Each entry in the log indicated mental health status. Copies were kept of all mental health assessments done in connection with RVRs.

CRC devised a practice designed to ascertain whether all inmates who should have been referred for a mental health evaluation in fact were. The senior supervising psychologist reviewed lists of all caseload inmates charged with infractions.

Her goal was to identify inmates with multiple infractions or those whose difficulties warranted the attention of mental health.

No RVRs were issued for self-injury during the monitoring period.

No information regarding DA referrals was provided.

Transfers:

Staff reported that the practice of moving EOP inmates to CIM or CIW within one day of identification remained in force.  CRC staff continued to track the time it took for inmates to reach an institution with an EOP unit via CIM  and CIW.  Male EOP inmates rarely went on to a receiving institution within 60 days.  Thirty-four male EOP inmates were slated for transfer during the monitoring period.  Eighteen were paroled or were not candidates for transfer to CIM for other reasons.  Sixteen were moved to CIM. Only three stayed in CIM for 60 or fewer days.  Lengths of stay for CRC's male EOP inmates in CIM's reception center ranged from 21 days to 136 days.  One inmate sent to CIM for EOP treatment and processing was summarily returned after his level of care was changed to 3CMS.  He remained in need of a higher level of care three months later.

Fourteen women were slated for transfer to CIW because they required an EOP level of care.  Eight either paroled or returned to CRC.  The remaining six had reception center stays ranging from 1 to 85 days.  Two remained on reception center status longer than 60 days.

Inmates treated at the 3CMS level of care continued to be processed out of the reception center within the required timelines.

Approximately ten referrals were made to MHCBs. Six people were transferred to crisis beds. Transfers were not always timely. Three referrals may have been rescinded when crises subsided. Early in November 2005, one case referred to a MHCB was placed 29th on the wait list. Later in November, the same person attempted suicide in the OHU but remained there overnight due to lack of a crisis bed (see Exhibit O, Case Review 5).

There were 27 admissions to the OHU from February 1, 2005 through November 12, 2005. Four inmates were admitted more than once. Lengths of stay ranged from one to six days. The institution maintained a log of psychiatric admissions to the OHU that included dates and lengths of stay. The log did not clearly reflect which cases were referred to an MHCB, whether they were accepted, when beds were assigned or whether or when inmates were transferred to crisis beds.

Inmates who were sent to MHCBs went to CIM, LAC, RJD, CSATF and SVSP. Records from MHCB stays were rarely available when inmates returned from crisis beds. Mental health staff at CRC were forced to proceed in the absence of records of recent treatment. Absent or cursory discharge summaries did not reliably alert bus screeners of the need for an urgent referral to mental health at the receiving institution. On occasion a bus screening failed to detect that a new arrival was on his way back from a stay in an MHCB (see Exhibit O, Case Review 5).

Over one third of psychiatric admissions to the OHU were for suicidal ideation associated with safety concerns. Suicidal inmates remained in the OHU where conditions were unsafe. At least two inmates injured themselves while on constant watch in the OHU (see Exhibit O, Case Reviews 5 and 6). As late as December 2005, the OHU

307

lacked standard procedures for the use of restraints, observation of suicidal inmates and other routine operations. Psychiatric treatment provided in the OHU was at times inadequate. Poor documentation by nursing and psychiatry was the norm. Mental health contacts were well documented. They included relevant clinical and custodial information.

A bright spot in the grim OHU picture was that mental health and custody staff collaborated closely to resolve successfully crises precipitated by inmates' fears about their personal safety. Several OHU stays responded to those fears. Mental health staff monitored inmates who expressed suicidal ideation and safety concerns closely and followed them up after they were discharged from the OHU.

Other CAP Issues:

a. Partial Compliance

According to the results of large institutional audits, roughly half of IDTT meetings did not have a psychiatrist present. Correctional counselors attended over 90 percent of IDTT meetings held from February through July but their attendance fell to 83 percent over the next three months. The drop was identified by regular staff audits that examined the composition of IDTT meetings. Custody and mental health staff collaborated to overcome obstacles to attendance. The monitor's review of a small sample of charts found higher attendance rates for psychiatrists and correctional counselors, 82 percent and 98 percent, respectively.

C-files were not brought to IDTT meetings.

Staff reported that a previously resolved problem with access to UHRs had recurred. UHRs were often unavailable for appointments and IDTT meetings.

308

b. Non-Compliance

The institution continued to use inmate helpers to type ducats.

Institutional Summary:

Staffing levels were maintained in most disciplines with the exceptions of nursing and psychiatry. Two psychiatrists were added to the staff ending a lengthy period of heavy reliance on contractors, but a vacant half-time psychiatry position was left uncovered. The allocation of just 2.5 psychiatry positions left insufficient time for psychiatrists to cover the caseload of 1,000, attend IDTT meetings, treat inmates in crisis in the OHU and participate in quality management.

Among the four focal areas reviewed, disciplinary matters involving caseload inmates moved into compliance and remained so for much of 2005. Quality management continued to function as intended but the process was evidently not equal to the task of addressing systemic flaws in medication management.

Medication management improved in circumscribed areas largely as a result of the efforts of individuals. Previous gains were sustained but, overall, the system of medication management did not improve much. The timeliness of follow-up visits by psychiatrists and the quality of their documentation progressed during the second half of 2005. CRC continued to do a good job of sustaining the continuity of medication for newly arrived male inmates but was less successful with females. Informed consent was nearly always obtained. Parole medications were dispensed.

Problems with the male pill line, long believed to lie at the root of the high rate of medication non-compliance, were addressed by a QIT but the effort came to naught. Inmates who were non-compliant with medication were referred using an

atypical mechanism, and their non-compliance continued to be tracked closely by mental health. MARs were more often incomplete and missing from UHRs. The institution was still without working policies and procedures regarding DOT and HS medications. Further, misinformation on HS orders was disseminated to psychiatrists by supervisors at CRC.

Regarding transfers, while EOP inmates rarely were quickly moved out of CRC to CIM or CIW, their subsequent transfer to general population EOPs was routinely subject to considerable delay.   Most inmates in need of an MHCB were transferred to one. Some, however, were held in the OHU at CRC for several days either pending transfer or until a decision was made regarding their need for a crisis bed. Conditions in the OHU were dangerous; psychiatric treatment was inadequate. Nursing and psychiatry notes were impoverished. Records associated with crisis bed stays were rarely available to staff at CRC.

Among lingering deficiencies in CRC's CAP, psychiatrists and C-files were often absent from IDTT meetings. Once again UHRs were frequently unavailable for mental health appointments and IDTT meetings. The institution continued to use inmate clerks to prepare ducats.

Access to mental health crisis beds and the quality of psychiatric care in the OHU will be examined closely during the next monitoring period. Monitoring will also focus on medication management with particular attention to the pill line, non-compliance and the development of procedures for DOT and HS medication. Participation by psychiatry in IDTT meetings, quality management and aspects of medication management tied most closely to psychiatric treatment are also key. Positive

findings on these issues would make CRC a good candidate for paper review in future monitoring rounds.

## Service Area J

This service area includes <u>R.J. Donovan Correctional Facility (RJD)</u>, <u>Ironwood State Prison (ISP)</u>, <u>Calipatria State Prison (CAL)</u>, <u>Centinela State Prison (CEN)</u> and <u>Chuckawalla Valley State Prison (CVSP)</u>.

