EXHIBIT A

High Desert State Prison (HDSP)

October 12, 2005 - October 14, 2005

B - Yard

1.    Inmate A

Inmate A arrived at HDSP on 1/14/03. His brother was his cellmate. He described himself to the monitor's expert as "fine." He indicated that he had an adjustment disorder and took Prozac 20 to 30 mg q a.m. for more than a year. He said he often felt down and did not socialize much. He indicated that he had finished ABE in the school program. The inmate described his medications as OK and stated that they were helpful with no side effects. He had never been in a MHCB unit and was generally stable. He saw the psychiatrist every 90 days, but said that he never saw a case manager. The inmate had no heat card.

According to the inmate history, Inmate A's last case manager visit was on 6/24/05. The inmate had a total of three case management visits, but four months had elapsed since the last one.

Assessment:

1.    This stable inmate had received appropriate care.

2.    The inmate did not have a heat card.

2.    Inmate B

Inmate B described himself to the monitor's expert as "fantastic." He complained that his medications were often not renewed and that he ran out. He also frankly indicated that he had some memory issues. He seemed somewhat disoriented to time and his cognitive processes were slow. He responded to questions in a histrionic manner.

Inmate B indicated that he took Zyprexa 15 mg every evening. He said that he used to take Mellaril and that he was prescribed Risperdal earlier in the year, but it made him sick with side effects that resulted in an admission to the CTC. A review of the inmate's UHR confirmed that he was on Zyprexa as well as Keppra. Inmate B experienced a stressful time during lockdown. His medications were brought to him in his housing unit.

The inmate also described his case manager as "fantastic." More importantly, he said that his case manager was very accessible. According to his inmate history, Inmate B had seen four different psychiatrists this year and had seven case manager visits this year, three of the latter by referral.

Inmate B had a heat card. He indicated that he had participated in group therapy while in C-yard, but had received none in B-yard and would like to have it. He was previously in ASH where he said he enjoyed group therapy every day.

Assessment:

1.  This inmate received good psychiatric and case manager care. He was being seen very frequently for a stable inmate.

2.  The inmate had a heat card

Inmate C

Inmate C indicated that he was doing OK to the monitor's expert. His medications included Risperdal at 5 p.m. and Dilantin, but he wanted HS medications. The inmate indicated that his medications had been helpful to him and that his emotions were under good control. The inmate heard voices, but indicated that Risperdal helped him. He was not experiencing any side effects from his medications and said that his medications are always available.

Inmate C suffered some kind of brain damage in 1992 from trauma and was in a coma for a few months. He had seen two different psychiatrists and his case manager every 90 days. He had a full-time job as a porter. His UHR was not reviewed, but his inmate history revealed that he was in a MHCB unit from 3/14/05 and 3/18/05 for suicidal ideation. He had received clinical follow-up upon his discharge from the unit both times.

Assessment:

1.  This stable inmate received appropriate psychiatric and case management care.

2.  Inmate C wanted and could benefit from group therapy.

3.  The inmate wanted to have his medications administered HS.

4.  Inmate D

Inmate D reported that he had arrived at HDSP two years ago. At the time of his interview with the monitor's expert, the inmate was taking no medications. He said that he had stopped his medications on the advice of his psychiatrist. He experienced some withdrawal symptoms, which gradually got better. The inmate further reported that, while in the county jail, he had became very depressed and was sent to a state hospital for a competency hearing. He indicated that he heard voices and was very anxious. He reported taking no medications at that time because he felt he wanted to handle his illness on hi's own.

Inmate D reported that he had a heart attack six weeks ago. His UHR confirmed a myocardial infarction on 8/30/05. He was taken to a Medical Center and stented. The inmate also complained of bleeding ulcers.

His inmate history indicated that the inmate had been seen by his case manager three times since his heart attack in August. He had seen the psychiatrist only once this year in the emergency room in February 2005. A psychiatric assessment concluded that the inmate had no Axis I disorder. His treatment plan of 8/10/05 was adequate. The plan included a diagnosis of Major Depressive Disorder, Recurrent, in partial remission. Inmate D participated in group therapy last year while in D-facility and was on the waiting list for group therapy in B-Yard. His case manager checked that he was still on a waiting list.

Assessment:

1.    This inmate received very close management after his myocardial infarction.

2.    Inmate D was on a waiting list for group therapy.

3.    Overall, the inmate received good management and treatment planning.

5.    Inmate E

Inmate E reported that he had taken Remeron in the past, but was not taking any medication at the time of the interview. The inmate had refused medication in February 2005 and felt he was doing well without it. Inmate E was currently in school, but he wanted a trade that he could not obtain at HDSP and consequently wanted a transfer.

The inmate complained that he had not received help from mental health in dealing with his current stresses. He said that he was seen by a case manager every 90 days, but the case manager simply asked him how his problems were going. The inmate expected to be taken off the mental health caseload in another six months. He said that he was promised group therapy, which he wanted, but never received; he was still on a waiting list after many months. Inmate E indicated that he saw a telemedicine psychiatrist every 90 days; his last visit was in June.

The inmate's UHR was not reviewed, but his inmate history revealed that he had received six case management contacts by three different case managers during 2005. He had been seen by the telemedicine psychiatrist every two months until June. After that, the inmate had no further psychiatric contacts.

Assessment:

1.    Overall, good mental health care was provided for this for stable inmate who was off medications.

2.    The inmate's need for telemedicine contacts every two months was questionable. C-Yard:

6.    Inmate F

3

Inmate F indicated to the monitor's expert that he had personal and family problems and was not doing well. The inmate reported that he was taking Geodon, which had been first prescribed during a five-day CTC admission earlier in the year. Inmate F said that he was taking Geodon because he heard unusual voices, but he was unable to clarify this further. According to the inmate's account, his dosage had just been lowered because he became groggy in February 2005. The inmate claimed that he was not currently hearing voices. The inmate's UHR confirmed that he was on Geodon for paranoid schizophrenia in remission. The record also confirmed that his Geodon was initiated during a 1/13/05 admission to the MHCB unit.

Inmate F reported contact with a telemedicine psychiatrist every month. He indicated that he had been trying to see his case manager and sent frequent requests. The inmate had received a stressful letter, which he read to the psychiatrist, indicating that his mother and grandmother were very sick. He indicated that he was working with his counselor to get a transfer to be near his family.

A review of the inmate's UHR revealed that he was seen by a psychiatrist on seven occasions this year. A senior psychologist saw him the day prior to his interview with the monitor's expert in response to his frequent referrals. According to his UHR and inmate history, Inmate F was seen by his case manager at least monthly. Many of these visits occurred earlier in the year during suicide follow-up. Since then, the inmate had received five case management contacts, but none since 8/15/05 until the senior psychologist saw him yesterday. The inmate history did not list any referrals after 5/23/05, although the inmate indicated that he had been referred by the psychiatrist three weeks ago and that he had make frequent self-referrals.

Although Inmate F experienced occasional suicidal ideation in the past, he never made a suicide attempt. He had participated in group therapy, which he valued, in the past, but was not receiving such therapy in C-Yard. The inmate had great difficulty with the frequent lockdowns at HDSP this year; he indicated that the lockdowns were "really hard" on him. The inmate's cellmate was a good friend. He had no recent problems with availability of medication. Inmate F had a September 2006 release date.

Assessment:

1.     This inmate received good psychiatric medication management.

2.     Inmate F did not have sufficient case management contacts in recent months.

3.     The inmate received inadequate responses to multiple mental health referrals.

4.     The inmate had a heat card.

5.     This inmate needed and wanted the extra support of group therapy.

7.     Inmate G

Inmate G reported that he was doing fine. He indicated that he was not on any medications, but reported that he took some briefly last year. The inmate said that he had been depressed and losing sleep while on the medications and had stopped taking them after several months. The inmate saw his case manager every 90 days. He indicated that he had seen his case manager twice since the lockdown began and had sent several requests to be seen, but had not received a reply. The inmate saw a physician, possibly a psychiatrist, three or four days prior to his interview with the monitor's expert. He never had, and never requested, any group therapy. Inmate G reported that he had a good cellmate.

The inmate's UHR was not reviewed, but his inmate history indicated a diagnosis of Major Depressive Disorder, in full remission. This history showed that the inmate was seen on several occasions by a psychiatrist following his medication refusal last year. According to the history, he had seen his case manager four times this year.

Assessment:

1      This stable inmate received appropriate care.

2      Inmate G received a good response and follow-up to his medication refusal.

3      According to the inmate's report, which the monitor's expert was unable to confirm, the inmate did not receive a timely response to his referrals.

8.      Inmate H

Inmate H reported that his medications included Keppra and Benadryl for mood stabilization. The inmate was doing well on his medication, with no side effects. He had no problem with medication availability and no problem receiving his last dose of the day at 5 p.m.

Inmate H was seen by a telemedicine psychiatrist every two months. He said that he did not see his case manager very often and that there had been some turnover in his case managers. The inmate claimed to have handled the changes all right and said that he had not sent any mental health requests to be seen. The inmate had a new cellmate, with whom he got along better. He coped with the lockdown with an in-cell program that included radio, some television, a typewriter, books and learning a language. The inmate said he slept well. He had never heard of a heat card and did not recall being taken in from yard during a heat alert. Inmate H had never participated in group therapy and had never asked about it.

The inmate's UHR was not reviewed, but his inmate history confirmed that he saw a psychiatrist every one to two months. It also showed that he had seen his case manager every 90 days this year.

Assessment:

1.     This stable inmate received appropriate mental health care.

2.     The inmate did not have a heat card.

9.     Inmate I

In his interview with the monitor's expert, Inmate I described his reaction to the lockdown as "weathering the storm." The inmate arrived at HDSP more than a year and a half ago from CSP/LAC. He appeared to have a positive relationship with his case manager who he indicated had been helpful with his stress. The inmate reported that his case manager had an "open door" policy and checked with him frequently during the lockdown.

Inmate I indicated that he had been off medications since March 2005. According to the inmate, he was last seen by a psychiatrist four months ago. He said that he wanted to participate in group therapy but, because of the lockdown, was unable to do so. Inmate I indicated that he had never made a self-referral to mental health.

The inmate's UHR was not reviewed, but his inmate history confirmed that he had seen his case manager on six occasions this year. More recently, his case management contacts occurred every month. The inmate had five psychiatric contacts this year as well. He was seen on multiple occasions for refusing his medications earlier in the year and was monitored by psychiatry since then.

Assessment:

This inmate received appropriate mental health care for a stable patient off medications.

10.     Inmate J

Inmate J told the monitor's expert that he had been extremely stressed because of the lockdown, difficulties with his cellmate and problems at home. He had been taking Geodon and Keppra for 14 months in the mornings and at 5 p.m. He had been in prison for ten years and had taken psychiatric medication for many years prior to his incarceration. The inmate indicated that his medications were helpful and without any side effects. Occasionally, the inmate experienced poor sleep and agreed that medications later in the day might help him.

The inmate reported monthly case management contacts, which he found very helpful. He indicated that he saw a psychiatrist every three months, occasionally by telemedicine. The inmate's last psychiatric visit was six weeks prior to his interview with the monitor's expert. The inmate complained of a two-week gap in medication in February. He claimed to have run out of medication and told the MTA, but was never

seen by mental health. Because of this, he said he began "stressing out" and experiencing thoughts of self-harm, which led to a two-day admission to the CTC. He reported receiving five-day follow-up after his discharge from the CTC, but indicated that he had been unable to sleep during this period because of the stress. Inmate J reported that he had no problems since that time.

Inmate J indicated that he had been coping reasonably well with the lockdown. He watched some TV, did some exercise, read religious materials and occasionally went to the day room and canteen. He was not able to participate in any group therapy, however, because of the lockdown. The inmate had a heat card and reported returning to the housing unit when the temperature hit 90 degrees. Inmate J had HBP, which caused occasional dizziness. Years ago, prior to his incarceration, he had attempted suicide through an overdose with heroin.

A review of the inmate's UHR confirmed this history. The inmate had an IDTT meeting on 2/24/05. The clinical picture he presented at that meeting was consistent with his presentation during the interview with the monitor's expert, including reports of stress related to problems with his cellmate and a three-strikes conviction. The inmate was on Geodon and Remeron at the time of his IDTT meeting. He had been place on this medication in the p.m. during a psychiatric evaluation by telemedicine on 1/26/05. The inmate's chart also confirmed a two-day admission to the MHCB unit. This inmate was seen in the emergency room on 3/6/05 because of psychiatric decompensation. He had been off medications for some time. A review of his MAR for that time period revealed that a renewal was missed and he had been off medications for ten days. A psychiatrist was unavailable at that time. During July, he began refusing his morning medications. He was referred to a psychiatrist for non-compliance, but was not seen for 17 days and seven days respectively. The inmate had five case management contacts since his MHCB discharge.

