EXHIBIT E

California State Prison at Solano (CSP/Solano)

July 11, 2005 – July 14, 2005

1.     Inmate A

This 3CMS inmate was housed in general population on one of the Level III yards. He was diagnosed with Bipolar I disorder, severe with psychotic features, and treated with Wellbutrin 300 mg/day, Prozac 40 mg/day, Seroquel 300 mg/day and Depakote 1000 mg/day.

Inmate A arrived at CSP/Solano on 4/13/04 from WSP. He was treated with the above medications at the time of his transfer. Progress notes during the review period indicated that the inmate worked in the kitchen and was generally stable on his medications. The inmate experienced some periods of hypomanic as well as obsessive/compulsive symptoms. At his last psychiatric appointment on 6/10/05, Inmate A presented with continued hypomanic symptoms and complaints of medication side effects from Lithium; his Lithium was then discontinued and Depakote was initiated.

<u>Assessment:</u>

The following comments were noted regarding the care provided to this inmate:

- Inmate A's informed consent for treatment with Seroquel and Depakote had expired. Consent was present in the inmate's chart for his other prescribed psychotropic medications.

- Appropriate laboratory testing for treatment with Depakote had been ordered for the week of the monitoring visit. Laboratory testing for treatment with Lithium was conducted while the inmate was treated with this medication.

- The inmate's MARs were very poor. There were multiple blank spaces as well as a number of refusals without any documentation of mental health referrals during May and June.

- All of the required participants were present at the inmate's annual IDTT meeting.

- Documentation in the inmate's chart reflected at least quarterly case management contact.

2.     Inmate B

This 3CMS inmate was housed in general population on one of the Level III yards. He was diagnosed with Major Depressive Disorder with psychotic features, and treated with Seroquel 700 mg/day, Abilify 5 mg/day, Prozac 40 mg/day, Lamictal 100 mg/day and Remeron 15 mg/day.

Inmate B arrived at CSP/Solano from Folsom on 12/23/04. He had received a 3CMS level of care while at Folsom, which was continued upon his transfer to CSP/Solano. A

MH-2 was completed on 12/29/04, documenting the above diagnosis.

The inmate was seen by a psychiatrist on 1/10/05, when he reported recurrent depression; his Prozac was increased at that time. A psychiatric progress note dated 6/16/05 was very difficult to decipher, but stated "Seroquel – S/I, H/I paranoid." The note later indicated that the inmate was euthymic with a full range of affect and no psychotic symptoms.

<u>Assessment</u>:

The following comments were noted regarding the care provided to this inmate:

- A MH-2 was completed within six days of the inmate's arrival at the facility; his treatment plan was timely.

- All of the required participants were present at the inmate's annual IDTT meeting.

- Informed consent for treatment with psychotropic medications was present in the inmate's medical record.

- The inmate's medications were continued upon his arrival at the institution.

- The inmate's MARs contained some blank spaces. There were also a number of medication refusals and no-shows noted in the MARs, but there was no documentation of any mental health referrals.

- The psychiatric follow-up received by this inmate after medication adjustments was inadequate. The inmate was not seen for follow-up for more than two months after his Prozac was increased, despite his reports of increased depression.

- The inmate's last psychiatric progress note was confusing and raised some concern. Specifically, it was unclear whether the psychiatrist was reporting that the inmate had suicidal and homicidal ideation; if so, no assessment of suicide risk was performed and the issue was not adequately addressed clinically.

- There was a gap in the documentation of quarterly case management contacts for this inmate between 12/29/04 and 4/29/05.

3.      Inmate C

This 3CMS inmate was housed in general population on one of the Level III yards.  He was diagnosed with Bipolar II Disorder and treated with Paxil 20 mg/day and Seroquel 500 mg/day.

This inmate was transferred from MCSP to CSP/Solano on 2/7/05.  He had received a 3CMS level of care at MCSP, which was continued after his transfer to CSP/Solano.  Inmate C was initially treated with Prozac and Seroquel; his medical record indicated that he had a history of elevated cholesterol and diabetes, yet he was prescribed Seroquel at the sending facility and at CSP/Solano.

Inmate C was seen for his first psychiatric appointment on 2/23/05, at which time the psychiatrist noted that the inmate's triglyceride and cholesterol levels were elevated; the inmate was informed that these elevated levels were most likely due to Seroquel.  The psychiatric note indicated that the inmate wished to continue taking the medication, despite these risks; in fact, the inmate's Seroquel dosage was actually increased at that time.  The most recent progress notes by the inmate's psychiatrist and case manager indicated that the inmate was stable.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with psychotropic medications was present in the inmate's medical record.

- The inmate's medications were continued in a timely manner upon his arrival at the institution.

- The inmate's initial IDTT meeting did not document the presence of custody staff.

- Inmate C's MARs had blank spaces.  The inmate's April MAR was the worst example, showing a lapse in the documentation of medication administration from 4/21 through 4/27/05.  A review of the inmate's record indicated that he had current medication orders during this lapse.

- There were written notes on the inmate's MARs from nurses indicating no shows; however, there was no evidence that any mental health referrals were made regarding medication non-compliance.

- It was a matter of some concern that this inmate with diabetes and elevated lipids continued to receive treatment with Seroquel, an atypical antipsychotic medication that can cause or worsen these conditions.  An alternative medication should have been considered in light of the inmate's concurrent

treatment with cholesterol lowering medications. More frequent laboratory testing was also indicated, as well as better collaboration with medical staff regarding this issue.

- The inmate's chart included documentation of quarterly case management contacts.

4.    Inmate D

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with an Adjustment Disorder, but was not treated with any psychotropic medications at the time of the monitor's visit.

Inmate D was transferred from Folsom to CSP/Solano on 2/24/05. He was not on the mental health caseload at the time of his transfer to CSP/Solano. It appeared that the inmate had been housed in general population until 4/28/05, but there was limited documentation in the UHR regarding his housing. On 4/28, Inmate D was admitted to the MHCB unit due to suicidal ideation. Progress notes indicated that the inmate had concerns regarding his safety in the dormitory and was fearful because other inmates had threatened him. The inmate was discharged from the MHCB unit to the administrative segregation unit on 5/3/05 the above diagnosis and on no psychotropic medications. He was also discharged to the 3CMS level of care with five-day follow-up care. Subsequent progress notes indicated that the inmate was "stable," but the majority of these contacts occurred at cell-front.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Both the MHTS and the inmate's UHR contained lapses in the documentation of weekly case management contacts in the administrative segregation unit. The largest lapse occurred between 5/6 and 6/3/05.

- A number of case management contacts occurred at cell-front. A progress note indicated that the inmate declined out-of-cell contact.

- There was documentation of five-day follow-up after the inmate was discharged from the MHCB unit.

- The inmate's medical record was incomplete and did not include information such as progress notes; this appeared to be a medical records filing issue. The discharge summary from the MHCB unit was present.

5.     Inmate E

This 3CMS inmate was housed in the general population. He was diagnosed with Depressive Disorder, NOS and treated with Remeron 30 mg/day.

Inmate E was transferred from HDSP to CSP/Solano on 5/19/05. He was being treated at the 3CMS level of care at the time of this transfer. He had been prescribed Prozac until late March, when this medication had been tapered at HDSP. An MH-2 was completed on 5/2/05. On the following day, the case manager and the psychiatrist saw the inmate and reported that he was depressed with suicidal ideation. A suicide risk assessment was completed and the inmate was admitted to the MHCB unit for treatment.

The inmate was hospitalized from 5/3 to 5/10/05. He was released with the above-noted diagnosis and medication to a general population housing unit with five-day follow-up. The inmate's most recent progress notes indicated that he was without suicidal ideation; a decrease in his depressive symptoms was also noted.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- A MH-4 was completed on the day of the inmate's arrival at the institution.

- A MH-2 was completed within 14 days of the inmate's arrival.

- There was documentation in the inmate's chart of five-day follow-up after his discharge from the MHCB unit.

- The provision of quarterly case management contacts in general population was also documented in the inmate's chart.

- In-patient information from the inmate's MHCB stay was not contained in his UHR, but his MHCB discharge summary was present.

- Informed consent for treatment with psychotropic medications was present in the inmate's UHR.

6.     Inmate F

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Major Depressive Disorder and treated with Risperdal 5 mg/day, Remeron 45 mg/day and Seroquel 400 mg/day.

Inmate F was transferred to CSP/Solano from WSP on 8/18/04. He had been at the 3CMS level of care while at WSP and he was continued at that level after his transfer. The inmate had been housed in the administrative segregation unit since 12/12/04.

Psychiatric progress notes indicated that he reported periods of hallucinations, but was stable on medications.

Inmate F was admitted to the MHCB unit from 5/19 to 5/24/05 after he threatened to kill himself in administrative segregation.   The inmate had reportedly discontinued his medications four days prior to this, although his May MAR did not reflect any medication non-compliance during this period.  Inmate F was discharged back to the administrative segregation unit at 3CMS level of care on the above medications with orders for five-day follow-up.  The inmate's most recent progress notes indicated that he had no acute mental health concerns or suicidal ideation.

<u>Assessment</u>:

The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with psychotropic medications was present in the inmate's UHR.

- Both the MHTS and the inmate's UHR contained gaps in the documentation of weekly case management contacts in administrative segregation.

- There was documentation showing some out-of-cell clinical contacts in the administrative segregation unit.

- The inpatient information from the inmate's MHCB stay was not contained in his UHR, but his discharge summary was present.

- There was a gap in the provision of five-day suicide follow-up to Inmate F.  It appeared that the inmate was not seen on the fifth day after his discharge, but he was seen daily for the first four days and again on the sixth and seventh days after discharge.

7.      Inmate G

This EOP inmate was housed in the administrative segregation unit.  He was diagnosed with Major Depressive Disorder, recurrent with psychotic features, and treated with Depakote ER 1500 mg/day, Celexa 30 mg/day and Seroquel 200 mg/day.

Inmate G was transferred from CSP/LAC to CSP/Solano on 4/20/05.  He had been in the EOP program until January 2004, when he was downgraded to the 3CMS level of care while he was housed at CSP/Corcoran.  The inmate remained at 3CMS level of care at the time of his transfer to CSP/Solano.  A MH-2 and a MH-4 were completed for the inmate, recommending that he continue in the 3CMS program.

