EXHIBIT J

Avenal State Prison (ASP)

October 3, 2005 - October 5, 2005

1.    Inmate A

Inmate A's chart indicated that he was admitted to ASP on 3/9/05. A MH-2 dated
3/23/05 described the inmate as psychotic. There was no psychiatrist in attendance at the
inmate's IDTT meeting of that date. Inmate A was prescribed Risperdal and Prolixin, but
medication consent forms were not filed in his chart until 4/8/05. The inmate was
prescribed Abilify, Prolixin and Risperdal on 4/4/05; the doctor's order, however, did not
include a time frame for how long the inmate was to receive these medications. Inmate
A's medications were discontinued in August pursuant to an agreement with the
psychiatrist who evaluated him at that time. The inmate was described as acutely
psychotic by September 14 and a MH-2 from 9/27/05 indicated a diagnosis of
Schizophrenia Paranoid Type. Again, no psychiatrist was in attendance at the inmate's
IDTT meeting. Inmate A was endorsed as an EOP inmate at that time. The inmate was
housed in the OHU from 9/28 through 10/3/05 secondary to "a brief decompensation".

Assessment:
This inmate's care and treatment were inadequate as there was no appropriate psychiatric
input into his treatment planning process.

2.    Inmate B

Inmate B was admitted to ASP on 2/3/03. An IDTT meeting on 1/27/05 included a
psychologist, a correctional counselor and a psychiatrist. The inmate was diagnosed with
Schizophrenia Undifferentiated Type and prescribed Seroquel, Depakote, Zoloft and
Dilantin. In addition to schizophrenia, the inmate suffered from a seizure disorder and
diabetes. Inmate B was admitted to the OHU on 3/8/05 for a seizure disorder and was
described as obtunded. He was transferred on 4/17/05 to an outside hospital and then
returned to the OHU, where he remained for another six months.

The inmate was interviewed by the monitor's expert in the OHU. He was anticipating a
return to administrative segregation housing or transfer to CMF EOP. In response to the
expert's questions, Inmate B indicated that he did not really know what it meant to be an
EOP inmate. Upon hearing that the EOP program involved more intensive treatment,

including group therapy, the inmate responded that he thought such treatment would be
good for him. He reported that his last seizure was approximately three months prior to
his interview with the expert.

It was not clear from the inmate's history why he had been in a cell in the administrative
segregation section of the OHU for more than seven months. Staff explained that the
inmate had both medical and psychiatric problems, but this explanation appeared to be
inadequate. Prior to the end of the monitor's visit, a cell was found in administrative
segregation that could accommodate the inmate's wheelchair and it was expected that the
inmate would be discharged from the OHU and returned to administrative segregation.

This inmate's care and treatment were inadequate. The inmate had been in the OHU for a very long time and there was no evidence in the inmate's record that his treatment planning included sufficient psychiatric input or consideration of his medical problems.

3.    Inmate C

This inmate was housed in the OHU under the category of "AOD." Mental health staff reported that he was not receiving mental health or medical services, but was retained in the OHU for "custody" reasons. Despite the assertion that Inmate C was not receiving mental health services, Wellbutrin was ordered for the inmate. A doctor's order dated 9/21/05 indicated that a medication consent form had been filed, but the only consent form in the inmate's record was dated 9/1/04, more than one year earlier. The inmate had been on multiple medications in the past.

Inmate C was admitted to the OHU at SQ from 8/2 through 8/4/05. The inmate requested that he be prescribed Wellbutrin XL; a note by a psychologist indicated that the requested medication was non-formulary and, therefore, would not be prescribed. The inmate subsequently requested to be evaluated by a psychiatrist. At the time of the monitoring visit, there was no psychiatric note in the chart indicating that the inmate had been evaluated. The inmate was admitted to the OHU again on 9/1/05, discharged for several days and returned on 9/12/05. The most recent MH-2 in the inmate's UHR was dated 1/10/05; no psychiatrist was in attendance at that IDTT meeting.

Assessment:

This inmate's care and treatment appeared to be inadequate. Inmate C had legitimate issues regarding his medication prescription, which were not addressed by a psychiatrist. He also had an extended stay in the OHU that, according to the mental health staff, did not appear to be for medical or mental health reasons.

4.    Inmate D

Inmate D was interviewed by the monitor's expert in the OHU on October 3; the inmate had been housed in the OHU since 9/21/05. He was interviewed at the cell door because he refused to "cuff up" for the interview in a confidential area. During the interview, the inmate apologized for refusing to "cuff-up" and reported that he has been awaiting transfer to a MHCB unit since his admission to the OHU. Inmate D indicated that he was an EOP inmate. He said that the mental health staff had appealed to him to allow them to transfer him back to a regular housing yard in order to make room for other inmates who needed an OHU cell.

The inmate was mildly agitated at the start of the interview and had pressured speech but, during the course of the interview, he was able to focus more appropriately on his clinical needs. He stated that he had experienced suicidal ideation and that he had received a disciplinary infraction for exhibitionism, specifically exposing himself during masturbation. The expert's discussion with the staff revealed that Inmate D was an EOP inmate diagnosed with Exhibitionism. The inmate met the criteria for receiving two hours of treatment per week and possibly for medication interventions. Inmate D had not been seen by a psychiatrist and, therefore, he had not been prescribed any medications to treat his obsessive compulsive behaviors. The psychologist was informed that the inmate

was on the transfer list as of 10/23/05. The inmate's UHR was not available on 10/24/05 because the inmate was reportedly accepted for transfer to a MHCB unit and was expected to transfer that day.

Assessment:

This inmate's care and treatment were inadequate. Inmate D had exceeded the maximum length of stay in the OHU and had been waiting for a transfer to a MHCB unit for an extended period of time. The inmate had been diagnosed with Exhibitionism, but no treatment approach had been initiated and, in light of the staffing shortages at the institution and clinician qualifications, treatment was probably not available at ASP.

5. Inmate E

Inmate E had three or more admissions to the OHU. He was prescribed Seroquel and Wellbutrin and was noted to have a history of suicidal threats. The inmate was endorsed as an EOP inmate on 4/11/05. He was transferred to RJD on 5/20/05 and returned to ASP and placed in the OHU from 5/21 to 5/25/05, possibly related to a pending disciplinary infraction hearing. He remained at ASP until he was transferred to RJD as an EOP inmate on 8/11/05. The inmate also had previous admissions to the OHU from 4/23 through 4/27/05 and from 4/15 through 4/19/05.

Assessment:

This inmate had multiple admissions to the OHU, but had not been referred to DMH or to a MHCB unit. His initial transfer to the EOP program at RJD resulted in his unexplained return to ASP. His subsequent transfer to RJD as an EOP inmate appeared to have been appropriate. The inmate's extended length of stay in the OHU and his delay in transfer to RJD contributed to a lack of appropriate care.

6.    Inmate F

This inmate, according to his record, was classified as a general population inmate and was not a member of the MHSDS caseload. This was surprising since he had diagnoses of Dementia as well as Hypertension, Asthma and Valley Fever. The inmate was admitted to the OHU from 11/2/04 through 5/14/05. He appeared to have been transferred sometime thereafter, but staff could not identify the institution to which he had been transferred. Inmate F was initially admitted to the OHU because of fecal incontinence, confusion, memory lapses, disorientation, confabulation and a lung nodule. The status of these problems was not clearly described in the inmate's UHR.

This inmate was not considered a member of the MHSDS program, despite diagnoses that included dementia and a need for both mental health and medical management. His case should be more thoroughly reviewed to determine the status of his long-standing problems as well as his current medical and mental health issues.

7.    Inmate G

This inmate received bridge orders on 9/2/05for Haldol, Lithium and Cogentin, which were scheduled to expire on 9/16/05. The inmate's record showed a gap in medication from 9/16 through 9/23/05. A telemedicine contact on 9/21/05 indicated that the inmate

would be prescribed Haldol, Lithium and Cogentin. This order was not picked up by nursing until 9/23/05. There was no MAR in the inmate's chart for September, making it impossible to determine whether Inmate G actually received his medication.

A MH-2 of 9/28/05 described the inmate as compliant with his medication, but unstable; there was no psychiatrist present at the inmate's IDTT meeting, but the inmate's status was converted to EOP at that time. The description of the inmate's behavior in the MH-2 contrasted with a case management note of 9//1 /05, which indicated that the inmate was stable on medication.

Assessment:

This inmate's care and treatment were inadequate. The degree of psychiatric involvement in the inmate's treatment, either at the institution or through telemedicine, was not clear from the UHR.

8.    Inmate H

Inmate H was admitted at ASP on 8/3/05 from RJD. His bus screening indicated Hepatitis C only. On 8/6/05, the inmate was referred to mental health by a correctional officer because he reportedly showed his penis to other inmates. A note by a psych tech on that same day indicated the inmate was engaging in bizarre behavior. On 8/9/05, the inmate had an IDTT meeting attended by a psychiatrist and a psychologist; there was no documentation of attendance by either the inmate or a correctional counselor. The inmate was endorsed for an EOP level of care at that time, but no medications were ordered. An 8/17/05 chrono indicated that the inmate was an EOP inmate and that psychiatric medications had been prescribed for him, but there were no medications in the doctor's orders and no MARs in the inmate's UHR.

The inmate was seen weekly by a case manager on 8/9, 8/17, 8/23 and 8/31. There were, however, no notes in the inmate's UHR after 8/31, with the exception of psych tech notes from rounds on 8/14 through 8/20 and 9/4 through 9/10. It was unclear what treatment the inmate received after 9/10/05. Despite the description of the inmate's bizarre behavior and references to psychotropic medications, there was no indication in the chart that the inmate received any medications or that involuntary medications were considered.

Assessment:

This inmate's care and treatment appeared to be inadequate. There was no documentation of the inmate's treatment after 9/10/05 in his UHR at the time of the monitoring visit on 10/4/05. This inmate's care and treatment should be re-evaluated to determine his current mental health needs.

9.    Inmate I

Inmate I was admitted to ASP on 5/24/05 from CIM. His bus screening was negative. The inmate was in the OHU from 8/15 through 8/20/05 on suicide precautions, after stating "I'm going to kill myself." An 8/16/05 suicide risk assessment indicated that the

inmate was at mild risk and that he was referred to a psychiatrist. On 8/17, the inmate signed a medication consent form, but there was no psychiatric note in the chart indicating the inmate's diagnosis or treatment plan. An IDTT meeting, held on 8/18/05, was attended by a psychologist, a correctional officer and the inmate, but not by a psychiatrist.

Inmate I received five-day follow-up from 8/22 through 8/29/05 upon his discharge from the OHU. According to notes in the inmate's UHR, he was seen by the psych tech on rounds in administrative segregation from 8/21 through 8/27 and from 8/28 through 9/3/05. The inmate was re-admitted to the OHU from 9/3 to 9/14/05. On 9/19 and again on 9/21/05, the inmate was referred by a psychologist to a psychiatrist for medication. There was no note from the psychiatrist in the inmate's UHR, nor was there any indication that medications were ordered for the inmate. On 9/21/05, Inmate I was re-admitted for a third time to the OHU. There were notes in the chart indicating that the inmate was designated EOP and sensitive needs and placed on suicide precautions because of major depression. These were the last notes contained in the inmate's UHR, making it impossible to determine whether the inmate continued to receive weekly follow-up by a case manager as an EOP inmate.

Assessment:

This inmate's care and treatment were unclear at the time of chart review by the monitor's expert. The inmate had three OHU admissions and there was no indication that he had been referred to a MHCB unit or to DMH. He was noted to be at an EOP level of care, but there were no notes in the inmate's record to indicate his on-going care and management.

10.    Inmate J

Inmate J was admitted to ASP on 1/14/05. The inmate's MH-2 was undated but, based on a progress note, it appeared that the inmate received an IDTT meeting on 1/26/05. There are references in the record to the inmate suffering from Post-Traumatic Stress Disorder and Major Depression, Recurrent, in addition to Psychotic Disorder, characterized by auditory hallucinations. The inmate was initially prescribed Risperdal by a non-psychiatrist, which was continued by a psychiatrist. The inmate's medication was later changed to Remeron, despite a diagnosis of Psychotic Disorder.

