EXHIBIT N

<u>Correctional Institution for Men (CIM)</u>

October 5 — October 7, 2005
January 31, 2006

1.    Inmate A

This 22-year-old inmate had five admissions to the MHCB between May 30 and August 8, 2005. He cut his left wrist on or around 6/11/05. Sutures were required. He was not referred to DMH. When questioned about this case a member of the staff stated orally that the staff believed that because his diagnoses were primarily on Axis II no referral was warranted.

The day before or the day of the self-inflicted injury, he was charged with a disciplinary infraction. He received an RVR for battery on staff on 6/10/05. RVR documents were incomplete. There was no incident report number. A mental health evaluation for the RVR of 6/10/05 was done on 6/22/05, the day of discharge. The progress note said the RVR was for self-injury. Other sources of information said the RVR was for assault on staff. Staff indicated orally that the lack of an incident number and a complete set of documents suggested that the charge was not fully adjudicated.

About ten days before the incident he was in the MHCB for one day. He was in the MHCB from 5/30-5/31/05 for suicidal ideation. He said he wanted to overdose on pills. He came from RC-E on a Code I, which meant he had to be transferred and admitted immediately. On 5/31/05, Risperdal was discontinued and Zoloft was initiated. He was given a diagnosis of Adjustment Disorder and discharged at the 3CMS LOC with orders for five-day follow-up.

He was admitted to the MHCB a second time after he cut his wrist and needed sutures. He was in the MHCB for five days, from 6/11-6/16/05. He was admitted on a Code I. Discharge diagnoses were Major Depressive Disorder, recurrent, severe, with psychotic features. His GAF was assessed as 48. Zoloft was discontinued. He was discharged with orders for Remeron 50 and Zyprexa 7.5 bid. A psychiatry note dated 6/16, the day he was discharged, contained the subjective report: "I hate myself." The same note said he would be discharged that day with orders for five-day follow-up.

He was admitted to the MHCB for a third time either that day or the day following his discharge. He was in the MHCB from 6/17-6/22/05. An admission note dated 6/17/05 said that he heard hallucinations that told him to kill himself. Diagnoses on the discharge summary were Psychosis NOS, Axis II Deferred, Asthma, and GAF of 45. He reported a history of substance abuse. He was discharged with orders for Zyprexa and Wellbutrin. A note dated 6/22 described him as doing better and wanting double portions of food. He was discharged to administrative segregation with planned five-day follow-up.

Two SRACs were in the UHR. One was dated 6/13; the other was dated 6/22. No category indicating his level of risk was checked off on the SRAC of 6/13. He was found not to be at risk on the SRAC of 6/22.

He was readmitted to the MHCB for a fourth time three days after being discharged. He had an MHCB stay of two days on 6/25-6/27/05. He was admitted on a Code 2 meaning that admission had to occur within 45 minutes. He was medicated with Wellbutrin 100

bid, Remeron 15, and Zyprexa 7.5 bid. He was electively mute at times. The discharge summary showed diagnoses of Major Depressive Disorder, recurrent, with psychotic features, Axis II was deferred, Asthma, and a GAF of 45. He voiced suicidal ideation for two days and was discharged when he contracted for safety. Once again, he was discharged to administrative segregation with planned five-day follow-up. He reported a history of substance abuse.

He was admitted to the MHCB a fifth time on 8/5/05 following an intentional overdose. He was discharged from the MHCB on 8/9/05. A note written shortly after he was admitted to the MHCB said that he reported ingesting 12 Zyprexa pills and that he said he self-induced vomiting. According to the discharge summary, he was admitted for "suicidal thoughts, depression, selectively mute, refusing medication, refusing vital signs and refusing to talk to staff." A diagnosis of Adjustment Disorder Psychosis Features (sic) was shown on the discharge summary. He had no diagnosis on Axis II; his GAF was assessed at 40. He was treated at the EOP LOC and was slated for transfer to CSP/Lancaster the following day. He had orders for Wellbutrin 100 bid.

According to the MHTS database, he was transferred to CSP/Lancaster for EOP treatment on 8/9/05 as scheduled.

Assessment:

Mental health treatment of this at-risk inmate was inadequate and inconsistent with departmental policy. MHCB staff was largely unresponsive to his threats of self-injury as well as his recent history of self-inflicted injury. SRACs were not completed as needed. SRACs that were completed were cursory and failed to give sufficient weight to salient factors. On two occasions, he was readmitted to the MHCB within one to three days of being discharged. He met the criteria for referral to DMH but there was no documentation in the UHR that referral to a higher level of care was considered. Staff reported orally that a referral was considered but not made because his diagnoses were primarily on Axis II. No documentation on the disposition of his disciplinary infraction was available. Incomplete paperwork suggested that the charge was not pursued.

2.      Inmate B

An abridged review of this case was restricted to referral logs, portions of the inpatient record and portions of Volume V of the outpatient record.

Records suggested that he was discharged on parole in December 2004 or January 2005. A bus screening form indicated he arrived at CIM from LA County on 6/15/05. He reported a history of psychiatric treatment.

He was in the MHCB for either one or ten days, June 17-27 or only on June 17 (records were inconsistent). He was medicated involuntarily on 6/21/05 on the grounds that he was gravely disabled. At that time, he was described as irritable, hostile, demanding, inappropriate, highly unpredictable and having poor insight. He was said to have a long

history of mental illness and non-compliance with medication.

The log stated that his referral to CMF was dropped by the MHCB IDTT on 6/27/05. Progress notes indicated that his condition improved markedly. He was discharged to general population on 6/27/05 at the EOP LOC. He had orders for Risperdal 2 bid, Depakote 500 or 1000 bid, Zoloft 50, and Geodon 10 bid if po or 20 injectable. There was little clinical information in progress notes written immediately prior to his discharge but he exhibited signs of psychosis shortly before his discharge.

Five days before discharge he had been unable to answer mental status questions. Four days before discharge he was agitated, angry, and screaming about the Holocaust. Three days before discharge he was angry about being on Keyhea and demanded a 602. There were no mental health notes two days prior to discharge. The day before discharge, he was seen by a psychiatrist and described as irritable and "demanding but making sense at times." The day he was discharged the same psychiatrist noted that he was cooperative and reported no suicidal or homicidal ideation.

MARs indicated that he took medication from July 1-18 but MARs spanning the next 4 weeks were blank, indicating that he may not have received medication. He was readmitted to the MHCB around August 19 where he remained for over six weeks. A September MAR showed he received medication September 1-21. Surprisingly, a small number of progress notes written during that time seemed to indicate that he was stable on medication.

An updated log showed that he was referred to ASH for acute care on 9/1/05. A Vitek ruling was requested by ASH on that date. A Vitek hearing was completed and sent to ASH three weeks later, on 9/23/05. The referral was rejected on 9/27/05 on the grounds that he was too dangerous. The CCAT discussed the case on 9/29. He was redirected to CMF but remained in the MHCB at CIM as of 10/5/05.

A Keyhea order was renewed on 8/26/04 and expired on 2/22/05. It was renewed through 2/22/05. The grounds for the Keyhea orders were that he posed a danger to others. He was involuntarily medicated pursuant to his Keyhea order on some occasions while in the MHCB in August and September. He had orders for Risperdal and Depakote.

Assessment:

This inmate was psychotic when he arrived at CIM. His condition improved during his stay in the MHCB. After he was released to the general population, it appeared that medication continuity was not sustained and he was readmitted to the MHCB one month later in a decompensated state. During his second stay in the MHCB, involuntary medication was used appropriately and a Keyhea order was obtained. Referrals to acute care were not made and completed in a timely manner.

A referral was made after he had been in the MHCB over ten days. He remained in the MHCB over six weeks because access to DMH acute care beds was blocked by several

obstacles. A referral to ASH for acute treatment was on hold for three weeks pending a Vitek ruling. Four days after a Vitek decision was reached, ASH rejected him on the grounds that he was too dangerous. Two days later the referral was redirected to DMH at CMF. Five days after that referral was made no decision on acceptance had been communicated to CIM staff.

3.      Inmate C

An institutional log of referrals to higher levels of care, a portion of Volume 3/3 of the UHR and the inpatient record of his MHCB stay in September 2005 were reviewed. Volume 3 of his UHR showed that this inmate had a history of MHCB stays at different CDC prisons dating back to 2001.

A log showed that he was admitted to the MHCB on 9/9/05 and referred to acute care at DMH/CMF on 9/13/05. A Vitek hearing was requested on 9/26/05. According to the log, the referral was dropped by the MHCB IDTT around the time a Vitek was requested and he was retained in the MHCB. The referral was reinitiated a few days later on 9/31/05.

On the day he was admitted to the MHCB, orders for Seroquel 200 bid crush and mix in water were written. He refused to take Seroquel intermittently between 9/18 and 9/24/05. Nursing notes indicated that at times he screamed and yelled while at others he rested quietly.

Progress notes written during the next three weeks showed that his mood disorder had a rapid cyclical pattern. He nearly precipitated a cell extraction on the day he was admitted to the MHCB. He was depressed, tearful and exhibited some anger six days later, on 9/15. Between 9/15 and 9/20 his mood was labile. He continued to exhibit anger and tearfulness. He engaged in sexual misconduct directed toward staff on 9/21. Two days later he argued with staff and claimed his food had been tampered with. On that day, he exhibited goal-directed behavior. His thought processes were described as linear and logical as he tried to avoid being moved to an institution that could provide a higher level of care. That behavior coincided with the request for a Vitek and was closely followed by the staff's decision to rescind the referral because he was more stable. The following day he flooded his cell and was electively mute. Two days later, he was described as doing better, calm, and cooperative with some delusional thought that was not considered bizarre.

Assessment:

The MHCB stay was far in excess of ten days. A two-week gap between referral and request for a Vitek was excessively lengthy. Staff in the MHCB failed to recognize the cyclical nature of his illness and respond accordingly. The referral to a higher level of care should not have been rescinded.

4.    Inmate D

This 3CMS inmate was from CRC; no C-file was available. The review included an OBIS print out, a 14-page temporary medical record of his treatment at CIM, portions of the UHR and an inmate history generated by MHTS. The earliest document in the temporary medical record was dated June 24, 2005. Staff who treated him at CIM did not have access to his history of psychiatric treatment at CRC. The pharmacy generated an order history at the request of the monitor's expert. That history showed that he was maintained in Seroquel while he was at CRC.

When seen in a group interview on 10/4/05 he reported that he slept in a cage (holding cell) in the main corridor for three nights. He reported that he knew of another inmate housed in the holding cell for six nights.

According to OBIS data, he came to CIM from CRC on 4/7/05. He was housed in administrative segregation. The day after he arrived, he went to CIM's hospital for one day and returned to administrative segregation. He was segregated for five months. He was released to a general population housing unit in RC-C on 9/28/05, only days before he was included in a group interview with the monitor's expert.

A MAR indicated that he had orders for Seroquel 300 DOT and Wellbutrin 250 a.m. crushed in water DOT. There was no MAR for June. Medication was administered throughout July and August with the exception of a small number of blank dates. There were two weeks of psych tech rounds notes from 7/24-8/6/05; his presentation was unremarkable. An IDTT scheduled for 7/28/05 was cancelled for custodial reasons. He was seen by a case manager on 8/5/05. He complained of paranoid ideation but appeared to be doing well otherwise.

There were many discrepancies between case manager contacts recorded in the UHR and the MHTS. The UHR showed that nine case manager contacts were made from June 2-September 2, a period of 12 weeks. The inmate history showed that 11 to 14 contacts were made, in addition to IDTT meetings and psychiatry contacts, from April 8 through September 2, a period of 19 weeks.

While in segregation, IDTT meetings were held at the required intervals. He was seen twice by psychiatrists individually and presumably in the context of several IDTT meetings. According to the UHR he was seen on psych tech rounds June-September but there was no documentation of rounds spanning July 10-August 20 or for the week of July 2-10.

Assessment:

Incomplete medical records for mental health treatment prior to June and discrepancies between contacts shown in the UHR and MHTS put treatment providers at a disadvantage. Medication orders were renewed in a timely fashion. The MAR for June was missing from the UHR. While in administrative segregation, approximately 20

percent of required case manager contacts were missed, but psychiatry contacts and IDTT meetings met program guide requirements. Five weeks of psych tech rounds were not documented in the UHR. Overall mental health treatment was adequate given the high level of this inmate's functioning but it but fell short of meeting program guide requirements.

