audited certain aspects of treatment.  Beginning in July 2005, psychiatrists engaged in peer review, which focused largely on CDCR directives on medication usage.  Few mental health clinicians participated in or perceived the value of quality assurance activities.  Most reported being overtaxed by mandatory clinical duties and asserted that participation in quality assurance efforts would cut into treatment delivery.  No mechanism existed for examining objectively and correcting problems identified in daily practice.  Once identified, problems tended to be addressed slowly.

The most effective QIT was formed by the suicide prevention committee and chaired by an associate warden.  It solved the problem of non-compliance with five-day follow-up requirements.  That QIT examined the problem, developed a solution and recommended changes to local procedures.  New procedures for custody observation reportedly were implemented fully as of July 2005.   Audits of the new procedures had not yet been conducted.

Suicide prevention at CIW was characterized by excellent practices and significant omissions.  The suicide prevention committee met regularly and covered required topics.  Meetings were lightly attended particularly by custody staff.  The committee itself ferreted out the fact that self-injuries resulting in incident reports were not always reported to the committee, so some incidents were not reviewed.  The suicide prevention committee needed to improve its attendance, its functioning and to expand its scope.  A serious suicide attempt during the summer of 2005, the outcome of which continued to be uncertain as the involved inmate remained in a coma, needed to stimulate review, reports and perhaps corrective action.  The suicide prevention committee should

have also examined treatment provided in the OPHU and access to OPHU patients during emergencies.

Medication Management:

CIW's medication non-compliance mechanism worked well and resulted in the resolution of that CAP item. The number of referrals for non-compliance was high. Mental health staff received nearly 100 referrals for medication refusal each month. Anecdotal reports suggested that the non-compliance mechanism was sometimes used in lieu of self-referrals, which were perceived by some inmates as unlikely to elicit a response. A sizable proportion of interviewed inmates throughout the institution reported that their psychiatrists sometimes seemed flippant, punitive and/or uninterested. The monitor had no opportunity or way to evaluate this perception, but psychiatric leadership needed to assess the claim and, if accurate in whole or part, correct it.

Institutional audits found problems with medication continuity on arrival and changes of location within the institution. Staff attempted to improve medication continuity using a model adopted successfully in another CDCR facility, but union opposition reportedly torpedoed the attempt. Documentation of medication errors was in its early stages; meanwhile, most errors apparently went unreported.

The institution's audits have shown pill lines of ten minutes or less during the past two years. Inmates continued to report that lines were longer, occasionally as long as 40 minutes. Inmates in the outdoor pill line waited in an area exposed to direct sunlight. Waits were clearly longer than ten minutes when inexperienced personnel administered medications or when an alarm halted all movement. The institution needed to devise some way to shelter inmates from the sun when long waits occurred. During

the monitor's October visit, staff reported that construction of an awning in the pill line waiting area required architecture and engineering approval from central office. No timeframe was provided for the possible completion of the recommended cover.

The issue of HS medications was revisited following the monitor's August visit. As noted in the preceding round of monitoring, HS orders were not written at CIW. Although theoretically permitted, HS orders were contingent upon approval by the CMO, and psychiatrists apparently never sought such approval; no medications were administered pursuant to an HS order in August. The latest medication delivery occurred at 7:30 p.m. In September, the requirement for the CMO's approval of HS medication orders was dropped, and psychiatrists were trained on the use of HS medication. The number of HS orders grew from zero to 71. As of October 2005, roughly a dozen of these HS orders were written for psychotropic medications, and staff had determined that no new resources were required to administer HS medication. This meant that HS medications were ordered for approximately 1.5 percent of the MHSDS caseload, an unacceptably small portion of the caseload.

Mental Health Assessments for the Disciplinary Process:

Logs of disciplinary proceedings involving caseload inmates were complete. Final RVRs documented consideration of mental health assessments. The associate warden in charge of discipline reported that hearing officers found information provided by mental health staff useful. In many cases reviewed by the monitor, sanctions were mitigated based on mental health information. No RVRs were written for self-injury. During the monitoring period, 56 EOP inmates were referred for and received mental health assessments. RVRs were written for 223 3CMS inmates. Sixteen were

referred for a mental health assessment due to bizarre, unusual or uncharacteristic behavior. Some clinicians were of the opinion that not all inmates who should have received a mental health assessment were referred. Staff reported that they interviewed the charged inmate and reviewed UHRs when completing assessments for disciplinary purposes but did not review C- files.

Nine caseload inmates (six EOP and three 3CMS) incurred RVRs that were referred to the district attorney during this review period. The average time to referral was over three months with a range of one to five months. None of the cases was selected for prosecution.

Staff reported that in the recent past the use of disciplinary detention was resurrected. No records of its use were kept. Staff reported orally that seven caseload inmates had been in disciplinary detention. EOP inmates reportedly were not subject to disciplinary detention. Inmates on disciplinary detention status were housed in administrative segregation in the absence of pending charges or the imposition of sanctions. They were housed in a row of cells usually devoted to reception center inmates on overflow status. CIW staff reported that disciplinary detention was used for inmates with three or more RVRs. A ten-day term in disciplinary detention was reported to be the norm. Days of entry and exit were not considered part of the ten-day term. Inmates in disciplinary detention were on lock-down status. They were allowed out of cell for just five hours of recreation per week. They received fewer privileges than administrative segregation inmates and no canteen. Because inmates in disciplinary detention were not formally placed on administrative segregation status, they were not provided with psych tech rounds, nor were caseload inmates on the status provided with

weekly case management contacts. In August, the monitor found two caseload inmates on this status.

Transfers:

CIW's new CTC with ten MHCB beds was originally scheduled to open in 2003, but the vicissitudes of construction long postponed its inauguration. Staff guessed that the CTC might open for patients in the summer of 2006. In the meantime, the situation in the OPHU was becoming dire. During the monitoring period, 50 to 70 inmates in psychiatric crises were admitted to the OPHU monthly. Roughly 25 percent of the stays exceeded 72 hours. At its peak, the census of psychiatric patients in the OPHU reached 16. Staff reported that the typical census was ten or less. Many of the inmates admitted to the OPHU were on some form of watch. CIW relied heavily on video monitoring. In August 2005, the institution was aware of recently revised requirements relative to video monitoring. While the mechanics of video monitoring at CIW were adequate and comported with departmental policy, its use led to what the monitor's expert found to be an inordinate number of inmates being placed on "watch," sometimes inappropriately and wastefully. The use of 24-hour video monitoring also created some serious gender-related issues of privacy, especially when applied in cases where its use was clinically unnecessary.

Access to MHCB treatment was impeded. Impediments were both internal and external. Crisis beds were not always available when needed. Some clinicians at CIW were reluctant to send inmates in crisis to the MHCB unit at CCWF for treatment. On average, three inmates were transferred to the MHCB unit in CCWF. According to a detailed log of referrals maintained by the institution, four inmates waited

from four to eight days in the OPHU before being transferred to a crisis bed. CIW's use

of the MHCB unit at CCWF did not change between the monitor's August and October

visits. One inmate was referred during that period to a crisis bed after being rejected by

Patton State Hospital (PSH).

Statistically, CIW's access to PSH appeared consistent with access in

earlier monitoring periods. PSH admitted 31 CIW inmates during the monitoring period.

Staff maintained a detailed log of referrals and communications on pending referrals.

CIW staff, however, reported greater difficulty in obtaining access to PSH during the

monitoring period. Reportedly, beds at PSH were not always available, and some

referrals were rejected reportedly because PSH clinicians believed referred patients were

malingering. Beyond differences in clinical judgment, administrative obstacles

sometimes obstructed access. In one case reviewed by the monitor's expert (see Exhibit

Q, Case Review 4), an inmate was referred to PSH for intermediate care, but the referral

was rescinded because she was within a month of her parole date. CIW clinicians also

complained that PSH returned some inmates inappropriately to CIW without Axis I

diagnoses and/or orders for medication.

A case reviewed by the UNA team in February 2005 (see Exhibit Q, Case

Review 3) was cited by staff as illustrative of another type of impediment to PSH. This

particular inmate spent a year at PSH before returning to CIW in October 2004. When

her case was reviewed by the UNA team she had been back at CIW for three months,

during which she experienced multiple crises, requiring the use of force to quell. The

UNA team found the treatment offered in CIW's EOP insufficiently therapeutic and

recommended a higher level of care. She was referred to PSH in September but was

rejected for readmission because her condition was viewed as not susceptible to improvement and she was disruptive.

