CAL, CSATF, CSP/Corcoran, CVSP and SVSP accomplished full or nearly full compliance with DOT policy. Nurses at CSP/Corcoran followed DOT orders but automatically administered some medications DOT. CAL, CSATF and SVSP needed to compile lists of inmates on DOT and otherwise improve their documentation of DOT procedures.

Continuity of Medication: Institutional levels of continuity of medication on inmate arrival, intra-institutional transfers and renewals of medication orders were consistent with levels reported during the preceding monitoring period. ASP, CIM, CSP/Sacramento, DVI, HDSP, RJD and SCC did not sustain continuity of medications at any of the critical points, although there was some progress. HDSP improved on transfers and renewals, and DVI improved on arrivals and transfers. ASP, on the other hand, lost ground with reports of some improper renewals by psych techs and MTAs and others without personal evaluations of inmates.

CAL, CCI, CIW, CSP/Solano, MCSP, NKSP, SVSP and WSP maintained continuity at only one of the three critical points, although CSP/Solano, MCSP, SVSP and WSP improved in at least one area. However, there were reports of improper medication renewals by staff at SVSP.

CCWF, CMF, CRC, CSATF, CSP/LAC, CSP/Solano, CTF, Folsom, ISP and SQ managed to maintain continuity at two of the three points. CMF lost ground on internal transfers, but CRC, CSATF, CSP/LAC, CSP/Solano and SQ all moved closer to full compliance. CCC, CEN, CMC, CVSP, PVSP and VSPW performed satisfactorily in all three areas.

Thorough review of institutional performance was hindered by the failure of many institutions to conduct full medication management audits. Improved and more frequent audits were needed.

Laboratory Testing: The importance of monitoring inmates on mood-stabilizing psychotropic medications and related reporting and auditing was recognized throughout the department, but compliance levels were erratic. CCC, CSP/Corcoran, DVI, HDSP, MCSP, PBSP, SQ, SVSP and VSPW conducted insufficient and/or inconsistent laboratory testing of inmates' blood levels. Audits at CSP/Corcoran indicated that deficiencies in laboratory testing might have been attributable to the exclusive use of contracted services on weekends. Audits at VSPW revealed untimely testing and return of results, but additional auditing was required for follow up on inmates on mood-stabilizing medications. CCI, CCWF, CRC, Folsom, ISP, MCSP, NKSP, SCC, SQ and WSP conducted insufficient or no audits, which hindered assessment of compliance at these institutions.

CCC, CEN, CSP/Corcoran, CSP/Sacramento, CTF/Soledad, CVSP, DVI, PBSP, RJD and VSPW conducted adequate and effective auditing. In particular, audits in CTF, DVI and CVSP were conducted well.

Medication Non-compliance: Institutions varied widely during this monitoring period in referral, follow-up and recording of inmate medication non-compliance, and in auditing institutional responses. ASP, CCI, CIM, CMC, CMF, CRC, CSATF, CSP/Sacramento, CSP/Solano, DVI, HDSP, MCSP, PBSP, PVSP, RJD, SCC, SQ, VSPW and WSP were ineffective in at least one of the three critical phases of the referral process.

402

CCI, CIM, CMF, CSATF, CSP/Solano, HDSP, MCSP, SCC, VSPW and WSP were deficient in making medication non-compliance referrals to mental health. At CCI, only 60 percent of non-compliant inmates were referred to mental health, and relatively few of those were seen by a clinician in a timely manner. At CRC, MTAs did not use the protocol referral mechanism.

CCI, CSP/Sacramento, DVI, MCSP, PVSP, RJD and SCC failed to follow up adequately on non-compliant inmates. AT PVSP, follow up took an average of 11.12 working days from referral until evaluation, well over the institution's goal of a maximum of seven days. At CSP/Solano, responses to follow up were overshadowed by institutional compliance with Plata requirements.

Timeliness of psychiatric responses to referrals was problematic at ASP, CCI, CMF, CSP/Solano, PVSP, SCC, SQ, VSPW and WSP. At WSP, out of 78 referrals over a 90-day period, 18 were seen by a clinician within seven days as required. At CCI, 54 percent of inmates were seen within two weeks of a prescription change, with delays attributed to staff shortages. At SCC, fewer than 16 percent of audited referrals received timely psychiatric responses. First appointments for psychiatric evaluation often took three to four weeks and sometimes one to two months before an inmate was scheduled to be seen by a psychiatrist. At VSPW, less than half of inmates referred for non-compliance were seen within seven days as required, with delays ranging from 8.7 to fourteen days. At CSP/Solano, UHRs indicated that some referrals elicited a response within one to two weeks, and others elicited no contact at all.

Although still not fully compliant, CEN, CSP/Corcoran, CSP/LAC, CTF, NKSP and SVSP improved by adopting new procedures in the management of

medication non-compliance. While CSP/Corcoran under-reported non-compliance, it increased referrals and psychiatric follow up, and modified its auditing practices. SVSP noted non-compliance in MARs, although it conducted no audits to measure inmate referral rates. CTF chartered a new QIT and established new procedures to fortify follow up, but still did not audit implementation. At NKSP, within seven days of referral, 66 percent of its inmates received response, and within an additional day, another 11 percent received response. CSP/LAC improved on referrals, training and supervision, with better results reflected in audits, although MTAs did not always refer when warranted. CEN sharpened its medication management policy for increased follow up.

CIW and CCWF were close to full compliance. CIW referred many inmates with its well-functioning referral mechanism, resolving this CAP item. A study of charts at CCWF showed 100 percent psychiatric follow up of non-compliant inmates, although the institution did not assess referrals to mental health.

Auditing of timeliness of psychiatric follow up was generally deficient. CMF, CSP/Sacramento, DVI, HDSP, MCSP, PBSP, RJD, SQ and VSPW had poor to non-existent auditing practices, which hindered assessment of referral and follow up levels.

HS Medications: During the monitoring period, the rate of institutional compliance with HS medication standards remained approximately the same at many institutions. CIM, CSP/LAC, CTF and PBSP progressed during the monitoring period from minimal or no ordering to full compliance.

In July 2003, the court ordered defendants to include in their medication policy a requirement that HS medication administrations occur no earlier than 8:00 p.m.

404

CMC, CRC and HDSP still did not have written HS policies and procedures. Some institutions with written HS policies, including CAL, CCC, CCWF, CEN and CVSP still did not prescribe and/or deliver these medications properly.

