IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, et al.

   Plaintiffs,

          vs.                                No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

   Defendants.


SPECIAL MASTER'S REPORT AND RECOMMENDATIONS ON
DEFENDANTS' PLAN TO PREVENT SUICIDES
IN ADMINISTRATIVE SEGREGATION


On May 9, 2006, the special master submitted his Report on Suicides

Completed in the California Department of Corrections in Calendar Year 2004 to the

Court.  Among other findings, that report noted that in 2004, 69.2 percent of all

California Department of Corrections and Rehabilitation (CDCR) suicides (18 of 26)

occurred in administrative segregation, representing a substantial increase over the

number of suicides that took place in administrative segregation in 2003, when 17 of

CDCR's 35 suicides were completed in administrative segregation units.

The special master's report recommended that the defendants be required

to develop a plan by May 31, 2006 specifically to contain or prevent the escalating

number of suicides in administrative segregation.  On May 19, 2006, the defendants

1

responded to the special master's Suicide Report, indicated their commitment to developing the suicide prevention plan and sought the collaboration of the special master's experts in conducting their analysis and generating the required plan. The defendants also sought an extension of the proposed timeline for submission of their plan to August 31, 2006. Plaintiffs' counsel agreed to the extension and requested that any collaborative effort to analyze and address the causes of suicide in administrative segregation include input from their expert.

In a June 7, 2006 order, filed on June 8, 2006, the court ordered the defendants to develop a plan to address the rising rates of suicide in the administrative segregation units of the CDCR. The order granted the defendants until August 31, 2006 to develop their plan and specified that it must include a budget and implementation schedule for any policy and procedure changes, staffing or budget augmentation, and if necessary, include a mechanism for obtaining mid-year funding on or before September 30, 2006. The order further directed the defendants to collaborate with the special master's experts and plaintiffs' counsel and their expert in their effort to analyze the causes of and methods for preventing suicides in administrative segregation units.

On July 14, 2006, defendants and their experts met with the special master and his experts and plaintiffs' counsel and their experts to discuss CDCR's analysis of suicides in administrative segregation and preliminary proposals for dealing with suicide in administrative segregation. The open and fruitful discussion that followed during this meeting provided defendants with a broader range of potential options for preventing suicides in administrative segregation, some of which involved significant policy changes and a potential need for substantially enhanced resources. The complexity of some of the

discussed options prompted the defendants to seek yet another extension to explore fully

the obstacles to their adoption and the extent of resources required for their

implementation. The plaintiffs agreed to the extension, which was granted by the court

while giving the defendants until October 2, 2006 to file their plan.

On September 5, 2006, the defendants submitted to plaintiffs and the

special master a draft of their proposed suicide prevention plan for administrative

segregation units. A written critique from the plaintiffs followed, along with multiple

telephone conferences among and between defendants, plaintiffs, special master and

experts. On October 2, 2006, the defendants submitted their final plan. On October 31,

2006, plaintiffs' counsel filed objections to the plan. The court on November 2, 2006

gave the defendants until November 15, 2006 to respond to those objections and ordered

the special master to report to the court on the adequacy of the defendants' plan by

December 1, 2006. The defendants subsequently sought an extension of the time within

which they might respond to the plaintiffs' objections. On November 16, 2006, the court

allowed the defendants until December 1, 2006 to file their response to the plaintiffs'

objections and directed the special master to file his report on the plan's adequacy by

December 18, 2006. This report on the defendants' plan for suicide prevention in their

administrative segregation units is filed pursuant to the court's November 16, 2006 order.

The Plan

After a brief description of the genesis of the planning process, the

defendants' October 2, 2006 suicide prevention plan identifies and categorizes some of

the key factors that contribute to suicides in administrative segregation. The categories

include failures or breakdowns in the delivery of mental health services and custody care

3

to inmates who have committed suicide, as well as the personal issues and concerns that seem to drive inmates in administrative segregation to commit suicide. The identified factors were winnowed from a broad and interdisciplinary review of suicides in administrative segregation during 2004, supplemented by an examination of suicide prevention policies and memorandums and minutes over the past two years of CDCR's Suicide Prevention and Response Focused Improvement Team. The resulting list of key factors was unremarkable and was readily accepted by parties, counsel and experts. .

