PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
AMY WHELAN Bar No.: 215675
LORI RIFKIN Bar No.: 244081
SARAH M. LAUBACH Bar No.: 240526
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>    Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>    Defendants | No.: Civ S 90-0520 LKK-JFM<br><br>**PLAINTIFFS' RESPONSE TO SPECIAL MASTER'S REPORT AND RECOMMENDATIONS ON DEFENDANTS' PLAN TO PREVENT SUICIDES IN ADMINISTRATIVE SEGREGATION AND REQUEST FOR ADDITIONAL RELIEF** |

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| ASU | Administrative Segregation Unit. |
| CCCMS | Correctional Clinical Case Management System. CCCMS is the name for the largest mental health program within California Department of Corrections and Rehabilitation. It currently houses 27,700 inmates with mental illness who live in housing units alongside non-mentally ill inmates. CCCMS inmates are generally provided with medication management and a meeting with their case manager at least every 90 days. A few participate in group therapy. The Revised Program Guide requires that CCCMS inmates housed in administrative segregation be provided with enhanced mental health services, including a weekly case manager contact and daily psych tech rounding. |
| CIM | California Institute for Men. A prison for men located in Chino, California. |
| CDCR | California Department of Corrections and Rehabilitation |
| EOP | Enhanced Outpatient Program. EOP is the name for sheltered treatment programs for seriously mentally ill inmates who require a higher and more intensive level of mental health care. There are currently approximately 4,100 EOP inmates. Because these inmates are vulnerable and require some supportive services, they live in separate housing units. The Revised Program Guide mandates at least ten hours of structured therapeutic activities for EOP inmates regardless of where they are housed, weekly case manager contacts, and daily psych tech rounds for those housed in administrative segregation. |
| MHSDS | Mental Health Services Delivery System. The name given by defendants to their entire mental health system. |
| PVSP | Pleasant Valley State Prison. A prison for men located in Coalinga, California. |

**TABLE OF CONTENTS**

TABLE OF ABBREVIATIONS ................................................................................................... i

TABLE OF CONTENTS ............................................................................................................. ii

INTRODUCTION ........................................................................................................................ 1

STATEMENT OF FACTS ............................................................................................................ 1

ARGUMENT ................................................................................................................................ 2

I.  THE COURT SHOULD DIRECT DEFENDANTS TO PROVIDE 30 MINUTE WELFARE CHECKS TO ALL INMATES HOUSED IN ADMINISTRATIVE SEGREGATION ............................................................................................................... 2

II. THE COURT MUST ORDER DEFENDANTS TO REDUCE LENGTHS OF STAY IN ADMINISTRATIVE SEGREGATION WITHIN SPECIFIC GUIDELINES ................................................................................................................... 5

III. DEFENDANTS MUST SEEK FUNDING FOR THE SMALL MANAGEMENT YARDS THEY HAVE IDENTIFIED THEY CURRENTLY NEED FOR ADMINISTRATIVE SEGREGATION INMATES ......................................................... 7

CONCLUSION ............................................................................................................................. 8

## INTRODUCTION

Plaintiffs made several objections to Defendants' Plan to Address the Escalating Rate of Suicides in Administrative Segregation Units, filed 10/2/06. Plaintiffs' Objections to Defendants' Plan to Address Suicide Trends in Administrative Segregation Units ("Plaintiffs' Objections"), filed 10/31/06. Defendants filed a Response to some of plaintiffs' objections and indicated a willingness to implement and expedite additional recommendations made by the expert panel. Defendants' Response to Plaintiffs' Objections to Submitted Plan to Address Suicide trends in Administrative Segregation Units ("Defendants' Response"), filed 12/1/06. Although Defendants' Plan includes many of the recommendations made by the expert panel almost five months ago, it fails to incorporate three critical elements that must be implemented if CDCR is serious about reducing the high rate of suicides within their administrative segregation units. Plaintiffs request that this Court order defendants to expeditiously implement these recommendations with specific orders that will ensure implementation:

(1)   Provision of 30 minute welfare checks by custody officers to all inmates housed in administrative segregation units;

(2)   Reduction in length of stay of inmates housed in administrative segregation and;

(3)   Provision of Title 15 Out of Cell Requirements to all inmates housed in administrative segregation units.

