PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
AMY WHELAN Bar No.: 215675
LORI RIFKIN Bar No.: 244081
SARAH M. LAUBACH Bar No.: 240526
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants | No.: Civ S 90-0520 LKK-JFM<br><br>**DECLARATION OF JANE KAHN IN SUPPORT OF PLAINTIFFS' RESPONSE TO SPECIAL MASTER'S REPORT AND RECOMMENDATIONS ON DEFENDANTS' PLAN TO PREVENT SUICIDES IN ADMINISTRATIVE SEGREGATION AND REQUEST FOR ADDITIONAL RELIEF** |

H:\0489\3\PLEADING\Kahn Dec ISO Plf' Resp to SM Report & Recomm to Def Plan, 12-21-06, 489-3.DOC

DEC OF JANE KAHN ISO PLFS' RESP TO SM'S REPORT & RECOMMENDATIONS ON DEFS' SUICIDE IN AD SEG. PLAN, & REQ FOR ADDITIONAL RELIEF, NO.: CIV S 90-0520 LKK-JFM

I, Jane Kahn, do hereby declare under penalty of perjury as follows:

1. I am an attorney admitted to practice law in California and an associate in the law firm Rosen, Bien & Galvan, one of the counsel of record for plaintiff class in this case. I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify. I make this declaration in support of Plaintiffs' Response to Special Master's Report and Recommendations on Defendants' Plan to Prevent Suicides in Administrative Segregation and Request for Additional Relief.

2. Defendants provide plaintiffs' counsel and the Special Master with a Suicide Report for every inmate who commits suicide within the California Department of Corrections and Rehabilitation ("CDCR"). I review every Suicide report provided to plaintiffs' counsel, as well as many of the medical records of the inmates who have committed suicide. In my review of administrative segregation suicides there have been numerous suicides where the CDCR Suicide Report has noted that the inmate was dead for many hours before being discovered by an officer in the housing unit. For example, on March 28, 2006, an inmate housed in administrative segregation at Kern Valley State Prison was discovered by officers during a security check. The officers described his left leg, which was bent at the knee in a 90-degree angle and raised toward his torso, as so stiff that it would not extend or straighten. The Suicide Report for this inmate concluded that he was likely to have been dead during several security counts. On August 5, 2006, an inmate housed in administrative segregation at Pleasant Valley State Prison was discovered unresponsive on the floor on his cell during a security check. He had a rope around his neck, his body was cold and his face and neck were described as purple. Medical personnel estimated his time of death as two hours prior to the discovery of his body. On August 13, 2006, an inmate housed in administrative segregation at CIM was found hanging from a noose tied to the cell light fixture. Preliminary results from the autopsy indicated that the inmate was dead for a minimum of four hours before he was discovered by officers. It is possible that these three inmates could have been discovered alive and been administered emergency life support if 30 minute welfare checks had been in place.

3. On October 20, 2006, Lisa Tillman provided plaintiffs with two charts containing defendants' mental health populations in administrative segregation. These charts provide the percentages of mentally ill inmates housed in administrative segregation and include the total number of inmates housed in these units. Attached hereto as Exhibit A is a true and correct copy of Ms. Tillman's October 20, 2006 email with the attached Health Care Placement Unit Charts, dated October 5, 2006. These Charts indicate that the administrative segregation capacity is 5504 inmates, which represents approximately 3% of the current prison population of 172,000. According to the Charts, mentally ill inmates represent 40.23% of the total administrative segregation population. The charts do not report the inmates housed in the 1000 stand-alone (Super-Max) administrative segregation cells where mentally ill inmates are excluded. Assuming all of those inmates are double-celled (highly unlikely), little over 4% of the total prison population resides in administrative segregation units.

4. Defendants produce monthly documents to the Special Master and plaintiffs' counsel which contain information about administrative segregation, crisis bed admissions, staff vacancies, wait lists for in-patient beds, psychiatric housing unit beds, reception center processing, suicides and various other areas governed by *Coleman* orders. Plaintiffs last received the monthly documents on July 21, 2006. These documents reported March and April 2006 data. I reviewed Enclosure 3, Section R10-1 through 35, which reported EOP and CCCMS Placements in ASU greater than 90 days for March 2006. There were more than 400 mentally ill inmates listed in Enclosure 3, Section R10-1 through 35, who had been on the mental health caseload **and** in administrative segregation for more than six months. Among that group of 400 mentally ill inmates, at least 250 of them had been in administrative segregation for at least ten months. Among that group of mentally ill inmates, there were at least 51 mentally ill inmates that had been housed in administrative segregation for at least two years. It is likely that these statistics are an under-representation of the actual lengths of stay in administrative segregation because there is no clear directive to local institutions from CDCR Headquarters about whether they should "restart the clock" when a mentally ill inmate goes to a crisis unit from administrative segregation and then returns to the administrative segregation

1  unit after stabilization.  As a result, some institutions start recounting length of stay when an
2  inmate returns to administrative segregation from a crisis bed or from an in-patient unit at the
3  Department of Mental Health.

4      5. Under my supervision, paralegals in our law firm track all CDCR suicides in a
5  database.  Defendants inform Special Master Keating and our office of each suicide in the
6  CDCR.  We add the name of each inmate who commits suicide, and other key data relevant to
7  the database, when we receive the suicide notification and suicide reports from defendants.
8  We also cross-check our database against the Special Master's and defendants' annual suicide
9  reports, and make adjustments to our tracking data where necessary.  Our numbers do not
10 always coincide with the total suicides reported by defendants in a year, especially in recent
11 years.  For example, in 2005, plaintiffs counted 41 suicides by CDCR inmates, which included
12 three deaths reported by defendants as non-suicides.  In 2005, CDCR's suicide rate was more
13 than twice the national average for prisons and was the highest number of suicides ever in the
14 CDCR.  According to our current tracking log, which does not count eight deaths reported
15 through the suicide notification process as accidental overdoes or non-suicides (which may
16 upon further review turn out to be suicides), there have already been at least 41 suicides in the
17 CDCR, with 20 of these occurring in administrative segregation units and one in a Security
18 Housing Unit.  There have been three suicides so far in 2006 that occurred in the stand-alone
19 (Super Max) administrative segregation units where mentally ill inmates are not housed.
20 CDCR does not exclude former mental health inmates, inmates with suicide attempt or in-
21 patient histories from these new administrative segregation units.  CDCR's own data indicates
22 that less than 5% of the approximately 172,000 inmates within CDCR are housed in
23 administrative segregation units, yet almost 50% of the suicides in 2006 have occurred there to
24 date.

25 Dated: December 21, 2006                                                     Respectfully submitted,

27                                                  */s/ Jane Kahn*_____
28                                                  Jane Kahn