

*ORIGINAL*

FILED

JAN 1 1 2007

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORN
BY_____
DEP.

1          UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF CALIFORNIA

3                  --o0o--

4   RALPH COLEMAN,              )   Case No. CIV-S-90-0520-LKK
                                )
5             Plaintiff,        )   Sacramento, California
                                )   Thursday, August 17, 2006
6      vs.                      )   11:07 A.M.
                                )
7   SCHWARZENEGGER, et al.,     )   Plaintiff's Motion for Post
                                )   Judgment Discovery and
8             Defendants.       )   Production of Copies of Tour
    _____ )   Binders and Documents
                                )
9              TRANSCRIPT OF PROCEEDINGS
10        BEFORE THE HONORABLE JOHN F. MOULDS
            UNITED STATES MAGISTRATE JUDGE
11
    APPEARANCES:
12
    For Plaintiff:             MICHAEL BIEN
13                             JANE KAHN
                               Rosen Bien & Galvan, LLP
14                             315 Montgomery Street
                               10th Floor
15                             San Francisco, CA  94104
                               (415) 433-6830
16
    For Defendant:             LISA ANNE TILLMAN
17                             Attorney General's Office
                               1300 I Street, Suite 125
18                             Sacramento, CA  95816
                               (916) 327-7872
19
    Court Recorder:            CASEY FORESTER
20                             U.S. District Court
                               501 I Street, Suite 4-200
21                             Sacramento, CA   95814
                               (916) 930-4193
22
    Transcription Service:     Petrilla Reporting &
23                               Transcription
                               5002 - 61st Street
24                             Sacramento, CA   95820
                               (916) 455-3887
25
    Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

2107

1

1    SACRAMENTO, CALIFORNIA, THURSDAY, AUGUST 16, 2006, 11:07 A.M.

2

3         (Call to order of the Court.)

4         THE CLERK:  Calling Civil 90-0520-LKK, Coleman vs.

5    Schwarzenegger.  Your Honor, it's on calendar for defendant's

6    motion for post judgment discovery and production of copies of

7    tour binders and documents.

8         MR. BIEN:  Good morning, Your Honor.

9         THE COURT:  Good morning.  Would counsel state their

10   appearance, please.

11        MR. BIEN:  I'm Michael Bien and Jane Kahn for

12   plaintiff.

13        THE COURT:  It's been a while, Mr. Bien.  Good

14   morning.

15        MS. TILLMAN:  Good morning, Your Honor.  Lisa Tillman

16   on behalf of the defendant.

17        THE COURT:  Ms. Tillman, good morning.

18        MS. TILLMAN:  Just to note that it's not the

19   defendant's motion.  Thank you.

20        THE COURT:  Thank you for the correction.  I would

21   note, however, that I don't prepare the calendar, so it does

22   not constitute a ruling that it's your motion.

23        Mr. Bien, did you wish to be heard?

24        MR. BIEN:  Your Honor, this motion presents two

25   threshold issues or actually one threshold issue which is --

2

1   well, we think once resolved with enable us to move forward

2   with defendants cooperatively and determine what kinds of focus

3   discovery would be appropriate so that we may prepare for any

4   necessary evidentiary hearings.

5         Ruling on our motion, the issue of whether we're

6   entitled to post-judgment discovery would not be an approval of

7   any particular discovery plan which we think we would be a next

8   step.  So that's one issue we want to focus on.

9         We want to get over this hump which has stopped us

10   from being able to negotiate anything with the defendants and

11   we think the law that we presented, there is a right to

12   post-judgment discovery.  There's obviously appropriate limits

13   on all discovery and such discovery would be limited to

14   particular issues and situations.

15         We would expect to negotiate, for example, on a

16   representative institution or two to look at, not all 33 on

17   something and focused on a particular plan.  But we feel that

18   in order for us to present to Judge Karlton in an evidentiary

19   hearing the kind of evidence and opinion that he needs to make

20   these final limited number of determinations, some discovery is

21   appropriate.

