1  PRISON LAW OFFICE
   DONALD SPECTER Bar No.: 83925
2  STEVEN FAMA Bar No.: 99641
   E. IVAN TRUJILLO Bar No.: 228790
3  General Delivery
   San Quentin, California 94964
4  Telephone: (415) 457-9144

5  ROSEN, BIEN & GALVAN, LLP
   MICHAEL W. BIEN Bar No.: 096891
6  JANE E. KAHN Bar No.: 112239
   AMY WHELAN Bar No.: 215675
7  LORI RIFKIN Bar No.: 244081
   SARAH M. LAUBACH Bar No.: 240526
8  315 Montgomery Street, 10th Floor
   San Francisco, California 94104
9  Telephone: (415) 433-6830

10 THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
11 CLAUDIA CENTER Bar No.: 158255
   LEWIS BOSSING Bar No.: 227402
12 600 Harrison Street, Suite 120
   San Francisco, CA 94107
13 Telephone: (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

**FILED**

JAN 1 6 2007

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

SEALED

15  Attorneys for Plaintiffs

16              UNITED STATES DISTRICT COURT

17              EASTERN DISTRICT OF CALIFORNIA

18

19  RALPH COLEMAN,                    )  No.: Civ S 90-0520 LKK-JFM
                                      )
20        Plaintiffs,                 )  **PLAINTIFFS' RESPONSE TO**
                                      )  **DEFENDANTS' MENTAL HEALTH**
21  vs.                               )  **BED PLAN, DECEMBER 2006**
                                      )
22  ARNOLD SCHWARZENEGGER, et al.,    )  **[FILED UNDER SEAL]**
                                      )
23        Defendants                  )
                                      )
24  ─────────────────────────────────

25  **THIS DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO THE MODIFIED**
    **PROTECTIVE ORDER ISSUED BY THE COURT ON JANUARY 12, 2007 AND MAY**
26  **NOT BE COPIED OR EXAMINED EXCEPT IN COMPLIANCE WITH THAT**
    **ORDER.**
27

28

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| ALOS | Average Length of Stay. |
| APP | Acute Psychiatric Program. A 150-bed acute inpatient unit operated by the Department of Mental Health inside the California Medical Facility. |
| ASH | Atascadero State Hospital. A state mental hospital operated by the Department of Mental Health in Atascadero, California. |
| ASU | Administrative Segregation Unit |
| CCC | Consolidated Care Center |
| CCCMS | Correctional Clinical Case Management System. CCCMS is the name for the largest CDCR mental health program, which currently houses 26,000 inmates with mental illness who live in general population housing units alongside non-mentally ill inmates. CCCMS inmates are generally given medication management, and a meeting with their case manager every 90 days. A few also participate in groups. |
| CDCR | California Department of Corrections and Rehabilitation. |
| CIW | California Institution for Women. A women's prison in Corona, California. |
| CMF | California Medical Facility. A prison in Vacaville, California. |
| CMC | California Men's Colony. A prison in San Luis Obispo, California. |
| COR | California State Prison-Corcoran. A prison in Corcoran, California. |
| CTC | Correctional Treatment Centers. CTCs are licensed inpatient units inside prisons. Mental Health Crisis Beds operate inside Correctional Treatment Center Units. In addition to Mental Health Crisis Beds, most CTCs also include medical beds. |
| DCHCS | Division of Correctional Health Care Services. This is the Department in CDCR headquarters that manages medical and mental health care. |
| DMH | Department of Mental Health. |
| DOF | Department of Finance. |
| DVI | Deuel Vocational Institute. A prison in Tracy, California. |
| EOP | Enhanced Outpatient Program. EOP programs are sheltered treatment programs that house severely mentally ill inmates. There are currently approximately 4,100 EOP inmates. Because these inmates are unable to function in a general population setting, they live in segregated housing units. They are given 10 hours each week of therapy or other "structured therapeutic activities." EOP inmates meet weekly with their case managers. |
| ICF | Intermediate Care Facility. ICF programs are "intermediate" inpatient care programs. These programs are operated by the state Department of Mental Health. There are currently ICF programs at Salinas Valley State Prison, the |

-i-

| | | |
|---|---|---|
| 1 | | California Medical Facility, Atascadero State Hospital, and Coalinga State Hospital. Inmates in these programs have frequent clinical contact, 24-hour nursing care and 20 or more hours of therapy and treatment each week. Inmates generally spend 6-12 months in these programs. |
| 2 | | |
| 3 | KVSP | Kern Valley State Prison. A new prison in Delano, California. KVSP has an MHCB unit. |
| 4 | | |
| 5 | LOU | Locked Observation Unit. An unlicensed Outpatient Housing Unit that is currently operating as a de facto MHCB at California Men's Colony. |
| 6 | | |
| 7 | MCSP | Mule Creek State Prison. A prison in Ione, California. |
| 8 | MHSDS | Mental Health Services Delivery System. The name given by defendants to their entire mental health system. |
| 9 | MHCB | Mental Health Crisis Beds. MHCB units are licensed inpatient units inside many California prisons where mentally ill inmates who are suicidal or experiencing another kind of mental health crisis can be admitted and treated for up to 10 days. MHCB are generally located inside a Correctional Treatment Center. |
| 10 | | |
| 11 | OHU | Outpatient Housing Units. Unlicensed infirmaries inside many CDCR institutions that provide treatment for medical and mental health conditions. |
| 12 | | |
| 13 | PBSP | Pelican Bay State Prison. A prison in Crescent City, California. |
| 14 | PSU | Psychiatric Services Unit. There are psychiatric treatment programs providing Enhanced Outpatient Program level of care to inmates with a Security Housing Unit term. |
| 15 | | |
| 16 | RC | Reception Center. This refers to designated prisons or housing units within prisons where inmates are classified and processed when they first arrive in the CDCR. |
| 17 | | |
| 18 | SHU | Security Housing Unit. This is a segregated high-security housing unit for inmates who have committed serious infractions while in prison or who have been "validated" by the CDCR as belonging to a gang. There are male SHU units at Pelican Bay State Prison (from which all inmates with serious psychiatric conditions are excluded), Corcoran State Prison, and California Correctional Institute. There is a SHU for women at Valley State Prison for Women. |
| 19 | | |
| 20 | | |
| 21 | SVSP | Salinas Valley State Prison. A prison in Soledad, California. |
| 22 | UNA | Unidentified Needs Assessment. This is the name given to the study of unmet demand for intermediate and acute inpatient care that was published by the CDCR on March 30, 2006. |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

**TABLE OF CONTENTS**

TABLE OF ABBREVIATIONS ..................................................................................................... i

TABLE OF CONTENTS........................................................................................................... iii

INTRODUCTION ...................................................................................................................... 1

PROCEDURAL HISTORY ....................................................................................................... 4

I.    Plaintiffs Object To Defendants' Proposal To End The Department Of
      Mental Health's Obligation To Provide Inpatient Psychiatric
      Hospitalization To California Prisoners In Need Of The Highest Levels Of
      Mental Health Care.................................................................................................... 8

II.   Defendants' December 2006 Bed Plan Will Cause Unacceptable Delays In
      The Provision Of Adequate Inpatient Care And Contains Too Many
      Contingencies To Justify Setting Aside Currently Approved Inpatient Bed
      Expansion Projects.................................................................................................. 12

III.  Even If The Court Accepts That Some Revision To The Bed Expansion
      Plans Is Warranted Given The New Navigant Bed Need Projections, This
      Court Should Not Approve Speculative New Construction Projects.................... 13

      A.    The California State Prison-Sacramento 350 Acute Bed Unit .................. 14

      B.    The CSP-Sacramento 128 Bed Inpatient Care Facility ............................ 16

      C.    The Salinas Valley State Prison 128 Bed Inpatient Care Facility ............ 16

IV.   This Court Should Order Defendants to Proceed With The 50 Mental
      Health Crisis Unit at California Men's Colony ...................................................... 17

V.    Defendants' Proposal To Remove All But Five Mental Health Beds from
      Pelican Bay State Prison Should Not Be Approved In The Absence of
      Coordination With And Explicit Authorization From The *Madrid* Court
      And Special Master................................................................................................. 17

