1 | PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
2 | STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
3 | General Delivery
San Quentin, California 94964
4 | Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

5 | ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
6 | JANE E. KAHN Bar No.: 112239
AMY WHELAN Bar No.: 215675
7 | LORI RIFKIN Bar No.: 244081
SARAH M. LAUBACH Bar No.: 240526
8 | 315 Montgomery Street, 10th Floor
San Francisco, California 94104
9 | Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

10 | THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
11 | CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
12 | 600 Harrison Street, Suite 120
San Francisco, CA 94107
13 | Telephone: (415) 864-8848

**FILED**

JAN **1 6** 2007

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

14 | **SEALED**

15 | Attorneys for Plaintiffs

16 | UNITED STATES DISTRICT COURT

17 | EASTERN DISTRICT OF CALIFORNIA

18 |

19 | RALPH COLEMAN,

No.: Civ S 90-0520 LKK-JFM

20 | Plaintiffs,

21 | vs.

22 | ARNOLD SCHWARZENEGGER, et al.,

23 | Defendants

**DECLARATION OF MICHAEL W.
BIEN IN SUPPORT OF PLAINTIFFS'
RESPONSE TO DEFENDANTS'
MENTAL HEALTH BED PLAN,
DECEMBER 2006**

[FILED UNDER SEAL]

24 |

25 | **THIS DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO THE MODIFIED
PROTECTIVE ORDER ISSUED BY THE COURT ON JANUARY 12, 2007 AND MAY**
26 | **NOT BE COPIED OR EXAMINED EXCEPT IN COMPLIANCE WITH THAT
ORDER.**
27 |

28 |

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' MENTAL HEALTH BED PLAN,
DECEMBER 2006, NO.: CIV S 90-0520 LKK-JFM

1    I, Michael W. Bien, do hereby declare:

2        1.      I am a member of the Bar of this Court, and a partner in the law firm Rosen, Bien
3    & Galvan, one of the counsel of record for plaintiff class in this case. I have personal
4    knowledge of the matters set forth herein and if called as a witness I could competently so
5    testify. I make this declaration in support of Plaintiffs' Response to Defendants' Mental
6    Health Bed Plan, December 2006 (hereinafter "December Plan").

7        2.      I attended the All Parties meeting called by Special Master Keating on December
8    6, 2006, in Sacramento. In addition to the Special Master and his team, the meeting was
9    attended by representatives of plaintiffs' counsel, defense counsel, and numerous
10   representatives of CDCR, Department of Mental Health, Department of Finance and other state
11   agencies and officials. Defendants reported at the meeting that they had finally been able to
12   execute their contract with Navigant a few days earlier. Defendants had previously reported
13   that they had encountered various state government obstacles to contracting with Navigant and
14   had been trying to get them back on board since the summer. Defendants have not provided
15   plaintiffs' counsel or the Special Master (to my knowledge) with a copy of the executed
16   contract with Navigant.

17       3.      Defendants also reported during the All Parties meeting that they had only been
18   able to fill 3 or 4 of the 86 central office staff positions previously ordered by this Court and
19   that even if they were able to hire more staff members, they did not have the office space for
20   them.

21       4.      On January 8, 2007, my office had a conference call with Matthew Lopes, the
22   deputy Special Master, several of the Special Master's experts, and defendants, including high
23   level management staff from the CDCR, from the Department of Mental Health and from the
24   Department of Finance. John Misener, a staff member with Navigant Consulting Services, was
25   also on the call. The purpose of that call was to discuss defendants' December 2006 Bed Plan.
26   I asked defendants a series of questions about the proposed "Consolidated Care Centers"
27   during that call, including what the centers will look like, how they will be built, when they
28   will be completed and what planning stage they are in. Defendants stated that the new

-1-

1 | Consolidated Care Centers are only "concepts" in the very early development phase.
2 | Defendants were unable to specify any details at all about the new facilities, including whether
3 | the new construction would be freestanding units and whether that construction would occur
4 | inside or outside existing prison fences. Doug McKeever, the Program Director of the
5 | CDCR's Mental Health Services (a division with the Healthcare Services Department), stated
6 | during the call that defendants could not determine if the new construction would be
7 | freestanding units until they were aware of the *Plata* Receiver's plans for medical beds at the
8 | Consolidated Care Centers.

