IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    Plaintiffs,

vs.　　　　　　　　　　　　　　　　No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

## SPECIAL MASTER'S SUPPLEMENTAL REPORT ON THE STATUS OF THE SWAP OF ACUTE INPATIENT BEDS BETWEEN CALIFORNIA MEDICAL FACILITY AND ATASCADERO STATE HOSPITAL AND DELAYS IN TRANSFERS TO MENTAL HEALTH CRISIS BEDS

In an October 20, 2006 order, the Court directed the Special Master to monitor the swap of acute inpatient beds between California Medical Facility and the Department of Mental Health's (DMH) Atascadero State Hospital proposed by defendants as a key component in their plan to create 75 mental health crisis beds for California Department of Corrections and Rehabilitation (CDCR) inmates in need of a crisis level of mental health care. The "swap" was designed to exchange 25 acute inpatient beds in California Medical Facility for 25 acute inpatient beds created nearly two years earlier at Atascadero State Hospital to provide mental health crisis beds primarily for mental health caseload inmates in California Men's Colony and California Institution for Men. Neither of these two CDCR institutions, however, transferred nearly enough inmates in need of mental health crisis bed care to Atascadero State Hospital to fill the 25 available beds, largely because the hospital was not secure enough to house

most of the inmates eligible for transfer. Due to Atascadero State Hospital's inability to house high custody CDCR inmates (i.e., Level III and IV inmates who represent security risks for violence or escape), nearly half of the beds allocated for the transfers remained persistently vacant.

The defendants' proposed swap was based on the theory that the acute inpatient program at California Medical Facility could identify in its present and anticipated caseload population up to 25 seriously mentally ill inmates who could meet the custody criteria for placement in Atascadero State Hospital. The transfer to Atascadero State Hospital of 25 such inmates would free up 25 comparable beds in the acute inpatient program at California Medical Facility where Level III and Level IV inmates in need of a mental health crisis bed could be housed routinely.

The swap meant that the 130 beds comprising the acute inpatient DMH program at California Medical Facility (20 other beds in DMH's originally 150-bed program had earlier been set aside for use as mental health crisis beds by inmates in California Medical Facility) would now include 105 acute inpatient beds and 25 mental health crisis beds, while Atascadero State Hospital would lose its 25 acute inpatient beds designated as mental health crisis beds and gain 25 straight acute inpatient beds. The swap, thus, envisioned no diminution in the number of overall acute inpatient beds operated by DMH for CDCR, just a redistribution of the 25 beds to enhance the efficiency of their use. Similarly, while the swap provided no expansion in the number of mental health crisis beds available to CDCR, it promised fuller utilization of the 25 acute inpatient beds at Atascadero State Hospital formerly designated as mental health crisis

2

beds that turned out to be inaccessible for high custody CDCR inmates in need of crisis care.

Essential to the swap's success, however, was CDCR's consistent ability to fill the 25 acute inpatient beds transferred to Atascadero State Hospital with inmates qualified by their mental illness and custody level for placement there. If the acute inpatient beds relocated in Atascadero State Hospital could not be kept filled with lower custody inmates in need of acute inpatient treatment, the swap would only dilute further the stock of acute inpatient program beds available to CDCR inmates.

During the late summer of 2006, defendants revised the memorandum of understanding between CDCR and DMH to facilitate the swap; prepared a transfer plan, as well as procedures and forms for referrals; developed training materials for referrals to the mental health crisis beds at California Medical Facility; and scheduled initial transfers for appropriate inmates currently in the acute inpatient program at California Medical Facility to Atascadero State Hospital.

Data on referrals and admissions to the 25 new beds in each of the institutions involved in the swap from September 1 through December 31, 2006, indicated that the underlying premise for the swap, namely, the existence of a ready pool of lower custody CDCR candidates for the inpatient acute care component now located in Atascadero State Hospital, turned out to be inaccurate. During September 2006, eight inmates were admitted to the 25 acute care beds in Atascadero State Hospital, while just seven admissions occurred monthly in October and November along with nine more in December. Among the eight inmates transferred to Atascadero State Hospital in September, five were discharged respectively within three, ten, 17, 28 and 48 days; data

on discharges in the following months were not available. This meant that transfers of inmates at lower levels of custody from the acute inpatient program at California Medical Facility occurred less often than anticipated, leaving acute inpatient beds in Atascadero State Hospital empty.

