IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    Plaintiffs,

    vs.                                  No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

## SPECIAL MASTER'S REPORT AND RECOMMENDATIONS ON DEFENDANTS' DECEMBER 2006 MENTAL HEALTH BED PLAN

I.    Introduction

        On December 19, 2006, defendants filed their Mental Health Bed Plan ("the Plan") in compliance with this Court's order of October 20, 2006. The Plan supersedes all previously submitted long-range mental health bed projects beginning with the August 2005 plan. It is the product of a group of multi-disciplinary representatives from components of the California Department of Corrections and Rehabilitation (CDCR), including the Division of Adult Institutions, Human Resources, Budget, Facilities Management, Legal Affairs Division and Correctional Health Care Services, together with representatives from the Department of Mental Health (DMH), Department of Health Services (DHS), Department of Personnel Administration (DPA) and the Department of Finance (DOF).

        The Plan presents CDCR's strategy for addressing the mental health program bed needs for all seriously mentally ill male and female inmates who have been

determined to require placement in an Enhanced Outpatient Program, a Mental Health Crisis Bed or in an inpatient acute or intermediate care facility. CDCR, together with DMH, intends to meet the ongoing, interim mental health needs of these inmates as fully as possible in their present programs and institutions during implementation of the Plan and all of its transition phases. The Plan looks for the coordination of mental health construction projects at institutions where the Plata receiver has stated his expectation of placing new medical beds. The Plan is also designed to utilize other existing mental health beds at these sites.

The Plan contains general background information on previous bed plans submitted to the Court, including the August 2005 Intermediate Care Facility Bed Plan; the April 2006 Statewide Mental Health Bed Plan; the June 2006 Interim Intermediate Care Facility and Mental Health Crisis Bed Plan; and the June 2006 Amended Statewide Mental Health Bed Plan. In addition, the Plan provides three enclosures, including the June 2006 Navigant Mental Health Bed Need Study (Enclosure I), the December 2006 Detailed Beds Spreadsheet for Male Inmate-Patients (Enclosure II) and the December 2006 Detailed Beds Spreadsheet for Female Inmate-Patients (Enclosure III).

Plaintiffs filed their objections to the Plan on January 16, 2007. They contend that the Plan is inadequate, violates existing Court orders regarding construction of mental health care facilities at various institutions and does not comply with the Court's October 20, 2006 order. They also object to the adequacy of proposed Enhanced Outpatient Program beds and to the proposed removal of mental health programs from Pelican Bay State Prison without the explicit approval of the Madrid Court and its Special

2

Master. Other more specific objections by plaintiffs are set forth below in discussion of related Plan features.

II.  Population Projections

Program population projections in the Plan were taken from a Navigant study that was based on spring 2006 general population projections for both males and females in the mental health program through June 2011. Defendants contend that their Plan provides sufficient capacity to meet or exceed mental health bed demands at the higher levels of care projected in the court-approved Navigant projections. The projections in the submitted plan include reserves of 513 male inmate beds and 43 female inmate beds over and above the Navigant projections to permit added program flexibility.

Projections for June 2011 estimate a need for 6,306 beds for male prisoners in programs providing more intensive levels of mental health care, i.e., those levels of care higher than the department's Correctional Clinical Case Manager System, which provide outpatient care for seriously mentally disordered inmates who, with appropriate care and medications, are able to function adequately in the general prison population. This figure includes 4,175 inmates in Enhanced Outpatient Program-general population beds, 675 inmates in Enhanced Outpatient Program-administrative segregation beds, 471 inmates in Psychiatric Services Unit beds, 268 inmates in Mental Health Crisis Beds, 229 inmates in inpatient acute care beds, 299 inmates in inpatient intermediate care beds (Levels I, II, III) and 264 Level IV or high custody inmates in inpatient intermediate care beds.

Projections for female inmates include 345 beds, with 262 Enhanced Outpatient Program-general population beds, 22 Enhanced Outpatient-administrative

segregation beds, 22 Mental Health Crisis Beds and 39 inmates in inpatient acute and intermediate care beds.

