IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    Plaintiffs,

       vs.                       No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

## SEVENTEENTH MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS

## PART A

       As indicated in the preceding long-delayed monitoring report, the seventeenth round report will be divided into smaller installments covering different categories of California Department of Corrections and Rehabilitation (CDCR) institutions. This first installment, Part A, will focus on institutions where the defendants' Mental Health Services Delivery System (MHSDS) serves the largest populations in the most complex array of programs, including Correctional Clinical Case Management System (3CMS), Enhanced Outpatient Program (EOP), Psychiatric Services Units (PSUs), EOP administrative segregation hub units, Mental Health Crisis Bed (MHCB) units and DMH acute and intermediate inpatient programs. Subsequent installments will group institutions with large 3CMS programs, reception centers and Security Housing Units, as well as women's institutions, desert institutions and a small group of miscellaneous facilities.

The goal of these multiple reports is to expedite finalization and submission of the 17th round report. Site visits for the preceding 16th round report were completed in February 2006, but due to variety of causes, principally a steady stream of intervening controversy and litigation on a range of critical issues throughout 2006, the final report for the round will not be submitted to the court until mid-December. This means that an analysis of data collected on compliance during the last half of 2005 and the first two months of 2006 is only now being submitted to the court. Our aim is to cut that delay at least in half with this new approach to reporting. By dint of more careful scheduling of site visits and jump starting the analysis of data and report writing, as well as the assignment of additional personnel to the reporting task, the goal is to submit final reports to the court within 60 days of the completion of future rounds.

The division of the report into smaller components also allows a more thoughtful analysis of the shared problems and achievements of institutions with similar MHSDS programs and populations. Covering compliance in all 33 CDCR institutions in one document inevitably resulted in generalizations that were not always useful for the various subsets of facilities with like programs because they were based on data from too many institutions with widely diverse programs and experiences.

This report, then, contains the monitor's findings relative to compliance with the Program Guide for mental health services and each institution's own Corrective Action Plan (CAP) for eliminating local deficiencies in the delivery of mental health services in eight institutions, including, in alphabetical order, California Medical Facility (CMF), California Men's Colony (CMC), California State Prison, Los Angeles County (CSP/LAC), California State Prison, Sacramento (CSP/Sac), California State Prison, San

Quentin (SQ), Mule Creek State Prison (MCSP), R.J. Donovan Correctional Facility (RJD) and Salinas Valley State Prison (SVSP). Monitoring teams visited these institutions from March through July, 2006. Multiple visits occurred in SQ and SVSP.

The general format for this partial report will remain basically the same as for the larger ones in the past. An institutional summary of compliance for each CDCR institution is provided, which includes a description of current staffing and staffing vacancies; a list of resolved CAP problems when appropriate; discussion of the institution's progress, or lack of progress, in meeting requirements related to quality management, medication management, mental health input into the disciplinary process and transfers to more intensive levels of mental health care; identification of problems cited in the institution's CAP and targeted for elimination; and a brief concluding summary of the institution's overall performance during the monitoring period. A comparative analysis of compliance among all of the eight covered facilities follows, along with recommendations springing from the analysis.

The nature of some issues that were the focus of intense scrutiny in the preceding round, including the use of video monitoring to observe inmates on suicide watch or precaution in MHCB units or Outpatient Housing Units (OHUs) and the application of cardio-pulmonary resuscitation (CPR) in emergency medical interventions, shifted during the 17th round as policy changes were adopted by the defendants and incorporated into departmental practices. Another complication arose from the court's formal approval in March 2006 of the revised Program Guide containing enhanced standards for mental health care applicable in all CDCR institutions. The defendants published their plan for the adoption of the new guidelines in April, and much of the

3

early summer was consumed in a struggle to obtain sufficient additional mental health staffing to implement them effectively. That effort succeeded during the special legislative session at summer's end, but the 551 additionally allocated permanent and temporary mental health positions are only now beginning to make an appearance at the institutional level. Thus, all CDCR institutions have been struggling over the past seven months to meet substantially expanded service requirements without the additional clinical staffing necessary for their implementation.

As in the past, administrators and mental health staff at the visited institutions continued to cooperate fully with the monitoring process. Also, while the data collected and findings discussed in this report are the product of many members of different monitoring teams, references to various monitors throughout this report will be singular rather than plural. Clinical judgments of the monitor's psychiatric experts are explicitly attributed to an expert.

### Institutional Summaries

### California Medical Facility
July 26, 2006 – July 28, 2006

The overall vacancy rate among mental health staff remained at about 20 percent. The vacancy rate among clinical positions, including staff psychiatrists, psychologists, social workers, psych techs, occupational therapists and recreation therapists was 22 percent. Contractors and an occupational therapist lent by the medical department covered the vast bulk, some 94 percent, of those vacancies.

While the chief psychiatrist position was filled, one of the two senior psychiatric positions was vacant. Two of 11 positions for staff psychiatrists were vacant, with contracted psychiatrists covering the equivalent of 1.2 positions.

4

Among case managers, positions for the chief psychologist and all six senior psychologists were filled. Seven of 27 clinical psychologist positions were vacant, but the equivalent of 6.1 of those was covered by contractors. Both senior psych social work positions were filled, while six of 18 psych social worker positions were vacant, but, again, the equivalent of 5.2 of these vacancies were covered by contractors. One of five recreation therapist positions was vacant, but the equivalent of 2.1 was covered by contractors. All but 1.37 of CMF's 19.37 psych tech positions were filled; staff reported that 16 MTA positions had been reclassified to psych tech positions following the freeze on hiring of MTAs imposed by the Plata receiver.

While the foregoing statistics suggested that, after contracting, CMF was adequately staffed for its mental health population, mental health staff at all levels insisted unanimously that it was difficult to complete their required duties, resulting in increasing levels of professional frustration. EOP case managers reported high stress, and 3CMS case managers in particular, claimed to be hard pressed. Administrators attributed much of the strain to the lack of relief coverage for allocated staff. When case managers were on sick or vacation leave, other case managers had to cover the caseloads of their absent colleagues as well as their own.

At the end of July 2006 the caseload population was 1,253, including 646 EOP and 474 3CMS inmates. There were 72 EOP and 30 3CMS inmates in administrative segregation. In the DMH-operated acute inpatient program (DMH/APP), up to 20 beds were set aside to accommodate CMF inmates in need of an MHCB level of care. Meanwhile, two housing wings formerly occupied by CMF were being converted

to house DMH intermediate inpatient programs. Each wing had a capacity of 32 inmates. One wing was already operating, and the other was slated to open in January 2007.

During the monitoring period, ground was broken for construction of the long planned stand alone 50-bed MHCB unit. In March 2006, a wing of the General Acute Care Hospital (GACH) was designated as a Mental Health Outpatient Housing Unit (MHOHU) to provide medical treatment for inmates from SQ's reception center. A second wing of the GACH was being converted to a 21-bed licensed elder care facility.

Quality Management:

CMF's mental health component developed its own quality management process that, for the most part, functioned independently of the institution's overall health care quality management structure. A coordinator of standards and compliance oversaw the mental health quality management process. Mental health quality management meetings were attended by supervisors, and selected program indicators and CAP issues were tracked regularly. Line mental health and custody staff were not usually involved in quality management activities. Aside from a series of multidisciplinary QITs chartered to solve problems associated with medication in EOP units, QITs were used infrequently to identify problems, collect facts and develop remedies.

Supervisors used quality management audits effectively to monitor and supervise the EOP. Available audits focused on accurate records of hours of EOP treatment, cancellations in the EOP, quality of weekly case manager contacts in EOP, quality of treatment plans and psychiatric practices. Quality management activities related to the 3CMS program seemed restricted to the issue of medication non-compliance. Staff was informed routinely of the results of quality management audits

related to their caseloads. The disciplines of psychiatry and psychology continued to be engaged in peer review.

The suicide prevention committee met monthly and minutes were maintained. Meetings were not well attended by custody staff. A representative from DMH usually attended, but meeting records contained no reference to substantive discussion of CMF's access to MHCBs in the DMH/APP, dissatisfaction with which was widespread among CMF clinicians. The committee reviewed some cases involving discharges of CMF referrals from DMH for assaultive behavior and tracked incidents involving self injury, but did not review them.

Suicide CAPs generated in the follow-up to two December 2005 suicides were completed in a timely manner. Most of the recommendations in both suicide reviews were adopted. DOT deficiencies were cited in one case where an inmate overdosed on hoarded medications, and MTAs subsequently received additional training on DOT protocols.

