problems than any failure to allocate sufficient staffing resources.  The recruitment challenge will remain CSP/Sac's most critical issue for some time to come.

## California State Prison at San Quentin (SQ)
March 16, 2006
July 11, 2006 - July13, 2006

Significant vacancies and turnover in supervisory, line and auxiliary mental health positions persisted at CSP/SQ.  Overall vacancy rates were exacerbated by allocated positions that were not yet established.  Among supervisory and staff psychiatrists, psychologists and psych social workers, the functional vacancy rate was 14 percent.  Thirty three percent, or three of nine, allocated permanent supervisory and staff psychiatry positions were vacant, two of which were covered by contractors.  Among supervisory and staff psychologists, 44 percent, or 12.6 out of 28.4 permanent positions were vacant, seven of which were covered by contractors.  All psych social work positions were filled.

Despite clinical vacancies, caseloads were generally moderate in size. Caseloads in general population and administrative segregation EOPs were at or below designated ratios. Psychiatry caseloads were the largest at about 140, although only one psychiatrist was assigned to all of administrative segregation.

Vacancy rates were high among psych techs.  Institutional data indicated that seven of ten allocated positions were permanently vacant or had incumbents on extended leave.  Only one of these positions was covered by a contractor.

Although 30 percent of RN positions and 50 percent of MTA positions were vacant, all of the vacancies were covered by contractors.  The sole pharmacist II

position was vacant, but all three pharmacist I positions were filled. Of 5.8 pharmacy tech positions, all but the 0.8.position were filled.

Quality Management:

The quality assurance processes at SQ were in flux. The institution held weekly presentations on the status of its MHOHU, medication management, services in administrative segregation and the MHTS. An action list of items needing correction was maintained, which identified actions to be undertaken, persons responsible for their completion and due dates. A lack of leadership and custody participation was the principal weakness in SQ's quality management efforts. The suicide prevention committee met monthly and seemed to generate good substantive discussions, but custody attendance and participation were rare.

Ten mental health QITs and three FITs were active during the monitoring period. The QIT on suicide follow-up practices reflected an effective utilization of the quality improvement process. The mental health quality management subcommittee met weekly, and minutes reflected sound problem solving mechanisms. Its members collaborated well to conduct meetings, record proceedings and track follow-up.

Medication Management:

The institution had numerous medication problems. Staff reported deficiencies with continuity of medication for arriving inmates and those whose location within the institution was changed. According to staff in MHOHU, about a third of new admissions experienced interruptions in medication. Audits of medication continuity showed a decline with compliance rates of 67 to 76 percent, down from an earlier reported compliance rate of 90 percent. Staff confirmed inmates' complaints of

medication delays in reception and cited a practice among psychiatrists of requiring the completion of reception center screenings and evaluations before they would assess inmates' medication needs. The practice led to medication interruptions of approximately three weeks in most cases. Audits also revealed weaknesses in timeliness of initial psychiatric assessments. One audit during a one-month period indicated that 21 percent of inmates were not seen for their initial evaluation within 14 days of arrival. Audits also showed that medications were not delivered regularly within a day of their order.

According to staff, institutional policy required the distribution of all medications via DOT unless specifically exempted. Effective DOT administration was hindered by poor lighting and visibility.

HS medication administration was available for some inmates, but laboratory testing for inmates on mood stabilizing medications was provided only erratically.

There was partial compliance with the procurement and maintenance of Keyhea orders. During the monitoring period, 17 patients were on active Keyhea orders or had requests for an order pending. Of six orders that needed renewal during the monitoring period, four were renewed and two were denied for unknown reasons. The Keyhea coordinator circulated lists of active orders every one to two months to psychiatrists and supervisory clinical, nursing, pharmacy and custodial staff. Earlier problems with obtaining a timely CDCR-wide Keyhea list persisted.

Follow-up to medication non-compliance was inadequate. Chart reviews revealed a lack of follow-up to referrals in several UHRs. Monthly audits found

compliance rates as low as 40 to 50 percent, although the methodology and criteria measured were unclear.

Mental Health Assessments for the Disciplinary Process:

Staff reported that mental health assessments were prepared for 38 3CMS and 71 EOP inmates and for nine inmates in the MHOHU. Early audits showed improvement in the completion of assessments, with compliance rates at 70 to 80 percent, although timeliness remained a problem in some instances. Some hearing officers failed to document their consideration of assessments in their dispositions. Staff reported that an associate warden and captain were working with hearing officers on this issue, meeting weekly, issuing periodic memos and conducting training managers, but results from these efforts were not yet apparent.

Custody provisions of policies and protocols for handling sexual misconduct were not yet implemented; jumpsuits and Lexan covers were not available or used. Inmates involved in even one indecent exposure incident were housed on East Yard or in the Adjustment Center, with identifying markings on their cell doors, the unit housing board and the door to the tier.

Transfers:

Referrals to DMH acute inpatient programs fell during the monitoring period. Until May 2006, transfers were typically accomplished within a week, but delays thereafter resulted in stays in the MHOHU that lasted as long as three and a half weeks. (See Exhibit D, Case Reviews 5, 7, 11 and 14.) The CCAT upheld the only rejection of a referral that occurred during the monitoring period.

Data on other transfers to more intensive levels of care was confused. Lengths of stay for inmates in the institution's MHOHU increased due to frequently dilatory clinical referrals, rescinded MCHB referrals and administrative delays after clinical discharge. The longest MHOHU stays lasted from four to seven weeks and involved inmates awaiting transfer to DMH programs, MHCB units elsewhere in CDCR or back to housing locations in SQ. (See Exhibit D, Case Review 5.) Despite the lengthening stays, access to MHCB units elsewhere improved somewhat during the monitoring period. Over half of completed transfers to all levels of higher care occurred timely or within a day or two of established timelines, but many of the rest took as long as two to five weeks to complete. In emergency cases, such as serious self-injury committed in the MHOHU, the inmate was given "clinical priority," which assured expedited transfer. Staff provided no explanations for rescinded referrals.

In early 2006, referrals to DMH intermediate inpatient programs were promoted, resulting in increased referrals to ASH, CMF and SVSP. Inmates referred to these programs all stayed in the MHOHU while awaiting transfer. Transfers typically took less than a week for inmates referred to the DMH/DTP at CMF; just over a week for those referred to other DMH intermediate inpatient programs at CMF; two weeks for those referred to ASH with one exception that took four weeks; and seven weeks for inmates referred to DMH/SVPP. Transportation for the DMH transfers was generally timely. None of the referrals was rejected; two were withdrawn because the inmate paroled or was transferred to another CDCR institution. Seven PSU cases took from two and a half months to two years from their original EOP dates for endorsement.

Approximately half of newly arrived inmates in the reception center were endorsed sufficiently promptly for timely placement in a general population program in SQ or elsewhere. On the other hand, placement in programs elsewhere or release on parole for 55 percent of reception inmates exceeded mandated timelines anywhere from two weeks to five months. Among the 84 caseload inmates in reception at the time of the monitor's visit, the percentage of delayed transfers was slightly lower, with a range in delay of one to 14 months. Overall, the timeliness of transfers out of reception worsened somewhat during the monitoring period.

Among the 455 3CMS inmates transferred out of the reception center during the monitoring period, 76 percent were transferred in a timely fashion. For most of the rest, transfers occurred within a month or two after expiration of the mandated 90-day timeline, although 18 inmates had been awaiting transfer for as long as 12 to 18 months. Even so, this represented some improvement over the timeliness, or untimeliness, of transfers in the preceding monitoring period.

Other CAP Issues:

b. Partial Compliance

Despite a substantial history of compliance with reception screening and evaluation practices, some problems cropped up in reception during the monitoring period. Most contacts occurred at cell-front, rather than in a confidential setting. As indicated earlier, audits revealed medication assessment practices in reception that resulted in significant delays in the delivery of medications to newly arriving inmates.

All condemned EOP inmates received daily psych tech rounds, but EOP inmates on grade B status did not receive the required ten hours of structured therapeutic

activities unless they were housed in the Adjustment Center. Clinical case management contacts occurred weekly for EOP inmates and at least every 90 days for 3CMS inmates, but only about a third of contacts occurred out-of-cell due to long waits for available office space.

