meetings and treatment plans for inmates with modified treatment plans or awaiting DMH beds were cursory.

The monitor's expert observed two EOP groups during the June monitoring visit. The size of the groups ranged from seven to 11. The curriculum was well received by the members of the groups. Group leaders were highly skilled.

EOP caseloads were too large. Six case managers provided group and individual treatment to 252 EOP inmates distributed between general population and administrative segregation. Caseloads averaged 43. Many weekly case management contacts were made cell-front through solid doors. Lack of recreation therapists reduced the number of groups offered and eliminated non-verbal treatment. An increasing number of psychiatry contacts were missed. In some cases, medication orders were renewed without patient contact. Many psychiatry notes were cursory. Treatment provided to some of the most severely ill inmates in the EOP did not meet their needs. (See Exhibit G, Case Reviews 2, 4, 5, 6.)

The number of referrals received by mental health climbed during the first six months of use of a new system. Clinical staff in each yard triaged and responded to referrals five days per week. Referrals were recorded in the MHTS. In June 2006, staff was slated to examine and modify how referrals were handled.

b. Non-compliance:

A high rate of cancellations had a deleterious impact on group treatment in the EOP. From January through April 2006, group treatment in the EOP was cancelled 60 to 72 percent of the time. Early in the year, custody-driven cancellations

predominated. Later in the monitoring period, mental health staff shortages resulted in yet more cancellations.

A staff audit of ten percent of the EOP population found that on average EOP inmates were offered six and one half hours of scheduled structured therapeutic activities per week. Staff reported that about 15 percent of inmates in the EOP were scheduled for three hours or fewer weekly. Staff gave two rationales. First, the inmates no longer benefited from the activities because they had been in the same groups many times. Second, some were too ill or too low functioning to participate in group treatment. Their treatment plans were reviewed monthly to ascertain whether a reduced schedule was appropriate. The monitor's expert reviewed a small number of these cases and found that the strategy was misguided. Some inmates needed a type of group that was not offered in the EOP. Others needed more intensive treatment rather than less.

The 58 EOP inmates in administrative segregation were typically offered five to six hours of scheduled structured therapeutic activities weekly. The number dipped to three when staff was absent or routines were disrupted.

The level of mental health treatment provided to 3CMS inmates in administrative segregation was similar to that reported in the two preceding monitoring periods. Each week a large number of inmates were seen out of cell, but effort alone could not overcome structural impediments to meeting Program Guide requirements. In June 2006, there were 142 3CMS inmates in administrative segregation. Case managers had caseloads of 30 to 40. During the first four months of 2006, case managers offered out-of-cell contacts to 75 to 95 percent of caseload inmates. Typically 50 to 60 percent of inmates offered an out-of-cell session accepted the offer. The arrangement of holding

cells used for group treatment remained problematic. Psych tech rounds were made as required.

Group treatment for 3CMS inmates in the general population was offered on only one of three yards. Meetings were cancelled 79 percent of the time. Modified programming and lockdowns occurred so frequently on the other two yards that no attempt was made to schedule group treatment. Staff assigned to one yard reported that confidential space for case management meetings was not available.

SVSP was partially compliant with CPR policy. The monitor found that all but four correctional officers were trained. Two of these were scheduled for training in the near future. The other two were out on leave. Officers who returned to work would receive block training prior to resuming their duties. Some inventory sheets for the first five months of 2006 were missing. In the housing units the monitor found some inventory sheets that did not include all required items. One housing unit did not have a cut-down tool. Staff informed the monitor that one had been ordered but not yet delivered. All correctional officers responded affirmatively when asked if the were in possession of a micro-shield.

The monitor reviewed three incident packages. The incidents took place during the period from November 2005 through May 2006. CPR with a mouth shield was conducted in one case, and an ambu bag was used in another. CPR was not used in the third case, which did not involve a death.

Institutional Summary:

Mounting pressures took a toll on the quality of mental health treatment provided at SVSP. Compliance with most quantitative requirements was sustained due to

robust mechanisms that were already in place.  Constant demands to devise solutions to
unexpected problems, many associated with changes in the institution's increasingly
complex mission or disrupted daily routines, deflected staff attention from systems
building and prevented the consolidation of gains.  Custody, medical and mental health
staffs were all hard pressed to collaborate on joint ventures while handling urgent
problems.

SVSP did a good job of recruiting psychiatrists and psychologists, but the
overall permanent vacancy rate remained around 40 percent.  Psychiatry staffing
improved significantly, but the functional vacancy rate remained over 30 percent.  The
institution covered a large proportion of the vacancies by using contractors.
Administrative segregation was understaffed because the supply of contractors was
exhausted.  Needed improvements in psychiatry practices and medication management
were stymied by lack of a chief psychiatrist and lack of a supervising mental health RN.
The absence of an associate warden for health care hurt the EOP.

SVSP maintained that too few case manager positions were allocated
given the size of the caseload and the demands of the institution.  No response reportedly
had been received to the institution's request for 16.5 additional case managers.  Nursing
and MTA positions were nearly all filled or covered by contractors.  High rates of
turnover among psych techs and office techs and the loss of all recreation therapists
hampered treatment in the EOP.

SVSP was able to maintain the status quo in the three of the four focus
areas.  Quality management remained a useful management tool.  Audits were conducted
regularly, but QITs were rarely used.  Few mental health staff and no custody staff were

involved in quality management. The capacity of the MHTS to track referrals was not fully realized.

Medication management did not progress. The loss of a supervising RN assigned to mental health was a blow. Fewer audits were done. Staff acknowledged widespread problems with medication continuity but were unable to identify or remedy the sources of the breakdowns. Procedures for non-compliance with medication were neither followed consistently nor audited. The handling of Keyhea orders needed improvement.

Custody staff at SVSP was diligent about referring unusual disciplinary cases to mental health, but hearing officers needed more training. Twenty five percent of 3CMS inmates charged with disciplinary infractions were referred. Mental health assessments were often late. Hearing officers did not consistently document whether they considered mental health findings. In a number of cases, hearing officers inappropriately applied to the RVR process state laws on competency and the insanity defense. The protocol for sexual misconduct screening was not followed strictly. Fairly comprehensive mental health evaluations were done. None of 81 inmates charged with sexual misconduct were diagnosed with exhibitionism. Limited group treatment was offered to inmates who were in administrative segregation for sexual misconduct.

Access to crisis beds became critical. Chronic care medical patients in CTC beds reduced the number of MHCBs to five or six. The demand for crisis beds outstripped the supply. As during the preceding monitoring period, SVSP continued to use several different areas to hold inmates awaiting a crisis bed. Records of the use of holding areas were incomplete. Available information indicated that some inmates spent

days in holding cells. Some never made it to a crisis bed. Incomplete logs indicated that there were at least 143 admissions to holding cells during the monitoring period. MHCB staff was unaware of the moratorium on the use of video cameras for suicide watch, but cameras reportedly were used only to supplement direct observation.

