EXHIBIT A

<u>California Medical Facility (CMF)</u>

July 26, 2006 -- July 28, 2006

1.    Inmate A

This case illustrated systemic problems with access to crisis bed and higher levels of care. First, CMF staff was slow to refer when clinically warranted. Second, the referral was rejected and redirected by DMH but decisions were not communicated in writing.

This 19 year old inmate arrived at the EOP at CMF in 2/06. His most recent diagnoses were Schizophrenia, paranoid type and Borderline Intellectual Functioning. He had a history of head trauma. He sustained gunshot wounds at age six.

He was serving his first incarceration. He was scheduled to be released in 12/07. He arrived at CMF's EOP by way of Centinela, RJD's MHCB and acute care. He was treated at the acute level of care for roughly five weeks in 12/05 and 1/06. A written discharge summary was filed in the UHR. He was described as childlike, compliant with treatment and liked by everyone. He was given diagnoses of Psychotic Disorder NOS, Borderline Intellectual Functioning and discharged to the EOP level of care with orders for Seroquel and Lamictal. His GAF at discharge was 35.

Soon after his release from acute care he was non-compliant with medication. He took very few doses in 2/06, 3/06, 4/06, 5/06 and 6/06. MARS were legible and filed in the UHR.

Progress notes indicated that clinicians noted non-compliance, expressed doubts about his self-reported compliance or said his compliance needed to be monitored but he was not formally referred until 6/06. His possible need for intermediate care was noted by his treatment team in 2/06 and referred to in later months. But he was not referred until 5/06.

He moved from one wing to another in 4/06. Although his presentation remained the same the new treatment team soon identified him as needing a higher level of care. He was identified as needing a referral to A3 intermediate care on 5/9/06. The package was completed on 5/24/06. He was rejected two days later on the ground that he was too acutely ill for a dorm. The rejection and the reason for it were communicated orally. CMF staff had a case conference with A3 staff on 5/31/06 to discuss the reason for rejection. CMF staff felt strongly that he could function in a dormitory but A3 staff disagreed. They suggested that he go to acute care first and then be discharged to intermediate care. CMF staff were required to redo and resubmit a referral and direct it to acute care. The packet was completed on 6/19/06 and this inmate was accepted one day later. He remained on the wait list for acute care as of 7/27/06. He was a low priority because he was not suicidal and was not in an MHCB.

Assessment:

This inmate should have been referred earlier. Medication non-compliance did not elicit referrals nor were treatment providers attentive to weeks of no-shows reflected on MARs. A Keyhea or a treatment plan designed to escort him to the pill cart should have been considered. Given his chronic psychotic presentation he clearly needed a higher level of

care. The avenue to intermediate care was effectively blocked by his relatively low priority for admission to acute care. He had been waiting for an acute care bed for over one month.

2.    Inmate B

This case illustrated systemic barriers to higher levels of care. In addition, this inmate inflicted serious self-injury with a sharp object while being treated in a crisis bed.

According to a history given in a clinical note this inmate was incarcerated for indecent exposure. He often exposed himself and had incurred sexual misconduct charges while in CDCR custody. Staff reported that he had a pending competency evaluation at Atascadero State Hospital (ASH). In 3/06 while he was in S2, CMF's designated crisis bed unit, he inflicted a serious self-injury to his throat with a sharp object. He was hospitalized at a trauma center for roughly two weeks. He also had a history of inserting objects into his urethra.

He was sent from CMC to acute care in 7/05. He remained in acute care for two months. He was released to CMF's EOP where he remained for three months before being referred to acute care on 12/23/05 because he attempted to hang himself. He was subsequently treated in S2, the crisis bed unit, for four weeks. He was clinically discharged from the crisis bed 13 days into his stay but was not moved for another two weeks. Keyhea proceedings were initiated during his stay. He remained in the EOP for two months before being referred back to a crisis bed. He was admitted to a crisis bed on 3/13/06. While there he punctured his throat with a sharp object. He was hospitalized in the community for two weeks and discharged back to a crisis bed. He was discharged back to the EOP on 4/17/06.

Current diagnoses for this inmate were Schizophrenia, paranoid type, Exhibitionism, Anxiety Disorder NOS and Borderline Intellectual Functioning. He also had a seizure disorder. He was treated at the EOP level of care. He was housed in administrative segregation in 4/06, 5/06 and 6/06. In 7/06 a 180-day Keyhea order was renewed.

According to a pharmacy profile he had orders for Prolixin 50 IM q 2 weeks, Paxil 30 a.m., Thorazine 150 qid, Thorazine 100 prn for agitation, Cogentin and Dilantin. MARS indicated that he was compliant with medication in 5/06 and 6/06.

This inmate was released from a crisis bed on 4/17/06. He was referred to acute care on 5/19/06. Staff completed the referral packet in three days and he was accepted within one day. He remained on the wait list as of 7/27/06, over two months later. Because his admission to acute care was stymied he was referred to ASH by his clinical team on 7/13/06 for a 1370 evaluation, which is for competency to stand trial.

While waiting for an acute care bed he was compliant with medication. He continued to exhibit a number of odd behaviors that he could not explain while on the wait list for an acute care bed. Sustained loud groaning was a prominent behavior. He was not certain

about the reason he groaned. At times he attributed it to EPS. He said that his neck twisted. He reported to treatment providers that he felt more depressed in segregation and cried a lot. He was seen twice weekly by his case manager, attended groups infrequently and had a monthly IDTT meeting. He was withdrawn and was observed sleeping on the floor.

Staff reported that he was already found to be incompetent and was waiting to go to ASH for restoration of competency.

Assessment:

This inmate was too impaired to function at the EOP level of care. He had a recent history of serious self-injury and remained at risk. He was insufficiently protected from serious self-inflicted injury while in a crisis bed. His behavior in the EOP was markedly deficient in comparison to other inmates. He was likely to incur further disciplinary charges for sexual misconduct and perhaps elicit hostile or aggressive reactions to his inappropriate behavior.

He needed a higher level of care but could not gain admission.

3.    Inmate C

This inmate was seen individually on the P-3 unit because he was an EOP administrative segregation inmate. He reported that he had been transferred from HDSP in 1/06 and had been incarcerated for the last 14 years. He reported further that he had been prescribed a variety of medications in the past, including Haldol, Depakote, Prozac, Wellbutrin, Klonopin and "ADHD meds."

The inmate reported that he was awaiting transfer to a federal facility. Review of his record indicated that his commitment offense involved selling a home that he did not own to another party and preparing the necessary paperwork to execute the sale.

He reported that he has written to "Being??" of plaintiffs' counsel and had received a response.

He further reported that he was currently detoxing from medications and that he last saw a psychiatrist two months prior to this interview. He reported that he had been receiving Methadone for pain but it had been discontinued for one and a half days and he was feeling anxious because of that. The Methadone was ordered in connection with his kidney stones for which he said he had had surgery.

This inmate reported that he had attended groups but did not find them useful, that he had had trouble with medications and that the staff believed that he was drug-seeking and "manipulative". He reported further that an MTA did not give him his Prozac on the day of this interview. Staff subsequently reported however that the MAR documented that he did receive Prozac.

During the interview this inmate was anxious, had a tic of his eye and his pupils were dilated. Review of his record indicated that he had had a variety of diagnoses. There were concerns that he was polysubstance dependent on the street and that he had been seeking drugs in prison.

Assessment:

This inmate's care and treatment appeared to be appropriate. Despite his being dissatisfied with his medication management protocols he was receiving appropriate assessments and evaluations by the clinical staff. His complaint of not receiving Prozac was not substantiated by the record.

4.    Inmate D

At this EOP inmate's request, he was seen on the P-3 administrative segregation unit. He reported that he is a "DD1 and paranoid schizophrenic". In addition, he reported that he is hearing impaired and is part of Coleman, Armstrong and Clark.

He reported that his complaints were primarily about custody issues and his property. He complained that his TV and radio were taken from him and donated after he received a charge for disrespect following his mother's death. He also reported that his magazines had been taken and that his groups were cancelled because he "held the cage hostage." Regarding that charge he reported that he refused to come out of the individual treatment cell at the conclusion of the group and that his groups were suspended after that time.

The inmate reported that the mental health staff was "trying to help me" and that he had a "90-day extension in administrative segregation." This inmate reported that he was currently prescribed Trazodone, Seroquel and Olanzapine and that he received his medications. He also reported that he wrote to "Coleman-Rosenbeing" and "all I got back was a thank you and send us more."

Assessment:

This inmate's mental health care and treatment appeared to be appropriate and he was fully aware of the avenues available to him to express his concerns and complaints.

5.    Inmate E

This EOP inmate was in administrative segregation and was seen on I-3. He was seen in a confidential setting and was very suspicious of who I was and the purpose of the interview. Even after explanations that the monitor's expert did not work for CDCR but was a Coleman expert, he wanted to know if he could see the written interview notes.

This inmate reported that he wanted to be moved from I-3 back to P-3 because it was air conditioned and the "correctional officers are more compromising." He reported that he

had been "raising hell in I-3" to get back to P-3. He reported that he had been seen by his clinical case manager each week "in the cage," and that there had not been groups "lately" because it was "too hot." He reported that he had been going to groups before the heat wave and that one group had started yesterday but then was stopped because of the heat. He reported that he had been receiving Abilify with "no problems" but added that the MTAs had "missed my HIV meds." This inmate concluded the interview by stating, "I admit that I manipulated to get where I want to go like saying I would kill myself but I want to go back to P-3."

Assessment:

This inmate's care and treatment appeared to be appropriate.

6.     Inmate F

This inmate was seen in a group but also requested a confidential interview. He reported that he needed to be in a group or have treatment for exhibitionism from which he had suffered for many years. He reported that there were no groups at CMF for treatment of his condition.

A review of this inmate's record indicated that he had a diagnosis of schizoaffective disorder. He was transferred to CMF on 6/8/06 from CMC and was being prescribed Wellbutrin, Zydis and Abilify. His controlling offense was indecent exposure with priors.

A 6/1/06 note from CMC indicated that the inmate "continues to request treatment for exhibitionism" and an MH-2 of 9/27/05 included reference to multiple DMH and acute care admissions. An MH-4 of 6/12/06 included a diagnosis of Exhibitionism. There was no treatment plan in the record as 9/27/05. (*sic*)

Assessment:

This inmate's care and treatment were inadequate in that he had a documented history of exhibitionism and there had been no referral for screening, assessment or treatment for this condition.

This inmate appeared to have received RVRs prior to his arrival at CMF. The referral policy at CMF included those inmates who had received RVRs. Discussion with staff indicated that they understood that a referral should have been generated for inmates who may have qualified for treatment of this condition.

7.    Inmate G

This 3CMS inmate was interviewed in the T-1 administrative segregation unit. He reported that he had been on no medications for the preceding three years and had been in administrative segregation for the preceding week. He reported that since his arrival in administrative segregation he had seen a case manager once and had seen a psych tech every day. This inmate reported that he showered every other day and received ice every day or two during the heat alerts. He reported that he was in no need of further mental health services.

Assessment:

This inmate's care and treatment appeared to be appropriate.

8.    Inmate H

This 3CMS inmate was seen on the T-1 administrative segregation unit. He reported that he had been at the 3CMS level of care since 2004 and was taking Seroquel and Effexor. He reported that he had been receiving his medication each day prior to the interview for three weeks since his arrival in T-1 from J-1.

He said that he received showers every other day and ice every day or two during heat alerts.

Assessment:

This inmate's care and treatment appeared to be appropriate.

9.    Inmate I

This 3CMS inmate was seen on the T-1 administrative segregation unit. He had been removed from the MHSDS roster three months prior to the interview. He reported that since his arrival in administrative segregation one month before the interview he wanted to be placed back on the roster.

