EXHIBIT D

California State Prison at San Quentin (SQ)

March 16, 2006
July 11, 2006 – July 13, 2006

1.    **Inmate A**

This inmate's record was reviewed following his suicide on 5/22/06. He was a Native American born on 4/13/78. His original charge involved domestic violence and other offenses. He was returned to CDCR at SQ on 3/8/06 as a parole violator.

This inmate had been diagnosed with a Seizure Disorder and Hepatitis C and had a history of treatment for mental illness since childhood. His most recent MH-7 was 3/22/06 and described diagnoses of Amphetamine Dependence and Cannabis Dependence but indicated no need for mental health services. He was seen on 3/29/06 when the examining clinician recommended that no further mental health services were needed and follow-up as needed.

An MH-4 done by a social worker on 4/28/06 referenced the MH-7. It indicated that the social worker did not know why an MH-4 was being requested, but referred to the inmate's history of a suicide attempt at age 18 by cutting his wrists, an accidental overdose of Neurontin in 2004 and a suicide-positive family history, noting that his brother hanged himself "accidentally" at age 13." The diagnosis at that time was Poly-substance Dependence, Muscular Dystrophy, Hepatitis C, and Spinal Bifida with a GAF of 64. No further mental health services were recommended.

On 5/4/06, a social worker wrote a note indicating that the inmate was reviewed at IDTT, but was a general population inmate and was not in need of 3CMS services. This was the last note by a mental health clinician.

Assessment:

This inmate's care and treatment will be reviewed further because the suicide review process was not completed at the time of the site visit.

2.    **Inmate B**

This inmate's record was reviewed following his suicide on 2/18/06. At the time of his death, he was a Reception Center 3CMS inmate who was single-celled in administrative segregation. The record indicated that the inmate had been returned to the institution as a parole violator on 9/6/05 with an indicated maximum release date of 11/20/06.

On 10/21/05, this inmate received an RVR as a result of an alleged battery on an inmate with a weapon and was assessed a SHU term of 15 months. However, the RVR was to be reheard because the hearing officer had not recognized that the inmate was in 3CMS.

The UHR indicated a diagnosis of Major Depression, Mild, with a GAF of 55. The inmate was being treated with Prozac, Trazodone, Wellbutrin and Trileptal. No MH-7 was located in the record at the time of this review. This inmate had been placed on the 3CMS caseload on 12/27/05 and received two MH-2's on that date by two different treatment teams.

An undated SRA was conducted by a psychologist. It was based on an interview of the inmate only, without any review of records, and was noted to have been done to formulate treatment planning. The conclusion in the SRA was that the inmate was currently in administrative segregation and was at low risk for suicide.

This inmate was referred to a case manager and a psychiatrist. He had approximately weekly contacts with the case manager and less frequent contacts with the psychiatrist who was prescribing medications. The last clinical note by the case manager was dated 2/14/06 and indicated that the inmate had stated, "I'm pretty good," in contrast to earlier notes in which the inmate had reported ongoing depression.

Assessment:

This inmate's care and treatment will be reviewed further when additional documentation is available.

3.    Inmate C

This inmate was referred for review by plaintiffs' counsel with concerns about his having "recently been experiencing severe mental decompensation," having cut his wrists in an attempt to take his life. In addition, his mental condition had deteriorated sharply following the recent discontinuation of his prescribed Lithium due to severe side effects and "apparently because his blood levels were not regularly monitored."

Plaintiffs' counsel noted that this inmate had a history of severe mental illness and suicidal ideation and that he had been treated successfully with Seroquel in the past but that was denied that medication at SQ. Counsel requested that he be evaluated immediately.

The monitor's expert interviewed this inmate, consulted with his clinical case manager and reviewed his UHR. Based on review of the available records, including records from the county facility where he resided prior to his incarceration at SQ, it appeared that this inmate had reported involvement in psychotherapy as a child and subsequently as an adolescent. This was related to reports that he had been sexually abused by a family member and that he had sexually abused others subsequently.

On interview, the inmate reported that until he was in the county jail, he was unaware of his having been diagnosed with Bipolar Disorder or Post Traumatic Stress Disorder that was based on an evaluation done when he was 16 year of age. There were questions expressed in the record with respect to the validity of this diagnosis. However, he was followed weekly by his clinical case manager except when he refused appointments.

He had been treated with a number of medications including Depakote, Lithium, Trazodone, Geodon, Vistaril, and Remeron, except when he refused the Lithium because he was experiencing weight gain. Blood levels in the UHR were reported for Lithium

and Valproic acid as 0.9 and 47.4, respectively, on 11/24/05, and 0.8 and 14.6, respectively, on 2/28/06. The latter number of 14.6 was below therapeutic blood range based on this inmate's non-compliance with medication that was being offered to him.

A progress noted dated 3/23/06 indicated that he told his case manager he had refused medications for seven days because he had administered tattoos to himself and did not want an MTA to see them, which would prompt an RVR. It was also noted that this inmate stated that letters sent by his sister and mother to the Prison Law Office stating that he had attempted suicide and "other exaggerations" were inaccurate and that "they mean well but just get too upset about things."

On interview, this inmate denied current suicidal ideation and intent, although he reported that he had had suicidal ideation at times since he was a child. He reported that he had no intent to kill himself and was hopeful that he could be transferred to the EOP program at MCSP.

Plaintiffs' counsel also asked about the timeliness of this inmate's transfer to an MHSDS program. The monitor's review of his C-file revealed that there were several local practices that contributed to his nine-month EOP wait as of the time of the monitor's visit. The intake audit and Clark review had been delayed. Staff reported that because of a union requirement, there were only two correctional counselors who handled all SNY requests, and that the first interview for this patient's safety requests was not initiated for three months. He was endorsed quickly after that, and had been ready to transfer for nearly six months. During that time he had a minor RVR that was handled quickly. It appeared that the six-month wait was a bed space issue for his Level IV EOP endorsement.

Assessment:

This inmate's care and treatment appeared to be appropriate under the conditions at SQ. He had been waiting for transfer to MCSP, SNY EOP Yard but local breakdowns contributed to this delay. Although he was first on the list for transfers, he was one of ten inmates awaiting such transfer. This represented a failure in the system to provide timely transfer of inmates in need of the EOP level of care at the MCSP SNY.

4.    Inmate D

Plaintiffs' counsel asked about the appropriateness of the length of stay for this inmate. The monitor reviewed his C-file and determined that he was serving a parole revocation term of two to four months, much of which has been served. The actual duration of the term depended on credit-earning. He was expected to be paroling shortly after the monitor's visit.

This inmate's term was too short for him to be transferred to a program effectively. Time constraints prevented verification of whether he received pre-release planning.

5.    Inmate E

This inmate was interviewed in the MHOHU where he was on psychiatric observation status and where he had been housed since 6/1/06. At that time he was returned from DMH acute care where he had been placed after an attempted hanging. This inmate was on administrative segregation status because of enemy concerns.

Review of the record indicated that his diagnosis at DMH was Personality Disorder. This inmate reported that he was receiving Seroquel which was helpful. He also reported that he was on Depakote and Prozac, but that they were discontinued at DMH where, according to staff, he was not considered for intermediate care.

This inmate reported significant medical complaints of gastrointestinal symptoms. He appeared to be stable but had been in the MHOHU for over one month.

Assessment:

This inmate's care and treatment were inadequate in that he had been housed in the MHOHU for an extended period of time, largely because of repeated threats of suicidal ideation. His placement and continued care in the MHOHU were inappropriate. Staff was pursuing alternative housing for him.

6.    Inmate F

This inmate was seen in the interview room in the MHOHU where he had been admitted on 7/10/06, the day prior to the monitor's site visit. He was on suicide precaution with 15-minute checks. He reported hearing voices and feeling jumpy. He stated that he thought he was "at home," that he believed that his "family identities" had been stolen, and that he could "see and hear" his family. He reported that he had been taking Prozac and Seroquel from the physcian on call clinic.

The MHOHU staff's conclusions were that this inmate was suffering from Schizophrenia. He was started on Geodon, an antipsychotic, to address his symptoms.

Assessment:

This inmate's care and treatment appeared to be appropriate.

7.    Inmate G

This inmate was housed in the MHOHU where he was admitted on 6/28/06, approximately two weeks before the monitor's visit. He was to have been seen in the MHOHU IDTT on 7/11/06, but staffing difficulties caused the session to be postponed until 7/13/06.

This inmate had been on one-to-one observation for over a week. He had been sent to the CSP/Sac MHCB and was returned with a diagnosis of Impulse Control Disorder and a determination of need for further treatment at SQ.

When seen on 7/13/06 for more than an hour, he presented as an alert, well oriented, approximately 20-year old African American male who had significant elements of Impulse Control Disorder, Personality Disorder including Paranoid, Borderline and Narcissistic Features and possible Psychotic Disorder NOS.

After extensive discussion and interview of the inmate, the treatment team determined that referral to DMH would be appropriate. Referral would be to both the acute level of care based on his repeated suicidal threats, and to the intermediate level of care because of his need of longer term treatment to address his chronic mental health problems. Based on the interview, it appeared that these needs stemmed from deprivation, abandonment and possible sexual and other abuse during childhood and adolescence.

Assessment:

This inmate's care and treatment were not appropriate for an MHOHU because he needed a more consistent and higher level of care.

8.      Inmate H

This 3CMS inmate was seen during an IDTT meeting on 7/11/06. His case manager and psychiatrist interviewed the inmate and discussed his ongoing care and treatment.

Review of this inmate's UHR indicated that he was admitted to SQ on 5/16/06. An MH-2 dated 7/11/06 indicated a diagnosis of Psychotic Disorder NOS and Alcohol Abuse and Polysubstance Dependence.

He had been receiving treatment with Geodon and Benadryl, sleep hygiene and cognitive and behavioral therapy. He reported continued difficulty sleeping. He also reported instances when he did not get his medications in a timely manner because the MTAs did not have them. He had difficulty specifying the frequency of these problems.

The treatment team decided to continue him at the 3CMS level of care.

Assessment:

This inmate's care and treatment appeared to be appropriate except as they concerned the problems with his medication administration.

9.      Inmate I

This 3CMS inmate was seen during an IDTT meeting. He had been diagnosed with Major Depressive Disorder, Mild, In Remission. He was receiving his annual IDTT but for the previous six months he had not been on his medications, Lexipro and Zyprexa.

This inmate requested to be taken off the 3CMS caseload because he believed that he no longer needed mental health treatment and had been taken off his medications.

After a comprehensive review, the treatment team agreed with the inmate that he no longer needed mental health services and was prepared to remove him from the 3CMS caseload. This inmate was advised that he should seek further mental health treatment on an as-needed basis.

Assessment:

This inmate's care and treatment appeared to be appropriate. The treatment team appropriately deliberated its decision to remove him from the caseload, as per his request.

10.    Inmate J

This condemned inmate was admitted to SQ on 10/19/92. He was housed in East Block and had been in EOP for a number of years. He reported that he had had no write-ups since 1998.

This inmate was seen at his own request via message from his case manager. He wanted to inform the Coleman expert that he was concerned that custody staff had been retaliating against him because of his filing of appeals. He also reported that he had written to Judge Henderson, been in contact with the Prison Law Office, and was represented by a federal public defender. He wanted all to know that he had not considered suicide and would not commit suicide despite his history of mental illness.

