PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California  94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
AMY WHELAN Bar No.: 215675
LORI RIFKIN Bar No.: 244081
SARAH M. LAUBACH Bar No.: 240526
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington  98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN,

     Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.,

     Defendants

)
)
)
)
)
)
)
)
)
)
)
)

No.:  Civ S 90-0520 LKK-JFM

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR
EMERGENCY RELIEF REGARDING
DEFENDANTS' DENIAL OF ACCESS
TO INPATIENT PSYCHIATRIC BEDS
IN DMH'S STATE HOSPITALS**

Hearing Date:  April 23, 2007
Time:  10:00 a.m.
Location:  Courtroom 4
Judge:  Hon. Lawrence K. Karlton

1

**TABLE OF ABBREVIATIONS**

2    APP        Acute Psychiatric Program.  A 150-bed acute inpatient unit operated by the
Department of Mental Health inside the California Medical Facility.

3

ASH        Atascadero State Hospital.  A state mental hospital operated by the Department
4              of Mental Health in Atascadero, California.

5    ASU        Administrative Segregation Unit.

6    CCC        Consolidated Care Center.

7    CCCMS    Correctional Clinical Case Management System.  CCCMS is the name for the
largest CDCR mental health program, which currently houses 26,000 inmates
8              with mental illness who live in general population housing units alongside non-
mentally ill inmates.  CCCMS inmates are generally given medication
9              management, and a meeting with their case manager every 90 days.  A few also
participate in groups.
10

CDCR      California Department of Corrections and Rehabilitation.
11

CMF        California Medical Facility.  A prison in Vacaville, California.
12

CMC       California Men's Colony.  A prison in San Luis Obispo, California.
13

CSH        Coalinga State Hospital.  A state mental hospital operated by the Department of
14              Mental Health in Coalinga, California.

15    CTC        Correctional Treatment Centers.  CTCs are licensed inpatient units inside
prisons.  Mental Health Crisis Beds operate inside Correctional Treatment Center
16              Units.  In addition to Mental Health Crisis Beds, most CTCs also include medical
beds.
17

DMH      Department of Mental Health.
18

DOF       Department of Finance.
19

EOP        Enhanced Outpatient Program.  EOP programs are sheltered treatment programs
20              that house severely mentally ill inmates.  There are currently approximately
4,100 EOP inmates.  Because these inmates are unable to function in a general
21              population setting, they live in segregated housing units.  They are given 10
hours each week of therapy or other "structured therapeutic activities."  EOP
22              inmates meet weekly with their case managers.

23    ICF         Intermediate Care Facility.  ICF programs are "intermediate" inpatient care
programs.  These programs are operated by the state Department of Mental
24              Health.  There are currently ICF programs at Salinas Valley State Prison, the
California Medical Facility, Atascadero State Hospital, and Coalinga State
25              Hospital.  Inmates in these programs have frequent clinical contact, 24-hour
nursing care and 20 or more hours of therapy and treatment each week.  Inmates
26              generally spend 6-12 months in these programs.

27    LOU       Locked Observation Unit.  An unlicensed Outpatient Housing Unit that is
currently operating as a de facto MHCB at California Men's Colony.
28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR EMERGENCY RELIEF REGARDING
DEFENDANTS' DENIAL OF ACCESS TO INPATIENT PSYCHIATRIC BEDS IN DMH'S STATE HOSPITALS, NO.:  CIV S 90-0520 LKK-JFM

| | |
|---|---|
| MHSDS | Mental Health Services Delivery System.  The name given by defendants to their entire mental health system. |
| MHCB | Mental Health Crisis Beds.  MHCB units are licensed inpatient units inside many California prisons where mentally ill inmates who are suicidal or experiencing another kind of mental health crisis can be admitted and treated for up to 10 days.  MHCBs are generally located inside a Correctional Treatment Center. |
| MSH | Metropolitan State Hospital.  A state mental health hospital operated by the Department of Mental Health in Norwalk, California. |
| NSH | Napa State Hospital.  A state mental health hospital operated by the Department of Mental Health in Napa, California. |
| OHU | Outpatient Housing Units.  Unlicensed infirmaries inside many CDCR institutions that provide treatment for medical and mental health conditions. |
| PBSP | Pelican Bay State Prison.  A prison in Crescent City, California. |
| PSH | Patton State Hospital.  A state mental health hospital operated by the Department of Mental Health in San Bernardino, California.  This is the only state hospital that houses female 2684 patients. |
| PSU | Psychiatric Services Unit.  These are psychiatric treatment programs providing Enhanced Outpatient Program level of care to inmates with a Security Housing Unit term. |
| SHU | Security Housing Unit.  This is a segregated high-security housing unit for inmates who have committed serious infractions while in prison or who have been "validated" by the CDCR as belonging to a gang.  There are male SHU units at Pelican Bay State Prison (from which all inmates with serious psychiatric conditions are excluded), Corcoran State Prison, and California Correctional Institute.  There is a SHU for women at Valley State Prison for Women. |
| SVPP | Salinas Valley Psychiatric Program.  The free-standing DMH-run unit on the grounds of Salinas Valley State Prison that has ICF beds. |
| SVSP | Salinas Valley State Prison.  A prison in Soledad, California. |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR EMERGENCY RELIEF REGARDING
DEFENDANTS' DENIAL OF ACCESS TO INPATIENT PSYCHIATRIC BEDS IN DMH'S STATE HOSPITALS, NO.:  CIV S 90-0520 LKK-JFM

# TABLE OF CONTENTS

TABLE OF ABBREVIATIONS ....................................................................................................... i

TABLE OF CONTENTS ............................................................................................................... iii

INTRODUCTION ........................................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................................... 3

ARGUMENT .................................................................................................................................. 9

    I.    Defendants' Failure To Ensure Adequate Staffing Levels At DMH
        Facilities And Failure To Maintain Sufficient Beds Violates Numerous
        Court Orders Issued By This Court ................................................................................ 9

    II.    This Court Should Order Defendants To Take All Necessary Steps To
        Open ASH's 256 Beds To The *Coleman* Class Within 30 Days ........................... 11

        A.    Defendants' Closure Of ASH To CDCR Patients Has Exacerbated
              The Critical Shortage Of Acute And ICF Beds Throughout The
              System ............................................................................................................. 11

        B.    The Staffing Shortages At DMH Are Creating A Crisis For *Coleman*
              Class Members That Warrants Emergency Action By This Court ............... 13

