1  PRISON LAW OFFICE
   DONALD SPECTER Bar No.: 83925
2  STEVEN FAMA Bar No.: 99641
   E. IVAN TRUJILLO Bar No.: 228790
3  General Delivery
   San Quentin, California  94964
4  Telephone: (415) 457-9144

5  ROSEN, BIEN & GALVAN, LLP
   MICHAEL W. BIEN Bar No.: 096891
6  JANE E. KAHN Bar No.: 112239
   AMY WHELAN Bar No.: 215675
7  LORI RIFKIN Bar No.: 244081
   SARAH M. LAUBACH Bar No.: 240526
8  315 Montgomery Street, 10th Floor
   San Francisco, California  94104
9  Telephone: (415) 433-6830

10 THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
11 CLAUDIA CENTER Bar No.: 158255
   LEWIS BOSSING Bar No.: 227402
12 600 Harrison Street, Suite 120
   San Francisco, CA  94107
13 Telephone:  (415) 864-8848

14

15 Attorneys for Plaintiffs

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington  98104
Telephone: (206) 447-0900

16                UNITED STATES DISTRICT COURT

17               EASTERN DISTRICT OF CALIFORNIA

18

19 RALPH COLEMAN,                     )   No.:  Civ S 90-0520 LKK-JFM
                                      )
20        Plaintiffs,                 )   **DECLARATION OF JANE E. KAHN IN**
                                      )   **SUPPORT OF PLAINTIFFS' MOTION**
21 vs.                                )   **FOR EMERGENCY RELIEF**
                                      )   **REGARDING DEFENDANTS' DENIAL**
22 ARNOLD SCHWARZENEGGER, et al.,     )   **OF ACCESS TO INPATIENT**
                                      )   **PSYCHIATRIC BEDS IN DMH'S STATE**
23        Defendants                  )   **HOSPITALS**
   _____)

24

25

26

27

28

I, Jane E. Kahn, do hereby declare under penalty of perjury as follows:

1.      I am an attorney admitted to practice law in California and an associate in the law firm Rosen, Bien & Galvan, one of the counsel of record for plaintiff class in this case.  I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify.  I make this declaration in support of Plaintiffs' Request for Emergency Relief.

### DECEMBER 6, 2006 POLICY MEETING

2.      On December 6, 2006 the Special Master held a Policy Meeting at the offices of the California Department of Corrections and Rehabilitation ("CDCR") which I attended. Attached hereto as **Exhibit A** is a true and correct copy of the Coleman Policy Meeting Agenda dated December 6, 2006.  Present at this policy meeting were Special Master Keating, Deputy Special Master Lopes, Coleman experts and monitors, plaintiffs' counsel including Michael Bien, Ivan Trujillo, Lori Rifkin, Sarah Laubach and Amy Whelan, defendants' counsel including Lisa Tillman, Michael Stone and Van Kamberian, and representatives from CDCR, Department of Mental Health ("DMH"), the Governor's Office and Department of Finance ("DOF").

3.      Cindy Radavsky, Deputy Director of DMH, and Vic Brewer, Executive Director of Salinas Valley Psychiatric Program ("SVPP") and CMF-Vacaville Psychiatric Program ("VPP"), responded to questions from the Special Master and plaintiffs' counsel regarding the status of DMH programs providing care to CDCR patients.  DMH runs and staffs all of the licensed inpatient psychiatric hospital beds available to the *Coleman* class, including all acute and Intermediate Care Facility ("ICF") beds.  Both acute and ICF beds are licensed beds, with acute reserved for patients who urgently require the highest level of mental health care to stabilize their condition.  ICF beds are designed for longer-term mental health treatment for patients who have a serious mental disorder requiring treatment that is not available within CDCR.  Ms. Radavsky reported that the D-6 unit at Salinas Valley State Prison, one of the temporary intermediate care facility units, currently had 40 patients in its 56 beds.  Defendants informed the Special Master and plaintiffs' counsel that the second temporary 56 bed unit, D-5,

would be activated on January 17, 2007.  Ms. Radavsky reported that the census at ASH was 128 CDCR patients in the intermediate care program and 7 CDCR patients in the 25 ASH acute beds designated for CDCR.  Defendants indicated that there was a current waiting list of 28 CDCR patients for acute beds despite the empty acute beds at ASH and a waiting list of 106 patients for Level IV ICF beds.

4.      The CDCR salary increases proposed by the Department of Personnel Administration ("DPA") were discussed during the December 6, 2006 policy meeting.  At that time, plaintiffs' counsel raised concerns over defendants' failure to apply the increases to DMH salaries.  Dr. Peter Farber-Szekreyni acknowledged plaintiffs' concern that DMH clinicians might leave for the higher salaries in CDCR but noted that DMH staffing vacancies would be monitored.  The DOF representative stated that the issue was on their radar.  DMH officials at the meeting refused (on the advice of counsel) to respond to questions concerning the likely impact of the CDCR salary increase on DMH's ability to recruit and retain clinical staff.

### DMH NOTIFICATION THAT ASH ADMISSIONS RESTRICTED

5.      On January 24, 2007, our office received an email copy of a letter sent by Cindy Radavsky to Special Master Keating officially notifying him that DMH was restricting admissions to ASH due to staffing limitations.  Attached hereto as **Exhibit B** is a true and correct copy of Radavsky Letter to Special Master Keating dated January 23, 2007.  In her letter, Ms. Radavsky indicated that the restriction on admissions applied to all beds in ASH, not just CDCR beds, however, she set forth a prioritization of referrals:  (1) Mentally disordered Offenders and Sexually Disordered Offenders who have reached their parole day; (2) Not Guilty By Reason of Insanity Referrals; (3) CDCR Referrals; and (4) Incompetent to Stand Trial Referrals.  In discussing the staffing limitations, she noted that they are driven by both vacancies and illness, which has resulted "in only 9 psychiatrists, including the Medical Director and the Chief of Staff, being available to meet the facility needs.  While they have 17 full time equivalents (FTEs) filled in this practitioner area, it alters on a daily basis due to required court testimony, illness, and scheduled days off as well as five practitioners of the 17

who are on long-term leave." *Id*. at 2. In describing the existing staffing situation, Ms. Radavsky informed Special Master Keating that "[t]his situation has risen to crisis levels due to ASH's high vacancy rate in the psychiatry department." *Id.*

6. It is my understanding that no CDCR patient has been admitted to ASH since January 2007. During the February 21, 2007 Tour of ASH with the Special Master, Mel Hunter, Executive Director at ASH informed us that there has been a moratorium on admissions of almost all groups of patients, including CDCR patients, in effect since January 18, 2007. I have been informed that at a public meeting of the Council on Mentally Ill Offenders attended by my colleague, Lori Rifkin, on March 14, 2007, DMH Director Mayberg also confirmed that ASH is closed to CDCR patient admissions due to staffing shortages.

7. The effects of the ASH closure on the *Coleman* class are immediate and dire. In the recent March 1, 2007 report on Monthly Bed Utilization, there are seven patients listed as admitted to ASH, but who were actually placed on the waitlist with the following explanations: "ASH initially accepted on 1/12/07, but ASH experiencing admission restrictions" or "Review pending change in admission restrictions." In addition, we received notice of one acutely mentally ill patient, not listed among the seven described above, who was returned to custody from parole solely for psychiatric care, under the "psychiatric return to custody" procedures, and has spent the last four months in the CIM Hospital while a transfer to ASH was being pursued. According to defendants, his transfer is on hold pending the opening of ASH to intake. This patient previously spent approximately six months in DMH care before being transferred to the CIM Reception Center, where he was then immediately placed in the CIM hospital and referred again for DMH care. Not only are these eight patients failing to receive the appropriate level of care, but they are occupying beds that are also scarce and oversubscribed resources for other mentally ill patients in the CDCR system.

## FEBRUARY 1, 2007 POLICY MEETING

8. On February 1, 2007 the Special Master held a Policy Meeting in Sacramento at CDCR headquarters which I attended. Attached hereto as **Exhibit C** is a true and correct copy of the *Coleman* Policy Meeting Agenda dated February 1, 2007. Present at this policy meeting

-3-

1  were Special Master Keating, Deputy Master Lopes, Coleman experts and monitors, plaintiffs'

2  counsel, defendants' counsel and representatives from CDCR, DMH and the Governor's

3  Office. DMH issues were the first item discussed during the meeting. Vic Brewer, the DMH

4  official in charge of the DMH inpatient programs at SVSP and CMF, reported on the on-going

5  obstacles to providing yard to DMH patients housed in D-6, the temporary ICF unit located in

6  the SVSP prison on Facility D. Mr. Brewer described labor negotiations between CDCR and

7  CCPOA as the primary obstacle to the provision of outside yard to the patients in D-6 where

8  patients have been housed since May 2006. Mr. Brewer also reported that he had submitted a

9  request on January 31, 2007 to activate the additional 56 ICF beds in D-5, that he expected to

10  open the first pod in that unit within 30 days and that he planned to fill all the beds by June 1,

11  2007. In response to questions about the current waiting list for Level IV ICF beds, Mr.

12  Brewer reported that there were 104 patients on the list despite 20 empty beds at SVPP. He

13  explained that he had been unable to fill the empty beds in large part because of CDCR

14  custody restrictions that prevented the movement of patients with SHU or single-cell status

15  into dorm rooms despite DMH treatment team recommendations that those patients were safe

16  and ready to be housed in dorms. DMH has been unable to fill the dorm beds since it opened

17  SVPP four years ago. Plaintiffs' counsel first learned of the practice of excluding these

18  patients from dorm housing, despite clinical recommendations, in early 2006 and objected to

19  the practice at that time. Attached hereto as **Exhibit D** is a true and correct copy of a March 28,

20  2006 email that I sent to Michael Stone, Lisa Tillman, Special Master Keating, and Deputy

21  Special Master Lopes about this issue. During a tour of SVPP on December 13-14, 2006, Mr.

22  Brewer informed Deputy Special Master Lopes and plaintiffs' counsel of the continuing

23  practice of excluding all patients with SHU and single-cell status from the dorm beds.

24  Plaintiffs' counsel objected to the practice for several reasons: (1) that there are empty dorm

25  beds at SVPP and a long waiting list for Level IV ICF beds; (2) Level IV patients with SHU

26  and administrative segregation status are priority admissions for SVPP but are denied access to

27  dorm beds when clinically ready, thereby creating a barrier to the normal flow of admissions;

28  and (3) CDCR custody staff are interfering with DMH clinical decisions and affecting access

to scarce beds.  Attached hereto as **Exhibit E** is a true and correct copy of my December 26, 2006 letter to Special Master Keating, Lisa Tillman, Michael Stone and Cindy Rodriguez about these issues.  On February 1, 2007, Mr. Brewer reported that CDCR had quite recently implemented an improved process for custody review of patients recommended for dorm housing and had reviewed 35 patients for a waiver or suspension of their SHU/single cell status within the past four days.  Upon request, defendants, however, were unable to provide any policy or procedure that documented this new improved process, and in fact, referred to it as an "improvisation."

9.    During the discussion of the CMF-ASH swap of acute beds on February 1, 2007, Cindy Radavsky reported that because of the crisis caused by the staffing vacancies at ASH, acute referrals to ASH had been redirected back to CMF.  At the same time, Ms. Radavsky reported that there were 28 CDCR patients on the waiting list for an acute bed.  There was discussion among the parties of the news coverage about ASH's restrictions on new patients in mid-January 2007.  Attached hereto as **Exhibit F** is a true and correct copy of the Los Angeles Times Article, "Prison Pay Hikes Drain Staff at State Hospitals: Lack of Health Workers Force Atascadero To Turn Away New Patients," dated January 27, 2007.  Ms. Radavsky was unwilling to say that staff were leaving ASH solely because of the increased compensation offered to CDCR clinicians; however, she did state that she believed that she could keep staff if she were able to match CDCR salaries.  The Governor's representative at the meeting stated that DOF continued to review the issue of DMH salaries.

### COALINGA STATE HOSPITAL TOUR: 2/21/07

10.    On February 21, 2007, Deputy Special Master Lopes, Coleman experts and monitors, plaintiffs' counsel Michael Bien, Amy Whelan, Lori Rifkin, Ivan Trujillo and Jane Kahn, defendants' counsel Lisa Tillman and Michael Stone, and representatives from California Department of Corrections and Rehabilitation ("CDCR") and California Department of Mental Health ("DMH") visited Coalinga State Hospital.  During the pre-tour meeting with Coalinga staff, including Deputy Director Tom Voss, we were provided with some basic information about the hospital.  According to Mr. Voss, of the 470 total patients at CSH, there

1  are 50 CDCR patients (PC 2684) housed in Unit 9, which was activated in May 2006.  He

2  reported that all of these patients were transferred from ASH to Coalinga and that Coalinga

3  does not take patients from any prison or hospital other than ASH.  Only eight of the original

4  50 CDCR patients transferred to Coalinga have discharged back to CDCR institutions or to the

5  community on parole and Coalinga staff indicated that they neither provide parole discharge

6  planning nor coordinate with TCMP (the CDCR program for pre-release planning for EOP

7  level prisoners preparing for parole) for patients who are paroling.  Staffing on Unit 9 has

8  reportedly been consistent because the staff enjoys working with the CDCR patients.  The

9  program for the CDCR patients was described in the following manner:  CDCR patients have

10 their own dedicated dining hall and yard; the majority of treatment activities occur on Unit 9;

11 CDCR patients are escorted by a psych tech or hospital police when they leave the unit to

12 attend activities or programming.  When staff were asked why the CDCR patients at Coalinga

13 are segregated in their meals, recreation, treatment and movement through the hospital, staff

14 reported that they were legally required by *Hydrick*, 449 F. 3d 978 (C.A. 9 2006) which is a

15 lawsuit filed by a group of sexually violent predators ("SVPs") at ASH challenging their

16 conditions of confinement.  In fact, Cindy Radavsky stated that the requirement to separate

17 these populations was why DMH told the Court that housing CDCR patients at Coalinga was a

18 bad idea in the first place.  Contrary to defendants' statements, however, *Hydrick* is in the pre-

19 trial stage of litigation and no substantive orders have been issued.  *Id.* at 992 ("we hold that

20 Plaintiffs have sufficiently alleged Defendants' role in the alleged constitutional violations

21 against SVPs to survive this motion to dismiss"). Staff reported that the CDCR patients at

22 Coalinga are provided fewer hours of treatment than CDCR patients at ASH – 10 versus 20

23 hours  per week – because of both staffing vacancies and staff's perception that CDCR patients

24 and SVPs must be separated, which makes the provision of 20 hours of treatment to the CDCR

25 patients at Coalinga more difficult.  Indeed, staff at CSH reported that it would take a

26 "Herculean effort" to hire enough staff to deliver more hours due to the staffing shortages.

27 ASH, the named defendant in the *Hydrick* case, does not segregate 2684 patients from SVPs.

28

11.     Mr. Voss also reported on current clinical vacancies during the pre-tour meeting. The numbers he provided indicated shortages in clinical positions, including psychology (6-7 vacancies out of 30 budgeted positions), rehabilitation therapists (10 vacancies out of 20 positions) and social workers (22 vacancies out of 30 positions).  He reported that he was using contract doctors to fill most of the psychiatrist positions at CSH, but that CSH did not have a current contract in place for psychologists.  During this discussion, we learned that 5 RNs had recently left Coalinga for jobs at CDCR, that CDCR had made reference calls regarding rehab therapist and social worker applications, and that several other nurses had inquired about the salary increases.

12.     In response to the Court's 2/7/07 Order to provide monthly reports on staffing and staffing vacancies in all DMH hospitals with programs providing mental health services to CDCR patients, defendants submitted a report on staffing vacancies for each DMH facility where CDCR patients are currently treated.  Attached hereto as **Exhibit G** is a true and correct copy of Defendants' Response to the Court Order to Address Pay Parity Issue for Department of Mental Health Clinicians, dated March 6, 2007 and provided to Special Master and plaintiffs' counsel on March 13, 2007.  This document reports data as of January 1, 2007 and February 15, 2007.  The data confirms the extensive vacancies that exist at ASH, Coalinga and the other DMH hospitals where CDCR patients receive treatment.

13.     The data, for instance, reports significant staffing vacancies at Coalinga as of February 15, 2007 for staff and senior psychiatrists (37.6 vacant of 40.1 positions), for staff and senior psychologists (21.3 vacant of 40.3 positions) and for rehabilitation therapists (12 vacant of 21 positions).[1]  *Id*.  This data may actually *under-report* vacancies because it represents positions as "filled" when those staff members are actually on medical or other long-term leaves, or on vacation.  Plaintiffs' counsel has been informed that DMH cannot open

---

[1] The CSH data on rehabilitation therapists is confusing or wrong.  It lists 17 funded positions for Rehabilitation Therapists (Recreation-Safety), but then lists 0 vacancies even though there are only 5 filled positions.  With only 5 of the 17 positions filled, there are 12 vacancies, not 0.

