**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

RALPH COLEMAN, et al.

    Plaintiffs,

    vs.                       No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

**SEVENTEENTH MONITORING REPORT OF THE SPECIAL MASTER**
**ON THE DEFENDANTS' COMPLIANCE WITH**
**PROVISIONALLY APPROVED**
**PLANS, POLICIES AND PROTOCOLS**

**PART B**

J. Michael Keating, Jr., Esq.
Special Master
2351 Sussex Drive
Fernandina Beach, FL 32034
(904) 491-7157
Fax: (904) 491-7158
April 2, 2007

# TABLE OF CONTENTS

Avenal State Prison (ASP)                                                4

California State Prison, Solano (CSP/Solano)                             15

California Substance Abuse Treatment Facility (CSATF)                    28

California Training Facility, Soledad (CTF)                              41

High Desert State Prison (HDSP)                                          47

Pleasant Valley State Prison (PVSP)                                      63

Sierra Conservation Center (SCC)                                         73

Summary                                                                  84

Recommendations                                                          102

Exhibits

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    Plaintiffs,

      vs.                 No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

---

**SEVENTEENTH MONITORING REPORT OF THE SPECIAL MASTER
ON THE DEFENDANTS' COMPLIANCE WITH
PROVISIONALLY APPROVED
PLANS, POLICIES AND PROTOCOLS**

**PART B**

The following is the second installment of the 17th round report on the California Department of Corrections and Rehabilitation's (CDCR's) compliance with the plans, policies and protocols provisionally approved by the court in mid-1997. This installment of the 17th round report will focus on seven institutions in CDCR with large Correctional Clinical Case Management System (3CMS) caseloads. The total 3CMS population in these seven facilities as of December 2006 was 7,792 inmates, 462 of them in administrative segregation. The total represented roughly 28 percent of all 3CMS inmates in CDCR. On the other hand, the seven institutions housed just 60 Enhanced Outpatient Program (EOP) inmates. Four of the seven institutions had Correctional Treatment Centers (CTCs) containing a total of 40 Mental Health Crisis Beds.

      The goal of these multiple reports, again, is to expedite finalization and submission of the 17th round report. Monitoring visits to the institutions covered in the

17th round were completed by early August, although some paper reviews were not submitted until later. Still, the data presented here reflects conditions largely in the first half and middle of last year. Since mid-2005, when intervening issues involving finalization of the revised Program Guide, access to Department of Mental Health (DMH) inpatient care, a crisis in the availability of MHCBs, a rapidly expanding population and multiple organizational and personnel changes in CDCR, together with a much increased level of litigation in the case, left little time and few resources for report preparation, the submission of regular reports has lagged. By dint of more careful scheduling of site visits and jump-starting the analysis of data and report writing, as well as employing additional personnel to prepare reports, the goal is to submit final reports to the court within 60 days of the completion of future rounds.

This report contains the monitor's findings relative to compliance with the Program Guide for mental health services and each institution's own Corrective Action Plan (CAP) for eliminating local deficiencies in the delivery of mental health services in seven institutions, including, in alphabetical order, Avenal State Prison (ASP), California State Prison, Solano (CSP/Solano), California Substance Abuse Treatment Facility (CSATF), California Training Facility (CTF), High Desert State Prison (HDSP), Pleasant Valley State Prison (PVSP) and Sierra Conservation Center (SCC).

The general format for this partial report will remain the same as in Part A. An institutional summary of compliance for each CDCR institution is provided, which includes a description of current staffing and staffing vacancies; a list of resolved CAP problems when appropriate; discussion of the institution's progress, or lack of progress, in meeting requirements related to quality management, medication

management, mental health input into the disciplinary process and transfers to more intensive levels of mental health care; identification of problems cited in the institution's CAP and targeted for elimination; and a brief concluding summary of the institution's overall performance during the monitoring period. A comparative analysis of compliance among all of the seven covered facilities follows, along with recommendations springing from the analysis.

The nature of some issues that were the focus of intense scrutiny in the ~~preceding round, including the use of video monitoring to observe inmates on suicide~~ watch or precaution in MHCB units or Outpatient Housing Units (OHUs) and the application of cardio-pulmonary resuscitation (CPR) in emergency medical interventions, shifted during the 17th round as policy changes were adopted by the defendants and incorporated into departmental practices. Another complication arose from the court's formal approval in March 2006 of the revised Program Guide containing enhanced standards for mental health care applicable in all CDCR institutions. The defendants published their plan for the adoption of the new guidelines in April, and much of the early summer was consumed in a struggle to obtain sufficient additional mental health staffing to implement them effectively. That effort succeeded during the special legislative session at summer's end, but the 551 additionally allocated permanent and temporary mental health positions took months to appear at the institutional level, and the recruitment of clinicians to fill them still proceeds slowly. For all of these reasons, the defendants' implementation of the revised Program Guide did not begin until well after completion of the 17th round of compliance.

As in the past, administrators and mental health staff at the visited institutions continued to cooperate fully with the monitoring process. Also, while the data collected and findings discussed in this report are the product of many members of different monitoring teams, references to various monitors throughout this report will be singular rather than plural. Clinical judgments of the monitor's psychiatric experts are explicitly attributed to an expert.

## Institutional Summaries

### ~~Avenal State Prison (ASP)~~
March 20, 2006 – March 22, 2006

ASP had significant vacancies among mental health staff. All 3.5 allocated psychiatrist positions were vacant. Contractors covered the equivalent of 1.8 vacancies. There were no mental health supervisors other than the chief of mental health.

Half of the 12 allocated psychology positions were filled, while the equivalent of 3.1 of the six vacant positions was covered by contractors. Both psych social worker positions were filled. Three of four psych tech positions were filled, and contractors covered the equivalent of one position.

An RN II recently joined the staff, and contractors covered a vacant half-time RN position. All 5.5 office tech positions were filled, but one office tech had been diverted indefinitely to medical appeals and another was about to leave on long-term medical leave. Staff believed that too few clerical positions were allocated.

ASP's total population was 7,317, and the mental health caseload included 941 inmates, 22 percent below its cap of 1,199. The caseload included 923 3CMS inmates, while 17 inmates were designated EOP and one was at the MHCB level of care. Of the 130 inmates in administrative segregation, 30 were 3CMS and six were EOP. The

sensitive needs yard (SNY) population included 381 3CMS and five EOP inmates. The census on the SNY rose from 1,275 in September 2005 to 2,607 in March 2006.

Issues Resolved:

> Chronos necessary to prepare cases for transfer were forwarded to classification timely.

Quality Management:

Quality management improved significantly during the monitoring period but was still non-compliant. The local governing board was inoperative, and not all required committees were active. The quality management committee met monthly during the last three months of 2005 but did not meet during the first three months of 2006. Nonetheless, data produced by the institution improved significantly during the monitoring period in reliability, quality and relevance.

Quality Improvement Teams (QITs) addressed Inter-disciplinary Treatment Team (IDTT meetings, inmate sexual misconduct, supervision of unlicensed staff, psychotropic medication in the Outpatient Housing Unit (OHU), medical forms, policies and procedures, delivery of files and medication to yards, loose filing, Medical Technician-Assistant (MTA) workload and self-audits in medication management. Audit results pertaining to the CAP were available.

The mental health subcommittee met monthly in five of the preceding six months. Minutes showed that it addressed ducats, delivery of Uniform Health Records (UHRs) and medication to yards and psych tech duties in administrative segregation.

The Mental Health Tracking System (MHTS) database was not accurate. A small concordance study done by the monitor found that many clinical contacts and

IDTT meetings documented in UHRs were not recorded in inmate histories generated by the MHTS. Staff attributed the omissions to lack of allocated clerical positions.

Regarding suicide prevention, a QIT addressed five-day follow-up and implementation of requirements regarding inmate histories of suicidal behavior. ASP adopted tracking forms used with the MHTS, which had been expanded to include historical and current suicide-related information. Additional office tech allocations were requested to support this function.

