Institutional population stood at 4,665 with 291 inmates in administrative segregation. The January 2006 re-opening of the institution to outside 3CMS and MHCB admissions did not increase the population. General and caseload populations were less overcrowded than at some of the other institutions because of population restrictions imposed because of physical plant characteristics.

The 3CMS census was 571 inmates or 88 percent of the institution's 3CMS capacity of 649. Of these, 422 were in the general population; 52 were in administrative segregation; and 97 in reception. Nine EOP inmates were awaiting transfer, including two in the general population, two in administrative segregation, four in the reception center and one in the Behavior Modification Unit. Six inmates were in MHCBs.

Dayrooms were not used for housing during the monitoring period. Administrative segregation had spilled over into an overflow unit for three months before the monitor's visit, but the overflow was eliminated prior to the visit.

Issues Resolved:

Staff was trained on the amended CPR policy and the use of micro-shields. Emergency response equipment was on the yards.

Case management contacts with 3CMS inmates were made at least quarterly.

Annual IDTT meetings and treatment plan updates were timely.

Case managers in yards were notified when inmates were discharged from the MHCB unit.

Quality Management:

Quality management infrastructure was fully established and generally functioned well with good multidisciplinary participation and appropriate discussion at

49

meetings. Custody staff was supportive of quality management. The governing body met quarterly, and the mental health quality management subcommittee met twice per month.

The nursing and psychology sectors of the institutional health care quality management committee were struggling with medication management audits. In a move to resolve this struggle, the senior psychologist, who chaired the mental health subcommittee and performed medication management audits, also assumed chairmanship of the health care quality management committee. Although under Plata nursing assumed responsibility for auditing medication management, mental health input was expected to continue as needed.

Wide-ranging audits were conducted routinely. Methodology was generally sound, although exceptions occurred principally in the area of medication management. While many chronic program deficiencies called for QITs, only one, on medication refusals, was chartered during the monitoring period. The level of the institution's skill in the use of the QIT process was questionable given its history of failing to implement QIT recommendations. No peer review occurred at HDSP.

Membership on the suicide prevention committee remained problematic. Non-mental health staff participation was limited and little substantive discussion seemed to occur at meetings. Despite four completed suicides in recent years, several aspects of some of the resulting suicide corrective action plans were never implemented. Use of the MHTS for suicide tracking was routine and generally operated well, although some early entries, key facts and risk factor calculations were missing or incomplete. Sources of information on five-day clinical contacts and custody observations following discharge

from the MHCB conflicted but still seemed to reflect a decline in this area. The monitor found that 77 percent of custody checks were completed and documented, but the balance had no documentation and could possibly have been overlooked.

Medication Management:

Timeliness in the filling of medication orders for newly arriving inmates varied. Audits found one-day first doses were accomplished in 57 to 89 percent of cases. For all other groups, particularly those in administrative segregation and reception, delays were longer and became more frequent during the monitoring period. An early 2006 audit found that first doses following orders or changes occurred within one day in about 64 percent of cases, although delays as long as 23 days occurred occasionally. The pharmacy would not dispense orders for inmates arriving with written medication orders from psychiatrists not on the pharmacy signature list or if the written orders could not be verified. Nursing and pharmacy staff needed to communicate better and resolve this problem.

Continuity of medications remained problematic. For newly arriving inmates with current orders for medication, continuity was maintained via bridge orders in approximately 80 to 90 percent of cases. For inmates on non-formulary medications in reception, one audit found that bridge orders had been written in only 56 percent of cases. Psychiatrists sometimes discontinued what they believed were non-formulary medications without ordering a substitute. Staff attempted to stop this practice, which was initiated as a corrective action item in response to a suicide completed in 2005. In addition, pharmacy staff sometimes rejected and rerouted orders they believed to be inappropriate. RNs examined unverified medication orders and made routine or urgent

referrals as indicated, but some referrals did not reach mental health staff. In some cases weeks passed before psychiatric contacts were made.

The monitor found medication lapses ranging from five days to three weeks in over one third of reviewed cases. Staff attributed lapses to lateness of orders and late deliveries. Medication continuity following internal housing changes and transfers to other institutions was good. Audits found compliance rates nearing 92 percent.

A QIT on medication refusals was chartered during the monitor's visit.

During much of the monitoring period, the distribution of medications at the time of parole was non-compliant. According to staff, psychiatrists failed to order parole medications or did so untimely. Audits of the issue employed questionable methodology.

No more than four inmates had DOT or HS orders. The institution still had not chartered a QIT on DOT. The sole staff psychiatrist did not prescribe HS medication; he reportedly saw no reason for their use. Some training and supervision were needed in these areas.

Staff reported that the institution had not had an inmate on a Keyhea order "in years." One Keyhea order had been obtained for an inmate who was transferred to DMH.

Psychiatrists obtained and recorded informed medication consent forms erratically; only 50 to 55 percent of reviewed UHRs contained completed forms.

Blood levels of inmates on mood-stabilizing medications were not monitored adequately, nor were lab tests routinely taken. Staff attributed lapses to

weekend gaps in contractual coverage. The staff psychiatrist's earlier decision to perform all lab follow-up had not resolved the problem.

Medication non-compliance was reported rarely. Reasons included an opinion among MTAs that referrals were futile because of the lack of psychiatrists. When non-compliance was reported, responses were untimely about half the time, and reasons for the non-compliance were almost never recorded. A QIT was chartered to address medication non-compliance.

One audit found that approximately 28 percent of MARs were incomplete, and others found inconsistencies in filling out MARs. Staff believed that the problem was grounded in poor documentation practices rather than lapses in medication administration.

Revised institutional policies and procedures for medication management had not advanced beyond draft form. The draft lacked procedures for HS medication and continuity on arrivals. It also lengthened delivery time for formulary medication to the next business day and for stat medication to two hours because the pharmacy was closed on weekends. The draft procedures eliminated mandatory referral of inmates with histories of hoarding, cheeking or selling medication for DOT; eliminated DOT requirements for controlled medications and Keyhea orders; and reduced requirements for notifying prescribing psychiatrists when medication non-compliance occurred.

There were good procedures in place for identifying and categorizing medication errors. Reporting levels were said to be high.

Frequency of psychiatric contacts was generally compliant, with almost half of sampled cases seen at intervals shorter than 90 days. About 15 percent were seen

late, with the longest interval reaching five months. Problems with continuity of care and prescription changes appeared to be minimal. Only two terminations of medication appeared to lack an appropriate basis. In reception, however, psychiatric contacts after referrals were less frequent and were missed altogether in some cases (see Exhibit D, Case Reviews 4, 5 and 6), sometimes with deleterious consequences (see Exhibit D, Case Reviews 7 and 8). The monitor's review of 12 reception inmates' UHRs found only one with a timely contact by a psychiatrist. Staff audits yielded different results, finding that in 93 percent of audited cases inmates were seen before the expiration of 30-day orders.

Psychiatrists did not regularly follow-up inmates after medication orders were discontinued. Intervals between contacts exceeded one year in some cases. Although this was a component of a corrective action plan in response to a 2005 suicide, supervisors did not monitor the issue.

Deficiencies in timely psychiatric progress notes were persistent and troubling. Progress notes were present only in about 79 percent of cases and sometimes did not accompany medication orders and changes. One EOP inmate had four orders without corresponding progress notes. This, too, was an unenforced issue arising from a corrective action plan following a 2003 suicide.

Mental Health Assessments for the Disciplinary Process:

The institution's performance in this area remained essentially unchanged during the monitoring period. Twenty-one percent of RVRs were issued to caseload inmates, who comprised 13 percent of the institutional population.[1] Only ten or 4.6 percent of the 217 RVRs issued to 3CMS inmates were referred for mental health

---

[1] These figures do not include the 620 RVRs which were issued in one day to D-Yard inmates who were protesting limits on toilet flushing in their cells. None of those RVRs resulted in referrals for mental health assessments.

assessments. Assessments were made for all 12 RVRs issued to EOP inmates and for the sole RVR issued to an MHCB inmate. In 70 percent of referred cases, the clinician responded affirmatively to one or more questions on the need for a staff assistant, the impact of mental illness on the inmate's conduct and the need for consideration of mitigation.

