76 percent of 17 EOP transfers within 60 days and all but one within 67 days. CTF transferred its 16 EOP inmates within 21 to 100 days. ASP, CSP/Solano and HDSP were able to transfer a half to two-thirds of their EOP inmates within 60 days. At HDSP two-thirds of 43 EOP transfers were timely, with excessive stays sometimes reaching 105 days. ASP transferred two-thirds of 36 cases timely with one stay exceeding 135 days. ASP reported that none of the eight EOP inmates awaiting transfers to a SNY was moved. CSP/Solano made half of its 54 completed EOP transfers timely. Of 22 EOP inmates on site at the time of the monitor's visit, eight had been awaiting transfer longer than 60 days, one for as many as 191 days. PVSP had 13 EOP inmates awaiting transfer, the longest for six months.

## 3CMS Treatment Generally

Each of the seven institutions covered in this report provided care at the 3CMS level to a large number of inmates. Some 85 percent of the defendants' overall MHSDS caseload of some 32,000 inmates participated at the 3CMS level of care, which provided to seriously mentally disordered inmates treatment services on an outpatient basis to allow them to function adequately in the general prison population. In addition to providing some basic treatment, the 3CMS program also helped identify inmates, who might have decompensated, experienced a crisis or become unstable and/or suicidal and unable to function in the difficult prison context, and facilitated their transfer to a more intensive level of mental health care. What follows are limited comparative observations on some components of the 3CMS programs in the reviewed institutions. Comparisons are limited because the monitoring was focused on the issues of staffing, quality management, medication management, mental health assessments in RVRs, transfers and

the unresolved deficiencies in each institution's corrective action plan. The last area, despite its focus on multiple institutions, rarely allows comparisons among program components across all seven reviewed institutions, because all seven, or even a majority of the seven, failed infrequently to resolve the same CAP deficiencies. This means that only one or two institutions typically shared similar on-going deficiencies, making generalizations difficult.

The type and intensity of 3CMS treatment in any specific case was informed by clinical need, formulated by a multi-disciplinary treatment team and reflected in an individualized treatment plan. Minimal clinical intervention required contact with the inmate by a correctional clinical case manager not less than every 90 days. Other treatment modalities might include psychotropic medication, individual and/or group psychotherapy, more frequent case management contacts and other supportive services as clinically indicated.

The most basic requirement of the 3CMS program was the participant's contact with his or her case manager every 90 days. With some exceptions, the ability to maintain regular and timely case management contacts at least quarterly with 3CMS inmates remained somewhat erratic among the seven institutions. Lack of sufficient staffing and increases in 3CMS populations posed substantial obstacles to full compliance. Many quarterly case management contacts were late at SCC. The large number of new admissions, coupled with high staff turnover and space constraints, prevented CSATF from maintaining prior gains in meeting the 90-day goal. HDSP was able to maintain timely case management contacts, largely because its case manager resources were not overtaxed by steadily increasing 3CMS caseloads. The facility's

3CMS caseload was capped in 2005 due to the critical shortage of psychiatrists, and overcrowding was less of an issue there that it was elsewhere.

Individualized treatment plans for 3CMS inmates needed to be completed by case managers in consultation with the other IDTT members within 14 days of an inmate's referral to a 3CMS program. Consistency in timeliness and quality of treatment plans represented a continuing challenge for the seven covered institutions. Many treatment plans were generic rather than individualized and often untimely. While a few treatment plans developed in ASP contained detailed descriptions of problems and treatment goals, most were not individualized. At CSP/Solano, CSATF and HDSP, lack of psychiatric staffing compromised the timeliness and quality of IDTTs and initial and updated treatment plans. Initial IDTT meetings and treatment plans were timely in just 65 percent of surveyed cases in HDSP. Similarly, treatment planning was undermined at CSP/Solano by the long-standing lack of adequate participation by psychiatrists and correctional counselors in IDTT meetings.

