EXHIBIT A

Avenal State Prison (ASP)

March 20, 2006 – March 22, 2006

1.    Inmate A

This case was reviewed at the request of plaintiffs' counsel.  At the time of the monitoring visit, Inmate A had been housed in administrative segregation for more than eight months after being endorsed for MCSP Level III SNY on 9/13/05.  He was initially placed into administrative segregation as a function of safety concerns and pending transfer to an SNY program in July 2005.  He was made EOP level of care in August 2005.

The inmate reported that the initial change from 3CMS to EOP occurred, in part, in an attempt to facilitate his transfer out of administrative segregation so that he could receive appropriate care for treatment of an affective disorder.  He remained at EOP level of care from 8/31/05 through 2/28/06 but was not transferred.  Staff reported that transfer did not occur because of unavailability of appropriate Level III EOP beds.

The inmate claimed that when it became clear that transfer to EOP was going to be delayed and when he felt that his condition had stabilized, he requested return to the 3CMS level of care in consideration for his credit-earning status.  Notes by clinical staff appeared to indicate that they disagreed with the request to change the inmate's level of care back to 3CMS at that time.

A note written on 12/14/05 indicated that a psychologist met with the inmate and indicated that "it is the opinion of this writer that his emotional and psychological well being would best be served by maintaining him at EOP level of care."  The inmate reacted angrily to this suggestion and stated that he wanted to return to the sensitive needs yard.

A note written on 1/25/06 indicated that the inmate "admitted exaggerating symptoms." He reported that the actions that led him to be perceived as requiring EOP services were "designed to gain transfer to another setting."  A note on 12/10/05 (by a psychiatric technician) indicated that the inmate did not desire EOP level of care.

In this case, the progress notes and the records of clinical consideration were well written and appeared to reflect a well-considered decision.  A brief interview with the clinician who initially recommended EOP placement revealed that the decision was made primarily on the basis of an existing "AXIS II" (not a Borderline) condition that, in the clinician's opinion, resulted in the likelihood that the inmate would require contact at intervals more frequent than every 90 days.  The decision to move back to 3CMS came after additional consideration and evaluation had occurred.

In interview, Inmate A reported that the initial discussion regarding changing to EOP level of care occurred in an attempt to facilitate his move from administrative segregation.  He was well groomed, sociable, alert and quite verbal.  He was clearly angry regarding what he viewed as mistreatment, including the delay resulting in his

lengthy stay in administrative segregation. His affect was rather restricted but appropriate to the context. There were no indications of a thought disorder. He reported that the current medication regimen was working well in addressing symptoms of depression. He reported having made plans to enter an inpatient substance abuse treatment program upon his release on parole.

He was apparently due to parole on 4/8/06. It appeared that he has been seen weekly since the decision on 2/1/06 to reduce his level of care. He was stable and looking forward to his upcoming parole.

EXHIBIT B

California State Prison, Solano (CSP/Solano)

June 26, 2005 – June 28, 2006

1.    Inmate A

This Level III EOP inmate was diagnosed with Schizophrenia, paranoid type. He was treated with Haldol 5 mg/day, Cogentin 2 mg/day and Desyrel 200 mg/day.

This inmate arrived at CSP/Solano during October 2004 from CMF. He was receiving 3CMS LOC at the beginning of the review period (December 2005). Progress notes described the inmate as presenting with paranoid thinking, angry affect, irritability and poor frustration tolerance. He had been treated with Risperdal and Desyrel; however, the MARs reflected poor medication compliance. On 5/16/06, he was seen by the psychiatrist with the above described symptoms; his medication was switched from Risperdal to Haldol at that time. He was referred for <u>Clark</u> testing, but the results during May 2006 did not indicate developmental disability. He remained hostile with irritability and poor functioning in the general population. On 5/31/06 the IDTT recommended EOP LOC. He was awaiting transfer to an EOP at the time of the visit.

<u>Assessment:</u>

This EOP inmate was functioning poorly in general population, noncompliant with medications and presented with hostility and agitation. Despite this, no measures were taken to attempt to adequately manage this inmate or to address his symptoms, even after he was recommended for EOP LOC.

Additional comments noted regarding the care provided to this inmate included the following:

There was no documentation of weekly CCM contacts for this inmate after he was recommended for EOP LOC.

There was no documentation of nursing referral or mental health follow-up or acknowledgement that this inmate was consistently noncompliant with his psychotropic medications. This was of particular concern for this inmate who reportedly presented with the above mentioned symptoms.

There was no documentation of custody or psychiatric presence in the IDTT meeting on 5/31/06.

There was no intervention such as a Keyhea petition or change in medications considered for this inmate with poor response to treatment and unrecognized medication noncompliance.

Medication management for this inmate was poor. As previously stated, there was no documentation that the psychiatrist was aware of the inmate's medication noncompliance. Furthermore, medication was not adjusted when clinically indicated.

2.      Inmate B

This EOP inmate was diagnosed with Mood Disorder, NOS. He was treated with
Stelazine 4 mg/day, Risperdal 3 mg/day, Vistaril 100 mg/day and Depakote 1000
mg/day.

This inmate had been incarcerated at CSP/Solano since October 2003. At the beginning
of the review period, he was receiving 3CMS LOC. He was housed in administrative
segregation during February 2006, reportedly for a charge of staff assault. Subsequent
progress notes described him as presenting with occasional suicidal ideation, insomnia
and depression. He was followed consistently by the administrative segregation mental
health staff. He continued to complain of racing thoughts and depression and was given a
trial of Depakote. An IDTT meeting on 6/13/06 recommended EOP LOC. The last
psychiatric progress note dated 6/20/06 indicated that the inmate insinuated that he had
exaggerated his symptoms to get into the EOP.

Assessment:

The following comments were noted regarding the care provided to this inmate:

        The appropriate laboratory testing for treatment with Depakote was conducted.
        A review of this inmate's UHR did not clearly elucidate the rationale for EOP
        LOC.

        A review of the MARs indicated that the inmate was compliant with psychotropic
        medications.

3.      Inmate C

This EOP inmate was housed in the administrative segregation unit. He was diagnosed
with Psychotic Disorder, NOS. He was not treated with antipsychotic medications at the
time of the visit.

This inmate was transferred from CTF to CSP/Solano on 5/4/06. At the time of his
arrival, he was receiving 3CMS LOC. He had previously been treated with Risperdal that
was discontinued during April 2006 at CTF.

Progress notes described the inmate as presenting with unkempt appearance, hostile
affect, bizarre behavior and refusal to shower. He also reportedly refused to take
psychotropic medications. He was also described as "gravely disabled." A chrono dated
6/8/06 indicated that his LOC was changed to EOP on that date.

On 6/16/06, he was seen by the psychiatrist who was concerned that the inmate might possibly have delirium or decompensation of his mental illness and recommended admission to the CTC; however, he was not admitted due to a lack of beds.

Subsequent CCM notes dated 6/19/06 and 6/21/06 indicated that he remained gravely disabled; however, a different psychiatric evaluation on 6/21/06 indicated that the inmate was not gravely disabled and that he was not in need of CTC admission.

Assessment:

There appeared to be a failure to take aggressive actions to help to stabilize this inmate. Although he was appropriately placed into the EOP, no further interventions were undertaken to address this inmate's very significant psychotic symptoms. The following comments were noted regarding the care provided to this inmate:

This inmate was described by clinicians as being gravely disabled, yet despite this, Keyhea was not initiated despite his refusal to shower, come out of his cell and his continued psychotic symptoms.

It was very concerning that this inmate was seen by the psychiatrist on 6/16/06 when he was described as having delirium (a life-threatening emergency) vs. dementia vs. schizophrenia. The psychiatrist recommended admission to the CTC at that time; however, the UHR reflected that this did not occur as there were "no beds." There was no documentation of mental health follow-up after this encounter for three days. He was then seen by a CCM on 6/21/06 when he was again recommended for admission to the CTC. A psychiatric evaluation on that same date indicated that he was not gravely disabled and did not require CTC admission.

Addendum:

The acting Chief Psychiatrist reported that the inmate was evaluated by the medical physician on 6/16/06 for evaluation of possible dementia. He reportedly was disoriented, but was not delirious. The physician progress note was not present in the medical record, and the staff was attempting to locate this note.

After discussion with the treating staff and supervisors, the decision was made to initiate Keyhea proceedings which appeared to be a clinically appropriate treatment decision.

4.    Inmate D

This EOP inmate was housed in the administrative segregation unit. He was diagnosed with Schizoaffective Disorder, bipolar type. He was treated with Depakote 750 mg/day, Zyprexa 20 mg/day and Artane 5 mg/day.

This inmate had been housed at CSP/Solano since at least June 2005; at that time he was receiving care at the 3CMS LOC. He was housed in the administrative segregation unit on 9/29/05 when he reportedly assaulted an officer upon his return from ICC. He was admitted to the CTC where he remained from 9/29/05 to10/4/05. He was discharged on no medication from the CTC.

On 10/17/05, he presented with medication refusal, lability, loud yelling and delusional thinking in the administrative segregation unit. He was readmitted to the CTC from 10/22/05 to 11/2/05 for similar symptoms. He was then transferred to DMH for stabilization. The DMH discharge summary dated 11/14/05 indicated that he continued to have symptoms of mania and psychosis and was refusing to provide informed consent for medications. For these reasons he would be discharged. The clinician also noted that he did not meet criteria for Keyhea.

