EXHIBIT F

Pleasant Valley State Prison (PVSP)

March 23, 2006 – March 24, 2006

1.   Inmate A

The case was reviewed at the request of the Special Master in the <u>Coleman</u> case. The review included the UHR, interview of Inmate A, correspondence from Inmate A's wife and discussions with the clinical case manager, custody staff and mental health administrative staff.

This 40 year-old inmate had been incarcerated for approximately 11 years following conviction of a sexual offense involving a child. He had an SNY designation. He reported a history of a prior placement in CYA that was relevant for his having experienced an assault while living in a dorm housing setting.

The UHR documented an increasing level of anxiety and dysphoric mood correlating with his learning (approximately one year ago) of the possibility of being moved from his current housing in a cell to a dorm living situation. Across the preceding several months, the frequency of his contact with mental health staff increased. He often presented as anxious and depressed and had consistently verbalized apprehension regarding a potential move to a dorm setting. On at least one occasion, he indicated that he would "rather die" than live in a dorm.

Letters from his wife (to CDCR Division of Health Care Services and to the Special Master in the <u>Madrid</u> case) documented her observations of her husband's increasing levels of anxiety, depression and irritability. Interviews with mental health administrative staff during the monitoring visit confirmed that, in repeated telephone contact with various mental health staff members, this inmate's wife had reported concerns regarding her husband's mental health and advocated for his retention in a cell as opposed to dorm housing.

Within the context of an interview that occurred on 3/24/06, Inmate A presented as an articulate man with above average cognitive skills. His mood through the course of the interview was highly variable and he was clearly dysphoric while talking about the prospect of moving to a dorm. There was no indication of disorganized thinking or other correlates of active psychosis.

He reported that he began to experience an increased level of anxiety after an ICC meeting during which he learned that, after April 2006, a transfer to a dorm living situation could occur at the time that he moved from Level III to Level II custody status. He reported that, in the time since receiving this information, he had steadily become more anxious and fearful, experienced "uncontrollable crying" at times and experienced periods of time during which he had thoughts of suicide. He reported feeling little support from a previous case manager. Through this period, he kept in close contact with his wife through "nearly daily" telephone calls and weekly visits. He clearly attributed his current dysphoria and anxiety to fears of being physically harmed or otherwise

victimized if he were moved to a dorm setting. Although he reported that he was not currently contemplating suicide, he acknowledged that he did experience such thoughts "from time to time."

In an interview his case manager expressed concern over Inmate A and reported at least one incident in which he had "fallen apart" in her office while speaking of the potential transfer. She reported the impression that his presentation was "not manipulative." The clinician reported that she had been in contact with the correctional counselor assigned to his case in an attempt to determine whether a move to a dorm setting was, in fact, imminent. The case manager also reported that she had arranged for him to be seen at 14-day intervals and that she had requested that he contact her on any occasion on which his experience of anxiety or depression became more acute. In interview, Inmate A confirmed that he intended to maintain close contact with the clinician and expressed appreciation for the manner in which the initial contacts between himself and the newly-assigned clinician had been conducted.

On 3/30/06, I spoke briefly with the acting Chief Psychologist and the acting Health Care Manager to follow up. I was informed by the acting Chief Psychologist that the correctional counselor involved with the case had provided assurances that there were no plans to house Inmate A in a dorm setting at PVSP. The need to inform Inmate A of these findings was discussed in this conversation. Custody staff had explored reportedly the availability of Level II cell housing in other settings and reported that the only Level II housing currently open to intake was, in fact, in dorm settings. In discussion with the acting Health Care Manager, it was suggested that the IDTT consider available housing options and that, in light of the possible impact of dorm housing on this inmate's mental health, documentation of the treatment team's recommendations for housing would be appropriate.

Assessment:

This inmate's exhibited anxiety and mood disorder apparently related to a history of assault in a CYA dorm and the current possibility of a move from cell to dorm housing. Although he appeared to experience considerable support from his wife, which might have been seen as mitigating the possibility of attempted self-injury, there was a history of impulsive behavior that may have increased the level of risk of self-injury. There was no indication that he was actively considering suicide at the time of the 3/24/06 interview but the possibility of self-injury remained should transfer to a dorm setting occur.

