IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    Plaintiffs,

    vs.                No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

**SPECIAL MASTER'S REPORT
ON DEFENDANTS' ESTABLISHMENT OF INTERIM INPATIENT
INTERMEDIATE DEPARTMENT OF MENTAL HEALTH BEDS AND THE
NEED FOR APPROVAL OF SOME BASIC COMPONENTS OF DEFENDANTS'
REVISED DECEMBER 2006 BED PLAN**

        In an October 20, 2006 order, the Court directed the Special Master to review and report by the end of March 2007 on defendants' progress in implementing their plan for establishing interim inpatient intermediate Department of Mental Health (DMH) beds in the D-5 and D-6 units at Salinas Valley State Prison and the P-3 Wing at California Medical Facility.  The original source of this order was defendants' Statewide Mental Health Bed Plan, filed with the Court on April 17, 2006, followed nine days later by a contentious hearing on the shortcomings and merits of defendants' planning efforts. Among other things, the hearing confirmed that the April bed plan was based on outdated population figures and contained projections for bed needs at various levels of care in the defendants' Mental Health Services Delivery System that were no longer accurate or adequate and needed revision.

        In a subsequent order, filed on May 2, 2006, the Court directed defendants to file within 45 days a revised plan for, among other things, the provision of additional

interim intermediate inpatient DMH beds.  Revisions, moreover, were to include a list of

projects that could be accelerated, as well as a list of statutory, licensing or staffing

barriers to acceleration or timely completion of any projects described in their plans. The

defendants in late June filed the required revised plan.  In a  September 11, 2006

supplemental report to the court on the status of both interim and long-range revised bed

plans of defendants, the special master described two projects identified by defendants to

provide a total of 142 temporary Level IV intermediate inpatient DMH beds on an

accelerated basis.

       The first involved the conversion of Enhanced Outpatient Program (EOP)

beds into 112 Level IV intermediate inpatient DMH beds in housing units D-5 and D-6 at

Salinas Valley State Prison, a project originally identified in defendants' April 2006 plan

but not scheduled for completion until March 2009.  Defendants' June revision to the

interim April bed plan reported that the physical conversion of an initial 36-bed

intermediate inpatient program on the D-6 housing unit had been accelerated and was

initially activated in May 2006.  It was projected that renovations of 20 additional

intermediate DMH beds on D-6 would be complete by August 1, 2006.  Conversion of

another 56 beds on the D-5 unit to intermediate inpatient beds reportedly was scheduled

to be completed by December 31, 2006.

       The second project called for the creation of 30 additional intermediate

inpatient DMH beds for high custody inmates on the P-3 unit at California Medical

Facility by June 30, 2007.  All of these units, D-5 and D-6 at Salinas Valley State Prison

and P-3 at California Medical Facility, intended for high custody intermediate inpatient

DMH inmates, were interim, temporary measures and would be used to house high

security DMH intermediate inpatient inmates only until projected sufficient numbers of permanent beds for Level IV inmates in need intermediate inpatient treatment were available. That projected event remains uncertain, but is unlikely to occur before Fiscal Year 2011/12.

Because both of these projects committed defendants to an uncharacteristically swift accomplishment of physical renovations and the procurement of staff, the Court ordered the review provided in this report. In late February 2007, the special master's experts and monitors, accompanied by counsel for parties, visited all of the southern California DMH programs for male CDCR offenders, including those at Atascadero State Hospital, Coalinga State Hospital and the intermediate inpatient programs at Salinas Valley State Prison. The visits included physical tours, interviews with administrators, staff and some inmates and some exposure to treatment activities. A highlight of the visit was the description of and presentation on the treatment program provided by participating inmate/patients.

At the time of the February 22, 2007 visit, 44 of 56 cells in D-6 were occupied. In early February, DMH reported that the physical renovation of the D-5 unit was complete and the unit was ready for activation. Just two clinical vacancies remained, and 106 of 150 MTA positions were filled. The D-5 unit received its first four inmate/patients in the first week of April, and the first pod in the unit was expected to be filled by April 23. The three pods in the unit, comprising 56 beds in all, reportedly were expected to be filled by July 31, 2007.

Renovations, recruitment of staff and activation and integration of the units within the wider environment of Salinas Valley State Prison have not proceeded

without glitches and traumas. These units, as indicated already, are not intended to form a permanent part of the DMH intermediate inpatient program at Salinas Valley State Prison. Rather, they are temporary expedients cobbled together to provide some interim housing to bridge the gap between currently inadequate resources for high security inmates in need of intermediate inpatient treatment and the anticipated future delivery of permanent beds created specifically for the provision of inpatient mental health treatment. Units D-5 and D-6 are basically high security general population EOP units with some physical modifications and enhancements designed to provide limited additional programming space. Once defendants have completed the construction of sufficient permanent Level IV intermediate inpatient beds, these units will be returned to their original general population Enhanced Outpatient Program function. Meanwhile, the units must function within D-Yard, a larger component of the Salinas Valley State Prison environment and world.

