| | |
|---|---|
| PRISON LAW OFFICE<br>DONALD SPECTER Bar No.: 83925<br>STEVEN FAMA Bar No.: 99641<br>E. IVAN TRUJILLO Bar No.: 228790<br>General Delivery<br>San Quentin, California  94964<br>Telephone: (415) 457-9144 | BINGHAM, McCUTCHEN, LLP<br>WARREN E. GEORGE Bar No.: 53588<br>Three Embarcadero Center<br>San Francisco, California  94111<br>Telephone: (415) 393-2000 |
| ROSEN, BIEN & GALVAN, LLP<br>MICHAEL W. BIEN Bar No.: 096891<br>JANE E. KAHN Bar No.: 112239<br>AMY WHELAN Bar No.: 215675<br>LORI RIFKIN Bar No.: 244081<br>SARAH M. LAUBACH Bar No.: 240526<br>315 Montgomery Street, 10th Floor<br>San Francisco, California  94104<br>Telephone: (415) 433-6830 | HELLER, EHRMAN, WHITE & McAULIFFE<br>RICHARD L. GOFF Bar No.: 36377<br>701 Fifth Avenue<br>Seattle, Washington  98104<br>Telephone: (206) 447-0900 |
| THE LEGAL AID SOCIETY – EMPLOYMENT LAW CENTER<br>CLAUDIA CENTER Bar No.: 158255<br>LEWIS BOSSING Bar No.: 227402<br>600 Harrison Street, Suite 120<br>San Francisco, CA  94107<br>Telephone:  (415) 864-8848 | |

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>    Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>    Defendants | No.:  Civ S 90-0520 LKK-JFM<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR EMERGENCY RELIEF REGARDING DEFENDANTS' DENIAL OF ACCESS TO INPATIENT PSYCHIATRIC BEDS IN DMH'S STATE HOSPITALS**<br><br>Hearing Date:  April 23, 2007<br>Time:  10:00 a.m.<br>Location:  Courtroom 4<br>Judge:  Hon. Lawrence K. Karlton |

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| APP | Acute Psychiatric Program. A 150-bed acute inpatient unit operated by the Department of Mental Health inside the California Medical Facility. |
| ASH | Atascadero State Hospital. A state mental hospital operated by the Department of Mental Health in Atascadero, California. |
| ASU | Administrative Segregation Unit. |
| BCP | Budget Change Proposal. |
| CCC | Consolidated Care Center. |
| CCCMS | Correctional Clinical Case Management System. CCCMS is the name for the largest CDCR mental health program, which currently houses 26,000 inmates with mental illness who live in general population housing units alongside non-mentally ill inmates. CCCMS inmates are generally given medication management, and a meeting with their case manager every 90 days. A few also participate in groups. |
| CDCR | California Department of Corrections and Rehabilitation. |
| CMF | California Medical Facility. A prison in Vacaville, California. |
| CMC | California Men's Colony. A prison in San Luis Obispo, California. |
| CIM | California Institution for Men. A prison in Chino, California. |
| CRIPA | Civil Rights of Institutionalized Persons Act, 42 USC § 1997 *et seq.* |
| CSH | Coalinga State Hospital. A state mental hospital operated by the Department of Mental Health in Coalinga, California. |
| CTC | Correctional Treatment Centers. CTCs are licensed inpatient units inside prisons. Mental Health Crisis Beds operate inside Correctional Treatment Center Units. In addition to Mental Health Crisis Beds, most CTCs also include medical beds. |
| DMH | Department of Mental Health. |
| DOF | Department of Finance. |
| EOP | Enhanced Outpatient Program. EOP programs are sheltered treatment programs that house severely mentally ill inmates. There are currently approximately 4,100 EOP inmates. Because these inmates are unable to function in a general population setting, they live in segregated housing units. They are given 10 hours each week of therapy or other "structured therapeutic activities." EOP inmates meet weekly with their case managers. |
| ICF | Intermediate Care Facility. ICF programs are "intermediate" inpatient care programs. These programs are operated by the state Department of Mental Health. There are currently ICF programs at Salinas Valley State Prison, the California Medical Facility, Atascadero State Hospital, and Coalinga State Hospital. Inmates in these programs have frequent clinical contact, 24-hour |

| | | |
|---|---|---|
| | | nursing care and 20 or more hours of therapy and treatment each week. Inmates generally spend 6-12 months in these programs. |
| | LAO | Legislative Analyst's Office. |
| | LOU | Locked Observation Unit. An unlicensed Outpatient Housing Unit that is currently operating as a de facto MHCB at California Men's Colony. |
| | MHSDS | Mental Health Services Delivery System. The name given by defendants to their entire mental health system. |
| | MHCB | Mental Health Crisis Beds. MHCB units are licensed inpatient units inside many California prisons where mentally ill inmates who are suicidal or experiencing another kind of mental health crisis can be admitted and treated for up to 10 days. MHCBs are generally located inside a Correctional Treatment Center. |
| | MSH | Metropolitan State Hospital. A state mental health hospital operated by the Department of Mental Health in Norwalk, California. |
| | NSH | Napa State Hospital. A state mental health hospital operated by the Department of Mental Health in Napa, California. |
| | OHU | Outpatient Housing Units. Unlicensed infirmaries inside many CDCR institutions that provide treatment for medical and mental health conditions. |
| | PBSP | Pelican Bay State Prison. A prison in Crescent City, California. |
| | PSH | Patton State Hospital. A state mental health hospital operated by the Department of Mental Health in San Bernardino, California. This is the only state hospital that houses female 2684 patients. |
| | PSU | Psychiatric Services Unit. These are psychiatric treatment programs providing Enhanced Outpatient Program level of care to inmates with a Security Housing Unit term. |
| | SHU | Security Housing Unit. This is a segregated high-security housing unit for inmates who have committed serious infractions while in prison or who have been "validated" by the CDCR as belonging to a gang. There are male SHU units at Pelican Bay State Prison (from which all inmates with serious psychiatric conditions are excluded), Corcoran State Prison, and California Correctional Institute. There is a SHU for women at Valley State Prison for Women. |
| | SVP | Sexually Violent Predators. |
| | SVPP | Salinas Valley Psychiatric Program. The free-standing DMH-run unit on the grounds of Salinas Valley State Prison that has ICF beds. |
| | SVSP | Salinas Valley State Prison. A prison in Soledad, California. |

