# EXHIBIT F

1  BEFORE THE SENATE AND FISCAL REVIEW SUBCOMMITTEE NO. 3

2                    SENATE BUDGET HEARING

3

4

5

6                            CERTIFIED COPY

7

8

9

10              PUBLIC HEARING TRANSCRIPT

11              SACRAMENTO, CALIFORNIA

12              MONDAY, MARCH 12, 2007

13

14                CORRECTED TRANSCRIPT

                   APRIL 13, 2007

15

16

17

18

19

20

21

22

    ATKINSON-BAKER, INC.

23  COURT REPORTERS

    (800) 288-3376

24  www.depo.com

25  FILE NO.:  A102E4E

```
 1   A P P E A R A N C E S :
 2   COMMITTEE MEMBERS:
 3   SENATOR ELAINE K. ALQUIST, CHAIR
     SENATOR ALEX PADILLA
 4   SENATOR DAVE COGDILL
 5   DEPARTMENT OF MENTAL HEALTH:
     DR. STEPHEN MAYBERG
 6   MS. ELAINE BUSH
     MR. MIKE BORUNDA
 7
     LEGISLATIVE ANALYST OFFICE:(LAO)
 8   SHAWN MARTIN
 9   OFFICE OF STATE AUDITS AND EVALUATIONS (OSAE)
     DEPARTMENT OF FINANCE:
10
     ZACH STACY
11   JIM ALICE
     JAN ROSMAN
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2          MONDAY, MARCH 12, 2007

3                    -o0o-

4

5      SENATOR ALQUIST:  Good morning.  Even though the clock

6  says three minutes after nine, we know that it's three

7  minutes after ten with the time change.  We have many

8  critical issues today regarding public mental health

9  programs, and these are very, very important -- very grave

10 issues, and we will give them the attention that they

11 deserve.

12      First, the state hospitals are having

13 significant difficulty in hiring staff, particularly

14 clinical personnel, which may lead to problems in meeting

15 our federal CRIPA requirements as follows providing

16 appropriate treatment for patients.  We want to hear from

17 the administration on how they plan to address the many

18 issues at hand.

19      Second, the Department has mismanaged their

20 administration of the Early Periodic Screening Diagnosis and

21 Treatment Program, known as EPSDT.  This is a key community-

22 based mental health treatment program that serves children

23 and their families.  We want to hear from -- we want to hear

24 from the Office of State Audits and Evaluation on their just

25 released report on the mismanagement by the Department with

1   this program, and we want to hear from the Department on how

2   they will address these issues in a timely manner.

3       So let's begin today's agenda and start with the

4   For Vote Only, which are items one through three from page

5   four through six.  That would include the Healthy Families

6   Program Adjustments for Mental Health Services, No. 1; No.

7   2, Adjustment for the Early Mental Health Initiative, and

8   No. 3, Convert Limited-Term Positions to Permanent for

9   Medicare Part D.  These are For Vote Only.

10      SENATOR PADILLA:  And --

11      SENATOR ALQUIST:  And --

12      SENATOR PADILLA:  And I -- I'm fine with Items 2 and

13  3.  On Item No. 1, I just have two very, very quick

14  questions --

15      SENATOR ALQUIST:  Sure.

16      SENATOR PADILLA:  -- if I can on Item No. 1.  One is

17  that, you know, apologies for being the new guy around here,

18  but it seemed that a thumbnail percentage for administration

19  or overhead was ten percent.  Is that what's typical here?

20  I guess if you need more of a --

21      SENATOR ALQUIST:  Who -- who is responsible for this

22  area -- issue area?  The -- the director.  If you could sit

23  down and say your name and speak into the microphone,

24  please.

25      MR. BORUNDA:  Hi, my name is Mike Borunda.  I'm acting

1    deputy with Systems of Care at the Department of Mental

2    Health.  Regarding the ten percent, that's what we give to

3    counties for administration of the program

4        SENATOR PADILLA:  Okay.  So that just a -- a standard

5    policy.  And then the other question is the Healthy Families

6    Program Health Plan is required to assign an annual user fee

7    for each applicable county.  Are they all in place?

8        MR. BORUNDA:  Yes.

9        SENATOR PADILLA:  Okay.  Thank you.  I'm fine with the

10   move.

11       SENATOR ALQUIST:  Okay.  So it's -- it's 2-0 on all

12   three items, and we will hold the roll open for Senator

13   Cogdill should he like to add on.  With that, we will begin

14   issues for discussion.  It starts on page ten.  I'd like to

15   welcome Steve Mayberg, Director, and Cynthia -- is it

16   Radavsky?

17       MS. RADAVSKY:  Radavsky.

18       SENATOR ALQUIST:  Deputy over state hospitals.

19       DR. MAYBERG:  And could I introduce my -- the new

20   chief deputy of the department, Elaine Bush, who started an

21   hour ago.

22       SENATOR ALQUIST:  Well, welcome.

23       MS. RADAVSKY:  Thank you.  Good morning.  Let me take

24   this opportunity to address the questions that the Subcommittee

25   has laid out in the agenda.

```
 1        SENATOR ALQUIST:  Sure.  Right before you -- you do
 2   that, if I could just say I'm very concerned about the staff
 3   and level of vacancies at the state hospitals, the
 4   administration, and you know when I use the term
 5   administration, I'm looking at you.  It's not somebody else
 6   someplace.  It's the person and the people who are most
 7   responsible.  The administration really needs to find a
 8   better way, so yes, if you could.  Thank you.
 9        MS. RADAVSKY:  Actually, I think the staff laid out a
10   lot of our issues very concisely within the agenda.  So what
11   I'd like to do is just walk through the questions.  On the
12   first one, you've asked for an update on the implementation
13   of the United States Department of Justice Consent Judgment,
14   and for about the last three years, we have worked very
15   aggressively in organizational change and implementing the
16   enhancement plan which is the consent judgment.  We've
17   modified treatment techniques and modalities.  We're
18   reviewing our research and our data so that we're using
19   evidence-based practices.  We have worked on efforts and
20   achievements and by choice positive behavior support,
21   wellness and recovery planning as well as implantation of
22   what we call a treatment mall, which is where the actual
23   treatment occurs.
24   So, you know, we're now working on our
25   monitoring efforts as we're moving down the road on the
```

1    implementation.  The legislature in the governor's budget

2    last year gave us four hundred additional positions to

3    address these efforts, and essentially, some of those were

4    new.  We had not used those in the Department before, and

5    we've had some difficulty filling those vacancies.

6    I think it's important to note that our -- and

7    I'll kind of lead into the second question.  Our court

8    monitor has identified the fact that we have developed a

9    state-of-the-art program.  We do not have the resources to

10   implement it, and he has told us that after each visit.  A

11   court monitor comes to the state hospitals, each state

12   hospital every six months, a different hospital every six

13   weeks.  So we see him frequently, and he is monitoring our

14   progress.

15   So the other question you asked is in addition

16   to the clinical and medical classifications are there what

17   we call non-level of care classifications that we're

18   concerned about, and I think the most specific one is our

19   hospital police officers.  We are starting to see an exodus

20   in those staff, particularly at Atascadero.  What we hear

21   from them is it's cost of living, and there has been some

22   changes in the way the background checks are handled by

23   other departments, and that's expediting the exodus.

24       SENATOR ALQUIST:  A couple of questions.  One is how

25   will the vacancies affect common requirements, and when you

1    speak to you're starting to see an exodus, could you be

2    please more analytic in giving us numbers and percentages.

3        MS. RADAVSKY:  Okay.  The common requirements --

4    essentially, we are required to provide services to three

5    hundred and fifty-six CDCR patients within the state

6    hospitals.  How that's impacting is the fact that right now

7    because of the vacancies, we cannot accept those patients.

8    We've notified the Coleman Court Master that we now have a

9    triage, a system for bringing folks in, and our priority on

10   the triage is the patients that literally would go from the

11   streets and impact public safety.

12       SENATOR ALQUIST:  So what happens if you -- where do

13   they go?  I mean what has --

14       MS. RADAVSKY:  They stay in corrections and the mental

15   health system there until we can bring them in.

16       SENATOR ALQUIST:  And when does that occur?

17       MS. RADAVSKY:  Right now we have over --

18       SENATOR ALQUIST:  If and when.

19       MS. RADAVSKY:  If and when.  Right now we have a

20   hundred people on the waiting list.  What I've ended up

21   doing is moving some of those folks into the two psychiatric

22   programs that we operate.  I've not been able to bring them

23   into the state hospital.  We're licensed for twelve hundred

24   and thirty-nine beds in Atascadero.  That means that's the

25   max under licensing that I can go -- I have enough staff

1    right now to operate approximately eight hundred beds, but

2    we're running eleven hundred beds.

3        SENATOR ALQUIST:  So you are short staff?

4        MS. RADAVSKY:  We are very short staff.

5        SENATOR PADILLA:  And what are you doing about it?

6        MS. RADAVSKY:  We're continuing to do overtime.

7    Overtime is up over twenty percent.

8        SENATOR ALQUIST:  Uh-huh.

9        MS. RADAVSKY:  We're facilitating some emergency

10    contracts, and essentially what Atascadero has informed me

11    is they've hired their first psychiatrist.  We have several

12    others that we're credentialing right now.  There's

13    approximately twenty-eight that they're interested in some

14    emergency contracts.  We're continuing with some unit

15    closures and consolidation because we have to maintain

16    compliance with licensing regulations.

17        SENATOR ALQUIST:  Are you doing salary adjustments for

18    clinical staff and other key positions or --

19        MS. RADAVSKY:  We're in discussion.

20        SENATOR ALQUIST:  I guess what I'm asking is what is

21    your plan?

22        MS. RADAVSKY:  Well, we're in discussion on that right

23    now cause we have a plan due to the Coleman Court on April

24    6th, and that includes looking at the analysis for the

25    salary adjustments.

```
 1   As far as specifics on vacancy rates, let me
 2   just briefly -- systemically, we are running forty to sixty
 3   or seventy percent vacancy in the majority of our clinical
 4   classes -- rehabilitation therapists, social workers,
 5   psychologists, psychiatrists.  In fact, psychiatrists
 6   specifically at Atascadero were in the high seventy percent
 7   vacancy at fifteen point five psychiatrists for eleven
 8   hundred patients.
 9   As far as the HPOs, we've lost about four.  We
10   have fifteen that have indicated they have applications in,
11   are in the hiring process right now.
12       SENATOR ALQUIST:  Do we have a breakout of the
13   positions and which ones are --
14       MS. RADAVSKY:  It's in the handout.  Yes, ma'am.
15       SENATOR ALQUIST:  The one thing I didn't read over the
16   seven hours that I read all of this material over the
17   weekend.  And so what is the highest, is the clinical
18   psychologist or psychiatrist?
19       SENATOR PADILLA:  The psychiatrist right now is the
20   highest.
21       SENATOR ALQUIST:  Close -- closer to seventy percent?
22       MS. RADAVSKY:  Yes ma'am.  At Atascadero,
23   systemically, I think it's about fifty to sixty percent.
24       SENATOR ALQUIST:  And how long can you do the
25   emergency contracts?
```

1    MS. RADAVSKY:  One year.  We can do an emergency

2    contract for one year, and in the process, we have to start

3    bidding or put it out for bid in order to do a contract.

4    SENATOR ALQUIST:  So what's going to happen in one

5    year?

6    MS. RADAVSKY:  Well, I'm hoping we have staff and we

7    won't need emergency contracts.

8    SENATOR ALQUIST:  Your plan is going to address these

9    issues?

10   MS. RADAVSKY:  Yes, ma'am.

11   SENATOR ALQUIST:  And what is the cost of the

12   contracts?

13   MS. RADAVSKY:  The contracts vary, but our salary

14   estimates have indicated they're at least double and

15   sometimes triple what the civil service salaries are.

16   SENATOR ALQUIST:  And is that because they know they

17   have you?

18   MS. RADAVSKY:  Partially.

19   SENATOR ALQUIST:  Okay.  These are a lot of issues.

20   And I know you're working hard.  I do understand that, but

21   certainly when anybody -- you cannot negotiate if somebody

22   knows --

23   MS. RADAVSKY:  We're very concerned.

24   SENATOR ALQUIST:  So it sounds like we need to

25   increase some state salaries.

1       MS. RADAVSKY:  That's what we're addressing in the

2   plan.

3       SENATOR ALQUIST: Okay.  Well, thank you on that.  Now

4   LAO.

5       MR. MARTIN:  I'm Shawn Martin, Legislative Analyst's

6   Office, and we've been monitoring the situation at the state

7   hospitals and the vacancy rates, and at this point, it's a

8   difficult issue to address.  We don't have any

9   recommendations at this point.

10      SENATOR ALQUIST:  Okay.  Are there public comments?

11  One.  And if there are any others, please line up so we can

12  move quickly.

13      MR. MIRCH:  Good morning.  I'm Ken Mirch.  I'm

14  representing the Psychiatric Technicians Association.  As

15  you will -- as you can see on that handout sheet, we

16  represent the largest amount of vacancies unfilled in the

17  Department.  Although we welcome a review of the salaries,

18  which is needed, we're in competition now with the salaries

19  that was increased by the Coleman Courts and the Department

20  of Corrections.

21  The main issue here is how we're going to fill

22  the vacancies.  As of last July, the Legislative Analyst's

23  Office projected that in our bargaining unit we had a

24  thousand and forty-eight vacancies.  This covers vacancies

25  not only in mental health but also the expansion of the

1  Corrections Mental Health Program as well as DDS.

2  We need to take a look at the Department's

3  budget to see if there can't be additional funds put in it

4  so that they're able to do sponsorship programs so that

5  people with a lower license like Psychiatric Technicians

6  Assistants or CNAs can come in and work a twenty-twenty

7  program where they can go to school twenty hours and work

8  twenty hours to get their license.

9  The Psychiatric Technicians classification is a

10  bridging classification between like a nursing assistant,

11  psych techs -- a lot of the psych techs then become RNs, and

12  people advance up the line even to running state hospitals.

13  What the Department needs is additional money,

14  not only to address the salary issues but to address the

15  training of -- for potential candidates to fill these vacant

16  positions.  Mental health has got some much needed

17  recognition the last couple of years based upon the passage

18  of Proposition 63, and every report you read that comes out

19  of 63, and every report you see relative to the problems in

20  the state hospital address the needs of more staff, more

21  clinical staff, and we would think that someone ought to

22  take a look and see if there's any of that money in

23  Proposition 63 that can be used to create resources so that

24  we can get more mental health professionals trained.  Thank

25  you.

 1      SENATOR ALQUIST:  Would the Department like to comment

 2  on that?

 3      MR. BORUNDA:  Mr. Mirch is correct that the workforce

 4  is a -- an issue not only in the state hospitals but in the

 5  counties and that there is money set aside for education and

 6  training and workforce development, and we're in the process

 7  of having that plan be vetted and should be available very

 8  soon.

 9      SENATOR ALQUIST:  Thank you.

10      MR. HAGAR:  Madam Chair, Committee, Randall Hagar

11  representing the California Psychiatric Association.  You

12  know, I can't do better than echo Ken's comments.  I think

13  that there does need to be a very hard and strong look at

14  budget issues here with a view to augmenting the budget at

15  the Department of Mental Health to create some equity in pay

16  scales.

17      We have members now at Napa State Hospital who

18  have gone from forty-seven individual patients then

19  redirected to new units, and the process of trying to meet

20  the demands placed on what psychiatrists are left, and

21  they're now dealing with somewhat less than a hundred

22  patients, and that's four times the licensing scale of one

23  to twenty-five for the intermediate care units.

24  We also know that at least in a court report on

25  February 6th, there were only nine psychiatrists at

