PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
AMY WHELAN Bar No.: 215675
LORI RIFKIN Bar No.: 244081
SARAH M. LAUBACH Bar No.: 240526
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>    Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>    Defendants | No.: Civ S 90-0520 LKK-JFM<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR EMERGENCY RELIEF REGARDING DEFENDANTS' DENIAL OF ACCESS TO INPATIENT PSYCHIATRIC BEDS IN DMH'S STATE HOSPITALS**<br><br>Continued Hearing Date: May 21, 2007<br>Time: 10:00 a.m.<br>Location: Courtroom 4<br>Judge: Hon. Lawrence K. Karlton |

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| APP | Acute Psychiatric Program. A 150-bed acute inpatient unit operated by the Department of Mental Health inside the California Medical Facility. |
| ASH | Atascadero State Hospital. A state mental hospital operated by the Department of Mental Health in Atascadero, California. |
| ASU | Administrative Segregation Unit. |
| BCP | Budget Change Proposal. |
| CCC | Consolidated Care Center. |
| CCCMS | Correctional Clinical Case Management System. CCCMS is the name for the largest CDCR mental health program, which currently houses 26,000 inmates with mental illness who live in general population housing units alongside non-mentally ill inmates. CCCMS inmates are generally given medication management, and a meeting with their case manager every 90 days. A few also participate in groups. |
| CDCR | California Department of Corrections and Rehabilitation. |
| CMF | California Medical Facility. A prison in Vacaville, California. |
| CMC | California Men's Colony. A prison in San Luis Obispo, California. |
| CIM | California Institution for Men. A prison in Chino, California. |
| CRIPA | Civil Rights of Institutionalized Persons Act, 42 USC § 1997 *et seq.* |
| CSH | Coalinga State Hospital. A state mental hospital operated by the Department of Mental Health in Coalinga, California. |
| CTC | Correctional Treatment Centers. CTCs are licensed inpatient units inside prisons. Mental Health Crisis Beds operate inside Correctional Treatment Center Units. In addition to Mental Health Crisis Beds, most CTCs also include medical beds. |
| DMH | Department of Mental Health. |
| DOF | Department of Finance. |
| EOP | Enhanced Outpatient Program. EOP programs are sheltered treatment programs that house severely mentally ill inmates. There are currently approximately 4,100 EOP inmates. Because these inmates are unable to function in a general population setting, they live in segregated housing units. They are given 10 hours each week of therapy or other "structured therapeutic activities." EOP inmates meet weekly with their case managers. |
| ICF | Intermediate Care Facility. ICF programs are "intermediate" inpatient care programs. These programs are operated by the state Department of Mental Health. There are currently ICF programs at Salinas Valley State Prison, the California Medical Facility, Atascadero State Hospital, and Coalinga State Hospital. Inmates in these programs have frequent clinical contact, 24-hour |

| | | |
|---|---|---|
| | | nursing care and 20 or more hours of therapy and treatment each week.  Inmates generally spend 6-12 months in these programs. |
| | LAO | Legislative Analyst's Office. |
| | LOU | Locked Observation Unit.  An unlicensed Outpatient Housing Unit that is currently operating as a de facto MHCB at California Men's Colony. |
| | MHSDS | Mental Health Services Delivery System.  The name given by Defendants to their entire mental health system. |
| | MHCB | Mental Health Crisis Beds.  MHCB units are licensed inpatient units inside many California prisons where mentally ill inmates who are suicidal or experiencing another kind of mental health crisis can be admitted and treated for up to 10 days.  MHCBs are generally located inside a Correctional Treatment Center. |
| | MSH | Metropolitan State Hospital.  A state mental health hospital operated by the Department of Mental Health in Norwalk, California. |
| | NSH | Napa State Hospital.  A state mental health hospital operated by the Department of Mental Health in Napa, California. |
| | OHU | Outpatient Housing Units.  Unlicensed infirmaries inside many CDCR institutions that provide treatment for medical and mental health conditions. |
| | PBSP | Pelican Bay State Prison.  A prison in Crescent City, California. |
| | PSH | Patton State Hospital.  A state mental health hospital operated by the Department of Mental Health in San Bernardino, California.  This is the only state hospital that houses female 2684 patients. |
| | PSU | Psychiatric Services Unit.  These are psychiatric treatment programs providing Enhanced Outpatient Program level of care to inmates with a Security Housing Unit term. |
| | SHU | Security Housing Unit.  This is a segregated high-security housing unit for inmates who have committed serious infractions while in prison or who have been "validated" by the CDCR as belonging to a gang.  There are male SHU units at Pelican Bay State Prison (from which all inmates with serious psychiatric conditions are excluded), Corcoran State Prison, and California Correctional Institute.  There is a SHU for women at Valley State Prison for Women. |
| | SVP | Sexually Violent Predators. |
| | SVPP | Salinas Valley Psychiatric Program.  The free-standing DMH-run unit on the grounds of Salinas Valley State Prison that has ICF beds. |
| | SVSP | Salinas Valley State Prison.  A prison in Soledad, California. |

