PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
AMY WHELAN Bar No.: 215675
LORI RIFKIN Bar No.: 244081
SARAH M. LAUBACH Bar No.: 240526
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, | No.: Civ S 90-0520 LKK-JFM |
| Plaintiffs, | **SUPPLEMENTAL DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' MOTION FOR EMERGENCY RELIEF REGARDING DEFENDANTS' DENIAL OF ACCESS TO INPATIENT PSYCHIATRIC BEDS IN DMH STATE HOSPITALS** |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants | |

Date:      May 21, 2007
Time:      10 A.M.
Location:  Courtroom 4
Judge:     Hon. Lawrence K. Karlton

1    I, Jane E. Kahn, do hereby declare as follows:

2        1.    I am an attorney admitted to practice law in California and an associate in the

3    law firm Rosen, Bien & Galvan, one of the counsel of record for plaintiff class in this case.  I

4    have personal knowledge of the matters set forth herein and if called as a witness I could

5    competently so testify.  I make this declaration in support of Plaintiffs' Supplemental Brief in

6    Support of the Motion for Emergency Relief Regarding Defendants' Denial of Access to

7    Inpatient Psychiatric Beds in DMH's State Hospitals.

8        **THE IMPACT OF ASH BED CLOSURES ON ACUTE AND MHCB BED ACCESS**

9        2.    The closure of Atascadero State Hospital ("ASH") to CDCR ("2684") patients

10    has created a large waiting list of patients for acute care and mental health crisis beds.  The

11    official waiting list data severely undercounts the actual number of patients on that waitlist.

12    This is because inmates housed in other locations are not officially counted on the waiting list

13    for an acute care or mental health crisis bed.  On April 17-19, 2007, I accompanied the

14    *Coleman* experts, CDCR staff attorney Michael Stone and plaintiffs' counsel Amy Whelan on

15    a monitoring tour of California Medical Facility ("CMF") in Vacaville, California.  As part of

16    this tour, we briefly visited the programs run by the Department of Mental Health ("DMH")

17    within CMF, including the Acute Psychiatric Program ("APP"), the Intermediate Care

18    Programs ("ICF"), the Day Treatment Program ("DTP"), and the mental health crisis bed units

19    administered by DMH in the S-1 and S-2 housing units.  At the time of the tour, DMH was

20    running S-1 as a 25-bed mental health crisis unit for CDCR inmates system-wide and S-2 as a

21    20 bed mental health crisis unit for CMF inmates.  These units also include some acute care

22    beds (5 in S-1 and 10 in S-2).

23        3.    On April 19, 2007, I visited the Clinical Care Assessment Team ("CCAT") office

24    at CMF with a *Coleman* monitor and CDCR staff attorney Michael Stone.  The CCAT office

25    manages the waiting list for DMH and MHCB beds system-wide.  The staff regularly reviews

26    the waiting list of patients accepted to these beds to determine which of these patients will be

27    moved to the next available bed.  It was initially unclear during the presentation by CMF

28    administrators whether the reported waiting list for APP beds (which at that time was 44)

1  included patients admitted to S-1 and S-2 who were retained longer than a mental health crisis

2  bed stay.  The purpose of the visit by the *Coleman* monitor to the CCAT office was to resolve

3  that issue: whether the S-1 and S-2 patients were included on the APP waitlist.  Jody

4  Hutchinson, from the CCAT, reported to us that the APP waiting list only included patients

5  located in MHCBs outside of CMF (and not in S-1 and S-2).  Thus, the 44 patients on

6  defendants' APP waitlist on April 19, 2007 did not include the 37 patients in S-1 and S-2 who

7  had been treated in those units for lengths of stay ranging from 15 to 112 days.[1]  Although

8  those patients did not appear formally on any waiting list, Ms. Hutchinson informed us that

9  they were also evaluated for possible transfer when an empty bed became available in the APP.

10  The waiting list for APP therefore under-estimates the current need for APP beds because it

11  does not include the inmate-patients housed in S-1 and S-2 with extended stays who remain in

12  the units until an APP bed is available. The actual number of patients waiting for APP was

13  actually at least 81 patients, almost double what was reported.

14       4.      The mental health crisis beds in S-1 and S-2 are intended to provide services for

15  conditions that require an inpatient setting to treat acute symptoms of a serious mental disorder

16  with a maximum length of stay of 10 days.  *See* April 6, 2007 Letter from Victor Brewer to

17  Special Master Keating, which is attached to the Special Master's Supplemental Report on the

18  Swap of California Medical Facility and Atascadero State Hospital Beds (Docket 2208, Ex. 1).

19  The letter explains the differences between MHCB and acute level of care treatment.  It

20  explains, for instance, that patients in acute beds receive thorough psychiatric and medical

---

22  [1] I reviewed a list of the patients currently admitted to S-1 and S-2 which was provided by the
23  CCAT office.  As of April 19, 2007, there were a total of 56 patients on that list.  I copied
    down this list of patients, including each patient's admission date to the unit. In S-1, the mental
24  health crisis unit for CDCR patients, there were 23 patients who had been in the unit for
    lengths of stay ranging from 15 to 107 days.  In S-2, the mental health crisis unit for CMF
25  patients, there were 14 patients who had been housed in the unit for lengths of stay ranging
    from 22 to 112 days.  When I returned to my office, I directed a paralegal to make a chart for
26  S-1 and S-2 using the date of admission and length of stay for each patient as of 4-19-07.  I
    supervised the paralegal when she created the charts and I have reviewed the final version of
27  the charts.  Attached hereto as **Exhibit A** is a true and correct copy of a Chart entitled "Lengths
    of Stay for Inmate-Patients housed in S-1"; Attached hereto as **Exhibit B** is a true and correct
28  copy of a Chart entitled "Lengths of Stay for Inmate-Patients Housed in S-2".

evaluations, neuropsychological and psychological testing, nursing assessments, social history evaluation, rehabilitative therapy, and social/therapy groups during a length of stay that is approximately 30-45 days long. During the tour of S-1 and S-2, as part of the CMF 19th round tour, clinical staff reported to the *Coleman* monitors and to plaintiffs' attorneys that they were unable to provide this enhanced acute level of care to the patients housed in S-1 and S-2 for extended lengths of stay, even though those patients clearly needed acute care. Indeed, this very problem was identified by Cynthia Radavsky, Deputy Director of DMH, in her March 29, 2007 letter to Special Master Keating in which she requested that the *Coleman* Court allow S-1 to return to acute care beds and S-2 to be utilized only for MHCB level of care for both CDCR and CMF patients. ("DMH now realizes these mixed type units interfere with programming. The result is that all beds on S-1 and S-2 operate at a MHCB level and patients on those units who are in need of acute services are limited to MHCB services.") Attached hereto as **Exhibit C** is a true and correct copy of Ms. Radavsky's March 29, 2007 letter to Special Master Keating re VPP and MHCBs.

5.    During the visit to the CCAT office, Ms. Hutchinson identified lower custody inmates on the APP waitlist whom she stated would have transferred to Atascadero for acute care if Atascadero were not closed to all acute care referrals. Among those patients were four men at California Men's Colony who were currently on the APP wait list that she reported would have been referred for transfer to ASH if it were not closed to referrals.

6.    On May 1, 2007, the Special Master issued his Supplemental Report on the Status of the Swap of Acute Inpatient Beds Between the California Medical Facility and Atascadero State Hospital and Delays in Transfers to Mental Health Crisis Beds [Docket 2208]. In this report, the Special Master discussed the failed swap of acute care beds between CMF and ASH and recommended adoption of defendants' proposal to create an acute care bed unit in S-1 and an MHCB unit in S-2. The proposal will increase acute care beds by 15 beds but will also reduce MHCBs by the same number. Docket 2208 at p. 3. In order to soften the blow of this reduction, the Special Master also recommended that ASH be required to provide CDCR with 25 MHCBs. *Id.* In reality, however, until ASH is ordered to hire sufficient staff

1  to reopen admissions to new patients, the Special Master's recommendation will have no

2  practical impact on the loss of these critical MHCBs.

3      7.      On April 6, 2007, Victor Brewer, Executive Director of the Vacaville Psychiatric

4  Program, (ICF, DTP, APP, S-1 and S-2 ) wrote to Special Master Keating, and outlined the

5  different levels of treatment provided to patients in the MHCB and Acute Inpatient programs.

6  Attached hereto as **Exhibit D** is a true and correct copy of the April 6, 2007 Letter from Victor

7  Brewer to Special Master Keating, which was attached to the Special Master's Supplemental

8  Report on the Swap of California Medical Facility and Atascadero State Hospital Beds.  In his

9  letter, Mr. Brewer aptly described the dilemma faced by DMH clinicians due to severe bed

10  shortages.  Should they discharge patients to inappropriate settings or turn away patients in

11  need of inpatient beds?  He asked the Special Master to help prioritize admissions to and

12  discharges from the APP unit because of the inpatient bed shortages.  *Id.* at 4.  Mr. Brewer

13  asked:  "[I]s the MHCB patient to take priority over the current patients on the APP wait

14  list?...Further, in the event the patient's recommended LOC is to either an Intermediate

15  Treatment Program (ITP) or Day Treatment Program (DTP) and there is currently a wait list.

16  [sic]  VPP is faced with the same dilemma, which is to either hold the patient in a MHCB bed

17  or return the patient to the [EOP] level of care, which is below the LOC required for the

18  patient's well being."  *Id*.  Mr. Brewer concludes by requesting that the Special Master provide

19  direction regarding this dilemma:

20          The simple fact is that the previous bed plan, approved by the
            court, demonstrated the need for additional APP and Level IV ICF
21          beds.  The current delay in completing the plans that included 350
            APP and 128 Level IV ICF beds and initiating the construction is a
22          major factor that drives the current and continued bed shortage.
            The simple fact is that the bed shortage places both the CDCR and
23          VPP in the current operational dilemma.

24  *Id*.

25      8.      During the April 2007 monitoring tour at CMF, both CDCR and DMH clinical

26  staff expressed their concern over the impact of the inpatient and mental health crisis bed

27  shortages that they experienced at CMF.  For example, CDCR clinicians reported that they

28  often had to wait hours with their patients before they were admitted to either a mental health

SUPPLEMENTAL DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' MOTION FOR EMERGENCY RELIEF REGARDING
DEFENDANTS' DENIAL OF ACCESS TO INPATIENT PSYCHIATRIC BEDS IN DMH STATE HOSPITALS, NO.:  CIV S 90-0520 LKK-JFM

crisis or an acute inpatient bed.  DMH clinicians expressed frustration over the pressure to prematurely move patients from acute beds back to CDCR in order to admit CDCR inmates from the waitlist.  Both CDCR and DMH staff were quite concerned about a recent CMF suicide that occurred on March 31, 2007.  Many issues were being reviewed in this suicide which involved an EOP/CCCMS patient who used a wheelchair and had both disability access concerns and significant suicidal issues that were not appropriately managed by either CDCR or DMH due, in part, to pressures on bed space within the system.  This patient was discharged from S-2 after a brief admission for suicidal ideation in contravention of a new policy implemented at the direction of the *Coleman* experts requiring that inmates admitted to the MHCB unit for suicidal ideation be retained for at least 72 hours for a complete treatment team assessment.

9.    On May 15, 2007, defendants filed their Responses and Objections to the Special Master's Report regarding the CMF/ASH Swap Plan.  Docket 2214.  In that response, defendants objected to the Special Master's finding that the CMF/DMH Bed Swap had failed but agreed to comply with the Special Master's recommendation to convert the S-1 unit at CMF back into an acute care unit and to provide 25 mental health crisis beds at ASH, "subject to the availability of staff."  Docket 2214 at 2:13.  ASH remains closed to new admissions, including any MHCB admissions from CDCR due to critical staffing vacancies.

**ASH POPULATION OF 2684s HAS DECLINED SIGNIFICANTLY SINCE 1/07**

10.    Between January and April 2007, the 2684 population at ASH decreased from 133 patients to 95 patients.  Attached hereto as **Exhibit E** is a true and correct copy of the Summary Monthly Reports of CDCR Patients in DMH Hospitals for January 2007-April 2007.  The documents reveal a startling decline in the ASH population since the restriction on admissions was imposed by ASH in January 2007.  On May 8, 2007, defendants provided updated data for DMH populations and waiting lists reflecting May 1, 2007 populations.  Attached hereto as **Exhibit F** is a true and correct copy of Enclosure II, Department of Mental Health Populations as of May 1, 2007 and Waitlist Data.  According to this data the CDCR population in ASH dropped by another 15 patients between April and May, down to 80

patients. *Id*. at 3. In other words, in the past four months, CDCR population at ASH has dropped from 133 to 80 patients, a decline of approximately 40 percent. It is our belief and understanding that no new 2684 patients have been admitted to ASH since admissions were restricted in January 2007.

### DMH BED SHORTAGES HAVE CREATED BACKLOG THROUGHOUT THE SYSTEM WHICH ENDANGERS THE *COLEMAN* CLASS

11.    Mental health crisis bed shortages system wide have also been exacerbated by the closure of DMH hospitals. Throughout CDCR, patients are remaining in mental health crisis beds for longer than 10 days because of unavailable DMH beds. In the most recent monthly statistical package provided by defendants on April 19, 2007, there is clear evidence of extended stays in both the mental health crisis beds ("MHCB") and the outpatient housing units ("OHU") system-wide reflecting the impact of both DMH bed shortages and MHCB bed shortages. The monthly statistical package includes a report for each prison's MHCB or OHU. This report lists each inmate-patient admitted to the MHCB/OHU, his or her CDCR number, their admission/discharge date, the reason for admission (e.g. suicide ideation), the principle diagnosis, and the total census days in the unit. I have reviewed the data provided on April 19, 2007 which includes statistics about inmates who were retained in MHCBs in February 2007 for greater than ten days.[2] In February alone, 166 inmates stayed for longer than 10 days in MHCBs at 16 state prisons. These 166 inmates had lengths of stay in the MHCBs ranging from 11 days to several months.

