1   EDMUND G. BROWN JR.
    Attorney General of the State of California
2   DAVID S. CHANEY
    Chief Assistant Attorney General
3   FRANCES T. GRUNDER
    Senior Assistant Attorney General
4   ROCHELLE C. EAST
    Supervising Deputy Attorney General
5   LISA A. TILLMAN, State Bar No. 126424
    Deputy Attorney General
6    1300 I Street, Suite 125
     P.O. Box 944255
7    Sacramento, CA 94244-2550
     Telephone:  (916) 327-7872
8    Fax:  (916) 324-5205
     Email:  Lisa.Tillman@doj.ca.gov
9
    Attorneys for Defendants
10

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE EASTERN DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| 14  **RALPH COLEMAN, et al.,** | Case No.:  2:90-cv-00520 LKK JFM P |
| 15                     Plaintiffs, | **DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO** |
| 16    **v.** | **PLAINTIFFS' MOTION FOR REFERRAL TO A THREE-JUDGE** |
| 17  **ARNOLD SCHWARZENEGGER, et al.,** | **PANEL** |
| 18                    Defendants. | Hearing Date:   June 4, 2007 |
| 19 | Time:               11:00 a.m. |
|  | Courtroom:       4, 15th Floor |
|  | Judge:     The Honorable Lawrence K. Karlton |

20

21

22

23

24

25

26

27

28

DEFENDANTS' SUPPLEMENTAL BRIEF POPULATION

1

# TABLE OF CONTENTS

2

**Page**

3 INTRODUCTION                                                                                        1

4 LEGAL STANDARD                                                                                      3

5 LEGAL ARGUMENT                                                                                      4

6     I.    BECAUSE THE STATUTORY BASES FOR REFERRAL HAVE
7         NOT BEEN MET, THE MOTION SHOULD BE DENIED.                              4

8         1.    Appropriate Mental Health Care Policies and Procedures.              4

9         2.    Recruitment of Qualified Mental Health Care Clinicians.              5

10         3.    Sufficient Mental Health Care Beds for Mentally Ill Inmates.         6

11         4.    Efforts to Address Suicide Issues Are Underway.                     8

12     II.   ANY REFERRAL TO A THREE-JUDGE PANEL WOULD BE
13         INAPPROPRIATE IN LIGHT OF DEFENDANTS' AGGRESSIVE,
        MULTI-PRONGED APPROACH TO  OVERCROWDING.                             9

14             A.    The State Is Taking Immediate and Dramatic Steps to Reduce
15                  Overcrowding, Including Transferring Inmates Out of State,
                 Changing Parole Policies, Implementing Rehabilitation Programs to
                 Reduce Recidivism, Building New Prison Space, and Appointing
                 Management Strike Teams to Implement These Efforts.                 10

16         1.    General Provisions of Assembly Bill 900.                            10

17

18         2.    Expert Strike Teams Will Improve Prison Management and
            Ensure Expedited Implementation of AB 900.                          12

19         3.    AB 900 Allows Out-of-State Transfers of Inmates and Dovetails With Other
20             State Efforts to Reduce Prison Overcrowding.                        13

21             a.    Out-of-State Transfers Will Continue With Passage of AB 900.    13

22             b.    The In-Fill Beds Provided by AB900 Will Reduce Crowding.       13

23             c.    AB 900 Re-Entry Beds Will Enhance Rehabilitation and Successful
                Return to Society.                                                 14

24             d.    AB 900 Addresses the Construction of Mental Health Beds.       14

25         4.    Administrative Parole Changes.                                      15

26             a.    Timely Discharge From Parole In Accord With State Law          15

27             b.    Implementation of Risk and Needs Assessment Tool and
                Decisionmaking Matrix.                                             16

28

**TABLE OF CONTENTS  (continued)**

Page

    B.   Although the Current Prison Population Exceeds 174,000 Inmates, the State's Prison Reform Plans Will Dramatically Reduce Overcrowding. ........ 16

III.  A POPULATION CAP IS AN OVERLY INTRUSIVE REMEDY AND WOULD NOT BE NARROWLY TAILORED TO TARGET RELIEF FOR THE *COLEMAN* CLASS BECAUSE PLAINTIFFS CANNOT PROVE THAT OVERCROWDING HAS CAUSED THE DEFICIENCIES IN MENTAL HEALTH CARE. ........ 17

CONCLUSION ........ 19

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Coleman v. Wilson*, 912 F. Supp. at 1298 n.10 (1995)
    citing *Balla v. Idaho State Board of Corrections*
    595 F. Supp. 1558, 1577 (D. Idaho 1984).    2, 4, 5, 8, 9, 14, 17, 18

*Plata v. Schwarzenegger*
    USDC N.D. Cal. Case No. C01-1351 THE.  (Order, 6/8/06.)    6, 7, 14, 18

**Court Rules**

California Penal Code
    § 3001    15, 17

18 United States Code

    § 3626(a)(3)(E)    4

    §3626(a)(1)    3

    § 3626(a)(3)(A)    3

**Other Authorities**

Assembly Bill 900    2, 7, 9-15, 18, 19

Prison Litigation Reform Act of 1995    3, 4

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DAVID S. CHANEY
   Chief Assistant Attorney General
3  FRANCES T. GRUNDER
   Senior Assistant Attorney General
4  ROCHELLE C. EAST
   Supervising Deputy Attorney General
5  LISA A. TILLMAN, State Bar No. 126424
   Deputy Attorney General
6   1300 I Street, Suite 125
    P.O. Box 944255
7   Sacramento, CA 94244-2550
    Telephone:  (916) 327-7872
8   Fax:  (916) 324-5205
    Email:  Lisa.Tillman@doj.ca.gov
9
   Attorneys for Defendants
10

