EDMUND G. BROWN JR.
Attorney General of the State of California
DAVID S. CHANEY
Chief Assistant Attorney General
FRANCES T. GRUNDER
Senior Assistant Attorney General
ROCHELLE C. EAST
Supervising Deputy Attorney General
LISA A. TILLMAN, State Bar No. 126424
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 327-7872
 Fax: (916) 324-5205
 Email: Lisa.Tillman@doj.ca.gov

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　　　　　　Plaintiffs,<br><br>　v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　　　　　　　Defendants. | 2:90-cv-00520 LKK JFM P<br><br>**DECLARATION OF SCOTT KERNAN IN SUPPORT OF DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR REFERRAL TO A THREE-JUDGE PANEL**<br><br>Hearing Date:　　June 4, 2007<br>Time:　　　　　　11:00 a.m.<br>Courtroom:　　　4<br>Judge: The Honorable Lawrence K. Karlton |

I, Scott M. Kernan, declare as follows:

1. I am currently the Chief Deputy Secretary of the Division of Adult Institutions for the California Department of Corrections and Rehabilitation (CDCR), which is tasked with the operation of California's prisons, correctional facilities, and adult parole. Before becoming the Chief Deputy Secretary, I held the positions of Deputy Director, and later Acting Director of the Division of Adult Institutions.

2. I have personal knowledge of the facts stated in this brief and if called to testify upon those facts would do so competently.

3. In November 2005, I was reassigned from my position as Warden at California State Prison-Sacramento to CDCR headquarters to serve as Deputy Director of the Division of Adult Institutions. As the Deputy Director, I oversaw the development of alternative solutions to the overcrowding problem. These efforts included a comprehensive analysis of existing CDCR beds, programming space, clinical/mental health space, infrastructure capacities, and projected mitigation. I also conducted an analysis of additional capacity available within existing in-state private prison facilities, evaluated potential capacity within the Department of Mental Health and the Department of Juvenile Justice, expansion of female capacity in private facilities, expansion of capacity at existing prisons ("in-fill"), and an analysis of reactivating a previously decommissioned facility in Stockton, California.

4. Housing inmates in non-traditional quarters presents serious safety concerns for both the inmates and correctional staff. The overcrowding of CDCR facilities has led to increased numbers and riots and disturbances system-wide.

For instance, riots in different facilities at Avenal caused the prison to spend a combined 34 days on modified program; riots and disturbances at the California Correctional Center caused the prison to go on modified program or lockdown for a combined 324 days, with two facilities remaining on lockdown or modified program since March 5, 2007; all facilities at Calipatria State Prison remained on lockdown or modified program for 552 days following the attempted murder of a peace officer; and as a result of a riot in Facility B at Wasco on December 30, 2002, that facility remained on modified program for 1,435 days. These riots deflect prison resources so that while correctional officers now must respond to the increased security concerns and maintain watch over an increasingly dangerous prison population, they are not able to assist Defendants' addressing the inmates' mental health concerns by escorting inmates to appointments and providing access to yard.

5. On April 26, 2007, in response to California's prison overcrowding crisis, the California Legislature enacted, and Governor Schwarzenegger signed into law on May 3, 2007,

Assembly Bill 900 (AB 900) which is directed at reducing California's prison population. AB 900 will reduce prison overcrowding through four measures: (1) through the out-of-state transfer of inmates, (2) by creating in-fill beds, (3) by establishing more community re-entry beds, and (4) by creating more medical and mental health beds. These four measures are also directed at reducing CDCR's use of "non-traditional beds" or beds that are used to house inmates in areas that were neither designed nor intended for inmate housing, including in areas such as gymnasiums, day rooms, program rooms, and triple bunk beds. Further, AB 900 also provides for the creation of approximately 13,000 county jail beds.

