1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DAVID S. CHANEY
Chief Assistant Attorney General
3 | FRANCES T. GRUNDER
Senior Assistant Attorney General
4 | ROCHELLE C. EAST
Supervising Deputy Attorney General
5 | LISA A. TILLMAN, State Bar No. 126424
Deputy Attorney General
6 | 1300 I Street, Suite 125
P.O. Box 944255
7 | Sacramento, CA 94244-2550
Telephone: (916) 327-7872
8 | Fax: (916) 324-5205
Email: Lisa.Tillman@doj.ca.gov
9 |
Attorneys for Defendants
10 |

11 |            IN THE UNITED STATES DISTRICT COURT

12 |          FOR THE EASTERN DISTRICT OF CALIFORNIA

13 |

14 | RALPH COLEMAN, et al.,                      2:90-cv-00520 LKK JFM P

15 |                            Plaintiffs,      DECLARATION OF JOAN
                                                PETERSILIA IN SUPPORT OF
16 |              v.                             DEFENDANTS' SUPPLEMENTAL
                                                BRIEF IN OPPOSITION TO
17 | ARNOLD SCHWARZENEGGER, et al.,             PLAINTIFFS' MOTION FOR
                                                REFERRAL TO A THREE-JUDGE
18 |                            Defendants.      PANEL

19 |                                             Date:       June 4, 2007
                                                Time:       11:00 a.m.
20 |                                             Courtroom:  4
                                                Judge:      Lawrence K. Karlton
21 |

22 |

23 |        I, Joan Petersilia, declare as follows:

24 |        1.    I am the Senior Consultant to the Rehabilitation Strike Team that was created by

25 | Governor Schwarzenegger on May 11, 2007 to expedite the implementation of Assembly Bill

26 | 900 (AB 900). The Rehabilitation Strike Team is focused on evaluating existing education,

27 | training, and substance abuse programs; developing leading-edge rehabilitation classes;

28 | delivering services to inmates and parolees that will in turn improve public safety; designing

DEF. SUPP. BRIEF POPULATION, DECL. PETERSILIA

1  facilities to best accommodate rehabilitative programs; and working with communities to

2  continue services in local settings.

3      2.    I have personal knowledge of the facts stated in this brief and if called to testify upon

4  them would do so competently.

5      3.    I am a Professor of Criminology, Law, and Society at the University of California,

6  Irvine. I have been an advisor to the California Department of Corrections and Rehabilitation

7  (CDCR) for the last three years, and currently co-chair CDCR's Expert Panel on Adult Offender

8  Recidivism Reduction Programs (Expert Panel). The Expert Panel is tasked with reviewing the

9  existing rehabilitation programs offered by CDCR for adult offenders, and providing a blueprint

10  for improving current programs and their effectiveness. I am the former Director of the Criminal

11  Justice Program at the RAND Corporation where, for 25 years, I studied the performance of

12  California criminal justice agencies. I am also the former President of the American Society of

13  Criminology.

14      4.    The Rehabilitation Strike Team is responsible for the following tasks: (1) assessing

15  existing CDCR rehabilitation programs and space; (2) designing an integrated rehabilitation

16  services delivery plan for inmates and parolees including, but not limited to, substance abuse

17  treatment, education, job training, counseling, and life skills; developing a plan to integrate all

18  elements of inmate job training – vocational education, Prison Industry Authority, institution

19  inmate labor, and private partnerships – to ensure the most efficient and effective use of

20  resources; (3) fast-tracking the implementation and adoption of inmate intake and pre-release

21  needs assessment tools; (4) developing a system of inmate incentives for program participation;

22  (5) working with CDCR senior management to develop a plan to immediately begin reducing the

23  number of lockdown days (i.e. days that the movement of inmates outside of their cells is

24  restricted), so that inmates can participate in rehabilitative programming; and (6) developing

25  expenditure priorities for the $50 million in rehabilitation and treatment supplement funds that

26  was authorized by AB 900, Section 28(b).

27      5.    The Rehabilitation Strike Team has been able to successfully commence its operations

28  due in part to prior work completed by the Expert Panel, and also due to the fact that the

DEF. SUPP. BRIEF POPULATION, DECL. PETERSILIA

1  Rehabilitation Strike Team includes two other members from the Expert Panel. The

2  Rehabilitation Strike Team also consists of a number of other nationally recognized rehabilitation

3  experts with extensive professional backgrounds in substance abuse treatment, education,

4  workforce preparation, and security.

