1   PRISON LAW OFFICE
    DONALD SPECTER Bar No.: 83925
2   STEVEN FAMA Bar No.: 99641
    E. IVAN TRUJILLO Bar No.: 228790
3   General Delivery
    San Quentin, California  94964
4   Telephone: (415) 457-9144

5   ROSEN, BIEN & GALVAN, LLP
    MICHAEL W. BIEN Bar No.: 096891
6   JANE E. KAHN Bar No.: 112239
    AMY WHELAN Bar No.: 215675
7   LORI RIFKIN Bar No.: 244081
    SARAH M. LAUBACH Bar No.: 240526
8   315 Montgomery Street, 10th Floor
    San Francisco, California  94104
9   Telephone: (415) 433-6830

10  THE LEGAL AID SOCIETY –
    EMPLOYMENT LAW CENTER
11  CLAUDIA CENTER Bar No.: 158255
    LEWIS BOSSING Bar No.: 227402
12  600 Harrison Street, Suite 120
    San Francisco, CA  94107
13  Telephone:  (415) 864-8848

    BINGHAM, McCUTCHEN, LLP
    WARREN E. GEORGE Bar No.: 53588
    Three Embarcadero Center
    San Francisco, California  94111
    Telephone: (415) 393-2000

    HELLER, EHRMAN, WHITE &
    McAULIFFE
    RICHARD L. GOFF Bar No.: 36377
    701 Fifth Avenue
    Seattle, Washington  98104
    Telephone: (206) 447-0900

14

15  Attorneys for Plaintiffs

16  UNITED STATES DISTRICT COURT

17  EASTERN DISTRICT OF CALIFORNIA

18

19  RALPH COLEMAN,

20          Plaintiffs,

21  vs.

22  ARNOLD SCHWARZENEGGER, et al.,

23          Defendants

24  _____

No.:  Civ S 90-0520 LKK-JFM

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO CONVENE A THREE-JUDGE PANEL TO LIMIT THE PRISON POPULATION**

Hearing Date:    June 4, 2007
Time:            11:00 a.m.
Location:        Courtroom 4
Judge:           Hon. Lawrence K. Karlton

25

26

27

28

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| ALOS | Average Length of Stay. |
| APP | Acute Psychiatric Program. A 150-bed acute inpatient unit operated by the Department of Mental Health inside the California Medical Facility. |
| ASH | Atascadero State Hospital. A state mental hospital operated by the Department of Mental Health in Atascadero, California. |
| ASU | Administrative Segregation Unit. |
| BCP | Budget Change Proposal. |
| BPH | Board of Parole Hearings. |
| C-file | Central File. |
| CCC | Consolidated Care Center. |
| CCCMS or 3CMS | Correctional Clinical Case Management System. CCCMS is the name for the largest CDCR mental health program, which currently houses 26,000 inmates with mental illness who live in general population housing units alongside non-mentally ill inmates. CCCMS inmates are generally given medication management, and a meeting with their case manager every 90 days. A few also participate in groups. |
| CCCPOC | Committee To Continue a Centralized Parole Outpatient Clinic. |
| CCRC | Community Correctional Reentry Center. |
| CCWF | Central California Women's Facility, a prison located in Chowchilla, California. |
| CDCR | California Department of Corrections and Rehabilitation. |
| CIM | California Institution for Men. A prison in Chino, California. |
| CIW | California Institute for Women. CIW is a prison in Corona, California, with a planned MHCB. |
| CMF | California Medical Facility. A prison in Vacaville, California. |
| CMC | California Men's Colony. A prison in San Luis Obispo, California. |
| COMPAS | Correctional Offender Management Profiling for Alternative Sanctions |
| COR | California State Prison-Corcoran. A prison in Corcoran, California. |
| CRIPA | Civil Rights of Institutionalized Persons Act, 42 USC § 1997 *et seq.* |
| CSH | Coalinga State Hospital. A state mental hospital operated by the Department of Mental Health in Coalinga, California. |
| CSP | California State Prison. |

| | | |
|---|---|---|
| 1 | CTC | Correctional Treatment Centers. CTCs are licensed inpatient units inside prisons. Mental Health Crisis Beds operate inside Correctional Treatment Center Units. In addition to Mental Health Crisis Beds, most CTCs also include medical beds. |
| 3 | DAPO | Division of Adult Parole Operations. |
| 4 | DCHCS | Division of Correctional Health Care Services. This is the Department in CDCR headquarters that manages medical and mental health care. |
| 6 | DJR | Daily Jail Rate. |
| 7 | DMH | Department of Mental Health. |
| 8 | DOF | Department of Finance. |
| 9 | DTP | Day Treatment Program. |
| 10 | DSW | District Social Workers. |
| 11 | DVI | Deuel Vocational Institute. A prison in Tracy, California. |
| 12 | EID | Electronic In Home Detention. |
| 13 | EOP | Enhanced Outpatient Program. EOP programs are sheltered treatment programs that house severely mentally ill inmates. There are currently approximately 4,100 EOP inmates. Because these inmates are unable to function in a general population setting, they live in segregated housing units. They are given 10 hours each week of therapy or other "structured therapeutic activities." EOP inmates meet weekly with their case managers. |
| 17 | FRMSC | Female Residential Multi-Service Centers. |
| 18 | GACH | General Acute Care Hospital. These are licensed hospital units within a prison. They are licensed by the California Department of Health Services. CDCR has these units at CIM, CMC, CMF and Corcoran State Prison. |
| 20 | ICDTP | In-Custody Drug Treatment Program. |
| 21 | ICF | Intermediate Care Facility. ICF programs are "intermediate" inpatient care programs. These programs are operated by the state Department of Mental Health. There are currently ICF programs at Salinas Valley State Prison, the California Medical Facility, Atascadero State Hospital, and Coalinga State Hospital. Inmates in these programs have frequent clinical contact, 24-hour nursing care and 20 or more hours of therapy and treatment each week. Inmates generally spend 6-12 months in these programs. |
| 26 | IDTT | Interdisciplinary Treatment Team. A treatment team composed of, at a minimum the primary clinician, psychiatrist, correctional counselor and the inmate patient, as well as licensed psychiatric technicians and custody officers. This team makes admissions decisions, formulates and approves things. |

| | |
|---|---|
| KVSP | Kern Valley State Prison.  A new prison in Delano, California.  KVSP has an MHCB unit. |
| LAC | California State Prison, Los Angeles County.  This is a prison in Lancaster, California. |
| LAO | Legislative Analyst's Office. |
| LOU | Locked Observation Unit.  An unlicensed Outpatient Housing Unit that is currently operating as a de facto MHCB at California Men's Colony. |
| MCSP | Mule Creek State Prison.  A prison in Ione, California. |
| MHSDS | Mental Health Services Delivery System.  The name given by Defendants to their entire mental health system. |
| MHCB | Mental Health Crisis Beds.  MHCB units are licensed inpatient units inside many California prisons where mentally ill inmates who are suicidal or experiencing another kind of mental health crisis can be admitted and treated for up to 10 days.  MHCBs are generally located inside a Correctional Treatment Center. |
| MSH | Metropolitan State Hospital.  A state mental health hospital operated by the Department of Mental Health in Norwalk, California. |
| NKSP | North Kern State Prison, a prison in Delano, California. |
| NSH | Napa State Hospital.  A state mental health hospital operated by the Department of Mental Health in Napa, California. |
| OHU | Outpatient Housing Units.  Unlicensed infirmaries inside many CDCR institutions that provide treatment for medical and mental health conditions. |
| OST | Out of State Transfer Program. |
| PAII | Parole Agent II. |
| PBSP | Pelican Bay State Prison.  A prison in Crescent City, California. |
| POC | Parole Outpatient Clinic. |
| PPP | Parole Planning and Placement.  This is a pre-release planning program run by the Division of Adult Parole Operations. |
| PSA | Parole Services Associate. |
| PSAP | Parolee Substance Abuse Program. |
| PSC | Parole Service Centers. |
| PSH | Patton State Hospital.  A state mental health hospital operated by the Department of Mental Health in San Bernardino, California.  This is the only state hospital that houses female 2684 patients. |

| | | |
|---|---|---|
| 1 | PSU | Psychiatric Services Unit. These are psychiatric treatment programs providing Enhanced Outpatient Program level of care to inmates with a Security Housing Unit term. |
| 3 | PV-RTC | Parole Violator Returned To Custody. |
| 4 | PVWNT | Parole Violator With New Term. |
| 5 | RC | Reception Center. This refers to designated prisons or housing units within prisons where inmates are classified and processed when they first arrive in the CDCR. |
| 7 | RJD | R.J. Donovan Correctional Facility, a prison in San Diego, California. |
| 8 | RMSC | Residential Multi-Service Centers. |
| 9 | RTC | Return To Custody. |
| 10 | SAC | California State Prison, Sacramento. A prison located in Sacramento, California. |
| 11 | SASCA | Substance Abuse Services Coordination Agencies. |
| 12 | SATCU | Substance Abuse Treatment Control Units. |
| 13 | SHU | Security Housing Unit. This is a segregated high-security housing unit for inmates who have committed serious infractions while in prison or who have been "validated" by the CDCR as belonging to a gang. There are male SHU units at Pelican Bay State Prison (from which all inmates with serious psychiatric conditions are excluded), Corcoran State Prison, and California Correctional Institution. There is a SHU for women at Valley State Prison for Women. |
| 17 | SQ | San Quentin State Prison, a prison in San Quentin, California. |
| 18 | SSA | Social Security Administration. |
| 19 | SSI | Supplemental Security Income. |
| 20 | SVP | Sexually Violent Predators. |
| 21 | SVPP | Salinas Valley Psychiatric Program. The free-standing DMH-run unit on the grounds of Salinas Valley State Prison that has ICF beds. |
| 23 | SVSP | Salinas Valley State Prison. A prison in Soledad, California. |
| 24 | TCMP-MI | Transitional Case Management Program for Mentally Ill. |
| 25 | YACA | Youth and Adult Correctional Agency (predecessor of the California Department of Corrections and Rehabilitation |

-iv-

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO CONVENE A THREE-JUDGE PANEL TO LIMIT THE PRISON
POPULATION, NO.: CIV S 90-0520 LKK-JFM

# TABLE OF CONTENTS

TABLE OF ABBREVIATIONS.................................................................................... i-iv

TABLE OF CONTENTS ............................................................................................. v-vi

TABLE OF AUTHORITIES ........................................................................................ vii

INTRODUCTION ............................................................................................................ 1

    The Plata Receiver's Report on Overcrowding ...................................................... 3

    AB 900 Worsens The Crisis ...................................................................................... 4

    A Prisoner Release Order Will Be An Effective Remedy To Address The
        Ongoing Constitutional Violations ..................................................................... 6

STATEMENT OF FACTS................................................................................................. 7

    I.    The Overcrowding Crisis Continues To Worsen Conditions For The
           *Coleman* Class ................................................................................................. 7

        A.    Overcrowding Has Worsened Since December 2006 By Every
               Measure ................................................................................................. 7

        B.    Overcrowding Prevents The Delivery Of Constitutionally Adequate
               Mental Health Care In The CDCR And Results In Grave Harm To
               The *Coleman* Class ............................................................................ 8

             1.    Bed shortages result in inappropriate placements and lack of
                    access to care................................................................................. 9

             2.    Staffing shortages make provision of Constitutional mental
                    health care impossible................................................................. 11

