# EXHIBIT A

CSP000008

California Department of Corrections and Rehabilitation
Division of Adult Parole Operations
Mental Health Services Continuum Program
Budget Change Proposal
Fiscal Year 2007-2008

## A. NATURE OF REQUEST

The California Department of Corrections and Rehabilitation (Department) is requesting $4.94 Million dollars to augment the Division of Adult Parole Operations' budget to improve the current Parole Outpatient Clinic (POC) Mental Health Services Continuum Program (MHSCP). Specifically, this Budget Change Proposal would:

- Increase the clinical staffing to provide enhanced services, such as; medication management/symptom management, anger management/conflict resolution, goal planning, stress management, depression group therapy, and individual therapy to parolees at high risk of criminal behavior due to their mental illness.

The increase in clinical staffing will better address the needs for mentally ill parolees at high risk of committing crimes and/or parole violations as a result of their mental illness. Intervention through increased frequency of POC appointments, and specialized treatment, will assist the Department in maximizing cost savings to the state while simultaneously improving public safety.

## B. BACKGROUND/HISTORY

Each year over 6,000 parolees suffering from serious mental illness are returned to prison for periods ranging from a few months up to one full year or longer if they receive a new term. This is primarily due to technical violations or other criminal behavior that can result from their mental illness. Many of the problems exhibited by these individuals when non-compliant with their parole conditions are related to the disorganization produced by their mental illness. Based on findings from the recent, November 2005, and prior University of California Los Angeles (UCLA) evaluation report on the processes, outcomes and cost savings of the POC's, indicates a positive and direct relation between the frequency of POC visits and reduction to recidivism. However, the frequency of parolee appointments with POC clinicians is limited due to the current client ratio exceeding POC's ability to be fully effective as an outpatient clinic.

As cited, the Legislature finds in Penal Code Section 2960 that "severely mentally disordered prisoners should be provided with an appropriate level of mental health treatment while in prison and when returned to the community," Further the Legislature finds that to protect the public's safety "it is necessary to provide mental health treatment until the severe mental disorder which was one of the causes of, or an aggravating factor in the person's prior criminal behavior, is in remission and can be kept in remission."

CSP000009

In 1986, the Legislature mandated the Department to contract for a study of the prevalence of severe mental illness in the prison population (Penal Code Section 1615). In response to the study, the Department contracted with outside consultants to develop a treatment system model. A subsequent study in 1991 identified three levels of in-custody general population treatment; those who need treatment services as part of case management, Correctional Clinical Case Management System (CCCMS) and those who need treatment due to severe/serious mental illness, Enhanced Outpatient Program (EOP), and mental health crisis beds. A subsequent federal court decision (Coleman) required the Department to provide the services identified by the consultants.

A subsequent court decision (Whitley) set strict limits on the Department's protocol for returning parolees with mental illness to prison for psychiatric treatment. The decision set strict guidelines regarding inpatient placement options for mentally ill parolees. Due in part to the court's ruling and to the lack of community-based residential settings, the Department is obligated to provide services to a greater number of individuals whose mental stability is marginal. During the calendar year 2005, over 6,000 parolees with documented mental illness returned to prison for various violations and criminal behavior. Increasing the POC staffing as requested in the proposal is expected to significantly reduce the number of mentally ill parolees returned to prison.

In Fiscal Year 1999/2000, the Department received an augmentation of $6 million dollars to the POC's existing base budget to implement the MHSCP. The MHSCP provides invaluable pre-release planning and post-release treatment (via the POC) for both EOP and CCCMS offenders and provides empirical research to determine what measures/systems work for these populations.

In subsequent Fiscal Year's, the MHSCP received additional resources in order to accommodate the service needs of increased numbers of releasing mentally ill offenders. However, the current staffing pattern does not rise to the level necessary to maximize cost savings to the state and treatment benefits to parolees.

The MHSCP includes:

- Pre-release needs assessments of paroling mentally ill inmates for treatment plan development.
- Expanded and enhanced post release mental health treatment for mentally ill parolees.
- Improved continuity of care from the in-custody Mental Health Services Delivery System to the POC MHSCP.
- Medication management.
- Increased assistance for successful reintegration into the community upon discharge from parole.
- A standardized program in all four parole regions.

Increasing the clinical staffing will improve public safety and maximize cost savings to the State. This request is based on findings from the recent, June, 2005, UCLA evaluation report on the processes, outcomes and cost savings of the POC's MHSCP. Based on this report, which is the third of four annual reports, additional resources needed would include a total of 60 positions (4 Staff Psychiatrists, 12 Clinical Psychologists, 40 Clinical Social Workers, and 4 Senior

Supervising Clinical Social Workers). Based on a the current parolee population of 19,531 mentally ill parolees, this increase in staffing will assist with the reduction of parolees returning to custody as a result of their mental illness, as well as crime prevention. The following lists current and proposed statewide POC staffing:

**Current Staffing:**
Staff Psychiatrist = 37 current positions
Clinical Psychologist = 35 current positions
Clinical Social Worker = 88 current positions

**Proposed Staffing:**
Staff Psychiatrist = 41 positions
Clinical Psychologist = 47 positions
Clinical Social Worker = 128 positions

**DAPO Positions Requested: $4,881,404**
Four Psychiatrist positions:
$207,213 X 4 = $828,852

Twelve Psychologist positions:
$88,404 X 12 = $1,060,848

Forty Clinical Social Worker (SW) positions:
$67,444 X 40 = $2,697,760

Four Senior Supervising Clinical Social Workers:
$73,486 X 4 = $293,944

**Computer Costs: $60,000 (one time cost)**
Hardware and software (60)                    $1,000 X 60 = $60,000

## C. STATE LEVEL CONSIDERATIONS

Mentally ill parolees make up the majority of those which are homeless, jobless, most likely to commit a new crime on parole; and cause the most public concern. There is increasing awareness that the mental illness is a factor in criminal/inappropriate behavior. This group of parolees needs specialized care, treatment and supervision, and without it, they are the most likely to be the returning faces and names on the jail rosters, prison counts, and parole caseloads.

The number of identified mentally ill individuals in the criminal justice system has increased dramatically during the past ten years. While on parole these parolees are often homeless and suffer from other health-related problems such as hepatitis, sexually transmitted diseases, or HIV/AIDS infection. These parolees may cycle continuously between local jails and prison; without a plan for treatment or aftercare within the community; therefore, the cycle remains unbroken.

CSP000011

Without sufficient treatment services, inmates diagnosed as having a serious mental disorder are often paroled into the community with little or no resources for dealing with their mental illness. Without adequate linkages to services within the community, and family or friends for support, mentally ill parolees return to prison or jail at a higher rate than that of any other offender group.

In keeping with the Legislators' and the Department's support for programs that provide treatment and services to inmates and parolees that facilitate their reintegration into the community and reduce recidivism, the proposed enhancements of the MHSCP becomes necessary. Linking mentally ill inmates with services and treatment upon release to parole coupled with adequate resources for medication management has proven in the UCLA study to be an effective strategy in reducing recidivism.

## D. FACILITY/CAPITAL OUTLAY CONSIDERATIONS

Existing facilities within each parole region (i.e., parole units, and regional headquarters), will be utilized for the additional staffing.

## E. JUSTIFICATION

The Department has contracted with the University of California, Los Angeles' (UCLA) Integrated Substance Abuse Programs to conduct a process and outcome evaluation of the Department's Mental Health Services Continuum Program (MHSCP). The contract has recently completed its third of a four year evaluation of the MHSCP and, per contractual scope of work requirements, has submitted its report findings in the form of an annual report, due on or before June 30 of each fiscal year. This request is based on findings from the most recent UCLA evaluation report, dated June 30, 2005.

Consistent with previous research, the UCLA analysis revealed a strong positive relationship between the number of POC sessions attended and recidivism risk. Specifically, the greater number of POC contacts a mentally ill parolee has, the less likely he or she is returned to prison. According to the UCLA evaluation, the POC program retention was the strongest predictor of post-release success among parolees sampled. This evaluation concluded that enhancing retention in the program would further reduce recidivism outcomes. Parolees who were seen at least once a month by a POC clinician for the twelve-month period insured the lowest return to custody rate and the highest cost avoidance for re-incarceration.

The current UCLA evaluation, as noted in previous reports, identified the following factors and key points of interest in the report.

Impact Evaluation:
* Pre-Release Assessments: For parolees who had appeared on the Offender Information Services (OIS) list at least 45 days prior to release, assessment rates increased from 40.9 percent from July 1, 2001 to December 31, 2001, to 70.9 percent for those released during the time of July 1, 2004 to December 31, 2004.

CSP000012

- POC Attendance: Inmates who were assessed prior to release were significantly more likely to attend a POC at least once than those who did not receive a pre-release assessment (66.2 percent versus 50.8 percent, respectively)

Outcome Evaluation:

- Receiving a pre-release assessment by a Transitional Case Management Program social worker was associated with a 19 percent reduction in the likelihood of being returned to custody within 12 months; having one or more POC contacts following release was associated with a 37 percent reduction in recidivism risk.
- The UCLA analysis revealed a strong relationship between the number of POC sessions attended, and recidivism risk. Specifically, the greater number of POC contacts a Correctional Clinical Case Management System (CCCMS)/Enhanced Outpatient Program (EOP) parolee has, the less likely he or she is to be returned to prison. For example, 37.2 percent of parolees with 9 or more POC contacts were returned to custody within 12 months, compared to 70.4 percent of parolees with no POC contacts.
- Parolees who had received a pre-release assessment had an average of 16.7 additional days on parole and parolees who had one or more POC contacts had an additional 78.5 days on parole.

Cost Analysis:

- The cost savings associated with POC attendance: The UCLA analysis calculated that having one or more POC contacts following release was associated with savings of $5,998 per EOP parolee and $3,224 for each CCCMS parolee, relative to those with no POC contact.

The Department's mentally ill parolee population currently consists of 3,540 Enhanced Outpatient Program (EOP) and 15,991 Correctional Clinical Case Management (CCCMS) for a total of 19,531 parolees. To estimate annual correctional cost savings associated with the program, the UCLA evaluators assumed daily incarceration costs of $93.30 per day for EOP inmates and $48.70 per day for CCCMS inmates. However, these costs can be much higher when you consider the possibility of in-custody specialized treatment, medication management, single celled housing, the Department of Mental Health (DMH) referral preparation, staff time required for parole violation charge sheets, Board of Prison Hearings (BPH) screening offers, BPH hearings, and attorney fees.

The POC's present clinical staffing is incapable of meeting the current treatment needs of the over 19,000 mentally ill parolees statewide. Although the initial request considered for this proposal was to establish a standard clinician to parolee ratio, the high cost of such a staffing increase would not be feasible without first taking this smaller approach of moderately increasing staff for the purpose of enhancing treatment and frequency of appointments for mentally ill parolees at the highest risk of re-offending.

The Division of Adult Parole Operation's (DAPO) methodology used to determine the need to increase the frequency of appointments is based on the number of POC contacts identified in the UCLA evaluation which have proven to attain the lowest possible recidivism rate.

CSP000013

Based on the DAPO's projection of a thirty percent recidivism rate, the institutional cost savings are as follows:

- If the Department achieves extending the average days on parole by 108 days or longer without a return to custody for seventy percent of EOP parolees (2,478) due to increased POC contact, the annual cost avoidance for the Department could be over $20,000,000 based on the UCLA study.
- If the Department achieves extending the average days on parole by 108 days or longer without a return to custody for seventy percent of CCCMS parolees (11,993) due to increased POC contact, the annual cost avoidance for the Department could be over $59,000,000 based on the UCLA study.

However, it should be noted that with this modest increase in staffing, DAPO alone will not be able to achieve the full potential in cost avoidance, without immediate and consistent treatment and evaluations while prison, to accelerate the return to parole when parolees must be returned to prison for psychiatric services. See attached process flow charts; specifically chart 2 of 2 for in-custody process.

Approval of the present proposal ensures that an increased number of mentally ill parolees identified as being at a high risk of violating parole would receive the increased treatment necessary to help maintain the parolee in the community and to provide for the public's safety.

## F. ANALYSIS OF ALL FEASIBLE ALTERNATIVES

Alternative 1: Continue the existing operation.

By continuing the current operation level of the MHSCP, the State will be unable to maximize cost savings generated from the program, by reducing the recidivism rate of the Department's mentally ill parolee population.

## G. TIMETABLE

Begin recruitment and hiring for new positions concurrent with the approval of the California State Budget for Fiscal Year 2007-08. It is anticipated that all requested positions will be fully staffed by November of 2007.

## H. RECOMMENDATION

Increase the POC clinical staffing to maximize the Department's cost savings to the State identified in the UCLA report and improve public safety.

CSP000014

Referral for Psychiatric Evaluation and Return to Custody
Flow Chart 1 of 2



*BPH reserves the right to dismiss, modify, sustain, assess time, credit time served and continue on parole for any and all charges.

CSP000015

## Returned to Custody or Placed in Community Care for Psychiatric Services
### Flow Chart 2 of 2



* 30-Day Evaluations are required to begin 30 days from receipt of patient and continue every 30 days until release.

CSP000016

# EXHIBIT B

CSP000017

STATE OF CALIFORNIA
BUDGET CHANGE PROPOSAL - COVER SHEET
FOR FISCAL YEAR    2007/08
DF-46 (WORD Version) (REV 03/05)
*Please report dollars in thousands.*

Department of Finance
915 L Street
Sacramento, CA 95814
IMS Mail Code: A-15

| BCP # | PRIORITY NO. | ORG. CODE | DEPARTMENT California Department of Corrections and Rehabilitation |
|---|---|---|---|
| PROGRAM Division of Adult Parole Operations | ELEMENT Parole Outpatient Clinics | COMPONENT Mental Health Care for Parolees | |

TITLE OF PROPOSED CHANGE
Day Treatment Programming For Severely Mentally Ill Adult Parolees

SUMMARY OF PROPOSED CHANGES

The Division of Adult Parole Operations (DAPO) is requesting an augmentation to its existing Parole Outpatient Clinic (POC) funding of $2.55 million dollars to establish and create the following:

A. POC clinical and support positions to provide an array of enhanced treatment services to the Department's severely mentally ill population that requires additional resources, treatment and monitoring above and beyond the current level of resources provided by the DAPO. Specifically, this request would entail utilizing these newly requested positions at 3 Day Treatment Program (DTP) sites within each of the 4 Parole Regions to provide enhanced treatment and monitoring services. The cost for these positions would be approximately $1.55 million annually.

B. Lease community facility space within each Parole Regions at 3 locations per Region, totaling 12 facility leases for a total of $1million annually.

C. Increase to DAPO psychotropic medication budget.

POC presently provides outpatient mental health treatment to mentally ill parolees. However, a number of these parolees require more intensive treatment than can presently be provided by POC due to staffing and site limitations; some of these parolees, therefore, end up being returned to custody (RTC) for psychiatric treatment (at a cost of $40,000.00 to $100,000.00 per year, range of estimated cost related to delivery of mental health services, and mental health housing during incarceration) after committing parole violations that may be influenced by their mental illness. Currently individuals returned to custody as "psychiatric returns" receive no specialized treatment, and are retained for the maximum period of re-incarceration, contrary to the California Code of Regulations, Title 15, Chapter 6, Section 2600 requirements. 8,000 parolees with mental illness were RTC during the calendar year of 2005. It has been estimated that enhanced POC services through DTC's will reduce the RTC rate by 75%, resulting in a savings of $ _____.

| REQUIRES LEGISLATION | CODE SECTION(S) TO BE AMENDED/ADDED | BUDGET IMPACT—PROVIDE LIST AND MARK IF APPLICABLE |
|---|---|---|
| ☐ YES<br>☒ NO | | ☐ ONE-TIME COST  ☒ FUTURE SAVINGS<br>☒ FULL-YEAR COSTS  ☐ REVENUE<br>☐ FACILITIES/CAPITAL COSTS |

| PREPARED BY | DATE | REVIEWED BY , DIRECTOR OF DAPO | DATE |
|---|---|---|---|
| CHIEF DEPUTY SECRETARY DAVE RUNNELS | DATE | AGENCY SECRETARY | DATE |

IF PROPOSAL AFFECTS ANOTHER DEPARTMENT, DOES OTHER DEPARTMENT CONCUR WITH PROPOSAL?

PAGE II-1

CSP000018

☐ YES    ☐ NO    ATTACH COMMENTS OF AFFECTED DEPARTMENT, SIGNED AND DATED BY THE DEPARTMENT DIRECTOR OR DESIGNEE.

FOR INFORMATION TECHNOLOGY REQUESTS, SPECIFY THE DATE SPECIAL PROJECT REPORT (SPR) OR FEASIBILITY STUDY REPORT (FSR) WAS APPROVED BY THE DEPARTMENT OF FINANCE.

DATE    PROJECT #    FSR ☐    OR    SPR ☐

DEPARTMENT OF FINANCE ANALYST USE
(ADDITIONAL REVIEW)

CAPITAL OUTLAY ☐    OTROS ☐    FSCU ☐    OSAE ☐    CALSTARS ☐

STATE OF CALIFORNIA
BUDGET CHANGE PROPOSAL—FISCAL DETAIL
STATE OPERATIONS
DF-46 (REV 03/05)
*Please report dollars in thousands.*

Department of Finance
915 L Street
Sacramento CA 95814
IMS Mail Code A-15

| BCP # | DATE | TITLE OF PROPOSED CHANGE Parole Planning and Placement Program | | | | | |
|---|---|---|---|---|---|---|---|
| PROGRAM Division of Adult Parole Operations | ELEMENT Pre-Release | COMPONENT | | | | | |
| | PERSONNEL YEARS | | | | | | |
| | CY | BY | BY + 1 | CY | BY | BY + 1 | |
| TOTAL SALARIES AND WAGES [1] | | | | $ | $ | $ | |
| SALARY SAVINGS | . | - | - | - | - | - | |
| NET TOTAL SALARIES AND WAGES | | | | $ | $ | $ | |
| STAFF BENEFITS [2] | | | | $ | $ | $ | |
| TOTAL PERSONAL SERVICES | | | | $ | $ | $ | |
| OPERATING EXPENSES AND EQUIPMENT [3] | | | | | | | |
| GENERAL EXPENSE | | | | | | | |
| PRINTING | | | | | | | |
| COMMUNICATIONS | | | | | | | |
| POSTAGE | | | | | | | |
| TRAVEL—IN STATE | | | | | | | |
| TRAVEL—OUT OF STATE | | | | | | | |
| TRAINING | | | | | | | |
| FACILITIES OPERATIONS | | | | | | | |
| UTILITIES | | | | | | | |
| CONSULTING & PROFESSIONAL SERVICES: Interdepartmental [3] | | | | | | | |
| CONSULTING & PROFESSIONAL SERVICES: External [5] | | | | | | | |
| CONSOLIDATED DATA CENTERS | | | | | | | |
| Health and Human Services Date Center | | | | ( ) | | | |
| Stephen P. Teale Data Center | | | | ( ) | ( ) | ( ) | |
| DATA PROCESSING | | | | | | | |
| EQUIPMENT [3] | | | | | | | |
| DEBT SERVICE | | | | | | | |
| OTHER ITEMS OF EXPENSE (specify below) | | | | | | | |
| | | | | | | | |
| TOTAL OPERATING EXPENSES AND EQUIPMENT | | | | $ | $ | $ | |
| SPECIAL ITEMS OF EXPENSE [4] | | | | $ | $ | $ | |

PAGE II-2

CSP000019

| TOTAL STATE OPERATIONS EXPENDITURES | | | | $ | $ | $ |
|---|---|---|---|---|---|---|
| **SOURCE OF FUNDS** | **APPROPRIATION NO.** | | | | | |
| | ORG | REF | FUND | | | |
| GENERAL FUND | | | | | | |
| SPECIAL FUNDS | | | | $ | $ | $ |
| FEDERAL FUNDS | | | | $ | $ | $ |
| OTHER FUNDS (SPECIFY) | | | | $ | $ | $ |
| REIMBURSEMENTS | | | | $ | $ | $ |
| | | | | $ | $ | $ |

[1] ITEMIZED DETAIL ON PAGE I-3 BY CLASSIFICATION AS IN SALARIES AND WAGES SUPPLEMENT.

[2] PROVIDE DETAIL ON PAGE I-3.

[3] PROVIDE LIST ON PAGE I-4.

[4] SPECIAL ITEMS OF EXPENSE MUST BE TITLED. PLEASE REFER TO THE UNIFORM CODES MANUAL FOR A LIST OF THE STANDARDIZED SPECIAL ITEMS OF EXPENSE OBJECT WHICH MAY BE USED.

**Fiscal Detail Continued**

**LOCAL ASSISTANCE AND DETAIL OF STAFF BENEFITS AND PERSONAL SERVICES**

| LOCAL ASSISTANCE | | | | $( ) | $( ) | $( ) |
|---|---|---|---|---|---|---|
| **SOURCE OF FUNDS** | **APPROPRIATION NO.** | | | | | |
| | ORG | REF | FUND | | | |
| GENERAL FUND | | | | | | |
| SPECIAL FUNDS | | | | $ | $ | $ |
| FEDERAL FUNDS | | | | $ | $ | $ |
| OTHER FUNDS | | | | $ | $ | $ |
| REIMBURSEMENTS | | | | $ | $ | $ |
| | | | | $ | $ | $ |

| CLASSIFICATION [1] | POSITIONS | | | SALARY/RANGE (WHOLE DOLLARS) | AMOUNT | | |
|---|---|---|---|---|---|---|---|
| | CY | BY | BY + 1 | | CY | BY | BY + 1 |
| Psychiatrists (12 PYs) | | | | $ | $ | $ | $ |
| Psychologist (12 PYs) | | | | | | | |
| Clinical Social Worker (24 PYs) | | | | | | | |
| Occupational Therapist (12 PYs) | | | | | | | |
| Recreation Therapist (12 PYs) | | | | | | | |
| Psychiatric Technician (24 PYs) | | | | | | | |
| Office Technician (12 PYs) | | | | | | | |
| Parole Agent (24 PYs) | | | | | | | |
| **TOTAL SALARIES AND WAGES** [2] | | | | ////// | $ | $ | $ |

| STAFF BENEFITS DETAIL | | CY | BY | BY + 1 |
|---|---|---|---|---|
| | | | (WHOLE DOLLARS) | |
| OASDI | | $ | $ | $ |
| HEALTH INSURANCE | | | | |
| RETIREMENT [3] | | | | |

PAGE II-3

CSP000020

| WORKERS' COMPENSATION | | | |
|---|---|---|---|
| INDUSTRIAL DISABILITY LEAVE | | | |
| NON-INDUSTRIAL DISABILITY LEAVE | | | |
| UNEMPLOYMENT INSURANCE | | | |
| OTHER | | | |
| TOTAL[2] | $ | $ | $ |

[1] USE STANDARD ABBREVIATIONS PER THE SALARY AND WAGES SUPPLEMENT. USE FOOTNOTES TO REFLECT ANY EFFECTIVE DATE OR LIMITED TERM IF POSITION IS NOT PROPOSED FOR A FULL YEAR. NOTE: INFORMATION PROVIDED SHOULD APPEAR IN THE SAME FORMAT AS IT WOULD APPEAR ON THE SCHEDULE 2 (CHANGES IN AUTHORIZED POSITIONS).

[2] TOTALS MUST BE ROUNDED TO THE NEAREST THOUSAND DOLLARS BEFORE POSTING TO PAGE I-2.

[3] LIST TYPE OF RETIREMENT, I.E., MISCELLANEOUS, SAFETY, INDUSTRIAL, ETC.

## SUPPLEMENTAL INFORMATION
*Please report dollars in thousands.*

| DEPARTMENT | BCP# | FISCAL YEAR |
|---|---|---|
| California Department of Corrections and Rehabilitation | | 2007/08 |

IDENTIFY ALL PROPOSED ITEMS WHICH FIT INTO THE CATEGORIES LISTED BELOW. SEE INSTRUCTIONS ON PAGES I-7 AND I-8.

| | CURRENT YEAR | BUDGET YEAR | BUDGET YEAR + ONE |
|---|---|---|---|
| PROPOSED EQUIPMENT | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| TOTAL | $ | $ | $ |
| PROPOSED CONTRACTS | | | |
| | | | |
| | | | |
| | | | |
| TOTAL | $ | $ | $ |
| ONE-TIME COSTS (LIST BY ITEM) | | | |
| Computer Hardware and Software | 36,000 | | |
| | | | |
| | | | |
| TOTAL | $ | $ | $ |
| FUTURE SAVINGS | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| TOTAL | $ | $ | $ |

PAGE II-4

CSP000021

| FULL-YEAR COST ADJUSTMENTS | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| TOTAL | $ | $ | $ |

CSP000022

| FACILITIES/CAPITAL COSTS * | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| TOTAL | $ | $ | $ |

* Indicate one-time or ongoing.

# CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
## DIVISION OF ADULT PAROLE OPERATIONS
## FISCAL YEAR 2006/2007 BUDGET CHANGE PROPOSAL
## PAROLE PLANNING AND PLACEMENT PROGRAM

**A.    NATURE OF REQUEST**

The Division of Adult Parole Operations (DAPO) is requesting an augmentation to its existing POC funding of $$$$ million dollars to establish and create the following:

A. POC clinical and support positions to provide an array of enhanced treatment services to the Department's severely mentally ill population that requires additional resources, treatment and monitoring above and beyond the current level of resources provided by the DAPO. Specifically, this request would entail utilizing these newly requested positions at 3 Day Treatment Program (DTP) center locations within each of the 4 Parole Regions to provide enhanced treatment and monitoring services. The cost for these positions would be approximately $1.55 million annually.

B. Lease community facility space within each Parole Regions at 3 locations per Region, totaling 12 facility statewide leases for a total of $1 million annually. Each DTP facility has a requirement of ## square feet, including staff required spacing, recreational therapy room, medication and group counseling rooms, and garage for transportation van.

POC presently provides outpatient mental health treatment to mentally ill parolees. However, a number of these parolees require more intensive treatment than can presently be provided by POC due to staffing and site limitations. Therefore, some of these parolee, end up being returned to custody (RTC) for psychiatric treatment (at a cost of $40,000.00 to $100,000.00 per year, range of estimated cost related to delivery of mental health services, and mental health housing during incarceration) after committing parole violations that may be influenced by their mental illness. 10,000 parolees with mental illness were RTC during the calendar year of 2005. It has been estimated that enhanced POC services through DTP's will reduce the RTC rate by 75%, resulting in a savings of

*Day Treatment Program sites (which would provide services for 35 to 45 parolees) are as follows:*

*Parole Region 1, Adult Parole Day Treatment Programs be established in Bakersfield, Fresno and Sacramento.*

*Parole Region 2, Adult Parole Day Treatment Programs be established in San Francisco, San Jose and Oakland.*

CSP000023

*Parole Region 3, Adult Parole Day Treatment Programs be established in Alameda, Van Nuys and*

*Parole Region 4, Adult Parole Day Treatment Programs be established in*

Day Treatment Programming for severely mentally ill inmates has already been endorsed by the Federal Courts (i.e., Coleman case) as an appropriate level of care for some higher need individuals; thus, it logically follows that this same population of individuals, while on parole, could continue to benefit from Day Treatment Programming, Following is a summary proposal which outlines a program for Adult Parole Day Treatment which we believe could be an important first step in further reducing recidivism and enhancing public safety.

**Group therapy and activities proposed for the Day Treatment Program are as follows:**

**Social Skills** – Teaches basic social transactions, such as how to initiate a conversation, how to end a conversation, how to pick up internal and external social clues, how to respond appropriately to others, etc.

**Daily Living** - Teaches skills such as how to ride public transportation, how to shop for clothes and groceries, how to prepare simple meals, and how to manage money.

**Hygiene and Grooming** – Teaches basic grooming skills such as bathing, hair care, dental care, shaving, cleaning one's clothes, etc.

**Leisure Development and Leadership** - Teaches activities that could become hobbies or long term leisure activities, such as board games, reading books, playing team sports such as volleyball, and developing interest in an area such as nature or collecting. Leisure Leadership skills would focus on how to initiate a leisure activity i.e. obtain a board game, arrange an area to play, invite friends to play, how to start the game, etc.

**Medication Management/ Symptom Management** - Helps parolees understand their symptoms and the relationship between alleviation of their symptoms and adherence to prescribed medication regimen.

**Anger Management/Conflict Resolution** – Teaches parolees ways to recognize and control their anger, to deal with their feelings and conflicts in an effective manner, and to practice resolving conflicts in calm and reasonable ways.

**Movement Therapy/(Exercise)** – Teaches parolees ways to use movement in order to alleviate stress and practice healthy living skills. Easy yoga, tai chi, and other forms of movement would be utilized

**Assertiveness Training** – Teaches parolees ways to communicate assertively. Didactic teaching techniques and practice sessions would be utilized.

**Problem Solving** – Helps parolees verbalize many of their daily problems and helps them solve these issues in an effective manner utilizing a logical approach.

**Current Events** – Helps direct parolees to sources of information regarding current events, such as radio, newspapers, magazines and television as well as discussing many current issues within group sessions.

