**EXHIBIT D**



**LOCAL 1000**

**SEIU**

**Stronger Together**

# CDCR Reforms
# for
# Safer Communities

Produced by SEIU Local 1000, representing 14,000 employees of the
California Department of Corrections and Rehabilitation

**March 2007**

**Executive Summary**

We are the 14,000 members of the largest union of non-custody employees in CDCR. We are employed in 173 job classifications at more than 40 adult and youth facilities.

**We are the "R" in CDCR.**
We are teachers and vocational instructors, nurses and other health care staff. We help thousands of offenders turn their lives around. We are accountants, supervising cooks, case records analysts, office techs, IT professionals and others essential to CDCR's day-to-day operations.

**CDCR is melting down.**
California prisons are at nearly 200 percent of capacity. The parole population is more than 120,000, with a nearly 70 percent recidivism rate. **Change is essential and inevitable.**

**Governor Schwarzenegger proposes to build his way out of this crisis.**
The governor wants to add 78,000 new beds, at a cost of $10.9 billion instead of reducing the demand for new beds. For every $1 spent on recidivism reduction in the current fiscal year, he would spend $250 to expand the current system. Much of this money would come from the General Fund, jeopardizing education and other key public services Californians need and deserve.

**Local 1000's Safer Communities Program,** on the other hand, will bring CDCR into the 21st century--enhancing public safety, and saving money for taxpayers.

Our recommendations are based on three simple principles:

- **Prison policies should safeguard public safety in our communities**
- **Prison policies should use taxpayer dollars efficiently.**
- **Prison policies should be evidenced-based.**

Our recommendations are based on these principles, on our own experience, and our research--an in-depth study of CDCR's population projections and a rigorous examination of current studies.

---

## EXPAND AND IMPROVE REHABILITATION AND REENTRY PROGRAMS.

Rehabilitation and reentry programs work. They improve public safety and save money for taxpayers.

- Offenders who receive basic education have lower recidivism rates than those who do not.
- Offenders who participate in additional vocational training have still lower recidivism rates.
- Recidivism rates decline even further for those who participate in some form of post-secondary education.

### ➢ Action Steps
- CDCR must assess educational needs for each prisoner, provide academic and vocational training at all institutions, give all eligible offenders the opportunity to participate in vocational instruction programs, and provide services for successful reentry.
- CDCR must increase the proportion of the eligible population enrolled in educational and vocational instruction programs through 2011—at which point 40% of the projected un-served population would be enrolled.

2

> **Results of Action Steps**
**When recidivism rates go down, fewer crimes are being committed in our communities.**

This program would reduce the number of beds needed by 1,178 in fiscal year 2009-10, by 2,952 in fiscal year 2010-11, by 4,246 in fiscal year 2011-2012 and by 5,512 beds in fiscal year 2012-13.

These programs will save the state $141 million by fiscal year 2012-13.

## PAROLE REFORM

Parole and sentencing reform increase the likelihood of successful rehabilitation of low-level offenders and keep high-risk predatory felons off our streets.

Parole supervision needs to be restructured to ensure that the state's resources are used more effectively to monitor parolees posing a risk to our communities. Parole agents currently use a "one-size-fits-all" approach that treats low-level offenders and high risk predatory felons identically.

Other states have reduced the burden of technical violators on their overcrowded prisons by using the principle of risk-management and implementing a more comprehensive approach to reentry.

> **Action steps**
We encourage the governor and the Legislature to investigate and adopt best practices in other states, including Kansas, Rhode Island, New Jersey and Georgia.

These policies include:

- Making assessment of offender risk a key priority, and using assessments to help parole agents and support staff ensure appropriate supervision and programming.
- Establishing a broader range of sanctions and incentives to manage parolee behavior, and reserving re-incarceration for offenders posing a risk to public safety.

> **Results of Action Steps**
Implementation of reform policies in Georgia in 2001 resulted in a 14.2 percent drop in the number of parole revocations in the first year. In New Jersey they resulted in a 22.3 percent drop during the same period of time.

Our research shows that implementing these reforms in California would reduce the number of beds needed by 3,832 in fiscal year 2008-09, by 3,947 in fiscal year 2009-10, by 4,952 in fiscal year 2010-11, and by 5,105 in FY 2011-12.

Gross cost-savings based on reduction in prison operating costs related to the reduced demand for these beds could save the state hundreds of millions of dollars over the next five years.

## REFORM SENTENCING POLICIES

California's sentencing structure needs to be simplified to ensure greater public safety, ensuring that repeat, violent, predatory felons are confined while those who can be rehabilitated are helped to become productive members of society.

3

The best way to achieve this goal is to create an independent, non-partisan, politically-insulated sentencing commission, with adequate resources and staff. Commission recommendations should carry the force of law absent opposition from a majority of the state Legislature.

➤ **Action steps**

California should join the twenty states, the District of Columbia and the federal government, establishing a sentencing commissions with appropriate structure, resources and powers.

➤ **Results of Action Steps**

Lawmakers, including prominent Republicans in other states facing similar overcrowding problems, have endorsed reforms in sentencing laws as an effective way to improve public safety and spend tax dollars more rationally

## FULL STAFFING AND TRAINING

Vacancy rates are in excess of 25 percent in many strategic job classifications. Massive expansion of the existing system makes no sense when CDCR suffers from high vacancy rates at existing facilities.

There is a clear relationship between understaffing and non-competitive wages. Our survey of 16 strategic job classifications shows that CDCR compensation lags behind other public and private sector entities.

CDCR does not provide adequate training to its employees to carry out their responsibilities, particularly when duties are modified by new legislation or policies.  Understaffing also makes it more difficult to enable employees to participate in training.

o **Action Steps**

- CDCR must take immediate steps to lower vacancy rates and must examine the relationship between employee compensation and ongoing staff shortages.
- CDCR must investigate the relationship between lack of training and delays in implementing new additions to the Penal Code.
- CDCR should use its Training Academy to provide comprehensive training and retraining for all classifications and develop a training and staff development program for all categories of personnel.

## CONCLUSIONS

We cannot build our way out of California's overcrowding crisis but we can change the way we operate state prisons to make them more effective and more efficient.

By expanding rehabilitation programs, reducing recidivism, implementing parole and sentencing reform, and by assuring adequate staffing and training we can help solve California's prison crisis, make our communities safer, and save tax dollars.



# CDCR Reforms
# for
# Safer Communities

**Produced by SEIU Local 1000, representing 14,000 employees of the California Department of Corrections and Rehabilitation**

**March 2007**

**Recommendations and Appendicles**

# SEIU LOCAL 1000
# CDCR Reform for Safer Communities

## Who We Are

We are the teachers and vocational instructors, nurses and other health care staff who work for the California Department of Corrections and Rehabilitation (CDCR). We help thousands of offenders turn their lives around. We are accountants, supervising cooks, case records analysts, office technicians, information technology professionals and others who are essential to the day-to-day operation of these challenging and often dangerous work sites.

*We are the 14, 000 members of the largest union of non-custody employees in CDCR. We work in 173 job classifications more than 40 adult and youth facilities.*

*We live and work with the problems of CDCR every day.*

We've also done the research. We've analyzed policies and programs in California, and we've examined what other states are doing. We've looked at best practices across the country, and compared them with what's happening at our own facilities. We know what works and what doesn't work.

In the following pages, we spell out a balanced **Safer Communities Program** —a program that will bring California's correctional system into the 21st century. We provide specific recommendations to the state Legislature, for the governor, for CDCR leadership and for California community leaders

Our recommendations are based on three simple principles:

- Prison policies should safeguard public safety in our communities.
- Prison policies should use taxpayer dollars efficiently.
- Prison policies should be evidenced-based.

Based on these principles, on our research and the experience of our members, we recommend the following reforms:

- **Expand and improve rehabilitation and reentry programs.** The evidence overwhelmingly shows that these programs work. They improve public safety and they save money for taxpayers.[1]

---

[1] Aos, Steve, Marna Miller, and Elizabeth Drake. "Evidence-Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs, and Crime Rates." Olympia: Washington State Institute for Public Policy, 2006; Finn, Peter . "Texas' Project RIO." Washington D.C. National Institute of Justice: Program Focus, 1998.; Fowles, Richard & Christensen, Matt. "A Statistical Analysis of Project Horizon: The Utah Corrections Education Recidivism Reduction Plan." December 1995; Harer, Miles D., "Recidivism Among Federal Prisoners Released in 1987." *Journal of Correctional Education.* Vol. 46, No. 2., September 1995; Saylor, William & Gaes, Gerald. "PREP: Training Inmates Through Industrial Work Participation, and Vocational and Apprenticeship Instruction." U.S. Federal Bureau of Prisons. Sept. 1996; Steurer, S., Smith, L., & Tracy, A. "Three State Recidivism Study." Report Prepared for the U.S. Department of Education. Correctional Education Association. September 2001; Bazos, Audrey and Jessica Hausman. "Correctional Education as a Crime Control Program". UCLA School of Public Policy and Social Research. March 2004.

- **Parole and sentencing reform:** Good parole and sentencing policies increase the likelihood of successful rehabilitation of low-level offenders and help keep high-risk predatory felons off our streets.[2]

- **Help the professionals do their jobs.** CDCR employees are dedicated professionals working under tough and often dangerous conditions. Yet CDCR facilities are often critically understaffed. Full staffing and improved training will allow employees to do their jobs properly, eliminate the need for wasteful outsourcing and ensure the effectiveness of rehabilitation.

- **We can't build our way out of the current overcrowding crisis:** While the Administration has proposed a few good policy reforms, its current plan is too costly, too heavy on bricks and mortar, and too light on real long-term reform. We have to fix CDCR, not make it bigger.

The evidence is overwhelming. The SEIU Local 1000 **Safer Communities Program** will increase public safety, reduce costs and make California communities better places to live.

In the pages that follow we provide an overview of the problems at CDCR, a detailed analysis of the governor's current proposals, and the steps the governor and the Legislature can take to clean-up the mess at CDCR.

## The Mess at CDCR

CDCR is in a state of melt-down. Consider the following:

- **Overcrowding gets worse every day:** California prisons house more than 170,000 inmates, nearly 200 percent of their design capacity.[3]
- **CDCR is a revolving door:** The parole population is now more than 120,000. California has one of the highest recidivism rates (nearly 70 percent) in the country.[4]
- **The courts are taking action:** Virtually all CDCR operations are under scrutiny. "Piece by piece, judges over the past 12 years have taken control of vast segments of California's prison system, ordering fixes for past failures that have already cost taxpayers more than $1 billion and will cost nearly $8 billion more over the next five years." according to the Sacramento Bee.[5]
- **CDCR is an extremely unattractive place to work:** Vacancies and turnover are high. Pay is non-competitive, working conditions are unsafe, and morale is poor.
- **Taxpayers' money is being wasted:** CDCR has a record of wasteful spending on outside contractors to perform duties that could be better and more cost-effectively performed by civil servants.[6]

---

[2] Petersillia, Joan. "Understanding California Corrections." California Policy Research Center. University of California. May 2006. See Chapter 7; Burke, Peggy. "Parole Violations Revisited: A Handbook on Strengthening Parole Practices for Public Safety and Successful Transition to the Community." National Institute for Corrections. U.S. Department of Justice. November 2004; Michael Jacobson. *Downsizing Prisons: How to Reduce Crime and End Mass Incarceration.* New York University Press: New York. See Chapter 5. Petersillia, Joan. *When Prisoners Come Home: Parole and Prisoner Reentry.* Oxford University Press: Oxford, 2003. Chapters 4-9.
[3] CDCR. "Weekly Report of Population." February 14, 2007.
[4] Ibid. See also Fisher, Ryan G. "Are California's Recidivism Rates *Really* the Highest in the Nation? It Depends on What Measure of Recidivism You Use." UC Irvine Center for Evidence-Based Corrections Bulletin. Vol. 1. No. 1. September 2005. The chief problem in California is the improper use of administrative returns.
[5] Andy Furillo. "Prison's legal strain: State's costs skyrocket as correctional system struggles to comply with court orders in eight inmate rights cases." *Sacramento Bee.* February 4, 2007. p.A1.
[6] CDCR has misspent millions on its medical and substance abuse treatment programs. See Steve Westly. "CDCR Review Report: Healthcare Delivery System." California State Controller. August 2006. p.1-5; See also, Matthew L. Cate. "Special Review Into In-Prison Substance Abuse Programs Managed by CDCR." Office of the Inspector General. February 2007.

- **Change is essential and inevitable.** If the legislature does not act soon, the courts will impose their own remedies, up to and including receivership. Absent action by June 2007 a federal judge has threatened to impose a cap on prison population.

## Gov. Schwarzenegger's "More of the Same" Plan
## Rhetoric vs. Reality

In December 2006 the governor released a "comprehensive" prison reform plan. The centerpiece of the Administration's package is a massive building plan that expands the current broken system by spending $10.9 billion to add 78,000 beds.[7]

Specifically, the governor's proposals include plans to spend:
- $2.7 billion to expand existing facilities by 16,238 beds.[8]
- $1.6 billion for 5000-7,000 reentry beds.
- $4.4 billion for an additional 50,000 juvenile and local jail beds.

Instead of making a serious commitment to reducing the demand for new beds, the governor proposes to build the state out of the current crisis. This contradicts his verbal commitment to reduce recidivism through rehabilitation, parole reform and a sentencing commission. The governor proposes to add only $41.1 million in 2007-08 in new money to lower the recidivism rates of prisoners now at the state's institutions. **For every additional $1 spent to ensure that offenders are rehabilitated before they return to our communities the governor would spend $250 to expand the current broken system.**[9]

The Administration's priorities are wrong and his plan is too costly. Setting aside interest and principal on bond debt, the governor's proposals would cost taxpayers approximately $3.3 billion dollars a year.[10] It would divert billions from the states' General Fund and jeopardize funding for education and other important public services. The governor's program would be financed using lease-revenue bonds, which are not subject to voter approval.

## Getting Smart on Crime: Rehabilitation Programs that Work

SEIU Local 1000 supports reforms that will ease prison overcrowding and improve public safety in our communities in a much more cost-effective manner.

We believe that meaningful CDCR reform must focus on programs to reduce recidivism by increasing educational and vocational programs and other rehabilitative services. The elimination of 300 vocational education and other programs in recent years has won headlines for politicians, but very little else. Failure to invest in programming can be seen in elimination of staff, vocational and educational programs, and programming space.

---

[7] Office of the Governor. "Comprehensive Prison Reform: Governor Schwarzenegger's Proposal." December 2006.

[8] LAO. "Analysis of the 2007-2008 Budget Bill." Criminal Justice Chapter. P. D-46; Office of the Governor. "Comprehensive Prison Reform: Governor Schwarzenegger's Proposal." December 2006.

[9] The Governor would spend $10.9 billion on bricks and mortar for new beds but only an additional $41.1 million in the coming fiscal year on rehabilitation programs for offenders currently being housed at the state's institutions. See Office of the Governor. (2006). "Comprehensive Prison Reform: Governor Schwarzenegger's Proposal." Released December 2006. The ratio is a little more than 250:1.

[10] Based on the per bed annual cost of $43,287 found in the LAO report. Elizabeth Hill.. "California's Criminal Justice System: A Primer." LAO. January 2007. And based on $94,000 for 5,000 juvenile beds, block grant figure from Governor's proposal. Reentry and local beds were estimated at same cost as adult beds.

4

Education and rehabilitation aren't pie in the sky, do-good programs. Expert peer-reviewed policy studies subjected to the highest scientific standards show that these programs work. They reduce crime, they reduce prison populations and they are cost-effective. [11]

- Offenders who receive basic education have lower recidivism rates than those who do not. [12]
- Offenders who participate in additional vocational training have still lower recidivism rates. [13]
- The recidivism rate declines even further for those who participate in some form of post-secondary education. [14]

The evidence is straightforward. Requiring that prisoners receive education and vocational training makes our communities safer because it reduces the likelihood that offenders will commit new crimes.

Research also shows that education and vocational instruction are extremely cost-effective and save taxpayers' money. [15] A review of more than 250 rigorous studies of adult corrections programs found that in-prison vocational education provides a net benefit of more than $13,000 per participant to taxpayers. [16]

A recent UCLA study found educational programming to be two times as cost-effective in reducing crime as prison expansion. [17]

## Action Steps

*Our communities deserve cost-effective public safety policies that work. We encourage lawmakers to develop legislation guided by the following policies:*

- CDCR must assess educational needs for each offender and base program delivery on this assessment.
- CDCR must provide academic and vocational training at all institutions and give all eligible offenders the opportunity to participate in vocational instruction programs, and must allocate space for them.

---

[11] Aos, Miller, and Drake. (2006). "Evidence-Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs, and Crime Rates." Olympia: Washington State Institute for Public Policy; Finn, Peter (1998). "Texas' Project RIO." Washington D.C. National Institute of Justice: Program Focus; Fowles, Richard & Christensen, Matt. "A Statistical Analysis of Project Horizon: The Utah Corrections Education Recidivism Reduction Plan." December 1995; Harer, Miles D., *Recidivism Among Federal Prisoners Released in 1987. Journal of Correctional Education.* Vol. 46, No. 2., September 1995; Saylor, William & Gaes, Gerald. (1996). "PREP: Training Inmates Through Industrial Work Participation, and Vocational and Apprenticeship Instruction." U.S. Federal Bureau of Prisons. Sept. 1996; Steurer, S., Smith, L., & Tracy, A. "Three State Recidivism Study." Report Prepared for the U.S. Department of Education. Correctional Education Association. September 2001.
[12] Research shows that offenders in basic education and general equivalency diploma programs have an odds of recidivating that is 1.44 times less likely than those not participating in these programs. Wilson, David B., Catherine A. Gallagher, and Doris L. MacKenzie: "A Meta-Analysis of Corrections-Based Education, Vocation, and Work Programs for Adult Offenders", *Journal of Research in Crime and Delinquency,* Vo. 37, No. 4, November 2000, 347-368.
[13] Ibid. Participants in vocational training have an odds of recidivating that is 1.55 times less likely than those not participating in these programs.
[14] Ibid. Participants in postsecondary education have an odds of recidivating that is 1.74 times less likely than those not participating in these programs.
[15] Aos, Steve, Marna Miller, and Elizabeth Drake. "Evidence-Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs, and Crime Rates." Olympia: Washington State Institute for Public Policy, 2006; Bazos, Audrey and Jessica Hausman. "Correctional Education as a Crime Control Program". UCLA School of Public Policy and Social Research. March 2004.
[16] Aos, Steve, Marna Miller, and Elizabeth Drake. "Evidence-Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs, and Crime Rates." Olympia: Washington State Institute for Public Policy, 2006.
[17] Bazos, Audrey and Jessica Hausman. "Correctional Education as a Crime Control Program". UCLA School of Public Policy and Social Research. March 2004.

