# EXHIBIT H

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

MARCIANO PLATA , et al.,

    Plaintiffs

      v.

ARNOLD SCHWARZENEGGER, et al.,

    Defendants,

NO.  C01-1351-T.E.H.

**RECEIVER'S REPORT RE
OVERCROWDING**

# TABLE OF CONTENTS

Page

I.    Introduction ................................................... 1

II.   Constitutional Violations at Issue ................................ 2

      A.    Introduction ............................................ 2

      B.    The Court's Findings of Fact and Conclusions of Law of October 3, 2005 ..... 2

      C.    The Receiver's Bi-Monthly Reports ......................... 2

      D.    Defendants' Inability to Provide Basic Medical Care Services Required by
            Plata Stipulations ....................................... 3

            1.    Introduction ...................................... 3

            2.    Provisions for Prisoner/Patient Services .................. 3

            3.    The Receiver's Plan of Action ......................... 7

      E.    Unconstitutional Medical Conditions Are Only One Part of an
            Unconstitutional Prison Health Care Delivery System ........... 8

III.  The Scope and Characteristics of Prison Overcrowding in California ............. 8

      A.    Introduction ............................................ 8

      B.    The Pervasiveness of Prison Overcrowding in California ......... 8

            1.    Introduction ...................................... 8

            2.    The Long Term Continuation of California Prison Overcrowding ...... 9

            3.    The Consequences of Decades of Overcrowding .............. 9

            4.    A Progressive Lowering of Standards:  CDCR Facilities Master
                  Plans ............................................ 10

      C.    California Prison Overcrowding Is Accompanied by Severe Staffing
            Shortages ............................................. 11

            1.    Clinical Staffing Shortages .......................... 11

            3.    Custody Staffing Shortages .......................... 12

            3.    Managerial and Executive Staffing Shortages ............. 13

      D.    The Short Average Length of Sentences Among California Prisoners ........ 13

i

## TABLE OF CONTENTS

Page

E.    The Impact and Severity of California Prison Overcrowding Varies By Instiution .......................................................... 13

     1.    Introduction ................................................... 13

     2.    Factors Which Determine the Impact of Overcrowding In California's Prisons .......................................... 14

F.    The Velocity of Prisoner Movement Within the CDCR ................... 15

     1.    Introduction ................................................... 15

     2.    The Scope of Prisoner "Moves" .............................. 17

     3.    Mission Change and "Yard-Flips" ............................ 17

     4.    The Heightened Negative Impact of Overcrowding on CDCR Reception Centers ............................................ 18

G.    The State's Failure to Plan, Design, and Build Appropriate Clinical Space In Its Newest and Most Modern Prisons .............................. 19

     1.    Inadequate Clinical Support in the State's Newest and Most Modern Prisons ............................................... 20

     2.    A Case Study of How CDCR Construction Planning Ignores the Crowding Related Clinical Space and Staffing Needs of the CDCR Health Services Program – Kern Valley State Prison .............. 21

     3.    Millions Of Dollars Allocated for Prison Health Care Space Projects and Little to Show for It ............................... 22

IV.    The Manner in Which Overcrowding Interferes with the Receiver's Ability to Successfully Implement Timely Programs Which Will Remedy the Unconstitutional Violations at Issue ................................... 24

A.    Introduction ...................................................... 24

B.    Crowding Related Substantive Interference with the Receiver's Remedial Programs ........................................................ 24

     1.    Crowding Related Obstacles to the Recruitment, Hiring, and Retention of Competent Medical Personnel ...................... 24

     2.    Crowding Related Obstacles Re the Development of Competent Managers and Executives ................................... 26

003

**TABLE OF CONTENTS**

Page

3.     Crowding Related Obstacles Preventing the Establishment of Constitutionally Adequate Reception Center and Inter-Prison Transportation Procedures ................................ 26

4.     Crowding Related Obstacles Concerning Provisions for an Adequate Number of Health Care Beds ........................ 27

5.     Crowding Related Obstacles Concerning Medical Delivery Support Services ................................................. 28

C.     Crowding Related Process Interference with the Receiver's Remedial Program ................................................ 28

    1.     Introduction ........................................ 28

    2.     Out of State Transfers ............................... 29

    3.     Responding to Mission Changes and Yard Flips ........... 29

    4.     Disturbances ....................................... 29

    5.     Infectious/Communicable Disease Management ............ 30

    6.     The Inability to Deliver Basic Health Care Services Due to Staffing Shortage and Increased Numbers of Inmates ................ 30

    7.     Class Action Coordination Issues Aggravated by Overcrowding ...... 30

V.     The Impact of Assembly Bill 900 ............................... 31

A.     Introduction ............................................ 31

B.     Summary of AB-900 ..................................... 31

C.     CDCR Does Not Have an Adequate Plan to Create "In-Fill" Beds With the Necessary Support (Including Health Care Clinic) Space .............. 36

    1.     Introduction ........................................ 36

    2.     Inadequate Space Allocations For Health Care Services ........... 36

    3.     Inadequate Overall Health Care Space Allocations ............... 37

    4.     Conclusion ......................................... 38

iii

1

## TABLE OF CONTENTS

Page

2

3    D.    AB-900 Will Not Reduce the Number of Temporary ("Ugly") Beds at the
Ten CDCR Prisons Subject to AB-900 ................................ 38

4
      E.    AB-900 Does Not Address the CDCR's Most Serious Need For
5            Additional Prison Beds ......................................... 39

6    F.    AB-900 Re-Entry Facilities ...................................... 40

7    G.    Staffing ...................................................... 41

8    VI.   Conclusions ...................................................... 41

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                      iv

# I.

## INTRODUCTION

In the Order filed February 15, 2007 the Court directed "the Receiver to report to the Court within 90 days of the date of this Order, his best assessment of the manner, and extent to which, overcrowding is interfering with his ability to successfully remedy the constitutional violations at issue." *Order* at 4:3 - 13. The Order also called for the Receiver to provide the Court with information concerning the "types of obstacles" that overcrowding presented to the Receivership. *Id.*

This report responds to the Order. It is organized as follows:

Section II. summarizes the findings which led to the Receivership. It also references the Receiver's Plan of Action concerning those remedial programs necessary to bring California's prisons up to constitutional standards.

Section III explains the special characteristics of prison overcrowding in California. As explained below, the specifics of prison crowding are far worse than previously explained by State officials. Furthermore, the characteristics of overcrowding within California's massive prison system have especially adverse consequences concerning the delivery of medical, mental health, and dental care. The impact of overcrowding presents complicated problems, challenges which further complicate the already difficult remedial challenge faced by the Receivership. Thus, very specific information relative to the real-life impact of overcrowding is necessary to provide relevant background data concerning the types and the scope of crowding related obstacles that interfere with the remedial programs developed by the Receiver.

Section IV summarizes the manner by which overcrowding interferes with the Receiver's remedial projects, discussing both "substantive" and "process" related interference.

Section V analyzes the real life impact of the recent 2007 California Legislation.

Section VI provides a conclusion concerning the Court's directives of February 15, 2007.

1

## II.

## CONSTITUTIONAL VIOLATIONS AT ISSUE

A. Introduction.

The California Department of Corrections and Rehabilitation ("CDCR") has failed to deliver constitutionally adequate medical care to the more than 170,000 prisoner/patients presently incarcerated in the State of California. There are three relevant frameworks of analysis within which it is possible to summarize the "constitutional violations at issue" referenced in the Court's February 15, 2007 Order.

B. Court's Findings of Fact and Conclusions of Law of October 3, 2005.

The Court's Findings of Fact and Conclusions of Law re Appointment of Receiver filed October 3, 2005 set forth facts which demonstrated that California' prison medical delivery system was broken beyond repair, holding that future injury and death was virtually guaranteed in the absence of drastic action. Those findings will not be repeated here; however, the Receiver believes it important to point out the following. As found by the Court, California's prison medical care crisis has persisted for decades. And while the State had ample opportunity to improve medical conditions, it failed to do so. The failure was caused, to a significant degree, by institutional paralysis and a lack of will. The State's response to decades of overcrowding is similar; despite various task forces, numerous studies and reports, and Special Sessions, California has not instituted any effective response to the worsening overcrowding crisis.

C. The Receiver's Bi-Monthly Reports.

The Receiver has submitted four Bi-Monthly Reports. Each provides up-to-date information concerning the deplorable state of California's prison medical care delivery. To summarize, the Receiver concludes that the degree of operational chaos within the CDCR, the institutional paralysis in many State agencies, and trained incompetence are even worse than indicated by the Court's findings.

2

D. <u>Defendants' Inability to Provide Basic Medical Care Services Required by Plata Stipulations.</u>

1. *Introduction.*

The final relevant measure of the "unconstitutional violation at issue" is the twenty-eight basic prisoner/patients services called for by the June 13, 2002 Stipulation for Injunctive Relief. These are the services which the State, for more than five years, had failed to provide.

2. *Provisions for Prisoner/Patient Services.*

1. <u>Health screening:</u> A process for screening all patients for communicable disease, such as tuberculosis and sexually transmitted disease, and chronic disease, such as diabetes, renal disease, seizure disorders, cardiovascular disease, and pulmonary disease; screening for cancer; review of vital signs, blood pressure, pulse, and weight; review of current medications; and nurse review and referral for patients with urgent or acute conditions; history and physical examination for all patients within 14 days of arrival at Reception Center; and routine laboratory tests, such as serum pregnancy, cholesterol screening, and optional HIV testing. (Stipulated Injunction ¶ 4)

2. <u>Health transfer:</u> Process to ensure continuity of care when patients transfer to another institution, transfer between levels of care, or are paroled, including continuity of medications, specialty referrals, and other treatment. (Stipulated Injunction ¶¶ 4, 6)

3. <u>Access to Primary Care</u> (Sick Call): System that allows patients to self-refer for medical treatment, including nurse review to identify the need for immediate referral to urgent or emergency treatment, an urgent walk-in procedure, and follow-up services; policies require face-to-face nurse triage for patients with symptoms within 24 hours, and an appointment with a primary care provider within 5 days for patients classified as urgent and within 14 days for patients classified as routine. (Stipulated Injunction ¶ 4)

4. <u>Priority Ducat System:</u> System for ensuring that custody staff treat health care appointments as high-priority. (Stipulated Injunction ¶¶ 4, 6)

5. <u>Patient Health Care Education:</u> Program to provide patients with instruction in wellness, lifestyle changes, disease prevention, newly diagnosed illness or disease, treatment

3

1  plans or procedures, pre- and post-operative care, chronic care morbidity reduction. (Stipulated

2  Injunction ¶ 4)

3      6. <u>Preventive Services</u>:  Services to prevent disease and mitigate morbidity and mortality

4  due to existing disease provided to select patient populations based upon risk factors, such as age

5  and chronic conditions, that include cancer screening, immunizations, and health education

6  (education regarding diet, exercise, smoking cessation, etc.).  (Stipulated Injunction ¶ 4)

7      7. <u>Outpatient Specialty Services</u>:  Program for providing specialty services, including

8  procedures for urgent and routine referrals and required follow-up; policies require that high-

9  priority consultations or procedures occur within 14 calendar days and routine consultations or

10  referrals within 90 calendar days, with follow-up by a primary care provider within 14 calendars

11  days after the consultation or procedure. (Stipulated Injunction ¶ 4)

12      8. <u>Physical Therapy</u>:  Program to ensure timely access to physical therapy services,

13  including specifications for the follow-up by primary care providers and provisions for

14  transferring to an institution with these services if the home institution does not provide them.

15  (Stipulated Injunction ¶ 4)

16      9. <u>Diagnostic Services</u>:  Program for the appropriate processing of laboratory tests and

17  other diagnostic testing, including procedures for prioritizing the urgency of laboratory orders

18  (STAT, critical, urgent, routine) and required timeframes for review and follow-up of results

19  (routine laboratory tests processed within 14 days of order, x-ray examinations completed within

20  30 days of order, primary care provider review of lab results within two business days of receipt,

21  notification of patient of results within 14 days of receipt).  (Stipulated Injunction ¶ 4)

22      10. <u>Medication Management</u>:  Services to dispense, administer, and distribute

23  pharmacotherapeutic treatments, including provisions for medication error reporting, medication

24  follow-up counseling, medication renewals and refills, medication for parole, and continuity of

25  medication upon transfer; policies require that prescriptions for formulary medications be filled

26  by the following day and that "stat" medications be issued within 1 hour. (Stipulated Injunction ¶

27  4)

28                                          4

1      11.  Urgent / Emergent Response:  Program for the provision of urgent care services and
2  24-hour emergency medical treatment that includes basic life support, emergency response, and
3  physician on-call services; policies require follow-up within five days for patients whose urgent
4  encounter was due to chronic disease. (Stipulated Injunction ¶¶ 4, 6)

5      12.  Medical Emergency Response Documentation and Review:  Process for the review
6  of deaths, suicide attempts, and calls for emergency assistance to determine compliance with
7  existing policies and procedures, adequacy of response time, and appropriateness of custody and
8  medical response and patient treatment, with follow-up actions to address identified deficiencies.
9  (Stipulated Injunction ¶ 4)

10      13.  Outpatient Housing Unit and Licensed Care:  Specialized treatment services for
11  varying levels of acuity, including outpatient services requiring specialized housing (Outpatient
12  Housing Unit care), licensed skilled nursing facility care (Correctional Treatment Center care),
13  General Acute Care Hospital care, and palliative care; policies require physician evaluation
14  within 24 hours of admission to a Correctional Treatment Center and an evaluation by a primary
15  care provider within 5 days for all patients returning from an inpatient acute care facility.
16  (Stipulated Injunction ¶ 4)

17      14.  Outpatient Therapeutic Diets:  Program for the provision of nourishments and
18  supplements for patients who are pregnant, diabetic, immunocompromised, malnourished, or
19  have oropharyngeal conditions causing difficulty eating regular diets and special diets for
20  patients with renal failure or hepatic failure, or who require a Heart Healthy diet, gluten-free
21  diet, or diet to preclude food allergies. (Stipulated Injunction ¶¶ 4, 6)

22      15.  Medical Report of Injury or Unusual Occurrence:  Process for documentation of
23  patients' on-the-job injuries, physical contact with a staff member during an incident, and any
24  self-reported injury due to self-injury or altercation, Administrative Segregation Unit placement,
25  use of force, or other medical emergency situation. (Stipulated Injunction ¶ 4)

26      16.  OC Contraindications:  Process for the evaluation and treatment of patients prior to
27  or after the use OC. (Stipulated Injunction ¶ 4)

28                               5

17. <u>Medical Evaluation of Patients Involved in Assaults</u>: Process for the evaluation of patients who have been involved in the use of force, including review of the patient's mental health record. (Stipulated Injunction ¶¶ 4, 6)

18. <u>Hygiene Intervention</u>: Process for the identification, evaluation, and referral of patients who demonstrate poor hygiene or whose hygiene compromises the sanitation/hygiene of their personal and immediate housing area. (Stipulated Injunction ¶ 4)

19. <u>Inmate Hunger Strike</u>: Process for the identification, evaluation, and treatment of inmates on hunger strike, including required coordination and reporting between custody and health care staff. (Stipulated Injunction ¶ 4)

20. <u>Comprehensive Accommodation Chrono</u>: Process for the authorization and review of special equipment, housing accommodations, or other accommodations that are medically necessary or are required under the Americans with Disabilities Act. (Stipulated Injunction ¶ 4)

21. <u>Pregnant Patient Care and the Birth of Children</u>: Prenatal care and post-delivery services, including required screenings, frequency of prenatal treatment visits, vitamin and nutritional requirements, referrals for child placement services, and post-partum follow-up; policies require that patients be seen by a obstetrics provider within 7 calendar days of determination of pregnancy that each patient be provided six-weeks post-delivery for follow-up. (Stipulated Injunction ¶ 4)

22. <u>Nursing Services and Protocols</u>: Clinical protocols for nurses in the appropriate evaluation and treatment of patients presenting with specific systemic conditions or complaints. (Stipulated Injunction ¶¶ 4, 6)

23. <u>Health Record Services</u>: Provisions for the management, content, and archiving of patient health records, including policies for disclosure of information. (Stipulated Injunction ¶ 4)

24. <u>Chronic Care Program</u>: Diagnosis and management of chronic disease (diseases lasting longer than 6 months), including identification and treatment of high-risk patients; policies require an initial intake evaluation within 30 days for patients referred to the Chronic

6

1    Care Program, and ongoing evaluations every 90 days. (Stipulated Injunction ¶¶ 4, 6)

2        25. <u>Pharmacy Services</u>: Provisions governing pharmacy operations, including pharmacy

3    licensing, emergency drug supplies, drug storage, consultation with a pharmacist, prescription

4    requirements, and the ordering, stocking, and receiving of medications. (Stipulated Injunction ¶

5    4)

6        26. <u>Public Health and Infection Control</u>: Program for infection control, communicable

7    disease reporting, and bloodborne pathogen control. (Stipulated Injunction ¶ 4)

8        27. <u>Telemedicine Services</u>: Program for the provision of specialty services through

9    videoconferencing. (Stipulated Injunction ¶ 4)

10        28. <u>Utilization Management</u>: System to facilitate appropriate use of resources for

11    patients requiring higher levels of care and select specialty services and medications, including

12    reviews to determine placement at appropriate level of care and appropriate utilization of

13    specialty care and pharmacy resources. (Stipulated Injunction ¶ 4)

14        3. *The Receiver's Plan of Action.*

15    On May 10, 2007 the Receiver filed his initial Plan of Action to remedy the

16    unconstitutional medical care system in California's prisons. (Exhibit 1.)[1] As set forth in the

17    Plan, the CDCR requires an entirely new infrastructure of medical delivery before necessary

18    programs of clinical remediation can be effectively implemented in a sustainable manner.

19    Therefore, when considering "the manner, and extent to which, overcrowding is interfering with

20    his ability to successfully remedy the constitutional violations at issue," the Receiver necessarily

21    referred not only to the stipulated injunctions re medical delivery (standards agreed to by the

22    attorneys in this case), but also to the substance of the Plan of Action that will be necessary to

23    successfully remedy the unconstitutional medical conditions in California's prisons.

24

25

26

27    [1] All exhibits referenced in this report are found in the Appendix of Exhibits Supporting the
Receiver's Report Re Overcrowding filed concurrently with this Report.

28            7

1     E. Underlying Medical Conditions Are Only One Part of an Unconstitutional

2     Prison Health Care Delivery System.

3          Context is critical. The State of California has allowed its massive prison system to

4     operate with unconstitutional levels of medical care. At the same time, however, the State is

5     under Federal Court mandated remedial plans concerning the delivery of Mental Health, Dental,

6     and Americans With Disability Act services. Under the best of circumstances, correcting

7     medical problems present a significant challenge; however when the medical remedial plan must

8     also consider the legitimate remedial objectives of the *Coleman*, *Perez*, and *Armstrong* class

9     actions, in addition to uncontrolled overcrowding, the scope, duration, and cost of Federal Court

10    intervention may increase dramatically, as explained below.

11                                             **III.**

12         **THE SCOPE AND CHARACTERISTICS OF PRISON OVERCROWDING**

13                                    **IN CALIFORNIA**

14         A. Introduction.

15         From the perspective of a Receivership tasked with creating a medical delivery system

16    that meets constitutional minima, the size, scope, pervasiveness and specifics of overcrowding in

17    California's prisons have special negative consequences, as explained below.

18         B. The Pervasiveness of Prison Overcrowding in California.

19              1. *Introduction.*

20         Prison overcrowding is not a new phenomenon in California. To the contrary,

21    overcrowding has been a way of life in the CDCR for twenty years. For example, as

22    demonstrated below, overcrowding is ingrained in the CDCR style of constructing and managing

23    prisons. Crowding related policies that do not provide adequate clinical and program space are

24    now an accepted practice of CDCR prison planning, as is California's practice of offering

25    inadequate salaries and failing to provide adequate hiring programs which have created crisis

26    levels of shortages of clinical personnel and correctional officers.

27

28                                              8

1          2. *The Long Term Continuation of California Prison Overcrowding.*

2          Despite spending billions of dollars on construction, the level of overcrowding in

3   California's prison system has not decreased; indeed, despite waves of prison expansion

4   overcrowding has now reached crisis levels.

5          Exhibit 2 charts prison by prison and system-wide overcrowding from June 30, 1997 to

6   May 4, 2007.[2] To summarize, in 1997 there were a total of 32 prisons within the CDCR with an

7   average overcrowding rate of 196.0 percent for Males and 175.3 percent for Females. In 2002

8   there were 33 institutions (with the additional of Substance Abuse Treatment Facility ["SATF"])

9   and an average overcrowding rating of 191.3 percent for Males and 155.9 percent for Females.

10  In 2007 the number of institutions remained at 33.[3] The Statewide overcrowding average for

11  Male inmates increased to 196.4 percent and the Female overcrowding rating increased to 175.8

12  percent. In 1997 there were 11 institutions at or above 200 percent of overcrowding. By 2002

13  that number had increased to 12 institutions. By 2007, 19 institutions were at or above 200

14  percent of overcrowding. To summarize, despite massive waves of construction, prison

15  overcrowding has grown worse in California.

16          3. *The Consequences of Decades of Overcrowding.*

17          No one disputes the consequences of decades of prison overcrowding; indeed, both

18  formal studies and official proclamations affirm the crisis nature of today's overcrowding. For

19  example:

20          a. Corrections Independent Review Panel.

21          Three years ago, June 30, 2004, an independent panel of experts, chaired by former

22  Governor George Deukmejian issued a report entitled "Reforming Corrections." In a section

23  titled "Inmate/Parole Population Management" the panel found California's prisons "filled to the

24

25    [2] The chart was created based on the data obtained from the CDCR's Data Analysis Unit (from
26  the "Monthly Report" for the dates specified).

27    [3] Kern Valley State Prison ("KVSP") was activated and Northern California Women's Facility
    ("NCWF") was deactivated.

28                                         9

1    breaking point," exceeding both "safe and reasonable capacity" and "far exceeding operable

2    capacity." (Exhibit 3.)[4] The panel also found that numbers alone understated the impact of

3    overcrowding, that staffing reductions have accompanied overcrowding, and that overcrowding

4    and inadequate staffing impedes programming. The panel made a number of crowding related

5    recommendations, none of which have been implemented.

6                       b. Little Hoover Commission Report.

7          On January 25, 2007 California's Little Hoover Commission issued a report entitled

8    "Solving California's Corrections Crisis - Time is Running Out" finding that California's prisons

9    are swelled past capacity, that as a result of crowding there was little room or budget for

10   rehabilitation, that California had a recidivism rate of 70 percent (near the highest in the United

11   States), and that thousands of correctional officer shortages have created huge overtime bills and

12   mounting stress for those officers on duty. (Exhibit 4.)

13                      c. Governor Schwarzenegger's Declaration of Emergency.

14         On October 4, 2006 Governor Arnold Schwarzenegger proclaimed a State of Emergency

15   because of prison overcrowding, declaring that "the current severe overcrowding in 29 CDCR

16   prisons has caused a substantial risk to the health and safety of . . . the inmates housed in them . .

17   . The declaration further stated that overcrowding puts prisoner/patients in "increased,

18   substantial risk for transmission of infectious illnesses."

19         4. *A Progressive Lowering of Standards: CDCR Facilities Master Plans.*

20         A telling example of the CDCR's institutionalized acceptance of overcrowding and the

21   lowering of correctional standards to accommodate overcrowding is found in CDCR "Facility

22   Master Plan" documents. Exhibits 5, 6, and 7 contain relevant sections from the CDCR's

23   Facility Master Plan for 1993-1998, 1995-2000, and 1998-2003. Reviewed in sequence, they

24   provide insight into a correctional mindset that allows *overcrowding* rather than *sound*

25   *correctional management* to drive crucial construction and prisoner management policy. Note

26

27   _____

     [4] The entire "Reforming Corrections" report is found at cpr.ca.gov/report/indrpt/corr.

28                                              10

.015

1    the following:

2            1. No Master Plan addresses overcrowding driven problems with the delivery of medical

3    services. All the plans focus on corrections, as if medical, mental health, and dental care have no

4    place in prison design, prison construction, or prison management.

5            2. As the CDCR failed to "build its way out" of the overcrowding crisis, crowding

6    restrictions were steadily lowered, until by the issuance of the 1998-2003 Plan there were

7    essentially no restrictions. For example, the 1993-1998 Master Plan (Exhibit 5) limited celled

8    crowding to 130 of design percent and dormitory crowding to 120 percent of design capacity.

9    By the 1995-2000 Master Plan (Exhibit 6), however, a 170 percent crowding standard was

10   utilized for *the highest security prisoners, Level IV*. The 1998-2003 Master Plan (Exhibit 7)

11   allowed for a 190 percent crowding rate at almost all prisons (and for the housing of prisoners in

12   gyms). During these same years various CDCR housing definitions were repeatedly modified,

13   and new terms were instituted such as "crisis" and "nontradtional" (the CDCR's designation for

14   prisoners housed in classrooms, hallways, etc.). Prison staff refer to such beds as "ugly" beds.

15           C. California Prison Overcrowding Is Accompanied by Severe Staffing Shortages.

16               1. *Clinical Staffing Shortages.*

17           The Receiver has previously reported to the Court about the serious clinical vacancy rates

18   throughout the CDCR's medical delivery system. Likewise, reports have issued concerning

19   staffing shortages in the *Coleman* and *Perez* class actions. When considering the manner and

20   extent to which overcrowding is interfering with his ability to successfully remedy the

21   constitutional violations at issue, the Receiver must take into consideration the fact that

22   overcrowding is accompanied by serious staffing shortfalls for both clinical providers and

23   correctional officers.

24           For example, Exhibit 8 provides a snap shot comparison of clinical staffing shortages

25   between January 31, 2002 and January 31, 2007.[5] Concerning every clinical category except for

26   _____

27       [5] One difficulty encountered by the Receiver when preparing this report is that limited and at
     times inaccurate staffing data is maintained by the CDCR. The figures in Exhibit 8 were obtained

28                                              11

1  registered nurses, vacancies are worse today than five years ago.[6]

2      The true scope of clinical staff shortfalls is actually *far worse* than the numbers set forth

3  in Exhibit 8 because there are additional staffing needs projected in each of the health care class

4  actions as well as upcoming time-phased "roll-outs," none of which are yet listed on the chart.

5          2. *Custody Staffing Shortages.*

6      Correctional officer vacancies on April 30, 2002 were 1,179. As of January 31, 2007

7  "budgeted" correctional officer vacancies had risen to 1,915.[7] However, the actual total of

8  officer vacancies is several hundred higher than the "budgeted" vacancies due to the practice of

9  assigning "unbudgeted" positions for posts such as medical guarding at community hospitals,

10 and monitoring and providing services for prisoners confined to "nontraditional" beds. CDCR

11 officials estimate the actual officer shortage to be somewhere between 2,400 and 2,700.

12      Based on response to numerous inquiries by the Office of the Receiver, there appear to be

13 no innovative or unique CDCR program that has been developed to address the correctional

14 officer shortage. To the contrary, the existing system of recruitment and hiring is experiencing

15 bottlenecks in its recruitment process that may have an adverse impact on the number of cadets

16 admitted to future academy classes. For example, according to CDCR personnel, as of Friday,

17 May 11, 2007 there were somewhere between four to seven thousand "unassigned" background

18 verifications awaiting processing (background checks are required for correctional officer

19 applicants who successfully complete the CDCR's initial testing programs). The exact backlog

20 is not known in that the background unit is behind in entering data into its computer tracking

21

22 from the State Controller's Office; thus, there may be a time lag in the reporting of actual staffing
   shortfalls, as well as hires. Nevertheless, these numbers represent accurate "ball park" estimates of
23 the scope of staffing shortages between 2002 and 2007. These numbers do not, however, consider
   future staffing enhancements and roll-outs. According to CDCR staff, hundreds of additional dental,
24 medical, and mental health clinicians will be needed to comply with remedial plan standards.

25  [6] Improved rates of hiring and retaining registered nurses are the result of the Receiver's salary
   increase and the Receivership's streamlined clinical hiring process.
26

27  [7] These figures were provided by the CDCR's Human Resources Division based on State
   Controllers Office data.
28                                    12

1   system.

2                3. *Managerial and Executive Staffing Shortages.*

3         In addition to the severe staffing shortfalls within the ranks of clinicians and correctional

4   officers, the CDCR has also experienced very significant turnover among its executive and

5   managerial ranks, ranging from Secretaries to Wardens. Likewise, given the unconstitutional

6   conditions in health services, turnover among prison Chief Medical Officers and Chief

7   Physicians and Surgeons remains excessive.

8         D. <u>The Short Average Length of Sentences Among California Prisoners</u>.

9         According to CDCR statistical records, the average sentence for a California prisoner is

10  46.7 months, and the average time served is 24.1 months. (Exhibit 9.) Given the fact that

11  California confines thousands of prisoners facing Life or Life Without the Possibility of Parole

12  sentences, the CDCR average time served is indicative of two distinct classes of California

13  prisoners: (1) longer term prisoners, a significant portion of whom (but not all) are confined to

14  Level III and Level IV prisons; and (2) a group of short term prisoners (of whom a significant

15  percentage are parole violators) who come into and go out of the CDCR with such frequency that

16  the average length of CDCR sentences is pushed down to two years.

17        Each class of prisoner has different and distinct medical needs. Therefore, when

18  implementing the Plan of Action, the Receiver must consider this characteristic of California

19  prison crowding. Lifers, for example, will eventually age and require special housing as infirm

20  patients. On the other hand, the constant churning of parolees into and out of the CDCR (and

21  between CDCR institutions) requires special clinical and correctional support staff at reception

22  centers and in the "receiving and release" units at each state prison.

23        E. <u>The Impact and Severity of California Prison Overcrowding Varies By Institution</u>.

24           1. *Introduction.*

25        The California prison system is unique not only in terms of its overall size and prisoner

26  population, but also because of a wide variety of different types of prisons, the remote location

27  of most prisons, and the different impacts of overcrowding at each specific institution. As a

28                        13

1  result, overcrowding related negative impacts on the Plan of Action become both complicated

2  and interrelated.  There is no single fixed strategy that can be employed by the Receiver to bring

3  medical care delivery in California's prisons up to constitutional standards.  Invariably, the

4  overcrowding problems at each specific prison are unique, and specialized remedial programs

5  must be developed for each.

6       2. *Factors Which Determine the Impact of Overcrowding In California's*

7       *Prisons.*

8       1. Degree of Overcrowding: As shown in Exhibit 2, not all CDCR prisons suffer from

9  the same degree of overcrowding.  The challenge of providing constitutional medical care at a

10 prison with more than two hundred percent overcrowded will be different from the challenge at a

11 prison that is less crowded.

12      2. Institution Size: California opted to construct mega-prisons in the 1980s and 1990s, a

13 strategy rejected by other jurisdictions.   In addition, California has a policy of adding new

14 prisons to sites with older prisons, creating a number of prison complexes (e.g. the California

15 Institute for Men ["CIM"] and the California Correctional Institution at Techachapi ["CCI"]).

16 Ultra-large prisons and prison complexes which are severely overcrowded, as they are today,

17 create special medical delivery challenges, as well as recruitment difficulties.

18      3. Remote Location: Many of mega-prisons constructed in the 1980s and 1990s have

19 been sited in remote locations, far from the urban centers where it may be possible to recruit

20 adequate numbers of competent clinicians.  With the remote prisons so severely overcrowded,

21 recruitment problems have intensified, not only for clinical personnel but also for correctional

22 officers.

23      4. Institutional Design: Because of overcrowding, many California prisons which should

24 have been de-commissioned decades earlier remain not only fully operational, but operate at 200

25 percent of their design capacity.  Thus in terms of real life remedial fixes, it is a far different

26 problem addressing the impacts of overcrowding on the aged, poorly maintained and diverse

27 housing units at San Quentin or Old Folsom, compared to the impacts of crowding presented by

28       14

019

1    a prisoner population of more than 260 percent of design capacity as at the more modern but

2    sprawling and remotely-located prison located at Avenal.

3        5. Institution Mission: Many CDCR prisons have been charged with special "missions."

4    Because there has been no adequate long-term planning in CDCR, prison specific missions have

5    been assigned in a manner that inhibits the establishment of a safe and effective medical

6    remedial plan. In most cases the designation of CDCR prison "missions" are comprehendible

7    only in a historical context. The diversity, lack of organization among missions, ad hoc and

8    incompetent changes in mission combined with severe crowding will complicate the timely and

9    cost effective implementation of the Plan of Action, especially when the Plan calls for assigning

10    the appropriate patient to the appropriate medical delivery facility.

11        For example, Avenal State Prison has been designated for *Armstrong* class members and

12    for housing older, low security prisoners – despite its remote location and the resulting

13    difficulties hiring adequate numbers of clinicians. Salinas Valley State Prison contains a long

14    term "Intermediate" mental health facility for high security inmates, despite being hundreds of

15    miles from outpatient mental health units at Pelican Bay State Prison ("PBSP") and California

16    State Prison-Sacramento (which feed patients into and accept patients from the Intermediate

17    unit). Prisoners with medical conditions that may make them especially vulnerable to Valley

18    Fever, for example, patients with serious kidney problems, are housed in prisons in the Central

19    Valley, the primary locus of Valley Fever spores, because those facilities have been designated

20    for the delivery of dialysis treatment. Correcting these types of anomalies will be difficult,

21    requiring an entirely new program of cohorting patients, which will in turn require modifications

22    to the manner by which CDCR classifies inmates and assigns them to specific prisons. This

23    challenge is rendered far more difficult, however, because of the extent of the CDCR's

24    overcrowding.

