**EXHIBIT I**

1  HANSON BRIDGETT MARCUS VLAHOS & RUDY, LLP
   JERROLD C. SCHAEFER - 39374
2  PAUL B. MELLO - 179755
   425 Market Street, 26th Floor
3  San Francisco, CA 94105
   Telephone:     (415) 777-3200
4  Facsimile:     (415) 541-9366
   jschaefer@hansonbridgett.com
5  pmello@hansonbridgett.com

6  EDMUND G. BROWN JR.
   Attorney General of the State of California
7  DAVID S. CHANEY
   Chief Assistant Attorney General
8  FRANCES T. GRUNDER
   Senior Assistant Attorney General
9  ROCHELLE C. EAST
   Supervising Deputy Attorney General
10 CHARLES ANTONEN – State Bar No. 221207
   Deputy Attorney General
11 SAMANTHA TAMA – State Bar No. 240280
   Deputy Attorney General
12 455 Golden Gate Avenue, Suite 11000
   San Francisco, CA 94102-7004
13 Telephone:  (415) 703-1113
   Facsimile: (415) 703-5843
14 charles.antonen@doj.ca.gov

15 Attorneys for Defendants

16             UNITED STATES DISTRICT COURT

17    NORTHERN DISTRICT OF CALIFORNIA -- SAN FRANCISCO DIVISION

18 MARCIANO PLATA, et al.,                No. C01-1351 TEH

19             Plaintiffs,               CLASS ACTION

20        v.                            DEFENDANTS' REPORT IN RESPONSE
                                        TO THE COURT'S FEBRUARY 15, 2007
21 ARNOLD SCHWARZENEGGER, et al.,        ORDER

22             Defendants.

23

24

25

26

27

28

DEFS.' REPORT IN RESPONSE TO COURT'S FEB. 15, 2007 ORDER
(CASE NO. C-01-1351 TEH)                                    1320445.1

## INTRODUCTION AND BACKGROUND

1

2          The Governor and the Legislature recently approved a historic, bipartisan plan to reduce

3     prison overcrowding, increase rehabilitation programs, and provide more beds for inmate medical

4     care. Assembly Bill 900 (AB 900) creates a comprehensive plan to immediately relieve

5     overcrowding by providing for additional out-of-state inmate transfers (CDCR anticipates

6     transferring 8,000 inmates by March 2009), as well as the construction of 40,000 prison beds

7     including much-needed medical beds, in addition to approximately 13,000 new jail beds. AB 900

8     also provides for new rehabilitation programs and re-entry facilities to improve inmate re-entry

9     into California communities, thereby reducing recidivism, easing prison overcrowding, and

10    ensuring public safety. AB 900's comprehensive plan and CDCR's parole reforms effectively

11    address prison overcrowding without encouraging or causing the early release of dangerous

12    criminals.

13          The Governor also recognizes that out-of-state transfers and expanding prison capacity are

14    not enough. California's prisons must be expertly managed and the prison reforms must be

15    implemented immediately. Accordingly, the Governor has established two strike teams -- one for

16    construction and another for rehabilitation -- to expedite construction and to create and improve

17    programs for rehabilitation, substance abuse, education, and job training. And CDCR is

18    immediately implementing administrative parole changes that reward successful rehabilitation,

19    which will further reduce overcrowding.

20          This comprehensive, historic plan for prison reform will directly assist the Receiver in his

21    efforts to provide constitutional medical care. AB 900 provides for medical beds needed by the

22    Receiver, who recently submitted his Plan of Action for providing constitutional medical care.

23    Defendants will continue to support the Receiver's efforts. The Receiver's report on prison

24    overcrowding also suggested that he should be permitted to expand the scope of his authority,

25    such as assuming direct oversight over CDCR's correctional officer hiring and AB 900

26    implementation. However, Defendants respectfully contend that while cooperation and

27    coordination between the Receiver's Office and the State must continue, there is no need for the

28    Receiver to expand the scope of his authority over CDCR. The Receiver should work to

- 1 -

DEFS.' REPORT IN RESPONSE TO COURT'S FEB. 15, 2007 ORDER
(CASE NO. C-01-1351 TEH)

1320445.1

1 | implement his Plan of Action, and the State should work to implement its own bipartisan prison

2 | reforms and parole reforms.

3 |      Within this context, the Court now considers Plaintiffs' motion for a referral to a three-

4 | judge panel to limit California's prison population. It is undisputed that California's prisons are

5 | overcrowded, and that the overcrowding has created emergency conditions in at least 29

6 | California prisons. But as this response shows, the State and the Receiver are already

7 | aggressively addressing the medical care and overcrowding issues. The underlying question is

8 | whether it is necessary and appropriate – applying the limited criteria of the Prison Litigation

9 | Reform Act of 1995 (PLRA) – to refer this matter to a federal three-judge panel at this time. The

10 | answer is no, because the criteria for referral have not been met.

11 | **Legal Standard.**

12 |      As this Court recognized, the relevant statutory criteria are whether (i) the court has

13 | previously entered an order for less intrusive relief that has failed to remedy the deprivation of the

14 | Federal right sought to be remedied through the prison release order; and (ii) the defendant has

15 | had a reasonable amount of time to comply with the previous court orders. (Feb. 15, 2007 Order

16 | at 2; 18 U.S.C. § 3626(a)(3)(A).) The broader statutory scheme requires that any prospective

17 | relief must be narrowly drawn, shall extend no further than necessary to correct the specific

18 | constitutional violation involved, and must be the least intrusive means necessary to correct the

19 | constitutional violation. 18 U.S.C. § 3626(a)(1). In addition, substantial weight must be given to

20 | any adverse impact on public safety. *Id.*

21 |      This Court determined that the first element of the statutory criteria was satisfied: that the

22 | Court had previously entered an order for less intrusive relief, referencing this Court's June 2002

23 | and September 2004 Orders. (Feb. 15, 2007 Order at 2.) This Court noted, however, that the

24 | second requirement – that Defendant has had a reasonable amount of time to comply with the

25 | previous court orders – speaks to the issue of timing. (*Id.* at 3.) This Court said that it must

26 | assess when a reasonable period of time has passed such that it is "persuaded that the remedies it

27 | has ordered will not be achieved." (*Id.*) This Court added that "this issue must be considered in

28 | the unique context of the recently initiated Receivership which – in lieu of Defendants – is

- 2 -

1320445.1

1    attempting to remedy the violations." (*Id.*)

2          The State contends that referral to a three-judge panel is premature, because insufficient

3    time has passed for this Court to be persuaded that the Receiver's efforts will fail. The Receiver,

4    by his own statements, contends that he has made great progress in the past year. (*See*

5    www.cprinc.org/faq.htm, at 4-6, reporting that under the Receiver's management, the salary crisis

6    has been addressed, the pharmacy crisis has been addressed, nurse staffing has been restructured,

7    the contracting crisis is under control, the broken discipline system is under repair, and medical

8    equipment and supplies have been delivered.) In addition, the Receiver just issued an aggressive

9    Plan of Action for moving forward to ensure a constitutional level of medical care. As the

10   Receiver said in his Plan of Action, "failure is not an option." The Governor and his

11   administration agree, and that is why the Governor called a special session of the Legislature,

12   issued an Emergency Proclamation, initiated the transfer of inmates out of state, and pushed for

13   passage of AB 900.

14         Plaintiffs nevertheless contend that although the Receiver has not yet failed, it is already

15   clear that the Receiver *will fail.* (Pls.' Notice of Mot. and Mot. to Convene Three Judge Panel,

16   17:4-7.) But Plaintiffs support their contention by citing to findings made *before* the Receiver

17   was appointed, and Plaintiffs do not give sufficient credit to the historic, groundbreaking efforts

18   now being made by the State and the Receiver. For example, Plaintiffs cite the prior finding that

19   "on average, an inmate in one of California's prisons needlessly dies every six to seven days due

20   to constitutional deficiencies in the CDCR's medical delivery system." (*Id.* at 10:4-5, referencing

21   this Court's October 3, 2005 Findings of Fact and Conclusions of Law Re Appointment of

22   Receiver at 1.) But this finding was made by the Court before the Receiver was appointed and

23   before the Receiver had an opportunity to make changes to the prison medical delivery system.

24   Since that time, the Receiver has reported great progress in improving prison medical care. (*See*

25   www.cprinc.org/faq.htm at 4-6.) Circumstances are changing rapidly, and reliance on outdated

26   information is inappropriate.

27         The PLRA requires a nexus between the relief sought and the federal right at issue, and it

28   also reiterates the limits of federal authority to order prospective relief. For example, a three-

- 3 -

1 | judge panel cannot issue a prison release order unless it finds, by clear and convincing evidence,

2 | that (i) crowding is the *primary cause* of the constitutional violation at issue, and (ii) *no other*

3 | *relief* will remedy the violation. 18 U.S.C. § 3626(a)(3)(E).

4 | **The Receiver's Report on Overcrowding.**

5 | This Court recognized the need for current information regarding the required nexus and

6 | on February 15 ordered the Receiver to provide his best assessment of the manner and extent to

7 | which overcrowding is *currently* interfering with the Receiver's ability to remedy the

8 | constitutional violations. The Receiver's report does not conclude that a population cap is

9 | needed. The Receiver states: "those who believe that the challenges faced by the Plan of Action

10 | are uncomplicated and who think that population controls will solve California's prison health

11 | care problems, are simply wrong." (Receiver's Report re Overcrowding at 42-43.)

12 | When considering the nexus between population and medical care, this Court cannot make

13 | a referral to a three-judge panel *unless* that panel could order relief that would clearly assist the

14 | Receiver in the delivery of constitutional medical care. The State and the Receiver are already

15 | making great progress to address prison overcrowding and to provide constitutional medical care

16 | to inmates. A prison population-cap order could not provide the comprehensive reform that the

17 | State and the Receiver are already implementing. Referral to a three-judge panel will not provide

18 | immediate overcrowding relief, and an order issued by a three-judge panel could not ensure

19 | efficient management, adequate medical care, or public safety. A far better course is to allow the

20 | State and the Receiver to implement their comprehensive reform plans.

21 | **The Specific Questions Posed to Defendants.**

22 | In addition to directing the Receiver to provide up-to-date information, this Court also

23 | directed the State to provide current information regarding the specific measures being taken to

24 | alleviate overcrowding. This Court asked the State to identify:

25 | (1) each specific, concrete measure the State has taken, is taking, or is planning to take,

26 | that is expected to result in a reduction in the number of inmates confined in state prisons by

27 | March 1, 2008 (in roughly one year), and by March 1, 2009 (in roughly two years), and the

28 | amount of the reduction expected to result from each such measure by March 1, 2008, and March

- 4 -

1, 2009, respectively. With respect to the transfer of inmates to out-of-state institutions, the
report shall also identify the number of inmates confined in out-of-state facilities as of the date of
the report;

      (2) at what point in time the Governor estimates he will be able to rescind the October
2006 "Prison Overcrowding State of Emergency Proclamation" and the basis for this estimate;
and

      (3) the total population of inmates confined by the CDCR as of the date of the Report.[1]

## RESPONSES TO THE COURT'S SPECIFIC QUESTIONS

**1.**    **The State Is Taking Immediate and Dramatic Steps to Reduce Overcrowding, Including Transferring Inmates Out of State, Changing Parole Policies, Implementing Rehabilitation Programs to Reduce Recidivism, Building New Prison Space, and Appointing Management Strike Teams to Implement These Efforts.**

      The State is working on many fronts to reduce overcrowding in California's prisons. As
an initial matter, CDCR will pursue all in-state private beds, and will transfer inmates to those
private beds to the extent they are available. (Kernan Decl., ¶ 7.) And beginning in June 2007,
CDCR will resume transferring inmates to out-of-state private prison facilities. It is expected that
CDCR will process up to 400 inmates per month for transfer out of state, and that approximately
8,000 inmates will be transferred by March 2009. (Kernan Decl., ¶ 7.) Transfers will continue
thereafter as needed, as AB 900 authorizes transfers until July 1, 2011. In addition, the State will
expedite construction of all AB 900 Phase I beds, as described below. Expediting construction
will include waiving state laws, as needed, under the Governor's Emergency Proclamation.
(Hysen Decl., ¶ 9.) It is expected that construction of 12,000 Phase I in-fill beds will be
completed in 2009. (Hysen Decl., ¶ 7.)

      CDCR is also making administrative changes to its parole policies, which will reduce
overcrowding. In addition, CDCR will implement new rehabilitation programs that will reduce
recidivism, again reducing overcrowding. Finally, to ensure that these reform measures are
implemented aggressively and efficiently, two new managerial strike teams have been

---

[1] In addition to directing the State to respond to these questions, the Court's February 15th Order also authorized the parties to file a supplemental reply no later than Tuesday, May 29, 2007, which the State intends to do.

- 5 -

1320445.1

1  established. (Petersilia Decl., ¶ 1; Hysen Decl., ¶ 2.) The Rehabilitation Strike Team will be
2  offering suggested program improvements within the first 60 days, concluding with
3  recommendations within 9 months. (Petersilia Decl., ¶ 3; Jett Decl., ¶ 5.)

4     **A.    General Provisions of Assembly Bill 900.**

5          On May 3, 2007, Governor Schwarzenegger signed AB 900 into law. AB 900 will
6  immediately reduce prison overcrowding by providing for additional inmate transfers to private
7  out-of-state prison facilities. In addition, AB 900 will further address prison overcrowding by
8  authorizing construction of in-fill beds, establishing more community re-entry beds, and creating
9  more medical and mental health beds. The medical beds will directly support the Receiver's
10  efforts, and the entire comprehensive plan will quickly reduce, and eventually eliminate, the
11  thousands of "non-traditional beds" that currently fill common areas such as gymnasiums, day
12  rooms, and program rooms.

13          Phase I of AB 900 provides for 7,484 in-fill beds at existing enumerated prisons, plus an
14  additional 4,516 in-fill beds once site assessments have been done for other facilities, for a total
15  of 12,000 Phase I in-fill beds. (Hysen Decl., ¶ 6.) AB 900 specifies that the purpose of the in-fill
16  beds is to replace the non-traditional beds currently in use. Phase I also provides for 6,000 re-
17  entry beds and 6,000 medical, dental, and mental health beds. (Hysen Decl., ¶ 6.) The
18  construction of all Phase I beds will total 24,000 beds.

19          Phase II of AB 900 provides for an additional 4,000 in-fill beds; 2,000 medical, dental,
20  and mental health beds; and 10,000 re-entry beds. The construction of all Phase II beds will total
21  16,000 beds. (Hysen Decl., ¶ 6.) However, AB 900 specifies that funds for Phase II construction
22  shall not be released unless specific enumerated progress in construction, rehabilitation programs,
23  management planning, and parole review has been confirmed by a panel consisting of the State
24  Auditor, the Inspector General and an appointee of the Judicial Council of California. AB 900
25  also provides for construction of approximately 13,000 county jail beds. (Kernan Decl., ¶ 4.)

26          AB 900 ties prison bed construction to rehabilitation, requiring that each new bed have
27  appropriate programming for inmates, including education, vocational programs, substance abuse
28  treatment programs, employment programs, and pre-release planning. These programs will

- 6 -

1    address overcrowding by reducing the recidivism rate.  As Joan Petersilia's declaration

2    establishes, California currently has one of the highest recidivism rates in the nation. (Petersilia

3    Decl., ¶ 5, 6.)  Such recidivism increases overcrowding in California's prisons.  The

4    Rehabilitation Strike Team expects to reduce recidivism by 10%, which would eliminate 8,100

5    prison returns in a single year. (Petersilia Decl., ¶ 9.)

6          AB 900 also requires CDCR to develop and implement, by January 15, 2008, a plan to

7    address management deficiencies within the department.  Among other things, the plan must

8    address (1) filling vacancies in management positions, (2) improving accountability, (3)

9    standardizing processes to improve management, (4) improving communications within the

10   Department, and (5) developing and implementing more comprehensive plans for management of

11   the prison and parole populations.  AB 900 authorizes CDCR to contract with outside

12   management experts to assist in identifying and addressing deficiencies.

13              **B.    Expert Strike Teams Will Improve Prison Management and Ensure**
                       **Expedited Implementation of AB 900.**
14

15         In addition to the management assessment and plan required by AB 900, Governor

16   Schwarzenegger has already established two expert strike teams to ensure that California's

17   prisons are managed effectively and that bed construction and rehabilitation programs are

18   implemented expeditiously.  The Facilities Construction Strike Team will restore CDCR's major

19   project management capability and will work to expedite in-fill, re-entry, medical/dental/mental-

20   health, and jail beds authorized by AB 900.  (Hysen Decl., ¶ 5.)  The Facilities Construction

21   Strike Team will, among other things, (1) consider all available options for housing inmates and

22   improving inmate housing, (2) evaluate alternative construction methods, (3) work to overcome

23   impediments to expedited construction, and (4) work with local communities impacted by prison

24   facilities.  (Hysen Decl., ¶ 11.)

25         At the same time, the Rehabilitation Strike Team will provide expertise on rehabilitation

26   and will expedite implementation of the rehabilitation programs, which will increase successful

27   community re-entry and reduce recidivism.  In addition, the Rehabilitation Strike Team will (1)

28   assess existing CDCR rehabilitation programs and space, (2) design an integrated rehabilitation

- 7 -

1   services delivery plan for inmates and parolees including substance abuse treatment, education,

2   job training, counseling, and life skills; and develop a plan for inmate job training, (3) quickly

3   implement inmate intake and pre-release needs assessment tools, (4) develop incentives for

4   program participation; (5) develop a plan to immediately reduce the number of lockdown days so

5   that inmates can participate in rehabilitative programming; and (6) develop the $50 million in

6   rehabilitation and treatment funds that are authorized by AB 900. (Petersilia Decl., ¶ 3; Jett

7   Decl., ¶ 3.) The strike teams are composed of numerous experts from universities, community

8   organizations, and state government. (Petersilia Decl., ¶ 4; Hysen Decl., ¶ 5.)

9              **C.    Specific Details Regarding Implementation of AB 900 and Other State**
               **Efforts to Reduce Prison Overcrowding.**
10

11                  **i.    Out-of-State Transfers.**

12          In order to immediately reduce overcrowding in California prisons statewide, CDCR will

13   initiate additional inmate transfers to out-of-state facilities starting in June 2007 under AB 900

14   and the Governor's Emergency Proclamation. (Kernan Decl., ¶ 7.) CDCR will initially transfer

15   up to 300 inmates per month for the first four months, and then increase the transfers to 400

16   inmates per month. It is anticipated that this rate of transfer will continue through the end of

17   fiscal year 2007/2008. Under this plan, 5,060 inmates will be transferred to out-of-state facilities

18   by the end of June 2008, and 8,000 inmates will be transferred by March 2009. (Kernan Decl., ¶

19   7.) After that, transfers may continue as needed, as AB 900 authorizes continued transfers until

20   July 1, 2011.

21          These out-of-state transfers will reduce the number of non-traditional beds from

22   approximately 18,000 to approximately 13,000 by the end of the 2007/2008 fiscal year. (Kernan

23   Decl., ¶ 7.) CDCR will pursue all in-state transfer opportunities before initiating out-of-state

24   transfers to the extent possible. (Kernan Decl., ¶ 7.) Inmates selected for transfer to out-of-state

25   facilities will undergo a comprehensive medical screening. (Kernan Decl., ¶ 11.) Only those

26   inmates who meet the Receiver's medical criteria will be selected for transfer. Transferring

27   inmates out of state will reduce overcrowding, which in turn will decrease the risk of violence and

28   the spread of infectious disease. Additionally, these transfers will result in reduced staffing

                                            - 8 -

1  requirements; for example, escort officers and medical staff will be better able to serve a smaller

2  population. (Kernan Decl., ¶ 11.)  The transfers will also free space at existing facilities for

3  enhanced medical services.  Medical staff will be able to focus on non-emergent services, because

4  reducing prison overcrowding, and in particular the use of non-traditional beds, will ease prison

5  living environments and decrease violence and the spread of infectious diseases. (Kernan Decl., ¶

6  11.)

7         As a sub-part of its first question, the Court asked the State to identify the current number

8  of inmates who are currently housed in out-of-state private prison facilities.  There are currently

9  360 inmates housed out of state.  Each of these inmates voluntarily transferred to an out-of-state

10  facility, and each was pre-screened in compliance with standards established by the Receiver's

11  Office to ensure that the inmate was appropriate for transfer. (Kernan Decl., ¶ 11.)

12                        ii.    **In-Fill Beds.**

13         AB 900 will also reduce prison overcrowding by authorizing the construction of 16,000

14  in-fill beds. (Hysen Decl., ¶ 6.)  In-fill beds will provide additional capacity at existing prisons in

15  a way that ensures proper facilities, support, and services. (Hysen Decl., ¶ 6.)  Creating in-fill

16  beds will not require the construction of new prisons; rather, there will be construction of new

17  facilities at existing prisons. (Kernan Decl., ¶ 12.)  In-fill beds, like the out-of-state transfer of

18  inmates, will eliminate non-traditional beds and provide better care and services for inmates.

19         The Facilities Construction Strike Team will expedite construction. (Hysen Decl., ¶ 6.)

20  As required by AB 900, these beds will be constructed so as to fully integrate rehabilitative

21  programs into the new facilities. (Hysen Decl., ¶ 6.)  The Facilities Construction Strike Team

22  will work to finish construction as quickly as possible, but at a minimum it is expected that

23  construction of the 12,000 Phase I in-fill beds will be completed in 2009. (Hysen Decl., ¶ 6.)  As

24  new in-fill beds are constructed, AB 900 mandates the reduction in a proportionate number of

25  non-traditional beds, until non-traditional bed use is entirely eliminated. (Kernan Decl., ¶ 12.)

26                        iii.    **Re-Entry Beds.**

27         AB 900 also provides for the creation of 16,000 re-entry beds, which are beds in small,

28  secured facilities (500 inmates maximum per facility), that are operated by CDCR but are

- 9 -

DEFS.' REPORT IN RESPONSE TO COURT'S FEB. 15, 2007 ORDER
(CASE NO. C-01-1351 TEH)                                        1320445.1

1  geographically closer to communities and are focused on providing rehabilitation services and

2  preparing inmates for re-entry into society. (Kernan Decl., ¶ 13.) Again, the Facilities

3  Construction Strike Team will expedite construction to provide 6,000 Phase I re-entry beds.

4  (Hysen Decl., ¶ 8.)

5             iv.    **Medical and Mental Health Beds.**

6         The addition of medical and mental health beds is also provided for by AB 900. A total of

7  8,000 medical/mental health beds will be created. Again, the Facilities Construction Strike Team

8  will expedite construction and will work to bring the beds on line as soon as possible. (Hysen

9  Decl., ¶ 9.) Based on the scope of the *Plata* Receivership, construction of the AB 900 medical

10 beds will require the cooperation of the Receiver. (Kernan Decl., ¶ 14.)

11            D.    **Administrative Parole Changes.**

12        Parole reform strategies will also play a large role in the reduction of prison overcrowding

13 and the provision of constitutional medical care. In addition to the implementation of AB 900,

14 CDCR has implemented immediate parole changes to reward successful rehabilitation. (Kernan

15 Decl., ¶¶ 15-19.) CDCR is actively pursuing strategies to release parolees from their statutory

16 parole periods as soon as is appropriate. (Kernan Decl., ¶¶ 17, 21.)

17        Under current California law, parolees initially released from prison after serving a period

18 of incarceration for a non-violent offense (a conviction not delineated in Penal Code Section

19 667.5(c)), and who have complied with the terms of their parole continuously for one year since

20 their release, shall be discharged on the 30th day after their first year of parole (or at the 13th

21 month of their parole term), unless the recommendation to retain them on parole has been made

22 to, and approved by, the Board of Parole Hearings. (Cal. Penal Code § 3001.) Similarly, parolees

23 initially released from prison after serving a period of incarceration for a violent offense (as

24 defined by Penal Code Section 667.5(c)) and who have complied with the terms of their parole

25 continuously for two years since their release, shall be discharged the 30th day after their second

26 year of parole (or at the 25th month of their parole term), unless the recommendation to retain has

27 been made to, and approved by, the Board of Parole Hearings. (Kernan Decl., ¶ 17.)

28

- 10 -

DEFS.' REPORT IN RESPONSE TO COURT'S FEB. 15, 2007 ORDER
(CASE NO. C-01-1351 TEH)                                                              1320445.1

1      Prior practice within the Division of Adult Parole Operation (DAPO) resulted in fewer

2    parolees being discharged from parole at the 13th and 25th months than is allowed by California

3    Penal Code Section 3001. In order to ensure compliance with Penal Code Section 3001, DAPO

4    issued a memorandum clarifying when parolees must be released from parole under state law.

5    (Kernan Decl., ¶¶ 17, 21, Ex. B.)    Specifically, parolees initially released from prison after

6    serving a period of incarceration for a non-violent offense, described as a conviction not noted in

7    Penal Code Section 667.5(c), and who have been on parole continuously for one year since their

8    release, shall be discharged the 30th day after their first year, unless the recommendation to retain

9    has been made to, and approved by, the Board of Parole Hearings. (Kernan Decl., ¶¶ 17, 21, Ex.

10    B.) Additionally, parolees initially released from prison after serving a period of incarceration for

11    a violent offense, as defined by Penal Code Section 667.5, and who have been on parole

12    continuously for two years since their release, shall be discharged the 30th day after their second

13    year, unless the recommendation to retain has been made to, and approved by the BPH. (Kernan

14    Decl., ¶¶ 17, 21, Ex. B.)

15      Historically, DAPO discharged approximately 13,800 parolees annually at the 13th

16    month, and 5,000 at the 25th month. Based on the revised practice, it is anticipated that there will

17    be an additional discharge of between 2,000 and 4,000 parolees from parole in the next 12

18    months. (Kernan Decl., ¶ 17.) By discharging more parolees from supervision, CDCR expects to

19    experience a reduction in the number of parolees returned to custody for various parole violations.

20      Further, the Division of Adult Parole Operations (DAPO) implemented a risk and needs

21    assessment tool in each of the 33 institutions: the Correctional Offender Management Profiling

22    for Alternative Sanctions (COMPAS). A study is currently being conducted to evaluate the

23    predictive validity of COMPAS in terms of its ability to effectively identify key risk and needs

24    factors in the parole population. Additionally, DAPO has undertaken extensive research into the

25    use and effectiveness of a parole-violation decision-making matrix with the support of corrections

26    expert Dr. Joan Petersilia and other topic area experts. This tool has been shown to improve

27    organizational decision-making consistency, as well as help to establish a culture of determining

28    sanctions based on policy-driven rationale and then tailoring the sanction to the specific risk and

- 11 -

1   needs of the parolee. When supported by evidence-based programs, such as COMPAS, this type

2   of matrix has been proven to play a meaningful role in the overall reduction of recidivism rates

3   among the parolee population. DAPO anticipates that a decision-making matrix will be ready for

4   a pilot deployment by the end of 2007. Once implemented, these tools will result in even more

5   discharges from parole.

6       **2. The Emergency Proclamation for Prison Overcrowding Can Be Rescinded in 2009, When Out-of-State Transfers, AB 900 Implementation, and Parole Changes**

7   **Will Eliminate the Emergency Conditions Caused By Non-Traditional Beds.**

8       The Governor issued an Emergency Proclamation to address the peril to persons and

9   property caused by the non-traditional beds used in 29 California prisons. (*See* Gov. Code, §§

10   8558, 8571.) Government Code section 8567(b) provides that orders issued during an emergency

11   shall be of no further effect when the emergency ends. In addition, the Legislature can vote to

12   terminate an Emergency Proclamation.

13       Based on CDCR's current plan for continued out-of-state transfers, AB 900

14   implementation, and administrative parole changes, it is expected that the emergency conditions

15   caused by non-traditional beds will likely be eliminated in 2009. (Kernan Decl., ¶ 23.) When the

16   emergency conditions are eliminated, the Emergency Proclamation will be rescinded.

17       **3. Although the Current Prison Population Exceeds 174,000 Inmates, the State's Prison Reform Plans Will Dramatically Reduce Overcrowding and Assist the**

18   **Receiver in Providing a Constitutional Level of Medical Care.**

19       Approximately 162,848 male and 12,141 female inmates are currently housed by CDCR,

20   for a total prison population of approximately 174,989 inmates. (Kernan Decl., ¶ 4.) As stated in

21   paragraph 5 above, CDCR anticipates housing--in California prisons--164,599 male inmates in

22   March 2008, and 167,614 male inmates in March 2009. These figures, however, do not account

23   for the impact that the anticipated out-of-state transfers and the DAPO May 15, 2007

24   Memorandum clarifying Penal Code section 3001 administrative discharge will have on the male

25   prison population. Taking these two factors into account, it is estimated that CDCR will house

26   in-state approximately 159,939 male inmates in March 2008, and 162,674 male inmates in March

27   2009. (Kernan Decl., ¶ 22.) These population projections do not take into account the additional

28   parole reduction strategies discussed above, such as alternative programming, the COMPAS risk

- 12 -

1   and needs assessment tool, the decision-making matrix, and alternative sanctions programs,

2   which are expected to further decrease CDCR's in-state male prison population.

**CONCLUSION**

4       As demonstrated in this report, the State is launching an aggressive and comprehensive

5   plan to reduce overcrowding in California's prisons. AB 900 provides for out-of-state transfers,

6   thousands of beds including medical beds, and better rehabilitation programs to reduce

7   recidivism. Expert strike teams have been established to expedite implementation and ensure

8   effective prison management. Administrative parole changes have been implemented to further

9   reduce overcrowding. In addition, the Receiver reports great progress in the past year, and has

10   just issued his Plan of Action to provide a constitutional level of medical care. Nothing supports

11   Plaintiffs' contention that the Receiver will fail; rather, the Governor's administration and the

12   Receiver will work to implement their respective plans. Accordingly, referral to a three-judge

13   panel is premature.

14   DATED: May 16, 2007                 HANSON BRIDGETT MARCUS
                                       VLAHOS & RUDY, LLP

16

17                               By:_____/s/_____
                                     PAUL B. MELLO
                                   Attorneys for Defendants

19   DATED: May 16, 2007                 EDMUND G. BROWN JR.
                             Attorney General of the State of California

22                               By:_____/s/_____
                                     SAMANTHA TAMA
                                     Deputy Attorney General
                                     Attorneys for Defendants

- 13 -

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **MARCIANO PLATA, et al. v. ARNOLD SCHWARZENEGGER, et al.**

No.:   **C 01-1351 TEH**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **May 16, 2007**, I served the attached

### DEFENDANTS' REPORT IN RESPONSE TO THE COURT'S
### FEBRUARY 15, 2007 ORDER

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

| | |
|---|---|
| **Paul B. Mello, Esq.** | **Martin H. Dodd, Attorney** |
| **Hanson Bridgett Marcus Vlahos & Rudy** | **Futterman & Dupree LLP** |
| **LLP - SF** | **160 Sansome Street, 17th Floor** |
| **425 Market Street, 26th Floor** | **San Francisco, CA 94104** |
| **San Francisco, CA 94105** | |
| | **John Hagar** |
| | **Chief of Staff** |
| **Donald Specter** | **Judges' Reading Room** |
| **Attorney at Law** | **Court Library, 18th Floor** |
| **Prison Law Office** | **United States District Court** |
| **General Delivery** | **Northern District of California** |
| **San Quentin, CA 94964** | **450 Golden Gate Avenue** |
| | **San Francisco, CA 94102** |
| **Warren E. George** | **Caroline N. Mitchell, Esq.** |
| **Attorney at Law** | **Jones Day - San Francisco** |
| **Bingham McCutchen - San Francisco** | **555 California Street, 26th Floor** |
| **Three Embarcadero Center** | **San Francisco, CA 94104** |
| **San Francisco, CA 94111-4066** | |

Jared Goldman
Staff Attorney
California Prison Health Care
Receivership
1731 Technology Drive, Suite 700
San Jose, CA  95110

Jerrold C. Schaefer, Esq.
Hanson Bridgett Marcus Vlahos & Rudy
LLP - SF
425 Market Street, 26th Floor
San Francisco, CA  94105

Steven Fama
Attorney at Law
Prison Law Office
1 Main Street
San Quentin, CA 94964

Robert Sillen
California Prison Receivership
1731 Technology Drive, Suite 700
San Jose, CA 95110

Alison Hardy, Esq.
Prison Law Office
General Delivery
San Quentin, CA 94964

I declare under penalty of perjury under the laws of the State of California the foregoing is true
and correct and that this declaration was executed on **May 16, 2007**, at San Francisco, California.