### Richard J. Donovan Correctional Facility (RJD)
July 25, 2005 – July 26, 2005
September 29, 2005
November 1, 2005 – November 4, 2005

The number of mental health staff vacancies at RJD decreased slightly during the monitoring period, but the institution continued to struggle with a large number of vacant positions. In early November, positions for a senior psychiatrist, 2.5 staff psychiatrists, a senior psychologist, four staff psychologists, a psych social worker, seven psych techs, 2.5 recreational therapists and two office techs were vacant. In addition, the chief psychologist had not been present for duty at RJD since May 2005.

Contractors covered all psychiatric vacancies during some months from April through August 2005, but were available to cover only a portion of vacant positions, less than 1.5 positions, during other months. During that same period, most vacant case manager positions were covered by contract clinicians, but less than half of vacant psych tech positions and none of the vacant recreational therapist positions were covered. Vacancies among auxiliary staff were low; with only 1.5 of 34.5 MTA positions and 3.56 of 28.56 nursing positions unfilled.

Overcrowding was an increasing problem at RJD. Already by July 2005, overcrowding was responsible for double and triple bunking in the reception center. By

November, the population of the EOP administrative segregation hub unit intermittently exceeded its capacity of 63 inmates, climbing up to 67 inmates.

While RJD, with help from headquarters in Sacramento, seemed to address some of the serious and pervasive deficiencies noted in the preceding monitoring round, little actual change had occurred by the monitor's November visit.

Quality Management:

The quality assurance process at RJD remained weak.  Many of the institutional audits conducted during the monitoring period, especially in the area of medication management, were significantly flawed methodologically, leaving the results obtained in some doubt.  More QITs were needed to study and redress the substantial array of problems facing the mental health program.

The institution's MHTS remained largely incapable of supplying data for aggregate reports.  No centralized referral system existed, and referral data was entered in the system erratically.  Clerical staffing shortages contributed to problems with the information system.

Medication Management:

Medication continuity for inmates arriving from other CDCR institutions declined between the monitor's July and November visits.  An institutional audit for the period from September 3 through September 12, 2005 indicated that 67 percent of inmates received their medication within 24 hours of their entry, while 29 percent of the remaining inmates waited more than 48 hours for their medications.  Earlier audits in May and June reflected a 72-percent rate of compliance.  Medication continuity for

inmates arriving from country jails also declined, falling from 88 percent in June to 74 percent in September.

Medication continuity for inmates changing housing locations within the facility remained uneven. An institutional audit based on inmates' MARs for October 2 through October 5, 2005 found that 73 percent of inmates received their medication within 24 hours, with ten percent waiting longer than 72 hours. Continuity of medication for inmates moving from the MHCB unit to other housing areas, on the other hand, improved. An institutional audit of inmates discharged from the MHCB unit between September 6 and September 28 indicated that 89 percent received their medications within 24 hours of transfer, compared with 61 percent in May and 63 percent in July. Just five percent of inmates discharged from the MHCB unit in September waited longer than 48 hours for their medications.

Problems with medication continuity at the time of the renewal of medication orders persisted. Institutional audits found that established renewal procedures were not always followed, often resulting in medication expirations. A new system for ensuring timely renewals of medications had been developed and installed, but it was too early to assess its effectiveness.

Follow-up to medication non-compliance was erratic. Institutional audits for a five-week period from late August through September looked only at four housing units. The percentage of non-compliant inmates referred to mental health was adequate in three units, but no referrals occurred in Facility 3. In addition, monitoring and follow-up of medication non-compliance was inadequate in the administrative segregation overflow unit, which had no consistent MTA coverage.

Parole medications for inmates discharged from the facility reportedly were provided regularly, and an institutional audit reported 100-percent compliance in this area.

Institutional audits indicated that laboratory testing of inmates on mood-stabilizing medications improved during the monitoring period. According to August audits, laboratory test results were found in 93 and 100 percent of audited inmates' charts. The audits indicated that it took an average of 14 to 23 days from the time laboratory tests were ordered until results were returned.

Compliance with DOT requirements was variable. Institutional audits in June and September produced widely different rates of compliance, ranging from 76 to 98 percent, depending upon the housing location surveyed.

The length of pill lines improved. Institutional audits and inmate interviews both indicated that pill lines were shorter than in earlier monitoring rounds. Interviewed inmates reported that a conflict existed between the morning pill line and breakfast for some inmates in Facility 3.

RJD continued to have some problems with the provision of HS medications. Psychiatrists in the reception center in Facility 4 appeared to have been actively discouraged from prescribing HS medications, and few, if any, HS medications were prescribed on that housing unit. Meanwhile, the median time for distribution of HS medications throughout the facility reportedly was 7:40 p.m.

Informed medication consent forms were not always present in inmates' charts. Institutional audits in mid-September indicated a 71-percent rate of compliance. RJD seemed to have a system in place for dealing with medication errors.

Documentation indicated that medication errors were tracked and physicians were notified of errors.

Mental Health Assessments for the Disciplinary Process:

Implementation of the mental health assessment process in disciplinary procedures lagged during the monitoring period. The custody log and the mental health log were both incomplete, making tracking of caseload inmates' RVRs difficult. Among other shortcomings, the disciplinary logs did not include inmates' levels of care, and mental health logs did not record whether mental health was found to be a factor in assessed inmates' behavior. Institutional audits on the issue were unreliable, and the institution was unable to provide basic information, including the number of MHSDS inmates receiving disciplinary infractions.

No infractions for self-injurious behavior were reported, but the monitor found three RVRs for such behavior, which appeared to have violated CDCR guidelines on the handling of such charges.

Transfers:

RJD continued to have problems meeting transfer timelines for 3CMS and EOP inmates in the reception center. Institutional audits for April through August 2005 found that 19 percent of EOP inmates remained in the reception center over 60 days, while 23 percent of 3CMS inmate had lengths of stay over 90 days. At the time of the monitor's November visit, 31 percent of EOP inmates in the reception center had been there more than 60 days. The expedited transfer process for inmates found clinically to need a more immediate transfer was not implemented in RJD, and clinicians were unaware of its existence.

During the preceding monitoring round, RJD was found to have failed often in identifying and referring decompensating inmates to higher levels of mental health care. Since then, a committee was established to identify and monitor high-risk EOP inmates and ensure their referral to higher levels of care when appropriate. The composition of the committee was inadequately interdisciplinary and its procedures were problematic, limiting the committee's ability to accomplish its goals.

It was unclear whether inmates at RJD had timely access to a MHCB level of care. According to some interviewed clinicians, access reportedly was difficult and some inmates in need of MHCB care were simply given medication and returned to their housing units. Mental health supervisors, on the other hand, reported that beds were always made available for inmates needing MHCB treatment, although some inmates might be placed in a holding area in the emergency room for a few hours until a bed became available. Institutional overcrowding and a rash of suicides prior to the first monitoring visit increased the significance of this issue. Institutional data indicated that the MHCB unit was generally filled and inmates often remained in MHCBs after their clinical discharge due to the lack of housing elsewhere in the facility. The length of stays in the MHCB unit, as a result, was frequently longer than ten days. The average length of stay in the unit was eight days, but approximately 20 percent of MHCB inmates remained beyond the ten-day timeline.