Assessment:

1.     The unavailability of a psychiatrist led to a renewal gap for this inmate, which caused an emergency MHCB admission

2.     The inmate had received close management and good mental health care since the March MHCB admission.

3.     Psychiatric responses to this inmate's referrals for medication non-compliance were untimely.


D – Yard:

11.     Inmate K

The inmate began his interview with the monitor's expert with a tirade against the quality

of mental health care in HDSP. He reported that his medications had expired yesterday and that an MTA had told him to "drop a slip." The inmate was on Thorazine, 500 milligrams per day, which he described as a "wonder-drug." Inmate K indicated that he had experienced auditory hallucinations for years, telling him things that were not necessarily negative. The inmate said that he experienced no side effects from his medications and felt that his hallucinations were under reasonable control, although always present at a low level. The inmate enjoyed working full-time as a porter in building three. He said that he saw his psychiatrist four to five times per year for medications and other problems and his case manager, of whom he had a very positive opinion, every one to two months. He had participated in group therapy last year, but was unable to receive such therapy in D-Yard. The inmate found the eight-month lockdown this year very difficult, but indicated that he had found ways to cope with the stress. He said that he never had to make a referral to mental health. The inmate had a heat card and occasionally, during the summer, was recalled from the yard when the temperatures were high.

A review of the inmate's UHR revealed that he was seen by a psychiatrist on 2/12/05, who diagnosed him as having a psychotic disorder. The inmate was on Thorazine at the time and considered stable. The psychiatrist ordered a return visit for four to six weeks. Inmate K saw his case manager on 3/25/05 and was found to be handling the lockdown well. The case manager called for a return visit in ten weeks. The inmate was seen 12 weeks later by his case manager, but the return psychiatric visit was missed. The inmate had five case management visits during 2005.

The inmate's MARs for May and June revealed medication gaps associated with a failed renewal. The inmate's last medication order had been on February 12 for 90 days. The pharmacy print-out, however, listed February 16 as a start date for the inmate's medications with various stop-dates; the stop-date should have been approximately June 11. The inmate was next seen by a psychiatrist on 6/11/05 for a follow-up visit in response to the expiration of his medications. The medication ordered by the psychiatrist was not, however, administered until two days later on 6/13. It appeared that the inmate's medication expired again in the early fall as an order dated 9/2/05 for Thorazine was not delivered to the inmate; there was no psychiatric note accompanying that order.

Assessment:

1.    This inmate experienced frequent lengthy renewal gaps in medication.

2.    The inmate did not receive a return visit ordered by the psychiatrist.

3.    Inmate K received good case management support.

4.    The senior psychologist intervened on behalf of the inmate and solved the medication renewal problem cited above.

5.    The inmate had a heat card.

12.    Inmate L

Inmate L told the monitor's expert that he talked to mental health regularly and was doing well. His medications included Prozac, Risperdal and Remeron. The inmate indicated that he took his medications every morning, but had a number of changes in order to get the right dose. He said that he found the medication helpful, without any side effects, and indicated that he did not hear voices anymore. He had never gotten the wrong medications and, during the lockdown, his medications were brought to him.

Inmate L arrived at HDSP in November 2004 and, in his terms, "hid his illness" trying to manage his problems on his own. He said that he had become ill in the county jail and was placed on suicide watch while in the reception center. He was on no medications at the time, but was on the mental health caseload for support. He began taking medication about seven months ago. When his cellmate attempted suicide five or six months ago and a social worker began coming to see him, Inmate L made a request to be seen, which he indicated took three months. The inmate noted that his case managers changed somewhat and that he saw the program director on several occasions over the last month or so. Inmate L reported seeing his psychiatrist every several months.

Inmate L admitted that the lockdown had been very hard on him over the last several months. He said he watched some television, tried to read and occasionally went to the canteen. The inmate indicated that he had a reasonable cellmate. He reported that he experienced a number of stresses, which affected him adversely. The inmate noted that his attention span and sleep patterns were poor. He received no visits during this time period. He had a heat card and said he was never sent to the yard during a heat alert. He had no opportunity to participate in group therapy because of the lockdown.

The inmate's UHR was not reviewed, but his inmate history revealed that he had four case manager contacts this year as well as four psychiatric contacts. His diagnosis was Mood Disorder NOS.

Assessment:

1.    This inmate received appropriate mental health care for a stable patient.

2.    Mental health clinicians failed to respond appropriately and in a timely manner to this inmate's self-referral.

3.    This inmate had a heat card.

13.    Inmate M

Inmate M told the monitor's expert that he was off medications had been doing very well and expected to be discharged from the mental health caseload. The inmate had been trying to get a job at the prison for two years without any success. He occasionally saw the psychiatrist and continued to see a case manager every two or three months. He was tired of the lockdown, but said he was handling it well. He meditated, did some reading,

maintained a positive outlook, exercised and talked to his cellmate who he felt was reasonable. He has no interest in attending group therapy and no interest in other forms of mental health support.

Assessment:

This inmate received appropriate mental health and psychiatric monitoring for a stable patient.

14.    Inmate N

Inmate N told the monitor's expert that he was getting along well, but that he had problems with medication expirations. The inmate indicated that he took Geodon twice a day and that he saw the psychiatrist for renewal sometimes; his medications were changed from Thorazine to Geodon in July 2004. He reported gaps in his medications earlier in the year, resulting from expirations. The inmate complained that when he talked to a correctional officer, he did not get any help. He indicated that last month he missed his medications for a week and was told by a MTA that it was a "mistake." Inmate N's cognitive processes appeared to be somewhat concrete and slow. At times, he spoke of the auto-renewal of his medications.

Inmate N reported that he was seen by his case manager every three months, although previously he had been seen more often. He had a very negative relationship with his case manager and felt that the case manager was uncaring and unsupportive. He complained that he had received no help from his case manager recently when a family member died. He said he felt like hurting himself. Inmate N indicated that he had problems with anger, with being hyper and with hallucinations. He had participated in an anger management group, but had not done so in D-Yard. The inmate had not been admitted to the MHCB unit at any time.

The inmate said that the lockdown was "very hard" on him. He indicated that he had nothing to do and that he wanted to "go off." He said that he was tired of HDSP and would do anything to get out, even hurt somebody. He felt that the correctional officers were provocative and agitated him. He said that he tried to cope unsuccessfully with the lockdown by exercising, watching television and occasionally reading, although he complained that it took months to get a book. The inmate played dominos sometimes with his cellmate, who is his cousin. He had a heat card.

A review of the inmate's UHR confirmed that he was taking Geodon. His MAR for July revealed gaps in medication. His MAR for September also showed that he received no Geodon for reasons that were not clear; there appeared to be a problem with medication availability. Inmate N had several emergency room visits in July. He sent a grievance to the chief psychologist and requested an EOP level of care. He was told that although he was a candidate for EOP treatment, it was felt that he was doing better, knew how to ask for help and was being seen more frequently than monthly. The inmate history

showed that Inmate N had seven case management contacts since February.

Assessment:

1.  This inmate had an unexplained gap in his medication during September; it appeared        that his medication was unavailable.

2.  Inmate N was stable but did not function well during the stressful lockdown.

3.  The inmate received four psychiatric contacts this year, but his medication was occasionally renewed without contact

4.  The inmate will be assessed again by the senior psychologist to determine whether the needs an EOP level of care.

EXHIBIT B

Mule Creek State Prison (MCSP)

December 5, 2005 - December 7, 2005

1.    Inmate A

This inmate was housed in the MHCB unit. He was diagnosed with Major Depressive Disorder with psychosis and Personality Disorder, NOS. The inmate was on a Keyhea order and was treated with Zydis 20 mg/day, Remeron 30 mg/day and Thorazine 250 mg/day.

Inmate A was initially transferred to MCSP on April 21, 2003. A review of his UHR indicated that he had a history of several MHCB and OHU admissions, including an OHU admission on September 9, 2005 and a MHCB admission on September 12, 2005. Inmate A's admissions were prompted by threats or actual incidents of self-harm. He was hospitalized at SVPP and returned to MCSP on November 7, 2005; his discharge summary was not present in the UHR.

On November 26, 2005, Inmate A was sent to an outside hospital for medical treatment after he took an overdose of Dilantin in a suicide attempt. He was then transferred to the OHU where he began banging his head. He was subsequently transferred to a padded cell in the MHCB unit and provided with one-to-one custody observation. Progress notes by the psychiatrist indicated that he remained "very unpredictable."

Assessment:

The following comments were noted regarding the care provided to this inmate:

1.    This inmate was appropriately transferred to the OHU and the MHCB unit after voicing or exhibiting suicidal behavior.

2.    Inmate B

This 3CMS inmate was housed in the OHU. He was diagnosed with Psychotic Disorder, NOS and Borderline Personality Disorder. He was treated with Risperdal 4 mg/day, Prozac 20 mg/day, Remeron 15 mg/day and Benadryl 25 mg/day.

Inmate B was transferred to MCSP from CSP/LAC on November 18, 2005 as a 3CMS inmate. He had been receiving a 3CMS level of care since January 2003. He had a history of biting his arms in response to stressful circumstances and a history of auditory hallucinations. An IDTT meeting was held on December 1, 2005 recommending that he continue in the 3CMS program at MCSP.

Inmate B was admitted to the OHU on December 4, 2005 after threatening to bite himself. The last progress note in the inmate's chart indicated that he was showing some

improvement, but the staff planned to transfer him to the CTC when a bed was available.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Although Remeron was ordered on the day of the inmate's arrival, he received one dose on November 22 and did not receive his medication again until November 24, 2005.

- There was no documentation of any psychiatric presence at the 3CMS IDTT meeting held for this inmate.

This inmate signed a refusal form for his Risperdal. There was documentation in the chart showing that the psychiatrist was aware of the inmate's refusal and followed-up the inmate's non-compliance.

Inmate C

This 3CMS inmate was housed in the OHU. He was diagnosed with Schizophrenia, paranoid type and treated with Geodon 120 mg/day and Depakote 500 mg/day. Inmate C was transferred to MCSP on March 16, 2004 as an EOP inmate. He remained in the EOP unit until May 6, 2004 when he was downgraded to the 3CMS level. The inmate was briefly housed in the administrative segregation unit in July 2005. He was returned to general population in late July, where he was followed consistently by the case manager and the psychiatrist.

Inmate C was admitted to the OHU on December 3, 2005 after making a serious suicide attempt by cutting his arm. The clinical staff was concerned about the inmate and viewed him as having a significant risk of suicide due to the fact that he had a life sentence. The inmate remained in the OHU at the time of the monitoring visit. Progress notes indicated that the staff planned to transfer him to the CTC when a bed was available. Assessment:

The following comments were noted regarding the care provided to this inmate:

- There was documentation showing that this inmate was seen on a quarterly basis by his case manager while in the 3CMS program.

- The inmate's 3CMS IDTT meeting on July 21, 2005 did not document the presence of a psychiatrist. Documentation indicated that all of the necessary participants were present at the meeting on May 5, 2005.

The appropriate laboratory testing for treatment with Depakote had not been conducted for this inmate, but Inmate C had only recently been prescribed this medication.

4.    Inmate D

This EOP inmate was housed on the Level III EOP unit. He was diagnosed with Schizoaffective Disorder, depressed type and Tourette's Disorder. He was treated with Wellbutrin 200 mg/day and Risperdal M tabs 1 mg/day.

Inmate D had been housed at MCSP since 1999. He was in the EOP program until August 24, 2004 when he was downgraded to the 3CMS level. His UHR documented frequent medication non-compliance during this period. According to clinicians' notes, the inmate complained of having to wait in pill lines and indicated that his non-compliance was related to these waits. Clinicians also documented an increase in the inmate's depressive symptoms. An IDTT meeting held on August 29, 2005 recommended upgrading the inmate to the EOP level of care.

After the inmate's transfer to the EOP program, he continued to exhibit depressive symptoms, specifically anhedonia, social isolation and lethargy. His medications were adjusted and he was treated for a time with Wellbutrin only. On December 6, 2005, Inmate D was seen by the psychiatrist and Risperdal was added to his medication list for the treatment of his Tourette's Disorder.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- The inmate's complaints regarding the long pill lines were consistent with reports by staff and other inmates indicating that lengthy pill lines contributed to medication non-compliance.

A review of the inmate's MARs indicated that he had significant medication non-compliance during the month of September 2005. There was documentation showing that the inmate had been referred to metal health by nursing staff and that he had received follow-up from mental health regarding this issue.
Informed consent for treatment with psychotropic medications was present in the inmate's UHR.
Both the EOP and 3CMS IDTT meetings did not document the presence of psychiatrists

- A review of the inmate's chart indicated that he was offered more than ten hours of structured therapy; nine to ten hours, however, were either recreational therapy or leisure awareness. Inmates consistently reported that these groups lacked structure and therapeutic benefit.

5.    Inmate E

This EOP inmate was housed in the Level III EOP unit on the B yard. He was diagnosed with Schizophrenia, paranoid type and treated with Seroquel 450 mg/day, Risperdal consta 50 mg IM every 2 weeks, Remeron 45 mg/day and Benadryl 150 mg/day. His case was reviewed as follow-up from the UNA.