The inmate was seen by a case manager on 6/14/05, when he reported paranoid and suicidal ideation.  He was admitted to the MHCB unit at that time for stabilization.  The

MHCB discharge summary indicated that the inmate had transferred from a Level IV to a Level III prison and that he was having difficulty adjusting to the differences in the security level at CSP/Solano. On 6/22/05, Inmate G was discharged from the MHCB unit back to the administrative segregation unit at the EOP level of care with orders for five-day follow-up. The only other documentation of clinical contact in the inmate's file was a progress note dated 6/30/05 by a case manager who saw the inmate at cell-front; the progress note included only a checklist, which indicated that the inmate's mental status was within normal limits.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with psychotropic medications was present in the inmate's UHR.

- Appropriate laboratory testing for treatment with Depakote was also present in the inmate's chart.

- Although the inmate's MH-4 was not present in his UHR, the case manager's progress note indicated that a MH-4 was completed on the day the inmate's arrival at the institution.

- A MH-2 was completed 19 calendar days after the inmate's arrival at the facility; this treatment plan appeared to be late.

- There was no documentation of custody presence at the inmate's initial IDTT meeting in general population.

- Weekly case management contacts in the administrative segregation unit were documented in the MHTS; progress notes, however, were not always present in the inmate's UHR.

- Neither the MHTS nor the inmate's UHR contained documentation of five-day follow-up after the inmate's discharge from the MHCB unit.

- The May MAR documented medication non-compliance between 5/4 and 5/7/05, but there was no documentation indicating that the inmate had been referred to mental health regarding this issue.

8.    Inmate H

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Schizoaffective Disorder and treated with Thorazine 500 mg/day, Artane 10 mg/day, Remeron 45 mg/day and Prozac 30 mg/day.

Inmate H transferred from HDSP to CSP/Solano on 3/29/05. He had been treated at the 3CMS level of care at HDSP and was continued at this level after his transfer to CSP/Solano. The inmate was seen for his first psychiatric appointment on 4/11/05, at which time his medications were continued; the psychiatrist indicated that an atypical antipsychotic medication would be considered as well as an increase in Remeron, but the change in medication did not occur. A review of the medical record indicated that the inmate was also treated for diabetes, which could be worsened by treatment with an atypical antipsychotic medication. The inmate was transferred to the administrative segregation unit on 5/24/05. Subsequent progress notes from administrative segregation clinicians indicated that the inmate was stable.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with psychotropic medications was present in the inmate's UHR.

- There was a significant number of blank spaces on the inmate's April MAR. There was no documentation indicating that the inmate had been referred to mental health after these instances of medication non-compliance.

- A MH-4 was completed within three days of the inmate's arrival at the institution.

- The inmate's initial IDTT meeting documented the presence of all required participants.

- Despite the inmate's report to the contrary, both the MHTS and the inmate's UHR progress notes indicated that the inmate was seen by the administrative segregation case manager on a weekly basis, with some clinical contacts occurring out-of-cell.

- There was documentation in the chart, indicating that medications were ordered for the inmate upon his arrival at CSP/Solano. The inmate's MAR for that month and for the beginning of the following month contained blank spaces and instances of medication refusal without any documentation showing that the inmate had been referred to mental health.

9.    Inmate I

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Depressive Disorder, NOS and treated with Vistaril 100 mg/day, Remeron 45 mg/day and Stelazine 10 mg/day.

Inmate I had been housed at CSP/Solano since November 2003. It appeared that he was

placed in the 3CMS program during May 2004 and transferred to the administrative segregation unit on 7/27/04; he remained in that unit throughout the review period. Progress notes indicated that Inmate I presented with episodes of impulsive and agitated behavior; this behavior did not result in a MHCB admission. Clinicians noted the inmate's history of treatment for ADHD and his continued impulsivity and auditory hallucinations.

On 5/4/05, the inmate's roommate reportedly presented to the clinic with physical symptoms after snorting Wellbutrin. His room was searched and "hundreds" of tablets of various medications were found. The inmate's medications were held for approximately two weeks and he was then treated with Loxitane and Remeron. These medications were not ordered DOT. At the inmate's next clinical visit on 6/1/05, he admitted to cheeking and flushing his Loxitane. The psychiatrist noted the inmate's possible drug seeking behavior but, again, DOT was not ordered. There were several subsequent medication changes due to the inmate's complaints of side effects or lack of therapeutic response. Progress notes reported that the inmate presented with expansive mood, medication seeking behavior and lability.

<u>Assessment</u>:

The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with psychotropic medications was present in the inmate's UHR.

- There were significant gaps in the documentation of weekly case management contacts in the administrative segregation unit prior to 6/1/05.

- There were no orders for DOT located in the UHR, after the inmate was found hoarding medications in the administrative segregation unit. This inmate should have been placed on DOT, in light of several episodes of hoarding and medication non-compliance.

- There was no documentation referring this inmate to mental health for his medication non-compliance. This may have resulted from inadequate monitoring of medication administration in administrative segregation.

10.    Inmate J

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Impulse Control Disorder and treated with Prozac 20 mg/day and Geodon 60 mg/day. His medical record was reviewed by the monitor's expert and the inmate was interviewed at the request of the plaintiffs' attorneys regarding the care provided to him.

This inmate's case was described in detail at the last monitoring visit during December 2004. The inmate remained in the administrative segregation unit throughout the review

period. He was followed consistently by the case manager and psychiatrist on the unit. Progress notes described him as exhibiting periods of irritability and inappropriate behavior toward female staff members. There was no report of overt psychosis or suicidal ideation.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Not all of the required participants were present for this inmate's IDTT meeting.

- Weekly case management contacts were documented in the inmate's chart; there were some out-of-cell contacts noted.

- The monitor's expert was unable to review the inmate's C-file as it was unavailable.

- Informed consent for psychotropic medications was present in the inmate's UHR.

11.    Inmate K

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Schizoaffective Disorder and treated with Artane 2 mg/day, Remeron 30 mg/day and Abilify 20 mg/day. At the request of plaintiffs' attorneys, this inmate was interviewed by the monitor's expert and his UHR was reviewed regarding the care provided to him in the administrative segregation unit.

Inmate K had been housed in the administrative segregation unit since 3/26/04, except for a brief period when he was transferred to another facility. Although the medical record did not include all of the necessary documentation, it appeared that the inmate was transferred from administrative segregation to the MHCB unit at CSP/Solano during late January 2005. He was discharged at the EOP level of care and subsequently transferred to the EOP hub unit at MCSP on 2/1/05. At his first IDTT meeting there on 2/10/05, the inmate was downgraded to the 3CMS level of care. He was returned to the administrative segregation unit at CSP/ Solano at the 3CMS level of care on 2/18/05.

Since his return to CSP/Solano, progress notes described the inmate as exhibiting irritability, paranoia regarding the staff and anxiety. He was consistently seen by the psychiatrist who made several medication changes to address his continued symptoms. Inmate K was admitted to the MHCB unit from 3/26 to 3/30/05 due to suicidal ideation. The psychiatrist documented that the inmate continued to threaten self-harm upon discharge, but the inmate was returned to the administrative segregation unit nonetheless. The most recent case management progress note provided little relevant clinical information, but a preceding note indicated that the inmate remained irritable and labile.

<u>Assessment:</u>

The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with psychotropic medications was present in the inmate's UHR.

- There was documentation in the inmate's chart of five-day follow-up after discharge from the MHCB unit.

- It appeared that this inmate was discharged from the MHCB unit despite his threats of self-harm without an adequate suicide risk assessment at the time of discharge.

- There was adequate documentation of clinically appropriate psychiatric contacts in the administrative segregation unit.  The inmate was seen one to two times per month by the psychiatrist.

- There was documentation of weekly out-of-cell case management contacts in administrative segregation.  Some of the clinical notes regarding Inmate K, however, lacked relevant clinical information.

- Custody presence was not documented for the inmate's IDTT meeting in administrative segregation on 7/5/04.

EXHIBIT F

<u>California State Prison at San Quentin (SQ)</u>

<u>2005 - 2005</u>

1.    Inmate A

This inmate completed suicide on 6/9/05 by hanging in his single administrative segregation cell. He was a 28-year-old Caucasian male who was admitted to SQ on 5/24/05 as a parole violator; his EPRD was 6/24/05. Inmate A's bus screening on 5/24 was negative for mental health issues; a mental health screening on 5/27 was also negative and no referrals were generated.

It was unclear whether Inmate A was in the 3CMS or EOP program in 1998 and 1999. The inmate was referred to mental health at DVI on 12/14/99 by the MTA. A psychologist's note from 12/15/99 indicated that the inmate had a history of being suicidal without medications, including a history of cutting his arm and trying to hang himself approximately two and a half weeks earlier. The inmate was placed on the MHSDS as a 3CMS medical necessity inmate on 12/29/99 and removed from the MHSDS on 2/18/00. Inmate A requested medications in January 2004 for possible ADHD and was referred to a case manager for follow-up. The inmate received diagnoses of Polysubstance Dependence, Borderline Personality Disorder and Depressive Disorder, mild, during the course of his incarceration, and was treated with Paxil in the past.

On 6/8/05, the inmate sent a sick call slip on a health care services request form indicating, "emergency please help." The request was received by a nurse on 6/9/05 at 7:00 a.m., but was not received by mental health until 6/10/05, after the inmate's death. The inmate was not in the MHSDS at the time of his completed suicide. He was placed in administrative segregation on 6/7/05 at his own request, because of safety concerns. It was unclear from the inmate's UHR whether a mental health contact had been conducted within 24 hours of the inmate's placement in administrative segregation.

According to an incident report, Inmate A was discovered by a correctional officer on 6/9/05 at approximately 11:05 p.m. An extraction team was assembled, and CPR was begun after the inmate was removed from his cell. The inmate death report indicates that the inmate's body temperature was 88 degrees and rigamortis was present. The psychological autopsy and suicide report were not available at the time of this review by the monitor's expert.

Assessment:

It appeared that there was no mental health screening conducted when this inmate was placed in administrative segregation. There was no emergency response to the inmate's initiated sick call request, which was reviewed by a nurse prior to the inmate's death but not received by mental health until after his death. A more comprehensive review of this inmate's suicide will be conducted as additional information becomes available.

2.    Inmate B

Inmate B was housed in the OHU. The monitor's expert observed an interview conducted by the psychiatrist and psychologist with the inmate in a confidential setting

in the OHU. The inmate was primarily Spanish speaking; despite efforts by the psychiatrist to translate the inmate's statements, there were some difficulties with the translation. The discussion focused on the inmate's medications and his responses to medications. The lack of a translator compromised this inmate's assessment and treatment.

Assessment:

This inmate's care and treatment were barely adequate. There was a clear need for translators at SQ, particularly on second watch. There was also a need for a telephone language line to be available to the staff in the OHU.