There were psychiatric progress notes in the inmate's chart from 7/15 and 9/28, but the July note was illegible. There was a reference in the inmate's treatment plan to the inmate being referred for group therapy, but there was a notation that the inmate, who is Vietnamese, was not appropriate for group therapy because of a "language barrier." There were case management notes in the inmate's UHR from 4/21 and 7/18/05, showing clinical contact every 90 days as required for 3CMS inmates.

Assessment

This inmate's diagnosis should be clarified because he was prescribed an anti-depressant, despite repeated notations that he suffered from a psychotic disorder characterized by

auditory hallucinations.

11.     Inmate K

It was unclear from the inmate's chart when he was admitted to ASP. There were references to an admission date of 8//2/04, as well as to an admission date of 9/04 in the record. The inmate was referred to psychiatry in October 2004. A MH-2 dated 10/10/04 was attended by a psychiatrist, a psychologist and a correctional counselor, but not by the inmate. The inmate received a diagnosis of Psychosis NOS. A MH-2 dated 1/24/05 was attended by a social worker, a correctional counselor and the inmate, but not by a psychiatrist. The inmate received the same diagnosis in January 2005 that he had received in October 2004.

Inmate K was prescribed Zyprexa, Benadryl and Haldol in October 2004, and referred for a psychiatric evaluation ASAP. The only medication consent form in the record was for Zyprexa. Inmate K subsequently had MH-4, MH-2 and IDTT notes, all completed on the same day with no psychiatric participation. The inmate was again referred for a psychiatric evaluation on 4/12/05, but there was no notation in the inmate's record that he was seen by a psychiatrist since then. There were case management notes in the UHR from 1/24, 3/3, 4/27 and 7/27/05.

Assessment:

This inmate's care and treatment appeared to be inadequate. The use of poly-pharmacy, i.e., two anti-psychotics, did not appear to be justified by the record. Psychiatric participation in this inmate's treatment was minimal.

12.     Inmate L

This inmate had eight OHU admissions since his arrival at ASP in November 2004. At a group meeting with the monitor's expert, other inmates reported that Inmate L was "psych" or "crazy" and in need of treatment. Notes in the inmate's chart indicated that he had refused treatment and medications and that he was admitted to the OHU on suicide precautions. Inmate L had suicide risk assessments on 1/10, 7/7 and 8/18/05. The first two assessments did not indicate any risk of suicide, while the third assessment indicated a mild risk. The inmate's MH-2 of 2/11/05.indicated that a psychiatrist was in attendance. The inmate received a diagnosis of Polysubstance Abuse and Post-Traumatic Stress Disorder. Another diagnosis in the record included Psychosis NOS with Delusions.

Assessment:

This inmate's care and treatment appeared to be inadequate. His treatment should be reviewed to determine his needs and appropriate level of care.

EXHIBIT K

Salinas Valley State Prison

August 8 – August 9, 2005
November 1 – November 4, 2005
January 7 – January 18, 2005

1.      Inmate A

DOB: 10/13/65. This 3CMS inmate was housed in administrative segregation at the time of the site visit due to enemy concerns. He had been incarcerated since 1999 and at SVSP since 2003. He was in an SNY yard. He had a history of multiple head traumas. According to a medical report he thought he had a seizure on 8/25/05.

He had at least four IDTT meetings recently. One meeting was not attended by a psychiatrist. Two had a full team; the composition of a fourth team was unknown. An IDTT meeting attended by a full team was held in June 2005. He had a diagnosis of Major Depressive Disorder, recurrent, severe with psychotic features. His GAF in June 2005 was 67. He was placed on a wait list for an Anger Management group. Documentation did not indicate that a psychiatrist attended an IDTT meeting held in April although medication was an issue. At the April meeting he asked to have Wellbutrin SR restarted. He made the same request in June when he met with a psychiatrist.

In his view there were problems associated with the change from Wellbutrin SR to Wellbutrin crush. He said that they did not work the same way and that the SR was much more helpful. In January 2005 he had orders for Wellbutrin 150 SR and Geodon 80. In April the order was changed from SR to 150 bid crush, and Geodon was discontinued. That regimen remained in effect through September 2005. He had a very short course of Vistaril in September.

He was seen every two to three months by his CCM during the first half of 2005. He incurred an RVR in April 2005 for not attending his education assignment. At that time he reported to his case manager that he had missed mental health groups because he wasn't let out of his cell.

According to a clinical note, he was placed in administrative segregation on 8/25/05 because he was charged with indecent exposure on A-Yard. The case was referred to the district attorney. He had an IDTT in administrative segregation on 8/31/05. The meeting was attended by a full team. The treatment plan was individualized. His subjective report was that he was in distress and felt that he was losing control. He asked for GED materials in order to help distract himself while segregated.

He was first seen by a CCM in administrative segregation on 8/29/05 and again on 9/1/05. He was seen at least four times out of cell in September by his case manager and declined to come out once. He was seen cell-front on that occasion. In October he was seen only once out of cell. He declined one office visit. There was no indication of the reason for the other two cell-front contacts. He appeared dysphoric and said he was not doing well.

He was seen by psychiatry with the requisite frequency. MARs indicated he was medication compliant.

Assessment:

Mental health treatment was adequate assuming that psych tech rounds were made in administrative segregation. No psych tech rounds notes for September were in the UHR. The requisite IDTT meetings were held in general population and in administrative segregation. Treatment plans was individualized. Case manager contacts were made weekly out of cell in administrative segregation and on schedule in general population. Medication continuity was sustained. MARs were legible. Informed consent was obtained.

2.      Inmate B

DOB: 5/29/80. This case was reviewed by the UNA team in August 2004. Referral to DMH/ICF was recommended. The UNA review is reproduced in brackets below.

[UNA review: I/P is a 24-year-old Caucasian EOP I/P who is currently at SVSP. He was transferred to SVSP on 10/18/00 from CMF as an EOP. He was sentenced to life in prison for killing his adopted family during his first "psychotic break." He has been diagnosed with Schizophrenia, Paranoid Type; Antisocial and Schizotypal Personality Disorders.

On 6/12/03 he was described as being productive, working first watch in the kitchen but keeping to himself. He would stay in his cell all day and would eat his only cooked meal in the AM where he could see others making it. He would then take a bag lunch/dinner for later. He was paranoid of others and fearful that he may harm others, so he stayed away from them. He thinks that he was "a mistake" and shouldn't have been born. He related that there was no point in living except for his belief in the Bible and that he does not know what would happen in the after life. He has a long history of mental illness and a violent history since early childhood. He made multiple attempts to kill himself in juvenile hall and is described as being learning disabled. He has a history of assaulting inmates and officers.

More recently, he was admitted to the SVSP MHCB (2/3 — 25/04) as he had become agitated and increasingly paranoid secondary to losing his job. He was concerned that there was poison in his food, and it was noted that he had a long history of paranoid ideation. He was diagnosed as DHD [sic] at age 7 and Schizophrenic at age 17. He had a head injury when he was 10 years of age. He related that he had AH and in 2000 reported finding metal shavings in his food. He asked for packaged food and has remained paranoid regarding his food. He would become agitated, angry and engage in banging behavior. Notes indicate that it was discussed with the Case Manager that the I/P should be referred to ICF DMH. However, notes indicate that although the I/P had initially consented to go to DMH while in the MHCB (2/5/04), he was notified that he had been accepted (2/25/04) and was awaiting a bed. He apparently stated that he did not want to go to DMH and it was not pursued further. On 3/12/04, a MD note indicated that his psychiatric medications had not been renewed because he had refused an appointment

and he had subsequently been off medications since 3/9/04. On 3/9/04 he engaged in a fight with a fellow inmate in the kitchen and on 3/12/04 was found with a razor.

Conversations were held with the former Case Manager and the MHCB clinician. The I/P was currently prescribed Seroquel 400mg.

Classification information indicates that the I/P is a Level IV I/P with a classification score of 83. He does not have a pending SHU term but did serve a 3 month SHU term in AdSeg in 3/03 for battery on an inmate. He has not attempted escape.

Team Discussion: It was the team decision that this I/P has not been adequately stabilized, that he continues to show signs of emotional decompensation, and that he has an unmet need and should be reconsidered for a DMH ICF referral.]

In November 2005 at the time of the site visit this EOP inmate was housed in administrative segregation. He had been treated at the EOP LOC for over four years. He had diagnoses of Schizophrenia, paranoid type, OCD, and ASPD. He had orders for Seroquel 400 and Artane 5 crushed. He was seen monthly by psychiatry. His regimen was unchanged since at least May 2005. MARs indicated that he was typically compliant.

He had only two out of cell CCM contacts in six months. He usually refused office visits but a large number of CCM contacts were cell-front due to security obstacles. He rarely attended group treatment. He held a long-term culinary job. He reported to his CCM that his work was highly meaningful to him. Recently his level of functioning seemed to staff to be slightly improved.

IDTT meetings were held every two months. They were attended by a full team with the exception of the September meeting at which no psychiatrist was present. The plans were individualized. Treatment plans stated that he would be given the opportunity to engage in more active EOP treatment before being referred to intermediate care.

No records of psych tech rounds for April-October were in the UHR.

Assessment:

Psych tech rounds were missing from the UHR. Medication continuity, administration, compliance and documentation were good. Informed medication consent was obtained. He was nearly always seen cell-front for individual case manager contacts. Although withdrawn and rarely seen for an individual treatment session, he was well known to his case manager and seemed to avail himself of treatment to the extent that he functioned well enough to hold a job.

He remained highly resistant to participating in the amount of treatment most
EOP inmates receive. IDTT meetings were held more frequently than quarterly.
Whether he
was functioning at baseline and might benefit from more intensive treatment
remained open questions.

Inmate C

DOB: 8/14/72. This 3CMS inmate was housed in an SNY yard that had been locked
down for over four months. According to a clinical note he had Level II points and has
been incarcerated since 1991. In 1998 he was housed in a SHU.

He appeared to have been treated at the 3CMS LOC for several years with at least one
recent admission to a crisis bed and a history of suicide threats and attempts. He reported
that he was on a suicide watch in August 2005. He said he was in a room that was not a
cell for an extended period of time. His description of the experience led the monitor's
expert to the conclusion that it was both stressful and aversive.

When interviewed in a group on 11/2/05 he was neatly dressed and well groomed. He
conversed relevantly and demonstrated linear thought processes. He said that SVSP was
the worst prison he had ever been in. He reported that he had been in a SHU previously
and in administration segregation at SVSP. He reported that access to mental health
treatment and basic resources such as yard and showers were better in both the SHU and
administrative segregation than they were in his present location.

A recent progress note indicated that his mood state was consistently dysphoric and
dysthymic. Review of the UHR indicated that for years he has expressed fear of being
unable to control his angry impulsive behavior. Most recently he had diagnoses of Major
Depressive Disorder, severe, without psychotic features, Polysubstance Dependence in
institutional remission, and ASPD. The treatment plan was individualized. An IDTT
meeting was held in June 2005. It was attended by a full team. Anger Management group,
a work assignment, education, and AA/NA were recommended as well as quarterly CCM
contacts.

In May 2005, one month prior to the IDTT meeting held in June, he was in the MHCB.
An IDTT meeting was held there on 5/9/05. His history of making suicidal threats was
noted. He expressed a strong desire for a change in medication and acted out to effect the
change. SRACs were completed. Both the treatment plan and SRACs were rich in
clinical information. They were filed amongst the outpatient progress notes. No inpatient
record was filed in the back section of the UHR.

Since February 2005 he had orders for Haldol and Cogentin. He took 5 mg until
he was in a crisis bed in May. At that time the dose was increased to 10 mg. The
dose was reduced to 5 mg in June and Prozac was added to his regimen.