5.    Inmate E

When interviewed in a group on 10/5/05, this 3CMS inmate reported that he had been at CIM for one year. He also reported that he was housed in a cage (holding cell) in the corridor of the main building for four days about two months earlier. He said he did not receive medication while he was in the cage. He was one of several SNY inmates who reported that their food was intentionally contaminated by the inmates who prepared it and that the officers who were asked to intervene in the adulteration of food or to supervise food prep declined to do so.

His UHR was reportedly at CIM but it was not available for review.

According to OBIS, he went to court from WSP/RC in August 2004. He returned to WSP/ RC from court in October 2004. He apparently was en route from court in San Bernardino County to WSP from 10/19-11/2, staying at RCC while en route.

He arrived at CIM from WSP RC on 1/20/05. He remained at CIM at the time of the site visit in October 2005. He had been on reception center status since he returned from court in October 2004.

Assessment:

Transfer timelines were not met for this 3CMS inmate. He remained at CIM in the reception center for 12 months.

No findings were made regarding his mental health treatment because his medical record was unavailable. If also unavailable to treatment providers, its absence would constitute an impediment to adequate treatment.

Living conditions were reported to be unusually bad. The sleeping quarters and food preparation that he reported fell below minimum correctional standards.

6.    Inmate F

When interviewed in a group on 10/5/05 this 3CMS inmate reported that he had been at CIM for one year. He said he thought his records must have fallen through the cracks and that processing of his paperwork was permanently halted. His case was brought to the attention of high ranking institutional staff. During the monitor's second visit staff reported that he was endorsed to FSP on 11/3/05.

This inmate's C-file was not available for review. Nor was the institution able to provide an OBIS print-out on him. The review was based upon his UHR and an inmate history generated by MHTS.

A progress note indicated he was seen by mental health staff at CIM on 12/15/04. He was nearing parole at that time. He was also seen at CIM in February 2005. There was no indication he was seen in March. The sequence and type of documentation in the MAR suggested that he may have been out on parole in March for a few weeks.

According to his UHR, he arrived at CIM from San Bernardino County on 4/22/05 with orders for Risperdal, Wellbutrin, and Prozac. He received medication on April 28 and 30. Medication continuity was not sustained when he arrived. There was no MAR for June although he had current orders for psychotropic medication. He received medication in July but not until the 13th of the month. Medication continuity was sustained in August.

When seen by a psychiatrist on 4/28/05, he was alert and well oriented. No earlier mental health contacts were documented in the UHR but the inmate history showed that a case manager completed an MH-7 on 4/27/05. That document was not in the UHR.

The psychiatry note of 4/28 indicated that his hygiene was good; his attitude was cooperative. Affect was mildly dysphoric; mood was "ok." He denied suicidal ideation and overt psychotic symptoms. A diagnosis of Major Depressive Disorder with psychosis in partial remission was given. Orders for Risperdal and Wellbutrin were continued.

During the current five-month stay at CIM, he was seen ten times by psychiatry. He was not seen by a case manager from 4/28/05-10/5/05.

Assessment:

Mental health treatment did not meet program guide requirements. Transfer timelines were not met. Vital paperwork was lost.

Medication continuity was interrupted for six days upon arrival. There was no MAR for June. Medication was not administered despite current orders during the first two weeks of July. The initial mental health contact may have been made by a case manager within five days, but all records associated with such a contact were lost. No chrono was completed to place him on the MHSDS roster. He was lost to follow-up by a case manager and did not appear on the mental health rolls, but he was seen regularly by psychiatry.

He was seen by a psychiatrist within six days of arriving. Psychiatry follow-up was appropriate throughout his stay. Medication orders were renewed in a timely manner. There was no indication that he had an IDTT meeting. Because his case manager was unaware of his existence and no IDTT meeting was held, his case had not come to the attention of a correctional counselor.

Neither his C-file nor his OBIS data were available for review. Custody staff reported that they could not find those records. It was not impossible that his hypothesis about his misplaced paperwork was in fact true. He was endorsed three weeks after the case was brought to the attention of staff.

7.    Inmate G

This 3CMS inmate was interviewed in a group on 10/5/05. Along with several inmates housed in the same unit, he reported that plumbing in the dorm backed up on October 2°d Reportedly feces and contaminated water flooded their dorm. The inmates housed in the dorm were not removed despite the unsanitary conditions.

Review of an OBIS print-out, the C-file, and medical record indicated that he had been at CIM's reception center for nearly seven months. He arrived on 3/8/05 and was endorsed on 10/5/05. He was slated for transfer to CRC on 10/6/05.

According to the C-file, he was serving his first prison term. He had 23 points. He incurred two disciplinary infractions. He was in the vicinity of a race riot.

When he arrived at CIM he was taking Seroquel. He was seen by a case manger for an initial mental health and placed on the 3CMS roster on 3/10/05. An MH-7 completed on 3/10/05 had diagnoses of Schizophrenia, paranoid type and Bipolar I Disorder, manic. His GAF was assessed as 55.

He was seen nine times by psychiatry during the 6.75 months he was at CIM. He was not seen by a case manager after the initial evaluation. He was seen by a psych tech on rounds during the few days in August that he was in administrative segregation.

Assessment:

Transfer timelines were not met. This 3CMS inmate was in the reception center for seven months. There was an unnecessary delay of two to three months between the date his ISRS was finalized by a CCI on 7/11 and his endorsement. A mental health chrono was dated 8/11/05. Presumably it was a replacement for a lost chrono that was generated five months earlier when he first arrived.

The initial mental health contact was timely. An MH-7 was completed and filed in the UHR. He was not seen for follow-up by a case manager during his seven-month stay at CIM. Psychiatry follow-up was appropriate throughout his stay. Medication orders were renewed in a timely manner. There was no indication that he had an IDTT meeting.

8.    Inmate H

This inmate overdosed on Risperdal on 6/23/05 and was admitted to the MHCB for a five-day stay.

A bus screen indicated that he arrived at CIM on 5/19/05. His reception center physical exam was dated 5/31/05. When he arrived, he reported that he had a seizure disorder and took Dilantin and Seroquel. A three-day bridge order continuing Seroquel was written for 5/19-5/22. Dilantin was ordered for a longer period of time. He first received Seroquel on 5/21, two days after he arrived.

A Clark evaluation showed that he functioned adequately enough to live independently in prison but he was illiterate, had been on SSI since age 15 and lived in a board and care home.

Seroquel was changed to Rispderal 2 bid when he was seen by psychiatry on 5/23/05. He received Risperdal for the first time on the afternoon of that same day. Medication was administered consistently for the next five weeks. MARs showed that he refused and failed to show up on occasion. The dose was raised to 3 mg bid on 6/7 when he was seen for follow-up by a psychiatrist.

His initial mental health contact was the psychiatry visit of 5/23, four days after he arrived. He was seen by clinicians who completed MH-7s on 5/23/05 and 5/25/05. The assessments were particularly well documented and contained much individualized information. He was placed in the 3CMS LOC. Diagnoses included Psychotic Disorder NOS, ASPD, and substance abuse.

He was referred to the At-risk program on 6/10/05. Because he was 3CMS he was not seen weekly. The staff was able to see only EOP patients weekly during that period of time.

His inpatient record was not available for review. A note in the outpatient record indicated that he was discharged, presumably from the MHCB, on 6/28/05 with plans for five-day follow-up, which was completed. During his 4.5-month stay at CIM, he was seen frequently by psychiatry but did not have regularly scheduled appointments with a case manager.

He was discharged to the 3CMS LOC around 7/2/05. An SRAC was done on that date. In August his dosage of Risperdal reached 3 mg bid.

Assessment:

There was a gap of 12 days between his arrival at CIM and his physical exam. Transfer timelines for this EOP inmate were not met nor were they met after his level of care was changed to 3CMS.

Medication was interrupted for two days on arrival. Initial mental health contacts were timely and the MH-7 was highly individualized. There was no indication that an IDTT meeting was held. There was no case manager follow-up but he was followed appropriately by psychiatry. Follow-up subsequent to a change in regimen was appropriate.

There was no record of his MHCB stay in the UHR. A log showed that five-day follow-up was completed. There was no indication that custody observations were made.

9.     Inmate I

When seen in a group interview on 10/5/05 this 21-year-old inmate reported that he had been at CIM for nine months. A mental health note written in March 2005 indicated that he was serving a first term and was sentenced to 40 years to life.

Review of his records supported his claim that he had been at CIM for nine months. The C-file indicated that no custody classification assignments had been made since 3/29/05. Six months later, on 9/28/05, a CSR endorsed him to HDSP, Level IV.

He was first admitted to CIM on 12/28/04. A bus screen was done at CIM on 12/28/05. It was negative for mental health indicators. He first began receiving mental health treatment on March 3, 2005. Eleven weeks after he first arrived at CIM, on 3/21/05, he was moved to CAL. He had a bus screening on 3/21/05 at CAL. The bus screener noted that he was treated at the 3CMS LOC and had been on Remeron and Depakote for three weeks for treatment of depression. He was returned to CIM two weeks later.

There were no mental health chronos in the UHR that showed he was placed on the 3CMS roster at CIM during his first stay there, although he was treated by a psychiatrist during that time. According to the UHR, he was first seen at CIM by mental health staff on 3/3/05. He was seen by a psychiatrist without a UHR. He was given a diagnosis of Bipolar Disorder NOS, current episode depressed. Orders for Depakote and Remeron were written. He was seen by a psychiatrist for follow-up nine days later. No change was made in the regimen.

After he went to CAL, he was placed on the 3CMS roster. He was then returned to CIM where he was seen by mental health staff on 4/14/05, one week after his return. A chrono placing him on the MHSDS roster was generated that day. He was seen monthly by psychiatry from April through September. Depakote was discontinued and Seroquel initiated in June. After initial evaluations in March and April he was not seen by a case manager while at CIM.

Assessment:

Transfer timelines were not met in the case of this 3CMS inmate. Most recently, he had remained at CIM for five and one half months. Previously he was on reception center status for three months with the exception of two weeks spent at CAL, apparently as the result of an error. He had been in the custody of CDCR since 12/28/04, over nine months. Classifications processing was unnecessarily delayed after he returned to CIM in April. Paperwork placing him on the MHSDS roster was either lost or not completed when he came to the attention of mental health and started taking psychotropic medication. Lack of access to the medical record was problematic in several ways. Psychiatry follow-up was appropriate subsequent to a change in regimen and throughout his stay at CIM. There

was no indication that an IDTT meeting was held. There was no case manager follow-up during his five months on the 3CMS rolls. No deleterious effects associated with lack of case management follow-up were apparent.

10.    Inmate J

This 3CMS inmate was seen in a group interview on 10/5/05.

His date of arrival at CIM could not be discerned from his medical record. A bus screening in the UHR indicated that he arrived at CIM on 6/30/05. Surprisingly, an MH7 was completed at CIM on 6/6/05.

His C-file showed that the most recent classification custody action occurred at WSP in April 2004. An intake audit was done at CIM on 8/10/05. An INS hold was received on 8/23/05.

He was seen by a psychiatrist at CIM on 6/9/05. Orders for Lithium and Buspar were written to treat Bipolar Disorder. Labs were ordered on 6/22/05. Results were back on 6/24/05. The level was sub-therapeutic, but labs were not reordered. Psychiatry follow-up was excellent in terms of frequency. There were no case management contacts.

Assessment:

Transfer timelines were not met. Classifications processing was marked by long pauses between steps. He appeared to have been on reception-center status for over six months, two months at WSP followed by four months at CIM.

On the whole, mental health treatment was adequate given his level of functioning, but it did not meet program guide requirements. Psychiatry follow-up was appropriate with the exception of the failure to monitor blood levels of a mood-stabilizer after the initial level was sub-therapeutic. Processing of a lab order was timely. There was no case management follow-up nor was an IDTT meeting held during his four months at CIM, but no deleterious effects were apparent.