Another case involving a suicidal inmate returned from PSH to CIW was the subject of an appeal to the agency levels of DMH and CDCR. The patient was eventually sent to the MHCB unit at CCWF. CIW staff claimed that reception inmates arriving at CIW in a decompensated state with elevated risk for self-injury or suicide did not have ready access to PSH because they lacked release dates, reportedly a required element in the referral package to PSH.

According to the institution's log, PSH's responses to referrals were timely. Staff also reported that nearly all accepted referrals were transferred within five days. The amount of time required to process and finalize transfers to PSH reportedly was one of the factors contributing to OPHU stays in excess of 72 hours.

During the monitoring period, seven EOP inmates were transferred from CIW's administrative segregation unit to the hub EOP unit located at VSPW. None of these transferees remained at CIW in administrative segregation longer than 30 days.

Caseload inmates were transferred out of the reception center in a timely manner. Institutional data for January through June 2005 indicated that only three of 184 3CMS inmates were not transferred within required timeframe and 11 of 166 EOP inmates remained in reception longer than 60 days. The length of time it took for EOP inmates to be endorsed was of some concern, because unendorsed EOP inmates received less programming than endorsed EOP inmates. Although housed in the EOP unit, they were confined in their cells nearly 24 hours a day while treatment groups met nearby. They left their cells only to attend three groups a week, shower every three days and take

outdoor recreation in a small paved enclosure. Interviewed reception EOP inmates reported feeling stressed by their long period of relative close confinement and idleness. Staff reported that they never expedited the processing of clinically fragile inmates within 30 days as encouraged in policy and the Program Guide.

Other CAP Issues:

a.  Partial Compliance

Clinicians treating EOP and 3CMS inmates reported poor access to UHRs, although methodologically sound audits indicated that access to records was not a problem.  In two UHRs of EOP inmates reviewed by the monitor's expert, roughly 30 percent of all recent progress notes indicated that contacts were made in the absence of a UHR.  Psychiatrists reportedly unanimously that they often had to make clinical decisions in the absence of information about recent treatment.  Some clinicians reported that the loose filings they generated were never incorporated into UHRs.  Anecdotal reports cited significant backlogs of filing in medical records.  With regard to electronic records, the MHTS was modified in an effort to improve its utility to CIW clinicians. Reception center data was separated from general population data.  Staff continued to maintain two sets of tracking data to ferret out inaccuracies in the MHTS.  A full-time psychologist tracked contacts and compared MHTS entries against other written records.

b.  Non-Compliance

Despite long-standing concerns about the EOP unit, no quality improvement process was undertaken to identify and redress problems.  While the number of hours of scheduled structured therapeutic activities offered weekly met or exceeded requirements, the amount of treatment actually received fell considerably short

358

of ten hours weekly for most inmates in the EOP. Inmates and staff alike consistently complained about the quality of group treatment and the adequacy of group leaders' training and skills. Psych techs reportedly led all or most groups in order to leave psychologists and social workers enough time to make mandated individual contacts.

Security constraints exercised a profound effect upon the range of privileges and programs afforded to EOP inmates. The EOP building was surrounded by its own perimeter fence, which separated it from the rest of the facility. Routine custody practices in the EOP building were not designed to sustain a therapeutic environment. Despite the EOP unit's isolated setting and small size, its inmates were routinely locked in their cells for thirty minutes before a facility-wide lock-down went into effect. EOP inmates lacked access to the large yard used by most inmates at CIW. Meals, recreation and treatment all took place within the building. Few women in the EOP were permitted to attend activities held in the main prison. This isolation, a planned element of the EOP program to protect vulnerable inmates typically unable to function in regular programming, seemed to weigh particularly heavily on female EOP inmates. Higher functioning and long-term chronic EOP inmates perceived the isolation and physical limitations of their environment as punitive.

The heat plan at CIW fell into serious disrepair during the monitoring period. The institution seemed to believe it was no longer obligated to submit monthly summaries of heat alerts to central office. Temperature logs were not maintained consistently in many units. Logs were left blank or filled in only intermittently. Lists of inmates on heat-risk medications were no longer available in every unit. Temperatures were monitored in cooler spots within living units. Some correctional officers reported

that if temperatures were monitored in warmer parts of units, Stage II heat alert levels would be required daily during the warmest months. These reports on temperature-taking were confirmed by hand-held thermometers, which registered significantly higher temperatures in different areas within units.

Days before the monitor's August visit, a Stage III heat alert was activated in general population housing units, but rounds were not made by medical staff as required in the heat plan. Even in the OPHU, where 16 inmates on a variety of psychotropic medications were housed, rounds were not made. Staff acknowledged the failure, insisted that no other Stage III alerts had occurred during the summer and the OPHU census was the highest it had been all year, and expressed confidence that they would be able to respond appropriately to future Stage III alerts.

Due to a recent ban of small individual fans, all such fans in living units were confiscated. Interviewed staff confirmed inmate assertions that correctional officers sometimes redirected the large fans in units to cool their own work areas rather than larger dorm and living areas within units. Dismissal of heat-sensitive inmates from work sites when alerts were triggered was erratic. Inmates working in prison industries were required to take two fifteen-minute breaks outdoors regardless of outside temperatures. Staff defended the practice on the grounds that exposure to sunlight and high temperatures for as long as thirty minutes was acceptable under the heat plan. Reports by inmates regarding dismissals from hot work sites were variable.

Women housed in the reception center reported that during heat alerts extra showers were not permitted. Inmates in the general population reported that cool water was brought to their housing units when temperatures were high, but the manner in

which it was distributed did not ensure that inmates on psychotropic medications would get a cup before the supply ran out.

Between the monitor's August and October visits, the institution revisited its implementation of the heat plan and provided supplemental training on heat plan requirements. In October, the monitor found correctional officers were considerably more knowledgeable about the stages of the heat plan; current lists of inmates on heat-risk medications were available in living units; temperatures were logged consistently; and flyers on the adverse affects of heat were posted in all visited units. Correctional officers possessed heat plan cards. Roughly half of correctional officers encountered by the monitor on living units and at worksites reported recent participation in on-the-job training on the heat plan. Custody staff indicated that they now controlled the distribution of cool water in living units. Temperatures, however, were still monitored at cooler locations within housing areas.

Institutional Summary:

CIW had few staff vacancies. Progress in the four areas of focus for the round was mixed. The mental health component of the institution's quality management system remained largely a supervisory function with little participation on the part of line clinicians. During the monitoring period, the institution's overall healthcare quality management committee focused largely on the implementation of Plata requirements, many of which, such as continuity of medication, had a direct impact on the mental health caseload. Peer review among psychiatrists tended to consist of reviews of DCHCS directives on medication use. The suicide prevention committee met often, had some success and needed to do more.

Isolated gains were made in medication management.  Medication management continued to be the subject of regularly scheduled audits.  A new system for handling medication non-compliance was implemented and appeared to be successful.  Medication continuity on arrival and movement within the institution needed further work.  Efforts to convert to a more effective distribution mechanism reportedly were blocked by union opposition.  The availability of HS medications improved somewhat, but remained problematic.  Difficulties with lengthy pill lines in times of high temperatures and exposure to strong sunlight continued to elude solution.

DMH use remained statistically constant, but CIW staff reported more difficulty gaining access to inpatient programs in PSH during the monitoring period.  Individual cases raised questions about administrative and clinical obstacles.  After two years of delay, CIW's CTC was still not expected to be able to admit inmate/patients until mid-2006.  Meanwhile, inmates in crisis were supposed to be transferred to the CCWF MHCB unit, but such transfers occurred rarely.  CIW's OPHU, totally inappropriately and contrary to clear departmental policy, the program guide and court orders, functioned as a *de facto* MHCB.  On average, three of the some fifty to seventy inmates in crisis admitted monthly to the OPHU were transferred to an MHCB unit.  In the interim, treatment provided in the OPHU was deficient in virtually every aspect, and physical conditions in the unit were inadequate.

The mental health assessment process for caseload inmates receiving RVRs remained largely compliant.  Uncertainty persisted about whether all 3CMS inmates who might have been referred for mental health assessments in connection with disciplinary charges actually received assessments.  The mental health assessments

conducted did not regularly include a review of C-files. CIW's use of "disciplinary detention," a local level of punitive, restricted confinement of inmates, including members of the MHSDS caseload, outside the purview of any departmental policy or procedure, raised concerns about the application of suicide prevention measures to caseload inmates within the disciplinary detention population.