ASP, CAL, CCC, CCI, CCWF, CEN, CIW, CMC, CRC, CSP/Solano, CVSP, Folsom, HDSP, ISP, NKSP PVSP, RJD, SCC and WSP prescribed HS medications rarely or not at all. Staff at CCWF, CRC, RJD and PVSP were uninformed, misinformed or discouraged from prescribing HS medications. CIW dropped its requirement for the CMO's approval before issuing a prescription for HS medications, but HS orders still were written for only 1.5% of the MHSDS population, an unacceptably small minority.

Another group including CMF, CSP/Sacramento, DVI, SVSP and VSPW ordered HS medications but failed to appropriately administer them after 8:00 p.m., although DVI and SVSP made progress toward compliance with the mandated delivery time. Delivery at CSP/Sac generally occurred between 7:30 p.m. and 8:00 p.m. At VSPW, post-8:00 p.m. delivery was inhibited by the unavailability of psych techs and RNs at that time of day. As a result, HS medications were often distributed earlier with instructions to defer taking them. A custody decision at CMC to close all yards by 8:30 p.m., in addition to insufficient nursing staff, impeded proper HS medication distribution there.

Further education and training on the proper use of HS medications, and the removal of obstacles to implementation of sound HS medication practices, were needed in most institutions.

Keyhea Process: ASP, CAL, CSP/LAC, CSP/Solano and SVSP remained deficient in tracking inmates on Keyhea orders. Staff at CSP/Solano lacked awareness of inmates' Keyhea status. CAL had no notification proceedings consistent with its operating procedure. Although no inmates at ASP were on orders, a monitor's expert identified inmates for whom orders were appropriate. Despite some improvement, SVSP's tracking process remained fundamentally flawed. Two petitions lapsed due to human error. A single psychiatrist from the MHCB unit at SVSP, who prepared all Keyhea renewal petitions, often contradicted the treatment team by relying heavily on subjective information rather than on records or a treatment team's findings. CSP/LAC lost ground after earlier resolving deficiencies in this area. Twenty-four petitions were initiated or renewed, but 12 of them resulted in no orders because of abandonment, denial or inmate transfer. The institutional coordinator maintained two lists of cases which overlapped but were not identical.

Keyhea processes were moderately successful, although still in need of improvement at CIM, CCWF, CSP/Sacramento and SQ, and were adequate at CCC, CCI, CMC, CSATF, CSP/Corcoran, Folsom, MCSP, NKSP, PBSP, VSPW and WSP. MCSP improved by implementing a tracking procedure that worked well and identified inmates in need of involuntary medication.

Parole Medications: Generally, institutional progress in providing medication to inmates released on parole continued during the monitoring period. CCC, CCI, CCWF, CEN, CIM, CMF, CRC, CSATF, CSP/Corcoran, CSP/Solano, CVSP, DVI, Folsom, ISP, PVSP, RJD, SQ and SVSP dispensed and documented parole medications adequately. VSPW, which was cited previously for failing to maintain a log of parole

medication recipients, improved and appeared to be headed toward full compliance if it maintains improvement.

CAL, CSP/LAC, MCSP, PBSP and SCC adequately supplied medications but fell short on tracking efforts. CMC, NKSP and WSP failed to record the distribution of parole medication in UHRs. CAL and CTF needed to improve auditing practices.

Audits at CSP/Sac revealed significant problems with parole medications. At HDSP only one to two-thirds of discharged inmates received medications, and although the institution developed a CAP, it was too early to assess its effectiveness.

Informed Medication Consent Forms: Institutional compliance in gathering and filing informed medication consent forms varied among institutions during the monitoring round. Practices were deficient at ASP, CCWF, CIM, CSP/LAC, DVI, HDSP, ISP, NKSP, RJD, SCC, SVSP and WSP. At CSP/Sacramento, forms were not obtained. CSP/LAC improved but needed to do more. Although an audit at NKSP showed a 92-percent compliance rate, the monitor found current forms in only about half of reviewed UHRs. Low compliance rates were found at DVI (42 percent), HDSP (51.5 percent to 66.9 percent), RJD (71 percent), SCC (66 percent), SVSP (70 percent) and WSP (61.1 percent). CIM dropped from its 80 percent compliance rate in the preceding monitoring period to 57 percent. At CCWF, forms were missing from some files, and some used were outdated. Local policies at NKSP and WSP did not cover informed consent.

Appropriate forms were regularly obtained and filed in inmates' UHRs in CAL, CCI, CEN, CMC, CMF, CRC, CVSP, MCSP and SQ. Audits at CVSP revealed a compliance rate of 100 percent. Although there was room for greater compliance at

CMC, compliance rates were less than 90 percent in only two of its 11 psychiatric caseloads.

Medication Administration Records (MARs):  Levels of use and filing of MARs continued to vary widely during the monitoring period.  Use and filing of MARs were deficient at ASP, CIM, CMC, CRC, DVI, PBSP and SCC, where MARs were often illegible and/or incomplete, and filed inconsistently, late or not at all. An audit at DVI of 45 charts found only 25 percent contained appropriate MARs.  Filings in UHRs were delayed by 30 to 60 days at CMC.  Use of MARs at SCC was disorganized and confusing, with forms incomplete, filed in multiple versions, filed out of order or missing.  PBSP's deficiency with MARs appeared to be part of a larger institutional problem with its management information system, making it difficult to determine whether inmates were consistently referred to mental health for medication non-compliance.

MARs were generally current, legible and correctly filed in UHRs at CCC, CEN, CMF, CSATF, CSP/Sac, HDSP, MCSP and NKSP, where compliance rates were 85 percent or better.  Any non-compliance usually involved delays or mistakes in filings. CSP/Corcoran and CSP/Solano used current MARs forms correctly but filed them late. CCI, SVSP and WSP filed forms correctly and timely, but the forms were outdated or improperly filled out.

Mental Health Assessments for the Disciplinary Process:

Mental health assessments for the disciplinary process were implemented to facilitate identification of inmate misconduct that is caused or affected by mental

illness, and to encourage appropriate institutional response. Levels of quality in mental health assessments across institutions varied significantly.