The defendants' plan next provides a brief description of the July 14, 2006 conference of parties, counsel, special master and all of their respective experts and the various recommendations and proposals presented and discussed during that meeting. The bulk of the proposed actions listed came at the suggestion of the defendants and were based on sound common sense. Most involved changes in policies and practices that could be accomplished relatively quickly and economically. The proposals emerging from that conference, whether generated by the defendants or the experts, provided the framework for the defendants' subsequent planning efforts. Three principal issues emerged from the July 14th conference that became the focus of much of the subsequent discussion of the preventive plan:

1. Intake measures: Data collected by the defendants and the special master's expert on suicides confirm that a high percentage of suicides occur within 72 hours of an inmate's confinement in administrative segregation. Suicides, moreover, occur more often among newly arrived inmates in administrative segregation who are single-celled, rather than double-celled. Past efforts to address the need for some sort of intake process in administrative segregation had foundered on obstacles arising from

security and population management considerations.  Out of the July 14th meeting came a

general agreement among experts that a special intake section in each administrative

segregation unit, where newly arriving inmates would be held for an initial period of time

for more intensive observation, was absolutely critical.  Physically, the intake cells

needed to be made as suicide proof as possible and located in an area of the unit

conducive to increased observation by custody staff.  The requisite physical renovations

would require removal of dangerous protrusions from which inmates might hang

themselves; installation of vent covers and retrofitted light fixtures, similarly to prevent

hangings; new cell doors with better visibility; and, where possible, the installation of

concrete slab beds.  The experts thought that the intake period for each new arrival should

last two or three weeks.

          The defendants adopted the proposal but also made some major changes in

its particulars.  First, they reduced the intake period of intensive observation to 72 hours;

they also decided that newly arrived inmates capable of being double-celled safely would

not need to be placed in a designated intake cell because the double-celling itself would

serve as a prophylactic measure.  The defendants' reduction was based on the data from

the analysis of suicides in administrative segregation in CDCR, which indicated that the

first 72 hours, rather than the experts' suggested two to three weeks, was the critical

initial period.  That reduction, along with the exception from placement in intake cells of

double-celled new arrivals, reduced considerably the number of intake cells needing to be

set aside and retrofitted in each administrative segregation unit.

          The defendants forthwith made a calculation of the number of intake cells

that would be required to meet the reduced need, identified 406 administrative

segregation cells for the required renovations and developed a three-phased plan for
retrofitting those cells incrementally over the next three fiscal years with completion
scheduled in FY2009/10. The defendants' most recent December 1, 2006 submission to
the court, however, contained an accelerated commitment to complete the recommended
renovation of physical features in all of the intake cells by July 2008, a reduction of two
years in the original schedule.

Plaintiffs' counsel and the special master's experts have expressed serious
concerns over the reduction of the formal intake period from two to three weeks to 72
hours. In some measure, those concerns have been addressed in the most recently
proposed resolution of the following issue.

2. Welfare checks:

At the July 14th meeting, the experts urges the defendants to adopt the
American Correctional Association's standard for welfare checks in an administrative
segregation unit, which requires that inmates in such units "be personally observed by a
correctional officer at least every thirty minutes at an irregular schedule." At first, some
confusion arose over whether the defendants' presently required hourly "security" checks
constituted *bona fide* welfare checks. The dispute focused on whether the rounding
correctional officer needed to awaken each inmate to ensure that he was alive. That
dispute was resolved, and CDCR's security checks were found to be "welfare" checks.
Subsequent memorandums to custody staff confirmed the agreed-on nature of the welfare
checks to be conducted by CDCR custody staff hourly in administrative segregation. The
principal argument for half-hour welfare checks, especially when conducted on an
irregular schedule, is that they reduce by at least half the temporal window of time within

which suicidal inmates might effect a successful hanging, the method elected in 90

percent of completed CDCR suicides, whether in administrative segregation or

elsewhere.  That argument, among other issues, rendered moot the need for waking every

inmate during each check.  In any event, the defendants' October 2, 2006 plan rejected

the experts' recommendation for 30-minute welfare checks, citing the strain on thin

custody resources it would entail, but promising to continue studying the issue.

In the their December 1, 2006 response to the plaintiffs' objections to the

October plan, the defendants agreed to provide 30-minute welfare checks by July 1, 2007

of all newly arriving inmates in an administrative segregation unit for the first three

weeks of their stay in the unit.  While not fully responsive to the experts'

recommendation or the American Correctional Association Standard, the concession does

address partially the experts' recommendation for more intensive observation of arriving

inmates during the first two or three weeks of their presence in administrative

segregation.

3.   Property for non-disciplinary inmates in administrative segregation:

A significant percentage of inmates in administrative segregation are placed there not for

disciplinary infractions but for their own safety.  During the July 14th meeting, plaintiffs'

counsel and the experts urged the department to consider either establishing separate

housing or creating some personal property allowance (i.e., permission to retain in their

administrative segregation cell some personal property, e.g., radio, television, etc.) for

non-disciplinary inmates in administrative segregation for safety reasons.  The defendants

initially rejected the recommendation, citing the lack of any available independent space

in the vastly overcrowded CDCR and arguing that such privileges would mark the

inmates receiving them as needing protection and increasing thereby physical threats and

psychological torment directed at them in the administrative segregation environment.