Current conditions in administrative segregation and the unabated number of suicides within these units – at least 20 of the 41 reported to date in 2006 – mandates a serious response by defendants to the conditions of confinement and lengths of stay within these housing units which have been identified by the expert panel as contributing to the continuing high suicide rate within CDCR administrative segregation units.

## STATEMENT OF FACTS

On June 8, 2006, this Court ordered Defendants to develop a plan to address the high rate of suicides within the administrative segregation units within CDCR. 6/8/06 Order ¶1. Defendants requested and were granted an extension for submission of their plan from May 31, 2006, to August 31, 2006. As part of the Court Order, defendants were directed to include a

1  budget and implementation schedule for any policy and procedure changes, staffing or budget
2  augmentation, and if necessary, include a mechanism for obtaining mid-year funding on or
3  before September 30, 2006.  6/8/06 Order ¶ 2.  Finally, the Court Order directed defendants to
4  work with the Special Master's experts, plaintiffs' counsel and plaintiffs' expert, Lindsay
5  Hayes, to develop the plan.  6/8/06 Order ¶3.  Defendants' Plan, however, does not include any
6  budgetary requests whatsoever, and the implementation schedule is vague and incomplete for
7  key elements.

## ARGUMENT

### I. THE COURT SHOULD DIRECT DEFENDANTS TO PROVIDE 30 MINUTE WELFARE CHECKS TO ALL INMATES HOUSED IN ADMINISTRATIVE SEGREGATION

Defendants have agreed to provide 30 minute welfare checks to inmates housed in administrative segregation during the first few weeks of their placement in the unit.  Ex. D to Defendants' Response.  For the remainder of the inmates housed in administrative segregation, no welfare checks will be performed.  Instead, defendants only provide hourly security checks during part of the day "to ensure inmates are accounted for and secured within their assigned housing units." *Id*.  In short, no other administrative segregation inmates, including mentally ill inmates whose suicide risk increases over time according to defendants' data, will be provided with welfare checks under Defendants' Plan.  Ex. D to Defendants' Response; Declaration of Jane Kahn in Support of Plaintiffs' Objections to Defendants' Plan to Address Suicide Trends in Administrative Segregation Units ("Kahn Dec.") filed 10/31/06, ¶14, Ex. D, Graph of Length of Stay in ASU Prior to Suicide: MHSDS vs. Non-MHSDS.  Defendants' Plan is unacceptable.

The expert panel recommended that defendants provide 30 minute welfare checks to **all** inmates housed in administrative segregation units.  Defendants' Plan at 9.  This recommendation mirrors the American Correctional Association Standard for welfare checks, which was adopted in 1983, and requires that all inmates in administrative segregation units shall be personally observed by a correctional officer at least every 30 minutes at an irregular schedule.  American Correctional Association Standard 4-4257.  Kahn Dec. filed 10/31/06 ¶

17, Ex. F.  A welfare check was defined by the expert panel as a "living and breathing" check, that involves a cell-front observation by a custodial officer who stands long enough at the cell-door to see some movement by the inmate that indicates that he or she is alive (i.e., leg, head, chest movement).  Lindsay Hayes Declaration In Support of Plaintiffs' Objections to Defendants' Plan to Address Suicide Trends in Administrative Segregation Units, filed 10/31/06 ("Hayes Dec") ¶ 9.  The value of welfare checks was uncontested by the expert panel who agreed that these checks were extremely valuable in reducing the suicide rate in administrative segregation units because they increase the opportunity for emergency response to a suicide in progress and because they increase inmate contact with staff in these isolated housing units.  *Id.*  The 30 minute welfare checks allow officers to more rapidly identify the security and treatment needs of inmates in the administrative segregation units, particularly those who have been newly admitted or those who are particularly vulnerable, like mental health inmates.  Declaration of Walter L. Kautzky In Support of Plaintiffs' Objections to Defendants' Plan to Address Suicide Trends in Administrative Segregation Units, filed 10/31/06 ("Kautzky Dec.") ¶ 8.