22         The second issue we presented is access to these tour

23   binders and other documents that are provided to the Special

24   Masters team.  Again we feel that the law requires their

25   production and that the burden argument raised by defendants

3

1    is -- does not outweigh our need for this information.

2           We're not asking for anything in the past.  We're not

3    asking to catch up.  We're just asking as the tours begin -- a

4    round is about to begin in the next month -- that when they

5    make their copies, they make one extra copy and put it aside

6    and send it to us.

7           And I think the law requires that.  The Court orders

8    in this case require it, and because this information becomes

9    the foundation for the Special Master's reports and hence

10   the -- Judge Karlton's orders, our lack of access to this

11   information is problematic.

12          THE COURT:  Thank you, counsel.

13          MS. TILLMAN:  Good morning, Your Honor.  Thank you

14   for your time.   This is a very --

15          THE COURT:  You're entitled to my time, counsel.

16          MS. TILLMAN:  This is a difficult issue as you know,

17   and you were here at the start of this case over ten years ago.

18   There has been extraordinary amount of litigation and discovery

19   in this case even before judgment was rendered.

20          It was a lengthy trial.  There was lengthy discovery

21   before the trial, and essentially there has been lengthy and

22   exorbitant amounts of informal discovery in the past ten years.

23          So to say that plaintiffs have been in some fashion

24   foreclosed from discovery in their case is a misnomer.  It is

25   perhaps an inaccurate statement.

4

1          There have been over 17 rounds of tours at the

2   institutions providing mental health care to inmates.  The

3   Special Master determines when those tours will involve

4   attorneys, and more often than not, whenever the Special Master

5   has invited plaintiff's counsel to accompany the tour, they

6   have accompanied and they have gotten the tour binders.

7          In the midst of all those tours, we've also had all

8   parties meeting at least two or three times a year.  We've had

9   monthly reports.  We've had twice yearly monitoring reports.

10  We've had biweekly reports.  We've had informal conversations

11  involving key leadership of the Department of Finance, of the

12  Department of Corrections, and of the Department of Mental

13  Health.

14         When the plaintiffs are on the tour, they're often

15  given access to various members of CDCR staff.  So it's not as

16  if they don't know what might be -- what information is out

17  there.  Is not that they have been in any way barred from

18  gaining access to the institutions and access to important

19  information necessary to their case.

20         In fact what I brought here today, as I indicated in

21  my moving -- or my responding papers, suggests one month of

22  rule violation reports from an institution that we provide to

23  the plaintiff counsel and the Special Master every month.

24         This is the tour binder for one institution at one

25  tour.  And just for the record, I am showing the Court two

5

1   large binders about an inch and a half I believe a piece full

2   of documents.

3          This is the monthly report of July 3, 2006.  I

4   believe we provided the Court with a cover letter for that

5   report, and again it's a monthly report providing statistical

6   information regarding each and every area of care delivered by

7   the Department of Corrections and Rehabilitation to mentally

8   ill inmates ranging from bed availability to nurse

9   availability.

10          And again it numbers at least 500 pages long, a

11  monthly report.  The Special Masters monitoring report consists

12  of two volumes and again the first volume is over 260 pages

13  long and contains pertinent data about every institution

14  visited.

15          And then we have a report for every quality

16  improvement plan that comes out whenever there's an incident

17  involving the death of an inmate by suicide and a suicide

18  report, both numbering at least 10 to 20 pages a piece.

19          We give plaintiffs a lot of information.  We've also

20  given plaintiffs the opportunity to negotiate the program guide

21  issues over a three-year period involving numerous discussions

22  with the Court's own appointed experts.

23          Quite frankly, CDCR went into those negotiations with

24  the belief that if they could create a program guide that

25  provided the type of policies and procedures the Special

6

1    Master's experts themselves found to be adequate, to be a means

2    of reaching towards compliance, that we would essentially move

3    forward a large -- in a large step towards gaining Court

4    approval of the program.