VI.   Defendants' Plan to Remove Mental Health Crisis Beds Brom CSP-
      Corcoran Is Dangerous And Should Be Rejected By This Court ......................... 18

VII.  The December Plan Does Not Provide Sufficient Interim EOP Beds and
      Treatment Space for Either Male or Female Prisoners ........................................ 20

      A.    Construction of Interim EOP Beds for Male and Female Prisoners ......... 20

      B.    The Construction of EOP Treatment and Office Space at Mule
            Creek State Prison (MCSP) ...................................................................... 21

VIII. The December Bed Plan Should Not Be Sanctioned By This Court Until
      The New Navigant Population Projections are Released And The Special
      Master Has Direct Input Into Those Projections As Previously Ordered By
      This Court ............................................................................................................... 23

CONCLUSION........................................................................................................................ 24

# INTRODUCTION

On December 19, 2006, defendants provided the Court and the Special Master with the fourth in a series of plans to address the serious shortage of California Department of Corrections and Rehabilitation's (CDCR's) inpatient psychiatric hospital beds and other mental health beds at higher levels of care. *See* Defendants' 12/19/06 Submission of Long-Term Bed Plan (hereinafter "December Plan").[1] This Plan, contrary to the direction of this Court in the October 2006 Order, is a major step backward and must be rejected. Rather than refining and accelerating already approved construction projects, and addressing the substantial MHCB and EOP bed gap, the December Plan requests this Court's permission to abandon rather than accelerate previously approved construction plans. In addition, the December Plan trades already planned, sited, budgeted and approved construction projects for unplanned, unsited, unbudgeted and unapproved "super-projects" to be devised by the *Plata* Receiver. The *Plata* Receiver, however, as defendants admit, has no existing plans for any such "super-projects." The needs of the *Coleman* class for these already approved projects is urgent and unmet and further delay to permit defendants and the Receiver to start over with a new, yet unknown process is unacceptable.

Last May, and again in October 2006, the Court ordered defendants to *expedite* the development and construction of the new inpatient facilities and to provide detailed plans for realistically completing the necessary budgeting, planning, construction and staffing tasks necessary to timely open the projects. 5/2/06 Order at ¶ 3 (Docket 1800) ("Defendants shall include with the Long Term plan a list of those projects that can be accelerated, as well as a list of any statutory, licensing, or staffing barriers to acceleration and/or to timely opening of the projects described in the amended long-term plan."); *see also* 10/20/06 Order at ¶ 4 (Docket 1998) ("Defendants' consolidated plans shall include a timetable, budget planning, and resource allocations to meet the projected populations by June 30, 2011."). This Court, at

---

[1] The December Plan also addresses the long-term shortages of Enhanced Outpatient (EOP) beds and Mental Health Crisis Beds (MHCBs).

1  defendants' explicit request, approved and ordered immediate implementation of a long-
2  delayed CDCR plan to build more than $600 million in freestanding inpatient bed facilities at
3  three prisons with a history of successful mental health program management – CSP-
4  Sacramento, California Medical Facility, and the Salinas Valley State Prison. 5/2/06 Order at ¶
5  1 (Docket 1800) ("The defendants' long-term plan for provision of acute and intermediate
6  inpatient care is approved, subject to modification based on current population projections.").
7  The Governor included these Court-approved projects in the May revise to the budget and the
8  projects were approved and funded. The Legislature included millions of dollars in funding in
9  the 2006-2007 Budget for preliminary architectural planning for these facilities. Although the
10  Court's subsequent Orders contemplate some minor modifications of these projects based on
11  revised population estimates, the Court's Orders do not permit defendants to once again delay
12  the projects by starting again from scratch with an entirely new plan – but that is exactly what
13  the defendants have done.

14  Defendants' December Plan proposes a radical and far reaching reorganization of their
15  mental health care system. These changes are unrelated to the fine tuning and updating of
16  population projections that the Court permitted to be taken into account in defendants'
17  December final Bed Plan. Instead, the proposed changes set forth by defendants are a
18  wholesale abandonment of the previously approved and court-ordered projects and of major
19  aspects of the *Coleman* Revised Program Guide itself. Implementation of the December Plan
20  will require a massive amount of planning, construction management, staff recruitment, and
21  budget and resource allocations and a transition and construction period that will simply not
22  meet the Court's June 30, 2011 deadline for finally meeting the identified need of the *Coleman*
23  class for these critical higher levels of care.

24  Defendants seek approval for an unspecified delay of necessary inpatient beds so that
25  they can be built as part of five new "Consolidated Care Centers" (CCC's) which would each
26  offer a range of mental health programs. *See* December Plan at 5. Defendants propose that the

27

28

1  CCC's be somehow "tied" to new prison medical centers that they assert are part of the
2  "vision" of the *Plata* Receiver. *Id.*[2] Defendants admit, however, that, unlike the *Coleman*
3  court-ordered projects that they seek to abandon, the *Plata* medical center prisons and the
4  CCC's, are unplanned, unfunded, unsited and have no timetable for construction or
5  completion. *See, e.g.,* December Plan at 20 (listing target completion dates for the CCC's as
6  "to be determined"); Declaration of Michael Bien in Support of Plaintiffs' Response to
7  Defendants' Mental Health Bed Plan, December 2006 Bed at ¶¶ 4-5 (hereinafter "Bien Decl.").

8      The Court should not and must not permit defendants to abandon the "bird in the hand,"
9  the approved and funded construction projects, for "two in the bush," the speculation that the
10  Receiver, who has not agreed to take responsibility for the building of mental health beds, will
11  deliver a better prison mental health hospital at some unknown location and at some uncertain
12  date in the future. Unless and until defendants can demonstrate that any speculative new
13  project will be constructed, licensed, staffed and operational at a date certain that is equal to or
14  earlier than the completion date for the already approved projects, the Court must require
15  defendants to press ahead and accelerate the already approved projects. Lives are at stake and
16  additional delay, which is what defendants are proposing, is unacceptable. Moreover, because
17  the December Bed Plan is contingent upon major projects to be undertaken by the *Plata*
18  Receiver that have not yet occurred, been funded or approved, it places a critical part of the
19  *Coleman* remedial process beyond the control of this Court. Defendants acknowledge that "the
20  Receiver [has] not developed a formal proposal for construction of these new health care
21  beds," and that additional information regarding the Receiver's plans is not expected until
22  April 2007 at the earliest. December Plan at 5. Unlike the previously approved projects, the
23  Consolidated Care Centers are only "concepts" in the very early stage of development; as

---

26  [2] Related to this proposed radical restructuring in defendants' December 2006 Bed Plan is the
    reduction or elimination of established mental health programs at a significant number of
27  institutions, such as Pelican Bay State Prison, Corcoran State Prison, and Mule Creek State
    Prison. See *infra* at sections V, VI and VII(B).

1 | defendants acknowledged, and they cannot represent to the Court that any of the CCC projects
2 | could be built, staffed and operational by June 30, 2011. Bien Decl. ¶¶ 4-5.

3 |     Defendants' December Plan also seeks permission for an additional speculative and
4 | dangerous change in the *Coleman* remedial process: The Governor and the CDCR defendants,
5 | who have been unable to build, license, operate and hire staff for their existing system of
6 | Enhanced Outpatient Programs (EOPs) and mental health crisis beds (MHCBs), now announce
7 | their intention to become responsible for the management, licensing, hiring, operation and
8 | supervision of *all* present and future *inpatient* mental health programs in CDCR prisons that
9 | are now the responsibility of defendant Department of Mental Health (DMH). December Plan
10 | at 16. In addition, the *Coleman* class will be excluded from access to mental health
11 | hospitalization at state mental hospitals outside of CDCR prisons where they have traditionally
12 | received such care, such as Atascadero, Patton, Metropolitan and Coalinga. This is obviously a
13 | lose-lose deal for the *Coleman* class and an abandonment of a key element of the *Coleman* and
14 | *Gates* remedy; the provision of licensed, quality inpatient psychiatric care for acutely ill
15 | prisoners in Department of Mental Health run hospitals. Bien Decl ¶¶ 8-11. As this Court
16 | found when it recently added DMH's Director as a party defendant, there certainly have been
17 | and continue to be problems with access to DMH inpatient hospitalization for the *Coleman*
18 | class. The solution to this problem, however, is certainly not to remove DMH—the primary
19 | state agency responsible for the highest and most intensive levels of mental health care for
20 | prisoners—from any obligation to cure the ongoing Constitutional violations that deprive the
21 | *Coleman* class of appropriate access to necessary psychiatric hospitalization in appropriate and
22 | licensed health care facilities.