9 |     5.    When I asked defendants what deadline they had in mind for the Consolidated
10 | Care Centers, counsel for defendants said that while 2011 is their "goal," defendants could not
11 | say that the centers would actually be constructed by that date and that licensing of those units
12 | would be even further in the future.

13 |     6.    During the telephone conference on January 8, 2007, John Misener from
14 | Navigant Consulting Services confirmed that Navigant and CDCR had entered into a contract
15 | in December 2006 and that he was again able to work with CDCR. He also confirmed that
16 | Navigant had not done any work for CDCR on the December 2006 Bed Plan and that the
17 | Navigant information reflected in that Plan was based only on their work which was completed
18 | in June 2006. The Deputy Special Master also confirmed during this call that Navigant had not
19 | yet sought input from the Special Master's office about the Navigant population projections.
20 | Mr. Misener said that he was in the process of updating Navigant's projections but had not yet
21 | received all of the data he required to do so. He expected to receive some of the missing
22 | information about the acute and inpatient programs within the next couple of days. Although
23 | he could not say during the call when he would have complete data for all of the mental health
24 | programs, he estimated that he could have the new projections ready within about two weeks
25 | after receiving complete data.

26 |     7.    George Sifuentes, the Deputy Director of Facilities Management for the CDCR,
27 | was also on the telephone call on January 8, 2007. I asked Mr. Sifuentes to explain
28 | defendants' proposal to "rescope" the construction of 350 acute beds at California State Prison-

1 Sacramento. Mr. Sifuentes explained that by "rescoping," he intended to cancel the existing
2 project and use the funds to build the different project described for CSP-SAC in the plan,
3 which would save some time when compared to seeking legislative approval for a brand new
4 and different project. He also stated that CDCR was not currently proceeding with work on the
5 350 acute bed SAC unit and that, in fact, the CDCR had never really begun that work.

6      8.     I also asked defendants about their proposal to end their relationship with the
7 Department of Mental Health through which CDCR inmates receive inpatient psychiatric care
8 at DMH facilities and at DMH programs run inside of CDCR prisons. Defendants were unable
9 to provide much information about the transition or the reasons for it. DMH representatives
10 did state that they projected a large increase in Sexually Violent Predator Admissions as a
11 result of the passage of Proposition 83 (Jessica's Law) and that they were planning to make
12 room for that population by removing the CDCR population. Doug McKeever, the Program
13 Director of the CDCR's Mental Health Services (a division with the Healthcare Services
14 Department), said during the call that while defendants intend to eventually take over operation
15 of inpatient programs in CDCR facilities and remove all CDCR patients from DMH facilities
16 outside of the prisons, such as Atascadero and Coalinga, there were no plans to do so in the
17 near future and the transition would not take place until 2011, at the earliest.

18     9.     I have been involved with major litigation concerning, in part, DMH hospitals
19 used by CDCR prisoners, for more than 20 years. During that time I have toured DMH
20 facilities on many occasions and had numerous meetings with DMH officials and CDCR
21 officials responsible for the relationship between CDCR and DMH. I have also reviewed
22 numerous documents and other information setting forth plans, goals and information about
23 DMH and its programs. DMH has been a key part of the remedial plans to deliver the highest
24 level of mental health care to CDCR inmates for more than 25 years. The State's defense in
25 the *Gates* case to the inadequate psychiatric hospitalization provided to men at CMF was to
26 turn the hospital over to DMH for operation, and undertake a major renovation of S and Q-
27 Wings at CMF to add air conditioning and meet other DHS licensing standards for acute care.

28

1    As a result, the *Gates* Consent Decree addressed access and inappropriate exclusion from
2    DMH programs, but not the quality of care in DMH programs.