Meanwhile, the number of CDCR inmates in need of a Mental Health Crisis Bed level of care admitted to the 25 beds relocated in California Medical Facility from elsewhere in CDCR was just four in September; 16 in October; ten in November; and 20 in December. The flow toward California Medical Facility was fuller than that toward Atascadero State Hospital, but still not enough to fill the available beds in either, especially since the length of stays in a mental health crisis bed unit were generally shorter than those in an acute inpatient program.

Prompted by the disappointing numbers, as well as persistent waiting lists for inmates referred to the acute inpatient program at California Medical Facility, defendants sought to obtain permission in early December to utilize greater flexibility in filling empty beds in the acute inpatient program designated as mental health crisis beds pursuant to the swap. After November data confirmed continuing mental health crisis bed vacancies, the Special Master gave defendants the requested permission, but required them to retain a small reserve of beds for a possible subsequent surge in admissions of inmates in need of a mental health crisis bed.

As of January 8, 2007, defendants reported that the greater flexibility provided allowed them to fill 18 of the 25 beds at California Medical Facility allocated in the swap, with 11 of those occupied by acute inpatient inmates and seven by mental health crisis bed inmates. Meanwhile, the waiting list for acute inpatient inmates

4

reportedly dropped from nine in early December to zero on January 8, while the waiting list for admission to the mental health crisis beds allocated under the swap also fell to zero. Defendants' January report did not indicate how many acute inpatient inmates were occupying the 25 acute inpatient beds allocated at Atascadero State Hospital pursuant to the swap.

The effectiveness of the swap in alleviating CDCR's critical shortage of mental health crisis beds was just one of several measures included in defendants' interim plan. CDCR fairly quickly activated and filled the former Locked Observation Unit at California Men's Colony, which, with its 42 beds, was temporarily approved by the Court for use as a mental health crisis bed unit. The use of 18 beds in the General Acute Care Hospital at California Institution for Men for mental health crisis beds was confirmed, and mental health crisis bed units at Kern Valley State Prison and California State Prison, Sacramento were occupied. But even with these additions and the reported absence of a waiting list for mental health crisis beds at California Medical Facility, it cannot yet be demonstrated that every seriously mentally disordered inmate in need of a mental health crisis bed is transferred within 24 hours of a referral to a crisis bed, nor is the department's critical shortage of mental health crisis beds resolved.

During the monitoring tours that have occurred and generated reports during implementation of the interim measures from September through December, the Special Master' visiting experts and monitors have noted and reported some improvement in access to mental health crisis beds, but the progress is uneven. Some institutions, e.g., California Conservation Center, California State Prison/San Quentin and

Pelican Bay State Prison, report reasonably dependable and timely access to mental health crisis beds.

Some others, such as California Correctional Institution and California Training Facility, seem to rely overmuch on local institutional alternatives, such as outpatient housing units (OHUs) or holding cells, rather than the prompt referral and transfer of inmates in crisis to *bona fide* mental health crisis beds. And a few units, often reception centers with large caseloads, such as North Kern State Prison and Wasco State Prison, show little improvement over the past 18 months and continuing reliance on completely inappropriate holding arrangements for inmates they cannot transfer expeditiously to mental health crisis beds.

The swap, then, has not helped alleviate defendants' inadequate stock of mental health crisis beds as much as anticipated. The later introduction of some flexibility in the allocation of available beds among mental health crisis and inpatient acute programs at California Medical Facility seemed to provide some initially beneficial boost, but it is too early to tell.

The Special Master recommends that he be required to continue monitoring the program through the end of April and report again in writing on the status of defendants' interim measures to relieve the mental health crisis bed shortage along with any appropriate recommendations at that time.

        Respectfully submitted,

        /s/
        _____
        J. Michael Keating, Jr.
        Special Master

January 22, 2007