III.   Consolidated Care Centers: Overview

One goal of the Plan is to consolidate mental health care for male inmates in five institutions designated as Consolidated Care Centers. These five institutions are California State Prison, Sacramento (CSP/Sac), Richard J. Donovan Correctional Facility (RJD), California State Prison, Los Angeles County (CSP/LAC), California Institution for Men (CIM) and California Men's Colony (CMC). Defendants' selection of these sites was based on the location of existing mental health beds, current mental health bed expansion projects and the Plata receiver's preliminarily announced sites for increased health care beds.

Under defendants' consolidation strategy, existing and planned mental health beds at two additional institutions, Salinas Valley State Prison (SVSP) and California Medical Facility (CMF), would also be utilized. In addition, CDCR would maintain a subset of existing Mental Health Crisis Beds throughout the State and develop additional mental health beds as needed at the consolidated sites for male inmates. For female inmates, the Plan includes expanding mental health beds at the California Institution for Women (CIW). Mental health programs involving intensive levels of treatment will be limited to these eight CDCR institutions, a concentration that would require the shifting of some mental health programs from their current locations, as explained below.

Where appropriate under the Plan, mental health bed expansion projects currently underway and existing mental health programs at proposed Consolidated Care

4

Centers will continue to provide mental health services. California Men's Colony's existing 580 Enhanced Outpatient Program-general population beds and 54 Enhanced Outpatient Program-administrative segregation unit beds will be replaced with new construction. California Institution for Men (CIM) will return its existing 18 General Acute Care Hospital beds, used now as Mental Health Crisis Beds, to the medical program.

Defendants emphasize in the Plan that consolidation of mental health programs will improve their ability to provide the clinical services and staff necessary to meet mental health program demands. They also posit that the proposed Consolidated Care Centers are in closer proximity to urban areas where CDCR has been more successful at recruiting and retaining mental health staff. Defendants also point out that the proposed Consolidated Care Centers will offer a continuum of both medical and mental health levels of care at one location, which is likely to improve timely access to appropriate mental health services and reduce the need to transport inmates between prisons.

IV.    Important Features of the Plan

    1.    DMH

Under the Plan, CDCR will eventually cease to contract with DMH for the provision of inpatient acute and intermediate treatment for CDCR inmates. Instead, CDCR will itself operate all inpatient acute and intermediate care beds, including those currently operated by DMH within CDCR institutions. Notably, these changes will not take effect until CDCR has developed sufficient bed capacity at the inpatient acute and intermediate levels of care to assume effective responsibility for such treatment. The

5

Plan proposes that once sufficient inpatient acute and intermediate care beds are constructed and the department has created its own inpatient care resources, contracted beds in DMH hospitals will be returned to DMH, while DMH-operated beds in CDCR facilities will be returned to CDCR.

The Plan will return to DMH, which is expected to experience substantial population growth with the passage of Proposition 83 (Jessica's Law) last November, 346 beds, including 256 beds (25 acute and 231 intermediate) at Atascadero State Hospital; 50 intermediate beds at Coalinga State Hospital; five intermediate beds each at Napa and Metropolitan State Hospitals; and 30 women's beds at Patton State Hospital. CDCR in turn will reacquire 446 DMH-operated beds in CDCR facilities, including 150 acute and 120 intermediate and day treatment program beds at CMF and 176 temporary and permanent intermediate beds at Salinas Valley State Prison.

Plaintiffs object to this proposed shift of responsibility for inpatient care away from the DMH on the ground that it would require modification of the Revised Program Guide and a commitment by the State to provide significant additional management resources, planning and supervisory capacity to CDCR, none of which is budgeted for or otherwise addressed in the Plan.

2. <u>Construction Projects: Men's Institutions</u>

The Plan envisions major construction at all five of the proposed Consolidated Care Centers, as well as California Medical Facility and Salinas Valley State Prison. Plaintiffs object to the proposed changes to previously-approved program bed plans on the ground that defendants have not offered new timeline, budget and

6

construction plans that will address the interim unmet need for these bed capacities before June 30, 2011.