Medication Management:

Audits of medication continuity, DOT administration and parole medication were not available. Staff believed that medication orders were not processed promptly due to staffing shortages in the pharmacy.

Medication was administered five times daily in the EOP. The arrival of medication carts sometimes interrupted groups that met at noon and 2:00 p.m. Solid doors and low lighting hindered the use of DOT in administrative segregation. Staff reported that HS medications were distributed in the EOP at 8:00 p.m. or later.

Staff also reported that medication continuity on discharge from DMH programs improved, although no confirming audits were provided. Some interviewed inmates, however, claimed that their medications were interrupted when they were discharged from DMH to administrative segregation.

Medication non-compliance outside of the EOP was a priority during the monitoring period. Staff reported that medication continuity among general population 3CMS inmates improved due to the addition of two psych techs, who tracked impending expirations and responded to referrals for non-compliance. Non-compliant inmates reportedly were also subject to Plata requirements governing failure to appear at pill lines.

Staff expressed their belief that medication errors were under-reported despite a 30 percent increase in the number of errors reported.

Mental Health Assessments for the Disciplinary Process:

CMF improved its handling of mentally ill inmates charged with disciplinary infractions. Documentation improved, and hearing officers appeared to consider the clinical conclusions in mental health assessments. Institutional tracking records indicated that CMF issued 1,335 RVRs during the first six months of 2006, including 278 for EOP inmates, 80 for inmates in DMH programs and two to MHCB inmates. In addition to these mandatory referrals, custody staff made 66 additional discretionary referrals. Five of them involved non-caseload inmates and the rest, 3CMS inmates.

The monitor's review of a sample of logs and completed RVR packets indicated that mental health assessments began genuinely to impact the disciplinary

process during the monitoring period. A number of RVRs were dismissed and penalties were mitigated based on mental health assessments.

CMF had a coherent set of draft policies and procedures on inmate sexual misconduct by July 2006. The expressed intent of the policy was to provide clinical resources for the assessment, treatment and monitoring of indecent exposure or "exhibitionistic" behavior associated with a serious mental disorder and/or a diagnosis of exhibitionism. It directed clinical and custody staff to work together in the IDTT process to assess inmate behavior, collect data, share information and develop clinical and custody interventions to reduce the occurrence of behavior involving indecent exposure. Mental health staff developed a treatment protocol specifically for indecent exposure. During the first seven months of 2006, 20 of 28 inmates charged with indecent exposure were screened and had an IDTT meeting. IDTTs referred seven inmates for a formal evaluation. During the site visit, the monitor's expert noted one case that should have been screened but was overlooked. Four inmates were diagnosed with exhibitionism. One began treatment in July 2006, but the other three had not yet begun treatment.

Transfers:

Because CMF did not have an MHCB, DMH set aside up to 20 beds in the DMH/APP to provide an MHCB level of care to CMF inmates. A year earlier in July 2005, access to crisis beds was described as improved but still inadequate. In July 2006, the monitor's expert found EOP inmates who clearly needed to be stabilized, but were not being referred to the DMH/MHCBs. CMF staff reported that access to the MHCB was limited, with only five to eight crisis beds functionally available at any one time.

While conflicting data from different sources impeded accurate analysis, it appeared that CMF placed fewer than fifteen inmates per month in the DMH crisis beds.

The failure of CMF clinicians to make referrals when clinically warranted and inappropriately stringent criteria for admission to the MHCBs were two salient barriers among a larger number of obstacles. Other obstacles included mixed data on bed use among the designated MHCBs, redirected referrals and informal and ineffective communication. Staff at CMF compiled thorough logs of all referrals they initiated and tracked the dispositions of cases. Referral logs indicated that crisis bed referrals dropped by 36 percent, while 66 percent fewer cases were admitted. DMH/APP data during the first six months of 2006 indicated that 61 inmates were discharged from DMH's acute inpatient program; 34 were discharged from a crisis bed and 14 were observed and released within 24 hours. A unique aspect of the DMH/MHCB unit was the need to go through a two-tiered admissions process. As described in earlier reports, CMF and DMH created a system under which inmates thought to require a MHCB level of treatment were assessed by psychiatric evaluation services for 24 hours and either admitted to a ten-bed psychiatric admissions unit (PAU) in DMH/APP, returned to their housing unit or admitted to the APP for acute inpatient care. Inmates not stabilized within ten days in the PAU were referred to the APP, although they remained in the same unit and were treated by the same team. DMH admissions staff reportedly insisted that inmates meet the criteria for a Keyhea order to be retained in a crisis bed longer than 24 hours. Any designated crisis beds that were unoccupied were filled with acute care inmates from other CDCR institutions. Following the monitor's visit, CMF and DMH staff reportedly

met to discuss revisions to the memorandum of understanding between agencies to clarify

MHCB admission and discharge criteria and processes.

CMF initiated a large number of referrals to all levels of care and

treatment programs. At least one full-time staff position was devoted to the completion,

coordination and tracking of referrals, which were well documented in logs. Preparation

of the clinical and medical portions of a referral took a full week, while custody staff

typically took another week to complete the case factor sheet. Decisions were routinely

made by DMH within 72 hours. Staff reported that written rejections were not provided

routinely by any of the DMH programs at CMF. Rejections were communicated orally,

unless CMF staff indicated an intention to appeal a rejection to the coordinated clinical

assessment team (CCAT) and insisted upon a written decision. DMH provided written

discharge summaries. Staff reported that communications with staff at the DMH

intermediate inpatient program at SVSP (SVPP) and Atascadero State Hospital (ASH)

were consistently excellent.

CMF's tracking data indicated that it directed just 30 referrals to the

DMH/APP at CMF during the six months preceding the monitor's visit. DMH's data,

however, indicated that CMF made 31 referrals monthly, but that data apparently also

included referrals to MHCBs within DMH/APP. Disposition of the 30 referrals reported

by CMF indicated that the institution's access to DMH/APP was limited. Twenty

referrals were accepted for acute care, but only five inmates, or 16 percent of those

referred, were actually transferred to DMH/APP beds. Twelve were redirected to the

psychiatric evaluation services unit for 24-hour observation before the referral process

was completed. Six others never reached any higher level of care although their

treatment needs did not abate. Eight of the referrals were withdrawn because the inmates' conditions improved or they were transferred to other prisons.

Access to DMH intermediate inpatient care was erratic. Staff reported that access to intermediate care was often unimpeded and timely. The referral log showed that most uncompleted referrals were withdrawn for unspecified reasons and redirected to other DMH programs. Some referrals were cancelled because inmates refused treatment and were unlikely candidates for a successful Vitek hearing. Other referrals were rejected because DMH objected successfully to custodial factors or medical conditions.

CMF was most successful with referrals to DMH's Day Treatment Program in CMF. Fifty-seven percent of referrals to the program, or 27 of 47, resulted in transfers. One initially accepted referral was cancelled subsequently for custody reasons, while four other referrals were withdrawn due to medical conditions that precluded living in the day treatment environment.

During the first six months of 2006, CMF made 24 referrals to the DMH intermediate inpatient programs located in CMF. Eight resulted in transfer, nine referrals were withdrawn and redirected to other DMH programs, and one referral was rescinded when the inmate's condition improved. Two referrals were rejected and redirected to other DMH programs by the CCAT. Two referrals were withdrawn because the inmates were subsequently placed in administrative segregation and became ineligible for dormitory housing. One patient refused consent and did not meet Vitek criteria. CMF referred 18 inmates to intermediate care at SVPP. Fourteen were accepted and put on a waiting list but none were transferred to SVPP. Two were redirected to intermediate care

beds at CMF and one was redirected to ASH. Two did not consent and did not meet Vitek criteria. One referral was withdrawn when the inmate's condition improved.

According to CMF's tracking records, 16 EOP inmates were endorsed to PSUs at CSP/Sac and Pelican Bay State Prison (PBSP). Nine of these endorsements resulted in transfers. An average of 68 days elapsed between initial endorsement and transfer, with a range of 49 to 112 days. In four cases, the inmate's SHU term expired prior to transfer but anywhere from two to five months after endorsement. Two PSU transfers were pending at the end of June, but their endorsements were just days old.