In the MHOHU, the daily census averaged between 11 and 14 inmates. New admissions were placed in the OHU. Overflow was managed by moving more stable inmates to a third housing unit near the OHU. This third alternative unit, which was employed for about a third of inmates passing through the MHOHU, typically housed one to five inmates who stayed in the unit for one to five days. A fourth alternative, holding cells for inmates with clinical appointments, were used for much shorter periods. Nursing checks in all of these units were erratic but documented daily.

A core of mental health staff provided integrated care in the MHOHU, including assessments, monitoring, follow-up in daily case conferences, supervision of Keyhea orders and referrals to higher levels of care. An increasing number of IDTT meetings were conducted, but were provided only for about 35 percent of inmates with multiple admissions. Even with daily staff coverage, just 59 percent of patients saw a psychiatrist daily and 88 percent saw a clinician daily. More patient contacts were in private settings, except on weekends. Audits found frequent use by the MHOHU clinicians of suicide risk assessment forms, but timely completion at both admission and discharge was not tracked. Multiple admissions, i.e., three or more, were frequent; one inmate was admitted 13 times. Among 59 inmates with repeated admissions, 39 were referred to a higher level of care. Suicide watches were conducted in accordance with policy.

Pre-release planning appeared to have resolved earlier problems with the provision of discharge medications, but other aspects of aftercare planning needed to be addressed more fully.

c. Non-compliance

The screening of inmates admitted to administrative segregation and the provision of treatment in the unit were both inadequate. New screening procedures were implemented prior to the monitor's visit and reportedly were conducted timely, but staff continued to find inmates whose screening had been overlooked for weeks. One sampling found some inmates who had been missed altogether. Screenings typically occurred at cell-front without privacy.

Audits indicated that case management contacts met standards for just 20 percent of the administrative segregation caseload. Insufficient custody escort staff and programming space impeded the delivery of mental health programs in four units. Psych techs appeared to miss several days of rounds each month, and no rounds occurred in the condemned unit for a month. The provision of structured therapeutic activities for EOP inmates in administrative segregation was inadequate despite the assignment of six case managers for fewer than 30 inmates, nearly double the mandated ratio. About 40 percent of EOP inmates were often offered no therapeutic activities, while others were offered indeterminate, but significantly less, than the mandated ten hours weekly. Refusal rates were high. Yard time was not provided to EOP inmates, and while 3CMS inmates were supposed to receive an hour of yard time weekly, none reportedly had been provided for weeks preceding the monitor's visit. No management effort to address and correct these basic service deficiencies was apparent.

Staff reportedly was routinely informed when administrative segregation inmates were placed in overflow units, where, again reportedly, services were delivered timely.

Triaging of mental health referrals was resumed by a psych social worker. Staff performed no audits of responses to emergency and urgent referrals. Audits of routine referrals showed that 75 percent of referrals were answered within two weeks, while some 100 to 300 were left unanswered each month. Staff reported no changes in practice or corrective efforts.

Other Issues:

Suicides were a significant concern at SQ. In the 18 months preceding the monitor's visit, the institution had six completed suicides, most of which occurred in administrative segregation. In the same time period, another inmate died in the OHU while on video monitored suicide precautions. The institution's substantial administrative segregation population and unstable reception center population heightened the concern over suicides.

The institution's responses to the series of suicides were alarmingly inadequate. Only one of the corrective action plans generated by the department in its formal review of these suicides was fully implemented. No documentation on the facility's progress in ensuring mandated timely and appropriate responses to emergency or urgent mental health referrals, initiating emergency CPR more consistently and quickly, rounding of tiers by correctional officers, screening new admissions to administrative segregation and providing weekly summaries of administrative segregation rounds was provided to the monitor. Investigations of policy violations

and/or misconduct directed in the departmental review process were "lost" or unreasonably extended.

Minutes of the emergency review committee reflected more concern with the correct completion of reporting forms than the substantive deficiencies exposed in the suicide review process, particularly those related to the adequacy of custody monitoring of vulnerable inmates and CPR administration. In one suicide, correctional officers reportedly insisted that the hanging inmate submit to handcuffs and, when the inmate failed to do so, remained outside the cell until an MTA arrived, rather than entering the cell and administering emergency CPR. Investigation of another February 2006 suicide, in which the prompt provision of CPR was also an issue, was still pending five months later.

Staff, meanwhile, reported that as of December 2005, 995 staff members had been trained in CPR; 63 other staff members were not trained because they were on leave. CPR training was offered weekly at the institution and was required for all employees returning to work from extended leave.

In the monitor's review of the availability of suicide prevention equipment in various units, only one ambu bag found was located in the adjustment center, where it was stored separately from the other equipment and required a different set of keys for access. Units in the general population had ambu bags, and most officers carried micro-shields. Each five-tier unit had only one cut-down kit located on the first tier. Equipment inventories were generally accurate and frequently updated.

Clerical practices undermined the usefulness of the institution's MHTS suicide tracking system. After every clinical contact, clinicians submitted a suicide

tracking screen form for input, but clerical staff often disregarded the narrative content and reduced entries to formulaic shorthand, such as "past history" or "denies." Entries for suicide related admissions to the MHOHU were incomplete and uneven, often consisting only of dates and conclusory opinions on the genuineness of the reported suicidality, rather than descriptions of inmates' actions, thoughts or other useful objective information. Clinicians did not indicate the level of suicide risk, and clerical staff was untrained in extracting and recording clinically significant information. The result was repeated entries indicating "no suicidality risk," which obscured other important and relevant information and provided no critical analysis of actual risk.

Institutional Summary:

Staffing shortages were significant, particularly among psych techs, but were mitigated by use of contractors and the moderate sizes of clinicians' caseloads. High turnover in custody, medical and mental health leadership positions continued to impede compliance with Program Guide requirements.

The timeliness of transfers to MCHB units improved marginally but worsened for those to DMH/APP at CMF. Overall, lengths of stay in the MHOUH also improved slightly. Transfers to DMH intermediate inpatient programs improved in both number and timeliness. In the reception center, transfers to general population programs continued to be delayed for nearly half of all EOP inmates and 20 percent of 3CMS inmates.

Quality management developed slowly, but wider progress was blocked by the lack of leadership in critical health care management positions and limited participation by custody staff and supervisors. Mental health input into the disciplinary

process also improved slowly. More assessments were completed more timely, and, while some hearing officers failed to document the impact of mental health input on dispositions, efforts were underway to address the problem. Inmates who committed indecent exposure were moved promptly to designated housing, but other custody provisions of the sexual misconduct protocols were not yet implemented, nor was there much evidence of efforts to implement the evaluation and treatment aspects of the departmental policy.

Significant medication management issues remained, particularly for newly arriving, transferring and paroling inmates. HS medication administration and the Keyhea process remained only partially compliant. Although all psychotropic medications were administered by DOT, actual conduct of DOT was limited by poor lighting and visibility. Follow-up on medication non-compliance was deficient, as was laboratory follow-up of mood stabilizing medications.

Suicide response and prevention practices were inadequate. Despite six suicides in the institution in the preceding 18 months, responses to departmental suicide reviews were partial, delayed and defensive. Investigations into the accountability of personnel for lapses in performance contributing to completed suicides lagged, as did the institution's responses to the inadequacies of local policy and practice identified in suicide reviews. Custody and health care administrators alike needed to address the issue of suicide in SQ much more aggressively and effectively.

### Mule Creek State Prison (MCSP)
May 16, 2006 - May 18, 2006

MCSP continued to struggle with staffing vacancies. From December 2005 to May 2006, allocated mental health positions increased by 14.5 percent, from 55

to 63 positions. Newly allocated positions included a half-time psychiatrist, 5.5 staff psychologists, a psych tech and an office tech. Administrators reported that the reportedly streamlined hiring process was ineffective. Hiring delays increased, and candidates were lost.

Staffing shortages were exacerbated by increases in the size of the MHSDS population. The 3CMS population grew from 947 in December 2005 to 1,143 in May 2006, exceeding the cap of 999 by 14 percent. The EOP population did not increase during the monitoring period; it stood at 235, with 36 in administrative segregation, 57 in a pilot Level IV SNY and 142 in a Level III SNY.