Access to acute care was adequate but untimely. Nearly all inmates referred to acute inpatient care were eventually transferred to DMH, although staff often waited too long to refer inmates to acute care. Access to intermediate care was poor, with only two inmates transferred and waits ranging from 95 to 314 days.

Two buildings at SVSP had been converted to DMH use to expand the number of intermediate inpatient beds available to CDCR. Details regarding the operations of the buildings remained to be worked out.

Gains in the quantity and quality of treatment in the 3CMS program of the past few years were largely sustained, but the level of treatment provided to EOP inmates slipped during the monitoring period.

## SUMMARY

The year 2006 has been a tumultuous one for CDCR and its mental health services delivery system. The inexorably rising census of institutionalized prisoners exceeded 172,000 inmates in October, pushing institutional counts perilously close to 200 percent of capacity, and led to the formal declaration of a state of emergency by Governor Schwarzenegger in early October. The appointment of a receiver in the Plata case on medical care introduced a sharply different dynamic into the management of the bulk of CDCR's health care services, a development with substantial potential impact on the delivery of mental health care. A special session of the Legislature convened in the

late summer to address CDCR's multiple and growing problems accomplished little and generated only limited remedies for CDCR's systemic difficulties. Meanwhile, the court in Coleman approved a final version of the Program Guide, the collection of basic standards and policies controlling mental health services in CDCR, and mandated extensive program and staffing expansions to implement them.

The continuing growth of both the general CDCR population and the MHSDS caseload, which reached 32,348 in early October, was beginning already in 2005 to swamp the capacity of the defendants' programs for the most seriously mentally ill inmates in CDCR, especially for those at high levels of custody. Moreover, in 2005 as the result of the Unmet Needs Assessment, which examined the extent to which CDCR clinicians made use of inpatient beds maintained by DMH for CDCR's most seriously mentally ill inmates, it became clear that, for many reasons, CDCR clinicians failed to refer for DMH inpatient care numerous inmates in need of such treatment, a finding that required the defendants to expand significantly their resources for the provision of inpatient care.

A disturbing byproduct of population growth was a steady rise in self injurious behavior, both real and feigned, among seriously mentally disordered inmates, who felt substantially more vulnerable and threatened in overcrowded conditions that, from their perspective, were spiraling out of control. The result was a sharp increase in referrals for suicidal ideation and gestures, as well as instances of self injury. Responsive clinicians referred growing numbers of apparently suicidal inmates to a MHCB level of care for evaluation and stabilization, which, in turn, gradually overwhelmed the defendants' limited supply of mental health crisis beds. As early as mid to late-2004,

institutions spontaneously began generating an array of housing alternatives for inmates clinically referred for a crisis level of care for whom no MHCB was available. It took CDCR nearly a year to organize and regulate the randomly sprouting alternatives, many of which were transparently inappropriate, often lacking sufficient staff to provide close clinical or custody monitoring and treatment and characterized by physical conditions full of dangers for potentially suicidal inmates. This situation made glaringly apparent the department's lack of sufficient MHCBs and precipitated a genuine crisis, requiring both immediate and long-term efforts to provide an adequate supply of MHCBs.

Just these two population-related developments alone, apart from a half dozen other crises that also erupted in CDCR over the past two years, required the defendants to undertake substantial construction and physical renovation projects and allocate many hundreds of additional clinical and custody staff positions. Allocations needed to address changes in the Program Guide alone reached 551, while additional positions to staff, new DMH programs, MHCB units, newly created MHOHUs, expanding EOPs and SNYs for caseload inmates and increases in the capacity of existing programs to service their growing population included nearly 500 more clinical, custody and clerical positions. In the last two budget cycles, the mental health staffing has grown by 50 percent, and when the dust clears, the overall size of the staff will be close to 3,000 positions. This deluge presents prodigious recruitment problems, which have no chance of being addressed effectively until compensation rates for mental health clinicians have been significantly enhanced, another problem the defendants are currently struggling with.

These developments only began to impact CDCR institutions directly during the late summer of 2006, the tail-end of the monitoring period covered by this report. But already the pressures created by program populations that exceeded program capacities and faltering recruitment were squeezing the defendants' over-stretched clinical resources. Among the seven institutions covered in this report, which possessed the richest mixture of intensive levels of mental health and high-custody inmates in CDCR, the average vacancy rate for permanent mental health positions was 30 percent. Five of the seven institutions, CMF, CSP/LAC, MCSP, RJD and SQ, were able to reduce the functional vacancy rate (i.e., permanent allocations – vacancies + contractors) of their overall mental health staff to ten to 15 percent with contracted services, but the heavy reliance on contractors was accompanied by problems of orientation, supervision and repeatedly changing clinicians for a significant proportion of the caseload.

Even after contracting, the vacancy rate among psychiatrists at CSP/LAC was 52 percent, and among case managers, 23 percent. At CMC, the functional vacancy rate among staff psychiatrists was also 23 percent. When these levels of functional vacancies were added to caseloads that regularly exceeded program capacities by ten to 15 percent, no amount of staff dedication or management expertise would suffice to prevent critical shortcomings in the mental health services being provided.

Further complicating the tracking and analysis of defendants' mental health staffing was the inability of DCHCS to provide anywhere nearly contemporaneous monthly statistical reports on staffing allocations, recruitment and vacancies or on department-wide contracting. It is some five months since allocations of headquarters staffing quintupled the number of positions available in DCHCS to enhance, among other

policy and monitoring capabilities, the ability to compile, collate and analyze data on CDCR's mental health system.   One can only hope that the fruits of those staffing additions will soon be harvested.

Meanwhile, the management of cascading allocations of staff and the associated recruitment challenge, as well as the need to address forthwith the compensation aspects of CDCR's ongoing recruitment and retention conundrum, must remain the immediate focus of the defendants' efforts.

Quality Management:

Quality management had long functioned smoothly at CMC and CSP/Sac. The mental health quality management committee at CSP/Sac met weekly while CMC's met monthly.  Quality management activities were well documented.  QITs were chartered and disbanded when their tasks were complete.  Psychology and psychiatry engaged in peer review.  Peer review documentation was largely uninformative.

MCSP did not regain ground lost during the preceding monitoring period. Improvement was needed because a six-month hiatus in quality management meetings derailed multidisciplinary participation in mental health quality management. Documentation of QIT activities was lost.  It was unclear that mental health staff was well informed about quality management activities.