He reported he had been transferred from Unit IV and that in the past he had been prescribed Zoloft. He reported he saw the case manager during the prior week, asked her about getting back on medications and that she had scheduled to see him again to discus further his return to medication treatment.

He also reported that he had seen the psych tech everyday since his arrival on T-1. Review of this inmate's record indicated that he was removed from the 3CMS caseload on 6/13/06 and had requested return on 7/5/06. His past diagnosis was depressive disorder by history. An MH-2 of 5/6/06 had the signature of a psychologist only.

Assessment:

This inmate's request for return to the 3CMS caseload should have been seriously considered by treatment providers.

10.    Inmate J

This 3CMS inmate was seen on the T-1 administrative segregation unit. He reported that he had been 3CMS for the preceding two months since his admission to administrative segregation and was being prescribed Remeron and Vistaril. He reported that he saw the case manager each week and the psych tech everyday. He reported that his only complaint was that he missed his Remeron three to four times in the preceding month, approximately once per week.

Assessment:

This inmate's care and treatment appeared to be appropriate with the exception of his complaint of not receiving his medication consistently.

11.    Inmate K

This 3CMs inmate was seen on the T-1 administrative segregation unit. He reported that he had been in administrative segregation for five months and that he had been transferred from Unit IV. He also reported that he had been on the caseload for 15 years, had taken medication for depression and was receiving Vistaril.

He reported that he was in MHCB at HDSP for eight months prior to this admission. He reported that he saw his case manager each week and the psych tech each day.

He said he received showers every other day. He reported that he received ice which was given out by inmates in a cup every day or two. This inmate reported "I'm good."

Assessment:

This inmate's care and treatment appeared to be appropriate.

12.    Inmate L

This 3CMS inmate was seen on the S-3 administrative segregation unit. He reported that he had been in 3CMS care for the preceding "few days" and that he had been in administrative segregation for approximately a month and a half.

He said that he was placed in the MHSDS because his problems were overwhelming after he had been assaulted by an officer. He reported that he saw the case manager each week at cell side and the psych tech each day.

He reported that he was taking anti-depressants and sleep medication that was prescribed the week prior to the site visit, and that he felt "a little better." He reported that he did sign consents for each of these medications.

<u>Assessment:</u>

This inmate's care and treatment appeared to be appropriate.

13.    Inmate M

This 3CMS inmate was seen on the S-3 administrative segregation unit. He reported that he had been 3CMS since 10/04 and was off medications, although he took Trazodone and Abilify. He reported that he was seen by his psychiatrist for approximately two months although he was not taking any psychotropic medications.

He reported that he saw a psych tech every day and the case manager daily. He reported that he had an IDTT on 6/7/06 and that he believed it was relevant to his needs.

<u>Assessment:</u>

This inmate's care and treatment appeared to be appropriate.

14.    Inmate N

This 3CMS inmate was seen on the S-3 administrative segregation unit. He reported that he had been 3CMS for the past several years and in administrative segregation since 4/06.

He reported that he was taking Zyprexa and Zoloft, but continued to hear voices "sometimes." He also reported that the MTA may "miss me in the mornings but get to me in the evenings" with regard to receiving his medications.

He reported that he went to the yard three times per week, showered every other day on Monday, Wednesday and Friday, saw his case manager "all the time – two times a week" and the psych tech everyday. He reported that he had an IDTT during the preceding week and that it "went good."

This inmate reported that he did not understand why he was still in administrative segregation because he had not received any RVRs since he had been there. He was anxious to return to general population.

<u>Assessment:</u>

This inmate's care and treatment appeared to be appropriate.

15.    Inmate O

This 3CMS inmate was seen on the S-3 administrative segregation unit. He reported that he had been 3CMS for the preceding five to six years and that he had restarted Paxil at 5 mg one day before this interview. He reported that he "came in with cognitive problems" and described memory problems related to a B-12 deficiency.

He reported that he had been off medications for two years, filed various appeals regarding medication changes and agreed to restart Paxil because he heard "maniacal music" played by the officers as a form of "psychological torture." When asked what this music was, he reported that the officers played songs like "99 bottles of beer on the wall over and over again" to harass him.

A review of this inmate's record indicated that he had been very high functioning and had participated in two 3CMS groups while in administrative segregation. An MH-4 of 4/12/06 provided a diagnosis of major depressive disorder recurrent in full remission and personality disorder NOS. There were very good case manager notes and psych tech rounds documented. There was no reference to the music or to any psychotic process in the documentation. An MH-2 was noted as completed on 7/11/06 but it was not in the UHR at the time of this review which was roughly two weeks later.

Assessment:

This inmate's care and treatment appeared to be appropriate.

16.    Inmate  P

This inmate was seen at the request of plaintiffs' counsel. At issue was his request to be removed from the 3CMS level of care despite his diagnosis of anxiety disorder with anxiety and paranoid symptoms and his age of 76 years.

The inmate was interviewed at length. He provided a very detailed history of his confinement and his being "really mad" and a desire to "get some things off my chest." He elaborated that he just "wanted to bitch a little bit."

The inmate gave a history of being seen "a few days ago by a guy from Rosenbeing." He went on to describe his problems with officers at Queens Hospital in 12/05. He reported that he did not have any problem with mental health staff and did not believe that he was mentally ill or in need of mental health treatment. He gave a very complicated and complex description of information that was quite circumstantial and could have indicated a fixed delusional system or some degree of confabulation.

A review of his record indicated that he had multiple medical problems for which he had been properly assessed and was receiving what appeared to be appropriate treatment. His last IDTT was on 5/2/06 when he was removed from the MHSDS.

Assessment:

This inmate's care and treatment appeared to be appropriate as he was in no acute mental distress and did not meet any criteria for involuntary treatment. He appeared to be competent to make a treatment decision regarding his mental health care. His issues appeared to be primarily centered on his relationship with custody officers regarding his medical care.

17.    Inmate Q

This inmate was referred for review by plaintiffs' counsel due to concerns that he had developed severe suicidal ideation secondary to learning that he would be transferred to another prison where he had enemy concerns regarding an inmate who had sexually assaulted him in the past.

A review of his record indicated that his medications were Seroquel, Abilify, Depakote and Zoloft with an existing Keyhea order through 11/28/06. He had been treated at the 3CMS level of care since 6/4/04.

An MH-2 of 7/25/06 indicated that he would be retained at the EOP level of care with diagnoses of psychotic disorder NOS, Post Traumatic Stress Disorder, seizure disorder and antisocial personality disorder.

A 7/20/06 inmate classification committee recommended Lancaster or SVSP as a second choice for a level IV review as this inmate had 85 points. This review was based on a 6/21/06 directive from the deputy director to C&PR to evaluate level IV inmates for possible transfers to other facilities. The inmate classification committee also indicated that there would be further review of any enemy concerns.

Assessment:

A decision as to which facility he might be transferred had not been made at the time of this review.

18.    Inmate R

This inmate was seen in a group setting on the P-3 in an EOP administrative segregation group on P-3. He was on a Keyhea order which ran through 6/15/07. He was prescribed Haldol, Decanoate and Depakote. His diagnosis was schizoaffective disorder and personality disorder NOS. His valproic acid level measured on 6/19/06 was 56, within the therapeutic range.

He had had multiple DMH admissions and also suffered from Hepatitis C, HIV infection and blindness. The record indicated that in 6/06 49 groups were offered and 34 were received.

<u>Assessment:</u>

This inmate's care and treatment appeared to be appropriate.

19.    Inmate S

This inmate's UHR was reviewed and he was seen in an administrative segregation EOP group on I-3. The record indicated that he was receiving Abilify, Depakote and Zoloft and was in administrative segregation for refusing a cellie. His diagnosis on an MH-2 of 3/22/06 was major depressive disorder recurrent with psychotic features.

An MH-2 of 6/14/06 referenced in progress notes stated that no psychiatrist was available at that time. However the MH-2 itself was not filed in the chart at the time of this site visit, over four weeks later. The record also indicated that the inmate was offered 46 EOP groups and received 39 during 5/06.

<u>Assessment:</u>

This inmate's care and treatment appeared to be appropriate with the exception of no psychiatrist participating in the IDTT of 6/14/06.

EXHIBIT B

California State Prison, Los Angeles County (CSP/LAC)

May 2, 2006 – May 5, 2006

1    Inmate A

This inmate was interviewed in the administrative segregation EOP unit. He described significant issues relevant to his concern about being double-celled, which appeared to be related to paranoid thinking. He described being set up by correctional officers.

With this inmate's consent, the situation was discussed with a sergeant in the general population EOP.

The healthcare record of this inmate was reviewed, with a focus on progress notes written since 11/05. Notes indicated psychiatric opinion that this 39 year old inmate was not taking his medications because he felt that he was getting too much Depakote. His presentation was consistent with psychosis NOS.

On 11/12/05 he was double celled in the general population EOP. He continued to be medication noncompliant based on review of an 11/20/05 progress note. Medications were discontinued, a psychiatrist wrote a 128 chrono which was not in the UHR and the plan was see him again in 30 days.

A different psychiatrist wrote on 12/16/05 indicating that this inmate was experiencing auditory hallucinations and was paranoid. His presentation was consistent with probable schizophrenia. Geodon was restarted.

On 12/20/05 this inmate requested to be single celled related to a conflict with another inmate. On 1/13/06 he described being very paranoid to the psychiatrist who wrote the 12/16/05. Geodon was increased. The plan was to see him again in 90 days.

A 3/8/06 progress note indicated that this inmate continued to be worried about having another cellie and stated he was ready to go to administrative segregation before taking a cellie. Delusional thinking remained.

A 4/4/06 progress note indicated that he had been referred to the psychiatrist due to poor medication compliance. Progress notes demonstrated continued paranoid thinking regarding correctional officers.

This inmate was subsequently transferred to the administrative segregation unit on 4/6/06 after allegedly threatening a correctional officer. Review of the 4/5/06 RVR indicated that this inmate made verbal threats towards correctional officers after he apparently was told he was going to have a cellie.

Review of progress notes indicated that this inmate continued to demonstrate delusional thinking concerning the correctional officers. Weekly progress notes from his case manager were present in the UHR. However, a mental health assessment relevant to his RVR was not present in the UHR.

The most recent IDTT was dated 4/18/06. He was noted to be paranoid. Diagnoses were psychosis NOS and antisocial personality disorder. Treatment plan interventions included medication, 11 therapy contacts, psych tech contact and yard. Other than describing an objective of taking on a cellmate, neither issues related to single cell status nor to medication non-compliance appeared to have been addressed.

Assessment:

The treatment plan did not adequately address issues related to this inmate's serious mental illness. In addition, there was no reference to the mental health assessment regarding this inmate's RVR that led to his administrative segregation placement. In fact, the staff could not locate the RVR mental health assessment. Inadequate intervention occurred concerning this inmate's medication non-compliance.

2.     Inmate B

This inmate, who was in a wheelchair in the administrative segregation unit, reported his EOP level care had been changed to 3CMS several months previously. He described numerous medical problems. He reported that he required surgery that was not available in the CDCR. He was requesting transfer to a federal facility in order to receive adequate medical care. He was referred to the Prison Law Office.

The healthcare record of this inmate was reviewed. The problem list included neck and knee problems and depression. This inmate has been intermittently on hunger strike since 1/06. It appeared that his hunger strikes were related to various issues including allegations concerning mistreatment by custody staff and inadequate medical care.

It was very difficult to summarize this inmate's course of treatment due to incomplete health care records. For example there were references to neurosurgical consultations although the neurosurgical consult was not present in the chart, and there was a reference to a telemedicine consultation although the results of the telemedicine consultation were not in the UHR. In addition, the treatment plan did not address this inmate's somatic issues or his hunger strike.