During the interview this inmate reported that he was being treated with Trazodone and Effexor. He appeared to be compliant with his medications. He reported that he found his case manager's service to be appropriate. According to this inmate, he went to DMH several years ago but had not needed to return to any acute care services.

Review of this inmate's record indicated diagnoses of Delusional Disorder Persecutory Type and Depression NOS. The record revealed that he attended most of his therapeutic yard and some but not all psychotherapy groups. Notes indicated that he did not appear to be at risk for harm to himself or others.

Assessment:

This inmate's care and treatment appeared to be appropriate.

11.    Inmate K

-6-

This EOP inmate was in administrative segregation and was seen on the therapeutic yard. He stated that he had been at SQ for one year. This was confirmed by review of his record which indicated admission to SQ on 5/9/06.

He reported that he had been hearing voices for the past four years. During the interview he removed ear plugs in order to converse with the monitor's expert. He reported difficulties with the psychiatrist who was prescribing medications for his "voices." He did not want be held accountable for taking medications regularly and believed that he should take medications, including sleep medications to suppress the "voices," on an "as-needed" basis or "when I say so." The most recent notes on this inmate indicated that he had had difficulties with medication compliance and that he had refused medications multiple times in 5/06, 6/06 and 7/06.

This inmate had been prescribed Zyprexa, Haldol and Benadryl for a diagnosis of Psychotic Disorder NOS. The most recent notes indicated that he was actively psychotic. His severe dental deterioration suggested possible methamphetamine abuse.

He had had three OHU admissions, in 11/05, 3/06 and 5/06, but had not been referred to a higher level of care. An SRA done on 3/29/06 which indicated a moderate suicide risk resulted in the 3/06 admission to the MHOHU. Other SRAs done in 5/06 during his MHOHU stay indicated a low risk of suicide.

Assessment:

This inmate's care and treatment should be have been reviewed with particular regard to the need for referral to a higher level of care, and most appropriately referral to acute care if his medication compliance continued to be sporadic.

12.    Inmate L

This EOP inmate was in administrative segregation and was seen on the therapeutic yard. He had been at SQ for the preceding eight months and was housed in East Block. Review of his UHR indicated that he had been admitted to SQ on 2/2/04 and was housed in the MHOHU from 7/6/06 to 7/10/06.

He reported that he was receiving two hours of yard time per week. He also reported that he had no mattress in his cell because he had ripped up the last one and staff members were reluctant to give him a new one.

This inmate stated he had been taking a Risperdal shot and a nightly sleeping pill for the preceding two weeks since he had been placed on EOP status. He also stated that he had not been assigned to any groups. An MH-2 of 5/30/06 indicated that he had a diagnosis of Paranoid Schizophrenia, Alcohol Dependence, Polysubstance Dependence and Adult Antisocial Behavior.

Assessment:

This inmate's care and treatment appeared to be appropriate. He should have been actively reviewed for referral to an appropriate EOP program when his administrative segregation status concluded.

13.    Inmate M

This EOP inmate was in administrative segregation and was seen on the therapeutic yard. He reported he had been at SQ for approximately one year and in EOP since 5/06. Review of this inmate's record indicated that he was admitted to SQ on 7/20/05.

He stated that at age 13 he started abusing PCP and that his "mind traveled to another century." He reported he had spit on and gassed custody staff which resulted in a crisis bed referral to Vacaville Q2 in the acute care program from 3/3/06 through 5/26/06. This inmate stated that he had been taking Clausaril at that time but was off all medications at the time of the interview. He reported amnesia for the crisis which resulted in his referral to acute care.

Review of this inmate's record indicated that he had been admitted to MHOHU on 2/15/06, which resulted in his referral to DMH acute care. An MH-2 on 6/13/06 indicated that this inmate was on a Keyhea Order and was receiving Geodon.

Assessment:

This inmate's care and treatment appeared to be appropriate.

14.    Inmate N

This inmate's record was reviewed because he had had multiple MHOHU admissions and multiple uses of restraints. He was admitted to SQ on 8/18/05.

An MH2 for this inmate on 1/10/06 indicated a diagnosis of Anxiety Disorder NOS and Polysubtance Abuse in addition to an expressive speech and language disorder. His diagnosis of record from 5/12/06 was Mood Disorder NOS.

SRAs conducted during his incarceration ranged from negligible risk to moderate risk. He had been treated with Zydis, Abilify, Paxil and Vistaril, and had been considered on multiple occasions for referral to DMH. He was being maintained at SQ and based on the record reviewed he appeared to be stable.

Assessment:

This inmate's care and treatment should have been reviewed for the most appropriate level of care including consideration of a DMH intermediate care referral.

15.    Inmate O

This condemned Grade B inmate was seen in an IDTT setting in the Adjustment Center. He had been transferred from East Block because he was suspected of "taking one for the team" during a dog drug search in which he refused to come out of his cell. That resulted in the use of pepper spray and inability to use the dogs for further search. He was noted to have had a bag of fecal material that he wished to bring to the IDTT. He was presented after custody removed it from his possession. He presented with some degree of bizarre thought processes. However, he was also evasive in his answers and refused to respond to questions regarding recent methamphetamine or other drug use.

This inmate was diagnosed with Psychotic Disorder NOS, Rule Out Schizophrenia, Rule Out Drug Induced Psychosis. He had had a rocky course since his admission to SQ and had been prescribed a number of medications including Trileptal and Abilify.

This inmate's clinical case manager presented her opinion that the inmate was decompensating and that, although he was in the EOP level of care, he had not been coming out of his cell for the past several weeks. The treatment team reviewed the inmate's case in depth and determined that a DMH referral was appropriate, but also gave the inmate a set of directives to follow in order to be transferred from the Adjustment Center to East Block.

Assessment:

This inmate's care and treatment appeared to be appropriate.

16.    Inmate P

This condemned EOP inmate was seen on the therapeutic yard.

He reported that he was receiving two hours per week of therapeutic yard time and two hours of group per day for four days per week, for a total of ten hours of structured therapeutic activity per week. He stated that he was receiving daily medications for his mental illness and that he had not missed any while in East Block.

This inmate reported he had "no problems" with the mental health staff, although he expressed belief that custody staff was attempting to "provoke us" and that they "try to get us to act out." He described custody staff as dismissive and verbally abusive of inmates in the EOP program.

Assessment:

This inmate's care and treatment appeared to be appropriate.

17.    Inmate Q

This condemned EOP inmate was seen on the therapeutic yard. An MH-2 of 1/24/06 indicated that this inmate was at the 3CMS level of care, although he was clearly an EOP inmate.

An MH-2 indicated diagnoses of Psychotic Disorder NOS, Antisocial Personality Disorder and Polysubstance Abuse. An updated MH-2 of 3/14/06 in the MHOHU reported that he was admitted because of suicidal ideation which the MHOHU staff believed was related to a possible change in his housing or level of care. He stated that he had been on medications in the past but had not taken any "for years" because the staff attempted to "experiment on me."

This inmate reported that he was receiving ten hours per week of structured therapeutic activity, consisting of two hours per week in the therapeutic yard and two hours of group therapy per day for four days per week. He reported that he "gets along okay" with mental health staff but that custody staff was provocative and disrespectful toward him.

Assessment:

This inmate's care and treatment appeared to be appropriate.

EXHIBIT E

Mule Creek State Prison (MCSP)

May 16, 2006 – May 18, 2006

1.    Inmate A

This 3CMS inmate was admitted to MCSP on 6/30/98. His record was reviewed by the monitor's expert.

Treatment plans written for this inmate on MH-2s dated 1/30/06 and 1/31/06 indicated a diagnosis of Post Traumatic Stress Disorder. They were signed only by a psychologist, with no psychiatrist in attendance at the IDTT.

This inmate was taking Buspar with appropriate consent. MARs indicated compliance with this medication. Quarterly progress notes of a psychiatrist and clinical case manager were appropriate and timely, occurring at least once every 90 days for each of these disciplines.

Assessment:

This inmate's care and treatment appeared to be appropriate except for the lack of participation by a psychiatrist in the treatment plan, making it non-multidisciplinary.

2.    Inmate B

This 3CMS inmate was admitted to MCSP on 7/6/03.

A treatment plan for this inmate on an MH-2 dated 4/12/06 was signed by a social worker only, with no psychiatrist in attendance at the IDTT. Psychiatric progress notes and clinical case manager notes were written at least once every 90 days and were appropriate. Prozac 90 mg per week was prescribed for this inmate, with the appropriate consent form filed in his UHR. The MAR indicated that he was compliant with his medication.

Assessment:

This inmate's care and treatment appeared to be appropriate except for the lack of participation by a psychiatrist at the IDTT which made this inmate's treatment plan non-multidisciplinary.

3.    Inmate C

This inmate was interviewed in a group setting and his UHR was reviewed. He was referred by plaintiffs' counsel for review because he had written to them with concerns regarding his level of care. He notified them that he suffered from Post Traumatic Stress Disorder, severe panic attacks and Bipolar Disorder and needed a transfer to DMH. He also reported to counsel that he had been recommended for transfer to DMH in the past but that these recommendations had been rescinded.

On interview, this inmate reported that he suffered from Panic Disorder and that the EOP program was ineffective for him. He expressed a desire for transfer to ASH where he believed he would receive Klonopin, which he had been taking on the street. He reported symptoms of panic disorder and auditory and visual hallucinations of "demons and dead people without limbs."

Review of this inmate's record indicated that an MH-2 dated 3/28/06 contained a treatment plan signed only by the social worker with no documentation of a psychiatrist in attendance at the IDTT. This inmate's diagnoses were Anxiety Disorder NOS and Pedophilia. The UHR revealed that he had had trials of several different medications and that he reported that none of them were effective. Despite the medications and his placement in EOP program, he sometimes refused medications and refused to attend group therapies and individual counseling sessions.

Review of his record also indicated a history of past hospitalizations at Napa State Hospital, with his first at age eight reportedly secondary to having been raped. He had been hospitalized at ASH in 2003 for which the discharge summary indicated a diagnosis of Generalized Anxiety Disorder and Panic Attacks without Agoraphobia.

Review of recent progress notes indicated that this inmate's reported symptoms did not appear to be consistent with his overall presentation nor with staff observations of his behaviors on the yard. Despite his reported statements to counsel that he had suicidal ideation every day, the medical records reviewed indicated that he denied suicidal intent or plan.

Assessment:

This inmate's care and treatment did not appear to be appropriate at the EOP level of care. It was recommended that his care and treatment, and specifically a treatment plan, be reviewed by a full IDTT including a psychiatrist to determine the most appropriate treatment interventions for this inmate.

4.    Inmate D

This EOP inmate was seen in a group setting and his record was reviewed. He was referred by plaintiffs' counsel because of reports that he had attempted to hang himself on 8/18/05 after he had reported concerns about correctional officer misconduct to a Coleman monitor. This inmate had recently experienced the death of his sister due to lung cancer.

This inmate reported difficulties with his medical treatment. Although his mental health treatment appeared to support him at the EOP level of care, he also had a lung mass which was suspicious as malignant carcinoma. In 3/06 because of "claustrophobia," he refused to board the van for transport to undergo a lung biopsy. However, he informed mental health staff that he would like to go to ASH because of the availability of treatment for his medical condition.