        C.    The Current Staffing Levels Are So Low That *Coleman* Class
              Members Housed In DMH Programs Are In Danger And Are Not
              Receiving Adequate Programming ................................................................. 14

    III.    This Court Should Order Defendants To Take All Necessary Steps To
        Accelerate The Opening Of All Beds At Coalinga State Hospital ....................... 15

    IV.    This Court Should Order Defendants To Take All Necessary Steps To
        Open The D-5 Unit At SVSP By June Of 2007 And To Ensure That All
        Patients Housed In D-5 And D-6 Have Immediate Access To 20 Hours Of
        Programming In Addition To Yard Time On The Grassy Yard ........................... 16

    V.    This Court Should Order Defendants To Take All Necessary Steps To
        Ensure That Patton, Napa And Metropolitan State Hospitals Remain Open
        To The *Coleman* Class ................................................................................... 19

CONCLUSION ............................................................................................................................ 19

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR EMERGENCY RELIEF REGARDING
DEFENDANTS' DENIAL OF ACCESS TO INPATIENT PSYCHIATRIC BEDS IN DMH'S STATE HOSPITALS, NO.: CIV S 90-0520 LKK-JFM

# INTRODUCTION

The CDCR's Mental Health Services Delivery System (MHSDS) is in a crisis that warrants emergency action by this Court. The *Coleman* class, prisoners with serious mental illness, is being denied access to the highest levels of mental health care, licensed inpatient psychiatric beds operated by Defendant Department of Mental Health ("DMH"), and death and serious harm have already resulted. Beginning on or about January 24, 2007, Defendants, the Governor, Arnold Schwarzenegger, the Director of DMH, Steven Mayberg, the Secretary of CDCR, James E. Tilton, and the Director of the Department of Finance, Michael C. Genest, have intentionally excluded from Atascadero State Hospital ("ASH") *Coleman* class members who were in dire and immediate need of inpatient psychiatric care. *See* Declaration of Jane Kahn In Support of Plaintiffs' Motion for Emergency Relief Regarding Defendants' Denial of Access to Inpatient Psychiatric Beds in DMH's State Hospitals ("Kahn Decl.") at ¶ 5-6. In addition, these Defendants and their agents and employees have failed to take necessary and appropriate actions to end the shortage of clinical and custody staff that has made ASH and other DMH facilities dangerous and unsafe locations to house and treat prisoners with serious mental illness. In fact, while staffing vacancies at DMH facilities rose to crisis levels, Defendants sat idly by, preferring to passively blame this Court for the result of their ineptitude rather than proactively addressing the crisis. In recent newspaper articles about Defendants' belated and inadequate attempts to staunch the staffing drain, Defendant Mayberg said:

> The governor was very concerned, very passionate about what's happening because of the ripple effect of decisions that are made by the courts about salaries…I think it's really sort of a dramatic commitment by the administration to deal with the impending crisis created by federal court decisions made with little thought about the implications for other parts of the system.

1  Kahn Decl. ¶ 37 and Ex. J.[1]

2          Defendants sought permission from this Court in their December 2006 Bed Plan,

3  (Docket 2091) to *gradually* move Penal Code Section 2684 patients (the *Coleman* patients) out

4  of DMH State hospitals.[2]  Although Defendants assured this Court and the parties that patients

5  would not be removed from DMH hospitals until adequate beds and staffing were available

6  within the CDCR, Defendants are barring and removing 2684 patients *right now* and will

7  continue to do so until the DMH staffing crisis ends.  Kahn Decl. ¶ 6.  As of July 2006, ASH

8  was required to have 256 beds available to the *Coleman* class, including 25 acute beds and 231

9  Intermediate Care Facility (ICF) beds.  *See* Special Master's Report and Recommendations On

10  Defendants' December 2006 Mental Health Bed Plan at p. 6 (Docket 2133).  As of February

11  2007,  however, ASH had only 110 CDCR patients.  Kahn Decl. ¶ 17.  DMH staff have

12  reported that no *Coleman* class members will be accepted to ASH and that the number of

13  *Coleman* patients at ASH will likely have to decrease even further due to the ongoing, severe

14  staffing shortages.  *Id.*¶ 24-25 At the same time that ASH and other state hospitals are

15  restricting admissions, the DMH-run units at CMF and SVSP have long waiting lists and there

16  have been an unprecedented number of suicides and suicide attempts at DMH facilities since

17  the beginning of 2007.  In short, Defendants, rather than complying with this Court's orders to

18  increase timely access to inpatient psychiatric beds, are deliberately *decreasing* the availability

19  of inpatient psychiatric beds.  Without an emergency Order from this Court, additional DMH

20  units will close, programming will be reduced even further and inpatient psychiatric beds will

21  continue to be denied to the most acutely ill members of the *Coleman* class.

22  _____

23  [1] Recent press reports indicate that Defendants have finally taken a step to curb the serious
   staffing crisis at DMH.  Defendant Mayberg announced on March 22, 2007, that DMH would
24  temporarily raise salaries of DMH psychiatrists "to within 5% of prison salaries" and would
   raise other clinicians' pay "to within 18% of the prison rate."  Kahn Decl. ¶ 24 and Ex. I.  The
25  details of this pay raise have not been made public and many questions remain.  Plaintiffs
   agree with Dr. John Cannell, a doctor at ASH whose patient load surpasses 100, that, "[t]his
26  [plan] will slow down the hemorrhage but the patient is still bleeding to death."  *Id.*

27  [2] Plaintiffs objected to Defendants' attempt to remove DMH from the *Coleman* remedy in its
   January 16, 2007 Response to Defendants' December Bed Plan (Docket 2111).
28

# FACTUAL BACKGROUND

DMH runs and staffs all of the licensed inpatient psychiatric hospital beds available to the *Coleman* class, including all acute and Intermediate Care Facility ("ICF") beds. The acute beds, as their name suggests, are reserved for *Coleman* class members who urgently require the highest level of mental health to stabilize their condition. ICF beds are designed for longer term treatment and are also licensed inpatient psychiatric beds. Kahn Decl. ¶ 3. Even before the current DMH crisis, as this court found in May 2006, there was a severe shortage of acute and ICF beds for the *Coleman* class. *See e.g.* 5/2/06 Order at p. 2:16-18 ("It is undisputed that the [intermediate care facility bed] shortage is leaving critically mentally ill inmates languishing in horrific conditions without access to immediately necessary mental health care."). Since the May order was issued, a documented waiting list of more than 100 men continue to await admission to DMH-run ICF programs every day. Kahn Decl. ¶ 3. Delays and wait lists also continue to be common for men referred to acute beds at CMF. *Id.* ¶ 3 (28 patients were on the waiting list for acute beds as of February 1, 2007). Indeed, Defendant's most recent mental health population projections released in June of 2006 predicted a need for 203 acute beds in 2007 and 211 acute beds by 2008, yet there are only 105 acute beds available to the *Coleman* class right now.[3] *See* Docket 1867, Ex. A-1 at p. 5 (Defendants' June Bed Plan). Defendant's decision to close the 25 acute and more than 100 ICF beds at ASH places the *Coleman* class at an unacceptable level of risk and violates this Court's Orders. *See, e.g.,* 5/2/06 order at 6:9-11 ("[u]ntil further order of this court, defendants shall not close any intermediate inpatient bed…without the approval of the special master.").