1  more beds at Coalinga because of current staffing shortages. Even if such staffing shortages

2  did not exist, though, Cindy Radavsky stated during the February 21-22, 2007 DMH tour that

3  there are no funds for CSH to accept additional 2684 patients and that CSH had no intention of

4  providing additional beds to 2684 patients.

5      14.     In fact, we were informed by Ms. Radavsky during the pre-tour meeting that, in

6  addition to maintaining the number of CDCR patients at Coalinga at 50, defendants do not plan

7  to increase the overall patient population at Coalinga to anywhere near its 1,500 capacity in the

8  next few years. Defendants stated that they have only requested budgeting to increase beds to

9  717 by July 2007 and 922 by July 2008, but they also said that adding those beds depended

10  heavily on staffing, which is going "very slowly." Defendants also explained that they had no

11  intention of using any of the additional beds for CDCR patients and that the CDCR bed

12  capacity would remain at 50 beds. This means that Coalinga, which is DMH's flagship state-

13  of-the-art hospital, at best will be operating at only 60 percent capacity by 2008 (and only if it

14  can retain and hire enough staff for those additional beds.) According to statements by Ms.

15  Radavsky during a March 13, 2007 conference call with plaintiffs, admission and population

16  levels of DMH hospitals are inter-related, and the effects of opening or closing of beds at one

17  hospital have a domino-like effect on the other hospitals. If nearly 600 beds at Coalinga will

18  remain empty, this means that those patients are occupying much-needed beds elsewhere in the

19  DMH system. Defendants stated that they have the executive ability to add staff positions at

20  Coalinga if they need them, but they are not planning to do so.

21      15.     Following the pre-tour meeting, we toured the hospital grounds, including Unit 9

22  where the CDCR patients are housed. One startling observation was that CDCR patients are

23  required to wear "prison blues" at Coalinga, rather than the khaki clothing worn by the other

24  patients at Coalinga (and *all* patients at ASH regardless of their Penal Code commitments). In

25  addition, some of the hospital signs referred to "patients and inmates" and we overheard

26  hospital police in the CDCR housing unit refer to patients in Unit 9 as "inmates." I personally

27  spoke to clinical staff, including Deputy Director Tom Voss, about these concerns. During our

28  tour we were shown the dining hall where the CDCR patients eat and observed that the

-8-

windows of their dining hall were covered with dark shades. The reason given for the window covering was the "SVP lawsuit." The separate yard for the CDCR patients has opaque glass which separates them from the rest of the hospital population. During the tour we spoke with some of the CDCR patients about the treatment program and about their experience at Coalinga State Hospital. All of them had transferred from ASH to Coalinga and were thus knowledgeable about the two programs. While the two men I spoke with felt that the treatment program was very good, they were very unhappy about the extreme segregation within the hospital. One man said that he was not permitted to speak with friends that had transferred with him from ASH (SVPs) and said that he was quite isolated in Unit 9. Unlike Coalinga, at ASH he programmed on the "Mall" where he was permitted to participate in a variety of treatment activities, including vocational training, with patients committed under various Penal Code sections.

16.    On March 22, 2007, I received a phone call from a patient at Coalinga State Hospital. This patient reported that a meeting was held on March 21, 2007 for patient representatives who were informed by DMH staff that commencing on April 2, 2007, all hospital police will carry pepper spray and batons on the job. Hospital police, who work in housing units as well as common areas of the hospital, do not currently carry pepper spray and batons in Coalinga State Hospital. According to the patient who contacted me, DMH staff gave no reason for this decision. This patient was unaware of any incidents that would warrant this type of response by hospital administrators.

**ATASCADERO STATE HOSPITAL TOUR – FEBRUARY 21, 2007**

17.    Following the tour of Coalinga, our group drove to Atascadero State Hospital ("ASH") where we met with the hospital administrators prior to touring the facility. During the pre-tour meeting, Deputy Director Mel Hunter provided us with basic admissions and staffing information. He explained that ASH has been experiencing an ongoing staffing shortage for at least four or five years. The shortage was exacerbated, according to Dr. Hunter, by Defendants' refusal to permit ASH to advertise vacant positions. DMH was able to "manage" this ongoing chronic shortage, however, without taking the extreme step of

restricting admissions or bringing patient care to dangerously low levels. The current CDCR census was 110 ICF and 0 acute patients, even though there are supposed to be 256 beds available for CDCR patients. He reported a total census of 1230 patients, but Dr. Hunter reported that he had to reduce that number by 102 patients (to 1128) due to the severe staffing shortages. Dr. Hunter reported that the hospital was in a crisis due to shortages of clinical staff and had placed a moratorium on new admissions since January 18, 2007. The hospital was, however, continuing to accept Mentally Disordered Offenders (MDOs) upon their CDCR release dates because, he said, the MDOs have no where else to go. The waiting list on February 21, 2007 was 13 CDCR patients for intermediate care and 7 CDCR patients for acute care. In reporting on the staffing shortages, Dr. Hunter indicated that according to the November 2006 CRIPA Report, the hospital should have 70 psychiatrists, but that they only had 17.5 psychiatrists, 2 of which were leaving in the next two weeks. He said he was unable to fill these positions with contract staff because no contract existed. In addition to the 70% vacancy rate in psychiatry and in other professional positions, he estimated that he would need to lower vacancy rates to 50% before he could begin readmitting patients, which he stated would mean a minimum of 34 psychiatrists so that he could have one psychiatrist on every unit. Dr. Hunter described the recent salary increases by CDCR as "tipping the boat" on historical staffing shortages at ASH. Prior to the recent salary increases, Dr. Hunter indicated that the hospital was able to retain enough staff to safely run its program. Dr. Hunter and other staff reported to us during the meeting and on the tour that high level managers were working overtime to provide nursing coverage due to the severe staffing shortages.

18.    In the staffing vacancy data provided by defendants on March 13, 2007 (and attached as **Exhibit G** to this declaration), the report on ASH indicates that as of February 15, 2007, 55.4 of the 79.4 senior and staff psychiatrist positions were vacant, or in other words, only 24 of those positions were filled. It also shows that 37.6 of the 72.4 senior and staff psychologist positions are vacant and that 39 of the 80.5 rehabilitation therapist positions were vacant. Again, this data may *under-report* vacancies because it represents positions as "filled" when those staff members are actually on medical, or other leaves, or on vacation. On January

23, 2007 Ms. Radavsky notified Special Master Keating that ASH was restricting  admissions due to staffing limitations because although ASH has 17 full time equivalent (FTEs) psychiatrists, "*it alters on a daily basis due to required court testimony, illness, and scheduled days off as well as five practitioners of the 17 who are on long-term leave.*  With only 9 to 12 FTEs reporting per day, this is a caseload of over 100 patients per psychiatrist."  Attached hereto as **Exhibit B** is a true and correct copy of Ms. Radavsky Letter to Special Master Keating, dated January 23, 2007 (emphasis added).  Mr. Hunter clearly stated that he cannot safely reopen admissions with these vacancy rates.

19.     During the physical tour of ASH, we were shown several of the units designated for CDCR patients.  These patients are permitted to use all general areas on the "mall" and are not segregated from other patients like the CDCR patients are segregated at Coalinga.  All ASH patients, including CDCR 2684 patients, wear the same khaki clothing.  Staff reported that they provide no pre-release planning at ASH for parolees and are not working with TCMP.

### DMH SALARIES AND VACANCY RATES

20.     At the February 1, 2007 Policy Meeting the parties discussed the closure of ASH's 25 acute beds to CDCR referrals.  During this discussion, Cindy Radavsky, stated that it was her belief that she could retain staff at DMH if she were able to match CDCR salaries.  A representative from DOF stated that DMH salaries remained under review.

21.     On March 13, 2007, plaintiffs' counsel, defendants' counsel Lisa Tillman, representatives from CDCR and DMH, and Special Master Keating and several of his experts participated in a phone conference to discuss various DMH related issues.  During the phone conference, Cindy Radavsky reported that due to increased staffing vacancies, DMH has been forced to slow admissions to Napa State Hospital.  Furthermore, she reported that she anticipates closing several more units at ASH and Napa State Hospital.  Ms. Radavsky indicated that she had no updates on the status of any DMH pay raises, although she did state that the topic was still being discussed within several different departments, including the Governor's Office, the Department of Finance and the Department of Personnel Administration.

DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' MOTION FOR EMERGENCY RELIEF REGARDING DEFENDANTS' DENIAL OF ACCESS TO INPATIENT PSYCHIATRIC BEDS IN DMH'S STATE HOSPITALS, NO.:  CIV S 90-0520 LKK-JFM

22.    Pursuant to this Court's 12/15/06 Order, the Department of Personnel Administration ("DPA") issued a "Pay Letter" on March 8, 2007 authorizing CDCR clinical pay increases set forth in the Order.  It is my understanding that CDCR institutions could not advertise the increased clinical salaries until this DPA Pay Letter was issued.  Now that CDCR institutions can formally advertise positions with the increased salaries, plaintiffs' counsel expect that additional DMH clinical staff will apply for the CDCR positions which offer significantly higher pay.  Attached hereto as **Exhibit H** is a true and correct copy of DPA Pay Letter: 07-09, Issue Date March 8, 2007 based upon Court Order filed on December 15, 2006.

## DMH SUICIDES AT APP AND ASH

23.    Under my supervision, paralegals in our law firm track all CDCR suicides in a database.  Defendants inform Special Master Keating and our office of each suicide that occurs within a CDCR or DMH facility.  We add the name of each inmate-patient who commits suicide, and other key data relevant to the data base, when we receive the suicide notification and suicide reports from defendants.  We also cross-check our database against the Special Master's and defendants' annual suicide reports, and make adjustments to our tracking data where necessary.  Our numbers do not always coincide with the total suicides reported by defendants in a year.  For example, in 2005, plaintiffs counted 41 suicides by CDCR inmate-patients, which included three deaths reported by defendants as non-suicides.  In 2006, defendants reported 43 suicides and plaintiffs counted an additional 3 suicides, which defendants have reported to date as accidental overdoses.

24.    Our office was recently informed that two CDCR patients who were transferred to ASH as 2684s committed suicide while housed at the hospital.  One death occurred on February 15, 2007, and the other on March 12, 2007.  During the tour at ASH on February 21, 2007, DMH officials did not report the February 15, 2007 suicide.  We were told, however, that admissions were closed due to unsafe staffing levels.  We have since learned that four other patients at ASH have attempted suicide since early February 2007, including two who attempted to hang themselves, one who took a mediation overdose and one patient who set himself ablaze.  Attached hereto as **Exhibit I** is a true and correct copy of the LA Times

DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' MOTION FOR EMERGENCY RELIEF REGARDING DEFENDANTS' DENIAL OF ACCESS TO INPATIENT PSYCHIATRIC BEDS IN DMH'S STATE HOSPITALS, NO.:  CIV S 90-0520 LKK-JFM

1  article, "Flight Of Mental Health Hospital Staff Taking A Human Toll," March 22, 2007.  We

2  await further information about the circumstances surrounding these suicides through the

3  CDCR's suicide review process.

4       25.     Suicides within DMH facilities are unusual because the staffing, treatment and

5  supervision within acute and intermediate care facilities is far greater than that available within

6  a prison context.  Between 2000 and 2006, a total of three CDCR (2684) patients at ASH

7  committed suicide.  According to a Los Angeles Times Article, ASH reported that over the

8  past six years, it has averaged less than one attempted suicide per month.  *See* **Exhibit I**.  As

9  noted above, in February 2007 alone there have already been four suicide attempts and two

10  completed suicides by CDCR patients transferred to ASH.  In addition, there have been two

11  suicides in the DMH APP unit at CMF since January 2007, raising the total number of CDCR

12  suicides in DMH facilities in 2007 to four.

13                 **SALINAS VALLEY STATE PRISON DMH UNITS**

14       26.     On May 2, 2006, the Court ordered defendants to open 36 intermediate inpatient

15  beds at SVSP by May 30, 2006, and an additional 36 intermediate inpatient beds using the

16  same licensing waivers to create the first 36 beds on a similar accelerated timeframe.  5/02/06

17  Order ¶¶ 7-8.  In response to this order, on June 14, 2006, defendants submitted their Interim

18  Bed Plan.  The Interim Bed Plan provided for the expedited conversion of an additional 76

19  Intermediate Care Facility ("ICF") beds at Salinas Valley State Prison ("SVSP") located in D-5

20  and D-6, for a total of 112 temporary beds.  *See* Defendants' June Bed Interim Bed Plan

21  (Docket 1873-2) at p. 20.  According to the Plan submitted to the Court, the conversion of

22  these housing units to ICF beds would be expedited so that D-6 would be completed by August

23  1, 2006, and D-5 would be completed by December 31, 2006.  *Id.* at 20.  These dates are also

24  reflected in the Special Master's Seventeenth Monitoring Report (Part A).  *See* Docket 2140 at

25  121 ("The defendants were also committed to opening a final component of 56 beds on D-5 at

26  SVSP by December 31, 2006.")  In addition, Defendants' Interim Bed Plan provided that

27  "DMH and CDCR will ensure appropriate staff are available to begin operation of the interim

28  ICF beds upon completion of construction and licensing."  *See* Defendants' June Bed Interim

DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' MOTION FOR EMERGENCY RELIEF REGARDING DEFENDANTS'
DENIAL OF ACCESS TO INPATIENT PSYCHIATRIC BEDS IN DMH'S STATE HOSPITALS, NO.: CIV S 90-0520 LKK-JFM

1   Bed Plan (Docket 1873-2) at p. 20.  The Court approved Defendants' interim plan for the

2   temporary establishment of the 76 ICF beds in the D-5 and D-6 units at SVSP and directed

3   Special Master Keating to review this program and report to the Court by March 31, 2007 on

4   defendants' success in implementing the interim program.  10/20/06 Order ¶6.

5        27.    The establishment of the temporary ICF beds in D-5 and D-6 has not proceeded

6   as promised in defendants' plan and as approved by this Court.  *See* 10/20/06 Order (Docket

7   1998).  CDCR custody decisions and staffing shortages have interfered with the establishment

8   of appropriate and timely programs while the waiting list of Level IV inmates remains

9   constant.  On December 13 and 14, 2006, I accompanied Deputy Special Master Matthew

10  Lopes, several *Coleman* monitors, defendants' counsel and plaintiffs' counsel, Lori Rifkin, on

11  a *Coleman* monitoring tour of SVSP, which included a tour of D-6.  D-6 opened in May of

12  2006 and is located inside the prison alongside the enhanced outpatient programs and

13  administrative segregation units on Facility D.  D-6 is a two-tier housing unit of cells that look

14  out on a dayroom that has been retrofitted to resemble a treatment unit.  Vic Brewer, Executive

15  Director of the SVPP, and his clinical staff provided us with a tour of D-6, which lacks any

16  private treatment space despite promises from the CDCR Warden that group rooms would be

17  created in an adjacent cafeteria space.  All treatment is provided on the dayroom floor.  The

18  treatment teams meet in the adjacent cafeteria space where private treatment space was

19  supposed to be built.  In addition, Mr. Brewer reported that the patients in D-6 are not

20  permitted to go outside for any yard; any free time out of their housing is spent on the dayroom

21  floor where treatment activities also occur.  By contrast, patients in the SVPP units report that

22  they receive daily yard.  Mr. Brewer stated that the major obstacle to providing yard was the

23  necessity to negotiate with CCPOA about the staffing requirements associated with providing

24  yard.

25       28.    I have observed numerous enhanced outpatient programs in various CDCR

26  institutions and the treatment space provided to the DMH program located in D-6 is

27  significantly substandard to those programs.  The unit is clearly temporary treatment space and

28  the staff reported to me that they do the best that they can with the existing facility.  CDCR has

1   not provided the treatment space or yard access as promised for these patients.  Most recently,

2   defendants' December 2006 Bed Plan proposes to stop construction on the permanent 128 bed

3   ICF unit that will replace the temporary, inadequate units established in D-5 and D-6.

4          29.     At the time of our December tour, the D-5 unit was not open.  Mr. Brewer

5   reported that his current timeframe for opening the unit was to open one D-5 pod in

6   February/March, 2007, a second pod in April/May, 2007, and the final pod in June/July, 2007.

7          30.     At the February 1, 2007 Policy Meeting, Mr. Brewer reported that patients

8   housed in D-6 were not provided with any outside yard because of continued negotiations

9   between CDCR and CCPOA.  Furthermore, SVPP (the stand-alone treatment facility with 64

10   beds) had 20 beds empty, including dorm beds, because of a CDCR policy prohibiting the

11   movement of patients with SHU or single-cell status into dorm rooms despite the fact that

12   those patients were cleared for those cells by their treatment teams.