Medication Management:

In January 2006 ASP adopted a revised local operating procedure that addressed medication administration, refusals, hoarding, intra-facility transfers and medication renewal and delivery for arriving and paroling inmates. Procedures included a provision for mandatory referrals for medication non-compliance. An RN II, who initiated several medication administration monitoring procedures, had recently joined the staff. No audits of whether medication non-compliance reliably triggered referrals were conducted prior to the monitor's visit.

Medication continuity upon arrival and expiration of orders were problematic. A staff audit of 400 records found that 53 percent of inmates arriving at ASP with current orders received medication within 24 hours of arrival. Delays in administration were attributed to the process for obtaining non-formulary medication and under-referral for psychiatric evaluations. ASP improved its ability to track and audit renewal procedures and the length of time that elapsed between writing of orders and administration of medication. No audits examined medication continuity following changes in housing.

Orders were not processed expeditiously after being written. Staff audits found that medication was administered within one day of an order in 62 to 77 percent of cases. Delayed administration was more frequent in administrative segregation. A staff audit found that in administrative segregation medication was administered within 36 hours of being ordered in just 40 percent of cases.

A UHR audit found that orders were renewed prior to expiration in 73 to 82 percent of cases. Orders for psychotropic medication were often renewed without face-to-face contact. The use of bridge orders decreased medication lapses, but the shortage of psychiatrists delayed face-to-face contacts for renewals. At times only one psychiatrist was on duty. Bridge orders extended as long as 30 days but were typically written for seven to 14 days. The condition of the inmate was a factor in the duration of a bridge order.

Mental health response time to referrals triggered by medication non-compliance was prompt at least half of the time. Two audits done by mental health staff that included data from a total of approximately 400 UHRs yielded disparate results. One audit found that inmates were referred and seen within seven days in 53 percent of cases, while the other found a compliance rate of 82 percent.

No written protocol addressed monitoring blood levels of inmates on mood-stabilizing medications. Staff audits found a wide range of results. Lab tests were ordered in fewer than 30 percent or in as many as 93 percent of cases.

No Keyhea orders were initiated.

Nursing staff reported that 20 inmates had orders for HS medication. HS orders were administered after 8:00 p.m.

Available information suggested that a supply of medication was provided to paroled inmates. Pharmacy staff reported that they typically received up to one week's notice that inmates on psychotropic medication were paroling. The pharmacy provided a 30-day medication supply to inmates at the time of parole and maintained signed receipts for the medication distributed.

Mental Health Assessments for the Disciplinary Process:

ASP was non-compliant in the use of mental health assessments for mentally ill inmates who received Rule Violation Reports (RVRs). From September 1, 2005 to March 10, 2006 1,320 RVRs were issued. Of that number, 300 were issued to 3CMS inmates. Only seven mental health assessments were completed. The institution did not provide the number of EOPs who were issued RVRs nor document that assessments were completed for all of them.

There were significant omissions in the documentation of RVRs issued for sexual misconduct. Available records showed that ten inmates were evaluated for exhibitionism, resulting in negative findings for nine; no status report was available for the remaining inmate. Eight RVRs for sexual misconduct were referred to the district attorney. ASP did not use security measures such as Lexan door covers or color coded jumpsuits to reduce sexual misconduct.

Transfers:

ASP rarely referred inmates to DMH. For the first time in two years, and only the second time in over four years, an inmate was referred and transferred to DMH intermediate inpatient care. Two additional referrals were initiated but dropped before completion. Referrals were directed to acute care. The log of referrals was complete.

ASP made 24 referrals to MHCBs between mid-October 2005 and mid-March 2006, an average of four per month.  Average transfer time was 5.5 days, with 14 cases, or 60 percent, taking five days; four cases taking from six to ten days; and five cases, or 20 percent, taking longer than ten days.  Stays in the OHU while awaiting transfer to a MHCB ranged from one to 22 days and averaged five days in duration.  Transfer delays were attributed to lack of readily available MHCBs.

Psychiatrists assigned to administrative segregation declined to see OHU inmates.  A lack of psychiatric care in the OHU essentially precluded the use of involuntary medication on an emergency basis and sharply curtailed mental health treatment of all inmates in crisis.  Psychiatrists were reportedly concerned about potential liability arising out of the unlicensed status of the OHU, the insufficiency of psychiatric staff and management's failure to address these issues.

The dearth of psychiatric care in the OHU was associated with inadequate clinical contacts and medication management.  Staff attempted to ameliorate the situation by seeing inmates on yards prior to OHU placement or by asking physicians in the OHU to write medication orders, but these measures did not compensate for the lack of psychiatric treatment.  IDTT meetings and treatment plans for inmates housed in the OHU were non-compliant because psychiatrists did not participate.

Lengths of stay in the OHU commonly exceeded 72 hours.  During the five months preceding the monitor's visit, 23 inmates placed in the OHU remained there longer than four days, with eight remaining 12 days or longer.  Three stayed longer than 60 days; one stayed 75 days; and another for 88 days.

ASP began tracking multiple OHU and MHCB admissions. Staff reported that DMH referrals were considered in cases of multiple admissions to the OHU or to MHCBs. One inmate with multiple admissions was transferred to another institution for EOP treatment.

ASP was compliant with transfer timelines in roughly two-thirds of its EOP inmates. All told, nine of 36 or 37 cases were either transferred within 60 days or had been awaiting transfer less than 60 days at the time of the monitor's visit. In March 2006, 18 inmates were awaiting transfer to an EOP unit.

During the four months preceding the monitor's visit, 19 EOP inmates were transferred to EOPs in other institutions. Transfers took an average of 35 days with seven taking 45 days; five taking more than 60 days; and one taking 105 days. Three of eight SNY EOP inmates had paroled, while the remaining five were awaiting transfer; one had been waiting roughly six months (see the Case Review in Exhibit A).

Other CAP Issues:

a. Partial Compliance

IDTT meetings were no longer conducted in conjunction with unit classification reviews. Custody participation improved but psychiatric participation remained deficient.

b. Non-Compliance

Not all newly arriving 3CMS inmates, some 103 of whom arrived on average each month, were seen timely. Two audits found that initial mental health evaluations were done within five working days in 62 to 69 percent of cases. Newly arrived inmates referred to psychiatry on a routine basis were seen within 30 days in 73 to

82 percent of the audited cases, with an average wait of 23 days. Two staff audits of 90-day contacts by psychiatrists found compliance rates of 74 and 93 percent, with documentation of contacts occurring in about 80 percent of cases.

There was considerable variability in the quality of treatment plans. A few plans were individualized with problematic behavior detailed and specific treatment goals listed, but most were not. Also, most subsequent progress notes did not reference treatment goals. Treatment plans for recently arrived 3CMS inmates were somewhat better.

Group treatment was negatively affected by the reassignment of several mental health treatment spaces to dental applications. About 100 inmates were on waiting lists for group treatment. Active groups addressed, among other issues, Post-Traumatic Stress Disorders (PTSD) and substance abuse recovery.. The monitor observed a substance abuse group attended by five inmates. Group discussion was relevant and lively.

Identification of decompensating 3CMS inmates in administrative segregation improved.

Other Issues:

Daily psych tech rounds were conducted in administrative segregation. Psych techs annotated and signed 114As (recording contacts and unusual incidents) and isolation logs and wrote progress notes that were filed in UHRs. A full-time clinician was assigned to make weekly contacts but many contacts were conducted at cell-front. A psychiatrist saw inmates in administrative segregation four days per week. A contract clinician followed up EOP inmates in administrative segregation on weekends.

All emergency response kits were inventoried by captains or lieutenants, and housing officers were required to complete inventories and sign weekly inventory sheets at the beginning and end of each watch. A master inventory included cut-down tools and other emergency equipment. The monitor's examination of kits in two housing units on each of three yards found that kits contained cut-down scissors, ambu bags, biohazard protection suits, individual sharps tubes, latex gloves, search mirrors, spit masks and micro-shields. Inventories were completed and filed as required.