The monitor's review of five assessments found some untimely requests for evaluations and incomplete assessments. Lapses between incidents and assessments ranged from 11 to 40 days. Custody failed to refer for assessment an inmate whose behavior was clearly bizarre and probably influenced by mental illness (see Exhibit D, Case Review 8). No staff assistant was requested for an inmate in a MHCB (see Exhibit D, Case Review 9). Assessments were not consistently filed in C-files and one was unattached to its RVR. Mental health did not retain copies of referred RVRs and assessments. One institutional audit found that assessments were not consistently returned to custody; custody sometimes failed to sign completed assessments and thereby acknowledge receipt; and senior hearing officers inconsistently documented their consideration of mental health input in their findings and dispositions.

Staff reported that the new sexual misconduct protocol was implemented during the summer of 2005. The same contract psych social worker who was responsible for completing most of the mental health assessments was also assigned to complete screens for indecent exposure for all inmates who had been issued RVRs. Measurement of compliance was impeded because the institution did not track or maintain copies of the screenings. The psych social worker estimated that he had screened approximately ten inmates, none of whom met the criteria for diagnosis of a sexual misconduct disorder.

55

HDSP had initiated a two-year pilot Behavior Modification Unit (BMU) in November 2005. One EOP and three 3CMS inmates were among the approximately 40 inmates in the BMU at the time of the monitor's visit. BMU placement consisted of three levels of earned graduated privileges. First-level placements lasted for a minimum of 90 days with strict property and out-of-cell restrictions. A few inmates reportedly had remained at this initial level for up to four months. During the first two levels, the only out-of-cell time included one class and three periods in the dayroom for a total of ten hours per week. The third level involved additional programming, yard and out-of-cell time with the possibility of half-time job assignments. ICC reviews occurred every 30 days to review inmates' eligibility for advancement. Returns to the BMU required a minimum stay of 180 days, but no inmates had been returned to the BMU as of the time of the monitor's visit.

Transfers:

Referrals to DMH inpatient programs continued to drop. HDSP made eight referrals to DMH acute inpatient at CMF in six months, a monthly rate of 1.3, of whom six were actually transferred. Two referrals were withdrawn when inmates' conditions improved. Two referrals were tardily initiated. Transportation was timely. Reportedly psych and return procedures were followed.

MHCB stays by inmates awaiting transfer to DMH regularly exceeded the ten-day norm, with the longest stay lasting 24 days. Staff knew of no avenue for prioritizing transfers to DMH, which was troubling. The monitor observed one case of lengthy restraint that clearly warranted a priority transfer.

No referrals were made to DMH intermediate inpatient programs. Staff cited as impediments onerous paperwork requirements and restrictive admissions criteria associated with referrals to the DMH intermediate inpatient programs at SVSP and ASH. In practice, 3CMS inmates in need of higher levels of care were sent to a local MHCB, subsequently transferred to EOP units at other prisons or referred to the DMH acute inpatient program at CMF. The monitor saw an unrelated but troubling practice among HDSP clinicians of often downgrading of the level of care of EOP inmates sent from other institutions.

The MHCB unit had an average daily census of 5.3, but peaks of up to nine or ten patients were not uncommon. The MHCB unit was located in a 35-bed CTC with 12 MHCBs. No alternative holding cells were used at HDSP to house inmates referred for a MHCB level of care. The MHCB unit was busy with 150 admissions in six months. The volume had doubled after beds were opened to other CDCR institutions in February 2006. A full-time psychiatrist, psychologist, psych social worker and recreational therapist were assigned to the MHCB unit. On-call coverage improved significantly. A psychiatrist was typically on call, but a psychologist occasionally took calls.

Staff audited the operations of the MHCB unit quarterly. Audits found high rates of compliance on 12 performance indicators. There were occasional lapses in the completion of admissions notes and initial suicide risk assessments, with compliance rates of 80 and 90 percent, respectively. Daily rounds by a psychiatrist were the weakest area audited. Daily psychiatry contacts were found to be at a 40-percent and 30-percent rate of compliance in quarterly audits conducted in November and February respectively.

Daily clinical contacts were always made. Case managers were notified when inmates were discharged from the MHCB unit to a yard. In one case reviewed by the monitor, the inmate involved was not referred to a MHCB level of care despite multiple referrals to mental health, clinicians' observations of his deterioration over time and his ultimately acute psychotic state (see Exhibit D, Case Review 8).

No figures were reported for the number of multiple admissions or excessive lengths of stay in the MHCB. Staff audits found that all lengths of stay over ten days were "justified" and DMH referrals were considered in all cases involving three or more MHCB admissions.

Access to inmates for out-of-cell clinical contacts remained good. MHCB inmates rarely used the day room or the yard. The CTC yard was under construction and regulations barred out-of-cell time for anything but clinical contacts until the length of stay reached six months. The staff reported it planned to increase the amount of out-of-cell-time available to MHCB inmates.

Twenty eight or two thirds of completed EOP transfers were timely. The rest were transferred within three and a half months, an improvement from the preceding monitoring period. Most of the nine pending cases were already late, with one at five months and another over two years due to frequent and often postponed court dates. Two EOP inmates in administrative segregation had been there for three months and two years, respectively. All but three of those awaiting transfer had been endorsed early enough for timely transfer. Transfers were slowed by shortages of correctional counselors and system-wide EOP beds and by an increasing number of parole violators kept at HDSP to serve short terms.

Other CAP Issues:

  a. Partial Compliance

   Among surveyed 3CMS inmates arriving at the institution, audits found a compliance rate of 65 percent for initial IDTT meetings and treatment plans and a compliance rate of 50 percent for initial assessments. Some new arrivals were not screened by mental health (see, for example, Exhibit D, Cases 5, 6 and 8). Overall, more group therapy was offered although waiting lists remained long.

   ~~EOP inmates awaiting transfer were not seen weekly. Audits by staff and~~ the monitor found timely contacts were made early in the monitoring period, but performance declined later. According to UHR reviews, psychiatric contacts were frequent, but initial IDTT meetings and updates were late.

   In the stand-alone administrative segregation unit, staff described a good system for daily clerical checks for inappropriate caseload placements. Case managers reportedly completed most of daily rounds. Although audits of rounding documentation generally found adequate performance and oversight, rounds were missed on some days in the stand-alone administrative segregation unit. Audits also found some gaps in weekly summaries of rounds.

   Due to scarcity of psych techs, case managers also performed mental health screenings of newly arriving inmates in administrative segregation. Compliance rates dipped before rebounding to 71 percent, with some inmates evaluated late or missed altogether. Case management contacts were good with a compliance rate of 83 percent, but interviews often were conducted in rotunda holding cells, which compromised

privacy. Psychiatry contacts occurred more frequently than every 90 days and often as frequently as every few weeks.

The reception center received an average of 229 inmates per month and was gradually displacing more general population cells. On average, roughly a hundred caseload inmates were awaiting transfer in the reception center. Medication continuity in reception center remained problematic, and the compliance rate with screening and evaluation timelines was about 70 percent.

The MHTS was functional for the most part, but problems relative to tracking referrals, transfers and pharmacy interface lingered.

Access to treatment space declined with increasing overall competition for space. Inefficient release practices, particularly after coming off of a lockdown, further reduced the amount of available clinical contact time.

Response times for referrals remained deficient. For hundreds of routine referrals, response times took more than two weeks; 63 took from one to two months; and an undetermined number never resulted in contact at all. Most recorded emergency referrals were addressed the same day. Only 16 percent of all urgent referrals were addressed timely, while the rest took up to two weeks to answer or received no recorded response. Delays in rescheduling appointments persisted. They usually lasted up to two weeks, and some delays stretched to six weeks.

b. Non-Compliance

Psychiatrists did not attend IDTT meetings, and correctional counselor participation declined at least temporarily. C-file availability for IDTT meetings reportedly improved but remained inconsistent. In administrative segregation, only about

40 percent of initial IDTT meetings occurred prior to an arriving inmate's initial ICC hearing. IDTT updates were often untimely or missed.

Staff reported that the local system for informing case managers of imminent parole dates for purposes of pre-release planning had broken down. TCMP social workers, moreover, reportedly had not visited the institution for over four months.

Institutional Summary:

HDSP's overall vacancy rate among mental health positions increased from 32 percent to 37 percent. Staffing problems were exacerbated by turnover and personnel issues. Contractors covered fewer than half of the vacancies. Psychiatric staffing remained in dire straits despite the procurement of a senior psychiatrist and a staff psychiatrist. Thirteen contractors covered three to four of the four vacant psychiatrist positions, but psychiatric care was substandard in quality, misguided or altogether lacking in too many instances.

Five CAP issues were resolved. The quality management infrastructure was well established and the mental health quality management subcommittee met regularly. QITs were under-used but audits improved except for those that addressed medication management.