## RECOMMENDATIONS

As with the first installment of this 17th round report, the most pressing issues identified in this report are already the subjects of various orders, plans and developments. The two central problems related here have to do with inadequacies of staff, particularly psychiatric staff, and the lack of readily accessible beds in programs for the most seriously mentally ill inmates in the system.

The second of these two overriding concerns is particularly insidious because it breeds in too many CDCR clinicians the conviction that the treatment available locally in their local OHUs, MHCB units and even general population EOPs is good

102

enough and, possibly, even better than transferred inmates are likely to receive at a higher level of treatment. A substantial cause of that spreading conviction is frustration with the whole referral, acceptance and transfer imbroglio, which demands what is perceived as excessive paperwork resulting only in interminable delays and aborted transfers. Forced to deal repeatedly with the consequences of the broken transfer system, some clinicians have become resigned to the inevitability of treating the most seriously mentally ill locally despite obviously inadequate resources of staff and space. Meanwhile, the perception grows that pressure on the higher levels of care has become so intense, clinicians in those programs must increasingly accelerate the return to lower levels of care people who are not stable enough to cope successfully. The premature returns feed growing doubts about the clinical value of long delayed transfers to programs incapable of providing genuine stabilization, and the reluctance to refer to higher levels spreads further. This cyclical despair makes the defendants' efforts to provide more intensive care beds as quickly as possible absolutely critical.

The whole area of medication management, in which local progress varies from institution to institution and, within institutions, from issue to issue, is in a suspended mode while changes in the distribution and administration of medications arising from developments in the Plata inch closer to implementation. CDCR mental health administrators and the monitor's experts are working together currently with the Plata receiver and his medications contractor to make the transition as smooth as possible for the massive number of CDCR inmates on psychotropic medications.

Quality management remains substantially a local implementation issue, with some institutions showing impressive progress, while others still feel too pressed to

103

provide a modicum of adequate clinical care to spare the resources needed to address quality improvement fully. Where, for example, does peer review among psychiatrists fit when, as in HDSP, a kaleidoscopic array of 13.5 changing contract psychiatrists are needed to cover in part four vacant permanent positions? Encouragingly, even in hard-pressed HDSP, most of the other basic components of a quality management structure were in place and functioning surprisingly well. Leadership and resources are the indispensable ingredients for implementing effective local quality management. Work on providing increased resources is well underway; leadership is a more elusive commodity.

Some problems were encountered in the seven reviewed institutions with the timeliness and/or quality of some components of the 3CMS program. Inadequacies in the timeliness of IDTT meetings and treatment plans were widespread and often the result of staffing shortages, while the lack of individualized treatment plans, also widespread, typically resulted from insufficient training and supervision. Otherwise, the monitor found defects in the basic components of the 3CMS program in one or two, sometimes three, of the seven monitored institutions, but not across the board or even in a majority of institutions. The premise underlying these reviews is that each institution is working to resolve program deficiencies identified in its CAP; once an issue is found to be in compliance, it is noted as resolved and, thereafter, is presumed to remain resolved unless the monitor finds some evidence of backsliding while reviewing other unresolved CAP items, as happens frequently. Relative to CAP items, then, the monitoring teams focus on unresolved deficiencies; if they report nothing damning on other previously resolved CAP items, the presumption is that they encountered no evidence of backsliding.

All of the foregoing suggests that, given the efforts underway already to address staffing, transfers and medication management, further recommendations for court orders are not needed. There is one area, nonetheless, that needs to be addressed, namely, the mental health assessment process in disciplinary matters.