The inmate was briefly housed at MCSP and he returned to CSP/Solano on 12/5/05. Progress notes indicated that he remained with hypomanic symptoms and mild psychosis. He continued to refuse medications but the clinicians indicated that he did not meet the criteria for involuntary medications.

He had a subsequent CTC admission on 4/19/06 to 4/27/06. He was discharged to EOP LOC. Despite this admission, he continued to present with poor functioning and psychosis. Subsequent progress notes indicated that he was intermittently compliant with medications and presented with grandiose and paranoid delusional thinking as well as dysphoria.

Assessment:

Additional comments noted regarding the care provided to this inmate included the following:

This inmate received an RVR on 9/29/05 after reportedly assaulting a corrections officer. Despite the erroneous documentation on the RVR that this inmate was not an MHSDS participant, he was appropriately referred to mental health for a mental health assessment. The RVR was dismissed due to mental health issues. That was the appropriate intervention for this mentally ill inmate.

He was appropriately admitted to the CTC for stabilization for psychiatric stabilization. It appeared however that he had not been stabilized at the time of discharge. He remained psychotic on 10/17/05, approximately two weeks after discharge. After he was readmitted to the CTC later that month he was appropriately referred to DMH.

5.     Inmate E

This inmate had a diagnosis of Adjustment Disorder. He was treated with Risperdal and Benadryl before and after his admission to a crisis bed. His medication order expired while he was in administrative segregation. He said that he told MTAs daily for three weeks that he needed the medication. He reported that MTAs wrote his name and number down and promised repeatedly to look into it. He said his symptoms returned incrementally.

Staff concurred with his belief that being off of medication for three weeks, being in a locked down situation and his recent commitment to CSP/Solano precipitated his admission to a crisis bed. He was in a crisis bed for one day and one night.

Assessment:

Medication was interrupted in administrative segregation. Staff was unable to reinstate medication for three weeks.

6.     Inmate F

This inmate was treated at the EOP level of care. He was housed in administrative segregation. He arrived at CSP/Solano on 3/23/06. He was seen by mental health staff three days later. He was diagnosed as having Schizophrenia, undifferentiated type. His GAF was assessed as 52.

Although he denied symptoms of psychosis, the examiner believed that his illness might not be in remission. He was not referred to a psychiatrist.

Four weeks later he was acutely psychotic. He was referred on an urgent basis by his cellie and a correctional officer. The case manager who saw him referred him to psychiatry at that point. He was seen by a case manager on 4/22/06 because his cellie reported that he was getting into other inmates' belongings, was talking to himself and was staring inappropriately. He was referred by an officer on 4/24/06 because he was paranoid. He believed someone was out to get him and he vowed to get them first. He was not seen by a psychiatrist for over one week.

An IDTT meeting was held on 4/26/06. His LOC was changed to EOP. He was seen by a psychiatrist on 5/2/06. Although he was calm and cooperative he was guarded. He exhibited signs of psychosis. He was described as having rapid speech, difficult to interrupt, delusional, circumstantial and exhibiting loose associations. An order for Risperdal was written. Follow-up in two weeks was planned. He was seen two weeks later. He appeared to be doing better. Three days later he was seen by a case manager at his request. He said he was not doing well. His speech was pressured. For the next four weeks he was seen weekly in administrative segregation in a holding cell. He was described as concrete but organized.

Assessment:

The following comments were noted regarding the care provided to this inmate:

> An initial mental health evaluation and two IDTT meetings were timely.

> Weekly EOP meetings were made cell-front while he was in administrative segregation.

> Mental health staff was unresponsive to this inmate's apparent need for treatment. Acute psychosis was insufficient to trigger an urgent psychiatric contact or referral to a crisis bed. He did not have timely access to a psychiatrist. He was not referred to the MHCB when clinically warranted.

> ~~His untreated mental illness made him a management problem and elevated the~~ risk of harm to him and those around him.

7.    Inmate G

This inmate had a diagnosis of Schizophrenia. He was in the MHCB twice. When admitted to the MHCB in April 2006 he was intoxicated from marijuana use, agitated, delusional and unable to follow instructions. As per a doctor's order, he was housed in a safety cell with a smock but no mattress or blanket. A mattress was ordered 18 hours later. He was moved from the safety cell to an MHCB cell 22 hours after he was admitted. Three days after admission he was allowed a book. Four days after admission he was issued a tee shirt and boxers. Five days into his stay he received socks and a toothbrush. He was not referred to DMH until day 14 of his stay. He remained in the MHCB for 48 days.

Initially he was treated with Geodon and Paxil. Stelazine was added to his regimen two and a half weeks into his stay. He had IDTT meetings at intervals of five to seven days. He was doing better by 5/24/06. He was discharged on 5/30/06 at the EOP LOC. He was readmitted to the MHCB around 6/19/06.

He was referred for medication non-compliance in January, February, March and April 2006 when he did not show up for six or more doses of Risperdal. His regimen during that time included Paxil and Risperdal. He typically took Paxil but did not show up to get Risperdal. A psychiatrist wrote a 45-day bridge order in December 2005 because he did not show up for an appointment. He was seen by a psychiatrist in January 2006. He had an IDTT meeting late in February 2006, approximately two weeks after the second referral was made. The meeting was attended by a full team. The team was apparently unaware of his lack of compliance. The plan was to continue to see him on a quarterly schedule.

When he was seen by psychiatrists and case managers during the three months that preceded his admission to the MHCB he was described as having an odd presentation or

peculiar facial expressions. He was seen twice by two different clinicians in the week prior to his admission. One contact was precipitated by a problem between him and a correctional officer. They noted that he had impaired judgment, rambling speech, disturbed mood and grandiose or paranoid thinking. One note said he might be delusional. He was not referred to the MHCB.

He was medication-compliant in June 2006 during the period between his discharge and readmission to the MHCB. He presented in the same agitated delusional state at the time of his next admission on 6/19/06. He was also grandiose. He became better organized and less delusional within a few days. His medication regimen remained the same. He was seen as being in fairly good condition by day five and was released on day seven. He was returned to a yard to await EOP transfer. He was referred for a psychiatric evaluation, seen within three days and Geodon was ordered.

Assessment:

The following comments were noted regarding the care provided to this inmate:

> Mental health staff was unresponsive to this inmate's clinical presentation for three months.

> An IDTT failed to notice his lack of compliance with medication.

> Although seen in a decompensated state he was not referred to the MHCB.

> This inmate was in a holding cell for 22 hours awaiting an MHCB bed.

> IDTT meetings in the MHCB were not held frequently enough.

> Access to acute care was poor. His 45-day stay in the MHCB was excessive. He was not referred to DMH until he had been in the MHCB for two weeks. Staff reported that he was not accepted by DMH because he was psychotic but not delusional or suicidal.

> He should have been referred for expedited transfer to an EOP institution but was not.

8.    Inmate H

After he was discharged from the EOP at SVSP this inmate functioned adequately at the 3CMS LOC for approximately two years. Following a downturn in his level of functioning he was placed in administrative segregation and his level of care was changed to EOP.

When his case was reviewed he had been in administrative segregation for several months. He was not acutely ill nor had he been admitted to the MHCB recently. His level of care was changed to EOP in March 2006.

At CSP/Solano he was treated for Bipolar Disorder. He was maintained on a regimen of Prolixin Decanoate, Seroquel, Artane and Depakote. He was off of Prolixin for five months in 2005. It was restarted at his request in October 2005. Two weeks elapsed between the referral for a medication adjustment and a contact with a psychiatrist. Prolixin Decanoate at two-week intervals was ordered.

According to MARs, Prolixin injections were not given as ordered. He received only one injection in November 2005. It was administered as ordered in December, January, February and April 2006 but he got only one injection in March 2006. No MARs for April or May 2006 were in the UHR when it was reviewed at the end of June 2006.

He had a current treatment plan done in conjunction with an IDTT meeting held in August 2005. The meeting was attended by a full team. He was seen more frequently than quarterly by his CCM and quarterly by a psychiatrist. He discussed issues of emotional concern. Progress notes by psychiatry and his CCM contained clinical information.

He was referred for non-compliance with Depakote and Seroquel in November 2005. Refusals and the referral were marked on the MAR. Although he was seen twice by his case manager during the next six weeks there was no indication that she was aware of the referral or his lack of compliance.

His LOC was changed to EOP on 3/9/06 as per a chrono filed in the UHR. An IDTT meeting was held 12 days later on 3/21/06. It was attended by a full team. The plan noted that his affect was flat and he was confused, but a GAF of 60 was assessed and the 3CMS LOC was marked. The plan called for quarterly case manager contacts less than every 90 days and psychiatry contacts as needed.

The first administrative segregation contact documented was dated 3/29/06. He was only seen cell-front for the next month. Notes contained little information regarding his functioning. At the end of the month he was seen by a psychiatrist. He was described as calm and cooperative. A VPA level was ordered. The dose of Seroquel was increased to combat ongoing auditory hallucinations, reported by the inmate as "yelling in my head all night." He reported feeling depressed and staying awake all night.

An IDTT meeting was held in administrative segregation weeks after he was placed there. Documentation did not permit a reader to discern whether the meeting was attended by a full team. The plan noted that he was still waiting to go to an EOP. It indicated that he was endorsed to go to CMC. Half of the case manager contacts in May 2006 and half in June 2006 were out of cell. No confidential area was available. As per SOP, he was seen in a holding cell located in the middle of a large common area. Psych tech rounds were documented only for the month of June 2006.