PVSP mental health staff members acted to increase the frequency of contacts with this inmate and he appeared amenable to seeking support from a newly-assigned case manager. Mental health administrative staff provided assurance that attempts would be made to seek alternatives to Level II dorm placement and that concerns regarding such placement would be represented at any upcoming Classification Committee meetings in which housing changes would be discussed. Finally, an IDTT was to review the possibilities for insuring that future considerations of housing include discussion of the

possible adverse impact that placement into a dorm setting may have had on this inmate's mental health.

2.	Inmate B

During the monitoring visit, the status of Inmate B was reviewed per the request of the plaintiffs' attorney. In the referral, concern was expressed over his possible need for a higher level of care.

Inmate B has been on the mental health caseload since at least 12/04/05, was currently at the EOP level of care (as of 3/9/06) and was awaiting transfer to an EOP program.

This inmate appeared to have an extensive pre-commitment mental health history. A previous neurological assessment found deficits in general verbal intelligence and in most areas of academic-based functioning, mild expressive aphasia and stereognosia (the inability to name common objects). In 1992 he was found to be incompetent to stand trial and given a diagnosis of paranoid schizophrenia. An evaluation done in March 1993 found a full scale (Wechsler) I.Q. of 76. He reported a history of sexual abuse as a child. He had been described as evidencing multiple personality disorder at times.

He had been administered a variety of psychoactive medications including Abilify and Remeron (2/13/06), Thorazine (700 mg) and Benadryl. He was apparently administered Haldol involuntarily.

The inmate was placed into the MHCB unit on 12/7/05, 1/25/06 and again on 3/5/06. He was admitted to the MHCB unit again on 12/7/05 when he was found to be angry and depressed and refused to respond to questions regarding potential self-injury. Following admission he refused medication and quickly decompensated, was referred to DMH, accepted and placed on a waiting list. He was transferred to DMH on 1/26/06 and remained there for only a few days and was discharged because "his assaultive behavior is unpredictable." He was discharged at EOP level of care and transferred to SAC.

His level of care was lowered approximately one week after arrival at SAC (to 3CMS) and he was transferred back to PVSP on 2/8/06. Records indicated that his medication was re-started on 2/10/06.

He was placed in the MHCB unit (on suicide watch) again on 3/5/06. He was involuntarily medicated and stabilized to the point that, on 3/8/06, the Keyhea officer determined that the criteria for involuntary medication were not met. The inmate acknowledged the need for treatment and agreed to continue the medication. He was discharged back to administrative segregation on 3/9/06.

Notes from 3/17/06 indicate that the inmate was reporting that he no longer wanted to take Haldol but wanted his medication changed to Thorazine and Abilify. He had apparently been prescribed these medications before with limited effect. He did, however, agree to continue the medication upon further discussion with the clinician. Notes from

50

3/20/06 described his condition as "cooperative, organized, mildly anxious, psychotic symptoms evident, some delusional content."

When seen in interview this inmate was cooperative and oriented to place and person. He was clearly delusional as he described a process of slashing his arm to allow "demons" to escape. He reported that his arm was "not my real arm" but an arm which had been provided to him for the purpose of "blood runs," the name of a ritual in which he slashed his arms and chest.

During the interview, he reported that he had been offered yard time very infrequently. In fact, 114s in the housing unit documented that during a period of approximately six weeks he had been offered yard time only twice. When asked, custody staff reported that there was a severe shortage of "walk alone" yard space that resulted in limited yard being offered to administrative segregation inmates. They reported that although the need for construction of additional yard space had been identified, it would be over a year before construction would begin.

Observation of Inmate B's cell confirmed that the cell's lone window was frosted, preventing a view of outdoors from the cell.

Assessment:

Inmate B was in need of a higher level of care and was awaiting transfer to an EOP program at the time of the monitoring tour. He was quite delusional and had a history of refusing medication. It thus appeared likely that he was at risk of additional deterioration.

An attempt at initiating a Keyhea petition was unsuccessful. Mental health supervisory staff was advised of the need to consider expediting his transfer to an EOP program or referring him to intermediate or acute DMH care if his condition deteriorated further.