The contrast with the 64-bed DMH Salinas Valley Psychiatric Program constructed early in the decade and functioning now for several years is sharply distinct. That facility was built specifically for the delivery of inpatient mental health treatment in a secure facility. It is licensed, furnished with ample programming space and has access to its own outdoor recreational area. Because it is self-contained, its inmate/patients have virtually no contact with non-caseload inmates. Treatment schedules are not subject to the vagaries of larger institutional security measures such as lockdowns. Custody is provided largely by MTAs, who are hired and supervised by and accountable to DMH program administrators. Construction of a twin 64-bed unit, similarly isolated and also

built specifically to provide intermediate inpatient care, is scheduled to begin in July of this year.

      The D-5 and D-6 units must function in a different world, situated as they are within a larger general population yard unattuned to the special needs of delivering intermediate inpatient mental health care.  Access to outdoor recreational space, the assignment of correctional staff for yard activities and interruptions associated with lockdowns have tested the administrative skills of DMH personnel who are unaccustomed to operating within a strictly correctional high security environment.  The only other CDCR institution with DMH programs is California Medical Facility, a Level III prison with a long history of dealing with specialized medical and mental health components.  Operating an intermediate inpatient program fully immersed in a Level IV correctional institution is a significant challenge to DMH mental health and CDCR correctional administrators alike.  So far, they seem to be working slowly through a number of early problems.  Program inmates last week reportedly got their first access to D-Yard's grassy recreational yard, and negotiations have led to some limitation of the impact of lockdowns on DMH programming activities.

      These units, again, do not now, and never will, constitute *bona fide* intermediate inpatient facilities.  They are temporary and limited expedients designed to address on an interim basis defendants' present lack of adequate appropriate space for the provision of intermediate inpatient treatment for high security inmate/patients.  The difficulties encountered so far, moreover, provide a useful cautionary warning about some of the difficulties CDCR is likely to face on its proposed assumption from DMH of

all responsibility for providing both acute and intermediate inpatient treatment to CDCR inmate/patients.

While these interim intermediate inpatient beds are not ideal, they will enable defendants to provide a DMH-operated program of inpatient treatment for 112 Level IV CDCR inmates some two years earlier than originally projected in defendants' April 2006 bed plan.

The second project involved the conversion of the P-3 housing unit at California Medical Facility to an interim 30 single-celled intermediate inpatient DMH program. The most complex aspect of this undertaking was finding appropriate replacement housing for the 38 EOP administrative segregation inmates who occupied the P-3 unit in June 2006 when the project was initially raised as a possibility. The M-3 unit at California Medical Facility, which housed 67 general population EOP inmates, was selected as the replacement housing for the 38 EOP administrative segregation inmates from P-3, which, in turn, meant finding appropriate housing for the displaced 67 general population EOP inmates. These serial movements would clear the P-3 unit and permit its renovation by May 23, 2007. Defendants also needed to staff the new intermediate inpatient program, obtain the appropriate license and activate the unit.

Defendants report that the renovations are now scheduled for completion by May 31, 2007 and project full occupancy of the unit's 30 beds by June 29, 2007. See Exhibit A for DMH's detailed projection for the completion of tasks associated with the unit's activation. This unit, too, will house intermediate inpatient DMH inmate/patients only temporarily. Once sufficient permanent intermediate inpatient beds are constructed

and available for use, the P-3 unit will revert to California Medical Facility for alternative housing.

Full activation of the D-5 and D-6 units at Salinas Valley State Prison has fallen somewhat behind schedule, and the contemplated full occupation of P-3 is still sufficiently remote to allow for some slippage as well. However, in this suit in which any action requiring physical renovation or construction has inevitably been plagued by delays, defendants' expedited and relatively timely completion of these two projects is unusual, welcome and needs to be sustained.

These two projects represent but a small piece of the defendants' much larger pending bed plan. Defendants are now well into that crucial time of the year when they must persuade the Legislature to provide both the construction and operational resources with which to implement their overall bed plan, and there are growing indications of confusion among the defendants.

2006 started out well for CDCR. After nearly eight years of effort, failure and crises, the department seemed finally to have a firm grasp of its need for acute and intermediate inpatient and mental health crisis beds. Completion of the Unmet Needs Assessment in early 2005 after three earlier failed attempts and the subsequent re-engagement of a contractor to help sort through bed need projections for the various categories of treatment and custody needs allowed the department to formulate with growing confidence a plan to meet the mental health treatment needs of the most seriously mentally ill portion of its population. The formulation and implementation of this plan potentially represented the last step in providing constitutionally adequate mental health care and fulfilling CDCR's obligations under Coleman.