**TABLE OF CONTENTS**

TABLE OF ABBREVIATIONS ................................................................................................... i

TABLE OF CONTENTS ............................................................................................................ iii

INTRODUCTION ........................................................................................................................ 1

ARGUMENT ................................................................................................................................ 2

I. Defendants' Opposition Ignores The Fact That Their Failure To Maintain Sufficient Beds Violates The Program Guides And This Court's Previous Orders .......... 2

II. ASH Remains Dangerously Understaffed And The Risk Of Additional Pain, Suffering And Death By Suicide To Coleman Class Members Must Be Addressed ................................................................................................................ 4

III. In Addition To Their Violations Of The Program Guides And Court Orders, Defendants Have Not Complied With This Court's February 7, 2007 Order Regarding Pay Disparity For DMH Clinicians ................................................................ 4

  A. Defendants Did Not Assess The Issues Created By Pay Disparity And Did Not Set Forth DMH's Experience Filling Relevant Vacancies Over the Last Three Years ........................................................................................ 5

  B. Defendants Do Not Have a "Plan" to Address Pay Disparity Issues As Ordered By This Court And Do Not Have Any Way To Fill Vacant Mental Health Staffing Positions ............................................................................... 6

IV. Defendants' Opposition To This Motion Further Demonstrates The Need For Emergency Action By This Court .................................................................................... 8

V. Defendants' Failure To Open Beds At Coalinga State Hospital Has Directly Harmed The Coleman Class .......................................................................................... 10

VI. This Court Should Order Defendants To Take All Necessary Steps To Open The D-5 Unit At Svsp By June Of 2007 And To Ensure That All Patients Housed In D-5 And D-6 Have Immediate Access To 20 Hours Of Programming In Addition To Yard Time On The Grassy Yard ............................................................................. 13

VII. This Court Should Order Defendants To Take All Necessary Steps To Ensure That Patton, Napa And Metropolitan State Hospitals Remain Open To The Coleman Class ............................................................................................................... 14

CONCLUSION ........................................................................................................................... 15

# INTRODUCTION

> *"With unilateral pay increases for CDCR institutions, there has been an almost daily drain of staff employed by the DMH at the state hospitals to CDCR institutions…Absent some form of salary parity system-wide, DMH staff will continue to transfer from state hospitals to CDCR facilities for the substantive salary increase and other practitioners/clinicians will leave out of concern for their license and liability as their caseloads increase."[1]*

On February 7, 2007, this Court ordered Defendants to assess the impact of the pay disparity between CDCR and DMH mental health staff and to devise a plan to address any problems revealed by that assessment. Well before that Order, Defendants were aware of the staffing crisis at DMH, culminating in Defendants' decision to restrict admissions to ASH in January for the first time in the hospital's fifty-three year history. In the intervening months since the Court's February 7th Order (and while passively watching staff leave DMH in droves), Defendants have done next to nothing to address this crisis, willfully allowing beds at ASH to close, beds at Coalinga to remain empty and staff to continue their exodus from state hospitals. What this Court wanted to know in February when it issued its Order, and what Plaintiffs, state legislators and members of the public also want to know is simple: What is Defendants' plan to address the staffing crisis at DMH? Defendants' answer, as reflected in their recent filings with this Court, is no plan at all. Defendants point to two funding requests that they have submitted to the Department of Finance and to the Legislature. Those include requests for: (1) a long overdue but inadequate pay increase that applies only to the remaining staff members at DMH hospitals (which is not available for newly hired staff members) that will, depending on their job position, bring their salaries to between 5 and 18 percent *below* CDCR salaries, and; (2) a $1.0 million funding request (for two years) to contract with an unidentified headhunter who will be tasked with recruiting and hiring qualified mental health

---

[1] State of California Budget Change Proposal regarding "*Coleman*-Related Salary Increases" at pp. 1 and 3 (attached as Ex. A to the Reply Declaration of Jane E. Kahn In Support of Plaintiffs' Motion for Emergency Relief Regarding Defendants' Denial of Access to Inpatient Psychiatric Beds In DMH's State Hospitals" (hereinafter "Reply Kahn Decl.").

staff, primarily outside the United States, for four state agencies, one of which is DMH. The goal of this unapproved contract is to "reduce the overall vacancy rate for healthcare professionals by at least 3 percent" in the first year and "by at least 4 percent" in the second year. Reply Kahn Decl., Ex. B at p. I-9. ASH has a 70 percent psychiatrist vacancy rate *right now* and "DMH is currently experiencing a 30-70 percent vacancy rate for all healthcare positions. *Id.* at p. I-6.