```
 1  Atascadero State Hospital.  So if we have fifteen now, we're
 2  very grateful that there have been some additional
 3  psychiatrists, but of those nine, two -- one was the chief
 4  of staff and the other was a medical director.  So they're
 5  not necessarily line staff.
 6  So we have watched people in all of the
 7  clinical disciplines walk basically across the street to get
 8  new jobs at higher salaries in safer conditions at the Men's
 9  Colony, which is right, you know, there proximate to
10  Atascadero State Hospital and the same thing for Vacaville,
11  which is proximate to Napa State Hospital.  So we appreciate
12  your attention to this issue.
13       SENATOR ALQUIST:  Are there any comments from my
14  colleagues?  And I also see that my colleague Senator
15  Cogdill has joined us.  Welcome.
16       SENATOR COGDILL:  Thank you.  The question I have
17  relating to the difficulties with recruitment of staff -- we
18  talked about salaries and benefits.  I'm well aware of
19  what's going on with the Coleman Court and the impact that's
20  having, and I think the recent information I read was that
21  psychiatrist are going to three hundred and fifty thousand
22  dollars a year or something like that.  How does that
23  compare number one with existing salaries, the same position
24  in your agency, and my second question is is it strictly an
25  issue of salaries and benefits, or is it a working
```

1  conditions issue as it relates to the environment that these

2  folks are asked to work in?

3      MS. RADAVSKY: I would start with it is a significant

4  salary issue.  We're talking about over about double what

5  our psychiatrist get versus what correction psychiatrist get

6  under the Coleman salaries, but as far as working conditions

7  -- let me see.  I'll find it.  In the list here, staff

8  psychiatrists max step for a DMH psychiatrist is $eleven

9  thousand a month.  Max step for a CDCR psychiatrist is

10 twenty-one thousand a month.  Not quite double but pretty

11 significant.

12 As far as working conditions, traditionally, I

13 would say that would not be the case.  However, what we have

14 seen is as we continue to turn more forensic, which means

15 our folks are coming in under the judicial system, through

16 the courts.  Traditionally about ten years ago we were

17 eighty to ninety percent civilly committed, and the rest

18 forensic.  Now we are over ninety percent forensic.

19 Our rate of violence has gone up about thirty-

20 six percent in the last year or two, and that just is

21 exacerbated as the staff goes down, and I would say that's

22 part of the working condition.  It's not so much the

23 philosophy of the department or the enhancement plan.  It's

24 the fact that the workload has gotten so heavy.  The

25 patients are coming in, and they need more attention that

```
 1   the staff are unable to give them, and that's causing part
 2   of the issue on the working environment.
 3   We've also lost some of our -- you know, Mr.
 4   Mirch did talk about our pscyh tech classes and our twenty-
 5   twenty.  One of our main recruiting tools over the years,
 6   our feeder classes, has been the fellowships with the
 7   universities, our internships, our twenty-twenty programs.
 8   We lost the twenty-twenty in the psych tech apprenticeship
 9   money during the last set of budget cuts a couple of years
10   ago, but we've now reduced our staff, or we've lost our
11   staff so significantly the current staff cannot provide the
12   supervision that interns require.  So we're starting to lose
13   our feeder, and that's generally where we would get our
14   staff.
15       SENATOR COGDILL:  From a security standpoint, if
16   you're a psychiatrist working in either one of these
17   departments and you have a patient, client, inmate what have
18   you that's violent or has that tendency, where is the
19   greatest security right now for you as a psychiatrist?
20       MR. BORUNDA:  I guess that it's probably safer in the
21   prisons because an individual can --
22       SENATOR COGDILL:  So it's -- it's safer, and they pay
23   you twice the money?
24       MR. BORUNDA:  That's correct.
25       SENATOR COGDILL:  Okay.  Thank you.
```

1    SENATOR ALQUIST:  Senator Padilla.

2    SENATOR PADILLA:  Thank you.  The first question is a

3  legal question.  If you don't have the answer, I'll research

4  it on my own.  Is there a difference between a consent

5  judgment and a consent decree?

6    MS. RADAVSKY:  Yes, there is.

7    SENATOR PADILLA:  What's the difference?

8    MS. RADAVSKY:  A consent decree is a more formalized

9  document that requires either a special master or a receiver

10  with oversight scheduled reports to the court.  With the

11  consent judgment, it's something that we negotiated in good

12  faith on both sides with an agreed-upon court monitor who,

13  while reporting to the court, does not have court authority

14  to order us to make changes.

15    SENATOR PADILLA:  Okay.  I'm familiar with consent

16  decrees in my past, not consent judgments.

17    MS. RADAVSKY:  We were very happy with the consent

18  judgment.

19    SENATOR PADILLA:  And given the updates that you were

20  given in this committee and I would imagine the public

21  safety committee as well, have they agendized this recently

22  or soon?

23    MS. RADAVSKY:  Not to my knowledge.

24    SENATOR PADILLA:  Not to your knowledge?  Is there any

25  update or report inviting that can give us section by

1  section of the consent judgment that I can use to continue

2  to track this and learn more about the judgment?

3      MS. RADAVSKY:  Yes, sir.  We post each visit, the

4  results that we get from the court monitor, on our website,

5  and there is reports that come into the legislature every

6  quarter.

7      SENATOR PADILLA:  Okay.  On the specific subject area

8  of the Coleman Center, Senator Cogdill was commenting on the

9  questions about the disparity in pay.  Obviously the working

10  environment just as to the safety issue alone for employees

11  being what it is, I've heard reports from state employees

12  and some of the clinical physicians that are in the position

13  of having to mentor or even train their contracted

14  counterparts who as you in your report have recognized are

15  sometimes paid twice what the state employee is.  You can

16  image what kind of impact it has on morale above and beyond

17  the workload, above and beyond other issues.  Any -- other

18  than trying to rectify the salary differential, any other

19  efforts to address that?

20      MS. RADAVSKY:  At this point in time, we're just

21  trying to get the contracts in place to provide the

22  services.  You know, we've been out of state recruiting.

23  We've been looking at it.  In fact, we've had to release a

24  couple of our contractors for that very reason.  The staff

25  working side by side with them are making less and doing

1  their work.

2      SENATOR PADILLA:  It just seems impossible to me to

3  have some of our state employees in that situation.

4      SENATOR ALQUIST:  First I want the Department to

5  report back to us on April 30th regarding CRIPA

6  implementation, and second, I move to approve as budgeted

7  the amount of the technical errors so we can make sure we

8  have funding.  Three-0.

9  Next we'll go to page fourteen, number two, the

10 proposed baseline population at the state hospitals.  The

11 issue, the budget proposed is an increase of one point one

12 million to fund seventeen physicians, including psychiatric

13 technicians, registered nurses, and teachers to support an

14 increase of twenty-eight patients at the five state

15 hospitals.  First we'd like to hear from DMH, please

16     MS. RADAVSKY:  Okay, well on the baseline population,

17 asking about the methodology that we use -- essentially, we

18 agreed upon with the Department of Finance, and the Leg

19 Analyst Office a methodology approximately, I think four or

20 five years ago, and what we do twice a year is take the

21 baseline, and we do a two-year regression analysis that

22 comes out with the new projection.

23 So for each different commitment category, we do

24 that with incompetent to stand trial, not guilty by reason

25 of insanity, the mentally disordered offenders.  What does

1  not change is the CDCR patients because that is on contract

2  with the Department of Corrections, and for the last three

3  or four years, we have done that with sexually violent

4  predators, and as you'll see later in the agenda, that

5  methodology is changing.  So.

6      SENATOR ALQUIST:  Okay.  LAO?

7      MR. MARTIN:  Thank you Madam Chair.  Sean Martin, Leg

8  Analyst's Office.  At this time we're not recommending any

9  adjustments to the Department's caseload.  However, we will

10  update -- provide you with an updated recommendation at the

11  time of the May Revision, and we'll continue to monitor the

12  caseload.

13      SENATOR ALQUIST:  Okay.  Thank you.  Public comment.

14  Probably not.  Comments from my colleagues?  No?  So what

15  we'll do -- DMH will be recalculating the state hospital.

16  We will approve it as budgeted until the May Revision.

17  Okay.  Let's see here.  What we're going to do is to approve

18  as budgeted, and then when May Revision comes, we will look

19  at the numbers again to see if we need to do something

20  differently than that.  Okay.  Thank you very much.

21      Next, we will move on to -- and that was -- you

22  okay with that?  That is three-0.  Next, page fifteen.

23  Okay.  Proposed implementation of SB 1128, Alquist and Prop

24  83.  Three issues: Evaluation Cost, Estimated State Hospital

25  Population for SVPs, and DMH Administrative Cost.  So first,

1   let me say there's a chart on page fifteen that shows a

2   summary of these three issues that we will be talking about

3   regarding evaluation and incarceration of sexually violent

4   predators, which we know is very important to us.

5   The first issue begins on page sixteen, 3A,

6   Proposed Evaluation Cost for Changes to the SVP Program, and

7   we will start with DMH, and the questions are on page

8   eighteen.

9       MS. RADAVSKY:  Okay.  Thank you.  The evaluation process

10   -- let's start with that one for sexually violent

11   predators.  We have seen a tremendous increase in this

12   workload.  Essentially, the way the process works is the

13   Department of Mental Health receives a referral from the

14   Department of Corrections.  When we receive the referral, we

15   have to do a screening, and that screening looks at whether

16   the person probably will be positive or if they will be

17   negative.  If it's determined it possibly will be positive,

18   it's referred over to two independent evaluators.  If we get

19   two positive reports, it's referred to the D.A. for trial.

20   If it's two negatives, the case is dropped, and the person

21   goes out on parole.  If we get a difference of opinion, we

22   must have two additional evaluations.

23   And just to give you an idea, for the last ten

24   years, we have processed six thousand referrals,

25   approximately seven hundred a year.  Since November 8th, we

```
 1   have processed over three thousand referrals.  So you can

 2   see tremendously the difference in our workload.  Basically,

 3   we are figuring that fifty-five twenty-eight is going to be

 4   the annual rate of referral from the Department of

 5   Corrections, and the thing that concerns me about the three

 6   thousand number is we normally work six to nine months in

 7   advance, and we are barely one month ahead of schedule right

 8   now.  So our workload has significantly increased.

 9   These evaluations include initial referrals.

10   They include recommitment referrals, which are still a

11   little bit up in the air because of some of the court

12   decisions, and then any annual evaluations that a sexually

13   violent predator requests because they have the right to

14   request a trial each year.  So along with the evaluation

15   comes court testimony, time to go into the hospital and

16   review the record.  It's a pretty detailed process.