**TABLE OF CONTENTS**

TABLE OF ABBREVIATIONS ................................................................................................ i, ii

TABLE OF CONTENTS ............................................................................................................ iii

INTRODUCTION ......................................................................................................................... 1

UPDATED INFORMATION ABOUT THE CRITICAL SHORTAGE OF INPATIENT BEDS ............................................................................................................................... 2

    A.    ASH Continues to Deplete Its Court-Mandated *Coleman* Population ......................................................................................................... 3

    B.    The Depleted *Coleman* Patient Population at ASH Has a Ripple Effect on the Rest of the Already Over-Burdened Mental Health Services Delivery System ............................................................................. 3

    C.    Staffing Vacancy Rates Persist and Will Only Get Worse Now That the CDCR Pay Raises Have Become a Reality .................................. 5

    D.    Even the Salary Increases for *Filled* DMH Positions Have Not Yet Taken Effect, Leaving DMH Prone to Ongoing Staff Departures .............. 6

ARGUMENT ................................................................................................................................. 7

Defendants' Written "Plan" Completely Ignores the *Coleman* Class and Sets Forth a Series of Empty Promises That Have Already Failed ............................................ 7

    A.    The Budgeted Staffing Plan to Fill Vacancies Will Not Open *Coleman* Beds and Offers Even Lower Salaries to New Staff Than The Raises for Incumbent Staff (Which Still Have Not Taken Effect) ......................................................................................................... 8

    B.    The State Personnel Board Resolution Is Vague, Inadequate and Likely to Require Negotiation With the Unions .......................................... 9

    C.    Federal Loan Repayment ....................................................................... 10

    D.    Registries and Emergency Contracts ..................................................... 10

    E.    Internship Programs ............................................................................... 11

CONCLUSION ........................................................................................................................... 11

UPDATED REQUEST FOR RELIEF ....................................................................................... 12

**INTRODUCTION**

On February 7, 2007, this Court ordered Defendants to assess the impact of the pay disparity between CDCR and DMH mental health staff and to devise a plan to address any problems revealed by that assessment. Plaintiffs filed this motion on March 23, 2007 seeking emergency orders from this Court regarding the severe staffing vacancies in DMH state hospitals and the dire effects of those shortages on the *Coleman* class. Plaintiffs sought to have this motion heard on shortened time due to the gravity of these issues. On March 29, 2007, this Court denied the request for shortened time to permit Defendants to address the issues when they submitted their previously ordered salary disparity plan. See 3/29/07 Order at p. 2:9-11 ("The issues to be addressed in the [salary disparity] plan appear to be highly relevant to the issues raised in plaintiffs' motion. For that reason, the court will not advance the schedule for hearing on plaintiffs' motion."). On April 2, 2007, Defendants submitted their salary disparity "plan," which consisted of a one page document that referred to two unapproved funding requests that failed to address salary disparity issues between CDCR and DMH mental health positions. Defendants' inadequate April 2nd Plan sought raises only for the remaining DMH staff and not for the vacant positions that needed to be filled, and failed to achieve parity with CDCR salaries. Defendants represented to this Court that these two inadequate and unapproved funding requests "mooted" this motion, solved all the problems of inpatient bed shortages and that no additional action or orders were necessary or appropriate. Docket 2182 at p. 4:17-21.