12.    The Special Master has found that inmates waiting for transfer to DMH beds are frequently housed in MHCB beds. Docket 2081 at 415-416 (Sixteenth Monitoring Report of The Special Master on The Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols ("At CSP/SAC, MCSP, NKSP and RJD an unduly high number of inmates remained in MHCBs for too long. At CSP/SAC more than half of inmates referred to

---

[2] Chapter 5, Program Guide: The mental health crisis bed has a length of stay of up to 10 days. 12-5-1. Inmates will be discharged from an MHCB to DMH inpatient care if they have clinical need for inpatient services of a duration greater than 10 days. 12-5-25.

1  DMH were awaiting acceptance.")  The monthly statistics also document lengthy stays in the

2  OHUs, which are unlicensed infirmaries.  Mental health inmates who are placed in OHUs and

3  are determined to need an MHCB bed must be transferred out of the OHU within 24 hours, or

4  within 72 hours of placement except for limited reasons (if the inmate is an EOP patient

5  awaiting placement or is too unstable to transfer).  *See* Docket 1753 (Revised Program Guide,

6  Ch. 5, 12-5-27-12-5-29).  In the most recent monthly statistical package that I reviewed

7  provided by defendants on April 19, 2007, there were many prisons where inmates were

8  inappropriately housed in their OHUs for lengths of stay ranging from 15-27 days for mental

9  health reasons including acute psychosis, bizarre behavior and depression (California

10  Correctional Institution, San Quentin, Chuckawalla State Prison, Sierra Conservation Center)

11  and suicide precautions/watch (Calipatria, Correctional Training Facility, Deuel Vocational

12  Institution).  The Special Master has found that access to mental health crisis beds is deficient

13  and as a result, many institutions rely "on their local OHUs, or even worse alternative settings,

14  all characterized by inadequate physical conditions and staffing, rather than promptly

15  transferring inmates to MHCB units elsewhere."  Docket 2082 at 416.

16      13.      As a result of MHCB shortages, inmates are being inappropriately housed in

17  OHUs which has resulted in injury and death to *Coleman* class members.  I have reviewed the

18  medical and central files of two *Coleman* class members who suffered serious harm after being

19  admitted to OHUs on suicide watch.  *See* Declaration of Jane Kahn in Support of Plaintiffs'

20  Objections to Defendants' In-Patient and MHCB Bed Plan filed April 21, 2006 [Docket 1790]

21  at ¶¶ 21-22.  The first inmate severely injured himself while monitored by a video camera on

22  suicide watch in the OHU at SQ.   He was admitted to the OHU on November 20, 2005,

23  because he was behaving in an acutely psychotic manner and had put fecal matter in his eyes,

24  on his body and had bruising on his face.  San Quentin does not have an MHCB unit.

25  Plaintiffs were provided with a copy of the video tape made of this suicide watch which I

26  observed in total.  On this tape, the inmate was placed in the OHU in his tee-shirt, which he

27  removed and gave to the officer when he was placed in the unit.  He was left naked in the cell

28  with a blanket and a mattress on the floor.  He alternated between sitting on the floor rocking

back and forth, standing and sitting quietly.  At one point, he put his fingers in his eyes and appeared to gouge them.  In the video, he is then observed for the next hour and twenty minutes to be rocking back and forth, stumbling around the cell, and holding his head and eyes in pain before a staff person comes to his food port and speaks to him.  When the staff person finally noticed his injuries, he was told to cuff up, which he was unable to do at first.  The cuffing up took a few more minutes and he was finally transported to Marin General where his medical records indicate that he was determined to have been blinded.  *Id* at 21.

14.     The second inmate died while monitored by a video camera on suicide watch in the OHU at DVI.  He had a history of previous suicide attempts.  *Id* at 22.  During his previous admissions to the DVI OHU, he had been quickly transferred to a prison with an MHCB unit.  When this inmate returned from parole in on November 17, 2005, he was placed in the DVI OHU and retained there for a week despite the *Coleman* mandates prohibiting the housing of psychotic, suicidal inmates in OHUs for more than 24 hours.  He was noted to be in a manic, agitated and delusional state even five days after his admission, yet he was not referred for transfer to an MHCB at that time.  When he was discharged two days later, he was noted to still have slightly pressured speech, with a diagnosis of Bipolar, Manic, severe with psychotic features.  On November 29, 2005, he was readmitted again because he reported that he wanted to hurt himself.  Defendants provided a video tape containing the first two hours of suicide watch.  The remaining 19 hours of suicide watch were missing.  I viewed the available video taped suicide watch and observed this EOP patient placed in the OHU cell in a suicide smock without a mattress or a blanket.  The cell had no toilet except for a hole in the floor.  The patient appeared quite agitated and rarely sat for more than a minute or two at a time.  According to the Incident Report provided in the medical records, when the patient was discovered dead in his OHU cell at 6:45 a.m., he was rigid with rigor mortis, and was estimated to have been dead for at least 3-4 hours.  *Id*.

15.     I accompanied the *Coleman* monitors, Deputy Special Master Matthew Lopes, and CDCR staff attorney Michael Stone on the 18th round monitoring tour of DVI on November 13-15, 2006.  Also present on that tour was plaintiffs' counsel Ivan Trujillo.  During

1  the tour we visited the DVI OHU and attended treatment team meetings with *Coleman* class

2  members admitted to the OHU for suicide precautions or suicide watch.  Each of the patients

3  came to the treatment team meetings "naked" wrapped in a blanket.  The clinical staff running

4  the treatment team had no reaction to the "naked" state of the patients.  One of the patients, a

5  young man, kept his eyes averted during the entire interview with the clinical staff while he

6  discussed his suicide attempt and his suicidal ideation.  He had been sent to an MHCB bed at

7  another institution and had returned to the OHU.  The clinical staff was evaluating whether he

8  was ready to return to his housing unit.  He had a pained look on his face and one of the

9  clinicians finally asked him why he looked so unhappy.  The young man responded that he was

10  so unhappy because "I am naked in front of all these people."  There were approximately five

11  or six people, including at least three women, sitting in the small office where the treatment

12  team was held.  The young man asked the clinical staff if he could return to his housing unit.  It

13  was unclear to me whether he wanted to return to his housing unit because he no longer felt

14  suicidal or because of the conditions on suicide watch.  After the treatment team meetings, I

15  asked a custody officer working in the OHU whether there were suicide smocks available for

16  patients admitted for suicide watch but he was unable to respond affirmatively.  None of the

17  patients that we saw that day were provided with suicide smocks.

18       16.     The Special Master has documented the use of alternative sites in his monitoring

19  reports and found that movement into higher levels of care has been problematic because of

20  insufficient beds.  At CSP-Sacramento, lengths of stay in the MHCB exceeded ten days in 35

21  percent of cases, approximately half of which involved DMH referrals.  Docket 2140 at 46

22  (Seventeenth Monitoring Report of the Special Master on the Defendants' Compliance with

23  Provisionally Approved Plans, Policies and Protocols, Part A, filed 2/14/07.)  At San Quentin,

24  the longest OHU stays lasted from four to seven weeks and included inmates waiting for

25  transfers to DMH programs and MHCB units elsewhere in CDCR.  *Id.* at 55.  I have reviewed

26  the Draft Seventeenth Monitoring Report of the Special Master on the Defendants' Compliance

27  with Provisionally Approved Plans, Policies and Protocols, Part C, dated May 4, 2007.

28  Attached to the Draft 17C Report are Exhibits which include clinical assessments of *Coleman*

class members done by the *Coleman* experts during their site visits at the prisons. To my knowledge, defendants have never filed objections to any evidence presented in the Exhibits attached to the Draft Monitoring Reports. In the Exhibits to 17C, three inmates at California Institute for Men had extended stays in the mental health crisis beds while waiting for transfer to an inpatient bed. Exhibit B to 17C at 13-19. Inmate A was described as psychotic and delusional and was housed in the MHCB while he waited for transfer to intermediate care in Salinas Valley Psychiatric Program. He had been housed in the MHCB for more than a month at the time that he was reviewed by the experts. Inmate B had been housed a mental health crisis bed at CIM for 50 days while waiting for his transfer to an intermediate care bed. Inmate C was treated by MHCB staff for six weeks while they were waiting for his acceptance to an acute care bed. In fact, the *Coleman* expert noted that it was unclear what level of inpatient care inmate C had been referred to by the clinicians at CIM. All three of these patients were housed for extensive stays in the MHCB beds while they waited for transfer to an inpatient bed. The Special Master found that the level of mental health treatment in the MHCB at CIM was inadequate for a variety of reasons in addition to overcrowding:

> Cooperation among mental health, health care and custody staff was poor. The physical plant was unsanitary. Smeared feces reportedly were not removed but were left for weeks by order of custody staff. Mental health staff did not have ready access to patients. SRA [suicide risk assessments] checklists were not always completed when warranted, and some that were completed omitted salient factors…Contrary to doctors' orders, psychiatric patients were not permitted to have clothing routinely allowed other GACH patients. Patients were left standing in holding cells not equipped with a bench seat longer than four hours.

Docket 2081 at 294 (Sixteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols).

17. Despite the recognized shortage of mental health crisis beds, defendants currently have no additional crisis beds funded for construction. Attached hereto as **Exhibit G** is a true and correct copy of Mental Health Program Infrastructure Modification Projects, dated May 3, 2007. The only new mental health crisis beds currently under construction and scheduled for completion and occupancy are the 50 mental health crisis beds at CMF, which

were originally slated for completion and occupancy by March 2008, but which Defendants have recently reported will not be occupied until July 2008, "pending licensing." *Id.* There is no explanation provided for this newly announced four-month delay in the CMF 50-bed MHCB project.

## DMH'S ONGOING PROBLEMS WITH STAFFING SHORTAGES AND SALARY RAISES

18.     I reviewed the DMH and State Personnel Board (SPB) websites to determine whether any salary increase for DMH employees has taken effect.  It is apparent from the websites that they have not.  Attached hereto as **Exhibit H** is a true a correct copy of a printout of a SPB web page, located at

http://spb.ca.gov/employment/search_p.cfm?COUNTY=FRESNO&&sRow=51 (last viewed May 18, 2007).  As this website demonstrates, a job posting for Fresno County advertises a psychiatric technician position by CDCR at a monthly salary of $5,058-5,715.  An adjacent job posting for the *exact same position* at DMH is advertised at a monthly salary $3,870-4,614.  Similarly, the vacancy listings for identical Staff Psychiatrist positions at a prison and a state hospital that are physically adjacent to each other demonstrate that the CDCR position offers twice the salary of the DMH position.  *Id.*   Moreover, a clinician clicking through the DMH website for job postings can directly link to the SPB website, which advertises the CDCR and DMH positions side by side.

19.     Attached hereto as **Exhibit I** is a true and correct copy of the Governor's May Revise: Revised Budget Summary (published May 14, 2007), located at http://www.ebudget.ca.gov/pdf/Revised/BudgetSummary/FullBudgetSummary.pdf (last viewed May 18, 2007).  In this May Revise document, under a heading "Salary Increases for Classifications Affected By The Coleman and Perez Court Cases," it states, "[t]his funding will enable the departments to increase salaries for psychiatrists and senior psychologists by between 66 and 74 percent, and raise salaries for all other impacted mental health classifications by between 10 and 40 percent."  Exhibit I at p. 32.

20.    If DMH psychiatrist/senior psychologist salaries for new hires are increased by 66 to 74 percent, as indicated in the May Revise (Exhibit I), this increased salary will still fall far short of CDCR salaries for the same positions. For example, for the position of Staff Psychiatrist, DMH salaries even if boosted by 66-74 percent will still lag behind CDCR salaries by **14 to 20 percent**. DMH psychiatrists would earn between $14,651 (if 66 percent increase) and a maximum of $18,668 (if 74 percent increase), while CDCR psychiatrists are already earning between $18,426 and $21,641. *See* Exhibit H (SPB ads for CDCR/DMH job postings).

21.    Attached hereto as **Exhibit J** is a true and correct copy of the transcript from the April 23, 2007 hearing before this Court addressing DMH's staffing crisis.

22.    Attached hereto as **Exhibit K** is a true and correct copy of a printout from the National Health Service Corps (NHSC) website, located at http://nhsc.bhpr.hrsa.gov/jobs/vac-limits.cfm (last viewed May 18, 2007). This web page establishes that any given institution or site is eligible for loan repayment assistance for only four clinicians, such that each DMH hospital could at best be eligible for loan repayment assistance for two doctors/psychiatrists and two other clinicians, such as psychologists, nurses, or social workers. *Id.*

23.    I declare under penalty of perjury that the foregoing is true and correct, and that this declaration is executed in San Francisco, California on May 18, 2007.

*/s/ Jane E. Kahn*
Jane E. Kahn

# EXHIBIT A

**Lengths of Stay for Inmate-Patients Housed in S1**
*(A 30 bed unit, containing 25 mental health crisis beds for CDCR inmates system-wide and 5 acute beds run by DMH at California Medical Facility)*
Statistics obtained during the *Coleman* Monitoring Tour of California Medical Facility on 4-19-07[1]

| Patient # | Date of Admission | LOS as of 4-19-07 |
|---|---|---|
| 1 | 4/4/2007 | 15 |
| 2 | 2/21/2007 | 57 |
| 3 | 3/9/2007 | 41 |
| 4 | 2/22/2007 | 56 |
| 5 | 1/9/2007 | 100 |
| 6 | 4/10/2007 | 9 |
| 7 | 1/2/2007 | 107 |
| 8 | 2/14/2007 | 64 |
| 9 | 1/17/2007 | 92 |
| 10 | 3/12/2007 | 38 |
| 11 | 4/8/2007 | 11 |
| 12 | 4/10/2007 | 9 |
| 13 | 2/20/2007 | 58 |
| 14 | 2/14/2007 | 64 |
| 15 | 1/27/2007 | 82 |
| 16 | 3/29/2007 | 21 |
| 17 | 3/27/2007 | 23 |
| 18 | 3/5/2007 | 45 |
| 19 | 3/16/2007 | 34 |
| 20 | 4/12/2007 | 7 |
| 21 | 3/5/2007 | 45 |
| 22 | 3/13/2007 | 37 |
| 23 | 2/23/2007 | 55 |
| 24 | 1/30/2007 | 79 |
| 25 | 3/23/2007 | 27 |
| 26 | 4/13/2007 | 6 |
| 27 | 3/28/2007 | 22 |
| 28 | 3/7/2007 | 43 |

[1]On April 19, 2007, during the *Coleman* monitoring tour at CMF, Jane Kahn, plaintiffs' counsel, Michael Stone, CDCR staff counsel, and Paul Nicoll, *Coleman* monitor, went to the CCAT (Centralized Clinical Assessment Team) Office at CMF to review the waiting list data for APP (acute beds). Ms. Kahn was shown the list of the inmate-patients currently housed in both S1 and S2. This list included their admission date to the unit. Ms. Kahn copied down each inmate-patient's admission date. We have calculated length of stay for each of the inmates' listed above, based upon their date of admission to the unit through April 19, 2007. During the visit to the CCAT office, plaintiffs' counsel was informed that the inmate-patients housed in S1 and S2 with lengths of stay greater than 10 days, are not counted on the APP waiting list; these inmates are, however, reviewed for transfer to an APP bed when a bed becomes available as part of the CCAT triage process.