11          IN THE UNITED STATES DISTRICT COURT

12         FOR THE EASTERN DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| 14  **RALPH COLEMAN, et al.,** | Case No.:  2:90-cv-00520 LKK JFM P |
| 15                   Plaintiffs, | **DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR REFERRAL TO A THREE-JUDGE PANEL** |
| 16  **v.** | |
| 17  **ARNOLD SCHWARZENEGGER, et al.,** | |
| 18                   Defendants. | Hearing Date:  June 4, 2007 |
| 19 | Time:          11:00 a.m.<br>Courtroom:    4, 15th Floor<br>Judge:    The Honorable Lawrence K. Karlton |

20

21                    **INTRODUCTION**

22         On May 4, 2007, this Court issued an order inviting the parties to file supplemental briefs

23  and evidence to address any developments since this Court's December 12, 2006 hearing on

24  Plaintiff's motion to convene a three-judge panel to limit population.  At the time of the

25  December 2006 hearing, Defendants described their steady progress in complying with court

26  orders developing the elements of a constitutionally adequate system.  Now, Defendants can

27  point to landmark legislation and other aggressive efforts by the State to eliminate prison

28  overcrowding and provide needed reforms.

1    Assembly Bill 900 (AB 900) is a key development in Defendants' completion of an

2    adequate mental health services delivery system. With AB 900, the Governor and Legislature

3    approved a historic, bipartisan plan to reduce prison overcrowding, increase rehabilitation

4    programs, and provide more beds for inmate medical care. AB 900 creates a comprehensive

5    plan to immediately relieve overcrowding by providing for additional out-of-state inmate

6    transfers. It is expected that approximately 8,000 inmates will be transferred by March 2009,

7    and transfers will continue thereafter as needed, as AB 900 authorizes transfers until July 1,

8    2011. The bill provides for the construction of 40,000 prison beds, including much-needed

9    mental health beds, and approximately 13,000 new jail beds. In addition, AB 900 provides for

10    new rehabilitation programs and re-entry facilities to improve inmate re-entry into California

11    communities, thereby reducing recidivism, easing prison overcrowding, and ensuring public

12    safety. AB 900's comprehensive plan, along with the additional parole reforms implemented by

13    the California Department of Correction and Rehabilitation (CDCR), will aggressively address

14    prison overcrowding without encouraging or causing the early release of dangerous criminals.

15    But that is not all. California's prisons must be expertly managed and the prison reforms

16    must be implemented immediately. Accordingly, the Governor has established two strike

17    teams – one for construction and another for rehabilitation – to expedite construction and to

18    create and improve programs for rehabilitation, substance abuse, education, and job training.

19    Further, CDCR is immediately implementing administrative parole changes that reward

20    successful rehabilitation, which will further reduce overcrowding.

21    This comprehensive, historic plan for prison reform will directly assist the Defendants in

22    their efforts to provide constitutionally adequate mental health care. AB 900 provides for much-

23    needed mental beds. During the implementation of these bipartisan prison reform efforts, work

24    continues and will continue on the integral components of an adequate mental health services

25    delivery system within the prison system: appropriate policies and procedures for mental health

26    care, sufficient and qualified mental health care staff, accurate record and data management, and

27    sufficient licensed and unlicensed beds for mental health patients. *Coleman v. Wilson*, 912 F.

28    Supp. at 1298 n.10 (1995), citing *Balla v. Idaho State Board of Corrections*, 595 F. Supp. 1558,

1   1577 (D. Idaho 1984). In this supplemental brief, Defendants show that they have already made

2   significant progress, and that they will work aggressively to accomplish more.

3       Within this context, the Court now considers Plaintiffs' motion for a referral to a three-

4   judge panel to limit California's prison population. It is undisputed that California's prisons are

5   overcrowded, and that the overcrowding has created emergency conditions in at least 29

6   California prisons. But as this response shows, Defendants are already aggressively addressing

7   overcrowding, and the State's efforts will provide more comprehensive reform than any prison

8   cap ever could. Thus, the question is whether it is necessary and appropriate, applying the

9   limited criteria of the Prison Litigation Reform Act of 1995 (PLRA), to refer this matter to a

10  federal three-judge panel at this time. The answer is no, because the criteria for referral have not

11  been met. Plaintiffs cannot meet their burden to prove, by clear and convincing evidence, that

12  crowding is a primary cause of the alleged mental health violations. And less intrusive means to

13  provide relief are already being implemented, and Plaintiffs cannot establish that they will fail.

14  Under the circumstances, this Court should not make a referral to a three-judge panel.

15  **LEGAL STANDARD**

16      The PLRA limits the referral of prison population issues to a three-judge panel. Before

17  making a referral, the district judge must find:

18      (i) the Court has previously entered an order for less intrusive relief that has failed to

19  remedy the deprivation of the Federal right sought to be remedied through the prisoner release

20  order; and

21      (ii) the Defendant has had a reasonable amount of time to comply with the previous court

22  orders. (18 U.S.C. § 3626(a)(3)(A).)

23      Moreover, the broader statutory scheme requires that any prospective relief must be

24  narrowly drawn, shall extend no further than necessary to correct the specific constitutional

25  violation involved, and must be the least intrusive means necessary to correct the constitutional

26  violation. 18 U.S.C. § 3626(a)(1). In addition, substantial weight must be given to any adverse

27  impact on public safety. *Id*. Both the spirit and the language of the PLRA indicate referral to a

28  three-judge panel is a matter of last resort.

1    The PLRA also requires a nexus between the relief sought and the federal right at issue.

2    A three-judge panel cannot issue a prisoner release order unless it finds, by clear and convincing

3    evidence, that (i) crowding is the primary cause of the constitutional violation at issue, and (ii)

4    no other relief will remedy the violation.  18 U.S.C. § 3626(a)(3)(E).

**LEGAL ARGUMENT**

**I.**

**BECAUSE THE STATUTORY BASES FOR REFERRAL HAVE NOT BEEN MET, THE MOTION SHOULD BE DENIED.**

The State is now embarking on groundbreaking efforts to reduce prison overcrowding and to increase inmate beds and programs.  Plaintiffs cannot prove at this time that these new reform efforts will fail, and Defendants should be given the chance to succeed.  These efforts will provide comprehensive reform and will avoid releasing dangerous criminals into the community.