6. CDCR projects, based on Spring 2007 published projections, the May 2007 population to be approximately 162,848 male and 12,141 female inmates, for a total prison population of approximately 174,989 inmates. CDCR anticipates housing 164,599 male inmates and 12,200 female inmates (176,799 total) in March 2008, and 167,614 male inmates and 12,562 female inmates (180,176 total) in March 2009. These projected figures do not account for the impact that AB 900 and other population reduction strategies (including parole population reduction strategies described in paragraphs 15 through 21) will have on the prison population, as described below.

7. CDCR also proposed in the May budget revision the establishment of approximately 4,500 beds in Female Rehabilitative Community Correctional Centers (FRCCC). These facilities will house non-serious, nonviolent women offenders. The FRCCC's were developed specifically for California using the National Institute of Correction's Gender-Responsive Strategies: Research, Practice, and Guiding Principles for Women Offenders (Bloom, Owen & Covington, 2003) as a foundation for the program design. Services will include, but not be limited to: substance abuse education and treatment, physical and mental health care, trauma treatment, education, vocational training, life skills, cultural competency, parenting and family reunification, and reentry assistance. These facilities, upon approval, are scheduled to begin occupancy in April 2008. The FRCCC's will eliminate all non-traditional beds for the female population with the first activation in April 2008 and with subsequent activations to address any growth in this population beyond 2015-2016. These new beds will reduce CDCR's female

DEF. SUPP. BRIEF POPULATION, DEC. KERNAN

3

1  population by one-third and perhaps allow CDCR to convert current female prisons into male
2  capacity, thus effectively relieving male prison overcrowding as well.
3      8.    To date, approximately 360 inmates are currently confined in out-of-state facilities
4  To reduce overcrowding in California prisons statewide, CDCR currently plans to re-commence
5  the involuntary transfer of inmates to either in-state private facilities or out-of-state facilities
6  starting in June 2007. CDCR will pursue all in-state transfer opportunities before initiating out-
7  of-state transfers to the extent possible. CDCR will transfer up to 300 inmates per month for the
8  first four months of the out-of-state transfer program. Beginning in month 5 of transferring
9  inmates to out-of-state facilities, CDCR will increase the number of inmates transferred out of
10 state to 400 inmates per month. This rate of transfer will continue through the end of fiscal year
11 2007/2008, totaling 5,060 inmates transferred to out-of-state facilities by the end of June 2008.
12 The out-of-state transfer of inmates will continue at a rate of 400 inmates per month into fiscal
13 year 2008/2009, and it is estimated that the out-of-state transfer of inmates will reduce to 320
14 inmates per month for the months of December 2008 and January 2009, and finally 300 inmates
15 during the month of February 2009 for a total of 8,000 inmates transferred out of state. This will
16 result in a reduction in CDCR's male population of approximately 3,860 inmates by March 2008,
17 and a total of 8,000 inmates by March 2009.
18     The out-of-state transfer of these nearly 5,060 inmates in fiscal year 2007/2008 will
19 reduce the number of non-traditional beds from approximately 18,000 to approximately 13,000
20 by the end of the 2007/2008 fiscal year. The use of out-of-state facilities is the only immediate
21 option available to reduce crisis level overcrowding, protect public safety, enhance security
22 within the prison and jail systems, and enhance the Receiver's ability to provide court-mandated
23 medical services to the inmate population.
24     9.    Inmates eligible for involuntary out-of-state transfer must meet one of the
25 following criteria: (1) inmates with an active Immigration and Customs Enforcement (ICE) hold
26 (i.e. inmates who have been previously deported by the federal government and are criminal
27 aliens subject to deportation following the fulfillment of their criminal sentence), or (2) inmates
28 with a potential ICE hold (i.e. inmates who are criminal aliens and committed an aggravated

DEF. SUPP. BRIEF POPULATION, DEC. KERNAN

felony as defined by federal statute and may be subject to deportation following the fulfillment of their criminal sentence). Attached as Exhibit A is a true and correct copy of a February 2, 2007 Memorandum outlining CDCR's procedure with regard to the out-of-state transfer of inmates.