5      6.    The Rehabilitation Strike Team will be offering suggested program improvements

6  within the first 60 days, concluding with recommendations within 9 months. I know, as an

7  expert in the field, that when the Rehabilitation Strike Force's recommendations are fully

8  implemented by CDCR, these policies and programs can improve the reentry success of prisoners

9  and parolees. With improved rehabilitation programs, offender recidivism will be reduced with

10  an associated impact on reducing prison overcrowding. Currently, California has one of the

11  nation's highest recidivism rates: 66% of California parolees return to a California prison within

12  3 years of their release, compared to a national average of about 40% in large states.

13      7.    Each year, CDCR receives nearly 140,000 prisoners. Only about 1% of these prisoners

14  enter state prisons to serve life sentences or face capital punishment. This means that virtually all

15  of these prisoners will be returning to their communities; most within a relatively short time

16  frame. The average length of incarceration in California prisons is about 27 months, which is

17  comparable to the national average. The Legislative Analyst's Office (LAO) reported that

18  81,000 parole violators were returned to California prisons in 2005, 80% of whom were returned

19  for technical parole violations (violations of their parole conditions), rather than new criminal

20  convictions. Many parole violators returned for technical violations are quickly released again,

21  serving an average of just four months in prison. Technical parole violators rotate quickly in and

22  out of CDCR's custody and occupy 20,000 beds on any given day. If the Rehabilitation Strike

23  Team can implement the programs that have proven successful in other states, CDCR should be

24  able to reduce the number of parole violators returning to prison and their associated impact on

25  prison overcrowding.

26      8.    The evidence supporting effective rehabilitation programming is growing. In the

27  1970s, the conventional wisdom was that offenders could not be rehabilitated. Research now

28  demonstrates that there are several effective correctional interventions that can reduce the rates of

DEF. SUPP. BRIEF POPULATION, DECL. PETERSILIA

1 offenders committing new crimes and returning to prison.  Researchers have also indicated that

2 some of the popular rehabilitation programs currently in use are not effective at curtailing future

3 criminal behavior.  Programs such as in-prison "therapeutic communities" with strong post-

4 release re-entry services have shown to be effective for drug-involved offenders.  Quality

5 vocational education in prison and for parolees has yielded positive results.  Cognitive behavioral

6 treatment in prison and in the community is solidly supported by research.  Intensive community

7 supervision programs that emphasize the delivery of treatment services and not simply

8 surveillance, yielded impressive results in reducing future criminal behaviors by released

9 offenders.  Gender-responsive programs have also demonstrated positive outcomes for female

10 offenders.

11    9.    Fully implementing evidence-based rehabilitation programs will reduce California's

12 recidivism rate.  A realistic expected reduction in recidivism from evidence-based programming

13 is about 10% overall, although different programs can expect different recidivism-reduction

14 outcomes.  The Washington State Institute for Public Policy reviewed 571 adult and juvenile

15 corrections programs and found several programs that reduced recidivism between 5 and 17

16 percent:

17 ////

18 ////

19 ////

20 ////

21 ////

22 ////

23 ////

24 ///

25 ///

26 ///

27 ///

28 ///

DEF. SUPP. BRIEF POPULATION, DECL. PETERSILIA

| Evidence-Based Programs, Crime Outcomes | |
|---|---|
| **Selected Adult Corrections Programs** | **Expected Change in Crime**[1] |
| Vocational education in prison | -9.0% (4) |
| Intensive supervision: treatment oriented programs | -16.7% (11) |
| General education in prison (basic education or post-secondary) | -7.0% (17) |
| Cognitive-behavioral therapy in prison or community | -6.3% (25) |
| Correctional industries in prison | -5.9% (4) |
| Drug treatment in prison (therapeutic communities or outpatient) | -5.7% (20) |
| Adult drug courts | -8.0% (57) |
| Sex offender treatment in prison with aftercare | -7.0% (23) |
| Intensive supervision: surveillance-oriented programs | 0.0% (23) |

10.   To achieve the above recidivism rate reduction benefits, programs must use risk assessments, trained staff, performance measurement, and an intensity of services that does not now exist within CDCR.  The Expert Panel will deliver a blueprint for effective program implementation in June 2007.  If CDCR fully implements the Expert Panel and Rehabilitation Strike Team's recommendations, CDCR will be able to reduce parolee recidivism and associated prison returns by at least 10% per year.  Given that in 2005, 81,000 parolees returned to custody, that 10% would amount to 8,100 prison returns avoided in one year alone.  This anticipated reduction is realistic and will significantly reduce prison overcrowding and increase cost savings.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in Irvine, California, on May 24, 2007.

JOAN PETERSILIA, Ph.D.

_____

1.  Percent change in crime outcomes and the number of evidence-based studies on which the estimate is based (in parentheses).

DEF. SUPP. BRIEF POPULATION, DECL. PETERSILIA