             3.    The suicide rate continues to rise................................................... 13

    II.    The "Remedial Measures" Promised By Defendants Will Not And Cannot
           Address The Effects Of Overcrowding On The *Coleman* Class ........................ 14

        A.    Even Assuming Defendants' Plans All Are Successful,
               Overcrowding Will Continue At Levels That Prevent Delivery Of
               Constitutional Levels Of Mental Health Services ..................................... 15

        B.    Defendants' Construction Plans And Prison And Parole "Reforms"........ 16

             1.    Assembly Bill 900........................................................................... 16

                   a.    New State Prison Beds........................................................... 17

                   b.    Re-entry Beds ....................................................................... 19

                   c.    Out of State Transfers ......................................................... 20

              2.    Parole "Reforms" ............................................................................ 20

-v-

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO CONVENE A THREE-JUDGE PANEL TO LIMIT THE PRISON
POPULATION, NO.: CIV S 90-0520 LKK-JFM

C.    Overcrowding Will Continue To Prevent Delivery Of Mental Health Services Because AB 900 Will Expand The Prison Population And Thus Worsen Understaffing ............................................... 22

III.    Defendants Continue To Engage In Practices That Needlessly Increase The Number Of Mentally Ill Individuals In Prison ................................................ 23

A.    Failure To Provide Appropriate Mental Health Treatment Services To Parolees ..................................................................................................... 23

B.    Returns To Custody Of Mentally Ill Parolees For Reasons Primarily Relating To Unmet Mental Health Needs ................................. 23

C.    Failure To Implement Remedial Sanctions Programs ............................... 24

D.    Failure To Implement Pre-Release Planning ............................................. 25

THIS COURT SHOULD CONVENE A THREE-JUDGE PANEL FOR ENTRY OF APPROPRIATE PRISONER RELEASE ORDERS ...................................................................... 26

I.    The Prison Litigation Reform Act's Requirements For Convening A Three-Judge Panel To Consider Limits On The Prison Population Are Satisfied And This Court Should Refer This Matter To Such A Panel ............... 26

II.    A Prisoner Release Order Will Be Effective In Remedying Ongoing Violations In The Delivery Of Mental Health Care To Class Members ............. 27

A.    A Prison Release Order Will Be Effective Because It Will Reduce The Current Staff-Inmate Ratio And Enable The *Coleman* Remedial Plan To Move Forward ................................................................... 27

B.    Given The Present Situation, A Prisoner Release Orders Is The Only Effective Means Of Addressing The Ongoing Violation Of Class Members' Constitution Right To Adequate Mental Health Care, And Of Eventually Ending The *Coleman* Case ............................... 28

1.    Defendants refuse to take measures to alleviate the effects of overcrowding on implementation of the *Coleman* remedy ........... 28

2.    A prisoner release order will effect the relief from overcrowding necessary for the *Coleman* remedy ....................... 30

III.    Prisoner Release Orders That Require Defendants To Meet General Population Limits As Well As Specific Reductions Of The Population Of The Coleman Class Are Required To Remedy The Violations ........................... 32

A.    A General Population Limit Is Needed To Effect Relief For The *Coleman* Class .......................................................................................... 32

B.    In Addition To A General Population Cap, A Prisoner Release Order Should Direct Defendants To Specifically Reduce The Population Of The *Coleman* Class .......................................................... 35

CONCLUSION ............................................................................................................... 36

# TABLE OF AUTHORITIES

<u>CASES</u>

*Essex County Jail Inmates v. Amato*
726 F.Supp. 539 (D.N.J. 1989) ................................................................. 30

*Plata v. Schwarzenegger,*
No. Civ. C01-1351 TEM (N.D. Cal.)...................................................*passim*

*Roberts v. Tennessee Dept. of Correction*
887 F.2d 1281 (6th Cir. 1989) ............................................................. 31

*Valdivia v. Schwarzenegger*
No. Civ S-94-0671 LKK/GGM (E.D. Cal.) ............................................. 24, 25

*Williams v. McKeithen*
963 F.2d 70 (5th Cir. 1992).................................................................. 31

<u>STATUTES</u>

Assembly Bill 900 ..........................................................................*passim*

# INTRODUCTION

In response to this Court's May 4, 2007 Order, plaintiffs have provided additional evidence and argument in support of the motion to convene a three-judge panel to limit the prison population. The Court also requested a response to the question: "whether a prisoner release order will be effective to remedy ongoing Constitutional violations in the delivery of mental health care to class members, and, if so, what type of prisoner release order would be required to remedy those violations." 5/4/07 Order.

A prisoner release order will be effective in remedying the ongoing Constitutional violations plaguing the *Coleman* class because the key to delivery of appropriate mental health care is recruiting and retaining sufficient clinical staff, and planning and building sufficient hospital beds, treatment spaces and mental health housing units to appropriately house and treat the population. The evidence before this Court establishes that California can begin to meet the appropriate ratio of staff and mental health beds to address the needs of the *Coleman* class only through an order limiting the overall prison population. All other measures, including numerous orders of this Court, have failed due to the overwhelming pressure of population growth and defendants' failure to adequately address the crisis.

The type of prisoner release orders that are required to accomplish this necessary goal, assuming the three-judge panel makes the necessary findings, would be the establishment of an overall prison population limit, as well as specific limits on the population of *Coleman* class members, based on the State's ability to provide appropriate staffing and housing to address their needs. Given the admitted current magnitude of the unconstitutional conditions, and the ongoing pain and suffering of the class, the three-judge panel should also order the State to develop a short-term plan to promptly reduce the prison population by benchmark dates.

Governor Schwarzenegger stated as follows on January 9, 2007:

> "Our prisons are in crisis. We have inherited a problem that has been put off year after year after year. Last year I called a special session to address the crisis. That session was not successful, so I declared a state of emergency. It is still an emergency. Our prison system is a powder keg. It poses a danger to the prisoners, a danger to the officers… We have thousands of prisoners housed in gymnasiums, TV rooms, dining rooms, hallways, anywhere there is space. You

all know 172,000 prisoners in facilities designed to hold about 100,000.  That is a danger and that is a disgrace."

Governor Schwarzenegger, 1/9/07 State of the State Address, Attached hereto as Exhibit F to Declaration of Lori Rifkin in Support of Plaintiffs' Supplemental Motion to Convene a Three-Judge Panel to Limit the Prison Population ("Rifkin Decl.") ¶ 13.  Five months later, the number of inmates is now up to almost 175,000, but defendants have done nothing that addresses the danger.[1]  California's prisons are still powder kegs, are still a disgrace and will remain so for many more years if the State is left to its own devices.

This Court told defendants at the December 11, 2006 hearing:  "As reluctant as I am, I will do it… You tell your clients June 4th may be the end of the line, may really be the end of the line."  12/11/06 Hearing Transcript at 7:22-9:22.  More than 32,000 Coleman class members suffer today in California prisons.  *See* Draft Seventeenth Monitoring Report of the Special Master on the Defendants' Compliance With Provisionally Approved Plans, Policies, and Protocols, Part C at 182 ("17C")[2][3]  Yet, in the face of this Court's warning that the State must act now to address overcrowding in order to remedy Constitutional violations of delivery of mental health care, the State has once again failed.  Defendants have not enacted a single

---

[1] *See* Rifkin Decl. ¶ 16, Ex. I at 12. (Defs.' Rpt. in Response to the Court's 2/15/07 Order, filed 5/16/07 in *Plata v. Schwarzenegger* (Defs.' Rpt.)) (stating current CDCR prison population).

[2] Part A of the Special Master's Report will be referred to throughout as ("17A"), and Part B as ("17B").  17 A was filed with this Court as Docket 2140, and 17 B was filed with this Court as Docket 2180.

[3] *See* Declaration of Jane Kahn In Support of Plaintiffs' Supplemental Motion to Convene a Three-Judge Panel to Limit The Prison Population ("Kahn Supp. Decl.") at. ¶ 2 for discussion concerning use of the Draft 17C Report.

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO CONVENE A THREE-JUDGE PANEL TO LIMIT THE PRISON POPULATION, NO.: CIV S 90-0520 LKK-JFM

1  prison reform that will meaningfully impact the delivery of mental health treatment to the tens

2  of thousands of individuals with serious mental illness languishing in California's prisons. [4]

3                    **The Plata Receiver's Report on Overcrowding**

4         Last week, the *Plata* Receiver filed his response to an order from Judge Henderson to

5  report on the manner and extent to which overcrowding is interfering with his ability to remedy

6  the Constitutional violations of inmates' right to medical care.  *See* Rifkin Decl. ¶ 14, Ex. G

7  (2/15/07 Henderson Order); *Id.* ¶ 15, Ex. H (Receiver's Report Re Overcrowding ("Receiver's

8  Overcrowding Rpt."), filed 5/15/07).  The Receiver outlines in horrifying detail the manner in

9  which defendants have knowingly and intentionally designed a prison system to warehouse

10 human beings, planning to cram them into prisons at almost double the design occupancy rate,

11 while deliberately failing to provide adequate clinical space to allow for basic minimums of

12 medical and mental health care mandated by the Constitution.  *See* Rifkin Decl. ¶ 15, Ex. H

13 (Receiver's Overcrowding Rpt.) at 025 ("This CDCR policy and practice, for more than twenty

14 years, to limit health care space…to only the base staffing level of the institution, ignoring pre-

15 existing plans to double-cell the prison up to 200 percent capacity, adversely impacts the daily

16 medical, mental health, and dental operations…"; *id.* at 024. "[T]he newest CDCR prisons

17 were designed with clinic space which is *only one-half that necessary for the real-life capacity*

18 *of the prisons*" (emphasis in original)).  This is true even for the prison defendants opened only

19 two years ago, Kern Valley State Prison, *ten years* after this Court issued its decision in the

20 *Coleman* case.  *See Id.* at 027 ("In essence, KVSP was planned, designed, and subsequently

21

22 _____

23 [4] The State ignored, once again, the advise of its experts.  *See, e.g.,* Rifkin Decl. ¶ 12, Ex. C
   (1/07 Little Hoover Commission Report) at 49 ("Policy-makers must manage the correctional
24 population…the State should not settle for simply building more cells.  It has done that for
   nearly two decades and the State is still in crisis."); *id.* ¶ 30, Ex. BB (2/16/06 CDCR Press
25 Release) (quoting Jeanne Woodford, Undersecretary of CDCR, "It is not enough to just build
   capacity, but we must be smart about how we plan."); Declaration of Ernest Galvan in Support
26 of Supplemental Brief in Support of Motion for Three-Judge Panel to Limit Prison Population
   ("Galvan Decl.") ¶ 4, Ex. D (Corrections Independent Review Panel Report) at 121 ("The size
27 of the prison population has resulted in part from tough-on-crime sentencing policies of recent
   decades, but the state has also been widely criticized for fueling the numbers by not doing a
28 better job of preparing inmates to return to society.").

1  constructed knowing full well that the medical, mental health, and dental space and staffing
2  would be entirely insufficient for the prison's actual population.")

3        Indeed, the Receiver concluded that "Crowding related policies that do not provide
4  adequate clinical and program space are now an accepted practice of CDCR prison planning,
5  as is California's practice of offering inadequate salaries and failing to provide adequate hiring
6  programs which have created crisis levels of shortages of clinical personnel and correctional
7  officers."  Rifkin Decl. ¶ 15, Ex. H (Receiver's Overcrowding Rpt.) at 013.   The Receiver also
8  observed that CDCR's Facility Master Plans fail to address overcrowding driven problems
9  with the delivery of health services, "focus[ing] on corrections, as if medical, mental health,
10 and dental care have no place in prison design, prison construction, or prison management."
11 *Id.* at 016.