**Goal Planning/ Achieving** – Assists parolees to come up with lists of goals they would like to achieve and then focus on teaching them simple steps to follow so that they can achieve as many goals as possible. Focus would also be placed on the development of realistic goals.

**Stress Management** – Teaches parolees methods of reducing stress. Emphasis would be placed on defining daily stressors, learning how stress affects mental health and daily functioning, ways

CSP000024

to reduce stress in general, and specific methods (i.e., progressive relaxation, meditation) to reduce unavoidable stress.

**Depression Group** – Teaches parolees the symptoms of depression, how these symptoms affect their mood, ways to increase their mood through simplified cognitive behavioral techniques, information on how adherence to prescribed medication can decrease their depression, and education about how being depressed affects daily life.

**Transition Planning** – assist parolees who will be discharging parole within approximately 180 days, aiding them in their transition back to community care. The group helps to prepare them to manage without the support of parole and the Day Treatment Program or would help connect them to similar care in the community when off of parole.

**First Aid** – Teaches and Demonstrates Basic First Care

**Community Field Trips** – This activity will allow participants to practice social skills, access public transportation, and experience shopping for clothes, food, and entertainment, and using money.

**Individual Therapy** – will be provided on an as-needed basis

## B.    BACKGROUND/HISTORY

As cited, the Legislature finds in Penal Code Section 2960 that "severely mentally disordered prisoners should be provided with an appropriate level of mental health treatment while in prison and when returned to the community." Further the Legislature finds that to protect the public's safety "it is necessary to provide mental health treatment until the severe mental disorder which was one of the causes of, or an aggravating factor in the person's prior criminal behavior, is in remission and can be kept in remission."

In 1986, the Legislature mandated the Department to contract for a study of the prevalence of severe mental illness in the prison population (Penal Code Section 1616). In response to the study, the Department contracted with outside consultants to develop a treatment system model. The consultants identified two levels of general population treatment; those who need treatment services as part of case management, Correctional Clinical Case Management System (CCCMS) and those who need treatment due to severe/serious mental illness, Enhanced Outpatient Program (EOP). A subsequent federal court decision (Coleman) required the Department to provide the services identified by the consultants.

A subsequent court decision (Whitley) set strict limits on CDCR's protocol for residential placement of parolees with mental illness. The decision set strict guidelines regarding inpatient placement options for mentally ill parolees. Due in part to the court's ruling and to the lack of community-based residential settings, the Department is obligated to provide services to a greater number of individuals whose mental stability is marginal.

In Fiscal Year (FY) 1999/2000, the Department's DAPO received an augmentation of $6 million dollars the POC's existing base budget to implement the MHSCP. The MHSCP provides invaluable pre-release planning and post-release treatment (via the POC) for both EOP and CCCMS offenders and provides empirical research to determine what measures/systems work for these populations.

In subsequent FY's, the MHSCP received additional resources in order to accommodate the service needs of increased numbers of releasing mentally ill offenders. However, the current staffing pattern does not rise to the level necessary to maximize cost savings to the state and treatment benefits to parolees.

CSP000025

Specifically, the MHSCP includes:
- Pre-Release needs assessments of paroling mentally ill inmates.
- Pre-Release benefits eligibility and applications assistance.
- Expanded and enhanced post release mental health treatment for mentally ill parolees.
- Improved continuity of care from the institutions Mental Health Services Delivery System to DAPO's MHSCP.
- Increased assistance for successful reintegration into the community upon discharge from parole.
- A standardized program in all four parole regions.

Project implementation is dependent of the amount of time required to establish the new POC positions, and negotiate leases for facility space in the community.

## C.    STATE LEVEL CONSIDERATIONS

## D.    FACILITY/CAPITAL OUTLAY CONSIDERATIONS
N/A

### C. JUSTIFICATION

One of the CDCR's top priorities is to ensure public safety and reduce recidivism through the successful reintegration of parolees back into the community and off of parole. The POC was designed for that purpose. The State assumes responsibility for parolees through its criminal justice system but this program also involves local public and private sector interaction and resources in assisting the parolee to be successful as a citizen in the community which they reside.

In keeping with the Legislators' and the Administration's support for programs that provide treatment and services to inmates and parolees that facilitate their reintegration into the community and reduce recidivism, the proposed enhancements of the MHSCP becomes necessary. Linking mentally ill inmates with services and treatment upon release to parole coupled with adequate resources for medication management has proven to be an effective strategy in reducing recidivism.

Mentally ill parolees make up the majority of those which are homeless, jobless, most likely to commit a new crime on parole, and cause the most public concern. There is increasing awareness that this group needs specialized care, treatment and supervision, and without it, are the most likely to be the returning faces and names on the jail rosters, prison counts, and parole caseloads.

The California Code of Regulations and CDCR policy allow for parolees with serious mental illness and/or disorders to be returned to prison specifically for the purpose of receiving mental health treatment. This process has been challenged in both State and Federal court.

To meet this challenge the DTP model was developed and has already been endorsed by the federal courts. DTP allows for assessment and evaluation of needs/risk factors followed by intensive, focused treatment designed to stabilize the patient and prepare them for community reintegration.

Without sufficient treatment services, inmates diagnosed as having a serious mental disorder are often paroled into the community with little or no resources for dealing with their mental illness. Facing loss of the correctional institution's support system and psychiatric care, and inadequate linkages to services in the community, severely mentally ill parolees, frequently without friends or family, return to prison or jail at a higher rate than that of any other offender group.

CSP000026

Day Treatment Programming would allow for more intensive treatment services for severely mentally ill, higher need parolees. To enhance the services mentally ill parolees are already receiving from POC, Day Treatment Programming could ensure that needed additional services would be provided. This treatment includes: imparting necessary skills in a short time frame; targeting and addressing symptoms and adjustment issues; teaching coping strategies and promoting community reintegration. This model utilizes primarily behavioral and cognitive techniques, and allies with the inmate patient's strengths to remediate their unmet needs. Additionally, DTP staff would monitor parolees' responses to medications (including side effects) and provide medication administration. Occupational Therapy and Recreational Therapy would be added to the treatment options. Adding a DTP component to the services already provided by POC could further reduce recidivism and enhance public safety.

Consistent with previous research, the November 2003, University of California Los Angeles (UCLA) evaluation report revealed a strong positive relationship between the number of POC sessions attended and recidivism risk. Specifically, the greater number of POC contacts a mentally ill parolee has the less likely he or she is returned to prison. For example, 17.4% of parolees with at least 9 POC sessions had recidivated within 12 months, relative to 70.6% of parolees with no POC contact. The average POC parolee had 5 POC sessions during the 12 months following release. According to the UCLA evaluation, the POC program retention was the strongest predictor of post-release success among parolees sampled. The evaluation concluded that enhancing retention in the program would further reduce recidivism outcomes. Parolees who were seen at least once a month by a POC clinician for the twelve-month period incurred the lowest return to custody rate and the highest cost avoidance for re-incarceration. In addition, the report concluded that one or more POC contacts following release from prison was associated with a 65% reduction in the recidivism risk.

The DAPO's mentally ill population currently consists of 3,279 enhanced outpatient program (EOP) and 13,332 correctional clinical case management (CCCMS) for a total of 16,611 parolees. To estimate annual correctional cost savings associated with the program, the UCLA evaluators assumed daily incarceration costs of $93.30 per day for EOP inmates and $48.70 per day for CCCMS inmates. From these figures, the estimated daily cost of parole supervision and program costs ($9.99) were subtracted, which resulted in estimated daily cost savings of $83.31 for each additional day an EOP parolee remains under community supervision, relative to being incarcerated, and $38.71 for each additional day a CCCMS parolee remains under community supervision.

Based on the DAPO's projection of a thirty percent recidivism rate, the institutional cost savings are as follows:

- Seventy percent of EOP parolees (2,296) in the program would remain on parole an average of 108 days longer, thereby realizing a savings of $20,651,916.

- Seventy percent of CCCMS parolees (9,332) in the program would remain on parole an average of 108 days longer, thereby realizing a savings of $39,015,778.

- Total projected institution cost savings = $59,631,694.

The POC's present staff of 152 clinicians is incapable of meeting the current treatment needs of the approximately 16,000 mentally ill parolees statewide. The number of POC staff should be adjusted bi-annually to maintain the level of services necessary to achieve maximum cost savings identified in the UCLA report. If this request is denied mentally ill parolees will not be seen often enough in order for the state to fully maximize cost savings and for the parolee to achieve maximum treatment benefit and subsequently reduce victimization and increase public safety.

Approval of the present proposal would ensure that mentally ill parolees receive the treatment necessary to maintain the parolee safely in the community and to provide for the public's safety.

Another critical component of the MHSCP is the provision of psychotropic medication management to the mentally ill parolee population it serves.

CSP000027

## Psychotropic medication budget

This request is needed due to the fact that the cost of psychotropic medication itself continues to increase, as does the total number of mentally ill parolees accessing services and treatment through the POC's MHSCP.

The POC's budget for psychotropic medications is $3.9 million annually. However, that baseline budget does not adequately rise to the level of needed resources. Psychotropic medication costs continue to increase due to higher costs for the medications themselves as well as yearly increases in mentally ill parolees releasing from the department's institutions. In FY 2003/04, expenditures for psychotropic medication were $15,400,000.

For the methodology used to calculate a standardized costing for medication per parolee the program divided the FY 2003/04 medication expenditure of $15,400,000 by the number of parolees that were prescribed medication during that time. Approximately 11,000 parolees were prescribed medications for a total cost of $15,400,000, which equals a standardized medication costing $1,400.00 per parolee annually.

Sufficient baseline budget dollars for psychotropic medications could ensure that every parolee in need of mental health services would receive the necessary treatment. In doing so, the department may reduce the number of crimes committed by mentally ill parolees and incur cost savings without jeopardizing the public's safety by ensuring each mentally ill parolee was medicinally managed in an efficient and comprehensive manner.

If this request is denied, the DAPO will continue to overspend its budget for psychotropic medications. In addition, the total amount of mentally ill parolees receiving psychotropic medications will continue to increase, thus creating additional deficit spending, forcing the DAPO to shift funds from other existing DAPO programs to cover the psychotropic medication costs. Finally, continuous psychotropic medication deficits may result in insufficient or curtailed medication management of many mentally ill parolees in order to maintain a semblance of fiscal responsibility. As a result, this inaction may jeopardize public safety.

## Program Staffing

Proposed staffing allow the staff to focus on and carry out the basic tasks required to help the patient successfully entrench in the community quickly reducing incarceration costs and recidivism.

| | |
|---|---|
| Staff Psychiatrist | 4.0 |
| Staff Psychologist | 12.0 |
| Supervising Social Worker | 12.0 |
| Licensed Clinical Social Workers | 24.0 |
| Registered Nurse | 12.0 |
| Occupational Therapist | 12.0 |
| Recreational Therapist | 12.0 |
| Psychiatric Technician | 24.0 |
| Parole Agents | 16.0 |
| Office Technician | 12.0 |

**4.0 – Staff Psychiatrists**
These positions provide primary psychiatric care and may include:

♦ Medication evaluation, prescribing, and monitoring, via Telemed Communication

♦ Crisis Intervention

♦ Interdisciplinary Treatment Team (IDTT) member

♦ Enters schedules, individual appointments and case notes into the Parolee Automated Tracking System (PATS) database

**12.0 – Staff Psychologists**

CSP000028

These positions provide primary care and assessment and may include:

♦ Conduct initial evaluations on new patients
♦ Provide individual and group therapy
♦ Administration of psychological testing when appropriate
♦ Provide individual therapy and consultation as needed
♦ Enters schedules, individual appointments and case notes into the PATS database
♦ Review of community adjustment issues and participation in treatment planning
♦ Providing clinical case management in selected cases
♦ Participation in development of release plans
♦ IDTT member

## 12.0 – Supervising Social Workers

These positions will provide office supervision and community based assessment and planning of clinical case management, and may include:

♦ Coordinate DTP activities
♦ Supervise staff and parolee scheduling, attendance, and time keeping
♦ Assist in facility budgeting
♦ Conduct initial evaluations on new patients when needed
♦ Ensure all appropriate paperwork is completed for entitlement benefits including but not limited to; SSI, V.A., and Medi-Cal
♦ Participate in initiation of Conservatorship actions
♦ Enters schedules, individual appointments and case notes into the PATS database
♦ Participation in development of discharge planning for parolees
♦ Conduct assigned groups
♦ Provide individual therapy and consultation
♦ Report to regional Chief Psychiatrist
♦ IDTT member.

## 12.0 – Clinical Social Workers

These positions will focus on community adjustment assessment and planning and clinical case management, and may include:

♦ Conduct initial evaluations on new patients
♦ Review of previous community interventions
♦ Complete paperwork for entitlement benefits including but not limited to; SSI, V.A., and Medi-Cal and other financial support applications
♦ Enters schedules, individual appointments and case notes into the PATS database
♦ Participate in initiation of Conservatorship actions
♦ Participation in development of discharge planning for parolees
♦ Conduct assigned groups
♦ Provide individual therapy and consultation
♦ IDTT member

CSP000029

## 12.0 - Registered Nurses

These positions will have primary responsibilities for medication distribution and symptom monitoring, including:

- Review of medical records of past medications
- Distribution of current prescribed medications
- Provide crisis intervention
- Participate in the development of medication plans for community release
- Provide medication management training for patients
- Address health issues in group and individual sessions to evaluate medical complaints and/or observed medical needs
- Administer injection therapy when prescribed
- IDTT member

## 12.0 - Occupational Therapists

These positions will provide opportunities for patients to receive training in occupational skills and receive assessment for community job placement, including:

- Conduct parolee interviews to determine their occupational needs and skills
- Provide group activities for enhancing occupational skills
- Provide consultation to various parole staff
- Review and community job placement for patients
- Participate in development of individual release plan
- IDTT member

## 12.0 - Recreational Therapists

These positions will provide recreational therapy opportunity for patients to interact socially, develop emotional control, cultivate individual interests and constructive use of free time, and have alternatives to substance abuse for personal entertainment. These position will:

- Provide individual assessment of personal interests and historical recreational activities
- Schedule and supervise daily recreational activities for individual and groups
- Assess patient participation and monitor interpersonal relationships among participants
- Enhance social skills associated with recreational activities
- Provide consultation to various parole staff
- Participate in development of individual release plan
- IDTT member

## 24.0 - Psychiatric Technician

These positions provide monitoring of patient behavior, response to therapeutic programming, and assistance ion activities of daily living. Specific responsibilities may include:

- Provide fundamental nursing care including first-aid methods
- Assist and monitor patients in activities of daily living, including personal hygiene, eating medication compliance, and unit work activities
- Supervise and support recreational and group therapy sessions
- Assist in initial and ongoing patient assessment and treatment planning
- Provide crisis intervention

CSP000030

- ♦ Have the ability to recognize medical needs and refer for care.
- ♦ Participate in development of individual release plan
- ♦ IDTT member

## 12.0 - Office Technicians
These positions will require exceptional levels of document preparation, and may including:
- ♦ Gather information of audits and schedules
- ♦ Schedules treatment groups in accordance with court mandates
- ♦ Completes daily/weekly reports for various mental health programs
- ♦ Tracks parole attendance and participation in various programs
- ♦ Communicates new patient arrivals and transfers to appropriate supervisors and clinical staff.
- ♦ Prepares correspondence to community members and support organizations
- ♦ Preparation of funding applications, conservatorship documents
- ♦ Answers telephones and responds to questions within area of expertise, copies and assists with distribution of various mental health communications and reports.
- ♦ Attends IDTT meetings
- ♦ Prepare, order, and maintain office supplies

## 18 - Parole Agents
This position reflects the unique nature of this DTP unit and will include the safety and security consideration in community based treatment planning and re-entry decisions. Specific responsibilities may include:
- ♦ Assessment of criminogenic therapeutic factors
- ♦ Participate in the development of individual treatment plans
- ♦ Liaison with local law enforcement and Agent of Record
- ♦ Participation in group and individual treatment, as needed
- ♦ Assist in maintaining safety and security of program
- ♦ Participate in IDTT review
- ♦ Oversight of program staff
- ♦ Oversight of parole population while at DTP

If the expanded staffing package is not approved, the proposed increase in the population to be served will not be adequately addressed. CDCR will be unable to provide the appropriate staff to

## F.    ANALYSIS OF ALL FEASIBLE ALTERNATIVES

### Alternative 1.

*Alternative 1: Approve the requested additional resources.*

Establishing a standardized clinician to parolee ratio and augmenting the current POC baseline budget for psychotropic medication will maximize cost savings to the State identified in the UCLA report and improve public safety.

*Alternative 2: Continue the existing operation.*

CSP000031

By continuing the current operation level of the MHSCP, the State will be unable to maximize cost savings generated from the program and the DAPO will continue to deficit spend on its psychotropic medication budget. This, in turn, forces the DAPO to shift funds from other existing DAPO programs to cover the psychotropic medication costs which causes further budgetary problems and potential reductions in other key line items such as Casework services funding.

Denial of this request will allow for the status quo to continue: the inability to quickly and efficiently treat seriously mentally ill parolees, and continued high levels of revocation for this specific parolee population.

Additional consequences include higher levels of recidivism, reduced availability of psychotropic medications needed for the MHSCP population, and increased public outcry for state officials to reduce mentally ill parolee crime

## G.    TIMETABLE

## H.    RECOMMENDATION

Alternative 2 Alternative 1.

By selecting Alternative 1, the Department will achieve maximum cost savings to the State identified in the UCLA report and improve public safety.

CSP000032

| REAL ESTATE SERVICES DIVISION | | | PROGRAM DATA | |
|---|---|---|---|---|
| PROFESSIONAL SERVICES BRANCH | | | | |
| DESIGN SERVICES | | | Date: 5/24/2006 | |
| Department of General Services | | State of California | Transaction No. | |
| Department | Department of Corrections and Rehabilitation | | Space Type | |
| Division | Division of Adult Parole Operations | | O = Open Space | |
| Location | 12 sites total; 3 in each Region 1, 2, 3 & 4 | | P = Private Office | |
| | | | G = Group Workstations | |

**PROGRAM FOR:**  Parole Outpatient Clinic Day Treatment Program

| (T)ype | (B)ase | CLASSIFICATION | STAFF PROJECTIONS | | Space | Total Area |
|---|---|---|---|---|---|---|
| | | | NOW | 2 YRS | Area | Type | Required |
| A | A | Psychiatrists | 1 | 1 | 125 | P | 125 |
| A | A | Psychologists | 1 | 1 | 125 | P | 125 |
| A | A | Parole Agent I | 1 | 1 | 100 | P | 100 |
| A | A | Clinical Social Worker (2 per office) | 2 | 1 | 100 | P | 100 |
| A | A | Occupational/Recreational Therapist (2-office) | 2 | 2 | 100 | G | 200 |
| A | A | Psychiatric Technician | 2 | 2 | 100 | G | 200 |
| A | A | Office Technician | 3 | 3 | 100 | G | 300 |
| A | A | Registered Nurse | 1 | 1 | 80 | O | 80 |
| | | | 1 | 1 | 100 | P | 100 |
| | | Subtotal Office Requirements | 12 | 12 | | | 1230 |
| | | Circulation | 40 Percent | | | | 492 |
| | | **TOTAL OFFICE SPACE REQUIRED** | | | | | **1722** |
| | | *S.F. of Office Space per py* | | | | | |

**SPECIAL REQUIREMENTS**

| | |
|---|---|
| Reception | |
| Recreation Therapy Room, 30x30 (w/unisex restroom) | 200 |
| Employee Room | 900 |
| Supply Storage | 400 |
| Telephone - Computer Room / Vented | 100 |
| Group Counseling Room ( 2 each @ 225 sq.ft) | 100 |
| Parolee Restrooms (1 - Male & 1-Female, 80 sq. ft each) | 450 |
| Mail / Copy / Fax Room | 160 |
| Medication Room with locked Refridgeration Unit | 100 |
| Training Room - Industrial Kitchen | 200 |
| Garage for Transportation Van (lockable) | 300 |
| Janitorial Closet | 200 |
| | 80 |

| | | | |
|---|---|---|---|
| Subtotal Special Requirements | | | 3190 |
| Circulation | 40 Percent | | 1276 |
| **TOTAL SPECIAL USE SPACE REQUIRED** | | | **4466** |
| *S.F. of Special Requirements per py* | | | |

| | | |
|---|---|---|
| **TOTAL NET SPACE REQUIRED** | | **6188** 0 |
| *S.F. of Total Net Space per py* | | 0 |

**COMMENTS:**

PARKING
| | |
|---|---|
| Public | 22 |
| Handicap per code | |
| State | 2 |

CSP000033

# EXHIBIT C

CSP000034



*State of California*

# LITTLE HOOVER COMMISSION

January 25, 2007

The Honorable Arnold Schwarzenegger
Governor of California

The Honorable Don Perata
President pro Tempore of the Senate
    and members of the Senate

The Honorable Dick Ackerman
Senate Minority Leader

The Honorable Fabian Núñez
Speaker of the Assembly
    and members of the Assembly

The Honorable Michael Villines
Assembly Minority Leader

Dear Governor Schwarzenegger and members of the Legislature:

California's prisons are out of space and running out of time.

The State already has ceded control to the federal courts for prison mental health, juvenile justice and the prison health system. In December, a federal judge ordered the State to fix the overcrowding problem within six months, or face the prospect of a prison population cap.

The State is past the point for assigning blame. The urgency of the crisis demands we look now to those who can produce a solution. That responsibility lies with the Governor and the Legislature. You have the authority and, as California's leaders, must share the duty of fixing California's failed corrections system.

A default strategy of waiting until federal judges order needed changes is not governing. The Governor and Legislature need to take the initiative away from federal courts by demonstrating you have a better plan. That way, the Governor and Legislature can regain the confidence of the courts as well as the Californians they govern.

You must assess your options frankly and move forward together on a solution. The Governor has taken a first step with proposals that acknowledge the key issues and signal willingness to engage in the process of developing solutions. But proposals have been made before only to stop short of full implementation. The Governor and Legislature need to lay out plans that include strategies and timetables for major milestones. And you need to deliver on your commitments.

The Governor and Legislature must find the political will to move past rhetoric and address ways to solve the prison population crisis and make good on promises to improve public safety. "Tough on Crime" sentencing laws have to be judged by outcomes and matched with fiscal responsibility. To ensure public safety, reforms will have to jettison posturing to make room for smart on crime policies.

You must act decisively on the problem or turn it over to an independent body, insulated from politics, that can. Our recommendation and preference is for you to do it yourselves.

The problem does not need further study. The State knows what the answers are, thanks to nearly two decades of work by such groups as the Blue Ribbon Commission on Population Management, the Corrections Independent Review Panel and a series of reports by this Commission. Despite ample evidence and recommendations, policy-makers have been unwilling to take on the problem in a purposeful, constructive way.

The consequences of failing to act aggressively now leave the State open to losing control of the State correctional system and with it, control of the state budget. The debacle developed over decades. Solutions, likewise, will be years in the making. But making a start now is essential.

The bare facts have earned California's Department of Corrections and Rehabilitation an ignoble distinction for systemic failure. Inmates have swelled prisons far past capacity. With cells already full, new inmates camp out in hallways, gyms and classrooms. The goals of punishment and confinement have left little room, or budget, for rehabilitation. The bulk of the State's prisoners are not succeeding once released. California's recidivism rate, at 70 percent, is near the highest in the nation. The ranks of correctional officers have not kept pace with the rising prison population. The department has thousands of openings, resulting in huge overtime bills and mounting stress for correctional officers.

These are some of the problems you must solve.

During the past five years, the Department of Corrections and Rehabilitation budget has surged 52 percent. California taxpayers legitimately can ask what return they are getting in increased public safety and question the trade-offs the State implicitly makes in spending an increasing portion of its general fund dollars on corrections.

The status quo is not acceptable. But even federal court intervention, a special legislative session and a Governor's emergency proclamation have yet to generate a level of alarm that reflects the size of the crisis.

The choices are stark. The price of failure is unimaginable. It is not too late to act.

Sincerely,

Michael E. Alpert
Chairman

# SOLVING CALIFORNIA'S CORRECTIONS CRISIS
## TIME IS RUNNING OUT

### Table of Contents

Executive Summary.................................................................................i

Time is Running Out...............................................................................1

Managing the Population.......................................................................17

Making Sense of Sentencing..................................................................33

Conclusion.............................................................................................49

Study Process........................................................................................51

**Appendices**

    Appendix A: Public Hearing Witnesses............................................55

    Appendix B: Sentencing Reform Advisory Committee Members........57

    Appendix C: Parole and Juvenile Justice Reform Roundtable Discussion Participants......59

    Appendix D: Prior Recommendations................................................61

    Appendix E: History of Sentencing Commission Legislation...............63

    Appendix F: Sentencing Enhancements Since 1976...........................67

Notes.....................................................................................................77

### Table of Sidebars & Charts

Civilian Corrections Committee.................................................................3

Assessing Risks and Needs......................................................................7

Court Ordered Correctional Reform.........................................................10

Defense Base Closure and Realignment Commission (BRAC)....................11

Expert Panel on Reentry and Recidivism Reduction..................................12

Successful Inter-Agency Corrections Task Forces.....................................14

Inter-Agency Task Force..........................................................................15

Milestones in California Corrections........................................................18

California Prison Capacity........................................................................19

Major Prison Disturbance in Chino..........................................................20

Comparison of California Corrections Spending, 1984-85 and 2006-07.......21

Prior Parole Policy Recommendations......................................................22

CSP000037

Failed Implementation of the New Parole Model.........................................................23

Earned Discharge from Parole..............................................................................26

Percent of Felony Convictions Sentenced to State Prison by County, 2002...................27

Citizen's Option for Public Safety and Juvenile Justice Crime Prevention Act..............28

Involving the Courts in Reentry............................................................................29

Trial Court Consolidation....................................................................................30

Expanding Community-based Punishment Options.....................................................31

Judicial Empowerment.......................................................................................32

Impact of Sentencing Laws on Women...................................................................34

Overview: Sentencing Guidelines and Commissions...................................................39

Data Collection and Analysis...............................................................................41

Dissolved or Abolished Sentencing Commissions......................................................42

Strengths and Weaknesses of Sentencing Commissions..............................................45

Membership of a Sentencing Commission................................................................46

University of California Board of Regents................................................................47

Link Sentencing Laws to Fiscal Appropriations.........................................................48

Immediate Opportunities to Address Overcrowding....................................................50

CSP000038

# *Executive Summary*

California's correctional system is in a tailspin that threatens public safety and raises the risk of fiscal disaster. The failing correctional system is the largest and most immediate crisis facing policy-makers. For decades, governors and lawmakers fearful of appearing soft on crime have failed to muster the political will to address the looming crisis. And now their time has run out.

State prisons are packed beyond capacity. Inmates sleep in classrooms, gyms and hallways. Federal judges control inmate medical care and oversee mental health, use of force, disabilities act compliance, dental care, parolee due process rights and most aspects of the juvenile justice system. Thousands of local jail inmates are let out early every week as a result of overcrowding and court-ordered population caps. The State may soon face the same fate.

The Governor declared a state of emergency. But even that didn't bring action, only more reports to federal judges that underscore the fact that the State's corrections policy is politically bankrupt. As a result, a federal judge has given the State six months to make progress on overcrowding or face the appointment of a panel of federal judges who will manage the prison population.

For years, lawmakers and government officials have failed to do their jobs. This failure has robbed the State of fiscal control of the correctional system and placed it in the hands of federal courts.

The court-appointed receiver for inmate medical care has threatened to "back up the truck to raid the state treasury" – if that is what it will take to bring the system into constitutional compliance.[1]

The receivership has set up a parallel management structure between the courts and the California Department of Corrections and Rehabilitation (CDCR) that impedes the State's ability to attract and retain the exceptional leadership required to guide the State out of the quagmire. In 2006, the department saw two secretaries resign abruptly before the current secretary was appointed in November. In testimony before a federal judge, both former secretaries stated that politics trumped good policy in correctional reform efforts. A nationally recognized correctional administrator told the Commission that no one

i

CSP000039

with the competency and leadership skills required to succeed as secretary would be willing to take the job under these circumstances.

Unlike other states, California relies almost completely on CDCR to improve correctional outcomes. It fails to tap the resources of other agencies that could assist in reducing crime and improving chances for offenders to improve themselves before they are released.

Despite the rhetoric, thirty years of "tough on crime" politics has not made the state safer. Quite the opposite: today thousands of hardened, violent criminals are released without regard to the danger they present to an unsuspecting public.

Years of political posturing have taken a good idea – determinate sentencing – and warped it beyond recognition with a series of laws passed with no thought to their cumulative impact. And these laws stripped away incentives for offenders to change or improve themselves while incarcerated.

Inmates who are willing to improve their education, learn a job skill or kick a drug habit find that programs are few and far between, a result of budget choices and overcrowding. Consequently, offenders are released into California communities with the criminal tendencies and addictions that first led to their incarceration. They are ill-prepared to do more than commit new crimes and create new victims.

Not surprisingly, California has one of the highest recidivism rates in the nation. Approximately 70 percent of all offenders released from prison are back within three years – mostly due to parole violations, many of which are technical in nature. California's parole system remains a billion dollar failure.