5

- CDCR must provide a continuum of services and successful reentry by expanding transitional educational service programs currently in place.
- CDCR must regularly increase the proportion of the eligible prison population enrolled in educational and vocational instruction programs through 2011, at which point 40 percent of the projected un-served population must be enrolled.

## Results of Action Steps

Our research shows that implementing this program would reduce the number of beds needed at CDCR by 1,178 in fiscal year 2009-10, by 2,952 in fiscal year 2010-11, by 4,246 in fiscal year 2011-12 and by 5,512 beds in fiscal year 2012-13.[18]

These programs will save the state $141 million by fiscal year 2012-13.[19]



Prison Population Growth, With and Without Growth in Educational Programs

## Parole Reform: Targeted Risk Management

California has the highest rate of parole failure in the nation. Rather than effectively re-integrating offenders into communities, the current system is a revolving door for sending parolees back to prison. More than 60,000 parolees are administratively returned to custody for parole violations every year -- including those engaged in new criminal activity *and* those returned for minor technical violations.[20]

---

[18] Our projected numbers are based on CDCR historical population statistics and CDCR's own three year projections. Projections and assumptions are carefully specified in Appendix A.
[19] For details on our cost-analysis also see Appendix A.
[20] CDCR. "Historical Trends 1985-2005." CDCR Offender Information Services Branch. Data Analysis Unit. 2006.

Parole supervision needs to be restructured to ensure that the state's resources are used more effectively to monitor parolees posing a risk to public safety. Under the current system parole agents use a "one-size-fits-all" approach that treats low-level offenders and high risk predatory felons identically.

For example:

- Almost all parolees are supervised for three years, regardless of the risk they pose to our communities.
- The parole system lacks reentry services.
- With increased caseloads and the need to provide supervision to large numbers of low-risk offenders, parole agents must necessarily reduce critically-needed supervision of high-risk offenders.
- There is no system of graduated sanctions; as a result the parole system is over-reliant on re-incarceration to manage massive caseloads. Parolees who commit a broad range of offenses –missing an appointment, testing positive for drug use or committing a felony – are subject to the same punishment: re-incarceration.
- Offenders who could be diverted into less costly programs are sent back to prison—which costs tax-payers approximately $43,287 per bed per year. [21]

Other states have done better by reforming their parole systems to ensure improved public safety outcomes. These states have reduced the burden of technical violators on their overcrowded prison systems by using the principle of risk-management and implementing a more comprehensive approach to reentry. [22] In Georgia implementation of these parole reform policies in 2001 resulted in a 14.2 percent drop in the number of parole revocations in the first year. In New Jersey the same parole reforms resulted in a 22.3% drop during the same period of time. [23]

While the governor has indicated a willingness to adopt some type of parole reform, his proposals do not focus on operational changes to make parole more effective. Instead, his proposals shrink the pool of parolees being supervised. [24]

## Action Steps

We encourage the Administration and the Legislature to adopt the operational best practices used in states including Kansas, Rhode Island, New Jersey and Georgia. [25]

Such policies include:

- Making an assessment of offender risk a key priority.
- Helping parole agents and support staff strategically approach the problem of case-management by using offender assessments to ensure appropriate supervision and programming.
- Timely intervention and rehabilitation of low-level offenders, while subjecting high risk offenders to more intensive supervision.
- Establishing educational reentry programs.

---

[21] Based on the per bed annual cost of $43,287 found in the LAO report. Elizabeth Hill.. "California's Criminal Justice System: A Primer." LAO. January 2007.
[22] Burke, Peggy B. "Parole Violations Revisited: A Handbook on Strengthening Parole Practices for Public Safety and Successful Transition to the Community." National Institute for Corrections. U.S. Department of Justice. November 2004.
[23] Ibid.
[24] One proposal would end parole for non-violent low level offenders having no prior serious offenses. Another would end parole after a period of 12 months with no parole violations. See LAO. "Analysis of the 2007-2008 Budget Bill. Criminal Justice Chapter. P. D-71
[25] Burke, Peggy B. "Parole Violations Revisited: A Handbook on Strengthening Parole Practices for Public Safety and Successful Transition to the Community." National Institute for Corrections. U.S. Department of Justice. November 2004.

- A broader range of sanctions and a more comprehensive incentive structure to manage parolee behavior, to assure that re-incarceration is reserved for offenders posing risks to public safety.
- Establishment of collaborative relationships between parole offices and community organizations with resources for parolees to address inmate educational, substance abuse and job-training needs.

## Results of Action Steps

Our research shows that implementing these parole reforms would reduce the number of beds needed at CDCR by 3,832 in fiscal year 2008-09, by 3,947 in fiscal year 2009-10, by 4,952 in fiscal year 2010-11, and by 5,105 in FY 2011-12.[26]

Gross cost-savings based on reduction in prison operating costs related to the reduced demand for these beds could save the state hundreds of millions of dollars over the next five years.[27]



## A Truly Independent Sentencing Commission

In 1976, California passed the Determinate Sentencing Act, shifting the purpose of incarceration from rehabilitation to punishment. The Act's goals included:

- Reducing racial disparities in time served.
- Addressing the perceived lack of time served by violent criminals.
- Replacing judicial discretion with standardized sentences determined by the governor and the Legislature.

While the goals of the Determinate Sentencing Act made sense, the law gave politicians a free hand to determine sentence lengths. An explosion of "tough-on-crime" bills followed – creating a complex, bureaucratic, expensive

---

[26] Our projected numbers are based on CDCR historical population statistics and CDCR's own three year projections. Projections and assumptions are carefully specified in Appendix A.
[27] For details on our cost-analysis also see Appendix A.

and irrational sentencing structure that is in large part responsible for the current overcrowding crisis. Experts believe that this structure is in dire need of reform.[28]

- The system is so complex judges and lawyers need specialized software to apply the rules.[29]
- The system is so complex it makes the goal of deterrence more difficult to achieve.[30]
- Piecemeal alterations to the rules have led to irrational outcomes. For example, kidnapping for purposes of robbery carries a life sentence, but kidnapping for purposes of rape does not.[31]
- The system is expensive since California cannot afford to lock-up all of its criminals forever, corrections officials must choose how to best ensure public safety by focusing resources to achieve optimal outcomes.

## Action steps

California's sentencing structure needs to be simplified to ensure greater public safety. A new sentencing structure would ensure that repeat, violent, predatory felons are confined, while those who can be rehabilitated are helped to become productive members of society.

- Create an independent, non-partisan, politically-insulated sentencing commission. The Commission must have adequate resources and staff to execute a comprehensive study of California's sentencing laws to determine who is being incarcerated, why, for how long, with what impact and how to best maximize resources to achieve quality outcomes.

- Empower the Commission to develop more effective public safety policies, to rationalize the sentence structure, reduce criminal activity, and ensure proportionality in sentences. Commission recommendations should carry the force of law absent opposition from a majority of the state Legislature.

While the governor and CDCR Secretary James Tilton have endorsed the creation of a sentencing commission, we believe the commission they envision will have neither the power nor the political independence necessary to carry out the changes needed in California. According to the Legislative Analysts' Office, staffing in the Governor's plan is insufficient.[32] Appointees, under the governor's plan, would not be sufficiently insulated from the political process to make the necessary changes.

## Results of Action Steps

Twenty states, the District of Columbia and the federal government, have sentencing commissions with a variety of different models, structures and powers. The most effective compile information about offenders and use rigorous research to develop sentencing guidelines to ensure quality outcomes.[33]

---

[28] Little Hoover Commission. "Putting Violence Behind Bars." January 1994. Report #124; Geisler, Lauren H. "Creating and Passing a Successful Sentencing Commission in California. *California Sentencing & Corrections Policy Series*. Stanford Criminal Justice Center. January 2006; Tonry, Michael. "The Politics and Processes of Sentencing Commissions." *Crime and Delinquency*. Vol. 37.3. July 1991. p. 307-329.

[29] Geisler, Lauren H. "Creating and Passing a Successful Sentencing Commission in California. *California Sentencing & Corrections Policy Series*. Stanford Criminal Justice Center. January 2006.

[30] Ibid.

[31] Ibid.

[32] LAO. "Analysis of the 2007-2008 Budget Bill." Criminal Justice Chapter. P. D-46.

[33] Dansky, Kara. "Contemporary Sentencing Reform in California: A Report to the Little Hoover Commission." Stanford Criminal Justice Center. 2006.

Sentencing commissions in other states link sentencing policies and available public resources.[34] This approach would alleviate overcrowding and ensure public safety by prioritizing prison bed space for the most serious offenders.

Lawmakers, including prominent Republicans in other states facing similar overcrowding problems, have endorsed reforms in sentencing laws as an effective way to improve public safety and spend tax dollars more rationally.[35]

According to Republican Arizona State Representative Bill Konopnicki "We have a prison crisis in Arizona, not just because of beds, but because of how we incarcerate...It's time to stop warehousing people."[36]

## A Commitment to Rehabilitation and Effective Prison Operations

Employees are the heart of CDCR. While the role of custodial employees is well-known, few Californians understand or appreciate the important role played by non-custody staff.

Our research demonstrates several clear patterns:

- **Lack of training:** CDCR does not now provide adequate training to its employees to carry out their responsibilities, particularly when job duties are modified as a result of policy changes or the implementation of operational reforms.

- **Understaffing:** Vacancy rates are in excess of 25 percent in many strategic classifications, creating safety problems, delays in records processing, fiscal mismanagement, and failure to provide rehabilitative and educational services that would enhance public safety and well being.[37] It makes absolutely no sense for the Governor to contemplate a massive expansion of the existing system when the Department cannot provide adequate staff coverage at existing facilities.

- **Non-competitive compensation:** There is a clear relationship between understaffing and wages that are well below the compensation received for comparable jobs in the private sector or other public employment.[38] This relationship was confirmed in both the *Plata* and *Farrell* court decisions. When competitive wages were made available, staff shortages were mitigated.

## Operational Changes and Training Needs

---

[34] Ibid.

[35] Justice Policy Institute. **Texas Sentencing Reforms Reflect National Trend: States Emphasizing Treatment Over Incarceration for Low Level Offenders.** June 23, 2003. Retrieved online at: http://www.justicepolicy.org/redesign/releases/press030623texas-reforms.html on 3/2/07; Andrews, Tara and Schiraldi, Vincent (2003). **GOP Leads the Way on Drug Policy Reform.** The Baltimore Sun. July 21, 2003. Retrieved online at: http://www.mapinc.org/drugnews/v03/n1106/a08.html on 3/2/07; Crawford, Amanda J. **Prison-sentence reform urged.** The Arizona Republic. May 12, 2004. Retrieved online at: http://www.azcentral.com/specials/special21/articles/0512sentencing12.html on 3/2/07; Dorman, Todd. **Criminal-Sentencing Reform Suggested for Slicing Iowa Budget.** Quad City News. December 3, 2002. Retrieved online at: http://www.justicepolicy.org/news/news021203criminal-sentencing.html on 3/2/07

[36] Crawford, Amanda J. **Prison-sentence reform urged.** The Arizona Republic. May 12, 2004. Retrieved online at: http://www.azcentral.com/specials/special21/articles/0512sentencing12.html on 3/2/07.

[37] See Appendix B.

[38] See Appendix B.

For CDCR to function properly, the Department must ensure that its employees receive adequate training, especially when duties are modified as a result of new legislation or through the implementation of operational reforms. Legislative intent is often frustrated by operational mismanagement.

For example, the department's more than 500 Correctional Case Records Analysts are responsible for applying state laws, court decisions, and administrative policies connected with sentencing and parole terms. But they receive either inadequate training or no training despite constant changes and additions to the law—including such high-profile laws as Megan's Law and Jessica's law. These laws cannot be properly implemented if CCRAs do not receive adequate training, or do not have the time to access such training because of excessive workload.

## Vacancies and Compensation

Federal courts have imposed increased compensation for CDCR medical classifications and for educators at the Division of Juvenile Justice. These increases will help reduce some of the department's vacancy rates. But CDCR and DPA must examine and eliminate pay inequities in other areas.

We have performed an extensive survey of 16 CDCR prison classifications with high vacancy rates and found that compensation for workers in these classifications lags behind compensation of workers performing comparable jobs in other public and private sector entities. For the details of our analysis see Appendix B.

For example:

**Teacher- High School, General Education**
**Vacancy rate: 25.6 percent; Vacancies 209**

High school teachers work with wards and inmates in the adult and juvenile justice institutions. They perform traditional teaching roles, but they also maintain order and protect the safety of inmates, staff and property at these institutions. While pay at DJJ has been increased by court order, pay inequities for educators at adult facilities have not been addressed. This classification lags in seven out of eight salary comparisons.

**Office Assistant (Typing)**
**Vacancy rate: 21.4 percent; Vacancies 326.18**

This is the full journey level class for clerical duties. Typing is a regular and essential part of the job, and incumbents must type at a speed of 40 words per minute. They may have lead responsibilities over less experienced individuals. The salary for the Office Assistant (Typing) lags in eight out of nine comparisons, including DPA's 2006 salary survey.

**Correctional Supervising Cook**
**Vacancy Rate: 17.99 percent; Vacancies 172.57**

Correctional Supervising Cooks supervise cooks and food service workers, including inmate workers, in the preparation and serving of meals to inmates, wards and CDCR employees. They train, supervise and evaluate inmate workers; plan menus; inspect and oversee standards of safety and sanitation; conduct searches for contraband; and prevent escape and injury. Short staffing has led to excessive overtime,, which is a major cost item and a threat to health and safety.

This class lags in seven of the seven comparisons we made.

## *Action steps*

- CDCR must take immediate steps to lower staff vacancy rates and must examine the relationship between employee compensation and ongoing staff shortages.

- The state should investigate the relationship between lack of training and delays in implementing new additions to the Penal Code.

- The governor's budget calls for the development of Southern California Training Academy to improve recruitment and training of Correctional Officers. But training and recruitment problems afflict custody and non-custody staff alike. We recommend that the Southern California Training Academy be used to provide comprehensive training and retraining for all job classifications.

- In line with national prison accreditation standards we recommend that the department follow the advice of the American Correctional Association and develop "written policy and procedures to establish a training and staff development program for all categories of personnel. The training requirements [should] address all pre-service, in-service and specialized training curricula with clear timelines, and consider the institution's mission, physical characteristics and inmate populations."[39]

  We agree with the American Correctional Association's findings that, "the professional growth of employees is systematically developed through training plans that annually identify current job-related training needs in relation to position requirements, current correctional issues, new theories, techniques and technologies."[40]

## Conclusions

We cannot build our way out of California's overcrowding crisis but we can change the way we operate state prisons to make them more effective and more efficient.

On behalf of our 90,000 members statewide, including our 14,000 members at CDCR, we invite the Legislature and the Administration to work with us to achieve these goals.

By expanding rehabilitation programs, reducing recidivism, implementing parole and sentencing reform, and by assuring adequate staffing and training at all state correctional facilities we can solve California's prison crisis and make our communities safer.

---

[39] American Correctional Association. http://www.aca.org/standards/benefits.asp.
[40] Ibid.

Appendix A:

# Model Specification, Assumptions and Calculations

We developed our prison population projections and cost-savings analysis using California Department of Corrections and Rehabilitation data.[41]  We developed baseline trends from three to five years of historical data and three-year projections that appear in CDCR publications.  Our figures on attendance in academic and vocational programs come from unpublished CDCR data.  We are cognizant that a fully developed model that predicts the future prison population and cost savings under these initiatives would require considerably more information but we are confident that greater model complexity would add little to the results.[42]

The simplicity of the model requires that projected numbers be interpreted as approximations rather than highly accurate estimates.  We are confident that they are not biased, however, and truly reflect the impact that parole reform and expanded correctional educational programming can be expected to have.  We believe that our simplifying assumptions, on balance, do not have a tendency to lead to estimates that are more positive nor more negative than a more fully developed model would predict.

While our reform implementation schedule might be regarded as optimistic, similar effects can be expected under slower implementation.  Moreover, we have been very conservative in our use of estimates of recidivism decline, discounting effects reported in the published research on which we base our findings.

Our model compares projections under certain reforms to projections under no changes.  Our projections do not include proposed legislation, programs, propositions or policy changes other than those we specifically describe.

It should be pointed out that our model only estimates cost savings generated within the corrections system.  However, a full cost-benefit analysis would take into account the many savings to society that are created when crime declines and former criminals become contributing members of society.  While such an analysis is beyond the scope of our research, we recognize that cost savings in the CDCR budget are only a small part of the greater savings one would expect to be realized under these reforms.

## Trend Lines

**Why are our population trend lines different from CDCR's?**

We used the CDCR-published population data for 2001-2005 and their three year projections for the male and female felon population (slightly smaller than the total prison population).  Based on that data we created our own trend line, shown below.  The equation for the trend line was used to calculate the prison population up through fiscal year 2012-13.

---

[41] CDCR, "Historical Trends, 1985-2005" (Tables 1 5, and 8) http://www.cdcr.ca.gov, and CDCR, , "Fall 2006 Adult Population Projections, 2007-2012" (Tables 7 and 8).  http://www.cdcr.ca.gov
[42] We did request additional information from CDCR on January 17 and received it February 22, too late to incorporate into our work.

Our trend line projects that the most recent growth rate will slow and adjust downward at some point. In our charts, we show that adjustment between fiscal years 2007-8 and 2008-9.