25        F. The Velocity of Prisoner Movement Within the CDCR.

26            1. *Introduction.*

27    Overcrowding creates increased prisoner movement as correctional officials struggle to

28                                    15

1  manage crowding by transferring prisoners from institution to institution in a constant search for

2  "open" beds. This form of crowding driven movement adversely impacts on health care delivery

3  in at least six important ways. First, adequate health care in the correctional environment

4  requires some form of "intake" or "reception" screening whenever a prisoner arrives at an

5  institution. The health care screening (medical, mental health, and dental) that takes place at a

6  CDCR Reception Center is necessarily wider in scope and more complete than the intake

7  screenings which take place as a result of inter-prison transfers; nevertheless, both processes call

8  for specific clinical reviews, reports, and the coordination of necessary follow-up care. Thus, an

9  increase in prisoner movement equals an increased workload concerning screening. Second, all

10  "out" transfers from a CDCR prison require action by health care staff, including, in some cases,

11  an evaluation of whether the prisoner is fit for transfer. Third, the appropriate medical records

12  must accompany the transferring prisoner. However, given the existing transportation process,

13  the speed by which transfers need to be effectuated, and the absence of any form of electronic

14  record, this means that a paper record must be assembled, updated, transported to the intake and

15  release area and physically placed inside the transportation vehicle with the transferring prisoner

16  for delivery to the reception nurse at the receiving institution in time for the intake screening.

17  Not surprisingly, many prisoners are transferred without their records. Fourth, some percentage

18  of inmates who are transferred must be provided with medication during the transfer process, and

19  plans must be initiated for the timely renewal of medications at the receiving institution, placing

20  an additional work load on physicians, pharmacy personnel, nurses and correctional officers.

21  Fifth, some percentage of transferring inmates must be afforded special transportation (and in

22  some cases must be accompanied by clinical personnel) during the transfer, a staff intensive

23  procedure for both clinical and correctional personnel. Finally, transfer often adversely impacts

24  patient clinician relationships and clinical programs (whether medical, mental health, or dental

25  oriented). Given the scope of overcrowding, however, and an unceasing need for more and more

26  transfers, the present CDCR system functions in a manner whereby classification driven

27  decisions are primary, with medical/mental health/dental issues assuming a secondary and in

28                                                    16

1 every instance unacceptably low level of importance.

2                2. *The Scope of Prisoner "Moves."*

3       Given the State's decision to construct very large correctional facilities and given the

4 decision to site many prisons in remote locations, it is not surprising that CDCR effectuates

5 hundreds of thousands of prisoner moves each year. Movement into and out of the CDCR, as

6 well as between CDCR prisons has now reached crisis proportions. For example, Exhibits 10

7 through 12 provide a prison-by-prison summary of inmate movement into and out of specific

8 institutions, as well as a systemic total, for the months of January, February, and March 2007.[8]

9 In total there were *more than 170,000 prisoner moves during the first quarter of calendar year*

10 *2007 alone.* CDCR reception centers were especially hard hit. For example, the California

11 Institution for Men ("CIM"), a male reception center, averaged *more than 11,000 prisoner moves*

12 *each month.*

13                3. *Mission Change and "Yard-Flips."*

14       In addition to an increasing velocity of prisoner movement and its adverse impact on

15 attempts to deliver constitutionally adequate medical care, correctional officials in the CDCR are

16 forced, because of the pressures of overcrowding, to constantly re-evaluate the correctional

17 mission of each CDCR institution and to periodically alter those missions in order to provide

18 housing for classifications of inmates for whom bed shortages have become especially acute.

19       Yard flips (a procedure whereby housing units or yards within a prison are designated for

20 a different classification of prisoner) and mission changes (a procedure whereby an entire prison

21 is designated for a different classification of prisoner) exemplifies yet another characteristic of

22 California prison overcrowding: *the real life impact of crowding is not only in the overall*

23 *numbers, but also in the population pressures created by a lack of beds for specific*

24 *classifications of prisoners.* For example, an increase in long term violent offenders classified as

25

26    [8] Official CDCR statistics are reported by counting a prison transfer "out" and the resulting
27 prison transfer "in" (at a different institution) as only one move. However, because both the transfer
out and the transfer in require some form of health care intervention, this report totals all moves.

28                17

1  Level IV prisoners requires an increase in celled housing. An increase in short term non-violent

2  offenders calls for increased housing in dormitories/lower security housing.[9]

3      Yard flips and mission changes are necessitated by classification related housing

4  shortage. In essence, one classification of prisoner is moved out of a specific yard or prison and

5  transferred to other institutions while a different classification of prisoner is moved into those

6  units. Exhibit 13 summarizes CDCR bed conversions from February 2003 through May 2007.

7      It is important to emphasize that with increasing overcrowding, yard flips and missions

8  changes have become an unceasing process. *See*, for example, Exhibits 14 - 16, three CDCR

9  Memorandums issued the same day – March 30, 2007. The first calls for 11 emergency

10 revisions to previously issued "Institution Activation Schedules," the second converts Facility D

11 of the California State Prison at Los Angeles County ("LAC") from a Level IV General

12 Population housing unit into a Reception Center, and the third converts Centinela State Prison

13 from a Level III prison to a Level IV prison.

14      4. *The Heightened Negative Impact of Overcrowding on CDCR Reception*

15      *Centers.*

16      Because of overcrowding, the Plan of Action faces special challenges relative to CDCR

17 reception centers. For example:

18      1. One of the factors driving California prison overcrowding is the State's failure to

19 implement rehabilitation programs. Therefore, in California, high percentages of paroled

20 prisoners either "violate" their conditions of parole or "re-offend" with a new crime.

21      2. Thus CDCR reception centers have, during the past twenty years, encountered ever

22 increasing prisoner movement pressures as more and more prisoners flow into the CDCR for

23 relatively short terms of incarceration. As demonstrated by Exhibits 10 - 12, this flow into the

24 CDCR has a special impact on reception centers such as CIM, SQ, the Deuel Vocational Institute

25 ("DVI").

26 _____

27  [9] As explained below, when analyzing the impact Assembly Bill 900, creating additional CDCR dormitories will not address the crisis shortage of Level IV cells.

28                                         18

1    3. Reception centers are institutions which must be staffed and have the appropriate

2    clinical space to provide a level of medical care and clinical evaluations above that of the general

3    population institutions.  When a former prisoner violates parole or re-offends, he or she returns

4    to the CDCR through a reception center where a medical/mental health/dental health care

5    appraisal must be performed.  Once that appraisal is completed the newly received prisoner is

6    transferred to an open bed at a prison which has been designated for his or her classification.

7    However, none of the CDCR's designated reception centers were designed or constructed with

8    adequate clinical space.  To make matters worse, as the original prisons designated for reception

9    became overwhelmed by the influx of parole violators, the CDCR was forced to "convert"

10   general population prisons into reception centers.  These "conversions," however, were not

11   accompanied by adequate additions to clinical staff or clinical space.  For example when San

12   Quentin, the State's oldest prison, converted to a reception center it was allocated an entirely

13   inadequate temporary relocatable structure, which until the Receiver began his San Quentin Pilot

14   Project, had not been renovated or replaced.

15      The degradation of CDCR reception process continues to this day.  As Exhibit 15

16   demonstrates, because of overloads at other reception centers, slowly but surely, yard by yard,

17   LAC is mutating into a full blown reception center.  Although chapels and libraries have been

18   converted into some additional clinical space, LAC has neither the staffing nor the clinical space

19   to accomplish the health care elements of reception.

20      G.  The State's Failure to Plan, Design, and Build Appropriate Clinical Space In Its

21          Newest and Most Modern Prisons.

22      The Receiver has discovered that the Plan of Action, as it relates to overcrowding, cannot

23   assume adequate prison medical clinics/treatment area infrastructure exists even in California's

24   newest and most modern prisons.  To the contrary, when measuring the impact of overcrowding

25   on his remedial efforts, the Receiver is forced to consider the following two facts:

26      (1) the newest CDCR prisons were designed with clinic space which is *only one-half that*

27   *necessary for the real-life capacity of the prisons;* and

28                                        19

1    (2) while millions of dollars have been allocated for prison health care space projects

2    during the past five years, the great majority of the project were never completed; indeed,

3    some projects do not appear to exist.

4          1. *Inadequate Clinical Support Space in the State's Newest and Most Modern*

5          *Prisons.*

6        In the beginning of the prison construction boom in the early 1980s, the CDCR

7    developed a "Prototypical Prison Policy Design Criteria." (Exhibit 17.) This policy has been

8    revised over the years and continues to reflect CDCR and the State's policy on what will be built

9    at each new prison. In 1988 the policy was revised to clearly reflect the reality of overcrowding

10    in the prison system even at that time. The policy states that at Level II, III, IV and reception

11    centers, certain functional areas of the new prison will be built to accommodate 130 percent

12    overcrowding. Those functional areas included *only* personnel, accounting, inmate records,

13    procurement, receiving and release and family visiting. The policy goes on to mandate that the

14    infrastructure at new prisons, (which includes *only* water, wastewater, electrical, mechanical)

15    will be designed to accommodate 190 percent overcrowding in celled prisons and 140 percent

16    overcrowding in dormitory prisons. Thus, at a policy level, by default, the CDCR short-changed

17    by at least 50% all health care related space needs.

18        Therefore, while the overcrowded populations of the modern facilities approach or

19    exceed two hundred percent, and regardless of how the CDCR attempts to *characterize* the level

20    of crowding, the available clinic space is *one half of what is necessary for daily operations.*

21        This CDCR policy and practice, for more than twenty years, to limit health care space,

22    including staff offices, examination/treatment rooms and medical beds, to only the base staffing

23    level of the institution, ignoring pre-existing plans to double-cell the prison up to 200 percent of

24    capacity, adversely  impacts the daily medical, mental health, and dental operations at the

25    following prisons.

26        1. Avenal State Prison

27        2. California State Prison-Calipatria

28                    20

3. California State Prison-Centinela

4. California State Prison-Corcoran

5. California State Prison-Solano

6. Chuckawalla Valley State Prison

7. California State Prison-Sacramento

8. High Desert State Prison

9. Mule Creek State Prison

10. Ironwood State Prison

11. Kern Valley State Prison

12. California State Prison-Los Angeles County

13. North Kern State Prison

14. Pelican Bay State Prison

15. Pleasant Valley State Prison

16. R.J. Donovan Correctional Facility

17. Substance Abuse Treatment Facility

18. Salinas Valley State Prison

19. Wasco State Prison

   2. *A Case Study of How CDCR Construction Planning Ignores the Crowding*
   *Related Clinical Space and Staffing Needs of the CDCR Health Services Program*
   *- Kern Valley State Prison.*

Kern Valley State Prison ("KVSP"), the CDCR's newest prison, opened in June of 2005, was built to a standard of "base staffing", except for water, wastewater, electrical, mechanical. (Exhibit 18.) To summarize, absolutely no consideration was given to the real life impact on the prison's health care program that would result by the CDCR's plans to immediately double cell the entire prison. As a result of this policy, at KVSP the health care space on each of the four semi-autonomous facilities was limited to accommodate one Primary Care Provider's office based on the ratio of 1 doctor for every 500 inmates. Each of the four facilities was also built

21

026

1  with one Examination/treatment room, a medication distribution/sick call window, and a dental

2  operatory/office.

3       Likewise, in KVSP's Central Health Care Services space the number of "infirmary beds"

4  was determined by the prison's "design" bed capacity, even though CDCR officials knew before

5  the construction began that the prison would be overcrowded. A Correctional Treatment Center

6  ("CTC") was subsequently constructed in lieu of infirmary beds. KVSP has a design capacity of

7  2,448 inmates. Based on the CDCR's space standards this would then require KVSP to have 1

8  medical bed for every 125 inmates for a total of 19 beds. In fact KVSP has a total of 24 CTC

9  beds. However, KVSP now confines not 2,448 inmates but, as of April 4, 2007, 4,952 inmates

10  (202.3 percentage of overcrowding).

11       Based on the level of overcrowding at KVSP they should have at least 38 medical beds in

12  order to accommodate the inmate-patient needs. Likewise KVSP now needs, even under the

13  CDCR's own standards (which the Receiver finds inadequate as explained below) twice the

14  number of clinical offices, clinical space, and infirmary beds as presently exist. In essence,

15  KVSP was planned, designed, and subsequently constructed knowing full well that the medical,

16  mental health, and dental space and staffing would be entirely insufficient for the prison's actual

17  population.

18            3. *Millions of Dollars Allocated for Prison Health Care Space Projects and Little*

19               *to Show for It.*

20       A summary of health care services Capital Outlay projects for the past five fiscal years is

21  set forth in Exhibit 19. This information is significant when evaluating CDCR efforts to address

22  the pervasive lack of health care space within its prison system. As stated above, each and every

23  prison approved, funded and built by the State over the past twenty plus years was constructed to

24  only accommodate "base staffing" only – except for infrastructure, water, wastewater, electrical,

25  mechanical and certain other functions (such as receiving and release, family visiting, and

26  accounting). The policy to build only to base staffing levels has left the CDCR in crisis

27  regarding the clinical space needed to provide constitutional levels of access to health care.

28                              22

1    In a small effort to attempt to improve this flawed system, CDCR had obtained in the past

2 five years approval to go forward with a limited number of health care space projects.  For

3 example, in fiscal year 2002/03 a total of $6.917 million was approved, one-third of which was

4 for a Ambulatory Care Center at CMF, which has in fact been completed. Many other projects,

5 however, such as $375,000 allocated for a CTC at SQ and $1.9 million for a "Hospital" at DVI

6 have not come to fruition.  SQ does not have a CTC, nor does DVI have a hospital.

7 Unfortunately, the CDCR construction program has a tendency to invest significant funds for the

8 planning of projects which fail to come to fruition. For example, in fiscal year 2003/04

9 Ironwood State Prison ("ISP") received approved for an expenditure of $3.8 million for the

10 completion of a CTC.  These funds were in addition to $50,000 approved in 2002/03.  As of this

11 date the CTC has not been completed, as of today it does not house a single inmate or provide

12 any health care services to inmates at ISP.  Likewise, during fiscal year 2004/05 $1 million was

13 approved for a nineteen chair dialysis center at SATF.  The construction has finally, years later,

14 been completed; however due to litigation over the contracting-out for the dialysis services, the

15 operation of the chairs is not fully implemented.  In fiscal year 2006/07 $2.5 million was

16 approved for a "Hospital" at DVI, in addition to a fiscal year 2002/03 allocation of $1.9 million.

17 After inquiries, the Receiver's staff were informed that this particular CDCR allocation is in fact

18 controlled by the Department of General Services for a "seismic retrofit" of an "infirmary

19 building."  The Receiver has not approved this project; in fact, he was not aware of it until the

20 preparation of this report, despite the allocation of $4.4 million.

21    In addition to the above projects,  each year the CDCR has been allocated approximately

22 $5 million for "Minor Capital Outlay" projects. These funds were allocated on a priority basis as

23 determined by CDCR officials. Through this process, some CDCR institutions have received

24 funds to provide additional health care space. For example, at Wasco State Prison a triple-wide

25 trailer has been added for clinician office space, primarily utilized by mental health staff.  A new

26 health care building has been constructed next to the existing Central Health Clinic at Avenal

27 State Prison, which, unfortunately, is located hundreds of yards of away from inmate housing

28                                           23

1   units. This space is primarily utilized for staff offices. At California State Prison Solano, a

2   building was constructed on the Facility IV grounds approximately eight to ten years ago, to be

3   utilized by mental health staff. In 2006 at R.J. Donovan custody staff moved out of their offices

4   for use by health care staff, and a trailer has been placed in a plaza area for use as additional

5   health care offices. At Sierra Conservation Camp ("SCC") an office has been converted into a

6   telemedicine clinic, and at Mule Creek State Prison a former vocational area on Facility B has

7   been converted into mental heath clinics and offices. Nevertheless it cannot be disputed that,

8   based on the CDCR budget of the last five years, very little health care space has been added to

9   any of the prisons which now confined at least twice as many inmates as they were designed to

10  hold.

11                                              **IV.**

12          **THE MANNER IN WHICH OVERCROWDING INTERFERES WITH THE**

13      **RECEIVER'S ABILITY TO SUCCESSFULLY IMPLEMENT TIMELY PROGRAMS**

14          **WHICH WILL REMEDY THE UNCONSTITUTIONAL VIOLATIONS AT ISSUE**

15          A. Introduction.

16          Overcrowding interferes with the Receiver's ability to successfully remedy the

17  constitutional violations at issue in two significant ways: (1) substantive interference; and (2)

18  process interference.

19          B. Crowding Related Substantive Interference With the Receiver's Remedial Programs.

20          As explained in the Plan of Action, in order to implement adequate and sustainable

21  programs which will bring California's prisons up to constitutional standards of medical

22  delivery, the Receiver needs to both establish the necessary correctional care infrastructure and

23  to implement time phased, coordinated medical delivery programs. Overcrowding will inhibit

24  this process in a number of significant ways.

25              1. *Crowding Related Obstacles to the Recruitment, Hiring, and Retention of*

26                 *Competent Medical Personnel.*

27          The Receiver's top priority during the next two years will involve recruitment, hiring and

28                                              24

the implementation of orientation and training programs to improve retention of necessary clinical staff (including physicians, mid-level providers, registered nurses, licensed vocational nurses), as well as support staff ranging from information technology staff to office assistants. Overcrowding adversely impacts this efforts in three ways:

a. The long-standing nature of California's prison overcrowding and the CDCR's policy of deliberately short changing the need for clinical space, combined with crisis levels of staffing shortages creates adverse barriers to the Receiver's ability to recruit and retain necessary, competent medical care staff. The Receivership will be building from "the ground up" a medical delivery system within a prison culture where what should be a relatively simple task – bringing a patient to a prison clinic – presents an almost insurmountable challenge because the number of patients who need care far exceeds the number of correctional officers available for escorts. Concerning some of the most basic elements of an adequate medical delivery system, the Receiver has found that the State's long standing acceptance of overcrowding, combined with staffing shortages, has created a culture of cynicism, fear, and despair which makes hiring and retaining competent clinicians extremely difficult.

b. The total number of clinicians and support staff needed because of the present levels of overcrowding is far above the number that would have been needed if all CDCR prisons operated at their design capacity. For the same reasons, the difficulties that would have been faced recruiting competent medical providers for the CDCR's remote prisons is also intensified, requiring necessary but costly remedial programs such as developing an air force to transport physicians out of urban areas to and from work assignments in rural prisons.[10]

c. Some of the special characteristics of California prison overcrowding will require

---

[10] In similar fashion, overcrowding will render other infrastructure programs set forth in the Plan of Action more difficult to effectuate. For example, an increase in the number of clinicians needed to care for prisoner/patients will require an increase in the number of computer terminals that will eventually be installed as part of a new information technology system. Likewise the number of medical records needs to increase as the inmate population increases, and therefore additional space must be constructed for medical records. In similar fashion the amount of medical supplies must be increased, as well a pharmacy services, etc.

25

1  significant numbers of additional clinical personnel. For example, the number of additional

2  clinical staff that will be needed at CIM to provide health assessments, monitor medical records,

3  provide follow-up care, and ensure that appropriate medications are provided for more than

4  12,000 inmate moves each month will be significant to say the least.

5      To summarize, the cost and the duration of the remedial effort of the Receiver's

6  recruitment, hiring and retention programs will increase significantly because of overcrowding.

7  In some rural counties, the number of clinicians and support staff needed to bring local prisons

8  up to constitutional standards may well require additional salary increases for CDCR clinicians

9  and a resulting disruptive impact on the availability of clinicians for county and private health

10  care programs.

11          *2. Crowding Related Obstacles Re the Development of Competent Managers and*

12          *Executives.*

13      In similar fashion, overcrowding has an adverse impact on the Receiver's ability to

14  recruit and retain competent health care managers and executives. As the Court is aware the

15  Receiver has filed a motion to establish Receiver Career Executive Assignment ("RCEA")

16  positions. Given on-going intensification of overcrowding, not only will the recruitment of such

17  personnel be more difficult, but the larger the remedy, the more managers and executive who

18  will be necessary.

19      To summarize, the cost and the duration of the remedial effort of the Receiver's

20  recruitment, hiring and retention of managers and executives will increase significantly because

21  of overcrowding.

22          *3. Crowding Related Obstacles Preventing the Establishment of Constitutionally*

23          *Adequate Reception Center And Inter-Prison Transportation Procedures.*

24      The stipulated *Plata* injunction, as set forth above, calls for adequate reception center

25  health care appraisals and the appropriate programs to protect prison medical conditions during

26  inter-prison transportation. However the present velocity of prisoner movement into and out of

27  reception centers as well as between prisons creates a serious obstacle to meeting these

28                                          26

1    objectives. Given present conditions, hundreds of additional "budgeted" correctional officers

2    and clinical staff will be required to appropriately manage the hundreds of thousands of inmate

3    moves that take place every year, not to mention a vast fleet of transportation vans and escort

4    vehicles.

5        To summarize, the cost and duration of the remedial effort of the Receiver's programs for

6    adequate reception centers and inter-prison transportation practices will increase significantly

7    because of the velocity of prisoner movement in the CDCR.

8           4. *Crowding Related Obstacles Concerning Provisions for an Adequate Number*

9           *. of Health Care Beds.*

10       An adequate number of different levels of medical care beds are an absolutely necessary

11   component of the Plan of Action. Overcrowding presents an obstacle to achieving this objective

12   because, as explained by the Receiver in his bi-monthly reports, three different types of

13   additional construction will be necessary:

14       1. The addition of approximately 5,000 new medical beds to provide the appropriate

15   treatment, care, and sheltered living for CDCR prisoner/patients. To a significant degree, these

16   beds are necessary because the CDCR has neither planned for nor provided adequate medical

17   beds for disabled prisoners, aged inmates, and prisoners who need some form of sheltered living

18   due to their medical or mental health conditions.

19       2. The construction of an as yet undetermined amount of additional clinical space at

20   existing CDCR prisons, primarily because of (a) the existing level of overcrowding and (b) the

21   CDCR's long standing policy and practice of constructing new prisons with design capacity

22   limitations on clinical space and thereafter operating those facilities at 200 percent of design

23   capacity.

24       3. The construction of an as yet undetermined amount of clinical offices, medical records

25   storage areas, medical supply warehouses, etc., primarily because of (a) the existing level of

26   overcrowding and (b) the CDCR's long standing policy and practice of constructing new prisons

27   with design capacity limitations on clinical space and thereafter operating those facilities at 200

28                     27

1  percent of design capacity.

2      To summarize, the cost and duration of the remedial effort of the Receiver's construction

3  programs will increase significantly because of overcrowding.

4          5. *Crowding Related Obstacles Concerning Medical Delivery Support Services.*

5      California prison overcrowding will also impact those elements of the Plan of Action

6  which provide for necessary medical support services.  For example, the Office of the Receiver

7  is presently involved with a program to completely restructure the CDCR's medical contracting

8  process.  Very positive initial results have been achieved.  However an increasing number of

9  prisoners in the more remote prisons has placed a heavy burden on a very limited number of

10 hospitals and speciality providers which in turn has created obstacles in the Receiver's efforts to

11 achieve a more efficient, patient oriented, and less wasteful contracting process.  Overcrowding

12 presents similar obstacles to other support services.  For example, the use of telemedicine should

13 be, and will be expanded for both improved patient care and cost containment purposes.

14 However, even the most simple of necessary expansion steps; for example, finding a room

15 adequate for telemedicine purposes often presents an unsurmountable barrier because

16 California's prisons were constructed without adequate clinical or office space for the numbers

17 of inmates housed at the prison.

18      To summarize, the cost and the duration of the remedial effort of the Receiver's Plan to

19 implement necessary medical care support services will increase significantly because of

20 overcrowding.

21      C. Crowding Related Process Interference With The Receiver's Remedial Program.

22          1. *Introduction.*

23      Every element of the Plan of Action faces crowding related obstacles.  Furthermore,

24 overcrowding does not only adversely impact the Receiver's substantive plans, it also adversely

25 impacts on the very process of implementing remedies because overcrowding, and the resulting

26 day to day operational chaos of the CDCR, creates regular "crisis" situations which call for

27 action on the part of the leadership of the Receivership and take time, energy, and person power

28                                  28

1  away from important remedial programs. Examples of crowding related crisis/chaos situations

2  which impact on Receivership's remedial activities include the following.

3          *2. Out of State Transfers.*

4        The Receiver and his staff worked in a diligent manner to support the Governor's efforts

5  to effectuate out of state transfers. This effort required the implementation of a formalized

6  health screening process; training nursing staff on screening; allocating staff to conduct

7  screenings; allocating staff to inspect the private out-of-state prisons where CDCR prisoners

8  would be confined; and reviewing contracts with private prisons to ensure that mechanisms

9  existed to provide compliance with Court orders, etc. Suddenly, however, the process was halted

10  due to State Court decisions. Recently, however, plans for out of state transfers have begun

11  again due to the passage of Assembly Bill 900, although questions apparently remain concerning

12  future State Court processes. Starting, then stopping, and then restarting these support efforts

13  must be managed in a careful manner so that the Receivership does not begin to experience the

14  day to day chaos which afflicts the CDCR.

15          3. *Responding to Mission Changes and Yard Flips.*

16        In a similar manner, the Receiver has attempted to work with CDCR concerning the

17  various mission changes and yard flips associated with increased overcrowding. However it has

18  been necessary on occasion to stop changes which would have put prisoner/patients in increased

19  jeopardy of receiving inadequate medical care. Needless to say, monitoring mission changes and

20  yard flips has become a full time activity. It may be necessary for the Receiver to provide direct

21  oversight over CDCR yard flips and mission changes at some time in the future should this

22  problem further exacerbate efforts to implement the Plan of Action.

23          4. *Disturbances.*

24        CDCR reports an increasing number of overcrowding related prisoner disturbances.

25  Most disturbances are followed by prisoner "lock downs," and on occasion the lock downs are

26  protracted. Lockdowns call for a radically different form of medical delivery than the services

27  provided under normal general population conditions. Under normal operating procedures,

28                      29

1  inmates housed in general population leave their housing units to go to yard clinics to see

2  medical providers, to receive medications, etc. Under lockdown conditions, clinical staff must

3  go from cell to cell to see the prisoner/patient, or small groups or individual prisoners must be

4  escorted by correctional officers to and from clinic areas. In either case, lockdowns inhibit the

5  delivery of medical care and increase the staffing necessary for such care. As crowding related

6  disturbances increase, the Receiver may need to modify the Plan of Action in order to establish

7  special clinical and correctional officer staffing standards for those institutions which function

8  under lockdown conditions on a regular basis.

9         5. *Infectious/Communicable Disease Management.*

10         As reported in the Fourth Bi-Monthly Report, overcrowding has increased the number

11  and seriousness of infectious and communicable diseases, jeopardizing prisoners, staff, and the

12  public. Thus far system wide outbreaks have been avoided, however, given the number of

13  prisoners, conditions in gyms and hallways converted to housing units, the velocity of prisoner

14  movement between institutions and in and out of the CDCR itself, the risk of such an outbreak

15  cannot be underestimated.

16         6. *The Inability to Deliver Basic Health Care Services Due to Staffing Shortage*

17            *and Increased Numbers of Inmates.*

18         Many CDCR prisons are unable to sustain the basic delivery of medical, mental health,

19  and dental services because of limited staffing (clinical and custody) and an overwhelming

20  number of prisoner/patients who require care. Every day, many California prison wardens and

21  health care managers make the difficult decision as to which of the class actions, *Coleman,*

22  *Perez, Armstrong* or *Plata* they will fail to comply with because of staff shortages and patient

23  loads. This in turn creates crisis conditions (as described in the Fourth Bi-Monthly Report

24  concerning Avenal State Prison) which, because it requires immediate attention, diverts the

25  Receiver's resources from Plan of Action related activities.

26         7. *Class Action Coordination Issues Aggravated by Overcrowding.*

27         Overcrowding combined with twenty years of CDCR construction practices has created

28                                    30

1   competition and tensions between medical and mental health providers concerning use of clinical
2   space. For example, because of the failure, for more than fifteen years, to provide an adequate
3   number of inpatient beds for prisoners with very serious mental illnesses, prison CTC beds
4   confined many patients in a mental health "crisis" creating shortages of CTC beds for medical
5   needs which, at times, pits medical staff against mental health staff. In similar fashion, the
6   failure by the CDCR to plan for and construct beds for aged and disabled prisoners has lead to a
7   practice of using the CTC beds for sheltered living housing, creating similar tensions. While
8   these issues are being addressed in monthly coordination meetings between the Receiver, the
9   Special Master in *Coleman*, and the Court experts in *Perez*, they present another series of
10  serious, constant problems which divert attention from Plan of Action remedial programs.

11         The Receiver recognizes that he is responsible for a prison medical delivery system in
12  crisis and therefore regular crisis situations, and the appropriate response, are to be expected.
13  However, without question, overcrowding and the resulting chaos in the CDCR has an adverse
14  impact on the Receiver's efforts to implement the Plan of Action, and the day to day problems
15  created by overcrowding will increase both the cost and the duration of his remedial efforts.

16                                          **V.**

17                      **THE IMPACT OF ASSEMBLY BILL 900**

18         A. Introduction.

19         This report would not be complete without the Receiver commenting on the possible
20  impacts of Assembly Bill ("AB") 900. A summary of the bill follows.

21         B. Summary of AB-900.

22  **Section 1. Name of Act.**

23         Names act as "the Public Safety and Offender Rehabilitation Services Act of 2007."

24  **Section 2. Prison Construction—Phase I**

25         Requires the CDCR to add up to 7,484 beds at 10 specified prisons.[11]

26         Requires the CDCR to add an additional 4,516 beds after site assessments are completed

27  ───────────────
    [11] Government Code 15819.40(a)(1)(A).

28                                          31

036

1   at other facilities.[12]

2        Requires that the above beds be supported by rehabilitation programming.[13]

3        Declares that purpose of new beds built under this phase is to replace "temporary

4   beds"—not to house additional inmates.[14]

5        Authorizes construction of reentry program facilities for up to 6,000 inmates.[15]

6        Authorizes construction of new buildings at existing CDCR facilities "to provide

7   medical, dental, and mental health treatment or housing for 6,000 inmates."[16]

8        Subjects all projects to approval and administrative oversight of State Public Works

9   Board.[17]

10        Authorizes the State Public Works Board to issue bonds to finance construction.[18]

11   Authorized costs for medical, dental and mental health construction are $857,100,000.[19]

12   **Section 3. Prison Construction—Phase II**

13        In addition to the construction required in Phase I, authorizes the CDCR to construct

14   4,000 beds at existing prison facilities, and requires that such beds be supported by rehabilitation

15   programming.[20]

16        In addition to the construction authorized in Phase I, authorizes the CDCR to construct

17   new buildings at existing CDCR facilities "to provide medical, dental, and mental health

18   treatment or housing for 2,000 inmates."[21]

19        In addition to the construction authorized in Phase I, authorizes the CDCR to construct

20   reentry program facilities that will house up to 10,000 inmates.[22]

21        Subjects all projects to approval and administrative oversight of State Public Works

22
23
24
25
26
27

[12] Government Code 15819.401(a)(1)(B).
[13] Government Code 15819.40(a)(2).
[14] Government Code 15819.401(a)(3).
[15] Government Code 15819.40(b).
[16] Government Code 15819.40(c).
[17] Government Code 15819.401.
[18] Government Code 15819.403.
[19] Government Code 15819.403.
[20] Government Code 15819.41(a).
[21] Government Code 15819.41(b).
[22] Government Code 15819.41(c).

28

1  Board.[23]

2      Authorizes the State Public Works Board to issue bonds to finance construction.[24]

3      Authorized costs for medical, dental and mental health construction under Phase II are

4  $285,700,000.[25]

5      Provides that the board may not release funds for Phase II construction until a 3-member

6  panel, composed of the State Auditor, the Inspector General and an appointee of the Judicial

7  Council of California, has certified that 13 specified requirements have been met.[26]

8      Authority provided for Phase II construction expires on January 1, 2014, but projects

9  already commenced may be completed.[27]

10      **Sections 4 & 5.  County Jail Facilities**

11      Relates to the financing and construction of county jail facilities, and authorizes the

12  issuance of up to up to $750,000,000 in bonds for that purpose.

13      Authorizes the issuance of an additional $470,000,000 in bonds for county jail

14  construction if the 3-member panel has certified that certain conditions have been met.

15      **Section 6.  Rehabilitation Incentives**

16      Requires CDCR to implement a system of incentives to increase inmate participation in

17  academic and vocational education.[28]

18      **Section 7.  Management Deficiencies**

19      Requires CDCR to implement a plan to address management deficiencies.[29]

20      **Section 8.  Rehabilitation Plan**

21      Requires CDCR to implement a plan to obtain additional rehabilitation and treatment

22  services for prison inmates and parolees.[30]

23

24      [23] Government Code 15819.411.
       [24] Government Code 15819.413(a).
25      [25] Government Code 15819.413(a).
       [26] Government Code 15819.417; Penal Code 7021.
26      [27] Government Code 15819.417.
       [28] Penal Code 2054.2.
27      [29] Penal Code 2061.
       [30] Penal Code 2062.
28
                              33

1    **Section 9. Inmate Payments; Report to Legislature**

2    Requires CDCR to report to the Legislature on whether existing laws related to payments

3    to inmates released from prison are hindering the success of parolees and resulting in their rapid

4    return to prison for parole violations.[31]

5    **Section 10. Substance Abuse Treatment**

6    Requires CDCR to expand substance abuse treatment services in prisons to accommodate

7    at least 4,000 additional inmates.[32]

8    **Section 11. Interdisciplinary Assessments**

9    Requires CDCR to conduct interdisciplinary assessments for the purpose of program

10   placement.[33]

11   **Section 12. Day Treatment and Crisis Care for Parolees**

12   Authorizes CDCR to obtain day treatment, and to contract for crisis care services, for

13   parolees with mental health problems.[34]

14   **Section 13. Prison to Employment Plan**

15   Requires CDCR to develop an Inmate Treatment and Prison-to-Employment Plan.[35]

16   **Sections 14 & 15. OIG: California Rehabilitation Oversight Board**

17   Creates within the OIG the California Rehabilitation Oversight Board, which will

18   examine and report on CDCR mental health, substance abuse, educational and employment

19   programs.[36]

20   **Section 16. Reentry Program Facilities**

21   Relates to the establishment and operation of the re-entry program facilities authorized in

22   Phases I and II of construction described above.

23

24   _____

25   [31] Penal Code 2713.2.
     [32] Penal Code 2694.