_____
J. Tucay
Declarant

_____
*J. Tucay*
Signature

20088774.wpd

**EXHIBIT J**

1  HANSON BRIDGETT MARCUS VLAHOS & RUDY, LLP
   JERROLD C. SCHAEFER - 39374
2  PAUL B. MELLO - 179755
   425 Market Street, 26th Floor
3  San Francisco, CA 94105
   Telephone: (415) 777-3200
4  Facsimile: (415) 541-9366
   jschaefer@hansonbridgett.com
5  pmello@handsonbridgett.com

6  EDMUND G. BROWN JR.
   Attorney General of the State of California
7  DAVID S. CHANEY
   Chief Assistant Attorney General
8  FRANCES T. GRUNDER
   Senior Assistant Attorney General
9  ROCHELLE C. EAST
   Supervising Deputy Attorney General
10 CHARLES J. ANTONEN, State Bar No. 221207
   Deputy Attorney General
11 SAMANTHA D. TAMA, State Bar No. 240280
   Deputy Attorney General
12   455 Golden Gate Avenue, Suite 11000
   San Francisco, CA 94102-7004
13 Telephone: (415) 703-5708
   Fax: (415) 703-5843
14 Email: Samantha.Tama@doj.ca.gov

15 Attorneys for Defendants

16

17             IN THE UNITED STATES DISTRICT COURT

18    NORTHERN DISTRICT OF CALIFORNIA -- SAN FRANCISCO DIVISION

19
   MARCIANO PLATA, et al.,                    C-01-1351 TEH
20
                              Plaintiffs,     DECLARATION OF SCOTT
21                                            KERNAN IN SUPPORT OF
          v.                                  DEFENDANTS' REPORT IN
22                                            RESPONSE TO THE
   ARNOLD SCHWARZENEGGER, et al.,             COURT'S FEBRUARY 15,
23                                            2007 ORDER
                              Defendants.
24

25

26    I, Scott M. Kernan, declare as follows:

27    1.   I am currently the Chief Deputy Secretary of the Division of Adult Institutions for the

28 California Department of Corrections and Rehabilitation (CDCR), which is tasked with the

Decl. Kernan Supp. Defs.' Report                         *Plata, et al. v. Schwarzenegger, et al.*
                                                                            C-01-1351 TEH
                                    1

1    operation of California's prisons, correctional facilities, and adult parole. Before becoming the

2    Chief Deputy Secretary, I held the positions of Deputy Director, and later Acting Director of the

3    Division of Adult Institutions. This declaration is submitted in support of Defendants' Report in

4    Response to the Court's February 15, 2007 Order. All matters set forth in this declaration are

5    personally known to me and if sworn as a witness in this matter, I could and would testify

6    competently as to all matters set forth in this declaration.

7         2.    In November 2005, I was reassigned from my position as Warden at California State

8    Prison-Sacramento to CDCR headquarters to serve as Deputy Director of the Division of Adult

9    Institutions. As the Deputy Director, I oversaw the development of alternative solutions to the

10   overcrowding problem. These efforts included a comprehensive analysis of existing CDCR

11   beds, programming space, clinical/mental health space, infrastructure capacities, and projected

12   mitigation. I also conducted an analysis of additional capacity available within existing in-state

13   private prison facilities, evaluated potential capacity within the Department of Mental Health and

14   the Department of Juvenile Justice, expansion of female capacity in private facilities, expansion

15   of capacity at existing prisons ("in-fill"), and an analysis of reactivating a previously

16   decommissioned facility in Stockton, California.

17        3.    Housing inmates in non-traditional quarters presents serious safety concerns for both

18   the inmates and correctional staff. The overcrowding of CDCR facilities has led to increased

19   numbers infectious disease outbreaks and riots and disturbances system-wide.

20        For example, infectious disease outbreaks have included a possible NoroVirus outbreak at

21   California State Prison, San Quentin (San Quentin); Hepatitis A and Varacilla (Chicken Pox)

22   outbreaks at Wasco State Prison (Wasco); a possible Chicken Pox outbreak at California State

23   Prison, King-Avenal (Avenal) and the Correctional Training Facility (CTF) as well; suspected

24   Tuberculosis, Chicken Pox, and Gastroenteritis outbreaks at California State Prison, Solano

25   (Solano); Gastroenteritis and a possible Tuberculosis exposure at California State Prison, Los

26   Angeles County (Lancaster); and Chicken Pox and possible Tuberculosis exposure at the

27   California Substance Abuse Treatment Facility & State Prison (SATF). Because of these

28

1  infectious disease outbreaks, institutions were forced to adopt a modified program, or in extreme

2  instances, lockdown, to contain the spread of the outbreak.

3    Additionally, overcrowding in CDCR prisons has also led to increased riots and

4  disturbances.  For instance, riots in different facilities at Avenal caused the prison to spend a

5  combined 34 days on modified program; riots and disturbances at the California Correctional

6  Center caused the prison to go on modified program or lockdown for a combined 324 days, with

7  two facilities remaining on lockdown or modified program since March 5, 2007; all facilities at

8  Calipatria State Prison remained on lockdown or modified program for 552 days following the

9  attempted murder of a peace officer; and as a result of a riot in Facility B at Wasco on December

10  30, 2002, that facility remained on modified program for 1,435 days.  These riots deflect prison

11  resources so that while correctional officers now must respond to the increased security concerns

12  and maintain watch over an increasingly dangerous prison population, they are not able to assist

13  the Receiver's efforts in addressing the inmates' medical concerns by escorting inmates to

14  medical appointments, for instance.

15    4.    On April 26, 2007, in response to California's prison overcrowding crisis, the

16  California Legislature enacted, and Governor Schwarzenegger signed into law on May 3, 2007,

17  Assembly Bill 900 (AB 900) which is directed at reducing California's prison population.  AB

18  900 will reduce prison overcrowding through four measures: (1) through the out-of-state transfer

19  of inmates, (2) by creating in-fill beds, (3) by establishing more community re-entry beds, and (4)

20  by creating more medical and mental health beds.  These four measures are also directed at

21  reducing CDCR's use of "non-traditional beds" or beds that are used to house inmates in areas

22  that were neither designed nor intended for inmate housing, including in areas such as

23  gymnasiums, day rooms, program rooms, and triple bunk beds.  Further, AB 900 also provides

24  for the creation of approximately 13,000 county jail beds.

25    5.    CDCR projects, based on Spring 2007 published projections, the May 2007 population

26  to be approximately 162,848 male and 12,141 female inmates, for a total prison population of

27  approximately 174,989 inmates.  CDCR anticipates housing 164,599 male inmates and 12,200

28  female inmates (176,799 total) in March 2008, and 167,614 male inmates and 12,562 female

Decl. Kernan Supp. Defs.' Report

*Plata, et al. v. Schwarzenegger, et al.*
C-01-1351 TEH

1   inmates (180,176 total) in March 2009. These projected figures do not account for the impact

2   that AB 900 and other population reduction strategies (including parole population reduction

3   strategies described in paragraphs 15 through 21) will have on the prison population, as described

4   below.

5       6.     CDCR also proposed in the May Revise the establishment of approximately 4,500 beds

6   in Female Rehabilitative Community Correctional Centers (FRCCC). These facilities will house

7   non-serious, nonviolent women offenders. The FRCCC's were developed specifically for

8   California using the National Institute of Correction's Gender-Responsive Strategies: Research,

9   Practice, and Guiding Principles for Women Offenders (Bloom, Owen & Covington, 2003) as a

10   foundation for the program design. Services will include, but not be limited to: substance abuse

11   education and treatment, physical and mental health care, trauma treatment, education, vocational

12   training, life skills, cultural competency, parenting and family reunification, and reentry

13   assistance. These facilities, upon approval, are scheduled to begin occupancy in April 2008. The

14   FRCCC's will eliminate all non-traditional beds for the female population with the first

15   activation in April 2008 and with subsequent activations to address any growth in this population

16   beyond 2015-2016. These new beds will reduce CDCR's female population by one-third and

17   perhaps allow CDCR to convert current female prisons into male capacity, thus effectively

18   relieving male prison overcrowding as well.

19       7.     To reduce overcrowding in California prisons statewide, CDCR currently plans to

20   begin the involuntary transfer of inmates to either in-state private facilities or out-of-state

21   facilities starting in June 2007. CDCR will pursue all in-state transfer opportunities before

22   initiating out-of-state transfers to the extent possible. CDCR will transfer up to 300 inmates per

23   month for the first four months of the out-of-state transfer program. Beginning in month 5 of

24   transferring inmates to out-of-state facilities, CDCR will increase the number of inmates

25   transferred out of state to 400 inmates per month. This rate of transfer will continue through the

26   end of fiscal year 2007/2008, totaling 5,060 inmates transferred to out-of-state facilities by the

27   end of June 2008. The out-of-state transfer of inmates will continue at a rate of 400 inmates per

28   month into fiscal year 2008/2009, and it is estimated that the out-of-state transfer of inmates will

Decl. Kernan Supp. Defs.' Report                            *Plata, et al. v. Schwarzenegger, et al.*
                                                            C-01-1351 TEH

Case 2:90-cv-00520-KJM-SCR    Document 2240-6    Filed 05/24/07    Page 23 of 141
Case 3:01-cv-01351-TEH    Document 668-1    Filed 05/16/2007    Page 5 of 15

1   reduce to 320 inmates per month for the months of December 2008 and January 2009, and finally
2   300 inmates during the month of February 2009 for a total of 8,000 inmates transferred out of
3   state.  This will result in a reduction in CDCR's male population of approximately 3,860 inmates
4   by March 2008, and a total of 8,000 inmates by March 2009.

5          The out-of-state transfer of these nearly 5,060 inmates in fiscal year 2007/2008 will
6   reduce the number of non-traditional beds from approximately 18,000 to approximately 13,000
7   by the end of the 2007/2008 fiscal year.  The use of out-of-state facilities is the only immediate
8   option available to reduce crisis level overcrowding, protect public safety, enhance security
9   within the prison and jail systems, and enhance the Receiver's ability to provide court-mandated
10  medical services to the inmate population.

11         8.     Inmates eligible for involuntary out-of-state transfer must meet one of the
12  following criteria: (1) inmates with an active Immigration and Customs Enforcement (ICE) hold
13  (i.e. inmates who have been previously deported by the federal government and are criminal
14  aliens subject to deportation following the fulfillment of their criminal sentence), or (2) inmates
15  with a potential ICE hold (i.e. inmates who are criminal aliens and committed an aggravated
16  felony as defined by federal statute and may be subject to deportation following the fulfillment of
17  their criminal sentence).  Attached as Exhibit A is a true and correct copy of a February 2, 2007
18  Memorandum outlining CDCR's procedure with regard to the out-of-state transfer of inmates.

19         Inmates who meet either of the above criteria (i.e. they have an active or a potential ICE
20  hold) will be prioritized for involuntary out-of-state transfer as follows (beginning with the first
21  inmates to be transferred): (1) inmates who have not received any visitation within the last two
22  years and cannot demonstrate family or supportive ties in California; (2) inmates who have not
23  received any visitation within the last year and cannot demonstrate family or supportive ties in
24  California; (3) inmates classified as Work Group/Privilege Group C/C meaning inmates who
25  voluntarily choose not to work and are not receiving any good time credits or time off of their
26  sentence for work; (4) inmates classified as Work Group/Privilege Group A2/B meaning inmates
27  who have worked in the past but are not currently working because there are no jobs available,
28  and are receiving good time credits; (5) inmates classified as Work Group/Privilege Group A1/A

Decl. Kernan Supp. Defs.' Report

*Plata, et al. v. Schwarzenegger, et al.*
C-01-1351 TEH

1  meaning inmates who hold unskilled jobs such as in the kitchen or as porters; (6) inmates

2  classified as Work Group/Privilege Group A1/A but who hold jobs in an educational, vocational,

3  or substance abuse program; and (7) (the last group to be transferred) inmates with the longest

4  amount of time to serve.

5      In the event that the above criteria yield an insufficient number of inmates for transfer, the

6  same prioritized criteria listed above in items (1) through (7) will apply to those inmates without

7  an active or potential ICE hold, but who have committed an aggravated felony.

8      9.      CDCR performed an initial review of inmates eligible for out-of-state transfer,

9  and 34,766 inmates were identified as eligible on a cursory level. Following a more thorough

10  review of eligibility (as described in paragraph 8 above), as of January 2, 2007, 17,908[1] inmates

11  were identified as eligible for transfer:

12      •      2,898 inmates have an active ICE hold. Of those 2,898 inmates:
                - 1,565 committed an aggravated felony
13              - 1,282 have not received a visit in the preceding two years
                - 1,477 have not received a visit in the preceding year[2]
14              - 2,162 are illegal aliens from Mexico
                - 175 are illegal aliens from El Salvador
15              - 9 are Work Group/Privilege Group C/C (voluntarily choose not to
                work)
16              - 434 are Work Group/Privilege Group A2/B (not assigned to an
                inmate work incentive assignment)
17
18      •      1,473 inmates have a potential ICE hold. Of those 1,473 inmates:
                - 725 committed an aggravated felony
19              - 376 of those who committed an aggravated felony have
                not received a visit in the preceding year
20              - 349 of those who committed an aggravated felony have not
                received a visit in the preceding two years
21              - 739 have not received a visit in the preceding year[3]
                - 690 have not received a visit in the preceding two years
22              - 933 are illegal aliens from Mexico
                - 63 are illegal aliens from Vietnam
23              - 8 are Work Group/Privilege Group C/C (voluntarily choose not to
                work)

24

25      1. As of January 2, 2007, inmates incarcerated at Richard J. Donovan Correctional Facility
26  (RJD) were not included in the totals. Approximately 1,138 eligible inmates are incarcerated at RJD.

27      2. No visiting information is available on 20 inmates with active ICE holds.

28      3. No visiting information is available on 6 inmates with potential ICE holds.

Decl. Kernan Supp. Defs.' Report                                    *Plata, et al. v. Schwarzenegger, et al.*
                                                                    C-01-1351 TEH

6

1        - 388 are Work Group/Privilege Group A2/B (not assigned to an
         inmate work incentive assignment)

2    •    13,537 inmates do not have either an active or potential ICE hold
         - 7,006 committed an aggravated felony and are not subject to
3        deportation
         - 6,856 have not received a visit in the preceding year[4]
4        - 6,124 have not received a visit in the preceding two years
         - 1,181 of these inmates who do not have an active or potential ICE
5        hold are *not* assigned to an inmate work incentive assignment and
         have *not* had a visit in the preceding two years
6        - 50 are Work Group/Privilege Group C/C (voluntarily choose not
         to work)
7        - 2,376 are Work Group/Privilege Group A2/B (not assigned to an
         inmate work incentive assignment)
8
    10.    CDCR has a current contract with the Correctional Corporation of America
9
(CCA) that permits expansion of the number of out-of-state beds as inmates become available for
10
transfer. CCA provided a schedule to CDCR that permits up to 4,400 beds for California use.
11
CDCR will concurrently negotiate contracts for additional beds with private and/or public
12
vendors to meet the schedule detailed in paragraph 7.
13
    11.    This out-of-state transfer of inmates will further improve inmates' access to
14
medical care at CDCR. Inmates selected for out-of-state facilities will undergo a comprehensive
15
medical screening and only those inmates who meet the medical criteria, as established by the
16
Receiver, will be selected for transfer. The reduction in population at CDCR institutions will
17
permit medical staff to focus resources on a smaller population. Additionally, these transfers will
18
result in reduced staffing requirements and free space at existing facilities for enhanced medical
19
services. A reduced inmate population will ease prison living environments and decrease
20
violence, and will permit medical staff to focus on non-emergent services as is currently required
21
in existing prisons. To date, approximately 360 inmates are currently confined in out-of-state
22
facilities.
23
    12.    AB 900 will also reduce California's prison overcrowding through the use of in-
24
fill beds. "In-fill beds" are those beds that will be added to existing capacity in current prisons.
25
The creation of in-fill beds will not require the construction of new prisons; but rather the
26
construction of new facilities at existing prisons. In-fill beds will be created as either dorms or
27

28        4. No visiting information is available on 50 inmates without an active or potential ICE hold.

Decl. Kernan Supp. Defs.' Report                                    *Plata, et al, v. Schwarzenegger, et al.*
                                                                    C-01-1351 TEH

1    cells. In-fill beds, like the out-of-state transfer of inmates, are designed to eliminate CDCR's

2    reliance on non-traditional beds, and will permit CDCR to address population growth and the

3    current overcrowding in existing prison facilities. As new in-fill beds are constructed, AB 900

4    mandates the reduction in a proportionate number of non-traditional beds, until non-traditional

5    bed use is entirely eliminated.

6          13.    AB 900 also provides for the creation of 16,000 re-entry beds, which are beds in

7    small, secured facilities (500 inmates maximum per facility), that are operated by CDCR but are

8    geographically closer to communities and are focused on providing rehabilitation services and

9    preparing inmates for re-entry into society.

10          14. The addition of medical and mental health beds is also provided for by AB 900.

11    Indeed, there are 8,000 total medical/mental health beds. The medical beds will be created in

12    cooperation with the *Plata* Receiver.

13          15.    Parole reduction strategies will result in the reduction of CDCR's inmate

14    population. While AB 900 does not address parole accountability, CDCR has continued to

15    implement parole population reduction strategies through alternative programming in lieu of

16    returning inmates to prison. These strategies are proving effective in reducing California's prison

17    population and have led to CDCR's continued expansion of these alternative sanction programs

18    in the 2007/2008 fiscal year.

19          As evidence of CDCR's successful parole reduction strategies, the CDCR Spring Adult

20    Population projections, though originally estimated in the fall of 2006 to be 120,117 parolees,

21    were later adjusted in June 2007 to 122,833 parolees, reflecting an increase of 2,716 parolees. At

22    the same time that the parole population increased, parolee referral to programs also increased,

23    and the parole revocation rate remained steady. This evidences the fact that parole agents are

24    referring parolees to programs instead of recommending incarceration. This trend and change in

25    parole culture will continue to be monitored as a benchmark for CDCR's efforts in the area of

26    parole reform.

27          16.    Alternative programming, however, only accounts for one aspect of CDCR's

28    overall implementation of parole accountability strategies. Reduction in the parole population

Decl. Kernan Supp. Defs.' Report

*Plata, et al. v. Schwarzenegger, et al.*
C-01-1351 TEH

1  requires, as a matter of public safety, a validated risk and needs assessment to evaluate an

2  individual's risk of re-offending and threat to public safety. Parole decisions are now being made

3  based upon a subjective determination of individual circumstances and correctional judgment.

4  Secretary Tilton, however, directed that a statistically validated decision-making matrix, with

5  input from national experts, be developed to provide clear and objective decisions throughout

6  CDCR. Furthermore, Secretary Tilton directed that a policy be issued clarifying when parolees

7  must be discharged from parole. These strategies will lead to further development of parole

8  reform strategies after thoughtful evaluation and implementation of CDCR's parole

9  accountability model.

10      17.    **California Penal Code Section 3001 Administrative Discharge.** Penal Code §

11  3001 addresses the statutory requirements for DAPO to consider prior to discharging a parolee

12  from supervision. Specifically, parolees initially released from prison after serving a period of

13  incarceration for a non-violent offense (a conviction *not* delineated in Penal Code § 667.5(c)),

14  and who have been compliant with the terms of their parole continuously for one year since their

15  release, *shall be discharged on the 30th day after their first year* of parole (or at the 13th month of

16  their parole term), unless the recommendation to retain them on parole has been made to, and

17  approved by, the Board of Parole Hearings (BPH). Similarly, parolees initially released from

18  prison after serving a period of incarceration for a violent offense (as defined by Penal Code §

19  667.5(c)), and who have been compliant with the terms of their parole continuously for two years

20  since their release, *shall be discharged the 30th day after their second year* of parole (or at the

21  25th month of their parole term), unless the recommendation to retain has been made to, and

22  approved by, the BPH.

23      Current organizational practice within DAPO results in fewer parolees being discharged

24  from parole at the 13th and 25th months than is authorized in California Penal Code § 3001. In

25  order to ensure complete compliance with Penal Code § 3001, DAPO Director Thomas Hoffman

26  issued a memorandum dated May 15, 2007 clarifying when parolees must be discharged from

27  parole. Attached as Exhibit B is a true and correct copy of Thomas Hoffman's May 15, 2007

28  Memorandum regarding Penal Code § 3001 Compliance Policy Statement.

1          Departmental databases identify 7,642 parolees who potentially meet the requirements for

2   discharge after 12 months of successful parole, but were nonetheless retained on parole during

3   the past 12 months.  CDCR electronic databases do not quantify the reasons for retention, but in

4   the majority of these instances, the parole agent lacked specific administrative direction to

5   discharge the parolee and therefore referred the case to the BPH.  The BPH, in turn, chose to

6   retain the majority of these cases on parole.

7          The May 15, 2007 Memorandum, with specific administrative parameters and

8   administrative oversight, is anticipated to result in the discharge of between 2,000 to 4,000

9   additional parolees from parole in the next 12 months.  Currently, discharge decisions are made

10  at the supervisory level.  To ensure full implementation of this policy, however, all discharge

11  recommendations will be reviewed at the Parole Administrator level (which is one level above

12  the supervisory level).  This change in oversight will require management-level executives to

13  make the discharge decision and will result in a more consistent application of the policy.

14  Additionally, CDCR will electronically track the discharges by parole region to ensure proper

15  compliance.  This data will be added as a performance measurement to the regular statistical

16  analysis (COMSTAT) system currently employed by CDCR.

17          18.    **Risk and Needs Assessment Tool.**  The Division of Adult Parole Operations

18  (DAPO) implemented a risk and needs assessment tool in each of the 33 institutions: the

19  Correctional Offender Management Profiling for Alternative Sanctions (COMPAS).  COMPAS

20  is a research-based, risk and needs assessment tool for criminal justice practitioners to assist

21  them in the placement, supervision, and case-management of offenders in community settings.

22  To date, DAPO has completed over 45,000 pre-release assessments of inmates to be released

23  from the institutions and placed on parole.  CDCR contracted with UCLA Professor David

24  Farrabee to statistically validate COMPAS and determine if the assessments are producing

25  accurate and effective recommendations.  Further, a study is being conducted to evaluate the

26  predictive validity of COMPAS in terms of its ability to effectively identify key risk and needs

27  factors in the parole population.

28

Decl. Kernan Supp. Defs.' Report

*Plata, et al. v. Schwarzenegger, et al.*
C-01-1351 TEH

19. **Decision-Making Matrix.** Since November 2006, DAPO has undertaken extensive research into the use and effectiveness of a parole-violation decision-making matrix with the support of corrections expert Dr. Joan Petersilia and other topic area experts. This tool has been shown to improve organizational decision-making consistency, as well as help to establish a culture of determining sanctions based on policy-driven rationale and then tailoring the sanction to the specific risk and needs of the parolee. When supported by evidence-based programs, such as COMPAS, this type of matrix has been proven to play a meaningful role in the overall reduction of recidivism rates among the parolee population. DAPO anticipates that a decision-making matrix will be ready for a pilot deployment by the end of 2007.

Other states that have employed strategies similar to the decision-making matrix described above have experienced significant reductions in parole return-to-custody rates, in turn directly reducing the prison population. The National Institute of Corrections assisted a number of other states with the implementation of a policy-driven parole model including the decision-making matrix. All of those such states report that they have experienced reduced recidivism rates. For example, Georgia reported an 11% reduction in the first year following implementation of the matrix and its related components. Similarly, Kansas reported a 6% reduction, and Texas reported a reduction by 14,000 admissions after implementation of the parole model. If California's effort resulted in even a 6% reduction in violations, that would amount to 5,840 fewer violations and a reduction in 1,920 prison bed days.

20. **Alternative Sanction Programs.** The DAPO is actively expanding its programs that are available as remedial sanctions in lieu of parole revocation in response to parole violations. CDCR has program capacity for 4,175 parolees at an annual cost of $82,648,665. By sanctioning these parole violators, rather than returning them to CDCR custody, it is estimated that CDCR will reduce its monthly intake and free-up much needed bed space. CDCR recognizes that a number of logistical issues prevent these remedial sanction programs from being filled, however CDCR is committed to addressing and overcoming these obstacles such that these programs will reach capacity.

21.    I created additional parameters for discharge that will provide parole agents in the field with necessary administrative direction and clear expectations. The parameters are as follows: all parolees who have successfully completed a 12 month consecutive period of parole without revocation and who meet the following criteria *will* be discharged in accordance with Penal Code section 3001: (1) no serious or violent controlling or non-controlling offense (as defined in Penal Code §§ 667.5 or 1192.7); (2) no conviction for serious or violent offense in the preceding 10 years; (3) no conviction for any offense requiring registration under Penal Code § 290; and (4) not classified as a gang member.

This directive will result in the necessary relief of prison beds in the next 12 months and will enable CDCR to pursue other aspects of parole reform described previously. Historically, DAPO discharges approximately 13,800 parolees annually at the 13th month, and 500 at the 25th month. It is anticipated that there will be an increase in these discharge numbers during the first year that the policy is in effect. By discharging more parolees from supervision, it is estimated that CDCR will experience a reduction in the number of parolees returned to custody for various parole violations. Thus, while it is difficult to quantify, CDCR anticipates that this policy will reduce the prison population.

22.    As stated in paragraph 5 above, CDCR anticipates housing 164,599 male inmates in March 2008, and 167,614 male inmates in March 2009. These projected figures, however, do not account for the impact that the anticipated out-of-state transfers and the DAPO May 15, 2007 Memorandum clarifying Penal Code section 3001 administrative discharge will have on the male prison population. Taking into account these two factors, it is estimated that CDCR will house in-state approximately 159,939 male inmates in March 2008, and 162,674 male inmates in March 2009. These population projections do not take into account the additional parole reduction strategies discussed above, such as alternative programming, the COMPAS risk and needs assessment tool, the decision-making matrix, and alternative sanctions programs, which are expected to further decrease CDCR's in-state male prison population.

23.    Based on CDCR's current plan for continued out-of-state transfers, AB 900 implementation, and administrative parole changes, it is planned that the emergency conditions

Decl. Kernan Supp. Defs.' Report

*Plata, et al. v. Schwarzenegger, et al.*
C-01-1351 TEH

1 | caused by non-traditional beds should be eliminated in 2009. When the emergency conditions

2 | are eliminated, the Emergency Proclamation will be rescinded.

3 |

4 | I declare under penalty of perjury that the foregoing is true and correct. Executed in

5 | Sacramento, California, on May _16_ 2007.

6 |

7 |

8 | SCOTT M. KERNAN
  | Chief Deputy Secretary, CDCR Division of Adult
  | Institutions

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

Decl. Kernan Supp. Defs.' Report

*Plata, et al. v. Schwarzenegger, et al.*
C-01-1351 TEH

13

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **MARCIANO PLATA, et al. v. ARNOLD SCHWARZENEGGER, et al.**

No.:   **C 01-1351 TEH**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **May 16, 2007**, I served the attached

### DECLARATION OF SCOTT KERNAN IN SUPPORT OF DEFENDANTS' REPORT IN RESPONSE TO THE COURT'S FEBRUARY 15, 2007 ORDER

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

| | |
|---|---|
| **Paul B. Mello, Esq.** | **Martin H. Dodd, Attorney** |
| **Hanson Bridgett Marcus Vlahos & Rudy** | **Futterman & Dupree LLP** |
| **LLP - SF** | **160 Sansome Street, 17th Floor** |
| **425 Market Street, 26th Floor** | **San Francisco, CA 94104** |
| **San Francisco, CA 94105** | |
| | **John Hagar** |
| | **Chief of Staff** |
| **Donald Specter** | **Judges' Reading Room** |
| **Attorney at Law** | **Court Library, 18th Floor** |
| **Prison Law Office** | **United States District Court** |
| **General Delivery** | **Northern District of California** |
| **San Quentin, CA 94964** | **450 Golden Gate Avenue** |
| | **San Francisco, CA 94102** |
| | |
| **Warren E. George** | **Caroline N. Mitchell, Esq.** |
| **Attorney at Law** | **Jones Day - San Francisco** |
| **Bingham McCutchen - San Francisco** | **555 California Street, 26th Floor** |
| **Three Embarcadero Center** | **San Francisco, CA 94104** |
| **San Francisco, CA 94111-4066** | |

Jared Goldman
Staff Attorney
California Prison Health Care
Receivership
1731 Technology Drive, Suite 700
San Jose, CA  95110

Jerrold C. Schaefer, Esq.
Hanson Bridgett Marcus Vlahos & Rudy
LLP - SF
425 Market Street, 26th Floor
San Francisco, CA  94105

Steven Fama
Attorney at Law
Prison Law Office
1 Main Street
San Quentin, CA 94964

Robert Sillen
California Prison Receivership
1731 Technology Drive, Suite 700
San Jose, CA 95110

Alison Hardy, Esq.
Prison Law Office
General Delivery
San Quentin, CA 94964

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **May 16, 2007**, at San Francisco, California.

_____
J. Tucay
Declarant

_____
J. Tucay
Signature

20088773.wpd

# EXHIBIT A

# Memorandum

Date : February 2, 2007

To : Associate Directors – Division of Adult Institutions
Regional Medical Directors
Regional Administrators, Division of Correctional Health Care Services
Wardens
Health Care Managers
Classification Staff Representatives
Classification and Parole Representatives
Correctional Counselor IIIs-Reception Centers
Correctional Case Records Manager

Subject: **CALIFORNIA OUT-OF-STATE CORRECTIONAL FACILITY PROGRAM, PHASE III**

On October 31, 2006, the California Department of Corrections and Rehabilitation (CDCR) implemented Phase II of the California Out-of-State Correctional Facility (COCF) Program. Despite the enormous effort of interviewing every potential candidate for voluntary placement, insufficient numbers of inmates have volunteered for out-of-state placement. The purpose of this memorandum is to announce mandatory transfers in Phase III of the implementation of the COCF program and to instruct staff on the procedures for identification and transfer of inmates to out-of-state facilities. Please ensure a copy of this memorandum is provided for all Correctional Counselors (CC).

In accordance with the October 4, 2006, Governor's State of Emergency Proclamation, the CDCR Secretary is authorized to prioritize the mandatory transfer of inmates who meet the following criteria:

1. Inmates who: (a) have been previously deported by the federal government and are criminal aliens subject to deportation; or (b) have committed an aggravated felony as defined by federal statute and are subject to deportation.
2. Inmates who are paroling outside of California.
3. Inmates who have limited or no family or supportive ties in California based on visitation records and/or other information deemed relevant and appropriate by the CDCR Secretary.
4. Inmates who have family or supportive ties in a transfer state.
5. Other inmates as deemed appropriate by the CDCR Secretary.

The potential pool of eligible inmates who meet the criteria as set by the Governor's Emergency Proclamation shall be prioritized as follows:

1. Inmates who have active Immigration and Customs Enforcement (ICE) holds.
   A. The inmate has not had a visit in the last two years as reflected by the visiting records.
   B. The inmate has not had a visit in the last year as reflected by the visiting records.
   C. The inmate is not currently in a work, education, vocation, or Substance Abuse Treatment Program (SAP) assignment.
      - Work Group/Privilege Group C/C.
      - Work Group/Privilege Group A2/B, pending assignment.
      - Work Group/Privilege Group A1/A, pending assignment.
   D. All other inmates who have an active ICE hold.

Associate Directors – Division of Adult Institutions
Regional Medical Directors
Regional Administrators, Division of Correctional Health Care Services
Wardens
Health Care Managers
Classification Staff Representatives
Classification and Parole Representatives
Correctional Counselor IIIs-Reception Centers
Correctional Case Records Managers
Page 2

2. Inmates who have a potential ICE hold and have a conviction for an aggravated felony.
   A. The inmate has not had a visit in the last two years as reflected by the visiting records.
   B. The inmate has not had a visit in the last year as reflected by the visiting records.
   C. The inmate is not currently in a work, education, vocation, or SAP assignment.
      • Work Group/Privilege Group C/C.
      • Work Group/Privilege Group A2/B, pending job assignment.
      • Work Group/Privilege Group A1/A, pending job assignment.
   D. All other inmates who have a potential ICE hold and have a conviction for an aggravated felony.

3. Inmates who have a potential ICE hold and do not have a conviction for an aggravated felony.
   A. The inmate has not had a visit in the last two years as reflected by the visiting records.
   B. The inmate has not had a visit in the last year as reflected by the visiting records.
   C. The inmate is not currently in a work, education, vocation, or SAP assignment.
      • Work Group/Privilege Group C/C.
      • Work Group/Privilege Group A2/B, pending job assignment.
      • Work Group/Privilege Group A1/A, pending job assignment.
   D. All other inmates who have a potential ICE hold and do not have a conviction for an aggravated felony.

4. Inmates who were born in the United States or inmates who are naturalized citizens.
   A. The inmate is not currently in a work, education, vocation, or SAP assignment and he has not had a visit in the last two years as reflected by the visiting records.
   B. The inmate is not currently in a work, education, vocation, or SAP assignment and he has not had a visit in the last year as reflected by the visiting records.
   C. The inmate is currently in a work, education, vocation, or SAP assignment and he has not had a visit in the last two years as reflected by the visiting records.
   D. The inmate is currently in a work, education, vocation, or SAP assignment and he has not had a visit in the last year as reflected by the visiting records.

## MINIMUM CUSTODY NOTIFICATION

Inmates who currently have minimum custody or eligible for reduction to minimum custody are **not eligible** for involuntary transfer out of state; this includes inmates with an active or potential ICE hold. The Wardens are to ensure the affected inmates are aware of this decision. To attempt to eliminate the potential risk of flight, please advise the inmates and provide them with the English (Attachment A) or Spanish (Attachment B) handout which notifies the inmate that he is not subject to involuntary out-of-state transfer.