Seven cells in the MHCB unit were equipped with two video cameras each; four of the cells had new cameras with good resolution. The monitoring equipment was used for all observations of inmates on suicide precaution and suicide watch, as well as for inmates in five-point restraints. The monitoring equipment was kept in a cabinet in

the area dayroom and monitored by one officer; post orders and a manual on suicide precautions were also available in the cabinet. A second video monitor was installed in the nursing station where it could be observed by clinical staff, but no one was specifically assigned there to conduct video monitoring. Some improvements occurred in the safety conditions of cells.

During the monitoring period, the number of DMH referrals increased substantially, due in part to the appointment of a DMH coordinator in November 2004. From November to August 2005, 130 inmates were referred to DMH, 117 of whom were accepted and 104 actually transferred. Reasons for the difference in the number of accepted referrals and actual transfers were unclear, but staff thought that the overall improvement in the number of actual transfers sufficiently addressed the problem of inmates decompensating without referrals to higher levels of care.

Other CAP Issues:

      a.  Partial Compliance

The institution conducted audits indicating that better than 90 percent of 3CMS inmates in reception received quarterly case management contacts, while better than 80 percent of EOP inmates in reception were seen weekly by a case manager. Six EOP groups and one 3CMS group were operating at the time of the monitor's July 2005 visit.

The timeliness of initial mental health evaluations and IDTT meetings for endorsed 3CMS inmates arriving from other institutions improved. Institutional audits found a range of compliance from 60 to 100 percent.

The provision of mental health treatment to EOP inmates in administrative segregation also improved marginally. Inmates were offered more than ten hours of therapy and received an average of roughly five hours. The groups provided were generally more interactive and less focused on videos than in the past, and adequate clinical space and sufficient escort officer coverage for group therapy were available in the unit. It was not clear, however, whether all caseload inmates in the administrative segregation unit were seen by case managers every week. Institutional MHTS audits for July found weekly case management contacts with 77 percent of EOP inmates and 75 percent of 3CMS inmates, and audits for August reported weekly case management contacts with 83 percent of EOP inmates and 84 percent of 3CMS inmates. Alternatively, audits of inmates' charts found the compliance rates above 90 percent for both EOP and 3CMS inmates in administrative segregation.

In contrast, the mental health care provided to caseload inmates in administrative segregation overflow units in Buildings 7 and 16 was extremely poor. The institution was not staffed adequately to operate these additional segregation units. The Building 7 unit had no MTA or psych tech coverage and Building 16 had no permanent psych tech assigned. As a result, daily psych tech rounds did not occur on either unit and, when they did occur, they were often inadequate. It was disturbing to note that, while psych tech rounds did not occur on a daily basis, documentation showed that rounds were completed every day.

Case management caseloads were high, between 40 and 50 inmates per clinician in Building 7, and case managers often assumed duties that should have been completed by MTAs and psych techs. Case management contacts occurred solely at cell-

front in Building 7, and in Building 16 case managers had to communicate with inmates through cracks in the sides of doors.  Lack of adequate clinical interview space and insufficient escort officer coverage also impeded effective communication.  Access to yards in all administrative segregation units and the lack of any yard time for inmates in Building 16 were serious problems.  Despite assurances in September that administrative segregation inmates would be moved out of Building 16, little change in this regard had occurred by the time of the monitor's November visit.  Although treatment in these overflow units was inadequate, many inmates remained in the units for long periods. Institutional data from September through October 28, 2005 for Building 16 showed that a number of inmates remained in the unit for at least three weeks to a month, while several inmates remained over two months and one inmate stayed for 146 days.  The overflow units housed both reception center and general population inmates and it was difficult for clinicians, especially contract clinicians, to identify and track inmates in the unit.

The timeliness of EOP treatment plans improved during the monitoring period, but remained inconsistent.  Institutional audits indicated that 79 percent of treatment plans were completed within 14 days.

Inmate records were not regularly available for clinical contacts. Institutional audits indicated that charts were available for 75 percent of scheduled appointments during September 2005, but the monitor's review of charts found that they were available only 50 percent of the time.

RJD managed to reduce its filing backlog to inches through the use of extensive overtime, but the monitor still found documents missing from a great many charts.

### b. Non-Compliance

EOP inmates were not provided adequate treatment. According to the institution, EOP inmates were offered between ten and 12 hours of structured therapeutic activities per week, but lockdowns reduced the amount of activities actually delivered to six to eight hours. Group therapy was primarily conducted by psych techs, and the quality of the groups remained poor.

The heat plan was implemented erratically at RJD. The monitor toured several housing units in July and found a wide range of compliance. Some units, for example, had current heat lists, while other units had old lists and others had no list at all. Audits confirmed the problem with the distribution of heat lists to housing units. Remedial training was conducted on this issue in October 2005, and current heat lists were found in all of the units during the monitor's November visit. Temperatures in housing areas were monitored inadequately, such that temperatures were reported in the 70s when the temperatures were actually in the mid to upper 80s. In this connection, the monitor discovered during the September visit that the thermometer on the administrative segregation overflow unit had been broken for a month. The thermometer was repaired by the time of the November visit, but heat logs had been completed in the unit for the entire period even though it was not possible to get an accurate reading.

A new system for documenting the distribution of heat cards had been initiated at RJD during the preceding monitoring period. An institutional audit, however,

indicated that only 60 percent of inmates had heat cards. Housing officers showed varying degrees of knowledge about the heat plan. Discussions with staff evidenced some confusion about the requirements of Stage II and Stage III heat alerts. In fact, no cooling measures other than showers were provided to inmates during a Stage II heat alert that occurred the day before the monitor's July visit. Additional heat plan training was needed.

Institutional Summary:

RJD's mental health program floundered during most of the preceding monitoring period. Some direct assistance from DCHCS was provided to help prevent further backsliding but resulted in few improvements. Despite subsequent changes in leadership and reorganization of the EOP program, progress came slowly and many of the deficiencies noted during the preceding monitoring period persisted.

With respect to the four areas of focus, all aspects of quality management were poor. Similarly, the institution continued to have problems with most areas of medication management, including the delivery of HS medications; the procurement of informed medication consent forms; the provision of follow-up to medication non-compliance; medication continuity on arrival, changes in housing locations and renewal of medication orders; and the provision of DOT. Pill lines reportedly were shorter and parole medications were provided regularly. The laboratory testing of inmates on mood-stabilizing medications showed some improvement.

The mental health assessment component of the disciplinary procedure deteriorated. Applicable logs were poorly maintained, and there was little evidence that the institution took the mental health assessment process seriously. Disciplinary

infractions apparently were written for the self-injurious behavior of some inmates without regard for policy requirements for a mental health check prior to the issuance of a RVR.

Some improvement was noted in transfers of inmates to higher levels of care, specifically in regard to transfers to DMH. Both EOP and 3CMS inmates, however, remained in the reception center beyond mandated transfer time-frames; access to the MHCB unit was a matter of concern; the length of stays in the MHCB unit were often excessive; and the committee established to track high-risk EOP inmates was ineffective.