This inmate was transferred from the APP at CMF to MCSP on March 22, 2005; he had been hospitalized there for approximately one week and was discharged to an EOP level of care. Since his return to MCSP, the inmate had been followed consistently by his psychiatrist and case manager who reported that he experienced irritability, sleep difficulties and chronic auditory hallucinations that at times told him to harm himself. His medications were adjusted to address these issues.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- There was documentation in the inmate's chart indicating that he was offered at least ten hours of structured therapeutic activities each week, including work. Recreational therapy amounted to only about one-third of the hours offered.

- The inmate was seen on August 24 when he reported command auditory hallucinations to harm himself. There was no documentation that a suicide risk assessment was completed at that time.

- The inmate's chart contained documentation that he was seen by his case manager on a weekly basis.

- Psychiatric participation was not documented at any of the three IDTT meetings during the monitoring period.

- The inmate reported a lapse in his medications during November, but the monitor was unable to assess this complaint because the MAR for the second half of November was not present in the inmate's UHR.

- Informed consent for treatment with psychotropic medications was present in the chart.

- The inmate's discharge summary from DMH was present in his UHR.

- The UNA team recommended transferring this inmate to DMH. Inmate E remained with chronic symptoms that were not resolved after his one week hospitalization at the CMF APP.

6.    Inmate F

This inmate was housed in the Level IV EOP unit. He was diagnosed with Mood Disorder, NOS and Bipolar II Disorder. He was treated with Risperdal Consta 25 mg IM every 2 weeks, Propranolol 40 mg/day, Lithium 600 mg/day and Effexor 150 mg/day.

Inmate F had been housed at MCSP since May 25, 2000. He was upgraded to an EOP level of care during December 2004 when he was housed in the administrative segregation unit. The inmate was recommended for a DMH level of care by the UNA team due to his history of multiple and near lethal suicide attempts. There was no documentation in the inmate's UHR indicating that he was actually transferred to DMH; in fact, the records indicated that the inmate showed some improvement and was downgraded to a 3CMS level of care on March 29, 2005. During early April, Inmate F had another episode of suicidal ideation, which was resolved after he received frequent clinical interventions.

The inmate was released from administrative segregation to general population during April 2005. He appeared to adjust to general population until November 23 when he experienced an increase in depression, with feelings of hopelessness and occasional suicidal ideation without plan or intent. On December 1, 2005, an IDTT meeting recommended transferring the inmate to an EOP level of care. The inmate remained in the EOP unit at the time of the monitoring visit.
Assessment:
The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with psychotropic medications was present in the inmate's UHR.

- Appropriate laboratory testing for treatment with Lithium was conducted.

- Although this inmate was not transferred to DMH as recommended by the UNA team, there was documentation explaining why this did not occur.

- This inmate was appropriately returned to an EOP level of care.

- According to the documentation in his chart, Inmate F was seen at least quarterly by a case manager while in the 3CMS program and more

frequently as clinically indicated.

7.    Inmate G

This inmate was housed in the Level IV EOP unit on the A yard. He was diagnosed with Major Depressive Disorder, recurrent with psychotic features, and treated with Geodon 120 mg/day, Benadryl 150 mg/day and Prozac 20 mg/day.

Inmate G was originally transferred to MCSP on October 21, 2004 as an EOP inmate. He was recommended for transfer to DMH by his treating clinicians and by the UNA team during February 2005. The inmate was transferred to ASH where he was hospitalized from April 5 to April 16, 2005. He was returned to MCSP on April 26, 2005 after a brief stay at CMC. The inmate continued to experience occasional suicidal ideation and auditory hallucinations, but he was reportedly stable and doing well with his roommate on the B yard. He was subsequently transferred to the EOP unit on the A yard. The inmate went out to court briefly during September. He returned to the A yard EOP program where he was reportedly stable and attended groups, but frequently requested to return to the B yard EOP program.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- A discharge summary from the inmate's DMH hospitalization was not located in his UHR.

- It appeared that this inmate received some benefit from his hospitalization at DMH as he did not have any subsequent MHCB hospitalizations after his return.

- The chart contained documentation of weekly EOP case management contact, with the exception of a one week lapse.

- According to the institutional documentation, continuity of medication was maintained for Inmate G upon his return from court.

- There was documentation of consistent, almost monthly, psychiatric contacts in the inmate's UHR.

- The inmate's chart did not document the presence of a psychiatrist at any of his IDTT meetings.

- The MARs reflected medication compliance.

    - Informed consent for psychotropic medications was documented.

8.     Inmate H

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Mood Disorder, bipolar type. He was on a Keyhea order and was treated with Zydis 15 mg/day, Lithium 900 mg/day and Benadryl 50 mg/day.

Inmate H was transferred to MCSP on February 4, 2005 from NKSP where he was receiving a 3CMS level of care. The inmate was transferred to administrative segregation during July 2005 related to a battery on an inmate. A review of the inmate's UHR indicated that he was admitted to the MHCB unit from July 1 through July 7, from July 11 through July 14 and from November 28 through December 5, 2005. After his discharge from the MHCB unit on July 14, 2005, the inmate's level of care was changed from 3CMS to EOP. Admission to the MHCB unit was reportedly recommended for Inmate H on a number of other occasions, but the inmate was monitored instead in one of the administrative segregation observation cells, presumably due to a lack of MHCB beds.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- There was a lapse in the inmate's medication after he was discharged from MHCB unit, possible resulting in the above mentioned behaviors. This was particularly troubling in light of his Keyhea status.

- This inmate was monitored in a h9olding cell in the administrative segregation unit rather than in the MHCB unit, due to a lack of MHCB beds. The administrative segregation unit did not provide adequate clinical observation for such monitoring.

- Appropriate laboratory testing fro treatment with Lithium was conducted.

- The inmate's chart indicated that the inmate received weekly case management contacts while in the administrative segregation unit.

EXHIBIT C

Sierra Conservation Center

March 22, 2006 – March 24, 2006

1.    Inmate A

Inmate A was interviewed by the monitor's expert in a group context. He reported taking Effexor and Elavil with good effect for the last seven years. The inmate had no side effects and wanted his medications HS. He was doing well and saw someone from mental health every two weeks.

A review of his inmate history revealed that Inmate A arrived at SCC on 2/9/06 from a reception center. His first treatment plan was dated 3/8/06, 30 days after his arrival. The inmate was first seen by a psychiatrist on 2/22/06, 12 days after his arrival. His first IDTT meeting was dated 2/13/06, prior to the completion of his MH-4. The inmate's mental health appointment of 2/24/06 was canceled due to a lockdown and could not be rescheduled until 3/8/06. At that time, his treatment plan was generated and he received his first case management visit. Inmate A was seen by the psychiatrist for follow-up at one and two-week intervals.

The inmate's MAR for March 2006 was reviewed by the expert. Inmate A did not receive his medications for the first three days following his entry into the facility. He was currently taking Vistaril 100 mg, Effexor 50 mg, Risperdal 3 mg. and Elavil 100 mg, all at Q. p.m.

Assessment:

This inmate had an untimely treatment plan. He missed a mental health appointment due to a lockdown and there was a delay in rescheduling the appointment. Inmate A also experienced a gap in his medication upon arrival. Psychiatric practice was good for this inmate newly started on medication.

2.    Inmate B

Inmate B was interviewed by the monitor's expert in a group context. He reported taking Prozac along with Seroquel 200 mg HS. He indicated that his medications were helpful, although he experienced some anxiety. The Seroquel helped the inmate sleep, without sedating him in the morning. Inmate B received his medications during the evening, but wanted to take them HS. The inmate had a very positive relationship with the psychiatrist he saw every 90 days.

A review of the inmate's UHR revealed that he arrived at SCC on 12/16/04. He was described as asymptomatic without any complaints at his last case management visit on 3/6/06. He was on Prozac 50 mg and Seroquel 100 mg HS. His last IDTT meeting, which was on 2/2/06, was conducted without the benefit of a psychiatrist. A housing change was considered. The inmate's last psychiatric visit was on 1/26/06. The inmate was stable and had no particular issues or complaints. His medications were continued.

A review of his inmate history confirmed the information contained in the inmate's chart. In the last six months, Inmate B had two case management visits and two psychiatric

visits. The inmate missed a self-referral appointment on 8/24/05 and was not seen until 10/13/05, his regular 90-day psychiatric visit. Inmate B's MARs for February and March 2006 demonstrated medication compliance. The MARs were filled out completely and appropriately by nursing staff.

Assessment:

This stable inmate received appropriate psychiatric care. His MARs were adequately completed, but he missed a mental health appointment scheduled in response to a self-referral.

3      Inmate C

Inmate C was interviewed by the monitor's expert in a group context. He reported taking no medications. The inmate was experiencing physical pain from medical conditions, including headaches and sleeplessness. He indicated that he got "straight medications" like Valium or Xanax, which helped him when he was treated by the Veterans Administration Hospital. He reported that the psychiatrist gave him Benadryl, which did not work, but that inexplicably he also got Benadryl KOP.

The inmate's UHR was reviewed. His case management notes, as well as notes by the chief psychologist and psychiatry, all pointed to Axis III problems. The inmate had, in fact, agreed to take Benadryl. He had been seen by the medical department frequently for cervical neck pain and headaches. On 1/23/06, Inmate C received multiple trigger point injections with anesthetics and steroids. A medical note dated 2/23/06 indicated that the inmate was on hold for an epidural in the cervical neck area. It was unclear whether the inmate had agreed to this procedure. The note was only on a post-it and the inmate was awaiting a final assessment and an evaluation for treatment with this procedure.

A review of his inmate history revealed that Inmate C had two case management visits and four psychiatric visits over the last six months. His MAR for March indicated that he was taking Benadryl 25 milligrams HS as prescribed by a psychiatrist. The inmate failed to show-up for medication numerous times, but there were no referrals made for non-compliance.

Assessment:

Inmate C received appropriate case management and psychiatric support for an inmate with a severe medical condition and pain. His MAR was appropriately filled out, but there were no mental health referrals made for medication non-compliance

4.      Inmate D

Inmate D was interviewed by the monitor's expert in a group context. He reported taking Seroquel 100 mg HS and Wellbutrin 150 mg BID. He indicated that he was not doing well on this medication because he woke up in the middle of the night and could not get

back to sleep. The medication was, however, otherwise helpful to the inmate's underlying depression. Inmate D said that he had done better on a higher dose of Seroquel 200 milligrams HS. The inmate saw a psychiatrist every 90 days and was about to start group therapy. His UHR was unavailable for the expert to review.

A review of his inmate history revealed that Inmate D had two case management visits, the last of which on 12/13/05 was two weeks late. The inmate had seen psychiatry on five occasions during the preceding six months.

Inmate D's MAR for March 2006 confirmed his above-described medications. The inmate's medications were renewed without a psychiatric contact. His MAR was filled out appropriately and was complete.

Assessment:

This inmate had a delayed case management visit in December 2005. The inmate's MAR was completed appropriately, but his medication renewals were made without any clinical contacts. The inmate needed to have his dose of HS Seroquel increased.

5.    Inmate E

Inmate E was interviewed by the monitor's expert in a group context. He reported taking Elavil 75 milligrams and Trazodone, along with Klonopin HS. The inmate was awaiting surgery. He also reported that he had taken 300 mg of Elavil for 20 years until the deaths at CMF. Inmate E had a chronic bipolar disorder. He was also in an anger management group. Unlike many other inmates, Inmate E received his medications during lockdown. The inmate saw his psychiatrist every 90 days.

His inmate history indicated that Inmate E arrived at SCC on 11/11/05 from an outside hospital. He had a diagnosis of Depressive Disorder NOS. In the preceding six months, the inmate had three case management visits and two psychiatric contacts, the last of which was late by 4.25 months. Two of the case management contacts were separated by four months.

The inmate's MAR for March 2006 was reviewed. It confirmed that the inmate was taking Elavil 75 milligrams and Trazodone 200 milligrams q p.m. The medications were all started on 3/16/06 after psychiatric contact. The inmate's MAR was appropriately completed.

Assessment:

Inmate E received appropriate mental health care for a stable inmate with medical problems. His MAR was well maintained, but he received late psychiatric and case manager contacts

6.    Inmate F

Inmate F was interviewed by the monitor's expert in a group context. He reported that he was not taking any medication. He also said that he was supposedly off the mental health caseload and had not been seen by anyone from mental health in the last six months. While the inmate's UHR was unavailable, his inmate history indicated that he had two case management visits in the preceding six months with a four-month gap. The inmate was also seen twice by a psychiatrist, also with a four-month gap. In between case management visits, Inmate F received an annual IDTT meeting. The inmate's three case management contacts were all conducted by different clinicians. This was reportedly a common occurrence at SCC.

Inmate F has a diagnosis of Schizoaffective Disorder. In August and September 2005, Inmate F had two case management contacts cancelled by lockdowns. On 1/27/06, the inmate missed an appointment scheduled in response to a self-referral.

Assessment:

Inmate F experienced delayed case management and psychiatric contacts. Lockdowns resulted in the cancellations of two case management contacts. The inmate also missed a scheduled self-referral appointment. With a diagnosis of Schizoaffective Disorder, it appeared highly unlikely that the inmate was scheduled to be removed from the caseload as he indicated. In fact, he had been seen multiple times by mental health during the preceding six months.