3.    Inmate C

This inmate had been in the OHU for three weeks when he was seen by the monitor's expert. He was admitted to the OHU because of his history of head banging and because he had a noose in his possession. The inmate was diagnosed with a history of conduct disorder and histrionic behaviors.

On interview, Inmate C reported that he had complained to the chief psychiatrist that he did not trust the staff psychiatrist and that the staff psychiatrist had revealed confidential issues to custody staff. The inmate refused .to speak with the staff psychiatrist, referring instead to what he perceived as the psychiatrist's unfair treatment. The inmate indicated that he had become disrespectful and agitated, which resulted in his being placed in five-point restraints. The inmate was in restraints on June 22 and June 23. Nursing checks were conducted approximately every two hours during the time he was in restraints. The q15-minute security checks could not be located in the inmate's UHR.

Inmate C's statements were clear and he was articulate. The inmate indicated that his attorney had advised him not to speak to mental health staff. He also reported that he had received a RVR for head banging. The inmate had a Keyhea order pending. He stated that he would take medications voluntarily, but not by force. He added, "I'm calmer."

Assessment:

This inmate's care and treatment appeared to be appropriate, with the exception of his being in the OHU for an extended period of time. The inmate should have been referred to a MHCB unit for further treatment, if his condition was not stabilized in the OHU within the required time frames.

4.  Inmate D

This administrative segregation EOP inmate was seen by the monitor's expert in the therapeutic yard for East Block. He reported that he had been prescribed Risperdal and Prozac. The inmate believed that his treatment was helpful.

Inmate D reported that he read books, played games and got fresh air in the therapeutic yard. The inmate, however, indicated that there were no organized activities on the yard. He expressed concerned that "real movies" brought in by staff as part of the EOP program were taken away from inmates because the SQ administration did not agree with the content of the films.

Assessment:

Inmate D's therapeutic yard did not appear to provide structured therapeutic activities led by a therapist. The inmate's complaint regarding movie materials was referred to the mental health administration for discussion with custody.

    5.  Inmate E

This administrative segregation EOP inmate was interviewed by the monitor's expert on the therapeutic yard for East Block. He reported that he had been in SQ since February 2005. He indicated that he had problems with hearing voices and with sleeping, despite being prescribed 800mg of Seroquel h.s.

Inmate E complained that he had seen the same videos every week and that their content was "boring." He indicated that the videos were better when the doctors brought them in but, according to the inmate's report, the doctors were no longer allowed to bring videos in for the inmates to watch.

Assessment:

This inmate did not appear to be receiving structured therapeutic activities on the therapeutic yard.

    6.  Inmate F

This administrative segregation EOP inmate was interviewed by the monitor's expert on the therapeutic yard in East Block. He reported that he had been in administrative segregation for four months. The inmate indicated that he was receiving Seroquel, Phenobarbital and Dilantin, in addition to another medication he could not recall. Inmate F said that he enjoyed the outside fresh air, but that there were no real activities in the therapeutic yard.

Assessment:

This inmate reported that there were no structured therapeutic activities available on the therapeutic yard for administrative segregation EOP inmates.

    7.      Inmate G

This administrative segregation EOP inmate was interviewed by the monitor's expert on

the therapeutic yard. He reported he has been in the administrative segregation EOP unit since April 2005. He indicated that he was starting Celexa for his anger on the day of his interview.

Inmate G stated that he enjoyed his one-to-one contacts with clinicians. He also reported that his "program is going good", but he believed that the videos shown in the therapeutic yard should be more educational.

Assessment:

This inmate reported that the administrative segregation EOP program was working well for him.

      Inmate H

The monitor's expert interviewed this administrative segregation EOP inmate in the therapeutic yard. Inmate H reported that he had been at SQ for 13 months. He indicated that he was endorsed for MCSP in August 2004 and had written a 602 to facilitate his move to that institution. The inmate said that he was taking Seroquel and Celexa, although he had taken Ritalin from age three until he was incarcerated and believed that it was the most appropriate medication for him.

Assessment:

This inmate's care and treatment appeared to be appropriate. He had, however, a prolonged wait for transfer to MCSP and had written a 602 in an attempt to remedy the delay.

9.    Inmate I

Inmate I reported that he had been incarcerated at SQ for the previous 35 to 40 days, after having been convicted of killing his girlfriend. He had been prescribed Risperdal three weeks prior to his interview with the monitor's expert, but said that it had not helped him. On interview, the inmate exhibited disorganized thinking. He appeared to be paranoid, reporting a conspiracy between the police, his teacher and members of his household. Inmate I denied any suicidal ideology at the time of the interview.

Assessment:

10.    Inmate J

Inmate J completed suicide by hanging on 6/25/05. The inmate was a 53-year-old male who was admitted to SQ for his first term on 3/9/05; he had an EPRD of 6/29/05. His bus screening upon admission was negative for mental illness as was a mental health screening conducted on 3/28/05.

Inmate J was placed in administrative segregation on 4/6/05 at his own request because of safety concerns; he was retained in administrative segregation following an ICC hearing on 4/13/05. On 5/11/05, the ICC cleared him for general population and he was returned to general housing. From 5/12 through 5/15/05, the inmate was at the county hospital because he had been found "down" at SQ secondary to hypotension. The inmate was subsequently diagnosed with acute renal failure, hypokilemia, syncopy and an altered mental status. He was placed in the OHU from 5/17 through 5/21/05 and subsequently returned to administrative segregation. Inmate J was discovered hanging in a single administrative segregation cell on 6/25/05 at approximately 2:35 a.m.

Assessment:

It was unclear from the record whether this inmate had a mental health screening and follow-up upon his return to administrative segregation. A more comprehensive review of the inmate's care and treatment will be conducted as additional information becomes available.

      11.     Inmate K

This inmate's record was reviewed by the monitor's expert for the use of restraints. Inmate K had been admitted to the OHU on 6/24/05 and was in restraints from 6/24 through 6/25/05. Notations in the inmate's chart indicated that he was checked while in restraints by nursing at 8:10 a.m., 9:30 a.m., noon, 2:00 p.m., midnight and 2:00 a.m. The security q15-minute checks could not be located in the UHR.

Assessment:

The documentation of this inmate's care and treatment while in restraints was inadequate. There was a gap in nursing checks of approximately ten hours and documentation of the security q15-minute checks could not be located.

      12.     Inmate L

This administrative segregation 3CMS condemned inmate was seen by the monitor's expert in the adjustment center. The inmate reported that he had sent a sick slip requesting to be seen by a case manager, but had been waiting for two weeks for a visit. He reported that he was "still having problems," even though he had been prescribed Seroquel.

This inmate reported that he had not been seen weekly while in the adjustment center.

12.    Inmate M

This EOP condemned inmate was seen by the monitor's expert in the adjustment center. The inmate reported that he wanted to go to DMH to receive more programming. He stated that he was "paranoid," but a review of his record indicated that he had a history of psychosis and was compliant with his medications.

Assessment:

This inmate's care and treatment appeared to be appropriate, except that he was not receiving ten hours of structured therapeutic programming per week.

13.  Inmate N

This EOP condemned inmate was seen by the monitor's expert as he attended group therapy in the adjustment center. Innate N was the only inmate in the group. He was on a Keyhea order and appeared to want programming and group therapy, which he had refused in the past. According to his UHR, Inmate N attended only four hours per week of structured therapeutic activities and received one-to-one clinician contact for a half an hour weekly, for a total of 4.5 hours of therapy each week in November 2004. An MH-2 dated May 11, 2005 was well done, but the inmate was still offered only six to seven hours of structured therapeutic activities per week and accepted only four to five hours per week.

The inmate was hospitalized at DMH/APP from 5/19 through 7/14/05. Although he improved initially after his hospitalization, he decompensated soon thereafter and his Keyhea order was renewed.

Assessment:

This inmate's care and treatment appeared to be appropriate, except that he was not receiving legitimate group therapy or ten hours of structured therapeutic activities per week.

14.  Inmate 0

This newly condemned inmate was seen in the adjustment center where he was undergoing an intake evaluation. The inmate had been in the CDCR system for a previous seven-year term, but had no mental health history at that time. The psychologist conducted a good evaluation.

The evaluation and assessment of this inmate were proceeding appropriately.

16.    Inmate P

This inmate was in restraints in the OHU from 6/11 through 6/12/05. Nursing notes were not always present in the inmate's UHR. There was a gap of approximately nine hours in the nursing notes during the time the inmate was in restraints. Those nursing notes that were present in the chart contained good information and always commented on the inmate's range of motion while in restraints.

Inmate P was transferred to the MHCB unit at PVSP from 6/12 to 6/27/05 with a diagnosis of Substance Induced Psychotic Disorder. The inmate was prescribed Geodon and Trazodone and returned to SQ.

Assessment:

Restraints appeared to have been appropriately applied to Inmate P. There were, however, gaps in the nursing documentation regarding the monitoring of the inmate while in restraints. During the restraint period, Inmate P remained on one-to-one custody observation.

17.    Inmate Q

This 3CMS inmate was housed in the adjustment center with a diagnosis of Psychotic Disorder NOS. The inmate was prescribed Remeron and Wellbutrin; consent forms were in the chart for these medications. Chart notes indicated that inmate Q saw his case manager at cell-front on a weekly basis.

Assessment:

This inmate's care and treatment appeared to be appropriate for his mental health needs.

18.    Inmate R

Inmate R was an administrative segregation EOP inmate. He had a diagnosis of Bipolar Disorder and was treated with Abilify and Benadryl. The inmate's UHR contained documentation of weekly case management visits in the reception center. It also contained good psychiatric and psychology notes dated 7/1/05, regarding a RVR. Clinical contact, however, occurred at cell-front. Inmate R was in the OHU in May 2005; five-day follow-up was appropriately conducted on 5/18 through 5/22/05.

Assessment:

This inmate's care and treatment appeared to be appropriate for his mental health needs.

19.    Inmate S

Inmate S was an EOP condemned inmate. His UHR contained documentation of weekly case management visits, although the inmate was noted to have refused out-of-cell contacts with his case manager and four group therapy sessions between 6/20 and 6/27/05. According to his chart, Inmate S refused approximately half of the group therapy offered to him, but he did go to the outside yard on average three to five hours per week.

The inmate's MH-2 dated 6/14/05 indicated a diagnosis of Mood Disorder NOS. The inmate was prescribed Abilify. Inmate S was admitted to DMH twice between January and March 2005 and returned to the OHU on 3/4/05 for psychiatric observation. He received five-day clinical follow-up after his discharge from the OHU on 3/5/05. Documentation of custody follow-up was not in the inmate's chart.