According to the July MAR, Haldol and Cogentin were administered daily but Prozac was administered intermittently. Boxes were blank on July 5-6, 10th, 14tH, 18th, and 26th although other medication was given. In August he refused Prozac on seven days but took Haldol and Cogentin. The MAR was annotated on the back; it indicated that a referral was made to

mental health. The dose of Haldol was increased to 10 mg late in September. He took all medication ordered each day in September.

He was seen on a quarterly basis by psychiatry and a CCM. He was seen in June and September. He appeared to be doing well both times. He refused the CCM contact in September and was seen a few days later at cell-front. He was exercising at that time and said he was fine.

During the group interview he lost composure. Throughout a subsequent individual interview he was highly emotional when discussing stressors, among them the impact the current lengthy lockdown had on his willingness to leave his cell. He hedged when asked whether he could make use of written language. Staff was given his name and asked to make contact with him to assess his current status, level of coping skills, and need for more intensive mental health treatment.

Assessment:

> Mental health treatment was not adequate. This inmate needed more than quarterly contacts. Treatment plans were individualized. Had the plan been implemented the treatment provided might have met his needs.

This case illustrates SVSP's inability to treat 3CMS inmates as clinically warranted. As a group the mental health staff was unanimous in their reports that they knew which of the inmates on their 3CMS caseloads needed more intensive treatment but did not receive it because the demand outstripped the supply.

Documentation of treatment was poor with the exception of high quality suicide risk assessments, case manager notes and treatment plans. The UHR did not contain records of his May MHCB stay nor was there a paper trail that showed that a non-compliance referral was made, received and elicited a response.

> Medication was not administered as ordered. A pattern of blanks on his MAR as well as those in other records suggested that missed days of administration were associated with staffing difficulties. Treatment providers were placed at a disadvantage because records of his crisis bed stay were not filed in the UHR.

There was no record that this inmate was on a suicide watch in August. If in fact he was observed in a location outside of the MHCB, such as a holding cell or a BPT room located on his yard, it is plausible that no record of the watch was generated or filed.

4.    Inmate D

> DOB: 5/3/65. This inmate was treated at the 3CMS LOC. He was housed in general population. When seen in a group interview on 11/2/05 he was neatly but unusually

dressed. He responded relevantly to questions but quickly became tangential and voiced

grandiose persecutory beliefs. He responded well to redirection and limit setting.

Review of his UHR indicated that he arrived at SVSP from SAC and had a bus screening on 6/17/05. His 3CMS status was noted by the screener. The first attempted mental health contact at SVSP was dated 6/30/05. He was not seen because no escort was available. He was first seen on 7/6/05 nearly three weeks after he arrived. A treatment plan was prepared for an IDTT meeting that was held five weeks after he arrived on 7/21/05. It was attended by a full team. The plan was individualized. He was enrolled in Anger Management groups and slated for quarterly individual follow-up. He had a diagnosis of Bipolar Disorder in remission. He was medicated with Seroquel. He did not attend Anger Management groups. Staff reported that they were not held due to security constraints.

Medication continuity was sustained by means of a 30-day order upon arrival followed by a second bridge order via telephone. Seroquel 100 hs was ordered via telephone on 7/15; the duration of that order was 30 days. He was first seen by a psychiatrist at SVSP in an IDTT meeting on 7/21/05. On that date a 90-day order for Seroquel 100 hs was written. On 8/18 he was seen by a psychiatrist and another order for Seroquel hs 90 days was written.

The psychiatrist's documentation of that meeting and the subsequent order had discrepancies. There were two notes written by the same psychiatrist for the same date. One note was more descriptive and said that decreasing the dose was discussed. The plan was to decrease the dose and follow-up in 90 days. A second note that was very general did not mention changing the dose. In fact the dose was not changed until the error was corrected over one month later. The dosage was reduced to 50 on 9/21/05.

A CCM attempted to see him for a quarterly follow-up on 10/12 and 10/17 but did not because no escort officers were available. A contact in an office occurred on 10/24. He discussed issues of emotional concern and seemed to be doing fine. The office had visual privacy but auditory privacy was compromised.

> Medication continuity was sustained when he first arrived. He refused medication several days in July. The MAR was annotated and indicated that a referral to mental health was made. He continued to refuse many doses in August.

Assessment:

> Mental health treatment did not meet program guide requirements. The initial mental health contact was attempted late and then further delayed by lack of an escort officer. Subsequent case manager contacts were also delayed due to security issues. They were not held in a setting that afforded auditory privacy. Psychiatry notes and medication orders were confused. The IDTT meeting was late but it was attended by a full team. Treatment plans were individualized.

Group treatment was planned but not provided.

The inmate appeared to be hypomanic during a group interview. Staff was informed of his presentation in the group.

5.      Inmate E

This 3CMS inmate was housed in an SNY. When interviewed in a group on 11/2/05 he reported that he had been at SVSP for ten years. He was not as well dressed or as well groomed as the other people in the group. He remained very quiet but responded relevantly when questioned early in the interview. Much of the time he seemed to be inattentive to the group's conversation.

His most recent IDTT meeting was held on 8/1/05. It was held in the SNY and was attended by a full team. The plan was individualized. Diagnoses were Schizophrenia, paranoid type, by history, Polysubstance Dependence not in institutional remission, and ASPD. Quarterly individual CCM follow-up, Anger Management group, work and AA/NA were recommended. He did not attend any group meetings due to an extended lockdown. He was maintained on a regimen of Haldol Decanoate 125 q 2 weeks, Zoloft 100 and Artane.

MARs indicated that he did not receive medication as prescribed. The MAR indicated that the second injection in June was not administered. Neither dose was shown as administered in September. He experienced a crisis on September 9. He voiced suicidal ideation and told staff that his dose of Haldol was overdue. Haldol was administered on that date and he was seen by his case manager. The crisis resolved quickly.

Review of the UHR indicated that he was housed in general population until a written threat against him was sent in May after which he was moved to segregation on May 12. Shortly thereafter he requested SNY status.

While in administrative segregation he was seen weekly at cell-front. He appeared to be doing fine. The most frequent reason given for the cell-front contact was a shortage of clinical staff. On occasion he refused an office visit. Some progress notes did not record whether the contact was in an office or cell-front. He had an IDTT in administrative segregation in June. It was attended by a full team. The plan was individualized.

Assessment:

Haldol Decanoate was not administered on three occasions. No record of psych tech rounds was in the UHR. A quarterly IDTT meeting in administrative segregation was late. IDTT meetings were attended by a full team. Treatment plans were individualized. Too many weekly CCM contacts were made cell-front. Group treatment was planned but not provided.

6.      Inmate F

This 3CMS inmate was interviewed in a group on 11/2/05. He was housed in an SNY. He was neatly dressed and well groomed. He responded relevantly to questions and followed the conversation closely. He reported that his medication order expired.

According to the inmate history generated by MHTS, he arrived at SVSP in 2000. The UHR showed that he had a diagnosis of Polysubstance Abuse. He had an IDTT meeting in April that was attended by a full team. He was seen quarterly by psychiatry and maintained on Zyprexa 5 hs. Side effects were discussed during a recent psychiatry visit. He was seen quarterly by his CCM in April and July but the October contact was two weeks overdue at the time his UHR was reviewed.

MARs indicated that medication continuity was sustained through overlapping orders and that medication was administered as ordered. There was no informed consent for Zyprexa.

The UHR and MHTS were consistent with one another. Assessment:

Mental health treatment conformed to program guides in most respects and was adequate. Informed consent was not obtained.

Inmate G

DOB: 5/24/56. This EOP inmate was slated for transfer to ASH in July for a 1370 (competency evaluation) but did not go due to changes in security requirements associated with admission to ASH. He was scheduled to go to SVPP during the week of 10/31-11/5/05 for evaluation. He was housed in administrative segregation when his case was reviewed in November. He had been segregated since April.

He had diagnoses of Delusional Disorder, persecutory type and ASPD. He typically refuses out of cell contacts but was talkative when he was seen during his yard time in September. At that time he was described as paranoid and grandiose with rambling speech and auditory hallucinations. Notes indicated that his presentation has not changed for an extended period of time.

Since April 2005 he has had quarterly IDTT meetings in segregation. The meetings were not attended by a full team. The plans were individualized in the sense that his treatment needs were described thoroughly but fell short of being individualized in its goals and interventions, which were generic, e.g. one goal was for him to attend 80% of groups.

A recent progress note said that he was at CMF in July 2005 when an attempt to obtain a Keyhea injunction failed. Clinical records suggested that he was in Vacaville for approximately ten days. He typically refuses medication.

Assessment:

Mental health treatment was adequate but IDTT meetings were not attended by a full team. The treatment plan did not adequately address his long history of refusing to take medication or participate in other modalities of treatment.

Although there was an indication that he was treated at an acute care hospital and returned to SVSP no records associated with a DMH stay were filed in the UHR. Staff reported orally that by policy DMH records are not filed in UHRs.

8.      Inmate H

Volume 2/2 of the UHR and an inmate history generated by MHTS were reviewed. This 3CMS inmate was housed in general population. When interviewed in a group on 11/2/05 he was very talkative and unusual in his presentation.

According to MHTS data, he had a diagnosis of Psychotic Disorder NOS. The UHR showed that he was medicated with Depakote, Prozac and Risperdal. Volume 2 did not contain the most recent treatment plan, so current diagnoses were unavailable from the medical record. Medication continuity was sustained for the past five months.

> Psychiatric treatment was erratic. A psychiatry note written in June was unsigned. The order followed a gap of five days between expiration and renewal. A planned six-week follow-up did not take place.

His VPA level was checked on 10/12/05. It was within the therapeutic range. The lab work was ordered by the chief psychiatrist as opposed to a treating psychiatrist. He had not been seen by a psychiatrist since the results were returned, so it was premature to determine whether those results were known to a treating psychiatrist.

> He was enrolled in group treatment but meetings had been cancelled every week for the past five months (with one exception on 6/28) because the yard was locked down. Groups meetings were held for three weeks in April but cancelled once because the yard was locked down. His participation was described as active. He was seen quarterly by psychiatry and a case manager. He was seen in an office that afforded visual privacy but auditory privacy was compromised.

Assessment:

Mental health treatment was inadequate. Psychiatric treatment was erratic. Group treatment was planned but not provided due to lockdowns. Case manager contacts were not made in a confidential setting. A medication order lapsed inadvertently.

9.      Inmate I

This 3CMS inmate was interviewed in a group on 11/2/05. He was neatly dressed and well groomed. He reported that his medication recently lapsed for 30 days.

His UHR was not available for review. According to the inmate history generated by MHTS, he had a diagnosis of Major Depressive Disorder, single episode, severe without psychotic features. The history also showed that he had orders for Prozac from May 5, 2005 through February 4, 2006 with the exception of a lapse of one month. There was a gap in the orders for Prozac from July 1-July 31, 2005.

Assessment:

> A medication order expired inadvertently resulting in a one month gap in
> administration.

> 10.    Inmate J

An OBIS summary, an inmate history generated by MHTS, and Volume IV of IV of this 53-year-old 3CMS inmate's UHR was reviewed.

According to OBIS he came from CSP/Corcoran's SHU to SVSP in September 2004. He was placed in administrative segregation at SVSP on 9/10/05 because he was the victim of a battery. In June 2005 he was placed in administrative segregation on victim status because he and his cellie cut their arms simultaneously. He was returned to general population within a few weeks.

He had diagnoses of Adjustment Disorder with depressed mood, Polysubstance Dependence and Personality Disorder NOS by history. A note on an IDTT update done in administrative segregation on 10/5/05 said that he "can appear paranoid schizophrenic." A psychiatrist who saw him the week before without a UHR surmised "probably Psychotic Disorder NOS" and continued treatment with Haldol. He had been maintained on Sertraline and Haldol for at least the past eight months.

> There was no treatment plan associated with the update of 10/5/05, but the plan
> was recently revised during an annual review. The most recent plan in the UHR
> was written in August 2005 prior to his transfer to segregation. It showed
> diagnoses of r/o Schizophrenia by history, Polysubstance Dependence and
> Personality Disorder NOS. He is also medically ill.