11.    Inmate K

According to a bus screening this 42-year-old man arrived at CIM on 5/4/05 and reported that he was recently on Lithium and Abilify. An MH-7 was completed within two days of arrival. Bipolar I Disorder was diagnosed, and he was placed at the EOP LOC.

He was seen for the first time by psychiatry on 5/10/05; no UHR was available at that time. Orders for Abilify and Lithium were written. He was followed appropriately by psychiatry. He was seen weekly by a case manager in May and June, but weekly contacts were missed in July and August. Some missed contacts were noted as due to location/escort problems, and some were missed for custodial reasons. One was missed due to a mandatory meeting of mental health staff.

His level of care was changed to 3CMS in July. He was slated for discharge from the caseload in September.

MARs showed that medication administration was consistent from May through August. A Lithium level was obtained on 9/16/05; it was sub-therapeutic.

Assessment:

Transfer timelines were not met while he was in the EOP nor later when his LOC was reduced to 3CMS. The initial mental health contact was timely. Weekly contacts were made while he was treated at the EOP LOC. Lack of access to his UHR and the cancellation of contacts attributed to a wide variety of sources was impediments to treatment.

EXHIBIT 0

Correctional Rehabilitation Center (CRC)

December 6, 2005 — December 27, 2005

1.    Inmate A

When seen in a group interview on 12/6/05, this 3CMS inmate was neatly dressed and well groomed. He responded relevantly to questions. He reported that he incurred an RVR several months ago at a time when he did not know what he was doing. He said that he should have been referred for a mental health evaluation but was not.

A bus screening indicated that he had been at CRC since November 2003. He participates in a PTSD group for veterans. Recent progress notes associated with group treatment indicated that he was very supportive of others. Progress notes written by a variety of clinicians indicated that he consistently reported auditory hallucinations throughout 2005. The hallucinations were responsive to changes in medication but did not cease.

His current regimen included Trazodone 100 and Paxil 30. Missing MARs and blanks on MARs made it impossible to discern whether he was medication compliant. The MAR for October was blank after the 6th. There were no MARs for November or September. There were no written referrals for non-compliance in the UHR but progress notes indicated that he was seen by mental health in response to non-compliance. Changes in medication were made in response to his reports.

His regimen was changed in June when Risperdal was discontinued. He refused Risperdal for 18 consecutive days in June. The regimen was adjusted again in July when Seroquel was discontinued. He refused Seroquel for nearly two consecutive weeks at the end of June and beginning of July. He was seen by different psychiatrists and adjustments were made in response to his reports. The rationales for changes were documented. Psychiatric follow-up was implemented as planned at a frequency of nearly once per month for the past several months.

There were informed consent forms for some but not all psychotropic medications he had taken in 2005.

An annual IDTT was held in November. It was attended by a correctional counselor but not a psychiatrist. The revised plan showed he was treated for Mood Disorder NOS. The plan was individualized in its problems and targets but generic in interventions. It overlooked that he was medically unassigned and was enrolled in a treatment group.

Assessment:

Mental health treatment was adequate but did not meet program guide requirements in all respects. Deviations from the requirements were lack of a psychiatrist at the IDTT meeting, an informal referral mechanism for non-compliance referrals, a portion of the treatment plan was generic and informed consent was not always obtained.

2.    Inmate B

This 3CMS inmate had a serious medical condition and was markedly overweight. He

was due to be released soon. When seen in a group interview on 12/6/05 he was not as well dressed or groomed as most other members of the group. His presentation was characterized by exaggerated affability and inappropriate remarks. He was either unaware of or unconcerned about the reactions of others in the group. He reported that he was leaving to go to the community soon, that while at CRC he stopped taking medication of his own accord, and that he needed a better discharge plan.

Review of his UHR indicated that he arrived at CRC from a reception center in March 2005. His initial IDTT was timely. His treatment plan gave a diagnosis of Mood Disorder NOS secondary to a medical condition (cancer). He was on Lexapro for the past several months. He was seen by different psychiatrists. Follow-up visits were carried out as planned. He was seen quarterly by a case manager.

He was seen by a psychiatrist in response to a referral for non-compliance. He reported, as he had several times in the past, that the morning pill line was too long. Orders were changed to afternoon administration in the fall. A MAR for September showed that he was compliant with medication. There was no MAR for October. The MAR for November was blank after the 3"d day of the month.

Informed consents were filed in the UHR.

No chrono by a TCMP staffer was in the UHR. Assessment:

Assessment:

Mental health treatment was adequate and consistent with program guide requirements with the possible exception of the IDTT meeting. The institution's SOP typically falls short of meeting program guide requirements regarding team composition and classifications information. The October MAR was missing from the UHR.
Inmate B said that he was leaving soon and had no discharge plan.

3.      Inmate C

Clinical documents indicated that this inmate was serving his first CDCR term. He was found to be in need of the EOP LOC by CRC staff but was designated 3CMS at the time of the site visit. He had diagnoses of Schizophrenia, paranoid type and Polysubstance Dependence. He was treated with Wellbutrin, Zoloft and Zyprexa/Zydis during the summer and into the fall of 2005 but Zyprexa was discontinued at his request in the fall when he complained of side effects. No alternative antipsychotic or mood stabilizer was initiated.

Documents pertaining to his mental health treatment were missing from the UHR. He was sent to CIM from CRC after he was found to need the EOP LOC. CIM staff disagreed with the level of care, redesignated him 3CMS and returned him to CRC. There were hints in the mental health notes that he may have been suffering from a stomach ailment and a seizure disorder. There were also hints that he was either admitted or met

the necessary criteria for admission to the MHCB at NKSP but was not admitted while he was in the NKSP reception center in May or June. No records of crisis bed treatment or triage were in his UHR. There were only blue-paper progress notes made by clinicians who saw him at both institutions.

He was admitted to CRC's OHU on 7/21 or 7/22/05 and discharged 7/26/06 at the 3CMS LOC. The admission was precipitated by what one note characterized as grossly disorganized behavior. He was agitated, banging his head and exhibited disorganized behavior. He was given Haldol IM initially, and then Zyprexa was ordered. He responded well to Zyprexa. He stabilized within a day and was discharged at the 3CMS level of care. He was discharged with orders for Zyprexa and Wellbutrin crushed. At a later point in time Zydis was ordered. Within two weeks of his release from the OHU, staff decided that he was not functioning well enough at the 3CMS LOC but needed the EOP LOC.

He was seen by a psychologist in October because he was found crying in a stairwell. He was also seen by a psychiatrist that day. He was upset about a recent legal decision and also complained of stomach problems associated with his medication. Zyprexa was discontinued. Documentation in the UHR indicated that he may also have a medical condition that affects his stomach. A trial of a different antipsychotic was not initiated. He was left with only antidepressants. In December 2005 his regimen included only Wellbutrin and Zoloft.

When seen in a group interview on 12/6/05 his behavior was markedly inappropriate. He talked long and loudly about violence he might direct toward others. Interspersed with indirect threats were jokes and other remarks intended to be humorous. He was largely unaware of the effect of his behavior upon others although he appeared at times to look to listeners for approval. Aspects of his behavior were suggestive of hypomania.

A few particulars regarding his medication regimen at CRC and his movements were gleaned from the records that were available. The UHR did not contain a MAR for November. An October MAR was annotated to indicate that he cheeks Wellbutrin so it was to be crushed. An October MAR showed an order for Zydis. The September MAR showed that he took Wellbutrin but often refused Zyprexa.

There were minor discrepancies among documents in the UHR and various logs regarding his movements and dates of endorsement. He arrived at CRC from WSP on 6/28/05. According to the priority tracking list, he was made EOP at CRC on 7/21/05. Another document indicated that he was not made EOP until 7/26. According to institutional SOP, EOP inmates are moved to CIM within one day. He was returned by CIM to CRC on 8/5/05 at the 3CMS LOC.

<u>Assessment</u>:

Mental health treatment was fragmented and inadequate. This inmate needed the EOP level of care but it was denied him by CIM staff who over-ruled CRC staff. Records of crisis bed admissions from two institutions with crisis beds were absent from his UHR,

which further hampered treatment.

Four major problems were missing documentation, discontinuity of care by psychiatrists, changes in level of care by a non-custodial institution and inconsistent documentation of medication orders and the administration of medication at CRC.

Medication management was problematic across the board. His treatment with antipsychotics was discontinued by psychiatry despite an evident need for a regimen that was not limited to antidepressants. Psychiatry contacts were frequent but distributed between at least two psychiatrists. Orders were renewed without contact when he did not show up for an appointment. He was once seen for follow-up in three weeks rather than two as planned. There was a lack of clarity regarding DOT and crush orders. A crush order written on discharge from the OHU was not continued subsequently. The use of Zydis as opposed to Zyprexa was neither well documented nor considered at appropriate times

4.    Inmate D

Only Volume 2/2 of this 3CMS inmate's UHR was reviewed.

When interviewed in a group on 12/6/05 he was neatly dressed and well groomed but his appearance differed from that of the other members of the group. His manner of speaking and looking at his interlocutors was unusual. He rocked constantly from the hips. He responded relevantly to questions.

Brief history: He arrived from NKSP in March 2005. He may have been in and out of CDCR custody several times in the past. Clinical entries in the UHR indicated that he was treated at the EOP LOC in 2001 and 2003. In 2002 he was 3CMS but staff was considering changing his level of care to EOP. He was enrolled in the DDP program at the time of the site visit. Annotations indicated that he needed help with written language including filling out self-referral forms for medical treatment. His level of adaptive functioning and need for other adaptive supports were not specified in the UHR documents reviewed.

The current diagnosis was Psychotic Disorder NOS. When he first arrived at CRC he had a timely initial IDTT meeting. His current regimen included Zoloft 100, Trazodone 300, and Risperdal 2 am and Risperdal 3 pm. No MARs for November or October were in the UHR. A September MAR showed that he was compliant with his regimen.

He was seen by three psychiatrists since he arrived. Two contacts were made within a short time frame as scheduled. A thirty day follow-up was missed altogether. He was seen at quarterly intervals by a case manager.

Assessment:

Mental health treatment was adequate in most respects but fell short of program guide

requirements. Changes in medication were accompanied by a documented rationale. Most psychiatry contacts were timely. Quarterly case management contacts were made. There were deficits regarding the IDTT meeting. According to routine institutional procedures C-files were not brought to IDTT meetings, and many IDTT meetings were not attended by a full team.

5.    Inmate E

Inmate E arrived at CRC in August 2005. He did not come to the attention of mental health staff until November when he made a suicide attempt in the OHU where he was being treated for a medical condition. Documentation of his stay(s) in the OHU was sketchy to the extent that dates and reasons of his admissions were not always discernable. Inmate E was treated for at least two major medical problems while at CRC, seizure disorder and kidney stones. He was sent out to a community hospital on at least two occasions but remained for extended periods of time in the OHU at CRC. His desperation about his medical condition may have been one factor in his attempts to injure himself.

This inmate may have been in the OHU from November 18, 19, or 20 until November 24, when he was sent to the MHCB at CIM. He was returned to CRC on December 5. CRC staff reported orally that they were concerned about his return in light of the severity of his suicidal behavior. Following discussions with CIM staff they agreed that he could return to CRC.

On 11/1/05 he returned to CRC from RCRMC (hospital in the community) where he was apparently sent due to seizure disorder. Upon his return to CRC he was in the OHU for one week on seizure precautions. After no seizure activity was observed he was released from the OHU on 11/8/05. During his stay in the OHU, however, he made a suicide attempt and was placed on suicide watch. On 11/2/05 he was found on the floor with a blanket around his neck. He expressed suicidal ideation on that date saying that he wanted to kill himself. He was given oxygen and became alert and responsive. He was placed on one-on-one watch with custody observation. Nursing notes suggested that the suicide attempt took place before lunchtime on 11/2/05. He was seen soon after by mental health staff. That was his first contact with mental health staff at CRC. A history was taken and he was referred to the MHCB. A call to Sacramento resulted in him being placed in 29th place on the wait list for a crisis bed.