Three CAP items were resolved during the monitoring period, but there was not much progress on other pending CAP issues. Mental health staff's access to UHRs was poor, and MHTS tracking needed to be supplemented by manual tracking. Neither conditions nor treatment in the EOP improved. Meanwhile, compliance with the institution's heat plan dissolved during much of the summer, but when confronted with the failure in August, institutional administrators aggressively addressed the underlying deficiencies. By October, most elements of the heat plan were back in operation.

Two issues presented substantial continuing problems for CIW. The first was occasioned by the long delay in opening the new CTC with its MHCB component. While the hope was for a mid-2006 occupation of the new unit, the acquisition of adequate staffing and licensing may push off the new unit's availability even further. CIW's interim dependence on its OPHU, which was totally inadequate clinically and physically for the provision of a MHCB level of care, is simply unacceptable. The institution needed both to expedite occupancy of the CTC and, in the meantime, rely to a far greater extent on the placement of caseload inmates in need of a MHCB level of care in the CCWF MHCB unit or PSH.

The second issue, and one which seems over time to be ineradicable in CIW, has to do with interpersonal relations among and between clinicians and mental

health and healthcare administrators. The permutations of the conflicts have often shifted during the monitor's decade-long observations of CIW, but the conflict goes on and on and on, sometimes with damaging impact on the delivery of mental health services. It is time for the institution's clinicians and their leaders to observe the Socratic mandate to heal themselves.

## Service Area L

This service area includes the Central California Women's Facility (CCWF) and Valley State Prison for Women (VSPW).

### Central California Women's Facility (CCWF)
September 7, 2005 – September 9, 2005

The number of vacancies among mental health positions at CCWF increased significantly during the monitoring period. Psychiatrist vacancies rose from 2.5 to five, while psychologist openings increased from one to five. In addition, the institution still had two psych social worker vacancies. The institution utilized one contract psychiatrist for a limited number of hours and two contract social workers to cover only a small portion of the vacant positions. These staffing shortages contributed to growing problems in previously resolved areas and made it increasingly difficult for CCWF to provide adequate mental health services. The psychiatric vacancies had a particularly negative impact on medication management.

Staffing shortages were compounded by an increase in the inmate population at CCWF. In August 2005 the reception center received 104 new arrivals weekly, compared with weekly admissions of 77 in August 2004. Consistent with this increase, the EOP census, which numbered about 50 in September 2004, was consistently

364

over 70 at the time of the monitor's visit in September 2005. Allocated staffing for the EOP program, which was based on a capacity of 53 inmates, remained unchanged despite the larger population. Although the EOP continued to operate in accordance with most program guide requirements, the program's resources were severely strained to meet the needs of its participants.

Quality Management:

Not much changed with respect to quality management during the monitoring period. Voluminous minutes indicated that the mental health quality management committee, which had been meeting biweekly for a long time, was well-structured and active and conducted numerous useful audits. The committee regularly went well beyond the requirement for a monthly review of ten charts and tailored numerous audits to particular problems and specific elements of the institution's CAP.

On the other hand, the QIT process remained underutilized, and the institution had yet to charter studies recommended a year ago. Clinical staff, other than the quality assurance director, did not participate regularly in audits or analyses of components of the CAP. Peer Review was only partially implemented

Medication Management:

Arriving inmates apparently received their prescribed medications in a timely manner, but other problems with continuity of medication on arrival were not adequately assessed during the monitoring period. The institution's study of ten charts in May 2005 indicated that nine inmates received their first dose of medication on the day of their arrival, while another received her first dose the following day. The institution did not, however, determine whether inmates, who were given a 14-day medication

extension order on arrival, were actually seen by a psychiatrist before the 14-day extension expired.

Continuity of medication for inmates changing housing locations continued to be managed effectively. On the other hand, the institution reported some slippage with regard to timely medication renewals. An institutional study of 22 charts for the month of July 2005 indicated that 85 percent of reviewed inmates received their medication within 24 hours of a prescription renewal. This area required some continued monitoring to confirm compliance.

Psychiatric follow-up to medication non-compliance improved significantly during the monitoring period. An institutional audit found that 11 percent of all mainline 3CMS inmates were non-compliant with their medications. A subsequent study of the charts for 26 non-compliant inmates found psychiatric follow-up in 100 percent of these cases. The institutional study, however, failed to assess whether all non-compliant inmates were referred to mental health.

CCWF had yet to undertake a comprehensive study of laboratory testing for inmates on mood-stabilizing medications that looked at the timeliness of the order for and conduct of blood tests, as well as timely completion of clinical review of test results and their placement in inmates' UHRs.

According to staff, CCWF had procedures in place for delivering parole medications to inmates discharged from the institution. In addition, an institutional binder contained forms documenting delivery of parole medications pursuant to these procedures. Although this information did not assess whether all paroling inmates received medications upon discharge, the monitor found no evidence to the contrary.

The provision of DOT was resolved in an early monitoring round but was noted to be a problem again during the preceding monitoring period. Although the institution's operating procedures included a provision for DOT, DOT medications were neither prescribed nor administered at CCWF. This issue could no longer be considered resolved.

A new Keyhea coordinator had been assigned to oversee the process at CCWF. At the time of the monitor's visit, three inmates were on Keyhea orders in the institution, but an order for a fourth inmate had been allowed to expire inadvertently during the monitoring period. A hearing to seek a new order for this inmate was scheduled a full month after its expiration.

Institutional logs documented 17 medication errors in the period from April 2004 to August 2005. The pharmacist reported that he was unable to state whether the inmates involved in the reported errors had actually taken the "wrong" medication. None of the documents reported errors in dosages, although the monitor's chart reviews turned up two specific instances involving the administration of erroneous dosages of medication. While the facility had a local operating policy for medication errors, it was unclear how fully practices in this regard comported with the policy.

The institution's policies and practices on HS medications remained unchanged during the monitoring period. CCWF's operating procedures did not provide for the administration of HS medication, and staff continued to report that they had been instructed not to prescribe such medications.

Although problems with lengthy pill lines were resolved earlier, the institution's recent review of pill lines raised questions. CCWF reported that the average

length of pill lines ranged from five to ten minutes, but staff and inmates alleged that pill

lines often ran longer than reported by the institution. The monitor's observation of one

pill line confirmed that inmates spent considerably more than five to ten minutes waiting

in the observed line. Staff agreed to re-examine the methodology for the assessment of

this issue.

Informed medication consent forms were not present in all of the UHRs

reviewed by the monitor; and some charts contained consent forms that were no longer

current.

Some problems resurfaced with regard to heat-sensitive medications.

CCWF did not distribute heat cards to inmates on heat-sensitive medications but, instead,

issued heat chronos, which permitted access to housing units during Stage I heat alerts

but contained no information on Stage II and Stage III alerts. As a result, many inmates

interviewed by the monitor were unaware of the definitions and protections incorporated

in the facility's heat plan. The institution needed to provide inmates with heat cards and

display posters with relevant heat information in housing units, clinics and program areas.

In addition, current lists of heat-risk inmates were not maintained in all housing units.

Mental Health Assessments for the Disciplinary Process:

CCWF continued to track mental health assessments for inmates involved

in the disciplinary process. Between September 2004 and August 2005, mental health

assessments were completed for 86 RVRs. Of these, 27 involved EOP inmates, 48

involved 3CMS inmates and 11 involved general population inmates. Mental health

assessments were generally completed in a timely manner, within two to three days of the

assignment of a case to a clinician. In no instance did an assessment take longer than

seven calendar days to complete. Clinicians found that mental health was a contributing factor in the inmate's behavior in 29, or 34 percent, of assessments.

Hearing officers appeared to take mental health factors into account in assessing penalties. At the time of the monitor's visit, 25 of the 29 cases in which mental health was identified as a factor had been heard. Hearing officers found inmates not guilty in ten cases, while in eight cases where the inmates were found guilty, no forfeitures of credit were imposed. The monitor reviewed the RVR materials in five cases and found that the hearing officers considered and responded to the mental health assessments in their findings and dispositions.

No inmate received a disciplinary infraction for self-injurious behavior during the monitoring period.

CCWF was in the process of finalizing an agreement with the district attorney's office on the types of cases that would be referred for prosecution, which included certain assaults, possession crimes, escapes and third-strike violations. In the period from November 2004 through August 2005, 30 cases involving MHSDS inmates were referred by CCWF to the district attorney's office, representing 37.9 percent of all district attorney referrals from CCWF. Of these 30 cases, three were accepted; eight were rejected; four were returned with a recommendation that CCWF handle them administratively; and 15 were pending.