Assessments lagged in quality and timeliness at CCI, CIM, CIW, CSATF, CSP/LAC, CTF, HDSP, NKSP, PBSP, RJD, SQ and SVSP. At PBSP, all assessment components were completed in only 16 of 35 cases. Clinicians did not interview inmates at PBSP and SQ, and did not review UHRs and/or C-files at CIW, HDSP and PBSP, although CIW was otherwise largely compliant. Assessments were untimely at HDSP, SVSP and NKSP. The mental health assessment process at CCI was ineffective throughout, although an accurate evaluation was hindered by often unreliable RVR data. Clinicians appeared to misapprehend the purpose of mental health input in the disciplinary process and rarely recommended mitigation of punishment. CTF still had not implemented the mental health assessment component of its disciplinary process. Inmate confidentiality was not guarded at CSP/LAC, where inmates continued to type RVRs, and at NKSP, where clinicians conducted assessments in non-confidential settings.

At CAL, CCWF, CEN, CMC, CRC, CSP/Corcoran, CSP/LAC, CSP/Solano, DVI, Folsom, ISP, MCSP, SCC and VSPW, mental health assessments were generally timely and thorough. SCC began reviewing UHRs and C-files, and implemented the assignment of assessments to clinicians other than inmates' own case managers. CSP/LAC raised its assessment completion rate to 86 percent and its use of lay language to 93 percent, although 17 percent of assessments reviewed lacked timeliness and documentation of outcomes. CEN revised procedures and improved content of assessments. VSPW improved significantly with thorough, accurate and

409

timely assessments by clinicians who interviewed inmates and reviewed UHRs, although not C-files.

Several institutions improved their rates of referrals of inmates with RVRs for mental health assessments. CEN, CIW, CVSP, ISP, NKSP and PVSP had good referral rates, although some clinicians at CIW believed that more inmates should have been referred. Some institutions, including CSATF and CAL, lagged behind with low referrals.

3CMS and non-caseload inmates with RVRs should be referred for assessment if their behavior at the time of the infraction "would reasonably be considered bizarre, unusual or uncharacteristic for that inmate." Referrals of these inmates were inconsistent. CEN referred all caseload inmates for assessment while others made few referrals. Low referrals in some institutions were attributable to lack of recognition of mental health involvement in RVRs. Referrals were unusually low at CIM, CSP/Sac, Folsom, MCSP and SCC. CSP/Sacramento referred only one of 543 RVRs among 3CMS and non-caseload inmates, and Folsom only 12 of 514. MCSP made no effort to identify inmates who should have been referred but were not. Although referrals of MHCB and EOP inmates with RVRs are mandatory, CSP/LAC and SVSP had low referrals of inmates in these classifications.

Effects of mental health assessments on hearing officers' findings and dispositions of RVRs varied widely among institutions. At CAL, CCC, CCWF, CIM, CIW, CMC, CRC, Folsom, HDSP, MSCP, PBSP, SCC, SQ and VSPW, hearing officers took assessments into account appropriately in their findings and/or dispositions. In most cases at CAL, CCC, CIM, CMC, MCSP, SCC and VSPW, hearing officers considered

410

and noted assessments in their findings. Assessments led to significant reductions in penalties or dismissal of charges at CCWF, CMC, MCSP and SCC. At CCC, mitigation or dismissal occurred in 64 percent of assessed cases. Clinical findings at CMC were influential in 83 percent of dispositions, the majority of which resulted in mitigation or dismissal of charges. In four of five cases at CAL, hearing officers referred to mental health input in their findings, and dismissed one case based on clinical input. At PVSP, it appeared that assessments were beginning to affect the disciplinary process. Hearing officers considered assessments in slightly more than half of cases, and reduced penalties or dismissed charges in some of these.

In another group of institutions, hearing officers apparently gave minimal or no consideration to assessments in the consideration and disposition of disciplinary matters. These institutions included ASP, CCI, CEN, CMF, CSATF, CSP/LAC, CSP/Solano, CTF, DVI, NKSP and SVSP. Use of assessments was erratic at CEN and CMF. At DVI, only 30 percent of hearing officers responded to mental health input in their decisions, and in only 60 percent of EOP cases did assessments result in penalty reduction or dismissal of charges. At SVSP, mental health factors influenced less than half of assessed case outcomes. Four cases requiring but lacking assessments were adjudicated without their absence being noted.

Logs of cases referred for mental health assessment continued as the primary documentation tool in this area. They were inadequate or incomplete at several institutions, including ASP, CIM, CMF, CSATF, HDSP, ISP, PVSP, RJD and SVSP. ASP's log improved but still did not record the name of the clinician assigned to prepare the assessment or record the hearing officer's consideration of the assessment. At CVSP,

documentation improved as well, but still did not record whether assessments were considered by hearing officers in reaching dispositions.

Without accurate and complete logs, individual RVRs must be reviewed in order to determine the extent and impact of assessments on disciplinary decision-making. However, this approach was frustrated because of deficiencies in RVRs at some institutions.   At CSP/Sac some RVRs failed to document mental health input or its role in dispositions.  The list of RVRs at HDSP did not include identities of inmates who were involved, and RVRs at CCI were largely unreliable, containing inconsistencies and voided entries.

Hearing officers at CCI, CEN, CTF, NKSP and SVSP did not document mental health input adequately or at all.  At CEN, hearing officers referred regularly to mental health input, but gave it little effect on disposition.  Hearing officers at CTF documented consideration of mental health input in only three cases.  Audits at NKSP showed that 25 percent of hearing officers did not incorporate mental health input into their findings, and 50 percent of them did not document their consideration of mental health input in their decisions.  While hearing officers at CCI generally noted clinicians' conclusions, they did not consistently document the relationship between mental health assessments and their dispositions.  Hearing officers at CSP/LAC improved their documentation in findings and dispositions, but lingering deficiencies were attributed to the need for further training of clinicians completing assessments.

Documentation practices were generally compliant at CCWF, CEN, CIW, CMC, CRC, CSP/LAC, CSP/Solano, Folsom, MCSP, NKSP and VSPW, and improved

at CSP/Corcoran and NKSP since the previous monitoring period. Tracking of inmates was implemented at CEN and improved at PVSP and HDSP, but it was lacking at CMF.