Plaintiffs' counsel and the experts countered that other correctional systems around the

country allow different levels of privileges within the administrative segregation context;

indeed, CDCR itself was currently conducting such an experiment in Pelican Bay State

Prison under the auspices of the Madrid litigation.

In their December 1, 2006 filing, the defendants reversed their earlier

outright rejection of some form of property privilege for non-disciplinary inmates in

administrative segregation and indicated they are exploring some such a privilege and

anticipated articulating a revised policy on the issue for executive review by December

29, 2006.

Other Issues:

The defendants' plan for curtailing suicide in administrative segregation

included a list of 14 additional discrete initiatives, most of them identified and articulated

initially by CDCR. Some of those have prompted protests from the plaintiffs primarily

related to the speed with which the defendants plan to implement them. Included among

the 14, the most troublesome are:

- Compliance with Title 15 requirements: Defendants' plan to meet

Title 15 requirements for administrative segregation inmates for out-of-cell time focused

almost exclusively on exercise. The department has directed institutions with "small

management yards" to offer new administrative segregation inmates "walk alone" access

to outside exercise as quickly as possible after their arrival. Defendants admit that the

number of available small management yards is insufficient, but report a plan to construct

and/or fund 921 such yards in fiscal year 2006/2007. Even this effort, however, will leave a confessed shortfall of 441 small management yards, which will require future funding and construction, the details for which are not contained in the defendants' plan.

Pre- and post-placement screenings: The defendants propose to administer to all inmates entering administrative segregation a short pre-placement screening that seeks self-reported suicide history or current suicidal ideation. Any positive responses or a refusal to cooperate with the screening supposedly requires a mental health referral before placement in administrative segregation. The department has already developed a pre-placement chrono for the screening, which was scheduled to be implemented in June 2007. In their December 1, 2006 filing, the defendants indicated they would implement the pre-placement screening no later than January 1, 2007.

The post-placement screening includes the department's standard 31-item mental health questionnaire and is already required to be administered to all inmates in administrative segregation within 72 hours of their arrival. The defendants reportedly have already undertaken measures to ensure that an inmate's suicidal history recorded in the Mental Health Tracking System will be available to psych techs for all caseload inmates newly placed in administrative segregation, including inmates who may have been recently transferred from elsewhere in CDCR.

The defendants' plan also reports that, effective October 2, 2006, mental health staff will be conducting screening interviews in private settings, which afford confidentiality of sight and sound from other inmates and confidentiality of sound from custody staff. In addition, screening interviews are to be announced by custody staff as a "health appointment" to avoid stigmatization and possible retribution by other inmates.

Defendants assert they can prioritize space in administrative segregation units for confidential mental health interviews at each institution.  If additional plant and/or staffing resources are needed to provide confidential interview space, the defendants promise to assess the need and submit an appropriate proposal through the annual budget process.

Reduction in length of stays in administrative segregation:  Defendants' proposal optimistically cites the expected opening of a Sensitive Needs Yard for Level IV inmates (the highest level of CDCR security classification system) in January 2007 as a possible outlet for numerous eligible inmates in administrative segregation units around the system, and enumerates a quartet of management audits and utilization reviews that may serve as potential cures for extended stays in administrative segregation.  Given the long and failed history of policy mandates, tracking systems, practice improvements and multi-discipline projects that have struggled with this issue, one can be forgiven for harboring some skepticism about the eventual efficacy of this latest round of proposed administrative remedies.  To be successful, they must be closely managed by defendants and monitored.

Other elements of the defendants' suicide prevention plan for administrative segregation units are unremarkable in the sense that everyone agrees with their utility and appropriateness.  All of them, including regular recording of "bad news" on inmates' return from court appearances; daily coordination among custody and mental health staff in administrative segregation units; audits of weekly rounds, screening refusals and suicide prevention practices; increased use of double-celling whenever appropriate; and faster implementation of cardio-pulmonary resuscitation and other

emergency measures, require extraordinary training, supervisory and monitoring efforts if they are to have much of an impact on the incidence of suicide in administrative segregation.

Having said all of that, the defendants have come a long way in recognizing and endorsing the elements essential to effective suicide prevention in administrative segregation. Beginning with a collaborative approach in mid-2006, parties, counsel, special master and all of their experts have teased much agreement out of apparent discord. The best course seems to be more of the same.

Recommendation:

The court should approve the defendants' October 2, 2006 plan, as amended in their December 1, 2006 filing, and require the defendants to implement the plan. At the same time the special master should be required to meet with defendants and plaintiffs' counsel monthly in person or by teleconference to follow up, refine and monitor implementation of each element of the defendants' plan and report back to the court in 90 days on the status of the defendants' compliance with the plan and any further recommendations that may be necessary.

Respectfully submitted,

/s/

_____
J. Michael Keating, Jr.
Special Master

December 18, 2006