Defendants' Draft Suicide Plan noted that within CDCR administrative segregation units, custody officers are required to perform hourly security checks.  Ex. B. attached to Kahn Dec. filed 10/31/06.  It is clear that security checks are not welfare checks.  In discussing the recommendation to provide welfare checks, defendants noted that "it does not appear that the terms 'Welfare Check' and 'Security Check' are synonymous."  Draft Report at 8.  The Draft Report included a list of functions required during a security check, none of which included a "living and breathing check." Draft Report at 9.  Defendants' October 2, 2006 Plan differentiated between security and welfare checks and stated that "[T]he Division of Adult Institutions is unable to proceed with the recommendations of the experts as they relate to hourly welfare checks at this time.  However, Division of Adult Institutions will re-evaluate the impact of implementation of this proposal in terms of workload impact and resource allotment…and submit a request for resources to the Legislature through the budgetary process." Defendants' Plan at 16.

As a result of the inadequate custody rounding currently provided by CDCR in administrative segregation units, there have been numerous suicides where inmates have been dead for many hours when eventually discovered by officers – negating the value of any life-saving emergency response.  Hayes Dec. ¶11.  This continues to be a serious problem in 2006.  In two recent suicide reports the CDCR evaluators noted that the inmates who committed suicide in administrative segregation units were dead for hours at the time that they were discovered by custody officers performing security checks:  On August 5, 2006, an inmate housed in administrative segregation at PVSP was discovered unresponsive on the cell floor with a rope around his neck during a security check and was estimated dead for about two hours. On August 13, 2006, an inmate housed in administrative segregation at CIM was found hanging by officers conducting security checks and was estimated to be dead for a minimum of four hours before he was discovered by officers.  Kahn Dec. to Plaintiffs' Response ¶2.

This Court's June 8, 2006 Order directed defendants to include in their plan any necessary budgetary requests – including mid-year requests -- for implementation of their plan to address the suicide rate within the administrative segregation units.  6/8/06 Order ¶2.  Despite this clear direction, defendants have submitted a plan that failed to assess the "workload impact and resource allocation" for welfare checks and failed to include any budgetary request to implement this critical recommendation.  As discussed further below, defendants' acknowledged current inability to provide inmates housed in administrative segregation with their required out of cell time and their inability to reduce the long stays of mentally ill inmates in administrative segregation makes life in these harsh units even more stressful and dangerous.  Any remedial plan developed to reduce the high suicide rate within the administrative segregation units will be meaningless unless it includes a commitment by defendants to implement 30 minute welfare checks for all inmates in administrative segregation as soon as possible.  Hayes Dec. ¶14.

## II. The Court Must Order Defendants To Reduce Lengths of Stay in Administrative Segregation Within Specific Guidelines

The expert panel identified long stays in administrative segregation as a contributing factor to the high suicide rate within CDCR's administrative segregation units and recommended that lengths of stay be shortened.  Defendants' Plan at 7.  CDCR's own suicide data confirms that the risk of suicide increases for mentally ill inmates who remain in administrative segregation for lengthy periods of time.   Kahn Dec. filed 10/31/06, ¶14, Ex. D.  In 1999, early in the monitoring phase of this case, the Special Master expressed concern over the lengthy stays of mentally ill inmates in administrative segregation units.  In the Supplemental Recommendations of the Special Master on Staffing Ratios and Administrative Segregation, ("Supplemental Recommendations") filed 5/12/99, the Special Master expressed concern over the numbers of mentally ill inmates who had spent more than 90 days in both administrative segregation and on the mental health caseload and concluded that "[T]he defendants at the institutional level need to work on this piece of the solution to the extended tenure of seriously mentally disordered inmates in administrative segregation". Supplemental Recommendation at 11.  The problem, however, has become worse.