5         It is surprising to find that after three years of

6    negotiations with CDCR itself submitting a program guide that

7    has been approved by the Special Master's experts who are the

8    experts in the field of correctional care, it is surprising to

9    find that we are at a juncture now where litigation will occur

10   over those same areas that essentially were litigated at trial

11   by plaintiffs.

12        There is a sense of disbelief.  There's a sense that

13   all this discovery, all these discussions, all these

14   negotiations were for naught because plaintiffs have

15   essentially returned to square one.

16        Plaintiffs still want to litigate the issues of

17   secured housing units, administrative segregation units, of

18   staffing and of rounds that while granted provided judgment

19   against defendants at time of trial have now been substantially

20   improved to the point where the Special Master's own experts

21   find the policies and procedures on those issues to be

22   appropriate.

23        There is no reason at this point for defendants to

24   have to endure another round of discovery, some 9 to 12 months

25   of depositions, on areas where the Special Master's own experts

1    have found defendants to be in compliance.

2              We're happy to give plaintiffs the usual reports that

3    we've been providing for the past ten years, but to allow

4    plaintiffs now to bring in a whole new set of experts --

5    correction -- the Court's own experts does not seem to be the

6    most effective or expedient means of getting defendant into

7    compliance in allowing care to occur within the policies and

8    procedures approved by the Special Master's experts.

9              One of the problems is we have a program guide that

10   has been approved.  So long as discovery and litigation over

11   those issues is occurring, defendants cannot act upon those

12   aspects of the program guide.  Defendants thus will still be

13   out of compliance.

14             So plaintiffs have essentially set up a situation

15   where defendants will continue to be found, quote, out of

16   compliance, not by their own fault but by plaintiffs own

17   discovery and litigation tactics.

18             In addition, the sheer burden on counsel of having to

19   review each and every one of the tour binders before they are

20   released to plaintiff's counsel will result in huge delays.

21             THE COURT:  How are you handling the review of those

22   tour binders that do go to counsel?

23             MS. TILLMAN:  They are not reviewed.  They are not

24   reviewed because in the past there's been an informal

25   understanding that if you're on the tour, you get what the

8

1   Special Masters team gets.  The Special Masters team were --

2   essentially the Special Masters team had initially requested

3   the tour binders with the understanding that the binders

4   provided preliminary information and it was with that

5   understanding that the information had been given and it has

6   not been reviewed by litigation counsel.

7          Once it is given in a formal fashion to plaintiffs,

8   it becomes clear, particularly given their other discovery

9   requests, that it is no longer with the understanding that the

10  information is preliminary.

11         I understand that plaintiffs might well have used the

12  information however tentatively it is stated in these tour

13  binders as a means of showing that defendants are not ready yet

14  for any sort of compliance finding.

15         And so, yes, I will be reviewing the material before

16  it goes out and the tour schedules will have to be delayed as a

17  result.

18         I would ask this Court to simply find that the

19  defendants have negotiated the outstanding program guide issues

20  in good faith.  They have agreed to comply with the Special

21  Master's own experts' findings about the program guide, and

22  that if defendants have any continual problems with compliance,

23  those will be discussed in the course of the monitoring tours.

24         There is no need at this point to burden defendant's

25  compliance efforts with discovery over issues that have been

1   negotiated at full length and essentially approved already by
2   the Special Master's experts.

3          It has to be noted that at the get-go of this case
4   when the order of reference was provided there was no
5   indication in the order of reference that there be some sort of
6   formal discovery, some sort of formal right to have tour
7   binders or even be part of tours.

8          We were ask this Court to continue to abide by that
9   implicit understanding at the outset of this case.  As much as
10  defendants want to comply with this Court and want to comply
11  with the Special Master's experts' findings and
12  recommendations, they can't please two masters at once.