23 | **PROCEDURAL HISTORY**

24 |     For nearly eight years, this Court has been supervising the efforts of defendants to build
25 | an adequate supply of inpatient care beds – those beds required to provide mental health care to
26 | the most vulnerable and most severely mentally ill inmates in the *Coleman* class. In March of
27 | 2005, after nearly six years and at least five separate attempts to adequately assess their need
28 | for inpatient care beds, defendants finally completed a competent assessment, which is known

1 as the Unidentified Needs Assessment Study or "UNA Study." The parties, the Special

2 Master, and the Court all agreed that this final study was thorough, complete, and acceptable as

3 a measure of the need for additional inpatient beds. *See* 15th Monitoring Report of the Special

4 Master at 377 (Docket 1746).

5 Defendants' March 28, 2005 UNA Study found that at the time of the study (in the Fall

6 of 2004), the CDCR had an existing unmet need for 435 additional Intermediate Inpatient Care

7 Facility (ICF) beds and for 77 additional Acute Psychiatric Program (APP) beds, above and

8 beyond those beds in operation for CDCR inmates at the time of the study.[3] *See* Docket 1791,

9 Ex. E at p. 5 (3/30/05 UNA Study). Accompanying the March 28, 2005 Report was an

10 inadequate plan by the defendants to develop the necessary additional inpatient beds. The

11 Special Master rejected the plan and asked defendants to revise their plan on or before August

12 15, 2005. *See* 15th Monitoring Report of the Special Master at 377-380. The resulting plan,

13 issued in August 2005, was again unacceptable and resulted in an order (including several

14 extensions requested by defendants), requiring that a third comprehensive bed plan be

15 presented to the Court on or before April 17, 2006. *See* 3/3/06 Order at ¶ 3 (Docket 1772).

16 Finally, on April 17, 2006, the defendants presented a comprehensive short and long-term plan

17 to expand capacity of not just inpatient beds, but also MHCB and EOP beds. *See generally*,

18 5/2/06 Order (Docket 1800). While the plan was not perfect (it left a massive gap of EOP

19 beds, for example), the parties agreed to and this Court approved significant portions of the

20 long-term plan to expand inpatient beds, as well as portions of defendants' interim expansion

21 plans. *Id.*

22

23

---

24 [3] At the time of the March 28, 2005 UNA Study Report, the CDCR had the following inpatient beds available, all in programs run by the State Department of Mental Health: 150 Acute

25 Inpatient Beds in the APP program at CMF, 125 Intermediate Care Facility Beds for inmates at Levels I-III custody at Atascadero State Hospital, 64 Intermediate Care Facility Beds for

26 inmates at Level IV custody at Salinas Valley State Prison, and 84 beds in the A-Wing at California Medical Facility that were split between the Day Treatment Program and ICF

27 program (both for level III inmates). *See* Docket 1791, Attachment A to Ex. E at Table 4 (UNA Study).

28

1        Subsequent to the May 2, 2006 Order, defendants, on June 30, 2006, submitted what

2 was titled an amendment to the April bed plan, but was actually a new set of population

3 projections by a consultant, Navigant Consulting (formerly Tucker-Alan). Navigant's bed

4 projection methodology "produced a significantly lower forecasted demand for mental health

5 beds at most levels of care" than the April plan. *See* Statewide Mental Health Bed Plan, April

6 2006 – June 2006 Amendment at 1-2 (Docket 1867).

7        On October 20, 2006, after reviewing the Special Master's Recommendations, this

8 Court issued an Order requiring defendants to develop a final bed plan "for the provision of

9 acute and intermediate inpatient beds, as well as a plan for enhanced outpatient beds (EOP), for

10 all seriously mentally ill male and female CDCR inmates clinically determined to be in need of

11 those levels of care." 10/20/2006 Order at 2:18-3:2 (Docket 1998). The bed plan must "meet

12 or exceed the Navigant program population projections" and include "a timetable, budget

13 planning, and resource allocations to meet projected populations by June 30, 2011." *Id.* at

14 3:16-18. The Order specifically directed the Special Master to "work with the defendants and

15 Navigant to improve the projections and ensure that all necessary data is collected to make

16 future projections as accurate as possible." *Id.* at 2:24-3:2. The Order also directed defendants

17 to "contract with Navigant Consultants to conduct annual population reviews and updates of

18 their projections for mental health program populations from 2007 through 2009" and "include

19 a process for regular updates of bed need projections and ongoing planning for new mental

20 health beds based on subsequently revised projections." *Id.* at 2:19-21; 3:7-13.

21       On December 19, 2006, defendants submitted the most recent long range bed plan.

22 Contrary to the Court order, defendants did not work with the Special Master to improve the

23 projections or ensure adequate data collection. Bien Decl. ¶ 6. Nor did defendants work with

24 Navigant during the critical period when they created the December bed plan, despite the

25 Court's clear directive that defendants work with Navigant to improve data collection and

26 projections. *Id.* The Bed Plan does not include a process for regular updates of bed need

27 projections or ongoing planning for new mental health beds. Finally, the December Bed Plan

28

does not include "a timetable, budget planning, and resource allocations to meet projected populations by June 30, 2011." 10/20/06 Order at ¶ 4 (Docket 1998)

Last Spring, this Court, at the request of defendants who wanted an Order to be referenced in the Governor's May Budget Revise, ordered defendants to immediately implement their long-range plan for the following new construction projects, each of which was subsequently included in the Governor's budget and approved by the Legislature: (1) a 350-bed acute inpatient bed program for CSP-Sacramento, (2) a 128-bed Intermediate Inpatient Care program at CSP-Sacramento, (3) a 64-bed Intermediate Inpatient Care program at California Medical Facility, and (4) a 128-bed Intermediate Inpatient Care program at Salinas Valley State Prison. 5/2/06 Order (Docket 1800). With the exception of the 64-bed ICF program at the California Medical Facility, the December 20, 2006 Plan would stop work[4] and abandon each of these existing and approved projects, all of which are, according to defendants' approved plans, are already well along in the process. Instead, the December Bed Plan proposes that defendants be permitted to start over, substantially delaying the completion of these long-overdue inpatient psychiatric beds to some unspecified date in the future, well beyond the completion dates of the already approved projects. *See* December 19, 2006 Plan at 14 (chart showing that all of these inpatient projects, except for the CMF intermediate care proposal, will be eliminated or changed into non-inpatient care projects). Although the December 19, 2006 Bed Plan indicates that the inpatient projects are being "re-scoped," the reality is that other than the 64-bed CMF intermediate care unit, none of the inpatient bed expansion projects promised in the April 2006 plan and approved by the Court and the Legislature in May of 2006 will be built under the new plan. "Rescoping" is apparently a method by which CDCR hopes to be able to use the money allocated for the April inpatient bed plan construction projects, as well as the approved sites, for other purposes. While some

---

[4] Defendants, in violation of this Court's orders, have apparently already "stopped work" on many of the court-approved inpatient bed construction projects, anticipating that the Court will permit the abandonment of those projects pursuant to the December Bed Plan. Bien Decl. ¶ 7.

1 of these "other purposes" may in theory benefit some members of the *Coleman* class at some
2 date in the future, the particular Constitutionally-required remedy—inpatient psychiatric
3 beds—will be postponed and will be finally available at a date that may be too late to benefit
4 some members of the class who will suffer and die as a result of the additional delay.