3        10.    The mission of DMH contrasts sharply with that of CDCR. While DMH is a
4    health care institution that runs hospitals to treat patients, the CDCR is a severely overcrowded
5    correctional department with the primary mission of public safety, punishment and, only
6    recently, rehabilitation. This is exemplified by the different level of care provided to inmates
7    with mental health problems in CDCR-run programs as opposed to DMH-run programs. In the
8    CDCR-run PSU (for EOP level patients with SHU terms), for instance, the inmate spends most
9    of his time locked in his cell, leaving only in mechanical restraints and under custodial escort
10   for "group therapy" in a room where he is locked in an uncomfortable small cage ("treatment
11   module") with other men in cages in a semi-circle. The same man, upon transfer to the DMH-
12   run high security inpatient program at Salinas Valley State Prison, SVPP, will move on his
13   own, without mechanical restraints or custody escort, from his housing unit to therapy rooms
14   where he participates in group therapy with other high custody men sitting uncuffed and
15   unchained in chairs, not cages. In the PSU, the men eat alone in their cells and exercise alone
16   or in small groups in "walk alone" cages. At SVPP the men eat together in a dining room and
17   exercise together on their own grassy yard.

18       11.    While access to and exclusions from DMH programs have continued to be a
19   problem over the years, plaintiffs and the Special Master in this case, as well as the Mediator,
20   Alan Breed, in the *Gates* litigation, have always viewed the quality of the care provided to
21   CDCR inmates in DMH facilities as exceptional. CDCR patients in DMH inpatient programs
22   receive a quantity and quality of mental health care far beyond any program in CDCR, and
23   with far less custodial intrusion into the mental health treatment and rehabilitation process.
24   DMH mental health programs were the first to provide CDCR inmates with advanced
25   psychotropic medications, such as Clozaril, which CDCR refused to provide until ordered by
26   this Court. DMH developed innovative programs such as the Day Treatment Program at CMF,
27   which CDCR has continually tried to shut down (the Day Treatment Program is left out of the
28   December Bed Plan). DMH hospitals are licensed by DHS and accredited by the Joint

1  Commission on Accreditation of Health Care Organizations. (DMH recently reported that they
2  are in the process of JCAHO accreditation for the SVPP and CMF DMH programs.) On the
3  other hand, CDCR has had great difficulty even obtaining DHS licenses for its small 10-20
4  Correctional Treatment Centers and MHCB's, a very low level licensing category that was
5  devised by and for CDCR itself. DMH, for all its faults, is the only part of State government
6  capable of building, staffing, operating and licensing the many hundreds of beds of inpatient
7  psychiatric facilities in California that need to be developed in the next ten years.

8          12.    On January 8, 2007, Lisa Tillman, counsel for defendants, sent my office a copy
9  of defendants' "Monthly Utilization Report for Acute Psychiatric Care Services at Atascadero
10 State Hospital and the Vacaville Psychiatric Program," from December 2006. As of the date
11 that report was generated, the CDCR was utilizing only nine of the twenty five acute hospital
12 beds available at ASH for CDCR prisoners.

13         13.    During the 17th round Coleman site visit, defendants provided my office with a
14 tour binder that included a "Mental Health Crisis Bed Admissions / Discharge Log" which
15 showed admissions to and discharges from mental health crisis beds between August 1, 2005
16 and March 31, 2006. That log shows that within that eight month time period, 133 CCCMS
17 inmates were referred to mental health crisis beds directly from the CSP-Corcoran SHU.
18 During this same eight month time period, COR referred 73 CCCMS inmates from the
19 administrative segregation unit, 72 CCCMS inmates from general population and 5 CCCMS
20 inmates from other units directly into mental health crisis beds. In addition, 20 more general
21 population, non-CCCMS inmates from all over Corcoran (including the SHU and
22 administrative segregation units) were admitted to MHCB beds during this period.

23         I declare, under penalty of perjury under the laws of the State of California and the
24 United States, that the foregoing is true and correct and that this declaration is executed in San
25 Francisco, California on January 16, 2007.

26
27                                              /s/ Michael W. Bien
                                                Michael W. Bien
28

-5-