    (a)    <u>California State Prison, Sacramento (CSP/Sac)</u>

The Plan proposes to re-design the 350-bed inpatient acute care project at CSP/Sac, which was previously proposed in the Statewide Mental Health Bed Plan of April 2006 ("the April 2006 Plan"). The Plan seeks to change that project into a multi-level, 432-bed capacity package, together with office and treatment space, with 336 Enhanced Outpatient Program-general population beds, 26 Mental Health Crisis Beds, 46 inpatient intermediate care beds and 24 high custody inpatient intermediate beds. Projected date of completion for all of this work is June 2011. In addition, already-authorized and preliminarily-designed office and treatment space connected to existing Enhanced Outpatient Programs at CSP/Sac will continue with no changes.

Plaintiffs object to this proposal to modify or stop the originally proposed 350-bed CSP/Sac inpatient acute care project.

    (b)    <u>Richard J. Donovan Correctional Facility (RJD)</u>

The Plan proposes building at RJD a 696-bed facility with 390 Enhanced Outpatient Program-general population beds, 62 Enhanced Outpatient Program-administrative segregation beds, 128 Psychiatric Services Unit beds, 16 Mental Health Crisis Beds, 30 inpatient acute beds, 46 inpatient intermediate beds and 24 high custody inpatient intermediate beds.

    (c)    <u>California Men's Colony (CMC)</u>

Under the Plan, CMC would have a 1,073-bed facility with 720 Enhanced Outpatient Program-general population beds, 125 Enhanced Outpatient Program-

administrative segregation beds, 128 Psychiatric Services Unit beds, 30 inpatient acute beds, 46 inpatient intermediate beds and 24 high custody inpatient intermediate beds. The existing 580 Enhanced Outpatient Program-general population beds and 54 Enhanced Outpatient Program-administrative segregation beds currently at CMC will be released for general population use. The proposed CMC project does not include the 50-bed Mental Health Crisis Bed unit project, which will proceed as originally proposed. With the Court's approval, defendants propose to add those 50 beds to the project which would increase total bed capacity to 1,123 beds.

Plaintiffs object to inclusion of the 50-bed Mental Health Crisis Bed unit on the ground that the Plan does not specify budgetary appropriations or construction plans for completion of the project.

    (d)    <u>California Institution for Men (CIM)</u>

The Plan proposes a 975-bed facility including 720 Enhanced Outpatient Program-general population beds, 125 Enhanced Outpatient Program-administrative segregation beds, 30 Mental Health Crisis Beds, 30 inpatient acute beds, 46 inpatient intermediate beds and 24 high custody inpatient intermediate beds. The existing 18 General Acute Care Hospital beds presently used for Mental Health Crisis Beds at CIM will be returned to the medical program.

    (e)    <u>California State Prison, Los Angeles County (CSP/LAC)</u>

The Plan proposes a 449-bed facility including 270 Enhanced Outpatient Program-general population beds, 71 Enhanced Outpatient Program-administrative segregation beds, 38 Mental Health Crisis Beds, 46 inpatient intermediate beds and 24 high custody inpatient intermediate beds plus accompanying treatment and office space.

This project has already received legislative authorization, is in preliminary design stage and is projected for completion in June 2011. The proposed 270 Enhanced Outpatient Program-general population beds are in addition to the 150 Enhanced Outpatient Program-general population beds proposed for conversion from existing general population beds in the April 2006 Plan.

      (f)    <u>Salinas Valley State Prison (SVSP)</u>

The Plan proposes to proceed without changes to the construction of a facility for an additional 64 inpatient intermediate care beds for use by Level IV high custody inmates at SVSP. That project has been authorized by the Legislature and is on schedule with completed construction expected by March 2009. The Plan also recommends changes to the 128-bed inpatient intermediate care project at SVSP originally proposed in the April 2006 Plan. Revisions include construction of a 70-bed Enhanced Outpatient Program-administrative segregation unit facility that will incorporate the 45 Enhanced Outpatient Program-administrative segregation beds currently in the D-1 and D-2 housing units at SVSP, plus 25 new Enhanced Outpatient Program-administrative segregation beds. It further proposes modification of the vacated D-1 and D-2 units for an additional 96 Enhanced Outpatient Program-general population beds along with accompanying office and treatment space to create an additional 166 Enhanced Outpatient Program-general population beds at SVSP.