Other CAP Issues:

During the preceding monitoring period, the problem of polypharmacy was resolved. Staff continued to work to improve psychiatry practices and documentation, including those related to polypharmacy. Peer review and audits were used to improve psychiatry practices. Audits of polypharmacy after February 2006 found marked improvement in its documented use. While an earlier audit found polypharmacy use accompanied by a rationale 68 percent of the time, by May 2006 a series of peer review audits found that a rationale for its use was documented in all but seven of 104 reviewed cases, for a compliance rate of 94 percent. A staff audit of 50 medical records found that medication orders matched target symptoms and diagnoses over 96 percent of the time.

a. Partial Compliance

Case managers reported that their 3CMS general population caseloads included, on average, from 125 to 135 inmates. Despite high staff turnover and heavy reliance on contractors, available audits indicated that Program Guide requirements on

frequency of contacts and annual updates of treatment plans were met. Over 210 caseload inmates participated in 12 treatment groups during the first six months of 2006. Quality of treatment reportedly was being sacrificed in the interest of compliance with quantitative requirements. Cell-front case management contacts, lack of confidentiality during out-of-cell contacts and brevity of sessions due to volume were common.

About 20 percent, or 117, 3CMS inmates were housed in Unit IV, a specialized unit for HIV-positive inmates that formerly operated as a therapeutic community. Staff and inmates expressed the conviction that the unit's therapeutic value was lost when the therapeutic community model was replaced by a case management model. The character of group treatment changed when inmates not on the mental health caseload were excluded from groups. Groups in Unit IV were cancelled occasionally when case managers were redirected to cover EOP groups.

EOP treatment improved as fewer groups were cancelled and the content of group sessions became more relevant. Staff recently adopted a more accurate method of documenting group hours received by individuals, although the system still did not distinguish between curtailed group sessions and those that ran their full course. Quality management and supervision focused on limiting cancellations and enhancing the content of group treatment. Schedules were revised to make them more realistic; new materials were purchased; and groups were covered when regular leaders were absent. Staff elicited inmates' opinions about groups. A QIT on untimely medication distribution reduced, but did not eliminate, the loss of treatment time to late and disruptive medication passes. Despite the efforts, however, groups continued to be cancelled, started late and or finished early. Scheduled groups were preempted by crises and security needs, often

because space was insufficient to accommodate routine and extraordinary demands simultaneously. Groups also frequently lacked sufficient tables or materials to permit all members to participate. Groups were not organized on the basis of the individual treatment needs of participants. Inmates were enrolled in groups based simply on their cell assignments.

EOP inmates had no access to work assignments, education or other resources that were available in the prison outside of the EOP unit. They reported spending nearly 80 percent of their time locked in their cells, and excessive heat precluded use of the yard for days or weeks at a time for much of the year. Group treatment sessions limited the use of day rooms to a few hours each week. Many inmates praised the quality of group treatment, but some faulted the lack of group therapy for anxiety disorders, including post-traumatic stress disorder. Inmates reported that they were seen weekly in a confidential setting and had an opportunity to discuss their concerns. CMF was unable to offer ten hours of treatment per week to EOP inmates. During the first six months of 2006, hours offered weekly ranged from 7.65 to 8.87, with a drop to 5.6 in February due to lockdowns and staff absences.

There were 72 EOP and 30 3CMS inmates in administrative segregation in July 2006. CMF was no longer designated as a hub unit for administrative segregation EOP inmates. No caseload inmates were housed in the Willis Unit. CMF reportedly maintained the required 9 to 1 ratio of inmates to case managers for EOP inmates in administrative segregation by using contractors. Staff audits showed that confidential case manager contacts occurred weekly, and ten hours of scheduled structured therapeutic activities were scheduled weekly. During the first six months of 2006, 21 percent of

scheduled group sessions were cancelled, and inmates refused to participate in roughly a quarter of offered groups. Many inmates reported medication errors. Most interviewed inmates thought their IDTT meetings were relevant to their treatment.

Other Issues:

From May 1, 2006 to July 27, 2006, outdoor temperatures reached or exceeded 90 degrees on 45 days; they exceeded 100 degrees for eleven consecutive days within that period. Indoor temperatures reached or exceeded 90 degrees in one or more housing units on 15 days. On three days, indoor temperatures reached or exceeded 95 degrees in one or more housing units. From July 21, 2006 to July 24, 2006 all non-air conditioned housing wings in CMF reached 90 degrees or more. In a handful of housing units indoor temperatures hovered between 90 and 96 degrees for three consecutive days.

The institution effectively implemented its heat plan. Heat logs were maintained, heat-risk lists were regularly circulated to housing units and staff and inmates were familiar with the institutional heat plan. Heat incident reports were prepared and sent to Sacramento on a monthly basis, although the June 2006 report neglected to note three Stage II heat alerts. Housing unit logs confirmed that nursing rounds were conducted during Stage III heat alerts. Nonetheless, inmates fell ill from the unrelenting heat, and two were sent to a community hospital. In the EOP, treatment groups were cancelled because of excessively high temperatures in day rooms.

CMF employed a variety of cooling measures. Portable swamp coolers were used in some areas, and the local fire department hosed down selected exterior walls of some housing wings. Ice was procured from distant sources and distributed two to three times daily to inmates taking heat risk medications. Inmates in general population

housing units were permitted to shower during most unlocked periods. Inmates in administrative segregation, however, were not allowed extra showers.

CMF's emergency response policy incorporated recent departmental changes, but more clarity, training and better implementation were needed. The monitor visited three housing towers, each with three floors. Each floor was equipped with cut down tools, micro-shields and personal protective equipment (PPE) kits. Extra cut down tools and micro-shields were located on each floor. Extra PPE kits and an extra ambu bag were located on the first floor. Inventories were accurate and up to date. Officers encountered during the visit possessed micro-shields and reported that they had received on the job training on their use.

Institutional Summary:

The vacancy rate among permanent mental health staff remained at roughly 20 percent although vacant positions were nearly fully covered by contractors. Substantial program changes were underway at CMF, including expansion of DMH intermediate inpatient capacity, initial construction of a 50-bed MHCB unit and the conversion of a wing of the institution's GACH into a MHOHU to accommodate reception inmates from SQ.

Quality management activities appeared to have a salutary effect, particularly in regard to EOP activities and treatment. Medication management received heightened attention with more audits focused on medication management issues than any other area. Review of logs and completed RVR packets indicated that mental health assessments were beginning to exert some impact on the disciplinary process as it applied to mentally ill inmates. An increasing number of RVRs were dismissed and penalties

mitigated based on mental health assessments. CMF's policy and procedures on inmate sexual misconduct were finally inching toward implementation. Mental health staff developed a treatment protocol for indecent exposure, pursuant to which four inmates were diagnosed with exhibitionism. Of the four, one actually received treatment, while the other three were awaiting treatment.

Transfers to higher levels of mental health care at CMF were problematic. Access to the MHCB component in the DMH/APP continued to be limited principally by DMH's application of inappropriately stringent admission criteria and a responding reluctance of CMF clinicians to make timely referrals of inmates clearly in need of crisis intervention. Similarly, CMF access to DMH acute inpatient care appeared to be inadequate; too many severely impaired inmates in need of acute inpatient care were found in the EOP during the monitor's visit. The issue of access to acute inpatient care was obfuscated by conflated data on the issue from CMF and DMH, but the institution's accounting of its access to DMH/APP seemed more focused and accurate. Referrals to other DMH programs fared somewhat better but erratically. No referral to SVPP resulted in an actual transfer, although one of the failures was redirected to ASH. On the other hand, CMF was able to effect transfers to other DMH intermediate inpatient programs in CMF, especially to the Day Treatment Program.

CMF managed to meet quantitative Program Guide treatment requirements for 3CMS inmates, but often at the expense of qualitative excellence. Cell-front case manager contacts, lack of confidentiality during out of cell contacts and the curtailment of sessions due to volume were common. On the other hand, nearly half of 3CMS inmates in general population were enrolled in some group treatment.

Treatment in the EOP improved thanks to a reduction in the cancellation of group activities and some improvement in their content.  Nonetheless, due to physical plant limitations, group treatment activities were often preempted by crises and security needs, and EOP inmates complained that they spent nearly 80 percent of their time locked in their cells.

In one of the hottest summers on record in California, CMF effectively implemented its heat program for inmates on heat-sensitive psychotropic medications.  Temperatures were recorded, heat alerts triggered, cooling measures, some of them quite imaginative, were taken and clinical rounds conducted.  Despite all of the measures, in a particularly brutal July heat wave, inmates fell ill from the unrelenting heat, with two inmates being sent to a community hospital.

### California Men's Colony (CMC)
July 6, 2006 - July 7, 2006

CMC had an overall vacancy rate of 19 percent among permanent mental health staff, but the vacancy rate among staff psychiatrists was 24 percent.  Positions for a chief psychiatrist and two senior supervising psychiatrists were filled.  Of 19.5 positions for staff psychiatrists, 4.75 were vacant.  Three psychiatrists were hired during the monitoring period, but twice that number was lost.  Contractors covered the equivalent of just 0.2 of these 4.75 vacancies.