MCSP's overall vacancy rate was 36 percent, with 22.5 total vacancies among 63 allocated positions. Vacancies remained particularly high among staff psychiatrists, staff psychologists and psych social workers. Five of seven psychiatric positions were open, but contractors reduced these vacancies to 2.4 for a functional vacancy rate of 34 percent. A total of 23.5 case manager positions, including 16.5 psychologists and 7.0 psych social workers were allocated. Twelve of the permanent psychologist positions and 2.5 of the psych social worker positions were vacant, but contracted services equal to 6.9 psychologists and 4.7 psych social workers reduced the functional vacancy rate among case managers to 11.5 percent. Three of 15 psych tech positions were vacant, but all positions for chief and senior psychiatrists and psychologists, senior psych techs, recreation therapists and clerical staff were filled.

Staffing shortages, together with the excess of population over program capacity, negatively impacted the provision of mental health services. Psychiatrists did not routinely attend all IDTT meetings, nor were they able to respond to referrals in a

timely manner. As the caseload population continued to grow and programs changed, administrators struggled to fill expanding allocations of mental health staff, and the small number of crisis beds available in the institution became increasingly inadequate. By virtue of hard work and dedication, the institution was able to sustain compliance in many areas. Not surprisingly there were setbacks and stagnation in other areas. Quality of care suffered. The mental health staff's collective frustration was palpable and morale among clinicians declined.

Quality Management:

MCSP did not regain ground lost during the preceding monitoring period. The quality management process was largely unchanged. A six-month hiatus in meetings undermined multidisciplinary participation in mental health quality management. Documentation of QIT activities was lost. It was unclear whether mental health staff was well informed about quality management activities. Psychiatrists and psychologists conducted peer review.

Generally, audits based on the review of medical records and the MHTS were adequate in method and sample size. One exception was the audit of medication non-compliance.

Medication Management:

Continuity of medication at MCSP was erratic. Medication interruptions were attributed to a high daily volume of orders, inadequate pharmacy space and the transition from the pharmacy's current information management system to VISTA in a pilot project that apparently will now be abandoned. Staff anticipated some relief once

new larger space for the pharmacy was completed and 11 newly allocated pharmacy tech positions were filled.

Audits conducted early in 2006 found that 71 percent of new arrivals with medication orders received their medication within 24 hours of arrival. When inmates were moved within the institution, 63 percent received medication in a timely manner. Gaps in medication when inmates were discharged from the MHCB were common. Several weeks before the monitor's visit, the institution initiated a new procedure to improve continuity when inmates were discharged from the MHCB. It was too early to evaluate the results of the new procedure.

The status of medication non-compliance was murky. In early 2006, an audit of 30 referrals made to mental health for non-compliance indicated consistent but slow psychiatric follow-up. That audit did not examine whether non-compliance routinely triggered a referral. During the monitor's visit, staff reported that delayed communication to MTAs about changed and discontinued orders led to over-reporting of medication non-compliance. Staff also reported that overly long pill lines were a factor in non-compliance. Staff believed that lengthy pill lines could be shortened by adding a second pill window.

Although all psychotropic medication orders were supposed to be administered via DOT, implementation varied across yards. Staff reported inconsistent implementation of DOT and incidents of cheeking, hoarding and misuse of medication. The monitor's review of a sample of RVRs found cases of cheeking or hoarding. At MCSP, certain medications were routinely crushed upon administration. Staff estimated that DOT administration was carried out roughly half of the time in administrative

segregation. MCSP abandoned its former practice of opening cell doors to administer medication to selected inmates in administrative segregation. A QIT was formed to address DOT in administrative segregation, but no corrective measures had been taken.

MCSP reported that over 400 HS orders, 80 percent of them for psychotropic medication, were written in the institution. HS orders were administered after 8:00 p.m.

Mental Health Assessments for Disciplinary Process:

Review of over 100 completed RVRs and associated mental health assessments indicated that MCSP had incorrectly implemented departmental protocols regarding the discipline of mentally ill inmates. Both mental health assessments and documentation prepared by disciplinary officers were flawed. The kind of errors that were made indicated fundamental misapprehension of the purpose and procedures for the use of mental health assessments in the disciplinary process. Most mental health assessments were poor in quality. The monitor found one case in a sample of ten in which an undated, unsigned, uninformative mental health assessment of an EOP inmate was provided to the hearing officer. Despite the poor quality of mental health assessments, hearing officers and the chief disciplinary officer frequently mitigated charges and sanctions on the strength of clinical findings.

From December 1, 2005 to May 6, 2006, MCSP issued a total of 1,121 RVRs. Of these, 35 percent or 395 were issued to 3CMS inmates. None of the 3CMS inmates who incurred RVRs were referred for a mental health assessment. EOP inmates accounted for 121, or 11 percent of RVRs. All RVRs issued to inmates in the EOP, MHOHU or the MHCB triggered a referral for a mental health assessment.

Hearing officers often reduced charges or penalties based on clinical input but infrequently articulated the role of mental health assessments in their findings and dispositions. Hearing officers assigned to one yard routinely relied upon sections of the state code relating to burden of proof and presumptions of sanity and criminal responsibility. In some cases, hearing officers incorrectly rejected mental health findings or concluded that they should not consider mental health factors when assessing penalties. In two confused cases reviewed by the monitor, mental health assessments concluded that psychotic symptoms were a factor in behavior that led to the RVRs but recommended that hearing officers not consider mental health factors when imposing sanctions.

Mental health assessments did not always serve their purpose. The monitor's review of 12 cases found seven in which the content of mental health assessments was scanty or lacked clarity. For example, in a case in which a caseload inmate punched another inmate, the assessment recommended that the senior hearing officer consider mental health factors in assessing the penalty but provided no clinical rationale. In another case, an inmate was issued an RVR for possession of a razor blade. The assessment found that mental illness had not influenced this inmate's conduct and should not be considered by the senior hearing officer, but recommended leniency in the imposition of a penalty because the inmate had recently experienced a severe psychosocial stressor and intense feelings of guilt and depression. Both custody and mental health staff needed further training.

MCSP supposedly implemented the new sexual misconduct protocol in July 2005, but actual implementation proceeded slowly. At the time of the monitor's

67

visit, a tracking tool was being developed. Information gathered from staff, the nascent tracking report and review of completed sexual misconduct screens indicated that 14 inmates were referred to mental health for screenings. Results were available for seven cases. One of the 14 screenings was pending. No tracking information was provided for two cases. One inmate was transferred to another prison, and three were transferred to DMH prior to being screened. All seven cases that were screened reportedly were reviewed by an IDTT, although there was no record of when the IDTTs met. In three of the cases, an IDTT recommended a comprehensive evaluation. One evaluation resulted in a diagnosis of exhibitionism. In May, a second IDTT review of a treatment plan intended for use in that case was pending.

Staff complained that no additional resources were available to implement the sexual misconduct protocol. A part time staff psychologist who did Board of Prison Term reports was assigned to do all sexual misconduct screens. Mental health supervisors reported that few, if any, clinicians at MCSP possessed the expertise to treat exhibitionism. They feared that attempts to provide such treatment might violate professional scope-of-practice guidelines.

Transfers:

Access to DMH/APP at CMF remained adequate. Transfers and follow-up improved with the appointment of staff to coordinate and track DMH referrals. A tracking log data indicated that out of 11 referrals to DMH/APP, nine were transferred within three days of a bed assignment, one was transferred within nine days and one was rejected due to his close custody status. That referral was redirected. In May, the inmate was awaiting a bed in a DMH intermediate inpatient program.

Access to crisis beds was poor.  The eight MHCBs available at MCSP did not meet the institution's needs.  Staff believed that the planned expansion of Level III and Level IV EOP beds was likely to exacerbate the shortage.

From December 1, 2005 to May 12, 2006, there were 111 MHCB admissions, on average 20 per month, with stays exceeding ten days in 26 percent of cases.  An OHU and holding cells were used to accommodate inmates who would have been sent to the MHCB had a bed been available.

MCSP activated six new mental health outpatient housing unit (MHOHU) beds in an SNY housing unit in July 2005.  The MHOHU was busy.  Logs recorded 71 admissions, on average 16 per month, from December 1, 2005 to April 16, 2006.  Many inmates remained in the MHOHU too long.  Lengths of stay exceeded 72 hours in 41 percent of admissions.  Seven percent were longer than one week.