At CMF, RJD and SVSP, quality management was blended with program management to the general detriment of quality management.  CMF's efforts focused mainly on EOP treatment; RJD's quality management process but still had far to go; and SVSP's process was broadly focused but empirically based.  Line mental health staff, custody staff and other disciplines participated infrequently in quality management

activities in CMF, RJD and SVSP. Documentation of quality management efforts was good at SVSP and adequate at CMF and RJD. All three institutions kept mental health staff informed about the results of quality management audits and used their quality management infrastructure and activities to manage their insufficient resources more effectively.

At SQ the mental health quality management committee met regularly and received reports from all QITs. Lack of mental health leadership and too little custody involvement hampered quality management. CSP/LAC's quality management efforts had yet to get off the ground; they were in a redevelopment mode. Quality management activities depended upon individuals rather than any organizational structure. While audits were not uniformly useful, EOP supervisors tracked treatment hours and reasons for cancellations meticulously.

Peer review was conducted at most institutions. Several institutions sought clarity from central office regarding expectations for peer review. Peer review was conducted among at least two disciplines at CMC, CMF, CSP/LAC, CSP/Sac and MCSP. SVSP's psychologists conducted peer review, but too few psych social workers were available for peer review. SVSP's peer review process was well documented. RJD and SVSP reported that peer review by psychiatrists was thwarted by heavy reliance on contractual staff. RJD had no peer review.

<u>Medication Management</u>:

<u>DOT and Nurse-Administered Medications</u>: Most of the eight institutions continued to be challenged by the distinction between nurse-administered medication and medication administered by direct observation therapy (DOT). Three locations within

RJD were compliant, while two were non-compliant in about half of cases. At MCSP, although DOT orders accompanied all psychotropic medication orders, compliance reportedly varied across yards depending on the competence of the MTA delivering medications. Lack of compliance with protocols reportedly led to incidents of cheeking, hoarding and medication abuse, causing the institution to order routine crushing of certain medications. DOT was estimated to have been effective in only about half of cases in administrative segregation due to large caseloads and staffing shortages.

CSP/LAC did not maintain a central list of inmates on DOT, although the chief psychiatrist reported that psychiatrists addressed the distinction between DOT and nurse-administered medications during peer review. At SVSP, a list of inmates on DOT was kept, but no review focused on how distinctions between DOT and nurse-administered medications were made or whether inmates on DOT were observed when given their medications. By institutional policy at SQ, all medication was administered DOT, unless specifically exempted. Proper execution was hampered by poor lighting and visibility. CMC had not implemented DOT protocols for the most part, except in its hospital and East Clinic areas.

Continuity of Medication: Problems with continuity of medications persisted throughout the institutions, for both arriving inmates and following intra-institutional transfers. Inmates reported interruptions particularly on transfer to administrative segregation, including admissions following DMH discharges.

At MCSP, persistent problems with continuity when inmates were transferred within the institution were attributed to the daily high volume of prescription processing and pharmacy shortages of staff, space and an effective MIS. The compliance

rate for continuity following moves within the institution was 63 three percent and even lower for inmates after discharge from MHCBs. Nearly 30 percent of inmates arriving with verified prescriptions experienced interruptions in medications. Continuity also remained problematic for relocations between yards and on releases from MHCBs at SVSP. Psychiatrists at SVSP now wrote medication orders for a maximum of 90 days but sometimes renewed orders without seeing inmates.

Following transfers within CMF, prescription renewals were left unfilled in the pharmacy for up to seven days, and expired in one to two percent of cases. Results of audits by location were highly inconsistent, with sustained continuity rates in housing units varying between 20 and 83 percent. At RJD, an audit found an 84 percent compliance rate for continuity following transfers. Continuity following discharges from MHCBs was slightly better with a compliance rate of 93 percent. Lapses between expiring orders and renewals persisted. Continuity compliance rates at SQ fell from a former high of 90 percent to 67 to 76 percent compliance. Reports of delays of up to three weeks for inmates in reception were corroborated by staff and were attributed to psychiatrists' preference for conducting reception center screenings and evaluations before assessing the inmates' medication status. Generally, medications were not delivered timely within 24 hours of orders. At CMC, arriving inmates faced gaps in medication of about 1.5 days, with delays attributed to a requirement that the institutional psychiatrist evaluate the inmate before reordering medications.

Laboratory Testing: Monitoring of blood levels of inmates on mood-stabilizing medications at SVSP and SQ was deficient. RJD was compliant in this area.

Medication Non-compliance:  Institutional follow-up of medication non-compliance was mixed.  At MCSP, follow-up was slow and problematic.  Staff attributed weaknesses to lack of timely communication of medication changes and discontinuation orders to MTAs, which led to over-reporting of medication non-compliance.  Responses to non-compliance improved but remained inconsistent at CSP/LAC, where the compliance rate for follow-up improved from 50 percent in March to 90 percent in May 2006.  Audits showed referrals to mental health in 30 to 70 percent of cases of medication non-compliance.

Follow-up to medication non-compliance at SQ remained deficient, with several instances found where no follow-up was documented.  Audits finding compliance rates of 40 to 50 percent were vague as to the methodology and criteria employed.  Protocols were not followed at SVSP.  At CMF, no audits of follow-up were conducted.  The only institution that showed improvement in this area was RJD.

HS Medications:  Compliance with the current policy on the administration of HS medications was mixed.  At RJD, HS medications were administered to over 560 inmates on all yards, but yard lockdowns sometimes interfered with the timeliness of their distribution.  CMC had only ten inmates on HS medication orders with a so-called "p.m." medication line, but remained non-compliant.  Efforts were frustrated in part by custody rules on inmate lock-up before dark.  SQ was partially compliant.

At MCSP, 80 percent of 400 inmates on psychotropic medications were given their medications appropriately after 8:00 p.m.  The institution planned to

114

implement bi-monthly observations of HS pill lines, rotating among yards. At CMF the last medication pass of the day in EOP was after 8:00 p.m.

Keyhea Process: Institutions attained partial compliance in this area, although problems with obtaining a timely statewide Keyhea list persisted. SQ had 17 inmates on actual or requested orders. Of these, six orders were up for renewal, four were renewed and two were not. The institution circulated Keyhea order lists monthly or bi-monthly to psychiatrists and supervisory clinical, nursing, pharmacy and custody staff. At CSP/Sac, weaknesses persisted in timely renewals of Keyhea orders. A QIT on the issue was about to be chartered. SVSP did not track orders adequately, and four orders lapsed because the Keyhea coordinator was unaware of their status. The institution did not change its unique and inappropriate procedure allowing a non-treating physician to overrule a treatment team's recommendation for a Keyhea order.