The monitor's expert summarized this inmate's medical record as follows:

> Though this inmate has often claimed mental illness, evaluators have consistently questioned the veracity of these claims. The inmate was placed into CMF from 6/7/04 until 7/1/04 following a number of episodes of "paranoia with some questionable delusional thinking" including racial statements against Caucasians. Once at DMH, he denied the experience of auditory hallucinations and DMH clinicians reported that they "did not observe evidence of psychotic symptoms" during a one-month period. The DMH discharge diagnosis included "Adjustment Disorder NOS" and noted a history of probable malingering.

This inmate has a history (for more than 1 year) of claiming the inability to walk secondary to knee and back problems. Though notes from various medical tests appear to indicate that there was no clear basis for this limitation, he has continued to claim the disability. It would appear that the institution has (probably correctly) provided the requested accommodation as the inmate has been provided with a wheelchair. He reacted to a change from EOP to 3CMS level of care by initiating hunger strikes and becoming threatening toward staff.

Assessment:

This inmate's treatment plan was not specific to his presentation and continued symptoms. Better coordination with medical services also needed to be developed. The IDTT needed to review existing clinical information including previous assessments, conduct any necessary additional evaluations and arrive at a conclusive diagnostic impression. An appropriate treatment plan should then have been developed. Options considered by the IDTT should have included possible referral for evaluation at an intermediate level of care if mental illness were found to be present.

3.    Inmate C

During a prior site visit the monitor's expert had previously interviewed this inmate in connection with his acts of indecent exposure. He showed the monitor's expert a 9/3/05 evaluation by a licensed social worker who made diagnoses of Post Traumatic Stress Disorder and Exhibitionism, which were confirmed by several other clinicians. A treatment program relevant to both of these conditions was recommended. He reported that he had not received the recommended treatment.

A 7/6/05 IDTT also recommended an endocrine consultation apparently related to possible use of anti-testosterone medications.

Since being transferred from the general population EOP to administrative segregation EOP he had received multiple RVRs related to exhibitionism.

Current medications included Geodon, Zoloft, Depakote and Remeron.

The healthcare record of this inmate was reviewed. A 7/16/05 mental health assessment written by a psychologist related to a pending RVR for indecent exposure was reviewed. This inmate acknowledged that he had masturbated from three to seven times a day and had done so since childhood sexual abuse that involved him engaging in sex in the presence of men and women. He was referred to an IDTT for consideration of a psychological evaluation that will include psychiatry's role in assessing hormonal intervention and an endocrine evaluation.

Post Traumatic Stress Disorder was diagnosed by a psychologist on 7/31/05. Administrative segregation progress notes indicated that this inmate was participating in EOP groups.

A 9/3/05 memorandum from a licensed clinical social worker to a psychologist included the following:

> [This inmate] has been on my EOP caseload almost continuously since August 2004 in administrative segregation EOP.
>
> A review of his file from the yard EOP indicated that he suffered from posttraumatic stress disorder resulting from severe childhood sexual abuse. However, during his treatment at D yard, he had only one RVR for "indecent exposure" which was dismissed. His former case manager . . . had designed a special 12 week treatment program for [this inmate], which he was unable to complete because of his transfer.
>
> Since being transferred to administrative segregation, [this inmate] has accrued 8 RVRs for "indecent exposure."
>
> My clinical impression is that [name deleted] suffers [from] posttraumatic stress disorder and exhibitionism. My impression has been validated by two psychologists . . .
>
> Last February I wrote a chrono stating that [name deleted] would benefit from placement on a program of features designed to treat his mental illness. At that time, he was transferred, and his return to D yard was not an option.
>
> Now, with his "enemies" gone from D-yard, [name deleted] could benefit from returning there to complete the 12 week program designed for him by (a psychologist).

A 10/21/05 note included the following: "His masturbation is not part of the psychodynamics of 'exhibitionism' wherein symptoms are similar to that of OCD with a dysphoric affect."

A 10/25/05 form-128 stated the following: "I have assessed this inmate's mental health history, interviewed the inmate, and discussed his care with multiple treating clinicians in order to assess whether the behaviors that led to multiple 115s (RVRs) are driven by mental health factors. Although this inmate does not meet criteria for diagnosis of exhibitionism, he would likely benefit from additional treatment in the EOP program, where, in the past, such behaviors were infrequent."

A 10/24/06 note relevant to this inmate's compulsive masturbation was reviewed. He was assessed to have features of exhibitionism but not meeting strict diagnosis of exhibitionism. However, this assessment had flawed reasoning which is not summarized in this review.

Review of subsequent progress notes appeared to indicate that the 10/05 assessment essentially resulted in this inmate being viewed as not having any type of paraphilia, and hence, no treatment was provided relevant to this issue.

A 3/23/06 note indicated that this inmate had been "reprimanded due to his chronic masturbatory habit."

Assessment:

This inmate has not been appropriately treated with respect to his paraphilia NOS.

4.    Inmate D

During this monitoring visit, the inmate was seen following referral by his case manager who expressed concern over his poor adaptive functioning. This clinician had known this inmate for a period of over two and a half years during which this inmate had consistently functioned at a very low level. At the time of the monitor's visit, custody staff routinely cleaned the inmate's cell, and the clinician and others reminded the inmate to flush his toilet and to complete simple grooming tasks.   Notes covering the preceding year indicated that this inmate experienced auditory hallucinations and somatic delusions. For example, he maintained that his spine had been removed. He refused groups and seldom left his cell. He became irritable and hostile toward staff at times.

Notes appeared to indicate that the inmate was being prescribed a high dosage of psychotropic medication. Records and the report of the inmate's primary clinician indicated that the IDTT was in the process of referring the inmate to DMH for a Clozaril trial.

The inmate was awakened and seen at cell front with his case manager. His cell was disorganized and his mattress was on the floor. At the time that the inmate approached the cell he was disheveled and appeared disoriented. His case manager reminded him of who she was. The inmate was able to report where he was but when asked the date, he replied with an incomprehensible verbalization. After a brief period, he returned to his mattress. When the clinician attempted to re-engage him he instructed her to leave him alone. He was not responsive beyond that point.

More recent information in the record indicated that the clinical staff intended to refer this inmate to a higher level of care. Notes from 2/06 indicated that the intent was to refer him to acute care at Salinas Valley Psychiatric Program (SVPP), while by 3/06 notes appeared to indicate that the intent was to refer him to DMH acute care for a trial of Clozaril.

Assessment:

This inmate required referral to a higher level of care. Staff should have continued with the plan for referral for a trial of Clozaril and pursued other methods for referring the

inmate to acute care as necessary. The delay of three months from 2/06 to 5/06 was too long.

5.    Inmate E

This inmate was seen in the context of an IDTT meeting observed on 5/1/06. At the time of his IDTT appearance, the inmate's clinician explained that the inmate did not leave his cell often and that his attendance at IDTT was rare. He was disheveled and appeared quite psychotic and withdrawn. He interacted minimally with the committee. This inmate was not prescribed psychoactive medication at the time of the IDTT meeting.

There was essentially no evaluation in the inmate's record. The MH-4 was essentially blank. It noted that the inmate refused the examination and was seen at cell door.

An in-patient record from 2/12/06 through 2/16/06 noted a referral for suicide watch while the inmate was housed in another facility. Notes indicated that he was withdrawn, uncooperative and was refusing medication at that time. It did not appear that he was improved substantially at the time that he was released from CTC at EOP level of care. Notes indicated little in the way of a treatment plan except that this inmate was to be monitored for the need for a higher level of care, as noted in the 2/27/06 note.

This inmate arrived at CSP/LAC in early 3/06. Notes through early 3/06 indicated that he refused an examination with the psychiatrist, refused medication and often refused out-of-cell activities. He met with his case manager out of cell on 3/18/06 when he appeared to respond to internal stimuli and was characterized as evidencing a "poverty of speech." A note apparently from a psychiatrist on 3/26/06 indicated that this inmate "will require time to assess whether is able to improve or will be in a position to take medication." In late 3/06 or 4/06, he was attending EOP groups more regularly and was coming out of cell for case manager contact. A psychiatrist's note on 4/10/06 indicated that the patient was apparently refusing medication.

Psych tech notes from 4/9/06 indicated that the inmate was responding occasionally to cell front contact. He was keeping his cell clean and was occasionally attending groups. He appeared "incoherent," avoiding eye contact, etc. A psychologist's note dated 4/28/06 indicated that he was "mute and stared at the writer for long latencies for before responding through gestures."

Assessment:

This is a low functioning inmate with a history of suicidal threats. He was withdrawn but did attend some groups and case manager meetings. He had characteristically refused medication. He had been at CSP/LAC since early 3/06. It appeared that staff had been monitoring him and had considered medication. He had not been referred to the MHCB. It was not clear whether the inmate was a candidate for involuntary medication. He may have been a candidate for intermediate care if his condition did not improve.

6.    Inmate F

This inmate's chart was reviewed after the inmate was seen in administrative segregation by the monitor's expert.

This inmate apparently had a grand mal seizure disorder. Notes through 2/06 indicated that he was refusing to speak to staff except through his cellie. A note from a clinical contact on 2/27/06 indicated that the inmate was "brought in a wheel chair, appearing gravely disabled, unable to care for himself and unable to communicate coherently." By 4/15/06, notes indicated that the inmate presented as "stable, oriented" and was coherent and alert. He denied suicidal ideation and was demonstrating "clear insight and judgment."

He was dropped from EOP and placed at 3CMS level of care on 4/25/06. A note of that date indicated that the inmate had made superficial cuts on his arms which did not require suturing. The clinician's impression was that this was an isolated impulsive incident likely related to the inmate's desire to be retained in EOP. An MH2 on 4/25/06 indicated that the inmate was stable and that he was diagnosed with "major depression, mild, recurrent."

A note dated 4/29/06 indicated that this inmate was transferred from D Yard after being dropped from 3CMS on 4/25/06. The note indicated that the writer, a mental health clinician, overheard the inmate stating to another inmate, "Watch, I'll get my EOP back in -?—day." He was seen as evidencing no signs of psychosis at that time.

Assessment:

This inmate was apparently stable immediately prior to the IDTT's decision to reduce his level of care from EOP to 3CMS. His behavior appeared to have deteriorated at the time that this transfer occurred. It appeared that clinicians were appropriately monitoring the situation at that time.

7.    Inmate G

This 21 year old inmate was received at CSP/LAC reception center on 1/30/06. He had been in the reception center for more than 60 days at the time of the monitoring tour. He was made EOP on 2/7/06, after he was seen in the clinic in a catatonic state. Clinical notes at the time described him as having "paper stuffed in both ears and cannot say why. Has several pages of schizophrenic writing, catatonic."

This inmate's case manager continued to describe him as "bizarre and catatonic/mute" even weeks later as seen in an MH-3 dated 2/22/06. On 3/24/06 the psychiatrist noted, "Admits non-compliance – delusional about physical injuries. Bizarre, Psychosis, NOS. Review Meds."

Notes from 2/06 through mid-3/06 indicated that although he was not "catatonic" as had been observed in 2/06, this inmate continued to be quite delusional. Through the early part of 4/06, he was "preoccupied" with somatic issues. Later notes in the record indicated that this inmate continued to experience auditory hallucinations. His clinical condition at that time was described as "fairly stable."

When interviewed during the monitor's visit, this inmate reported that his release date was 7/3/06 and that he had been told that he would not be transferring to an EOP program prior to his release.

Assessment:

This EOP inmate had not been expedited for endorsement to an EOP program or referred to DMH where he could be stabilized before parole. Notes appeared to indicate that he remained somewhat delusional through the period following his arrival in 1/06. Although some improvement in his condition had apparently occurred, his functioning remained low. He was not referred to an MHCB.

It appeared that this inmate's treatment should have been more actively managed. The fact of his upcoming parole was seen as a reason for delaying referrals that might otherwise have been initiated. Referral to intermediate or acute care should have been initiated when it was obvious that this inmate's condition was not going to be successfully stabilized in this setting.