This inmate had been referred to Atascadero State Hospital but was rejected. He was referred to CMF DMH and was rejected there as well because he was on close custody status. He was then referred to intermediate care at Salinas Valley on 5/11/06 and was accepted. However, there was a waiting list of 180 inmates. In discussion with the chief psychologist he suggested that this inmate be referred again to CMF and be considered by the coordinated clinical assessment team (CCAT) for a determination of his eligibility. The chief psychologist also recommended that this inmate be given an SRA to establish his baseline at that time.

Assessment:

This inmate's care and treatment appeared to be appropriate. Mental health staff was attempting to facilitate attention to his medical and mental health needs with appropriate referral to DMH. Although he had a number of life issues, acute care hospitalization did not appear to be appropriate because he was reportedly coping with these issues and with his history of depression, despite having a potentially life threatening condition.

5.    Inmate E

This EOP inmate in administrative segregation was seen upon referral by plaintiffs' counsel who requested that he be evaluated for Exhibitionism and specific treatment. The referral was initiated because of this inmate's report of suicidal ideation and multiple RVRs for indecent exposure. Charges brought against him by the district attorney were pending. Review of his record indicated that he had threatened to kill himself if were taken to court or if he were transferred to ASH.

On 3/16/06 following an episode of indecent exposure, this inmate had a mental health screening as per CDCR policy. His diagnoses were expanded from Bipolar NOS and Paraphilia NOS to Exhibitionism. He also reported auditory and visual hallucinations but denied suicidal and homicidal ideation. This inmate was noted to have been a questionable "historian," reporting past sexual involvements with staff at a different CDCR facility.

On interview, this inmate reported that he was being seen by a social worker for individual sessions, although he remained in administrative segregation. He received a comprehensive evaluation for Exhibitionism and it was determined that he needed treatment. His record indicated that he was prescribed Risperdal, Zoloft and Lithium at a therapeutic level on 4/5/06. He had been treated in individual psychotherapy since approximately 4/06 and had attended from zero to four hours of group per week during the three-month period preceding the monitor's expert's visit. He was noted to have diabetes and to be noncompliant with his dietary restrictions, eating sweets and making pruno in his administrative segregation cell.

There was no provision for group therapy for Exhibitionism at MCSP due to insufficient numbers of inmates and lack of staff qualified to provide such intervention.

Assessment:

This inmate's care and treatment appeared to be appropriate for his level of need and his pending legal issues.

6.    Inmate F

This 3CMS inmate was seen in administrative segregation. He reported that he had resided there for the preceding five weeks and that he had been taking Seroquel 300mg.

On interview in the therapeutic module this inmate demonstrated psychomotor agitation with rocking back and forth and excessive arm movements. He reported that he was not leaving his cell. When asked about this, he responded that he remained in his cell most of the time, not coming out for yard or for showers, because he did not like to be around people. He reported that the case manager came to cell approximately once per week to call him out. Because he would not leave his cell, the case manager came to his cell on some occasions but not on others. He also reported that psych techs made daily rounds and that he knew them and talked with them through his cell door.

Assessment:

This inmate's monitoring in administrative segregation appeared to be appropriate. However, he should have been brought out of his cell for an evaluation of his psychomotor agitation and medication status.

7.    Inmate G

This 3CMS inmate was interviewed in an administrative segregation therapeutic module. He reported that he had been at MCSP for five months and in administrative segregation for one and a half months. He had been transferred to MCSP from Lancaster, before which he had been at Wasco State Prison.

He reported that he was seeing a psych tech "mostly everyday" and seeing his case manager each week but that he had not seen a psychiatrist. He reported a history of suicidal ideation five years previously, and an attempted overdose on pills four years previously, but that he had had no suicidal ideation or intent since that time. This inmate reported that he had been taking Seroquel and Wellbutrin.

Assessment:

This inmate's care and treatment appeared to be appropriate.

8.    Inmate H

This 3CMS inmate reported that he had been at MCSP for the past year and in administrative segregation for the past nine months because of enemy concerns. He stated that he had been awaiting transfer to DMH but expected that he would not be transferred. He reported his EPRD was 9/11/06. He had already worked with mental health staff to set up mental health treatment when he would be released.

He reported that he was not taking any medication and that none had been prescribed for him. However, when the chief psychiatrist questioned him, he recalled having been treated in the CTC approximately four months earlier, that medications were prescribed, and that he sent a medication refusal slip.

This inmate reported that he has Multiple Personality Disorder and has fugue states. He does not believe that there is any medication which will help his fugue states. He also stated that he had had no effective treatment for his Multiple Personality Disorder for many years except for individual therapy with a case manager when he was on C-Yard at this institution. He reported he was no longer seeing this case manager and that he would wait out his time in administrative segregation.

Assessment:

This inmate reported his history as complex and confusing. However, his care and treatment appeared to be appropriate at that level of care.

9-13.  Inmates I-M

These five EOP inmates in administrative segregation were interviewed in a group on C-12. Although a group of eight was requested, only five inmates appeared.

These inmates reported that they saw psych techs making rounds four to five times per week. They reported they had one-to-one contacts with their case managers, usually out of cell, and contacts with the psychiatrist once per month on average. They reported that they did not receive IDTTs on the same days when they had institutional classification committee reviews, which were approximately every three months. However, they did not feel that the IDTTs were beneficial because they did not have much opportunity to talk about their issues.

Four of the five inmates reported that they were taking daily medications and that their HS medications were administered at 8:00 p.m. They reported that they attended approximately two to seven hours of group therapy per week, and the content of the groups was relative. They reported that the correctional officers were generally respectful except for those on the third shift, and that after leaving their cells they returned to find that their property has been searched and that some of their belongings had been discarded.

14-21.  Inmates N-U

The monitor's expert conducted a group interview of eight inmates on the B-Yard Level 3 EOP. These inmates reported that the correctional officers in B-Unit were helpful except those on the third shift, by whom these inmates believed they had been mistreated.

Several of these inmates reported that they were functioning better than they ever had. One inmate who was also DDP reported that he did not believe he could "make it" on the mainline. Two of these inmates questioned why during periods of crisis, medications were not available on an as-needed basis to help them, and why correctional officers would not call mental health staff to assist them.

They had some complaints about medication administration, particularly Wellbutrin which must be crushed and is upsetting to the stomach for three of these inmates. Two of them who were taking Lithium, Depakote or Tegretol had had blood drawn within the preceding month, but could not recall when it was drawn before that time.

With regard to heat medications, they reported that no ice or extra water was given and that ventilation was poor because the cells had solid doors.

They reported that they saw their case managers on a weekly basis but for only an average of five minutes at a time, and that they saw the psychiatrist every 90 days. They saw these clinicians in cubicles with very little privacy. They reported that there were approximately three to four groups each week, and that most of them attended all of their groups.

The monitor's expert attended an anger management group led by a psych tech on B-Yard. This group was comprised of Level 3 EOP inmates and was attended by 12 of the 20 inmates assigned to the group. Although the monitor's expert arrived 15 minutes after the group had started, the inmates immediately informed him that they had been waiting to speak to him. The psych tech confirmed this, even though the monitor's expert's purpose was to observe the regular operation of this anger management group.

The inmates reported that the groups "need standardization" and that this anger management group was typical in that any number of inmates may appear for any session of this group which meets at the same time each week. They reported that the psych tech was doing her best, but that she had no materials, curriculum or structured program. They also reported that there was no beginning or end for the terms of the individuals in the group. The psych tech confirmed that the anger management group had been meeting for the preceding seven months. These inmates reported that of all of the groups in which they were engaged, only the Suicide Prevention and the Post Traumatic Stress Disorder groups, which were lead by clinical psychologists, were effective and structured. When asked what would make the EOP program more effective and what would make the groups more effective for them, they responded, "structure, curriculum and activities as a group with materials that we can read and use for follow up sessions."

The psych tech leading the anger management group also reported that the admissions and discharges to the group were based on the case managers' determinations. There were times when a new member would appear for the group and other times when someone who had been missing the group for several weeks would remain on the roster until they were replaced by someone else, which was determined by the clinical case managers. In discussing group therapies generally with the members of this group, they reported that the number of groups they had ranged from two to 14 per inmate, and that these were the "core groups." The recreational groups were additional ones that also did not have structure or clinical leadership. These inmates also reported that there were groups led by other inmates, that a therapist may move from group to group, and that at times a therapist may not sit in for the entire group.

These inmates spent a considerable amount of time during the meeting reporting great concern and fear that they would be "kicked out of EOP," most likely by the senior psychologist in charge of the EOP program, and downgraded to 3CMS. They also reported significant difficulties with the correctional officers in the EOP buildings on B-Yard because some officers did not recognize the mental health difficulties which EOP inmates have.

Assessment:

Similar to other inmates interviewed in other settings, these inmates reported that the quality of the group therapy sessions had deteriorated and that they no longer represented structured therapeutic activities.

22-30.    Inmates V-FF

The monitor's expert requested a meeting with twelve 3CMS inmates on B-Yard to obtain their input on the services being provided to 3CMS inmates. Eleven inmates appeared for the group.

These inmates reported that they were all seen by the case manager every 90 days and by the psychiatrist approximately every 90 days. Ten of these inmates reportedly were on medications, and the eleventh inmate was waiting for medications prescribed during the previous week to begin. Only two inmates reported that they had been given consent forms to sign at the time their medications were instituted or changed. These inmates also reported delays of one to three weeks between being told by the doctor that medications were being ordered and actually receiving them.

They reported variability in the MTAs' responses to not having medication for these inmates when they appeared at pill lines. Some inmates reported that MTAs went out of their way to try to get the medications. Others simply told them that they had no medications ordered and that they would have to see the doctor. Three inmates reported that they had experienced instances when their medications had been changed or discontinued, but they were still given the same medication for up to two weeks before the change was effectuated. Two inmates also reported experiences in which the MTAs

attempted to give them the wrong medications because there were several cups with pills on the medication shelf or cart. When they told the MTAs that they were not the right medication, the MTAs agreed and gave them different medications.

These inmates reported that on B-Yard HS medications began at about 7:30 or 8:00 p.m. depending on whether the medication line was being monitored by supervisory staff. They acknowledged that some inmates cheek, sell or misuse their medications, but they believed that it was unfair for inmates who were taking certain medications to have them crushed because some of these medications upset their stomachs. They recommended that the officers and MTAs watch them take the medications so that they wouldn't have to be crushed, although they also reported that officers varied in how closely they watched inmates take these medications.

The inmates reported that they were aware of the heat plan, that some of the correctional officers were cooperative and moved inmates inside, but that there was no provision for extra showers or extra ice. They added that if an inmate asked a correctional officer to take the temperature inside the cell because of the heat, the correctional officer would comply, but there was no regular monitoring of cell temperatures.

Two of these inmates reported that they were housed in the B-Yard gym with triple bunking and that it was "horrible." They described it as dangerous and uncomfortable because they didn't know how the other men would respond to them or if the officers could provide them with safety. When asked how they thought the program could be improved, they suggested that (1) groups be restarted, as none of these 11 inmates were in any group therapies on B-Yard, (2) correctional officers be trained to be more sensitive to inmate mental health needs and (3) triple bunking in the gym be stopped and inmates sent to other institutions rather than be housed in overcrowded gyms.

Assessment:

These inmates reported that they were having clinical contacts with their case managers and psychiatrists. However, they had concerns regarding overcrowding, safety of the institution, medication management, and training and attitudes of correctional officers whom they encountered in the 3CMS program on B-Yard.