_____

[3] Originally, there were 150 acute beds at CMF-Vacaville. Pursuant to the "ASH/CMF Swap," however, 25 of CMF's acute beds moved to ASH so that CMF could use those beds as mental health crisis beds. The "swap" of those 25 beds left only 125 acute beds at CMF (but created 25 acute beds at ASH to maintain the 150 beds). *See* August 23, 2006 Order (Docket 1962). Defendants also requested permission from the Special Master to use 20 more of its 125 acute beds as mental health crisis beds. Seventeenth Monitoring Report of the Special Master, Part A at p. 9 (Docket No. 2140). This means that, with the closure of ASH's acute beds, there are only approximately 105 acute beds available in the entire system right now.

Defendants have known for some time that salary and staffing problems in CDCR and DMH were likely to erupt into serious staffing shortages.  During a recent tour at ASH (described in more detail below), Mel Hunter, the Executive Director of the Hospital, explained that ASH has been experiencing an ongoing staffing shortage for at least four or five years.  The shortage was exacerbated, according to Dr. Hunter, by Defendants' refusal to permit ASH to advertise vacant positions.  DMH was able to "manage" this ongoing chronic shortage, however, without taking the extreme step of restricting admissions or bringing patient care to dangerously low levels.  Kahn Decl. ¶ 17.

The current staffing crisis is a product of Defendants' deliberate and intentional refusal to bring DMH clinical salary levels in line with recent CDCR pay raises, which were ordered by this Court after a finding that CDCR was unable to fill its vacant clinical positions due to salaries far below market rates.  In response to a recommendation made by the Special Master in the Sixteenth Monitoring Report that CDCR salaries were too low to attract necessary mental health staff, Defendants submitted a salary matrix that proposed salary increases for mental health clinicians working for the CDCR.  *Id.* and "Sixteenth Monitoring Report" (Docket 2081), Ex. T.  On December 15, 2006, this Court adopted the Special Master's Recommendation that Defendants increase salaries for mental health clinicians employed by the CDCR.  12/15/06 Order at 1:17-22 (Docket 2083).  Plaintiffs filed a motion on December 18, 2006 requesting that the pay raises ordered by the Court also apply to DMH facilities so as to avoid "the inevitable staffing crisis at DMH programs" that was sure to result from the pay disparity.  *See* Plaintiffs' Response to the Special Master's Sixteenth Monitoring Report and

1    Request for Additional Order" (Docket 2085) at p. 5.[4]  Defendants eventually agreed to apply

2    the salary increases to DMH-run programs within CDCR prisons, but refused to extend the

3    increases to staff working in state hospitals such as ASH and Coalinga State Hospital ("CSH"

4    or "Coalinga").  Defs' Resp. re Sixteenth Report at p. 4 (Docket 2115).  They asked the Court

5    to reject Plaintiffs' request for an order requiring salary parity for DMH clinicians at other

6    DMH facilities that treat *Coleman* class members, including Coalinga, ASH, and Patton.  *Id*.

7    Along with their response, Defendants filed an exhibit that summarized the salary

8    discrepancies between the new salaries for clinicians in CDCR (and DMH clinicians working

9    in CMF and SVSP) and the salaries of all remaining DMH clinicians.  *Id*. at Ex. A.  For

10   example, Chief Psychiatrists working for DMH will earn between $11,614 and $14,309 per

11   month, while the Chief Psychiatrists working for CDCR (or for DMH programs in CMF or

12   SVSP) will earn $20,672-$24,874 per month – nearly double that of their DMH counterparts.

13   *Id*.  These large disparities exist for every clinician category.  *Id*. at 2:11-15.

14          The Special Master reported on this issue on January 30, 2007.  Special Master's Report

15   on Pltfs.' Resp. to the Sixteenth Report, 1/30/07 (Docket 2121).  The Special Master noted that

16   pay raises for CDCR clinicians "may, indeed, result in defections of DMH clinicians for

17   positions in CDCR."  *Id*.  The Special Master stated that "for the first time in the history of

18   *Coleman*, Atascadero State Hospital has turned away referred and accepted CDCR inmates

19   because of a lack of adequate staff to treat them."  *Id*. at p. 4.  The Special Master found,

20   however, that he had an insufficient factual basis to make any further recommendations on the

21   need for additional salary enhancements.  *Id*. at p. 5.  He instead recommended that Defendants

22   

23   _____

     [4] In this filing, Plaintiffs documented the well-established trend of employees at DMH
24   relocating to CDCR (or vice versa) in response to a salary change made by one agency but not
     the other.  *Id*.  Based on an awareness of this trend, Plaintiffs first argued that Defendants
25   needed to increase salaries for DMH clinicians who were working for DMH programs located
     *inside* CDCR institutions, because those programs would be most susceptible to defections by
26   DMH clinicians.  *Id*.  Plaintiffs also voiced their concern that DMH programs – even those
     located outside CDCR prison walls – would likewise be affected: "[t]he pay disparity will
27   likely also result in the loss of DMH clinicians in existing programs who will leave their
     positions to pursue higher-salary work with CDCR such that DMH units will be left
28   understaffed and *Coleman* class members will be deprived of much-needed clinical care."  *Id*.

1  be directed to submit to the Court an assessment and plan "to meet the issues created by the

2  disparity in pay for DMH clinicians providing mental[] health services to CDCR inmates in

3  CDCR institutions and those providing services to CDCR inmates in all other DMH

4  institutions." *Id.* at pp. 5-6.