13          31.     On February 22, 2007, plaintiffs' counsel, defendants' counsel, Deputy Special

14   Master Matthew Lopes and his experts, and representatives from CDCR and DMH toured D-6

15   and SVPP.  We did not tour D-5 because no patients have been moved into the 56 beds in that

16   unit.  At the December 6, 2006 Policy Meeting, DMH informed participants that D-5 would be

17   activated on January 17, 2007.  During the tour on February 22, 2007, Mr. Brewer reported

18   that full activation of D-5 was still on track according to the schedule he presented during the

19   December tour, despite the fact that there were no patients in the unit.  We met with patients

20   housed in D-6 and they expressed their distress over the continued lack of any outside yard in

21   their treatment program.  All of the patients housed in D-6 had transferred from the SVPP unit

22   and were accustomed to the daily yard program there.

23          32.     After the tour, we met in a conference room to discuss our observations.  Mr.

24   Brewer reported during that meeting that there were continuing obstacles to instituting yard for

25   the D-6 patients, including the number of CDCR officers in the control room of the unit (which

26   determines how many patients can go to yard and at what frequency they can be escorted

27   outside), and CDCR and CCPOA negotiations that have no timeframes.  Again, during this

28   meeting, Mr. Brewer reported a waiting list of 111 patients for SVPP with EOP general

population patients waiting between 140-180 days for transfer after acceptance into a DMH bed.

### MARCH 13, 2007 CONFERENCE CALL RE DMH ISSUES

33.     On March 13, 2007 I participated in a conference call scheduled to discuss a variety of DMH issues with Special Master Keating and some of his experts, representatives from CDCR and DMH, defendants' counsel and plaintiffs' counsel.  Special Master Keating began the teleconference by identifying two critical issues:  the denial of yard to DMH patients housed in D-6 at SVSP and the possible transfer of CDCR patients who had been accepted to ASH (but not transferred because ASH was closed to new admissions) to empty dorm beds in the Level IV facility at SVPP.  Vic Brewer first reported that 10 of the 15 CDCR patients who had been accepted at ASH had been transferred to SVPP and were initially admitted to D-6 to be stabilized.  Once stabilized, the patients would be moved to the dorm housing.  Three of the 15 patients were admitted pending custody/medical clearance, one had paroled and one referral was rescinded.  The closure of ASH has forced DMH and CDCR to transfer these lower security CDCR patients who were accepted at ASH to the scarce Level IV ICF beds at SVPP.  According to Mr. Brewer, on March 13, 2007, there were at least 106 patients waiting for these beds including 37 mainline EOP patients, who typically remain on the waiting list for 150 to 180 days.

34.     It was also reported during the March 13, 2007 phone conference that five days earlier, on March 8, 2007, patients in the D-6 unit were provided with their very first yard access since the unit opened 10 months earlier (in May of 2006).  Those patients were given access not to the grassy yard, but rather to a concrete enclosure located adjacent to their housing unit.  Mr. Brewer reported that staff are currently running four, one-hour yard shifts per day, which takes six hours because the control booth officer in D-6 must operate all four doors (cell, pod, inner and outer) for each patient.  It is unclear whether additional custody procedures, which apply within the prison (but should not apply within a DMH facility), are slowing down the yard process.  For example, we were informed that each patient must be searched before he leaves his "room" for yard release.  It was reported on the phone call that as

1   a result of this provision of yard, treatment hours have been reduced from 20 to fewer than 10

2   hours per patient.  Mr. Brewer referenced both staffing shortages and custody restrictions as

3   reasons why the provision of yard to this unit is so complicated.  When questioned by *Coleman*

4   experts as to whether these complications could be overcome, Mr. Brewer responded that

5   CDCR would have to allocate more officers to the control room.

6         35.    Mr. Brewer reported that there are additional CCPOA negotiations scheduled on

7   March 15-16, 2007, regarding the use of the grass yard where both D-6 and D-5 patients could

8   go together, which would save significant staff time.  The parties have been informed of on-

9   going CCPOA negotiations about the DMH yard access issue since November 2006.  CDCR

10  obstacles continue to prevent DMH patients in D-6 from accessing adequate yard and clinical

11  care and have also prevented the opening of D-5.  During the phone call, Mr. Brewer stated

12  that he could not open D-5 to patients because he has to use so many staff members to run the

13  concrete yard time on D-6.  He reported that he is negotiating for additional MTA positions to

14  permit him to begin accepting patients in D-5 and that he is also waiting for CDCR approval to

15  use the grassy yard, which will allow him to run yard for both ICF units simultaneously.

16  Currently the opening of the D-5 unit is on hold.

17        36.    Cindy Radavsky, Deputy Director of DMH, confirmed during this conference

18  call that no decision has been made about how to address the disparity in CDCR/DMH salaries

19  and its impact on staffing vacancies in DMH programs system-wide.  Ms. Radavsky reported

20  that admissions to ASH remained restricted, and noted that as of March 9, 2007, DMH had

21  slowed admissions to Napa State Hospital due to staffing shortages.  She indicated that Patton

22  State Hospital was losing staff and that she anticipated closing units at Patton and Napa soon.

23  She spoke of the "domino effect" of the staffing vacancies on all of the state hospitals.

**ADDITIONAL INFORMATION**

24

25        37.    Attached hereto as **Exhibit J** is a true and correct copy of "Raises at Mental

26  Health Agency Move Aims To Halt Psychiatrists' Flight To Prison System," Sacramento Bee,

27  March 22, 2007.

28

DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' MOTION FOR EMERGENCY RELIEF REGARDING DEFENDANTS'
DENIAL OF ACCESS TO INPATIENT PSYCHIATRIC BEDS IN DMH'S STATE HOSPITALS, NO.:  CIV S 90-0520 LKK-JFM

38.    Attached hereto as **Exhibit K** is a true and correct copy of Defendants' Census and Wait List Data for Intermediate Care Facility and Day Treatment Program Beds at California Medical Facility reporting December 1, 2006 data.  This data was provided to the Special Master and plaintiffs' counsel via email from defendants' counsel, Lisa Tillman.  The A-3 ICF reported capacity for the Level I-III ICF beds at CMF is currently 35 beds, reduced from 40 beds for State Fire Marshall required renovations.

39.    Attached hereto as **Exhibit L** is a true and correct copy of "Atascadero State Hospital Continues To Struggle With High Vacancies," Atascadero News, February 7, 2007.

40.    Attached hereto as **Exhibit M** is a true and correct copy of "ASH Unions Hold Demonstration to Address Staffing Shortages, Safety," Atascadero News, February 28, 2007.

41.    Attached hereto as **Exhibit N** is a true and correct copy of "CMC Plan Would Aggravate ASH Staffing Shortage, Some Say," San Luis Obispo Tribune, February 1, 2007.

I declare under penalty of perjury, that the foregoing is true and correct, and that this declaration is executed in San Francisco, California on March 23, 2007.


*/s/ Jane E. Kahn*
Jane E. Kahn

DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' MOTION FOR EMERGENCY RELIEF REGARDING DEFENDANTS'
DENIAL OF ACCESS TO INPATIENT PSYCHIATRIC BEDS IN DMH'S STATE HOSPITALS, NO.:  CIV S 90-0520 LKK-JFM

# EXHIBIT A



PANNONE
LOPES &
DEVEREAUX

December 1, 2006

**VIA EMAIL, FACSIMILE AND
VIA OVERNIGHT MAIL**

Peter Farber-Szekrenyi, DR. P.H.          Michael Bien, Esq.
Director                                  Rosen Bien & Galvin LLP
Division of Correctional Health           315 Montgomery Street 10FL
  Care Services                 San Francisco CA 94104
California Department of Corrections
  and Rehabilitation
1515 S Street, Suite 502 South
Sacramento CA 95814


Lisa A. Tillman, Esq.                     Donald Specter, Esq.
Deputy Attorney General                   Prison Law Office
Office of the Attorney General            2173 East Francisco Blvd.
1300 I Street                             Suite M
PO Box 944255                             San Rafael CA 94901
Sacramento CA 94244


Dear Colleagues:

This is to confirm that our next <u>Coleman</u> policy meeting will take place from
10:00 a.m. to 2:00 p.m. on Wednesday, December 6, 2006.  The meeting will be
held at the California Department of Corrections and Rehabilitation located at
1515 S Street in Sacramento.

Sincerely yours,

Matthew A. Lopes, Jr.

Enclosures

cc:    J. Michael Keating, Jr., Esq.
Kerry C. Hughes, M.D.
Mohamedu F. Jones, Esq.
Dennis F. Koson, M.D.
Jeffrey L. Metzner, M.D.
Virginia Morrison, Esq.
Paul L. Nicoll, M.P.A.
Raymond F. Patterson, M.D.
Ted Ruggles, M.D.
Melissa G. Warren, Ph.D.
Patricia Williams, Esq.
Jane Kahn, Esq.
Steven Fama, Esq.
E. Ivan Trujillo, Esq.
Sharon Riegel

# COLEMAN POLICY MEETING

California Department of Corrections and Rehabilitation
1515 S Street, South Building
5th Floor Conference Room
Sacramento, CA  95814
December 6, 2006
10:00 a.m. to 2:00 p.m.

## Agenda

I. Program Updates

    A. EOP/PSU Programs

- 150-Bed Level IV EOP SNY at MCSP
- 180-Bed Level III EOP SNY at MCSP (Facility B)
- PSU at CIW
- Implementation of RC EOP programs

    B.  DMH Programs

- SVSP – Unit D-6 census, activation of Unit D-5
- SVPP -  current census and waiting list, planned expansion
- Coalinga State Hospital -  CDCR census
- APP waiting list and census

    C.  MHCB Units

- CTC construction and licensure
- Current waiting list for MHCBs - use of OHUs and holding areas
- ASH – CMF swap – current census

    D.  CCMS/RC Programs

- Transfer of Level IV 3CMS/SNY from CSP-Lac to RJD

II. Status of Miscellaneous Issues

    A.  Implementation of the Suicide History Tracking System
    B.  Expansion of PBSP vent project
    C.  Department's 4/28/06 plan to address LPT rounding inadequacies
    D.  QMAT/Central Office staffing
    E.  Any plans to centralize indecent exposure treatment and adopt security measures piloted at PBSP
    F.  System-wide space assessment, including administrative segregation units
    G.  Navigant contract

H.  Number, location and census of BMUs: implementation of monthly case manager contacts, mental health participation in ICC hearings and exclusion of EOP patients
I.  CDCR's proposed confidentiality policy
J.  Assessment of psychiatrists who do not meet the revised Program Guides' requirements for psychiatrists
K.  Changes, if any, to MHTS

III. Discussion

A.  Implementation of revised Program Guides
B.  Implementation of plans to reduce suicides in administrative segregation
C.  Short-term and long-term plans to reduce MHSDS staffing vacancies
D.  Missing monthly data

III.    New Business

# EXHIBIT B

CALIFORNIA DEPARTMENT OF

# Mental Health

1600 9th Street, Sacramento, CA  95814
(916) 654-2413

January 23, 2007

J. Michael Keating, Jr.
Office of the Special Master
2351 Sussex Lane
Fernandina Beach, FL  32034

Dear Mr. Keating:

This letter is to officially notify you that the Department of Mental Health, Long Term Care Services has received information from Atascadero State Hospital (ASH) that necessitates immediate restriction of admissions due to staffing limitations.  This restriction applies to all admissions, including inmate/patients from the Department of Corrections and Rehabilitation (CDCR).  The restriction of admissions will be evaluated on a daily basis until further notice.

The Department is defining the need to "restrict admissions" by the following prioritization of referrals based upon its mission to assure the public's health and safety; Mentally Disordered Offenders and Sexually Violent Predator referrals who have reached their parole day and will be released immediately if not admitted, Not Guilty by Reason of Insanity referrals, Coleman (CDCR) referrals, and Incompetent to Stand Trial referrals.  I want to assure you that when any referral for admission cannot be accepted currently at ASH, the Department is immediately working with other facilities to check bed availability to accommodate the admissions if at all possible.   The accommodation of admissions to other facilities continues to include abiding by the parameters of the current Memorandum of Understanding with CDCR regarding levels of care required, due process, facility ability to meet licensing requirements for staffing ratios, etc.  An example of this occurred January 18, 2007 when three inmates were denied admission to ASH (although the sending institution was informed of the admission restriction early in the AM, these inmates were already in transit, recognizably an unfortunate situation for all parties).  While these three ICF level of care referrals could not be accommodated, another three referrals (same day to ASH) at the Acute level of care were admitted to Vacaville Psychiatric Program effective Monday, January 22, 2007.   The three ICF referrals remain in Mental Health Crisis Beds and are on a wait list for DMH ICF beds.  The restriction of admissions is applicable to all beds in ASH, not just CDCR beds.  The Department will continue to triage the admission referrals to ASH in this manner until the current situation is negated.

J. Michael Keating, Jr.
January 23, 2007
Page 2

ASH is a facility with a current patient census of 1,223 as of January 17, 2007. The staffing limitations driven by vacancy, and more recently some illness, have resulted in only 9 psychiatrists, including the Medical Director and the Chief of Staff, being available to meet the facility needs. While they have 17 full time equivalents (FTEs) filled in this practitioner area, it alters on a daily basis due to required court testimony, illness, and scheduled days off as well as five practitioners of the 17 who are on long-term leave. With only 9 to 12 FTEs reporting per day, this is a caseload of over 100 patients per psychiatrist. This puts the Department in the position of making decisions based on the health and safety of both the patient and the staff as required by licensing.

Title 22 does not dictate specific staffing ratios but as example §71205 b (2), requires the Department to assure "there shall be sufficient psychiatrists on the staff to meet the needs of the patients" and furthermore, §71213 f, requires "there shall be a method for determining staffing requirements based on assessment of patient needs", which deals with the level of acuity required. Additionally, the current CRIPA consent judgment requires DMH to meet specific staffing ratios for psychiatrists of 1:15 for Acute level-of-care and 1:25 for ICF level-of-care. The admission units are licensed as Acute so as you can see, with the current FTEs available, we are forced to react to assure ASH maintains compliance or comes into compliance with these staffing ratios. This situation has risen to crisis levels due to ASH's high vacancy rate in the psychiatry department.   ASH is in the process of acquiring emergency contract staff to assist with this staffing situation.

Again, it should be noted that the decision to restrict ASH admissions does not have to do with bed capacity it is in response to licensing requirements for staffing ratios as they relate to health and safety per Title 22 and the CRIPA Consent Judgment. DMH will keep you advised of this situation.

Sincerely,

*Jean Barawed*

CYNTHIA A. RADAVSKY
Deputy Director
Long Term Care Services

c:    Dr. Stephen Mayberg, Director (DMH)
      Cynthia Rodriguez, Chief Legal Counsel (DMH)
      Lisa Tillman, Deputy Attorney General (DOJ)
      Frank Furtek, Agency Chief Counsel (HHSA)

# EXHIBIT C



**PANNONE**
**LOPES &**
**DEVEREAUX**

# RECEIVED

JAN **3 1** 2007

## Rosen, Bien & Galvan

January 30, 2007

**VIA EMAIL, FACSIMILE AND
VIA OVERNIGHT MAIL**

Michael W. Bien, Esq
Rosen, Bien & Galvin LLP
315 Montgomery Street, 10th Floor
San Francisco, CA 94104

Peter Farber-Szekrenyi, Dr. P.H.
Director
Division of Correctional Health Care Services
California Department of Corrections and
  Rehabilitation
1515 S Street Suite 502
Sacramento, CA 95814-0001

Donald  Specter, Esq.
Prison Law Office
2173 East Francisco Boulevard
Suite M
San Rafael, CA 94901

Lisa A. Tillman, Esq.
Deputy Attorney General
Office of the Attorney General
1300 I Street
PO Box 944255
Sacramento, CA 95814

Michael Stone, Esq.
California Department of
Corrections
Legal Affairs Division
1515 S Street, Room 314S
Sacramento, CA 95814

Re: <u>Coleman Policy Meeting</u>

Dear Collegues:

    I write to confirm that our next <u>Coleman</u> policy meeting will be held on Thursday, February 1, 2007 at the California Department of Corrections and Rehabilitation located at 1515 S Street in Sacramento. The meeting will begin at 10:00 a.m. and end no later than 4:00 p.m. I have attached an agenda for your review.