As of January 16, 2006 micro-shield training was a component of annual on-the-job training for custody staff. The nineteen officers who had not been trained on CPR/micro-shield use were on long-term sick leave or military leave. Mental health and custody staff reported that there had been no incidents since October 2005 related to attempted or completed suicides in which micro-shields were used or warranted.

ASP's local heat plan was reviewed and approved in February 2006. The plan covered medication procedures, housing and assignments, temperature monitoring, activation procedures, bed moves, staff training, logging and special procedures.

All window coverings in administrative segregation installed by the institution had been removed. Any remaining coverings were fashioned by inmates to block unwanted sunlight. Staff reported that sun control window film was being obtained to reduce excessive heat. The film was described as having good two-way visibility and a natural appearance.

Institutional Summary:

A lack of psychiatric staffing and supervision adversely affected the delivery of mental health care throughout the institution, most acutely in the OHU. The mental health caseload was 22 percent below capacity.

ASP resolved one of its outstanding CAP issues; the completion of chronos was no longer an obstacle to timely transfers.

Little progress was made in three of the four areas of monitoring focus. Quality management was still non-compliant but had improved. Data produced by the institution improved significantly in reliability, quality and relevance. The local governing body was inactive but the quality management committee and the mental health subcommittee met, several important QITs were active and CAP items were audited.

Medication management remained problematic, but there were harbingers of improvement. Local procedures were revised, and a new mechanism for handling non-compliance was in use. Tracking and audits improved, but much improvement was still needed. Orders were not processed expeditiously; bridge orders were frequently used to span expiring orders; and medication continuity was not sustained for new arrivals. Results of audits regarding lab work for monitoring blood levels of inmates on mood stabilizers were inconclusive.

ASP was non-compliant with requirements regarding mental health assessments in selected disciplinary actions. Documentation was poorly maintained. Only seven 3CMS inmates who received RVRs were referred for mental health

assessments. Eight inmates who had RVRs for sexual misconduct were referred to the district attorney for prosecution. No inmates were diagnosed with exhibitionism.

Access to higher levels of care was impeded. ASP made three referrals to DMH for acute care but completed only one. Of the 24 referrals made to MHCBs, nearly 60 percent were transferred in five days, while 20 percent took longer than ten days to reach an MHCB. Stays in the OHU were excessively long. The dearth of psychiatric care in the OHU was associated with inadequate mental health treatment for inmates in crisis. Reportedly, psychiatrists' concerns about potential liability plus a handful of other issues trumped other priorities. ASP transferred two-thirds of its EOP cases within transfer timelines, and EOP inmates were typically seen weekly.

Relative to other CAP issue, initial mental health contacts with newly arrived 3CMS inmates, 90-day psychiatric contacts and IDTT meetings were non-compliant. IDTT meetings were not attended by a full team, and treatment plans were not individualized. There was a long waiting list for group treatment which was reduced during the monitoring period by the reassignment of meeting space to dentistry.

ASP was compliant with requirements on CPR training. Emergency response kits in housing units were inventoried regularly. Inventory records were completed and filed.

ASP showed some signs of forward movement. Improvements in quality management were promising, and some indications were discernible that medication management might soon progress. Psychiatry staffing and practices remained a significant problem. ASP clearly needed Division of Correctional Health Care Services (DCHCS) assistance in resolving its problems with the OHU.

## California State Prison, Solano (CSP/Solano)
June 26, 2005 – June 28, 2006

Staffing at CSP/Solano worsened as the institution experienced dire shortages in the pharmacy and among psychiatrists. Among its allocation of 4.5 staff and one chief psychiatrist positions, the institution filled one position for a staff psychiatrist, who acted as chief throughout the monitoring period. Several part-time contractors covered only 1.4 of the psychiatric vacancies, leaving a functional vacancy rate of 69 percent.

The vacancy rate among psychologists rose with five of 15 positions vacant in June 2006. Contractors covered all but half of one full-time position.

Positions for two five psych social workers, four psych techs and one of 2.5 recreational therapists were vacant. None of these was covered by contractors. Three mental health RN positions, a senior RN position and a medical transcriber position were filled, as were seven of 7.5 office tech positions.

Completion of Mentally Disordered Offender and Bureau of Prison Terms reports continued to occupy the equivalent of 2.5 psychologists. One psychologist was assigned to Clark duties and the equivalent of 1.5 clinicians conducted initial mental health evaluations. Two full time case managers treated 127 caseload inmates in administrative segregation.

Vacancies in the pharmacy reached crisis proportions. One pharmacist and two technicians could not manage the volume of orders.

The institution's caseload of 1,544 exceeded its capacity of 1,199 by 29 percent. There were 127 caseload inmates in administrative segregation, much the same as during the preceding monitoring round.

<u>Issues Resolved</u>:

> Newly arrived inmates were seen by mental health staff within five days.
>
> Medical records were generally available for mental health appointments.
>
> The CTC was not used for custody purposes.

<u>Quality Management</u>:

Quality management continued to develop. All mental health staff participated in the mental health quality management subcommittee. It met weekly in the context of a staff meeting and forwarded reports.

Quality management subcommittees on pharmacy and therapeutics, emergency responses and mental health quality management operated under the auspices of the governing body, although the overall health care quality management committee had not developed apace.

Medication management for caseload inmates was addressed by a FIT. It narrowed its scope in expectation of imminent changes associated with <u>Plata</u> that would address multiple problems. It focused on pill lines and the acquisition of a machine to automate the dispensation of medication. This FIT recommended the installation of benches near pill lines so that inmates with physical disabilities would not have to stand while waiting in long lines.

Five mental health QITs were active during the monitoring period. Two fulfilled their charters and were disbanded. The three remaining active teams addressed quality of treatment plans, custody attendance and C-file availability at IDTT meetings and lack of treatment space. QITs approached problems in accordance with the statewide protocol and documented their activities. Some QIT recommendations did not achieve

desired results, while some others were not directed to the appropriate level of authority and acted upon.

All mental health staff participated in strategic planning under the auspices of quality management. Staff identified salaries, staffing levels, supplies for treatment in the CTC and treatment space in the yards as pressing issues. The staff was aware of quality management activities. Psychology and social work engaged in peer review, reviewing records and holding case conferences. There were insufficient numbers of psychiatrists on staff to conduct peer review.

In February 2006, CSP/Solano revised its operations plan for suicide prevention. The plan incorporated mandates regarding the suicide prevention committee. The plan was consistent with statewide directives on the use of video cameras to monitor inmates on suicide watch and specified which staff should observe inmates on watch. The plan incorporated departmental directives on treatment provided in the MHCB and follow-up of inmates discharged from it.

The suicide prevention committee did not fulfill its mandate. Attendance at its monthly meetings was light, particularly among custody members, and did not improve even after four suicides occurred in the institution between April 2005 and May 2006. The committee discussed completed suicides and subsequent findings. Minutes were sparse and silent on the committee's review of recommendations and its role in implementing them. Five-day follow-up contacts were sometimes missed on weekends, and custody staff did not always initiate or carry out regular observations when inmates were first discharged from the MHCB. Still, informal reports of these lapses did not prompt audits.

The accuracy of the MHTS reportedly improved. It was used to manage caseloads, track referrals and for supervisory purposes. Supervisors were closely involved with methods of data reporting and entry. Audits based on the MHTS continued to yield higher compliance rates than those based upon review of UHRs.

Medication Management:

Medication management was haphazard. The pharmacy lacked ample personnel to process the volume of orders demanded by the institution. Staff believed that insufficient attention during medication administration was associated with inmate misuse of medication. Case managers and psych techs reported that they sometimes spent two to three hours per day trying to locate written orders that had gone astray and bridge gaps in medication continuity. The sole full-time psychiatrist on staff reported that he wrote forty to sixty bridge orders per week to prevent orders from expiring.