Few of HDSP's medication management practices functioned well. Local policies and procedures had been in draft form for over a year, and newly proposed procedures were inconsistent with state-wide mandates. Among the most serious shortcomings were untimely evaluations of new arrivals, discontinuation of medication orders without ordering substitutes and medication expiration. Erratic practices in

nursing, the pharmacy and psychiatry contributed to substantial failures in medication management practices.

Membership on the suicide prevention committee remained problematic. An audit indicated that in nearly one quarter of cases custody observation of inmates discharged from the MHCB went either undocumented or undone. Local practices related to medication management that were specifically earmarked for redress in official suicide reviews remained in place.

Mental health input into the disciplinary process neither improved nor conformed to departmental requirements. Documentation maintained by the institution was incomplete. Few 3CMS inmates were referred for mental health assessments. Hearing officers did not refer to mental health assessments in their findings and dispositions. No inmates referred for assessments in connection with RVRs for sexual misconduct were diagnosed with exhibitionism.

The number of referrals to DMH continued to decline. Only six inmates were transferred to DMH programs in six months. MHCB staff was unaware of procedures for priority transfers to DMH. Psychiatrists did not see MHCB inmates daily, but other important requirements were met.

Reception center transfers of 14 percent of caseload inmates exceeded allowable timelines, and delays were becoming more common. At the time of the monitor's visit, one-fifth of the 88 caseload inmates in the reception center had been there longer than 90 days.

Regarding 3CMS treatment, HDSP succeeded in resolving the problems of timely quarterly case management contacts and timely annual IDT meetings and

treatment plan updates in the general population. The quality of IDTT meetings, however, was compromised by a decline in participation by custody staff, while psychiatrists simply did not participate in IDTT meetings held in administrative segregation. Missed mental health screenings, lack of timely mental health evaluations of new arrivals, late initial IDTT meetings and late or omitted responses to referrals, even urgent ones, were common.

Approximately 71 percent of inmates placed in administrative segregation received intake mental health screenings. Daily rounds were conducted, but weekly summaries of rounds for caseload inmates were not always filed timely in UHRs. Weekly case management contacts were made but often in physical surroundings that compromised confidentiality.

Staff reported that the system for alerting case managers to upcoming paroles for pre-release planning had broken down. TCMP social workers reportedly had not been at HDSP during the preceding four months.

HDSP needed better oversight of its contractors and tighter control over psychiatric practices, more diligent suicide prevention efforts, better recognition of when referrals to higher levels of care were clinically warranted and reliable identification and appropriate responses for inmates arriving in need of immediate mental health treatment.

### Pleasant Valley State Prison (PVSP)
March 23, 2006 – March 24, 2006

Mental health supervisors were in short supply at PVSP. The former chief of mental health was acting as health care manager while a senior psychologist was acting both as chief psychologist and chief of mental health.

63

All 4.5 staff psychiatrist positions were vacant but were covered largely by contractors. There were 10.5 vacancies among the 19.5 allocated clinical psychologist positions, one of which was assigned to <u>Clark</u> duties and one was out on long-term sick leave. Two new psychologists were hired. Contractors covered 7.8 positions for a functional vacancy rate of 14 percent among psychologist positions.

Half of one psych social worker position was vacant, as were 2.5 of 6.5 psych tech positions and the sole recreational therapist position.

With the use of contractors, all 25 RN positions and all 39 MTA positions were covered. The three pharmacist positions were filled. Three pharmacy tech positions were vacant, but contractors covered another four such positions.

There were 2.5 vacancies among the 6.5 office tech positions. An office assistant was reassigned to medical records, and the medical transcriber position was vacant.

Transition of a general population yard to a Level IV SNY brought about need for an additional psychiatrist and consumed an increased proportion of mental health resources. The institution also had a high rate of new arrivals. The MHCB unit operated with up to 14 beds although it was staffed for just five beds. Staffing was further challenged by competition with other institutions which offered more attractive recruitment and retention packages. Coalinga State Hospital hired away two PVSP psych techs and two senior office techs during the monitoring period. Recent pay raises will end the poaching of clinical staff, if not the clerical staff.

The total inmate population stood at 5,000. The 3CMS caseload census was 1,564, which exceeded program capacity by 115 inmates and included 137 inmates

in administrative segregation.  There were 13 EOP inmates in the institution and eight

inmates in the MHCB unit.

Quality Management:

Quality assurance continued to work well with all required bodies and

committees established and functioning.  An emergency response review committee was

also functioning.  Minutes of mental health quality management committee meetings

from October to March reflected efforts to address issues involving medication

management, office space for mental health treatment, RVR assessments and suicides.

QITs were chartered to address psychiatric care, medication, laboratory testing,

medication continuity and IDTT meetings.  Peer review was ongoing.  Concordance

between MHTS data and UHR entries ranged from 84 to 90 percent.

Medication Management:

An institutional audit found that medication continuity was sustained for

newly arriving inmates in 78 percent of audited cases.  An audit of 81 randomly selected

UHRs showed that newly arriving inmates received their medication within 24 hours of

their arrival in 57 percent of cases and within two days in 78 percent of cases.  Delays of

up to 11 days occurred among remaining cases.  New arrivals were seen timely by a

psychiatrist in 66.2 percent of audited cases.  Average waiting time was 10.7 days, down

from an average of 13.4 days during the preceding monitoring period.  PVSP had no

policy for inmates arriving with unverified medication, but staff reported that the R&R

nurse would refer the inmate for assessment and meanwhile request the pharmacy to

locate any previous orders.  Medication interruptions persisted on intra-institutional

transfers.  When inmates were discharged from the MHCB unit to general population

yards, medication lapses averaged 1.45 days. On transfers from yards to administrative segregation, the lapse in medications averaged two days, with approximately 70 percent of inmates receiving their medication on the same or following day and another 11 percent encountering delays of seven days or longer. Training on the use of forms was ongoing in order to reduce medication disruptions upon transfer.

The monitor's review found some six-month medication orders. The health care manager stated that this was a limited practice based on a memorandum from the former chief medical officer, which would be discontinued. Bridge orders of up to 14 days in duration were written to cover expirations of medication orders in the yards.

PVSP had a policy on medication non-compliance and referrals. An audit of 214 such referrals found an average of 2.18 days between date of referral and receipt by mental health, and an average of an additional 4.7 working days from receipt until the inmate was scheduled and seen.

Staff reported that long pill lines caused some inmates to discontinue their medications rather than fighting the long waiting lines. In response, a second pill line was instituted in the clinics on all yards. Pill-line waiting times reportedly were reduced to ten minutes or less.

A facility audit found that the average time lapse between medication orders and deliveries was two days. Under Plata, the institution had begun audits to assess the medication delivery process, but concerns arose with the reliability of the early data yielded by these audits. Staff was undertaking additional training and revising the audit process to address the concerns.

Institutional audits found lapses in ordering and reviewing laboratory testing for inmates on psychotropic medication. For the 40 inmates on Depakote, laboratory test orders had been processed for 32, but test results were missing from the records of 22. Among ten inmates on Risperidone, no test orders were found for seven, and of 15 inmates on Lithium, no test orders were found for ten.

All psychotropic medications were ordered DOT. The pharmacy maintained a central record of MARs for all orders and could produce summaries sorted by method of administration. No formal process existed, however, to evaluate distinctions between DOT and nurse-administered medications, but supervisors observed medication passes one day each week and reportedly made additional random observations.

The reliability of MARs was questioned in the preceding monitoring round. MTAs were trained, and more recent audits indicated that the MARs were being filled out more accurately. The senior MTA continued to monitor the problem. MARs reportedly were filed on their completion with the use of overtime help on weekends to avoid any more than a week's backlog.

Two inmates had active Keyhea orders. Of four petitions initiated, two cases were transferred to DMH before completion of the process; the third was found not to meet criteria (see Exhibit E, Case Review 2); and the fourth was pending judicial review. One Keyhea order was renewed in February 2006, and another lapsed following a transfer because the sending institution had not initiated necessary paperwork timely.

There were 20 orders for HS medication with administration beginning at 8:00 p.m.

Paroling inmates were provided with a 30-day supply of medication. The pharmacy retained receipts signed by inmates. Pharmacy staff reported that they usually received a week's notice of an inmate's upcoming parole but sometimes filled orders with only a few hours' notice of an imminent parole.

Reports of medication errors were forwarded to the RN III, resulting in on-the-job training or other feedback to staff members who made the error. Records of errors were then were forwarded to the pharmacy. Corrective action information was recorded on a sheet used for on-the-job training, but staff was also considering noting corrective action on the error report.