The first version of the assessment process, introduced in mid-1998, was developed to respond to the finding in the original <u>Coleman</u> order that seriously mentally disordered inmates were often subjected to punitive discipline even when their misconduct was attributable to their mental illness. The impact of an approach to discipline that ignored the role of mental illness in inmates' misbehavior was recognized as being cumulative. As seriously mentally ill inmates incurred repeated disciplinary convictions, often for conduct they were barely able to control or incapable of controlling, their lengths of stay in administrative segregation and eventually Security Housing Units (SHUs) grew ever longer. Seriously mentally disordered inmates grew to occupy a percentage of administrative segregation and SHU cells considerably out of proportion to their presence in the overall population, yet the defendants still needed to provide them with mental health services, only now in an environment that tended to accelerate their illness and was inimical to the provision of such services. The approach bred increased illness, requiring ever more treatment that was exponentially more expensive and difficult to provide due to the enhanced security within which it needed to be provided.

The original assessment process required a mental health evaluation of every caseload inmate who received a rule violation report (RVR) for a disciplinary infraction. Developed when the defendants were still struggling to create a basically

viable mental health system, the assessment process simply overwhelmed available clinical resources.  In early 2000, the defendants initiated an overhaul of the original assessment process that eventually took nearly three years to develop and implement. The principal resulting change in the policy limited the automatic application of the assessment process to inmates at the EOP and MHCB levels of care, while referring for a mental health assessment 3CMS or non-mental health caseload inmates whose behavior was "bizarre, unusual or uncharacteristic."  The change was aimed at focusing the assessment process on those inmates most likely to need its protection and reduce the incredible drain on clinical resources generated by the original version's automatic applicability to the entire mental health caseload, which in 2000 topped 20,000 inmates.

Since its introduction in mid-2003, the revised policy has slowly taken root and been applied with varying but reasonable degrees of success to inmates at the EOP and MHCB levels of care, where its application is mandatory.  While the "bizarre, unusual or uncharacteristic" standard sounded plausible, it has proven extremely difficult to apply in practice.   This report, focused as it is on the major 3CMS programs in CDCR, confirms that difficulty.  Five of the six reviewed institutions provided statistics on RVRs written for their collective 3CMS population of some 7,000 inmates during all or part of the monitoring period.  A little less than five percent (c. 85 to 90) of the nearly 1800 RVRs issued to 3CMS inmates in these five institutions resulted in referrals for a mental health assessment.  That averages out to 18 referrals per institution for the monitoring period or just 3.6 assessments per month per institution.  It was unclear whether these numbers included RVRs written for non-caseload inmates; no one apparently captured data on assessments of non-caseload inmates, probably because few, if any, occurred.

Arguments can be made that the small number of 3CMS referrals reflects reality. Inmates are placed in 3CMS outpatient programs because, by and large, they are able to function in the prison environment and their mental illness is under control. If they were unable to cope, they would be referred, at least theoretically, to an EOP or other more intensive level of treatment. Their disciplinary infractions, then, are presumptively attributable to bad behavior, not mental illness. Perhaps, but too many inmates not referred for an assessment end up immediately or shortly thereafter in MHCBs or with referrals to more intensive levels of care or referrals for medication non-compliance, acute situational stressors or other indices of decompensation, all of which suggest that intervening mental health issues may well have played a significant role in their cited misbehavior. Part of the problem is that correctional officers are often loath, for lots of reasons, to distinguish between just plain bad behavior and behavior that is "bizarre, unusual or uncharacteristic" and driven by mental illness. That, of course, is the reason for the referral process. In its current permutation, however, the decision to refer is entirely in the hands of the correctional officer who writes up the RVR and that individual's custody supervisor, both of whom are often ill-equipped or unwilling to determine whether a mental health evaluation is needed. Whatever the reasons for the bottleneck, the metal health assessment process in disciplinary matters for 3CMS inmates has been completely marginalized in these five institutions.

It is time to take a closer look at improving the applicability of the mental health assessment process in disciplinary matters involving 3CMS inmates. The effort should provide CDCR with enough time to pull together a task force of 3CMS clinicians to review the existing process and its operations and generate policy and/or operational

changes focused tightly on enhancing its applicability to 3CMS inmates. It seems clear that the criteria for referral need either to be made more objective, or if left subjective, applied by, or in consultation with, mental health clinicians.