Lab tests were ordered on 4/25/06. No results were in the UHR when it was reviewed one month later.

Assessment:

Mental health treatment provided at the 3CMS LOC met program guide requirements and was responsive to his needs. He was seen more frequently than quarterly.

The following additional comments were noted regarding the care provided to this inmate:

> Medication management was poor. Referrals for non-compliance did not reach his case manager. Injections of Prolixin were not administered on at least two occasions. Results of lab tests were not in the UHR one month after tests were ordered. MARs were not filed in the UHR in a timely manner.

> Mental health treatment provided in administrative segregation was inadequate. The first contact was not made until he had been segregated for weeks. The IDTT meeting was late. He was seen by a case manager weekly, but half of the contacts were cell-front. None was confidential. Psych tech rounds were documented for only one month.

> Transfer to an EOP institution exceeded time limits. He had been waiting for fourteen weeks.

9.    Inmate I

This inmate was treated at the EOP LOC. English was not his first language. All mental health contacts were made with the assistance of a translator. The only available volume of the UHR began with his admission to a reception center in October or November 2005.

He threatened an officer in his housing unit on 11/1/05 and was placed on the mental health roster. The clinician thought that he met the criteria for Psychosis NOS and also gave an r/o diagnosis of Schizophrenia, paranoid type. A psychiatrist wrote orders for Risperdal and Effexor. MARs indicated that he was compliant with medication for the next six weeks. Approximately seven weeks later an MH-4 was completed. He was given a diagnosis of Psychosis NOS. He was described as behaving inappropriately.

He was transferred to CSP/Solano shortly thereafter. He had a bus screening at CSP/Solano on 12/21/05. It was negative for mental health indicators. The person who completed his medical intake paperwork incorrectly marked that he was not on medication.

13

He was seen in a UCC meeting on 12/29/05. The case manager's attendance at the UCC meeting was documented in the UHR. At that time the inmate said he wanted to be off medication.

Beyond seeing him in a UCC meeting, the initial mental health contact was made three weeks after he arrived. The clinician who saw him on 1/10/06 noted that he was new and he refused medication. One week later he was seen in preparation for an IDTT meeting. He reported that he wanted to be removed from the mental health caseload and said he was treated in the reception center because he was depressed and had insomnia. The IDTT discharged him from the caseload the following day. His GAF was assessed at 68. The only signature on the MH-2 was that of a sole clinician but a summary form in the UHR showed that the meeting was attended by a psychiatrist and a correctional counselor in addition to a case manager.

He next came to the attention of mental health staff nearly three months later on 4/10/06. He was referred by custody staff because he was behaving strangely. He was staring at people. He denied distress. His responses were described as sparse. The clinician was unable to do a thorough interview due to lack of a translator. The clinician wondered whether the inmate was experiencing hallucinations. In addition to interviewing the inmate the clinician reviewed the UHR. While the progress note was detailed it did not include a plan beyond interviewing the inmate the next day with the aid of a translator. When he was seen the following day he was viewed as psychotic but he was not referred to a psychiatrist or to the MHCB. He was not added to the mental health roster until four weeks later.

The next encounter was three weeks later when he was again seen by a case manager. The clinician noted that it was difficult to talk with the inmate without a translator. The inmate denied problems. The clinician noted that a referral to psychiatry was warranted. He or she also called the pharmacy and learned there were no current medication orders. That note did not record a referral to psychiatry but the inmate was seen by another case manager the same day. A second clinician recorded unusual statements and behavior and described the inmate as either acutely psychotic and in need of medication or as stressed about an environmental problem. The writer reported that officers had observed the inmate hiding behind posts and beds and talking to unseen others. He also exhibited signs of religiosity and ritualistic behavior. That clinician planned to put him back on the 3CMS roster and follow him to determine whether he needed involuntary medication orders. He was formally added to the caseload via an IDTT meeting held eight days later. He did not attend the meeting. Two days later he was admitted to the MHCB because he was floridly psychotic.

An abridged version of the MHCB documentation was copied and filed in UHR. He was admitted the first time on May 6 because he was not following officers' directions. MHCB documentation filed in the UHR did not show the reason he was discharged following his admission on 5/6/06 or how he presented to staff at that time. He was discharged with orders for Risperdal and five-day follow-up. He took medication

reluctantly and signed a consent form for Risperdal. A note indicated that involuntary medication was considered. He was out for only three days.

He was psychotic when seen for the third follow-up visit. He was readmitted to the MHCB where he remained for six days, from 5/12/06 to 5/18/06. During his second stay an IDTT meeting was held. The day before he was discharged a note indicated he was doing better. After he was out of the MHCB for a few days he self-referred, writing that he wanted to be off medication. His refusal to take it was recorded on a MAR. He was referred to mental health staff by medical staff who noted the refusal. At the same time he was seen by a case manager and an IDTT meeting. He continued to deny mental health problems but he was described by his case manager as deteriorating.

One week after his discharge from the MHCB his level of care was changed to EOP. He was determined by the case manager not to need a crisis bed. He was seen one week later for a weekly EOP contact. He appeared to be logical and coherent. He reported that he was taking medication. He did not appear to be psychotic. He continued to say that he wanted to be off the mental health caseload. No case manager contacts were documented between 6/2/06 and 6/26/06.

Assessment:

There were numerous problems in the mental health treatment received by this inmate:

> A bus screening at CSP/Solano failed to note this inmate's current mental health treatment and medication orders.

> He was not seen for an initial mental health evaluation for three weeks.

> His initial IDTT meeting was late and failed to serve its purpose.

> On two occasions he was described as psychotic but was not referred to the MHCB or seen by a psychiatrist. On one of those occasions he was not even added to the mental health roster.

> He was apparently not stabilized during his first three-day admission to the MHCB. After he was discharged he was referred for non-compliance and followed closely by mental health.

> After he was designated EOP he was not seen by a case manager weekly.

10.    Inmate J

This inmate was admitted to the MHCB three times in 14 weeks. He was often non-compliant with medication. In the weeks leading up to his decompensation he came to the attention of staff but warning signs elicited no response.

As of January 2006 he was treated at the 3CMS LOC. He was treated for Schizoaffective Disorder. He had orders for Risperdal and Benadryl.

MARs indicated many refusals each month during the first quarter of 2006. Early in February 2006 he was seen by a psychiatrist in response to a referral for non-compliance with Depakote. According to MARs and orders, he did not have orders for Depakote. The progress note said that Depakote was discontinued. There was no corresponding order. According to that note no further action was planned.

He was seen roughly two weeks later by a case manager because he was referred by staff. He reported non-compliance with medication for two months. The case manager said that he seemed a bit disorganized, restless and disheveled. No further action was planned.

According to a progress note he was scheduled to see a psychiatrist three weeks later. He did not show up for the appointment. The note said that his medication order would not be renewed because the patient had asked to have it discontinued. The plan was to reschedule the appointment.

One week later, on 3/13/06, he was admitted to the MHCB. He was taken to the CTC after hours because he behaved bizarrely in his housing unit. He drew symbols on his body, was paranoid, hostile and disorganized. He refused Risperdal but agreed to take Geodon. He had an IDTT meeting two days after admission. He remained psychotic but said he was ready to return to his housing unit. His mood was labile. His speech was pressured and he was paranoid. He was retained in the MHCB. The dose of Geodon was increased. During the next few days his mood improved. He developed enough insight to say that he needed to take psychotropic medication. He was discharged to a housing unit at the 3CMS LOC one week after admission. He had orders for Geodon, Buspar and Benadryl.

There was no indication in the UHR that he was seen after he was discharged. He was readmitted to the MHCB 11 days later. The admission note indicated that he was paranoid, hostile and manic. Lithium was initiated in the MHCB. Blood levels of Lithium were monitored appropriately.

During his second stay in the MHCB, which lasted for two weeks, he was intermittently compliant with medication. A Keyhea order was considered on day six of his stay. He began to respond to medication one week into his stay. He remained volatile and argumentative. On day nine he became goal oriented and more coherent. He wanted to return to his housing unit. On day ten he continued to improve and a referral to DMH was rescinded. He presented as relaxed and calm during the next three days. On 4/18/06 an IDTT met and discharged him to general population.

Labs were ordered on 4/17/06 and results were back on 4/18/06. Lithium had reached the .5 level. He was discharged with orders for Geodon, Lithium and Buspar. A Lithium level was ordered for a future point in time.

16

Medication continuity was interrupted for one or two days when he left the MHCB. He received the first dose on 4/20/06. He was seen by a case manager three days after he was discharged, on 4/21/06. The note indicated he reported he was doing fine and said he was medication-compliant. Nonetheless within a few days he was observed behaving bizarrely. A written referral indicated that he was referred by staff because he was walking fast, talking to himself, talking nonsense and being disruptive in general population. An annotation on the 128B indicated that it was handled five days later on 4/26/06 by an unidentified person.

MARs indicated he was compliant with his regimen throughout April, May and into the first two weeks of June 2006.

He was seen cell-front by case managers weekly in May 2006. All notes indicated that he was stable and had no unusual behaviors with the exception of one. On 5/11/06 he was described as angry, confused and seriously ill. The plan was to consider him for EOP LOC.