Four events in the course of 2006 seemed to hijack the swelling confidence and hope that characterized the year's beginning. First came the growing population crisis. By late 2005, it was evident that the reduction in population growth and then in the population itself in the first few years of the decade were over, and the numbers were rising fast. Early in 2006, defendants were staring at a galloping growth rate that threatened to hit 200 percent of capacity shortly, and the scramble was on to deal with the flow. One victim of the turnaround was CDCR's mental health bed plan. The numbers in the April 2006 plan were based on earlier, rosier projections and needed to be re-worked.

Next came the Plata receivership and an entirely new twist to defendants' relationship with the courts. Unlike a mastership, which essentially monitors defendants' efforts to implement remedies and reports to the Court defendants' success or failure in doing so, a receiver assumes responsibility for the entire planning and management of remediation. Early on, a merger of all pending healthcare-related suits seemed possible, even imminent, but that possibility seems to have waned. It is clear that control over healthcare-wide aspects of the delivery of medical, mental health and dental services will need to be assumed by the receiver, but the fiscal and management specifics of mental health and dental care will probably remain where they are for the foreseeable future. For a period in mid-2006, visions of shared facilities built on a fast-track by the receiver beguiled defendants' planning, which became more preoccupied with means than ends. Still, the coordination of construction projects, as well as healthcare-wide matters, remains absolutely critical for all three services. The rapidly changing healthcare environment of CDCR certainly has had an impact on planning for meeting established

bed needs, but it does not change the nature and extent of the defendants' mental health bed needs.

The third and fourth events unfolded late in 2006. CDCR announced its intention to sever its relationship with the Department of Mental Health, CDCR's long-time contractor and provider of acute and intermediate inpatient care, and assume responsibility itself for the delivery of inpatient treatment. The department then unveiled a plan to reorganize and consolidate the delivery of its intensive mental health programs in just seven of its 33 institutions. Both of these dramatic changes in the structure of defendants' mental health care were contained in CDCR's mid-December 2006 revision of its mental health bed plan. Neither announcement came as a complete surprise. CDCR's dissatisfaction with reliable access to DMH intermediate inpatient programs at Atascadero State Hospital and Coalinga State Hospital were clear and growing, as was DMH's frustration with the relentless expansion of CDCR's need for inpatient programs for high security and high risk Level IV inmates. And, while never calling it consolidation, CDCR's plans for almost all of its new and expanded mental health programs placed them in a small number of institutions with already successful programs in places where recruiting clinicians seemed easiest. Nonetheless, defendants' December revision contained no details on the transitional planning required to take the department's mental health delivery system through these far-reaching and fundamental changes.

These fast-paced events have caused widespread confusion and uncertainty, which now threaten to stall the allocation of construction and operational funding critically needed to meet the increasingly desperate need for acute and

intermediate inpatient and mental health crisis beds in CDCR. Articulation of the need

began in 1998; the dimensions of the need became clear in 2005; subsequent planning

committed defendants to meeting the need fully in Fiscal Year 20011/12. The defendants

must not be allowed to postpone funding decisions needed now to meet the Fiscal Year

2011/12 goal and thereby condemn CDCR's most seriously mentally ill inmates to still

another year or more of cruel and unusual punishment. The number of beds needed is

clear; the levels of treatment at which they are needed are equally clear, as are the needed

levels of custody. CDCR's plan calls for the construction of new programs in a limited

number of facilities. None of the placement choices in the plan appears to be

unreasonable. Apparently CDCR's December plan for the construction of the number,

type, custody level and placement need to be formally approved by the Court in order for

defendants to formulate clear requests to the Legislature for the allocation of necessary

construction and operational resources in Fiscal Year 2007/08 to meet the Fiscal Year

2011/12 goal.

As for the confounding events precipitated by defendants' revised

December plan, by order of March 26, 2007, filed on March 27, 2007, the Court has

already directed defendants to report in detail within 90 days on their plan to assume

responsibility for the delivery of acute and intermediate inpatient treatment currently

provided by DMH or, if the assumption of that responsibility is not feasible, what

alternative the defendants will pursue. In their late February response to the special

master's February 2, 2007 status report to the Court on the revised December bed plan,

which identified concerns raised by the vagueness of the consolidation proposal,

defendants conceded the lack of detailed planning for the reorganization by offering to

submit a supplemental report with "a detailed analysis of key components" of consolidation within 90 days. The defendants should be directed to submit expanded planning information on both issues, consolidation and CDCR's relationship with DMH, simultaneously by June 15, 2007.

As for coordination of potential construction with the receiver, the <u>Plata</u>, <u>Perez</u> and <u>Coleman</u> Courts have made abundantly clear their determination that their respective appointees will meet often and regularly to ensure that any potential conflicts are addressed early and resolved in a manner mutually responsive to the interests and needs of all three cases.

Respectfully submitted

/s/

_____
J. Michael Keating, Jr.
Special Master

April 12, 2007