In other words, Defendants have no plan to comply with this Court's Order or to address the existing emergency caused by the closure of DMH beds to the *Coleman* class. Even if existing DMH staff members decide that they can live with a salary that is 5-18 percent below the market rate, Defendants have no legal authority, funding or ability to fill any of the vacant positions at those salary levels. Nor have they even requested such authority. The plan, in other words, is akin to placing a band-aid over a gaping hole in an almost empty bucket of water, while doing nothing to refill the lost water. Defendants are unable or unwilling to address the staffing crisis at DMH, opting to take a "wait, see, and hope for a miracle" approach. At a time when the mental health care system is already operating well below constitutional standards, this approach is reckless and must be immediately addressed by this Court.

## ARGUMENT

**I.  Defendants' Opposition Ignores The Fact That Their Failure To Maintain Sufficient Beds Violates The Program Guides And This Court's Previous Orders**

As set forth in detail in Plaintiffs' opening brief, Defendants' decision to restrict admissions at ASH and to limit the *Coleman* class members' access to other DMH beds violates several Court orders, including the March 3, 2006, May 2, 2006, and October 20, 2006 Orders and the *Coleman* Program Guides. Defendants' opposition is silent about their violations of these Orders and no Defendant other than DMH even bothers to respond to Plaintiffs' motion. Each of the Defendants must comply with this Court's orders and remedy the ongoing Constitutional violations. There is no evidence that Defendants Tilton, Secretary of the CDCR, Genest, Director of the Department of Finance, or Schwarzenegger, the

Governor, have taken any responsibility to address this crisis and to remedy the denial of access to inpatient psychiatric beds so vital for the health and safety of the *Coleman* class.

It is apparent that this crisis is a product of a decision to save money and nothing else. That decision was apparently made by various members of the Schwarzenegger administration and follows the pattern of avoidance, denial and delay typical of Defendants' attempts to comply with Orders, implement the Program Guides and fill the necessary clinical positions required to deliver the basic and necessary level of mental health to the *Coleman* class.[2] This Court has ordered Defendants to do everything in their power to accelerate building projects, bed conversions, staffing and licensing in order to rapidly increase the number of inpatient beds available for use. Yet despite these orders and despite the acknowledged severe shortage of these beds, Defendants have actually *closed* critical inpatient beds at ASH, offering only 110 of the 256 contracted beds to the *Coleman* class.[3] This Court has specifically forbidden Defendants from taking such action: "defendants shall not close any intermediate inpatient bed…on the basis of state licensing requirements without approval of the special master." 5/2/06 Order at 6:9-11. The restricted access also explicitly violates the Program Guides,

---

[2] *See, e.g.*, 6/28/06 Order (Docket 1855) (ordering that Director of Mental Health, Stephen Mayberg, be joined as a Defendant); 6/21/06 Special Master's Report on the Status and Sufficiency of the Defendants' Budget Requests for Staffing to Implement the Revised Program Guide (Docket 1851-1) (identifying the Department of Finance's role in frustrating CDCR's attempt to procure adequate funding for staffing to implement the Program Guide); 7/17/06 Order (Docket 1899) (observing that Defendants "have failed to provide the Special Master with critical documents relevant to an assessment of the adequacy of their staffing augmentation requests" and ordering Defendants to provide to the Special Master all documents relevant to CDCR's request for staffing to implement the Revised Program Guide); 7/28/06 Supplemental Report of the Special Master (Docket 1921-1) (recounting the full story of the Department of Finance's refusal to fund the staffing positions requested by CDCR, and summarizing the confused and misleading budget proposal process that occurred); 7/28/06 Order (Docket 1922) (ordering that Director of Finance, Michael Genest, be joined as a Defendant); 8/1/06 Order (Docket 1929) (ordering Defendants to prepare and present to the special session of the Legislature a budget proposal for the allocation of no less than the 530.65 permanent and 21.2 limited term positions).

[3] Plaintiffs learned during the February 2007 tour of ASH that the current CDCR patient census at that time was 0 acute patients and 110 ICF patients. We have not received any updated data about the ASH population, which means that there may be even fewer than 110 CDCR patients as ASH now. Plaintiffs assume that Defendants will provide these and other essential statistics during the hearing on April 23, 2007.

which list ASH as an institution providing acute beds. *See Program Guide*, Ch. 6 at p. 1. For the last several months, ASH has severely restricted admissions of any new CDCR patients (we are unaware, in fact, of *any* CDCR patients accepted by ASH since January 2007), has not housed any acute class members and, in fact, has referred all acute patients to the overcrowded acute program at CMF-Vacaville. 3/23/07 Kahn Decl. ¶ 9. Defendants' "plan" to address this problem, by their own admission, will not open ASH to CDCR patients in need of these inpatient psychiatric beds for years, if ever. This Court must intervene.

## II. ASH Remains Dangerously Understaffed And The Risk Of Additional Pain, Suffering And Death By Suicide To *Coleman* Class Members Must Be Addressed

Conditions for CDCR patients (as well as the 1,000 "non-CDCR" patients) still housed at ASH remain dangerous. Defendants have failed to provide any evidence that the staffing ratio at ASH meets any standard of licensing or care or to counter Plaintiffs' assertion that the rash of suicides and suicide attempts at ASH in recent months is a direct consequence of the DMH staffing crisis. Defendants' unusual response to this powerful evidence of serious and ongoing harm to the *Coleman* class housed at ASH is to "move to strike" the argument and evidence from this motion. Plaintiffs have responded to the motion to strike and objection in a separate pleading filed herewith, which is also incorporated herein by reference. *See* Plaintiffs' Response to Defendants' Objection to and Motion to Strike Certain Assertions in Plaintiffs' Motion for Emergency Relief Regarding Defendants' Denial of Access to Inpatient Psychiatric Beds in DMH State Hospitals.