17       SENATOR ALQUIST:  Okay.  Counsel?

18       MR. MARTIN:  Thank you Madam Chair.  We recommend the

19   legislature reduce the administration's funding for sexually

20   violent predator evaluations by three point four million

21   dollars general fund in the current year and four point one

22   million dollars general fund in the budget year.  The

23   administration based its estimate of resources it needs to

24   perform these evaluations and the information that was

25   available to it in the fall.  We have more recent
```

23

1    information upon which to base our estimate.  We've

2    identified two components of the evaluation process where we

3    will -- believe that they won't -- the workload is not

4    materializing at this point.

5        SENATOR ALQUIST:  Okay.  What are these two

6    components?

7        MR. MARTIN:  The two components are initial court

8    testimony and evaluation updates and from what we've seen so

9    far, they've referred the cases to the D.A.'s, but the

10   D.A.'s have not been immediately pursuing commitments, and

11   so we're not seeing as much testimony in the current year as

12   we expected to see.  It's basically a time lag issue.  And

13   then also on the evaluation updates, sometimes D.A.s just

14   decide that they're going to pursue a sexually violent

15   predator commitment, but they can't get a court date in a

16   timely manner, so before they go to trial, they request an

17   update in order to have a current assessment by two

18   psychiatrists or two psychologist, and we're not seeing that

19   workload materialize yet either.  So that's the basis for

20   our recommendation, and we'll update it at the time of the

21   May Revision.

22       SENATOR ALQUIST:  Do you have any response to that?

23       MS. RADAVSKY:  Yes, ma'am, I do.  Essentially, what we

24   have seen on our numbers -- and we'll be coming back in May

25   Revision with this as well -- we're within one percent of

 1   the number that we originally requested, albeit -- yeah.

 2   The LAO is correct; it's changed in those two categories.

 3   What we're seeing is a shift.  There's categories that were

 4   up higher than we anticipated; so we think the balance is

 5   going to work out.

 6        SENATOR ALQUIST:  Thank you.

 7        SENATOR PADILLA:  If I could just ask some questions,

 8   some more on this topic.  I appreciate the LAO's perspective

 9   on whether it's an over projection, under projection on the

10   additional cost.  On page sixteen, the Department is

11   suggesting a one hundred percent decrease in recommitment

12   evaluation, and I'm curious as to the LAO's assessment of

13   that figure and for the savings figure attached.

14        MR. MARTIN:  With regards to the recommitments, there

15   seems to be some issues about the interpretation of the law,

16   and some district attorneys I've seen do feel that if

17   someone was committed under the prior law, then they should

18   continue to undergo recommitment proceedings.  The senate

19   bill 1128 allows for indeterminate commitments, and so

20   anyone committed under the new law would not undergo

21   recommitment proceedings.  So at this point until they

22   settle that legal issue, it's difficult to assess how much

23   we'll need to spend in the future for recommitment

24   proceedings.

25        SENATOR PADILLA:  Given that uncertainty then, how do

1  you explain how you arrive at that projection?

2      MS. RADAVSKY:  Well, essentially what we're looking at

3  is some of the other frontloaded work as well.  So where we

4  might not be in court per se, there is other backup of

5  frontloaded work that's balancing some of that out.  We've

6  got two different things happening with the courts, and I

7  think that's what the LAO is referencing in the

8  indeterminate.  The courts are interpreting very differently

9  how that's supposed to work.  We've had one court that

10  basically says, "I can continue to put you on a two-year

11  recommitment that's now in appeal," and we also have a court

12  that's saying, "You have no right to a recommitment.  We are

13  going to indeterminately sentence," and the patient's

14  attorney is appealing that as well.  So -- and I think we

15  need more data to figure out where we're going at this point

16  in time.  Two and a half months is not sufficient data to

17  analyze all of this.

18      SENATOR PADILLA:  Thank you.

19      SENATOR ALQUIST:  Senator Cogdill.

20      SENATOR COGDILL:  Just some general comments, I guess,

21  not so much about the dollars involved, but just the, I

22  guess, disturbing timeline that we're seeing in this -- this

23  area of sexually violent predators.  I've got a question and

24  then a comment that I want to make.

25  I'll make the comment first.  Just my personal

 1   experience in what I'm seeing in my district.  We're getting

 2   more and more reports of minors involved in this type of

 3   activity where bullying seems to be going to another level

 4   here, where it's not only intimidating or beating up kids on

 5   the playground, but it's actually escalating into some kind

 6   of sexually violent situation.  I'm just wondering, are you

 7   seeing more and more of that, and that's one question, and

 8   the other is people are being evaluated for this as adults.

 9   Have you been able to determine does this activity begin in

10   adulthood, or are they actually usually starting into this

11   much earlier?

12   And it appears to me the increment cases that

13   I'm seeing, the people I'm talking to is that there's kind

14   of this gap, a very serious gap in the law relating to the

15   victims here and what this does to their lives and our

16   inability to deal with that, and there's a lot of people

17   walking around that are upset that it appears that their --

18   the predators that are preying upon them, there's really no

19   consequence because they did it when they were minors, and

20   until they offend as an adult, there doesn't seem to be much

21   in the way of recourse.  So anyway, if you could speak to

22   those issues.

23       DR. MAYBERG:  Steve Mayberg.  I've read the majority

24   of the evalu -- the SVP evaluations, and it is correct that

25   -- that many of the sexually violent predators were both

1   victimized and victimizing at a younger age, and that it's

2   not something that seemed to just start when they became

3   adults, and I think there's -- it is a consideration now for

4   us to have the ability to look at juvenile offenses, but

5   sometimes those aren't recorded or those records are sealed,

6   but it is a growing problem that we have in terms of

7   sexually violent behaviors at all ages and that

8   unfortunately when we're dealing with them at the tail end,

9   after they've been predatory for a number of years, there

10  really hasn't taken away any of the consequences of the

11  persons that have been victimized during the course of that,

12  and in a sense, some of the retraumatization that occurs

13  when those individuals returned to the community and

14  triggers all that kind of anxiety and fear.

15  So that is something that we will continue to

16  try and look at, how to better assess what the reasons are

17  that contributed to sexually predatory behavior, but the

18  research is pretty clear.  No one really seems to understand

19  what drives that.  The research is also pretty clear that we

20  don't have a cure for that.  We can work on relapse

21  prevention, but it seems, in reading this, it's my personal

22  opinion that it's almost like an addictive behavior; so it's

23  very troublesome.

24      SENATOR COGDILL:  So it sounds like from what you're

25  tell -- telling us is that we really need to be much more

1   careful, and I guess do everything we can to educate the

2   general population of young people to be careful and to

3   report these kind of things when it happens and not be

4   afraid to do that and be sure that you're getting a log,

5   getting an early warning on these things.

6   See there's kind of an amazing thing, I mean,

7   we just had a crop of this in the last couple of years in my

8   district.  I don't know if everybody's experiencing it or

9   not, but it seems to be a situation where the intimidation

10  has been taken to the next step so to speak where these kids

11  are being victimized, are just afraid to say anything, and

12  it goes on for years.

13      DR. MAYBERG:  Senator, I think that really is crit --

14  is critical is that -- and I think that's been the advantage

15  of some of the publicity that's gone along with both the

16      SENATOR Alquist bill and Jessica's law is raising that

17  awareness and really encouraging individuals to be aware of

18  whose in their neighborhood but also that it -- that this

19  needs to be recorded, and it needs to be dealt with

20  seriously.  If it does -- often times, it is ignored at

21  younger ages, and I think that's something that we need to

22  work with our partners in law enforcement to be able to work

23  together.

24      SENATOR ALQUIST:  As one who wrote the legislation, SB

25  1128, I've spent quite a bit of time working on getting it

 1   signed into law, as you mentioned, there doesn't seem to be

 2   a cure for this in the research that I have done anyway, and

 3   it's going to be very important to see that we have the

 4   resources to deal with what is a growing issue.

 5        One small question, and that is when the

 6   evaluators are evaluating the inmates, is that videotaped?

 7        MS. RADAVSKY:  No, ma'am.  They have the option of

 8   requesting a cassette tape.  So in some cases, but they are

 9   not videotaped.

10        SENATOR ALQUIST:  It may be audio taped?

11        MS. RADAVSKY:  It may be audio taped.

12        SENATOR ALQUIST:  Okay.  Thank you.  With that, we are

13   going to hold this item open until the May Revision and move

14   on to 3B, Caseload Cost of the State Hospitals for Changes

15   to the SVP Program.  We're on page nineteen, and we'll begin

16   with DMH questions on page twenty.

17        MS. RADAVSKY:  Now we're going to talk about the

18   change in methodology here.  Let me talk a little bit about

19   the budget requests.  Essentially when SB 1128 and

20   Proposition 83 passed, the only methodology that DMH had was

21   to look back at ten years' worth of experience with sexually

22   violent predators, and what our experience over the ten

23   years had shown us was that out of all of the referrals, and

24   again we're talking about six thousand to date, about forty-

25   two percent of those required an independent evaluation from

1  a contract evaluator.  Out of that forty-two percent,

2  approximately thirty-some percent went on to the D.A. for

3  prosecution, and out of those that went to the D.A., eight

4  percent were committed to the state hospitals.

5  Having nothing else to work with methodology-

6  wise, we applied that methodology to the new numbers not

7  sure what was going to happen with two significant, or

8  really three significant changes between the two laws.  We

9  didn't know how indeterminate sentencing was going to impact

10  the numbers.  We didn't know how one victim versus two

11  victims was going to impact the numbers, and we also didn't

12  know how the increase in qualifying criterion cause we went

13  from nine potential crimes to thirty-five potential crimes

14  that could qualify somebody as an SVP.

15  So you have three pretty significant unknowns,

16  and that was one reason we went ahead and used the known

17  methodology figuring we would have to reevaluate the May

18  Revise, we'll have to reevaluate next fall, you know, as we

19  have more and more data to take into consideration.

20  At this time, we are predicting in May Revise,

21  a decrease in those committed to the state hospitals.  As

22  the LAO mentioned earlier, we have a time lag, and there is

23  somewhat of a delay.  I think some people are watching to

24  see how this is going to work out in the court on some of

25  these specific cases.  So that's the first one, and then on

31

```
 1   the second question, sexually violent predators can only

 2   live in two of our state hospitals: Coalinga State Hospital

 3   is where all of the new admissions are going, and we've been

 4   able to transfer from Atascadero State Hospital, which is

 5   where they all were until Coalinga opened a year ago.

 6   We still have about two hundred -- up to two

 7   hundred and fifty sexually violent predators still in

 8   Atascadero State Hospital slated to move to Coalinga.

 9       SENATOR ALQUIST:  And when you say SVPs can only live

10   in these two places, what else are you really saying when

11   you -- when you're saying that?

12       MS. RADAVSKY:  That they will not --

13       SENATOR ALQUIST:  Just briefly.

14       MS. RADAVSKY: -- that they will not be admitted to the

15   other state hospitals.  The intent of building Coalinga

16   under state law is they would house the sexually violent

17   predators, and they were to be -- the hospital was to be

18   built on the grounds of a state prison.

19       SENATOR ALQUIST:  And is -- will there be enough

20   capacity?