At the April 23, 2007 hearing, Defendants, through counsel, represented that a more realistic and comprehensive plan regarding the DMH staffing crisis would be made public by the Governor in connection with the May Revision to the California state budget. See Supplemental Declaration of Jane E. Kahn In Support of Plaintiffs' Motion for Emergency Relief Regarding Defendants' Denial of Access to Inpatient Psychiatric Beds in DMH State Hospitals (hereinafter "Supp. Kahn Decl."), Ex. J at p. 6. This Court, finding the April 2nd Plan inadequate on its face, continued the motion until May 21, 2007 and ordered Defendants to submit, by May 16, 2007, "a plan for addressing the staffing vacancies that affect class

members in this action and an evaluation of whether the plan is realistic, i.e., whether it can effectively solve the severe staffing shortages that continue to plague efforts to achieve delivery of necessary mental health care services to class members." 4/25/07 Order at p. 2:18-22.

On May 16, 2007, Defendant DMH (and not any other Defendant) filed a five-page letter setting forth, as the *Coleman* court-ordered "plan," the techniques it has been using since 2005 to recruit staff, followed by a point-by-point explanation as to why each one of those techniques would fail. This "plan," in other words, regurgitates old and failed hiring strategies and in no way sets forth specific goals to promptly open the 256 *Coleman*-mandated beds at ASH. 5/16/07 Plan (Docket 2219).

In addition, Defendants' new Plan fails to include any information about the underlying problem which the Court ordered Defendants to address: the salary disparity between CDCR and DMH and the severe staffing shortage that has resulted. The Plan fails to include any information about the proposed salary levels to be offered to fill the vacant DMH positions!

Moreover, not one other Defendant came forward with any information about what steps their agency or department would be taking to address the crisis. The Governor and the Director of the Department of Finance, for instance, did not inform the Court that they would use their powers to expedite the salary increases (whatever they may be) so that the recruitment process could begin in earnest. The CDCR did not explain how, if DMH would be unable to offer the 256 *Coleman* beds at ASH, it would ensure that class members receive constitutionally adequate care in an already overcrowded, overburdened and understaffed system. Not one Defendant has taken responsibility for this crisis, putting the complete burden to protect the *Coleman* class on this Court.

**UPDATED INFORMATION ABOUT THE CRITICAL SHORTAGE OF INPATIENT BEDS**

Important events have occurred since Plaintiffs filed their reply brief and since the argument on April 23, 2007, all of which further demonstrate the need for immediate Court intervention.

### A. ASH Continues to Deplete Its Court-Mandated *Coleman* Population

In Defendants' opposition to this motion, they made bold assertions that "there has been no denial of access to [DMH] services" and that "[t]here has been no 'closure' of ASH to CDCR patients." Docket 2182 at pp. 2:1 and 6:16-18. Defendants did not come forward with one piece of evidence to support those claims then and their recent actions have proven those statements to be false. Since January of 2007, Defendants have unilaterally decreased the *Coleman* patient population at Atascadero State Hospital without seeking this Court's approval. It is undisputed that ASH is required to have 256 inpatient beds available to the *Coleman* class, including 25 acute beds and 231 intermediate care beds. Since January of 2007, however, ASH has not housed even one acute *Coleman* patient and has steadily discharged its intermediate care patients as follows: Between January and February, ASH went from 133 to 120 *Coleman* class members; between February and March, it went from 120 to 103 patients; between March and April it went from 103 to 95 patients, and; between April and May it went from 95 to the current census of 80 patients. Supp. Kahn Decl. ¶ 10 and Ex. E & F. In other words, in the past four months, Defendants have reduced the *Coleman* population at ASH from 133 to 80 patients, a decline of about 40 percent. Since Defendants have yet to implement any part of their plan to stem the staffing crisis (no pay raises have yet been implemented) it is likely that DMH is continuing to lose staff and will therefore have to further reduce the ASH population.

### B. The Depleted *Coleman* Patient Population at ASH Has a Ripple Effect on the Rest of the Already Over-Burdened Mental Health Services Delivery System

The bed closures at ASH have caused and continue to cause serious harm to *Coleman* class members throughout the CDCR system. Defendants' failure to make precious ASH beds available to the *Coleman* class translates into dire choices faced by mental health care providers every day in the CDCR system. Victor Brewer, the Executive Director of DMH inpatient bed programs at CMF-Vacaville and Salinas Valley State Prison, explained one piece of this dilemma in an April 6, 2007 letter to the Special Master about the severe shortage of mental health crisis beds (MHCBs). Because there are severe shortages of acute and