# EXHIBIT B

**Lengths of Stay for Inmate-Patients Housed in S2**

*(A 30 bed unit, containing 20 mental health crisis beds for CMF inmates and 10 acute beds run by DMH at California Medical Facility)*

Statistics obtained during the *Coleman* Monitoring Tour of California Medical Facility on 4-19-07[1]

| Patient # | Date of Admission | LOS as of 4-19-07 |
|---|---|---|
| 1 | 4/9/2007 | 10 |
| 2 | 4/17/2007 | 2 |
| 3 | 3/23/2007 | 27 |
| 4 | 4/12/2007 | 7 |
| 5 | 4/6/2007 | 13 |
| 6 | 4/18/2007 | 1 |
| 7 | 3/30/2007 | 20 |
| 8 | 3/26/2007 | 24 |
| 9 | 12/28/2006 | 112 |
| 10 | 3/23/2007 | 27 |
| 11 | 2/21/2007 | 57 |
| 12 | 4/9/2007 | 10 |
| 13 | 3/21/2007 | 29 |
| 14 | 3/27/2007 | 23 |
| 15 | 4/16/2007 | 3 |
| 16 | 4/19/2007 | 0 |
| 17 | 4/16/2007 | 3 |
| 18 | 4/15/2007 | 4 |
| 19 | 3/27/2007 | 23 |
| 20 | 3/9/2007 | 41 |
| 21 | 3/19/2007 | 31 |
| 22 | 4/1/2007 | 18 |
| 23 | 3/7/2007 | 43 |
| 24 | 4/17/2007 | 2 |
| 25 | 3/15/2007 | 35 |
| 26 | 3/28/2007 | 22 |
| 27 | 4/7/2007 | 12 |

[1]On April 19, 2007, during the *Coleman* monitoring tour at CMF, Jane Kahn, plaintiffs' counsel, Michael Stone, CDCR staff counsel, and Paul Nicoll, *Coleman* monitor, went to the CCAT (Centralized Clinical Assessment Team) Office at CMF to review the waiting list data for APP (acute beds). Ms. Kahn was shown the list of the inmate-patients currently housed in both S1 and S2. This list included their admission date to the unit. Ms. Kahn copied down each inmate-patient's admission date. We have calculated length of stay for each of the inmates' listed above, based upon their date of admission to the unit through April 19, 2007. During the visit to the CCAT office, plaintiffs' counsel was informed that the inmate-patients housed in S1 and S2 with lengths of stay greater than 10 days, are not counted on the APP waiting list; these inmates are, however, reviewed for transfer to an APP bed when a bed becomes available as part of the CCAT triage process.

# EXHIBIT C



CALIFORNIA DEPARTMENT OF
# Mental Health

1600 9th Street, Sacramento, CA 95814
(916) 654-2413

J. Michael Keating, Jr.                    via:   Lisa Tillman
Office of Special Master                          Deputy Attorney General
2351 Sussex Lane                                  1300 I Street, Suite 125
Fernandina Beach, FL 32034                        P.O. Box 944255
                                                  Sacramento, CA 94244-2550

**RE:   VACAVILLE PSYCHIATRIC PROGRAM (VPP) ACUTE AND MENTAL
        HEALTH CRISIS (MHCBs) BEDS**

Per the conversation during the teleconference on March 13, 2007, the Department of
Mental Health (DMH) is forwarding the information requested regarding the status of
the Acute Beds and Mental Health Crisis Beds (MHCB) for male patients at the
Vacaville Psychiatric Program (VPP). Over the past several years, VPP has operated
20 beds on S-2 as MHCBs for exclusive use by the California Medical Facility (CMF).
In September 2006, after many discussions to resolve the concerns for the long waiting
lists for high security level inmate/patients in need of MHCBs, the Coleman Court
ordered that 25 additional MHCBs be added to VPP to provide services to all California
Department of Corrections and Rehabilitation (CDCR) male inmates. It also ordered
that the services of 25 acute beds be moved to Atascadero State Hospital (ASH) with
the understanding that ASH could utilize these beds for lower level security
inmate/patients. Therefore, due to the conversion of S-1 to a MHCB unit, VPP had
fewer beds for high level security patients needing acute care.

It was later realized that VPP needed to be able to fluctuate bed usage in order to
provide more acute beds. This was requested and the Court approved the bed
fluctuation. Both S-1 and S-2 have 30 beds with both patients needing MHCB services
and acute services. On S-2 there are 10 beds that are used for acute services rather
than MHCB services and on S-1 there are 5 beds also reserved for acute patients. The
fluctuation of bed usage, as approved by the Court, has helped to provide more beds
for the acute referrals to VPP, but DMH now realizes these mixed type units interfere
with programming. The result is that all beds on S-1 and S-2 operate at a MHCB level
and patients on those units who are in need of acute services are limited to MHCB
services. In addition, DMH has discovered that the need for acute level services for
high level security patients remains high and that because these individuals can not be
transferred to ASH, the waiting list for acute beds at VPP has increased to 20 to 30
individuals.

J. Michael Keating, Jr.
March 29, 2007
Page 2

To remedy the programmatic dilemma, DMH is suggesting that the Coleman Court allow the following:

1.  All 30-beds on S-2 should be utilized at the MHCB level of care with 20 beds that may be used by CMF and the remaining 10 beds may be used by all remaining CDCR institutions. Furthermore, that we establish an understanding that if CMF's census is below 20 beds, any unfilled bed could be assigned to another facility. Inversely, if any of the 10 beds for use by the other CDCR institutions is unfilled, a CMF patient needing MHCB services can be assigned that bed. Bed utilization will be based on clinical need.

2.  S-1 would return to male acute patient care for all CDCR institutions with the intention of reducing the current acute care waiting list.

If you need clarification on any aspect of this report, please contact Dr. Char Schultz, Long Term Care Services Division at (916) 654-2413.

Sincerely,

CYNTHIA A. RADAVSKY
Deputy Director

c:    Doug McKeever, Mental Health Project Director

# EXHIBIT D

Case 2:90-cv-00520-KJM-SCR    Document 2227    Filed 05/18/07    Page 22 of 70
Case 2:90-cv-00520-LKK-JFM    Document 2208    Filed 05/01/2007    Page 2 of 5
LTCS
PAGE  02/05
04/06/2007    05:19    9166536376



CALIFORNIA DEPARTMENT OF

# Mental Health.

1600 9th Street, Sacramento, CA  95814
(916) 654-2413

April 6, 2007

J. Michael Keating, Jr.                          via:    Lisa Tillman
Office of Special Master                                  Deputy Attorney General
2351 Sussex Lane                                         1300 I Street, Suite 125
Fernandina Beach, FL  32034                              P.O. Box 944255
                                                          Sacramento, CA  94244-2550

RE:    SPECIAL MASTER KEATING REQUEST FOR INFORMATION

Pursuant to Lisa Tillman's communication of April 4, 2007 the following information is intended to provide Mr. Keating with information relative to the differences between the goals for patients admitted to Mental Health Crisis Beds (MHCB) and Acute Psychiatric Program (APP) as well as assurances that the Vacaville Psychiatric Program (VPP) will make every reasonable effort to appropriately discharge MHCB patients at the earliest possible time and to the appropriate level of care.

The basic differences and similarities between the MHCB and APP goals are outlined below:

## COMPARISON OF MHCB AND ACUTE LEVEL OF CARE TREATMENT

| MHCB | ACUTE |
|---|---|
| Goal: To provide services for conditions which require an inpatient setting to ameliorate mental health symptoms in the least restrictive environment with a length of stay of 10 days. An inmate-patient admitted to the mental health crisis bed for mental health treatment may be described as having acute symptoms of a serious mental disorder of suffering from a significant or life threatening disability. | Overall Goal: To fully remit, or significantly reduce the symptoms of a presenting psychiatric illness, while providing education and guidance in developing basic coping skills.  The primary goal of the APP is to identify and provide a successful transition to the most appropriate level of care for the patient, i.e. Intermediate Care (CMF or Salinas Valley), the Day Treatment Program at CMF, Atascadero State Hospital, the CDCR Enhanced Outpatient Program (EOP), Correctional Clinical Case Management System (CCCMS), general mainline population, or parole. A particular emphasis is placed on diagnosis and evaluation, including thorough psychiatric and internal medicine examinations, psychological and neuropsychological testing, nursing assessment, social history evaluation and rehabilitation therapy evaluation. Diagnosis and evaluation is an on-going process that continues throughout the patient's hospitalization. Length of stay is anticipated to be 30-45 days. |

Case 2:90-cv-00520-KJM-SCR    Document 2227    Filed 05/18/07    Page 23 of 70
Case 2:90-cv-00520-LKK-JFM    Document 2208    Filed 05/01/2007    Page 3 of 5
LTCS

04/06/2007    05:19    9166536376                                                PAGE    03/05

J. Michael Keating
April 6, 2007
Page 2

| Intake Assessments: • Nursing Evaluation | Intake Assessments: • Nursing Evaluation |
|---|---|
| o Interview and give orientation<br>o Assess and take Vital Signs<br>o Notify physician of admission status including any admission problems<br>o Assemble Chart<br>o Initiate the Patient Care Plan<br>o Note and implement any admission orders, such as laboratory, x-rays, medications, etc. | o Interview and give orientation<br>o Assess and take Vital Signs<br>o Notify physician of admission status including any admission problems<br>o Assemble Chart<br>o Initiate the Patient Care Plan<br>o Note and implement any admission orders, such as laboratory, x-rays, medications, etc. |
| Physical Examination within 24 hours of admission | Physical Examination and completion of history and physical within 24 hours of admission |
| Initial Treatment Plan formulated within 24 hours by physician | Brief Mental Status exam and preliminary treatment plan note on admission |
| Individualized Treatment Plan within 72 hours of admission by IDTT | Full Psychiatric Evaluation by physician within 24 hours |
| Case review and Treatment Plan update as necessary but at least every 7 days | Individualized Treatment Plan within 72 hours of admission by IDTT |
| Assess, monitor and document patient status daily by either a psychiatrist or psychologist | Assess, monitor and document patient status each shift by RN and MTAs |
| Review of release of discharge plans – referral to DMH or EOP for continuity of care | Admission note with psychological assessment by psychologist within 10 days of admission |
| Medication evaluation and management | Medication evaluation and management |
| Brief intensive therapy (individual) | Initiate and complete Keyhea (Involuntary medication) process if appropriate |
| Rehabilitation services (indoor, outdoor recreation) | Social History Evaluation by clinical social worker within 10 days of admission |
| Additional rehabilitation therapies available if patient is in MHCB over 10 days | Assessment and evaluation by rehabilitation therapy within 10 days of admission |
| Initiate Keyhea process (involuntary medications) if appropriate | Comprehensive Dietary Assessment within 30 days of admission |
| Restraint and Seclusion with continual observation during restraint and seclusion | Referral to dental services within 90 days of admission |
| | Referral to optometry services as needed |
| | Referral for psychological testing as needed |

Case 2:90-cv-00520-KJM-SCR    Document 2227    Filed 05/18/07    Page 24 of 70
Case 2:90-cv-00520-LKK-JFM    Document 2208    Filed 05/01/2007    Page 4 of 5
04/06/2007   05:19   9166536376                    LTCS                    PAGE   04/05

J. Michael Keating
April 6, 2007
Page 3

| | |
|---|---|
| | Complete psychological testing |
| | Individualized Treatment Plan within 10 days of admission |
| | Weekly and monthly notes by Clinical Social Workers and Rehabilitation Therapists |
| | Individual psychotherapy as indicated in Individualized Treatment Plan |
| | Participation in psycho-educational and/or psychotherapeutic groups (5 days per week) |
| | Participation in socialization groups (7 days per week) |
| | Participation in outside yard activities (7 days per week) |
| | Individualized Treatment Plan updates every 30 days or as needed after admission |
| | Mini-Treatment Conferences to address problem behaviors or emergent psychiatric or behavioral issues |
| | Provide Functional Analyses for more in depth assessment of patient psychiatric condition to formulate advanced behavioral plans |
| | Development and implementation of Interdisciplinary patient behavioral plans |
| | Develop Interdisciplinary discharge plan begun at 72 hour IDTT). Refer to Intermediate, Day Treatment, EOP or CCCMS levels of care as appropriate |
| | Parole planning when indicated which may include coordinating assessment at a County facility if patient remains a danger to self or others or gravely disabled upon parole |
| | Assessment and/or treatment for competency to stand trial |
| | Restraint and Seclusion with close and continual observation before and after as determined necessary by the physician |
| | Suicide watch as determined to be necessary by the physician and IDTT. |
| | Initiate clozapine trial and monitor progress |
| | Any other clinical interventions as determined necessary and appropriate by the IDTT |

As one can see the critical area is the goal for admission. The MHCB goal is to stabilize the patient from the current acute state and return the patient to the outpatient setting within 10 days or less.