In addition, this Court has already issued orders for less-intrusive relief, and Defendants are making significant progress.  As the following summary establishes, Plaintiffs cannot show that the current efforts will necessarily fail.

**1.    Appropriate Mental Health Care Policies and Procedures.**

With this Court's approval of the Revised Program Guide in March 2006, Defendants commenced training on the implementation of its policies and procedures. (Dec. McKeever, ¶ 4.) Training has now occurred on a system-wide basis with mental health clinicians.  (*Id.*)  The Revised Program Guide will continue to be the subject of in-service training, particularly as new staff are hired.  (*Id.*)

The scope of mental health care has been expanded.  Defendants' mental health system now reaches those inmates often most in need of mental health services: those just entering the prison system at Reception Centers.  (Dec. McKeever, ¶ 5.)  In compliance with this Court's March 2006 order, Defendants have launched, system-wide, Enhanced Outpatient Care at Reception Centers.  (Dec. McAloon, ¶ 6.)  This program addresses the needs of those prisoners who, upon entry into the system, are found to need mental health care.  (*Id.* at ¶ 5.)  Their numbers are higher and their needs often more critical than those of the general *Coleman*

DEFENDANTS' SUPPLEMENTAL BRIEF POPULATION

1   population.  In the overall inmate population, approximately 18% of inmates are in the mental

2   health caseload.  (*Id.* at ¶ 7.)   In the Reception Center population, an even higher percentage of

3   inmates are in need of immediate mental health services at the time of arrival because they have

4   not had access to mental health care resources, particularly medication management, in the

5   community. (*Id.*)  These Reception Center inmate-patients are often severely decompensated.

6   (*Id.*)  With early diagnosis and intervention, these inmates are stabilized and transferred to

7   appropriate beds.  (*Id*. at ¶ 8.)

8          **2.     Recruitment of Qualified Mental Health Care Clinicians.**

9          In the past year, this Court has issued several orders addressing the quality and quantity

10  of mental health staff available to *Coleman* class members. (Orders, 3/3/06, 6/21/06, 8/11/06,

11  12/15/06, 2/7/07.)  Defendants have not only complied with those system-wide orders, but have

12  implemented steps beyond what was required.  Defendants have undertaken efforts to expand the

13  Headquarters staff at CDCR.  The initial step of obtaining funding for only the mental health

14  staffing necessary to implement the Revised Program Guide has been followed by significant

15  increases in the salaries of CDCR and DMH clinicians system-wide.[1]   Those salary increases

16  have been paired up with a request for the Legislature to authorize $1 million in funding to

17  support the recruitment of psychiatric and medical services staff within state institutions.  (Def.

18  Response to Ct. Order Regarding a Plan to Address Pay Parity with DMH Clinicians, filed

19  4/2/07.)  In addition, the hiring of clinicians is about to be revamped by compressing the process

20  for mandated hiring ranks to ensure a greater pool of 'reachable' candidates.[2]  Defendants are

21  also nearing completion of the court-approved process for the evaluation of the competency of

---

23  1. Effective April 1, 2007, DMH will provide salary adjustments for incumbent staff in the
24  *Coleman* classes working in state hospitals. DMH will fund the salary adjustments for the current
    year, April 2007 through June 2007, from salary savings and the budget year costs will be funded
25  through the Spring Finance Letter and May Revision proposals that were submitted to the
    Legislature. The raises and resulting new salary ranges included in the Spring Finance Letter are
26  subject to negotiations with the various bargaining units and approval by the Legislature.  (Def.
    Response to Ct. Order to Address Staffing Vacancies Within DMH, filed 5/16/07.)

27
28  2. At the hearing on CDCR's proposed resolution to compress the hiring ranks of certain
    mental health classifications, the State Personnel Board indicated approval of the resolution.  (Dec.
    McKeever, ¶ 6.)  CDCR awaits issuance of the resolution.  (*Id.*)

DEFENDANTS' SUPPLEMENTAL BRIEF POPULATION

1  psychiatrists employed by CDCR.  (Dec. McKeever, ¶ 7.)  Defendants acknowledge the

2  challenge of staffing the CDCR and DMH facilities serving the needs of mentally ill inmates and

3  commit to monitoring the impact of these efforts.[3/]

4       Defendants are keenly aware of the integral role of DMH beds and services in delivering

5  care to inmate-patients.  They are working to remove the January 23, 2007 triaged admissions

6  process at ASH by recruiting and retaining staff.  Their plan to address the recruitment issues of

7  the Department of Mental Health was submitted on May 16, 2007.  (Def. Plan To Address

8  Staffing Vacancies Within DMH, filed 5/16/07.)  Defendants remain committed, as stated in that

9  plan, to apprize the Court at three-month intervals of the efficacy of that plan.

10       **3.    Sufficient Mental Health Care Beds for Mentally Ill Inmates.**

11       This Court is well-aware of the plans Defendants have submitted to address the mental

12  health bed needs of mentally ill inmates.  This Court has ordered several plans: acute and

13  intermediate inpatient beds; mental health crisis beds; interim provision of intermediate inpatient

14  and mental health crisis beds; and an amended long-term plan based on current population

15  projections.  (Orders, 3/3/06, 5/2/06.)  Further, Defendants were ordered to coordinate their

16  compliance efforts, particularly those involving bed planning, with the Receiver appointed on

17  April 17, 2006 in *Plata v. Schwarzenegger*, USDC N.D. Cal. Case No. C01-1351 THE.  (Order,

18  6/8/06.)