Inmates who meet either of the above criteria (i.e. they have an active or a potential ICE hold) will be prioritized for involuntary out-of-state transfer as follows (beginning with the first inmates to be transferred): (1) inmates who have not received any visitation within the last two years and cannot demonstrate family or supportive ties in California; (2) inmates who have not received any visitation within the last year and cannot demonstrate family or supportive ties in California; (3) inmates classified as Work Group/Privilege Group C/C meaning inmates who voluntarily choose not to work and are not receiving any good time credits or time off of their sentence for work; (4) inmates classified as Work Group/Privilege Group A2/B meaning inmates who have worked in the past but are not currently working because there are no jobs available, and are receiving good time credits; (5) inmates classified as Work Group/Privilege Group A1/A meaning inmates who hold unskilled jobs such as in the kitchen or as porters; (6) inmates classified as Work Group/Privilege Group A1/A but who hold jobs in an educational, vocational, or substance abuse program; and (7) (the last group to be transferred) inmates with the longest amount of time to serve.

In the event that the above criteria yield an insufficient number of inmates for transfer, the same prioritized criteria listed above in items (1) through (7) will apply to those inmates without an active or potential ICE hold, but who have committed an aggravated felony.

10.    CDCR performed an initial review of inmates eligible for out-of-state transfer, and 34,766 inmates were identified as eligible on a cursory level. Following a more thorough review of eligibility (as described in paragraph 8 above), as of January 2, 2007, 17,908[1] inmates were identified as eligible for transfer:

- 2,898 inmates have an active ICE hold. Of those 2,898 inmates:
  - 1,565 committed an aggravated felony
  - 1,282 have not received a visit in the preceding two years

---

1. As of January 2, 2007, inmates incarcerated at Richard J. Donovan Correctional Facility (RJD) were not included in the totals. Approximately 1,138 eligible inmates are incarcerated at RJD.

DEF. SUPP. BRIEF POPULATION, DEC. KERNAN
5

   - 1,477 have not received a visit in the preceding year[2/]
   - 2,162 are illegal aliens from Mexico
   - 175 are illegal aliens from El Salvador
   - 9 are Work Group/Privilege Group C/C (voluntarily choose not to work)
   - 434 are Work Group/Privilege Group A2/B (not assigned to an inmate work incentive assignment)

- 1,473 inmates have a potential ICE hold. Of those 1,473 inmates:
   - 725 committed an aggravated felony
   - 376 of those who committed an aggravated felony have not received a visit in the preceding year
   - 349 of those who committed an aggravated felony have not received a visit in the preceding two years
   - 739 have not received a visit in the preceding year[3/]
   - 690 have not received a visit in the preceding two years
   - 933 are illegal aliens from Mexico
   - 63 are illegal aliens from Vietnam
   - 8 are Work Group/Privilege Group C/C (voluntarily choose not to work)
   - 388 are Work Group/Privilege Group A2/B (not assigned to an inmate work incentive assignment)

- 13,537 inmates do not have either an active or potential ICE hold
   - 7,006 committed an aggravated felony and are not subject to deportation
   - 6,856 have not received a visit in the preceding year[4/]
   - 6,124 have not received a visit in the preceding two years
   - 1,181 of these inmates who do not have an active or potential ICE hold are *not* assigned to an inmate work incentive assignment and have *not* had a visit in the preceding two years
   - 50 are Work Group/Privilege Group C/C (voluntarily choose not to work)
   - 2,376 are Work Group/Privilege Group A2/B (not assigned to an inmate work incentive assignment)

11.  CDCR has a current contract with the Correctional Corporation of America (CCA) that permits expansion of the number of out-of-state beds as inmates become available for transfer. CCA provided a schedule to CDCR that permits up to 4,400 beds for California use. CDCR will concurrently negotiate contracts for additional beds with private and/or public vendors to meet the schedule detailed in paragraph 8.