12                    **AB 900 Worsens The Crisis**

13        Defendants ask this Court to rely on yet another prison-building plan[5] for 40,000 state
14 prison beds[6], passed at the thirteenth hour, as a solution to alleviate the overcrowding and
15 Constitutional violations that defendants have deliberately perpetuated for more than twenty
16 years.  Yet, according to the Legislature's own independent consultants, the bill fails to include
17 any timelines, concrete details about construction, more importantly, or plans for staffing,
18 clinical, or programming space.  *See* Rifkin Decl. ¶ 17, Ex. L (Senate Budget and Fiscal
19 Review Committee Subcommittee No. 4, 4/12/07 Agenda ("4/12/07 Agenda")) at 7-12
20 (Agenda containing extensive analysis by Legislative Analyst's Office on proposed prison
21 legislation and CDCR activity).  *Moreover, even if every single one of the beds defendants*
22 *propose were constructed, the system would still be at an unacceptable level of overcrowding,*
23 *exceeding what experts have determined to the be the "maximum safe and reasonable*
24 *capacity."*  Galvan Decl. ¶ 4, Ex. D at 123-124 (Corrections Independent Review Panel Rpt.);
25 Rifkin Decl. ¶ 16, Ex. J at ¶ 22. (Kernan Decl.).

26 _____

27 [5] On April 20, 2007, the Legislature passed Assembly Bill 900.  A summary of the Bill is
found in the Receiver's Overcrowding Rpt. at 31-36.
28 [6] The Bill approves building 53,000 beds in total.  13,000 of these are county jail beds.

1    In short, the Governor's Plan will make the situation worse as it adds beds and buildings

2  but does nothing to address the critical shortages of clinical staff, hospital beds and treatment

3  space necessary to remedy the Constitutional violations. [7]  By expanding capacity without

4  limiting population AB 900 will further delay the remedy – it is part of the problem, not the

5  solution.

6    Since the enactment of AB 900, defendants have also filed promises of new plans for

7  "meaningful" corrections and parole reform in *Plata* and *Armstrong*.  New distinguished

8  panels of nationally prominent correctional experts have been formed and "strike" teams have

9  been assembled.  But a careful review of the predictions of possible future reforms (most of

10  which have not even been proposed, let alone adopted, funded or implemented), only

11  underscore the importance that this Court act now to refer this issue to the three-judge panel.

12  The critical point is this:  even if every promised reform were funded, enacted and

13  implemented, CDCR's population would still substantially exceed any measure of

14  unconstitutional overcrowding for years to come.   It is undisputed that today's prison

15  population of approximately 175,000 is excessive and must be reduced in order to permit the

16  remedial process to proceed in *Plata* and *Coleman*.  Yet defendants' most optimistic

17  predictions will result in nothing more than a stabilization of CDCR's projected population

18  growth and no meaningful reduction from today's unconstitutional levels.  *See* Rifkin Decl. ¶

19  16, Ex. J at ¶¶ 5-22 (Kernan Decl.).

20    This Court found in 1995 that California's failure to provide a minimal level of mental

21  health care to prisoners with mental illness constituted cruel and unusual punishment in

22  violation of the Eighth Amendment.  More then a decade later, despite numerous Court orders,

23  the Constitutional violations persist.  Overcrowding has overwhelmed the remedial process,

24  setting back years of slow but steady progress.  This Court recently stated, "[P]risons are

25

26  _____

27  [7] *See also* Rifkin Decl. ¶ 15, Ex. H at 046 (Receiver's Overcrowding Rpt.).  ("It is easy to talk of constructing prisons and jails.  It is more difficult and expensive to staff correctional institutions with the appropriate clinical personnel and correctional officers.  AB 900, however,

28  is silent about how the jails and prison beds cited in the bill will be staffed and managed.")

prisons because people have broken the law and they represent a danger to society and the prison's primary function is acting as a prison. That doesn't mean that you get away with not providing them mental health services." Transcript at 4:7-14. 4/23/07 Hearing. The State cannot provide minimally adequate mental health services—to the point where every day tens of thousands of class members are being held in conditions indistinguishable from those this Court found to violate the Eighth Amendment's prohibition against cruel and unusual punishment more than a decade ago. Plaintiffs come to this Court in a situation even more dire than last November. Conditions have substantially worsened in the past six months and no plans have been enacted by defendants that will address the crisis of overcrowding in 2007 or 2008, or even 2009 or 2010.

## A Prisoner Release Order Will Be An Effective Remedy To Address The Ongoing Constitutional Violations

A prisoner release order will be an effective mechanism for remedying ongoing violations because it will reduce the population and allow appropriate ratios of clinical staff to *Coleman* class members to be achieved. The policies and procedures comprising the backbone of a Constitutional mental health services delivery system are in place. A prisoner release order will finally compel the State to enact meaningful short-term and long-term measures to reduce its prison population and clear the way for this long-promised mental health care system to be fully implemented. Without population limits, defendants cannot hope to recruit and retain sufficient staff to provide the minimum necessary treatment to the *Coleman* class. The State's own experts have identified numerous reforms that would yield immediate relief for the *Coleman* class, improve public safety and reduce the ever-increasing burden of the prison system budget on California's tax payers. The three-judge court should set a general population limit and timeframes for meeting that limit, and also direct defendants to implement reforms specifically aimed at reduction of the population of the *Coleman* class.

These are win-win solutions: California can improve public safety at the same time it remedies the Constitutional violations in its prison system by substantially reducing its

population to appropriate and safe levels and respecting the basic human rights and dignity of all of its citizens.

## STATEMENT OF FACTS

**I.    The Overcrowding Crisis Continues To Worsen Conditions For The *Coleman* Class**

    **A.    Overcrowding Has Worsened Since December 2006 By Every Measure**

Overcrowding continues to overwhelm the CDCR.  The population continues to rise[8], the staffing vacancy rate continues to soar[9], and available space continues to shrink.[10]  CDCR's executive and managerial staff continue to turn over at significant rates.  Rifkin Decl. ¶ 15, Ex. H at 018 (Receiver's  Overcrowding Report); Assembly Bill 900, Section 24).  CDCR institutions have severe infrastructure problems, with water shortages and sewage violations. *See, e.g.,* Rifkin Decl. ¶ 19, Ex. P (Cease & Desist Order re Mule Creek Wastewater Treatment Plant); Rifkin Decl. ¶ 18, Ex. O at 122-23 (CDCR has received notices from regional water board at 6 prisons).  18,500 inmates are housed in "bad" beds, which are bunks in gymnasiums, dayrooms, classrooms and hallways.  *See* Rifkin Decl. ¶ 19, Ex. P at 18 (Governor's 2007 CA Five-Year Infrastructure Plan).  As detailed in plaintiffs' opening brief, there is essentially an extreme system-wide lockdown that has been building for years. Pls.' Memo at 9:28; *see also* Docket 2062, CCPOA Amicus Brief filed 12/4/06 at 2:21-22 ("Double and triple bunking is now commonplace, canceling inmate programs is routine, and lockdowns and limitations on exercise are the norm.")

---

[8] Defs.' Report filed in *Plata* on May 15, 2007 states that there the total prison population is approximately 174,989 inmates.  Rifkin Decl. ¶ 16, Ex. I at 12.  The population was at 173,463 inmates as of November 1, 2006.  Docket 2041, Pls.' Memorandum in Support of Motion for Three-Judge Panel to Limit Prison Population ("Pls. Memo") at 5.

[9] "As of January 31, 2007, "budgeted" correctional officer vacancies has risen to 1,915…CDCR officials estimate the actual officer shortage to be somewhere between 2,400 and 2,700." Rifkin Decl. ¶ 15, Ex. H at 017 (Receiver's Overcrowding Rpt.).  AB 900, Section 24 finds that are over 2,400 correctional staff vacancies.

[10] *See, e.g.,* AB 900, Section 29 ("In order to provide prison capacity beyond 2007, it is necessary that this act take effect immediately.")

Indeed, the LAO notes that "the overcrowded conditions are projected to worsen over the next several years as the population continues to grow."  Rifkin Decl. ¶ 17, Ex. L at 2.  The Governor's 2007 Five-Year Infrastructure Plan states:

> [M]ale inmate housing capacity will be exhausted sometime in 2007.  All 33 CDCR prisons are now at or above maximum capacity.  Twenty-nine of the prisons are so overcrowded that the CDCR is required to house approximately 18,500 inmates in prison gymnasiums, dayrooms, and program space.  Approximately 1,700 inmates are sleeping in triple bunks.  The shortage of maximum-security beds has led to increased confrontation between inmates…as well as exacerbating the risk of injury to staff.

Rifkin Decl. ¶ 19, Ex. P at 118.

Defendants themselves candidly admit that the overcrowding of CDCR facilities has caused infectious disease outbreaks, riots, and disturbances system-wide.  Rifkin Decl. ¶ 16, Ex. J at ¶ 3 (Kernan Decl.).  The Receiver confirms that this is the case.  Rifkin Decl. ¶ 15, Ex. H at 035 (Receiver's Overcrowding Report).  Yet defendants have failed to take any actions that will alleviate the avoidable and unnecessary pain, suffering and deaths these unconstitutional conditions will continue to cause this year and for many more years.

**B.  Overcrowding Prevents The Delivery Of Constitutionally Adequate Mental Health Care In The CDCR And Results In Grave Harm To The *Coleman* Class**

Recent reports issued by both the *Coleman* Special Master and the *Plata* Receiver conclusively establish the fact that the overcrowding crisis in CDCR prevents the delivery of Constitutionally adequate mental health treatment to inmates.  *See* 17A, 17B, 17C; Rifkin Decl. ¶ 15, Ex. H (Receiver's Overcrowding Rpt.).  The *Coleman* class is gravely affected by overcrowding, both in terms of the generally deleterious effects of overcrowded conditions on persons with serious mental illness, and in terms of the specific inability of defendants to deliver mental health services given the population overflow, clinical and custody staff shortages, and lack of treatment space that when added together produce the overcrowding crisis.

Plaintiffs have established, and defendants do not dispute, the ongoing failure of defendants to provide appropriate mental health care as mandated by the Constitution and the Program Guide.  *See* Pls' Memo.  These violations include: the shortage of mental health beds

at all levels throughout the system; lack of timely access to urgent care for inmates who are decompensating; lengthy and stagnating waiting lists of inmates requiring higher levels of care; medication delays and errors; and horrific seclusion and isolation for thousands of prisoners housed in administrative segregation and other locked down units, leading to increased illness and high rates of suicide.

The recently filed Seventeenth Monitoring Report of the Special Master reports a multitude of deficiencies in mental health treatment stemming from overcrowding, and describes the effects of overcrowded conditions on the *Coleman* class. These include, for example: "a steady rise in self injurious behavior, both real and feigned, among seriously mentally disordered inmates, who felt substantially more vulnerable and threatened in overcrowded conditions that, from their perspective, were spiraling out of control" (17A at 107); a "crisis in the availability of mental health crisis beds, attributable in large part…to the defendants' increasing population crunch" (17A at 124); an inability to "maintain regular and timely case management contacts at least quarterly with 3CMS inmates" (17B at 101); and "the perception...that pressure on the higher levels of care has become so intense, clinicians in those programs must increasingly accelerate the return to lower levels of care people who are not stable enough to cope successfully" (17B at 102-03).