If the problems are not fixed, the consequences will be severe. While many Californians and their policy-makers have heard or read about the corrections crisis, few are aware of how serious the crisis has become and what the consequences will be. The fiscal ramifications will affect funding for virtually every other government program – from education to health care.

Governor Schwarzenegger proposed an ambitious plan in December 2006 to increase the number of prison cells, expand space in county jails and establish a sentencing commission. That is an encouraging start, but insufficient given the seriousness of the situation that requires immediate action and demonstrable results.

CSP000040

Once, policy-makers had ample opportunities to make choices that could have put the State on a different path. Now, policy-makers are down to just two:

- The Governor and the Legislature can summon the political will to immediately implement reforms to improve the corrections system to ensure public safety and eliminate federal involvement.

- Or, they must turn over the task to an independent commission – free from political interference – with the authority to fix this broken system.

It will not be easy and change will not happen overnight. It will require cooperation and courage on the part of the Governor and the Legislature. And the solutions will require skillful and determined implementation.

The top priority should be to take back control of the prison medical system, by developing a plan to work with an organization such as Kaiser Permanente or a university that can run the system for the State. This is a critical step in restoring confidence that the State can run the entire system and demonstrate the professional competence needed to attract top managers.

The State must immediately take action to improve its management of the correctional population and implement the recommendations made by this and other commissions, including expanding in-prison programs, improving prisoner reentry, and reallocating resources to community-based alternatives. The State must use all of its human resources, not just the personnel of the Department of Corrections and Rehabilitation.

The State must re-invent parole, moving to a system of post-release supervision for certain prisoners to ensure public safety.

At the same time, the State should begin a comprehensive evaluation of its sentencing system by establishing an independent sentencing commission to develop guidelines for coherent and equitable sentencing guided by overarching criminal justice policy goals. This is not a short-term solution, but a way to create rational long-term policy. Critics who suggest that a sentencing commission is code for shorter sentences are misinformed. Other states have used sentencing commissions to lengthen sentences for the most dangerous criminals, develop community-based punishment for nonviolent offenders and bring fiscal responsibility to criminal justice policies.

As they start the process, the Governor and Legislature should set goals and targets and insist on performance management to meet them. These reforms must not be allowed to fail in implementation, as they have

CSP000041

before. From start to finish, policy-makers must provide consistent support and oversight. In doing so, they can demonstrate progress to the public and the courts and begin to rebuild confidence in the State's ability to manage this critical responsibility.

Each of these proposals presents opportunities to fix a portion of California's corrections system. But they must be undertaken together, guided by a comprehensive strategy. Each reinforces the others as California embarks on changing the culture of its corrections system and restoring its status as a national model of success.

**Recommendation 1: The Governor and Legislature should immediately implement a comprehensive strategy to reduce prison overcrowding and improve public safety in California communities. Specifically, the Governor and the Legislature should:**

❑ *Implement prior reform recommendations.* Policy-makers do not need to further research solutions. They must immediately implement the evidence-based recommendations made by this Commission and others over the past two decades in order to regain control of major areas of prison operations where court intervention exists and avoid additional court intervention. To improve the performance of the correctional system, policy-makers must re-invent parole; expand educational, vocational and substance abuse treatment programs in prisons; reallocate resources to expand local punishment alternatives; and, expand judicial discretion.

❑ *Establish a corrections inter-agency task force.* The State should establish an inter-agency task force to develop partnerships with CDCR to bolster in-prison and reentry programs with a goal of reducing recidivism and improving public safety. The inter-agency task force should include all government entities that currently or potentially could assist offenders in improving their education, getting a job, finding housing, getting photo identification or a driver's license or treating an addiction or mental health problem.

**Alternative Recommendation: If the Governor and Legislature are unwilling or unable to advance these critical correctional reforms, they should turn the job over to a board of directors with the power and authority to enact reforms. Specifically:**

❑ The board should be an independent entity modeled after the federal Base Realignment and Closure Commission with members appointed by the Governor and legislative leaders.

iv

CSP000042

❑ The board of directors should have the authority to enact criminal justice policies that become law unless rejected by the Governor or two-thirds of the Legislature.

❑ The secretary of CDCR should report to the board of directors and should be accountable for implementing the policies of the board.

**Recommendation 2: To improve public safety and make the best use of correctional resources, the State must immediately implement evidence-based policies to reduce overcrowding and hold offenders accountable for improving themselves. Specifically, the State should:**

❑ **Re-invent parole.** For determinately sentenced offenders, the State should eliminate parole and implement a system of post-release supervision for certain offenders based on a validated risk and needs assessment tool. Specifically, the State should:

✓ Apply the greatest resources in post-release supervision to those offenders who pose the greatest risk of re-offending and who are the most serious, violent and dangerous.

✓ Waive post-release supervision for certain low-risk offenders with no history of violence.

✓ Provide opportunities for former offenders to earn discharge from supervision by maintaining employment, going to school, completing drug treatment or achieving other goals that reduce recidivism.

✓ Authorize a grid of community-based sanctions, including jail, for offenders who violate the terms of post-release supervision.

> **Expanding Community-based Punishment Options**
>
> The State should reallocate resources to assist communities in expanding community-based punishment options for offenders who violate the terms of post-release supervision. Working with communities, the State should reallocate resources to establish a continuum of alternatives to prison, including electronic monitoring, day reporting centers, drug treatment, jail time and other community-based sanctions.

❑ **Try offenders who commit new crimes.** Offenders on post-release supervision who commit a new, serious crime should be charged and tried in court, and if found guilty, sentenced to a new term.

❑ **Shift responsibility.** The State should shift post-release supervision and responsibility, and accountability for offender reintegration, to communities. It should begin with three or four willing counties and develop agreements and provide funding for sheriffs or probation departments in those counties, in partnership with community agencies, to provide supervision, services and sanctions for parolees.

❑ **Expand programs and create incentives for completing them.** The State should expand programs that research shows reduce recidivism. As programs are increased, the State should establish incentives for offenders to participate, including:

CSP000043

✓ Linking credits toward early release to completion of education and job training programs, as well as plans for a job and housing.

✓ Requiring inmates to make progress toward educational or drug treatment goals before becoming eligible for work assignments.

❑ **Expand local capacity.** The State should reallocate resources to assist counties in expanding local capacity including jail space, drug treatment programs, day reporting centers and other locally-based punishment options. The State also should reallocate resources to assist counties in expanding intensive probation as an alternative sanction to jail or prison and to enhance crime prevention.

❑ **Expand the role of judges.** Guided by an offender risk assessment tool prior to sentencing, judges should be empowered to set goals that offenders should achieve, whether they are put on probation or sentenced to jail or prison. Additionally, the State should assist willing counties in establishing reentry courts where judges oversee the reentry of selected offenders back to the community.

**Recommendation 3: California should establish a sentencing commission to guide the State's criminal justice sentencing policies to enhance public safety. Specifically, the sentencing commission should be:**

❑ **Protective.** The Governor and the Legislature should establish a sentencing commission whose primary goal should be to enhance public safety and use public resources wisely. A sentencing commission is not a vehicle to revisit indeterminate sentencing, but a way to ensure sentencing laws match sentencing goals. Consideration should be given to successful strategies of sentencing commissions in other states.

❑ **Independent.** The sentencing commission should be permanent and independent from all branches of government with dedicated funding to support a small staff that would include criminologists, statisticians, legal experts and policy advisors.

❑ **Diverse.** The sentencing commission should be geographically and culturally diverse and its members must have demonstrated leadership capabilities. Members could include judges, district attorneys, public defenders, local law enforcement officials, academic experts, including an expert in gender responsive strategies for female offenders, victims' rights representatives, correctional leaders, former offenders or families of offenders and members of the public.

CSP000044

❑ *Authoritative*. The sentencing commission should have the authority to develop sentencing guidelines, as well as post release supervision and revocation guidelines that become law unless rejected by a majority vote of the Legislature.

❑ *Data-oriented*. The sentencing commission should be the State's clearinghouse for all sentencing and offender data. Policy-makers should immediately task and fund one or more California universities to perform this function for the commission.

❑ *Accountable.* The sentencing commission should assess all proposed sentencing law changes for their potential effect on criminal justice policies and correctional system resources.

CSP000045

# *Time Is Running Out*

California's correctional crisis has been brewing for years. But time is running out for the State to solve it. Solutions will not be quick or easy. But the problems can be solved if policy-makers can muster the political will.

If policy-makers are unwilling or unable to address the crisis, the federal court will step in to fill the void.

Lawsuits filed in three federal courts alleging that the current level of overcrowding constitutes cruel and unusual punishment ask that the courts appoint a panel of federal judges to manage California's prison population. U.S. District Judge Lawrence Karlton, the first judge to hear the motion, gave the State until June 2007 to show progress in solving the overpopulation crisis.

Judge Karlton clearly would prefer not to manage California's prison population. At a December 2006 hearing, Judge Karlton told lawyers representing the Schwarzenegger administration that he is not inclined "to spend forever running the state prison system." However, he also warned the attorneys, "You tell your client June 4 may be the end of the line. It may really be the end of the line."[2]

The Governor and the Legislature must take this crisis seriously and resolve to fix it or they should turn it over to an independent body to do so. The State must take the initiative to gain control of the system and to regain the confidence of the courts and the public.

The Governor called a special legislative session in the summer of 2006 to address the crisis, yet not one new law or policy shift came out of it. The Governor declared a State of Emergency in October 2006, and still the crisis continued. On December 21, 2006, the Governor unveiled a proposal which builds on the prison bed expansion proposed by the Administration in the special session. It also would expand local jail space and establish a sentencing commission.

On the following pages the Commission offers comprehensive recommendations. If implemented, they will result in correctional policies that research shows are effective in improving public safety and managing public dollars.

CSP000046

### Lack of Political Will

It is clear that substantive reform cannot go forward without the combined effort of the Governor and the Legislature – this means political support as well as the necessary resources.

Absent such backing, the State's correctional system has been in a downward spiral for decades. Well-intentioned correctional administrators have attempted the reforms that experts agree are required, but none have materialized. Policy-makers have paid lip service to reform, but withheld the political support and funding required to get the job done.

At a Commission hearing, former CDCR Secretary Roderick Hickman testified that corrections reform has been stalled by internal and external forces. "Corrections is still years away from sustainable change," Hickman said. "The environment needed to truly reform corrections is still overly influenced by special interests wedded to the status quo."[3]

Appearing before a federal judge to explain their abrupt resignations in 2006, Hickman and former CDCR Secretary Jeanne Woodford testified that election-year politics had thwarted their efforts to fix the corrections crisis.[4]

With the 2006 election behind us, the Governor and the Legislature have the opportunity to look beyond scoring quick political points to focusing on solutions. A look at the most recent significant attempt at reform shows pitfalls to be avoided.

In November 2003, Arnold Schwarzenegger was elected Governor and vowed to make prison reform a top priority. He took several promising steps to tackle the problem. He authorized his newly appointed corrections secretary, Roderick Hickman, to implement a "new parole model," which expanded alternatives to prison for parole violators. He also established the Corrections Independent Review Panel (IRP), chaired by former Governor Deukmejian, to evaluate the correctional system and make recommendations.

Attempts to implement the "new parole model" began in early 2004. The plan was designed to expand alternatives to prison for low-level parole violators, including jail time, residential substance abuse treatment and other community-based punishments. The department projected cost savings of approximately $150 million over two years and even closed the correctional officer training academy, anticipating a reduced need for new officers.[5]

2

However, the department stumbled in its efforts to implement the new parole model. After more than a year of only limited implementation, Crime Victims United, an organization funded by the California Correctional Peace Officers Association, began airing television advertisements charging that the Governor's parole reform policies put communities at risk – that the parole policies "kept murderers, rapists and child molesters on our streets."[6]

In reality, the parole reform policies targeted non-violent, non-serious offenders, but the political ramifications from the opposition to the parole reforms proved to be too much at a time when the Governor was defending his 2005 "Year of Reform" against numerous other special interests, including nurses, teachers, firefighters and others.

In April 2005, the new parole model was abruptly terminated. Roderick Hickman issued an official explanation stating there was no evidence the new parole policies were working. However, the shift in policy was thought by many to be an expedient, easy way to squelch a political hotspot. Hickman asserted at the time that the department would have the opportunity to re-evaluate and re-introduce parole reform policies.

The Governor's other major corrections initiative, the establishment of the Independent Review Panel, was more successful. In June 2004, the IRP published 239 recommendations for reforming corrections. Using the IRP recommendations as a guide, the Governor submitted a plan to this Commission in January 2005 to reorganize what was then the Youth and Adult Correctional Agency into the California Department of Corrections and Rehabilitation. In its review of the plan, the Commission noted several areas of concern, but stated the reorganization overall was an important step in the right direction. The Commission recommended that the Legislature allow the plan to go into effect, but also recommended that the Legislature continue to work with the Administration to address the flaws.

> ### *Civilian Corrections Commission*
>
> The first recommendation made by the Corrections Independent Review Panel (IRP) was to "create a Civilian Corrections Commission at the highest level of the organization and assign the commission authority to approve policy and provide direction to the correctional administration."
>
> The commission would report to the Governor and would perform the following functions:
>
> - Adopt integrated plans and policies for CDCR
> - Conduct performance oversight
> - Approve the overall department budget
> - Issue directives to the secretary of CDCR
> - Perform other duties as may be appropriate
>
> The panel recommended the commission consist of five members, each to be appointed by the Governor and confirmed by the Senate for staggered five-year terms. The commissioners would serve at the pleasure of the Governor for a period no longer than 10 years. No commissioner would be eligible for appointment if he or she had been affiliated with CDCR or its predecessor entities prior to his or her appointment.
>
> The commission would recommend a CDCR secretary to be appointed by the Governor who would serve at the pleasure of the commission.
>
> Source: Final Report. June 2004. Corrections Independent Review Panel.

CSP000048

One of the Governor's critical departures from the IRP recommendations was the omission of an independent civilian oversight panel which was to have functioned as a board of directors for the department. At the time, then-Secretary Hickman said that the Administration did not believe the civilian commission was necessary and that concerns about public scrutiny are addressed by the Little Hoover Commission, the Bureau of State Audits and the Legislature.[7]

However, in testimony to the California Performance Review Commission, former Governor Deukmejian and the panel's executive director emphatically stated that the agency does not have the capacity to "correct" itself and without independent oversight, meaningful reform would not occur.[8]

Their testimony illuminates the imbedded cultural challenges that have thwarted meaningful progress. The deep-seated resistance to change requires more than support from the Governor and the Legislature, but also close, focused oversight which they have not shown the capacity for.

In July 2005, the Governor's reorganization plan went into effect creating the California Department of Corrections and Rehabilitation. While no one expected an organization that had been headed in the wrong direction for several decades to shift course overnight, conditions in the months since have deteriorated further.

In June 2006 the courts continued to signal that the system remained at risk for further court intervention and John Hagar, the special master overseeing one of the court cases issued a report expressing his concerns over the Governor's "retreat from prison reform."[9] Shortly after, Governor Schwarzenegger called an August 2006 special legislative session to review a package of reform proposals that focused heavily on new prison construction. Although a highly revised version of the plan was adopted by the Senate, the Assembly failed to act on the proposal. In October 2006, the Governor declared a state of emergency in the prison system and called for the voluntary transfer of inmates to facilities in other states. As of January 17, 2007, 278 inmates had been transferred to Arizona and Tennessee.[10]

On December 21, 2006, the Governor unveiled a new $11 billion prison reform package, which included many of the measures that the Administration proposed in the special session, but added new elements. Highlights of the plan include 16,000 new prison beds on existing sites, 5,000 to 7,000 new secure re-entry beds, 10,000 medical and mental health beds and 45,000 local jail beds. The plan also includes resources to implement Jessica's law, which voters overwhelmingly supported in the November 2006 election, creates a sentencing commission and

4

CSP000049

modifies California's parole structure to focus on offenders at the highest risk for committing another crime.[11]

The Governor is to be commended for embracing a plan that includes more than just building new prisons, and which also addresses sentencing and parole reform. However, CDCR has a dismal track record for turning talk into action. To fully implement the Governor's ambitious agenda, the department will have to employ more consistent leadership, management and communication than it has in recent years. It will need to establish performance measures and track and report progress on reaching goals, such as lower recidivism rates and program completion.

And it will need the consistent and vocal support of a united Governor and Legislature.

## The Leadership Void

A key condition for reform is consistent state leadership. The Governor and the Legislature must create the conditions for CDCR to successfully fend off attempts to dull or deflect its efforts to move forward. This is particularly crucial to helping CDCR to mount bureaucratic hurdles that can unintentionally stall or thwart change.

To the extent that CDCR has not enjoyed such leadership, its efforts to change have been eroded. The departures of secretaries Hickman and Woodford in quick succession undercut efforts to communicate and push a consistent reform agenda through the department.

Hickman and then Woodford were thwarted by external forces in their attempts to hire senior managers who could advance the reorganization reforms. In his testimony to the Commission, Hickman stated that the corrections reorganization was essentially the only major government reform to come out of the California Performance Review (CPR). None of the changes recommended by the CPR relating to the fiscal control agencies or oversight bodies were advanced by the Administration. As a result, he stated that "we had this new structure modeled after the recommendations that came from CPR...attempting to communicate, operate and change within a government structure and Governor's Office that were operating from a different model. Consequently, the goals and objectives articulated in the strategic plan, organizational design and reorganization were not recognized or adequately funded."[12]

> "Stability in a corrections agency is of the utmost importance. Of course...it's important to have sustained leadership at the Secretary level, but it also is important at other executive level posts. When there isn't stability, leadership is often disregarded...Stability alone isn't enough. Support, especially from the Governor's office and the Legislature, must be provided. The best managers and leaders will ultimately fail without assistance from policy-makers."
>
> Dr. Reginald Wilkinson, former Director, Ohio Department of Rehabilitation and Correction. November 16, 2006. Testimony to the Commission.

CSP000050

That cannot be allowed to happen again. If the Governor and the Legislature agree on a plan, they need to provide the political support and resources for it to succeed.

This is not the first or only example of external forces stopping reform efforts. In the 2003-04 budget, the Legislature directed the department's parole division to implement the reforms outlined in the "new parole model." But the Department of Finance denied the deputy director of the parole division the staff and management team required to successfully implement the reform.[13]

When there is political support at the top, things can get done quickly. Current Secretary James Tilton has been at the helm since April 2006, first as an interim secretary and now in a permanent capacity. His first order of business was to eliminate the vacancies in senior management that hobbled the abilities of his predecessors to execute a plan. In his first six months, he appointed more than 50 officials to management positions. Mr. Tilton told the Commission that his success was facilitated by an expedited appointment process within the Governor's office. He also said, compared to other state agencies, positions that require a Governor's appointment go much deeper in the CDCR organizational structure. While his ability to appoint top managers has been facilitated by the current crisis, the large number of appointees in the organization could impede the ability of future secretaries to fill positions quickly.[14]

## "Trained Incapacity"

Tilton's new management team, in addition to grappling with half-implemented reforms, has the challenge of establishing its credibility with U.S. District Judge Thelton Henderson and other parties. In his October 2005 findings prior to establishing the medical receivership in the Plata lawsuit, Henderson coined the phrase "trained incapacity" to describe what he called the "can't do" attitude of corrections staff toward implementing reforms. Citing multiple failures to comply with court orders for reform, Henderson found "that the CDCR leadership simply has been – and presently is – incapable of successfully implementing systemic change or completing even minimal goals toward the design and implementation of a functional medical delivery system."[15]

Robert Sillen, the court-appointed receiver over inmate medical care, in his July 2006 report to the court, stated that the "trained incapacity" was understated and presented a major cultural obstacle to implementing reform. Sillen asserted that the "trained incapacity" is "both a vertical and horizontal issue, i.e., it involves not only CDCR but all other state agencies and departments whose performance significantly

6

affects CDCR's ability to perform adequately and appropriately." Sillen took aim at, among others, the Department of Finance and the State Personnel Board for making the hiring process overly complex. [16]

## Failed Implementation

In 2003, the Little Hoover Commission recommended the department implement a risk and needs assessment tool to evaluate offenders upon entry into prison. This has not happened. However, one of the objectives of the department's 2005 strategic plan was to "provide offender risk and needs assessment at the time of initial incarceration and at designated time periods," by January 2006.[17] Queried on the progress in late 2005, the department said that it had begun to use risk and needs assessment as part of pre-release planning for offenders nearing parole release. In a September 2005 meeting, the deputy director of the parole division said that 45,244 offenders had been assessed using the COMPAS North Point risk assessment tool and that the department was validating the tool for California's correctional population.[18] Some meeting participants questioned whether staff had been adequately trained with the tool and whether offenders were being matched with programs once assessed. When queried again in October 2006, the department told the Commission that the tool had been implemented in March 2006 and that 16,916 inmates had been assessed between March and August 2006. Additionally, the department was evaluating the possibility of using the tool at intake.[19] However, at a roundtable meeting the Commission held in November 2006 on parole reform, a parole agent told the Commission that she and her colleagues had not seen any data from parolee risk assessments.

### Assessing Risks and Needs

Many correctional organizations in the United States, Canada and other countries use offender information to develop correctional policies, cost-effectively target correctional strategies and improve public safety. In its 2003 report on parole policies, the Commission recommended that CDCR implement a proven, validated risk and needs assessment tool to assess inmates when they enter prison.

Information developed through structured risk and needs assessments allows correctional administrators to distinguish among offenders who present real risks to public safety and those who do not and to target resources effectively. These assessments can help prison administrators strategically allocate available education, job training, treatment and pre-release opportunities.

Assessments also can guide transition planning and be used to link offenders with critical post-release services. With reliable information, more resources can be targeted to higher-risk offenders released to parole, while fewer resources safely be spent on lower-risk offenders.

## Signs of Hope

The department has achieved some success since the July 2005 reorganization, particularly in the areas of gender responsive strategies. While female and juvenile offenders make up less than 7 percent of the state prison population, lessons learned from the strategies successfully

CSP000052

being implemented in this area could be applied to the overall population.

In December 2004, the Commission recommended that the department develop a strategy to hold female offenders accountable for their crimes, but also make it easier for them to reintegrate into their communities. The Commission recommended that the State create a continuum of community correctional facilities to prepare female offenders for success on parole. Shortly after, the department established the position of associate director of female offender institutions, camps and community correctional facilities. In February 2005, CDCR established the Gender Responsive Strategies Commission to advise the department on the development of a gender-specific strategic plan.

A key part of the plan is to move approximately 4,500 low-level, non-violent female offenders into community-based correctional facilities with a continuum of support services. The plan was introduced in the Legislature in 2006 and then came under consideration during the special session. Though it failed to gain approval from the Legislature, a bill has been introduced in the 2007-08 legislative session and the department has sent out requests for proposals for the community correctional facilities.[20] Other progress includes the elimination of male correctional officer pat searches of female offenders; a new law that limits the practice of shackling pregnant offenders during childbirth; the establishment of a mother-baby wing at the California Institute for Women; gender-responsive training throughout the CDCR organization; and, ongoing efforts to develop and implement evidence-based gender-responsive programs.[21]

## Changing the Culture

Communication will be key. Success will depend on department managers effectively expressing concrete sets of goals and objectives throughout the department – in the institutions and in the parole offices. But management must also be open to input coming from below the top ranks and from outside the organization. This likely will require a significant cultural change.

Correctional reforms often have been doomed because corrections managers do not seek input from, nor effectively communicate with, staff members on the front line who ultimately must implement new policies or programs. The failure to effectively implement the risk and needs assessment tool is one example of failed communication between headquarters and the field.

CSP000053

Another recent example involves the abrupt closure of a Los Angeles psychiatric crisis clinic that served high risk parolees and sex offenders. In letters to the Governor and to the Commission, the clinicians detailed the negative ramifications of this policy decision. They said they were not consulted on the closure decision and that the management staff in the parole division at headquarters has no one with counseling experience to understand the ramifications. Staff was dispersed to parole units, duplicating mental health services already available, while leaving behind a high risk transient parole population who found it difficult, if not impossible, to get to counseling.[22]

When correctional reform goals are communicated to staff in the field, the needed training often is lacking. Many long-term corrections employees simply choose to "wait out" implementation of new policies until the next leader drops the initiative or unveils their own higher priority plan. In testimony to the Commission, former Secretary Hickman said that one of the challenges he faced in implementing the reforms outlined in the department's strategic plan was that "managers were unwilling to really step forward and challenge the status quo" because of the "organizational thought that nothing will change." Additionally, Mr. Hickman said, even those who supported the changes, "took a wait and see approach. Concerns led to them entering into the pool of change with only one toe."[23]   It is a problem nationwide, according to Dr. Reginald Wilkinson, who added, it is related directly to stability and consistency of leadership.[24]

## *Ceding Management to the Courts*

Absent action by policy-makers, inmate lawyers and the federal courts have become de-facto managers and reformers of the system. Many observers assert that the only meaningful correctional reforms that have occurred in recent years are those that result from court intervention. And those reforms have come at a staggering price.

- ✓ In the Plata lawsuit, the court appointed a medical receiver, whose projected annual budget for operating and capital expenses for 2006-07 is $8.38 million, primarily for salaries and contractors. The biggest budgetary impact, however, will be financing the improvements the receiver orders, which are expected to run in the billions of dollars over the course of the next several years.[25]

- ✓ Approximately 18 percent of the $440 million budget for the CDCR Division of Juvenile Justice for fiscal year 2006-07 is in response to the Farrell v. Tilton consent decree. The State spends

CSP000054

approximately $120,000 per ward and the 2006-07 budget authorized more than 4,200 positions to manage approximately 2,700 wards and 3,100 juvenile parolees.[26]

While the court's intention in the Plata case is to save lives by bringing the State into constitutional compliance for inmate medical care, in testimony to the Commission, Robert Sillen, the receiver, indicated it would be 18 months before a plan was in place and many years before the State could expect to reassume control of the inmate medical system.[27] That could be time during which the State will be unable to plan or budget for its inmate medical expenditures.

Court intervention has resulted in more than just unnecessarily large costs. Court intervention has created a parallel management structure with a chain of command that is separate from the CDCR chain of command. While the receiver has expressed a willingness to work in sync with CDCR, there is no mechanism to make sure that implementation of reforms is coordinated or that the two systems even have common goals.

The State and the Secretary of CDCR have lost control over a significant portion of corrections operations and budget. Observers assert this parallel management compromises the State's ability to attract the caliber of leadership that is required to turn around this complex organization.[28]

To be able to attract the leadership it needs and to save taxpayer dollars, the State must do whatever it takes to speed the process to regain control of areas where the court has intervened and to avoid future court involvement.

---

### Court Ordered Correctional Reform

**Disability rights**

***Armstrong v. Davis (2001)*** – Federal Court ordered the State to comply with the Americans With Disabilities Act during parole hearings.

**Prisoner treatment**

***Madrid v. Gomez (1995)*** - Federal Court ordered the State to end the use of excessive force at Pelican Bay State Prison.

***Wilson v. Deukmejian (1983)*** – State Court ruled the conditions at San Quentin State Prison constituted cruel and unusual punishment and ordered immediate improvement.

**Prisoner health rights**

***Perez v. Tilton (2006)*** – Federal Court ordered the State to provide adequate and timely dental care to all state inmates.

***Plata v. Schwarzenegger (2005)*** - Federal Court placed California's prison medical system under federal receivership.

***Farrell v. Tilton (2004)*** – State Court ordered CDCR to improve virtually every aspect of the State juvenile justice system.

***Coleman v. Wilson (1995)*** - Federal Court ordered the State to provide efficient mental health treatment to mentally ill inmates.

**Due process for parole revocations**

***Valdivia v. Davis (2002)*** – Federal Court ordered the State to provide due process protection to parolees returned to custody.

Source: Prison Law Office, www.prisonlaw.org.

CSP000055

## Alternative Management Models

Other states have tackled and solved these and other tough problems. And management models exist at both the state and federal level for resolving seemingly intractable issues. One successful model is the federal Base Closure and Realignment Commission. This independent and authoritative commission assists the President and Congress in making decisions on closing military bases which otherwise would not be politically feasible.

---

### Defense Base Closure and Realignment Commission (BRAC)

Faced with the arduous and politically charged task of closing military bases, the United States Congress in 1990 established the Defense Base Closure and Realignment Commission, commonly referred to as BRAC. The commission was charged with providing an objective, accurate and non-partisan review and analysis of a list of base and military installations which the Department of Defense (DOD) recommended be closed or realigned.

The President appoints a chair of the commission and eight additional members with the advice and consent of the Senate. Using selection criteria established by Congress, the commission can modify or reject DOD recommendations and also add military installations to the list. The commission tours sites and holds meetings and public hearings to gather public input.

The commission publicly reports its findings and recommendations to the President, who can either forward the report to Congress or return it to the commission for further evaluation. If the report is returned, the commission can modify and resubmit the report to the President. If the President submits the report to Congress, Congress has 45 days to enact a joint resolution rejecting the report in full, or the report becomes law. If the President does not submit the report to Congress, the BRAC process is terminated.

Sources: Defense Base Closure and Realignment Act of 1990. Also Charter of the Defense Base Closure and Realignment Commission. www.brac.gov. Web site accessed December 15, 2006.