The CDCR projects a faster rate of growth for the prison population in coming years, apparently relying on a shorter historical period from which to extrapolate. Recent CDCR projections (Fall 2006) have been revised downward from those made six months previously, so there is uncertainty about the best forecast.

Whichever forecast turns out to be more accurate in coming years, population growth will diverge downward from any projected baseline in the manner we have laid out. Our methods and results are generalizable.

Combined Effects

We have modeled the effect of parole and educational reform separately. Each model was made on the assumption that "all else is held constant". Because no interaction effects were included in the models, treating affects in this "additive" manner is legitimate. Our results show that the combined effect of both reforms is a prison population in 2012-13 that has 10,983 fewer beds than would be the case absent the reforms. Moreover, the projected population of 177,164 in 2012-13 is virtually unchanged from the 07-08 projected population of 177,917.



**Prison Population Growth, With and Without Reforms**

Defining parole violator categories

The model we present in the body of this report is one of several that we calculated in our research. We chose this model as the most appropriate with the most realistic assumptions. The three models we considered differed in how they treated the population sub-categories of parolees returning to prison.

Since the impact of parole reform has been measured elsewhere in terms of reductions in incarceration due to technical parole violation, and since the impact of educational reform has been measured in terms of reductions in re-incarceration due to new terms, we sought a way to adjust the CDCR statistics to allow us to model how these reforms would impact California prison returnees and populations.

A number of states have initiated parole reform over the past five years, and results have been tracked. In particular, the handbook, "Parole Violations Revisited", published by the U.S. Department of Justice in 2004, documents a drop in the number of parolees returning to prison for technical violations in several states that implemented changes in the parole system. The National Institute of Corrections (NIC) funded the multi-state technical assistance and research project in Georgia, Kansas, New Jersey and Rhode Island from 2002 to 2004 to assist with and then document the impact of parole reform in those states.[43]

In this NIC study, the rates of parolee return were defined as parole violators returning for technical violations. To model the impact of parole reform in California we had several choices about how best to capture a comparable group. One possibility was to simply use the statistics from CDCR on the annual numbers of "parole violators returning to custody" (PV-RTC). However, we are aware that research shows that a high percentage of returnees in this category have been returned for technical violations when they have actually engaged in further criminal

---

[43] Burke, Peggy B. "Parole Violations Revisited: A Handbook on Strengthening Parole Practices for Public Safety and Successful Transition to the Community." National Institute for Corrections. U.S. Department of Justice. November 2004.

activity.[44] This happens because the practice here is to utilize technical violation returns in lieu of prosecution as a means for getting criminals back into prison. However, this practice is followed far less in other states.

For the California population of these returnees (PV-RTCs) to better match those in other states, we needed to shift some portion of them into another category, "parole violators with new terms" (PV-WNTs), even though they have not actually returned to prison through the courts. Petersilia has shown that approximately 80 percent of PV-RTCs were "administrative criminal returns", and parolees were returned to prison for new criminal activity.[45]

In our model, we took a smaller percentage of the PV-RTCs, half the 80 percent, and transferred them to another more appropriate category of returnees, PV-WNTs. We did so under the assumption that not all new criminal activity was felonious, warranted additional prison time, or would be successfully prosecuted.

Calculations and results are available from the SEIU Local 1000 Research Department for two other models, one which shifts 80 percent of the PV-RTCs to the other category of returnees, PV-WNT; and another which simply utilizes the CDCR statistics as they exist. It is important to note that the combined results of education and parole reforms in these other models do not radically depart from the results we present here.


Simplifying Assumptions

Our projections are made on the basis of a simple model that utilized only CDCR data and three-year projections on prison populations, releases, PV-RTCs and PV-WNTs. By necessity, we utilized simplifying assumptions in order to obtain our results:

1. Changes in the number of releases in one year are reflected fully in the next year's parolee return numbers, not over several years.
2. The average length of terms is assumed to be one year.[46]
3. The impact of enrollment in educational programs is assumed to be reflected fully in parolee return numbers two years after the year of their enrollment. The simplifying assumption is that they are released the year after their enrollment and return (or don't) during the following year.
4. Inmates enrolled in vocational programs are assumed to be enrolled only in vocational programs; similarly, those enrolled in academic programs are assumed to be only in academic programs.
5. The drop in re-incarceration with new terms of ex-inmates who participated in educational programming is assumed to 12 percent. The widely recognized Three-State Recidivism Study (2001), funded by the Correctional Education Association, found a reduction in re-incarceration of prisoners who took part in educational programming while in prison of: 16 percent in Maryland, 33 percent in Minnesota and 23 percent in Ohio. After weighting these percentages to reflect the larger number of participants in Minnesota and Ohio, and discounting the findings by 50%, we obtained a conservative estimate of a 12% drop in re-incarceration for education participants.[47] The actual effect in this study was twice as large.

---

[44] Fischer, R.G., "Are California's Recidivism Rates Really the Highest in the Nation?", U.C. Irvine Center for Evidence-Based Corrections Bulletin, Vol. 1, Issue 1, September 2005; Little Hoover Commission, "Back to the Community: Safe & Sound Parole Policies", November 2003.

[45] See Petersillia, Joan. "Understanding California Corrections." California Policy Research Center. May 2006. Chapter 7 is especially instructive.

[46] Actually they are 16 months for males and 13 months for females. CDCR Offender Information Services Branch. "Historical Trends 1985-2005." 2006.

[47] Steurer, S., L. Smith and A. Tracy. 2001. "Three State Recidivism Study." Correctional Education Association. Retrieved February 1, 2007 from http://www.ceanational.org/documents/3StateFinal.pdf

6.  Published historic data from CDCR on prison population movements are in calendar years and projections are in fiscal years. The last year of historic data is 2005 and the first year of projected data is 2005-06. In our projections, 2005-06 is graphed as a full year, but our trend line formula is treats it as a half-year.
7.  Projections are based on three to five years of historic data and CDCR projections for the fiscal years 2005-06, 2006-07 and 2007-08. Trends are assumed to be linear for the following four fiscal years: 2008-09, 2009-10, 2010-11 and 2011-12 for the following measurements:
    (a)   Parole Violators With New Terms
    (b)   Parole Violators Returning to Custody
    (c)   Releases
    (d)   Population
8.  Holding all other things equal, the rate of return with new terms of parolees who were never enrolled in educational programs while in prison is assumed to be constant.
9.  The full direct effect of parole reform is assumed to begin (and end) in the year following reform. Later effects are indirect.
10. The impact of parole reform on re-incarceration for technical violations is assumed to be amended to 9 percent. In the NIC study, in the first year of reform, Georgia reported a 14.2 percent drop in the number of parole revocations and New Jersey reported a 22.3 percent drop.[48] For our projections, we calculated a weighted average of the above percent declines in parole returns in Georgia and New Jersey and discounted that average by 50 percent. The result is a conservative estimate of a 9 percent decline. The actual effect in this study was twice as large.

Robust Growth in Educational Programming Defined

Using the prison population projection for 2006-07 -- 174,457 -- the total number of prisoners who were enrolled in academic and vocational programs in fall 2006 – 19,485 – is 11.7% of this population. We are aware that not all prisoners are eligible for such programming. Using CDCR information on the number of prisoners in segregated housing units, reception centers and other ineligible categories, we estimate that the number of prisoners eligible for academic and vocational programming in 2006-07 is 79.0 percent of the total prison population. Current programming thus can be estimated to reach 14.1 percent of *eligible* prisoners.

The growth we target in our "robust growth" plan is one in which new enrollments reach approximately 40 percent of the projected prison population of 2010-11 who are not receiving any educational programming, under the assumption that program enrollment numbers do not grow. We do not have sufficient data to make projections regarding what proportion of the future prison population will be eligible or not for educational programming. For this reason, we did not set a target of projected eligible prisoners without access to educational programming, but rather utilized the population as a whole.

We project that there would be 163,231 prisoners in 2010-11 who are not receiving educational programs, assuming no growth in current enrollments. An increase of 66,380 enrollments was calculated to be approximately 40 percent of that number. This enrollment growth, when spread over a four year period and split equally between academic and vocational programs yielded an annual increase of 505 female enrollments for each program and an annual increase of 7792 male enrollments for each program.

Education Reform Calculations

---

[48] Burke, Peggy B. "Parole Violations Revisited: A Handbook on Strengthening Parole Practices for Public Safety and Successful Transition to the Community." National Institute for Corrections. U.S. Department of Justice. November 2004.

The first step in our calculations was to determine a constant rate of parolee return with new terms (PV-WNT) for prisoners who do not attend any educational programs. This was done as follows:

In 2006-07, the Female PV-WNT rate is projected to be .3126 utilizing the trend line formula. This overall rate reflects differing rates for those who went through academic and vocational programs the year before and those who did not.

We assume the rate was 12 percent lower for those who went through either a vocational or educational program than for those who did not. That's .88 of the non-enrolled group's rate. Using the percentage that was enrolled in these programs (.2101), we can solve for the PV-WNT rate for those in neither program.

$.3126 = .88*.2101x + .7899x$
$.3126 = (.1849 + .7899)x = .9748x$
$.3207 = x$

In 2006-07, the Male PV-WNT rate is projected to be .3845 utilizing the trend line formula described above. Again, this overall rate reflects differing rates for those who went through academic and vocational programs the year before and those who did not.

We assume the rate is 12 percent lower for those who go through either a vocational or educational program, according to credible research results. That's .88 of the non-enrolled group's rate. Using the percentages that were enrolled in these programs (.1047), we can solve for the PV-WNT rate for those in neither program

$.3845 = .88*.1047x + .8953x$
$.3845 = (...0921 + .8953)x = .9874x$
$.3894 = x$

These rates (x=.3207 for females, x=.3894 for males) are utilized throughout the remaining calculations as a constant PV-WNT rate for prisoners without educational programming.

The second step calculates annual PV-WNT rates based on increased numbers (and percentages) of prisoners enrolling in academic and vocational programs under the Robust Growth scenario.

During each of a four-year expansion period, overall PV-WNT rates are calculated as follows:

Year 1 (2007-08 educational programming – affecting 2009-10 PV-WNT rates):

Male:        $PV\text{-}WNT_{09\text{-}10} = .88*.1964*.3894 + .8036*.3894 = .3802$

- .1964 is the percent of males attending both vocational and academic programs in 2007-08 and .8036 is the percent attending neither.
- .3894 is the PV-WNT rate for males who haven't received any educational programming of any kind (constant in all equations).

Female:      $PV\text{-}WNT_{09\text{-}10} = .88*.293*.3207 + .7070*.3207 = .3094$

- .293 is the percent of females attending both vocational and academic programs in 2007-08 and .707 is the percent attending neither.

18

- .3207 is the PV-WNT rate for females who haven't received any educational programming of any kind (constant in all equations).

<u>Year 2 (2008-09 educational programming – affecting 2010-11 PV-WNT rates):</u>

Male:    $PV\text{-}WNT_{10\text{-}11} = .88 * .2915 * .3894 + .7086 * .3894 = .3758$

- .2915 is the percent of males attending either vocational or academic programs in 2008-09 and .7086 is the percent attending neither.

Female:    $PV\text{-}WNT_{10\text{-}11} = .88 * .3772 * .3207 + .6227 * .3207 = .3062$

- .3772 is the percent of females attending either vocational or academic programs in 08-09 and .6227 is the percent attending neither.

<u>Year 3 (2009-10 educational programming – affecting 2010-11 PV-WNT (year 4) rates):</u>

Male:    $PV\text{-}WNT_{11\text{-}12} = .88 * .3799 * .3894 + .6201 * .3894 = .3716$

- .3799 is the percent of males attending either vocational or academic programs in 2009-10 and .6201 is the percent attending neither.

Female:    $PV\text{-}WNT_{11\text{-}12} = .88 * .4535 * .3207 + .5465 * .3207 = .3032$

- .4535 is the percent of females attending either vocational or academic programs in 2009-10 and .5465 is the percent attending neither.

<u>Year 4 (2010-11 educational programming – affecting 2011-12 PV-WNT (year 5) rates):</u>

Male:    $PV\text{-}WNT_{12\text{-}13} = .88 * .4658 * .3894 + .5341 * .3894 = .3676$

- .4658 is the percent of males attending either vocational or academic programs in 2010-11 and .5341 is the percent attending neither.

Female::    $PV\text{-}WNT_{12\text{-}13} = .88 * .5268 * .3207 + .4732 * .3207 = .3004$

- .5268 is the percent of females attending either vocational or academic programs in 10-11 and .4732 is the percent attending neither.

Step 3: New population trends are calculated in this manner:

1. The new PV-WNT rate for 2009-10 is multiplied by the number released the prior year (the trend line) to obtain the new number of parolees returning with new terms in 2009-10. This is done separately for males and females.

2. The reduction in the number of PV-WNTs from their trend line is subtracted from the population trend line to yield the new 2009-10 prison population under this program.

19

3. 2010-11 is the first fiscal year when the number of releases is expected to drop due to educational reforms. The lower population in 09-10 provides a smaller base out of which the following year's releases occur. Using the release rate (from trend lines), 2010-11's releases are calculated as a percentage of the new 2009-10 prison population under this program. (We define the release rate as the ratio of the number of projected releases in one year to the projected population of the year before.)

4. From this point forward, the new number of parolees returning with new terms is calculated for each year with the new PV-WNT rate for the year multiplied by the recalculated number of released prisoners the preceding year (rather than the trend line of released prisoners – this adjusts for more slowly growing pool of prisoners and parolees).

Cost Savings of Robust Educational Programming Growth

In calculating cumulative cost savings, one must consider the difference in beds for each year in the future period being considered, as there are annual per-bed operating costs that are thereby avoided. We project yearly differences in the number of beds required as follows: assuming that savings begin two years after educational program growth is initiated:

- o  2009-10       180,002 – 178,284 = 1,718 fewer beds
- o  2010-11       182,716 – 179,764 = 2,952 fewer beds
- o  2011-12       185,432 – 181,186 = 4,246 fewer beds
- o  2012-13       188,147 – 182,635 = 5,512 fewer beds

The cumulative savings in per-bed operating costs should thus be calculated for the four years total difference in beds of 14,428. Without adjusting for inflation, and using the latest estimated per-bed cost of $43,287[49], we project a savings in per-bed operating costs of:

- o  $43,287 * 14,428 beds = $624,545,000

In addition, we can project a decrease in parolee supervision costs based on the projected difference in the number or prisoners released over this time horizon, brought about by a declining prison population. We project these declines beginning in 2010-11, three years after educational program growth is initiated:

- o  2010-11       147,391 – 145,953 = 1,438 fewer parolees
- o  2011-12       151,451 – 148,980 = 2,471 fewer parolees
- o  2012-13       155,510 - 151,180 = 4,330 fewer parolees

The cumulative savings in parolee supervision costs should thus be calculated for the three years cumulative difference in parolees released: 8,239. Without adjusting for inflation and using the CDCR estimate of $4,067[50] for a per-person supervision cost, we project a savings of:

- o  $4,067 * 8,239 parolees = $33,508,000

In our plan for educational programming growth, we anticipate the need for an additional 346 teachers per year for four years, 2007-08 through 2010-11. The cumulative cost of those additional positions over a six year period, with an estimated compensation of $83 thousand per position[51] would be:

---

[49] Elizabeth Hill.. "California's Criminal Justice System: A Primer." LAO. January 2007.
[50] http://www.corr.ca.gov/divisionsboards/aoap/FactFigures.html
[51] This average figure assumes that new teachers hire in each year at the lowest step and receive 5% raises as they move up annually.

- o   2007-08      346 positions
- o   2008-09      692 positions
- o   2009-10    1,038 positions
- o   2010-11    1,384 positions
- o   2011-12    1,384 positions
- o   2012-13    1,384 positions
- o   Total      6,228 position-years @ $83,017 = $517,027,211

Thus, over a six year period, this plan will save the difference between the projected cost of $517 million for additional teaching staff and the cost savings from lower prison operating costs ($624.5 million) and parole supervision costs ($33.5 million) attributable to a decreased prison population. That difference is

- o   $658 million - $517 million = $141 million


Parole Reform Calculations
In the parole reform scenario, the rate of return to custody after parole reform (RTC-A) is assumed to be 91% of the rate without reform projected for that year (reflecting a 9% difference).

$$\text{RTC-A}_{08-09} = .91(\text{RTC}_{08-09})$$

Reform is assumed to take place in 2007-08 and the effect to begin in 2008-09 with reduced numbers of parolees returning and a corresponding reduction in the projected prison population.

The formula below shows the difference between the originally projected number of RTCs and the reduced number being subtracted from the projected population number to obtain the adjusted population for a particular year.

$$\text{Population-A}_{08-09} = \text{Population}_{08-09} - [\text{RTC}_{08-09} - .91(\text{RTC}_{08-09})]$$

An impact on the number of releases is assumed to begin in the following year, 2009-10.
New release numbers are calculated in this manner: The release rate for 2009-10 is calculated using the projected releases and the projected population for that fiscal year. That rate is then applied to the new population numbers under this scenario to obtain a new release number in 2009-10.

$$\text{Release-A}_{09-10} = \text{Release rate}_{09-10} * \text{Population-A}_{09-10}$$

Beginning with 2010-11, the number of RTC-A's is no longer just 91% of that year's projected RTC, it is that times the proportion of the new (smaller) release numbers to the original projected release numbers for the year before, 2009-10.

$$\text{RTC-A}_{10-11} = .91(\text{RTC}_{10-11}) * (\text{Release-A}_{09-10} / \text{Release}_{09-10})$$

This captures the cumulative impact, both direct and indirect of parole reform.