26   [33] Penal Code 3020.
     [34] Penal Code 3073.

27   [35] Penal Code 3105.
     [36] Penal Code 6140 & 6141.

28                                  34

Section 17.  Master Plan

Expands provisions defining facilities "master plan" to include the department's plans to activate or remove temporary beds in dayrooms, gyms, and other areas.[37]

Sections 18 & 19.  Submission of Plans and Reports to Joint Legislative Budget Committee

Requires CDCR to submit to the Joint Legislative Budget Committee (prior to submissions of preliminary plans to the State Public Works Board) (1) a preliminary facility plan, (2) an operating cost estimate, (3) a staffing plan, (4) a plan for medical, dental and mental health care, and (5) a programming plan.[38]

Requires CDCR to submit annual and quarterly reports to the Joint Legislative Budget Committee regarding the status of funded projects, including medical, mental health and dental projects.[39]

Section 20.  Communication with Local Governments

Requires CDCR to meet with representatives of cities or counties related to new permanent housing units prior to CEQA review.[40]

Section 21.  [Repeals]

Section 22.  Phase II Construction Panel

Creates 3-member panel charged with verifying whether certain conditions have been met before the State Board of Public Works may release funds for Phase II construction.[41]

Section 23.  Temporary Construction

Authorizes use of portable or temporary buildings for housing and rehabilitation programming.[42]

---

[37] Penal Code 7000.
[38] Penal Code 7003.
[39] Penal Code 7003.5
[40] Penal Code 7004.5.
[41] Penal Code 7021.
[42] Penal Code 10007.

35

1    **Sections 24-26. Out-of-State Transfers**

2    Temporarily authorizes (until 2011) out-of-state transfers of inmates, without inmate

3    consent.[43]

4    Provides that "no inmate with serious medical or mental health conditions, as determined

5    by the Plata Receiver, or an inmate in the mental health delivery system at the [EOP] level of

6    care or higher may be committed or transferred to an institution outside the state unless he has

7    executed a written consent to the transfer."[44]

8    **Section 27. Training Academy**

9    Authorizes CDCR to establish a training academy for correctional officers in southern

10    California.[45]

11    **Section 28. Supplemental Infrastructure Capacity & Rehabilitation Funding**

12    Appropriates $350,000,000 from the General Fund to CDCR for capital outlay to

13    renovate, improve, or expand infrastructure capacity at existing prison facilities and to

14    supplement funds for rehabilitation and treatment of prison inmates and parolees.

15    **Section 29. Urgency Statute**

16    Provides that Act goes immediately into effect.

17    C.  CDCR Does Not Have An Adequate Plan to Create "In-Fill" Beds With the

18    Necessary Support (Including Health Care Clinic) Space.

19    1. *Introduction.*

20    Following a first review by his staff of AB 900 and an evaluation of CDCR plans to

21    implement AB-900, the Office of the Receiver can provided initial findings concerning possible

22    impacts of the bill, as set forth below.

23    2. *Inadequate Space Allocations For Health Care Services.*

24    The CDCR's Infill Bed Plan is included as Exhibit 20.  A summary of the space

25    proposed to be allocated for health care space (medical, mental health, and dental) is attached as

26    [43] Penal Code 11191(a).

27    [44] Penal Code 11191(b).
      [45] Penal Code 13602.1.

28                                    36

041

1  Exhibit 21. As is apparent from the summary, the clinical space allocated to different prisons are

2  wildly disparate, and in many cases obviously inadequate. For example, for clinical purposes,

3  the proposed administrative segregation unit at Avenal (190 beds) is allocated 2,970 square feet

4  of space, while the administrative segregation unit at Calipatria (190 beds) is allocated 2,127

5  square feet of space and the administrative segregation unit at Centinela (190 beds) is allocated

6  1,779 square feet of space.[46]

7       The Receiver has not been informed concerning what elements of the January 2007 Infill

8  Bed Plan will be utilized under AB-900. Regardless, there exists a fundamental error in the

9  manner in which CDCR has traditionally approached health care clinic construction (in addition

10  to the past practice of allocating only one-half as much space as actually necessary given the real

11  prisoner population intended for new prisons). CDCR allocates *space only*, ignoring the real life

12  differences in clinical requirement based on the characteristics of the patient population, security

13  level and escort officers requirements, the need for clinical privacy, equipment requirements, and

14  other critical factors.

15       In terms of all future clinic construction, the Receiver believes that, consistent with

16  standards promulgated by the National Commission on Correctional Health Care ("NCCHC")

17  and because of the vast differences among facilities, design, number of facilities in any given

18  prison complex, and the age of buildings, rather than specifying square footage adequate space

19  will be based on a number of different standards including the type of service provided, the need

20  for pharmacy services, equipment need, inmate classification, supply needs, examination

21  services, etc. (Exhibit 22.)

22            3. *Inadequate Overall Health Care Space Allocations.*

23       It must be noted that the existing CDCR construction related space allocations for clinics

24

---

25  [46] In addition to requiring medical and dental treatment, inmates confined to administrative
segregation require heightened levels of mental health care and monitoring. Historically, a very high
26  percentage of CDCR suicides take place in administrative segregation housing units. Therefore it
is essential that the planning and construct of administrative segregation housing provides for
27  enhanced space for mental health clinical interview and staff offices. The January 2007 Infill Plan
appears to ignore this.

28                                      37

042

1    and clinical office space are inadequate. For example, the CDCR allocation of 60 square feet for

2    a nursing station, given the need for examination equipment, escorts, records, etc. is grossly

3    inadequate. Exhibit 23 provides a summary of certain of the major shortfalls of current CDCR

4    allocations.

5            4. *Conclusion.*

6            The existing CDCR Infill Bed Plan, if allowed to be implemented without oversight by

7    the Receiver, the Special Master in *Coleman,* and the Court representatives in *Perez* and

8    *Armstrong* will jeopardize prisoner/patient care and have a serious adverse impact on the

9    Receiver's ability to implement the Plan of Action in a timely and cost effective manner.

10           D.  <u>AB-900 Will Not Reduce the Number of "Temporary ("Ugly") Beds at the Ten</u>

11               <u>CDCR Prisons Subject to AB-900.</u>

12           Phase I of AB-900 identifies ten prisons that will have a total of 7,184 beds added to their

13   design capacity. The stated intent of AB-900 is to build new prison capacity which will "replace

14   the temporary beds currently in use, and they are not intended to house additional inmates." AB-

15   900 defines temporary beds as "those that are placed in gymnasiums, classrooms, hallways, or

16   other public spaces that were not constructed for the purpose of housing inmates."[47] The CDCR,

17   in its Master Bed List refers to these same beds as "non-traditional overcrowding beds."

18           In order to determine if AB-900, if fully implemented as written will reduce the existing

19   and overcrowding levels at these ten prisons, Exhibit 25 was created. The first column of this

20   exhibit lists the ten prisons as specified by AB-900 followed by the current security level and

21   number of "temporary beds". The third column sets forth the CDCR's proposed Infill Bed Plan

22   for each of the ten prisons by security level. For example, at Pleasant Valley State Prison there

23   currently exists 774 Level III "temporary" beds and 150 Level IV "temporary" beds. However,

24   the CDCR Infill Bed Plan proposes to add only 600 Level II beds.

25           From what the CDCR has provided, it appears that the total number of beds that will be

26   "replaced" as required by AB-900 will be limited to 472 reception center beds. Eight of the ten

27   _____

      [47] A summary of "temporary beds," also know as "ugly beds" is attached as Exhibit 24.

28                                              38

1  prisons will have zero temporary beds replaced based on CDCRs In-Fill Bed Plan. Based on the

2  fact that only 472 reception center temporary beds will be taken down per AB-900, the

3  remaining 4,280 exiting temporary beds at these ten institutions will remain filled with inmates.

4        It may be possible to fill proposed Infill beds at these ten prisons with inmates from other

5  prisons. However in Phase I of AB-900 the vast majority of the 7184 new beds being created are

6  Level II beds (4,300 beds). The movement of Level II inmates from other institutions'

7  "temporary beds" into the new housing units may have a positive impact on the sending

8  institutions, *but only if they are then prohibited from back filling those temporary beds.*

9  However considering the CDCR's history and practice of filling all available beds, coupled with

10  the fact that AB-900 does not prohibit such action, we should anticipate that CDCR will continue

11  to house inmates in these temporary beds even *after inmates are moved to the ten institution's*

12  *new housing units*. In reality, therefore, AB-900 will serve only to increase the number of

13  prisoner/patients who will required medical, mental health, and dental care.

14        E.  <u>AB-900 Does Not Address The CDCR's Most Serious Need For Additional Prison</u>

15        <u>Beds.</u>

16        The Infill Bed Plan proposes total (Phase I and II) addition of 16,238 beds, of which

17  9,440 are Level II beds, which will have some impact on the severe crowding at lower level

18  prisons. The Infill Bed Plan, however, does nothing to address the serious levels of crowding

19  within the CDCR's most dangerous high security prisons.

20        The top chart in Exhibit 26 summarizes the CDCRs projected Male population needs by

21  security level from fiscal year 2007/08 through fiscal year 2011/12.[48] The first column identifies

22  the fiscal year, the second through the eighth columns identifies the security level, and the last

23  column is the projected grand total of Male inmates. The CDCR projects that the Male

24  population for all security levels except Protective Housing Unit will increase over the next five

25  fiscal years. The greatest increase is projected to be at security level IV with 3,830 additional

26  

---

27  [48] This information was obtained from the CDCRs Spring 2007 Adult Population Projections 2007-2012 report.

28                    39

1   Male inmates to be accommodated within the existing overcrowded institutions. Level IV

2   prisoners are considered by the CDCR to be the most dangerous in terms of escape risk and

3   potential for in-prison misbehavior.

4        The lower chart compares *only* the additional projected Male population needs with the

5   CDCRs proposed In-Fill Bed Plan. Based on this comparison, there appears to be a significant

6   disconnect between the CDCR's projected housing needs, especially in its most dangerous

7   prisons, and what the CDCR is planning to build. For example, CDCR projects an increase of

8   3,840 Level IV inmates while the CDCR's Infill Bed Plan does not include a single Level IV

9   bed. The same is true for Security Housing Unit (SHU) inmates with a projected increase of 425

10   inmates with no plan to increase the SHU beds by even one bed/cell.

11        Given current levels of overcrowding at two of the CDCR's Level IV and SHU

12   institutions, a serious need for additional Level IV and SHU beds is clearly demonstrated. For

13   example, as of April 4, 2007 Pelican Bay State Prison ("PBSP"), a SHU and Level IV institution

14   was operating at 154.5% of design capacity. Salinas Valley State Prison ("SVSP") another

15   Level IV institution as of April 4, 2007 was operating at 206.8% of design capacity. The failure

16   to plan for additional Level IV beds based on the current level of overcrowding and the projected

17   increase of Level IV and SHU bed needs, will create additional severe overcrowding within the

18   CDCR's most dangerous and difficult to manage prisons at this time. If overcrowding intensifies

19   in the CDCR's highest security institutions, the Receiver's effort to implement the Plan of

20   Action will require more time and additional funding.

21        F.  <u>AB-900 Re-Entry Facilities</u>.

22        AB-900 proposes to site and construct numerous re-entry facilities throughout the State.

23   Each of those facilities will require clinical staff to provide intake and exit health care

24   assessments. In addition, each facility will require on-site health care staff to delivery needed

25   care. In essence AB-900 calls for a new set of institutions to be included in the existing Federal

26   Court remedial plans. Given the record in this case, the Receiver must assume that adding more

27   CDCR institutions will increase the cost and the time necessary to implement the Plan of Action.

28                          40

1    G. Staffing.

2         It is easy to talk of constructing prisons and jails.  It is more difficult and expensive to

3    staff correctional institutions with the appropriate clinical personnel and correctional officers.

4    AB-900, however, is silent about how the jails and prisons beds cited in the bill will be staffed

5    and managed.  Unless and until adequate staffing is provided, the Receiver anticipates that the

6    additional beds proposed in AB-900 institutions will increase the cost and the time necessary to

7    implement the Plan of Action.

8                                          **VI.**

9                                    **CONCLUSIONS**

10        The Receiver summarizes his best assessment of the manner and extent to which

11   overcrowding is interfering with his ability to successfully remedy the constitutional violations

12   as follows:

13        1. The Receiver's Plan of Action will work.  Failure is not an option.  Over time the

14   CDCR's medical delivery system will be raised to constitutional levels.  However, the time this

15   process will take, and the cost and the scope of intrusion by the Federal Court cannot help but

16   increase, and increase in a very significant manner, if the scope and characteristics of CDCR

17   overcrowding continue.  For example, the Receiver can, over time and with great expense,

18   develop a reception center medical delivery system that will appropriately handle the more than

19   11,000 prisoner moves into and out of CIM each month.  The cost of such effort, however, may

20   all but bankrupt the State of California and create a medical delivery problem in Riverside and

21   San Bernardino counties because there may not be enough competent clinicians to both provide

22   medical care for an unlimited number of State prisoners and for the public also.  Thus, when the

23   Court considers the issue of intrusion relative to controlling overcrowding, it should also

24   consider the scope of intrusion that will be necessary to provide constitutionally adequate

25   medical care in California's prisons if overcrowding is not managed.

26        2. The manner by which overcrowding is managed will have a fundamental and perhaps

27   irrevocable impact on the Plan of Action.  For example, if the State's response is limited to

28                                          41

046

1   effectuating out of state transfers, and thereafter filling empty beds behind departed prisoners,

2   the overcrowding related challenges to the Plan of Action will only increase and it will take the

3   Receiver longer and it will cost more to correct the constitutional violation at issue. Likewise, if

4   the State charges off to construct infill beds in remote locations without adequate support

5   services space, including adequate clinical space, overcrowding related challenges to the Plan of

6   Action will only increase, and as a result, it will take the Receiver longer and it will cost more to

7   correct the constitutional violation at issue. Finally, unless steps are taken to stop the revolving

8   door of a failed parole system and thereby manage the out-of-control number of prisoner moves,

9   the churning related challenges to the Plan of Action will continue and it will take the Receiver

10   longer and it will cost more to correct the constitutional violation at issue.

11          3. Finally, and perhaps more important, it is critical that the Court and counsel

12   understand that the motion for a three judge panel can be separated and distinguished from the

13   fundamental challenges faced by Receivership. While the attorneys for plaintiffs have filed three

14   separate requests for a three judge panel in three different cases, it is important to emphasize that

15   even if a three judge panel is appointed and even if the California prison system is, over time,

16   capped, and even if its population is reduced by, for example, twenty-five percent (thereby

17   releasing from existing housing units as many as 42,500 prisoners), the challenges faced by the

18   Receiver and the Courts in *Armstrong*, *Coleman*, *Perez*, and *Plata* would remain a daunting one:

19   to provide constitutional levels of prison health care for 125,000 prisoner/patients who will

20   remain confined thirty-three inadequately constructed prison that function far above their

21   correctional design capacity. Thus, even when assuming some form of population management,

22   it will take years of effort and significant State resources to address the prison health care

23   problems faced by the Federal Courts in California at this time.

24          To summarize, those who believe that the challenges faced by the Plan of Action are

25   uncomplicated and who think that population controls will solve California's prison health care

26   problems, are simply wrong. Population limits may help effectuate a more timely and cost

27   effective remedial process. However, the cure to existing health care problems will be difficult

28                                              42

1   and costly to implement, regardless of population control efforts.

2       4. The following remedial actions in *Plata* are warranted now:

3           a. The CDCRS "in-fill" bed project, if allowed to proceed without oversight by

4   the Receiver may well jeopardize prisoner patient health care. The Receiver recommends that

5   the Court issue an order compelling the Secretary of the CDCR to file, within fifteen days, a

6   report to this Court and to the *Armstrong, Coleman*, and *Perez* Courts concerning all aspects of

7   the "infill" project, *including all studies and expert reports* that have been conducted relative to

8   the issue of whether adequate space exists to construct additional non-medical beds with the

9   appropriate support services, including clinical space. The Receiver has reviewed prior CDCRS

10  submissions and recommends that the order should specifically require an executive summary of

11  all proposed infill programs not to exceed ten pages.

12          b. The CDCR's long standing failure to hire an adequate number of correctional

13  officers jeopardizes prisoner patient heath care. The Receiver recommends that the Court issue

14  an Order to Show cause compelling the Secretary of the CDCRS to file, within fifteen days, a

15  response as to why the Receiver should not begin to provide direct oversight over the CDCR's

16  correctional officer recruitment and hiring program.

17          c. The Office of the Governor will be filing responsive pleadings to the Court's

18  February 15, 2007 Order concurrently with this filing by the Receiver. The Receiver

19  recommends that the Court consider whether the Governor should create his Plan of Action

20  concerning how California will address the serious correctional problems afflicting the CDCR.

21  Thus far, the Governor has worked to encourage the initial successes of the Receivership;

22  however, for the Receiver's Plan of Action to be implemented in the most timely and cost

23  effective manner possible, the State should develop a CDCR Plan of Action. As pointed out in

24  this report, the CDCR's lack of planning, the day to day chaos within the CDCR, and its long

25  standing failure to effectively perform basic correctional functions including prison construction

26  and correctional officer hiring jeopardize prisoner patient medical care. The development of and

27  adherence to a complementary correctional Plan of Action will enhance efforts by the Federal

28                                                  43

1    Courts to bring California's prison health care up to constitutional standards of access and

2    quality and will thereby hasten the return of the system back to the State.

3

4    Dated: May 14, 2007.

5

6

7                                          _____
                                           Robert Sillen
8                                          Receiver

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                     **PROOF OF SERVICE BY MAIL**

2      I, Kristina Hector, declare:

3      I am a resident of the County of Alameda, California; that I am over the age of eighteen (18)
years of age and not a party to the within titled cause of action. I am employed as the Inmate

4   Patient Relations Manager to the Receiver in *Plata v. Schwarzenegger*.

5      On May15, 2007 I arranged for the service of a copy of the attached documents described as
RECEIVER'S REPORT RE OVERCROWDING on the parties of record in said cause by

6   sending a true and correct copy thereof by pdf and by United States Mail and addressed as
follows:

7

8   ANDREA LYNN HOCH
Legal Affairs Secretary
Office of the Governor

9   Capitol Building
Sacramento, CA 95814

10

11   ELISE ROSE
Counsel
State Personnel Board

12   801 Capitol Mall
Sacramento, CA 95814

13

14   BRIGID HANSON
Director (A)
Division of Correctional Health Care Services

15   CDCRS
P.O. Box 942883

16   Sacramento, CA 94283-0001

17   J. MICHAEL KEATING, JR.
285 Terrace Avenue

18   Riverside, Rhode Island 02915

19   ROCHELLE EAST
Deputy Attorney General

20   455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102

21

22   STEVEN FAMA
DON SPECTER
ALLISON HARDY

23   Prison Law Office
General Delivery

24   San Quentin, CA 94964-0001

25   PAUL MELLO
Hanson Bridgett

26   425 Market Street, 26th Floor
San Francisco, CA 94105

27

28                      45

1  BRUCE SLAVIN
   General Counsel
2  CDCR-Office of the Secretary
   P.O. Box 942883
3  Sacramento, CA 94283-0001

4  KATHLEEN KEESHEN
   Legal Affairs Division
5  California Department of Corrections
   P.O. Box 942883
6  Sacramento, CA 94283

7  RICHARD J. CHIVARO
   JOHN CHEN
8  State Controller
   300 Capitol Mall, Suite 518
9  Sacramento, CA 95814

10 MOLLY ARNOLD
   Chief Counsel, Department of Finance
11 State Capitol, Room 1145
   Sacramento, CA 95814
12

13 LAURIE GIBERSON
   Staff Counsel
   Department of General Services
14 707 Third Street, 7th floor, Suite 7-330
   West Sacramento, CA 95605
15

16 MATTHEW CATE
   Inspector General
   Office of the Inspector General
17 P.O. Box 348780
   Sacramento, CA 95834-8780
18

19 DONNA NEVILLE
   Senior Staff Counsel
   Bureau of State Audits
20 555 Capitol Mall, Suite 300
   Sacramento, CA 95814
21

22 WARREN C. (CURT) STRACENER
   PAUL M. STARKEY
   Labor Relations Counsel
23 Department of Personnel Administration
   Legal Division
24 1515 "S" Street, North Building, Suite 400
   Sacramento, CA 95814-7243
25

26

27

28                          46

1  GARY ROBINSON
   Executive Director
2  UAPD
   1330 Broadway Blvd., Suite 730
3  Oakland, CA 94612

4  YVONNE WALKER
   Vice President for Bargaining
5  SEIU
   1108 "O" Street
6  Sacramento, CA 95814

7  PAM MANWILLER
   Director of State Programs
8  AFSME
   555 Capitol Mall, Suite 1225
9  Sacramento, CA 95814

10  RICHARD TATUM
    CSSO State President
11  CSSO
    1461 Ullrey Avenue
12  Escalon, CA 95320

13  TIM BEHRENS
    President
14  Association of California State Supervisors
    1108 O Street
15  Sacramento, CA 95814

16  STUART DROWN
    Executive Director
17  Little Hoover Commission
    925 L Street, Suite 805
18  Sacramento, California 95814

19  MICHAEL BIEN
    Rosen, Bien & Asaro
20  155 Montgomery Street, 8th Floor
    San Francisco, CA 94104
21
    JAY D. SHULMAN, D.M.D., M.A., M.S.P.H.
22  Associate Professor, Public Health Sciences
    Baylor College of Dentistry
23  3302 Gaston Avenue
    Dallas, TX 75246
24
    BENJAMIN C. SYBESMA
25  Chief Legal Counsel
    CCPOA
26  755 Riverpoint Drive, Suite 200
    W. Sacramento, CA 95605-1634
27

28
                                    47

RONALD YANK
Carroll, Burdick & McDonough
44 Montgomery Street, Suite 400
San Francisco, CA 94104-4606

JOSEPH D. SCHAZO, D.D.S., C.C.H.P.
3785 N. 156th Lane
Goodyear, AZ 85338

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on May 15, 2007 at San Francisco, California.

Kristina Hector

48

053

1

2

3    **IN THE UNITED STATES DISTRICT COURT**
4    **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

5

6    MARCIANO PLATA , et al.,                    )
                                                  )    NO.  C01-1351-T.E.H.
7          Plaintiffs                             )
                                                  )    **APPENDIX OF EXHIBITS IN SUPPORT**
8          v.                                     )    **OF RECEIVER'S REPORT RE**
                                                  )    **OVERCROWDING**
9                                                 )
                                                  )
10   ARNOLD SCHWARZENEGGER,                       )
     et al.,                                      )
11                                                )
           Defendants,                            )
12                                                )

13

14

15                                                        RECEIVED

16                                                       MAY 1 8 2007

17

18                                                 Rosen, Bien & Galvan

19

20

21

22

23

24

25

26

27

28

## APPENDIX OF EXHIBITS

**Exhibit #'s**

1.    CPR, Inc. Prison Medical Care System Reform Plan of Action.

2.    CDCR Inmate Population Table 6/30/1997 – 4/04/2007.

3.    Independent Review Panel Report on Reforming Corrections, Section 7: "Inmate/Parolee Population Management".

4.    January 2007 Little Hoover Commission Report, "Solving California's Corrections Crisis: Time is Running Out".

5.    CDCR Facilities Master Plan 1993-1998 – August 12, 1994.

6.    CDCR Facilities Master Plan 1995-2000 – August 24, 1995.

7.    CDCR Facilities Master Plan 1998-2003 – February 23, 1998.

8.    Comparison of Health Care Staff Vacancies Between January 2002 and January 2007.

9.    CDCR Second Quarter 2006 Facts and Figures

10.   CDCR Inmate Movement Table January 1, 2007 – January 31, 2007.

11.   CDCR Inmate Movement Table February 1, 2007 – February 28, 2007.

12.   CDCR Inmate Movement Table March 1, 2007 – March 31, 2007.

13.   Bed Conversions Occurring from Fiscal Year 2/03 to 6/07.

14.   March 30, 2007 Memorandum Re Emergency Revision of the April 2007 Institution Activation Schedules and Issuance of May 2007 Institution Activation Schedule.

15.   March 30, 2007 Memorandum Re Conversion of CSP-LAC Facility D to a Reception Center.

16.   March 30, 2007 Memorandum Re Conversion of Centinela State Prison Level III to a Level IV.

17.   CDCR Prototypical Prison Policy Design Criteria.

18.    Kern Valley State Prison Base Staffing Profile.

19.    CDCR Capital Outlay Projects Per Governor's Budget Fiscal Years 2002/2007.

20.    January 2007 CDCR Infill Bed Plan.

21.    January 2007 CRCR In-Fill Bed Plan Table

22.    National Commission on Correctional Health Care, 2003.

23.    Clinical Space Table

24.    Assembly Bill 900 Table

25.    Assembly Bill 900 Phase I Comparison of Temporary Beds and In-Fill Beds.

26.    Assembly Bill 900 Projected Placement Needs for Total Male Population by Fiscal Year and Level; Comparison of Projected Bed Increases by Level with Proposed In-Fill Beds by Level For Fiscal Year 2007/08 through 2011/12.

# EXHBIT 1

# California
# Prison Health Care
# Receivership Corporation
## (CPR, Inc.)

Prison Medical Care System Reform

Plan of Action

May 2007

**Filed May 10, 2007**

# Plan of Action Table of Contents

A.    General Introduction .................................................................3

B.    Purpose of the Plan of Action .......................................................3

C.    Background of Stipulated Agreements and Orders .........................4

D.    Conceptual Basis for the Plan of Action ......................................11

E.    Potential Barriers and Success Factors......................................13

F.    Plan of Action Goals and Objectives ..........................................14

G.    Organizational Transformation Strategies ..................................38

H.    18-24 Month Focus of the Receivership ......................................41

I.    Metrics..................................................................................43

J.    References ............................................................................50

*CPR Plan of Action*

## A.    General Introduction

The Plan of Action, set forth below, presents an initial roadmap for the change necessary to bring the delivery of medical care in California's prison up to Constitutional levels. This Plan of Action is not a plan for change. To the contrary, it encompasses a number of remedial activities begun prior to the Receivership as well as remedial activities initiated by the Receiver to comply with the Court's order in *Plata v. Schwarzenegger.* In addition, the Plan of Action articulates high-level steps to be taken over the next two years.

The Plan of Action is a living, growing document providing overall direction as the Receiver's staff moves forward to tackle the enormous challenges of improving medical care for California's inmate-patients. The November 2007 revision of the Plan of Action will address additional system imperatives, timelines, and stakeholder concerns. It should be clear to the reader that the process of raising the delivery of medical care in California's prisons to constitutional levels, as described in this Plan of Action, will be a daunting challenge, requiring thoughtful planning, careful coordination, and a number of time-phased inter-related remedial programs. The Receiver emphasizes that his Plan of Action is a living document, subject to revision and additional detail as it is developed. At this point in time, it is not possible to set forth a proposed time line for all future remedial actions, nor is it possible to describe all future budgetary impacts of the Plan. This information, however, will be presented in future iterations of the Plan as various elements of the Plan are effectuated.

As explained below, the long-term transformation of California's prison medical care will rely on the combined efforts of the Receiver's staff, CDCR staff, and outside resources, encompassing both custody and health care, to create a system that meets constitutional standards of access and quality.

## B.    Purpose of the Plan of Action

1. To provide a comprehensive report to the Honorable Thelton E. Henderson, the California Department of Corrections and Rehabilitation ("CDCR"), State officials, key stakeholders, and the public about the Receiver's overall strategy for change and his specific plans for the next two years.

2. To outline a health care delivery system that encompasses a continuum of medical care, ancillary, and support services necessary for optimal outcomes, safety, and cost-effectiveness that will be achieved by the Receiver in collaboration with Court mandated remedial programs in *Coleman v. Schwarzenegger* (mental health care), *Perez v. Schwarzenegger* (dental care), and *Armstrong v. Schwarzenegger* (Americans with Disabilities Act).

**3**

3. To define strategies for achieving and sustaining timely, effective, and efficient clinical services as well as responsible overall medical management and operations.

4. To serve as a dynamic framework for prioritizing leadership activities and communicating ongoing progress, successes, and challenges.

### C.    Background of Stipulated Agreements and Orders

The October 3, 2005 "Findings of Fact and Conclusion of Law re Appointment of a Receiver" sets forth the facts and law which created the Receivership.   This order has not been appealed.

**Standards** – Stipulated Agreements and Orders

Patient care standards under *Plata v. Schwarzenegger* are specified in the Stipulation For Injunctive Relief, June 13, 2002 ("Stipulated Injunction") and Stipulated Order Re Quality Of Patient Care And Staffing, September 13, 2004 ("Patient Care Order"). The specific direct patient care services ordered by the Federal Court are as follows:

1. Health Screening: a process for screening all patients for communicable disease, such as tuberculosis and sexually transmitted disease, and chronic disease, such as diabetes, renal disease, seizure disorders, cardiovascular disease, and pulmonary disease; screening for cancer; review of vital signs, blood pressure, pulse, and weight; review of current medications; and nurse review and referral for patients with urgent or acute conditions; history and physical examination for all patients within 14 days of arrival at Reception Center; and routine laboratory tests, such as serum pregnancy, cholesterol screening, and optional HIV testing.

   Reference to Plan of Action:  Initial health screening will be addressed as part of the San Quentin reception pilot intake process. Once the pilot is completed, a standard reception intake process including a comprehensive health screening will be replicated as appropriate at other prisons with reception centers. (Refer to Goal B, Objective B.2.1.)

2. Health Transfer:  Process to ensure continuity of care when patients transfer to another institution, transfer between levels of care, or are paroled, including continuity of medications, specialty referrals, and other treatment.

   Reference to Plan of Action:  Health transfer will be addressed under Goal B, Objective B.3.1.6.

3. Access to Primary Care (Sick Call):  System that allows patients to self-refer for medical treatment, including nurse review to identify the need for immediate referral to urgent or emergency treatment, an urgent walk-in procedure, and follow-up services; policies require face-to-face nurse triage for patients with symptoms within 24 hours, and an appointment with a primary care provider

**4**

within 5 days for patients classified as urgent and within 14 days for patients classified as routine.

Reference to Plan of Action: Access to primary care will be addressed under Goal B, Objective B.2 and B.3.

4. Priority Ducat System: System for ensuring that custody staff treat health care appointments as high-priority.

Reference to Plan of Action: A health care access team pilot is already underway at San Quentin. Once the pilot is completed, the health care access team model will be replicated as appropriate to other prisons statewide. (Refer to Goal E.)

5. Patient Health Care Education: Program to provide patients with instruction in wellness, lifestyle changes, disease prevention, newly diagnosed illness or disease, treatment plans or procedures, pre- and post-operative care, chronic care morbidity reduction.

Reference to Plan of Action: Patient health care education will be part of primary care and chronic care model implementation. The Plan of Action also includes plan to expand cultural and linguistically appropriate patient education resources by collaborating with community health education programs. (Refer to Goal B, Objective B.2.)

6. Preventive Services: Services to prevent disease and mitigate morbidity and mortality due to existing disease provided to select patient populations based upon risk factors, such as age and chronic conditions, that include cancer screening, immunizations, and health education (education regarding diet, exercise, smoking cessation, etc.).

Reference to Plan of Action: Preventive services will be part of primary care and chronic care model implementation. Currently a primary care process with a new staffing model pilot is underway at San Quentin. Once the pilot is completed, new processes and models will be replicated as appropriate at other prisons statewide. (Refer to Goal B, Objective B.2.)

7. Outpatient Specialty Services: Program for providing specialty services, including procedures for urgent and routine referrals and required follow-up; policies require that high-priority consultations or procedures occur within 14 calendar days and routine consultations or referrals within 90 calendar days, with follow-up by a primary care provider within 14 calendars days after the consultation or procedure

Reference to Plan of Action: Before program can be developed for providing specialty services, the infrastructure for provider contracting needs to be developed with trained staff. (Refer to Goal A, Objectives A.4. and A.6.) In the meantime, CPR has initiated interim efforts to establish individual contracts with specialists,

5

university providers, and telemedicine providers. (Refer to Goal B, Objective B.3.1.2.)

8. <u>Physical Therapy:</u>  Program to ensure timely access to physical therapy services, including specifications for the follow-up by primary care providers and provisions for transferring to an institution with these services if the home institution does not provide them.

   <u>Reference to Plan of Action:</u>  Programs to ensure timely access to physical therapy will be addressed as part of the health care continuum infrastructure redesign and efforts to address the needs of aging and impaired inmates. (Refer to Goal B, Objective B.1.4.)

9. <u>Diagnostic Services:</u>  Program for the appropriate processing of laboratory tests and other diagnostic testing, including procedures for prioritizing the urgency of laboratory orders (STAT, critical, urgent, routine) and required timeframes for review and follow-up of results (routine laboratory tests processed within 14 days of order, x-ray examinations completed within 30 days of order, primary care provider review of lab results within two business days of receipt, notification of patient of results within 14 days of receipt)

   <u>Reference to Plan of Action:</u>  Refer to Goal B, Objective B.12. and Goal D, Objective D.2.2.