Associate Directors – Division of Adult Institutions
Regional Medical Directors
Regional Administrators, Division of Correctional Health Care Services
Wardens
Health Care Managers
Classification Staff Representatives
Classification and Parole Representatives
Correctional Counselor IIIs-Reception Centers
Correctional Case Records Managers
Page 3

## PHASE III PROCESS

Prior to implementing the Phase II mass screening of the potentially eligible population, the Classification and Parole Representative (C&PR) and the previously trained CC-III or CC-II provided training to all caseload carrying CCs on the screening process. The inmates who were identified as eligible, but did not volunteer pursuant to the Phase II mass screening are the population to be further screened at this point for placement. However, staff will continue to pursue voluntary placements as outlined in the Phase II memorandum.

The following is the Phase III step-by-step process for screening and the mandatory transferring of inmates into the COCF Program.

### Armstrong and Clark Class Members

Inmates who have been identified as qualifying for the Disability Placement Program (DPP) and/or Developmental Disability Program (DDP) shall not be involuntarily transferred to an out-of-state facility at this time.

### Classification Section

Inmates who volunteer to participate in the COCF Program shall be processed in accordance with the October 31, 2006, Deputy Director Memorandum titled, *California Out-of-State Correctional Facility, Phase II* and the November 21, 2006, Deputy Director Memorandum titled, *California Out-of-State Correctional Facility, Phase II Addendum.*

The following provides direction on the mandatory placement process:

1. The Wardens will be provided an Activation Schedule and a list of inmates, using the criteria established by the Governor's proclamation (see page one), who are potentially eligible for the mandatory COCF Program for involuntary transfer in a subsequent memorandum.
2. The Warden shall ensure the lists are provided to the CC-Is or caseload carrying CC-IIs whose caseload includes identified potential COCF inmates.
3. The CC shall screen the Central Files (C-File) of the inmates who appear on the potentially eligible screening list to determine COCF eligibility.
4. The CC shall review the C-file for the presence of the pre-formatted CDC Form 128-B, *Chrono-General*, generated during the Phase II review process.
   - The CC shall ensure the eligibility status on the pre-formatted CDC Form 128-B has not changed. If the C-file does not contain a pre-formatted CDC Form 128-B or the current pre-formatted CDC Form 128-B is inaccurate, the CC shall generate a new pre-formatted CDC Form 128-B.

Associate Directors – Division of Adult Institutions
Regional Medical Directors
Regional Administrators, Division of Correctional Health Care Services
Wardens
Health Care Managers
Classification Staff Representatives
Classification and Parole Representatives
Correctional Counselor IIIs-Reception Centers
Correctional Case Records Managers
Page 4

- If the inmate is screened "Eligible", the CC shall mark which facilities the inmate may be housed.
- The CC shall forward the newly generated CDC Form 128-B to the C&PR.

5. The CC shall complete the pre-formatted CDC Form 128B, *Medical/Dental/Psychiatric Referral*, for all eligible screened inmates requesting a medical/dental/psychiatric evaluation for participation in the program.

- The CC shall document on the pre-formatted CDC Form 128B, any indication of mental health concerns notated in the Probation Officer's Report (POR), psychological reports for the court or Board of Parole Hearings, confidential and non-confidential psychiatric reports to include Parole Out-Patient Clinic reports, Criminal Identification and Information (CI&I), or Federal Bureau of Investigations (FBI) Rap Sheet.
- The C&PR or designee shall fax copies of all completed preformatted CDC Form 128B, *Medical/Dental/Psychiatric Referrals*, to Facility Captain (FC) David Higginbotham at (661) 863-6717.

6. The CC shall interview the potentially eligible COCF inmate.

- The CC shall ensure the identified potential COCF inmate is notified that he is being reviewed for mandatory transfer.
- The CC shall inform the inmate of his right to attorney consultation prior to Institution Classification Committee (ICC).
  - The attorney may be of the inmate's choosing at his expense, or he may utilize the McGeorge School of Law Institute for Administrative Justice.
  - The CC shall notify the C&PR or designee if an inmate requests legal consultation prior to ICC. The C&PR or designee shall arrange for the attorney consultation.
  - The C&PR shall e-mail the list of inmates who have requested attorney consultation to CC-III Milliner at Phyllis.Milliner@cdcr.ca.gov.
  - The COCF Unit shall notify the McGeorge School of Law Institute for Administrative Justice of the preliminary number of inmates requesting consultation pending medical clearance.
  - The COCF Unit shall coordinate the attorney consultation with the institution for all medically cleared inmates.
- The CC shall provide the inmate with a CDC Form 128B-1, *Notice of Classification Hearing*, informing him that he will appear before ICC upon being medically / psychiatrically cleared.

Associate Directors – Division of Adult Institutions
Regional Medical Directors
Regional Administrators, Division of Correctional Health Care Services
Wardens
Health Care Managers
Classification Staff Representatives
Classification and Parole Representatives
Correctional Counselor IIIs-Reception Centers
Correctional Case Records Managers
Page 5

7. The C&PR or designee shall ensure a list with the inmate's name and number is submitted to Health Records personnel for COCF medical screening.
   - The C&PR or designee shall enter the "Eligible" screened inmates in the COCF Transfer Wait List.
8. Designated medical staff shall complete the Health Care Screening for Out-of-State Placement form in accordance with the Medical Section of the November 21, 2006; Deputy Director Memorandum titled, *California Out-of-State Correctional Facility, Phase II Addendum*.
9. Upon receipt of the Health Care Screening for Out-of-State Placement form, the C&PR or designee shall enter the medical screening results in the COCF Transfer Wait List. If the inmate is medically eligible enter the date of the COCF Medical Screening form in the appropriate cell. If the inmate is medically rejected for out-of-state placement, enter "REJ" in the appropriate cell.
10. It is the responsibility of the Warden to ensure that inmates referred by the Registered Nurse (RN) for mental health screening are tracked and processed.
11. Inmates' cases, who are Medical / Mental Health cleared, shall be prepared for review by the ICC in accordance with current workload agreements.
12. The ICC shall review the case and recommend out-of-state placement for eligible inmates.
   - The ICC shall review the Automated Visiting Information System (AVIS) print out to validate the inmate's visiting status.
   - The ICC shall ensure inmates who are recommended for out-of-state placement are Medical / Mental Health cleared.
   - The ICC shall record the classification committee's actions on a pre-formatted CDC Form 128G, *Chrono – Classification*.
   - The call sheet shall be given to the C&PR.
13. The C&PR shall ensure an ICC recommended inmate is updated in the COCF Transfer Wait List. The C&PR shall e-mail the COCF Transfer Wait List and the pre-formatted CDC Form 128G to CC-III Milliner at Phyllis.Milliner@cdcr.ca.gov.
14. The COCF Unit shall notify the C&PR of which cases need to be ready for Classification Staff Representative (CSR) review.
15. The C&PR shall ensure the cases are presented to a CSR for out-of-state transfer consideration.
   - The C&PR shall ensure the case is ready and all required documentation is in the C-File prior to scheduling the CSR review.
   - The COCF Unit shall advise the Classification Services Unit (CSU) of the cases pending CSR review.
16. The CSR shall review the C-File and all supporting documentation of cases referred for transfer to the COCF Program.
17. The CSR shall ensure all required documentation has been completed and that the inmate meets COCF eligibility.

Associate Directors – Division of Adult Institutions
Regional Medical Directors
Regional Administrators, Division of Correctional Health Care Services
Wardens
Health Care Managers
Classification Staff Representatives
Classification and Parole Representatives
Correctional Counselor IIIs-Reception Centers
Correctional Case Records Managers
Page 6

18. The CSR shall complete the CDC Form 840, *CDC Reclassification Score Sheet.* The CDC Form 840 shall have **all** appropriate fields completed.
19. The C&PR or designee shall ensure the inmate receives a copy of the CDC Form 128G, *Endorsement Chrono,* by the next business day after the CSR action.
    * The institution shall be required to provide proof of practice that the inmate received his copy of the endorsement CDC Form 128G.
20. The C&PR shall ensure the endorsement information is entered into the COCF Transfer Wait List. The C&PR shall e-mail their institution's completed COCF Transfer Wait List to CC-III Milliner at Phyllis.Milliner@cdcr.ca.gov.
21. The C&PR shall fax endorsed inmates' CDC Forms 812, 812C, and the endorsement CDC Form 128G to CC-II Vanessa Miller, at (916) 323-1752.
22. The C&PR shall coordinate with the Correctional Case Records Manager (CCRM), Education Department, and Visiting to complete the Field File.
23. The C&PR shall coordinate with the CCRM to send the C-File to the COCF Records Office after the inmate has transferred from their facility.
24. The C&PR shall coordinate with the medical department to ensure the Unit Health Record (UHR) is sent to the HUB facility. The C&PR at the HUB facility shall ensure the UHR is sent overnight mail to the COCF Records Office upon the inmate's transfer to the out-of-state facility.

## Reception Center Processing

The Reception Center (RC) Processing instructions are addressed in the October 31, 2006, Deputy Director Memorandum titled, *California Out-of-State Correctional Facility, Phase II.*

Inmates undergoing the RC processing, who have an active or potential ICE hold, shall be transferred to a receiving institution upon completion. The receiving institution shall evaluate the inmate for potential local ties utilizing the visiting records or any other official documentation. Potentially eligible inmates shall be processed in accordance with this memorandum.

## Appeals Section

The CCR, Title 15, Subsection 3084.1(a) states in part, "Any inmate or parolee under the department's jurisdiction may appeal any departmental decision, action, condition, or policy which they can demonstrate as having an adverse effect upon their welfare." Inmates who are being transferred out-of-state involuntarily shall be allowed to appeal the transfer. Reasonable accommodation for effective communication shall be afforded inmates with disabilities. No inmate shall be transferred to an out-of-state facility prior to resolution of his second level appeal.

Associate Directors – Division of Adult Institutions
Regional Medical Directors
Regional Administrators, Division of Correctional Health Care Services
Wardens
Health Care Managers
Classification Staff Representatives
Classification and Parole Representatives
Correctional Counselor IIIs-Reception Centers
Correctional Case Records Managers
Page 7

If an inmate appeals his transfer to an out-of-state facility, the first level of appeal shall be waived. The institution shall be responsible for completing the second level response within 5 working days. If the COCF appeal process proves to be burdensome to any specific institution, the institution shall contact their Associate Director to discuss resource needs to ensure compliance.

If an inmate is dissatisfied with the second level response, the appellant may resubmit the appeal to the appeals coordinator who shall fax the documentation to the chief, inmate appeals for a third level review which shall be completed within five working days. The necessary documentation shall include, but is not limited to the CDC Form 602, *Inmate/Parolee Appeal Form*; the ICC CDC Form 128G; the CSR Endorsement CDC Form 128G; the CDC Form 850A, *Detainer Summary-United States Immigration and Naturalization Services (USINS)*; and the Automated Visiting Information System (AVIS) printout.

The second and/or third level appeal shall be returned to the appellant with a written response stating the appeal issue and reasons for the decision. Upon receipt of the completed second level appeal, the C&PR shall notify the COCF Unit if the inmate's appeal has been granted or denied. Additionally, the COCF Unit shall be immediately notified if an appeal is granted at the third level, requiring that the inmate be removed from the transfer list or returned to California.

## Sending Institution's Case Records Section

The Sending Institution's Case Records instructions are addressed in the October 31, 2006, Deputy Director Memorandum titled, *California Out-of-State Correctional Facility, Phase II* and the November 21, 2006, Deputy Director Memorandum titled, *California Out-of-State Correctional Facility, Phase II Addendum.*

## California Out-of-State Correctional Facility Records Office

The California Out-of-State Correctional Facility Records Office instructions are addressed in the October 31, 2006, Deputy Director Memorandum titled, *California Out-of-State Correctional Facility, Phase II* and the November 21, 2006, Deputy Director Memorandum titled, *California Out-of-State Correctional Facility, Phase II Addendum.*

## Medical Section

The Medical Section instructions are addressed in the November 21, 2006; Deputy Director Memorandum titled, *California Out-of-State Correctional Facility, Phase II Addendum.*

Associate Directors – Division of Adult Institutions
Regional Medical Directors
Regional Administrators, Division of Correctional Health Care Services
Wardens
Health Care Managers
Classification Staff Representatives
Classification and Parole Representatives
Correctional Counselor IIIs-Reception Centers
Correctional Case Records Managers
Page 8


**Transportation Section**

The Transportation Section instructions are addressed in the October 18, 2006, Deputy Director Memorandum titled, *California Out-of-State Correctional Facility, Phase I.*

**Property**

The Property Section instructions are addressed in the November 21, 2006; Deputy Director Memorandum titled, *California Out-of-State Correctional Facility, Phase II Addendum.*

- If you have any questions concerning the COCF, please contact Terri McDonald, Chief Deputy Administrator (A), COCF, at (916) 327-8375, or via e-mail at Terri.McDonald@cdcr.ca.gov.
- Classification questions should be directed to Lydia Romero, Associate Warden, COCF, at (916) 323-1776, or via e-mail at Lydia.Romero@cdcr.ca.gov.
- Case Records questions should be directed to Janet Rodriguez, Chief, Case Records Services (CRS), at (916) 324-2242, or via e-mail at Janet.Rodriguez@cdcr.ca.gov.
- Transportation questions should be directed to Jeff Macomber, Chief, Transportation Unit, at (916) 322-8729, or via e-mail at Jeff.Macomber@cdcr.ca.gov.
- Medical questions should be directed to Tim Rougeux, Project Director, DCHCS, at (916) 322-2278, or via e-mail at Tim.Rougeux@cdcr.ca.gov.


SCOTT KERNAN
Director
Division of Adult Institutions

Attachments

cc: Kingston Prunty        Dave Runnels         Bernard Warner
    Peter Farber-Szekrenyi  Tim Virga            Richard Kirkland
    Kathleen Keeshen        Thomas Hoffman       Lea Ann Chrones
    Kathleen Dickinson      Ombudsman's Office   Terri McDonald
    Janet Rodriguez         Jeff Macomber        Lydia Romero
    Rich Hawkins            Patricia Miller      Nola Grannis

# EXHIBIT B

Case 2:90-cv-00520-KJM-SCB Document 2240-6 Filed 05/24/07 Page 44 of 141

# Memorandum

Date : May 15, 2007

To : Regional Parole Administrators
District Administrators
Unit Supervisors
Parole Agents

**Policy No.: 07-24**

Subject: **3001 PENAL CODE COMPLIANCE POLICY STATEMENT**

A recent review of cases from this past year revealed that over 7,500 non violent/non-serious offenders who were eligible for discharge at the Unit level at the thirteenth month were retained for additional supervision. While I understand that a certain element of our offender population is in need of additional supervision, the significant number of these cases has been found to be low risk and warrant early discharge consideration.

California Penal Code (PC) Section 3001 addresses the statutory requirements to consider prior to discharge from parole. Specifically, parolees initially released from prison after serving a period of incarceration for a non-violent offense, described as a conviction **not** noted in PC Section 667.5(c), and who have been on parole continuously for one year since their release, ***shall be discharged the 30th day after their first year***, unless the recommendation to retain has been made to, and approved by, the Board of Parole Hearings (BPH).

Additionally, parolees initially released from prison after serving a period of incarceration for a violent offense, as defined by PC Section 667.5, and who have been on parole continuously for two years since their release, ***shall be discharged the 30th day after their second year***, unless the recommendation to retain has been made to, and approved by the BPH.

Continuous parole is defined as a parole period with no interruptions as a result of previous actions taken by the BPH. Previous actions taken by the BPH constitute an assessment of revocation time, credit for time served, suspension of parole with reinstatement with time loss, and retention on parole. Those individuals who are eligible for discharge will be allowed to discharge at the Unit level.

Effective immediately, all non-violent/non-serious eligible offenders, not identified in the exclusionary criteria below, **shall** be discharged in compliance with 3001 PC. Those offenders excluded from discharge consideration at the Unit level are:

- Offenders with a Serious or Violent controlling or non-controlling offense as defined in PC Section 667.5(c) or 1192.7(c).
- Offenders with a prior conviction for Serious or Violent offense as defined in PC Section 667.5(c) or 1192.7(c). in the last ten (10) years.
- Offenders required to register in accordance with PC Section 290.

* CDC 1617 (3/89)

.Regional Parole Administrators
District Administrators
Unit Supervisors
Parole Agents
Page 2

- Offenders classified as a validated California Department of Corrections and Rehabilitation gang member, associate, affiliate, or in-active.
- Offenders documented as being associated with a gang or gang activity from allied law enforcement agency during period of review.

If the Unit recommendation is to retain, the report **shall** be forwarded to the District Administrator (DA) for consideration. In the event that there is a difference of opinion regarding an otherwise eligible offender, the decision to discharge by the DA will stand as the final decision. The DA shall have the authority to discharge any offender who has been on continuous parole, with no prior BPH actions. If the DA elects to recommend retain the case, the comprehensive discharge review report shall be forwarded to the BPH for final action.

If you have any questions, please contact Margarita Perez, Parole Administrator, Parole Operations, Division of Adult Parole Operations, at (916) 445-1787.


THOMAS G. HOFFMAN
Director
Division of Adult Parole Operations

cc:  Scott Kernan
     John Monday

# EXHIBIT K

1 | HANSON BRIDGETT MARCUS VLAHOS & RUDY, LLP
JERROLD C. SCHAEFER - 39374
2 | PAUL B. MELLO - 179755
425 Market Street, 26th Floor
3 | San Francisco, CA 94105
Telephone: (415) 777-3200
4 | Facsimile: (415) 541-9366
jschaefer@hansonbridgett.com
5 | pmello@hansonbridgett.com

6 | EDMUND G. BROWN JR.
Attorney General of the State of California
7 | DAVID S. CHANEY
Chief Assistant Attorney General
8 | FRANCES T. GRUNDER
Senior Assistant Attorney General
9 | ROCHELLE C. EAST
Supervising Deputy Attorney General
10 | CHARLES J. ANTONEN, State Bar No. 221207
Deputy Attorney General
11 | SAMANTHA D. TAMA, State Bar No. 240280
Deputy Attorney General
12 | 455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
13 | Telephone: (415) 703-5708
Fax: (415) 703-5843
14 | Email: Samantha.Tama@doj.ca.gov

15 | Attorneys for Defendants

16

17 |                UNITED STATES DISTRICT COURT

18 |        NORTHERN DISTRICT OF CALIFORNIA -- SAN FRANCISCO DIVISION

19 | MARCIANO PLATA, et al.,                | C-01-1351 TEH

20 |                            Plaintiffs,  | **DECLARATION OF JOAN PETERSILIA IN SUPPORT OF DEFENDANTS' REPORT IN RESPONSE TO THE COURT'S FEBRUARY 15, 2007 ORDER**

21 |                v.

22 | ARNOLD SCHWARZENEGGER, et al.,

23 |                            Defendants.

24

25 |    I, Joan Petersilia, declare as follows:

26 |    1.   I am the Senior Consultant to the Rehabilitation Strike Team that was created by

27 | Governor Schwarzenegger on May 11, 2007 to expedite the implementation of Assembly Bill

28 | 900 (AB 900). The Rehabilitation Strike Team is focused on evaluating existing education,

Decl. Petersilia Supp. Defs.' Report                    *Plata, et al. v. Schwarzenegger, et al.*
C-01-1351 TEH

1

1  training, and substance abuse programs; developing leading-edge rehabilitation classes;

2  delivering services to inmates and parolees that will in turn improve public safety; designing

3  facilities to best accommodate rehabilitative programs; and working with communities to

4  continue services in local settings.  This Declaration is submitted in support of Defendants'

5  Report in Response to the Court's February 15, 2007 Order.  All matters set forth in this

6  declaration are personally known to me and if sworn as a witness in this matter, I could and

7  would testify competently as to all matters set forth in this declaration.

8      2.    I am a Professor of Criminology, Law, and Society at the University of California,

9  Irvine.  I have been an advisor to the California Department of Corrections and Rehabilitation

10  (CDCR) for the last three years, and currently co-chair CDCR's Expert Panel on Adult Offender

11  Recidivism Reduction Programs (Expert Panel).  The Expert Panel is tasked with reviewing the

12  existing rehabilitation programs offered by CDCR for adult offenders, and providing a blueprint

13  for improving current programs and their effectiveness.  I am the former Director of the Criminal

14  Justice Program at the RAND Corporation where, for 25 years, I studied the performance of

15  California criminal justice agencies.  I am also the former President of the American Society of

16  Criminology.

17      3.    The Rehabilitation Strike Team is responsible for the following tasks: (1) assessing

18  existing CDCR rehabilitation programs and space; (2) designing an integrated rehabilitation

19  services delivery plan for inmates and parolees including, but not limited to, substance abuse

20  treatment, education, job training, counseling, and life skills; developing a plan to integrate all

21  elements of inmate job training – vocational education, Prison Industry Authority, institution

22  inmate labor, and private partnerships – to ensure the most efficient and effective use of

23  resources; (3) fast-tracking the implementation and adoption of inmate intake and pre-release

24  needs assessment tools; (4) developing a system of inmate incentives for program participation;

25  (5) working with CDCR senior management to develop a plan to immediately begin reducing the

26  number of lockdown days (i.e. days that the movement of inmates outside of their cells is

27  restricted), so that inmates can participate in rehabilitative programming; and (6) developing

28

1    expenditure priorities for the $50 million in rehabilitation and treatment supplement funds that

2    was authorized by AB 900, Section 28(b).

3       4.    The Rehabilitation Strike Team has been able to successfully commence its operations

4    due in part to prior work completed by the Expert Panel, and also due to the fact that the

5    Rehabilitation Strike Team includes two other members from the Expert Panel. The

6    Rehabilitation Strike Team also consists of a number of other nationally recognized rehabilitation

7    experts with extensive professional backgrounds in substance abuse treatment, education,

8    workforce preparation, and security.

9       5.    The Rehabilitation Strike Team will be offering suggested program improvements

10    within the first 60 days, concluding with recommendations within 9 months. I know, as an

11    expert in the field, that when the Rehabilitation Strike Force's recommendations are fully

12    implemented by CDCR, these policies and programs can improve the reentry success of prisoners

13    and parolees. With improved rehabilitation programs, offender recidivism will be reduced with

14    an associated impact on reducing prison overcrowding. Currently, California has one of the

15    nation's highest recidivism rates: 66% of California parolees return to a California prison within

16    3 years of their release, compared to a national average of about 40% in large states.

17       6.    Each year, CDCR receives nearly 140,000 prisoners. Only about 1% of these prisoners

18    enter state prisons to serve life sentences or face capital punishment. This means that virtually all

19    of these prisoners will be returning to their communities; most within a relatively short time

20    frame. The average length of incarceration in California prisons is about 27 months, which is

21    comparable to the national average. The Legislative Analyst's Office (LAO) reported that

22    81,000 parole violators were returned to California prisons in 2005, 80% of whom were returned

23    for technical parole violations (violations of their parole conditions), rather than new criminal

24    convictions. Many parole violators returned for technical violations are quickly released again,

25    serving an average of just four months in prison. Technical parole violators rotate quickly in and

26    out of CDCR's custody and occupy 20,000 beds on any given day. If the Rehabilitation Strike

27    Team can implement the programs that have proven successful in other states, CDCR should be

28

Decl. Petersilia Supp. Defs.' Report                 *Plata, et al. v. Schwarzenegger, et al.*
                                                         C-01-1351 TEH

1 | able to reduce the number of parole violators returning to prison and their associated impact on
2 | prison overcrowding.

3 |     7.    The evidence supporting effective rehabilitation programming is growing. In the
4 | 1970s, the conventional wisdom was that offenders could not be rehabilitated. Research now
5 | demonstrates that there are several effective correctional interventions that can reduce the rates of
6 | offenders committing new crimes and returning to prison. Researchers have also indicated that
7 | some of the popular rehabilitation programs currently in use are not effective at curtailing future
8 | criminal behavior. Programs such as in-prison "therapeutic communities" with strong post-
9 | release re-entry services have shown to be effective for drug-involved offenders. Quality
10 | vocational education in prison and for parolees has yielded positive results. Cognitive behavioral
11 | treatment in prison and in the community is solidly supported by research. Intensive community
12 | supervision programs that emphasize the delivery of treatment services and not simply
13 | surveillance, yielded impressive results in reducing future criminal behaviors by released
14 | offenders. Gender-responsive programs have also demonstrated positive outcomes for female
15 | offenders.

16 |     8.    Fully implementing evidence-based rehabilitation programs will reduce California's
17 | recidivism rate. A realistic expected reduction in recidivism from evidence-based programming
18 | is about 10% overall, although different programs can expect different recidivism-reduction
19 | outcomes. The Washington State Institute for Public Policy reviewed 571 adult and juvenile
20 | corrections programs and found several programs that reduced recidivism between 5 and 17
21 | percent:

22 | ////
23 | ////
24 | ////
25 | ////
26 | ////
27 | ////
28 | ////

Decl. Petersilia Supp. Defs.' Report

*Plata, et al. v. Schwarzenegger, et al.*
C-01-1351 TEH

| Evidence-Based Programs, Crime Outcomes | |
|---|---|
| **Selected Adult Corrections Programs** | **Expected Change in Crime**[1] |
| Vocational education in prison | -9.0% (4) |
| Intensive supervision: treatment oriented programs | -16.7% (11) |
| General education in prison (basic education or post-secondary) | -7.0% (17) |
| Cognitive-behavioral therapy in prison or community | -6.3% (25) |
| Correctional industries in prison | -5.9% (4) |
| Drug treatment in prison (therapeutic communities or outpatient) | -5.7% (20) |
| Adult drug courts | -8.0% (57) |
| Sex offender treatment in prison with aftercare | -7.0% (23) |
| Intensive supervision: surveillance-oriented programs | 0.0% (23) |

9.    To achieve the above recidivism rate reduction benefits, programs must use risk assessments, trained staff, performance measurement, and an intensity of services that does not now exist within CDCR.  The Expert Panel will deliver a blueprint for effective program implementation in June 2007.  If CDCR fully implements the Expert Panel and Rehabilitation Strike Team's recommendations, CDCR will be able to reduce parolee recidivism and associated prison returns by at least 10% per year.  Given that in 2005, 81,000 parolees returned to custody, that 10% would amount to 8,100 prison returns avoided in one year alone.  This anticipated reduction is realistic and will significantly reduce prison overcrowding and increase cost savings.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in Irvine, California, on May 16, 2007.

*[signature]* JOAN PETERSILIA, Ph.D.

JOAN PETERSILIA, Ph.D.

---

1.  Percent change in crime outcomes and the number of evidence-based studies on which the estimate is based (in parentheses).

Decl. Petersilia Supp. Defs.' Report

*Plata, et al. v. Schwarzenegger, et al.*
C-01-1351 TEH

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **MARCIANO PLATA, et al. v. ARNOLD SCHWARZENEGGER, et al.**

No.:   **C 01-1351 TEH**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **May 16, 2007,** I served the attached

## DECLARATION OF JOAN PETERSILIA IN SUPPORT OF DEFENDANTS' REPORT IN RESPONSE TO THE COURT'S FEBRUARY 15, 2007 ORDER

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

| | |
|---|---|
| **Paul B. Mello, Esq.**<br>**Hanson Bridgett Marcus Vlahos & Rudy**<br>**LLP - SF**<br>**425 Market Street, 26th Floor**<br>**San Francisco, CA 94105** | **Martin H. Dodd, Attorney**<br>**Futterman & Dupree LLP**<br>**160 Sansome Street, 17th Floor**<br>**San Francisco, CA 94104** |
| | **John Hagar**<br>**Chief of Staff**<br>**Judges' Reading Room** |
| **Donald Specter**<br>**Attorney at Law**<br>**Prison Law Office**<br>**General Delivery**<br>**San Quentin, CA 94964** | **Court Library, 18th Floor**<br>**United States District Court**<br>**Northern District of California**<br>**450 Golden Gate Avenue**<br>**San Francisco, CA 94102** |
| **Warren E. George**<br>**Attorney at Law**<br>**Bingham McCutchen - San Francisco**<br>**Three Embarcadero Center**<br>**San Francisco, CA 94111-4066** | **Caroline N. Mitchell, Esq.**<br>**Jones Day - San Francisco**<br>**555 California Street, 26th Floor**<br>**San Francisco, CA 94104** |

Jared Goldman
Staff Attorney
California Prison Health Care
Receivership
1731 Technology Drive, Suite 700
San Jose, CA 95110

Jerrold C. Schaefer, Esq.
Hanson Bridgett Marcus Vlahos & Rudy
LLP - SF
425 Market Street, 26th Floor
San Francisco, CA 94105

Steven Fama
Attorney at Law
Prison Law Office
1 Main Street
San Quentin, CA 94964

Robert Sillen
California Prison Receivership
1731 Technology Drive, Suite 700
San Jose, CA 95110

Alison Hardy, Esq.
Prison Law Office
General Delivery
San Quentin, CA 94964

I declare under penalty of perjury under the laws of the State of California the foregoing is true
and correct and that this declaration was executed on May 16, 2007, at San Francisco, California.

| J. Tucay | J. Tucay |
| --- | --- |
| Declarant | Signature |

20088768.wpd

**EXHIBIT L**

*Senate Budget and Fiscal Review—Denise Moreno Ducheny, Chair*

# SUBCOMMITTEE  NO. 4     **Agenda**

**Michael J. Machado, Chair**
**Robert Dutton**
**Christine Kehoe**



**Thursday, April 12, 2007**
**10:00 a.m. or Upon Adjournment of Session - Room 112**

**Consultant:  Keely Martin Bosler**

| **Item** | **Department** | **Page** |
|---|---|---|
| 5525 | California Department of Corrections and Rehabilitation | 2 |
| | 2007-08 Governor's Infill Prison Bed Construction Plan | 5 |
| | Critical Infrastructure for Infill Bed Plan | 9 |
| | Reentry Beds – Capital Outlay | 11 |
| | *Coleman* Ordered Mental Health Capital Outlay | 13 |
| | *Plata* Related Medical Care Capital Outlay | 20 |
| | *Perez* Related Dental Care Capital Outlay | 24 |
| | *Farrell* Related Minor Capital Outlay | 26 |
| | San Quentin Condemned Inmate Complex | 28 |
| | Correctional Officer Training Academy | 30 |
| | Other Capital Outlay | 32 |
| | Maintenance and Equipment | 43 |
| | Information Technology Issues | 48 |
| | Capital Outlay Staffing | 50 |
| | Local Assistance Infrastructure Issues | 52 |

# 5525    California Department of Corrections and Rehabilitation

### Background

**Background.**    The California Department of Corrections and Rehabilitation (CDCR) is responsible for the incarceration, training, education, and care of adult felons and non-felon narcotic addicts, as well as juvenile offenders. The CDCR also supervises and treats adult and juvenile parolees, and is responsible for the apprehension and re-incarceration of those parolees who commit parole violations. The department also sets minimum standards for the operation of local detention facilities and selection and training of law enforcement personnel, as well as provides grants to local governments for crime prevention programs.

The department operates 33 adult prisons, including 11 reception centers, a central medical facility, a treatment center for narcotic addicts under civil commitment, and a substance abuse facility for incarcerated felons. The CDCR also operates eight juvenile correctional facilities, including three reception centers. In addition, CDCR manages 13 Community Correctional Facilities, 44 adult and juvenile conservation camps, the Richard A. McGee Correctional Training Center, and 202 adult and juvenile parole offices.

In 2005, the CDCR was created pursuant to the Governor's Reorganization Plan 1 of 2005 and Chapter 10, Statutes of 2005 (SB 737, Romero). All departments that previously reported to the Youth and Adult Correctional Agency were consolidated into CDCR.   The departments consolidated into the current CDCR are: the Youth and Adult Correctional Agency; the California Department of Corrections; the California Youth Authority; the Board of Corrections; the Board of Prison Terms; and the Commission on Correctional Peace Officers' Standards and Training.

**Prison Overcrowding and "Bad" Beds.**    The California prison system is currently overcrowded, which has resulted in the activation of over 16,000 "bad" beds, which are bunks on dayroom floors and gyms. This means that about 10 percent of the prison population is currently housed in "bad" beds. Some of these beds have been in operation for decades. "Bad" beds impact prison operations on many levels. They make it more difficult for prison officials to maintain safe conditions for prison staff and inmates and reduce the space available for inmate programs. Furthermore, the overcrowding of the prison facilities has overburdened the basic infrastructure of the institutions resulting in sewage spills and shortages of safe drinking water.

The overcrowded conditions are projected to worsen over the next several years as the population continues to grow. Over the past 20 years, the state inmate population has grown at an average annual rate of 5 percent. If this trend continues, the LAO indicates that the state prison system will be deficient 152,900 beds by the year 2022.

**How are Inmates Housed?**  Inmates in state prison are housed according to classification levels. An inmate's classification level is based on the inmate's commitment offense, in-institution behavior, and other factors. Inmates are assigned a classification level of I through IV. A Level I classification is the lowest-risk inmate that typically has a less serious commitment offense.

Lower-risk inmates (Level Is and IIs) are typically housed in dorm-style housing, while higher level inmates are typically housed in celled housing. A large portion of the inmates in "bad" beds are lower level inmates. However, at reception centers, where classification levels are often mixed, this may not be the case.