With respect to other CAP issues, the timeliness of initial mental health assessments and IDTTs for arriving endorsed 3CMS inmates reflected some improvement, as did the provision of group therapy in the administrative segregation unit, the timeliness of EOP treatment plans and the filing backlog. Serious deficiencies persisted with the provision of clinical services to inmates in administrative segregation overflow units, where MTA and psych tech staffing was inadequate, psych tech rounds were erratic, virtually all case management contacts occurred at cell-front, sometimes through cracks in the door; and access to the yard was problematic. In addition, there were deficiencies in the application of the heat plan, the provision of structured therapeutic activities to EOP inmates, the frequency of case management contacts with 3CMS inmates in administrative segregation and the availability of inmates' charts for clinical contacts.

Overall, RJD had problems in many aspects of its mental health programs and showed little progress in dealing with those problems during the monitoring period.

### Ironwood State Prison (ISP)
Paper Review

Mental health staffing issues at ISP improved during the monitoring period. Only one position for a staff psychologist remained vacant, and two consistently available contract psychologists covered the vacancy more than fully. The institution also filled previously vacant positions for an office tech and two psych techs.

As of September 30, 2005, the institution's caseload census consisted of 15 3CMS inmates. The institution's CTC was undergoing physical renovation for licensure and stopped admitting MHCB inmates in mid-2005. Until construction was complete, all inmates requiring MHCB treatment were being transferred to CVSP, where they were put on a priority transfer list for appropriate MHCB housing elsewhere in CDCR.

<u>Issues Resolved:</u>

3CMS and EOP transfers were timely.

Daily psych tech rounds were conducted in administrative segregation.

<u>Quality Management:</u>

The quality assurance process continued to make progress. The quality management committee met monthly throughout the monitoring period. In contrast, the suicide prevention committee met monthly from September 2004 through April 2005, but the only minutes provided thereafter were from a July meeting. Custody staff did not participate in suicide prevention committee meetings.

QITs were appropriately chartered when needed. In addition, it appeared that peer review occurred monthly from October 2004 through February 2005 and again

in April.  Standardized peer review forms were not, however, utilized and no summaries or findings of reviews were included for the monitor's review.

Medication Management:

Medication management continued to function adequately.  There did not appear to be any problems with medication continuity on arrival or changes in housing locations within the institution.  On the other hand, some inmates' medications ran out prior to their refill dates.  A QIT had been chartered to study this issue.

The only caseload inmate paroled from ISP during the monitoring period received a 30-day supply of discharge medications.  The only inmate to arrive at ISP on a Keyhea order was transferred to another institution within approximately six weeks.  No caseload inmates in ISP were on HS medications.  Medication errors were tracked, but only two errors were documented during the entire review period.   Informed medication consent forms were not always present in inmates' charts.

ISP did not provide the monitor with sufficient information to determine the adequacy of laboratory testing for inmates on mood-stabilizing medications.

Mental Health Assessments for the Disciplinary Process:

All 18 caseload inmates who received RVRs during the monitoring period were referred for a mental health assessment.  The assessments conducted found mental health to be a contributing factor in seven cases.  The extent to which mental health input influenced the outcome of disciplinary proceedings, however, was unclear.  The RVR logs included dispositions, but not whether mental health input was considered.  Since the monitor was not provided with any of the actual RVRs, it was impossible to determine

324

whether hearing officers documented consideration of the mental health assessments. No RVRs were written for self-injurious behavior.

Transfers:

During the monitoring period, 253 caseload inmates were transferred to appropriate mental health programs elsewhere. All 3CMS and EOP inmate transfers were timely, taking an average of 20 days to complete.

During the brief portion of the monitoring period in which the MHCB unit was open, lengths of stay in the MHCB unit were excessive. The average length of stay for MHCB inmates increased from 15 days to 16.84 days, with a range from two to 98 days. The average stay for clinical reasons was about eight days, compared with nine days during the preceding monitoring period. Approximately 17 percent of MHCB inmates had clinical lengths of stay longer than ten days.

ISP inmates continued to have timely access to higher levels of care at DMH. Ten inmates were transferred during the monitoring period to DMH programs at CMF. The average length of time from referral to acceptance was 7.7 days, while the average time from acceptance to transfer was 3.8 days, making the entire transfer time on average less than two weeks. One inmate was referred to ASH; the transfer took 21 days from referral to movement.

Other CAP Issues:

a. Partial Compliance

The frequency of psychiatric contacts for MHCB inmates improved prior to closure of the unit. The monitor reviewed 70 institutional admission audits and found that daily psychiatric contact was documented 86 percent of the time. The institution did

not, however, address the lack of psychiatric coverage for MHCB inmates on weekends and holidays.

The institution continued to monitor the distribution of monthly heat alert reports.

b. Non-Compliance

Although the composition of IDTT meetings was found to be problematic in the preceding monitoring round, the institution did not audit the issue. Copies of IDTT logs for five inmates showed attendance by all of the required participants at IDTT meetings for just two.

The timeliness of initial IDTT meetings for MHCB inmates, an issue previously resolved, slipped badly during the monitoring period. The monitor's review of institutional audits for 70 MHCB admissions revealed that initial IDTT meetings did not occur within 72 hours for 51 percent of inmates. Charts for 22 percent of the inmates admitted to MHCB care did not contain treatment plans or MH-2s.

The provision of weekly case management contacts for administrative segregation inmates remained unclear. During the preceding monitoring period, the monitor found significant gaps in weekly contacts, while most of the contacts that occurred took place at cell-front. Although data from the MHTS recorded case management contacts for inmates in administrative segregation during the monitoring period, the data did not include the dates when inmates entered and left the unit, making it difficult to determine compliance. Moreover, the institution failed to provide sufficient information to determine whether contacts were held out-of-cell.

Despite the absence of a mechanism for five-day clinical follow-up of suicidal inmates discharged from a MHCB unit, noted in the preceding monitoring period, ISP did not provide any information on this issue in the review materials submitted to the monitor.

Institutional Summary:

ISP had only one mental health vacancy and a minimal MHSDS census. As a result, two CAP issues were resolved and progress continued in the four focus areas. Quality management functioned well. Medication management was also largely compliant, but some medications ran out before orders were renewed. Informed medication consent forms were not consistently acquired and filed in UHRs, and insufficient information prevented an assessment of the institution's provision of laboratory testing. With respect to RVRs, the mental health assessment process appeared to be operating smoothly, but it was unclear whether hearing officers took mental health input into account. Transfers to higher levels of care were generally timely, although lengths of stay in the MHCB unit often exceeded guidelines before it closed.

As for the remaining outstanding CAP items, little change occurred during the monitoring period. The frequency of psychiatric contacts for MHCB inmates improved somewhat prior to closure of the unit, but psychiatric coverage was not provided in the unit on weekends and holidays. The composition and timeliness of IDTT meetings were problematic; treatment plans for MHCB inmates were frequently missing from inmates' charts; documentation of weekly out-of-cell case management contacts in administrative segregation was inadequate; and clinical follow-up of suicidal inmates

discharged from a MHCB unit was poor.  In a number of other areas, the institution

simply did not provide the monitor with sufficient information to determine compliance.

While the mental health system at ISP generally functioned well, the

institution needed to focus its attention on resolving outstanding CAP issues and

confirming compliance through audits or other forms of documentation.

### Calipatria State Prison (CAL)
Paper Review

CAL had three long-standing psych techs vacancies.  No candidates had

been identified for these positions during the monitoring period, and no ongoing

recruitment efforts were documented.  The rest of the institution's allocated clinical

mental health staff positions, including a psychiatrist, two psychologists and two other

psych techs, were permanently occupied.  Establishment of additional positions for a

half-time psychologist and a full-time psych tech position was pending.  The MHSDS

census at the time of the paper review consisted of 31 3CMS and five EOP inmates.