7.    Inmate G

Inmate G was interviewed by the monitor's expert in a group context. He reported taking Remeron 30 mg, which he described as "great". The inmate had no side effects from his medication and was satisfied with the evening administration of his medications. Inmate G saw his psychiatrist every four months and his case manager every three months. He also reported that he had an IDTT meeting less than one year ago and none since. He said that only his case manager was present for the IDTT meeting.

His inmate history showed that Inmate G had received three case management contacts in the preceding six months. He had been seen by a psychiatrist twice during that interval. The inmate's last IDTT meeting was on 1/19/06. His diagnosis was Major Depressive Disorder, Recurrent, Severe with psychotic features. He had been seen by two different psychiatrists and two different case managers during the last six months.

Inmate G's MAR of March 2006 confirmed that he was taking Remeron 30 mg HS and Benadryl 50 mg HS. His medication renewal of 2/21/06 was made without psychiatric contact. The inmate's MAR was completed appropriately.

Assessment:

Inmate G received appropriate psychiatric and case management contacts, although five different clinicians were involved. His medications were inappropriately renewed without psychiatric contact.

8.      Inmate H

Inmate H was interviewed by the monitor's expert in a group context. He reported that he took Prozac in the morning and Buspar at night, along with Risperdal, which he said was for his schizophrenia. Inmate H had numerous problems stemming from a back injury that occurred while he was an inmate. He had a 1987 complaint and numerous 602s all related to his back injury. Inmate H wanted to transfer out of SCC because of various conflicts regarding his medical care. The inmate saw a case manager every two to three months and a psychiatrist every 90 days. Inmate H's UHR was unavailable.

His inmate history was reviewed. It showed that the inmate had three case management contacts in the preceding six months, the most recent of which was two weeks late. He also had two psychiatric contacts during that interval, both by referral. In November 2005, Inmate H made a request to be seen by a psychiatrist regarding his medication compliance.

Inmate H's MAR from March 2006 was reviewed. It confirmed that the inmate was prescribed Risperdal .5 mg bid, Buspar 10 mg Q. p.m. and Prozac 20 mg Q. a.m. There were five refusals noted on the MAR and three blanks. There were two episodes of three consecutive missed doses without a referral and 11 no-shows. There were confusing entries, including circled initials and an R without a circle. The pattern of refusals noted in the MAR was somewhat suspicious, in that the inmate ostensibly refused one medication but took others.

Assessment:

Inmate H received a delayed case management contact. His MAR showed episodes of medication non-compliance without referrals. The MAR was also in extremely poor condition and, at times, was incomprehensible. It reflected a suspicious pattern by the inmate of occasionally refusing one medication out of three.

9.      Inmate I

Inmate I was interviewed by the monitor's expert in a group context. He reported taking Benadryl 50 mg in the evening prn. He wanted to receive his medication HS because of the sedating effect it had on him. He also complained, as did all of the other inmates in this Level III yard, that inmates who forgot their water cups were not given any medications. Inmate I had many bad experiences with side effects from medications like Thorazine and Paxil. He indicated that he was doing very well on his current medications. He also reported that he saw both of his mental health clinicians every 90 days.

A review of his inmate history revealed that Inmate I had received a total of four case management contacts during the preceding six months by two different case managers. He also had two psychiatric contacts, the first of which was one month late.

A review of the inmate's UHR found progress notes by both case managers and psychiatrists confirming that Inmate I was stable and functioning at a high level. All of the inmate's progress notes called for a return visit in 90 days. Inmate I's MARs for November, December, January and February were missing.

Assessment:

Inmate I received appropriate case management and psychiatric care for a stable inmate, expect for a delayed psychiatric contact.

10.    Inmate J

Inmate J was interviewed by the monitor's expert in a group context. He reported that he had been off medications and was doing very well. A MTA had discontinued his medication after he missed two days. Although Inmate J expected to be off the mental health caseload, he still saw a psychiatrist for follow-up monitoring. His inmate history confirmed that he received two case management contacts during the preceding six months, with a four-month gap. He had seen a psychiatrist once, with a six-month gap.

Assessment:

Inmate J received appropriate monitoring for a stable inmate off medications, but he experienced some gaps in psychiatric and case management contacts. The inmate was a candidate for release from the mental health caseload.

11.    Inmate K

Inmate K was interviewed by the monitor's expert in a group context. He reported taking Remeron 45 mg per day. He indicated that he was doing very well and that his medication was helpful and without side effects. His inmate history was reviewed and revealed two case management visits within the preceding six months, with a gap of four months between the contacts. Inmate K had been seen by a psychiatrist on three occasions during that interval. Three out of four of his last psychiatric contacts were for medication non-compliance. A clinical appointment scheduled for 1/26/06 was cancelled by the case manager was due to a lockdown; it took one month for the appointment to be rescheduled.

The inmate's MARs for February and March 2006 indicated that he had been prescribed Remeron 15 mg Q. p.m. According to the MARs, the inmate only took two doses of his medication; there were 18 circles and eight blanks noted on his MARs. The inmate was referred to mental health on 3/7/06 for medication non-compliance.

Assessment:

Inmate K's MARs were poorly maintained. It was, however, apparent that he was frequently non-compliant with his medications. The inmate was only referred to mental health after a long period of repeated and erratic medication non-compliance. Inmate K also experienced a gap in case management contacts.

12.    Inmate L

Inmate L was interviewed by the monitor's expert in a group context. He reported taking Seroquel 100 mg HS. The inmate further indicated that his medication was very good for him and without side effects. A review of the inmate's UHR confirmed that he had been prescribed Seroquel 100 mg HS.

Inmate L was placed on suicide watch on 11/10/05. He was regarded as stable and was seen by a case manager every 90 days. His last case management contact was on 3/16/06. This inmate only spoke Spanish but, often, there was no translator present during his clinical contacts. There did not appear to be an order for HS medications in the inmate's chart.

According to his inmate history, Inmate L arrived at SCC on 10/14/05 from a reception center. His first treatment plan was not completed until 11/22/05. The inmate history confirmed that the inmate received quarterly case management contacts. In addition, Inmate L received three psychiatric contacts within the preceding six months.

The inmate's MARs for February and March 2006 indicated that he had been prescribed Seroquel 100 mg Q. p.m. and Celexa 20 mg Q. p.m. on 12/2/05. The MAR contained five blanks and indicated two no-shows.

Assessment:

This stable inmate received adequate care, with the exception of a delay in completing his initial IDTT meeting and treatment plan. Inmate L's MAR was adequately maintained.

13.    Inmate M

Inmate M was interviewed by the monitor's expert in a group context. He reported that he had been off medication for one month and was doing well. The inmate had been seen by a psychiatrist two to three weeks earlier.

A review of the inmate's UHR confirmed that he had been on Seroquel 25 mg HS, which was discontinued on 3/2/06. A psychiatric note indicated that the inmate often did not take his medications and was rigid about the matter. A case management progress note of 3/14/06 indicated the inmate was doing well and sleeping without medication. Inmate M's diagnosis was Depressive Disorder NOS.

His inmate history indicated that he had four case management contacts in the preceding six months. He also had four psychiatric contacts, all by referral for medication non-compliance.

Assessment:

This inmate received appropriate psychiatric management for a treatment resistance and non-compliant inmate.

14.    Inmate N

Inmate N was interviewed by the monitor's expert in a group context. He reported taking Seroquel 25 mg per day after dinner. He had no complaints about his mental health care. His inmate history revealed that he arrived at SCC on 11/4/05 from a reception center. He was initially admitted to the OHU where he was seen in an IDTT meeting on 12/16/05. He received his first treatment plan on 12/27/05 and was followed closely by the case manager and psychiatrist thereafter. He had three case management contacts and two psychiatric contacts in the preceding six months.

Contrary to the inmate's report, his MAR for March 2006 indicated that he had been prescribed Remeron 50 mg q p.m. Inmate N's MAR was complete and appropriately filled out.

Assessment:

This stable inmate received appropriate care. His MAR was well maintained.

15.    Inmate O

Inmate O was interviewed by the monitor's expert in a group context. He reported taking Trazodone 100 milligrams and Paxil 50 mg for the last year. He described his medications as helpful and said that he experienced no side effects. Inmate O was satisfied with his mental health care. His inmate history indicated that he had three case management and psychiatric contacts over the preceding six months. His first psychiatric contact on 10/13/05 was two weeks late.

The inmate's MAR for February and March 2006 confirmed that he had been prescribed Paxil and Trazodone. His Trazodone 100 mg p.m. was renewed on 1/26/06 without the benefit of a psychiatric contact. The inmate was entirely medication compliant during February and March and there were no blanks in his MAR.

Assessment:

Inmate O experienced a delayed psychiatric contact. Otherwise, his mental health care was appropriate for a stable inmate. He received adequate case management and

psychiatry contacts and his MAR was well maintained.

16      Inmate P

Inmate P was interviewed by the monitor's expert in a group context. He reported taking Neurontin, Ultram, Elavil 50 mg HS, Tegretol in the morning and Prozac 30 mg every morning. The Elavil was included for neuropathy, which caused the inmate some bladder hesitation. Inmate P said that he was doing "great" on his medications and had no side effects. The inmate indicated that he had not had any blood level testing for Tegretol.

His inmate history revealed that Inmate P arrived at SCC on 1/31/06 from a reception center. He was first seen on 2/8/06 by his case manager and on 3/3/06 by a psychiatrist. His first treatment plan was dated 2/14/06, 15 days after his arrival at the institution. On 2/3/06, during his intake with the case manager, Inmate P was referred to psychiatry by custody; it took 30 days for the inmate to be seen by a psychiatrist in response to the referral.

Inmate P's MAR of March 2006 indicated that he had been prescribed Tegretol 200 mg BID, Prozac 20 mg q a.m. and Elavil 5 mg q p.m. The Tegretol and Prozac were prescribed on 2/10/06 by a psychiatrist without contact. There were a total of 28 blanks in the inmate's MAR and nine no-shows. Three of the no-shows were consecutive on 3/16 through 3/18/06, but the inmate was not referred to mental health.

Assessment:

Inmate P was first seen by his case manager in a timely manner and received a timely initial treatment plan. He did, however, experience a delayed psychiatric response to a staff referral. Some of his medications were prescribed without the benefit of any psychiatric contact. Inmate P's MAR was poorly maintained, with numerous blanks and no-shows. Despite repeated no-shows, the inmate was not referred to mental health.

17.     Inmate Q

Inmate Q was interviewed by the monitor's expert in a group context. He reported taking Remeron 45 mg, which had been increased from 15 mg. His Wellbutrin was discontinued because of high blood pressure. The inmate indicated that his blood pressure had come down and that he was doing fine, with no side effects. According to the inmate, he had taken Remeron for years at the 45 mg level without problems. He said that he occasionally got depressed and was generally able to access mental health reasonably quickly. His inmate history confirmed two case management and two psychiatric contacts during the preceding six months.

The inmate's MARs for February and March 2006 indicated that he had been prescribed Remeron 30 mg q p.m. in an order dated 12/8/05, which was increased to 45 mg q p.m. on 3/6/06. There were three blanks in the inmate's February MAR; the first five days of his March MAR showed a renewal gap. Inmate Q's MARs were otherwise compliant.

Assessment:

Inmate Q experienced a gap in medication upon renewal but, otherwise, received appropriate mental health care for a stable inmate.

18.     Inmate R

Inmate R was started on Lithium IM on 12/8/05. There was no Lithium work-up and no order for blood level testing in his chart. The inmate was subsequently seen by a psychiatrist on 12/28/05. He was scheduled to be seen on 3/1/06 but, because of a lockdown, was not seen. He had not been seen again at the time of the expert's visit.

Assessment:

Clinicians failed to conduct a work-up or blood level testing for this inmate newly started on Lithium.

19.     Inmate S

Inmate S was started on Depakote in December 2005 at SQ. On 12/13/05, a CBC, CMP and Valporic Acid level were drawn. The inmate's level was less than .7 on 12/16/05 (50.0-125). On the same day, he arrived at SCC. His Depakote dosage was 1500 mg per day on arrival. According to his MAR, he received that dosage until 1/12/06. On 1/13/06, a psychiatrist inexplicably wrote orders for 1000 mg of Depakote per day, without apparently reviewing the SQ record. Seroquel was also added. The Valporic Acid level was never repeated. Clinically, the inmate was in poor condition, which has not changed at all during his stays at the two institutions.

Assessment:

This inmate on mood-stabilizing medication received inadequate psychiatric management. Clinicians failed to order appropriate blood level testing.

20      Inmate T

Inmate T had been taking Lithium long-term at a dosage of 600 mg per day. His last order for this medication was on 3/10/06. In August 2005, Inmate T's Lithium level was normal .9. An order for another Lithium level test was written on 12/9/05. It appeared that the level was never drawn, although a hepatic panel was erroneously drawn. The ordering physician wrote to the laboratory that he "didn't write this order", but he never reordered the Lithium level test.