Assessment:

This inmate's care and treatment appeared to be appropriate, with the exception of documentation of five-day custody follow-up after the inmate's return from DMH.

20.    Inmate T

The monitor's expert reviewed the chart of this 3CMS administrative segregation inmate specifically regarding five-day follow-up. The inmate was diagnosed with Schizophrenia and prescribed Depakote. He was admitted to the OHU and received five-day follow-up upon discharge by both clinical and custody staff from 5/28 through 6/1/05. The documentation of the custody follow-up in the inmate's UHR was excellent.

Assessment:

This inmate's care and treatment appeared to be appropriate for his mental health needs.

21.    Inmate U

This EOP condemned inmate was diagnosed with Delusional Disorder and Nicotine Withdrawal. He was prescribed Risperdal and Clonodine. Although group therapy was offered to him three times per week, the inmate refused all sessions. Inmate U was also offered access to the therapeutic yard, but there was no note to indicate whether he took advantage of these opportunities. Inmate U received weekly case management contacts, all of which were at cell-front since the inmate refused to come out of his cell. A MH-2 from 5/24/05 indicated that the inmate would continue to be offered ten hours of structured therapeutic activities per week, but did not address his repeated refusals.

This inmate's care and treatment should be reviewed, and alternative strategies should be considered regarding his continued refusals to attend therapy.

22.    Inmate V

This EOP administrative segregation inmate was diagnosed with Psychotic Disorder NOS and treated with Risperdal. A review of the inmate's record by the monitor's expert showed that Inmate V attended most of the group and individual therapy offered to him. There was an appropriate MH-2 dated 2/24/05 in the inmate's chart. Inmate V was seen by his case manager weekly.

Assessments:

This inmate's care and treatment appeared to be appropriate for his current mental health needs.

23 – 30.        Inmate W – Inmate DD

The monitor's expert reviewed the restraint monitoring forms for these eight inmates and found that the documentation of custody monitoring was kept separately from the inmates' UHRs. Four of the eight monitoring sheets reflected significant gaps in the q15 minutes-checks, most notably between 11:15 a.m. and 1:45 p.m. for an average period of 2.5 hours. Inmate Z had a monitoring gap from 10:15 a.m. to 1:45 p.m.

Assessment:

The need to have more vigorous documentation of restraint observations and monitoring was reported to the mental health and custody staffs.

EXHIBIT G

<u>California State Prison at Corcoran (CSP/Corcoran)</u>
<u>May 3, 2005</u>
<u>July 27, 2005 — July 28, 2005</u>
<u>September 13, 2005 — September 15, 2005</u>
<u>December 15, 2005 — December 16, 2005</u>

1.    Inmate A

This inmate's UHR was reviewed at the request of plaintiffs' attorneys. According to plaintiffs' attorneys, Inmate A, who had an indeterminate SHU sentence based on safety concerns and an inability to safely program on SNY yards, had been housed in the SHU for years. He reportedly decompensated predictably in lock-downs and had been referred to MHCBs, EOP Hubs, PSU and SVPP. He had been discharged from both the PSU and SVPP because he refused to program in groups and did not want or apparently need an EOP or DMH level of care. He simply could not tolerate locked-down conditions any longer and decompensated whenever he was returned to the SHU. He was currently waiting for two pending requests for out-of-state transfers; if these were denied, which was likely, his remaining hope was a transfer to the PHU. Inmate A's mental health care and treatment represented a significant challenge to CDCR.

Inmate A appeared to do well in the EOP Hub where he received weekly case manager contacts and yard, but he did not participate in group programming. Because he refused to go to a PSU, he was removed from EOP. In his last letter to plaintiffs' counsel, he wrote that he was going to IDTT for removal from EOP and transfer back to SHU. Plaintiffs' counsel understood that CSP/Corcoran would not retain Inmate A in EOP Hub housing while awaiting a final decision on his out-of-state transfer requests and/or PHU referral.

Inmate A's current UHR volume, volume V, was reviewed. Volumes I-IV of his UHR were not available for review.

The most recent IDTT was dated 9/7/05. The assessment section included the following: "Inmate is higher functioning. Inmate programmed approximately 40% of time. [He said] I'm gonna give it 30 days... and come back over here...."

A significant history relevant to self-injury or assaultive behavior was reported. He denied suicidal thinking.

The treatment plan included a change of level care from EOP to 3CMS. This inmate predicted he would be back to EOP in 30 days.

This inmate has an interstate compact request pending in New Hampshire. Discussion with staff indicated it was unlikely that the transfer would be approved.

The diagnosis of major depressive disorder, recurrent, moderate was documented on 8/29/05. An 8/25/05 progress note by a psychiatrist described this 43-year-old man as having had a history of a recurrent major depressive disorder. Medications included Risperdal 6 mg po qd, Artane 2 mg po bid, Wellbutrin 450 mg po qd and Benadryl 100 mg po hs.

On 8/22/05, this inmate requested his level of care be changed from EOP to 3CMS.

Staff reported that Inmate A has a SNY classification related to having provided information to investigators on the manufacturing of a bomb. He reports being unable to safely program on a SNY and has refused returning to a PSU environment. He has also had treatment in the past at DMH, where it was reportedly recommended that he receive an EOP level of care.

Inmate A has had multiple EOP administrative segregation admissions at CSP/Corcoran during the past year. In general, staff reported that he has been assessed as not requiring an EOP level of care following various admissions to the EOP. Upon his return to the SHU at a 3CMS level of care, the frequency of his case manager contacts met Program Guides requirements from a minimum frequency perspective but did not occur more frequently.

Despite this inmate's desire to be transferred to the PHU, custody staff indicated that he did not meet criteria for such a placement.

Assessment:

The monitor's expert made the following recommendations to staff:

The frequency of his clinical contact with his case managers should be weekly until clinically indicated otherwise. IDTTs should be frequent in order to help minimize negative transference issues and develop/implement treatment plans. He should be assigned to an experienced clinical case manager, who should remain his clinician even when housing moves occur. The treatment plan should include a careful suicide risk assessment and any indicated interventions should he again express suicidal ideations.

2.      Inmate B

This EOP inmate was housed in the administrative segregation hub. He was treated with Wellbutrin 150 mg/day, Risperdal 1 mg/day, Artane 5 mg/day and Benadryl 50 mg/day. His case was reviewed for follow-up after a UNA recommendation for DMH referral, as well as a recommendation for intermediate inpatient DMH care during the preceding monitoring visit.

This inmate had been housed at CSP/Corcoran since 10/20/04. He had initially been treated at C3MS level of care. This inmate had previously been placed on a Keyhea on 12/10/03 for dangerousness to self and/or others; it was allowed to expire on 6/3/04. He had at least five MHCB admissions since 10/04 due to chronic suicidal ideation. He had a history of suicide attempts by hanging, cutting his wrist and overdoses of medication. He reportedly had been incarcerated since age 14. After his fifth MHCB admission, he was referred to DMH; this inmate was also identified by the UNA team as needing a DMH referral; information was not available whether he was recommended for acute vs. intermediate care.

He was transferred to DMH/APP at CMF, where he was hospitalized from 3/16/05-4/13/05. The discharge summary indicated that this was his second DMH admission after he had suicidal ideation and cut his wrist. At the time of discharge, he was reportedly not suicidal, but was described as impulsive, labile and not psychotic.

The inmate was returned to CSP/Corcoran's EOP administrative segregation hub during the week prior to the site visit. Several days before the visit, he inserted a spoon into his rectum requiring transfer to an outside hospital for medical treatment. He was subsequently admitted to the MHCB on 4/25/05 due to continued suicidal ideation. Progress notes from the MHCB stay indicated that the IDTT on 4/26/05 stated that his self-injury/assaultive risk was minimal or negligible and that he did not meet DMH admission criteria. Despite the fact that his suicide risk assessment indicated that he "claims not eating because he wants to die," he was not deemed to be at risk for self harm.

The inmate remained in the MHCB from 4/25/05 to 6/28/05. While there, he was referred initially to DMH intermediate care on 5/2/05, but due to the long wait list for SVPP, he was instead referred to DMH/APP. He was readmitted to DMH/APP for only one day on 6/29/05 and was subsequently returned to CSP/Corcoran on the following day. The DMH discharge summary indicated again that the inmate had an Axis II diagnosis and that he did not have a major mental illness. Despite this, he was discharged on the above medications, indicating treatment for psychosis. He was housed in the EOP administrative segregation hub unit at the time of the monitor's visit. He had an incident with correctional officers on the unit on 7/22/05, resulting in the use of OC spray.

Assessment:

This inmate remained in need of DMH intermediate care, but reportedly was ninth on the list for transfer to SVPP. He continued to experience difficulties with poor impulse control and altercations with custody staff. Clinical supervisors indicated that they would continue to work to get him transferred to the necessary level of care as soon as possible. He did not appear to require a MHCB level of care at the time of this visit.

3.      Inmate C

This EOP inmate was housed in the EOP administrative segregation hub. He was diagnosed with Intermittent Explosive Disorder. There were past diagnoses of Schizophrenia, paranoid type and Psychotic Disorder, NOS present in the UHR. He was not treated with psychotropic medications at the time of the site visit.

This inmate had a history of paranoid thinking and violence toward staff. A review of the UHR indicated that he refused most attempts at clinical evaluation out of cell. He was

seen, however, by the CCM on a weekly basis at cell-front. Attempts were also made for an evaluation by a psychiatrist, but he again refused any psychotropic medications. Clinicians did report that although he remained paranoid and noncompliant, he was not believed to be suicidal. Staff reported that transfer to the PSU was considered, but was delayed until after his RVRs were reissued and reheard.

Assessment:

In light of his treatment noncompliance, inpatient care should have been considered for this inmate. There was no documentation of consideration of a higher level of care. He was upgraded from 3CMS to EOP level of care. The most recent treatment plan did not specifically address this inmate's treatment needs and was extremely generic in nature. A review of 602 complaints regarding staff revealed that this inmate had made complaints about a former CCM regarding breaches in confidentiality in speaking with correctional officers. The documentation revealed threats to the CCM. In light of the possibility that this perception was related to his mental health symptomatology, the treatment team should reevaluate his diagnosis and treatment plan. This issue was discussed with mental health supervisors.

EXHIBIT H

California Substance Abuse Treatment Facility (CSATF)

November 29, 2005 - December 2, 2005

1. Inmate A

Only Volume 3/3 of the UHR was reviewed. The case was notable for length of
    stay in administrative segregation, three MHCB admissions and difficulty in
    finding a medication regimen that was helpful and tolerated.