Both IDTT meetings were attended by a full team. The treatment plan written in August was individualized. He was enrolled in Coping Skills group with quarterly CCM and psychiatry contacts. Work and self help groups were recommended. His GAF was assessed as 60.

One week after he went to administrative segregation he precipitated a crisis and was

evaluated for admission to the MHCB. He complained that he did not receive his medication, demanded medication and cut his arm superficially. He had previously cut his arm in October 2004. When he was evaluated for MHCB admission, his risk was found to be low and he was not admitted. He was returned to segregation with planned five-day follow-up. Four of the five contacts were made; the 5th day, a Sunday, was missed.

Assessment:

Mental health treatment was inadequate given his needs. Treatment plans were individualized but they were not implemented. Had the treatment plan been implemented treatment would probably have met his needs.

IDTT meetings were timely and attended by full teams. A psychiatric contact was made without access to the medical record.

> Evaluation for admission to a crisis bed was adequate and planned mental health follow-up was conducted on four of five subsequent days. No conclusion was drawn regarding custody observations following his discharge from a crisis bed.

11.    Inmate K

Inmate K was designated DD2, meaning that his levels of cognitive and adaptive functioning were sufficiently below average that he required prompting to initiate self care and complete routine activities of daily living. He also requires protection from predatory behavior and is a likely candidate for victimization. His DOB was 1/5/74. He has a lengthy history of EOP treatment and crisis bed admissions. His level of care changed in 2005 to 3CMS and he was housed in administrative segregation.

> A neurological evaluation done in May regarding seizure disorder found no hard indicators of a neurological problem.

> He was discharged from the EOP level of care in February but was not removed from his EOP location immediately. He remained in an EOP bed for several weeks or months but was treated at the 3CMS LOC pending transfer to an institution that could accommodate his security and classifications requirements. Staff reported that they were under the impression that EOP inmates designated DD2 should be discharged to a lower level of care to facilitate their transfer to an institution that was designated to house DD2 inmates. He remained in segregation at the 3CMS LOC from February through October 2005.

While awaiting transfer he decompensated in administrative segregation. In June while

housed in the EOP portion of administrative segregation he reported suicidal ideation to officers on 6/29/05. He was evaluated and found by mental health staff to be disorganized and psychotic. His level of risk was assessed as moderate.

He was admitted to the MHCB on 6/30. He remained there for 12 days. The inpatient record of that stay was in the UHR. He was discharged back to administrative segregation at the 3CMS LOC and was slated for transfer to CSP/LAC because it could accommodate inmates designated DD2.

He was seen weekly cell-front and had quarterly IDTT meetings from May-October. There were no psych tech rounds documented in the UHR. All contacts were cell-front. He was seen at least quarterly by a psychiatrist. Progress notes did not indicate whether psychiatry contacts were cell-front or made in a private setting.

> He was maintained on Geodon. MARs indicated that he was compliant with medication when it was administered but MARs were distinguished by a regular repeating pattern of blanks indicating that medication was not given in administrative segregation on a daily basis or that it was administered but not recorded.

Assessment:

Mental health treatment met the requirements in many respects but did not meet his needs. Quarterly IDTT meetings were held but they evidently did not fulfill their purpose. Psych tech rounds were not documented in the UHR. Medication was either not administered or not recorded daily in administrative segregation. All case manager contacts made in segregation were cell-front.

His discharge from the EOP level of care and subsequent nine-month wait in administrative segregation was detrimental to his level of functioning. He should not have been discharged from a higher level of care for the sake of facilitating a transfer to another institution. Nor should he have been discharged from the MHCB back to administrative segregation without plans for more intensive treatment or expeditious transfer to less restrictive conditions.

Staff reported that psych tech rounds were completed but they were not documented in the UHR for a period of time.

12.    Inmate L

This case was reviewed in August 2004 by the UNA team. Referral to intermediate care was recommended.

The review of this case done by the UNA team is reproduced in brackets.

[This 26-year-old I/P was treated at the EOP LOC. He had been given diagnoses of Schizophrenia, paranoid type and Schizophrenia, undifferentiated type. He lived in a board & care home in the community. He was in the EOP at RJD in 2003, moving to the EOP at SVSP within the past year. He was referred due to his low level of participation in structured therapeutic activities.

He was medicated with Risperdal 2 and Depakote 750 bid in August 2004. The most recent VPA level, obtained in January 2004, was in the therapeutic range. For the most part, he was compliant with medication for the past four months, missing few doses. Summaries of IDTT discussions said that his baseline level of functioning was low, that he was stable, and referral to a higher level of care was not warranted.

Review of the C-file showed that he had 70 points, Level IV, and had been involved in acts of violence within the past five years. He did not have a pending SHU term.

Information in the UHR indicated that he was involved in mutual combat, for which he received a RVR on 18 April 2004. The mental health evaluation said that he had poor compliance with medication, no insight into his mental illness, poor impulse control, and did not have a clear understanding of his surroundings.

Records of psychiatric hospitalizations while in the community in 2000 and 2001 described him as suffering from schizophrenia and depression. He stabilized rapidly on Zoloft and an antipsychotic.

Team Discussion: I/P appears to need require antidepressant medication and a referral to DMH ICF level of care. ]

The case was reviewed by the monitor's expert in November 2005.

According to the institution's log, this inmate was referred to intermediate care at DMH within three weeks of the UNA review. He was accepted and a bed number was assigned on 11/19/04. He was on the wait list. He was withdrawn from the wait list because he began attending group treatment sessions in the EOP.

> Inmate L was treated at the EOP level of care. One of his treatment goals was to avoid going to DMH. He attended groups regularly from January 2005 through May 2005. Staff reported that his desire to avoid treatment at DMH functioned as an incentive for group attendance. In May a summary of his progress indicated that his participation in groups rose from 12 to 58 percent. His attendance dropped dramatically beginning in June. He rarely attended groups after June because so many were cancelled.
>
> From April-October 2005 he had orders for Depakote, Risperidone, and Paxil. He refused it 20 to 30 percent of the time in May, June, and July. Depakote levels

were measured in September and October and found to be in the therapeutic range. He did not have a Keyhea order but had been subject to one in the past.

He had quarterly IDTTs but the treatment team did not note that he missed many doses of medication. The team said that he was medication compliant. Therefore a Keyhea order was not considered.

Assessment:

A behavioral treatment plan was effective in increasing his participation in EOP group treatment. The cancellation of many group sessions after June 2005 undercut treatment gains. Non-compliance with medication did not elicit a referral nor was it discussed by his treatment team.

13.    Inmate M

This 23-year-old EOP inmate was not doing well. He was at APP in August 2004 and had assaulted staff prior to that. He was at DMH/ICF from for approximately one month in May and June 2005. Staff at SVSP reported that he was discharged as a "treatment failure" because he did not participate in treatment.

He has had diagnoses of Schizophrenia, paranoid type and Schizoaffective Disorder. He was medicated with Risperdal consta at DMH. Since his return from DMH he was medicated with Zydis 10. His compliance was sporadic. He did not participate in treatment at SVSP.

A progress note dated 8/21/05 said that he was poorly groomed, unhygienic, dysphoric, and paranoid. He had loose associations, distorted cognition and disorganized speech. The plan was to monitor him for Keyhea as he would be assisted by mandatory medication. He did not attend group treatment in September. All groups were either refused or cancelled. He met with his CCM only at cell-front. He would not wake up to talk to his CCM if he was asleep.

A progress note dated 10/6/05 indicated that he was being considered for re-referral to DMH. His CCM believed that his condition was deteriorating.

The Keyhea coordinator reported that he thought the case had been discussed in an IDTT meeting but that the team decided against pursuing a Keyhea order.

An IDTT was held on 9/14. It was not clear that the meeting was attended by a full team. His sporadic compliance was noted. The team also discussed him not having left his cell since he returned from DMH.

Assessment:

Mental health treatment was inadequate for this psychotic withdrawn inmate. It was characterized by a wait and see stance rather than being responsive to

his clinical

presentation. This severely mentally ill inmate was discharged from DMH after roughly one month reportedly because he did not actively engage in treatment. After returning to SVSP he did not leave his cell for several months. He was acutely ill during all or part of that time but he was not referred to a higher level of care or to a crisis bed. Nor did his treatment team recommend seeking a Keyhea order despite sporadic medication compliance coupled with other indicators of severe impairment.

14.    Inmate N

DOB: 8/31/65. This EOP inmate was housed in administrative segregation in November 2005. He had a Keyhea order that was in effect until September 2005. He also had Keyhea injunctions in 2003 and possibly earlier than that.

To the surprise of his treatment team, his Keyhea order was recently allowed to lapse. He was compliant with medication at that time, but in light of his history the team expected the order to be renewed. Notes in the UHR indicated that he becomes assaultive when off medication. No documentation in the UHR indicated that his IDTT or a clinician considered not pursuing a renewal.

Clinical staff who worked with him expected the hearing to be held and was surprised to find that the order had expired. Oral reports by staff indicated that all Keyhea decisions at SVSP are made by a psychiatrist who staffs the MHCB. He does not communicate with treatment teams regarding Keyhea orders. He typically reviews the UHR, interviews the patient, and decides independently whether or not to seek a Keyhea order. Negative decisions are not necessarily documented in the UHR.

Inmate N injured another EOP inmate, but the two were considering a reconciliation that would permit him to return to the general population EOP unit. He seemed to be taking medication as prescribed, attending out of cell CCM visits and engaged in problem solving with his CCM.

Assessment:

Mental health treatment was adequate and appeared to meet his current needs but it illustrated pitfalls in SVSP's standard procedures regarding Keyhea orders.

The treatment team is not included in decisions about whether to seek Keyhea orders. A decision made by a single clinician who does not know the case and is uninvolved in the treatment is not a sound process.

In this instance consideration of whether or not to seek renewal of a Keyhea order was not documented. Either a psychiatrist who makes such decisions did

not document the process or the Keyhea coordinator did not bring the case forward for clinical consideration.

DOB: 5/10/66. An IDTT update note dated 7/7/05 said that while this inmate was awaiting transfer to the ICF at SVPP he assaulted an officer and was sentenced to a 12-month SHU term. He went to SVPP on 3/8/05 and returned on 5/3/05. After his return he was described as isolative, failing to learn from social experience and was refusing to take psychotropic medication.

Orders for Depakote and Risperidone were allowed to lapse on 7/28/05. He had not been taking medication. Three months (on 10/27) later an order for Zyprexa (Zydis) 20 hs DOT was written. No duration for that order was specified nor was a follow-up visit planned. Labs were ordered. The psychiatrist found that he did not meet Keyhea criteria. He remained paranoid and delusional. He signed a consent form on that date.

Assessment:

Mental health treatment of this acutely ill psychotic inmate was wholly inadequate. DMH treatment was cut short. Treatment at SVSP was unresponsive to his clinical presentation. He was permitted to languish in a decompensated withdrawn state for months. Non-compliance with medication was ignored. Orders were discontinued because he did not take medication. A single psychiatrist determined that he did not meet Keyhea criteria. Treatment team discussions did not serve their purpose. He should have been considered for a Keyhea hearing, emergency involuntary medication, commitment to DMH, and admission to an MHCB.

15.    Inmate P

DOB: 9/30/63. This inmate had been treated in SVSP's EOP for over three years. He had a diagnosis of Major Depressive Disorder recurrent, severe with psychotic features. He had medication orders for Remeron 45 and Risperdal consta 25 IM q 2 wk.

Review of the current volume of his UHR indicated that his typical presentation is one of dishevelment, low energy and social isolation. His level of functioning does not fluctuate. He talks with his CCM, works as a porter and attends most of the groups for which he is scheduled. He says he likes to watch TV and go out into the yard. His treatment plan was individualized but erroneously listed a medication that had been discontinued two days prior to the date the plan was written. The IDTT meeting held in September was not attended by a full team.

Assessment:

Assuming that this inmate's level of functioning was at his baseline, mental health treatment met his needs.