At the end of the day at 2330, he contracted for safety with a nurse. The next morning, 11/3 at 8:30 a.m., he was feeling better and in no distress. One-on-one observation was continued. He was seen several times by mental health staff that day. At different meetings with psychologists on 11/2 and 11/3 he serially reported what eventually grew into a constellation of major stressors. Some related to his health, others to his legal situation, some were familial in nature and some involved events that transpired inside CIM and CRC. No SRAC done at that time was in the UHR. Mental health staff communicated extensively with custody staff in an attempt to mitigate some of his stressors. Psychologists talked with Inmate E several times to keep him abreast of

developments and monitor his suicidal ideation.

He seemed comfortable on 11/3/05 and the suicide watch was discontinued after he was seen by mental health staff that afternoon around 3:00 p.m. The CMO ordered that he remain in the OHU on seizure precautions to monitor his Seizure Disorder. Five-day post suicide attempt follow-up was planned and conducted while he was in the OHU. By the end of the day, he was on close watch, which according to a nursing note called for hourly observations.

There were few nursing entries on 11/4, 11/5, and 11/6. There were no nursing notes corresponding to hourly observation. It was unclear who was supposed to make hourly observations. There were three nursing notes on 11/7. He was usually found to be in no distress but on the morning of 11/7 he complained of blood in his urine.

He was discharged from the OHU on 11/8. He was given a lay-in, and custody located a lower bunk for him. There were no nursing entries between 11/8 and 11/15. He was seen by mental health staff three days later and formally placed on the caseload.

One week after he was discharged from the OHU, he was seen by medical staff and complained of blood in his urine. The possibility of a kidney stone was noted but much of the note of 11/15 was illegible. The following day he complained of pain and numbness on his left side, said he could not eat or sleep, and reported blood in his urine. His subjective report included the complaint that "nobody does anything" and that Tylenol-3 was not working. That note, written 11/16 indicated he was seen at U/C on 11/15/05. A physician ordered him transported to RCRMC ER on 11/16/05.

He was back at CRC by early in the afternoon on 11/18/05. He complained of pain and was given medication. Later that day an entry written at 10:45 a.m. indicated that he had been seen the day before in the ER at RCRMC for r/o kidney stone and that no stone was seen on an X-ray.

Two days later on 11/20 he was seen by a nurse because he had 7 superficial cuts on his left forearm. A nursing note written at 5:20 p.m. included the subjective report, "I cut it up and I don't know; I guess tried to hurt myself and I tried to strangle myself three weeks ago." He was retained in the OHU and placed on one-on-one watch.

He was readmitted to the OHU on or around 11/18, 11/19 or 11/20. He was seen by mental health staff on 11/21. He told the psychologist that he had a visit from his family the day before during which his young son told him that he was disappointed in him. That note indicated that he was admitted to the OHU by a physician the day before because he cut himself.

As per institutional SOP, he was on constant one-on-one observation throughout his stay in the OHU. According to a medical report completed on 11/24/05 at 10:15 p.m., he had multiple lacerations on his arms, legs, and head. It was unclear whether he inflicted multiple lacerations on himself on 11/20 and a second time on 11/24 or only on 11/20.

Resource was ordered on 11/21 because he was not eating.

According to a progress note written on 11/23/05, he had constant suicidal ideation, a plan, and said he did not want to live. Paxil was initiated. Around 10:30 that morning staff at Sacramento told CRC that no crisis bed was available but said that CRC staff should call back hourly to find out when a bed became available.

According to a nursing note he tried to choke himself in the bathroom and was found seated on a toilet with something around his neck. Oxygen was administered on 11/24. He received Ativan IM at 1830 on the 24th

He was transferred to an MHCB on 11/24/05. He was discharged on 12/5/05. A discharge summary from CIM written by a nurse or an MTA showed that he was discharged at the 3CMS LOC with plans for psych line follow-up in five days and medical follow-up in seven days. Diagnoses of Mood Disorder NOS and Seizure Disorder were shown. Discharge medication orders were Depakote ER 1000, Remeron 15, Dilantin, and Ensure. There was no record further of his MHCB stay at CIM in the UHR.

The discharge summary was not signed by a psychiatrist or a psychologist and had no prominent indicators that he had been discharged from a psychiatric treatment setting.

He was back at CRC on 12/5/05. The bus screener at CRC did not know that he was returning from the MHCB. He was placed in a general population housing unit and a routine referral to mental health was made.

Assessment:

During his first crisis early in November this inmate was 29th on the wait list for a crisis bed. Later in the month, when his situation deteriorated and he became acutely suicidal, he did not have access to a crisis bed for several days. It was unclear at what point during his second OHU stay that a referral to an MHCB was initiated.

Treatment in the OHU fell far short of adequate. It was unacceptable. Risk assessments were not done when warranted, essential documentation was lacking and suicide watch observations were insufficient. He made three suicide attempts and inflicted superficial lacerations on himself while on constant watch.

Once referred on an emergency basis during the second crisis, he spent at least one more night in the OHU. Given his elevated level of risk he should have been hospitalized immediately.

When he returned to CRC, there were no records of his MHCB stay beyond what appeared to be a routine discharge summary that nowhere indicated he should be seen by mental health staff on an urgent basis. The urgency of his status was apparently undetected by the bus screener who made a routine referral to mental health. He was not

seen by mental health staff when he arrived but was placed in general population.

6.    Inmate F

This 3CMS inmate was moved from CIM to CRC around 9/2/05. He was treated with Geodon and Depakote at CIM. Shortly after arriving at CRC he was referred to mental health staff due to non-compliance with medication. He was seen shortly thereafter by mental health staff. There was no 128B documenting the referral. There was an alternative form of documentation regarding non-compliance in the UHR. Apparently mental health staff met with him and asked him questions regarding reasons for non-compliance.

He was in the OHU at CRC from 11/6-11/15/05. An SRAC was done on 11/7/05. It showed that his level of risk was elevated and concluded that referral to an MHCB was warranted. He was suicidal and planned to hang himself. He pierced a vein in his wrist while on constant one-on-one observation in the OHU.

He went to SVSP for MHCB treatment on 11/15/05. He was treated for Schizoaffective Disorder. His GAF was assessed at 30. He was medicated with Haldol, Vistaril, Lamictal and Cogentin.

The only documentation of MHCB treatment from SVSP was an MH-2, three progress notes written by a psychologist in the MHCB, and two chronos. He was discharged at the 3CMS LOC. There was no discharge summary in the UHR.

He returned to CRC 11/28/05 but did not go through the bus screening. His UHR was reviewed by CRC staff on 11/29/05. He was also seen by a psychologist on 11/28/05. Reportedly SVSP contacted CRC when he was discharged from the MHCB. A conversation about his missing UHR ensued. CRC staff had reportedly sent his UHR to SVSP, but SVSP staff could not locate the UHR at the time he was discharged.

He reportedly was at SVSP for six days between 11/22 and 11/28, but there was no documentation in the UHR regarding his stay during those dates.

Back at CRC he was seen for five days of follow-up spanning 11/29-12/3/05. No MARS for November were in the UHR. There was no way to determine whether medication continuity was sustained when he returned from the MHCB.

Assessment:

Access to a crisis bed was blocked in the case of this high risk inmate. Mental health treatment was inadequate. He remained in an OHU for over one week before being moved to an MHCB. He inflicted injury on himself while on constant observation in the OHU.

Five-day follow-up was conducted and documented in the UHR. The UHR did not

contain a MAR for November. Non-compliance in September elicited a mental health contact.

Incidentally, his stay at the MHCB exceeded ten days, but part of the stay may have been for administrative reasons. His UHR may have been misplaced for a time while he was at SVSP. No inpatient record of his MHCB stay was in the UHR. He did not return to CRC for six days after he was clinically discharged from an MHCB.

7.      Inmate G

Treatment of this 3CMS inmate, who had recently been at high risk of self-injury or suicide, was uncertain. Documentation of his recent treatment, including stays in crisis and/or OHU beds, was fragmented and disorganized. It did not yield a coherent account of events. He may have gone back and forth between CIM and CRC in May independently of any mental health considerations. He arrived at CRC on 5/16 and 7/28.

He was at RJD in February 2005. He was not on the mental health rolls. He went to CIM after February 2005. While at CIM he self-referred to mental health staff and complained of nightmares. He was placed at the 3CMS LOC and seen for five days of follow-up in May. In June he was again seen for five days of follow-up visits.

There was no indication that he was treated in the MHCB in May, but he may have been in June and he was admitted in July. A document completed in June resembled a discharge summary. It gave diagnoses and planned for five days of follow-up. The document showed that he was treated at the 3CMS LOC, had diagnoses of Depression and Personality Disorder NOS and orders for Remeron and Benadryl.

He was at CRC in July 2005. On 7/13/05 he reported suicidal ideation. An SRAC was done on 7/13, and he was found to be deteriorating and in need of a crisis bed. He was sent to CIM for MHCB treatment.

According to a log, he was returned to CRC on 7/28/05. No discharge summary regarding his MHCB stay was found in the UHR. He was seen for five-day follow-up on 7/16, 7/17, 7/18 and on 7/26, 7/30, 7/31, 8/1, and 8/2. A case manager note dated 7/26 said he was not distressed.

Assessment:

Poor documentation of mental health treatment obscured what may have been as many as three admissions to an MHCB or an OHU within a three-month period. There was no documentation on his treatment in CIM's MHCB in July. Following his return from the MHCB he was seen for four days of follow-up. No conclusions were drawn regarding his treatment. Any clinician treating this high risk inmate would be at a distinct disadvantage given the paucity of records of his recent treatment.

8.    Inmate H

DOB: 10/17/81. This 3CMS inmate was in CRC's OHU in February 2005 soon after he
arrived because he was delusional. He had orders for Vistaril, Neurontin, and Risperdal at
the San Diego Jail prior to coming to CRC. The CRC bus screening showed that he was
treated for depression at the sending institution.

His treatment plan of February 2005 was individualized. It showed diagnoses of
Psychotic Disorder NOS (PRO), Mood Disorder NOS (PRO), Polysubstance
Dependence, and a GAF of 57 and the 3CMS LOC. No psychotropic medications were
ordered for him after February 2005. Records of his OHU stay were not reviewed. It was
unclear from the UHR where he was or what treatment he received after being released
from the OHU in February.

He was seen by a psychiatrist in May 2005. He had no orders for psychotropic
medication. The physician did not order medication and planned follow-up on a prn
basis. In June he was seen by his case manager. They discussed his recent RVR and his
refusal of medication. He was described as unmotivated. He had a UCC in June because
he refused his assignment.

He remained on C-status for weeks or months in 2005. He was seen for quarterly
individual sessions by his case manager but more frequently when required by special
UCC meetings. When seen in August he was in no apparent distress. An SRAC done on
10/15/05 found no significant risk of self-injury or suicide.

Assessment:

Mental health treatment was adequate and consistent with program guidelines with
certain exceptions. Given staffing conditions at the institution, it is unlikely that a full
team was present at his IDTT meeting or that the team had access to information in his C-
file. His stay in the OHU may have been an exception to outpatient treatment that was
adequate overall.

9.    Inmate I

This 61-year-old inmate was treated at the 3CMS LOC. When see in a group interview on
12/6/05, he reported that some but not all of his medications were continued upon arrival.
He said he was taking a variety of medication for treatment of medical and psychiatric
problems. He said that he was being discharged to the community soon. He saw a
discharge planner two weeks ago. He thought that the plan, which was for him to return
to an SRO frequented by substance abusing residents, was not a good one for him. He
thought that the environment was unlikely to help him remain sober.

According to his UHR, he arrived at CRC from RJD on 10/19/05. He had orders for
Neurontin 1200 bid, Trazodone 300 and Seroquel 300. He had a timely initial IDTT. His
treatment plan showed diagnoses of Mood Disorder NOS and Alcohol Dependence in

institutional remission, with a GAF of 50. Due to the lack of a MAR for October, medication continuity upon arrival could not be determined with certainty.

A TCMP chrono dated 12/2/05 was in the UHR.

Assessment:

Mental health treatment was adequate. Given staffing at the institution, it is unlikely that a full team was present at his IDTT meeting or that the team had access to information in his C-file. No conclusions were drawn about whether his discharge plan was adequate or whether medication continuity was sustained on his arrival.