Transfers:

The MHCB unit was almost always full, and staff reported that access to the unit was increasingly difficult. Three cells had been unavailable for new admissions for several months. One of these was being repaired, while the other two were used for

369

inmates with chronic mental health conditions.  The MHCB unit needed generally to discharge an inmate each time a new admission was received.  One inmate admitted to the unit during the monitor's visit had been confined to her cell and monitored regularly for ten days before being admitted.  While not on a formal MHCB waiting list, this inmate, who required 24-hour supervision and seclusion, clearly needed a MHCB level of care and would have been transferred to the MHCB unit earlier, if beds had been more readily available.  Despite the consistently full census, the average length of stay for inmates in the unit increased only slightly in the past year.  A review of the daily log for 2005 showed an average length of stay of 7.5 days.

Transfers to DMH were still timely, but problems occurred with the acceptance by PSH of MHCB inmates with borderline personality disorders and other severe Axis II pathology.  Eight inmates were accepted to PSH during the monitoring period, and all were transferred within five days of their acceptance.  During the same period, three referrals to PSH were rejected, and their rejections were upheld on appeal. All three were inmates with severe Axis II pathology, who were extremely difficult to manage.  Pursuant to procedures developed as a result of the UNA study, the EOP IDTT indicated that they had identified several EOP inmates in need of treatment at PSH. According to staff, however, the mental health leadership at CCWF discouraged these identified referrals to PSH.  As a consequence, only one inmate was referred to PSH from the EOP program during the monitoring period

There were 23 3CMS inmates and one EOP inmate in administrative segregation at the time of the monitor's visit.  Most had been admitted to the unit between July and September 2005, but two of the caseload inmates were admitted in

March and April respectively. IDTT meetings were held for most of the inmates within seven days, but it took between seven and 14 days to complete IDTT meetings for three of the inmates. No information on admission or IDTT dates was available for two other inmates.

Other CAP Issues:

 a. Partial Compliance

 The availability of group therapy for 3CMS inmates increased significantly. The institution reportedly offered 15 groups for 292 inmates as of August 2005, compared to just three groups for 110 inmates during the preceding monitoring period. The number of inmates on the waiting list for groups also increased, presumably in response to the growth in the number of opportunities for group therapy. According to the institution, group treatment was recently introduced for inmates suffering from PTSD, although the monitor's chart reviews found no inmates with this disorder actually participating in therapy groups appropriate to their condition. Despite the increase in the number of groups offered, a limited review of the treatment services provided to inmates at the 3CMS level of care for medical necessity and not on psychotropic medications raised concerns. All nine reviewed charts contained treatment plans calling for group therapy, but five inmates had, as yet, not participated in any group.

 The frequency of case management contacts for 3CMS inmates, an issue resolved previously, may have deteriorated somewhat. An institutional audit indicated that between 86 and 90 percent of inmates were seen at least every 90 days. The monitor's limited review of nine charts found two inmates who did not receive quarterly contacts, one of whom had not been seen by a case manager for a year. The institution

also noted some slippage with respect to the frequency of psychiatric contacts, another issue resolved earlier. While these issues remained resolved, the institution needed to monitor them closely to prevent further decline.

The timely completion of initial treatment plans for 3CMS inmates, yet another issue resolved earlier, also regressed somewhat. An institutional audit for March 2005 found that 85 percent of initial treatment plans were completed within 14 days. Among the nine charts reviewed by the monitor, treatment plans were missing or misfiled in three, and some others were untimely. Problems with the timeliness of treatment plans appeared to be related to the increased 3CMS population and shrinking case management resources.

Problems with the provision of ten hours of scheduled structured therapeutic activities for EOP inmates were resolved for the first time in the preceding monitoring round. Compliance in this area, however, declined during this monitoring period. A limited institutional study of 18 charts for the period from March 1 through May 1, 2005 found that 88 percent of inmates were offered the requisite amount of therapy. EOP programming was negatively impacted by frequent lockdowns and increasing difficulty in getting correctional officers in sufficient number to escort EOP inmates to treatment services in other buildings. Another serious problem for the EOP was the placement of overflow general population administrative segregation inmates in the EOP housing unit. While separated physically within the unit, the administrative segregation inmates, who were often noisy and verbally abusive, frequently disrupted EOP programming and counseling activities.

Psychiatric coverage in the MHCB unit, another resolved CAP item, also deteriorated due largely to staffing shortages and the unit's consistently high census. An institutional review found that 80 percent of MHCB admissions from November 1, 2004 through July 31, 2005 received daily psychiatric contacts. The institution reportedly was planning to take corrective measures.

The timeliness of psychiatric responses to inmate referrals continued to be problematic. According to an institutional audit for January 2005, the average response time to inmate self-referrals was 7.24 days. This data was old and provided only the average response time without showing the range of delays. No data was provided on responses to staff referrals. The monitor's review of nine 3CMS inmates' charts found several delays of a month or more in responding to inmate self-referrals. The institution needed to conduct a more detailed audit of this issue.

The composition of IDTT meetings continued to improve during the monitoring period. An institutional audit of January 1 to July 31, 2005 indicated that psychiatrists attended 98 percent of IDTT meetings, while custody staff attended 97 percent. This issue can be resolved in the next monitoring period if this level of compliance continues.

Problems with the frequency of psych tech rounds in administrative segregation, which resurfaced during the preceding monitoring round, appeared related in part to a short-term lack of psych tech coverage. Institutional audits found documentation of psych tech rounds at a rate of 64 percent in April and 65 percent in May, but back up to 99 percent as of June 2005.

CCWF continued to provide five-day clinical follow-up for suicidal inmates released from the MHCB unit. An institutional study of 40 inmates found that 92.5 percent of discharged inmates received fully the required follow-up. Custody checks were reportedly reviewed by the suicide prevention committee, but no data was provided.

Inmates referred during bus screenings were still not always seen within three working days. An institutional audit for May 2005 showed that clinicians saw 86 percent of bus screening referrals within the required time frame.

The filing of infirmary records in inmates' UHRs improved during the monitoring period. A limited institutional review of ten charts found inpatient records present in all ten charts. Although the organization of charts also improved, some problems persisted with missing documents. The institution presented no data on performance in this area, but the monitor's limited review of nine charts found missing or misfiled entries in three.

<u>Other Issues:</u>

CCWF installed video-monitoring equipment in the spring of 2000 and, since then, has promulgated a number of policies and procedures governing use of the equipment, including requirements that, in addition to nursing contacts, correctional officers have hourly face-to-face contacts with inmates on suicide watch. CCWF reportedly was about to upgrade its video equipment because the resolution of the current system was poor. It was unclear whether the institution needed an elaborate and expensive video monitoring system, given that no suicide watches were conducted during the past year. In addition, the use of video monitoring for other than suicide watches

raised privacy and gender issues because the monitors operated continuously in a room frequented by male correctional officers and other staff.

Institutional Summary:

The number of mental health vacancies at CCWF, particularly among psychiatrists and psychologists, grew significantly during the monitoring period.  These vacancies, covered only in part through contracted services, coincided with an expanding mental health caseload to impose considerable strain on mental health services.

Among issues of focus for the round, implementation of mental health assessments in the disciplinary process progressed satisfactorily.  Assessments were completed in a timely manner, and mental health input seemed to have an impact on dispositions.  On the other hand, implementation of the quality assurance process was stalled.  QITs were underutilized, and peer review remained incomplete.

Access to higher levels of care appeared to be less readily available than formerly.  Transfers to the MHCB unit were sometime delayed due to the high census in the unit, and transfers to DMH, while still timely, were complicated by confusion over admission criteria for inmates with borderline personality disorders and severe Axis II pathology.

Medication management improved in some areas but struggled in others due often to the shortage of clinical resources.  Inmates generally received their medications in a timely manner on arrival at CCWF and changes of housing within the facility; psychiatric follow-up to medication non-compliance improved, procedures for providing parole medications were in place and the Keyhea process was, with one exception, functioning well.  The institution, however, needed to conduct a

comprehensive study of laboratory testing for inmates on mood-stabilizing medications. HS medications were still not available in CCWF, and some slippage was noted with respect to timely medication renewals. HS and DOT medications were simply not available at CCWF, notwithstanding clear departmental policies requiring that both be provided.