CCC, CSATF, NKSP, PBSP and SCC implemented some aspects of the new protocols for dealing with sexual misconduct infractions, but other institutions lagged in this area. Staff at CSATF required further training in this area. NKSP did not include a list of all inmates who had received sexual misconduct RVRs in its log. HDSP conducted screenings but they were not confirmed by supporting documentation. SVSP, which had the highest number of sexual misconduct infractions in the Department, encouraged its staff to refer perpetrators for assessments. Four of five of its cases of indecent exposure were screened, but it had not begun compiling information on completed screenings. Although WSP reportedly implemented the new protocols, it lacked clinicians with expertise to train staff in compliance with the Department's policy. MCSP and VSPW had not implemented the new protocols, although the latter institution had six RVRs involving indecent exposure.

Transfers:

Transfers of inmates to more intensive levels of mental health programming and treatment became increasingly erratic during the monitoring period. Delays in transfers, especially to the most intensive treatment programs for inmates at the highest custody levels, became endemic and old habits among clinicians of not referring inmates in need of a higher level of care to appropriate treatment programs re-emerged. Only a few isolated or minimal improvements at some institutions relieved this general pattern. Access to intermediate and acute inpatient levels care of care at DMH was often delayed or foregone, although a few institutions managed to make timely referrals to this

level of care. Availability of Mental Health Crisis Beds (MHCBs) also continued to be extremely problematic, with minimal improvement at only a handful of institutions. Transfers of EOPs progressed minimally at a few institutions but otherwise remained extremely deficient. Transfers of EOPs and 3CMSs out of reception improved more than other transfers to higher levels of care, but problematic institutions continued to outnumber those which functioned well in this respect.

DMH:

Some institutions were able to make timely and successful referrals of inmates to higher levels of care within DMH. These institutions included CSP/Corcoran, CSP/Solano, CVSP, ISP, PVSP, RJD, VSPW and WSP. However, institutional referrals met largely with delays and lack of access at CCI, CIM, CMC, CMF, CSATF, CSP/LAC, CSP/Sac, MCSP and NKSP. At SVSP, access to DMH/APP was adequate, but access to the intermediate inpatient care program continued to be slow. Transfers from CCWF to DMH were generally timely, except for problems with DMH acceptance of inmates who had borderline personality disorders. At MCSP, transfers to acute levels of care at ASH and DMH/APP were adequate, but transfers to the intermediate inpatient level of care were slow.

Some institutions, including ASP, CAL, DVI, SCC and SQ made few or no referrals to DMH, suggesting, at least in part, some institutional reluctance as a result of past frustration with gaining access to inpatient care at this level.

Intermediate Inpatient DMH Care: Transfers to DMH intermediate levels of inpatient care were slow at CMC, CMF, CSP/LAC, CSP/Sac, MCSP and SVSP. At CSP/Sac, transfers to SVSP/DMH were exceedingly difficult and delayed. Many inmates

414

had no access to this level of care for months, which sometimes led to their referral to other DMH programs. Inmate stays in the local OHU were excessive at CMC, where referrals to DMH/SVPP were often delayed. Timeliness of referrals from CMF was erratic with some occurring on time but many others delayed.

Acute Inpatient DMH Care: Transfers to acute levels of inpatient care fared better than transfers to intermediate levels, but remained too slow at some institutions. At CSP/LAC, transfers slowed significantly, resulting in long delays. At CIM, referrals to DMH were high but efforts to place these inmates in beds operated by DMH at ASH were stymied, resulting in most inmates needing acute care being sent to DMH/APP at CMF. At CSP/Corcoran, CSP/Solano, MCSP and SVSP, access to acute levels of care appeared to be adequate. At CSATF, an average of 12 days elapsed between MHCB admission and referral to DMH/APP. This last was a local clinical problem, rather than a case of untimely inter-agency transfers, and was a problem in many institutions. Institutional clinicians increasingly attempted to stabilize inmates in crisis in local MHCB units or OHUs due to the difficulty in procuring timely transfers and consequently did not make referrals to higher levels of care until local stabilization efforts were exhausted.

MHCB: Access to MHCBs was more deficient than access to any other higher level of care. A few institutions, including CMF, CSP/Corcoran, HDSP and PBSP, made progress or adequately provided this level of short-term care to their own unstable or suicidal inmates. A large number of institutions, including ASP, CAL, CCI, CCWF, CEN, CIM, CIW, CMC, CRC, CSATF, CSP/LAC, CSP/Sac, DVI, ISP, MCSP, NKSP, RJD, SQ, SVSP, VSPW and WSP, were deficient in transfers to MHCBs because

of bed shortages. At CSP/Sac, MCSP, NKSP and RJD an unduly high number of inmates remained in MHCBs for too long. At CSP/Sac more than half of inmates referred to DMH were awaiting acceptance. More and more seriously ill inmates in an increasing number of institutions were placed in physically unacceptable conditions outside of a MHCB unit because of the lack of beds. And, as with transfers to DMH, institutional clinicians were trying to deal with unstable and suicidal inmates in totally inappropriate physical conditions and inadequate staffing resources before referring them out to scarce or often unattainable MHCBs.

At SQ, referrals of fifteen percent of inmates in need of a MHCB level of care were not referred until it was too late to meet transfer deadlines. Nor was SQ alone; other institutions, including ASP, CAL, CIM, CIW, CMC, CRC, MCSP, VSPW and WSP, consistently relied on their local OHUs, or even worse alternative settings, all characterized by inadequate physical conditions and staffing, rather than promptly transferring inmates to MHCB units elsewhere. CCI kept some of its inmates in crisis in holding cells, and inmates in CEN were held in the CTC with minimal treatment because it no longer had any MHCBs. MCSP, however, stopped using its contraband cells for inmates in need of MHCBs, although some inmates were inappropriately housed in observation cells, as were some inmates in CSATF.

PSUs: During the monitoring period, institutional referrals to PSUs did not change markedly. SQ made only one referral which encountered a long delay before the transfer was executed. Transfers at CMC were delayed, with inmates spending much time in administrative segregation.