In October 2006, defendants reported an administrative segregation population of 5504 inmates, with 2214 of those inmates on the mental health caseload (40.23%).  This number did not include the 1000 stand-alone (Super-Max) administrative segregation cells where mentally ill inmates are excluded.  Despite the exclusion, there have been at least three suicides in these stand-alone administrative segregation units so far in 2006.   Kahn Dec. to Plaintiffs' Response ¶¶3-5, Ex. A, Health Care Placement Unit Data, dated October 5, 2006.  Based on March 2006 data provided by defendants to the Special Master and plaintiffs counsel which includes a listing individual inmates housed in the administrative segregation units, more than 400 (18%) of the mentally ill inmates (EOP and CCCMS) housed in administrative segregation have been there for at least six months.  *Id.*  Of these 400, at least 250 (11%) had been housed in administrative segregation for at least ten months and 51 of this group of mentally ill inmates (EOP and CCCMS) had been housed in administrative segregation for at least two years.  *Id.*

1    Clearly, in the intervening seven years since the Special Master filed his Supplemental
2    Recommendations, defendants have not developed effective mechanisms for reducing the
3    lengthy stays of mentally ill inmates in their administrative segregation units. In fact, they
4    have amended their own regulations to reduce the frequency of committee reviews of inmates
5    placed in administrative segregation from every 30 days to 180 days in most cases. Kahn Dec.
6    filed 10/31/06, Ex. H. Notice of Adoption of Emergency Regulation, Title 15, Section 3335 of
7    the California Code of Regulations.

8        In his evaluation of Defendants' Plan, the Special Master notes "[g]iven the long and
9    failed history of policy mandates, tracking systems, practice improvements and multi-
10   discipline projects that have struggled with this issue, one can be forgiven for harboring some
11   skepticism about the eventual efficacy of this latest round of proposed administrative
12   remedies." Special Master's Report and Recommendations at 10. Unfortunately, defendants'
13   latest list of proposals promises no specific reductions, no time limits for administrative
14   segregation placements, and no new policies or regulations to address this intractable problem.

15       Plaintiffs request that this Court direct defendants to develop a concrete plan that will
16   substantially reduce the length of stay of inmates placed in administrative segregation to
17   achieve the following measurable goals: reducing the length of stay in administration by
18   twenty percent (20%) as soon as possible, but no later than June 1, 2007, and an additional
19   twenty percent (20%) by December 1, 2007. Plaintiffs' Objections at 25. Furthermore, the
20   Court should direct defendants to produce monthly reports to the Special Master documenting
21   lengths of stay for all inmates housed in administrative segregation units at every CDCR
22   institution and shall report the data for the previous month. *Id.* This reporting will enable the
23   Court and the Special Master to track compliance. Lengths of stay for mentally ill inmates
24   housed in administrative segregation have grown unabated despite the Special Master's
25   suggestion of limits and exclusions. The admitted direct relationship of this problem to
26   defendants' high administrative segregation suicide rate provides sufficient justification for this
27   additional order that sets specific, measurable goals.
28

### III. Defendants Must Seek Funding For The Small Management Yards They Have Identified They Currently Need For Administrative Segregation Inmates

The administrative segregation units within the CDCR are harsh and dangerous living environments where inmates remain locked in their cells 23 to 24 hours a day. Kahn Dec., filed October 31, 2006, ¶11. The inmates are cell-fed and have no educational, vocational or work programming, regardless of the reason they have been placed in administrative segregation. Inmates are not permitted to have radios or televisions and the possession of other personal property is severely restricted. *Id.* The expert panel recommended providing inmates housed in administrative segregation with more out of cell time and privileges. Kahn Dec. filed 10/31/06 at ¶4. Out of cell activities reduce isolation and seclusion and provide some activity in administrative segregation units where isolation, seclusion and lack of activity can lead to depression and even suicide. Hayes Dec. ¶16.