13         They cannot please the Court and please the
14  plaintiffs.  In order to actually engage in expedient means of
15  implementing the approved program guide in full, defendant
16  should be free of any discovery from the plaintiffs on these
17  issues.  Thank you, Your Honor.

18         THE COURT:  Mr. Bien.

19         MR. BIEN:  There are a lot of issues raised here
20  today that are not really raised in the papers, but I certainly
21  respond to them all.

22         THE COURT:  Well, we've gone a fair distance from the
23  papers already.  When you started your presentation, which I
24  still think of as the two speed bumps presentation -- must
25  confess I began to see this coming.  So keep going.

**1**      MR. BIEN:  We -- I think Ms. Tillman has to some

**2**  extent in her argument but not in her papers framed an issue

**3**  which I think is central to this.  The fact is that the

**4**  plaintiff's counsel do have a role in this case that continues

**5**  beyond --

**6**      THE COURT:  Mr. Bien, I don't think anybody disputes

**7**  that.  Looking at this, I can't help but note that children

**8**  born during the year this case got filed will be voting for

**9**  members of Legislature in two years.

**10**      And the -- there's absolutely no doubt in my mind

**11**  that you have a role to play in the case and that -- and also I

**12**  know in what could be best described as a less than fully

**13**  formal way that you are in your role accommodated by the

**14**  District Court and to an increasing extent, you seem to be

**15**  accommodated in that role by the defendants because I do relate

**16**  back to a day when the discovery battles were quite different

**17**  than what I'm confronting today and frankly the attitude of

**18**  then defendants was quite different.

**19**      And you have some relatively lengthy findings and

**20**  recommendations which I issued a long, long time ago that

**21**  reflect that.

**22**      The -- and when I finish my preparation today, I saw

**23**  this primarily as an issue of transparency, but I don't think

**24**  there's any doubt that this case is being handled by the

**25**  District Court and by the Special Master in a way that's

11

1    largely transparent.

2         The -- when this week started, I was also looking at

3    some other filings that you have before the Court that looked

4    as if we might be returning to some earlier days in this

5    litigation.  I'm not sure at all from today that that's where

6    we are.

7         MR. BIEN:  I -- Your Honor, I think that there are --

8    you know, to respond to Ms. Tillman -- some of her points,

9    the -- we are -- the idea that we are attempting to delay any

10   part of this remedy is difficult for me to respond, as strong

11   as I feel that we are doing everything we can to expedite this

12   remedy and Ms. Tillman is doing her job, but certainly nothing

13   that we will do will be -- will we allow it to be an excuse to

14   delay any part of the remember nor will Judge Karlton who has

15   issued an order to implement the program guides and set exactly

16   what is -- what they're to implement and what they're not.

17        If defendants feel that they are providing a

18   particular bit of information to us already and we ask for it,

19   then in the normal course of discovery negotiation, we would

20   not be entitled to that and they should raise that if we're

21   being improper about a request.

22        If in fact we've seen something that -- and they say

23   we're trying to see it again, that's what discovery's all

24   about.  They won't negotiate with us about access.

25        She said we have not been barred from access.  We

12

1  have been barred.  I have requested numerous times to bring my

2  experts to the prisons.  I have my own experts.  They're not

3  new experts.  They're the same experts that testified before

4  you in your courtroom.  They have not seen anything.

5       I have a job I have to rely on them and they

6  cannot -- I cannot in some of these issues -- from what they

7  hear, they believe there's some issues where they are going to

8  come out differently than where the Special Master and his

9  experts are coming out.

10       Judge Karlton knows that and that's why we're -- he

11  wants that evidentiary hearing and that's why he's suggesting

12  that we can depose Mr. Keating's expert on that issue.  They

13  can depose our expert and we have a hearing.  That's how --

14  that's what Judges do is decide these things and in order for

15  our expert to be able to lay the foundation and do his job,

16  they need to have some access.