5 **I.   PLAINTIFFS OBJECT TO DEFENDANTS' PROPOSAL TO END THE
6 DEPARTMENT OF MENTAL HEALTH'S OBLIGATION TO PROVIDE
   INPATIENT PSYCHIATRIC HOSPITALIZATION TO CALIFORNIA
7 PRISONERS IN NEED OF THE HIGHEST LEVELS OF MENTAL
   HEALTH CARE**

8        One of the most drastic and disturbing elements of defendants' December Plan is the
9 CDCR's proposal to cease all ties with the Department of Mental Health (DMH). *See*
10 December Plan at 16-17. This is a two-pronged proposal involving both the removal of CDCR
11 inmates from DMH hospitals, such as ASH, Patton and Coalinga, and the removal of DMH
12 management and oversight from the acute and ICF programs currently located and under
13 construction within CDCR institutions. Both of these transitions would require changes in the
14 Revised Program Guide, as well as significant addition of management resources, planning and
15 supervisory capacity on the part of the CDCR which is not discussed, budgeted or even
16 addressed in the present plan. For instance, the plan fails to address if and how existing DMH
17 clinical and administrative staff will be transitioned into the new CDCR programs, what
18 staffing ratios will be used, how the CDCR will obtain funding for those programs, what
19 licensing and accreditation requirements will be met and even whether the programs will
20 provide the same level of care currently provided by the DMH.

21        DMH has played an integral role in providing inpatient mental health care services to
22 CDCR inmates for decades and is an express part of the remedy in the *Gates* and *Coleman*
23 cases. DMH currently operates inpatient programs that at any given time treat nearly eight
24 hundred (800) *Coleman* class members. December Plan at 16. The DMH beds are the highest
25 level of care for the most acutely ill patients and are the most richly staffed and complex
26 programs available to *Coleman* class members with life-threatening illnesses. It is not
27 reasonable to assume that CDCR could build, supervise, manage and operate these high level
28 mental health programs on its own. Neither the December Plan (which provides no budget,

1 details or information) nor CDCR's track record of failing to provide adequate care to seriously
2 mentally ill class member provides a basis for the Court to approve this Plan. Each one of the
3 transition points identified above (plans for staff transitions, staffing ratios, additional funding,
4 licensing and level of care issues) is by itself daunting, but the combination of all of them is
5 nothing short of overwhelming. It is not at all clear that the CDCR, a department that is
6 currently under a Governor-proclaimed state of emergency for overcrowding, under a
7 Receivership for medical care, that has been unable to hire headquarters staff [5] (in violation of
8 this Court's 8/1/06 Order, Docket 1929), and that has severe custodial, clinical and medical
9 staffing shortages at all levels, can competently assume control of the DMH programs.

10 By way of example, Enclosure XI to defendants' April 2006 Bed Plan forecasted the
11 significant staffing needs of the newly proposed acute and inpatient units. The April Plan
12 made clear that DMH had *already agreed* to fund the hundreds of clinical staffing positions
13 required for the various APP and ICF beds proposed in that plan. *See* Enclosure XI to April
14 Plan (Docket 1788-4). According to Enclosure XI, those clinical staffing needs were as
15 follows:

16 • The SAC 350 APP unit: 620 clinical positions at a total cost of $60,316,000

17 • The SAC 128 ICF unit: 198 clinical positions at a total cost of $18,286,000

18 • CMF 64 ICF unit: 104 clinical positions at a total cost of $10,054,000

19 • SVSP 128 ICF unit: 172 positions at a total cost of $14,133,000

20 *Id.* at p. 4. If the CDCR assumes control of these units, it will have to staff and fund not only
21 these clinical positions,[6] but also the accompanying custody positions for these units at a time
22

---

23 [5] Defendants admitted during the *Coleman* Policy Meeting on December 6, 2006, that they had
24 only been able to fill 3 or 4 of the 86 central office staff positions ordered by this Court and
that even if they were able to hire more staff members, they did not have the office space for
them. Bien Decl. ¶ 3.
25
26 [6] The December Plan proposes to "rescope" the 350 APP unit at SAC and also proposes to halt
all work on the 128 ICF unit at that institution. Plaintiffs address the substance of those
proposals below. Regardless of this Court's inclination to allow the CDCR to change or stop
27 construction on these units, there is a real concern that the CDCR will be unable to staff the
units in whatever final form they take.
28

1 when the CDCR has been unable to staff its existing programs with *either* custody or medical
2 personnel. According to the CDCR's own projections, the additional custodial staffing
3 requirements for these units are as follows:

4 • The SAC 350 APP unit: 156.7 custody positions at a total cost of $10,914,000

5 • The SAC 128 ICF unit: 70.4 custody positions at a total cost of $4,936,000

6 • CMF 64 ICF unit: 38.9 custody positions at a total cost of $2,727,000

7 • SVSP 128 ICF unit: 70.4 custody positions at a total cost of $4,943,000

8 *Id.* at p. 5. The December Plan attempts to remove all responsibility for staffing and funding
9 the clinical positions from the DMH, but fails to provide any plans or details as to how CDCR
10 will staff, run, or even license the inpatient programs proposed in the December 2006 Plan.

11 Perhaps an even more important ground on which this Court should reject the planned
12 transition of inpatient programs from DMH to CDCR control is the fact that a *Coleman* class
13 member is a patient in a DMH inpatient facility and a prisoner in a CDCR health care facility.
14 The mission of DMH contrasts sharply with that of CDCR; while the former is a health care
15 institution that runs hospitals to treat patients, the latter is a severely overcrowded correctional
16 department with the primary mission of public safety, punishment and, only recently,
17 rehabilitation. CDCR programs treat prisoners, even the seriously mentally ill, as dangerous,
18 and frequently place security concerns over treatment needs. This is best exemplified by
19 comparing treatment of the same high custody Level IV *Coleman* class member on day one in
20 a Psychiatric Security Unit (PSU) program at CSP-Sacramento or Pelican Bay State Prison
21 (PBSP) and on day two, upon transfer to the highest security DMH ICF program at Salinas
22 Valley State Prison, the SVPP. In the CDCR-run PSU (for EOP level patients with SHU
23 terms), the inmate spends most of his time locked in his cell, leaving only in leg chains and
24 hand cuffs for "group therapy" in a room where he is locked in an uncomfortable small cage
25 ("treatment module") with a few other men also in cages, in a semi-circle. The same man upon
26 transfer to SVPP, moves uncuffed from his housing unit to therapy rooms where he
27 participates in group therapy with other high custody men sitting unchained in chairs, not
28 cages. He eats his meals in a dining room and has recreational yard with other men outside on

1  a grassy yard without chains. Bien Decl. ¶¶ 8-10. If CDCR rather than DMH was responsible
2  for the operation of the SVPP program, the Court should expect more custodial interference
3  with treatment programs, more chains, hand cuffs and cages, and less mental health treatment.
4  This is unacceptable.

5      Moreover, as the need for inpatient care for inmates has increased over the years, an
6  increasingly burdened CDCR – failing to meet constitutional standards even at the basic
7  CCCMS and EOP levels of care – has repeatedly demonstrated that it cannot plan, license and
8  run its existing mental healthcare programs. It has taken years beyond originally projected
9  dates for the CDCR to build, staff and then meet the minimal licensing standards for 10-bed
10  MHCB units at many prisons. Why should the substantial additional challenges of building,
11  staffing, operating and licensing the highest levels of mental health care be something that
12  should now be imposed on this clearly inadequate Department? How can this transition be
13  consistent with achieving a Constitutional level of mental health care for the *Coleman* class?

14      In light of the pivotal role DMH has played in providing much-needed care to the
15  *Coleman* class members and in light of the current staffing and overcrowding crises in the
16  CDCR, plaintiffs respectfully request that this Court refrain from approving defendants'
17  proposal to end DMH involvement in the *Coleman* case. The responsibility for inpatient
18  mental health care at the ICF and acute levels of care must remain with the DMH, the state
19  agency with the skills, staffing and experience to provide that level of care. There is no
20  evidence in this record upon which the Court can find that the CDCR can competently and
21  fairly assume control over the acute and inpatient beds currently controlled by the DMH. Nor
22  should the Court permit the State to exclude CDCR patients from DMH facilities outside of
23  CDCR prisons that have historically provided care to CDCR prisoners. The alleged
24  "pressures" of an anticipated (but still speculative) Sexually Violent Predator population
25  cannot and should not interfere with the real, urgent and current needs of seriously mentally ill
26  CDCR prisoners who are suffering and dying today due to this persistent shortage. Bien Decl.
27  ¶ 8.