Plaintiffs object to the proposed changes in construction at the SVSP inpatient intermediate care facility.

(g) <u>California Medical Facility (CMF)</u>

Under the Bed Plan, construction of an additional 50 Mental Health Crisis Beds at CMF that is already in progress will continue, with completion projected for December 2007. In addition, construction of an additional 164 inpatient intermediate beds for Level IV high-custody inmates under the Statewide Mental Health Bed Plan of April 2006 will continue as originally proposed. This project is in the planning phase with completion projected for June 2011.

Completion dates for all projects other than those in CSP/Sac, CMF and SVSP were not determined as of the time the Plan was submitted. The Plan also reports that conversion of the temporary 36-bed inpatient intermediate care facility at CMF and the temporary 56-bed inpatient intermediate care facility at SVSP have been completed.

3. <u>Construction Projects – Women's Institutions</u>

The sole women's Consolidated Care Center envisioned in the Plan is at the California Institution for Women (CIW). The Plan proposes a 203-bed facility, including 168 Enhanced Outpatient Program-general population beds, 15 Enhanced Outpatient Program-administrative segregation beds, three Mental Health Crisis Beds and 17 inpatient acute/intermediate beds, all in addition to the 25 inpatient intermediate beds previously proposed in the April 2006 Plan. The Plan calls for converting existing space at CIW to accommodate the proposed Enhanced Outpatient Program-general population and Enhanced Outpatient Program-administrative segregation unit beds and modifying the original 25-bed acute/intermediate proposal in the April 2006 Plan. This will increase total acute/intermediate beds at CIW to 45.

The Plan also anticipates availability of space for women's Enhanced Outpatient Programs at CIW as a result of a planned 4,500 community-based female offender reform effort. These community facilities are expected to be phased in during FYs 2007-08 and 2008-09 and may be activated as early as December 2007.

4. The Impact of the December 2006 Bed Plan on Previously Proposed Construction

Projects that were proposed previously under the Intermediate Care Facility Bed Plan of August 2005 and the April 2006 Plan are expected to be affected by the Plan as described below.

(a) Projects to Continue Without Change

Construction of the 64-Bed inpatient intermediate facility at CMF; conversion of general population beds to 150 Enhanced Outpatient Program-general population beds and construction of additional office and treatment space to support the Enhanced Outpatient Program at CSP/LAC; and construction of office and treatment space for the Enhanced Outpatient Program at CSP/LAC will continue without regard to the Bed Plan.

(b) Projects to be Modified to Increase Available Mental Health Beds

The previously proposed 350-bed inpatient acute care project at CSP/Sac will be modified to increase the total number of beds to 432; the 28-bed inpatient intermediate care program at SVSP will be modified to provide 70 Enhanced Outpatient Program-administrative segregation beds; and the 25-bed inpatient acute/intermediate facility at CIW will be modified to increase the total number of available beds to 45.

(c) <u>Projects to be Halted</u>

A 128-bed inpatient intermediate unit at CSP/Sac, an EOP-general population office and treatment space project at Mule Creek State Prison (MCSP), a conversion of the P-2 housing unit at CMF into a permanent 36-bed inpatient intermediate care facility, and a project to convert the D-5 and D-6 housing units at Salinas Valley State Prison into a permanent 112-bed inpatient intermediate care facility will all be halted under the Plan.

Plaintiffs object to the proposal to stop construction of the EOP-general population treatment and office space at MCSP.