There were no vacancies among the positions for chief and senior supervising psychologists, psych techs or office techs.  Of four positions for senior psychologist specialists, 3.5 were filled.  The sole supervising psych social work position was filled.  All 11.6 psych tech positions and all 6.5 office tech positions were filled.

Significant progress was achieved in filling RN vacancies, bringing this aspect of staffing into partial compliance.

Vacancies were more prevalent among case managers and recreation therapists. Nearly one third, or 8.25 of the 28.5, of allocated positions for staff psychologists were vacant. Three of 12.5 allocated positions for psych social workers were vacant, as were two of six allocated positions for recreation therapists.

CMC was extremely concerned about staff retention. During the monitoring period, seven psychiatrists left and the departure of an eighth was imminent. Of these, four retired, three transferred to other CDCR institutions and one went to ASH. Staff reported that CMC's ability to recruit and retain staff was hampered by several factors, including the cut in compensation contractors who became state employees had to take and the institution's inability to use clinicians, many of whose duties were not clinical in nature, in a fashion commensurate with their education and experience.

At the time of the monitor's visit, staffing of the new and temporary MHCB unit, with a capacity of 36 to 42 inmates, was described as "skeletal." CMC's old Locked Observation Unit (LOU) was converted to a temporary MHCB unit pursuant to an April 2006 court order. Funding for mental health staff to run the unit was granted in May 2006. Staff at CMC reported that full time positions for two psychiatrists, six psychologists, five psych social workers, two recreation therapists and one full-time office tech position were established for the MHCB unit.

The need for more custody staff in the MHCB was no less critical than the need for more clinical staff. Of the 23.3 correctional officer positions requested to provide custody coverage in the temporary MHCB unit, 10.4 were approved. Funding

for six additional correctional officer positions was anticipated, and several more had been requested again. A request for a full-time physician position to conduct required physical examinations in the MHCB unit was denied.

Treatment space and facilities in the unit were unacceptable due to the severe limitations of the physical plant, which needed renovation, planning for which was underway. Meanwhile, the unit was incapable of providing treatment at a level required in an MHCB unit.

Quality Management:

Although staff reported that QITs were adversely affected by personnel shortages, quality improvement efforts appeared to function adequately. Mental health quality management efforts were part of a long-standing quality assurance structure associated with the institution's GACH. CMC reported that mental health disciplines engaged in peer review and the quality assurance committee met regularly. The mental health quality management subcommittee met monthly. QITs addressed mental health issues. The monitor's expert observed a meeting of the quality management subcommittee, which was conducted competently and well attended by custody and mental health staff. Staff reported that mental health quality management was being revamped, with changes focused on shifting the emphasis from retrospective quality assurance audits of past performance to a more dynamic model of quality management based on concurrent monitoring.

Medication Management:

Medication management remained problematic at CMC. Inmates new to CMC typically experienced a gap in medication continuity of about a day and a half. The

interruption was due largely to a local requirement that a psychiatrist at CMC evaluate an inmate before reordering medications. CMC had not strictly implemented DOT medication protocols. Officers typically did mouth checks after inmates were handed medication. The exceptions were a small number of inmates in the GACH and east clinic areas, where DOT was used. When inmates were known to be non-compliant with medication psychiatrists considered alternatives to DOT including changing to liquid or intramuscular delivery. Because DOT orders could not be carried out, medication was frequently floated or crushed as an alternative.

Attempts to improve the administration of HS medication were unsuccessful. Local rules requiring inmates to be locked up before nightfall conflicted with the administration of HS orders. Only ten inmates had new orders for HS medication.

Inmates reported pill lines of up to two hours, but the monitor was unable to confirm the reports.

Mental Health Assessments for the Disciplinary Process:

CMC's records indicated that an institutional total of 1,893 RVRs were issued from December 1, 2005 to June 16, 2006. Of these, 695 were issued to 3CMS inmates, 281 to EOP inmates and 11 to inmates in the OHU or MHCB. Just over 52 percent of all RVRs written in the facility during the period were issued to caseload inmates. Four percent, or 28, of the RVRs issued to 3CMS inmates generated a referral for a mental health assessment. All inmates receiving a RVR while in the EOP, OHU or MHCB were referred for mental health assessments. Seven inmates not on the mental health caseload were referred and received a mental health assessment.

Mental health assessments had some impact on disciplinary proceedings. The institution's RVR log documented the results of mental health assessments including whether hearing officers considered mental health assessments in disposing of the RVR and penalties imposed were affected by the assessments. From January 2006 to June 2006, a significant number of penalties were reduced or suspended and outright dismissals were granted in cases where mental health assessments were submitted.

Transfers:

Access and timely transfers to higher levels of care were a significant problem in CMC. Conversion of CMC's LOU into an MHCB unit brought attempts to transfer inmates in crisis to acute inpatient beds in ASH to a halt. Meanwhile, waiting periods for transfers to DMH/APP at CMF were often several weeks in duration. CMC staff reported that access to DMH/SVPP was virtually non-existent due to waiting periods of six months or longer.

CMC reported making 411 referrals during the period from December 1, 2005 to June 14, 2006 to MHCB units elsewhere in CDCR and DMH acute inpatient programs. Of this number, 48 or 11.6 percent actually went to an MHCB unit. Another third, or 117, of the 411 referrals were transferred to a DMH program before a MHCB elsewhere in CDCR became available. The remaining 246, or 60 percent, reportedly were stabilized and returned to their housing units before a bed became available.

Nominal transformation of the LOU into a 42-bed MHCB unit occurred swiftly, but necessary staffing additions and physical plant modifications followed more slowly. The result was that treatment provided in the temporary MHCB unit improved slightly but did not approach the level of treatment required in the Program Guide. The

unit initially was staffed by clinicians diverted from other CMC programs, and the number of correctional officers assigned was reportedly inadequate. Twenty-four-hour RN coverage was provided. Staff reported they could not complete physical examinations of new admissions within 24 hours, write individual treatment plans or meet with inmates out of cell to provide treatment. Inmates were seen out of cell only during IDTT meetings. Thirty minutes of in-cell recreation therapy per day was provided to eligible inmates.

By July completed renovations included new cell doors, additional offices, outdoor yard areas, enlargement of a conference room and a nursing station. In July CDCR reported that renovations could not bring the former LOU space into compliance with CTC licensing requirements. CDCR acknowledged that the new MHCB did not have enough space to meet licensing requirements regarding cell size, offices, pharmacy facilities, lab and examination areas nor could it meet ADA standards, confirming again the temporary nature of its future use.

Multiple admissions and excessive lengths of stay were common in the OHU and the LOU/MHCB unit. Logs indicated that 88 inmates had multiple admissions to the OHU, with the number of admissions ranging from three to 24. After April 28, 2006, 24 inmates had LOU/MHCB stays in excess of ten days. Lengths of stay ranged from 11 to 32 days.

CMC staff reported adequate access to DMH acute and intermediate inpatient programs at CMF, as well as the intermediate inpatient program at ASH. Acute care provided at ASH garnered mixed reviews. Some inmates reportedly were

discharged from ASH after stays of two to three days, although their mental health was no better.

Transfers to PSUs were untimely. Administrative segregation logs showed significant delays, with some exceeding a full year. As of May 2006, seven inmates had been waiting from 59 to 249 days to be transferred to a PSU.

Other CAP Issues:

At the time of the monitor's visit, 60 EOP inmates were housed in the EOP administrative segregation hub unit, six over the unit's capacity. Given the hub unit's staffing and physical plant limitations, CMC staff believed that a maximum of 32 EOP inmates could be treated in administrative segregation consistently with Program Guide requirements. Staffing and programming resources continued to be deficient. Although nearly all psych tech positions were filled, CMC utilized contractors to cover daily rounds when psych techs were on leave.

Institutional Summary:

CMC's vacancy rate among all mental health staff was 19 percent but it ranged from 24 to 30 percent among clinicians. In the new and temporary MHCB unit, where recruitment of clinicians to fill recently allocated positions was just beginning, much larger staffing shortages limited the provision of adequate treatment. Lack of staffing in the EOP administrative segregation hub unit similarly left inmates deprived of mandated treatment services. CMC administrators were concerned about recent staff losses and the institution's ability to fill the expanded allocations associated with the conversion of the old LOU into a temporary MHCB unit.