MCSP had been using holding cells as alternative housing for inmates in need of a MHCB since July 2005.  Five cells in an administrative segregation unit were used to house inmates when no MHCB was open.  No records of the use of these holding cells were kept.  Staff reported that inmates in holding cells were observed by custody staff on a one-to-one basis until they were either admitted to an MHCB or released back to administrative segregation.

Five-day clinical follow-up for suicidal inmates discharged from the MHCB unit was not provided regularly.  An institutional audit showed an 84 percent compliance rate for five-day clinical follow-up of suicidal inmates following their discharge from the MHCB.  During the five-day follow-up period, hourly custody observation was provided and the inmate's movement was restricted.  Records of five-

day follow-up were not maintained on inmates discharged from the MHOHU or from holding cells.

Other CAP Issues:

The amount and quality of treatment provided in the EOP declined. EOP inmates were not receiving ten hours of scheduled structured therapeutic activities per week due in part to a lack of escorts. Most EOP groups were run by psych techs to give case managers sufficient time to make weekly clinical contacts, cover for absent colleagues and attend IDTT meetings. The treatment space available for general population Level III EOP inmates was adequate but staff warned that there was not enough suitable space to accommodate the number expected after the program expanded.

Case managers were faced with managing a growing 3CMS population with SNY classifications. Caseloads exceeded 130. Case managers made quarterly contacts but were unable to increase the frequency and duration of contacts when clinically indicated. Staff reported that the duration of quarterly contacts was as brief as five minutes and likened them to welfare checks.

While most caseload inmates in administrative segregation were seen by their case managers out of cell on a weekly basis, the quality of the contacts diminished as clinicians were forced to shorten the duration of contacts.

Other Issues:

The monitor's review of a sample of UHRs of non-caseload inmates placed in administrative segregation indicated that that mental health screens were consistently attempted within 24 to 72 hours of arrival. In six of the nine reviewed cases,

inmates refused to be screened, but they were not referred to mental health for a UHR review.

Regarding emergency CPR responses, all but 19 of 605 staff members had been trained in CPR procedures, for a compliance rate of 97 percent. Control rooms were equipped with micro-shields, cut-down tools and, with one exception, PPE kits. Inventories were maintained in control rooms. Only a few control rooms were equipped with ambu bags, which were not listed as a required item and were not on inventory sheets. Staff reported that officers had not been trained to use ambu bags and that, in practice, CPR was not administered until medical staff arrived and used ambu bags. All interviewed correctional officers carried micro-shields, reported having been trained in their use and affirmed that they knew how to use them.

Institutional Summary:

Staffing remained problematic at MCSP with an overall vacancy rate among permanent allocated positions of 36 percent. Functional vacancies were higher among psychiatrists than case managers, but the rates for both, when combined with excess caseload population, were sufficient to tax seriously the institution's ability to provide mandated mental health services. Staff struggled to meet the demand for treatment. Quality of care suffered. Staff retention was a concern. By virtue of hard work and dedication, the institution managed to sustain compliance in many areas. Not surprisingly, there were setbacks and stagnation in other areas.

Regarding quality management, MCSP did not regain ground lost during the preceding monitoring period. The quality management process was largely

unchanged. Psychiatry and psychology continued to engage in peer review. Audits that relied upon MHTS were adequate in size and method.

Medication management was problematic during the monitoring period. Medication continuity was not sustained for new arrivals, intra-institutional transfers or when inmates were discharged from the MHCB. Response to medication non-compliance was deficient. DOT protocols were followed inconsistently, particularly in administrative segregation units, leading to reports of cheeking, hoarding and medication misuse. Psychiatrists wrote HS orders, and HS medications were administered after 8:00 p.m.

All RVRs issued to EOP, MHOHU and MHCB inmates resulted in referrals for mental health assessments. None of the 3CMS inmates who incurred RVRs was referred. The results of mental health assessments were used by hearing officers, but documentation of their use was lacking. In some cases hearing officers inappropriately cited code provisions related to criminal responsibility and the insanity defense and rebuffed clinical findings. Many reviewed mental health assessments had confusing content or omitted pertinent information. Further training in this area was needed. Implementation of the new sexual misconduct protocols was slow. Staff expressed frustration with a lack of resources and specialized clinical expertise.

Access to DMH/APP at CMF was adequate, but the number of referrals was small. Access to the MHCBs was poor. MCSP's eight MHCBs did not meet the demand. The six-bed MHOHU was overused, with the length of stay of 41 percent of admissions exceeding 72 hours. Five holding cells in administrative segregation were

also used as alternative housing, but no records of their use were kept. Five-day clinical follow-up after inmates were discharged from the MHCB unit was 84 percent compliant.

Inmates who did not cooperate with mental health screening in administrative segregation were not referred to mental health. Although nearly all staff received CPR training they were not trained to use ambu bags. Staff reported that, in practice, CPR was not initiated until medical staff arrived and used ambu bags. Officers carried micro-shields on their person and reported proficiency in their use.

### Richard J. Donovan Correctional Facility (RJD)
April 19, 2006 – April 21, 2006

RJD continued to struggle with its high rate of vacancies in mental health positions but utilized contractors effectively. Staff reported that 22 percent or 24.5 of 111.5 mental health positions were vacant in March 2006. Positions for a chief psychiatrist, a senior psychiatrist, 2.5 staff psychiatrists, two senior psychologists, 2.5 clinical psychologists, one psych social worker, eight psych techs, 2.5 recreation therapists and three office techs were vacant. The chief and senior psychiatrist and the chief psychologist positions were covered by existing staff. According to staff, all vacancies except those for recreation therapists were covered by contractors. Positions for a senior psychologist, a half time clinical psychologists and the health services administrator had been redirected to other locations.

Vacancies among RNs increased as allocations rose from 28.56 to 34.51, with eight and a half positions unfilled. MTA vacancies also increased, with five MTAs on extended leave and 3.5 positions vacant. All three pharmacist positions were filled, and the vacant pharmacy tech position was covered with contracted services. Of 8.4 allocated medical records positions, three supervisory positions were vacant but were

covered by existing staff. The 1.4 vacancies among non-supervisory staff were not covered.

Turnover among mental health clerical support staff contributed importantly to delayed data entry and recently reduced audit results. Three of 12 office tech positions were vacant, but both office assistant positions were filled.

Staff shortages were severe among correctional offices, with vacancies for 104 positions, some of which were unfunded. Correctional officers often worked two to three shifts of mandatory overtime each week. A shortage of custody staff in the EOP yard contributed to missed yard time, cancelled shower schedules and a lack of laundry services.

Issues Resolved:

Treatment plans and IDTT meetings for new EOP inmates were timely.

EOP inmates in administrative segregation were offered over ten hours of treatment weekly.

Initial contacts, mental health evaluations and IDTT meetings for 3CMS inmates who arrived from other CDCR institutions were timely.

3CMS inmates in the general population were seen quarterly.

Blood levels of inmates on mood stabilizing medications were monitored appropriately.

A supply of medication was provided to inmates who were paroled to the community.

Quality Management:

Quality management improved as the institution's governing body and health care quality management committees continued work that was useful to supervisory staff. A large number of audits were completed, but some sample sizes were

too small to support the conclusions reached.  DCHCS provided more concrete support for quality management efforts.

The mental health quality management subcommittee held well attended weekly meetings from December 2005 through March 2006.  Documentation was more informative.

QITs were comprised mainly of supervisors, but staff was kept informed of audit results.  Many QITs functioned like standing committees that addressed multiple problems, rather than multidisciplinary teams with a focus on resolving a single problem and then disbanding.   Some QITs lacked necessary members and expertise.

Peer review for psychiatrists was well established, but its effectiveness was diluted by heavy institutional reliance on contractors.  Psychologists and social workers did not engage in peer review.

The MHTS was used to schedule contacts in many locations and for audits of case management contacts and EOP treatment hours.  Data entry into MHTS often lagged due to clerical staff shortages.  One consequence was that audit results later than February were unavailable at the time of the monitor's visit.  Staff relied on supplemental automated systems to track contact due dates.  A new procedure to manage referrals using the MHTS had not yet been tested.