Other Issues: Polypharmacy rationales and documentation improved at CMF. An audit early in the monitoring period found documented rationales for the use of polypharmacy in 68 percent of reviewed cases, followed by a May 2006 audit which found the compliance rate improving to 93 percent.

Timeliness and documentation of psychiatric responses to case managers' referrals remained problematic at MCSP. The institution lost ground with a compliance rate of 50 percent in late 2005 and early 2006. Regression was attributed to the shortage of psychiatrists, but the chief psychiatrist was conducting training sessions to improve performance in this area.

Mental Health Assessments for the Disciplinary Process:

CDCR policy requires referrals for mental health assessments when 3CMS and non-caseload inmates receive rule violation reports (RVRs), if their behavior at the time of the infraction "would reasonably be considered bizarre, unusual or uncharacteristic for that inmate." The process was implemented to promote appropriate institutional response to RVRs arguably caused or affected by mental illness.

The rate of referrals for assessments of 3CMS and non-caseload inmates receiving RVRs differed significantly among the institutions. At SVSP, 25 percent of 3CMS inmates were referred, while at MCSP no 3CMS inmate was referred. Among the other institutions, referral rates for 3CMS inmates ranged from two to ten percent. Referrals of non-caseload inmates were rare in all eight institutions.

Mental health assessments were completed in a timely manner except at SQ. The quality of mental health assessments improved overall at seven of the eight institutions. SQ raised its compliance rates in this area to 70 to 80 percent. Improvements were noted at CSP/LAC, except for one clinician, who continued to include inappropriate information in assessments. About half of mental health assessments at SVSP concluded that mental health was a contributing factor and should be considered in the disposition of the RVR.

At MCSP, clinical input was often confusing, contradictory or insufficient, and in one case it was missing altogether. Some assessments omitted explanations of why the provided mental health input should be considered, while some others reflected misapprehension of the required content of assessments and their role in the disciplinary process.

At CMF, CSP/LAC, MCSP, RJD and SQ, mental health assessments generally were given consideration and affected dispositions and penalties. At RJD, where the chief disciplinary officer actively reviewed their decisions, hearing officers nearly always took mental health input into consideration in their findings and dispositions. At MCSP, hearing officers reduced charges or penalties based on mental health assessments, but some of them improperly relied on their own legal interpretation of the insanity defense to reject mental health input. Mental health assessments had an impact at CMF and SQ, where some significant dismissals and penalty reductions were based on mental health assessments

Mental health input was sometimes rejected at SVSP. One hearing officer there rejected a mental health assessment, substituted his own opinion and imposed the maximum penalty, even though the inmate was psychotic at the time of the incident and spent the ensuing eleven weeks in a crisis bed or DMH. In some other cases at SVSP, hearing officers improperly applied standards on competency and the insanity defense. Staff acknowledged the need for further training on this issue.

CSP/LAC had several problems with the process. Mental health staff reported that some hearing officers rejected mental health input in favor of the reportedly "more credible" testimony of correctional officers. Some dispositions, moreover, were delayed as long as nine to 12 months. Inmates at CSP/LAC were still employed to type up RVRs, a breach of confidentiality raised with the institution repeatedly.

Logs for RVRs and mental health assessments were maintained at most institutions with varying degrees of completeness and usefulness. Lapses in documentation continued to occur at all of the institutions reviewed. Hearing officers at

117

MCSP, RJD, SQ and SVSP inconsistently recorded their consideration of assessments, although SQ staff reported that an associate warden and captain held regular meetings and training sessions for hearing officers on this issue.

Implementation of the new protocols on the handling of sexual misconduct varied among the eight institutions and remained largely a work in progress during the monitoring period. CSP/LAC had promulgated its local operating procedure in August 2005, which closely followed CDCR directives. Although staff were trained in the new procedures and logs were maintained, in one indecent exposure case the inmate was not screened to determine if an IDTT should be convened for an evaluation. In two other cases, inmates with numerous sexual misconduct charges, who were diagnosed with sexual disorders warranting treatment, had received none.

At SVSP, 81 inmates were charged with sexual misconduct, 13 of them EOP inmates and 52, 3CMS inmates; none was diagnosed with exhibitionism. Screenings, while comprehensive and reviewed by a senior psychologist, were completed as long as two weeks to six months after the precipitating incidents, and none was further evaluated by an IDTT. At MCSP, sexual misconduct protocols were implemented but needed further work. Fourteen inmates were referred for mental health assessments, with one screening pending, but only one evaluation resulted in a diagnosis of exhibitionism. No treatment had begun in that one case.

CSP/Sac was partially compliant. RVRs for indecent exposure prompted screens, most of which were completed within a week. The screens, however, were not consistently reviewed by an IDTT to determine if a more comprehensive evaluation and/or treatment were clinically indicated. In cases of repeated exhibitionism, the

institution adopted a process for review by the chief psychologist to decide whether

monthly screens or regular review by an IDTT should be utilized.  In practice, only one

case was referred for more comprehensive evaluation, resulting eight months later in a

diagnosis of exhibitionism and pedophilia, but no treatment had yet been provided as of

the time of the monitor's visit.

In July 2006, CMF produced a coherent draft of its sexual misconduct

policy and procedures, and mental health staff had developed a treatment protocol for

indecent exposure.  From January to July 2006, screenings and IDTT meetings were

conducted for 20 of 28 inmates charged with indecent exposure, seven of whom were

referred for evaluation.  Of the four inmates diagnosed with exhibitionism, one had begun

treatment as of July 2006.

Transfers:

The quality of information available about transfers to all levels of

intensive MHSDS programming ranged from incomplete and indecipherable to thorough.

Automated records were often misleading or lacked essential information, and

institutions regularly supplemented automated logs and tallies with additional manual

lists and records.  Some savvy institutions devoted a staff position specifically to

coordinating and tracking referrals to higher levels of care.  Not surprisingly, those

facilities typically compiled the best data and successfully dispatched the most inmates to

all levels of more intensive care.

DMH Acute Inpatient Care:  Some institutions, including CSP/LAC,

CSP/Sac, MCSP and SVSP, were able routinely to gain adequate and timely access to the

DMH acute inpatient program (DMH/APP) at CMF.  CSP/LAC and MCSP, however,

119

made few referrals to DMH acute care, only one or two a month. Demand was somewhat

higher at CSP/Sac and SVSP, where four to six referrals were made monthly. During the

monitoring period, both RJD and SQ referred and transferred fewer inmates to

DMH/APP than in the preceding monitoring period. RJD persistently failed to identify

and refer all decompensating inmates to DMH inpatient care; the number of referrals

from RJD fell 30 percent during the monitoring period.