8.    Inmate H

This inmate's case was reviewed in response to a request by the plaintiffs' counsel who cited concerns regarding the inmate's removal from the EOP level of care.

He was originally in EOP at CSP/Sac in 1999. He apparently had a serious suicide attempt in 7/03 that resulted in a severe tendon injury that required surgery. One week after the initial attempt he was readmitted to the CTC when he reported to the unit staff that he "wasn't feeling well" and "I don't think that I can hold myself together."

Notes in 9/05 indicated that the inmate was not seen as experiencing auditory hallucinations though notes around that same point in time appeared to indicate that the inmate was complaining of tactile hallucinations.

Notes in late 10/05 suggested that this inmate was complaining of auditory and tactile "hallucinations." His affect was "bright" and he was able to describe the symptoms readily. He appeared to be in no obvious distress regarding these experiences. In 11/05 he was described by clinicians as "hopeful" as he was anticipating a lowering of his custody level to level III and a board review. A note in mid 11/05 documented that this inmate was unstable and experiencing auditory hallucinations. By late 11/06 he was complaining of "new" auditory hallucinations that he felt might be "due to someone

trying to communicate with him." He was noted to present as "cooperative thoughtful and quite intelligent."

On 12/15/05, an IDTT note indicated that because "of his insight and intelligence" he was seen as a candidate for reduction to the 3CMS level of care. A note dated 1/24/06 indicated that a psychiatrist thought that his medications should be continued.

The inmate's presentation appeared consistent with what it had been for the preceding several months, demonstrating symptoms of auditory and possibly tactile hallucinations but insightful and generally functioning appropriately on medication. On 3/9/06 a long-standing prescription for Geodon was discontinued. A note dated 3/14/06 indicated that three weeks thereafter he was to be discharged from EOP to 3CMS. Notes indicated that he was "angry and frustrated" regarding this change. He subsequently began to refuse contact and interaction with his case manager. The 3/14/06 note indicated "the supervisor and team did not feel that the inmate was psychotic" . . . "in that he was very articulate and organized and clear in his thinking and speech." There were no notes in the record after 3/28/06. A chrono in the record dated 4/6/06 indicated that the inmate's level of care was changed from EOP to 3CMS.

This inmate was interviewed on 5/3/06. He was quite articulate though at times he was rather distracted by noises outside of the room in which the interview took place. He reported a long history of "battling" voices and tactile hallucinations since at least 1999. He appeared to have exceptional insight into his psychotic symptoms and reported a long history of having been constantly vigilant in an attempt to separate real experiences from those attributable to psychotic process. He reported that he was quite angry upon learning of the IDTT plan to discharge him from EOP. In the time since this occurred he appeared to have accepted the decision and reported having interacted with other inmates who had experienced the same transition.

At the time of interview he was high functioning, well groomed and maintained his cell in a well organized fashion. He reported that he did not desire re-prescription of medication. He also reported that he felt that his "artistic" pursuits were negatively affected by dosages of psychotropic medication which were sufficient to eliminate psychotic symptoms. This inmate reported that he had not seen a mental health clinician since he was released from the EOP in mid-3/06.

Assessment:

This inmate had a history of at least one serious suicide attempt approximately three years earlier and appeared to have been maintained successfully during that period of time through a combination of medication and active participation in the EOP program. Throughout that period he continued to experience perceptual disturbance but appeared to have been able to cope with symptoms effectively. While the inmate may have been appropriately referred to CCMS level of care with appropriate preparation, the decision to discontinue his medication and to transfer him out of EOP at the same time did not appear to have been appropriate.

-9-

This inmate was likely to function appropriately at 3CMS level of care but he would likely require the presence of a "safety net." He had demonstrated the ability to work effectively with clinicians in the past and would benefit from an ongoing clinical relationship. As part of his transition, he should have been seen at short intervals by his 3CMS case manager. Thirty day intervals were recommended at least for the short term. He should have been scheduled to be seen again shortly.

9.    Inmate I

This EOP inmate was housed in administrative segregation at the time of the monitor's visit. He had a history of attempting suicide, most recently by overdose at the end of 3/06 after which he was transferred for treatment to Antelope Valley Hospital. He was in administrative segregation due to receiving RVRs for indecent exposure.

Review of his record indicated a rather lengthy history of diagnoses of paraphilia and Exhibitionism, including an MH-4 completed 10/21/03. Other diagnoses included impulse control disorder. This inmate had a history of safety concerns. He had been characterized as having borderline intellectual skills as well as depression.

Recent notes indicated that the inmate had consistently requested assistance for treatment of Exhibitionism. Notes from his record appeared to indicate that mental health staff agreed with his need for such treatment. Treatment plans written as early as 2004 cited indecent exposure as an issue and notes appeared to indicate that regular contact and work with an individual clinician had at times been at least partially effective.

The inmate was interviewed on 5/3/06. He was adequately groomed, alert and exhibited a narrow range of affect. His speech was clear and his thinking was goal directed. He described a long history of committing acts of indecent exposure including his commitment offense. He reported that he had served previous prison terms for burglary and for check forgery. By his report, he was committed to prison for eight years and had recently received another four-year term for indecent exposure. He reported that he "hears voices" and that he interacted with an "imaginary friend." He was prescribed Paxil and Risperidone but that these medications had not helped him control a recurring impulse to masturbate in front of women.

This inmate reported that he received approximately one hour of yard time in an open yard every day of the week except Thursdays when he received four hours of yard time.

Assessment:

This inmate was committed for indecent exposure and had received a second term for this behavior. His record included several diagnostic evaluations that cited Exhibitionism. He had repeatedly requested an appropriate treatment program. Clinical notes appeared to support his need for such treatment. It appeared that this inmate had interacted beneficially on a one to one basis with clinicians.

Information in the record suggested that this inmate had been diagnosed with Exhibitionism. The IDTT should have reviewed this information and, if satisfied with the diagnostic, it should have facilitated his involvement in appropriate treatment. If in the collective opinion of the IDTT there remained some doubt as to whether a current diagnosis indicative of Exhibitionism was appropriate, the team should have facilitated an appropriate diagnosis and acted on those recommendations.

10.    Inmate J

This EOP inmate was housed in an administrative segregation unit and was awaiting transfer to the MCSP Level IV Special Needs Yard. He had attempted suicide on multiple occasions during the preceding six months. He had a history of DMH placement at both ASH and Patton State Hospital (PSH). There were notations in his medical records indicating that he had been considered for acute care at SVPP referral while housed in the EOP administrative segregation unit.

A recent MH-2 reported that this inmate had a diagnosis of Bipolar Disorder, Manic and Antisocial Personality Disorder  He was noted to have exhibited unstable mood as a result of poor medication compliance.

Notes indicated that during the two months preceding the monitor's visit, he had been seen as periodically highly agitated and threatening, tending to escalate in the course of conversations and discussions.

On the evening of 3/18/06 this inmate informed a nursing staff member that he was suicidal and that he wanted to hang himself. Notes indicated that the on-call psychiatrist instructed the nurse to tell the inmate that he "will see him in the AM."

On 3/19/06 at 6:30 a.m., notes indicated that the inmate was seen following an "attempted suicide by hanging." He was noted to have "redness to neck area with approximately a 1 centimeter laceration near the left eyebrow." A late entry noted that an additional contusion was noted to the bridge of the nose with "dried blood noted L(?) nares" (*sic*) and that this inmate had stated, "I broke my nose with my finger."

An incident package regarding the above incident was generated but there were no charges filed.

On 3/19/06 this inmate was placed into a holding cell, apparently in the CTC "with custody observing from the outside."

Records indicated that he was released from the infirmary on 3/21/06. Notes at discharge included the following:

> "Given that the CTC staff knew this patient very well, there was no evidence that he was not at his baseline and that further treatment could be

-11-

continued back in his original treatment setting. It was also felt that, should these suicidal behaviors be in any way an attempt to manipulate staff for a change of environment, this should not be reinforced by a prolonged hospital stay."

On 4/27/06 at 10:43 a.m., this inmate was found hanging by his neck by a bed sheet from his bed. He was cut down. He was conscious and "cyanotic in appearance" with abrasions around his neck. He was transported to the CTC via ambulance. It appeared, however, that this inmate was not admitted to the CTC. He was prescribed Ativan, Cogentin and Geodon STAT on 4/27/06.

This inmate was apparently back in his housing unit on the morning of 4/28/06. There was no indication in the record that he was admitted nor was there any inpatient record. Notes on 4/28/06 indicated that on the previous day this inmate had been found with bruises on his neck after attempting to hang himself with a sheet. That day he had also been observed drinking from the toilet and claiming that he wanted to die. A note at 9:20 a.m. stated that he was to be admitted to the CTC but a second note at 12:40 p.m. indicated that the admission had been cancelled after the inmate had become "calm" and had agreed to begin taking medication again.

In an interview during this monitoring visit, this inmate reported that upon returning to his cell following the 4/27/06 incident, his property and clothing had been removed from his possession. He was placed on five-day follow-up at that time. At the time of interview he reported that he had not yet received his property.

While an inmate's property apparently is removed from his cell at the time he is placed in CTC, it is not clear why inmate this inmate's property was removed since it did not appear that he was not admitted to the MHCB.

When seen in interview this inmate was adequately groomed and initially cooperative. His speech was rapid and tangential, contained delusional elements and was often quite difficult to follow. He reported "hearing evil voices." He quickly became agitated, raised his voice and was confrontational. He de-escalated upon instruction from the examiner but on several successive instances he became again highly agitated.

This inmate repeatedly demanded that I facilitate his transfer, first to DMH and then to an SNY program at MCSP. He appeared to be quickly agitated at any comment that he viewed as not endorsing his requests. The inmate appeared to have a rather incomplete memory of the details of the 4/28/06 incident but he did report that he was taken out of the unit on a stretcher and was returned soon afterwards.

Assessment:

This inmate presented with active psychosis and often acted in an impulsive manner. Staff had failed to prevent an initial incident of "hanging" and had opted not to place this inmate into the CTC following two incidents in which he hanged himself, including the

incident on 4/27/06 when he had to be cut down. This inmate continued to be quite psychotic and impulsive. It appeared that he had been prescribed stat medication during the few days preceding the monitor's visit.

This inmate had not been appropriately evaluated following a series of serious suicide attempts. He was not provided with appropriate crisis care following these incidents.

11.    Inmate K

This inmate paroled out of the CSP/Sac EOP on 1/22/05. He was brought to the CSP/LAC reception center on 2/13/06 as a parole violator.

He was diagnosed with Mood Disorder NOS and methamphetamine dependence at the time of his arrival and his level of care was designated at 3CMS. He was elevated to EOP level of care in 3/06. Notes through 2/22/06 indicated that this inmate arrived at CSP/LAC's reception center on medication but that medication had not been ordered following his arrival.

On 3/1/06 he was characterized as "clinically stable bipolar." On 3/8/06 he refused a psychiatric interview in what the psychiatrist described in his note as a "fit of petulance." He was still not on medication as of 3/22/06, appeared stable but was resistant to all but his "preferred" medication.

On 4/5/06 he was interviewed by a psychiatrist. During the interview, this inmate became angry and made a derogatory statement to the psychiatrist. Apparently, the psychiatrist changed this inmate's diagnosis to "adjustment disorder with angry mood" and wrote "no meds." It did not appear that there had been any subsequent opinion to the contrary.

This inmate was seen in his housing area on 5/5/06. His speech was rapid and grandiose and he was quite suspicious and angry. He became animated and agitated at times through the course of the conversation. He made repeated accusations of mistreatment by psychiatry staff. He reported that he still had not received medication or an appropriate psychiatric evaluation. This inmate reported that he did not get yard and that he was not being allowed into the day room. He reported that he would be paroling in approximately three months. He also reported that he had been prescribed medication from a parole outpatient clinic while on parole and that it was effective.