31.    Inmate GG

This C3MS inmate was housed in the A-5 Level IV EOP building. He was interviewed and his UHR was reviewed at the request of the plaintiffs' counsel because of his recent decrease from EOP to C3MS level of care.

This inmate had been transferred from SVSP to MCSP on 11/14/05. It appeared that at the time of his transfer to MCSP, this inmate had been receiving EOP level of care which was continued at MCSP.

He had been diagnosed with Adjustment Disorder with mood and anxiety symptoms and Personality Disorder with Borderline, Antisocial and Narcissistic features. He was treated with Seroquel 200 mg per day and Zoloft 150 mg per day. This inmate had a history of suicide gestures. Progress notes indicated that he was reportedly stable, that he had significant complaints regarding the quality of EOP groups, and that he had requested single cell status due to his concerns about past assaults.

He was downgraded to C3MS on 4/27/06, after which he reported an increase in depression and anxiety. He remained in the A-5 Level IV EOP building despite his change in level of care. This inmate expressed his concern that he could not tolerate general population and might have recurrent suicidal ideation if moved.

There was no documentation of weekly case manager contacts during the early part of the review period, although there was documentation during the several months preceding the monitor's expert's visit.

The psychiatrist diagnosed this inmate with Mood Disorder or Major Depressive Disorder and prescribed medications consistent with the diagnosis of a Mood Disorder. These diagnoses differed from the case manager's diagnoses of Adjustment Disorder with mood and anxiety symptoms and Personality Disorder with Borderline, Antisocial and Narcissistic features. It was unclear if the differences in diagnoses reflected differences in clinicians' beliefs regarding the severity of this inmate's mental illness or whether they reflected poor treatment team planning and discussion.

Assessment:

Despite this inmate's apparent high level of functioning, at the time of the monitor's expert's visit he presented with anxiety, depression and concerns regarding his safety if moved from the EOP building. It appeared that better preparation regarding a change from EOP care and further observation at that level of care were warranted.

EXHIBIT F

Richard J. Donovan Correctional Facility (RJD)

April 19, 2006 – April 21, 2006

1.    Inmate A

This inmate was in the MHCB as of 4/20/06. His UHR was not available for review. According to the MHTS contact history he was in and out of the MHCB on multiple occasions in 3/06 and 4/06. The contact history showed that during the four to five months preceding his crisis bed stays, he had participated in no group treatment beyond recreational therapy during yard release and socialization groups held in his housing unit. Both RT and socialization groups were loosely organized to the extent that participation could have been credited if he had left his cell and went to the day room or the yard during designated group times. During that time he consistently refused to attend didactic groups such as anger management, stress management and substance abuse.

Assessment:

This inmate languished in the EOP until he decompensated. He needed more intensive treatment in the EOP.

2.    Inmate B

This inmate was in the MHCB as of 4/20/06. According to the MHTS contact history he was in and out of the MHCB at least four times in 2/06, 3/06 and 4/06. The contact history showed that he was housed in administrative segregation when he was not in the MHCB. He was designated DD3.

He had a diagnosis of Impulse Control Disorder NOS. He often inflicted bloody but insignificant injuries upon himself. He explicitly stated that he used self-injury to elicit attention. His recent regimen included Haldol Decanoate 100 mg/ml q 7 days, Prolixin 10 bid, Dilantin 300, and Artane.

As of 4/21/06 he had been on reception center status for over 60 days. Available information suggested that he arrived at RJD mostly recently around 1/24/06. He was well known to RJD staff as he had had several recent admissions and typically had multiple MHCB admissions during his stays. His attempts to control his environment were not calculated to improve his conditions. His demands were not planned. They were concrete responses to his immediate environment. He typically expressed a desire to return to the setting he had just left.

Clinical staff informed his correctional counselor that he was unable to benefit from EOP programming at RJD. He was too low functioning to perform routine daily tasks. He was not, however, slated to move to an institution designated for DD3 inmates on the ground that EOP needs overrode DDP placement. Because he could not live in general population and participate in EOP activities he was housed in administrative segregation when he was not in the CTC. EOP programming was available to him there but he was unable to benefit from it.

Assessment:

Transfer timelines for this EOP inmate in the reception center were not met. This inmate was housed in administrative segregation because he was too low functioning to engage in EOP treatment. He was allowed to engage in a pattern of self-injurious behaviors punctuated by crisis bed admissions. He should have been referred to intermediate care and/or to an institution designated to house and treat DD3 inmates, such as CMF or CMC, but was not.

3.    Inmate C

This case review relied upon an abridged review of his UHR, an inmate history generated by MHTS, logs of MHCB admissions and five-day follow-ups, a DMH referral log and conversations with staff. The particulars culled from multiple sources were questionable but the overall picture they painted was unambiguous. This inmate needed proactive treatment formulated in light of his well documented pattern of dysfunction at RJD, rather than a series of ad hoc interventions precipitated by his behavior at a given moment in time.

This 25 year old inmate was well known to RJD staff. He had had multiple admissions to RJD in the recent past. He was always designated as in need of the EOP level of care. He was housed in administrative segregation at times due to his uncontrolled hostility. His willingness to take medication fluctuated. He was treated at DMH at the acute level of care for roughly one month in 3/06. He had diagnoses of Schizophrenia or Schizoaffective Disorder depending upon which records were used as a source. His mental illness clearly had an affective component.

His presentation varied from day to day from 9/05 through 4/06 but on the whole he exhibited signs and reported symptoms of uncontrolled or partial psychosis. A cursory review of treatment records dating from the summer of 2005 was consistent with those observations. At times he presented as neatly dressed and well groomed and was able to engage in relevant conversation. At other times he was disheveled, reported hallucinations and was hostile. His compliance with medication was inconsistent.

Progress notes written in 9/05 at RJD in the weeks prior to his release on parole indicated he was treated at the EOP level of care and was placed in administrative segregation because he threatened staff. He had fixed delusions but his hygiene was good. Arrangements were made for him to receive a supply of medication when he left. When he returned he was delusional, disoriented, had poor hygiene and reported visual hallucinations.

A Keyhea order was considered as early as 10/05 as he was non-compliant with medication. No outpatient MARS for 9/05, 10/05, 11/05, 12/05 or 1/06 were in the UHR. Medication compliance could not be determined with any degree of specificity beyond that reported in progress notes.

Most recently he was screened off a bus from a county jail on 10/28/05. His psychiatric treatment with Seroquel was noted by the screener. Clinical notes indicated that he was released from RJD and returned on VOP approximately two weeks later because he slapped his father. He was seen by both a case manager and a psychiatrist within two days of his arrival.

Upon his return to RJD in 10/05 he was again designated EOP. He was housed in administrative segregation. He was seen almost weekly by a case manager and once every six weeks by a psychiatrist while in the reception center. He was described as grandiose and as alternating between cooperative and hostile. During the two months following his return to RJD he was seen by a case manager seven times and twice by psychiatry. According to the inmate history he did not attend group treatment in 11/05, 12/05 or 1/06. The record suggested that he was confined to his cell in administrative segregation for three months.

On 12/9/05, five weeks after he arrived, he reported that he felt "really depressed." During that period of time he was described as having labile mood, tangential thought processes and bizarre and grandiose thought content. He had orders for Haldol and Cogentin throughout 10/05, 11/05, 12/05 and 1/06. He was not treated for depression until he was admitted to a crisis bed seven weeks later.

He was in the MHCB from 2/3/06 to 2/28/06. During his stay a Keyhea petition was initiated but dropped. Written records in the UHR, which included a copy of the inpatient record, did not readily yield an explanation of why the petition was not carried through.

Discussions with staff suggested two explanations. One likely reason was that his transfer to DMH pre-empted a scheduled Keyhea hearing. Another possible explanation was that he was cooperative while in the MHCB. Staff reported that the Keyhea coordinator maintained records of individual cases that probably contained more detailed information about hearings than information found in the medical record.

The inmate history and five-day follow-up log indicated that he was admitted to the MHCB around 1/26/06. Risperdal was initiated. He was treated for an unknown period of time. After his discharge he attended EOP groups and seen for four days of five-day follow-up. He was readmitted to the MHCB on the fifth day.

According to RJD's log of DMH referrals and returns he was identified as needing acute care on 2/6/06, three days after he was readmitted to the MHCB. The referral and transfer resulted in his reaching an acute care bed three weeks later. He was referred on 2/9/06. A decision to accept him was communicated to RJD staff 14 days later on 2/24/06. He was transferred four days later on 2/28/06. Many cases listed in the log proceeded at that pace.

He was treated at the acute level of care at DMH for approximately one month. A bus screening indicated that he returned to RJD from CMF on 4/1/06. He returned with

orders for Risperdal and Cogentin. It was not possible to discern whether medication continuity was sustained when he arrived.

Two weeks after his return from DMH, a discharge summary from DMH had not been filed in the UHR. The discharge summary was received by a clinician at RJD who coordinated DMH referrals and returns. Multiple copies were distributed throughout the institution. One was forwarded to the case manager to whom he was assigned.

DMH materials indicated that his mood improved with antidepressants. He was thought by DMH staff to be a good candidate for intermediate care but they deferred to his choice to return to RJD instead. According to their discharge note his main rationale was that he wanted to be at RJD because his parents lived nearby.

Assessment:

The following was noted regarding this inmate's care:

Many interventions, such as bus screenings, initial mental health contacts, weekly case manager contacts in the reception center and psychiatric follow-up were rarely missed. They were carried out conscientiously and completed in a timely manner. Documentation contained clinical information and demonstrated that staff was attentive to this inmate. A supply of discharge medication was provided when he paroled.

This EOP inmate should have been subjected to expedited reception center processing that resulted in endorsement within 30 days.

He was psychotic but was not referred to a crisis bed or a higher level of care in 9/05 and 10/05. He was released to the community while psychotic. There was no indication that staff considered civil commitment.

Staff were unresponsive to the affective component of his severe mental illness despite being told of it. This inmate was not treated for depression until he reached a crisis point and was admitted to the MHCB.

A Keyhea petition should have been heard. His willingness to take medication waxed and waned.

Staff at DMH and RJD should not have deferred to his preference to be in a reception center located near his parents at a time when he clearly needed more intensive treatment. He met the criteria for intermediate care. Given his age and his presentation it was clear that he was in the early stages of a severe and persistent mental illness. At this early stage of the illness his insight into its effect upon his functioning was poor. His long-term prognosis and current level of impairment pointed to a need for aggressive treatment designed to decrease the frequency and severity of acute psychotic episodes. A considered treatment approach formulated by a multidisciplinary team would have served him far better than a series of ad hoc decisions made by individual providers.

4. Inmate D

The UHR, an inmate history, a DMH referral log and conversations with staff served as the basis of this review. Although this inmate had been in the EOP at RJD since 9/04, this review spanned only the preceding several months.

This EOP inmate had diagnoses of Schizoaffective Disorder Bipolar Type, Polysubstance Dependence and ASPD. Since 10/05 he had had four crisis bed admissions, was referred to intermediate care but was rejected and was treated for one month in an acute care bed. He had two crisis bed admissions after he was discharged back to RJD from acute care. He was admitted to the MHCB on four occasions between 10/05 and 3/06. He appeared to be doing better in recent weeks.