5       The Court adopted this recommendation, and on February 7, 2007, ordered such a plan

6  be submitted to the Court in 60 days. 2/7/07 Order at p. 2:2-8 (Docket 2134). The Court also

7  ordered that Defendants submit monthly reports to the Special Master on staffing and staffing

8  vacancies in all DMH hospitals with programs providing mental health services to CDCR

9  inmates. *Id.*[5]

10       Plaintiffs continued to raise the likely DMH staffing crisis during *Coleman* policy

11  meetings and phone calls. At the December 6, 2006 policy meeting, for instance, Plaintiffs'

12  counsel raised concerns over Defendants' failure to address any DMH salaries in their original

13  proposal. Dr. Peter Farber-Szekreyni, the Director of Health Care Services at that time,

14  acknowledged Plaintiffs' concern that DMH clinicians might leave for the higher salaries in

15  CDCR but noted that DMH staffing vacancies would be monitored. The DOF representative at

16  the meeting stated that the issue "was on their radar." DMH officials at the meeting refused (at

17  the advice of counsel) to respond to questions concerning the likely impact of the CDCR salary

18  increase on DMH's ability to recruit and retain clinical staff. Kahn Decl. ¶ 4.

19

20

_____

21  [5] The fact that Defendants must report on the DMH salary disparity and their plan to address
22  that problem by April 9, 2007, should not deter this Court from issuing an Order now about
   DMH staffing issues. This is not a problem that can wait for yet another unspecified plan of
23  action. Staff are leaving DMH in droves; every month that goes by translates into huge
   amounts of time and resources that DMH will have to spend to recruit and train new staff
24  members. *See e.g.*, Declarations of William Safarjan, Malvern Holland and Paul Guest in
   Support of AFSCME's *amicus* brief (Docket Nos. 2125-2127) (ASH currently has a 56 percent
25  psychologist vacancy rate; at least 50 percent vacancy rate of psychologists at CSH and
   approximately half of the mental health staff have already interviewed or are planning to
26  interview with the CDCR; 10-20 percent of Patton mental health staff have already or plan to
   interview with CDCR). The scope of this issue has far exceeded mere salary and staffing
27  issues. DMH has actually closed its hospital doors to CDCR patients, and the only meaningful
   remedy is to order DMH to open these doors and make these beds available to *Coleman* class
28  members. There is a very short window of time within which to address this crisis.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR EMERGENCY RELIEF REGARDING
DEFENDANTS' DENIAL OF ACCESS TO INPATIENT PSYCHIATRIC BEDS IN DMH'S STATE HOSPITALS, NO.: CIV S 90-0520 LKK-JFM

On January 24, 2007, Cindy Radavsky, Deputy Director of DMH, wrote to Special Master Keating officially notifying him that DMH was closing ASH to new admissions due to staffing limitations. *Id.* ¶ 5 and Ex. B. In her letter, Ms. Radavsky indicated that the restriction on admissions applied to all beds in ASH, not just CDCR beds. She further noted DMH had established a prioritization of referrals who might still gain access to ASH during the staffing crisis, and CDCR referrals were close to the bottom of the list. The staffing shortages, she wrote, were driven by both vacancies and illness, which resulted in only 9 psychiatrists, including the Medical Director and Chief of Staff, being available to meet ASH's needs. She also wrote that while there were 17 full time psychiatrist positions filled, 5 of those practitioners were on long-term leave and others were not available on a day-to-day basis due to illness, scheduled days off, or because they were testifying in court. *Id*. Ms. Radavsky informed Special Master Keating that "[t]his situation has risen to crisis levels due to ASH's high vacancy rate in the psychiatry department." *Id.*

On January 30, 2007, State Assembly member Sam Blakeslee (R-San Luis Obispo) identified the emergency staffing situation in a letter to DMH Director, Defendant Steven Mayberg. In the letter, Representative Blakeslee asserted that, "[u]nless this issue is promptly addressed, the lack of pay equity and poor working conditions will further exacerbate the hemorrhaging of professional staff from ASH to the [local CDCR institutions]." *Id.*¶ 39 and Ex. L. Indeed, ASH Medical Director David Fennell announced on February 23 (one day after the *Coleman* DMH tour described below) that he, too, would be leaving ASH to begin a position as a CMC senior psychiatrist on March 26. *Id.*¶ 40 and Ex. M.

On February 1, 2007, there was another *Coleman* policy meeting. During the discussion about the CMF-ASH swap of acute beds, Cindy Radavsky reported that because of the staffing vacancies at ASH, DMH had been redirecting all acute patient referrals to CMF. Meanwhile, there were 28 CDCR patients on the waiting list for an acute psychiatric bed. There was also discussion about news coverage of ASH's decision, in mid January, to restrict admissions. Ms. Radavsky was unwilling to say that staff were leaving solely because of the increased compensation offered to CDCR clinicians; however, she did state that she believed that she

1   could keep staff if she were able to match CDCR salaries.  The Governor's representative at

2   the meeting assured everyone that the Department of Finance ("DOF") continued to "review"

3   the issue of DMH salaries.  Kahn Decl. ¶ 8-9.

4         On February 21-22, 2007, the parties and the Special Masters' Team conducted a

5   comprehensive two-day tour of DMH hospitals, including Atascadero State Hospital (ASH),

6   Coalinga State Hospital (CSH), and the DMH units at Salinas Valley State Hospital (the free-

7   standing DMH treatment unit called the SVPP, and the D-6 unit which is a unit run by DMH in

8   the D-wing of SVSP).  Kahn Decl. at ¶¶ 10-19.  At a time when there is a dire shortage of ICF

9   beds, Defendants have failed to open the D-5 unit at SVSP, a unit that will eventually house 56

10  patients.  DMH also reported during the two-day tour that it could only provide 10 hours of

11  programming time to patients at Coalinga due to staffing shortages and that they had no plan to

12  house more than 50 *Coleman* class members in that hospital.  More detail about this tour,

13  including the severe staffing shortages at DMH hospitals, is provided below.  In general,

14  however, the tour of ASH, CSH and the DMH units at SVSP illustrated the dire and ongoing

15  staffing problems at DMH and the harm to the Plaintiff class that continues to result.

16        On March 13, 2007, the parties and the Special Master's team had a follow-up

17  conference call to discuss issues raised during the February 21-22 DMH tour.  Cindy

18  Radavsky, Deputy Director of DMH, reported during that call that there was no change to the

19  admission situation at ASH and that, as of March 6, 2007, she had also been forced to slow

20  admissions to Napa State Hospital due to staffing shortages.  She also said that she expected to

21  close units at Napa and Patton State Hospitals soon, referring to the "domino effect" of staffing

22  shortages throughout DMH.  Kahn Decl. ¶ 36.  Meanwhile, there have been two suicides at

23  ASH by *Coleman* class members since January 1, 2007.  Prior to January 1, 2007 and the

24  current staffing crisis, suicides in ASH were historically very rare, with only three suicides by

25  *Coleman* class members since 2000.  *Id.* ¶¶ 24-25.