January 30, 2007
Page -2-

If you have any questions or concerns, please do not hesitate to contact me.

Sincerely yours,

*Matthew A. Lopes /llq*

Matthew A. Lopes, Jr.

c: J. Michael Keating, Esq.
  Linda E. Buffardi, Esq.
  Kerry C. Hughes, M.D.
  Dennis F. Koson, M.D.
  Jeffrey L. Metzner, M.D.
  Virginia Morrison, Esq.
  Paul L. Nicoll, M.P.A.
  Raymond F. Patterson, M.D.
  Ted Ruggles, Ph.D.
  Melissa G. Warren, Ph.D.
  Patricia M. Williams, Esq.
  Jane Kahn, Esq.
  Sara Laubach, Esq.
  Lori Rifkin, Esq.
  Amy Whelan, Esq.
  Steven Fama, Esq.
  E. Ivan Trujillo, Esq.
  Van Kambrian, Esq.
  Sharon Riegal, Health Program Specialist
  Doug McKeever, Mental Health Program Director

# COLEMAN POLICY MEETING

California Department of Corrections and Rehabilitation
1515 S Street, South Building
5th Floor Conference Room
Sacramento, CA 95814
February 1, 2007
10:00 a.m. to 4:00 p.m.

## AGENDA

I.    Program/Area Updates

    A.  DMH Programs

- SVSP: Activation date for Unit D-5; status of hiring MTAs
- SVPP: Current census and waiting list; blanket prohibition on placing PSU and EOP hub patients in dorms
- ASH/CMF swap – current status
- Recent problems with ASH admissions

    B.  MHCB Units

- CTC at ISP
- Current waiting list for MHCBs; concern with medical use of MHCBs
- Update regarding the use of OHUs and other holding areas

    C.  CCCMS/RC Programs

- Transfer of Level IV 3CMS/SNY inmates from CSP-Lac to RJD
- Implementation of RC EOP programs

    D.  Staffing Issues

- Hiring staff for EOP expansions at SAC and MCSP
- Filling Central Office and QMAT positions
- Timeline for implementation of salary increases
- Assessment of psychiatrists who do not meet the revised Program Guide credentialing requirements
- CDCR proposal to use osteopaths (of certain background and training) within the MHSDS

II.   Status of Miscellaneous Issues

    A.  Navigant contract and updated population projections
    B.  Out-of-State Transfers: CDCR and <u>Coleman</u> staff reports on programs
    C.  In-fill projects
    D.  Proposal to provide non-disciplinary inmates in ad seg with property
    E.  Statewide procedures for inmates issued RVRs for indecent exposure

III.  Discussion

    A.  Provision of monthly statistical packages
    B.  Revised protocol for documenting 30-minute welfare checks in administrative segregation
    C.  SB 618: San Diego County program for inmates transferred to RJD and CIW

IV.  New Business

V.   Right Prison/Right Mission Presentation

# EXHIBIT D

**From:** Jane E. Kahn
**Sent:** Tuesday, March 28, 2006 5:29 PM
**To:** Stone, Michael; Lisa Tillman; kriley@cdcr.ca.gov
**Cc:** jmichaelkeatingjr@yahoo.com; mlopes@pld-law.com; 'Michael Bien'; Thomas Nolan; Keith Wattley; Jane Kahn; Nathan Kleiner
**Subject:** 489-3: SVPP Dorm exclusionary criteria
March 28, 2006

Dear All:

Plaintiffs' counsel have been provided with a copy of a March 8, 2006 Memo from Linda Neal, one of the SVPP administrators.  This Memo lists patients who are not dorm eligible due to PSU/ASU status.  Seven of the eight inmate names are scratched out, presumably for confidential reasons, since the memo was provided to an inmate-patient.

It was our understanding that PSU/ASU inmates, who are the top priority for transfer to SVPP, would be permitted to program through the treatment program designed for high custody inmates (which includes movement into a dorm setting).  We are quite concerned to learn about a dorm exclusion for PSU/ASU inmates.  Have these inmates been excluded simply on the basis of their PSU/ASU status, as it appears from this Memorandum?  According to the March 24, 2006 Status Report on ICF Bed Census, 10 of the 32 (32%) dorm beds at SVPP remain vacant.

Please provide plaintiffs and the Special Master with additional information regarding the implementation of the policy articulated in the Neal Memorandum and on its impact on the availability of dorm housing to inmate-patients who have been transferred from PSU and EOP ASU programs. It was our understanding that clinical factors drove the decision whether to move patients to the dorms;  we now learn otherwise.

Defendants must address this issue immediately because of the on-going bed shortages for Level IV inmates needing ICF level of care.  The current waiting list is 126, with 48 of those housed in PSU or EOP ASU settings.

Thank you very much for your prompt response.


Sincerely,


Jane Kahn

# EXHIBIT E

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ERNEST GALVAN

HOLLY BALDWIN
GAY C. GRUNFELD
JANE KAHN
MEGHAN LANG
SARAH LAUBACH
ANNE MANIA
NURA MAZNAVI
THOMAS NOLAN
LORI RIFKIN **
LOREN STEWART
KENNETH WALCZAK***
AMY WHELAN
SARAH OLSON ZIMMERMAN ***

# ROSEN, BIEN & GALVAN, LLP
ATTORNEYS AT LAW

315 MONTGOMERY STREET, TENTH FLOOR
SAN FRANCISCO, CALIFORNIA  94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rbg@rbg-law.com

December 26, 2006

J. Michael Keating, Jr.
Office of the Special Master
2351 Sussex Drive
Fernandina Beach, FL 32034

Lisa A. Tillman, Esq.
Deputy Attorney General
1300 I Street
PO Box 944244-2550
Sacramento, CA 95814

Michael Stone
CDCR Legal Affairs Division
1515 S Street, Room 314 S
Sacramento, CA 94283-0001

Cindy Rodriquez
Chief Legal Counsel
Legal Services
Department of Mental Health
1600 9th Street, Room 153
Sacramento, CA 95814

Re:   Coleman v. Schwarzenegger
      SVPP and SVSP D5-D6 Units
      Our File No. 489-3

Dear Mr. Keating, Ms. Tillman, Mr. Stone, and Ms. Rodriquez:

During a recent *Coleman* monitoring tour at Salinas Valley State Prison on December 13-14, 2006, Deputy Master Matthew Lopes, several *Coleman* experts and monitors, CDCR counsel Michael Stone, Deputy AG Van Kamberian, and plaintiffs' counsel visited the new DMH unit located in D-6.  This unit was activated in May 2006 in compliance with Judge Karlton's orders, and is located along side the EOP programs and administrative segregation units on Facility D at Salinas Valley State Prison.  During this tour, we had an opportunity to meet with administrators of the program and discuss programming in both D-6 and SVPP.

Two important issues were raised during this meeting that require immediate attention from CDCR and DMH.  <u>First</u>, DMH administrators reported that they have been

*       MEMBER OF THE CONNECTICUT AND THE CALIFORNIA BAR
**      MEMBER OF THE CONNECTICUT, NEW YORK AND THE CALIFORNIA BAR
***     MEMBER OF THE ILLINOIS BAR AND THE CALIFORNIA BAR

Michael Keating, et al.
December 26, 2006
Page 2

in negotiation with SVSP Warden Evans since January 2006 for yard access for the DMH patients who are treated in the D-6 unit.  To date, none of these patients have been provided with **any** outside yard during the past seven months since the unit was activated. It is our understanding, based upon what we were told during the meeting at SVSP and what our clients have informed us, that patients in the other DMH programs have daily access to outside yard.  CDCR and DMH must immediately address the barriers to providing these patients with access to outside yard.  We ask that CDCR and/or DMH provide Special Master Keating and plaintiffs' counsel with any documentation regarding the negotiations concerning yard access for these patients, barriers to the provision of yard, and any corrective actions taken to remedy this clinical and constitutional inadequacy.

Second, DMH administrators reported that CDCR has instituted a blanket policy prohibiting the transfer of patients currently receiving treatment at SVPP into dorm housing if the patient came from a PSU or EOP Hub, even when the patient's DMH IDTT finds that he is clinically appropriate for dorm housing.  This is quite disturbing for several reasons:  (1) There are empty dorm beds at SVPP and a waiting list for Level IV ICF beds; (2) PSU and EOP Hub inmates are given priority for admission to SVPP, but cannot move into dorm beds when clinically ready which slows new admissions to the program and; (3) Clinical decisions are being over-ridden once again by blanket custody exclusions imposed by CDCR.

Of course, this policy is not new.  Plaintiffs first learned of this policy when a patient housed at SVPP, who had transferred there from a PSU, was told that he could not be moved into the dorm despite the fact that he was clinically appropriate for the program.  The patient provided plaintiffs' counsel with a March 8, 2006 chrono documenting the exclusionary policy. In an email to Mr. Keating and the defendants' attorneys on March 28, 2006, plaintiffs objected to this practice of excluding PSU/ASU inmates from dorm housing.  See copy of March 28, 2006 email with chrono, attached hereto.  In that email, plaintiffs requested additional information regarding the implementation of the policy articulated in the March 8, 2006 Memo and its impact on the availability of dorm housing to inmate-patients who had transferred from PSU/EOP Hub programs.  **Plaintiffs received no response to this email** and clearly no policy changes have been implemented.

During the meeting with DMH administrators on December 14, 2006, they reported that they have 9 patients, who transferred to SVPP from PSU/EOP Hub programs and have been found appropriate for dorm housing through the IDTT process, who cannot be moved into the dorms due to the CDCR blanket exclusion.  As a result, dorm beds remain empty at SVPP and inmates on the waiting list suffer from the lack of care due to CDCR's interference with in-patient treatment at SVPP.  In his May 2, 2006

Michael Keating, et al.
December 26, 2006
Page 3


Order, Judge Karlton expressed concern over the severe shortage of ICF beds, with the most serious shortfall "for inmates who have a Level IV security classification".  5/2/06 Order at 3.  CDCR's custody policy at SVPP negatively impacts on access to available beds.

Plaintiffs are gravely concerned over CDCR's impact on the type and availability of treatment in the programs DMH runs within CDCR facilities.  We request an immediate review of these issues and response in writing.[1]  Of immediate concern is CDCR's interference with DMH's IDTT process at SVPP and CDCR's blanket exclusion of all patients coming from PSU/EOP ASU programs from dorm housing there.  Thank you for your prompt attention.


Sincerely yours,

ROSEN, BIEN & GALVAN, LLP



By: Jane E. Kahn

JEK:ts

Cc:    Matthew A. Lopes, Jr.
       Van Kamberian, Deputy AG
       Coleman Team

---

[1]  In the most recent data provided for October 6, 2006, half of the dorm beds, 16 were empty.  The wait list was 94, with 47 of those inmates housed in either PSU or EOP Hub beds.

# EXHIBIT F

# Prison pay hikes drain staff at state hospitals

## Lack of health workers forces Atascadero to turn away new patients.

By Lee Romney
Times Staff Writer

January 26, 2007

ATASCADERO — Court orders mandating drastic pay increases for health personnel in California prisons have led to an exodus of workers from state mental hospitals and left the facilities struggling to provide adequate patient care.

Staff shortages at Atascadero State Hospital, where psychiatrist vacancies stand at 70%, have caused the facility to all but freeze new admissions.

All the state's mental hospitals, which like the prisons are also under federal scrutiny, report staff departures for prison jobs that now pay about 40% more. And they fear that many more staffers will leave.

At Patton State Hospital in San Bernardino, the medical staff chief pleaded with the federal court-appointed monitor in a December letter, saying a mass exodus of Department of Mental Health "psychiatrists and physicians is expected, and we are already seeing the start of it affecting our institution. Recruiting new people has become increasingly difficult."

In order to keep Napa State Hospital licensed, the state had to hire contract pharmacists after many fled for higher-paying prison jobs. Workers at Metropolitan State Hospital in Norwalk now refer to the facility as "the Titanic" as psychologists apply in droves for prison system jobs. Recruiting e-mails featuring a photo of happy correctional staff members were sent directly to hospital psychologists this month, noting that 1,000 positions must be filled at the new pay rates.

But nowhere is the crisis as pronounced as at Atascadero, which treats California's most seriously mentally ill jail inmates, prisoners and parolees who cannot safely be released to the streets. The admissions freeze at Atascadero has left California prisons, which have long relied on the hospital to stabilize their most severely mentally ill inmates, scrambling to find acute care beds within the prison system.

Atascadero State Hospital Executive Director Mel Hunter said closing the door to most new patients was his only option.

"We had to limit the number of admissions in order to maintain the treatment, safety and security of the 1,230 patients we already had in treatment," he said.

The last straw came Jan. 17, when three psychiatrists left for prison jobs — swelling the number of psychiatrist departures over the last year to 10. The next morning, Atascadero Medical

Director David Fennell told Hunter that the facility could not continue admitting the eight to 12 new patients a day it usually handled.

Hospital officials quickly spread the word to prisons across the state, but some inmates were already en route: Three severely mentally ill prisoners from Chino's California Institution for Men arrived at the hospital gates late in the day after a 250-mile drive, only to be turned back.

Since then, 50 more patients have been denied admission, forcing prisons to hold on to sick inmates.

Parolees who are too ill and dangerous to be released to the streets are still being accepted at Atascadero, Hunter said, along with a handful of other extremely ill patients. And the hospital has been cleared by the Department of Mental Health to hire psychiatrists under short-term contracts as soon as possible.

"We are anxious to get our staffing back up to some adequate numbers so we can honor our commitments to the Department of Corrections," he said.

The unprecedented restrictions come at a critical time for both the prison and the state mental health bureaucracies, which are closely intertwined. Although several of the state hospitals still accept patients committed through the civil courts, the vast majority of mental hospital patients statewide now are channeled through the criminal justice system.

Abysmal medical and mental-health care in the state's prisons prompted federal overseers in two separate lawsuits to order the soaring pay increases as a way of luring competent clinicians to the California Department of Corrections and Rehabilitation.

The first order, which applied to medical care, triggered a mass departure of nurses last year from the state hospital system. (Department of Mental Health raises helped slow that flow somewhat but did not match the prison salaries.) The most recent order — pertaining to mental health clinicians in the prisons — took effect this month.

The departures come at a time when the Department of Mental Health is also struggling to satisfy federal regulators.

In May 2006, the U.S. Department of Justice filed suit against the 5,000-patient mental hospital system for faulty patient care. A 90-page consent decree spells out required improvements, including an increase in staff.

The departures are draining experience and numbers from the hospitals at a time when morale was already plummeting.

At Atascadero, high Central Coast housing costs have long made recruitment difficult, and a spike in assaults on staff in the last few years had contributed to departures even before the prison raises kicked in.

Psychiatrists who remain are saddled with increasingly demanding patient loads. The medical schedule for Thursday showed one psychiatrist assigned to 174 patients.

"When I saw so many other psychiatrists had left, I just felt my license would be endangered," said Dr. James Dietch, an 11-year veteran of Atascadero who left this week to begin a new job at the nearby California Men's Colony, where he will earn about 45% more. "I felt I would eventually be put in a position where I could not adequately provide care."

Now, Dietch said, Atascadero psychiatrists can do little more than "put out fires, provide basic medication."

The pull to the prison system is strong. A psychiatrist at Atascadero can make between $13,000 and $14,000 a month, but those in the prison system can make between $19,000 and $21,000 a month.

Marilyn Gill of San Diego, whose 30-year-old son is a patient at Atascadero, wrote to her state senator to plead for help, noting that her son's psychiatrist is assigned 103 patients.

"I don't understand how anyone's son can receive adequate care at a psychiatric hospital with an inadequate number of psychiatrists," Gill wrote.

Department of Mental Health Director Stephen Mayberg said he was "very concerned" about the staff departures. "It's the highest priority to us to make sure we have clinical staff available."

However, while the federal courts ordered the salary increases for the prison system, Mayberg said, his department cannot unilaterally match them. Instead, he said, the Department of Mental Health must convince the governor and the Legislature that some higher salaries might be necessary.

But that, he said, is an imperfect solution. If the Department of Mental Health matched the prison salaries, he said, it might prompt the federal receiver and monitor overseeing the prison improvements to simply order further pay increases in that system, triggering a bidding war.

"The priority has to be patient care," he said, "so we aren't shuttling staff between the institutions. How do we bring people into both institutions?"

Critics say the current crisis, though perhaps unintended, was not unforeseeable.

"Everyone in the world knew that once you raise the salaries of the [prison] clinicians that the DMH clinicians would literally sometimes walk across the hall or walk across the street" to higher-paying jobs," said Donald Specter, an attorney with the Prison Law Center, which has pressed the mental health case on behalf of prisoners.