Staff did not audit medication continuity on arrival. They reported problems with medication continuity when inmates were moved within the institution. Long pill lines were reported in two yards.

No list of inmates with DOT orders was maintained. Inmates with current Keyhea orders or histories of medication hoarding or overdoses were not systematically flagged for staff who administered medication. Staff reported unreliability in referrals to mental health for non-compliance.

Medication orders were not always filled promptly. Some orders were not noted and others were not processed for two to three days. These problems were attributed to staffing shortages among nurses and MTAs and to short pharmacy hours.

Staff reported that an audit of parole medication identified a problem. The problem was remedied.

No orders for HS medications were written in the institution during the monitoring period.

Mental Health Assessments for the Disciplinary Process:

CSP/Solano lost its way in handling the discipline of mentally ill inmates. Documentation was inaccurate. The few referrals to mental health for assessments were mishandled. In some cases errors were corrected at a higher level of review. Ten cases reviewed by the monitor were rife with errors of fact and internal inconsistencies. Staff seemed to have lost sight of the purpose of the endeavor.

A total of 1,924 RVRs were issued between July 1, 2005 and June 1, 2006, although this count excluded one of the institution's four facilities. Caseload inmates accounted for 409, or 21 percent, of these violations. Approximately 15 to 20 inmates were referred to mental health for assessments in connection with RVRs. Mental health staff reported that mental illness was found to be a factor in just four cases.

RVRs did not always accurately reflect MHSDS participation or level of care. Documentation was flawed and internally inconsistent in individual cases. It rarely referred to the content of mental health assessments or stated whether mental health findings were considered in the disposition. In some cases hearing officers appeared to be aware of but ignored mental health assessments, and in other cases hearing officers appeared to be unaware that a mental health assessment had been completed.

The monitor's review of ten cases found four in which the RVR noted that a mental health assessment was conducted, but in each of the four, the hearing officer's

documentation did not refer to the content of the assessment or state whether it was considered in the disposition. In four other cases the RVR stated that a mental health assessment was not needed but nonetheless one was completed and attached to the RVR. In one case, despite the fact that the inmate was confused, delusional and easily led by others, the hearing officer's documentation did not refer to the mental health assessment, and the inmate lost 90 days of credit for assaulting another inmate. In a similar case, mental health staff found that an EOP inmate who injured his cellmate was confused, delusional and paranoid and probably should have been housed alone. The hearing officer's documentation did not refer to the mental health assessment, although sanctions were not imposed because procedural timelines were not met. In a third case the hearing officer was unfamiliar with the protocol for RVRs issued for suicidal behavior, and the inmate was found guilty of manipulation. The chief disciplinary officer dismissed the RVR.

CSP/Solano deviated from departmental directives in handling inmate sexual misconduct. The institution's management plan for indecent exposure was still in draft form. Staff did not routinely refer cases of indecent exposure to mental health staff for screening. The mental health screenings that were conducted were untimely; most were done one month or more after the incident. The monitor's review of cases found that most RVRs were issued to inmates who were caught masturbating during the night or in the early morning hours. It was unclear from the RVRs that the inmates had intended to expose themselves. In one case the RVR stated that an officer pulled a sheet off an inmate who was sitting on his bed during count. Some inmates lost time credits.

Transfers:

The CTC was issued a two-year license by the Department of Health Services in June 2006. It was licensed for fifteen beds of which nine were designated as mental health crisis beds. Seven were designated for medical patients with accommodation for psychiatric patients in four of them if necessary. There were 125 MHCB admissions from January to mid-June 2006, for an average of 19 per month.

The institution reported that crisis beds were nearly always full, but medical beds and holding cells had not been used for psychiatric patients. Staff managed demand for crisis beds by discharging the least impaired inmate when another inmate in crisis needed a bed. Not all inmates who needed a crisis bed were referred. Some cases reviewed by the monitor's expert raised questions about whether inmates were stabilized before being discharged. See Exhibit B, Case Reviews 3, 6, 7, 9 and 10.

The average length of stay was 8.58 days, with the longest stay being 41 days. In 33 cases, or 26 percent, clinical lengths of stay exceeded ten days. Eleven inmates were admitted to the MHCB twice and four were admitted three times. Inmates who were clinically discharged were not always moved from the MHCB quickly. Staff reported that inmates from other institutions accounted for most of the administrative delays.

Staff reported that video monitoring was not used to observe inmates on suicide watch. Watches were performed one-to-one by an officer.

Access to DMH acute inpatient care was slow. During the first six months of 2006, CSP/Solano made 18 referrals to acute care with ten resulting in transfers to DMH. More than half of the inmates who reached acute care waited longer than ten days to be accepted and assigned a bed number. On average 11.6 days elapsed between

referral and transfer with a range of one to 20 days. Two cases were transferred within zero to five days; four took six to 15 days. Four transfers took 16 to 20 days. Eight referrals were rescinded.

Staff did not refer any inmates to DMH intermediate inpatient programs during the monitoring period.

EOP inmates at CSP/Solano were not transferred within 60 days. Of 22 EOP inmates at the institution in June, six had been there for over 60 days and had been awaiting transfer for 80 to 191 days. Staff reported that half of the 54 EOP inmates in the institution between July 2005 and June 2006 were moved within 60 days.

Other CAP Issues:

 a. Partial Compliance:

Access to medical records improved significantly and was credited to a staffing increase concomitant with Plata. The backlog of loose filing was reduced, and records were generally available for mental health appointments. The concordance rate for psychiatry contacts recorded in the MHTS and UHRs rose from 67 to 78 percent. Mental health staff reported that it was difficult to transport the number of records used to the locations where they were needed. Psychiatrists seemed to have the most problem obtaining medical records, and those who left the institution to work elsewhere cited this problem in exit interviews.

Staff reported that TCMP counselors saw inmates for discharge planning, although reports among inmates were inconsistent. A small sample yielded a finding that most but not all had seen a TCMP counselor. Audits were needed to assess the accuracy of the parole list and whether all inmates who should have been seen were actually seen.

During the preceding monitoring period quarterly case manager contacts occurred in a timely fashion. MHTS audits consistently found that over 90 percent of case manager contacts were made quarterly. Lower rates of compliance based on reviews of UHRs were attributed to missing or unfiled documentation. While this problem was expected to be resolved during this monitoring period, it was not resolved due to discrepancies between audits of UHRs and reports generated by the MHTS. Staff audits of UHRs during the monitoring period found an improved compliance a rate of 88 percent which still fell just short of the 90-percent measure.

Mental health staff did not respond to referrals in a timely manner. Staff reported that intervals of two to three weeks between referrals and responses were common. An MHTS-generated report covering 830 referrals over a ten-month period showed that response times to 42 percent of surveyed referrals exceeded seven working days.

Staff reported poor access to psychiatry. Inmates on the brink of a crisis, or who experienced side effects to medication or had no medication orders, were not seen for two to three weeks.

Treatment space for confidential mental health contacts was insufficient, resulting in some individual quarterly contacts taking place in non-confidential settings. Space for group treatment was also insufficient. Some members of the staff reported that they had no place to sit while completing paperwork. A one year-old audit of mental health space needed to be updated.

Blood levels of inmates on mood-stabilizing medications were not monitored systematically. A staff audit found that only half of the levels needed for one mood-stabilizing medication were ordered.

The overall quality and timeliness of mental health treatment was often below acceptable levels. Although the problem of timely initial evaluations was resolved, the monitor's expert reviewed two cases in which bus screenings failed to detect and refer mentally ill inmates. See Exhibit B, Case Reviews 9 and 11. Mental health staff sometimes failed to react when a decisive mental health intervention was needed. See Exhibit B, Case Reviews 1, 7, 9 and 10. Treatment plans were often late. IDTT meetings were not always attended by a psychiatrist. Some inmates reported that meetings were cursory and seemed to be an opportunity for staff to complete paperwork. Case managers did not always have a confidential space in which to see inmates. Group treatment was not offered on two yards, and only a small number of inmates had access to group treatment on the other two yards.