Mental Health Assessments for the Disciplinary Process:

The institution failed to keep adequate records on the use of mental health assessments in the disciplinary process. Because assessment logs did not reflect levels of care, the monitor was unable to reach conclusions as to whether RVR mental health assessments were completed timely. During the monitoring period, 2,678 RVRs were issued, but there was no breakout of RVRs issued to caseload inmates. Staff reported that only Yards A and B tracked levels of care reliably as part of the RVR process and agreed to correct this deficiency.

From mid-September to early March, 16 sexual misconduct RVRs were issued to 11 inmates. Among four cases examined, one was no longer at PVSP; another did not meet the criteria for exhibitionism and on re-screening was not diagnosed with exhibitionism; the third was diagnosed with a paraphilia but did not meet the criteria for exhibitionism; and the fourth did not meet the criteria for exhibitionism. In administrative segregation several doors had black Lexan coverings. The institution

68

accorded "management status" to selected inmates who received RVRs. This status was imposed on unruly or disruptive inmates by a lieutenant or higher-ranking custody supervisor. Inmates on "management status" were allowed a pair of under shorts and socks, a t-shirt, shower thongs, a blanket and a mattress. It was unclear whether departmental policy permitted such a procedure.

Transfers:

PVSP rarely tried to access higher levels of mental health care. From mid-September through early March, just six inmates were referred to DMH inpatient acute care at CMF. The interval between referral and transfer averaged 14 days, with a range of six to 34 days. Inmates sent to the DMH acute inpatient program took nearly three weeks on average to reach CMF and DMH.

The MHCB unit was much busier, nearly a third of admissions coming from other CDCR institutions. Admissions to the MHCB unit increased to 105, including 29 from other institutions, with an average length of stay of 10.45 days. Staff also attributed the growth in admissions internally to greater demand associated with the institution's newly opened Level IV SNY.

Review of cases with excessive lengths of stay indicated that most were attributable to administrative causes involving custody arrangements for re-housing within PVSP, transportation to other sending CDCR institutions or transfers to DMH. No information on multiple MHCB admissions was gathered. Five-point restraints were used on four occasions.

Five-day follow-up after discharge of suicidal inmates from the MHCB unit was ordered for 52 inmates. Twenty-two MHCB inmates were discharged to EOPs

elsewhere; ten were transferred to DMH; 69 were discharged at the 3CMS level of care; and four were discharged to general population.

Long delays in acceptances and transfers to EOPs elsewhere were common. At the time of the monitor's visit, 13 EOP inmates were awaiting transfer. The longest stay among these was already over six months.

Other CAP Issues:

The compliance rate for seeing new caseload arrivals in a timely manner remained at 76 percent, leaving the problem only partially in compliance. Delays were attributed to inadequate staffing, although the number of new caseload arrivals had also increased by 52 percent during the preceding year. A QIT was chartered to assess the utility of creating a weekly auditing team for this problem.

Data stored in the MHTS indicated that psychiatric contacts occurred at 90-day intervals or more frequently in 98 percent of cases. An audit of 683 appointment histories also showed that inmates were seen at least every 90 days, while follow-up appointments were scheduled as requested by the treating psychiatrist or case manager.

Average response time to referrals was 4.7 days from the receipt of a referral to the time an inmate was seen by a psychiatrist or another clinician.

There were 14 mental health treatment groups involving 300 inmates. Group topics included anger management, lifer self-help, moral development and communication skills. Groups were also offered in administrative segregation.

A random audit of IDTT meetings and treatment plans showed that psychiatrists were present at 92 percent of meetings and a custody representative participated in two-thirds of them. In administrative segregation, psychiatrists

70

participated in the vast majority of IDTT meetings. The monitor's expert observed IDTT meetings where inmates interacted actively with treatment team members and discussions covered appropriate topics.

Lack of sufficient private treatment space continued to be a serious impediment to the delivery of mental health services.

Other Issues:

A review of inmate histories of inmates in administrative segregation indicated that inmates were seen weekly in 90.4 percent of cases and were seen timely when referred. Isolation logs were maintained, and psych tech logs documented rounds, intake screenings, referrals and orientation meetings of new arrivals with the sergeant. Rounds were made as required, but weekly summaries of rounds were not filed timely. Two to three case managers had to work simultaneously to meet contact requirements, which further exacerbated the shortage of confidential meeting space.

Windows were frosted in unit D-4, where 3CMS inmates were housed, limiting light and outside visibility. Staff and inmates reported that inmates on walk-alone status were not offered the mandated minimum amount of yard time.

Staff reported that some clinicians recommended imposing "management status" on some inmates. The institution agreed to direct clinicians to cease doing so. "Management status" ended for two of the three inmates so designated during the monitor's visit.

The heat plan revised in January 2005 was in effect. A list of inmates on heat risk medication was distributed to housing units five days per week.

Amended CPR and micro-shield training had been given to all but 36 of the institution's 875 correctional officers. Delays in training were attributed to officers' military leave and long-term sick leave. Completion of training was a precondition of returning to work. The institution required twice-daily daytime inventories of cut-down tools and extra micro-shields on each watch. A check in administrative segregation found compliance with requirements for cut-down tools, micro-shields and inventory sheets.

Institutional Summary:

Mental health supervisors were in short supply at PVSP. All staff psychiatrist positions were vacant, as were half of allocated clinical psychologist positions, but vacancies were largely covered by contractors. Psychiatric staffing shortages were exacerbated by the added demand associated with the creation of a Level IV SNY in the facility and a higher volume of admissions to the MHCB.

Quality management was sound with good infrastructure and essential bodies and committees functioning. The mental health quality management committee took up appropriate issues. The MHTS appeared to be working well, but some discrepancies persisted between contacts recorded in the MHTS and UHR entries.

PVSP did a good job of monitoring medication management. Medication continuity was often interrupted on arrival and intra-institutional transfers. PVSP apparently addressed successfully problems with medication non-compliance and long pill lines. Blood levels of inmates on mood-stabilizing medications, however, were not appropriately monitored and managed.

While little use was made of the Keyhea process, HS medication orders were administered appropriately. Medication errors also elicited responsive supervisory attention. A supply of medication was given to inmates who paroled.

The institution failed to provide sufficient information on the use of mental health assessments in the disciplinary process and still had not implemented the new sexual misconduct protocol.

MHCB admissions increased, primarily due to demands from PVSP's new SNY and other CDCR institutions. PVSP rarely sought access to higher levels of care. The few inmates who were transferred to the DMH acute inpatient program at CMF generally took up to three weeks to reach the appropriate level of care. Long delays were common for EOP transfers.

Relative to its provision of 3CMS care, mental health contacts by psychiatrists and case managers were timely, although confidential treatment space was inadequate. PVSP succeeded in providing group treatment to nearly 300 inmates in 14 groups in the general population and administrative segregation.

Most staff was trained on the amended CPR policy, and inventories of emergency equipment kits were performed regularly. Some frosted windows, the use of "management status" and the inability to offer the mandatory minimum amounts of yard time to inmates were notable administrative segregation defects.

## Sierra Conservation Center (SCC)
March 22, 2006 – March 24, 2006

Long-term staffing shortages among supervisory mental health positions continued. The chief psychiatrist position was vacant and the supervising psychologist was on loan to SQ.

Employment of line staff and contractors was more stable. Of the two allocated psychiatrist positions, both vacant, one was half-filled and the other was covered by two long-term contractors. Of the positions for five psychologists and one supervising psychologist, 5.5 were filled, although one was about to become vacant. The sole psych social worker position was filled. Two of the four psych tech positions were vacant. No telemedicine was used.

Among auxiliary staff, three of four pharmacy positions were filled and one was covered by contractors. Five of six medical records positions were filled. All laboratory, 10.73 RN and 16 MTA positions were filled. There was a shortage of correctional officers, although the shortfall was less severe than at some other institutions.

The size of the mental health caseload increased by approximately 18 percent to 564, with four EOP inmates and one inmate in the OHU. Of the 221 inmates in administrative segregation, 55 were 3CMS and three were EOP. One tier in one building was used for administrative segregation overflow for about one month, reportedly the only such occurrence during the monitoring period. No common space was used for beds, but 140 beds were set up in common areas in anticipation of the arrival of more Level III inmates.