Such an effort ought to result in the development of a revised version of the policy and/or operational adjustments, which, in turn, should be implemented in a living unit or institution with a significant 3CMS population for a trail period. The results of the new model's application should be appraised and followed, if necessary, by any required re-tooling. Only then should the changes be more widely disseminated.

The first two iterations of this assessment process were enormously time and resource-consuming. This is not the time to ditch the fruits of the first two efforts, which between them have helped mitigate the often harsh impact of the prison disciplinary system on seriously mentally disordered inmates. It is easier to engage custody staff who work in EOP and MHCB units in the assessment process, both because they work regularly with the mentally ill and the nexus between illness and behavior is more evident. Also, there is always the stimulus of automatic referral. Overall, there are indications that custody staff in EOP and MHCB units is gradually becoming acclimatized to the assessment process. It is important to retain these gains and figure out how to apply them reasonably to the 3CMS population.

The recommendation, then, is for the defendants to develop within 60 days a plan for putting together the analysis described here, identifying and developing the changes deemed necessary to broaden the impact of the assessment process on 3CMS inmates, testing those changes and implementing them system-wide. The plan should be submitted to the monitor and plaintiffs' counsel for review and comment and filed

subsequently with the court along with any further recommendations that may be required.

The plaintiffs objected to this recommendation in the draft version of the report on the grounds that the remedial process suggested for the reform of deficiencies found in the mental health assessment process was inadequate. They sought immediate court orders requiring institutions to comply with the current process; develop training programs for clinical and custody staff on the existing process and improve auditing of the overall process. All of these are useful suggestions for enhancing operations of the existing process, but the analysis in this report of the deficiencies of the process suggested that, relative to its application to 3CMS and non-caseload inmates, the process needed to be re-tooled.

Examination of the operations of the assessment process exclusively in institutions with large and primarily 3CMS mental health programs made clear that provisions for addressing the impact of mental illness on the misbehavior of 3CMS inmates resulting in disciplinary infractions were not working well. The analysis did not purport to address the assessment process's impact on the disposition of RVRs of inmates at the EOP or MHCB levels of care, whose referral for a mental evaluation is automatic. The focus of the analysis was on how to improve the inclusion of 3CMS inmates, whose decompensation was a serious factor in their misbehavior. This requires, first, a rethinking of the policy's provisions to ensure that decompensating 3CMS inmates are identified for an assessment. That will require the creation of a thoughtful, multi-disciplinary, but clinically-oriented working group, and, hence, the more limited recommendation.

Plaintiffs also sought a court order directing the defendants to develop a training program to instruct clinicians in the need for and methods of referring inmates who require inpatient DMH treatment to appropriate DMH programs. Currently, the availability of DMH programs for CDCR inmates already identified and referred for inpatient care is inadequate to meet the demand. Once more such programs are on-line and DMH has overcome its present staffing crisis, the training push urged by the plaintiffs will be appropriate and useful.

~~Finally, the plaintiffs sought an order requiring the defendants to monitor~~ and report on efforts to address medication management deficiencies that may not be addressed in the reform of pharmaceutical practices currently underway under the Plata receivership. As indicated above, the special master and the defendants are working closely with the receiver's contractor in the development of policies and procedures in order to ensure that policies and issues relative to the delivery of medications to mental health caseload inmates are understood and addressed.

The defendants submitted no objections to the draft version of this report.

The third and final installment of this report on the 17th round of compliance review will be ready for filing within 40 days. It will cover reception centers, institutions for female prisoners, desert institutions, facilities with SHUs and the remaining CDCR institutions that do not fall into one or another of these categories. At

this point, the assumption is that the 18th round report will be delivered *en masse,* rather than in installments.

Respectfully submitted,

/s/

_____
J. Michael Keating, Jr.
Special Master

April 2, 2007