He was seen by a psychiatrist in mid-June 2006 in addition to cell-front case manager contacts. He reported racing thoughts and poor sleep. He asked for Seroquel and said Geodon was working well. He was described as having glazed eyes and as "spacey." Thought was linear. A Lithium level was ordered. He denied that his cellie pressured him for Seroquel.

Blood for a Lithium level was sent to a lab on 4/27/06. Results were back on 4/28/06. The level remained at .5. The third level was obtained one day after it was ordered and results were back the following day. His level on 6/15/06 was 1.0.

Outpatient treatment plans were not updated following his discharge from the MHCB. The most recent outpatient treatment plan was written in April 2005.

A progress note indicated he incurred an RVR in December 2005. There was no indication in institutional logs that he was referred for a mental health assessment.

Assessment:

Records were confusing to treatment providers. They contained conflicting information regarding his medication regimen. This inmate may not have been stabilized in the MHCB. He may have warranted referral to a higher level of care. He continued to exhibit signs of mania after he was discharged from the MHCB for the second time.

Blood levels of Lithium were monitored appropriately. Orders for lab tests were processed expeditiously.

The following additional comments were noted regarding the care provided to this inmate:

Warning signs of decompensation elicited no response from mental health staff. He incurred a disciplinary infraction in the weeks leading up to his decompensation but was not referred for a mental health assessment.

Once he was discharged from the MHCB his treatment in administrative segregation was inadequate. Medication was interrupted for one or two days. After discharge from the MHCB he was not seen for 11 days. Signs of psychosis were ignored. The treatment provided was the same as that afforded all caseload inmates in administrative segregation. He was seen cell-front for weekly case manager contacts. Cell-front contacts were cursory. His outpatient treatment plan was not updated.

Although his need for EOP LOC was raised it was never fully considered. He was not made EOP.

11.    Inmate K

This inmate was on the list of EOP inmates. His medical record contained conflicting documentation regarding his need for EOP treatment and whether he had been referred for it.

He was at DVI in October 2005. He took Remeron and Risperdal for a time at DVI. He stopped taking medication at his request. He reported that he had a heart attack and remained concerned about cardiac problems.

He arrived at CSP/Solano in February 2006. He did not have current orders when he arrived. There was no indication that he was referred to mental health by the bus screener despite the records and his report of recent psychiatric treatment.

He was seen by mental health staff in a UCC meeting one week later. The note indicated that he would be referred to a case manager. That plan was not carried out.

He was not seen again by mental health staff until he was referred by a nurse two weeks later. He discussed his concerns with mental health staff. He was not added to the mental health caseload.

He was admitted to the CTC for medical treatment. He was there from 4/18/06 to 4/29/06.

He was first seen in administrative segregation by mental health staff on 5/23/06. He was found to need continued treatment for adjustment problems. According to a chrono he was made EOP on that date.

An initial IDTT meeting was held two weeks later. A full team attended. Level of care was not specified but his GAF was assessed as 58. There was no reference to his need

for EOP LOC. There was no clinical information that elaborated on his need for EOP
treatment. Diagnoses of Adjustment Disorder with anxiety and depression and a history
of PTSD were made. A psychiatrist at the IDTT meeting ordered Remeron. He was seen
weekly in June 2006. Two contacts were out of cell, one was cell-front. He reported that
he was doing well.

Assessment:

Mental health treatment broke down at every turn. The bus screening failed to detect this
inmate. He was not referred to mental health. Mental health staff who saw him in a UCC
meeting also failed to bring him in for an evaluation. Four months after he arrived at
CSP/Solano he had not been seen for an individual psychiatric evaluation.
Documentation in the UHR supporting his need for the EOP level of care was
incomplete.

12.    Inmate L

This inmate was treated at the 3CMS LOC. He arrived at CSP/Solano from a reception
center on 11/29/05. He was seen in a timely manner by mental health staff. An MH-4
was completed. Diagnoses of Adjustment disorder with depressed mood and
bereavement were noted. An IDTT meeting was held three weeks later. It was attended
by a full team. Diagnoses were refined to Major Depressive Disorder, single episode, in
remission and Anxiety Disorder NOS.

One month later, in mid-March 2006 he was followed-up by a psychiatrist. His regimen
was changed at his request. Celexa was discontinued and Remeron was initiated. He
wrote a self-referral to healthcare staff reporting that his new medication made his eyelids
and face erupt. The referral was dated 5/9/06.

MARs indicated that he refused many doses in April and May 2006. Refusals were
documented on the back of the MARs. He was referred to mental health on 5/9/06
following 30 to 40 consecutive refusals. There was no indication in the UHR that his
non-compliance resulted in a contact with mental health. A psychiatrist wrote a bridge
order continuing Remeron on 6/11/06, one day after the 90-day order expired. He
continued to refuse Remeron daily throughout May and June 2006. There was no
indication that another referral was made.

He was seen for quarterly case manager contacts on 2/20/06 and 6/5/06. The interval was
slightly over 90 days. He was due to parole on 7/9/06. There was no TCMP chrono in
the UHR.

Assessment:

An initial mental health evaluation was timely but the initial IDTT meeting was late.

The following additional comments were noted regarding the care provided to this inmate:

> Medication management was poor. Referrals for non-compliance and side effects did not result in a psychiatric contact. Medication orders expired.

> A quarterly case manager contact was slightly late.

> There was no documentation that TCMP contacted him for discharge planning.

13.    Inmate M

This inmate arrived at CSP/Solano from a reception center. He was on the 3CMS roster. The bus screener noted his current mental health treatment and referred him on a routine basis. The initial mental health contact was timely. He was seen by a case manager 11 days after he arrived. An IDTT meeting was timely. It was attended by a full team. A diagnosis of Bipolar Disorder was recorded. The treatment plan was cursory.

Assessment:

Intake processing met program guide timeline requirements. The treatment plan was not individualized.

EXHIBIT C

California Substance Abuse Treatment Facility (CSATF)

May 31, 2006 – June 2, 2006

1.    Inmate A

Inmate A was treated at the 3CMS level of care. His case was referred to the monitor by plaintiffs' counsel. Plaintiffs' counsel asked that the monitor review his treatment plan, the status of his transfer or indeterminate SHU placement and make recommendations regarding his treatment plan. According to the letter written by plaintiffs' counsel, Inmate A received RVRs for indecent exposure and had been housed in administrative segregation for over a year while being evaluated for an indeterminate SHU term.

In a letter to his counsel Inmate A wrote that he was serving a sentence of 75 years to life for three counts of indecent exposure that occurred while he was prison. He had at least one mental health evaluation for an RVR written for indecent exposure in which the clinician noted that his mental illness had an impact on his behavior because he had a "history of impulsive control disorder." He wrote that he was seeking treatment for his disorder.

Review of his C-file indicated that this inmate was first incarcerated in July 1981 for kidnapping, robbery and rape. He was paroled more than once before returning to prison in June 1988 in connection with four counts of robbery and assault with a firearm. Most recently, probably in 2003, he was convicted of three counts of indecent exposure with priors in connection with behavior that occurred in 2000. He was sentenced to a term of 75 years to life.

This inmate had an extensive disciplinary history, receiving his first RVR for indecent exposure in August 1995. Thereafter, he received RVRs for indecent exposure or masturbation on 10/ 9/97, 6/18/98, 1/29/99, 6/87/99, 11/8/99, 2/25/00, 8/17/00, 11/9/00, 10/12/01, 9/27/02, 12/24/02, 1/10/03, 8/18/03, 7/13/04, 11/19/04, 3/30/05, 5/8/05, 1/31/06 and 4/17/06 (disciplinary hearing pending).

On 4/10/06, his case was referred to the Director's Review Board (DRB) with a recommendation for an indeterminate SHU term related to repeated indecent exposure. As of 6/1/06, he remained in administrative segregation pending resolution of the DRB referral.

As indicated above, he was issued an RVR on 1/31/06 for masturbation without exposure. While in the process of distributing medications, an MTA knocked on this inmate's door. Looking into the cell, the MTA saw that this inmate was seated at his desk with his back to the door and appeared to be eating dinner. The inmate then stood up and turned to face the cell door, at which point the MTA noted that he was masturbating inside his boxer shorts. The mental health assessment was not attached to the completed RVR. However, the SHO referenced the mental health assessment stating:

> The assessment provided by the clinical staff indicates the inmate's mental disorder did appear to contribute to the behavior that led to this RVR. The clinician states…that the inmate has a long-term history of psychotic and

impulsive control disorder. The SHO has reviewed the clinician's assessment and the SHO has determined that the inmate's mental disorder did not appear to contribute to the behavior that led to this RVR. This SHO concludes that if this inmate was influenced by mental illness in the commission of this offense, this would mean the inmate was suffering from either diminished capacity caused by his mental illness or motivated by an irresistible impulse driven by his mental illness. Per Penal Code 25, public policy precludes consideration of either diminished capacity or irresistible impulse. Not guilty by reason of insanity can be found only with a preponderance of evidence that the inmate was incapable of understanding right from wrong or knowing the nature and quality of his act at the time of the offense. Per Evidence Code Section 522, the party claiming insanity has the burden of proof and anyone who had not met that burden of proof, including a person who had been diagnosed with a mental illness, is presumed to be sane and responsible for the commission of the offense. This burden of proof has not been met. For this reason, this SHO presumes the inmate to be sane and fully responsible for his actions at the time of this offense.