This Court must intervene to assure that Defendants take all necessary measures to bring staffing at ASH to safe and appropriate levels. There is no evidence in the record before this Court that Governor Schwarzenegger, Mr. Genest, Dr. Mayberg or Secretary Tilton are aware of the danger to the *Coleman* class or are responding to this emergency.

## III. In Addition To Their Violations Of The Program Guides And Court Orders, Defendants Have Not Complied With This Court's February 7, 2007 Order Regarding Pay Disparity For DMH Clinicians

This Court's February 7, 2007 Order mandated that Defendants "assess and develop a plan to meet the issues created by the disparity in pay for DMH clinicians providing mental

health services to CDCR inmates in CDCR institutions and those providing services to CDCR inmates in all other DMH institutions." 2/7/07 Order at p. 2 (Docket 2134). The Order also required that Defendants' assessment of pay disparity issues include "the experience of DMH in filling its relevant vacancies over the last three (3) years." *Id.*

### A. Defendants Did Not Assess The Issues Created By Pay Disparity And Did Not Set Forth DMH's Experience Filling Relevant Vacancies Over the Last Three Years

On April 2, 2007, Defendants filed their "Response To Court Order Regarding A Plan To Address Pay Parity For DMH Clinicians" (Docket 2181). That response, which was less than one page long, stated in a summary fashion that Defendants' two funding requests to the Department of Finance address the pay parity issue and that no other action is necessary. Defendants attached two cover letters about the funding requests to their April 2nd filing. The cover letters pertained to a funding request for the "Coleman-Related Salary Increases For Filled Mental Health Classifications (Issue 120)," and a request for $1.0 million to support "increases associated with recruitment for psychiatric and medical services within state institutions," and were attached as Exhibits A and B to Defendants' filing.[4]

Neither the filing itself nor the attachments to the filing includes an assessment of the issues created by the pay disparity between CDCR and DMH mental health staff or DMH's experience over the past three years (or at any time) filling those positions. Defendants offer no explanation or excuse for the missing information and they—rather than be excused—must be held to task. Lives are at stake. The Court's Order was a reasonable request that gave

---

[4] Perhaps even more important than Defendants' April 2, 2007 filing was what was missing from that filing. The original cover letters to the Department of Finance referred to "attachments" that Defendants did not file with this Court. At Plaintiffs' request, Defendants eventually sent copies of those attachments to Plaintiffs' counsel and the Special Master. Reply Kahn Decl. ¶¶ 2-3. The missing documents were the "Budget Change Proposal" ("BCP") to the funding request regarding Coleman-Related Salary Increases and a Department of Personnel Administration ("DPA") Finance Letter regarding the recruitment request. These documents provide essential information about the requests, including much more detail about the background and history of the requests, justifications for them, and alternatives that were considered. The BCP regarding "*Coleman*-Related Salary Increases" and the DPA letter regarding "Recruitment for Health & Mental Health Professionals" are attached to the Reply Kahn Decl. as Exhibits A and B respectively.

Defendants two months to carefully address a serious issue. Defendants chose instead to sit idly by, as they have been doing for months now. Nevertheless, they ask that the "Court find that no further response is necessary to the Court order of February 7, 2007." Docket 2181 at p. 2. The Court should obviously reject this request and make appropriate orders regarding the staffing and salary crisis.[5]

### B. Defendants Do Not Have A "Plan" To Address Pay Disparity Issues As Ordered By This Court And Do Not Have Any Way To Fill Vacant Mental Health Staffing Positions

Since Plaintiffs filed this motion for emergency relief, Defendants submitted two documents to this Court about the DMH staffing crisis, including the April 2nd response (described above) and Defendants' April 9, 2007 opposition to this emergency motion. In their opposition to this motion, Defendants asserted that the two funding requests attached to their April 2nd filing "mooted" any pay parity problems between CDCR and DMH mental health staff members and that no additional action was needed. Docket 2182 at p. 4:17-21.

Although Defendants have admitted, before legislative committees, in public testimony and in filings with this Court, that there are dire and emergency staffing shortages in DMH hospitals, their funding request regarding DMH salaries covers only *filled* positions. Thus, even if those requests go forward, they apply only to *existing* staff members; *DMH is still unable to advertise and recruit employees for its vacant positions at the higher salary levels.*[6] The request is thus a token attempt to persuade remaining staff to stay and achieves nothing in

---

[5] Defendants offered to provide additional information to this Court within one week if the Court found the salary plan inadequate. *See* Docket 2182 at p. 4, fn. 1. Accordingly, the Court should order Defendants to comply with the February 7th Order within 5 court days.

[6] There is a deafening silence in Defendants' Opposition regarding this point and any other evidence about salary levels. While Defendants were tasked with establishing a plan to address the salary disparity, they never explain in their brief that the one funding request about salary parity does not even apply to the droves of empty positions at DMH. The accompanying Radavsky declaration is also completely silent about salary issues. In DMH's Budget Change Proposal seeking raises for filled positions, however, which was signed by Ms. Radavsky, Defendants admit the extent of this crisis: "Absent some form of salary parity system-wide, DMH staff will continue to transfer from state hospitals to CDCR facilities for the substantive salary increase and other practitioners/clinicians will leave out of concern for their license and liability as their caseloads increase." Reply Kahn Decl., Ex. A at p. 3.