21       MS. RADAVSKY:  Yes, ma'am.

22       SENATOR ALQUIST:  Down the line?

23       MS. RADAVSKY:  No, ma'am.  There will be enough

24   capacity depending on how the numbers factor out.  Again,

25   with all of the potential litigation and the magnitude, we
```

1  looked at the high-end volume, and we're predicting four

2  hundred and forty.  I think we probably have about a year

3  here and a half.

4      SENATOR ALQUIST:  So within a year and a half, we're

5  going to be faced with not having secure places to house

6  sexually violent predators?

7      MS. RADAVSKY:  And all of our other --

8      SENATOR ALQUIST:  That has commitment --

9      MS. RADAVSKY:  Our commitments are increasing in most

10  of the cases.

11      SENATOR ALQUIST:  We will make note of that.  Thank

12  you very much.  Any questions?

13      SENATOR PADILLA:  Yeah, just on the point of whether

14  or the possibility that it be more difficult for district

15  attorneys to prove a pattern of predatory behavior based on

16  the one victim versus multiple victims.  Does the District

17  Attorney's Association or the Deputy District Attorney's

18  Association have a position on this issue.  They stated

19  their views and/or, I guess we're still compiling empirical

20  evidence to project it going forward.

21      DR. MAYBERG:  Steve Mayberg.  They don't have a

22  position.  They look at each case individually and look at

23  the patterns and want to have that option.  We're meeting

24  with them on a regular basis to see how we can assist to

25  make sure they get all the information they need to be able

1  to move forward.

2      SENATOR PADILLA:  Was this a concern expressed during

3  the process of Jessica's law qualifying for the ballot or

4  even after it was qualified for the ballot?

5      DR. MAYBERG:  Not to my knowledge.

6      SENATOR PADILLA:  Thank you.

7      SENATOR ALQUIST:  LAO, please.

8      MR. MARTIN:  Thank you.  We recommend the legislature

9  reduce the administrations funding request by six million

10  dollars general fund in the current year and by twenty-one

11  point six million general fund in the budget year to reflect

12  the fact that caseloads for SVPs is now tracking

13  significantly lower than the amount that was projected by

14  the administration.  This is based on our review of more

15  recent caseload data the new administration had available

16  when they made their projection.

17      We note that Proposition 83 changed from two to

18  one the number of victims likely to qual -- victims

19  necessary to qualify an offender for a sexually violent

20  predator commitment, and therefore, it would likely be more

21  difficult for district attorneys to prove a pattern of

22  predatory behavior and obtain a sexually violent predator

23  commitment for one-victim sex offenders.  In our view, the

24  administration's estimate for SVP caseload as a worse case

25  scenario does not adequately take into account the change

1   from the two-victim to the one-victim criteria.

2       SENATOR ALQUIST:  Thank you.  Any comments from the

3   public?  If not, we're going to hold this open until the May

4   Revision, and with that move on to 3c, DMH Headquarters

5   Administrative Costs for Changes to SVP, page twenty-one,

6   and we'll start with DMH, questions on page twenty-two.

7       MS. RADAVSKY:  Okay, the budget request covers three

8   specific areas -- an increase in headquarters.  Currently,

9   we have staff in headquarters that have been handling the

10  cases up to now.  With the significant increase, we need

11  more staff to review the packets, to track missing data it

12  assigns the evaluators to manage the evaluator contracts.

13  We've had to hire a minimum of twenty additional contractors

14  and probably need another twenty additional contractors; so

15  there's additional work that goes along with that as well as

16  communication with the D.A.s and then tracking these cases

17  to conclusion.

18  The second component of the budget request

19  talks about just that, a database, and the tracking of the

20  database so that -- our current system right now just cannot

21  handle the number.

22      SENATOR ALQUIST:  And in your comments, could you

23  address -- it says, "DMH only assumes a forty-percent

24  efficiency rate in processing the cases," and could you

25  define "efficiency rate" so we understand that?

1        MR. ALICE:  Sure.  This is Jim Alice, Department of

2    Finance.  We had worked with the Department of Mental Health

3    in determining an efficiency rate.  So what you're seeing

4    there is the impact.  When we were trying to calculate the

5    staffing means, we looked at their existing staffing

6    component for the work that they were doing now and how this

7    was going to potentially increase by eight hundred percent,

8    the workload.  So in realizing that, we came to an original

9    number, and in meeting with the Department of Mental Health

10   and looking at their resources and how they were handling

11   initially the tremendous increase in referrals, they had

12   built an additional secondary screening tool, a paper tool,

13   that they had used to help, and we found that that had

14   helped to decrease the amount of time spent on each

15   referral.

16   So as a result of that, we had built in an

17   additional forty percent efficiency.  So in essence, each

18   case review is taking a shorter period of time than what was

19   originally, you know, what they work on now, I guess as the

20   baseline.

21       MS. RADAVSKY:  We -- we've been working hard to figure

22   out if there are better ways to approach this given the

23   workload, and we're continuing to do that.

24       SENATOR ALQUIST:  What I'm really asking -- it sounds

25   like there is an increase of about forty percent of which

1  you are able to accomplish, but my real question is how do

2  you determine -- is that all you're saying when you're

3  saying an efficiency rate, or is there -- are there

4  components to that, which is what I really was asking?

5       MR. ALICE:  Oh, I'm sorry.  Yes, to specific

6  components, just the overall time spent on each referral --

7       SENATOR ALQUIST:  Oh, okay.

8       MR. ALICE:  -- has seemed to im -- take fewer, lesser

9  amount of time due to these increased, an increased paper

10 tool.

11      SENATOR ALQUIST:  Because then I was going to ask DMH

12 to use that efficiency rate on another -- we're going to be

13 speaking on that.

14      SENATOR PADILLA:  The flipside to that is the -- sure,

15 that while saving time, we're not compromising the quality

16 of the evaluation.

17      MS. RADAVSKY:  Exactly.  And that's part of our

18 concern and again why we don't feel we have enough data.

19 You know we had to do certain things just to get ahead of

20 the curve when all of a sudden, you know, two hundred

21 referrals hit the door, and we had three days to process

22 them.  So there were certain pieces we had to jump ahead and

23 get in, but now we are looking at that because we've got to

24 be, you know, very certain something does not slip through

25 the cracks, but we do want to work smarter.

1       SENATOR ALQUIST:   LAO.

2       MR. MARTIN:   We withheld recommendation on this

3   request for resources, and we'll update our recommendation

4   at the time of the May Revision.  The reason for our

5   withhold is we didn't feel that there was enough data

6   available in January to really determine what the ongoing

7   workload was going to consist of.  We'll have a better idea

8   of what that ongoing workload will be in May.

9       SENATOR ALQUIST:   Thank you.  Public comment?  Any

10  other comments from my colleagues.  No?

11      SENATOR PADILLA:   Two questions.  Going back to page

12  twenty-one, two hundred and fifty thousand dollars at one

13  time for only funding for consultants.  Tell me what the

14  scope of that contract is.

15      MS. RADAVSKY:   It's for the database.  Essentially,

16  it's for consultants to assist us in building a new sequel

17  server that can handle all of the data coming in.  They're

18  doing an analysis of workflow once it comes into DMH from

19  CDCR, but there's also workflow at the state hospitals for

20  the SVPs and in and out to the district attorneys' offices.

21  Well, so that we know at any given time how many

22  evaluations, when they were evaluated, who evaluated them,

23  what the outcome was, when the next reports are due in order

24  to not miss any specific time frames.  So they're

25  contractors for some IT consulting.

1          SENATOR PADILLA:  So they're doing data entry for us

2     or developing software for us?

3          MS. RADAVSKY:  They will be developing hardware and

4     software for us, not data entry.  We'll have staff doing

5     data entry.

6          MS. TERTERJIAN:  Terry Terterjian, Deputy Director of

7     the Administrative Services for Mental Health.  There's also

8     one-time contracting money in there for your typical IT

9     consultants that are called IPOC and IBNV that help with

10    oversight and implementation.  So the project is tracking.

11    That's included.

12         SENATOR PADILLA:  They're two different teams

13    inclusive of --

14         MS. RADAVSKY -- of all of those things.

15         SENATOR PADILLA:  So the two fifteen is only for the

16    consulting services.  Once we get the hardware and/or

17    software, those will be additional costs.

18         MS. TERTERJIAN: Correct.

19         MS. RADAVSKY:  And that's what some of the Coalinga

20    State Hospital positions will do.  We have some limited-term

21    positions so that they can do the initial data entry once

22    the system is in place and, you know, we're going to have to

23    frontload that cause you've got to catch the system up and

24    then they'll have enough staff to maintain it once it's

25    frontloaded.

1       SENATOR PADILLA:  For the hardware or the software

2   that's supposed to be developed.

3       MR. ALICE:  Yes, there's money in the request for all

4   of those P.C.s

5       SENATOR PADILLA:  What are those amounts?

6       MR. ALICE:  There's -- let's see.  There's sixteen

7   thousand at, uh, Department of Technical Services for their

8   server support.  There's --

9       SENATOR PADILLA:  For the hardware or the software is

10  that?

11      MR. ALICE:  For hardware, there's fifty thousand

12  dollars for database servers, storage, web servers; there's

13  twenty-nine thousand for sound sequel software maintenance.

14      SENATOR PADILLA:  That's not for maintenance.

15  Software.  I guess where I'm coming from is at a budget

16  committee meeting as a whole just a couple weeks ago -- the

17  State of California's far too familiar with IT projects,

18  software projects, specifically that have gone awry.  So if

19  there's a potential here to nip another mistake in the bud,

20  I'd like to do that.

21      MS. RADAVSKY:  We do have an approved FSR for this.

22      SENATOR PADILLA:  What's an FSR?  I'm sorry.

23      MS. RADAVSKY:  Feasibility Study Report that's --

24      SENATOR PADILLA:  Okay.

25      MS. RADAVSKY:  -- that's required for all of the IT

1   projects that's been through the Department of Finance and

2   the legislature for approval.

3       SENATOR PADILLA:  Okay.  Okay.  That was one of my

4   questions.  The other is on the SVP tracking the information

5   system processing, that's what you were referring to on the

6   other line item.  Okay.

7       MS. RADAVSKY:  Yes, sir.

8       SENATOR PADILLA:  Thank you.

9       SENATOR ALQUIST:  One last question before we move on.

10  Given that CDCR and Department of Mental Health really need

11  to be cooperating with each other, do you use some

12  complimentary software?

13      SENATOR PADILLA:  Compatible.

14      MS. RADAVSKY:  Well, for this specific --

15      SENATOR ALQUIST:  Compatible.

16      MS. RADAVSKY: -- use.  Compatible.

17      SENATOR ALQUIST:  Compatible.

18      MS. RADAVSKY:  Essentially, what we're tracking, they

19  do not track; so there's no back and forth done, that type

20  of information, but we are consulting them because we have

21  to work both with CDCR and the Board of Prison Hearings; so

22  anything that would need to be on the front end.  That

23  includes them.  We include them in some of our discussions.

24      SENATOR ALQUIST:  Thank you.  We're going to hold this

25  open until the May Revision.  We want you to have staff, but

1  we just might need to make an adjustment since we will have

2  more information at that point in time.  And with that,

3  we'll move on to Item 4, Coleman versus Schwarzenegger,

4  Salary Adjustments, Vacaville and Salinas, page twenty-

5  three, and we'll begins with DMH, questions on page twenty-

6  three.

7      MS. RADAVSKY:  Okay, essentially the question is to

8  give a brief summary of the proposal and the technical

9  adjustment.  DMH operates two psychiatric programs for the

10  Department of Corrections on the grounds of a state prison,

11  one at California Medical Facility, and one at Salinas

12  Valley State Prison.  The Coleman Order required those two

13  programs to receive the same salary parity that CDCR

14  receive, the same salary scales.  So essentially, the

15  calculations were done at several different points in time,

16  and that was what the technical adjustment was for.  We

17  originally calculated at nine months.  It ended up being six

18  months, plus there was some issues with employee

19  compensation.  So at this point, it's full parity with the

20  employee comp included for those two programs.

21      SENATOR ALQUIST:  LAO?

22      MR. MARTIN:  We didn't raise any issues with the

23  proposal.

24      SENATOR ALQUIST:  Okay, public comment?  Comments from

25  my colleagues?

1    SENATOR PADILLA:  Quick question.  Other than salary

2  and parity, are there other, you know, benefits, working

3  environment, safety, other type issues that will make the

4  job equally attractive to what we're competing against?

5    MS. RADAVSKY:  Actually, we have all of the safety

6  that the prisons have because we are inside of the prison,

7  and the only vacancies that we have at Salinas Valley and at

8  Vacaville are because of the program expansion.  We have

9  been unable to successfully recruit into those significant

10  areas.

11    SENATOR PADILLA:  Thank you.

12    SENATOR ALQUIST:  Senator Cogdill.

13    SENATOR COGDILL:  Thank you.  Just a quick question.

14  You know why the receiver decided not to require an increase

15  in these salaries, or was this beyond his purview or could

16  he have done that and chose not to?

17    MS. RADAVSKY:  Well, in this particular case, it's a

18  special master.  I have to keep them straight because

19  there's two cases.  Essentially, no, sir, I have no idea why

20  the state hospitals were not addressed.

21    SENATOR COGDILL:  As far as you know, he had the

22  authority to do it or whoever.  They just chose not to?

23    MS. RADAVSKY:  That's my understanding.  Yes, sir.

24    SENATOR COGDILL:  Thank you.

25    SENATOR ALQUIST:  I move to approve as budgeted.

1  Three-o.  Number five, Continued Activation of Coalinga

2  State Hospital, page twenty-four, questions for DMH on page

3  twenty-four.

4      MS. RADAVSKY:  Okay.  The question is about the update

5  on activation for Coalinga State Hospital.  Coalinga was

6  budgeted to be at a census of seven seventeen at the end of

7  this year until the passage of Proposition 83 and eth

8  passage of SB 1128.  Essentially, we have been on track to

9  meet that seven seventeen until the Coleman salaries were

10  issued.  At this point in time, we're about a unit and a

11  half behind.  Each unit holds fifty people.  We're about

12  seventy-five patients behind schedule.  We've lost some non-

13  level of care staff as well as level of care staff at

14  Coalinga, and you know, there's a concern with not being

15  able to meet that seven seventeen.

16  This particular budget request is for what we

17  consider non-level-of-care positions that -- these are the

18  folks that support the hospital, the physical plant, the

19  dietary, the infrastructure, so that should we get level-of-

20  care staff and we have the need to raise the patient census,

21  we need the support staff there to continue to activate the

22  plant pieces of the hospital.

23      SENATOR ALQUIST:  Thank you.  Okay.  LAO.

24      MR. MARTIN:  We haven't raised any issues with this

25  proposal.

1      SENATOR ALQUIST:  Okay.  Public comment.  Comment from

2   my colleagues.

3      SENATOR PADILLA:  Just one more quick question.  It

4   says here five hundred and thirteen thousand is identified

5   in recruitment and retention purposes.  Can you describe how

6   we go about recruiting and retaining.

7      MS. RADAVSKY:  What we've been doing, we've been very

8   aggressive at Coalinga, and in fact, last year, we took

9   thirteen out-of-state trips trying to recruit across the

10  nation to bring folks in, knowing what the competition is

11  like within California.   To date this year, we have had nine

12  out-of-state trips, and we continue to aggressively recruit.

13  The salary disparity again, you know, puts us a little

14  behind the curb.  We were at a conference two weeks ago, and

15  we had close to twenty people that said, "When you get it,

16  call me.  We'll come work for you."

17      SENATOR PADILLA:  Can you give us some numbers of what

18  the out-of-state trips have resulted in?

19      MS. RADAVSKY:  With the exception of probably two of

20  the psychiatrists, I would say we've been very successful

21  number-wise, probably sixty percent of the staff, the

22  clinical staff we have brought in psychologists,

23  psychiatrists, mainly, we've brought some rehab therapists

24  in, minimal social workers, but our psychiatric technicians,

25  which, you know, are our backbone.  We're working with West

1  Hills College on those, and we've graduated several classes

2  through West Hills, and we've ramped that up several years

3  before the hospital was open.

4      SENATOR PADILLA:  So now we're bring folks in from out

5  of state to go to this college?

6      MS. RADAVSKY:  Well, no.  In the other

7  classifications.  We're continuing to graduate from West

8  Hills for the psychiatric technicians.

9      SENATOR PADILLA:  And I ask only because in my

10  proposed -- propositions in a previous positions, I'm very

11  wary about out-of-state recruitment.  It seems to me that

12  for the high cost for the results, we're probably better off

13  not only trying to recruit locally, and I appreciate the

14  level of competition there is within the state, but with

15  another goal that the administration has, the legislature

16  has is revisiting career vocational education, trying to

17  grow the pool of potential employees, and if we dedicated

18  this, you know, dozen trips a year out of state towards the

19  education and training of Californians for these positions,

20  I think we'd be better off.

21      MS. RADAVSKY:  I don't disagree with you.  The problem

22  is we need to get into the junior highs to do that now

23  because with some of these career paths, they need to make

24  that decision, you know, I think we lost a lot of our folks

25  when the boom hit on the high-tech, you know, the healthcare

46

1   careers for some reason right now are not as attractive, and

2   so we're trying to get into the junior highs and the high

3   schools so that if they want to do a four-year or an

4   advanced degree, we can start them on that track.

5   We've also been going in and trying to

6   encourage them as seniors and juniors in high school if

7   you're not sure what to do, come on, you know, try it out,

8   see what you think, people.  It's a good salary for coming