intermediate inpatient beds throughout the system and long waiting lists for all higher levels of care, clinicians are forced to hold patients in mental health crisis beds (or other inadequate programs) far beyond the maximum 10-day treatment program intended for those beds.  They then are faced with daily serious ethical dilemmas as to which of several seriously ill patients who need inpatient psychiatric care should be admitted, whether other patients who are in the psychiatric hospital should be discharged before they are truly stabilized and whether the patient at CMF (who the DMH staff can personally evaluate) should have priority over the equally critically ill patient at another CDCR prison who is on a waiting list for inpatient care. These life and death decisions are being made daily by dedicated DMH and CDCR clinicians throughout the State.  Defendants are failing to take action to address the crisis and help these clinicians do their jobs and save lives.  As Mr. Brewer concluded, "[t]he simple fact is that the bed shortage places both the CDCR and VPP [inpatient DMH psychiatric program] in the current operational dilemma."  Supp. Kahn Decl. ¶ 7 and Ex. D.

The severe shortage of acute and intermediate DMH inpatient beds throughout the system creates a negative, domino effect on other CDCR mental health beds.  Patients in MHCBs cannot move to intermediate care or acute beds and therefore remain in MHCBs. Patients in OHUs, unlicensed infirmary beds, cannot move to MHCBs.  Patients in Ad Seg or reception centers cannot move to OHUs and so on.  Now that ASH is providing none of the 25 acute or MHCB beds and housing no more than 80 CDCR intermediate inpatient patients (rather than 231), the crisis worsens daily.

On May 1, 2007, the Special Master issued his Supplemental Report on the Status of the Swap of Acute Inpatient Beds between California Medical Facility and Atascadero State Hospital and Delays in Transfers to Mental Health Crisis Beds.  Docket 2208.  In this report, the Special Master noted the failed swap of acute care beds between CMF and ASH and endorsed Defendants' proposal regarding the separation of the acute and MHCB units at CMF. Docket 2208 at p. 3.  The Special Master rejected the part of Defendants' plan that would result in a net loss of MHCBs to the *Coleman* class and recommended that "simultaneously the 25 beds at ASH be returned to use as MHCBs."  Docket 2208 at p. 3.  The Special Master's

urgent recommendation can only be a reality if the Court addresses the salary disparity issue and requires all Defendants to take responsibility for this crisis.

During an April 17-19, 2007 *Coleman* tour at CMF, the long waiting list of patients in need of DMH inpatient beds was an obvious and critical problem. Staff reported that 43 out of 56 patients housed in CMF's MHCB units had been in those beds longer than the 10-day maximum period--many had been there for as many as 50-112 days—and that these men needed but were not receiving inpatient psychiatric hospitalization. *Id.* at ¶ 3 and Ex. A & B. In addition, a significant wait list of 44 additional men, housed at prisons other than CMF throughout the State, were also waiting for the small DMH inpatient psychiatric unit at CMF. *Id.* at ¶ 3. Meanwhile, CDCR clinicians who need to move new patients into MHCBs from EOP programs, OHUs, administrative segregation units or even general population units find that all of CDCR's MHCBs are occupied. Thus the dilemma outlined in Mr. Brewer's letter: Do clinicians prematurely discharge patients housed in MHCBs or turn away patients who need those beds? *Id*. at ¶ 7 and Ex. D. Both options endanger *Coleman* class members and the crisis at ASH has compounded this risk.[1]

### C. Staffing Vacancy Rates Persist and Will Only Get Worse Now That the CDCR Pay Raises Have Become a Reality

Despite orders to DMH to provide monthly staffing statistics to the Special Master and Plaintiffs' counsel, Defendants have not provided staffing statistics since March 2007. As far as Plaintiffs' counsel can tell, however, vacancy rates have persisted or worsened and will only continue to worsen in coming months. This is because the CDCR salary raises finally became

---

[1] The Special Master has reported that OHUs, EOP units and many MHCB units throughout the CDCR system are dangerous and inadequate places that do not meet Program Guide Standards, that fail to provide constitutionally adequate levels of care and that, in some notable examples, are places that endanger the lives of *Coleman* class members. Supp. Kahn Decl. ¶¶ 11-16. This reality further illustrates the dilemma described in Victor Brewer's April 6, 2007 letter. It is one thing for DMH to reject patients from these units when there is some reasonable assurance that, although patients are not housed at the level of care they need, their general level of care is acceptable. It is a very different situation when clinicians know that units pose real dangers to the *Coleman* class. They must then decide, should I leave the patient in the dangerous OHU or EOP bed, or should I prematurely discharge another patient back to one of those units to make room for the new admission?