Case 2:90-cv-00520-KJM-SCR    Document 2227    Filed 05/18/07    Page 25 of 70
Case 2:90-cv-00520-LKK-JFM    Document 2208    Filed 05/01/2007    Page 5 of 5
LTCS
04/06/2007   05:19   9166536376                                              PAGE   05/05

J. Michael Keating
April 6, 2007
Page 4

By converting S-1 back to an APP unit, the positive aspect is that there will be an additional 30 APP beds for the patients incarcerated within the California Department of Corrections and Rehabilitation (CDCR). Inversely, the negative aspect is that there will be 25 fewer MHCB beds available for CDCR patients. VPP therefore fully agrees to appropriately review the patient's Level Of Care (LOC) and upon discharge refer the patient from the MHCB to the appropriate LOC and not retain the patient in an MHCB for prolonged periods of time. However, if it is determined that the appropriate LOC is to transfer the patient from MHCB to an APP bed, the question arises: is the MHCB patient to take priority over the current patients on the APP wait list? If this is the direction the Special Master elects to take then the negative aspect is that any patient in the MHCB within VPP will take priority over the current wait list which will result in additional days before the non-VPP MHCB patients will be admitted to APP. Further, in the event the patient's recommended LOC is to either an Intermediate Treatment Program (ITP) or Day Treatment Program (DTP) and there is currently a wait list. VPP is faced with the same dilemma, which is to either hold the patient in a MHCB bed or return the patient to the Enhanced Out Patient (EOP) level of care, which is below the LOC required for the patient's well being.

In summary, I will do whatever the Special Master selects. However, the simple fact is that the previous bed plan, approved by the court, demonstrated the need for additional APP and Level IV ICF beds. The current delay in completing the plans that included 350 APP and 128 Level IV ICF beds and initiating the construction is a major factor that drives the current and continued bed shortage. The simple fact is that the bed shortage places both CDCR and VPP in the current operational dilemma.

Sincerely,

*Chas Schultz. Ed D*

VICTOR F. BREWER
Executive Director

# EXHIBIT E

STATE OF CALIFORNIA— DEPARTMENT OF CORRECTIONS AND REHABILITATION                     ARNOLD SCHWARZENEGGER, GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P.O. Box 942883
Sacramento, CA 94283-0001



**MAY 04 2007**

J. Michael Keating, Jr.                     Via:    Lisa Tillman
Office of the Special Master                        Deputy Attorney General
2351 Sussex Lane                                    Department of Justice
Fernandina Beach, FL  32034                         1300 "I" Street, Suite 125
                                                    P. O. Box 944255
                                                    Sacramento, CA  94244-2550

RE:  **INFORMATION REQUESTED, RESPONSE TO JANUARY 19, 1999,
     COURT ORDER REGARDING STAFF VACANCIES**

Dear Mr. Keating:

Enclosed are the missing Enclosures 8 and 10 from the monthly report reflective of January 2007 through April 2007 data and responsive to the January 19, 1999, court order regarding staff vacancies, including changes agreed to at the August 7, 2003, All Parties Meeting:

Enclosure 8 – Atascadero State Hospital (ASH) Discharges
Enclosure 10 – The DMH Monthly Report of CDCR Patients in DMH Hospitals –
       Summary and Penal Code 2684

If you have any questions, please contact me at (916) 323-0229.

Sincerely,

*Brigid Hanson*

BRIGID HANSON
Director (A)
Division of Correctional Health Care Services

Enclosures

cc:   Lawrence McCabe, Deputy Director (A), Division of Correctional Health Care
         Services (DCHCS) (w/o enclosures)
      Matthew A. Lopes, Jr., Deputy *Coleman* Special Master (with enclosures)
      Jeffrey L. Metzner, M.D., *Coleman* Expert (with enclosures)
      Dennis F. Koson, M.D., *Coleman* Expert (with enclosures)
      Kerry Hughes, M.D., *Coleman* Expert (with enclosures)
      Melissa G. Warren, Ph.D., *Coleman* Expert (with enclosures)

STATE OF CALIFORNIA— DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P.O. Box 942883
Sacramento, CA 94283-0001



Raymond F. Patterson, M.D., *Coleman* Expert (with enclosures)
Paul Nicoll, *Coleman* Expert (with enclosures)
Ted Ruggles, Ph.D., *Coleman* Expert (with enclosures)
Mary Perrien, Ph.D., *Coleman* Expert (with enclosures)
Mary-Joy Spencer, Esq., *Coleman* Expert (with enclosures)
Yong Joo Erwin, LCSW, *Coleman* Expert (with enclosures)
Kathryn A. Burns, M.D, MPH, *Coleman* Expert (with enclosures)
Lisa Tillman, Office of the Attorney General (with enclosures)
Michael Stone, Office of Legal Affairs (with enclosures)
Michael Bien, Rosen, Bien and Galvan (with enclosures)
Donald Specter, Prison Law Office (with enclosures)
Virginia Morrison, Esq., *Coleman* (with enclosures)
Mohamedu F. Jones, Esq., *Coleman* (with enclosures)
Patricia Williams, Esq., *Coleman* (with enclosures)
Linda Buffardi, *Coleman* (with enclosures)
Doug McKeever, Director, Mental Health Program, DCHCS (with enclosures)
Andrew Swanson, M.D., Chief Psychiatrist, DCHCS (with enclosures)
Margaret McAloon, Ph.D., DCHCS (w/o enclosures)
Mary Neade, Division of Adult Institutions (with enclosures)
Char Schultz, Ed.D., Department of Mental Health (with enclosures)
Yolanda Smith, Department of Mental Health (with enclosures)
Sharon Riegel, DCHCS (with enclosures)

# Department of Mental Health

**For Month Ending**
**January 2007**

### Summary Monthly Report of CDC Patients in DMH Hospitals
### Cumulative total of all patients treated during the month

| Facility Name<br>Legal Classification | Patients Treated | Average Length of Stay |
|---|---|---|
| **Atascadero  State Hospital** | | |
| PC2684    CDC inmates referred to DMH for treatment | | |
| | 133 | 275 |
| **California Medical Facility at Vacaville** | | |
| PC2684    CDC inmates referred to DMH for treatment | | |
| **INTERMEDIATE TREATMENT PROGRAM** | 105 | 197 |
| PC2684    CDC inmates referred to DMH for treatment | | |
| **ACUTE INPATIENT** | 389 | 81 |
| | 494 | 139 |
| **Patton State Hospital** | | |
| PC2684    CDC inmates referred to DMH for treatment | | |
| | 22 | 481 |
| **Salinas Valley Psychiatric Program** | | |
| PC2684    CDC inmates referred to DMH for treatment | | |
| | 145 | 207 |
| **Total** | **794**    *Average* | **248** |

This report includes confidential data and is governed by privacy laws and requirements.  Unauthorized use is illegal.  Shred to dispose.

# Department of Mental Health

*For Month Ending*
*February 2007*

### Summary Monthly Report of CDC Patients in DMH Hospitals
### Cumulative total of all patients treated during the month

| *Facility Name* *Legal Classification* | *Patients Treated* | *Average Length of Stay* |
|---|---|---|
| **Atascadero State Hospital** | | |
| **PC2684**  CDC Inmates referred to DMH for treatment | 120 | 280 |
| | | |
| **California Medical Facility at Vacaville** | | |
| **PC2684**  CDC inmates referred to DMH for treatment | | |
| **INTERMEDIATE TREATMENT PROGRAM** | 83 | 186 |
| **PC2684**  CDC inmates referred to DMH for treatment | | |
| **ACUTE INPATIENT** | 306 | 88 |
| | 389 | 137 |
| **Patton State Hospital** | | |
| **PC2684**  CDC inmates referred to DMH for treatment | 22 | 481 |
| | | |
| **Salinas Valley Psychiatric Program** | | |
| **PC2684**  CDC inmates referred to DMH for treatment | 134 | 206 |
| | | |
| ***Total*** | **665** | *Average* **248** |

*This report includes confidential data and is governed by privacy laws and requirements. Unauthorized use is illegal. Shred to dispose.*

*Printed:*

**Page** *1*

*Thursday, May 03, 2007*

# Department of Mental Health

**For Month Ending**
**March 2007**

### Summary Monthly Report of CDC Patients in DMH Hospitals
### Cumulative total of all patients treated during the month

| Facility Name<br>Legal Classification | Patients Treated | Average Length of Stay |
|---|---|---|
| **Atascadero State Hospital** | | |
| PC2684    CDC inmates referred to DMH for treatment | 103 | 297 |
| | | |
| **California Medical Facility at Vacaville** | | |
| PC2684    CDC inmates referred to DMH for treatment | | |
| INTERMEDIATE TREATMENT PROGRAM | 70 | 191 |
| PC2684    CDC inmates referred to DMH for treatment | | |
| ACUTE INPATIENT | 246 | 96 |
| | 316 | 144 |
| **Patton State Hospital** | | |
| PC2684    CDC inmates referred to DMH for treatment | 19 | 538 |
| | | |
| **Salinas Valley Psychiatric Program** | | |
| PC2684    CDC inmates referred to DMH for treatment | 126 | 210 |
| **Total** | 564 | **Average**   266 |

*This report includes confidential data and is governed by privacy laws and requirements. Unauthorized use is illegal. Shred to dispose.*

**Page**   *1*

**Printed:**    Thursday, May 03, 2007

# Department of Mental Health

**For Month Ending**
**April 2007**

### Summary Monthly Report of CDC Patients in DMH Hospitals
### Cumulative total of all patients treated during the month

| Facility Name | | |
|---|---|---|
| Legal Classification | Patients Treated | Average Length of Stay |

**Atascadero State Hospital**

| | | |
|---|---|---|
| PC2684 · CDC inmates referred to DMH for treatment | | |
| | 95 | 303 |

**California Medical Facility at Vacaville**

| | | |
|---|---|---|
| PC2684 · CDC inmates referred to DMH for treatment | | |
| INTERMEDIATE TREATMENT PROGRAM | 81 | 158 |
| PC2684 · CDC inmates referred to DMH for treatment | | |
| ACUTE INPATIENT | 250 | 75 |
| | 331 | 116 |

**Patton State Hospital**

| | | |
|---|---|---|
| PC2684 · CDC inmates referred to DMH for treatment | | |
| | 19 | 535 |

**Salinas Valley Psychiatric Program**

| | | |
|---|---|---|
| PC2684 · CDC inmates referred to DMH for treatment | | |
| | 136 | 172 |

| | | | |
|---|---|---|---|
| **Total** | 581 | **Average** | 248 |

*This report includes confidential data and is governed by privacy laws and requirements. Unauthorized use is illegal. Shred to dispose.*

**Page** *1*

**Printed:** Thursday, May 03, 2007

# EXHIBIT F

## Jane E. Kahn

| | |
|---|---|
| **From:** | Lisa Tillman [Lisa.Tillman@doj.ca.gov] |
| **Sent:** | Wednesday, May 09, 2007 1:13 PM |
| **To:** | jmichaelkeatingjr@yahoo.com |
| **Cc:** | Kerry Courtney Hughes, M.D.; Dennis F. Koson, M.D.; harconwil@aol.com; Mary Perrien; Melissa G. Warren, M.D.; Ginny Morrison; hammujones@comcast.net; Raymond F. Patterson, M.D.; Ted Ruggles, Ph. D.; Paul Nicoll; FDoVale@pld-law.com; LBuffardi@pld-law.com; mlopes@pld-law.com; Mary-Joy Spencer; Donald Specter; itrujillo@prisonlaw.com.; Amy E. Whelan; Jane E. Kahn; Lori E. Rifkin; Michael W. Bien; Sarah M. Laubach; Jeffrey.metzner@uchsc.edu; Yong Joo Erwin; Kathryn Burns, M.D., MPH |
| **Subject:** | Corrected Enclosure II to April 2007 Agenda Packet |
| **Attachments:** | Enclosure II Corrected.pdf |

May 9, 2007

Re: Coleman v. Schwarzenegger

Greetings:

We sent you via email yesterday a package of information responsive to the April 20, 2007 agenda items.  We have just noticed that Enclosure II inadvertently contained a typographical error regarding the month of the stated information.  A corrected Enclosure II is attached.  In addition, to provide a complete picture, Enclosure II now reflects staff capacity numbers for the EOP units at Mule Creek State Prison.

We regret any inconvenience.

Sincerely,

Lisa Tillman
Deputy Attorney General
Office of the Attorney General
Telephone: 916-327-7872
Facsimile: 916-324-5205

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

Enclosure II (Corrected)

**INFORMATION REQUESTED, APRIL 20, 2007, COLEMAN POLICY
MEETING AGENDA ITEMS**

- **Reception Center (RC) Enhanced Outpatient Program (EOP) numbers:**

| RC LOCATION | RC EOP CENSUS[1] |
|---|---|
| CCI-RC | 19 |
| CIM-RC | 137 |
| DVI-RC | 21 |
| HDSP-RC | 2 |
| LAC-RC | 6 |
| NKSP-RC | 45 |
| RJD-RC | 59 |
| SQ-RC | 24 |
| WSP-RC | 81 |
| CCWF-RC | 1 |
| CIW-RC | 42 |
| VSPW-RC | 11 |
| TOTAL: | 448 |

( [1] *DDPS census data as of 5-3-07)*
Distributed Data Processing System (DDPS)

- **Report on the status of the testing of the psychiatrists at University of California San Diego (UCSD):**

The following update is provided as of May 3, 2007.

At the all parties meeting in January 2007, there was concurrence to revise the language in the previous court order on the competency of psychiatrists with the addition of board certification and/or three years of Accreditation Council for Graduate Medical Education (ACGME) approved and completed psychiatry residency to meet the minimum training qualifications (MQs) for employment. Judge Karlton signed the revised stipulated court order on Feb 5, 2007

The list of employed psychiatrists originally submitted to Special Master Keating in the summer of 2006, included forty-five psychiatrists who did not meet at that time the MQs. As reported at previous all parties meetings, this list has been adjusted to exclude psychiatrists who now meet the MQs and would not be subject to competency testing per the court order.

Due mostly with the updating of the psychiatrists training credentials to reflect actual approved and completed psychiatry residency time and adding the smaller number of psychiatrists now meeting MQs due to the revised 2007 court order, the list of forty five was reduced to seven psychiatrists who would be subject to testing.

Testing at UCSD began on April 11, 2007 and the last psychiatrist is scheduled to take the exam June 1, 2007.