19       Under the amended long-term bed plan, Defendants stated their intent to construct

20  sufficient mental health beds at consolidated care centers to serve the forecasted population of

21  mentally ill inmates in 2011.  (Def. Am. Long-Range Bed Plan, filed 12/19/06.)  The key

22  components of the plan were expressly stated:

23  ///

24  ///

25  _____

26       3.  To the extent Plaintiffs rely upon any of the preliminary findings and recommendations
    stated in Special Master Keating's Seventeenth Round monitoring report, part C, Defendants hereby
27  object to such reliance as premature and inappropriate.  The information has not been subject to the
    the parties' review and response nor to final review by the Special Master and acceptance by this
28  Court.

1     i.  Consolidate mental health care for male inmate-patients in five prisons

2   identified as Consolidated Care Centers – California State Prison, Sacramento, Richard J.

3   Donovan, California State Prison, Los Angeles County, California Institution for Men and

4   California Men's Colony – while maintaining mental health programs at Salinas Valley State

5   Prison and California Medical Facility;

6     ii.  Expand mental health beds for female inmate-patients at California Institution

7   for Women;

8     iii.  Continue mental health bed expansion projects currently underway, where

9   appropriate; and

10    iv.  Return mental health beds within state hospitals to Department of Mental

11   Health (DMH) use, with CDCR assuming responsibility for the provision of acute and

12   intermediate care beds and services for CDCR inmate-patients.

13     AB 900 also provides for mental health beds.  (Dec. Hysen, ¶ 10.)  The Facilities

14   Construction Strike Team will ensure expedited construction, and the Governor's emergency

15   powers will be utilized, as needed, to facilitate this effort.  (*Id.* at ¶ 11.)  With the implementation

16   of bed construction under AB 900, this Court will be apprized of the coordination of bed-

17   planning activities with those of the *Plata* Receiver.  (Orders, 6/8/06, 10/20/06.)  Defendants are

18   confident the necessary beds and treatment space for the care of mentally ill inmates will be

19   available.

20     Defendants also are ready to meet the short-term bed gap.  To meet mental health care

21   needs before the construction of new facilities, Defendants have activated or will soon activate

22   additional Enhanced Outpatient Program and intermediate care beds as follows:

23     i. Mule Creek State Prison has activated 180 Level III Enhanced Outpatient

24   Program (EOP) beds and an additional 115 Level IV EOP beds beginning in January 2007;

25     ii. The California Institute for Women activated ten psychiatric services unit

26   (PSU) beds in January 2007;

27   ///

28   ///

DEFENDANTS' SUPPLEMENTAL BRIEF POPULATION

7

1    iii. Salinas Valley Psychiatric Program has already activated 18 intermediate care

2    bed in the D5, C-pod and will activate 38 intermediate care beds in the A and B pods by July 30,

3    2007, with two additional intermediate care beds within D-6 under construction; and

4    iv. Vacaville Psychiatric Program is scheduled to activate 30 intermediate care

5    beds in P-3 by June 29, 2007.  (Dec. McKeever, ¶ 9.)

6    Defendants are committed to exploring with Special Master Keating other strategies to

7    provide sufficient beds, including:

8    i. CDCR's removal of the four classification points accorded to inmates

9    diagnosed as *Coleman* class members at reception, with the removal premised upon a showing of

10   consistent non-violent programming by the inmate, would possibly enable some 1,300 Coleman

11   class members within the CCCMS level of care to move into available Level I and Level II

12   housing;

13   ii. The development of an appropriate plan, with review of the mental health

14   policies and staffing of the selected facilities and review of the screening criteria, for the out-of-

15   state transfer of certain CCCMS inmates;

16   iii. Ending the automatic use of intermediate care beds for the care of CDCR

17   inmates who are found incompetent to stand trial for a CDCR-based offense, and instead

18   assessing the individual inmate's clinical need for such care.  This strategy would enable proper

19   use of  intermediate care beds; and

20   iv. Revising CDCR policies and regulations to permit, under certain

21   circumstances, the suspension of certain security measures (e.g., SHU terms, close-custody

22   status) to enable placement of high-custody inmate-patients requiring DMH inpatient care.  (Dec.

23   Kernan, ¶ 24.)

24   As with the staffing issues, Defendants remain committed to apprizing the Court at three-

25   month intervals of the efficacy of the plans.

26   **4.**    **Efforts to Address Suicide Issues Are Underway.**

27   Defendants worked closely with Special Master Keating's team and Plaintiffs' experts in

28   preparing their submitted plan for addressing suicide trends in administrative segregation units.

DEFENDANTS' SUPPLEMENTAL BRIEF POPULATION

1   (Order, 6/8/06; Def. Filed Plan, 10/2/06.)  Upon receipt of objections to certain aspects of the

2   plan, Defendants agreed to adopt many of Plaintiffs' recommendations.  (Def. Response to Plf.

3   Objections, filed 12/1/06.)  Even before this Court formally approved the plan, Defendants had

4   already implemented portions of the plan, such as the commencement of thirty-minute welfare

5   checks. (*Id.*)  Since this Court's approval in February 2007, Defendants have performed other

6   aspects of the plan, such as increasing the property allowance of inmates within administrative

7   segregation units and retrofitting vent screens.  (Special Master's Report on Ad. Seg. Plan, pp. 4-

8   5, filed 5/14/07.)  Defendants will continue to implement this plan and inform the Court of its

9   efficacy.  (Doug McKeever, ¶ 10.)

10          In sum, less-intrusive reform efforts are already underway, and Plaintiffs cannot prove

11  that they are failing.  These efforts can provide more targeted relief than the referral of this

12  matter to a three-judge panel and the introduction of a population cap.