---

2. No visiting information is available on 20 inmates with active ICE holds.

3. No visiting information is available on 6 inmates with potential ICE holds.

4. No visiting information is available on 50 inmates without an active or potential ICE hold.

DEF. SUPP. BRIEF POPULATION, DEC. KERNAN

12. This out-of-state transfer of inmates will further improve inmates' access to health care at CDCR. Inmates selected for out-of-state facilities will undergo a comprehensive medical and mental health screening and only those inmates who meet the medical criteria, as established by the Receiver, and mental health criteria, as established by Special Master Keating, will be selected for transfer. The reduction in population at CDCR institutions will permit staff, particularly medical and correctional staff and, to a lesser extent, mental health staff, to focus resources on a smaller population. To the extent overcrowded prisons create tense living environments with greater incidents of violence, a reduction in the prison overcrowding will reduce the tension and so decrease such incidents of violence.

13. AB 900 will also reduce California's prison overcrowding through the use of in-fill beds. "In-fill beds" are those beds that will be added to existing capacity in current prisons. The creation of in-fill beds will not require the construction of new prisons; but rather the construction of new facilities at existing prisons. In-fill beds will be created as either dorms or cells. In-fill beds, like the out-of-state transfer of inmates, are designed to eliminate CDCR's reliance on non-traditional beds, and will permit CDCR to address population growth and the current overcrowding in existing prison facilities. As new in-fill beds are constructed, AB 900 mandates the reduction in a proportionate number of non-traditional beds, until non-traditional bed use is entirely eliminated.

14. AB 900 also provides for the creation of 16,000 re-entry beds, which are beds in small, secured facilities (500 inmates maximum per facility), that are operated by CDCR but are geographically closer to communities and are focused on providing rehabilitation services and preparing inmates for re-entry into society.

15. The addition of medical and mental health beds is also provided for by AB 900. Indeed, there are 8,000 total medical/mental health beds. The medical beds will be created in cooperation with the *Plata* Receiver. The AB 900 mental health beds include those stated in Defendants' amended long-term bed plan of December 2006.

16. Parole reduction strategies will result in the reduction of CDCR's inmate population. While AB 900 does not address parole accountability, CDCR has continued to

implement parole population reduction strategies through alternative programming in lieu of returning inmates to prison. These strategies are proving effective in reducing California's prison population and have led to CDCR's continued expansion of these alternative sanction programs in the 2007/2008 fiscal year.

As evidence of CDCR's successful parole reduction strategies, the CDCR Spring Adult Population projections, though originally estimated in the fall of 2006 to be 120,117 parolees, were later adjusted in June 2007 to 122,833 parolees, reflecting an increase of 2,716 parolees. At the same time that the parole population increased, parolee referral to programs also increased, and the parole revocation rate remained steady. This evidences the fact that parole agents are referring parolees to programs instead of recommending incarceration. This trend and change in parole culture will continue to be monitored as a benchmark for CDCR's efforts in the area of parole reform.

17. Alternative programming, however, only accounts for one aspect of CDCR's overall implementation of parole accountability strategies. Reduction in the parole population requires, as a matter of public safety, a validated risk and needs assessment to evaluate an individual's risk of re-offending and threat to public safety. Parole decisions are now being made based upon a subjective determination of individual circumstances and correctional judgment. Secretary Tilton, however, directed that a statistically validated decision-making matrix, with input from national experts, be developed to provide clear and objective decisions throughout CDCR. Furthermore, Secretary Tilton directed that a policy be issued clarifying when parolees must be discharged from parole. These strategies will lead to further development of parole reform strategies after thoughtful evaluation and implementation of CDCR's parole accountability model.

18. **California Penal Code Section 3001 Administrative Discharge.** Penal Code § 3001 addresses the statutory requirements for DAPO to consider prior to discharging a parolee from supervision. Specifically, parolees initially released from prison after serving a period of incarceration for a non-violent offense (a conviction *not* delineated in Penal Code § 667.5(c)), and who have been compliant with the terms of their parole continuously for one year since their

release, *shall be discharged on the 30th day after their first year* of parole (or at the 13th month of their parole term), unless the recommendation to retain them on parole has been made to, and approved by, the Board of Parole Hearings (BPH). Similarly, parolees initially released from prison after serving a period of incarceration for a violent offense (as defined by Penal Code § 667.5(c)), and who have been compliant with the terms of their parole continuously for two years since their release, *shall be discharged the 30th day after their second year* of parole (or at the 25th month of their parole term), unless the recommendation to retain has been made to, and approved by, the BPH.