In fact, the Special Master concluded that, at this time, in "the deepest winter of CDCR's discontent," defendants are so incapable of complying with already-existing Court orders, "this does not seem the appropriate moment to pile more orders on the barely discernible plate of the defendants." 17A at 137, 132.

### 1. Bed shortages result in inappropriate placements and lack of access to care

Indeed, in the six months this Court provided defendants as a last chance, the provision of mental health treatment has deteriorated even further, fulfilling the warning of the Special Master of "CDCR's seeming slouch toward catastrophe." 17A at 137. As this Court found in its May 23, 2007 Order, "defendants do not have enough acute psychiatric beds to meet the needs of class members, and that severe staffing shortages at Atascadero State Hospital (ASH)

are rendering unavailable at least 151 of the 231 intermediate care beds that are supposed to be available to CDCR inmates in need of intermediate care at ASH." 5/23/07 Order at 2:18-3:3. The Court also found that "[t]he consequences of insufficient numbers of intermediate care beds include, but are not limited to, the use of MHCBs and/or acute psychiatric beds for inpatient stays far in excess of that for which those beds were intended." *Id*. at 3:3-6. The bed shortage resounds throughout the CDCR, and the Special Master recently noted the "increasingly desperate need for acute and intermediate inpatient and mental health crisis beds in CDCR." Docket 2186 at 9-10.

During the Seventeenth Monitoring Round, the Special Master found a pattern of inmates waiting in MHCBs for prolonged periods of time because of insufficient beds at higher levels of care. Kahn Decl. ¶ 4-12. He provided examples of two inmates at CIM who were in MHCBs for more than six weeks after being referred for transfers to inpatient beds. *Id*. at ¶ 10. Inmates throughout the system face similar waits, not only in MHCB beds, but also in Outpatient Housing Units (OHUs), which are unlicensed infirmaries developed as a coping mechanism for the shortage of MHCB beds. *Id.* at ¶ 4-9. The Special Master described the grave consequences of inappropriate placements and lack of access to mental health beds:

> Prisons with poor access to DMH beds…relied heavily on holding cells…Along with three bad outcomes at DVI, documentation compiled at NKSP highlighted the pitfalls associated with the use of holding cells. NKSP's records show that of 75 inmates placed in holding cells… 33 percent were in a holding cell longer than 2 days and 62 percent never made it into an MHCB. Some of these inmates shuttled between holding cells and their housing units on multiple occasions without ever having been fully evaluated by a clinician or their case being reviewed by an IDTT. At DVI, an inmate self-inflicted lacerations while in a holding cell located in administrative segregation, a second inmate committed suicide by hanging in a holding cell located in the infirmary, and an EOP inmate whose death was attributed to cardiac arrest died while on a 15-minute watch protocol but whose body was not discovered for hours.

17C at 178-79.

The use of these dangerous holding cells because of the shortage of appropriate beds is widespread throughout CDCR institutions. The Special Master's 17th Round Reports are full of examples of decompensating inmates placed in such barbaric locations. For example, an EOP patient housed in an administrative segregation unit as Salinas Valley State Prison was

interviewed by the Special Master's team in a mesh holding cage where he was being held that was described as no larger than 30 inches square. Kahn Decl. at ¶ 9. He had been moved back and forth between holding cells, an MHCB unit and administrative segregation, despite a serious suicide attempt, and *Coleman* experts found that his mental health treatment was inadequate. *Id*.[11]

### 2. Staffing shortages make provision of Constitutional mental health care impossible

Recruitment of clinical staff to fill the stunning vacancies in the CDCR system has been a dismal failure. Not only have defendants miserably mismanaged the recruitment process, but even if they had performed well, it is doubtful that they could succeed in filling all of their vacancies. Staffing is the linchpin of mental health care. As the Special Master recently stated:

> The principal problem identified in this report is the lack of adequate mental health staff in the CDCR institutions...The clinical staffing shortage is not only serious; it is worsening. Since the end of the 17th monitoring period, the rate of vacancies has grown from critical to catastrophic proportions. As of early 2007, vacancies among allocated positions for psychiatrists, case managers (psychologists and psychiatric social workers) and psych techs hovered at the rate of fifty percent.

17C at 181-82; *see also* Kahn Decl. ¶ 19 (clinical vacancy rates at fourteen CDCR prisons above fifty percent). The staffing shortage has forced a "planned reduction in services" whereby institutions attempt to triage care to provide mental health treatment to those inmates with the greatest need. Kahn Decl. ¶ 17. This results in a severe drop in services not only to EOP inmates who are not in crisis or acute care beds, but also to CCCMS inmates, who make up the majority of the *Coleman* class. They are subject to delays in treatment, insufficient

---

[11] Another consequence of the bed shortage is frequent movement of inmates between institutions: "Overcrowding creates increased prisoner movement as correctional officials struggle to manage crowding by transferring prisoners from institution to institution in a constant search for "open" beds. This form of crowding driven movement adversely impacts on health care delivery in at least six important ways." These "prisoner moves" exceeded 170,000 in the first quarter of 2007 alone. Rifkin Decl. ¶ 15, Ex. H at 15-16 (Receiver's Overcrowding Rpt.).

1  monitoring, missed or erroneous medications and are thus, more likely to decompensate and

2  require higher levels of care.  *Id.*

3      Without staffing, all the treatment space and beds in the world cannot satisfy the

4  Constitutional demand for adequate mental health treatment.  The Special Master concluded

5  that "While the CDCR's inability to fill its clinical positions has languished, its mental health

6  caseload population has expanded.  By early 2007, it reached 32,385 inmates, which exceeds

7  program capacity of 28,694 by 3,691 or 12.8 percent.  In the context of the functional clinical

8  vacancy rate of 36.5 percent, this means that the CDCR may realistically provide full mental

9  health services to only about 56 percent of its mental health caseload population."  17C at 182-

10  83.  Even the headquarters staffing, which is critical to the ability of CDCR to recruit new staff

11  and manage delivery of mental health treatment, has a vacancy rate of "a devastating 70

12  percent." *Id.* at 183.  The Special Master continued:  "As reiterated in virtually every *Coleman*

13  compliance report filed over the past decade, staffing is the absolutely essential and

14  indispensable ingredient for defendants' meeting the Program Guide requirements.  It is true

15  today more than ever.  The extraordinary present need for recruitment and hiring requires an

16  extraordinary response….Vacant positions do nothing to improve the delivery of mental health

17  services in the institution of the CDCR."  *Id.* at 185-86.

18      In fact, the severe staffing shortage reverberates through every component of the mental

19  health delivery system.  The Special Master found, for example, that at CSP-Lancaster, "[t]he

20  overall quality of EOP treatment was undermined by turnover among case managers and the

21  scarcity of psychiatrists… Decisions to retain or discharge inmates seemed to be contingent on

22  extra-clinical considerations."  17A at 35-36.  On December 26, 2006, an inmate at CSP-

23  Lancaster committed suicide after he was improperly removed from the EOP program.  Kahn

24  Decl. ¶¶ 25-26.  The clinical notes stated that he was medication non-compliant, had signs of

25  active psychosis and had attempted suicide. After being removed from the EOP program, this

26  inmate was being retained in the EOP housing unit in a secluded plexi-glass cell without EOP

27  care.  He had been in the cell for more than five weeks awaiting transfer to a mainline bed.

28  The CDCR Suicide Report notes that the case manager's decision to remove the inmate from

1    the EOP program for reasons unrelated to clinical need and that the inmate was in

2    inappropriate housing due to bed shortages.  *Id.*

3         The significant custody officer shortages also have a dramatic impact on CDCR's

4    ability to provide Constitutionally adequate mental health care and programming to the

5    *Coleman* class.  Kahn Decl. ¶¶ 20-21.  Defendants recently stated that "while correctional

6    officers now must respond to the increased security concerns and maintain watch over an

7    increasingly dangerous prison population, they are not able to assist the Receiver's efforts in

8    addressing the inmates' medical concerns by escorting inmates to medical appointments, for

9    instance."  Rifkin Decl. ¶ 16, Ex. J at ¶ 3 (Kernan Decl.).  Custody officers are integral to the

10   provision of mental health treatment as well.  For example, custody escorts move *Coleman*

11   class members housed in administrative segregation housing units from their cells to the

12   treatment areas.  Kahn Decl. ¶ 20.  When housing units do not have adequate custody staffing,

13   clinical contacts are likely to occur cell-front rather than in a confidential setting.  *Id.*  Access

14   to mental health beds for suicidal inmates can also be delayed because of custody staffing

15   shortages.  *Id.*  During a recent monitoring tour at CMF that plaintiffs' counsel attended,

16   clinical staff reported that they often waited hours with patients they had referred to a crisis bed

17   for a custody escort to the MHCB.  *Id.*  One clinician described her patient sitting cuffed for

18   several hours on a dayroom floor while he waited to be transported to the crisis bed.  *Id.*

19              **3.   The suicide rate continues to rise**

20        The suicide rate in the CDCR continues to escalate and is an indication of the

21   depression, hopelessness and suffering of inmates throughout the CDCR who are kept in

22   dangerous housing conditions and receive inadequate mental health care.  Kahn Decl. ¶ 22.

23   Between January 1 and April 30, 2007, defendants have reported 16 suicides and two

24   additional deaths of EOP patients that are currently under investigation as possible suicides.

25   This is a larger number of suicides than was reported during of the same period in 2006, when

26   14 suicides were reported by the CDCR.  14 of the 18 possible suicides in 2007 were *Coleman*

27   class members.  The 2007 suicide rate for the four month period from January through April is

28

27.8 per 100,000 inmates, which is approximately double the national state prison suicide rate and an increase over the record high rates of 2005 and 2006.  *Id.*

Meanwhile, overcrowding and understaffing contribute to defendants' inability to comply with necessary provisions of suicide prevention in administrative segregation units. Kahn Decl. ¶¶ 27-33.  For example, defendants do not currently provide the existing administrative segregation population with necessary outdoor exercise and out of cell time.  *Id.* Defendants admit a massive shortfall of at least 565 small management yards that are necessary to provide exercise space for inmates housed in administrative segregation units today, and have a plan  to possibly complete the construction of these yards *by the end of 2012 or 2013.  Id.*  The Special Master has rejected the five year plan, stating, "That is simply too late."  Kahn Decl ¶ 28 .  In the meantime, inmates with serious mental illness are deprived of outdoor exercise or weeks on end.  *Id.*  Administrative segregation units without proper yards had multiple suicides in 2006.  *Id.*

## II.    The "Remedial Measures" Promised By Defendants Will Not And Cannot Address The Effects Of Overcrowding On The *Coleman* Class

On February 15, 2007, Judge Henderson ordered defendants in *Plata* to report within 90 days "each specific, concrete measure the State has taken, is taking, or is planning to take, that is expected to result in a reduction in the number of inmates confined in state prisons by March 1, 2008…and by March 1, 2009…and the amount of the reduction expected to result from each such measure by March 1, 2008 and March 1, 2009, respectively."  Rifkin Decl. ¶ 14, Ex. G (2/15/07 Order).  On May 15, 2007, defendants filed their response and outlined two sets of measures, those found in Assembly Bill 900 and  those characterized by defendants as "administrative changes to its parole policies."  Rifkin Decl. ¶ 16, Ex. I (Defs.' 2/15/07 Report). Defendants submitted a similar response on May 21, 2007 to the *Armstrong* Court, which is also considering a motion for a three-judge panel.  Rifkin Decl. ¶ 16.