---

## Other Players Could Help

CDCR is not solely responsible for the corrections crisis, nor can it solve it alone. CDCR, for example, has no control over which or how many offenders the courts send to prison. Nor does it control, for the most part, when offenders get out. Sentencing laws that send offenders to prison and determine how long they will stay are established not by CDCR but by the Governor, the Legislature and, increasingly, by ballot measures.

There are other state agencies that could play a role in helping prisoners and parolees succeed, but they would need to expand their capacity and vision, as well as partnerships, to measure up to the level of cooperation seen in some other states. Dr. Reginald Wilkinson, former director of the Ohio Department of Rehabilitation and Correction, told the Commission,

CSP000056

"You can't succeed with just CDCR staff. You need the expertise of the departments of health, mental health, aging...all the resources already in place." He added that if the correctional system is failing, "it is not only the fault of CDCR, but the fault of California state government."[29]

It will be critical for the Governor to communicate to all departments that could and should have a role in offender re-entry, that they too will be held accountable for the success or failure of the State's efforts; certainly all departments would bear the cost of the failure should the State lose control of the prison system.

CDCR currently has several partnerships with other state agencies, but could do more. CDCR partners with the California Department of Forestry and Fire Protection to manage the California Conservation Camp program. More than 4,000 low-level male and female offenders join the fire line during fire season and assist with flood control, search and rescue operations and other community services. However, thousands more are on waiting lists for the program. CDCR partners with the Employment Development Department to provide employment services in some, but not all parole offices. CDCR also partners with the Department of Alcohol and Drug Programs for community-based drug treatment provided through the Parolee Services Network. CDCR manages the in-prison treatment programs and drug treatment furlough programs, when it could collaborate more closely with ADP for these programs. The State has expanded its partnership with community colleges so that college coursework is available in all prisons, however, only 2 percent of the inmate population participates.[30]

CDCR also participates on 10 councils, work groups or committees with various missions from conquering homelessness to expanding collaborative courts. In 2006, the Legislature established a Re-entry Advisory Committee to bring together state and local agencies that can assist CDCR in improving offender re-entry and also established an Expert

---

### Expert Panel on Reentry and Recidivism Reduction

The Legislature included $900,000 in the Budget Act of 2006 for CDCR to contract with correctional program experts to perform a comprehensive evaluation of all adult prison and parole programs designed to reduce recidivism. CDCR has convened an expert panel co-chaired by the chief deputy secretary of CDCR adult programs and nationally-recognized criminologist Joan Petersilia, director of the Center for Evidence-Based Corrections at the University of California at Irvine. The panel's 15 other members include academic experts, current and former correctional department leaders and successful re-entry program managers. The expert panel is charged with three overarching tasks:

- Evaluate all adult prison and parole programs to assess whether these programs are likely to have a significant impact on recidivism and to estimate the number of offenders not currently participating in these programs who could benefit from them.

- Design a model system to serve as a guide for building an effective multi-year strategic plan for programs that reduce crime and recidivism.

- Recommend specific legislative and policy changes that could lead to a reduction in crowding and intake numbers.

CDCR is to report the findings and recommendations of the panel to the Legislature by June 30, 2007.

Sources: Budget Act of 2006. California Department of Corrections and Rehabilitation. "Adult Programs – Expert Panel on Adult Offender Reentry and Recidivism Reduction Charter."

CSP000057

Panel on Reentry and Recidivism Reduction.[31]

Other agencies could be doing much more. The Department of Motor Vehicles could better assist offenders in getting photo identification cards and drivers license cards prior to release from prison. CDCR could partner with the Department of Housing and Community Development to identify transitional housing. As the bond measures passed in 2006 are allocated for road construction and levee repairs, the inmate labor force could be trained and tapped for these projects.

California could learn from other states who are succeeding in collaborative efforts. Several states have successfully implemented inter-agency teams to improve the transition from prison to the community. Inter-agency teams in three states – Michigan, Missouri and Indiana – are recognized by the National Institute of Corrections and by other correctional system experts as models of collaborative efforts to improve prisoner re-entry. In these states, inter-agency collaboration takes place at multiple levels and has at least three phases: institutional, re-entry and community.

Additionally, Michigan, Missouri and Indiana use evidence-based tools to measure progress. The most important component of the inter-agency collaboration is a clear mission shared by all of the participating agencies to improve public safety through effective re-entry.[32]

## Solutions Close at Hand

In moving forward, the Legislature and Governor can draw upon a wealth of research and evidence-driven policy recommendations made over the past two decades. In 1987 the Legislature established the Blue Ribbon Commission on Inmate Population Management, which submitted its recommendations in 1990.

The Little Hoover Commission has conducted studies and published recommendations on corrections reform in 1994, 1998, 2003 and 2004. The IRP made its comprehensive recommendations in June 2004. The National Council on Crime and Delinquency convened a Task Force on Prison Crowding with state, local and national experts and issued its recommendations in August 2006. The key recommendations of these prior efforts are summarized in Appendix D.

The ideas are there.

What has been lacking is the political will to solve the problem. Lawmakers afraid of being labeled "soft on crime" have allowed the

13

CSP000058

correctional system to decay and as a result of their negligence, California spends more on corrections than most countries in the world, and reaps fewer public safety benefits.

---

### Successful Inter-Agency Corrections Task Forces

**Indiana Road to Re-entry Initiative**

**Inter-agency team leadership structure:** Department of Correction, Bureau of Motor Vehicles, Department of Veterans Affairs, Attorney General's Office, Family and Social Services Administration, Department of Education, Criminal Justice Institute, Department of Natural Resources, Department of Transportation, Housing and Community Development Authority, Department of Workforce Development, and the Council of Community Mental Health Centers Inc.

**Mission:** To enhance public safety through improving the successful transition of offenders to the community.

**The Plainfield Re-entry Educational Facility:** In 2006, the Indiana Department of Correction created a re-entry facility primarily focused on providing services to offenders returning to the greater Indianapolis area. Offenders spend their last 6 to 24 months of incarceration at Plainfield and receive intensive education and job training through local partnerships.

**Michigan Prisoner Re-entry Initiative (MPRI)**

**Inter-agency team leadership structure:** Department of Corrections, Department of Community Health, Department of Labor and Economic Growth, Department of Human Service, and the Department of Education.

**Mission:** Reduce crime by implementing a seamless plan of services and supervision developed with each offender – delivered through state and local collaboration — from the time of their entry to prison through their transition, reintegration, and aftercare in the community.

**Local governance:** The re-entry initiative is structured with 18 local implementation sites governed by a steering team, administrative agency, board of directors, advisory council, prison facility coordination team, field operations coordination team and a community coordinator. The purpose of the local governance structure is to provide statewide consistency in the implementation of the plan and to ensure community oversight and participation in key decisions about the design and implementation. The local governance team also educates the public about the initiative.

**Missouri Re-entry Process (MRP)**

**Inter-agency team leadership structure:** Department of Corrections, Social Services, Mental Health, Revenue, Health and Senior Services, Economic Development, Elementary and Secondary Education, and the Office of the State Courts Administrator.

**Mission:** Integrate successful offender re-entry principles and practices in state agencies and communities resulting in partnerships that enhance offender self-sufficiency, reduce re-incarceration and improve public safety.

**Transitional Housing Unit (THU):** The Missouri Department of Corrections has established transitional housing units in 12 correctional institutions where offenders serve the last 180 days of their sentence. While in the unit, offenders receive job training, education, parenting classes, substance abuse treatment and other services to prepare them for re-entry. Additionally, every offender in the unit is enrolled in the "GreatHires" system to help them find employment and services in the community where they will be released.

Sources: National Institute of Corrections. Offender Transition and Community Re-entry. Available at the NIC Web Site: http://www.nicic.org/WebTopic_454.htm. Missouri Re-entry Process Executive Order 05-33. Available at the Missouri Department of Corrections Web site: http://www.doc.mo.gov/reentry/PDF/ExecutiveOrder05_33.pdf.

---

CSP000059

***Recommendation 1: The Governor and Legislature should immediately implement a comprehensive strategy to reduce prison overcrowding and improve public safety in California communities. Specifically, the Governor and the Legislature should:***

☐ ***Implement prior reform recommendations.*** Policy-makers do not need to further research solutions. They must immediately implement the evidence-based recommendations made by this Commission and others over the past two decades in order to regain control of major areas of prison operations where court intervention exists and to avoid additional court intervention. To improve the performance of the correctional system, policy-makers must re-invent parole; expand educational, vocational and substance abuse treatment programs in prisons; reallocate resources to expand local punishment alternatives; and, expand judicial discretion.

The Commission's detailed recommendations for population management policies are included in the next section of this report.

☐ ***Establish a corrections inter-agency task force.*** The State should establish an inter-agency task force to develop partnerships with CDCR to bolster in-prison and re-entry programs with a goal of reducing recidivism and improving public safety. The inter-agency task force should include all government entities that currently or potentially could assist offenders in improving their education, getting a job, finding housing, getting photo identification or a driver's license or treating an addiction or mental health problem.

---

**Inter-Agency Task Force**

The State should establish an inter-agency task force to develop partnerships with CDCR. The State should ensure that all its available resources are used to assist offenders in successful re-entry to reduce recidivism and improve public safety. Possible task force participants include, but are not limited to:

- Department of Education
- Department of Motor Vehicles
- Employment Development Department
- Department of Social Services
- Department of Alcohol & Drug Programs
- Department of Mental Health
- Department of Health Services
- Department of Forestry and Fire Protection
- Department of Transportation
- Department of Housing and Community Development
- Department of Veterans Affairs
- Community colleges and the state university system

---

15

CSP000060

***Alternative Recommendation: If the Governor and Legislature are unwilling or unable to advance these critical correctional reforms, they should turn the job over to a board of directors with the power and authority to enact reforms. Specifically:***

- ❑ The board should be an independent entity modeled after the federal Base Realignment and Closure Commission with members appointed by the Governor and legislative leaders.

- ❑ The board of directors should have the authority to enact criminal justice policies that become law unless rejected by the Governor or two-thirds of the Legislature.

- ❑ The secretary of CDCR should report to the board of directors and should be accountable for implementing the policies of the board.

16

CSP000061

# Managing the Population

California's correctional system is failing in its primary mission to protect public safety. Overcrowded conditions inside the prison walls are unsafe for inmates and staff. Packed beyond capacity, the State's correctional institutions provide few opportunities for willing offenders to turn their lives around and prepare for their release.

Each year, California communities are burdened with absorbing 123,000 offenders returning from prison, often more dangerous than when they left.[33] Two-thirds of them will commit another crime, create another victim or simply violate a condition of parole.[34] They will return to prison and repeat the cycle of crime.

Protecting public safety should be the top goal of policy-makers. Yet for decades, policy-makers have neglected the correctional system that spawns this dangerous cycle of crime.

As recommended in the previous chapter, the Governor and the Legislature must act immediately to improve public safety or empower another entity that can and will. The strategy must attack both the immediate crisis of overcrowding as well as the underlying causes of this perilous situation. The following pages describe ways to address the immediate crisis. The next section of this report describes broad sentencing policy reforms the State can undertake to reverse the decades-long correctional system decline and better plan for those who are sent to prison.

## Unsafe and Overcrowded

California's prison population currently is at an all-time high with more than 173,000 inmates housed in facilities designed to hold half that. Growth in the State's prison population unfolded in two distinct phases. Until the 1980s, California's inmate population grew at a relatively slow pace, its prison population growing by an average of 500 inmates a year. But from 1980 to 2006, the inmate population surged more than 600 percent, adding an average 5,500 inmates a year.[35]

17

CSP000062

# Milestones in California Corrections

**Commitment Offenses of the CA Prison Population, August 2006**

| Violent and serious crimes | |
|---|---|
| Violent crimes* | 69,462 |
| Serious crimes | 18,501 |
| Subtotal | 87,963 |
| Nonviolent and other crimes | |
| Drug crimes | 34,080 |
| Property crimes | 28,567 |
| Crimes against people | 10,789 |
| Other | 9,076 |
| Subtotal | 82,512 |
| Total | 170,475 |

\* A list of violent felonies is provided in the end notes of this report



**Prison Population**

170,475 prisoners
33 prisons

161,000 prisoners
33 prisons

99,145 prisoners
20 prisons

27,916 prisoners
12 prisons

22,339 prisoners
12 prisons

21,660 prisoners
8 prisons

11,598 prisoners
4 prisons

**1969** "Use a Gun, Go to Prison" enacted by the Legislature

**1976** California invoked determinate sentencing

**1994** Voters passed Three Strikes Law

**1988** Voters approved the sale of $817 million in general obligation bonds for the construction of youth and adult correctional facilities to relieve overcrowding.

Sources: California Department of Corrections and Rehabilitation, July – August 2006; the California Department of Justice, "California Criminal Justice Time Line, 1822-2000." Sacramento, CA. California Department of Corrections. May 2003. "Correctional Facilities." Available at the CDCR Web Site: www.cdcr.ca.gov/Visitors/docs/facility_map.pdf.

18

CSP000063

To keep up with the growth, California in 1980 embarked on a building boom that lasted through 1997. The State added 21 prisons and more than 120,000 inmates.[36] One additional prison opened in June 2005, adding nearly 3,000 beds. It wasn't enough. As of November 30, 2006, California's 33-prison system was operating at 200 percent of the design capacity.[37] Approximately 19,000 offenders are double- and triple-bunked in dorms, hallways and classrooms.[38] Overcrowding threatens the safety of prison staff and inmates and obstructs the efficient delivery of services needed to prepare inmates for parole and prevent recidivism.

Mike Jimenez, President of the California Correctional Peace Officers Association, told the Commission that the current overcrowding, coupled with the current understaffing, seriously hampers CDCR's ability to provide programs to inmates inside the institutions. He said that in his 20-year career as a correctional officer, he has never seen conditions as oppressive as they are today. Correctional officers are unable to safely move offenders between their cells and programs. "We are stretched so terribly thin at this point in time," Jimenez said, adding that the department was short approximately 3,900 correctional officers. He also expressed concern about losing control of a prison to an inmate riot, stating that all the warning signs are "in our rear view mirror." He added, "We are sitting on the edge of what NASA calls catastrophic failure."[39]

Violence behind bars has declined across the nation and in California in the past two decades.[40] However, California prisons are more violent than other similarly sized correctional systems. California prisons have nearly twice as many assaults as the Texas prison system and almost three times as many assaults as the federal prison system. Inmates not only assault other inmates, each year hundreds of staff are seriously assaulted by inmates. During a recent three-year period, the Legislative Analyst's Office reported that 1,700 staff health and workers' compensation claims were filed for injuries resulting from inmate violence.[41]

---

### California Prison Capacity

Design capacity is a term used to designate the number of inmates a prison is designed to accommodate based on standards set by the Commission on Accreditation for Corrections and the American Correctional Association. The number can be based on any combination of single-occupancy or double-occupancy cells, single or double-bunked multiple occupancy rooms or dormitories. The standards reflect the need for humane conditions, as well as the need to prevent violence and safely move inmates to and from programs.

In California, design capacity is based on one inmate per cell, single bunks in dormitories, and no beds in space not designed for housing. Based on this, the CDCR design capacity is 83,219. However, offenders can be safely housed much beyond the design capacity. CDCR officials assert that the institutions could safely house approximately 150,000 and that it is the approximately 19,000 offenders tripled-bunked and housed in hallways and classrooms that are the cause of the current overcrowding.

Sources: Corrections Independent Review Panel, June 2004, Final Report. CDCR, Monthly Report of Population, November 30, 2006. Also, Bill Sessa, Deputy Press Secretary, CDCR. Personal communication December 29, 2006.

---

19

CSP000064

California also has higher prison homicide and suicide rates than the U.S. average. This in part is attributed to California's overcrowding, but also is a result of its violent prison gang culture. Additionally, data indicate that suicide and homicide rates increase when an inmate population ages and lengths of sentences increase, both factors which characterize California's inmate population.[42]

While the initial surge in inmate growth in the 1980s was likely due to an increase in drug-related crimes, changes in sentencing laws over the past two decades, as well as changes in incarceration and parole policies fueled further growth. Those policy changes established punishment as the primary goal of incarceration and fundamentally changed the nature of parole.

---

### Major Prison Disturbance in Chino

On December 30, 2006 a major altercation erupted at the California Institute for Men in Chino, resulting in one inmate suffering serious stab wounds and 27 others being taken to hospitals for medical treatment. Fortunately, no CDCR staff was hurt during the disturbance. Although the incident is under investigation, early reports indicate the fighting began between two individuals on the prison yard, then quickly spread to five of the eight dorm rooms in the Reception Center West Facility. Approximately 800 inmates were involved.

Correctional officers were commended for quickly containing the disturbance and for preventing it from spreading further. Staff secured the facility within four hours of when the fighting began, and effectively implemented an emergency plan which led to the rapid deployment of additional correctional officers from nearby facilities and local law enforcement.

The California Institute for Men is severely overcrowded. Overall, the facility is operating at 202 percent of design capacity, with 6,483 inmates in a facility designed for 3,207. Crowding in the Reception Center West Facility, where the disturbance occurred, is even greater, with 1,464 inmates housed in space designed for 640, meaning it is operating at 229 percent of design capacity.

Sources: California Department of Corrections and Rehabilitation. Press Release. December 30, 2006. "Major Disturbance at the California Institution for Men in Chino." Also, "Weekly Report of Population as of Midnight December 27, 2006.

---

CSP000065

## *Incredibly Expensive*

This expansion of the prison population has come at a significant cost. At the beginning of the building boom in the early 1980s, adult and youth corrections accounted for 4 percent of California's General Fund expenditures at $1 billion per year.[43] Today, it represents 8 percent of the total General Fund, approximately $9 billion, and continues to grow. Governor Schwarzenegger has proposed a budget of approximately $10 billion for 2007-08.[44]

### Comparison of California Corrections Spending, 1984-85 and 2006-07



Source: The Legislative Analyst's Office. July 2006. "State of California Expenditures, 1984-85 to 2006-07." See Endnotes Page 82 for chart values.

CSP000066

LITTLE HOOVER COMMISSION

## Parole is Broken

On any given day, 6 out of 10 admissions to California prisons are returning parolees.[45]  The failure of the State's parole policies are well-documented in the Commission's 2003 report, *Back to the Community: Safe and Sound Parole Policies*.  Its recommendations are as relevant today as they were three years ago and more urgently needed.

California's parole system is unlike any other in the nation.  At 70 percent, California's recidivism rate is one of the highest in the nation.[46] California is one of just two states that places every felony offender on parole and the only state where parole can last three years – in some cases longer than the actual prison term served.[47]

The concept of parole as a reward for good behavior and preparation for release for determinately sentenced offenders has not been valid in California since the 1970s.  By most accounts, when California enacted the Determinate Sentencing Act, little, if any, discussion occurred about what it meant for the State's parole policies.[48]

Under the previous indeterminate sentencing system, parole in California was a reward for inmates who were deemed ready for release. As defined, parole is a conditional release of a prisoner serving an indeterminate or unexpired sentence. Offenders who did not get into trouble and could convince what was then called the Adult Authority that they had changed their behavior and had lined up housing and a job, could be granted early release to parole once they had served their minimum sentence.  Policy-makers eliminated discretionary parole release under determinate sentencing and offenders now are released from prison when they have served their term – ready or not.

The exceptions are a small percentage of the most serious and violent offenders, and those sentenced under the three strikes law, who are sentenced to an indeterminate term – usually 15 or 25 years to life in prison. They still must go before the current Board of Parole Hearings,

### Prior Parole Policy Recommendations

In its November 2003 report on parole policies, the Little Hoover Commission made the following recommendations:

❏ To protect the public, the correctional system must use proven strategies to prepare inmates for release, supervise and assist parolees in California communities, and intervene when parolees fail.  The State should create the means to improve the performance of the correctional system by changing laws, budgets and programs to increase success among parolees.

❏ To increase public safety, state and local correctional agencies, community organizations and the inmates themselves should prepare for the predictable release of inmates from prison.

❏ To maximize public safety, communities must assume greater responsibility for reintegrating parolees, and the State should provide the leadership and funding to make those efforts successful.

❏ The State should make better use of the resources currently spent re-incarcerating parole violators – and provide more public safety – by developing a range of interventions for failing parolees.

❏ To ensure public safety and fairness, the State should scrutinize its responses to parolees charged with new, serious crimes.

Source: Little Hoover Commission.  November 2003.  "Back to the Community:  Safe & Sound Parole Policies."  Sacramento.

22

which determines whether or not to recommend parole. For the vast majority of California offenders who are serving determinate sentences, parole does not exist in the same form it does in other states and as it is used for indeterminately sentenced offenders in California. Parole in California, for offenders with determinate sentences, is a one to three-year community supervision sentence applied automatically to virtually all offenders released from prison, regardless of whether they pose a danger. This unusual hybrid of determinate sentencing and mandatory parole supervision for all offenders is used by just one other state. As a leading criminologist has stated, it "maximizes both risks to the community and state expenses."[49]

By using its limited resources to supervise all parolees, the system hinders the State's ability to closely supervise the most dangerous parolees and results in the return to prison of many low-level "technical" parole violators. By placing all offenders on parole and setting numerous conditions, the State has greatly increased the chances that many will violate parole. In 2005, 62,000 parolees were returned to prison for parole violations and served, on average, a four-month prison term.[50]

Although parole violators cycle through the system quickly, they further burden an already stressed intake system and add to the prison overcrowding crisis, particularly in the State's reception centers which are some of the most dangerous and severely overcrowded facilities.

---

### Failed Implementation of the New Parole Model

One of the earliest strategies to manage the correctional population under the Schwarzenegger administration was the "new parole model." The program was designed to expand alternative sanctions for low-level parole violators to reduce the number of parolees returning to prison. The department expected to implement the new program in January 2004 and erroneously based savings estimates on the program being fully implemented at that time.

The new parole model modified some existing programs and added others. The "Halfway Back" program converted existing work and drug treatment furlough facilities into facilities for parole violators. The Substance Abuse Treatment Control Unit (SATCU) program revised and expanded a program that included drug treatment and short jail stays. But both were underutilized in part because of eligibility constraints. The department also had problems contracting with counties for jail space, due to the $59 per day rate and the lack of space. Also, the Administration had imposed a statewide contracting and hiring freeze, which limited the ability of the department to negotiate contracts and hire additional staff to help implement the programs. The electronic monitoring program was delayed due to protests in the contracting processes. When it was finally implemented, parole agents discovered numerous equipment failures.

The department was required to negotiate implementation of the new or modified programs with the labor union, which also delayed implementation. Stakeholders also contended that parole agents were reluctant to use the sanctions instead of returning parolees to custody, in part because the department failed to implement a risk assessment tool to guide their decision-making. As a result, population reductions never materialized nor did the projected $150 million in savings.

Sources: Bureau of State Audits. November 2005. California Department of Corrections and Rehabilitation: The Intermediate Sanction Programs Lacked Performance Benchmarks and Were Plagued With Implementation Problems. Little Hoover Commission. September 25, 2005. Roundtable Meeting on Parole Reform.

---

CSP000068

Because parole violators serve such short sentences, many never move out of the reception center before being released again. As a result, reception centers no longer serve their original purpose – to quickly process and classify incoming felons and recommend placement in an appropriate facility. Reception centers should return to their original purpose.

The decision to send a parole violator back to prison for an additional sentence is made not by a judge, but by a correctional official – a parole agent, a parole supervisor or a deputy commissioner at the Board of Parole Hearings. Criminologists and academic experts have coined the term "back-end sentencing" to describe the parole revocation process. And not only are back-end sentences determined by corrections officials instead of judges, the standard of evidence used is much lower than would be required in a court of law.

Most frightening, the parole revocation process is frequently used to respond to new and serious criminal behavior by parolees. In 2000, the most recent year for which data is available, more than 47,000 parolees were returned to custody on a parole violation for serious criminal activities. These serious parole violators served an average of five months for criminal activities that included homicides, robberies and rapes.[51]

Some states abolished parole completely when they eliminated indeterminate sentences. In its place they use post-release supervision to apply the greatest resources to the offenders who pose the greatest risks. Some states established reentry courts where judges, instead of correctional officials, control the outcome of a post-release supervision violation. And many states do much more than California to help inmates prepare for their inevitable release.

## Just Doing Time...

Part of the reason for California's high rate of parolee failure is that prison time is not used to prepare inmates for their return to the community. Educational programs, job training and substance abuse treatment programs that could help an offender succeed upon release are available only to a small percentage of the prison population. Prison programs have not been a priority in California since the state shifted the primary purpose of incarceration to punishment. The Legislature, when it changed sentencing from indeterminate to determinate in 1976, made that shift explicit, enacting an addition to the Penal Code that states, "the purpose of imprisonment for crime is punishment."[52]

CSP000069

The lack of programs in prisons is well-documented in the Commission's previous reports, by the Blue Ribbon Commission on Inmate Population, the Independent Review Panel and others. The Governor, in his correctional reorganization plan, emphasized the importance of programs when he named the new department the Department of Corrections and Rehabilitation. However, most observers agree that little has been done in the two years since the reorganization to support the "R" in the CDCR. Until the population crisis is under control, the programs that can improve public safety by reducing recidivism will continue to take a back seat to custody-driven population management strategies. But the two strategies are linked and efforts must be made to plan and implement both.

## ...With No Incentive for Change

Even if programs were more available, the current system creates no incentive for offenders to participate. That too, is a change brought by determinate sentencing. Under the old system, all inmates had to prove they were ready for release by participating in educational programs, gaining job skills, completing treatment programs and by demonstrating hat they had a job and a place to live in the community.

Today, all determinately sentenced offenders entering prison know exactly when they will be released, giving them little incentive to change their behavior or prepare for a more successful life on the outside. Good time credit frequently cuts a prison term down to one half or even one third of the original sentence, but the credit system is used more as a population management tool than an incentive for anything other than staying out of trouble.

Good time credits are not awarded for achieving a goal, they are given to any offender who works to keep the prison running or who signs up

> ### Earned Discharge from Parole
>
> In 2006, the Legislature enacted and the Governor signed SB 1453 (Speier), a law that mandates that certain nonviolent offenders who participate in substance abuse treatment while in prison, when possible, receive aftercare treatment in the community once released from prison. Offenders who successfully complete 150 days of residential aftercare treatment will be discharged from parole supervision. Nearly two-thirds of California inmates have a serious need for drug treatment, but just 2 percent participate in professionally run treatment while incarcerated. Under the State's current policy, aftercare is funded for only half of those who have participated in treatment while in prison. SB 1453 did not include additional funding for the anticipated increase in demand for aftercare, although the Governor's 2007-08 Budget included nearly $1.3 million for SB 1453. Additionally, it is anticipated that SB 1453 will save money by reducing parole and re-incarceration costs. Research has proven that the aftercare component of drug treatment is key in reducing recidivism. The Little Hoover Commission has previously recommended that the State, in coordination with communities, should expand the availability of aftercare treatment for parolees who participated in drug treatment while in prison.
>
> Sources: Governor's Budget 2007-08. Also, Joan Petersilia and Robert Weisberg. May 2006. "California's Prison System Can't Solve Prison Crisis Alone: Sentencing Reform Urgently Needed." Also, Harry K. Wexler. 1999. "Three-Year Reincarceration Outcomes for Amity In-Prison Therapeutic Community and Aftercare in California." The Prison Journal. Also, Michael Prendergast, Ph.D., April 2003. "Outcome Evaluation of the Forever Free Substance Abuse Treatment Program: One-Year Post-Release Outcomes.

CSP000070

for a program – even if they are just on a waiting list. The Prison Literacy Act requires that inmates who do not have a 9th grade reading level participate in educational programs. However, these offenders are often given work assignments – precluding their participation in educational programs. For many offenders, it is much easier to mop the floor or work in the kitchen than to attempt to recover from years of addiction, learn to read or learn a marketable job skill.

Additionally, where resources do exist, sentences, once good time credits are figured in, often are too short to allow prisoners to complete an effective program, such as drug treatment. As a result, many offenders are released to the community with no more ability to succeed than when they arrived. Not surprisingly, they fail and return to prison.

In the Commission's 2003 report on parole reform, it recommended that early release credits be linked with the completion of education and job training programs, as well as plans for housing and employment. The Commission also recommended that the State require inmates to make progress toward educational or drug treatment goals before becoming eligible for work assignments.

## Local Correctional Resources and Judicial Discretion

While judges have very little discretion when sentencing offenders convicted of serious felonies, they do have sentencing options for many of the State's low-level offenses. These options include probation, county jail or state prison.[53]

If mandatory sentencing laws and sentence enhancements explicitly define what a judge can do, a judge's discretion also is implicitly limited by the resources available at the local level, which varies widely by county. Experts, judges and local law enforcement say this is one result of a lack of systematic state investment in community correctional programs and one that makes itself apparent in California's surging prison population.