Cost Savings of Parole Reform

In calculating cumulative cost savings of parole reform, one must consider the difference in beds for each year in the future period under consideration, as there are annual per-bed operating costs that are thereby avoided. We project yearly differences in the number of beds required as follows, assuming that savings begin in 2008-09, one year after reforms are initiated:

- 2008-09    177,286 – 173,454    = 3,832 fewer beds
- 2009-10    180002 – 176055    = 3,947 fewer beds
- 2010-11    182,716 – 177,764    = 4,952 fewer beds
- 2011-12    185,432 - 180,327    = 5,105 fewer beds
- 2012-13    188,147 - 182,676    = 5,471 fewer beds

The cumulative savings in per-bed operating costs should thus be calculated for the five years total difference in beds of 23,307. Without adjusting for inflation, and using the latest estimated per-bed cost of $43,287[52], we project a savings in per-bed operating costs over a five year period of:

o    $43,287 * 23,307 beds = $1,008,890,000

In addition, we can project a decrease in parolee supervision costs based on the projected difference in the number or prisoners released over this time horizon, brought about by a declining prison population. We project these declines beginning in 2009-10, two years after parole reform is initiated:

o    2009-10        143,331 – 140,204 = 3,127 fewer parolees
o    2010-11        147,391 – 144,129 = 3,262 fewer parolees
o    2011-12        151,451 – 147,300 = 4,151 fewer parolees
o    2012-13        155,510 - 151,180 = 4,330 fewer parolees

The cumulative savings in parolee supervision costs should thus be calculated for the four years cumulative difference in parolees released: 14,870. Without adjusting for inflation, and using the CDCR estimate of $4,067[53] for a per-person supervision cost, we project a savings of:

o    $4,067 * 14,870 parolees = $ 60,476,000

Combining these two sources of cost savings, a decline in per-bed costs of $1,008,890,000 and a decline in parole supervision costs of $60,476,000, we project gross savings of around one billion sixty nine million dollars.

We realize that there will be considerable expenditures associated with the implementation of parole reform, including training, provision of new services, and additional parole officers. The numbers just presented are *not* net of those expenses. We do not have sufficient information to project expenditures, but do anticipate that they will be far outweighed by the cost savings, whose magnitude is impressive.

## Additional Information

This Appendix has not included all the calculations used in this model, nor has it presented the other models that we calculated. For more information, please contact:

---

[52] "California's Criminal Justice System: A Primer", Legislative Analyst's Office, http://www.lao.ca.gov/2007/cj_primer/cj_primer_013107.pdf , accessed 2/20/2007.
[53]    http://www.corr.ca.gov/divisionsboards/aoap/FactFigures.html

SEIU Local 1000 Research Department
1108 'O' Street
Sacramento, CA, 95814
Attn.: Dan Rounds and Jane Kiser

**Appendix B:**

# Methodology and Data for Salary Survey

Using data available from the State Controller's Office, we uncovered significant vacancies at CDCR in 16 job classifications whose incumbents are represented by SEIU Local 1000. These classifications include the following:

> Associate Health Program Adviser
> Health Program Specialist I
> Associate Budget Analyst
> Teacher- High School, General Education CF
> Teacher Elementary, Multiple Subjects
> Management Services Technician
> Accountant I Specialist
> Associate Governmental Program Analyst
> Accounting Officer Specialist
> Office Services Supervisor I (Typing)
> Executive Assistant
> Correctional Supervising Cook (CF)
> Office Assistant (Typing)
> Laboratory Assistant, Correctional Facility
> Clinical Laboratory Technologist, Correctional Facility
> Senior Clinical Laboratory Technologist, (CF)

State Controller's Office vacancy data for these classes is shown in Table 1 which appears at the end of this appendix. All of these classes have either a significant number of vacant positions, a high vacancy rate, or both. For most of these classes, vacancy rates exceed 25 percent.

<u>Methodology</u>

In order to determine whether vacancies were related to compensation we conducted a salary survey using wage data reported by EDD, the Bureau of Labor Statistics, Salary.com, and public sector salaries for workers employed in similar classifications in Santa Clara, Los Angeles, San Diego, and two Central Valley counties - San Joaquin and Stanislaus counties.

For comparisons we used the top salary for State classes as reported in DPA's salary schedules. In public sector comparisons, we compared state worker salaries to the top salaries for county workers with similar class specifications. EDD, BLS and Salary.com wage figures used in comparisons are median wage figures.

For healthcare-related classes, we also reviewed data obtained from the UC Davis Medical Center and the University of California San Francisco Medical Center.

24

All salaries were standardized using appropriate mathematical formulas.  Hourly, bi-weekly, and annual salaries were converted to monthly salaries.[54]  For Teacher classes, we used the daily salary rate in our comparisons.[55]

For Correctional Supervising Cooks (CF) we also used data for workers performing similar job duties at the Federal Bureau of Prisons and in other large states where staff work with inmate populations that have similar custody levels.[56]

The salaries we used to make comparisons and from which drew our substantive conclusions linking vacancies and pay inequities are reported in Table 2 which appears at the end of this appendix.  The classifications we used in these comparisons are reported in Table 3 which also appears at the end of this appendix.  A description of the job duties of incumbents in state worker classifications is also provided at the end of this appendix.

<u>Findings</u>

State salaries for classifications with high vacancies lag behind other public and private sector entities.  Our findings for each of the classes are as follows:

- The State salary for the <u>Associate Health Program Adviser</u> class (AHPA) lags in four out of five reviewed salary comparisons, while the <u>Health Program Specialist I</u> (HPSI) lags in five out of six comparisons.
- The State salary for the <u>Associate Budget Analyst</u> class (ABA) lags in five out of nine salary comparisons, including DPA's 2006 salary survey.
- The State salary for the <u>Management Services Technician</u> class (MST) lags in five out of five reviewed salary comparisons.
- The State salaries for the <u>Accountant I Specialist</u> and the <u>Accounting Officer Specialist</u> classes lag, respectively, in four out of seven, and six out of seven salary comparisons.
- The State salaries for the <u>Associate Governmental Program Analyst</u> (AGPA) lags in five out of seven salary comparisons.
- <u>Teacher- High School, General Education CF; Teacher Elementary, Multiple Subjects</u>.  For the Teacher - High School class, the class lags in seven out of eight salary comparisons.  For the Teacher Elementary class, the class lags in five out of six salary comparisons.
- The Office Support Classes: The salary for the <u>Office Assistant (Typing)</u>, lags in eight out of nine comparisons, including DPA's 2006 salary survey.  The <u>Office Services Supervisor I (Typing)</u> lags in all seven comparisons.
- <u>Executive Assistant</u>. The State's Executive Assistant class salaries lag in all seven public and private comparisons.
- <u>Correctional Supervising Cook (CF)</u>.  The State salary for Correctional Supervising Cook (CF) lags significantly when compared with similar cook classes in the Federal Bureau of Prisons other large states, and in select California counties where the job specifications are similar.  State wages lag in seven of the seven comparisons we made.

---

[54] Hourly salaries were converted by multiplying the hourly rate x 40 hrs/wk x 52 weeks/year, then dividing by 12 months/yr.  Bi-weekly rates were converted to monthly salaries by multiplying by 26/2-week periods, then by dividing by 12/months/yr.  Annual salaries were converted to monthly salaries dividing the annual figure by twelve.

[55] Since Teachers work various "full-time" schedules, e.g., 180-185 hrs/yr for many regular school districts and 248 hrs/yr for CDCR teachers, we calculated daily rather than monthly rates.  For BLS, EDD and salary.com, we used 180 days/yr as the standard school schedule for determining daily pay rate.  The salary comparisons for CA counties were taken from County Board of Education Teacher salary schedules as being indicative of those used within that county. We used our Range F for comparison as most CDCR Teachers use that salary schedule.

[56] We used salary data for Virginia, Illinois and the federal prisons at Dublin and Atwater in California.

- Laboratory Assistant (CF). We found that State wages lag in eight out of nine comparisons.
- Clinical Laboratory Technologist (CLT) and Senior Laboratory Technologist (SLT). State salaries lagged in all thirteen comparisons. State salaries are more than $2,000/month behind the University of California.

While our findings are significant, there are also other personnel, budget and classification issues relevant to CDCR's staff shortages.

- Many of the office support and analyst positions advertised in the SPB vacancy positing are in selection, certification, delegated testing and other personnel functions.
- We have found that chronic understaffing and the lack of sufficient trained staff in delegated testing and hiring positions contributed to vacancies in all classes.
- This human infrastructure problem has also been repeatedly cited by the Federal Receiver as a barrier to enabling the State to hire qualified health care providers providing health care services.
- The MST and the OSSI classifications have become outmoded and their specifications and salaries need overhaul. The MST was once a "bridging" class from the Unit 4 clerical classes into the Unit 1 analyst series. However, since the salary for the OT (T) class increased a few years ago, it has become easier for a State worker to transfer from the OT (T) class directly into the Staff Services Analyst class without entering into a "bridging" class.
- There is little doubt that MST jobs are neither sought nor advertised.
- Similarly, the OSSI class is responsible for the lowest level of supervision of office support workers. However, the OT (T) class, which can include the role of lead person, is higher paid. So the OSSI class, although it should be more advanced on the classification and compensation continuum, is less desirable.
- Laboratory workers report that because the State specifications and job announcements have not been updated to include California's new certified phlebotomist technician requirements, the hiring lists for Laboratory Assistants have become clogged with unqualified applicants.
- Job announcements for the Clinical Laboratory Technologist class are often misleading. They list the salary for Range B instead of for Range A even though Range B is virtually unattainable (it is for inmate supervision). New recruits become disillusioned and leave.
- For all classes, these conditions, as well as the geographic isolation of many prisons, are further barriers to recruitment and retention.

Class Descriptions

Class descriptions of the high vacancy classes we surveyed follow. These descriptions are based on and taken from SPB class specifications and DPA allocation guides.

**Associate Health Program Adviser** is the full journey level class whose incumbents perform the more difficult and complex duties in the planning, implementation, monitoring and evaluation of health programs and projects. They apply and recommend changes in health regulations, policies and procedures; monitor and evaluate contracts for compliance; and represent the department in dealings with local, State, Federal and private jurisdictions.

**Health Program Specialists I** are highly skilled, technical program consultants in areas of "extreme" sensitivity with responsibility for coordinating the development of broad health care policy that has multiple departmental, immediate and long range impacts. They perform functions considered "critical to a department's basic mission." Minimum qualifications require a combination of experience and education, including the a master's degree in public health, health administration, health planning or public administration.

26

**Associate Budget Analysts** perform the more responsible and complex technical budget work for the department. They prepare the department's baseline budget; analyze, evaluate, and process budget change proposals; make recommendations on budget matters to higher level department management; analyze proposed legislation to determine funding impacts; and may review purchase estimates, contracts, and personnel transactions documents. They need to know the principles and practices of governmental accounting and budgeting, public finance, research techniques and statistical principles and procedures, as well as applicable State law, structure and financial procedures.

**Teachers – High School, General Education, CF and Elementary, Multiple Subjects, CF**, work with wards and inmates in the adult and juvenile justice institutions of the Department of Corrections and Rehabilitation. Not only do they perform traditional teaching roles, but also they have additional duties to maintain order and protect the safety of persons and property at these institutions.

**Management Services Technicians** perform the least technical, semiprofessional duties in management services, including employment relations, tax compliance, budgeting, auditing and management analysis. The MST is considered a "bridging class" to provide state workers with upward mobility and training to move from the clerical to the professional analytical classes, including staff services analyst (SSA).

**Accountant I (Specialist)**, under direct supervision by an Accounting Officer, performs the most difficult technical accounting work for a segment of a department's accounting function (e.g. accounts receivable, accounts payable, cash disbursements). They may perform the preliminary reconciliation and adjustment of financial records and reports (including on contracts and interagency billings) or assist in the review of the project budget or/or expenditure reports from automated systems to ensure data is complete. They may also have lead responsibilities.

The **Accounting Officer Specialist** performs journey level professional accounting duties for the establishment and maintenance of agency accounts and financial records. Typical duties include the reconciliation of the General Ledger to the State Controllers Office and review of expenditures against allocations. The Accounting Officer (Specialist) may act as a lead person and have on-going contacts with contractors, program managers, the Department of Finance, the State Controller, the federal government and local government jurisdictions.

The **Associate Governmental Program Analyst (AGPA)** is the full journey level analyst class in state civil service. AGPAs perform the more complex, varied and responsible technical analysis in program evaluation, policy, budgeting, planning and personnel analysis. In CDCR, AGPAs may evaluate and supervise contracts, analyze correctional policy issues; evaluate prison population projections; and plan, implement and/or oversee personnel, facility and resource development projects.

**Office Services Supervisor I (Typing)** is a Unit 4 rank and file classification for first line, working supervisors who train and supervise other employees in a small clerical unit (less than eight employees) such as a mail room, a files unit, a typing pool or record-keeping unit.

**Office Assistant (Typing), Range B** is the full journey level class for clerical duties. Typing is a regular and essential part of the job, and incumbents must type at a speed of 40 words per minute. They may have lead responsibilities over less experienced individuals.

The **Executive Assistant** provides administrative assistance on sensitive departmental issues and secretarial support to a high level administrator. The Executive Assistant class is a flexible alternative to the executive secretary II and combines secretarial with analytic duties, equivalent to those of a staff services analyst or management services technician.

The **Correctional Supervising Cook I**, Correctional Facilities supervise cooks and food service workers, including inmate workers, in the preparation and serving of meals to inmate, wards and CDCR employees. In a small facility, the Correctional Cooks I have direct responsibility for three meals a day; in a medium sized facility, they have charge of a shift; and in a large facility, they supervise a large crew and/or may also have shift responsibility. They train, supervise and evaluate inmate workers; plan menus; determine the amount of food to be prepared; inspect and oversee standards of safety and sanitation; keep records and prepare reports; conduct searches for contraband; and prevent escape and injury.

**Laboratory Assistants, Correctional Facility,** work primarily as phlebotomists (performing blood draws) in the clinical laboratories of correctional facilities. CDCR laboratory assistants have certified phlebotomist certifications and attend continuing education classes. Under the direction of clinical laboratory technologists, laboratory assistants collect and prepare samples of blood, urine, feces, sputum, and human tissue for diagnostic screening and testing.

**Clinical Laboratory Technologists** run the medical laboratories and must make accurate serological, bacteriological and biochemical tests and analyses. They are licensed as clinical laboratory scientists by the Department of Health Services and possess Bachelor of Science degrees with post graduate scientific training and experience.

**Senior Clinical Laboratory Technologists** are in charge of laboratory testing in small clinical laboratories. They act as lead persons in larger clinical laboratories and perform the more difficult technical work.

28

**Table 1:  State Controller's Office Vacancy Data for Select CDCR Classifications, 2006**

| CB UNIT | CLASS TITLE | CLASS CODE | TOTAL ESTABLISHED | TOTAL VACANT | % VACANT | Current CA State Pay |
|---|---|---|---|---|---|---|
| 01 | ASSOCIATE HLTH PRO ADV | 8337 | 11.00 | 6.00 | 54.55% | $4255 - 5172 |
| 01 | ASO BUDGET ANALYST | 5284 | 28.00 | 10.50 | 37.50% | $4255 - 5172 |
| 01 | MG SVS TECH, RB | 5278 | 35.50 | 12.00 | 33.80% | $2724 - 3313 |
| 01 | HLTH PROG SP I | 8338 | 45.70 | 15.00 | 32.82% | $4674 - 5681 |
| 01 | ACCT I/SP | 4177 | 51.50 | 13.00 | 25.24% | $2776 - 3373 |
| 01 | ASO GOVRL PROG ANL | 5393 | 579.50 | 139.45 | 24.06% | $4255 - 5172 |
| 01 | ACCT OF/SPL | 4546 | 33.00 | 7.00 | 21.21% | $3715 - 4516 |
| 03 | TEACHR HS-G ED CF, RF | 2290 | 818.00 | 209.00 | 25.60% | $4661 - 5945 |
| 03 | TEACHR ELEM M S CF, RF | 2287 | 181.60 | 32.60 | 18.00% | $4661 - 5945 |
| 04 | OF SER SUP I (TYP) | 1148 | 151.20 | 146.20 | 96.69% | $2551 - 3104 |
| 04 | EXEC ASSISTANT, RA | 1728 | 47.00 | 12.50 | 26.60% | $3180 - 3165 |
| 04 | OFF ASST/TYPE, RB | 1379 | 1523.54 | 326.18 | 21.41% | $2248 - 2733 |
| 11 | LAB ASSISTANT CF, RB | 9265 | 47.50 | 14.50 | 30.53% | $2236 - 2715 |
| 15 | CORR SUP CK, RA | 2183 | 959.11 | 172.57 | 17.99% | $2804 - 3410 |
| 20 | CLINCL LAB TEC CF, RA | 9293 | 31.40 | 10.00 | 31.85% | $3884 - 4496 |
| 20 | SR CL LAB TECH CF, RA | 9348 | 28.50 | 6.50 | 22.81% | $4073 - 4951 |