10. <u>Medication Management:</u>  Services to dispense, administer, and distribute pharmacotherapeutic treatments, including provisions for medication error reporting, medication follow-up counseling, medication renewals and refills, medication for parole, and continuity of medication upon transfer; policies require that prescriptions for formulary medications be filled by the following day and that "stat" medications are issued within 1 hour.

    <u>Reference to Plan of Action:</u>  Refer to Goal B, Objective B.8. and Maxor National Pharmacy Corporation's "Road Map to Excellence."

11. <u>Urgent / Emergent Response:</u>  Program for the provision of urgent care services and 24-hour emergency medical treatment that includes basic life support, emergency response, and physician on-call services; policies require follow-up within five days for patients whose urgent encounter was due to chronic disease.

    <u>Reference to Plan of Action:</u>  Refer to Goal B, Objective B.1.

12. <u>Medical Emergency Response Documentation and Review:</u>  Process for the review of deaths, suicide attempts, and calls for emergency assistance to determine compliance with existing policies and procedures, adequacy of response time, and appropriateness of custody and medical response and patient treatment, with follow-up actions to address identified deficiencies.

Reference to Plan of Action: Refer to Goal C.

13. Outpatient Housing Unit and Licensed Care: Specialized treatment services for varying levels of acuity, including outpatient services requiring specialized housing (Outpatient Housing Unit care), licensed Skilled Nursing Facility care, Correctional Treatment Center care, General Acute Care Hospital care, and palliative care; policies require physician evaluation within 24 hours of admission to a Correctional Treatment Center and an evaluation by a primary care provider within 5 days for all patients returning from an inpatient acute care facility.

Reference to Plan of Action: Appropriate levels of care will be addressed in Goal B, Objective B.5.2. Clinical space issues will be addressed under Goal F.

14. Outpatient Therapeutic Diets: Program for the provision of nourishments and supplements for patients who are pregnant, diabetic, immunocompromised, malnourished, or have oropharyngeal conditions causing difficulty eating regular diets and special diets for patients with renal failure or hepatic failure, or who require a Heart Healthy diet, gluten-free diet, or diet to preclude food allergies.

Reference to Plan of Action: Refer to Goal B, Objective B.9.

15. Medical Report of Injury or Unusual Occurrence: Process for documentation of patients' on-the-job injuries, physical contact with a staff member during an incident, and any self-reported injury due to self-injury or altercation, Administrative Segregation Unit placement, use of force, or other medical emergency situation.

Reference to Plan of Action: Refer to Goal C.

16. Oleoresin Capsicum (OC) Contraindications: Process for the evaluation and treatment of patients prior to or after the use OC.

Reference to Plan of Action: There is now a policy and procedure regarding oleoresin capsicum spray. Variation in implementation and performance will be addressed under Goals B and C.

17. Medical Evaluation of Patients Involved in Assaults: Process for the evaluation of patients who have been involved in the use of force, including review of the patient's mental health record.

Reference to Plan of Action: There is now a policy and procedure regarding medical evaluation of patients involved in use of force. Variation in implementation and performance will be addressed under Goals B and C.

CPR Plan of Action

18. Hygiene Intervention:  Process for the identification, evaluation, and referral of patients who demonstrate poor hygiene or whose hygiene compromises the sanitation/hygiene of their personal and immediate housing area.

Reference to Plan of Action:  There is now a policy and procedure regarding hygiene interventions.  Variation in implementation and performance will be addressed under Goals B and C.

19. Inmate Hunger Strike:  Process for the identification, evaluation, and treatment of inmates on hunger strike, including required coordination and reporting between custody and health care staff.

Reference to Plan of Action:  This standard has been met.

20. Comprehensive Accommodation Chrono:  Process for the authorization and review of special equipment, housing accommodations, or other accommodations that are medically necessary or are required under the Americans with Disabilities Act.

Reference to Plan of Action:  There is now a policy and procedure regarding comprehensive accommodation chronos.  Implementation has been difficult for multiple reasons, including gross inadequacies in information technology.  The latter will be addressed in Goal D.  The clinical and custody practices will be addressed in Goals B and C.

21. Pregnant Patient Care and the Birth of Children:  Prenatal care and post-delivery services, including required screenings, frequency of prenatal treatment visits, vitamin and nutritional requirements, referrals for child placement services, and post-partum follow-up; policies require that patients be seen by an obstetrics provider within 7 calendar days of determination of pregnancy and that each patient be provided post-delivery follow-up care after six-weeks.

Reference to Plan of Action:  Prenatal care and post delivery services will be addressed under Goal B.

22. Nursing Services and Protocols:  Clinical protocols for nurses in the appropriate evaluation and treatment of patients presenting with specific systemic conditions or complaints.

Reference to Plan of Action:  Will be addressed under Goal B, Objective B.2.

23. Health Record Services:  Provisions for the management, content, and archiving of patient health records, including policies for disclosure of information.

8

Reference to Plan of Action:  Current focus is on organizing the manual paper process and expediting filing of the medical records. Long term solution will be addressed through deployment of the electronic health records. (Refer to Goal D.)

24. Chronic Care Program:  Diagnosis and management of chronic disease (diseases lasting longer than 6 months), including identification and treatment of high-risk patients; policies require an initial intake evaluation within 30 days for patients referred to the Chronic Care Program, and ongoing evaluations every 90 days.

Reference to Plan of Action:  Refer to Goal B, Objective B.2.

25. Pharmacy Services:  Provisions governing pharmacy operations, including pharmacy licensing, emergency drug supplies, drug storage, consultation with a pharmacist, prescription requirements, and the ordering, stocking, and receiving of medications.

Reference to Plan of Action:  Refer to Goal B, Objective B.8. and Maxor National Pharmacy Corporation's "Road Map to Excellence."

26. Public Health and Infection Control:  Program for infection control, communicable disease reporting, and blood borne pathogen control.

Reference to Plan of Action:  Refer to Action Goal B, Objective B.6.

27. Telemedicine Services:  Program for the provision of specialty services through videoconferencing.

Reference to Plan of Action:  Refer to Goal D, Objective D.6.

28. Utilization Management:  System to facilitate appropriate use of resources for patients requiring higher levels of care and select specialty services and medications, including reviews to determine placement at appropriate level of care and appropriate utilization of specialty care and pharmacy resources.

Reference to Plan of Action:  Refer to Goal B, Objectives B.3. and B.5.

The Receiver supports all of the above patient care standards, and the Receiver's Plan of Action will address each.  It is important to point out, however, that many of these standards cannot and will not be achieved until the necessary medical delivery infrastructure is established (for example, competent clinicians and a viable information technology system).  The reader should also note that, within the Plan of Action, many of the standards are renamed and/or subsumed, *e.g.*, "health transfer" (number 2 above) has become the care transitions program (Objective B.3.1.6.). Furthermore, the Receiver's implementation strategies are far different than the "phased roll-out" strategy of defendants, and therefore some standards are prioritized differently.  For example, the issues of hygiene intervention, oleoresin capsicum spray,

9

and patient health care education are not as pressing as others and will be addressed once a new infrastructure is in place. Lastly, several standards will be addressed by external entities based on contracts with the Office of the Receiver, *e.g.*, the pharmacy services improvements currently being implemented by the Maxor National Pharmacy Corporation.

As mentioned above, although the care standards set forth in the June 2002 Stipulated Injunction and the September 2004 Patient Care Order exemplify the minimum level of medical care required under the Eighth Amendment of the Constitution, the standards cannot be met and sustained without the appropriate and necessary support provided by a well-functioning, administratively-sound health care organization. Attempts to implement these standards in isolation have proven to be ineffective— indeed prior remedial efforts have wasted time and resources—because nearly every area within the CDCR, *e.g.*, procurement, custody support, population, and personnel, affects and potentially hinders each process of health care delivery. Each function of the organization as a whole, as well as pertinent functions of other State agencies, must be analyzed and modified appropriately to support a redesigned, effective, constitutionally-adequate health care operation. As the Office of the Receiver learned at San Quentin, the inter-relatedness of the problems and processes within the institution, as well as between the institution, CDCR, State overhead and control agencies, the Legislature, and the Governor is an immense barrier. The Receiver's Plan of Action addresses the impact and inter-relatedness of all the pertinent processes within the CDCR and the State.

The June 2002 Stipulated Injunction and the September 2004 Patient Care Order specified a number of worthy patient care standards, but for multiple reasons the defendants had little chance of achieving them. For example, the stipulations stopped short of addressing the requisite custody and support staff, technology, space, and personnel processes. Furthermore, the State attempted to apply innovations in a pre-determined, *en bloc* fashion rather than on a pilot basis, and the delivery system remained dominated by the solo physician model rather than team-based care. These errors will not be repeated. Instead, the Receiver will apply an entirely new method of transformation to the medical delivery system in California's prisons.

The fastest, most cost-efficient way to reach constitutionally-adequate levels of care is to implement a coherent set of intervention strategies that have proven to be successful in transforming other health care organizations. As explained below, these strategies include redesign of care processes, use of information technology, knowledge and skills management, development of effective teams, care coordination, and performance measurement.

Sustaining constitutionally-adequate levels of care after the Receivership ends will require significant infrastructure investments and commitment over a period of years. The Receiver must remove or mitigate external barriers to progress and develop internal drivers of quality, illuminated by reliable metrics, synergistic and strong

enough to withstand political and bureaucratic erosion. The challenges are daunting; however, as the Receiver has emphasized: failure is not an option.

**D.     *Conceptual Basis for the Plan of Action***

The overall goals of a constitutionally-adequate prison medical care system are to reduce unnecessary morbidity and mortality, improve inmates' health status and functioning, coordinate care with mental health and dental, and protect public health. The Receiver must create a sustainable, evidence-based, cost-effective system of care that is continually monitored and revised to meet those overall goals.

## Institute of Medicine

The conceptual basis for the Receiver's Plan of Action draws heavily from the experience of free-world, mainstream initiatives launched to move American health care from fragmentation and error to safety and reliability. For example, work by the Institute of Medicine (IOM) over the past decade, in response to the quality crisis within mainstream American health care, has led to a widely-accepted conceptual framework that applies within corrections as well (*Crossing the Quality Chasm*, 2001). Just as in the free world, personal health care within California prisons should be safe, effective, patient-centered, timely, efficient, and equitable. To achieve these goals, the IOM recommends six essential organizational supports for change:

1.  Redesign of care processes based on best practices.
2.  Information technologies for clinical information and decision support.
3.  Knowledge and skills management.
4.  Development of effective teams.
5.  Coordination of care across patient conditions, services and settings over time.
6.  Incorporation of performance and outcome measurements for improvement and accountability.

The IOM has demonstrated that these strategies will transform medical care delivery systems. In the 1990s, for example, the Veterans Health Administration used integrated, system-level strategies to move from a culture of low expectations to performance far exceeding the national average. Isolated interventions, such as educating or even replacing groups of physicians or nurses, would not have yielded the same progress.

The IOM's formulation of goals and strategies is reflected in the Plan of Action. The opening sentence of the 2001 IOM report resonates with California's prison medical care crisis: "The American health care delivery system is in need of fundamental change." It is important to remember, however, that the systems described as "dysfunctional" by the IOM have been vastly superior to California's prison medical care system. It is one thing to lack an electronic health record; it is another to try running a patient scheduling system on hundreds of unconnected, unsupported desktop

11

computers by having staff hand-carry data drives from one computer to another in sequence. It is one thing to bemoan a lack of teamwork among clinicians; it is another to work in a system that has traditionally hired any physician with "a license, a pulse, and a pair of shoes," as described in the Court's February 14, 2006 "Order Appointing Receiver." Even worse, some clinicians of that caliber managed to migrate into positions of local leadership. Because of the abject levels of dysfunction and chaos in hiring, review, promotion, and discipline, for example, the Receiver's team has spent countless hours in its first year on personnel issues, working to establish the infrastructure required for the most basic of quality initiatives.

### Baldrige Systems Framework

The seven categories of the Baldrige National Quality Program systems framework complement the IOM framework and also inform the Plan of Action:

1. Leadership
2. Strategic planning
3. Focus on patients and other customers
4. Measurement, analysis, and knowledge management
5. Human resource development
6. Process management
7. Results

The Baldrige framework highlights the leadership and personnel dimensions that have captured so much of the Receiver's attention. Because of the State's dysfunctional clinical oversight and personnel processes, the Receiver has filed a motion to waive state law regarding peer review and physician discipline. In addition, the Receiver has begun to identify, within existing staff and new recruits, the transformational leaders who can focus the system on new goals and strategies.

### High Reliability

The right people and systems must be in place to ensure that inmates get the right care in the right place at the right time. Change must be both top-down and bottom-up, with a focus on staff engagement and empowerment and a relentless emphasis on training and communication. The infrastructure must support innovation among front-line clinicians, must facilitate innovations from the "outside" world, and must be able to disseminate evidence-based practices. Responses to error and bad outcomes must move from finger-pointing to an honest, comprehensive critique that includes analysis of individual human factors as well as team factors, communication, and organizational effectiveness.

The interdependence of medical care and custody presents opportunities as well as challenges. Reliability—ensuring that the right thing happens every time—is a goal of custody just as it is within medical care. Some organizations in the military, law enforcement, and emergency services have achieved remarkable improvements in

reliability by developing a strong safety culture, utilizing personnel and equipment back-up systems, promoting inter- and intra-group communication, cross-training personnel, and focusing attention on errors and near-misses without wrongfully blaming or absolving individuals. The CDCR already partners with one such organization, the California Department of Forestry and Fire Protection, in its successful inmate firefighting program. Achieving reliable prison medical care in California will depend upon new levels of collaboration and respect between medical care and custody. Developing shared language and practices for reliability and safety will hasten this collaboration.

## E.    Potential Barrier and Success Factors

This section lists potential barriers with heavy emphasis on critical success factors drawing upon several key lessons learned to date from the San Quentin pilots. Although the barriers are plenty, the Receiver team is confident that through thoughtful planning and steadfast implementation, barriers can be mitigated.

The programs described in the Plan of Action have been formulated to consider the serious dysfunction which presently exists in California's prisons and the wide range of barriers that have, for many years, worked to defeat all prior efforts to reform prison medical care. Nevertheless, a complete Plan of Action requires a summary of some of the more important barriers the Receivership must overcome to effectuate the Plan.

### Barriers

- Continuation of CDCR political and management chaos impeding the Receivership's efforts.

- Oppressive impact of the dysfunctional prison culture on the custody and medical staff expectations, attitudes, and ethical decision-making.

- Poor working conditions and work environments impacting safe delivery of medical care.

- Space limitations due to overcrowding and poor design that continue to thwart efforts for appropriate bed placement, delivery of safe patient care, and ineffective support systems.

- Ineffective regional and local leadership structure to manage 33 prison sites.

- Lack of competent clinical and administrative staff at all levels exacerbated by limited CDCR training capacity.

- Bureaucratic constraints on contracting and hiring/firing.

*CPR Plan of Action*

- Active and passive resistance to the Receivership's efforts from entrenched stakeholders with an interest in maintaining the status quo.

- Prison overcrowding and Assembly Bill 900. The impact of these issues is the subject of separate report to be issued by the Receiver to the Court on May 15, 2007.

**Critical Success Factors**

- Leadership support at all levels. Based on the San Quentin pilot, the importance of Warden support and collaboration is critical. While relief in the trenches is critical, given the abject disrepair of the system, change must begin with the highest levels of management and proceed from the top to the bottom.

- System-wide synchronization of action plans and operations to support short-term pilots and long-term transformation efforts. The depth and scope of the inter-relatedness of serious problems must be addressed.

- Headquarters, regional, and local senior management support, joint ownership between CPR and CDCR, and clear communication of transformation strategic vision, action plans, pilot progress, and accomplishments.

- Appropriate information system infrastructure, skills, and staffing level to carry out system redesign and implementation efforts.

- Recruitment of industry experts to support the pilot projects and to mentor future CDCR teams in innovation and diffusion of promising practices and processes.

- Meaningful metrics to measure and evaluate the effectiveness of clinical care and transformation initiatives.

**F.    Plan of Action Goals and Objectives**

The Plan of Action is organized into seven domains. Goals A and B emphasize building critical administrative and clinical capacities required as the foundation to support timely, effective, and efficient patient-centered care; Goal C outlines activities required to build a quality and patient safety infrastructure; Goal D focuses on developing information technology (IT) from the ground up. A scalable IT network with adequate local technical support is the requisite foundation for our future electronic health record.

Goal E addresses the interdependency of custody and clinical functions required to transform the health care system and provide effective care. For example, one of the objectives under Goal F is to implement a Health Care Access Team to provide

dedicated custody escort support to the health care team, thus ensuring inmate-patient access to health care services in a timely and safe manner.

Lastly, Goal G speaks to the need to envision the end from the beginning, pointing beyond development of a successful system to its transition from the Receiver back to the State.

### Key Plan of Action Goals

Goal A:    Establish meaningful and effective financial and administrative infrastructure and processes that are precursors to clinical transformation.

Goal B:    Redesign, pilot, and implement an effective prison health care continuum of services utilizing evidence-based, standardized processes and including screening, medical management, care coordination, case management, patient movement, parole, discharge planning, ancillary services, and other clinical support.

Goal C:    Design, pilot, and implement a CDCR quality and patient safety infrastructure including measurement and evaluation components to guide system improvement, accountability, and effectiveness.

Goal D:    Design, pilot, and implement an integrated health information system(s) including network infrastructure, electronic health records, patient scheduling and tracking, disease registry, medical management including utilization management, decision support, performance measurement, and reporting to support safe, effective, timely, and cost-efficient, patient-centered care based on a thorough understanding of redesigned work and pilot results.

Goal E:    Develop, pilot, and implement institution-specific, on-site custody capacity to ensure safe and timely patient access to health care services.

Goal F:    Create new clinical and administrative space to provide a safe environment for staff and patients based on the new clinical process redesign and on projections of future bed capacity needs.

Goal G:    Develop a transition plan including timelines, knowledge management, and oversight monitoring to ensure successful transition of the new prison health care system from the Receiver back to the State, with continuing mandates which guarantee that medical services meet constitutional standards for access and quality.

### Plan of Action Goals and Objectives

Goal A:    Establish meaningful and effective financial and administrative infrastructure and processes that are precursors to clinical transformation.

Objective A.1. Develop smaller regions (3-5 prisons each) including clearly delineated leadership roles, responsibilities, and accountabilities among headquarters, regions, and local prisons.

A.1.1. Define regional Chief Executive Officer, Chief Medical Officer, Director of Nursing, and Health Care Administrator roles, responsibilities, and accountabilities.

A.1.2. Define local institutional Chief Executive Officer, Chief Medical Officer, Director of Nursing, and Health Care Administrator roles, responsibilities, and accountabilities.

A.1.3. Define headquarters, regional administrative, and support functions.

A.1.4. Develop and implement a performance management system to align individual and team performance results with organizational mission, vision, goals, and objectives.

Objective A.2: Implement structure, business processes, and metrics for finance, accounting, budgeting, and reporting functions for CPR and CDCR to ensure accountability and transparency.

A.2.1. Define and implement financial structure and processes for CPR.

A.2.1.1. Determine Executive and Legislative protocol for the ongoing funding of Receivership initiatives.

A.2.1.2. Determine Department of Finance (DOF) and Controller protocol for identifying funding provided to the Receivership by the Executive and Legislative branches.

A.2.1.3. Agree to a process for the Receivership's access to and control of identified funds.

A.2.1.4. Determine extent of Receivership's access to and control of the Divison of Correctional Health Care Services (DCHCS) annual spending authority.

A.2.2. Define and implement accounting structure and processes for CPR.

A.2.2.1. Identify authoritative literature to support accounting, reporting, and disclosure of transactions that are unique to the structure of CPR's court ordered authority and maintain CPR's accounting records accordingly.

A.2.2.2. Develop and document a system of internal control to meet the court's requirements for transparency of CPR operations and that is also acceptable to other governmental and non-governmental stakeholders.

A.2.2.3. Develop reports that include financial information and related disclosure that meets the court order's requirements for complete and periodic reporting of CPR's financial operations.

A.2.2.4. Arrange for an annual independent financial audit by a regional Certified Public Accountant (CPA) firm recognized as having public sector expertise.

A.2.3. Define and implement accounting structure and processes for CDCR.

A.2.3.1. Engage an independent consulting firm with recognized public sector financial expertise to review CDCR's current recording and reporting of financial information and produce the following deliverables:

A.2.3.1.1. Prepare flow charts and narratives that document the current state of the CDCR accounting system from transaction recording to reporting.

A.2.3.1.2. Identify bottle necks, weaknesses, and gaps in key processes that have the most significant impact on timeliness and accuracy.

A.2.3.1.3. Identify critical interventions to the management information process that can be immediately implemented through reasonable system enhancements and workarounds.

A.2.3.1.4. Assist CPR and DCHCS management in developing critical, high level financial and management reports that are timely, accurate and compliant with Generally Accepted Accounting Principles (GAAP) as appropriate.

A.2.3.2. Identify resources within CDCR, State Controller

**17**

Office (SCO) and Department of Finance (DOF) to provide timely and accurate metrics that include paid hours and other workload indicators that reconcile to and are consistent with financial information.

A.2.3.3. Develop processes to readily extract accurate financial information specific to the Receiver's initiatives, e.g. Registered Nurse (RN) salary enhancement, Licensed Vocational Nurse (LVN) salary and benefit costs, San Quentin planning, and construction costs.

A.2.3.4. Identify key staff positions in the accounting, budgeting and financial reporting processes; assess workload and recommend appropriate staffing and/or skill level enhancement as necessary in light of recording and reporting objectives noted above.

A.2.4. Define and implement budgeting structure and processes for CPR.

A.2.4.1. Identify and develop plans for hiring additional staff, engaging consultants, and initiating capital projects in the 2007-08 budget year in collaboration with CPR Executive Staff.

A.2.4.2. Identify those plans that should be appropriately recorded as an asset, liability and/or expense of CPR and not expected to be transferred to CDCR prior to the end of the 2007-08 budget year.

A.2.4.3 Estimate the cost of such plans and include in the budget proposal to be presented to the Receiver for approval.

A.2.4.4 Project current budget year commitments for salaries, benefits, and other operating expenses specific to operation of the Receivership for the 2007-08 budget years.

A.2.4.5 Prepare budgeted balance sheet, profit/loss, and cash flow statements for the 2007-08 budget year.

A.2.5. Define and implement budgeting structure and processes for CDCR.

A.2.5.1. Continue coordination with Budget Management Branch staff to gain a complete understanding of the budget development, monitoring, and reporting processes.

075

A.2.5.2. Focus CPR's involvement in preparation of the 2007-08 budget on reviewing the process, assumptions, and current budget year actual information used as the basis to develop the following:

- Personnel Year (PY) and related salary costs, including overtime, vacancies (salary savings) and temporary help.
- Consulting and professional services – medical expenses.

A.2.5.3. Determine that the final 2007-08 budget includes the cost of CPR sponsored initiatives, such as:

- Full year effect of budget year 2006-07 initiatives such as salary increases, Medical Technical Assistant (MTA)/LVN conversion etc.
- Budget year 2007-08 portions of ongoing capital related projects initiated in the 2006-07 budget year.

A.2.5.4. Maintain a shadow budget to monitor the following:

A.2.5.4.1. Develop budgeted consulting and professional services – medical expense on the basis of prior years' historical utilization, by prison facility.

A.2.5.4.2. Monitor actual to budgeted expense and compare to accuracy of current CDCR budgeting technique.

Objective A.3. Establish mechanisms to ensure CPR financial and operating transparency.

A.3.1. Identify a nationally recognized standard of financial operating transparency and model CPR's operating and reporting systems as appropriate. For example, consider voluntary certification as Sarbanes- Oxley compliant.

A.3.2. Develop an internal control document that details CPR's reporting, recording, and management of the Receivership's assets, liabilities, and contractual commitments including input from State oversight agencies. Ensure this document is focused on operational transparency; facilitates knowledge transfer, particularly when responsibilities are reassigned; and includes input from State oversight agencies such as the OIG

Objective A.4. Improve provider contracts and contracting processes to

**19**

ensure accountability and transparency. (Refer to A.6.)

A.4.1.Model contract processes on current health care industry practices.

A.4.2. Develop new payment methodology based on Medicare payment system as documented and recommended by Navigant study.

A.4.3. Appoint trained staff member(s) dedicated to the ongoing development and management of CDCR provider contracting activities.

A.4.4. Establish CDCR provider contracting capacity to perform a full complement of services including:
- Provider network selection and development management,
- Credentialing,
- Rate setting,
- Contracting and contract management,
- Quality and utilization monitoring,
- Electronic claims payment and adjudication,
- Contract performance metrics monitoring and reporting.

Objective A.5. Develop a Responsibility-Focused Financial Reporting Process and System.

A.5.1. Identify appropriate metrics as a basis for monitoring CDCR DCHCS financial operations.

A.5.1.1. Focus initial efforts on paid and worked hours.

A.5.1.2. Develop and implement a system-wide training program appropriate to each level of CDCR and DCHCS financial staff.

A.5.1.3. Establish a multi-year goal to decrease the lag in periodic reporting to the health care industry standard of 10 working days.

A.5.1.4 Redesign the Reporting Structure of DHCS' Financial Staff

A.5.2.Create a "Controller" position solely dedicated and responsible to CPR leadership.

20

A.5.2.1. Identify key staff members to fill top technical/decision making financial positions at CDCR and DCHCS headquarters.

A.5.3. Focus on timely and accurate reporting of financial information useful in decision making to CDCR and DCHCS headquarters and from/to regions, and facilities.

A.5.3.1. Improve and increase quality communication by removing barriers to inter- and intra- department communication, and communication between headquarters, regions, and facilities.

A.5.3.2. Delegate decision-making authority to appropriate management and staff levels.

A.5.3.3. Provide recognized industry standard processes and tools to help staff do their job efficiently and effectively.

Objective A.6. Redesign, pilot, and implement a sound contract negotiation and management process based on industry standard and ethical business practices. (Refer to A.4.)

A.6.1. Design, pilot, and implement a cohesive approach to the contract negotiation of scope and rates for those contracts which are not competitively bid.

A.6.1.1. Establish a benchmark rate system taking into account specific geographic areas and types of service.

A.6.1.2. Establish a training program for all contracts staff on medical services negotiations, diagnoses and procedures, rate analysis, etc.

A.6.1.3. Build interdisciplinary negotiation teams that include subject matter experts such as payment data experts, clinicians, and negotiation specialists.

A.6.1.4. Standardize a contract and processes for specialty services to increase percentage of specialty care performed on-site via local providers or "circuit" physicians; and increase use of telemedicine for specialty services.

A.6.1.5. Establish mechanisms to ensure contract providers are adhering to CDCR utilization management protocols, clinical guidelines, and quality standards.

A.6.2. Design, pilot, and implement an automated contract management and monitoring system including policies and procedures to ensure accurate documentation, adequate monitoring of key information such as licenses, performance, usage, and credentialing.

A.6.2.1. Establish separate units to focus on contract management and internal auditing functions.

A.6.2.2. Establish an external, independent auditing program.

A.6.2.3. Develop policies and procedures and a training program.

A.6.3. Design, pilot, and implement a mechanism, including policies and procedures, to provide timely review, approval, adjudication, and payment for services rendered.

A.6.3.1. Adopt an electronic invoicing process to automatically capture critical information to support contract monitoring, analysis, negotiation and auditing.

A.6.3.2. Implement a standard mechanism to give providers instructions for correctly formatted information needed for invoicing prior to or at the time of service.

A.6.3.3. Review and analyze contract providers' utilization data as one of the contract performance indicators to monitor appropriate utilization patterns.

Objective A.7. Create a pool of at-will, civil service, Career Executive Appointment (CEA) positions in order to populate local, regional, and statewide leadership positions with qualified, responsive leaders.

Objective A.8. Develop a human resources program focused on providing patient–centered health care services based on industry standards that effectively manages staffing, compensation, job descriptions, competency, performance evaluation, professional development, and training in collaboration with clinical teams or other subject matter experts. (Refer to Goals B and C)

A.8.1. Restore and standardize competency levels of clinical staff based on health care industry standards.

A.8.2. Redesign, pilot, and implement clinical staffing model for all levels of care within the prison health care system.

22

A.8.2.1. Define roles, responsibilities, and clinical accountabilities for mid-level practitioners and advanced practice professionals.

A.8.2.2. Develop, pilot, and implement plan for adequate minimum staffing including physicians, nurses, and ancillary services throughout the system with enhanced staffing to match needs at particular prisons.

A.8.3. Recruit adequate numbers of qualified clinical staff within each discipline.

A.8.3.1. Adjust clinical and support salaries as needed based on competitive industry, market, and community rates.

A.8.3.2. Implement a loan forgiveness program as an incentive to recruit and retain qualified physicians and nurses.

A.8.3.3. Design and implement "24-hour" expedited hiring process to address clinical staff vacancies.

A.8.4. Develop appropriate administrative and clerical support after the redesign of work processes.

A.8.5. Standardize orientation, training, and professional development programs through the prison health care system for employees of all levels in collaboration with clinical team and other subject matter experts.

A.8.5.1. Review and revise orientation programs including appropriate prison health care information and specific orientation for providers, nurses, and ancillary clinical staff.

A.8.5.2. Develop a centralized approach to education and training in collaboration with academic institutions.

A.8.5.3. Develop adequate leadership and support for medical staff credentialing, privileging, and peer review, as well as for other essential committees of all other disciplines.

A.8.5.3.1. Implement an information system to track credentialing and education requirements including Continued Medical Education (CME) and Continued Education Units (CEU).

A.8.5.4. Develop ongoing leadership and managerial training

080

programs to support clinical professionals in leadership positions as well as direct patient care areas.

A.8.5.5. Develop communities of practice within each clinical discipline with designated leadership and appropriate communication tools.

A.8.5.6. Develop interdisciplinary communities of practice within clinical topic areas with designated leadership and appropriate communication tools.

A.8.5.7. Develop systems for routinely reviewing and revising health care policies and procedures and making them readily accessible to staff.

A.8.6. Develop and implement innovative approaches to address professional staffing needs of remote facilities.

A.8.6.1. Implement an air-force program using chartered airplanes to transport clinical personnel from San Francisco, Los Angeles, and San Diego areas to work three-four days a week in remote prisons.

Goal B:   Redesign, pilot, and implement an effective prison health care continuum of services utilizing evidence-based, standardized processes and including screening, medical management, care coordination, case management, discharge planning, ancillary services, and other clinical support.

Objective B.1. Develop, pilot, and implement emergency response staffing models, protocols, and programs to prevent unnecessary patient or staff injury or death.

B.1.1. Develop, pilot and implement a statewide emergency response mechanism through an on-site paramedics pilot program.

B.1.2. Develop and implement emergency response training programs for clinical and custody staff.

B.1.3. Develop an ongoing mechanism to improve interface with local ambulance services.

Objective B.2. Pilot and implement statewide initiatives to redesign and support screening, primary care and chronic care processes and programs. (Refer to Objective D.6.)

081

*CPR Plan of Action*

B.2.1. Redesign and replicate reception center intake processes and staffing model based on the San Quentin pilot or alternative pilot site.

B.2.2. Redesign and replicate primary care processes and staffing model based on the San Quentin pilot and other pilot sites.

B.2.3. Develop a pain management initiative and implement statewide, building on CDCR's current collaboration with the University of California, Davis.

B.2.4. Expand cultural and linguistically appropriate patient education resources by collaborating with community health education programs.

B.2.5. Develop and pilot appropriate inmate peer education programs, *e.g.*, for diabetes and asthma.

B.2.6. Design and implement structure, process, and staffing to support evidence-based chronic care management including overall vision and leadership.

B.2.6.1. Establish clinical/administrative leadership for chronic care program by condition, e.g., cardiovascular, diabetes, asthma, seizure disorders, HIV/AIDS, hepatitis C.

B.2.6.2. Pilot and implement disease registries for chronic disease management and monitoring.

B.2.6.3. Review and revise Plata chronic care policies and procedures to be consistent with community chronic care standards.

B.2.7. Design and implement structure, process, and staffing to support evidence-based prenatal care and post-delivery services, including appropriate and timely management of high risk pregnancies.

Objective B.3. Design and implement programs and processes to ensure patient-centered continuity of care including care coordination, case management, utilization management, and quality management. (Refer to Goal C)

B.3.1. Design, pilot, and implement care coordination and case management mechanism to ensure continuity of care.

B.3.1.1. Develop position descriptions, recruit, and train care coordinators and case managers.

B.3.1.2. Direct high-risk chronic care patients to qualified providers, teams, prisons (including telemedicine option).

B.3.1.3. Develop a new nursing functional assessment and acuity assessment form based on experience and data from the medical bed assessment sweep conducted in March 2007.

B.3.1.4. Plan and implement case management software as part of an enterprise-wide electronic health record. (Refer to Goal D)

B.3.1.5. Incorporate social worker expertise into care coordination and case management teams by developing new social worker positions and recruiting qualified professionals.

B.3.1.6. Develop care transitions programs to ensure continuity of care from jail to prison, general population (GP) to medical beds and back, prison to prison, and prison to community.

B.3.1.7. Redesign and pilot community hospital utilization management and optimize the use of utilization review nursing knowledge in case management.

B.3.1.8. Redesign and pilot a standardized specialty utilization management process including indicators to monitor specialty utilization and quality of services.

Objective B.4. Improve coordination of medical, mental, and substance abuse services to promote patient-centered care.

B.4.1. Create a designated CPR staff position to be responsible for coordination and integration of programs between medical, mental health, and substance abuse to ensure patient-centered care.

B.4.2. Incorporate behavioral/mental health and substance abuse knowledge competencies into primary care and chronic care programs via interdisciplinary collaboration, staff training, and/or new staff recruitment.

Objective B.5. Optimize placement and care of impaired and/or aging prisoners with chronic conditions by expanding long-term care (LTC) services and bed capacity in the prison health care system.