**LAO Gap Analysis.** The LAO has performed a gap analysis that compares the state's current permanent prison bed capacity (excluding "bad" beds) to the prison population. This analysis finds that the current prison system does not have the right mix of beds to safely house the current prison population. For example, the state prison system is currently deficient dormitory beds for Level I and Level II inmates (the majority of these inmates are in "bad" beds). The prison system is also deficient beds in the highest-security celled housing for Level IV inmates and beds in celled housing at reception centers. The LAO finds that the prison system does have a surplus of beds in celled housing appropriate for Level III inmates, but a large portion of this housing is in older prisons that have unique security concerns as compared to the new Level IV celled housing units. The following table summarizes the LAO's gap analysis:

| LAO Inmate/Security Housing Unit Gap Analysis – Men | Surplus/ Deficit (-) |
|---|---|
| Level I | -7,524 |
| Level II | -7,237 |
| Level III | 8,386 |
| Level IV | -6,324 |
| Reception Center | -4,350 |
| Special | 857 |
| Total | -16,192 |

**2006 Special Session.** On June 26, 2006, the Governor called a special session of the legislature on prison overcrowding and recidivism. The Governor offered the following proposals in an attempt to help address the overcrowded conditions:

- **New Prison Construction.** $1.2 billion from lease-revenue bonds and $11.7 million from the General Fund for the construction of two new prison facilities (9,000 new beds).
- **Construction of Beds at Existing Prisons.** $2.5 billion from lease-revenue bonds and $238 million from the General Fund to construct over 16,000 beds at existing prisons, re-activate the Northern California Women's Facility as a male reception center, and convert female beds at the California Rehabilitation Center to male beds. These funds would also be used to support the construction of additional medical space at existing prison facilities.
- **Re-Entry Program Facilities.** $2 billion from lease-revenue bonds to construct re-entry facilities and authorize CDCR to enter into a lease for a state or city/county operated inmate housing facility.
- **Transfer of Inmates Out of State.** Legislation and $2.1 million from the General Fund to transfer inmates with Immigration and Customs Enforcement holds to out of state prisons (private and public).
- **Female Community Correctional Centers.** Legislation to authorize contracts for up to

4,500 beds in local community correctional centers.
- **Male Community Correctional Facilities.** Legislation to authorize contracts for 4,000 beds in local community correctional facilities.
- **Southern California Training Academy.** Legislation to allocate $55 million from lease-revenue bonds and $6.9 million from the General Fund to construct and staff a new correctional officer training academy in Southern California.

On August 30, 2006, the State Senate passed the following components of the Governor's special session proposal along with some other proposals:
- **Construction of Beds at Existing Prisons.** SB 10xx (Machado) authorized $606 million in lease-revenue bonds and appropriated $312 million from the General Fund for the construction of 5,340 prison beds and to address various infrastructure issues at existing prisons.
- **Parole Reentry Challenge Grant.** SB 11xx (Machado and Runner) appropriated $25 million from the General Fund for competitive grants to counties to reduce the recidivism rate of parolees.
- **Transfer of Inmates Out of State.** SB 12xx (Machado) authorized the department to transfer inmates out of state on a voluntary basis.
- **Female Community Correctional Centers.** SB 9xx (Speier) authorized the department to enter into contracts for up to 4,500 beds in community facilities for female inmates.
- **Information Technology Advisory Committee.** SB 8xx (Bowen) established an advisory committee to CDCR to assist in the development and implementation of enterprise-wide integrated information technology systems for the department.

The State Assembly did not act on these pieces of legislation and, as a result, the Legislature did not pass any of the Governor's proposals to address overcrowding and recidivism during the special session.

**Governor's Emergency Proclamation.** The Governor declared a State of Emergency on October 4, 2006, citing that California's prisons are beyond capacity and that action needed to be taken immediately to remedy the situation. Soon after the declaration, the department entered into contracts with several private prisons outside of the state to house volunteer inmates. To date, the state has transferred 358 inmates out of state to private prison facilities in Arizona (279) and Tennessee (79). The Governor's budget proposal contemplated transferring 994 inmates in the current year and 2,260 inmates in the budget year to correctional facilities out of state. The total cost of these contracts is estimated to be $31 million General Fund in the budget year, but the administration proposes to offset these costs with savings from not housing the inmates in state institutions of about $20 million. Therefore, these contracts are projected to cost about $10 million General Fund in the current year. These costs are projected to grow to $13 million General Fund in the budget year.

**Out of State Inmate Transfer Lawsuit.** On February 20, 2007 a superior court judge ruled that the Governor's plan to transfer inmates to out of state correctional facilities was illegal. The judge found that the Governor's actions violated the Emergency Services Act. The state has appealed the case to the State Appeals Court. Meanwhile, the department has continued to identify inmates that can be transferred out of state.

## 2007-08 Governor's Infill Prison Bed Construction Plan

**Background.** As mentioned above, the Governor called a special session in June of 2006. At this time the Governor proposed $1.2 billion in lease-revenue bonds and $11.7 million in General Fund monies to construct two new prison facilities (9,000 beds). The Governor also proposed $2.5 billion in lease-revenue bonds to construct over 16,000 beds at existing prisons.

In response to these proposals, the Senate approved SB 10xx (Machado) in August 2006 to authorize $606 million in lease-revenue bonds for construction of 5,340 prison beds and to address various infrastructure issues at existing prisons. This legislation died in the Assembly.

**Governor's Budget.** The Governor's budget proposal includes a new Strategic Growth Plan that outlines infrastructure investments for the state. This plan contains $2.3 billion in lease-revenue bonds to construct 16,000 prison beds at existing prisons. This is the same proposal that was made by the Governor in the 2006 special session on corrections.

The following chart summarizes the Governor's infill prison bed plan by bed type:

| Infill Prison Bed Plan by Security Level | Number of Beds |
|---|---|
| Level I and II | 10,420 |
| Level III | 2,223 |
| Level IV | 1,505 |
| Reception Center | 2,090 |
| Total | 16,238 |

These beds would be added at 26 different institutions around the state. Included in these numbers are 2,250 new stand-alone administrative segregation unit beds. Administrative segregation unit beds are used by the department for short-term detention of inmates that must be separated from the general population for the safety of others or for their own safety.

The CDCR estimates that it will activate the prison beds on the following schedule if the proposal is authorized by July 1, 2007:

| Infill Prison Bed Plan Approximate Completion Date | Number of Beds |
|---|---|
| July 1, 2009 | 5,340 |
| July 1, 2010 | 3,270 |
| July 1, 2011 | 4,908 |
| July 1, 2012 | 2,720 |
| Total | 16,238 |

**Governor's Other Proposals Impact Bed Need.** The Governor's budget includes a package of proposals to address overcrowding in the state's prison systems. The Governor's infill prison bed construction proposal should be evaluated in the context of these other proposals. Major components of the Governor's package to reduce overcrowding include the following proposals to reduce the state prison population:

- **Shift Adult Offenders to Jail.** This proposal would change where the sentence for certain offenses are served from prison to jail.
- **Direct Discharge.** This proposal would allow for certain offenders to be directly discharged from prison without parole.
- **One Year Clean Time Discharge.** This proposal would allow for certain offenders to be discharged from parole early after one year of clean time.

The proposals above, if enacted, would mainly impact Level I inmates, thereby reducing the number of dormitory beds needed in state prison.

**Right Mix of Beds Critical.** As mentioned above, the state prison system is currently overcrowded, which has resulted in the need to activate "bad" beds. Furthermore, the LAO finds that the current state prison system does not have the right mix of beds to house its inmate population. These two conditions reduce the safety of the institutions for staff and inmates. When conditions are less safe, programming is reduced. Staff finds that the right mix of beds is critical to improving safety within the institutions.

**LAO Finds Size and Mix Wrong.** The LAO identified several concerns pertaining to how the Governor's package of proposals to reduce overcrowding fit together as a whole. The LAO finds that if all of the Governor's proposals are adopted (bed construction and proposals to reduce the population) it would result in a dramatic surplus of prison beds and would provide the wrong mix of beds for the inmate population. Specifically, the LAO finds that if the Governor's package of proposals were adopted it would result in a significant surplus of Level II and Level III beds, but that the department would continue to have a deficit of Level IV beds.

The LAO recommends approving only the infill projects to add Level IV and reception center beds. This would result in 3,595 additional beds in celled housing units at eight different institutions.

**Timing is Critical.** The LAO recommends that the Legislature carefully consider proposals that will help to relieve overcrowding in the short term, particularly in the next one to three years. The LAO finds that the department will likely exhaust any excess capacity in dayrooms and gyms within this timeframe.

As referenced above, the department estimates that it could have 5,340 beds built within the next two years. This timeline relies on a design-build contract and a streamlined environmental review process. Even under these circumstances, staff finds that the department's assumptions are overly optimistic for several reasons (see below).

**CDCR's Schedule is Optimistic.**  The CDCR is exempted by Public Contracts Code 10106(d) from going through the capital outlay process at the Department of General Services. Therefore, CDCR and its Office of Facilities Management oversee all of the capital outlay projects it undertakes, including the infill prison bed construction proposal.  Staff finds that the department's Office of Facilities Management does not have the staff to manage all of the projects proposed in the infill bed plan, especially given their current workload (see other ongoing and new infrastructure projects in the rest of the agenda).  Furthermore, staff finds that this office has suffered significant staffing reductions since the last wave of prison construction in the 1980s.

The department has indicated that it will need to hire a significant number of new staff to oversee construction of the infill bed projects.  The department will need to hire these staff before project teams can be developed.  Furthermore, the department has not completed a Project Management Plan, which is a plan used in large capital outlay projects to determine the staff needed to oversee the entire project.  Staff recognizes that the department will utilize contracted firms to handle some of this workload, but it is critical that a core state staff is in place to ensure proper oversight and coordination.

Secondly, the department's timeline for constructing the infill beds depends on its core business services functioning in a timely manner, including the contracts, personnel, accounting and legal divisions.  As this Subcommittee heard at a hearing on March 15, 2007, the majority of these functions within the department are not operating in a timely manner.  The department currently has long delays in its contracting division and the accounting division is not able to pay invoices in a timely manner.

Furthermore, staff finds that the remote location of many of the construction sites means that the department will likely have difficulty finding contractors willing to bid for the contract.  This problem has often caused delays for CDCR and other state departments like the Department of Parks and Recreation that have remote properties.

In addition, the department indicates that there are several other steps that need to be taken before construction will start on the infill bed projects.  These steps include hiring engineers and architects and establishing project and schedule controls.  Staff finds that given the size of these projects it will be critical that the department establish project and schedule controls and hires sufficient staff to oversee these efforts before construction commences.  Otherwise, these projects may experience significant cost overruns.  (As referenced later in this agenda, several of the department's recent capital outlay projects have experienced cost overruns approaching 50 percent.  While a portion of these cost overruns are due to increased costs associated with materials, a large portion of the cost overruns are due to major scope changes that the department did not anticipate.)

Finally, all of the prisons where the department is proposing to build infill housing require major infrastructure upgrades to accommodate the *current* overcrowding.  These infrastructure upgrades include waste water treatment, water supply, and electricity capacity.  Many of the facilities are currently operating under Cease and Desist Orders from the Regional Water Quality Control Boards.  If the "bad" beds are not removed from these housing units, the infill bed

**Subcommittee No. 4**                                         **April 12, 2007**

proposal will exacerbate the infrastructure problems. The department indicates that it plans to address the infrastructure issues while it constructs the new infill beds. However, it is not clear whether the infrastructure upgrades will accommodate both the infill beds and the "bad" beds or just the infill beds. Furthermore, if there are delays in these infrastructure projects (which are likely because of the factors listed above) there may be delays in the department's ability to activate new infill housing units.

**Capital Outlay Budget Proposals Lack Detail.** The department has not submitted traditional capital outlay proposals for the infill bed projects. Staff finds that the department has submitted essentially the same package of information that was submitted in August 2006, except that the numbers have been adjusted by 5 percent for inflation. The department has only determined what it will cost "on paper" to build the additional housing units and has not considered site specific issues that make these projects more or less costly. The department indicates that it has only done 11 site assessments for the infill proposal even though they propose to build new housing units at 26 different institutions. The lack of background and site specific work will likely result in large cost overruns and delays in the future as the department starts the construction process and encounters site specific problems.

Furthermore, the lack of detail makes it difficult to determine how the department arrived at the costing of the project. There is very little information on anything about the project except for the number of beds being built. For example, it is not clear whether the department is proposing to build adequate programming space, dining space, and yard space consistent with standards for constructing prisons.

In addition, the LAO finds that the amount budgeted for Architectural and Engineering services is significantly higher than is expected for these projects. Again, the department has not provided sufficient information to justify these expenditures.

**Operational Costs Not Identified.** Furthermore, the LAO finds that the department has not identified operational costs associated with the infill bed proposal. The LAO indicates that the costs to staff and operate these new housing units will likely be in the hundreds of millions of dollars. Staff estimates that the infill proposal will likely require an additional $750 million General Fund to the department's operating costs annually. However, if the "bad" beds are taken down there should be some offsetting savings that will result. Given the current level of overcrowding and the population projections, the department may not take down the "bad" beds even if the new infill prison bed plan is approved.

**Staff Recommendation.** Staff recommends that the Subcommittee hold this issue open.

## Critical Infrastructure for Infill Bed Plan

**Background.** As mentioned above, the Governor called a special session in June of 2006. At this time the Governor proposed $238 million from the General Fund to fund critical infrastructure projects and provide CDCR with additional staff to support the infill construction proposal.

In response to these proposals, the Senate approved SB 10xx (Machado) in August 2006 that contained $312 million from the General Fund for various infrastructure projects at existing prisons and for staff to support the infill construction activities. The vast majority of these infrastructure improvements are needed in order to add additional prison beds to the existing prisons. This legislation died in the Assembly.

**Governor's Budget.** The Governor's budget proposal includes $271 million in General Fund monies to address various infrastructure issues at the existing prisons that, for the most part, accommodate the additional prison beds proposed in the infill proposal ($29.5 million is for infrastructure upgrades at institutions where no new beds are proposed for construction).

**All Infill Sites Require Major Upgrades.** As mentioned above, new beds are proposed at 26 different institutions and every one of these institutions has critical deficiencies in its existing infrastructure. The chart below identifies the major types of infrastructure deficiencies and illustrates that most institutions have more than one critical infrastructure deficiency:

| Infill Prison Bed Plan Existing Infrastructure Deficiencies | Number of Institutions with Deficiencies |
|---|---|
| Drinking Water | 20 |
| Waste Water Treatment | 18 |
| Electrical | 20 |
| Other | 14 |

Many of the infrastructure deficiencies involve a major upgrade of the existing waste water treatment plant or upgrade to the electrical capacity for the entire institution. The department has not provided details on how much each of the infrastructure upgrades will cost, but instead has provided only a rough estimate of what, collectively, the infrastructure upgrades at each institution will cost. Staff finds that the department has submitted essentially the same package of information that was submitted in August 2006, except that the numbers have been adjusted by 5 percent for inflation. The lack of information on the scope of these projects raises concerns related to the potential for significant cost overruns.

**Is Infrastructure Sized Correctly?** Another concern raised by the lack of detail provided by the department is the determination of whether the infrastructure upgrades are sized correctly. For example, is an upgrade to a waste water treatment plant sufficient to support the infill beds, but not sufficient to support the infill beds and "bad" beds. It is also not clear whether the

upgrades to the electrical system are sufficient to address the future information technology needs of the department (see below). Furthermore, it is not clear that the infrastructure improvements bring the department into compliance with regulatory agencies. Many of the department's institutions are currently operating under Cease and Desist Orders and if the violations are not dealt with the department could face significant penalties or even lawsuits from neighboring communities impacted by the pollution caused by some prisons.

**LAO Recommends Smaller Package.** As mentioned above, the LAO only recommends approving Level IV and reception center housing units that are part of the infill bed plan. Consistent with this recommendation, the LAO recommends approving $46 million for infrastructure improvements at the eight institutions where the department proposes to add Level IV and reception center beds.

**Staff Recommendation.** Staff recommends that the Subcommittee hold this issue open.

# Reentry Beds – Capital Outlay

**Background.** As mentioned above, the Governor called a special session in June 2006. At this time the Governor proposed $2 billion in lease-revenue bonds to construct re-entry facilities and authorize CDCR to enter into a lease for a state or city/county operated inmate housing facility.

In response to this proposal, the Senate approved SB 11xx (Machado and Runner) that appropriated $25 million from the General Fund for competitive grants to counties to reduce the recidivism rate of parolees. The intent of these grants was to fund supportive services that would help parolees transition back into their communities. The legislation died in the Assembly.

**Governor's Budget.** The Governor's budget proposal includes $1.6 billion in lease-revenue bonds or contracting authority to construct up to 7,000 beds in coordination with local governments for inmates nearing their parole date and revoked parolees. These facilities would be designed to provide additional re-entry services for inmates before they are paroled into their communities.

**LAO Finds Details Lacking.** The LAO withholds recommendation on the funding for reentry facilities pending the receipt of key fiscal and operational details regarding these facilities. The LAO notes that research studies suggest that the establishment of reentry beds and programming could benefit public safety by reducing recidivism. However, basic details about this proposal have not been provided including: (1) the basis for the construction cost estimate, (2) proposed programs, and (3) specific facility locations.

The LAO does not recommend approving funding for reentry facilities until more details have been provided. However, they suggest that the Legislature limit any funding in the budget year for these facilities to funding for preliminary plans. This would provide the Legislature with additional time to get information from the department about the scope and cost of these facilities. The LAO estimates that preliminary plans would cost about $45 million General Fund. The LAO also suggests that the reentry facilities may be a good fit for serving short-term parole violators. The LAO sites that parole violators, generally, have a high need for services that could be provided in a reentry facility, including substance abuse, job training, and education. The LAO notes that diverting parole violators from reception centers could also help with the overcrowding at reception center facilities.

**Staff Comments.** Staff finds that dedicated reentry facilities could significantly help in preparing inmates for parole. This mission is more difficult at a "mainline" institution where inmates are separated by classification and not by the amount of time they have left on their sentence before parole. Furthermore, bringing inmates closer to the community where they will parole can help to strengthen family bonds and/or coordinate with community services that will provide a more secure safety net for the inmate upon release.

Staff also finds that these facilities could work well for short-term parole violators that return to prison because of a dirty drug test or other parole violations that carry relatively short recommitment terms. Transporting short-term parole violators to reception centers is inefficient

and does not provide an opportunity for rehabilitative programming, because many short-term parole violators spend their entire sentence at the reception center with extremely limited access to rehabilitative programming. (Generally, reception centers have very little programming because the goal of the reception center is to classify and process the inmate to determine the best permanent placement for the inmate.)

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Hold this issue open.
- Request that the department submit at May Revision draft guidelines that could guide the development of the reentry facility concept.

# *Coleman* Ordered Mental Health Capital Outlay

## *Background*

***Coleman* Court's General Approach to Facility Modifications.** The Special Master and the court overseeing the settlement of the *Coleman* lawsuit have taken a multi-pronged effort to improve mental health care facilities within the department. The court has pursued interim and temporary measures to improve mental health care facilities in the short-term. Many of these short-term efforts have already been implemented or are currently being constructed.

However, the department has also been working on a long-term Mental Health Bed Plan that will provide a plan for permanent mental health bed capacity that will provide various levels of care. These beds and facilities will provide a more appropriate place to house the most seriously mentally ill inmates on a long-term basis and provide appropriate housing for inmates needing acute care. A revised version of this plan was submitted to the court in December. The Special Master and the court had some comments on the plan, but for the most part were satisfied by the number and mix of beds put forward in the plan. The department is now setting forth on a plan to construct the beds in the plan.

In addition to building beds to provide more appropriate housing for the mentally ill population in prison, the department is also implementing other court orders to improve suicide prevention. These court orders do not just target the diagnosed mentally ill population in prison, but the entire prison population. In order to comply with this plan, facility improvements are being made to prison facilities across the state.

**Mental Health Bed Plan – December 2006.** The CDCR has developed a Mental Health Bed Plan in response to the October 20, 2006, court order in the *Coleman* lawsuit. The court order directed CDCR to develop a final long range bed plan for the provision of various levels of mental health care, including appropriate beds and programming space for the Enhanced Outpatient Program (EOP) inmate population. Inmates are classified as EOP if they have current symptoms and/or require treatment for the following mental disorders:

- Schizophrenia
- Delusional Disorder
- Schizophreniform Disorder
- Schizoaffective Disorder
- Brief Psychotic Disorder
- Substance-Induced Psychotic Disorder (excludes intoxication and withdrawal)
- Psychotic Disorder Due to a General Medical Condition
- Psychotic Disorder not Otherwise Specified
- Major Depressive Disorders
- Bipolar Disorders I and II

The department submitted a plan to the court in December 2006. This plan expects the following permanent mental health bed capacity to meet the projected mental health population for June 2011:

| Expected Permanent Mental Health Bed Capacity by Type of Bed | Number of Beds | | |
|---|---|---|---|
| | Female | Male | Total |
| **Enhanced Outpatient Program -** Long-term beds for EOP inmates that require significant services to function well. | 297 | 4,488 | 4,785 |
| **Mental Health Crisis Beds -** Short-term licensed beds for inmates in mental health crisis that need intensive 24-hour care. Length of stay not to exceed 10 days generally. | 25 | 342 | 367 |
| **Acute -** Short-term licensed beds for inmates that require 24-hour mental health treatment to prevent danger to themselves and others. The average length of stay at this level is two to three months. | 42 | 240 | 282 |
| **Intermediate Care Facility -** Longer-term licensed beds for inmates that need intensive mental health care services. Length of stay not to exceed nine months. | | 314 | 314 |
| **Intermediate Care Facility - High Custody -** Same as above, but for high custody inmates. | | 312 | 312 |
| **Administrative Segregation Unit -** Housing units for temporary segregation of EOP inmates that are pending investigations, evaluation, and/or disciplinary action. Similar to regular ASU, but with space to deliver treatment services. | 24 | 752 | 776 |
| **Psychiatric Services Unit -** Housing units for EOP inmates that have been found guilty of an offense committed in the institution, or have been deemed to be a threat to the safety of others or the security of the institution. Similar to Security Housing Units (SHU), but with space to deliver treatment services. | 10 | 448 | 458 |
| **Total** | **398** | **6,896** | **7,294** |

The department currently operates some mental health beds that it will continue to operate under this plan. However, in order to meet the requirements of this bed plan the department will need to construct new mental health facilities. The department plans to build the following new mental health beds to comply with the *Coleman* settlement agreement:

**Subcommittee No. 4**                                              **April 12, 2007**

| New Mental Health Beds to Be Constructed by Type of Bed | Number of Beds | | |
|---|---|---|---|
| | Female | Male | Total |
| Enhanced Outpatient Program | 168 | 2,532 | 2,700 |
| Mental Health Crisis Beds | 3 | 110 | 113 |
| Acute | 17 | 90 | 107 |
| Intermediate Care Facility | | 230 | 230 |
| Intermediate Care Facility - High Custody | | 120 | 120 |
| Administrative Segregation Unit | 15 | 453 | 468 |
| Psychiatric Services Unit | | 256 | 256 |
| **Total** | **203** | **3,791** | **3,994** |

The majority of the beds will be built at the following five prisons, which are referred to as Consolidated Care Centers:

- California State Prison, Sacramento
- Richard J. Donovan Correctional Facility
- California Men's Colony
- California Institute for Men
- California State Prison, Los Angeles County

In addition to these prisons, additional beds will be added to the Salinas Valley State Prison, which already has a significant mental health mission. The California Medical Facility in Vacaville will also continue its mental health mission, but no new beds for this facility are part of the mental health bed plan. In addition, existing housing units will be modified around the state to ensure that most of the other prisons have a limited number of Mental Health Crisis Beds.

The California Institute for Women will be the equivalent of a Consolidated Care Center for the women. However, some new mental health beds will also be built at the other two prisons that house female inmates.

Currently, the department is housing mentally ill inmates at many different institutions. Therefore, the plan has identified 1,749 beds that will no longer be dedicated to mentally ill inmates after the new facilities are constructed. The majority of these beds are at California Men's Colony and Mule Creek State Prison. This will enable the department to return these beds to general population inmates.

**Construction Projects Approved Before December Bed Plan.** In addition to the housing units in the December bed plan, the department is also constructing four other projects that were approved before the December plan. These projects are a 50 bed Mental Health Crisis Bed unit at both California Men's Colony and California Medical Facility, a project to convert general population beds to 150 EOP beds at California State Prison, Los Angeles County, and a 64 bed Intermediate Care Facility at California Medical Facility. The department expects to complete construction of the 50 Mental Health Crisis Beds at the California Medical Facility by December 2007. The 50 bed Mental Health Crisis Bed project at California Men's Colony may be added to the Consolidated Care Center plan for this institution. The other two projects are in the preliminary planning stage.

**Department Revision to Mental Health Bed Plan.** The department recently submitted a summary of the Mental Health Bed Plan that was slightly different than the plan submitted to the court. This plan contained additional housing units for non-mentally ill inmate workers at each of the Consolidated Care Center institutions. The department indicates that because each of these centers will be stand-alone units they will need inmate workers to help maintain the facilities. The department now plans on adding 1,330 additional beds in 270-design celled housing units at the Consolidated Care Center institutions. The department plans to build one inmate worker housing unit (accommodates 190 inmates) at each of the following institutions:

- California State Prison, Sacramento
- Richard J. Donovan Correctional Facility
- California State Prison, Los Angeles County

Furthermore, the department plans to build two new inmate-worker housing units at both of the following institutions:

- California Institute for Men
- California Men's Colony

**Update on Mental Health Bed Projects Approved in 2006 Budget Act.** The 2006-07 Budget Act contained $50.8 million from the General Fund to support various mental health capital outlay projects. Several of these projects were modified or have been permanently cancelled based on the latest Mental Health Bed Plan submitted to the court in December 2006. The following projects were approved as part of the 2006-07 Budget Act and will continue without modifications:

- **Intermediate Care Facility (High Custody) – California Medical Facility.** $3.9 million General Fund was provided for preliminary plans to build a 64 bed facility. Design and environmental review will commence in April 2007.
- **Enhanced Outpatient Program Treatment Space – California State Prison, Sacramento.** $250,000 General Fund was provided for preliminary plans for this project and the plans are complete.
- **Enhanced Outpatient Program Treatment Space – California State Prison, Los Angeles County.** $250,000 General Fund was provided for preliminary plans for this project and the plans are complete.

The following projects were approved as part of the 2006-07 Budget Act and will continue, but with major modifications as per the December 2006 Mental Health Bed Plan:

- **Acute/Intermediate Care Facility/Mental Health Crisis Beds – California Institute for Women.** $2.2 million General Fund was provided for preliminary plans to build a 25 bed facility. Design is underway and environmental review is completed for the 25-bed facility. The December plan added an additional 20 beds to this project. The Legislature was notified of the change in a Finance Letter (dated March 15, 2007) and the department is pursuing the design of the new project with existing funding.
- **Intermediate Care Facility – Salinas Valley State Prison.** $7.9 million General Fund was provided for preliminary plans to build a 128 bed facility. Environmental review for this project is underway. This project has been re-scoped to a 70 bed administrative segregation unit.

Subcommittee No. 4                                                                April 12, 2007

The following projects were approved as part of the 2006-07 Budget Act and will not continue:

- **Acute – California State Prison, Sacramento.** $15 million General Fund was provided for preliminary plans for a 350-bed facility. This project was never started.
- **Intermediate Care Facility – California State Prison, Sacramento.** $7 million General Fund was provided for preliminary plans for a 128-bed facility. This project was never started.
- **Enhanced Outpatient Program Treatment Space – Mule Creek State Prison.** $250,000 General Fund was provided for preliminary plans for this project and the plans are complete. However, this project has been canceled.
- **Temporary Intermediate Care Facility – California Medical Facility.** $5.5 million General Fund was provided for working drawings and construction to convert 30 temporary Intermediate Care Facility beds to permanent beds. Working drawings for this project had been started, but the project has now been canceled.
- **Temporary Intermediate Care Facility – Salinas Valley State Prison.** $8.5 million General Fund was provided for working drawings and construction to convert temporary Intermediate Care Facility beds to permanent beds. Working drawings for this project had been started, but this project has been canceled.

Given the various changes to the department's mental health bed plans since the 2006-07 Budget Act was enacted, a significant amount of money should revert to the General Fund. Staff estimates that about $36 million should be reverted to the General Fund.

**Other Court Ordered Capital Outlay Modifications.** The *Coleman* court has ordered other changes to the state prison infrastructure outside of the Mental Health Bed Plan. The department submitted to the court the court ordered Administrative Segregation Unit Suicide Prevention Plan on October 2, 2006. This plan requires the department to create intake cells in Administrative Segregation Units in prisons across the state. The intake cells will be modified to reduce the apparatus the inmate can use to commit suicide. The Legislature was notified in a Finance Letter (dated January 29, 2007) that it needed $2 million General Fund to make modifications to create the new intake cells. The Legislature has not appropriated funds for this project. The department indicates that it has started retrofitting cells by redirecting funds from other department activities.

The *Coleman* court has also required the department to implement an Enhanced Outpatient Program (EOP) for the most seriously mentally ill at Reception Centers. However, the department does not anticipate the need for capital outlay modifications at this time.

### Governor's Budget

**Mental Health Crisis Beds – California Men's Colony.** $3.6 million General Fund is proposed for preliminary plans for the construction of a new 50-bed facility. This proposal will replace the emergency temporary operation of the Outpatient Housing Unit at California Men's Colony as Mental Health Crisis Beds as ordered by the *Coleman* court on May 1, 2006. The total project is expected to cost $55.7 million or $1.1 million per bed to construct these beds.

**Psychiatric Services Unit – California Institute for Women.**  $423,000 General Fund is proposed for preliminary plans for the conversion of the East Wing of the Support Care Unit at the California Institute for Women to a 20 bed Psychiatric Services Unit. The total project is expected to cost $4.5 million or $225,000 per bed to convert these beds. This proposal is not part of the December Mental Health Bed Plan, but the *Coleman* court issued a court order in late March directing the department to construct these beds.

## Issues

**Court Has Not Approved Plan.**  The *Coleman* court has not approved the December 2006 Mental Health Bed Plan. The LAO withheld a recommendation in their Analysis on the mental health bed proposals pending action by the federal court. The department has indicated that the court may reevaluate and make a decision regarding the department's bed plan in the next few weeks.

**Costs High for California Men's Colony Proposal.**  The Governor's budget proposal to build 50 Mental Health Crisis Beds is expected to cost $1.1 million per bed. These are extremely high per bed costs. The department indicates that these high costs were expected because the building was scoped as a stand-alone building. The department now proposes to include this project as part of the Consolidated Care Center planned for the California Men's Colony. This is part of the department's December 2006 Mental Health Bed Plan that is currently pending before the court.

**Current Year Funding Should Revert.**  As was mentioned above, the 2006-07 Budget Act included $50.8 million General Fund for various capital outlay projects to build mental health beds. A large portion of these projects were amended by the December 2006 Mental Health Bed Plan. Therefore, staff estimates that approximately $36 million should be reverted to the General Fund. The department has not put forward a proposal to revert these monies even though they have indicated that they have stopped planning on several of the projects.

**Department has Redirected Funds.**  The department has commenced work on several court ordered projects, including the conversion of the administrative segregation units to prevent suicide. The department indicates that it has commenced work consistent with the court orders. However, the Legislature has not approved monies for this work. Therefore, the department has had to redirect monies from other activities and/or projects to fund these new court-directed projects. The Legislature has not received information about what activities and/or projects the monies have been redirected. Staff finds that this information is critical to legislative oversight and transparency of the budget process, because when the Legislature approved the budget act in 2006 they expected that the funding would be used to support certain activities and projects. The redirection means that some of these activities and/or projects are not being funded in the current year.

**Transparency Needed on Inmate-Worker Beds.**  The Mental Health Bed Plan that was submitted to the court did not include a provision for additional inmate-worker beds. As mentioned above, the department recently revised the Mental Health Bed Plan to include a provision for 1,330 additional beds for inmate workers. The department has not provided any details regarding these new housing units, except that they are needed because the mental health

Consolidated Care Centers at five institutions will be stand-alone and will need inmate workers. The department has also indicated that the housing for these inmate-workers will be celled. Generally inmate-workers are lower-level inmates that live in dorm-style housing. Staff finds that additional information is needed regarding these housing units before action should be taken.

**Plan is Complicated and Confusing.** Staff finds that the department must complete a significant number of capital outlay-type projects to comply with *Coleman* court orders. Staff finds that the department's current information regarding these projects is disjointed and confusing. For example, the department is pursuing projects in the December Mental Health Bed Plan, but it is also pursuing projects approved before the bed plan and other projects that do not augment permanent bed capacity. The sheer number and diversity of the different projects that the department is undertaking makes it difficult to track. Staff finds that the department needs to improve its tracking of these projects, which would improve the transparency of the department's efforts to comply with the *Coleman* settlement. For example, the department could prepare one document that contains all of the *Coleman* related projects, including when and where they were authorized, what funding has been provided, and the status of each project.

### Recommendations

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Deny the proposal to fund preliminary plans for the 50 Mental Health Crisis Beds at the California Men's Colony, with the understanding that this project will likely be part of a larger Consolidated Care Center proposal in the future.
- Approve the proposal to fund preliminary plans for the 20 Psychiatric Services Unit beds at the California Institute for Women.
- Request that the department prepare a proposal to revert monies at May Revision for the capital outlay projects approved in 2006 that are no longer being pursued.
- Request that the department and DOF provide information regarding where the monies have been redirected from to fund *Coleman* court directives in the current year.
- Request that staff, LAO, DOF, and the department work on an annual report that tracks all of the mental health capital outlay projects being pursued so that transparency can be improved.