Quality Management:

The quality assurance process continued to improve.  The mental health

subcommittee consistently met twice a month.  Attendance at the meetings, which had

been problematic during the preceding monitoring visit, was much improved, and the

meetings appeared to provide a good forum for discussing mental health issues.  The

suicide prevention committee continued to meet monthly and maintain adequate minutes,

but some of the requisite participants did not attend regularly.  Moreover, the committee

often failed to discuss critical issues, including the five attempted suicides that occurred

in the institution during the monitoring period.  Ten charts belonging to 3CMS

administrative segregation inmates were audited monthly, and two QITs were chartered

during the monitoring period.  No peer review was conducted at CAL due to the small size of the clinical staff.

Medication Management:

Although no problems with medication continuity on arrival were noted in the preceding monitoring report, more than half of the 45 caseload inmates arriving at CAL on medication between October 1, 2004 and November 8, 2005 did not receive prescriptions within eight hours of their arrival.  The institution did not audit this issue to determine when medications were first delivered to these inmates.  The medication error report included only one case in which an inmate's medication was not continued upon arrival.

Similarly, the institution did not audit medication continuity for inmates on changing housing locations within the facility.  Minutes from the mental health subcommittee, as well as medication error reports, indicated that some problems were occurring in this area.

Medication continuity at the time of renewal of medication orders apparently went more smoothly.  In November 2005, 26 inmates were in CAL with current medication orders.  Neither minutes from the mental health subcommittee nor medication error reports mentioned any expirations for these inmates.  The institution had not, however, conducted an audit to confirm compliance.

Parole medications were reportedly provided to inmates discharged from the institution, but CAL neither tracked nor audited the distribution of parole medications.  The monitor reviewed the data used by the institution to identify paroling inmates and found it difficult to interpret.

CAL developed during the monitoring period a mechanism for tracking and reporting medication errors. According to the institution, eleven medication errors were reported in the period from October 1, 2004 to October 1, 2005. The reports were detailed and often included a supplemental narrative and recommendations.

Despite provisions for HS medications in the institution's medication management operating procedure, HS medications were not prescribed for any MHSDS inmates at CAL. Nor had the institution developed Keyhea notification procedures consistent with the institution's operating procedure. Only one inmate at CAL was on a Keyhea order during the monitoring period.

CAL did not appear to have a problem with DOT, but no audits had been conducted to confirm compliance. Although psychotropic medications were generally nurse administered at CAL, it was unclear whether DOT had been prescribed for any inmates. Similarly, CAL reported that informed medication consent forms were present in the inmates' charts, but no documentation was provided to the monitor to confirm the reported compliance.

Given the small caseload population at CAL and the short lengths of stay, few inmates on mood-stabilizing medications were likely to require much laboratory testing at CAL; no problems with testing were noted in either the mental health subcommittee minutes or the medication error reports.

Mental Health Assessments for the Disciplinary Process:

The number of RVRs written on MHSDS inmates was small. Just 38 MHSDS received RVRs, less than one percent of the total number of infractions issued in the year from October 1, 2004 through September 30, 2005. Of these inmates, 23 were

referred for mental health assessments. None of the RVRs involved self-injurious behavior. The documentation provided by the institution for these 23 inmates varied and was often incomplete.

Mental health assessments were generally completed in a thorough and cogent manner. The assessments typically included relevant and understandable narratives. There was ample evidence that hearing officers considered mental health input in reaching their dispositions. In four of five well documented cases reviewed by the monitor, the hearing officers referred to the mental health input in their findings. One case was dismissed by the hearing officer based on the clinical input. This issue is close to resolution, provided that compliance continues at this level.

Transfers:

Both EOP and 3CMS transfers generally occurred in a timely manner. Only one of 21 EOP transfers that occurred during the period from October 1, 2004 to September 30, 2005 took longer then 60 days to complete. Of the 224 3CMS transfers during this same time period, just six exceeded 90 days. Of the five EOP inmates in CAL at the time of the paper review, none had been there longer than 60 days; of the 31 3CMS inmates currently in CAL, just three had been there is excess of 90 days. Most of the delays beyond the transfer timelines were related to court proceedings.

Access to the OHU was good, but access to MHCB treatment was slow apparently due, in large part, to the state-wide shortage of crisis beds. As a result, lengths of stay in the OHU increased. During the preceding monitoring period, only about 20 percent of OHU admissions lasted longer than 72 hours. More than half of OHU stays during this monitoring period lasted longer than three days. Of 119 OHU admissions

331

from July 5, 2004 to November 21, 2005, 15 lasted ten days or more. There were 27 MHCB transfers during the period from October 1, 2004 to October 1, 2005. Nearly 60 percent of the inmates transferred to a MHCB unit elsewhere spent more than three days in the OHU awaiting transfer; almost 30 percent spent a week or more. CAL chartered a QIT to address the treatment of OHU inmates awaiting MHCB transfers.

There were no referrals to DMH during the monitoring period.

The institution failed to provide transfer information on caseload inmates mistakenly sent to CAL for whom a shorter 21-day transfer deadline applied. MHSDS inmates, for example, were occasionally returned inappropriately to CAL upon discharge from MHCB units. During the monitoring period, one such inmate was returned to CAL and admitted to the OHU. Although the inmate was ultimately transferred to an appropriate program elsewhere, CAL did not record how long the transfer took to complete. There also continued to be a problem with some caseload inmates arriving at CAL without UHRs and C-files.

Other CAP Issues:

a. Partial Compliance

The timeliness of initial clinical intake assessments improved. MHTS data for 463 mental health referrals showed that 95 percent of inmates were seen within five days, including those referred for clinical intake assessments.

The provision of daily psych tech rounds in administrative segregation inmates also improved. The institution reported that daily rounds were conducted in both the administrative segregation unit and the overflow segregation unit despite the three vacancies among psych techs; rounds were often completed by mental health clinicians

and supervisors in the absence of sufficient psych techs. CAL submitted little documentation on this issue, but an institutional report of a recent administrative segregation tour dated October 27, 2005 confirmed compliance with the requirement for daily rounds. According to the report, isolation logs for the period from July 13 through October 21, 2005 documented daily rounds typically taking 40 to 60 minutes. This issue will be resolved, if compliance continues during the next monitoring period.

Inmates in administrative segregation were reportedly offered weekly confidential case management contacts. Institutional audits did not, however, indicate where the contacts occurred. Moreover, it was of some concern that 40 percent of offered contacts were refused.

Suicidal inmates discharged from the OHU consistently received five-day clinical follow-up. According to institutional data, five-day follow-up was ordered on 40 occasions between October 4, 2004 and November 12, 2005; follow-up was either completed or interrupted by the inmate's return to the OHU in all but one case. CAL, however, still did not track custody follow-up

Transfers of inmates on heat-sensitive medications continued to improve. As indicated above, almost all EOP and 3CMS inmates were transferred within time frames. Only a handful of caseload inmates remained at CAL longer to complete court proceedings, a situation over which CAL had no control. This issue will be resolved next monitoring round if compliance continues at this level.