Assessment:

Appropriate Lithium level testing was not completed for this inmate.

21.    Inmate U

Inmate U had been on Depakote long-term. Most currently, he was taking 1000mg per day. His medications were renewed every 120 days and his last medication order was on 3/17/06. The inmate's MARs were incomprehensible because of large gaps and blanks; additionally, the information was recorded on old forms. As a result, Inmate U's level of medication compliance could not be determined.

On 12/13/05, a Depakote level was ordered for Inmate U. The test results were low at 36, with normal being 50-100. The inmate was referred to a psychiatrist, but he was not seen until one month later. On 1/12/06, new orders were written for a Depakote work-up and a blood level test to be conducted after 1/17/06. On 1/18/06, the inmate's Depakote level was 66, within the normal therapeutic range.

Assessment:

This inmate received adequate psychiatric care for someone taking a mood stabilizer.

22.    Inmate V

Inmate V arrived at SCC on 3/3/06 from DVI on Trazodone and Seroquel, which had stop dates of March 4. The inmate received no medications until March 10, when he was admitted to the OHU in crisis. He was subsequently sent to a MHCB unit. He came back to SCC without any MARs or other medication records. The inmate apparently told the clinicians at HDSP that the Seroquel and Prozac they were giving him were not working. He arrived back at SCC at midnight and, bypassing a bus screening, was placed in the OHU. On the next day, he told his psychiatrist that he was still hallucinating and was on no medications.

Assessment:

Inmate V's medications were not renewed in a timely manner upon his arrival at SCC, resulting in a one-week gap in medication and precipitating a mental health crisis. This inmate's return from a MHCB unit to his sending institution was not handled appropriately, as he arrived at midnight with no MARs.

EXHIBIT D

California Medical Facility (CMF)

August 22, 2005 - August 26, 2005

Inmate A

This inmate was reviewed at the request of plaintiffs' counsel because the inmate had been recommended for ICF by the UNA team, but was deemed to be stable and not referred.

Inmate A's institutional records indicated that he was referred to intermediate care at DMH/CMF on 12/8/04, but refused to go. A Vitek hearing found that the inmate was capable of making his own decision. A CASE evaluation dated 4/25/05 showed that Inmate A was designated DD2 and needed adaptive supports. He needed prompts to shower and assistance with reading and writing CDCR forms. It was also felt that he should have reminders and extra time to learn new tasks and routines and should be monitored for manipulation by other inmates.

A progress note dated 8/8/05 showed that Inmate A arrived on EOP wing M one year earlier. His current diagnoses included Schizophrenia, paranoid described as active on the yard and very quiet in the dayroom. The inmate was so introverted in the dayroom that it was difficult for the therapists to ascertain how beneficial the groups were to him.

Inmate A was seen weekly by his case manager and monthly by a psychiatrist. He changed case managers in May. The transition appeared to be uneventful. Progress notes consistently documented a very low level of functioning. In April and May, the inmate said he had trouble sleeping and thought his medication was not working. His hallucinations were noted as worsening at night. During individual meetings in July, he reported command hallucinations that instructed him to do terrible things and paranoia regarding food. He occasionally self-reported medication non-compliance and he repetitively voiced simple thoughts. The inmate also reported having bad dreams in which he was chased and sometimes saw the whole room in red. His speech was halting and he rocked in the chair when talking. On 7/14/05, he repeatedly said that it was hot and that he needed ice, yet, he wore long denim pants and kept his denim jacket buttoned up to his neck, refusing to unbutton it.

A note documenting an UNA case conference call on 7/13/05 suggested that the inmate might be under-medicated. A decision was made to obtain laboratory test results before his medication was increased. Despite indications that his medication regimen was ineffective in controlling hallucinations, the July plan to obtain serum levels was not implemented; no laboratory tests were ordered for the inmate and his medication regimen was not changed. The inmate was seen by a psychiatrist the day before his UNA case conference and not since, although he was due for his 30-day follow-up appointment at the time his UHR was reviewed.

Assessment:

This inmate had exhibited active mental health symptoms and a low level of functioning for many months. His mental health treatment was inadequate and he needed better

care.The amount of structured therapeutic activity afforded to the inmate was inadequate most months, but the content of the activities was related to the inmate's clinical presentation. Weekly case management and monthly psychiatric contacts were made. The documentation in the inmate's chart was clinically informative, but one MAR was missing from the record. MARs contained a small number of blanks and were difficult to read, but were intelligible overall.

The staff had recently considered conducting diagnostic testing for Inmate A. Conversations between the monitor's expert and the staff indicated that clinicians intended to follow through on three treatment options for the inmate, including testing, re-referral to intermediate care and greater attention to medication management.

2.      Inmate B

This case was reviewed at the request of plaintiffs' counsel because the inmate was recommended for ICF by the UNA team, but was not referred.

Inmate B was a 71-year old inmate who was housed in G-3, a general population housing unit in close proximity to the hospital at CMF. G-3 is staffed by a nurse and correctional officers. Inmates housed there generally have medical problems or are infirm. When observed by the monitor's expert on August 24, 2005, the inmate was asleep in a dormitory on G-3. Several other inmates housed in the dormitory were asleep or resting quietly. There was nothing remarkable about his appearance or the appearance of the dormitory.

Inmate B had apparently moved to G-3 from the EOP unit around November 2004. He had a Keyhea order that was due to expire on 9/2/05. According to a progress note, the inmate was no longer given Haldol after December 2004 and was not on psychotropic medication in 2005. His current diagnoses were Psychotic Disorder NOS, r/o Dementia NOS, Alcohol Dependence and r/o Moderate Mental Retardation. He was treated at either the 3CMS or the EOP level of care. Two January 2005 UCC notes gave contradictory levels of care.

A progress note indicated that the inmate speaks Spanish, but not English. Nearly all case management contacts were made through a translator. Inmate B was seen by a mental health clinician from Unit IV on approximately seven occasions in 2005. He was frequently described as having poor hygiene and complaining of pain associated with medical problems. In July 2005, he was interviewed through a translator and determined not to warrant placement in the developmental disability program. Prior to that he was designated DD3, indicating that his cognitive impairment rendered his level of adaptive functioning so low that he needed to be housed in a specialized unit that offered adaptive supports. When he was designated DD3 in March 2004, the CASE said that he had experienced a significant decrease in memory functioning that resulted in the need for adaptive support services.

Progress notes written at the end of 2004 and early in 2005 indicated that the inmate did not like taking medication, complaining that it made him shaky, and did not like living

inG-3. He reported having an ongoing problem with one of the MTAs in that unit. He said he was happy and did better when that person left. During the past few months, the inmate no longer asked to leave G-3. He was, however, injured by another inmate as he slept in April. The injury had no enduring effects.

Assessment:

Inmate B required a sheltered environment, such as that afforded by G-3. He would probably benefit from more environmental stimuli, but may not be capable of functioning well enough to live in an EOP or an ICF unit. His level of functioning could change dramatically, however, in a structured environment. Although he had a current Keyhea order, no rationale was given for discontinuing his Haldol IM; the inmate did not exhibit signs of psychosis after the medication was discontinued. Notes in the chart reflected that he discussed Haldol with his case manager and reported that he did not like it because it made him shaky.

3.    Inmate C

This case was referred to the monitor's expert by plaintiffs' counsel. Inmate C was a 78 year-old man who was reportedly identified at an IDTT meeting as needing intermediate care at SVPP. He was not, however, referred to SVPP, possibly due to a medical condition. The inmate did not have a psychotic or an affective disorder. He had a diagnosis of dementia and his ADLs were quite poor. He required prompts to care for himself.

According to annotations in the inmate's UHR, he was in the EOP program at CMC until January 2004, when he came to CMF's EOP. One year later, in December 2004, he was referred to ASH. No custodial obstacles to a transfer were identified. Copies of the completed referral were in his UHR. The referral was rejected by ASH on 1/3/05 on the grounds that it was a medical referral and not a psychiatric one.

Inmate C was moved to G-3, a sheltered general population unit near CMF's hospital, in February 2005. He was still living in G-3 in August 2005. His level of care had changed from EOP to 3CMS in order to facilitate his transfer to G-3. After moving to G-3, he began to have problems. He was apparently involved in an altercation or an assault in G3 and was removed to administrative segregation for several weeks. A note written one month after he was placed in administrative segregation indicated that the clinician was concerned about his care and the maintenance of his immediate environment; the inmate needed the care provided in G-3. Within two weeks of that note, approximately six weeks after he was placed in segregation, Inmate C was moved back to G-3, where he was housed in a single cell on administrative segregation status. At the end of March, he was moved from G-3 to L-3, an EOP unit. He was moved to I-3 shortly thereafter.

The mental health component of the inmate's RVR said that he was mentally ill, suffered from hypertension and stroke and was demented; the assessment concluded that his mental illness had caused the behavior reported on the RVR. Medical staff in G-3 reported orally that the inmate lashed out when he became confused. They said he

typically made slow weak slaps in the air aimed at the person trying to provide him assistance.

Inmate C's overall condition deteriorated from January to the end of March. After he was involved in the altercation or assault, staff considered seeking an order to administer Risperdal on an involuntary basis. He was given Atarax and Vistaril, but no psychotropic medications. He became more resistant to care, agitated and threatening in April and May. He continued to live in a cell in G-3. He was described as malodorous with long dirty fingernails. His cell smelled of urine during one social work contact. He was seen by mental health staff three times in May and twice in August, but there was no documented contact in the months of June and July.

When the inmate was observed by the monitor's expert on August 25, 2005, he was asleep in his cell. An officer who regularly worked in the unit reported that he was sometimes resistant to taking a shower and slapped ineffectually at anyone who attempted to assist him. His cell contained several cartons of what appeared to be papers and perhaps cardboard containers. The toilet was smeared with feces, as was a hand towel hanging on a rack. The cell was cluttered and unsanitary.

Assessment:

This inmate's care was inadequate. Inmate C functioned at a higher level in the EOP unit than he did in G-3. He required more intensive, consistent help with ADLs and better mental health treatment. He should not have been removed from a sheltered environment and placed in administrative segregation for weeks. The disciplinary infraction was eventually handled appropriately, but there was no record of it in CMF's centralized log.

4.     Inmate D

The monitor only reviewed the fourth volume of Inmate D's UHR. Different clinical documents reported conflicting information regarding this 25-year-old EOP inmate on his first incarceration. As a result, it was not clear whether the inmate was serving a life sentence or was eligible for release in 2011. At the time of the monitoring visit, Inmate D had been at CMF for eight months. There were indications in the inmate's UHR that he had been sent to DMH from CSP/Corcoran in November or December 2004.

Inmate D had a number of diagnoses during his time at CMF; the differences among these diagnoses were not insignificant. In July 2005, Inmate D was discharged from DMH with diagnoses of Schizophrenia, paranoid type, Exhibitionism, ASPD and Polysubstance Dependence in institutional remission. His GAF at discharge was 35. He was viewed as schizophrenic and antisocial. On August 4, 2005, he was discharged from a MHCB unit and admitted to administrative segregation. Upon his release from the MHCB unit, he was given diagnoses of Psychotic Disorder NOS, Exhibitionism, Personality Disorder NOS and Borderline Intellectual Functioning.

Some clinicians believed that the inmate's level of intellectual functioning was very low. The inmate had a Keyhea order that was in effect until 2/7/06. The order was renewed on

August 10 or 11, 2005 for a period of six months on the grounds that the inmate posed a danger to others.

There were differences of opinion about whether the inmate should be considered mentally retarded. He was classified as D 1 A before coming to CMF. The CASE evaluation done in December 2004 said that he needed assistance with low frustration tolerance and impulse control, that his personal hygiene and leisure skills needed to be monitored and that he needed assistance in special administrative hearings. He was believed to be vulnerable to mistreatment by other inmates. A more recent CASE done in May 2005 found that he was not cognitively impaired. His TABE scores were reported to be at the eighth and ninth grade levels. The examiner was of the opinion that his low level of functioning might be due to his mental illness. He was said to be hallucinating during the evaluation.

According to logs maintained by CMF staff, this inmate incurred 12 RVRs in five months from February through June 2005, many of them related to inappropriate sexual behavior. The mental health evaluations completed for the inmate's RVRs typically found that mental illness was a factor in his behavior, but five of the RVRs concluded that mental health factors were not influential. A charge for inappropriate sexual behavior was written in February and referred to the district attorney in March. It was picked up for prosecution within one week, but dismissed in July. Progress notes written at that time, which coincided with the inmate's hospitalization for acute care, indicated that he was floridly psychotic, paranoid and aggressive toward staff. He was disruptive in court and was removed by bailiffs. Clinical notes indicated that his behavior had deteriorated. He exhibited himself sexually more often and spent more time talking about a chip that he believed was in his brain and about bombs that he believed were being exploded outside the window of his cell.