According to an MH-4 completed in 1999, this inmate was admitted to the
    CDCR in 1999. At that time he reported a history of chronic paranoid
    schizophrenia and said he had been subject to a conservatorship from 1989-
    1994. At that time he was given a diagnosis of Schizophrenia, paranoid type,
    treated with Risperdal and slated for the EOP level of care.

As early as February 2000 he was treated at the 3CMS level of care. Information
    on changes in levels of care during the interim was unavailable. He may have
    arrived at CSATF in June 2000. He was treated at the 3CMS level of care at
    CSATF from 20002005. He may also have been and out of CDCR custody;
    immediately available records were unclear on that point. Clinical notes
    indicated that he was slated to parole early in 2005. In contrast, another
    clinical document showed that his EPRD was 2029.

A mental health progress note written in February 2005 indicated that he was
    doing fairly well without medication but was on C-status, meaning that his
    privileges were suspended by custody staff due to behavior problems. He
    incurred a charge for making threats against staff. He was placed in
    administrative segregation around April 8, 2005. Within a short time he
    reported auditory hallucinations and began taking Wellbutrin and Geodon.
    Although he agreed to try Geodon, he immediately experienced unpleasant side
    effects. He was seen promptly in the CTC on an emergency basis.

Diagnoses made in administrative segregation evolved over time from Major
    Depressive Disorder to Schizoaffective Disorder. His reality testing became
    poorer in isolation. He was admitted to the MHCB three times in September
    and October and designated EOP around 10/12/05. He remained at CSATF as
    of 12/2/05, 50 days later.

Problems with medication were a factor in his decompensation. He complained of
    headaches for an extended period of time, from at least April through October
    2005. At various times he complained of muscle problems and in April he
    experienced side effects the day after taking Geodon. In September while in the
    MHCB he reported feeling overmedicated.

He stopped taking Geodon and Zyprexa in 2004. He had no orders for psychotropic
medication for nearly one year. He began taking Geodon again in May 2005, had a bad
reaction to it, and then was switched to Zyprexa in June. He was compliant through June
and July. More recently, in August, he was given Risperdal. He refused Risperdal on
eight consecutive days in August, but there was no indication that a referral was written
for non-compliance.

On 9/30/05, the date of his first admission to the MHCB, when talking with his CCM in administrative segregation he was adamant that he would be fine without medication. He also reported suicidal ideation and threatened to hang himself upon return to his cell. At the request of his CCM a psychiatrist came to segregation and saw him on an urgent basis. He was admitted to the MHCB. It was noted that he was non-compliant with medication during the time between MHCB admissions.

Copies of the inpatient records were filed in the UHR. He was in the MHCB September 17-26, 2005. He was out for four days. He had a one-week stay from 9/30-10/6. He was out for six days and then returned for an eight-day stay. At the time of the second MHCB admission he was placed at the EOP level of care (around 10/12/05) by an IDTT. He was discharged to administrative segregation after each crisis bed stay.

He was on watch in a safety cell in the MHCB from 9/30-10/1/05. He was treated with Risperdal, Propanolol and Haldol pm for agitation. Nursing notes documented observations q 15 minutes. Observations were stepped down to q 30 minutes on 10/1/05 on physician's orders. At that time he was moved out of the safety cell and given a mattress, blanket and property. In the MHCB he was given a diagnosis of Bipolar Disorder I most recent episode Bipolar and Dependent Personality Disorder. Suicide Risk Assessment Checklists were completed on 9/30/05 and 10/6/05, when he was admitted and discharged from the MHCB.

He had an initial IDTT meeting in administrative segregation on April 11, 2005. A full team attended. Treatment plans written in administrative segregation were individualized. The IDTT met quarterly; CCM contacts were made weekly; and he was seen frequently by a psychiatrist. Many CCM contacts were made cell-front. He frequently refused to come out. A chrono indicated that IDTT input was provided during his initial ICC meeting.

Psych tech rounds were documented throughout his stay in administration segregation beginning with his arrival on or around 4/8/05. Psych tech entries contained behavioral observations.

All MARs contained blank boxes for multiple medications on the same dates. There were one or two dates left blank most months.

<u>Assessment:</u>

Mental health treatment was consistent with program guide requirements in most respects but it did not meet his needs. An urgent problem associated with a reaction to medication was addressed rapidly. Reported suicidal ideation also elicited a prompt response.

His initial IDTT meeting in administrative segregation was timely and attended by a full team. Input was provided to the ICC by mental health staff; he was

seen regularly by a psych tech; and documentation of rounds contained useful information. Documentation of MHCB treatment was in the UHR. It, too, contained useful information. Suicide Risk Assessment Checklists were completed. While in a safety cell he was deprived of a mattress as a matter of standing policy or practice rather than through consideration of individual factors. No conclusion regarding five-day follow-up was reached.

Medication management was problematic in terms of psychiatry practice and administration of orders. Blanks on MARs were consistent with regular lapses in medication administration in administrative segregation. It was unfortunate that a medication regimen that worked for this inmate did not evolve in a planned manner over time. He was not referred for non-compliance with medication in August 2005.

He was unable to tolerate the conditions of administrative segregation but remained there for eight months.

2. Inmate B

This case illustrated problems with the management of infirmary and crisis beds and issues at the intersection of security and mental health. Inmate B was in an OHU on suicide watch for 12 days before arriving at an MHCB. Subsequently he occupied a crisis bed for a total of 28 days.

Inmate B was in CDCR custody since 2001 but was not on the mental health caseload until August 2005. He referred himself for mental health treatment in June. He reported having high anxiety and panic attacks. He was taught anxiety reduction techniques in one session and told to self-refer as needed. He was seen again late in August when he reported feeling too much pressure as a result of dorm living.

He was sent from Folsom to CVSP in March 2005. Records from CVSP indicated that he was observed in the CVSP infirmary 12 days from 8/27-9/9/05 for suicide observation. He was then moved to the MHCB at CSATF. He was sent from CVSP to CSATF due to suicidal ideation.

He was admitted to the MHCB on 9/9/05 and discharged after six days of treatment, but he did not leave the CTC. He was given a diagnosis of Adjustment Disorder with depressive features. According to the MHCB log, this inmate remained in the MHCB at CSATF for 22 days after he was clinically discharged from a crisis bed. A chrono written during his stay in the MHCB said that he was not eligible for a return to CVSP.

While in the MHCB he was on a 30-minute watch schedule in a safety cell. He was moved to a standard cell on the day of his admission by order of an IDTT. Intervals of observation were pushed to hourly observations after three days. He did not appear to be

in distress while in the MHCB. He was released with orders for Zoloft and Benadryl and five-day follow-up.

A chrono dated 9/15/05, the date he was discharged from the MHCB, included the direction, "retain in CTC pending CSR transfer." He remained on an hourly watch interval for the next three weeks, until 10/7/05, when he was moved from the CTC.

> As of 12/1/05 he was treated at the 3CMS LOC in one of CSATF's general population yards. Five-day follow-up was completed after he moved to a GP yard. It was documented in the UHR. An IDTT meeting was scheduled for 12/2/05. Staff reported orally that the CCM assigned to the yard he was on had been out on medical leave for at least six months. The yard was covered by a CCM based at another institution who worked part-time at CSATF.

> The inmate reportedly was due to parole in January 2006. There was no indication that he had been seen by a TCMP social worker. Given his recent transfer to CSATF, it was likely that he was not on the local list.

> Assessment:

> The intersection of security and mental health issues was not handled well in this case. This inmate remained too long in an OHU (12 days) and too long in an MHCB. He occupied a crisis bed for 22 days after he was clinically discharged. His six-day stay lengthened to 28 days because he was ineligible to return to the desert institution that sent him. He was kept in the MHCB waiting for his transfer to CSATF to be endorsed by a CSR. He was eventually endorsed to CSATF and housed in a general population unit.

> His initial IDTT meeting at the 3CMS level of care at CSATF was late due to staffing shortages. Five-day follow-up was conducted after he was housed in general population.

> As of 12/2/05, he had not been seen by a TCMP representative despite being slated to be released in fewer than 60 days.

> 3. Inmate C

This case was remarkable for multiple crisis bed admissions and the interplay among mental health and security issues. Inmate C was housed in administrative segregation throughout 2005. He was treated at the 3CMS level of care until recently.

He had three MHCB admissions in 2005. One was in January. He had a one-day stay in August and a five-day stay in October. He was made EOP 10/6/05 by an IDTT after his third admission to the MHCB. He remained at CSATF as of 12/1/05, nearly two months later.

He had diagnoses of Bipolar Disorder, Polysubstance Abuse and ASPD. His current regimen included Lithium 600 bid, Seroquel 100 am and 200 pm, and Wellbutrin 100 crush. MARs showed that he refused medication throughout August and September. He was referred and seen for non-compliance twice in August.

> Throughout 2005, IDTT meetings were held quarterly in segregation. A full team attended. He refused to attend the February and August meetings. He was described as angry. His level of functioning was assessed as 65. He did not come out of his cell to see the case manager.

> He sustained an injury in mid-May when he reportedly fell from a top bunk. A medical report documented injuries. Early in June he expressed fears for his personal safety, threatened to injure himself, and seemed agitated and out of control to a psychiatrist who did not know him. Custody was notified of his statements.

> In addition to poor compliance with medication, changes in orders seemed to vary according to which psychiatrist he saw and how he presented himself. At his request a psychiatrist who saw him only once in response to the request discontinued Seroquel and Prozac. A few days later a psychiatrist who treated him regularly saw him and restarted the orders.

In August, around the time he was admitted to the MHCB for one day, he reported that he did not want to have a cell mate because he had been drugged and sexually assaulted by a cellie in the past. Custody was informed of his statements.

> An emergency IDTT was held on 10/8. It was triggered by the manner in which he refused to cooperate with custody staff. Custody staff was present at the meeting. His lack of compliance with medication was also discussed. A Suicide Risk Assessment Checklist was completed that day. It found his level of risk to be moderate to high. Once the stressor contributing to his immediate problem was resolved through the collaborative efforts of custody and mental health staff, his level of risk dropped to low.

Staff reported orally that seeking a Keyhea injunction was unwarranted in this case.

Assessment:

> This case is a good example of collaborative efforts by custody and mental health staff to resolve environmental and mental health issues. A considered treatment approach, as opposed to an *ad hoc* response, more fully informed about his recent history might have resulted in a faster resolution of his mental health and security issues.