This 3CMS inmate recently arrived from another prison. He was transferred to SVSP's new Level IV SNY. When seen in a group interview on 11/2/05 he was neatly dressed and well groomed. He reported that when he arrived at SVSP his medication was not continued.

His UHR was unavailable for review as it was being used by a treatment provider. According to the inmate history generated by MHTS he was seen by a case manager on 10/24/05. The only medication orders shown were written on 10/13/05 by a psychiatrist. He had orders for Remeron and Paxil.

Assessment:

> This new arrival reported that his medication was interrupted when he first arrived at SVSP. He had not yet had an IDTT meeting. The CCM contact was late for an initial evaluation. Staff reported that the large influx of new 3CMS inmates to a newly converted SNY yard pushed timely processing of new arrivals out of reach.

> Inmate R

> The UHR of this inmate was reviewed at the request of plaintiffs' counsel.

A typed August 22, 2005 psych social worker's assessment indicated the following:

> Patient assessment completed to determine recommendation on level of care and current mental health status. This clarification began at the request of Judge Karlton-who has received numerous disturbing letters from patient. The letters allegedly contain serious suicidal threats from patient. He has an extensive behavioral and mental health history. Diagnoses are numerous: bipolar, major depressive disorder, paraphilia, exhibitionism, borderline personality disorder, antisocial personality disorder, narcissistic personality disorder and polysubstance dependence. Confusing reports appear to split into two opinions: patient has no Axis I versus patient has serious Axis I diagnosis, most clinicians agree on strong Axis II diagnosis.

> One undeniable feature is that patient has had 50 plus suicide attempts. His "suicide by cops" gestures have resulted in two bullet wounds. His third strike is related to approaching police with two knives and stating "if you don't kill me, I'll kill you."

> During his incarceration history patient has become easily agitated, when his

needs are not met, he acts out. He has had two sutures after he broke a window during a suicide gesture. He has also attempted to hang himself and overdosed on Mellaril.

Patient has been on a multitude of antipsychotics, antidepressants and mood stabilizers-which do not show improvement in patients functioning.

LCSW interviewed patient-he presented as alert and oriented x 3, "I know I have a personality disorder that makes people angry." "I am nervous and upset all the time and need something structured to do." Patient denies current suicidal ideation or homicidal ideation, affect is labile, mood changes quickly, behavior is restless. He denies current perceptual disturbances. Patient's instrumental behavior does meet C3MS level of care standard.

Due to multiple behavioral problems, patient needs a strong behavior modification program. The most structured program at SVSP is EOP. LCSW is recommending EOP level care at this time.

An October 12, 2005 MH2 IDTT indicated that "although inmate meets C3MS level of functioning, due to his extensive history of suicide attempts and severe instrumental behavior, this inmate will be returned EOP for behavioral management per senior psychologist and chief psychologist.

This inmate remains in the administrative segregation unit pending transfer to Mule Creek State Prison. Staff reported that he was not demonstrating symptoms of decompensation. Review of progress notes during the past month indicates continued behavioral problems, which included smearing feces.

Assessment:

This inmate presents with a very long and complicated mental health history. I am in agreement that he does not function well within the administrative segregation unit although it is unclear whether he functions very well in other housing settings. I would expedite his transfer to the Mule Creek EOP.

19.    Inmate S

The UHR of this inmate was reviewed at the request of plaintiffs' counsel. The reason for referral was concern about him making a forced choice between receiving EOP treatment and leaving administrative segregation. His counsel reported that Inmate S used to be housed in the EOP SNY Ad Seg, but was forced to give up his EOP status to get out of the administrative segregation unit.

This inmate had been receiving an EOP level of care until his level of care was changed following an IDTT during October 6, 2004. He had been admitted to

administrative segregation unit during September 20, 2004 following an indecent exposure incident. An

October 21, 2004 mental health assessment relevant to his RVR was completed, which indicated no relationship to mental health issues.

It appears that he has predominately been in administrative segregation since that time while awaiting transfer to a SNY. He has also had several CTC admissions related to suicidal ideation. During his January 19, 2005 IDTT he was assessed to have a mood disorder NOS, inhalant abuse, and an antisocial personality disorder.

Symptoms reported by this inmate to the psychiatrist included auditory hallucinations and depression. Medications prescribed have included Prozac and Zyprexa.

This inmate apparently was readmitted to administrative segregation on April 8, 2005 related to another indecent exposure incident. Progress notes indicated that he wanted to return to the administrative segregation unit.

On May 7, 2005, he was diagnosed as having an adjustment disorder following a reported overdose of medications although pills were not found. Clinicians questioned the accuracy of his reported symptoms.

On June 29, 2005, he was diagnosed by a psychiatrist as having a Major Depressive Disorder with psychotic features. Prozac and Zydis were prescribed.

On July 7, 2005, he was "put up for indeterminate SHU due to multiple 115's for indecent exposures." During September 3, 2005 his differential diagnosis included psychosis NOS versus malingering.

An October 17, 2006 IDDT/mental health crisis bed update indicated that this inmate just received an indeterminate SHU. He had been admitted to the CTC related to suicidal ideation. His diagnoses included a mood disorder NOS, polysubstance dependence, and an antisocial personality disorder with strong narcissistic traits. He was also grieving his father's death, which occurred in September 2005.

An October 19, 2005 note indicated the following: "patient indicated he is not having problems regarding indeterminate SHU. I don't have one. Patient has been recommended but not endorsed for SHU according to patient. Patient stated he's depressed because of father's death.

October 21, 2005 CCM note described this inmate as doing well. There was no mention relevant to his pending SHU term.

Information was subsequently obtained from a CCII that the information relevant

to the indeterminate SHU was inaccurately reported by his case manager. At his
ICC today, it was recommended that he be transferred to a SNY at Kern Valley
State Prison. He will be referred for endorsement in the very near future.

Assessment:

The documentation relevant to the differing diagnoses for this inmate was not good. A
C3MS level of care appears to be appropriate. There is a very good chance that he will be
transferred in the near future related to the bed openings at KVSP.

<u>EXHIBIT L</u>
<u>North Kern State Prison (NKSP)</u>
<u>December 19, 2005 — December 20, 2005</u>

1.    Inmate A

This 3CMS inmate was housed in general population. He was diagnosed with
Schizoaffective Disorder, depressed type and treated with Risperdal 4 mg/day and
Geodon 100 mg/day.

Inmate A arrived at NKSP on 4/14/04 from a county jail. He was placed in the 3CMS
program and continued to receive that level of care throughout his stay at NKSP.
Progress notes indicated that the inmate was followed by a psychiatrist and a case
manager in general population during the monitoring period. On 9/10/05, Inmate A was
seen by his psychiatrist after reporting an increase in depressive symptoms; his Paxil was
increased at that time. That was the last psychiatric contact documented in the inmate's
chart. Inmate A was last seen by his case manager on October 18, 2005 for discharge
planning related to his upcoming parole.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- There was documentation in the inmate's chart of pre-release planning by a
  TCMP contractor.

- An informed consent form for treatment with Risperdal was present in the
  inmate's UHR. There was no consent form located in the UHR, however, for
  treatment with Geodon.

- Review of the inmate's MARs reflected occasional no-shows for pill lines.
  The frequency of the inmate's medication non-compliance did not warrant a
  mental health referral.

- The inmate's prescription for Paxil expired on 12/9/05. Inmate A's last
  documented psychiatric contact occurred on 9/10/05, with the result that the
  inmate was not seen for psychiatric follow-up for greater than 90 days.

- The inmate's annual IDTT meeting was held in a timely manner, but no
  psychiatrist was present.

- Inmate A was seen by multiple psychiatrists and experienced poor continuity
  of care.

2.    Inmate B

This EOP inmate was housed in general population. He was diagnosed with Major
Depressive Disorder and treated with Remeron 30 mg/day and Abilify 10 mg/day.

Inmate B was transferred from the OHU at SCC to the MHCB unit at NKSP for suicide

monitoring after he made a suicide attempt by medication overdose. The inmate history indicated that Inmate B was hospitalized in the MHCB unit from 12/2/05 through 12/12/05. Theinmate's medical record did not include any information regarding this MHCB admission, other than the inmate observation logs for suicide watch following his discharge. Nor did the chart contain any information regarding the inmate's care while in general population. The inmate reported that he was upgraded to the EOP level of care while in the MHCB unit. Inmate B was awaiting transfer to an EOP unit.

Assessment:

The following comment was noted regarding the care provided to this inmate:

- There was no documentation in the inmate's chart regarding his clinical care while incarcerated at NKSP. This appeared to be a medical records filing issue.

3.    Inmate C

This 3CMS inmate was housed in general population. He was diagnosed with Bipolar I Disorder and treated with Seroquel 600 mg/day.

Inmate C had been housed at NKSP since 2001. He had been in the 3CMS program since that time. Progress notes during the monitoring period indicated that he was followed by a case manager and a psychiatrist in general population. The inmate was reportedly stable at his last case management contact on 11/30/05

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Informed consent forms for treatment with psychotropic medications were located in the inmate's chart.

- An IDTT meeting on 11/2/05 did not document the presence of a psychiatrist.

- There was documentation of quarterly case management contacts in the inmate's chart.

- Although this inmate's medications were reordered for 60 days on 12/7/05, there was no documentation of psychiatric contact in the inmate's UHR related to that order.

- The inmate's last documented psychiatric contact occurred on 9/10/05; at the time of the monitoring visit, Inmate C had not been seen for psychiatric follow-up for greater than 90 days.

- This inmate was seen by multiple psychiatrists and experienced poor continuity of care.

4.    Inmate D

This 3CMS inmate was housed in general population. He was diagnosed with Mood Disorder, NOS and treated with both Paxil 20 mg/day and Benadryl 100 mg/day.

Inmate D had been housed at NKSP since 3/15/02. He had been in the 3CMS program since that time. Progress notes during the monitoring period indicated that the inmate presented at times with hypomanic behavior and symptoms. He reportedly refused treatment with a mood stabilizing medication. The inmate's last documented clinical contact occurred on 10/2/05.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- The last informed consent form in the inmate's chart for treatment with Paxil was outdated.

- The inmate's annual IDTT meeting was not due at the time of the monitor's visit.

- The inmate's September MAR and progress notes confirmed a gap in his medication from 9/24/05 until he was seen by the psychiatrist on 10/2/05.

- The inmate's UHR contained documentation of quarterly case management contacts.

- This inmate was seen by many different psychiatrists and, as a result, experienced poor continuity of care.

5.    Inmate E

This 3CMS inmate was housed in general population. He was diagnosed with Schizophrenia, paranoid type and treated with Prozac 20 mg/day, Trazodone 300 mg/day and Seroquel 800 mg/day.

Inmate E had been housed at NKSP since 4/24/02. He had been in the 3CMS program since his arrival at NKSP. Progress notes during the monitoring period indicated that the inmate was followed consistently by his case manager and psychiatrist. He reportedly had a history of mood swings and psychosis. At his last psychiatric evaluation, Inmate E reportedly exhibited some increase in depressive symptoms and auditory hallucinations; his medications were adjusted accordingly.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- There was no informed consent form for treatment with Prozac in the inmate's chart.

- This inmate was seen by multiple psychiatrists and received poor continuity of care. • The inmate's UHR contained documentation of quarterly case management contacts.

6.     Inmate F

This 3CMS inmate was housed in general population. He was diagnosed with Schizoaffective Disorder, depressed type and treated with Zyprexa 20 mg/day.

Inmate F was transferred from the reception center at WSP to NKSP on 10/12/05. He had been recommended for a 3CMS level of care prior to transfer. The inmate received a MH-7 on the day of his arrival at NKSP, detailing his history of depressive symptoms and auditory hallucinations. A suicide risk assessment, also completed at that time, concluded that the inmate was at low risk for self-harm. An IDTT meeting held on 11/16/05 recommended continuation in the 3CMS program.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- An informed consent form for treatment with Zyprexa was contained in the inmate's chart.