10.    Inmate J

DOB: 3/27/60. This 3CMS inmate was treated in the OHU at CRC, the MHCB at SATF and the MHCB at CIM.

He was in the OHU at CRC from 9/17-9/23/05. His mood was labile. He was escorted in restraints. He was described as toxic from snorting Wellbutrin. A nursing note said that he was brought to the OHU by a correctional officer because he exhibited bizarre behavior. He was sent out to a community hospital, returned after an unknown period of time and was placed on one-on-one observation. He was banging his head and stated to the nurse that he wanted to die. A note indicated that he had returned from the hospital and was in restraints on 9/20/05. Three days later he was sent to the MHCB at SATF.

He was in the MHCB at SATF from 9/23-10/4/05. After he returned to CRC three days of follow-up were documented spanning 10/6-10/8. Four days later he was sent to the MHCB at CIM.

He was at CIM 10/8-10/12. He returned to CRC on 10/12/05. A discharge summary written by a nurse or an MTA showed diagnoses of Major Depression, Polysubstance

Abuse, Asthma and a GAF of 51. He was discharged at the 3CMS LOC with orders for five days of follow-up.

Assessment:

This inmate was apparently in crisis for the better part of a month. His treatment in the OHU did not appear to follow any established protocols for observation or the use of restraints. Only three of five days of follow-up were carried out after he returned from his first MHCB stay. Documentation of his treatment in crisis beds was sparse. No conclusions were drawn regarding timely access to crisis beds.

EXHIBIT P

Richard J. Donovan Correctional Facility (RJD)

July 25, 2005 – July 26, 2005

1.    Inmate A

This EOP inmate was housed in the administrative segregation unit.  He was diagnosed with Schizophrenia, paranoid type, and treated with Seroquel 600 mg/day, Buspar 300 mg/day, Vistaril 200 mg/day and Cyproheptadine 4 mg/day.  His medical record was reviewed by the monitor's expert at the request of the plaintiffs' attorneys.

Inmate A had been at RJD since October 2003.  He had been housed reportedly in administrative segregation since December 2003.  The inmate was previously treated at the 3CMS level of care, but had been upgraded to the EOP level of care on 2/15/05.  The inmate's latest progress notes indicated that he was actively involved in group therapy in the administrative segregation unit.  Progress notes also documented that he was consistently followed by the case manager and the psychiatrist on the unit.

Inmate A was most recently described as exhibiting paranoid content, pressured speech and periods of mild lability.  According to his record, Inmate A was not consistently compliant with his prescribed psychotropic medications, but the last MAR located in the inmate's UHR was from April 2005.  The psychiatrist ordered the inmate's medications to be crushed and administered DOT.  Inmate A was described in recent clinical encounters as having a low suicide risk.

A review of the inmate's C-file yielded the following chronology of events:

October 20, 2003:  Inmate G arrived at RJD.

December 30, 2003:  This 3CMS inmate was diagnosed with Bipolar Disorder and placed in the administrative segregation unit for safety and security concerns. He was in the protective custody unit, but experienced "interpersonal problems with peers" and did not want to continue in that unit.  He remained in administrative segregation pending reception center processing.  Inmate G requested placement in sensitive needs housing.  He was referred to the CSR for a 90-day administrative segregation extension.

February 24, 2004:  The CSR retained this inmate in the administrative segregation unit for 90 days pending reception center processing and possible sensitive needs housing.

April 7, 2004:  Inmate G was referred at an ICC review to CSR for a 90-day extension of his administrative segregation stay pending reception center processing.

June 17, 2004:  The CSR approved another 90-day extension pending transfer due to the inmate's safety concerns.

June 30, 2004:  Behavior issues were reviewed by the ICC.  Inmate G received a RVR for mutual combat on 12/30/03, a RVR for refusing a direct order to double-

cell on 1/11/04, a RVR for willfully delaying and obstructing a peace officer on 1/27/04 and a RVR for obstructing a peace office in performance of duty on 5/16/04.  The ICC concluded that the inmate was not compatible with sensitive needs placement and recommended indeterminate housing in the SHU and transfer to the SHU at CSP/Corcoran.

July 29, 2004:  A classification chrono indicated that the CSR disagreed with the ICC about sensitive needs placement, indicating that RVRs do not make an inmate incompatible with sensitive needs housing.  This inmate's case was sent to the CSU for resolution.  A 60-day extension of the inmate's administrative segregation stay was approved pending CSU review.

August 18, 2004:  The ICC concurred with the inmate's request for sensitive needs placement.  The case was referred to CSR for another 90-day extension, pending reception center processing.

October 12, 2004:  The CSR approved a 30-day administrative segregation extension pending reception center processing.

November 11, 2004:  The ICC referred the inmate's case to the CSR for a 90-day administrative segregation extension pending reception center processing with the following notation:  "No further inquiry into IM's safety concerns will be conducted. Case closure has been completed.  IM is requesting SNY placement and ICC concurs."

January 10, 2005:  The CSR approved a 90-day administrative segregation extension "to complete investigation into inmate's safety concerns."

February 9, 2005:  The ICC referred the inmate yet again to the CSR for a 90-day extension pending reception center processing.  It was noted that the safety investigation "has been completed".

March 17, 2005:  The CSR approved a 30-day extension "to complete investigation into inmate's safety concerns and RC processing."

April 13, 2005:  The ICC reviewed the inmate's EOP level of care and referred his case to the CSR for a 90-day extension pending reception center processing with the following note:  "Case is ready for work-up transfer to PVSP IV SNY/MCSP IV SNY."

May 19, 2005: The CSR approved a 45-day extension "to complete RC casework."  The CSR found "no reason to justify a delay in the processing of this case. PLEASE EXPEDITE."

May 25, 2005:  The ICC reviewed the case and made the following notation: "SNY placement was considered but does not appear warranted at this time as IM

safety concerns appear specific to the Southern region.  IM is requesting placement at CMC-E.  ICC notes prior SNY request.  IM stated in committee he can program at CMC-E.  Refer to CSR for 90-day ASU extension and for CMC-E override with an alternative of SAC IV.  RC processing is being delayed pending medical chronos (TB)."

Assessment:

This inmate's UHR did not reveal any problems with the documentation of clinical contacts.  He was reportedly non-compliant with his medications, but his most recent MARs were not available to review.

The inmate's prolonged length of stay in administrative segregation was partially due to changed case factors, specifically a change in the inmate's level of care from 3CMS to EOP, confusion regarding the inmate's sensitive needs status and the inmate's disciplinary infractions.  Despite this, RJD's inexplicable failure to complete reception center processing appeared to be the primary obstacle to the inmate's transfer.

2.      Inmate B

Inmate B completed suicide by hanging in a single cell in administrative segregation on 6/11/05.  The inmate had been admitted from a county jail to RJD on 5/19/05 with a positive bus screening for psychotropic medications.  Inmate B had a history of Bipolar Disorder and was being treated with Depakote and another medication prior to his admission.  Notes in the chart indicated that the inmate was not compliant with his Depakote and had missed eight doses of medication in three weeks.  Although the inmate had a history of Bipolar Disorder as well as a seizure disorder and a positive bus screening, he was not placed in the MHSDS.  Inmate B requested to be housed in administrative segregation for safety reasons related to a gang altercation and was moved from Facility 4 to Building 16, the overflow administrative segregation unit.

A review of the UHR revealed that Inmate B's medications were reordered at RJD based on his county jail treatment, but he was never seen by a psychiatrist.   Inmate B was seen by a psychologist on 5/25/05 and by a second psychologist on 5/31/05.  His MH-7 indicated a positive mental health screening.  Inmate B was seen by a psych tech in B, the overflow administrative segregation unit, on 6/11/05, the date he committed suicide.  There was no MH-3 in the inmate's chart, but the inmate reportedly had a negative administrative segregation screening on that date.

Inmate B's cell was checked on 6/11 at approximately 11:12 p.m. for the 11:30 count.  The correctional officer conducting the count initially recorded the inmate's cell as empty and indicated that "there's not an inmate in the cell, only a dummy."  When the count was off by one inmate, a second correctional officer went to check for the inmate and discovered him hanging in his cell at approximately 12:00 midnight.  CPR was instituted by the MTA four to five minutes after the inmate was discovered and cut down.  The inmate's condition was described as "skin warm, pale color, unresponsive, no pulse or

respiration." A note in the inmate's cell window stated that skinheads could not get him where he was going.

Assessment:

There were multiple problems with the care and management of this inmate. Inmate B was not placed in the MHSDS, despite a positive bus screening, and he was not seen by a psychiatrist, even though his medications were continued upon arrival. In addition, there were concerns regarding the psych tech's meeting with the inmate on 6/11/05, which was not recorded on a MH-3. The correctional officer's description of the cell as empty with a "dummy" and the delay in finding the inmate were also matters of great concern, particularly since the inmate was described as having warm skin when he was discovered. Lastly, CPR was started by a MTA, not a correctional officer, four to five minutes after the inmate was found and cut down. A more comprehensive review of this inmate's death will be conducted when additional information is available.

3.    Inmate C

Inmate C completed suicide on 6/20/05, with a reported death by injection of a controlled substance and exsanguinations secondary to throat slashes. The inmate entered the CDCR system on 3/25/87 on his third offense, a conviction for murder with a 76-year term. Inmate C arrived at RJD on 9/22/97. He had diagnoses of Mood Disorder, Poly-substance Dependence, Antisocial Personality Disorder, Dysthymia and Hepatitis C; he was receiving Interferon for his Hepatitis. On 5/31/05, he had requested removal from the 3CMS program. The psychiatric MH-2 for that date indicated that psychiatric treatment would be discontinued. A letter from a staff psychologist to the warden, dated 6/20/05, reported that the inmate had been seen by the psychologist on June 14 and was not suicidal or depressed. According to the note, the inmate was calm, coherent and receptive, with euthymic mood. He said that he was "doing okay" and denied any suicidal or homicidal ideation or hallucinations.

The plan was to discontinue his psychiatric treatment and to have one-to-one counseling on a p.r.n. basis.

The incident summary of 6/21/06 reported that pruno, two syringes and a razor blade were found in the cell. As described in the summary, the inmate had superficial cuts with hesitation marks to the neck with toxicology positive for methamphetamine and morphine. The actual incident report in the inmate's record indicated that Inmate C was discovered at 1:30 p.m. The Investigative Services Unit team put on protective clothing because there was a pool of blood in the cell and then entered the cell with transport starting at 1:45 p.m. No CPR was performed prior to transport. CPR was noted to have started at the TTA following this delay at which time the inmate's core temperature was recorded as 100.4 degrees.

Assessment:

There were a number of areas of concern relative to this inmate's care and treatment, including the intent to remove him from the MHSDS, the discontinuation of his mental health treatment and the delay in entering his cell and beginning CPR. A comprehensive review of this inmate's death will be conducted when more information is available.

4.    Inmate D

Inmate D was a 30-year-old American Indian who completed suicide by hanging in the CTC on 7/25/05. This EOP inmate had a history of severe asthma and a positive PPD; he was noted to have been steroid dependent and was utilizing oxygen prior to his admission to the CDC. The inmate was discovered hanging by the braided IV tubing that had been used for his oxygen supply in the CTC.

This inmate was apparently admitted to the CDCR system on 10/22/04, when he was placed in the MHSDS as a 3CMS inmate. He was subsequently transferred to an outside hospital; his last hospital admission was from 5/30 to 6/6/05. Thereafter, he was readmitted to the CTC as a medical patient and prescribed steroids at 60 – 80 mgs per day as well as oxygen. He was followed in the CTC jointly by the medical department for his asthma and steroid dependence and by the psychiatric department for his mental health symptoms, which included labile and irritable mood, medical refusals and paranoia.

The inmate's CTC course was described as rocky. He ripped out his IV on 6/28/05, splashing bodily fluids in a correctional officer's eyes. On 7/8/05, a psychiatrist described his condition as deteriorating; the inmate was throwing food, hyperventilating and showing signs of paranoia. Although there was no evidence of hallucinations or suicidal ideation, the psychiatrist indicated that the inmate "verges on being delusional."