No new CAP items were resolved during the monitoring period, but improvement was noted with regard to the provision of group therapy for 3CMS inmates, the composition of IDTT meetings and the filing of inpatient records in inmates' charts. The institution continued to provide clinical follow-up for suicidal inmates discharged from the MHCB unit. The frequency of psych tech rounds in administrative segregation, which lagged badly in the preceding monitoring period, apparently rebounded.

A number of previously resolved areas, including the frequency of case management contacts with 3CMS inmates, timely completion of initial treatment plans for 3CMS inmates and the provision of ten hours of scheduled structured therapeutic activities for EOP inmates, deteriorated somewhat. The timeliness of psychiatric responses to referrals was still a problem, and inmates referred during bus screening were not always seen in a timely manner. The quality of the institution's video monitoring equipment for suicide watches was poor, and it was unclear whether the institution needed such a system.

As in the past, CCWF seemed able to cope surprisingly well despite its serious shortage of permanent and contracted clinical resources, but there were growing indications of stress that augured badly for the future. CCWF must somehow attract more clinicians or reduce its mental health caseload if mental health services in the

facility are to remain reasonably adequate. In the meantime, the institution needs to monitor carefully and closely those elements of treatment and care that are beginning to show signs of backsliding.

### Valley State Prison for Women (VSPW)
January 10, 2006 – January 12, 2006

In VSPW, 18.3 of 38.3 allocated mental health positions were vacant, including positions for 4.5 psychiatrists, a senior psychologist, three staff psychologists, 4.3 psych social workers, three psych techs, l.5 office techs and a nurse. During the monitoring period, 1.5 additional staff psychiatrist and 2.7 psychologist positions were redirected to PVSP, although the redirections had not yet produced any additional clinicians. The institution utilized contract clinicians to cover many, but not all, of its clinical vacancies.

VSPW also suffered from a lack of office and treatment space. Only about one-third of the mental health staff and none of the contract clinicians had access to an office. The situation was expected to worsen as presently vacant positions became filled.

Quality Management:

The mental health quality management committee met monthly from January through October 2005. Minutes of the meetings covered, among other things, issues related to medication management, the OHU, treatment plans, programming space and staffing. The institution also had an active mental health subcommittee. Minutes of the subcommittee meetings showed that it met monthly from August 2004 through December 2005. Suicide prevention, peer review and the OHU were among the issues considered by the subcommittee during this time.

The QIT process improved during the monitoring period. Documentation showed that the institution chartered a number of QITs that met regularly to address important issues, such as the development of treatment plans, OHU procedures and transfers to higher levels of care.

Since November 2004, the peer review committee, which included psychiatrists, psychologists and psych social workers, met monthly to review selected medical records. According to minutes of peer review committee meetings, the results of chart reviews were shared with staff at meetings, in consultations and through memoranda.

The MHTS was used to help manage the mental health delivery system, generating dozens of valuable reports. The monitor compared 25 UHRs to MHTS inmate histories and found a concordance rate of over 90 percent. A similar comparison conducted by the monitor's expert also showed a high correlation.

Medication Management:

VSPW's local operating policy on medication management improved during the monitoring period. The revised policy was consistent with, and often more detailed than, the departmental policy. A confusing definition of medication non-compliance included in an earlier draft of the local policy had been clarified.

Medication continuity for arriving inmates who went straight to the general population was adequate. Institutional audits of the issue also improved and confirmed that from January to October 2005, 96 percent of inmates received their medications within 24 hours of arrival. Medication continuity for inmates arriving in reception, on the other hand, was less consistent. An institutional audit of 167 inmates

arriving from county jails with verified medication orders indicated that only 74 percent received their medications within 24 hours. The audit did not track inmates arriving without medication orders. It was unclear how long it took for these inmates to be seen by a psychiatrist at VSPW, but once medication orders were written, more than 90 percent of all inmates arriving in reception in the six months prior to the monitor's visit received their medications within 24 hours.

Medication continuity for inmates changing housing locations was adequate, and institutional audits of this issue were also methodologically improved. The audits showed that greater than 95 percent of inmates received their medications in a timely manner after intra-institutional housing transfers.

Medication continuity on the renewal of medication orders also improved. The monitor reviewed limited institutional data on the issue during the six months preceding the visit and found that the range of monthly targeted performance, which aimed at no missed doses after the expiration of current medications, varied from 82.4 to 95.7 percent. Some gaps in medication, however, were lengthy, up to ten days or more in three cases. The institution was close to substantial compliance.

Parole medications were provided to most inmates on psychotropic medications on their discharge from the facility. The monitor reviewed institutional procedures for providing parole medications along with a summary of the medications that were distributed to paroling inmates and found substantial compliance. This issue will be reviewed again during the next monitoring period and resolved if the institution maintains this level of compliance.

Inadequate auditing, once again, made it difficult to evaluate follow-up to medication non-compliance. Institutional audits indicated that less than half of the inmates referred for non-compliance were seen within seven days as required; on average, inmates were seen within 8.7 to 14 days. The audits, however, looked only at referred inmates and it was not clear whether all instances of non-compliance were actually referred to mental health.

The medication error system progressed during the monitoring period. Medication error reports were reviewed by the pharmacist, nursing supervisors and the chief medical officer and then classified according to the cause of the error. Summary data was discussed quarterly in the medication management committee. According to institutional data, 13 errors occurred in more than 40,000 delivered prescriptions between May and August 2005 and just five errors in more than 60,000 prescriptions delivered between September and December 2005. The few number of errors reported, in combination with the monitor's review of error reports, suggested that some mistakes were not being reported.

The institution conducted an audit of the timeliness of laboratory testing. According to the audit, only 39 inmates were taking mood-stabilizing medications, indicating that psychiatrists were writing fewer prescriptions for such medications. According to the institution's status report, it took an average of ten days from the date a laboratory test was ordered until the blood sample was drawn and 2.1 days until the test results were returned. Psychiatrists failed to review test results within seven days as required; the status report indicated that it took an average of 10.5 days to review results. The audit, however, studied only laboratory tests and not blood levels. Moreover, some

drugs that can have adverse effects, like atypical anti-psychotics and TCA, were not included in the audit.

Little changed during the monitoring period with respect to the confused state of DOT at VSPW. Due to a continuing pharmacy labeling error, all inmates on psychotropic medications were noted on their MARs to be receiving their medications via DOT. As a result, the institution could not generate a list of 3CMS inmates with actual DOT orders. There were no DOT orders for high-risk inmates, although out-of-cell DOT was required for all such inmates; institutional procedures provided in-cell DOT only for inmates in restricted housing units. A December quality management audit, confirmed by a nursing audit, found a number of serious deficiencies in DOT procedures. Medications were often passed under doors or through cracks at the sides of doors; many windows were covered and cell lights were often inadequate for staff to ensure that medications were taken properly. Custody was rarely involved in the DOT process, although the institution's operating procedure required the presence of correctional officers. The medication management committee reportedly was developing a corrective action plan designed to improve the situation.

VSPW had few inmates on Keyhea orders. There were no inmates with Keyhea orders in the facility during the preceding monitoring period and only one at the time of the monitor's visit in this round. That inmate reportedly was doing well on her medications.

According to an institutional audit, psych techs and nurses often were not available after 8:00 p.m. for the distribution of HS medications. Under these

381

circumstances, HS medications were distributed at evening pill lines, and inmates were told to take them later.

Mental Health Assessments for the Disciplinary Process:

VSPW's RVR log improved and contained all relevant tracking information. Institutional data from September 2004 to November 2005 indicated that caseload inmates constituted roughly 25 percent of inmates charged with disciplinary infractions. Of the 1,091 caseload inmates who received RVRs during that period, 121 were referred for mental health assessments, of whom 58 were 3CMS inmates, 46 were EOP inmates and 17 were non-caseload inmates.

Mental health input into the disciplinary process improved significantly during the monitoring period. The monitor reviewed 25 completed mental health assessments and found that the assessments were generally accurate, thorough and timely. Assessing clinicians found that mental health had influenced the behavior of 63 inmates. Clinicians reportedly interviewed inmates and reviewed UHRs as part of the assessment process, but C-files were not usually reviewed. Inmates were not assessed by their own clinicians.

Hearing officers appeared to take mental health input into account. The monitor's RVR reviews showed that mental health assessments were generally included in the hearing officers' findings and dispositions. Clinical assessments were also considered by officers in mitigating punishments.