Reception EOP and 3CMS Transfers:  Some institutional improvements were outweighed by continuing overall deterioration. Transfers out of reception for EOPs and 3CMS inmates were delayed at ASP, CIM, HDSP, NKSP, RJD and WSP.  At HDSP, while local treatment for inmates delayed in reception declined, the number of delays was down.  ASP resorted to housing some EOP inmates in its OHU.  Delays for 3CMS inmates in reception at CIM were particularly protracted.  The monitor found delays of six months to a year before some inmates were transferred out of reception.  The timeliness of transfers was mixed at other institutions.  EOP transfers improved but 3CMS transfers worsened at SQ; EOP transfers worsened but 3CMS transfers improved at DVI.  Transfers at CAL, CIW, ISP and VSPW, on the other hand, were timely.  At CEN, both groups were generally transferred in a timely manner, but the treatment provided to EOP inmates while in reception was uncertain at best.

CPR Training and Video Monitoring:

Late in the monitoring period, agreement was reached on the implementation of new policy requirements related to the delivery of cardio-pulmonary resuscitation (CPR) during emergency medical situations, especially those involving suicides and suicide attempts.  Monitors were asked to begin checking the delivery of training to custody staff, the distribution and possession of mouth shields and the presence on all living units of emergency kits with a cut-down tool.  By the time training was actually provided, the monitoring period was well-advanced, so not all institutions were monitored on this issue during the 16th round of review.  The issue will continue to be reviewed in the 17th round.

Among those institutions where activity relevant to the revised CPR policy occurred, completed training rates were high at CSP/Sacramento (95percent) and

417

CSP/Solano (92 percent). At CMC, 770 correctional officers had already attended CPR training, with the completion of training expected to be completed in the following month. PVSP conducted training sessions in the fall of 2005 with more planned. Training was in progress during the monitoring period at ASP, CCI, NKSP, SCC and WSP.

Correctional officers at CSP/Solano, ASP, CMC and PVSP were equipped with mouth shields in accordance with policy, but spot checks at NKSP and CCI revealed some deficiencies in this area.

With regard to video monitoring, events during the monitoring period resulted in a moratorium on the use of video monitoring in the observation of inmates on suicide watch. After two instances in which video monitoring served to document strikingly two cases of serious negligence, the department conceded the inadequacy of video-monitoring as a substitute for individual and personal one-on-one observation of high-risk suicidal inmates, characteristically conducted by correctional officers. The practice of relying on video monitoring for the conduct of one-on-one suicide watch was discontinued in March 2006 for at least a six-month period during which the department indicated it would study the issue further and make a final determination on its future use.

Before the department's suspension of video monitoring, the monitor found that practices among facilities for the use of cameras to monitor inmates on suicide watch varied widely. CSP/Corcoran, CSP/Solano and NKSP did not monitor inmates on suicide watch by video cameras. The CTC at CSP/Solano had been wired to accommodate video cameras but none was installed; only one medical cell was monitored by video in the nursing station. At CSP/Corcoran, MHCB overflow inmates were

418

sometimes housed in the medical wing, but none was placed in a cell with cameras. NKSP was in the process of revising its ambiguous video monitoring policy. It used video cameras primarily to supplement monitoring of inmates in MHCB, where six of its ten beds were equipped with cameras. Four cells were monitored by correctional officers in the security area, and the rest were monitored by staff in the nursing station. Correctional officers monitored suicidal inmates by one-on-one observation.

CSP/Sacramento used video monitoring only about once per week with no hourly contacts, a violation of then existing department policy. It kept no records on video monitoring of suicidal inmates and retained videotapes of only "serious" suicide attempts. The viewing monitor could carry up to seven observed cells, but the resolution and camera positions made effective monitoring impossible. Video monitoring was unsatisfactory at VSPW. The OHU had three rubberized safety cells and one large mental health observation room, each equipped with four cameras. However, two cameras were broken, lenses on others were dirty, monitor screen resolution was poor and video tapes were overused.

CEN, SVSP and WSP used video cameras to supplement one-on-one or cell-front monitoring of inmates on suicide watch. Video cameras were placed in eight cells in the mental health area of CTC and two cells across from the nursing station at SVSP. Cameras were being installed in two safety cells. WSP had two monitors in the nursing station, one showing four rooms simultaneously and the other showing a full view of one of four rooms. Quality of video monitoring in the CTC was acceptable, but camera angles allowed for blind spots. CEN had four cells in its CTC equipped with cameras. It planned to use video monitoring only if more than two suicide watches were

419

conducted simultaneously, which had not occurred so far.  Other institutions using video monitoring adequately included CCI, CIW and RJD.

Suicide watches at SQ were conducted exclusively by video monitoring with five camera watch rooms in use and monitors in the officers' station.  Two months before the monitor's visit, six cells with video cameras and a monitor in an additional officers' station were added.  However, use of video monitoring at SQ was confusing and difficult to assess. Not surprisingly, one of the two horrific cases involving the use of video monitoring that led to the moratorium occurred at SQ.

Video monitoring at CIW and CCWF led to concerns about inordinate and sometimes inappropriate use and gender-related privacy problems.

Overall, the use of video monitoring was plagued by serious technical deficiencies and inadequate training and supervision locally, and an utter lack of any centralized direction, oversight or coordination.  The moratorium was well-advised, and the department would do well to abandon permanently reliance on video monitoring to replace one-on-one personal observation of suicidal inmates.  Examination and planning apparently were aimed, commendably, at reducing the cost of one-on-one observation by substituting trained mental health/medical nursing aides for high-priced correctional officers.  The goal is constant observation and some modicum of interpersonal connection with the inmate(s) under surveillance.

### Conclusion and Recommendations

The 16th monitoring round began in the summer of 2005, but was not physically completed until March 2006.  The compilation and production of this report has been punctuated and delayed by a series of intervening events, including the approval

in early 2006 of the bulk of the revised Program Guide and the ensuing struggle to secure

adequate staffing to implement it; a series of hearings and reports on the defendants'

plans for assessing and meeting the need for intensive treatment and high custody beds; a

special session of the Legislature supposedly focused on CDCR's growing problems; and

the initiation of the <u>Plata</u> receivership.  All of these events, occurring against a backdrop

of a steadily escalating overall prison population serious enough to impel the Governor

most recently to declare a state of emergency, have contributed substantially to a long

overdue report, a problem that will be addressed below.  In the meantime, many of the

critical issues raised in this report have already been defined in one or another of these

competing forums, and the search for effective responses is already underway.