Defendants readily acknowledge in their Plan that they are not and cannot currently provide legally mandated out of cell time, exercise and showers to inmates housed in these harsh environment. Defendants' Plan at 11-12. The California Code of Regulations sets forth the basic rights of inmates placed in administrative segregation units which include a minimum of ten hours of out of cell time and three showers a week. CAL. CODE REGS. TIT. 15 §§ 3343 (g) (h) 2006.

In their Plan, defendants identify the lack of 441 Small Management Yards as an obstacle to providing mandated out of cell time. Defendants' Plan at 12. The Special Master notes that defendants' plan for fiscal year 2006/2007 "will leave a confessed shortfall of 441 small management yards, which will require future funding and construction, the details for which are not contained in the defendants' plan." Special Master's Report and Recommendations at 9. Defendants have clearly identified the needed resources for providing the state law required out of cell time for inmates housed in administrative segregation, yet without regard for this Court's June 8, 2006 Order, they have failed to act to request the necessary funding for these exercise yards. In light of the horrific conditions within CDCR's administrative segregation units, defendants must be ordered to secure the necessary funding to

1 provide minimally adequate out of cell time as mandated by state law. CDCR has already
2 identified the number of yards required to provide out of cell time for their administrative
3 segregation population.
4     Plaintiffs request that defendants be ordered to prepare and submit an emergency
5 funding request for all necessary staffing and construction, to enable CDCR to provide all
6 inmates housed in administrative segregation units with the out of cell time required by law
7 and recommended by the expert panel as necessary to reduce the suicide rate, as soon as
8 possible, but no later than July 1, 2007.

## CONCLUSION

10     On May 9, 2006, the Special Master issued his Report on Suicides in 2004, which
11 contained a single recommendation directing defendants to develop a plan to address the
12 escalating rate of suicides within the administrative segregation units by May 31, 2006.
13 Defendants' Plan, which was delayed until after the budget cycle, contained no mid-year
14 funding requests despite the need for additional funding to implement many aspects of their
15 Plan. Suicides within CDCR continue to rise in 2006 with more than 41 to date, including 20
16 in administrative segregation units where less than 5 percent of the prison population resides.
17 Kahn Dec. to Plaintiffs' Response, ¶5. Despite these shocking numbers, defendants appear
18 unwilling to acknowledge the urgency of addressing the escalating rate of suicides within their
19 administrative segregation units by promptly implementing critical recommendations of the
20 expert panel.
21     Based on the foregoing, plaintiffs request that the Court issue the following orders:
22     1.    Defendants shall implement 30 minute welfare checks in every administrative
23 segregation unit within CDCR no later than July 1, 2007. Custody officers shall provide 30
24 minute welfare checks to all inmates housed in administrative segregation.
25     2.    Defendants shall develop a plan that will substantially reduce the length of stay
26 of inmates placed in administrative segregation to achieve the following measurable goals:
27 reducing the length of stay in administrative segregation by twenty percent (20%) as soon as
28 possible, but no later than by June 1, 2007, and by an additional twenty percent (20%) by

December 1, 2007. Defendants shall be required to produce monthly reports to the Special Master documenting the length of stay for all inmates housed in the administrative segregation units at every CDCR institution. The monthly reports shall provide data from the preceding month.

3. Defendants shall prepare and submit an emergency funding request for all necessary staffing and construction (441 Small Management Yards), to enable CDCR to provide all inmates housed in administrative segregation units with the out of cell time required by law and recommended by the expert panel as necessary to reduce the suicide rate as soon as possible, but no later than July 1, 2007.

Dated: December 21, 2006                                    Respectfully submitted,

*/s/ Jane E. Kahn*
Jane E. Kahn
Rosen, Bien & Galvan
Attorneys for Plaintiffs