17       We're not saying broad opening of discovery.  There

18  is no discovery requests now pending.  There's nothing.  I

19  wrote a letter at the request of Mr. Keating about, you know,

20  things before we had a conference for Judge Karlton and I

21  outlined possible issues and possible discovery.  There has

22  been no response other than no discovery.

23       And that's all we're trying to get over.  I said

24  there was a speed bump.  There really is a speed bump because I

25  work a lot of things out with Ms. Tillman.  We worked out two

13

1   things in the last few days.  The contempt motion was resolved.

2   We just resolved another thing.  We can get along when the

3   ground rules are there.

4        She's making a sincere argument about there's no

5   post-judgment discovery, but not one case says that.  There's

6   no law that supports that, and, you know, we think that --

7   we're not saying that discovery starts like it was before

8   trial, you know, but --

9        THE COURT:  I'm puzzled, Mr. Bien, that you seem to

10  be focusing on the defendant's position here.  Have you made

11  requests of the sort you're alluding to of the Special Master?

12       MR. BIEN:  Yes.  For years.  The Special Master has

13  decided not to decide these issues and that's where he said

14  we're going -- Judge Karlton's going to decide how we resolve

15  the final disputes about the program guides.

16       And we had a conference with Judge Karlton and he

17  said he -- issue his order.  Then he said Judge Moulds should

18  decide on discovery.

19       So the bucket has been passed a little bit.  You

20  know, I understand that there's this fear of -- you know, of

21  reopening and, you know, expanding things.  I can tell you that

22  I have -- my greatest dream is to end this case and to finish

23  it.

24       One of the things that has to be finished is just

25  agreeing on what the remedy is.  I mean we have -- we've

14

1  resolved -- if you've seen the program guides -- I don't think

2  we burdened you with them, but they're about this wide and it's

3  all agreed to except for several issues, even though several

4  issues are still under negotiation.  And I am still negotiating

5  and some of them, defendants have indicated they're still

6  interested in.

7         Some of this -- some of the things we're asking for I

8  think are necessary steps to get to the final deal, and, you

9  know, I think that we're almost there.  We're not almost there

10  in terms of compliance.  I mean unfortunately the system has

11  taken two giant steps backwards due to overcrowding in the last

12  couple of years, and so unfortunately with all the goodwill in

13  the world, as the Governor's is making clear, there's going to

14  be a mess for a while, and we're now worried about day-to-day

15  survival of our clients.

16         One of the things that we do by getting these tour

17  binders -- Mr. Keating can't be everywhere and can't do

18  everything.  We respond to daily letters.  We respond to phone

19  calls, and the tour binders provide some individualized

20  information that helps us get some assistance to our clients.

21         We have -- by the way, the defendants are very

22  cooperative in terms of when we have -- we have an emergency

23  system with them which we never had before trial, where if we

24  have an emergency, we call a number in Sacramento, and they

25  immediately take care of it.  And that's a much -- I feel

15

1  wonderful about that.

2          But we -- but having the tour binders allows us

3  sometimes to answer people's questions and, you know, I can see

4  you're in this unit.  You know, here's what you should expect

5  to happen.  It gives us better ability to assist our individual

6  clients.

7          Also there are a lot of things happening.  I mean the

8  system right now is in disarray.  Wardens are resigning and

9  people are shuffling and one reason we've been more active and

10  the Court has been more active -- more active is things need

11  some shoring up in various places and just getting the

12  information from the tour binders allows us to see more things.

13  We then can call Mr. Keating and his experts when they're about

14  to go to a prison.  We just more on top of things when we see

15  that information.

16          And, you know, I think that -- you know, Ms. Tillman

17  brought these boxes of information.  It's impressive, but, you

18  know, this is one of the largest cases there has ever been.

19          THE COURT:  Mr. Bien, the one argument that doesn't

20  get very far with me is we have provided 983,000 documents and

21  answered 7,300 questions.

22          MR. BIEN:  Right.

23          THE COURT:  The -- I've heard that believe it or not,

24  not only in this case, so we don't need to deal with that one.