28

**II. DEFENDANTS' DECEMBER 2006 BED PLAN WILL CAUSE UNACCEPTABLE DELAYS IN THE PROVISION OF ADEQUATE INPATIENT CARE AND CONTAINS TOO MANY CONTINGENCIES TO JUSTIFY SETTING ASIDE CURRENTLY APPROVED INPATIENT BED EXPANSION PROJECTS**

After years of delays in building desperately needed inpatient beds, defendants are now proposing a plan that is certain to cause significant further delays. The UNA Study that documented an unmet need for 435 additional intermediate inpatient beds and 77 additional acute inpatient beds is now nearly two years old, and defendants have not even begun architectural planning for the new permanent beds they are proposing to build to meet these admitted unmet needs. A documented waiting list of more than 100 men await admission to DMH-run ICF programs every day. Delays and wait lists also continue to be common for men referred to the acute psychiatric program (the APP) at CMF. Yet defendants now ask this Court to approve yet another delay in the construction of these beds.

The proposal to build new Consolidated Care Centers may be worthy in the abstract, but in practice the proposal will require significant delays in the construction of needed beds. First, defendants will need to wait for the *Plata* Receiver to decide where to locate medical beds, an event that may or may not happen by April of 2007, in order to know where they are going to be co-locating their new Consolidated Care Centers. Second, defendants will need to coordinate the planning and construction of medical and mental health beds, potentially delaying the construction of mental health beds every time the medical bed construction project changes in scope or location. Third, changes to the projects are likely, given the preliminary nature of the Receiver's current plans for medical care centers. *See* December Plan at 5 ("It is important to note that by the time the Mental Health Bed Plan, December 2006 was developed, the Receiver had not developed a formal proposal for construction of these new health care beds (with additional information regarding this proposal expected by April 2007.")) Fourth, during a January 8, 2006 conference call on this issue, defendants admitted that the new Consolidated Care Centers are still only "concepts." *See* Bien Decl. ¶ 4. Defendants could not say during the conference call whether the new Consolidated Care Centers would be freestanding units or located inside existing units. *Id.* During the same

1    conference call, counsel for defendants conceded that she could not confirm that these new

2    Consolidated Care Centers would be completed or licensed by 2011. *Id*. at ¶ 5. The Court

3    should not allow fully-funded projects in the architectural planning stage to be set aside and

4    replaced by such vague, unwieldy, and unsubstantiated plans for new mental health beds.

5    Indeed, defendants' December Plan plainly does not comply with the requirements of

6    the Court's October 20, 2006 Order that defendants provide detailed documentation concerning

7    the new plans, including "timetables, budget planning, and allocations." 10/20/06 Order at ¶ 4

8    (Docket 1998). By way of contrast, the April 2006 Bed Plan previously approved by this

9    Court included detailed planning documents that took defendants many months to develop.

10   The planning documents included complete staffing packages for each of the new DMH-run

11   inpatient mental health facilities. They included firm locations for the new programs. They

12   included a proven management team – the Department of Mental Health managers – for the

13   new programs. All of this work will be set aside by the December 2006 Plan unless the Court

14   acts to preserve key elements of the earlier plans. Given that defendants are asking the Court

15   to set aside an existing Court order, they should be held to a much higher burden of

16   documentation and realistic project planning than what is set forth in their vague December 20,

17   2006 Bed Plan.

18   **III.   EVEN IF THE COURT ACCEPTS THAT SOME REVISION TO THE
         BED EXPANSION PLANS IS WARRANTED GIVEN THE NEW**
19       **NAVIGANT BED NEED PROJECTIONS, THIS COURT SHOULD NOT
         APPROVE SPECULATIVE NEW CONSTRUCTION PROJECTS**

20
     Defendants' December Plan seeks to abandon or substantially modify previously
21
     approved inpatient bed construction projects at Salina Valley State Prison (SVSP) and CSP-
22
     Sacramento (CSP-SAC). At CSP-SAC, defendants propose (1) abandoning the 128 ICF unit
23
     in its entirety and, (2) "rescoping" the 350 APP construction project to "change the number of
24
     beds to a total of 432 beds." December Plan at 14. Defendants also propose to "rescope" the
25
     128 ICF bed construction at Salinas Valley State Prison (SVSP). For the reasons set forth
26
     below, plaintiffs request an Order from this Court mandating that the 128 ICF bed projects at
27
     CSP-SAC and SVSP go forward as planned in the April 2006 Bed Plan and that the
28

1  "rescoping" of the 350-bed APP project only be permitted if the project can still be completed
2  by June 30, 2011 and will include a substantial number of much needed acute beds.

3  ## A.  The California State Prison-Sacramento 350 Acute Bed Unit

4  Defendants submitted a request to the State Legislature in March 30, 2006 for $14.9
5  million to create the preliminary plans for the 350 APP bed project. The Legislature approved
6  the project and various deadlines for construction were set forth in defendants' April Bed Plan,
7  including a 6/30/07 deadline to complete preliminary planning, a 6/30/08 deadline to complete
8  working drawings, and a 6/30/11 deadline to complete construction and staffing of this unit.
9  April Bed Plan at 17 (Docket 1786-2). Defendants' new plan is to continue with this project,
10  "but with a scope change to increase the number of beds to a total of 432 beds." December
11  Plan at 14. *None* of the beds proposed in the rescoped project, however, are acute beds.
12  Rather, defendants seek permission to build 336 EOP beds, 26 MHCBs, 46 ICF beds and 24
13  ICF high custody beds (for a total of 432 beds). In other words, defendants propose to stop all
14  work on a legislatively approved project with set deadlines in favor of constructing a brand
15  new project that lacks a completion date, plans and legislative approval. Indeed, defendants'
16  proposal to stop this work is more than just a proposal. Defendants admitted during the
17  January 8, 2007 telephone conference that they have already stopped all work on the 350 acute
18  bed project at SAC and, in fact, that they never even started much of the work, despite this
19  Court's order. Bien Decl. ¶ 7.

20  According to Navigant's June 2006[7] projections and defendants' own statistics about
21  currently available or ongoing construction of acute beds (from Enclosure II to the December

---

23  [7] Plaintiffs raised serious concerns about Navigant's reduced projections that have yet to be
24  addressed since Navigant was not employed by CDCR between July 1, 2006 and December
    2006 and did not participate in the December Bed Plan. *See* "Corrected Plaintiffs'
25  Supplemental Brief on Defendants' Compliance with May 2, 2006 Orders Regarding Interim
    and Long Range Bed Plans and Reception Center EOP Programs" at pp. 12-13 (Docket 1981);
26  "Plaintiffs' Notice of Violations of May 2, 2006 Court Order and Request for Relief and
    Objections to Defendants' Amended Long-term Bed Plan and Request for Additional 60 Day
27  Extension," at pp. 2-7 (Docket 1885); Special Master's Supplemental Report at 11 (Docket
    1969).

28

1   Bed Plan), the CDCR will have the following acute bed shortages for male prisoners between

2   2007 and 2011:

| Bed Type | June '06 Navigant Projected Bed Needs | Actual Number of Available Beds | Bed Deficit |
|---|---|---|---|
| APP (men) | 2007: 203<br>2008: 211<br>2009: 217<br>2010: 222<br>2011: 224 | 2007: $150^8$<br>2008: 150<br>2009: 150<br>2010: 150<br>2011: $[240]^9$ | 2007: -53<br>2008: -61<br>2009: -67<br>2010: -72<br>2011: unknown |

7      In light of the current and serious shortage of acute beds throughout the system as

8 established by defendants' own projections, plaintiffs respectfully request that this Court order

9 defendants to move forward with the existing plans regarding the CSP-SAC acute beds with

10 construction to begin immediately and on an expedited basis. If the Court orders the project to

11 go forward in its entirety, as originally planned and approved, defendants will be able to use

12 "extra" beds, if any, for inmates who need another level of licensed care.[10] In the alternative,

13 defendants should be required to build, on the same schedule, a rescoped project that includes a

14 substantial number of acute beds. No other part of the December Plan has even the prospect of

15 adding critical acute beds to the system by June 30, 2011. Defendants could build 250 acute

16 beds at SAC on the current schedule and with the current legislative approval, and then take

17 the 150 acute beds at CMF offline down the road. (The CMF acute unit is outdated and

18 currently operates on licensing waivers.) Alternatively, defendants could build 60 or 80 acute

19 beds at SAC and "rescope" the rest of the project. The point is to ensure that at least some of

21   [8] The 150 figure for the years 2007 through 2010 actually *overstates* the number of available

22 acute beds since the CDCR has never fully utilized the acute beds at Atascadero State Hospital (ASH). The CDCR represents that it has 125 acute beds at CMF and 25 at ASH. The occupancy rates of acute beds at ASH have been chronically low ever since those beds became

23 available. For example, as of the date the report was generated, only 9 of the 25 acute beds at ASH were filled. *See* Bien Decl. ¶ 12.