5. <u>Mental Health Bed Reductions at Other CDCR Institutions</u>

A major component of the Plan would be the removal of mental health programs from CDCR institutions other than the eight identified with key roles in the new configuration, resulting in a reduction in existing mental health beds by 1,933. The defendants state that the bed reduction process at these other CDCR institutions will be monitored to ensure that the mental health needs of inmates at the affected institutions are met. Reductions of mental health bed capacity at affected institutions, moreover, will not begin until sufficient new capacity is constructed and operable under the Plan. Once the new facilities are constructed and implemented sufficiently, replaced beds will be turned over to other CDCR use.

The Plan's reduction process will allow CDCR to return a substantial number of beds heretofore occupied by mental health caseload inmates to the use of general population, non-caseload inmates. Returns would include 36 temporary inpatient intermediate beds at CMF; a total of 670 beds at CMC, including 580 Enhanced

12

Outpatient Program-general population beds, 54 Enhanced Outpatient Program-administrative segregation beds and 36 temporary Mental Health Crisis Beds; SVSP would return 157 mental health beds, including 45 Enhanced Outpatient Program-administrative segregation beds and 112 temporary inpatient intermediate care beds; California State Prison, Corcoran would return 227 mental health beds, including 150 Enhanced Outpatient Program-general population beds, 54 Enhanced Outpatient Program-administrative segregation beds and 23 Mental Health Crisis Beds; MCSP would return 549 mental health beds, including 510 Enhanced Outpatient Program-general population beds, 36 Enhanced Outpatient Program-administrative segregation beds and three Mental Health Crisis Beds; Pelican Bay State Prison would return 197 mental health beds, including 64 Enhanced Outpatient Program-general population beds, 128 Psychiatric Services Unit beds and five Mental Health Crisis Beds; and California State Prison, San Quentin would return 36 Enhanced Outpatient Program-administrative segregation beds. In addition, the following institutions would return all or a portion of their existing Mental Health Crisis Beds to medical care use: High Desert State Prison: five beds; Kern Valley State Prison: 12 beds; North Kern State Prison: five beds; California Substance Abuse Treatment Facility: 11 beds; California State Prison, Solano: nine beds; and Wasco State Prison: one bed.

6.     Fiscal Impact and Coordination with Plata and Madrid

Implementation of the Plan will require requests for funding for planning, design, construction and staffing, as needed. Defendants indicate they will prepare an activation schedule, including staffing requirements, once the Plan is approved by the Court. They further propose that once project plans have been finalized, they will seek the

necessary funding and authorization, as needed. Defendants point out that because the Plan affects medical and mental health services at Pelican Bay State Prison and delivery of health services state-wide, it will require concurrence by the Plata and Madrid courts prior to implementation.

7. Projection and Bed Planning Updates

Defendants report that CDCR has received approval to contract with Navigant for regular updates of the department's mental health bed projections through the end of 2009. Under the contract, Navigant will produce five-year mental health bed forecasts each spring and fall and participate in three meetings per year with a task force to address overall forecasting efforts. It will also be required to prepare an annual report on the accuracy of its projections. During the final contract year, Navigant will train Division of Correctional Health Care Services staff to enable CDCR to project its own mental health bed figures after the contract expires. Defendants also state that they are developing a detailed project plan, which would require re-convening the mental health bed planning group following the completion of each five-year mental health bed forecast.

**Recommendations**

At first glance, defendants' latest bed plan seems to be just another entry in a long list of plans for future bed plans. Like its many predecessors, the Plan is full of explanations of which beds will be located here or there or re-located from one facility to another, but short on the specifics of when and how construction will occur and programs staffed. In fact, however, this submission is even less than a plan for a future plan; it is, more accurately, a concept paper. It introduces two major and far-reaching changes in CDCR's handling of mental health services that will radically alter defendants' delivery of mental

14

health services and seeks the court's approval of the changes so the department will be able to begin planning their implementation.

There is no effort to conceal this agenda; the intent is clear. In paragraph III F of their Plan, which deals with its fiscal impact, defendants assert baldly:

> The Administration will request resources as needed to implement this plan including resources for planning, design, construction, and staffing. An activation schedule, including appropriate staffing complements, will be prepared once this plan has been approved by the *Coleman* court.
> At p. 17.