Access and timely transfers to higher levels of care presented a mixed picture. CMC abandoned its efforts to procure access to MHCB/acute care beds at ASH when conversion of the LOU to a temporary MHCB unit was ordered by the court. By then, 60 percent of inmates referred to MHCB units elsewhere in CDCR or DMH were never transferred. Throughout that period, and even after opening the LOU/MHCB unit, multiple admissions and excessive lengths of stay in the OHU and the new unit were common.

CMC reported that mental health disciplines engaged in peer review and the quality management committee met regularly. Quality management was being revamped to shift its emphasis from retrospective quality assurance audits to a more dynamic model.

Medication management deficiencies persisted. There was a short yet persistent gap in medication continuity when new inmates arrived. Inmates reported pill lines of up to two hours; DOT protocols were not implemented; and the administration of HS medication remained problematic.

Mental health assessments were making an increasing impact on the dispositions of disciplinary proceedings involving caseload inmates. From January 2006 to June 2006 penalties were reduced or suspended in a significant number of cases, and in some cases charges were dismissed.

### California State Prison, Los Angeles County (CSP/LAC)
May 2, 2006 - May 5, 2006

CSP/LAC's ability to procure contractors to cover psychiatric vacancies declined further during the monitoring period. The functional vacancy rate among psychiatrists climbed to 52 percent, up from 28 percent during the preceding monitoring

period.  The position of chief psychiatrist was filled, but one of two senior psychiatrist positions and 4.5 of 8.5 staff psychiatrist positions were vacant, with contractors covering the equivalent of just two of these positions.

The functional vacancy rate among case managers was 23 percent.  The position of chief psychologist was filled; one of six senior psychologist positions was vacant; and 13 of 32 allocated case manager positions were vacant with only 4.5 of these positions covered by contractors.  Seven additional and unallocated case manager positions were covered by contractors to maintain the required staffing ratio in the hub EOP administrative segregation unit.

One of three recreation therapist positions was vacant and covered by a contractor.  Four of 16 psych tech positions were vacant with three new hires pending.  The position of senior psych tech was filled.  Two of 9.5 office tech positions were vacant.  Positions for an office manager and a medical secretary were filled.

At the time of the monitor's visit, CSP/LAC's reception center had been open for five months.  The mental health caseload, which included 1,171 3CMS, 369 EOP inmates and three inmates in MHCBs, represented a third of the institution's overall population.  The number of caseload inmates in administrative segregation hovered around 250.

Quality Management:

Quality management was not yet fully functional at CSP/LAC.  During the preceding monitoring period mental health quality management had been brought to a near halt by a vacancy in one senior psychologist position and other demands associated with the institution's assumption of its new reception function.  By May 2006, quality

management was in the early stages of redevelopment.  Minutes of monthly meetings indicated renewed regular attendance by custody staff.  At the May 2006 meeting of the mental health quality management committee, the monitor heard useful discussion. QITs were chartered following a prolonged period of QIT inactivity.

Peer review was conducted in the disciplines of psychiatry, psychology and psych social work.  UHRs were audited in the context of peer review.  Staff reported that psychiatry peer review was going well.  Chart reviews done under the auspices of psychology and social work peer review needed improvement.  For example, in contrast to the monitor's expert's findings, peer reviewers found that treatment plans were individualized and problem specific.

The suicide prevention committee continued to meet monthly and keep minutes.  The composition of the committee was consistent with CDCR requirements. Meetings were typically attended by half of the committee's members.  The committee identified omissions in five-day follow-ups and took steps to correct the problem.  Staff reported that hourly custody observations were completed routinely during the first 24 hours after discharge from the MHCB.  Five-day follow-up was completed for selected inmates who were evaluated but not admitted to the MHCB.

The suicide prevention committee did not review cases of well known high-risk inmates whose multiple crises taxed institutional resources.  Cases of self injury were neither tallied nor reviewed.  A local procedure on the use of holding areas for inmates who were candidates for MHCB admission or who needed a crisis bed when none was available was promulgated in October 2005.  The procedure was largely consistent with statewide directives.

The local operational procedure on suicide prevention was updated in February 2006. The use of video monitoring was inconsistent with CDCR policy. It permitted the use of video monitoring for suicide watches if three or more inmates were on watch simultaneously. When two inmates were on watch, they were placed in adjacent cells. An officer seated in front of the cells had direct lines of sight. Staff in the CTC reported that in practice video monitoring was not used for suicide watch.

Medication Management:

On the whole prior gains were maintained, but medication management improved little. Staff continued to audit ten medical records per month to gauge compliance with medication management targets. Audits done by staff remained opaque despite instructions to provide information about methodology used.

Medication continuity remained problematic across the board. Audits that showed medication continuity was sustained upon arrival were undercut by reports that the pharmacy was days behind in processing orders and that it was not unusual for reception center inmates to receive medication three or four days after orders were written. There were still problems with medication continuity when inmates were relocated within the institution. A series of small audits with wide-ranging results found that medication continuity was sustained in 20 to 83 percent of housing relocations. An audit found that one or two percent of expirations were inadvertent, but staff reported that the pharmacy was seven days behind filling renewal orders.

Response to non-compliance with medication remained inconsistent despite additional staff training. In a series of small audits with wide-ranging results non-compliance generated referrals to mental health 30 to 70 percent of the time.

An audit of medical records found informed medication consent forms filed in 93 percent or more of them, but an audit of reception center cases was needed.

CSP/LAC did not maintain a central list of inmates with DOT orders. The chief psychiatrist reported that psychiatrists addressed the distinction between DOT and nurse administered medication during peer review. He reported that psychiatrists were recently trained to discuss the risk of heat-related pathology with their patients.

Mental Health Assessments for the Disciplinary Process:

CSP/LAC continued to maintain a comprehensive log of RVRs and mental health assessments. During the monitoring period, 1,456 RVRs were written. Of that number 475 involved 3CMS inmates and 189 involved EOP inmates. One EOP inmate who incurred an RVR did not have a mental health assessment. (See Exhibit B, Case Review 1.) Nineteen mental health assessments were requested and completed for 3CMS inmates. In a breach of confidentiality, inmates continued to type RVR reports.

Staff who audited disciplinary packets and mental health assessments reported that it was difficult to obtain completed packets from a centralized location. A staff audit begun in November 2005 remained incomplete in May 2006. To speed processing staffing was increased in the inmate records department, and caseload sizes were distributed more equitably among correctional counselors.

The proportion of RVRs written for disobeying orders, disrespect toward staff and grooming violations dropped. Hearing officers' dispositions reflected the content of mental health assessments. Staff audits and the monitor's review found that the quality of mental health assessments improved with one exception. Despite additional training, one clinician continued to include inappropriate information. In the

reception center, case managers who provided treatment also performed mental health assessments of inmates on their caseloads.

Inmates sent to the EOP administrative segregation hub at CSP/LAC waited a long time for RVRs to be processed. Staff reported that some arrived without RVRs and that in some counties the district attorney took nine to 12 months to decide whether to prosecute.

CSP/LAC issued one RVR for self-injurious behavior during the monitoring period without following applicable policy. The mental health staff was unaware of the case and no clinical review was done. (See Exhibit B, Case Review 21.) A mentally ill and mentally retarded inmate who precipitated a series of crises received an RVR for self injurious behavior. The charge was written after he injured himself for the second time in two hours.

CSP/LAC promulgated a local operational procedure for responding to inmate sexual misconduct in August 2005. The procedure closely followed CDCR directives. Staff was trained on the new procedures and proof of practice records were maintained, but implementation fell short. The procedure was not followed in a case of indecent exposure in October. The inmate was not screened soon after the incident occurred. Rather, a standard mental health assessment used for disciplinary purposes was done that concluded that mental illness was not a factor in the behavior. The monitor's expert reviewed the case and concurred with that finding. In two other cases inmates with numerous sexual misconduct charges who were previously found to have a sexual disorder that warranted treatment received none. (See Exhibit B, Case Reviews 3 and 9.)

Transfers:

Logs of referrals to DMH for acute and intermediate care were incomplete. Staff attributed a seven-week hiatus in record keeping to lack of staff. The number of referrals to acute care was constant. On average two inmates per month were referred to acute care. One referral per month was made to intermediate care. From November 1, 2005 through March 2006, 12 inmates were referred to acute care. Nine were accepted and transferred. Disposition of the remaining three referrals was not logged. Time from referral to transfer to an acute care bed ranged from ten to 22 days. During the same five-month period, seven inmates were referred to intermediate care and five were accepted. By May 2006, only one had been transferred and four were wait-listed. No information on the disposition of the remaining two referrals was recorded in the log. The rate of one intermediate inpatient referral a month contrasted with the flurry of 39 referrals made earlier in 2005 subsequent to CSP/LAC's review of unmet needs.