Medication Management:

Medication management improved in discrete areas.  The local procedure on medication management was revised.  Two problems were resolved, and procedures in three other areas appeared to be working.  Staff devoted considerable effort to medication

continuity, but the use of small sample sizes and brief time periods made audits of medication continuity vulnerable to anomalies.

Procedures to ensure medication continuity for arriving inmates were changed again only a few weeks before the monitor's visit. A small audit that spanned one week showed that 19 of 20 new arrivals received medications within 24 hours. Medication continuity following intra-institutional transfers remained problematic. Audits done in November 2005 and March 2006 found that medications were administered within 24 hours in 84 percent of sampled cases. Medication continuity was typically sustained when inmates were discharged from the MHCB. An audit of two thirds of the relevant cases showed that medications were administered within 24 hours in 25 out of 27 cases.

RJD improved its handling of medication non-compliance. Problems with timely renewal of medication orders persisted despite implementation of a new procedure. A sound audit done in January and February 2006 found that medication orders had expired for the six of 33 sampled inmates.

Audits indicated that blood levels of inmates on mood stabilizing medications were monitored appropriately.

The rate of obtaining informed medication consent from inmates improved but continued to fall short of required compliance levels. An audit in December 2005 found that informed consent was obtained in 141 of 175 orders, for a compliance rate of 80 percent.

Compliance with DOT requirements varied by location. At three locations, DOT procedures were followed routinely, but in two others they were followed about half of the time.

HS medications were administered on all yards, and were ordered for over 560 inmates. Staff reported that administration of HS medication was sometimes problematic when yards were locked down.

A small audit indicated that parole medications continued to be provided.

<u>Mental Health Assessments for the Disciplinary Process</u>:

Mental health input into the disciplinary process improved with monitoring and supervision. The chief disciplinary officer reviewed errors made by hearing officers. Audit results were distributed to associate wardens and the chief psychologist. However, no audits had been conducted to measure rates of referral of inmates whose behavior warranted assessment.

From November 2005 through January 2006, 675 RVRs were issued, including 70 to inmates in the MHCB or EOP. All of the latter were referred for a mental health assessment. Inmates treated at the 3CMS level of care accounted for 27 percent or 182 of all RVRs issued, four of which were referred for a mental health assessment.

Logs of RVRs kept in each of the institution's four facilities failed to record whether inmates were on the mental health caseload or were referred for a mental health assessment. A log maintained by mental health staff did not always include dispositions of charges, although staff reported that such information had been requested but not received.

The monitor's review of nine cases in which mental illness was found to be a contributing factor showed that hearing officers nearly always took mental health assessments into account in their findings and dispositions. In three cases, hearing officers failed to document their consideration of mental health input but nonetheless reduced penalties. In another three cases, charges were dismissed or the inmate was found not guilty based on the mental health assessment. In one case, charges were reissued and reheard because the hearing officer had proceeded without a staff assistant, and in another case, the chief disciplinary officer reduced penalties.

Transfers:

Access to higher levels of care and MHCBs was poor. RJD's improved performance reported in the preceding monitoring period turned out to be ephemeral. Referrals and transfers to DMH programs declined by roughly 30 percent during the monitoring period. In the five months between October 2005 and March 2006, RJD referred 16 inmates to DMH/APP at CMF. Fourteen were transferred. DMH took more than one week to communicate decisions in half of the cases. RJD transported most inmates to DMH/APP within 72 hours of acceptance, but in four cases transfers took four to six days.

Two DMH/APP referrals were rescinded due to clinical improvement. In one case the improvement was short lived. The inmate was referred again nine days later. Once the referral was accepted, he was not transferred for two weeks.

According to transfer logs, RJD made between16 and 23 referrals to DMH intermediate inpatient programs. Six inmates were on the waiting list in April. Staff

reported that one person had recently been transferred to DMH/SVPP after a six-month wait.

Logs of referrals to DMH and MHCBs were marginally adequate. They provided an overall picture rather than a definitive record. Logs were difficult to decipher due to shifting time parameters and the convoluted routes taken by many cases. Lengths of stay and the number of multiple admissions could not be calculated precisely.

RJD was cited in the past for taking too long to complete referrals to higher levels of care. The referral log, therefore, recorded time lapses between the points at which a clinical decision was made and referral paperwork was submitted to DMH. That information was not available at most other institutions. Staff succeeded in shortening the amount of time taken to complete referrals, but the lapses remained a factor in lengths of MHCB stays. Staff reported that they typically initiated acute care referrals at about the fifth day of an MHCB stay and completed the referral packet three to five days later. According to the referral log, 12 referrals were completed within seven days and 12 were completed within eight to eleven days.

The licensed CTC had 15 beds that were used as MHCBs. Access to the MHCB unit was poor. RJD continued to fail to identify and refer decompensating inmates to the MHCB. A process was established to monitor high risk inmates and trigger referrals when they were warranted. Staff monitored the inmates but inexplicably failed to make clinically indicated referrals. The monitor's expert found a number of high risk inmates that should have been referred to the MHCB or DMH acute or intermediate programs. (See Exhibit F, Case Reviews 2, 3, 4 and 5.)

The MHCB had approximately 190 admissions, an average of 38 per month, during the five months that preceded the monitor's April visit. Many MHCB stays exceeded ten days. During the six-month period preceding the monitor's visit, over 25 percent of admissions to the MHCB unit had excessive lengths of stay. In contrast, staff reported that only 13 percent of stays exceeded ten days, with the difference stemming from different calculation methods. Staff distinguished between stays that were extended by MHCB staff for clinical reasons and long stays attributable to other factors. According to the log, 14 inmates who remained in the MHCB longer than ten days were too ill to discharge, but they were not referred to a higher level of care or considered for a Keyhea order. Approximately 46 inmates were admitted to the MHCB unit two or more times between October 2005 and April 2006.

DMH notified RJD of inmates returning from DMH programs and sent discharge summaries. The DMH coordinator at RJD in turn notified case managers and forwarded copies of discharge summaries. Case managers did not see inmates who returned from the hospital immediately. Like any new arrival they were seen within five days.

Five EOP inmates were endorsed to a PSU during the monitoring period. None was transferred.

RJD continued to have problems meeting transfer timelines for 3CMS and EOP inmates in the reception center. Institutional audits for November 2005 through February 2006 found that 34 percent of EOP inmates remained in the reception center over 60 days, and 23 percent of 3CMS inmate had lengths of stay exceeding 90 days. In April 2006, the monitor found that 24 of 74 EOP inmates had been in the reception center

longer than 60 days, and 60 3CMS inmates, or 16 percent, of 377 3CMS inmates had been there longer than 90 days.

Reasons for excessive lengths of stay included missing medical chronos and pending RVRs. Staff reported that 165 pending RVRs in the reception center could not be processed expeditiously due to staffing shortages. RJD sent central office a proposal to endorse and transfer inmates with minor RVRs. The expedited transfer process for EOP transfers out of reception center worked with limitations. Mental health staff referred 14 inmates for expedited transfer, four of which were accomplished within 30 days while two took much longer. Eight requests, however, never reached the correctional counselor who handled expedited transfers.

Other CAP Issues:

a. Partial compliance

In the reception center, RJD was unable to sustain its performance in following up caseload inmates. By the time of the monitor's visit, staff no longer saw reception center 3CMS inmates every 90 days, and weekly contacts with EOP inmates were inconsistent. Frequent psychiatric contacts were made in nearly all cases reviewed by the monitor's expert. Reception center staff spent a great deal of time trying to bridge gaps in medication continuity, but written orders did not result in reliable medication administration. An IDTT meeting observed by the monitor's expert was meaningful, fulfilled Program Guide requirements and served its purpose. Treatment groups offered in the reception center declined from seven to one. Staff attributed the drop to larger caseloads, loss of staff, a series of errors in ducating inmates and competition for treatment space between medical and mental health.

General population EOP treatment was revamped and improved, eliciting favorable comments from inmates. Case managers replaced psych techs as group leaders. Groups observed by the monitor's expert were excellent but ill suited to the needs of the lowest functioning inmates, who elected not to attend and were treated in their housing units. Groups conducted in housing units boosted treatment hours but varied widely in content and sometimes lacked meaning. Some groups featured structured educational or recreation activities, while others offered merely an opportunity to spend time in the day room.