Both CMC and CMF had special arrangements for access to acute

inpatient beds at, respectively, ASH and DMH/APP. For much of 2004 and 2005, ASH

was supposed to provide care for CMC inmates in need of a placement in a MHCB after

CMC's Locked Observation Unit, which CMC had long used as its local MHCB unit,

was closed as a result of the Budd litigation. To accommodate CMC inmates in need of a

MHCB, ASH got 25 of its intermediate care beds licensed for the provision of acute

inpatient care. For a variety of reasons, CMC and ASH never managed successfully to

make anywhere near full use of these 25 ASH beds as intended, and CMC was able to

place only a few of its many MHCB referrals in ASH. The rest had to find placements in

MHCB units elsewhere in CDCR, an increasingly difficult task. CMF, on the other hand,

which also lacked its own MHCB unit, worked out an arrangement more than two years

ago with DMH/APP at CMF to accept up to 20 CMF inmates in need of a MHCB level of

care. After a rocky beginning, during which CMF was accused of flooding DMH/APP

with its MHCB inmates, a *modus vivendi* was reached that included the creation of a

psychiatric admissions unit (PAU), where MHCB candidates from CMF were initially

evaluated before being placed in a MHCB within the APP or an acute APP bed or being

returned to CMF. Although the PAU was early viewed as a successful innovation, during

the 17th monitoring period it began to be viewed by CMF clinicians as an impediment to full access to the MHCBs in APP/DMH. The results left CMC and CMF with access perceived as limited to MHCBs within the acute DMH inpatient programs at ASH and DMH/APP at CMF.

All of the foregoing involved the access of CMC and CMF solely to those beds earmarked for a level of MHCB care operated in ASH and DMH/APP. Direct transfers from both institutions to *bona fide* acute inpatient care in DMH/APP apparently continued at a normal pace, although CMF's transfer data mingled acute care transfers with MHCB transfers, making a definitive analysis difficult.

DMH Intermediate Inpatient Care: During the monitoring period, DMH's capacity for providing intermediate inpatient care, especially for Level IV inmates, continued slowly to expand. The first increment of 36 beds on the D-6 living unit at SVSP designed to provide DMH intermediate inpatient care for Level IV inmates opened in the late spring of 2006, while an additional 20 beds were to be made available beginning in August 2006. The defendants were also committed to opening a final component of 56 beds on D-5 at SVSP by December 31, 2006. Meanwhile, the 36-bed Level IV DMH intermediate inpatient unit on P-2 at CMF, which had been scheduled for closure in May 2006 due to the installation of air conditioning, remained open and operational.

Encouraging as these developments were, they were still evolving during much of the monitoring period and had, as yet, little positive impact on access to DMH intermediate inpatient programs for Level IV inmates. The mainstay Level IV DMH intermediate inpatient program at SVSP (SVPP) continued to be dramatically

oversubscribed throughout the monitoring period. The waiting list for access to this 64-bed, relatively long term program did not dip below 100 inmates until September 2006. The lengthy waiting list at DMH/SVPP was the greatest single obstacle to DMH intermediate inpatient care for Level IV inmates, resulting in inordinate delays between most referrals and actual transfers to the program, delays that reportedly made referrals to the program seem futile to many CDCR clinicians.

The availability of DMH intermediate inpatient programs for Level III CDCR inmates was much greater. CDCR still struggled to make full use of its allocated DMH beds at ASH and Coalinga State Hospital (CSH), which together amounted to 256 beds, about half of which CDCR was able to fill. The gap confirmed yet again the frustratingly uneasy fit between DMH's supply of and CDCR's demand for intermediate inpatient beds. The problem for the defendants was not that they lacked a sufficient overall number of DMH intermediate inpatient beds, but rather the dearth of intermediate inpatient beds capable of housing Level IV inmates. In addition to the surplus of intermediate beds at ASH and CSH, the DMH Day Treatment Program at CMF could accommodate up to another 44 relatively low-risk inmates, housed in an open dormitory.

Apart from its referrals to SVPP, CMF placed 47 inmates, a third of its referrals to DMH intermediate inpatient care, primarily in those intermediate inpatient programs operating in CMF. CMF did make 20 referrals to SVPP. Fourteen remained on the waiting list; none had been transferred. CSP/Sac had considerably less recourse to DMH intermediate inpatient programs. Fifteen CSP/Sac inmates, half of those referred, were admitted and actually transferred. Delays ranged from five to 213 days. RJD referred between six and 16 inmates to intermediate inpatient care, for one of whom

122

transfer took six months. CSP/LAC made seven referrals, but only one inmate had been transferred at the time of the monitor's visit. Despite SVPP's location within the SVSP complex, SVSP enjoyed no special access to the DMH/SVPP. Referrals were accepted, but inmates typically languished for months on the waiting list. In June 2006, four EOP inmates were pending transfer to SVPP. The number of referrals and transfers reported by the eight institutions as having occurred during the monitoring period seemed inordinately small given the combined size and intensive levels of their MHSDS programs.

Timeliness has always been a key factor in access to DMH acute and intermediate inpatient care. Historically, both DMH, with its limited resources for Level IV inmates, and CDCR, with its penchant for procrastinated referrals, contributed importantly to delays in access to acute and intermediate care. The crucial importance attached to the assignment of a bed number by the receiving DMH program reflected the primacy of available space in the timing of transfers to acute inpatient and Level IV intermediate inpatient programs. To confirm and track the ebb and flow of availability, the defendants were first encouraged and then pressed to develop a tracking system in every institution that would record all of the milestones for each DMH referral and transfer, including dates of referral, acceptance or rejection (with reasons), assignment of a bed number, endorsement by CDCR classification and actual transfer. In early 2005, frustrated with the defendants' failure to develop voluntarily a system-wide tracking mechanism for DMH transfers, the court specifically ordered CDCR to ensure the implementation of such a system in every institution and submit within 15 days of the end of each month a copy of each institution's log of transfers during the preceding

month.  Even after the entry of that order, the development of the required tracking system remained erratic and incomplete, and copies of institutional monthly summaries have not been provided to the monitor.

MHCB:  The crisis in the availability of mental health crisis beds, attributable in large part, as discussed above, to the defendants' increasing population crunch, continued during the monitoring period with only slight abatement in the eight institutions covered in this report.  The emergence of a temporary MHCB unit at CMC from the ashes of the old Locked Observation Unit (LOU) occurred too late in the monitoring period to have much impact.  In the six months preceding the monitor's early July visit to CMC, 60 percent of inmates in need of a crisis bed were still unable to reach one.  They were treated in the institution's GACH or the downgraded former LOU and/or returned to their housing units.  But problems with the provision of a MHCB level of care were not confined to CMC.  None of the eight institutions covered here provided adequate MHCB care to all of their unstable and/or suicidal inmates.  Two institutions, CSP/LAC and RJD, reported minimal problems with access to MHCBs, but some clinicians at both of those facilities consistently failed to refer inmates to MHCBs as clinically warranted.