Assessment:

This inmate appeared to have been appropriately diagnosed with bipolar disorder. He had been prescribed medication from parole outpatient clinics and reported that he had been stable in the community. It appeared that mental health staff may not have accessed records to determine an appropriate medication regimen. It did not appear that an appropriate psychiatric evaluation had been completed.

12.    Inmate L

This inmate's IDTT meeting was observed and the UHR was reviewed briefly. According to the interdisciplinary discussion that took place prior to this inmate's arrival at the IDTT meeting, he was treated at the 3CMS level of care in 8/05 at CCI. He came to the EOP at CSP/LAC on 8/25/05. He was serving his first term in prison. He had two prior convictions for petit theft. He was very frightened when he arrived at CSP/LAC and was easily redirected. He had normal cognitive functioning. He was also in the MHCB in 8/05. He had a history of suicide attempts. He had a diagnosis of Psychotic Disorder NOS and was medicated with Haldol, Cogentin and Buspar.

He received an RVR on the yard in 12/05. The charge was resisting staff for which he lost 60 days. His correctional counselor helped him appeal sanctions which would have delayed his release date.  The correctional counselor reported that this inmate was told to get down while on the yard but instead he ran because he believed that he was being chased by aliens. He was scheduled to be released on 6/15/06.

Team discussion indicated that this inmate required containment and supervision. He became fearful about the future and erupted in tears frequently and with little provocation. Staff discussed whether he should be considered for civil commitment upon release. The correctional counselor faxed a strongly worded recommendation to the POC advising them to pick up this inmate when he is released.

Staff had no knowledge of discharge planning done by TCMP. The UHR contained no chronos written by TCMP staff.

Assessment:

Mental health treatment was adequate. The IDTT meeting served its purpose. This inmate needed residential placement upon release but discharge planning was not done.

13.    Inmate M

This inmate's IDTT meeting was observed. His UHR was not reviewed. He was on the DMH wait list for intermediate care. His case was reviewed monthly by the IDTT.

According to the interdisciplinary discussion that took place prior to his arrival at the meeting, he was at SVSP in the EOP in 2003. A Keyhea order was issued on 10/224/03 before he came to CSP/LAC.

This inmate's Keyhea order was renewed 11/7/05 for a period of 12 months on the ground of grave disability. He was taking Depakote 1750 liquid and Risperdal 2 with a Haldol IM back up.

His diagnoses varied from Schizoaffective Disorder to Bipolar Disorder with psychotic features. At the time of the monitor's visit, this inmate refused to attend approximately

half of his scheduled appointments. He was described as sociable. His speech was tangential and he expressed delusional material in casual conversation. He denied that he was mentally ill and that he should take medication.

He had had many RVRs including several for sexual misconduct. The most recent sexual misconduct RVR was on 4/9/05 and the second most recent was in 7/05. During that incident he resisted staff when he was instructed to drink his liquid medication in front of the MTA. He wanted to take it to his cell for later consumption.

During the IDTT meeting he exhibited a neck twist. Members of the IDTT asked the psychiatrist about it. The matter was dismissed without further discussion.

During the IDTT meeting the inmate was neat, well groomed and conversed logically and with relevancy. When questioned about the discrepancy between his history and his presentation, this inmate's case manager said that he was very ill but able to appear high functioning. During the meeting the inmate said that he wanted his liquid medication discontinued in favor of pills. Staff discussed the likelihood that he would cheek medication.

Assessment:

This inmate needed a higher level of care but was on the waiting list. A dystonic reaction observed during the IDTT meeting did not elicit appropriate attention. The IDTT meeting served its purpose with the exception of the inadequate psychiatric contribution.

No conclusion was drawn regarding the handling of his RVRs for sexual misconduct. The most recent incident predated the department's revision of its policy regarding inmate sexual misconduct.

14.    Inmate N

Volume two of this inmate's UHR was reviewed. The earliest mental health documents in it dated from 2005. He reportedly returned from DMH in 1/04 and was treated at the EOP level of care throughout 2005.

He was seen by different psychiatrists at intervals of roughly six weeks. In 12/05 an order was rewritten without patient contact because this inmate went to visits at time when a psychiatrist could see him.

He was seen weekly by a case manager. Many contacts were made cell front. After his case manager left abruptly he was seen by several different case managers who covered his building.

He did not have quarterly IDTT meetings. His treatment plan was individualized in terms of problems and targets but the planned interventions were not individualized. Problems listed were social withdrawal, lethargy, somatic complaints and poor

participation. The plan was essentially a schedule of routine EOP contacts and groups. No IDTT meetings were held between 8/05 and 2/06.

The inmate history generated by MHTS showed an old diagnosis dated 2004. It was Bipolar I Disorder, most recent episode depressed, moderate. The diagnosis in the UHR through 2005 was Panic Disorder/agoraphobia.

He was treated with Paxil and Zyprexa from 3/05 to the time of the monitor's visit. In 10/05 he expressed concerns about lack of medical treatment for infections as he had significant medical problems with associated chronic infections. He had had a urinary tract infection for an extended period of time. A chronic care appointment was cancelled.

This inmate also expressed concern about weight gain. A psychiatrist noted his concern about this in 2/06 but did not change his regimen. It did not appear that his obesity and weight gain were considered in his treatment. A case manager returned a call to his father but the note contained no further information regarding that contact.

Assessment:

Mental health treatment in the EOP did not meet program guide requirements. IDTT meetings were missed. Many case manager contacts were made cell front. Treatment was fragmented and did not address this inmate's needs. Due to a shortage of psychiatrists and the resignation of his case manager he was seen by different psychiatrists and case managers. His concerns about recognized medical problems for which he needed continued treatment were not afforded due attention. Weight gain possibly associated with the use of Zyprexa was ignored in his treatment. Despite these shortcomings he appeared to benefit from EOP treatment.

15.    Inmate O

This EOP inmate was on a wait list for DMH. He was seen monthly in an IDTT meeting. His UHR was reviewed.

Diagnostic clarification had not been achieved. Diagnoses shown were inconsistent on recent treatment plans and on MHTS. He was treated for either Substance Induced Psychotic Disorder with hallucinations or for Schizophrenia, undifferentiated type. Review of the UHR indicated that he experienced episodes in which his eyes were rolled upward and he was minimally responsive. He later explained that behavior as "chasing the hallucinations." Staff reported that he experienced overwhelming hallucinations that he characterized as anxiety attacks.

His medication regimen included Haldol Decanoate 100 IM q 2 weeks and Cogentin, Remeron 15, Ranitidine 150 bid, Dilantin, and Geodon 60 p.m. Most orders were written for 60 to 90 days. An order of 1/06 was written for 90 days with one refill. He had a prn for Geodon 20 IM for anxiety and agitation. He received prn medications when he experienced unusual episodes or reported having an anxiety attack. That happened twice

per month in 2/06 and 3/06. MARs indicated that he was compliant with medication at least from 1/06 through 3/06.

Review of the UHR indicated that he was seen roughly every six weeks by psychiatry and weekly by his case manager. He was seen by different psychiatrists.

A urinalysis was ordered during an episode on 4/19/06 when he was minimally responsive and his eyes were rolled upward. On that date he was seen on an urgent basis by a case manager and a psychiatrist. His po order for Haldol was increased, labs were ordered and follow-up by psychiatry in one week was planned.

He was seen in an IDTT meeting on 5/2/06. He was not seen in the interim by a psychiatrist. Neither the IDTT note nor the corresponding treatment plan mentioned the episode or the need for lab results. No lab results were in the UHR when it was reviewed on 5/3/06.

Progress notes indicated that he appeared to be losing weight. His weight loss was discussed in recent IDTT meetings. The plan was to monitor his weight for one month. Entries in the UHR indicated that he had been weighed in 4/06. His weight was very close to what it had been in 10/05.

Assessment:

This inmate needed a higher level of care. Mental health treatment in the EOP did not meet program guide requirements. Psychiatry treatment was particularly inadequate. This inmate's medication regimen did not control his hallucinations. He needed more intensive treatment, a focused interdisciplinary approach and better follow-through by psychiatry. Treatment providers were responsive to immediate problems but on the whole the approach to treatment was fragmented and lacked continuity.

Lack of access to intermediate care was a serious problem given the severity of this inmate's illness and his compromised functioning.

16.   Inmate P

This DD2 or developmentally disabled inmate was treated at the EOP level of care. His DD2 status indicated that he required prompts to complete activities of daily living and assistance in using the resources available to the prison population. Staff at CSP/LAC described him as easily victimized.

According to the UHR he was discharged from the EOP at SVSP between 7/05 and 10/05 in order to facilitate his transfer to an institution designated to receive DDP inmates. He had been treated at the EOP level of care for a long period of time. He may have been in administrative segregation at SVSP while awaiting transfer as per standard operating procedure there.

This inmate had a diagnosis of Schizophrenia, undifferentiated type. He was treated with Risperdal at the time of his transfer in 11/05. Shortly after he arrived at CSP/LAC his condition deteriorated markedly.

His bus screening and first medication order at CSP/LAC were dated 11/17/05. He arrived with a current order for Risperdal. The order was rewritten on 11/17/05. According to MARs filed in the UHR he got his first dose of medication on 11/18/05. He was seen by a psychiatrist on 11/23/05. He was housed in a general population EOP unit immediately upon his arrival at CSP/LAC.

During his first two to three weeks at CSP/LAC progress notes described him as alternately calm and cooperative or agitated and yelling. His level of functioning deteriorated. He was consistently deemed a poor historian. During the third week of 11/05 he was described as malodorous, disheveled, disorganized and agitated. He was found to be actively psychotic, agitated and delusional.

An initial IDTT meeting was held on 11/28/05. It noted that he was psychotic. He was noted as delusional with loose bizarre speech, using nonsensical expressions and having poor reality testing. He was not referred to the MHCB.

On 11/30/05 he reportedly yelled, threw himself against his cell door and generally disrupted the EOP unit for hours. Staff believed that his condition warranted referral to DMH. He was seen by a psychiatrist on that date. A 72-hour involuntary medication order was invoked. The reason for the involuntary order was unclear. It was unclear from the documentation that he had refused medication.

On 11/30/05 and 12/2/05 he received stat injections of Geodon. When he was seen by a psychiatrist on 12/2/05 his regimen was changed. In addition to receiving the stat dose of Geodon, the dosage of Risperdal was increased and Depakote was added.

Two days later on 12/2/05, he was seen by a different psychiatrist. He was described as agitated and psychotic and stat Geodon was ordered again. Labs were ordered in conjunction with the start of Depakote.

There was no indication that he was referred to the MHCB on either occasion. MARs indicated that he was compliant with medication with only a handful of refusals noted.

He was next seen on 12/8/05 when he was doing better but remained disorganized. He was being fed in his cell in order to minimize disruptions to the unit. He remained in that state through 12/05.

Staff reported that he was involved in a use-of-force incident in 3/06 that resulted in his removal to administrative segregation and an RVR.

Assessment:

Mental health treatment was poor. His deterioration, eventual involvement in a disciplinary problem that elicited the use of force and his removal to administrative segregation were associated with inadequate treatment. His discharge from the EOP at SVSP on the ground that he needed to go to an institution that was designated to house DDP inmates was misguided. Once he was in CSP/LAC treatment he was not referred to a crisis bed but was allowed to remain acutely psychotic while in general population housing.

Intake processing met program guide requirements. Medication continuity was sustained upon arrival. The IDTT was timely and attended by a full team. Mental health treatment was not responsive to his psychosis. He should have been referred to an MHCB in 11/05 and 12/05.

17.    Inmate Q

Volume three of three was reviewed. This DD2 or developmentally disabled EOP inmate arrived at CSP/LAC on 3/2/06 from CSP/Corcoran where he had been treated at the EOP level of care for a long period of time. His DD2 status indicated that he required prompts to complete activities of daily living and assistance in using the resources available to the prison population.