Progress notes indicated that he was organized and relevant in 7/05 in the EOP. MARs showed that he had orders for Depakote and Aripiprazole and took them throughout 9/05. He rarely took medication in 8/05. His order for Seroquel was discontinued in 8/05. He began refusing medication early in 10/05. The MAR showed that he took no doses that month prior to his first admission to the MHCB in late 10/05.

He was referred to intermediate care at VPP on 10/27/05 subsequent to an MHCB stay. His admission was precipitated by his reports of problems with his cellie and an extended period of wakefulness. Five-day follow-up was done after he was discharged. At that time he was described as having a fixed delusional system, paranoid, experiencing auditory and visual hallucinations, agitated and disorganized.

He was identified as in need of a higher level of care on 10/20/05 and referred to intermediate care two weeks later. According to a log he was not eligible to go to ASH due to a history of arson. Twelve days later he was accepted for treatment at the acute level of care and assigned a bed number. He was transferred to DMH Vacaville at the intermediate level of care five days after he was accepted and assigned a bed. He returned to RJD four weeks later on 12/20/05.

While awaiting a decision and transfer to DMH he was on the high risk list in the EOP. He had orders for Depakote and Aripiprazole. He attended ten group sessions and was seen weekly by his case manager. Sixteen groups were cancelled for mental health staffing or custody reasons. His hygiene was not consistently adequate.

Less than two weeks after he returned from DMH at Vacaville he was readmitted to the MHCB for a stay of five days. In the MHCB Haldol was added to his regimen. When he was discharged his regimen was comprised of Depakote and Haldol.

Despite crisis bed admissions his participation in EOP activities increased each month thereafter. He was in the EOP for three weeks in 1/06 and 2/06. In 1/06 after he was discharged from the MHCB he attended 13 or 14 group sessions. He elected not to attend four sessions. Five were cancelled by mental health or custody staff.

In 2/06 he was in the EOP for three weeks. He went to the MHCB during the last week of the month. During the first three weeks of the month he attended 18 groups. He was seen for two weekly case manager contacts and on six additional occasions for MHCB follow-up visits or an MHCB admission work-up.

In 3/06 he was not admitted to the MHCB. He was treated at the EOP level of care all month but was moved from administrative segregation to general population during the last week of the month. The amount of treatment he received dropped sharply when he went to general population. During the first 3 weeks of 3/06 he attended 20 group sessions. He did not attend three sessions that he was offered. Ten sessions were cancelled for mental health, medical or custody reasons. After he left administrative segregation he continued to be seen weekly by a case manager but he was rarely out of cell.

During the two weeks following his move to the general population EOP unit he attended one group session and went to the yard for loosely organized recreational therapy three times. Two more groups were scheduled for him but he did not attend one and the other was cancelled for custody reasons.

Assessment:

The following were noted regarding this inmate's care:

Multiple MARs were missing from the UHR.

Prior to his decompensation there was little coordinated response to this inmate's steady deterioration and his decision to discontinue taking first Seroquel, then Depakote. After two months of decline he was admitted to the MHCB.

Time taken to complete a referral to a higher level of care, wait time for a decision by DMH and time lapse between decision and transfer were excessive. He was moved to a higher level of care four weeks after his need was identified.

Access to intermediate care was blocked. A referral to intermediate care was redirected to acute care because he had a history of arson. Intermediate care was appropriate given his history and his presentation.

This EOP inmate was engaged in more structured therapeutic activities while housed in administrative segregation than in the general population section of the EOP. Once he was moved to the general population portion of the EOP he spent most of his time in his cell.


5.     Inmate E

This review was based upon the UHR, an inmate history and conversations with staff. Records of this inmate's most recent admission to RJD and of one or more recent crisis bed admissions were either incomplete or missing from the UHR.

This newly arrived inmate was not identified as in need of mental health treatment until he had been at RJD for over one week. He was apparently too impaired to conform to the requirements of intake processing. His lack of cooperation and failure to voice his needs were associated with his being monitored but he was largely untreated until he was admitted to a crisis bed roughly two weeks after he arrived.

He apparently arrived around 11/14/05 but there was no bus screening associated with the medical history form that he completed. The form may have been completed for him. He had a physical exam on that date. The examiner reported that he was unable to assess due to "probably psychological status."

He was first seen by mental health on 11/23/05, nine days later. On that date an MH-7 was completed and an IDTT meeting was held. He was placed at the EOP level of care. A diagnosis of Schizophrenia, undifferentiated type was given.

There was no indication in the UHR of when he first saw a psychiatrist or when medication was ordered or administered. According to the MHTS inmate history he was either seen by a psychiatrist or was scheduled to be seen on 11/28/05. No corresponding medication order for that date was shown on the inmate history. According to the MHTS history he was admitted to a crisis bed around 12/1/05. He was back in the reception center by 12/9/05.

One week after that IDTT meeting a case manager contact indicated that he was seen in cell. The condition of his cell was poor, the window was dirty, he was agitated and said "leave me alone." The case manager's note said that he or she was unable to assess the inmate fully.

He was admitted to the MHCB on 12/28/05. He remained there until he was transferred to DMH three weeks later. A referral packet was completed five days after his need was identified. He was referred to acute care on 1/9/06 because he was delusional, had poor ADLs and was disoriented. He was accepted and assigned a bed number four days after he was referred. He was transferred six days after being accepted.

He was treated at DMH for roughly eight weeks, returning to RJD around 3/23/06. A discharge summary from DMH was filed in the UHR. According to the summary he was discharged with orders for Haldol and Zyprexa, the same regimen he had been on in the MHCB at RJD. While at DMH he gained 15 pounds. He could not program at DMH due to inappropriate behavior. He made sexual remarks to staff, mumbled and paced in his cell and occasionally smashed food on the window of his cell. At discharge he was described as less disorganized, having poor insight and judgment and partially impaired memory.

Records from two prior incarcerations were also in the UHR. When he arrived in 2001 he reported he was taking Zyprexa and Depakote. When he was admitted in 2003 he reported that he was taking Risperdal, Haldol, Artane and Wellbutrin.

No MARs from 11/05, 12/05 or 1/06 were in the UHR. The only MAR from this incarceration was for the period since he returned from DMH on 3/23/06.

Assessment:

Records in the UHR were fragmented and missing. Several MARs were not present.

This inmate was severely mentally ill and remained in a decompensated state for weeks. He needed antipsychotic medication immediately upon arrival in the reception center. Although he was seen and an MH-7 was completed he needed more intensive treatment earlier in his stay.

A referral to acute care should have been initiated and completed more swiftly. Given the acuity of his condition he should have been considered for the top of the priority list. Once accepted for acute care he was not transferred for six days.

He was not well enough to be returned from DMH to RJD. He should have been retained by DMH and considered for transfer from acute care to intermediate care.

EXHIBIT G

Salinas Valley State Prison (SVSP)

April 26, 2006 – April 27, 2006
June 5, 2006 – June 7, 2006
July 14, 2006

1.    Inmate A

This inmate was interviewed in a 3CMS group during the 11/05 monitor's visit. His UHR was reviewed. The monitor's expert found that the mental health treatment planned for him at the 3CMS level of care might have met his needs but it was not carried out as planned. He was referred to staff for a needs assessment. Subsequently his level of care was changed to EOP.

His case was reviewed during the 6/06 monitor's visit at the request of plaintiffs' counsel. A memo dated 6/2/06 written by plaintiffs' counsel reported that this inmate was placed in administrative segregation on 11/23/05 because he elected SNY status while being treated at the EOP level of care. The wording of the 114-D suggested that he was asked to choose between SNY status and EOP treatment.

When the case was discussed on 6/5/06 staff reported that he could not remain in the general population portion of the EOP with an SNY designation. They reported that EOP inmates waited months, and in some cases as long as one year, to be moved to an institution that had a SNY that provided the EOP level of care. If inmates disavowed their SNY status while waiting, they could move to the general population portion of the EOP.

Review of his UHR indicated that an IDTT meeting changed his level of care to EOP on 11/14/05. The meeting was attended by a full team. He was housed in the administrative segregation portion of the EOP. He was described as angry and tearful in response to being in segregation. He was also upset by the possibility that he would have a cellie.

Progress notes written during his first several weeks in the EOP indicated that he was ambivalent about his placement and about his participation in EOP treatment. He changed his mind several times about whether he would give up SNY status to go to the general population portion of the EOP, whether he wanted to return to the 3CMS level of care or whether he would participate in EOP treatment in administrative segregation. He was treated with Prozac 20 a.m. and Haldol 10 p.m. At the end of a 30-day evaluation period he was discharged to the 3CMS level of care. Upon discharge his diagnosis was Adjustment Disorder with mixed mood, anxiety and depression.

An IDTT held by his 3CMS treatment team in 1/06 was associated with treatment plan diagnoses of Major Depressive Disorder, Severe, with Psychotic Features and ASPD. The plan called for him to be seen quarterly by a psychiatrist and a case manager. He refused group treatment. His regimen was changed from Prozac to Sertraline 50 a.m. and Haldol 10 p.m. He was compliant with medication save for a few missed doses each month in 1/06, 2/06 and 3/06. A two-week bridge order was written in mid-4/06 when the order was due to expire. According to a progress note when he was seen by a psychiatrist the dose of Sertraline was raised to 100 mg. Haldol 10 p.m. was continued. The inmate did not respond to a 90-day case manager ducat on 4/18/06. He was seen cell front instead. He was exercising and reported that he was "okay."

Assessment:

This inmate changed his mind frequently, missed case manager appointments when he felt well and was emotionally reactive when faced with stressors that outstripped his coping skills. He appeared to have passed through a series of crises that roughly spanned 5/05 through 8/05. He had difficulty coping with confinement during a lockdown that spanned the next several months. During the lockdown his level of care was changed from 3CMS to EOP. Due to his SNY classification he was ineligible for placement in the general population portion of the EOP.

Functionally, CDCR rules regarding housing of SNY inmates in concert with this inmate's level of functioning put him in the position of choosing among several options. Presumably because his level of functioning fell on the cusp of the EOP/3CMS divide, mental health staff allowed him to choose whether or not to remain at the EOP level of care.

His discharge diagnosis of Adjustment Disorder at the time he left the EOP stood in contrast to his recent history of treatment and flew in the face of prior diagnostic formulations. The IDTT that met to plan his 3CMS treatment appropriately recognized that he needed treatment for a depressive disorder. His need for skills training was not noted. The quarterly case manager contact called for in the plan would do little to help him cope with daily adversity that he would inevitably encounter. One goal of treatment should have been to teach him how to recognize signs of trouble and to seek help proactively.

2.    Inmate B

Immediately prior to the UNA review SVSP staff had already determined that this inmate needed a higher level of care and had referred him to intermediate care.

When the case was reviewed during the 6/06 monitor's visit this inmate was treated at the EOP level of care. Staff reported orally that he had been treated at both DMH's acute unit at Vacaville and at SVPP's intermediate care unit in recent months. They reported that his condition was much the same as it had been before he went. When he was interviewed on 6/6/06, however, his condition was markedly different from that observed previously. His presentation differed from that described in recent progress notes.

This inmate had a history of suicide attempts, weight loss and psychotic episodes. In the past he had paced his cell quickly and obsessively for weeks or months, refusing to pause even for brief interactions with other people. He was committed to CDCR several years previously after having been convicted of a heinous crime. His UHR indicated that he had exhibited signs of a serious mental disorder for several years. Diagnoses and descriptions of his behavior indicated that he suffered from a severe mood disorder such as Schizoaffective Disorder or recurrent Major Depression. He was not on medication. He told clinicians that he did not want it.