26

27

28

**ARGUMENT**

**I.    Defendants' Failure To Ensure Adequate Staffing Levels At DMH Facilities And Failure To Maintain Sufficient Beds Violates Numerous Court Orders Issued By This Court**

This Court has repeatedly ordered that DMH play an integral role in remedying the constitutional inadequacy of the CDCR's Mental Health Services Delivery System.  DMH is the sole provider of inpatient beds, the highest level of care, to the most acutely ill *Coleman* class members.  This Court has time and time again expressed its concern with Defendants' inadequate inpatient psychiatric programs and the extreme delays experienced by *Coleman* class members who require that level of mental health care.  The Court found last year that the severe shortage of intermediate care facility beds, "is leaving critically mentally ill inmates languishing in horrific conditions without access to immediately necessary mental health care." 5/2/06 Order at 2:16-18.  Defendants themselves admitted there is a shortage of 125 ICF beds. *Id.* at 2:22.

In light of this shortage of beds, it is essential that *each and every* promised DMH inpatient bed be open and available to CDCR inmates.  This Court has ordered defendants to do all in their power to accelerate building projects and conversions, staffing and licensing in order to rapidly increase the number of inpatient beds available for use.  Yet despite these orders and despite the acknowledged severe shortage of these beds, Defendants have actually *closed* critical inpatient beds at ASH.  This Court has specifically forbidden Defendants from taking such action.  Defendants' decision to close ASH and restrict admissions to other DMH facilities flagrantly violates this Court's order that "defendants shall not close any intermediate inpatient bed…on the basis of state licensing requirements without approval of the special master." 5/2/07 Order at 6:9-11.  Despite this Order, Defendants willfully ignored the obvious reality of the impending staffing crisis, thereby allowing staffing ratios to violate state licensing requirements.  The Deputy Director of DMH, Cindy Radavsky, stated that "the decision to restrict ASH admissions…is in response to licensing requirements for staffing ratios." Kahn Decl., Ex. B.  By unilaterally restricting access to ASH's inpatient beds without

1   consulting or seeking approval of the Special Master, Defendants are violating this Court's

2   order.

3         Defendants are also in violation of this Court's many orders that name ASH as an

4   integral part of the *Coleman* inpatient programs.  As this Court declared in its June 28, 2006

5   Order, "DMH plays a critical role in creating sustainable and effective solutions for inpatient

6   care" within the CDCR.  6/28/06 Order at 2:1-2 (Docket 1855).  ASH has been providing

7   inpatient psychiatric services to CDCR inmate-patients for decades and Defendants have

8   consistently included DMH beds in their plans to meet the projected mental health bed needs

9   of the *Coleman* class.  Thus, the decision to close ASH to CDCR inmate-patients violates

10  numerous court orders, including, but not limited to, the March 3, 2006, May 2, 2006, and

11  October 20, 2006 Orders.  The Program Guide also specifically requires that DMH provide

12  inpatient psychiatric care to *Coleman* class members and specifies the availability of inpatient

13  beds at specific DMH institutions, the vast majority of which are at ASH.  When describing

14  which DMH institutions "are available for referrals for the indicated level of care," the

15  Program Guide names ASH as an institution available to provide Emergency Acute care as

16  well as Intermediate Care.  *See Program Guide*, Ch. 6 at 1.  The Program Guide is not an

17  optional or advisory standard, but a court-ordered and court-implemented system for delivery

18  of constitutionally adequate mental health services.  Thus, Defendants' failure to ensure that

19  ASH beds remain open to the *Coleman* class is a direct violation of this Court's order to

20  "immediately implement" all provisions of the Revised Program Guide.  *See* 3/3/2006 Order at

21  2:10-11 (Docket 1773).

22        This Court also included ASH as a specific remedy in this case in its orders regarding

23  the 25-bed "swap" between ASH and CMF, which was designed to increase access to acute

24  inpatient psychiatric beds by allowing DMH to "swap" 25 acute beds between ASH and CMF.[6]

25  In its October 20, 2006 Order, this Court ordered the Special Master to "monitor closely the

26

27  ─────────────────────

[6] *See* footnote 3 for a description of the ASH/CMF swap.

28

swap of acute inpatient beds between California Medical Facility and Atascadero State Hospital." Order at ¶ 3. Defendants' closure of ASH beds renders this Order meaningless and undermines the remedial efforts of this Court.

Additionally, this Court specifically ordered *all* Defendants to facilitate the placement of CDCR inmates at DMH hospitals. On May 2, 2006, Defendants were ordered to "take all steps necessary to facilitate promptly" the placement of ICF-level inmates in the DMH programs at ASH or Coalinga. 5/2/06 Order at 5:9-17 (Docket 1800). This order applied at the time to the 123 inmates "presently awaiting placement" in ICF programs. *Id.* Defendants are under an ongoing obligation to review wait-listed inmates for placement at ASH or Coalinga. Closing ASH negates even the possibility that these men will be placed in appropriate mental health beds.

Defendants have acted with reckless disregard to the critical needs of the *Coleman* class for access to inpatient psychiatric beds by taking a "wait and see" attitude to an obvious threat to their ability to staff DMH hospitals at safe levels. The CDCR salary levels were established by Defendants themselves, not this Court. It was Defendants' responsibility to act promptly to establish parity between CDCR salaries and DMH salaries once the crisis was evident in mid-January. Yet months later, Defendants still are playing games with inadequate DMH pay raises, an additional "wait and see" delay tactic. While they wait, Coleman class members continue to suffer and sometimes die, as a result. Today, ASH remains closed to CDCR admissions.