For the workers who remain at Atascadero, exhausting mandatory overtime is taking a toll, and an influx of young inexperienced students and recent graduates has further reduced safety in the patient wards, said John Ransom, a psychiatric technician who has been assaulted seven times in

his eight years on the job.

He counts 16 friends among those who have departed in the last six months alone.

"I play golf with three of the guys that have left. They say the atmosphere is totally different. They feel safe. They're making more money. And they're telling their friends this," Ransom said.

The gap in coverage took a toll when a patient released from restraints broke another patient's nose in a unit bathroom earlier this week. Under normal circumstances, a psychologist would have crafted a plan to help that patient deal with his assaultive behavior. But the unit has no psychologist.

"There's no one to write the plan," said Dr. Bill Walters, the psychiatrist who now cares for 86 patients in two units at Atscadero. "I could do it — if I had two other hands and another head."

# EXHIBIT G

## Jane E. Kahn

| | |
|---|---|
| **From:** | Lisa Tillman [Lisa.Tillman@doj.ca.gov] |
| **Sent:** | Tuesday, March 13, 2007 1:28 PM |
| **To:** | jmichaelkeatingjr@yahoo.com |
| **Cc:** | DocKC99@aol.com; DoctorKoson@aol.com; harconwil@aol.com; Melissa G. Warren; gmorrison@collaboration-specialists.com; hammujones@comcast.net; rpattersonmd@earthlink.net; gasquetflat@msn.com; paul_nicoll@msn.com; FDoVale@pld-law.com; lbuffardi@pld-law.com; mlopes@pld-law.com; Donald Specter; itrujillo@prisonlaw.com.; Amy E. Whelan; Jane E. Kahn; Lori E. Rifkin; Michael W. Bien; Sarah M. Laubach; Jeffrey.metzner@uchsc.edu |
| **Subject:** | Documents/ASH |
| **Attachments:** | rptdmh.pdf; stats.pdf |

March 13, 2007

Re: Coleman v. Schwarzenegger

Dear Mr. Keating:

As discussed at this morning's teleconference, please find enclosed the following documents:

1. PDF version of the previously-submitted DMH report on staffing vacancies;

2. Statistical matrix for Salinas Valley Psychiatric beds, dated March 13, 2007.

Sincerely,

Lisa Tillman
Deputy Attorney General
Office of the Attorney General
Telephone: 916-327-7872
Facsimile: 916-324-5205

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

Jean Baraived - DRAFTTRANSMITTAL Vacancies.doc



CALIFORNIA DEPARTMENT OF

# Mental Health

1600 9th Street, Sacramento, CA 95814
(916) 654-2413

March 6, 2007

J. Michael Keating, Jr.    via: Lisa Tillman
Office of the Special Master     Deputy Attorney General
2351 Sussex Lane        1300 I Street, Suite 125
Fernandina Beach, FL 32034    P.O. Box 944255
              Sacramento, CA 94244-2550

RE: **RESPONSE TO THE COURT ORDER TO ADDRESS PAY PARITY ISSUE FOR DEPARTMENT OF MENTAL HEALTH (DMH) CLINICIANS**

In accordance with the February 7, 2007 Court Order issued by Judge Lawrence Karlton to address the issue of pay parity for Department of Mental Health (DMH) clinicians, the department is submitting to the Special Master the first monthly report on staffing and staffing vacancies in all DMH hospitals with programs providing mental health services to CDCR inmates.

If you need clarification on any aspect of these reports, please contact Dr. Charlene Schultz at 916-654-2413.

■

Sincerely,



CYNTHIA A. RADAVSKY
Deputy Director

Name
Date or Blank
Page 2


Enclosures

c:      Stephen W. Mayberg, Ph.D.

## TOTALS

| Classification as of January 1, 2007 | Budgeted | Filled | Vacant | % Vacant |
|---|---|---|---|---|
| **COLEMAN RELATED POSITIONS** | | | | |
| Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 25 | 21 | 4 | 16% |
| Senior Psychiatrist (Specialist), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Supervisor), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist, Correctional Facility (Supervisor) | 43.9 | 8 | 35.9 | 82% |
| Staff Psychiatrist (Safety) | 302.8 | 182.15 | 120.65 | 40% |
| Senior Psychiatrist (Specialist) | 24.4 | 3 | 21.4 | 88% |
| Psychiatric Technician (Safety) | 2142.4 | 1813.7 | 328.7 | 15% |
| Senior Psychiatric Technician (Safety) | 317 | 208 | 109 | 34% |
| Clinical Social Worker (Health/Correctional Facility) -- Safety | 375.3 | 294 | 81.3 | 22% |
| Psychologist (Health Facility-Clinical-Safety) | 248.15 | 215.7 | 32.45 | 13% |
| Senior Psychologist (Health Facility) (Specialist) | 30.5 | 4 | 26.5 | 87% |
| Senior Psychologist, Correctional Facility (Supervisor) | 52.3 | 10 | 42.3 | 81% |
| Rehabilitation Therapist, State Facilities (Art-Safety) | 39 | 26.4 | 12.6 | 32% |
| Rehabilitation Therapist, State Facilities (Dance-Safety) | 11.3 | 8.3 | 3 | 27% |
| Rehabilitation Therapist, State Facilities (Music-Safety) | 72.8 | 49.9 | 22.9 | 31% |
| Rehabilitation Therapist, State Facilities (Occupational-Safety) | 9 | 8 | 1 | 11% |
| Rehabilitation Therapist, State Facilities (Recreation-Safety) | 224.2 | 140.1 | 84.1 | 38% |
| Medical Director, State Hospital/Developmental Center, CEA | 5 | 5 | 0 | 0% |
| Medical Director, State Hospital/Developmental Center | 0 | 0 | 0 | 0% |

ASH

| Classification as of January 1, 2007 COLEMAN RELATED POSITIONS | Budgeted | Filled | Vacant | % Vacant |
|---|---|---|---|---|
| Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Specialist), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Supervisor), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist, Correctional Facility (Supervisor) | 2 | 1 | 1 | 50% |
| Staff Psychiatrist (Safety) | 76 | 28 | 48 | 63% |
| Senior Psychiatrist (Specialist) | 3.4 | 3 | 0.4 | 12% |
| Psychiatric Technician (Safety) | 660 | 511.3 | 150.7 | 23% |
| Senior Psychiatric Technician (Safety) | 98 | 76 | 22 | 22% |
| Clinical Social Worker (Health/Correctional Facility) – Safety | 85.7 | 55.3 | 30.4 | 35% |
| Psychologist (Health Facility-Clinical-Safety) | 44.4 | 35.3 | 9.1 | 20% |
| Senior Psychologist (Health Facility) (Specialist) | 22 | 3 | 19 | 86% |
| Senior Psychologist, Correctional Facility (Supervisor) | 6 | 5 | 1 | 17% |
| Rehabilitation Therapist, State Facilities (Art-Safety) | 1 | 1 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Dance-Safety) | 2 | 2 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Music-Safety) | 14 | 12 | 2 | 14% |
| Rehabilitation Therapist, State Facilities (Occupational-Safety) | 1 | 0 | 1 | 100% |
| Rehabilitation Therapist, State Facilities (Recreation-Safety) | 62.5 | 27.5 | 35 | 56% |
| Medical Director, State Hospital/Developmental Center, CEA | 1 | 1 | 0 | 0% |
| Medical Director, State Hospital/Developmental Center | 0 | 0 | 0 | 0% |

CSH

| Classification as of January 1, 2007 COLEMAN RELATED POSITIONS | Budgeted | Filled | Vacant | % Vacant |
|---|---|---|---|---|
| Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Specialist), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Supervisor), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist, Correctional Facility (Supervisor) | 0 | 0 | 0 | 0% |
| Staff Psychiatrist (Safety) | 24.1 | 3 | 21.1 | 88% |
| Senior Psychiatrist (Specialist) | 16 | 0 | 16 | 0% |
| Psychiatric Technician (Safety) | 258.8 | 145 | 0 | 0% |
| Senior Psychiatric Technician (Safety) | 31 | 30 | 1 | 3% |
| Clinical Social Worker (Health/Correctional Facility) – Safety | 20.9 | 20 | 0.9 | 4% |
| Psychologist (Health Facility-Clinical-Safety) | 28.8 | 20 | 8.8 | 31% |
| Senior Psychologist (Health Facility) (Specialist) | 6.5 | 1 | 5.5 | 85% |
| Senior Psychologist, Correctional Facility (Supervisor) | 5 | 4 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Art-Safety) | 2 | 2 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Dance-Safety) | 0 | 0 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Music-Safety) | 2 | 1 | 1 | 50% |
| Rehabilitation Therapist, State Facilities (Occupational-Safety) | 0 | 0 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Recreation-Safety) | 17 | 6 | 11 | 65% |
| Medical Director, State Hospital/Developmental Center, CEA | 0 | 0 | 0 | 0% |
| Medical Director, State Hospital/Developmental Center | 1 | 0 | 1 | 100% |

MSH

| Classification - as of January 1, 2007 COLEMAN RELATED POSITIONS | Budgeted | Filled | Vacant | % Vacant |
|---|---|---|---|---|
| Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Specialist), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Supervisor), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist, Correctional Facility (Supervisor) | 9.5 | 6 | 3.5 | 37% |
| Staff Psychiatrist (Safety) | 49 | 38.4 | 10.6 | 22% |
| Senior Psychiatrist (Specialist) | 0 | 0 | 0 | 0% |
| Psychiatric Technician (Safety) | 299.9 | 279.8 | 20.1 | 7% |
| Senior Psychiatric Technician (Safety) | 50 | 49 | 1 | 2% |
| Clinical Social Worker (Health/Correctional Facility) -- Safety | 52.5 | 43.4 | 9.1 | 17% |
| Psychologist (Health Facility-Clinical-Safety) | 40.3 | 35 | 5.3 | 13% |
| Senior Psychologist (Health Facility) (Specialist) | 2 | 0 | 2 | 100% |
| Senior Psychologist, Correctional Facility (Supervisor) | 8 | 1 | 7 | 88% |
| Rehabilitation Therapist, State Facilities (Art-Safety) | 7 | 7 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Dance-Safety) | 4.5 | 2.5 | 2 | 44% |
| Rehabilitation Therapist, State Facilities (Music-Safety) | 10.3 | 7.1 | 3.2 | 31% |
| Rehabilitation Therapist, State Facilities (Occupational-Safety) | 0 | 0 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Recreation-Safety) | 35.5 | 30.5 | 5 | 14% |
| Medical Director, State Hospital/Developmental Center, CEA | 1 | 1 | 0 | 0% |
| Medical Director, State Hospital/Developmental Center | 0 | 0 | 0 | 0% |

**NSH**

| Classification as of January 1, 2007 COLEMAN RELATED POSITIONS | Budgeted | Filled | Vacant | % Vacant |
|---|---|---|---|---|
| Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Specialist), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Supervisor), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist, Correctional Facility (Supervisor) | 6 | 1 | 5 | 83% |
| Staff Psychiatrist (Safety) | 65.5 | 44.5 | 21 | 32% |
| Senior Psychiatrist (Specialist) | 4 | 0 | 4 | 100% |
| Psychiatric Technician (Safety) | 254.6 | 254.6 | 0 | 0% |
| Senior Psychiatric Technician (Safety) | 53 | 53 | 0 | 0% |
| Clinical Social Worker (Health/Correctional Facility) – Safety | 72.1 | 62.8 | 9.3 | 13% |
| Psychologist (Health Facility-Clinical-Safety) | 59.4 | 60.6 | -1.2 | -2% |
| Senior Psychologist (Health Facility) (Specialist) | 0 | 0 | 0 | 0% |
| Senior Psychologist, Correctional Facility (Supervisor) | 6 | 0 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Art-Safety) | 16 | 12.4 | 3.6 | 23% |
| Rehabilitation Therapist, State Facilities (Dance-Safety) | 2.8 | 2.8 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Music-Safety) | 16.2 | 12.3 | 3.9 | 24% |
| Rehabilitation Therapist, State Facilities (Occupational-Safety) | 5 | 5 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Recreation-Safety) | 29.4 | 26.2 | 3.2 | 11% |
| Medical Director, State Hospital/Developmental Center, CEA | 0 | 0 | 0 | 0% |
| Medical Director, State Hospital/Developmental Center | 0 | 0 | 0 | 0% |

PSH

| Classification as of January 1, 2007 COLEMAN RELATED POSITIONS | Budgeted | Filled | Vacant | % Vacant |
|---|---|---|---|---|
| Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Specialist), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Supervisor), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist, Correctional Facility (Supervisor) | 25.4 | 0 | 25.4 | 100% |
| Staff Psychiatrist (Safety) | 82.2 | 63.25 | 18.95 | 23% |
| Senior Psychiatrist (Specialist) | 0 | 0 | 0 | 0% |
| Psychiatric Technician (Safety) | 669.4 | 623 | 46.4 | 7% |
| Senior Psychiatric Technician (Safety) | 85 | 0 | 85 | 100% |
| Clinical Social Worker (Health/Correctional Facility) – Safety | 109.1 | 90.5 | 18.6 | 17% |
| Psychologist (Health Facility-Clinical-Safety) | 56.25 | 49.8 | 6.45 | 11% |
| Senior Psychologist (Health Facility) (Specialist) | 0 | 0 | 0 | 0% |
| Senior Psychologist, Correctional Facility (Supervisor) | 27.3 | 0 | 27.3 | 100% |
| Rehabilitation Therapist, State Facilities (Art-Safety) | 10 | 3 | 7 | 70% |
| Rehabilitation Therapist, State Facilities (Dance-Safety) | 2 | 1 | 1 | 50% |
| Rehabilitation Therapist, State Facilities (Music-Safety) | 25.3 | 12.5 | 12.8 | 51% |
| Rehabilitation Therapist, State Facilities (Occupational-Safety) | 2 | 2 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Recreation-Safety) | 57.8 | 39.9 | 17.9 | 31% |
| Medical Director, State Hospital/Developmental Center, CEA | 1 | 1 | 0 | 0% |
| Medical Director, State Hospital/Developmental Center | 0 | 0 | 0 | 0% |

VPP

| Classification as of January 1, 2007 COLEMAN-RELATED POSITIONS | Budgeted | Filled | Vacant | % Vacant |
|---|---|---|---|---|
| Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 25 | 21 | 4 | 16% |
| Senior Psychiatrist (Specialist), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Supervisor), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist, Correctional Facility (Supervisor) | 0 | 0 | 0 | 0% |
| Staff Psychiatrist (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Specialist) | 0 | 0 | 0 | 0% |
| Psychiatric Technician (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatric Technician (Safety) | 0 | 0 | 0 | 0% |
| Clinical Social Worker (Health/Correctional Facility) – Safety | 22 | 14 | 8 | 36% |
| Psychologist (Health Facility-Clinical-Safety) | 13 | 10 | 3 | 23% |
| Senior Psychologist (Health Facility) (Specialist) | 0 | 0 | 0 | 0% |
| Senior Psychologist, Correctional Facility (Supervisor) | 0 | 0 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Art-Safety) | 3 | 1 | 2 | 67% |
| Rehabilitation Therapist, State Facilities (Dance-Safety) | 0 | 0 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Music-Safety) | 4 | 4 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Occupational-Safety) | 1 | 1 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Recreation-Safety) | 12 | 5 | 7 | 58% |
| Medical Director, State Hospital/Developmental Center, CEA | 1 | 1 | 0 | 0% |
| Medical Director, State Hospital/Developmental Center | 0 | 0 | 0 | 0% |

SVPP

| Classification as of January 1, 2007 COLEMAN-RELATED POSITIONS | Budgeted | Filled | Vacant | % Vacant |
|---|---|---|---|---|
| Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Specialist), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Supervisor), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist, Correctional Facility (Supervisor) | 1 | 0 | 1 | 100% |
| Staff Psychiatrist (Safety) | 6 | 5 | 1 | 17% |
| Senior Psychiatrist (Specialist) | 1 | 0 | 1 | 100% |
| Psychiatric Technician (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatric Technician (Safety) | 0 | 0 | 0 | 0% |
| Clinical Social Worker (Health/Correctional Facility) – Safety | 13 | 8 | 5 | 38% |
| Psychologist (Health Facility-Clinical-Safety) | 6 | 5 | 1 | 17% |
| Senior Psychologist (Health Facility) (Specialist) | 0 | 0 | 0 | 0% |
| Senior Psychologist, Correctional Facility (Supervisor) | 0 | 0 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Art-Safety) | 0 | 0 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Dance-Safety) | 0 | 0 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Music-Safety) | 1 | 1 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Occupational-Safety) | 0 | 0 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Recreation-Safety) | 10 | 5 | 5 | 50% |
| Medical Director, State Hospital/Developmental Center, CEA | 0 | 0 | 0 | 0% |
| Medical Director, State Hospital/Developmental Center | 0 | 0 | 0 | 0% |