IDTT meetings held for new arrivals were often untimely. A staff audit found that just 51 percent were held within 14 working days. Psychiatrists did not attend IDTT meetings but instead devoted their time to writing orders. A staff audit found that correctional counselors were present at 72 percent of IDTT meetings, and a QIT found that correctional counselors in one yard did not have a schedule for rotating through IDTT meetings. Staff remedied the problem and planned to conduct a second audit. Treatment plans were late, not individualized and updated annually 75 percent of the time. A QIT on quality of treatment plans found that they were not completely filled out.

CSP/Solano was not fully compliant with emergency response requirements. The staff was not trained in the most recent iteration of the revised CPR policy. Not all officers interviewed by the monitor possessed micro-shields. Control booths examined by the monitor contained cut-down kits but inventories did not specify the contents of the kits.

CSP/Solano's implementation of the heat plan improved. Heat lists were current and temperature logs were maintained. The institution made a concerted effort to house heat-risk inmates in air conditioned buildings but could not do so for all. The monitor noted that some wall-mounted digital thermometers were inoperable. Officers relied on older thermometers that were less accurate and more difficult to read. During the monitor's visit, expedited work orders were submitted to repair or replace thermometers.

b. Non-Compliance

EOP inmates were not transferred out of the institution in a timely manner. Weekly contacts were made 63 percent of the time.

The log of restraint use did not record the length of time that inmates were subjected to restraints. Orders for the use of restraints did not specify release criteria. Staff did not seem aware of the significance of release criteria or of the importance of considering alternatives to the use of restraints.

Mental health treatment provided in administrative segregation did not meet Program Guide requirements. Staff reported that the number of caseload inmates in administrative segregation reached 150 during the monitoring period. Shortages in staff and treatment space were cited as two reasons for non-compliance. Four psych techs,

25

two case managers and a half-time contractual psychiatrist treated 127 caseload inmates. The monitor reviewed medical records of nine recently placed inmates in administrative segregation. None contained mental health screenings, although staff reported that screenings had been completed.

In administrative segregation, psych techs reportedly made daily rounds on all inmates including those housed in a building used for overflow. Roughly half of weekly case manager contacts were made out-of-cell. IDTT meetings were not always timely and were not attended by psychiatrists. Two cases reviewed by the monitor's expert revealed deficiencies in the treatment provided to the most severely ill inmates in administrative segregation. Staff planned to consider the EOP level of care for an inmate with multiple MHCB admissions (Exhibit B, Case Review 9) but did not follow through or update his treatment plan. Weekly cell-front contacts were cursory but his Lithium level was monitored. A second inmate (Exhibit B, Case Review 3), who was placed at an EOP level of care, was referred but not admitted to the MHCB unit despite signs of psychosis and severe impairment over a sustained period of time.

Institutional Summary:

Staffing shortages in psychiatry and in the pharmacy reached a crisis point with only one staff psychiatrist and one pharmacist actually working in the facility. One third of psychologist positions were vacant but covered by contractors. Vacant psych social worker, psych tech and recreation therapist positions were not covered. Caseloads remained excessively high.

Quality management continued to expand. Several mental health QITs were active. Recommendations made by QITs were not always directed to an

appropriately high level of authority nor acted upon.  Psychologists and psych social workers engaged in peer review.  The suicide prevention committee did not fulfill its mandate.  The MHTS was used to manage caseloads and for supervisory purposes.

Medication management was inadequate.  The pharmacy could not process the volume of orders written.  Psychiatrists could not see inmates whose orders needed to be renewed.  DOT orders were not carried out.  Medication continuity was problematic.  Pills lines were reportedly long.  HS orders were not written.  Parole medication was audited and a problem was remedied.

CSP/Solano lost its way in handling the discipline of mentally ill inmates. Documentation was inaccurate, and few inmates were referred for mental health assessments.  Cases were mishandled.  The institution's implementation of directives regarding inmate sexual misconduct was flawed.

EOP inmates were not transferred regularly within 60 days, while the number of EOP inmates at CSP/Solano doubled.  Access to acute care was slow.  Some inmates who needed crisis beds could not be accommodated, but the institution did not use holding cells or shift medical patients to community hospitals.

The institution was able to resolve three issues and made progress in access to medical records and documentation of timely case manager contacts.

The overall quality and timeliness of mental health treatment was often unacceptable.  Access to psychiatry, medication continuity, lack of treatment space and meaningful IDTT meetings were four prominent problems that affected nearly all of the 1,500 caseload inmates.  Other equally pressing problems affected a smaller group of more severely ill inmates.  In administrative segregation, access to treatment was

impeded, and psych tech rounds and screenings were not consistently documented in medical records. For 3CMS inmates in the general population, treatment was plagued by long-standing deficits in participation by psychiatrists and correctional counselors in IDTT meetings, timely treatment plans, timely responses to referrals and group treatment. The institution needed to focus on general program-wide problems and more specific problems in a systematic and sustained manner.

## California Substance Abuse Treatment Facility (CSATF)
### May 31, 2006 – June 2, 2006

Staff turnover had a deleterious impact on the delivery of mental health treatment. Of CSATF's 30 direct care mental health positions, 22 or 73 percent turned over in the past 12 months. The vacancy rate was reduced to 23 percent by May. Positions for two psychiatrists, 3.5 psychologists, three psych social workers and one psych tech position were vacant. Contractual staff covered 87 percent of these vacant positions.

Staffing levels in nursing improved dramatically. While the nursing allocation grew 12 percent by March 2006, the vacancy rate dropped from a high of 50 percent in January 2006 to 14 percent. Nursing staff reported a turnover rate of ten percent. The MTA vacancy rate remained high, hovering between 37 and 47 percent. Contractual staff covered vacant positions. Four of five laboratory positions were occupied with contractual hours more than covering the sole vacancy.

Three of nine pharmacy positions remained vacant, with all three covered by contractors. The vacancy rate among medical records staff increased from 18 percent to 56 percent leading to heavy reliance on contractual staff.

Custody and mental health staff enjoyed a good working alliance throughout the institution, including in the MHCB, where the relationship had been strained earlier.

CSATF's closure to new mental health intakes during 2003 and 2004 lowered the MHSDS population by 237 inmates, from 1,200 in August 2003 to 963 by July 2004. One year after re-opening to intakes of new caseload inmates in mid-2005, the MHSDS population exceeded 1,300, an expansion of 26 percent in two years.

In May, CSATF's overall census was 7,414, highest among California's 33 state prisons. The caseload population stood at 1,309, 16 to 18 percent above its rated capacity of 1,049. Twelve EOP inmates awaited transfer; five were in administrative segregation. There were roughly 300 to 330 inmates in administrative segregation, 68 of them 3CMS inmates. Eleven inmates were in crisis beds.

Nearly nine percent or 80 of CSATF's 953 correctional officer positions were vacant.

Quality Management:

CSATF continued its institution-wide quality management activities. Minutes indicated that the overall health care quality management committee and its mental health subcommittee met regularly. Meetings were well attended and collaborative in nature. The monitor attended a health care quality management meeting. Inmate appeals, yard cleanliness, lockdown status and issues related to four legal cases, including Coleman, were among the agenda items covered during the meeting. Subcommittees gave status reports. Medication management was the focus of many

quality management activities. Audits, particularly those regarding medication management, were sound.

The mental health quality management committee generally functioned well, but two QITs, one on treatment space and the second on referrals, were ineffectual. Due to the auditing schedule, half of the audit results provided to the monitor was based on information compiled during the previous monitoring period. Mental health staff was well informed about quality management. Peer review remained on hold pending direction from the central office.

The MHTS served as the basis for many audits and was used to track referrals. The concordance rate between MHTS and UHR documentation of case manager contacts fell to 70 percent.