Quality Management:

Quality management was almost non-existent at SCC. There was no local governing body. The health care quality management committee and the mental health subcommittee met rarely. QITs were inoperative. Staff audited selected targets as scheduled, but audit results were insufficiently analyzed. Audit results were not disseminated nor were they used to solve problems or manage the medical or mental health services. Recommendations made in the past regarding improvements to audits were not adopted. There was no peer review. Shortly before the monitor's visit, management proposed the appointment of a contract LVN to coordinate quality management activities, although funding was uncertain.

Meetings of the suicide prevention committee occurred intermittently and were poorly attended. The MHTS suicide history tracking function was not well implemented. A review of some recent suicide-related OHU admissions showed that only 27 percent of the cases had pertinent information or up-to-date indicia of suicide risk recorded in the MHTS. It was unclear whether the deficit was due to lack of clinical input, data entry or both.

Medication Management:

Many medication management functions were deficient. The most recent modifications to the still-incomplete local operating policies and procedures were proposed over a year ago. Plata directives had not been implemented.

New arrivals were not seen by mental health staff within required timeframes. Initial assessments were done within two weeks in fewer than half of cases and most took from 18 to 34 days. Medication continuity for newly arriving inmates

75

showed signs of deteriorating with a compliance rate of 80 percent. For inmates arriving with claimed but unverified medication orders waits ranged from ten days to one month.

Although medication renewals were generally timely, there were some expirations with long gaps between renewals. Some inmates reported medication gaps of a few days following lockdowns.

Fewer than half of caseload inmates were seen by a psychiatrist at least once every 90 days. Some intervals between contacts were extremely long. When psychiatrists indicated a need for follow-up before the normal 90-day interval, those contacts were often missed.

Response to medication non-compliance remained weak. Of approximately 630 referrals for non-compliance, 195 inmates were seen, suggesting that multiple referrals were often needed before inmates were seen. When appointments were made and kept, approximately 18 percent occurred within timeframes and more than half took four to six weeks.

Only 60 percent of MARs were appropriately filled out. During one month, only 13 percent of MARs documented reasons for refusals and just one percent noted failures to come to the pill line. There were gaps in MARs records of three to eight days.

The monitor's expert's review of four cases in which mood-stabilizing medications were prescribed found that orders for labs tests were missing and blood levels were unmonitored in three cases. Staff had not audited this area.

Despite reports of cheeking and suspected hoarding on MARs, the pharmacist reported no DOT orders, a lapse attributed to a failure to communicate those

problems to psychiatrists. According to psych techs, psychotropic medications were in practice administered via DOT, particularly in administrative segregation. There was no oversight of whether inmates arrived with or might need a Keyhea order.

Only one medication error was reported during the preceding six months, suggesting that the medication error oversight system was not being used.

There were 91 orders for HS medications for 50 to 70 inmates, a significant increase since the preceding monitoring period. Although the requirements for HS medication were spelled out in a local operating procedure, it appeared that HS orders were no longer administered after 8:00 p.m.

Mental Health Assessments for the Disciplinary Process:

SCC lost ground in the use of mental health assessments in connection with the disciplinary process. Tracking and audits had fallen off. Different methods for identifying bizarre or uncharacteristic behavior were tried but did not succeed. A total of 378 RVRs were issued, but only five inmates were referred for assessments. 3CMS inmates were rarely if ever referred. During the monitoring period, no assessments were conducted in one yard that had a high 3CMS population. Almost all completed assessments were for EOP inmates.

Routine ordering and review of C-files facilitated the use of record reviews to inform mental health assessments done for disciplinary purposes. Case managers did not assess inmates on their caseloads.

The quality of mental health assessments declined. About one third of reviewed assessments provided useful information but most assessments were barely adequate and a few were inadequate. Most clinicians did not remember that EOPs should

have staff assistants, although custody staff generally intercepted that error and appointed one.

Although penalties were mitigated or charges were dismissed in five of eight cases in which mental illness was found to be a factor, it was unclear from the hearing officers' decisions whether there was a relationship between the content of the mental health assessment and the infraction. Documentation needed to reference whether the findings of mental health assessments played a role in adjudication of the charges. Screenings for sexual misconduct infractions were conducted, and copies of chronos were kept by the supervising psychologist. Clinicians reportedly wrote detailed progress notes rather than using screening forms. In no cases was a paraphilia diagnosed.

Transfers:

SCC did not make referrals to DMH. There were 15 referrals to MHCBs, an increase over the previous monitoring period. One third of the referrals were rescinded because inmates' conditions improved during waiting periods that ranged from three to seven days. Five inmates were transferred timely. Five were transferred after waits of six to nine days.

The number of OHU admissions, 63, was consistent with previous levels of activity. Length of stays was problematic. Thirty six percent of OHU stays exceeded the 72-hour time frame, even after subtracting lengthy stays associated with waits for a transfer to a MHCB unit, the clinical needs of EOP inmates and cases held over to avoid discharges on Fridays or during holidays. The longest stays in the OHU were 63 days for

an EOP inmate, ten days for a MHCB candidate and 13 days for an inmate whose conditions was described as non-acute.

Staff was attentive to clinical need and responded to signs of acuity. Inmates in need of MHCB treatment or OHU admission were not housed in alternative spaces or holding cells but were sent to a community hospital if necessary. Considered in light of its obvious drawbacks, the OHU continued to provide fairly good mental health care but for the infrequent use of suicide risk assessments, completed just 64 percent of the time, and the excessive length of stays. Improvement would be effected with more out-of-cell time, particularly during long stays, and by changing the policy to permit standard clothing and property issue to non-suicidal inmates.

The monitor observed a suicide watch in its second day that was conducted in compliance with the revised policy. Compliance with suicide prevention measures such as five-day follow-up and hourly custody observations following discharge from the OHU declined. Available documentation was thorough. Staff audits found that some clinical and custody checks may have been missed in 11 percent of cases, but the monitor's review of a sample of cases found some custody checks missing in 22 percent of reviewed cases.

Transfers of EOP inmates were timely. Four EOP inmates were at SCC at the time of the monitor's visit. All of their stays were within required timelines, and all were seen weekly by mental health staff. Of a total of 17 EOP inmates transferred during the monitoring period, 76 percent of the transfers were timely, and all but one were transferred within 67 days. Records showed that all of them received weekly contacts. No EOP inmates were in administrative segregation longer than 60 days.

Other CAP Issues:

    a.  Partial Compliance:

    Case managers' caseloads in administrative segregation ran at about 60 inmates. On the whole, treatment provided to inmates in administrative segregation met requirements, but there were notable exceptions. Every case in a sample reviewed by the monitor had timely psychiatric contacts. Review of inmate histories indicated that weekly case management contacts occurred, but staff audits found a compliance rate of 69 percent. Initial IDTT meetings were timely in 91 percent of cases. Quarterly IDTT meetings and treatment plan updates were timely in 75 percent of the time. Staff reported increased frequency of cell-front contacts, particularly in overflow. Discontinuity was problematic due to turnover among case managers. There was no reliable system for escorts and space use. At the monitor's suggestion, caseload inmates were removed from the overflow unit.

    Psych techs did not use the 31-question mental health screening tool with caseload inmates. Monthly reports indicating that psych tech rounds were always made were not confirmed by an audit that found a compliance rate of just 38 percent. Staff credibly attributed the audit results to paperwork problems.

    In a sample of general population 3CMS records reviewed by the monitor, many quarterly case management contacts were late. Group treatment for 3CMS inmates improved with the reinstatement of defunct groups and the development of three new ones. A small proportion of the caseload was treated in groups. Thirty one inmates were enrolled and 26 participated. The number of inmates on wait lists exceeded the number

enrolled, with some inmates waiting one to two years. Space limitations were problematic. Three groups observed by the monitor's expert were of good quality.

Response to referrals remained problematic. A large proportion of referrals initiated by staff and inmates had response times ranging from one week to nearly a month. Once referred, 71 percent of inmates were seen by a psychiatrist within one week, with the longest delays reduced to two months, showing some improvement in this regard over past performance. Case managers' responses to referrals were timely 93 percent of the time, but the longest response time stretched to five weeks. The monitor's review of inmate histories showed several referrals that did not result in contacts.

Informed medication consent forms were obtained in fewer than 90 percent of cases.

b.  Non-Compliance:

Timely initial contacts with newly arriving 3CMS inmates continued their two-year decline. Bus screens were missing in 20 percent of cases. Almost half of the treatment plans or treatment plan updates were missing or late. A staff audit found that all annual treatment plan updates were timely. Treatment plans were not individualized. Many were stereotypical.