None of the RVRs for indecent exposure that were issued during 2004 and 2005 were referred to mental health for completion of a mental health assessment. Four mental health assessments completed during 2002 and 2003, all related to indecent exposure, concluded that mental illness had not influenced this inmate's behavior and indicated that the SHO need not consider mental health factors when assessing a penalty.

Review of the UHR of this 43 year-old inmate showed that current medication orders included Risperdal 3 mg po q d. He had been prescribed medication since October 2005 under a Keyhea order. A 3/27/06 report was in the record. The report was called "comprehensive mental health evaluation for indecent exposure behavior." The report contained historical information summarized below:

This inmate was incarcerated as a juvenile for murder in the course of a robbery. His uncle also received a life term for the same crime. He was also incarcerated as an adult in 1980 for kidnap, rape and robbery with a term of 24 years. In the year 2000 this inmate was given three consecutive 25 to life terms for indecent exposure. Six similar charges were dismissed.

This inmate received his first RVR for indecent exposure on August 13, 1995. Since that date he has had 19 additional RVRs for the same or similar offense. None of the RVRs he received prior to 1995 were for indecent exposure.

The report contained a useful summary of the events surrounding the inmate's inappropriate sexual behaviors. It said that his presentation was consistent with the diagnoses of Impulse Control Disorder NOS, Exhibitionism, Psychotic Disorder NOS and Antisocial Personality Disorder. He also had a diagnosis of Hepatitis C. The report

included recommendations or proposed treatment methods. They included psychiatric consultation regarding the use of psychotropic medications.

Subsequent to the March 2006 assessment, this inmate received at least one more RVR related to allegations of indecent exposure. A 5/1/06 progress note indicated that an IDTT assessed his most recent inappropriate sexual behavior as essentially due to a pattern of antisocial behavior.

A 5/17/06 treatment plan did not include exhibitionism or a paraphilia among the diagnoses. The treatment plan addressed his sexual misconduct in relation to anger.

Information regarding this inmate was obtained orally from clinical staff. Staff indicated that the IDTT had determined that this inmate did not meet the criteria for a paraphilia despite the findings of the previous assessment.

Assessment:

This inmate's presentation, and the fact that he ultimately received a sentence of 75 years to life for repeatedly exposing himself, was consistent with the presence of a paraphilia or, at least, inappropriate sexual behaviors. These behaviors and treatment needs were not adequately addressed by his treatment plan. He was under a Keyhea order.

In addition, mental health input relevant to a more recent RVR for indecent exposure, which concluded that his behavior was influenced by mental illness, was not appropriately considered by the SHO. Consequently, rather than receiving treatment related to his sexual misconduct, this inmate was facing an indeterminate SHU which, if authorized by the DRB, would likely place him in SHU for the duration of his life sentence.

2.    Inmate B

This case was referred by plaintiffs' counsel. They requested that the monitor review his current transfer status, treatment plan and UHR for any history, diagnosis or treatment for exhibitionism. They also requested recommendations regarding his treatment.

Inmate B was an EOP patient waiting for transfer. According to a letter written by plaintiffs' counsel, he was housed in administrative segregation because of his multiple RVRs for indecent exposure. He reported to his counsel that he was referred to ICC on 3/2/06 for indeterminate SHU placement due to his indecent exposure RVRs. He reported that when he was housed at Pelican Bay he had the indecent exposure window coverings and jumpsuit. He reported that a 602 appeal that he filed requesting treatment for his exhibitionism was screened out because he did not attach chronos with the diagnosis.

According to the UHR and an interview of the inmate he has had several brief assessments related to alleged sexual misconduct at both PBSP and CSATF. Those assessments essentially found that his inappropriate sexual behaviors were not due to a paraphilia. Documentation related to these assessments was sparse. This inmate has frequently been uncooperative with these assessments as characterized by, on at least one occasion, denying the allegations. At other times he acknowledged having a problem with masturbation. The most recent mental health assessment found in the UHR indicated that it was the evaluator's opinion that this inmate's mental disorders did not appear to contribute to the behavior that led to the RVR.

This inmate was clinically referred for an EOP level of care during 3/2/06 but was not endorsed for transfer to the EOP administrative segregation unit at CSP/Corcoran until 5/17/06 due to various internal glitches at CSATF.

A 3/6/06 treatment plan update indicated diagnoses of Bipolar Disorder and Borderline Personality Disorder. His inappropriate sexual behaviors were not addressed in the treatment plan. Another treatment plan dated 3/8/06 listed his diagnoses as Mood Disorder NOS and Antisocial Personality Disorder. His sexual misconduct was not addressed in that treatment plan. In the past he had been diagnosed with Schizoaffective Disorder.

This inmate was being treated in the CTC during 6/1/06. An IDTT meeting was observed by monitor's expert in the CTC during the morning of 6/1/06. The inmate was interviewed during the IDTT process. He reported the presence of psychotic symptoms which appeared to be exacerbated by his current stay in administrative segregation.

<u>Assessment</u>:

This inmate's inappropriate sexual behaviors were not adequately addressed by his treatment plan. It was also likely that his clinical condition had deteriorated within the administrative segregation unit. The reasons for the delay in his EOP endorsement were unclear. Staff reported that his transfer was delayed due lack of an available bed.

3.    Inmate C

This case was referred by plaintiffs' counsel. Plaintiffs' counsel requested that the monitor review whether Inmate C's current level of care is appropriate. According to a letter written by plaintiffs' counsel, Inmate C is a former EOP patient who was seen at SVSP during a <u>Coleman</u> monitoring visit several years ago. At that time he expressed a delusional belief that his body was poisonous and would kill his case manager if the case manager were to touch him. He was reportedly issued an RVR because he voiced that belief.

At CSATF this inmate was treated at the 3CMS level of care. Plaintiffs' counsel received letters from other inmates in his housing unit that were written on his behalf. The letters

were about his poor functioning and decompensation. Inmate C's recent letters were about his poisonous body, depression and his suicidal history.

Inmate C was interviewed and his UHR was reviewed. Psychotic symptoms have not been noted by his clinicians since his arrival at CSATF. In addition, there was documentation beginning during his incarceration at HDSP that this inmate feigned a hearing loss. For example, a correctional officer wrote that he observed this inmate communicating with another inmate by speaking through the adjacent cell vents. When confronted by the officer, the inmate reportedly just smiled. Similar concerns have been raised during his current incarceration. Information obtained from a correctional escort officer as well as a psychiatric technician indicated that this inmate was able to hear without reading lips.

As of 6/2/06, this inmate was in administrative segregation pending adjudication of his latest RVR for indecent exposure. The monitor's expert interviewed this inmate in an administrative segregation unit. It appeared that he was able to hear without reading lips. For example, he responded appropriately to questions even when the interviewers hand was covering his mouth as questions were asked. In addition, he had significant difficulties responding to questions when the interviewer mouthed questions but made no sounds.

The interviewer discussed issues with the inmate related to his credibility based on the above information. In addition, his current treatment was discussed with him. This inmate indicated that he wanted an EOP level of care. He minimized his sexual misconduct by stating that he was not intentionally exposing himself. However, review of the C- file indicated multiple RVRs for sexual misconduct.

This inmate's hygiene was without problems. He did not demonstrate any evidence of a thought disorder or psychotic thinking.

Review of the C- file indicated that he had received RVRs for indecent exposure on 3/3/04 and 3/13/06, the latter of which had not been heard as of 6/2/06. With regard to the March 2004 RVR, he was found guilty and assessed 90 days loss of credit. He was not referred to mental health for completion of a mental health assessment.

Prior to this, he received RVRs for indecent exposure on 6/9/03, 1/24/03, 11/25/01, 8/26/01, 12/26/00, 11/26/99, 11/8/99 and 7/17/98. The C- file did not contain an RVR related to threatening staff.

A DA referral log indicated that the latest RVR for indecent exposure was referred to the district attorney's office on 3/14/06 and accepted for prosecution on 4/19/06. At the end of April 2006 the inmate was involved in pre-trial proceedings.

<u>Assessment</u>:

At the time of this case review, treatment at the 3CMS level of care appeared to be appropriate. An IDTT should address issues relevant to his credibility and his treatment plan, including his sexually inappropriate behavior. It appeared likely that he would receive a longer sentence related to repeated RVRs for indecent exposure.

EXHIBIT D

<u>High Desert State Prison (HDSP)</u>

May 1, 2006 – May 3, 2006

1.    Inmate A

This patient was interviewed within the context of the IDTT in the MHCB. He was off the mental health caseload for one month and had been medication-free for eight months.

He had been placed in a safety cell for suicidal ideation three days ago and was paranoid and evasive when questioned. He had been in the safety cell for three days. Today there was no suggestion of any suicidal ideation. He was to be discharged from safety cell today after three days.

Assessment:

Appropriate placement and treatment.

2.    Inmate B

This patient was interviewed within the context of the IDTT in the MHCB. He had been admitted one day previously and reportedly "wants to die." He appeared to be somewhat depressed. He had been here in the MHCB previously in December 2005 for similar issues. He was in a safety cell and was to be referred to a higher level of care quickly.

Assessment:

Appropriate management of a suicidal patient.

3.    Inmate C

This patient was interviewed within the context of an administrative segregation IDTT meeting. He was placed in administrative segregation for battery on a law enforcement officer. He previously was in a CTC crisis bed for five days, reportedly for intoxication.