1   the way of recruitment, which is the crux of the staffing crisis.[7]  According to recent staffing

2   statistics provided by Defendants for March 2007, the vacancy rates at DMH remain dire and

3   in some instances, have become even worse.  *See* Reply Kahn Decl. ¶¶ 4-5 and Ex. C

4   (showing, for example, only 8 of 42.9 Senior Psychiatrist (Supervisor) positions filled; 2 of 23

5   Senior Psychiatrist (Specialist) positions filled; 166 of 296.8 Staff Psychiatrist (Safety)

6   positions filled; and 10 of 53.3 Senior Psychologist Correctional Facility (Supervisor) positions

7   filled).

8   It is telling, moreover, that Defendants have been unable to convince any public official

9   to state under oath that these two facially inadequate funding requests are likely to address the

10  staffing crisis caused by the December 2006 CDCR pay increases.  No declarant has set forth

11  the "plan" or explained the decision to apply the inadequate pay increases only to filled

12  positions, rather than also to the vacant positions.  The only declaration submitted in support of

13  Defendants' Opposition, that of Cindy Radavsky, DMH's Deputy Director of Long-term Care

14  Services, fails to address the "plan" or the DMH salary increases at all.  This is so even though

15  Ms. Radavsky was the very DMH official who signed the BCP regarding Coleman-Related

16  salary increases.  Reply Kahn Decl., Ex. A.

17  Moreover, even with respect to remaining staff members, the funding request does not

18  achieve pay parity and is therefore unlikely to persuade even existing staff members to remain

19  at DMH.[8]  Defendants have once again failed to provide any evidence in support of the

20  proposition that a DMH pay increase below the level of CDCR salaries will be sufficient to

---

[7] This Court denied Plaintiffs' motion for an order shortening the briefing schedule for the present motion specifically because it was awaiting Defendants' salary plan. *See* 3/29/07 Order at p. 2:9-11 ("The issues to be addressed in the [salary disparity] plan appear to be highly relevant to the issues raised in plaintiffs' motion.  For that reason, the court will not advance the schedule for hearing on plaintiffs' motion.").  By devising no plan at all in response to this Court's Order, Defendants have recklessly wasted two precious months that could have been used to address this crisis.

[8] Even if the funding request is granted, funds will not be available until July, with even more delay likely before the increases actually take effect.  Reply Kahn Decl., Ex. A at p. 5 (under the "Timetable" heading).

retain existing clinical staff.  To the contrary, DMH officials recently testified that, in their opinion, CDCR currently offers not only higher pay but also better working conditions for clinical staff.  Reply Kahn Decl. ¶ 9 and Ex. F.  If that is the case, why offer less than 100% pay parity to DMH clinicians?

## IV. Defendants' Opposition To This Motion Further Demonstrates The Need For Emergency Action By This Court

Defendants previously explained that CDCR patients are already near the bottom of the list of patients it will admit to DMH hospitals.[9]  Defendants make several admissions in their Opposition that further highlight why the staffing crisis at DMH warrants emergency relief by this Court:  First, Defendants admit that they have no current ability to open beds to the *Coleman* class, including the 256 contracted beds at ASH.  They admit, for instance, that even after transferring 150 sexually violent predator patients from ASH to Coalinga, the "vacated beds at ASH will not be open for use by any patients."  Docket 2182 at p. 6:3.  Defendants also admit that they "cannot end the restricted admission policy [at ASH] until sufficient staff are available to provide the very care Plaintiffs' class requires."  Docket 2182 at p. 6:20-21.  Defendants explain:

> The severity of this staffing crisis is illuminated by DMH's inability to use beds vacated by sexually violent predators, and DMH's need to close those vacated beds to get closer to meeting staffing ratios.

*Id.* at p. 6:22-24.

These admissions make clear that Defendants have no intention of providing the 256 contracted beds for the *Coleman* class at ASH and, in fact, are requesting permission from this Court to take an unlimited amount of time to reach adequate staffing levels before providing

---

[9] When DMH began restricting admissions to ASH in January of 2007, it explained to the Special Master that DMH was using the following prioritization of referrals: (1) Mentally Disordered Offenders and Sexually Disordered Offenders who reached their parole date; (2) Not Guilty By Reason of Insanity referrals; (3) CDCR referrals, and; (4) Incompetent to Stand Trial referrals.  3/23/07 Kahn Decl. at ¶ 5 and Ex. B.  As set forth in the conclusion and the accompanying proposed order, Plaintiffs request an Order mandating that CDCR patients in need of inpatient psychiatric hospitalization have equal admission priority to any other population served by DMH.

those beds. Docket 2182 at p. 6:24-25. Defendants therefore admit that rather than comply with this Court's orders to increase access to inpatient psychiatric beds (and contrary to their assertion in the December Bed Plan that they would not take any DMH beds offline until sufficient replacement beds were available within the prisons), they are deliberately *decreasing* the availability of inpatient psychiatric beds to the *Coleman* class.