9   right of school, and we'll educate you.

10      SENATOR COGDILL:  Thank you.  I just had a quick

11  question.  Am I understanding correctly that the facility

12  has the ability to house fifteen hundred?

13      MS. RADAVSKY:  Yes, sir.

14      SENATOR ALQUIST:  But you're at about a third of that

15  right now?

16      MS. RADAVSKY:  Yes, sir.  We're around five hundred

17  patients.

18      SENATOR COGDILL:  And this is primarily again because

19  of the staffing issues you can't adequately --

20      MS. RADAVSKY:  Yes, sir.

21      SENATOR COGDILL:  -- treat that population.  Would the

22  remaining thousand folks if you had the staff, would they

23  come out of the existing corrections, or would there all be

24  a different population that isn't being served right now?

25      MS. RADAVSKY:  Well, what we would end up doing is

1    moving the two hundred and fifty additional sexually violent

2    predators that are at Atascadero right now over to Coalinga,

3    which would help reduce the overbedding at the other

4    hospitals because we're significantly overbedding at Patton,

5    and we've had to reduce that at Atascadero.  We would bring

6    the hundred in off of a waiting list for Atascadero, and we

7    would bring in the thirteen seventies, the incompetent to

8    stand trials, the approximately two hundred to three hundred

9    that are sitting in county jail because they cannot come

10   into the hospital.  So there's a lot of folks that would go

11   in over there.

12        SENATOR COGDILL:  Is there any opportunity at all to

13   use any of this space on a temporary basis to deal with our

14   overcrowding in the prisons?

15        MS. RADAVSKY:  We've had that discussion several times

16   with corrections, and because of the security issues and the

17   way the hospital was built, essentially what we would have

18   to do -- and there are two Coleman court reports on this --

19   we would have to tear down a portion of the hospital and DMH

20   would lose two hundred beds to net thirty beds for the

21   Department of Corrections and its over ten-plus million

22   dollars.  Plus, it would have to be restored at probably a

23   higher rate in the long run --

24        SENATOR COGDILL:  Right.

25        MS. RADAVSKY:  -- to return back to us.  So it was

1    something we didn't feel was feasible.

2    　　　SENATOR COGDILL:   Okay.   Thank you.

3    　　　SENATOR ALQUIST:   I move to approve this budget.

4    Three-O. Number six, Request for DMH Headquarters Support.

5    Two issues, page twenty-five.   DMH, please.

6    　　　MS. RADAVSKY:   This is essentially a request for --

7    we're going to have physicians in labor relations and the

8    personnel office to just deal with the exponential growth

9    we've experienced in the department.   Our state hospitals

10   have gone from about nine thousand staff to about twelve

11   thousand staff.   You know, we've brought on Coalinga in the

12   last year.   We've added beds at Salinas Valley, and so it's

13   really just to build some administrative infrastructure for

14   us to keep up with all of those recruitments and hiring and

15   testing and the labor relations.   We're in eighteen of the

16   twenty-one bargaining units, and so that workload is just

17   exponentially growing, and this is our request to keep up

18   with that workload.

19   And in addition to that -- I'm sorry -- there

20   is a request for one attorney in our legal office to deal

21   with the Coleman versus Schwarzenegger lawsuit and make

22   those, you know, court appearances, do testimony, provide

23   written responses to the special master and keep up with

24   that workload.

25   　　　SENATOR ALQUIST:   The motion would be with the

49

1    adjustment for the staff counsel position?

2        MS. RADAVSKY:  Correct.

3        SENATOR ALQUIST:  LAO?

4        MR. MARTIN:  We're not raising any concerns.

5        SENATOR ALQUIST:  Okay, public comment?  Comment from

6    my colleagues?  Senator Cogdill?

7        SENATOR PADILLA:  Just to reiterate, I know you

8    mentioned it, but is this for the increase in workload only?

9    There's no other non-administrative, non-contract related,

10   non-regulatory related --

11       MS. RADAVSKY:  No.

12       SENATOR PADILLA:  -- reasons for these positions?

13       MS. RADAVSKY:  No.

14       SENATOR PADILLA:  Thank you.

15       SENATOR ALQUIST:  I move to approve as budgeted with

16   the adjustment for the staff counsel position.  Two aye and

17   one no.  Two-one.  Okay.  Thank you Ms. Ridaski.  She's

18   gone.  There she is. Okay.  And I want to thank all the many

19   wonderful state hospital employees who are working so

20   diligently to maintain a good program.  We really, really do

21   appreciate it.

22       Next we are going to be discussing mental health

23   issues.  So we begin with D, Issues for Discussion,

24   Community Mental Health, page twenty-six, number one, Mental

25   Health Medi-Cal Managed Care, page twenty-six.  We will

## LEGAL TRANSCRIBER CERTIFICATE

I, MARY MONTGOMERY, Legal Transcriber, certify;

That the foregoing is a true and correct transcript of the
**MARCH 12, 2007 SENATE BUDGET HEARING BEFORE THE SENATE AND
FISCAL REVIEW SUBCOMMITTEE NO. 3;**

That the content was transcribed from DVD;

I further certify that I am not a relative or employee of
any attorney of the parties, nor financially interested in
the action.

I declare under penalty of perjury under the laws
of California that the foregoing is true and correct.

Dated this ___ day of April, 2007.

_____
MARY MONTGOMERY

# END OF EXHIBIT F

# EXHIBIT G



Analysis of the 2006-07 Budget Bill

**Legislative Analyst's Office**
**February 2006**

# Department of Mental Health (4440)

The Department of Mental Health (DMH) directs and coordinates statewide efforts for the treatment of mental disabilities. The department's primary responsibilities are to (1) provide for the delivery of mental health services through a state-county partnership, (2) operate five state hospitals, (3) manage state prison treatment services at the California Medical Facility at Vacaville and at Salinas Valley State Prison, and (4) administer various community programs directed at specific populations.

The state hospitals provide inpatient treatment services for mentally disabled county clients, judicially committed clients, clients civilly committed as sexually violent predators, mentally disordered offenders, and mentally disabled clients transferred from the California Department of Corrections and Rehabilitation (CDCR).

*Budget Proposal Decreases DMH Overall Budget.* The budget proposes $3.4 billion from all fund sources for support of DMH programs in 2006-07, which is a decrease of about $173 million, or 5 percent, below the revised estimate of current-year expenditures. The decrease in overall DMH spending, when all fund sources are taken into account, is mainly due to the discontinuation of one-time current-year expenditures. Specifically, the Governor's spending plan reflects (1) a reduction of about $139 million in reimbursements related to one-time costs incurred in 2005-06 for settling past Early and Periodic Screening, Diagnosis and Treatment (EPSDT) program claims and (2) one-time General Fund spending of $120 million for two state-mandated programs for mentally ill children (known together as the "AB 3632" mandates) that would not be continued in the DMH budget for 2006-07.

The budget proposes about $1.6 billion from the General Fund, which is an increase of about $316 million, or 25 percent, above the revised estimate of current-year expenditures. If some significant budget adjustments had not been included in the Governor's budget proposal, the DMH General Fund budget for 2006-07 would have grown by about $96 million, or about 7.5 percent, above the revised estimate of current-year expenditures.

The increase in General Fund spending is mainly due to a technical budget adjustment in which General Fund support previously displayed in the Department of Health Services (DHS) Medi-Cal budget for the EPSDT program (which provides mental health services to children who are enrolled in Medi-Cal) would now be displayed in the DMH budget item. This transfer of about $340 million in General Fund support is offset in the DMH budget with a corresponding reduction in reimbursements.

Another significant technical change is the shift of funding for support of AB 3632 services from the DMH budget item to the Commission on State Mandates (CSM) budget item. (We discuss the Governor's further proposals to modify the AB 3632 mandates in *The 2006-07 Budget: Perspectives and Issues.*) As a result of the AB 3632 budgeting change, $50 million in General Fund spending that would otherwise have been included in DMH spending totals in 2006-07 appears instead in the CSM budget item.

*Budget Proposal Includes Proposition 63 Funds.* In November 2005, California voters approved Proposition 63, the Mental Health Services Act. This measure established a surcharge of 1 percent on the portion of a taxpayer's taxable income that exceeded $1 million beginning in January 2005.

Revenues are deposited into a newly created Mental Health Services Fund. For the first time, the Governor's budget display reflects the expenditure of these Proposition 63 resources, with proposed spending of $649 million in local assistance in 2005-06 and $656 million in 2006-07.

***Budget Proposal Includes Some Increases.*** Although the budget plan provides for an overall net decrease in total funding, it does include some significant proposals to increase spending on some programs. About $38 million from the General Fund would be spent to add 453 staff positions to the state hospital system to resolve U.S. Department of Justice (U.S. DOJ) civil rights investigations of four state hospitals. We discuss this proposal in more detail later in this analysis. The budget plan also requests an increase of about $19 million in General Fund for additional caseload costs for EPSDT.

# Response to Federal Investigations Premature

***The Governor's proposed budget requests additional resources to address deficiencies in state hospitals cited in civil rights investigations conducted by the U.S. Department of Justice. We withhold recommendation on the proposal at this time because this request is premature until a final agreement to resolve federal findings of deficiencies has been finalized and until documents detailing a remediation plan for the hospitals have been provided to the Legislature. Also, we find the proposed timetable for hiring 453 new staff by July 2006 to be unrealistic.***

## Background

***Deficiencies Found at State Hospitals.*** Pursuant to the Civil Rights of Institutionalized Persons Act (CRIPA), a federal civil rights law to protect individuals housed in public institutions such as mental hospitals, the U.S. DOJ has undertaken a series of actions affecting California's state hospital system.

The U.S. DOJ completed an on-site review of conditions at Metropolitan State Hospital (MSH) for both the children and adult programs in July 2002. The U.S. DOJ has since issued reports finding a number of deficiencies, including wrong diagnoses, improper medication, and insufficient protection of some patients from other patients. The U.S. DOJ recommended improvements in several program areas, including assessment, treatment, and medication of hospital patients.

The U.S. DOJ has also conducted on-site visits at Atascadero State Hospital and Patton State Hospital but at the time this analysis was prepared, had not yet reported its findings from these on-site visits. However, in June 2005, without first conducting an on-site visit, U.S. DOJ issued a report on the operations at Napa State Hospital that identified a number of deficiencies and recommended changes similar to those presented for MSH.

We are advised by DMH that the conditions that U.S. DOJ found and cited at MSH and Napa exist at all state hospitals except Coalinga State Hospital, which has been open less than one year. The DMH expects U.S. DOJ to issue findings similar to those for MHS and Napa in forthcoming reports on Atascadero and Patton. Accordingly, DMH has already undertaken program improvements to address CRIPA deficiencies at all state hospitals.

***Proposed Remediation Plan.*** According to DMH, U.S. DOJ has developed a remediation plan detailing the specific actions the department must take to resolve the problems identified at MSH. We are further advised by DMH that the proposed remediation plan, and a related draft settlement agreement, could serve as the basis for resolving CRIPA issues at all four state hospitals. The department has indicated that a consent decree between the state and the federal government settling all of these matters could be completed by late February.

The proposed remediation plan was considered confidential and thus was not available for review by the Legislature at the time this analysis was prepared. According to DMH, the document sets out measurable performance standards and establishes a timeline for state hospitals to address the U.S.

DOJ's findings of deficiencies. We are advised that the proposed remediation plan also includes agreements related to treatment planning, patient assessments, patient discharge planning, patient discipline, and documentation requirements. It also apparently addresses issues surrounding the use of seclusion and restraint of patients, incident management, quality improvement, and safety hazards in hospital facilities.

***Probable Consequences if the State Does Not Act.*** We have been advised by DMH that if the state fails to address CRIPA deficiencies, the state hospitals could be placed into federal receivership by the federal courts. Such an action could be similar to the recent federal court decision to place CDCR's health care program into receivership.

## The Governor's Budget Proposal

***Additional Resources for CRIPA Compliance.*** The Governor's budget proposes about $43 million in total funds (about $38 million from the General Fund) in 2006-07 to implement the U.S. DOJ remediation plan. Most of the funds would be used to add 453 additional staff positions to the state hospital system. About $1.8 million of the budget-year funding would be for consulting contracts and about another $1.8 million would be spent on special repairs to address potential safety hazards in hospital facilities.

***New Treatment Program Would Be Implemented.*** The DMH proposes to use most of the additional staff to implement a "recovery model" in which the hospitals would assist individuals through individualized mental health treatment to achieve their own goals and to recover the ability to effectively function in the community. The DMH describes this as a shift away from the present approach that focuses more on medical treatment of the patient's mental illness.

According to DMH, the U.S. DOJ's proposed remediation plan assumes that some of the problems found at MSH are the result of inadequate clinical staff (psychiatrists, psychologists, rehabilitation therapists, social workers, nurses, and psychiatric technicians) relative to the number of patients. We are advised that the staffing increases proposed by the Governor increase staff in some categories so as to establish patient-staffing ratios consistent with the proposed remediation plan.

## CRIPA Settlement Agreement Has Not Been Finalized

We have two main concerns with the administration's budget request. The first is that the request is premature until an agreement to address federal findings of deficiencies has been finalized and until documents detailing the proposed remediation plan for the hospitals have been provided to the Legislature. Our second concern is that the proposed timetable for hiring 453 new staff by July 2006 is unrealistic. We discuss both of these concerns below.

***Budget Request Is Premature.*** At the time this analysis was prepared, DMH and U.S. DOJ had not yet finalized the proposed remediation plan or the terms of the consent decree. Moreover, the documents that are identified as being the basis of resolving the CRIPA investigations have been kept confidential and are not yet available for legislative review.

Under these circumstances, the Legislature has no way to determine at this time whether the staffing expansions and other measures proposed by DMH meet or exceed what is actually being required by U.S. DOJ in response to the deficiencies cited in the CRIPA reports. If DMH is correct and an agreement is finalized in February, and if the remediation plan is subsequently made available for review, the Legislature will be in a much better position to assess the administration's budget request.

In our view, it would be premature to approve the administration's request for these additional staff and funding until and unless DMH reaches a final settlement agreement with U.S. DOJ for each hospital subject to investigation. Until such time as both parties have signed final agreements completely addressing all of the CRIPA findings of deficiencies affecting all four of the state hospitals, the

Legislature has no assurances that still further costly demands from U.S. DOJ would not follow.

***Administration's Plan Assumes 453 New Staff in July 2006.*** The administration's plan provides full-year funding for 453 positions that are all assumed to join the staff of the state hospital system as of July 2006. However, our analysis indicates that it is unlikely that all of the proposed new positions could possibly be filled by that time. Typically, state agencies, including the state hospital system, cannot recruit and appoint individuals to fill newly created positions until months after they have been established.

Based on State Controller's Office data, about 2,030, or 24 percent, of the authorized positions in the four state hospitals subject to the CRIPA investigation were vacant in January 2006. Some of the new clinical positions proposed in the Governor's budget request could prove to be very difficult to fill. The administration proposes to add about 47 senior psychiatrists and about 48 registered nurses. Increasingly in recent years, the state hospitals have had difficulties filling these types of positions and often experience large numbers of staff vacancies in these classifications. If the Legislature were to provide full-year staffing and funding for the 453 new positions proposed by the administration for 2006-07, it is likely that the state hospital system would be significantly overbudgeted as it encountered delays in actually using these resources.

## Analyst's Recommendation

We withhold recommendation at this time on the administration's entire budget request for additional resources to respond to the CRIPA investigations. Once the consent decree has been finalized, and the documents resolving the matter have been provided to the Legislature, we will review this additional information and provide the Legislature with our recommendations on this matter.

If the Legislature does choose to approve some or all of the positions requested by the administration, we recommend that it budget any such positions on a half-year basis. This approach would recognize that it will take DMH several months in many cases to fill these new positions after they have received approval in the budget process.