1  effective in March of 2007.  Over the past several months, the mere prospect of the *Coleman*
2  salary raises for CDCR staff caused staff exoduses from DMH hospitals.  Losses can only
3  become worse now that the raises are actually showing up in CDCR pay checks.

      **D.**     **Even the Salary Increases for *Filled* DMH Positions Have Not Yet Taken Effect, Leaving DMH Prone to Ongoing Staff Departures**

6        The one piece of progress that Defendants made with respect to pay disparity issues
7  (and that they restate in their most recent "plan") was the long overdue, but still inadequate,
8  pay increase for *incumbent* staff members at DMH hospitals that would bring existing DMH
9  employee salaries to between 5 and 18 percent *below* CDCR salaries.  Yet even these raises,
10 which are not available for newly hired staff members, have apparently not taken effect.
11 5/16/07 Plan at p. 2 ("The raises and resulting new salary ranges included in the Spring
12 Finance Letter are subject to negotiations with the various bargaining units and approval by the
13 Legislature.")  In other words, not one DMH staff member has seen this raise and Defendants
14 have no sense of urgency about making that money immediately available.
15       Meanwhile, identical but higher-paying positions are available, in some circumstances,
16 in the same exact county where DMH staff are currently working.  As this State Personnel
17 Board web site job posting for Fresno County starkly demonstrates, a psychiatric technician
18 position is being advertised by CDCR (monthly salary $5,058-5,715) adjacent to a job posting
19 for the *exact same position* at DMH (monthly salary $3,870-4,614).  The clear impact of this
20 incongruity between salaries is that DMH positions will go unfilled because any qualified
21 candidate would obviously choose the significantly higher-paid CDCR position:

| Job Title | Approx. Salary | Job Type | Dept. and Location | Posted | Deadline |
|---|---|---|---|---|---|
| SENIOR PSYCHIATRIC TECHNICIAN (SAFETY) | $5,058.00-$5,715.00 | Full Time | CORRECTIONS AND REHABILITATION, PLEASANT VALLEY STATE PRISON Pleasant Valley State Prison, FRESNO | 04/25/07 | Until Filled |
| SENIOR PSYCHIATRIC TECHNICIAN | $3,870.00-$4,614.00 | Full Time Permanent | MENTAL HEALTH, COALINGA STATE HOSPITAL | 04/06/05 | Until Filled |

-6-
PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR EMERGENCY RELIEF REGARDING DEFENDANTS' DENIAL OF ACCESS TO INPATIENT PSYCHIATRIC BEDS IN DMH'S STATE HOSPITALS, NO.:  CIV S 90-0520 LKK-JFM

| Job Title | Approx. Salary | Job Type | Dept. and Location | Posted | Deadline |
|---|---|---|---|---|---|
| (SAFETY) | | | COALINGA, CA, FRESNO | | |

Supp. Kahn Decl. at ¶ 18 and Ex. H.

Similarly, the following vacancy listings for identical Staff Psychiatrist positions at a prison and a state hospital that are physically adjacent to each other demonstrate that the CDCR position offers twice the salary of the DMH position:

| Job Title | Approx. Salary | Job Type | Dept. and Location | Posted | Deadline |
|---|---|---|---|---|---|
| STAFF PSYCHIATRIST (SAFETY) | $8,826.00-$10,729.00 | Full Time Permanent | MENTAL HEALTH, COALINGA STATE HOSPITAL COALINGA CALIFORNIA, FRESNO | 02/08/06 | Until Filled |
| STAFF PSYCHIATRIST, CORRECTIONAL AND REHABILITATIVE SERVICES(SAFETY) | $18,426.00-$21,641.00 | Full Time Permanent | CORRECTIONS AND REHABILITATION, PLEASANT VALLEY STATE PRISON PLEASANT VALLEY STATE PRISON, FRESNO | 07/22/03 | Continuous |

*Id.* How can DMH ever hope to compete for qualified psychiatrists when DMH positions pay only half of their CDCR counterparts? And, even when the inadequate salary raises do finally take effect, why would staff work for DMH when they can make much more money doing the exact same work in CDCR?