Date: May 8, 2007                                                    Page 1 of 6
Corrected: May 9, 2007

Enclosure II (Corrected)

## INFORMATION REQUESTED, APRIL 20, 2007, COLEMAN POLICY MEETING AGENDA ITEMS

- **Mule Creek State Prison (MCSP) Sensitive Needs Yard (SNY) EOP population figures and updated report on programming space:**

  Population Figures:

  | Mule Creek State Prison Enhanced Outpatient Program Sensitive Needs Yard Census for May 4, 2007 | | |
  |---|---|---|
  | **Location** | **Staff Capacity** | **Census** |
  | Level III | 360 | 261 |
  | Level IV | 150 | 111 |
  | Source: DDPS for May 4, 2007. | | |

  MCSP programming Update:

  As of May 4, 2007, the institution's request for one trailer, to provide additional treatment and office space for the EOP program, is currently under review.

- **Status of the S1 and S2 units and the Department of Mental Health (DMH) proposal to revert S1 to an Acute Psychiatric Program (APP):**

  Victor Brewer, Executive Director, Vacaville Psychiatric Program, wrote a letter to Mr. Keating on April 6, 2007, outlining the issues related to switching the units to make them homogeneous in treatment designation, (See Enclosure IV). As of May 2, 2007, Mr. Brewer is waiting to speak further with Mr. Keating regarding this issue.

- **Current DMH populations (data which was not included in the monthly statistical package):**

  On May 4, 2007, Brigid Hanson, Director (A), Division of Correctional Health Care Services, sent a letter to Mr. Keating regarding the DMH data that was not included in the monthly statistical package (See Enclosure V – cover letter only: no enclosures).

Date: May 8, 2007
Corrected: May 9, 2007

Enclosure II (Corrected)

**INFORMATION REQUESTED, APRIL 20, 2007, COLEMAN POLICY
MEETING AGENDA ITEMS**

In addition, for the date of May 1, 2007, DMH reports the following information for *Coleman* beds only:

| Department of Mental Health Populations as of May 1, 2007*: | | | |
|---|---|---|---|
| Level of Care | Census | Number of Beds | Comments |
| *Vacaville Psychiatric Program (VPP):* | | | |
| Intermediate Care Facility (ICF) | 66 | 76 | 2 beds on hold, 1 referral pending, 7 beds available. |
| Day Treatment Program (DTP) | 40 | 44 | |
| Acute Psychiatric Program (APP) | 142 | 150 | 4 beds on hold, 4 beds available. |
| *Salinas Valley Psychiatric Program (SVPP):* | | | |
| ICF | 124 | 175 | 11 beds on hold, 40 beds available. |
| *Atascadero State Hospital (ASH):* | | | |
| ICF | 80 | 265 | Admissions are restricted. |
| *Coalinga State Hospital (CSH):* | | | |
| ICF | 49 | 50 | One admission is pending. |
| *Patton State Hospital (PSH):* | | | |
| ICF | 17 | 30 | Female patients. |
| *Data for *Coleman* beds only. | | | |

- **Waiting list data for Mental Health Crisis Beds (MHCBs), APP, Salinas Valley Psychiatric Program (SVPP), Atascadero State Hospital (ASH):**

For the date of May 1, 2007, DMH reports the following information for *Coleman* beds only, and the California Department of Corrections and Rehabilitation (CDCR) reports for MHCBs as of May 2, 2007:

| Department of Mental Health (DMH) and California Department of Corrections and Rehabilitation (CDCR) Waitlist Data*: | | |
|---|---|---|
| Level of Care | Wait List Census | Comments |
| **DMH** | | |
| *Vacaville Psychiatric Program (VPP):* | | |
| Intermediate Care Facility (ICF) | 6 | |
| Acute Psychiatric Program (APP) | 50 | |

Enclosure II (Corrected)

**INFORMATION REQUESTED, APRIL 20, 2007, COLEMAN POLICY
MEETING AGENDA ITEMS**

| Department of Mental Health (DMH) and California Department of Corrections and Rehabilitation (CDCR) Waitlist Data*: | | |
|---|---|---|
| Level of Care | Wait List Census | Comments |
| *Salinas Valley Psychiatric Program (SVPP):* | | |
| ICF | 50 | Problems with suspension of Secured Housing Unit (SHU) terms has caused the delay of 4 patients into SVPP. |
| *Atascadero State Hospital (ASH):* | | |
| ICF | 0 | No waiting list.  The 7 patients currently on the data base have been transferred to other locations. Admissions are restricted. |
| *Coalinga State Hospital (CSH):* | | |
| ICF | 0 | No waiting list. |
| *Patton State Hospital (PSH):* | | |
| ICF | 0 | No waiting list. |
| **CDCR** | | |
| Mental Health Crisis Beds (MHCBs) | 15 | |
| *DMH Data as of May 1, 2007, and is for *Coleman* beds only.  CDCR data as of May 2, 2007. | | |

- **In Fill Projects, including assessment of Coleman infrastructure at In-Fill institutions:**

    Assembly Bill (AB) 900 was passed by the Legislature on April 26, 2007, and was signed by the Governor.  Discussion regarding the In Fill Projects is now occurring.

- **Pre-release planning programs:**

    The Transitional Case Management Program for the Mentally Ill (TCMP-MI):
    - Provides pre-parole assessments and bridges the information to the Parole Outpatient Clinics (POC) via the Parole Automated Tracking System.
    - TCMP-MI social workers also provide the inmate with a POC appointment, and advocate for POC in an attempt to get the inmate to attend the scheduled appointment upon parole.
    - TCMP-MI social workers complete Social Security Supplemental Security Income (SSI) applications for Enhanced Outpatient Program (EOP) designated inmates prior to parole.

Date: May 8, 2007
Corrected: May 9, 2007

Enclosure II (Corrected)

### INFORMATION REQUESTED, APRIL 20, 2007, COLEMAN POLICY
### MEETING AGENDA ITEMS

The Transitional Case Management Program for Human Immunodeficiency Virus and Acquired Immune Deficiency Syndrome (TCMP-HIV):

- Program services available to mentally ill inmates that are HIV/AIDS.
- Assists this population in obtaining local HIV/AIDS related support services to ensure a smooth transition to parole and provide some incentives to HIV infected parolees to remain in the community rather than return to prison to receive the specialized and expensive care required for their illness. The services most used by TCMP-HIV participants are support groups, emergency housing, entitlement programs, hospice care, residential substance abuse, placement, transportation assistance, employment assistance, and HIV peer education.
- This requires inmate's voluntary participation.

Pre-Parole Benefits:

- The Department has begun implementation of a new program that will utilize contracted social workers (benefits workers) within the prisons to apply for and secure federal and state benefit entitlements prior to an inmate's return to the community. Benefits that will be applied for are; Social Security benefits, State sponsored Medi-Cal, and Veteran's Affairs benefits.
- The target population is inmates within 210 days to parole that are medically, mentally or developmentally disabled, enduring a long-term illness, or have reached the age of 62 years or older (55 if a disabled widow/widower).
- This also includes inmates designated as members of the Coleman, Plata, Armstrong, and Clark class action lawsuits will be screened for potential eligibility.

**Note:** Due to delays and uncertainty of finalizing a contract with expected contractor, Division of Adult Parole Operations (DAPO) is now working with other potential partners. This has caused a delay to the targeted January/February, 2007 implementation, and is now not expected to be implemented for several months (hopefully by the end of summer 2007).

### Pre-Parole/Transitional Services
### For Inmates in Department of Mental Health (DMH) Programming

Currently the DAPO - TCMP-MI does not ducat or go to inmates that are in DMH beds, as it is not in the scope of services for which they are contracted to provide.

Additionally, no definite plan is in place to have the upcoming benefits workers provide pre-parole services to DMH inmate-patients.

Date: May 8, 2007                                                    Page 5 of 6
Corrected: May 9, 2007

Enclosure II (Corrected)

**INFORMATION REQUESTED, APRIL 20, 2007, COLEMAN POLICY
MEETING AGENDA ITEMS**

DAPO is not closed to serving this population if resources were made available, contract staff is available, and the agreement between CDCR and DMH includes processes for the pre-parole services.

Also, DAPO is willing to discuss the possibility of DMH providing transitional services in their discharge planning, and would be open to developing a process with them from which necessary information sharing could occur.

DMH facilities outside of CDCR grounds are not currently included in planning for pre-parole services.

# EXHIBIT G

Enclosure III

# CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
## Mental Health Program Infrastructure Modification Projects
### As of May 3, 2007

| Institution | Program | Construction Schedule | Comments | Update Provided By (Institution, OFM, General Services, etc.) |
|---|---|---|---|---|
| **Completed Projects (by Institution)** | | | | |
| AVE | CCCMS | Completed | | OFM |
| CCWF | EOP, RCSE | Completed | | OFM |
| CCWF | CCCMS | Completed | | OFM |
| CIM | CCCMS | Completed | | OFM |
| CIM | CCCMS, RCSE | Completed | | OFM |
| CIW | CCCMS, EOP | Completed | | OFM |
| CIW | RCSE | Completed | | OFM |
| CIW | CTC | Completed | | OFM |
| CMC | EOP, CCCMS | Completed | | OFM |
| CMF | CTC | Completed | | Institution |
| CMF | P Unit HVAC | Completed | | OFM |
| CMF | ICF (36 bed) | Completed | | OFM |
| COR | CCCMS, EOP | Completed | | OFM |
| CRC | CCCMS | Completed | | OFM |
| DVI | RCSE | Completed | | OFM |
| KVSP | CTC | Completed | | OFM |
| LAC | CCCMS, EOP | Completed | | OFM |
| MCSP | CCCMS, EOP | Completed | | OFM |
| MCSP | CTC | Completed | | OFM |
| NKSP | RCSE | Completed | | OFM |
| NKSP | CCCMS | Completed | | OFM |
| NKSP | CTC | Completed | | OFM |
| RJD | CCCMS, RCSE | Completed | | OFM |
| SAC | CCCMS, EOP | Completed | | OFM |
| SAC | 64-bed PSU addition | Completed | | DGS / Institution |
| SAC | CTC | Completed | | OFM |
| SATF | CCCMS | Completed | | OFM |
| SOL | CCCMS | Completed | | OFM |
| SOL | CTC | Completed | | OFM |
| SVSP | 36-Bed ICF | Completed | | OFM |
| SVSP | 20-Bed addition to 36-Bed ICF | Completed | | OFM |
| SVSP | EOP, CCCMS | Completed | | OFM |

1

## CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
### Mental Health Program Infrastructure Modification Projects
### As of May 3, 2007

| Institution | Program | Construction Schedule | Comments | Update Provided By (Institution, OFM, General Services, etc.) |
|---|---|---|---|---|
| WSP | CCCMS | Completed | | OFM |
| WSP | RCSE | Completed | | OFM |
| **Current and Out-Year Projects by Institution and Projects Completed Since Last Report** | | | | |
| CIM | Hospital Cell Door Project | Pending Project delayed. An updated completion date is pending. | The cell doors are on site but the project delayed. The institution has submitted, and is awaiting approval of, a request for funding to convert a portion of South Dorm into temporary housing (swing space) for the hospital inmates displaced during the door conversion. Work cannot start until hospital inmates are relocated. The request to temporarily relocate the inmates is pending the court receiver's approval. | OFM |
| CIM | CTC Conversion | Pending | Conversion of one wing of existing hospital. Project is awaiting a COBCP funding request. | OFM |
| CIW | 20-Bed PSU | Pending | The project is included in the Governor's Budget for FY07/08 funding for Preliminary Plans, and is included in the Five-year Infrastructure Plan for FY 08/09 for Working Drawings and Construction. | OFM |
| CIW | 25 45 Bed Acute Care / ICF | FY 2010/11 | Environmental documents including the Initial Study and Mitigated Negative Declaration for the 30-day public review period were filed with the State Clearinghouse on 10/2/06. The Architectural and Engineering firm have been selected. Funding for Preliminary Plans was approved in the FY 06/07 Budget with Working Drawings and Construction funding being requested for the FY 07/08 budget. Pursuant to the CDCR December 2006 Mental Health Bed Plan, this project is proposed for an increase in scope from a 25-bed to a 45-bed facility. | OFM |
| CMC | 36 Crisis Beds – Bldg 7 LOU Conversion Modifications | Pending | Conversion of existing LOU space to temporary MHCB beds pending the construction of the 50-bed Mental Health Crisis facility at CMF, with activation scheduled for the fall of 2008. The Federal Court issued a waiver of the Contract Code dollar limit on minor cap funding for this project up to $457,000. The outside exercise yard is in progress and some interior work is underway. The project is approximately 25% complete per institution. The contract for the specially modified cell doors was awarded April 2007. At this time, the institution does not have an anticipated completion date. | Institution |

## CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
### Mental Health Program Infrastructure Modification Projects
#### As of May 3, 2007

| Institution | Program | Construction Schedule | Comments | Update Provided By (Institution, OFM, General Services, etc.) |
|---|---|---|---|---|
| CMC | 50 Mental Health Crisis Beds | FY 2010/11 | Project is included in the Five-year Infrastructure Plan for FY07/08 funding for Preliminary Plans, and FY 08/09 for Working Drawings and Construction. **Project scope is proposed to change to a 1,503-bed Consolidated Care Center pursuant to the December 2006 Mental Health Bed Plan and is incorporated into the Five-year infrastructure Plan for design/build Working Drawings and Construction in FY 2008/09.** | OFM |
| CMF | 64-Bed ICF | Mar 2012 | Preliminary Plans approved in the FY 06/07 Budget Act. Funding for Working Drawings and Construction is included the FY 07/08 Infrastructure Plan. | OFM |
| CMF | 50 Mental Health Crisis Beds | 5/06 – 12/07 | Construction began 5/06. Staff occupancy scheduled for 1/08 and inmate occupancy by 7/08 (pending licensing). Project 50% complete. | OFM |
| CMF | M-3 - Convert EOP Unit to Ad Seg Unit | **Completed** | | OFM |
| CMF | P-3 – Convert Ad Seg Unit in P-3 to ICF beds | 2/07 to 5/07 | This is an institution Plant Operations project. The project is 82 percent complete and on schedule for a 5/07 completion | Institution |
| ISP | CTC | **Completed April 07** | Pending licensure. | OFM |
| LAC | 150 EOP Beds | FY 2010/11 | Preliminary Plans funded in the FY 06/07 Budget Act are complete. Funding for Working Drawings and Construction is included the FY 07/08 Infrastructure Plan. | OFM |
| MCSP | Phase I Level IV EOP/SNY GP to EOP Bed Conversion - Bldg. 5 | **Phase I Complete 6/06** | Project includes the addition of 6 OHU beds that have been activated. | Institution |
| MCSP | Phase II EOP Conversion | **Completed January 2007** | Convert existing Voc. Ed. Space to EOP/CCCMS program space. Construction Plans were approved by the State Fire Marshal 1/23/06. Phase II is on schedule. | Institution |
| MCSP | Level III EOP/SNY Facility B (180 beds) | **Completed Feb. 2007** | Minor capital outlay project for the temporary conversion of additional voc ed space to temporary program space for 180 EOP beds. | Institution/Health Care |

# CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
## Mental Health Program Infrastructure Modification Projects
### As of May 3, 2007

| Institution | Program | Construction Schedule | Comments | Update Provided By (Institution, OFM, General Services, etc.) |
|---|---|---|---|---|
| MCSP | 150-Bed EOP treatment space. Project proposed for cancellation | FY 2010/11 | Preliminary Plans approved in the FY 06/07 Budget Act are completed. Funding for Working Drawings and Construction is included the FY 07/08 Infrastructure Plan. **This project is proposed for cancellation pursuant to the CDCR December 2006 Mental Health Bed Plan.** | OFM |
| PBSP | Mental Health Space Modifications | Completed April 2007 | Construct three Mental Health clinician/staff offices, two custody staff offices, one group room, one medical exam room and one triage room. Project is 78% complete | OFM |
| SAC | 350-Bed Acute Mental Health Facility | FY 2010/11. | Preliminary Plans approved in the FY 06/07 Budget Act are complete. Funding for Working Drawings and Construction is included the FY 07/08 Infrastructure Plan. **Project scope is proposed to change to a 622-bed Consolidated Care Center pursuant to the CDCR December 2006 Mental Health Bed Plan. The expanded project is incorporated into the Five-year infrastructure Plan for design/build Working Drawings and Construction in FY 2008/09.** | OFM |
| SAC | 128-Bed ICF Project proposed for cancellation | Sep. 2009 | **This projected is proposed for cancelled pursuant to the CDCR December 2006 Mental Health Bed Plan** | OFM |
| SAC | 350 EOP Treatment Space | Nov 2009 | Preliminary Plans are included in the FY 06/07 Budget Act and are 80% completed Funding request for Working Drawings and Construction is included the FY 07/08 Infrastructure Plan. | OFM |
| SQ | Condemned Inmate Complex | Pending | This project includes a 24-Bed CTC. Preliminary Plans and Working Drawings were approved in the FY 2003/04 Budget Act. Due to significant site clean-up remediation and other site-driven costs, the project was delayed pending resolution of the project costs. These issues resolved, the request for Construction funding is in the current Infrastructure Plan for construction funding in the FY 2008/09 Budget. | OFM |

4

Enclosure III

# CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
## Mental Health Program Infrastructure Modification Projects
### As of May 3, 2007

| Institution | Program | Construction Schedule | Comments | Update Provided By (Institution, OFM, General Services, etc.) |
|---|---|---|---|---|
| SVSP | 56-Bed temporary ICF conversion | Completed | A 56-bed temporary conversion of Bldg. D5 to ICF beds. Project funded through the 2005-06 minor capital outlay program. | OFM |
| SVSP | 112-Bed permanent CTC conversion **Project proposed for cancellation** | 2009 | A 112-bed permanent conversion of Building D5/D6 to CTC beds, with temporary use as an ICF. The ICF beds generated by this renovation must be replaced as part of the long-term plan for 2010. Preliminary Plans is complete. A 12/06 Public Works Board is scheduled for Working Drawings and Construction. **This project is proposed for cancellation pursuant to the CDCR December 2006 Mental Health Bed Plan** | OFM |
| SVSP | 128-Bed ICF **Project is proposed to be rescoped to a 70 – bed EOP/ASU** | FY 2010/11 | Preliminary Plans approved in the FY 06/07 Budget Act. Funding for Working Drawings and Construction is included the FY 07/08 Infrastructure Plan. CEQA consultant negotiations completed and initiation meeting /site visit with consultant on 10/19/06. **This project is proposed to be rescoped to a 70-bed EOP/ASU project as provided in the December 2006 Mental Health Bed Plan. The CDCR is going forward in the 2008/13 Infrastructure Plan for funds for construction.** | OFM |
| SVSP | 64-Bed Mental Health Facility | Mar 2009 | Working Drawings and Construction approved in the FY 06/07 Budget. Preliminary Plans approved by PWB 7/14/06. Project on schedule. Working Drawings scheduled for 11/06. | OFM |

5

# EXHIBIT H

California Home

Friday, May 18, 2007

Welcome to *California*

## SPB State Vacancy Results

SPB Home Page
Employment Home Page

**Non State Employees**
- Getting Started
- Exams Open for Testing
- No Exam Required
- Passed a State Exam
- Other Employment Information

**Current and Former State Employees**
- Getting Started
- Exams Open For Testing
- Employment Opportunities
- Employment Benefits
- Other Employment Information

Results 51 - 100 of about 107 Vacancy(s) in FRESNO

[New Search]  [Show All Counties]  [Previous]  [Next]

| Job Title | Aprox. Salary | Job Type | Dept. & Location | Posted | Deadline |
|---|---|---|---|---|---|
| OFFICE ASSISTANT (TYPING) | $2,073.00-$2,520.00 | Full Time Permanent | EMPLOYMENT DEVELOPMENT DEPARTMENT Fresno / Paid Family Leave, FRESNO | 05/02/07 | Until Filled |
| OFFICE ASSISTANT (TYPING) | $2,073.00-$2,520.00 | Full Time Permanent | EMPLOYMENT DEVELOPMENT DEPARTMENT Fresno / Paid Family Leave, FRESNO | 01/22/07 | Until Filled |
| OFFICE ASSISTANT (TYPING) | $2,073.00-$2,733.00 | Full Time Permanent | INDUSTRIAL RELATIONS, DEPARTMENT OF FRESNO - L&R, FRESNO | 05/10/07 | 05/21/2007 |
| OFFICE SERVICES SUPERVISOR I (TYPING) | $2,551.00-$3,156.00 | Full Time Permanent | CALIFORNIA HIGHWAY PATROL, DEPARTMENT OF 125 SOUTH SIXTH STREET, COALINGA, FRESNO | 05/07/07 | 05/21/2007 |
| OFFICE SERVICES SUPERVISOR I (TYPING) | $2,602.00-$3,156.00 | Full Time Permanent | CALIFORNIA HIGHWAY PATROL, DEPARTMENT OF 125 SOUTH SIXTH STREET, COALINGA, FRESNO | 05/07/07 | 05/21/2007 |
| OFFICE TECHNICIAN (TYPING) | $2,598.00-$3,157.00 | Full Time Permanent | MENTAL HEALTH, COALINGA STATE HOSPITAL Coalinga State Hospital, FRESNO | 05/08/07 | 05/25/2007 |
| OFFICE TECHNICIAN (TYPING) | $2,598.00-$3,157.00 | Full Time Permanent | EDUCATION, DEPARTMENT OF Diagnostic Center Central, FRESNO | 05/03/07 | 05/24/2007 |
| OFFICE TECHNICIAN (TYPING) | $2,598.00-$3,157.00 | Full Time Permanent | FISH AND GAME, DEPARTMENT OF Fresno, Central Region, FRESNO | 05/16/07 | 05/24/2007 |
| OFFICE TECHNICIAN (TYPING) | $2,598.00-$3,157.00 | Full Time Permanent | FAIR EMPLOYMENT AND HOUSING, DEPARTMENT OF Fresno District Office, FRESNO | 05/14/07 | Until Filled |
| OFFICE TECHNICIAN (TYPING) | $2,551.00-$3,157.00 | Full Time Permanent | CORRECTIONS AND REHABILITATION, PAROLES 2222 "G" Street, Fresno Ca 93706, FRESNO | 05/11/07 | 05/25/2007 |
| OFFICE TECHNICIAN (TYPING) | $2,598.00-$3,157.00 | Full Time Permanent | CORRECTIONS AND REHABILITATION, PAROLES Fresno, FRESNO | 05/17/07 | 05/31/2007 |
| OFFICE TECHNICIAN (TYPING) | $2,598.00-$3,157.00 | Full Time Permanent | INSURANCE, DEPARTMENT OF Fraud Division, FRESNO | 03/15/07 | Until Filled |
| PESTICIDE USE SPECIALIST | $2,957.00-$4,305.00 | Full Time Permanent | PESTICIDE REGULATION, DEPARTMENT OF Fresno, FRESNO | 04/05/07 | Until Filled |
| PHARMACIST I, DEPARTMENTS OF MENTAL HEALTH AND DEVELOPMENTAL SERVICES | $5,236.00-$5,949.00 | Full Time Permanent | MENTAL HEALTH, COALINGA STATE HOSPITAL COALINGA, CA, FRESNO | 03/02/05 | Until Filled |
| PHYSICIAN AND SURGEON (SAFETY) | $10,366.00-$11,867.00 | Full Time Permanent | MENTAL HEALTH, COALINGA STATE HOSPITAL COALINGA CALIFORNIA, FRESNO | 01/04/06 | Until Filled |
| PHYSICIAN AND SURGEON, CORRECTIONAL FACILITY (INTERNAL MEDICINE/FAMILY PRACTICE) | $15,000.00-$16,667.00 | Full Time Permanent | CORRECTIONS AND REHABILITATION, PLEASANT VALLEY STATE PRISON PLEASANT VALLEY STATE PRISON, FRESNO | 08/23/05 | Continuous |
| PLUMBER II (CORRECTIONAL FACILITY) | $4,257.00-$4,678.00 | Full Time | CORRECTIONS AND REHABILITATION, PLEASANT VALLEY STATE PRISON Pleasant Valley State Prison, FRESNO | 05/11/07 | 05/23/2007 |
| PRE-LICENSED PSYCHIATRIC TECHNICIAN (SAFETY) | $2,660.00-$2,923.00 | Full Time | MENTAL HEALTH, COALINGA STATE HOSPITAL COALINGA, CA, FRESNO | 12/23/05 | Until Filled |
| PROGRAM DIRECTOR (MENTAL DISABILTIES-SAFETY) | $5,883.00-$6,483.00 | Full Time Permanent | MENTAL HEALTH, COALINGA STATE HOSPITAL COALINGA, CA, FRESNO | 06/10/05 | Until Filled |

| | | | | | |
|---|---|---|---|---|---|
| PROGRAM TECHNICIAN II | $2,465.00-$2,998.00 | Full Time Permanent | **CORRECTIONS AND REHABILITATION, DEPARTMENT OF** CENTRAL SELECTION CENTER/BIU, FRESNO | 04/17/07 | Until Filled |
| PROGRAMMER II | $3,900.00-$4,978.00 | Full Time Permanent | **MENTAL HEALTH, COALINGA STATE HOSPITAL** Coalinga State Hospital, FRESNO | 04/04/07 | Until Filled |
| PSYCHIATRIC NURSING EDUCATION DIRECTOR | $6,088.14-$7,101.14 | Full Time Permanent | **MENTAL HEALTH, COALINGA STATE HOSPITAL** COALINGA CALIFORNIA, FRESNO | 01/09/06 | Until Filled |
| PSYCHIATRIC TECHNICIAN (SAFETY) | $3,478.00-$4,115.00 | Full Time Permanent | **MENTAL HEALTH, COALINGA STATE HOSPITAL** COALINGA, CA, FRESNO | 04/06/05 | Until Filled |
| PSYCHIATRIC TECHNICIAN INSTRUCTOR | $4,507.00-$5,475.00 | Full Time Permanent | **MENTAL HEALTH, COALINGA STATE HOSPITAL** Coalinga State Hospital, FRESNO | 04/25/07 | Until Filled |
| PSYCHOLOGIST (HEALTH FACILITY-CLINICAL-SAFETY) | $4,655.00-$6,111.00 | Full Time Permanent | **MENTAL HEALTH, COALINGA STATE HOSPITAL** COALINGA STATE HOSPITAL, FRESNO | 03/11/05 | Until Filled |
| PSYCHOLOGIST-CLINICAL, CORRECTIONAL FACILITY | $6,882.00-$8,636.00 | Full Time Permanent | **CORRECTIONS AND REHABILITATION, PLEASANT VALLEY STATE PRISON** PLEASANT VALLEY STATE PRISON, FRESNO | 07/22/03 | Continuous |
| PUBLIC HEALTH NURSE I | $4,593.00-$5,449.00 | Full Time Permanent | **MENTAL HEALTH, COALINGA STATE HOSPITAL** COALINGA, CA, FRESNO | 06/21/05 | Until Filled |
| PUBLIC HEALTH NURSE II | $6,433.14-$7,409.14 | Full Time Permanent | **MENTAL HEALTH, COALINGA STATE HOSPITAL** COALINGA, CA, FRESNO | 12/29/04 | Until Filled |
| PUBLIC SAFETY DISPATCHER II, CALIFORNIA HIGHWAY PATROL | $3,413.00-$4,147.00 | Full Time Permanent | **CALIFORNIA HIGHWAY PATROL, DEPARTMENT OF** 1382 WEST OLIVE AVENUE, FRESNO, CA 93728, FRESNO | 11/08/06 | Until Filled |
| RADIOLOGIC TECHNOLOGIST (SAFETY) | $2,974.00-$3,614.00 | Full Time Permanent | **MENTAL HEALTH, COALINGA STATE HOSPITAL** COALINGA CALIFORNIA, FRESNO | 08/30/05 | Until Filled |
| REGISTERED NURSE (SAFETY) | $4,501.00-$5,276.00 | Full Time Permanent | **MENTAL HEALTH, COALINGA STATE HOSPITAL** COALINGA, CA, FRESNO | 04/06/05 | Until Filled |
| REHABILITATION THERAPIST, STATE FACILITIES (ART-SAFETY) | $3,142.00-$3,912.00 | Full Time Permanent | **MENTAL HEALTH, COALINGA STATE HOSPITAL** COALINGA CALIFORNIA, FRESNO | 10/25/05 | Until Filled |
| REHABILITATION THERAPIST, STATE FACILITIES (MUSIC-SAFETY) | $2,992.00-$3,725.00 | Full Time Permanent | **MENTAL HEALTH, COALINGA STATE HOSPITAL** COALINGA, FRESNO | 10/25/05 | Until Filled |
| REHABILITATION THERAPIST, STATE FACILITIES (RECREATION-SAFETY) | $2,992.00-$3,725.00 | Full Time Permanent | **MENTAL HEALTH, COALINGA STATE HOSPITAL** COALINGA, CA, FRESNO | 04/26/05 | Until Filled |
| SANITARY ENGINEER | $3,838.00-$4,442.00 | Full Time Permanent | **HEALTH SERVICES, DEPARTMENT OF** DDWEM Fresno District Office, FRESNO | 05/09/07 | 05/23/2007 |
| SEASONAL CLERK | $1,371.00-$1,567.00 | Seasonal Temporary | **CONSUMER AFFAIRS, CONTRACTORS STATE LICENSE BOARD** Fresno-Investigative Center, FRESNO | 03/22/07 | Until Filled |
| SENIOR BIOLOGIST SUPERVISOR (MARINE/FISHERIES) | $5,028.00-$6,069.00 | Full Time Permanent | **FISH AND GAME, DEPARTMENT OF** Fresno, Central Region, FRESNO | 05/16/07 | Until Filled |
| SENIOR HATCHERY SUPERVISOR | $5,028.00-$6,114.00 | Full Time Permanent | **FISH AND GAME, DEPARTMENT OF** Fresno, Central Region, FRESNO | 05/03/07 | Until Filled |
| SENIOR PESTICIDE USE SPECIALIST | $4,259.00-$5,176.00 | Full Time Permanent | **PESTICIDE REGULATION, DEPARTMENT OF** Fresno, FRESNO | 03/28/07 | Until Filled |
| SENIOR PSYCHIATRIC TECHNICIAN (SAFETY) | $3,870.00-$4,614.00 | Full Time Permanent | **MENTAL HEALTH, COALINGA STATE HOSPITAL** COALINGA, CA, FRESNO | 04/06/05 | Until Filled |
| SENIOR PSYCHIATRIC TECHNICIAN (SAFETY) | $5,058.00-$5,715.00 | Full Time | **CORRECTIONS AND REHABILITATION, PLEASANT VALLEY STATE PRISON** Pleasant Valley State Prison, FRESNO | 04/25/07 | Until Filled |
| SENIOR PSYCHOLOGIST, CORRECTIONAL FACILITY (SUPERVISOR) | $5,528.00-$7,045.00 | Full Time Permanent | **MENTAL HEALTH, COALINGA STATE HOSPITAL** COALINGA, CA, FRESNO | 03/11/05 | Until Filled |
| SENIOR VOCATIONAL REHABILITATION COUNSELOR, QUALIFIED REHABILITATION | $3,437.00-$4,707.00 | Full Time Permanent | **REHABILITATION, DEPARTMENT OF** Fresno, FRESNO | 05/09/07 | 05/22/2007 |