13                                             **II.**

14          **ANY REFERRAL TO A THREE-JUDGE PANEL WOULD**
            **BE INAPPROPRIATE IN LIGHT OF DEFENDANTS'**
15          **AGGRESSIVE, MULTI-PRONGED APPROACH TO**
            **OVERCROWDING.**
16

17          Referral to a three-judge panel is inappropriate.  Defendants are working aggressively to

18  provide appropriate beds for the *Coleman* class members and increased salaries to enable

19  staffing of those beds.  (Def. Response 16th Monitoring Report (draft); Def. Am. Long-Range

20  Bed Plan, filed 12/19/06; Def. Responses to Court Orders re. Pay Parity, filed 4/2/07, filed

21  5/16/07.)  AB 900 also provides for mental health beds.  The Governor has shown his

22  commitment to reform. He called a special session of the Legislature, issued an Emergency

23  Proclamation, initiated the transfer of inmates out of state, and pushed for passage of AB 900 in

24  an extraordinary effort to address overcrowding and reform the prison system.  AB 900 provides

25  for the facility and program development necessary for a constitutionally adequate mental health

26  care system, and the State should be given the opportunity to implement it.

27  ///

28  ///

DEFENDANTS' SUPPLEMENTAL BRIEF POPULATION

9

1    ///

2    **A.    The State Is Taking Immediate and Dramatic Steps to Reduce**
      **Overcrowding, Including Transferring Inmates Out of State, Changing**
3    **Parole Policies, Implementing Rehabilitation Programs to Reduce**
      **Recidivism, Building New Prison Space, and Appointing Management Strike**
4    **Teams to Implement These Efforts.**

5    The State is working on many fronts to reduce overcrowding in California's prisons.  As

6    an initial matter, CDCR will pursue using all in-state private prison beds, and will transfer

7    inmates to those private beds to the extent they are available.  (Kernan Decl., ¶¶ 3, 8.)  And

8    beginning in June 2007, CDCR will resume transferring inmates to out-of-state private prison

9    facilities.  (Kernan Decl., ¶ 8.)  It is expected that CDCR will process up to 400 inmates per

10   month for transfer out of state, and that approximately 8,000 inmates will be transferred by

11   March 2009.  (*Id.*)  Transfers will continue thereafter as needed, as AB 900 authorizes transfers

12   until July 1, 2011.  In addition, the State will expedite construction of all AB 900 Phase I beds,

13   as described below.  Expediting construction will include waiving state laws, as needed, under

14   the Governor's Emergency Proclamation.  (Hysen Decl., ¶ 8.)  It is expected that construction of

15   12,000 Phase I in-fill beds will be completed in 2009.  (*Id.*, ¶ 7.)

16   CDCR is also making administrative changes to its parole policies, which will reduce

17   overcrowding.  In addition, CDCR will implement new rehabilitation programs that will reduce

18   recidivism, again reducing overcrowding.  Finally, to ensure that these reform measures are

19   implemented aggressively and efficiently, two new managerial strike teams have been

20   established, as more fully explained below.  (Petersilia Decl., ¶ 1; Hysen Decl., ¶¶ 3, 6.)

21   **1.    General Provisions of Assembly Bill 900.**

22   On May 3, 2007, Governor Schwarzenegger signed AB 900 into law.  AB 900 will

23   immediately reduce prison overcrowding by providing for additional inmate transfers to private

24   out-of-state prison facilities.  In addition, AB 900 will further address prison overcrowding by

25   authorizing construction of in-fill beds (beds on grounds of existing prisons), establishing more

26   community re-entry beds, and creating more medical and mental health beds.  The medical beds

27   will directly support the Receiver's efforts, and the entire comprehensive plan will quickly

28   reduce, and eventually eliminate, the thousands of "non-traditional beds" that currently fill

DEFENDANTS' SUPPLEMENTAL BRIEF POPULATION

1    common areas such as gymnasiums, day rooms, and program rooms.

2           Phase I of AB 900 provides for 7,484 in-fill beds at existing enumerated prisons, plus an

3    additional 4,516 in-fill beds once site assessments have been done for other facilities, for a total

4    of 12,000 Phase I in-fill beds.  (Hysen Decl., ¶ 7.)  AB 900 specifies that the purpose of the in-

5    fill beds is to replace the non-traditional beds currently in use.  Phase I also provides for 6,000

6    re-entry beds and 6,000 medical, dental, and mental health beds.  (*Id.*)  The construction of all

7    Phase I beds will total 24,000 beds.

8           Phase II of AB 900 provides for an additional 4,000 in-fill beds; 2,000 medical, dental,

9    and mental health beds; and 10,000 re-entry beds.  The construction of all Phase II beds will total

10   16,000 beds.  (Hysen Decl., ¶ 7.)  However, AB 900 specifies that funds for Phase II

11   construction shall not be released unless specific enumerated progress in construction,

12   rehabilitation programs, management planning, and parole review has been confirmed by a panel

13   consisting of the State Auditor, the Inspector General and an appointee of the Judicial Council of

14   California.  AB 900 also provides for construction of approximately 13,000 county jail beds.

15   (Kernan Decl.,  ¶ 5.)

16          AB 900 ties prison bed construction to rehabilitation, requiring that each new bed have

17   appropriate programming for inmates, including education, vocational programs, substance

18   abuse treatment programs, employment programs, and pre-release planning.  These programs

19   will address overcrowding by reducing the recidivism rate.  California currently has one of the

20   highest recidivism rates in the nation.  (Petersilia Decl.,  ¶¶ 6, 7.)  This high recidivism rate

21   increases overcrowding in California's prisons.

22          AB 900 also requires CDCR to develop and implement, by January 15, 2008, a plan to

23   address management deficiencies within the department.  Among other things, the plan must

24   address (1) filling vacancies in management positions, (2) improving accountability, (3)

25   standardizing processes to improve management, (4) improving communications within the

26   Department, and (5) developing and implementing more comprehensive plans for management

27   of the prison and parole populations.  AB 900 authorizes CDCR to contract with outside

28   management experts to assist in identifying and addressing deficiencies.

1   ///

2       **2.    Expert Strike Teams Will Improve Prison Management
                 and Ensure Expedited Implementation of AB 900.**

3

4           The management assessment and plan required by AB 900 is not the Defendants' only

5   tool for addressing management and administrative concerns.  Governor Schwarzenegger has

6   already established two expert strike teams – one for facilities and one for rehabilitation –

7   composed of numerous experts from universities, community organizations, and state

8   government to ensure that California's prisons are managed effectively and that bed construction

9   and rehabilitation programs are implemented expeditiously.