Current organizational practice within DAPO results in fewer parolees being discharged from parole at the 13th and 25th months than is authorized in California Penal Code § 3001. In order to ensure complete compliance with Penal Code § 3001, DAPO Director Thomas Hoffman issued a memorandum dated May 15, 2007 clarifying when parolees must be discharged from parole. Attached as Exhibit B is a true and correct copy of Thomas Hoffman's May 15, 2007 Memorandum regarding Penal Code § 3001 Compliance Policy Statement.

Departmental databases identify 7,642 parolees who potentially meet the requirements for discharge after 12 months of successful parole, but were nonetheless retained on parole during the past 12 months. CDCR electronic databases do not quantify the reasons for retention, but in the majority of these instances, the parole agent lacked specific administrative direction to discharge the parolee and therefore referred the case to the BPH. The BPH, in turn, chose to retain the majority of these cases on parole.

The May 15, 2007 Memorandum, with specific administrative parameters and administrative oversight, is anticipated to result in the discharge of between 2,000 to 4,000 additional parolees from parole in the next 12 months. Currently, discharge decisions are made at the supervisory level. To ensure full implementation of this policy, however, all discharge recommendations will be reviewed at the Parole Administrator level (which is one level above the supervisory level). This change in oversight will require management-level executives to make the discharge decision and will result in a more consistent application of the policy. Additionally, CDCR will electronically track the discharges by parole region to ensure proper

9

compliance. This data will be added as a performance measurement to the regular statistical analysis (COMSTAT) system currently employed by CDCR.

19. **Risk and Needs Assessment Tool.** The Division of Adult Parole Operations (DAPO) implemented a risk and needs assessment tool in each of the 33 institutions: the Correctional Offender Management Profiling for Alternative Sanctions (COMPAS). COMPAS is a research-based, risk and needs assessment tool for criminal justice practitioners to assist them in the placement, supervision, and case-management of offenders in community settings. To date, DAPO has completed over 45,000 pre-release assessments of inmates to be released from the institutions and placed on parole. CDCR contracted with UCLA Professor David Farrabee to statistically validate COMPAS and determine if the assessments are producing accurate and effective recommendations. Further, a study is being conducted to evaluate the predictive validity of COMPAS in terms of its ability to effectively identify key risk and needs factors in the parole population.

20. **Decision-Making Matrix.** Since November 2006, DAPO has undertaken extensive research into the use and effectiveness of a parole-violation decision-making matrix with the support of corrections expert Dr. Joan Petersilia and other topic area experts. This tool has been shown to improve organizational decision-making consistency, as well as help to establish a culture of determining sanctions based on policy-driven rationale and then tailoring the sanction to the specific risk and needs of the parolee. When supported by evidence-based programs, such as COMPAS, this type of matrix has been proven to play a meaningful role in the overall reduction of recidivism rates among the parolee population. DAPO anticipates that a decision-making matrix will be ready for a pilot deployment by the end of 2007.

Other states that have employed strategies similar to the decision-making matrix described above have experienced significant reductions in parole return-to-custody rates, in turn directly reducing the prison population. The National Institute of Corrections assisted a number of other states with the implementation of a policy-driven parole model including the decision-making matrix. All of those such states report that they have experienced reduced recidivism rates. For example, Georgia reported an 11% reduction in the first year following

implementation of the matrix and its related components. Similarly, Kansas reported a 6% reduction, and Texas reported a reduction by 14,000 admissions after implementation of the parole model. If California's effort resulted in even a 6% reduction in violations, that would amount to 5,840 fewer violations and a reduction in 1,920 prison bed days.