Defendants' Response to Judge Henderson's Order is a stark admission of the State's inability to address the crisis without the intervention of a three-judge court.  No measures have been instituted by defendants since December 2006 that have limited the prison

population; in fact, it has continued to grow.  The heart of defendants' proposals is yet another prison building boom, enacted without sentencing or parole reforms.  Nothing has been included to address the critical staffing shortages.  The underlying answer to Judge Henderson's questions is that even if every proposal is adopted, funded and successfully implemented at a record pace, CDCR will remain just as dangerously overcrowded in March 2008 and March 2009 as it is today.

> **A.    Even Assuming Defendants' Plans All Are Successful, Overcrowding Will Continue At Levels That Prevent Delivery Of Constitutional Levels Of Mental Health Services**

Defendants do not claim that their long term massive building projects or their shorter term "reforms" will reduce overcrowding to a level that will permit the *Coleman* process to remedy the ongoing Constitutional violations for the plaintiff class.  Current *Coleman* bed plans, for example, speak to 2012 as the year that the supply of mental health beds may meet the demand.  Docket 2091, Defs.' Final Long-Range Bed Plan.  Most of those projects, however, are now delayed or on hold.  *Id.*

In their recent filing with the *Plata* Court, defendants project that, accounting for their parole "reforms" and out-of-state transfers, in March 2008, CDCR will house 159,939 male inmates in-state, and in March 2009, CDCR will house 162,674 male inmates in-state.[12]  Rifkin Decl. ¶ 16, Ex. J at ¶ 22 (Kernan Decl.).  CDCR's recently published Spring 2007 Population Projections predict 164,599 male inmates and 12,000 female inmates (176,799 total) in March 2008, and 167,614 male inmates and 12,562 female inmates (180,176 total) in March 2009.  Galvan Decl. ¶ 46, Ex. W.  Even assuming the validity of defendants' optimistic forecast of their population reduction strategies, the best case scenario for 2008 and 2009 still puts CDCR significantly in excess of the  137,764 "maximum safe and reasonable capacity" of the CDCR's male prison system as determined by the Corrections Independent Review Panel.  *See*

---

[12] Defendants provide no explanation of how they derived these figures.  Defendants also apparently ignore the female inmate population, despite the fact that as of May 16, 2007, CIW was at 185 percent of design capacity and CCWF was at 206 percent of design capacity.  Rifkin Decl. ¶ 21, Ex. R (CDCR Population Data as of 5/16/07).

1  Galvan Decl. ¶ 4, Ex. D at 123-24.  Meanwhile, according to defendants' "Estimated

2  Construction Schedule for Infill Bed Plan," not a single "infill" bed will be activated by March

3  2008.  Rifkin Decl. ¶ 15, Ex. H at 383 (Ex. 20 to Receiver's Overcrowding Rpt.)  In fact, the

4  first "infill" bed is scheduled for activation in January 2009.  *Id.*

5      Defendants further concede that CDCR will remain in a State of Emergency through

6  2009, even if all of CDCR's plans come to fruition in the most expeditious manner.  Rifkin

7  Decl. ¶ 16, Ex. J at ¶ 23  (Kernan Decl.).  Thus it is undisputed that CDCR will remain at

8  dangerously overcrowded levels for years to come and the State has come forward with no

9  plans to address the crisis in 2007, 2008 and well into 2009.

10      Defendants' proposals do not address the fundamental deficiency that must be included

11  to remedy the ongoing Constitutional violations.  As the Special Master stated, "Staffing is the

12  absolute essential and indispensable ingredient for defendants meeting the Program Guide

13  requirements."  17C at 185-6.  Appropriate staffing can never be achieved without reducing the

14  population.  AB 900 increases the population but fails to address staffing.

15      **B.    Defendants' Construction Plans And Prison And Parole "Reforms"**

16      Defendants' recently enacted prison construction bill, as well as the proposed prison and

17  parole "reforms," will never remedy the ongoing Constitutional violations.  Numerous

18  political, legal and practical obstacles stand in the way of defendants' plans and therefore it is

19  unreasonable to rely on defendants' optimistic projections based on ideas that have not even

20  been proposed, let alone approved, budgeted or implemented.

21      **1.    Assembly Bill 900**

22      The resounding answer to the question of whether any remedial measures taken by

23  defendants in recent months will relieve the effects of overcrowding on the provision of mental

24  health treatment is "No."  Despite repeated recommendations from multiple bi-partisan

25  commissions, the recent legislation enacted by the State, Assembly Bill 900 ("AB 900"),

26  ignores parole and sentencing reform, and focuses on long-term building and short-term "in-

27

28

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO CONVENE A THREE-JUDGE PANEL TO LIMIT THE PRISON
POPULATION, NO.:  CIV S 90-0520 LKK-JFM

1    fill" housing[13].  *See* Rifkin Decl. ¶ 12 (Recommendations including establishment of

2    sentencing commission, parole reform, and implementation of remedial sanctions made in

3    Reports of Little Hoover Commission 1/98, 11/03, 2/05, and 1/07 Reports; Report of National

4    Council on Crime and Delinquency, Task Force on California Prison Overcrowding, 8/06;

5    Report of Corrections Independent Review Panel 6/04; Report of Blue Ribbon Commission on

6    Inmate Population Management 1/90.)  The bill's much-touted 53,000-bed  increase is itself an

7    illusion, with a complete lack of timeframes or deadlines for the building process, and much of

8    the new prison expansion contingent upon first completing steps in a dubious "infill" process

9    that crams more prison beds into already-existing prisons—resulting in further harm to the

10   *Coleman* class.

11       Most important, AB 900 does nothing to address the ongoing violations in the delivery

12   of mental health care.  In fact, by expanding the prisons it makes it even less likely that

13   adequate clinical staffing and hospital beds to address the needs of the *Coleman* class will ever

14   be obtained.

15                              **a.  New State Prison Beds**

16       This legislation calls for building 40,000 new state prison beds[14] on an unspecified

17   timeline, and provides very little additional detail.  *See* Rifkin Decl. ¶ 17, Ex. L at 8 (4/12/07

18   Agenda)("There is very little information on anything about the project except for the number

19   of beds being built.  For example, it is not clear whether the department is proposing to build

20   adequate programming space, dining space, and yard space consistent with standards for

21   constructing prisons.").   Moreover, while this Court has witnessed repeatedly throughout the

22   years the inability of defendants to complete any building project in an efficient and

23

24

25

26   _____
     [13] "Infill" is the term chosen by defendants to characterize the beds they intend to construct at

27   already-existing prisons after identifying space that they can "fill in" at those prisons.

28   [14] These new beds fall into three categories:  "Infill"; Re-entry; and Health Care.  Reentry and
     Health Care beds appear to be part of the construction of new facilities.

expeditious manner[15], this Bill specifically requires significant additional delays.  It provides for two overall phases of building, the first with 24,000 beds, and the second with 16,000 beds. The second phase cannot start until the first phase is fifty percent complete.  AB 900, Section 22.  Within the first phase, there are additional sub-phases that must be completed in order for the next to start.

The CDCR's own building timeline puts completion of the first 1,600 "infill" beds no earlier than January 2009, and the first phase of 4,000 "infill" beds completed no earlier than May 1, 2009.[16]  *See* Rifkin Decl. ¶ 15, Ex. H at 385 (CDCR Estimated Construction Schedule for Infill Bed Plan).  That means that, even in the "best-case" scenario, the first new beds in the system—aimed explicitly only at moving inmates presently in "bad" beds—would not come online until 2009.[17]

The LAO concluded that CDCR's schedule is "optimistic;" the CDCR "does not have the staff to manage all of the projects in the infill bed plan;" "the department's timeline for constructing the infill beds depends on its core business services functioning in a timely manner [and] the majority of these functions within the department are not operating in a timely manner;" and "the remote location of many of the construction sites means that the department will likely have difficulty finding contractors willing to bid for the contract." Rifkin Decl. ¶ 17, Ex. L at 7 (4/12/07 Agenda).  Additionally:

> [A]ll of the prisons where the department is proposing to build infill housing require major infrastructure upgrades to accommodate the *current*

---

[15] *See, e.g.,* 17B at 178. ("Delays in the construction, completion, staffing and occupancy of CIW's new MHCB unit spanned at least three years.  They physical plan was essentially completed by April 2005, two years behind schedule, but was not slated to open to patients until February 2006.")

[16] Construction of at least 4,000 "infill" beds is required by AB 900 before funds can even be released for the second phase of defendants' building plan.  Thus, even on defendants' optimistic schedule, this will not happen for another two years.

[17] In fact, Defendants' timeline for construction of both "infill" and new beds is overly optimistic.  Acting Director of Adult Institutions for CDCR stated in a sworn declaration in February 2007 that a 3-5 year timeline for constructing a new prison "is extremely aggressive," and the first new beds ("infill" beds) will not be available for at least 18 months.  Rifkin Decl. ¶ 16, Ex. J at 4:15-25 (Decl. of Scott M. Kernan in Opposition to Petition for Writ of Injunctive and Decl. Relief, *CCPOA v. Schwarzenegger*).

overcrowding…If the 'bad' beds are not removed from these housing units, the infill bed proposal will exacerbate the infrastructure problems…Furthermore, if there are delays in these infrastructure projects (which are likely…) there may be delays in the department's ability to activate infill housing units.[18]

*Id.* at 7-8 (emphasis in original). The Receiver and the LAO identify many additional deficiencies in defendants' "infill" bed plan, noting especially that it ignores real life clinical requirements for delivery of care and that it focuses on building beds at the wrong custody levels for CDCR needs. Rifkin Decl. ¶¶ 15, Ex. H and ¶ 17, Ex. L. The Constitutional violations cannot and will not be remedied with more prisons and more beds. More beds will lead to more prisoners and make achieving the remedy in *Coleman* even more difficult.

### b. Re-entry Beds

AB 900 also proposes to site and construct 16,000 re-entry beds at 500-bed facilities throughout the State (requiring a minimum of 32 re-entry facilities). There are serious obstacles identified by the LAO to the timely construction of these beds. Rifkin Decl. ¶ 17, Ex. L at 11 (4/12/07 Agenda). Most significantly, the reentry beds are to be sited *only* in cities or counties that request a reentry program and propose a location. But the State has been hard-pressed to find cities or counties willing to contract with the State for only a few hundred beds for parole drug treatment or other rehabilitation programs. *See* Declaration of Ernest Galvan in Support of Pls.' Supp. Motion to Convene a Three-Judge Panel to Limit Prison Population (Galvan Decl.) ¶¶ 7, 8, 21, 36. Given this history, it is doubtful that these facilities will be built in a timely fashion. [19] Moreover, as the Receiver points out, "each facility will require on-site health care staff to deliver needed care. In essence AB 900 calls for a new set of institutions to be included in the existing Federal Court remedial plans." Rifkin Decl. ¶ 15, Ex. H at 045 (Receiver's Overcrowding Rpt.). In *Coleman*, as in *Plata*, this major prison

---

[18] Defendants have recently delayed timelines on much smaller construction projects due to overcrowding-related barriers. *See* Rifkin Decl. ¶ 17, Ex. M at 33 (5/9/07 Agenda) (LAO notes that because facilities are so crowded and there is not sufficient room to relocated inmates, construction must be done piecemeal, forcing longer timelines for completion).