In testimony to the Commission, former Sacramento Superior Court Judge Roger K. Warren wrote that "the principal reason...judges are sentencing too many non-violent offenders to prison is the absence of effective community corrections programs providing intermediate punishments and necessary and appropriate treatment and rehabilitation services to non-violent offenders."[54]

The situation is exacerbated by court-ordered or self-imposed population caps at jails in 32 counties around the state.[55] In 2005, these counties

CSP000071

released more than 155,000 sentenced offenders early because of the shortage of bed space.[56]

Lacking local alternatives, many offenders who could be sentenced to county jail, probation or other community-based punishment alternatives are sent to prison. In doing so, the State squanders its most expensive resource on low-level offenders who could be more effectively supervised by local authorities.

A look at how four counties have handled felony convictions shows the disparities that can result. As illustrated in the table, in 2002, Lassen County sentenced 30 percent of its convicted felons to prison, which compares with 24 percent of convicted felons in Los Angeles County. Only 8 percent of those convicted of felonies in San Francisco County received prison sentences.

**Percent of Felony Convictions Sentenced to State Prison by County: 2002**

| County | County Population | Felony Arrests | Felony Convictions | % of felony arrests that lead to convictions | Sentenced to Prison | % of felony convictions sentenced to prison |
|---|---|---|---|---|---|---|
| Los Angeles | 9,817,400 | 62,528 | 37,062 | 59 | 9,016 | 24 |
| San Francisco | 789,100 | 11,269 | 3,797 | 33 | 313 | 8 |
| Lassen | 34,250 | 244 | 178 | 73 | 52 | 30 |
| Inyo | 18,250 | 42 | 30 | 71 | 1 | 3 |

Sources: California Attorney General Web Site: http://ag.ca.gov/cjsc/statisticsdatatabs/DispoCo.php.  California State Library, Counting California Web Site: http://countingcalifornia.cdlib.org/pdfdata/csa03/B04.

Often, the low-level offenders sent to state prison serve fairly short terms. With good time credit, some serve just six months. In 2005, of approximately 64,000 felons released to parole for the first time, the median time served for nearly 45,000, or 69 percent, was less than a year in prison.[57]  Most experts agree that these short prison stints do little for public safety, while they do disrupt families and communities where these offenders come from and return to, and diminish the potential for offenders to get and keep jobs, maintain housing and become law-abiding citizens.

At one time, the State subsidized counties to encourage them to sentence offenders to local punishment programs instead of state prison. Under the Probation Subsidy Act of 1965, the State paid counties up to $4,000 for every offender that remained at the county level who otherwise would have gone to prison. The California Research Bureau estimated that more than 45,000 offenders were diverted from state facilities under the program. The State eliminated the subsidy in the late 1970s, primarily

CSP000072

due to increasing costs associated with an increasing offender population.[58] Public hearing witnesses and advisory committee members told the Commission that the State should consider establishing an incentive system similar to the probation subsidy.

The number of juveniles sent to state facilities dropped dramatically after the State increased the fees charged to counties for wards sent to the State in 1996. At the time, counties paid $25 per month for each ward. The State increased the fee to $150 per month for the most serious offenders and introduced a sliding scale fee that required counties to pay the most for the lowest level offenders, up to a maximum of $31,200 per year. The fees have since been raised slightly and counties pay $176 per month for serious offenders and a maximum of $36,500 per year for low-level offenders. The state youth offender population dropped from an all-time high of more than 10,000 in 1996 to approximately 2,700 in November 2006. While the sliding scale fee is not the only reason for the decline, experts assert that the financial incentive to keep juvenile offenders out of state facilities was key to the sharp decline in the state juvenile offender population.[59]

In 1990, the Blue Ribbon Commission on Inmate Population Management recommended adoption of a Community Corrections Act to provide state funds to significantly expand community-based intermediate sanctions. As a result, the Legislature enacted the Community-Based Punishment Act of 1994, which established a partnership between state and local governments to create alternative punishments at the local level for prison-bound non-violent offenders.[60] However, the collaboration has never been funded.

In a pilot project being implemented in San Diego County, California is testing the concept of involving local probation departments and judges in identifying offender risks and needs at the time of sentencing, and connecting offenders to local programs and services upon release from prison to improve reentry

---

**Citizen's Option for Public Safety (COPS) / Juvenile Justice Crime Prevention Act (JJCPA)**

COPS / JJCPA provide grants to counties and cities to expand community-based services, and add law enforcement, district attorneys and corrections staff. This year, the Governor has proposed allocating $238 million for COPS / JJCPA grants. Counties receive a portion of the allocation based on population.

In 2004-05, JJCPA grants supported 168 programs to address locally-identified issues concerning juvenile justice and crime, such as:

✓ Los Angeles County's After-School Enrichment Program
✓ Nevada County's Outreach School Truancy Program
✓ San Diego's Community Assessment and Working to Insure and Nurture Girls' Success

Similarly, COPS grants are used to support locally-identified "front-line" law enforcement needs such as hiring additional police officers or buying new equipment to support law enforcement activities.

Source: California Department of Corrections and Rehabilitation. March 26, 2006. "Partnering to Promote Public Safety: Juvenile Justice Crime Prevention Act Annual Report."

CSP000073

outcomes. The law creating the pilot project authorized CDCR to assist three counties and $3.42 million was allocated to the program for 2006-07.[61]

Additionally, the Governor's 2007-08 budget proposes $50 million in funding to target at-risk 18 to 25 year-old probationers. The Governor also has proposed $4.4 billion in lease revenue bonds to build additional jail beds.[62]

Judges testifying before the Commission stated that they use the correctional resource that is best suited to the offender and the crime and do not base sentences on available jail space or associated costs. However, judges also told the Commission that they would sentence more low-level offenders to community punishments if more local options were available.



## *A Fragmented System*

Many states manage their correctional populations in one seamless system. The absence of an integrated state-local corrections program in California is exacerbated because probation is treated almost solely as a local responsibility, although the Governor has proposed $50 million in probation funding in his budget for 2007-08. California is one of just two states in which local government is the primary source of money for probation services.[63] California's trial court system was similarly plagued by fragmentation and financial insecurity until lawmakers

CSP000074

consolidated court funding in 1997 and voters later unified the county courts into a state-run system.

In the court consolidation model, the State provided funding and support to improve the function of the court system. In the Commission's study process for its 2003 parole report, local law enforcement representatives told the Commission they would be willing to assume the responsibility and accountability for offender reentry if adequately funded. The State could consider applying the lessons learned in the court consolidation model to streamline parole and probation into a seamless local function with state support.

---

**Trial Court Consolidation**

The Lockyer-Isenberg Trial Court Funding Act of 1997 consolidated all court funding at the state level and gave the Judicial Council the authority to allocate resources to all California courts, including trial courts. Previously, trial courts received the bulk of their funding from local boards of supervisors and were consistently under-funded. In 1998, California voters approved Proposition 220 to allow the consolidation of county municipal courts into a single superior court.

The unification allowed courts to expand programs such as drug courts, domestic violence courts and services to juveniles. Also, unification dramatically decreased the caseloads of judges and narrowed the types of cases heard by superior court justices. In 2001, the State's Administrative Office of the Courts gained responsibility for all former municipal court employees. The following year, the lawmakers enacted the Trial Court Facilities Act which shifted the governance of California's 450 courthouse facilities from the counties to the State, completing unification of California's court system.

Sources: The California Constitution, Article VI, Section 6. Also, the Judicial Council of California, www.courtinfo.ca.gov.

---

CSP000075

*Recommendation 2: To improve public safety and make the best use of correctional resources, the State must immediately implement evidence-based policies to reduce overcrowding and hold offenders accountable for improving themselves. Specifically, the State should:*

❑ *Re-invent parole.* For determinately sentenced offenders, the State should eliminate parole and implement a system of post-release supervision for certain offenders based on a validated risk and needs assessment tool. Specifically, the State should:

✓ Apply the greatest resources in post-release supervision to those offenders who pose the greatest risk of re-offending and who are the most serious, violent and dangerous.

✓ Waive post-release supervision for certain low-risk offenders with no history of violence.

✓ Provide opportunities for former offenders to earn discharge from supervision by maintaining employment, going to school, completing drug treatment or achieving other goals that reduce recidivism.

✓ Authorize a grid of community-based sanctions, including jail, for offenders who violate the terms of post-release supervision.

> **Expanding Community-based Punishment Options**
>
> The State should reallocate resources to assist communities in expanding community-based punishment options for offenders who violate the terms of post-release supervision. Working with communities, the State should reallocate resources to establish a continuum of alternatives to prison, including electronic monitoring, day reporting centers, drug treatment, jail time and other community-based sanctions.

❑ *Try offenders who commit new crimes.* Offenders on post-release supervision who commit a new, serious crime should be charged and tried in court, and if found guilty, sentenced to a new term.

❑ *Shift responsibility.* The State should shift post-release supervision and responsibility, and accountability for offender reintegration, to communities. It should begin with three or four willing counties and develop agreements and provide funding for sheriffs or probation departments in those counties, in partnership with community agencies, to provide supervision, services and sanctions for parolees.

❑ *Expand programs and create incentives for completing them.* The State should expand programs that research shows reduce recidivism. As programs are increased, the State should establish incentives for offenders to participate, including:

✓ Linking credits toward early release to completion of education and job training programs, as well as plans for a job and housing.

31

CSP000076

✓ Requiring inmates to make progress toward educational or drug treatment goals before becoming eligible for work assignments.

❏ **Expand local capacity.** The State should reallocate resources to assist counties in expanding local capacity including jail space, drug treatment programs, day reporting centers and other locally-based punishment options. The State also should reallocate resources to assist counties in expanding intensive probation as an alternative sanction to jail or prison and to enhance crime prevention.

❏ **Expand the role of judges.** Guided by an offender risk assessment tool prior to sentencing, judges should be empowered to set goals that offenders should achieve, whether they are put on probation or sentenced to jail or prison. Additionally, the State should assist willing counties in establishing reentry courts where judges oversee the reentry of selected offenders back to the community.



Judicial Empowerment

The State should give judges the authority to sentence offenders who would otherwise be destined for prison to a community-based sanction. Judges should use a validated risk and needs assessment tool to identify these offenders. Intensive case management could be handled by probation. The State should reallocate funding equal to one-half the cost of state incarceration to pay for expanded services and supervision at the local level. Judges should oversee the progress of the offenders in the assigned community sanctions.

CSP000077

# *Making Sense of Sentencing*

California lacks a coherent criminal justice sentencing policy as well as a system of accountability for the impact of sentencing laws on public safety and correctional resources. Unlike many other states who rely on credible independent sentencing commissions to guide policy, California has created a haphazard jumble of sentencing laws enacted incrementally over three dozen years.

Critics often suggest that a sentencing commission is a code word for shorter sentences or for limiting correctional capacity. This is not supported by evidence in other states. Sentencing commissions frequently lead to longer terms, particularly for the most dangerous and serious offenders.

Sentencing commissions in both North Carolina and Virginia increased sentences for violent criminals. North Carolina increased sentences for violent crimes and simultaneously increased spending on probation and drug treatment programs to try to keep low-level offenders from becoming more dangerous. The result was a decrease in crime and savings of billions of dollars.[64] Virginia tripled sentences for some of the worst offenders, but also diverted low-level offenders to community-based punishment. The result also has been cost savings and a decrease in crime.[65]

Prior attempts to establish a sentencing commission in California have failed. These efforts and the lessons learned are summarized in Appendix E. But today, California faces unprecedented challenges and the momentum for establishing a sentencing commission is snowballing. Its time has come.

A sentencing commission does not mean a return to indeterminate sentencing and to the consequences that all stakeholders agree were unacceptable. The Determinate Sentencing Act, enacted 30 years ago, dramatically changed criminal sentencing in California. The law addressed egregious inequities that existed under California's indeterminate sentencing structure and put certainty in the sentencing process for most offenders. While this significant

> "California sentencing policy is currently neither dynamic, nor grounded on a policy-making process that provides a thorough, balanced, and informed consideration of all of the relevant evidence and factors. Nor is the policy-making staffed by an independent, credible, professional non-partisan entity with the skills and ability to accurately forecast the fiscal, managerial and programmatic consequences of alternative policy decisions."
>
> Honorable Richard Warren, former California Superior Court Judge, Scholar-in-Residence, Judicial Council of California and Project Director, National Sentencing Reform Project, National Center for State Courts. June 22, 2006. Written testimony to the Commission.

33

achievement brought necessary reform, it also produced significant unintended consequences that reduced public safety and laid the groundwork for the current corrections overcrowding crisis.

These public safety consequences include:

✓ The release of thousands of ill-prepared and often dangerous offenders into California communities every month.

✓ Over reliance on the most expensive sanction – state prison – instead of local correctional alternatives that could provide more effective and efficient punishment for many low-level offenders.

✓ The absence of incentives for offenders to improve themselves in prison or while on parole.

## Complex and Confusing

What initially was a fairly straightforward determinate sentencing structure has been radically rewritten – law by law – over a 30-year span with no consistent or informed evaluation of the laws for their effect on public safety and the state treasury. Today, there are more than 1,000 felony sentencing laws and more than 100 felony sentence enhancements across 21 separate sections of California law.[66]

---

### Impact of Sentencing Laws on Women

Women are the fastest growing segment of the California prison population. In a prison system as large as California's, it is easy to overlook the nearly 12,000 incarcerated women. The vast majority of female inmates are not a threat to public safety. Two-thirds were convicted of property or drug-related crimes. More of them have been victims of violent crimes than were convicted of violent crimes.

Like thousands of men, many of these women were caught by the sentencing laws enacted to catch violent drug dealers in the mid 80s. In 1980, nearly half of all women incarcerated in California had committed a serious crime against another person, while just 13 percent were convicted of a drug offense. Today, the percentage of women incarcerated for non-violent drug offenses is greater than the percentage incarcerated for crimes against persons. As a result, the State has four over-packed prisons filled primarily with nonviolent low-level female offenders.

The cost is immense. Each year, the State spends nearly a half a billion dollars for their incarceration alone. And because of their roles as mothers, the costs and consequences go far beyond the criminal justice system. Many of these women were single parents before their incarceration. Their children are either raised by other family members or are sent to the State's foster care system. Children who have incarcerated parents are more likely to follow the path of their parents and become the next generation of prisoners continuing the perpetual cycle.

In its 2004 report on women and parole policies, the Commission recommended that the State develop coherent strategies for female offenders. The State also should consider gender in its sentencing policy decisions.

Sources: CDCR. Weekly Report of Population as of Midnight January 3, 2007. Also, California Department of Corrections and Rehabilitation. Historical Trends 1985-2005 and Historical Trends 1980-2000. Also, U.S. Department of Justice, Bureau of Justice Statistics. April 1999. "Prior Abuse Reported by Inmates and Probationers."

---

CSP000079

Legal scholars have dubbed the incremental changes "drive-by" sentencing laws – often enacted as knee-jerk responses by lawmakers to horrific, high-profile and frequently isolated crimes. The result is a chaotic labyrinth of laws with no cohesive philosophy or strategy.

Some participants in the Little Hoover Commission's advisory committee process maintained that hundreds of sentencing laws and enhancements have been enacted to increase incarceration time, while others suggested that the only sentencing-related legislation enacted in the past decade increased "good time" credit, thereby shortening incarceration. Advisory committee members differed about whether longer sentences increase or decrease public safety. The advisory committee agreed that additional research and analysis in this area would be particularly useful to an informed discussion.

As a result, this Commission asked the Stanford Criminal Justice Center (SCJC) to analyze amendments to California's sentencing structure. The Stanford researchers focused solely on penal code amendments to sections 1170 and 12022, two of the more substantial sections of criminal justice sentencing code. They immediately found that a review of just these two sections was labor-intensive and time consuming. The final report states, "as most experts have already concluded, California's sentencing system is unbelievably complex and in dire need of simplification." The report also concluded:

1.  There have been countless increases in the length of criminal sentences since the enactment of the Determinate Sentencing Act. The analysis of the two sections of penal code revealed 80 substantive increases in sentence lengths for specific crimes since the enactment of determinate sentencing.

2.  Statutes also "increased" sentences in other ways. While the Legislature occasionally increased the number of years to be imposed upon conviction of a particular offense or imposition of a particular enhancement, it also frequently increased sentences by limiting the discretion of sentencing judges to make determinations with respect to the imposition, aggravation, or enhancement of a sentence.

The complete report, *Increases in California Sentencing Since the Enactment of the Determinate Sentencing Act*, is included as Appendix F. Although the focus of the review was limited due to time constraints, the work not only illuminates how many changes have been made to the Determinate Sentencing Act since 1976, but also the need for broader analysis of this and other sections of code containing sentencing laws.

CSP000080

## Disparity Still Abounds...

Though determinate sentencing was designed to create uniformity, today sentences for similar crimes can vary significantly by county and by courtroom depending on the charges and enhancements filed by the district attorneys and the sentencing choices made by judges regarding probation, jail or prison. Outcomes for offenders also vary depending upon the availability of correctional resources at the local level, creating inequities along county lines. As a result, many offenders who could be more effectively punished at the local level are given the most expensive sanction – prison, at an annual cost of $36,000 per year.[67]

Judges also have discretion in determining strikes under the Three Strikes Law. As a result, similar crimes can produce wildly different sentences. Placer County Superior Court Judge Richard Couzens described to this Commission a hypothetical situation in which, under the State's current laws, a judge would have multiple sentencing options.[68]

Couzens presented the hypothetical case of a 40-year-old man with two prior felony convictions accused of stealing a $350 chainsaw from Sears. Upon finding the man guilty, a judge could:

a) Find the man guilty of a misdemeanor and sentence him to probation and local jail time;

b) Dismiss the two strikes from his record and sentence him to felony probation and local jail time;

c) Dismiss the two strikes and sentence him to a prison term of 16 months to 3 years;

d) Dismiss one strike and sentence him to a prison term of 2 years and 8 months to 6 years; or,

e) Issue a third strike and sentence him to a prison term of 25 years to life.

## ...But Rigidity Still Limits Discretion

While judges have discretion in sentencing many low-level offenders and in determining whether an offense counts as a strike, their flexibility is limited. The sentencing structure is far more rigid for the more serious crimes as well as for mandatory enhancements for firearms, gang affiliations and dozens of other conduct or status enhancements. The law treats many crimes alike, even when the circumstances of an individual case or the characteristics of the offender might warrant a different resolution that would better benefit victims and the community.

CSP000081

Additionally, California's sentencing laws can be inconsistent as new crimes or enhancements are added without consideration of larger policy goals and without coordination with other sentencing laws.

## Release is Certain

One goal of the shift to determinate sentencing was to create certainty – both for victims and offenders – in the length of a prison sentence. Although it was a vast improvement over the ambiguity of an indeterminate sentence, the new law eliminated the incentive for inmates to participate in programs that could help them succeed in the community once released, as described in the previous chapter.

In testimony before this Commission, a victims' rights advocate stated that "determinate sentencing is dangerous since it expects nothing from the offenders."[69]   And, because there is no hearing regarding the suitability for release, there also is no opportunity for victims to provide an impact statement or request special conditions for post-release supervision.[70]

## From the SHU to the Street

The certainty of determinate sentencing also means that the State lacks a mechanism to prevent the release of violent and dangerous offenders once they have served their time.   Each year, hundreds of offenders locked in the State's most restrictive cells, the secure housing units (SHU), who have been deemed too dangerous to participate in prison programs, are shackled and escorted by correctional officers to the prison door and then put on a bus bound for California communities.[71] They are ill-prepared for anything more than committing additional crimes and creating more victims.

Changes to restore incentives to participate in programs have been proposed by this Commission as well as by Governor Schwarzenegger's 2004 Corrections Independent Review Panel, by the Legislature and by others.  As mentioned earlier in this report, one of the biggest hurdles has been the lack of program availability in prisons.  Most experts agree that until the overcrowding issue is addressed, programs will be available only to a very limited portion of the inmate population.  Despite this challenge, incentives can be built into the existing sentencing structure to improve public safety and offender outcomes.

CSP000082

## A Lack of Accountability

As California grapples to find the resources to address prison overcrowding spawned by its sentencing and parole policies, no single entity can be held accountable for the failure to match resources with changes in laws and policies. The vast majority of the incremental sentencing laws that expanded crimes and enhanced sentences were put on the books in the 1980s and early 1990s by legislators and Governors who, for the most part, have long ago left the State Capitol.

Some stakeholders suggest that most, if not all, sentencing law changes were necessary responses to crime. They add that voters have supported lawmakers who enacted these measures. At the same time, however, the State has given low priority to planning and paying for facilities and staffing necessary to keep pace with the state's prison population growth. It is relatively easy for lawmakers to cast a vote for measures that appear tough on crime when they are not also required to allocate money to pay for the costs of those measures. In the same manner, ballot initiatives that increase sentence lengths have not queried voters as to whether they prefer cuts in other government services or new taxes to pay for the resulting increase in the prison population and other correctional costs.

## Sentencing Commissions Guide Decisions in Other States

Confronted by similar policy challenges, nearly two dozen other states developed sentencing commissions to enact or recommend sentencing laws and guidelines. Many of these states not only were confronting overcrowding and fiscal challenges, they also had indeterminate sentencing structures and the inequities that frequently accompany those systems. For many of these states, the first order of business for the sentencing commission was to review sentencing practices and establish sentencing guidelines, either mandatory or voluntary.

> "The experience of many states has shown that sentencing commissions are emerging as the most successful modern governmental institution to prevent or cure the kind of correctional crisis that California now faces."
>
> Kara Dansky, Executive Director, Stanford Criminal Justice Center. Written testimony to the Commission. August 24, 2006.

In the best models, a sentencing commission sets guidelines that provide an overarching framework consistent with policy goals, while allowing judicial discretion and appellate court review of sentences that depart from the guidelines.[72] Minnesota was the first state to establish guidelines and its sentencing commission is frequently used as a model. There are, however, several key variances among the two dozen states with sentencing guidelines and sentencing commissions.[73]

CSP000083

The underlying goals for the majority of states that have established sentencing commissions or adopted guidelines have been:

✓ To improve public safety by preventing the premature release of dangerous offenders.

✓ To make sentencing more uniform and reduce disparity.

✓ To promote more rational policy formation that is at least somewhat insulated from political pressure.

✓ To develop data for informed resource management decisions.

States that use the knowledge and analysis of sentencing commissions have been able to improve long-term forecasting and management of correctional resources. These states have benefited from accurate computer simulations of the impact of sentencing law changes on prison resources and the budget. States aided by this kind of data and analyses

---

### Overview: Sentencing Guidelines and Commissions

In 1980, Minnesota pioneered the guideline-setting sentencing commission structure. Minnesota's sentencing commission was tasked by the Legislature with developing sentencing guidelines that would go into effect unless voted down by the Legislature. Minnesota's sentencing commission specifies presumptive sentences through legally binding guidelines. The guidelines, however, also authorize and invite substantial trial court discretion to deviate from presumptive sentences in cases with extraordinary circumstances. When judges deviate from the presumptive sentence, they must explain for the record why they deviated from the guidelines and there is an appellate review mechanism for these cases.

In written testimony to the Commission, Anoka County Attorney Robert M.A. Johnson said that the primary goals of the commission "are to assure public safety, promote uniformity in sentencing, promote proportionality in sentencing, provide truth and certainty in sentencing, and coordinate sentencing practices with correctional resources." Since the 1980 Minnesota model was enacted, a permanent sentencing commission overseeing and setting sentencing guidelines has been emulated with adaptation by nearly two dozen other states.

Sentencing guidelines have been adopted in 18 states and a half-dozen other states are considering adopting guidelines. Several states, including Connecticut, Maine, Texas, Colorado, Nevada, New York and Montana, considered guidelines and chose not to adopt them. In seven states, sentencing guidelines are voluntary and are not subject to the appellate process. In some of these states, judges are required to give reasons for departing from the guidelines. Because of this, compliance rates in voluntary guideline states are often quite high.

Fourteen of the guideline states have permanent sentencing commissions; four do not. Alaska had a temporary commission in the early 1990s, and the guidelines developed in Florida and Michigan were written by sentencing commissions that were later abolished. New Jersey created a temporary commission in 2004 and is currently evaluating whether or not to make the commission permanent. Some states have sentencing commissions, but have not adopted sentencing guidelines. In all, 21 states have sentencing commissions. Most sentencing commissions include judges, prosecutors, defense attorneys, corrections officials, academics, public members and sometimes legislators. In all states with permanent sentencing commissions, the commission (or occasionally another state agency) performs the critical assessments of the impact of proposed sentencing guidelines and statutes on resources.

Richard S. Frase. May 2005. *State Sentencing Guidelines: Diversity, Consensus and Unresolved Policy Issues.* Columbia Law Review. Volume 105, Number 4. Pages 1190-1232. Also, United States Sentencing Commission and National Association of State Sentencing Commissions Web site. Accessed July 31, 2006. www.ussc.gov/states/nascaddr.htm.

CSP000084

are able to more easily set policy priorities and make fiscal forecasts whenever guidelines, amended guidelines or new punishment laws are proposed or enacted. In these states, legislators and other policy-makers know, with reasonable precision, the cost of a change in penalties for crime. Armed with this data, most states with sentencing commissions have reduced overall crime rates by increasing penalties for the most dangerous offenders and expanded options for community-based sanctions for certain low-level, nonviolent offenders.[74]

In California, CDCR provides inmate population projections. While its short-term forecasts – two years or less – have been reasonably accurate, the long-term projections have been significantly less accurate. In a 2005 assessment of the inmate projection process, the Bureau of State Audits found the department's projection unit used subjective variables and that its credibility has been diminished by its lack of independence.[75]

Two of the most respected sentencing commissions, particularly in the area of providing credible unbiased data, are the North Carolina Sentencing and Policy Advisory Commission and the Virginia Criminal Sentencing Commission.

**North Carolina Sentencing and Policy Advisory Commission.** The North Carolina Sentencing and Policy Advisory Commission was created in 1990 to bring certainty and rationality to a system in which incarcerated felons were serving just a fraction of their sentences and the public confidence in the criminal justice system had seriously eroded. It took three years of political wrangling, but ultimately the commission developed a structured sentencing system that was reviewed, amended and adopted by the North Carolina General Assembly. The system set sentencing guidelines based on the crime committed and the prior record of the offender and also expanded community-based sanctions. The reform eliminated early release to parole but included mandatory post-release supervision for certain offenders. As a result of the reform, violent offenders sentenced after 1993 serve much longer sentences. To accommodate the increased length of incarceration for violent offenders, the state developed and adequately funded alternative sanctions for non-violent, non-repeat offenders. Since the passage of the structured sentencing law, the 30-member commission continues to advise the Legislature on sentencing policy by providing correctional resource assessments and annually providing prison population projections.[76]

**Virginia Criminal Sentencing Commission.** The Virginia Criminal Sentencing Commission was created during a politically tumultuous time that demanded tougher penalties for violent felons. After a successful, come-from-behind gubernatorial campaign that prominently touted

CSP000085

longer sentences for violent offenders and abolishing parole, then newly-elected Governor George Allen established a Commission on Parole Abolition and Sentencing Reform. The commission included Republican and Democratic legislators, prosecutors, judges, crime victims, law enforcement and legal scholars. Additionally, the commission had access to a fully-staffed and highly trained group of social scientists who served in Virginia's Criminal Justice Research Center. These experts had doctoral degrees in criminology, government, psychology and statistics. Additionally the center had developed one of the nation's most detailed databases on convicted felons. The center's research showed that Virginia's criminal justice system did not efficiently use incarceration to protect public safety and that Virginia incarcerated older, non-violent offenders much longer than younger, violent offenders. Based on the research, the commission developed voluntary sentencing guidelines that resulted in violent and younger offenders serving longer prison terms, abolished parole release and replaced it with post-release supervision for certain offenders and expanded alternative sanctions and intermediate punishment programs. The sentencing commission became permanent, and its 17 members were charged with administering the guideline system and annually making sentencing law revisions which take effect if the Legislature takes no action to override the revisions. Additionally, the commission was charged with developing a risk assessment tool for low-level non-violent offenders to be used by judges at sentencing to divert these offenders to community-based sanctions.[77]

These states are "tough on crime," much more so than California. And in

### Data Collection and Analysis

A critical responsibility of most sentencing commissions is to provide credible, nonpartisan data analysis to policy-makers. In many states, sentencing commissions provide accurate forecasts and computer simulations of the effect of sentencing laws on correctional resources. In these states, policy-makers know, with reasonable precision, the cost of a change in penalties for crime. Data elements for individual offenders often include:

- Offense type and most serious offense
- Drug or weapon use
- Sentencing type and length
- Total number of convictions
- Concurrent or consecutive sentence
- Treatment ordered
- Fines, fees, victim compensation, restitution
- Mitigating and aggravating circumstances
- Prior criminal history
- Offender demographics
- Length of time served
- Recidivism

Sources: Kevin Reitz, Reporter, Model Penal Code Revision Project. June 16, 2006. American Law Institute. Richard P. Kern, Ph.D., Director, Virginia Criminal Sentencing Commission. David Wright, former Director of Research, Oklahoma Criminal Justice Resource Center. "So You Want to Direct Sentencing Commission Research?" August 14, 2006. Web site accessed December 6, 2006. http://correctionssentencing.blogspot.com/2006/08/so-you-want-to-direct-sentencing.html.

CSP000086

these states, tough on crime does not equate to tough on tax coffers. Crime rates in many of these states have declined more quickly than in California as a result of the states' willingness to evaluate sentencing policies and promote cost-effective, evidence-based correctional policies.