29

## Table 2: Salary Comparisons

| CLASS TITLE | Top CA State Pay | DPA 2006 DPA Salary Survey: 1. Public Sector; 2. Private Sector | Public/Private Sector | | | Public Sector | | | | Medical Classes: 1. UC Davis MC 2. UCSF |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | EDD Labor Market: Median | Bureau of Labor Stats - Statewide-Median | Salary.com: CA-Sacto, Median | Bay Area: Santa Clara | LA Area: LA County | San Diego Area: San Diego County | Central Valley: 1.San Joaquin County, 2.Stanislaus Cty | |
| ASSOCIATE HLTH PRO ADV | $5,172 | | $5,831 | $5,570 | $4,989 | $5,198 | $5,671 | | | |
| ASO BUDGET ANALYST | $5,172 | 1. $6,304 2. $4,763 | $5,587 | $5,488 | $4,989 | $7,918 | $5,089 | $5,077 | $5,612 | |
| MG SVS TECH, RB | $3,313 | | | | $4,038 | $4,693 | $5,089 | $4,281 | $4,684 | |
| HLTH PROG SP I | $5,681 | | $5,689 | $5,570 | $6,776 | $6,230 | $6,674 | $6,642 | | |
| ACCT I/SP | $3,373 | | $5,226 | $2,795 | $2,890 | $4,171 | $3,687 | $3,342 | $3,928 | |
| ASO GOVRL PROG ANL | $5,172 | | $5,587 | $5,488 | $4,989 | $5,458 | $5,671 | $5,077 | $5,317 | |
| ACCT OF/SPL | | | $5,226 | $4,617 | $4,369 | $5,339 | $4,952 | $4,801 | $4,663 | |
| TEACHR HS-G ED CF, RF | $5,945; DR $288 | | DR $337 | DR $295; $336 | DR $276 | DR $401 | DR $436 | DR $391 | DR $398 | |
| TEACHR ELEM M S CF, RF | $5,945; DR $288 | | | DR $295 | DR $265 | DR $401 | DR $436 | DR $391 | DR $398 | |
| OF SER SUP I (TYP) | $3,104 | | $3,928 | $4,110 | $3,691 | $4,671 | $4,076 | $3,225 | $3,217 | |
| EXEC ASSISTANT, RA | $3,165 | | $3,496 | $3,430 | $4,038 | $4,518 | $5,927 | $3,214 | $3,987 | |
| OFF ASST/TYPE, RB | | 1. $2,902 2. $2,555 | $2,805 | $2,753 | $3,146 | $3,389 | $3,132 | $3,020 | $2,906 | |
| LAB ASSISTANT CF, RB | $2,715 | | $2,917 | $2,857 | $2,202 | $3,867 | $2,695 | $2,761 | $2,975 | 1. $3245 2. $3621 |
| CLINCL LAB TEC CF, RA (1/07 + 5%) | $4,721 | | | | $4,798 | $7,112 | $5,320 | | 1. $5720 2. $5888 | 1. $6644 2. $7070 |
| SR CL LAB TECH CF, RA (1/07 + 5%) | $5,199 | | $5,512 | $5,398 | | $7,808 | $5,616 | | 1. $6624 2. $6410 | |

| CLASS TITLE | Top CA State Pay | Illinois State | Virginia State | Federal Bureau of Prisons. 1. Atwater 2. Dublin | Bay Area: Santa Clara | LA Area: LA County | San Diego Area: San Diego County |
| --- | --- | --- | --- | --- | --- | --- | --- |
| CORR SUP CK, RA | $3,410 | $4,955 | $3,947 | $4,626 $6,257 | $5,407 | $3,816 | $3,456 |

Table 3: Classes Used

| CLASS TITLE | DPA 2006 DPA Salary Survey | CA Public/Private Sector EDD Labor Market Median | Bureau of Labor Stats - Statewide Median | Salary.com CA- Sacto, Median Pay | CA Public Sector Bay Area: Santa Clara | LA Area: LA County | San Diego Area: San Diego County | Central Valley: 1.San Joaquin County, 2.Stanislaus Cty | Medical Classes: 1. UC Davis MC 2. UCSF |
|---|---|---|---|---|---|---|---|---|---|
| RESEARCH PROG SP II, SOCIAL/ BEHAVIORAL | | Operations Research Analyst | Operations Research Analysis | Operations Research Analyst II | Operations Research Analyst | Research Analyst III, Behavioral Science | Health Planning & Program Specialist | | |
| ASSOCIATE HLTH PRO ADV | Associate Budget Analyst | Financial Examiner | Operations Research Analysis | Budget Analyst II | Health Care Program Analyst I | Program Specialist II | | | |
| ASO BUDGET ANALYST | | Budget Analyst | Budget Analysts | Budget Analyst II | Budget and Public Policy Analyst | Program Specialist II | Administrative Analyst II | Management Analyst II | |
| MG SVS TECH, RB | | | | Budget Analyst I | Associate Management Analyst A | Program Specialist I | Administrative Analyst I | HSA Staff Analyst I | |
| HLTH PROG SP I | | Operations Research Analyst | Operations Research Analysis | Corporate Compliance Officer- Healthcare | Health Care Program Analyst II | Program Specialist III | Health Planning & Program Specialist | | |
| ACCT I/SP | | Accountants and Auditors | Bookkeeping, Accounting, Auditing Clerks | Accounting Clerk II | Accountant Assistant | Accountant I | Accounting Technician | Accountant I | |
| ASO GOVRL PROG ANL | | Budget Analyst | Budget Analysts | Budget Analyst II | Associate Management Analyst B | Program Specialist II | Administrative Analyst II | HSA Staff Analyst II | |
| ACCT OF/SPL | | Accountants and Auditors | Accountants & Auditors | Accountant II | Accountant II | Accounting Officer I | Assistant Finance Auditor | Accountant II | |
| TEACHR HS-G ED CF, RF | | Adult Literacy, Remedial Education | Secondary School Teachers; Adult Literacy, Remedial Education, GED Teachers. | Teacher, High School | Teacher | Teacher | Teacher | Teacher | |
| TEACHR ELEM M S CF, RF | | | Elementary School Teachers | Teacher, Elementary School | Teacher | Teacher | Teacher | Teacher | |
| OF SER SUP I (TYP) | | First line Supervisors/ Managers of Office & Admin. Support Workers | First Line Supervisors/ Managers of Office and Admin. Support Workers | Clerical Supervisor I | Clerical Office Supervisor | Supervising Word Processor | Senior Word Processing Operator | 1. Office Supervisor | |

| | DPA | CA Public/Private Sector | CA Public Sector | | DPA | CA Public/Private Sector | CA Public Sector | CA Public Sector | DPA |
|---|---|---|---|---|---|---|---|---|---|
| EXEC ASSISTANT, RA | | Executive Secretaries and Administrative Assistants | Executive Secretaries and Administrative Assistants | Executive Assistant Word Processing Operator | Executive Assistant I | Executive Assistant | Administrative Secretary II | 1. Executive Secretary | |
| OFF ASST/TYPE, RB | Office Assistant (Typing) | Word Processing and Typist | Word Processing and Typist | | Office Specialist II | Senior Typist Clerk | Office Support Specialist | 1. Senior Office Assistant | |
| LAB ASSISTANT CF, RB | | Medical Laboratory Technicians | Medical and Clinical Laboratory Technicians | Phlebotomists | Senior Laboratory Assistant | Phlebotomy Technician I | Laboratory Assistant | 1. Lab Assistant II / 1. Clinical Laboratory Technologist II / 2. Clinical Laboratory Scientist II / 1. Clinical Laboratory Technologist III / 2. Clinical Laboratory Scientist III | Certified Phlebotomy Technician II |
| CLINCL LAB TEC CF, RA | Clinical Laboratory Technologist | Medical & Clinical Laboratory Technologists | Medical & Clinical Laboratory Technologist | Medical Technologist | Clinical Laboratory Technologist | Clinical Laboratory Scientist I | | | Clinical Laboratory Scientist |
| SR CL LAB TECH CF, RA | | | | | Senior Clinical Laboratory Technologist | Clinical Laboratory Scientist II | | | |

| CLASS TITLE | Illinois State | Virginia State | Federal Bureau of Prisons: 1. Atwater 2. Dublin | Bay Area: Santa Clara | LA Area: LA County | San Diego Area: San Diego County |
|---|---|---|---|---|---|---|
| CORR SUP CK | Food Service Supervisor II | Food Service Technician III/ Food Service Manager 1 | Cook Supervisor | Head Cook | Chief Cook | Food Services Supervisor |

**EXHIBIT E**



*Centennial*

# NCCD

*Continuing the
Struggle for Justice*

# *Task Force on California
Prison Crowding*

**Christopher Baird**
*Executive Vice President
Children's Research Center*

**Barbara Bloom**
*Professor
Sonoma State University*

**Allen Breed**
*Criminal Justice Consultant*

**Loren Buddress**
*Chief Probation Officer
San Mateo County*

**James P. Fox**
*District Attorney
San Mateo County*

**Joe Gunn**
*Former Executive Director
Corrections Independent Review Panel*

**Craig Haney**
*Professor
University of California, Santa Cruz*

**Vincent Iaria**
*Regional Representative
American Probation and Parole
Association*

**Barry Krisberg**
*President
National Council on Crime and
Delinquency*

**Mary Lou Leary**
*Former U.S. Attorney
Executive Director
National Center for Victims of Crime*

**Calvin Remington**
*Chief Probation Officer
Ventura County*

**Laurie Robinson**
*Former U.S. Assistant
Attorney General*

**Rick Roney**
*Roney Family Foundation*

**Don Specter**
*Prison Law Office*

**Robert Weisberg**
*Professor
Stanford University*

**Carl Wicklund**
*Executive Director
American Probation and Parole
Association*

**John Van de Kamp**
*Former California Attorney General*

**Frank Zimring**
*Professor of Law
University of California, Berkeley*

## *Responding to California's Prison Crisis*

The purpose of this report is to offer some policy and program options to be considered in the Special Session of the Legislature on the severe problems in California prisons. Although the challenges confronting the state's corrections system cannot be solved simply, cheaply, or immediately, there is no alternative but for all of our top elected officials to engage this crisis with honesty, a spirit of cooperation, and a genuine commitment to advancing public safety.

For three decades, most California elected officials and the voters have radically transformed the penal system by enacting tough new sentencing laws, building 22 new prisons, and, until recently, making punishment the sole purpose of the penal system. For almost 30 years there has been scant attention paid to adequate funding for rehabilitation services or successful programming to permit inmates to successfully return home. The fiscal and social costs of these policies were neither examined nor sufficiently shared with the electorate. And so, we are close to a boiling point which most observers believe could lead to a prison catastrophe.

The National Council on Crime and Delinquency (NCCD) has been part of the debate over correctional and sentencing policy in California for years. The NCCD is the nation's oldest criminal justice research and policy group, often called upon by policy makers, practitioners, the media, and private foundations for objective, evidence-based responses to crime and justice issues. The following recommendations represent the Council's views on needed next steps to alleviate the prison crisis. We have drawn extensively on analysis and suggestions put forth by the California Department of Corrections and Rehabilitation (CDCR), the Office of Inspector General, key legislators and their staff members, and prestigious independent groups such the Little Hoover Commission, the Legislative Analyst, and the Independent Review Panel, which was appointed by Governor Schwarzenegger and led by former Governor George Deukmejian.

We also wanted to include the views of nationally renowned experts in criminal justice. To that end, the NCCD recruited an impressive group to serve on a special Task Force on Prison Crowding (listed in the sidebar at left). Some members of that group provided drafts of the recommendations, and these were reviewed by every member of the Task Force. Editorial and substantive changes to the draft proposals

## Contents

| | |
|---|---|
| *Reducing Women's Imprisonment in California* | 3 |
| *The California Parole System* | 7 |
| *Creating A New State-Local Partnership* | 10 |
| *The Need for A California Sentencing Commission* | 12 |

were made, and each member of the Task Force was asked to endorse these proposals. **The members of the Task Force were asked to reflect their own views, and we did not require them to achieve the endorsement of the organizations that they represent.** Ultimately, NCCD takes full responsibility for these proposals and any errors or omissions. The NCCD stands ready to work with concerned Californians to commence meaningful and needed reforms in the penal system.

## "We Face an Insurmountable Opportunity"

Beloved humorist Al Capp reminded us via his cartoon character Pogo that enormous challenges also present great possibilities for positive change. The depth of the crisis in our prisons may well pose such an "insurmountable opportunity."

There is an undeniable consensus among elected officials, the courts, advocates, prison administrators, criminologists, and service providers that severe crowding has led to an untenable state of danger and inhumane conditions within the prisons. Day-rooms, gyms, outside yards, and TV rooms have been converted into makeshift dormitories to house over twice as many prisoners as these facilities were intended to hold. The CDCR is under receivership for medical care of its inmates and for internal investigations. Many other aspects of the operations of the CDCR are governed by consent decrees based on federal and state court litigation. Current projections of the inmate population into the future indicate this situation will only get worse. According to a recent statement by Secretary Tilton, the CDCR will be completely out of bed space by June of 2007.

We know that adverse prison conditions can have a negative effect on prisoners, an effect that can carry over to their post-prison adjustment, increasing the chances that they will reoffend and, in the long run, contribute to prison crowding. Conversely, improved prison conditions, ones that are well managed, safe, and provide prisoners with badly needed services can enhance their chances of making a successful adjustment to free society (Haney, 2006, Liebling and Maruna, 2005).

It is important to keep in mind that the prison population is only part of the story. Besides nearly 170,000 state prisoners, more than 115,000 offenders are supervised in the community on parole. At the county level, there are nearly 80,000 jail inmates and more than 350,000 adult offenders under probation supervision. Local correctional resources are also strained to the breaking point. Many jails have been ordered by the court to expedite the release of inmates, and probation departments are handling thousands of offenders on "banked caseloads"— meaning that these probationers are rarely seen by their probation officers. The crowding and budget problems faced by county sheriffs and chief probation officers sometimes requires them to implement local policies to ship more offenders to state facilities. High rates of recidivism of both local and state inmates further fuels the inmate population crisis confronting California.

Over the past 30 years, the state and the counties have attempted to increase the number of prison and jail beds, but the expansion of incarceration capacity has been overwhelmed by the growth in inmates. Indeed, as the CDCR tripled its bed capacity, the number of inmates grew by over 800 percent. Jails experienced a more modest increase in bed capacity, but inmate populations exceeded this increase in jail space. In large measure, the corrections population increases were a function of sentencing and parole policies.

All of this came at an enormous cost to the taxpayers. The CDCR budget is over $8.9 billion dollars for 2005-2006. California taxpayers may even be willing to spend this much on corrections, but it is doubtful that they realize or accept the current high level of recidivism or the budget-driven policies that compromise public safety.

Clearly, this crisis did not develop overnight; Californians have a now long history of choosing a punitive versus rehabilitative approach, although that view is changing (NCCD, 2004). Continued media and political focus on crime, despite decreased violent crime over the past decade, have inflamed and distorted the public discourse about crime and its

rational consequences. Ironically, the policies that led to prison crowding have not increased public safety. The recommendations put forward in this paper are designed to achieve exactly that goal. Although this problem will not be solved in just a few weeks or months, there are short- and medium-term measures that are consistent with protecting the public that could well relieve some of the pressures on correctional infrastructure, staff, inmates, and the courts. We also know that evidence-based corrections policies help crime victims and prevent future victimization from occurring.

There is also consensus that the problem must be dealt with as a genuine emergency, not as "business as usual." The Governor and his opponent in the upcoming election have put forth their plans. The Legislature is considering a number of policies directed at improving the situation. In response to the crisis, the National Council on Crime and Delinquency reached out to a national panel of experts representing a variety of views and expertise. In its role as convener, NCCD holds to the conviction that the prison crisis is of such a magnitude that it warrants a consideration of all the options, not just those that seem politically safe. A creative, collaborative, and intelligent process is needed now more than ever before.

One of our main proposals that speaks to reforming how the state deals with women offenders is essentially in agreement with the Governor's plan. Other proposals about revamping parole and creating a new state-county correctional partnership, built on realistic cost sharing, represent immediate steps that would reduce prison crowding in the near term. The final recommendation is much longer term, but the NCCD firmly believes that a comprehensive and thoughtful review of sentencing laws and policies must begin if we are ever to resolve the crisis in our penal system.

## References

Haney, C. (2006). *Reforming punishment: Psychological limits to the pains of imprisonment.* Washington, DC: American Psychological Association Books.

Liebling, A., & Maruna, S. (Eds.) (2005). *The effects of imprisonment.* Cullompton: Willan Publishing.

# Reducing Women's Imprisonment in California: A Blueprint for Reform

In July, 2005, the former California Department of Corrections changed its name and mission to address the rehabilitative and reentry needs of incarcerated men and women. As part of this reorganization, the California Department of Corrections and Rehabilitation (CDCR) established a new unit, Female Offender Programs and Services, to implement standards for the management, rehabilitation, and community reintegration of more than 11,000 women incarcerated in California state prisons (CDCR, 2006).

The CDCR has embarked on an unprecedented women offender reform effort that recognizes the importance of developing gender-responsive strategies to specifically address the issues pertaining to women offenders. This endeavor includes the creation of a Strategic Plan for Female Offender Reform, the establishment of gender-responsive policies and operational practices that are designed to promote safe and productive institutional and community environments, a review and development of gender-appropriate classification and risk/needs/case management tools, as well as the establishment of community rehabilitative correctional centers and programs for non-serious, nonviolent women offenders.

There are currently four state prisons housing approximately 11,600 women offenders. Of those, only seven percent (867) are housed in community-based facilities. As of February 28, 2006, nearly 5,900 women that are also eligible for community placement were incarcerated in existing state prisons for nonviolent property and drug offenses and are

classified as Level I or Level II. According to the CDCR Spring 2006 Population Projections, the female prison population will increase by an additional 1,550 by June 30, 2009.

To facilitate the women offender reform efforts, the CDCR created a strategic plan for improving outcomes for female offenders. As a part of this plan, CDCR is proposing to move approximately 4,500 Level I and Level II female offenders from "mega-prisons" located far from urban centers to smaller community facilities located in the areas from which women are committed and to which they will return upon parole. The NCCD strongly endorses this plan. We believe this should be a key component of any reform package.

The Senate Concurrent Resolution (SCR) 33 Commission on Female and Parolee Issues was established to study issues that affect female inmates and parolees. During its study, the Commission assessed such issues as work, education, sentencing, classification, substance abuse, alternative treatment programs, and parental status and reviewed programs and services available to female inmates and parolees. The Commission's final report as published in 1994 presents an analysis of these issues and the Commission's findings and recommendations, which revolve around three central concepts:

- Female inmates differ significantly from male inmates in terms of their needs while incarcerated and upon their release to the community.

- Female inmates and parolees generally have a lower rate of commitment to prison for violent offenses and exhibit significantly less violent behavior in prison than males.

- Upon release to parole, over 95 percent of all female inmates are returned to the communities from which they were sentenced. The successful reintegration of these women into their communities is, to a large degree, dependent on those communities sharing responsibility with the CDCR and its Parole & Community Services Division for supervision, care, and treatment.

As described in the 2004 Little Hoover Commission (LHC) report, a significant number of California women inmates do not represent a serious threat to public safety. The LHC recommended a greater reliance on community corrections rather than large remote prisons for women. It proposed that the State should use evidence-based practices and develop "a robust system of community correctional facilities focused on preparing women offenders for success on parole." It urged the CDCR to develop a continuum of facilities for female inmates to cost effectively match inmates with the facility that best achieves the goals of public protection and successful reentry. The continuum should include community correctional facilities to house women offenders closer to their communities and to support their reintegration process.