083

B.5.1. Increase LTC services and bed capacity to address immediate needs.

B.5.1.1. Develop additional sheltered dorms within CDCR.

B.5.1.2. Acquire additional LTC beds off-site by leasing or purchasing additional facilities if needed.

B.5.1.3. Support aging inmates and inmates with disabilities in general population housing via environmental modifications, inmate helper programs, care management, staff training, and adult day health programs.

B.5.1.1. Develop inpatient neurobehavioral programs with appropriate levels of care.

B.5.1.2. Develop palliative care program for terminal inmates not requiring hospice placement, and optimize use of hospice beds at California Medical Facility (CMF) and Central California Women's Facility (CCWF).

B.5.1.3. Recruit and optimize use of clinical staff with geriatric and LTC nursing expertise.

B.5.1.4. Recruit and optimize use of clinical staff with physiatry and rehabilitation expertise, including expertise in traumatic brain injury.

B.5.1.4.1. Optimize use of physical, occupational, and speech therapies to keep inmates functional at lowest possible level of care.

B.5.2. Design and implement new clinical assessment forms and processes and placement criteria based on Abt Associates project (medical beds assessment sweep and 5000 beds planning).

B.5.2.1. Incorporate new custody risk assessment distinguishing inmates who could be in dorm setting from those requiring cells.

B.5.2.2. Enhance Health Care Placement Unit (HCPU) capacity with information technology support and clinical leadership including medical and mental health services collaboration.

B.5.2.3. Implement new criteria for placement in medical beds such as Correctional Treatment Center (CTC), Outpatient

Housing Unit (OHU), and sheltered dorms.

B.5.2.4. Convert inappropriately used General Acute Care Hospital (GACH) beds to infirmary and long-term care medical beds.

B.5.3. Design new LTC facilities planning (5000 beds project) for physical plants and clinical programming to address future needs.

B.5.3.1. Complete Abt Associates project to estimate future chronic disease burden and long-term care burden.

B.5.3.2. Plan clinical programs for new facilities.

B.5.3.3. Begin working with construction management contractors, CDCR, and other state agencies to oversee facility location, design, and construction.

Objective B.6. Develop a centralized Public Health Unit to be responsible for pandemic preparedness; communicable disease outbreak response; immunization and tuberculosis testing administration; and surveillance, communication, and training to prevent the spread of infectious diseases.

B.6.1. Establish centralized clinical/administrative leadership for public health and infection control.

B.6.2. Develop communication and training infrastructure for regional and local prison health care teams.

B.6.3. Develop outbreak response collaboration and other projects with local public health officers and Department of Health Services (DHS).

Objective B.7. Redesign, pilot, and implement clinical post hours to optimize space and coverage to ensure patient access to care.

B.7.1. Develop, pilot, and implement statewide model hours of operation for yard clinics and central clinics including provider lines, face-to-face RN triage, and specialty clinics.

B.7.2. Develop, pilot, and implement statewide model hours of operation for pharmacies, labs, radiology, and other ancillary and support services.

085

Objective B.8. Improve CDCR's pharmacy management and operations system by implementing the Maxor's road map to produce sustainable, patient-centered, and outcome-driven processes.

Objective B.9. Develop nutrition programs for inmate-patients who are pregnant or who have chronic conditions or dysphagia requiring modifications in diet.

> B.9.1. Recruit and hire a team of Registered Dietitians with centralized leadership to develop statewide nutrition programs.

Objective B.10. Create ethics resources within health care services to support health care and custody staff, inmates, and families.

> B.10.1. Develop expertise, resources, and quality metrics for advance care planning.

> B.10.2. Provide ethics education for health care and custody staff.

> B.10.3. Make ethics consultation available to health care and custody staff, inmates, and families.

Objective B.11. Continue to expand CDCR collaborations with University of California campuses, California State University, other universities, and community colleges to enhance clinical service delivery, system improvement, staff education, staff recruitment, and health services research.

Objective B.12. Redesign, pilot, and implement centrally-managed clinical operations to ensure standardization of data, processes, and costs across the system and to take advantage of economies of scale in driving efficiency.

> Objective B.12.1. Design, pilot, and implement a statewide, centrally-managed approach to imaging and radiology, including equipment, supplies, staffing, training, certification, external contracts and information systems.

> Objective B.12.2. Design, pilot, and implement a statewide, centrally-managed approach to clinical laboratory services, including equipment, supplies, staffing, training, certification, external contracts and information systems.

> Objective B.12.3. Design, pilot, and implement a statewide, centrally-managed approach to materials management, including a modern, just-in-time supply chain, equipment, supplies, staffing, external contracts and information systems.

086

Goal C:    Design, pilot, and implement a CDCR quality and patient safety infrastructure including measurement and evaluation components to guide system improvement, accountability, and effectiveness.

Objective C.1. Recruit and hire a Chief Quality Officer to develop and manage the CDCR Quality and Patient Safety program.

Objective C.1.1. Develop and lead implementation of quality and patient safety programs that integrate clinical quality metrics, complaints and appeals, incident reporting, sentinel event reviews and root cause analysis, and clinical improvement initiatives.

Objective C.1.2. Ensure linkage of interdisciplinary quality improvement and peer review to education and training.

Objective C.2. Design, pilot, and implement clinical quality metrics consistent with appropriate free world health care delivery systems. (Refer to Evaluation, Measurement and Compliance Section)

C. 2.1. Pilot measurement of patient-centered care, e.g., using patient satisfaction surveys.

C. 2.2. Pilot measurement of organizational culture, e.g., using nursing turnover rates.

C.2.3. Collaborate with other correctional systems in efforts to standardize correctional metrics throughout the country.

Objective C.3. Redesign, pilot, and implement a credible complaint and appeal process that is efficient, responsive, and effective in achieving rapid resolutions.

C.3.1. Build on lessons learned from the San Quentin Patient Advocacy model.

C.3.2. Develop adequate staffing and software to track and analyze complaints and appeals.

C.3.3. Continue to maintain an independent response process for complaints to Receiver (*versus* complaints to CDCR) and use findings to inform interventions.

C.3.4. Expand collaboration with CDCR ombudsman program for early resolution of complaints.

Objective C.4. Institute reliable patient safety, incident, and near-miss incident reporting and link reports to improvement initiatives and education.

Objective C.5. Develop sentinel event and root cause analysis policies, protocols, and curricula.

C.5.1 Train clinical, administrative, and custody leadership in sentinel event review and root cause analysis.

Objective C.6. Design and implement organizational structures, staff and technological support, and processes for evaluation, measurement, analysis, and improvement of organizational and clinical performance. (Refer to D.4)

Objective C.6.1. Introduce a culture of ongoing clinical improvement initiatives at all levels of health care delivery.

C.6.2. Develop and implement strategies for utilizing process improvement methodologies in the prison system.

C.6.3. Train clinical and administrative staff in rapid cycle quality improvement and high-reliability practices.

C.6.4. Develop custody/health care collaborations in high-reliability practices.

Objective C.7. Design, pilot, and implement a combined clinical-administrative crisis management team model to provide timely response to address prison crises with potential for adverse impact to access or quality.

Objective C.8. Enhance system-wide clinical accountability through peer review mechanisms.

C.8.1. Expand focus of PPEC beyond review of individual performance to focus on process and system vulnerabilities and link findings to educational and quality improvement initiatives.

C.8.2. Develop custody/health care capacity for joint investigations as needed.

088

Goal D:    Design, pilot, and implement integrated health information system(s) including network infrastructure, patient scheduling and tracking, disease registries, electronic health records, medical management including utilization management, decision support, performance measurement, and reporting to support safe, effective, timely, cost-efficient, and patient-centered care based on a thorough understanding of redesigned work flows.

Objective D.1. Design, pilot, and implement a health care information infrastructure to support health care clinical and business operations with compliance to record retention, privacy, HIPAA, and State law, if applicable.

D.1.1. Conduct health care network assessments including scope of work for engineering, installation, and operations.

D.1.2. Select, test, and implement network-centric clinical technology.

D.1.3. Design and implement a network engineering layout of highly reliable, ubiquitous high speed bandwidth for clinical operations utilizing leading technology such as wide area wireless, multi-protocol layers services, bandwidth management and upon demand bandwidth utilization management.

D.1.4. Design, develop, and implement processes for system operation at clinical service levels including functionality to ensure timely electronic processing of clinical information.

D.1.5. Design, develop, and implement system support operations to support health care service levels including system operation redundancy, change control, customer service surveys, interoperability testing, automatic testing, and clinical help desk.

D.1.6. Design and implement programming standards to allow for industry standard desk top, network and application data housing to allow for minimal acceptable down times through highly redundant and reliable technology.

D.1.7. Implement industry standard project methodology to allow for full project charter compliance to budget, expected results, and post implementation project reviews to allow for system standard Information service costs.

D.1.8. Design, develop, and implement data security systems and

089

operations to ensure privacy, HIPAA, audit, proactive data intruder diction systems, internet monitoring and management systems, e-mail filters, and records retention are in compliance with Federal and State laws as well as correctional level security.

Objective D.2. Standardize data through verifiable data processes and compile medical data across all compliant data sources into a unified database that can be used to generate information valuable for patient care and health care management.

D.2.1. Develop implementation plan to achieve health care industry clinical data standards for clinical services and operations including standardization of data architecture design, data repository, communication tools, electronic data engine, and master patient, and master provider indexing for statewide adult corrections clinical staff access.

D.2.2. Standardize data models for pharmacy, laboratory, radiology, PACS, medical management, case management, schedule tracking, and encounters including dental, mental health, Americans with Disabilities Act (ADA), and other medical service data records through interoperable data standards, technical data standards, and data engine.

D.2.3. Standardize automatic and ad hoc reporting of metrics required by the Federal Court and ongoing performance monitoring.

D.2.4. Develop and implement a secure clinical web-based portal tool that allows clinical staff appropriate access to verified and standardized patient data at the point of care or clinical work areas.

D.2.5. Develop and implement a data security system to ensure Federal and California State HIPAA and privacy laws pertaining to correctional related health care services.

Objective D.3. Create systems for compiling and managing medical knowledge that will enable clinical service providers to have timely and medically significant data in order to make the appropriate evidence-based decisions for their patients at the point-of-care.

D.3.1. Create and implement a system for developing, documenting, disseminating, and maintaining clinical protocols, guidelines, and algorithms required to manage care of patients throughout the system.

D.3.2. Implement online medical library services to support clinical information, research, and clinical CME requirements.

D.3.3. Implement appropriate clinical decision support tools, both electronically and on paper that provide just-in-time information to clinicians to ensure that patients continually receive the most cost-effective and appropriate care.

D 3.4. Redesign, pilot, and maintain clinical information tools that inform and influence patient care, including clinical documentation forms, flow sheets, and order sheets.

Objective D.4. Improve and streamline care-delivery processes in preparation for automation.

D.4.1. Redesign, pilot, and implement clinical and business processes in preparation for implementation of electronic health records.

D.4.2. Redesign, pilot, and implement a laboratory information system process to allow for point-of-care testing, automated assays and virtual systems to allow for faster point-of-care test turn-around times and accuracy.

D.4.3. Develop and implement a digital radiography central image storage, retrieval, and review through data standard systems.

D.4.4. Develop and implement a pharmacy bar code system for patient safety through unit dose in conjunction with Maxor Pharmacy roll out that will allow for an electronic Medical Administration Record.

Objective D.5. Implement system–wide, standardized clinical transformation change management initiatives and training to ensure clinical staff acceptance and adoption of information technology solutions such as the electronic health record and evidence based medical decision systems.

D.5.1. Design, pilot, and implement processes for health care information management document storage and maintenance, electronic forms workflow, auto routing for "whole system" access, scanned data storage and access.

D.5.2. Design, pilot, and implement information system applications to support business processes such as provider credentialing, continuing education tracking, scheduling, time keeping, contracting for provider services, equipment, and supplies,

**34**

materials management, and supply chain. (Refer to Goal A)

Objective D.6. Improve and enhance the existing telemedicine program and integrate it into continuum of inmate medical care to provide primary, emergency and specialty care to allow for greater access to inmates while reducing cost of care as well as custody inmate transportation to outside clinical care locations.

D.6.1. Expand telemedicine clinical processes to all correctional facilities as part of core primary and specialty care operations for inmate health care including medical, dental, and mental health.

D.6.1.1. Conduct a system- wide assessment of the current telemedicine practices by external experts to develop a road map for improvement of CDCR telemedicine services.

D.6.1.2. Upgrade telemedicine technology, including Internet Protocol (IP) infrastructure, to ensure sufficient bandwidth and security and to allow for optimal and flexible location of telemedicine units in correctional facilities as well as contracted specialty clinician offices, in hospitals with a "high availability" technical infrastructure, and for use in emergency conditions at various locations.

D.6.1.3. Redesign telemedicine workflows to allow for clinical visit optimization through ensuring that all needed tests and documentation are completed prior to the visit according to standardized protocols consistent with all other care delivered for a given condition.

D.6.1.4. Provide specialized telemedicine carts to each site that enable tools including remote electronic monitoring, EKGs, point-of-care laboratory test units, electronic whiteboard data sharing, high definition dermatology imaging, and ultrasound.

D.6.1.5 Develop methodology and clinical workflow for multi-care provider conference and specialty consults.

D.6.1.6. Develop "smart" databases that will enhance patient care through proactive monitoring of specific care plans by working with industry vendors.

D.6.2. Redesign and implement facility and telemedicine staff training to ensure competency level to maximize timely use of telemedicine.

D.6.2.1. Implement on-going training and in-services reviews to

**35**

ensure the reliable availability of qualified clinical support staff to maximize inmate access to clinical care.

D.6.2.2. Establish programs and protocols for virtual expert visits for remote monitoring, observation, and consultations with centralized and contracted specialty staff through "IP" enabled web conferencing through Data Security Health Care standards.

Objective D.7.  Establish a statewide project governance model for integrated health information system(s) and related applications, with representation by multi-disciplinary clinicians to allow for the clinical staff cultural adoption of the electronic health record and evidence based decision support systems.

Objective D.8.  Create and successfully implement an enterprise electronic health record that is consistent with current health care information technology trends regarding functionality, paperless workflow systems, security, and interoperability.

Goal E:   Develop, pilot, and implement institution-specific, on-site custody capacity to ensure safe and timely patient access to health care services.

Objective E.1. Design, pilot, and implement necessary institution-specific on-site custody components that ensure appropriate patient security, escorting and transporting for health care services.

E.1.1. Analyze, develop, and implement institution specific on-site health care access teams to ensure patient access to health care services.

E.1.2. Conduct analyses of custody requirements for the day-to-day operations and security for each institution's health care services.

E.1.3. Conduct analyses of custody personnel and equipment/vehicles needs for institution access teams.

E.1.4.Conduct analyses of personnel needs for community hospital custody coverage.

E.1.5. Activate San Quentin pilot custody access team and replicate model statewide.

Objective E.2. Redesign, pilot, and implement transportation support for off-site health care teams to ensure safe and timely transport of patients to services in the community.

E.2.1. Analyze current statewide transportation operations to determine necessary resources for providing adequate/timely medical transportation.

E.2.2. Develop, and implement institution-specific off-site custody transportation unit to ensure patient access to community-based health care services.

E.2.3. Develop Regional Medical Transportation Units to move patients from prison to hospital, hospital to hospital, and hospital to prison.

E.2.4. Develop and implement Regional medical guarding units within community facilities in collaboration with clinical leadership.

Goal F    Create new clinical and administrative space to provide a safe environment for staff and patients based on the new clinical process redesign and on projections of future bed capacity needs.

Objective F.1. Plan, design, and build clinical space to provide a safe environment for staff to deliver appropriate patient care at all levels.

F.1.1. Review reception center space needs based on reception center process redesign and supplement or redesign the space to match the new processes.

F.1.1.1. Review primary care (sick call, chronic care, TTA) and infirmary space needs at all prisons and supplement or redesign the space.

F.1.2. Plan, design, and build work space to provide a safe environment for staff to provide support to the delivery of safe patient care at all levels.

F.1.2.1. Conduct reviews of clinical space around the state to ensure inmate access areas and holding cell areas are adequate.

F.1.2.2. Identify areas, where clinical space is inadequate, to place new space, e.g., modular buildings, within secure areas of the prison.

F.1.2.3. Establish adequate custody work stations within institution clinics and institution medical housing areas.

F.1.2.4. Implement space additions at the prison sites in

collaboration with contract construction managers.

Objective F.2. Oversee construction of comprehensive new clinical complex at San Quentin to provide medical, mental health, and dental services.

Objective F.3. Plan, design, and build 5,000 new medical beds and 5,000 new mental health beds (estimates) in various regions to provide additional bed space and appropriate levels of care.

Goal G:    Develop a transition plan including timelines, knowledge management, and oversight monitoring to ensure successful transition of the new prison health care system from the Receiver back to the State, with continuing mandates which guarantee that medical services meet constitutional standards for access and quality.

## G.    Organizational Transformation Strategies

On the one hand, the Receiver is committed to using evidence-based organizational change strategies as recommended by the Institute of Medicine. For example, a meta-analysis of 39 controlled trials of diabetes care showed that the following interventions improve outcomes: provider education, provider reminders, audit with feedback to providers, patient education, case management, and team-based changes. Unfortunately, each of these interventions requires infrastructure elements that still do not exist within the CDCR. Cutting-edge interventions or even the most basic educational strategies are futile in the absence of stable staff and functional management. Over the next two years, the steps just outlined within this Plan of Action will guide the Receiver's team and CDCR through infrastructure development into a new world of organizational transformation focused on improving outcomes for California's inmate-patients. The good news is that progress in some domains has already been substantial:

- Recruitment and retention of sufficient qualified clinical staff requires competitive salaries. The Receiver has made significant strides in recruitment by raising salaries and he has plans for developing professional working environments, another critical element for recruitment and retention.

- Adequate support and supervision of frontline clinicians will require smaller regions managed by qualified, responsive leaders. The Receiver has filed a motion to waive state law regarding creation of new at-will, civil service, Career Executive Appointment (CEA) positions in order to recruit these leaders.

- Adequate peer review and clinical accountability requires provisions for terminating unqualified or unscrupulous clinicians, who in the current system may

095

be reinstated by the State Personnel Board. The Receiver has filed a motion to waive state law regarding peer review and physician discipline.

- Provision of health care requires adequate space. The Receiver has launched major building projects at San Quentin, has facilitated modest improvements elsewhere, and has begun plans for fast-tracking construction of up to 5,000 new medical beds and 5,000 new mental health beds.

- Access to care in correctional settings requires adequate custody escorts. The Receiver is piloting dedicated health care access teams and is ordering much-needed transport vehicles.

- Effective use of outside providers for specialty and hospital services requires coherent contracting procedures. The Receiver's team revised the invoice payment system to pay off debts to providers that were up to four years old, and the Receiver has since taken over all aspects of health care contracting, which was dysfunctional under the former CDCR management.

- The chronic care model, case management, utilization management, and appropriate long-term care all require a modicum of reliable clinical information, none of which is currently available even in hard-copy format. The Abt Associates project includes a pilot model for development of the necessary information sources, and the Receiver's IT team is developing an electronic platform for information distribution.

## Leadership and Human Resources

As noted earlier and illustrated in the examples above, in his first year the Receiver has focused heavily on leadership and human resources. The shift from using peace officer MTAs to using LVNs has been a time-consuming challenge, yet one that is essential for aligning all clinical staff with the clinical mission. The Receiver has prioritized restoring a statewide nursing structure and empowering nursing leadership. Nurses must function as change agents and drivers of patient-centered care throughout the organization in order to create and implement new clinical models. Contracting pharmacy management to Maxor National Pharmacy Corporation is another illustration of the Receiver's early emphasis on the leadership and human resources infrastructure.

As the infrastructure elements develop, including leadership, human resources, space, and information technology, the Receiver will be able to implement IOM strategies for process redesign, knowledge management, teamwork, and care coordination, and the pace of change at the patient level will accelerate. Meanwhile, one should not underestimate the clinical impact even now as good clinicians assume care and competent local leaders begin to exert managerial direction.

### Takeovers, Interim Fixes, and Pilots

The above initiatives illustrate the Receiver's practical approach to initial reforms, with an emphasis on implementing and then stabilizing infrastructure changes. One principle reappearing throughout is the need to pilot changes before attempting system-wide implementation. The San Quentin project and the Receiver's takeovers of contracting and pharmacy management have piloted new programs, processes, positions, and software prior to full-scale implementation. The Receiver is determined to avoid the pre-determined, entire-system "roll-out" projects that were characteristic of prior State efforts, most of which were cumbersome affairs that fell far short of full implementation. The Receiver has looked for opportunities to turn even interim "quick fixes" into organized pilot projects. For example, the mobilization of CDCR and University of California clinicians and leaders to physician-deprived Avenal in January illustrated the need for clinical and administration "SWAT" teams that can mobilize to points of crisis within the organization. Because the Receiver anticipates that crises will continue to occur within the system, the development of crisis teams has become an objective within the Plan of Action (Objective C.7).

### A Toolkit of New Practices

In order to change expectations, performance, and outcomes in CDCR health care, the Receiver will promulgate a toolkit of process improvement skills and practices which are new to CDCR but well-proven elsewhere, including:

- Sentinel event review and root cause analysis
- Rapid cycle quality improvement and small tests of change using "just enough" data
- Human factors analysis for development of safety and high-reliability systems

Sentinel event review and root cause analysis are familiar to community hospital leaders but done poorly or not at all in CDCR prisons. Difficult though it may be, teams must be willing and able to reflect upon their work, relationships, and vulnerabilities in order to develop a culture of improvement. Skills development in process improvement techniques will help clinical, administrative, and custody leaders get beyond preconceived ideas and defensiveness in order to make real changes in the ways they work together.

With adequate support from management and clinical leadership, frontline clinicians will learn how to test small changes in their work processes in rapidly repeating cycles. Small scale in this context can be a few clinicians and a dozen or so patients. The teams need to collect only enough data to provide credible guidance, and then move on to other small changes, week by week.

In addition to process improvement skills, the Receiver will promote specific techniques that have proven useful for patient safety. The SBAR (Situation,

Background, Assessment, Recommendation) technique, for example, is easy to learn and helps communicate essential information in critical situations. In addition to its role in fostering patient safety and teamwork, it has become a marker for professional environments that are supportive of nurses.

### Learning Collaborative Model

Once an adequate infrastructure has stabilized, the Receiver intends to pilot use of the Learning Collaborative Model (based on the Break-Through Series developed by the Institute for Healthcare Improvement) for clinical improvement initiatives. The Collaborative Model promotes sustainable cultural change through a dynamic collaborative learning process. Deployment of collaboratives will engage a critical mass of staff members in process improvement, disseminate practical skills, and promote a patient-centered culture.

The pilot sites within each CDCR region will be selected based on leadership commitment, presence of opinion / thought leaders, and willingness to embrace change, among other factors. A steering committee and external subject matter experts will help design, organize, and standardize pilot interventions to minimize variations in care, improve quality, and harvest replicable best practices. The clinical team members will be given protected time away from routine work duties to participate in the project. Regular data collection and reporting of processes and proxy outcome measures will be used monitor effectiveness of the interventions. Technical assistance calls and face-to-face meetings will be scheduled throughout the pilot period to share lessons learned. Effective interventions or processes will be replicated state-wide.

**H.    18-24 Month Focus of the Receivership**

As pointed out above, the Plan of Action is a living document. This initial version of the Plan must incorporate existing programs, and provide the Court with information concerning the Receiver's priorities. During the next 18 to 24 months, the Receivership will focus on the following projects:

1. Establish programs for appropriate and timely recruitment and hiring programs to increase the number and quality of prison clinician personnel (top priority for the next eighteen months) (*see* Plan of Action Objective A.8). Establish a program for the recruitment and hiring of 250 Receiver's Career Executive Assignment staff (*see* Plan of Action Objective A.7).

2. Commence a program to construct approximately 5,000 prison medical beds (*see* Plan of Action Objective F.3).**[1]

---

[1] Those programs followed by a * represent programs where the Receiver will manage health care administrative functions that will serve all disciplines (medical, mental health, and dental). Those programs followed by a ** represent programs where the Receiver may, after further coordination discussions with the Special Master in *Coleman* and Court

**41**

3. Commence a program to construct necessary clinical space and medical support facilities (e.g. medical records and administrative office space) in existing prisons (approximately 8 to 12 prisons per year) (*see* Plan of Action Objective F.1).**

4. Implement the custody access team program at San Quentin and commence a time phased roll out at three other prisons (*see* Plan of Action Goal E).*

5. Begin with constructing the "foundation" and "walls" of the Receiver's health care system wide IT program (including telemedicine) (*see* Plan of Action Goal D).*

6. Continue the existing system-wide pharmacy restructuring program (*see* Plan of Action Objective B.8).*

7. Continue the existing remedial program re contract re-structuring (specialty care, registries, hospitals) and expand the program to re-structure aspects of contracting that involve negotiations and payments (*see* Plan of Action Objectives A.4 and A.6).*

8. Re-structure existing State medical care support services functions (both the support services staff at 501 J Street and support service staff at 1515 S Street) into a single appropriately organized and managed Plata Support Services Division (*see* Plan of Action Objectives A.1 and A.2).

9. Re-structure the health care credentialing process (*see* Plan of Action Objective A.8.5.3).*

10. Continue several existing pilot projects, including the San Quentin Pilot (*see* Plan of Action Objective B.2) and the LAC/CCI Specialty Care Pilot.

11. Initiate several new pilot projects: including a pilot project to bring emergency response staff and ambulance on-site at eight California prisons (*see* Plan of Action Objective B.1); a pilot project to establish the Receiver's Air Force to deliver full time permanent State physicians from urban locations (e.g. Los Angeles, Sacramento) into rural prisons (*see* Plan of Action Objective A.8.6.1); a pilot project for joint clinical/internal affairs investigations (to be developed cooperatively with the Office of Internal Affairs and the California Inspector General) (*see* Plan of Action Objective C.8); and a pilot project enabling clinical SWAT teams to be dropped into prisons to resolve clinical crisis (*see* Plan of Action Objective C.7).

12. Implement an initial model of an appropriate medical care budget (*see* Plan of Action Objectives A.2.4 and A.2.5).

13. Implement a clinical peer review based program to evaluate physician clinical

experts in *Perez*, manage health care administrative functions that will serve all disciplines (medical, mental health, and dental).

competency (*see* Plan of Action Objective C.8).*

14.  Participate actively in coordinating remedial efforts with the Special Master in *Coleman*, the Court experts in *Perez*, and the Court in *Armstrong*.*

15.  Design phase II of the Plan of Action.

16.  Establish an Office of Evaluation, Measurement and Compliance (see below).

In providing this list, the Receiver emphasizes two points. First, the list set forth above is subject to change. The Receiver has scheduled two days of meetings with his staff at the end of May 2007 concerning this list because there are indications that resources do not exist to fulfill each of these activities in a careful, complete, and responsible manner. Second, while staff have been assigned to each project and directed to prepare a project roadmap including the time lines for project completion, certain projects may be commenced in a slow paced manner or as limited pilot efforts prior to system-wide implementation.

**I.    Metrics**

In 2001 the IOM identified one of its six essential strategies for health care transformation as "the incorporation of performance and outcome measurements for improvement and accountability." In 2006 the IOM consolidated current thinking from measurement science in a volume called *Performance Measurement: Accelerating Improvement.*

**Prior CDCR Attempts to Measure Quality**

The Plata Court experts and CDCR leadership recognized the importance of measurement. The June 2002 Stipulation for Injunctive Relief called for monitoring compliance with an extensive new set of policies and procedures using an audit instrument. Quality Management Assistance Teams (QMAT) of physicians, nurses, and support staff were assembled to descend upon individual prisons for a roughly weeklong administration of the audit instrument. The QMAT audit instrument was designed to generate 213 indicators, some from an electronic tracking system, most from manual chart reviews.

While well-intentioned, this measurement strategy suffered from multiple flaws. The electronic tracking system consisted of unconnected, unsupported Access databases that soon varied from location to location and contained unreliable data. In addition to being overwhelming in number, the individual measures were unvalidated and yielded results that often flew in the face of direct observation. The attempt to average all the measures into a composite score was wholly uninformed and misguided. Most critically, the findings, even had they been trustworthy, were not actionable. The available management infrastructure could not support development and implementation of appropriate interventions, for reasons already discussed.

**43**

The National Quality Forum evaluates candidate measures based on four sets of standardized criteria: importance, scientific acceptability, usability, and feasibility. Approved measures are deployed by federal, state, and private sector health care organizations. To be worthy of use in accountability and public reporting, a measure should address one or more key leverage points for improving quality. It should be valid, precise, and reliable, yielding consistent and credible results when implemented. The benefit should outweigh the burden of measurement. The results should be useful in making decisions.

QMAT attempted to use the audit instrument in 2004 and 2005, and then abandoned the effort. In 2006 the QMAT physicians were redirected to assist with peer review activities and direct patient care, and the QMAT nurses were reassigned to consultant roles.

## Moving Measurement into Corrections

Several state prison systems have made significant progress in developing useful measurement strategies. In 1999 the Missouri Department of Corrections began a measurement collaboration with the University of Missouri–Columbia School of Medicine's Center for Health Care Quality and the Department of Health Management and Informatics. In 2006 these researchers described their initial experience in the Journal of Correctional Health Care. Their initial measurement matrix consisted of 50 indicators, a number that was considered "unmanageable for annual data collection." The final matrix is shown below. The indicators are adapted from free-world sources and from state and national correctional standards.

44

**WOMEN'S HEALTH**
Response to an abnormal mammogram
Timeliness of prenatal care
Checkups after delivery
Cesarean section rate
**HEART DISEASE**
Monitoring hypertension
Response to an abnormal blood pressure test
Myocardial infarction, aspirin when sent out
Myocardial infarction, aspirin at return to facility
Beta-blocker treatment after a heart attack
Cholesterol management after cardiovascular events, LDL screening
Cholesterol Management after cardiovascular events, LDL level
**INFECTIOUS DISEASES**
Tuberculosis treatment completed
HIV viral load levels
**PULMONARY DISEASE**
COPD receiving appropriate care
Response to an abnormal chest x-ray
**WELLNESS AND PREVENTION**
Physical exam in past year
Breast cancer screening

Cervical cancer screening
Yearly influenza immunization
High blood cholesterol levels
High blood cholesterol management
Cholesterol management
**ASTHMA**
Frequency of preventable acute episodes
**DIABETES**
Annual eye exams
**MEDICATION ADMINISTRATION**
Tegretol levels
**SCREENING**
Physical appraisal exam within 1st week
Dental exam within 1st week
**BEHAVIORAL HEALTH**
Optimal practitioner contacts for depression
Effective acute treatment for depression
Effective continuation treatment for depression
Follow-up within a week of intake
Suicide attempts after positive screen
**DIALYSIS**
Adequacy of dialysis
Hemoglobin levels in dialysis patients

*Missouri Department of Corrections Quality Performance Indicator Matrix*

The Missouri quality measurement initiative is truly groundbreaking for corrections, but it has several limitations as a model for California at this point. The Missouri Department of Corrections uses an electronic health record, so it is possible to identify all the inmates in the state with a given health condition, at least for some conditions. The CDCR Division of Correctional Health Care Services has no reliable electronic databases, with the possible exception of the one used to track invoices from outside hospitals and specialists. Furthermore, the Missouri measures are statewide aggregates generated annually, so their utility in identifying specific problems in a timely fashion is limited.

The University of Texas Medical Branch (UTMB) took a different approach in 2002 when it contracted with the Texas Medical Foundation, a quality improvement organization, to review the quality of care provided by UTMB to state prison inmates. The Texas Medical Foundation performed manual chart audits on 385 inmates and derived measures of utilization and measures of compliance with prevention and chronic care guidelines similar to those above. In addition, the Texas Medical

**45**

*CPR Plan of Action*

Foundation assessed UTMB for compliance with managed care organization guidelines and correctional standards.

The burden of manual measurement limits the frequency and therefore utility of this approach for guiding quality initiatives. UTMB also routinely gleans a variety of quality measures from its electronic health record, but again, that approach is presently out of reach in California.

## Plans for Rigorous Metrics in CDCR

Over the next several years, however, the Receiver will develop a robust information technology system well-informed by current measurement science, so an increasing number of rigorous measures will be available for quality improvement and accountability purposes.

In the short term, several forthcoming information technology projects present opportunities for generating data. A new enterprise-wide patient scheduling and tracking system will allow routine analysis of delays in requests for clinical services such as chronic care or specialty appointments. The pharmacy information system being provided by Maxor will allow us to confirm that patients with various chronic conditions are receiving appropriate and timely pharmaceutical treatments. We will combine scheduling, pharmacy, laboratory, and imaging data into a clinical data warehouse, once each source of data is verified as reliable. These data can be mined for operational metrics useful for utilization management and population assessments, as well as for valuable clinical information at the point-of-care.

The scheduling and tracking data in the warehouse, to be operational later this year, will begin to yield measures of access to care for most of the metrics embedded in the Plata standards, as shown in the box below. Over time the diagnostic services metrics will also be available.