## *Plata* Related Medical Care Capital Outlay

**Background.** The federal court-appointed Receiver took over medical care at CDCR about one year ago. Since that time, the Receiver has undertaken several initiatives to improve medical health care within the prisons. One of these initiatives is to commence planning for 5,000 multi-purpose medical beds including beds appropriate for geriatric inmates, terminally ill inmates, and inmates with mobility issues at up to seven sites across the state. Those sites under consideration include:

- California Men's Colony
- California Institution for Men
- California State Prison, Sacramento
- Richard J. Donovan Correctional Facility
- California State Prison, Los Angeles

- County
- Deuel Vocational Institution
- California Medical Facility
- Fred C. Nelles Juvenile Correctional Facility (this facility is now closed)

In order to plan for the construction of 5,000 medical beds, the Receiver's office is conducting a survey of the prison population to determine what type of specialized housing and treatment space is needed. The Receiver's office has not completed this survey to date and in his most recent quarterly report to the court has indicated that this effort has been hindered by a lack of reliable data on the burdens of chronic disease and physical impairment in the prison population. The Receiver indicates that this survey data is critical to properly planning for facility and medical care needs and has retained a consultant that will help in developing an assessment tool that can be used to assess inmate health and assign them to levels of care. The Receiver estimates that the consultant will complete their work by July 2007.

**500 Correctional Treatment Center Bed Project.** The Receiver had launched a project to identify and secure 500 additional Correctional Treatment Center-type beds within 180 days. This effort was undertaken in an effort to reduce the department's current overuse of expensive acute beds and beds in community hospitals. The Receiver had determined that many inmates could be more appropriately and less expensively treated when recovering in alternative housing. After surveying viable options for identifying 500 additional Correctional Treatment Center-type beds in the short run, the Receiver has decided to fold this project into the overall 5,000 bed project.

**San Quentin Project.** In addition to the efforts above, the Receiver's office has also started a pilot project to address physical plant deficiencies at California State Prison, San Quentin. The plan includes three phases and is estimated to cost $175 million. The first phase will include various projects to "create space" for longer term projects, improve level of services in Neumiller Infirmary Building, and create temporary structures to provide basics to San Quentin medical personnel. The first phase includes the following projects:

- **Personnel Office.** A personnel office will be constructed to support recruitment and hiring of medical, mental health, and dental staff at the institution. The Receiver's office indicates that conceptual design for this building is complete and that working drawings are being developed.

- **Replacement Parking Spaces.** San Quentin currently does not have adequate parking for its staff or escort vehicles to transport inmates to medical appointments off prison grounds. The Receiver's Office has indicated that additional parking spaces have been added and placed into service.
- **Relocation of Walk Alone Yards.** Walk alone yards in the Upper Yard will be relocated to the "C" Yard to make room for temporary clinical offices and examination areas in the Upper Yard. The Receiver's Office indicates that documents are being prepared to solicit construction bids.
- **Medical Supply Warehouse.** A new central warehouse will be constructed to replace the current system that houses medical supplies in more than four spaces on the institution's grounds. A conceptual plan has been developed for a medical warehouse, but a decision has been made to integrate the medical warehouse into the development of a main warehouse at San Quentin.
- **Trauma Treatment Area Renovations.** The Trauma Treatment Area in the Neumiller building will be relocated from the northern entrance to within the building's core on the first floor. Renovation and construction is currently underway and should be complete by May 2007. This will provide four trauma treatment areas for patients and provide more adequate space for personnel.
- **Ventilation Upgrades to North Block.** The Receiver has initiated a plan to improve air ventilation in North Block and increase the overall cleanliness of the North Block.
- **Expansion of West and East Block Rotundas for Sick Call.** This project will make use of space in the rotundas of East and West Blocks for expanded clinical areas for sick call. Currently, medical personnel are using converted cells that are inadequate. Designs are currently being developed to utilize the rotundas.
- **Other Upgrades.** The Receiver also proposes to make various other upgrades to clinical space in the North Block, Adjustment Center, and Gym. These upgrades are currently being developed. Trailers have also been procured and are in use for office space for medical care personnel.

The second phase of the Receiver's San Quentin Project includes the following:

- **Primary Care/Specialty Medical Services Modular in Upper Yard.** These modular units will be put in place after the "walk alone" yards are moved to "C" yard to augment the inadequate medical treatment space in the Neumiller Building. These modular units will be used until a permanent Central Health Services Building can be constructed. Planning for this project is in the final stages.
- **Minor Remodel of Medical Records Unit.** Minor changes will be made to the existing Medical Records Unit until a permanent Central Health Services Building can be constructed. Modifications are currently being planned.
- **Minor Remodel of Receiving Modular.** Reception of new inmates is currently conducted in modular buildings at San Quentin. Minor changes will be made to provide additional space for mental health screening and medical personnel.

The third and final phase of the San Quentin Project involves the construction of a new Central Health Services Building at San Quentin. The current plan is to raze Building 22, one of the oldest buildings in Marin County, and construct a new building in its place. The majority of Building 22 is not being used by the prison because of seismic issues. The new facility would

**Subcommittee No. 4**                                                        **April 12, 2007**

include a 50-bed correctional treatment center, a reception center, and treatment space for mental health and dental clinicians. The concept design is in its final phase and environmental work for this project has commenced. In a Finance Letter (dated March 15, 2007) the Legislature was notified that $492,593 General Fund was transferred, from the $100 million in unallocated funds set aside to be directed by the Receiver in the 2006-07 Budget Act, for environmental impact documents related to the construction of a new Central Health Services Building at San Quentin.

**Governor's Budget.** The Governor's budget proposal includes $1 billion in lease-revenue bonds for construction of specialized beds, treatment space, and program space for health care services. The administration indicates that these funds will be set aside until cost estimates of specific projects become available from the court-appointed Receiver in *Plata v. Schwarzenegger.*

The Receiver, in his most recent report to the court, indicates that there is general agreement among the court appointed experts in the *Coleman* and *Perez* lawsuits that the Receiver should take the lead on the construction of the 5,000 medical beds, including clinical space and treatment centers.

**Most Bond Funding Premature.** The Receiver has indicated, in his most recent report to the court, that the survey of inmate needs is critical before planning can commence on new health care beds. The Receiver does not expect that the survey will be complete before July 2007. It will likely take some time after the survey is complete to develop a plan for the beds, including developing the types of beds that are needed. Therefore, staff finds that it is premature to expect that funding will be needed to construct new facilities in the budget year. (The exception may be the San Quentin Project where considerably more planning has been completed.)

The LAO withheld recommendation in their Analysis on the $1 billion in lease-revenue bonds for medical facilities because no specific projects had been submitted to the Legislature. Since the LAO Analysis was released, the administration has come forward with some details regarding the San Quentin Project. However, to date information commensurate with what would be included in a capital outlay budget change proposal has not been received.

Furthermore, the LAO recommends that the Legislature only provide funding for site acquisition and preliminary plans. The LAO indicates that this approach may require direct General Fund appropriations to initiate projects and in future years the Legislature could authorize lease-revenue bonds to finance the construction of these projects.

**$1 Billion Likely Not Enough.** Even though bond funding may be premature, staff finds that the $1 billion in lease-revenue bonds for specialized beds, treatment space, and program space for health care services will likely not be enough to cover all of the projects needed to comply with the settlement agreements. Specifically, preliminary plans to comply with the *Perez* lawsuit alone are estimated to cost about $1.4 billion. Staff estimates that the costs associated with the mental health bed plan are also likely to be over $500 million. Furthermore, development of a capital outlay plan to comply with the *Plata* lawsuit is still being developed and the costs are largely unknown.

**How Will Construction Proceed?** To date, the Receiver has contracted directly for support in developing capital outlay projects needed for compliance with the *Plata* settlement. These projects are currently in the planning stages, but it is unclear whether they will proceed to construction through the normal state capital outlay process. The Receiver has indicated that he intends to employ the design-build process for construction of the Central Health Care Services Building at San Quentin. This process generally requires special authorization by the Legislature and allows the state to contract with one firm to both design and build a facility. The Receiver has also indicated that to the extent possible his office plans on following other state processes regarding capital outlay, including complying with environmental regulations, prevailing wage, and reporting to the Public Works Board. However, because of the unique position and power of the Receiver there is some uncertainty about how this process will work.

The LAO recommends that, to the extent practical, the Legislature apply its standard budgetary processes to carefully review and act upon capital outlay budget requests submitted to it in behalf of the Receiver. The LAO finds that the Legislature continues to bear the responsibility, under the State Constitution, to appropriate funds and to enact an annual budget to support state programs.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Hold this issue open.
- Request that staff, the LAO, DOF, and the department request additional information on the San Quentin Project from the Receiver to determine what level of funding is appropriate for this project in the budget year.
- Request that staff, the LAO, DOF, and the department request to work with the Receiver to develop a standardized process for proceeding with capital outlay projects to ensure adequate information for the Legislature to provide fiscal oversight.

## *Perez* Related Dental Care Capital Outlay

**Background.** In December 2005, the department entered into a Stipulated Agreement to settle the *Perez v. Hickman* lawsuit claiming inadequate dental care in state prisons. This Agreement lowered the ratio of inmates to dentists from 950 inmates to one dentist to 515 inmates to one dentist. Additional treatment space is needed to accommodate this higher level of staffing.

The 2006-07 Budget Act included $1.7 million General Fund to the department to develop capital outlay plans to add additional dental treatment and office space to implement the *Perez* settlement. The department indicates that $500,000 was utilized to plan for treatment and office space at the first seven institutions where the new lower inmate to dentist ratio is being implemented.

**Finance Letter.** A Finance Letter (dated March 29, 2007) proposes $15.1 million General Fund for preliminary plans for dental treatment and office space at the following seven prisons:
- Avenal State Prison
- Calipatria State Prison
- Centinela State Prison
- Chuckawalla Valley State Prison
- Ironwood State Prison
- Kern Valley State Prison
- Folsom State Prison

These are the first seven institutions where the new lower inmate to dentist ratio is being implemented. The total cost of these projects is estimated to be $285 million.

**Details Lacking.** Staff finds that the department is requesting money for preliminary plans in the construction of seven major capital outlay projects. However, very little information has been provided to describe these projects. Staff has not received information commensurate with what is typically included in a capital outlay budget change proposal. Furthermore, the department has not submitted a Space Needs Study that was the basis for these proposals.

**Coordination Needed.** The Receiver has made numerous findings regarding the lack of adequate treatment space and program space for medical care. However, at this time, the Receiver has not developed a plan for addressing these space shortfalls at most of the institutions. (The Receiver is currently working on the San Quentin Project to address deficiencies at this institution as a pilot project.) As mentioned earlier in this agenda, there has been agreement among the experts in the three major health care lawsuits (including *Perez*) that the Receiver will take the lead on the construction projects to build 5,000 additional beds and the necessary clinical and treatment space. Staff finds that these projects have not been coordinated with efforts by the Receiver, because at this time the Receiver has not developed plans to address the space shortfalls at these institutions. Coordination is needed to ensure that the space at the facilities is best used to meet the collective needs of medical, mental health, and dental care in the most efficient manner.

**Projects Should Be Scheduled Separately.** Staff finds that these seven major capital outlay projects are proposed as one mega project. Staff finds that it would be easier to track if these projects were scheduled separately and tracked separately in the budget document.

**Subcommittee No. 4**                                                                 **April 12, 2007**

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Hold this issue open.
- Request that the department provide additional detail on the scope of the projects, including the Space Needs Study developed.
- Request that staff, the LAO, DOF, and the department request to work with the Receiver and other court appointed experts in the *Perez* and *Coleman* lawsuits to determine the best way to proceed with these projects to ensure coordination among the lawsuits.

## *Farrell* Related Minor Capital Outlay

**Background.** In 2004, the state settled the *Farrell* lawsuit that alleged poor conditions of confinement and lack of treatment services for youth housed in Division of Juvenile Justice institutions. Beginning in 2005-06, the department started implementing reforms as stipulated in a Consent Decree in the following seven functional areas:

- Mental Health
- Sex Behavior
- Disability
- Education
- Medical Care
- Safety and Welfare

The department has developed remedial plans for each of these areas, which has required the addition of a significant number of new staff. The current juvenile institutions do not have adequate or appropriate space to house these staff and/or space for these staff to deliver programming.

The 2006-07 Budget Act included $12.5 million General Fund to fund minor capital outlay projects to increase the programming and office space to start the implementation of the *Farrell* reforms. The department indicates that the majority of this funding was utilized to purchase portable units to provide temporary treatment space and classroom space. The department has also expended about $5.7 million ($2.9 million federal funds) to upgrade the telecommunications switch at each juvenile institution to accommodate the additional space. The department indicates that it is also funding an architect to design a new 280 bed core treatment facility and has indicated that in the future hopes to site one of these facilities in both Northern California and Southern California.

**Finance Letter.** A Finance Letter (dated March 29, 2007) requests $5 million for preliminary plans, working drawings, and construction for various minor capital outlay projects to increase programming space and office space for new staff to implement the *Farrell* implementation plans. The department indicates that $3 million is needed to supplement money provided in the current year to make modifications at seven Behavior Treatment Programs. The remaining $2 million is needed to renovate space for additional treatment space, classrooms, office space, and medical treatment space.

The proposal includes budget bill language to exempt these projects from state law that limits minor capital outlay projects to $400,000 or less. The budget bill language would allow the department to fund minor capital outlay projects to comply with the *Farrell* lawsuit that cost up to $600,000.

**Details Lacking.** Staff finds that very little information has been provided to describe these projects. Information on individual projects has not been put forward. Furthermore, the per foot costs for renovating the new Behavior Treatment Programs has more than doubled in cost since initial planning. However, no information has been provided to describe why these costs have doubled. Furthermore, it is unclear whether this request, combined with the funding provided in the current year, meets the space requirements of the remedial plans.

**Subcommittee No. 4**                                                  **April 12, 2007**

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:

- Hold this issue open.
- Request that the department provide additional details on where the new modular units were placed and what needs they met, including what has been done to improve conditions at the Herman G. Stark Youth Correctional Facility (this facility was supposed to be the focus of the department's reform during the current year).
- Request that the department provide additional details on what the new funds will support including where additional classrooms, etc., are needed within the system and whether this is adequate to meet the space requirements of the remedial plans.

# San Quentin Condemned Inmate Complex

**Background.** The 2003-04 Budget Act authorized $220 million in lease-revenue bonds for the design and construction of a new Condemned Inmate Complex for condemned male inmates at California State Prison, San Quentin. The original project was designed to provide 1,408 beds which were projected to meet the department's condemned inmate population needs through 2037. However, because of increased costs related to this project cost containment measures were taken in September 2005 to: (1) eliminate one housing unit, thereby reducing the number of beds by 18 percent; and (2) change the project scope for warehouse and maintenance support space from the construction of freestanding buildings to the conversion of existing dormitory buildings. Even with these cost containment measures, it was recognized that the project had a 6 percent budget deficiency in September 2005. The preliminary plans for this project were approved by the Public Works Board in November 2005.

There are currently 604 condemned inmates at San Quentin. The capacity of the current condemned housing is 634 beds. The new Condemned Inmate Complex would provide 1,152 beds.

**Governor's Budget.** The Governor's budget proposal includes $116.5 million in lease-revenue bonds to address additional funding needed to complete construction of the Condemned Inmate Complex at California State Prison, San Quentin. This is a 53 percent increase in estimated costs, since 2003, despite reducing the size of the project.

**Project is Expensive.** The LAO finds that the costs for this project will be nearly twice the cost of other high security beds. The main reasons for these higher costs are due to the location of the project. In particular, engineering requirements are more challenging at San Quentin because of the instability of the soil. Also, labor and materials are more expensive in the Bay Area than other potential sites for such a facility. This project is estimated to cost $300,000 per bed to construct. This is considerably higher then other high security beds.

**Environmental Impact Report Caps Population at San Quentin.** The LAO finds that the Environmental Impact Report that was developed for this project restricts the total number of inmates that can be housed at San Quentin to 6,558. The LAO finds that this limit may prevent the department from using all of the cells being vacated with the relocation of the condemned inmate population to a new Condemned Inmate Complex. Furthermore, the Receiver is currently pursuing the San Quentin Project that includes the construction of a 50-bed correctional treatment center, which may bring the total population at San Quentin closer to the cap.

**LAO Recommends Moving Project.** The LAO recommends that the Legislature cancel the condemned housing project at San Quentin and use the remaining funding authorized to build additional prison capacity for condemned and maximum-security inmates at a lower cost per bed elsewhere. This could include: (1) building a new condemned inmate complex at an existing prison or at a new site, or (2) constructing new Level IV capacity and moving condemned inmates to Level IV housing at an existing prison. The LAO indicates that some states house condemned inmates with other Level IV population in a single facility and suggests that this

could also be an option.

The department indicates that the unique site specific costs that could be avoided if the Condemned Inmate Complex was built at another prison are about $33 million. The department indicates that these costs are less than the land acquisition and waste water treatment facilities that may need to be acquired or expanded to meet the needs of a new condemned housing unit. Staff finds that the costs associated with adding additional housing units for the condemned inmate population should not be any different from the department's infill bed plan, where the department has not needed to acquire additional land.

Furthermore, the department indicates that moving the Condemned Inmate Complex to another institution would most likely delay the start of construction by two years. The department estimates that it will be ready to go to construction during the upcoming budget year if the project is built at San Quentin.

**Staff Comments.** Staff finds that there was considerable debate regarding moving the Condemned Inmate Complex to an alternative site in 2003 when the project was authorized. A drawback that surfaced during this debate was that moving the condemned population to a remote prison facility would make it more difficult for specialized legal representation to have access to the condemned inmate population. State law allows for automatic appeals and habeas corpus appeals for all condemned inmates.

Furthermore, there would likely be local community opposition to moving the condemned inmate population to any other location in the state.

**Staff Recommendation.** Staff recommends that the Subcommittee hold this issue open.

# Correctional Officer Training Academy

**Background.** Currently, the department operates one main correctional officer training academy called the Richard A. McGee Correctional Training Center located in Galt. The department is also currently utilizing the Northern California Women's Facility in Stockton as a satellite training facility. Between the training facility in Galt and the satellite facility in Stockton, the department currently has the capacity to train 2,520 cadets annually. The department was provided $58 million to fund these expansions in the current year. The basic training academy in Galt will graduate 250 cadets on April 20, 2007.

The department is also developing collaborative relationships with the California Community College Chancellor's Office to pilot the delivery of basic academy training to students enrolled in four community colleges (Santa Rosa, Napa, Fresno, and Susanville). These efforts help to improve the recruitment of citizens living near CDCR institutions. These pilots have, or will, produce about 135 new correctional officers this year.

The department estimates that it will need about 4,600 additional adult correctional officers in the budget year. This number may increase further based on actions taken by the Receiver to ensure that custody staff is available to deliver health care services in a safe manner. The number may also increase if additional housing units are constructed as proposed in the Governor's infill prison bed plan. The department reports that it currently has 1,780 correctional officer vacancies. (This does not include correctional classifications with supervisory responsibilities.)

**2006 Special Session.** As mentioned above, the Governor called a special session in June of 2006. At that time, the Governor proposed $55 million from lease-revenue bonds and $6.9 million from the General Fund to construct and staff a new correctional officer training academy in southern California. In response to this proposal, the Senate approved SB 10xx (Machado) in August 2006 to authorize $7.2 million General Fund for planning to establish a new training academy for correctional officers in southern California. (This funding was also proposed to fund per diem costs for correctional officer cadets that would be displaced from the relocation of cadets currently utilizing the abandoned Northern California Women's Facility for training.)

**Governor's Budget and Finance Letter.** The Governor's budget proposal includes $105 million in lease-revenue bonds to acquire land, develop preliminary plans and working drawings, and construct a new correctional officer training academy in southern California. The Governor's budget also includes $29.9 million in General Fund monies to support these efforts. The department indicates that it has assumed the allocation of $17.5 million for the acquisition of 100 acres for the site of the new academy.

**Details Lacking.** Staff finds that the department is requesting funding for a major new facility. However, very little information has been provided to describe this project. Staff has not received information commensurate with what is typically included in a capital outlay budget change proposal. In addition, the department has not identified a site for the academy, which makes it difficult to estimate actual costs of acquiring land or constructing the facility.

Furthermore, the estimate of the cost of this proposal increased from $58 million in the Governor's budget proposal to $135 million in the detail provided to the Legislature on February 8, 2007. Staff has not received information to justify this increase and has not received information on the ongoing operational costs of this facility. The LAO withholds their recommendation until additional information is provided on the construction and operational costs of the academy.

**Correctional Officers in Demand.** Staff finds that the department needs to recruit more correctional officers. The department currently has over 1,700 vacancies, which adversely impacts department operations. A high number of vacant correctional officer positions reduce safety at the institutions for staff and inmates. High vacancies also contribute to high levels of staff burnout due to large amounts of overtime that must be worked. Furthermore, the Receiver has indicated, in his most recent report, that he plans to create health care access teams because of a lack of custody staff available to accompany inmates to medical appointments. In addition, other operations within the institution, including visiting and programming, can be adversely impacted by a lack of custody staff.

**Southern California Academy May Improve Recruitment Efforts.** The LAO finds that having an academy in Southern California may help the department recruit more officers and fill its vacancies. The department indicates that it is difficult to recruit cadets from southern California who may be unable or unwilling to move and be away from their families for the 16-week academy. Staff concurs with these findings.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Hold this issue open.
- Request that the department provide additional information on the proposal, including information on the basic components of the facility.

# Other Capital Outlay

## 1.    Waste Water Treatment Plant Upgrades

**Background.** Overcrowding at the adult institutions has significantly impacted existing infrastructure systems, most notably, wastewater systems. These systems are often required to operate at or above the maximum intended capacity, resulting in an increased health and safety risk to CDCR staff, inmates, the public, and the environment. Overcrowding the prison sewage and wastewater systems has caused the discharge of waste beyond treatment capacity, resulting in sewage spills and environmental contamination. These spills can contaminate groundwater drinking supplies and place the public's health at risk. Furthermore, the department's wastewater issues have already resulted in multiple fines, penalties, and notices of violation to the CDCR from environmental control agencies (mainly the Regional Water Quality Control Boards). The department has been issued fines and wastewater violations at the following facilities, among others:

- California Men's Colony
- Deuel Vocational Institution
- California Correctional Center/High Desert State Prison
- Mule Creek State Prison

**Governor's Budget and Finance Letter.** The Governor's budget proposal and a Finance Letter (dated March 29, 2007) propose funding for the following Waste Water Treatment Plant (WWTP) upgrades:

- **California Correctional Center/High Desert State Prison.** The Governor's budget proposal includes $28.9 million General Fund for working drawings and construction for a project to make major upgrades to the WWTP that serves both of these prisons.

  The Finance Letter proposes $22.6 million General Fund in additional funding for this project to expand the scope of the project to meet the Regional Water Quality Control Board's Waste Discharge Requirement (WDR) permit requirements. This facility is currently operating under a Cease and Desist Order issued by the Board in July 2005 and the Governor's January proposal did not account for all of the upgrades needed to meet the WDR permit requirements. Specifically, the new project scope includes construction of an additional storage pond, the lining of five existing storage ponds, doubling of acreage needed to spray effluent, and the demolition and replacement of five support buildings. Total costs for this project are now estimated to be $54.6 million. Of this total, $3.2 million was appropriated in 2005-06 and 2006-07.

- **Deuel Vocational Institution.** The Finance Letter proposes to revert $25 million General Fund allocated for the construction of a new WWTP at this prison in 2006-07 due to delays with this project. The Finance Letter also proposes an additional $37 million General Fund so that construction of this project can continue in the budget year. Based on the most recent construction estimates for this project, costs have increased by

over 40 percent since last April. The department indicates that it is currently operating this plant under a Cease and Desist Order issued by the Regional Water Quality Control Board and that the delays in the project will make it impossible to meet the Board's compliance schedule. Total costs for this project are now estimated to be $40 million. Of this total, $3.1 million was appropriated in 2005-06 and 2006-07.

- **California Correctional Institution.** The Finance Letter proposes $8.7 million in lease-revenue bonds for increased construction costs related to major upgrades of the WWTP at this prison. Funding for this project was first allocated in 1997-98. The department indicates that there have been major increases in the construction costs since the estimate for this project was completed in January 2005. Total costs for this project are now estimated to be $29.5 million. Of this total, $20.8 million was appropriated in 2005-06 and in several other previous budget years.

- **Chuckawalla Valley State Prison/Ironwood State Prison.** The Governor's budget proposal includes $5.7 million General Fund for working drawings and construction to rehabilitate the WWTP that serves both of these prisons.

  The Finance Letter proposes to reduce the amount provided in the Governor's budget by $4.4 million General Fund due to scope changes that require additional preliminary plans and working drawings before construction can commence. This proposal results in a request of $550,000 for additional preliminary plans and $724,000 for working drawings in the budget year. The revised proposal would replace the existing trickling filter system with an oxidation ditch and total costs for this project are now estimated to be $24.7 million. Of this total, $455,000 was appropriated for preliminary plans in 2006-07.

- **Sierra Conservation Center.** The Finance Letter proposes to revert $11.8 million General Fund allocated in 2005-06 for construction of a new effluent disposal system that includes a pumping station, a pipeline, and a new reservoir. The Finance Letter also proposes an additional $18.8 million General Fund so that construction of this project can continue in the budget year. This project went out for bids in May 2006. All of the bids exceeded the state's estimate, especially the bids related to the construction of the reservoir. Total costs for this project are now estimated to be $21.2 million. Of this total, $2.4 million was appropriated in previous budget years starting in 1998-99.

- **Centinela State Prison.** The Governor's budget proposal includes $5.5 million General Fund for construction of various upgrades to the WWTP at this prison.

  The Finance Letter proposes to increase construction-related costs for this project by $896,000 General Fund. The department indicates that this funding is needed for fire sprinklers in a chemical building and other electrical upgrades not identified in the initial preliminary plans. Total costs for this project are now estimated to be $7.4 million. Of this total, $988,000 was appropriated in 2005-06 and 2006-07.

- **California State Prison, Corcoran/Substance Abuse Treatment Facility.** The Governor's budget proposal includes $5 million General Fund for construction of

numerous upgrades to the WWTP that serves both of these prisons.

The Finance Letter proposes to increase construction-related costs for this project by $913,000 General Fund. The department indicates that this funding is needed due to significant increases in the cost of equipment needed to complete this project, including electrical equipment. Total costs for this project are now estimated to be $6.5 million. Of this total, $554,000 was appropriated in 2005-06 and 2006-07.

- **Mule Creek State Prison.** The Governor's budget proposal includes $390,000 General Fund for preliminary plans to make numerous upgrades to the WWTP at this prison. This prison was issued a Notice of Violation of its WDR permit requirements by the Regional Water Quality Control Board in September 2006. Total costs for this project are estimated to be $4.9 million.

**Water Use Efficiency Important.** It is unclear whether water use efficiencies have been implemented at all of the institutions listed above. Staff finds that $11 million General Fund was provided in the current year for various maintenance efforts and that some of the funding was provided for flushometers (meters that limit the number of times in an hour an inmate can flush his/her toilet) and other water use efficiency measures. Staff finds that implementing water use efficiencies can be more cost effective than expanding WWTP facilities. However, given the overall magnitude of the overcrowding at some of these institutions, staff finds that water use efficiency will not meet all of the needs of the department. Nevertheless, staff finds that the department should have a policy of pursuing all water use efficiency options before taking efforts to greatly expand an institution's WWTP.

**Costs Out of Control.** The costs of several of the projects listed above have increased significantly since the preliminary planning stage. In some cases the department's estimates have nearly doubled, including the projects at the California Correctional Center/High Desert State Prison and the Deuel Vocational Institution. Staff finds that the department needs to do more to contain costs and ensure that the original scope of the project is accurate before proceeding to preliminary plans and working drawings. Furthermore, more needs to be done to ensure that these projects stay on schedule. Two of these projects, California Correctional Institution and the Sierra Conservation Center projects, were first funded in the 1990s. Staff finds that the same lack of cost controls and schedule controls could impact the infill bed housing plan or other major capital projects that are currently being proposed. Cost overruns on these much larger projects could be significantly more than these WWTPs.

**How Will Facilities be Sized?** The department has proposed infill projects at the majority of the facilities that need WWTP upgrades. Furthermore, the Receiver and the department have proposed building additional beds at some prisons that will further stress the WWTP at certain institutions. All of these upgrades are being designed to accommodate current overcrowding, except for the Chuckawalla Valley State Prison/Ironwood State Prison project. This means that if the department stays in the "bad" beds and also builds the new infill beds and/or health care beds, it is likely that the WWTP upgrades will not accommodate the expanded demands on the infrastructure. The department has indicated that each of these projects pose different challenges for expansion. Furthermore, the department indicates that it plans on issuing change orders to

contracts it has already awarded if the infill beds are approved. Staff finds that issuing large change orders to projects that have already been awarded compromises the state's negotiating position and may significantly increase the costs of the project.

**Specific Project Issues.** Staff has identified the following issues with the projects listed above:

- **California Correctional Center/High Desert State Prison.** The scope of this project has changed dramatically to comply with requirements of the Regional Water Quality Control Board. However, the department finds that it can complete the preliminary plans for the new scope within the funds already appropriated for the preliminary plans. The Legislature has not received a notification to change the scope of this project. Given the major changes to the scope and projected delays it is unclear that construction funding is needed in the budget year. Furthermore, if the Legislature approves the infill bed plan that would add 750 beds to these prisons, this project would have to be further amended. This would result in a further delay to the project or a costly change order.

- **Deuel Vocational Institution.** This project has had significant cost overruns. Staff finds that some of these cost overruns could have been avoided if the preliminary planning for this project had been more accurate and complete.

- **California Correctional Institution.** This project has been delayed significantly. Staff finds that delays in this project have increased the costs of the project. Furthermore, if the Legislature approves the infill bed plan that would add 875 beds to this prison this project would have to be further amended. This would result in a further delay to the project or a costly change order.

- **Chuckawalla Valley State Prison/Ironwood State Prison.** The scope of this project has changed to comply with requirements of the Regional Water Quality Control Board. The Legislature has not received a notification to change the scope of this project. This project can accommodate the additional infill housing being planned for these prisons.

- **Sierra Conservation Center.** Staff finds that it is difficult to understand what is driving the increased costs for this project. Additional information is needed from the department. Furthermore, if the Legislature approves the infill bed plan that would add 400 beds to this prison, this project would have to be further amended. This would result a further delay to the project or a costly change order.

- **Centinela State Prison.** If the Legislature approves the infill bed plan that would add 590 beds to this prison, this project would have to be further amended. This would result in a further delay to this project or a costly change order.

- **California State Prison, Corcoran/Substance Abuse Treatment Facility.** The Governor's infill bed plan includes 150 new beds for the Substance Abuse Treatment Facility. However, additional upgrades may still need to be made to this WWTP given the current deficiencies in overcrowded conditions.

- **Mule Creek State Prison.** If the Legislature approves the infill bed plan that would add 400 beds to this prison, this project may have to be further amended. However, since this project is in the preliminary planning stage, changes could be made relatively easily.

**Staff Recommendations.** Staff recommends that the Subcommittee take the following actions:

- California Correctional Center/High Desert State Prison – Approve funding for working drawings and hold open funding for construction.

- Deuel Vocational Institution – Approve Finance Letter for this project (reversion

language and funding for construction).
- California Correctional Institution – Hold this issue open, pending action on the infill bed plan.
- Chuckawalla Valley State Prison/Ironwood State Prison – Approve the Governor's budget and Finance Letter proposals and request that a scope change be issued for this project.
- Sierra Conservation Center – Hold this issue open pending additional information on what is driving the increased costs for this project.
- Centinela State Prison – Hold this issue open.
- California State Prison, Corcoran/Substance Abuse Treatment Facility – Hold this issue open.
- Mule Creek State Prison – Approve this budget proposal.
- Request that the department provide information on the water use efficiency measure that it has taken at each of these institutions.
- Request that staff, the LAO, DOF, and the department develop and report, by May Revision, on strategies to address cost controls and schedule controls on the department's capital outlay projects.
- Request that the department develop estimates and report by May Revision on what funding and modifications are needed to expand the scope of each of these projects to accommodate infill beds and health care beds that have been identified, where applicable.

# 2.    Sierra Conservation Center - Water Supply Treatment Plant

**Background.** The Sierra Conservation Center is located in the Sierra Nevada foothills near the town of Sonora. The center pre-treats raw water from Lake Tulloch for all uses at the center, including drinking, showering, toilets, and kitchen uses.

**Governor's Budget and Finance Letter.** The Governor's budget proposal and a Finance Letter (dated March 29, 2007) propose funding for a filtration structure for the water supply treatment plant at the Sierra Conservation Center. The Governor's budget includes $2 million General Fund for working drawings and construction of a filtration structure for the water supply treatment plant at the Sierra Conservation Center.

A Finance Letter proposes to reduce the amount provided in the Governor's budget by $1.8 million General Fund due to delays in the construction of this project. The total cost of this project is now estimated to be $2.2 million. Of this total, $151,000 was appropriated in 2006-07 for preliminary plans.