MHTS data sometimes appeared to be unreliable and incomplete. In assessing the timeliness of IDTT meetings, an issue that had been resolved earlier, the monitor found that the MHTS did not contain IDTT dates for 50 percent of caseload

inmates. Moreover, much of the MHTS data conflicted with information from inmates' UHRs, which showed timely IDTT meetings and treatment plans.

Institutional Summary:

CAL continued to have psych tech vacancies that were difficult to fill. Despite this, the institution appeared close to full compliance. The institution, however, needed to provide better documentation of its practices to confirm compliance, particularly with respect to medication management.

Among the fours issues of focus for this round of monitoring, CAL's quality management process improved. The RVR process was adequate, and mental health input into the disciplinary process seemed to function well. Medication management improved with the development of a system for recording medication errors, but minutes of the mental health subcommittee raised some concerns about medication continuity for inmates switching housing locations.

While transfers were generally timely, delays with MHCB transfers climbed due to the state-wide shortage of bed space. As a result, lengths of stay in the OHU increased. Transfer data for MHSDS inmates sent inappropriately to CAL was lacking, making it difficult to determine if transfer timelines were met for this group of inmates.

Progress was also made with respect to outstanding CAP issues, including daily psych tech rounds in administrative segregation and timely initial clinical intake assessments. Custody monitoring of suicidal inmates discharged from the OHU was still not tracked, and the MHTS was unreliable. The high rate of refusals of case management

contacts in administrative segregation was also a concern. Overall, CAL met or was close to meeting all Coleman requirements.

## Centinela State Prison (CEN)
Paper Review

CEN's only psychiatrist position, a 0.75 position, was vacant, along with positions for two of the institution's three psychologists. The only permanent mental health clinician on staff was an unlicensed psychologist. As a result, the mental health program was functionally operated largely by two mental health RNs. In addition, three of the institution's six psych tech positions, its sole recreational therapist and one of its three mental health RN positions were vacant.

Contractors covered some, but not all, of these mental health vacancies. During the early part of the monitoring period, two to five contract clinicians covered the psychiatric vacancy, but that coverage gradually declined, and, by the end of the monitoring period, a CDCR psychiatrist on loan reportedly provided coverage for about half of the unfilled psychiatrist hours. Contracts clinicians covered slightly more than one psychologist position, while contract psych tech coverage was minimal.

CEN also had a significant number of vacancies among auxiliary staff. Among RNs, 11.5 of 27.5 positions were vacant, as were four of 21 MTA positions, four of seven pharmacy positions and 4.5 of 21.5 medical records positions. Contract services covered just 3.5 each of the RN and MTA vacancies and one pharmacy vacancy.

At the time of the paper review, the institution's caseload population included 36 general population and ten administrative segregation 3CMS inmates; there were no EOP inmates in the institution.

<u>Quality Management:</u>

The composition of the institution's health care quality management committee was adequate, and the group met monthly throughout the monitoring period. Committee discussions were adequate and included monthly reviews of mental health charts. As noted in the past, no separate mental health subcommittee existed at CEN, given the small size of the mental health staff. The suicide prevention committee continued to meet, but attendance was poor, particularly among administrative segregation and other custody staff, and little substantive group discussion occurred even about completed suicides.

No QITs for mental health issues were chartered. Audits were generally well handled, although some aspects of medication management were not audited. The pharmacy was particularly active in sharing information and building collaborative relationships with departments.

<u>Medication Management:</u>

The local medication management policy, which was revised during the monitoring period, was largely consistent with the department's policy. Some of its basic provisions contained expanded directives, such as requirements for closer follow-up of medication non-compliance and the maintenance of medication continuity following changes in housing. The institution's policy, however, did not address some essential topics, including laboratory studies and informed medication consent forms.

Medication continuity for arriving inmates was not a problem, given that CEN did not regularly receive inmates on psychotropic medications. The institution, however, recently initiated a log pursuant to <u>Plata</u> requirements, which indicated that five

inmates arrived on psychotropic medications during the monitoring period. Four of these five inmates received timely medications, while the fifth experienced a three-day gap. Medication continuity for inmates on housing changes and medication renewals was not audited during the monitoring round, but both issues had been found compliant in the past. CEN also recently began keeping a log of parole medications, but only one caseload inmate was paroled during the monitoring period.

The institution had an excellent medication error tracking system. The Director of Nursing was required by policy to review all medication errors.

While institutional policy permitted HS medications, no caseload inmates were on HS medications during the monitoring round. The institution reported that no inmates with Keyhea orders were present in the facility during the monitoring period.

Although no medication orders were specifically mandated to be administered DOT, staff indicated that all psychotropic medications were delivered as DOT. There were no reported overdoses or incidents of cheeking.

Laboratory testing appeared adequate. Institutional audits indicated that laboratory tests were consistently conducted and test results were returned in a timely manner. The audits did not, however, assess whether laboratory tests were appropriately ordered in all instances.

MARs were completed appropriately, and informed medication consent forms were properly obtained.

<u>Mental Health Assessments for the Disciplinary Process:</u>

CEN developed a tracking log for assessments during the monitoring period. According to the log, 29 RVRs were issued to mental health inmates, including one for self-injurious behavior, during the monitoring period.

Assessment procedures were revised to require clinicians to review accused inmates' C-files. Staff indicated that inmates were interviewed and charts were reviewed for each assessment, but nearly a quarter of completed mental health assessments did not include an interview date. The monitor reviewed each case and found that the mental health input was routinely detailed and helpful. Some jargon occurred, however, and clinicians occasionally and inappropriately volunteered incriminating information.

All caseload inmates involved in disciplinary infractions at CEN were referred to mental health for assessments. In addition, there were 24 referrals for general population inmates exhibiting bizarre or uncharacteristic behavior during the monitoring period. Clinicians found mental illness to have influenced assessed inmates' behavior in approximately 20 percent of assessments.

The impact of mental health input on the decisions by hearing officers was erratic. The monitor was provided information on only 20 adjudicated cases. Hearing officers referred specifically to the mental health assessment in 16 of these cases. Of the 20 cases, only six involved inmates whose behavior was found to have been influenced by mental illness. The penalty was mitigated for just one of these inmates; in another case, the hearing officer applied an insanity standard. Mental health staff believed that hearing officers did not reliably document the effect of mental health input on the

outcome in many cases. Further training appeared needed for hearing officers, particularly since high turnover occurred during the monitoring period among custody staff performing this function.

Nine incidents involving MHSDS inmates were referred to the local DA during the monitoring period. The DA chose to prosecute four of the referrals, and several others were still pending. CEN took from a week to three months to decide to make these referrals, while the DA generally took from six to ten weeks to decide whether to prosecute, although in one case a decision to prosecute took five months.

Transfers:

MHSDS inmates were rarely transferred to CEN. Only seven caseload inmates were transferred into the facility in all of 2005 and none in the three months preceding the paper review. All of these inmates were returned to their sending institutions within three days or less, well within the prescribed timeline.

3CMS transfers generally occurred in a timely manner. There were 383 3CMS inmates in CEN during the monitoring period, 98 percent of whom were transferred to appropriate programs or paroled within the 60-day timeline. The remaining inmates were mostly on out-to-court status and were transferred within five months.