As indicated above, Inmate D was referred to acute care a short time before he went to court in July, in connection with an incident that occurred on 6/29/05. At that time, he slipped his cuffs from back to front, threw a medical record at the clinician talking with him and accused that person of keeping him in a military experiment. He was admitted to DMH the following day. His UHR contained a form that indicated his admission to DMH was for crisis stabilization. He was treated at DMH from 7/30/05 through 8/19/05, a period of two and a half weeks. He was not scheduled for five-day follow-up.

A DMH discharge summary was included in the inmate's UHR. The discharge summary reported that Inmate D was treated at DMH for three weeks in June 2004, for two weeks in June/July 2004, for six weeks in September/October 2004 and for six weeks spanning January through March 2005. According to the inmate history, Inmate D behaved in an inappropriate sexual manner during his hospitalization in early 2005, with the result that he was not able to participate fully in the mental health program. He exhibited physical aggression toward staff and voiced conspiracy theories of which he was the target. He was involuntarily medicated with an injectable anti-psychotic and his delusional concerns and agitation cleared gradually. He then progressed to full programming and posed no management problems. According to his chart, Inmate D was discharged in March because he had received maximum benefit from his hospital stay. He was apparently

doing well enough at that time to be considered for discharge to the 3CMS level of care by a clinician who saw him at CMF. He appeared to be in good spirits and said he was eager to return to CDCR.

When he was discharged from DMH, the inmate was placed administrative segregation. He was seen by a psychiatrist who did not have his medical record. He received a thirty-day order continuing the DMH medication regimen. The inmate was seen within a few days by a case manager and an IDTT meeting was held within two weeks. It was attended by all of the required participants. Two notes written by different participants in the IDTT meeting mentioned different treatment plans. One plan was to retain the inmate in administrative segregation at the EOP level of care until he could be returned to CSP/Corcoran. The other plan was to "continue with some treatment and level of care--plan to decrease level of care to 3CMS."

Medication management for Inmate D, thereafter, was poor. Although he was an EOP inmate housed in administrative segregation, the inmate was not seen again by a psychiatrist for over a month. His medication orders ran out for two days. A bridge order was written, but he was still not seen by a psychiatrist. Notes of his psychiatric contacts were either missing, cursory or uninformed by important facts. Three days after the bridge order was written, the inmate's medication regimen was changed. There was no documentation of the rationale for the change and no progress note associated with the order in the inmate's chart. Orders for Geodon and Lithium were continued; Depakote, Benadryl and Wellbutrin were not reordered. A MAR for June indicated that the inmate refused most doses of Lithium and Geodon. The MAR was annotated with refusals, but there was no documentation of clinical follow-up to the inmate's non-compliance.

During his eight months at CMF, Inmate D was never treated by the same psychiatrist for any extended period of time. His medication administration was difficult to decipher from the medical record. The inmate had several trials of different medications as well as bridge orders written by different physicians. His movement between CMF's EOP program and DMH complicated his medication history even further. Prior to his DMH admission in June 2005, Inmate D had orders for Geodon 80 q eve, Depakote 1000 q eve, Lithium Citrate 300 tid, Wellbutrin 150 bid crushed, Vistaril 70 po bid prn anxiety and Benadryl Elixir 75 po q eve for sleep. He was discharged from DMH in July 2005 with orders for Haldol Dec 100 mg IM q 2 weeks, Thorazine 300 po hs and Cogentin 2. Although there were several informed medication consent forms in the inmate's UHR, there was no consent form for Lithium. In February, when the inmate was at DMH, his Lithium level was .5 and his Valporic Acid level was high at 103. Blood tests for Geodon, Valporic Acid and Lithium were ordered on 3/11/05 and 6/21/05. Results for the March order were obtained on 3/16/05 and reviewed by someone who initialed them. All of the inmate's levels were low.

The inmate's most recent treatment plan was dated 5/2/05. The EOP staff considered referring him to intermediate care in June; they were aware that, given his level IV points, Inmate D would have been returned to SVSP. Their plan was to seek clarification from DMH regarding the inmate's diagnosis and treatment needs and to continue treating him in EOP groups. That plan predated the inmate's June admission to DMH for acute

care and his non-compliance with medication. There was no record in the inmate's UHR indicating which groups he attended. Inmate D participated in 16 hours of group treatment in March, although he was not discharged from DMH until March 11. The UHR contained notes documenting psych tech rounds and weekly case management contacts in administrative segregation.

The inmate incurred a disciplinary infraction in June that was referred to the district attorney's office. No decision regarding prosecution had been made at the time of the monitor's visit in August. This inmate had lost a total of 43 months in credit time for 12 infractions. According to a clinical note, he had 189 points.

<u>Assessment:</u>

This inmate had received extensive, but inadequate, mental health treatment. Diagnostic clarification, individualized treatment planning and consistent medication management were lacking from this inmate's care. He needed sustained treatment by a psychiatrist, involuntary medication when he was non-compliant with his Keyhea order and treatment for his inappropriate sexual behavior. Laboratory testing, however, was completed in a timely manner. The records of this inmate's medication administration were difficult to understand. An informed consent form was missing for one medication. DMH discharge summaries for three recent admissions were present in the inmate's UHR.

Disciplinary infractions were often, but not always, handled appropriately by mental health and custody staff. The inmate suffered a loss of 43 months credit as a result of RVRs.

5.    Inmate E

Inmate E reportedly suffered from severe Post-Traumatic Stress Disorder, panic attacks, nightmares and general anxiety as a result of a temporally distant sexual assault. He said that he was not receiving help for his trauma disorder.

This 59-year-old inmate was admitted to WSP's reception center in February 2005 for violating parole conditions. He was treated at the EOP level of care as of 8/16/05. He was originally scheduled to be released in August 2005. He was seen by a TCMP social worker for a 30-day pre-release assessment on 8/11/05.

Inmate E was treated at DMH's APP for approximately one month in March and April 2005. According to a DMH discharge summary dated 4/22/05, he had a long history of treatment as an MDO at ASH and had attempted to escape once while being treated at DMH; the actual date of his discharge was left blank. The inmate had a history of multiple suicide attempts and a family history of suicide.

Inmate E was treated for Schizoaffective Disorder, depressed type, by history at DMH. He also had several other diagnoses. He was prescribed Seroquel 400 bid, Wellbutrin crushed 950 bid (sic), Buspar 30 bid and Vistaril prn for agitation. He also took medication for several medical problems. According to his MARs, the inmate had taken

his medication regularly since he was released from DMH, with the exception of May during which time the documentation indicated he had refused his morning dose of Seroquel many times. The inmate's MAR contained annotations regarding his non-compliance, but there were no document indicating how this problem was handled.

The inmate had IDTT meetings on 5/9, 6/29 and 8/16/05. His resulting treatment plans were individualized. One plan was signed by three members of the treatment team, but the correctional counselor was noted as absent. All of the required participants attended the August IDTT meeting. The inmate's June treatment plan indicated that in May the inmate received 19 hours of structured therapeutic activity and refused 19 hours; the inmate was only offered 29 hours during that month. The only group hours recorded in the inmate's UHR for the month of June were 14 hours of recreational rehabilitation therapy. According to a summary in the UHR, Inmate E attended a total of 29 hours of structure activities in July, 13 of which were rehabilitation therapy. The remaining hours were ADL/Housekeeping, Anger Management, Bibliotherapy, Current Events, Mental Health Education, Health Education, Community Meeting, Substance Abuse and Pre-release groups. In July, the inmate refused seven hours, and eight hours were cancelled. Had the inmate attended all of the group meetings that were offered, his total for the month could have reached 35 hours.

Inmate E was seen weekly by his case manager for individual therapy and monthly by a psychiatrist. He was seen twice by the same psychiatrist and twice by two different psychiatrists, one of whom saw him without a medical record. Inmate E reported high levels of distress associated with a suicide in his housing unit in May.

Assessment:

Inmate E did not receive adequate treatment for sequelae stemming from previous trauma, current anxiety and a suicide that occurred in close proximity to him. His psychiatry treatment was fragmented. The amount of structured therapeutic activities offered to the inmate fell short of the minimum required for EOP inmates and was not responsive to his individual characteristics. The inmate's IDTT meetings were timely and his treatment plans were individualized. One IDTT meeting did not have a correctional counselor in attendance. A discharge summary from DMH was in the UHR. There was no indication that MTAs referred the inmate for medication non-compliance or that mental health clinicians responded in a timely manner to any such referrals.

6.    Inmate F

Only the last of three volumes of Inmate F's UHR was reviewed by the monitor's expert. This file was reviewed at the request of plaintiffs' counsel, who reported that the inmate was on the waiting list for transfer to SVPP. Inmate F was identified during the UNA as needing intermediate care and subsequently referred to SVPP.

A chrono in the inmate's UHR showed that he refused to go to SVPP in February. A Vitek hearing was held, and the committee found that, despite the inmate's wishes, he

should be transferred to SVPP for treatment. Inmate F was delusional at that time.

A CASE done in 2004 indicated that the inmate was DD 1. He needed to have instructions repeated slowly and to be given ample time to respond. He also had a diagnosis of Schizophrenia, paranoid type. Progress notes indicated that the inmate was not doing well while waiting to be transferred to intermediate care.

Inmate F consistently refused medication in 2005, but a psychiatrist saw him at least monthly. A psychiatry note written in December 2004 was cursory and contained little information; the inmate was seen without a chart. According to the note, Inmate F refused medication. He was rambling, circumstantial and tangential. The plan was to observe the inmate and document his behavior. A case manager note written within a few days of the psychiatry note said that the treatment team had recommended transfer to SVPP. The inmate was seen by the same psychiatrist one month later. The note was odd as it conflated subjective and objective reports, indicated a treatment plan at the EOP level of care and reported the inmate refusing to attend the interview. Like the psychiatry note written in December, this note was not responsive to the inmate's need for treatment and did not seem to be informed by important facts.

Inmate F was seen by a different psychiatrist less than one month later. The note in the chart by that psychiatrist was also cursory. Again, the plan was to observe the inmate and document his behavior. Inmate F was seen by a third psychiatrist early in March and by a fourth psychiatrist at the end of March. A fifth psychiatrist saw him in April. That psychiatrist's note was also cursory. The inmate was described as rambling nonsensically and having loud pressured speech. A psychiatry note dated 6/27/05 stood out from all the rest because it contained relevant information. It said that the inmate continued to need a higher level of care. It noted that Inmate F was on the waiting list for SVPP. The note erroneously said that there was no change in the inmate's presentation, although case manager notes from that time documented deterioration in his condition. The inmate was seen by a sixth psychiatrist three days later and was found not to meet Keyhea criteria. He had paranoid delusions about staff doing harmful things to him and to his food. He believed that the staff members were actually inmates in disguise. He seemed to his case manager to be getting worse.

Case manager notes were usually rich in clinical detail and many contained meaningful plans, such as referring the inmate to acute care if his condition deteriorated. The inmate often refused to talk to the case manager, but the case management notes provided relevant information regarding his functioning. One plan said that Inmate F would go to CSP/Corcoran, if he did not go to SVPP. IDTT meetings were held more frequently than quarterly. They were attended by a full team of required participants. The inmate did not always attend. A mini-IDTT meeting was held to discuss his case on 7/28/05.

Inmate F attended 42 hours of structured therapeutic activities in March. He did not have the opportunity to attend that many in April, May or June. In April, he attended 19 hours and refused six hours; 14 hours were cancelled. In May, the inmate attended 13 hours and refused four hours; 14 hours were cancelled. The record of May rehabilitation therapy hours might have been missing from the inmate's UHR. In June, Inmate F

attended 26 hours and refused two hours; 19 hours were cancelled.

According to institutional documents reviewed by the monitor's expert at the institution, Inmate F was treated at ASH for seven months in 2003. When he came back to CMF's EOP program, he was compliant with medication and functioned well. The inmate stopped taking medication when he learned that his medications were not vitamins, as he had believed.

Inmate F was identified by staff as needing a higher level of care in December 2004. As per SOP, before completing the clinical referral to ASH, the CMF staff completed a case factor sheet. The C&PR reviewed these case factors within a few days and determined that the inmate could not go to ASH, so he was not referred. The inmate had a history of in-cell violence and Level-IV points. As indicated above, the inmate was referred to SVPP in February 2005. It took several weeks to complete the inmate's packet due to the need for a Vitek hearing and because the inmate did not cooperate in completing a physical exam. The Vitek hearing found that Inmate F could be committed to SVPP. The inmate was accepted to SVPP one month after he was referred. He remained on the waiting list as of 8/22/05, over four months later.

Assessment:

This inmate's psychiatric treatment at the EOP level of care was fragmented and inadequate. He was allowed to remain psychotic for months. He needed a higher level of care, but did not receive it. The inmate attended 42 hours of structured therapeutic activities in March, but was offered less than 40 hours per month for the next three months.

7.     Inmate G

The monitor's expert reviewed only the last of this inmate's three-volume UHR. Inmate G was a 3CMS inmate. He had a controlling diagnosis of Major Depressive Disorder, moderate, with psychotic features. He also had insulin-dependent diabetes. The inmate stopped taking Trazodone in August 2004 and was not on psychotropic medication in 2005.