Mental health treatment was consistent with program guide requirements. Transfer timelines were not met after he was found to need the EOP level of care.

Mental health and custody staff mounted two quick responses to urgent situations that involved the intersection of mental health and security issues. Overall, however, some salient facts about his recent history were not given sufficient weight until his behavior escalated to a point where treatment providers with only one option—to refer him to a higher level of care.

> In retrospect it is apparent that fears about his personal safety were paramount. He sustained an injury in May and was so fearful and agitated two weeks later that he was out of control. He refused to leave his cell for the next few weeks. When the prospect of having a cellmate arose he precipitated a crisis. Two months later he reported that he was in danger and would do anything, including injure himself, to avoid an environment he believed to be dangerous. Like many persons who feel endangered he had mixed feelings about taking medication and changed his mind more than once.

> Medication management by psychiatry was responsive but perhaps overly so. A psychiatrist who did not know him discontinued medication at his request at a time of high anxiety and fear.

This inmate needed to be removed from what he believed to be a dangerous environment. He needed to be removed in August when he was admitted to the MHCB for one day. At worst he should have been moved no later than 11/6/05, one month after he was found to need the EOP level of care.

4. Inmate D

This 3CMS inmate was treated at the 3CMS LOC. He had diagnoses of Mood Disorder NOS, Paranoid PD and chronic back pain. He used a walker to ambulate. His GAF was assessed at 60, when his treatment plan was updated in September 2005. The IDTT meeting was attended by a full team. The plan was individualized. He was not prescribed psychotropic medication. Buspar was discontinued at his request in August and again in September.

He was in and out of administrative segregation recently. Treatment plans were updated quarterly in 2005. He was placed in administrative segregation in March 2005 when he was charged with battery on a peace officer. He also incurred an RVR in September 2005. He was charged with resisting staff with the use of force.

According to disciplinary logs, he incurred an RVR for indecent exposure. No mental health assessment was requested. The date of the offense was unknown. There was no indication in the UHR that the behavior occurred prior to July 1, 2005.

Psych tech rounds were thoroughly documented. CCM contacts were evenly divided between in-cell and out-of-cell. Most notes of contacts made cell-front indicated that he refused to come out.

Within the past eight months, the inmate initiated legal action to acquire pain

medication during his lengthy trips to and from court. A neurological consult obtained in July favored pain medication.

Assessment:

Mental health treatment provided in administrative segregation met program guide requirements.

5.      Inmate E

This 3CMS inmate was not doing well. He was discharged from the EOP level of care roughly one year ago. Following an MHCB admission in August 2004 he was admitted to SVSP's EOP. He had a five-month trial of treatment at the EOP level of care. The trial was unsuccessful. He did not participate in treatment. He was discharged at the end of December 2004. He was moved from SVSP to CSATF a few weeks later in January 2005. He was housed in the general population.

He was transferred from SVSP to CSATF for routine housing early in 2005. He arrived at CSATF on *1/31/05* and was seen by mental health staff on 2/2/05. A timely IDTT attended by a full team was held. He was placed at the 3CMS LOC. He consistently refused psychotropic medication. He was seen quarterly by his CCM throughout 2005. He presented with fixed delusions in July 2005 but may not have exhibited the signs of psychosis observed in December 2005.

When seen in a group interview on 12/1/05, he appeared to be psychotic. He was neatly dressed and adequately groomed. In addition to repetitively discussing a fixed delusional system, he exhibited poor social skills, lack of awareness of the reactions of others, religiosity, and used words in an unusual rhythmic manner that was similar to clanging. He was courteous and easily redirected. A sample of his written communication was filed in his UHR. The writing was extremely neat and well organized. It contained the same ideas he voiced in the group interview.

He was in SVSP's EOP from August 2004-December 2004. He was treated for Delusional Disorder, Mood Disorder NOS and depression. He had a notable social skills deficit. He was housed in administrative segregation for much or all of his tenure in the EOP. He refused medication. He was discharged from the EOP by an IDTT on 12/29/04. He reportedly did not want the EOP LOC and refused treatment. His GAF was assessed at 55

Assessment:

Intake processing at CSATF was timely. Quarterly case manager contacts were insufficient given his resistance to treatment and his fixed delusions. This inmate needed either a higher level of care or a crisis bed admission followed by more intensive

outpatient treatment.

6.    Inmate F

This 3CMS inmate had diagnoses of Bipolar II recurrent with Major Depressive Episodes with episodes of hypomanic (illegible), PTSD (improving), Intermittent Explosive Disorder (improving), Polysubstance Dependence (in institutional remission) and a GAF of 57. A timely annual IDTT meeting attended by a full team was held on 11/29/05. The treatment plan was individualized.

During a group interview he was neatly dressed, well groomed and conversational. He reported that crushed Wellbutrin inflamed his throat.

Review of the UHR showed that he recently discussed that problem with his psychiatrist. The regimen was adjusted in response to his reports. The progress note indicated that other antidepressants may be tried in the near future. Follow-up was scheduled for three weeks in the future. He was seen by the same psychiatrist four weeks later and further adjustments were made according to plan.

He was seen according to plan.

Assessment:

Mental health treatment met program guide requirements. Psychiatric treatment was responsive to his presentation.

Staff reported that Wellbutrin SR was not available at CSATF, and all Wellbutrin was administered crushed by policy.

7.    Inmate G

This inmate was a recent arrival at CSATF from CSP/Corcoran. His history was remarkable for a sustained period of time in administrative segregation due to concerns about safety. When he was at CSP/Corcoran in August 2005, he was seen weekly by mental health. His GAF was assessed as 55.

His bus screening was dated 10/24/05. At CSATF he was housed in the general population and treated at the 3CMS level of care. Twelve days before he was transferred to CSATF he saw a psychiatrist at CSP/Corcoran. Orders for Geodon 40 bid and Benadryl 100 were written. Prozac was discontinued. The psychiatrist referred to an EKG and monthly weight monitoring.

A timely IDTT was held on 11/13/05 by a CCM who was covering the yard in the absence of the regular CCM, who was out on long-term medical leave. Diagnoses of Depressive Disorder NOS and ASPD remained current. His GAF was unchanged from

that of 9/8/05 when it was assessed at 65.

When interviewed in a group, the inmate reported that his medication was interrupted when he arrived at CSATF.

Assessment:

Mental health intake at CSATF was timely. No conclusion was drawn regarding medication continuity, which, reportedly was not sustained when he first arrived at CSATF.

Documentation of mental health contacts at CSATF was missing from the UHR, as was a MAR for October. The only mental health documentation filed in the UHR was a suicide risk assessment checklist administered on 11/1/05.

8.    Inmate H

This inmate was treated at the 3CMS level of care. He had arrived at CSATF from CSP/Corcoran nearly five months earlier. He had been in the SHU at CSP/Corcoran. When seen in an interview, he reported that his UCC meeting was overdue.

He arrived on 6/5/05 from CSP/Corcoran with 3CMS status and orders for Zoloft, Depakote and Benadryl. He was first seen at CSATF on 6/14/05, when a Suicide Risk Assessment Checklist was completed. His level of risk was minimal. He was seen by a psychiatrist on 6/23/05. His current regimen was continued.

An IDTT meeting was held on 6/30/05. He had diagnoses of Major Depressive Disorder with psychotic features, r/o Psychotic Disorder, Polysubstance Abuse and ASPD with a GAF 65.

His medication regimen was changed in response to his reports. Depakote was discontinued in August. As of December 2005, he had orders for Zoloft 75 and Benadryl.

Assessment:

Mental health treatment did not meet program guide requirements. Mental health intake processing was late. It was unclear whether a full team was present at the IDTT meeting. Medication was changed in response to his reports. Medication was interrupted for three to four days when he arrived.

9.  Inmate I

This 3CMS inmate was housed in administrative segregation. He arrived at CSATF from

a SHU roughly one year ago. His recent history was remarkable for two MHCB admissions in 2005, a newly imposed Keyhea order and many RVRs for sexual misconduct. He was referred to DMH in October 2005 but rejected. His first MHCB admission resulted in a stay of 20 days that spanned parts of March and April. In September he was treated in the MHCB for 15 days, from 9/4-9/19/05. He was referred to DMH on 10/31/05 but rejected as not meeting the criteria.

> A 12-month Keyhea order was issued on 10/13/05 on grounds of grave disability. The petition was initiated while he was in the MHCB.

> He had a diagnosis of Psychotic Disorder NOS. His current regimen was Risperdal 1 bid with a Geodon IM backup. He had been largely compliant with medication since May 2005.

> Inmate I had incurred 17 RVRs since 1995. One of many sexually harassing letters he had written and given to staff was filed in the UHR. He incurred another RVR for indecent exposure on 8/13/05, eleven days after a mental health evaluation for indecent exposure was completed. He had a prior RVR for indecent exposure in March 2005. The case was referred to the DA but rejected.

> An IDTT reviewed his case on 7/20/05 and determined that a mental health evaluation was warranted. The evaluation was done on 8/4/05. A copy of the evaluation was filed in the UHR. The evaluation was based on an interview with the inmate and a review of his UHR and C-file. The report of the evaluation was informative about his history but lacked a required element. There was no functional analysis of the offenses and no psychological testing, an optional element, was conducted. The evaluation found that the sexual misconduct was an outgrowth of his severe antisocial personality disorder and concluded that his psychotic disorder played no role in the offenses.

> According to a history given in the report, Inmate I was sentenced to 24 years for rape, kidnapping and robbery at age 17. He was out on parole in 1987 for approximately three months. At age 37 while incarcerated he was convicted at trial and sentenced to three consecutive 25-to-life terms for indecent exposure. Six similar charges were dismissed. The offenses took place in his cell.

Assessment:

> In October 2005, staff determined that this inmate needed a higher level of care but he was not accepted by DMH. He remained in administrative segregation.

> A mental health evaluation was more informative about this inmate's history than his current psychosocial functioning.

10.    Inmate J

Only volume 2/2 of this inmate's UHR was reviewed. The review focused on materials associated with his arrival at CSATF in June 2005.

He arrived from WSP on 6/22/05 with orders for Seroquel and Remeron. He received the first doses of his medication on 6/23/05. He was seen by a psychiatrist one week after he arrived. His regimen was continued, but he changed his mind about taking medication. It was discontinued by a psychiatrist when he was seen on 7/11/05.

During an ICC meeting on 7/12/05, he refused to double cell. He was also refusing medication. An IDTT meeting, attended by a full team, was held on that date. Mental health staff found no reason to recommend against double ceiling. He was released to general population rather than retained in administrative segregation. He was given diagnoses of Bipolar Disorder, manic and Polysubstance Abuse. His GAF was assessed as 60. His refusal of a cellie and medication was noted by the team.