- The inmate's MH-7 was completed in a timely manner as required by the program guide.

- The inmate's IDTT meeting held on 11/16/05 did not document the presence of a psychiatrist.

- There was documentation in the inmate's UHR showing that he had been referred by a MTA to mental health for medication non-compliance.

- There was a signed medication refusal form in the inmate's chart for Zyprexa.

EXHIBIT M

<u>California State Prison, Los Angeles County (CSP/LAC)</u>

September 26 — September 28, 2005

December 5, 2005

1.    Inmate A

This inmate was identified by the UNA team in January 2005 as in need of intermediate care for diagnostic clarification and treatment. The UNA review is reproduced following the current review. At that time he was not participating in treatment and had chronic psychiatric symptoms. On September 26, 2005 he remained at CSP/Lancaster, where he was treated at the EOP level of care. Tracking logs indicated that he was accepted by DMH and placed on the wait list.

Review of the UHR showed that his current diagnoses were Delusional Disorder, grandiose and Cocaine Dependence, in remission. His GAF was assessed as 45 during an IDTT meeting in July 2005. He was described as having disorganized thought, loose associations, and poor contact with reality. He harbors fixed delusions. His mood is typically irritable.

IDTT meetings were held quarterly. They were attended by a full team. The plan was individualized in its diagnostic formulation and problems but generic in terms of interventions. His consistent refusal to take medication was not mentioned in the plan, nor was his wait list status for intermediate care. The plan was limited to "CM contact lx per week, Med Managment lxper month, and Group Therapy l0x per week."

Case manager contacts were made weekly but very few were in a confidential setting. Over half of the meetings were cellfront in July and August due to lockdowns. Progress notes indicated that there was a language barrier between the inmate and his case manager because his command of English, his second language, was not excellent. He discussed issues of personal concern in June but not later. He voiced displeasure when he was given a cellie in June 2005. In March he was described as participating in programming more often, but most notes indicated that he remained at "baseline."

A Vitek hearing was held on 2/16/05 because he refused transfer to SVPP. The committee determined that he should be transferred to DMH despite his wishes.

He was not seen by a psychiatrist between April 1 and September 26. The psychiatrist who saw him in April saw him without the UHR. According to the progress note the psychiatrist ascertained that he had the UHR of an inmate with the same name but a different CDC number. The psychiatrist called the pharmacy and learned that the patient was not on medication. The patient refused medication during that visit.

Back in November 2004, he incurred an RVR for self-mutilation. He was in the EOP at the time. According to the reporting officer, the inmate was observed in a shower slashing his arm. He refused to stop cutting when ordered. He was sprayed in the face with OC. The reporting officer noted that the inmate was treated at the EOP level of care. A mental health evaluation was requested and a staff assistant was assigned. The evaluation found that mental illness may have been a contributing factor, a finding noted by the senior hearing officer. He pled guilty to the charge. He stated, "They moved another inmate into my cell. They made me do it." Despite an obvious language barrier,

the hearing officer deemed him able to comprehend ideas and instructions that were issued in fairly complex English. No penalty was assessed because time constraints were not adhered to.

There was no indication that he experienced an exacerbation of mental illness or was referred to a crisis bed in 2005.

His IDTT meeting was observed on 9/27/05. It was a quarterly review. He was neatly dressed and well groomed. During interdisciplinary discussion his case manager voiced the opinion that he needed neither intermediate care nor more intensive EOP treatment while he waited for a DMH bed. The team's discussion of his presentation was consistent with that documented in the UHR. The staff refrained from asking him any questions because he reliably reacts to questions with a high level of irritation. The team noted that he recently participated in more groups. They decided to retain him in the EOP while he waited for a DMH bed.

UNA review: I/M is a 32-year-old Vietnamese male who was referred for Criteria 3 (chronic psychiatric symptoms). His classification score is 54 and he is a Close B. He does not have a pending SHU term and has no history of escapes. He is serving a second term for robbery as he robbed a church after "being forced to live on a park bench because he did not get any money for his design." He claimed the money was really his as he was working on a design for a new church and Bible

I/M came to the US in 1989 and was incarcerated in CDC in 2000. His initial presentation raised the concern of custody (7/04) resulting in his being brought to the attention of Mental Health. He was acting bizarrely including writing letters on CDC forms with no direct meaning or organized thoughts and sending them out to addresses from Magazine advertisements. He claimed to work for the Federal Government and was infiltrating the CDC prison system in order to report back to the Vietnamese Government, which he calls "Bolabu" He also claimed to be a Supervisor of the "The Glowing Pen Technology."

Mental Health evaluation on 8/5/04 indicated that he presented in a disorganized fashion with a delusional system involving designs and numbers. He claimed that he was "working on the war, " "designing computers." He was noted on 8/10/04 to be vague and disjointed and denying any mental illness although he rambled on at length regarding his "designs" and that were to "remove evil." He scribbles in English and Vietnamese "code" and geometric designs – "world designs." His speech is spontaneous but tangential. He believes that if he writes in code he will solve the problem. He also talks about Y2K. His social judgment and insight are poor and his fund of knowledge is limited. He refuses any medications.

More recent notes, including 9/22/04 and 12/14/04, describe him as withdrawn, having rapid and incoherent speech, mumbling to self and irritable. He is described as having normal sleep and appetite. He attends groups sporadically and is content to spend his time drawing. Staff describe him as operating at baseline and given a diagnosis of

delusional disorder. There is also a reported history of head trauma but no further information is available in the UHR.

An earlier evaluation completed on 10/23/02 indicated that the I/M had reported being a high school graduate, working as a designer and having been psychiatrically hospitalized at a state hospital in 1998 (26 years of age).

<u>Team Discussion</u>: Recommend that the I/P be sent to an intermediate higher level of care (ICF) for diagnostic clarification and treatment.

<u>Assessment</u>:

He waited for a higher level of care for over four months. He was not seen monthly by a psychiatrist. Over five months elapsed between two psychiatry contacts. The treatment plan did not address essential elements of his clinical picture. The IDTT met quarterly rather than monthly. Many case manager contacts were cellfront due to lockdowns. Involuntary medication was not considered despite lack of improvement of his chronic psychiatric symptoms. In November 2004 staff did not follow the protocol that requires the completion of several steps before an RVR for self-mutilation can be issued.

Noted: When questioned staff reported that the use of the term "lockdown" in a clinical note did not necessarily mean that an actual lockdown impeded contact. The term is commonly used to indicate any custodial impediment to meeting outside of a cell, such as training, a shortage of S&E, or an alarm.

2.    Inmate B

Volume 5/5 of his UHR was reviewed on 9/26/05. Mental health documents dating only from March 15, 2005 through September 26, 2005 were reviewed. This case was also reviewed in 2004. A portion of the earlier review is reproduced below.

This inmate 46-year-old man is serving a life sentence. He has 735 points. He has a lengthy history of disciplinary problems while incarcerated. He incurred many RVRs for mutual combat and sexual misconduct. He had a medical problem and lost weight. He was prescribed Resource for much of 2005. He was treated at the 3CMS level of care. None of his disciplinary problems in 2005 resulted in referrals to the DA.

It was not entirely clear whether any of his infractions in 2005 involved sexual misconduct. An abridged review of his C-file showed that although he incurred several infractions in 2005 none were for sexual misconduct. The most recent RVR for sexual misconduct in the C-file was dated 10/31/04. Because he was treated at the 3CMS level of care and the behavior was not considered bizarre, no mental health evaluation was requested. Mental health documentation in the UHR, however, indicated that he had a pending RVR for sexual misconduct as of 3/15/05.

At the request of healthcare staff in Sacramento, he was seen for a consultation by a

senior psychologist on 3/15/05. According to the UHR a letter about him was sent by
Coleman attorneys.

A progress note dated 3/15/05 reported that he had SNY status and four pending 115s,
one of which was for inappropriate sexual behavior and one of which was found to be
indicative of underlying symptoms of poor behavioral controls. He was not in
administrative segregation at that time but was segregated a short time later. Mental
health staff planned a six-step intervention: (a) more frequent case manager contacts with
the goal of avoiding RVRs for the next three to four months; (b) followed by a
reassessment; (c) refer to psychiatry; (d) schedule an IDTT; (e) recommend that custody
staff waive his C-status; and (f) discuss case with a correctional counselor II and a
Captain. The plan was also documented on a 128B, one copy of which was filed in the
UHR. Documentation in the UHR reflected that central office staff called to check on the
case two months later. An older chrono done in September 2004 also noted that he had a
history of being a chronic exhibitionist and was in the 3CMS program.

An IDTT meeting was held within ten days, and a second IDTT meeting was held two
months later after he went to administrative segregation. Both meetings were attended by
a full team. Treatment plans showed current diagnoses of Impulse Control Disorder NOS,
Exhibitionism, ASPD and BPD. His GAF was assessed as 55. He was motivated for
treatment. He was retained at the 3CMS level of care. He was not seen by a psychiatrist
for over a month. Contacts in segregation appeared to have been triggered by his
admission to segregation rather than driven by the individualized treatment plan.

An RVR packet showed that he incurred an infraction for attempted battery on an inmate
on 4/21/05. He and another inmate appeared to act in concert against a third inmate. The
behavior was not deemed bizarre or unusual, and no mental health evaluation was
requested. The reporting officer noted that the inmate was treated at the 3CMS level of
care. He pled not guilty. He was found not guilty of the charged offense but guilty of a
lesser offense, conduct which by reason of intensity creates a potential for violence. He
lost 30 days of credit.

A clinical note indicated that he incurred infractions for manufacturing pruno, fighting
and disrespecting staff and was moved to administrative segregation early in late April or
early in May. When seen by psychiatry, he was seen by two psychiatrists two days apart.
Paxil was continued, and Geodon was restarted. The new order was administered one day
after it was written. He was largely compliant with psychotropic medication in June but
refused it consistently in July. Geodon and Paxil were not administered on the mornings
of 6/5 and 6/19; the notation on the MAR indicated that the refusal was due to his refusal
to stop masturbating. He refused both medications on the morning of 6/6/05.

In July Geodon was discontinued and Depakote was initiated. There was a two-day delay
between when the orders were written and administered. On the back of the MAR it
noted that he refused Depakote immediately and signed a refusal for all psychotropic
medication. He never took Depakote and was effectively unmedicated after the first
week of July. There was no indication that he was referred to mental health staff for non-

compliance. His refusal of medication coincided with his release from administrative segregation. He was seen by a psychiatrist in mid-July and found to be stable without medication. He was seen by a case manager for a 3CMS contact one month after he was released to general population. He was seen monthly by the case manager. When seen in August and September he was described as exhibiting labile mood, pressured speech, impulsivity, agitation and complaining that he was being harassed by staff and that his chance to parole was in jeopardy.

There was no indication in the progress notes that his treatment was consistent with the issues that were addressed during the March consultation and discussions with central office staff.

While in administrative segregation in May and June, he was seen weekly by a case manager. Most contacts were cellfront. He refused three or four out-of-cell offers, but the majority was impeded for other reasons. He was seen twice in a confidential setting by his case manager during that period of time. Double ceiling was an issue for him during that time. He told his case manager that he would injure any cellie that was placed with him and complained of command auditory hallucinations on that topic.

Previous review: According to a review of the C-file, he incurred seven R VRs associated with exhibitionistic and other inappropriate sexual behavior between 25 May and 12 July 2004. Mental health evaluations were done for all; all reported that he has a compulsive sexual disorder that was influential in the behaviors. The only sanction imposed was a 90 day loss of credit time. Most charges were invalidated by due process violations involving timeframes.

Based on review of the UHR, his condition in recent months was no different than that exhibited earlier in 2004. He appeared to be functioning at a low level and to repeatedly incur disciplinary infractions. Treatment in Ad Seg at the 3CMS LOC provided in segregation conformed to Program Guide requirements with the possible exception of a lack of confidential individual sessions. IDTT meetings were held quarterly and level of care changes were made within the context of those meetings. Disciplinary documentation was present in the UHR and 115X evaluations provided relevant information. Sanctions were mitigated based upon mental health input in one instance.