On 7/20/05, the psychiatrist suggested that the inmate might be suffering from a steroid induced mood disorder, but the available treatment modalities were limited because of his medical condition. He was treated with Zydis and Lamictal. On 7/21/05, the psychiatrist indicated that the inmate might have "steroid induced rage," that his insight and judgment were very poor and that he was even more agitated with labile mood. The inmate was described as banging his head and reporting that he was "losing it." On 7/25/05, the psychiatrist wrote an addendum to his note of 7/21, indicating that the inmate had been agitated on Thursday and possibly in need of restraints but that he was calmer on Friday and no restraints were necessary. The charges of splashing bodily fluids on a correctional officer were discussed. The psychiatrist noted that the inmate never mentioned or threatened suicide, but did ask for a "do not resuscitate" order the week or two prior to his actual suicide.

Assessment:

There are a number of questions regarding this inmate's care and treatment. The inmate's escalating psychiatric symptoms, including agitation, paranoia and delusional or near delusional thinking, as well as the implication that restraints might have been necessary, were matters of concern. A comprehensive review of this inmate's care, treatment and death will be conducted when more information is available.

The monitor's expert had an opportunity to view the inmate's cell. Inmate D completed suicide using the oxygen tubing attached to a large mesh box that enclosed the TV over the toilet. This box prevented a line of sight by medical staff in this cell, although the cell was used for medically ill inmates.

5.      Inmate E

Inmate E was thought to have completed suicide on 1/4/05, 2005, with the cause of death "unknown" at that time. Subsequently, the cause of death was noted as "sudden" and the manner of death as "natural". According to his record, this EOP inmate arrived at RJD on 6/24/04. He had a history of suicide attempts. An MH-2 dated 10/20/04 indicated a diagnosis of Major Depressive Disorder, Recurrent and Severe with Psychotic Features, Seizure Disorder and Cirrhosis. He had a history of seizure disorder, hypertension and end-stage renal disease; a note of 12/23/04 indicated that the inmate had been on dialysis for approximately one year. The inmate was prescribed Effexor and Lexipro and was noted to have improved.

Inmate E was scheduled for release on 1/29/05, 25 days after his death. On 11/23/04, the inmate met with a TCMP worker and plans were made for him to be released to a skilled nursing facility. Several days prior to his death, a CT scan indicated a possible old stroke. The day prior to his death, the inmate was noted to have ataxia and a Dilantin level was ordered.

An autopsy report, dated 1/5/05, the day after the inmate's death, showed hypertensive cardiovascular disease and anticonvulsant drug levels in the normal range. There was no trauma with the manner of the inmate's death noted. The incident report indicated that correctional officers came to the inmate's cell at 3:00 p.m. to transport him to dialysis and found him unresponsive. CPR was conducted, but the inmate did not survive.

Assessment:

This inmate's death was ruled a sudden death and the manner of his death was determined to be from natural causes. The inmate's care, treatment and death will be further reviewed, if the cause of death is modified or suicide is indicated.

6.    Inmate F

This inmate's care and treatment were reviewed at the request of plaintiffs' counsel, who had questions about a change in his level of care from EOP to 3CMS and about his placement in administrative segregation. A review of the record indicated that the inmate had not been on any medications since August 2004. Attempts were made by clinicians to see him out-of-cell for mental health evaluations on 5/16 and 5/26/05, but the inmate refused out of cell contacts. On 6/16/05, the case manager indicated that the inmate had reported severe anxiety, racing thoughts since 1996 and approximately two hours of sleep per night. At that time, the inmate was five months away from parole, but had been charged with two or three counts of attempted murder on a correctional officer at CEN. The inmate told his case manager that the correctional officers' union was provoking assaults by inmates on officers and "fostering racism."

A case management note dated 5/26/05 indicated that Inmate F was at the 3CMS level of care, but suggested that the inmate did not need to be in the MHSDS. On 6/20/05, a psychiatrist attempted to interview the inmate; according to the progress notes, the inmate refused to attend the interview. The psychiatrist's notes from that date further indicated that the inmate was not on psychotropic medications and that he was not in the MHSDS. On 6/21/05, an IDTT meeting was held, indicating that the inmate had been at the 3CMS level of care since 3/15/05 with a diagnosis of Psychotic Disorder NOS and PCP Dependence, with secondary diagnoses of Rule Out Delusional Disorder, Antisocial Personality Disorder and Schizotypal Personality Disorder. The inmate's GAF was noted as 65. His MH-2 was only signed by a case manger and not by a psychiatrist or correctional counselor; the inmate did not sign the MH-2 either. A case management note from 6/27/05 reported the inmate as saying, "I'm doing just fine" during an interview in the administrative segregation law library. On 7/21/05, a psychiatrist indicated that the inmate refused to attend clinic and was scheduled for return in four months.

Assessment:

This inmate's care and treatment were curious, at best, in that he has had diagnoses of serious and persistent mental illness but, by the time of the monitor's visit, he had not received psychotropic medications for almost one year and had been refusing appointments. An IDTT meeting should have been held to review his care and treatment and to determine the most appropriate diagnosis and treatment interventions for his overall care and management.

EXHIBIT Q

California Institution for Women (CIW)

August 29, 2005 — August 30, 2005
October 4, 2005

1.    Inmate A

This inmate/patient was treated at the EOP level of care. Although over 50 years old she was serving her first prison term. She was due to be released in the near future.

She had a bus screening on April 28, 2005 when she arrived from LA County. She was not taking psychotropic medication when she arrived at CIW but was referred to mental health by the bus screener due to a history of psychiatric treatment. She had a mental health screening the day after admission to CIW. The screen was positive. She was seen by mental health that day and an MH-7 was completed. She was also designated EOP and seen by a psychiatrist that day.

She reported symptoms of psychosis and was ordered Geodon 20 bid increasing to 40 bid, Remeron 15 q hs increasing to 30 q hs. She was housed in the EOP unit. According to the MAR for May, she did not receive medication on May 1, 2 or 3.

Although psychiatry planned to follow-up in two weeks, she was seen for follow-up three weeks later. Her first case manager contact was on May 19, over two weeks after entering the EOP unit. Her IDTT meeting on May 25 was three weeks after she arrived in the EOP. Early in May, within three days of arriving, she was scheduled to attend two hours of group five days per week.

The treatment plan indicated that a full team attended the IDTT meeting. The plan contained individualized patient information but the plan itself, which called for "medication management monthly, groups daily and individual case management weekly" was generic. No attempt was made to link her treatment needs or personal characteristics to the groups that she would attend or to tailor the treatment provided.

Individual case manager contacts were made monthly. She was seen by a case manager on June 16 (no UHR), June 23, August 12 and July 15. No UHR was available to the clinician on August 12. She was seen by psychiatry on August 1 and July 5. No UHR was available on July 5.

According to a summary in the UHR, she attended only two groups during her first week in the EOP. She was scheduled to attend four additional groups, but they were cancelled. She attended a total of 27 group sessions in May. Eighteen group sessions were cancelled, and two were not held due to a holiday. She elected not to attend five groups. There was no documentation of her group treatment for June or July in the UHR.

Informed consent was in the UHR.

Assessment:

Response at intake to urgent referrals was appropriate. The administration of medication was delayed for three days after she went to the EOP unit. HS medication was administered around 5:30-6:30 p.m. in the EOP. Once she was in the EOP she received little treatment. Her IDTT meeting was late. Progress notes filed in the UHR were out of order. There were indications that some mental health progress notes were missing from the UHR.

2.    Inmate B

This 3CMS inmate/patient was referred to CIW's OPHU from CRC on April 26, 2005 because she was suicidal and agitated. CRC staff called CIW OPHU staff, and she was accepted for OPHU housing. She arrived at CIW at 2100 on 4/26/05. She was admitted and medicated.

She was discharged the following day. An SRAC was done prior to discharge. She was discharged to the EOP unit. She was seen for follow-up each of the next six days. She was discharged back to CRC within a few days of completion of the six-day follow-up.

A short time later, on May 12, while at CRC she reported command hallucinations. An SRAC found that she needed to be in a crisis bed on suicide precautions and she was referred back to CIW, admitted and transported. After approximately five days in the OPHU, she was discharged with plans for five- day follow-up. She was seen daily for the next six days. She was designated EOP.

She had diagnoses of Major Depressive Disorder, recurrent, severe with psychotic features, a history of substance abuse, TB and a seizure disorder. She was medicated with Seroquel and Effexor at CIW.

An ICC hearing on 5/25/05 considered her for endorsement to CIW or CCWF in light of her level of care.

In the EOP she was enrolled in the SAP and she met weekly with her case manager. She was seen monthly by a psychiatrist.

Assessment:

The OPHU functioned as an MHCB by admitting patients from other institutions. The appropriateness of treatment during her OPHU stay was not assessed by the monitor's expert. The EOP unit was used for observation during five-day follow-up prior to return to her assigned institution, calling into question whether she would receive five-day follow-up after returning to her assigned housing unit at CRC. There was an unanswered question of whether custody observations were made and documented during the two periods of post-discharge follow-up.

Custody and clinical staff worked together expeditiously to place her in the level of care she needed. Shortly after the finding by mental health staff that she needed the EOP level of care, an ICC meeting was held, she was endorsed to CIW and she remained in the EOP unit.

3.    Inmate C

The review below was excerpted from the UNA report of March 2005:

Only Vol 3/3 was reviewed. DOB: 12/9/69. This case was included because she had multiple admissions to the OPHU or MHCB. She attended four hours of group treatment on average per week during the last four months. She was admitted to the OPHU on multiple occasions. Most recently, she returned from PSH in October 2004. Prior to that, she was treated at PSH in October 2003 subsequent to decompensation at CIW. At that time, she believed that prison officers were changing her body parts and assaulting her. She had three prior hospitalizations at PSH prior to 2000 and was there for one year, from October 2003-October 2004.

She returned with orders for Zyprexa 25, Loxitane 5, and Depkene 1250. Her regimen at CIW did not include Zyprexa; the dose of Loxitane was increased.

She had a 180-day Keyhea order from November 2003-May 2004. It was not renewed. At CIW, she was treated at the EOP LOC. She was housed in Ad Seg in December 2004 following her discharge from the OPHU.

Dates OPHU. • 10/10; 10/14; 11/27; 12/14; 12/17. She had not been sent to an MHCB during the past six months. As above, she returned from Patton after a stay of one year in October 2004. Since her return she had five OPHU admissions. She wanted to return to PSH, was uncooperative, angry and refused some doses of medication. She also seemed depressed and voiced suicidal ideation.

She had a diagnosis of Schizophrenia, paranoid type and was medicated with Loxitane 100 and Depakote ER 750. MARs did not reveal whether she was compliant with medication. The UHR did not contain a MAR for January, but a lab done in January showed that her VPA level was within the therapeutic range. She appeared to be compliant in December before and after her stay in a crisis bed but to staff she appeared to be responding to internal stimuli. When she threatened to harm another inmate, OC was used, and she was transferred to Ad Seg. She remained there only a few days before returning to the EOP.

On 11/26 she incurred a R VR for mutual combat requiring the use of force (OC). A summary of classification information indicated that she had 56 points, Level IV.

According to recent progress notes, she harbored the same crystallized delusions regarding maltreatment by custody staff that had been observed when she was hospitalized at PSH. She continued to exhibit no insight into her illness and assert that

she did not need medication. She said she wants to the 3CMS LOC.

When interviewed on 2/18/05, she was neatly dressed and well groomed. Her manner was pleasant and cooperative. It was evident that she was eager to please, but she was extremely uncomfortable during the interview. She readily voiced the persecutory thought content about officers harming her and believed it was happening at this time. She believed that she was slated to stop taking Loxitane within the next two weeks and transfer to the general population.

Staff reported that she was very uncomfortable sitting and talking in EOP groups.

<u>Team discussion</u>: She was not doing well even three months after arriving at CIW... Her judgment and insight were extremely impaired. She had multiple crises and elicited the use of force. Treatment offered in the EOP was not therapeutic for her. She needed a higher level of care.

<u>Assessment</u>:

This case illustrated a problem. This inmate was too low functioning to benefit from EOP treatment provided at CIW but was deemed unsuitable for admission or readmission to PSH due to a history of disruptive behavior or a chronic condition that was previously unresponsive to treatment at PSH.