The institution was in the process of renewing its referral agreement with the district attorney's office. During 2005, 24 completed cases involving MHSDS inmates were completed by the district attorney's office. Of those cases, 15 were rejected

by the district attorney, one was dismissed, three resulted in convictions and the remainder were classified as "not filed." At the time of the monitor's visit, 21 referrals to the district attorney's office were pending, including three that were being prosecuted.

VSPW had not implemented the department's new sexual misconduct policy. The monitor identified six RVRs involving indecent exposure. The administration agreed to implement the policy and to review these six RVRs.

Transfers:

EOP inmates were generally transferred from VSPW in a timely manner. According to the institution's status report, 68 EOP inmates were transferred in the period from September 2004 through November 2005. Only six transfers, or less than ten percent, took longer than 60 days to accomplish; two of the six tardy transfers were delayed only one or two days beyond the specified timeframe. Of the other four transfers, one inmate was paroled, while the remaining three involved inmates with pending disciplinary actions.

Mental health staff at VSPW indicated that the institution had adequate access to the MHCB unit at CCWF. It appeared from OHU admissions information and MHCB referral data, however, that VSPW underutilized the crisis beds at CCWF, attempting instead to stabilize many of its inmates in the OHU. From September 1, 2004 to November 30, 2005, VSPW transferred 49 inmates to the CCWF MHCB unit. During that same period, there were 384 admissions to the OHU, 23 percent of which lasted longer than 72 hours. From January through November 2005, the average length of stays in an OHU safety cell for the 97 inmates who remained beyond 72 hours was, according to the institution's status report, 137.5 hours, with a range of 73 to 550.6 hours.

Ninety percent of inmates admitted to the OHU were placed in suicide watch cells. The monitor's expert identified inmates who had been placed in these cells but were not suicidal and could have been admitted to a regular OHU cell. This was particularly disturbing given the onerous conditions imposed on inmates placed in the suicide watch cells. Inmates were allowed no clothes and were given only a blanket. Contrary to departmental policy, they had no mattresses and were forced to sleep on the floor. Bright lights shown continuously in the unit and inmates had to go to the bathroom in a hole in the floor. Female inmates had no privacy from observing male correctional officers. These difficulties were often compounded by the excessive length of stays documented above.

The video monitoring system for inmates on suicide watch in the OHU was fair. There were three rubberized safety cells and one large mental health observation room in the OHU that were each equipped with four video cameras, capturing four different views of each cell. Two of the four cameras in the observation room were broken. All fourteen views were recorded simultaneously on a single videotape, reducing the quality of the resolution. Some of the camera lenses were filthy, and the monitoring images were poor due to the accretion of substances thrown at the lenses, but the resolution was reasonably good for lenses that were clean. Videotapes were rewound and used again contrary to policy. Hourly rounds were made by officers checking visually on inmates, but there was little verbal communication. Correctional officers on suicide watch in the camera rooms were recently provided new training.

Caseload inmates were routinely transferred from the reception center within prescribed timelines. From June 1, 2004 through November 30, 2005, only three

percent of 3CMS inmates remained in the reception center longer than 90 days and just seven percent of EOP inmates remained in the reception center longer than 60 days.

Access to DMH/PSH was adequate. There were 22 referrals to DMH during the period from September 1 through November 30, 2005, 20 of which resulted in transfers. The average time between referral and transfer was three days.

Psych and return protocols were not consistently followed. In accordance with departmental policy, CIW generally picked up VSPW inmates upon their discharge from PSH and returned them to VSPW usually within a week or two. As a result, discharge summaries and medication information for these inmates was sent from PSH to VSPW, then from VSPW to CIW and finally back to VSPW from CIW. Problems in transmitting this information reportedly occurred at every step in the process, and VSPW often did not know when inmates were returning. Continuity of medication and treatment was compromised by these procedures.

Mental health screenings were conducted for most non-caseload inmates placed in administrative segregation. A small number of MHSDS inmates were not screened upon their placement in the administrative segregation unit.

At the time of the monitoring visit, the monitor's expert found ten EOP SHU inmates and six administrative segregation EOP inmates with SHU terms in VSPW, who appeared to be in need of transfers to an inpatient PSH level of care. According to clinicians, some ten to 15 acutely ill inmates in the institution routinely went back and forth between the OHU, a MHCB unit, administrative segregation and the SHU because their referrals to inpatient levels of care were either contested or rejected. Treating these inmates in the prison environment was extremely difficult. The monitor's expert

attributed the steady rise in the census of the EOP SHU population at VSPW to this pattern. VSPW clinicians reported that CDCR apparently was planning to open a 20-bed PSU for female inmates at CIW in January 2007, which was expected to help alleviate the problem.

Other CAP Issues:

a. Partial Compliance

The percentage of IDTT meetings attended by all of the required participants decreased during the monitoring period to 67 percent in June 2005 and 87 percent in November 2005, down from 95 percent during the preceding monitoring period. Psychiatric attendance was significantly lower than that of representatives from other disciplines. The institution failed to audit IDTT meetings in administrative segregation, where interdisciplinary participation was reported as problematic during the preceding monitoring period.

The methodology used by the institution to audit staff and inmate referrals improved significantly. During the monitoring period, the institution began tracking urgent referrals. Institutional audits indicated that almost all urgent referrals were seen within one day.

Problems re-surfaced with the provision of five-day clinical follow-up for suicidal inmates discharged from the CCWF MHCB unit and VSPW's OHU, an issue resolved more than three years ago. According to institutional audits, only 81 percent of the 41 suicidal inmates released from the CCWF MHCB unit from September 2004 through November 2005 were seen by a clinician for five consecutive days. Of the 252 inmates released from the OHU with orders for clinical follow-up, just 64 percent were

seen consistently for the full five days.  The problem was compounded by the failure to document clinical contacts, particularly on weekends.

 The provision of structured therapeutic activities for EOP inmates in administrative segregation improved.  Institutional data indicated that, on average, 11 EOP inmates were housed monthly in administrative segregation.  These inmates were offered an average of 11.24 hours of therapy per week, compared with 9.84 hours offered during the preceding monitoring period.  Inmates actually participated in 7.99 hours of activities a week.  Limited program space caused the cancellation of some groups and impeded the formation of new groups.

 During the preceding monitoring period, problems with daily psych tech rounds in administrative segregation re-emerged.  Psych techs were supervised by nursing administrators, rather than mental health staff, without clearly delineated lines of supervision or job descriptions.  A quality management audit in December 2005 also found that psych tech rounds were not documented as required, although nursing supervisors indicated that rounds were being conducted.  The institution responded well to this problem, providing extensive training for all psych techs, including contract employees.

 According to an institutional audit reported in the status section of the institution's CAP, clinicians requested previous mental health records for 40 percent of the 167 inmates surveyed.  Most of the other charts documented appropriate consideration of the need for such record requests.  Only four audited charts indicated that no consideration of the need for a request occurred when such a request appeared pertinent.  The audit concluded that 98 percent of the surveyed charts reflected that

appropriate actions were taken with respect to the acquisition of prior mental health records.

       b.  Non-Compliance

       The institution had significant difficulty providing inmates with individualized treatment plans.  The institution switched to a system of treatment planning involving standardized treatment plans for each disorder or problem.  As a result, target behaviors, treatment goals and interventions were the same for every inmate with a particular disorder.  In addition, it appeared that treatment services specified for inmates in their treatment plans were seldom provided.  Institutional audits, for example, indicated that only five percent of inmates received the treatment services specified in their treatment plans within a year.  The monitor's chart reviews were consistent with the findings of these audits.

       Clinical staff complained that inmate UHRs were not available for clinical contact approximately 60 to 80 percent of the time.

       VSPW provided training on the department's original CPR policy to 509 correctional officers, while 493 correctional officers received training on the department's amended CPR policy.  Mouth shields were issued to correctional officers, but the monitor's spot check revealed that not all correctional officers had the mouth shields on their persons as required by the policy.

Institutional Summary:

       VSPW had a significant number of mental health staffing vacancies, but many of the openings were covered by contract employees.  Of the four issues that were the focus of this round of review, quality assurance continued to make progress.  The

mental health quality assurance subcommittee was active; the QIT process improved and the institution successfully restored its peer review efforts.