       The single most serious problem chronicled in this report is the continuing

deterioration of mental health staffing.  The obvious cause of the problem is the

inexorably expanding demand for services resulting from the bulging population.  By

early spring, CDCR's total institutional population topped 170,000.  As of mid-April, the

mental health caseload stood at 32, 212 inmates, 14.2 percent over existing program

capacity.  At the same time, 38.49 percent of the department's allocated psychiatrist

positions were vacant, as were 24.96 percent of allocated psychologist and 25.8 percent

of allocated psych social worker positions.  Efforts to obtain the contracted services of

temporary clinicians, moreover, also deteriorated due both to bureaucratic difficulties and

a long-standing inability of the defendants to pay millions of dollars worth of pending

contractor bills.  By May 2006, the patient work of a decade, which saw the functional

vacancy rate among psychiatrists in 2002 shrink to some five percent and among

caseworkers to some two percent, was simply swept away.  Even after contracting,

clinical resources were 12 to 15 percent shy of existing program capacity, while the actual population exceeded program capacity by another 14 percent. Twelve years after the determination that mental health treatment in CDCR was unconstitutional, the defendants still lacked clinical resources to meet the needs of some 25 to 30 percent of inmates identified as seriously mentally disordered.

The defendants' scrambling efforts to calculate their need for intensive care units accurately and develop plans to meet the identified need have occupied much of the past two years. The resulting long term and interim plans are ambitious but still not final; they include substantial increases in inpatient DMH beds and MHCB units, as well as a considerable expansion of EOP beds. Meanwhile, clinical staffing allocated over the past few months to implement the interim programs, keep up with the growing population and meet the requirements of the revised Program Guide amounts to nearly a third of the already existing mental health staff. The resulting infusion of staff, clearly needed to meet the growing demand for services, exceeds considerably the size of the total mental health staff when the original remedial order was entered in <u>Coleman</u>.

The real difficulty, however, lies in the recruitment of clinicians to fill these allocations; without incumbents, the allocated positions are largely useless. The defendants have promised regularly for over a decade to reform and regenerate their recruitment efforts without effect. The administration of recruitment has been centralized and de-centralized; the list of advertisements and "recruitment events" has steadily expanded; creative alternatives, including internships, educational loan repayment programs, etc. have been initiated with meager results. Meanwhile, the compensation of some categories of CDCR mental health clinicians has slipped further and further behind

comparable levels of pay in both public and private sectors. The Department of Personnel Administration's most recent survey of comparable pay rates confirmed the substantial inequities reported anecdotally for CDCR staff psychiatrists, clinical psychologists and recreational therapists and to a lesser extent for psych social workers. To date, these findings have resulted in no proposals for pay increases to address these inequities. Whatever increases have occurred over the past ten years have come in the form of court orders or incremental bumps in differential recruitment and retention (R&R) rates for some positions in some institutions where recruitment was especially difficult. The major effect of these increases has been to sow uncertainty, chaos and increasing disparity in payment scales, while doing little to reduce the inequitable compensation paid to psychiatrists, psychologists, psych social workers and recreational therapists in CDCR.

In 2005, DMH began to recruit staff for its new Coalinga State Hospital (CSH), adjacent to CDCR's PVSP and close to ASP. While DMH had limited success in recruiting staff for its remote Coalinga site among clinicians in the general community, it was able to offer better salaries and higher entry level payments than the neighboring CDCR facilities were paying their clinicians. The new CSH facility, moreover, is a state-of-the-art structure; caseloads are significantly lighter than those in CDCR; overtime requirements are minimal; the primary function of CSH is mental health, not security. Not surprisingly, some mental health staff at PVSP and ASP opted to seek employment in CSH. Not one of the 6.5 allocated psychiatrist positions at PVSP and ASP had a permanent incumbent.

The receiver in <u>Plata</u> has now sought a waiver of applicable state laws from the court to implement substantial across-the-board pay increases, comparable with compensation in the private sector, for medical staff in CDCR. Why would any mental health RN in CDCR elect to continue working in the same facility with the same conditions of work for substantially less pay than her or his colleague on the medical staff? Why would any RN from the general community choose to work in mental health in a CDCR institution at a level of compensation significantly lower than that provided for RNs on the medical side of the house? The implementation of the new pay scale for medical staff without a comparable increase for mental health staff would deal a further crippling blow to the delivery of mental health services.

The general breakdown in transfers was another transcendent issue in the 16th round of review. As the overall caseload population continued to increase, so too did the percentage of the caseload in need of program beds with intensive care and high security, including specifically DMH inpatient beds, MHCBs, PSU beds and EOP administrative segregation placements. During the monitoring period, the inadequacy of MHCBs led to the particularly worrisome utilization of inappropriate and dangerous alternative placements in everything from so-called "ZZ" or contraband cells to metal holding cells or "cages" in open corridors, where neither monitoring nor treatment was regularly provided. To eliminate these inadequate alternatives, the defendants elected instead to create "Mental Health OHUs" in a number of institutions, some with and some without MHCB units. This response followed a decade-long effort to wean institutions without MHCB units from reliance on understaffed and physically inadequate OHUs to observe and treat suicidal inmates and rigidly compel the transfer of such inmates within

424

72 hours.  This new emergency strategy has the potential for reviving and institutionalizing a bankrupt concept.  Only recently and belatedly have the defendants begun to address the policy and staffing implications of this crisis strategy.

The 15th round monitoring report, which described the growing crisis in the shortage of beds in intensive care programs for high custody inmates, resulted in recommendations and orders in early March 2006 that led to a series of court hearings, orders and reports designed to deal with the issue in both the short and long term.  Meanwhile, as demonstrated in this report, access to appropriate levels of care for seriously mentally ill inmates remained a problem in almost every CDCR institution.

With regard to medication management, the Plata receiver commissioned a contract to review CDCR practices in the management and administration of medications.  The contractor confirmed the inefficiency and inadequacy of the department's pharmaceutical practices.  The Plata court subsequently endorsed the finding, and the receiver has issued a RFP to take over and operate the department's pharmacy operations and management.  This development will eventually shift to Plata responsibility for many of the medication-related issues that have occupied Coleman monitoring teams, including the use and maintenance of MARs, the acquisition of medication consent forms, continuity of medications, the administration of HS medications, laboratory testing and the distribution of parole medications.  Some medication-related issues will need continuing Coleman involvement, including Keyhea orders, the DOT administration of medications and medication non-compliance.  These latter issues will involve on-going active Coleman monitoring, but even the former issues will need input from mental health to ensure that policies and protocols involving

425

psychotropic medications are properly addressed. The monitor's psychiatric experts will be working with <u>Plata</u> personnel to develop appropriate policies and procedures for the delivery and management of psychotropics.