25  That's not my problem.  I think the problem's a little more

16

1   subtle than that.

2           MR. BIEN:  The other thing I just wanted to make a

3   point of is that we're not relitigating issues from the trial.

4   The programs we're looking at are problems that have been

5   established in the last two or three or four years.  They are

6   things where defendants have taken a step forward.  They've

7   created a program.

8           We don't think, for example -- we have a dispute with

9   the Special Master's experts about whether or not it's

10  appropriate to provide psychiatric treatment in caged areas for

11  people in high security prisons.  They say it is.  We say

12  there's got to be -- maybe for some people, but there's got to

13  be some limits on that.

14          There's a -- you know, correctional experts are

15  different on that.  I think Judge Karlton needs to make the

16  final call.  Mr. Keating agrees with that.  I mean -- but we

17  need our guy to see it, look at these units, talk to the staff,

18  see why -- what else is possible or not.

19          That's a -- it's a -- it's not a -- you know, it's

20  not like 20 inspections of something.  We pick a couple of

21  units.  We look at them and then we can have input.  It may be

22  that --

23          THE COURT:  Well, how many of these visits

24  happening --

25          MR. BIEN:  How many what?

1    THE COURT: How many of the tours happen per -- in a
2   year?

3    MR. BIEN: Okay. The tours that go on, we're not on.
4   There are -- it depends year to year, maybe up to 60 tours by
5   Mr. Keating and his experts. Sometimes more or less.

6    We're invited on seven of them, but when we're
7   invited, we're invited to monitor the monitors. We don't set
8   the agenda. We can't bring an expert. We can have one
9   attorney and we go along.

10    Sometimes you can say -- you can ootz them one
11   direction or the other, but it's their tour and, by the way,
12   that was not the deal at the beginning of the case. We did
13   have much more active roles in the first few years of
14   monitoring. We'd bring a whole staff of people, but this is
15   what -- the Special Master said this is my stuff. I'm doing
16   this. These are my tours. If you want your tours, you're
17   going to have to get them. We haven't been able to get them.

18    So -- yeah, we appreciate being able to go on those
19   seven tours, and it gives us some insight into his reports and
20   we meet with him in the beginning of each round for an hour and
21   talk about what areas we want him to look at. That has some
22   influence.

23    But he makes his own agenda and he has his own
24   duties. And it doesn't replace what we need for our experts.
25    In addition, I think that their tours are -- I mean

18

1    he's got staff there.  They have things to do.  They're not

2    going to wait around for us, you know, to do what we think we

3    need to do to get ready and we'd have to balance that out,

4    whether these inspections be part of these tours or not.

5    That's something that we could work out.

6            Maybe it's better for the defendants if it's -- if

7    they go on the same time and take a day.  That's fine.  It may

8    be more burdensome on the institution, us coming separately.

9    That's one of the things we'd negotiate.

10            You know, the kind of information that defendants are

11   providing is very useful, but also it is very late.  One thing

12   about the tour binders it's created at the institution at the

13   time of the tour and it's current.

14            The information we receive from the defendants in

15   their monthly packages is months and months late and is also a

16   summary form.  The information we received from Mr. Keating --

17   and this is no criticism of Mr. Keating -- is years late.  In

18   other words, he's -- we're waiting right now for the

19   publication of the 16th round tour.  The 18th round is about to

20   begin.  These are six-month rounds.

21            They're big books and I'm not -- he's doing a lot of

22   really excellent work, but it's not a report on current

23   situations and sometimes we've dealt with emergencies in the

24   last year that are current situations.  There's a problem with

25   a particular prison.  There's a -- and we've been able to bring

1   them to Mr. Keating or Judge Karlton.

2       And the tour binders I think are something that would

3   give us a better handle on that.