24

25   [9] The bracketed 2011 figure is the "final expected permanent bed capacity" taken from the last column on Enclosure II to the December Bed Plan and includes 90 additional acute beds.

26 Defendants propose building these 90 beds in three Consolidated Care Centers which will have 30 beds each. The December Plan does not provide a completion date for these acute beds.

27   [10] In addition, even if those beds are not fully utilized in 2011, there is no indication that they will not be utilized in 2012 or 2015.

28

1  the acute beds will be up and running by 2011. Whether the Court deems it appropriate to
2  build 60 or 250 acute beds, however, defendants should be prohibited from "rescoping" this
3  project in the manner set forth in defendants' December Plan that results in no acute beds
4  whatsoever by June 30, 2011. The least risky plan to assure that necessary APP beds will be
5  available no later than June 30, 2011, is to require defendants to build the original 350-bed
6  project. It will surely not go to waste.

7  **B.  The CSP -Sacramento 128 Bed Inpatient Care Facility**

8  The December Plan also proposes to stop entirely the construction of a 128-bed ICF
9  (intermediate) inpatient care unit at SAC for Level IV inmates. Like the 350 acute bed project,
10  this project was already presented to the legislature, received preliminary funding for plans
11  ($7.69 million) and has the same deadlines for completion as the acute bed project. *See* April
12  Plan at p. 17 (Docket 1786-2). Defendants should not be permitted to abandon construction on
13  this unit on the speculative promise that other ICF units may be built by the Receiver with
14  unbudgeted and unapproved funds, at an unspecified time and at currently unconfirmed sites.
15  This Court should order that defendants move forward with the 128-bed intermediate care
16  facility, a project that is already approved and preliminarily funded.

17  **C.  The Salinas Valley State Prison 128 Bed Inpatient Care Facility**

18  The December Plan proposes to stop construction of the 128 ICF bed project at SVSP
19  and to instead "rescope" that project into the construction of 70 new EOP-ASU beds and 96
20  new EOP beds. Defendants' Plan at p. 12. Defendants' plan explains that it will build 70 new
21  EOP-ASU beds. Once those beds are completed, the 45 EOP-ASU inmates currently housed
22  in units D-1 and D-2 will move into them, along with 25 other EOP-ASU inmates. Thus, it is
23  only at the point that construction is completed on the 70 EOP-ASU beds that the CDCR can
24  even begin the renovation of the D-1 and D-2 units (expanding those 45 single cells into 96
25  regular EOP beds plus additional office and treatment space for the 96 beds). Once again,
26  defendants are attempting to stop already approved projects in favor of projects that are not
27  approved and have no end date in mind. Plaintiffs respectfully request an Order from this
28  Court that the 128 bed unit move forward as originally planned.

**IV. THIS COURT SHOULD ORDER DEFENDANTS TO PROCEED WITH THE 50 BED MENTAL HEALTH CRISIS UNIT AT CALIFORNIA MEN'S COLONY**

The December Plan, as ordered by this Court, proposes going forward with the construction of the 50 bed MHCB unit at CMC, but defendants propose indefinitely delaying this necessary unit by "combining this project with the 1,073 bed project," another speculative project without a budget, approvals or plans. December Plan at 11. The 1,073 bed project is the entire construction project to convert CMC into a "Consolidated Care Center," including the construction of 720 EOP beds, 46 ICF beds, 24 ICF high custody beds, 125 ASU-EOP beds, 30 acute beds and 128 EOP-PSU beds. *Id.* If defendants are permitted to combine the already ordered 50 bed MHCB unit into this new construction plan, there is no chance that those beds will be completed by June 2011. *See* 10/20/06 Order at ¶ 4 (Docket 1998) ("The consolidated plan shall also include construction of the 50-bed mental health crisis bed unit at California Men's Colony proposed in defendants' revised interim plan.") Accordingly, plaintiffs request a renewed Order from this Court that the 50-bed MHCB unit construction at CMC go forward separately from the tenuous Consolidated Care Center construction and that all construction on this unit be expedited to ensure completion by June 2011, at the latest.

**V. DEFENDANTS' PROPOSAL TO REMOVE ALL BUT FIVE MENTAL HEALTH BEDS FROM PELICAN BAY STATE PRISON SHOULD NOT BE APPROVED IN THE ABSENCE OF COORDINATION WITH AND EXPLICIT AUTHORIZATION FROM THE *MADRID* COURT AND SPECIAL MASTER**

The December Plan seeks to remove virtually all mental health programs from Pelican Bay State Prison: the 128 bed Psychiatric Services Unit (PSU), the 64 Enhanced Outpatient beds (EOP), and 5 of the 10 existing mental health crisis beds (MHCBs). The 128-bed PSU unit at PBSP was created pursuant to the efforts of the Special Master and the Court in *Madrid v. California Department of Corrections*, N. Dist. Cal. Case No. 3:90-cv-03094 TEH. Though PBSP is also included in the *Coleman* remedial plan, this prison is subject to a different remedial process involving a different Special Master and Court. Judge Henderson and Special Master Hagar have invested substantial energy and effort into developing procedures for this

1 PSU and the mental health programs at PBSP are progressing overall, according to Special
2 Master Keating's recent report, "toward compliance warranting a reduced level of review
3 during the next monitoring period." *See* Special Master's Sixteenth Monitoring Report at 32
4 (Docket 2081). Defendants have not sought or obtained approval from the *Madrid* Court for
5 the removal of these programs from PBSP. Accordingly, plaintiffs request that this Court
6 disapprove defendants' plan to remove the PSU, remove all EOP beds and reduce MHCBs
7 unless and until those plans are coordinated with and explicitly approved by the *Madrid* Court
8 and Special Master Hagar. In addition, the closing of well-functioning and staffed mental
9 health programs in remote CDCR prisons, such as PBSP, are of great concern. It has taken
10 more than a decade to get mental health care at PBSP to meet minimal standards—why should
11 the Court approve a plan to shut down these programs now?

12 **VI. DEFENDANTS' PLAN TO REMOVE MENTAL HEALTH CRISIS BEDS FROM CSP-CORCORAN IS DANGEROUS AND SHOULD BE**
13 **REJECTED BY THIS COURT**

14 The December Plan proposes removing the EOP and EOP-ASU units from CSP-COR
15 and also removing all MHCB beds from that prison. Plaintiffs do not object to the removal of
16 the EOP and EOP-ASU units, but urge this Court to reject defendants' planned closing of the
17 MHCBs. These beds are necessary to meet the continuous and frequent demand for MHCB
18 beds created by the operation of the large Security Housing Unit (SHU) at Corcoran. Unlike
19 the Pelican Bay SHU, defendants are presently permitted to house a large number of mentally
20 ill inmates in the Corcoran SHU.[11] According to the Special Master's Sixteenth Monitoring
21 Report, which was issued on December 14, 2006, CSP-COR's SHU housed approximately 500
22 CCCMS inmates. Sixteenth Monitoring Report at 163 (Docket No. 2081). Between August 1,
23 2005 and March 31, 2006, 133 CCCMS inmates were admitted into COR's MHCB unit
24 directly from the SHU (out of a total of 592 admissions into those beds). Bien Decl. ¶ 13.

27 [11] Plaintiffs object to this practice and seek an exclusion order, as is now in effect at the PBSP SHU, barring CCCMS inmates from the Corcoran, CCI and VSPW Security Housing Units.