The first underlying concept for which defendants seek approval envisions CDCR assuming responsibility for the delivery of inpatient acute and intermediate care and ending its reliance on DMH for the provision of inpatient care. The second calls for a significant restructuring and consolidation of CDCR's delivery of all of its more intensive mental health treatment programs.

The proposed divorce of CDCR and DMH is a concept that possesses possible advantages and grave danger. The association of the two agencies has long been a difficult one. The hospital structures within which DMH provides most of its services to CDCR inmates are not secure enough to accommodate inmates in need of a high level of custody. They are mental hospitals, not prisons. As a result, an increasing number of DMH beds allocated for use by CDCR are inaccessible to a rapidly growing segment of CDCR's mental health caseload critically in need of inpatient care. By assuming responsibility for the delivery of inpatient care to its own inmates, CDCR anticipates resolving its long-standing problem of accessibility to inpatient care.

On the other hand, CDCR has no track record of providing inpatient mental health treatment to seriously mentally ill inmates. The fundamental purpose of correctional

institutions is security; CDCR institutions are prisons, not mental hospitals. CDCR's reiterations of dedication to rehabilitative goals, expressed most recently in its name change, have simply sunk beneath the inexorably rising tide of population that has reached 200 percent of capacity and swallowed up every inch of institutional space formerly available for rehabilitative activities. And there is a genuine and serious question whether prisons generally, much less CDCR's vastly overcrowded and troubled prisons, can create an appropriately therapeutic milieu for inmate/patients desperately in need of the most intensive level of clinical psychiatric treatment. This is a correctional system in which medical and mental health care and dental services have all been found recently incapable of meeting even the Eighth Amendment's ban against inflicting cruel and unusual punishment.

Finally, other than simply asserting CDCR's desire to assume responsibility for the provision of inpatient mental health treatment and identifying where in CDCR inpatient acute and intermediate beds might be located, the Plan offers no roadmap for such an undertaking. In a mental health headquarters currently staffed with no more than a half dozen planners, managers and supervisors, all of them struggling heroically to manage CDCR's existing outpatient and residential mental health programs, who will plan and direct the creation of an 866-bed inpatient mental health program within CDCR during the next four years? What commitments of administrative personnel and expertise will be necessary to create the infrastructure to support such an undertaking? How will the department recruit and retain the clinicians necessary to staff inpatient programs with much richer staffing needs? How will the custody components of CDCR respond to this new mission as a secure mental hospital for nearly a thousand seriously mentally ill inmates?

These issues are neither raised nor addressed in the defendants' Plan, yet, presumably, they look to the court for approval of the concept. Instead, the Plan restricts its discussion of the concept to the possible location of inpatient beds within CDCR and an enumeration of the beds presently occupied by CDCR inmates that will be returned to DMH. That is not an adequate basis for an evaluation of the proposed concept.

The second concept, the consolidation of CDCR's residential and crisis intervention programs, is less radical than the elimination of DMH as a provider of inpatient care, but it, too, represents a fundamental change in defendants' delivery of mental health care. Its implementation will require the dismantling and relocation of some relatively successful mental health programs, like the Psychiatric Services Unit at Pelican Bay State Prison, a troubling consequence in a system with too many struggling programs. The need for joining the execution of the projected consolidation with the development of defendants' medical response to Plata, moreover, introduces inevitable uncertainty in the short run because CDCR's hospital construction planning depends on the results of the bed needs assessment currently being undertaken by Abt Associates, not to mention the ability and/or willingness of the medical side of the house to accommodate its needs to those of mental health. In the absence of a firmer understanding of the options for cooperation and coordination with Plata construction plans, the details of defendants' consolidation plans necessarily remain uncertain.