In one case reviewed by the monitor's expert, staff planned to refer the inmate to intermediate care in February 2006 and to acute care for a trial of Clozaril in March 2006. Neither referral had been made at the time of the monitor's visit. (See Exhibit B, Case Review 4.) No systematic information was available on the length of time it took staff to make a referral once clinical need was identified.

Access to DMH intermediate care at SVPP was problematic. In one case reviewed by the monitor's expert, an inmate on the waiting list did not receive adequate care as he waited. (See Exhibit B, Case Review 15.) In another case an inmate was discharged from SVPP for security reasons. He had a SHU term that was scheduled to run its course in less than four weeks. (See Exhibit B, Case Review 21.) In a third case

no clinical discharge summary was provided by DMH when the inmate was discharged for security reasons. (See Exhibit B, Case Review 22.) In that case the inmate had progressed to living in a four-man dorm at SVPP. He was discharged precipitously after being charged with assault on staff. Both inmates precipitated a series of crises after being returned to CSP/LAC, but in neither case did staff at CSP/LAC formulate a considered treatment approach.

The CTC had 18 beds, 12 of which were mental health crisis beds. Only eight or nine of those beds were available for psychiatric patients. Five chronic care medical patients were housed in the CTC. From November 1, 2005 through April 18, 2006, there were 11 to 19 MHCB admissions per month with a total of 101 admissions during the period. Lengths of stay ranged from two to 27 days. Excluding cases that awaited transfer to DMH, 25 percent of MHCB stays exceeded ten days.

Access to the MHCB was poor for reasons that went beyond the small number of beds available. Referrals were not regularly made when clinically indicated, and admission criteria were applied too narrowly to candidates for admission. Inmates who needed to be stabilized languished in the EOP, administrative segregation and the reception center. (See Exhibit B, Case Reviews 5, 7, 11, 16 and 23.) There appeared to be an implicit prohibition against admitting inmates well known to staff for a series of self-injuries. (See Exhibit B, Case Reviews 10, 21 and 22.) Environmental issues that precipitated trips to the treatment and triage area for consideration of admission to a crisis bed were not resolved, returning the inmates involved to the same crisis-generating placement. Severity of self injury, number of previous admissions, prior self-injuries and history of treatment were not given sufficient weight in admission decisions.

CSP/LAC revised its local operating procedure on the use of holding cells and the management of crisis beds in October 2005. Staff did not maintain a log of holding cell use for psychiatric patients. A log was begun during the May 2006 site visit. A log of all emergency room visits was insufficiently detailed to yield information on prospective crisis bed admissions. When no bed was open but an inmate in crisis was admitted, staff discharged another MHCB patient. Staff reported that inmates who were candidates for admission to a crisis bed were held in the CTC treatment and triage area and observed one-on-one by an officer until evaluated. Examinations of candidates for admission to the MHCB appeared to be perfunctory after hours and on weekends.

CSP/LAC appeared to move caseload inmates through the reception center within required timeframes. Although the institution neglected to track lengths of stay during its first six months of reception center operations only nine of 161 caseload inmates in the reception center in May had been there beyond applicable timelines.

At the time of the monitor's visit, 142 3CMS and 19 EOP inmates were in the reception center. Three EOP inmates had been waiting longer than 60 days to transfer. No reasons for their extended stays, which ranged from 69 to 111 days, were documented. EOP inmates were seen weekly while in the reception center but not all were referred to the MHCB or higher levels of care as clinically indicated. Six 3CMS inmates had lengths of stay that ranged from 103 days to 145 days. No reasons for the delays were documented. Transfers were rarely expedited. Only one of 13 EOP inmates for whom an expedited transfer was requested was moved expeditiously. Four requests for expedited transfer were made at or on the 60th day. The most severely mentally ill inmates often had the longest lengths of stay and needed heightened treatment most.

Other CAP Issues:

a. Partial Compliance

EOP treatment was back on track after lockdowns and *ad hoc* cancellations attributed to inadequate custody staffing had severely curtailed programming hours. Staff reported that hiring recreation therapists, improved coverage for absent group leaders and scheduling most inmates for 12.5 hours increased the number of hours of structured therapeutic activities actually offered. In a concomitant effort to normalize the operations of the EOP yard, release time was expanded to 18 hours per week. A more realistic schedule that afforded a 15-minute buffer between groups resulted in more timely starts. Hours of group treatment were counted on an individual basis before being aggregated. Ten or more hours of treatment were offered to EOP inmates in the general population for 17 of 20 weeks from November 2005 through March 2006.

Levels of participation differed between the two EOP buildings. Roughly half of the inmates in one housing unit participated in at least ten hours of therapeutic activities weekly. The other half participated in fewer than ten hours. The rate of participation was markedly lower in the second EOP unit. Combined tallies indicated that roughly one quarter of EOP inmates in the general population were engaged in at least ten hours of structured therapeutic activities each week. Group attendance varied from three to 15. Staff did not explain the difference between buildings.

The overall quality of EOP treatment was undermined by turnover among case managers and the scarcity of psychiatrists. Fragmented psychiatric coverage resulted in EOP inmates being seen by different psychiatrists, missed contacts and orders

being renewed without patient contact. Due to staff turnover, a large number of inmates in one EOP unit were seen by several case managers during the monitoring period. Weekly individual case management contacts with EOP inmates were often not made in a confidential setting. Insufficient custody coverage was reported to be a significant factor. A QIT was chartered to address the problem with confidential meetings.

Most observed groups were of high quality. Groups used a cognitive behavioral model. Current videos and written materials were used for the curriculum. Inmates were actively engaged in the groups. Groups led by substitutes who covered for absent group leaders were lower in quality and poorly attended.

Treatment plans were not individualized. Inmates were enrolled in groups in accordance with their needs and levels of functioning, but treatment plans did not reflect links between needs and group treatment.

The quality of IDTT meetings held in the EOP varied by unit. Meetings were attended by a multidisciplinary team that regularly included a correctional counselor. Psych techs did not attend meetings. Medical and C-files were available. In one unit, inmates participated in interdisciplinary discussion. Salient treatment and custody issues were addressed. IDTT meetings held in another unit were characterized by unfocused discussions and treatment decisions that did not flow rationally from the facts of the cases. Each inmate was given a mental status exam, but salient treatment issues were not discussed. Decisions to retain or discharge inmates seemed to be contingent on extra-clinical considerations. (See Exhibit B, Case Reviews 2, 7, 8, 9, 12, 13, 14, 15, 17 and 18.)

Some communication problems existed between mental health and custody staff in the general population EOP. Inmates reported that correctional officers on the third watch treated them like general population inmates. A QIT was formed during the monitor's visit, and the administration was examining the allegations to determine whether an investigation was warranted.

### b. Non-compliance

The treatment needs of the 80 inmates in CSP/LAC's EOP administrative segregation hub exceeded available resources. Inmates were not offered ten hours of treatment weekly, nor were those on walk-alone status offered ten hours of yard weekly. Nine more programming cells were added but their location precluded visual and audio privacy. Treatment plans were not developed during IDTT meetings, which were used simply as an opportunity for a clinician to evaluate the inmate. Psych techs did not attend IDTT meetings, and treatment team members appeared unfamiliar with the inmates being reviewed. The monitor's expert observed psych tech rounds in administrative segregation, which were thorough. The overall physical environment was unclean, with dirty lexan obscuring views into cells. Many inmates exhibited symptoms of their serious mental illnesses. As in the past, interviewed inmates alleged that correctional officers harassed them and used excessive force.

CSP/LAC did not screen all admissions to administrative segregation. During the monitoring period, the institution audited their practices in this regard for the first time in more than a year. The staff's audit of 57 cases found a compliance rate of 85 percent. The monitor's audit of 23 cases found that five inmates were not screened and

three had twice refused screening. The refusals did not elicit chart reviews or other follow-up.

Other Issues:

Beginning in December 2005, CSP/LAC began functioning as a reception center. From December 2005 through March 2006, 1,534 inmates were processed. Staff maintained a comprehensive log of new arrivals that showed date of arrival, date of the mental health screening with the 31-item questionnaire, date of referral for a psychological assessment, date of completion of the MH-7 and level of care. Automated reports indicated that all new arrivals were screened by mental health. Eighteen percent, or 286, of the screenings were positive. In all cases but three, inmates with positive screenings had a full mental health evaluation. Mental health evaluations were done in a confidential setting, but screenings were done in an area that lacked sound privacy. Mental health evaluations were generally timely with the exception of those conducted during March 2006 when CSP/LAC received an influx of inmates twice the normal monthly rate. The monitor's review of a small sample of reception center records found that bus screenings were administered timely.