The amount of treatment offered to and received by EOP inmates increased. Expanded offerings included education for some inmates. On average each inmate was offered 9.82 hours per week by mid-February 2006, up from 7.24 hours at the end of 2005, although inmates reported that offerings were actually closer to six hours per week. Group leader absences were covered by a floater. The amount of average treatment actually received rose from 3.86 hours in November and December 2005 to 6.36 hours per week during the first seven weeks of 2006. In May 2006, inmates reported that they were scheduled for one hour of group each weekday and offered one "bonus" group session each week.

EOP group treatment availability was impaired by tight scheduling. Groups sometimes began late, and minor disruptions led to cancellation of outdoor recreation time, showers and the use of the day room, as well as the loss of treatment hours. Inmates and staff reported that inmates were locked in their cells 23 hours per day and yard and showers were cancelled. Inmates found this environment stressful and asked to attend more than one group per day. RJD continued to struggle with accounting

for the discrepancy between the number of treatment hours scheduled and those actually offered. A lack of more recent audits in this area was attributed to a shortage of office techs and a resulting lag in data entry.

In administrative segregation, the caseload population remained below the mandated capacity of 63. EOP inmates were seen weekly by a case manager, although there was no record of cell-front versus out of cell sessions. MHTS audits for November 2005 through January 2006 found that 93 percent of EOP inmates and 83 percent of 3CMS inmates had weekly case management contacts. Audits of UHRs of all relevant cases found compliance rates above 90 percent for both EOP and 3CMS inmates. Some 3CMS inmates were housed in two buildings used for administrative segregation overflow, where access to treatment was impeded by a lack of escort officers and holding cells.

Audits of all cases in administrative segregation found that every EOP inmate was offered twelve hours of group treatment plus two hours of individual treatment weekly. In the past EOP inmates housed in overflow units could not attend groups or receive required treatment. RJD solved the problem by moving EOP inmates from overflow buildings within 24 hours.

b. Non-compliance

Institutional audits found that UHRs were available for clinical contacts 74 to 79 percent of the time. The 63 inches of loose filing in March 2006 had grown to 98 inches, or the equivalent of 45 days of backlog, at the time of the monitor's April visit.

Other Issues:

Implementation of the heat plan improved at RJD. Staff was trained, the local operating procedure was revised to centralize temperature logs, and heat alert posters were displayed in all visited housing units. All custody staff surveyed had new heat plan cards. A small staff audit found that psychiatrists distributed heat cards when ordering psychotropic medications in 16 of 25 cases reviewed. These weak compliance rates were attributed to time of year and file documentation gaps. Current heat lists were distributed to housing units, and complete temperature logs had been compiled in a central location. Staff confirmed that medical rounds were made during Stage III heat alerts.

RJD's implementation of emergency response directives was examined. On February 28, 2006, RJD instituted its plan for the provision of cut-down kits and emergency response. All but seven of 788 correctional staff members had been trained on the amended CPR policy. During the monitor's visit, RJD directed that employees who were on leave longer than four months must report to in-service training for verification of their status with annual CPR training and the amended CPR and mouth shield training. Staff would not be posted until trained.

A review of 13 of RJD's 22 housing units showed that all units examined had readily accessible cut-down tools, ambu bags and PPE kits, although one unit lacked gloves. All but three officers carried mouth shields. Those three officers, however, had been trained in the use of mouth shields and knew where to obtain them.

RJD's emergency response and death review committee met regularly until November 2005. When it next met in April 2006, the meeting was co-chaired by

84

the associate warden for operations and the chief physician. A captain, a psychiatrist, the director of nursing and a nurse attended the meeting, but representatives of medical records and bargaining unit six were absent.

To date, two emergency responses involved caseload inmates, but neither was reviewed by the emergency response and death review committee. Incident reports in one case stated that the inmate said he could not breathe, but an MTA left his cell to call for a gurney and an ambu bag. When the MTA returned, the inmate was unresponsive. The MTA then initiated respiration in the cell with an ambu bag, and CPR was initiated in the transport vehicle. In the second case, a vague incident report stated that an inmate in a van in transit between RJD and DMH/CMF was found unresponsive, life saving techniques were initiated and an ambulance crew took over rescue respiratory efforts.

Institutional Summary:

RJD lost 2.5 positions to other locations and continued its struggle with a large number of vacancies, although it was successful in covering vacancies with contractors. Three supervisory positions were filled by staff who had long served in acting capacities.

Staff planning and diligence resulted in several significant improvements and the resolution of six CAP deficiencies. Staff met with 3CMS inmates quarterly, evaluated arriving 3CMS within five days and held timely initial IDTT meetings. Treatment plans and IDTT meetings for new EOP inmates were timely. EOP inmates in the reception center were offered over ten hours of treatment weekly. Blood levels of

inmates on mood stabilizing medications were monitored appropriately. Paroling inmates were supplied with medications.

The institution improved in three of four focus areas. Quality management audits were conducted on mental health program. QITs addressed relevant issues, but some needed broader membership and improved methodology.

Although medication management improved in circumscribed areas, broad systemic issues had not improved. Non-compliant inmates were referred to mental health. Blood levels of inmates on mood stabilizing medications were monitored. Medication continuity was sustained for inmates discharged from the MHCB unit. RJD lagged in renewing medication orders before their expiration and in administering medications to relocated or newly arriving inmates. Pill lines needed more work.

Mental health input into the disciplinary process at RJD improved, with referrals to mental health for assessments of all EOP and MHCB inmates who had RVRs. In some cases hearing officers reduced penalties or found inmates not guilty based upon mental health assessments. Logs and documentation in RVR packets needed improvement. There had been no audits to measure rates of referral of inmates whose behavior warranted assessment.

RJD failed to identify and refer decompensating inmates to crisis beds or higher levels of care when clinically warranted. There was a 30 percent decline in the number of inmates referred to DMH. A process to monitor high risk inmates foundered because staff did not recognize when referral to a crisis bed or DMH was warranted.

RJD also failed to meet transfer timelines for caseload inmates in the reception center where the former practice of seeing 3CMS inmates quarterly and EOP

inmates weekly was not sustained. An expedited transfer process was implemented but only four of 14 inmates referred for expedited transfer were moved within 30 days.

With respect to other CAP issues, there was significant improvement in both the amount and the quality of treatment provided to general population EOP inmates. For several months, case managers made weekly contacts with caseload inmates in administrative segregation, but compliance was not sustained. An indeterminate amount of contacts in administrative segregation were cell-front. Medical records were not routinely available for clinical contacts, with a backlog of loose filing that was five to eight feet in depth.

The institution demonstrated greater diligence in implementing the heat plan. Local procedures were revised, staff was trained and heat alert flyers were posted in housing units, although full implementation of the heat plan could not be assessed at the time of the monitor's April 2006 visit.

The revised CPR policy was implemented. Staff was trained, PPE kits were distributed to housing units and most officers carried a micro-shield.

RJD's mental health program needed to sustain its efforts, maintain its improvements and continue to monitor its progress with meaningful audits. Most importantly, RJD needed to improve its treatment of severely mentally ill inmates by placing inmates in crisis in a MHCB, developing a method to handle resulting bed shortages, promptly referring MHCB inmates who did not stabilize within a few days to DMH acute care and moving inmates to DMH programs within required time limits.

**Salinas Valley State Prison (SVSP)**
April 26, 2006 - April 27, 2006
June 5, 2006 - June 7, 2006
July 14, 2006

During the monitoring period, the vacancy rate among permanent mental health staff at SVSP was 43 percent. The chief psychiatrist position, filled briefly during the preceding monitoring period, was once again vacant. Four of seven positions for staff psychiatrists were vacant. Through the use of contractors, 2.5 of four vacant psychiatry positions were covered. Even without a chief psychiatrist, SVSP had the equivalent of 5.5 psychiatrists, more than at anytime in the recent past.

All three supervisory psychologist positions were filled, as were 13 of 16.5 clinical psychologist positions. The 3.5 vacancies were covered by contractors. Two of four psych social work positions were vacant, one of which was covered by a contractor. Because the registry's supply of psychologists was depleted, SVSP could not obtain enough contractors to maintain the required ratio of case managers to caseload inmates in administrative segregation.