The number of inmates affected by poor access to MHCBs in these eight institutions was significant.  Their combined EOP population exceeded 3,000 inmates, representing more than 80 percent of CDCR's total EOP caseload, which in the tiered structure of the defendants' MHSDS generated the bulk of MHCB referrals.  All of these institutions and their EOP inmates had direct access in their own facilities to a grand total of 73 MHCBs, 26 OHU beds and CMC's emerging 42 temporary MHCBs.  The demand

for crisis beds was not restricted to EOPs; CSP/LAC, RJD and SQ each exercised a

reception function, which, after EOPs, was the department's second largest source of

demand for crisis beds.

Three of the institutions covered in this report, CMF, CMC and SQ, had

no MHCBs of their own. The difficulties associated with obtaining access to DMH acute

inpatient beds for a MHCB level of care for CMF and CMC have been recounted, but

their resulting distress can perhaps be measured best by a comparison. SVSP had some

250 EOP inmates, less than half the EOP population of both CMF and CMC. When the

number of MHCBs began to shrink in SVSP due to expanding medical use of shared

CTC beds, admissions to the MHCB fell to just 19 a month, a figure that SVSP reported

as quite inadequate. In contrast, CMF, with an EOP population of 600, was able to place

just 15 inmates per month in the MHCBs available to it in DMH/APP. SQ, meanwhile,

reported good access to the MHCB unit at CSP/Solano during the monitoring period.

CSP/LAC, CSP/Sac, MCSP and SVSP, all of which operated a MHCB

unit, had a different problem. During the monitoring period, they collectively reported

the loss of 13 to 15 crisis beds in their licensed CTCs. Beds formerly designated for

mental health crises were being converted for use by inmates in need of nursing care for

long-term medical conditions. SVSP was perhaps the hardest hit. SVSP's MHCB unit

served its own population and that of neighboring CTF, which had a 3CMS program for

699 inmates and a general population of some 7,000 inmates. SVSP had ten crisis beds

in its CTC designated as MHCBs, but in the past had typically had access to as many as

12 beds. By April 2006, the number of SVSP's MHCBs had shrunk to five or six in the

face of expanding medical demand. Both CSP/Sac and MCSP also reported reduced

access to former MHCBs now dedicated to medical uses.  Conversations with the <u>Plata</u>
receiver confirmed increased demand for the medical use of CTC beds, but disavowed
any directed effort to usurp MHCBs to meet the need.  For many years, CTCs contained
what were referred to as swing beds, meaning, in effect, that empty medical beds could
be used as MHCBs.  Those days were clearly at an end, and mental health henceforth
could expect to have access only to designated MHCBs in CTCs.

        As indicated earlier, the lack of MHCBs forced institutions to create a
range of alternative placements for inmates clinically determined to be in need of a
MHCB but for whom no MHCB was available either in the referred inmate's institution
or elsewhere in CDCR.  The first alternative was an Outpatient Housing Unit (OHU), an
unlicensed infirmary usually located in an institution without a CTC or a GACH.  SQ was
the only one of the eight institutions without a CTC or GACH.  It relied exclusively on
moving inmates in need of a MHCB elsewhere, typically CSP/Solano, and used its OHU
for inmates waiting for a MHCB transfer.  CMC had its developing temporary MHCB.
CSP/Sac put together its own second 11-bed MHCB unit, which opened in June 2006, as
well as a 20-bed Mental Health OHU or MHOHU, to meet the climbing demand for
MHCBs.  Once the second MHCB unit was opened, CSP/Sac reportedly no longer had to
rely on the use of five so-called ZZ cells for the temporary placement of inmates in need
of a MHCB.  Similarly, MCSP put together a six-bed MHOHU to supplement its eight
MHCBs; the MHOHU was located within a SNY housing unit.  MCSP's final back-up
consisted of five "observation cells" in administrative segregation, but the institution kept
no record of their use.  Inmates held in these cells reportedly were observed by

correctional officers one-to-one until being admitted to an MHCB or released back to administrative segregation.

SVSP, which also reported using holding cells when no MHCBs were available, maintained the most complete records of its use of alternative housing. SVSP's documentation indicated that 143 inmates were placed in holding cells during one four-month period. A quarter of these remained in the holding cells longer than two days; eleven inmates were kept in them from four to seven days; and some never made it to a MHCB at all.

Reception Center Transfers: Among the three institutions with a reception function covered in this report, CSP/LAC, which had less than half the reception population of the other two, appeared to be most successful at complying with mandated timelines for the transfer of caseload inmates from reception to mainline programs. As of May 2006, only nine of 161 caseload inmates in reception had been there overlong. RJD moved roughly two-thirds of its EOP inmates out of reception within 60 days and 77 to 84 percent of its 3CMS inmates within 90 days, while SQ managed to transfer or parole some 55 percent of its EOP inmates within the 60-day timeline and 75 percent of its 3CMS inmates within 90 days. One EOP inmate had been in the SQ reception center for 14 months; 18 3CMS inmates had been there for 12 to 18 months. Excessive lengths of stay were often blamed on missing medical chronos and pending RVRs. Backlogs of pending RVRs in reception were most often attributed to custody and classification staffing shortages.

The provision in the Program Guide for expediting the transfer of clinically more fragile or vulnerable EOP inmates from reception within 30 days was

employed only rarely in the three facilities. CSP/LAC was proficient neither in expediting transfers nor providing adequate monitoring and treatment for EOP inmates in reception with extended stays. The most severely ill inmates were often those with the longest lengths of stay and the least adequate mental health care. RJD also failed to complete expedited transfers when appropriate.

EOP Treatment Generally:

The eight institutions reviewed in this report, as indicated, possessed both the bulk of the defendants' EOP capacity (88 percent) and population (over 80 percent). What follows are some observations on the status of the principal treatment components of the EOPs in the reviewed institutions.

Three factors, space, staff and schedules, continued to determine the quantity and quality of EOP treatment. Problems with space involved both availability and suitability. Group therapy, identified in the Program Guide as "scheduled structured therapeutic activities," was the core of EOP treatment for most program participants. Four of the required ten hours of group treatment weekly were usually provided in the form of recreational therapy. The balance typically comprised various cognitive behavioral and didactic group sessions, each some 45 to 60 minutes in duration. Group sessions generally were attended by eight to 18 inmates, but the range extended as high as 40 to 50. Individual counseling sessions with case managers and psychiatrists represented another critical component of EOP care.