In the EOP at CSP/Corcoran he attended group treatment and was treated with Geodon, Haldol and Omeprazole.

At CSP/LAC he was placed immediately into the general population. He was first seen by mental health staff six days later on 3/8/06 and one week later by a psych tech for orientation. According to MARs he received his first dose of medication at CSP/LAC on 3/5/06, three days after he arrived.

On 3/27/06 he tried to jump off the second tier of the EOP unit. He was seen by a psychiatrist. He could not contract for safety. He was sent to the MHCB for admission. There was no indication in the UHR as to whether he was admitted to the MHCB.

A gap in the records suggested that he may have been out of the EOP and perhaps in the MHCB for ten days or less. The next note was a case manager contact was on 4/7/06 when he was seen out of cell. He reported feeling suicidal most of the time but had no concrete plan to injure himself. He attended several groups during the next few days. The case manager planned to refer him to psychiatry when indicated.

This inmate was not seen again until 4/19/06 when he had a case manager contact. During that contact he was described as alert and rational. He reported that his cell still smelled of pepper spray that had been used there a few days previously. He was described as having poor insight, being over-reactive, feeling like a victim and having little insight into his escalating behavior.

A treatment plan written in conjunction with an IDTT meeting indicated that discharge to the 3CMS level of care in 120 days would be considered. That plan was not linked to any discernable individual treatment considerations.

Assessment:

Mental health treatment in the EOP did not meet program guide requirements. This EOP inmate experienced a three-day gap in medication upon arrival. He was not seen by a case manager until he had been in the EOP for six days. He was seen for orientation nearly two weeks after he arrived. There was no indication that his level of cognitive functioning and its impact upon his transition was considered by mental health staff.

He was sent to the MHCB when he tried to jump off a tier. Records were missing from the UHR. It contained no indication of whether he was admitted or if five-day follow-up was planned or carried out. Suicide risk was not assessed thoroughly ten days after the suicide attempt. Psychiatry follow-up and case manager contacts were not made shortly after a suicide attempt.

The treatment plan either contained boilerplate language regarding discharge from the EOP or it was formulated with little regard for salient clinical factors.

18.    Inmate R

The most recent volume of the UHR was reviewed. According to this inmate's C-file he had had no recent RVRs.

This inmate was treated at the EOP level of care since at least 4/05. His level of functioning fluctuated somewhat. At best he was able to concentrate on studying for a GED and slept adequately while experiencing a low level of auditory hallucinations. At the lower end of his range he had disturbed sleep, frequent and disturbing auditory hallucinations, problems rooming with a cellie and agitated depressed mood states. His problems with a cellie were associated in part with involuntary movements associated with the use of psychotropic medication. Consideration of a single cell was raised but no determination was reached.

He had been seen by a number of different psychiatrists and several managers. Some were contractors and others were filling in for missing staff. He had quarterly IDTT meetings. Although all IDTT meetings indicated that he was treated at the EOP level of care his treatment providers did not know that. A series of progress notes of psychiatry and case manager contacts indicated that he was being prepared for discharge to the 3CMS level of care.

He was not seen monthly by a psychiatrist. Even when he was referred to psychiatry by EOP clinicians he was not seen by a psychiatrist for two to three weeks. Medication orders were changed frequently. Some changes were made in response to his reports of side effects or symptoms of psychosis while others were made without a rationale.

The IDTT meeting held on 3/30/06 stated that he would be prepared for discharge to 3CMS. Although a full team was present the members were either new to the staff or were part-time contractors. In conjunction with the IDTT this inmate's antipsychotic medication was discontinued. No rationale was written by the psychiatrist. Although the psychiatrist was not new to CSP/LAC and the EOP, he did not know the inmate. The progress note contained a confusing entry that said this inmate would be discharged from the EOP after a period of 12 months without medication. Within three weeks this inmate reported increased auditory hallucinations. He was seen by a psychiatrist and Risperdal was restarted.

Assessment:

Mental health treatment did not meet program guide requirements. Ongoing treatment was disconnected from IDTT meetings. Neither IDTT meetings nor ongoing treatment were informed by this inmate's history, diagnosis or current needs. Treatment was fragmented. Access to psychiatry was poor. Changes in medication that were clearly contraindicated were made without a rationale. A recommendation for single cell housing was considered but no determination was made.

19.    Inmate S

This inmate came to CSP/LAC from RJD for EOP treatment in 3/05. He was reportedly serving a life sentence. He was treated at the EOP level of care in 5/06 when his case was reviewed.

According to his most recent treatment plan he had diagnoses of Major Depressive Disorder with psychotic features and Antisocial Personality Disorder by history. His GAF was assessed as 35. He was viewed as having a long-term need for EOP treatment. During the monitoring period he had quarterly IDTT meetings. They were attended by a full team.

He was seen by three or four different psychiatrists. From 8/05 through 12/05 his medication regimen was comprised of Zoloft, Effexor, Buspar, Risperdal and Remeron. Zoloft was tapered off. Dosages were adjusted in response to his reports. His regimen changed again in 1/06. Risperdal was discontinued and Thorazine was added. Effexor was continued. His compliance with Remeron, Thorazine and Effexor was good from 1/06 through 4/06.

He was seen at least monthly by psychiatry. He was seen once in the context of an IDTT meeting. That note was stamped with language to alert the reader of the context of the contact. He was seen by the same psychiatrist for follow-up one week later. He was seen monthly by a case manager with the exception of 12/05 when he was seen only once. He discussed issues of personal concern with his case manager.

The treatment plan was individualized in terms of his individual characteristics but not in terms of interventions. Planned interventions consisted of a schedule of required EOP contacts.

Assessment:

Mental health treatment in the EOP met program guide requirements with the exception of the treatment plan, which was not completely individualized, and missed case manger contacts in 12/05. He was seen by several different psychiatrists but his regimen was managed deliberately. Mental health treatment met his needs.

20.    Inmate T

This inmate had been treated at the EOP level of care at CSP/LAC since at least 10/04. He had quarterly IDTT meetings interspersed with more frequent updates on occasion. Meetings were attended by a full team.

He had a diagnosis of Schizophrenia, undifferentiated type. He was described as having poor ADLs and sleeping a great deal. He was withdrawn and uncooperative. A 12-month Keyhea order was renewed for another 12 months in 3/06. He was medicated with Haldol Decanoate 50/25 q 4 weeks and Cogentin. He also had an order for Ranitidine 15 bid. MARs in the UHR were marked to show that injections were given in 3/06 and 4/06.

He was in the CTC for medical treatment as of 5/2/06. He was taken back and forth to a community hospital several times shortly before the monitor's expert's visit.

He was seen weekly by his case manager and every six to seven weeks by a psychiatrist. Progress notes described him as minimally responsive to attempts to engage him in conversation. Notes contained little clinical information because he emitted little information. His condition appeared to be unchanged for months. He required prompts to complete ADLs and attended a small number of groups.

According to the MHTS inmate history he attended nine group sessions in 3/06. He did not participate in recreational therapy in the yard.

Assessment:

Mental health treatment met program guide requirements with the exception of monthly psychiatry contacts. Due to a shortage of psychiatrists contacts were made every six weeks.

21.    Inmate U

This inmate was identified as needing intermediate care at the time of the UNA review in 1/05. His case was not reviewed by the UNA team. Staff at CSP/LAC determined at that time that he needed a higher level of care.

When the latest volume of his UHR was reviewed at CSP/LAC in 5/06 the record was incomplete and incoherent. It was not possible to discern events that transpired in his recent treatment with precision. In conjunction with other sources of information a general overview of his condition and his recent treatment was developed. A copy of his discharge summary from SVPP was obtained via fax from DMH on 5/2/06 at the request of CSP/LAC staff. It was reviewed by the monitor's expert.

In brief, this inmate was charged with indecent exposure in late 10/05. He went to acute care at Vacaville at the end of 11/05 and remained there one month. He was discharged to intermediate care at SVPP. He was there less than two weeks. When he returned to CSP/LAC he precipitated a crisis. In 1/06, 2/06, 3/06 and 4/06 he was seen repeatedly in the triage and treatment area of the CTC because on numerous occasions he precipitated crises and self-inflicted injuries that required sutures.

This inmate had diagnoses of Schizoaffective Disorder, Cognitive Disorder NOS, Polysubstance Dependence, and other convulsant disorder on Axis III. He was treated at the EOP level of care in administrative segregation at the time of the site visit. On a test of intelligence administered at DMH he scored 62. His history showed that he was dependent upon his mother, was prone to experiencing high anxiety in the absence of reassurance and had very poor coping skills.

According to a log of multiple MHCB admissions he was in the MHCB on 10/2/05 to 10/4/05, 10/26/05 to 11/3/05, 11/9/05 to 11/15/05, 1/13/06 to 1/19/06 and 2/15/06 to 2/17/06.

His medication regimen changed somewhat over the past four months. It was comprised of predominantly Haldol Decanoate 100 q 2 weeks, Haldol 5 po daily with an IM back-up if refused, and Risperdal. Prozac was added in 3/06. Lithium was added to the regimen in 4/06. A Keyhea order was renewed in 3/06. He also took Dilantin.

He went to acute care at Vacaville on 11/29/05. He was discharged on 12/22/05. A discharge summary indicated that he was to be discharged to intermediate care at SVPP. He was described as enthusiastic about the placement. He was there for less than two weeks. He was returned to CSP/LAC on 1/11/06. He went to administrative segregation. He precipitated a crisis the following day.

The C-file showed that although his SHU term was due to expire in less than four weeks he was discharged from SVPP on security grounds. According to a goldenrod copy of the proceedings of an inmate classification committee meeting entitled SVSP/SVPP DMH Initial Review that took place on 1/5/06, the IDTT determined that he should not remain at SVPP. The rationale given was that because he was on administrative segregation status at CPS/Lancaster and was serving a SHU term for threatening a peace officer he was deemed to be unsuitable to participate in the program.

The action read, "Inmate [name deleted] arrived at SVSP/SVPP DMH for Psych and Return on 12/22/05 from LAC ASU [Name deleted] is currently serving a SHU term with a MERD of 1/26/06 for Threatening A Peace Officer. In accordance with the Memorandum of Understanding..." The meeting was chaired by a CDW and attended by a CCII, a CCI and a recreational therapist.

Immediately upon his return to CSP/LAC he precipitated a crisis by kicking his cell door. He also refused medication on 1/12/06 in administrative segregation. Neither the clinical notes nor the custody reports provided a complete account of events or included the most salient factors in the incident. The following account relied upon both.

According to an RVR written that date he was kicking his door and refused to stop when ordered. Pepper spray was used to stop him. He was removed from the cell and decontaminated. An RVR was written. He was charged with disobeying a direct order and necessitating the use of force. According to clinical notes he had a Keyhea order and an order for a Haldol IM back-up upon refusal. For that reason he was brought to the TTA portion of the CTC for involuntary administration of medication. He was then admitted to the MHCB where he remained for six days.

At the end of 1/06 he was involved in an incident that was precipitated by a failed telephone call to his mother. His attempts to go through staff to contact his mother were unsatisfactory. He eventually inflicted a serious laceration to his arm by biting himself. According to a clinical note he nearly lacerated an artery. The physician on call, who knew him well, was called twice. He was called around midnight and again around 2:30 a.m. A clinical note indicated that the inmate was taken to the TTA as directed by the physician after the first call but not following the second. A clinical note said that the watch commander decided against moving the inmate to the TTA the second time. According to an RVR written in connection with the incident, this inmate bit himself and drew blood twice. The first time he was taken to the infirmary. The second time he was treated by an MTA in the dayroom. He was not admitted to the MHCB in connection with that incident.