This inmate was on modified programming meaning that he had a monthly IDTT meeting and was enrolled in a small number of weekly groups rather than being scheduled to attend ten or more hours of structured therapeutic activity. UHR review indicated that his case manager always or nearly always saw him cell front. Progress notes indicated that he typically mumbled to himself continuously in a manner that was suggestive of auditory hallucinations.

According to the UHR this inmate returned from DMH in 12/05. He was treated at the acute level of care at Vacaville for nine weeks. According to the discharge summary he had diagnoses of Schizoaffective Disorder, bipolar type and Personality Disorder NOS with narcissistic features. He was medicated with Benadryl. He was released to the EOP level of care. He refused to participate in daily treatment activities at DMH. A social work discharge summary said that he had no insight into his mental illness and at times talked and yelled to himself while in his cell.

From 1/06 through 5/06 records of weekly cell front contacts indicated that he was stable. He was consistently described as poorly groomed, incoherent, disorganized, tangential, paranoid and grandiose. Documentation of monthly IDTT meetings was limited to an account of his history and a conclusion that modified programming would be continued. It appeared that his treatment was limited to monitoring.

When interviewed on 6/6/06 he exhibited none of the signs of psychosis that were prominent in the past. He was alert, his hygiene was good and he was neatly dressed. He wore a long beard in violation of CDCR grooming standards. He was emotionally well related. His mood ranged from euthymic to genial. His level of intellectual functioning appeared to be well above average. According to notes in the UHR he attended college or graduate school in the United States.

English was not this inmate's first language. He had extreme difficulty communicating orally in English. His ability to communicate in written English was excellent. His conversation was similar to that of individuals who have extreme difficulty with auditory processing and oral expressive language. He compensated by orally answering those questions which he guessed his interlocutor would be likely to ask and by writing lengthy statements. The structure of his written language, which was in English, was complex. The thoughts expressed were logical and coherent. His written expression demonstrated that he was fully oriented to person, place and time. His written statement demonstrated that during the interview he immediately and accurately deduced the identity and purposes of his interlocutors.

This inmate appeared to be unable to benefit from treatment modalities that depended solely upon spoken English language or auditory processing. He typically eschewed athletic activities. His mode and level of functioning on the day when he was interviewed suggested that he needed more opportunities to engage in activities that relied upon both nonverbal skills and written language. The abilities and the demeanor which he demonstrated suggested that he could perform clerical or other written work and might willingly engage in non-verbal activities such as work assignments that did not

require facility with spoken English. He might also be engaged in non-verbal therapeutic activities or therapeutic activities that depend upon written language.

Assessment:

There was no documentation of his treatment at the intermediate level of care in the UHR. Treatment in the EOP was inadequate. It was not individualized. A monthly IDTT meeting between his case manager and a supervisor, weekly cell front visits, and being invited to attend a small number of didactic groups that he could not comprehend was the extent of his treatment.

Staff was inattentive to this inmate's behavior, treatment needs and level of functioning. The range of opportunity for observation and communication during weekly cell front contacts was too restricted to allow staff to perceive his behavior accurately. His presentation on 6/6/06 stood in marked contrast to the floridly psychotic state he exhibited in 2005. It also differed markedly from that described in recent progress notes.

Modified programming was inappropriate for this inmate. He needed to be engaged in more therapeutic activities rather than fewer. He should have been provided with written information regarding the operations of the EOP, the nature of his mental illness and about any medication recommended by psychiatrists. Communications with treatment providers should have been facilitated by the use of writing.

3.    Inmate C

This inmate was born on 3/26/81. He was caught in a downward spiral. He needed a well formulated treatment approach. Mental health treatment was reactive, and at times insufficiently reactive, rather than proactive.

This inmate was treated at the EOP level of care. He was housed in administrative segregation. He was seen in a mesh holding cell located in the CTC on 6/6/06. The holding cell was a small mesh enclosure not larger than 30 inches square. Although constructed as a standing-room-only cell it was retrofitted with a seat.

He reported that early that morning he had been pepper sprayed in his cell prior to being brought to the CTC. He reported that he was left in his cell for a few minutes before being removed for decontamination. Staff who went to the cell on 6/6/06 reported that pepper spray lingered in it and had adhered to some surfaces.

An abridged review of his UHR indicated that he came to SVSP from WSP in 8/05. He was treated at the 3CMS level of care. According to the C-file he was sentenced to 28 years to life. A clinical note indicated that he was serving his first term in prison. He was housed in SVSP's A yard, a Level IV SNY and treated at the 3CMS level of care until 3/30/06. An inmate classification committee action recorded on 3/30/06 indicated that he was moved to administrative segregation pending completion of an investigation.

He was placed on single cell status. The investigation focused on an allegation that on 3/20/06 he was sexually assaulted on the A-Yard by his cellie.

Medication orders for Seroquel, Celexa and Wellbutrin spanned 1/06 through 5/06. He changed locations several times and went to and from the MHCB and was moved among holding cells. It was not possible to discern whether medication continuity was sustained.

He was in the MHCB on 3/21/06. He was discharged on 3/23/06. An IDTT placed him at the 3CMS level of care. Diagnoses of Acute Stress Disorder, PTSD, Polysubstance Dependence and ASPD were made. He made threats toward his alleged assailant. He was re-housed in administrative segregation with orders for five-day follow-up. Completion of five-day follow-up was documented in the UHR. Mental health clinicians in the MHCB attempted to follow up on the results of a medical exam associated with his report of sexual assault. No results were found the UHR. Subsequent mental health notes were silent on the matter.

A coherent account of his whereabouts and the venues in which treatment decisions were made on 3/29/06 and 3/30/30 could not be discerned from available records. There were nursing notes that indicated he was in a BPT holding cell in A2 from 3/20/06 to 3/30/06. The nurse observed him washing his penis in a compulsive and forceful manner. Two nursing notes were roughly eight to nine hours apart with a third made after an interval of two hours. He was seen in an IDTT on 3/29/06. The meeting was not attended by a psychiatrist. His level of care was changed to EOP. At that time he voiced certainty that his conviction would be overturned and he would be released from prison. He was placed on five-day follow-up.

Little mental health treatment was provided during the month of 4/06. He was seen daily on psych tech rounds. He was seen cell front by a case manager on 4/19/06. He was described as poorly groomed, dismissive and unwilling to look at the case manager. His mood was dysphoric and his affect was flat. He exhibited paranoia and ruminative thought and was circumstantial. There were no other entries documenting mental health treatment in 4/06l.

On 4/29/06 he wrote a self-referral to medical staff. The content of the referral was that his sink had been broken for three weeks and he was without water. He reported that he was dehydrated. Five weeks later, on 6/6/06, staff who went to the cell reported that the water in the sink and toilet was operating. Officers who were asked about any problems with the water in the cell in the preceding two months reported none.

He was seen by a case manager on 5/2/06 because he was referred by custody staff. He looked disheveled and depressed. He reported that he had stopped taking his medication three weeks earlier. No action had been taken save for planned weekly contact the following week. He was seen again, cell front, five days later. He was lying on the floor in a fetal position with a blanket over his head. He told the case manager that he was fine but sleepy from medication. The progress note indicated that his presentations on 5/2/06

and 5/7/06 were the same. He was curled up on the floor under a blanket on both occasions.

He was admitted to the MHCB on 5/8/06. He remained there until discharged on 5/11/06. An SRAC dated 5/11/06 found negligible risk. A note written in the MHCB indicated that he divulged a list a stressors to clinicians. Notes indicated that he scratched his wrist at some point in time proximal to his MHCB admission.

He was seen by a case manager four days after he was discharged from the MHCB. In addition he was seen daily for five-day follow-up. He had two more case manager contacts during the next two weeks. Both case manager contacts were made cell front. He did not readily engage in conversation.

He was seen cell front by a case manager on 5/24/06. He said that he was okay. He was described as poorly groomed with slow speech, dysphoric mood and inappropriate affect. He was also dismissive, irritable and evasive. The diagnosis on the progress note was Acute Stress Disorder. According to the inmate history he was seen by his case manager the following week, on 5/30/06, out of cell. No clinical information regarding his presentation was available. That contact was not documented in the UHR.

An SRAC dated 6/5/06 found that his level of risk was high. That finding triggered a referral to the MHCB. He voiced persecutory ideas. He told a clinician that he kept finding things in his food. Reportedly there were no staff qualified to decide whether or not he should be admitted to the MHCB at 4:00 p.m. or after on 6/5/06. He was evaluated on 6/6/06 around 9:00 a.m. Staff decided against admission.

Staff provided a copy of the incident report associated with his removal to the CTC on 6/5/06. Incident Report #SVP-FD1-06-06-0336 was written by a lieutenant and dated 6/5/06. The report was countersigned by a facility captain on 6/6/06. The incident was described as an attempted suicide. The report contained the following account of the incident. The inmate was observed cutting his neck in his cell. He did not stop when ordered. Officers observed blood dripping from his neck. They opened the food port and sprayed MK-9 pepper mace into his upper torso and facial area. He stopped cutting, flushed an object down the toilet and backed up to the food port to cuff up as ordered. He was taken to a holding cell for further medical evaluation. He was decontaminated from OC spray with "cool fresh outside air." An MTA and an LVN did a medical evaluation and performed basic first aid. The MTA's evaluation found lacerations to the neck and both wrists. The MTA's evaluation included a subjective statement that "staff wouldn't pay attention to me so I cut myself." The LVN described the lacerations as superficial scratches. The incident report indicated that a 128B was issued and included a log of the use of the holding cell. He was in the holding cell from 2:13 p.m. until 3:30 p.m. The documentation suggested that the holding cell was located in building D1 where the inmate was housed.

He was placed in a mesh holding cell on 6/5/06 at 4:00 p.m., thirty minutes after he had been removed from the holding cell in D1. He remained in a mesh holding cell in the

-6-

CTC for 1.75 hours. At 5:45 p.m. he was removed and placed in cell 115 which is a large communal holding cell with a sink and a toilet. A blanket, smock and mattress were provided at that time. Officers reported that by policy inmates held overnight in the large holding cells were clothed in a tear proof smock and given a mattress and blanket.

He remained in cell 115 overnight. Staff reported orally that he was moved to a mesh holding cell around 8:00 to 8:15 a.m. on 6/6/06. The move had taken place roughly 45 minutes earlier but it was not logged. The officers' explanation as to why the log was not current was because the CTC was short staffed was at odds with the large number of officers who were there waiting for the medical staff to commence seeing patients. At 9:00 a.m. the most recent log entry was 4:30 a.m. when he was asleep in cell 115.

As reported above, he was not admitted to the MHCB on 6/6/06. Presumably he was returned to his housing until sometime after 9:00 a.m. on that date.

Assessment:

This inmate was obviously in distress. He precipitated a series of crises during an 11-week period. He had a number of risk factors. His reports of lack of water and contaminated food in administrative segregation warranted both clinical and administrative attention.

Treatment from 34/20/06 through 6/6/6 was driven by crises. As of 6/6/06 there was no indication that salient facts regarding his circumstances and his need for treatment had been considered in their entirety by a single clinician or a team. Mental health treatment needed to focus on his reported stressors, including his report that he was sexually assaulted in 3/06, his report that he was deprived of sanitary water in his cell for an extended period of time in 5/06, his complaints that his food was tampered with in 4/06 or 5/06 and his expectations regarding his release from prison. His risk of self injury or suicide needed to be assessed regularly in light of his stressors.