## II.  This Court Should Order Defendants To Take All Necessary Steps To Open ASH's 256 Beds To The *Coleman* Class Within 30 Days

### A.  Defendants' Closure Of ASH To CDCR Patients Has Exacerbated The Critical Shortage Of Acute And ICF Beds Throughout The System

Before this crisis, *Coleman* class members had access to 130 licensed acute psychiatric beds run by DMH (105 at CMF and 25 at ASH). Even those beds were not enough—CDCR's own population projections show that there is a current need for 203 acute beds in 2007 and that there will be a need for 211 acute beds by 2008. *See* Docket 1867, Ex. A-1 at p. 5

1    (Defendants' June Bed Plan).  This means that while there was already an anticipated shortage

2    of 73 acute beds for 2007 and 81 acute beds for 2008—had the ASH acute beds remained

3    open—there will now be a shortage of 98 beds in 2007 and 106 beds in 2008.  *Id.*

4        The effect of the ASH closure on ICF beds is also dire.  Despite Defendants' projections

5    that the *Coleman* class needs 267 ICF level I-III beds in 2007 and 279 in 2008, the current

6    DMH crisis means there are at most 200 of these beds available (100 at ASH, 50 at CSH, 10 at

7    Napa and Metropolitan and 35 at CMF-Vacaville).[7]  *See* Docket 1867, Ex. A, Enclosure I at p.

8    16 (Defendants' Interim June Bed Plan); Kahn Decl. Ex. K (showing CMF A-3 unit capacity

9    as 35 beds).  The extreme shortage of lower security level ICF beds also worsens the ongoing

10   shortage of high custody level IV ICF beds since Defendants have now begun to house lower

11   custody inpatient class members in the level IV ICF beds at SVSP and CMF.  Kahn Decl. ¶ 33.

12   The shortage of any category of beds also necessarily exacerbates the shortage of all MHCB

13   beds because many class members will remain improperly housed in MHCB, EOP, OHU or

14   administrative segregation beds when they have already been identified as needing higher

15   levels of care.  This pattern is already evident from the diversion of patients recently referred to

16   ASH to inappropriate beds in other facilities, such as the hospital at CIM.  Kahn Decl. ¶ 7

17   (describing eight actual patients who have been directly harmed by ASH's closure and who

18   continue to linger in inappropriate beds).

19

20

21

22

23
_____

24   [7] There is no question that the programs and beds available at ASH are extremely valuable to
     the *Coleman* class.  This is not just because ASH has historically provided the most beds, but

25   also because the Penal Code 2684 patients at ASH are fully integrated with the other Penal
     Code patients.  At ASH (but *not* at Coalinga State Hospital), the *Coleman* patients are

26   permitted to use all general areas on the "mall" and are not segregated from other patients like
     the CDCR patients are segregated at Coalinga.  All ASH patients, including CDCR 2684

27   patients, wear the same khaki clothing and are consistently referred to as "patients," not
     "inmates."  Kahn Decl. ¶¶ 10,19.

28

**B.    The Staffing Shortages At DMH Are Creating A Crisis For *Coleman* Class Members That Warrants Emergency Action By This Court**

The staffing shortages at DMH were a major theme that came up over and over again during the two-day tour of ASH, CSH and SVSP on February 21-22, 2007.[8]  Coalinga State Hospital (CSH) staff reported, for instance, that there were 6 or 7 psychologist vacancies out of 30 budgeted positions (with no contract staff for those positions), that there were 10 vacancies of rehabilitation therapists out of 20 budgeted positions and that there were 22 vacancies of social workers out of 30 budgeted positions.  Kahn Decl. at ¶ 11.  Recent staffing statistics provided by DMH show that CSH had 21.3 senior and staff psychologist positions vacant (out of 40.3 budgeted positions) and 37.6 senior and staff psychiatrist positions vacant (out of 40.1 positions) as of February 15, 2007.  *Id.* ¶ 13.  CSH staff also reported on February 21 that 5 registered nurses had left recently for CDCR jobs and that several more were likely to leave.  Although CSH lost only 2 psychologists in the last 1 ½ years it has been opened, staff reported during the tour that they lost 2 in January alone (in addition to losing 2 pharmacists and 1 nurse practitioner).  All of the staff members we talked to during the tour stated that the staffing exodus was due in large part to salary disparity in the CDCR.  *Id.*, ¶¶ 11-13.

The story at ASH was even worse.  Although ASH was obligated to make 256 beds available to CDCR 2684 patients as of July 2006 (25 acute and 231 ICF), the patient census during the tour was 110 ICF patients and 0 acute patients.  Kahn Decl. ¶ 17.  The Executive Director, Mel Hunter, reported that ASH is now in a "crisis staffing mode."  Although a federal consent decree requires ASH to have a minimum of 70 psychiatrists, ASH reported that it had only 17.5 psychiatrist positions filled and that 2 of those were leaving in the coming weeks.

---

[8] As this Court recognized in its original *Coleman* decision, one of the essential components of a minimally adequate mental health treatment program is the employment of sufficient numbers of trained mental health professionals to identify and treat inmates with serious mental illness in an individualized manner.  *Coleman v. Wilson,* 912 F. Supp. 1282, 1306 (E.D. Cal. 1995) *citing Balla v. Idaho State Bd. of Corrections*, 595 F. Supp. 1558, 1577 (D. Idaho 1984); *see also Ruiz v. Estelle*, 503 F. Supp. 1265 (S.D. Tex. 1980) (formulating six components of minimally adequate mental health treatment program, of which one is adequate staffing).

Dr. Hunter also explained that he could not fill the vacant positions with contract psychiatrists because no such contract exists. Dr. Hunter estimated that he would need 50 percent vacancy rates before he could admit patients again, including a minimum of 34 psychiatrists. *Id*. As of the tour, ASH had a total census of 1230 patients, but reported that it had to reduce that number by 102 patients (to 1128) because of the severe staffing shortages. *Id*. Recently produced DMH staffing data in response to this Court's order show no improvement. *Id.* ¶ 18 and Ex. G (showing 55.4 vacant senior and staff psychiatrist positions out of 79.4; 37.6 vacant senior and staff psychologist positions out of 72.4, and; 39 vacant rehabilitation therapist positions out of 80.5 positions).

Meanwhile, patients are being turned away from ASH and diverted to inappropriate levels of care. In their monthly reports on bed utilization, Defendants listed seven patients who were admitted to ASH, but remained on the waitlist in other bed placements because of the admission restrictions. Plaintiffs' counsel also received notice of one acutely mentally ill patient who was returned to custody from parole solely for psychiatric care, and has spent the last four months in the CIM Hospital while a transfer to ASH was being pursued. According to Defendants, his transfer is on hold pending the opening of ASH to intake. His current placement means not only that he is receiving inappropriate care, but also that he is occupying a bed that is a scarce and oversubscribed resource for other mentally ill patients in the CDCR system. Kahn Decl. ¶ 7.