## TOTALS

| Classification as of February 15, 2007 COLEMAN RELATED POSITIONS | Budgeted | Filled | Vacant | % Vacant |
|---|---|---|---|---|
| Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 25 | 21 | 4 | 16% |
| Senior Psychiatrist (Specialist), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Supervisor), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist, Correctional Facility (Supervisor) | 42.9 | 8 | 34.9 | 81% |
| Staff Psychiatrist (Safety) | 301.8 | 171.55 | 130.25 | 43% |
| Senior Psychiatrist (Specialist) | 24.4 | 3 | 21.4 | 88% |
| Psychiatric Technician (Safety) | 2192.2 | 1794.7 | 397.5 | 18% |
| Senior Psychiatric Technician (Safety) | 321 | 226 | 95 | 29% |
| Clinical Social Worker (Health/Correctional Facility) – Safety | 375.6 | 287.3 | 88.3 | 23% |
| Psychologist (Health Facility-Clinical-Safety) | 248.15 | 194.8 | 53.35 | 21% |
| Senior Psychologist (Health Facility) (Specialist) | 30.5 | 4 | 26.5 | 87% |
| Senior Psychologist, Correctional Facility (Supervisor) | 53.3 | 12 | 41.3 | 77% |
| Rehabilitation Therapist, State Facilities (Art-Safety) | 39 | 23.2 | 15.8 | 40% |
| Rehabilitation Therapist, State Facilities (Dance-Safety) | 11.3 | 9.3 | 2 | 18% |
| Rehabilitation Therapist, State Facilities (Music-Safety) | 72.8 | 51.9 | 20.9 | 29% |
| Rehabilitation Therapist, State Facilities (Occupational-Safety) | 9 | 9 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Recreation-Safety) | 223.2 | 136.2 | 87 | 39% |
| Medical Director, State Hospital/Developmental Center, CEA | 5 | 5 | 0 | 0% |
| Medical Director, State Hospital/Developmental Center | 0 | 0 | 0 | 0% |

ASH

| Classification as of February 15, 2007 COLEMAN-RELATED POSITIONS | Budgeted | Filled | Vacant | % Vacant |
|---|---|---|---|---|
| Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Specialist), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Supervisor), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist, Correctional Facility (Supervisor) | 1 | 1 | 0 | 0% |
| Staff Psychiatrist (Safety) | 76 | 21 | 55 | 72% |
| Senior Psychiatrist (Specialist) | 3.4 | 3 | 0.4 | 12% |
| Psychiatric Technician (Safety) | 659 | 488.3 | 170.7 | 26% |
| Senior Psychiatric Technician (Safety) | 99 | 96 | 3 | 3% |
| Clinical Social Worker (Health/Correctional Facility) – Safety | 85.7 | 54.3 | 31.4 | 37% |
| Psychologist (Health Facility-Clinical-Safety) | 44.4 | 26.8 | 17.6 | 40% |
| Senior Psychologist (Health Facility) (Specialist) | 22 | 3 | 19 | 86% |
| Senior Psychologist, Correctional Facility (Supervisor) | 6 | 5 | 1 | 17% |
| Rehabilitation Therapist, State Facilities (Art-Safety) | 1 | 1 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Dance-Safety) | 2 | 2 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Music-Safety) | 14 | 11 | 3 | 21% |
| Rehabilitation Therapist, State Facilities (Occupational-Safety) | 1 | 0 | 1 | 100% |
| Rehabilitation Therapist, State Facilities (Recreation-Safety) | 62.5 | 27.5 | 35 | 56% |
| Medical Director, State Hospital/Developmental Center, CEA | 1 | 1 | 0 | 0% |
| Medical Director, State Hospital/Developmental Center | 0 | 0 | 0 | 0% |

CSH

| Classification as of February 15, 2007<br>COLEMAN RELATED POSITIONS | Budgeted | Filled | Vacant | % Vacant |
|---|---|---|---|---|
| Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Specialist), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Supervisor), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist, Correctional Facility (Supervisor) | 0 | 0 | 0 | 0% |
| Staff Psychiatrist (Safety) | 24.1 | 2.5 | 21.6 | 90% |
| Senior Psychiatrist (Specialist) | 16 | 0 | 16 | 100% |
| Psychiatric Technician (Safety) | 258.5 | 116 | 0 | 0% |
| Senior Psychiatric Technician (Safety) | 31 | 29 | 2 | 6% |
| Clinical Social Worker (Health/Correctional Facility) – Safety | 20.9 | 21 | -0.1 | 0% |
| Psychologist (Health Facility-Clinical-Safety) | 28.8 | 13 | 15.8 | 55% |
| Senior Psychologist (Health Facility) (Specialist) | 6.5 | 1 | 5.5 | 85% |
| Senior Psychologist, Correctional Facility (Supervisor) | 5 | 5 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Art-Safety) | 2 | 1 | 1 | 50% |
| Rehabilitation Therapist, State Facilities (Dance-Safety) | 0 | 0 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Music-Safety) | 2 | | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Occupational-Safety) | 0 | 0 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Recreation-Safety) | 17 | 5 | 0 | 0% |
| Medical Director, State Hospital/Developmental Center, CEA | 0 | 0 | 0 | 0% |
| Medical Director, State Hospital/Developmental Center | 1 | 0 | 1 | 100% |

MSH

| Classification as of February 15, 2007 COLEMAN RELATED POSITIONS | Budgeted | Filled | Vacant | % Vacant |
|---|---|---|---|---|
| Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Specialist), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Supervisor), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist, Correctional Facility (Supervisor) | 9.5 | 6 | 3.5 | 37% |
| Staff Psychiatrist (Safety) | 49 | 39.75 | 9.25 | 19% |
| Senior Psychiatrist (Specialist) | 0 | 0 | 0 | 0% |
| Psychiatric Technician (Safety) | 304.9 | 275.6 | 29.3 | 10% |
| Senior Psychiatric Technician (Safety) | 52 | 47 | 5 | 10% |
| Clinical Social Worker (Health/Correctional Facility) – Safety | 52.5 | 40.3 | 12.2 | 23% |
| Psychologist (Health Facility-Clinical-Safety) | 40.3 | 34 | 6.3 | 16% |
| Senior Psychologist (Health Facility) (Specialist) | 2 | 0 | 2 | 100% |
| Senior Psychologist, Correctional Facility (Supervisor) | 8 | 2 | 6 | 75% |
| Rehabilitation Therapist, State Facilities (Art-Safety) | 7 | 5 | 2 | 29% |
| Rehabilitation Therapist, State Facilities (Dance-Safety) | 4.5 | 3.5 | 1 | 22% |
| Rehabilitation Therapist, State Facilities (Music-Safety) | 11.3 | 8.1 | 3.2 | 28% |
| Rehabilitation Therapist, State Facilities (Occupational-Safety) | 0 | 0 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Recreation-Safety) | 34.5 | 28.5 | 6 | 17% |
| Medical Director, State Hospital/Developmental Center, CEA | 1 | 1 | 0 | 0% |
| Medical Director, State Hospital/Developmental Center | 0 | 0 | 0 | 0% |

NSH

| Classification as of January 1, 2007<br>COLEMAN RELATED POSITIONS | Budgeted | Filled | Vacant | % Vacant |
|---|---|---|---|---|
| Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Specialist), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Supervisor), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist, Correctional Facility (Supervisor) | 6 | 1 | 5 | 83% |
| Staff Psychiatrist (Safety) | 65.5 | 44.5 | 21 | 32% |
| Senior Psychiatrist (Specialist) | 4 | 0 | 4 | 100% |
| Psychiatric Technician (Safety) | 254.6 | 254.6 | 0 | 0% |
| Senior Psychiatric Technician (Safety) | 53 | 53 | 0 | 0% |
| Clinical Social Worker (Health/Correctional Facility) -- Safety | 72.1 | 62.8 | 9.3 | 13% |
| Psychologist (Health Facility-Clinical-Safety) | 59.4 | 60.6 | -1.2 | -2% |
| Senior Psychologist (Health Facility) (Specialist) | 0 | 0 | 0 | 0% |
| Senior Psychologist, Correctional Facility (Supervisor) | 6 | 0 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Art-Safety) | 16 | 12.4 | 3.6 | 23% |
| Rehabilitation Therapist, State Facilities (Dance-Safety) | 2.8 | 2.8 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Music-Safety) | 16.2 | 12.3 | 3.9 | 24% |
| Rehabilitation Therapist, State Facilities (Occupational-Safety) | 5 | 5 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Recreation-Safety) | 29.4 | 26.2 | 3.2 | 11% |
| Medical Director, State Hospital/Developmental Center, CEA | 0 | 0 | 0 | 0% |
| Medical Director, State Hospital/Developmental Center | 0 | 0 | 0 | 0% |

PSH

| Classification as of February 15, 2007<br>COLEMAN RELATED POSITIONS | Budgeted | Filled | Vacant | % Vacant |
|---|---|---|---|---|
| Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Specialist), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Supervisor), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist, Correctional Facility (Supervisor) | 25.4 | 0 | 25.4 | 100% |
| Staff Psychiatrist (Safety) | 81.2 | 63.3 | 17.9 | 22% |
| Senior Psychiatrist (Specialist) | 0 | 0 | 0 | 0% |
| Psychiatric Technician (Safety) | 713 | 658 | 55 | 8% |
| Senior Psychiatric Technician (Safety) | 85 | 85 | 0 | 0% |
| Clinical Social Worker (Health/Correctional Facility) – Safety | 109.4 | 90.5 | 18.9 | 17% |
| Psychologist (Health Facility-Clinical-Safety) | 56.25 | 49.8 | 6.45 | 11% |
| Senior Psychologist (Health Facility) (Specialist) | 0 | 0 | 0 | 0% |
| Senior Psychologist, Correctional Facility (Supervisor) | 28.3 | 0 | 28.3 | 100% |
| Rehabilitation Therapist, State Facilities (Art-Safety) | 10 | 3 | 7 | 70% |
| Rehabilitation Therapist, State Facilities (Dance-Safety) | 2 | 1 | 1 | 50% |
| Rehabilitation Therapist, State Facilities (Music-Safety) | 25.3 | 14.5 | 10.8 | 43% |
| Rehabilitation Therapist, State Facilities (Occupational-Safety) | 2 | 2 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Recreation-Safety) | 57.8 | 39.9 | 17.9 | 31% |
| Medical Director, State Hospital/Developmental Center, CEA | 1 | 1 | 0 | 0% |
| Medical Director, State Hospital/Developmental Center | 0 | 0 | 0 | 0% |

VPP

| Classification as of February 15, 2007 (COLEMAN RELATED POSITIONS) | Budgeted | Filled | Vacant |
|---|---|---|---|
| Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 25 | 21 | 4 |
| Senior Psychiatrist (Specialist), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 |
| Senior Psychiatrist (Supervisor), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 |
| Senior Psychiatrist, Correctional Facility (Supervisor) | 0 | 0 | 0 |
| Staff Psychiatrist (Safety) | 0 | 0 | 0 |
| Senior Psychiatrist (Specialist) | 0 | 0 | 0 |
| Psychiatric Technician (Safety) | 0 | 0 | 0 |
| Senior Psychiatric Technician (Safety) | 0 | 0 | 0 |
| Clinical Social Worker (Health/Correctional Facility) – Safety | 22 | 13 | 9 |
| Psychologist (Health Facility-Clinical-Safety) | 13 | 10 | 3 |
| Senior Psychologist (Health Facility) (Specialist) | 0 | 0 | 0 |
| Senior Psychologist, Correctional Facility (Supervisor) | 0 | 0 | 0 |
| Rehabilitation Therapist, State Facilities (Art-Safety) | 3 | 1 | 2 |
| Rehabilitation Therapist, State Facilities (Dance-Safety) | 0 | 0 | 0 |
| Rehabilitation Therapist, State Facilities (Music-Safety) | 4 | 4 | 0 |
| Rehabilitation Therapist, State Facilities (Occupational-Safety) | 1 | 1 | 0 |
| Rehabilitation Therapist, State Facilities (Recreation-Safety) | 12 | 5 | 7 |
| Medical Director, State Hospital/Developmental Center, CEA | 1 | 1 | 0 |
| Medical Director, State Hospital/Developmental Center | 0 | 0 | 0 |

VPP

| % Vacant |
|----------|
| 16% |
| 0% |
| 0% |
| 0% |
| 0% |
| 0% |
| 0% |
| 41% |
| 23% |
| 0% |
| 0% |
| 67% |
| 0% |
| 0% |
| 0% |
| 58% |
| 0% |
| 0% |

SVPP

| Classification: as of February 15, 2007 COLEMAN RELATED POSITIONS | Budgeted | Filled | Vacant | % Vacant |
|---|---|---|---|---|
| Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Specialist), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist (Supervisor), Correctional and Rehab Svs (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatrist, Correctional Facility (Supervisor) | 1 | 0 | 1 | 100% |
| Staff Psychiatrist (Safety) | 6 | 5 | 1 | 17% |
| Senior Psychiatrist (Specialist) | 1 | 0 | 1 | 100% |
| Psychiatric Technician (Safety) | 0 | 0 | 0 | 0% |
| Senior Psychiatric Technician (Safety) | 0 | 0 | 0 | 0% |
| Clinical Social Worker (Health/Correctional Facility) – Safety | 13 | 8 | 5 | 38% |
| Psychologist (Health Facility-Clinical-Safety) | 6 | 5 | 1 | 17% |
| Senior Psychologist (Health Facility) (Specialist) | 0 | 0 | 0 | 0% |
| Senior Psychologist, Correctional Facility (Supervisor) | 0 | 0 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Art-Safety) | 0 | 0 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Dance-Safety) | 0 | 0 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Music-Safety) | 0 | 0 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Occupational-Safety) | 1 | 1 | 0 | 0% |
| Rehabilitation Therapist, State Facilities (Recreation-Safety) | 10 | 5 | 5 | 50% |
| Medical Director, State Hospital/Developmental Center, CEA | 0 | 0 | 0 | 0% |
| Medical Director, State Hospital/Developmental Center | 0 | 0 | 0 | 0% |

# EXHIBIT H

PAY LETTER:  07-09
ISSUE DATE:  March 8, 2007

# DEPARTMENT OF PERSONNEL ADMINISTRATION
## SECTION I

**SUMMARY OF REVISIONS TO THE FIFTY THIRD EDITION (JULY 2006) OF THE CALIFORNIA STATE CIVIL SERVICE PAY SCALES LOCATED ON DPA'S PUBLIC WEB SITE**
**http://www.dpa.ca.gov/jobinfo/pay_scales/toc.shtm**

For questions regarding Section I, call (916) 324-9381, (ATSS) 454-9381
Technical questions will be referred to the appropriate DPA analyst.

The following changes are now updated on the electronic Pay Scales.  Changes to the Alphabetical and Schematic Listing (Section 15) will be updated within the first week of each month.

This pay letter is based on the provisions provided by the Federal court order No. CIV S-90-0520 LKK JFM P, Coleman vs. Schwarzenegger, filed on December 15, 2006.

NOTE:  A pay letter addressing salary equity for the Division of Juvenile Justice will be issued in the near future.

## SECTION 5: HIRING ABOVE MINIMUM AUTHORIZATION

The following classes and locations are deleted from the HAM section effective 01/01/07.

| Class Code | Class Title | Locations |
|---|---|---|
| 7616 | Senior Psychiatrist (Specialist) | **Mental Health**<br>Salinas Valley Psychiatric Program |
| 8232 | Psychiatric Technician | **Corrections and Rehabilitation**<br>Salinas Valley State Prison and<br>Correctional Training Facility<br>**Mental Health**<br>Salinas Valley Psychiatric Program |
| 8253 | Psychiatric Technician (Safety) | **Mental Health**<br>Salinas Valley Psychiatric Program |
| 9283 | Psychologist-Clinical, Correctional Facility | **Corrections and Rehabilitation**<br>Salinas Valley State Prison and<br>Correctional Training Facility |
| 9286 | Recreation Therapist, Correctional Facility | **Corrections and Rehabilitation**<br>Salinas Valley State Prison and<br>Correctional Training Facility |

# EXHIBIT I

# Flight of mental hospital staff taking a human toll

**Head of Atascadero state facility refuses to link suicides to acute loss of workers, but concedes that care is eroding.**

By Lee Romney and Scott Gold
Times Staff Writers

March 22, 2007

Two Atascadero State Hospital patients have killed themselves and four others have attempted suicide since early February — an alarming surge in such incidents at the Central Coast psychiatric facility that comes as it is rapidly losing key staff to more lucrative jobs in the prison system.