Medication Management:

CSATF did an extensive QIT framed by Plata to address myriad medication management issues. Audits done by nursing supervisors served as a basis for corrections of practices and staff training. Audits were well designed and well documented in a standardized fashion. Most audits did not distinguish between psychotropic and other types of medication. One of CSATF's main hurdles to sound medication management was the dissemination of information among seven clinics in the absence of a computerized pharmaceutical management information system. Many records, including those used to process 550 new arrivals and release 150 inmates per month, were on paper.

The one clear improvement in medication management was in the area of continuity. Medication continuity was sustained when inmates were transferred within the institution. The problem will be resolved if compliance is sustained.

Psychiatrists renewed at least 90 percent of medication orders in a timely manner during the first quarter of 2006, but the rate slipped to 89 percent in April. CSATF's local procedure permitted bridge orders of 30 days to prevent lapses in continuity when inmates were not seen at 90-day intervals. Blood levels of inmates on mood-stabilizing medications continued to be monitored appropriately.

Procedures for medication non-compliance were in place, and audits focused on whether medical staff followed them. The handling of referrals for non-compliance with psychotropic medication remained problematic.

Informed medication consent forms were not obtained consistently. An April audit found that current consent forms were filed in only 40 percent of audited UHRs, down from earlier compliance rates of 75 to 77 percent.

Pill lines reportedly were not problematic but staff recognized that the administration of medications during lockdowns merited closer monitoring.

Seven inmates had current Keyhea orders. Twenty caseload inmates had DOT orders. A central list was maintained and distributed to clinics in the yards. HS medication was ordered for 73 caseload inmates.

Medication supplies were distributed to paroling inmates. A nursing audit of paroling inmates during the monitoring period found that medications were provided monthly to 91 to 100 percent of paroling inmates.

Mental Health Assessments for the Disciplinary Process:

CSATF did not much improve its implementation of the mental health assessment process for seriously mentally ill inmates who incurred RVRs. Hearing officers received additional training late in 2005, but the training yielded limited results. Staff audits and the monitor's review of ten cases found that hearing officers did not consistently adhere to departmental requirements or properly consider mental health assessments in their findings. In several reviewed cases, documentation prepared by hearing officers cited state laws to support opinions that an inmate failed to meet the legal standard for mitigation due to diminished capacity and irresistible impulse. In some other cases, hearing officers rejected the findings of mental health assessments.

From December 1, 2005 to April 30, 2006, a total of 1,151 RVRs were issued, of which 363, or 23 percent, involved 3CMS inmates; three involved EOP or MHCB inmates. Of the 363 RVRs issued to 3CMS inmates, 19, or five percent, were referred for mental health assessments. Staff reported that all EOP or MHCB inmates who received RVRs were referred.

A May 2006 audit done by staff found that mental health assessments were timely, thorough and based on non-confidential interviews and reviews of UHRs and C-files. Some assessments did not provide information in laymen's terms. In over half of the audited cases hearing officers failed to document consideration of mental health assessments in their findings or dispositions of cases.

The monitor found that copies of mental health assessments were not consistently filed in C-files. In one case, an inmate who was psychotic and needed daily adaptive support due to his cognitive impairment and a low level of daily functioning

threw a shoe at an officer, was issued an RVR and referred for a mental health assessment. The assessment found that mental illness was influential in his behavior and recommended that the hearing officer consider mental illness in assessing the penalty. The hearing officer appeared to be totally unaware of the mental health assessment. The inmate lost 150 days of credit.

CSATF's handling of sexual misconduct by inmates was also problematic. The institution implemented the revised sexual misconduct protocol in July 2005. From December 1, 2005 to April 30, 2006, a total of 24 inmates, including 12 3CMS and two MHCB inmates and ten non-caseload inmates, were screened by mental health staff in connection with RVRs for sexual misconduct. All cases were reviewed by an IDTT, but none was referred for a more comprehensive mental health evaluation. A mental health evaluation was completed in one case (See Exhibit C, Case Review 1), and a diagnosis of exhibitionism was made. Although treated at the 3CMS level of care, the inmate had a current Keyhea order. The diagnosis of exhibitionism was rejected weeks later by an IDTT.

Inmates who engaged in repeated acts of sexual misconduct that resulted in serious consequences did not receive treatment. In those few cases in which multiple RVRs raised the very real possibility of substantial losses of time credits, long stints in administrative segregation and/or additional prison terms, the monitor's expert recommended that the institution address repetitive sexual misconduct in the treatment plan and offer treatment designed to address that behavior. (See Exhibit C, Case Reviews 1, 2 and 3.) During the same period, the institution referred 25 cases of sexual

misconduct among 23 inmates (two individuals were referred twice) to the district attorney.

Transfers:

Staff described access to DMH inpatient acute care at CMF as good. Between December 1, 2005 and April 30, 2006, CSATF made 11 referrals to acute care, two per month. Two referrals were rescinded. Nine inmates were transferred to acute care beds. Transfers occurred within 72 hours of a bed assignment. Once a referral was made, time to transfer averaged ten days although the intervals between referral and transfer ranged from as few as three to as many as 19 days. Staff often waited too long to refer an inmate to acute care. On average, 15 days elapsed between admission to an MHCB and referral to DMH. Three inmates, for example, had lengths of stay of 19, 29 and 48 days before they were referred. CSATF made no referrals to intermediate care.

Staff reported that the psych and return process had operated smoothly and efficiently over the preceding two years.

CSATF's 45-bed hospital included 14 MHCBs, 31 medical beds, four safety cells and two observation cells. From December 1, 2005 through April 2006, there were 171 admissions to MHCB beds, roughly 34 per month. Three quarters of the admissions were CSATF inmates, while the remainder came from other CDCR prisons. CSATF staff reported that access to the MHCB unit was good.

Lengths of stay in the MHCB continued to climb. The frequency of excessive MHCB stays was 38 to 39 percent throughout the two previous monitoring periods but jumped to 55 percent during this monitoring period. According to a tally of 164 discharges, 90 admissions, or 55 percent, lasted longer than ten days. Lengths of

stay were 15 days or longer in 26 cases and 20 days or longer in 12 cases. In 47 cases, stays were extended for clinical reasons. Just under half, 43, of the excessive stays were attributed to DMH referrals, Keyhea processing or administrative delays in removing inmates who were discharged.

Extended MHCB stays were routinely reviewed by an IDTT, approved by the clinical director and documented in UHRs. Nonetheless, the retention of inmates in the MHCB unit for long periods of time, the failure to make referrals until inmates had been in a crisis bed for two to six weeks and the referral of so few inmates to DMH were all problematic given the statewide shortage of MHCBs.

CSATF no longer met transfer timelines for EOP inmates, although that issue had been resolved in the past. At the end of May 2006, CSATF housed 11 endorsed EOP inmates, six of whom had waited more than 60 days to be transferred to an institution capable of meeting their treatment needs. Most delays were attributed to a shortage of EOP beds, particularly Level IV SNY EOP. In a few cases, internal endorsement delays were a factor.

a. Partial Compliance

Caseload sizes, waves of new admissions, the turnover among case managers and space constraints combined to impede compliance with program requirements. Staff reported that a lack of psychiatrists disrupted continuity of treatment, compromised the quality of IDTT meetings and made scheduling difficult. In May, case managers reported that caseload sizes were manageable, but an influx of 140 new 3CMS inmates within three weeks loomed. Of the 15 case managers assigned to general population, six carried caseloads of over 125 inmates, while three had caseloads in excess

of 150 inmates. Staff assigned to administrative segregation continued to carry caseloads of 30 to 35 inmates.

Waiting lists for group treatment were long. An estimated six to 14 percent of the caseload was treated in groups. Staff planned to treat more inmates in groups but reported that it was difficult to carry out those plans. Two yards with a large proportion of caseload inmates had limited access to treatment space. The yard with the largest number of caseload inmates housed Level IV inmates with special needs. A disproportionate number of inmates on that yard, 28 percent, were on the mental health caseload, but fewer than a dozen were treated in groups. A Level III SNY with nearly 300 caseload inmates also had a disproportionately high enrollment rate of caseload inmates.