SCC remained non-compliant with its CAP on improving the frequency and rescheduling of appointments. For rescheduled psychiatric appointments, compliance rates for frequency and timeliness declined, with response times in the more egregious cases taking as long as two to seven weeks. Timeliness of case managers' rescheduling of appointments was similar to past performance with about 90 percent of inmates seen within two weeks and a few taking just over a month.

TCMP contacts declined. Audits found that barely half of the inmates leaving on parole were seen once by TCMP counselors. Mental health staff at SCC did not provide pre-release planning or information.

Other Issues:

All but five staff members were trained in CPR. A sergeant on each watch on each yard checked cut-down kits and signed verifying that his check had occurred and sets were complete. An associate warden's staff member provided oversight. In September 2005, an emergency medical event occurred involving a non-caseload inmate who may have required CPR. The monitor reviewed the incident report and ERRC review. This inmate appeared to have been dead for quite a while before being found in his bunk. There was no indication of suicide. CPR was initiated about five minutes after the man was discovered and was performed jointly by an MTA and an officer after the MTA arrived.

Institutional Summary:

Significant staffing shortages among supervisory mental health positions continued. Among line staff and contractors the employment picture was more stable except for psych techs among whom two of four positions were vacant and uncovered. Auxiliary staff positions were generally filled by a mix of full-time employees and contractors. Meanwhile, the mental health caseload increased by approximately 18 percent.

Quality management was moribund at SCC, with no local governing body and a health care quality management committee, a mental health subcommittee and suicide prevention subcommittee that rarely met. QITs were non-functional. Peer review

was not attempted.  Although audits were conducted, they were often marred by faulty methodology and were not used to improve or manage programs.

Long-term medication management problems persisted.  Local policies and procedures for medication management remained in draft form.  Compliance in providing medication continuity for newly arriving inmates dropped to 80 percent. Although medication renewals were generally timely, in some instances there were long intervals between orders.  The use of DOT and HS medication orders lagged, while the procurement of informed medication consent forms and monitoring blood levels of inmates on mood-stabilizing medications were deficient.

Fewer than half of the inmates on the caseload were seen by psychiatrists at least every 90 days.  Follow-up to medication non-compliance was deficient.  Referrals to mental health did not elicit timely psychiatric contacts, although response times by case managers were compliant.

Mental health assessments conducted for disciplinary purposes provided useful information in about a third of cases, but assessments were sought so rarely the overall impact of the assessment process was negligible.  Tracking of and audits on the assessment process declined and were barely useful.  Hearing officers did not appropriately reference clinical input in their documentation.  Inmates who were charged with sexual misconduct were screened; none was found to have a paraphilia.

The number of admissions to the OHU was consistent with past usage. Lengths of stay in the OHU were excessive.  Staff in the OHU was attentive to inmates' conditions and responded to signs of acuity.  Suicide risk assessments, however, were

completed only 64 percent of the time. Access to MHCB units elsewhere was seldom sought, but generally accessible.

Transfers of EOP inmates were timely and all had weekly contacts. No EOP inmates were in administrative segregation longer than 60 days. Rounds and screenings in administrative segregation were reportedly timely and complete but documentation and an audit failed to confirm the reports. There were mixed reports about weekly case management contacts. Initial IDTT meetings were timely but nearly a quarter of updates were late. The frequency of cell-front contacts increased. Turnover among case managers was associated with some discontinuity of treatment.

The timeliness of contacts with newly arriving 3CMS inmates continued to decline. Treatment plans, which were most often generic, were timely for just over half of new arrivals. 3CMS inmates were often not seen at least every 90 days; few participated in any group treatment. Responses to referrals took from one week to nearly a month. Case managers' responses were timely 93 percent of the time.

## SUMMARY

Staffing

The principal staffing challenge for the defendants during the monitoring period continued to be filling allocated mental health positions. Increases in both general and mental health populations quickly absorbed available mental health resources and left the system in need of more positions and, more importantly, more bodies to fill the positions already allocated and vacant. Throughout the monitoring period, moreover, it was difficult to track changes in allocations, vacancies and contracting because the defendants continued to fail to provide a monthly statistical package on staffing. The

defendants more recently have distributed a statistical package for December 2006, but it remains to be seen whether they will be able to deliver subsequent packages monthly.

Mental health staffing vacancy rates remained high among the seven institutions. Rates worsened at CSP/Solano and HDSP, while CSATF experienced some improvement due, in part, to the institution's closure for most of the monitoring period to new mental health intakes. Among the seven institutions covered in this report, the overall permanent vacancy rate for all categories of clinicians, excluding supervisors, was 52 percent. The institutions' collective capacity to attract and utilize contracted clinical services reduced the functional vacancy rate (i.e. permanent allocations – vacancies + contractors) to 22 percent. Among case workers, i.e., psychologists and psych social workers, the functional vacancy rate (16 percent) was slightly better than the average among all categories of clinicians. These figures were based on the then allocated allotment of clinicians, which assumed that the allocated sufficed to service programs at their capacity rate of occupancy, but the department's actual 3CMS population during the monitoring period ran some eight percent over capacity, thereby heightening still further the disparity between available clinical staffing and actual program populations.

The seven institutions' individual vacancy rates varied widely. At one extreme, CTF mental health positions were covered fully with just limited reliance on contracting. HDSP, on the other hand, had a functional clinical vacancy rate of 44 percent. The functional vacancy rate among clinicians in the remaining five institutions ranged from 18 to 25 percent. When the excess program populations, also varying from institution to institution, are added in, the level of pressure on existing staff can be better appreciated.

Vacancies among staff psychiatrists were particularly high. Collectively CSP/Solano, PVSP and SCC treated over 3,500 3CMS inmates, and CSP/Solano and PVSP also had MHCB units with a combined total of 29 MHCBs. Yet these three institutions together employed a combined total of 1.5 permanent staff psychiatrists and relied on contractors for any additional psychiatric care covered. After calculating available contractual help or lack thereof, ASP and CSP/Solano were the most challenged institutions, with functional vacancy rates of 48 and 47 percent, respectively. Psychiatric vacancies at ASP affected the delivery of care broadly, but particularly in the institution's OHU, where psychiatrists simply declined to work because of the risk to their licenses.

Through the use of contracted psychiatric services, CTF and PVSP were able to cover all permanent vacancies. The remaining three institutions, CSATF, HDSP and SCC, reported functional vacancy rates among psychiatrists in the 20 to 25-percent range. HDSP needed 13.5 contract psychiatrists to cover three to four full-time vacancies, and the demands of orientation and clinical supervision of this phalanx of contractors far outstripped the institution's administrative resources. Even in circumstances less desperate than those in HDSP, contracted psychiatric services generally failed to provide the level of care expected from full time, permanent practitioners.

HDSP also reported the highest functional vacancy rate among case managers at 35 percent. CTF fared much better with full coverage of its case manger positions. SCC fared nearly as well with just an eight percent functional vacancy rate. In the other four facilities, case manager functional vacancy rates ranged from 12 to 21 percent. Staff shortages were less among psych social workers than psychologists, with

the functional vacancy rates being 13 and 24 percent respectively, although the percentage of psychologists among case managers was much higher than that of psych social workers. Shortages among case managers at PVSP were exacerbated by a 3CMS caseload in excess of capacity, a heavy caseload population in administrative segregation and the conversion of a general population yard to a SNY.

Among psych tech positions the overall functional vacancy rate was 33 percent, with institutions again reporting varying rates. The functional vacancy rate for psych techs at HDSP was extremely high at 83 percent, followed by SCC with a rate of 50 percent. There were no functional psych tech vacancies at ASP and CTF. The other institutions fell in the middle of this broad range with rates of 25 to 38 percent.

All of the institutions fared better at covering their RN and MTA positions, collectively reporting functional vacancy rates of three and five percent respectively in these disciplines.

Quality Management

CSATF and HDSP continued to monitor the overall operation of their mental health delivery systems via reasonably effective institution-wide quality management activities. Minutes indicated that the health care quality management committee and its mental health subcommittee met regularly in both facilities. Meetings were typically well attended and collaborative in nature. Mental health staff at CSATF, as well as at CSP/Solano, was well informed about quality management activities and results.

At ASP, CSP/Solano, CTF and PVSP, the mental health quality management subcommittee met at least monthly and kept minutes. CSP/Solano's mental

health quality management meeting was held weekly within the context of a staff meeting. The mental health subcommittee met twice monthly at CTF, but activity did not rise to previous levels. Meetings were not well attended, and few audits were undertaken.