He has had no treatment with psychotropic medication in the past. It was highly likely that his case would be referred to the district attorney with respect to his pending 115 charge.

His UHR was reviewed and there was no CTC record in it. The patient felt that he would do all right going to ICC without taking any medication. He was serving 24 years to life for third strike assault. He was to be followed by the case manager.

Assessment:

Appropriate evaluation by the case manager prior to ICC. The record of his mental health treatment in the CTC was missing from his UHR.

4.    Inmate D

This inmate arrived on 4/4/06 and reported to the screening nurse that he had had no medication for a week. He previously had taken Zoloft. A 24-hour referral to mental health was made from the bus screening.

The UHR revealed that he was seen by case manager on 4/7/06. He was very symptomatic and needed a psychiatric evaluation. He was referred to psychiatry but the record was silent as to whether or not he was seen.

Assessment:

Poor medication continuity. An urgent referral failed to result in a timely psychiatric contact.

5.    Inmate E

This inmate arrived on 3/23/06 reporting that he had taken Abilify in the past. He had had no medication in the preceding three months but was not referred to mental health by the bus screener. The UHR contained no 31-question screening.

On 4/12/06 he was referred by staff to mental health because he was extremely symptomatic, exhibiting severe paranoia, suspiciousness and assaultiveness. His appetite had decreased and he was experiencing auditory and visual hallucinations.

He was seen on 4/16/06 by a case manager. He was referred to psychiatry but was not seen. On 4/23/06 he was referred by an MTA to psychiatry. He was seen for the first time by psychiatry on 4/27/06. He had been assaultive. He received an appropriate evaluation from the psychiatrist but it culminated in an unclear diagnosis without any plan or medications.

He was not placed on the mental health caseload.

Assessment:

Failure to refer from bus screen. Failure to conduct mental health screening. Multiple failed referrals to psychiatry. Slow response to a referral for bizarre behavior. Failure to provide mental health treatment subsequent to an evaluation of his need for treatment.

6.    Inmate F

This inmate arrived on 4/21/06 reporting that he had taken Zoloft recently. There was no verification of his medications. A review of his UHR revealed that there was no information written by mental health staff after he was referred from the bus screening. In addition, there was a self-referral on 4/21/06 that was not answered.

Assessment:

Appropriate referral from bus screening. No mental health contacts in response to bus screening or self-referral. Never seen by mental health.

7.    Inmate G

This inmate arrived on 2/14/06 after having been out to court for four days. There was no order for his Seroquel in the chart and he did not receive any in jail.

A review of his chart revealed that he had a 24-hour referral from the bus screening on 2/14/06. He was subsequently paroled, without being seen by mental health, and returned 16 days later with new charges.

He was seen timely on 3/2/06 by a case manager. There were notes written on 3/17/06 referring him to a psychiatrist and also indicating that the UHR was not available for that assessment. The most recent note was written on 4/10/06. It was a suicide risk assessment done prior to his crisis bed admission. At that point he had never been seen by psychiatry.

Assessment:

Appropriate bus screening and referrals. Multiple failed referrals for psychiatric contacts, none of which resulted in a psychiatric evaluation, leading up to a crisis bed admission. Unavailable UHR.

8.    Inmate H

This 3CMS inmate was issued an RVR on 1/10/06 for battery on an inmate. After not showering "for a while," this inmate was given a shower by custody. After completing the shower, he refused to get dressed and return to his cell. He became agitated, asking the officer why he was helping him and what the officer had done to his clothes. In an attempt to de-escalate the situation, the officer asked another inmate to talk to him. The inmate agreed, at which point he screamed, "You nigger loving cop, you're a race traitor," and spit in the face of the inmate.

The institution was unable to locate a copy of the mental health assessment. A log maintained by mental health staff indicated that an assessment was completed on 1/31/06 and that the assessing clinician answered 'yes" to at least one of three questions.

According to the completed RVR, a staff assistant was not assigned and the inmate did "not display any bizarre, unusual or uncharacteristic behavior," indicating that this case was not referred to mental health. If an assessment was, in fact, completed and reviewed as part of the disciplinary process, it was not referenced in the RVR.

At a 1/31/06 hearing (the same date the assessment was reportedly completed), this inmate was found guilty and assessed 90 days forfeiture of credit. In addition, he was referred to the UCC for consideration of a SHU term. This case was not referred to the district attorney's office.

Review of the UHR indicated that this inmate arrived at HDSP from Shasta County Jail on 11/5/05. His bus screen was positive; he claimed to be taking psychotropic medications. He was referred to be seen by mental health "ASAP for non-documented meds (Abilify & Cogentin)."

Progress notes indicated that he was first seen by a psychiatrist on 12/9/05, 34 days after the "ASAP" referral. The psychiatrist noted no overt psychosis or evidence of dangerousness, but found his vague answers, internal preoccupation and blunted affect concerning.

He was next seen by a LCSW on 1/10/05 in response to a staff referral related to a cell fight. He as seen by the same clinician that completed the RVR mental health assessment. During the interview, the inmate presented as tense and unstable, and was reportedly seen earlier that day regarding hygiene. Correctional officers reported a "pattern of deterioration" and the clinician surmised that the inmate may have been responding to internal stimuli. The inmate was further described as negative and non-communicative.

Psychiatric contact occurred on 1/22/06, 12 days later, when the psychiatrist concluded that the inmate was antisocial, goal driven, manipulative, narcissistic and vague. Medication was not ordered.

Thereafter, he was seen frequently related to body odor and repeatedly yelling obscenities and racial slurs on the tier. A 2/22/06 MH-2, reviewed by a full IDTT, placed him in 3CMS/medical necessity with diagnoses of Substance-induced Persistent Dementia and PTSD, with a GAF of 50. Target problems included poor judgment and impulse control. Medication was not prescribed. A special IDTT, held the following day, on 2/23/06, recommended an EOP level of care, noting a diagnosis of severe OBS secondary to chronic and severe inhalant abuse.

MHSDS placement chronos indicated that he was EOP on 2/23/06, 3CMS/medical necessity on 3/1/06 and EOP on 3/13/06. Adding to the confusion, a 3/6/06 MH-4 placed him in 3CMS with diagnoses of Substance-induced Mood Disorder, PTSD and Personality Disorder NOS, with a GAF of 55.

Shortly thereafter he spit in an officer's face and, as of 5/2/06, he was EOP. The most recent CCM contact was documented on 3/14/06.

Assessment:

Mental health treatment was characterized by omissions and when provided it was haphazard. A mental health screening was not conducted upon arrival. An urgent referral made by the bus screener did not result in a mental health contact. Subsequent staff referrals did not elicit appropriate responses.

When found by mental health staff to be psychotic after he demonstrated that he was a danger to others he was not referred to an MHCB nor was he seen by a psychiatrist on an urgent basis. After months of inadequate mental health treatment he spat in the face of an officer.

The disciplinary process involving this severely mentally ill inmate was non-compliant. It appeared that solicited mental health input that was needed was not included in the disciplinary process or documented in the RVR. In addition, the mental health assessment, if in fact it was completed, was not attached to or referenced in the RVR. Mental health staff did not maintain copies of completed assessments.

9.      Inmate I

This 3CMS inmate, while housed in the MHCB, was issued an RVR on 9/30/05 for indecent exposure (sexual harassment). He was observed masturbating while watching a nurse through the window of a safety cell.

According to the RVR, the incident was videotaped, having occurred in one of the safety cells located in the CTC. However, due to the "poor quality of recording the videotape," it "held no evidentiary value" and could not be used.

A 10/15/05 mental health assessment concluded that a staff assistant was required, adding "IM was MHCB when this incident occurred." Nonetheless, the clinician concluded that mental illness had not influenced the inmate's behavior and indicated that the SHO need not consider mental illness when assessing a penalty.

However, contrary to RVR protocols and the clinician's recommendation, a staff assistant was not assigned. The RVR read, "The SHO determined that [the inmate] speaks English, is literate, the issues are not complex and a confidential relationship is not required. [The inmate] therefore did not meet the criteria for assignment of a Staff Assistant…"

The RVR did not correctly cite the inmate's MHSDS level of care at the time of the incident, instead indicating that the inmate was 3CMS. The RVR did accurately summarize the content of the mental health assessment. A 1/30/06 hand-written note on the RVR read, "Forthcoming medication order to reissue & rehear this RVR."

<u>Assessment</u>:

Noncompliant disciplinary process in that this MHCB inmate was not assigned a staff assistant.

EXHIBIT E

Sierra Conservation Center (SCC)

March 22, 2006 – March 24, 2006

1.    Inmate A

This patient was interviewed in a group context and reported taking Effexor and Elavil with good effect for the last seven years. He had no side effects and wanted his medications HS. He said that he was doing well and saw someone from mental health every two weeks.

A review of his inmate history revealed that he arrived on 2/9/06 from a reception center. He was first seen by a psychiatrist on 2/22/06, 12 days after he arrived. His first IDTT was dated 2/13/06 and was completed prior to the corresponding treatment plan. His first treatment plan was dated 3/8/06, 30 days after he arrived.

An appointment scheduled for 2/24/06 was canceled due to a lockdown and could not be rescheduled until 3/8/06. At that time the treatment plan was written and he received his first case manager visit. He was seen for follow-up at one and two weeks by the psychiatrist.