Defendants use the result of their own poor planning (vacancy levels at DMH hospitals) as the key argument as to why they should not be ordered to provide more beds to the *Coleman* class. This makes no sense. Defendants must solve the staffing crisis *in order to provide adequate beds.* Plaintiffs agree that the staffing levels are not adequate and agree that Defendants should comply with appropriate staffing ratios, including those required by the CRIPA consent decree. What Defendants (who include the Governor, DMH, the CDCR and the Department of Finance) do not understand, however, is that each one of those entities is obligated to do everything in its power to keep units open and to provide desperately needed beds to the *Coleman* class. That is why they were ordered by this Court to devise a plan to address pay disparity issues and that is also why the Court has repeatedly ordered in the past that Defendants do everything in their power to expedite bed access, not deplete it. Without an emergency Order from this Court now, additional DMH units will close, programming will be reduced even further and inpatient psychiatric beds will continue to be denied to the most acutely ill members of the *Coleman* class.[10]

---

[10] During a hearing on March 12, 2007, the California Senate and Fiscal Review Subcommittee included on its agenda as Item 4 "Coleman v. Schwarzenegger, Salary Adjustments, Vacaville and Salinas." Senator Cogdill asked during that hearing why the *Coleman* court did not raise salary levels in all DMH hospitals, not just the programs at SVSP and CMF-Vacaville. Ms. Radavsky responded, "…Essentially, no, sir, I have no idea why the state hospitals were not addressed." Senator Cogdill went on, "As far as you know, [the special master] had the authority to do it or whoever. They just chose not to?" Ms. Radavsky responded, "That's my understanding. Yes, sir." Reply Kahn Decl., Ex. F at p. 43:14-23. Earlier in the testimony, Ms. Radavsky represented to the committee members that DMH was in the process of addressing pay disparity issues in *Coleman*: "Well, we're in discussion on [salary adjustments] right now cause [sic] we have a plan due to the *Coleman* Court on April 6th, and that includes looking at the analysis for the salary adjustments." *Id.* at p. 9:17-25.

(continued . . .)

## V. Defendants' Failure To Open Beds At Coalinga State Hospital Has Directly Harmed The *Coleman* Class

Despite Defendants' acknowledgement that there are 50 *Coleman* class members housed at Coalinga state hospital pursuant to a *Coleman* Court Order, Defendants argue in their opposition that Coalinga beds are "outside this Court's jurisdiction." Docket 2182 at p. 6:8. They cite Welfare & Institutions Code section 6600.05 to support this contention, and also assert that "the activation of Coalinga State Hospital will not impact the availability of beds for CDCR inmate-patients referred for inpatient services at ASH." *Id.* at p. 6:5-7 and citing to the Declaration of Cindy Radavsky at ¶ 17. Common sense, however, and Ms. Radavsky herself, contradict this position.

Before the Senate and Fiscal Review Subcommittee on March 12, 2007, Ms. Radavsky was questioned by Senator Cogdill about this very subject, namely how the opening of beds at Coalinga might affect patient populations at other DMH hospitals. Ms. Radavsky responded:

> Well, what we would end up doing is moving the two hundred and fifty additional sexually violent predators that are at Atascadero right now over to Coalinga, *which would help reduce the overbedding at the other hospitals* because we're significantly overbedding at Patton, and we've had to reduce that at Atascadero. *We would bring the hundred in off of a waiting list for Atascadero*, and we would bring in the thirteen seventies…

Reply Kahn Decl., Ex. F at pp. 47:25-48:7 (emphasis added). Ms. Radavsky admitted during that testimony the obvious, namely that by activating the 1,000 empty beds at Coalinga, Defendants could use either CSH or vacated beds elsewhere in the system for *Coleman* class members. This concept is also supported by the realities of an overburdened and deficient system—since Defendants closed ASH beds (utilizing only 110 of the 256 contracted beds),

---

Ms. Radavsky's testimony at that hearing is, to say the least, disingenuous. Ms. Radavsky was personally present at numerous policy meetings and during phone calls with Plaintiffs' counsel and the Special Master, during which Defendants took the position (which Plaintiffs contest) that this Court lacks jurisdiction to raise salary levels throughout DMH. Indeed, Defendants made this exact argument in their January 17, 2007 filing with this Court. *See* Docket 2115-1 at pp. 4-5. Moreover, Defendants have represented to the Legislature that they are dealing with pay disparity issues through *Coleman* and, through the present filing, represent to this Court that pay disparity will be addressed through the Legislature. The reality is that Defendants are not adequately addressing this crisis in either venue.

1  they have been forced to use mental health beds within the CDCR system to house patients that
2  could otherwise go to ASH or CSH.  As Plaintiffs discussed in their opening brief, it is
3  essential that every contracted DMH bed be available for use by CDCR patients.  *See* Plfs.'
4  Motion for Emergency Relief (Docket 2166) at p. 12:9-18; 3/23/07 Kahn Decl. ¶ 33.  When
5  DMH beds are unavailable to CDCR patients, those patients remain in inappropriate
6  placements such as MHCBs, EOP, OHU, or administrative segregation beds while they await
7  inpatient beds.  *Id.*[11]  Alternatively, CDCR patients turned away from DMH hospitals—most of
8  whom are at low custody levels—will be placed in the scarce high-custody ICF beds at SVSP
9  and CMF, beds that must remain available to high-custody patients.  Reply Kahn Decl. ¶ 25.
10 Defendants' own statistics establish this trend of inappropriate placements.  *See id*. ¶¶ 22-25
11 (discussing EOP, EOP Ad Seg, and PSU programs that the Special Master determined do not
12 meet minimal Program Guide standards, yet where level IV inmates accepted to DMH
13 programs languish); 3/23/07 Kahn Decl. ¶ 33 (discussing the problematic transfer of low-
14 custody CDCR patients to the Level IV facility at SVPP rather than to ASH).