# Hospital Caseload Funding Overbudgeted As Staffing Problems Mount

***Updated caseload data indicate that the amount of General Fund needed for support of the state hospital system is overbudgeted by a combined $39 million in the current and budget year. Accordingly, we recommend that the Legislature make appropriate budget adjustments. (Reduce Item 4440-011-0001 by $20 million.) We also recommend that the administration clarify whether it intends to continue to operate a children's unit at the Metropolitan State Hospital given the dwindling caseloads at this facility.***

## Background

The DMH operates five state hospitals: Atascadero, Patton, Napa, Metropolitan, and Coalinga. The DMH also operates two acute psychiatric programs at the California Medical Facility in Vacaville, and the Salinas Valley State Prison. Forensic patients are generally committed by the courts to state hospitals under one of four categories: "incompetent to stand trial" (ISTs), "mentally disordered offender" (MDOs), "not guilty by reason of insanity" (NGIs), and "sexually violent predator" (SVPs). Some inmates and wards of CDCR receive care in the Vacaville and Salinas Valley facilities, while additional offenders in the custody of CDCR are transferred to the state hospitals for mental health treatment. Also, counties contract with the state to purchase beds at state hospitals for adults and children committed for mental health treatment under the provisions of the Lanterman-Petris-Short (LPS) Act.

The cost of caring for various categories of forensic patients is generally supported from the state General Fund. Counties reimburse the state hospitals using funds they receive from the state under the 1991 state-local realignment of tax revenues and mental health program responsibilities. About 90 percent of occupied beds are now utilized for forensic patients while about 10 percent are purchased by the counties.

## Governor's Budget Proposal

The Governor's budget proposes a net increase of about $12.4 million from all fund sources compared to the revised current-year estimate of expenditures. The increase is a result of updated estimates for the state hospital system population and baseline adjustments. The overall hospital population (including CDCR inmates in the Vacaville and Salinas psychiatric programs) is projected to grow from the revised estimate of 5,591 patients by the end of 2005-06 to 5,830 patients by the end of 2006-07, for an increase of 239 patients.

## Hospital Caseload Lagging as Coalinga Activation Stalls

*Updated Caseload Information Shows Overall Population Lagging.* The DMH's current-year hospital caseload adjustment is based on comparing the estimated population for September 30, 2005 to the actual caseload at that time for ISTs, NGIs, MDOs, and SVPs (the main population groups traditionally supported from the state General Fund).

However, more recent hospital population data we have reviewed through January 2006 indicate that the caseload is likely to be about 190 patients below DMH's revised and reduced estimate of patients for the current year. On this basis, we believe that the spending plan overestimates the funding needed in the current year by about $10 million from the General Fund. Similarly, our analysis indicates that the spending plan overestimates the funding needed in the budget year by about $20 million from the General Fund.

*Coalinga Startup Behind Schedule.* The 2005-06 budget provided an additional $65.7 million in General Fund support for the activation of the new Coalinga State Hospital. The 1,500-bed hospital began accepting its first patients in September 2005. The patient population was projected to be about 250 patients initially, increasing during the current year to a total of about 680 patients (or about 430 more) by March 2006.

In order to accommodate the first wave of 250 patients, the 2005-06 DMH budget plan assumed hiring about 875 clinical and support staff by August 2005. It also assumed that another 449 staff would be hired by January 2006 in order to receive the second wave of 430 additional patients.

However, neither the actual patient population nor staffing levels assumed in the state budget plan are close to being achieved. As of mid-January 2006, the total Coalinga patient population was about 140-approximately 300 patients below the number assumed in the hospital's activation plan. Staffing efforts were also well behind schedule. Data provided by the State Controller's Office indicate that, as of January 2006, about 58 percent of the staff positions authorized at that point in time were still vacant.

*Why Is the Coalinga Activation Off Track?* We are advised by DMH that the slowdown in activation of their new hospital facility is due mainly to the difficulty being experienced by the department in recruiting and hiring qualified staff for the new facility. Key clinical staff positions, we have been advised by DMH, have been particularly difficult to fill, and some clinical staff that had been initially recruited and hired to work at the hospital have already left to work elsewhere.

The department indicates that its difficulties in hiring and retaining staff stem in part from the recent federal *Plata* court case involving problems with the provision of health care at state prisons. On December 1, 2005, the federal judge in the case ordered the state to immediately increase

compensation for several classes of prison medical personnel (such as physicians, nurse practitioners, and registered nurses). State hospital administrators advised us that soon after the *Plata* ruling, efforts to recruit and hire additional clinical staff for Coalinga hit a snag for medical personnel in part because compensation levels at Coalinga were not competitive with nearby prisons.

***Coalinga Staffing Problem Has Ripple Effects.*** At the time this analysis was prepared, DMH indicated it was seeking administration approval to increase pay rates for its clinical staff to help offset the effects of the *Plata* decision. Even with the funding and position authority already available in its budget, Coalinga's beds cannot be activated without the appropriate staff in place to care for additional patients.

The problems in opening up Coalinga are already having a significant ripple effect throughout the state hospital system. For example, state hospital administrators had been counting on the activation of Coalinga to relieve overcrowding at Atascadero and Patton as some of their patients were transferred to Coalinga. Both Atascadero and Patton are currently over their licensed bed limit. Consequently, administrators of these two state hospitals have contended that their operations are at some risk if DHS, which licenses these hospital beds, will not continue to permit the "overbedding" of the two facilities.

The maximum patient population permitted at Patton, which is established in statute, was supposed to decrease by 334 patients one year after Coalinga was activated. Instead, the administration budget plan proposes statutory language to allow Patton to maintain its current maximum population for four years after the date Coalinga was activated.

This situation is also complicating efforts by CDCR to comply with federal court orders to provide additional mental health treatment beds for prison inmates. The Coalinga activation plan included 50 intermediate care beds at the hospital for inmates. Recent caseload information indicates that none of these 50 beds has been occupied.

County jail operations are also apparently being affected by this situation. According to the DMH budget request, the state hospital system has a waiting list of 350 individuals who have been committed to their system by the courts, but who remain in county jails because state hospitals are operated at their maximum staffed capacity. According to DMH, the size of that list is increasing daily.

## LPS and Children's Population in Decline

***LPS Patient Count Under Budgeted Level.*** The caseload data we have reviewed also show that the number of beds being occupied by county LPS patients is running somewhat below the level assumed in the *2005-06 Budget Act*. As of mid-January, there were 526 LPS patients in Napa and MSH, the two hospitals that care for this patient group, instead of the 555 that were expected, continuing a slow but steady decline that has occurred in recent years. Notably, the Governor's budget plan assumes that the number of LPS beds occupied in 2006-07 will hold steady at 520, but that figure now appears likely to be overstated.

***Children's Caseload at MSH Has Dropped by One-Half.*** One subset of this population is a unit at MSH that provides mental health services for severely emotionally disturbed children and adolescents. This population has also been in decline. Recently, however, we were advised by state hospital administrators that the remaining population of 50 in this unit is down by half to a total of 25 patients. As a result, we are advised that DMH had held up the bidding process for an estimated $8.8 million project to construct an on-site school building at MSH for these clients, and is reviewing whether the current population (if it holds) is sufficient to justify the continuation of this unit.

## Analyst's Recommendation

Based on (1) the updated caseload information we have reviewed, (2) the problems evident in the

activation of Coalinga, and (3) the declining LPS population, including the children's unit at MSH, we recommend that the Legislature take the following actions in regard to the budget proposal for state hospital population adjustments:

- *Caseload Adjustment for Certain Forensic Groups Warranted.* Based on our analysis of updated caseload information for ISTs, NGIs, MDOs, and SVPs, we recommend the Legislature reduce the General Fund budget for the state hospital system by $10 million General Fund for 2005-06 and by $20 million General Fund for the budget year. We anticipate that DMH will propose further adjustments for state hospital population trends for these specific patient groups at the time of the May Revision.

- *Adjust for Unavailable CDCR Beds at Coalinga.* We recommend the Legislature reduce the General Fund budget for the state hospital system by $8.5 million in the current year because Coalinga is unlikely to have the staffed capacity to accept the 50 patients anticipated when the 2005-06 budget was enacted. This amount represents the funding provided in the *2005-06 Budget Act* for these 50 beds.

- *Monitor and Respond to the Coalinga Problems.* Given the ongoing problems in activating the new Coalinga hospital, and uncertainty as to how and if these staffing difficulties can be overcome, we recommend approval of the administration's proposed statutory language to allow Patton to maintain its present capacity for three more years. We will continue to monitor the situation at Coalinga and will advise the Legislature whether additional budget adjustments are warranted for the budget of the hospital at the time of the May Revision. If significant progress is not made in hiring staff and bringing more patients into the facility, further budget and staffing adjustments may be warranted.

- *MSH Intentions Should Be Clarified.* The DMH should report to the Legislature at budget hearings regarding the outcome of its evaluation as to whether operation of the children's unit at MSH can and should continue. The department should also report on its final decision in regard to the construction of the new school on the grounds of MSH, and whether budget authority for the project should be reverted.

---

Return to Health and Social Services Table of Contents, 2006-07 Budget Analysis

# EXHIBIT H



**Legislative Analyst's Office**
California's Nonpartisan Fiscal and Policy Advisor

Search
Subscription
Links
Home

| Subject Areas | Products | Other Resources | Ballot/Initiatives | Careers | About Us |

Analysis of the 2007-08 Budget Bill: Health and Social Services

# Department of Mental Health (4440)

The Department of Mental Health (DMH) directs and coordinates statewide efforts for the treatment of mental disabilities. The department's primary responsibilities are to (1) provide for the delivery of mental health services through a state-county partnership, (2) operate five state hospitals, (3) manage state prison treatment services at the California Medical Facility at Vacaville and at Salinas Valley state Prison, and (4) administer various community programs directed at specific populations.

The state hospitals provide inpatient treatment services for mentally disabled county clients, judicially committed clients, clients civilly committed as sexually violent predators, mentally disordered offenders, and mentally disabled clients transferred from the California Department of Corrections and Rehabilitation (CDCR).

***Budget Proposal Increases DMH Overall Budget.*** The budget proposes $4.8 billion from all fund sources for support of DMH programs in 2007-08, an increase of $653 million, or 16 percent, above the revised estimate of current-year expenditures due mainly to increases in the Mental Health Services Fund established by Proposition 63. The budget proposes about $1.9 billion in General Funds, which is a decrease of $217 million from the revised current-year budget. The year-over-year decrease of $217 million is due mainly to one-time funding proposed for 2006-07 to address a deficiency in the Early and Periodic Screening Diagnosis and Treatment (EPSDT) program.

***State Hospitals Budget Proposal.*** The Governor's spending plan proposes $1.2 billion ($1.1 billion General Fund) in 2007-08, an increase of $115 million ($88 million General Fund) from the adjusted 2006-07 budget. The proposed increase is due primarily to a projected increase in caseload for sexually violent predators (SVPs) due to passage at the November 2006 election of Proposition 83, known as Jessica's law, and to comply with the Civil Rights for Institutionalized Persons Act consent decree requirements.

***Community Services Budget Proposal.*** The Governor's spending plan proposes $3.4 billion from all funds ($763 million General Fund) for support of the Community Services Programs, an increase of $562 million (a decrease of $264 million General Fund) compared to the revised 2006-07 budget estimate.

The community services budget plan includes the following proposals:

- ***Continued Implementation of the Mental Health Services Act.*** The Governor's spending plan provides $1.5 billion from the Mental Health Services Fund for implementation of the Mental Health Services Act (MHSA). Approved as Proposition 63 in November 2004, MHSA supports local programs by expanding community mental health services to children, youth, and adults with severe mental illnesses. The Mental Health Services Fund is a special fund which is continuously appropriated and is not subject to annual Budget Act appropriation.

- ***EPSDT Program.*** The Governor's spending plan proposes $303 million General Fund for the current year to meet a deficiency of unpaid county claims. The plan proposes a $93 million General Fund increase in 2007-08 above the *2006-07 Budget Act* to pay for an increase in caseload, costs and utilization of the EPSDT program services. We discuss this proposal in more detail later in this analysis.

- ***Mental Health Managed Care Program.*** The budget plan proposes a total of $462 million ($235 million General Fund) for 2007-08, an increase of $8 million ($4 million General Fund) over the current year mostly due to increases in caseload.

- ***Integrated Services for Homeless Adults.*** The Governor's budget plan proposes to eliminate this program, for a reduction of $55 million General Fund. The program provides comprehensive services to individuals who are homeless or at risk of homelessness and have a serious mental illness.

- ***Mental Health Services to Special Education Pupils (AB 3632).*** The budget proposes $52 million in General Fund to fund mental health services provided to children enrolled in special education as directed under the AB 3632 mandate and as required by the federal Individuals with Disabilities Education Act.

- ■ **Healthy Families.** The budget proposes an increase of $9.8 million ($537,000 General Fund) to provide supplemental mental health services to children enrolled in the Healthy Families program.

- ■ **Early Mental Health Initiative Program Expansion.** The budget plan proposes a $5 million increase in General Fund spending to expand mental health intervention and prevention services to children in grades K-3.

# Community Program Issues

## Early and Periodic Screening Diagnosis and Treatment Program: Estimate and Claims Processing System Need an Overhaul

*The Governor's Budget proposes $303 million General Fund for the current-year to address a prior- and current-year deficit in the Early and Periodic Screening Diagnosis and Treatment (EPSDT) program. We withhold recommendation on both the funding requested for the current year and the budget year pending receipt from the Department of Mental Health (DMH) of its revised EPSDT estimating methodology. We recommend the Legislature require the Office of State Audits and Evaluations within the Department of Finance to report at budget hearings on the findings from its review of the EPSDT estimating methodology and of DMH's related administrative practices.*

### Background

The EPSDT, a federally mandated program, requires states to provide a broad range of screening, diagnosis, and medically necessary treatment services to Medi-Cal beneficiaries under age 21, even if treatment is optional under the state's Medicaid plan. The requirements apply to mental health as well as physical health.

*EPSDT Estimate Methodology Has Proven To Be Inaccurate.* The EPSDT estimating methodology used prior to 2003-04 proved to be inaccurate. A new EPSDT estimating methodology was developed and first applied to 2003-04 expenditures at the time of the 2004 May Revision and has continued in use up to the present time. This new methodology has also proven to be inaccurate.

The DMH requested that the Office of State Audits and Evaluations (OSAE), within the Department of Finance (DOF), review the EPSDT estimating methodology as well as perform an internal control review of its fiscal systems. We are advised by DMH that it intends to present a revised estimate methodology for EPSDT in March 2007 to allow for legislative review prior to the May Revision.

*DMH Awaits Federal Audit Findings.* Late in 2005, DMH discovered that it had over-billed for federal matching funds for EPSDT for fiscal years 2003-04 and 2004-05. As a result, the federal Centers for Medicare and Medicaid Services (CMS) began to more closely review county reimbursement claims. In the fall of 2006, federal auditors reviewed DMH's reconciliation of 2003-04 claims, but the department had not received a final report on the federal audit at the time this analysis was prepared.

### The Governor's Proposal

*Budget Year.* The Governor's budget plan proposes $439 million General Fund for support of the EPSDT program in 2007-08, a decrease of $210 million, or 32 percent, below adjusted current-year expenditures. This year-over-year decrease in spending is mainly due to prior- and current-year deficiencies in the EPSDT program that we describe later. The budget plan proposes an increase of about $93 million General Fund for 2007-08 to provide for increased utilization, costs, and caseload.

*Current-Year Deficiency.* The Governor's budget plan proposes a current-year increase of $303 million General Fund above the amount approved in the *2006-07 Budget Act*. This increase consists of two parts: (1) prior-year deficiencies from 2003-04, 2004-05, and 2005-06 of about $243 million, and (2) a current-year deficiency of about $60 million. The administration attributes the prior-year deficiencies to a combination of "misestimating" of EPSDT claims and different accounting methodologies employed by DMH and the Department of Health Services in conjunction with a technical fund shift that occurred in 2006-07 The administration attributes the current-year deficiency of $60 million to greater-than-anticipated caseload growth. The administration has indicated that it will seek funding for these deficiencies in a supplemental appropriations bill.

The DOF sent a letter to the Joint Legislative Budget Committee (JLBC) in November notifying the JLBC of the $243 million prior-year deficiencies. The DOF sent another letter in January notifying the JLBC of the current-year deficiency of about $60 million General Fund.

## JLBC's Concerns

The JLBC sent a letter to DOF indicating several concerns with its proposal. First, the committee expressed its concern that the portion of the deficiency due to misestimating of provider claims and dating back to 2003-04 was not identified earlier by DMH and was not brought to the attention of the Legislature in a timely manner. The passage of more than two fiscal years before the existence of an ongoing problem with the EPSDT estimating methodology was identified indicates lax fiscal administration of this program.