### ARGUMENT

**Defendants' Written "Plan" Completely Ignores the *Coleman* Class and Sets Forth a Series of Empty Promises That Have Already Failed**

DMH begins its May 16th plan with an acknowledgement that various licensing requirements and the U.S. Department of Justice Consent Judgment have interfered with its ability to "comply with its contractual and legal obligations to provide inpatient care to the

-7-
PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR EMERGENCY RELIEF REGARDING DEFENDANTS' DENIAL OF ACCESS TO INPATIENT PSYCHIATRIC BEDS IN DMH'S STATE HOSPITALS, NO.: CIV S 90-0520 LKK-JFM

*Coleman* class members at state hospitals." 5/16/07 Plan at p. 1. DMH then explains the various steps it will take to address staffing shortages, including the already announced, but not yet implemented, raises for incumbent staff members and its possible $1 million contract with a headhunter that will also recruit for the Department of Developmental Services, the CDCR and the Department of Veteran's Affairs. DMH then presents its "new" proposals. Not one of these proposals is new, many have failed in the past, and none targets the *Coleman* class or remedy.

### A. The Budgeted Staffing Plan to Fill Vacancies Will Not Open *Coleman* Beds and Offers Even Lower Salaries to New Staff Than The Raises for Incumbent Staff (Which Still Have Not Taken Effect)

DMH explains that it currently has 1,860 vacant staff positions, although it does not explain what those positions are or which positions would, if filled, most quickly allow DMH to open *Coleman* beds. In any event, the budgeted staffing plan, even if 100 percent successful, would only reduce the vacancies by 750 positions by July of 2008 (leaving 1,110 positions still vacant more than a year from now!). As to the 750 positions, DMH explains that it will hire in two phases, including 300 staff between July 2007 and December 2007 and 450 staff between January 2008 and June 2008. During phase one, it hopes to hire 10 staff members per month in each of the five state hospitals, or 50 staff in July, 50 in August, 50 in September and so on. During the second phase, 15 staff members will be hired per month per hospital.

At some point, but DMH does not say when, it hopes to be able to hire these staff members at an as-yet-to-be-determined, higher salary level. The plan itself does not say what the salary increases would be for new staff, but the information from the May Revise, which Defendants did not submit to this Court, includes raises that are *even lower* than the ones that eventually will apply to incumbent DMH staff. In the May Revise documents under a heading "Salary Increases for Classifications Affected by the Coleman and Perez Court Cases," it states, "[t]his funding will enable the departments to increase salaries for psychiatrists and senior psychologists by between 66 and 74 percent, and raise salaries for all other impacted mental health classifications by between 10 and 40 percent." Supp. Kahn Decl. ¶ 19 and Ex. I

-8-

1  at p. 32.  In other words, Defendants initially sought and supposedly obtained salary increases
2  for *incumbent* staff within 5-18 percent below the CDCR levels.  Proposed salary increases for
3  *recruited* staff will be even lower.  *Id.* at ¶ 20.  There is absolutely no way that Defendants will
4  be able to recruit permanent staff members at these levels, particularly since they also intend to
5  keep temporary registry and contract staff who are paid double or even triple the salaries of
6  incumbent staff.

7  Moreover, even if this hiring plan works exactly as planned, DMH does not explain
8  when the *Coleman* beds will reopen.  The fact is that the most important state hospitals for the
9  *Coleman* class right now are Atascadero and Patton State Hospitals—ASH because it is
10 supposed to house the lion's share of male class members (256 compared to 50 at Coalinga, 5
11 at Napa, and 5 at Metropolitan) and Patton because it is the only hospital providing inpatient
12 beds to 30 female class members.  Rather than focus on ASH and Patton, however, Defendants
13 offer a murky staffing plan that fails to say when ASH beds will be open and fails to set forth a
14 timeline for the *Coleman* units.  Will DMH, for instance, continue to close beds at ASH to the
15 *Coleman* class between now and July?  If so, how many more will they close and how will
16 CDCR care for those extra patients?  Will the first 10 staff members whom ASH intends to
17 hire in July, August and September staff the *Coleman* units or some other unit?  Which patients
18 will DMH treat as a priority to open beds and where do *Coleman* class members fall on that
19 list?  Without answers to these questions, even the rosiest fulfillment of these goals has no
20 concrete meaning for the *Coleman* class.