| PROFESSIONAL | | | | | |
|---|---|---|---|---|---|
| SPECIAL AGENT, DEPARTMENT OF JUSTICE | $3,740.00-$4,400.00 | Full Time Permanent | **JUSTICE, DEPARTMENT OF** DLE/CCBI/Fresno Regional Office, FRESNO | 05/02/07 | 05/24/2007 |
| STAFF PSYCHIATRIST (SAFETY) | $8,826.00-$10,729.00 | Full Time Permanent | **MENTAL HEALTH, COALINGA STATE HOSPITAL** COALINGA CALIFORNIA, FRESNO | 02/08/06 | Until Filled |
| STAFF PSYCHIATRIST, CORRECTIONAL AND REHABILITATIVE SERVICES (SAFETY) | $18,426.00-$21,641.00 | Full Time Permanent | **CORRECTIONS AND REHABILITATION, PLEASANT VALLEY STATE PRISON** PLEASANT VALLEY STATE PRISON, FRESNO | 07/22/03 | Continuous |
| STAFF SERVICES MANAGER II (SUPERVISORY) | $5,393.00-$6,506.00 | Full Time Permanent | **TRANSPORTATION, DEPARTMENT OF** Fresno, FRESNO | 05/04/07 | 05/18/2007 |
| STUDENT ASSISTANT | $8.13-$10.83 | Intermittent Permanent | **INSURANCE, DEPARTMENT OF** Enforcement Branch - Fraud Division - Fresno, FRESNO | 05/02/07 | Until Filled |
| SUPERVISING CLINICAL LABORATORY TECHNOLOGIST | $4,470.00-$5,393.00 | Full Time Permanent | **MENTAL HEALTH, COALINGA STATE HOSPITAL** COALINGA, CALIFORNIA, FRESNO | 08/01/05 | Until Filled |
| SUPERVISING REGISTERED NURSE (SAFETY) | $6,549.00-$7,549.00 | Full Time Permanent | **MENTAL HEALTH, COALINGA STATE HOSPITAL** COALINGA, CA, FRESNO | 03/02/05 | Until Filled |

Previous    Next

# EXHIBIT I

GOVERNOR'S BUDGET

  

# MAY REVISION 2007-08

## INTRODUCTION

The Governor's Budget for 2007-08, as proposed in January, eliminated the net operating deficit (the balance between ongoing revenues and expenditure, after accounting for various one-time revenues and expenditures, most significantly the $1.6 billion that was proposed to pre-pay the Economic Recovery Bonds (ERBs)), held spending growth to 1.0 percent and maintained a reserve of $2.1 billion.

The May Revision continues the Governor's commitment to restraining the growth in spending, pre-paying debt, eliminating the net operating deficit, not raising taxes and maintaining an adequate reserve. As such, the Governor's May Revision includes several measures to further reduce spending, generate additional revenues from publicly-owned assets and provide a reserve of $2.2 billion.

While the net operating deficit of $1.4 billion is not eliminated entirely even with these changes, this reflects major progress as compared to the $4.4 billion that was anticipated for 2007-08 at the time the Governor signed the 2006 Budget Act and reflects a reduction of 92 percent from the projected deficit when the Governor took office.

HEALTH AND HUMAN SERVICES

### SALARY INCREASES FOR CLASSIFICATIONS AFFECTED BY THE COLEMAN AND PEREZ COURT CASES

The May Revision includes total funding of $1.6 million ($914,000 General Fund) for the Department of Developmental Services and $7.5 million ($7.4 million General Fund) for the Department of Mental Health to provide salary increases to employees in job classifications affected by these court cases. These increases are necessary to properly protect and serve the clients of these departments by retaining existing staff and enhancing the recruitment of additional mental health and dental professionals. This funding will enable the departments to increase salaries for psychiatrists and senior psychologists by between 66 and 74 percent, and raise salaries for all other impacted mental health classifications by between 10 and 40 percent. This funding also will increase salaries for both departments' dental staff by between 36 and 58 percent.

### EARLY AND PERIODIC SCREENING, DIAGNOSIS AND TREATMENT PROGRAM

The Early and Periodic Screening, Diagnosis and Treatment Program (EPSDT) program provides physical and mental health services to full-scope Medi-Cal beneficiaries under the age of 21. The May Revision proposes a decrease of $24.3 million ($12.2 million General Fund and $12.1 million in federal fund reimbursements) due to a lower estimate of EPSDT claims than included in the Governor's Budget. The May Revision includes an increase of $39.9 million ($17.2 million General Fund and $22.7 million in federal fund reimbursements) to pay for the settlement of audits from the 2004-05 fiscal year, consistent with historical practice.

Responding to program and fiscal concerns, including a 2006-07 deficiency request for $243 million to pay prior year obligations owed to counties, the Department of Finance's Office of State Audits and Evaluations (OSAE) recommended the elimination of the cost settlement adjustment, historically used to discount claims estimates. The OSAE found that continuing to use the discount factor could result in under-funding and contribute to future deficiency requests. The May Revision reflects an increase of $61.6 million ($30.8 million General Fund and $30.8 million in federal fund reimbursements) for 2007-08, and will minimize the future accumulation of obligations for each fiscal year going forward.

### EMERGENCY FUNDING FOR FOOD BANKS

The May Revision continues the Administration's unprecedented commitment to provide state funding, in response to last winter's freeze disaster, to local food banks and the California Emergency Foodlink, a private organization that stores and delivers food during emergencies. A total of $4.7 million General Fund already has been allocated pursuant to Government Code

HEALTH AND HUMAN SERVICES

non-medical transportation funding that is included in the Intermediate Care Facility/ Developmental Disabled Bundled Rate Proposal in the Governor's Budget.

# DEPARTMENT OF MENTAL HEALTH

- 2006-07 -$25.9 million

- 2007-08 $18.6 million

## LONG-TERM CARE / STATE HOSPITALS

### CURRENT YEAR

The May Revision reflects decreased funding for long-term care and state hospitals of $25.9 million General Fund due to the following major adjustments:

- State Hospital Population—A decrease of $24.9 million General Fund to reflect a reduction in the Judicially Committed/Penal Code population of 487 patients, including a decrease of:

  - 71 Incompetent to Stand Trial (IST) patients

  - 68 Not Guilty by Reason of Insanity (NGI) patients

  - 106 Mentally Disordered Offenders (MDOs)

  - 242 Sexually Violent Predators (SVPs)

- The decrease across commitment categories is primarily due to staffing shortages within the state hospitals and a re-estimation of the impact of Chapter 337, Statutes of 2006 (SB 1128) and Jessica's Law, resulting in a reduction of 50 percent in the number of SVP commitments estimated in the Governor's Budget.

- SVP Evaluations and Court Testimony—An increase of $366,000 General Fund for SVP evaluation services, based on actual data from implementation of SB 1128 and Jessica's Law, and a decrease of $527,000 General Fund for headquarters positions and consultant services in the Sex Offender Commitment Program.

### BUDGET YEAR

Funding for long-term care and state hospitals is anticipated to decrease by a net $12.4 million (a decrease of $12.6 million General Fund and an increase of

44

$176,000 Realignment reimbursement) in 2007-08. The change is comprised of the following adjustments:

- State Hospital Population—A net decrease of $10.4 million (a decrease of $10.6 million General Fund and an increase of $176,000 in Realignment reimbursement):

  - An increase of $4.4 million General Fund to reflect an anticipated increase in the Judicially Committed/Penal Code population of 38 patients, including an increase of 158 IST patients, 46 NGI patients, 54 MDOs, and a decrease of 220 SVPs. The increase in IST, NGI, and MDO patients is based on an anticipated increase in staffing resulting from recent salary increases. The decrease in the SVP population reflects the revised estimated impact of SB 1128 and Jessica's Law.

  - A decrease of $28.2 million General Fund to reflect full-year impact of the current year reduction in the state hospital population of 487 patients. This decrease is in addition to the $21.7 million General Fund reduction previously requested in an April Finance Letter.

  - An increase of $5.9 million ($5.8 million General Fund and $144,000 in Realignment reimbursement) to provide funding for salary increases. This request funds salary increases ranging from 66 to 74 percent for psychiatrists and senior psychologists and salary increases ranging from 10 to 40 percent for all other impacted mental health classifications. Budget Bill language also is proposed to allow for increased funding for these salaries if more vacancies than anticipated are filled, or for contract costs for registry funding, if necessary.

  - An increase of $1.6 million ($1.6 million General Fund and $32,000 in Realignment reimbursement) to provide all budgeted Department of Mental Health dental staff with salary increases ranging from 36 to 58 percent.

  - An increase of $4.3 million General Fund to contract for competency restoration services. Contracting for local beds will expedite services, reduce the average length of stay, and address state hospital capacity issues. Additionally, the May Revision includes $696,000 General Fund for four Level-of-Care positions and associated costs to run an 18 bed unit at the Salinas Valley Psychiatric Program for IST patients too dangerous to reside within state hospitals.

- Forensic Conditional Release Program (CONREP)—The May Revision includes an increase of $929,000 General Fund, to increase CONREP capacity by 30 beds. This will free up 30 additional state hospital beds by addressing the current backlog of patients

HEALTH AND HUMAN SERVICES

waiting to enter CONREP and fund a projected increase in the number of hospital liaison visits.

- SVP Evaluations and Court Testimony—The May Revision includes a net decrease of $2.9 million General Fund, primarily for SVP evaluation services based on actual data from implementation of SB 1128 and Jessica's Law.

## COMMUNITY MENTAL HEALTH SERVICES

The May Revision includes a net increase of $65.6 million ($31.1 million General Fund and $34.5 million in federal fund reimbursement) for community mental health services relative to the Governor's Budget. The major adjustments include the following:

- Early and Periodic Screening, Diagnosis and Treatment (EPSDT) Program— The May Revision includes an increase of $67.4 million ($32.1 million General Fund and $35.3 million in federal fund reimbursement) in 2007-08. This includes the following adjustments:

  - A decrease of $24.3 million ($12.2 million General Fund and $12.1 in federal fund reimbursement) due to lower than projected EPSDT claims.

  - An increase of $61.6 million ($30.8 million General Fund and $30.8 million in federal fund reimbursement) to remove the cost settlement adjustment factor. Upon its review of the EPSDT estimation methodology this spring, the Office of State Audits and Evaluations (OSAE) recommended eliminating the cost settlement adjustment historically used to discount claims estimates.

  - An increase of $39.9 million ($17.2 million General Fund and $22.7 million in federal fund reimbursement) for the 2004-05 cost settlement.

  - OSAE will conduct a review of EPSDT local assistance programs and an internal control review of the DMH's accounting and administrative controls. The reviews are expected to be completed by September 2007 and January 2008, respectively, with a DMH action plan issued in March 2008.

- Mental Health Managed Care Program—The May Revision includes a decrease of $1.9 million ($926,000 General Fund and $926,000 in federal fund reimbursement from the Department of Health Services), primarily due to a decrease in the number of Medi-Cal eligibles receiving psychiatric inpatient hospital services and specialty mental health professional services.