10  (Petersilia Decl., ¶ 5; Hysen Decl.,  ¶ 6.)

11          The Facilities Construction Strike Team will restore CDCR's major project management

12  capability and will work to expedite in-fill, re-entry, medical/dental/mental-health, and jail beds

13  authorized by AB 900.  (Hysen Decl., ¶ 6.)  The Facilities Construction Strike Team will (1)

14  consider all available options for housing inmates and improving inmate housing, (2) evaluate

15  alternative construction methods, (3) work to overcome impediments to expedited construction,

16  and (4) work with local communities impacted by prison facilities.  (*Id.* at ¶ 12.)

17          At the same time, the Rehabilitation Strike Team will provide expertise on creating and

18  expediting the implementation of rehabilitation programs.  Such programs are integral to

19  increasing successful community re-entry and reducing recidivism.  The Rehabilitation Strike

20  Team will be responsible for (1) assessing existing CDCR rehabilitation programs and space, (2)

21  designing an integrated rehabilitation services delivery plan for inmates and parolees which

22  includes substance abuse treatment, education, job training, counseling, and life skills, (3)

23  developing a plan for inmate job training, (4) quickly implementing inmate intake and pre-

24  release needs assessment tools, (5) developing incentives for program participation; (5)

25  developing a plan to immediately reduce the number of lockdown days so that inmates can

26  participate in rehabilitative programming; and (6) developing the $50 million in rehabilitation

27  and treatment funds that are authorized by AB 900.  (Petersilia Decl., ¶ 4; Jett Decl., ¶ 4.)  The

28  Rehabilitation Strike Team expects to reduce recidivism by 10%, which would eliminate 8,100

1    prison returns in a single year.  (Petersilia Decl., ¶ 10.)

2        **3.    AB 900 Allows Out-of-State Transfers of Inmates and Dovetails With
             Other State Efforts to Reduce Prison Overcrowding.**

4            *a.    Out-of-State Transfers Will Continue With Passage of AB 900.*

5            The out-of-state transfer of inmates will be recommenced in order to quickly reduce

6    overcrowding in California prisons statewide.  The Governor issued an Emergency Proclamation

7    in October 2006 to permit transferring consenting inmates to out-of-state facilities.  That

8    Proclamation resulted in the current housing of some 360 inmates in out-of-state facilities.

9    (Kernan Decl., ¶ 8.)  CDCR will now continue the transfer process starting in June 2007.  (*Id.*)

10   CDCR will initially transfer up to 300 inmates per month for the first four months, and then

11   increase the transfers to 400 inmates per month.  (*Id.*)  It is anticipated that this rate of transfer

12   will continue through the end of fiscal year 2007/2008.  (*Id.*)  Under this plan, 5,060 inmates will

13   be transferred to out-of-state facilities by the end of June 2008, and 8,000 inmates will be

14   transferred by March 2009.  (*Id.*)  After March 2009, transfers will continue as needed because

15   AB 900 authorizes continued transfers until July 1, 2011.  (*Id.*)

16           These out-of-state transfers will reduce the number of non-traditional beds from

17   approximately 18,000 to approximately 13,000 by the end of the 2007/2008 fiscal year.  (Kernan

18   Decl., ¶ 8.)  CDCR will pursue all in-state transfer opportunities before initiating out-of-state

19   transfers to the extent possible.  (*Id.*)  Inmates selected for transfer to out-of-state facilities will

20   undergo a comprehensive medical, mental health and custodial screening.  (*Id.* at ¶ 12.)  Only

21   those inmates who meet approved medical and mental health criteria will be selected for transfer.

22           Transferring inmates to out-of-state facilities will reduce prison overcrowding and enable

23   correctional officers and health care staff to better serve the inmates.  (Kernan Decl., ¶ 12.)  To

24   the extent overcrowded prisons create tense living environments with greater incidents of

25   violence, a reduction in prison overcrowding will reduce the tension and decrease incidents of

26   violence.  (*Id.*)

27           *b.    The In-Fill Beds Provided by AB900 Will Reduce Crowding.*

28           AB 900 will also reduce prison overcrowding by authorizing the construction of 16,000

DEFENDANTS' SUPPLEMENTAL BRIEF POPULATION

1     in-fill beds.  (Hysen Decl., ¶ 7.)  In-fill beds will provide additional capacity at existing prisons

2     in a way that ensures proper facilities, support, and services.  (*Id.* at ¶ 8.)  Creating in-fill beds

3     will not require the construction of new prisons; rather, there will be construction of new

4     facilities at existing prisons.  (Kernan Decl., ¶ 13.)  In-fill beds, like the out-of-state transfer of

5     inmates, will eliminate non-traditional beds and provide better care and services for inmates.

6     The Facilities Construction Strike Team will expedite construction.  (Hysen Decl., ¶ 11.)  As

7     required by AB 900, these beds will be constructed to fully integrate rehabilitative programs into

8     the new facilities.  (*Id.* at ¶ 8.)  The Facilities Construction Strike Team will work to finish

9     construction as quickly as possible, but at a minimum it is expected that construction of the

10     12,000 Phase I in-fill beds will be completed in 2009.  (*Id.* at ¶ 8.)  As new in-fill beds are

11     constructed, AB 900 mandates the reduction in a proportionate number of non-traditional beds

12     until non-traditional bed use is entirely eliminated.  (Kernan Decl., ¶ 13.)

13                     ***c.***     ***AB 900 Re-Entry Beds Will Enhance Rehabilitation and***
                                     ***Successful Return to Society.***

14

15         AB 900 also provides for the creation of 16,000 re-entry beds. The focused of the re-

16     entry beds is to provide rehabilitation services and prepare inmates for re-entry into society.