21. **Alternative Sanction Programs.** The DAPO is actively expanding its programs that are available as remedial sanctions in lieu of parole revocation in response to parole violations. CDCR has program capacity for 4,175 parolees at an annual cost of $82,648,665. By sanctioning these parole violators, rather than returning them to CDCR custody, it is estimated that CDCR will reduce its monthly intake and free-up much needed bed space. CDCR recognizes that a number of logistical issues prevent these remedial sanction programs from being filled, however CDCR is committed to addressing and overcoming these obstacles such that these programs will reach capacity.

22. I created additional parameters for discharge that will provide parole agents in the field with necessary administrative direction and clear expectations. The parameters are as follows: all parolees who have successfully completed a 12 month consecutive period of parole without revocation and who meet the following criteria *will* be discharged in accordance with Penal Code section 3001: (1) no serious or violent controlling or non-controlling offense (as defined in Penal Code §§ 667.5 or 1192.7); (2) no conviction for serious or violent offense in the preceding 10 years; (3) no conviction for any offense requiring registration under Penal Code § 290; and (4) not classified as a gang member.

This directive will result in the necessary relief of prison beds in the next 12 months and will enable CDCR to pursue other aspects of parole reform described previously. Historically, DAPO discharges approximately 13,800 parolees annually at the 13th month, and 500 at the 25th month. It is anticipated that there will be an increase in these discharge numbers during the first year that the policy is in effect. By discharging more parolees from supervision, it is estimated that CDCR will experience a reduction in the number of parolees returned to custody for various parole violations. Thus, while it is difficult to quantify, CDCR anticipates that this policy will reduce the prison population.

DEF. SUPP. BRIEF POPULATION, DEC. KERNAN

23. As stated in paragraph 6 above, CDCR anticipates housing 164,599 male inmates in March 2008, and 167,614 male inmates in March 2009. These projected figures, however, do not account for the impact that the anticipated out-of-state transfers and the DAPO May 15, 2007 Memorandum clarifying Penal Code section 3001 administrative discharge will have on the male prison population. Taking into account these two factors, it is estimated that CDCR will house in-state approximately 159,939 male inmates in March 2008, and 162,674 male inmates in March 2009. These population projections do not take into account the additional parole reduction strategies discussed above, such as alternative programming, the COMPAS risk and needs assessment tool, the decision-making matrix, and alternative sanctions programs, which are expected to further decrease CDCR's in-state male prison population.

24. I am aware of this Court's orders requiring Defendants to submit long-term plans to meet the forecasted need for mental health care beds. I am also aware of the need for mental health care beds during the planning and construction of AB 900 mental health beds. I am committed to exploring with Special Master Keating certain strategies to assist in meeting the current bed gap, including:

i. CDCR's removal of the four classification points accorded to inmates diagnosed as *Coleman* class members at reception, with the removal premised upon a showing of consistent non-violent programming by the inmate, would enable some 1,300 CCCMS class members to move into available Level I and Level II housing;

ii. The development of an appropriate plan, with review of the mental health policies and staffing of the selected facilities and review of the screening criteria, for the out-of-state transfer of certain CCCMS inmates;

iii. Ending the automatic use of intermediate care beds for the care of CDCR inmates who are found incompetent to stand trial for a CDCR-based offense, and instead assessing the individual inmate's clinical need for such care. This strategy would enable proper use of scarce intermediate care beds; and

1    iv. Revising CDCR policies and regulations to permit, under certain circumstances, the
2  suspension of certain security measures (e.g., SHU terms, close-custody status) to enable
3  placement of high-custody inmate-patients requiring DMH inpatient care.
4    I declare under penalty of perjury that the foregoing is true and correct. Executed in
5  Sacramento, California, on May 24, 2007.

              SCOTT M. KERNAN
              Chief Deputy Secretary, CDCR Division of Adult
              Institutions

DEF. SUPP. BRIEF POPULATION, DEC. KERNAN
                    13