[19] Many locales that are already home to CDCR facilities are already resisting any further expansion. *See* Rifkin Decl. ¶ 29, Ex. AA (2/7/07 Letter from Mayor of Chino to Schwarzenegger regarding further prison expansion at CIM).

1  expansion will increase the cost and time necessary to bring the CDCR into compliance with

2  Constitutional standards of health care.  *See id.*

### c.  Out of State Transfers

4  Defendants claim they will transfer up to 8,000 inmates to out-of-state facilities

5  pursuant to AB 900 by March 7, 2009 .  Rifkin Decl. ¶ 16, Ex. J at ¶ 7 (Kernan Decl.).

6  However, the out-of-state transfer program has proven a dismal failure and has little chance of

7  meaningfully alleviating the overcrowding crisis.  Even assuming the State manages to

8  overcome the obstacles of the state court litigation that has blocked any transfers for months,

9  the CDCR has run out of volunteer prisoners for the program and does not have contracts in

10  place or policies and procedures to permit the OST program to move forward.  An involuntary

11  transfer program, which requires appropriate due process, the appointment of counsel and

12  additional medical and mental health screening procedures, raises a host of new challenges,

13  none of which have been addressed by CDCR.  Kahn Decl. ¶¶ 37-40.

14  Finally, even if and when the out-of-state transfer process is resumed, it is likely to have

15  little direct effect on the *Coleman* class.  Patients at the EOP level of care are excluded from

16  the program and are unlikely to be transferred, and it is uncertain whether the Special Master

17  would approve involuntary transfers for patients even at the CCCMS level of care unless

18  assurances are in place that they will receive appropriate care at the contracted out of state

19  prisons.  Kahn Decl. ¶¶ 37-40.

### 2.  Parole "Reforms"

21  Although AB 900 is silent about parole reform, defendants recently filed a brief in *Plata*

22  claiming that "Parole reform strategies will also play a large role in the reduction of prison

23  overcrowding…CDCR has implemented immediate parole changes to reward successful

24  rehabilitation." Rifkin Decl. ¶ 16, Ex. I at 10 (Defs.' Rpt).  The "reform strategy" defendants

25  describe is actually a memorandum requiring parole agents to follow existing state law (Penal

26  Code Section 3001) for early discharge from parole for persons who meet certain criteria.  *Id.*

27  at 10-11.  Defendants promise that based on the "new" practice of following state law, "there

28

1  will be an additional discharge of between 2,000 and 4,000 parolees from parole in the next 12

2  months." *Id.* at 11.

3        Moreover, this is a reduction of *parolees*, not inmates, and constitutes only at most a 2.5

4  percent reduction of the parole population which was at 161,638 as of May 16, 2007. Rifkin

5  Decl. ¶ 22, Ex. S (Parole Population, May 16, 2007).  This may result only in a reduction of

6  440 to 880 actual inmates in CDCR prisons.  Galvan Declaration, ¶ 41.  Furthermore, this

7  practice is unlikely to have more than a remote effect on the *Coleman* class, as parolees with

8  serious mental illness have an even higher recidivism rate than general population parolees, for

9  whom the recidivism rate is already an astounding 66 percent. Galvan Decl. ¶ 41; Rifkin Decl.

10  ¶ 6, Ex. A (DAPO MHSCP BCP).   Parolees with mental illness are less likely to be candidates

11  for early release because early release requires significant time periods without parole

12  violations.

13        Defendants have promised before that they would direct parole to follow the law and

14  grant early discharge to eligible parolees.  In fact, they have never fully implemented this state

15  law.  CDCR's most recent population data show a "decrease in discharge from parole" during

16  2006 and projects a *decrease* in discharges from parole in the future.  Galvan Decl. ¶ 43-46,

17  Ex. W at 4.

18        The other parole "reforms" defendants cite—a parole violation decision-making matrix

19  and a risk and needs assessment tool—are nothing more than the policies and procedures

20  defendants have been promising to implement since at least 2001.  Galvan Decl. ¶ 37.

21  Although defendants have made representations about their intended implementation of these

22  parole reforms for more than five years, they have repeatedly failed to put them into practice in

23  any meaningful way.  *See* Galvan Decl. ¶ 37; Declaration of Holly M. Baldwin in Support of

24  Pls.' Supplemental Brief in Support of Motion to Convene a Three-Judge Panel to Limit the

25  Prison Population ("Baldwin Decl.") at ¶ 7.

26

27

28

1 **C.   Overcrowding Will Continue To Prevent Delivery Of Mental Health Services
2 Because AB 900 Will Expand The Prison Population And Thus Worsen
Understaffing**

3        Regardless of when the physical beds outlined in the Bill could or will be built, empty

4 prisons and beds mean nothing in terms of a remedy for the *Coleman* class.  The unaddressed

5 elephant in the room is the State's inability to recruit and retain clinical or custody staff

6 sufficient to operate even its existing prisons, let alone 50,000 additional beds.  As the

7 Receiver observed, "It is easy to talk of constructing prisons and jails.  It is more difficult and

8 expensive to staff correctional institutions with the appropriate clinical personnel and

9 correctional officers.  AB 900, however, is silent about how the jails and prison beds cited in

10 the bill will be staffed and managed."  Rifkin Decl. ¶ 15, Ex. H at 41.  As Special Master

11 Keating and this Court have repeatedly recognized, staffing is the crucial element in the

12 provision of Constitutional mental health services.  Prison expansion in a system where the

13 clinical vacancy rate is between 36.5 and 50 percent cannot offer hope to the tens of thousands

14 of mentally ill inmates already incarcerated in an overburdened system.  It is absurd to think

15 that CDCR will somehow be able to staff these additional tens of thousands of beds when,

16 according to the Special Master, at present staffing levels it can serve less than 20,000 of its

17 more than 32,000 mentally ill inmates.  17C at 182-183.  Additionally, if the State does

18 succeed in constructing and activating more beds, this means that the staffing pool for both

19 custody officers and clinicians will be spread even more thinly across units and facilities.

20        AB 900 and the parole "reform" cited by defendants do not prioritize resources for

21 providing mental health treatment to the *Coleman* class.  Most of the construction for AB 900

22 hinges on successfully constructing a minimum number of "infill" beds.  There is no indication

23 that defendants have designed these "infill" beds to help meet the needs of the *Coleman* class.

24 In fact, the Senate Budget Committee observed that CDCR plans to build as "infill" beds more

25 stand-alone administrative segregation units, which are units this Court has specifically

26 prohibited defendants from using for *Coleman* class members. Kahn Decl. ¶ 34.

27

28

III.   **Defendants Continue To Engage In Practices That Needlessly Increase The Number Of Mentally Ill Individuals In Prison**

Even in the face of dire overcrowding, defendants are actively engaging in practices that needlessly increase the number of mentally ill individuals in prison, and have failed to implement Court-ordered programs that would help reduce recidivism for mentally ill inmates/parolees.

A.   **Failure To Provide Appropriate Mental Health Treatment Services To Parolees**

Defendants have recognized that "mentally ill parolees make up the majority of those which are homeless, jobless, most likely to commit a new crime on parole; and cause the most public concerns…This group of parolees needs specialized care, treatment, and supervision, and without it, they are the most likely to be the returning faces and names on jail rosters, prison counts, and parole caseloads." Rifkin Decl. ¶ 6, Ex. B at II-9. Yet defendants have consistently refused to provide the kinds of services and treatment known to break this cycle. Rifkin Decl. ¶¶ 6-11. Presently, the only mental health treatment defendants provide to parolees is through the Parole Outpatient Clinics ("POC"). POC resources are limited, however, and defendants have repeatedly rejected efforts to enhance staffing and services for POCs. *Id.* Defendants found that 10,000 parolees with mental illness were returned to custody during the 2005 calendar year, and "estimated that enhanced POC services through DTP's [day treatment programs] will reduce the RTC [return to custody] rate by 75%." Rifkin Decl. ¶ 6, Ex. B at II-6. However, proposal to address these known deficiencies were never funded. Rifkin Decl. ¶ 6. In April 2006, defendants *reduced* POC services available to parolees, closing the Region III parole outpatient clinic in Los Angeles that had been operating for approximately 50 years. Rifkin Decl. ¶ 28.

B.   **Returns To Custody Of Mentally Ill Parolees For Reasons Primarily Relating To Unmet Mental Health Needs**

Rather than provide mental health treatment on parole, defendants intentionally return thousands of mentally ill parolees to prison each year for violations related to their mental illness. Until January 8, 2007, defendants continued to engage in the process of "psychiatric

1  revocation" of parolees with mental illness, which was the practice of returning parolees to

2  custody solely for the purpose of providing mental health treatment.  Rifkin Decl. ¶¶ 4-8.  As a

3  result of negotiations in the *Valdivia* lawsuit, defendants ceased the official practice of

4  psychiatric revocations, admitting that the individuals the State had returned to custody

5  through this practice were being held illegally. *Id.*  However, defendants continue to return

6  more than 6,000 mentally ill parolees to custody each year for technical or minor violations of

7  parole that defendants themselves recognize to be primarily the result of unmet mental health

8  needs.  Rifkin Decl. ¶ 6, Ex. A at 1.  For example, out of 24 seriously mentally ill prisoners

9  serving psychiatric revocation terms whom defendants recently agreed to parole to

10 "appropriate placements" in the community, at least 25 percent were revoked again within

11 three weeks. Rifkin Decl. ¶ 8.

12      In practice then, California has created  a process in which thousands of mentally ill

13 inmates/parolees generally follow a cyclical course of failure within the corrections system.

14 As this group cycles in and out of custody, they serve large stretches of time in CDCR

15 reception centers.  A recent CDCR study found that a "backlog of approximately 500

16 individuals at RC's awaiting placement into Enhanced Outpatient Program (EOP) beds has

17 accumulated as existing mainline programs have reached maximum capacity."  Galvan Decl. ¶

18 45, Ex. V at 1.  200 of the 530 EOP inmates identified were parole violators returned to

19 custody on technical violations, which defendants admitted were "likely related to their mental

20 illness."  *Id.* at 3.

21      **C.    Failure To Implement Remedial Sanctions Programs**

22      Despite Orders in 2004 and 2005 from this Court in the *Valdivia* lawsuit requiring

23 defendants to implement remedial sanctions programs as alternatives to incarceration for

24 parolees charged with technical parole violations, defendants have failed to fully implement

25 remedial sanctions.  Galvan Decl. ¶¶ 11-31.  Although defendants recently agreed to a

26 Stipulation in *Valdivia* regarding the re-establishment of remedial sanctions programs, the

27 current timeframe for instituting these programs will not offer any material or immediate relief

28 for overcrowding.  *Id.;  see also* Rifkin Decl. ¶ 16, Ex. J at ¶ 20 (Kernan Decl.) ("CDCR

1   recognizes that a number of logistical issues prevent these remedial sanction programs from

2   being filled.")

3      Moreover, the remedial sanctions programs currently in place exclude parolees with

4   serious mental illness, either in a *per se* or case-by-case basis.  Galvan Decl. ¶¶ 32-35.