Not all sentencing commissions have been successful. Usually the commissions that have dissolved or been abolished lacked either judicial or political support, or both. Some commissions that are now defunct were created as temporary commissions and were dissolved once sentencing guidelines were developed. Experts agree that the best commissions are permanent as the commission's knowledge base is required to evaluate and monitor sentencing policy over time.[78]

---

### Dissolved or Abolished Sentencing Commissions

Several states established temporary sentencing commissions or abolished permanent commissions, and California can benefit from the lessons learned in these states as well as from the states that have had successful commissions.

The South Carolina Sentencing Guideline Commission was established as a temporary commission charged with recommending sentencing guidelines to the legislature. However, the judiciary in the state opposed the creation of the commission and, as a result, its recommendations were not enacted by the legislature. New York also had a temporary commission and its guidelines also were not enacted by the legislature.

In Michigan, the Supreme Court established sentencing guidelines based on sentencing practices of trial courts. Wanting to take a more active role in sentencing policy, the Michigan legislature established the Michigan Sentencing Commission in 1994. The Michigan Sentencing Commission recommended guidelines that were enacted by the legislature in 1998. The commission stopped meeting after it developed the guidelines and the legislature took over responsibility for evaluating, monitoring and amending the guidelines. Experts suggest that the commission dissolved prematurely due to the lack of political support from the legislature.

Florida's sentencing guidelines originally were established through its judicial branch. The chief justice of the Florida Supreme Court directed a research team to develop guidelines that would be tied to existing practices and have little impact on resources, but would reduce sentencing disparities. By the early 1980s, both the legislature and the governor became more interested in sentencing policy and created the Florida Sentencing Guidelines Commission within the state's department of corrections. With the commission's assistance, lawmakers enacted increasingly tough sentences, particularly for drug crimes. The inmate population quickly increased, prisons became severely overcrowded and the federal courts took control, imposing a population cap. As a result of the mandatory minimums used to incarcerate drug offenders, the courts were unable to shorten sentences for these offenders and instead were forced to reduce sentences for more violent and serious offenders. As a result of this fiasco, the sentencing commission was abolished.

Sources: Little Hoover Commission. January 1994. "Putting Violence Behind Bars: Redefining the Roles of California's Prisons." p. 18, citing Michael Tonry. July 1991. "The Politics and Processes of Sentencing Commissions." Crime and Delinquency. Also, Kara Dansky. Executive Director, Stanford Criminal Justice Center. August 24, 2006. Written testimony to the Commission. Also, Richard P. Kern, Director, Virginia Criminal Sentencing Commission. January 12, 2006. Personal communication.

---

CSP000087

## Current National Reform Efforts

Efforts to reform sentencing laws are part of a broader campaign to change the nation's correctional policies, a campaign fueled by critics of the status quo. They maintain the correctional system in the United States is overly reliant on incarceration, negating alternatives that could enhance public safety and protect public resources.

### American Law Institute Model Penal Code Revision

In 2002, the American Law Institute (ALI) dedicated itself to the first-ever revision of the Model Penal Code's provisions to sentencing, established in 1962. Established in 1923, ALI is a national organization of elected judges, attorneys and law professors that works to "promote the clarification and simplification of the law and its better adaptation to social needs."[79] ALI members recognized a need to reduce U.S. incarceration and recidivism rates. In a 2006 draft report, ALI members recommended that state legislatures take the "administrative model approach" to sentencing reform and establish "permanent sentencing commission(s) with the authority to promulgate sentencing guidelines."[80] According to ALI members, states with sentencing commissions achieve greater consistency in the application of law, are able to make more accurate predictions of sentencing patterns and enjoy improved information about how the sentencing system operates.[81]

### The Justice Kennedy Commission

One of the most talked about sentencing and criminal justice reform efforts in recent years has been the work done by the American Bar Association's Justice Kennedy Commission. The commission formed shortly after a speech by U.S. Supreme Court Justice Anthony Kennedy at the American Bar Association's annual meeting in 2003 in which he highlighted significant failings of the modern criminal justice system, including the record-high number of people in prison, the disproportionate impact of incarceration on minorities and the lack of judicial discretion in sentencing. Kennedy challenged ABA members to study and address these issues.

On August 9, 2004, the ABA adopted the recommendations of the Justice Kennedy Commission outlined in its final report[82]. On sentencing, the commission recommended that the ABA lobby state and federal lawmakers to:

a) Repeal mandatory minimum sentences;

CSP000088

b) Require sentencing courts to state the reason for increasing or reducing a sentence and allow appellate review of such sentences;

c) Consider diversion programs for less serious offenses;

d) Give greater authority and resources to an agency responsible for monitoring the sentencing system; and,

e) Develop graduated sanctions for violations of probation and parole.

### Cunningham v. California

On January 22, 2007, the U.S. Supreme Court ruled that California's determinate sentencing structure violated a defendant's right to a trial by jury. The Supreme Court had heard arguments in the fall of 2006 on the *Cunningham v. California* case that alleged California's determinate sentencing law violated the Sixth and Fourteenth Amendments by permitting judges to impose enhanced sentences based on facts not found by the jury. Specifically, the Cunningham case focused on the State's triad sentencing structure which provides judges three options for sentencing, a middle or presumptive term, an aggravated term or a mitigated term. For example, a first degree burglary charge could result in a sentence of two, four, or six years in prison.[83]

The Supreme Court found that "because the Determinate Sentencing Law allocates to judges sole authority to find facts permitting the imposition of an upper term sentence, the system violates the Sixth Amendment."[84] The Cunningham case is similar to *Blakely v. Washington*, in which the Court ruled that juries – not judges – must find virtually all facts that increase a defendant's sentence.

As a result of the Cunningham ruling, California must adjust the application of the Determinate Sentencing Law. The Supreme Court suggested that juries could be called upon to find any fact that would lead to an elevated sentence or the State could allow judges discretion in sentencing within the entire range of the existing triad.[85] While these or other possible modifications to make the Determinate Sentencing Law constitutional may not result in a major overhaul of the State's sentencing system, it certainly provides another impetus to evaluate the State's sentencing laws.

## Moving Forward in California Sentencing Reform

In its public meetings, this Commission heard from a diverse group of stakeholders who agreed that the State needs to re-evaluate its

44

CSP000089

sentencing policies. They expressed the belief that this effort could best be performed by an independent entity that could rise above the usual political obstacles that have blocked prior attempts to improve sentencing law. These stakeholders, listed in Appendix B of this report, took the additional step of agreeing to support legislative efforts to implement this concept.

## Functions of a Sentencing Commission

Stakeholders in this Commission's advisory committee meetings agreed that the functions of a California sentencing commission should be to:

➤ Collect offender data and conduct ongoing cost and population projects.

➤ Serve as an independent resource for the Legislature, charged with analyzing the impact on correctional resources of alternative sentencing and correctional policy options.

➤ Develop a classification system based on a risk assessment for all offenders in the State's correctional system that judges could use at the time of sentencing.

➤ Examine the relationship between state and local governments and conduct a thorough assessment of corrections infrastructure and programming needs.

➤ Educate the public on California's correctional and sentencing system.

## Composition of a Sentencing Commission

Governor Schwarzenegger, in his corrections reform plan released in December 2006, included a recommendation that the State establish a 17-member sentencing commission, to include the Attorney General, the CDCR Secretary, and 15 members appointed by the Governor, including

---

### Strengths and Weaknesses of Sentencing Commissions

In a 2006 national survey of state chief justices and court administrators, nineteen states with sentencing commissions responded to questions regarding the strengths and weaknesses of sentencing commissions. The two most common strengths were that all components of the criminal justice system were represented on the commission and that the commission provided reliable, trustworthy data allowing for information-based decision-making and credibility. The most frequently mentioned weaknesses were membership composition issues – either the absence of key stakeholders or that the diversity of the commission made it difficult to reach consensus. Additionally, the survey respondents noted that commissions serving in an advisory capacity suffered from a lack of authority.

Source: National Center for State Courts. August 2006. "Getting Smarter About Sentencing: NCSC's Sentencing Reform Survey."

---

CSP000090

legislators, a state judge, and representatives from law enforcement and crime victim groups. The Governor indicated that re-evaluating the purpose and nature of parole would be a priority for the commission. The Governor's 2007-08 Budget proposed $457,000 from the General Fund to establish a sentencing commission within CDCR.[86]

In January 2007, Senator Gloria Romero introduced a bill, SB 110 to create "a balanced, nonpartisan, independently staffed sentencing commission charged with the responsibility of collecting and analyzing sentencing and other corrections data, developing statewide sentencing and corrections policies, and achieving uniformity in our sentencing practices."[87]   Also in January 2007, Assemblymember Sally Lieber introduced AB 160 which creates a sentencing commission based on successful models from other states. Additionally, a working group convened by the California Correctional Peace Officers Association, and that includes many members from this Commission's Sentencing Advisory Committee, plans to sponsor legislation to create a sentencing commission.

---

### Membership of a Sentencing Commission

The American Law Institute in its Model Penal Code revision draft provides the following template for the composition of an 11-member sentencing commission:

    3 members from the state's judicial branch
    2 members from the state legislature
    1 district attorney
    1 criminal defense attorney
    1 representative from probation or parole
    1 academic with experience in criminal justice research
    1 public member

An alternative template doubles the membership from the first template and includes suggested appointing powers:

    1 chief justice of the supreme court or designee
    4 judges appointed by the chief justice
    4 members from the legislature appointed by the majority and minority
       leader of both houses
    1 director of the corrections department
    2 district attorneys
    2 criminal defense attorneys including at least one public defender
    1 probation official
    1 parole or reentry official
    1 chief of police
    1 representative of local government
    1 academic with experience in criminal justice research
    3 members of the public, one of whom shall be a crime victim and one of
       whom shall be a rehabilitated former state prisoner

Source: Kevin R. Reitz, Professor, University of Michigan and Reporter, The American Law Institute, Model Penal Code Revision Project. June 22, 2006. Written testimony to the Commission. The American Law Institute. Model Penal Code: Sentencing. April 17, 2006. P. 48-50.

---

CSP000091

Twenty-one states have active sentencing commissions. Membership varies by state, but ranges from a low of nine members in Arkansas and Oregon to a high of 31 members in Ohio.[88] While experts agree it is usually better to keep sentencing commissions small, advisory committee members generally agreed that California would require a sentencing commission large enough to include a diverse group of stakeholders appointed by the Governor, the Legislature and the Judiciary.

The American Law Institute draft report on sentencing recommends that states establish a sentencing commission, but does not recommend a specific composition as each state will have to adapt existing models to meet their own unique characteristics and political realities, although the report does include two templates. Most importantly, the ALI report states that a sentencing commission include "qualified persons to help drive a process of ongoing knowledge development, consensus-building, innovation, self-awareness and self-correction."[89]

Experts assert that a sentencing commission in California will need to be different than models in other states. It needs to be original and creative and should include a geographically and philosophically diverse group of leaders who have been successful in their chosen fields. Another model to consider is the University of California Board of Regents.

---

### University of California, Board of Regents

The University of California is governed by The Regents, which under the California Constitution has "full powers of organization and governance" subject only to very specific areas of legislative control. The Constitution states that "the university shall be entirely independent of all political and sectarian influence and kept free therefrom in the appointment of its Regents and in the administration of its affairs."

The Board of Regents was established in 1878 after a decade of political conflict demonstrated the importance of sheltering the university from shifting political winds. The board consists of 26 members:

- 18 regents are appointed by the Governor for 12-year terms
- One is a student appointed by the Regents to a one-year term
- Seven are ex officio members -- the Governor, Lieutenant Governor, Speaker of the Assembly, Superintendent of Public Instruction, president and vice president of the Alumni Associations of UC and the UC president.

In addition, two faculty members -- the chair and vice chair of the Academic Council -- sit on the board as non-voting members.

The current membership includes leaders with diverse backgrounds including investment banking, law, mass media, government, medicine, high tech, and real estate.

Source: University of California Regents Web site: http://www.universityofcalifornia.edu/regents/about.html. Accessed January 12, 2006.

CSP000092

LITTLE HOOVER COMMISSION

---

*Recommendation 3: California should establish a sentencing commission to guide the State's criminal justice sentencing policies to enhance public safety. Specifically, the sentencing commission should be:*

❑ **Protective.** The Governor and the Legislature should establish a sentencing commission whose primary goal should be to enhance public safety and use public resources wisely. A sentencing commission is not a vehicle to revisit indeterminate sentencing, but a way to ensure sentencing laws match sentencing goals. Consideration should be given to successful strategies of sentencing commissions in other states.

❑ **Independent.** The sentencing commission should be permanent and independent from all branches of government with dedicated funding to support a small staff that would include criminologists, statisticians, legal experts and policy advisors.

❑ **Diverse.** The sentencing commission should be geographically and culturally diverse and its members must have demonstrated leadership capabilities. Members could include judges, district attorneys, public defenders, local law enforcement officials, academic experts, including an expert in gender responsive strategies for female offenders, victims' rights representatives, correctional leaders, former offenders or families of offenders and members of the public.

❑ **Authoritative.** The sentencing commission should have the authority to develop sentencing guidelines, as well as post release supervision and revocation guidelines that become law unless rejected by a majority vote of the Legislature.

❑ **Data-oriented.** The sentencing commission should be the State's clearinghouse for all sentencing and offender data. Policy-makers should immediately task and fund one or more California universities to perform this function for the commission.

❑ **Accountable.** The sentencing commission should assess all proposed sentencing law changes for their potential effect on criminal justice policies and correctional system resources.



**Link Sentencing Laws to Fiscal Appropriations**

In Virginia, all sentencing changes proposed by lawmakers are evaluated by the Virginia Criminal Sentencing Commission that projects the effect on correctional resources and any additional costs. All proposed laws are given a price tag based on the commission's analysis. When sentencing laws pass the public safety committee, Virginia lawmakers must go before the appropriations committee to identify cuts to other government services or increases in revenue to pay for the new law.

California lawmakers proposing changes to sentencing laws that increase correctional costs should be required to tie fiscal appropriations to the proposed laws. Additionally, ballot initiatives that change sentencing laws should be assessed by the sentencing commission to project correctional resource requirements so that voters could better understand the fiscal implications of new sentencing laws.

Source: Richard Kern, Director, Virginia Sentencing Commission. August 24, 2006. Testimony to the Commission.

48

# *Conclusion*

"Our prison system is a powder keg. It poses a danger to the prisoners, a danger to the officers... and a danger to the well-being of the public," Governor Schwarzenegger proclaimed in his January 2007 State of the State address. Policy-makers from both sides of the aisle and correctional experts across the nation agree with this assessment.

The Governor and the current Legislature alone did not create the problem – California's leaders have neglected the correctional system for decades.

But never before has the need to resolve the crisis been so imperative. As California policy-makers failed to address the correctional crisis, federal courts stepped in to fill the leadership void. The State ceded control of its inmate medical system to a federal receiver. A new lawsuit could hand the keys to the prison gates over to a panel of federal judges who could decide who stays in and who gets released.

The Governor and the Legislature must act before that happens. Decisions should be made by California lawmakers, not the federal government. A federal judge has given California until June 2007 to make progress.

In 2006, the Governor and the Legislature showed Californians they could work together on contentious issues. They must do the same for the prison crisis. The situation is intimidating, but not hopeless.

The solutions for the crisis are clear. But policy-makers must flex their political muscles and do the heavy lifting required to move ahead. This Commission has concluded this is the best alternative. If policy-makers do not take swift and decisive action, they should appoint an independent entity that will.

Policy-makers must manage the correctional population. To do this, capacity may need to be expanded, particularly at the local level. But, the State should not settle for simply building more cells. It has done that for nearly two decades and the State is still in a crisis.

CSP000094

Immediate solutions to address the overcrowding are summarized below. Some are policy choices that can be implemented immediately, while others require legislative action.

The State also must look at the correctional horizon. It must analyze its sentencing policies and set priorities for who it wants to punish and how. To do this, the State must follow the trail blazed by nearly two dozen other states and establish an independent sentencing commission.

The sentencing commission must gather data and provide a credible independent analysis of California's correctional population. Armed with knowledge, the sentencing commission should assist the State – before it embarks on another prison building boom – in identifying what correctional resources are needed to achieve the greatest public safety.



CSP000095

# The Commission's Study Process

The Commission has examined the correctional system five times in the past dozen years. In 1994, the Commission assessed the State's overall correctional policies and in 1998, reviewed the overcrowding problem. In 2004, the Commission reviewed the State's parole policies and the following year reviewed the effect these parole policies have on female offenders.    Most recently, in 2005, the Commission reviewed the Governor's plan to reorganize the Youth and Adult Correctional Agency to fold it into the newly created California Department of Corrections and Rehabilitation.

The majority of the Commission's recent recommendations focused on improving prison and parole policies.    The Commission studied sentencing policies in its 1994 review. It also consulted experts on sentencing during its 2003 assessment of parole, but did not embark on a study at that point in time.  Given the national efforts in sentencing reform, the decades of experience available from other states and the current correctional crisis in California, the Commission in 2006 decided to again review sentencing policies as a critical element of overall correctional policies.    The Commission's goal was to provide well-researched recommendations to policy-makers for reforming California's sentencing structure that, in conjunction with reforms in prison programs and parole policies, will improve public safety and control spiraling costs.

When the Commission reviewed the Governor's reorganization plan in 2005, it recommended that the Legislature allow the plan to take effect, but also committed itself to oversight of the progress of the reorganization.

This report is the result of the convergence of these efforts – the Commission's review of the State's criminal justice sentencing policies and its ongoing correctional oversight effort.

As part of its study process for this report, the Commission held four public hearings.  The first two hearings focused on sentencing reform. The Commission received testimony from national experts on sentencing, leaders from other states who had implemented sentencing reforms and established sentencing commissions, judges, the California District Attorneys Association, a victims rights advocate, legal scholars from the

CSP000096

Administrative Office of the Courts, the Attorney General's office and
Stanford University, local law enforcement, the president of the
correctional officers union, former offenders and family members of
current inmates.

The third hearing was designed to provide an update on the progress of
the reorganization effort. The Commission heard from the current and
former secretaries of CDCR, legislators dedicated to corrections oversight
and reform, local law enforcement and the president of the correctional
officers union. The fourth hearing examined correctional management
structure. The Commission heard from the court-appointed receiver
overseeing the inmate medical system, a prisoner rights lawyer, an
correctional management expert and former correctional director, and an
expert in corporate turnaround. Witnesses invited to participate in the
Commission's public hearings are listed in Appendix A.

The Commission convened a sentencing reform advisory committee
comprised of diverse stakeholders impacted by the State's sentencing
policies. The advisory committee met three times. Advisory committee
members are listed in Appendix B.

Finally, as part of the oversight effort, the Commission held two round
table discussions on juvenile justice and parole policies to explore in
greater detail the progress that had been made since the reorganization,
the barriers to progress and what it will take to overcome those barriers.
Participants from those meetings are listed in Appendix C.

All written testimony submitted electronically for each of the four
hearings and this report are available online at the Commission Web site,
http://www.lhc.ca.gov/lhc.html.

CSP000097

# Appendices & Notes

- ✓ *Public Hearing Witnesses*
- ✓ *Advisory Committee Members*
- ✓ *Roundtable Meeting Participants*
- ✓ *Prior Recommendations*
- ✓ *History of Sentencing Commission Proposals in California*
- ✓ *SCJC – Increases in California Sentencing Since the Enactment of the Determinate Sentencing Act*
- ✓ *Notes*

CSP000099

# Appendix A

## Little Hoover Commission Public Hearing Witnesses

### *Witnesses Appearing at Little Hoover Commission Public Hearing on Sentencing Reform, June 22, 2006*

Kevin R. Reitz, Professor of Law, University of Minnesota, and Reporter, the American Law Institute, Model Penal Code Revision Project

Roger K. Warren, Scholar-in-Residence, Judicial Council of California, Administrative Office of the Courts and Project Director, National Sentencing Reform Project, National Center for State Courts

Joshua Weinstein, Senior Attorney, Judicial Council of California, Administrative Office of the Courts and Staff to the Criminal Law Advisory Committee

Les Kleinberg, Special Assistant Attorney General, Legislative Affairs, Office of the Attorney General

Sharon J. English, Crime Victim Rights and Services Advisor

Gregory D. Totten, Ventura County District Attorney and Member of the Board of Directors, California District Attorneys Association

Mike Jimenez, President, California Correctional Peace Officers Association

### *Witnesses Appearing at Little Hoover Commission Public Hearing on Sentencing Reform, August 24, 2006*

Thomas W. Ross, Executive Director, Z. Smith Reynolds Foundation; former Chair, North Carolina Sentencing and Policy Advisory Commission; and, former Director, North Carolina Administrative Office of the Courts

Robert M. A. Johnson, Anoka County Attorney, Minnesota

Richard P. Kern, Ph. D, Director, Virginia Criminal Sentencing Commission

Kara Dansky, Executive Director, Stanford Criminal Justice Center

Steven Z. Perren, Judge, California Court of Appeal, Second District

J. Richard Couzens, Judge, Placer County Superior Court

Joseph A. Gunn, Executive Director, Independent Review Panel on Corrections

CSP000100

## Witnesses Appearing at Little Hoover Commission
### Public Hearing on Correctional System and Sentencing Reform, October 26, 2006

James E. Tilton, Secretary, California Department of Corrections and Rehabilitation

Senator Jackie Speier, Chair, Senate Select Committee on Government Cost Control

Senator Gloria Romero, Chair, Senate Select Committee on the California Correctional System

Roderick Q. Hickman, Public Sector Management and Consultant, XRoads Solutions Group, LLC, and former Secretary, California Department of Corrections and Rehabilitation

Sheriff Leroy D. Baca, County of Los Angeles

James R. Milliken, Judge (Retired), San Diego Superior Court

Tim Silard, Assistant District Attorney, City and County of San Francisco, on behalf of Kamala Harris, District Attorney, City and County of San Francisco

Mike Jimenez, President, California Correctional Peace Officers Association

## Witnesses Appearing at Little Hoover Commission
### Public Hearing on Corrections Oversight – Management Structure, November 16, 2006

Robert Sillen, Court-appointed receiver overseeing prison medical care (*Plata v. Schwarzenegger*)

Donald Spector, Director, Prison Law Office

Reginald Wilkinson, Ph. D, former Director, Ohio Department of Rehabilitation and Correction, and Chair, National Institute of Corrections Advisory Board

Dennis Simon, Managing Principal, XRoads Solutions Group, LLC

CSP000101

# Appendix B

## Little Hoover Commission Advisory Committee on Sentencing Reform

Barbara Bloom, Associate Professor, Criminology and Criminal Justice Department, Sonoma State University

Susan Burton, Executive Director, A New Way of Life Foundation

Marci Coglianese, Co-Chair, The Family Council

Cathy Coyne, Legislative Analyst, California State Sheriffs' Association

Kara Dansky, Executive Director, Stanford Criminal Justice Center

Pam Douglas, Director, Corrections Institute of America

Charlie Fennessey, Principal Consultant, Office of Senator Charles Poochigian

Susan Fisher, Governor's Crime Victims Advocate, Office of the Governor

James Fox, District Attorney, San Mateo County

Mike Jimenez, President, California Correctional Peace Officers Association

Greg Jolivette, Director, Criminal Justice, Legislative Analyst's Office

J. Clark Kelso, Director, Capital Center for Government Law & Policy

Les Kleinberg, Special Assistant to the Attorney General, Office of the Attorney General, State of California

David LaBahn, Executive Director, California District Attorneys Association

Jim Lindburg, Legislative Advocate, Friends Committee on Legislation of California

John Lum, Public Policy Coordinator, Coalition for Effective Public Safety, and Californians United for a Responsible Budget

Dan Macallair, Executive Director, Center on Juvenile & Criminal Justice

Jerome McGuire, Counsel, Senate Public Safety Committee

Steven Meinrath, Counsel, Senate Public Safety Committee

Greg Pagan, Chief Counsel, Assembly Public Safety Committee

Joan Petersilia, Director, Center for Evidenced Based Corrections, University of California, Irvine

Dale Rickter, Co-Chair, The Family Council

Cory Salzillo, Senate Republican Policy Consultant

Tim Silard, Assistant District Attorney, City and County of San Francisco

Norma Suzuki, Executive Director, Chief Probation Officers of California

Steve Szalay, Executive Director, California State Sheriffs' Association

Jeffrey Thoma, Solano County Public Defender

Joshua Weinstein, Senior Attorney, Judicial Council of California, Administrative Office of the Courts

CSP000102

*LITTLE HOOVER COMMISSION*

CSP000103

# Appendix C

## Little Hoover Commission Corrections Oversight Project

### *Roundtable Discussions on Parole Reform and Juvenile Justice Participants, November 15, 2006*

Robert Ambroselli, Parole Administrator, California Department of Corrections and Rehabilitation

Alison Anderson, Chief Counsel, Senate Public Safety Committee

Michael Bien, Managing Partner, Rose, Bien & Galvan, LLP

Sue Burrell, Staff Attorney, Youth Law Center

Charlie Fennessey, Principal Consultant, Office of Senator Charles Poochigian

Cindie Fonseca, Educator, California Department of Corrections and Rehabilitation, Bargaining Unit 3, Service Employees International Union Local 1000

Joshua Golka, Government Relations Advocate, Service Employees International Union Local 1000

Thomas Hoffman, Director, Division of Adult Parole Operations, California Department of Corrections and Rehabilitation

Steve Krull, Chief of Police, Livermore Police Department

Dan Macallair, Executive Director, Center on Juvenile & Criminal Justice

Jerome McGuire, Counsel, Senate Public Safety Committee

Steven Meinrath, Counsel, Senate Public Safety Committee

John Monday, Acting Executive Director, Board of Parole Hearings

Gary Olson, Assembly Republican Consultant

Greg Pagan, Chief Counsel, Assembly Public Safety Committee

Karen Pank, Executive Director, Chief Probation Officers of California

Cory Salzillo, Senate Republican Policy Consultant

Del Sayles-Owen, Director, Division of Community Partnerships, California Department of Corrections and Rehabilitation

Elizabeth Siggins, Chief for Juvenile Justice Policy Division, California Department of Corrections and Rehabilitation

Melinda Silva, Parole Agent, California Department of Corrections and Rehabilitation

David Steinhart, Executive Director, Commonweal Juvenile Justice

Bernard Warner, Chief Deputy Secretary for Juvenile Justice, California Department of Corrections and Rehabilitation

CSP000104

CSP000105

# Appendix D

## To Improve California Corrections and Manage Inmate Population

| Blue Ribbon Commission (1990) | Independent Review Panel (2004) | Little Hoover Commission (1994, 1998, 2003, 2004 and 2005) |
|---|---|---|
| Enact a Sentencing Law Revision Commission to review the impacts of existing or revised sentencing laws, establish sentencing guidelines and expand intermediate sanctions for adult and juvenile offenders. | Charter a Commission with appropriate members to develop a presumptive sentencing model for non-second and third strike crimes. | Create a sentencing commission in California by action of the Governor and the Legislature or by ballot Initiative. Pattern it after successful models in other states. |
| Develop and expand intermediate sanctions for certain targeted short-term offenders who are serving less than one year in prison. | Release low-risk inmates to community supervision. | Fund community-based punishments that improve public safety by reducing recidivism. Begin with female offenders. |
| Develop a series of specialized, intensive, high impact, short-term, in-prison programs to prepare inmates for the successful return to society. | Provide inmate planning and re-entry assessment at the time of incarceration and expand the Community Re-Entry Bridging Program. | To protect the public, implement a risk and needs assessment tool at intake and, use proven strategies to prepare inmates for release, supervise and assist parolees in California communities, and intervene when parolees fail. |
| Develop an automated Corrections Management Information System designed to assist officers at all levels of the correctional system in identifying and classifying offenders statewide. | Develop a comprehensive data collection and analysis system that measures the effectiveness of the department's parole programs. This system must also link with other department data analysis systems. | Efforts should be made to accelerate the development of a robust technology system to provide the department with information to effectively manage its efforts. |

Sources: The Blue Ribbon Commission on Inmate Population Management Final Report. January 1990. Corrections Independent Review Panel. *Reforming California's Youth and Adult Correctional System.* June 30, 2004. Sacramento, CA. Little Hoover Commission. January 1994. *Putting Violence Behind Bars: Redefining the Role of California's Prisons.* Sacramento, CA. Little Hoover Commission. January 1998. *Beyond Bars: Correctional Reforms to Lower Prison Costs and Reduce Crime.* Sacramento, CA. Little Hoover Commission. November 2003. *Back to the Community: Safe & Sound Parole Policies.* Sacramento, CA. Little Hoover Commission. December 2004. *Breaking the Barriers for Women on Parole.* Sacramento, CA. Little Hoover Commission. February 2005. *Reconstructing Government: A Review of the Governor's Reorganization Plan Reforming California's Youth and Adult Correctional Agency.* Sacramento, CA.