The LHC further proposed that the CDCR should use a competitive process to develop contracts for community correctional facilities to deliver an array of services shown to reduce recidivism of women offenders. Private companies, public agencies, or partnerships among them should be encouraged to bid on the contracts. Moreover, measuring and reporting performance is essential. Other recommendations from the LHC included revising classifications procedures, developing community partnerships, establishing an Inter-agency Council on Reentry, providing technical assistance, and shifting parole supervision to the county level.

In 2003, the National Institute of Corrections (NIC) published the report, *Gender-Responsive Strategies: Research, Practice and Guiding Principles* (Bloom, Owen, and Covington, 2003). This report has been incorporated into strategic plans and state and national standards in multiple jurisdictions. NIC has also made these strategies and their supporting principles the foundation of their national training efforts.

Bloom, Owen, and Covington describe the differences in male and female pathways into criminality and their differential response to custody and supervision and provide a theoretical foundation that could lead to better outcomes for women offenders in both institutional and community settings.

Bloom, Owen, and Covington define gender-responsiveness as:

> Gender-responsive means creating an environment through site selection, staff selection, program development, content, and material that reflects an understanding of the realities of women's lives and addresses the issues of the participants. Gender-responsive approaches are multidimensional and are based on theoretical perspectives that acknowledge women's pathways into the criminal justice system. These approaches address social (e.g., poverty, race, class, and gender inequality) and cultural factors, as well as therapeutic interventions. These interventions address issues such as abuse, violence, family relationships, substance abuse, and co-occurring disorders. They provide a strength-based approach to treatment and skill building. The emphasis is on self-efficacy.

The guiding principles are:

1. *Gender:* Acknowledge that gender makes a difference.

2. *Environment:* Create an environment based on safety, respect, and dignity.

3. *Relationships:* Develop policies, practices and programs that are relational and promote healthy connections to children, family, significant others, and the community.

4. *Services and Supervision:* Address substance abuse, trauma, and mental health issues through comprehensive, integrated, culturally-relevant services, and appropriate supervision.

5. *Socioeconomic Status:* Provide women with opportunities to improve their socioeconomic conditions.

6. *Community:* Establish a system of community supervision and reentry with comprehensive, collaborative services.

There is significant evidence that the response of women to incarceration, treatment, and rehabilitation differs from that of men in the following areas:

- Levels of violence and threats to community safety in their offense patterns.

- Responsibilities for children and other family members.

- Relationships with staff and other offenders.

- Vulnerability to staff misconduct and revictimization.

- Needs for programming and services while under supervision and in custody, especially in health and mental health, substance abuse, recovery from trauma, and economic/vocational skills.

- Challenges in reentry and community integration.

Incarceration affects more than just the individual, especially in the case of women. Although difficult to measure, the impact on children of having a mother in prison is pervasive and disruptive. The majority of women in California prisons are the primary caretakers of dependent children. Our estimates indicate that around 19,000 children have mothers who are incarcerated in state facilities. In California, incarcerated women are more likely to be parents, to have multiple children, and to have been living with their children before arrest than incarcerated men (Powell & Nolan, 2003). Furthermore, their incarceration has very immediate consequences for their children. While the vast majority of children of incarcerated men continue to live with their mothers, children of incarcerated women are more likely to end up living with other relatives, particularly grandparents, and more likely to end up in foster care (Powell & Nolan, 2003).

Because many incarcerated mothers return home with an expectation that they will reunite with their children, it is important to prepare them for that reunion. There is also a need to provide support to their children. To the extent that the State of California fails to do so, it is a missed opportunity for intervention.

Given the nonviolent nature of most women's crimes and their low level of risk to public safety, increasing the availability of community-based placements is the primary objective of needed reform. Community-based placements offer a number of advantages for a system that has a stated goal of "reforming" and reintegrating women from prison into society to contribute positively to their families and communities. Women in community-based, family-focused settings face fewer obstacles to visitation and maintaining family connections. Community-based settings can emphasize treatment, service provision, and community reentry.

There is a critical need to develop a system of supervision and support in communities to better assist women in reuniting with their families and communities. Assistance is needed in the areas of housing, education, job training, employment, family counseling, child care, drug and alcohol treatment, health and mental health care, peer support, and aftercare. Wraparound services and other integrated approaches can also be very effective because they address multiple goals and needs in a coordinated way and facilitate access to services.

## A Blueprint for Reform

In an historic move, the CDCR has identified 4,500 non-serious, nonviolent women offenders currently confined in prison that could be eligible for community placement. The CDCR recently released a Request for Proposal for community beds and plans to phase in over 4,000 Female Rehabilitative Community Correctional Center (FRCCC) beds over two years beginning in 2007. The CDCR anticipates that the first FRCCCs could open in April, 2008.

The following recommendations are based on a recent survey of community-based programs conducted by NCCD. They suggest a blueprint for a gender-responsive, community-based system of programs and services for women offenders.

- Community-based alternatives to incarceration and reentry programs that are gender-responsive are more likely to be successful than prison.

- Community-based programs should focus on reducing recidivism and breaking the intergenerational cycle of incarceration though family-focused programming.

- The community-based service delivery model should include a gender-responsive risk and needs assessment.

- Community-based settings should offer an array of services including housing, job training and placement, parenting, education, health care, drug treatment, mental health services, and basic life skills.

- Programs should be flexible and include individualized treatment plans and coordinated case management.

- A process and outcome evaluation component should be included in program planning.

- A public awareness campaign should be conducted to encourage community ownership of programming for female offenders.

## References

Bloom, B., Owen, B., & Covington, S. (2003). *Gender-responsive strategies: Research, practice and guiding principles for women offenders.* Washington, DC: National Institute of Corrections.

California Department of Corrections and Rehabilitation (2006). *Strategic plan: Population placement and programming for female offenders sentenced to state prison, July 17, 2006.* Sacramento, CA: Author.

California Senate Concurrent Resolution 33 Commission on Female Inmate and Parolee Issues (1994, June). *Final report.* Sacramento, CA.

Little Hoover Commission (2004, December). *Breaking barriers for women on parole.* Sacramento, CA: Author.

Powell, M.A. & Nolan, C. (2003). *California state prisoners with children: Findings from the 1997 survey of inmates in state and federal correctional facilities.* California Research Bureau.

# The California Parole System: Improving Supervision and Public Safety

Every year, approximately 115,000 prisoners are released. Once returned to the community, ex-prisoners fail at an alarming rate. Recent data show that over two-thirds of California's parolees are returned to prison within two years. This recidivism rate is twice as high as the national average (Petersilia, 2006).

High rates of return to prison not only compromise public safety, but add significantly to the prison crowding problem. Due to their high failure rate, parolees account for the bulk of prison admissions. Between January 1 and May 31, 2006, parolees constituted 64 percent of the 57,000 people who were admitted to California prisons (CDCR, 2006b). At the end of 2005, one-third of the prison beds were filled by revoked parolees. Some of these parolees had been convicted of a new offense while on parole, but many—in fact 8 percent of the prison population—were there for technical violations of parole[1] (CDCR, 2006a).

Because the parole system contributes so heavily to prison crowding, improved parole practices could have an immediate and lasting impact on the need for prison beds in California. The following five-point program would reduce the parole recidivism rate, ease pressure on correctional institutions, reduce the overall cost of the correctional system, and most significantly, enhance public safety:

- Commit the State of California to a focus on successful community reentry.

- Adopt evidence-based assessment and supervision practices.

- Institute a program of intermediate sanctions to deal with parole violations.

- Implement a structured decision making process that ensures department policy is reflected in individual decisions.

- Reallocate resources to fund programs needed to assist offender's success in the community.

## Commit to a Focus on Successful Community Reentry

Spurred by the U. S. Department of Justice's Serious and Violent Offender Reentry Initiative, scores of jurisdictions across the country are shifting their correctional mission and philosophy from pure incapacitation to one that focuses on enhancing offenders' chances for successful reentry.

The rationale is clear: the better prepared offenders are for reentry, the greater their likelihood of success. Success translates into lower recidivism rates and therefore greater public safety. In addition, lower recidivism means fewer returns to prison and, therefore, less crowding.

The reentry model consists of multiple phases (prison, transition, parole) that are treated as a continuum of preparation and support for reintegration. The model emphasizes: 1) linking offenders with the types of programs and services that will address their criminogenic needs during all three phases, 2) the assessment tools to target the use of limited resources where they can have the greatest impact, 3) the use of transition facilities as a "step-down" process that serves as a bridge between the institution and the community[2], and 4) the use of a collaborative approach between the correctional system and community agencies, organizations, and individuals in developing and implementing the reentry model.

---

1 In some counties, these technical parole violations may be based on new criminal conduct.

2 Unfortunately, the newly proposed CDCR "Reentry Facilities have only a few characteristics of most transitional facilities. Although the proposed facilities will offer a wide range of important transition-related services, and will be located in the offender's home community, the proposed size and character of the facilities is likely to undermine their effectiveness. CDCR wants these facilities to be 500 bed maximum security institutions. They would be "community-based" only in the most narrow definition of that term and would negate any opportunity for the offenders to be tested in a less restrictive environment and the type of offender-community interaction typically associated with step down facilities. States such as Illinois, Georgia, and Texas all operate transitional facilities that are 200 beds or less.

California should adopt the central components of the reentry model, and commit to implementing it through necessary legislation, policy development, procedural changes, and engagement of California's communities.

## Adopt Evidence-Based Assessment and Supervision Practices

At a minimum, this must include the use of standardized risk and need assessment tools to drive the development of case plans.

Empirically-based risk instruments have repeatedly demonstrated their ability to sort the offender population into sub-groups that have very different probabilities of recidivism. It is possible to identify a group of high-risk offenders who are four to five times more likely to recidivate than low-risk offenders. This knowledge can be used to allocate resources to offenders who present the greatest risk to public safety.

Ideally, these assessments would be augmented by systems that assist parole officers with supervision strategies. For example, the widely used Client Management Classification system (CMC) has proven very successful in reducing revocations. A massive five-year study of CMC in Florida found that, "all else being equal, CMC offenders are 44 percent less likely to fail than non-CMC offenders," (Leininger, 1998). If California cut its recidivism rate even by half this amount using a strong case management model, it would reduce the need for prison beds significantly.

Supervision requirements can be tailored to each offender as follows:

- Parole officer time can be focused on those at the highest level of risk by seeing them more frequently (e.g., once per week), while seeing low-risk offenders less frequently (e.g., once every other month).

- Currently all parolees receive parole terms that are fairly similar in duration. This results in needlessly high caseloads, which prevent parole officers from paying sufficient attention to higher-risk parolees. It would be a far more efficient use of resources to tie the length of stay on parole to an offender's risk level or accomplishment of individual benchmarks. Low-risk offenders who adjust well could be released after three to six months of supervision. Moderate-risk offenders might be expected to serve a year on parole, while high-risk offenders would serve two years or more.

- Further risk assessment, used in conjunction with needs assessment, can be used to "match" offenders to the type of programs and services most appropriate for them. Very intensive (and expensive) programs should be reserved for the high-risk offenders they were designed to serve. Specific program assignments for high-risk offenders should be driven by assessed needs and/or a process such as CMC.

## Implement a Comprehensive Intermediate Sanctions Program

Offenders will violate the conditions of their parole. Long standing patterns of behavior are not changed overnight, especially without strong, consistent intervention. The question is, how can parole respond in such a way that violators are held accountable and concerns for public safety upheld, without consistently resorting to revocation?

Many jurisdictions have developed a range of intermediate sanctions for parole that can provide a meaningful, graduated, and proportionate response to violations. Such sanctions can include community service orders, electronic monitoring, increased drug testing, mandated participation in out-patient or in-patient drug treatment, short-term stays in local jails, attending a structured day-reported program,

and a host of other measures. Graduated sanctions, if used appropriately, can be more effective than revocation, because it is the certainty and the swiftness of a sanction—rather than its severity—that determine its impact.

CDCR's previous, limited experience with intermediate sanctions should not deter the Department from vigorously pursuing this strategy.[3] There has been considerable success in states that have made concentrated efforts to implement intermediate sanctions programs. For example, Georgia saw its revocation rate drop by 11 percent during the first year after it began using intermediate sanctions. New Jersey's revocations dropped by 27 percent in the two-year period following implementation (Burke, 2004).

## Implement a Structured Decision Making Process

The best graduated sanction programs are guided by a formal, structured decision making process (e.g., a violation/sanctions matrix) that takes into account the severity of the violation—as well as the offender's risk level—when determining the severity of the sanction. The system's response to a low-risk offender who violates parole can and should be very different from its response to a high-risk parole violator who represents a greater threat to the community.

The use of a structured decision making model will enhance consistency throughout California. It represents the most direct method for ensuring that state policy is reflected in practice. It ensures that equity in decision making is maintained and protects the State against egregious error.

## Reallocate Resources to Fund Necessary Programs and Services for Parolees

Offenders returning to their communities bring with them a host of problems including physical and mental health and substance abuse issues, illiteracy, few job skills, and minimal work history. These deficits contribute directly to continuing patterns of crime. And unless they are addressed in a comprehensive and consistent fashion—both in the institutions and in the community—parolees will continue to fail.

There is now a strong body of evidence that well-designed programs that target the right offenders for participation can have a substantial impact on recidivism rates. Several rigorous reviews of the research have shown that educational and vocational programs, substance abuse treatment, cognitive behavioral therapies, and reentry programming can reduce recidivism by 5-30 percent (Burke and Tonry, 2006).

Program selection and development should be based on prior evidence of success in helping offenders succeed in the community.

## Potential Impact

Improving the system of parole in California could have a substantial impact on prison crowding. There is strong evidence available from other states with large correctional populations that improved case management and expanded use of intermediate sanctions can reduce the need for prison beds. And, in no state is the potential as great as it is in California. This year, approximately 67,000 parolees will be administratively returned to prison, in other words, without a conviction for a new offense. About

---

3 CDCR implemented three alternative sanctions programs in 2004. All the programs were plagued with implementation problems and, amid fears that they weren't working, the CDCR terminated the programs after less than a year of operation.

44,000 of these will be for drug usage, drug possession and minor traffic violations, or for parole violations not based on new criminal conduct. If parole violations were reduced by 20 percent through the use of CMC, and the State were to use intermediate sanctions for even half of the remaining minor violations, it could find alternatives to prison for more than 30,000 offenders. Returnees serve an average of 4.5 months in prison after revocation. This translates to a savings of more than 11,000 beds annually.

It must be emphasized that an intermediate sanctions program would not jeopardize public safety and, in fact, would bring California's parole revocation rate in line with rates experienced in other states. Furthermore, the savings in bed space could provide the dollars needed to fund sorely needed programs.

## References

Burke, P. (2004). *Parole violations revisited*. Washington, D. C.: U. S. Department of Justice, National Institute of Corrections.

Burke, P., and M. Tonry (2006). *Successful transition and reentry for safer communities: A call to action for parole*. Silver Spring, MD: Center for Effective Public Policy.

California Department of Corrections and Rehabilitation, Data Analysis Unit (2006a). *Monthly programs: Table 1. Prison census data, total institution population, offenders by admission/return status and gender as of December 31, 2005*. Sacramento CA: CDCR. (February).

California Department of Corrections and Rehabilitation (2006b). *Inmate population, rehabilitation and housing management plan*. Sacramento, CA: CDCR (July).

Leininger, K. (1998, December). *Effectiveness of client management classification*. Tampa, FL: Florida Department of Corrections, Research and Data Analysis.

Petersilia, J. (2006). *Understanding California corrections*. University of California, Irvine: Center for Evidence-Based Corrections. Report at: http://www.seweb.uci.edu/users/joan/Images/CPRC.pdf

# Creating A New State-Local Corrections Partnership

California must create joint state-local planning and programming that expands the quality and quantity of community corrections sentencing options and enhances reentry services for released inmates. Such a program could be modeled after the highly successful Juvenile Challenge Grant Program, which expanded proven community alternatives for serious juvenile offenders and helped reduce the crowding crisis in state juvenile facilities (California Board of Corrections, 2004). The critical components of that program are described below.

In most instances, prisoners return to the same communities they came from. State prison inmates often have done time in local county jails or have been supervised on probation. The state and local correctional enterprises are inextricably linked despite a bifurcated funding system. Local corrections departments are primarily supported through county budgets, and state facilities receive appropriations from the Legislature and the Governor's budget. These two correctional systems exert significant influence on one another. For example, excellent local county programs such as drug courts can avert later state prison commitments. Funding for better care of mentally ill offenders in jail can relieve pressure on prison admissions. Parole revocation rates have major implications for county jail space if parolees are awaiting their parole revocation hearings in county jails. If the CDCR added community corrections beds or reentry facilities in urban areas, it would require the support and assistance of local elected officials and law enforcement leadership. Also, there are sections of the penal code that give discretion to local prosecutors and judges to handle cases as either misdemeanors or felonies (so-called *wobblers*). This means that district attorneys can greatly impact prison admissions based on their legitimate prosecutorial discretion. Furthermore, working at the local level would give victims their best chance at having a voice in appropriate sanctions and reentry planning.

There has been funding in the recent past through the Corrections Standards Authority (formerly the Board of Corrections) to support training of local corrections personnel and to defray some costs for local correctional facility construction. Unfortunately, these legislative subsidies of local corrections have diminished due to large state budget deficits.

Ultimately, California needs to find a structure and method of maximizing the appropriate investment in local and state correctional resources. Some states such as Minnesota, Kansas, and Oregon have established Community Corrections Acts that permit state funds to support programs that keep minor offenders in local correctional programs. Research on the effectiveness of these Community Corrections Acts has been positive (Shilton, 1992).

It is abundantly clear that communities are key to the successful reentry of state prisoners. The CDCR Parole Division by itself cannot ensure the success of released inmates. To paraphrase former Speaker of the U.S. House of Representatives, Tip O'Neill, "All reentry is local." As Petersilia (2003) and Travis (2005) have noted, the key ingredients to successful reentry include 1) finding safe housing, 2) obtaining employment, 3) reestablishing positive family and community ties, 4) having access to needed mental health, substance abuse, and other medical care services, 5) having a mentor or sponsor, or 6) completing a cognitive skills training program. All of these key areas of support must be obtained at the community level, with funding support from municipal and county budgets.