46

*CPR Plan of Action*

| Plata Standard | Metric |
|---|---|
| Health Screening | • History and physical examination for all patients within 14 days of arrival at Reception Center |
| Access to Primary Care (Sick Call) | • Face-to-face nurse triage for patients with symptoms within 24 hours<br>• An appointment with a primary care provider within 5 days for patients classified as urgent<br>• Within 14 days for patients classified as routine |
| Outpatient Specialty Services | • Policies require that high-priority consultations or procedures occur within 14 calendar days<br>• Routine consultations or referrals with 90 calendar days<br>• With follow-up by a primary care provider within 14 calendar days |
| Diagnostic Services | • Routine laboratory tested processed within 14 days of orders<br>• X-ray examinations completed within 30 days of order<br>• Primary care provider review of lab results within two business days of receipt<br>• Notification of patient of results within 14 days of receipt |
| Medication Management | • "Stat" medications be issued within 1 hour |
| Urgent/Emergent Response | • 24 hour emergency medical treatment<br>• Policies require follow-up within five days |
| Outpatient Housing Unit and Licensed Care | • Policies require physician evaluation within 24 hours of admission<br>• Evaluation by a primary care provider within 5 days for all patients returning from an impatient acute care facility |
| Pregnant Patient Care and the Birth of Children | • Policies require that patients be seen by a obstetrics provider within 7 calendar days of determination of pregnancy<br>• Each patient be provided six-weeks post delivery for follow-up |
| Chronic Care Program | • Policies require an initial intake evaluation within 30 days for patients referred to the Chronic Care Program<br>• Ongoing evaluations every 90 days |

A number of the measures available from the clinical data warehouse will meet the National Quality Forum's criteria for importance, validity, usability, and feasibility. Most importantly, as the Receiver develops the infrastructure elements to support quality interventions, the measures will be actionable.

Once clinical data at the individual level are available, it will be easy to aggregate them into measures of population health for specific groups, *e.g.*, for older inmates, inmates with HIV, and women.

### Uses of Rigorous and Non-Rigorous Data

The IOM makes a distinction between data for accountability *versus* data for improvement. Non-rigorous quantitative data, as well as qualitative data that may be rigorous or not, have critically important roles to play in the Receiver's quality improvement agenda.

Clinicians and managers need timely data at every level of rigor to guide improvement initiatives. At the microsystem level, frontline change agents need to develop skills in gathering just enough data to provide credible guidance for their improvement efforts, *e.g.*, reviewing six charts before next Tuesday. If it is already clear that a clinical process is broken, then waiting for an annual audit on the topic is unnecessary and unwise. Such measurement strategies are core elements of the rapid cycle quality improvement and high-reliability methodologies discussed above.

It is important to emphasize the critical role of qualitative (non-numeric) data in quality reporting systems. Root cause analysis of a single sentinel event could suffice to drive a statewide system redesign initiative, once we have adequate quality and managerial resources to carry out such an initiative. Research-level qualitative data and analysis may be warranted to provide guidance for more challenging system improvements. Also, just as there is a role for "quick-and-dirty" quantitative data for improvement initiatives, there is also an invaluable role for qualitative anecdotes and personal stories in gathering support for system change.

### Death Reviews and Mortality Data

In a 1998 report (*Summarizing Population Health*), the IOM concluded that "Mortality measures, although important, provide incomplete and insensitive information for decision-making." At the same time, the report acknowledged that "Both ordinary people and policymakers are deeply interested in extending life." In its 2006 report on measurement, the IOM acknowledged the multiple controversies that surround mortality measures, but some of the committee members felt that mortality is "too important to ignore."

We will continue to track the aggregate number of deaths per year, but this figure has limited value for assessing the quality of medical care or driving system changes. A measure of preventable deaths would be more useful. Unfortunately, the large literature on preventable deaths and excess mortality is almost entirely epidemiological, that is, it estimates such things as expected versus actual deaths within very large populations. There are few reports of systematic retrospective chart reviews examining the quality of care given prior to death, mostly in the setting of trauma care. Although every death is reviewed in the CDCR as in many other systems, no one has published a validated method for determining preventable versus non-preventable deaths using chart review in a primary care setting. The determination rests on the reviewer's best judgment.

*CPR Plan of Action*

This limitation in measurement, however, does not diminish the value of the death reviews. As noted above regarding qualitative data, a review of even one sentinel event could produce enough cause for concern to launch a statewide system redesign. Close reviews using root cause analysis are invaluable in revealing vulnerabilities in care processes. The Receiver's team will continue to oversee disciplined reviews of deaths within the CDCR.

## Measures of Organizational Culture and Satisfaction

In addition to access, quality, and cost measures, the Receiver will begin to develop measures of organizational culture and change. The Centers for Medicare and Medicaid Services (CMS) has begun to use staff turnover rates as a marker for organizational culture, and several state prison systems have begun to explore this use as well. Staff satisfaction surveys can also serve as measures of organizational culture and provide guidance for change.

The Receiver will also explore the use of patient satisfaction surveys. Patient satisfaction measures are increasingly required by managed care oversight organizations and state and federal agencies. Several state prison systems have begun to track inmate satisfaction with health care. These patient-centered measures complement complaint and appeal systems.

## Balanced Scorecards

As the Receiver's new information and managerial systems begin to mature over the next two years, his team will develop balanced scorecards for each prison, eventually to be available on a monthly basis. These one-page scorecards will include measures of population health, clinical quality, utilization, financial performance, and management.

Balanced scorecards facilitate transparency and accountability, bridging long-term goals and immediate challenges. They focus attention on organizational initiatives and provide early alerts regarding trouble areas. Showing the disease burden and staffing resources in a prison can put into context that facility's access, utilization, and clinical indicators.

Going forward, California will join with other leading state prison systems in an effort to standardize a measurement portfolio for the correctional setting, drawing heavily from the ambulatory care measures already endorsed by the National Quality Forum.

## Office of Evaluation, Measurement and Compliance

Despite serious problems with data collection, the Receiver will begin the process of establishing accurate metric reporting with a three prong intermediate program comprised of the following programs, all of which the Receiver plans to have operational at the time of the filing of his November 15, 2007 modified Plan of

**49**

Action:

(1) a system to objectively measure the basics of *Plata* remedial plan compliance at no less than six pilot prisons;

(2) an accurate and objective system of mortality reviews;

(3) a pilot program for institutional inspections and Plata remedial plan compliance developed with California's Office of the Inspector General.

To effectuate this program, as well as to manage the development of the more sophisticated longer term metrics set forth in the Plan of Action Objective C.2, the Receiver will establish a new administrative structure within California Prison Receivership, an Office of Evaluation, Measurement and Compliance. This Office is planned to be operational prior to the filing of the November 15, 2007 modified Plan of Action.

## J.    References

1. Baldrige National Quality Program. *Health Care Criteria for Performance Excellence*, 2007.

2. Institute for Healthcare Improvement (IHI). www.ihi.org.

3. Institute of Medicine. *Crossing the Quality Chasm: A New Health System for the 21st Century*. Washington, DC: National Academy Press; 2001.

4. Institute of Medicine. *Keeping Patients Safe: Transforming the Work Environment of Nurses*. Washington, DC: National Academy Press; 2004.

5. Institute of Medicine. *Performance Measurement: Accelerating Improvement*. Washington, DC: National Academy Press; 2006.

6. Institute of Medicine. *Summarizing Population Health: Directions for the Development and Application of Population Metrics.*. Washington, DC: National Academy Press; 1998.

7. National Quality Forum. www.qualityforum.org

8. Shojania KG, Grimshaw JM. Evidence-Based Quality Improvement: The State of the Science. *Health Affairs*. Jan/Feb 2005.

# EXHBIT 2

## California Department of Corrections and Rehabilitation
### Inmate Population 06/30/1997 - 04/04/2007

| Institution | 6/30/1997 Design | 6/30/1997 Actual | 6/30/1997 % of Over-Crowding | 6/30/2002 Design | 6/30/2002 Actual | 6/30/2002 % of Over-Crowding | 4/4/2007 Design | 4/4/2007 Actual | 4/4/2007 % of Over-Crowding | 6/30/1997- 4/4/2007 Design Change | 6/30/1997- 4/4/2007 Actual Population Change |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ASP | 2320 | 5699 | 245.6 | 2920 | 6943 | 237.8 | 2920 | 7611 | 260.7 | 600 | 1912 |
| CCC | 3682 | 5920 | 160.8 | 3682 | 5901 | 160.3 | 3883 | 6027 | 155.2 | 201 | 107 |
| CCI | 2781 | 5918 | 212.8 | 2781 | 5296 | 190.4 | 2757 | 5859 | 212.5 | (24) | (59) |
| CIM | 3078 | 6460 | 209.9 | 3078 | 6273 | 203.8 | 3207 | 6540 | 203.9 | 129 | 80 |
| CMF | 2315 | 3087 | 133.3 | 2315 | 3282 | 141.8 | 2307 | 3039 | 131.7 | (8) | (48) |
| CMC | 3884 | 6580 | 169.4 | 3884 | 6594 | 169.8 | 3840 | 6545 | 170.4 | (44) | (35) |
| CRC | 1814 | 4105 | 226.3 | 1814 | 3920 | 216.1 | 1814 | 4010 | 221.1 | | (95) |
| CAL | 2208 | 4054 | 183.6 | 2208 | 4102 | 185.8 | 2308 | 4122 | 178.6 | 100 | 68 |
| CEN | 2208 | 4377 | 198.2 | 2208 | 4446 | 201.4 | 2308 | 4893 | 212 | 100 | 516 |
| COR | 2916 | 4955 | 169.9 | 3016 | 4898 | 162.4 | 3116 | 5380 | 172.7 | 200 | 425 |
| LAC | 2200 | 4272 | 194.2 | 2200 | 3914 | 177.9 | 2300 | 4705 | 204.6 | 100 | 433 |
| SAC | 1728 | 3271 | 189.3 | 1728 | 2895 | 167.5 | 1724 | 3081 | 178.7 | (4) | (190) |
| SQ | 3283 | 5763 | 175.5 | 3273 | 5696 | 174 | 3109 | 5191 | 167 | (174) | (572) |
| SOL | 2110 | 5735 | 271.8 | 2610 | 5775 | 221.3 | 2610 | 6076 | 232.8 | 500 | 339 |
| SATF[1] | | | | 3324 | 6486 | 195.1 | 3424 | 7273 | 212.4 | 100 | 787 |
| CVSP | 1738 | 3579 | 205.9 | 1738 | 3611 | 207.8 | 1738 | 3885 | 223.5 | | 306 |
| CTF | 3281 | 7189 | 219.1 | 2771 | 5869 | 211.8 | 3301 | 7121 | 215.7 | 20 | (68) |
| DVI | 1787 | 3499 | 195.8 | 1787 | 4005 | 224.1 | 1787 | 3906 | 218.6 | | 407 |
| FOL | 2071 | 3781 | 182.6 | 2072 | 3739 | 180.5 | 2236 | 4076 | 182.3 | 165 | 295 |
| HDSP | 2224 | 4298 | 193.3 | 2224 | 4151 | 186.6 | 2324 | 4642 | 199.7 | 100 | 344 |
| ISP | 2200 | 4606 | 209.4 | 2200 | 4635 | 210.7 | 2200 | 4681 | 212.8 | | 75 |
| KVSP[2] | | | | | | | 2448 | 4952 | 202.3 | | |
| MCSP | 1700 | 3660 | 215.3 | 1700 | 3652 | 214.8 | 1700 | 3820 | 224.7 | | 160 |
| NKSP | 2692 | 5095 | 189.3 | 2692 | 5077 | 188.6 | 2692 | 5398 | 200.5 | | 303 |
| PBSP | 2280 | 3732 | 163.7 | 2280 | 3279 | 143.8 | 2252 | 3480 | 154.5 | (28) | (252) |
| PVSP | 2208 | 4660 | 211.1 | 2208 | 4665 | 211.3 | 2308 | 5142 | 222.8 | 100 | 482 |
| RJD | 2200 | 4662 | 211 | 2200 | 4577 | 208 | 3302 | 4717 | 142.9 | 1102 | 55 |
| SVSP | 2224 | 4204 | 189 | 2224 | 4170 | 187.5 | 2298 | 4752 | 206.8 | 74 | 548 |
| SCC | 3606 | 5975 | 165.7 | 3606 | 6047 | 167.7 | 3736 | 6175 | 165.3 | 130 | 200 |
| WSP | 2984 | 5879 | 197 | 2984 | 5949 | 199.4 | 2834 | 5843 | 206.2 | (150) | (36) |
| **Average % of Overcrowding:** | | | **196.0** | | | **191.30%** | | | **196.40%** | | |
| CIW | 1026 | 1829 | 178.3 | 1026 | 1773 | 172.8 | 1326 | 2650 | 199.8 | 300 | 821 |
| CRC | 500 | 893 | 178.6 | 500 | 631 | 126.2 | 500 | 539 | 107.8 | | (354) |
| CCWF | 2004 | 3328 | 166.1 | 2004 | 3044 | 151.9 | 2004 | 4014 | 200.3 | | 686 |
| NCWF[3] | 400 | 758 | 189.5 | 400 | 703 | 175.8 | | | | | |
| VSPW | 1980 | 3251 | 164.2 | 1980 | 3030 | 153 | 1980 | 3865 | 195.2 | | 614 |
| **Average % of Overcrowding:** | | | **175.3** | | | **155.9** | | | **175.8** | | |

1. SATF opened August 1997    2. KVSP opened June 2005    3. NCWF closed in 2004

SOURCE: CDCR, Data Analysis Unit Monthly Report of Population (06/30/97-06/30/02) and Weekly Report of Population (04/04/07)

# EXHBIT 3

# Inmate/Parolee Population Management

California's prison system presently holds more than 162,000 adult inmates, with another 114,000 former inmates under state parole supervision. The cost of that system now approaches $6 billion. The size of the prison population has resulted in part from tough-on-crime sentencing policies of recent decades, but the state has also been widely criticized for fueling the numbers by not doing a better job of preparing inmates to return to society. Approximately 90 percent of state prison inmates are eventually released on parole, and at present, more than half return to prison. A 2003 study by the Little Hoover Commission concluded that inmates are not prepared for their release from prison. Department of Corrections reports show that 43 percent of inmates released from prison in 1999 were sent back to prison within a year and that 56 percent returned within two years. Many of those returned to prison are parolees who are sent back for violating the conditions of parole, rather than for committing new crimes, and many of those go back for relatively short periods of time—an average of 5 ½ months. The vast numbers of parolees returning to prison help drive both the size of the prison population and the cost of the system. In 2001 more than 74,000 (47 percent) of the average daily prison inmate population of 157,000 was made up of parole violators.

To identify solutions to these problems the Corrections Independent Review Panel interviewed dozens of correctional experts, examined published studies, and researched the custody and parole practices of other states. As a result of that analysis, the panel recommends that the new Department of Correctional Services undertake several actions to better manage the inmate and parolee populations. The panel concluded that California can reduce the growing cost of managing its adult prison population by addressing three key factors that influence the size of that population — the length of time inmates serve in prison; the training and treatment they receive during incarceration to decrease the likelihood that they will return; and the services they receive during parole to help them remain crime-free and successfully integrate into society.

Underlying the panel's recommendations is the fundamental principle that the main goal of prison is to protect public safety, but that public safety is best served by a system that not only locks up criminals, but also helps inmates prepare for release and improves opportunities for parolees to stay out of prison. For those efforts to succeed, the custody and parole systems must work in concert, beginning with the first day inmates enter prison and continuing until parolees are released from supervision.

The length of time an inmate serves in prison depends on the sentence imposed by the court and on "time credits" earned by the inmate through in-prison work and program activities. The training and treatment inmates receive in prison includes education and other programs offered in accordance with goals identified for each inmate. And parole services include both surveillance and programs such as job placement and drug abuse treatment.

**REFORMING CORRECTIONS**

To address the length of time inmates spend in prison, the panel recommends eliminating the current time-credit system for non life-term offenses and adopting instead a "presumptive" sentencing structure that more effectively encourages inmates to achieve identified goals during incarceration. As an immediate measure to shorten prison terms, the panel recommends enhancing time credits inmates can earn in return for accomplishing specified goals. As a further means of reducing the prison population, the panel recommends identifying older inmates who could safely be released early, consistent with similar programs operating in several other states. To better prepare inmates for release, the panel recommends providing inmates with much greater access to in-prison education, vocational classes, life-skills training, re-entry services, and drug treatment. Those efforts should be guided by a research-based needs and risk assessment of each inmate upon entry into prison and should include a programming plan designed specifically to address the inmate's identified needs.

To reduce the number of parolees who return to prison, the panel recommends changes that will enable parole agents to concentrate the most intensive supervision on parolees who represent the greatest risk to the community and improving services to help parolees reintegrate into society. The changes should include a risk-assessment of each parolee. The risk-assessment tool should be updated regularly to reflect any changes in the demographics of the parole population. Parolees identified through risk assessment as very low risk should be discharged from parole after three months. In addition, the panel recommends increasing the number of substance abuse treatment beds in the community and continuing implementation of the Department of Corrections "new parole model," which includes pre-release planning, electronic monitoring, and residential treatment as an alternative sanction for technical parole violations. The new Department of Correctional Services should also implement effective research and data-collection capabilities to precisely identify the most effective and efficient methods of supervising parolees.

In implementing these reforms, the first order of business should be determining the operable capacity of the state's prisons—the maximum capacity of the prisons to house inmates safely and securely while providing effective education, training, and treatment. The second order of business should be to determine the appropriate staffing needed to operate each prison and to provide inmates with needed programming. To improve strategic planning capabilities, the panel recommends that the new Department of Correctional Services contract with one of the state universities to undertake responsibility for inmate population projections.

## Fiscal Impact

The department saves money with each inmate and parolee it safely removes from the prison and parole population. The present average cost of housing an inmate is $28,439 per year, and the average cost of supervising a parolee is $2,930 per year. Some of the recommendations presented here require an initial investment, but can be expected to save money in the future by improving the chances for inmates and parolees to succeed, thereby reducing the numbers who return to prison and shrinking the overall prison population.

**122**

Other recommendations may immediately reduce prison and parole populations and thereby produce savings upon implementation.

## Laying the Groundwork for Reform

Every day, hundreds of thousands of inmates and parolees are housed, supervised, and moved around within the state prison and parole systems. Managing this population is complex and challenging. In today's environment, prison administrators must contend with severe overcrowding, the potential for violence, court mandates to provide constitutionally adequate conditions of confinement, budget cuts that have reduced staffing, and burgeoning inmate population levels, fueled in large part by former inmates cycling back into prison.

The key to reforming the system lies in reducing the numbers. That effort will require attention to sentencing practices, time-credit policies that allow inmates to reduce sentences, early-release for low-risk offenders, and a commitment to programs that help inmates and parolees reintegrate into society. For programming to succeed, in turn, the system must free up programming space and provide adequate staffing to provide program services and run the institutions. Strategic planning for that task will require accurate population projections, knowledge of the system's basic operable capacity, and a determination of necessary staffing levels.

### Background

Operable prison capacity — the maximum capacity of the prisons to securely house inmates and provide effective programming— differs from both design capacity and maximum "safe and reasonable" capacity. "Design capacity" is the term used for the past 50 years to designate the number of inmates a prison is designed to accommodate according to standards developed by the Commission on Accreditation and the American Correctional Association.[1] The number can be based on any combination of single-occupancy cells, double-occupancy cells, single- or double-bunked multiple occupancy rooms, or dormitories. The standards take into account the need for humane conditions, as well as the need to prevent violence and move inmates to and from programs, such as mental health care, education classes, and drug abuse treatment. In California, design capacity is based on one inmate per cell, single bunks in dormitories, and no beds in space not designed for housing. The design capacity of California's male prison system, including the capacity of the state's new prison at Delano, is 76,879 inmates.  (See Table 1).[2]

---

[1] California's actual prison capacity has never been limited to design capacity due to an ever-growing prison population. Actual prison population is represented here as a percentage of design capacity to provide a conceptual framework to convey the volume of prisoners that must be managed within the existing fixed environment.

[2] This report focuses primarily on the male prison population, which comprises 88 percent of the state's total prison population. According to the Department of Corrections "Monthly Report of Population as of April 30, 2004," compiled by the Offender Information Services Branch, the institution population on that date totaled 161,394, with 141,763 male inmates and 9,638 female inmates in the state's prisons and 9,993 male and female inmates in other types of facilities, such as contracted jail beds, public and private community correctional facilities, and other placements.

**123**

**REFORMING CORRECTIONS**

Maximum "safe and reasonable" capacity, in contrast to design capacity, refers to the maximum number of inmates who can safely and reasonably be housed in the prison system. That number takes into account the "safe and reasonable" capacity of individual housing units according to inmate custody levels, staffing levels, and the physical structure of the units. Level IV facilities, with a greater potential for violence, for instance, have a lower maximum safe and reasonable capacity than Level II and Level III facilities. The safe and reasonable capacity of each prison can be determined by totaling the safe and reasonable capacities of each housing unit in the prison, and the safe and reasonable capacity of the system can be estimated by combining the totals for each prison. The Department of Corrections has determined the maximum safe and reasonable capacity of the general population and reception center housing to be 190 percent of design capacity, while other housing can be filled only to between 100 and 160 percent of design capacity. Overall, the department has determined that the maximum safe and reasonable capacity of the state's male prisons is 137,764 inmates - 179 percent of design capacity.

*Defining operable capacity.* Operable capacity, which takes into account space needed for effective programming in addition to safety and security, is greater than design capacity, but far less than maximum safe and reasonable capacity. A group of experienced California prison wardens told the panel at a recent forum that the operable capacity of the state's prisons to support full inmate programming in a safe and secure environment is 111,309 inmates, or 145 percent of design capacity.

*The state's prison system presently far exceeds operable capacity.* California prisons are presently filled to the breaking point, with populations exceeding both design capacity and "safe and reasonable capacity," and far exceeding operable capacity. With 141,763 male inmates in a prison system designed to hold 76,879, as of April 30, 2004, the state's prisons were operating at more than 184 percent of design capacity. That number exceeds the prison system's safe and reasonable capacity by 4,000 inmates — and it exceeds operable capacity by 30,000 inmates.

Even those numbers understate some of the overcrowding. Accommodating the present inmate population has been accomplished by confining two inmates in cells designed for one, by double- and triple-bunking inmates in dormitories designed for single bunks, and by converting activity space into inmate housing areas. As Chapter 9 of this report notes, more than 9,500 male inmates are presently housed in activity space that was never designed for housing. Because Level IV inmates are generally more violent and cannot be crowded to the same degree as other inmate levels, Level IV celled housing units have now reached 152 percent of design capacity and may not realistically be filled beyond that point. As a result, greater numbers of inmates are forced into other housing, which has raised Level III housing to 201 percent of design capacity, and Level II housing to 220 percent. Consequently, the overall population of male prisons exceeds a safe maximum, and individual housing units in some prisons are so severely over-crowded as to be at a crisis stage. Reception centers, for example, which house all inmates entering prison, are housing a population of 20,000 male inmates in space designed for only 8,500 — putting reception centers at 236 percent of design capacity.

**124**

*Female prisons are also overcrowded.* Female prisons are nearly as crowded as the male prisons although they do not experience the same levels of violence. The population of female prisons as of April 2004 stood at 9,945 inmates, compared to a design capacity of 5,830. The most severely crowded female prisons operate from 173 to 184 percent of design capacity.[3] The effects of crowding in these prisons are as severe as in the male prisons, even with lower levels of violence. While these prisons do not represent the same challenges for security as their male counterparts, the recommendations in the Report for inmate programming apply equally to both.

*Staffing reductions have accompanied overcrowding.* From fiscal year 1990-91 to 2004-05, more than 5,000 positions were reduced from the state prison workforce through various legislative budget reductions. During the same period, almost 1,200 additional positions were cut from the headquarters and parole staff.[4] The positions cut have extended throughout the system, and have included correctional officer, vocational and classroom teacher and other support staff positions, with a marginal number of correctional officer positions retained to perform essential security functions. Although some positions have been added to accommodate increases in prison population, these have not been sufficient to offset the overall reductions.

*Overcrowding and inadequate staffing impedes programming.* Staffing reductions, overcrowding, and attendant violence have eroded the ability of the prisons to operate effectively for any purpose other than security. While the prisons attend to the primary objective of safety and security, they are able to pay little attention to inmate programming.[5] As a consequence, programs have been curtailed, which in turn has increased inmate idleness — ironic, in that effective programming would actually enhance internal security. Instead, combined with the reductions in security and non-security staff, the crowded conditions and lack of programming have elevated security risks and increased the probability of violent confrontations. Meanwhile, inmate programs such as education and substance abuse treatment that might reduce recidivism cannot be delivered because space intended to be used for such programs is instead used to house inmates.

The current situation in California prisons is untenable, and changes are required to bring about necessary controls. Before consideration is given to implementing the recommendations in this report concerning inmate programs, the safety and operability of the prisons must be improved. This report substantiates that education and other programs for inmates contribute to public safety. The environment that is needed for these programs to work must first be created and that requires:

- Violence control;
- Opening up program space by reducing prison population;

---

[3] Monthly Report of Population as of Midnight April 30, 2004. Department of Corrections, Offender Information Services Branch

[4] Summary of Reductions, Department of Corrections, Budget Management Branch

[5] Warden's Forum on Prison Capacity, CIRP, May 26, 2004

**125**

- Adding staff necessary to implement specific effective programs; and
- Exploring creative measures for the use of existing resources.

The reduction of prison population may be accomplished through the use of the new parole model (which reduces returns to prison), the initiation of a program of increased credits for time served, and adoption of a new sentencing approach for the majority of inmates who otherwise would receive determinate sentences. These options are discussed below.

*Violence must be brought under control to make programming possible.* The violence potential of Level IV inmates, especially in crowded conditions, severely challenges the development of a program environment in male prisons. To support programming that emphasizes preparing inmates for re-entry into the community, order and control of potentially violent inmates is necessary.[6] Implementing a violence control program has the potential both to provide this needed order and control and to begin the process of improving inmate behavior through programming. Violence control programs use special support staff and a system of rewards to implement programs known to be effective, such as anger management courses designed to control violence and produce the means for violent inmates to improve behavior. The violence control program is endorsed by the National Institute of Corrections and used effectively in 20 other states.[7] This program will permit the new department to begin to take the initial steps necessary to establish an environment in the prisons that can foster a broader application of inmate programming and the "re-entry philosophy."

*Increased staff and program space are needed to support effective programming.* Increases in both program space and staff are required to make effective inmate programming possible. Once operable capacity is determined and accurate population forecasts are made, the Department of Correctional Services can use a standardized staffing model to identify when staffing levels must increase or decrease. The new Department of Correctional Services should undertake a project to determine the appropriate staffing required for the operation of each type of institution, including management, custody, health care, and all other programs. Mission and capacities of institutions should be carefully designated so as to distinguish them on the basis of their mission, physical plant, specific inmate/ward supervision and programming requirements, and any other special consideration for a particular institution. Prisons can generally be divided into two types: modern prisons constructed after 1984 and older prisons constructed before 1984.

While standard staffing "packages" were approved for activating the prisons built after 1984, these packages should be used only for reference and should be updated to reflect

---

[6] Fifty-eight percent of the current inmate population was sentenced to prison under a determinate sentence and will eventually be released for return to the community, according to *Prison Census Data as of December 31, 2003* provided by the Department of Corrections, Offender Information Services Branch.

[7] Department of Corrections, Violence Control Program Budget Change Proposal for fiscal year 2003-04.

**126**

position reductions, redirections, accommodations for "overcrowding," court decisions, and other mandates that have affected staffing allocations. Input from operating wardens should be incorporated in determining the final results of the staffing project to ensure the operability of the institutions. The results should then be reconciled with the current budget for each of the institutions. Other recommendations in this report should be considered with respect to their applicability to the staffing project. The completion of this project can result in a more stable environment for current management and future planning for the continued development of the new department.

*Population projections.* Projecting future institution population is a matter of extreme importance for the department. Providing effective management of inmates and wards is the fundamental mission of the new Department of Correctional Services and can be done only when forecasts of increasing or decreasing population are as accurate as possible, reflect the types of inmates and wards that will require housing, and support effective programs to encourage successful re-entry to parole or aftercare programs. The current method used to forecast institution populations has been shown to be remarkably accurate over a substantial period of years and appears to provide the best basis for planning to accommodate this population, but even this method cannot be 100 percent accurate and "surprises" or emergencies can occur, as when unexpected numbers of inmates arrive at prison reception centers. This kind of emergency prompts criticism of correctional management that at best alleges an inability to plan effectively, and at worst alleges manipulation of the population forecasts.

Notwithstanding the demonstrable accuracy of the current method of projecting population relative to any other forecasting method for this purpose, uncertainty and distrust undermine the credibility of administrators in carrying out their designated responsibilities. A change in methodology appears not to be required. A change in the manner in which the methodology is used is recommended. The new Department of Correctional Services should consider an interagency agreement with one of the state universities that is active both in corrections education and research to undertake the responsibility for population projections. Management of this university relationship should be assigned to the new Office of Research and Planning. Taking these important steps will move the vital function of population projections to a neutral site that has both experience and interest in the management and research value of this process. This move will provide independent credibility for the results. In addition, cooperative research between the new Department of Correctional Services and the selected university can be used to maintain and improve the current population projection model where warranted, and the information generated through the process can be used for other decision-making purposes. The costs of implementing this change are unknown at this time. The panel expects that the university-based researcher would supplement the current staff of the department.

*Reducing the amount of time served in prison.* At present, most California Department of Corrections prisoners can reduce the length of their prison terms by staying out of trouble and having a "work assignment" inside the prison. Work assignments are broadly defined

**127**

**REFORMING CORRECTIONS**

to include education and vocational training as well as more traditional work that supports the operation of the prison, such as gardening, maintenance, or food-service. Most prisoners earn "day-for-day" credit, in which they earn one day off their sentence for each day they have a work assignment. Prisoners who are on a waiting list for an assignment earn one day off for every two days they are unassigned. Beginning in January 2003, inmates housed in the department's conservation camps can earn "two-for-one" credit or two days off their sentence for each day they are otherwise eligible to earn sentence credits.[8]

*Methods to reduce sentences.* Short-range and long-range methods are available to reduce the average time served in prison sentences. The average length of time served in prison, the number of new admissions, and the number of parole violators returning to the prison system are the three major factors that influence the prison population. If the amount of time served drops significantly or the number of felons committed to prison declines, then the prison population will also decline. The Corrections Independent Review Panel proposes two methods that will motivate inmates to improve themselves in prison and will result in less time served in prison. (The panel also discusses changes to the parole system later in this chapter.) Both methods alter or expand the sentence-reduction credit process, but differ in how quickly the methods can generate benefits once implemented. The first method, called presumptive sentencing, will require a long implementation period and will only apply to newly committed inmates. The second method can be implemented immediately after minor statutory change, and will enhance the amount of sentence-reduction credits that inmates can earn—providing that the inmates accomplish certain goals.

*"Presumptive sentencing" focuses prisoners on preparing for release.* Inmates serving determinate sentences have a prescribed term imposed at the time of commitment to prison, the actual length of which is subject to change based on the application and removal of sentence-reduction credits for work and other activities. The credit system was originally intended to provide incentives for the inmates to improve themselves and thus reduce the actual time they need to serve in prison by taking advantage of opportunities to work or participate in education programs. It was to serve a dual function of making inmates more manageable in prison while improving their chances for a successful return to the community.

Due in part to the sheer size of the system, the administration of many of its provisions has become automatic, and coupled with its complexities it has become a system in which sentence-reduction credits have become a "right" to be protected. The responsibility of prison officials has shifted from making programs available to making sure the inmates are "programming." Likewise, the focus of inmates has shifted from preparing themselves for parole through treatment and education to simply earning sentence-reducing credits by any means. The system is not the incentive system contemplated but has become instead a constant struggle for obtaining sentence-reduction credits increasingly viewed as a right in a prison structure in which funding for programs has diminished.

---

[8] Penal Code, Section 2933.3

**128**

Numerous corrections officials expressed to the panel growing frustration in trying to safely manage inmates who have no particular incentive to behave under the current system. An alternative, such as a "presumptive sentence," can return both simplicity and incentives to the administration of prison sentences. Under such a system a presumptive term and a maximum term would be established by a sentencing judge. The maximum term would be the same term as would be assigned under the current sentencing laws. The presumptive term would be a smaller portion of the maximum term (perhaps 50 percent). In selecting the presumptive term, the judge considers that it includes "good behavior" so that the presumptive term becomes the actual time to be served *provided that* good behavior is maintained by the inmate. Good behavior is further defined as completing a "program plan" that is assigned to the inmate upon arrival at prison[9]. (The program plan would need to address specific deficiencies or needs of the inmate and prescribe solutions that are flexible enough to work in the department's varied prison settings.) The inmates would be reviewed periodically by a social worker or counselor to determine their progress with the plan.

Under a presumptive sentencing model, the inmate would be eligible for release after completing the presumptive term. However, actual release would require verification that the inmate actually completed the requirements — the presumptive elements — of the sentence. The details of such an approval process would require more specific development by the new Department of Correctional Services, but one recommended method would be to have the Hearings Administration identified in Chapter 1 of this report conduct a review to verify completion. If, after consideration of the inmate's progress, the Hearings Administration determined that the inmate had completed the prescribed requirement, the inmate would be released. Alternatively, if the Hearings Administration determined that the inmate had not completed the requirements, the inmate would be denied release until he or she had completed the requirements (or until the maximum term elapsed.) Other methods of administering this process should also be considered by the new Department of Correctional Services.

*Presumptive sentencing supports re-entry programming.* A presumptive sentencing model supports a needed shift in the department's philosophy toward a "re-entry" orientation. The concept of a presumptive sentencing model provides a focus on eventual re-entry into the community as well as providing incentives for inmates to behave. It also requires a shift in the capability of the new Department of Correctional Services toward a "re-entry philosophy" that focuses on the eventual release of the inmate. Public safety is served not just by incarceration, but by both incarceration and a prison term dedicated to improving the chances for successful re-entry. Presumptive sentencing will provide an incentive to in-

---

[9] An option would be to tie this process back to the community by having the sentencing judge approve or prescribe the content of the plan. There are a number of obstacles to implementing this option, including ensuring that the plan is prepared in advance of sentencing and making sure that the judge prescribes a plan that is actually available in the prison.

**REFORMING CORRECTIONS**

mates to take the responsibility of completing the program plan and to officials who will have the responsibility of developing and administering it.