**Is This Proposal Sized Correctly?** The administration proposes to add 400 beds to the Sierra Conservation Center in the infill bed plan. It is unclear whether this facility will accommodate additional capacity at this institution.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Hold this issue open.
- Request that the department develop estimates and report by May Revision on what

funding and modifications are needed to expand the scope of each of this project, if needed.

# 3.    Solid Cell Fronts

**Background.** In order to improve the safety of staff, the department started an effort to retrofit old administrative segregation units with open barred cell fronts and cell doors to a solid cell front design. The solid cell front design reduces the opportunity for gassing or spearing attacks by inmates upon staff.

**Governor's Budget and Finance Letter.** The Governor's budget proposal and Finance Letter (dated March 29, 2007) includes funding for an ongoing project to replace the bar construction of cell fronts in the Administrative Segregation Units with solid cell fronts. This modification will also require modifications to the heating/ventilation system and utilities. The budget and Finance Letter includes funding for the following conversions:

- **California Institution for Men.** The Governor's budget proposal includes $5.6 million General Fund for construction to convert 204 cells and 12 showers.

  The Finance Letter proposes to increase the amount provided in the Governor's budget by $588,000 General Fund due to a revised construction cost estimate. The department indicates that, given the shortage of inmate beds, the department has determined that only one-half of one floor will be available to the contractor to work on at a time. This will lengthen the duration of the construction contract from 12 months to 16 months. Total costs for this project are estimated to be $7.4 million. Of this total, $1.2 million was appropriated in 2005-06 and 2006-07.

- **California Medical Facility.** The Governor's budget proposal includes $4.1 million General Fund for construction to convert 126 cells and 6 showers.

  The Finance Letter proposes to increase the amount provided in the Governor's budget by $438,000 General Fund due to a revised construction cost estimate. The department indicates that given the shortage of inmate beds the department has determined that only one-half of one floor will be available to the contractor to work on at a time. This will lengthen the duration of the construction contract from 12 months to 16 months. Total costs for this project are estimated to be $5.3 million. Of this total, $759,000 was appropriated in 2005-06 and 2006-07.

- **Deuel Vocational Institution.** The Governor's budget proposal includes $504,000 General Fund for preliminary plans to convert 144 cells.

  The Finance Letter proposes to reduce this amount by $99,000 General Fund due to a refined estimate of actual costs prepared by the department. Total costs for this project are now estimated to be $6.4 million.

- **Correctional Training Facility.**  The Governor's budget proposal includes $504,000 General Fund for preliminary plans to convert 144 cells.

   The Finance Letter proposes to reduce this amount by $99,000 General Fund due to a refined estimate of actual costs prepared by the department.  Total costs for this project are now estimated to be $6.5 million.

**Staff Comments.**  Staff finds that gassing attacks on staff should be reduced when new housing units are constructed to accommodate the mentally ill population.  Furthermore, the infill housing plan includes several new administrative segregation units, which will allow the department to convert existing administrative segregation units back to general population housing units.  Therefore, the overall size of this project may be smaller if the infill bed plan is approved and the mental health bed plan is implemented.  However, staff finds that none of the projects proposed for funding in the budget year would receive a new administrative segregation unit in the infill bed proposal.

Furthermore, the department has identified additional changes that may be needed to the two projects proposed for construction in the budget year.  These changes may increase the costs of the projects.

**Staff Recommendation.**  Staff recommends that the Subcommittee take the following actions:
- Hold open funding for the construction phase at the California Institution for Men and California Medical Facility.
- Approve budget and Finance Letter for preliminary plans phase at the Deuel Vocational Institution and Correctional Training Facility.

# 4.    Small Management Yards

**Background.**  The CDCR is required, by a court order from the 1970s, to provide at least ten hours per week of out of cell exercise to inmates in administrative segregation.  Historically, the department would accommodate this requirement by releasing 15 to 25 inmates at one time into an exercise yard.  The department cites that the increased complexity of the administrative segregation inmate population has made it more difficult to release large groups of inmates without the threat of violence.  Therefore, several years ago, the department started to construct small management yards and so far 921 small management yards have been implemented.

The small management yards are approximately 150 square feet and can accommodate two inmates at one time.  They are made of a metal fencing-type material and have a combination toilet and sink.

**Governor's Budget.** The Governor's budget proposal includes $911,000 General Fund for preliminary plans and working drawings to add 179 small management yards at the following institutions:

- **California Correctional Center –** 20 yards
- **Sierra Conservation Center –** 20 yards
- **California State Prison, San Quentin –** 31 yards
- **North Kern State Prison –** 20 yards
- **Correctional Training Facility –** 38 yards
- **California Correctional Institution –** 50 yards

This proposal does not allocate monies for construction of these yards in the budget year. However, the department estimates that it will cost $7.4 million in total to complete this project. The department proposes to utilize Inmate/Ward labor to complete the construction of these yards.

**Staff Comments.** Staff finds that the department plans on constructing 262 additional small management yards in order to complete the roll out of small management yards at every institution. The department plans on requesting funds for design of these facilities in two additional phases over the next two budget years.

**Staff Recommendation.** Staff recommends that the Subcommittee approve this request as proposed.

## 5.    California Men's Colony Kitchen

**Background.** The kitchen at the West facility of the California Men's Colony was constructed in the 1940s using wood construction. Surveys by engineering firms in 1992 and 1995 found significant water damage had compromised the structure because of the wood construction and the years of use. In addition, two surveys conducted in 2006 found moderate to severe mold infestation in the kitchen and the dining areas. To date, some rooms in the kitchen have been sealed off and are no longer in use because of the high concentration of mold. The department also has indicated that over 25 percent of the floor area is severely affected by water damage.

The West facility currently houses 2,800 Level I and Level II inmates. Inmates have been housed in this facility continuously since 1984 without any major modifications to improve the kitchen facility.

**Governor's Budget.** The Governor's budget proposal includes $10.5 million for working drawings ($258,000 General Fund) and construction ($10.3 million in lease-revenue bonds) to replace the central kitchen at the West facility of California Men's Colony. This project was first funded in 1998 and has been delayed several times.

**Staff Recommendation.** Staff recommends that the Subcommittee approve this request as proposed.

## 6.    Folsom State Prison – Officers and Guards Building

**Background.**  In 2002, the department completed a $2.5 million seismic retrofit of the historic Officers and Guards Building at Folsom State Prison.  Further modifications are needed to this building before it can be used as office space.  The Officer and Guards Building is outside of the secure perimeter of the prison.

Folsom State Prison currently lacks adequate space to accommodate the levels of health care mandated by the federal courts.  The prison currently has an administration building that is within the secure perimeter of the prison.  The administration building currently houses the Warden's office, records, and other management activities.

**Governor's Budget.**  The Governor's budget proposal includes $370,000 General Fund for working drawings to convert the historic Officers and Guards Building at Folsom State Prison in to office space for prison administrative staff and inmate records personnel.

**Staff Comments.**  Staff finds that this project will provide for additional space in the current administration building within the secure perimeter that can be converted to health care space.  This should reduce the need to build additional space to meet health care space needs.

**Staff Recommendation.**  Staff recommends that the Subcommittee approve this request as proposed.

## 7.    Deuel Vocational Institution – Electrical Power Substation

**Background.**  The department utilizes groundwater as the water supply source for the institution.  The groundwater no longer meets the Department of Health Services' drinking water standards and in 2003 a project was funded to implement a reverse osmosis system to ensure that the groundwater was treated to a level suitable for drinking.  Furthermore, the department is also currently planning to make major upgrades to its current waste water treatment facilities.  Both of these facilities require additional electrical capacity.

**Finance Letter.**  A Finance Letter (dated March 29, 2007) proposes to revert $2.2 million General Fund for working drawings and construction appropriated in 2006-07 for a new electrical power substation to serve the Deuel Vocational Institution.  The Finance Letter also proposes to provide $3.9 million General Fund to continue working drawings and construction of this project in the budget year.  The department indicates that foundation costs have increased significantly due to a recently completed soils report.  In addition, raw materials needed to complete this project, including copper and core steel, have increased from 50 to 80 percent in the past year.  Total costs for this project are now estimated at $4.1 million.  Of this total, $250,000 was appropriated in 2006-07 for preliminary plans.

**Costs Out of Control.**  The costs of this project have increased significantly since the preliminary planning stage.  Staff finds that some of the increased costs are due to materials, but the majority of the increased costs are due to a significant change to the foundation required for this facility.  Staff finds that the department could avoid these cost overruns if it ensured that the

original scope of the project was accurate before proceeding to preliminary plans and working drawings.

**Staff Recommendation.** Staff recommends that the Subcommittee approve this Finance Letter proposal (reversion and language and funding for working drawings and construction).

# 8.    Sierra Conservation Center – Firing Range

**Background.** Correctional officers in armed posts participate in regular fire arms training. At some institutions all correctional officers participate in regular fire arms training. Some prisons have firing ranges to accommodate this training on site.

The department indicates that the firing range at the Sierra Conservation Center is used for training by the department, as well as local law enforcement.

**Finance Letter.** A Finance Letter (dated March 29, 2007) proposes $361,000 General Fund for preliminary plans for a new pistol and rifle firing range at the Sierra Conservation Center. This is a new project to relocate an existing training facility that is now close to new homes (Shotgun Estates) adjacent to the facility. The total costs for this project are estimated at $8.6 million and would include the construction of a classroom. The current firing range does not include classroom facilities.

**Staff Comments.** Staff finds that the firing range is important to ensuring adequate training for the correctional officers. However, staff also finds that the department is currently pursuing a number of high priority projects to improve the safety for correctional officers within the institutions by relieving overcrowding. It is not clear that the department will have enough internal resources to manage all of the projects it needs to pursue and may need to prioritize.

Staff finds that there may be multiple options that could be pursued that do not include constructing a new firing range at this time. These options include developing a relationship with a regional firing range that will accommodate the department's training needs, traveling to a nearby prison to utilize their firing range, and making modifications to the existing firing range to limit the risks to the nearby property line.

Furthermore, staff finds that additional information is needed regarding the mutual aid arrangement between the department and local law enforcement to share the firing range. It is unclear whether the department is reimbursed by local law enforcement for the use of this facility.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Reject this proposal.
- Request that the department develop and submit an alternative proposal for consideration in future budget years that includes a cost sharing with the local government agencies to help defray the costs of moving this facility.

## 9.    Statewide Project Planning

**Background.**   The department manages a significant number of facilities.   Most of these facilities are old and decaying.  This requires constant vigilance by the department to ensure that the state's correctional system is maintained and can be fully utilized.

**Governor's Budget.**   The Governor's budget proposal includes $2 million General Fund for advanced planning and budget packages for future capital outlay projects.

**Staff Comments.**   Staff finds that the Governor's budget increases the amount of money provided to the department by $750,000 in the budget year.  This increase is justified given the large volume of work projected over the next several years.  Furthermore, the department's current planning is inadequate and does not result in budget proposals that have enough information for appropriate fiscal oversight by the Legislature.  Staff finds that additional monies may improve the department's abilities to provide more detailed plans for future capital outlay projects.

**Staff Recommendation.**   Staff recommends that the Subcommittee approve this request as proposed.

# Maintenance and Equipment

## 1.    Maintenance Funding

**Background.**   The capital facilities of the adult prisons operated by CDCR represent an investment in today's dollars of as much as $20 billion.   Despite having made this significant investment, the state faces a growing backlog of special repair work that now exceeds $200 million.   This is partly the result of an aging prison infrastructure and sustained high levels of overcrowding of facilities but also due to the way that CDCR has managed and organized the responsibilities of keeping its adult institutions in good repair.

**Governor's Budget.**   The Governor proposes $69 million General Fund to augment the department's baseline budget for maintenance, special repairs, and major equipment purchases. Specifically, this budget request proposes to fund the following activities:

- **Special Repairs Program.**   $12 million to maintain the same level of funding for special repairs as was provided in the current year and augment it by $1 million.
- **Parts and Materials Inventory.**   $10 million to ensure that preventive maintenance is not deferred or neglected due to lack of adequate materials or parts.
- **Roof Maintenance.**   $6.4 million to create regional maintenance teams to undertake ongoing preventative maintenance and minor repairs to roofs.
- **High Voltage Maintenance.**   $6 million to perform preventative maintenance of high voltage switchgears, transformers, generators, and distribution networks.
- **Heating and Ventilation Maintenance.**   $5.9 million to create three regional maintenance teams to perform preventive maintenance of heating and ventilation systems all the facilities.
- **Electrified Fence Repairs.**   $3.1 million for electrified fence system repairs.
- **Road and Parking Lot Maintenance.**   $1.6 million to create a pilot project to repair and replace institution roads and parking lots.
- **Fire Alarm Maintenance.**   $1 million to develop maintenance contracts with fire alarm and suppression system maintenance companies.

This proposal does not include any additional positions to carry out the maintenance.   The department indicates that it plans to redirect vacant maintenance positions from the institutions to headquarters to support this budget proposal.

**Maintenance Efforts Not Well Managed or Organized.**   The LAO has found significant problems in the way that CDCR has organized and managed its responsibilities for keeping its adult institutions in good repair.   These problems are aggravating the maintenance and repair problems, contributing to a lack of preventative maintenance and the growing backlog of special repairs of its facilities.   Specifically, the LAO finds the following:

- **Prisons Not Provided Guidance.**   There is a general lack of policy guidance from headquarters to the prisons regarding what maintenance work will be prioritized or completed.   It is up to the Warden at each institution to determine the use of the maintenance allotment provided to the institution.

- **Preventative Maintenance Not Well Tracked or Coordinated.** The department does have an information technology system to track maintenance of its facilities. However, due mainly to lack of staff this system has not been effectively utilized. In addition, nobody at headquarters is trained to analyze the maintenance data that is submitted from the institutions. Furthermore, CDCR does not maintain a list of equipment that needs replaced.
- **Headquarters Authority Fragmented.** Currently the Adult Support Division determines the allocations for maintenance, while the Office of Facilities Management makes funding decisions about large special repair projects. This fragmentation of authority over maintenance undermines the department's effective use of state resources to prioritize funding.
- **State Maintenance Funding Redirected.** Data from the department indicates that many of the adult institutions are not spending all of their maintenance funds on maintenance. Recent data shows that 16 of the 33 institutions diverted more than 10 percent ($4 million) of their maintenance funding to non-maintenance items. This does not include salary savings from vacant maintenance positions.
- **Wardens Have Little Training.** Wardens generally have little training in maintenance issues and are generally not evaluated based on the maintenance of their facilities.
- **Institution Funding Based on Outdated Formula.** The current allocation methodology used to allocate maintenance funds is based on historic allocations. The current formula does not account for the age of the facility, its physical size, its mission, or the number of inmates it houses. Furthermore, the per square foot allocation can vary widely between institutions.
- **Staffing Not Available for Preventative Maintenance.** Generally there is not enough maintenance staff to handle preventative maintenance. Maintenance staff is needed for critical projects that require immediate response. The number of maintenance staff at individual institutions is not consistent with or based on objective measure of their maintenance and repair needs, such as their size, age, or the mission of their facility.
- **Use of Inmate Labor Limited.** Inmate labor is relatively limited for maintenance work because frequently inmates do not have specialized skills needed for some projects and current labor agreements require a staff trade worker to supervise maintenance workers at all times.

**Efforts Underway to Address Maintenance Problems.** The department indicates that it is beginning to improve its management and special repair functions. The department has established a Maintenance Services Branch within the Office of Facilities and Management to improve coordination of maintenance of CDCR facilities. These staff will be tasked with tracking maintenance activities. The new branch will be staffed with redirected vacant positions from the field. The department has also indicated that it intends to contract with a private firm to conduct a comprehensive assessment of the condition of the department's facilities and determine the level of funding and staffing that is needed for deferred, preventative, and corrective maintenance.

**LAO Recommendations.** The LAO makes several recommendations to improve maintenance of the department's facilities. The LAO recommends that the department take the following actions to improve maintenance operations:

- Direct CDCR to revise the formula used to allocate maintenance funding to the institutions. The new formula should account for the age, mission, and inmate population of each institution.
- Direct CDCR to modify the official duty statement of the Associate Warden of Business Services at each prison to make these state officers responsible for overseeing the maintenance budget.
- Move the responsibility for the allocation of maintenance funding from the Adult Support Division to the Office of Facilities Management.
- Direct CDCR headquarters to provide more policy guidance to the institutions on maintenance priorities and strategies.
- Take steps to reduce the vacancy rate for maintenance employees, ensure that future collective bargaining agreements provide more flexibility for the use of inmate labor, and expand maintenance staffing.
- Incorporate juvenile facilities into the department's maintenance tracking system.

Furthermore, the LAO recommends that the Legislature take the following actions to ensure that maintenance efforts at the department are improved:

- Approve the maintenance budget proposal but reduce it by $4 million to reflect a rough estimate of the funding that is currently being redirected by the department to support other purposes.
- Refrain from funding additional maintenance needs until the department has demonstrated improvements in the way it manages and organizes maintenance and special repairs responsibilities.
- Ensure maintenance funding is spent on maintenance by separately scheduling the item within the main support item or adopting budget bill language allocating a specified amount of the department's budget to maintenance.
- Modify state law to require that management audits conducted of wardens evaluate the performance of wardens in the maintenance of the facilities they are managing.
- Request a report that updates the Legislature on the department's efforts to take the actions listed above to improve its maintenance efforts.

**Proposal is Good First Step.**  Staff finds that the Governor's budget proposal and the actions that the department has started to take are a good first step to improving maintenance of the state's prison infrastructure.  However, staff recognizes that this money will not solve the current backlogs of special repairs that are well over $200 million.  Furthermore, staff concurs with the department's plans to employ a consultant to evaluate the current maintenance needs of the institutions.  This will provide a good starting point for evaluating future budget requests to solve the department's maintenance problems.  Staff recognizes that the solution to this problem will be a multi-year effort.

**Staff Recommendation.**  Staff recommends that the Subcommittee take the following actions:

- Approve the maintenance budget proposal less $4 million as recommended by the LAO and request that the department stop redirecting maintenance funding in its base budget.
- Approve budget bill language that ensures that the department expends these funds only on maintenance activities (similar to Provision 22 of 5225-001-0001 of the 2006 Budget Act).

- Request staff, the LAO, DOF, and the department to develop trailer bill language to require that management audits conducted of wardens evaluate the performance of wardens in the maintenance of the facilities they are managing.
- Request that the department provide an update on its efforts to take various actions to improve its maintenance efforts as detailed in the LAO Analysis.

## 2.    Equipment Funding

**Background.**  Similar to maintenance funding, staff finds that equipment replacement has generally been under-funded at the department.  Furthermore, in some cases, a portion of funding that has been provided for equipment replacement has been redirected to support other department activities.  The LAO estimates that a majority of institutions regularly diverted 15 percent of their equipment budget ($3.5 million annually) to other non-equipment activities.  The department's statewide equipment budget in the current year is $23 million General Fund.

**Governor's Budget.**  The Governor's budget proposal requests $23 million General Fund for equipment replacement.  This would double the baseline funding for equipment replacement. Specifically, this request includes:

- Telephone System Repairs/Upgrades - $4.4 million
- DJJ Private Branch Exchange - $1.1 million
- DJJ Cable Plant Replacement - $2.4 million
- Trunked Radio Systems Infrastructure Replacement - $10 million
- Hand-held Radio Replacement - $1.8 million
- Bus Replacement & Modifications - $3.3 million

**Juvenile Investments Need Careful Consideration.**  The LAO has raised concerns about the major investments in upgrading the telecommunications systems at the DJJ institutions ($3.5 million) given the Governor's proposal to reduce by half the DJJ's population.  The LAO finds that making major infrastructure improvements to DJJ facilities that may be closed or abandoned in future years is not a wise use of state funding.  Staff finds that the telecommunications systems at the juvenile institutions are some of the oldest and most out-of-date systems in the state.  Staff finds that these upgrades are needed if the state wants to continue to operate these facilities.  Staff also finds that the Legislature approved $5.7 million to upgrade the telecommunications switch at each of the juvenile institutions in the current year.

**Telecommunications Upgrades Impact Information Technology Proposal.**  Staff finds that the department has also proposed major upgrades to the telecommunications capabilities of the department's institutions in the Consolidated Information Technology Infrastructure Project.  It is unclear how this proposal to repair and upgrade the system is being coordinated with the information technology efforts.  Staff finds that more information is needed on how these proposals are coordinated.

**Radio System is Outdated.**  Staff finds that the department's current radio system is outdated and needs replaced.  Of the 27 trunked radio systems that the department has, nearly all of them are over 12 years old and have been discontinued by the vendors.  Furthermore, the number of

**Subcommittee No. 4**                                                        **April 12, 2007**

hand-held radios employed by the department has increased considerably and the department has not been provided with funding to ensure a regular replacement schedule. Current funding allows for replacement every nine years, which is 50 percent longer than is recommended by the manufacturer. Nevertheless, staff finds that radio usage has increased significantly in the institutions over the last several years. It is unclear what is driving this usage and how the radios are used in the institution.

**Bus Fleet Replacement Proposal is Aggressive.** The department's current fleet of buses is old and outdated and in some cases do not meet current emission requirements. However, staff finds that the department may be able to make changes to these buses to rehabilitate the engines and retrofit them to meet emissions standards instead of the aggressive replacement schedule being proposed by the department. Staff finds that these buses are built to last a long time and can survive for several million miles if properly maintained. Furthermore, staff finds that some school districts keep comparable buses much longer given that there are still 300 buses manufactured before 1977 in use by school districts around the state. The department's oldest bus was manufactured in 1985.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Staff recommends that the Subcommittee hold this issue open.
- Request that the department provide additional information, by May Revision, on the scope of the upgrades proposed for DJJ facilities, including an estimate of sunk costs if these institutions are abandoned.
- Request that the department provide additional information, by May Revision, on how this proposal coordinates with the Consolidated Information Technology Infrastructure Project.
- Request that the department provide additional information, by May Revision, on the policies that impact the role of radios within the institution, including information about why radio usage has increased.
- Request that the department provide additional information, by May Revision, on what funds it needs to replace buses that cannot be retrofitted to meet air standards.

## Information Technology Issues

## 1.    Consolidated Information Technology Infrastructure Project

**Background.** Currently, most of the department's information technology systems are past their useful life (many were designed and implemented in the 1970s). Furthermore, the department cannot improve these systems without first addressing serious deficiencies in the telecommunications and electrical infrastructures of the institutions. The current electrical infrastructure at some prisons will not support the use of additional computer technology. Furthermore, the department currently does not have the technology to utilize information technology devices (computers) in various places within the institutions outside of the Warden's office. The institutions generally have very little computing capabilities, records staff often do their work without the assistance of computers, and some institutions were not connected to the Internet until just a few years ago.

**Governor's Budget.** The Governor proposes $118.5 million General Fund in the budget year to fund the Consolidated Information Technology Infrastructure Project. The Project proposes to consolidate the department's current information technology infrastructure and provide the basic network infrastructure for planned and future projects to centrally track and update inmate information. This proposal proposes to put in place the foundation that is needed to run any information technology applications.

The Governor's budget proposes to finance this project using the GS $MART financing program administered by the Department of General Services. The administration estimates that financing this project could save $86 million in the budget year. However, the administration has not provided an estimate of what the total project costs will be, including financing costs under a GS $MART financing arrangement. The administration proposes budget bill language to allow for funding to be reverted when a GS $MART financing arrangement has been made.

**Plan Does Not Employ Latest Technology.** Staff finds that the goals of the Consolidated Information Technology Infrastructure Project are a necessary first step to implementing any information technology applications. This Project is akin to building the foundation that is needed to run any information technology applications. However, staff finds that the department plans on using outdated technology that will take considerable effort to implement at the institutions. The department's plan is to run cable and fiber optic wiring to every housing unit and treatment space at the institutions. In the first year the department plans on making sure there is adequate wiring at administrative buildings and in the health care treatment spaces. However, staff has been informed by the Receiver's office that they do not plan on using cable or fiber optic technology. The Receiver's office plans on using wireless technology to run their health care information technology programs. Furthermore, staff has learned that the Receiver's office has already put in place a wireless network for the medical facilities at California State Prison, San Quentin at a cost that is considerably lower than running cable to through the 150 year old buildings at San Quentin.

**Subcommittee No. 4**                                          **April 12, 2007**

Furthermore, staff finds that it will take a considerable amount of time before the cable and fiber optic systems are in place because of the considerable capital outlay that will need to be done at each institution to get the wiring to the correct spots at each institution. Staff understands that it would take considerably less time to roll out a wireless network for each institution.

**Project Needs Coordinated.** Staff finds that a significant portion of this project consists of capital outlay-like upgrades to the department's existing electrical and telecommunications infrastructure. Furthermore, as referenced above, the department is also undergoing other projects to upgrade electrical and telecommunications systems at the departments. It is not clear to staff that these proposals have been coordinated to ensure cost effective upgrades that are coordinated and limit the number of times we have to make modifications to the system.

**IT Issues Versus Infrastructure Issues.** Staff finds that some of the work in this proposal will be accomplished by staff in the information technology department and other work will be done by the Office of Facilities Management. Staff has requested that the department provide information on the division of labor proposed in this budget change proposal. Staff has not received this information.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Hold this issue open.
- Request that the department provide additional information by May Revision on why it is not using the latest and most cost effective technology for this information technology infrastructure upgrade.
- Request that the department and DOF develop options by May Revision for using wireless technology for some or all of the infrastructure upgrades.
- Request that the department provide additional information by the May Revision on how it will coordinate the efforts of the Consolidated Information Technology Infrastructure Project with other infrastructure projects to upgrade electrical and telecommunications infrastructure.
- Request that the department provide additional information by the May Revision on the division of labor in this budget proposal between the Information Technology Division and the Office of Facilities Management.

# Capital Outlay Staffing

**Background.** The Office of Facilities Management is responsible for all of the projects outlined in this agenda. This is a significant increase in workload for this office. Furthermore, several of these capital outlay programs are new, complex, and require a great amount of coordination with other programs.

Furthermore, staff finds that the budget documents submitted by the department to fund capital outlay projects are uniformly inadequate and do not provide the Legislature with the information that it needs to provide prudent fiscal oversight.

The department has indicated that the Office of Facilities Management currently has 300 authorized positions. Information has not been provided on how many of these positions are currently vacant and how many staff are in each branch. These positions support operations of five main branches. The branches under the Office of Facilities Management include:

- Telecommunications Branch
- Design Standards and Review Services
- Inmate/Ward Labor Program
- Maintenance Services
- Project Financing and Administration

During the 2006 special session on prison overcrowding, the Governor put forward a proposal to augment the department's internal capital outlay staffing support by $21.7 million in the budget year. A portion of this was included in SB 10xx (Machado), which was ultimately passed by the Senate and failed in the Assembly.

**Governor's Budget and Finance Letter.** The Governor's budget and a Finance Letter (dated March 29, 2007) provide funding for a few small augmentations to the staff within the Office of Facilities Management. These proposals include the following:

- **Inmate/Ward Labor Program.** The budget proposal includes $551,000 in reimbursement funds to support seven positions to manage additional workload associated with the management and supervision of projects undertaken by CDCR's Inmate/Ward Labor Program at juvenile institutions. The department indicates that it has established these positions administratively in the current year and needs $181,000 in additional reimbursement authority in the current year to fund these positions.
- **Training Academy.** The Finance Letter requests $521,000 General Fund to establish five positions to coordinate the development of a correctional officer training academy in southern California.

The department is also requesting additional positions in the Consolidated Information Technology Infrastructure Project, but it is not clear to staff which positions will be assigned to the information technology department and which staff will be assigned to the Office of Facilities Management.

**No New Positions to Support Majority of Proposals.** The administration has not put forward any proposals to augment capital outlay staffing levels at the department given the large number

of new capital outlay programs being proposed in the Governor's budget. Staff finds that the department, in correspondence with the Receiver, has estimated that staffing to address health care capital outlay alone would require 130 additional staff. Furthermore, no additional staff has been requested to support the infill bed proposal, which would be implemented on an expedited schedule that would likely take more staff resources. In addition, no positions have been requested to help implement the doubling of funding provided for maintenance. The department indicates that it is redirecting vacant positions from the field to headquarters to implement this program. While it is unclear to staff what the current 300 positions are responsible for on a daily basis, it is clear that the workload for the Office of Facilities Management will increase significantly if just a small number of the capital outlay budget proposals are approved.

Staff finds that the department has historically relied heavily on outside private contractors for the majority of its capital outlay programs, but it is critical that there is adequate state staff to oversee and direct the work of the contractors. Without adequate oversight, the department may not be able to provide the level of fiscal accountability that is required when public works projects are funded. Furthermore, staff notes that the department is exempt from utilizing the services of the Department of General Services so the CDCR is the only state entity that provides oversight of the work of outside contractors.

**Inmate/Ward Labor.** Staff finds that the department administratively established the inmate/ward labor positions in the current year to meet the needs of projects that were funded last summer. It is unclear to staff why these positions were not anticipated last year when the budget was being deliberated. In the future the department should try and avoid establishing positions administratively especially for efforts that are foreseen. Furthermore, it is unclear whether the department needs its reimbursement authority increased in the current year to fund the new positions.

**Training Academy Positions Do Not Fit.** Staff finds that the department likely needs additional staffing to support this and other capital outlay proposals detailed in this agenda. However, staff finds that the composition of the staffing proposal is not consistent with the current needs of the department in developing a new southern California training facility. The department is requesting a project director, an Associate Governmental Program Analyst, two telecommunications systems analysts, and a correctional sergeant. Given that this project is in the preliminary planning stage it is unclear why two telecommunications systems analysts are needed. These positions may be needed once a more developed proposal has been put together, but in the preliminary plan stage it is not clear why these positions are needed.

**Staff Recommendation.**
- Approve $551,000 in reimbursements and establish the seven positions for the inmate/ward labor program at the juvenile institutions.
- Request that the department provide additional justification for the positions being requested to support the new training academy.
- Request that the department and DOF provide, by May Revision, additional information on what staffing is needed to ensure adequate fiscal oversight of the capital outlay projects being proposed in the Governor's budget.

**April 12, 2007**

# Local Assistance Infrastructure Issues

## 1.    Jail Bed Grants

**Background.**  The county jails across the state are generally overcrowded.  The Sheriff's Association indicates that, in 2005, nearly 20,000 inmates were given pretrial releases or were released early from their jail sentences due to a lack of jail space.  Furthermore, 20 of the 58 counties are currently under court-ordered population caps and a dozen other counties have self-imposed population caps.  These population caps mean that, when a jail is full, someone in custody has to be released.

**Governor's Budget.** The Governor's budget proposal includes $5 billion to add 45,000 new jail beds statewide, including $4 billion in state lease-revenue bonds and $1 billion in local matching funds.  The proposal envisions the following mix of new beds:
- Adult Dormitory Beds – 17,000 beds estimated at $100,000 per bed for a total of $1.7 billion.  These beds, with overcrowding, will accommodate 25,500 inmates.
- Adult Jail Cells – 16,500 cells estimated at $200,000 per cell for a total of $3.3 billion.  These cells, with overcrowding, will accommodate 24,750 inmates.

The Governor's budget also includes a proposal to shift offenders with sentences of three years or less that have committed certain non-violent crimes from state prison to local jail.  The administration estimates that this would result in 25,000 fewer inmates in state prison and the additional jail beds would help to meet this need.

**Role of State Funding for Jail Beds.**  Staff finds that there is historical precedence for providing state monies to support local jail construction.  However, staff finds that the Legislature should evaluate this proposal in the context of other proposals that provide funding for local law enforcement and crime prevention programs.  This Subcommittee has heard testimony from local agencies in opposition to the Governor's proposal to shift offenders with sentences of three years or less to local jails.  However, staff finds that the Legislature should consider this proposal in the context of the Governor's proposal to provide state monies to build local jail beds.

**Staff Recommendation.**  Staff recommends that the Subcommittee hold this issue open.

## 2.    Local Juvenile Facility Grants

**Background.**  For the most part, the Juvenile Justice system in California is managed and funded by local government.  Following the arrest of a juvenile, law enforcement has the discretion to release the juvenile to his or her parents or to take the suspect to juvenile hall and refer the case to the county probation department.

Generally, probation officials decide how to process the cases referred to them and about one-half of the cases referred to probation result in the filing of a petition with the juvenile court for a

hearing. Judges declare the juvenile a ward of the court almost two-thirds of the time. The vast majority of wards (over 98 percent) are placed under the supervision of the county probation department. These youth are typically placed in a county facility for treatment (such as juvenile hall or camp) or supervised at home. Other wards are placed in foster care or a group home.

**Governor's Budget.** The Governor's budget proposal includes $500 million to build local juvenile facilities, including $400 million from state lease-revenue bonds and $100 million in local matching funds. The administration estimates that these funds will build 5,000 new juvenile beds at a cost of $100,000 per bed.

The Governor's budget also includes a proposal to stop intake at the state Division of Juvenile Justice (DJJ) for certain offenders and transfer certain offenders currently housed at DJJ back to their county of commitment.

**LAO Recommendation.** The LAO recommends that the Legislature reject the proposal to allocate $400 million in state lease-revenue bonds to construct additional local juvenile facilities. The LAO finds that the current proposal to provide additional resources to build local juvenile facilities was not based on an independent validation of the needs of local law enforcement.

Furthermore, the LAO finds that the current county juvenile justice system has a surplus of beds in both juvenile halls and camps of about 4,000 beds. The LAO recognizes that some modifications may be needed, to existing space at the county level, to modernize and provide for more specialized treatment space, but they indicate that this can be done for less than $100,000 per bed.