The timeliness of EOP transfers also was also adequate. Institutional lists indicated that 21 EOP inmates were in CEN during the monitoring period, all of whom were transferred within the specified time frame. The extent of treatment provided to EOP inmates while awaiting transfer, however, was at best uncertain. Inmate histories from the MHTS indicated that ten EOP inmates received weekly case management contacts, while some inmates received only one or two contacts over their entire stay at

CEN. On the other hand, institutional audits of EOP care found weekly contacts in all but one reviewed case. No explanation for the different findings was offered.

The number of inmates referred to MHCB units during the monitoring period declined. Only 17 MHCB referrals occurred, ten of them initiated too late to beat timely transfers elsewhere. Transportation of inmates to MHCB units elsewhere was generally timely. Staff indicated that inmates were returning from MHCB units in unstable condition at an increasing rate.

While CEN had a CTC, no portion of the unit was set aside for MHCBs. The length of stays of caseload inmates in the CTC at CEN increased during the monitoring period. Among 62 admissions to the CTC for mental health reasons, 76 percent exceeded applicable timeframes. While some of the delays lasted only a day or two, the majority of delays exceeded time limits from one to four weeks. Delays related to MHCB referrals accounted for just a small portion of the extended stays in the CTC. Several inmates on suicide watch had extended stays of three to 12 days, but it was unclear whether these inmates were referred to MHCB units elsewhere. No reasons were shown for most of the delays. One inmate was admitted three times to the CTC within a month, but was not referred to a higher level of care. Taken together, these data raise the question whether referrals to higher levels of care were made appropriately in all cases.

Treatment in the CTC was minimal. Clinical rounds were conducted only when contract or temporary psychiatrists and psychologists were in the institution, as little as three days a week. The shortage of clinical staff was compounded by the fact that many of the contractors were not initially credentialed to work in the CTC. Institutional audits showed that suicide risk assessments were completed 77 percent of the time on

340

admission and almost never at discharge. Inmates received conscientious nursing care, although none of the nurses with mental health training was working in the CTC for any extended period of time prior to the paper review. In one troubling incident, an inmate who presented with suicide concerns was not admitted to the CTC due to a shortage of beds, but was placed on suicide watch overnight in his administrative segregation cell, without the benefit of a suicide risk assessment; he was also allowed to keep his clothing. Once aware of the incident, the administration moved aggressively to correct the situation and preclude its recurrence.

Four cells in the CTC were equipped with video cameras. Prior to January 2006, suicide watches were generally conducted by video monitoring, but, pursuant to an administrative memo in late January, a correctional officer was regularly posted outside the cell door for all suicide watches. According to institutional policy, video monitoring of suicide watches was to be used only if more than two suicide watches were to be conducted simultaneously, a situation that had not yet occurred. It was unclear whether correctional officers had been sufficiently trained to use the video monitoring equipment.

There were no referrals to DMH during the monitoring period.

Other CAP Issues:

a. Partial Compliance

The timeliness of psychiatric responses to inmate referrals improved, but delays still occurred for some inmates. Response times could not be calculated from the MHTS. Inmate histories, however, showed that responses took three weeks or more or did not occur at all for 20 of 131 referrals. Some psychiatric referrals were seen by a psychologist or a psych nurse.

Inmates were appropriately referred to mental health following bus screenings, but scheduling difficulties and cancellations interfered with timely appointments. According to institutional audits, only 77 percent of referrals were scheduled for appointments in a timely manner; the remaining appointments were delayed from a day to six weeks. The data indicated that a significant number of cancelled appointments impeded clinical access to caseload inmates. While most missed appointments were rescheduled within a week, almost 30 percent took two to three weeks to reschedule or were never rescheduled at all.

Problems were noted with regard to the timeliness of some IDTT meetings. The composition of the meetings was often inadequate, due to the lack of clinical, particularly psychiatric, staff.

The litigation coordinator reportedly monitored the heat plan, reviewing materials regularly to ensure, among other things, that inmates on heat-risk medications with inappropriate work assignments were reassigned. There were many Stage I heat alerts at CEN, but no Stage II or III alerts because the buildings were air-conditioned.

b. Non-Compliance

Suicide prevention follow-up declined during the monitoring period. At least 46 inmates were admitted to the CTC for suicide prevention, but institutional logs reflected clinical follow-up for only 28 discharged inmates. Psych techs were expected to perform clinical follow-up for the first four days, while a psychiatrist was supposed to see inmates on the final day. Inmate histories showed that only 25 percent of inmates received a full five days of clinical follow-up; the great majority of inmates had one or more missed days. No audit of this issue was conducted. Custody checks were also

342

problematic in most housing units, other than administrative segregation. Different buildings used different methods for recording suicide-related follow-up custody checks, resulting in documentation that was inconsistent throughout the institution. Additional training on suicide follow-up reportedly was provided to custody staff in the fall of 2005.

Documentation of weekly case management contacts in administrative segregation was inadequate. Inmate histories from the MHTS for all current administrative segregation inmates found that at least half did not receive weekly contacts. Timely mental health screenings for inmates arriving in administrative segregation were also poorly documented; again, inmate histories showed that only about half of newly arriving inmates received timely screenings. Institutional audits showed a much greater level of compliance, but the reason for the discrepancy was not clear.

Institutional Summary:

Turnovers and vacancies among mental health and auxiliary staffs created increasing obstacles to the provision of mental health care to a growing number of caseload inmates in the institution during the monitoring period. Increased reliance on an inadequate and shifting cadre of contractors essentially left the direction of mental health services in the institution to a pair of well-intentioned and hard-working mental health RNs, whose clinical training was unequal to the task.

Among the four issues of focus in the monitoring round, quality management remained incomplete. The institution had a well-developed committee structure and conducted monthly chart reviews, but no mental health QITs were functioning and, given the lack of permanent clinical staff, peer review had simply ceased.

CEN had a new and well written local medication management policy. Most medication issues were not audited during the monitoring period, but earlier information suggested that medication continuity was reasonably good on arrival, when changing housing locations and at the time of renewal. Practices related to informed medication consent forms, medication errors, laboratory testing and MARs also improved, and the institution began logging parole medications.

CEN had an adequate system for tracking mental health assessments in the disciplinary process. A relatively large number of non-caseload inmates, whose infractions were accompanied by bizarre or unusual behavior, were identified, and mental health clinicians generally provided thoughtful input. Hearing officers referred regularly to mental health input, but the documentation provided by the institution was too sparse to determine the impact of assessments on the outcome of cases.

3CMS and EOP inmates were generally transferred to appropriate programs within specified timeframes. While awaiting transfer, 3CMS inmates were seen at least monthly, but EOP inmates were not seen weekly as required. Lengths of stay in the CTC were often extended beyond mandated timelines; too few inmates were referred to MHCB units; MHCB referrals were frequently initiated late; and there were no DMH referrals. Treatment in the CTC was inadequate, due in large part to the shortage of clinical staffing. There was some concern that not all inmates in need of higher levels of mental health treatment were being appropriately referred.

Among the institution's remaining CAP items, psychiatric responses to inmate referrals improved, but a significant portion of responses to referrals were untimely. Appointment cancellations were common, and scheduling delays sometimes

resulted in lengthy waits or lost appointments. Weekly case management contacts in administrative segregation and timely mental health screenings upon admission to the administrative segregation unit was either erratically provided or documented. Some ITDD meetings were untimely, and the composition of IDTTs was inadequate. Suicide prevention practices slipped during the monitoring period. Clinical and custody follow-up for suicidal inmates discharged from the CTC or MHCB units was increasingly erratic; suicide risk assessments were not always completed; and attendance at meetings of the suicide prevention committee was sparse.