In January 2005, Inmate G was put on a waiting list for group treatment. He incurred a disciplinary infraction at that time. A mental health evaluation was requested. The incident involved horseplay between friends. The mental health evaluation did not find that mental illness had influenced the inmate's behavior.

Inmate G lost his kitchen job in July or August 2005 because he did not show up for work. According to a note documenting attendance at a UCC hearing, the inmate's case manager was aware of this event. The inmate's UHR did not contain a current treatment plan. The most recent plan was dated 3/17/04. There were only two case manager contacts documented over the last eight months. Although the inmate was seen three times in the context of UCC meetings, he was seen in case management sessions only on 11/30/04 and 4/29/05. Case management contacts for this inmate were missed in

April and July.

Assessment:

This inmate's mental health treatment did not conform to program guide requirements. There was no current treatment plan in the inmate's UHR, and the inmate did not consistently receive quarterly case management contacts. Innate G had waited for entry into a mental health treatment group for eight months, but still was not enrolled.

8.    Inmate H

This EOP inmate's transfer to ASH was reportedly blocked on 3/11/05 because of pending RVRs. The UNA team recommended that he return to DMH for intermediate care for a possible trial of Clozaril. The UNA review noted that Inmate H was discharged from DMH in September or October 2004, but remained psychotic in December. He refused to participate in group treatment, experienced auditory hallucinations, exhibited grandiose delusions and reported disturbed sleep. A note in the UHR dated 7/14/05 indicated that the inmate would be referred to SVPP as per instructions of the UNA Case Conference Committee.

Inmate H had diagnoses of Schizoaffective Disorder and ASPD. In August 2005, he was medicated with Risperidone Consta 50 IM q 2 weeks, Risperidone 1 mg prn voices and Depakote 1500. There was contradictory information regarding Keyhea orders. The inmate may have had a Keyhea order that was current until 10/26/05. The institution's list of inmates with current Keyhea orders, however, did not carry his name. A flag in the inmate's UHR indicated that his Keyhea order expired one year earlier, on 10/26/04, but the year had been marked through manually, changed to read 2005 and initialed. The inmate's most recent treatment plan showed that he was given IM Risperidone in conjunction with a Keyhea order. According to his MARs, the inmate took Depakote and Risperidone po consistently. There was no MAR in the UHR for injectable Risperidone.

According to documentation in the inmate's chart, the staff at CMF recommended that Inmate H continue in single-cell housing. The inmate reportedly tried to choke his cellmate in 2003. Progress notes written during the past eight months seemed consistent with a slight improvement in the inmate's level of functioning. He adjusted adequately to the routine demands of the EOP unit, performed his duties as a porter well, was cooperative with the staff and attended two to four groups per week. He attended 12 hours of structured therapeutic activity in July and worked as a porter for at least 12 hours. He remained quite ill, however, with continued hallucinations, delusional thought, and paranoia. Currently, Inmate H presented as mildly paranoid and hallucinating, despite being medication compliant. His emotional range was described as restricted and his cognitive functioning as concrete and disorganized. IDTT meetings were held for Inmate H quarterly. They were attended by a full team of required participants. The inmate's treatment plans were individualized. A note indicated that he was considered for referral to a higher level of care in mid-July, but found not to be an appropriate for such a transfer due to his need for a single cell. Custody clearance was denied on July 15 pending an ICC hearing. As indicated above, that decision was reversed within a few days, and the

inmate was determined to be appropriate for referral. A progress note dated 8/15/05 stated that the inmate had been referred to a higher level of care at SVPP. A referral packet to PAU (a crisis bed at CMF/DMH) was completed on July 25. The inmate had been waiting for a PAU bed as of 8/8/05. He remained in the EOP unit at the end of August. The plan for Inmate H was to continue to encourage him to participate in EOP treatment.

Assessment:

Access to higher levels of care for this inmate was poor, and his mental health treatment was inadequate. Although the inmate gradually adjusted to the EOP program and was able to function well enough to attend groups and work as a porter, he was not doing well. He was allowed to remain psychotic for months. He should have been referred to a higher level of care and given the opportunity to benefit from a different medication regimen.

A delay of seven months between recommendation and referral to intermediate DMH care was too long. A custodial hurdle to intermediate care arose on 7/15/05, preventing his admission to a PAU bed in July and August.

9.      Inmate I

The monitor's expert reviewed only the last volume of this inmate's ten-volume UHR. Inmate I was reportedly identified in an IDTT meeting as needing intermediate DMH care at SVPP, but he was not referred. A progress note dated 7/14/05 indicated that this inmate's case was discussed in a conference to determine why he had not been referred to a higher level of care. It was determined that his medical needs outweighed his psychiatric needs and that he would remain on a certain EOP wing until a better situation arose. Other notes indicated that he was housed in that particular location as a convenience to custody staff.

According to institutional records, the inmate was referred to SVPP on 12/15/04. He was accepted at SVPP and cleared for transfer by custody. During a routine medical clearance, it was found that the inmate needed dialysis and, therefore, could not go to SVPP. He could not go to ASH because he could not live in a dormitory.

Inmate I had a controlling diagnosis of Schizophrenia, paranoid type with Narcissistic Personality Disorder. In addition, he was on dialysis. His regimen included Trilafon 2 am and 2 eve, which he began taking in July. A trial of Trilafon was apparently initiated in response to the inmate's statements to a psych tech and a psychiatrist. Inmate I said that he heard voices all the time, that he took Elavil in the past and that he needed something to help quiet him down.

Movement logs indicated that Inmate I was out at a community hospital for approximately two weeks in February and March 2005 for medical treatment. Recent progress notes indicated that he was resistant to attending group treatment, but attended

individual therapy sessions. In July, the inmate attended three hours of group treatment and saw his case manager more frequently than weekly. His hours in May were about the same. Because he refused to participate in most structured therapeutic activities, Inmate I's treatment team met monthly. The inmate's presentation had remained the same for the past several months. He was occasionally pleasant, but often angry. He went to dialysis, individual therapy sessions and IDTT meetings. He remained delusional and withdrawn. He was fed in his cell and received his medication apart from other inmates after they were finished. A cursory note said that he did not meet Keyhea criteria.

Staff reported orally that the inmate's EOP wing was uniquely suited to his needs. One half of the unit was single celled, while the other half was double celled. The census, therefore, was lower and the size of the treatment groups was small because of the low census. The unit had its own dining hall. Caseloads were small and inmates were encouraged individually to attend each therapy group.

Assessment:

This inmate's access to intermediate care at SVPP was blocked because of a medical issue. His access to intermediate care at ASH was blocked by a security issue.

Inmate I's mental health treatment in the EOP was inadequate and his psychiatric treatment was poor. Psychiatry notes suggested inattentiveness to his clinical picture and lack of any sustained effort to arrive at a therapeutic regimen. The inmate's low level of participation in structured therapeutic activities did, however, elicit an individualized treatment plan and more frequent individual case manager sessions.

10.     Inmate J

The UNA team reportedly found that Inmate J needed intermediate DMH care. The inmate was then referred to a higher level of care, but the referral was rejected or rescinded on 12/8/04 because he did not meet Vitek criteria.

This 44-year-old inmate was treated at the EOP level of care in August 2005. He had been in the EOP program for at least one year. His controlling diagnosis was Major Depressive Disorder, severe, with psychotic features, in partial remission. His regimen included Seroquel 750 eve, Trazodone 100 eve and Prozac 50 a.m.

Inmate J worked as a tier porter in May. According to summaries in the inmate's UHR, he attended 12 hours of structured therapeutic activities in May and June and refused 14 to 16 hours both months; nine hours were cancelled in June and nineteen hours were cancelled in May. Had the inmate attended all of the groups offered to him, his level of participation would have exceeded 40 hours per month in May and June. Recent notes indicated that the inmate was less depressed and was benefiting from occupational therapy activities. Inmate J recently went into occupational therapy where he presumably participated in more structured therapeutic activities.

The inmate was involved in a physical altercation in the EOP pill line in April. The mental health evaluation concluded that mental illness was a factor in his behavior and the charge, mutual combat, was dismissed.

Inmate J met weekly with his case manager and monthly with his psychiatrist. He discussed issues of personal concern with his case manager. Quarterly treatment plans indicated that he remained depressed and continued to report auditory hallucinations. His risk of suicide was found to be low. In March, the inmate agreed, despite earlier refusals, to be referred to a higher level of care. He also expressed concerns about his personal safety if he went to the general population 3CMS level of care; he reported that he had been assaulted there in the past.

Assessment:

This inmate's EOP treatment conformed to program guide requirements and met his needs. He appeared to benefit from treatment in recent months. He voiced concerns about personal safety and reported a history of assault, but did not exhibit a pressing need for treatment that focused on trauma. A disciplinary referral was handled appropriately by custody and mental health.

The inmate was referred to intermediate DMH care shortly after it was recommended by the UNA team. Referral procedures were followed, but the inmate refused to go and was found competent to make such a decision. He agreed, however, to be referred in March. It did not appear that the inmate was referred after December, as his name was not on the institution's centralized list of referrals.

Inmate J's treatment plan included therapeutic activities. The inmate was offered over 40 hours of structured therapeutic activities per month in May, June and July.

11.    Inmate K

This case was referred to the monitor's expert by plaintiffs' counsel because the inmate might have been in need of treatment for anxiety and Post-Traumatic Stress Disorder due to a history of sexual assault.

This 48-year-old inmate was treated at the EOP level of care. His diagnoses were Major Depressive Disorder, recurrent, severe, with psychotic features, in partial remission and Personality Disorder NOS. He also had a Seizure Disorder. His regimen included Geodon 40 a.m. 60 p.m., Zoloft 150, Artane and Cogentin until mid-August 2005, when Geodon was discontinued and Seroquel was initiated. The medication change was supported by a documented rationale. Inmate K had recent AIMS scores of mild to moderate involuntary movements of his jaw, mouth and tongue. Informed consent forms were present in the inmate's chart for all of his medications. The inmate also took Interferon.

In June, Inmate K refused most of his doses of psychotropic medication. His non-compliance was discussed at an IDTT meeting at the end of month. The inmate reported that he had been feeling sick and wondered if it was due to the combination of medications he was taking or because he had not been taking certain medication.

Inmate K attended few structured therapeutic activities. He participated in 13 hours of structured activities in May and refused four hours; 13 hours were cancelled. In June, he attended six hours; in July, he attended ten hours. His low level of participation was also discussed in IDTT meetings and individual sessions. The inmate sometimes refused to attend individual therapy sessions. When he attended, he did not disclose very much. The inmate was seen at least monthly by a psychiatrist. Although he was seen by more than one psychiatrist, psychiatry practices were responsive to the inmate's clinical needs and to his reports; progress notes were completed, changes in medication were accompanied by a rationale, side effects were noted and continuity of care was sustained.

Inmate K had monthly IDTT meetings due to his poor participation in therapy. He was seen by his case manager five times in May, twice in June and three times in July; a fourth contact in July was attempted, but the inmate refused to be seen.

A DMH summary found in the inmate's UHR indicated that he was in the EOP in January 2005 and then went to the Day Treatment Program (DTP) where he remained for about two months. The inmate's risk of suicide was assessed as low in the DTP. DMH records indicated that Inmate K progressed poorly in the DTP and was discharged due to behavioral problems inconsistent with his treatment. His discharge diagnoses were the same as those used at CMF in subsequent months.

When interviewed by the monitor's expert in a confidential setting on 8/24/05, the inmate was neatly dressed and well groomed. He exhibited a pronounced dystonic reaction. He recounted a history of treatment in DTP on several occasions, with one stay lasting 26 months. He said that the group treatment in DTP addressed his childhood sexual abuse and was useful in teaching him how to live with his trauma and manage it on a daily basis. He said that a particularly helpful aspect of the treatment was hearing feedback from other members of the group. He said that there were no groups in the EOP program in which he was encouraged to bring up trauma. He indicated that case managers had different responses to his reports of trauma when he raised it in individual sessions. Inmate K noted that, when he changed cells within the same housing unit, he also had to change case managers. Although one of his case managers was willing to discuss the issue of sexual trauma during individual sessions, those weekly sessions lasted only ten to 15 minutes. A different case manager discouraged discussion of trauma on the grounds that individual sessions were too short and that CDCR was not planning to start a trauma group. This inmate believed that it was important for him to be able to talk about his reactions to trauma at the present time. He said he was barely managing to get along on a daily basis. It was evident that the particulars of traumatic incidents were very much at the forefront of the inmate's mind during his interview with the monitor's expert.

<u>Assessment</u>:

The documentation in the inmate's UHR did not fully reflect this inmate's clinical picture. Inmate K probably needed treatment that addressed his traumatic reaction to events that transpired in the distant past. Neither the individual nor the group treatment he received was able to meet that need.

His low level of participation in EOP activities elicited more frequent case manager contacts and monthly IDTT meetings. Nonetheless, documentation indicated that weekly case manager contacts were often missed. Although psychiatric treatment was provided by different clinicians, it was consistent and responsive to the inmate's needs. AIMS tests were completed for Inmate K. The inmate's medication non-compliance and his reports of side effects elicited responses from mental health staff. A discharge summary from DMH was filed in the inmate's UHR.