Three months later a progress note dated 10/4/05 reported that he had loud pressured speech and mood swings, and noted that he had been off medication for three months.

Assessment:

Medication continuity was sustained upon arrival at CSATF. The IDTT meeting was late. Mental health treatment was not responsive to his illness. This inmate needed more frequent follow-up in light of his diagnosis of mania, his relatively low level of functioning when seen by the IDTT and recent signs that his mood was unstable.

11.    Inmate K

This inmate was reviewed at the request of plaintiff's counsel. Inmate K was treated at the 3CMS level of care, when his case was reviewed in December 2005. He had been on and off the mental health caseload during the past five years. His history indicated a hearing impairment and recurrent depressive episodes. In 2003 he inflicted wounds on his legs. He exhibited signs of psychosis during periods of stress. At times he self-referred to mental health and discussed issues of emotional concern. He typically, but not always, refused to take psychotropic medication.

A 11/26/97 IDTT/ICC meeting contained an assessment by a senior supervising psychologist that the inmate had no recent history nor any current signs/symptoms of an Axis I mental disorder.

On 9/24/98, the inmate was evaluated by a psych social worker, who indicated

that the inmate stated he needed medications because he felt that he was regressing. The precipitating factor for this referral appeared to be his mother's terminal illness. He was subsequently assessed by a psychologist, who reported no need for mental health treatment.

In July 1999, the inmate's psychologists discontinued his participation in the 3CMS level of care. On 7/20/00, 8/30/00 and 10/29/00, the inmate sought and received mental health evaluations. At the time of the last evaluation, he was in administrative segregation. On 11/1/00, he reported that he was stressed related to the lack of a transfer and his wife being suicidal. On 3/20/01, he was noted to be complaining of stress and paranoid thinking. He was seen for a crisis evaluation on 8/30/01 for having "violent thoughts." A severe adjustment disorder with emergent psychosis was diagnosed by the psychiatrist who saw him, and Zyprexa and Zoloft were prescribed. His medications were subsequently increased in September 2001. He was described as not being delusional on 9/18/01, and his Zyprexa was increased.

He was apparently transferred to CAL on 9/21/01. On 10/1/01, a psych tech note indicated this inmate was in administrative segregation at CSP/Los Angeles. On 10/3/01, his adjustment disorder was assessed by a psychiatrist as having been resolved. Medications were discontinued at his request.

During November 28, 2001 He was removed from the mental health caseload on 11/28/01 because he was assessed as no longer meeting medical necessity criteria. He was described by a psychiatrist on 12/6/01 as stable with no Axis I diagnosis.

On 8/13/02, a psychologist described him as reporting auditory hallucinations and expressing delusional beliefs. He refused referral to a psychiatrist. He was assessed to require a 3CMS level of care. The next documented contact with this inmate occurred on 1/24/03 at the inmate's request. The note indicated that the inmate was deaf. His presentation was consistent with Depressive Disorder NOS.

On 2/19/03, the inmate reported feeling very depressed and requested medications. His presentation was consistent with Major Depressive Disorder, recurrent, with psychotic features. He was referred to a psychiatrist.

On 3/11/03, a psychiatrist prescribed Geodon based on a phone call from a nurse and pharmacist. On 3/25/03, the inmate refused medications and stated he no longer wanted to be on the mental health caseload. A psych social worker found he did not meet the criteria for placement in the 3CMS level of care.

Buspar and Geodon were prescribed for the inmate on 4/19/03. On 4/29/03, the inmate showed a clinician self-inflicted wounds on his legs and reported the presence of auditory hallucinations. He was admitted to the 3CMS LOC.

On 5/16/03, the inmate's case manager noted extremely bizarre letters written by this inmate that contained his delusional thoughts. His presentation was consistent with a Major Depressive Disorder with psychotic features. In August 2003 his medications included Prozac and Wellbutrin. The inmate continued to describe delusional ideas during September 2003. A trial of an antipsychotic medication was recommended by a psychiatrist but the progress note was undated.

In April 2004 the inmate was refusing medications. In May, Wellbutrin was prescribed, and in June he was prescribed Effexor. He reported doing better in August 2004. In October 2004, the inmate began refusing 3CMS follow-up appointments with his clinical case manager. He reported doing well on 10/23/04. The psychiatrist noted no psychotic symptoms. This inmate was argumentative during his 10/28/04 IDTT meeting.

The inmate continued to be treated at the 3CMS level of care throughout 2005. Monthly psychiatric notes during February and March 2005 described the presence of psychotic symptoms. Low-dose antipsychotics were recommended. During April 2005, little clinical improvement was noted. He was referred to the MHCB unit for an assessment, although it does not appear that he was admitted. His medications were discontinued at his request on April 25, 2005.

Progress notes from June through September 2005 by his psychiatrist and clinical case manager indicated that the inmate was seen on a regular basis with little clinical change. A 10/19/05 clinical case management note indicated the inmate continually expressed paranoid beliefs about other people hurting him, reading his thoughts and manipulating him. He had no insight into his mental illness and believed that custody staff was a part of the delusion. He did not wish to take psychotropic medications at that time.

His presentation was consistent with Psychotic Disorder NOS and Antisocial Personality Disorder. He was assessed as requiring a C3MS level of care. A 10/20/05 IDTT indicated that the inmate was absent. He was noted to be overtly psychotic as characterized by a number of psychotic/paranoid beliefs, but his case manager reported he was doing well at the time; a referral to the psychiatrist was initiated.

A psychiatrist evaluated the inmate on 10/27/05. He requested medications to help him sleep better. He refused Prozac and Wellbutrin. Remeron was started by the psychiatrist, who planned to see him again in two to three weeks.

The last clinical progress note in his record was written by the same psychiatrist on 11/27/05. The inmate continued to report feeling depressed. He complained of not having any energy. The psychiatrist noted some improvement in his behavior. The plan was to see him again in eight weeks.

Review of the MARs indicated medication in the past included Prozac, Wellbutrin,

Remeron, Effexor and Geodon.

Information was obtained from an interview with his current clinical case manager, who described the inmate as functioning well in the general population despite his delusional beliefs which appeared to be fairly compartmentalized. He consistently refused medications and had no insight into the nature of his illness. Transfer to a higher level of mental health care has been considered but not initiated due to his currently adequate functioning within the general population. Increased frequencies of individual sessions did not appear to be helpful.

Assessment:

This inmate clearly has a serious mental disorder associated with psychotic features. The differential diagnosis includes a delusional disorder, major depressive disorder with psychotic features, psychotic disorder NOS, and a bipolar disorder. Recommended treatment would include the use of antipsychotic medications. However, this inmate does not appear to meet Keyhea criteria and clearly has not been interested in taking such medication. At the present time it does not appear that an EOP level of care would be helpful, although such a consideration should periodically be reviewed.

EXHIBIT I

Pleasant Valley State Prison (PVSP)

October 6, 2005 – October 7, 2005

1.    Inmate A

This inmate's chart was reviewed by the monitor's expert at the request of plaintiffs' counsel, who questioned whether he had been referred for EOP treatment. Inmate A was described by counsel as a 3CMS inmate who had decompensated in administrative segregation and was placed in the CTC. Review of the inmate's record revealed that he had been receiving psychiatric services for the past four to five years. He was diagnosed with Depressive Disorder NOS, lung cancer and diabetes. He was placed in administrative segregation for safety reasons; the inmate reported to the expert that he wanted to be transferred to a "safe place."

From 9/8 through 9/19/05, the inmate was housed in the MHCB unit. He was transferred to CMC at the EOP level of care from 9/21 through 9/28 but was returned to PVSP at the 3CMS level of care as a medical necessity on 10/4/05. Upon his return, he was placed in the OHU, where a suicide risk assessment on the same day concluded that the inmate had no apparent risk. Inmate A continued to receive Risperdal and Wellbutrin in the OHU. The next day, on 10/5, Inmate A attempted to hang himself. It was reported that he placed a sheet around his neck and stepped off his bunk. Fortunately, the noose broke and the inmate was sent to an outside hospital for a CT scan, which was negative. The inmate had just returned to the MHCB unit the day before the monitoring visit. An IDTT meeting held in the MHCB unit on 10/6/05 reviewed the inmate's case for re-referral to an EOP program.

Assessment:

This inmate's care and treatment appeared to have been appropriate. The inmate was appropriately referred to CMC as an EOP inmate. His return to PVSP with a change to the 3CMS level of care was properly discussed by the treatment team at PVSP with the intent to re-refer him to the EOP level of care.

2.    Inmate B

This inmate's treatment was reviewed at the request of plaintiffs' counsel, who were concerned with the inmate's statement that he heard voices telling him to kill himself, which he had acted on in the past. Plaintiffs' counsel indicated that they contacted the institution five times in the last six months, requesting a review of whether the inmate should be placed at the EOP level of care or in group therapies.

Review of this inmate's record revealed that he had a recent IDTT meeting. The treatment team decided to continue the inmate at the 3CMS level of care, but recommended that he be placed in group therapies at PVSP. At the same time, the inmate's medications were, pursuant to his request, changed to liquid Lithium, which he had taken in 2002.

Assessment:

This inmate's care and treatment appeared to be appropriate. The treatment staff should vigorously pursue the inmate's placement in group therapy as well as monitor his mental health adjustment since starting on Lithium.

3.     Inmate C

This inmate's care and treatment were reviewed by the monitor's expert at the request of plaintiffs' counsel, who were concerned with the inmate's report of suicidal thoughts and inconsistent clinical care. Counsel hoped to see Inmate C "moved from administrative segregation as soon as possible."

Inmate C had been incarcerated in the CDCR system for nine and a half years. The inmate's record indicated a diagnosis of Major Depressive Disorder with Psychotic Features. Inmate C was prescribed Wellbutrin and Seroquel, which had been increased in September 2005, but he was refusing both medications. A case management note of 9/28/05 indicated that the inmate had been in administrative segregation for six months. The note indicated that the inmate could have left administrative segregation four months earlier, but the inmate reported a problem with staff on one yard; plaintiffs' counsel reported that the inmate had been in administrative segregation because of enemies on two yards.

A progress note indicated that Inmate C was expected to transfer to CMC or CMF, but the inmate's level of care was not indicated in this note. The inmate reported that he had not heard voices for the last two months; he also stated that his depression was actually "resentment" related to the abuse he suffered from his father as a child. The inmate had a MH-2 from 9/17/05, which was appropriate. His care and treatment were continued at the 3CMS level of care at that time.