In light of inconsistent diagnoses concerning his sexual acting out and evident impairment in his ability to adjust to routine conditions of incarceration, he should have been referred to intermediate care for diagnostic clarification, and, if warranted, treatment of a compulsive sexual disorder.

Assessment:

Mental health treatment was not treatment plan-driven. A concerted effort to address his disciplinary problems was not sustained. Mental health treatment met program guide requirements while he was segregated, but he was rarely seen out of cell. He did not have a trial of medication that might improve impulse control. Medication non-

compliance did not elicit a referral to mental health.

He continued to engage in inappropriate sexual behavior to the extent that it impeded medical staff from administering medication as prescribed. He did not, however, incur RVRs for the behavior. Nor was it addressed by mental health staff.

3.      Inmate C

Only Volume 3/3 of the UHR was reviewed. An MHTS inmate history, a portion of an OBIS printout, and institutional logs also served as sources of information. The review by the UNA team is reproduced following the current review.

He was identified as in need of acute care during the UNA review in January 2005. He was transferred to DMH on May 19, 2005. According to a different institutional log, he went to DMH on 1/31/05 and was discharged approximately six weeks later. He was sent from DMH to PBSP's PSU on 3/16/05. He was back at CSP/LAC by July.

He had treatment plans in January and July 2005; he was not at CSP/LAC continuously through that period of time. Information found in various sources suggested that he was treated at DMH and PBSP's PSU in February and March. It was not possible to reconcile information obtained from different sources.

Current diagnoses used at CSP/LAC, according to a July 2005 treatment plan, were Bipolar Disorder and Polysubstance [abuse or dependence]. Depression was listed as the sole problem on the July plan, although his hygiene and cognitive processing should have been included. The plan was slightly individualized in the description of his presentation but vague in diagnoses and generic in planned interventions. The meeting was attended by a full team.

His movements among CSP/LAC and other places were impossible to decipher from the UHR. He was at CSP/LAC in EOP administrative segregation for one month, from mid-December 2004 until mid-January 2005 before being admitted to the MHCB for a stay of 18 days. He left the MHCB sometime after January 31.

He returned to CSP/LAC on the 3rd or 4th of April, coming from or through the reception center at NKSP. He was admitted directly to a crisis bed when he arrived at CSP/Lancaster. He remained in the MHCB for approximately six weeks until he was transferred to DMH/CMF. Following a stay of approximately six weeks at DMH, he returned to CSP/LAC on July 1. He went directly into EOP administrative segregation. He did not have an IDTT meeting for over three weeks, until July 25. He was out to court for two different cases in Los Angeles County for one day or less on 7/26, 8/9 and 9/1/05. He incurred RVRs on or around 8/13 and 8/25. He also had an RVR in May.

While in administrative segregation in July and August, he attended four to six groups per week and was seen weekly by a case manager. All individual contacts but one were made in a confidential setting. Progress notes indicated that he remained depressed and

angry and was not doing well in July.

Most recently he had orders for Depakote, Seroquel, Remeron and Trazodone. He was usually compliant with medication in July and August. MARs for April and May were missing or inconclusive. A psychiatrist who saw him in July discontinued one medication and planned to consider discontinuing two other medications and discharging him from the EOP to 3CMS.

Progress notes written in August indicated that he attended individual sessions and group treatment but exhibited signs of psychosis. He was described as withdrawn and preoccupied, with labile mood, blunted affect and tangential thought processes and had poor hygiene and grooming.

He was seen for possible admission to the MHCB around August 4, when a SRAC was administered. He was in the TTA. The SRAC indicated that he needed to be admitted to the MHCB. The inmate history indicated he probably was not admitted, because he was seen in administrative segregation the following day.

UNA review: This inmate was a 38-year-old white male who was in the EOP. He was diagnosed with Bipolar Disorder, NOS; a possible diagnosis of Schizoaffective Disorder had also recently been considered. He was treated with Risperdal 6 mg/day, Remeron 15 mg/day and Depakote ER 1000 mg/day.

His case was reviewed as he met criteria three (less than 50% participation). He was Level IV with 62 points. He had a pending SHU term for assault on a non inmate with a MERD on 7/23/06. He had a previous Ad Seg term for battery on a peace officer during 5/03.

The inmate reported a four to five- year history of mental health treatment for treatment of mood disorder symptoms. He reportedly had lived with his mother and never had a viable job. He was described as a poor historian. A review of his medical record indicated that he had been both in the 3CMS as well as the EOP during his CDC incarceration. This inmate arrived at CIM in 7/04; he had paroled from Folsom during 8/03 as a 3CMS inmate. He was admitted to the Ad Seg unit on the 3CMS caseload after his parole violation.

On 9/2/04, he gassed a correctional officer resulting in the use of OC spray; he was reportedly not psychotic at that time. He was admitted to the MHCB on 9/27/04, after he gassed other inmates on the unit. He was hospitalized for approximately two days, and was reportedly stable after discharge. A progress note entry indicated that the inmate was selectively compliant with his medication, although the MARS indicated compliance. He then began presenting with auditory hallucinations as well as pressured speech, mood instability and poor hygiene during November, 2004. There was discussion of changing to EOP at that time, but it did not appear that this actually occurred at that time. He was admitted to the MHCB on 12/6/04 for two days due to auditory hallucinations with suicidal ideation. He was discharged at EOP LOC for transfer to CSP/LAC. Upon arrival

at CSP/LAC, he was continued at EOP LOC on 12/14/04 and transferred to the Ad Seg unit. On 12/24/04, he was found with a noose in his cell. He was not admitted to the MHCB at that time, and the psychiatrist adjusted his medications. He continued to report auditory hallucinations and depressed mood at that time. The last progress note on 1/6/05 indicated that he continued to have auditory hallucinations and remained depressed with suicidal ideation. He also expressed hopelessness that he would ever be released from the CDC.

Team Discussion: This inmate remained with mood instability with hopelessness, suicidal ideation and persistent auditory hallucinations. Transfer to higher acute level of care (APP) appeared to be warranted for this inmate who was in need of stabilization.

Assessment:

Mental health treatment of this acutely ill inmate was long delayed, fragmented and inadequate. Among impediments to his sustained and effective treatment were the frequency of his movements and information missing from his medical records. He apparently never stabilized and remained psychotic for months. He incurred multiple RVRs. He may have been erroneously denied admission to an MHCB. His UHR contained no documents associated with his stays in MHCBs or at DMH. There was no discharge summary from DMH. Access to crisis beds and to acute care was poor.

4.    Inmate D

This case was reviewed previously. An abridged review of this inmate's history of recent treatment indicated that he was currently being treated at the EOP LOC. He was housed in one of the general population EOP buildings at the time of the monitor's visit. He had only recently been admitted to the EOP from the 3CMS LOC.

IDTT meetings were held quarterly. They were attended by a full team. The most recent plans were individualized. They showed a current diagnosis of Psychotic Disorder NOS.

On September 26, 2005, he declined to meet with the monitor's expert individually or in a group. The explanation he provided, which was relayed through a correctional officer, was that he did not want to meet with Coleman representatives because the last time he did he was ejected from the EOP level of care. After discussing it with his case manager and a supervisor, he later asked to see the Coleman monitor. He was not interviewed.

Previous review: Mental health staff was insufficiently responsive to his apparent problems over an extended period of time. It is not unlikely that [he] is at the low end of the range of typical 3CMS patient functioning and at the high end of the EOP range of functioning. He may be able to live successfully in the general population at the 3CMS LOC with appropriate mental health treatment and a favorable combination of environmental factors. As his illness waxes and wanes and his ability to adapt to his immediate environment changes, he may require treatment of different levels or intensity. Alternatively, he may be maintained at a lower level of care if his environment is a

hospitable one.

The 3CMS mental health staff did not adequately consider whether individual factors warranted a recommendation in favor of single- cell status. When staff was asked about the single- cell matter in regard to this case, the supervisor of the 3CMS program reported that if he or any other MHSDS inmate on the caseload was low enough functioning to warrant a single- cell recommendation, that he would have to have a GAF of less than 50, which would automatically result in a transfer to EOP. Since the team decided to retain him in 3CMS, the supervisor explained, the single-cell matter was rendered moot without further discussion. Therefore, it was not documented explicitly in the UHR, as it had been resolved implicitly if the reader was familiar with the SOP.

Assessment:

A full IDTT met quarterly and developed an individualized treatment plan. He seemed to need more intensive treatment than that afforded him when he was at the 3CMS LOC. He had legitimate problems sharing a cell, but mental health staff adhered to local policy without regard to the facts of his case. Local policy included a blanket prohibition on single-cell recommendations by mental health staff for 3CMS inmates. The rationale for the policy was that if mental health factors were such that a single-cell recommendation was warranted, then the individual was de facto in need of a higher level of care. His fear of reprisal had a negative impact upon the Coleman monitor's ability to conduct a thorough review.

5.      Inmate E

This 54 year-old man was treated at the 3CMS LOC. He was interviewed in a group on 9/26/05. He reported that he stopped taking medication in May 2005. He was demanding and intrusive during the group interview but was able to exercise behavioral controls. His affect was intense. He clearly felt aggrieved.

An abridged review of his UHR indicated that he had a short stay in administrative segregation in April 2005 due to safety concerns. He is hearing impaired and has medical problems. He told his case manager that he would like to be moved to a prison hospital.

His most current treatment plan was written in December 2004. It showed a diagnosis of Adjustment Disorder with depressed mood and "antisocial trends." He was treated with Depakote and Trazodone early in 2005. His regimen was changed in response to his reports of side effects. In April he had a trial of Lithium and Remeron, which he did not tolerate well. Blood levels were monitored appropriately, and follow-up by psychiatry was appropriate for initiation of a new medication. He was medication free for a short time until he reported that he was still experiencing racing thoughts, poor sleep, and weight loss.

In June he referred himself to mental health in an effort to have medication restarted. A psychiatrist who saw him concluded that he was doing well without medication and was

medication seeking. No orders were written. When seen two weeks later by a case manager, he was described as uncooperative, irritable and exhibiting expansive, irritable mood and pressured speech. He was seen by a psychiatrist on 7/18/05 and orders for Remeron 15 were written. He was seen three weeks later and reported that medication was helping but not enough. The dose was doubled to 30 mg of Remeron.

He was seen by case managers three times in August and once in September. Most of the contacts were cellfront. He was seen in September because he referred himself and sent a 602 about not getting enough medication for his bipolar disorder. The progress note described him as functioning normally. The plan was to see him again in 60-90 days and to discuss his concerns with a psychiatrist. There was no indication in the UHR that further discussion took place between 9/14 and 9/26.

Assessment:

Mental health treatment was characterized by poor diagnostic formulation, lack of continuity in psychiatry and case managers and intermittent unresponsiveness on the part of treatment providers. He was seen frequently, but his repetitive demands for medication alienated treatment providers and seemed to have had a deleterious effect upon the quality of treatment that was provided. He was seen cellfront on most occasions.

6.     Inmate F

He was identified by UNA review in January 2005 as being in need of intermediate care. The reproduced UNA review follows the current review.

He was not referred to DMH until after June 14, 2005. He was referred, accepted and placed on the ICF waiting list in July, August or September. While awaiting treatment at a higher level of care he had monthly IDTT meetings.

Review of the UHR showed that his current diagnosis was Schizoaffective Disorder, bipolar type. He took medication under duress. A Keyhea injunction was in effect until 11/2/05. Current medications included Risperdal 6 and VPA liquid 2000 with a back up of Haldol and Cogentin if he refused Risperdal and VPA. MARS indicated he was compliant with medication throughout 2005, although he was angry about it and often asked that the Keyhea order be discontinued.

Progress notes written in July reported that he required daily assistance with ADLs and induced vomiting after ingesting medication. He was uncooperative in a pill line to the extent that he was "taken down" by an officer while in the pill line and was confined to quarters.