*This case was brought to the attention of the monitor's experts by CIW staff during the October 2005 visit to illustrate a problem with access to DMH beds. Staff provided a copy of DMH's letter of rejection. Rather than reviewing the record on site in October 2005, the experts accepted at face value the staff's assessment that this inmate needed a higher level of care.

4.    Inmate D

Inmate D was referred to PSH because she needed intermediate care on 9/8/05. She was not sent because she was within one month of her parole date.

A clinical note dated 9/8/05 described her as posturing, yelling, screaming, refusing to answer questions, irrelevant, paranoid, suspicious, responding to internal stimuli and having poor insight. She was diagnosed as having a Psychotic Disorder NOS.

Her transfer to PSH was cancelled on 9/15/05. She was seen in CIW's EOP on 9/26/05 by a psychiatrist who did not have her chart. She was given a diagnosis of Bipolar Disorder in partial remission. She was medicated with Depkene and Risperdal. Lab tests were ordered.

While in the EOP unit she received little treatment. Four clinical contacts spanning 9/14-9/26/05 appeared to be the extent of her treatment.

She may have been released on parole at a time when she was acutely ill.

<u>Assessment</u>:

This acutely ill woman received inadequate treatment while at CIW and was not successfully referred to a higher level of care. She needed acute care but was instead referred to intermediate care. Her transfer to the DMH facility responsible for providing intermediate care was cancelled in mid-September because she was scheduled to parole in October.

EXHIBIT R

Central California Women's Facility (CCWF)

September 7, 2005 – September 9, 2005

1.    Inmate A

Inmate A was admitted to the EOP program on 8/25/05, 13 days prior to her interview with the monitor's expert. She was interviewed by the expert at the request of the psychiatric staff. The inmate was acting very bizarrely and was believed to be undergoing some form of psychotic process. She had been placed on Haldol Decanoate 100 mg, but responded to the medication slowly and poorly continuing to act in a bizarre manner. The inmate had been confined to quarters and placed on walk-alone status for the preceding last ten days. Oral Haldol was added to her regimen the prior week, but her response continued to be poor and her course variable. Reportedly, the inmate was drooling and screaming on the day of the expert's interview and appeared to have deteriorated even further. She was removed from her cell for a very brief shower several days earlier.

On evaluation by the monitor's expert in the presence of her female case manager, Inmate A stared continuously into her mirror without moving or making a response; she appeared to be looking sideways. Her room was grossly disheveled and she was wearing no bottoms. Her door was cracked, but efforts to speak with her received no response whatsoever. Inmate A continued to scream and appeared to be drooling. Her fists were clenched. Her chart was not reviewed as it was required for her admission to the MHCB.

Assessment:

- Inmate A required immediate acute care for what appeared to be a severe psychosis.

- Rule out post-ictal phenomenon, rule out EPS, was needed.

- In consultation with the psychiatrist staff, the inmate was subsequently admitted to the MHCB unit and treatment for EPS was initiated.

2.    Inmate B

This EOP inmate was interviewed by the monitor's expert at the request of her case manager. She had just been admitted to the EOP unit from the yard on 9/8/05 and was reportedly acting very bizarrely. In the shower, she was speaking Spanish, which she was never known to do, and masturbating. She was apparently well known to the EOP staff and to the psychiatric staff.

The inmate was evaluated by the expert in the shower area. She was fully dressed, but her speech was rambling. She was speaking what seemed to be Spanish and used some Spanish words, but her speech was essentially gibberish. She did not respond to questions framed either in English or Spanish and appeared to have a very prominent thought disorder. Her case manager, other staff and the psychiatrist felt that they would be able to get her back on her medications.

An unsigned note by her yard case manager, dated the day of her admission to the EOP unit, indicated that she was grossly psychotic and had been seen by the yard psychiatrist along with a Spanish-speaking interpreter. The note indicated that Inmate B was speaking "word salad," was

very disoriented and delusional. She had been non-compliant with her medications for one month. A psychiatric note on the same day indicated that the inmate was seen pursuant to a non-compliance referral. A psychiatric note one month earlier indicated that Inmate B was on no medications and was hearing "voodoo voices." Her speech seemed alright at that time and she indicated that she missed her children and was homesick. The psychiatrist felt that the inmate was not suffering from a true psychosis and decided to monitor her without medications, which she was thought to be refusing. The inmate did not show up for a case manager visit scheduled for 9/6/05. Her recent history indicated that she was discharged from the yard to the EOP unit on 5/5/05, where she had been briefly treated as a PSH returnee.

Assessment:

- This inmate had a genuine serious mental illness characterized by concrete and tangential thinking and a florid thought disorder; she was very agitated and needed medication urgently.

- The senior supervising psychiatrist, who was substituting for the EOP psychiatrist, indicated that the inmate was well known to him and started her on medication immediately.

- This inmate's medication non-compliance was mismanaged. Inmate B was obviously becoming psychotic one month earlier and had been off medications for a month. Either the psychiatrist's response to her non-compliance referral was very late or the identification of the inmate as non-compliant was delayed.

3.    Inmate C

Inmate C had been known to the monitor's expert for many years. The inmate was seen by the expert as a follow-up to an evaluation conducted one year ago. At that time, the inmate complained of being held in the "special management cell" for 13 days without treatment or observation. This assertion proved, upon investigation, to be true. Moreover, the investigation showed that the inmate had been housed in that cell for agitation and erratic behavior, which were side effects caused by her medication. The nurses who saw the inmate in response to her complaints did not recognize that she was experiencing side effects, nor did other staff in the EOP unit. Inmate C was not seen by a psychiatric during that time.

Thereafter, the inmate was interviewed by the senior supervising psychiatrist and seemed to have stabilized. Upon returning the following week for the UNA study, the monitor's expert learned from the inmate that she had been inappropriately and for no good reason placed back in the special management cell for three days. This cell appeared to the monitor's expert to function as a de facto OHU cell. At the exit conference, the expert recommended that the institution either abandon the use of this cell for mental health purposes or create criteria for admission to and discharge from the cell, along with policies and procedures for staff observation and treatment of inmates held in the cell.

During this monitoring visit, Inmate C indicated that she had been sent to PSH one week

following the UNA study, pursuant to the monitor's recommendation. The inmate remained at PSH until May; from there, she was sent to CIW for one month because she was on Clozaril and was then transferred back to CCWF. CIW wanted to keep her longer, but she wished to come back to the EOP unit at CCWF. Inmate C had a parole board hearing coming up in mid-2006. She experienced great stress in anticipation of the hearing and wanted to prepare for it at CCWF. She indicated seriously that she would kill herself, if she was rejected by the parole board.

Inmate C stated that she did well on Clozaril at CIW, but complained that her Clozaril was discontinued three days after her arrival at CCWF. The inmate reported that she had not been placed back in the special management cell, but she said that another inmate had been held in that cell three weeks earlier for several days before being sent to the MHCB unit. Inmate C said that she had to help clean up the management cell, which she described as "awful".

In a subsequent interview in the presence of the EOP clinical director and her case manager, the inmate indicated that she continued to hear voices and sometimes believed that people were reading her mind. She described these phenomena almost with a sense of embarrassment as such symptoms were unusual to her. It appeared that while the inmate was tearful and depressed on Clozaril, her psychosis was in remission. She was not doing as well on Zyprexa.

A review of the inmate's UHR revealed that she arrived from CIW on 6/5/05 on Clozapine, Lamictal, Dilantin and Synthroid. On 6/9/05, her Clozaril was discontinued and Zyprexa 20 mg q.p.m. was initiated. There was no psychiatric note or face-to-face evaluation recorded as the basis for discontinuing the inmate's Clozaril and starting Zyprexa. A review of the inmate's progress notes from CIW revealed that, on 5/20/05, her diagnosis was Bipolar Disorder, in full remission, Borderline Personality Disorder and Seizure Disorder. On 5/24/05, the inmate was noted to be tearful, depressed and doing poorly clinically. A transfer was anticipated. The first note recorded at CCWF was a note by an EOP clinician on 6/14/05. The first psychiatric note in the inmate's chart was dated 6/21/05.

Assessment:

- The special management cell at CCWF was reportedly still in use.

- The inmate's Clozaril was stopped by an unknown physician without a face-to-face evaluation.

- Although Inmate C's Axis I disorder was in full remission on Clozaril, she remained tearful and depressed. She was not doing as well on Zyprexa. In light of these considerations, the use of Clozaril should have been reconsidered.

- There were no evaluations or progress notes in the inmate's chart during the first week of her incarceration at CCWF.

The following ten charts were part of a study of treatment planning to determine the extent to which patients received treatment services called for in their treatment plan, and whether those services were appropriate to their mental health needs. Patients diagnosed under the rubric of

Medical Necessity were studied, including diagnoses of Post Traumatic Stress Disorder, Generalized Anxiety Disorder and Depressive Disorder NOS.

4.    Inmate D

Inmate D had been place on the 3CMS caseload in May 2005 and was housed in the administrative segregation unit for fighting.  The inmate's first treatment plan, however, was not completed until July of 2005.   The plan indicated a diagnosis of Panic Disorder with Agoraphobia.  A subsequent treatment plan was created on 8/24/05 for reasons that were unclear. The inmate's treatment plan called for case management visits every two weeks and psycho-educational group therapy.

Inmate D made a request to be seen on 5/19/05, indicating that she has been waiting one month to see a mental health clinician following her first referral.  The inmate was not seen pursuant to those requests but, on entry to the administrative segregation unit on 5/31/05, she received a 31-question screening, which was positive.  The inmate's first psychiatric contact was on 6/14/05. She was seen bi-weekly and, at some point, was placed in administrative segregation.  The inmate was referred for group therapy and was placed on medications which were helpful.

Assessment:

- This inmate received adequate, albeit delayed, treatment planning.

- Appropriate mental health care and group referral were provided for Inmate D, although her group therapy could not be given because she was in the administrative segregation unit.

- Psychiatric response to this inmate's referral was delayed.

5.    Inmate E

This inmate's treatment plan was dated 7/8/05.  The inmate had a diagnosis of Post-Traumatic Stress Disorder and group therapy was contraindicated.  Inmate E requested to be seen on 5/29 and was seen on 6/2/05.  The IDTT note in the inmate's chart indicated a return visit in 90 days for regular case management.

Assessment:

- This symptomatic inmate for whom group therapy was contraindicated was not provided appropriate treatment services.

6.     Inmate F

This patient has no current treatment plan. A 3CMS chrono was dated 5/16/05. Inmate F had a MH-7 on May 24, 2005 and was referred to psychiatry. She was not seen by a psychiatrist until 6/27/05. Her first case manager visit was 9/2/05.

Assessment:

- This inmate had no treatment plan.

- Inmate F's treatment was delayed.

- Appropriate mental health services were not provided to the inmate.

7.     Inmate G

Inmate G's treatment plan was dated April 2005 and contained various diagnoses, but not her main Axis I diagnosis, which is Post-Traumatic Stress Disorder. The inmate was diagnosed in the notes as having ADHD and Bipolar Disorder. She received her first and only case manager visit on 7/5/05.

Assessment:

- This inmate had an inadequate treatment plan.

- The treatment services provided to this inmate suffering from Post-Traumatic Stress Disorder were inadequate.

- The inmate was reportedly stable on medications.

8.     Inmate H

This inmate's treatment plan was dated September 2004. It called for psychiatric and case management contact consistent with program guide requirements, bibliotherapy and narcotics anonymous. Group therapy focused on anger management was recommended as available. The inmate never received any group therapy. A psychiatric note dated 7/15/05 indicated that Inmate H was "stable" on medications.

Assessment:

- This inmate never received the group therapy called for by her treatment plan.

- The inmate appears to be functionally stable on medications.

9.    Inmate I

Inmate I had a treatment plan dated January 2005 which contained diagnoses of Depressive Disorder as well as opioid and alcohol dependence. The inmate's treatment plan simply called for case management and psychiatric contact every 90 days and "group." An IDTT note dated 1/12/05 indicated the possibility of a serious mental disorder. While there were four psychiatric medication reviews in the inmate's chart, there were no notes by the case manager and the inmate was not receiving group therapy.