Local medication management efforts progressed in ensuring medication continuity for arriving general population inmates, inmates changing housing locations and on the renewal of medication orders, as well as providing medications routinely for paroling inmates. Medications lapses still occurred for inmates arriving via the reception process. Inadequate auditing made it difficult to assess follow-up to medication non-compliance and laboratory testing for inmates on mood-stabilizing medications. The medication error system improved, but its limited use suggested that errors were under-reported. DOT procedures for the delivery of medications were inadequate, and HS medications were not consistently distributed after 8:00 p.m.

Mental health input into the disciplinary process, as well as its documentation, improved. Mental health assessments were generally well-prepared, and hearing officers appeared to take mental health input into account.

Transfers to higher levels of care also improved, but some problems remained. EOP inmates were generally transferred in a timely manner, although a number of EOP administrative segregation and SHU inmates in need of transfers to inpatient levels of care apparently bounced around between CDCR treatment units. Inmates were also typically transferred from the reception center in a timely fashion. Access to MHCB treatment and to DMH was adequate, although psych and return protocols were not always followed. The institution, however, appeared to underutilize referrals to MHCB care at CCWF and, instead, admitted and retained too many inmates in its OHU, where the length of stays often exceeded guidelines. Too many inmates were

389

also placed in OHU suicide watch cells; suicide cells were often inappropriately used for inmates who were not suicidal and could have been housed in regular OHU cells; and conditions in the suicide watch cells were unnecessarily restrictive. Finally, some non-caseload inmates did not receive mental health screenings upon transfer to administrative segregation.

The institution made some progress during this monitoring period in addressing remaining unresolved CAP items. The provision of structured therapeutic activities for EOP inmates, the methodology employed for auditing staff and inmate referrals and the number of requests for inmates' prior mental health records all reflected continuing improvement. In contrast, psychiatric attendance at IDTT meetings declined; the provision of five-day suicide prevention follow-up worsened; psych tech rounds in administrative segregation were poorly documented; and treatment plans were not individualized.

Overall, VSPW had made some progress on difficult issues, but deficiencies remained in a number of important areas.

## SUMMARY

Staffing:

Vacancies among clinicians continued to climb during the monitoring period. Contracting reduced the actual or functional vacancy rate for psychiatrists, but not for case managers.

As of January 31, 2006, the vacancy rate among permanent psychiatrists in CDCR was 36.28 percent, with 79.3 vacancies among 218.55 allocated positions. This

increased by 2.49 percent the department's vacancy rate of 33.79 percent reported for May, 2005 in the 15th round report.

Among psychologists, 120.04 of 518.94 allocated positions were vacant for a vacancy rate of 23.13 percent, a considerable increase over the department's vacancy rate of 16.42 percent reported for May, 2005. For psychiatric social workers, the vacancy rate was 24.46 percent, with 36.59 vacancies among 149.59 allocated positions. This was slightly higher than the previously reported vacancy rate of 24.03 percent for May, 2005. The vacancy rate among all permanent case managers, i.e. psychologists and psychiatric social workers, was 23.43 percent, an increase of about six percent over the rate reported for the previous round.

Institutions covered clinical vacancies with contracted services to varying degrees of success. As of January, 2006, CDCR reduced the functional vacancy rate among psychiatrists from 16.3 percent reported in May, 2005 to 12.12 percent by contracting for the equivalent of 52.81 full-time psychiatrists. However, the defendants remained out of compliance with the June 12, 2002 order requiring them to contain the functional vacancy rate among psychiatrists to a maximum of ten percent.

The CDCR contracted for 17,161.6 hours of clinical case management services, or the equivalent of 107.26 full-time clinicians. Notwithstanding, the functional vacancy rate among case managers system-wide rose to 7.38 percent, up by 4.68 percent from the rate of 2.7 percent reported in May, 2005. As previously indicated, individual contract case managers tended more often than contract psychiatrists to work the monthly equivalent of a full-time clinician.

The functional vacancy rate for psych techs rose to 13.68 percent, higher than the rate reported in May, 2005 by 3.68 percent.  For mental health clerical staff, in February, 2006, the month closest to January, 2006 for which data on clerical staff were available, vacancies increased to 14.89 percent, up from the 11-percent rate reported in May, 2005.

The department's complement of nurses specifically dedicated to the provision of services within mental health programs increased for staff RNs but decreased slightly for supervisory RN positions.  For February, 2006, the month closest to January, 2006 for which data on RN allocations were available, there were 163.8 RN positions and 26.7 supervisory RN positions.  The vacancy rate among RN positions was 22.47 percent, representing 36.8 vacancies, and among supervisory RN positions it was 13.35 percent, representing 3.7 positions.  The department's data on RN contracting did not distinguish between medical and mental health RNs, leaving the extent to which institutions used contractors to cover vacant mental health RN positions unclear.  In addition, cumulative statistics on RN vacancy rates were skewed because 23.4 of the total 40.5 RN vacancies occurred in only four institutions, CSATF, CSP/Corcoran, CSP/Sac and SVSP.  CSP/Corcoran continued to have more vacancies (12) than any other institution, although far less than the 32 vacancies reported in April, 2005.

The overall vacancy rate among MTAs rose to 24.78 percent in January, 2006.  Although CTF's MTA vacancy rate dropped by four percent since May, 2005, it was the highest at 65 percent.  Other institutions with high MTA vacancy rates were PVSP with 49 percent, CSTAF with 45 percent and CMF with 44 percent.  At SVSP, the rate dropped from almost 61 percent in May, 2005 to 43 percent in January, 2006.

Meanwhile, the MHSDS caseload expanded to 31,573 by January, 2006, increasing the lag between program caseload and capacity to 12 percent, up by three percent since May 2005.

Vacancies remained unevenly distributed among CDCR institutions. CCC, CIW, CMF, CSP/Corcoran, PBSP, SVSP, and WSP had high vacancy rates among psychiatrists which they were unable to fill through contracting. CIM, CMF, CSP/Corcoran, VSPW, and WSP had high vacancies among case managers which they were unable to fill through contracting.

Staffing deficiencies were reported in the last round at CCI, CSP/Corcoran and VSPW continued. At CSP/Corcoran all mental health supervisors and managers resigned, and absenteeism rates were high. High turnover among psychologists at CCI caused problems with continuity of care, and unfunded allocations made the level of care insufficient.

No clinical contracting data were available for CMF, where vacancies, particularly among case managers, increased, and morale fell. At CIM, previous gains were eroded by a large increase in mental health caseload that was unmatched by staff, compounded by deteriorating physical conditions and custody problems. WSP also lost ground during the monitoring period, as many of its clinicians departed to work at DMH, case managers' caseloads expanded concomitantly, and clinical supervision was lacking. Its insufficient use of contractors left vacancies which negatively affected critical services.

MCSP lost considerable mental health staff, mostly among clinicians. Contracting data were unavailable for this institution. Staffing shortages were expected

to increase with a large influx of 3CMS inmates, upcoming implementation of a new Level IV EOP, and significant population increases. Caseload expansion and high turnover among permanent staff and contractors negatively affected CEN, whose mental health program was managed by two RNs who were well-meaning but unqualified for the task.

Another group of institutions achieved partial success in covering vacancies with contracted services. ASP's staffing levels were low following an increase in caseload, implementation of a large SNY and the opening of CSH by DMH, which inhibited the institution's ability to attract permanent psychiatrists, but it managed to cover at least partially with clinical contractors. At CCWF clinical vacancies and the mental health population both increased, but the institution covered the vacancies partially with contractors. CSP/Sacramento managed to fill many of its new mental health allocations and keep clinical vacancy rates relatively low. Staffing levels at HDSP improved, although it struggled with insufficient supervision, high turnover and resulting lack of continuity of care. SQ covered most of its many vacancies with contractors but population increases, low morale and high turnover rates inhibited overall institutional advancement.

At CSP/Solano, contractors covered over half of mental health vacancies, although 3CMS caseloads remained excessive. CSATF managed to cover vacancies with contractors, but staffing remained precarious given the loss of some permanent staff, high turnover rates and large caseloads. SVSP covered clinical vacancies with contractors, and slightly increased its permanent clinical and auxiliary staffing. PBSP's vacancies increased in part due to new allocations but were partially covered by contracting. At

CSP/LAC, permanent staffing was generally adequate and clinical vacancies were mostly covered by contractors.

PVSP had lost several mental health staff members to recently-opened CSH and anticipated difficulty filling existing vacancies because of higher compensation rates there. PVSP was entirely dependent on contracted psychiatric services to cover its significant vacancies, but its mental health program was well managed and provided required treatment services. CVSP managed to comply with its CAP and adhere to program guides despite a decline in staff coverage. CCC also reportedly functioned well with a miniscule caseload despite its vacancies. RJD covered most of its clinical vacancies with contractors.