Implementation of quality management system-wide continued to vary widely during the monitoring period, with institutions doing least well typically suffering from serious staffing shortages. Structures for the shaping of quality management, including health care management committees, mental health subcommittees and suicide prevention committees continued slowly to evolve, while both QITs and internal audits became increasingly erratic in both quantity and quality. While peer review functioned fully and well in a handful of institutions, it, too, was subject to erosion when staffing shortages increased. In those facilities largely dependent on contracted clinicians, which struggled simply to provide a modicum of meaningful supervision, genuine peer review among predominantly contracted clinicians was rarely possible. The cure for many of the system's deficiencies in quality management is to be found in enhanced staffing resources.

Clinical input into the disciplinary process was perhaps less dependant on staffing resources than most other mental health issues, although the lack of full staffing generated some pressure to limit the number of cases referred for assessment. The adequacy of individual institutional assessment processes seems to depend largely on local commitment and leadership, as well as a real understanding of the purpose of the process. Where the purpose was unclear, the mental health input tended to be perfunctory and unhelpful, and hearing officers were often indifferent to or dismissive of

clinical evaluations. Effective documentation of the assessment process and its impact on dispositions needed considerable work.

Implementation of the department's policy on exhibitionism and public masturbation, entitled "Procedures for Mental Health Assessment of Inmate Indecent Exposure and Treatment for Exhibitionism," and dated October 10, 2004, remained largely a dead letter during the 15th round of review. A handful of institutions had implemented the evaluation component, but even in those facilities inmates were rarely identified as suffering from an Axis I disorder of exhibitionism. Those so identified received meaningful treatment even more rarely, with most institutions simply reporting they lacked clinicians capable of providing the necessary treatment. No institution, moreover, seemed to have adopted any of the vague security measures that were part of the overall policy. In the pilot project for responding to indecent exposure in PBSP, security measures, including confinement in a lexan-covered isolation cell and the use of a specially designed body jumpsuit, in conjunction with meaningful oversight of the process by a local Indecent Exposure Review committee, were credited with doing more to reduce incidents of exhibitionism and public masturbation in the pilot program at PBSP than any other aspect of the overall program. A July 27, 2004 order in Coleman required the defendants to develop a plan to meet the system-wide need for the diagnosis and treatment of inmates with exhibitionism, and the defendants announced their intention to implement their plan in October 2004. Nothing much has happened since, although subsequent monitoring indicated that the problem may be more widespread than originally thought.

As indicated above, initial efforts to monitor two issues important in the defendants efforts to prevent suicides, including the prompt provision of CPR in emergencies and the use of video-monitoring to observe inmates on suicide watch, were undertaken in the 16th round of review. The defendants' revised policy on CPR was adopted during the monitoring round, and the review of this issue was incomplete, although the early returns indicated that the delivery of required training in CPR and provision of CPR equipment to individuals and on living units were generally adequate. Also during the monitoring period, the defendants voluntarily halted their use of video-monitoring to observe inmates on suicide watch.

Mindful of the efforts of parties, counsel, special master and the court to meet the orders imposed by the court at the conclusion of the 15th round of review, the recommendations included in the draft version of this report were limited to the following:

1. Defendants should prepare and submit to the special master within 30 days a plan for increasing the compensation provided to CDCR's mental health clinicians, including psychiatrists, psychologists, psych social workers, psych techs, occupational and recreational therapists, RNs, LVNs and medical transcribers, as well as supervisors in all of these categories, to make the salaries paid to mental health clinicians competitive with comparable positions in the private sector or, where applicable, commensurate with the pay in comparable categories of CDCR's medical staff. The plan should include a timetable for its adoption and implementation by no later than March 31, 2007, with the increases made retroactive to January 1, 2007. If the plan requires a waiver of any State statute(s), said statute(s) should be explicitly enumerated and identified in the defendants' plan.

2. The defendants should be required to review their "Procedures for Mental Health Assessment of Inmate Indecent Exposure and Treatment for Exhibitionism," dated October 10, 2004. The defendants should consider the concentration of the department's inmates with exhibitionism or a paraphilia associated with

exhibitionist behaviors in a smaller number of regional institutions in order to focus staff with requisite training and skills to provide the treatment services not presently available in many CDCR institutions. Institutions should be provided with specific direction on the appropriate security measures that need to be adopted, including, if deemed necessary, a requirement for the creation of an internal high-level custody and mental health committee to review local incidents involving indecent exposure or exhibitionism. The defendants should inaugurate a re-thought, fully staffed program for inmates with exhibitionism or a paraphilia associated with exhibitionist behaviors in at least three institutions by July 1, 2007.

Instead of objecting to the monitor's first recommendation for an order requiring the submission of a plan to address the currently inadequate compensation of mental health staff, the defendants responded with a concrete proposal for substantial pay increases for CDCR's clinical mental health staff to become effective as of January 1, 2007. See Exhibit T.

Perhaps the defendants' experience in Plata with the mechanics of salary enhancements persuaded them of the utility, even the necessity, of a proactive approach to the issue. In Plata, the Receiver developed and sought to impose his own schedule of salaries, which the defendants conceded to be reasonable but declined to implement. Instead, they cited the restraints imposed on them by state law requirements, which assigned to the Department of Personnel Administration (DPA) responsibility for the management of salaries for civil service and exempt employees, including specifically Government Code Sections 19816, 19826, 19829, 19832 and 19836, and orchestration of the collective bargaining process, including Sections 3516.5 and 3517, as well as Title 2, Section 599.681 of the California Code of Regulations (determining salaries when employees move between ranges within the same classification). On October 17, 2006, at the request of the Receiver, the Plata court waived the cited state law requirements for

429

the sole and limited purpose of allowing the Receiver to implement his proposed schedule of salaries.

Compensation issues in this case have followed a different trajectory. After repeated demonstrations of the connection between salaries and vacancies, the court has directed from time to time compensation enhancements for a whole category of clinicians, or all categories of clinicians in specific institutions or a specific category of clinicians in a particular institution.  Examples include a January 13, 2000 order for a $20,000 increase in annual compensation for all classes of full-time psychiatrists; a March 7, 2005 order for the provision of differential pay for various categories of clinicians in three institutions; and a June 9, 2005 order for increased differential pay for all clinicians in CSP/Corcoran.  None of these earlier orders was contested.