4       It's a difficult position we're all in now, you know,

5   and we are -- you know, and there are a lot of forces at issue

6   about whether or not we're going to move forward or backwards

7   right now, and I can assure the Court that we are not going to

8   be an obstacle to moving forward.  You know, we are doing

9   everything we can to help -- you know, for example, the battle

10  we're having in the Legislature this week, this was not our

11  doing, and -- but there are big forces at issue and unless some

12  of these things -- the state can do some of these things,

13  they're going to have years and years before we go away.

14      In other words, it's beyond me.  It's beyond you in

15  terms of how long this is going to take, but we feel that we

16  need to get over these little humps and get some -- little more

17  access to information to get to the final process of ending

18  this case.

19      THE COURT:  Thank you, counsel.  It's not your

20  motion, but if you have anything further, Ms. Tillman, I'll

21  be -- let you be heard again.

22      MS. TILLMAN:  Thank you, Your Honor.  Your Honor, I

23  would ask that the Court take judicial notice of the number of

24  tours being conducted within CDCR facilities at this time, not

25  just within Coleman, but also within Armstrong, Valdivia,

1   Clauda, Clark, and now we've got Heffer coming up, a class
2   action suit brought for vocational opportunities by mentally
3   ill inmates.

4           On any one day when you ever go into a CDCR facility,
5   you are likely to meet someone from some courtroom who is doing
6   a tour.

7           THE COURT:   Counsel, I've got to tell you.   That's
8   not going to get us anywhere because -- and you were bringing
9   up the number of books that you're dealing with in just this
10  case.  I was impressed more by the tired look on your face than
11  by anything else.

12          I realize you're overloaded and I also understand
13  from Judge Karlton and from what I see of the Special Master
14  that you're playing a critical role in this case and that's
15  appreciated.

16          But these problems were built with I supposed best be
17  described as casual care by the California Department of
18  Corrections over an incredible period of time.  Through one
19  case which was tried in front of me for close to three months,
20  settled and then the department and the state government did
21  everything possible to undermine the results of that case,
22  including behaving in ways with Alan Breed, the Special Master
23  in that case, that I thought were reprehensible to a gentleman
24  who was a remarkable figure in the corrections field and gave
25  this Court a lot of good service without complaint.

1    The -- it's true that the current administration is
2    reaping something they did not sow, but somebody over there did
3    and that's how it got into Federal Court.  Those cases aren't
4    supposed to be here, and handling them through the court
5    procedure is incredible cumbersome for everybody.

6    But I can't at this point say just because
7    everybody's tired doesn't mean we can stop.  The -- I am
8    concerned about not disrupting a process that appears to be
9    working better than anything else that has happened so far, but
10   I can't feel a lot of sympathy for what's happening in the
11   correction field in the State of California and if they feel
12   oppressed by the Federal Courts because we didn't ask to be
13   brought here.  We got drug in.

14   MS. TILLMAN:  I appreciate the Court's comments.  I
15   think -- what I'm trying to convey to the Court is as much as
16   the plaintiffs are on many of these cases as plaintiff's
17   counsel.  They do have a lot of access to the facilities on a
18   daily basis for not only this case, but many other cases.

19   And in addition, it is very hard to schedule top
20   level people for, as the plaintiffs are now requesting,
21   depositions in this case when they also have to be in other
22   places for other meetings with other special masters in other
23   courts on other cases.

24   And that's why I really want to inform the Court of
25   the delay that is going to be encumbered by plaintiff's

22

1    requests as of their last letter of April 18, 2006, for what

2    they said would be some nine months of discovery.

3           I think that's an underestimate.  When they speak of

4    touring Pelican Bay, PSU, with all their staff and their

5    experts, or they speak of touring Corcoran, CCI, and Valley

6    State Prison for Women, again with their staff and experts,

7    observing site tech rounds, doing informal interviews, doing

8    observation of the care given, when they speak of doing

9    requests for production and depositions of high level experts

10   as well as high level people within each institution statewide

11   on some of these issues, scheduling alone is going to take a

12   lot of time, and I can't guarantee that the people sought for

13   deposition by the plaintiffs on these issues are going to be

14   easily available.