1       This large number of referrals to mental health crisis beds at Corcoran from the non-

2 EOP population is not surprising. The Special Master has described the Corcoran SHU as "one

3 of the harshest physical and psychological environments in CDC." Fourteenth Monitoring

4 Report of the Special Master at 42 (Docket No. 1649). Because of the taxing conditions of the

5 SHUs, the Program Guide mandates heightened levels of care for CCCMS inmates in SHUs

6 versus CCCMS inmates in the general population, as well as additional mental health screening

7 for non-MHSDS inmates housed in the SHU. *See e.g.* Mental Health Services Delivery

8 System Program Guide, September 2006 Revisions at pp. 12-8-4 (mandating psychiatric tech

9 rounding in the SHU every other week for inmates who are not in the MHSDS and weekly for

10 those who are in the MHSDS). Because of these characteristics of the Corcoran SHU,

11 CCCMS SHU inmates continue to be at high risk for decompensation and a high need for

12 prompt access to MHCB beds (as shown by the 133 referrals described above). This need has

13 also been identified by the *Coleman* monitors, who found CCCMS inmates housed in the

14 Corcoran SHU who required immediate referral to higher levels of care, including to MHCB

15 beds, for stabilization. *See* Fourteenth Monitoring Report at Exhibit B (discussing Inmates E,

16 F, G, L, P, and Q).

17       Corcoran also has a large population of CCCMS patients housed in harsh administrative

18 segregation units and in the intense general population of this Level IV high security prison.

19 These CCCMS populations also generated approximately 150 MHCB admissions during the

20 same time period.[12] In addition, 20 more general population, non-CCCMS inmates from all

21 over Corcoran (including the SHU and administrative segregation units) were admitted to

22 MHCB beds during this period. Thus, more than half of all MHCB admissions at Cocoran

23 during this period were from populations (CCCMS and general population) that will continue

24 to be housed at Corcoran even if EOP programs are removed. Bien Decl. ¶ 13.

25

26

27 [12] COR referred 73 CCCMS inmates from the administrative segregation unit, 72 CCCMS inmates from general population and 5 CCCMS inmates from other units directly into mental health crisis beds. Bien Decl. ¶ 13.

28

1      In light of the historical and well-documented problems at Corcoran, plaintiffs

2 respectfully request that the Court order defendants to maintain an MHCB unit at Corcoran. It

3 is imperative that Corcoran staff members (both mental health and custody) have access to

4 immediate crisis bed placements for inmates at Corcoran who decompensate in the SHU,

5 administrative segregation and general population units.

6 **VII. THE DECEMBER PLAN DOES NOT PROVIDE SUFFICIENT INTERIM**
**EOP BEDS AND TREATMENT SPACE FOR EITHER MALE OR**
7 **FEMALE PRISONERS**

8     **A.   Construction of Interim EOP Beds for Male and Female Prisoners**

9      According to Navigant's June 2006 projections and defendants' own statistics about

10 currently available and/or ongoing construction of EOP beds (from Enclosure II to the

11 December Bed Plan), the CDCR will have the following EOP bed shortages for male and

12 female inmates between 2007 and 2011:

| Bed Type | June '06 Navigant Bed Projected Needs | Actual Number of Available Beds | Bed Deficit |
|---|---|---|---|
| **EOP (women)** | 2007: 211<br>2008: 227<br>2009: 244<br>2010: 256<br>2011: 262 | 2007: 129<br>2008: 129<br>2009: 129<br>2010: 129<br>2011: [297] | 2007: -82<br>2008: -98<br>2009: -115<br>2010: -127<br>2011: unknown |
| **EOP-ASU (women)** | 2007: 19<br>2008: 19<br>2009: 20<br>2010: 21<br>2011: 22 | 2007: 9<br>2008: 9<br>2009: 9<br>2010: 9<br>2011: [24] | 2007: -10<br>2008: -10<br>2009: -11<br>2010: -12<br>2011: unknown |
| **EOP (men)** | 2007: 3672<br>2008: 3869<br>2009: 4024<br>2010: 4123<br>2011: 4175 | 2007: 3260[13]<br>2008: 3260<br>2009: 3260<br>2010: 3260<br>2011: [4488] | 2007: -412<br>2008: -609<br>2009: -764<br>2010: -863<br>2011: unknown |
| **EOP-ASU (men)** | 2007: 572<br>2008: 614<br>2009: 646<br>2010: 666<br>2011: 675 | 2007: 524<br>2008: 524<br>2009: 524<br>2010: 524<br>2011: [752] | 2007: -48<br>2008: -90<br>2009: -122<br>2010: -142<br>2011: unknown |

[13] This figure includes the new EOP construction slated to be completed at Mule Creek State Prison by January 2007.

| Bed Type | June '06 Navigant Bed Projected Needs | Actual Number of Available Beds | Bed Deficit |
|---|---|---|---|
| **EOP-PSU** (men) | 2007: 332<br>2008: 355<br>2009: 374<br>2010: 390<br>2011: 401 | 2007: 320<br>2008: 320<br>2009: 320<br>2010: 320<br>2011: [448] | 2007: -12<br>2008: -35<br>2009: -54<br>2010: -70<br>2011: unknown |

The December Plan is inadequate as it fails to provide interim construction of male and female EOP beds to address these ongoing shortages. The only proposed construction of male EOP beds at all is the unspecified and unapproved construction of new EOP beds in conjunction with other Consolidated Care Center construction. Thus, the male EOP bed shortages described in the above chart will not be addressed, as required by the Court, by June 30, 2011, as defendants have no confidence that these massive projects will be built by then.

With respect to new EOP and EOP-ASU beds for female inmates, the December Plan proposes to create "new beds through conversion of existing space" at CIW.[14] December Plan, Enclosure III at fn*. Defendants fail to set forth any construction deadlines for that converted space, fail to state whether that project has been funded and fail to clarify whether legislative approval has been obtained or even sought. Accordingly, defendants plan for EOP beds is inadequate and should be rejected and defendants should be ordered to promptly come forward with concrete deadlines for construction of interim male and female EOP beds to deal with the existing and identified shortage of EOP beds between now and 2011.

**B. The Construction of EOP Treatment and Office Space at Mule Creek State Prison (MCSP)**

The December Plan proposes to halt all construction on office and treatment space in the EOP unit at MCSP. December Plan at 14. This is unacceptable. The Court should order

---

[14] Plaintiffs otherwise agree with defendants plan to move forward with new construction of 42 new acute beds and 3 additional mental health crisis beds at CIW, but only if that construction can be completed by June 2011.

1  defendants to accelerate rather than abandon the construction projects for the MCSP EOP
2  programs.

3      The interim plan for EOP beds at MCSP, published in the Spring of 2006, added 115
4  Level IV and 180 Level III beds by January 2007 (doubling the Mule Creek program to a total
5  of 510 EOP beds). April Bed Plan at p. 15 (Docket 1786-2). Defendants' December Plan still
6  expands the Mule Creek EOP unit to 510 inmates and makes clear that the CDCR intends to
7  retain that program until at least 2011 (but probably longer). December Plan, Enclosure II.
8  The Special Master has previously found that the MCSP EOP unit, even before this significant
9  expansion, lacks the treatment and office space necessary to provide group therapy,
10  confidential client contacts, and appropriate work space for clinical and custody staff in the
11  units. *See, e.g.* Special Master's 16th Monitoring Report at p. 68 (Docket 2081-2) ("Space
12  constraints [at MCSP] also impacted adversely on the provision of therapy, forcing groups for
13  Level IV EOP sensitive needs inmates to meet in dayrooms with limited confidentiality.")
14  Although defendants now propose that they will ultimately close the EOP unit at Mule Creek
15  (if the *Plata* Receiver's CCC's are constructed), they plan to double the EOP population now
16  without building the proposed treatment and office space required to provide programming and
17  therapy to these patients.

18      If defendants are going to retain more than 500 inmates in the MCSP EOP unit for the
19  next five years, they must construct needed office and treatment space for the program. Here
20  again, defendants propose to halt badly needed construction projects to save money based on
21  their speculative plan to ultimately remove EOP beds from MCSP at some unspecified time in
22  the future. In the meantime, 500 EOP inmates and the clinical and custody staff responsible
23  for those prisoners will be without necessary resources that will enable them to comply with
24  the Revised Program Guide standards and have a functional mental health program.

25      The Court should order that construction projects necessary for the MCSP EOP program
26  to function be accelerated so that they are completed as soon as possible, but no later than
27  January 1, 2008.