The business of identifying CDCR's mental health bed needs began in 1998. Not until early 2005 did CDCR comprehend fully its needs for residential, crisis care and inpatient levels of mental health care. It has taken another two years to develop this latest "Plan," which is fundamentally a preliminary concept paper, approval of which is needed

17

before defendants, confessedly, can identify and request resources for planning, design, construction and staffing the eventual, actual plan. Another fundamental problem, of course, is the fact that the mental health component of defendants' Division of Correctional Health Care Services presently lacks any meaningful planning resources; the same tiny cadre of managers responsible for coping with day-to-day operations and crises is somehow expected simultaneously to plan the system's future.

Defendants' Plan simply does not provide enough information to justify the Court's approval of the two major proposed underlying changes, namely, CDCR's assumption of responsibility for all inpatient mental health from DMH and the consolidation of all intensive mental health programs, with the exception of 72 Mental Health Crisis Beds, in just eight CDCR institutions.

Plaintiffs attacked both of the proposed major changes in the delivery of mental health services on many of the same grounds just rehearsed. They also interposed a number of other objections, most of them related to the Plan's apparent abandonment of construction projects arguably approved by the Court in 2006. Confirmation of several of such projects seems critical, given the continuing uncertainty over the contours of defendants' final plan. Two Mental Health Crisis Bed units, with 50 beds each, are presently under construction or about to begin construction at California Medical Facility and California Men's Colony respectively. They must be completed as expeditiously as possible and independently of any decision on the rest of the defendants' pending Plan.

The Plan also calls for termination of the development of treatment and office space for Enhanced Outpatient Programs at Mule Creek State Prison because those programs are slated to be relocated elsewhere in 2011 or whenever replacement construction projects

are actually finished. Meanwhile, however, CDCR has just opened 330 additional Level III and IV Enhanced Outpatient Programs for special needs, i.e., protective custody, inmates, at Mule Creek State Prison. Defendants should be required to complete the scheduled construction of permanent treatment and office space or provide adequate temporary treatment and office space at Mule Creek State Prison to accommodate the expanded mental health programs until they are actually removed from the facility.

Plaintiffs' insistence on the continued development of a 350-bed acute inpatient program at California State Prison, Sacramento, on the other hand, seems misguided, since the 2006 Navigant bed needs projection, approved by the Court in the October 20, 2006 Order, anticipated a need for just 224 acute inpatient beds. Plaintiffs also seem to have misread the October 20, 2006 Order, which "adopted in full" Navigant's early 2006 bed needs projections and then directed the Special Master and his experts to work with Navigant "to improve the projections and ensure that all necessary data is collected to make future projections as accurate as possible." At pp. 2, 3. Plaintiffs' argument that defendants' Plan is invalid and a violation of the October 20 2006 Order because it was based on the 2006 projections rather than a new set of projections is not sustained by the plain language of the order. Meanwhile, the Special Master's experts will be meeting and working with Navigant this month to improve the 2007 projections.

Based on the foregoing discussion, the Special Master makes the following recommendations:

1. Defendants should be directed to complete and occupy the 50-bed Mental Health Crisis Bed units at California Medical Facility and California Men's Colony as soon as possible; they should also be directed to complete the scheduled construction of permanent treatment and office space at Mule Creek State Prison or provide adequate temporary treatment and office space there to accommodate existing and newly opened mental

19

       health programs until replacement programs have been completed and occupied elsewhere in CDCR.

2. The Court should schedule a hearing within 30 days at which defendants should be required to demonstrate the reasonableness and feasibility of their proposals to assume responsibility for the provision of inpatient mental health services in place of DMH and reorganize and consolidate their delivery of existing mental health services.

The pace of development of defendants' plans to provide sufficient institutional and programmatic resources to meet the needs of CDCR's most seriously mentally ill inmates is appallingly slow. The consequences of inadequate resources to plan, supervise and manage effectively mental health services dramatically inhibit the system's capacity to respond to obvious needs with meaningful responses. The adversarial process is not an ideal forum in which to make decisions on the organization of services and the personnel and material resources essential for the delivery of basic correctional services, but no one else with the political authority to do so seems willing and/or able to undertake the task meaningfully.

                                             Respectfully submitted,

                                             /s/

                                             _____

                                             J. Michael Keating, Jr.
                                             Special Master

February 7, 2007