CSP/LAC reported that 98 percent of the staff was trained in the amended policy on CPR and micro-shields. Only 16 of 775 staff members, who were out on long term medical leave or military leave, were untrained. Staff members returning from leave were supposed to report to in-service training to ensure they were up-to-date with training requirements.

The monitor visited all but three housing units during the May visit and found a complete PPE kit locked in a box at the officers' podium in each unit. Each unit

had a cut down tool that was stored in the control booth. Completion of equipment inventory sheets was inconsistent and opinions were mixed about where completed inventory sheets were to be directed. Correctional officers reported that there was no mechanism in place to replenish used supplies. All correctional officers encountered during the tour possessed micro-shield mouth guards. Administrators reported that custody staff had been told how to obtain equipment replacements during their in-service training.

Institutional Summary:

The functional vacancy rate among psychiatrists rose to 52 percent, up from 28 percent during the previous monitoring period. In contrast to its prior experience, CSP/LAC was unable to procure sufficient clinical contractors to cover most case manager vacancies, and the functional vacancy rate among them rose to 23 percent.

After a period of stagnation, quality management was once again re-emerging. All three disciplines continued to perform peer review. The suicide prevention committee met regularly and kept meeting minutes, but needed to improve attendance, ensure that local operating policies were consistent with statewide policy and begin reviewing cases of high-risk inmates with multiple crises.

Medication management improved little and audits of medication management issues typically were small and/or lacked transparency. Medication was interrupted when inmates arrived and when they were relocated within the institution; responses to non-compliance with medication remained inconsistent despite additional staff training; and the pharmacy had a backlog of several days.

With regard to assessments of caseload inmates charged with disciplinary infractions, audits and the monitor's review found that the quality of mental health assessments improved, and hearing officers' dispositions increasingly reflected the content of mental health assessments. In addition, the proportion of RVRs written for caseload inmates for disobeying orders, disrespect toward staff and grooming violations dropped. The institution's provisions for dealing with sexual misconduct were inadequate and applied erratically. Inmate clerks inappropriately continued to be used to type RVR documents.

Access to DMH programs was inadequate. Referrals dropped dramatically. Inmates referred to the DMH/APP at CMF were usually transferred within ten to 22 days after their referral. Transfers to DMH intermediate inpatient programs virtually ceased to occur. Access to MHCBs similarly was poor, and referrals to crisis beds were often not made when clinically indicated. Criteria for admission to the MHCB unit were applied too stringently, and inmates in need of stabilization often languished in the general population and administrative segregation EOPs or the reception center.

EOP treatment was back on track after a long hiatus attributable to lockdowns and *ad hoc* cancellations reportedly generated largely by a lack of adequate custody staff. The amount of structured therapeutic activities increased and the quality of group offerings showed improvement. Treatment team performance was varied and too often failed to clarify diagnoses, identify clinical issues and formulate a treatment approach.

The number of EOP inmates in administrative segregation outstripped the institution's resources for treating them. The physical environment was dirty; inmates

alleged that correctional officers harassed them and used excessive force; and prompt mental health screenings were not provided to all non-caseload inmates admitted to administrative segregation.

The mental health aspects of CSP/LAC's newly assigned reception function were developing nicely. Bus screenings, mental health screenings and mental health evaluations were conducted timely. The institution tracked milestones in the reception process reasonably well, and, while the transfer of some reception inmates was untimely, most caseload inmates were moved on to general population programs on schedule. Some reception center inmates, who needed to be stabilized or referred to higher levels of care, remained in reception overlong, where treatment was unequal to their needs.

## California State Prison, Sacramento (CSP/Sac)
### July 18, 2006 – July 20, 2006

CSP/Sac's increasing staffing deficiencies were attributable largely to recent multiple expansions in mental health programs operating, or slated to operate, in the facility. The institution was struggling to hire additional staff to support the projected growth of existing EOPs and new inpatient DMH programs. During the monitoring period, mental health crisis beds increased 73 percent, from 15 beds to 26, and a 20-bed mental health outpatient housing unit (MHOHU) was activated. EOP capacity, including the PSU and the institution's administrative segregation EOP hub unit, expanded by 86 percent, from 383 to 662 patients. Administrators anticipated, but had not yet received, a staffing package for another 96-bed EOP unit that was expected to become operational in October 2006. Staff was being diverted regularly from 3CMS to higher levels of care in PSU, EOP, administrative segregation, MHCB units and the OHU. Administrators

expressed concern about the possibility of across-the-board service reductions in all programs as the institution struggled to accommodate its new and expanding programs.

Forty percent (86.54 of 214.14) of allocated mental health positions were vacant. Among staff psychiatrists, psychologists, psych social workers, recreation therapists and licensed psychiatric technicians, the vacancy rate was 41 percent, or 55.91 of 136.51 positions. Contractors covered 31 percent of these vacancies, reducing the functional vacancy rate to 28 percent. To place this surge of staffing vacancies in some perspective, it is important to remember that the number of allocated mental health positions at CSP/Sac during the preceding 12 months rose from 121.45 to 214.14, an increase of some 76 percent.

The vacancy rate among office technicians and office assistants was 57 percent. Allocations among key auxiliary positions, particularly in medical records and pharmacy, had not increased.

Issues Resolved:

DOT procedures were implemented for the afternoon distribution of medications to EOP inmates in administrative segregation.

A plan was developed for the administration of HS medications to inmates.

Quality Management:

Generally, the quality assurance process continued to function well. The quality management committee met weekly and maintained useful and ample minutes. Quality improvement teams were chartered to examine the preparation of incident reports, functions and practices related to "clinician of the day," five-day follow-up of suicidal inmates discharged from the MHCB units, the MHOHU and the preparation of

referral chronos. Peer review for psychiatrists and psychologists continued, although minutes on the nature of the review were vague.

Some internal monitoring activities were hampered by limitations within the MHTS and the institution's abandonment of its locally developed information management system. Both the methodology and reporting of medication management audits were flawed due to insufficient sample size, vagueness in the measured outcomes and a lack of specificity in reported results.

Medication Management:

While most CAP items pertaining to medication management remained resolved, a few areas required improvement. Problems continued with the distribution of parole medications. The overall compliance rate for timely follow-up to medication non-compliance was 67 percent, ranging from 50 percent in March 2006 to 90 percent in May 2006. Weaknesses in the timely renewal of Keyhea petitions also persisted. A QIT was about to be chartered to improve the documentation of Keyhea orders.

Mental Health Assessments for the Disciplinary Process:

Protocols for MHSDS inmates charged with disciplinary infractions were implemented adequately at CSP/Sac. Of the 1,676 RVRs issued during the monitoring period, 62 percent or 1,045 involved MHSDS participants. Of these, 52 percent or 549 involved 3CMS inmates; 18 percent or 190 involved EOP and OHU inmates; 16 percent or 166 involved PSU inmates; nine percent or 91 involved EOP administrative segregation inmates; and five percent or 49 involved MCHB patients.

Staff reported that indecent exposure was "out of control," with most incidents occurring among a group of about 15 inmates. Of the 549 RVRs issued to

3CMS inmates during the monitoring period, over three-quarters involved incidents of sexual misconduct. Ten percent of these were referred to mental health for mental health assessments.

An institutional log showed that among the 48 mental health assessments of 3CMS inmates conducted from November 11, 2005 to June 9, 2006, 38 or 79 percent involved indecent exposure, sexual harassment or sexual misconduct charges. A log of incidents reported from January 1 to July 6, 2006 indicated that 84 incidents of indecent exposure occurred among 40 inmates, just ten of whom were responsible for 58 percent of the incidents. A clear majority of these incidents involved MHSDS caseload inmates, over half of whom were EOP inmates. All of these incidents were referred to the local district attorney.

Most indecent exposure incidents occurred in cells. The few inmates who exposed themselves during group sessions were immediately removed from the group, but they were not subsequently denied access to mental health services. The inappropriate sexual behavior was not addressed in the offending inmates' treatment plans. (See Exhibit C, Case Review 1.)