The rate of turnover among psych techs was high. The position of senior psych tech was filled. Six psych techs resigned in April. Of 12.5 psych tech positions, 7.5 were vacant, with contractors covering six of the vacancies. None of the institution's 2.5 recreation therapist positions were filled, but two contract LVNs with relevant experience provided recreation therapist services late in the monitoring period.

Nearly all of SVSP's MTA and nursing positions were staffed or covered by contractors for the second consecutive monitoring period. There was no appreciable change in MTA staffing. The vacancy rate for MTA positions remained at 45 percent. Fifteen of 27 allocated MTA positions were filled. The 12 vacant positions were covered

by contract LVNs. Both senior MTA positions were filled by acting incumbents. Allocated RN positions were increased to 35.1 during the previous monitoring period and were either filled or covered by contractual staff. Positions for the director of nursing and two of three supervising RNs were filled. The third supervising RN position, dedicated to medication management for caseload inmates, became vacant during the monitoring period. Three RN positions assigned to the EOP were deployed elsewhere.

Turnover among mental health clerical staff was high. Eight positions were allocated, an increase of one. Six office techs resigned during the monitoring period. Five positions were filled; two remained vacant in June 2006. One position was long ago diverted for use by medical staff.

SVSP staff continued to insist that the number of allocated mental health positions was inadequate. Administrators argued that they were able to attract qualified job candidates but had no positions to offer. In March 2005, the institution requested five new case manager positions and one senior psychologist position. According to SVSP staff, DCHCS granted the six new positions. In August 2005, SVSP was told to fill the positions with contractors and paperwork to establish the positions formally would soon be completed. Later that month, SVSP was told that the institution from which the positions were supposed to be diverted was contesting the diversion. Ten months later, the fate of the six positions was unknown, and a second request to headquarters to increase the number of case manager positions reportedly did not receive a response. In addition, a proposal for 9.5 case managers and a senior psychologist for the institution's EOP submitted over one year ago reportedly had elicited no response.

The number of caseload inmates at SVSP grew to 1,500. The 3CMS caseload in June 2006 was 1,242, while the EOP had 251 inmates, 58 of whom were in administrative segregation. In June 2006, 142 3CMS inmates were housed in administrative segregation.

The vacancy rate among correctional officers remained around four percent, with approximately 30 of 800 positions vacant. Another 30 vacancies were imminent. SVSP expected to receive five to fifteen cadets from the academy each month.

Access to treatment was problematic in the EOP during the first half of the monitoring period. The associate warden for healthcare was tapped to serve as the acting chief deputy warden. In the absence of an active and involved associate warden for healthcare, routines were disrupted and many hours of treatment were lost. The level of collaboration between mental health and custody staff declined. During the second half of the monitoring period, lack of clinical staff to run groups was the primary reason for lost treatment hours.

SVSP's configuration of one general population and two SNY yards, one for Level III and one for Level IV, was associated with multiple problems. Any inmate who ran into difficulties that would typically be handled by moving from yard to yard within the institution now triggered a transfer to another institution. It was not uncommon for such transfers to take months.

A transitional programming unit (TPU) housed some inmates waiting for transfers. The TPU was an alternative to administrative segregation housing. It was established to afford inmates access to routine programming while transfer paperwork was processed. During the previous monitoring period, conditions in the TPU were

nearly as restrictive as those in administrative segregation. Staff reported that during the current monitoring period the day room was open to inmates and access to the yard was offered on a normal schedule. There were 62 inmates in the TPU in June 2006. Half were 3CMS inmates. Seven of the caseload inmates had been there for at least six months, and the remainder for longer. The monitor's audit of a third of the cases found that all had current treatment plans and were seen at least quarterly by a case manager.

On occasion an issue arose regarding inmates with a SNY classification who needed EOP treatment. The EOP at SVSP cannot accommodate inmates with SNY designations. Inmates who needed EOP level of treatment were offered the option of relinquishing their SNY classifications during their stays in the EOP. Those who chose not to relinquish it waited in administrative segregation until they were transferred to an EOP SNY bed. Such transfers typically took months. Plaintiffs' counsel reported that some inmates felt that staff pressured them to give up their SNY status in order to receive EOP treatment at SVSP. The effect of departmental rules in concert with the location of various treatment and housing combinations necessarily brought about forced choices between living in administrative segregation for months pending transfer or relinquishing SNY status during EOP treatment at SVSP. In one case reviewed by the monitor's expert, the array of options available presented in fact a forced choice between levels of care and desirable housing options. (See Exhibit G, Case Review 25.) A third option was feasible because the inmate's level of functioning was higher than that of the typical EOP inmate but lower than the typical 3CMS inmate. He probably could have been treated successfully at the 3CMS level of care if more individualized, intensive treatment were provided.

The mission of the D-Yard was no longer limited to administrative segregation, the EOP and the TPU. During the monitoring period, two buildings were used to expand the number of DMH intermediate inpatient beds available to CDCR inmates. Buildings were cleaned, painted and modified. Double cells were converted to single cells. An observation cell and a room for restraint and seclusion were built. Dining halls were to be converted into six offices. The first building opened in May. Its capacity was 36. Twenty patients were in the unit during the first week of June. Two had already been discharged. Treatment groups were held in the day room.

A number of questions about how the units would operate were unsettled. Eight beds were being held for inmates who had not yet arrived. Staff reported that 98 inmates were on the waiting list. PSU inmates had top priority. Staff reported that determination of priority was complicated by operation of a court order regarding the priority of inmates who were judged too dangerous for ASH but who needed competency evaluations. The use of offices in the converted dining rooms for treatment was under discussion. Negotiations with the correctional officers' union were underway. The second building was slated to open in September 2006.

CDCR also planned to open a behavioral modification unit (BMU) in June 2006 at SVSP. A small number of caseload inmates, estimated by staff to be three, were to be housed in the BMU. As of mid-July 2006 it had not yet opened.

Issues Resolved:

Decompensating inmates were identified and removed from administrative segregation.

Quality Management:

The institutional quality management committee met weekly. Mental

health staff served on the institutional quality management committee and audited
medication continuity for caseload inmates who were moved within the institution.

The mental health quality management committee remained an effective
management tool. The committee met weekly to review the results of audits, identify
problems and devise solutions. Selected indicators of EOP and 3CMS treatment, MHCB
use and compliance with treatment requirements for inmates housed in administrative
segregation were audited regularly. Resolved CAP items that were key to the provision
of mental health treatment were also audited. Audits used adequate sample sizes and
sound methodology.

The mental health quality management committee eschewed QITs in favor
of action items. Few members of the mental health staff were involved in quality
management, and custody staff rarely participated in quality management activities.
Mental health staff was informed of the results of audits. Because routine audits had
been done for approximately two years, the mental health staff was aware of the current
status of program indicators and could track changes over time.

Audits of medication management and telemedicine were derailed by the
resignation of the mental health supervising RN and a lack of psychiatrists. Two QITs,
one on monitoring blood levels of inmates on mood stabilizing medications, and the other
on medication management, were stymied for the same reason. In the absence of a chief
psychiatrist and a quorum of staff psychiatrists, the health care manager exercised some
degree of quality control by meeting weekly with contract and staff psychiatrists to
review cases. The goal of the reviews was to inform psychiatrists of the standards by
which their work would be judged.

Psychology staff continued to engage in peer review. The peer review committee kept records and held case conferences. A newly hired psychiatrist was assigned the task of developing peer review for psychiatry.

Use of the MHTS to track referrals progressed slowly. The number of referrals grew as a system that was put in place at the end of the preceding monitoring period was integrated into the operations of the institution. Referrals were triaged by a designated psych tech or case manager on each yard five days per week. In June 2006, staff was slated to examine the handling of referrals in the context of revised Program Guide requirements. Plata requirements regarding triage were expected to be a factor.

Medication Management:

Modest gains made in medication management during the preceding monitoring period did not develop into general improvement. Information provided about the status of medication management was fragmented. Medication continuity remained problematic when inmates were relocated between yards or were released from the MHCB unit. Medication continuity was also problematic for new arrivals.