At least three types of programming space were essential for this mix of treatment, including space, primarily outdoor, but some indoor as well, suitable for organized recreational pursuits and indoor space that could accommodate group

128

participants in tolerable conditions that allowed participants to hear the group leader or view a videotape, communicate with each other and, when necessary, write. Individual counseling required interview space that afforded privacy and full confidentiality while meeting security requirements.

Because of its rapidly expanding EOP caseload, CSP/Sac lacked adequate treatment space. A new facility designed specifically for treatment programming, however, was nearing completion and appeared likely to meet fully the institution's programming space requirements. Both CMF and CMC were older physical structures with large EOPs. At CMF, limited available space was largely unsuitable because ambient outside noise and the poor quality of sound inside the group treatment space substantially inhibited communication among the participants. At CMC, in contrast, a new building now available for general population EOP activities provided sufficient space and suitable conditions.

Four of the institutions in this group, CSP/LAC, MCSP, RJD and SVSP, had general population EOPs for between 200 and 330 participants and adequate program space to meet minimum treatment needs. Nonetheless, none of the four fully met minimum Program Guide requirements for weekly EOP therapeutic activities, principally due to staffing and scheduling failures. Staffing shortfalls were paramount at MCSP and SVSP, while past scheduling difficulties and frequent cancellations had long limited group treatment offerings at CSP/LAC and SVSP. During the monitoring period CSP/LAC was able to resolve scheduling and cancellation problems due largely to the collaborative efforts of custody and mental health staffs. SVSP also reduced shortages of custody and mental health staff to manageable levels and addressed cancellations due to

security issues, the late release of EOP group participants from housing units and other avoidable disruptions. Adopted remedies included the adoption of 15-minute intervals between groups, some changes in post orders and collaborative work to reduce treatment hours lost to minor security issues.

Challenges to the delivery of treatment in general population EOPs applied with even greater force in administrative segregation. Enhanced restrictions on the movement of staff and inmates, reliance on escort officers and "therapeutic modules," and schedules that needed to accommodate safely multiple security, classification and programming activities in the administrative segregation environment represented substantial additional obstacles to the delivery of EOP treatment.

SQ reportedly assigned nearly twice the required number of case managers to its EOP administrative segregation unit, while CMF and CSP/LAC met the staffing ratio by relying on contracted staff. Neither SVSP nor MCSP were able to procure enough contractors to meet the mandated 1:9 case manager ratio and keep up with the pace of expansion. Staffing at SVSP fell far short of required staffing with 58 EOP inmates in administrative segregation and just six case managers to cover these 58 plus some 190 general population EOP inmates. CMC complained again that, despite its official capacity of 54 EOP administrative segregation inmates, the facility could barely provide treatment consistent with Program Guide requirements to a maximum of 32 inmates. At the time of the monitor's visit, CMC's hub EOP administrative segregation unit held 60 inmates.

RJD and CMF were best able to provide mental health treatment to EOP inmates in administrative segregation. In both facilities, ten or more hours of structured

130

therapeutic activities were offered to inmates weekly, individual case manager contacts were provided weekly and IDTT meetings were conducted regularly. CSP/Sac offered its administrative segregation EOP inmates nine hours weekly of group activities.

Mental health services provided to EOP inmates in hub administrative segregation units at CMC, CSP/LAC and SVSP were inadequate. At CSP/LAC, 80 EOP inmates in administrative segregation outstripped the institution's resources for treating them. Inmates on walk-alone status were not offered ten hours of exercise; the physical environment was dirty; and inmates complained that correctional officers harassed them and used excessive force; ten hours weekly of group activities were not offered; the location of nine newly added treatment modules precluded visual and audio privacy; and IDTT meetings in the unit did not serve their purpose. SQ provided the worst care to EOP inmates in administrative segregation, despite reported staffing of six case managers for fewer than 30 inmates. Audits indicated that case management contacts occurred weekly for just 20 percent of EOP inmates in administrative segregation, while nearly 40 percent of EOP inmates were routinely offered no therapeutic activities and no one was offered the mandated ten hours weekly of activities.

Psych tech rounds appeared to occur regularly in hub EOP administrative segregation units, with the exception of SQ, where rounds were missed several days each month. CMC utilized contractors to cover daily rounds when psych techs were on leave. At CSP/LAC the monitor's expert observed psych tech rounds and found them to be thorough. Psych tech rounds at SVSP were made as required.

## RECOMMENDATIONS

None of the most serious problems described in this report is new. All have been blooming over the past two years, and parties, counsel, the monitor and the court have all been struggling mightily together to address them as effectively and expeditiously as possible. Many of them, ranging from inadequate inpatient treatment resources to staff recruitment and compensation, are already the subjects of pending court orders. With so many roiling issues of overcrowding, prisoners being transferred out of state, seemingly interminable changes in CDCR's leadership, organization and missions, implementation of the new Program Guide, and judicial assumption of control over medical care, this does not seem the appropriate moment to pile more orders on the barely discernible plate of the defendants.

Nonetheless, the draft version of this report highlighted three issues that needed to be kept on the defendants' radar screen. All three were targeted directly or indirectly in preceding reports and orders; all three had already received some measure of the defendants' earlier corrective attention, but not enough to resolve them; all needed further work. The draft version, therefore, offered three recommendations aimed at the development of a mechanism for compiling accurate data on referrals and transfers to more intensive levels of mental health care; improvement of the EOP level of care provided in administrative segregation; and resumption of the defendants' monthly statistical package on staffing, population, contracting and other aspects of the department's mental health resources. The monitor did not present the draft recommendations in the form of a court order, but sought instead a simple commitment from the defendants to address each issue within the next 60 days and generate an appropriately responsive plan for remedying each shortcoming within a reasonable time frame.

The draft recommendation for the development of a mechanism for more accurate data on all transfers to more intensive levels of care was an expansion of a March 7, 2005 court order that required CDCR to track and report on transfers just to DMH programs, an order never implemented. The defendants' response contained a broad expression of willingness to develop a single computerized information system to track appointments and referrals of patients within the dental, medical and mental health systems that might "at some time" supersede the existing mental health tracking system. The recording and reporting on transfers to higher levels of care, which is not part of the existing mental health tracking system, was never mentioned, nor was the defendants' long violation of the court order requiring such tracking and reporting in regard to DMH referrals.