Staff reported that he was housed in the general population portion of the EOP in 2/06 and 3/06. During that time he experienced crises and was seen in the TTA and admitted to the MHCB. He was removed to administrative segregation in late 3/06 or early 4/06 because he assaulted an officer in the unit.

Staff reported orally that this inmate was highly reactive to unexpected changes in his environment and to frustration. His ability to regulate his reactions to the environment was poor. He was confrontational toward staff. He also became self-injurious when external stimuli were insufficient. Staff reported that in 2/06 and 3/06 a behavioral intervention that allowed him extra out-of-cell time was used with good effect. Behavioral interventions were not captured in recent treatment plans.

There were many MARs in the UHR but none showed that Haldol Decanoate was administered. The MARs for 2/06 and 3/06 were annotated in a manner that marked the

scheduled dates of administration but they were silent on whether it was given. Staff reported orally that he received his medication as ordered.

Review of the C-file indicated that this inmate served five months of a nine-month aggravated SHU term beginning in 7/05 for threatening staff. He served the five months in administrative segregation at CSP/LAC. He was released from administrative segregation in 1/06.

He had three pending RVRs as of 5/24/06. An RVR of 1/12/06 was for disobeying a direct order and necessitating the use of force. He had kicked the door requiring cell extraction and use of OC spray. On 1/30/06 he received an RVR for self-mutilation by biting his arm. On 4/22/06 he received an RVR for assault on staff in the EOP by striking an officer on the chest with his fist. He was placed in administrative segregation after the staff assault.

There were no mental health assessments associated with the RVRs in1/06 filed in the UHR or the C-file. Staff reported that they would not reach the C-file until adjudication of the charges was completed. The 1/12/06 RVR noted that the behavior was not unusual, uncharacteristic or bizarre. The 1/30/06 RVR stated that his behavior was unusual and bizarre and that a mental health referral was warranted. Oddly, a log of RVRs referred to mental health showed that a referral was made for RVR of 1/12/06 but not for the RVR of 1/30/06.

There was no specialty evaluation for sexual misconduct in connection with an RVR incurred on 10/22/05 for indecent exposure directed at a particular officer. This inmate also used abusive language that was sexual in nature during that incident. A mental health evaluation found that mental illness was not a factor. Sanctions of 60 days' loss of time and 90 days' loss of packages and canteen were imposed. It was unlikely that a specialized mental health screening would have reached a different conclusion.

There were conflicting staff reports about when the revised policy for handling sexual misconduct was implemented. Some reported that it was implemented after 10/22/05. Others were certain that training was conducted and the policy was implemented before that date.

Assessment:

This case was notorious among staff but it had not been subject to scrutiny. Records were incomplete and incoherent. There was no written indication that the revised policy regarding inmate sexual misconduct was followed for an offense that occurred in 10/05. An RVR written for self-mutilation did not conform to departmental requirements.

This inmate's discharge from intermediate care appeared to be pretextual.

Mental health treatment was inadequate. There were no written records that showed Haldol Decanoate was administered as scheduled. Treatment was not tailored to his

characteristics nor was it responsive to his presentation. Suicide risk was not thoroughly assessed. Evaluations for admission to the MHCB were cursory. Staff grew less responsive to his distress and his self-inflicted injuries over time.

If CSP/LAC staff were not able or willing to treat him this inmate he should have been referred to a setting that would provide treatment. At the very least a specialized IDTT meeting or case conference should have been convened to fully consider his treatment history, current treatment needs and to review available housing and treatment options.

22.    Inmate V

In 4/06 this EOP inmate was engaged in a series of violent incidents in which he damaged state property and inflicted injuries on himself. His level of functioning had spiraled downward during the preceding several weeks. The first incident occurred at SVPP.

This inmate's history of treatment at DMH was interrupted by a return to CSP/LAC to make court appearances. He was at SVPP for intermediate treatment just over two months from 7/18/05 until 9/27/05. Following four or five months in administrative segregation at CSP/LAC he was returned to intermediate care for seven weeks from 2/24/06 to 4/14/06.

He was brought back to CSP/LAC around 9/27/05 to make court appearances. He was classified as out to court from 9/27/05 through early 1/06. He remained at CSP/LAC in administrative segregation in 10/06, 11/06 and 12/06. He was confined to quarters for a portion of that time. At times he was disruptive because he was not allowed to attend group sessions. When he attended his participation ranged from active to disruptive.

He received an adverse legal decision. Once his case concluded, which appeared to be at the end of 1/06 or in 2/06, he was sent back to intermediate care at SVPP. Mental health staff at CSP/LAC had no warning that he was leaving. The medical file was silent regarding the second segment of his SVPP stay. He remained at SVPP for roughly seven weeks.

According to the C-file on 2/24/06 he had an initial inmate classification committee meeting at SVPP. The C-file was the only source of information regarding his seven week stay at SVPP which lasted from 2/24/06 to 4/14/06. The C-file did not contain the inmate classification committee action at SVPP associated with his discharge in 4/06. The cumulative record of his movements was unclear. Essential information was missing.

No records contained clinical information regarding his second stay at SVPP. He incurred a charge of battery on a peace officer at SVPP. A SHU term of 18 months for that offense was assessed at CSP/LAC on 4/27/06. It was enlarged by six months due to two prior similar offenses.

Somewhat mysteriously the UHR showed that he had an IDTT attended by the MHCB team at SVSP on 4/10/06. Notes indicated that mental health staff at SVSP discussed the case with a DMH representative. The plan was to facilitate this inmate's admission to SVPP by sending him to acute care at DMH Vacaville. He was moved from SVPP to CSP/LAC on 4/14/06. On that date he kicked out the window of a van while in transit.

An overview of this inmate's recent treatment indicated that although different diagnoses had been made, he had consistently been described as being volatile, demanding and impulsive. He was often preoccupied with legal issues. Diagnoses ran the gamut and included Schizoaffective Disorder depressive type, Mood Disorder NOS, Intermittent Explosive Disorder, Adjustment Disorder and no diagnosis on Axis I. His presentation was variable. At times he appeared well organized and goal directed. On other occasions he was described as concrete and disheveled. He sometimes threatened to injure himself if his demands were not met.

At SVPP in 8/05 and 9/05 he was described as moderately uncooperative at first but interested in the program. He readily progressed through stages and was housed in a four-man cell. There was no evidence of a major Axis I disorder during his two-month stay. Discharge medications were Lithium 900 hs, Omperazole 40 am, Benzotropine 1 bid and Buspar 15 bid.

He was maintained on Buspar, Lithium and Artane at CSP/LAC before he returned to SVPP in 1/06 or 2/06. When he returned Geodon and Celexa were added to his regimen. A Lithium level was ordered in 1/06. A note indicated that results might have been received but none were filed in the UHR. A Lithium level obtained in 4/06 was in the subtherapeutic range.

After a seven week stay at SVPP he was returned to CSP/LAC on 4/14/06. He precipitated a series of crises and incidents. After he arrived back at CSP/LAC he reported that he took an overdose of medication. He was transported to a community hospital so that a neck injury could be examined. While in transit he kicked the doors and windows of the van. Clinical notes indicated that escape charges were pending. That was not borne out by the C-file. The charge was destruction of state property. He incurred an RVR on 4/25/06. He misbehaved in TTA and tried to run. The following day on 4/26/06, he incurred an RVR for destruction of state property. He tried to kick out the window in his cell.

After he returned to CSP/LAC in mid 4/06, the chief psychiatrist became involved in the case. Based upon lack of an Axis I disorder and his recent instrumental behavior the inmate was deemed appropriate for discharge to the 3CMS level of care by staff at CSP/LAC. Non-compliance with medication was not a focus of attention.

The inmate was reportedly fearful of suffering injury at the hands of officers. By one report the staff at CSP/LAC was working collaboratively to effectuate an expedited transfer to a different Level IV institution that could treat him at the EOP level of care. Time to transfer was estimated to be one to four weeks. That report stood in contrast to

-27-

the report of the C & PR, who was processing the transfer as a PSU case. Custody staff, including the C&PR, was not informed that his level of care had been changed to 3CMS.

Assessment:

This level IV inmate did well enough in intermediate care to progress to a four-man dorm. After a four to five month hiatus from treatment, during which he made court appearances and was housed in administrative segregation, he returned to intermediate care.

Clinical records of his stay in intermediate care were missing as was any record of an inmate classification committee meeting during which he was discharged from SVPP. He may have responded well to treatment at the intermediate level of care for six weeks.

After he was in intermediate care for seven weeks he was charged with assault on staff. He was returned to CSP/LAC and continued to engage in a downward spiral of destructive behaviors.

Although the case attracted the attention of health care and custody administrators it was not subjected to careful review. No one reviewed the records thoroughly or examined available options. A treatment team had not reached a considered decision regarding the level of care he needed or what constituted appropriate treatment while he was at CSP/LAC. Mental health and custody staff did not communicate clearly and effectively among themselves or with one another.

23.    Inmate W

This case was referred by plaintiffs' counsel. Counsel questioned this inmate's length of stay in the reception center and reported that when interviewed, he appeared to exhibit signs of psychosis.

This inmate arrived with the first wave of reception center inmates on 12/2/05 when he was seen by a bus screener. He remained in the reception center as of 5/3/06. He appeared to be hallucinating and reported a history of psychiatric treatment. He was referred to mental health.

He was brought to the attention of a psych tech by an officer who reported that he was behaving in a bizarre manner. He was seen by a psych tech and a psychiatrist on 12/4/05. The progress note associated with that meeting stated that the inmate reported that he was treated with medication for schizophrenia. He was a poor historian who appeared to be anxious and had labile mood. The psychiatrist wrote a five-day order for Benadryl and planned to see him in five days for a fuller evaluation.

He was seen for a physical examination and a TB test on 12/6/05. He was referred to mental health.

He was screened by mental health on 12/7/05. Results were positive. A risk assessment was also done on that date. The inmate was described as a poor historian. He had a scratch on his forearm that he said he had inflicted when he was freaking out. He was referred to psychiatry and told to exercise and breathe deeply. An MH-7 was completed on 12/14/05. He was described as disoriented, confused, inattentive, bizarre and fidgety with inappropriate affect and impoverished speech. Diagnoses of Organic Brain Injury/defect and Psychotic Disorder NOS were made. He stated that he did not want mental health treatment. He was slated for EOP treatment and weekly follow-up contacts. He was referred to psychiatry.

He was seen weekly for the next month. Notes were fairly consistent in their description of him. His mood improved but his cognitive processing remained very poor. He was seen by a psychiatrist on 1/16/06. He was seen cell front during a lockdown. He said he did not want medication. None was prescribed. At the beginning of 2/06 he was described as very fidgety, laughing inappropriately and saying he needed to talk to his mother. During the third week of 2/06 he reported insomnia and a history of substance abuse. He voiced suicidal ideation at the end of 2/06.

A psychologist brought this inmate to the attention of a psychiatrist on 2/24/06. He was seen without a UHR. They both thought that he was confused. He was perceived by the psychiatrist as very vulnerable due to his size, lack of social skills and confusion. He also laughed inappropriately. He was assessed as having dementia, a psychotic disorder or both. Haldol 5 bid, Remeron 45 and Cogentin were prescribed.

This inmate made superficial lacerations on his wrist on 2/26/06. He was seen in B1 by a psychiatrist whose signature was illegible. The monitor's expert reviewed this inmate's UHR. The inmate told him that he was on five different psychotropic medications but could not recall their names. Diagnoses of r/o Substance Induced Psychotic Disorder and r/o Malingering were given. Atavan was prescribed and he was referred to his correctional counselor and his case manager.

A nursing note dated 3/2/06 indicated that he was banging his head in his cell and said he could not be locked up. Atavan was given stat. He was referred back to his case manager.