Mental health treatment was reactive to crises that involved suicidal ideation or self injury but neither his reports that he stopped taking medication nor his evident depressive state elicited a response. His dismissive stance and assurances that he was fine were accepted at face value. Each mental health contact took place in isolation with little regard to the whole of his current circumstances.

Requirements for EOP treatment were not met during the month of 4/06. He had one cell-front contact and was seen on psych tech rounds during a month that was book-ended by stays in the MHCB and holding cells. In 5/06 he had only one case manager contact out of cell and it was on 5/30/06.

Documentation of his stays in holding cells was incomplete, fragmented and filed in different sections of the UHR. Documentation of medication administration was incomplete.

A log of holding cell use was maintained in the CTC but entries were not entirely complete and accurate. On the whole the log probably provided a general overview of his stay in holding cells. Logs of holding cell use on other occasions and other locations, including BPT rooms, were incomplete. They were scattered throughout the UHR. Some were not found in the UHR. Records of mental health and medical treatment were misfiled with some missing from the UHR.

4.    Inmate D

The last volume of the UHR and an inmate history for this inmate were reviewed.

This was one of the EOP inmates who were enrolled in less than the required amount of group treatment. He was too disruptive and paranoid to come out of his cell or to attend group sessions. It was not possible to discern from his UHR what treatment had been planned for him. He was seen weekly by a case manager from 1/06 through 5/06. Because he was on modified programming he was seen monthly by an IDTT.

He had a diagnosis of Schizophrenia, undifferentiated type. He was treated with Risperdal 2:00 a.m. and 4:00 p.m. He was compliant with medication from at least 1/06 through 4/06. Psychiatry contacts were documented in a cursory manner. Orders were renewed with the annotation that the patient agreed to continue with current medication. There was no indication that the treatment team or the psychiatrist considered changing his regimen.

He was fired from his culinary job in 3/06 due to poor hygiene. He incurred an RVR for not going to work. A mental health evaluation said that mental illness was a factor in his behavior.

Monthly IDTT meetings indicated that he was waiting for admission to SVPP, that he was too paranoid to hold a job and that he typically came out of his cell only for meals. He was paranoid and disruptive around others. The monthly treatment plan updates did not plan treatment or consider alternatives to current treatment.

According to a DMH referral log he was referred to intermediate care on 7/26/05. He was accepted on 8/11/05. He was placed on the wait list. He had been on it for nearly ten months.

A cursory clinical note dated 5/25/06 indicated that a Keyhea order was denied. According to cursory documentation in a file maintained by the Keyhea coordinator a psychiatrist acting alone decided against seeking a renewal of the order. The rationale for the decision was that the inmate was compliant and gave consent. There was no indication that the psychiatrist was aware of the inmate's history, his wait list for intermediate care or his current uncontrolled paranoia. There was no documentation in the UHR regarding the psychiatrist's review of the case or his decision not to pursue a renewal.

-8-

Assessment:

Modified programming was inappropriate for this inmate. He needed more rather than less treatment. Psychiatrists were unresponsive to this inmate's uncontrolled psychosis. Monthly IDTT meetings did not serve their purpose. This inmate needed more intensive treatment and a change in his medication regimen.

He needed intermediate care but was unable to gain access to it.

The institution's records regarding the use of Keyhea were in disarray. Tracking current orders, orders in need of renewal, petitions in progress and the outcome of hearings was disorganized and error prone. Records were incomplete. The standard procedure used for clinical evaluations for Keyhea petitions was inadequate.

In this case a unilateral decision by a non-treating psychiatrist not to seek a renewal of a Keyhea order was made without regard for the facts of the case or input from the treatment team. The treatment team was unaware that a local decision not to seek renewal of the Keyhea order had been made.

5.    Inmate E

This EOP inmate was on modified program list. By plan he was not enrolled in the required amount of structured therapeutic activities. He was scheduled to attend four group sessions each week.

He had a diagnosis of Schizophrenia, paranoid type, continuous (*sic*). He was compliant with a regimen of Zydis 25 from at least 1/06 through 4/06.

Case manager notes written in 3/06 and 4/06 described him as alert, oriented, calm and cooperative. In 5/06 he was described as listless and sad with blunted affect. He was enrolled in and attended four group treatment sessions weekly.

Psychiatry contacts were documented by cursory progress notes.

Treatment team meetings were held monthly. Documentation reflected monitoring only. Treatment plan updates did not suggest that staff considered whether the treatment approach was considered critically or whether modifications might be needed.

Assessment:

The rationale for enrolling this inmate in a smaller amount of treatment was not apparent. There was no indication that he was too low functioning to participate in ten hours of structured therapeutic activity each week. This inmate appeared to experience a downswing in mood during the past month although he was compliant with medication and with his modified EOP treatment plan.

Monthly IDTT meetings did not serve their purpose. Treatment was not individualized. He should have been afforded treatment that was tailored to his needs and abilities. He may have needed a different kind of treatment than the didactic cognitive behavioral group sessions that were offered to him.

6.    Inmate F

This inmate was born on 1/18/47. This case was reviewed by the UNA team which found that he did not warrant referral to DMH but that there should have been a low threshold for Keyhea.

Only the last volume of his UHR was reviewed. This EOP inmate was on a modified treatment schedule. He was enrolled in no groups.

The case was reviewed because staff pointed to it as an example of an inmate who was stable, not in need of a DMH referral and not willing to continue to attend EOP groups. He reportedly had been in the EOP for years, was not high functioning enough to be discharged to 3CMS and did not find the group offerings relevant.

At a quarterly IDTT meeting held in 3/06 a decision was made to change his treatment plan from ten groups to none on the grounds that he was resistant to treatment and that his baseline level of functioning was poor.

He had diagnoses of Schizophrenia, paranoid type, chronic and ASPD. His GAF was assessed as 35 in 5/06. He did not have a medication order because he refused medication. He was described on a 5/06 treatment plan as having bizarre thought content, grandiosity, paranoia and idea or reference or infidelity. The 4/06 treatment plan update stated that he was not gravely disabled nor a danger to self or others. He was described variously as able to take care of himself and as having poor grooming/ADLs. He had a chronic medical condition that affected his liver.

Recent case manager notes indicated that he was preoccupied with missing his parole date and that he wandered the yard looking for cigarette butts. On 5/16/06 a case manager note stated that he had large open wounds on his arms but refused medical treatment. His personal hygiene on that date was described as poor. Open sores and subcutaneous growths on his arms may have been connected with a chronic medical problem. He also had a seizure disorder.

Documentation suggested that he was seen monthly by a psychiatrist. Documentation was unusual and much of it was illegible. Psychiatry notes spanning 1/27/06 to 5/18/06 were written on a single sheet of paper rather than interspersed with the progress notes in chronological order. He was seen by the same psychiatrist on four occasions during that period. One date was illegible. The notes appeared to say that he was off medication and denied symptoms of mental illness. Treatment and reviews by psychiatry appeared to be unrelated to his presentation and divorced from the facts of the case.

-10-

Staff pointed to documentation that he was treated at the acute level of care in 2003. He remained there for two weeks. They also reported that a Keyhea petition was sought by his treatment team. Neither the Keyhea coordinator nor the UHR had useful information regarding a possible Keyhea petition. No documentation was found regarding whether the petition was actually filed and a hearing held.

Assessment:

Although this inmate's baseline level of functioning was low he should have been given another trial of antipsychotic medication. Records indicated that he may not have taken medication during the past three years and may have had a positive response to medication administered before 2003.

A Keyhea petition should have been brought regardless of previous outcomes. His refusal to have his open wounds treated and his obvious thought disorder warranted clinical and judicial consideration.

7.    Inmate G

This EOP inmate was born on 11/13/59. He had a diagnosis of Schizophrenia, paranoid type. Only volume three of three of his UHR was reviewed.

He came to SVSP from PBSP in 2000. He was treated at ASH from 1990 to1993.

Nothing in the UHR indicated what comprised his treatment plan. A summary statement associated with a treatment plan update indicated that he attended over 80 percent of group sessions but the UHR was silent on whether he was enrolled in one group or several.

When questioned about the omission staff reported that they typically relied upon an MHTS-generated schedule that showed the groups in which individuals were enrolled. His schedule was produced. He was enrolled in two groups each of which lasted one hour. Self-esteem and depression were the foci of the groups.

Documentation of psychiatry contacts was the same as that described in several other cases that were reviewed. Psychiatry notes spanning several months were recorded on a single page rather than interspersed throughout the chronologically-ordered progress notes. Medication orders were rewritten. The notes typically said continue present medication. Notes dated 10/14/05, 12/13/05, 1/24/06 and 2/8/06 were identical to one another. One exception was an order written on 5/26/06 in the absence of patient contact. The regimen of Risperdal 1 a.m. and 3 HS was changed to Risperdal 50 IM q 2 weeks. Staff reported orally that many EOP inmates were recently being treated with IM Risperdal with good results. MARs indicated that he was compliant with medication from 1/06 through 4/06.

Case manager documentation indicated that this inmate was consistently pleasant and jovial in demeanor. He missed case manager contacts intentionally and reported that he disliked groups. He claimed that he spoke Spanish better and that his command of English was an impediment to his participation in group treatment. Staff did not afford that attribution much weight. A note dated 4/20/06 reported signs of decompensation. He was described as disheveled, having blunted affect, irritable mood and being listless. A note dated 6/1/06 said that he had been doing better during the preceding few weeks.

Assessment:

Psychiatry treatment was perfunctory but without deleterious results. Documentation of psychiatry contacts and the particulars of his current treatment plan were inadequate. Two groups per week were insufficient. The rationale for this inmate's modified program appeared to be that he did not like the group treatment that was offered. Treatment available in the EOP may not have fit his needs and abilities. He may have needed a type of treatment other than that offered in didactic cognitive behavioral groups.

8.      Inmate H

This inmate was introduced to the monitor's experts by staff as he walked around the yard during the 6/06 site visit. English was his second language. He was fluent in English. As instructed, he verbalized allegations relevant to excessive use of force one week earlier. In response to questions he reported that he did not incur an RVR nor was he placed in administrative segregation. He was returned to his cell that night and had since participated in EOP activities as usual. Several dozen inmates using the yard approached the monitoring team the same day. Nearly all of them spontaneously reported the incident that had involved this inmate. They were all distressed by the incident. They reported that he was one of the most obedient and least troublesome EOP inmates.

During the conversation on the yard this inmate appeared to be fairly well oriented. He was unkempt but his hygiene was adequate. He spoke in a deliberate style. His conversation was concrete. At a glance his level of functioning appeared to be similar to that of inmates at the lower end of the EOP range.

The health care record of this inmate was reviewed twice to obtain updated information. A medical injury report dated 6/1/06 noted two abrasions. It quoted the inmate as saying, "I think it's my illness that makes me get angry." He denied chest pain. The name of the witness was listed as "C.O." A second medical injury report dated 6/3/06 noted five abrasions. It quoted the inmate as saying, "I scraped myself when the officers told me down." (sic) The name of the witness was listed as "yard inmates."