### C. The Current Staffing Levels Are So Low That *Coleman* Class Members Housed In DMH Programs Are In Danger And Are Not Receiving Adequate Programming

But the harm to the *Coleman* class results not just from DMH restricting admissions of class members and decreasing the number of 2684 patients; the staffing crisis throughout DMH is so severe that *Coleman* patients *already admitted* to DMH hospitals are being exposed to dangerously low levels of staffing and services. The *San Luis Obispo Tribune* reported that since staff vacancy rates have soared, the frequency of "red light warnings," used by staff to signal when a patient situation is beyond their control, has increased. Kahn Decl. ¶ 41 and Ex. N. One clinical employee from ASH stated that "[t]he people working out there on the units

are so tired and so worn down that they can't do their job properly and that endangers the patients." *Id.* These news reports are consistent with the restricted and minimal hours of clinical programming reported to the *Coleman* Team during the DMH tour and with the recent increase in suicides and suicide attempts. Between 2000 and 2006, a total of three CDCR patients committed suicide at ASH. ASH reports that over the past six years, it has averaged less than one attempted suicide per month. Kahn Decl. ¶ 25 and Ex. I. In February of 2007, alone, there were four suicide attempts at ASH. There have also been two completed suicides by CDCR patients at ASH in the first three months of 2007.[9] *Id.* This is an unprecedented number of suicides at DMH.

There are also problems at Coalinga State Hospital. Because of staffing shortages, CSH staff reported during the recent DMH tour that they have only been able to provide 10 hours of weekly programming to *Coleman* class members (about one half of the necessary treatment for ICF patients). When asked whether there were plans to increase the number of programming hours at CSH, Defendants stated that it would take a "Herculean effort" to hire enough staff to deliver more hours. Defendants did not indicate that such an effort is currently underway. *Id.* ¶ 10.

**III.    This Court Should Order Defendants To Take All Necessary Steps To Accelerate The Opening Of All Beds At Coalinga State Hospital**

During the two-day tour of DMH facilities, Defendants informed the Special Master and Plaintiffs' counsel that Defendants do not plan to increase the overall patient population at Coalinga to anywhere near its 1,500 bed capacity in the next few years. With respect to *Coleman* class members in particular, Defendants stated unequivocally that they have no intention of housing more than the 50 current CDCR patients. In terms of CSH's overall population, which is at a current census of 470, Defendants stated that they have only requested budgeting to increase the beds to 717 by July 2007 and 922 by July 2008. Kahn Decl. ¶ 14. Given the difficulty in recruiting and retaining clinical staff, it was unlikely that

---

[9] In addition, there were two suicides in the acute unit at CMF in January 2007. *Id.* ¶ 25.

Coalinga could meet even those modest goals by 2008.  Even assuming that none of Coalinga's additional beds will be used for the *Coleman* class, the delayed opening of these beds harms all *Coleman* class members.  *Id.*  Unless this Court intervenes, Coalinga, which is DMH's flagship state-of-the-art hospital, at best will be operating at only sixty percent capacity even by 2008.  According to statements by Ms. Radavsky during a March 13, 2007 conference call, admission and population levels at all DMH hospitals are inter-related, and the effect of opening or closing beds at one hospital has a domino effect on the other hospitals. *Id.*  If nearly 600 beds at Coalinga will remain empty, patients are occupying much-needed beds elsewhere in the DMH system.  Defendants stated that they have the executive ability to add staff positions at Coalinga if they need them, but they are not planning to do so.  *Id.*

This slow-motion roll-out of beds at Coalinga is unacceptable and bars the *Coleman* class from crucial DMH resources.  There is an urgent need for more beds to be open at Coalinga right now.  Whether defendants use these beds for Sexually Violent Predators, MDO's, or directly for *Coleman* class members, opening them will increase access by relieving pressure on other DMH facilities.  By failing to open more beds at Coalinga in a timely manner, Defendants are thumbing their collective noses at this Court, at the Court-ordered Program Guides and at the constitutional rights of the *Coleman* class.

**IV.    This Court Should Order Defendants To Take All Necessary Steps To Open The D-5 Unit At SVSP By June Of 2007 And To Ensure That All Patients Housed In D-5 And D-6 Have Immediate Access To 20 Hours Of Programming In Addition To Yard Time On The Grassy Yard**

On May 2, 2006, this Court ordered Defendants to open 36 intermediate inpatient beds at SVSP by May 30, 2006, and an additional 36 intermediate inpatient beds using the same licensing waivers used to create the first 36 beds on the same accelerated timeframe.  5/2/06 Order ¶¶ 7-8.  That Order was issued by this Court after a series of hearings and briefings about the horrifying shortage of intermediate care facility and mental health crisis beds in the CDCR:

> It is undisputed that the shortage is leaving critically mentally ill inmates languishing in horrific conditions without access to immediately necessary mental health care…Dr. Peter Farber-Szekrenyi…CDCR's Director of Health Care Services…repeatedly referred to the shortage as a 'crisis,' a

-16-

1

2

3

> description entirely supported by the record before this court.  Dr. Farber-Szekrenyi testified that at present there is a shortage of 75 mental health crisis beds and 125 intermediate inpatient beds.  In the latter category, the most serious shortfall is in beds for inmates who have a Level IV security classification.

4  5/2/06 Order at pp. 2-3.  In response to this order, on June 14, 2006, Defendants submitted an

5  interim bed plan that provided for the expedited conversion of an additional 76 Intermediate

6  Care Facility ("ICF") beds at Salinas Valley State Prison ("SVSP"), located in D-5 and D-6,

7  for a total of 112 temporary beds.  June Interim Bed Plan (Docket 1873-2) at p. 20.  According

8  to that plan, the conversion of these housing units to ICF beds would be expedited so that D-6

9  would be completed by August 1, 2006, and D-5 would be completed by December 31, 2006.

10  *Id*.  These deadlines are also reflected in the Special Master's Seventeenth Monitoring Report

11  (Part A).  Docket 2140 at p. 121 ("The defendants were also committed to opening a final

12  component of 56 beds on D-5 at SVSP by December 31, 2006.")  In addition, Defendants'

13  interim bed plan provided that "DMH and CDCR will ensure appropriate staff is available to

14  begin operation of the interim ICF beds upon completion of construction and licensing."  *Id.*

15  The Court approved Defendants' interim plan regarding the D-5 and D-6 units.  10/20/06

16  Order ¶ 6.[10]

17        The D-5 and D-6 units are intended to fill the critical shortage of Level IV intermediate

18  care beds identified in this Court's orders until permanent and appropriate ICF units can be

19

20

21

22

23

24  _____

25  [10] The D-5 and D-6 units at SVSP are *temporary* DMH-run inpatient care units intended to provide a short-term solution to the urgent shortage of high custody level IV inpatient mental health beds.  The history and origin of the D-5 and D-6 units is set forth in detail in the supporting Kahn Declaration.  Kahn Decl. ¶¶ 26-27.  These units, each of which will provide 56 ICF beds (for a total of 112) are temporary largely because they lack sufficient programming and treatment space.  *Id.*  Nevertheless, these units are essential interim solutions to the system-wide shortage of ICF beds.