Until February, the facility had not had a suicide since August 2005, and the one before that occurred in 2001. Over the last six years, Atascadero has averaged less than one attempted suicide per month.

The recent spate of deaths and injuries occurred in the weeks after hospital administrators severely curtailed admissions for the first time in the institution's history, concerned that staff shortages were jeopardizing patients' safety.

Atascadero Executive Director Mel Hunter said he couldn't directly tie the suicides to the crisis. But he noted that acute staff shortages are clearly eroding care. To keep wards fully staffed, he said, the hospital has had to rely on overtaxed employees working large amounts of overtime.

"The best way to prevent suicides is to spend time with the men, to develop good clinical relationships," Hunter said. "In an institution running shortages from 52% to 80% on our clinical staff, we are bound to start seeing some bad outcomes."

The two men who died, Matthew Miller and Roland James, had been sent to Atascadero from the California prison system, where mental health care is so poor that a federal judge ruled it unconstitutional. The court ordered reforms, including steep pay raises for clinicians.

But those reforms have contributed to what one legislator called a "death spiral" at Atascadero as psychiatrists and other clinicians have left the facility for much more lucrative prison jobs.

Staff members had already been leaving the hospital, frustrated by relentless mandatory overtime, increasing assaults by patients and orders by the California Department of Mental Health to dramatically change the treatment philosophy. After the court-ordered prison raises, that trickle became a flood. On Jan. 18, Atascadero administrators closed the hospital to all but the most urgent admissions, saying that safety could not be guaranteed.

The prison system only sends its most severely mentally ill inmates to Atascadero, which seeks to adjust their medication, stabilize them and keep them safe. But in the midst of its crisis, the hospital failed some of its patients.

The recent cluster of suicide attempts began Feb. 4, when staffers discovered a gasping patient who had tried to hang himself from his bedroom locker. He survived without serious injury. Then on Feb. 15, Miller, 52, of Lynwood, killed himself using a similar method.

He was deeply despondent, a cousin who grew up with him said, having learned the previous month that he would be kept at Atascadero rather than paroled. Ron Ward, who grew up watching out for his socially vulnerable cousin, wonders why the hospital was not able to prevent the suicide because it was evident from Miller's letters that he was distraught. "Maybe they should have watched him better once they told him that," Ward, 53, said.

The next weekend, a patient overdosed on the antipsychotic drug Seroquel and was hospitalized. Another doused himself in baby oil, wrapped tissue around his body and set himself ablaze, suffering burns.

On the night of March 2, in the same unit where Miller killed himself, James — a 43-year-old father of four — hanged himself from his locker with a bedsheet.

A panicked staff member called his mother, Christine James, at her Redding home at 11:30 that night to report that her son had been found without a pulse. Then, concerned about privacy laws, she and other staffers refused to elaborate, leaving the family to call frantically through the night trying to get more information.

Ten days later — after yet another patient in the same unit unsuccessfully attempted to hang himself — James was removed from a ventilator. He was brain-dead.

In the weeks before his death, Christine James said, her son seemed to sink into deep despair. He told her he had been placed under intensive monitoring, and then, a few days before he hanged himself, he said the monitoring had been lifted.

"It's hard to accept. Your kids are supposed to outlive you," said Christine James, 62. "It's a mental hospital. I would have thought they would have watched him since they know mental patients are capable of such things." Suicide attempts sometimes come in copycat clusters, and those determined to die can be difficult to thwart.

Still, staffers are dismayed by what some say is the worst series of patient tragedies in recent memory and believe that the staffing crisis contributed. Staff members say that licensed caregivers are in such demand that they are often required to shift to units where they don't know the patients. The problems, they say, are compounded by low morale.

"When you have staff who feel defeated, how do you help patients who are basically criminals and feel defeated all the time?" one psychiatrist asked.

Hunter said he is doing what he can to stabilize his hospital. Lockers have been redesigned to eliminate the risk of patients using them to hang themselves. And last week, what Hunter hopes will be the first of an influx of contract psychiatrists began working at the hospital to help plug the 80% vacancy rate. The temporary doctors will earn about $240 per hour — triple the rate of

staff psychiatrists.

Hunter has also been advocating pay parity with the California Department of Corrections and Rehabilitation. The judge in the prison mental health case — which includes the Department of Mental Health because the hospitals treat some prison inmates — recently ordered state officials to equalize salaries in the two systems or present an alternative plan in court by April 6.

On Wednesday, after a meeting with Gov. Arnold Schwarzenegger, Department of Mental Health Director Stephen W. Mayberg announced a plan for temporary raises that will increase state pay for psychiatrists to within 5% of prison salaries and pay for other clinicians to within 18% of the prison rate.

"The governor is very concerned about the impact of the exodus of staff on patient safety and staff safety," Mayberg said.

Psychiatrists at Atascadero responded to the news with skepticism.

"This will slow down the hemorrhage but the patient is still bleeding to death," said Dr. John Cannell, whose patient load surpasses 100. "The real question to me is whether doctors who have left for corrections will be willing to take a 5% pay cut for the privilege of working at Atascadero State Hospital in its current deteriorating state. I don't think so."

Atascadero psychiatrist Michael Lisiak, the hospital's union steward, urged the federal judge to reject the plan, saying the "crisis will only continue" without pay parity.

The deteriorating conditions at Atascadero and the state's other mental hospitals underscore how entangled the mental health and criminal justice systems have become. The hospitals increasingly serve mentally ill patients who are either too ill to be tried for crimes they are accused of committing, too sick for the prison system to handle or too dangerous to be paroled.

Many received no mental health care at all until they found themselves in prison, where the care was lacking.

Attorneys who pressed the class-action case that resulted in raises for prison clinicians say they now plan to seek an order from the judge to reopen Atascadero to mentally ill prisoners and to improve care there.

"Even before the deaths, we felt that the situation at Atascadero was very dangerous and very likely to result in harm to patients," lawyer Michael Bien said.

Assemblyman Sam Blakeslee (R-San Luis Obispo) has held numerous meetings with Atascadero staff members over the last year and faulted the governor for not taking action more promptly.

"We've seen the implosion in corrections and what happens when a crisis is allowed to fester," he said. "There is the potential for a federal takeover, in which case you have no control. I would

hope the state of California would have the foresight to appreciate that the same fate could await us in the Department of Mental Health if we don't prioritize this now."

_____

*lee.romney@latimes.com*

*scott.gold@latimes.com*

# EXHIBIT J



This story is taken from Sacbee / Politics.

# Raises at mental health agency

## Move aims to halt psychiatrists' flight to prison system.

### By Andy Furillo - Bee Capitol Bureau
### *Published 12:00 am PDT Thursday, March 22, 2007*

Gov. Arnold Schwarzenegger moved Wednesday to stem an exodus of psychiatrists and other employees from the Department of Mental Health to more lucrative jobs in the prison system by ordering up $43 million in pay raises for them over the next two years.

The pay hikes followed huge increases handed out to prison psychiatrists late last year by U.S. District Court Judge Lawrence Karlton in the ongoing federal class-action case that covers mental health care in the California Department of Corrections and Rehabilitation.

Since the court-ordered pay raises went into effect, prison psychiatrists are now making upward of $252,000 a year. By contrast, DMH psychiatrists are earning only on the order of $144,000, according to figures provided by the agency's director, Stephen Mayberg.

"The governor was very concerned, very passionate about what's happening because of the ripple effect of decisions that are made by the courts about salaries," Mayberg said. "I think it's really sort of a dramatic commitment by the administration to deal with the impending crisis created by federal court decisions made with little thought about the implications for other parts of the system."

Karlton ordered the pay raises for the prison psychiatrists after surveys in the so-called Coleman case showed the corrections agency needed an estimated 500 more positions to push its mental health treatment toward constitutional standards, said plaintiffs' attorney Michael Bien.

The salary increases went into effect in January, and the ensuing flow of psychiatrists and others from DMH to CDCR immediately depleted state mental hospitals to the point where its overall vacancy rate is now measured at 43 percent, Mayberg said.

At Atascadero State Hospital, the figure is tilting at 70 percent, Mayberg said. The San Luis Obispo County hospital houses more than 1,200 patients, including mentally disordered sex offenders, sexually violent predators, people declared not guilty of crimes they committed because they were insane at the time and others who are so mentally incompetent they can't stand trial.

The staffing crisis became so acute at Atascadero that the hospital stopped taking admissions Jan. 23, according to a letter to Coleman special master Michael Keating received from Cynthia A. Radavsky, DMH's deputy director of long term care services.

Bien said the impact of the staffing shortages at Atascadero, where each psychiatrist is handling a caseload of 100 patients, is "staggering." He said the facility had only two patient suicides this decade before Jan. 1. It has equaled that number in the less than three months since, he said.

"I think that the state made this problem," Bien said. "Not the court or the special master or the plaintiffs. It's obvious to anyone that if you raise a salary for someone in a state position where they have the freedom to move and that they can get a substantial increase, people will move. And sure enough they did."

Even with the increases, DMH psychiatrist salaries are still going to sit 5 percent below those in the prisons. Some other jobs in the mental health system will still pay 18 percent less than in the prisons.

The plaintiffs' lawyer said he pleaded for pay raises for the DMH staffers at the same time he was trying to get them for the prison psychiatrists. Both agencies were paying mental health workers well below market rates even before Karlton raised them for the prison doctors, Bien said. "The state's been cheating their employees for years," he said.

Meanwhile, the salary hikes ordered by Schwarzenegger for the DMH psychiatrists, as well as for psychologists and recreational therapists, will go into effect April 1, said Department of Finance spokesman H.D. Palmer. The agency will absorb about $9 million of the increases in its current-year budget while the governor is asking the Legislature to fund $34 million in added psychiatrist pay in the 2007-08 budget, Palmer said.

Besides the Coleman case, Mayberg said the increases also resulted from pressure the state has been getting from the federal government after its investigation into staffing ratios and treatment options in the state mental hospitals. He said an agreement Sacramento reached with Washington on the matter is threatened by the departure of the DMH psychiatrists to the prisons.

Schwarzenegger ordered the raises about 4:30 Wednesday afternoon.

"It's that high a priority, to get this started, to do the right thing," Mayberg said. "It's an issue of public safety and community safety and quality of care. If I can't keep a hospital open without adequate clinical staff, those folks go out in the street."

Go to:  Sacbee / Back to story

This article is protected by copyright and should not be printed or distributed for anything except personal use.
The Sacramento Bee, 2100 Q St., P.O. Box 15779, Sacramento, CA 95852
Phone: (916) 321-1000

Copyright © The Sacramento Bee

# EXHIBIT K

# CENSUS AND WAIT LIST DATA FOR INTERMEDIATE CARE FACILITY AND DAY TREATMENT PROGRAM BEDS
## AT THE CALIFORNIA MEDICAL FACILITY
### REPORT DATE: 12/01/2006

| UNIT | CAPACITY | FILLED | HOLD | AVAILABLE |
|---|---|---|---|---|
| A-2 DTP[1] | 44 | 43 | 1 | 0 |
| A-3 ICF[2] | 40 (35)* | 35 | 0 | 0 |
| P-2 Level IV | 36 | 36 | 0 | 0 |
| S-1 MHCB[3] | 25 | 16 | 2 | 7 |

*Bed capacity reduced for State Fire Marshall required renovations

| S-1 MHCB TOTAL REFERRALS | TOTAL ACCEPTED | TOTAL REJECTED |
|---|---|---|
| 41 | 41 | 0 |

| Unit | Single Cell Capacity | Single Cell Filled | Single Cell Hold | Single Cell Available | Dormitory Capacity | Dormitory Filled | Dormitory Hold | Dormitory Available |
|---|---|---|---|---|---|---|---|---|
| SVPP[4] | 32 | 27 | 5 | 0 | 32 | 22 | 0 | 10 |

| Unit | Single Cell Capacity | Single Cell Filled | Single Cell Hold | Single Cell Available |
|---|---|---|---|---|
| D-6 SVPP | 54 | 38 | 2 | 14 |

## WAIT LIST DATA

| UNIT | WAIT LIST |
|---|---|
| P2 ICF LEVEL IV | 0 |
| A3 ICF | 2 |
| A2 DTP | 9 |
| SVPP | 106 |

CENSUS AND WAIT LIST DATA FOR INTERMEDIATE CARE FACILITY AND DAY TREATMENT PROGRAM BEDS
AT THE CALIFORNIA MEDICAL FACILITY
REPORT DATE: 12/01/2006

WAIT LIST DATA BY HOUSING UNIT/LEVEL OF CARE

| FACILITY | PSU[5] | MHCB | ACUTE | AD. SEG – EOP[6] | SHU[7] | EOP[8] | PC 1370 | TOTAL |
|---|---|---|---|---|---|---|---|---|
| P-2 ICF LEVEL IV | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| A-3 ICF | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| A-2 DTP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SVPP | 7 | 11 | 1 | 26 | 0 | 31 | 30 | 106 |
| SVPP PC 1370 | 5 | 1 | 0 | 7 | 3 | 14 | --- | 30 |

[1]Day Treatment Program
[2]Intermediate Care Facility
[3]Mental Health Crisis Beds
[4]Salinas Valley Psychiatric Program
[5]Pyschiatric Services Unit
[6]Administrative Segregation Enhanced Outpatient Program
[7]Security Housing Unit
[8]Enhanced Outpatient Program

12/01/2006

2

# EXHIBIT L





5660 El Camino Real    Atascadero, CA 93422    Phone: 805-466-2585 -- Fax: 805-466-2714

News

Top Stories

Sports Update

Editorial

Obituaries

Redlight Roundup

Community Calendar

Community News

Sunny Side

Birth Announcements

Engagements/Weddings

Search Archives

RSS Feed Information

Classifieds

View Classifieds

Search Classifieds

Place Classified

Contact Us

Staff Directory

Engagement Form

Wedding Form

Birth Form

Subscription
Information

Local Links

City of Atascadero

Atascadero Chamber of
Commerce

Atascadero Main Street
Association

Paso Robles Press





Current
Weather
for
Atascadero

Partly Sunny
72

More ▶

powered by
AccuWeather.com

## Atascadero State Hospital continues to struggle with high vacancies

BY ELLEN HOLLAND FEB. 7, 2007

With state Assemblyman Sam Blakeslee calling for the Department of Mental Health to take "swift actions to address the staffing crisis at Atascadero State Hospital," the facility continues to struggle with low staffing levels in the wake of a proposal to add 4,854 permanent mental health beds within the state's prison system by 2011 including 1,073 beds at the California Men's Colony.

The proposal, which comes as a part of the California Department of Corrections and Rehabilitation's efforts to address the housing and treatment needs of its seriously mentally ill inmate patient population, is the result of two lawsuits that have also ordered pay increases in order to attract clinicians.

These CDCR pay increases have resulted in a wage disparity between the state's prison and hospital systems and contributed, in part, to staff shortages at ASH reaching all time highs along with the hospital's Jan. 18 decision to expand its waiting list for admission. "Unless this issue is promptly addressed, the lack of pay equity and poor working conditions will further exacerbate the hemorrhaging of professional staff from ASH to the California Men's Colony," Blakeslee wrote to DMH Director Dr. Steven Mayberg on Jan. 30. "The situation is unacceptable. As you know, the chronic understaffing at ASH has recently been aggravated by recruitment competition from the prison system, which is in federal receivership. Cannibalizing one institution to staff another only creates a more dangerous problem, by shifting staff shortages to those who must oversee the criminally insane in our state."

Blakeslee goes on to call for Mayberg to participate in a community stakeholders' forum "to discuss the impacts created by the current staffing shortage and your plans to ensure coordination between the [CDCR] and DMH on a forward-looking basis."

This forum, which will include top officials from the CDCR And DMH in addition to principle stakeholders within the community, is tentatively set for Friday, Feb. 23 at a location that has yet to be determined.

Blakeslee's District Director Christine Robertson said the forum, which will be open by invitation, will reflect a three-pronged approach addressing salary discrepancies between CMC and ASH in addition to a host of other impacts that could be affected by the proposal to increase the beds at CMC, including an additional 1,000 medical beds she said are soon to be proposed. The forum will also include an update on Assembly Bill 1880, which was introduced by the assemblyman to address staff safety at ASH and passed last year.