Staff assigned to the Level IV SNY estimated that 25 to 30 percent of scheduled contacts were cancelled because available counseling space was being used by medical or custody staff. Competition for suitable treatment space was stiff throughout the institution. As reported in the Quality Management section, a QIT on mental health treatment space did not result in improvement. The QIT, and supportive anecdotal reports, raised several issues regarding treatment space. Security concerns were a factor. The use of chapels and hobby rooms was at times problematic because sufficient custody staff was not routinely available to provide an adequate security presence. Priority ducats for mental health contacts were typically honored during reduced programming and lockdowns. An established procedure was implemented on those occasions when priority ducats did not ensure access to treatment.

b. <u>Non-compliance</u>:

Timely contacts with new admissions, timely quarterly case manager contacts and timely IDTT meetings for initial treatment plans and annual updates were no longer in compliance. Staff audits in December 2005 found that 79 percent of initial mental health contacts with newly arrived inmates were timely, but the compliance rate dropped to 55 percent during the first quarter of 2006. Staff reported that 55 percent of initial IDTT meetings and 72 percent of annual updates were timely during the first quarter of 2006. The monitor's expert found that the quality of IDTT meetings ranged from very good to highly problematic. Staff attributed the decline to staff turnover and a high volume of new arrivals, reported to be 13 to 21 caseload inmates per week.

Staff believed that referrals to mental health elicited faster responses than they had in the past, but no audits were done and a QIT on the issue came to naught.

Case managers developed pre-parole plans less often, a decline attributed to staff turnover. A staff audit that spanned December through March found compliance rates ranging from 47 to 73 percent.

<u>Other Issues</u>:

The monitor found five of six housing units toured had extra micro-shields, a cut-down tool, an ambu bag and protective disposable jumpsuits on hand, as well as current and complete inventory records. One housing unit did not have an ambu bag, though the inventory in the control booth listed one, and staff routinely marked it as present. Floor and control booth correctional officers in all areas toured carried micro-shields.

All currently assigned correctional officers had received CPR training, including instruction on the use of a micro-shield. In the monitor's review of incident packets of recent deaths there was one case in which responding officers appeared to have had the opportunity to initiate CPR but did not. In that case, an officer found an unresponsive inmate during a morning cell check in administrative segregation. A sergeant was notified and an emergency extraction team was assembled. Correctional officers entered the cell, applied wrist and leg restraints, placed the inmate on a Stokes litter and carried him to a waiting emergency vehicle for transport to the CTC. Medical staff initiated CPR in the emergency vehicle.

Institutional Summary:

The vacancy rate among mental health staff remained around 22 percent, but a high rate of staff turnover had a deleterious impact upon MHSDS programs. By using contractual staff and an occupational therapist lent by the medical department, CSATF covered nearly all vacant mental health positions. The size of the caseload exceeded its rated capacity by 16 to 18 percent.

CSATF struggled to maintain its prior gains. Quality management improved, as did one aspect of medication management. No discernible progress was made in the other areas. The institution's overall ability to provide mental health treatment to 3CMS inmates eroded.

CSATF continued to do a good job of self-monitoring by means of institution-wide quality management activities. Audits, particularly those of medication management, were done regularly and employed sound methodology. The mental health quality management committee continued to use QITs, submit reports and in general

function adequately. The institution's MHTS provided the basis for many audits. Some quality management activities were ineffectual due to staffing losses. Peer review was on hold pending guidance from the central office.

Medication management improved in continuity attendant on changes in housing within the institution, a problem that will be resolved if compliance is sustained. Psychiatrists renewed medication orders in a timely manner during nearly all of the monitoring period. Procedures regarding non-compliance with medication were in place, but little information was available on how mental health staff responded to non-compliance. Informed consent was not obtained consistently. Staff audits found that blood levels of inmates on mood-stabilizing medications were monitored appropriately, and supplies of parole medication were distributed as required to over 90 percent of paroled inmates.

CSATF's implementation of the disciplinary process with respect to seriously mentally ill inmates who incurred RVRs was in a shambles. Hearing officers did not consistently adhere to departmental requirements or properly consider mental health assessments in their findings. Additional training did not correct patent misapplications and misunderstandings of the purpose and intent of the mental health assessment process. Hearing officers continued to support their rejections of assessment findings on the spurious grounds that they failed to meet the legal standard for diminished capacity and irresistible impulse.

CSATF's handling of RVRs for sexual misconduct was also problematic. No inmates with RVRs for sexual misconduct were referred by an IDTT for a more comprehensive mental health evaluation.

39

Staff described access both to a MHCB level of care and DMH acute inpatient care as good. During a five-month period, nine inmates were transferred to DMH acute care beds. MHCB staff in CSATF often waited too long to refer an inmate to acute care, and the length of stay in the MHCB continued to climb. The low number of referrals made to DMH and CSATF's propensity to treat more inmates in its MHCB for longer periods of time, plus a practice of waiting until inmates had been in a crisis bed for two to six weeks before making referrals, created transfer problems, given the statewide shortage of crisis beds.

CSATF no longer met transfer timelines for EOP inmates.

CSATF also fell out of compliance in several areas relative to the treatment of 3CMS inmates. Growth in the size of the caseload, waves of new admissions, staff turnover and space constraints impeded compliance with program guide requirements. Two yards with a large proportion of caseload inmates had particular difficulty with access to treatment space.

Correctional staff was trained on the revised emergency response policy. Supplies and inventories of emergency equipment were typically well maintained in visited units. Correctional officers carried micro-shields. Correctional officers did not initiate CPR in one case in which it appeared that they could have done so.

CSATF's progress in meeting Coleman requirements seemed stalled. Four issues in particular demanded immediate attention. CSATF needed to (1) reduce lengths of stay in its MHCB and make more referrals to higher levels of care more promptly, (2) improve the handling of disciplinary cases involving mentally ill inmates, (3) rethink its approach to cases of repetitive sexual misconduct and (4) address the lack

of suitable treatment space in the two yards that housed the largest numbers of caseload inmates.

### California Training Facility, Soledad (CTF)
Paper Review

CTF covered all but two its 24 allocated mental health positions, for a vacancy rate of eight percent. Both psychiatrist positions were filled and were supplemented by contractors equivalent to an additional .75 full time psychiatrist. The senior psychologist position was filled. In February 2006 two additional psychologist positions were allocated and by March were covered by contractors, for a total of 9.5 staff psychologist positions. All five psych tech positions and a half-time psych social worker position were filled. The two sole vacancies were among six allocated office tech positions, with a third vacancy imminent. These vacancies slowed clinical contacts.

Staffing was down in the pharmacy and medical records. Three of the six allocated pharmacy positions were vacant but covered by contractual staff, and one staff person was on leave. Half of the ten allocated medical records technician positions were vacant with two staff members on leave.

CTF's population was 7,113 of whom 808 were on the mental health caseload. All of these were treated at the 3CMS level of care except for five EOP inmates. Of 286 inmates in administrative segregation, 21 were 3CMS; none were EOP.

Quality Management:

The mental health quality management process regained its footing but did not rebound to its former level. Few audits were done. Documentation revealed inconsistencies in the quality management process. No information regarding the suicide prevention committee was provided.

41

The mental health quality management committee met twice monthly from November 2005 through March 2006. Minutes were kept but attendance was low.

CTF needed to improve clinical follow-up and custody observations of suicidal inmates discharged from the OHU. Although the problem of five-day follow-up for inmates discharged from the OHU was resolved, a small number of checks were missed. An audit found that 94 percent, or 117 out of 124, clinical contacts were made. Missing documentation of custody observations cast further doubt on compliance in this area. A QIT found a compliance rate of 80 percent for completion and documentation of custody observations.

In January and February five QITs were chartered. They addressed five-day follow-up for inmates discharged from the OHU, completeness of the OHU log, referrals to psychiatry and psych tech rounds in administrative segregation. None had results to report by the end of the monitoring period.