An infrastructure sufficient to support quality management was lacking at both ASP and SCC. Neither the local governing board nor the institutional health care quality management committee held regular meetings. Despite this deficit, mental health quality management efforts improved somewhat in ASP, but they remained moribund at SCC. CSP/Solano's amorphous quality management process for overall health care hampered quality management efforts in mental health. Reports of the mental health quality management subcommittee went directly to the institutional quality management committee, which, again, functioned like a large staff meeting.

QITs were chartered and addressed relevant issues at ASP, CSP/Solano, CSATF, CTF and PVSP. Even at CSATF, where quality management functioned best, two of its QITs were ineffectual. QITs were employed least usefully at CTF and HDSP.

At CSP/Solano the disciplines of psychology and psych social work engaged in peer review. HDSP mental health staff did not conduct peer review. Peer review remained on hold at CSATF, pending direction from the central office. CTF provided no information regarding status of its peer review. SCC did not use peer review.

MHTS data were fairly accurate at PVSP, where concordance rates between the MHTS and UHRs ranged from 84 to 90 percent. The accuracy of the MHTS reportedly improved at CSP/Solano, but audits based on the MHTS continued to yield

higher compliance rates than those based on reviews of UHRs. At CSATF the MHTS served as the basis for many audits and was used to track referrals. The concordance rate between MHTS and UHR documentation of case manager contacts at CSATF, however, fell to 70 percent. The MHTS was often inaccurate at ASP, where clinical contacts recorded in UHRs were not reflected in inmate histories produced by the MHTS.

Medication Management:

Among the seven reviewed institutions, CSATF did the best overall job of managing medications in spite of having the largest population, a more complex mission and a sprawling physical plant. CSATF audited medication management intensively. PVSP also conducted numerous audits of its medication distribution and management. ASP revised its local procedure and exhibited some harbingers of improvement. Medication management at CSP/Solano was haphazard. At HDSP medication management practices were misguided; some were left unchanged in the face of specific directions for reform in suicide-related CAP recommendations. At SCC, where revisions to local policies and procedures languished in draft form for over a year, long standing problems with medication management persisted. Documentation and audits of medication management were scant at CSP/Solano, CTF and SCC.

Continuity of Medication: Problems with continuity of medication on inmates' arrival at the institution, their movements within the institution and on the renewal of medication orders persisted to some extent in all but one of the covered institutions. At the seventh facility, CSATF, compliance rates for the timely renewal of medication orders slipped to 89 percent, but in all other respects continuity of medication was sustained. ASP, CTF, PVSP and SCC had problems in two of the three aspects of

continuity. ASP and CTF did not audit medication deliveries following internal relocations. CSP/Solano and HDSP sustained medication continuity in none of the three areas.

There were indications in some institutions that medication orders were not routinely processed expeditiously. Orders went astray or ordered medications took too long to reach inmates at ASP, CSP/Solano and HDSP. PVSP reported that preliminary audits found two-day lapses between orders and actual delivery in some cases. No information on the timely processing of medication orders was provided by the other three institutions.

Medication Non-compliance: The seven institutions varied significantly in their handling of non-compliance. CSATF and PVSP addressed the issue more adeptly than their fellow-institutions. While procedures at CSATF were adequate, they were sometimes executed in an erratic manner. On the other hand, a lack of procedures for reporting and responding to referrals for non-compliance characterized operations at CSP/Solano, CTF and SCC.

PVSP addressed one major contributory cause of local non-compliance by opening a second pill window in each yard, thereby reducing reported disincentives to medication compliance, namely the long waits and frequent altercations that were associated with overlong pill lines. PVSP's audits of non-compliance found good rates of referral and timely responses to referrals.

ASP began to respond systematically to medication non-compliance during the reporting period. Neither CSP/Solano nor HDSP had a mechanism to identify or respond to non-compliance. Pill lines were probably associated with non-compliance

at CSP/Solano and CTF.  A QIT on non-compliance at CTF made recommendations, but they were not carried out.  At SCC hundreds of referrals for non-compliance were made, but less than a third elicited a response, suggesting that multiple referrals were made before mental health staff saw inmates who were non-compliant.

DOT and Nurse-administered Medication:  Imprecision or outright confusion often resulted in the failure to administer medication by direct observation therapy (DOT) when it was warranted.  While all psychotropic medications at PVSP were ordered DOT, distinctions between DOT and nurse-administered distribution were not noted when pill lines were audited.  Just 20 caseload inmates at CSATF had DOT orders. A central list was maintained and distributed to clinics in the yards.  CSP/Solano had a small number of inmates with histories that resulted in DOT orders but did not maintain a central list.  At HDSP no more than four inmates had DOT orders.  SCC reported instances of cheeking and hoarding, but no DOT orders were written.

Laboratory Testing for Mood-Stabilizing Medications:  Blood levels of inmates on mood-stabilizing medications were monitored appropriately at CSATF and PVSP.  Levels were neither monitored nor tested at CTF, HDSP and SCC.  Audits done by ASP staff were contradictory, with one audit finding that blood levels were not monitored.

Keyhea Orders:  CSATF had seven inmates with current Keyhea orders. PVSP initiated four Keyhea petitions during the monitoring period and had two inmates with current Keyhea orders at the time of the monitor's visit.  CSP/Solano had a few inmates with current Keyhea orders but did not maintain a central list or bring them to the attention of staff that administered medication from clinics on the yards.  ASP, CTF,

91

HDSP and SCC reported no inmates with current Keyhea orders. It should be remembered that Keyhea orders were typically sought for inmates in exceptional crisis, so the opportunities for initiating such orders in overwhelmingly 3CMS caseload population tended to be limited. Absent extraordinary circumstances, inmates who were decompensating or experiencing difficulty in coping at the 3CMS level were usually referred to an EOP level of mental health care before a Keyhea order was sought.

HS Medication: SCC had 91 HS orders for 50 to 70 inmates. At CSATF 73 caseload inmates had HS orders. ASP and PVSP each had 20, and HS orders were administered after 8:00 p.m. at both facilities. The number of HS orders dropped from 59 to 14 at CTF. The sole psychiatrist on staff at HDSP saw no reason for ordering HS medications, and not more than four inmates at HDSP had HS orders. At CSP/Solano there were no HS orders.

Parole Medications: CSATF supplied paroling inmates with medications, as confirmed by audits. ASP and PVSP reported good compliance but had no confirming audit results. Both institutions compiled signed receipts for medications supplied to paroling inmates, but did not verify the completeness of their lists of paroling inmates. CSP/Solano reported that an audit had identified a problem with parole medication, which was subsequently remedied. Parole medication was rarely dispensed at HDSP.

Mental Health Assessments for the Disciplinary Process:

The process for mental health assessments in conjunction with the disciplinary system was implemented to facilitate the identification of inmate misconduct that might have been caused or affected by mental illness, and to encourage appropriate

institutional response.  Among all seven institutions, performance levels in this focus area were unsatisfactory.

The rate of referral of inmates for assessments was exceptionally low. While most institutions made the mandatory referrals of EOP and MHCB inmates appropriately, referral rates for 3CMS inmates remained uniformly extremely low.  The average rate of referral of 3CMS inmates receiving RVRs was under five percent.  At HDSP ten or 4.6 percent (10) of the 217 RVRs issued to 3CMS inmates resulted in referrals.  For 3CMS inmates at ASP, just two percent (7) of the 300 inmates who received RVRs were referred.  CSATF referred five percent (19) of the 363 RVRs issued to 3CMS inmates.  CTF referred eight percent (10) of its 3CMS inmates to whom 125 RVRs had been issued.  CTF performed no audits in this area.  At SCC only one percent (4) of inmates receiving a total of 378 RVRs was referred; no referrals at all occurred on a yard with a high 3CMS population.  CSP/Solano lost ground during the monitoring period, and four to five percent (15 to 29) of its total of 409 RVRs resulted in referrals. Even among these few referrals, many of the assessments reviewed by the monitor contained errors and inconsistencies and suggested strongly that clinicians involved in their preparation had lost all sight of the objectives and purpose of the process.

The quality of mental health assessments for RVRs was, at best, inconsistent and marginal everywhere.  Only about a third of assessments at SCC, where the decline in the quality of assessments during the monitoring period was particularly notable, provided sound clinical input.  Most were marginally adequate and a few were completely inadequate.  CTF did not audit the quality of its assessments.

Except at CSATF, referrals for evaluations and completed assessments were untimely. At HDSP time lapses ranged from 11 to 40 days. CTF again did not audit its performance in this area.