His MAR for March 2006 was reviewed. Medications were not given for the first three days. He is currently taking Vistaril 100 mg, Effexor 50 mg, Risperdal 3 mg. and Elavil 100 mg, all at q. p.m.

<u>Assessment:</u>

There was a gap in medication continuity. Psychiatry follow-up subsequent to the initiation of a new medication was appropriate. His initial treatment plan was untimely.

2.    Inmate B

This patient was interviewed in a group context and reported taking Prozac along with Seroquel 200 mg HS. He reported that the medications were helpful although he experienced some anxiety. He said that he got the medication during the evening but would have liked to take it HS. The Seroquel helped with sleep without sedating him in the morning. He had a very positive relationship with the psychiatrist, whom he saw every 90 days.

A review of his UHR revealed that he arrived on the same medications on 12/16/ 04. The most recent case manager contact was on 3/6/06 and he was described as asymptomatic without any complaints. At that time he was on Prozac 50 mg and Seroquel 100 mg HS. His last IDTT was on 2/2/06 and was done without benefit of a psychiatrist. A housing change was considered. His last psychiatric visit was on 1/26/06 and the patient had no particular issues or complaints and was stable. His medication was continued.

A review of his inmate history corroborated the UHR information. In the last six months he had had two case manager contacts and two psychiatric visits. A self-referral of 8/24/05 did not result in a contact with mental health staff. He was not seen until 10/13/05 during his regular 90-day psychiatric visit. His MARs for February and March

2006 demonstrated compliance. The MARs were filled out completely and appropriately.

Assessment:

Mental health treatment was appropriate. A self-referral did not result in a mental health contact.

3.     Inmate C

This patient was interviewed in a group context and reported taking no medications. He said that he was experiencing physical pain from medical conditions, headaches and sleeplessness. He said that he could not get his "straight medications" like Valium or Xanax which helped him when he was treated by the Veterans Administration Hospital. He reported that the psychiatrist gave him Benadryl which did not work but inexplicably he also got Benadryl KOP.

The UHR was reviewed. The progress notes, including those by the chief psychologist and psychiatry, all pointed to Axis III problems. The patient had in fact agreed to take Benadryl. He had seen medical staff frequently for cervical neck pain and headaches. On 1/23/06 he received multiple trigger point injections with anesthetics and steroids. A medical note dated 2/23/06 indicated that he was on hold for an epidural in the cervical neck area. It was unclear whether the patient had agreed to this procedure. The note was written on a post-it. The inmate awaited final evaluation and treatment with this procedure.

A review of his inmate history revealed that he had had two case manager visits and four psychiatric visits over the preceding six months. His MAR for March 2006 indicated that he was taking Benadryl 25 milligrams HS ordered by the psychiatrist. There were numerous no-shows for medication for which no referrals were made.

Assessment:

Mental health support for a patient with severe medical conditions and pain was appropriate. Non-compliance with medication did not result in a referral.

4.     Inmate D

This patient was interviewed in a group context and reported taking Seroquel 100 mg HS and Wellbutrin 150 mg BID. He reported that he was not doing well on this medication because he woke up in the middle of the night and could not get back to sleep. It was otherwise helpful to his underlying condition of (depression). He had done better on Seroquel 200 milligrams HS and he was getting 100. He saw the psychiatrist every 90 days and was about to start a group. The UHR was unavailable.

A review of his inmate history revealed that he had had two case manager visits, the last of which, on 12/13/05, was late by two weeks. He had seen psychiatry on five occasions during the last six months.

His MAR for March 2006 was reviewed and confirmed his medications as above. His medication was renewed without a psychiatric contact. The MAR was filled out appropriately and was complete.

Assessment:

He was seen frequently by psychiatry but his medication order was renewed in the absence of patient contact. He needed a higher dose of Seroquel. A quarterly case manager contact was two weeks late. The MAR was completely filled out.

5.      Inmate E

This patient was interviewed in a group context and reported taking Elavil 75 milligrams and Trazodone along with Klonopin HS. He was awaiting surgery. He also reported that he had taken 300 mg of Elavil for 20 years until the deaths at CMF. He had a chronic bipolar disorder. He was in an anger management group. Once his lockdown began he got his medications. He saw his psychiatrist every 90 days.

His inmate history was reviewed. His diagnosis was Depressive Disorder NOS. He arrived on 11/15/04 from an outside hospital. He had had three case manager visits in the preceding six months and two psychiatric contacts, the last of which was late by 4.25 months. Two of the case manager contacts were separated by four months.

His MAR for March 2006 was reviewed. Elavil 75 milligrams and Trazodone 200 milligrams q p.m. were confirmed. They all started on 3/16/06 with a psychiatric contact. The MAR was appropriately filled out and complete.

Assessment:

Mental health care was appropriate for this stable patient with medical problems but psychiatry and case manager contacts were late. The MAR was appropriately filled out and complete.

6.      Inmate F

This patient was interviewed in a group context and reported that he was not taking any medication. He also said that he wasn't seen by anyone from mental health in the preceding six months and was supposedly off the mental health caseload. While his UHR was unavailable, his inmate history indicated that he had had two case manager visits in the preceding six months with a four-month gap. He was also seen twice by psychiatry with a four-month gap. Between case manager visits he had an annual IDTT meeting. He had a diagnosis of Schizoaffective Disorder.

The three case manager contacts were made by three different case managers. This was reportedly a common phenomenon. In September and August 2005 two case manager contacts were cancelled by a lockdown. A self-referral of 1/27/06 did not lead to a mental health contact.

Assessment:

This patient had been seen multiple times during the preceding six months but case manager contacts were made by several different case managers and one quarterly contact was late. Two psychiatry contacts were more than 90 days apart. Self-referral did not lead to a mental health contact.

7.    Inmate G

This patient was interviewed in a group context and reported taking Remeron 30 mg which he described as "great." He had no side effects. He was satisfied with evening administration of his medication. He saw his psychiatrist every four months and his case manager every three months. He also reported that he had had an IDTT less than one year previously. He said that only a case manager attended his IDTT meeting.

His inmate history was reviewed and revealed that he had had three case manager contacts in the preceding six months. He was seen by psychiatry twice during that interval. His last IDTT was on 1/19/06. His diagnosis was Major Depressive Disorder, recurrent, severe with psychotic features. He had been seen by two different psychiatrists and two different case managers during the preceding six months.

His MAR of March 2006 was reviewed and confirmed his medication as Remeron 30 mg HS and Benadryl 50 mg HS. His medication renewal of 2/21/06 was done without benefit of a psychiatric contact. The MAR was completely filled out.

Assessment:

Psychiatric and case manager contacts were appropriate, although five different clinicians were involved. A medication order was renewed without psychiatric contact.

8.    Inmate H

This patient was interviewed in a group context and reported that he took Prozac in the morning along with Risperdal and Buspar at night. He took Risperdal at night as well which he said was for his schizophrenia. He had had numerous problems with a back injury that occurred while he was incarcerated. He had a 1987 complaint and numerous 602s all relating to his back injury. He wanted a transfer out of the institution because of various conflicts he had had regarding his medical issue. He saw the mental health clinician every two to three months and the psychiatrist every 90 days. His UHR was unavailable.

His inmate history was reviewed and revealed that he had had three case manager contacts in the preceding six months, the last of which was two weeks late. He had two psychiatric contacts during that interval, both by referral. A November 2005 self-referral to psychiatry was for medication compliance.

His MAR of March 2006 was reviewed and confirmed Risperdal .5 mg bid, Buspar 10 mg q p.m., Prozac 20 mg q a.m. There were five refusals and three blanks on the MAR. There were two episodes of three consecutive missed doses without a referral. There were confusing entries on the MAR, including circled initials, an R without a circle, and 11 no-shows. The refusal pattern was somewhat unusual in that the patient ostensibly refused one medication but took others.

Assessment:

One case manager contact was late. The MAR was incomplete, had unusual entries, was inappropriately filled out and refusals did not result in referrals.

9.      Inmate I

This patient was interviewed in a group context and reported taking Benadryl 50 mg in the evening prn. He wanted medication HS because of the sedation he experienced. The patient had had many bad experiences with side effects of medications like Thorazine and Paxil. He reported that he was doing very well on his current medication and that he saw both of his mental health clinicians every 90 days.

A review of his inmate history revealed a total of four case manager contacts during the preceding six months by two different case managers. He had had two psychiatry contacts, the first of which was one month late.

A review of his UHR revealed that notes by both the case manager and psychiatrist confirmed that he was high-functioning and stable. All of his progress notes called for a return visit in 90 days. MARs for November, December, January and February were missing.

He also complained, as did all other inmates interviewed in this level III yard, that if you forgot your water cup you got no medication.

Assessment:

Appropriate case manager and psychiatric care was provided for this stable patient. A psychiatric contact was late. There were reports that when inmates forgot their water cups they did not receive medication. Three MARs were missing from the UHR.

10.    Inmate J

This patient was interviewed in a group context and reported that he had been off medication and was doing very well. He expected to be off the mental health caseload soon. He said that when he missed two days of medication, the MTA discontinued his medication. He still saw the psychiatrist for follow-up monitoring. His inmate history confirmed two case manager contacts during the preceding six months with a four-month gap. He had seen a psychiatrist once with a six-month gap.

Assessment:

Monitoring was appropriate for a stable patient off medication, who was a candidate for discharge from the caseload. A case manager contact was late.