15      Moreover, Defendants argue that "Coalinga State Hospital was funded, designed, and
16 constructed to treat sexually violent predators" and then cite to Welfare & Institutions Code
17 section 6600.05 to support this contention.  Docket 2182 at pp. 4:25-5:1.  In fact, nothing in
18 that section precludes the placement of *Coleman* class members at CSH.  *See* Reply Kahn
19 Decl., Ex. M (full text of § 6600.05).  There is nothing legally barring Defendants from placing

---

[11] In their opening brief, Plaintiffs described the inappropriate housing of eight actual patients who should be receiving inpatient care at ASH, yet remain in inappropriate beds at CIM due to ASH's closure.  3/23/07 Kahn Decl. ¶ 7.  Defendants make bold assertions in their Opposition that "there has been no denial of access to [DMH] services" and that "[t]here has been no 'closure' of ASH to CDCR patients."  Docket 2182 at pp. 2:1 and 6:16-18.  Defendants do not come forward with one piece of evidence to support these claims.  They do not explain how they are providing appropriate care to the eight patients, what the current waiting lists are for acute and ICF beds, or even how they are ensuring adequate care to patients lingering in EOP, OHU, MHCB or other beds.  And, despite their unsupported claims that CDCR patients are not barred from ASH, they offer no evidence that even one CDCR patient has been admitted to ASH since it began restricting patients in January.  Plaintiffs assume that Defendants will come forward with this evidence at the hearing, including statistics about CDCR admissions to ASH, CSH, Napa, Patton and Metropolitan State Hospitals since January 2007.

1  additional class members at CSH; rather, Defendants have made a reckless decision not to
2  open more CSH beds to the *Coleman* class.

3  Similarly, the fact that Defendants have not included Coalinga beds in their *Coleman*
4  bed plans does not support Defendants' argument that CSH beds are closed to the *Coleman*
5  class. Docket 2182 at pp. 5:19-6:1. Again, the failure to open CSH beds to the *Coleman* class
6  is a *choice* that should be rejected by this Court. Defendants unilaterally closed ASH beds to
7  the *Coleman* class in violation of this Court's orders, now refuse to fulfill their contractual
8  obligation to provide 256 ASH beds to the class and also refuse to open additional CSH beds to
9  the *Coleman* class. This conduct is outrageous in light of the severe bed shortages throughout
10 the CDCR mental health system. There are 1,000 beds that remain empty at Coalinga—
11 Defendants' failure to activate those beds as expeditiously as possible (particularly in light of
12 the current inpatient bed shortages) amounts to deliberate indifference to the needs of the
13 *Coleman* class. Defendants opened 50 beds to the *Coleman* class pursuant to this Court's
14 5/2/06 Order and Plaintiffs urge this Court for an Order mandating the provision of additional
15 beds at CSH for the *Coleman* class.

16 Finally, Defendants' implication that every Coalinga bed is needed for sexually violent
17 predators ("SVPs") is exaggerated and misleading. Defendants represent to the Court that
18 there have been "3,600 referrals for possible admission to Coalinga Hospital" since November
19 2006. Docket 2182 at p. 5:2-3. Defendants' perceived inundation of SVPs, however, falls
20 apart upon closer inspection. The Legislative Analyst's Office ("LAO") has studied this very
21 subject. The LAO explained recently to the legislature that fewer than 8 percent of people
22 referred to DMH from CDCR for SVP evaluations will require actual placement in DMH
23 beds. Reply Kahn Decl., Ex. H at p. 5. The LAO also noted that the administration's estimate
24 that it would place 271 new SVPs in 2006-2007 was a "worst-case scenario," and predicted
25 that the numbers were "likely to be substantially lower." *Id.* If fewer than 271 SVPs will
26 require a DMH bed in the fiscal year, what justification do Defendants have to deny Coalinga
27 beds to *Coleman* class members who are in desperate need of care *right now*, particularly since
28

those patients can eventually transfer into new DMH units currently under construction at CMF and SVSP?

Defendants knew the staffing crisis at DMH was coming for years, knew that it would become worse when the *Coleman* and *Plata* salary orders were issued and knew that if they did not deal with the pay parity problem, staff would leave in droves. Reply Kahn Decl. ¶ 11 and Ex. G (detailing the LAO's budget analysis for DMH in the Fiscal Year 2006-2007 and documenting Defendants' knowledge, back in February 2006, of severe staffing shortages caused by salary disparity). Rather than take responsibility for their inactions and inability (or refusal) to control this problem, they are now using the crisis as an excuse to close desperately needed *Coleman* beds.

### VI. This Court Should Order Defendants To Take All Necessary Steps To Open The D-5 Unit At SVSP By June Of 2007 And To Ensure That All Patients Housed In D-5 And D-6 Have Immediate Access To 20 Hours Of Programming In Addition To Yard Time On The Grassy Yard

The D-5 and D-6 units (two 56-bed ICF units) operated by DMH at Salinas Valley State Prison are intended to fill the critical shortage of Level IV intermediate care beds until permanent and appropriate ICF units can be built at SVSP and CMF. As set forth in detail in Plaintiffs' opening brief, Defendants' plan to open the D-5 unit has been an ever-moving target. Initially, the D-5 unit was supposed to be open by December 2006. Defendants changed this deadline during the December 2006 tour at SVSP, informing the Special Master and Plaintiffs' counsel that D-5 would open in stages, the first pod opening by February/March, the second by April/May and the third by June/July 2007. 3/23/07 Kahn Decl. ¶ 29.