The JLBC also indicated concern with the timing of the administration's presentation of the new EPSDT estimating methodology. The administration had indicated that the DMH intends to present the revised estimating methodology for EPSDT at an unspecified date in March to allow for legislative input prior to the May Revision. The JLBC's letter stressed that given the complexity of estimating annual expenditures in this program, receipt of the revised estimating methodology any later than March 1, 2007, may not allow sufficient time for legislative review. Without adequate review time, a revised estimating methodology may be adopted that does not address the causes of the misestimations that have occurred over the past three years as well as in the current year.

The JLBC's letter also indicated that the independent review being conducted by OSAE is a positive and necessary step towards improving management of the EPSDT program. However, the review should include an assessment of, and recommendations on, how to improve the cost settlement process by which county claims are reconciled. Further, the JLBC's letter urged that OSAE issue written findings and recommendations and share them with the Legislature.

## Analyst's Recommendation

In view of the concerns expressed by the JLBC, we withhold recommendation on both the administration's deficiency funding request in the current year and on the budget-year request for funding for the EPSDT program. Until the administration has provided the Legislature with an updated estimating methodology, as requested by the JLBC, we do not believe the Legislature will have the information necessary to fully assess this issue. We recommend the department report at budget hearings on the potential for the prior-year EPSDT deficiency to increase due to unfavorable federal audit findings.

We further recommend that the Legislature require OSAE to report at budget hearings and testify on its review of the EPSDT estimating methodology and its review of DMH's internal control systems.

# New Sexually Violent Predator Laws Drive Increased Costs

***Recent legislation, Chapter 337, Statutes of 2006 (SB 1128, Alquist), and the passage of Proposition 83, also known as Jessica's law, will increase the Department of Mental Health (DMH) workload related to screening, evaluating and housing sexually violent predators (SVPs). We recommend that the Legislature recognize current-year savings of $6 million General Fund due to lower-than-projected SVP caseload. We also recommend the Legislature wait until more information is available before taking action to fund additional administrative and caseload costs in the budget year. We will provide an updated recommendation at the time of the May Revision.***

## Background

Specified sex offenders who are completing their prison sentences are referred by CDCR to DMH for screening and evaluation to determine whether they meet the criteria as SVP. When DMH receives a referral it does the following:

- ■ ***Screening.*** The DMH screens referred cases to determine whether they meet legal criteria pertaining to SVPs to warrant clinical evaluation.

- ■ ***Evaluations.*** Two contract evaluators (Psychiatrists and/or Psychologists) are assigned to evaluate each sex offender while they are still held in state prison. Based on a review of the sex offender's records, and an interview with the inmate, the evaluators submit reports to DMH on whether or not the inmate meets the criteria for an SVP. If two evaluators have a difference of opinion, two additional evaluators are assigned to evaluate the inmate.

Those offenders who are found to meet the criteria for a SVP, as specified in law, are referred to district attorneys (DAs). The DAs then determine whether to pursue their commitment by the courts to treatment in a state mental hospital as an SVP. If a petition for a commitment is filed, the clinical evaluators are called as witnesses at court hearings. Cases that have a petition filed, but that do not go to trial in a timely fashion may

require updates of the original evaluations at the DA's request. The amount of time it takes to complete the commitment process may vary from several weeks to more than a year depending upon the availability of a court venue and the DA's scheduling of cases. While these court proceedings are pending, offenders who have not completed their prison sentences continue to be held in prison. However, if an offender's prison sentence has been completed, he or she may be held either in county custody or in a state mental hospital.

**Chapter 337, Statutes of 2006 (SB 1128, Alquist), and Proposition 83, Jessica's Law.** Chapter 337 was approved by the Legislature and signed by the Governor in September 2006. Chapter 337 made changes in law that generally increase criminal penalties for sex offenses and strengthen state oversight of sex offenders. For example, Chapter 337 requires that SVPs be committed by the court to a state mental hospital for an undetermined period of time rather than the renewable two-year commitment provided for under previous law. Chapter 337 also requires that every person required to register as a sex offender be subject to assessment using the State-Authorized Risk Assessment Tool for Sex Offenders (SARATSO) a tool for predicting the risk of sex offender recidivism.

Proposition 83, also known as Jessica's Law was approved by the voters in the November 2006 statewide election. This measure increases penalties for violent and habitual sex offenders and expands the definition of an SVP. The measure generally makes more sex offenders eligible for an SVP commitment by (1) reducing from two to one the number of prior victims of sexually violent offenses that qualify an offender for an SVP commitment and (2) making additional prior offenses "countable" for purposes of an SVP commitment.

**State Hospitals.** State mental hospitals hold sex offenders who have been committed as SVPs. State mental hospitals also hold some sex offenders who have completed their prison sentences, but are still undergoing SVP evaluations for commitment proceedings. As of January 2007 the total SVP caseload was 635 with 234 patients in Atascadero, 400 patients in Coalinga and 1 in Patton. We note that both Atascadero and Coalinga state hospitals have experienced difficulties in recruiting and hiring qualified staff. At the time this analysis was prepared, Atascadero was not accepting additional patients mostly due to staffing shortages. Although Coalinga was built with a bed capacity for 1,500 SVPs, it currently houses about 450 patients (about 400 SVPs and about 50 non-SVP patients). The inability to staff the facility due mostly to its remote location, limits the number of SVPs that can be placed there.

## Governor's Budget Proposal

As shown in Figure 1, the Governor's budget plan makes several requests related to the implementation of both Chapter 337 and Proposition 83. These proposals include:

- **Administrative Costs.** The budget plan proposes a current-year increase of $1.6 million General Fund and 21 positions for DMH headquarters and 8 positions for Coalinga. The budget plan proposes an increase in 2007-08 of $4.8 million General Fund and 44 positions at Coalinga and 8 positions at Coalinga for administrative and support positions to implement Chapter 337 and Proposition 83. The positions are requested in order to (1) screen and track referrals from CDCR, (2) oversee contracts for processing SVP evaluations, (3) provide assistance to the SARATSO Committee, and (4) develop, implement and evaluate a High Risk Sex Offender treatment program in collaboration with CDCR.

- **Evaluation Costs.** The budget plan proposes $15 million General Fund for the current year and $25 million General Fund in 2007-08 to account for the increased amount of evaluations that will be performed.

- **Caseload Costs.** The budget plan proposes $12 million General Fund for the current year and $43 million General Fund in 2007-08 due to a projected increase in SVP commitments.

Figure 1

### Governor's Budget Proposals for Sexually Violent Predator Programs

*(In Millions)*

| General Fund | 2006-07 | 2007-08 |
|---|---|---|
| Administration | $1.6 | $4.8 |
| Evaluations | 15.2 | 24.9 |
| Caseload | 12.1 | 43.3 |
| **Totals** | **$28.9** | **$73.0** |

## Analyst's Concerns

**Long-Term SVP Caseload Trend Still Uncertain.** At the time this analysis was prepared, Chapter 337 had been in effect for about four months and Proposition 83 had been in effect for about three months. As a result, there is little historical data available upon which to base an estimate of future ongoing costs. Thus, the administration had minimal data to work with when it prepared its budget plan and had to make several assumptions in order to estimate the costs of implementing Chapter 337 and Proposition 83.

**DMH Administrative Costs.** As a result of Chapter 337 and Proposition 83, CDCR estimates that its number of sex offender referrals to DMH for evaluation determination as SVPs will increase from about 500 per year to about 5,500 in 2007-08. This estimate was based on an initial surge of referrals from CDCR to DMH immediately after the passage of Proposition 83. Based on discussions with the administration, DMH and CDCR are still developing protocols to ensure the efficient referral of sex offenders to DMH.

Our analysis indicates that CDCR will likely refer significantly more sex offenders to DMH than it did prior to the passage of Chapter 337 and Proposition 83. Therefore some additional staff will be necessary to address the increase in sex offender referrals. However, given the recent passage of Proposition 83, the exact magnitude of the referrals and associated staff requirements is unknown.

**DMH Evaluation Costs.** Prior to implementation of Chapter 337 and Proposition 83, generally between 50 percent to 60 percent of referrals to DMH went on to receive full evaluations. It is uncertain the average percent of referrals that will go on to receive full evaluations under the new laws. The most recent data indicate that about 33 percent of the CDCR referrals warranted full evaluations since the new laws went into effect. This is significantly lower than the 50 percent to 60 percent that generally received evaluations under the prior standard.

**Caseload Costs.** Before Chapter 337 and Proposition 83, on average CDCR referred about 500 inmates per year to DMH for screening and on average about 40 of these inmates, or 8 percent, ultimately were given civil commitments to a state hospital as an SVP. The budget plan assumes that the same percentage will receive commitments under the new laws. However, as discussed above, Proposition 83 reduced from two to one the number of prior victims of sexually violent offenses that qualify an offender for an SVP commitment. Therefore, it will likely be more difficult for DAs to prove a pattern of predatory behavior and thus obtain an SVP commitment for sex offenders with only one victim compared with two or more victims. As a result, a potentially significantly lower percent of the CDCR referrals to DMH may ultimately result in an SVP commitment under the new one-victim standard.

The budget proposal assumes 271 new SVP commitments in 2006-07. The administration has indicated that this is a "worst-case scenario" and that this estimate was based upon preliminary data. Our analysis indicates that the number of new current-year SVP commitments resulting from Chapter 337 and Proposition 83 is likely to be substantially lower than assumed by the administration. In our view the administration did not adequately take into account that SVP caseload growth would likely increase at a gradual rate, if at all, during the first few months after implementation of Chapter 337 and Proposition 83. This gradual rate of increase is due to the amount of time it takes for DMH to complete SVP evaluations, for DAs to prepare their cases and for commitment proceedings to be heard by the courts.

## Analyst's Recommendation

We withhold recommendation on the administration's request for additional funds and positions for administrative costs as it is not certain at this time what the level of ongoing workload will be as a result of the new laws. Similarly, we withhold recommendation on the appropriate level of funding for evaluation costs to implement Chapter 337 and Proposition 83. We will update our recommendation at the time of the May Revision.

We recommend the Legislature recognize current-year savings of $6 million General Fund to take into account that the SVP caseload will initially increase gradually due to the amount of time it takes to have a sex offender committed as an SVP. We withhold recommendation on the Governor's 2007-08 request pending further data. We believe an additional three months of data will allow a more accurate assessment of the appropriate level of state support for SVP commitments in 2007-08. We will update our caseload recommendation for both the current year and the budget year at the time of the May Revision.

---

Return to Health and Social Services Table of Contents, 2007-08 Budget Analysis

# EXHIBIT I

Friday, Apr. 13, 2007

Posted on Fri, Mar. 23, 2007

# ASH workers may receive salary boost

## Stephen Curran

Psychiatrists at Atascadero State Hospital could see a significant pay increase as soon as next month under a proposal meant to keep employees from leaving the troubled facility.

A plan put forward by Gov. Arnold Schwarzenegger late Wednesday sets aside $9.4 million in unused Department of Mental Health funds to more closely align salaries within that agency with those at California Department of Corrections and Rehabilitation-run prisons.

The proposed "retention bonus" is effective April 1 through June 30, mental health Director Stephen Mayberg said. After that, the governor is expected to request an additional $34 million from the state Legislature to maintain the salary increases.

It marks Schwarzenegger's most aggressive response to the acute staffing shortages that employees say threaten to undermine safety and care at mental health hospitals for the criminally insane.

The projected boost is most significant for psychiatrists and senior psychologists, whose salaries will still be about 5 percent less than prison doctors. Other employees, such as psychiatric technicians and pharmacists, will see a pay increase but will still bring home 18 per-cent less than they would at a state prison.

Under the plan, ASH Executive Director Mel Hunter wrote in a memo to staff Thursday morning, a senior psychiatrist can expect to earn about $21,000 a month, while a psychiatric technician would earn about $4,267 a month.

That short-term bonus, Mayberg said, could translate to about $8,000 a month more for some senior-level psychiatrists.

The announcement came as Hunter and other mental health administrators are reeling with record-high vacancy rates as employees leave for jobs at prisons that pay up to 50 percent more. Shortages of up to 80 percent for psychiatrists prompted ASH administrators in January to close the facility's doors to new admissions for the first time in its history.

Statistics provided by the hospital show that, since January, two patients have killed themselves, the first successful suicides since 2005.

ASH officials have acknowledged that quality of care has suffered because of the shortages but did not say whether the high vacancy rate was to blame for the deaths.

"There's considerable concern about the impact of salary disparity and the rapidity of the exodus," Mayberg said. "The consequences it has for treatment and for staff and patient safety had to be addressed right away."

**A 'first step'**

Dr. Michael Lisiak, the hospital's chief steward with the Union of American Physicians and Dentists, said the plan could help stem a short-term exodus of doctors and psychologists.

But, he added, it falls short of the drastic, across-the-board measures — including full salary parity with the prison system— needed to revive the ailing state mental health system.

"In the two classes where the (salary) difference is only 5 percent, I definitely know this will slow down the attrition rate," said Lisiak, also the chief of staff at ASH. "But it takes a full team. You need all disciplines to treat patients effectively. The line staff are the ones who are constantly forgotten."

But, Mayberg said, automatically increasing Department of Mental Health salaries to rates equal to the prison system could then entice prison health care workers to seek out jobs at state-run mental hospitals.

Such large-scale departures would undermine the correctional department's progress in improving its own mental health staffing to comply with a federal judge's order for 500 new mental health positions.

Instead, Mayberg said, the departments need to create unique recruitment packages to prevent employees from going "back and forth" between institutions.

Assemblyman Sam Blakeslee, R-San Luis Obispo, who has championed legislative efforts to address safety and staffing problems at ASH, called Schwarzenegger's action an encouraging "first step" to correcting problems at the facility.

Blakeslee is planning a meeting April 13 with ASH and Department of Mental Health officials to discuss the problems.

State Sen. Abel Maldonado, R-Santa Maria, said he supported efforts to achieve parity with the prisons depar tment.

Wednesday's announcement is the latest in more than a year of lengthy discussions among unions, legislators and state administrators. Schwarzenegger's plan, Mayberg said, shows the state is committed to reversing the flood of workers away from mental health hospitals.

"Sometimes we don't get credit for being responsive, and I think this is something that is a solution that addresses the need," Mayberg said. "It would be helpful if the government worked things more quickly, but it's important that we do it right and think through these things."

© 2007 San Luis Obispo Tribune and wire service sources. All Rights Reserved.
http://www.sanluisobispo.com

# EXHIBIT J

# California Association of Psychiatric Technicians

RECEIVED

APR 1 1 2007

Rosen, Bien & Galvan

April 10, 2007

The Honorable Lawrence K. Karlton
Judge of the District Court
United States District Court
Eastern District of California, Department 4
501 I Street
Sacramento, CA 95814

Re: **Coleman v. Schwarzenegger**

Dear Judge Karlton:

The California Association of Psychiatric Technicians (CAPT) represents approximately
7000 psychiatric technicians and related classes employed by the California Department
of Mental Health (DMH), the California Department of Developmental Services (DDS)
and the California Department of Corrections and Rehabilitation (CDCR). CAPT is
writing in anticipation of the hearing scheduled before you on April 23, 2007.

The Psychiatric Technician is a nursing category parallel to a Licensed Vocational Nurse
(LVN). However, while LVNs focus on medical, maternity and pediatric nursing,
Psychiatric Technicians specialize in mental illnesses and developmental disabilities—the
only nursing staff in the nation to be so trained.

At DMH hospitals, Psychiatric Technicians provide round-the-clock care and "hands-
on" treatment to clients. Psychiatric Technicians are key treatment team members who
provide the first level of security on the units, basic nursing care, medication
administration, documentation, patient assessment, therapeutic activities, treatment plan
development and implementation, treatment for addictive disorders, group processes,
patient and family education, case management and geriatric care.

The lack of Psychiatric Technicians at DMH hospitals is reaching a critical stage. This
has a direct effect on client care and well being. For example, DMH has notified CDCR
that it cannot accept any more patients at Atascadero State Hospital (ASH) because of the