21 **B.    The State Personnel Board Resolution is Vague, Inadequate and
         Likely to Require Negotiation With the Unions**
22

23 Another part of DMH's plan is to seek a "resolution from the State Personnel Board to
24 compress the hiring ranks from six ranks to three ranks in an effort to accelerate the hiring
25 process."  This resolution appears to have something to do with changing the way testing is
26 scored.  In any event, DMH fails to quantify how this resolution will affect hiring or even
27 when it will take effect.  Because it relates to testing, it is also likely to trigger labor
28 negotiations.

### C. Federal Loan Repayment

ASH, Metropolitan and Napa applied for loan repayment grants from the National Health Service Corps (NHSC). DMH has already tried this strategy before (Coalinga applied once and was rejected) and the strategy, even if successful, is unlikely to have much effect. Defendants admit in their plan that this loan repayment program, "has its own funding limitations which will mean that not all DMH applicant-employees will be able to participate in the program."

In fact, the NHSC's website explains that, under the best case scenario, a DMH hospital would be eligible to receive loan repayment assistance only for two psychiatrists and two other clinical positions (which include psychologists, nurses, social workers, etc.) in a given year. *See* Supp. Kahn Decl at Ex. K. Coalinga recently applied to this program, but was rejected. 5/16/07 Plan at p. 4. Even if ASH, Napa and Metropolitan are approved for NHSC assistance (Patton did not apply), with over 1,800 vacant positions system-wide, the NHSC loan repayment provides only nominal assistance with the staffing crisis.

If Defendants are serious about loan repayment programs and have specifically identified them as an important recruitment tool, the NHSC program is not enough. Why not include a funding request for a loan repayment program in the May Revise or seek emergency funds to provide this incentive?

### D. Registries and Emergency Contracts

Part of DMH's plan is to have emergency contract staff and registry staff available. While the use of registry and contract staff may be necessary right now, there is no question that those staff members create serious problems. First, contract employees are temporary fixes. The emergency contracts that DMH is using to fill vacant positions right now can only be utilized for one year. 5/16/07 Plan at p. 5. Second, the very existence of these contracts undermines DMH's efforts to recruit and retain permanent and qualified staff members. Why would staff members remain or come on board as permanent DMH employees when they could be making double or even triple what they are making now as contract staff doing the exact same work? Finally, temporary staff members undermine patient care. Only permanent

-10-

1  staff members are able to establish meaningful relationships with their patients, including the
2  ability to identify and react to changes in behavior that might indicate an acute risk of suicide
3  or other harm.  *See, e.g.* 5/16/07 Plan at p. 7 (use of registry staff "creates concern that the
4  registry personnel will not have rapport with the patients or sufficient familiarity with standard
5  policies and routines, thereby creating inconsistency in the delivery of clinical treatment
6  services").

### E. Internship Programs

Finally, Defendants plan to partner with local community college and university programs to bring students to the hospitals who will hopefully join DMH as permanent staff members when their education is completed.  5/16/07 Plan at p. 4.  One page later, however, Defendants admit that no university or college will allow interns to work at hospitals that do not have sufficient supervisory staff and an "established clinical rotation created by permanent DMH staff."  *Id.* at p. 5.  With 30-70 percent vacancy rates at all clinical levels, it is difficult to believe that DMH has any realistic chance of sponsoring interns and thus using those programs as serious recruitment tools.

### CONCLUSION

Every strategy in DMH's plan is important and each one could provide some minimal relief to the huge staffing crisis.  The net result of the plan is that one Defendant has identified a list of strategies it has been utilizing since at least 2005 and that, even if 100 percent successful, is unlikely to seriously alleviate the staffing crisis at DMH and open *Coleman* beds.  Meanwhile, Defendants ignore the one strategy that has any chance of creating relief—salary increases for DMH staff in full parity with CDCR employees.  And, despite the fact that the Court ordered "defendants" to submit a plan, not one other Defendant has identified how it will deal with this crisis.  4/25/07 Order at p. 3:1.  At a time when there is a shortage of *Coleman* beds at all levels of care, Defendants are content to sit idly by as staff hemorrhage out of DMH hospitals, precious and scarce *Coleman* beds close, and patients languish in units where they do not receive Court-mandated and constitutionally adequate care.