# EXHIBIT J

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF CALIFORNIA

3                        ---oOo---

4      BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                        CASE NO. CIV. S-90-0520 LKK

9    ARNOLD SCHWARZENEGGER,
     et al.,

10

11         Defendants.                    **RECEIVED**

12    _____/           APR **2 5** 2007

13                                      Rosen, Bien & Galvan

14

15

16                       ---oOo---

17

18               REPORTER'S TRANSCRIPT

19            MONDAY, APRIL 23RD, 2007

20      RE:  PLAINTIFF'S MOTION FOR EMERGENCY RELIEF

21

22                       ---oOo---

23

24

25    Reported by:              CATHERINE E.F. BODENE,
                                CSR. No. 6926

       CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
                        (916) 446-6360

```
 1                          APPEARANCES

 2                          ---o0o---

 3

 4    FOR THE PLAINTIFF:

 5             ROSEN, BIEN & GALVAN, LLP
               315 MONTGOMERY STREET, TENTH FLOOR
 6             SAN FRANCISCO, CALIFORNIA  94104

 7             BY:  MICHAEL BIEN, ATTORNEY AT LAW
               BY:  AMY WHELAN, ATTORNEY AT LAW
 8             BY:  JANE KAHN, ATTORNEY AT LAW

 9

10

11

12    FOR AMICUS BRIEF, LOCAL 2620:

13             BEESON, TAYER & BODINE
               1404 FRANKLIN STREET, FIFTH FLOOR
14             OAKLAND, CALIFORNIA  94612

15             BY:  SHEILA K. SEXTON, ATTORNEY AT LAW

16

17

18    FOR THE DEFENDANTS:

19             STATE OF CALIFORNIA, DEPT. OF JUSTICE
               OFFICE OF THE ATTORNEY GENERAL
20             1300 I STREET
               SACRAMENTO, CALIFORNIA  95814
21
               BY:  LISA TILLMAN,
22                  DEPUTY ATTORNEY GENERAL
                    AND
23                  MISHA D. IGRA,
                    DEPUTY ATTORNEY GENERAL
24

25                          ---o0o---
```

1

| 1 | SACRAMENTO, CALIFORNIA |

2          MONDAY, APRIL 23RD, 2007

3          (On the record at 11:00 AM.)

4              ---o0o---

5     THE CLERK:  Calling Civil Case S-90-0520, Coleman

6  versus Schwarzenegger, et al.

7     THE COURT:  Counsel, approach the podium.  State your

8  appearance for the record.  Those arguing, remain at the

9  podium.

10    MS. TILLMAN:  Good morning, Your Honor.  Lisa Tillman

11  on behalf of defendants.

12    MS. WHELAN:  Amy Whelan on behalf of plaintiffs.

13    THE COURT:  Are you arguing, Ms. Whelan?

14    MS. WHELAN:  Yes, I am.

15    MR. BIEN:  Michael Bien on behalf of plaintiffs.

16    THE COURT:  Are you arguing, Mr. Bien?

17    MR. BIEN:  I'm back-up.

18    THE COURT:  Sit down.

19    MS. IGRA:  Misha Igra on behalf of defendants.  I

20  will not be arguing.

21    THE COURT:  You may retire.

22    MS. SEXTON:  Good morning, Your Honor.  Sheila Sexton

23  from Beeson, Tayer and Bodine, on behalf of the Amicus Brief,

24  Local 2620.

25    MS. KAHN:  Jane Kahn on behalf of plaintiffs.

2

1          THE COURT:  I want to tell you what I'm thinking.

2          Obviously, this is a very serious problem.  It's part

3    of the overall very serious problem.

4          I am not in charge of the Department of Mental

5    Health.  I don't intend to be.  And that's the first thing

6    that plaintiffs have to believe.  But they don't.

7          I don't have a writ to go everywhere in the state and

8    cure every problem.

9          Thank you goodness I don't because I can't solve the

10   one I got.

11         The other side of that coin, Miss Tillman, is that

12   obviously to the extent that the Department of Mental Health

13   Services CDCR patients, that's a problem that I have.

14         Having said all of that, it's so nice to have lawyers

15   that are sensible, that know what they're doing.  I've had a

16   morning in which I wonder what I'm doing up here.

17         Anyhow.  That has nothing to do with why we're here.

18         It seems to me, Miss Tillman, that you're right and

19   you're wrong.

20         You are right that seeking to have the Legislature

21   raise the salaries of the persons who treat CDCR patients in

22   light of the other orders that I've issued about your

23   reporting to me with X number of days about all of these

24   things is a step in solving the problem.

25         It is not solving the problem because the Legislature

3

1    hasn't acted yet.  But there's a greater problem.  And I will

2    be candid with you.  This is not the time and place to talk

3    about it except I worry about it a lot.

4         June 4th is coming.  If what I read in the newspapers

5    is right, I'm going to be faced with a problem that federal

6    judges ought not to be faced with, which is the enormously

7    serious problem of potentially capping the prison population.

8         There are 2000, I think, vacancies in the CDCR

9    program for mental health.

10        Is that right?

11        You're both looking at me staring so maybe I've got

12   the number wrong.

13        MS. WHELAN:  Are you talking about within CDCR

14   institutions?

15        THE COURT:  Yes.

16        MS. TILLMAN:  I haven't heard that number before,

17   Your Honor, so I can't speak to that.

18        THE COURT:  Okay.  I don't know where I got it from

19   then.

20        But there is a significant number.  And that

21   significant number will always be there because the State is

22   going to keep sending more and more people to prison.

23        But there's another problem, and that is is there

24   really enough protoplasm to really go around.

25        I mean, I don't know how many psychiatrists there are

4

1    in the state.  I don't know how many psychologists there are

2    in the state.  I don't know how many psychiatric social

3    workers and psych. techs there are in the state.

4        The question is whether there is ever going to be

5    enough.  Even if I were to cap -- I'm sorry.  This is a

6    different problem, but it is really so intimately related.

7        I don't know what the cap would be that would permit

8    the State to adequately provide mental health care to those

9    people in prison, setting aside the obvious fact that prisons

10   are prisons because people have broken the law and they

11   represent a danger to society and the prison's primary

12   function is acting as a prison.

13       That doesn't mean that you get away with not

14   providing them mental health services.  That just illustrates

15   how intractable the problem is.

16       What could plaintiffs want me to do today that would

17   be different than what the plaintiff -- that the defendants

18   have already set in motion?

19       MS. WHELAN:  Well, one main thing is that the funding

20   request submitted only applies to filled positions.  So we

21   know right now, standing here today, that there are between

22   30 and 70 percent vacancy rates at various clinical positions

23   in DMH.

24       The funding requests submitted in response to this

25   Court's February order does nothing in the way of allowing

5

1    DMH to hire and retain staff in those vacant positions.

2         So even the funding request that was submitted in

3    response to that order, it does nothing to help fill vacant

4    positions.

5         THE COURT:  Miss Tillman.

6         MS. TILLMAN:  I think if you have had a chance to

7    review some of the papers that were submitted by plaintiffs,

8    Your Honor, you'll see that in the Budget Change Proposal --

9         THE COURT:  You mean by defendants?

10         MS. TILLMAN:  As well as plaintiffs.  I'm grateful

11    for the plaintiffs' filing in this regard.  They did provide

12    you with a copy of the Budget Change Proposal.  It talks

13    about requesting an augmentation of the present fiscal year's

14    budget.

15         We are at a very difficult time in the budget cycle

16    right now.  So to address what the Court wanted DMH to

17    address within the time frame of the budget cycle, what

18    essentially DMH asked the Legislature to do is take present

19    salary savings and apply them to those presently employed by

20    DMH, give them the increases so they don't flee their jobs in

21    the coming months while CDCR implements increased salaries.

22         That doesn't mean that DMH will not actively seek --

23         THE COURT:  That doesn't mean that some day somewhere

24    DMH might do what needs to be done.

25         MS. TILLMAN:  I think --

6

1          THE COURT:  I'm sorry.  I didn't mean to sound like

2     that.  But, you know, there's this terrific crisis.

3          MS. TILLMAN:  If I might say, Your Honor, page 1 of 5

4     of the Budget Change Proposal says:

5          (Reading):

6          Funding needs for Coleman-related vacant positions,

7          population growth at the state hospitals and staffing

8          contracts will addressed in the May revision.

9          (Reading concluded.)

10         THE COURT:  Okay.

11         MS. TILLMAN:  So those will be addressed.

12         THE COURT:  All right.

13         I must confess, I will tell you that I am very

14    discouraged about whether we will ever, ever solve the

15    problem that we have.

16         I mean, this problem just illustrates how difficult

17    and intractable the overall problem is.

18         Matty, do you need to talk to me before I do what I

19    told you I thought I was going to do anyhow?

20         Haven, anything we need to talk about?

21         I'm going to continue the matter for -- I don't know

22    how long.  Tell me how long.

23         MS. WHELAN:  Well, Your Honor, can I just say one

24    thing?

25         THE COURT:  Sure.

7

1     MS. WHELAN:  I think what you're recognizing here is

2 that this truly is a crisis.  And I think that was recognized

3 in your February 7th order.  And what they came back with, in

4 all due respect, does not address the order.

5     THE COURT:  I know.  I know.

6     MS. WHELAN:  In the meantime, we've wasted two

7 precious months.  So at the very least they offered in their

8 opposition brief to come back within one week with a real

9 plan.  And --

10     THE COURT:  I don't believe it.

11     MS. WHELAN:  Well, I know.  I hope.  Something needs

12 to be done.

13     THE COURT:  Boy, are you right about that.  But the

14 problem is it's not at all clear to me what can be done and

15 whether it will ultimately make any difference.

16     That's true of this motion and the motion to be heard

17 June 4th.

18     I'm very discouraged.  I am very very discouraged.

19     I want to see more than a plan.  I'm going

20 to continue the matter 30 days.

21     Madam Clerk, give me a date.

22     THE CLERK:  May 21st at 10:00 a.m.

23     THE COURT:  I need from you a plan, and I need some

24 evaluation of whether it is realistic and what can be done

25 and can't be done, Miss Tillman.

8

1   You know, I have not felt this way before, but now

2   I'm beginning to wonder whether we can ever make this right.

3        I mean -- You know, it is inappropriate that the

4   federal government is running the mental health program --

5   not the federal government -- the federal court is running

6   the mental health program, much less Plata and what they are

7   doing.  But there is dentists.  There is ADA.

8        It is like the State doesn't pay any attention

9   whatsoever to the reality.  I'm not blaming you,

10  Miss Tillman.  I hope you understand that.

11       I want something concrete when you show up next time.

12       MS. WHELAN:  Your Honor, can I say one more thing?

13       THE COURT:  Yes.

14       MS. WHELAN:  I think we learned during the April

15  hearings last year that there's a very tight time frame with

16  the May revision.

17       And we are really afraid that coming in that late in

18  May is going to blow any chance of getting real funding

19  requests or real relief into that May revision.  So we

20  just -- I understand the position you're in, but we just want

21  to make that --

22       THE COURT:  It's on the record.  You've stated it.

23       That will be the order of the Court.

24       Stand in recess.

25       (Off the record at 11:15 AM.)

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

REPORTER'S CERTIFICATE

---oOo---

STATE OF CALIFORNIA   )
COUNTY OF SACRAMENTO )


        I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


                IN WITNESS WHEREOF, I subscribe this certificate at Sacramento, California on this 23RD day of APRIL, 2007.

                        _____

                        CATHERINE E.F. BODENE,
                        CSR NO. 6926

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

# EXHIBIT K



# National Health Service Corps

U.S. Department of Health and Human Services — HRSA — Health Resources and Services Administration

Home   Search   Site Map   Contact

- About NHSC
- Join Us
- Get Started
- Members
- Resources
- News
- Applications
- Publications
- Links
- Job Opportunities

## Job Opportunities

AMERICA'S HEALTH CARE HEROES

The number of vacancies on the NHSC Opportunities List may exceed the site vacancy limits for the NHSC Loan Repayment Program (LRP). The site must identify the clinicians to whom it wants the NHSC to offer NHSC LRP awards if the number of eligible clinicians exceeds the site vacancy limits.

### Site Vacancy Limits

NHSC LRP awards per site will be limited based on the following discipline categories:

- Primary care - includes primary care physicians (MDs and DOs), primary care nurse practitioners (NPs), physician assistants (PAs) and certified nurse midwives (CNMs)
- Oral health - includes dentists (DDs) and dental hygienists (DHs)
- Mental and behavioral health care - includes MD and DO psychiatrists, clinical or counseling psychologists (CPs), clinical social workers (SWs), licensed professional counselors (LPs), marriage and family therapists (MFTs), and psychiatric nurse specialists (PNSs)

**Phase 1:** During the early funding period (through March 30, 2007), high scoring HPSA sites will be limited to 2 new NHSC LRP awards per discipline category as follows:

- Primary care: no more than 1 MD or DO **and** 1 NP or PA or CNM
- Oral health: no more than 1 DD **and** 1 DH
- Mental and behavioral health care: no more than 1 MD or DO Psychiatrist **and** 1 CP or SW or LPC or MFT or PNS

**Phase 2:** After the early funding period, sites below the high scoring HPSA cutoff will also be limited to 2 LRP awards per discipline category as indicated above.

**Phase 3:** If funding remains available, sites may be allowed a maximum of 4 new FY 2007 NHSC LRP awards for each discipline category as follows:

- Primary care: no more than 2 MDs or DOs **and** 2 NPs or PAs or CNMs
- Oral health: no more than 2 DDs **and** 2 DHs
- Mental and behavioral health care: no more than 2 MD or DO psychiatrists **and** 2 CPs or SWs or LPCs or MFTs or PNSs

---

### Success Stories

**Maine**

**NHSC Scholar Helps Patients Manage Diabetes**

Dana Green, a certified physician assistant (PA-C) and National Health Service Corps (NHSC) Scholar, arrived in the remote rural community of Van Buren, Maine, and launched a personal crusade to educate underserved populations and their caregivers about diabetes. Four years and many success stories later, Green is now recognized nationally and locally as a leading researcher on the standards of diabetes care.

Read more

---