17     (Kernan Decl., ¶ 14.)  These beds will be located in small, secured facilities (500 inmates

18     maximum per facility) operated by CDCR.  (*Id.*)  The facilities will be located close to

19     established communities to better serve their rehabilitative and re-entry mission. (*Id.*)  The

20     Facilities Construction Strike Team will expedite the construction of  6,000 Phase I re-entry

21     beds.  (Hysen Decl., ¶ 9.)

22                      ***d.***     ***AB 900 Addresses the Construction of Mental Health Beds.***

23         The Facilities Management Strike Team is aware of Defendants' amended long-term bed

24     plan of December 19, 2006, with its aim of meeting the forecasted *Coleman* population of 2011.

25     (Dec. Hysen, ¶ 14.)  AB 900 states that a total of 8,000 medical/mental health beds will be

26     created.  The Facilities Construction Strike Team will expedite construction of these beds to

27     bring them on line as soon as possible.  (Hysen Decl., ¶¶ 10, 11.)  Based on the scope of the

28     *Plata* Receivership, construction of the AB 900 medical and mental health beds will require

DEFENDANTS' SUPPLEMENTAL BRIEF POPULATION

1    coordination with the Receiver.  (Kernan Decl., ¶ 15.)

2

3        **4.    Administrative Parole Changes.**

4        Parole reform strategies will also play a large role in the reduction of prison

5    overcrowding.  In tandem with the implementation of AB 900, CDCR has launched a set of

6    parole changes to reward successful rehabilitation.  (Kernan Decl., ¶¶ 16-20.)  CDCR is actively

7    pursuing strategies to release parolees from their statutory parole periods as soon as is

8    appropriate.  (Kernan Decl., ¶¶ 16- 22.)

9            *a.      Timely Discharge From Parole In Accord With State Law*

10       By way of background, current California law provides for the timely discharge of

11   parolees from parole so long as they have successfully programmed for a certain time on parole.

12   Under California Penal Code section 3001, those parolees initially released from prison after

13   serving time for a non-violent offense, and who have complied with the terms of their parole

14   continuously for one year after their release, shall be discharged on the 30th day after their first

15   year of parole (or at the 13th month of their parole term), unless the recommendation to retain

16   them on parole has been made to, and approved by, the Board of Parole Hearings.  (Cal. Penal

17   Code § 3001.)  Similarly, parolees initially released from prison after serving time for a violent

18   offense  and who have complied with the terms of their parole continuously for two years since

19   their release, shall be discharged the 30th day after their second year of parole (or at the 25th

20   month of their parole term), unless the recommendation to retain has been made to, and approved

21   by, the Board of Parole Hearings.  (Kernan Decl., ¶ 18.)

22       A review of the practices of the Division of Adult Parole Operation (DAPO) showed

23   fewer parolees being discharged from parole at the 13th and 25th months than is allowed by

24   California Penal Code section 3001.  On May 15, 2007, DAPO issued a memorandum clarifying

25   when parolees must be released from parole under this state law.  (Kernan Decl., ¶¶ 18, 22, Ex.

26   B.)  The memo reflects the language of Penal Code section 3001.  (*Id.*)  Historically, DAPO

27   discharged approximately 13,800 parolees annually at the 13th month, and 5,000 at the 25th

28   month.  With the issuance of this clarifying memorandum, it is anticipated that there will be an

1  additional discharge of between 2,000 and 4,000 parolees from parole in the next twelve months.

2  (Kernan Decl., ¶ 18.)  By discharging more parolees from supervision, CDCR expects to

3  experience a reduction in the number of parolees returned to custody for various parole

4  violations.

5           **b.**      ***Implementation of Risk and Needs Assessment***
                   ***Tool and Decisionmaking Matrix.***

6

7        Further, the Division of Adult Parole Operations (DAPO) implemented a risk and needs

8  assessment tool in each of the 33 institutions: the Correctional Offender Management Profiling

9  for Alternative Sanctions (COMPAS).  (Kernan Decl., ¶ 19.)  A study is currently being

10  conducted to evaluate the predictive validity of COMPAS in terms of its ability to effectively

11  identify key risk and needs factors in the parole population.  (*Id.*)  Additionally, DAPO has

12  undertaken extensive research into the use and effectiveness of a parole-violation decision-

13  making matrix with the support of corrections expert Dr. Joan Petersilia and other topic area

14  experts.  (*Id.*, ¶ 20.)  This tool has been shown to improve organizational decision-making

15  consistency, as well as help to establish a culture of determining sanctions based on policy-

16  driven rationale and then tailoring the sanction to the specific risk and needs of the parolee.  (*Id.*)

17  When supported by evidence-based programs, such as COMPAS, this type of matrix has been

18  proven to play a meaningful role in the overall reduction of recidivism rates among the parolee

19  population.  (*Id.*)  DAPO anticipates that a decision-making matrix will be ready for a pilot

20  deployment by the end of 2007.  (*Id.*)  Once implemented, these tools will result in even more

21  discharges from parole.  (*Id.*)

22       **B.**      **Although the Current Prison Population Exceeds 174,000 Inmates, the**
              **State's Prison Reform Plans Will Dramatically Reduce Overcrowding.**

23

24        Approximately 162,848 male and 12,141 female inmates are currently housed by CDCR,

25  for a total prison population of approximately 174,989 inmates.[4/]  (Kernan Decl., ¶ 6.)  CDCR

26  _____

27       4. Defendants provide this information in light of this Court's direction to Special Master
Keating to provide a report indicating, in part, the current inmate population in the California

28  Department of Corrections and Rehabilitation; and the current size of the Plaintiff class.  (Order,
5/18/07.)

DEFENDANTS' SUPPLEMENTAL BRIEF POPULATION

1    anticipates housing in-state 164,599 male inmates in March 2008, and 167,614 male inmates in

2    March 2009.  (*Id.* at ¶ 23.)  With the re-commencement of out-of-state transfers and the

3    anticipated impact of timely discharging certain parolees from parole, in accord with Penal Code

4    section 3001, those anticipated numbers of CDCR inmates housed in-state will decrease to

5    159,939 male inmates in March 2008, and 162,674 male inmates in March 2009.  (*Id.*)

6    Defendants anticipate that other parole reduction strategies discussed above, such as alternative

7    programming, the COMPAS risk and needs assessment tool, the decision-making matrix, and

8    alternative sanctions programs, will further decrease CDCR's in-state male prison population.