5   Exclusions of parolees with metal illness from general remedial sanctions programs continue

6   even under defendants' proposal for re-establishing remedial sanctions under the April 2007

7   *Valdivia* Stipulation.  *Id.*  This means that parolees with mental illness who are charged with

8   parole violations currently have little, if any, access to remedial sanctions programs, and this

9   access is unlikely to increase in the future, given defendants' refusal to drop exclusions from

10  general remedial sanctions programs and/or create significant remedial sanctions targeted at

11  mentally ill parolees.  *Id.*

12     **D. Failure To Implement Pre-Release Planning**

13     Meanwhile, defendants also have failed to implement practices in prisons that would

14  increase the likelihood that mentally ill offenders will succeed on parole, and reduce the more

15  than 66 percent recidivism rate for this population.[20]  *Coleman* class members do not receive

16  meaningful pre-release planning in prison, and are instead released on the day they parole with

17  merely gate money and, hopefully, the required 30-day supply of medication.  They are

18  released directly to parole from every level of care, including the most acute beds, without

19  benefits in place or even applications pending, and without a real parole discharge plan, and

20  often, without a parole outpatient clinic appointment scheduled.  Baldwin Decl. ¶¶ 5-17.

21

22

23

24

25

---

26  [20] The overall recidivism rate for California is 66 percent.  Mentally ill individuals are re-
    incarcerated at a higher rate.  Rifkin Decl.¶ 6, Ex. B at ii-9.  Defendants contracted with UCLA
27  to conduct an evaluation of the Department's Mental Health Services Continuum Program and
    the evaluation showed that pre-release assessments significantly reduce recidivism rates. *Id.* at
28  ¶ 6, Exs. A and B (DAPO BCP).

**THIS COURT SHOULD CONVENE A THREE-JUDGE PANEL FOR ENTRY OF APPROPRIATE PRISONER RELEASE ORDERS**

**I.     The Prison Litigation Reform Act's Requirements For Convening A Three-Judge Panel To Consider Limits On The Prison Population Are Satisfied And This Court Should Refer This Matter To Such A Panel**

In their opening brief, plaintiffs addressed the PLRA's two requirements that must be satisfied in order for a Court to refer consideration of a prisoner release order to a three-judge panel. A prisoner release order is appropriate for consideration when: 1) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and 2) the defendant has had a reasonable amount of time to comply with the previous court orders. 18 U.S.C. § 3626(a)(3)(A).

Plaintiffs recounted the numerous ways in which this Court has tried to effect relief for the *Coleman* class through its orders, including the appointment of a Special Master, appointing a team of experts to closely monitor mental health treatment in the prison system, approval of the Mental Health Services Delivery System Program Guides and the Revised Program Guide, waiving various state laws in order to expedite delivery of mental health services, and a more than ten-year string of orders regarding the development of short-term bed plans, long-term bed plans, interim bed plans, staffing allocations and qualifications, salary increases, and suicide prevention plans. Defendants' Opposition brief detailed some of the more recent orders this Court has issued in an effort to induce defendants to create a Constitutionally adequate mental health system. Docket 2068, Defs.' Opp. at 3. While defendants emphasize the orders of this Court over the last year, they do not dispute the fact that this Court has, for the past twelve years, entered orders less intrusive than prisoner release orders that were aimed at remedying the Constitutional violation in the provision of mental health services to the plaintiff class, and that these orders have failed to remedy this violation.

These orders, spanning twelve years since the *Coleman* decision, have given defendants at least a reasonable amount of time to create and actualize a Constitutionally adequate mental health services delivery system. Moreover, on December 11, 2006, this Court optimistically

granted defendants an additional six months to come up with a plan that would effect meaningful change for the *Coleman* class by limiting or controlling the population. In that time, defendants succeeded only in exacerbating the harm to plaintiffs: they closed the Department of Mental Health to admission of *Coleman* class members, they failed to engage in reasonable recruitment efforts to fill clinical staff vacancies, and each day, they mismanaged tens of thousands of inmates with serious mental illness, sometimes with fatal results.

## II.    A Prisoner Release Order Will Be Effective In Remedying Ongoing Violations In The Delivery Of Mental Health Care To Class Members

The remedy for the *Coleman* class has stalled, and overcrowding is reversing the forward progress toward provision of mental health treatment in CDCR. A prisoner release order that caps the prison population will be effective in remedying these ongoing violations. Only by limiting the population can the State remedy the Constitutional violations by recruiting and obtaining sufficient clinical staff to address the needs of the class. Without population limits, defendants can never catch up. Remedial plans for Constitutional mental health treatment are largely in place and the primary obstacle blocking defendants' ability to actualize those plans is the deadly combination of overpopulation, understaffing, and lack of treatment space that comprises the overcrowding crisis.

### A.    A Prison Release Order Will Be Effective Because It Will Reduce The Current Staff-Inmate Ratio And Enable The *Coleman* Remedial Plan To Move Forward

Since the decision of this Court in 1995, the manner in which CDCR policy provides for the delivery of mental health care services to *Coleman* class members has changed significantly. In 1997, the Program Guides, a collection of the standards for the delivery of mental health services within CDCR's various levels of health care and custody settings, was preliminarily approved by this Court. 6/27/97 Order. In 2002, the parties and the Special Master, recognizing that the original Program Guides were not a sufficient remedy, agreed to revise and update them. In March, 2006, the Court approved the Revised Program Guide. 3/3/06 Order. The *Coleman* case has succeeded in initiating a culture shift within the prison

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO CONVENE A THREE-JUDGE PANEL TO LIMIT THE PRISON POPULATION, NO.: CIV S 90-0520 LKK-JFM

system such that many state actors now recognize the duty to provide mental health care to inmates with serious mental illness.

Although prior to the current state of emergency, defendants had not achieved compliance with the Program Guide requirements sufficient to end Court-monitoring, many institutions were moving in this direction. The overcrowding crisis, which reached catastrophic levels in the past two years, however, set back the compliance effort and the remedial process significantly in most institutions and systemically. The failure to bring the population under control risks years of progress in *Coleman* towards achieving compliance with the Constitutional mandate of minimally adequate mental health care for the class. Orders from this Court are in place that would provide for adequate levels of staffing, treatment protocols, and treatment space if defendants could extract themselves from the overcrowding morass.

**B. Given The Present Situation, A Prisoner Release Orders Is The Only Effective Means Of Addressing The Ongoing Violation Of Class Members' Constitution Right To Adequate Mental Health Care, And Of Eventually Ending The *Coleman* Case**

**1. Defendants refuse to take measures to alleviate the effects of overcrowding on implementation of the *Coleman* remedy**

Defendants have chosen to turn their backs on the rising population crisis for years and have continued to do so in recent months, even with the possibility of a population cap looming. This is not because there are no solutions to the overcrowding problem or because the State does not know how to solve the problem: bi-partisan commissions and independent organizations have been telling the State for years exactly what it could do to prevent and now, fix, the overcrowding crisis. *See* Rifkin Decl. ¶ 12. However, good advice, even in the form of evidence-based methods, was not enough to overcome politics as usual. The actual imposition of a cap holds the promise that these lesser measures did not: in addition to safeguarding the Constitutional rights of the plaintiff class, it actually creates a positive political incentive for the State to enact meaningful and lasting prison reform. There are a myriad of ways that the State can immediately reduce its prison population that fall short of the

specter of releasing murderers and rapists into the streets.[21]  Neither this Court nor the three-judge panel are called upon to determine what those methods are, or which to employ—the State has already done that for itself numerous times.  *See, e.g.,* Rifkin Decl. ¶ 24, Ex. U (Office of the Governor's "Reforming Parole" document citing variety of parole reforms recommended by experts).

In the *Coleman* case specifically, the Special Master has recognized that, given current conditions, defendants are unable to comply with existing Court orders aimed at bringing mental health treatment to Constitutionally acceptable minimums, even were they to make good-faith efforts to do so.  The Special Master concluded:

> None of the most serious problems described in this report is new.  All have been blooming over the past two years…Many of them, ranging from inadequate inpatient treatment resources to staff recruitment and compensation, are already the subjects of pending court orders.  With so many roiling issues of overcrowding, prisoners being transferred out of state, seemingly interminable changes in CDCR's leadership, organization and missions, implementation of the new Program Guide, and judicial assumption of control over medical care, this does not seem the appropriate moment to pile more orders on the barely discernible plate of the defendants.

17 A at 132.  Without a prisoner release order, defendants will be unable to implement the Program Guide, unable to employ the appropriate staff-to-inmate ratio, unable to provide minimum mental health care, and unable to prevent the suffering on the level of cruel and unusual punishment that real people in the *Coleman* class are subjected to each and every day.

In July 2006, Defendant Tilton told the Assembly's Select Committee on Prison Overcrowding and Construction that by June 2007, the Department will run out of room.  Rifkin Decl. ¶ 25, Ex. V  However, even as CDCR is about to reach maximum population capacity, defendants have refused to act responsibly or Constitutionally.  Instead, the State has

---

[21] Plaintiffs note that even if defendants developed a plan that included early release of selected prisoners, research indicates no evidence of harm to public safety.  An April 2007 review by the National Council on Crime and Delinquency of published literature on "early release" and "public safety" compiled findings from approximately ten regions, noting that most studies found no significant difference in rates of recidivism among early release and full-term offenders.  Some studies found lower recidivism rates among early release offenders compared to those who served a full term in prison.  Rifkin Decl. ¶ 23, Ex. T at 1.

1  gone back to business as usual, pretending that another wave of prison expansion will fix the

2  problem that stems from, "[t]he political response to crime and its punishment in California

3  over the past half-century." 17A at 137.  Although the Special Master warned that "recourse to

4  more of the same is simply a prescription for disaster," defendants have stubbornly refused to

5  change course.[22]  *Id.*  The Receiver observed that "[d]espite spending billions of dollars on

6  construction, the level of overcrowding in California's prison system has not decreased;

7  indeed, despite waves of prison expansion overcrowding has now reached crisis levels."

8  Rifkin Decl. ¶ 15, Ex. H at 014 (Receiver's Overcrowding Rpt.).

9      **2.  A prisoner release order will effect the relief from overcrowding necessary
     for the *Coleman* remedy**

10

11      The only means left for protecting the Constitutional rights of the *Coleman* class is a

12  prisoner release order.  In 1989, when a District Court in New Jersey imposed financial

13  sanctions for a county jail's failure to meet a population cap and provide minimum recreation

14  time, the Court noted:

15      In so ruling as I have today, I am cognizant that some may perceive that
     this Courts' action may represent an unwelcome and unwarranted intrusion into

16  the functions that properly belong to the legislative and the executive branches of
     state and county government.  But, in representing to the Court that they are

17  literally unable to bring the jail into compliance with Constitutional standards,
     the County defendants have foisted onto this court the necessary role of insuring

18  that the Constitution is upheld.  What the County defendants have done is to
     blatantly pass the buck to this court by doing nothing but make empty promises.

19  Perhaps, the County defendants' hope that the taxpayers of Essex County will
     perceive defendants as clothed in pristine raiment while venting their spleen on

20  the judiciary.  While this may be viewed by some as good politics, it is sadly an
     abdication of the County defendants' responsibilities to the citizenry and to the

21  Court.

22  *Essex County Jail Inmates v. Amato*, 726 F.Supp. 539 (D.N.J. 1989).