CSP000106

CSP000107

# Appendix E

### History of sentencing commission proposals in California

California lawmakers have debated the merits of a sentencing commission for more than 20 years. Since 1984, seven different bills aimed at reforming California's troubled prison system proposed establishing an independent body of experts to recommend sentencing guidelines. Three of these bills made it out of the Legislature and to the Governor's desk; every attempt ultimately failed. The following summarizes these bills including their amendments, common aspects, main opponents and the reasons they failed.

| Past attempts to create a sentencing commission | | |
|---|---|---|
| Year | Bill | Status |
| 1984 | SB 56 (Presley) | Vetoed by Gov. Deukmejian |
| 1992 | SB 25 (Lockyer)* | Vetoed by Gov. Wilson |
| 1994 | AB 43 (Polanco) | Failed to pass Committee |
| 1994 | AB 2944 (Vasconcellos) | Vetoed by Gov. Wilson |
| 1995 | SB 166 (Polanco) | Failed to pass Committee |
| 1995 | AB 1036 (Vasconcellos) | Failed to pass Committee |
| 1998 | SB 670 (Vasconcellos) | Stalled in Assembly |
| 2006 | AB 14 (Lieber) | In the Assembly |

*SB 25 proposed a new sentencing structure with increased judicial discretion and presumptive sentence ranges.

### *Common aspects of sentencing commission legislation*

Four of the seven bills to establish a sentencing commission proposed the following 16-member panel with four ex officio members and 12 voting members[90]:

**Four ex officio members:** The Attorney General; the Secretary of then Department of Corrections; the Director of Finance; and, the State Public Defender.

**Six members appointed by the Governor[91]:** One prosecuting attorney; one chief of police or county sheriff; one public member who has never been an attorney, judge or law enforcement official; one retired member of the California Supreme Court or California Court of Appeal; and, one public member.

**Three members appointed by the Speaker of the Assembly:** One public member who has never been an attorney, judge or law enforcement official; one prosecuting attorney; and, one public member currently active in criminology research or academia in California.

**Three members appointed by the Senate Rules Committee:** One public member who has never been an attorney, judge or law enforcement official; one public defender; and, one faculty member of a law school in this state.

CSP000108

**LITTLE HOOVER COMMISSION**

The American Law Institute draft Model Penal Code on sentencing proposes, and other states have formed, sentencing commissions that include more judicial and legislative members.

### Duties and Considerations

In addition to devising sentencing guidelines, the duties and responsibilities charged to the sentencing commission included several provisions that addressed sentence lengths, inmate treatment plans, corrections data gathering and prison capacity.

**Sentence length.** All of the bills attempted to strike a balance between increasing and decreasing sentence length. Although SB 25 increased sentences for 50 crimes, Governor Wilson vetoed the bill because it would lower sentences for some crimes such as drug offenses. In later bills, language was included to allow a sentencing commission to consider a system of indeterminate sentencing for nonviolent offenders or the sentencing ranges proposed in SB 25.

**SB 25 (Lockyer)**

This bill placed determinate sentences into one of six sentencing ranges with a minimum, maximum and middle, or presumptive, term. The judge would have the discretion to select any sentence in the sentence range. SB 25 would have created the following sentence schedules:

|   | Minimum Term | Maximum Term | Presumptive Term |
|---|---|---|---|
| A | 5 years | 11 years | 8 years |
| B | 3 years | 9 years | 6 years |
| C | 3 years | 7 years | 5 years |
| D | 3 years | 6 years | 4 years |
| E | 2 years | 4 years | 3 years |
| F | 16 months | 3 years | 2 years |

**Inmate treatment.** Several bills charged the sentencing commission to devise a system of granting and rescinding sentence credits based upon individual treatment plans. The Department of Corrections criticized this provision for stripping it of authority over inmates.

**Data gathering and prison capacity.** At least two bills to establish a sentencing commission directed the commission to establish a database to trace crime statistics, sentencing outcomes and other corrections-related information to monitor the state's sentencing code for stability and fairness. Along the same lines, several bills also charged the commission to collect data on the current and future capacity of state prisons and to consider this information in devising sentencing guidelines.

### Reasons for failure

Sentencing commission bills failed based on concerns that they were too harsh or too lenient on offenders.[92] Governors Deukmejian and Wilson each sited an objection to removing the authority to create sentence law from the Legislature to an unelected commission in their veto messages. Other bills failed because opponents equated a sentencing commission with a return to indeterminate sentencing in California. Highlighted below are the major reasons sentencing commission bills failed and arguments used by their challengers.

**Fear of shorter sentences and / or a return to indeterminate sentencing.** In his veto message of AB 2944, Governor Wilson decried what he interpreted as the Legislature's attempt to return to an indeterminate sentencing structure: "AB 2944, by its legislative intent, favors a return to an indeterminate sentencing structure. Indeterminate sentencing, which was widely discredited in the 1970s, remains in disfavor with the law enforcement community. [I]ts expanded use eliminates the certainty in justice which the public desires."[93] Similarly, Governor Wilson

CSP000109

vetoed Senate Bill 25, which proposed presumptive sentencing, for fear that it would end "15 years of decisional law."[94]

Opponents of a sentencing commission also have expressed the fear that a sentencing commission would lower sentence lengths for some criminals. The Committee on Moral Concerns vehemently opposed AB 1036 on the grounds that it would lower sentences for nonviolent crimes such as drug offenses. "[AB 1036] calls for lesser penalties for nonviolent offenses . . with today's current drug problems, this is hardly the time to go easy on drug pushers."[95]

**Authority issues.** Many sentencing commission opponents have been uncomfortable with the idea of an unelected body making decisions that would impact public safety. In his veto message of Senate Bill 56, Governor Deukmejian wrote: "I strongly believe that the responsibility for setting the ranges of prison sentences should rest with the Legislature, which is directly responsible to the voters of California, rather than a non-elective commission."[96] Also on the issue of authority, the Department of Finance opposed SB 166, because it "would both delegate authority to devise sentencing guidelines to a new body while leaving the authority with the Judicial Council."[97]

**Composition conflicts.** Opponents of sentencing commission legislation expressed several concerns over the composition and appointment process used to select its members. California Attorneys for Criminal Justice opposed SB 670 because they believed the proposed commission membership was weighted too heavily with law enforcement and correctional interests. Instead, they wanted more public members including a member of a prisoner's rights group.[98]

Stakeholders also have opposed legislation based on the appointment process for the commission members. Every bill except SB 56 gave authority to appoint commission members to the Governor, the Speaker of the Assembly and the Senate Rules Committee. SB 56 gave appointment authority to the Governor, the Speaker of the Assembly and the Senate President Pro Tem. In opposition to AB 1036, the Office of Criminal Justice Planning argued that the Governor should have a greater role in appointing commission members.[99] However, Riverside Superior Court Judge Frank Moore, while supporting SB 56, opposed the idea of allowing the Governor to appoint a majority of the commission's members.

**Cost.** The Department of Finance repeatedly opposed sentencing commission legislation based on the "indeterminable costs" to the General Fund that such a commission would incur.

---

### Opponent's Arguments

**ACLU on SB 25:**

"...it is our view that enactment of this legislation will result in longer prison sentences thereby exacerbating our already overcrowded prison system." *(Letter to the Assembly, June 11, 1991)*

**Committee on Moral Concerns on AB 1036:**

"...this bill calls for guidelines that are neither based on public safety nor the will of the people." *(Letter to Assemblymember Vasconcellos, March 25, 1995)*

**California Correctional Peace Officers Association on SB 166:**

"[SB 166] would create another layer of bureaucracy subject to the same 'crime politic' which some find so distasteful in the Legislature." *(Letter to the Legislature, June 22, 1995)*

**California District Attorneys Association on AB 2944:**

"We are strongly opposed to any effort to shift to a sentencing structure that is primarily based upon an indeterminate scheme." *(Letter to Assemblymember Vasconcellos, July 1, 1994)*

---

CSP000110

LITTLE **HOOVER** **COMMISSION**

CSP000111

# Appendix F

<u>Increases in California Sentencing Since the Enactment of the Determinate Sentencing Act,</u>
§§ 1170, *et seq.* and 12022, *et seq*

### *Project Description*

In connection with its Sentencing Reform Project, the Little Hoover Commission has asked the Stanford Criminal Justice Center (SCJC) to prepare a report summarizing amendments to the California sentencing structure that have resulted in increased criminal sentences since the Determinate Sentencing Act became effective in 1977. The Little Hoover Commission requested that we provide our results by the end of calendar year 2006.

### *Project Method*

We began by convening a research team that included Kara Dansky, Executive Director of the SCJC; Kate Wilko, Research Attorney at Stanford Law School's Crown Library; and Laura Terlouw, third year Stanford Law Student.

Our first steps were to: (1) compile a list of all of the provisions of the California Code that relate in significant part to sentencing; (2) identify the enactment date of and the date of every amendment to each of those provisions; (3) locate the session law that correlates with each of those enactments and amendments; and (4) given the Little Hoover Commission's time frame, prioritize the sections according to their likelihood of having a substantial impact on sentencing.

We decided to begin with the Determinate Sentencing Act itself, § 1170, *et seq.*, and the conduct enhancements located at § 12022, *et seq.*, based on the likelihood that they would contain the majority of statutory provisions relating to sentencing.

Laura Terlouw began the analysis by reviewing the historical and statutory notes for each enactment and amendment. Laura quickly discovered that while these notes are useful as a guide, relying on them exclusively would result in skipping over relevant amendments.

Laura proceeded to analyze the session laws themselves. She read the entire text of every session law that correlated with every legislative enactment or amendment that could have an effect on sentencing. She compiled the session laws that had a substantive effect either on sentence length or on the prescribed method for imposing sentences and discarded those that had only grammatical or other non-substantive effects on sentencing. She then summarized her findings in a chart.

Kara Dansky then reviewed the chart that Laura had prepared in order to determine which of the substantive changes Laura had found could accurately be characterized as "increasing" sentences. Nearly every substantive amendment to the two sections of the Code that we studied resulted in an increase in sentences.

### *Scope*

As noted above, our research includes only the statutory provisions included in the Determinate Sentencing Act, § 1170, *et seq.*, and the conduct enhancements located at § 12022, *et seq.*, that substantively increased sentences.

We have not included grammatical or other non-substantive changes. We have also not included the following provisions of the California Code:

- Combination Determinate and Indeterminate Sentencing: §§ 668-678.
- Conduct Credits: §§ 2933-2935. These sections relate to work credits.
- Pre-sentence credits: §§ 4019-4019.5.

CSP000112

LITTLE HOOVER COMMISSION

- Violent felonies: §§ 1192-1192.8. Many of these sections address plea bargaining.
- Recidivism Enhancements under the following codes: California Penal Code; California Health & Safety Code; and California Insurance Code.
- Habitual Offenders and Three Strikes: §§ 667-667.17.
- Specific Conduct Enhancements under the following codes: California Penal Code; California Health & Safety Code; California Vehicle Code; California Welfare & Institutions Code.

Future researchers should review these provisions. We believe that these provisions have substantively affected sentencing, and have likely contributed to the trend of increasing sentences. If there is additional time, future researchers may want to also review the Indeterminate Sentencing Act. § 1168 was added in 1917, with only a few amendments during the years relevant to this project (post-1977) and no amendments since 1984. § 1168 includes a discussion of minimum penalties and good time credits. The other sections under the Act have been repealed.

*Conclusions*

1. <u>There have been countless increases in criminal sentences since the enactment of the Determinate Sentencing Act.</u> Our research revealed eighty substantive increases in sentencing since the enactment of the DSA included in §§ 1170, *et seq.*, and 12022, *et seq.*

2. <u>Statutes "increase" sentences in several ways.</u> We found that while the legislature occasionally lengthened the term of years to be imposed upon conviction of a particular offense or imposition of a particular enhancement, it also frequently increased sentences by limiting sentencing judges' discretion to make determinations with respect to the imposition, aggravation, or enhancement of a sentence.

3. <u>Analyzing every amendment to every section of the Penal Code that involves sentencing is a labor-intensive and time-consuming process.</u> Notably, session laws for the years 1977 through 1986 are available only in hard copy; Lexis Nexis contains session laws for the years 1987 to the present. To be done thoroughly and accurately, this work requires a significant investment of time and resources.

4. <u>Our research underscores the need for a comprehensive revision of the statutory provisions relating to sentencing.</u> As most experts have already concluded, California's sentencing system is unbelievably complex and in dire need of simplification.

5. <u>Our research underscores the need for a Sentencing Commission.</u> We believe that further analysis of this kind will be key to reforming California's sentencing system. A sentencing commission is the only type of entity that has the expertise and the resources to undertake a thorough review of the provisions of the Code that we were unable to review.

*Chart Summarizing Increases in Sentencing Since the Enactment of the DSA*

| Enact. /Amend. Date | Sess. Law Cit. | Code Sect. Cit. | Substantive Change |
|---|---|---|---|
| 1/1/1977 | 1977 c. 165 § 15 | § 1170 | Permitted sentencing judges to consider a single fact multiple times to determine, aggravate, or enhance a sentence. |
| 7/1/1977 | 1977 c. 165 § 91 | § 12022 | Added one year enhancement for being armed with or using a firearm in the commission or attempted commission of a felony, to be served consecutively. Enhancement applies to all principles if at least one principle is armed, even if the defendant was not personally armed. |
| 7/1/1977 | 1977 c. 165 § 93 | § 12022.6 | Added enhancement for taking, damaging, or destroying property in the commission or attempted commission of a felony, with intent to cause the taking, damage, or destruction. One year, consecutive, where the loss exceeds $25,000; two years, consecutive, where the loss exceeds $100,000. |

CSP000113

| Enact. /Amend. Date | Sess. Law Cit. | Code Sect. Cit. | Substantive Change |
|---|---|---|---|
| 7/1/1977 | 1977 c. 165 § 94 | § 12022.7 | Added three year enhancement for inflicting great bodily injury, with intent to inflict such injury, on any person other than an accomplice in the commission of a felony. To be served consecutively. |
| 1/1/1979 | 1978 c. 579 § 40 | § 12022.7 | Removed assault with a deadly weapon or assault by means of force likely to produce great bodily injury from the list of crimes to which the section does not apply. |
| 1/1/1980 | 1979 c. 944 § 12 | § 1170.1 | Removed limitations on sex crime enhancements. Provided that all sex crime enhancements shall be a full and separately served enhancement and shall not be merged with any term or with any other enhancement. |
| 1/1/1980 | 1979 c. 944 § 17 | § 12022.3 | Added three year enhancement for using a firearm (loaded or unloaded) or any other deadly weapon in the commission of a sex crime. Added two year enhancement for being armed with a firearm (loaded or unloaded) or any other deadly weapon in the commission of a sex crime. |
| 1/1/1980 | 1979 c. 944 § 18 | § 12022.8 | Added five-year enhancement for inflicting great bodily injury on any victim during the commission of a sex crime. Enhancement applies to each violation, to be served consecutively. |
| 1/1/1982 | 1981 c. 572 § 1 | § 1170.7 | Required sentencing judges to consider robbery or attempted robbery for the purpose of obtaining any controlled substance when committed against a pharmacist, pharmacy employee, or other person lawfully possessing controlled substances, a circumstance in aggravation. |
| 1/1/1983 | 1982 c. 1515 § 8 | §1170.1 | Provided that the subordinate term for each subsequent kidnapping conviction shall consist of the middle term (rather than one-third of the middle term) for each kidnapping conviction for which a consecutive term of imprisonment is imposed and one-third of any enhancements imposed (versus one-third or none). Also provided that the 5-year limitation on the total of subordinate terms doesn't apply. |
| 1/1/1983 | 1982 c. 1099 § 2 | § 1170.15 | Provided for full middle term consecutive sentencing where a person is convicted of a felony and of an additional felony that was committed against the victim of or a witness or potential witness with respect to the first felony, or a person about to give material information pertaining to the first felony. Amended again in 1998 to require full term consecutive enhancements for being armed with or using a firearm or deadly weapon and for inflicting great bodily injury. |
| 1/1/1983 | 1982 c. 929 § 1 | § 1170.8 | Required sentencing judges to consider robbery or an assault with a deadly weapon or instrument or by means of any force likely to produce great bodily injury committed against a person while that person was in a church, synagogue, or building owned and occupied by a religious educational institution, or any other place primarily used as a place of worship where religious services are regularly conducted, or where the person committed arson or intended to commit arson at one of these locations, a circumstance in aggravation. |
| 1/1/1983 | 1982 c. 1100 § 2 | § 1170.85 (formerly § 1170.8) | Required sentencing judges to consider any felony assault or battery offense where the offense was committed to prevent or dissuade a person who is or may become a witness from attending or testifying at any trial, proceeding, or inquiry authorized by law, or if the offense was committed because the person provided assistance or information to a law enforcement officer, or to a public prosecutor in a criminal or juvenile court proceeding, a circumstance in aggravation. |

69

CSP000114

| Enact. /Amend. Date | Sess. Law Cit. | Code Sect. Cit. | Substantive Change |
|---|---|---|---|
| 1/1/1983 | 1982 c. 1551 § 2 | § 12022.1 | Added § 12022.1, which provides that any person convicted of a felony offense which was committed while that person was released from custody on bail or on his or her own recognizance pending trial on an earlier felony offense shall, upon conviction of the later felony offense, be subject to a penalty enhancement as follows: if the person is convicted of a felony for the earlier offense and sentenced to state prison, then convicted of a felony for the later offense, then a state prison sentence for the later offense shall be consecutive to the earlier sentence and 2 years should be added to the term for the later offense; if the person is convicted of a felony for the earlier offense and granted probation, then convicted of a felony for the later offense, then two years should be added to the term for the later offense; if the earlier offense conviction is reversed on appeal, then the enhancement shall be suspended pending retrial of that felony and reimposed upon reconviction. |
| 1/1/1983 | 1982 c. 950 § 2 | § 12022.2 | Added three year enhancement, to be served consecutively, for being armed with a firearm in the commission or attempted commission of a felony while having in one's immediate possession ammunition for the firearm designed primarily to penetrate metal or armor. |
| 1/1/1983 | 1982 c. 1404 § 2.1 | § 12022.5 | Added two year enhancement, to be served consecutively, for personally using a firearm in the commission or attempted commission of a felony. |
| 1/1/1986 | 1985 c. 165 § 1 | § 1170.71 | Required sentencing judges to consider the fact that a person who commits lewd or lascivious acts with a child under age 14 has used obscene or harmful matter to induce, persuade, or encourage the minor to engage in a lewd or lascivious act a circumstance in aggravation. |
| 1/1/1986 | 1985 c. 1108 § 3 | § 1170.85 | Requires sentencing judges to consider fact that the victim of an offense is particularly vulnerable, or unable to defend himself or herself, due to age or significant disability a circumstance in aggravation. |
| 1/1/1986 | 1985 c. 463 § 4 | § 12022.4 | Added two year enhancement, to be served consecutively, for, during the commission or attempted commission of a felony, furnishing or offering to furnish a firearm to another for the purpose of aiding, abetting, or enabling that person or any other person to commit a felony. |
| 1/1/1986 | 1985 c. 1375 § 1 | § 12022.9 | Added five year enhancement, to be served consecutively, for, during the commission or attempted commission of a felony, personally inflicting injury that results in the termination of pregnancy, where the defendant knows or reasonably should know that the victim is pregnant, with intent to inflict injury and, without the consent of the woman. |
| 1/1/1987 | 1986 c. 1429 § 1 | § 1170.1 | Added penetration of a genital or anal opening by a foreign object, oral copulation & sodomy, as well as attempts to do so, to the list of crimes in which the court may impose both one enhancement for weapons and one enhancement for great bodily injury. |
| 1/1/1988 | 1987 c. 1423 § 3.7 | § 1170.1 | Provided that in cases of penetration of a genital or anal opening by a foreign object, oral copulation, sodomy, robbery, rape or burglary, or attempted penetration of a genital or anal opening by a foreign object, oral copulation, sodomy, robbery, rape, murder, or burglary the court may impose both one enhancement for weapons and one enhancement for great bodily injury. |
| 1/1/1988 | 1987 c. 1159 § 1 | § 12022.5 | Added five year enhancement, to be served consecutively, where any person who is convicted of a felony or an attempt to commit a felony, including murder or attempted murder, discharged a firearm at an occupied motor vehicle which caused great bodily injury or death to the person of another. |
| 1/1/1988 | 1987 c. 1147 § 2 | § 12022.55 | Added five year enhancement, to be served consecutively, for any person who, with the intent to inflict great bodily injury or death, inflicts great bodily injury as defined in § 12022.7, or causes the death of a person, other than an occupant of a motor vehicle, as a result of discharging a firearm from a motor vehicle in the commission of a felony or attempted felony. |

CSP000115

| Enact. /Amend. Date | Sess. Law Cit. | Code Sect. Cit. | Substantive Change |
|---|---|---|---|
| 1/1/1988 | 1987 c. 706 § 5 | § 12022.7 5 | Added three year enhancement, to be served consecutively, for any person who, for the purpose of committing a felony, administers by injection, inhalation, ingestion, or any other means, any controlled substance listed in certain sections of the Health and Safety Code, against the victim's will by means of force, violence or fear of immediate and unlawful bodily injury to the victim or another person. |
| 1/1/1989 | 1988 c. 1487 § 2 | § 1170.1 | Amended subdivision (e) of § 1170.1 by adding lewd or lascivious acts upon or with a child under the age of 14 years accomplished by means of force or fear and kidnapping, as well as attempts to do so, to the list of crimes in which the court may impose both one enhancement for weapons and one enhancement for great bodily injury. |
| 1/1/1989 | 1988 c. 635 § 2 | § 1170.3 | Deleted subdivision (a)(5) of § 1170.3, relating to rules for uniformity in sentencing, which had listed the imposition of an additional sentence for being armed with a deadly weapon, using a firearm, an excessive taking or damage, or the infliction of great bodily injury as criteria for judges to consider at the time of sentencing. |
| 1/1/1989 | 1988 c. 1249 § 2 | § 12022 | Added enhancement of three, four, or five years, to be served consecutively, for any person who is personally armed with a firearm in the commission or attempted commission of a violation of certain sections of the Health and Safety Code. Added enhancement of one, two, or three years, to be served consecutively, for any person not personally armed with a firearm, who is a principal in the commission or attempted commission of a violation of certain sections of the Health and Safety code, and knows that another principal is personally armed with a firearm. Required imposition of middle term unless circumstances in aggravation or mitigation stated on the record. Permitted judges to strike additional punishment where interests of justice would best be served. |
| 1/1/1989 | 1988 c. 1249 § 3 | § 12022.5 | Added enhancement of three, four, or five years, to be served consecutively, for any person who personally uses a firearm in the commission or attempted commission of a violation of certain sections of the Health and Safety Code. Required imposition of middle term unless circumstances in aggravation or mitigation stated on the record. Permitted sentencing judges to strike additional punishment where interests of justice would best be served. |
| 1/1/1989 | 1988 c. 1597 § 4 | § 12022.8 5 | Added three year enhancement, for each violation, to be served consecutively, for any person who violates one or more of the list of specified sexual offenses with knowledge that the person has acquired AIDS or with knowledge that the person carries antibodies of AIDS at the time of the commission of those offenses. |
| 1/1/1990 | 1989 c. 1378 § 4 | § 1170.13 | Provided that where a consecutive term of imprisonment is imposed for two or more convictions of willfully and maliciously communicating to a victim or witness of a crime for which a person was convicted a credible threat to use force or violence, each subordinate term shall be 100% of the prescribed middle term of imprisonment (as opposed to the standard, one-third of the middle term). Provided that the total term of imprisonment imposed may exceed 5 years, but shall not exceed 15 years. Amended again in 1997 to delete the 15-year limitation. Amended again in 1998 to delete the five-year language. |
| 1/1/1990 | 1989 c. 1284 § 2 | § 12022 | Added three year enhancement, to be served consecutively, where the firearm used in the commission or attempted commission of a felony is an assault weapon as defined in § 12276 or a machinegun as defined in § 12200, whether or not the arming is an element of the offense of which the person was convicted. Enhancement applies to all principles if at least one principle is armed, even if the defendant was not personally armed. |

CSP000116

LITTLE HOOVER COMMISSION

| Enact. /Amend. Date | Sess. Law Cit. | Code Sect. Cit. | Substantive Change |
|---|---|---|---|
| 1/1/1990 | 1989 c. 1167 § 2 | § 12022.2 | Added enhancement of three, four, or five years, to be served consecutively, where the person was armed with a firearm in the commission or attempted commission of any felony and had in his immediate possession ammunition for the firearm designed primarily to penetrate metal or armor. Required imposition of middle term unless circumstances in aggravation or mitigation stated on the record. |
| 1/1/1990 | 1989 c. 1167 § 3 | § 12022.3 | Added enhancement of three, four, or five years, to be served consecutively, where any person convicted of certain sex offenses uses a firearm (loaded or unloaded) or any other deadly weapon in the commission of the violation. Added enhancement of one, two, or three years, to be served consecutively, if the person is armed with a firearm (loaded or unloaded) or any other deadly weapon. Required imposition of middle term unless circumstances in aggravation or mitigation stated on the record. |
| 1/1/1990 | 1989 c. 1167 § 4 | § 12022.4 | Added enhancement of one, two, or three years, to be served consecutively, where any person who, during the commission or attempted commission of a felony, furnishes or offers to furnish a firearm to another for the purpose of aiding, abetting, or enabling that person or any other person to commit a felony. Required imposition of middle term unless circumstances in aggravation or mitigation stated on the record. |
| 1/1/1990 | 1989 c. 1167 § 5 | § 12022.5 | Added enhancement of three, four, or five years, to be served consecutively, when a person personally uses a firearm in the commission or attempted commission of a felony. Required imposition of middle term unless circumstances in aggravation or mitigation stated on the record. Added additional five year enhancement, to be served consecutively, for any person who personally uses an assault weapon as defined in § 12276 or a machinegun as defined in § 12200 in the commission or attempted commission of a felony. |
| 1/1/1991 | 1990 c. 777 § 1 | § 1170.73 | Required sentencing judges to consider quantity of controlled substance involved in determining whether to impose an aggravated term under § 1170(b) when imposing sentences for certain controlled substance offenses. |
| 1/1/1991 | 1990 c. 952 § 1 | § 1170.74 | Required sentencing judges to consider the fact that the controlled substance is the crystalline form of methamphetamine a circumstance in aggravation in imposing sentences for certain controlled substance offenses. |
| 1/1/1991 | 1990 c. 1031 § 1 | § 1170.81 | Required sentencing judges to consider the fact that the intended victim of an attempted life term crime was a peace officer, while the peace officer was engaged in the performance of his or her duties, and the defendant knew or reasonably should have known that the victim was a peace officer engaged in his or her duties, a circumstance in aggravation. |
| 1/1/1991 | 1990 c. 1216 § 1 | § 1170.84 | Required judges to consider it a circumstance in aggravation that during the course of any felony, the defendant engaged in the tying, binding, or confining of any victim. |
| 1/1/1991 | 1990 c. 41 § 3 | § 12022.5 | Removed discretion of sentencing judges to strike additional punishments where the interests of justice would best be served. |
| 1/1/1992 | 1991 c. 602 § 7 | § 1170.78 | Required sentencing judges to consider it a circumstance in aggravation that the defendant committed the offense of arson in retaliation against the (perceived) owner or occupant of the property or structure burned, for any eviction or other legal action taken by the (perceived) owner or occupant. |
| 1/1/1992 | 1991 c. 584 § 1 | § 12022.2 | Added an enhancement of one, two, or three years for any person who wears a body vest (any bullet-resistant material intended to provide ballistic and trauma protection for the wearer) in the commission or attempted commission of a violent offense. Required imposition of middle term unless circumstances in aggravation or mitigation stated on the record. |