Growing recognition of the important community role in reentry has led a number of California counties, including San Diego, Santa Barbara, San Mateo, and San Francisco, to establish county-wide reentry planning groups to work with CDCR officials to enhance and, in some cases, redesign reentry support systems. The current CDCR budget sets aside modest funding to encourage these community partnerships with local government and community-based organizations.

## An Adult Corrections Challenge Grant Program

The Division of Community Partnerships (DCP) of the CDCR should begin the process of alliance building by making available modest planning grants to counties that wish to participate. These grants would support local consultation and planning activities. Funding of planning grants would take into account the prisoner commitment rates of each county. The participating counties could form multi-agency task forces chaired by the Sheriff or Chief Probation Officer. These planning bodies would include all pertinent county justice agencies, representatives from agencies covering housing, employment, adult education, mental and physical health care, and substance abuse treatment. There should also be participation from the faith community, ex-offender self-help groups, and other voluntary community agencies.

The DCP should provide a planning protocol and offer technical assistance to counties that need this help. Within six months, the participating counties would be required to submit a data-driven analysis of local correctional needs for offenders returning home from prisons, people released from local jails, and enhanced local correctional programming. Based on these plans, each participating county would propose its top priorities for additional funding from the DCP. These proposed programs must be evidence-based and be justified by the local plan. There would need to be strict evaluation standards, and each county would have to demonstrate how the potential new projects would reduce crowding in CDCR facilities by averting initial prison commitments or reducing parole revocation rates.

The DCP would review these plans and proposals and provide up to four years of funding for selected programs. Funding would be based on a competitive review of all proposals. The DCP would define an evaluation and monitoring process to be followed by the counties. Successful grantees would be required to explain plans for ongoing financial support of effective programming at the end of the initial grant period.

Financial support for this Adult Offender Challenge Grant Program could increase over time, based on proven results. The DCP would offer ongoing monitoring and consultation of local efforts. Although it is difficult to predict in advance how many counties would want to participate in this program, or what would be the immediate impact on prison crowding, this Adult Offender Challenge Grant program would create a viable structure to encourage communication and collaboration between CDCR and local corrections officials.

## References

California Board of Corrections (2004). *Challenge Grant II Program: Final report to the Legislature, March, 2004.* Sacramento, CA: Author.

Petersilia, J. (2003). *When prisoners come home: Parole and prisoner reentry.* New York: Oxford University Press.

Shilton, M.K. (1992). *Community Corrections Acts for state and local partnerships.* Laurel, MD: American Correctional Association.

Travis, J. (2005). *But they all come back.* Washington, DC: The Urban Institute Press.

# The Need for a California Sentencing Policy Commission

California's Determinate Sentencing Law (DSL) was enacted in 1976, with bipartisan political support, to replace the old indeterminate sentencing system. That system was denounced by some as permitting overly lenient sentences and by others for allowing arbitrary and discriminatory sentences. Superficially, the DSL achieved its goal of greater uniformity of sentencing. In most cases, judges have discretion whether to commit an offender to prison. If they decide a commitment is warranted, they have very little flexibility to sentence below (or above) the statutorily-mandated terms. After 30 years of implementation, the DSL has turned into more of a problem than a solution. "Uniformity" has meant highly rigid sentences that make it impossible for judges to engage in the rational individualization necessary to ensure that the sentence truly reflects the culpability and harmfulness of the individual offender's act or imposes the degree of incapacitation necessary to prevent future serious criminality. The DSL's rigidity has also led to severe overcrowding, excessive costs, and dangerous and unconstitutional prison conditions. The DSL has, in fact, made the Legislature the sole sentencing authority in California. Those who are unhappy with legislative actions have resorted to ballot measures that amend the state constitution.

This has resulted in law changes piled onto older law changes. By many accounts, the current provisions of the DSL are a mélange of conflicting and, often, inconsistent provisions.

Worse yet, one of the DSL's key professed goals—eliminating the abuses of the old discretionary parole system—has remained unmet. For one thing, the DSL never really eliminated parole. Not only did parole remain in its old form as a system of deciding on the release of inmates who were convicted for the most serious violent crimes—most obviously homicide—but parole was retained, albeit in a different guise, for other crimes. Now all prisoners are released onto a fixed parole term of 1 to 3 years, set according to a formula. Therefore, all prisoners use up expensive parole supervision resources. Though parole conditions are somewhat individualized by parole officers, the system lacks the flexibility needed for sensible allocation of resources to prevent recidivism and enhance reentry. Some prisoners who pose no danger to public safety receive unnecessarily long terms of supervision and face being reincarcerated for minor technical violations. Other prisoners who pose greater community danger get released on parole at the end of their determinate sentences, whether they are ready for community reentry or not. The current concern about releasing dangerous sex offenders is an example of this dilemma.

With guaranteed parole release, convicts have little or no incentive to prepare for release by enrolling in reentry programs in prison, even those who wish to benefit from these programs. While Californians generally want to have minimum graduation standards from our high schools, there are no minimum life skills that inmates must have before they are released from prison, hence our crisis of dangerously crowded prisons, one of the highest parole recidivism rates in the nation, and no governmental infrastructure to comprehend, much less solve, these problems.

A legislative solution is necessary, but the key to sentencing reform is for the Legislature to realize that it cannot solve these problems by business as usual. Rather, the dramatically positive lesson from other states such as North Carolina and Virginia is that a new governmental mechanism is necessary: a sentencing policy commission. A sentencing policy commission is an administrative body authorized by the legislature to translate the broad design of sentencing statutes into a workable system that achieves the optimal mix of uniformity and flexibility.

## Functions of a Sentencing Policy Commission

What would a commission do? There are many possibilities. First, a commission could carefully review the current DSL and pinpoint major problems and inconsistencies. Next, it could issue sentencing guidelines to carry out the appropriate goals of sentencing legislation. Third, the commission could conduct research to assess the impact of the guidelines on public safety, prison and parole populations, and disparity in the statewide implementation of the guidelines. Statutes necessarily speak in large generalities. But effective sentencing rules to guide judges, promote reasonable state-wide uniformity and predictability, and allow for a necessary degree of individualization, cannot be drawn by the Legislature itself.

Under the DSL, judges are left with only a narrow set of choices called a "triad," a high, medium, and low sentence for the crime of conviction, but then may add on to those an array of automatic enhancements for certain factors. A commission can issue guidelines that, of course, operate within the range dictated by the Legislature but allow for more careful calibration of the sentence that balances principles of just deserts, deterrence, incapacitation, and restorative justice demand. These tasks require fine-grained rule making and identification of all relevant aggravating and mitigating factors, based on updated information and analysis provided by research staff. Second, sentencing guidelines rely on research-based expert information on the most efficient allocation of prisoners to state and county correctional options. No legislature has the time or the logistical ability to engage in this continuing readjustment. But a commission, acting as the eyes and ears for the Legislature, always subject to the ultimate control of the Legislature, can do just that.

Equally important, a sentencing policy commission can help resolve some of the problems of the parole system. Just as guidelines can ensure the proper mix of uniformity and individualized flexibility in actual sentences, they are a crucial tool in guiding parole officials in rationally allocating the use of parole resources to the most dangerous offenders, and in setting the most efficient parole conditions for released prisoners. Right now, parole officials, while no doubt acting in good faith, must make ad hoc decisions about the reentry needs and sensible supervisory conditions for released inmates without any overall guidance. They do this without receiving updated information about state-wide parole resources and without benefiting from timely and systematic data about the availability and effectiveness of various reentry programs. Again, a legislature can hardly perform this task, but a sentencing commission, with an expert staff, can do the job. We now have persistent criticism of decisions made by parole staff. A sentencing policy commission can provide statewide

guidelines to direct and assist the decisions of parole officials, while also supplying those officials with the crucial information they now lack.

## Success in Other States

This concept of a modern sentencing policy commission hardly requires much imagination, because superb models are readily available. Many states now have such commissions, and some, notably North Carolina, Virginia, Oregon, Washington, and Minnesota, are uniformly acknowledged by policymakers and academics to be very successful. With the help of their commissions, these states have drastically reduced prison costs and reallocated resources towards incapacitation of the truly dangerous convicts while providing alternative and less expensive sanctions for those who are not major threats to public safety. These commissions have done their work with a remarkable degree of bipartisan political consensus and a virtual absence of public controversy. For example, both North Carolina and Virginia employed sentencing guidelines to end court-ordered policies of accelerated release of inmates. These state commissions permitted longer terms for the most violent offenders and moved nonviolent and low-risk inmates to effective intermediate sanctions. Prison crowding was reduced in both states without massive new prison building. Both North Carolina and Virginia enjoyed at least as much of a decline in serious crime rates as the rest of the nation in the past decade.

Commission models vary among these states, and no one model fits California perfectly. If California takes the crucial next step in creating a sentencing policy commission, the Legislature will have the opportunity to make a number of choices about the design of that system: Should the commission be a direct delegate of the Legislature? Should it be placed within the Judiciary? Should it be an independent agency? How will its political accountability be ensured? What will be its size? Who will select its members? Will they be full or part-time? What mix of public officials and private citizens will it contain? Will the commission's sentencing guidelines be binding on judges or will the commission issue "presumptive guidelines" from which judges can diverge if they offer reasons on the record? California needs to designate a body, chaired by the Chief Justice, with members appointed by the Chair, the Governor, the Legislature, and the Attorney General, to propose answers to these questions about the structure and operations of the commission.

## A Time To Take Action

The successes of other states have been striking. They have shown that a sentencing policy commission can insulate the elected officials from the pressures to follow high visibility crimes with political sloganeering that, too often, produces laws that actually undermine the effectiveness of the criminal justice system. A sentencing policy commission can be a well-oiled machine to monitor the successes and failures of various sentencing initiatives while keeping prison populations within manageable capacities. It can enable government officials to benefit from the most thoroughly tested research from criminologists and other policy experts.

The commission concept has been fitfully considered by California legislators and other officials over the past 50 years, but our leaders have never resolved to utilize this well-tested tool of public administration. The Independent Review Panel led by former Governor George Deukmejian strongly endorsed this concept. Given our bulging and dangerous state prisons and county jails, no state needs this sort of reform more.

## Does the Political Will Exist To Respond to the Prison Crisis?

The Governor and the Legislature face a daunting task to effectively respond to the prison crisis. California is at a crossroads and must face up to the deep problems in its state and local corrections systems. This is no time for "sound bite" policies and politically popular quick fixes. Whatever solutions are adopted, there will be an urgent need to pay careful attention to the details of implementation. We also need to enlist the best thinkers and practitioners from across the nation to assist us.

A smart reform program must balance emergency steps, short-term measures, and a longer-term strategic vision. The NCCD believes that the proposals in this report represent a start in that direction. Fundamental to viable solutions is a continued movement toward a corrections system that combines effective rehabilitation and reentry programs that reduce recidivism with appropriate public protection considerations and sensitivity to the plight of victims.

There are evidence-based pathways out of the deep prison crisis that we have created. A comprehensive approach is needed that includes realistic forecasts of the impact of policy and law changes on state and local corrections. We need to understand the true financial implications to fixing the corrections imbroglio. Reforms must include a new alliance of state and local justice officials, and an exploration of proven safe alternatives to state confinement. California must expand its commitment to employ research and rigorous evaluations to determine if the taxpayers are getting value for their massive investments in the corrections system. A clear plan that achieves bipartisan support and includes all three branches of government is the standard we should uphold.

This is a time for honesty about what is working and what needs major reforms. The public debate on sentencing and corrections has too often been misinformed by myths rather than empirical data. Interest group politics must be replaced by a search for the best ways to make our communities safer. Finally, California must respond to the urgent plight of the estimated 500,000 children whose parents are incarcerated. To ignore the needs of these children is to perpetuate an inter-generational cycle of crime and violence that is diminishing our communities and extending the current prison crisis long into the future.

## Summary

As we attempt to move California's prisons and jails away from their current disastrous crowding, we acknowledge that this effort is driven by the initiative to create a humane, safe, and effective system of crime control and prevention that reflects the ideals of our society. Essential services, procedures, and structures designed to reduce recidivism, break the intergenerational cycle of violence, and save taxpayer dollars for more positive expenditures will serve the larger end of reducing crime in our communities and enhancing public safety.

## Recommendations

**Move 4,500 non-serious, low-risk women to community-based facilities.** The vast majority of women prisoners are nonviolent, pose a low threat to society, and need better access to their children and to rehabilitative services.

**Reform the parole system.** The state must commit to a focus on reentry, adopt evidence-based supervision and assessment procedures, institute intermediate sanctions, and use a structured decision making system.

**Create an Adult Corrections Challenge Grant Program.** Establishing a viable partnership between state and local corrections would expand sentencing options, enhance rehabilitative services, and strengthen local reentry systems. We must find creative ways to make the most of our expenditures.

**Establish a Sentencing Policy Commission.** This Commission model, already in use in many states, is an administrative body authorized by the legislature to translate the broad design of sentencing statutes into a workable system that balances uniformity of sentencing with flexibility for individualization. This body would ensure that sentencing reflects the culpability and harmfulness of a convicted individual. A Commission would also allow for an evaluation of the use of parole and a rational allocation of state and local correctional resources.

## Principles

**Implement evidence-based practices.** These will reduce recidivism and increase public safety.

**Standardize risk and needs assessments.** These must be a integral part of a coherent plan to match resources with needs and determine appropriate placements.

**Coordinate case management.** This is essential to ensuring continuity of care, reducing failure rates and returns to prison, maintaining morale of parole and probation officers.

**Provide essential services to reentering prisoners.** These include housing, employment, mental and physical health care, substance abuse treatment, education, family reunification, mentoring, and cognitive skills.

**Evaluate programs.** This is critical to knowing what works and what doesn't.

**Promote public awareness.** The public should be well informed; they should know how their tax dollars are being spent and what they are getting for their public safety investment.

**EXHIBIT F**



# Office of the Governor

ARNOLD SCHWARZENEGGER
THE PEOPLE'S GOVERNOR

# PRESS RELEASE

01/09/2007    FOR IMMEDIATE RELEASE

## Transcript of Governor Arnold Schwarzenegger's State of the State Address as Delivered

Time:  5:05 p.m.

Date:  Tuesday, January 9, 2007

Event:  State of the State Address, Assembly Chambers, State Capitol,

Sacramento, CA.

GOVERNOR SCHWARZENEGGER:

Thank you. Thank you very much. Thank you Lieutenant Governor Garamendi, Speaker Nunez, Senate Leader Perata, Senator Ackerman, Leader Villines and my fellow servants of the people, ladies and gentlemen... I am honored to stand here once again.

I want to thank the legislature, as I did in my Inaugural address, for putting the people above politics last year--an election year. The federal government was paralyzed by gridlock and games. But you here in this chamber acted on infrastructure, the minimum wage, prescription drug costs and the reduction of greenhouse gases in our atmosphere. What this said to the people is that we are not waiting for politics. We are not waiting for our problems to get worse. We are not waiting for the federal government. We are not waiting--period. Because, the future does not wait.

I believe that together not only can we lead California into the future...we can show the nation and the world how to get there. We can do this because we have the economic strength, we have the population and the technological force of a nation-state. We are the modern equivalent of the ancient city states of Athens and Sparta. California has the ideas of Athens and the power of Sparta.

As you know, California, if a nation, would be the sixth largest economy in the world. But it goes so much beyond that. According to The Economist magazine, California is home to three of the top six universities in the world. California has more Nobel Laureates, more scientists, more engineers more researchers, more high-Tech companies than any other state. We are responsible for one of every four U.S. patents. We account for one of every five U.S. technology jobs. We attract almost half of all U.S. venture capital, which funds the ideas and industries of the future. California leads the nation in biotechnology. We lead the nation in nanotechnology. We lead the nation in medical technology. We lead the nation in information technology. And we will soon be recognized as the leader in clean technology.

Worldwide, clean-tech investments are up by 50 percent in the first nine months alone last year. California is spurring clean technology by the environmental standards we are setting. Our innovation, our science, our knowledge, our creativity is un-equaled on the face of the earth. The 21st century can be the Golden Century for our Golden State.

So I have asked myself, what must we do in this chamber to help fulfill this future? It starts very simply. We can start by all of us working together.

Usually when a governor gives his State of the State Address, he talks about his vision. This year I want to talk about "our" vision, because I think we all want the same thing for Californians.

Let me tell you about some of the ideas of our legislative leaders. Speaker Nunez has made research into alternative energy and transportation fuels a top priority this year. Speaker Nunez, I will work with you on that.

A top priority for Senate Leader Perata is to create a world-class water transit system in the Bay area that could maintain vital transportation links after an earthquake or other disaster. Senator Perata, I will work with you on that.

Republican leaders in both the Senate and the Assembly have made debt reduction and building water storage their top priorities this year. Senator Ackerman, Assembly Leader Villines, I will work with you.

Let me explain some of the other areas where we can come together this year. In November, the people approved the first phase of infrastructure bonds necessary to rebuild our state.

During a speech at the Pat Brown Institute, I heard Senator Perata say that the people of California expect to see construction cranes right away. They want to see action. Well Senator Perata, I absolutely agree with you on that. We, the elected leaders, must authorize the cranes, the bulldozers, the cement trucks to begin their work without delay.

This is a test for those of us in this chamber in another way. Will the process turn into a porkfest as it did in Washington with all the earmarks and the backroom deals? Or, when we have allocated the spending, will the people say, "They spent our money wisely?" Yet this is more than just about the people's money. It is about the people's trust. Let us not disappoint them.

We must also be good stewards, because we must go back to the people for permission to build more and to finish the job. The building has just begun. One year ago I unveiled the 200 billion dollar plan that prepared California for the next ten years. We are a big state and we have big needs. And we have made a big down payment. But the job is not finished.

Some areas, such as prisons or water storage were not included. And we still have more roads to build, more schools to construct, and more universities to equip to keep up with the future. As I said last year, California's population is expected to increase by as much as 30 percent over the next 20 years. This is the equivalent of adding three new cities the size of Los Angeles'. We have to prepare for that growth.

So this year we must invest in five infrastructure areas in particular --public safety, water supply, transportation, education and disaster preparedness.