It is important to note that the recommendation for a presumptive sentencing model is to replace the current structure of determinate sentences only, as a means of including this sentencing method in a comprehensive correctional approach focusing on successful re-entry. It does not include the current structure for life sentences or the "two-strike" and "three-strike" sentences, which are beyond the scope of this recommendation. In December 2003 there were about 90,500 inmates (58 percent) serving determinate sentences. The remaining 42 percent of the inmates were serving life sentences, two-strike, or three-strike sentences.[10] (Programs for these inmates should be developed as a secondary priority and are not considered in this report.)

The Corrections Independent Review Panel expects that once fully implemented, a presumptive sentencing model would generate significant savings as inmates become better prepared for reintegration into society. The presumptive sentencing model would require further development by the new department, and the panel recommends that the new department charter a special commission to fully develop this important sentencing reform.

***Goal-oriented sentence reduction credits could be increased quickly.*** Under the current sentence-reduction credit system, most of the department's inmates are limited to day-for-day credits, although some can earn more. (Fewer than 4,000 inmates housed in conservation camps earn two-for-one credits.) Inmates earn their day-for-day credits by participating in work, academic, or vocational activities; however, there is no requirement that the inmate fulfill any specific goals or even complete the training. The panel proposes that the department create a bonus sentence-reduction credit that would supplement existing credits and reward completion of education, vocational, or drug-treatment programs that are proven to reduce inmate recidivism.

This bonus sentence reduction credit would provide incentives for inmates' work activities by rewarding *completion* of academic, vocational, or drug-treatment goals. For example, an inmate could earn a 90-day sentence reduction for completing a literacy program or a college-level class, or a 180-day reduction for completing a drug-treatment course or a vocational certificate. Larger sentence reductions could be awarded to inmates who complete more rigorous programs, such as a two-year college degree. To implement this concept, the department would need to develop specific policies and procedures, and develop legislation to amend the California Penal Code to grant the authority for inmates to earn additional time credits.

***Release of low-risk inmates to community supervision.*** Other states have successfully formed partnerships with law schools to identify and consider for release low-risk older

---

[10] California Department of Corrections, "Characteristics of the Inmate Population," Table 10, February 2004.

**130**

and geriatric inmates. The California Department of Corrections currently houses more than 3,700 inmates who are between 55 and 59 years of age, and nearly 3,100 aged 60 or older[11]. The Legislative Analyst's Office, in its fiscal year 2003-04 Budget Analysis, recommended that California consider early release of elderly inmates. In its analysis, the Legislative Analyst noted that California does not track the cost of incarcerating elderly inmates, but that several other states do and that these other states have estimated that elderly inmates cost two to three times the amount needed to house younger inmates. The Legislative Analyst further reported that New York, for example, estimated its annual cost of housing elderly inmates to be between $50,000 and $75,000 each. The National Center of Institutions and Alternatives estimated the annual cost of confining elderly inmates at $69,000 – nearly three times the national average of $22,000 to incarcerate other inmates.[12]

The Legislative Analyst's Office noted that housing nonviolent elderly inmates is not a good use of scarce resources when they represent a low risk to society.[13] While the majority of these offenders should remain in custody because of the serious, violent, or sexual nature of their crimes, a small percentage could be considered for early release. Statistics published by the U.S. Department of Justice indicate that recidivism drops significantly as inmates age—from over 50-percent nationally for inmates between ages18 and 29 to about 2-percent for inmates aged 55 or older.[14]

In a December 2003 analysis for the Legislative Analyst, the Department of Corrections estimated that release of non-serious, non-violent inmates aged 55 or older would reduce the inmate population by 657 and result in savings of $10.5 million in fiscal year 2005-06, if these provisions become effective on January 1, 2005. In the first fiscal year, the institution population would be reduced by about 332 inmates, resulting in savings of $5 million. Full-year savings would occur in fiscal year 2006-2007, when institution population would be reduced by 657 inmates, resulting in savings of $11 million. The institution savings would be offset by the cost of supervising these offenders on parole. Also, these savings are based on the average cost of incarceration for all inmates.[15]

In its calculations, the department assumed certain elderly inmates would be excluded from eligibility. Parole violators-returned to custody, inmates with life terms, second-striker inmates, sex registrants, and persons whose current or prior offenses are serious or violent (as defined in Penal Code, sections 1192.7(c), 1192.8, and 667.5(c)) were considered ineligible for early release.

Several states have released elderly inmates under a program created by George Washington University professor Jonathan Turley. Turley is the founder of the Project for Older Prisoners program, which uses a partnership between law schools and corrections depart-

---

[11] Department of Corrections, "Prison Census Data," December 31, 2003, Table 5.
[12] Legislative Analyst's Office, "Budget Analysis, Fiscal Year 2003-04," p. D-39
[13] Ibid., p. D-40
[14] U.S. Department of Justice, Bureau of Justice Statistics, "Trends in State Parole, 1990-2000."
[15] Department of Corrections, Legislative Estimates Unit, "Legislative Analyst Request 6," December 16, 2003.

REFORMING CORRECTIONS

ments to assess inmates for early release. To date, more than 200 inmates have been released under the program without a single act of recidivism.[16]

The Project for Older Prisoners program is likely to result in fewer early releases than the 657 figure estimated by the department because of its careful risk analysis and assessment of each inmate. This method is recommended, however, because of its conservative approach and excellent track record. Even if only one-quarter of the 657 inmates identified by the department met the more conservative criteria of the Project for Older Prisoners program, savings of $2.75 million could ultimately be realized.

***Contracting with private companies for low-level inmates.*** The Department of Corrections currently contracts with several private corrections companies for about 2,500 beds for lower level inmates. In January 2004 the department discontinued contracts for about 1,000 beds. Privatized beds provide a high degree of flexibility because the department has no long term investment in the infrastructure or the staffing and can renew contracts on an as-needed basis.

Based on the projected Level I male institution population in 2009, the department will need more than 10,000 additional beds in order to house Level I inmates in a safe environment with programming opportunities.[17] Renewing contracts with the existing facilities and reentering into agreements with the previously closed facilities would help to provide the beds needed for this population, with no capital outlay costs to the state.

## Recommendations

The Corrections Independent Review Panel recommends the following actions:

- Begin to create the environment in the prisons that is needed for inmate programs to be effective, which requires the following:

  - Implementation of a Violence Control Program;

  - Opening up program space by reducing prison population through lower returns to custody;

  - Adding staff necessary to implement specific, effective inmate programs;

  - Exploring creative measures for the use of existing resources.

- Develop an interagency agreement with one of the state universities that is active both in corrections education and in research to undertake the responsibility for

---

[16] George Turley, speaking at a sentencing seminar hosted by McGeorge Law School, April 16, 2004; Web-page viewed on March 25, 2004: www.gwu.edu/~ccommit/law.htm
[17] Table 1: Analysis of Male Institution Bed Capacity, CIRP, June 2004

**132**

population projections. Management of this function should be assigned to the new Office of Research and Planning.

- Undertake a project to determine the appropriate standard staffing required for the operation of each type of institution, including management, custody, health care and all other programs.

- Charter a commission with appropriate members from the judicial and corrections fields to develop a presumptive sentencing model. The model would apply only to sentences for offenses that are not subject to "two-strikes," "three-strikes," or other life terms.

- Modify the Penal Code to allow inmates to earn supplemental sentence reduction credits after they complete specified education, vocational, or drug-treatment goals.

- Establish a program to identify older inmates who could be safely released early from prison. The program should be similar to the Project for Older Prisoners program that has successfully released more than 200 inmates in other states without a single instance of recidivism.

- Renew contracts with existing privatized correctional facilities and consider reentering into contract agreements with previously closed facilities to provide the beds needed for the Level I population.

## Fiscal Impact

*For sentencing reform.* The panel expects that once fully implemented, a presumptive sentencing model would generate significant savings as inmates become better prepared for reintegration into society. It is not possible, however, to estimate the fiscal impact at this time. There may be up-front costs to restore vocational and education programs that have been reduced.

*Standardized staffing.* Until a standardized staffing model is developed, it is impossible to predict whether its use would increase or lower current costs. In the long run, however, use of a standardized staffing model will allow greater accountability, which should result in cost savings.

*University-based population projections.* Similar to standardized staffing, better population projections will allow better planning and, in turn, provide greater accountability for the new department's operations.

*For the early release program.* As noted above, estimated savings are $2.75 million. Even greater savings may accrue from savings in health care cost avoidance; however, those savings cannot be estimated.

**133**

**REFORMING CORRECTIONS**

## Education Reforms

Numerous studies show that prison education programs help inmates reintegrate into society and reduce recidivism rates — the rate at which former inmates return to prison. California's recidivism rate is high compared to those of other states, and many of the state's inmates are ill prepared when they return to their communities.

The Corrections Independent Review Panel identified several areas where the new department can improve its educational system and re-entry programs to improve inmates' chances for success. Specifically, the panel recommends on-going assessment and refinement of the education programs. In addition, recently launched programs such as the bridging program, which provides for education in the reception centers, re-entry services, and other programs aimed at increasing inmate employment opportunities should be expanded. Consideration should also be given to using selected inmates in educational programs for other inmates. Rather than seeking entirely to add staff to effectuate programming goals, the new Department of Correctional Services should explore the expansion of existing projects, such as the health care peer educator, teacher aide, and lead vocational trainer projects that identify and train inmates to be used to teach other inmates in programs. There is evidence in other jurisdictions of success with inmates tutoring other inmates in basic reading.

### Background

Many inmates released from California prisons do not have the skills needed to obtain and maintain employment. More than 65 percent are unable to read, write, communicate in English, and function on a job. Many are unable to find jobs when they return to society— the parolee unemployment rate is 70 to 80 percent.[18]  This situation is aggravated by the fact that re-entry programs designed to provide links to employment opportunities for parolees serve only abut 30 percent of all inmates.[19]

*Effective programs reduce recidivism.* There is ample evidence that prison education and substance abuse programs have a positive impact on parolee recidivism, whereas researchers agree that incarceration alone does not have a measurable impact on recidivism. In May 2002, the Urban Institute completed a literature review of the effectiveness of prison-based education and vocational programs and concluded that: "In general, participants in prison-based educational, vocational, and work-related programs are more successful—that is, they commit fewer crimes and are employed more often and for longer periods of time after release—than are non-participants."[20]  Similar results have been found in other studies, including a Federal Bureau of Prisons study that showed a 33 percent drop in recidivism among federal inmates who were enrolled in vocational and apprenticeship training."[21]

---

[18] Little Hoover Commission, "Back to the Community: Safe & Sound Parole Policies," November 2003, p. vi.
[19] *Ibid.*
[20] The Urban Institute, "The Practice and Promise of Prison Programming Report," May 2002, p 8.
[21] State Correctional Education Programs, State Policy Update by Michelle Tolbert, March 2002, p 1.

**134**

General evidence of the benefit of prison education programs is also reflected in specific studies at the state level. For example, a January 2001 study by the Florida Department of Corrections found that the recidivism rate for inmates who earn a general education degree (GED) was 29.8 percent, whereas the recidivism rate for inmates without a GED was 35.4 percent (a 5.6 percent reduction.) Even more dramatic reductions in recidivism were observed for inmates who both completed a GED and obtained a vocational certificate. In that situation, the inmate's recidivism rate was 19.9 percent compared to the 35.4 percent rate for inmates with neither a GED nor a vocational certificate. The recidivism rate in Florida was even smaller for inmates who completed a GED and improved their Test of Adult Basic Education score to a 9th grade level. The recidivism rate of those inmates was only 12.2 percent.[22]

A three-state study of education programs conducted by the Correctional Education Association and Management & Training Corporation also showed the benefits of education programming in prisons. Statistics from Maryland, Minnesota, and Ohio showed that their rates of re-incarceration dropped from 31 percent for inmates not participating in education programs to 21 percent when inmates participated in education programs.[23]

The Washington State Institute for Public Policy analyzed numerous evaluations of treatment and education programs in North America conducted over the past 25 years. Their findings showed that prison programs can reduce crime in a cost-effective manner. For example, the study showed that prison vocational programs generate savings of up to $12,000 per participant and reduce crime by 13 percent, and that education programs generate savings of up to $9,000 per participant and reduce crime by 11 percent. The Washington review also found that in-prison therapeutic community substance abuse programs could save $2,365 per participant and reduce crime by 5 percent. (After the cost of the treatment was deducted and including both the direct savings to taxpayers and the benefits to potential crime victims.) When the type of program was followed through to the community (parole), the savings increased to an estimated $5,230 per participant and the crime reduction increased to 8 percent. The study showed an even larger savings from cognitive-behavioral programs, which cost about $300 per inmate but generated more than $7,000 in savings per participant and reduced crime by 8 percent.[24]

*Inmates' preparation for release must begin upon entry to the prison.* Re-entry planning and a risk assessment tool are being developed as part of the new parole model.[25] However, the current plan is to use these features only during the six- to nine-month period prior to an inmate's release from prison. The Corrections Independent Review Panel con-

[22] Florida Department of Corrections, "Academic, Vocational and Substance Abuse Program Impacts," pp. 3 and 11.
[23] Correction Education Association, Management & Training Corporation, "Education Reduces Crime – Three-State Recidivism Study," February 2003, p.12.
[24] Aos, Steve, *et.al*, Washington State Institute for Public Policy, "The Comparative Costs and Benefits of Programs to Reduce Crime," May 2001, p.8.
[25] Department of Corrections, draft memorandum - New Parole Model, February 2004.

cluded that this is too late. Instead, risk assessment and re-entry planning should begin when the inmate enters the institution, so that parole and prison staff can plan, along with the inmate, for eventual reentry by offering educational, behavioral, and drug treatment programs from the moment the inmate enters prison. Using this time constructively will both enhance public safety and save money if it can reduce the offender's future criminal behavior. It is important to include the parole division in this process because they are familiar with the community resources and what is needed for a successful re-entry.

*The availability of program classes is still limited to a small percentage of inmates.* At present, only inmates in the general population may participate in academic, vocation, or work programs; participation is not allowed for inmates in administrative segregation, secure housing units, and hospitals. Inmates in the reception centers participate in the bridging program, but are not considered part of the eligible population for traditional academic programs. The number of inmates participating in academic education programs rose from 7,178 in 1990 to 11,668 in 2004. During the same time period vocational program participation increased from 7,426 to 15,000.[26] However, the 2004 enrollment numbers reflect that only 26,668 (23 percent) of the 116,338 eligible inmates are participating.

The number of inmates who can enroll in academic and vocation programs is calculated by a formula used by the department that designates one filled teaching position for every 27 inmates. The total number of inmates who can receive programming is referred to as the enrollment capacity. A review of enrollment statistics indicates that the department does not accurately assess a true enrollment capacity number. As an example, in October 2003 the enrollment capacity was determined to be 33,371, while only 30,288 inmates were actually enrolled. Factors that affect the enrollment capacity are classroom availability and teacher vacancies for sick leave, vacation, and special assignments. The department should revise the enrollment capacity numbers to project a true number that accounts for site-specific classroom size, availability limits, and projected teacher absences.

*Program participation is voluntary.* Factors that limit the department from offering programming to a higher number of inmates are further aggravated by the fact that program participation is voluntary. Legislative efforts to mandate programs and incentives that provide day-for-day sentence reduction for class participation have had a limited effect on enrollment numbers. In 1995, Penal Code Section 2053.1 mandated that literacy classes be offered to 60 percent of the eligible inmate population, yet only 35,136 of the available 80,016 eligible inmates participate.[27] The presumptive sentence concept described earlier in this chapter could increase enrollment and provide additional incentives for inmates to participate in education programs. If presumptive sentencing is implemented, the department would need to evaluate and adjust the number of education programs, teaching positions, and program hour needs.

---

[26] Vocation enrollment figures obtained verbally from John Jackson, Supervisor of Academic Instruction, Education and Inmate Programs Unit.
[27] Department of Corrections, "Vocational and Academic Program Summary," October 2003.

**136**

*Education begins in the reception centers.* The 2003 Budget Act required the department to implement education programming in reception centers so that inmates could begin earning "day-for-day" sentence-reduction credits pursuant to Penal Code Section 2933. In January 2004, the department began providing academic programs at the reception centers under its "bridging" program. The bridging program allows inmates to receive academic education and day-for-day sentence credits during the average three-month reception center period.

To implement these programs, the department uses an assessment through the Test of Adult Basic Education and Comprehensive Adult Student Assessment System, and education programs in anger management, employment options, life skills, and personal life planning.[28] In April 2004, 215 bridging instructors were in place and another 212 instructor positions were unfilled.[29] Some of the teaching positions were obtained as a result of shifting instructor positions from eliminated vocational programs. Typical academic programs use classroom settings with 27 students and one instructor. The bridging instructor program is designed to allow inmates to use cell study materials. The elimination of a classroom setting allows an inmate/instructor ratio of 54 to 1. This program is designed to provide academic training, which allows day-for-day credits upon entry into the reception centers. The program is new and not fully implemented. The effectiveness of the program will depend on its ability to be fully implemented and evaluations should be conducted to assess the benefits.

*College education shows a decrease in recidivism.* A 2003 Little Hoover Commission report on the parole system presented findings that inmates with at least two years of college education have a 10 percent re-arrest rate and a significantly better rate of employment (60 to 75 percent).[30] A 1997 report by Education Works reported findings from the state of Ohio that calculated that the recidivism rate for inmate graduates of college level programs decreased by as much as 72 percent compared to inmates who do not participate in prison education programs.[31] Correctional studies in Oklahoma found "the rate of recidivism was 8 percent for inmates who participated in college courses in prison and 3 percent for inmates who earned a college degree in prison."[32]

The Ironwood State Prison Community College Program provides an example of the benefits of college courses. The program provides distance learning to approximately 300 inmates. The estimated cost savings to the institution at $8 million dollars per year, based on lower rates of recidivism and a decrease in disciplinary incidents in the prison.[33] The

---

[28] California Department of Corrections, Bridging Program Mission Statement.

[29] Department of Corrections, "Instructor Vacancy Report," April 2004.

[30] Little Hoover Commission, "Back to the Community, Safe & Sound Parole Policies", 2003, p 44.

[31] Mary Ellen Batiuk, "The State of Post-Secondary Education in Ohio," *Journal of Correctional Education,* June 1997, pp.70-72

[32] Davis, Dr. H.C., "Correctional Education: Success and Hope," *Correctional Education Association News and Notes,* October 1999.

[33] Little Hoover Commission, "Back to the Community, Safe & Sound Parole Policies", 2003, p. 45.

**137**

program is provided at no cost to the department. The National Institute for Literacy defines distance learning as follows:

> *Distance learning is defined as the delivery of education through electronically mediated instruction such as satellite, video, audio graphic, computer and multimedia technology. Distance education refers to teaching and learning situations in which the instructor and learner or learners are geographically separated and therefore rely on electronic devices and printed materials for instructional delivery.*[34]

Another example of college-level courses available in the prisons is the Incarcerated Youth Offenders Program, which began in 1998. Inmates who are under 26 years of age with five years or less commitment time and who possess a high school diploma are allowed to participate. The program offers three areas of study: continuing coursework, obtainment of postsecondary education degree, and/or vocational certificate. In fiscal year 2002-2003, the program was operating at 12 institutions with 1,040 participants. Approximately 45 percent of the participants complete the program. During the same fiscal year, the 401 Incarcerated Youth Offenders Program participants released from prison showed that 124 (31 percent) were employed and 34 (8 percent) returned to prison within a year.[35] The program is paid for with federal funding through the U.S. Department of Education Office of Vocational and Adult Education.[36] The Incarcerated Youth Offenders Program has had a positive effect on recidivism and employment rates and should be continued and expanded.

In 2004, the possibility of implementing on-line college courses, with the program paid for by grant funding, was presented to the department's Education and Inmate Programs Unit by James Fay of California State University, Hayward. The department concluded that implementation of the program would need approval through the Department of Finance and the department's Information Services Division. Additional barriers include current restrictions that bar inmates from Internet access.[37] Based on its ability to provide postsecondary education using grant funding to reduce cost, this program would be beneficial. The program should be implemented and assessed for its effect on recidivism.

***Department of Corrections technology is inadequate to support education programs.*** The department lacks a computerized system to easily share inmate education program information and promote effectiveness of paper-based programs. Because an inmate's education files are paper-based and are retained at the institution of commitment, it is difficult for the department to share information. For example, it would be helpful for a parole agent to be aware of an inmate's education background, training, and coursework. Even when inmates are transferred between prisons, their education history may not travel with them. This

---

[34] National Institute for Literacy, "State Policy Update," February 2004, p 2.
[35] Gary Green, Ph.D., "Incarcerated Youth Offenders Program, 2002-2003 Annual Report."
[36] Department of Corrections, Education and Inmate Programs, Incarcerated Youth Offenders Program statistics sheet.
[37] Memorandum, Yvette M. Page, Superintendent of Correctional Education, Education and Inmate Programs Unit.

happens so frequently that inmates are simply retested when they are transferred to a new institution. This places both the inmate and those trying to assist the inmate with education programs at a disadvantage.

A larger-scale solution is needed to ensure that education programming information is widely available. This solution should include a computer program at each institution that is linked statewide to other institutions, parole offices, department education program personnel, and others.

***The Department of Corrections lacks statistical data on program effectiveness.*** The department lacks statistical information to show whether its education programs reduce recidivism. The department tracks the number of inmates eligible for vocation and education programs, the number of program participants, inmate levels of achievement, and teaching positions. However, it does not track program statistics to determine whether parolees who recidivate were involved in education programs.

As discussed earlier, various studies have shown that education programs reduce recidivism. However, it is important that the department collect specific information about how its programs reduce recidivism in California, so that the department can optimize its programs. One method to accomplish this would be for the department to document education programming for each parolee who recidivates. This information could be used to determine whether education programs or the lack of programs were a factor in the parolee's return to prison. Similarly, the department should debrief parolees who are about to be discharged from parole so that the department can learn what factors and programs may have contributed to the parolee's success. This information could then be used to measure the effectiveness of institutions and programs.

***Re-entry programs show success.*** The New Parole Model of the Department of Corrections includes a bridge between prison education programs and parole needs. The new model has planned for expanded inmate re-entry programs through its Police and Corrections Team program, which establishes a partnership between parole, law enforcement, and service providers in the community. (See Appendix A to this chapter for additional information about the New Parole Model).

During the first two weeks of parole, parolees must attend a mandatory Police and Corrections Team program. The program consist of a 2-1/2 hour orientation meeting where the parolee develops a personal action plan and receives on-site information about housing, food, employment, and substance abuse treatment. A key component of this program is the link to immediate employment opportunities in the community and on-site job training opportunities. Important skills, training, and job opportunities could be enhanced for the parolees if these programs were expanded to a full day instead of the current 2-1/2 hours. In a longer format, additional instruction could be offered for social and interpersonal skills, resume writing, job search, financial literacy, and personal management.

**139**

*Temporary Assistance for Needy Families.* Parolees who have been convicted of a drug felony since August 1996 are not eligible for Temporary Assistance for Needy Families or food stamps. Approximately half of the costs of these benefits are paid by the federal government. Although this restriction affects only the adult portion of the grant and not the portion attributable to children, receipt of these benefits may improve the likelihood that parolees will be successful in reintegrating into society. The federal government allows states to pass a waiver to allow drug offenders to receive these benefits, but this has not occurred in California. Full or partial waivers have been passed in 32 other states.[38]

*Police and Corrections Team.* One example of how employment opportunities are made available to parolees is the Police and Corrections Team program operating in the Sacramento area. This program provides on-site training through the Skills Center operated by the Sacramento Unified School District. One of the training programs available for parolees is an 18-week, 720-hour training class in truck driving. Since 1998, the recidivism rate for the 250 parolees who graduated from this training program has been 7 percent.[39]

*Community Re-Entry Bridging Program.* Another example of a successful re-entry program is the Community Re-Entry Bridging Program in Sacramento. This program supplements the institution re-entry programs by having a teacher assist parolees on an individual basis to identify housing, transportation, health care systems, food, and clothing needs. Participation in the program is voluntary. Sixty-one parolees from piloted institutions have participated in the program and all but one (98 percent) have successfully completed training and are now employed.[40]

These programs are examples of the positive impact that re-entry programs can have to reduce recidivism and help parolees integrate back into their communities. Programs such as these, when they produce demonstrable results, should be expanded to other regions of the state.

*The Joint Venture Program shows economic benefit.* In 1990 a statewide initiative created the Prison Inmate Work Incentive, which mandated the department to recruit private businesses into partnerships using inmate labor. Inmates participating in the joint venture programs are paid a comparable wage with deductions for restitution, room and board, and forced savings.[41] In return for their participation, the inmates receive day-for-day sentence reduction credits. According to the department, since its inception 13 years ago, the program has generated the following benefits:

---

[38] National Conference of State Legislatures website: www.ncsl.org/statefed/welfare/program.htm.

[39] PACT program statistics, e-mail communications with Ward Allen, Program Coordinator, Sacramento City Unified School District.

[40] Education and Inmate Programs Unit, memorandum dated May 7, 2004.

[41] California Department of Corrections Joint Venture Program website: www.cor.ca.gov/institutionsdiv/instdiv/programs/programs-jointventure.asp.

**140**

√ $18.7 million wages paid to inmates
√ $3.5 million in restitution for crime victims
√ $2.9 million in taxes paid from inmate wages
√ $2.3 million deducted for support of inmate families
√ $4 million placed in mandatory inmate savings accounts.[42]

In fiscal year 2002-03, the program costs were lowered and revenue of $35,000 was returned to the general fund. The statistics for 2003 were:

√ $315,066 program budget
√ $350,714 reimbursement to the general fund
√ 206 average number of inmates participating
√ 10 average number of programs
√ $1,350 administrative cost per inmate
√ $1,700,000 wages paid to inmates
√ $286,944 in restitution for crime victims
√ $235,924 federal taxes paid by inmates
√ $59,000 in inmate earnings withholding orders.
√ $222,855 deducted for support of inmate families
√ $351,034 placed in mandatory inmate savings accounts
√ $383,532 placed in inmate trust accounts

Unfortunately, the joint venture program budget for fiscal year 2003-04 was decreased to $103,709, and the budget does not provide adequate funding for the administrative positions and financial firm contract. According to an analysis by the Joint Venture Program, in fiscal year 2004-05 the budget will have to be increased to $410,542.[43]

Based on the low cost to operate the program and the financial benefits in restitution, tax revenue, inmate wages, and savings the department should provide an adequate budget and consider expanding the program. One possibility would be expanding the program to operate outside of the institutions, such as through joint ventures with community-based businesses that employ parolees. That arrangement would create a natural employment opportunity as parolees transition into their communities.

***Prison Industry Authority programs increase employment and reduce recidivism.*** Prison Industry Authority programs show success in increasing employment and reducing recidivism. The Prison Industry Authority was established in 1982 to develop and operate manufacturing, agricultural, and service industries within correctional institutions. The Prison Industry Authority operates more than 60 service, manufacturing, and agricultural industries at 22 prisons, employing 5,823 inmates.[44] According to its fiscal year 2002-03 report, the

---

[42] California Department of Corrections, Joint Venture Program document prepared by J. R. Griggs, Program Manager.
[43] Department of Corrections, Joint Venture Program analysis by Susan Jacobson
[44] Prison Industry Authority, fiscal year 2002-03 annual report.

Prison Industry Authority provided an annual net cost avoidance to the department of $14.1 million based on programming costs that the department would otherwise incur."[45]

As part of its Inmate Employability Program, the Prison Industry Authority provides certain inmates with industry-accredited certifications in fields such as welding, optical technician, laundry and linen management, and metalworking. Since 2001, 2,346 inmates have received industry-accredited certifications in 13 different fields. These certifications reduce parolee recidivism — the recidivism rate for parolees who obtained accredited certifications is about 13 percent.[46,47] Similarly, Prison Industry Authority-trained inmates have higher employment rates than inmates not trained in its programs. For example, for former Prison Industry Authority workers on parole who had completed six or more months in the program employment rates were approximately 60 percent compared to typical rates of 20 to 30 percent for other parolees.[48] Because of the success of the accredited certification program, it should be continued and expanded where appropriate.

To further assist inmates in finding employment after parole, the Prison Industry Authority will pilot a new job placement service through the Offender Employment Continuum that will begin in July 2004. The program will operate in five institutions and coordinate employment services between the institution and parole.

## Recommendations

The new Department of Correctional Services should take the following actions to improve results from education, vocational, and re-entry programs:

- Provide inmate planning and re-entry assessment at the time of initial incarceration.

- Revise enrollment capacity numbers to reflect accurate capacity.

- Expand education and vocational programs.

- Promote education program attendance by implementing presumptive sentencing.

- Fully implement the bridging program and evaluate the academic effectiveness and sentence reduction benefits.

---

[45] *Ibid.*

[46] California Department of Corrections, *California Prisoners and Parolees – 2002*, Tables 54 and 54a.

[47] Calculations for recidivism vary depending both on the definition of recidivism and amount of time elapsing between release and the moment recidivism is measured. As a result of these variables, the literature and this report cite various recidivism rates for California depending on the source and the context of the discussion. The panel found universal agreement from those it contacted that California's recidivism rate is high compared to those of other states. [Little Hoover Commission, *Back to the Community, Safe & Sound Parole Policies*, 2003, p. 39].

[48] Prison Industry Authority, Inmate Employability Program report, April 29, 2004.

**142**

- Expand college correspondence courses and conduct on going evaluations on their effect on recidivism.

- Continue and expand the Incarcerated Youth Offenders Program.

- Implement on-line college programs.

- Track education program participation against parole success (and recidivism.)

- Debrief successful parolees during their last scheduled parole agent contact to determine whether education programs affected their success.

- Develop a state-wide computer database to track inmate education assessment and classroom achievement.

- Continue mandatory participation in the Police and Corrections Team orientation program and consider expanding it to a full day.

- Provide job training programs at the Police and Corrections Team orientations when possible.

- Expand the Community Re-Entry Bridging Program.

- Expand the in-prison joint venture program and explore creating community-based joint venture programs for parolees.

- Expand the Inmate Employability Program.

### Fiscal Impact

Providing greater access to education and vocational programs for inmates will require an investment in additional teachers and other resources, but this investment will generate cost savings through a lower return to prison rate for parolees. This will occur because inmates will be better prepared for reintegration into society.

# Reforming Parole

It costs almost ten times as much to maintain an offender in prison as it does to supervise a parolee. Therefore, unless the risk to public safety requires returning a parolee to prison, supervising parolees in the community is a wiser use of the state's limited financial resources. To make that possible, California must make the best use of both the prison and parole options. The number of parolees returned to prison can be effectively and efficiently reduced by better preparing inmates for eventual release, beginning from the moment the inmate arrives in prison and continuing through careful re-entry planning before release. Once released into the community, the parolee must receive an appropriate level of supervision that includes a broad spectrum of possible services and sanctions.

The panel reviewed the state's existing parole process and found that the Parole and Community Services Division has partially implemented promising improvements through its "new parole model." The panel recommends that the new parole model be closely monitored and that successful programs be expanded as quickly as possible. In addition, the panel identified other improvement opportunities, including early discharge of low-risk parolees, expansion of eligibility rules for drug-treatment programs, better data collection and analysis of parole programs and, perhaps a reconsideration of the present policy of placing all offenders released from prison on parole.

## Background

In 2002, the California Department of Corrections released more than 117,000 inmates to parole supervision.[49] These inmates were released with few job skills and with limited treatment for health and drug abuse problems. Ten percent end up homeless and nearly 70 percent return to prison within 18 months.[50] In 2003, 78,056 were returned to prison for either parole violations or new prison terms.[51]

After release from prison, parolees are supervised by parole agents, whose duties include monitoring the parolee's activities, assisting the parolee in obtaining needed services such as drug-treatment or job training, and ensuring that parolees abide by specified conditions of parole. If a parolee threatens public safety by committing a new crime or by violating the parole conditions, the parole agent can arrest the parolee and recommend that the Board of Prison Terms revoke parole and return the parolee to prison. In cases where the parolee is to be returned to prison, the Board of Prison Terms decides the length of time the parolee will serve in prison. In 2001, the Board of Prison Terms revoked the parole of approxi-

---

[49] California Department of Corrections Data Analysis Unit, Offender Information Services Branch, "Historical Trends 1983-2002," Table 8a.

[50] Little Hoover Commission, "Back to the Community: Safe & Sound Parole Policies," November 2003, pp. i;vi.

[51] California Department of Corrections, Population Projection Unit, Offender Information Services Branch, "Actual vs. Spring 2004 Projections," March 17, 2004.

**144**

mately 74,400 parolees. Since then, the number of parole revocations has decreased. In 2002 the number dropped to 71,246 and in 2003, it dropped to 62,358.[52]

Not all parolees who violate conditions of parole are returned to prison. In some instances, a parole agent may recommend drug treatment, more intensive supervision, or some other kind of sanction. When appropriate, the use of these types of interventions is preferable to returning a parolee to prison—which is much more costly. However, a large percentage of parolees ultimately return to prison. According to department reports, 41 percent of the 55,321 inmates paroled in 2001 returned to prison within one year of release. After two years, the recidivism rate increased to nearly 55 percent.[53]

In recent years, the Department of Corrections has developed three programs to address these problems. The programs provide opportunities for parolees to make fundamental behavioral changes and also to refocus parole supervision into less punishment-oriented solutions. Specifically, the Preventing Parolee Crime Program offers employment, drug treatment and education; the Office of Substance Abuse Programs provides drug programs both in and out of prison; and the new parole model includes graduated sanctions for minor parole violations and re-entry planning, drug treatment, and program coordination among various community and law enforcement agencies. These programs are described in more detail in Appendix A to this chapter. The new parole model, which the parole division began developing in 2001, consists of the following:

- *Pre-release planning.* Provides for a plan to be developed for the inmate's reinte-gration into society, based on the inmate's needs and risks. Pre-release planning begins about six months before the end of the prison sentence.
- *Graduated sanctions.* Provides a matrix of sanctions for parole violations, matched to the severity of the violation.
- *Substance abuse treatment control unit.* Provides in-custody drug treatment for low risk parolees who have returned to drug use. Used in lieu of returning the parolee to prison.
- *Halfway back.* Residential treatment facilities that provide life skills, education, and employment assistance for low-risk parolees who have violated the condi-tions of parole. Used in lieu of returning parolees to custody.
- *Electronic monitoring.* For low-risk parolees who have committed minor viola-tions of parole. Used in lieu of incarceration.
- *Police and Community Corrections Team.* Establishes partnerships between parole, law enforcement, and community service providers. Requires each newly released parolee to attend an orientation meeting with this team.