**Staff Comments.** Staff finds that even though there is a surplus of beds at the local level for juvenile commitments, it may not be the right mix of beds. Generally, juvenile halls are not utilized for longer term commitments of youth. The average stay in these facilities is relatively short and the population is transitory, which makes it an environment that is difficult to deliver meaningful programming and consistency. Some counties have developed ranch facilities or youth centers that provide a more stable environment for delivering rehabilitative programming and education. However, staff understands that many of these facilities are filled.

Furthermore, staff finds that, in general, there are very few treatment facilities at the local level to serve the mentally ill youth population. Some of the youth being housed at DJJ that would be transferred back to the counties have mental disorders and significant behavioral issues. Most counties do not currently have placement options that would easily accommodate these youth.

Furthermore, staff finds that some communities may not need to build additional institution type settings, but may be better served by expanding its network of group homes and foster care placements. It is important that there be a continuum of placement options for local probation and courts to ensure the best possible placement for a youth based on their needs and risk level.

**Staff Recommendation.** Staff recommends that the Subcommittee hold this issue open.

**EXHIBIT M**

*Senate Budget and Fiscal Review—Denise Moreno Ducheny, Chair*

# SUBCOMMITTEE NO. 4      Agenda

**Michael J. Machado, Chair**
**Robert Dutton**
**Christine Kehoe**



## Part A
### Wednesday, May 9, 2007
### 9:30 a.m. - Room 113
(Consultant: Keely Martin Bosler)

| Item | Department | Page |
|------|------------|------|
| 8550 | California Horse Racing Board | 2 |
| 0250 | Judicial Branch | 3 |
|      | Trial Courts | 3 |
|      | Judicial Council/Administrative Office of the Courts | 4 |
|      | Courts of Appeal | 6 |
|      | Administrative Office of the Courts: Office of Court Construction and Management | 8 |
| 8120 | Commission on Peace Officer Standards and Training | 15 |
| 0552 | Office of the Inspector General | 16 |
| 0820 | Department of Justice | 17 |
| 5525 | California Department of Corrections and Rehabilitation | 24 |
|      | Health Care Issues | 24 |
|      | Other Issues | 31 |

---

**State Administration—General Government—Judiciary—Transportation**

Pursuant to the Americans with Disabilities Act, individuals who, because of a disability, need special assistance to attend or participate in a Senate Committee hearing, or in connection with other Senate services, may request assistance at the Senate Rules Committee, 1020 N Street, Suite 255 or by calling 916-324-9335. Requests should be made one week in advance whenever possible.

# 8550     California Horse Racing Board

**Background.** The California Horse Racing Board (CHRB) licenses racing industry participants, enforces racing rules related to drugs and other offenses, administers efforts to protect racing horses, and oversees programs to improve the health of jockeys and other industry employees. The CHRB regulates operations at 14 racetracks, 20 simulcast facilities, and advance deposit wagering services (available via telephone or on-line).

**Governor's Budget.** The Governor's budget proposal includes $10.8 million to support the CHRB in 2007-08. This is about 4 percent more than is estimated for expenditure in the current year due to one-time information technology hardware purchases proposed in the budget year.

Excess revenues from unclaimed pari-mutuel tickets (Racetrack Security Fund, also called the Special Deposit Fund) are transferred to the General Fund. The Governor's Budget estimates that $300,000 will be available for transfer to the General Fund.

## 1.    Legal Counsel

**Finance Letter.** A Finance Letter (dated March 29, 2007) requests one position and $170,200 to support in-house legal counsel. The board proposes to reduce its contract with the Attorney General by a like amount making this proposal cost neutral.

**Staff Comments.** The board indicates that by retaining in-house counsel it will be able to develop legal expertise specific to the horse racing industry, which will enable the board to achieve more efficient resolutions and settlements of enforcement issues.

**Staff Recommendation.** Staff recommends that the Subcommittee approve this Finance Letter proposal.

# 0250    Judicial Branch

## Trial Courts

## 1.    Equal Access Fund Program – Legal Aid

**Background.** The Equal Access Fund Program provides funds for legal services to assist low-income individuals in civil matters. These funds are distributed to legal aid agencies through the State Bar's Legal Services Trust Fund Program and are overseen by the Judicial Council.

In 2003, the most recent year for which complete data are available, California legal aid centers received $182 million from state, federal, and private sources. The state provides a relatively small portion of the overall funding for legal aid through the Equal Access Fund and other self-help programs.

**Governor's Budget and Finance Letter.** The Governor's budget includes about $16 million in funding from the Equal Access Fund (this is funding in the base budget). A Finance Letter (dated March 29, 2007) requests that the Legislature adopt budget bill language to allow the Department of Finance to augment the funds available for expenditure in the budget year if additional revenues are available after notification to the Joint Legislative Budget Committee.

**Staff Recommendation.** Staff recommends that the Subcommittee approve the budget bill language for the Equal Access Fund.

## 2.    Access to Justice Pilot Program

**Previous Subcommittee Direction.** At the March 1 meeting of the Subcommittee, the budget proposal to add $5 million to fund a pilot project in three Trial Courts to identify and provide legal representation to unrepresented litigants on civil matters was held open.

The LAO recommends rejecting the Governor's proposal to create a new Access to Justice Legal Representation pilot project. The LAO finds creating a new pilot program is not the most efficient means of expanding civil legal services to the poor and that a more efficient approach to expand the civil legal services available to the poor is to provide funding directly to legal aid agencies. Furthermore, the LAO is concerned that this pilot project could lead to significant new costs if expanded to fund legal services for all poor unrepresented litigants in civil cases on a statewide basis.

**Staff Comments.** Staff finds that the defense of unrepresented individuals in criminal court is a local funding responsibility. Therefore, it is unclear why the state would fund a similar type program for civil litigants. It is also unclear what type of civil cases will be targeted with this funding. For example, will these monies target family court matters or other matters? Furthermore, staff concurs with the LAO that funding legal services for all unrepresented

litigants in civil cases could lead to significant new costs, which would exacerbate the current state budget operating shortfall.

**Staff Recommendation.** Staff recommends that the Subcommittee reject the pilot project.

# Judicial Council/Administrative Office of the Courts

## 1.    Federal Grants—Informational Item

**Previous Subcommittee Direction.** At the March 1 meeting of the Subcommittee, $1 million in federal funds was approved for three projects; (1) child data collection, (2) judge and attorney training, and (3) study of elder courts. The Subcommittee also requested additional information on the total amount of the grants and the timeline for the products or projects that are being funded by these monies.

**Detail on Federal Grants.** The Administrative Office of the Courts (AOC) indicates that approximately $885,000 has been awarded for a Child Data Collection project that is expected to last through September 2010. This grant is intended to help the courts improve their data analysis and collection in child abuse and neglect and foster care cases. It is intended to help the courts jointly plan with other relevant agencies for the collection and sharing of data related to child welfare.

The AOC indicates that approximately $904,000 has been awarded for various Judge and Attorney Training and this grant is expected to last through September 2010. This funding is used to support numerous training efforts for judicial officers, attorneys, Court Appointed Special Advocates, court staff, foster parents, foster youth, tribal representatives, and other individuals involved in the dependency court system.

The AOC indicates that approximately $251,000 has been awarded for a Study of Elder Courts projects. This grant is expected to continue until the end of November 2007 and will fund a stakeholder focus group brainstorming better practices and providing recommended models for improvement.

## 2.    Administrative and Information Technology Services -- Technical Adjustment

**Background.** In the 2006-07 Budget Act, the Legislature deleted $12.3 million in funding from the Trial Court Improvement Fund and the Trial Court Trust Fund for development and implementation of several information technology systems for the trial courts because it was determined to not be needed in the current budget year because of revised implementation schedules. The 2006-07 Budget Act also included budget bill language that allowed the AOC to increase the amount they expended in the current year to implement these projects.

**Governor's Budget.** The Governor's budget proposes to restore $11.6 million in special funds in the budget year to continue implementation of several administrative and information

**Subcommittee No. 4**                                                                    **May 9, 2007**

technology systems for the trial courts. This adjustment includes an $8.4 million increase from the Trial Court Improvement Fund and a $3.2 million increase from the Trial Court Trust Fund.

The budget also proposes to restore $11.6 million in the current year.

The funding will be used to support staffing and related costs associated with the following statewide trial court administrative and information technology services:

**Administrative and Information Technology Systems**
*In Thousands*

| System/Office | Function | Costs |
|---|---|---|
| Court Accounting and Reporting System | Implements an information technology system that enables the trial courts to report timely and accurate financial information. | $5,765 |
| California Case Management System | Supports project management oversight for continued design and development of an integrated trial court case management solution for all case types. | 1,782 |
| Court Human Resources Information System | Supports continued design and development of a statewide trial court human resources information system and administrative support. | 902 |
| California Courts Technology Center | Supports infrastructure for centralizing court facility technology services, including hosting e-mail, help desk and other services. | 728 |
| Data Integration | Supports ongoing efforts to integrate data systems to allow courts to communicate with the counties and the Administrative Office of the Courts. | 249 |
| Enhanced Revenue Collection | Supports design and development of an automated fees and collection system within the Case Management System. | 547 |
| Regional Office Assistance Group | Supports positions that provide legal advice and assistance directly to the trial courts. | 1,615 |
| **Total** | | **$11,588** |

**Previous Subcommittee Direction.** This issue was held open at the March 1 meeting of the Subcommittee pending review of an annual report submitted by the AOC on the update of the California Case Management System and the Court Accounting and Reporting System (now referred to as the Phoenix Statewide Financial System).

**California Case Management System Update.** The AOC has divided the California Case Management System into the following three phases: (1) criminal and traffic module; (2) civil, probate, small claims, and mental health; and (3) a case unification phase to integrate the family law and juvenile case types. The AOC indicates that it has selected vendors to implement the first two phases and has started to implement these modules in some counties. The AOC indicates that it has already implemented the new criminal and traffic module in Fresno County and the court is working with six other counties to implement this module over the next two years. Furthermore, the AOC indicates that it working with five counties to deployed the civil, probate, small claims, and mental health modules. The AOC indicates that it has already deployed the small claims module in San Diego and Sacramento Counties. The AOC is still developing the third phase of the California Case Management System and is working with the Oversight Committee to design the system. The AOC plans to fully implementing the California Case Management System by 2011-12. The AOC indicates that $271 million has been allocated to implement this project, including $81.5 million to support the project in the budget year.

**Phoenix Financial System Update.** The AOC is in the process of implementing a statewide financial system for the judicial branch referred to as the Phoenix Financial System. Implementation of this system includes five steps: (1) creation of a trial court financial policies and procedures manual; (2) establishment of an internal audit unit; (3) installation of a standardized statewide financial system; (4) establishment of the trial court accounting and financials services center; and (5) establishment of a centralized treasury. Before the AOC implements the new financial system it conducts an audit of the court financial operations to ensure that the data being entered into the system is uniform across jurisdictions. The AOC has implemented the new Phoenix Financial System in 45 counties to date. The AOC plans to implementing this system in the remaining 13 counties by 2008-09. The AOC indicates that $88.4 million has been allocated to implement this project, including $27.7 million to support the project in the budget year.

**Staff Recommendation.** Staff recommends that the Subcommittee approve this budget proposal.

# Courts of Appeal

## 1.    Information Technology Upgrades

**Previous Subcommittee Direction.** At the March 1 hearing of the Subcommittee, a budget proposal to augment by $1.1 million the base budget of the Courts of Appeal for ongoing information technology upgrades was held open. The LAO had requested additional information

and justification from the courts regarding the assumption used to build the information technology upgrade schedule.

**LAO Review.** The LAO finds that the $1.1 million assumes a three-year replacement schedule for key information technology equipment. Furthermore, the LAO finds that a five-year replacement schedule is more inline with information technology equipment replacement schedules by other entities in state government. The LAO finds that $660,000 is all that is needed to ensure key information technology equipment is replaced on a five-year schedule.

**Staff Recommendation.** Staff recommends that the Subcommittee approve $660,000 to fund this request.

## 2.    Equipment for New Courthouse - Fourth Appellate District

**Previous Subcommittee Action.** At the March 1 meeting of the Subcommittee, a budget proposal to fund equipment for the new Fourth Appellate District, Division 3 (Orange County) was approved. The AOC has determined that construction of this facility will not be completed in the budget year since the construction start date has been delayed from March 2007 to September 2007. Staff understands that the AOC has withdrawn this proposal because the non-capital equipment will not be needed in the budget year.

**Governor's Budget.** The Governor's budget proposal includes $1.6 million from the Appellate Court Trust Fund. The majority of this funding is one-time and will fund essential non-capital furniture, equipment, and fixtures needed to make the building operational as an appellate court. (Of the total amount, $2,000 is proposed for ongoing maintenance of equipment.) The proposal will fund the following items:

| Item | Costs |
|---|---|
| Telephone System | $448,000 |
| Data (Computing) Infrastructure | 112,000 |
| New Free Standing Furniture | 450,000 |
| Reused or Refurbished Free Standing Furniture (Judges Furniture) | 28,000 |
| Bookshelves | 198,000 |
| High Density File Storage | 272,000 |
| Office Equipment (Copiers and Faxes) | 41,000 |
| Audio Visual Equipment | 192,000 |
| Security and Access Control Equipment | 133,000 |
| Ongoing Maintenance | 2,000 |
| Moving and Relocation | 120,000 |
| *less Architectural Revolving Funds* | *-400,000* |
| **Total** | **$1,596,000** |

**Staff Recommendation.** Staff recommends that the Subcommittee deny this budget proposal.

## 3.    Court Appointed Counsel Program

**Previous Subcommittee Direction.**   At the March 1 meeting of the Subcommittee, the Governor's budget proposal to provide $1.6 million General Fund to fully fund the Court Appointed Counsel Program was held open.

**Staff Comments.**  Staff finds that last year the AOC was directed to complete a market rate study to determine competitive reimbursement rates for court appointed counsel.  The AOC has not completed this study, but staff understands that it has recently entered into a contract with a consultant to complete the study.

Furthermore, despite recent increases in the rate paid private attorneys that are in the pool for the Court Appointed Counsel Program, these attorneys continue to be paid less than what they were paid in 1989 if you adjust these rates for inflation.  These low rates make it difficult to recruit qualified legal staff to take these cases.  Furthermore, staff finds that over half of the attorneys in the pool are close to retirement age, which makes it critical to take steps to ensure that there is a sizeable pool of qualified attorneys available to provide court appointed counsel on criminal and juvenile matters before the Courts of Appeal.

**Staff Recommendation.**  Staff recommends that the Subcommittee take the following actions:
- Approve the $1.6 million budget proposal to fully fund the Court Appointed Counsel Program.
- Approve a new $5/hour increase to the rates paid attorneys in the Court Appointed Counsel Program (total costs of this action are estimated at about $1.5 million).

# Administrative Office of the Courts:  Office of Court Construction and Management

## 1.    Appellate Courts Capital Outlay

**Finance Letter.**  A Finance Letter (dated May 1, 2007) requests $3.1 million from lease revenue bonds for the construction of a new courthouse for the Court of Appeal, Fourth Appellate District, Division 3 (Orange County).  The additional funding is needed to cover increased costs attributed to general escalations in the construction market.  The funding provided in the 2006-07 Budget Act was based on 2005 estimates and was only inflated to June 2005.  Construction on this project is expected to commence September 2007.  The total cost of the project is now estimated to be $25.5 million.

**2007-08 Five-Year Infrastructure Plan.**  The 2007 Five-Year Infrastructure Plan identifies $26.4 million in appellate court critical deficiencies in the budget year and over $117 million in projects over the next five years.  The budget proposal does not include funding for new court facilities in the Fourth (San Diego) and Sixth (San Jose) Appellate Districts to replace leased space.

**Subcommittee No. 4**                                                                 **May 9, 2007**

---

**Staff Recommendation.** Staff recommends that the Subcommittee approve the Finance Letter proposal.

# 2.    Trial Courts Facilities Transfers and Capital Outlay

**Previous Subcommittee Direction.** At the March 1 hearing of this Subcommittee, the Governor's proposals to start the process for constructing new court facilities were held open. The Subcommittee also requested the following:

- Staff, AOC, LAO, and DOF to work on budget bill language to require approval of the site by the local jurisdiction and the Judicial Council prior to expending funding for working drawings.
- Staff, AOC, LAO, and DOF to work on budget bill language to require the transfer of all relevant court facilities before expending funding on new court projects.
- Staff, the LAO, the AOC, and DOF work together to determine a forum for evaluating the best use of vacated court buildings.

Also at this meeting, the Subcommittee learned that the majority of court buildings (in the hundreds) would not be transferred to the state by the statutory deadline of July 1, 2007.

**Status of Trial Court Facilities Transfers.** The AOC reports that, as of April 26, 2007, 41 county facilities have been transferred to the state. Another 14 leased facilities have been "consolidated" and are no longer needed to support court operations. The majority of these transfers are a "transfer of responsibility" and do not include a transfer of title to the building. There are still hundreds of court facilities that need to be transferred to the state and will likely not make the statutory deadline.

**Governor's Budget and Finance Letters.** All of the projects listed above are not proposed for funding in the Governor's budget. Of the totals listed above, the administration has proposed $35.9 million in the Governor's budget and two Finance Letters (dated March 29, 2007 and May 1, 2007) from the Trial Court Facilities Construction Fund to support the first phases of construction of new trial court facilities. The Governor's budget contains $19.5 million and the March 29, 2007 Finance Letter requests $16.4 million. No General Fund monies are proposed for new court facilities in the budget year.

The Finance Letter also proposes budget bill language to require each county to transfer court facilities to the state before funds are released to acquire land to build new court facilities.

The Finance Letter (dated May 1, 2007) requests the re-appropriation of funding for ***working drawings and construction*** of the following project:

- **Fresno - Sisk Federal Courthouse Renovation.** The Finance Letter (dated May 1, 2007) requests the re-appropriation of $57.9 million in Trail Court Facilities Construction Fund monies appropriated in 2006. The AOC indicates that the site acquisition has been delayed because several federal agencies have not vacated the building and additional

---

**Subcommittee No. 4**                                              **May 9, 2007**

legal work is required to complete the conveyance of the site from the county to the state.
The total cost of this project is expected to be $61.3 million.

The Governor's budget proposes funding ***working drawings*** for the following projects and a
Finance Letter (date May 1, 2007) also requests re-appropriation of funding for ***acquisition and
preliminary plans*** for these projects.

- **Contra Costa - New East County Courthouse.** The Governor's budget proposal
  includes $3.6 million from the State Court Facilities Construction Fund for working
  drawings to build a new seven-court courthouse in eastern Contra Costa County.

  There have been some disagreements about the site for the new courthouse and as a result
  the site acquisition is estimated to be delayed until spring of 2008. A Finance Letter
  (dated May 1, 2007) requests re-appropriation of $1.6 million of the funding provided for
  acquisition and preliminary plans in the current year due to these delays. Approximately
  $9.5 million has been appropriated to date for acquisition and preliminary plans related to
  this project. The total cost of this project is expected to be $60.9 million.

  The project will replace a four-court courthouse in eastern Contra Costa County. This
  facility was transferred to the state in May 2006.

- **Plumas and Sierra - New Portola/Loyalton Court.** The Governor's budget proposal
  includes $346,000 from the State Court Facilities Construction Fund for working
  drawings to build a new one-court courthouse in the Sierra Valley of Plumas County to
  serve both Plumas and Sierra Counties.

  There have been delays in the site acquisition due to unforeseen site condition
  requirements and additional time required to complete the necessary CEQA
  documentation. A Finance Letter (dated May 1, 2007) requests re-appropriation of
  $594,000 of the funding provided for acquisition and preliminary plans in the current
  year due to these delays. Approximately $706,000 has been appropriated to date for
  acquisition and preliminary plans related to this project. The total cost of this project is
  expected to be $6 million.

  This project will replace a part-time courthouse in Portola and leased space in Loyalton.
  The Portola courthouse transferred to the state in April 2006.

- **Mono - New Mammoth Lakes Court.** The Governor's budget proposal includes
  $725,000 from the State Court Facilities Construction Fund for working drawings to
  build a new two-court courthouse in Mammoth Lakes, Mono County.

  The acquisition of the court site has been delayed in order for the current owner, the U.S.
  Forest Service, to complete environmental studies, appraisals, and surveys. A Finance
  Letter (dated May 1, 2007) requests re-appropriation of $1.7 million of the funding
  provided for acquisition and preliminary plans in the current year due to delays.

Approximately $2 million has been appropriated to date for acquisition and preliminary plans related to this project. The total cost of this project is expected to be $15.1 million.

This project will replace leased space that the court currently occupies in a shopping mall. The leased space was transferred to the state in September 2005.

The Governor's budget and a Finance Letter (dated March 29, 2007) propose funding the *acquisition* phase of the following projects. All of these projects are in the AOC's Immediate Need priority group.

- **Madera - New Madera Court.** The Governor's budget proposal includes $3.4 million from the State Court Facilities Construction Fund for acquisition to build a new 11-court courthouse in or near the City of Madera. The AOC has not identified a site for the new court building. The total cost of this project is expected to be $94.7 million.

  This project will replace the existing Madera courthouse and Family Court Services leased facility. Combined, these two facilities have seven courtrooms. These two facilities were transferred to the state on April 30 and May 1.

- **San Bernardino - New San Bernardino Court.** The Governor's budget proposal includes $4.8 million from the State Court Facilities Construction Fund for acquisition to build a new 36-court courthouse in the City of San Bernardino. The AOC has identified property across the street from the historic San Bernardino courthouse for construction of this property, but the site has not been approved by the Judicial Council or the local government. The total cost to the state of this project is expected to be $303.4 million.

  This project will consolidate court operations from nine facilities, seven of which will be vacated due to the project. The following facilities will be vacated after this project is constructed:
  - San Bernardino Courthouse Annex (T-Wing)
  - Court Executive Office
  - Appellate and Appeals North Annex
  - Juvenile Delinquency Courthouse
  - San Bernardino Juvenile Traffic
  - Redlands Courthouse
  - Twin Peaks Courthouse

  The Rialto caseload that is currently being served in the Fontana Courthouse will be transferred to San Bernardino, along with three judicial positions, thereby vacating half of the Fontana Courthouse.

  The county is pursuing the renovation of the historic San Bernardino Courthouse to retrofit the 15-court courthouse into a nine-court courthouse that will handle civil caseloads. The county is also pursing renovation of 303 Third Street for long-term use for two Child Support Commissioners.

San Bernardino County has agreed to set aside $8.8 million to help fund the 36-court courthouse project. These monies were redirected from a project to rehabilitate the T-Wing of the San Bernardino Courthouse that has been abandoned. The County is also funding the renovation of the historic San Bernardino Courthouse and 303 Third Street property.

The nine facilities have not yet been transferred to the state, but are expected to be transferred by June 29, 2007.

- **San Joaquin - New Stockton Court.** The Governor's budget proposal includes $3.3 million from the State Court Facilities Construction Fund for acquisition to build a new 29-court courthouse adjacent to the existing courthouse in downtown Stockton. The AOC has come to a tentative agreement with the City of Stockton to donate the land adjacent to the existing court building, but the site has not been officially designated. The AOC estimates that the value of the land donation from the City of Stockton would be $1.7 million.

  A Finance Letter (dated March 29, 2007) requests an additional $3.2 million from the State Court Facilities Construction Fund to augment the funding available for acquisition. The increase is due to the need to acquire additional parcels to provide security setbacks and parking. One additional courtroom has also been added to the project making it a 30-court courthouse project. The total cost to the state for this project is expected to be $231.7 million.

  This project will replace the existing 22-court courthouse in downtown Stockton. This courthouse has not been transferred to the state, but transfer is expected by May 10, 2007.

- **Riverside – New Mid-County Region Court.** The Governor's budget proposal includes $3.3 million from the State Court Facilities Construction Fund for acquisition to build a new 6-court courthouse in or near the City of Banning in Riverside County. The AOC has not identified a site for construction of this new facility. The total cost of this project is expected to be $56 million.

  This project will replace an existing 2-court courthouse in the City of Banning. This courthouse has not been transferred to the state, but transfer is expected by June 2007.

- **Tulare – New Porterville Court.** A Finance Letter (dated March 29, 2007) requests $4.4 million from the State Court Facilities Construction Fund for acquisition to build a new 9-court courthouse in the City of Porterville. The total cost of this project is expected to be $81 million.

  This project will replace two court facilities with five courtrooms. These facilities have not been transferred to the state, but transfer is expected by May 30, 2007.

- **San Benito – New Hollister Court.** A Finance Letter (dated March 29, 2007) requests $541,000 from the State Court Facilities Construction Fund for acquisition to build a new

3-court courthouse in the City of Hollister. The AOC indicates that both the city and county have passed resolutions expressing the commitment to donate land worth about $5.5 million to assist in the construction of the facility. The total cost to the state of this project is expected to be $5.5 million.

This project will replace the court facilities that are currently within the Civic Center Building in the City of Hollister. This facility has not been transferred to the state, but transfer is expected by June 2007.

- **Calaveras – New San Andreas Court.** A Finance Letter (dated March 29, 2007) requests $845,000 from the State Court Facilities Construction Fund for acquisition to build a new 4-court courthouse in the City of San Andreas. The total cost to the state of this project is expected to be $39.6 million.

  This project will replace two court facilities (one is a leased modular building). The AOC indicates that the County has written a letter expressing their commitment to provide land worth $316,000 for this project to be applied to the buy-out of the court-occupied space in an existing county facility. The two court facilities have not been transferred to the state, but transfer is expected by June 2007.

- **Lassen – New Susanville Court.** A Finance Letter (dated March 29, 2007) requests $1.5 million from the State Court Facilities Construction Fund for acquisition to build a new 3-court courthouse in the City of Susanville. The total cost to the state of this project is expected to be $35 million.

  This project will replace three county court facilities. Transfer of the historic Lassen County Courthouse was completed in July 2006. The transfer of the other two facilities has not been completed, but transfer is expected by June 2007.

**Funding Needed to Complete Projects.** If all of the projects listed above, go to construction in the next few years, an estimated $900 million will be needed to complete these projects. The State Court Facilities Construction Fund has revenues of about $125 million annually and will not be sufficient to fully fund construction of these projects without significant delays. The 2007 Five-Year Infrastructure plan identifies $151.4 million in trial court critical infrastructure deficiencies in the budget year and over $9.5 billion in projects over the next five years. The AOC has identified $2.5 billion of these projects as Immediate Need.

The Governor has proposed $2 billion in general obligation bonds for new and expanded court facilities. These bonds would help in fully funding the construction costs of the court projects discussed above.

**Staff Comments.** Staff finds that all court construction projects require approval by the State Public Works Board. The DOF has indicated to staff that it will not allow funds for preliminary plans or working drawings to be released until the site selection is confirmed. This process should safeguard against the premature expenditure of funds on preliminary plans and working drawings.

**Subcommittee No. 4**                                                                    **May 9, 2007**

The Finance Letter (dated March 29, 2007) proposes budget bill language that would restrict the release of funds for acquisition until the county had transferred relevant court facilities to the state. Staff finds that this language (with some minor edits) will help to encourage the transfer of more county facilities to the state, including the negotiations regarding the county facility payments.

There are still considerable questions about what the state will do with the court facilities that transfer to the state from the counties. The AOC estimates that about 200 facilities will be vacated after all of the new facilities are built and existing facilities are transferred. Some of these facilities are leased space or modular buildings that can easily be vacated and some of these facilities will be leased back to the counties. However, in some cases, the courts may need to look at leasing the facility to other tenants and/or selling the facility. The courts currently do not have a formalized plan for dealing with the disposition of properties that transfer to the state. Staff finds that the disposition plans for each facility will vary widely, but more needs to be done to safeguard fiscal resources and ensure that the state can make the best use of these vacated facilities.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Approve the Finance Letter to fund the Fresno Court renovation.
- Approve the Governor's budget proposal for working drawings and Finance Letter to re-appropriate funding for acquisition and preliminary plans for the new court buildings in Contra Costa, Plumas and Sierra, and Mono counties.
- Reject funding for the remainder of the projects listed above funded in the Governor's budget and Finance Letter (dated March 29, 2007).
- Approve amended budget bill language that requires relevant county court facilities be transferred to the state prior to the release of funds for acquisition for the construction of a new court facility.
- Approve placeholder trailer bill language that requires additional certainty about the disposition of the court facilities before they transfer to the state.
- Approve supplemental report language that requires the court to develop and submit disposition plans for all of the facilities transferred to the state. The reports should be submitted to the Legislature with the Governor's budget and should continue until all of the facilities are transferred to the state. The first report should also include recommendations on how the courts will deal with vacated court facilities that the counties do not want to lease. The courts should confer with the Department of General Services when developing these recommendations.

---

# 8120    Commission on Peace Officer Standards and Training

## 1.    Tolerance Training

**Previous Subcommittee Direction.**  At the March 22 meeting of the Subcommittee, staff was directed to develop budget bill language, in conjunction with the LAO and DOF, to develop budget bill language to allow for other state law enforcement, including the staff of the California Department of Corrections and Rehabilitation to participate in the Tools for Tolerance training if funding is available.

**Staff Comments.**  It has been indicated to staff that sometimes the Tools for Tolerance training sessions have empty slots that cannot be funded by POST personnel.  If this is the case, staff finds that it would be reasonable to fill these empty slots with other state law enforcement, including staff of the California Department of Corrections and Rehabilitation.  Staff finds that the Museum of Tolerance has developed a unique professional development program that could be useful for other professionals in state law enforcement.

**Staff Recommendation.**  Staff recommends that the Subcommittee adopt revised budget bill language to allow for other state law enforcement to participate in the Tools for Tolerance training if funding is available.

# 0552    Office of the Inspector General

## 1.    New Audit Functions

**Previous Subcommittee Action.** At the March 22 meeting of the Subcommittee, $1.8 million was approved for expanded audit activities by the OIG. Since then, the department has indicated that the proposal should be reduced by $51,000 to reflect salary savings for peace officer classifications that are a part of the budget proposal.

**Staff Recommendation.** Staff recommends that the Subcommittee reduce this proposal by $51,000.

## 2.    Review of Candidates for Superintendent of Juvenile Correctional Facilities

**Previous Subcommittee Action.** At the March 22 meeting of the Subcommittee, $1 million was approved for the OIG to review candidates for appointment as superintendent of a juvenile correctional facility. Since then, the department has indicated that the proposal should be reduced by $30,000 to reflect salary savings for peace officer classifications that are a part of the budget proposal.

**Staff Recommendation.** Staff recommends that the Subcommittee reduce this proposal by $30,000.

# 0820    Department of Justice

## 1.    Sexual Habitual Offender Program – DNA Analysis

**Governor's Budget.**  The Governor's budget proposes to transfer $694,000 for support of the DNA analysis component of the Sexual Habitual Offender Program from the Sexual Habitual Offender Program (SHOP) Fund to the General Fund, because revenues to the special fund are insufficient to support all elements of the program.

**Previous Subcommittee Direction.**  At the March 22 meeting of the Subcommittee, the following information was requested on the Sexual Habitual Offender Program:
- List of all of the programs and activities currently supported by the SHOP Fund.
- Description of all programs at DOJ that gather and track data related to this population of sexual offenders.
- Information about how the DNA program currently supported by the SHOP Fund is coordinated with the DNA program established by Proposition 69.

**Department Response.**  The DOJ indicates that there is $2.9 million estimated to be expended from the SHOP Fund in the current year.  The majority of this funding ($2.1 million) supports components of the Criminal Justice Information System.  The department indicates that these monies are used to support an assessment of CDCR records to determine if a paroling inmate is a Sexual Habitual Offender.  If they are a Sexual Habitual Offender the DOJ profiles the offender using CDCR data and provides it to local law enforcement.

The remaining funding is used to support DNA databank functions related to quality assurance, verifications, and documentation of DNA hits in the DOJ's Cal-DNA database.  The department indicates that these functions are distinct from the Proposition 69 functions, which involve receiving and logging new DNA samples.  The department indicates that 70 percent of the DNA databank hits have been for sex crimes.

**Staff Comments.**  Staff finds that the Sexual Habitual Offender Program was created well before recent legislation and initiatives that have radically changes the way we supervise convicted sex offenders.  First, Megan's law now requires that certain sex offenders, including Sexual Habitual Offenders, register as sex offender.  This information is available to local law enforcement and the public through a public Website.  Furthermore, Jessica's Law and legislation enacted in 2006 requires that CDCR parole make significant changes to the way they supervise sex offenders, including GPS tracking of certain offenders for life.  Furthermore, CDCR has implemented numerous other changes in its operations in recent years to increase the amount of data on parolees that is shared with local law enforcement.  For example, the department is currently implementing an information technology system that enables CDCR parole to share information directly with local law enforcement.  Furthermore, CDCR has implemented Parole and Corrections Teams (PACT Teams) around the state to further increase the communication between local law enforcement and CDCR.  Given this, it seems like the workis not clear what added value is provided by DOJ'sStaff finds that the Sexual Habitual

**Subcommittee No. 4**                                                           **May 9, 2007**

Offender Program activities related to the Criminal Justice Information System are duplicative of other activities done by CDCR and by DOJ.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Reject the Governor's proposal to add additional General Fund monies to the Sexual Habitual Offender Program.
- Reduce funding for the Criminal Justice Information System to ensure that the Cal-DNA program is fully funded in the budget year.