The paper review process at CEN was not entirely successful. The data provided by the institution was so often inadequate or ambiguous, a monitor had to visit the institution to sort it all out with local staff, confounding thereby the whole point of a paper review.

### Chuckawalla Valley State Prison (CVSP)
Paper Review

Psychiatric staffing was the most critical issue for mental health services in CVSP. The institution still had not filled a long-standing vacancy for its allocated half-time psychiatrist position. A single contract psychiatrist was employed to cover the vacancy and provide consistent care. From January through April 2005, the contract psychiatrist covered all unfilled hours; from May through June, however, only a portion of the vacancy was covered, while as few as 20 hours of contract coverage were provided in August and only 40 hours in June and September.

There were 24 caseload inmates in CVSP at the time of the paper review. During the period from October 1, 2004 through October 1, 2005, a total of 100 3CMS

and one EOP inmate were housed in CVSP.  Other CDCR institutions, particularly CIM,

inappropriately continued to send inmates on mood-sensitive medications to CVSP.

Quality Management:

        CVSP continued to operate an effective quality management system.  The

quality management committee met monthly, with two exceptions due to training

conflicts.  The mental health subcommittee and the suicide prevention committee also

continued to meet on a monthly basis.  Minutes of the suicide prevention committee

meetings for the entire monitoring period were provided to the monitor.

        One QIT was chartered during the monitoring period, but the team met

only once and no minutes from the meeting were provided.  The small size of the mental

health staff prevented the implementation of peer review at CVSP.

Medication Management:

        CVSP had a system for providing arriving inmates with their medications

in a timely manner, but an institutional audit of 54 charts included only one caseload

inmate who had arrived at the facility on medications.  Although the inmate received his

medication within eight hours of arrival, the audit sample was too small to be

representative.  The institution also had a long-standing process for ensuring medication

continuity for inmates changing housing locations.

        The institution's system for tracking follow-up to medication non-

compliance was adequate.  Logs showed that one inmate refused medications during the

monitoring period and was referred by the MTA to mental health.  CVSP, in addition,

had a system in place for providing parole medications, but one of the only three caseload

inmates discharged from the institution during the monitoring period did not receive his medications.

CVSP continued to provide inmates on mood-stabilizing medications with appropriate laboratory testing. The institution maintained a tracking log which showed that eleven inmates received laboratory tests during the monitoring period. According to the log, laboratory tests for these 11 inmates were drawn, returned and reviewed by the ordering physicians within appropriate timeframes.

During the monitoring period, the institution finalized an appropriate new policy and procedure for HS medications. No inmates, however, were reported to be on HS medications. Similarly, CVSP had no inmates on Keyhea orders. Institutional tracking data showed nine inmates had been prescribed DOT during the monitoring period. According to institutional audits, informed medication consent forms were present in 100 percent of inmates' charts. No medication errors were reported by the institution.

Mental Health Assessments for the Disciplinary Process:

Implementation of the department's mental health disciplinary process improved. Institutional logs included the outcome of mental health assessments, but still did not record whether mental health assessments were considered by hearing officers in reaching their dispositions.

During the monitoring period, RVRs were issued to five caseload inmates, all of whom received mental health assessments. Mental illness was found to have contributed to the behavior of two of these inmates. The monitor reviewed the RVRs for both inmates and found no mention of the mental health assessment in the findings of

one, while consideration of the mental health assessment was documented in the disposition of the RVR of the second, who was found not guilty.

Transfers:

      The monitor reviewed three comprehensive tracking logs and found that the timeliness of transfers to appropriate mental health programs remained compliant. During the monitoring period, the institution transferred one inmate to CMF/DMH for intermediate care. The time from referral to acceptance for this inmate was nine days, while the time from referral to transfer was 13 days.

Other CAP Issues:

      In the preceding monitoring round, the monitor expressed concern that suicidal inmates returning to CVSP from a MHCB unit were held in the OHU for 24 hours before receiving any suicide prevention follow-up. The institution's OHU operating procedure was updated in October 2005, but it did not specifically address this issue. Of the six inmates transferred to a MHCB elsewhere during the monitoring period, only one was returned to CVSP. According to the logs, follow-up occurred in the MHCB institution for one day and in CVSP for four days, but it was unclear where in CVSP the inmate was housed while receiving his follow-up.

Institutional Summary:

      CVSP had an opening for a psychiatrist that remained unfilled. Despite this, the institution was in compliance with its CAP and provided care consistent with the program guide requirements.

      With respect to the four areas of focus, the institution had a good quality management system, and transfers were generally timely. Medication management

functioned well, and the RVR process continued to improve, although hearing officers did not always take mental health input into account in reaching their decisions. Overall, CVSP was substantially in compliance with the requirements of Coleman.

## Service Area K

Service Area K includes the California Institution for Women (CIW) and the women's portion of the California Rehabilitation Center (CRC), but the mental health services available for both male and female inmates in the latter facility have already been discussed in Service Area I, above.

### California Institution for Women (CIW)
August 29, 2005 - August 30, 2005
October 4, 2005

Staffing for mental health and related disciplines apparently remained nearly full. CIW's inconsistent staffing data left unresolved discrepancies between reports on allocated mental health staff during the current and the preceding monitoring periods. The position for a senior psychiatrist had been vacant since April. All six staff psychiatrist positions were filled. Positions for a temporary staff psychiatrist and a chief psychiatrist were filled, yielding a total of eight psychiatrists.

The institution reported 12.85 allocated psychologist positions. A senior psychologist position was reclassified to chief psychologist and filled, while the two remaining senior psychologist positions were also occupied. One clinical psychologist was on military leave. Beginning in September, that position was covered by a limited term appointment. There were no vacancies among 4.5 psych social work positions. Similarly no vacancies existed among allocated psych tech and mental health clerical positions. One of eight RN positions was vacant. The sole allocated position for a

recreational therapist was vacant. No mental health contractors were engaged during the monitoring period.

Despite CIW's relatively unique full staffing, clinicians complained that duties unrelated to the direct delivery of mental health services, such as preparation of BPT and Z-case reports, shrank operational case manager-to-inmate ratios. The OPHU was staffed by 2.5 full-time mental health clinicians. One full-time clinical psychology position was devoted to monitoring tasks, such as tracking EOP hours, comparing MHTS data entries to other records and auditing performance indicators. Clinicians left to provide treatment in basic programs reported that they were stretched too thin to participate in quality assurance activities.

In August 2005, the size of the 3CMS population at CIW increased from 515 to 580 inmates during the monitoring period. The institution housed 107 EOP inmates, 33 of whom were unendorsed at the time of the monitor's visit. The institution's OPHU's 12 beds contained 11 MHSDS caseload inmates, while 31 caseload inmates were in administrative segregation.

Issues Resolved:

> Transfers from the reception center were made within required timeframes.

> Non-compliance with medication was handled appropriately.

> Psychiatrists met with inmates on an individual basis in administrative segregation.

Quality Management:

> Quality assurance efforts were driven largely by Plata requirements.

Mental health quality assurance remained a top-down process, in which supervisors