12.    Inmate L

This 3CMS inmate had a controlling diagnosis of Bipolar Disorder, most recent episode manic, moderate. He also was post-CVA, used a wheelchair and had seizures and HTN. He did not take psychotropic medication and was housed in the general population.

Inmate L had a current treatment plan that stemmed from an IDTT meeting attended by a full team. He was seen for individual case management sessions quarterly in March and June 2005, but there was a gap of five months between the March contact and the one immediately prior to it.

<u>Assessment</u>:

This inmate's mental health treatment met program guide requirements with the exception of a missed quarterly case management contact.

13.    Inmate M

This 3CMS inmate had diagnoses of Major Depressive Disorder, recurrent, Psychotic Disorder NOS in remission, Polysubstance Dependence and ASPD. He had several medical conditions, including Hepatitis C, migraine headaches and a knee injury.

Inmate M had a current treatment plan that stemmed from an IDTT meeting attended by a full team. Diagnostic clarification and a trial of a different medication were discussed in a recent IDTT meeting. The inmate was seen subsequently by a psychiatrist and a new medication order was written. Planned follow-up and laboratory testing were appropriate for the initiation of a new medication. The inmate was not seen for individual case management sessions quarterly. Documentation in the inmate's UHR indicated that he was seen by a case manager on 9/29/04, was next seen in a UCC meeting attended by a mental health clinician in May 2005 and was then seen in July.

Assessment:

There was a gap of over nine months between this inmate's case management contacts. The inmate's IDTT meeting met program guide requirements and served its purpose. Medication management was responsive to this inmate's needs and appropriate for the initiation of a new medication.

14.    Inmate N

This 3CMS inmate had a diagnosis of Major Depressive Disorder, severe, recurrent, with psychotic features. He took Seroquel 300 p.m. The inmate's MARs showed poor compliance in April, May and June. Annotations on the MARs indicated that Inmate N did not pick up his medication on many occasions. There was, however, no indication in the inmate's UHR that he was referred to mental health for medication non-compliance. Laboratory tests were ordered on April 29, blood samples were collected on May 19 and test results were returned the same day; the test results were initialed by the reviewing clinician.

Inmate N was seen quarterly by his case manager. Two of the case management contacts were two weeks late, but there were no deleterious consequences from the delay. In November, the inmate was referred to a group therapy session for inmates serving life sentences, but nine months later he was still not enrolled.

The inmate had an IDTT meeting on 8/4/05, but no updated treatment plan was found in the inmate's UHR. A note indicated that a psychiatrist was present at the IDTT meeting. There was no indication in the record that treating clinicians were aware of the inmate's poor medication compliance.

Assessment:

This inmate's mental health treatment was consistent with program guide requirements in most, but not all, respects. Two case manager contacts were two weeks late, but the delay was of little or no consequence. More significantly, this inmate's medication non-compliance did not trigger a referral to mental health. Although Inmate N had a timely IDTT meeting, his current treatment plan was not filed in his UHR. Laboratory tests were completed approximately three weeks after they were ordered. The tests results were obtained from the laboratory immediately and later initialed. The inmate had been waiting nine months to enroll in group therapy.

15.    Inmate O

This 3CMS inmate arrived at CMF from CSP/Solano on 6/24/05 because he was involved in mutual combat. He was seen by the physician on duty the day he arrived and cleared for housing in administrative segregation. A form entitled suicide prevention screen guidelines was completed in segregation, but it was undated. The inmate was deemed not at risk of suicide.

Inmate 0 was first seen on psych tech rounds three days after he arrived in administrative segregation. He was also seen by a case manager within three days of arriving. An attempt was made to see him the first day, but he was not seen out-of-cell due to a shortage of correctional officers. Inmate 0 was seen weekly by a case manager for the duration of his stay in administrative segregation, with several contacts occurring out-of-cell. Psych tech rounds were documented five days a week in July. Psychiatric contacts were made monthly, but the notes of those contacts were cursory.

An initial IDTT meeting was held in a timely manner. The inmate's updated treatment plan showed diagnoses of Polysubstance Dependence in partial remission, ADHD, predominantly hyperactive type, by history, ASPD and Narcissistic Personality Disorder. Inmate O's GAF was assessed as 70. He indicated on several occasions that he wanted to be discharged from the mental health caseload. The inmate was not taking psychotropic medication at CSP/Solano or at CMF.

After the staff became more familiar with the inmate, his diagnosis was changed to Bipolar II. His cognitive processing was described as circumstantial and tangential. His affect was lively and he exhibited hypomanic behavior. Despite the change in diagnosis and behavioral observations consistent with elevated mood and hypomania, Inmate 0 was scheduled for an IDTT meeting for the purpose of discharging him from the caseload.

Assessment:

This inmate's mental health treatment conformed to program guide requirements, except that his discharge from the caseload was contraindicated. Intake contacts with the inmate were timely when he first arrived and after he was placed in administrative segregation. A risk assessment for Inmate 0 omitted a crucial date and was documented on an unusual form, rather than on the suicide risk assessment form typically used by CDCR.

The inmate's IDTT meeting was timely. Psych tech rounds in administrative segregation were documented. Most clinical notes were informative and the inmate's diagnosis was clarified. Psychiatric notes were not informative and suggested inattention to the inmate's clinical presentation. Despite Inmate O's evident need for treatment, his requests to be discharged from 3CMS were honored and he was slated for discharge from the mental health caseload. If the inmate incurs another disciplinary infraction, he should receive a mental health assessment and should be referred for a thorough psychiatric evaluation. Both evaluations should be informed by a complete history, rather than resting solely upon the inmate's self-report.

16.     Inmate P

This 19-year-old EOP inmate was housed in administrative segregation at the time of the monitoring visit. His most recent diagnoses were Bipolar Disorder NOS, Polysubstance Dependence, ASPD and asthma. During his stay in the EOP unit, Inmate P did not have a long enough trial of any medication regimen to stabilize. He was seen

by many different psychiatrists. Medication orders were written in response to current events. An anti-psychotic medication and a mood stabilizer were discontinued on March 2 without a rationale. Seroquel was ordered in July 29, following an extended period of deterioration in the inmate's level of functioning.

A MH-2, completed at CMF in December 2004, indicated that Inmate P was new to the EOP and to CMF at that time. He is serving his first prison term. He was due to be released in December 2005. Early in his stay, the inmate presented as well organized with normal mood and clear thought. He had 37 points. He came to CMF from CIM's reception center. He was treated for Bipolar Disorder with Risperidone and Thorazine.

By January 25, his regimen was changed to Seroquel, Depakote and Trazodone. He had a brief stay at DMH due to suicidal ideation, but there was no discharge summary from DMH in the inmate's UHR. By February 22, he was in administrative segregation. He said he wanted to remain in prison his entire life. He was described as immature and desperate for parental guidance. He discussed with correctional officers how to receive a disciplinary infraction that did not result in a referral to the district attorney's office. He then gassed staff on two occasions. He did not present signs of Bipolar Disorder to the new treatment team. On one occasion when he returned from DMH after a stay of less than 24 hours, a suicide risk assessment was completed by members of his treatment team. His level of risk was found to be medium.

Progress notes written at CMF showed that inmate's presentation was variable. He was sometimes described as angry, hostile, threatening and impulsive. Yet, he also talked with mental health clinicians about issues of personal concern, sought help often and sometimes found talking beneficial. He participated in structured therapeutic activities. In July, he completed 42 hours of activities and was seen 11 times by his case manager. Clinical notes indicated that he was awaiting transfer to PBSP's PSU.

The inmate's reports of distress escalated from mid-June to mid-August. He consistently complained of gastric distress, vomiting and sleeplessness. His mood became increasingly labile. He contacted healthcare providers on many occasions to voice his complaints and ask for help. His level of functioning deteriorated to the point that he was no longer able to make use of therapeutic techniques that had been helpful to him. From the end of July through the month of August, his mood was labile and his behavior was extreme. He went on a hunger strike, precipitated a crisis and was seen one night by the physician on duty. He set a fire in his cell, was admitted to an acute care bed for a 23-hour observation period and broke out the windows in his cell. He told clinicians that he felt very low and that he felt like being in restraints. He was preoccupied with achieving a move from one administrative segregation unit to another and with obtaining copies of recent progress notes written by his case manager.

As indicated above, the inmate's orders for Seroquel, Trazodone and Depakote were discontinued on March 2. The corresponding psychiatric note said that the medication was discontinued because the inmate was non-compliant. The inmate's MARs

indicated that he was largely non-compliant with his medication regimen. After the discontinuation of these medications, Inmate P was not put on a maintenance regimen appropriate to his needs for five months.

The inmate's MARs were numerous, but difficult to decipher. None of Inmate P's MARs showed that he received medication consistently or that he was on a regimen that might have stabilized him. Medication orders were written by many psychiatrists. The inmate was given .5 cc Haldol Dec IM at two week intervals from June 7 to July 5. The June 19 injection was not given because the inmate was in DMH for a 23-hour evaluation period. During these weeks, the inmate also received stat doses of Thorazine, Haldol and Seroquel by order of different physicians on different occasions. He had a prn order for Haldol Conc 2 ml for agitation, but it was given only once in July.

The inmate's case manager referred him for a psychiatric appointment on July 21 and noted that he needed to be back on a medication regimen. The inmate was seen six days later. A 30-day order for Haldol and Cogentin was written on July 28, when the inmate was seen cell-front by a psychiatrist. An order for Seroquel 400 qhs was written on July 29 by a different psychiatrist who saw him out-of-cell.

During his most recent IDTT meeting, the inmate said that he did not belong in a Level IV prison. He said that Haldol made him feel bad and that the medication regimen that worked for him was Seroquel, Trazodone, Depakote and Benadryl. He was described as very worried about his transfer.

Assessment:

Inmate P's mental health treatment was inadequate. This young mentally ill inmate serving his first term was allowed to decompensate in an EOP unit over a lengthy period of time. It appeared that he would likely serve a longer term under more restrictive Level IV conditions due, in part, to inadequate mental health treatment.

The inmate's psychiatric treatment was fragmented and failed to consider his clinical picture. Medication was discontinued without a rationale. MARs were largely unintelligible. A referral to psychiatry by mental health staff did not result in timely enough contact given the circumstances. Case management contacts, both individual and group, were therapeutic and well documented. There was no discharge summary from DMH in the inmate's UHR.

17.    Inmate Q

This 3CMS inmate had a controlling diagnosis of Schizoaffective Disorder. He also had major medical problems. He had a seizure disorder and diabetes, both of which required daily medication.

He was discharged from the EOP program in January 2005. He was on a regimen of Lithobid 600 and Seroquel 300 in 2005. The inmate's MARs showed that he was compliant with his medications in May, June and July. Inmate Q's Lithium blood levels were monitored four times during the past six months. The level was within the therapeutic range in February, but fell below it in May and July.

During his most recent psychiatric appointment on 8/1/05, Inmate Q told the clinician that he stopped taking Lithium because he did not like it. He agreed to continue taking Seroquel. In response to his reports, Lithium was discontinued and the dose of Seroquel was increased. The psychiatrist's note did not mention the results of the inmate's laboratory tests, but it did refer to the inmate's self-report about medication non-compliance. There was no indication in the progress notes that the psychiatrist was aware of the inmate's laboratory test results. He did, however, order the tests. There was no mention of the contradiction between the nearly perfect medication compliance recorded on the inmate's MAR and the inmate's report that he had stopped taking Lithobid.

Inmate Q was seen for an initial 3CMS IDTT meeting in a timely fashion. He was also seen quarterly by a case manager. The inmate's treatment plan was individualized and signed by the clinical members of the treatment team. No correctional counselor was present at Inmate Q's IDTT meeting. The inmate reported that he had not received any medication, including medication for his diabetes, since he left the EOP unit. He was on waiting lists for a job and group treatment. He seemed to have made a successful transition.

Assessment:

This inmate's mental health treatment conformed to program guide requirements in most respects. An initial IDTT meeting was timely and the inmate was seen quarterly by his case manager. The inmate's treatment plan was individualized, but his IDTT meeting was not attended by a correctional counselor.

Inmate Q reported that the administration of his medication was interrupted when he moved from the EOP program to the 3CMS program. There was a discrepancy between the inmate's report of medication non-compliance and MARs that showed he was compliant. The inmate's blood levels were monitored for the presence of a mood stabilizer as required, but psychiatric notes did not mention the test results.

- This inmate was monitored in a holding cell in the administrative segregation unit rather than in the MHCB unit, due to a lack of MHCB beds. The administrative segregation unit did not provide adequate clinical observation for such monitoring.

- Appropriate laboratory testing for treatment with Lithium was conducted.

- The inmate's chart indicated that the inmate received weekly case management contacts while in the administrative segregation unit.

- There were some lapses in the documentation of five-day suicide prevention follow-up after the inmate's discharge from the MHCB unit or the administrative segregation holding cell.