Assessment:

This inmate's care and treatment, which included a recent increase in his medication, appeared to be appropriate for his level of need. The staff should review his treatment and document their referral to CMC or CMF at the proper level of care.

4.     Inmate D

This inmate's care and treatment were reviewed by the monitor's expert at the request of plaintiffs' counsel, who questioned whether custody staff had an "undue influence" on mental health decisions. In addition, Inmate D's recent IDTT meeting reportedly resulted in a "split decision" regarding his need for EOP treatment, which was of concern to plaintiffs' counsel.

Inmate D had been reportedly deteriorating in recent months, hearing more voices and showing signs of increased stress and depression. Review of the inmate's record revealed

that he had a diagnosis of Adjustment Disorder with Depressed Mood as well as Depressive Disorder NOS. The inmate was serving a life sentence, and progress notes indicated that he was depressed about his life term and recent three strikes decisions. The inmate was started on Zoloft in August, which was increased in September. Progress notes indicated that the inmate reported no problems with his sleep or appetite. He informed the psych tech that he had been placed in administrative segregation because another inmate had "dropped a kite on me, said I was gonna escape." The inmate also indicated that he was "pretty sure in the future if I don't get the treatment I need I will be suicidal."

According to a progress note dated 10/4/05, Inmate D denied having hallucinations. The most recent note in the inmate's chart indicating that he complained of hearing voices was from 9/19/05. The inmate had three IDTT meetings within one month, on 8/18, 9/19 and 9/30. Each of these IDTT meetings concluded that the inmate would be retained at the 3CMS level of care.

Assessment:

This inmate's care and treatment, including a recent increase in his medication, appeared to be appropriate for his mental health needs. The inmate received multiple IDTT meetings to review his care. The staff should continue to monitor the inmate for suicidality and perform a suicide risk assessment if the inmate makes similar statements regarding future risks of suicide.

5.    Inmate E

Plaintiffs' counsel requested the monitor's expert to review this inmate's care and treatment. The inmate, who had been placed in administrative segregation, was said to be suffering from Post-Traumatic Stress Disorder and depression. He had reportedly made several recent suicide attempts, including a suicide attempt on 8/25/05 while on watch in administrative segregation. The expert was unable to review the inmate's file as it was unavailable and could not be located during the course of the monitoring visit. Due to time constraints, the expert did not interview the inmate.

Assessment:

This inmate's care and treatment were not reviewed at the time of this monitoring visit. The unavailability of the inmate's chart was discussed with the mental health staff. It was further recommended that the mental health staff review the inmate's care and treatment to determine whether his level of care was appropriate.

6.    Inmate F

This inmate was placed at the EOP level of care on 8/15/05, but he had not yet been transferred to an EOP program. His diagnosis was Schizophrenia. A review of the inmate's record indicated that he had been receiving weekly case management visits

since his level of care was changed. A psychiatric evaluation on 10/1/05 indicated that the inmate was having more auditory hallucinations and that his Haldol was increased at that time. The inmate had a good treatment plan from 8/2/05, which indicated that his level of care should be changed to EOP.

Assessment:

This inmate's care and treatment appeared to be appropriate for his mental health needs. His transfer to an EOP program should proceed.

7.      Inmate G

This inmate was changed to an EOP level of care on 8/27/05. A MH-2 of 8/28/05 endorsed this level of care change. Inmate G had diagnoses of Schizoaffective Disorder and Intermittent Explosive Disorder and had been prescribed Neurontin. The inmate had been seen weekly since his level of care was changed.

Assessment:

This inmate's care and treatment appeared to be appropriate. His transfer should be vigorously pursued.

8.      Inmate H

Inmate H had a diagnosis of Bipolar Disorder and was prescribed Geodon and Depakote. The inmate's level of care was changed to EOP because his functioning at the 3CMS level of care had deteriorated. A MH-2 of 6/13/05 contained a good treatment plan, but the inmate had been awaiting transfer for longer than 60 days.

Assessment:

This inmate's care and treatment were inadequate because he should have been transferred to an EOP program within the required time frames.

9.      Inmate I

This inmate has a diagnosis of Mood Disorder NOS, and Rule Out Exhibitionism. His medications were Zoloft, Geodon and Depakote. His treatment was raised to the EOP level of care on 9/5/05. The inmate's MH-2s from 9/28 and 10/3/05 were appropriate.

Assessment:

This inmate's care and treatment appeared to be appropriate. He was, however, due to be transferred to an EOP level of care one day prior to the monitoring visit. His transfer had not met program guide requirements.

10.    Inmate J

Inmate J had an IDTT meeting on 8/31/05. He had a diagnosis of Rule Out Bipolar Disorder and was treated with Seroquel. The inmate was transferred to the EOP program at CMC, but an IDTT meeting at CMC on 9/28/05 indicated that the inmate had severe Axis II diagnoses and changed his level of care from EOP to 3CMS. Inmate J was returned to PVSP on 10/5/05. His level of care was again changed at PVSP and he was referred to an EOP program.

Assessment:

This inmate's care and treatment appeared to be inappropriate, given the conflict between PVSP and CMC as to the inmate's appropriate level of care. PVSP reported that CMC had, on several occasions, reduced a referred inmate's level of care from EOP to 3CMS. This issue should be resolved for the individual inmates involved and discussions should be held as to the appropriateness of level of care changes.

11.    Inmate K

This 3CMS inmate had a diagnosis of Adjustment Disorder with Anxiety and was prescribed Wellbutrin XL. Informed medication consent forms were present in the inmate's record. The content of a MH-2 dated 8/13/05 was appropriate; staff attendance was also appropriate. The inmate's record indicated that he was receiving case management contacts, as well as psychiatric follow-up, at least once every 90 days.

Assessment:

This inmate's care and treatment appeared to be appropriate for his mental health needs.

12.    Inmate L

This 3CMS inmate had diagnoses of Adjustment Disorder with Depressed Mood and Methamphetamine Dependence. He was treated with Wellbutrin and Visteril and received telemedicine psychiatric appointments. His case management and psychiatric appointments were timely and appropriate as was a MH-2 of 8/21/05.

Assessment:

This inmate's care and treatment appeared to be appropriate for his mental health needs.

13.    Inmate M

This 3CMS inmate had a diagnosis of Schizophrenia Paranoid Type. His MH-2 of 11/11/04 was appropriate, except that there was no correctional counselor in attendance. The inmate was admitted to the MHCB unit for a short period of time because he stopped taking his medication due to paranoia. His medications were, since then, restarted and he

was receiving Wellbutrin, Seroquel and Artane with good results.

Assessment:

This inmate's care and treatment appeared to be appropriate for his current level of need.

14.    Inmate N

This 3CMS inmate had diagnoses of Mood Disorder Rule Out Bipolar and Psychotic Disorder NOS and was prescribed Wellbutrin IR. His MH-2 from 11/12/04 was appropriate and was attended by all of the required participants. Inmate N received psychiatric and case management contacts at least every 90 days. A case manager progress note dated 8/25/05 indicated that the inmate did not want to receive morning medications because the lines were "too long." A review of the inmate's MAR showed that the inmate had been taking his medications.

Assessment:

This inmate's care and treatment appeared to be appropriate for his mental health needs.

15.    Inmate O

This 3CMS inmate had diagnoses of Psychotic Disorder NOS and Poly-Substance Abuse. A MH-2 from 6/3/05 indicated that the inmate had no current Axis I diagnosis, with the exception of his Poly-Substance Dependence in Remission. He had not been taking medications since April 2005 and there was a signed refusal dated 6/3/05 in the inmate's chart. Inmate O was seen by the case manager every 90 days and appeared to be stable.

Assessment:

This inmate's care and treatment appeared to be appropriate for his mental health needs.

16.    Inmate P

This 3CMS inmate had a diagnosis of Psychotic Disorder and was treated with Zoloft, Depakote, Olanzapine and Buspar. A MH-2 of 10/4/05 was not attended by all of the required participants and no psychiatrist was listed on the treatment plan. The treatment plan was also incomplete, as only the problem list page was found in the UHR; the inmate's previous treatment plan was not filed in his record.

Assessment:

This inmate's care and treatment could not be reliably evaluated based on the record, which was incomplete. Attendance at the treatment plan IDTT meeting was inadequate.

17.    Inmate Q

This 3CMS inmate was diagnosed with Major Depressive Disorder and Intermittent Explosive Disorder; he was treated with Depakote. A MH-4 was completed on 8/16/05 at PVSP, but there was no MH-2 filed thereafter. The most recent MH-2 located in the inmate's UHR was from 9/3/03, when the inmate was in the EOP program at CSP/Corcoran's SHU.

Assessment:

This inmate's care and treatment could not be adequately evaluated because his record was incomplete; the UHR did not contain any treatment plans since September 2003. The mental health staff should review this inmate's care to assure he is at the appropriate level of care and receiving appropriate services.

18.    Inmate R

This 3CMS inmate was diagnosed with Mood Disorder Secondary to Substance Abuse and Opioid Dependence; he was prescribed Wellbutrin, Depakote and Seroquel. There was a MH-1 update of the inmate's MH-2 reportedly conducted at MCSP on 8/28/03, but there was no MH-2 from MCSP in the chart and no treatment plan from PVSP in the record.

Assessment:

This inmate's treatment plan needed to be updated to assure that his level of care was consistent with his current mental health needs.

19.    Inmate S

This 3CMS inmate was diagnosed with Adjustment Disorder with Depressed Mood. The inmate was HIV Positive and also had Cirrhosis. He was currently taking no psychotropic medications. According to progress notes, Inmate S had a MH-2 dated 9/6/05 and IDTT meetings dated 9/6 and 9/25/05. The progress note of 9/25/05 was signed by a psychiatrist and a psychologist; it indicated that the inmate was currently doing well without medications, but had consistent complaints regarding his medical care, his status as HIV Positive and his Cirrhosis.

Assessment:

This inmate's mental health care appeared to be appropriate at the time of the monitoring visit, but the staff had documented the inmate's consistent complaints about medical care.

20.    Inmate T

This 3CMS inmate was diagnosed with Polysubstance Dependence Rule Out Bipolar Disorder and ADHD by History; he was currently prescribed Neurontin. A MH-2 of 4/21/05 appropriately described his current treatment, problems and interventions. The record also demonstrated that he was receiving appropriate case management and psychiatric follow-up at least every 90 days.

Assessment:

This inmate's care and treatment appeared to be appropriate for his current mental health needs.