He incurred an RVR for indecent exposure on 4/9/05. He employed inappropriate sexual behavior in an attempt to disrupt the administration of medication. The RVR findings included a mental health finding that mental illness was a contributing factor to the behavior. The penalty was mitigated; no privileges were lost. The lost credit time, 61

days, was at the low end of the range.

A blood level was ordered on 8/25/05. Results were not in the UHR as of 9/26/05. The most current lab result in the UHR was dated March 2004.

UNA review (which contained excerpts of a previous review): This I/P's UHR was reviewed in April 2004 during a Coleman monitoring visit. The case was included in the UNA pool because he had not responded sufficiently to treatment during the past six months, as evidenced by chronic psychiatric symptoms. He also participated poorly in EOP treatment activities.

He was treated in the MHCB for two days in September; suicide precautions were taken.

The most recent records of psychiatric treatment indicated that he was compliant for at least the past three months with a regimen of VPA 5 ml and Risperdal 6 mg. A 12-month Keyhea order was granted on 11/10/04 on grounds of grave disability.

Progress notes written in October indicated that his level of functioning was deteriorating. He exhibited inappropriate sexual behaviors, as he has during earlier episodes of decompensation. In November he seemed to be doing a bit better.

December progress notes described him as delusional, grandiose, expansive, hyperverbal, with intermittent cheerful affect. His presentation varied widely. He was also described as refusing contacts, unable to attend group treatment due to labile mood and guarded at times. During the past three weeks he has been unstable. Staff has been considering whether to refer him to DMH. As of 1/10/04 a "wait and see" stance was maintained.

A summary of classification information showed that he had 112 points, Level IV and was in Close B status. He had no pending or current SHU terms assessed. He had a SHU term with a MERD of 12/28/00 for battery on a non-inmate with force insufficient to cause GBI. He had no history of escape.

No information on whether he had been referred to ASH was obtained. Earlier volumes of his UHR indicated that he was at one time a Gates class inmate.

Previous review included in UNA review: When interviewed in a group on 4/22/04, [Identifier deleted] reported that he had a current Keyhea order but was non-compliant with medication. According to the UHR, a 12-month Keyhea order was issued on 11/10/03 on grounds of grave disability.

In January and March he had orders for Depakote and Risperdal, with a back up of Haldol IM if refused. Contrary to the plan written in an IDTT meeting, a psychiatrist discontinued all medication for the month of February in an attempt to ascertain whether he was actually mentally ill. He was floridly psychotic by the 3rd week of February. Medication was initiated on an involuntary basis. He regained his orientation and organization over the next few weeks but remained resistant to taking medication. A

MAR showed that he took medication daily in March.

He was seen weekly by his CCM, sometimes cellfront, and more frequently than monthly by psychiatry.

A radical departure from the treatment plan and flouting outing of a recent <u>Keyhea</u> order by psychiatry hurt this patient.

UNA Team Discussion: Given that he has been unstable for 3 weeks despite being compliant with his regimen and was also in a deteriorated state in October 2004, he is in need of a higher level of care (ICF).

<u>Assessment</u>:

He was not doing well while waiting for treatment at a higher level of care. An RVR for sexual misconduct resulted in a mitigated penalty of 62 days credit loss. An order for a blood level did not lead to lab results becoming available to treatment providers within one month.

7.    Inmate G

This inmate was treated at the EOP LOC at the time of the monitor's visit but his stay in the EOP was under four weeks. He was treated at the 3CMS LOC early in 2004. He was medicated with Remeron and Paxil at different times. Most recently, he was diagnosed with Major Depressive Disorder, Dysthymic Disorder, and Depressive Personality Disorder.

He incurred an infraction in July and went to administrative segregation. He was seen cellfront by a psych tech on 8/3/05. He was unresponsive and continued to rock. He was referred to a case manager but the referral did not result in a contact.

He was next seen in the MHCB two weeks later. He was admitted because he made a noose. He was diagnosed as suffering an Adjustment Disorder with depressed mood.

He was admitted to the MHCB twice. The first stay spanned 8/10-8/19; the second was 8/29-9/2/05. After the first stay he was discharged to the 3CMS LOC with five-day follow-up planned. After the second admission he was placed in the EOP. There were no records of his MHCB treatment in his UHR.

Hourly custodial observations were documented in the UHR for seven hours on 8/22/05. Five-day follow-up was not documented in the UHR. Four days after discharge he was seen by a psychologist due to a staff referral generated by an officer who brought him to the clinic. The mental health clinician who saw him discussed his case with other clinicians and opined that he might be manipulating. He was returned to his housing with instructions on how to self refer himself to mental health. No SRAC was completed.

No SRAs from July or August were found in the UHR. The sole SRAC was done in the CTC on 9/2/05.

Assessment:

Mental health treatment was characterized by significant omissions. A referral made by a psych tech in segregation should have elicited an urgent response but failed to effect a mental health evaluation. Five-day follow-up and custody observations were not conducted after he was discharged from the MHCB. Records of two recent MHCB stays were neither filed in his UHR nor accessible to subsequent treatment providers. Risk assessments were not performed when indicated.

8.      Inmate H

This 23-year-old inmate was treated at the EOP LOC. His most recent diagnoses were r/o Major Depressive Disorder, Depression NOS, Polysubstance Abuse in past, and r/o ASPD. A history of poor impulse control was noted on the most recent treatment plan. He was treated in the MHCB on three occasions in 2005 and evaluated but not admitted on a fourth occasion. He took an overdose and cut his arms in 2005.

He was interviewed accidentally as the monitor's expert walked across a yard where EOP inmates were out for recreation. He reported that officers and mental health staff said provocative things to him and were unresponsive when he injured himself. He was neat and well groomed at the time of the interview. His conversation was pressured but relevant. His level of emotional arousal was high, and his affect was appropriate but intense.

Review of the UHR indicated that he was in the MHCB in January, June, and September 2005. None of the records of his MHCB stays were filed in the UHR.

In January he was discharged from the EOP to the 3CMS LOC. He reported that he swallowed approximately 20 pills, some were Remeron and some were Trazodone, on 1/6/05. He said that he hoarded some and bought some in order to overdose. Medical staff described him as lethargic but oriented. He also said "I want to die. I got nobody." He was treated medically and held overnight for observation in the TTA until he could be seen the following morning by mental health. According to SOP, patients observed in the TTA are handcuffed to a bed and observed continuously by an officer.

In February, a psychiatrist discontinued all psych meds at the inmate's request. The rationale given was that he was non-compliant and no longer wanted medication. There was no indication in the progress note that his recent history of treatment was reviewed or considered in the decision.

In March, according to a psychiatry note, he was seen in the TTA on 3/15/05 and met the criteria for an emergency involuntary administration of medication. He was given an injection of Haldol plus Cogentin and Ativan. He voiced fears that he would be killed by

custody staff and said he might kill himself to avoid being killed. He was found to be gravely disabled by his persecutory beliefs. An SRAC was completed on that date. His level of risk was not assessed by summary or category. He was not admitted to the MHCB but was referred to his case manager. A 3CMS IDTT meeting was held ten days later. The plan did not adequately reflect his recent history of treatment. The meeting was not attended by a correctional counselor. According to a log provided by the Keyhea coordinator, the request for a Keyhea injunction was dropped.

In May and early June his medication compliance with Remeron and Geodon was spotty. He was admitted to the MHCB in June after he lacerated his arms and thighs, inflicting wounds that required sutures. At that time he reported to staff that correctional officers called him names and taunted him and he explained that he needed to get away for a few days to a different location.

He was placed in administrative segregation around 8/5/05 subsequent to a riot. Staff reported that he was one of a large number of inmates who were in the vicinity when a riot that broke out. He participated in EOP groups while in administrative segregation. There was no indication that he was found to have been personally involved in the riot.

He was discharged from the MHCB in September 2005 with orders for Geodon 80 bid, Effexor 150, Lithium 600 bid, and Remeron 45. Lithium was discontinued a few days later. Lab tests were ordered on 9/13/05. No results were found in the UHR as of 9/27/05. The most recent Lithium level was 1.0 in June 2005.

Five days of follow-up contacts were completed in late June/early July but there was no indication that custody observations were made.

Assessment:

This case is representative of several typical problems that characterized mental health treatment at CSP/LAC during the site visit. Treatment was fragmented, crisis driven and not therapeutic. Inappropriate responses to his behavior by staff may have exacerbated the problems. Treatment providers did not have access to records of MHCB treatment because they were not filed in the UHR. Psychiatrists made treatment decisions based primarily on his presentation in interviews, giving short shrift to his history of recent treatment. An IDTT meeting was not attended by a correctional counselor. The team did not adequately consider his recent crisis and history of treatment. The decision to drop a request for a Keyhea order was surprising. The MHCB was full so he was observed in a TTA cell rather than being admitted to the MHCB, when he was found to be gravely disabled and was medicated involuntarily. Five-day follow-up was completed on one occasion, but it did not appear to include custody observations.

9.    Inmate I

This inmate was treated at the EOP LOC throughout 2005. He had quarterly treatment plan updates. Diagnoses varied between Schizophrenia, undifferentiated type and

Psychotic Disorder NOS. IDTT meetings were attended by a full team. Treatment plans were cursory. He consistently exhibited bizarre behavior and disorganized speech, which was characterized in August 2005 as word salad. He was also described as hyper-energetic and having poor hygiene.

No orders for psychotropic medication were written for him in 2005. He consistently refused medication. When seen by a psychiatrist in February for a quarterly contact he was described as disorganized but not disruptive. The plan portion of the progress note said "No psychiatric f/u needed."

A progress note written on 12/8/04 indicated that he was considered for referral to intermediate care. He was not considered a strong candidate because he was cooperative with treatment and seemed comfortable in his current environment. Staff opined that a change might be more disruptive than helpful.

He was seen weekly by his case manager. A progress note written in April said that his DMH referral would be reconsidered as a change in treatment milieu could be disruptive.

Assessment:

Treatment provided to this person suffering from psychosis was inadequate. He should have been considered for a Keyhea injunction and referred to a higher level of care. Despite recommendations for a higher level of care, staff decided against making a referral on two occasions. Psychiatry failed to respond to his apparent psychosis.

10.    Inmate J

This inmate was returned to CSP/LAC from DMH, where he had been for seven months. He was currently treated at the EOP level of care. His IDTT meeting was observed on September 27, 2005 and his UHR was reviewed. He had diagnoses of Bipolar II Disorder by history, Cognitive Disorder, Polysubstance Dependence in institutional remission, and cognitive impairment with questions about dementia and thyroid dysregulation.

No discharge summary from DMH was in his UHR. He returned to CSP/LAC from DMH/CMF in January 2005 with orders for Seroquel, Risperdal, Lithium, and Paxil. He continued to take that regimen until September 2005. Staff treating him reported that they had not seen a discharge summary regarding his treatment. When questioned orally staff reported that he seemed to be functioning somewhat better since he returned.

He was referred for a higher level of care nearly one year ago after treatment providers noticed a rapid decline in his level of cognitive functioning in January 2004. He was rejected by ASH because he was Level IV and had a history of assaulting a police officer. Review of the UHR indicated that he was accepted by DMH at SVPP on 8/20/04. He was sent to DMH/CMF, however, later that month.

Medication continuity was sustained when he returned to CSP/LAC from DMH. The use

of Seroquel, which was not on the formulary, was approved but not swiftly. It was not approved until 3/18/05, nearly two months after he arrived. Lab work was ordered as needed and follow-up by psychiatry was appropriate.

He was seen more frequently than monthly by psychiatry. He was seen weekly by a case manager from March through September. He discussed issues of personal concern in a confidential setting. Only one contact was cellfront. MARS for January-July were legible and showed consistent compliance.

Quarterly IDTT meetings were held. They were attended by a full team. Interdisciplinary discussion and patient participation were observed at the meeting of 9/27/05. His treatment plan was individualized.

Assessment:

EOP treatment met program guide requirements. This inmate appeared to benefit from DMH treatment. There was no DMH discharge summary. Seroquel was not approved for two months despite his status as a hospital return.