Assessment:

- This inmate was not receiving the group therapy called for by her treatment plan.

- The inmate received no case manager visits whatsoever.

10.    Inmate J

Inmate J's treatment plan was dated December 2004 and called for case manager and psychiatric contact as needed along with institutional programs and alcoholics anonymous. The last case manager note in the inmate's chart was dated 4/27/05 and indicated that the inmate was still symptomatic. Inmate J was scheduled to receive weekly alcoholic anonymous sessions when available. She was in no group psychotherapy. The inmate's medications were not helping.

Assessment:

- Inmate J had an inadequate treatment plan.

- The inmate did not receive adequate mental health services.

- Supportive group therapy might have been beneficial for this inmate.

EXHIBIT R

<u>Central California Women's Facility (CCWF)</u>

September 7, 2005 – September 9, 2005

1.    Inmate A

Inmate A was admitted to the EOP program on 8/25/05, 13 days prior to her interview with the monitor's expert. She was interviewed by the expert at the request of the psychiatric staff. The inmate was acting very bizarrely and was believed to be undergoing some form of psychotic process. She had been placed on Haldol Decanoate 100 mg, but responded to the medication slowly and poorly continuing to act in a bizarre manner. The inmate had been confined to quarters and placed on walk-alone status for the preceding last ten days. Oral Haldol was added to her regimen the prior week, but her response continued to be poor and her course variable. Reportedly, the inmate was drooling and screaming on the day of the expert's interview and appeared to have deteriorated even further. She was removed from her cell for a very brief shower several days earlier.

On evaluation by the monitor's expert in the presence of her female case manager, Inmate A stared continuously into her mirror without moving or making a response; she appeared to be looking sideways. Her room was grossly disheveled and she was wearing no bottoms. Her door was cracked, but efforts to speak with her received no response whatsoever. Inmate A continued to scream and appeared to be drooling. Her fists were clenched. Her chart was not reviewed as it was required for her admission to the MHCB.

Assessment:

- Inmate A required immediate acute care for what appeared to be a severe psychosis.

- Rule out post-ictal phenomenon, rule out EPS, was needed.

- In consultation with the psychiatrist staff, the inmate was subsequently admitted to the MHCB unit and treatment for EPS was initiated.

2.    Inmate B

This EOP inmate was interviewed by the monitor's expert at the request of her case manager. She had just been admitted to the EOP unit from the yard on 9/8/05 and was reportedly acting very bizarrely. In the shower, she was speaking Spanish, which she was never known to do, and masturbating. She was apparently well known to the EOP staff and to the psychiatric staff.

The inmate was evaluated by the expert in the shower area. She was fully dressed, but her speech was rambling. She was speaking what seemed to be Spanish and used some Spanish words, but her speech was essentially gibberish. She did not respond to questions framed either in English or Spanish and appeared to have a very prominent thought disorder. Her case manager, other staff and the psychiatrist felt that they would be able to get her back on her medications.

An unsigned note by her yard case manager, dated the day of her admission to the EOP unit, indicated that she was grossly psychotic and had been seen by the yard psychiatrist along with a Spanish-speaking interpreter. The note indicated that Inmate B was speaking "word salad," was

very disoriented and delusional. She had been non-compliant with her medications for one month. A psychiatric note on the same day indicated that the inmate was seen pursuant to a non-compliance referral. A psychiatric note one month earlier indicated that Inmate B was on no medications and was hearing "voodoo voices." Her speech seemed alright at that time and she indicated that she missed her children and was homesick. The psychiatrist felt that the inmate was not suffering from a true psychosis and decided to monitor her without medications, which she was thought to be refusing. The inmate did not show up for a case manager visit scheduled for 9/6/05. Her recent history indicated that she was discharged from the yard to the EOP unit on 5/5/05, where she had been briefly treated as a PSH returnee.

Assessment:

- This inmate had a genuine serious mental illness characterized by concrete and tangential thinking and a florid thought disorder; she was very agitated and needed medication urgently.

- The senior supervising psychiatrist, who was substituting for the EOP psychiatrist, indicated that the inmate was well known to him and started her on medication immediately.

- This inmate's medication non-compliance was mismanaged. Inmate B was obviously becoming psychotic one month earlier and had been off medications for a month. Either the psychiatrist's response to her non-compliance referral was very late or the identification of the inmate as non-compliant was delayed.

3.      Inmate C

Inmate C had been known to the monitor's expert for many years. The inmate was seen by the expert as a follow-up to an evaluation conducted one year ago. At that time, the inmate complained of being held in the "special management cell" for 13 days without treatment or observation. This assertion proved, upon investigation, to be true. Moreover, the investigation showed that the inmate had been housed in that cell for agitation and erratic behavior, which were side effects caused by her medication. The nurses who saw the inmate in response to her complaints did not recognize that she was experiencing side effects, nor did other staff in the EOP unit. Inmate C was not seen by a psychiatric during that time.

Thereafter, the inmate was interviewed by the senior supervising psychiatrist and seemed to have stabilized. Upon returning the following week for the UNA study, the monitor's expert learned from the inmate that she had been inappropriately and for no good reason placed back in the special management cell for three days. This cell appeared to the monitor's expert to function as a de facto OHU cell. At the exit conference, the expert recommended that the institution either abandon the use of this cell for mental health purposes or create criteria for admission to and discharge from the cell, along with policies and procedures for staff observation and treatment of inmates held in the cell.

During this monitoring visit, Inmate C indicated that she had been sent to PSH one week

following the UNA study, pursuant to the monitor's recommendation. The inmate remained at PSH until May; from there, she was sent to CIW for one month because she was on Clozaril and was then transferred back to CCWF. CIW wanted to keep her longer, but she wished to come back to the EOP unit at CCWF. Inmate C had a parole board hearing coming up in mid-2006. She experienced great stress in anticipation of the hearing and wanted to prepare for it at CCWF. She indicated seriously that she would kill herself, if she was rejected by the parole board.

Inmate C stated that she did well on Clozaril at CIW, but complained that her Clozaril was discontinued three days after her arrival at CCWF. The inmate reported that she had not been placed back in the special management cell, but she said that another inmate had been held in that cell three weeks earlier for several days before being sent to the MHCB unit. Inmate C said that she had to help clean up the management cell, which she described as "awful".

In a subsequent interview in the presence of the EOP clinical director and her case manager, the inmate indicated that she continued to hear voices and sometimes believed that people were reading her mind. She described these phenomena almost with a sense of embarrassment as such symptoms were unusual to her. It appeared that while the inmate was tearful and depressed on Clozaril, her psychosis was in remission. She was not doing as well on Zyprexa.

A review of the inmate's UHR revealed that she arrived from CIW on 6/5/05 on Clozapine, Lamictal, Dilantin and Synthroid. On 6/9/05, her Clozaril was discontinued and Zyprexa 20 mg q.p.m. was initiated. There was no psychiatric note or face-to-face evaluation recorded as the basis for discontinuing the inmate's Clozaril and starting Zyprexa. A review of the inmate's progress notes from CIW revealed that, on 5/20/05, her diagnosis was Bipolar Disorder, in full remission, Borderline Personality Disorder and Seizure Disorder. On 5/24/05, the inmate was noted to be tearful, depressed and doing poorly clinically. A transfer was anticipated. The first note recorded at CCWF was a note by an EOP clinician on 6/14/05. The first psychiatric note in the inmate's chart was dated 6/21/05.

Assessment:

- The special management cell at CCWF was reportedly still in use.

- The inmate's Clozaril was stopped by an unknown physician without a face-to-face evaluation.

- Although Inmate C's Axis I disorder was in full remission on Clozaril, she remained tearful and depressed. She was not doing as well on Zyprexa. In light of these considerations, the use of Clozaril should have been reconsidered.

- There were no evaluations or progress notes in the inmate's chart during the first week of her incarceration at CCWF.

The following ten charts were part of a study of treatment planning to determine the extent to which patients received treatment services called for in their treatment plan, and whether those services were appropriate to their mental health needs. Patients diagnosed under the rubric of

Medical Necessity were studied, including diagnoses of Post Traumatic Stress Disorder, Generalized Anxiety Disorder and Depressive Disorder NOS.

4.      Inmate D

Inmate D had been place on the 3CMS caseload in May 2005 and was housed in the administrative segregation unit for fighting. The inmate's first treatment plan, however, was not completed until July of 2005. The plan indicated a diagnosis of Panic Disorder with Agoraphobia. A subsequent treatment plan was created on 8/24/05 for reasons that were unclear. The inmate's treatment plan called for case management visits every two weeks and psycho-educational group therapy.

Inmate D made a request to be seen on 5/19/05, indicating that she has been waiting one month to see a mental health clinician following her first referral. The inmate was not seen pursuant to those requests but, on entry to the administrative segregation unit on 5/31/05, she received a 31-question screening, which was positive. The inmate's first psychiatric contact was on 6/14/05. She was seen bi-weekly and, at some point, was placed in administrative segregation. The inmate was referred for group therapy and was placed on medications which were helpful.

Assessment:

- This inmate received adequate, albeit delayed, treatment planning.

- Appropriate mental health care and group referral were provided for Inmate D, although her group therapy could not be given because she was in the administrative segregation unit.

- Psychiatric response to this inmate's referral was delayed.

5.      Inmate E

This inmate's treatment plan was dated 7/8/05. The inmate had a diagnosis of Post-Traumatic Stress Disorder and group therapy was contraindicated. Inmate E requested to be seen on 5/29 and was seen on 6/2/05. The IDTT note in the inmate's chart indicated a return visit in 90 days for regular case management.

Assessment:

- This symptomatic inmate for whom group therapy was contraindicated was not provided appropriate treatment services.

6.    Inmate F

This patient has no current treatment plan.  A 3CMS chrono was dated 5/16/05.  Inmate F had a MH-7 on May 24, 2005 and was referred to psychiatry.  She was not seen by a psychiatrist until 6/27/05.  Her first case manager visit was 9/2/05.

Assessment:

- This inmate had no treatment plan.

- Inmate F's treatment was delayed.

- Appropriate mental health services were not provided to the inmate.

7.    Inmate G

Inmate G's treatment plan was dated April 2005 and contained various diagnoses, but not her main Axis I diagnosis, which is Post-Traumatic Stress Disorder.  The inmate was diagnosed in the notes as having ADHD and Bipolar Disorder. She received her first and only case manager visit on 7/5/05.

Assessment:

- This inmate had an inadequate treatment plan.

- The treatment services provided to this inmate suffering from Post-Traumatic Stress Disorder were inadequate.

- The inmate was reportedly stable on medications.

8.    Inmate H

This inmate's treatment plan was dated September 2004.  It called for psychiatric and case management contact consistent with program guide requirements, bibliotherapy and narcotics anonymous.  Group therapy focused on anger management was recommended as available.  The inmate never received any group therapy.  A psychiatric note dated 7/15/05 indicated that Inmate H was "stable" on medications.

Assessment:

- This inmate never received the group therapy called for by her treatment plan.

- The inmate appears to be functionally stable on medications.

10.    Inmate I

Inmate I had a treatment plan dated January 2005 which contained diagnoses of Depressive Disorder as well as opioid and alcohol dependence. The inmate's treatment plan simply called for case management and psychiatric contact every 90 days and "group." An IDTT note dated 1/12/05 indicated the possibility of a serious mental disorder. While there were four psychiatric medication reviews in the inmate's chart, there were no notes by the case manager and the inmate was not receiving group therapy.

Assessment:

- This inmate was not receiving the group therapy called for by her treatment plan.

- The inmate received no case manager visits whatsoever.

10.    Inmate J

Inmate J's treatment plan was dated December 2004 and called for case manager and psychiatric contact as needed along with institutional programs and alcoholics anonymous. The last case manager note in the inmate's chart was dated 4/27/05 and indicated that the inmate was still symptomatic. Inmate J was scheduled to receive weekly alcoholic anonymous sessions when available. She was in no group psychotherapy. The inmate's medications were not helping.

Assessment:

- Inmate J had an inadequate treatment plan.

- The inmate did not receive adequate mental health services.

- Supportive group therapy might have been beneficial for this inmate.