A third group of institutions, CAL, CMC, CTF, ISP, NKSP and SCC, was able to fill most or all of their allocated clinical positions with permanent staff or contractors. CAL and CTF reported no clinical vacancies, although CTF fell short on auditing following a staff psychologist's retirement. CMC covered its few vacancies with contractors, except among MTAs. SCC filled most of its clinical positions and almost entirely covered the balance with contractors. NKSP adequately covered its psychiatric vacancies with contractors, but supervision and continuity of care needed improvement. ISP improved by covering its psychologist vacancy with contractors and hiring permanent psych techs and an office tech.

During the monitoring period, CDCR received allocations for some 300 additional mental health positions, increasing staffing by roughly 18 percent, due to changes in the prevalence rate of caseload inmates in the overall population and allocations tied to new program requirements. At the same time, DMH's opening of its

new Coalinga State Hospital, with its higher salary structure and impressive physical set-up, served as a magnet for CDCR clinicians, as well as free-world clinicians looking to work for the state. Increasingly, the allocation of additional positions does not solve the defendant's chronic and growing mental health staffing problems. At a minimum, more, and perhaps much more, needs to be done to provide competitive salaries for mental health clinicians in CDCR.

Quality Management

The adequacy of local administrative structures for the oversight of quality management differed widely. Institutions with a substantially or fully adequate infrastructure were about equal in number to those with marginally adequate or inadequate infrastructures. The largest group, comprising roughly ten institutions, was marginally adequate. Most institutions had established quality management committees, mental health subcommittees and suicide prevention committees, but the continuing efficiency of all these committees was often limited by their composition and the level of participation by their members.

Lack of attendance was a common hindrance, most notably at ASP, CAL, CEN, CIM, CSP/Corcoran, CSATF, CSP/LAC, HDSP, MCSP, RJD and SQ. Psychiatrists at HDSP and custody, pharmacy, psych tech and medical records staff at MCSP did not attend meetings of the mental health subcommittee. Attendance at suicide prevention committees was regularly insufficient at CAL, CEN, CIM, CIW, CSP/Corcoran, CSATF, CSP/LAC and SOL. Staffing vacancies at many of these institutions, especially CSP/Corcoran and CIM, contributed significantly to attendance problems.

Insufficient interdisciplinary involvement impaired the success of many of the committees involved in quality assurance, including particularly those in ASP, CMF, CSP/LAC, SCC and SOL.

The content and level of committee activities and responsiveness to problems within the institutions were characteristic of the effectiveness of quality management committees. Deficiencies in these measures were noted in the deliberations of suicide prevention committees at CEN, CSATF and HDSP. At HDSP, the suicide prevention committee, which met monthly, failed to address adequately the two suicides that occurred during the monitoring period, nor did it respond appropriately to serious suicide attempts. At CSATF, the suicide prevention committee failed to confront key issues or devise appropriate resolutions. It was unclear whether self-injuries and suicide attempts were fully and adequately reviewed. At CEN, so few substantive exchanges occurred completed suicides were not even discussed.

Some mental health subcommittees also failed to focus their deliberations. At CSP/LAC, the mental health subcommittee was inadequately informed of audit results and failed to focus on issues of quality management. At SCC, mental health issues were given only limited consideration. The SQ subcommittee failed to consider medication management problems. At DVI, the subcommittee gave only limited consideration to any mental health issues.

In contrast, the various committees engaged in monitoring and improving quality of care at CAL, CRC, MCSP and WSP functioned reasonably well in addressing pertinent mental health issues. At CTF, the suicide prevention committee appeared to respond appropriately to suicide-related issues, while the CSP/LAC suicide prevention

committee was strong on content, documentation and dissemination of information, despite a lackluster interdisciplinary attendance record.

Institutions continued to work with existing QITs and generated new ones to provide issue-focused quality management. The level of reported effectiveness of these QITs ranged from "excellent" to "evolving" to "stalled." Generally successful and/or improving QITs were found in CMC, CRC, CSATF, CSP/Sac, ISP, PBSP and VSPW. A few institutions such as CCWF, CMF, Folsom and RJD failed to charter new and some apparently needed QITs. ASP and CEN had yet to charter any QITs at all.

QITs requiring improvement to varying degrees were found in CCC, CCI, CCWF, CIM, CMF, CSP/Corcoran, CSP/LAC, CVSP, DVI, Folsom, HDSP, MCSP, NKSP, RJD, SCC, SQ and SVSP  Weaknesses identified among these QITs included:

- lack of articulated mission,
- lack of focus on meaningful goals and objectives,
- lack of attendance and participation by professionals and staff in meaningful roles,
- distraction by other, non-QIT tasks such as routine management,
- lack of documentation and/or minutes,
- deficient or ineffective methodology for identifying and solving problems, or for auditing,
- ineffective notification of audit results, and
- premature disbanding

Institutions with severe staffing shortages were less able to establish and organize effective QITs. Institutions with staffing problems contributing markedly to weak QIT efforts were ASP, CIM, MSCP and WSP.

Effective use of peer review continued to be somewhat erratic but showed progress during the monitoring round. Peer review functioned adequately among all three categories of clinicians in CCI, CIM, CMC, CSP/Corcoran, CSP/LAC, ISP, PBSP, SQ, SVSP and VSPW. Several institutions implemented peer review during the

monitoring term: among psychiatrists at CIW, CSP/Corcoran, CSP/LAC, and MCSP; among psychologists, CSP/Sac, CSP/LAC, HDSP and MCSP; and among psych social workers at CSP/Sac, CSP/LAC and HDSP.

Peer review was deficient or entirely lacking at ASP, CSATF, CSP/Solano, DVI, SCC and WSP. As with other quality management practices, the absence or cessation of peer review at some institutions, e.g., CSP/Corcoran, MCSP and WSP, was attributed to turnovers in or shortages of clinical staff. In a few desert institutions, clinical staffs were too small to support any meaningful peer review process. CAL, CCC and CVSP lacked sufficient clinicians within any given class to conduct peer review usefully.

As for overall quality management, six institutions, including CMC, Folsom, ISP, PBSP, PVSP and SVSP, functioned reasonably well. On the other hand, overall quality management efforts were inadequate in ten institutions, including ASP, CCWF, CIW, CSP/LAC, CSP/Solano, CTF, DVI, NKSP, RJD and SCC. Staffing shortages exacted a far-reaching toll on quality management, leaving staff overtaxed in carrying out their daily clinical functions with little remaining resources for identifying problems and devising solutions. Quality management continued to be an area which required ongoing vigilance and monitoring.

Medication Management:

DOT and Nurse-Administered Medications: The revised departmental policy on administration of psychotropic medication distinguishes between DOT (direct observation therapy) and nurse-administered delivery. It limits DOT to inmates deemed

at risk for abusing or hoarding medications. Most institutions failed to implement the new DOT policy in one or more respects.

CEN, CSP/Sac (in EOP), MCSP, NKSP and PBSP routinely delivered all psychotropic medications by DOT. CCC and HDSP instituted DOT, albeit sparsely. CCI, RJD, SCC and WSP dispensed medications inconsistently, without distinguishing between DOT and nurse-administered. At DVI only two inmates were on DOT. Psychotropic medications were almost always nurse-administered at CCWF and VSPW; they neither prescribed nor administered medications via DOT. Reportedly because of nursing shortages, CMC used no DOT and dispensed all medications in liquid or crushed form.

CRC, CTF, Folsom, PBSP, SCC, VSPW and WSP failed to document DOT inmate identities and/or delivery procedures, although all reported administering medications via DOT. Folsom also had no DOT review system. SQ continued to lack audits but was in the process of designing an audit tool.

DOT management was confused and ineffective at CSP/Solano and VSPW. Pharmacy labeling errors caused all inmate prescriptions to be administered "DOT," which made it impossible to produce an accurate list of inmates actually on DOT in either facility. MTAs did not distinguish between DOT and nurse-administered protocols at CSP/Solano. Correctional officers failed to open cell doors for DOT, as required, at CSP/Sacramento.

PVSP agreed to a QIT to develop implementation of DOT in pill lines. Because staff at HDSP still had not implemented IDTTs' recommendations for the administration of DOT medications in individual cases, a QIT on the issue was in order.