Despite the piecemeal adjustments in compensation, the defendants have been unable since early 2005 to comply with the court's July 23, 1999 and June 12, 2002 orders requiring them to reduce the vacancy rates among psychiatrists and case managers to specific percentages.  In 2006, moreover, a substantial increase in the number of mental health positions allocated has simply overwhelmed the defendants' capability to recruit and retain permanent employees, resulting in an ever-increasing reliance on contractors to the detriment of the quality of mental health services throughout the system.  In the absence of any specific court order to do so, the defendants have developed a responsive proposal for the enhancement of salaries of mental health clinicians, a proposal they identify as critical for the recruitment of adequate staff.

To validate the need for their proposed salary changes, the defendants offer a 2005 survey commissioned by DPA of public and private sector salaries in key

mental health positions.  The survey indicates that in all categories except psych techs, CDCR clinicians received substantially less pay than their peers, with the range of salary lag in different areas of the state for psychiatrists as high as 57 percent; for psychologists, as high as 33 percent; for psych social workers, as high as nine percent; and for recreational therapists, as high as 22 percent.  See Exhibit U, at p. 1.

    The proposed compensation increases are intended to supersede all existing recruitment and retention (R&R) compensation provided to any and all affected classifications in any and all institutions throughout CDCR, including any retention and recruitment compensation provided by court orders in Pelican Bay State Prison (PBSP) pursuant to <u>Madrid</u>.  It is uncertain whether this schedule of salaries will solve the defendants' vacancy rate woes.  While the melding of all existing R&R rates into base salaries represents an additional indirect boost in compensation because the defendants' package of benefits is tied to base salary and excludes R&R, the impact of the new flat pay scale on recruitment in remote facilities, such as PBSP, will need to be watched.  The salary study's data, on which the proposed pay schedule is based, moreover, is now nearly two years old.

    While they are committed to the implementation of their proposed salary schedule, the defendants are faced with inhibiting state law requirements that may delay its approval and prolong further the defendants' failure to comply with the court's 2002 order.  In not dissimilar circumstances, the <u>Coleman</u> court, at the request of the defendants, permitted waivers of licensing requirements of the Department of Health Services, which would have barred seriously mentally disordered inmates from access to desperately needed mental health treatment facilities in three different CDCR institutions.

The waiver requested by the defendants here is central to perhaps the most basic of all compliance requirements, the availability of mental health staffing resources.

In view of these considerations, the original recommendation is revised as follows:

> 1. The court should require the defendants to adopt and implement the proposed schedule of pay for CDCR mental health clinicians contained in Exhibit S and waive California Government Code sections 19816, 19826, 19829, 19832, 19836, 3516.5 and 3517, and California Code of Regulations Title 2, section 599.681 solely for the purpose of implementing the proposed salaries and structural changes set forth in Exhibit S. The terms of the salary proposal, once adopted, should supersede all existing R&R compensation provided to any and all of the indicated job classifications, as well as psychiatrist longevity pay provided in pay differential 325.

In their objections to the draft version of this report, the defendants took exception to that portion of the monitor's second recommendation that would require the defendants to inaugurate a "re-thought, fully staffed program for inmates with exhibitionism or a paraphilia associated with exhibitionist behaviors in at least three institutions by July 1, 2007." The defendants apparently misread the recommendation as a requirement to concentrate the treatment of exhibitionism in three regional institutions, but that was not the intention of the proposed order. In a July 26, 2004 order, the court directed the defendants to develop within 90 days a plan to meet system-wide the needs for the evaluation and treatment of inmates with exhibitionism. The order cited PBSP's development of a model policy and practices in this area. In October, 2004, the defendants duly promulgated its "Procedures for Mental Health Assessment of Inmate Indecent Exposure and Treatment for Exhibitionism." This 16th round report documents that by early 2006, the policy had yet to be fully implemented in any CDCR institution

outside of PBSP. The monitor's experts have opined that, because the number of inmates in CDCR with a genuine Axis I disorder of exhibitionism is small and the department's resources for providing competent clinical evaluation and treatment of such inmates are quite limited, the department ought to consider housing inmates identified with the disorder in regional institutions to allow the consolidation of the scarce clinical resources needed to address the problem.

In their objection, the defendants agree to review the custody levels, medical and other mental health needs of inmates already diagnosed with exhibitionism within 90 days to determine the feasibility of providing suitable treatment in a smaller number of, perhaps, regional facilities and sharing the findings and conclusions of their review with the monitor and plaintiffs' counsel. There are two problems with this interim suggestion. The first is that the 16th round report makes clear that the defendants' process for identifying inmates with an Axis I disorder of exhibitionism "remained largely a dead letter." The second problem stems from the two and a half years that have passed since the defendants were ordered to fix the problem and the two years that have elapsed since the department instituted its policy for dealing with the issue. The department is free, and encouraged, to conduct its own study of the utility and/or feasibility of consolidating the delivery of its programs for evaluating and treating inmates with a diagnosis of exhibitionism, but it should still be required to implement fully staffed programs for such inmates in at least three CDCR institutions by no later than July 1, 2007. The draft version of the second recommendation remains unchanged.

Delays in the preparation and submission of this report on the monitor's 16th round of review have prompted remedial responses, including the hiring of

433

additional personnel to work on the preparation of future reports, limiting the special master's role in their preparation and an initial experiment with the generation of multiple reports in the 17th round of review instead of the single, huge opus heretofore used to deliver the findings, comparative analysis, summary and recommendations resulting from each semi-annual round of review. The 17th round report will attempt to facilitate a focus in shorter, more quickly generated reports on institutions with common characteristics, whether in the mix of their mental health programs, their specific mental health function, the size of their mental health programs or the nature of their overall population.

The appointment and early activities of the receiver in <u>Plata</u> have done much to energize and accelerate the defendants' focus on health care issues, a development that bodes well for all aspects of CDCR's delivery of health care services, including mental health care.  Relatively concurrent action on salaries for medical and mental health staff will provide a useful measure of the extent and speed with which improvements on the medical side of the department's health care "house" lead to improvements on the mental health side of the house.

Respectfully submitted,

J. Michael Keating, Jr.
Special Master

December 13, 2006