15          So I see this kind of discovery stretching out well

16   beyond nine months simply because of all the other things going

17   on within the system at this time.

18          I would hate to have key people taken up in

19   deposition when they could be actually doing some of the work

20   we need done towards compliance, and that really is where the

21   rubber doesn't hit the speed bump, it hits the road.

22          There is so much litigation going on that to actually

23   get attention to the work that needs to be done can sometimes

24   often be a challenge.

25          What I would suggest is that this Court take a look

1 | at the monthly report provided to the plaintiffs.  It is
2 | duplicative of the tour binders.  It does compile the
3 | information in some 250 pages as opposed to a separate tour
4 | binder whenever a tour binder comes up -- whenever a tour comes
5 | up, but it does give them the information on a ready basis, on
6 | a monthly basis.

7 | So why provide it in another format to the
8 | plaintiffs.  And I can't guarantee that it's going to get to
9 | them any faster by way of production of the tour binder when
10 | the tour occurred was sometime after that point as opposed to
11 | the usual monthly report that is provided.

12 | There's also a concern of duplication of efforts
13 | between this case and other cases that are out there.  In the
14 | Heffer case, there has already been a document request sent out
15 | by plaintiffs -- plaintiff's counsel, Michael Bien -- for the
16 | same information on the same issues being subject to possible
17 | discovery in this case, the classification of certain types of
18 | patients within mental health services delivery system.

19 | So I'll be honest with you, it's not as if they're
20 | not getting it from defendants.  Plaintiffs are getting it.
21 | Maybe through different means, but they are getting some of the
22 | information they need to litigate not only this case but other
23 | cases as well.

24 | I would simply ask that this Court find that
25 | plaintiffs have gotten the necessary information to litigate

1   the program guide after this number of years of tours, after
2   this number of years of negotiations.

3         It does become not a matter of facts to be gathered
4   in the field.  The issues at hand in the program guide are
5   actually about what is the standard of care.  And for that, you
6   need experts.

7         You don't need to take another look at the secured
8   housing unit or the PSU.  What you need are experts in
9   correctional healthcare law.

10        I thought the Court had appointed those experts
11   already.  Plaintiffs have chosen to dispute the findings of the
12   Court's experts on those issues.  They are permitted to go
13   ahead and get their own experts and litigate, but there is no
14   need to do this type of broad ranging discovery on those issues
15   that have been subject to so much negotiations over the past
16   three years.

17        Thank you, Your Honor.

18        THE COURT:  Thank you, counsel.  Mr. Bien, anything
19   further?

20        MR. BIEN:  I don't -- I'll just say that we -- if we
21   have information from another case, we would accept that, and
22   obviously all these things -- raising, I would -- if someone's
23   busy on a day, we wouldn't take his deposition that day.

24        I mean this is all normal negotiation and we would be
25   respectful of all those things.  And if she can show that we

25

1   received the information or equivalent information, obviously
2   that would be an appropriate objection.  We wouldn't ask for
3   something that we already have.  Thanks.
4            THE COURT:  All right.  Thank you very much.
5            MS. TILLMAN:  Thank you.
6            THE COURT:  In case it's not clear -- I thought I was
7   going to rule today.  I'm going to take the matter under
8   submission.  I hope you'll hear from me shortly because I
9   wouldn't want to delay you all in whatever you're up to.  Thank
10  you.
11           MS. TILLMAN:  Thank you.
12           MR. BIEN:  Thanks.
13       (Whereupon, the hearing in the above-entitled matter was
14  adjourned at 11:46 a.m.)
15                          --o0o--
16                        CERTIFICATE
17       I certify that the foregoing is a correct transcript from
18  the electronic sound recording of the proceedings in the above-
19  entitled matter.
20
21  _Mary C. Clark_                    January 8, 2007
    Mary C. Clark, Transcriber
22  AAERT CERT*D-214
23
24
25