28

1
2
3

**VIII. THE DECEMBER PLAN SHOULD NOT BE SANCTIONED BY THIS COURT UNTIL THE NEW NAVIGANT POPULATION PROJECTIONS ARE RELEASED AND THE SPECIAL MASTER HAS DIRECT INPUT INTO THOSE PROJECTIONS AS PREVIOUSLY ORDERED BY THIS COURT**

4        The Navigant projections filed with this Court on June 30, 2006 (and subsequently

5   included as Enclosure I of the December 19, 2006 Bed Plan) received only the conditional

6   approval of this Court. The Court specifically ordered defendants to "include a process for

7   regular updates of bed need projections and ongoing planning for new mental health beds

8   based on subsequently revised projections." 10/20/2006 Order at 3:12-13 (Docket 1998). This

9   Court also ordered that defendants work with the Special Master and Navigant to "improve the

10  projections and ensure that all necessary data is collected to make future projections as

11  accurate as possible." 10/20/2006 Order at 2:24-3:2 (Docket 1998). Additionally, the Special

12  Master criticized defendants for their "lack of requisite expertise to correct...population

13  projections regularly and competently," and identified defendants' "clear[] need" for

14  "continuing input from individuals with competence and experience in developing and

15  updating projected bed needs for their mental health programs." *See* Special Master's

16  Supplemental Report at 11 (Docket 1969). The Navigant report itself cited four areas in which

17  data collection needed improvement, namely daily or weekly logging of HCPU daily census

18  data, monthly updates of DMH data into an ACCESS database, EOP database development,

19  and periodic clinical audits similar to the UNA. *See* December Bed Plan, Enclosure I at 4.

20       Despite these clear directives issued by the Court and the Special Master, as well as

21  Navigant's own identification of inadequate data, defendants did not engage Navigant's

22  services between June and December of 2006, the period of time during which defendants

23  created the December Bed Plan. Bien Decl. ¶ 2, 6. Nor has the office of the Special Master

24  been involved yet in this process. As the Special Master has noted, bed plan projections and

25  mental health needs vacillate greatly based on "projection-rattling variable[s]." Special

26  Master's Supplemental Report at 11 (Docket 1969) (referring to the termination of the CDCR's

27  contract with the Pitchess Detention Center as an example of such a variable). Another

28  variable likely to upset old bed plan projections is the recent passage of Proposition 83, known

1    defendants' December Plan fails to include updated Navigant data as previously ordered by this
2    Court, opting instead to simply import the June Navigant data into the plan.

3         Defendants' refusal to "improve the projections" or conduct a "regular update[] of bed need
4    projections" violates the Court's order and calls into question the sufficiency of the December
5    Plan. Plaintiffs learned during the January 8, 2007 phone conference that Navigant is currently
6    completing a round of new projections, slated for completion in the next several weeks and
7    possibly sooner. Bien Decl. ¶ 6. In light of the imminent arrival of Navigant's new data,
8    plaintiffs seek an Order from this Court requiring defendants to immediately produce the
9    Navigant data when it is available and to report on any changes to the Navigant June 20, 2006
10   projections that result. Plaintiffs also request an Order mandating the production of all further
11   Navigant projection data to the Court, the Special Master, and plaintiffs' counsel.

12                                       **CONCLUSION**

13        For all of the above reasons, plaintiffs respectfully request that the Court issue the
14   following orders:

15        1.    Defendants' proposal to shift responsibility for inpatient care away from the
16   Department of Mental Health and to the CDCR is denied. The responsibility for inpatient
17   mental health care at the ICF and acute levels of care must remain with the DMH until further
18   order of this Court and the State shall not exclude CDCR patients from DMH facilities outside
19   of CDCR prisons.

20        2.    Defendants' December Bed Plan is unacceptable as it has proposed various
21   changes to previously approved inpatient, MHCB, and EOP bed plans, without a new time line,
22   budget and construction plan that demonstrates that defendants will address the unmet need for
23   these resources on or before June 30, 2011. Defendants shall not close, delay, abandon or stop
24   work on any previously approved inpatient, EOP or MHCB programs or projects without prior
25   Court approval. Defendants have also failed to demonstrate that they have taken all available
26   measures to accelerate construction projects.

27        3.    Defendants' proposal to "rescope" the 350-bed CSP-SAC acute care project is
28   denied. Defendants shall move forward with the existing plans regarding the CSP-SAC acute

1  beds with construction to begin immediately and on an expedited basis, so that the beds may be
2  built, staffed and licensed for operation no later than June 30, 2011.  Defendants may propose
3  changes to this project in the future only under the following conditions:  The modified project
4  will still be constructed, staffed, licensed and fully operational by June 30, 2011 and
5  defendants demonstrate that they will meet or exceed the projected need for male APP beds
6  through this project or other projects on the same schedule.

7      4.     Defendants' proposal to stop construction of the CSP-SAC ICF unit is denied.
8  Defendants shall move forward with construction of that 128-bed intermediate care facility on
9  an expedited basis, so that the beds may be built, staffed and licensed for operation no later
10  than June 30, 2011.

11      5.     Defendants' proposal to stop construction of the Salinas Valley State Prison ICF
12  unit is denied.  Defendants shall move forward with construction of that 128-bed intermediate
13  care facility on an expedited basis, so that the beds may be built, staffed and licensed for
14  operation no later than June 30, 2011.

15      6.     Defendants' proposal to build the 50 bed MHCB unit at CMC as part of a larger
16  project with no budget or construction plan is denied.  Defendants shall develop a plan to
17  complete construction of move forward with construction of this unit separately from the
18  tenuous Consolidated Care Center construction.  Construction of this unit shall be on an
19  expedited basis, so that the beds may be built, staffed and licensed for operation no later than
20  June 30, 2011.

21      7.     Defendants' proposal to remove mental health programs from Pelican Bay State
22  Prison is denied.  Defendants shall refrain from removing the PSU, the EOP beds and any
23  MHCBs until further Order of this Court.  No such Order will be forthcoming in the absence of
24  explicit approval from the *Madrid* Court and Special Master Hagar.

25      8.     Defendants' proposal to remove the MHCB unit from CSP-Corcoran is denied.
26  Defendants shall maintain that unit as is and shall not reduce any MHCB capacity at Corcoran.

27      9.     Defendants' long range plan regarding the provision of EOP beds to male and
28  female prisoners is denied as inadequate.  Within 60 days of the date of this Order, defendants

1  shall issue a new plan to meet or exceed the projected need for male and female CDCR
2  inmates for EOP beds at all security levels, including a timetable, budget planning, and
3  resource allocations, so that the beds may be built, have adequate office and treatment space,
4  be fully staffed and operational no later than June 30, 2011.

5      10.  Defendants' proposal to stop construction of treatment and office space in the
6  EOP units at Mule Creek State Prison is denied. Defendants are ordered to accelerate
7  construction of that space to ensure completion as soon as possible, but no later than January 1,
8  2008. Defendants must produce, within 60 days of the date of this Order, updated interim
9  plans to address the ongoing shortages of MHCB and EOP beds between now and June 30,
10  2011.

11      11.  Defendants have not complied with this Court's October 20, 2006 Order
12  concerning bed plan projections and their contract with Navigant. Defendants must
13  demonstrate full compliance with those provisions, including producing the actual contract,
14  consulting with the Special Master and plaintiffs' counsel, and creating procedures for revisions
15  and updates to projections and construction plans, no later than March 1, 2007. Navigant, after
16  consultation with the Special Master, shall issue revised projections for all levels of care no
17  later than May 1, 2007, utilizing CDCR's Spring 2007 population projections, and shall update
18  the projections at least every six months. Navigant shall produce all future projection data to
19  the Court, the Special Master and plaintiffs' counsel.

20
21  Dated: January 16, 2007                    Respectfully submitted,
22
23
24                                             /s/ Michael W. Bien
                                               Michael W. Bien,
25                                             Rosen, Bien & Galvan, LLP
                                               Attorneys for Plaintiffs
26
27
28

-26-
PLAINTIFFS' RESPONSE TO DEFENDANTS' MENTAL HEALTH BED PLAN, DECEMBER 2006, NO.: CIV S 90-0520 LKK-JFM