CSP/Sac was compliant with sexual misconduct protocols in that RVRs issued for indecent exposure prompted the completion of sexual misconduct screens, most of which were completed within a week of the incident. However, contrary to departmental policy, completed screens were not consistently reviewed by an IDTT to determine if a more comprehensive evaluation and some specific treatment were warranted. In incidents of repeated exhibitionism, the chief psychologist determined whether to conduct monthly reviews of sexual misconduct screens or to use regularly

scheduled IDTT reviews. In practice, however, screens were not properly reviewed. Only one case was referred for a more comprehensive evaluation, which took an inexplicable eight months to complete. Although a draft of the evaluation indicated diagnoses of exhibitionism and pedophilia, as of mid-July 2006, no treatment for exhibitionism had been initiated.

During the monitoring period, staff was given Lexan covers and jumpsuits to implement the custody elements of the departmental policy for handling sexual misconduct, but authorization to implement the procedures reportedly was withheld pending the assessment and outcome of a pilot program at PBSP.

Transfers:

Access to acute DMH inpatient care at CMF was adequate. A log of DMH/APP referrals from November 12, 2005 to June 9, 2006 documented 42 referrals. While the final disposition of three referrals was unknown, the remaining 39 resulted in 33 completed transfers, which occurred on average within 13 days, with individual transfers ranging from seven to 28 days. Six referrals were rescinded.

Access to the DMH intermediate inpatient program at SVSP remained problematic due to a long waiting list. From November 12, 2005 to June 9, 2006, the institution generated 32 referrals to SVPP, of which one was rejected, two were rescinded and one was transferred to PBSP. Fifteen inmates were transferred, including twelve to SVPP and three to DMH intermediate care beds at CMF. Delays between referral and transfer to SVPP varied widely, ranging from five to 170 days. Three transfers took 0-30 days; three took 31-60 days; three took 61-90 days; one took 91-120 days; and two took more than 150 days. The three intermediate care transfers to DMH at CMF took 15 days,

118 days and 126 days, respectively. Another 12 referrals were pending transfer at the time of the monitor's visit, with eight of them already pending longer than 60 days. As of July 17, 2006, the longest delays were 213, 210 and 208 days. No referrals or transfers to ASH occurred during the reporting period. Finally, the CCAT process reportedly contributed to the effectiveness of transfers to DMH.

CSP/Sac had two MHCB units, both licensed by the Department of Health Services (DHS). One was located within a stand-alone Correctional Treatment Center. It contained 15 beds, four of which were often occupied by medical patients. The second unit was located within a renovated gymnasium. It was activated on June 5, 2006 and contained 11 beds. Despite this addition, the institution's total MHCB capacity of 20 to 22 beds was inadequate, prompting the institution to activate a 20-bed Mental Health Outpatient Housing Unit (MHOHU). Administrators expressed concern that expanding EOP capacity would further strain MHCB resources and predicted resumed recourse to the use of ZZ cells and other temporary housing alternatives to the MHCB units and MHOHU.

From November 12, 2005 to June 9, 2006, 127 inmates were discharged from the larger MHCB unit. Discharge information was not provided for the recently-activated smaller MHCB unit. Lengths of stay exceeded ten days in 35 percent of cases, approximately half of which involved DMH referrals.

Use of the MHOHU, activated in December 2005, was substantial. From December 1, 2005 through June 9, 2006, 571 inmates were discharged from the unit, an average of 95 per month. Forty-eight percent of these stays in the MHOHU lasted longer than 72 hours, indicating that access to MHCBs in the facility was inadequate.

Staff reported that activation of the second MHCB unit in June relieved the demand on MHOHU beds. The MHOHU's population was said to have ranged from eight to ten patients during most of June and early July.

In March 2006, inmates placed in the stand-alone administrative segregation unit were routinely screened in settings that were typically private within 72 hours of their placement. Refused screens prompted referral to mental health, which resulted in timely responses.

Other CAP Issues:

a. Partial Compliance

Fewer group sessions were offered to 3CMS inmates during the monitoring period due to safety and security concerns, prolonged lockdowns and the redirection of mental health staff related to activation of the new MHCB unit.

Program space for EOP inmates continued to be inadequate. However, activation of the new mental health treatment center, set for the end of July, 2006, was expected finally to resolve this issue.

EOP inmates in administrative segregation were offered nearly nine hours of scheduled structured therapeutic activities a week, one hour short of the ten-hour goal. Activation of the new EOP and PSU beds was likely to challenge the institution's ability to sustain its current level of compliance.

Institutional audits continued to yield an unacceptably low 75 to 77 percent compliance rate for providing five-day clinical follow-up of suicidal inmates discharged from a MHCB unit or a MHOHU.

The institution did not utilize appropriate CPR measures. There were two suicides during the monitoring period. In both, CPR was not initiated by custody staff but was begun upon the inmates' arrival in the treatment and triage area. In one of these two cases, involving a non-MHSDS inmate, custody staff was unable to locate and utilize the ambu bag in a timely manner. Correctional officers did not utilize micro-shields. Chest compressions were suspended during transport of this inmate to the clinic. In addition, the reported three-minute duration between discovery of this inmate hanging in his cell and his arrival in the emergency room appeared questionable. (See Exhibit C, Review 3.)

Other Issues:

CSP/Sac was not fully compliant with heat plan requirements. While most heat logs were well maintained, others contained gaps in recording. Some units lacked current lists of inmates taking heat risk psychotropic medications.

Temperatures exceeded 100 degrees during the monitoring visit, but staff reported only one Stage II heat alert when indoor temperatures exceeded 90 degrees in a gym which served as a dormitory. Heat lists were not provided to or posted in that unit. Although correctional officers assigned to that unit denied that MHSDS inmates were housed there, the current roster of inmate assignments listed seven 3CMS inmates, two of whom were prescribed heat risk psychotropic medications. In another unit, where numerous heat risk inmates were housed, assigned correctional officers were unaware that a Stage I heat alert had been announced earlier the same day.

Ambient temperatures in housing units were taken by digital thermometers, all of which were attached to probes located on Section B's ceiling next to

the control booth. These thermometers failed to gauge temperatures accurately in sections of the building actually occupied by inmates.

Local policy and procedures on the use of restraints were revised to include a face-to-face evaluation by a clinician within the first four hours, but continued to fall short of Program Guide standards in other respects. Local policy required nursing staff to release "at least one limb every 2 hours for ten minutes," which did not satisfy the new Program Guide requirement for the release of all restrained limbs once every two hours and documentation of the patient's behavior, respiration and responsiveness.

Institutional Summary:

CSP/Sac continued to struggle to meet staffing requirements, recently increased nearly exponentially to support current and projected expansion of its MHCB and EOP capacities by 73 percent and 86 percent respectively and the introduction of DMH programs.

Access to DMH acute inpatient programs remained adequate, but transfers to the Level IV DMH intermediate inpatient program at SVSP remained erratic with a lengthy waiting list. Access to MHCBs was inadequate, even with the addition of a second MHCB unit, resulting in continued excessive use of the MHOHU and other inappropriate temporary housing alternatives. Approximately half of inmates with excessive MHCB stays were awaiting transfer to DMH programs. While access to the MHOHU was adequate, 48 percent of admissions remained in the unit beyond the prescribed timeline of 72 hours.

Quality assurance continued to function well and remained a resolved CAP item. The institution's quality management committee met weekly and regularly

chartered new QITs. Peer review continued, although minutes of peer review activities needed sharpening.

Although the mechanics of providing mental health assessments for caseload inmates charged with RVRs were generally in place, the institution still did not adequately address the problem of indecent exposure and related sexual offenses. When sexual misconduct screens were conducted, they were reviewed inconsistently by an IDTT, for example, to determine whether a more comprehensive evaluation and/or treatment were warranted. Even when referred for more thorough evaluation and treatment, delays were excessively long and treatment scarce.

With respect to other CAP issues, group sessions for 3CMS inmates were down. While program space for EOP inmates continued to be inadequate, anticipated activation of the new mental health treatment center was expected to resolve that problem. EOP inmates in administrative segregation were still not getting the minimum ten hours weekly of scheduled structured therapeutic activities. Five-day clinical follow-up of suicidal inmates discharged from a MHCB or MHOHU remained at a 75 to 77 percent rate of compliance. The institution also needed to improve its compliance with CPR policy, monitoring of temperatures and responses to heat alerts.

CSP/Sac was going through a transformation that will eventually make it one of the department's largest providers of mental health services, particularly for Level IV inmates in need of the most intensive treatment programs available to CDCR inmates, including administrative segregation EOP, PSU, and, eventually both acute and intermediate DMH inpatient programs. The transition process itself brought rapidly increasing caseloads but slowly expanding staff, due more to recruitment and retention