Protocols for medication non-compliance were not followed consistently. Blood levels of inmates on mood stabilizing medications were not monitored appropriately. A list of inmates on DOT medication was compiled. There had been no examination of how distinctions between DOT and nurse administered medication orders were made or whether inmates with DOT orders were observed when administered medication. A nursing audit found that MARs were often lost or misdirected when inmates were released from the CTC,

psychiatrists changed a regimen or inmates arrived at the institution. Completeness and legibility of MARs remained problematic.

Staff reported that psychiatrists wrote orders for a maximum of 90 days. Psychiatrists sometimes renewed orders without seeing inmates.

Keyhea orders were not tracked adequately. Four Keyhea orders lapsed because the Keyhea coordinator was unaware of their status. There was no change in an inappropriate local procedure that permitted a non-treating psychiatrist to overrule a recommendation made by a treatment team.

The mechanism for providing parole medications remained in place. The accuracy of the list of paroling inmates and whether medications were distributed to parting inmates were not examined.

Mental Health Assessments for the Disciplinary Process:

A total of 1,589 RVRs were issued from November 2005 through March 2006. EOP and DMH inmates accounted for 141of the RVRs issued. Staff reported that a mental health assessment was completed in all cases. Caseload inmates treated at the 3CMS level of care accounted for 27 percent of the RVRs. Mental health assessments were completed in 112 or 25 percent of those cases. The monitor's review of a small sample of cases found that mental health assessments were not completed within required time frames.

The monitor examined roughly 20 percent of the RVRs issued to inmates who were treated at the EOP level of care, were in a crisis bed or were in the DMH program. Eleven of the cases involved interactions between inmates and officers. Charges included willfully delaying an officer or a schedule, disobeying orders and

obstructing a peace officer. In half of the cases mental health assessments found that the inmate's mental disorder was a contributing factor and should be considered in penalty assessments. Hearing officers did not always consider mental health input. In one case reviewed by the monitor, a hearing officer rejected the findings of the mental health assessment, substituted his own judgment and imposed the maximum penalty. The inmate was psychotic at the time of the incident and had spent the next eleven weeks in a crisis bed or at DMH.

Hearing officers recorded the results of mental health assessments but did not consistently document whether those results were considered in their findings and dispositions. In a number of cases, hearing officers applied state law pertaining to competency and the insanity defense in the RVR process. Supervisory staff acknowledged that further training was needed.

A large number of inmates, 81, were charged with sexual misconduct. Thirteen cases involved EOP inmates; 52 involved inmates treated at the 3CMS level of care. The rest were not on the mental health caseload. The protocol for sexual misconduct screening and evaluation was not followed strictly. Screenings were not completed soon after the incident, nor were they reviewed by an IDTT. Instead, a fairly comprehensive assessment was done two weeks to six months after the incident. Assessments were reviewed by a senior psychologist. Exhibitionism had not been diagnosed in any case.

Inmates who were in administrative segregation for indecent exposure were eligible to attend a group that addressed sexual misconduct. The group was

96

reportedly well attended and well received. Scheduling conflicts and space limitations made weekly meetings impossible. Inmates attended only two sessions.

From January 2006 through May 2006, 145 cases were eligible for referral to the district attorney. Forty seven, or nearly one third, were referred. SVSP elected not to refer 31 incidents. No decision had been made regarding 67 additional incidents.

<u>Transfers:</u>

Logs of referrals to higher levels of care were complete. Staff reconciled different sources of information to improve their accuracy. SVSP made 21 referrals to DMH/APP at CMF care during the first five months of 2006. Seventeen of the 21 referrals resulted in transfers to acute care. Three referrals were rescinded, and one was pending transfer. Not all referrals were initiated and completed swiftly enough. The average lapse between MHCB admission and referral in the cases that were transferred was 11 days, ranging from one to 27 days. All but two of the inmates were transferred to DMH within 72 hours of acceptance.

Access to DMH intermediate inpatient programs was poor. Despite SVPP's location within the perimeter fence of SVSP, access to SVPP was no better than it was for referrals originated by other CDCR prisons. Referrals were accepted but inmates typically languished for months on SVPP's waiting list. In June 2006, four EOP inmates were awaiting transfer to SVPP. Two had been on the waiting list for 95 days. One had been on the waiting list for 217 days. The fourth was on the list for 314 days. A fifth inmate, in need of diagnostic clarification, was initially referred to SVPP but redirected to DMH/CMF. He had been waiting for transfer for 243 days.

The number of mental health crisis beds available for psychiatric patients continued to decline. Although licensed for 16 crisis beds, the number of crisis beds available for psychiatric use was reduced to 10 or 12 during the preceding monitoring period. By April 2006, the number was further reduced to five or six. Staff reported that DCHCS had required the admission of several more chronic care patients to the CTC. During the first four months of 2006, there were 76 admissions to the MHCB. The average of 19 admissions per month stood in contrast to the prior six months when there were 41 admissions per month.

The quality of IDTT meetings held in the MHCB was undermined by the unsuitable venue. A large conference room used in the past was often unavailable. It was the only location in the CTC equipped for telemedicine. The alternate meeting room did not have a holding cell. A high noise level in and near the alternate room made conversation difficult.

A six-bed MHCB did not meet the demands of the populations at SVSP and CTF. SVSP continued to use several different areas to hold inmates awaiting a crisis bed. Records of the use of holding areas were incomplete but better than average. Evaluations for MHCB admission and discharge were documented. Nursing contacts were not documented reliably. Records of the use of holding cells in locations distant from the CTC were not always returned to the CTC.

Available information indicated that some inmates spent days in holding cells. Some never made it to a crisis bed. They were released back to their housing units after staff found that their conditions no longer warranted admission. Incomplete records showed that during the period from January 1 to April 30, 2006, there were 143 holding

tank admissions. Length of stays exceeded two days in at least 25, or 17 percent, of cases. In 11 cases inmates remained in holding cells from four to seven days.

A local operational procedure regarding the use of MHCB overflow areas was consistent with CDCR policy. After normal clinical hours, four group holding cells that served as waiting rooms for clinic patients were used. Those cells had running water. Mattresses were provided during overnight stays. When the clinic's holding cells were in use by inmates awaiting medical appointments, BPT interview rooms located in the yards were used as holding areas. BPT interview rooms had running water. When BPT interview rooms were unavailable or occupied, inmates were placed in holding rooms located in the visit areas. Those cells did not have running water.

Three mesh standup holding cells located near to the custody post immediately outside the CTC were used daily for up to four hours. They were used when inmates were awaiting an evaluation for admission or to be moved to a holding cell located in a yard. Inmates raised questions about adherence to the four-hour limit. At the time of the monitor's June visit, correctional officers had not completed logs to reflect that inmates were removed from the wet holding cells and placed in the standup cells earlier that morning. Inmates who were interviewed in the standup holding cells reported that on other occasions they had been taken out of the cell after four hours and allowed to sit in a chair for two minutes before being returned to the holding cell.

Correctional staff in the CTC were unaware of CDCR's moratorium on the use of video cameras to monitor inmates on suicide watch. They used video equipment to supplement one-to-one direct cell front observation. Operational procedures and post orders did not reflect recent revisions to suicide watch procedures.

Due to poor sightlines, SVSP did not assign one officer to observe two inmates on suicide watch.

Other CAP Issues:

a. Partial compliance

Staff continued to audit previously resolved problems in such areas as case management contacts and treatment planning. Audits showed that case management contacts with nearly 1,500 caseload inmates were made as required. Case managers made timely contacts with 3CMS inmates 98 to 100 percent of the time. Staff made weekly contact with EOP inmates 91 to 97 percent of the time.

Treatment plans were written in a timely manner for 3CMS inmates. Annual IDTT meetings for 3CMS inmates continued to be held in a timely manner. A full team attended the meetings. Case managers prepared inmates in advance. Staff brought medical records and C-files to meetings. The quality of many 3CMS IDTT meetings was compromised by environmental conditions. Modified programming, lockdowns and competition for space made it necessary to hold them in locations bereft of such basics as lighting and furniture. Under those circumstances staff brought case summaries rather than records. Conscientious efforts to hold meaningful meetings could not overcome these adverse conditions. Most treatment plans were individualized. The compliance rate for individualized treatment plans fell short of 90 percent due to omissions by one case manager.

During the first quarter of 2006, 79 to 92 percent of EOP treatment plans were updated quarterly. Not all treatment plans were individualized. Monthly IDTT