The response contained no meaningful commitment to the suggested recommendation. The monitor's first interview with the then director of the California Department of Corrections, James Gomez, more than 11 years and seven directors of California corrections ago, ended with an identical, temporally vague promise for a future computerized information system for all of healthcare. Nine years later in its March 7, 2005 order, the Coleman court directed defendants to develop within 60 days a department-wide monthly summary of referrals and transfers to all DMH programs for each institution. The institutional summaries were to record and track the fact and dates of referral to each specific DMH program; acceptance or rejection (with reasons) by DMH; the status and outcome of any appeal; the issuance of a bed number by the DMH program; teletype authorizations or endorsements for transfer by CDCR classification staff representatives; and the actual transfer. The institutional monthly summaries were to include all pending transfers, as well as all transfers actually referred, rejected or completed during the preceding month. Each institution was to submit to

133

the Division of Correctional Health Care Services a monthly summary within 15 days of the end

of the month, and CDCR was required to submit to the monitor a copy of each institutional

summary within 30 days of the end of the month. In the absence of a system-wide computerized

management information capability, it was assumed that the required information would have to

be collected manually and submitted in manually prepared summaries. The required institutional

and departmental summaries apparently were never submitted as ordered; the defendants

certainly never submitted a monthly departmental summary to the monitor; and the defendants

have been in continuing violation of the court order for nearly two years. The draft

recommendation sought to prod the defendants gently to comply with this two-year old directive.

Gentle prodding, it appears, will not serve. So be it.

The plaintiffs' response to the draft version of the report rejected broadly the draft

version's request for commitments from the defendants to address the three issues identified by

the monitor; they insisted, instead, on detailed specific orders addressed to each. In view of the

defendants' response to the first draft recommendation, the plaintiffs' position is persuasive, and

a specific order seems appropriate.

The second recommendation included in the draft version of the report sought a

clear commitment from the defendants to look again at the provision of the EOP level of care in

hub administrative segregation units. The impetus for the recommendation was the report's

finding, once again, that the delivery of EOP care in the administrative segregation environment

remained beyond the capability of most institutions due to constraints of mental health and

custody staffing, programming space and scheduling. The defendants first objected that the

feasibility of any improvement in the existing delivery of EOP care in administrative segregation

units is substantially limited by the present physical infrastructure of administrative segregation

units, a limitation confirmed repeatedly by the monitor since at least mid-2001. The defendants, moreover, have been under court orders to improve programming space in administrative segregation hub units since early 2002. The fact that the rising population of EOP administrative segregation inmates has outrun earlier prognostications and provisions for programming space does not excuse defendants' increasing inability to provide an adequate level of mental health care for EOP inmates in hub administrative segregation units.

Putting aside that objection, the defendants expressed a willingness to work with the monitor's experts to explore possible alternative means for delivering EOP treatment more effectively in administrative segregation. Ideas specifically mentioned included an audit of the EOP administrative segregation population to identify any categories of inmates with possibly discrete housing or treatment needs; a review of alternative staffing models and service models for different categories of EOP inmates; and another review of physical plant needs.

The plaintiffs' response to the draft recommendation sought a court order requiring the defendants to assess within 60 days their ability (or inability) to provide ten hours of structured therapeutic activities and required out-of-cell activities to EOP inmates in hub administrative segregation units; to develop and implement a plan to meet any identified deficiencies 90 days thereafter; to review the custody status of all EOP inmates in hub administrative segregation units within 60 days; and, within 90 days, to require the defendants to conduct custody reviews of EOP inmates in hub administrative segregation facilities every 30 days. This approach seems doggedly devoted to a failed formula that eight years after its introduction in 1999 is largely bankrupt. The defendants' response, while unacceptably open-ended, at least reflected a willingness to look at the problem differently, a strategy, if limited in time, that may possibly generate approaches more constructive than those currently available.

Lastly, in regard to the third recommendation in the draft version of this report, which sought the resumption of the defendants' provision of the monthly statistical report on staffing, population, contracting and other aspects of CDCR's mental health resources and operations, the defendants reported they were currently preparing a monthly statistical report and hoped to return to a routine submission of such monthly reports in the future. In confirmation of at least the first portion of that representation, a monthly statistical package, dated January 31, 2007, has been provided to the monitor and plaintiffs, mooting at least for the time being this particular draft recommendation.

This discussion leads to the following revised recommendations:

1.  The defendants should be ordered to implement forthwith paragraph 4 of the March 7, 2005 court order, which required defendants to collect data and report on referrals and transfers to DMH programs. If the defendants are unable to do so, they should be required to file with the court within 30 days a report specifying the reasons for their inability to comply, along with a plan for coming into compliance with the March 7, 2005 order within the following 60 days. If the defendants have not come into compliance with the March 7, 2005 within 90 days, a show-cause order for why they should not be held in contempt should issue. The defendants' failure to comply forthwith should not be excused by the lack of a computerized system capable of generating the data needed for this report; the necessary data and summaries may be collected and prepared manually.

2.  The defendants should be ordered to develop within 90 days of the order a mechanism for compiling accurate data on referrals and transfers to more intensive levels of CDCR mental health treatment, including referrals and transfers to Mental Health Crisis Bed Units, Mental Health Outpatient Hospital Units, Psychiatric Services Units, Enhanced Outpatient Program hub administrative segregation hub units and Enhanced Outpatient Programs from Reception Centers. Each CDCR institution should be directed to record and track the dates of referrals and transfers to each of these programs. Each institution should also be required to prepare and submit monthly to the Division of Correctional Health Care Services an institutional summary of all referrals and transfers, including those pending as well as all referrals, rejections and transfers that occurred during the preceding month, within twenty days of

the end of each month.

3.  The defendants should be required to work with the monitor's experts to review the provision of Enhanced Outpatient Programs (EOPs) in administrative segregation units. The review process should conduct an audit of the EOP administrative segregation population and examine more effective ways for reducing the lengths of stay of EOP inmates in administrative segregation; alternative methods for the delivery of mental health treatment, including the use of a different mix of clinical and paraclinical professionals; the use of different housing and/or service models for particular categories of EOP administrative segregation inmates; and any other strategy or approach likely to better serve the treatment needs of EOP administrative segregation inmates. The study should result in a brief report within 90 days to be shared with parties, counsel and the court.

It should be noted that neither plaintiffs nor defendants objected to any of the findings of fact underlying this report and its recommendations.

Anyone familiar with California corrections knows these are critical days not just for CDCR's mental health services and the department's compliance with the requirements of Coleman. This may be, indeed, the deepest winter of CDCR's discontent. The political response to crime and its punishment in California over the past half-century has wrought unintended and costly consequences. The State appears to have run out of easy fixes, and recourse to more of the same is simply a prescription for disaster. For now, it is critical in Coleman to keep the focus on the central issue of resources for the provision of clinical staff and programs sufficient to tend to the caseload of seriously mentally ill inmates who cannot avoid CDCR's seeming slouch toward catastrophe.

Respectfully submitted,

/s/

_____
J. Michael Keating, Jr.
Special Master

February 14, 2007