He was seen for a weekly follow-up on 3/8/06. For the first time no psychopathology was reported in a progress note. He was calm and friendly and was using the yard. One week later he was described as having poor reality contact and poor hygiene and was laughing inappropriately. The plan was to continue to see him weekly. He was seen by a psychiatrist on 3/20/06. Orders for Haldol and Cogentin were rewritten.

He was seen in the treatment and triage area on 4/26/06. He asked a nurse if he could have his shots so that he could feel better. Orders were obtained from a psychiatrist who had seen him. Geodon, Ativan and Cogentin stat were ordered.

He was seen by a psychiatrist on 4/30/06. He reported thought-broadcasting and suicidal ideation. He was described as being alternately whiny and pleasant. His mood and affect were judged as incongruent with his complaints. His insight and judgment were described as poor. The dose of Haldol was raised to 10 bid. When seen for a weekly follow-up on 5/2/06 he appeared to be hallucinating.

On 5/2/06 he reported that he felt like cutting himself. He was seen in the treatment and triage area and returned to his housing.

He was referred by mental health for an expedited transfer on 3/23/06. His release date was 5/23/06.

Assessment:

Compliance with timelines and completion of reception center documentation failed to serve their purposes in the case of this inmate who was psychotic when he arrived at CSP/LAC. This inmate's apparent psychosis prompted medical and custody staff to refer him to mental health on several occasions. Mental health staff diagnosed his illness but did not treat it.

He was screened. An MH-7 was completed. He was designated EOP. He was seen weekly. His poor condition was documented repeatedly. Orders for psychotropic medication were not written until he voiced suicidal ideation nearly three months after he arrived. There was no concerted effort to arrive at a single diagnosis and treat him for that illness. He was not referred to the MHCB when clinically warranted. When he was seen in the triage and treatment area he was given stat doses of medication and returned to his housing. Expedited processing was not initiated until he had been in the reception center for nearly four months. He would spend seven months in the reception center in a psychotic state.

This case was discussed with the chief psychiatrist, a treating clinician and a clinical supervisor. Two conclusions grew from those discussions. Staff in the reception center did not recognize a duty to provide treatment. They focused on meeting reception center processing targets. Second, staff at all levels applied inappropriately stringent criteria when considering referral or admission to the MHCB.

24.    Inmate X

This inmate's UHR and MHTS inmate history were reviewed. He was treated at the EOP level of care. He was housed in a general population EOP unit. The UHR contained no records of group treatment. Group treatment was documented on the inmate history.

This inmate was treated for Psychotic Disorder NOS. His regimen included Geodon 40, which was raised to 80 in 2/06, Remeron 45 and Thorazine 25. He was also treated for diabetes and took Dilantin.

He had been seen at six week intervals by different psychiatrists. Orders were renewed to prevent expirations. Some psychiatry contacts were made in the context of an IDTT meeting. The notes were marked clearly in those instances.

He was seen weekly by his case manager. On occasion contacts were made cell front. According to the MHTS history he attended groups on anger management, stress management, depression, socialization, family issues and current events. He also attended community meetings and recreational therapy, and participated in the waiting room group. He attended 31 groups in 3/06 in addition to participating in recreational therapy and working as a porter.

His treatment plan was current and individualized in terms of history and problems but not in its interventions. A schedule of EOP activities and his job as a porter substituted for planned interventions.

Assessment:

Mental health treatment in the EOP met program guide requirements except for the lack of monthly psychiatry contacts and an incompletely individualized treatment plan. Group treatment needed to be summarized in his UHR. Mental health treatment was adequate and met his needs.

EXHIBIT C

California State Prison at Sacramento (CSP/Sac)

July 18. 2006 – July 20, 2006

1.    Inmate A

This DD2 EOP inmate was housed in the psychiatric services unit at CSP/Sac. He had a history of multiple suicide attempts and was serving an indeterminate term in the security housing unit for sexual misconduct. While previously housed at MCSP, this inmate received RVRs for indecent exposure on 8/11/05, 8/15/05, 9/29/05 and 11/10/05 for which he was assessed a loss of 420 days' credit. Prior RVRs had been issued on 1/5/03, 1/14/04 and 5/3/04. All of the related referrals to the district attorney were declined.

He was diagnosed with Psychotic Disorder, NOS and Depressive Disorder, NOS and was treated with Trileptal 1200 mg per day and Risperdal M tab 3 mg per day. Due to danger to himself and grave disability he was on a Keyhea order. Involuntary medications were initiated on 2/1/06, ordered by an administrative law judge on 3/9/06 and had an expiration date of 9/5/06.

While this inmate had been housed at CSP/Corcoran in 2004 he was diagnosed with Exhibitionism. At that time an undated comprehensive mental health evaluation for indecent exposure incident indicated that he had a diagnosis of ASPD but no diagnosis of Exhibitionism. A separate undated mental health evaluation for indecent exposure behavior provided a diagnosis of Exhibitionism. The latter evaluation recommended further, more in-depth assessment and group therapy. This inmate's medical record indicated that he was scheduled for group therapy at CSP/Corcoran that was specific for his Paraphilia, but he did not attend.

On 2/24/06, while this inmate was at MCSP, the DRB approved an indeterminate SHU term for repeated sexual misconduct. He was transferred from MCSP to CMF DMH acute care via psych and return protocols on 3/1/06.

On 5/16/06 this inmate was discharged to CSP/Sac where he was placed in the psychiatric services unit. He had not received any RVRs for indecent exposure since arriving at CSP/Sac. He remained in the psychiatric services unit as of 7/18/06.

Since this inmate's transfer to CSP/Sac, there had been documentation of weekly case manager contacts and consistent psychiatric contacts. The initial treatment plan completed on 5/22/06 mentioned that this inmate had a history of indecent exposure incidents with multiple RVRs. He was not diagnosed with Exhibitionism in the treatment plan or on subsequent progress notes. The listed target objectives indicated that this inmate should "demonstrate control over inappropriate impulses" and decrease the number of RVRs for indecent exposure. There were no specific interventions outlined in the treatment plan.

Assessment:

There were differing opinions regarding whether this inmate had a diagnosis of Exhibitionism. Although his treatment plan listed his multiple RVRs for exhibitionism,

-1-

there were no specific treatment interventions listed to assist the inmate in decreasing this behavior. Furthermore, clinical encounters did not document assessment or treatment interventions regarding this issue.

2.     Inmate B

This EOP inmate was housed in the psychiatric services unit at CSP/Sac. Review of his medical record indicated a history of RVRs for gassing, flooding, masturbation and other infractions. He was diagnosed with Psychotic Disorder, NOS and an alternative diagnosis of Antisocial Personality Disorder was also present in the UHR. This inmate had a history of paranoia, threats to staff and at times treatment resistance. He was programming with a modified program that assisted in increasing his treatment compliance. He was not being treated with psychotropic medications at the time of the monitor's expert's visit. This inmate had refused medications and was continuing to refuse psychotropic medications. There was no recent mention in the UHR of Keyhea proceedings

In 10/05 this inmate was transferred from the CTC at CSP/Corcoran to DMH where he was diagnosed with possible Shared Psychotic Disorder. During a hospitalization at DMH acute care in 11/05, he was noted to have threatened to kill staff at Corcoran but was not found to have met the criteria for a Keyhea order. It appeared that after his hospitalization he was placed in EOP.

A review of this inmate's medical record indicated that while housed in the psychiatric services unit he was noncompliant with group therapy and individual contacts. His treatment plan was modified to place him into a modified program with groups scheduled three days per week

In 4/06 he was referred to acute care at Salinas Valley due to poor treatment participation. Subsequent progress notes indicated that he had marked improvement in group participation, up to 100 percent, and attended individual clinical contacts. Before the monitor's expert's visit, this inmate was last seen by the psychiatrist on 6/14/06 when he remained hostile, but was described as less threatening and more involved in treatment. The psychiatrist indicted that the referral to acute care at Salinas Valley would be abandoned if this inmate's progress continued.

This inmate did not wish to go to DMH. On 7/3/06, his case manager indicated that he had 100 percent participation in the modified program and that he would be removed from the referral list for acute care at Salinas Valley.

The most recent case manager note indicated that this inmate was irritable, somewhat angry and depressed, with threatening and demanding behavior. He was described as anxious regarding the upcoming programming move to the new mental health treatment center. On 7/14/06, he received an RVR for threatening staff. The psychologist indicated that mental illness was not a contributing factor in the RVR.

This inmate was interviewed regarding his current mental status and level of functioning. He reported that he attended groups three days per week and enjoyed them. He expressed concern with the loss of his personal property as retaliation from custody staff. He also expressed anxiety and reluctance involving increased interactions with other inmates in connection with his upcoming programming changes after the move to the new mental health treatment center. He denied the need for psychotropic medications and indicated that the psychiatrist was attempting to "force meds on me." He reported that the weekly case manager contacts occurred as required and that they were beneficial. He also reported that he had received his back brace for a past back injury.

This inmate was pleasant, calm and cooperative. There was no evidence of auditory hallucinations, overt delusional thinking or suicidal ideation, plan or intent. He did exhibit some paranoid thinking regarding other inmates and custody officers.

Despite these improvements, he remained with paranoia, anxiety and had recently received an RVR for threats to staff. There seemed to be some disagreement regarding the inmate's diagnosis, specifically whether he had an Axis I diagnosis or if his symptoms were primarily a result of an Axis II disorder. This inmate continued to refuse treatment with psychotropic medications.

Assessment:

Although this inmate may not have met the criteria for Keyhea, he should have been closely monitored and Keyhea should have been pursued if and when he met the criteria, especially if his symptoms worsened with the changes in programming.

3.    Inmate C

This inmate was not included in the MHSDS. While housed in one of the free-standing administrative segregation units, he had committed suicide by hanging on 7/8/06. As a result of his suicide plaintiffs' counsel requested review of his incident reports and UHR

A review of the incident report indicated that this inmate was found in his administrative segregation cell on 7/8/06 at 6:37 p.m. by a floor officer who found him hanging from a sheet attached to a cell vent just above the toilet. He had been on single-cell status. After additional staff arrived, this inmate was cut down and placed onto a Stokes liter. The remainder of the sheet was removed from his neck "in order to establish an airway."

The incident report indicated that as he was rolled to the rotunda towards the yard door, the officer checked for a pulse. After no pulse was found the officer started chest compressions. This inmate's tongue and lips were described as swollen and purplish. He was then placed into a van and transported to the A-Facility emergency room. Chest compressions were temporarily suspended during transport due to space limitations in the van.

The incident report indicated that "at approximately 1840" he was taken out of the van and an automatic electronic defibrillator unit was placed on the inmate and CPR was conducted. CPR was stopped at approximately 7:06 p.m. after Folsom Fire Department paramedics arrived and ordered CPR stopped. He was pronounced dead at approximately 7:09 p.m. by one of the paramedics.

Regarding rescue breathing, one of the incident reports indicated that one of the officers commenced chest compressions while waiting for the ambu bag to be passed down, and that the A-Facility van arrived before the ambu bag could be passed down. In a supplemental report the officer provided some clarification, indicating that the control officers had to search for the ambu bag and that their primary focus was to expedite the inmate's transfer to the clinic. The officer indicated that he thought of using the micro-shield or ordering someone to employ theirs. However, this only occurred after the inmate was being wheeled to the van, and an attempt to establish an airway would have caused an unnecessary delay.

The medical record did not indicate any mental health contacts or concerns.

Assessment:

The following concerns were noted. CPR was not immediately initiated after the inmate was cut down. The custody staff was unable to locate and utilize the ambu bag in a timely manner. Officers did not utilize microshields as was indicated after this inmate had been found unresponsive and apparently without respirations. Chest compressions were suspended during the transport of this inmate to the clinic. The timing of the incident report suggested that the duration from the time that the inmate was found hanging in his cell to the time that he arrived in the emergency room and CPR was initiated was approximately three minutes. This reported timeline was questionable.