Review of the UHR showed that this inmate was treated at the EOP level of care. His UHR contained no reference to these allegations. The last individual therapy note was dated 5/11/06 when he was seen cell front. The diagnosis was Schizophrenia. Most case manager contacts were cell front. He was seen out of cell on 6/7/06 and reported being

-12-

beaten by officers and still feeling pain. A progress note dated 6/12/06 indicated that he was still emotionally distressed about the incident.

The UHR contained very readable documentation relevant to this inmate's participation in various weekly therapy groups. The most recent psychiatrist note was dated 4/19/06. The psychiatrist's note was difficult to read. Medications ordered included Prolixin Decanoate, Oxycarbamazepine, Cogentin, Risperdal and Zoloft. He was seen almost monthly by a psychiatrist. Notes for 2/21/06, 3/21/06, 4/4/06, 4/19/06 and 5/19/06 were written all on one page rather than interspersed through the chronologically-ordered progress notes. Psychiatry notes were cursory and largely unintelligible.

An EOP treatment plan written in conjunction with an IDTT meeting was written in 1/06. The meeting was attended by a full team. The plan showed a diagnosis of Schizophrenia, paranoid type. Intellectual functioning was noted as average. Axis III showed mitral and aortic valve pathology, history of fracture of lumbar spine and elbow, status post open heart surgery with three heart valve replacements.

Also noted on the treatment plan was "reduced group participation due to a medical lay-in awaiting a vest due to inability to prone out." A medical accommodation form indicated he could not prone out for ten weeks following his surgery. No vest was ordered by medical staff. Mental health staff reported that after this inmate had surgery he had difficulty getting to the ground.

In addition to the diagnostic and historical information contained above, the plan said that this inmate's history of psychotic symptoms dated to 1992. He had religious delusions with intermittent depressed mood secondary to psychotic symptoms, auditory (at times command) hallucinations, visual hallucinations and tactile hallucinations with periods of disassociation. He had a history of suicidal and self-injurious behavior, having stabbed himself in the chest three times. He also jumped from a tier. Narrative on the plan noted that there was a report of a head injury during a fight that needed to be substantiated. The narrative also said, "Report of sexual assault recently uncovered at DMH Vacaville, inmate complaining of some rectal pain." His GAF was assessed as 47. English was his second language.

A quarterly IDTT meeting was held in 4/06. It was attended by a full team.

A copy of a record of hospitalization indicated that he had heart surgery in 10/05. He was not wearing a vest when he was seen on the yard on 6/6/06.

During a subsequent site visit staff reported that an RVR for resisting staff was heard on 7/13/06. The inmate lost 60 days of credit time. No other sanctions were imposed.

A mental health assessment done for disciplinary purposes found that mental health was a factor in his behavior. The assessment concluded that he responded to real environmental events that occurred at that moment, felt pain and lost control.

-13-

<u>Assessment:</u>

It was very difficult to assess the accuracy of this inmate's allegations. It would have been surprising if he had been willing to file an appeal because he would have risked being sent to an administrative segregation unit for six to eight weeks while the investigation was pending.

On the whole the care provided to this inmate seemed haphazard. There was an indication that his mobility was impaired subsequent to open heart surgery but no vest was provided. There were indications that he had been recently taken to the ground by staff and attributed his injuries to two different causes on two occasions separated by two days. He may have been sexually assaulted in the past but there was no indication that his treatment plan examined that possibility or considered whether focused treatment was warranted.

Mental health treatment was adequate in some respects but not in others. It did not meet program guide requirements. Documentation of psychiatry contacts was impoverished. This inmate did not appear to be experiencing active psychotic symptoms.

9.    Inmate I

Plaintiffs' counsel requested review of the mental health care being provided to this inmate. According to a memo from plaintiffs' counsel, this case was previously reviewed because the inmate was given an RVR by his clinician for revealing that he was worried he might assault a particular inmate. Plaintiff's counsel reported that after the experts reviewed his case and spoke with SVSP staff about the issues it raised, his RVR was reheard. According to the inmate, the same evidence from his clinician was used to find him guilty when the RVR was re-heard. Plaintiff's counsel reported that he remained in administrative segregation in D-8, where he was reportedly decompensating. He was also experiencing side effects from his psychiatric medications and may have needed to be considered for a higher level of care. Plaintiffs' counsel requested that we review his current access to mental health care and the subsequent adjudication of his RVR.

Review of the UHR indicated that this inmate had weekly cell front sessions with his case manager since April 2006. Notes consistently described this inmate as having no current issues or concerns nor were mental health symptoms reported. He was described as stable. These reports were consistent with documentation generated by psychiatric technician rounds.

The most recent note by a psychiatrist was dated 4/12/06. Remeron was increased at the inmate's request.

An updated treatment plan was not found in his UHR. A 4/25/06 IDTT documented this inmate's significant hostility towards mental health staff.

-14-

A 5/15/06 note by his case manager indicated that this inmate remained angry at the mental health program due to the breach of confidentiality. He reported being perhaps more receptive to meeting with his current case manager.

A 5/26/06 note by the case manager included the following: "Met with inmate for case manager contact. Inmate reported no current issues of concern at this time and or mental health symptoms reported. Inmate continues to do well and is observed to be stable. Assessed for suicidal/homicidal ideation-not present."

According to review of his C-file this 3CMS inmate was issued an RVR on 9/29/05 for threats against an inmate. During an appointment with his clinical case manager, he stated that he had fought with another inmate and, if released to yard, would "hunt him down" and "do serious harm to him." This case was not referred to mental health for completion of a mental health assessment. At a 10/15/05 hearing, he was found guilty and was assessed 30 days forfeiture of credit.

Per the recommendation of <u>Coleman</u> monitors, the chief hearing officer ordered this case reissued/reheard on 1/16/06. The inmate was referred to mental health for completion of a mental health assessment. The 2/9/06 assessment concluded that a staff assistant was not needed, that mental illness had not influenced the inmate's behavior and the senior hearing officer need not consider mental health factors when assessing a penalty. At a 2/23/06 hearing, he was again found guilty. However, no credit loss was assessed, as time constraints were not met. However, a four month SHU term was imposed with a MERD of 12/30/05.

Chronos indicated that he was placed in administrative segregation on 10/4/05 pending adjudication of the 9/29/05 RVR. On 12/22/05, the inmate classification committee referred this case to the CSR for a SHU audit, recommending the remainder of the four-month SHU term (MERD 12/30/05) be suspended. The inmate classification committee requested a 90-day extension on 2/2/06 in order to complete a rehearing of the RVR. The inmate classification committee requested a 30-day extension on 3/2/06, again to complete a rehearing, completed on 2/23/05. The CSR granted a 90-day extension on 3/23/06. The most recent inmate classification committee meeting was held on 5/18/06, when the committee recommended that the inmate be held in administrative segregation due to enemy concerns pending transfer to either KVSP IV SNY or SATF IV SNY.

At of the beginning of 6/06 he remained in administrative segregation pending transfer to a Level IV SNY program.

Assessment:

Based on documentation in the UHR it did not appear that this inmate had experienced a decompensation. The RVR in question, while clumsily handled and controversial relative to <u>Tarasoff</u> issues, did not appear to have contradicted program guide requirements.

This inmate was issued an RVR based on information that he had divulged during a clinical interview. Due to these unique circumstances, the hearing was ordered reissued/reheard. Following the second hearing, he was again found guilty and given a four-month SHU term. The SHU term was subsequently suspended. Nonetheless, this inmate remained in administrative segregation for safety reasons pending transfer to an SNY program in another prison.

10.    Inmate J

This case was referred by plaintiffs' counsel. According to a memo written by plaintiffs' counsel, this inmate was developmentally disabled, frequently suicidal and incurred numerous RVRs for indecent exposure while housed in administrative segregation at SVSP. A case referred to the DA resulted in the imposition of an additional two-year sentence. Plaintiff's counsel reported that his continued RVRs for indecent exposure prevented his transfer from administrative segregation.

According to the institution's sexual misconduct tracking report, this 3CMS/D1A inmate was issued RVRs for indecent exposure on 12/22/05 and 2/7/06. In both instances he was referred to mental health for completion of sexual misconduct screens.

Review of progress notes found in volume three of three of his UHR indicated that a psychologist attempted to interview this inmate on 1/23/06 in order to complete a mental health assessment for indecent exposure, apparently for the RVR of 12/22/05. The inmate refused to be interviewed. In completing the assessment, the clinician interviewed the inmate's clinical case manager and reviewed his UHR. The assessing clinician concluded: "IM has a long history of failing to conform to societal norms, being impulsive, deceptive, manipulative, aggressive, threatening and lacking empathy or remorse. It is likely that his inappropriate sexual history is related to his antisocial traits rather than a mental illness or diagnosis of exhibitionism."

A 2/22/06 progress note indicated that the inmate again refused to be interviewed. The note referenced the 1/23/06 evaluation and concluded that he did not meet criteria for a diagnosis of exhibitionism. Both the 1/23/06 and 2/22/06 notes were countersigned by a senior psychologist.

The treatment plan was last updated before the monitor's expert's visit on 3/1/06. At that time, this inmate was continued in 3CMS with diagnoses of Psychosis NOS (by history) and ASPD with borderline features, and a GAF of 68. At the time of the UHR review this inmate was prescribed Buproprion 150 mg q am and noon (DOT, crush and float), Seroquel 200mg q am/600mg q pm (DOT, crush and float) and Benadryl 100 mg q pm (DOT).

Target problems as per the treatment plan included self-reported auditory hallucinations (internal sensory stimulation, strong emotional arousal in response to hallucinations and a pattern of maladaptive behavioral responses to hallucinations), stress management (inability to manage internal/external stress in an appropriate manner), and antisocial

-16-

behavior (consistent pattern of blaming others, little or no remorse, failure to conform to social norms, pattern of impulsive behavior and little regard for the truth). Interventions included psychopharmacological services, education regarding medications, teaching hallucination distraction techniques, helping the inmate understand and resolve psychodynamics expressed in hallucinations, helping the inmate identify triggers/sources of stress, practicing stress alleviation techniques, helping the inmate gain insight into short and long-term impacts of stress, encouraging him to come out of cell, exploring history of inmates pattern illegal/unethical behavior, confronting attempts to minimize, deny or project blame, reviewing the consequences for self and others of antisocial behavior and sensitizing the inmate to his lack of empathy for others through role reversal.

Group sessions entitled "Appropriate Sexual Group – Ad Seg" were scheduled on 4/7/06 (orientation session), 4/14/06 (ended prematurely due to an emergency count), 4/21/06 (group cancelled due to extraction) and 4/28/06.

The UHR contained inpatient records related to two recent MHCB admissions, one on 10/27/05 and another on 2/6/06, both related to suicidal ideation.

The UHR contained no documentation of IDTT reviews related to evaluations associated with the recent sexual misconduct charges.

Assessment:

Compliant in that the mental health department completed an evaluation related to indecent exposure. However, the institution did not strictly follow CDCR protocols in that a sexual misconduct screen was not completed within a day or two of the incident and a separate screen was not completed for each incident. Rather, a fairly comprehensive evaluation was completed four months after the first incident, the contents of which were referenced for the second incident. In addition, the evaluation was not reviewed by an IDTT. Rather, it was reviewed by a senior supervising psychologist. The evaluation concluded that an exhibitionism diagnosis was not clinically indicated.

Nonetheless, this inmate was offered group treatment that focused on sexual misconduct while in administrative segregation. Two of four group sessions were either interrupted or cancelled by custody. An unresolved scheduling conflict had ended the group in late 4/06.