26

27

28

1    built at SVSP and CMF. While D-6 did open in May of 2006,[11] the opening of D-5 has been

2    delayed and, as Plaintiffs' counsel recently learned, may be *indefinitely on hold* due to apparent

3    staffing shortages, custody regulations and/or labor problems. Kahn Decl. ¶ 35. Meanwhile,

4    as of the February DMH tour, there were 111 patients on the SVPP waiting list with EOP

5    general population inmates waiting between 140-180 days for transfer after acceptance into a

6    DMH bed. *Id.* ¶ 32. In other words, if Defendants open the 56 beds in D-5, the ICF waiting

7    list would be cut in half. In his Seventeenth Monitoring Report, the Special Master found that,

8    "[t]he lengthy waiting list at DMH/SVPP was the greatest single obstacle to DMH intermediate

9    inpatient care for Level IV inmates, resulting in inordinate delays between most referrals and

10    actual transfers to the program, delays that reportedly made referrals to the program seem futile

11    to many CDCR clinicians." Docket 2140 at p. 122.

12        Despite the repeated attention of this Court and the Special Master's team to the

13    opening of D-5 (and the issue of yard in D-6), Defendants have failed to fulfill their obligations

14    under Court orders, California law, and the Constitution. Whatever the reasons are for the

15    delay, whether they be staffing problems, yard access problems, or custody problems, the point

16    is that Defendants (who include the Governor's Office, DMH, the Department of Finance and

17    custody personnel) have the tools to solve the problems and to provide necessary ICF

18    placements without sacrificing programming and yard time. Accordingly, Plaintiffs request

19    that this Court order Defendants to take all necessary steps to open the D-5 unit at SVSP by

20    June of 2007, at the latest, and take all necessary steps to ensure that all patients housed in D-5

21

22

23

24    [11] Although the D-6 unit opened in May 2006, the first day that inmate-patients in the unit received a single minute of yard time was March 8, 2007. For a full history of the yard problem at SVSP and the effect that problem is having on the shortage of ICF beds system-

25    wide, see the Kahn Decl. at ¶¶ 26-35. As explained in that declaration, Plaintiffs learned recently that D-6 patients were finally provided with yard for the first time on March 8, 2007.

26    Because of the staffing requirements for that yard, however, which is in a segregated concrete enclosed area rather than SVSP's grassy yard, the clinical programming in D-6 has been

27    reduced from twenty hours per week to fewer than ten hours per week. Moreover, the yard issue on D-6 is hampering Defendants' ability to open the D-5 unit. *Id.*

28

1    and D-6 have immediate access to 20 hours a week of clinical treatment and programming in

2    addition to appropriate yard time on the grassy yard.

3    **V.    This Court Should Order Defendants To Take All Necessary Steps To**
     **Ensure That Patton, Napa And Metropolitan State Hospitals Remain Open**
4    **To The *Coleman* Class**

5         While ASH has already restricted admissions and is in the process of lowering its

6    census, it has become apparent that the DMH staffing crisis has begun to affect Napa, Patton

7    and possibly Metropolitan State Hospital as well.  Cindy Radavsky, the Deputy Director of

8    DMH, reported during the March 13, 2007 conference call that, in addition to ASH, she had

9    also been forced to slow admissions to Napa State Hospital due to staffing shortages.  She also

10   said that she expected to close units at Napa and Patton State Hospitals soon, referring to the

11   "domino effect" of staffing shortages throughout DMH.  Kahn Decl. ¶ 36.  It is imperative that

12   this Court curb any pending closures or slowed admissions at these hospitals as well.

13        CDCR patients are housed at each of these facilities.  Special Master's R&R on Defs'

14   December 2006 Bed Plan (Docket 2133) at p. 6.  In addition, DMH manages its population by

15   transferring patients between DMH hospitals.  Thus, reduced capacity at any DMH hospital

16   will have an adverse effect on *Coleman* class members.

17                                    **CONCLUSION**

18        For all of the above reasons, Plaintiffs respectfully request that the Court issue the

19   following emergency orders:

20        1.    Defendants shall take all necessary steps, including but not limited to appropriate

21   salary increases in full parity with CDCR, to retain and hire adequate clinical and custody

22   staffing levels to safely open every one of the 256 contracted ASH beds to *Coleman* class

23   members within 30 days of the date of this Order.  ASH shall not limit or restrict admissions to

24   those 256 CDCR beds without leave of Court.

25        2.    Defendants shall take all necessary steps, including but not limited to salary

26   increases in full parity with CDCR, to retain and hire adequate clinical and custody staff at all

27   other DMH hospitals that house CDCR patients.  DMH shall not limit access or restrict

28   admissions to CDCR beds without leave of Court.

1     3.     Defendants shall take all necessary steps to fully open the D-5 unit at SVSP by

2  June of 2007.  Defendants shall also ensure that all patients housed in D-5 and D-6 have access

3  to a minimum of 20 hours a week of clinical treatment and programming in addition to

4  appropriate yard time on the grassy yard within 10 days.  The SVSP Warden shall supply

5  sufficient custody officers to the control rooms of D-5 and D-6, for escorts and for yard

6  supervision to assure compliance with this order and shall assure that any CDCR obstacles to

7  compliance with this provision are removed.

8     4.     Defendants shall take all necessary steps, including salary increases in full parity

9  with CDCR, to accelerate the opening of all beds at Coalinga State Hospital for patient

10  admission in order to reach full licensed capacity by July 1, 2009.

12  Dated:  March 23, 2007                    Respectfully submitted,

15                                            /s/ Michael W. Bien
                                              Michael W. Bien,
16                                            Rosen, Bien & Galvan, LLP
                                              Attorneys for Plaintiffs

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR EMERGENCY RELIEF REGARDING
DEFENDANTS' DENIAL OF ACCESS TO INPATIENT PSYCHIATRIC BEDS IN DMH'S STATE HOSPITALS, NO.:  CIV S 90-0520 LKK-JFM