Shelly Thompson, CMC public information officer, said

the proposal to add mental health beds throughout the state's prison system including CMC will have to be reviewed by the court overseeing the Coleman v. Schwarzenegger lawsuit in addition to the federal reviewer in charge of medical services, special master, or person appointed by a court to supervise the execution of certain court orders, and the plaintiff's attorney. She added if the proposal to expand CMC is enacted "that would give us room for 600 inmates at the general patient population."

"This is sometime in the future at this point," Thompson said.

In the meantime, ASH has reached record vacancy rates, with 70 percent psychiatrist vacancies, followed by high vacancy rates in the fields of psychology, clinical social workers and rehabilitation, police services and nursing.

"The [state] hospitals in general are experiencing high vacancies," ASH Public Information Officer Barrie Hafler said in January, noting the vacancies are both complex and interactive.

On Jan. 18, the hospital expanded its waiting list for admissions and increased the number of transfers to other facilities within the state hospital system. In addition, ASH has been cleared by the DMH to hire psychiatrists under short-term contracts as soon as possible.

Last month, Hafler said while a psychiatrist can earn $13,872 a month at ASH, he or she is proposed to receive $21,031 per month with the CDCR.

A statewide investigation of the hospital system, pursuant to the Civil Rights Institutionalized Persons Act and completed by the Department of Justice on Dec. 2, 2005, found "significant and wide-ranging deficiencies in patient care provided at ASH," and resulted in a collaborative agreement that included improvements such as a requirement to maintain certain psychiatrist to patient ratios, which are not being met at ASH, Hafler said in January.

"The psychiatrists are working with extremely large case loads," ASH Executive Director Mel Hunter said in January and added while the bill introduced by Blakeslee last year "has helped us to reduce the amount of mandatory overtime," a significant amount of voluntary overtime is still required.

For more information on Blakeslee's forum, call 549-3381 or 1-916-319-2133.


**Send us your comments about this article.**

# EXHIBIT M





5660 El Camino Real    Atascadero, CA 93422    Phone: 805-466-2585 -- Fax: 805-466-2714

**News**
Top Stories
Sports Update
Editorial
Obituaries
Redlight Roundup
Community Calendar
Community News
Sunny Side
Birth Announcements
Engagements/Weddings
Search Archives
RSS Feed Information
**Classifieds**
View Classifieds
Search Classifieds
Place Classified
**Contact Us**
Staff Directory
Engagement Form
Wedding Form
Birth Form
Subscription Information
**Local Links**
City of Atascadero
Atascadero Chamber of Commerce
Atascadero Main Street Association
Paso Robles Press



## ASH unions hold demonstration to address staffing shortages, safety

BY ELLEN HOLLAND FEB. 28, 2007



Against the backdrop of a sinking ship, several community leaders addressed dozens of Atascadero State Hospital employees Friday during a union-led demonstration geared toward improving staffing shortages and safety within the facility as one component of the state hospital system.

"We've got the same type of patients back there, we've got prison commitments back there," said Richard Marshall, a psychiatric technician and shift leader at ASH, adding that state hospital employees face greater dangers for a lower salary than those within the California Department of Corrections and Rehabilitation. "I could easily go and work for the department of corrections, but that's not the answer. You don't torpedo a sinking ship that's salvageable. You deal with it. You fix the problem."



The demonstration was hosted by the American Federation of State, County and Municipal Employees Local 2620 in cooperation with the California Association of Psychiatric Technicians and marked the day CAPT's bargaining unit, which represents 7,000 psychiatric technicians across California, re-opened contract negotiations with the state.

The demonstration also came in the wake of a court order that includes proposals to add mental health beds within the CDCR in addition to pay increases for clinicians employed with the CDCR along with psychiatric facilities run by the Department of Mental Health. The pay increases mandated by Coleman v. Schwarzenegger do not include state hospitals and have caused a wage disparity between the state bodies.

The suit's special master, J. Michael Keating Jr., toured the hospital on Feb. 21 as one of many facilities within the DMH. Keating was joined by a team that included the suit's deputy special master and focused on the admissions process and delivery of treatment programs for the population of prisoners referred from the CDCR to the DMH, ASH Public Information Officer Barrie Hafler said.

A special master is a person appointed by a court to supervise the execution of certain court orders.

**Current Weather** for Atascadero



Sunny
52

More ▶

powered by AccuWeather.com



"Funny how the state finds the money when there's a lawsuit pending," ASH Music Therapist Mary Alverado said of the Coleman suit and added Schwarzenegger's proposal to spend $10.9 billion to construct new prisons and reduce overcrowding is not a viable solution. "We contend that changing the culture of punishment and dehumanization would be a better long term plan. We contend that spending taxpayer dollars on more prisons only extends the problem. Building more prisons does not make our community safer."

Many of Friday's demonstrators held signs that read messages such as "Hey, Arnold, it's up to you," "ASH staff = excellent, enthusiastic, exhausted," and "More prison beds won't make California safer — Good staff will," while cars passed the hospital's entrance, often honking in a show of support.

Hafler said staff vacancy levels at the hospital, which have reached an all-time high, have not improved since the hospital expanded its admission waiting list on Jan. 18. The field of psychiatrists, Hafler said, represents the highest vacancy rate at 70 percent followed by high vacancy rates in the fields of psychology, clinical social workers and rehabilitation, police services and nursing. In addition, ASH Medical Director Dr. David Fennell announced on Feb. 23 that he would be accepting a position as a senior psychiatrist at the California Men's Colony beginning on March 26, Hafler said.

ASH music therapist Alicia Nowicki was one of many hospital employees who said that a raise in wages would be a potential solution.

"We just don't get enough people coming," she said and added she prefers to work at ASH because she loves her work and is interested rehabilitating her patients to they can re-join society. "It's too expensive for California to keep locking people up."

Nowicki said she has had a double caseload for a long time and, combined with a system that is in the process of changing, finds herself struggling to keep up.

"We're not against anything, we're just for improved safety conditions and better staffing," she said. "It's a matter of integrity for us. We want to provide quality treatment. We can't do what we are supposed to be doing, that's the problem."

"This is about the safety of my community, the safety of my patients and the safety of my staff," added John Myers, the local chief steward of CAPT and senior psychiatric technician shift leader. "A society is judged by the way they treat their lowest common denominator."

Myers said his colleagues are flocking to positions within the CDCR not only for higher wages, but for safety.

"In here we use our talents, we use our license, we use our brains to take care of these individuals. We don't have weapons," he said and added that penalties for patients destroying property at ASH are often more severe than assaulting a staff member.

Myers also said that staff morale is declining due to the fact that employees are working enormous amounts of overtime.

"If we didn't do this, this place would not stay open," he said and added ASH employees that remain want to take care of their patients. "They want to stay in our community. This [demonstration] is about our community and what we do here."

ASH is the largest employer in the city of Atascadero and many of the demonstration's featured speakers acknowledged the hospital's connection with both the community's safety in addition to the city's economic well being.

Hafler said that two of ASH's 32 units will soon be emptied due to a reduction in the hospital's patient census, a result of restricted admissions coupled with

patient transfers to other state hospitals, along with a project slated to repair water damage. This means staff from the two units in question will join one of the 32 remaining units.

Atascadero City Councilwoman, ASH registered dietician and AFSME member Ellen Beraud said that working at the state hospital is like being a member of a family.

"It's important that we maintain our integrity," Beraud said of the demonstration that will be repeated at other state hospitals during the coming weeks.

Mayor George Luna said finding a solution for the problems plaguing ASH is a top priority of the city.

"The people who work here are our neighbors and friends and we support you 100 percent," he said and added the council is asking that Mayor Pro Tem Mike Brennler be appointed to the state advisory board, replacing the seat vacated by former Councilwoman Wendy Scalise in May 2006.

Luna went on to say that retention and recruitment in addition to salary increases, safe working conditions and effective personnel are issues that need to be immediately addressed at ASH.

"By failing to pay equitable wages, attrition has become systemic and is destroying staffing levels making a difficult job even more dangerous," Brennler said.

"Unless changes are made immediately this danger will, I repeat will, trickle down into the communities outside the walls of this state facility. We do not have the luxury of managing by crises, the stakes are simply too high. This has become far more than a black eye, and that said, I call upon our state officials to step up and resolve the problem. Assuming I will be appointed to the advisory board, you can be sure I will be your advocate."

CAPT's local President Steve Wright said overtime at ASH takes away from families and added with an increase in pay, the hospital will see an increase in staff.

"We cannot afford to have any more staff leave," he said. "Additional staffing means additional safety."

Atascadero Chamber of Commerce CEO and President Joanne Main said the loss of jobs at ASH is of great concern to the chamber, which is dedicated to creating jobs through business. Main added that when the heads of Atascadero households leave for better paying jobs elsewhere, a ripple effect is felt throughout the entire community.

Assemblyman Sam Blakeslee, who called for the DMH to take "swift actions to address the staffing crises at Atascadero State Hospital," will host a forum on Friday, March 9 that will include top officials from the CDCR and DMH in addition to principal stakeholders within the community.

Blakeslee's District Director Christine Robertson said the forum will address salary discrepancies between ASH and CMC in addition to a number of other impacts that could be affected by the proposal to increase the mental health beds within the CDCR. The forum will also include an update on Assembly Bill 1880, introduced by Blakeslee in an effort tackle staff safety at ASH and passed last year.

Hafler said a court order has also instructed the governor's administration to examine drafting a plan that will speak to the salary disparity.

"Keep up the pressure and let the community know what the problem is," Fifth District Supervisor Jim Patterson said and added potential solutions for ASH will not be easy. "Keep it up, good luck. I'm on your side."

"Your community is behind you," Councilman Tom O'Malley added.

"It is safety at the hospital, it is also public safety in the community," AFSME's Local Chief Steward and ASH psychologist Dr. Bill Safarajan said. Safarajan concluded

the demonstration by asking that all present contact their legislators and demand the governor develop a plan to stop the staff "hemorrhaging" at ASH and restore patient treatment.

**Send us your comments about this article.**

As an employee at Napa State Hospital, and one who is tired of seeing one great employee after another leave for CDC, or something else...we sympathize completely with what ASH employees are going through! We need as much help as they do. I hope that this will increase the awareness of how severe this crisis is at ALL the California state mental hospitals.

My sister is a music therapist at ASH. With so many of the staff leaving for more money at the prisons, I worry about her safety. All of their safety. She is in a position that is not offered at the prisons and she loves her job. It is hard to find people that really 'love' their job and not giving those who choose to stay on with ASH and all the other state mental facilities is just wrong. Why should prison employees be paid more for 'guarding' the inmates than those at the state mental facilities that are educated with associates and masters degrees, hired to rehabilitate the patients and make sure them ready for society. They are the key people who that when the patients are deemed ready for 'the real world' make sure they are both mentally stable and not a threat to the communities they are entering to. Inmates at the prisons are not going to get the treatment necessary to acquire this. I don't blame the employees from state facilities moving on to the prisons for more money. What is sad is that they should not have to. The STATE mandates the mental hospitals. Why can't the state take care of the state mental hospital employees as well as the prisons? Most of the hospitals for example ASH and PATTON are no safer a place to work than the prisons, yet the prison employees are the ones being compensated. It just doesn't make sense.
Margie Gonzalez

I am a Police Officer at Atascadero State Hospital. I have worked here for seven years and have seen the safety of this facility get worse by the year. Our problem for our agency is with our union. (Cause)Bargaining Unit 7 is the weakest link. They have done nothing for us and they will not stand up to Sacramento. The other problem for ASH is DMH's president Stephen Mayberg does not support his own department. I believe that when Mayberg leaves the problem will be solved. I thank you for the great article and hope more are to follow.
Sean Keller

# EXHIBIT N



THE TRIBUNE

# SanLuisObispo.com



Current: 58°
64° / 41°
Complete Forecast



Win an Ultimate *click here to learn more*
Smooth Skin Makeover
American Laser Centers

Search  ○ Recent News  ○ Archives  ○ Web  for  [_____]  Go    Welcome Guest
Sign Up | Sign In | Member Benefits

**News**
- Obituaries
- Breaking News
- Local
- Nation
- Photos
- Politics
- Elections
- State
- Weird News
- World
- Central Coast Sun Bulletin

**Sports**
**Entertainment**
**Business**
**Living**
**Opinion/Letters**

○ **Jobs**
○ **Cars**
○ **Real Estate**
○ **Apartments**
○ **Local Shopping**
○ **All Classifieds**
  - Create an Ad
  - Find an Ad
○ **Dating**

**Find a Job**
Keywords:
[e.g. registered nurse]
Location:
[San Luis Obispo, CA]
Web IDs:
[_____]



**ONLINE FEATURES**
Tribune Front Page
Newspaper Ads Online
Advertising sections
Past articles
Discussion Boards
Maps & Directions
Newcomers Guide
Newsroom Projects
Video/Audio
Yellow Pages

**SITE SERVICES**
Contact Us
• Staff List
RSS Headlines
Advertise

Back to Home >

**News**  XML                                   Wednesday, Mar 21, 2007

Posted on Thu, Feb. 01, 2007    ☑ email this  🖨 print this  ⬚ reprint or license this

# CMC plan would aggravate ASH staffing shortage, some say

Sarah Amquist
The Tribune

A recent proposal to add hundreds of mental health beds at the California Men's Facility by 2011 would aggravate an already severe staffing shortage at Atascadero State Hospital unless salary disparities between the state prison and mental health systems are amended, officials say.

The Department of Corrections & Rehabilitation has proposed constructing additional mental health beds at seven state prisons to address a current bed shortage and satisfy future needs. The plan calls for state prisons to build 4,854 permanent mental health beds by 2011, including 1,123 beds at CMC.

Expanding CMC's mental health program worries staffers at ASH, where clinicians are transferring in record numbers to work at the better paying prison.

ASH has all-time high staffing vacancy rates, reaching 70 percent for psychiatrists and 60 percent for psychologists.

ASH spokeswoman Barrie Hafler said Wednesday that hospital administrators had not yet received the proposal and could not comment on how specifically it would impact the facility.

"It's really too soon for us to make a forecast, other than the observation that the implication for personnel issues is big," she said. "This underscores the need to work (with the corrections department) toward a solution."

Members of several state departments created the plan for prison mental health beds, which has support from the Schwarzenegger Administration, said Terry Thornton, a spokeswoman for the Department of Corrections & Rehabilitation.

The plan is not final until the court that monitors the constitutionality of mental health services within state prisons reviews and approves it, Thornton said.

"It is all a work in progress," she said.

Mental health care at state prisons is over capacity. Currently, 32,577 inmates receive varying levels of mental health care in the state's prisons. That's above the prisons' capacity to treat 28,000 inmates, Thornton said.

The construction of 1,073 new mental health beds at CMC by 2011 would free the existing 670 mental health beds for use by the general inmate population. It would also free up 256 beds currently reserved for prisoners at ASH.

In December, a federal judge mandated salary raises to alleviate high vacancy rates for prison mental health staff. Clinicians are now leaving ASH to earn up to 45 percent more at CMC.

Assemblyman Sam Blakeslee, R-San Luis Obispo, has called on top officials in the governor's administration to fix a "meltdown at ASH" that poses significant safety risks to patients and staff.

Plans to expand CMC could worsen the crisis at ASH "unless these large agencies start coordinating with one another," Blakeslee said. He plans to host a local community forum on Feb. 28 where San Luis Obispo County residents can speak with top officials from the state Department of Mental Health and Department of Corrections.



"The hemorrhaging we're seeing at ASH is so critical that as a Legislator I feel it is my job to get the parties in the room talking to each other in front of key stakeholders in the community," Blakeslee said.

Christine Rash, a pharmacy technician at ASH for eight years said the current staffing situation is sad and increasingly becoming unsafe.

Expanding CMC "would take the rest of the people that we have here, and ultimately could end up closing the place down," Rash said. "Not only that, the danger rate in this place would go sky-high."

Since vacancy rates have soared, red light warnings are more common, she said. Staffers signal a red light warning when a patient situation is beyond their control.

"The people working out there on the units are so tired and so worn down that they can't do their job properly and that endangers the patients," Rash said.


SUBSCRIBE TODAY
SIGN UP FOR HOME
DELIVERY OF
THE TRIBUNE TODAY!

Ads by Google

Agostini Nurse Staffing
100% Nurse Owned 20 yrs in business Highest weekly pay, private lodging
www.nursesonthego.com

Staffing Business Plan
Business Plan for a Staffing Agency Immediate Download - Special Offer
www.125aday.com


Visit other Real Cities sites

News | Business | Sports | Entertainment | Living | Shop Local | Classifieds | Jobs | Cars | Homes
About SanLuisObispo.com | About the Real Cities Network | Terms of Use & Privacy Statement | Copyright | About the McClatchy Company