Medication Management:

Two small audits of medication management were reported. One found that CTF had difficulty maintaining medication continuity for newly arriving inmates, among whom continuity was sustained in seven of 32 surveyed cases. Centrally located pill windows prevented interruptions when inmates were moved within the institution. No information was provided about medication continuity when inmates were transferred to administrative segregation or released from the OHU. Psychiatrists reportedly wrote seven-day bridge orders to prevent expirations.

A QIT made recommendations for improving responses to medication non-compliance during the preceding monitoring period, but no information on the fate

42

of those recommendations was provided. There were anecdotal reports of long pill lines and inmates leaving before receiving medication.

Monitoring blood levels of inmates on mood-stabilizing medications seemed ripe for resolution, but CTF provided too little information to confirm the status of the issue. An audit found that in nine of 12 cases, blood levels were monitored appropriately.

The number of inmates with orders for HS medications dropped from 59 to 14 during the monitoring period.

No Keyhea petitions were initiated. No inmates with current Keyhea orders arrived at CTF during the monitoring period.

Mental Health Assessments for the Disciplinary Process:

The disciplinary process for caseload inmates was unchanged. Several aspects of the process were not audited.

Improvement was needed in two areas. Referrals for mental health assessments were made for only ten of 125 3CMS inmates who incurred disciplinary charges. Among these ten cases, mental illness was deemed a factor in three cases, was referenced by the hearing officer in one case and appeared to affect the disposition in none. Hearing officers needed to consider mental health findings and improve documentation.

The quality, timeliness and rate of referrals for mental health assessments were not audited. No audit was done to determine whether referrals were made when warranted.

<u>Transfers</u>:

Between November 1, 2005 and March 15, 2006, there were 69 admissions to the OHU. On average, four inmates per week were admitted to the OHU. Thirty, or 43 percent, of stays exceeded 72 hours in duration. Two stays lasted for 12 days, while the remainder lasted eight days or less. Approximately six inmates per month were discharged with orders for five-day follow-up. Nine inmates had multiple admissions. An audit found that psychiatric rounds were made daily in the OHU. Entries for some admissions were missing from the OHU log.

Eight inmates were sent to MHCB units elsewhere. Available information in six cases showed that transfers to MHCBs occurred within one to seven days. In two cases, dates were not recorded. CTF did not refer anyone to acute or intermediate DMH inpatient care.

A total of 16 EOP inmates were transferred to programs elsewhere in an 18-week period. Times to transfer ranged from 21 to 100 days.

<u>Other CAP Issues</u>:

a. Partial Compliance

The quality of treatment plans could not be fully assessed. Audit results showed a high rate of compliance but were available for only two months early in the monitoring period.

b. Non-Compliance

CTF remained non-compliant with and uninformed about screening requirements for inmates placed in administrative segregation. A small audit based on an erroneously assumed operative deadline of 14 days, instead of the actual 72-hour timeline

required in the revised Program Guide, found that 22 of 27 cases were screened within 14 days.

No information was provided on whether IDTT meetings were timely or whether bus screenings were done. CTF was non-compliant in both areas during the preceding monitoring period, when it reported that 20 to 30 percent of IDTT meetings for new arrivals and annual updates were late and that 64 percent of bus screenings were complete and performed on the day of arrival. The institution's continued inability to administer medication to newly arrived inmates and its late initial mental health evaluations suggested gaps in bus screenings.

Institutional Summary:

Reports provided by the institution covered only the first few months of the monitoring period, and many functions could not be assessed because CTF provided insufficient data and information.

The mental health quality management process did not rebound fully following the resignation of the psychologist formerly responsible for performing audits. Two areas previously reported non-compliant, bus screenings and the timeliness of initial mental health contacts, were not audited. An audit of lab work, a problem ripe for resolution, was too small to confirm resolution. CTF did not audit some crucial issues because they involved relatively few inmates, including, for example, referrals to MHCBs and higher levels of care when needed and weekly clinical contacts with EOP inmates. Although more than 250 inmates with medication orders were paroled annually from CTF, no audits were conducted of TCMP contacts or the distribution of medications at the time of parole.

Over 40 percent of inmates treated in the OHU had excessive lengths of stay ranging from four to eight days. Two inmates were in the OHU for 12 days. Eight inmates, not all of them timely, were transferred to MHCB units elsewhere. CTF referred no one to DMH acute or intermediate inpatient care. CTF needed to improve its observation of inmates who were discharged from the OHU. EOP inmates were not transferred to other prisons in a timely manner.

Medication management went largely unexamined. Institutional audits consistently found that medication was interrupted when new inmates arrived. There was no report of what became of QIT recommendations regarding medication non-compliance. The number of inmates with HS medication orders fell from 59 to 14.

CTF still has not implemented adequately the mental health assessment component of its disciplinary process. Few inmates were referred for mental health evaluations. In the few cases that were referred, hearing officers most often failed to document the presence or content of the resulting mental health evaluation; the assessments did not appear to be considered in the disposition of cases.

CTF's weak auditing and its failure to tackle known problems suggested institutional satisfaction with the status quo. There was no indication that the institution was committed to monitoring or improving its practices. More disturbing was the institution's lack of awareness of departmental mandates. CTF's policies and procedures did not keep pace with changing requirements relative to suicide prevention in administrative segregation. Staff erroneously believed that a mental health screening done within 14 days was timely, and failed to meet even that standard in over 20 percent of audited cases.

CTF's completion of its paper review was inadequate and left too many issues inadequately addressed. It will be subject to a monitoring visit in the next monitoring period.

### High Desert State Prison (HDSP)
May 1, 2006 – May 3, 2006

HDSP's overall staffing vacancy rate increased from 32 percent to 37 percent during the monitoring period. Staffing problems were exacerbated by turnover and personnel issues among case managers. Contractors covered fewer than half of vacancies

Psychiatric staffing at HDSP remained in dire straits despite the institution's filling of its senior psychiatrist position and its hiring of a staff psychiatrist. Four of five staff psychiatrist positions remained vacant. The equivalent of three to four full-time psychiatrists was provided by 13.5 contractors, but the level of care they provided did not approximate the level that would be expected from full-time psychiatrists. The institution also had approximately 30 hours monthly of telemedicine to help bridge the gap in psychiatric services.

Positions for the chief psychologist, the two senior psychologists and all eight office techs were filled. The sole recreational therapist position was filled but was expected to be vacated soon.

The institution lost two staff psychologists and a psych social worker during the monitoring period, leaving five vacancies among 14 case manager positions. These vacancies were partially covered by the equivalent of three contractors including the equivalent of 1.6 staff psychologists, for a net improvement in coverage. Caseload

sizes remained moderate but uneven on different yards. One case manager served 159 inmates or 60 percent more than others with caseloads of 65 inmates. Caseloads in administrative segregation were much smaller at 21 to 33.

Vacancies among psych techs were severe. Loss of another psych tech during the monitoring period left five of six allocated positions vacant. The sole psych tech had to complete rounds and administer psychotropic medication to nearly 300 inmates in administrative segregation.

Mental health clinicians screened all non-caseload inmates in administrative segregation. Audits showed that rounds were conducted and screens were completed, but compliance rates for UHR documentation of daily rounds ran at approximately 50 percent.

Staffing improved for some auxiliary positions. The two nursing vacancies were covered by contractors. Vacancies among MTAs declined to approximately one third of allocated positions, and use of contractors brought the functional vacancy rate to about 20 percent. There was only one uncovered vacancy in the pharmacy.

Among the institution's three laboratory positions, 1.8 was vacant with no contractor coverage. The long-term vacancies for the chief physician and surgeon positions continued. Physician positions in general remained understaffed but improved. Correctional officer vacancies had decreased by half, down from 160 to 80 after concerted administration recruitment effort. A shortage of correctional counselors reportedly led to a backlog in some classification functions.

48