The institutions also inadequately documented most aspects of the assessment process. HDSP failed to document any aspect of the process adequately; C-files contained assessments inconsistently; mental health failed to keep copies of referred RVRs and assessments; and custody staff did not receive completed assessments regularly and did not sign for completed assessments when they were received. RVR logs at PVSP omitted levels of care, and the institution kept no statistical data on the number of RVRs issued to caseload inmates, although staff promised to improve their documentation practices. CSP/Solano's documentation was often inaccurate. CSATF did not have assessments in C-files, while SCC's tracking and auditing fell off during the monitoring period.

Hearing officers at CSP/Solano, CSTAF, HDSP and SCC did not incorporate and document clinical input in their findings and dispositions. CTF hearing officers considered mental health assessments but needed to improve documentation of their consideration. Some hearing officers at CSP/Solano appeared to be aware of, but did not consider, assessments, while others seemed unaware that assessments had been completed. Two cases showed a significant lack of understanding of the process on the part of the involved hearing officers. In one case the assessment of a clearly delusional inmate was not considered, resulting in the loss of 90 days of credit; in the other case, the hearing officer, obviously unfamiliar with RVR assessment protocol, found the inmate guilty of "manipulation."

The new sexual misconduct protocol was implemented to variously limited degrees in the seven institutions. Black Lexan covered some doors in the administrative segregation unit at PVSP, but otherwise the new protocol was not implemented. PVSP instead imposed what it called "management status" under its own local operating procedure for disciplining disruptive inmates. There were significant documentary omissions and no custody component to the program at ASP. HDSP failed to track or keep copies of screens. At SCC, clinicians used progress notes rather that screening forms to record evaluations. Screenings at CSP/Solano were untimely, and some RVRs for sexual misconduct seemed inappropriately issued. At CSATF a number of inmates were screened and reviewed by an IDTT, but none was referred for a more comprehensive evaluation. CSP/Solano referred all cases of sexual misconduct to the district attorney for prosecution, while ASP and CSATF referred only some cases.

Transfers:

DMH: Five institutions, ASP, CSP/Solano, CSATF, HDSP and PVSP collectively referred 50 or more inmates to DMH acute care at CMF; 36 of the referrals resulted in transfers. Fourteen referrals were rescinded or dropped during the time it took to complete paperwork, receive an acceptance or obtain a bed assignment from DMH. At these five institutions, 41 of the 50 referred inmates were not transferred within the ten-day MHCB time limit or 72-hour OHU time limit, whichever was applicable.

At all seven institutions, lengths of stay in MHCB units and OHUs were overlong, whether the inmates were eventually transferred to DMH or the referrals were rescinded before transfer.

Six of the seven institutions did not refer all inmates to DMH who needed a DMH level of care. CSP/Solano made the largest number of referrals to DMH, but actually transferred no more inmates than any of the other facilities with a MHCB unit. Under-referral was problematic at ASP, CSATF and PVSP. The number and pace of DMH referrals made by HDSP suggested that it, too, under-referred. CTF made few MHCB referrals from its busy OHU. A large proportion of stays in SCC's OHU were excessively long.

Calculations of data from ASP, CSP/Solano, CSATF and HDSP, where the number of referrals and transfers to DMH were known, indicated that 26 of 40 referrals to DMH culminated in transfer, while 14 (35 percent) did not. The majority of the 26 who went to DMH were in MHCBs longer than ten days. For example, at CSP/Solano and HDSP together, nine of the 16 inmates who reached DMH were kept in the local MHCB unit longer than ten days. The average length of stay in an MHCB at CSATF prior to transfer to DMH was 25 days. ASP, which had an OHU and rarely referred inmates to DMH, successfully transferred just one inmate directly to DMH during the monitoring period.

CSP/Solano had the most referrals to the acute inpatient DMH program at CMF, with 18 referrals in six months, only ten of which resulted in transfers; the rest were rescinded. Nine of 11 inmates referred to acute DMH care by CSATF were actually transferred. Six of eight inmates referred by HDSP to DMH/CMF were transferred. PVSP more rarely referred inmates to DMH/CMF; only six to ten inmates were referred and transferred within a six-month.

At all seven facilities, access to DMH acute care was untimely. It typically took two weeks for inmates to reach DMH/CMF, but intervals of three weeks or more between referral and transfer were not uncommon. CSATF and HDSP took too long to initiate referrals. CSP/Solano referred promptly but enjoyed no better or more timely access. DMH took too long to communicate an acceptance and/or assign a bed number.

For whatever reasons, none of the institutions seemed to consider intermediate DMH programs a useful or readily available resource. Staff at one institution blamed onerous paperwork and restrictive admissions for the lack of referrals.

MHCBs: CSP/Solano had a licensed 15-bed CTC with nine MHCBs. The MHCB unit admitted an average of 19 cases per month for a total of 125 admissions in 5.5 months. The average length of stay was 8.5 days. Twenty-six percent of all stays exceeded ten days, with the longest lasting 41 days. Lengths of stay were increased by administrative delays especially for inmates from institutions elsewhere.

Access to MHCBs was poor for CSP/Solano inmates. The unit admitted more inmates from DVI, SQ and other institutions than from its own population. Not all inmates at CSP/Solano who needed a crisis bed were referred to the MHCB, and not all who were referred were admitted. Although MHCBs were always full, alternative holding cells were not used. Staff managed the demand for MHCBs by discharging the least impaired inmates in the MHCB unit to make beds available for new admissions. This seemed a prescription for the premature discharge of some clinically unstable inmates.

97

In a four-month period, CSATF had 171 admissions to its 14-bed MHCB unit. Of these, nearly a quarter were from other CDCR institutions. Over half of all MHCB stays exceeded ten days in length. Slightly under half of the overlong stays were attributed to Keyhea processing, pending transfers to DMH beds and administrative delays in removing clinically discharged inmates, while the rest of the extended stays were justified by clinical reasons that were reviewed and approved by a clinical supervisor. Staff at CSATF reported good access to the MHCB unit.

HDSP's 12 MHCBs had 150 admissions in six months with an average daily census of 5.3 and a peak population running to nine or ten inmates. Traffic doubled after beds were opened to other institutions early in the monitoring period. HDSP staff reported that access to MHCBs was good.

PVSP's MHCB unit became busier in the monitoring period with 105 admissions in 5.75 months. After the MHCB was designated to receive referrals from other institutions, 30 percent of admissions were from elsewhere. Staff at PVSP attributed higher local demand to the institution's newly opened Level IV SNY. Administrative delays in re-housing PVSP inmates and returning others to their sending institutions contributed to longer stays in the MHCB unit.

OHUs: ASP, CTF and SCC each audited the operations of their own OHUs. Differences in the treatment provided in these units, as well as in the number of referrals made by each to MHCB units elsewhere, varied widely. ASP and SCC made 24 and 15 referrals to MHCB units, respectively, while CTF made only eight. Typically, it took five days or longer for referred inmates to be transferred to a MHCB unit elsewhere, and referrals pending transfer were often rescinded.

None of the 24 inmates transferred from ASP to a MHCB unit elsewhere was transferred within three days of arrival in the OHU. The average time to transfer was 5.5 days. CTF sent eight inmates to MHCBs, six of whom were transferred within one to seven days of their admissions; data on the other transfers was not provided. SCC referred 15 inmates to an MHCB unit but rescinded five when inmates' conditions improved after waiting three to seven days for transfer. Five of the ten who were transferred waited six to nine days to be moved.

Treatment in the ASP OHU was substandard, and stays were excessively long. As indicated, contract psychiatrists refused to jeopardize their licenses by working in the OHU. Institutional physicians were asked to write medication orders for inmates in crisis. Eight inmates stayed in the unit 12 days or longer, while five remained there from 60 to 88 days, denying an astronomical ratio of bed/days to other ASP inmates. In 22 cases involving excessive stays, no referral to a MHCB occurred. CTF also under-referred to MHCBs, and operated its OHU more like an MHCB unit, with a psychiatrist and a psychologist on staff. CTF audits indicated that IDTT meetings were held regularly and daily psychiatric contacts were provided. While lengths of stay in the CTF OHU were generally shorter, with 57 percent of admitted inmates discharged within 72 hours, many stays were excessive, with two reaching 12 days. Lengths of stay in the SCC OHU were also excessive. Excluding inmates awaiting transfer to a MHCB unit or EOP elsewhere, 36 percent of stays in the OHU exceeded 72 hours. On the other hand, clinical staff in the OHU was attentive to clinical needs and responsive to signs of acuity.

EOP: None of the seven institutions met fully the required timelines for the transfer of EOP inmates to programs elsewhere in CDCR. SCC came closest, moving