11.    Inmate K

This patient was interviewed in a group context and reported taking Remeron 45 mg per day. He reported he was doing very well with no particular problems and that the medication was helpful without side effects. The inmate history was reviewed and revealed two case manager visits within the last six months one of which was after an interval of longer than four months. He had seen psychiatry on three occasions during that interval. Three out of four of his last psychiatric contacts were for noncompliance. A missed appointment on 1/26/06 by the case manager was cancelled due to a lockdown. It subsequently took one month to be seen.

The MARs for February and March 2006 confirmed an order for Remeron 15 mg q p.m. There were 18 circles, eight blanks and only two doses taken. A referral was made on 3/7 for noncompliance.

Assessment:

The MAR was inappropriately completed. A referral for noncompliance was made only after prolonged and erratic noncompliance. A case manager contact was late.

12.    Inmate L

This patient was interviewed in a group context and reported taking Seroquel 100 mg HS. He described the medication as very good for him and without side effects. A review of his UHR confirmed an order for Seroquel 100 mg but it was not written for HS administration. On 11/10/05 he was on suicide watch for 10 days.

He was regarded as a stable patient and was seen by case manager every 90 days. His last case manager contact was on 3/16/06. Often there was no translator for this patient, who spoke only Spanish.

His inmate history confirmed the case manager contacts and in addition he had three psychiatric contacts within the preceding six months. The patient arrived on 10/14/05 from a reception center and his first treatment plan was dated 11/22/05, 32 days after he arrived. The MARs for February and March 2006 confirmed his Seroquel 100 mg q p.m. and showed an order for Celexa 20 mg q p.m. These orders were written on 12/02/05. The MAR contained five blanks and two no-shows.

Assessment:

The initial IDTT meeting and treatment plan were late. Care was adequate for a patient who was stable.

13.    Inmate M

~~This patient was interviewed in a group context and reported that he was on no~~ medication. He had been off of Seroquel for one month and was doing well. He saw a psychiatrist two to three weeks earlier. A review of his UHR confirmed he was on Seroquel 25 mg HS which was discontinued on 3/2/06. The psychiatrist's note at that time indicated that the patient did not take his medication very often and was very rigid about this. The case manager progress note of 3/14/06 indicated the patient was doing well. His diagnosis was Depressive Disorder NOS. He had been sleeping very well without medication. His inmate history confirmed that he had had four case manager contacts in the preceding six months. He had also had four psychiatric contacts, all by referral, for noncompliance.

Assessment:

Medication noncompliance resulted in mental health contacts. Psychiatric management was appropriate for a treatment-resistant noncompliant patient.

14.    Inmate N

This patient was interviewed in a group context and reported taking Seroquel 25 mg per day after dinner. He had no complaints about his mental health care. His inmate history revealed that he arrived on 11/4/05 from a reception center. He had had three case manager contacts and two psychiatric contacts in the preceding six months. He initially presented to the OHU where he was seen by the IDTT on 12/16/05. He subsequently had his first treatment plan on 12/27/05. He was followed closely by the case manager and psychiatrist thereafter.

The MAR for March 2006 was reviewed and indicated that he took Remeron 50 mg q p.m. The patient was confused about the name of his medication. The MAR was complete and appropriately filled out.

Assessment:

Care was appropriate for a stable patient.

15.    Inmate O

This patient was interviewed in a group context and reported taking Trazodone 100 milligrams and Paxil 50 mg for the preceding year. He described his medication as very helpful to him and he experienced no side effects. He was satisfied with his mental health care. His inmate history indicated that he had had three case manager and psychiatric contacts over the preceding six months. His first psychiatric contact on 10/13/05 was two weeks late.

The MARs for February and March 2006 were reviewed and confirmed orders for Paxil and Trazodone. His Trazodone 100 mg p.m. was renewed on 1/26/06 without benefit of a psychiatric contact. He was completely compliant during February and March 2006 and there were no blanks in the MAR.

Assessment:

Case manager and psychiatry contacts were appropriate with the exception of a delayed psychiatric contact and a renewal of medication without patient contact.

16.    Inmate P

This patient was interviewed in a group context and reported taking Neurontin, Elavil 50 mg HS, Tegretol and Prozac 30 mg every morning. He reported that he was doing "great" on his medication but that he had never had a Tegretol level. He had no side effects. The Elavil was for neuropathy which caused some bladder hesitation.

The inmate history revealed that he arrived on 1/31/06 from a reception center and was first seen on 2/8/06 by his case manager and on 3/3/06 by the psychiatrist. His first treatment plan was dated 2/14/06, 15 days after he arrived. While the patient was undergoing the intake process by his case manager, custody referred the patient on 2/3/06 to psychiatry and it took 30 days to be seen.

His MAR of March 2006 confirmed orders for Tegretol 200 mg bid, Prozac 20 mg q a.m., and Elavil 5 mg q p.m. The Tegretol and Prozac were prescribed on 2/10/06 by the psychiatrist without a contact due to a missed appointment. There were a total of 28 blanks on the MAR and nine no-shows. Three of those were on consecutive dates, on the 16th, 17th and 18th. No referral was made.

<u>Assessment</u>:

Initial case manager contacts and treatment plan were timely, but psychiatric response to a staff referral was delayed and medication was prescribed without benefit of a contact. Poor MAR with numerous blanks and no-shows but no referral was made.

17.     Inmate Q

This patient was interviewed in a group context and reported taking Remeron 45 mg which was an increase from 15 mg. His Wellbutrin was discontinued because of high blood pressure. He was doing fine and experienced no side effects. In addition his blood pressure was down. He had taken Remeron for years at the 45 mg level without problems. He occasionally got depressed and could access mental health staff reasonably quickly. His inmate history confirmed two case manager and two psychiatric contacts during the preceding six months.

His MARs for February and March 2006 were reviewed and confirmed Remeron 30 mg q p.m. in an order dated 12/8/06 and an increase to 45 mg q p.m. on 3/6/06. There were three blanks in February and in March. The first five days were missed (renewal gap). The MAR was otherwise compliant.

<u>Assessment</u>:

Care was appropriate for a stable patient with the exception of the expiration of a medication order.

18.     Inmate R

This patient was started on Lithium IM 12/8/05. There was no Lithium workup or level ordered. There was nothing pertaining to Lithium in the lab section. He was seen by the psychiatrist subsequently on 12/28/05. He was scheduled to be seen on 3/1/06 but because of a lockdown he wasn't seen. He had not been seen again as of 3/22/05, three weeks after he was scheduled for follow-up.

<u>Assessment</u>:

Psychiatry failed to obtain a Lithium workup or order levels in conjunction with the initiation of Lithium. Scheduled follow-up did not take place.

19.     Inmate S

This patient was started on Depakote in December 2005 at San Quentin. On 12/13/05 blood for a CBC, CMP and VPA level was drawn. That VPA level was less than .7 on 12/16/06. He arrived on that same day at SCC from San Quentin. His Depakote dosage was 1500 mg per day on arrival. According to his MAR, he got that dosage until 1/12/06.

On 1/13/06, the psychiatrist inexplicably wrote for 1000 mg of Depakote per day apparently without reference to or reviewing the San Quentin record. Seroquel was added to the regimen. The VPA level was never repeated. Clinically, the patient had been in poor condition, which had not changed at all during his stays at the two institutions.

Assessment:

Psychiatric management of treatment with a mood stabilizer was inadequate. There was a failure to monitor VPA levels or consider a prior medication order.

20.    Inmate T

This patient had been taking Lithium long-term at a dosage of 600 mg per day. His last order was on 3/10/06. In August 2005 his level was .9 (normal). An order for a Lithium level was written on 12/9/05. That level was never drawn even though a hepatic panel was erroneously drawn. The physician wrote to the lab that he "didn't write this order," but never reordered the Lithium level.

Assessment:

Psychiatric management of treatment with a mood stabilizer was inadequate. There was a failure to monitor Lithium levels.

21.    Inmate U

This patient had been on long-term Depakote and was currently at the level of 1000 mg per day. His medication was renewed every 120 days and his last order was on 3/17/06. The MARs were incomprehensible because of the big gaps and blanks, and the old MAR forms were used. His level of compliance could not be determined.

On 12/13/05, a Depakote level was ordered and came back low at 36 (50-100). A referral to psychiatry was made, but he was not seen until one month later. On 1/12/06 orders were written for a new Depakote workup and a blood level to be taken after 1/17. On 1/18/06 the Depakote level was 66, which is in the therapeutic range.

Assessment:

Psychiatric management of a mood stabilizer was inadequate. MARs were incomprehensible.

22.    Inmate V

This patient arrived at SCC on 3/03/06 from DVI with orders for Trazodone and Seroquel, which had stop dates of 3/4/06. He received no medication until 3/10/06 when

he wound up in a mental health crisis and was placed in the OHU. He was subsequently sent to an MHCB.

He came back to SCC without a MAR or any mention of medications. The patient had told the clinicians at HDSP that the Seroquel and Prozac they were giving him were not working. He arrived at midnight and, bypassing a bus screening, was placed in the OHU. The next day he told his psychiatrist that he was still hallucinating but was on no medication.

Assessment:

The failure to renew medications on initial arrival resulted in a one-week gap and was followed by a mental health crisis. Information on the inmate's discharge from the MHCB was inadequate.