Defendants' opposition to this motion highlights again the problems at SVSP and Defendants' failure to address them. Defendants have repeatedly stated during policy meetings, during DMH tours, and during conference calls with the Special Master and Plaintiffs' counsel that there are staffing problems in the D-5 and D-6 units and that those problems are interfering with the opening of the D-5 unit and the provision of adequate programming and yard time to both D-5 and D-6 patients. *See* 3/23/07 Kahn Decl. ¶ 35. The

-13-

opposition changes the activation schedule for D-5 yet another time (with activation now by July 30, 2007 rather than June 30, 2007), yet also admits that the once-more delayed schedule still depends "upon the availability of staff." Radavsky Decl. ¶ 25. In other words, Defendants will activate the pods on the stated schedule *if staff are available*, yet they do not explain how the staffing problems with the yard were solved (if they were), whether adequate staff have been hired for the D-5 unit in the first place (or at least an update on that hiring), and even whether patients are receiving 20 hours of therapeutic programming in addition to time on the grassy (not concrete) yard. Indeed, Ms. Radavsky testified before the California Senate and Fiscal Review Subcommittee on March 12, 2007 that DMH had been unable to fill staffing positions in the DMH-run units at SVSP and CMF-Vacaville:

> …[T]he only vacancies that we have at Salinas Valley and at Vacaville are because of the program expansion. *We have been unable to successfully recruit into those significant areas.*

Reply Kahn Decl., Ex. F at p. 43:5-10 (emphasis added).

Far from being moot, therefore, these issues require answers about the activation of these badly needed beds (including staffing problems) and the Court should order Defendants to activate them as soon as possible, with full programming and yard access.[12] Construction on the D-5 unit was completed nearly five months ago—why are these badly needed beds still sitting nearly empty?

### VII. This Court Should Order Defendants To Take All Necessary Steps To Ensure That Patton, Napa And Metropolitan State Hospitals Remain Open To The *Coleman* Class

Again, Defendants completely ignore in their opposition the problems at Patton, Napa and Metropolitan State Hospitals. Defendants do not contest that DMH has been forced to slow admissions to Napa State Hospital due to staffing shortages and do not have a plan in place to fill vacant positions throughout DMH. In fact, Defendants admit that the staffing

---

[12] As stated in the accompanying Reply Kahn Declaration ¶¶ 22-25, empty beds in any DMH unit mean that CDCR patients who need inpatient levels of care are languishing in outpatient EOP, EOP Ad Seg and PSU beds. At this time, Defendants have not been able to meet minimal Program Guide standards in most of these outpatient units. *Id.*

1  crisis has affected all DMH hospitals: "Currently, all DMH hospitals are on controlled
2  admissions and two have substantially restricted admissions due to statutory caps on
3  population." Reply Kahn Decl., Ex. A at p. 2.
4      CDCR patients are housed at Napa, Patton and Metropolitan State Hospitals. Special
5  Master's R&R on Defs' December 2006 Bed Plan (Docket 2133) at p. 6. In addition, DMH
6  manages its population by transferring patients between DMH hospitals. Thus, reduced
7  capacity at any DMH hospital will have an adverse effect on *Coleman* class members. It is
8  imperative that this Court curb any pending closures or slowed admissions at these hospitals as
9  well.

## CONCLUSION

11      For all of the above reasons, Plaintiffs respectfully request that the Court issue the
12  following emergency orders:
13      1.    Defendants Schwarzenegger, Tilton, Mayberg and Genest are ordered to produce
14  a Plan in full compliance with this Court's February 7, 2007 Order within 5 court days of the
15  issuance of this Order. Defendants shall declare under oath what steps they will take to
16  address the staffing shortages caused by the CDCR pay increases, why they believe those steps
17  will be sufficient to restore safe staffing levels to all DMH facilities, and shall include a
18  detailed timeline for implementation of that plan such that all steps are fully implemented on or
19  before November 1, 2007. The failure to comply with this Order will result in the issuance of
20  an order to show cause why these Defendants should not be held in contempt of Court.
21      2.    Defendants shall take all necessary steps, including but not limited to appropriate
22  salary increases in full parity with CDCR, to retain and hire adequate clinical and custody
23  staffing levels to safely open every one of the 256 contracted ASH beds to *Coleman* class
24  members within 30 days of the date of this Order. ASH shall not limit or restrict admissions to
25  those 256 CDCR beds without leave of Court.
26      3.    Defendants shall take all necessary steps, including but not limited to salary
27  increases in full parity with CDCR, to retain and hire adequate clinical and custody staff at all

other DMH hospitals that house CDCR patients. DMH shall not limit access or restrict admissions to CDCR beds without leave of Court.

4. Defendants shall take all necessary steps, including salary increases in full parity with CDCR, to accelerate the opening of all beds at Coalinga State Hospital for patient admission in order to reach full licensed capacity by July 1, 2009. Defendants shall also make 100 additional beds at Coalinga State Hospital immediately available to the *Coleman* class.

5. Defendants are ordered to change the prioritization of admissions to DMH so that CDCR patients in need of inpatient psychiatric hospitalization have equal admission priority to any other population served by DMH.

6. Defendants shall take all necessary steps to fully open the D-5 unit at SVSP by June 30, 2007. Defendants shall also ensure that all patients housed in D-5 and D-6 have access to a minimum of 20 hours a week of clinical treatment and programming in addition to appropriate yard time on the grassy yard within 10 days. The SVSP Warden shall supply sufficient custody officers to the control rooms of D-5 and D-6, for escorts and for yard supervision, to assure compliance with this order and shall assure that any CDCR obstacles to compliance with this provision are removed. Within 15 court days of the date of this Order, Defendants shall file a declaration with the Court explaining the staffing levels on the D-5 and D-6 units and confirming that 20 hours a week of clinical programming in addition to yard time on the grassy yard has been provided to all patients housed in these units.

Dated: April 16, 2007                               Respectfully submitted,


/s/ Michael W. Bien
Michael W. Bien,
Rosen, Bien & Galvan, LLP
Attorneys for Plaintiffs