lack of staff. Coalinga State Hospital has a 1500 bed capacity and is unable to fill vacant
beds due to the lack of Psychiatric Technicians and other staff.

Psychiatric Technicians are required to work mandatory overtime because of the lack of
staff at all DMH hospitals. Psychiatric Technicians can be mandated to work up to 6
mandatory overtime shifts per month. For example, the overtime situation is so bad at
ASH that DMH is approving FMLA leave for Psychiatric Technicians because they are

medically unable to work the required 16 hour shifts. The staffing shortage undermines the care and services that are needed by clients at DMH hospitals. Staff is overworked and tired, and the environment is becoming increasingly dangerous as evidenced by the upswing in physical attacks on Psychiatric Technicians.

The recent court order that increased the salaries of Psychiatric Technicians employed by CDCR has caused an exodus from DMH hospitals and DDS facilities to state prisons. Psychiatric Technicians can earn more salary, with less overtime, by working at state prisons. The average salary increase for a Psychiatric Technician employed by CDCR was $768.00 per month and the average salary increase for a Senior Psychiatric Technician was $872.00 per month. Recently, the Governor's Office announced a proposed increase for salaries in DMH. The proposal results in an average salary increase of $77.00 per month for a Psychiatric Technician and an average salary increase of $126.00 per month for a Senior Psychiatric Technician.

The Governor's proposed salary increase will not prevent Psychiatric Technicians and Senior Psychiatric Technicians from leaving DMH. For example, since the CDCR salary increases ASH has lost 15 Psychiatric Technicians and 2 Senior Psychiatric Technicians to state prisons. This is likely to continue because of the disparity in salary between DMH and CDCR and the difference in security in state prisons and DMH hospitals. At state prisons there is a large security staff in place that does not exist at DMH hospitals, even though DMH hospitals care for clients with many of the same issues as those housed at state prisons. According to DMH, there currently are more than 4000 clients in DMH hospitals, with more than 80% of these clients committed by the courts, Board of Prison Terms or by CDCR itself as forensic (criminal) commitments. Finally, with the voters' approval of "Jessica's Law" that increases penalties for sexually violent predators, DMH has indicated that it estimates that approximately 400 more sexually violent predators per year will be housed in DMH hospitals beginning in 2007-2008.

In order to maintain the level of care needed by clients at DMH hospitals and to assure the well being of those clients and safety of all those working at DMH hospitals, CAPT supports increasing the salaries of Psychiatric Technicians and Senior Psychiatric Technicians at DMH hospitals to at least the salary levels of those for Psychiatric Technicians and Senior Psychiatric Technicians employed by CDCR. This will help in stemming the transfer of Psychiatric Technicians and Senior Psychiatric Technicians from DMH to CDCR, but does not alleviate the staffing shortage at DMH. CAPT suggests that additional measures be taken to address this issue.

California Welfare and Institutions Code section 4320 provides that: "To assure an adequate supply of licensed psychiatric technicians for state hospitals . . . the State Department of Mental Health, to the extent necessary, shall establish in state hospitals for

the mentally disordered a course of study and training equivalent, as determined by the Board of Vocational Nurse and Psychiatric Technicians . . . to the minimum requirements of an accredited program for psychiatric technicians in the state."

In CAPT's view, it is undisputed that there is not an adequate supply of licensed Psychiatric Technicians in state hospitals.  Therefore, DMH should be compelled to establish a course of study and training in state hospitals for Psychiatric Technicians.  This will serve to increase the number of "seats" for psychiatric technician students that are available at community colleges, and provide more Psychiatric Technicians to fill the vacancies at DMH hospitals and to handle the anticipated increase in clients that will be treated in DMH hospitals in the coming years.

CAPT recognizes the difficult decisions faced by the parties in this litigation.  The goal of all involved is to provide the best care possible to the clients involved, in an environment that is safe for both the clients and staff.  CAPT respectfully requests that the Court consider its suggestions as discussed above.

Very truly yours,

Tony Myers
CAPT State President

cc:  Michael W. Bien

# EXHIBIT K



# CALIFORNIA PSYCHIATRIC ASSOCIATION

1400 K STREET, SUITE 302, SACRAMENTO, CA 95814
(916) 442-5196 FAX (916) 442-6515 calpsych@calpsych.org



| | |
|---|---|
| To: | Senator Denise Ducheny, Chair |
| | Senate Budget Committee |
| | State Capitol, Room 5035 |
| | |
| | Senator Elaine Alquist, Chair |
| | Senate Budget Subcommittee No. 3 |
| | State Capitol, Room 5080 |
| | |
| | Assemblymember John Laird, Chair |
| | Assembly Budget Committee |
| | State Capitol, Room 6026 |
| | |
| | Assemblymember Patty Berg, Chair |
| | Assembly Budget Subcommiteee No. 1 |
| | State Capitol, Room 4146 |
| | |
| Re: | STATE HOSPITAL STAFFING CRISIS |
| | |
| Date: | March 8, 2007 |

We, the undersigned, are writing to you with grave and urgent concerns about pay disparities in rates for mental health clinicians in California State Hospitals as compared to pay scales for mental health and other clinicians in the California Department of Corrections and Rehabilitation (CDCR).

Those disparities, in effect for a very short time, have already created a significant "brain drain" as clinicians leave state hospitals to work for much higher salaries   and many would say much safer working conditions - in prison facilities. These conditions will only worsen in coming months. This "brain drain" has left state hospitals in general and Atascadero State Hospital in particular, in an acute stage of crisis that can only be termed a "meltdown." No classification of clinicians who play vital roles in the care for state hospital patients is left unaffected: psychiatrists, psychologists, clinical social workers, psychiatric technicians, pharmacists, and nurses as well as recreation and rehabilitation therapists.

Under these conditions psychiatrists, just to cite one example, cannot perform to meet standards of practice when patient loads exceed 100 patients for every psychiatrist, as they now do at Atascadero (which has only 9 full time psychiatrists, including the medical director and chief of staff, to treat a census of 1,223 patients as of January 17, 2007); or, when every dispensing pharmacist leaves a facility, as they did late last year at Napa State Hospital; or, when current vacancies for psychologists exceed 50% at Coalinga, 42% at Patton, and 56% at Atascadero; or, when vacancy rates of 45% for rehabilitation therapists, 40% for social workers and 35% for psychiatric technicians exist at Atascadero.

Page 2
State Hospital Crisis

Current state licensing and court mandates that require psychiatrist-to-patient ratios of
1:15 in acute units, and 1:25 in intermediate care units, are currently being exceeded, in
Atascadero State Hospital by as much as 4 times the allowed ratio, and conditions worsen
with each passing day. The inevitable result of this inexorable process is that patients and
their families will be harmed. It is impossible for the few clinicians left to practice to do
so in the ways in which they were trained and that would be judged competent, safe and
effective. Patients and their families and those employed in state hospitals deserve better
and steps must be taken immediately to correct the conditions what have led to the worst
staffing crisis our state hospitals have ever experienced.

State hospital personnel have been underpaid for decades. This chronic underfunding is a
good part of the reason why conditions at state hospitals have, twice in the last 15 years,
resulted in investigations and settlement agreements with the U.S. Department of Justice
over constitutionally inadequate conditions and violations of patients civil rights in
California state hospitals. It is axiomatic that adequate salaries, on a par with the CDCR,
will attract adequate numbers of well-qualified clinicians.

If pay inequity continues, admission restrictions such as those in effect at Atascadero
which has all but closed its doors to new patients (Atascadero has restricted admissions of
all patients to all beds for inmates since at least January 18, 2007 pending releases of
patients that free up beds), could spread to other hospitals as they too reach capacity to
handle CDCR patients, or new patients of any sort due to diversions from Atascadero.
The expected result of such a process will be the backing up of patients in prisons (or
direct releases of dangerous patients to the community); patients with committal orders
from local courts to state hospitals - who will languish in county jails with no prospect of
placement or long delayed placement and as result of which, may not receive proper
psychiatric treatment, leading to a potential increase in jail suicides and violent and
aggressive behavior towards other inmates and custody staff. In addition, of particular
concern, patients who will be released from county jails who might otherwise be held
will end up in acute psychiatric units in the community, or in public or private emergency
rooms, the overcrowding of which has already reached epidemic proportions. The total
sum of all these potential consequences in terms of both indirect and direct increased
costs to local and state agencies is likely to be of immense proportions.

As regards the warehousing of patients in local jails, some jails, under a recently adopted
statutory scheme may have courts order medication for certain categories of state hospital
bound inmates. Because of the existence at these jails of psychiatric treatment services,
these very same jails are able to provide treatment for the duration of local confinement
for patients on what are often long waiting lists. Other jurisdictions hold that the orders
for medication are only effective once patients arrive at the state facility, while yet other
local jails have no psychiatric treatment units. The latter two conditions result in
warehousing of inmates, who languish untreated and are in many cases floridly psychotic
and must remain so for the duration of their confinement. Even before the present crisis it
has been common for patients who have been declared incompetent to stand trial or not
guilty by reason of insanity to languish thus for many months at a time waiting for a state
hospital bed to open up. In fact some local jurisdictions have threatened to hold the state

Page 3
State Hospital Crisis

DMH in contempt due to the piling up of very sick individuals with mental disorders in
local jails. This situation can only get worse in the coming months, and will be
compounded by staffing shortage-induced admission restrictions and this process will
accelerate exponentially throughout the state.

Prompt action is imperative before the system-wide meltdown currently in process
reaches a tipping point beyond which no inducements, however powerful, can be
reasonably counted on to overcome the resistance potential clinicians would have to
abysmal working conditions in a dysfunctional system. Beyond a certain point salaries
cannot compensate for that type of judgment by individuals.

It is reassuring to read the Coleman court order of February 6, 2007, which orders DMH
clinician salary parity with the CDCR pay scale - for DMH clinicians in two CDCR
facilities (Vacaville Medical Facility and Salinas Valley Correctional Facility). It is also
reassuring to read further in the same Coleman court order that the court is likely poised
to make the same order with respect to DMH clinicians at state hospitals in Atascadero,
Patton and Coalinga within 60 days. This latter order derives authority from the fact that
CDCR inmates are patients in those facilities.

However, these orders neglect to act in any way whatsoever with respect to Napa and
Metropolitan state hospitals which, if no remedy is offered, will predictably hemorrhage
clinicians until treatment grinds to a total halt and all that is left for patients is detention.

Irrespective of court orders which address different components of this problem the State
of California must act to preserve the authority that has not been invested in the courts.
Immediate corrective action must be taken so that the entire state hospital system is made
whole in the midst of the actions of courts which each possess a different fragment of
authority to seek remedies, and taken all together may or may not ultimately take the final
steps to restore our state hospital system to good health.

Without prompt action California may cede its remaining authority to courts. If state
hospital conditions continue to deteriorate courts will ultimately have no recourse but to
step in and put our state hospitals in receivership as they have with the health care of our
prisons.

[SIGNATURE PAGE ATTACHED]

<u>SIGNATURE PAGE</u>

Randall Hagar, Director of Government Affairs, California Psychiatric Association

Sheree Kruckenberg, Vice President for Behavior Hospitals, California Hospital Association

Ralph E. Nelson, Jr, MD, President, NAMI California

Gary Robinson, Executive Director, Union of American Physicians and Dentists

Mary Reimersma, Executive Director, California Association of Marriage and Family Therapists

Geri Esposito, Executive Director, California Association of Clinical Social Work

Janlee Wong, Executive Director, National Association of Social Workers, California

Mark Grabau, Vice President, Forensic Mental Health Association of California

Jim Raphael, Vice-President, California Association of Patients Rights Advocates

Margaret Lydon, Legislative Liaison, Mental Health Association of Santa Barbara

Ken Murch, California Association of Psychiatric Technicians

Janice DeLoof, Legislative Chair, NAMI Orange County

Mark Chafee, President, Suicide Prevention Advocacy Network

# EXHIBIT L

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

***DIVISION OF CORRECTIONAL HEALTH CARE SERVICES***
P. O. Box 942883
Sacramento, CA  94283-0001



## DEC 1 9 2006

J. Michael Keating, Jr.                           via:    Lisa Tillman
Office of the Special Master                              Deputy Attorney General
2351 Sussex Lane                                         Department of Justice
Fernandina Beach, FL  32034                              1300 I Street, Suite 125
                                                         P. O. Box 944255
                                                         Sacramento, CA  94244-2550

**RE:  CENSUS AND WAIT LIST DATA FOR INTERMEDIATE CARE FACILITY
      AND DAY TREATMENT PROGRAM BEDS AT THE CALIFORNIA MEDICAL
      FACILITY**

Dear Mr. Keating:

In accordance with the January 19, 2006, All-Policy Meeting, the California Department of
Corrections and Rehabilitation and the Department of Mental Health are providing census and
wait list data for Intermediate Care Facility and Day Treatment Program Beds at the California
Medical Facility.  Staffing information and data related to physical plant modifications, as
originally required with the stipulated order entered at the hearing on January 14, 2005, will no
longer be included in the report.

If you need clarification on any aspect of this report, please contact Doug McKeever,
Program Director, Division of Correctional Health Care Services, at (916) 327-1168.

Sincerely,

PETER FARBER-SZEKRENYI, DR. P.H.                CYNTHIA A. RADAVSKY
Director                                        Deputy Director
Division of Correctional Health Care Services   Long Term Care Services
Department of Corrections and Rehabilitation     Department of Mental Health

Enclosure

cc:   John Dovey, Director, Division of Adult Institutions
      Doug McKeever, Program Director, Division of Correctional Health Care Services
      Yulanda Mynhier, Deputy Director (A), Health Care Administrative Operations Branch,
          Division of Correctional Health Care Services
      Nadim Khoury, M.D., Chief Deputy, Clinical Services, California Medical Facility

**CENSUS AND WAIT LIST DATA FOR INTERMEDIATE CARE FACILITY AND DAY TREATMENT PROGRAM BEDS AT THE CALIFORNIA MEDICAL FACILITY**
**REPORT DATE: 12/01/2006**

**WAIT LIST DATA BY HOUSING UNIT/LEVEL OF CARE**

| FACILITY | PSU[5] | MHCB | ACUTE | AD. SEG – EOP[6] | SHU[7] | EOP[8] | PC 1370 | TOTAL |
|---|---|---|---|---|---|---|---|---|
| P-2 ICF LEVEL IV | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| A-3 ICF | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| A-2 DTP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SVPP | 7 | 11 | 1 | 26 | 0 | 31 | 30 | 106 |
| SVPP PC 1370 | 5 | 1 | 0 | 7 | 3 | 14 | --- | 30 |

[1] Day Treatment Program
[2] Intermediate Care Facility
[3] Mental Health Crisis Beds
[4] Salinas Valley Psychiatric Program
[5] Psychiatric Services Unit
[6] Administrative Segregation Enhanced Outpatient Program
[7] Security Housing Unit
[8] Enhanced Outpatient Program

12/01/2006

12/01/2006

# CENSUS AND WAIT LIST DATA FOR INTERMEDIATE CARE FACILITY AND DAY TREATMENT PROGRAM BEDS AT THE CALIFORNIA MEDICAL FACILITY
## REPORT DATE: 12/01/2006

| UNIT | CAPACITY | FILLED | HOLD | AVAILABLE |
|---|---|---|---|---|
| A-2 DTP[1] | 44 | 43 | 1 | 0 |
| A-3 ICF[2] | 40 (35)* | 35 | 0 | 0 |
| P-2 Level IV | 36 | 36 | 0 | 0 |
| S-1 MHCB[3] | 25 | 16 | 2 | 7 |

*Bed capacity reduced for State Fire Marshall required renovations

| S-1 MHCB TOTAL REFERRALS | TOTAL ACCEPTED | TOTAL REJECTED |
|---|---|---|
| 41 | 41 | 0 |

| Unit | Single Cell Capacity | Single Cell Filled | Single Cell Hold | Single Cell Available | Dormitory Capacity | Dormitory Filled | Dormitory Hold | Dormitory Available |
|---|---|---|---|---|---|---|---|---|
| SVPP[4] | 32 | 27 | 5 | 0 | 32 | 22 | 0 | 10 |

| Unit | Single Cell Capacity | Single Cell Filled | Single Cell Hold | Single Cell Available |
|---|---|---|---|---|
| D-6 SVPP | 54 | 38 | 2 | 14 |

## WAIT LIST DATA

| UNIT | WAIT LIST |
|---|---|
| P2 ICF LEVEL IV | 0 |
| A3 ICF | 2 |
| A2 DTP | 9 |
| SVPP | 106 |

1

# EXHIBIT M

Westlaw.

West's Ann.Cal.Welf. & Inst.Code § 6600.05

c

**Effective: August 10, 2001**

WEST'S ANNOTATED CALIFORNIA CODES
WELFARE AND INSTITUTIONS CODE
DIVISION 6. ADMISSIONS AND JUDICIAL COMMITMENTS
PART 2. JUDICIAL COMMITMENTS
CHAPTER 2. COMMITMENT CLASSIFICATION
ARTICLE 4. SEXUALLY VIOLENT PREDATORS

➡ **§ 6600.05. Mental health facility; Atascadero State Hospital; alternate facilities; permanent facility**

(a) Until a permanent housing and treatment facility is available, Atascadero State Hospital shall be used whenever a person is committed to a secure facility for mental health treatment pursuant to this article and is placed in a state hospital under the direction of the State Department of Mental Health unless there are unique circumstances that would preclude the placement of a person at that facility. If a state hospital is not used, the facility to be used shall be located on a site or sites determined by the Director of Corrections and the Director of Mental Health. In no case shall a person committed to a secure facility for mental health treatment pursuant to this article be placed at Metropolitan State Hospital or Napa State Hospital.

(b) A permanent facility for the housing and treatment of persons committed pursuant to this article shall be located on a site or sites determined by the Director of Corrections and the Director of Mental Health, with approval by the Legislature through a trailer bill or other legislation. The State Department of Mental Health shall be responsible for operation of the facility, including the provision of treatment.

Current through Ch. 5 of 2007 Reg.Sess. urgency legislation

© 2007 Thomson/West

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.