# UPDATED REQUEST FOR RELIEF

For all of the above reasons, Plaintiffs respectfully restate their request that the Court issue the following emergency orders:

1.     Defendants Schwarzenegger, Tilton, Mayberg and Genest are ordered to produce a Plan in full compliance with this Court's February 7, 2007 Order within 5 court days of the issuance of this Order.  Each Defendant shall declare under oath what steps his agency or department will take to address the inpatient bed crisis caused by the DMH staffing shortages, why they believe those steps will be sufficient to restore safe staffing levels to all DMH facilities, and shall include a detailed timeline for implementation of that plan such that all steps are fully implemented on or before November 1, 2007.  The plan shall also include a detailed timeline as to when *Coleman* beds, specifically, will open.  The failure to comply with this Order will result in the issuance of an order to show cause why these Defendants should not be held in contempt of Court.

2.     The Special Master's May 1, 2007 Report regarding the CMF/ASH swap is adopted in full.  Defendants shall immediately open 25 MHCBs at ASH so that those beds are available during the conversion of S1 into an acute bed unit.  Defendants are also ordered to ensure that the 25 beds are fully utilized, including clear and prompt notifications to mental health clinicians throughout CDCR, and are ordered to report to the Special Master and Plaintiffs' counsel on a monthly basis regarding the utilization of those beds.

3.     Defendants shall take all necessary steps, including but not limited to salary increases in full parity with CDCR, to retain and hire adequate clinical and custody staffing levels to safely open 25 mental health crisis beds immediately at ASH and to open every one of the other 231 contracted ASH beds to *Coleman* class members by November 1, 2007.  ASH shall not limit or restrict admissions to those 256 CDCR beds without leave of Court.  Defendants shall implement the DMH salary increases by June 15, 2007 and shall use an expedited process to do so.

4.     Defendants shall take all necessary steps, including but not limited to salary increases in full parity with CDCR, to retain and hire adequate clinical and custody staff at all

-12-

other DMH hospitals that house CDCR patients.  DMH shall not limit access or restrict admissions to CDCR beds without leave of Court.  Defendants shall implement the pay raises by June 15, 2007 and shall use the expedited process to do so.

5. Defendants shall take all necessary steps, including salary increases in full parity with CDCR, to accelerate the opening of all beds at Coalinga State Hospital for patient admission in order to reach full licensed capacity as soon as possible and no later than July 1, 2008.

6. Defendants shall streamline and expedite the hiring process for DMH staff and shall, at a minimum, broaden the scope of recruitment efforts to the national level, develop regional recruitment centers, and use contracted subject-matter or professional specialty experts to assist in the recruitment process.  Defendants shall also submit a report to this Court, by June 30, 2007, assessing the State examination process, current DMH advertising efforts and any statutes or regulations that currently interfere with the hiring and recruitment process.  That report shall analyze any impediments to recruitment and hiring, including in the areas described above, and shall include concrete solutions with detailed timelines to remove identified impediments, if any.

7. Defendants shall take all necessary steps to fully open the D-5 unit at SVSP by June 30, 2007.  Defendants shall also ensure that all patients housed in D-5 and D-6 have access to a minimum of 20 hours a week of clinical treatment and programming in addition to appropriate yard time on the grassy yard within 10 days.  The SVSP Warden shall supply sufficient custody officers to the control rooms of D-5 and D-6, for escorts and for yard supervision, to assure compliance with this order and shall assure that any CDCR obstacles to compliance with this provision are removed.  Within 15 court days of the date of this Order, Defendants CDCR and DMH shall each file a declaration with the Court explaining the staffing levels on the D-5 and D-6 units and confirming that 20 hours a week of clinical programming in addition to yard time on the grassy yard has been provided to all patients housed in these units.

8. CDCR and DMH shall file monthly reports with this Court, by the 15th day of the following month, which set forth: total patient population and current CDCR (2684) population in each DMH facility (including number of admissions and discharges and length of stay); staffing at each DMH facility (for each job category, allocated and filled positions); the number of contract and registry positions at each DMH facility during the previous month (for each job category, number of hours worked and full-time equivalent); and updates on the status of Federal Loan Repayment Grants and Internship program participation at each DMH hospital.

Dated: May 18, 2007                    Respectfully submitted,


*/s/ Michael W. Bien*
Michael W. Bien,
Rosen, Bien & Galvan, LLP
Attorneys for Plaintiffs

-14-
PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR EMERGENCY RELIEF REGARDING DEFENDANTS' DENIAL OF ACCESS TO INPATIENT PSYCHIATRIC BEDS IN DMH'S STATE HOSPITALS, NO.: CIV S 90-0520 LKK-JFM