9         Within the overall population, the population of *Coleman* class members now totals some

10    32,667.  The population by level of care is as follows[5]:

11    | LEVEL OF CARE | POPULATION |
      | --- | --- |
12    | Correctional Case Management System (CCCMS) | 27, 982 |
13    | Enhanced Outpatient Program (EOP) | 4, 031 |
14    | Psychiatric Services Unit | 320 |
15    | Mental Health Crisis Bed | 270 |
16    | Inpatient Intermediate Care (ICF) | 316 |
17    | Day Treatment Program | 38 |
      | Inpatient Acute Care (APP) | 101 |

18

19    (Decl. McKeever, ¶ 11.)

20

21                                    **III.**

22    **A POPULATION CAP IS AN OVERLY INTRUSIVE REMEDY AND
      WOULD NOT BE NARROWLY TAILORED TO TARGET RELIEF FOR
23    THE *COLEMAN* CLASS BECAUSE PLAINTIFFS CANNOT PROVE
      THAT OVERCROWDING HAS CAUSED THE DEFICIENCIES IN
24    MENTAL HEALTH CARE.**

25         A prisoner release order cannot issue unless Plaintiffs prove, by clear and convincing

26    _____

27         5.  These stated population numbers are current as of May 11, 2007, for all levels of care,
      except: (a) the population numbers for Intermediate Care, Day Treatment, and Acute are current as
28    of May 16, 2007 and (b) the population number for Mental Health Crisis Bed is current as of
      May 14, 2007.

DEFENDANTS' SUPPLEMENTAL BRIEF POPULATION

1   evidence, that crowding is the primary cause of the lack of constitutional mental health care, and

2   that no other relief will remedy the violation.  18 U.S.C. 3626 (a) (3) (e).  Here, Plaintiffs cannot

3   meet their burden because the evidence establishes that the problems with the mental health care

4   system are primarily administrative problems.  This Court has recognized this fact, and its prior

5   orders have been targeted to address training, staffing, salaries and bed planning.  These orders

6   are the less intrusive ways to provide relief, and Plaintiffs cannot prove that they have failed.

7          There is no direct nexus between meeting the treatment needs of the *Coleman* population

8   and capping the overall population of CDCR.  Although a reduction in prison overcrowding will

9   improve the prison environment, the provision of constitutional mental health care requires

10  increased mental health beds and mental health staff to provide necessary care.  That staff must

11  be well-managed, well-paid, and well-trained.  A cap on the population will not ensure this.  But

12  this Court's less-intrusive, targeted orders in combination with the State's landmark reform

13  efforts will make a significant difference.  More beds will be created under the aegis of AB 900

14  through expedited construction processes.  Bed construction will require coordination with the

15  Receiver, but the Receiver urged the *Plata* court to allow his Plan of Action to be implemented

16  without the overlay of population cap proceedings and determinations, observing those who

17  think that population controls will solve California's prison health care problems, are simply

18  wrong.  (Receiver's Report re Overcrowding at 42-43.)  The *Coleman* Defendants likewise now

19  have a set of plans, embraced within AB 900, and request the Court to allow them to engage

20  fully in those plans without the need to address another set of proceedings and remedies in

21  another forum.

22         When considering the nexus between population and mental health care, this Court

23  cannot make a referral to a three-judge panel unless that panel could order relief that would

24  clearly assist Defendants in the delivery of constitutional mental health care.  Defendants are

25  already making great progress to address prison overcrowding and to provide constitutional

26  mental health care to inmates.  A prison population-cap order could not provide the

27  comprehensive reform that the Defendants are already implementing.  Referral to a three-judge

28  panel will not provide immediate overcrowding relief, and an order issued by a three-judge panel

DEFENDANTS' SUPPLEMENTAL BRIEF POPULATION

1  could not ensure efficient management, adequate mental health care, or public safety.  A far

2  better course is to allow Defendants to implement their comprehensive reform plans.

3

4                                    **CONCLUSION**

5           Defendants are launching an aggressive and comprehensive plan to reduce overcrowding

6  in California's prisons.  AB 900 provides for out-of-state transfers, thousands of mental health

7  beds, and better rehabilitation programs to reduce recidivism.  Expert strike teams have been

8  established to expedite implementation and ensure effective prison management.  Administrative

9  parole changes have been implemented to further reduce overcrowding.   These landmark and

10  deep-reaching changes in housing, rehabilitation, and parole policies constitute the integrative

11  approach necessary to create a properly working prison system.  At the same time, Defendants

12  have embarked upon court-approved plans addressing the key features of an adequate mental

13  health system. Just as this Court allowed Defendants sufficient time to prepare this integrative

14  approach, so it should allow Defendants sufficient time to implement it.  Accordingly, referral to

15  a three-judge panel is not appropriate.

16           Dated:  May 24, 2007

17                                         Respectfully submitted,

18                                         EDMUND G. BROWN JR.
                                           Attorney General of the State of California
19
                                           DAVID S. CHANEY
                                           Chief Assistant Attorney General
20
                                           FRANCES T. GRUNDER
21                                         Senior Assistant Attorney General

22                                         ROCHELLE C. EAST
                                           Supervising Deputy Attorney General
23
                                           */s/ Lisa A. Tillman*
24
                                           LISA A. TILLMAN
25                                         Deputy Attorney General
                                           Attorneys for Defendants
26
     30271960.wpd
27   CF1997CS0003

28

DEFENDANTS' SUPPLEMENTAL BRIEF POPULATION
                                       19