23      A prisoner release order will not be a miracle pill that completes the entire remedy for

24  defendants' violation of plaintiffs' Constitutional right to mental health treatment.  However, it

25

26  [22] Defendants' own expert, Joanne Petersilia, concluded in a 2006 Report, "Understanding
     California Corrections," that "[Rehabilitation] can only be implemented in a substantive and

27  meaningful way if the fundamental structures of corrections—the sentencing framework, the
     level of in-prison programming, and the nature of parole supervision—are configured so they

28  actually reflect that commitment.  Rifkin Decl. ¶ __, Ex. __ at 79.

is undisputed that without a remedy for overcrowding, the Constitutional violations cannot be remedied. The purpose of a prisoner release order is to effect enough relief in the overcrowded and understaffed system that the remedial orders and plans already existing in the *Coleman* case can be actualized. Without such an order, the *Coleman* remedial process will remain stalled or will backslide, and avoidable and unnecessary daily pain, suffering and death will be the result.

A prisoner release order would not prevent the State from pursuing its plans to build more prisons, nor from continuing its efforts to comply with this Court's orders to fill staffing vacancies. Any prisoner release order would surely be based on a ratio of inmates, staff, and space. If the State is able to build its proposed prisons, and if the State were able to staff them, as they came online, the population cap would presumably be adjusted. A prisoner release order does not eliminate these cards from the State's hand. What a prisoner release order does do, however, is assure that if and when the State fails to expeditiously build more beds that meet Constitutional standards, the *Coleman* class has a real remedy and is not left warehoused in prisons that provide only punishment without the Constitutional safeguards of treatment. *See, e.g., Williams v. McKeithen*, 963 F.2d 70 (5th Cir. 1992) (where consent decree or stipulation entered setting population limits, district court may assert generally supervisory authority over inmate population limits or staff-to-inmate ratios); *Roberts v. Tennessee Dept. of Correction*, 887 F.2d 1281 (6th Cir. 1989)(Court approves parties' negotiated settlement and lays out specific process state will follow to implement population reduction, including appointment, based on submission by all parties of nominations, of a Consultant for Legal Corrections to recommend total facility population limits for each jail, and non-binding recommendations on how to meet these limits).

**III.**   **Prisoner Release Orders That Require Defendants To Meet General Population Limits As Well As Specific Reductions Of The Population Of The Coleman Class Are Required To Remedy The Violations**

   **A.**   **A General Population Limit Is Needed To Effect Relief For The *Coleman* Class**

Given the breadth of defendants' violation, the size of the plaintiff class, and the fact that the severe systemwide overpopulation, understaffing, and lack of staff have completely overwhelmed the CDCR system, any viable prisoner release order must require defendants to reduce the total prison population.[23]  Without relief from the immense pressure of a system at 200 percent capacity, defendants cannot focus on the remedial measures in the *Coleman* case. Part of the provision of minimal mental health care must be the provision of basic humane living conditions.  Nobody can afford to ignore the effects that living in a system at 200 percent capacity—which defendants themselves have repeatedly tied to increased agitation among inmates, systemwide lockdowns and failures to provide out-of-cell time, increases in major violence, and outbreaks of infectious disease—have on the mental health of all inmates, and especially on the already-vulnerable *Coleman* class.

Addressing general overcrowding is a pre-requisite for being able to address the effects of overcrowding within the mental health services delivery system and the *Coleman* class.  The Receiver found that "overcrowding…adversely impacts on the very process of implementing remedies because overcrowding, and the resulting day to day operational chaos of the CDCR, creates regular "crisis" situations which call for action…and take time, energy, and person power away from important remedial programs.  Rifkin Decl. ¶ 15, Ex. H at 033-034.

---

[23] Plaintiffs note that under the PLRA, which directs that a prisoner release order can be considered and entered only by a three-judge court, this Court must make the threshold decision as to whether previous orders for less intrusive relief have been entered and failed to remedy the deprivation of plaintiffs' Constitutional rights; and whether defendants have had a reasonable amount of time to comply with the previous orders.  The three-judge court must then consider whether overcrowding is the primary cause of the violation of the right, and whether no other relief will remedy the violation of the right.  Plaintiffs anticipate that when the three-judge court is convened, it will take such steps as appointing experts and conducting evidentiary hearings in order to assess what kind of prisoner release order would best serve the *Coleman* class in terms of effecting a population reduction that would remove the barrier to Constitutionally adequate mental health care.

1

2    Moreover:

3     Many CDCR prisons are unable to sustain the basic delivery of medical, mental
     health, and dental services because of limited staffing (clinical and custody) and
4    an overwhelming number of prisoner/patients who require care. Every day,
     many California prison wardens and health care managers make the difficult
5    decision as to which of the class actions, *Coleman, Perez, Armstrong* or *Plata*
     they will fail to comply with because of staff shortages and patient loads.

6    *Id.* at 035.

7     In addition to freeing overall resources and eliminating general overcrowding-related

8    pressures and crises, reduction of the total CDCR population will also impact the *Coleman*

9    class directly in terms of delivery of mental health treatment. For example, it will:

10   • free space for treatment, patient interviews, work and educational programs, and

11    exercise;

12   • reduce demand on mental health staff as a result of the reduction of prison "moves"

13    outlined by the Receiver, allowing for more treatment and fulfillment of Program Guide

14    requirements;

15   • reduce demand on custody staff, who are an integral part of the delivery of mental

16    health treatment;

17   • result in a decrease of actual inmates with serious mental illness, freeing beds at various

18    levels of care and custody levels, and decreasing staff to inmate ratios

19   • reduce the need for double-celling or dorm placements of inmates whose mental illness

20    should preclude them from those placements;

21   • improve defendants' ability to keep medical records current by decreasing the workload

22    created by both population and high inmate movement between prisons;

23   • allow for delivery of medication at appropriate times of day and at appropriate intervals.

24    The mental health effects of overcrowding are not limited to the already-identified

25   inmates with serious mental illness, and every inmate must have access to Constitutionally

26   adequate mental health treatment if he or she requires it. Reduction of overall population will

27   not only free resources to supply mental health care, but, because overcrowding creates a

28   higher demand for mental health treatment from both inmates with serious mental illness and

-33-

1  inmates who might otherwise not require mental health treatment, reduction of population

2  should result in a corresponding reduction of the demand for mental health treatment.

3       The Receiver concluded in his report to the *Plata* Court regarding the manner in which

4  overcrowding interferes with efforts to remedy the medical care violations:

5         The manner by which overcrowding is managed will have a fundamental
  and perhaps irrevocable impact on the Plan of Action.  For example, if the State's

6  response is limited to effectuating out of state transfer, and thereafter filling
  empty beds behind departed prisoners, the overcrowding related challenges to the

7  Plan of Action will only increase and it will take the Receiver longer and it will
  cost more to correct the Constitutional violation at issue.  Likewise, if the State

8  charges off to construct infill beds in remote locations without adequate support
  services space, including adequate clinical space, overcrowding related

9  challenges to the Plan of Action will only increase, and as a result, it will take the
  Receiver longer and it will cost more to correct the Constitutional violation at

10  issue.  Finally, unless steps are taken to stop the revolving door of a failed parole
  system and thereby manage the out-of-control number of prisoner moves, the

11  churning related challenges to the Plan of Action will continue and it will take
  the Receiver longer and it will cost more to correct the Constitutional violation at

12  issue.

13  Rifkin Decl. ¶ 15, Ex. H at 046-047.  The three-judge panel must determine the degree of

14  specificity with which it must direct defendants to employ population reduction strategies,

15  from imposing a general cap and sanctions for failing to meet it, to requiring plans in target

16  areas of reform from defendants.  But plaintiffs implore this Court to consider the extensive

17  evidence of institutionalized and deliberate overcrowding the Receiver describes in his Report,

18  the failure of defendants to meet Constitutional standards in any area of health care, and the

19  reluctance of defendants, even in the face of possible Court-ordered caps, to enact real

20  solutions—and refer this matter to the three-judge court that can order relief.  This entrenched

21  "learned incapacity" of defendants can no longer be tolerated.

22       The three-judge panel should order the State to develop a plan to immediately begin the

23  reduction of the general prison population at a rate that will begin to alleviate the existing

24  Constitutional violations as soon as possible.  At the same time, the three-judge panel, with the

25  benefit of court-appointed experts and/or an evidentiary hearing, would determine appropriate

26  population restrictions on CDCR by reference to available measures and establish benchmarks

27  that the State would be required to meet.  These measures would take into account, for the

28  *Coleman* class, the standards and ratios established in the Revised Program Guide.

1

2

**B.    In Addition To A General Population Cap, A Prisoner Release Order Should Direct Defendants To Specifically Reduce The Population Of The *Coleman* Class**

3      After establishing a population cap, the three-judge panel should order the State to

4   create a plan for meeting that cap.  Effective mechanisms for reducing the prison population

5   both in the short-term and long-term have already been identified by multiple bi-partisan

6   independent commissions.[24]  Some of these mechanisms are aimed at reducing the overall

7   prison population, including the mentally ill, but a number of population reduction mechanisms

8   can be targeted specifically at decreasing the number of mentally ill inmates in CDCR

9   institutions.  This multi-pronged approach would be especially useful if the other District

10  Courts considering motions to refer consideration of a prisoner release order to a three-judge

11  court also decide to do so.

12     Moreover, standards for determining the maximum allowable population of inmates

13  defendants may house and provide Constitutionally adequate levels of mental health care have

14  already been established through the *Coleman* remedial process.  The MHSDS Program Guide

15  sets a maximum inmate to staff ratio, and provides additional standards such as transfer

16  timelines and clinical space requirements that could be used as guidelines for assessing

17  appropriate population limits based on CDCR's available resources.  The three-judge court

18  should also direct defendants to implement reforms specifically aimed at reducing the

19  population of the *Coleman* class.

20     The number of parolees with serious mental illness is in the tens of thousands.  Even as

21  thousands of inmates with serious mental illness are released onto parole each month, a

22  similarly high number are revoked, and they are revoked both at higher rates and more times

23  per parolee than for parolees without mental illness.  Rifkin Decl. ¶ 6.  Although defendants

24

25

26  [24] *See, e.g.,* Galvan Decl. ¶ 4, Ex. D at 121 (Corrections Independent Review Panel Report) (California can reduce the growing cost of managing its adult prison population by addressing three key factors that influence the size of that population—the length of time inmates serve in prison; the training and treatment they receive during incarceration to decrease the likelihood that they will return; and the services they receive during parole to help them remain crime-free and successfully integrate into society.)

27

28

1  make much of their efforts of two weeks ago to instruct that the BPH to comply with already-

2  existing law and discharge parolees who meet statutory standards from parole, they have the

3  power to enact real parole reform that would significantly impact that number of *Coleman*

4  class members in prisons.

## CONCLUSION

6        In sum, this Court has given defendants every possible opportunity to solve the

7  overcrowding crisis on its own.  The price the *Coleman* class would pay for further delay is far

8  too high.  Given current conditions and defendants' failure to act on their own, a prisoner

9  release order is the only effective mechanism for remedying ongoing violations.  It will

10  provide immediate relief and allow for the *Coleman* remedial plan to be implemented.  A

11  three-judge court should set a general population limit and benchmarks for meeting that limit,

12  and also direct defendants to implement reforms specifically aimed at reduction of the

13  population of the *Coleman* class.

14        Accordingly, the motion should be granted, and this Court should convene a three-judge

15  panel, to limit California's prison population, pursuant to 28 U.S.C. § 2284 and 18 U.S.C. §

16  3626(a)(3).

18  DATED:  May 24, 2007                    */s/ Michael W. Bien*
                                           Michael W. Bien