72

CSP000117

| Enact. /Amend. Date | Sess. Law Cit. | Code Sect. Cit. | Substantive Change |
|---|---|---|---|
| 1/1/1993 | 1992 c. 695 § 10 | § 1170 | Removed ability of sentencing judges to obtain information from Board of Prison Terms concerning the sentences of other persons convicted of similar crimes under similar circumstances. |
| 1/1/1993 | 1992 c. 235 § 1 | § 1170.1 | Added sexual battery, as well as attempts to do so, to the list of crimes in which the court may impose both one enhancement for weapons and one enhancement for great bodily injury. |
| 1/1/1993 | 1992 c. 104 § 1 | § 12022.6 | Added enhancement for taking, damaging, or destroying property in the commission or attempted commission of a felony, with intent to cause the taking, damage, or destruction. One year, consecutive, where the loss exceeds $50,000; two years, consecutive, where the loss exceeds $150,000; three years, consecutive, where the loss exceeds $1,000,000; four years, consecutive, where the loss exceeds $2,500,000. |
| 1/1/1993 | 1992 c. 510 § 2 | § 12022.9 | Added four year enhancement, to be served consecutively, for any person convicted of willfully and maliciously discharging a firearm from a motor vehicle at another person other than an occupant of a motor vehicle, if as a result of the defendant personally and willfully and maliciously discharging the firearm, the victim suffers paralysis or paraparesis of a major body part, including but not limited to the entire hand or foot. Added four year enhancement, to be served consecutively, for any person convicted of maliciously and willfully discharging a firearm at an inhabited dwelling house, occupied building, occupied motor vehicle, occupied aircraft, inhabited housecar or inhabited camper. |
| 1/1/1994 | 1993 c. 611 § 17 and § 17.98 | § 1170.1 | Created a new felony offense for carjacking, with a base term of up to nine years in state prison. Added carjacking, as well as attempts to do so, to the list of crimes in which the court may impose both one enhancement for weapons and one enhancement for great bodily injury. Added three year enhancement, to be served consecutively, for using a dangerous or deadly weapon during the commission or attempted commission of a carjacking. Added six year enhancement, to be served consecutively, for using a firearm during the commission or attempted commission of a carjacking. Imposed a maximum sentence of 18 years for violent carjacking when the sentence is coupled with an enhancement of 3 years for a violent prior offense. |
| 1/1/1994 | 1993 c. 592 § 4 | § 1170.1 | Provided that the term of imprisonment shall not exceed twice the number of years imposed by the trial court as the base term pursuant to §1170(b) unless an enhancement is imposed pursuant to Section 12022.1 and both the primary and secondary offenses specified in section 12022.1 are serious felonies as specified in § 1192.7(c). |
| Approved 11/8/1994 | Prop. 184 | § 1170.12 | THREE STRIKES. |
| 1/1/1994 | 1993 c. 131 § 1 | § 1170.72 | Required sentencing judges to consider it a circumstance in aggravation that an individual is convicted of a crime involving minors under 11 years of age. |
| 1/1/1994 | 1993 c. 611 § 30 | § 12022 | Provided that if the person has been convicted of carjacking or attempted carjacking, the additional term imposed shall be 1, 2 or 3 years (as opposed to the 1 year imposed for a person who personally uses a deadly or dangerous weapon in the commission or attempted commission of other felonies). |
| 1/1/1994 | 1993 c. 611 § 31.5 | § 12022.5 | Provided that if the person has been convicted of carjacking or attempted carjacking, the additional term imposed shall be 4, 5 or 6 years (as opposed to the 3, 4 or 5 years imposed for a person who personally uses a firearm in the commission or attempted commission of other felonies). |

CSP000118

LITTLE HOOVER COMMISSION

| Enact. /Amend. Date | Sess. Law Cit. | Code Sect. Cit. | Substantive Change |
|---|---|---|---|
| 1/1/1994 | 1993 c. 608 § 2 | § 12022.7 | Added five year enhancement, to be served consecutively, for any person found to have inflicted great bodily injury which causes the victim to become comatose due to brain injury or to suffer paralysis of a permanent nature.<br>Added five year enhancement, to be served consecutively, for any person who, with the intent to inflict such injury, personally inflicts great bodily injury on another person who is 70 years of age or older other than an accomplice in the commission or attempted commission of a felony. |
| 1/1/1995 | 1993/ 1994 c. 33 § 1.5 | § 1170.89 | Required sentencing judges to consider it a circumstance in aggravation in imposing firearm enhancements with triads that the person knew or had reason to believe that a firearm was stolen. |
| 1/1/1995 | 1993/ 1994 c. 33 § 4 | § 12022.2 | Added enhancement of three, four, or ten years, to be served consecutively, where the person was armed with a firearm in the commission or attempted commission of any felony and had in his immediate possession ammunition for the firearm designed primarily to penetrate metal or armor.<br>Added enhancement of one, two, or five years, to be served consecutively, for any person who wears a body vest (any bullet-resistant material intended to provide ballistic and trauma protection for the wearer) in the commission or attempted commission of a violent offense. |
| 1/1/1995 | 1993/ 1994 c. 33 § 5 | § 12022.3 | Added enhancement of three, four, or ten years, to be served consecutively, for any person convicted of certain sex offenses if the person uses a firearm (loaded or unloaded) or any other deadly weapon in the commission of the violation.<br>Added enhancement of one, two, or five years, to be served consecutively, for any person convicted of certain sex offenses if the person is armed with a firearm (loaded or unloaded) or any other deadly weapon in the commission of the violation. |
| 1/1/1995 | 1993/ 1994 c. 33 § 6 | § 12022.5 | Added enhancement of three, four, or ten years, to be served consecutively, when a person personally uses a firearm in the commission or attempted commission of a felony.<br>Added enhancement of four, five, or ten years, to be served consecutively, if the person has been convicted of carjacking or attempted carjacking.<br>Added enhancement of five, sex, or ten years, to be served consecutively, for any person who is convicted of a felony or an attempt to commit a felony, including murder or attempted murder, in which that person discharged a firearm at an occupied motor vehicle which caused great bodily injury or death to the person of another.<br>Added enhancement of five, six, or ten years, to be served consecutively, for any person who personally uses an assault weapon as defined in § 12276 or a machinegun as defined in § 12200 in the commission or attempted commission of a felony.<br>Added enhancement of three, four, or ten years, to be served consecutively, for any person who personally uses a firearm in the commission or attempted commission of a violation of certain sections of the Health and Safety Code. |
| 1/1/1995 | 1993/ 1994 c. 33 § 7 | § 12022.5 5 | Added enhancement of five, six, or ten years, to be served consecutively, for any person who, with the intent to inflict great bodily injury or death, inflicts great bodily injury as defined in § 12022.7, or causes the death of a person, other than an occupant of a motor vehicle, as a result of discharging a firearm from a motor vehicle in the commission of a felony or attempted felony. |
| 1/1/1995 | 1994 c. 1188 § 12.7 | § 1170.1 | Added spousal rape, as well as attempts to do so, to the list of crimes in which the court may impose both one enhancement for weapons and one enhancement for great bodily injury. |

74

CSP000119

| Enact. /Amend. Date | Sess. Law Cit. | Code Sect. Cit. | Substantive Change |
|---|---|---|---|
| 1/1/1995 | 1994 c. 352 § 1 | § 1170.82 | Required sentencing judges to consider it a circumstance in aggravation when a defendant is convicted of specified controlled substances offenses that the defendant knew, or reasonably should have known, that the person to whom he or she was selling, furnishing, administering, or giving away the controlled substance was pregnant, had been previously convicted of a violent felony, or was in psychological treatment for a mental disorder or for substance abuse. |
| 1/1/1995 | 1994 c. 873 § 873 | § 12022.7 | Added enhancement of three, four, or five years, to be served consecutively, for any person who personally inflicts great bodily injury under circumstances involving domestic violence in the commission or attempted commission of a felony. Required imposition of middle term unless circumstances in aggravation or mitigation stated on the record. |
| 1/1/1995 | 1994 c. 1263 § 6 | § 12022.95 | Added four year enhancement for each violation, to be served consecutively, for any person convicted of a violation of endangering a child or causing or permitting a child to suffer physical pain, mental suffering or injury, who under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or injury that results in death, or having the care or custody of any child, under circumstances likely to produce great bodily harm or death, willfully cause or permits any child to be injured or harmed, and that injury or harm results in death. |
| 1/1/1996 | 1995 c. 341 § 1 | § 12022.7 | Removed the requirement of intent to inflict injury from subsections relating to infliction of injuries on any person other than an accomplice and to persons over 70 years old. |
| 1/1/1997 | 1996 c. 421 § 1 | § 1170.16 | Provided that a full, separate and consecutive term (rather than just a one-third term) may be imposed for each voluntary manslaughter offense, whether or not the offenses were committed during a single transaction. |
| 1/1/1997 | 1996 c. 689 § 3 | § 1170.86 | Required sentencing judges to consider it a circumstance in aggravation when a person is convicted of a specified felony sex offense, that the felony was committed within a safe school zone against a victim who was a pupil currently attending school. |
| 1/1/1998 | 1997 c. 750 § 3 | § 1170.1 | Provided that the subordinate term for each subsequent kidnapping conviction shall include the full term imposed for specific enhancements applicable to subordinate offenses (instead of one-third of any enhancements imposed). Deleted subsections relating to particular crimes in which the court could impose more than one enhancement for a single offense and exceptions to the rule that the term of imprisonment shall not exceed twice the number of years imposed by the trial court as the base term. Provided that when 2 or more enhancements may be imposed for being armed with or using a deadly weapon or a firearm in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense, with no limits on the imposition of any other enhancements applicable to that offense, including an enhancement for the infliction of great bodily injury. Removed discretion of sentencing judges to strike punishments in appropriate circumstances. |
| 1/1/1998 | 1997 c. 750 § 4 | § 1170.11 | Provided list of specific enhancements. As used in § 1170.1, the term "specific enhancement" includes, but is not limited to, the enhancements listed in § 1170.11. |
| 1/1/1998 | 1997 c. 848 § 1 | § 1170.76 | Required sentencing judges to consider it a circumstance in aggravation that in specified cases of domestic violence the defendant is or has been a member of the household of the minor or the victim, or is a marital or blood relative of the minor or the victim, or the defendant or the victim is the natural parent, adoptive parent, stepparent, or foster parent of the minor, and the offense occurred in the presence of or was witnessed by the minor. |

CSP000120

*LITTLE HOOVER COMMISSION*

| Enact. /Amend. Date | Sess. Law Cit. | Code Sect. Cit. | Substantive Change |
|---|---|---|---|
| 1/1/1998 | 1997 c. 109 § 1 | § 12022.3 | Applied sentencing provisions to attempted violations of certain sex offenses. |
| 1/1/1998 | 1997 c. 503 § 3 | § 12022.53 | Added mandatory ten year enhancement, to be served consecutively, for certain firearm offenses. Added mandatory twenty year enhancement, to be served consecutively, for certain firearm offenses where the firearm is intentionally discharged. Added mandatory enhancement of twenty-five years to life, to be served consecutively, if great bodily injury was proximately caused to any person other than an accomplice as a result of the firearm being discharged. Provided that if more than one enhancement per person applies, the court shall impose the enhancement that provides the longest term of imprisonment. |
| 1/1/1998 | 1997 c. 109 § 2 | § 12022.8 | Added five year enhancement, to be served consecutively, for any person who inflicts great bodily injury on any victim during the attempted commission of certain sex offenses. |
| 1/1/1999 | 1998 c. 926 § 2.5 | § 1170.1 | Deleted provision limiting total of consecutive subordinate terms for non-violent offenses to five years. |
| 1/1/1999 | 1998 c. 936 § 26 | § 1170.11 | Declared the intent of the Legislature that all specific enhancements shall apply to criminal offenses from the time those enhancements are enacted, whether or not those enhancements are listed in § 1170.11. |
| 1/1/2000 | 1999 c. 996 § 12 | § 1170.17 | Provided that when a person is prosecuted for a criminal offense committed while he or she was under the age of 18 years, and the prosecution is lawfully initiated in a court of criminal jurisdiction without a prior finding that the person is not a fit and proper subject to be dealt with under the juvenile court law, upon subsequent conviction for any criminal offense, the person shall be subject to the same sentence as an adult convicted of the identical offense. |
| 1/1/2001 | 2000 c. 689 § 1 | § 1170.1 | Provided that when a person is convicted of two or more felonies (whether violent or non-violent), the aggregate term of imprisonment includes the principle term (the greatest term of imprisonment imposed by the court for any of the crimes, including any term imposed for applicable specific enhancements), the subordinate term (one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed), and one-third of the term imposed for any specific enhancements applicable to those subordinate offenses. Prior to this amendment, the subordinate term for each consecutive offense that wasn't a violent felony excluded any specific enhancements. |
| 1/1/2001 | 2000 § 919 § 1 | § 12022.7 | Added enhancement of four, five, or six years, to be served consecutively, for any person who personally inflicts great bodily injury on a child under the age of 5 years in the commission or attempted commission of a felony. Required imposition of middle term unless aggravated or mitigated circumstances stated on the record. |
| 1/1/2003 | 2002 c. 126 § 2 | § 12022 | Removed presumptive imposition of middle term for § 12022 enhancements. Made imposition of consecutive sentences for all § 12022 enhancements mandatory. |
| 1/1/2005 | 2004 c. 494 § 3 | § 12022 | Added three year enhancement, to be served consecutively, where the firearm used in the commission or attempted commission of a felony is .50 BMG rifle as defined in § 12278, whether or not the arming is an element of the offense of which the person was convicted. Enhancement applies to all principles if at least one principle is armed, even if the defendant was not personally armed. |
| 1/1/2005 | 2004 c. 494 § 4 | § 12022.5 | Added the .50 BMG rifle to the list of exceptions under subdivision (a). |

CSP000121

# Notes

1. Andy Furillo. November 17, 2006. "Bold Vow on Inmate Health." <u>Sacramento Bee.</u>

2. Andy Furillo. December 12, 2006. "Judge Balks at Prison Cap." <u>Sacramento Bee.</u>

3. Roderick Q. Hickman, former Secretary, Department of Corrections and Rehabilitation. October 26, 2006. Testimony to the Commission.

4. Jenifer Warren. December 21, 2006. "Governor's Aides Stymied Prison Reform, Ex-Prison Chief Says." <u>Los Angeles Times.</u>

5. Bureau of State Audits. November 2005. "California Department of Corrections and Rehabilitation: The Intermediate Sanction Programs Lacked Performance Benchmarks and Were Plagued With Implementation Problems." Sacramento, CA.

6. Mike Jimenez, President, California Correctional Peace Officers Association. President's Message. <u>http://www.ccpoanet.org/default.php?inc=pres_msg_blog&pagemode=view&news_id=46</u>. Web site accessed December 26, 2006.

7. Roderick Q. Hickman, Secretary, California Youth and Adult Correctional Agency. January 7, 2005. Press briefing conference call.

8. Little Hoover Commission. February 2005. "Restructuring Government: A Review of the Governor's Reorganization Plan. Reforming California's Youth and Correctional Agency." Sacramento, CA. Page 14. Citing remarks by former Governor George Deukmejian at a California Performance Review hearing.

9. John Hagar, Special Master, Madrid v. Tilton. June 20, 2006. "Special Master's Draft Report Regarding the Status of California Corrective Action Plans for Administrative Investigations and Discipline; Recommendations." Sacramento, CA.

10. California Department of Corrections and Rehabilitation. January 22, 2007. "Weekly Report of Population as of Midnight January 17, 2007." <u>http://www.cdcr.ca.gov/ReportsResearch/OffenderInfoServices/PopulationReports.asp</u> Web site accessed January 23, 2007.

11. Office of the Governor. December 21, 2006. "Press Release: Governor Schwarzenegger Unveils Comprehensive Prison Reform Proposal." Sacramento, CA.

12. Hickman. See endnote 3.

13. Richard Rimmer, former Deputy Director, Parole & Community Services Division, Department of Corrections. October 7, 2003. Personal communication.

14. James E. Tilton, Secretary, California Department of Corrections and Rehabilitation. October 16, 2006. Meeting with Commission staff.

15. Thelton E. Henderson, United States District Court Judge. October 3, 2005. "Findings of Fact and Conclusions of Law Re: Appointment of Receiver." *Plata v. Schwarzenegger.* Pages 7 and 27.

CSP000122

16. Robert Sillen, Court Appointed Receiver. Plata v. Schwarzenegger. July 5, 2006. First Bi-Monthly Report. Also, November 16, 2006. Testimony to the Commission.

17. Governor Arnold Schwarzenegger. January 6, 2005. "Strategic Plan for California." Submitted to the Commission with the Governor's Reorganization Plan – Reforming California's Youth & Adult Correctional Agency. On file.

18. Jim L'Etoile, Deputy Director, Division of Adult Parole, CDCR. September 21, 2005. Little Hoover Commission Roundtable Meeting on Parole Reform.

19. James E. Tilton, Secretary, California Department of Corrections and Rehabiliation. October 26, 2006. Written testimony to the Commission.

20. Assembly Bill 76 (Lieber) 2007-2008 Regular Session.

21. Tilton. See endnote 19.

22. Letter from Parole Region III clinicians to Governor Arnold Schwarzenegger. August 17, 2006. Also, Committee to Continue a Centralized Parole Outpatient Clinic. December 22, 2006. Written communication to the Commission. On file.

23. Hickman. See endnote 3.

24. Reginald Wilkinson, Ph.D., former Director, Ohio Department of Rehabilitation and Correction, and Chair, National Institute of Corrections Advisory Board November 16, 2006. Written testimony to the Commission.

25. Sillen. "First Bi-Monthly Report." See endnote 16.

26. California State Legislature. 2006. "Budget Act of 2006." Pages 412-413. Also, Governor Arnold Schwarzenegger's Budget Proposal 2007-08. "Corrections and Rehabilitation." Page 6. Also, Division of Juvenile Justice, California Department of Corrections and Rehabilitation. November 2006. "Population Movement Summary."

27. Sillen. November 16, 2006. Testimony to the Commission.

28. Wilkinson. See endnote 24.

29. Wilkinson, Ph.D., former Director, Ohio Department of Rehabilitation and Correction, and Chair, National Institute of Corrections Advisory Board November 16, 2006. Testimony to the Commission.

30. Joyce Hayhoe, Assistant Secretary, Department of Corrections and Rehabilitation. November 15, 2006. Written communication.

31. Hayhoe. See endnote 30.

32. Peggy B. Burke, Principal, Center for Effective Public Policy. December 22, 2006. Written and personal communication.

33. California Department of Corrections and Rehabilitation. January 2006. "County and Region of Parole: Calendar Year 2005." Sacramento, CA.

CSP000123

34. Joan Petersilia, Ph.D., Director, University of California, Irvine, Center for Evidenced-Based Corrections. May 2006. "Understanding California Corrections." California Policy Research Center, University of California. Page 72.

35. California Department of Corrections and Rehabilitation. "Historical Trends 1985-2005." Also, California Department of Corrections and Rehabilitation. "Historical Trends 1980-2000." Population in 1980 was 24,569. Also, California Department of Corrections and Rehabilitation. "Weekly Report of Population as of Midnight December 20, 2006." Population was 172,798. (172,798-24,569=148,229; 148,229/24,569=603%)

36. California Department of Corrections and Rehabilitation. Fall 2006. "Adult Population Projections, 2007-2012." Sacramento, CA. Page 13. Available at the California Department of Corrections and Rehabilitation's Web site: http://www.cdcr.ca.gov/ReportsResearch/OffenderInfoServices/Projections/F06pub.pdf.

37. California Department of Corrections and Rehabilitation. December 2006. "Monthly Report of Population as of Midnight November 30, 2006." Sacramento, CA. Page 1. Available at the California Department of Corrections and Rehabilitation's Web site: http://www.cdcr.ca.gov/Reports/Research/OffenderInfoServices/Monthly/TPOP1A/TOP1A0611.pdf.

38. Bill Sessa, Deputy Press Secretary, California Department of Corrections and Rehabilitation. Phone conversation December 29, 2006.

39. Mike Jimenez, President, California Correctional Peace Officers Association. June 22, 2006 and October 26, 2006. Testimony to the Commission.

40. Joan Petersilia, Ph.D., May 2006. "Understanding California Corrections." California Policy Research Center, University of California. Pages 29-34. Also, Bureau of Justice Statistics. August 2005. "Suicide and Homicide in State Prison." Also, Legislative Analyst's Office. February 2005. "Analysis of the 2005-06 Budget Bill, Judicial and Criminal Justice."

41. Legislative Analyst's Office. February 2005. "Analysis of the 2005-06 Budget Bill, Judicial and Criminal Justice." Sacramento, CA.

42. Petersilia. See endnotes 40.

43. Legislative Analyst's Office. July 2006. "State of California Expenditures, 1984-85 to 2006-07." Sacramento, CA.

44. Governor Arnold Schwarzenegger. January 10, 2007. "Governor's Budget Highlights 2007-08." Office of the Governor. Sacramento, CA.

CSP000124

45. California Department of Corrections and Rehabilitation. 2005. "Historical Perspectives 1985-2005." Sacramento, CA.

46. Joan Petersilia, Ph.D., May 2006. "Understanding California Corrections." Page 72. Also, Michael P. Jacobson, Ph.D., Professor, John Jay College of Criminal Justice, New York. January 23, 2003. Testimony to the Commission. Also, U.S. Department of Justice, Bureau of Justice Statistics. October 2001. "Trends in State Parole, 1999-2000." (Only Utah has a lower percentage of successful parolee discharges.)

47. Petersilia. May 2006. "Understanding California Corrections." Page 65. (The only other state to use determinate sentencing and place all offenders on parole is Illinois.)

48. Petersilia. See endnote 47. Page 64.

49. Petersilia. See endnote 47. Page 66. The only other state with this hybrid system is Illinois.

50. Tilton. See endnote 19.

51. California Department of Corrections. 2001. "California Prisoners and Parolees." Table 42. On file.

52. California Penal Code 1170.

53. California Center for Judicial Education and Research Felony Sentencing Handbook. 2006. Judicial Council of California. (There are approximately 600 "wobblers" or felonies that can result in a probation, jail or prison term.)

54. Roger K. Warren, Scholar-in-Residence, Judicial Council of California, Administrative Office of the Courts, and Project Director, National Sentencing Reform Project, National Center for State Courts. June 22, 2006. Written testimony to the Commission.

55. California State Sheriffs Association. June 2006. "Do the Crime, Do the Time? Maybe Not in California." Page V.

56. California State Sheriffs Association. See endnote 55. Appendix I. Local Detention Population Overview – Adult and Juvenile. Summary of Finding from the 2005 Corrections Standards Authority Jail Profile Survey Report.

57. California Department of Corrections and Rehabilitation. March 2006. "Time Served on Prison Sentence – Felons First Released to Parole by Offense Calendar Year 2005." Sacramento, CA.

58. Marcus Nieto. California Research Bureau. May 1996. "Community Correction Punishments: An Alternative to Incarceration for Nonviolent Offenders." Available online

CSP000125

at the California State Library Web site.
http://www.library.ca.gov/CRB/96?08/index.html. Accessed January 16, 2007.

59. California Department of Corrections and Rehabilitation. July 2004. "A Comparison of
    the Youth Authority's Institution and Parole Populations – June 30, 1995 through
    June 30, 2004." Also, Division of Juvenile Justice, CDCR. November 2006. "Population
    Movement Summary." Also, Senate Bill 681 (Hurtt) Statutes of 1996. Also, California
    Welfare and Institutions Code 912. Also, Legislative Analyst's Office. 2002. "Analysis
    of the 2002-03 Budget Bill – 2002 Budget Analysis: Judiciary and Criminal Justice,
    Department of the Youth Authority (5460).

60. Warren. See endnote 54. Also, Penal Code 8050 through 8093. Also, ABX1 99
    (Rainey) 1994.

61. Tilton. See endnote 19. Page 121.

62. Governor Arnold Schwarzenegger. See endnote 44.

63. Warren. See endnote 54. Citing the California Administrative Office of the Courts and
    California State Association of Counties, Probation Services Task Force: Final Report.
    June 2003.

64. Thomas W. Ross, Executive Director, Z. Smith Reynolds Foundation; former Chair,
    North Carolina Sentencing and Policy Advisory Commission; and, former Director,
    North Carolina Administrative Office of the Courts. August 24, 2006. Testimony to the
    Commission.

65. Richard P. Kern, Ph.D., Director, Virginia Criminal Sentencing Commission. August 24,
    2006. Testimony to the Commission.

66. Judicial Council of California. 2006. "Felony Sentencing Handbook." Center for
    Judicial Education and Research. San Francisco, CA.

67. Governor Arnold Schwarzenegger. January 10, 2007. "Governor's Budget Proposal,
    2007-08." Item 5225 Department of Corrections and Rehabilitation. Summary of Adult
    and Juvenile Per Capita Costs and Staff Ratios 2005-06.

68. Richard J. Couzens, Judge, Placer County Superior Court. August 24, 2006.
    Testimony to the Commission.

69. Sharon English, Crime Victim Rights and Services Advisor. June 22, 2006. Written
    testimony to the Commission.

70. English. See endnote 69.

CSP000126

71. Little Hoover Commission. November 2003. "Back to the Community: Safe & Sound Parole Policies." Page 43. Citing Department of Corrections Data Analysis Unit. "Number of New Admissions and Parole Violators With a New Term Who Paroled From SHU, During Calendar Year 2000, 2001, 2002 and through August 31, 2003." September 15, 2003. Renee L. Hansen, Manager, Legislative Liaison Office. Personal communication.

72. Kevin R. Reitz, Professor of Law, University of Minnesota. June 22, 2006. Testimony to the Commission. Also, American Law Institute. April 11, 2003. *Model Penal Code: Sentencing Report.*

73. Richard S. Frase. May 2005. *State Sentencing Guidelines: Diversity, Consensus and Unresolved Policy Issues.* Columbia Law Review. Volume 105, Number 4. Pages 1190-1232. Also, United States Sentencing Commission and National Association of State Sentencing Commissions Web site. Accessed July 31, 2006. www.ussc.gov/states/nascaddr.htm.

74. Reitz. See endnote 72.

75. Bureau of State Audits. September 13, 2005. "Department of Corrections: It Needs to Better Insure Against Conflicts of Interest and to Improve Its Inmate Population Projections." Sacramento, CA.

76. Ross. See endnote 64. Also, http://www.nccourts.org/Courts/CRS/Councils/spac/Default.asp. Web site accessed December 2006. Also, North Carolina Sentencing and Policy Advisory Commission. Revised 2005. *A Citizen's Guide to Structured Sentencing.*

77. Richard P. Kern, Director, Virginia Criminal Sentencing Commission. August 24, 2006. Testimony to the Commission. Including the following published articles: Richard P. Kern. September/ October 1995. *Sentence Reform in Virginia.* Federal Sentencing Reporter. Volume 8, Number 2. Richard P. Kern and Meredith Farrar-Owens. February 2004. *Sentencing Guidelines with Integrated Offender Risk Assessment.* Federal Sentencing Reporter. Volume 16, Number 3.

78. Reitz. See endnote 72.

79. The American Law Institute Charter Statement. Available at the ALI Web site: http://www.ali.org.

80. The American Law Institute. April 17, 2006. *Model Penal Code: Sentencing. Discussion Draft.* Philadelphia, PA. Page 4.

81. The American Law Institute. April 11, 2003. *Model Penal Code: Sentencing. Report.* Philadelphia, PA. Page 49.

CSP000127

82. Justice Kennedy Commission, American Bar Association. June 2004. "Reports with Recommendations to the ABA House of Delegates." http:www.abanet.org/crimjust/kennedy/JusticeKennedyCommissionReportsFinal.pdf. Web site accessed January 17, 2007.

83. Joshua Weinstein, Senior Attorney, Judicial Council of California, Administrative Office of the Courts, and staff to the Criminal Law Advisory Committee. June 22, 2006. Testimony to the Commission.

84. Supreme Court of the United States. January 22, 2007. Opinion of the Court. John Cunningham, Petitioner v. California.

85. Supreme Court of the United States. See endnote 84.

86. Office of the Governor. See endnotes 11 and 44.

87. Office of Senator Gloria Romero. January 18, 2007. "Press Release: Romero Unveils Legislation to Set Up a California Sentencing Commission: SB 110 (Romero) 2007." Sacramento, CA.

88. Kara Dansky, Executive Director, Stanford Criminal Justice Center. August 4, 2006. Written testimony to the Commission. Also, http://www.leg.state.vt.us/statutes/fullchapter.cfm?Title=13&Chapter=169 (Vermont established a sentencing commission in 2006.)

89. Reitz. See endnote 72. Also, the American Law Institute. April 17, 2006. *Model Penal Code: Sentencing. Discussion Draft.* Page 48.

90. The four bills include AB 2944, AB 1036, SB 670 and AB 14.

91. AB 14 (Lieber) would have the Governor only appoint five members and the California Supreme Court Chief Justice would serve as Commission chair.

92. Les Kleinberg, Deputy Director, Office of the Attorney General. Sacramento, CA. September 26, 2006. Telephone interview.

93. Governor Pete Wilson. September 28, 1992. Veto Message: AB 2944. Office of the Governor. Sacramento, CA. On file.

94. Governor Pete Wilson. September 26, 1992. Veto Message: SB 25. Office of the Governor. Sacramento, CA. On file.

95. Art Croney. March 29, 1995. Letter to Assemblymember John Vasconcellos on AB 1036. Committee on Moral Concerns. California State Archives.

CSP000128

eg

**LITTLE HOOVER COMMISSION**

96. Governor George Deukmejian.  September 27, 1984.  Veto Message: SB 56.  Office of the Governor.  Sacramento, CA.  On file.

97. Department of Finance.  March 30, 1995.  Analysis of SB 166.  California State Archives.

98. California Attorneys for Criminal Justice.  April 10, 1997.  Letter to Senator Vasconcellos regarding SB 670.  California State Archives.

99. Office of Criminal Justice Planning.  1995.  Letter to Assemblymember Vasconcellos regarding AB 1036.  California State Archives.

*Additional chart information from page 21:*

| Department / Program | Expenditures in 1984-85 | Expenditures in 2006-07 |
|---|---|---|
| Health services | $3,076,815 | $14,488,022 |
| Social Services | $3,259,402 | $9,206703 |
| ***Adult Corrections*** | ***$766,603*** | ***$9,152,392*** |
| University of California | $1,457,144 | $3,083,355 |
| California State University | $1,398,201 | $2,811,384 |
| Mental Health | $629,907 | $2,145,140 |
| Youth Corrections | $269,931 | $415,000 |
| Total State Expenditures | $25,721,660 | $101,260,998 |

* Dollars in thousands.

CSP000129