Now let me give you a couple of examples why we must act. Public safety is the first priority of government. Our prisons are in crisis. We have inherited a problem that was put off year after year after year. Last year I called a special session to address the crisis. That session was not successful, so I declared a state of emergency. It is still an emergency. Our prison system is a powder keg. It poses a danger to the prisoners, a danger to the officers... and a danger to the well-being of the public if—as the federal courts have threatened—we are forced to release prisoners because of overcrowding. We have thousands of prisoners housed in gymnasiums, TV rooms, dining rooms, hallways, anywhere there is space. You all know 172,000 prisoners in facilities designed to hold about 100,000. That is a danger and that is a disgrace.

Here are the court-ordered choices we face: We build more prisons or we release criminals. We build more prisons or the court takes the money from education and health care and builds the prisons itself. Now I am not in favor of releasing criminals. Nor am I in favor of taking money from classrooms and emergency rooms to build cells. Where do you stand? We must act. And we must act this year. Which is why on December 21st, I stood with Senator Gloria Romero and Senator George Runner and Assemblyman Greg Aghazarian to introduce comprehensive prison reform. We need a justice system that is fair, that is tough and that offers hope for those who can still turn their lives around.

Now let me give you another infrastructure example. The number of high technology companies that we have in California is related to how many brilliant scientists we have in our universities...which in turn relates to how many smart undergraduates we have... which is related to the number of high school students who graduate... and it goes down through the grades. That small child with the sticky hands starting the first day in kindergarten is the foundation of California's economic power and leadership.

We must invest in education. But it is not just how much money we spend but it is how we spend it. I have seen the need with my own eyes as I've toured schools across the state. I went to a school with bed sheets on the windows rather than blinds. I went to a school that was so overcrowded that they used the gyms locker-room for teaching space.

The education bond that passed in November builds 10,000 new classrooms and renovates 38,000 more, but that gets us only through the next two years. We need to build for the future.

This year I ask you to invest in 15,000 more classrooms and renovate 40,000 more. Yet we must build not only structures, but accountability and transparency into our education system. As a step towards the day when parents will have real choice in our public education system where to send their children, we should provide parents with relevant, accessible information, not bury it in bureaucracy. If you can get information about a car online, why can you not get information about your local school online? What percentage of money goes into the classroom? Does the school offer after-school programs, music, art, physical education? What is the graduation rate? The drop-out rate? You cannot easily get this information today.

So how can a school or a school district be held accountable? So, I want to work with the legislature to make this information readily available and user-friendly for the parents so that they can make intelligent choices about their child's school.

We must also continue to reinvigorate career tech education, I love career tech, love it, and we must support quality charter schools and find innovative solutions to the teacher shortage. I will not discuss all of our infrastructure proposals this evening, but I want to say one final thing about this topic. Building California and rebuilding California is not a burden. It is not a chore. It is a privilege. It is a privilege to be able to help this state reach its full potential. It is a privilege to be able to help the future generations fulfill their promise. And when they look back, they will see you in this room, and they will be grateful for what you have done.

Now, in addition to addressing our infrastructure last year, the legislature joined with me in passing the historic global warming measure that caps greenhouse gas emissions.

We hear so much about climate change. One area where we definitely need the climate to change is the national government's attitude about global warming. It would not act as California did. California has taken the leadership in moving the entire country beyond debate and denial... to action. As California goes, so goes the rest of the nation.

So, I ask you to appropriate the funds to implement this global warming legislation, so that we can become part of the world market that is already trading credits for the reduction of greenhouse gases.

I also ask you to work with me on another environmental first. I propose that California be the first in the world to develop a low carbon fuel standard that leads us away from fossil fuels. And let us use the freedom and the flexibility of the market to accomplish it. Let us blaze the way, for the U.S. and for China and for the rest of the world. Our cars have been running on dirty fuel for too long. Our country has been dependent on foreign oil for too long.

So, I ask you to set to motion the means to free ourselves from oil and from OPEC.

I ask you to encourage the free market to overthrow the old order.

California has the muscle to bring about such change. I say use it.

Now lets talk about health care. When I first came here in 1968, one of the first things I did was to ask people where can I get health insurance because I knew that, as an athlete, injuries can happen, as I could find out very recently. Here is the ironic thing about health care today. California's medical care, its medical knowledge, its medical technology is as strong and vibrant as a bodybuilder. Yet our health care system itself is a sick old man.

You know the reasons – it's rising costs and lack of coverage – nearly 6.5 million Californians have no insurance at all. Recently I visited California Hospital Medical Center in downtown Los Angeles and they are doing a terrific job, fantastic. Last year, the uninsured people who came to the emergency room left behind 60 million dollars in unpaid bills. This is just in one hospital. Multiply that by the number of hospitals in California, and the amount runs into the billions of dollars. Guess who's paying for all this? You and me and all of us who are lucky enough to have coverage. That's who pays.

The people with insurance pay a hidden tax through higher deductibles, higher costs, higher premiums, higher copays.

This year we must take action on health care. Yesterday I announced my proposal. I know you also have your proposals and I love that. I have always said you can never have too many ideas. So I welcome all those ideas, regardless of origin, are still on the table. I do believe, however, that the ultimate answer will come from the principle of shared responsibility – shared responsibility by the government, by employers, by health plans, by doctors, by hospitals and by the individual.

In the past, health care reform was always dead on arrival. But this year I can feel something different in the air. I can feel the energy, the momentum, the desire for action. People really want to get this taken care of. You can feel that the time is right. As a matter of fact, both leaders have said to me, "We will get this done." My Republican friends have said "We will get this done." Ladies and gentlemen, we will get this done. California is going to lead the nation in breaking new ground to meet the health care needs of its people.

Now, tomorrow, I will outline my budget, which is balanced and which fully funds education. Now, when I first became governor, we had an operating deficit of $16.5 billion. Our state was almost in bankruptcy. I said that through discipline and new revenues that flow from economic growth, we would reduce the deficit over time. Last year, we got it down to $4 billion. Tomorrow, I will propose a budget that will dramatically reduce this deficit even further.

Now here is the great thing. We have made this great progress without raising taxes. We have reduced the deficit, not by burdening the people and our businesses, but by encouraging economic growth. This year California has the highest revenues in its history, the highest revenues in its history and the lowest unemployment rate in 30 years. Ladies and gentlemen, the state of our state is strong.

We still have very difficult choices to make on the budget and other things, and I am eager to work with you on these choices. I am not asking you not to be Republicans or not to be Democrats or to give up your principles. I am asking you to be Californians and to work out a solution that is the best possible answer to the challenges that we face. As long as we recognize some progress toward our individual visions—whether it's Republican or Democrat --this should allow us the freedom to reach a budget agreement and to move forward together.

And one last item. And I don't want to be a pest about this. I again this year raise the issue of political reform. California politics is a centrifuge that forces voters and policies and parties away from the center. The centrifuge is powered by the way our legislative and congressional districts are drawn. Now we all know what they're talking about here. They are drawn to eliminate party competition. They work against the mainstream, which is where most Californians are. Currently, ours is not a system of the people, by the people and for the people. It is a system of the parties, by the parties and for the parties.

In the past three election cycles, only 4 out of California's 459 congressional and legislative seats changed hands. There was more turnover in the Hapsburg monarchy than in the California legislature.

I ask you to work with me to create an independent commission to fix a political system that has become petrified by self-interest. California certainly is not alone in this. No state legislature in U.S. history has put a redistricting reform on the ballot. California though can be the first, we can be the leader.

You will not benefit politically from this. I will not benefit politically from this. But the people will benefit from this. I ask you to work with me to do the right thing for the people.

Let me close with this thought. We accomplished historic things last year. Let us make this year historic as well. I know that what I have proposed is an ambitious agenda. I heard that last year and I heard the year before that and the year before that. Yes, it's an ambitious agenda, but we must be ambitious to get California to the future. We are addressing needs that have been ignored for decades. This is important work. It is hard, it's heavy work. Yes, I know. What we are doing relates directly to the kind of state this will be in ten or twenty years. But is this not what government should be doing?

For too long California has just stared at this mountain of the future. We couldn't climb it because our current problems blocked the path. We couldn't climb it because it was politically too steep. We couldn't climb it because we couldn't agree on the route that would take us there. But last year, we made the decision, we took a deep breath and we began our ascent. Working together we can scale that mountain. We can stand on top of it. And one day we will look down from it and say to ourselves, look how far we have come, look where we are, look what we have

accomplished for the people. Ladies and gentlemen of the legislature, let us continue the climb we began last year. Thank you very much and god bless all of you.

**EXHIBIT G**

FILED

2007 FEB 15  PM 2: 20

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST OF CA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARCIANO PLATA, et al.,

                Plaintiffs,

      v.

ARNOLD SCHWARZENEGGER, et al.,

                Defendants.

NO. C01-1351 TEH

CLASS ACTION

ORDER

On January 8, 2007, this Court heard argument on Plaintiffs' Motion to Convene A Three Judge Panel to Limit Prison Population. At the request of the Court, the parties thereafter submitted supplemental briefs. Having carefully considered the parties' written and oral arguments and the record herein the Court shall proceed as set forth below.

A.  DISCUSSION

    Plaintiffs move the Court to "request the convening of a three-judge court to determine whether a prisoner release order should be entered." *See* 18 U.S.C. § 3626 (3) (A), (D). Defendants oppose the motion on the ground that the prerequisites of section 3626(3)(A) have not been satisfied in this case.

    The governing language provides that a district court may request the convening of a three-judge court to consider population limits if the following requirements have been met:

> (i) [the] court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prison release order; and (ii) the defendant has had a reasonable amount of time to comply with the previous court orders.

In the event a three-judge court is convened, it is charged with "determining whether a prisoner release order should be entered." 18 U.S.C. § 3626(3)(D).[1] There does not appear to be any case law interpreting the relevant provisions, and it is unlikely that the drafters of the statute contemplated a section 3626(3)(A) motion arising in the context of a Receivership.

The Court is satisfied, however, having considered the statutory scheme and the record herein, that it has entered "an order for less intrusive relief that has failed to remedy the deprivation of the Federal right" sought to be remedied in this action – the lack of constitutionally adequate medical care. In particular, the Court issued remedial orders in June 2002 and September 2004 intended to address the constitutional deficiencies in the provision of medical care by the California Department of Corrections and Rehabilitation ("CDCR").[2] In 2005, the Court found that gross failures still existed in virtually every aspect of the system, which it described as "broken beyond repair." *See* Oct. 3, 2005 Findings of Fact and Conclusions of Law Re Appointment of Receiver. Further – as Defendants tacitly conceded – the CDCR was incapable of implementing the Court's remedial orders and curing the violations. *Id.* Accordingly, the Court found that it was necessary to appoint a Receiver to assume leadership of the medical health care system and bring it into constitutional compliance. *Id.*

---

[1] The three-judge court shall enter a prisoner release order if, but only if, it finds by clear and convincing evidence that (1) crowding is the primary cause of the violation of a Federal right; and (2) no other relief will remedy the violation of the Federal right. 18 U.S.C. § 3626(3)(E).

[2] *See* June 13, 2002 Stipulation for Injunctive Relief, and September 17, 2004 Stipulated Order Re Quality of Patient Care and Staffing.

2

United States District Court
For the Northern District of California

1

2      The second requirement – that "the defendant has had a reasonable amount of time to

3   comply with the previous court orders" – speaks to the issue of timing.  The court must

4   assess  when a "reasonable period of time" has passed such that it is persuaded that the

5   remedies it has ordered will not be achieved and that invocation of a three-judge court to

6   consider population measures is the next logical step.  In this case, this issue must be

7   considered in the unique context of the recently initiated Receivership which – in lieu of the

8   Defendants – is attempting to remedy the violations.

9      Defendants emphasize that the Receiver commenced his duties less than one year ago,

10   on April 17, 2006, and that simply establishing and staffing the Office of the Receiver took a

11   considerable period of time.  They suggest that this Court should postpone any action on

12   Plaintiffs' motion for potentially years, so that it can evaluate the Receiver's progress and

13   success over time.

14      Such an approach can not be squared with the "uncontested fact that, on average, an

15   inmate in one of California's prisons needlessly dies every six to seven days due to

16   constitutional deficiencies in the CDCR's medical delivery system." Oct. 3, 2005 Findings of

17   Fact and Conclusions of Law Re Appointment of Receiver at 1.  Where life and death hangs

18   in the balance, courts must act to ensure that constitutional violations are cured sooner rather

19   than later.

20      It is also undisputed that overcrowding in the CDCR has reached crisis proportions.

21   In October 2006, the Governor of California issued a "Prison Overcrowding State of

22   Emergency Proclamation" which declares that the "current severe overcrowding in 29 CDCR

23   prisons has caused substantial risk to the health and safety of the men and women who work

24   inside these prisons and the inmates housed in them." Glidden Dec., Ex. A.  Nor is it

25   disputed that the overcrowding is only projected to worsen with time, *see* Glidden Dec., Ex.

26   K at 3, 22), notwithstanding whatever minor adjustments may be achieved through the

27   Governor's plans to transfer a relatively small number of inmates to prisons in other states.

28

1    Nor do Defendants dispute that severe overcrowding has implications for the provision of

2    medical care.

3         Thus while the Court is cognizant that the Receiver has only recently begun his

4    reformation of the medical health care system, the Court is not persuaded that it is either

5    necessary or appropriate to wait years to assess the propriety of convening a three-judge

6    court. *See* Glidden Dec., Ex. Q (Receivership may require five to seven years to get system

7    up to constitutional muster).  Rather, the Court concludes that the Receiver is likely to be

8    able to provide, at this point in time, at least a rough assessment of how the overcrowding

9    crisis is interfering with and/or is likely to interfere with the remedial process, and the types

10   of obstacles that it presents.  Accordingly, the Court directs the Receiver to report to the

11   Court within 90 days of the date of this Order, his best assessment of the manner, and extent

12   to which, overcrowding is interfering with his ability to successfully remedy the

13   constitutional violations at issue.

14        At the same time, the Court's consideration of this matter would benefit from

15   additional information from the State as to what specific and concrete measures it is taking to

16   alleviate overcrowding in the short term.  Accordingly, the Court directs the State to report to

17   the Court, within 90 days of the date of this Order, the following:

18        (1) each specific, concrete measure the State has taken, is taking, or is planning to

19   take, that is expected to result in a reduction in the number of inmates confined in state

20   prisons by March 1, 2008 (in roughly one year), and by March 1, 2009 (in roughly two

21   years), and the amount of the reduction expected to result from each such measure by March

22   1, 2008, and March 1, 2009, respectively.  With respect to the transfer of inmates to out-of-

23   state institutions, the report shall also identify the number of inmates confined in out-of-state

24   facilities as of the date of the report;

25        (2) At what point in time the Governor estimates he will be able to rescind the

26   October 2006 "Prison Overcrowding State of Emergency Proclamation" and the basis for

27   this estimate; and

28

**United States District Court**
For the Northern District of California

4

1    (3) the total population of inmates confined by the CDCR as of the date of the Report.

2

3

4

5    B.  CONCLUSION

6        Accordingly, and in light of the above, this matter is continued until Monday, June 11,

7    2007 at 10:00 a..m at which time the Court will consider Plaintiffs' motion in light of the

8    additional information set forth above.  The parties may file a supplemental memorandum

9    addressing the additional information provided by the Receiver and/or Defendants, or any

10   other *new* relevant evidence or authority no later than Tuesday, May 29, 2007.

11

12

13   IT IS SO ORDERED.

14

15   Dated: 2/14/07

16                              THELTON E. HENDERSON
                                UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27

28

5

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

PLATA et al,

              Plaintiff,

  v.

SCHWARZENEGGER, et al,

              Defendant.

Case Number: CV01-01351 TEH

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on February 15, 2007, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Alton G. Burkhalter
Burkhalter Michaels Kessler & George LLP
2020 Main Street, Suite 600
Irvine, CA 92614

Benjamin C. Sybesma
California Correctional Peace Officers' Association
Legal Department
755 Riverpoint Drive, Suite 200
West Sacramento, CA 95605-1634

Caroline N. Mitchell
Jones Day
555 California Street
26th Floor
San Francisco, CA 94104

Christine Albertine
California Correctional Peace Officers' Association
Legal Department
755 Riverpoint Drive, Suite 200
West Sacramento, CA 95605-1634

Daniel Joseph Kessler
Burkhalter Michaels Kessler & George LLP
2020 Main Street, Suite 600
Irvine, CA 92614

Donald Howard Specter
Prison Law Office
General Delivery
San Quentin, CA 94964

Gregg McLean Adam
Carroll Burdick & McDonough LLP
44 Montgomery Street, Suite 400
San Francisco, CA 94104

Jennifer Spencer Stoughton
Carroll Burdick & McDonough LLP
44 Montgomery Street, Suite 400
San Francisco, CA 94101

Jerrold C. Schaefer
Hanson Bridgett Marcus Vlahos & Rudy LLP
425 Market Street, 26th Floor
San Francisco, CA 94105-2173

John Hagar
Judge's Reading Room
450 Golden Gate Ave
18th Floor
Law Library
San Francisco, CA 94102

Jonathan L. Wolff
CA State Attorney General's Office
455 Golden Gate Avenue Ste 11000
San Francisco, CA 94102-7004

Paul B. Mello
Hanson Bridgett Marcus Vlahos & Rudy LLP
425 Market Street, 26th Floor
San Francisco, CA 94105

Robert Sillen
California Prison Receivership
1731 Technology Drive, Suite 700
San Jose, CA 95110

Ronald Yank
Carroll Burdick & McDonough LLP
44 Montgomery Street, Suite 400
San Francisco, CA 94104

Sara Linda Norman
Prison Law Office
General Delivery
San Quentin, CA 94964

2

Shawn Hanson
Jones Day
555 California Street
26th Floor
San Francisco, CA 94104

Steven Fama
Prison Law Office
General Delivery
San Quentin, CA 94964

Warren E. George
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA 94111-4066

Dated: February 15, 2007

                          Richard W. Wieking, Clerk
                          By: R.B. Espinosa, Deputy Clerk