---

[52] California Department of Corrections, Data Analysis Unit, Offender Information Services Branch, "Historical Trends 1982-2002" Table 5; California Department of Corrections Population Projection Unit, Offender Information Services Branch, "Actual vs. Spring 2004 Projections," March 17, 2004.
[53] California Department of Corrections, Policy and Evaluation Division "Recidivism Rates Within One and Two Year Follow-Up Periods – Released From Prison for First Time in 2001," March 2004.

**REFORMING CORRECTIONS**

*Programs that address parolees' problems help reduce recidivism.* Research indicates that the most effective way to break the costly cycle of parolees returning to prison is to treat the parolees' problems of drug addiction, illiteracy, lack of employability, and criminal thinking. For example, a three-year study of the parole division's Preventing Parolee Crime Program showed that 28,000 parolees who participated in the program were significantly less likely to commit new crimes or abscond from parole supervision. The program has generated $21 million in savings for the department. The study further indicated that participants avoided returning to prison for 54 days longer, on average, than those who did not participate in the program. According to the study, for every dollar invested in the program, the program saved $1.56. [54] In another example, an analysis conducted by the Washington Institute of Public Policy of more than 400 research studies showed that many treatment programs both reduced recidivism and generated savings for every dollar invested.[55] Finally, a study of a 2,000-bed expansion in the department's substance abuse treatment program found that the 12-month return to custody rate was 24 percent for parolees who participated in aftercare and 15 percent for those who received 90 days or more of aftercare services.[56]

*The new organizational structure will support preparing inmates for release.* Chapter 1 of this report describes a new organization structure for the parole division. Under the reorganization, both the parole function and the custody function will operate under the control of the Director of Adult Operations. Regional directors will each manage five or six prisons and related parole operations. In turn, the wardens of individual prisons and the regional parole managers will report to the regional directors. The Corrections Independent Review Panel believes that placing responsibility for both prison and parole operations under the leadership and management of the regional directors, will properly align the focus of the regional directors onto preparing inmates for release back into society.

*Implementation of the department's new parole model has been slow.* The new parole model of the Department of Corrections will address many past recommendations and represents a good start toward bringing California's parole system in line with current research on how to reduce crime without jeopardizing public safety, but its implementation has been slower than expected. The re-entry portion was scheduled to begin in February 2004, and, according to an official from the parole division in charge of the new model, staff has been hired and was scheduled to begin training in May 2004. The pre-release program, which was scheduled to begin in the department's 32 institutions on June 1, 2004, has begun.[57]

---

[54] California State University San Marcos Foundation, "An Evaluation of the California Preventing Parolee Crime Program" by Sheldon Zhang, Ph.D., San Marcos, California, 2003, pp. 4, 45.

[55] Washington State Institute for Public Policy, "The Comparative Costs and Benefits of Programs to Reduce Crime," Olympia, Washington, May 2001, p. 8

[56] UCLA Integrated Substance Abuse Programs, "Semi-Annual Report on the UCLA-ISAP Evaluation of the 2,000-Bed Expansion of Therapeutic Community Programs for Prisoners," Michael L. Prendergast, Ph.D. July – December 2003, Appendix C.

[57] Shirley Poe, Parole Administrator, Parole and Community Services Division, interview, May 12, 2004

**146**

It is important to visualize the model not simply as an experiment, but as an investment toward making the department a national leader in helping inmates and parolees reintegrate into society. It is too early to judge the new model's impact on recidivism or public safety because most components have yet to be implemented, but there have been some promising signs. For example, the proportion of parolees returned to custody decreased by 7 percent between July-December 2003 compared to the same period one year earlier.[58] The decrease is probably due not to the new parole model, but to a new policy implemented earlier, which requires parole administrators to review each return to custody recommendation and consider alternatives to incarceration. Nonetheless, the new policy will dovetail with the new parole model because both encourage agents and supervisors to consider alternative sanctions instead of returning the parolee to custody.

The cornerstone of the new parole model is a risk assessment instrument, which the department plans to use, but has not yet purchased. The risk assessment instrument uses an actuarial approach to identify the treatment needs of the parolee and the likelihood that the parolee will re-offend. The predictions are made using a computerized system that takes into account specific information about the parolee's background, including criminal and social history, and compares that information to statistical risk scales. A research group assembled by the parole division reviewed several different risk-assessment instruments, recommended one for selection, and has submitted that recommendation to the Youth and Adult Correctional Agency for approval.

The risk assessment tool is critical to formalized, consistent decision-making by parole agents. For the instrument to be accurate, it is imperative that the parole division complete periodic follow-up evaluations of its results and update the instrument to reflect any changing demographics in the population being assessed. It is also important to evaluate the assessment tool to make sure that it has predictive validity and that the classification of parolees is in line with the parolees' actual behavior.

The violation matrix is another important component of the new parole model. Still being developed by the parole division, the violation matrix will guide parole agents in making decisions about what sanctions, including treatment alternatives to re-incarceration, to impose for particular violations. Parole agents will use the violation matrix to match a parolee's violation against a graduated range of increasingly strident sanctions. According to officials, changes to the violation matrix are pending approval by the division's deputy director.[59] It is risky to begin less-restrictive sanctions, such as drug treatment in the place of re-incarceration, without first using risk-assessment to determine who is appropriate for various programs.

---

[58] California Department of Corrections, "Spring Population Projections 2003," p.13; "Spring Population Projections 2004," p.13.

[59] Shirley Poe, Parole Administrator, Parole & Community Services Division, telephone interview, May 13, 2004

**147**

**REFORMING CORRECTIONS**

Other components of the new model have only recently been implemented or are similarly awaiting purchase, staffing, and approval. The electronic monitoring component has been submitted for bid offerings and should be solidified by June 2004. The halfway back facilities have been open since February 2004, and the Substance Abuse Treatment and Control Unit component became operational in mid-May 2004. The agents for the Police and Community Team had been chosen and were in place by June 2004, as was the staff for the pre-release component.

The new parole model incorporates many of the recommendations made by both the Little Hoover Commission and the 1990 report of the Blue Ribbon Commission on Inmate Population Management. Specifically, the Little Hoover Commission recommended that the department should prepare inmates for parole while they are still in prison, build strong partnerships with community agencies, use structured decision-making to establish clear guidelines for responding to parole violations, and consider less restrictive, treatment-oriented sanctions for parole violations. As described in Appendix A to this chapter, the new model includes a matrix as a guide for graduated dispositions for parole violations; includes a re-entry component; creates a community/law enforcement/parole team to work with parolees; and provides two new treatment programs to be used in lieu of incarceration for parole violations.

The Corrections Independent Review Panel is optimistic that the new parole model will help the parole division improve its operation and will reduce the number of parolees returned to prison each year. The parole division must implement all features of the new model as quickly as possible, however. Also, the new department must view the new model as an investment, rather than an experiment in reforming its much-criticized parole process.

*An inmate's preparation for release must begin upon arrival at prison.* As discussed earlier, re-entry planning and risk assessment are being developed as part of the new parole model, but the current plan is to use these only during the six- to nine-month period before the inmate is released from prison. Instead, risk assessment and re-entry planning should begin when the inmate enters the institution so that parole and prison staff, along with the parolee, can plan for the parolee's reentry with educational, behavioral and drug treatment programs available from the moment the inmate enters the prison. If it can reduce the future criminal behavior of the offender, using incarceration time constructively will both enhance public safety and save money. It is important that the parole division be included in this effort, because the parole staff is familiar with available community resources and what is needed for successful re-entry.

*Substance abuse treatment in prison should be expanded.* Approximately 210,600 prisoners and parolees under custody or supervision by the department need drug treatment. About 132,000 of those needed drug treatment are inmates, yet, according to the Office of Sub-

**148**

stance Abuse Programs, only 14,800 are being treated.[60] More than 95 percent of all inmates will eventually be released from prison. To reduce recidivism, save money and protect the public, the number of treatment beds should be increased. Participation in and completion of the treatment program could be tied to the offender's release using the presumptive sentencing model discussed earlier.

*Successful parole and re-entry programs should be expanded.* The Department of Corrections has made efforts to address parolees' needs for drug, vocational, and education intervention with the Preventing Parolee Crime Program, Office of Substance Abuse Programs, and the new parole model. These programs have demonstrated success, but because they have addressed the needs of only a fraction of eligible offenders, the programs should be expanded with more funding. There is a particular need for residential treatment beds for parolees whose problems cannot be resolved in an outpatient setting. One way to accomplish this would be to change the focus of the existing halfway back program to drug treatment. The department could expand the capacity of substance abuse treatment beds by contracting with existing community-based residential treatment programs. These community-based programs also have secure lock-up facilities available for when that type of program is required. In some instances, these community-based facilities may charge a lower fee than the $59 per day rate charged by the local jail-operated programs currently used by the state.

The Office of Substance Abuse Programs estimates that there are 78,000 parolees with drug abuse problems, but fewer than 25,000 of them receive treatment. A study of the Preventing Parolee Crime Program by California State University found that the rate of return to prison of those who completed the drug and education component was 20-percentage points lower than the non-treated population. For the study period, participants' incarceration rate was reduced by an average of 56.6 days per parolee, saving the state over $21 million after the costs of the program were subtracted.[61]

The Legislature has also recognized the value of providing drug treatment. Penal Code Section 3070 directed the Department of Corrections to develop and present a plan by December 31, 2000, that would ensure that all parolees and inmates "receive appropriate treatment, including therapeutic community and academic programs" by January 1, 2005. According to the parole division, this plan was not prepared; instead, a brief letter was sent to the Legislature reporting that it was not feasible to accomplish the plan now because of fiscal problems and changes in sentencing laws. The Legislature indicated that it agreed. Proposition 36, the ballot initiative that provides drug treatment in lieu of incarceration, passed soon after Penal Code Section 3070 went into effect, but the state's subsequent fiscal

---

[60] Merrie Koshell, Correctional Counselor III, Office of Substance Abuse Programs, telephone interview, Sacramento, California, April 15, 2004.
[61] California State University San Marcos Foundation, "An Evaluation of the California Preventing Parolee Crime Program," by Sheldon Zhang, PhD, (San Marcos, CA, 2003), p.5

crisis has resulted in uncertainty about whether any substance abuse treatment programs would continue.[62]

***Global positioning satellite tracking can bolster electronic monitoring.*** Global positioning satellites are an advanced form of electronic monitoring that allows real-time tracking of the location of parolees. The devices can be programmed to alert parole agents and local law enforcement when a parolee enters or leaves a particular area. The technology could be useful for high-risk parolees such as armed robbers or sex offenders. Global positioning satellite systems cost about $10 per day to operate — which is significantly less expensive than placing an offender back in prison.

Florida has used global positioning satellite systems since 1997 to target high-risk sex offenders, and other cases of high public interest. Texas also uses global positioning satellite systems to track the highest risk parolees, primarily sex offenders.

One potential drawback to global positioning satellite technology is that it requires parole agents or local law enforcement to respond quickly if an "alert" is issued by the device when a parolee leaves an authorized area. Failure to respond quickly could be a public safety risk, as well as a political embarrassment, if the parolee committed a crime while in an unauthorized area. Another potential drawback is that the increased surveillance that global positioning satellite systems generate can often lead to increased revocations. This increase may counter the money-saving aspect of global positioning satellite systems, but must be considered a necessary public safety benefit.

***Early discharge of low-risk parolees will reduce costs.*** California's existing parole policy focuses treatment time and money on non-serious, nonviolent parolees, yet it is the high risk, serious offenders who commit the most violent offenses and consequently pose the greatest threat to public safety. In 2001, 21 percent of those paroled had originally been sentenced to prison for possession of a small amount of drugs.[63] These parolees take as much time and effort to supervise as do those convicted of violent offenses. Rather than directing resources toward offenders whose crimes are drug-use related and who have no history of violence, the department's emphasis should be placed on serious, high-risk parolees. Low-risk parolees should be required to participate in self improvement programs throughout their prison stay and should be prepared for parole through a rigorous prison re-entry program. Immediately upon release they should be connected with needed community services. This "hand-off" component is critical because parolees tend to fail during the first few months on parole.

---

[62] Merrie Koshell, Office of Substance Abuse Programs, interview, April 15, 2004

[63] California Department of Corrections, Policy and Evaluation Division, "Recidivism Rates Within One and Two Year Follow-Up Periods – Released From Prison for First Time in 2001," March 2004.

**150**

The Corrections Independent Review Panel recommends that parolees who are employed or self supporting, have a stable residence, and have no violations of their parole conditions after three months on parole be discharged from parole supervision. The discharge would require approval from the hearings administration identified in Chapter 1 of this report. In December 2003, the Department of Corrections estimated annual savings of between $150 and $176 million if all non-serious or non-violent parolees were discharged after three months.[64] To enhance public safety, a portion of the savings realized from early discharge should be redirected to more closely supervising high-risk parolees. The panel assumes that about 50 percent of low-risk parolees will qualify for release after three months and that 50 percent of the resulting fiscal savings would be redirected to supervising high-risk parolees. Under these assumptions, according to Department of Corrections calculations, the department would save about $10 million in the first six months of implementation and $39 million and $44 million in the second and third years, respectively.[65]

To accomplish this change, the parolee's risk level should be determined using the evidence-based risk and needs instrument described earlier. Parolees with a history of violent or serious felony conduct (such as those crimes identified in Penal Code Sections 1192.7 and 667.5) and parolees who must register as sex offenders would be excluded. The goal would be to require that parolees participate in programs in prison, remain crime free and stable upon release, and be rewarded for their participation and success by early discharge from parole supervision. Following these guidelines will improve public safety.

*Should all inmates released from prison be placed on parole?* In California, 100 percent of those released from prison are placed on parole supervision for three or four years. In contrast, several other states supervise only certain prisoners after release. A few states, including Maine and Virginia, have abolished parole supervision altogether. Michigan supervises parolees for only two years, compared to California's three- or four-year parole supervision period.[66]

Scarce public resources are forcing corrections to make difficult decisions about where to place limited funds. Joe Lehman, Secretary of Washington State Department of Corrections, noted that when both low-risk and high-risk parolees are placed together on a caseload, parole agents don't give enough time to serious offenders. To remedy this, the Washington officials asked the questions: "Why do we (prison/parole) exist? What can the public reasonably expect us to do?" They concluded that the public wants to be protected from dangerous criminals and has tolerance toward treating drug addicts who are not violent.[67] They

---

[64] California Department of Corrections, Legislative Estimates Unit, "Legislative Analyst Request 4&7," December 16, 2003.

[65] Department calculations prepared in December 2003 for the Legislative Analyst.

[66] Petersilia, Joan, Ph.D., *Reforming Probation and Parole*, American Correctional Association, 2002, p.115.

[67] Lehman, Joseph D., "A Forum on Current Issues in the Field of Corrections," presented by the Department of Corrections for the California Performance Review, April 27, 2004.

**151**

**REFORMING CORRECTIONS**

further concluded that focusing on more dangerous offenders and not supervising those on parole for less serious offenses would lower recidivism.[68] That sentiment is echoed by nationally recognized corrections expert Joan Petersilia. Petersilia notes that research indicates that the public is becoming more willing to tolerate treatment for nonviolent offenders, particularly substance abusers, and to focus punishment on those convicted of violent crimes. This is especially so when the public is aware of the high costs of incarceration.[69]

*Participation in drug-treatment programs is presently too restricted.* Studies show that parolees who complete drug treatment programs are less likely to re-offend.[70] Yet many parolees in California are excluded from participation in drug treatment programs because of their past criminal history. For example, parolees whose crimes are defined under Penal Code Sections 667.5 and 1192.7 as "serious" or "violent," or who are required to register as sex offenders are barred from participating in the Substance Abuse Treatment Control Unit program, which has 30-day inpatient and 90-day outpatient components. This restriction is illogical from a public-safety standpoint because the Substance Abuse Treatment Control Unit program is a "lock-up" program typically located in city or county jails. So long as the normal criteria are met for this jail-based drug program and the violation is for drug use only, these currently excluded parolees would benefit from drug treatment as much as a lower risk offender. If these offenders were allowed to participate in the Substance Abuse Treatment Control Unit program, the department would save money because the cost of that program is cheaper than the cost of returning the offender to prison. Moreover, numerous studies have demonstrated that those who complete substance abuse programs are less likely to be sent back to prison, particularly when they complete both in and out patient components.

*Private contractors can be used to provide specific treatment.* Exploring the use of private contracted facilities to provide treatment can expand the availability of efficient resources to support the new parole model. Private contractors could be used to provide secure facilities for specific kinds of treatment designed to maintain the parolee in the community. These programs have the promise of success at a cost substantially lower than state prisons, and sometimes lower than county facilities. Programs provided include 90-day treatment for drug and alcohol addiction, which has been shown to have a positive effect on preventing new offenses. These facilities and programs can be found especially in large urban areas.

*Data collection is critical to measuring program effectiveness.* Collecting data and measuring the results of both new and existing programs is critical to on-going improvement. At

[68] Washington State Institute for Public Policy, "Washington's Offender Accountability Act: An Evaluation of the Department of Corrections' Risk Management Identification System," January 2003.

[69] Petersilia, Joan, Ph.D., *Reforming Probation and Parole*, American Correctional Association, 2002, p.180.

[70] Aos, Steve *et al*, Washington State Institute for Public Policy, "The Comparative Costs and Benefits of Programs to Reduce Crime," May 2001.

**152**

present, there is no comprehensive, integrated data system in the department to even provide information about trends or the success or failure of policies. This lack of data collection and analysis prevents the department from showing lawmakers and the public the effectiveness of its programs. The lack of data mirrors a similar lack of research to evaluate parole programs nationwide. Petersilia notes,

> *It is safe to say that parole programs have received less research attention than any other correctional component in recent years. A congressionally mandated evaluation of state and local crime prevention programs included just one parole evaluation among the hundreds of recent studies that were summarized for that effort.*[71]

For years the department has been focused on incarceration over rehabilitation programs, in spite of the research statistics that show rehabilitation programs help offenders and simultaneously reduce the skyrocketing prison populations and costs. As California's new parole programs are implemented, it is important that they be monitored to determine both whether they are affecting return to custody rates and whether they compromise public safety. A measurement component should be built into the programs, and adequate funding should be provided to the department so that decision making and public policy is based on valid analysis of what programs and policies are effective.

The following are suggested outcomes that the new Department of Correctional Services should measure to demonstrate the success of its prison and parole programs. Each of these outcomes should improve as the department becomes more effective at preparing inmates for reintegration back to society.

- Reduction in risk and needs scores, as measured by the risk and needs assessment instrument;
- Rate and duration of parolee employment;
- Program attendance rates;
- Improvements in reading levels;
- Reduction in the number of fugitives from parole; and
- Recidivism rate.

***Effectively supervising parolees requires parole agents to have a balance of skills.*** Most agents now working in parole were hired and trained when the department's focus was on surveillance and detection of criminal behavior. This focus was reinforced by department training, which included arrest procedures and use of force. The department provides no training in casework issues, such as patterns of recovery from drug addiction or mental illness and its impact on relapse.

---

[71] Petersilia, Joan, *Reforming Probation and Parole in the 21ˢᵗ Century,* American Correctional Association, 2002., p.190

**153**

**REFORMING CORRECTIONS**

Furthermore, hiring practices and requirements impede hiring individuals with social services background. Agents are rarely hired from social service disciplines, such as child protection agencies, treatment programs, or even probation, largely because of the lengthy background investigations required of applicants not already employed as peace officers by the department. It can take up to a year to hire an individual from other disciplines such as social services or probation, whereas current department correctional officers can be hired almost immediately. This is because correctional officers seeking parole agent positions have already gone through a Department of Corrections background investigation, so the investigator need only examine the period in the applicant's career subsequent to the original background investigation. To hire an applicant from outside the department, conversely, the investigation must start from scratch—a time-consuming process. Consequently, most new agents are chosen from the prison correctional officer ranks. To develop a more balanced force of parole agents who bring a combination of law enforcement and social work skills to parole operations, the new Department of Correctional Services should remedy these hiring barriers and provide on-going training in social service skills to its parole agents.

## Recommendations

To improve parole operations the new Department of Correctional Services should take the following actions:

- Continue implementation of the Department of Corrections new parole model.

- Consider the use of private contractors to provide specific kinds of treatment in secure facilities designed to maintain the parolee in the community.

- Begin preparation for re-entry when the offender enters prison.

- Increase the number of substance abuse treatment beds in prison.

- Increase the number of substance abuse treatment beds in the community by increasing funding for programs that are proven successful. This could include halfway back, Substance Abuse Treatment Control Unit, or other community-based facilities.

- Use the needs and risk assessment tool when the inmate first enters prison and design a programming plan that addresses those needs.

- Discharge parolees who are determined to be very low risk from parole three months after they are released from prison.

- Consider the use of global positioning satellite tracking for certain high-risk offenders.

**154**

- Allow both high- and low-risk parolees to participate in treatment and training programs.

- Add a quality control feature to the new parole model programs to measure effectiveness.

- Increase focus on casework skills when recruiting new agents and in agent training.

- Develop a comprehensive data collection and analysis system that measures the effectiveness of the department's parole programs. This system must also link with other department data analysis systems.

## Fiscal Impact

The Little Hoover Commission estimated that changes outlined in the commission's November 2003 report on parole could save the department $151 million by reducing the percentage of parole violators returned to prison. The commission further estimated that an additional $300 million could be saved by reducing the length of revocation sentences for "low end" offenders from an average of 140 days to 100 days.[72] The Department of Corrections has estimated that the new model will reduce the parolee return to prison rate by 5 percent in 2004.[73] Already, as agents seek alternatives to incarceration, there has been a decrease of 5,765 parolees in prison for violations from January 2003 to January 2004 as compared to the same period a year earlier.

Many of the recommendations of the Corrections Independent Review Panel require an initial investment, but are designed to save money in the future as they increase inmates' chances for success on parole.

The Corrections Independent Review Panel estimates the following savings would occur from implementation of the recommendations presented in this report:

- **Early discharge from parole – after 3 months of successful parole**

        Fiscal Year    2004-05 - $10 million
        Fiscal Year    2005-06 - $39 million
        Fiscal Year    2006-07 - $44 million

---

[72] Little Hoover Commission, "Back to the Community: Safe & Sound Parole Policies," November 2003, p. iii.
[73] Arthur Chung, Chief, Offender Information Services Branch, California Department of Corrections, interview, March 22, 2004

**155**

**REFORMING CORRECTIONS**

# Appendix A

## Preventing Parolee Crime Program

In 1998 Assembly Bill 2321 provided funding to expand the Department of Corrections pilot program known as the Preventing Parolee Failure program. As codified in Penal Code Section 3068, this program was renamed Preventing Parolee Crime Program and includes the following components.

- Offender Employment Continuum. This is a 40-hour mandatory employment workshop for parolees focusing on identifying and correcting long term barriers to employment. It includes job preparation, resume writing and interviewing skills, as well as employment referral and continued counseling to ensure that the parolee stays on the job.

- Residential Multi-service Centers. These facilities provide a therapeutic environment primarily for homeless parolees to help them transition into independent living. The program offers substance abuse treatment, literacy training, and individual and group counseling. Parolees can live in the program for up to 180 days. There is a 60- to 90-day aftercare period.

- Computerized Literacy Learning Center. This a computer-assisted instructional program staffed by credentialed teachers. The programs are located in parole offices at 21 sites throughout the state. (as of August 2003)

- Substance Abuse Treatment and Recovery. This is a 20-day education-based substance abuse program located in at least 28 parole offices. Parole agents refer parolees who have tested positive for drugs. Approximately 8,060 parolees are using this program.

In its February 1998 analysis of the fiscal year 1998-1999 budget, the Legislative Analyst's Office stated that, according to the department, the Preventing Parolee Failure program resulted in net state savings of $74 million over a four-year period. The Legislative Analyst recommended expanding the Preventing Parolee Failure program, noting that the program would save between $2 and $3 for every $1 invested.[74]

## Office of Substance Abuse Programs

The Office of Substance Abuse Programs estimates that there are 210,000 inmates and parolees with drug abuse problems. The office estimates that approximately 16,500 parolees are receiving treatment in one of its programs. The Office of Substance Abuse Programs coordinates the following prison and community based programs:

---

[74] Legislative Analyst's Office, "Analysis of the 1998-99 Budget Bill," February 1998, pp. D-25, D-33

**156**

- **Substance Abuse Program.** There are 8,500 therapeutic community slots in 35 substance abuse programs in 19 prisons. The length of stay is from six to twenty-four months. Each slot serves an average of 1.33 inmates annually.

- **Transitional Treatment Team Program.** At Folsom State Prison, 200 inmates participate in this four-month program that includes intensive pre-release planning. Parolees who go back to prison briefly for drug violations and who have completed a substance abuse program in prison are also eligible for this program.

- **Parole Services Network.** This program is for parolees who have not been in a prison substance abuse program but need drug/alcohol treatment. The average length of stay for a residential program is 30 to 90 days, followed by outpatient services. The Office of Substance Abuse Programs coordinates with the California Department of Alcohol and Drug Programs to manage the service networks. The Department of Alcohol and Drug Programs transmits funds to the counties, which in turn contract with treatment providers. These programs offer up to 180 days of services, which include assessments, detoxification, and residential and outpatient treatment.

- **Drug Treatment Furlough.** This is an in-prison substance abuse program for 1500 nonviolent, non-serious offenders. Inmates participate in this residential community aftercare treatment program during their last 120 days in prison.

- **Family Foundations Program.** A 70-bed program for women with small children who have been convicted of low-level felonies. This program is used in lieu of state prison.

- **Community Mother Infant Program:** This is also a 70-bed program for low-risk female inmates who are pregnant or give birth in prison. The 70 beds are divided between three facilities.

The Community-Based Aftercare Programs are included under the Office of Substance Abuse Programs. Merrie Koshell of the Office of Substance Abuse Programs indicated that according to a study, (R.J. Donovan In-Prison and Community Substance Abuse Program: Three-Year Return-to-Custody) 24 percent of those who complete both the prison and aftercare drug portions of the R.J. Donovan program return to prison, compared to 78 percent of those who complete only the prison component. The programs are much more successful if the inmate/parolee completes all components.

The Substance Abuse Services Coordination Agency is also included under Office of Substance Abuse Programs. The Substance Abuse Services Coordination Agency manages the aftercare portion of the drug programs. The agency has offices in each of the four parole regions and purchases services from community-based providers. These are 30- to 90-day residential care programs followed by outpatient drug treatment.

**REFORMING CORRECTIONS**

- Female Offender Treatment and Employment Program. This program was established by Penal Code Section 3054, as enacted by SB 491, Chapter 500 in 1998. Female parolees who graduated from a prison-based substance abuse program are eligible to receive up to 15 months of Female Offender Treatment and Employment Program services. For parolees who choose to use the program, the average length of stay is 135 days. Services include substance abuse treatment, employment/educations programs, and life skills development. Child care and transportation is provided. Some of the residential programs allow children to live with their mothers.

- Enhanced Substance Abuse Treatment Control. This is a 200-bed treatment program located at Folsom Prison. After completion of this program the parolee is eligible to use the other community-based programs of the Office of Substance Abuse Programs.

### The New Parole Model

In September of 2001 the Parole and Community Services Division created its new parole model to address recidivism issues. The model focuses on non-serious/non-violent offenders as they are thought to pose the least risk to the community if they are offered alternative sanctions to incarceration. The basic components of the model are the following:

- Violation matrix. This is a structured system for providing clear guidelines to decision making for parole violations.

- Pre-release planning. Inside prison, a Parole Agent II, social worker and parole service assistant will assess the inmate using a computer-based tool that identifies the inmates' needs and the risk they present to others. Agents will continue to use this tool throughout the parole period and will modify parole conditions and supervision levels accordingly.

- The Police and Corrections Team. The team establishes a partnership between parole, law enforcement, and service providers once the offender is released. Every newly released parolee will be required to attend an orientation meeting with this group of professionals. A Parole Agent II will run this program with the help of a social worker. The department plans to have a team in each of the 24 parole divisions.

- Electronic monitoring will become available for non-violent/non-serious offenders. This will allow agents to impose home detention as an alternative sanction for parole violations. It costs $43.00 a day to house an inmate in prison and approximately $5.00 a day to monitor a parolee at home with an electronic device. There will be 1,000 of these devices, which will provide about five per parole unit.

**158**

- The Halfway Back program offers residential treatment as an alternative sanction for parolees who have committed a technical violation and who need a more structured setting to both address their problems and monitor their behavior. The Halfway Back units focus on life skills, education, and employment. Statewide there are 18 facilities with a total capacity of 792 beds. These facilities were being used as work furlough beds for inmates during the last six months of their term. As the work furlough inmates parole, the beds are being filled with parolees. This program began in March 2004. Currently it is 74.5 percent full; however inmates are still in the process of transitioning out of the facilities.

- The Substance Abuse Treatment Control Unit will provide a 30-day, in-custody drug treatment program for parolees whose drug addiction is too advanced to be addressed in the community. It is designed to serve up to 1306 parolees. 1770 beds have been contracted in various jails throughout the state —600 beds are now available at the Los Angeles County Detention Center, with another 20 beds at Humboldt County Jail.

REFORMING CORRECTIONS

**TABLE 1**

| Male Institution Bed Type (Includes Civil Addict Program) | Design Capacity (DC) updated on 6/2/04[4] | Actual Male Institution Population April 2004[2] | Actual Percentage of Design Capacity April 2004 | CDC Defined Maximum % of DC | Male Institution Population Equivalent of CDC Maximum | Bed Changes Rec'd to Reach CDC's Maximum Percentages | Warden's Proposed Operable Capacity (OC) as % of DC[4] | Male Institution Population Equivalent of Warden's Proposed OC | Projected Male Institution Population on 6/30/09[3] | Population Reductions Needed by 2009 to Meet Warden's OC[3] |
|---|---|---|---|---|---|---|---|---|---|---|
| **CAMP BEDS** | **3,588** | 3,752 | 105% | 100% | 3,588 | 164 | **100%** | 3,588 | | |
| General Population: | | | | | | | | | | |
| Level 1 - MSFs | 4,759 | | | | | | | | | |
| Level I - old design | 5,091 | | | | | | | | | |
| **LEVEL I TOTAL** | **9,850** | 15,751 | 160% | 195% | 18,715 | -2,964 | **150%** | 14,775 | 29,054 | -10,691 |
| Level II - new design | 6,406 | | | | | | | | | |
| Level II - old design | 9,622 | | | | | | | | | |
| **LEVEL II TOTAL** | **16,028** | 35,306 | 220% | 195% | 30,453 | 4,853 | **150%** | 24,042 | 31,334 | -7,292 |
| Level III - standard | 13,252 | | | | | | 160% | | | |
| Level III - over/under | 2,122 | | | | | | 100% | | | |
| **LEVEL III TOTAL** | **15,374** | 30,912 | 201% | 195% | 29,211 | 1,701 | **152%** | 23,325 | 38,245 | -10,048 |
| Level IV - 180 design | 7,510 | | | | | | 140% | | | |
| Level IV - 270 design | 6,520 | | | | | | 140% | | | |
| **LEVEL IV TOTAL** | **14,030** | 21,293 | 152% | 195% | 26,657 | -5,364 | **140%** | 19,642 | 28,030 | -3,591 |
| Reception Center cells | 5,646 | | | | | | 150% | | | |
| Reception Center over/under | 256 | | | | | | 150% | | | |
| Reception Center dorms | 2,608 | | | | | | 190% | | | |
| **RECEPTION CENTER TOTAL** | **8,510** | 20,055 | 236% | 195% | 16,169 | 3,886 | **162%** | 13,808 | 17,628 | -3,820 |
| Administrative Segregation/III | 2,262 | | | | | | 150% | | | |
| Administrative Segregation/IV | 1,152 | | | | | | 120% | | | |
| **AD SEG TOTAL** | **3,414** | 7,092 | 208% | 150% | 5,121 | 1,971 | **140%** | 4,775 | | |
| **SUBSTANCE ABUSE TX** | 1,056 | 1,467 | 139% | 140% | 1,478 | -11 | **140%** | 1,478 | | |
| **SECURITY HOUSING UNIT** | 2,436 | 2,760 | 114% | 120% | 2,923 | -143 | **100%** | 2,436 | 3,165 | -729 |
| **CONDEMNED** | 604 | 604 | 100% | 100% | 604 | 0 | **100%** | 604 | | |
| **YOUTHFUL OFFENDERS** | 82 | 82 | 100% | 100% | 82 | 0 | **100%** | 82 | | |
| **EOP** | 1,691 | 2,397 | 142% | 150% | 2,537 | -140 | **150%** | 2,537 | | |
| **PSU** | 192 | 248 | 129% | 100% | 192 | 56 | **100%** | 192 | | |
| **PHU** | 24 | 24 | 100% | 100% | 24 | 0 | **100%** | 24 | 25 | -1 |
| **TOTAL SYSTEM** | **76,879** | 141,763 | 184.4% | 179.2% | 137,754 | 4,009 | **144.8%** | 111,309 | 147,481 | -36,172 |

160