## 2. Operations and Maintenance of Forensics Laboratories

**Previous Subcommittee Direction.** At the March 22 meeting of the Subcommittee, a proposal to add $793,000 ($572,000 one-time) to the department's maintenance and repair budget for its forensic laboratories was held open pending additional information. The department has provided additional information on how these monies will be used. The majority of the funding will be used to fund fire suppression and alarm upgrades at seven of the regional forensic laboratories. The remainder of the money will be used to make various repairs to the following facilities: Central Valley, Riverside, Fresno, and Redding. The cost of the repairs is increased by over 42 percent to account for Department of General Services' fees, contingency, and general price escalation.

**Staff Recommendation.** Staff recommends that the Subcommittee approve the budget proposal to fund operations and maintenance of forensics laboratories.

## 3. California Witness Protection Program

**Previous Subcommittee Direction.** At the March 22 meeting of the Subcommittee, the proposal to augment the California Witness Protection Program was held open. The Subcommittee requested that staff, LAO, and DOF look at ways to improve the efficiency and effectiveness of the delivery of witness protection services by looking at witness protection programs managed by the Office of Emergency Services.

**Governor's Budget.** The Governor's budget proposes $223,000 from the Restitution Fund to support two new positions to fund increased workload related to the growth of the California Witness Protection Program. The department currently has one full-time staff and two part-time retired annuitants managing this program. The department is requesting two additional support positions to handle the increased workload related to this program. These new staff will more than double the administrative costs of this program from $150,000 to $383,000, which is just over 10 percent of the total proposed program expenditures.

Adding additional staff to support the administration of this program results in the department exceeding the 5 percent cap on administrative costs. This cap on administrative costs is required in statute; therefore, the department is proposing trailer bill language to amend current law that limits administrative costs for this program to 5 percent of all program costs.

The department also proposes to increase the local assistance funds available to support this program by $500,000 from the Restitution Fund. This will increase the funds available for support of this program from $3 million to $3.5 million. Given the proposed administrative costs ($383,000), this would leave $3.1 million to be allocated to local district attorney's for relocation and protection services.

**Staff Comments.** Staff finds that the witness protection program managed by the Office of Emergency Services provides sufficiently different services than the program managed by DOJ. The Victim/Witness Assistance Program funds local centers that provide comprehensive assistance to victims and witnesses, including crisis intervention, emergency assistance, property return, and court escort. Whereas, the DOJ's program provides funding directly to local district attorney's to finance relocation and/or protection of witnesses and family members that have been threatened by individuals or criminal organizations.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Approve the budget request to augment administration of this program by $223,000.
- Approve the trailer bill language proposed by the Governor that removes the cap on administrative costs for this program.
- Approve the budget request to augment grant funding by $500,000.

# 4.    Two-Party Contracts

**Previous Subcommittee Direction.** At the March 1 hearing of the Subcommittee, the DOJ's request to implement a limited two-party contract process was held open. Information was also requested on what DOJ was doing to improve the transparency of its contracting process given the stories in the newspapers earlier this year that found that DOJ had incorrectly labeled 1,700 contracts as confidential and, therefore, shielded them from public view.

**Governor's Budget.** The Governor's budget proposes $9.4 million for the Legal Services Revolving Fund to implement a two-party contract process to allow the DOJ to enter into contracts directly with expert witnesses, consultants, investigators, court reporters, and other vendors whom are hired to assist in litigation on behalf of DOJ's reimbursable state agency clients. Approximately $6.2 million would be allocated to the Civil Law Division and $3.3 million for the Public Rights Division.

**Staff Comments.** The DOJ indicates that it has taken steps to implement a remedial plan to address the mislabeling of contracts as confidential. The department has issued an Administrative Bulletin (dated March 7, 2007) that tightens the process of reviewing contracts for purposes of labeling them as confidential in the new State Contract and Procurement Registration System. The new system requires staff to provide a written explanation of why any information on contracts should be withheld and the recommendation must be approved by a supervisor with advice from lawyers when needed.

The DOJ indicates that there will continue to be some issues with some contracts in the State Contract and Procurement Registration System because many of DOJ's contracts may be confidential when they are entered into the database, but may become non-confidential later.

This is the case for many of DOJ's confidential contracts for expert witnesses that may be confidential during the early stages of litigation, but may become non-confidential when the identity of the expert is revealed in court proceedings.

**Staff Recommendation.** Staff recommends that the Subcommittee approve the budget proposal to allow DOJ to use a two-party contract process for up to $9.4 million from the Legal Services Revolving Fund.

## 5.    Energy Litigation

**Previous Subcommittee Direction.** At the March 22 meeting of the Subcommittee, additional information was requested from DOJ on the status of the *Williams Energy* settlement monies allocated to funding a program to retrofit schools and other public buildings with renewable energy and energy efficiency projects.

**Department Response.** The department indicates that the Governor's budget proposal would transfer $25 million in *Williams Energy* settlement monies from the Ratepayer Relief Fund to the State Energy Conservation Assistance Account so that the California Energy Commission could fund a solar retrofit program for schools and other public buildings. Another $8 million currently resides in the Litigation Deposit Fund and is also proposed to be transferred to the State Energy Conservation Assistance Account in the budget year. Another $13 million will transfer to the State Energy Conservation Assistance Account in future years after Williams pays the remainder of its settlement.

This transfer of these funds to be used for solar retrofit and energy efficiency projects on school and other public buildings is being considered by Senate Budget Subcommittee 2.

**Governor's Budget.** The Governor's budget proposal includes $6 million from the Ratepayer Relief Fund to support 33 positions (15 attorneys) and $1.5 million in expert contracts to continue with numerous pieces of litigation related to the California energy crisis. There is no other funding in the DOJ's base budget for these activities.

**Staff Recommendation.** Staff recommends that the Subcommittee approve the Governor's budget proposal to continue to fund DOJ's litigation team related to the California energy crisis and its aftermath.

## 6.    Construction Related Litigation

**Previous Subcommittee Direction.** At the March 22 meeting of the Subcommittee, additional workload information was requested from DOJ on a request to add $549,000 from the Legal Services Revolving Fund to support 3.3 positions (two attorneys) to handle additional state construction related litigation.

**Department Response.** The DOJ indicates that it has not been adequately staffed to support various state agencies with construction litigation work and as a result has had to turn away

construction–related litigation. For example, in the past, the DOJ turned away litigation related to the construction of Kern Valley State Prison and the Metropolitan Regional Transportation Center. The department anticipates additional work in this area given the significant amount of construction that is forthcoming funded by the bonds approved by the voters in November 2006. Furthermore, staff finds that legislation was recently passed to approve $7.6 billion for dozens of new prison construction projects.

**Staff Recommendation.** Staff recommends that the Subcommittee approve the budget request to expand the DOJ's ability to handle construction-related litigation in-house.

# 7.    Natural Resources and Environmental Protection Litigation

**Previous Subcommittee Direction.** At the March 22 meeting of the Subcommittee, the following additional information was requested from DOJ:

- Information on how the $1 million General Fund, allocated in the 2006-07 Budget Act, has been allocated.
- Update on the status, timing, and costs of the defense of AB 1493 (Pavley).
- Update on the status of lawsuits related to the preservation of the Headwaters (the state's purchase of over 8,000 acres of old growth redwoods in Northern California).
- Updated list of new natural resource and environmental protection related lawsuits the DOJ is currently pursuing.

**Department Response.** The DOJ indicates that, in the current year, it has entered into various legal efforts that seek to reduce greenhouse gas emissions, including cases in other states. Presently, the department is involved in nine lawsuits and regulatory proceedings that support the reduction of greenhouse gas emissions. The department indicates that the $1 million allocated in the 2006-07 Budget Act has helped to support these efforts.

The DOJ indicates that the 2002 legislation that seeks to reduce greenhouse gas emissions from vehicles manufactured in model year 2009 and later, AB 1493 (Pavley), is being challenged by the automakers in three federal court lawsuits. The main challenge was filed in U.S. District Court, Eastern District of California, Fresno. However, this court case was stayed in mid-January to await the U.S. Supreme Court decision on the authority of the Environmental Protection Agency under the Clean Air Act to regulate greenhouse gas emissions from vehicles. In early April 2007, the U.S. Supreme Court found that the Environmental Protection Agency did have the authority to regulate greenhouse gas emissions from vehicles under the Clean Air Act. Given this decision, the DOJ indicates that the court case should resume. The DOJ is also assisting the Vermont Attorney General's Office in a similar case filed by the automakers in Vermont. The other two lawsuits brought by the automakers are expected to be briefed and decided sometime later this calendar year. The DOJ expects appeals in these cases regardless of the decisions.

The DOJ indicates that it is involved in three lawsuits related to the Headwaters agreement. The DOJ is representing the Department of Forestry and Fire Protection and the Department of Fish and Game in its struggle to enforce various regulatory agreements entered into by the Pacific Lumber Company as part of the Headwaters agreement. This case is now at the Supreme Court,

but because of bankruptcy filings by the Pacific Lumber Company the court has stayed this case. The DOJ is also actively seeking to move the venue of the Pacific Lumber Company's bankruptcy proceeding, which is currently in Texas. The DOJ is also defending the State Water Resources Control Board in a lawsuit by the Pacific Lumber Company challenging the water board's authority to regulate water quality impacts of timber harvesting. This case has just started in a Fresno Superior Court.

The DOJ indicates that it plans to pursue the three new natural resources and environmental protection lawsuits that follow:

- *Pacific Merchant Shipping Association v. Witherspoon*. This lawsuit, in federal court, challenges the Air Resources Board's actions related to regulating air pollution from cargo, tanker, and large passenger ships that dock at California's ports. The DOJ will represent the Air Resources Board's Executive Officer.
- *Natural Resources Defense Council v. Reclamation Board*. This lawsuit, in Sacramento Superior Court, is challenging the State Reclamation Board's approval of a fill permit for a large-scale luxury residential development called River Islands on Stewart Tract in the Delta. The DOJ will defend the California Reclamation Board.
- *United States v. 127.60 Acres (Tijuana Fence)*. The U.S. government has declared a taking of lands in San Diego County to construct a new fence along the California-Mexico border. The purchase of the property was financed by the State Coastal Conservancy and the Department of Parks and Recreation. There have been no objections to the condemnation, but there is a dispute over the price the U.S. government should pay for this property. The DOJ will represent the Department of Parks and Recreation in this lawsuit.

**Governor's Budget.** The Governor's budget proposes $3.9 million from the Legal Services Revolving Fund to support 16.4 positions (eight attorneys) on a three-year limited-term basis to support extraordinary litigation related to natural resources and environmental protection. This includes $1.5 million for external consultant funding for experts.

**Staff Recommendation.** Staff recommends that the Subcommittee approve this budget request.


# 8.   Division of Gambling Control – Technical Fund Shift

**Previous Subcommittee Direction.** At the March 22 meeting of the Subcommittee, additional information was requested regarding the current reimbursement process at DOJ. The department has provided staff with additional information and has indicated that it currently uses its reimbursement item exclusively for reimbursements from the General Fund. Therefore, the DOJ believes that it will be more transparent to directly fund its tribal gaming activities directly from the Indian Gaming Special Distribution Fund.

**Governor's Budget.** The Governor's budget proposal requests a permanent technical shift of $893,000 from reimbursements to the Indian Gaming Special Distribution Fund. This will enable the department to be funded for its investigatory role directly from the Indian Gaming Special Distribution Fund instead of through a reimbursement basis with the Gambling Control Commission.

**Subcommittee No. 4**                                                                    **May 9, 2007**

**Staff Recommendation.** Staff recommends that the Subcommittee approve the budget proposal to make a technical shift from reimbursements to the Indian Gaming Special Distribution Fund.

# 9.    Consolidated Division of Law Enforcement

**Finance Letter.** A Finance Letter (dated March 29, 2007) requests the consolidation of the following three divisions:

- Division of Law Enforcement - $216.6 million
- Division of Gambling – $20.4 million
- Division of Firearms - $16.6 million

The DOJ indicates that this consolidation would allow the department to apply consistent policies and procedures within the department for law enforcement personnel. The department indicates that this consolidation will not impact the way the programs are scheduled in the budget, which allows for transparency on the funding for gambling and firearms.

**Staff Recommendation.** Staff recommends that the Subcommittee approve the Finance Letter proposal.

# 10.    State Bond Counsel

**Background.** The voters approved $42.7 billion in bonds in the November 2006 election. Furthermore, the Legislature recently passed $7.4 billion in revenue bonds for the construction of new prison facilities.

**Finance Letter.** A Finance Letter (dated March 29, 2007) requests $1.1 million from the Legal Services Revolving Fund to support 6.3 new positions (four attorneys) that will provide state bond counsel and other public finance work for the increased number of upcoming bond transactions.

**Staff Comments.** Given the large increase in bond transactions anticipated, staff finds that these additional staff resources are warranted.

**Staff Recommendation.** Staff recommends that the Subcommittee approve this budget proposal.

# 5525    California Department of Corrections and Rehabilitation

## Health Care Issues

## 1.    *Plata* Lawsuit Compliance

**Background.** In April 2001, *Plata v. Davis* was filed in federal court contending that the California Department of Corrections and Rehabilitation (CDCR) was in violation of the Eighth (prohibits cruel and unusual punishment) and Fourteenth (right to due process and equal protection) Amendments to the United States Constitution by providing inadequate medical care to prison inmates. Some specific examples of key issues raised in the case include: (1) the lack of nationally recognized medical guidelines for managing inmates with chronic illnesses; (2) inappropriate and inconsistent medical follow-up visits; (3) inadequate number of registered nurses; and (4) poor coordination between medical and custody staff.

In January 2002, the state entered into a settlement agreement, committing to significant changes in the delivery of health care services to inmates. Generally, the settlement agreement focuses on improving inmate access to health care, as well as the quality of health care services provided in the prisons. Under the agreement, independent court-appointed medical experts monitored the implementation of the agreement, and periodically reported to the court on the state's progress in complying with the agreement.

In September 2004, the federal court issued an order finding significant deficiencies in the department's efforts to implement the terms of the settlement agreement and, in June 2005, the federal court decided to appoint a Receiver to manage CDCR's health care system. The Receiver will manage CDCR's health care system until the department proves to the court that it is capable and willing to manage a constitutional health care system or contract out for a similar level of care. The current Receiver, Robert Sillen, was appointed by the federal court in February 2006.

**Previous Funding for *Plata* Lawsuit Compliance.** To date, the Legislature has provided approximately $299 million General Fund to implement efforts to improve the medical health care delivery system and comply with the *Plata* lawsuit.

In the 2006-07 Budget Act, the Legislature decided to appropriate $100 million in unallocated funds that would be expended as directed by the Legislature. The Joint Legislative Budget Committee is notified when the Receiver wishes to allocate these monies. To date, the Joint Legislative Budget Committee has received notifications to transfer $79 million from the unallocated funds set aside in the 2006-07 Budget Act. The figure below summarizes how the funding has been allocated in the current year.

**Subcommittee No. 4**                                                                                      **May 9, 2007**

| *Plata* Litigation-Driven Expenditures<br>**Expenditures Directed by the Receiver**<br>**2006-07**<br>*(Dollars in Millions)* | **2006-07** |
|---|---|
| Court order to increase medical staff salaries, except for doctors. | $24.7 |
| Provide Receiver with enough funding to fund his operating budget for six months. | 18.6 |
| Establish 300 LVN positions. | 12.3 |
| Software and services to implement the Health Care Contracts Document Management system. | 5.7 |
| Receiver's operating budget. | 6.3 |
| Establish 41 position at San Quentin for the Receiver's project at San Quentin. | 3.0 |
| Establish 90 leadership and tracking health care positions. | 2.9 |
| Establish 50 positions at Avenal State Prison | 1.5 |
| Establish 35 medical positions at Deuel Vocational Institute | 1.2 |
| Establish 16 RN positions at the Correctional Training Facility. | 1.2 |
| Establish 20.3 positions at Avenal State Prison and 17.2 positions at Sierra Conservation Center | 0.9 |
| Funding to the Office of Facilities Management for EIR on San Quentin Project | 0.5 |
| Establish various other positions at San Quentin. | 0.2 |
| Establish two nurse positions at Corcoran. | 0.1 |
| **Total** | **$79.0** |

**Current Year Funding.** The Governor's budget includes allocation of an additional $50 million in unallocated funds to be expended upon direction by the Receiver in the current year. This funding is in addition to the $100 million in unallocated funds allocated in the 2006-07 Budget Act.

The budget also includes $1.3 million General Fund to provide commensurate salary increases for medical classifications at Division of Juvenile Justice institutions for the current year.

The funding for the Division of Juvenile Justice salary enhancements will likely be included in a Supplemental Appropriations Bill.

**Governor's Budget.** The Governor's budget proposal includes an additional $150 million in unallocated funds to be expended upon direction by the Receiver in 2007-08.

In addition, the budget includes the full-year costs of some of the expenditures directed in the current year by the Receiver (see list above). The full-year costs in 2007-08 of expenditures funded in the current year, through January 2007, are $54.6 million General Fund. This includes

about $29.6 million to cover the full year costs of the salary increases for various CDCR medical classifications.

The budget proposal does not include additional full-year costs for current year expenditures starting in February 2007.

The budget also includes full-year costs associated with the Division of Juvenile Justice salary enhancements, which is $1.5 million in the budget year.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following action:
- Approve $1.5 million for Division of Juvenile Justice salary increases for medical classifications.


# 2.    *Coleman* Lawsuit Compliance

**Background.** In June 1991, *Coleman v. Wilson* was filed in federal court contending that CDCR was in violation of the Eighth (prohibits cruel and unusual punishment) and Fourteenth (right to due process and equal protection) Amendments to the United States Constitution by providing inadequate mental health care to prison inmates. *Coleman v. Wilson* alleged that the department's mental health care system was inadequate in several areas, including intake screening, access to care, treatment, and record-keeping.

As a result, in 1994, the Federal Court ordered the department to develop a remedial plan to correct these deficiencies. The plan developed by the department is referred to as the Mental Health Services Delivery System (MHSDS). The intent of the MHSDS is to provide timely, cost-effective mental health services that optimize the level of individual functioning of seriously mentally disabled inmates and parolees in the least restrictive environment. At this time, the court also appointed a Special Master to oversee the implementation of the plan. The current Special Master is J. Michael Keating Jr.

In 1997, CDCR issued a preliminary version of the MHSDS Program Guide, which established preliminary policies and procedures to provide constitutionally adequate mental health services at all CDCR institutions. This Program Guide has been amended several times since 1997 under directives by the federal court. The court has found that successful implementation of the MHSDS Program Guide will require capital improvements at many institutions. The department has developed a Mental Health Bed Plan to address the capital outlay improvements that are needed. An amended version of the Mental Health Bed Plan was released at the end of January 2007.

**Previous Funding for *Coleman* Lawsuit Compliance.** To date, the Legislature has provided approximately $158 million General Fund to implement efforts to strengthen the department's mental health services and comply with the *Coleman* lawsuit.

**Current Year Funding.** The Governor's Budget proposal includes $24.1 million General Fund to implement various court-ordered actions, immediately, in the current year. These actions include the following:

- **Salary Enhancements.** $19.2 million General Fund to support salary enhancements for certain mental health classifications. This includes commensurate pay increases for all mental health classifications in the adult institutions, juvenile institutions, and parole operations. Classifications impacted include the following:

  | | |
  |---|---|
  | o  Chief Psychiatrist | o  Supervising Psychiatric |
  | o  Senior Psychiatrist | Social Worker |
  | o  Staff Psychiatrist | o  Clinical Social Worker |
  | o  Chief Psychologist | o  Senior Psychiatric Technician |
  | o  Senior Psychologist | o  Psychiatric Technician |
  | o  Clinical Psychologist | o  Recreation Therapist |

  These pay increases impacted 1,535 positions in the adult institutions, 71 positions in the juvenile institutions, and 282 positions in parole operations.

- **Reception Center Enhanced Outpatient Program Services.** $2.8 million General Fund to support partial year funding for 67.7 positions in the current year to deliver treatment to Enhanced Outpatient Program inmates (inmates with serious mental illnesses, such as Schizophrenia) at reception centers.

- **Administrative Segregation Intake Cell Conversions.** $2 million General Fund to support four positions to oversee the retrofit of the vents in 340 administrative segregation cells in the max-security administrative segregation units (also called stand-alone administrative segregation units). The funding will also be used to design the conversion of an additional 340 cells in regular administrative segregation units to administrative segregation unit intake cells that include, new concrete bed slabs, the elimination of all in-cell protrusions, replacement of light fixtures, and modification of cell doors to increase visibility.

  The department indicates that it has redirected $110,000 in special repair funds in the current year to replace the vent screens in 66 cells in max-security administrative segregation units.

The funding allocations listed above will likely be appropriated in a Supplemental Appropriations Bill in the upcoming months.

In addition, after the budget was enacted in 2006, the Legislature enacted supplemental legislation (SB 1134, Budget) to provide $35.5 million to partially fund 551.8 new positions established to fund the Revised Program Guide as ordered by the court in the *Coleman* lawsuit.

**Governor's Budget.** The Governor's budget proposal includes $112.3 million General Fund to support various court-ordered actions to comply with the *Coleman* lawsuit in the budget year. These proposals include the following:
- **Salary Enhancements.** $50.6 million General Fund for the full-year costs to support salary enhancements for certain mental health classifications (listed above).

- **Reception Center Enhanced Outpatient Program Services.** $5.1 million General Fund to support the full-year costs to support 67.7 positions to deliver treatment to Enhanced Outpatient Program inmates at reception centers.

- **Administrative Segregation Intake Cell Conversions.** $12.8 million General Fund to support the construction associated with converting 340 cells in regular administrative segregation units to administrative segregation intake cells. The required modifications are listed above under current year funding for this project.

- **Revised Program Guide.** $40.2 million General Fund funds the full-year costs associated with the 551.8 positions funded in SB 1134. This is a $4.8 million increase above what was allocated in SB 1134.

**Savings From Vacancies Likely.** The department has historically had a huge problem recruiting qualified mental health staff. The recent pay raises may help to improve recruitment. However, there is generally a shortage of mental health staff statewide. Staff finds that the department continues to have significant vacancies in mental health staff and will likely have some savings in the current year due to the number of vacant positions.

**Available Treatment Space at Reception Centers Unknown.** The department is in the process of implementing treatment for Enhanced Outpatient Program inmates at Reception Centers. However, it is unclear to staff that there is available space at reception centers for treatment. This is especially a problem at the older reception center institutions (San Quentin State Prison) where there is not a lot of viable space for programming. Furthermore, there is also generally a lack of office space available for the additional clinical staff the department needs to hire to implement these new programs.

**Max-Security Administrative Segregation Units.** The court in the *Coleman* case has ordered that no inmates in the Mental Health Delivery System (Enhanced Outpatient Program and Correctional Clinical Case Management System) can be held in the new max-security administrative segregation units (also called stand-alone administrative segregation units). The Subcommittee learned, at its April 12 hearing, that the department's in-fill bed plan includes 2,250 additional beds in new max-security administrative segregation units. Staff finds that the construction of these beds does not provide the department with a lot of flexibility since only some inmates can be placed in these units because of the cell design. This means that at institutions that have the max-security administrative segregation units they will have to maintain an alternative administrative segregation unit for the inmates in the Mental Health Delivery System.

Staff finds that before the department builds additional administrative segregation units it may want to modify its design so that they can use these units for the department's entire population, when appropriate.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Request that the department report, by May Revision, on the savings in the current year from staff vacancies.

- Request that the department report, by May Revision, with a strategy to modify the new stand-alone administrative segregation units to be compliant with the Coleman court.
- Approve funding for the salary enhancements.
- Approve funding for the Reception Center Enhanced Outpatient Program.
- Approve funding for the administrative segregation unit intake cell conversions.

# 3.  *Perez* Lawsuit Compliance

**Case Summary.** In December 2005, *Perez v. Hickman* was filed in federal court contending that CDCR was in violation of the Eighth amendment of the United States Constitution by providing inadequate dental care to prison inmates. Some specific examples of key issues raised in the *Perez* class-action lawsuit include: (1) inadequate numbers of dentists and dental assistants; (2) lack of proper training and supervision of staff; (3) insufficient dental equipment such as examination chairs and x-ray machines; (4) poorly organized inmate dental records; and (5) unreasonably long delays for inmates to receive dental treatment, including prisoners with dental emergencies.

The lawsuit was filed concurrently with a settlement agreement reached between the state and the plaintiffs. The agreement committed the state to implement significant changes in the delivery of dental care services to inmates. The agreement requires the department to implement a number of newly developed policies and procedures at all 33 state prisons over a six-year period, beginning with 14 prisons in July 2006. The agreement focuses on improving inmate access to dental care, as well as the quality of dental care services provided in the prisons. For example, the policies and procedures require the department to treat inmates within specified time frames according to the severity of the dental problem and set standards of care that prison dental staff must provide.

In August 2006, the federal court issued a revised order that, among other things, required a lower dental staff to inmate ratio. Currently, there are 950 inmates to one dentist and one dental assistant. The court has ordered this ratio lowered to 515 inmates. The order also directed the department to prepare a revised implementation plan for complying with the settlement agreement.

Generally, the policies and procedures modify or reiterate existing state regulations. For example, under the agreement, the department is required to provide a dental examination to inmates within 90 days of arriving at an institution from a reception center and provide subsequent examinations annually for inmates over 50 years of age and biennially for inmates under 50. Title 15 of the California Code of Regulations currently requires examinations within 14 days of an inmate's arrival; current requirements for subsequent inmate dental examinations are consistent with the settlement agreement. According to the department, none of the 33 prisons currently complies with the policies and procedures.

**Previous Funding for *Perez* Lawsuit Compliance.** To date, the Legislature has provided approximately $35.4 million General Fund to implement efforts to strengthen the department's dental services and comply with the *Perez* lawsuit.

**Current Year Funding.** The Governor's budget proposal includes $18.8 million General Fund to implement salary increases for dental classifications. This includes commensurate pay increases for all dental classifications in the adult institutions and juvenile institutions for the following classifications:

- Dental Assistant
- Dental Hygienist
- Dentist
- Oral Surgeon
- Supervising Dental Assistant
- Supervising Dentist
- Chief Dentist
- Regional Dental Director
- Statewide Dental Director

These pay increases will impact 719 positions at adult institutions and 28 positions in the juvenile institutions in the current year.

**Governor's Budget.** The Governor's budget proposal includes $78.7 million General Fund to support the following two actions to comply with the *Perez* lawsuit in the budget year. The proposals include the following:

- **Salary Enhancements.** $57.8 million General Fund ($2.1 million is for pay parity for dental classifications at the Division of Juvenile Justice) to provide increased salaries for selected dental classifications (see above).
- **New Dental Staffing Ratios.** $20.9 million General Fund for partial funding to support 231 new positions to meet the new lower inmate to dentist ratios (515:1). This funding will support 77 dental staff and 102 custody staff.

**LAO Recommendation.** The LAO recommends that the Subcommittee withhold action on the salary enhancements for the dental classifications pending a court order or an amended bargaining unit agreement.

Staff received a letter (dated May 4, 2007) from the Department of Personnel Administration indicating that an addendum to a memorandum of understanding was agreed to by DPA and Bargaining Unit 16 that represents the dental classifications. This addendum would implement the raises detailed in the Governor's budget proposal.

**Savings From Vacancies Likely.** Staff finds that the department currently has a 57 percent vacancy rate at the first 14 institutions where it has implemented the reduced inmate to dentist staffing ratios. The department has a 40 percent vacancy rate for all of the other institutions. Staff finds that a salary increase would help to fill these vacancies. Staff finds that the department will likely have some savings in the current year due to the number of vacant dental positions.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:

- Request that the department report, by May Revision, on savings in the current year related to salary savings.
- Hold open the salary enhancement proposal pending review of addendum to a memorandum of understanding submitted to the Legislature by the Department of Personnel Administration.
- Approve funding to reduce the inmate to dentist staffing ratio.

## Other Issues

## 1.   Classification Services Unit Training

**Background.** The classification process within CDCR consists of an analysis and review of individual case factors to determine an inmate's placement score, custody level, and work/privilege group. These case factors determine the housing and rehabilitative program eligibility of each inmate.

**Governor's Budget.** The Governor's budget proposal includes $800,000 in General Fund to address immediate training needs of correctional counselors and to develop a comprehensive training plan for these classification staff to ensure a greater degree of safety and security.

**Staff Comments.** Staff finds that classification is a critical step in the process and directly impacts the department's ability to match up inmates with safe living placements and appropriate programming opportunities. Staff finds that, as part of the reducing recidivism plan, the department is planning to implement a pilot project to use the COMPAS assessment to identify risk level and program needs at four reception centers. Staff finds that classification staff will need to be trained on how to use this new information within their existing process.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Hold this issue open.
- Request that the department report at May Revision with a coordinated report on what validations are needed of the COMPAS tool, the timing of those validations, and how they will be utilized by both institutions and parole.

## 2.   Redirection of Positions to the Office of Inspector General

**Previous Subcommittee Action.** At a March 1 hearing, this Subcommittee approved $1.8 million in General Fund money to augment the Inspector General's auditing resources.

**Governor's Budget.** The Governor's budget proposes to redirect 10 office technician positions and $1.8 million General Fund to support expanded auditing in the Office of the Inspector General. These positions and funding were taken from various program areas throughout the department.

**Staff Comments.** The administration has not provided information to justify the elimination of these office technician positions. However, the department reports that it currently has a 20 percent vacancy rate in its office technician classification. This equates to approximately 313 vacant positions and $17 million in salary savings. It is unclear to staff whether the department is using this salary savings to fund other budget items in the current year.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:

- Eliminate 10 office technician positions and reduce the department's budget by $1.8 million in the budget year.
- Request that the department report on how it is using the salary savings from vacant office technician positions in the current year.

# 3.    Workers' Compensation Staffing

**Background.** In the 2005-06 Budget Act, the department was provided with 29 positions to coordinate the "Return to Work" program at the department. These positions were created on a limited-term basis to address one-time workload associated with reducing the backlog of Workers' Compensation claims.

**Governor's Budget.** The Governor's budget includes a proposal to convert 29 limited-term positions to permanent positions. The department is not requesting additional funding for these positions.

**Staff Comments.** Staff finds that, with the additional positions allocated to the department in the 2005-06 Budget Act, it has been able to employ active claims management strategies to contain workers' compensation expenditures. The department has reviewed a large portion of the low-activity claims and is taking actions to close these claims. In 2005-06, the department had over $188 million in workers' compensation claims, which was over 40 percent of the total for all state agencies.

**Staff Recommendation.** Staff recommends that the Subcommittee approve this budget request.

# 4.    New Undersecretary for Program Support

**Background.** The Subcommittee heard a significant amount of testimony at its March 15 hearing regarding the deficiencies in its core business services. The department currently has one undersecretary that oversees all programs and functions in the department.

**Finance Letter.** A Finance Letter (dated March 29, 2007) requests $316,000 to fund a new undersecretary position of program support and two support positions.

**Staff Comments.** Staff finds that CDCR is one of the largest departments in state government with 65,000 authorized positions and a budget of over $10 billion General Fund. Staff finds that an additional undersecretary position is justified to help manage a department of this size.

**Staff Recommendation.** Staff recommends that the Subcommittee approve the Finance Letter proposal to establish a new undersecretary.

# 5.    Solid Cell Fronts

**Previous Subcommittee Direction.** At the April 12 meeting of the Subcommittee, the following budget proposals were held open:

**Subcommittee No. 4**                                                    **April 26, 2007**

- **California Institution for Men.** The Governor's budget proposal includes $5.6 million General Fund for construction to convert 204 cells and 12 showers.

  The Finance Letter proposes to increase the amount provided in the Governor's budget by $588,000 General Fund due to a revised construction cost estimate. The department indicates that, given the shortage of inmate beds, the department has determined that only one-half of one floor will be available to the contractor to work on at a time. This will lengthen the duration of the construction contract from 12 months to 16 months. Total costs for this project are estimated to be $7.4 million. Of this total, $1.2 million was appropriated in 2005-06 and 2006-07.

- **California Medical Facility.** The Governor's budget proposal includes $4.1 million General Fund for construction to convert 126 cells and 6 showers.

  The Finance Letter proposes to increase the amount provided in the Governor's budget by $438,000 General Fund due to a revised construction cost estimate. The department indicates that given the shortage of inmate beds the department has determined that only one-half of one floor will be available to the contractor to work on at a time. This will lengthen the duration of the construction contract from 12 months to 16 months. Total costs for this project are estimated to be $5.3 million. Of this total, $759,000 was appropriated in 2005-06 and 2006-07.

**Finance Letter.** A Finance Letter (dated May 1, 2007) requests the following changes to the projects listed above:
- **California Institution for Men.** The Finance Letter proposes to increase funding by $675,000 to account for additional costs identified with this project, including replacing the smoke detector system and adding additional observation windows. This will bring the total costs of these modifications to over $37,000 per cell.

- **California Medical Facility.** The Finance Letter proposes to eliminate new funding ($4.6 million) for this project in the budget year because of delays and overcrowding.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Approve the budget and Finance Letters (dated March 29, 2007 and May 1, 2007) for solid cell fronts in the budget year.