**EXHIBIT N**

May 15, 2007



# Overview of the 2007-08 May Revision

ELIZABETH G. HILL • LEGISLATIVE ANALYST

The administration released its May Revision yesterday, identifying over $2 billion in new budget solutions to address a comparable level of increased budgetary problem. In this document, we provide our initial assessment of the problem definition and the viability of the administration's proposed solutions. ■

AN LAO REPORT

## Acknowledgments

The Legislative Analyst's Office (LAO) is a nonpartisan office which provides fiscal and policy information and advice to the Legislature.

## LAO Publications

To request publications call (916) 445-4656.

This report and others, as well as an E-mail subscription service, are available on the LAO's Internet site at www.lao.ca.gov. The LAO is located at 925 L Street, Suite 1000, Sacramento, CA 95814.

LEGISLATIVE ANALYST'S OFFICE

AN LAO REPORT

# SUMMARY

## Major Changes in the May Revision

*Changes in Revenues and Expenditures Since January.* The administration's estimates for major tax revenues are down $243 million combined over the current and budget years since January. Stronger-than-expected 2006-07 revenue growth is more than offset by weakness in 2007-08. General Fund costs are higher for Proposition 98 and prisons. The administration has also provided a more realistic estimate of gambling revenues and delayed the sale of pension obligation bonds.

*New Budget Solutions.* These factors led to the administration putting forward over $2 billion in new budget solutions. The administration proposes to sell EdFund, capture tobacco securitization revenues now rather than over time, expand a redirection of public transit funds for General Fund purposes, and eliminate a scheduled increase for Supplemental Security Income/State Supplementary Program (SSI/SSP) recipients.

*Reserve.* Under the administration's estimates, the state would end the budget year with a reserve of $2.2 billion.

## LAO Comments

*Revenue Estimate Reasonable.* The administration's revenue forecast for the state's major revenues is reasonable. While our estimates for individual taxes differ from the administration's, offsetting forecasts result in similar totals.

*Reserve Likely Overstated by $1.7 Billion.* The May Revision makes a number of optimistic assumptions about its proposals—such as the legality of its public transit proposal, its estimates of gambling and property tax revenues, and assumed savings from midyear reductions. In total, we estimate that the Governor's reserve is likely overstated by $1.7 billion, and the May Revision

would leave only a $529 million reserve. This reduced reserve would be subject to additional risks and cost pressures.

*Out-Year Problem Has Worsened.* We estimate that, under the Governor's proposals, state expenditures would exceed revenues by more than $3 billion in 2007-08. This shortfall would grow to more than $5 billion in 2008-09 due to a number of one-time solutions contained within the May Revision.

*Focusing on Eliminating Deficit-Financing Bond Debt Should Not Be an Immediate Priority.* The administration continues to dedicate $1.6 billion in supplemental appropriations to pay off the state's deficit-financing bonds early. This would help the state's budget beginning in 2009-10. Due to the precariously balanced 2007-08 budget, we believe these funds could be better used in addressing near-term budget problems.

## LAO Bottom Line

The administration has attempted to address a $2 billion decline in the state's fiscal outlook. Due to several overly optimistic assumptions, however, the May Revision overstates its reserve by about $1.7 billion—leaving an estimated reserve of $529 million. Even this reserve level would be subject to considerable risks and pressures. As a result, the Legislature will face a significant challenge to develop a 2007-08 budget that realistically reflects revenues and spending while maintaining a prudent reserve. As it sets its own priorities, it should identify solutions that realistically balance the state's finances on an ongoing basis while also avoiding new ongoing commitments (absent identified funding to pay for them).

# MAJOR FEATURES OF THE MAY REVISION

In order to address a shortfall between the state's revenues and expenditures, the Governor's January budget proposed a number of budget-balancing actions, including a major redirection in transportation funds and significant reductions in social services. Since January, the administration's view of the budget outlook has worsened by more than $2 billion. Consequently, it has proposed new solutions to offset these higher costs and lower revenues. These changes are summarized in Figure 1.

## General Fund Condition

Figure 2 shows the administration's estimate of the General Fund's condition taking into consideration its May Revision proposals. It shows that the current fiscal year began with a prior-year balance of $10.5 billion. Consequently, even though current-year spending is expected to exceed revenues by $6.1 billion, the administration projects that the state will start 2007-08 with a balance of $4.4 billion. In the budget year, expenditures would exceed

revenues by $1.5 billion. The administration estimates the state would end the budget year with a reserve of $2.2 billion. This is slightly more than the $2.1 billion reserve assumed in the January budget proposal.

## Changes in Revenues

The administration's new revenue forecast projects stronger current-year tax revenues than

**Figure 1**

### How May Revision Addresses $2.3 Billion in Lower Revenues and Higher Costs

*(In Millions)*

| | |
|---|---:|
| **Governor's January 10 Reserve** | $2,085 |
| | |
| **Items Worsening General Fund Condition** | -$2,293 |
| **Updated Proposition 98** | |
| Higher 2006-07 minimum guarantee | -$372 |
| Higher 2007-08 minimum guarantee | -104 |
| Lower property taxes and other changes | -333 |
| **Pension Obligation Bonds Deferred to 2008-09** | -$525 |
| **Lower Revenues** | |
| Updated major tax revenues forecast | -$243 |
| Lower tribal gambling revenue forecast | -192 |
| Lower tideland oil revenues | -86 |
| **Higher Program Costs** | |
| Higher correctional officer arbitration costs | -$200 |
| Higher firefighting costs | -115 |
| Implementation of AB 900 prison system changes | -97 |
| All other (net) | -26 |
| | |
| **New Solutions Improving General Fund Condition** | $2,407 |
| Sale of EdFund—the state's student loan guaranty agency | $980 |
| Accelerate tobacco securitization fund transfers | 600 |
| Higher tobacco securitization revenues | 357 |
| Expansion of Home-to-School Transportation proposal | 200 |
| Suspend SSI/SSP cost-of-living adjustment | 185 |
| Additional midyear reductions to departmental budgets | 46 |
| Eliminate Williamson Act subventions | 39 |
| | |
| **May Revision Reserve** | $2,199 |

AN LAO REPORT

**Figure 2**

**Governor's Budget General Fund Condition**

*(In Millions)*

|  | 2006-07 | 2007-08 |
|---|---|---|
| Prior-year fund balance | $10,540 | $4,433 |
| Revenues and transfers[a] | 96,157 | 102,276 |
| Total resources available | $106,697 | $106,709 |
| Expenditures | 102,264 | 103,765 |
| Ending fund balance | $4,433 | $2,944 |
| Encumbrances | 745 | 745 |
| Reserve | $3,688 | $2,199 |
| Budget Stabilization Account | $472 | $1,495 |
| Reserve for Economic Uncertainties | 3,216 | 704 |

[a] 2006-07 amount includes $472 million and 2007-08 amount includes $1.023 billion in General Fund revenues transferred to the Budget Stabilization Account, which the administration excludes from its revenue totals. These different treatments do not affect the bottom-line reserve shown.

**Changes in Expenditures**

Compared to the Governor's January budget, proposed expenditures for the budget year are up $624 million. The major increases in budget-year expenditures since January are due to:

➤ Added General Fund spending to: (1) meet the higher 2007-08 Proposition 98 minimum guarantee ($104 million), and (2) reflect the altered treatment of a proposal to redirect public transit funds to benefit the General Fund ($627 million).

➤ Recognition that the pension obligation bonds will not be sold in 2007-08. The bonds were proposed to reduce General Fund retirement payments by $273 million (as well as increase revenues by $252 million). The administration now assumes the sale will occur in 2008-09.

These increased costs are partially offset by a proposed suspension of a January 2008 SSI/SSP cost-of-living adjustment (COLA) (reducing spending by $185 million).

in January, but this increase would be more than offset by downward adjustments in the budget year. Specifically, the current-year estimate shows increased revenues from major sources of $563 million—driven by improved personal income tax and corporation tax revenues. The struggling housing market and other economic factors have led the administration to reduce its budget-year estimate by $806 million. Personal income, sales, and insurance tax revenues are all assumed to be lower, partially offset by stronger corporation tax revenues.

# ECONOMIC AND REVENUE FORECAST OF THE MAY REVISION

### Economic Forecast

The economic forecast underlying the May Revision's fiscal estimates assumes that both the nation and California will experience continued, though modest, economic growth over the next couple of years. As shown in Figure 3, the state's economy is expected to experience slower growth than in 2006, with personal income growth averaging in the mid-5-percent range and growth in jobs well under 2 percent. Growth will be slowest in 2007, in part due to the drag on the economy associated with the housing market's problems, before strengthening in 2008 and beyond. The May Revision's forecast for continued modest economic growth reflects the consensus views of most economists at this time.

### Revenue Forecast

The May Revision projects that General Fund revenues and transfers will total $96.2 billion in 2006-07 and $102.3 billion in 2007-08, for a budget-year growth of $6.1 billion (6.4 percent). This represents a two-year increase of $1.1 billion over the amount of revenues forecast in January

2007 in the *2007-08 Governor's Budget,* reflecting the administration's EdFund and tobacco securitization proposals—partially offset by the decline in the state's major tax revenues. Figure 4 summarizes the changes, which are discussed in more detail below.

➢ *Corporation taxes* were revised up by over $640 million for the two years combined. This reflects the recent healthy performance of corporate profits and greater-than-projected revenue receipts from them collected since January. Through April, for example, corporate tax receipts were $564 million above expectations.

**Figure 3**

## Modest Economic Growth Anticipated

*Annual Percentage Change, 2007-08 May Revision*



AN LAO REPORT

➤ **Sales and use taxes** have been revised down by almost $500 million, all of which occurs in the budget year. Of this amount, over one-half is due to a weaker economy, while over $200 million reflects a higher spillover into the Public Transportation Account (PTA) primarily caused by increased retail gasoline prices.

➤ **Personal income taxes** are down a net of about $160 million. Revenues are up in the current year and down in the budget year.

➤ **Insurance taxes** are down by over $225 million, primarily reflecting a recent Board of Equalization ruling regarding how the timing of insurance premium receipts are treated.

➤ **Other revenues and transfers** are up by about $1.4 billion, including $0.6 billion in the current year and $0.8 billion in the budget year. This includes gains of $1 billion from the sale of EdFund and nearly $960 million in tobacco securitization revenues, and reductions of about $250 million associated with pension obligation bonds and close to $200 million in tribal gambling receipts. We discuss the tobacco securitization revenues in more detail in the nearby box.

## LAO Assessment of May Revision Economic and Revenue Forecasts

We find that the May Revision's economic and revenue forecasts are generally reasonable in light of the uncertainties that characterize both the economy and revenue picture. Our own revised economic forecast, while a bit stronger than the administration's in some areas, is similar in its general thrust—continued modest economic expansion with weakness in 2007 and strengthening thereafter. Likewise, our revenue forecast, while different for many of the state's individual revenue sources, has a similar bottom line. Thus, from this perspective, the administration's projections are reasonable.

The economic and revenue outlooks face two main uncertainties.

**Figure 4**

## May Revision Revenue Changes Compared to January Forecast

*(In Millions)*

| | 2006-07 | 2007-08 | Two-Year Totals |
|---|---|---|---|
| **Selected Major Taxes:** | | | |
| Personal income tax | $201 | -$362 | -$161 |
| Sales and use taxes | 12 | -506 | -494 |
| Corporation tax | 406 | 237 | 643 |
| Insurance tax | -54 | -173 | -227 |
| Other | -2 | -2 | -4 |
| Subtotals, Major Taxes | ($563) | (-$806) | (-$243) |
| **Other Revenues:** | | | |
| EdFund | — | $1,000 | $1,000 |
| Tobacco securitization | $600 | 357 | 957 |
| Pension obligation bonds | — | -252 | -252 |
| Tribal gambling | — | -192 | -192 |
| All other | 4 | -131 | -127 |
| Subtotals, Other Revenues | ($604) | ($782) | ($1,385) |
| **Totals** | **$1,167** | **-$24** | **$1,142** |

AN LAO REPORT

First is the economic uncertainties associated with the outlook for the housing market in light of recent sales declines, foreclosures, and price reductions. Second is the future path of crude oil and retail gasoline prices. Adverse developments in these areas could significantly impact both overall economic performance and state revenues. Likewise, key elements of the revenue base, such as capital gains and stock options, are highly volatile and, therefore, difficult to accurately predict. As shown in Figure 5, the administration is projecting that capital gains and stock options will experience modest

**Figure 5**

**Capital Gains and Stock Options to Drift Up**

*2007-08 May Revision (In Billions)*



growth in the near future. Relatively small differences in actual growth rates, however, could generate revenue swings of hundreds of millions of dollars.

---

### INCREASED REVENUES FROM TOBACCO BONDS

*Tobacco Securitization.* Under the terms of a 1998 agreement which California and most other states signed with four leading tobacco companies, the state receives annual tobacco settlement revenue (TSR) payments in perpetuity, including an estimated $10-plus billion over the first 25 years. In 2003, to help balance the state's budget, the state converted a portion of this future TSR stream into an upfront payment of $4.5 billion. In return, those investors who provided the $4.5 billion will be repaid over time, with interest, from the TSRs when they are actually received. A second round of tobacco securitization was done in 2005.

*Refinancing Yields More Revenues Than Expected.* The Governor's January budget proposal assumed that the previously issued tobacco bonds would be refinanced to take advantage of lower interest rates and other favorable market conditions. The budget assumed that the

AN LAO REPORT

# PROGRAMMATIC FEATURES OF THE MAY REVISION

Figure 6 (see next page) provides information on the major programmatic features of the May Revision affecting the General Fund. Below, we discuss the administration's proposals related to Proposition 98, EdFund, and transportation.

## PROPOSITION 98—K-14 EDUCATION

Figure 7 (see page 11) compares the Governor's revised budget for 2006-07 with the revised budget for 2007-08. As shown in the figure, Proposition 98 funding increases by $2.2 billion, or 3.9 percent, year over year. Two-thirds of this increase is covered with higher property tax revenues whereas one-third is covered with additional General Fund support. Using revised attendance estimates, the overall Proposition 98 increase translates into a 4.4 percent increase in K-12 per pupil spending and less than a 1 percent increase in community college spending per student.

*Major Proposition 98 Adjustments.* The Governor's May Revision makes Proposition 98 adjustments to 2005-06, 2006-07, and 2007-08.

For 2005-06, it increases the General Fund share of Proposition 98 by $316 million, due primarily to a downward adjustment in local property tax revenues. (See box on page 13 for information on this issue.) For 2006-07 and 2007-08, the May Revision increases the Proposition 98 minimum guarantee by $372 million and $104 million, respectively, due to healthier-than-expected General Fund revenues. These adjustments to the current year and budget year are shown in Figure 8 (see page 11).

## Major Changes in Ongoing Proposition 98 Spending

As shown in Figure 9 (see page 12), the May Revision totals include several changes to the Governor's budget. Of greatest magnitude, the administration proposes to restore Proposition 98 funding for the Home-to-School Transportation program ($627 million) and fully fund the Proposition 98 minimum guarantee. The Governor's budget initially had proposed to reduce Proposi-

---

refinancing would raise an additional $900 million, which for budgetary purposes would be transferred to the General Fund on the following schedule: $300 million in 2007-08, $450 million in 2008-09, and $150 million in 2009-10 (connected to the timing of increased costs for payments to schools under the Quality Education Investment Act). Ultimately, the refinancing raised an additional $357 million beyond what was assumed in January, for a total of $1.257 billion.

*May Revision Proposes to Accelerate General Fund Benefit.* The May Revision proposes to transfer these bond proceeds to the General Fund entirely in 2006-07 ($600 million) and 2007-08 ($657 million). Thus, the May Revision includes $957 million in current- and budget-year revenues beyond what was assumed in January. By accelerating the transfers to the General Fund, this proposal worsens the state's operating deficit in 2008-09 and 2009-10 relative to January's schedule.

AN LAO REPORT

tion 98 funding for the program and lower the guarantee. The May Revision provides $247 million to increase the K-14 COLA from the January estimate of 4.04 percent to the final rate of 4.53 percent. It also reduces support for community college apportionments by $80 million to adjust for unrealized enrollment. It makes no change to the administration's January proposal to increase Proposition 98 funding for child care by $269 million, and it continues to pro-

**Figure 6**

## Key General Fund Features of May Revision



**K-14 Education**
- Increases General Fund share of Proposition 98 by $113 million for 2007-08 due primarily to an increase in the minimum guarantee.
- Uses additional ongoing funds to support higher cost-of-living adjustment (COLA) and a variety of new programs. Underfunds 2007-08 K-12 attendance-related costs by $366 million due to technical error.
- Provides $542 million in additional one-time funds for various K-14 purposes, including emergency facility repairs, equipment, deferred maintenance, and several new one-time initiatives.

**Higher Education**
- Proposes selling EdFund to a private buyer for an estimated $1 billion.

**Health and Social Services**
- Suspends the statutory January 2008 Supplemental Security Income/State Supplementary Program (SSI/SSP) COLA, resulting in General Fund savings of $185 million in 2007-08 (half year) and $370 million in 2008-09 (full year).
- Retains proposals to suspend the July 2007 CalWORKs COLA, impose new time limits and sanctions on children whose parents cannot or will not comply with participation requirements, and shift certain CalWORKs child care costs to Proposition 98 funds.
- Provides $107 million for Medi-Cal managed care plans to reflect implementation of a new rate-setting methodology.

**Criminal Justice**
- Increases reserve for new initiatives of the court-appointed Receiver from $150 million to $175 million, but does not take into account the Receiver's own May Revision proposal for an additional $150 million for the corrections health budget.
- Does not include the new staffing and other resources needed to manage the major new prison-building program approved in recent state legislation (AB 900). The administration has created a team of experts to plan this work effort and intends to make a subsequent request for this purpose.

**Transportation**
- Proposes to use $200 million in additional projected Public Transportation Account "spillover" funds (related to sales taxes on gasoline) to reimburse the General Fund for Home-to-School Transportation expenditures in the current year. This is in addition to the modified January proposal of reimbursing the General Fund for $630 million in Home-to-School expenditures in the budget year.

**General Government**
- Proposes a long-term lease of the State Lottery to a private vendor (but makes no budgetary assumptions regarding the lease).
- Eliminates $39 million in subventions to local governments with agricultural and open-space lands under Williamson Act contracts.

AN LAO REPORT

vide virtually no funding for the ongoing cost of mandates (estimated to be about $185 million in 2007-08).

### Figure 7
### Proposition 98 Funding: Year-to-Year Changes

(Dollars in Millions)

| | 2006-07 (Revised) | 2007-08 (Revised) | Change Amount | Change Percent |
|---|---|---|---|---|
| K-12 | $49,284 | $51,224 | $1,940 | 3.9% |
| Community colleges | 5,996 | 6,223 | 226 | 3.8 |
| Other | 114 | 119 | 5 | 4.3 |
| **Totals** | **$55,395** | **$57,566** | **$2,171** | **3.9%** |
| General Fund | $41,192 | $41,930 | $737 | 1.8% |
| Local property tax | 14,203 | 15,636 | 1,433 | 10.1 |
| K-12 attendance | 5,960,176 | 5,931,525 | -28,651 | -0.5% |
| K-12 per pupil spending | $8,269 | $8,636 | $367 | 4.4% |
| CCC full-time equivalent students (FTES) | 1,139,921 | 1,174,118 | 34,197 | 3.0% |
| CCC per FTES spending | $5,260 | $5,300 | $40 | 0.8% |

### Figure 8
### Proposition 98 Funding: Comparing January Budget and May Revision

(In Millions)

| | 2006-07 | 2007-08 |
|---|---|---|
| **Total Proposition 98**[a] | | |
| January budget | $55,022 | $57,462[b] |
| May Revision | 55,395 | 57,566 |
| Changes | $372 | $104 |
| **K-12** | | |
| January budget | $49,011 | $51,073[b] |
| May Revision | 49,284 | 51,224 |
| Changes | $273 | $151 |
| **Community Colleges** | | |
| January budget | $5,897 | $6,274 |
| May Revision | 5,996 | 6,223 |
| Changes | $99 | -$52 |

[a] Includes Proposition 98 funding spent by other agencies including Department of Corrections and Rehabilitation and state special schools.

[b] To make comparisons more straightforward, does not include Governor's proposal to fund Home-to-School Transportation program ($627 million) from the Public Transportation Account.

***Expands Programs and Creates New Programs.*** Whereas the Governor's budget funded no ongoing program expansions or new ongoing programs, the May Revision proposes numerous ongoing initiatives. Building off of current-year initiatives, it includes $50 million for expanding preschool, $25 million to fund a higher reimbursement rate for the school meals program, and $25 million for hiring additional counselors focused on career technical education. It also includes slightly more than $100 million for about a dozen other special ongoing initiatives.

The May Revision also redirects $100 million from the High Priority School Grant Program (HP Program) to two new initiatives—hiring new career technical education teachers ($50 million) and new teachers of college preparatory classes ($50 million). The administration states that this redirection has been agreed to by the plaintiffs in the *Williams* settlement.

AN LAO REPORT

***Technical Error Creates $366 Million Problem.*** The May Revision also makes attendance-related adjustments to K-12 education and community colleges. For K-12 education, it adjusts average daily attendance (ADA) upward by slightly more than 19,000 in the current year and almost 14,000 in the budget year. Despite these ADA increases, the May Revision scores $293 million in attendance-related savings relative to the Governor's budget. We determined that this reduction was due to a technical error whereby the $350 million provided in the current year for revenue limit equalization was not carried forward, thereby understating the costs to the base budget for 2007-08. After adjusting for the 2007-08 COLA, this $366 million error can be addressed by: (1) making reductions to Proposition 98 spending of a comparable amount to stay at the minimum guarantee, (2) using special fund or one-time Proposition 98 monies to increase K-14 funding while still staying at the minimum guarantee, or (3) identifying other General Fund monies and appropriating above the guarantee. For community colleges, the May Revision reduces apportionments by $80 million to account for unrealized enrollment.

***LAO Approach.*** In constructing the Proposition 98 ongoing package, we recommend the Legislature cover baseline costs (such as mandates and other already authorized programs) prior to funding new programs. We also recommend covering the $366 million attendance-related cost within the Proposition 98 minimum guarantee. To cover this cost, we recommend rejecting all of the Governor's new ongoing proposals. Rejecting all of these proposals, however, still leaves more than $200 million in unfunded attendance-related costs. We recommend using one-time Proposition 98 funds to cover this remaining shortfall. In addition, rather than redirecting HP funds to new initiatives, we recommend augmenting Economic Impact

**Figure 9**

## Proposition 98 Ongoing Proposals

*(In Millions)*

| | |
|---|---:|
| **January Budget** | |
| Cost-of-living adjustment (COLA) (4.04 percent) | $2,137.5 |
| Attendance changes | 38.7 |
| Home-to-School Transportation | -626.8 |
| Child care funding shift | 269.0 |
| Other | -0.4 |
| **Total** | **$1,818.0** |
| **May Revision** | |
| Home-to-School Transportation | $626.8 |
| Higher COLA (4.53 percent) | 246.8 |
| Attendance changes | -374.9 |
| High Priority Schools Grant program | -100.0 |
| Additional teachers for career technical education | 50.0 |
| Additional teachers for a through g courses | 50.0 |
| Preschool expansion | 50.0 |
| Special education | 35.5 |
| Additional career technical education counselors | 25.0 |
| School meals/child nutrition | 24.9 |
| Other | 96.4 |
| **Total** | **$730.6** |

LEGISLATIVE ANALYST'S OFFICE

AN LAO REPORT

Aid. Such an approach would allow districts serving low-income students and English learners to determine what types of additional teachers and services likely would be most effective.

**Major Changes in One-Time Proposition 98 Spending**

As shown in Figure 10 (see next page), the May Revision contains $542 million in additional one-time funds. Coupled with the one-

---

## UNCERTAINTY REGARDING HISTORICAL PROPERTY TAX RECEIPTS

Approximately one-third of local property taxes are currently allocated to local schools (including community colleges). Virtually all these property tax receipts offset dollar-for-dollar the state's General Fund financing obligations under Proposition 98.

The LAO property tax growth forecast for 2007-08 is lower than that of the Department of Finance (DOF). This is due to different assumptions about the effect of the real estate slowdown and the amount of property tax receipts that will flow to local schools. For this reason, the LAO General Fund forecast for Proposition 98 is $190 million higher than that of the DOF.

Beyond this budget-year forecasting difference, there is also a serious risk related to baseline property tax revenues. During the 2005-06 fiscal year, the growth in property tax receipts received by K-12 school districts was significantly lower than the growth in overall property tax receipts around the state. This shortfall led to a gap of approximately $280 million between actual receipts and the budgeted amount. (The May Revision recognizes these higher costs.) There are a number of possible reasons for this difference and the state has experienced some differences between these growth rates in prior years. However, the shortfall in growth rates during 2005-06 was unprecedented by historical standards, and we do not yet understand the reasons it happened.

The allocation of property tax revenues has been particularly complicated in recent years (due to such factors as the vehicle license fee swap, two-year property tax shift in 2004-05 and 2005-06, the "triple flip," and the growth of redevelopment). This potentially explains some of the problem. Year-to-year timing differences between the collection of revenues by counties and the receipt of revenues by schools could also explain the 2005-06 shortfall. It is possible, for instance, that additional receipts may flow to the schools during the 2006-07 fiscal year, which may counterbalance the low growth in 2005-06. In making its Proposition 98 baseline forecasts, DOF has assumed that this rebound will occur, and also that it will be large enough in magnitude to compensate for the effects of the lower receipts in 2005-06.

There is, however, a significant chance that the shortfall will not be fully compensated by higher growth in 2006-07. As a result, the state could face up to $310 million in additional 2006-07 Proposition 98 General Fund spending and $350 million in additional 2007-08 spending.

---

AN LAO REPORT

time funds provided in the Governor's budget, over $800 million is available for one-time K-14 expenses. This amount is split about evenly between current-year "settle-up" funds and Proposition 98 Reversion Account funds.

**Proposed Uses of One-Time Funds.** Of these funds, almost $200 million is provided for the Emergency Repair Program, $100 million is provided for a special initiative relating to school safety plans, and $100 million is provided for K-12 and community college career technical equipment. Other sizable proposals include $65 million for assisting districts in providing the state with student-level data, $50 million for community college nursing programs, $50 million for teacher recruitment and retention, slightly less than $50 million to cover deficiencies in mandatory supplemental instruction programs, and slightly less than $50 million for community college deferred maintenance. The remaining funds support more than a dozen other one-time initiatives.

**LAO Approach.** Although we typically would recommend the Legislature not use onetime funds to support ongoing expenses, the $366 million attendancerelated technical error likely entails significant reworking of the Governor's proposed ongoing Proposition 98 budget. To the extent ongoing funds cannot be identified to fully fund ongoing baseline costs, available one-time funds would represent a potential short-term solution. After covering shortfalls with the ongoing budget, we recommend using any remaining one-time funds to cover program deficiencies.

## KEY MAY REVISION SOLUTION: GOVERNOR PROPOSES SALE OF EDFUND

Under federal guaranteed loan programs, students take out loans from private lenders (such as banks), while the federal government guarantees repayment of the loans if the student defaults. Federal law requires that each state designate a guaranty agency with responsibility for processing the guarantee and performing related administrative functions. Since 1979, the

**Figure 10**

**Proposition 98 One-Time Proposals[a]**

*(In Millions)*

| | |
|---|---|
| **January Budget** | |
| Emergency Repair Program | $100.0 |
| Teacher recruitment and retention | 50.0 |
| Charter School Facilities | 43.9 |
| Child Care Stage 2 | 25.7 |
| Other | 41.9 |
| Subtotal | ($261.6) |
| **May Revision** | |
| School safety plans | $100.0 |
| Emergency Repair Program | 96.0 |
| CalPADS pre-implementation plans | 65.0 |
| K-12 career technical equipment | 50.0 |
| CCC career technical equipment | 50.0 |
| CCC nursing programs | 50.0 |
| Supplemental instruction deficiencies | 48.1 |
| CCC deferred maintenance | 48.0 |
| Other | 34.4 |
| Subtotal | ($541.5) |
| **Total** | **$803.0** |

[a] Includes "settle-up" funds for 2006-07 as well as Proposition 98 Reversion Account monies.

LEGISLATIVE ANALYST'S OFFICE

AN LAO REPORT

California Student Aid Commission (CSAC) has been the state's designated agency, although the state could choose from many other private and public guarantee agencies operating in the United States.

Until the mid-1990s, CSAC sometimes performed its loan guarantee function in house and sometimes contracted with third parties. In 1997, the state created a nonprofit public benefit corporation, EdFund, to perform these functions as CSAC's auxiliary. EdFund earns revenues from the federal government for performing these duties, and some of this revenue has been used to offset costs CSAC incurs for administering state grant programs. In recent years, concerns have been raised about the organizational relationships between CSAC and EdFund. In addition, recent efforts by the U.S. Department of Education and the Congress to modify the federal loan programs have added uncertainty as to EdFund's costs and revenues.

As part of the May Revision, the Governor proposes to sell EdFund to a private buyer for an estimated $1 billion. The CSAC would no longer have responsibility for overseeing the federal loan program, and instead would concentrate on the state grant programs that it currently administers. Without annual revenues from EdFund to support CSAC's operations, the Governor proposes $20 million in ongoing General Fund support for CSAC. The Governor does not propose any reductions to CSAC staffing, although several positions are currently dedicated to overseeing EdFund.

**Issues for Legislative Consideration.** Given its existing structure as a public benefit corporation, EdFund already operates more like a private business entity than a traditional state agency. We believe the administration's proposal merits consideration, with a key issue being the amount that could be raised through the corporation's sale. With its large loan portfolio and history of profitable operations, it is reasonable to assume that the state could in fact raise a substantial sum from EdFund's sale. At the same time, the proposal raises several issues for legislative consideration:

➤ **Is the Price Right?** The Governor's proposal would trade potential ongoing revenue from EdFund for a one-time payment to the state. The Legislature will have to consider whether the sales price is worth foregoing this potential revenue stream.

➤ **What Would Be the Impact on Students and Colleges?** If EdFund were sold, campuses could either use the services of the privatized entity or various other guarantee agencies that operate in the state. Campuses also can choose to use federal direct student loan programs that avoid the need for private lenders and guarantee agencies. It is unclear how these various options could affect costs and services to students.

➤ **What Would Be the Impact on CSAC Staffing?** The CSAC has several employees with responsibility for overseeing EdFund activities, as well as about 50 employees assigned to work at EdFund itself. (EdFund has about 565 of its own direct hires who are not state employees.) The disposition of these CSAC employees would depend in part on whether CSAC would remain the state's designated guarantee agency.

AN LAO REPORT

In addition to the proposed sale of EdFund, the May Revision includes another proposal similar in nature—the leasing of the state lottery. (See box on the next page for more details.)

## TRANSPORTATION

Relative to the Governor's January budget, the May Revision projects higher gasoline and diesel sales tax revenues in 2007-08. The May



**LEASING THE LOTTERY TO A PRIVATE OPERATOR**

The administration is requesting authorization to lease operating rights for the California Lottery to a private concessionaire for a multidecade period—perhaps for 40 years. In exchange, the state would receive a one-time payment—perhaps totaling in the tens of billions of dollars and/or annual payments from the private entity. The May Revision scores no revenues from this proposal in 2007-08, but suggests the proposal could produce benefits for the state in future fiscal years. The proposal is a general framework rather than a detailed implementation plan.

*Lottery Revenues and Trends.* Voters approved the lottery in 1984. Under the law, at least 34 percent of revenues goes to public education and about 50 percent is used for prizes. With revenues of $3.6 billion in 2005-06, the lottery distributed $1.3 billion to schools, community colleges, and universities. This was a record amount for the lottery, but sales are projected to decline by about 10 percent in 2006-07, due to lagging consumer interest in several lottery games. Such declines have occurred periodically during the lottery's first two decades, including sharp drops during the late 1980s and early 1990s. During the last decade, including estimated 2006-07 results, lottery distributions have grown at an average of 4.1 percent per year. Lottery moneys total less than 2 percent of all K-12 revenues.

*Private Sector Interest.* The figure shows that per capita lottery sales in California lag the national average by about 40 percent.

### 2005-06 Lottery Sales Per Capita

All States West of the Mississippi Average: $110

All Lottery States Average: $184

Washington
Arizona
Oregon
**California**
Colorado
Texas
Ohio
Florida
Pennsylvania
New York
Massachusetts

$100    200    300    400    500    600    700

Source: California Lottery, *La Fleur's Magazine*, and Census Bureau. Excludes video lottery terminal sales.

AN LAO REPORT

Revision proposes to use most of these increased revenues to offset General Fund expenditures in the current and budget years.

***Current Law.*** The PTA has traditionally been funded by sales tax on diesel fuel and a portion of the sales tax on gasoline. Some PTA revenues come from "spillover"—the amount that gaso-

States west of the Mississippi typically have lower per capita sales, and California lags the average of this group by about 10 percent. Private-sector entities have been interested in operating lotteries due to the possibility of increased sales. Private entities operate lotteries in Europe and Australia, and several states recently have considered proposals similar to this one.

***Issues for Legislative Consideration.*** The administration's proposal is worth examining further. We have identified several issues for the legislature to consider.

➤ ***Education Funding.*** The administration proposes structuring a deal that would give schools a specified minimum level of funding. The Legislature would need to consider the appropriate level of funding—both in the short term and the long term—and how the funding would be provided.

➤ ***Use of One-Time Proceeds.*** The administration proposes using upfront proceeds from the lease to repay debt, including deficit-financing bonds. The Legislature could also use one-time proceeds to, for example, (1) retire other debt such as (2) make special fund loans (including transportation), (3) build infrastructure, or (4) reduce unfunded pension or retiree health liabilities.

➤ ***What Is the Lottery Worth?*** We believe a private entity may be able to improve lottery performance, but no one knows for sure what private firms would pay for the right to operate the lottery. If the Legislature agrees to the administration's plan, the Legislature may wish to establish parameters for a transaction to be completed, including a minimum upfront payment and/or minimum levels of annual payments from the concessionaire.

➤ ***Flexibility.*** The state likely would receive the largest bids from the private sector if many limitations on lottery activities—including percentage formulas for payouts, state employment rules (including civil service protections), and procurement requirements—were relaxed.

➤ ***Effect on Other State Revenue Sources.*** The Legislature should consider the effect a privately run lottery would have on both positive and negative on other state revenues, including revenues from tribal casinos, sales taxes, and income taxes.

➤ ***Voter Participation.*** The proposal raises significant policy questions. The Legislature would need to consider whether voter approval is required to go forward with a lease.

line sales tax revenues at the 4.75 percent rate exceed the amount generated from sales tax on all other goods at the 0.25 percent rate. Under current law, one-half of PTA revenues are to be transferred to the State Transit Assistance (STA) program for support of local transit systems, with the remainder used for various other transit and transportation planning purposes.

**Governor's Budget Proposals Prior to May Revision.** The January budget proposed to use $1.1 billion in the PTA funds to offset General Fund expenditures, including the use of:

➤ $340 million in spillover in 2007-08 to pay debt service on outstanding transportation bonds, which has traditionally been paid from the General Fund.

➤ $627 million in PTA money to fund the Home-to-School Transportation program in 2007-08, instead of using Proposition 98 funds. The January budget proposed the funding shift on a permanent basis and to "rebench" the Proposition 98 funding requirement downward by a like amount. In April, the administration modified its Home-to-School Transportation proposal. Instead of rebenching the Proposition 98 funding requirement, the administration proposed that PTA reimburse the General Fund for the cost of the Home-to-School Transportation program on an ongoing basis.

➤ $144 million in PTA money on a one-time basis to offset General Fund expenditures for regional center transportation in 2007-08.

In addition, the Governor's January budget proposed to permanently eliminate funding STA from spillover revenues.

**Governor's Proposals in the May Revision.** The May Revision projects $238 million in additional revenues into the PTA in 2007-08 than were anticipated in the January budget. Most of the increase would come from additional spillover revenues resulting from higher gasoline prices than projected in the January budget. Specifically, the May Revision projects a total of $827 million in spillover, compared to $617 million in the January budget. The May Revision includes the following proposals:

➤ **Additional Reimbursement to the General Fund for Home-to-School Transportation.** The May Revision proposes to use $200 million in PTA revenues to reimburse the General Fund for Home-to-School Transportation expenditures in the current year. The May Revision also increases by $3 million (to $630 million) the amount of PTA funds that would reimburse the General Fund for Home-to-School Transportation expenditures in 2007-08. The increase reflects higher transportation costs for the state special schools. After 2007-08, the May Revision also proposes that $200 million in PTA money be used to reimburse various unspecified General Fund expenditures annually, on an ongoing basis.

➤ **Reduced Funding for Regional Center Transportation.** The May Revision reduces by $15.2 million (to $129 million) the amount of PTA funds used for regional center transportation. The reduction reflects lower estimated program costs and a technical adjustment.

➤ **Slight Increase in Funding for STA.** The May Revision increases funding for STA

AN LAO REPORT

to $206 million, compared to $185 million in the January budget. This increased funding comes mainly from higher projected diesel sales tax revenues.

With these proposals, the May Revision would leave PTA with a balance of about $100 million at the end of 2007-08, a slight improvement over what was proposed in the January budget ($69 million). However, if PTA revenues fall short of the administration's projections or expenditures on transit capital projects are higher than anticipated, this projected balance would be reduced. Moreover, the projected balance does not include funding for continued development of a high-speed rail system.

***Home-to-School Transportation Proposal Unworkable.*** In February, we concluded based on conversations with Legislative Counsel Bureau that the administration's proposed re-benching of Proposition 98 as part of its original Home-to-School Transportation proposal was likely unconstitutional. In its modified form, we conclude that the proposal is still unworkable. In essence, the administration seeks to count the transportation funds simultaneously towards two separate (and mutually exclusive) legal spending requirements—under both the Proposition 98 guarantee and PTA.

# KEY CONSIDERATIONS FOR THE LEGISLATURE

As it reviews the proposals contained within the May Revision, the Legislature will face a number of key issues that we outline below.

## Reserve Likely Overstated by $1.7 Billion

In February, we identified a number of assumptions in the Governor's January budget that were overly optimistic. Since then, the administration has modified several of these assumptions, including (1) no longer assuming the sale of the pension bonds in 2007-08 and (2) reducing its tribal gambling revenue estimate by almost $200 million.

Despite these positive changes, the May Revision continues to rely on a number of optimistic assumptions from its January proposal and adds a number of new ones. As a result, we estimate that the May Revision overstates the state's General Fund reserve at the end of 2007-08 by almost $1.7 billion. Figure 11 summarizes these factors which are described in more detail below.

***Home-to-School Transportation Proposal.*** As discussed above, we do not believe the administration's transportation proposal is workable. It would not provide the assumed $830 million in savings.

**Figure 11**

**LAO: Reserve Likely Overstated by $1.7 Billion**

| *(In Millions)* | |
|---|---|
| **May Revision Reserve** | $2,199 |
| **LAO Major Adjustments** | -$1,670 |
| Home-to-School Transportation shift proposal unworkable | -$830 |
| Potential correctional officer contract costs | -330 |
| Property taxes growth rate too high | -190 |
| Tribal gambling revenues overly optimistic | -184 |
| Midyear reductions unlikely to achieve savings | -136 |
| **LAO Adjusted Reserve** | $529 |

AN LAO REPORT

*Correctional Officer Salary Increase.* Funds paid to correctional officers, their supervisors, and managers total about 40 percent of General Fund personnel costs. The correctional officers' labor agreement expired in July 2006, and the budget contains no funds for a potential new agreement. The administration's most recent contract offer, however, would raise General Fund costs by about $330 million in the budget year. While negotiations have been slow and the administration recently requested mediation, it would be prudent for the Legislature in building its budget to account for roughly this amount in potential costs. In February, we raised the possibility that correctional officers could receive a compensation increase on July 1, 2007, even without a new agreement. This is due to the possibility that the prior agreement would continue to govern pay raises. The prior agreement tied compensation to California Highway Patrol officers, who are scheduled for a pay increase in the budget year.

*Property Taxes Estimate.* As noted earlier, our property tax estimate for the budget year is $190 million lower than the administration's estimate. These lower revenues increase General Fund Proposition 98 expenditures on a dollar-for-dollar basis.

*Tribal Revenue Estimate.* As noted above, the administration has significantly reduced its original estimate of revenues from the approval of amended tribal gambling compacts currently pending in the Legislature. The new estimate, however, continues to rely on rosy assumptions regarding the timing of legislative approval, the number of slot machines that would be added by tribes in the short term, and the profitability of those machines. Given the Senate's action to approve the compacts on a majority vote, our

revenue assumption for the Governor's proposal now assumes implementation on January 1, 2008—rather than the immediate implementation that would occur with a two-thirds approval. To the extent that the five compacts were not effective for 2007-08, the impact on the reserve would be even greater.

*Midyear Reductions.* The administration assumes that the state will achieve $146 million in savings from reductions to departmental appropriations during the upcoming fiscal year. Recent experience with these types of assumptions has shown that most savings are either double-counted or lead to future departmental budgetary shortfalls. As a result, we project that only a minimal amount of savings ($10 million) could be achieved by the administration's proposal.

*More Realistic Budget Planning.* It is conceivable that some portion of the amounts discussed above could be realized. Our assessment, however, is that the Legislature should approach its budget planning without counting on the amounts scored by the administration. Instead of working from the May Revision's stated $2.2 billion reserve, the Legislature should—as its own starting point for budget deliberations—consider the budget as containing a $529 million reserve.

## Picture of Future Years More Gloomy

Based on our initial assessment of the May Revision, we have updated our long-term forecast of the state's ongoing budget shortfall under the Governor's proposed policies. Taking into account our assessment of the out-year revenue and expenditure implications of the May Revision, we estimate that the 2008-09 operating shortfall would be about $5 billion. The growth in the operating shortfall from the budget year to 2008-09 reflects the administration's approach

AN LAO REPORT

of closing the 2007-08 budget gap with a number of one-time solutions, such as the EdFund sale and the acceleration of tobacco securitization revenue transfers. In later years, the shortfall would drop to about $3 billion, as shown in Figure 12. This reduction primarily reflects the payoff of the state's deficit-financing bond debt in 2009-10. Thus, while closing the 2007-08 budget shortfall will be the most immediate task, the Legislature should also keep an eye on the effect of any budgetary actions this year on upcoming budgets.

**Additional Risks Warrant More Caution**

Every annual state budget has some legal uncertainties, potentially higher costs, and revenue estimates subject to downward adjustments. Yet, even after accounting for the overly optimistic assumptions discussed above, there are other risks and pressures contained within the administration's proposed 2007-08 budget plan which—if occur—would put it out of balance.

*Legal Issues.* Since January, the state prevailed at the appeals court level for a case involving California Work Opportunity and Responsibility to Kids (CalWORKs) grants. However, the case has been appealed to the California Supreme Court. In addition, the state faces a number of other court cases with sizable fiscal liabilities. For instance, the state is currently on the losing end of cases involving the constitutionality of a fee on limited liability corporations, the manner in which the state handles unclaimed property, and the state's reduction of a required payment to a fund for retired school teachers. In total, these legal risks could exceed $2 billion (primarily of a one-time nature). In addition, the state is currently dealing with a variety of federal lawsuits related to the correctional health care system. While the budget plan includes many costs associated with these lawsuits, the full magnitude of the associated costs remains unknown.

*Revenue Assumptions.* As discussed in the education section of this report, the lower-than-expected 2005-06 property tax receipts by school districts is not yet fully understood. If this reduction continues in the current and budget



**Figure 12**

**Significant Operating Shortfalls[a] Would Persist**

*General Fund (In Billions)*

[a] Annual revenues minus expenditures. Legislative Analyst's Office estimates of Governor's revenue and expenditure policies.
[b] Includes expenditures of $283 million in 2006-07 for Proposition 98 settle-up and $300 million in 2007-08 for Quality Education Investment Act that the administration shows as prior-year spending.

AN LAO REPORT

years, the state would be exposed to $660 million in additional costs. This amount is in addition to our lower property tax forecast based on the real estate outlook. In addition, as noted earlier, the level of revenues that would be received by the proposed sale of EdFund is subject to uncertainty.

*Retiree Health Unfunded Liabilities.* Like the vast majority of governments across the country, the state has not funded the estimated costs of future retiree health benefits as they *accrue.* Instead, the state uses a "pay-as-you-go" funding system where costs are paid as benefits are used by retirees. As a result, the state has a large unfunded liability for the benefits that are earned now but will be paid for later. On May 7, 2007, the State Controller released the state's first actuarial valuation which identified this unfunded liability as totaling $47.9 billion. In order to fully fund retirees' future benefits and eliminate this liability over the next three decades, the state would have to begin setting aside an additional $1.2 billion annually. These amounts will grow each year that the state continues its pay-as-you-go approach. Our estimates do not account for these higher costs that will need to be paid at a future date.

## Focus on Payoff of Deficit-Financing Bonds Should Not Be Immediate Priority

The administration's budget proposals have placed an emphasis on paying off the state's deficit-financing bonds. In addition to the base payment of $1.5 billion, the May Revision continues to propose $1.6 billion in supplemental payments in 2007-08 through two components.

➢ Choosing not to suspend a $1 billion payment through the Budget Stabilization Account. (June 1, 2007, would be the deadline for a suspension by the Governor.)

➢ Proposing a $595 million additional appropriation in the *2007-08 Budget Bill.*

The goal of these prepayments is to pay off the bonds earlier than scheduled and reduce debt costs. The payments would help the state's budget once the entire amount of outstanding bonds are paid off, beginning in 2009-10. These prepayments are a worthy aim when the state's budget situation allows. With the nearer-term outlook worsening, however, we question the wisdom of these payments at this time. Given the overstated reserve and additional financial risks, assisting the state to close its budget gaps in 2007-08 and 2008-09 is a more urgent demand.

AN LAO REPORT

# CONCLUSION

Despite the state's improved revenue picture in the current year, the Legislature will face a significant challenge to develop a 2007-08 budget that realistically reflects revenues and spending while maintaining a prudent reserve. The administration has attempted to address a $2 billion decline in the state's fiscal outlook. Due to several overly optimistic assumptions, however, the May Revision overstates its reserve by about $1.7 billion—leaving an estimated reserve of $529 million. Even this reserve level would be subject to considerable risks and pressures.

# EXHIBIT O

# CALIFORNIA FIVE-YEAR INFRASTRUCTURE PLAN 2007







ARNOLD SCHWARZENEGGER, GOVERNOR

STATE OF CALIFORNIA

# TABLE OF CONTENTS

| Section | | Page |
|---|---|---|
| i | Foreward | i |
| 1 | Executive Summary | 1 |
| 2 | Introduction | 5 |
| 3 | The Methodology of this Report | 9 |
| 4 | Infrastructure Needs and Proposed Funding by Agency and Department | 13 |
| | Legislative, Judicial, and Executive Agency | 15 |
| | Judicial Branch | 15 |
| | Office of Emergency Services | 20 |
| | Department of Justice | 22 |
| | State and Consumer Services Agency | 25 |
| | California Science Center | 25 |
| | Department of General Services | 28 |
| | Business, Transportation, and Housing Agency | 33 |
| | Department of Transportation | 33 |
| | California Highway Patrol | 40 |
| | Department of Motor Vehicles | 43 |
| | Resources Agency | 48 |
| | Conservancies | 50 |
| | California Conservation Corps | 67 |
| | Department of Forestry and Fire Protection | 70 |
| | California State Lands Commission | 76 |
| | Department of Fish and Game | 79 |
| | Department of Boating and Waterways | 83 |
| | Department of Parks and Recreation | 87 |
| | Department of Water Resources | 95 |
| | Environmental Protection Agency | 102 |
| | Department of Toxic Substances Control | 102 |
| | Health and Human Services Agency | 106 |
| | Department of Developmental Services | 106 |
| | Department of Mental Health | 111 |

TABLE OF CONTENTS

| | | |
|---|---|---|
| | **Department of Corrections and Rehabilitation** | **116** |
| | **Education** | **126** |
| | Public Kindergarten to Grade 12 School Facilities | 127 |
| | K-12 Education State School Facility Program | 127 |
| | State Special Schools | 135 |
| | Higher Education | 139 |
| | University of California | 142 |
| | California State University | 148 |
| | California Community Colleges | 154 |
| | **General Government** | **161** |
| | Department of Food and Agriculture | 161 |
| | Military Department | 165 |
| | Department of Veterans Affairs | 170 |
| 5 | **Summary of Proposed Expenditures and Funding** | **177** |
| | Expenditures | 177 |
| | Funding | 180 |
| | Affordability | 191 |
| 6 | **Bond Accountability** | **195** |
| | **Appendices** | |
| 1 | **Major Project Categories** | **197** |
| 2 | **2007 Five-Year Infrastructure Needs Reported by Department** | **199** |
| 3 | **Proposed 2007 Five-Year Infrastructure Funding** | **223** |
| 4 | **Capital Acquisition through Long-Term Financing** | **241** |
| 5 | **History of California Bonds by Program Area** | **247** |
| 6 | **History of California Bonds by Date of Authorization** | **253** |
| 7 | **Authorized and Outstanding General Obligation Bonds** | **259** |
| 8 | **State Public Works Board and Other Lease-Purchase Financing Outstanding Issues** | **263** |
| 9 | **Authorized but Unissued Lease Revenue Bonds** | **265** |
| 10 | **Executive Order S-02-07 Bond Accountability** | **267** |

## DEPARTMENT OF CORRECTIONS AND REHABILITATION

The mission of the California Department of Corrections and Rehabilitation (CDCR) is to improve public safety through programs that have demonstrated success at reducing recidivism.

The CDCR is organized into twelve programs: Corrections and Rehabilitation Administration; Corrections Standards Authority; Juvenile Operations; Juvenile Education, Vocations, and Offender Programs; Juvenile Parole Operations; Juvenile Health Care Services; Adult Operations; Adult Parole Operations; Board of Parole Hearings; Community Partnerships; Adult Education, Vocations, and Offender Programs; and Adult Health Care Services.

Effective July 1, 2005, all agencies that previously reported to the Youth and Adult Correctional Agency were consolidated into the CDCR pursuant to the Governor's Reorganization Plan 1 of 2005 and Chapter 10, Statutes of 2005.

**Existing Facilities:** The CDCR operates 41 youth and adult correctional facilities, 44 camps, and 5 adult prisoner/mother facilities. The CDCR contracts for 19 adult parolee service centers and 13 adult community correctional facilities and it leases beds at 3 county jails. The CDCR also operates 192 youth and adult parole units and sub-units, 4 parole outpatient clinics, and 2 correctional training centers. In addition, the CDCR has 10 regional accounting offices and leases almost two million square feet of office space.

Currently, the CDCR houses approximately 173,000 adult inmates and 2,500 youth wards. The CDCR also supervises approximately 122,000 adult and 2,400 youth parolees.

The CDCR operates 4 licensed general acute care hospitals, 1 licensed skilled nursing facility, 1 hospice program for the terminally ill, 14 licensed correctional treatment centers, 3 hemodialysis clinics, and outpatient housing units at most correctional facilities.

The CDCR's infrastructure includes more than 42 million square feet of building space on more than 27,000 acres of land (42 square miles) statewide.

State correctional facilities average approximately 1 million square feet of building space and are sited on an average of 350 acres. Because correctional facilities must provide the confined population with all of the services generally provided in a small city, their infrastructure includes a variety of buildings and systems including:

- Housing units
- Pharmacies
- Kitchen and dining facilities
- Laboratories
- Medical, dental, psychiatric, and substance abuse treatment space
- Chapels
- Recreation areas
- Classrooms
- Libraries
- Firehouse plant operations
- Vocational and industry space
- Warehouse, administrative, and records space

In addition, correctional facilities have sophisticated energy, utility, telecommunications, and electronic security systems. Because of their size and often-remote locations, many correctional facilities operate their own water and wastewater treatment systems.

Some correctional facilities also produce a portion of their power through cogeneration plants. Because all operations must occur in a secure environment, correctional facilities have various features and systems to provide both internal and perimeter security, which include lethal electrified fences at 25 of the CDCR's 33 adult correctional facilities.

Many of the CDCR's institutions are showing signs of aging. The oldest of the CDCR institutions, San Quentin and Folsom, were built in 1852 and 1880, respectively. Between 1933 and 1965 ten more adult correctional facilities were added. Since the early 1980s, the CDCR established an additional 21 adult correctional facilities. The most recent, Kern Valley State Prison, was completed in June 2005.

The CDCR's youth correctional facilities are also quite old, as seven of the eight operating facilities were built prior to 1960. The newest, N.A. Chaderjian, was completed in 1991. At the time these facilities were built they served a younger

population that, in general, was incarcerated for less violent offenses than today's population.

Many of the newer correctional facilities are now 15 to 20 years old. Given the age and complexity of the institutions and their support systems, excessive wear and tear caused by crowding, rapidly changing technology, modifications and upgrades required for adult inmate and youth ward population needs, modern building codes, health and safety standards, and court mandates, the CDCR expects to continue to need a large and aggressive capital outlay program to support its public safety mission.

**Drivers of Need:** The primary infrastructure need for the CDCR is housing capacity for the incarceration of adult and youth offenders. The factors affecting the number of new cells and beds needed include population growth, crime rates, crowding policies, and the availability of cell and bed space. Other factors include the creation of new criminal penalties, statutory increases in sentences, programs that reduce recidivism, and statutory policies on work and behavior credits. Capital outlay needs are also affected by several lawsuits in state and federal court regarding deficiencies in general conditions of confinement and delivery of services to adult inmates and juvenile wards. In addition, the CDCR's own strategic initiatives to improve efficiency and quality of services drive capital needs. Furthermore, housing alien felons in state correctional facilities instead of federal prisons further exacerbates the need for additional state facilities.

The CDCR has identified primary drivers of need within each of its program categories. They are as follows:

- Population (Inmate Housing)—shortage of maximum-security beds. Based upon the Fall 2006 Population Projections, male inmate housing capacity will be exhausted sometime in 2007. All 33 CDCR prisons are now at or above maximum capacity. Twenty-nine of the prisons are so overcrowded that the CDCR is required to house approximately 18,500 inmates in prison gymnasiums, dayrooms, and program space. Approximately 1,700 inmates are sleeping in triple bunks. The shortage of maximum-security beds has led to increased confrontation between inmates and mission changes among the institutions to try to accommodate different groups of inmates, as well as exacerbating the risk of injury to staff.

SECTION FOUR │ INFRASTRUCTURE NEEDS & PROPOSED FUNDING BY AGENCY & DEPARTMENT

- Caseload (Health Care Services)—specialized housing for the growing number of special health needs inmates, such as mental health and geriatric, within the prisoner population. This population shift is resulting in overcrowding and shortfalls in specialized housing and program space, as well as maximum-security cells that are often used to fulfill these needs. The CDCR's medical service delivery system is under federal receivership (Plata v. Schwarzenegger). Furthermore, the CDCR's mental health services delivery system is subject to court monitoring (Coleman v. Schwarzenegger). Lastly, the CDCR has entered a settlement to improve its delivery of dental services to inmates (Perez v. Tilton). The juvenile health care delivery system is also under legal scrutiny (Farrell v. Tilton). All of these legal cases may affect the CDCR's capital outlay program by requiring additional projects and accelerating the timelines for project completion.

- Facility/Infrastructure Modernization—age and deteriorating condition of buildings, changing inmate security requirements and support systems, new or expanded program needs, essential utility expansion or upgrades, and inmate population growth. These factors necessitate the renovation, modification, or replacement of institution components so the CDCR can more efficiently and effectively provide its services and programs to both adult and juvenile inmates.

- Critical Infrastructure Deficiencies—age and deteriorating condition of buildings and associated security structures and support systems, essential utility replacement, and inmate population growth. In addition to the 12 institutions built before 1966, several of the newer institutions or their components are experiencing premature degradation due to abuses from inmates and deterioration over time. Furthermore, many of the utilities, particularly water and wastewater treatment facilities, are worn out or facing penalties and non-compliance issues.

- Workload Space—providing medical treatment space for the growing number of special health needs inmates. This growing population has further taxed the existing office and storage space to provide essential services.

- Program Delivery Changes—new or expanded program needs resulting from changes to existing program delivery system. These needs are driven by litigation, court mandates, and legislation addressing areas such as access to health care services, substance abuse programs, exercise time, and work training

programs. The space allotted for delivery of these services is inadequate to fully support these initiatives.

**Five-Year Needs:** The CDCR identified $12.9 billion in needs for the next five years. This includes $339 million to address critical infrastructure deficiencies, $12.0 billion to address capacity needs driven by population increases, and $394 million to modernize facilities to current building and program standards. In addition, $56 million was identified for facility modifications resulting from various changes to existing programs and $74 million was requested for projects requiring more space because of increased workload.

The $339 million to correct critical infrastructure deficiencies includes large issues such as $115 million to upgrade deficient utilities, including installation of temperature control systems at Ironwood State Prison in Blythe and a water treatment discharge disposal project at Chuckawalla Valley State Prison in Blythe. It includes $72 million to deal with fire/life/safety issues including a fire alarm system upgrade at California Men's Colony in San Luis Obispo and statewide installation of fire protection sprinkler systems. In addition, the CDCR identified $65 million to replace the dorms at California Rehabilitation Center, Norco; Sierra Conservation Center, Jamestown; and Deuel Vocational Institution, Tracy.

The CDCR requested $12.0 billion to handle projected increases in segments of inmate population, including $9.8 billion for infrastructure, housing, re-entry facilities, and program space, $1.1 billion for dental treatment and office space to meet the requirements of the Perez court, $700 million for new mental health facilities throughout the state because of the increasing population of seriously mentally ill inmates, and $285 million for 2 new juvenile justice facilities to better house and program the wards.

Further, the CDCR identified $394 million to modernize its existing facilities. This includes $172 million for improvements to utilities serving CDCR facilities and $134 million for security systems.

Facility modifications resulting from various changes to existing programs were identified in the amount of $56 million. Finally, an additional $73 million was requested for projects requiring more space because of increased workload, including $25 million for new kitchens at California Men's Colony in San Luis Obispo

and Preston Youth Correctional Facility in Ione and $23 million for plant operations complexes at various Juvenile facilities throughout the state.

### Funding Needs Reported by the Department of Corrections and Rehabilitation
(Dollars in Thousands)

| Category Description | 07/08 | 08/09 | 09/10 | 10/11 | 11/12 | Total |
|---|---|---|---|---|---|---|
| Critical Infrastructure Deficiencies | $46,944 | $162,850 | $41,919 | $71,751 | $15,321 | $338,785 |
| Caseload/Population | 10,467,487 | 473,650 | 1,047,098 | 3,936 | 0 | 11,992,171 |
| Facility/Infrastructure Modernization | 67,411 | 68,230 | 188,549 | 33,606 | 36,057 | 393,853 |
| Program Delivery Changes | 1,368 | 13,388 | 33,790 | 307 | 7,593 | 56,446 |
| Workload Space Deficiencies | 10,522 | 2,218 | 28,620 | 17,337 | 14,871 | 73,568 |
| Total | $10,593,732 | $720,336 | $1,339,976 | $126,937 | $73,842 | $12,854,823 |

**Proposal:** The 2007 Plan proposes $10.2 billion for the next five years. Of this amount $9.8 billion is directly tied to the Governor's initiative targeting prison reform, which was announced on December 21, 2006. The initiative is designed to confront California's dangerous overcrowding crisis and reduce recidivism.

**Prison Reform Initiative:**

Specifically, the Plan allocates $2.7 billion to add 16,238 beds at existing facilities through infill projects and new construction while rectifying infrastructure problems that result from current overcrowding in these facilities. Infrastructure projects include improvements to water, sewer, and electrical systems that have been overburdened by overcrowding.

In addition to construction at existing facilities, the Plan provides $4.4 billion to build local jails and juvenile facilities. This proposal will result in the addition of 45,000 local beds and 5,000 juvenile beds to the existing capacity. In 2005 alone, 233,388 individuals avoided incarceration or were released early from jail sentences due solely to a lack of jail space. This proposal would provide 20,000 beds for local use and 25,000 beds for inmates transferred by the state to local jails. These transfers are intended to allow offenders who pose a minimal public safety risk to be housed in their communities rather than in state prisons. In addition, females and juvenile offenders will be allowed to serve their sentences in local facilities and to benefit from family and community resources that will help reduce their rates of recidivism.

SECTION FOUR | INFRASTRUCTURE NEEDS & PROPOSED FUNDING BY AGENCY & DEPARTMENT

Through shared responsibility for the offender population statewide, local governments and the state will each have a greater stake in positive outcomes.

The Plan provides $1.6 billion to construct new re-entry facilities throughout the state. These facilities will provide 5,000 to 7,000 beds in secure facilities for the purpose of transitioning inmates back to their communities upon the termination of their sentences. The overarching principal of the proposed re-entry facilities is to accomplish changes in parolee behavior by providing evidence-based programs for every inmate during incarceration in the re-entry facility and upon parole into the community. These re-entry facilities are proposed to be sited within urban locations, where community and governmental services can be provided seamlessly and transition with the parolee upon release.

The Governor's reform initiative also includes $1 billion to incorporate mental health and dental services and to provide specialized treatment beds and program space for medical services as directed by the court-appointed Receiver in Plata v. Schwarzenegger (medical) and the Coleman and Perez courts.

Finally, the reform initiative includes $117 million to complete the condemned inmate complex at San Quentin and $55 million to construct a CDCR training academy for correctional officers in Southern California. Delays in the San Quentin project have caused the project to suffer inflationary price increases. This proposal allows the CDCR to account for the rising cost of construction materials and to complete the project. As the CDCR adds facilities, it will depend more than ever on a workforce able to address the needs of an expanding population of inmates. Adding a training facility to Southern California is expected to significantly increase the number of correctional officers the CDCR will be able to train and employ.

**Additional Needs:**

The remaining $400 million includes $155 million to modernize existing facilities and infrastructure, $146 million to address critical infrastructure deficiencies, $61 million to address issues created by increases in inmate populations, and $38 million to resolve program delivery changes and workload space deficiencies.

The Plan includes $155 million to modernize infrastructure at existing facilities. This amount includes $57 million for wastewater projects at the Chuckawalla Valley State

SECTION FOUR | INFRASTRUCTURE NEEDS & PROPOSED FUNDING BY AGENCY & DEPARTMENT

Prison, Blythe, the California Correctional Center, Susanville, the California State Prison, Corcoran, the Centinela State Prison, Imperial, Mule Creek State Prison, Ione, and the Galt Correctional Training Center (GCTC). The CDCR has received notices concerning the management and discharge of wastewater from the regional water quality control boards at these prisons. Because the current arrangement between the CDCR and the City of Galt for the handling of wastewater is not sustainable, the project at the GCTC will allow the CDCR to continue to utilize this essential facility in the future. The amount also includes $24 million to replace existing cell fronts at the California Institution for Men, Chino, the California Medical Facility, Vacaville, the Deuel Vocational Institution, Tracy, and the Correctional Training Facility in Soledad with a more secure design that is compliant with CDCR safety standards. $20 million will be used to renovate the gas, storm, sewer, and water supply systems at Folsom State Prison in Represa. In addition, $19 million is included for a kitchen renovation at California Medical Facility, Vacaville.

The Plan includes $146 million to address ongoing critical infrastructure deficiencies not resulting from the Governor's initiative. The primary projects that make up that amount include $48 million to install a new heating and ventilation system at the Ironwood State Prison in Blythe, and $36 million to upgrade a fire alarm and suppression system at the California Men's Colony (CMC) in San Luis Obispo. The CMC system is needed to prevent the deadly effects of fire or other disasters that threaten older wooden structures such as those in use at that institution. The Plan also allocates $11 million to construct a double security perimeter fence at Patton State Hospital, which continues to house mental patients referred through the court system. Finally, $48 million will be used to carry minor capital improvements throughout the system and studies needed to prepare plans and develop designs for future capital projects.

Of the $61 million to address increasing inmate populations, $60 million is for mental health facilities at the CMC, San Luis Obispo and California Institution for Women, Corona to accommodate the expanding needs for mental health treatment.

For the remaining $38 million of proposed projects, $11 million is proposed to replace the central kitchen at the California Men's Colony in San Luis Obispo. An additional $8 million is for the substance abuse office and program space at the California Rehabilitation Center in Norco. Lastly, this also includes $7 million to construct 179

small management exercise yards at the California Correctional Center in Susanville, the Sierra Conservation Center in Jamestown, the San Quentin State Prison, the North Kern State Prison in Delano, the Correctional Training Facility in Soledad, and the California Correctional Institution in Tehachapi.

The statewide dental treatment and office space project requested by the Department is not being recommended in total for this five-year plan, but rather incorporated in the reform initiative for $1 billion. The initial proposal submitted by the Department was based on a ratio of inmates to dentists that has not been approved by the court. It is currently being revised to reflect the approved ratio. The two new core treatment facilities being proposed at Stockton and one in the Southern region are not being proposed at this time. These projects as well as other projects for the CDCR's juvenile facilities are not being proposed at this time as the CDCR is proposing to shift a portion of the population of juvenile offenders housed in state facilities to locals while providing resources to support their program and housing needs.

**Consistency with Chapter 1016, Statues of 2002:** The CDCR Plan is consistent with the state's planning priorities and is focused on rehabilitating and improving existing infrastructure and promoting infill development. The CDCR's individual projects are evaluated for their effect on the environment and projects are modified to minimize negative effects on a case-by-case basis.

### Proposed Funding for the Department of Corrections and Rehabilitation
(Dollars in Thousands)

| Category Description | 07/08 | 08/09 | 09/10 | 10/11 | 11/12 | Total |
|---|---|---|---|---|---|---|
| Critical Infrastructure Deficiencies | $11,471 | $57,936 | $22,233 | $44,725 | $9,500 | $145,865 |
| Caseload/Population | 9,823,593 | 57,761 | 0 | 0 | 0 | 9,881,354 |
| Facility/Infrastructure Modernization | 56,636 | 12,013 | 32,591 | 17,437 | 35,868 | 154,545 |
| Program Delivery Changes | 911 | 6,444 | 478 | 307 | 7,593 | 15,733 |
| Workload Space Deficiencies | 10,522 | 0 | 1,246 | 10,548 | 0 | 22,316 |
| **Total** | **$9,903,133** | **$134,154** | **$56,548** | **$73,017** | **$52,961** | **$10,219,813** |
| **Funding Source** | | | | | | |
| General Fund | $376,369 | $134,154 | $56,548 | $73,017 | $52,961 | $693,049 |
| Lease Revenue Bonds | 9,526,764 | 0 | 0 | 0 | 0 | 9,526,764 |
| **Total** | **$9,903,133** | **$134,154** | **$56,548** | **$73,017** | **$52,961** | **$10,219,813** |

**EXHIBIT P**

CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD
CENTRAL VALLEY REGION

ORDER NO. R5-2006-0130

CEASE AND DESIST ORDER
REQUIRING
CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
MULE CREEK STATE PRISON WASTEWATER TREATMENT PLANT
AMADOR COUNTY

TO CEASE AND DESIST
FROM DISCHARGING CONTRARY TO REQUIREMENTS

The Regional Water Quality Control Board, Central Valley Region, (hereafter referred to as "Regional Water Board") finds that:

1.  Waste Discharge Requirements (WDRs) Order No. 5-00-088, adopted by the Regional Water Board on 28 April 2000, prescribes requirements for the California Department of Corrections and Rehabilitation (CDCR) Mule Creek State Prison wastewater treatment plant (WWTP), and wastewater conveyance systems from the Preston Youth Correctional Facility and California Department of Forestry Fire Academy.

2.  The CDCR Mule Creek State Prison, Preston Youth Correctional Facility, and California Department of Forestry are jointly responsible for compliance with the WDRs. However, this Order pertains to issues at the Mule Creek State Prison WWTP, and therefore is issued solely to the CDCR (hereafter referred to as Discharger).

3.  The WWTP is about one mile north of the City of Ione on Highway 104, in Section 13, T6N, R9E, MDB&M.

**DESCRIPTION OF FACILITIES**
**AS FOUND IN THE WASTE DISCHARGE REQUIREMENTS**

4.  The current WDRs allow an average dry weather discharge flow rate of up to 740,000 gallons per day (gpd) and a peak wet weather discharge flow rate not to exceed 2.2 million gpd.

5.  The wastewater treatment plant consists of an oxidation ditch, two clarifiers, chlorination facilities, a filter belt press operation for dewatering sludge, sludge drying beds, a 4,000-gallon sodium hypochlorite storage tank, a 525 acre-foot storage reservoir, and 296 acres of irrigated land. Wastewater effluent is disposed of via spray irrigation on the land and by evaporation/percolation from the effluent storage reservoir. In addition, Mule Creek State Prison is under contract to deliver a minimum of 80 acre-feet and up to a maximum of 130 acre-feet of wastewater annually to the Amador Regional Sanitation Authority's (ARSA's) wastewater treatment and disposal system.

6.  There are three main sources of wastewater entering the treatment plant: wastewater generated from the prison, including prison industries (i.e., meat packing, laundry facilities, and coffee

CEASE AND DESIST ORDER NO. R5-2006-0130                                                         - 2 -
CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
MULE CREEK STATE PRISON WASTEWATER TREATMENT PLANT
AMADOR COUNTY

ground processing), wastewater generated from Preston Youth Correction Facility, and wastewater
from the California Department of Forestry Fire Academy. The WDRs state that average
wastewater flow volume from Preston is 153,000 gpd with peak flows up to 239,000 gpd. The
WDRs state that winter wastewater flows from the Forestry Fire Academy average 2,000 gpd.
During the summer months, when training classes are in session, the flows increase to
approximately 10,000 to 20,000 gpd. Influent flows from Preston and the Forestry Fire Academy
are measured by flow meters; however, they are not individually reported in the Discharger's
monthly monitoring reports.

7.    The Discharger is responsible for the operation and maintenance of the WWTP, the 525-acre foot
      storage reservoir, the sprayfields, and all conveyance lines on its property. The Discharger is also
      responsible for maintaining the sewer line between Preston's Pump Station #1 and the wastewater
      treatment plant.

8.    The Preston Youth Correctional Facility is responsible for the operation and maintenance of the
      two lift stations, the bar screen, and the sewer line between its two pump stations.

9.    The California Department of Forestry is responsible for the maintenance of all conveyance lines
      and appurtenances associated with the transport of wastewater from the Academy's property to
      Mule Creek State Prison's property line, including the pipe crossing above Mule Creek.

**HISTORY OF VIOLATIONS**

10.   On 25 July 2006, the Discharger's treatment plant operator notified Regional Water Board staff via
      telephone that effluent was being discharged in violation of the WDRs. Specifically, the operator
      stated that the effluent limits for total coliform organisms and BOD were being exceeded. The
      operator stated that the treatment plant was being hydraulically overloaded due to overcrowding in
      the prison, and that he was trying to implement improvements to bring the WWTP into
      compliance.

11.   On 14 August 2006, the Discharger's treatment plant operator contacted staff to provide an update,
      stating the plant effluent still did not comply with the effluent limits in the WDRs.

12.   On 15 August 2006, Regional Water Board staff received a call and e-mail from ARSA's
      wastewater treatment plant operator stating that he had toured the Discharger's wastewater
      treatment plant on 8 August 2006 and found that the plant was severely overloaded, resulting in
      wastewater not being adequately treated. Solids were bypassing the treatment system and being
      discharged onto land.

<u>16 August 2006 Inspection Violations</u>

13.   Staff conducted a compliance inspection of the Discharger's facility on 16 August 2006.

14.   During the inspection, the Discharger's staff provided Regional Water Board staff a letter
      describing the treatment plant problems. In summary, the letter stated (1) that the treatment plant

CEASE AND DESIST ORDER NO. R5-2006-0130                                                                     - 3 -
CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
MULE CREEK STATE PRISON WASTEWATER TREATMENT PLANT
AMADOR COUNTY

was poorly designed, (2) that the plant's equipment and sprayfields are undersized, causing
treatment and irrigation problems, and (3) that the continued increase in the prisoner population
has resulted in increased flows that the treatment plant cannot handle. The letter also stated that the
secondary clarifiers are being hydraulically overloaded every day, to the point that organic solids
are continually being discharged from the plant.

15. Several violations of the WDRs were found during the inspection, including bypass of wastewater
from the treatment system and discharge of wastewater to a surface drainage course. These
violations were detailed in an inspection report dated 25 August 2006, and are further described
below.

16. Discharge Prohibition A.2 of the WDRs states *"Bypass or overflow of untreated or partially
treated waste is prohibited."* During the inspection, staff noted that the secondary effluent
produced by the plant was of poor quality and that solids were overflowing the weirs within the
secondary clarifier units. Solids flowed into the wet well for the spray irrigation system.
Wastewater treatment plant staff indicated that solids carryover through the weir was most likely
the result of hydraulic overloading. Solids carryover is considered a bypass of partially treated
waste and is a violation of Prohibition A.2.

17. Discharge Prohibition A.1 of the WDRs states *"Discharge of wastes to surface waters or surface
water drainage courses is prohibited."* Discharge Prohibition A.7 states *"Excessive irrigation with
reclaimed water that results in runoff of reclaimed water… is prohibited."* Discharge
Specification B.4 states, *"The waste discharge shall at all times remain in the designated disposal
area."* During staff's 16 August 2006 inspection, the Discharger stated that a spill had occurred at
the spray disposal fields the night before the inspection. Approximately 20,000 gallons of
wastewater was spilled into Mule Creek because a sprayfield pump was left on overnight, resulting
runoff from the fields. Staff observed runoff flowing into a surface drainage course that flows into
Mule Creek. Because of the location of the spill and the fact that Mule Creek was not flowing at
the time of the inspection, the spill was contained within the Mule Creek State Prison property and
did not flow off site. However, the discharge was a violation of Prohibitions A.1 and A.7, and
Discharge Specification B.4.

18. Provision H.6 of the WDRs states, *"CDC shall comply with the 'Standard Provisions and
Reporting Requirements for Waste Discharge Requirements', dated 1 March 1991, which is
attached hereto and made part of this Order by reference. This attachment and its individual
paragraphs are commonly referenced as 'Standard Provision(s)'."* During staff's inspection, the
Discharger stated that another spill had occurred at one of the spray disposal fields approximately
three weeks before. The spill occurred when a sprayfield distribution line broke, allowing
approximately 12,000 gallons of treated effluent to flow into Mule Creek. Staff was not notified of
the spill. According to the Discharger, Mule Creek was not flowing at the time of the spill, and the
spill was reportedly contained within the Mule Creek State Prison property. The spill was a
violation of Prohibitions A.1 and A.7, and Discharge Specification B.4. Lack of reporting is a
violation of Provision H.6.

CEASE AND DESIST ORDER NO. R5-2006-0130                                                    - 4 -
CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
MULE CREEK STATE PRISON WASTEWATER TREATMENT PLANT
AMADOR COUNTY

Flow Limit and Effluent Violations

19.  A review of the Discharger's self monitoring reports from the months of June 2005 through June
     2006 was conducted following the 16 August 2006 inspection, and a number of additional
     violations of the WDRs and monitoring and reporting program were found, relating to violations of
     the flow limit and effluent limits.

20.  Discharge Specification B.1 of the WDRs states "*The average dry weather discharge flow rate
     shall not exceed 0.74 mgd [740,000 gpd].*" Staff's review of the monthly self-monitoring reports
     found that the average dry weather flow rate was exceeded in the months of July, September, and
     October 2005, and May and June 2006, when flows ranged from 757,000 to 814,000 gallons per
     day. These flows are a violation of the WDRs. The Discharger did not notify Regional Water
     Board staff of the flow limit exceedences, in violation of Provision H.6 of the WDRs.

21.  On 18 September 2006, the Discharger's treatment plant operator notified Regional Water Board
     staff that they had recently calibrated the treatment plant's flow meter, and found that the meter
     was not reading correctly. It was determined that the actual flows could be as much as twenty
     percent higher than reported. The operator stated that he had ordered a new flow meter, and
     anticipated it would be installed by the end of September 2006. It is not known if a new meter has
     yet been installed.

22.  Discharge Specification B.11 of the WDRs states, "The WWTP storage reservoir shall have
     sufficient capacity to contain all reclaimed wastewater flow, design seasonal precipitation,
     seasonal ancillary inflow, and infiltration during the wet season. Design seasonal precipitation
     shall be based on total annual precipitation using a return of 100 years, distributed monthly in
     accordance with historical rainfall patterns." Discharge Specification B.13 states "On or about 15
     **October** each year, the available storage reservoir capacity shall at least equal the volume
     necessary to comply with Discharge Specification B.11 and 12." Because the average dry weather
     flow limit prescribed in the WDRs has been exceeded, and staff's inspection found that the
     effluent storage reservoir was approximately half full, staff is concerned that the Discharger may
     not be in compliance with Discharge Specification B.11, and may not be able to maintain two feet
     of freeboard (required by Discharge Specification B.12) in the effluent storage reservoir in the
     2006/2007 wet season.

23.  Effluent Limitations C.1 states, "*Effluent discharged to the storage reservoir in excess of the
     following limits is prohibited:*

| Constituent | Units | Monthly Average | Monthly Median | Daily Max |
|-------------|-------|-----------------|----------------|-----------|
| *Total Coliform Organisms* | *MPN/100 ml* | - | *23* | *230* |
| *Total Suspended Solids* | *mg/l* | *40* | - | *80* |
| *Total Settable Solids* | *mg/l* | - | - | *0.2* |
| *BOD[1]* | *mg/l* | *40* | - | *80* |
| *Total Dissolved Solids* | *mg/l* | *450* | - | - |

[1] *5-day, 20° Celsius Biochemical Oxygen Demand"*

CEASE AND DESIST ORDER NO. R5-2006-0130                                                    - 5 -
CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
MULE CREEK STATE PRISON WASTEWATER TREATMENT PLANT
AMADOR COUNTY

Review of the monthly self-monitoring reports indicates that the total coliform organisms and
BOD effluent limits were exceeded in the month of May 2006. Preliminary lab data submitted by
the Discharger for the months of July and August 2006 also shows that the monthly average and
daily maximum total coliform organisms limitations were exceeded for both months, and the BOD
limit was exceeded in August. This preliminary lab data also shows that the total suspended solids
limit was exceeded for the month of August.

24.    Provision H.5 of the WDRs states, "*CDC shall comply with Monitoring and Reporting Program
No. 5-00-088, which is part of the Order, and any revisions thereto, as ordered by the Executive
Officer.*" Review of the monthly self-monitoring reports and case file indicates that some of the
monitoring reports have not been submitted, and some of the monitoring as required by the MRP
has not conducted. Prior to staff's 16 August 2006 inspection, staff had no record that the
monitoring reports for the months of February, March, April, or June 2006 had been submitted. In
addition, there was no record that the annual monitoring report for 2005 was submitted. During
staff's inspection, staff requested that the Discharger submit the missing monitoring reports. The
Discharger submitted the monitoring reports on 22 August 2006. However, surface water
monitoring results were not submitted with any of the monitoring reports.

Additional Violations

25.    On 21 September 2006, the Amador County Environmental Health Department notified Regional
Water Board staff that they had observed tailwater runoff from the Discharger's sprayfields
entering Mule Creek. In response, staff immediately called the Discharger and requested that they
investigate the complaint. On the evening of 21 September 2006, the Discharger notified staff that
a spill did in fact occur at the sprayfield in question. The Discharger estimates that approximately
5,000 gallons spilled into Mule Creek due to over saturation of the sprayfields. Mule Creek was
dry at the time of the spill and wastewater was contained within the state prison property. The
spill was a violation of Prohibitions A.1 and A.7, and Discharge Specification B.4.

26.    On 21 September 2006, the Discharger notified staff that a spill had occurred at a second
sprayfield, and it had also entered Mule Creek. The spill was approximately 3,000 gallons, and
was also caused by saturated conditions. The Discharger stated that it removed wastewater from
the Mule Creek drainage by placing loose dirt in the creek to soak up the water, and removing and
placing the saturated dirt in the sprayfields. The spill was a violation of Prohibitions A.1 and A.7,
and Discharge Specification B.4.

27.    On 28 September 2006, the Discharger notified staff that a 750-gallon spill occurred from the filter
belt press wet well located at the sludge drying facility. The spill occurred because the wet well
did not have an alarm system to notify plant personnel if the well was full. The spill entered a
storm drain which discharges into a surface water drainage course that flows into the Mule Creek.
The surface drainage course was dry at the time of the spill, and wastewater did not flow into
Mule Creek. The Discharger removed the spilled wastewater that was present in the drainage
course.   The spill was a violation of Prohibitions A.1 and A.7, and Discharge Specification B.4.

CEASE AND DESIST ORDER NO. R5-2006-0130                                          - 6 -
CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
MULE CREEK STATE PRISON WASTEWATER TREATMENT PLANT
AMADOR COUNTY

Staff are still waiting for the formal spill reports for this spill. Per the Standard Provisions, written reports are to be submitted within 14 days of a spill.

28.    On 29 September 2006, staff conducted an inspection of the Discharger's spray disposal fields. Staff noted numerous current and potential compliance issues within the sprayfields, including: spray heads being within the required 100-foot setback from creeks and drainages; sprayfields saturated from over-irrigation; overgrown vegetation within the sprayfields which limits the fields from properly being inspected and maintained; lack of tailwater control to prevent discharges into surface waters; lack of access to numerous sprayfields; and seepage from the storage reservoir. These issues are violations of Discharge Specifications B.5 and Reclamation Requirements D.4, D.5, and D.6. An inspection report and Notice of Violation were prepared.

29.    The Groundwater Limitation of the WDRs states that the discharge of waste shall not cause the underlying groundwater to contain waste constituents in concentrations greater than background water quality (except for coliform, which may not exceed 2.2 MPN/100 ml for any seven-day period). To date, the Regional Water Board has not required the Discharger to install groundwater monitoring wells to determine if the discharge of waste complies with the Groundwater Limitation. However, it is now appropriate to require the installation of monitoring wells, as local shallow groundwater is within 20 feet of ground surface, it appears that the storage reservoir is seeping, and this Order requires the Discharger to make long-term improvements to its storage and disposal facilities. Those improvements must have a reasonable assurance of compliance with the Groundwater Limitation.

**RESPONSE TO VIOLATIONS**

30.    On 28 August 2006, Regional Water Board staff met the Discharger to discuss the wastewater violations at the facility. The Discharger stated that increases in prisoner population have caused wastewater flows to increase beyond the permitted limit. The Discharger also stated that they were looking at mitigation measures to reduce the volume of wastewater inflows and to improve the quality of the effluent. Mitigation measures could include installing flushometers on toilets, limiting the number of showers that can be taken a day, reducing wastewater from the prison industries, and adding polymer to the wastewater treatment system to increase solids settling rates.

31.    On 5 September 2006, a Notice of Violation (NOV) was issued to the Discharger. The NOV required the Discharger to submit a number of reports, including: a *"Wastewater Inflow and Reduction Evaluation Report"*, a water balance showing whether the WWTP has sufficient treatment, storage, and disposal capacity to comply with the requirements of the WDRs, a description of how the Discharger will consistently comply with the Monitoring and Reporting Program, a description of how the Discharger will consistently comply with the Effluent Limitations, a *"Tailwater Containment Report"*, and a *"Long Term Wastewater Facilities Upgrade and Financing Plan.*

32.    On 1 September 2006, Mule Creek State Prison staff notified Regional Water Board staff that four days earlier they began adding polymer to the wastewater treatment system and that polymer

CEASE AND DESIST ORDER NO. R5-2006-0130                                              - 7 -
CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
MULE CREEK STATE PRISON WASTEWATER TREATMENT PLANT
AMADOR COUNTY

seemed to be working, such that solids were settling out in the secondary clarifiers and based on
visual observations, believed that that the effluent limits would be met.

33.    On 27 September 2006, the Discharger submitted a memorandum to Regional Water Board staff
       stating that there may not be sufficient storage capacity in the effluent storage reservoir for the
       winter of 2006/2007. The memo cited three reasons for the potential lack of storage capacity: (1)
       the wastewater treatment, storage, and disposal system was not designed to handle flows from the
       current prison population; (2) 20% of the sprayfields are within the firing range and are not used
       due to access issues; and (3) vehicle breakdowns and maintenance issues have prevented the
       operators from inspecting, repairing, and maintaining sprayfield equipment.

34.    On 10 and 16 October, the Discharger submitted the reports required by the 5 September 2006
       NOV.  The reports are summarized as follows:

       •   The *Wastewater Inflow and Reduction Evaluation Report* indicates that the average inflow to the
           treatment plant the month of August and first two weeks of September 2006 is approximately
           782,000 gpd. The report states that the Discharger has reduced flows by installing push-button
           shower valves in four buildings and has installed "electronic water savings devices" in one
           building. It has written letters to Preston and the Department of Forestry requesting that water
           conservation measures be implemented. Although the details are not provided, the Discharger
           states that it will reduce flows at the laundry and meat plant by 30% by April 2007, reduce flows
           from the showers in 15 buildings by 18% by December 2007 (if funding is approved), and
           reduce the flows in toilets and sinks in 15 buildings by 30% by July 2007. In addition, the
           Discharger states that it will install water cannons around the effluent storage reservoir to
           increase evaporation rates, and that it will install water cannons in the sprayfields to increase
           disposal rates.

       •   The *Wastewater Inflow and Reduction Evaluation Report* states that if the effluent storage pond
           is in danger of encroaching upon the required minimum of two feet of freeboard, then the
           Discharger "will review" trucking of wastewater to another wastewater treatment plant. The
           Discharger has already identified a trucking vendor and is in the process of identifying a
           wastewater plant that could accept its wastewater.

       •   The *Water Balance* shows that the facility does not have enough storage and disposal capacity.
           For the current flows and a 100-year annual precipitation event, an additional 108 million gallons
           of disposal and 31.1 million gallons of storage capacity are needed.  With 20% water
           conservation, the facility has enough storage capacity but lacks 45 million gallons of disposal
           capacity in a 100-year annual precipitation event.   With 30% water conservation, the facility has
           enough storage capacity but lacks 13 million gallons of disposal capacity in a 100-year annual
           precipitation event.

       •   The Discharger states that it will implement procedural changes to ensure compliance with the
           Monitoring and Reporting Program.

CEASE AND DESIST ORDER NO. R5-2006-0130                                                    - 8 -
CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
MULE CREEK STATE PRISON WASTEWATER TREATMENT PLANT
AMADOR COUNTY

- The report states that reduction of the wastewater inflow and continued use of polymer in the wastewater treatment plant will ensure compliance with the Effluent Limitations.

- The *Tailwater Containment Report* states that the Discharger will make improvements to the sprayfields by installing tailwater control berms and ditches, and removing sprinkler heads within low-lying areas of the sprayfields. This work has begun, and the Discharger estimates that all improvements will be completed by 30 June 2007. To replace the loss of disposal capacity from removing sprinkler heads in low-lying areas, the Discharger plans to install spray cannon type heads in several areas. Additionally, the Discharger states that it will inspect the sprayfields on an hourly basis when being used. Regional Water Board staff understand that the Discharger currently assigns one person to manage the sprayfields, and are uncertain whether this one person is sufficient to make hourly inspections and maintain the sprayfields. Therefore, it is appropriate to require the Discharger to complete and submit a staffing analysis report.

**REGULATORY CONSIDERATIONS**

35.    As a result of the events and activities described in this Order, the Regional Water Board finds that the Discharger has caused or permitted waste to be discharged in such a manner that it has created, and continues to threaten to create, a condition of pollution or nuisance. The Regional Water Board also finds that the Discharger is discharging waste in violation of WDRs No. 5-00-088 as described in the above Findings.

36.    Surface water drainage from the WWTF is to Mule Creek, a tributary to Sutter Creek, which is in turn tributary to Dry Creek, and then the Sacramento-San Joaquin Delta.

37.    The Regional Water Board's Water Quality Control Plan (Fourth Edition) for the Sacramento River and San Joaquin River Basins (Basin Plan) establishes the beneficial uses of the waters of the Sacramento-San Joaquin Delta. These beneficial uses are municipal and domestic supply; agricultural supply; industrial process and service supply; water contact recreation; non-contact water recreation; warm freshwater habitat; cold freshwater habitat; migration for aquatic organisms; spawning, reproduction, and/or early development; wildlife habitat; and navigation. The beneficial uses of underlying groundwater are municipal and domestic water supply, agricultural supply, and industrial service and process supply.

38.    Section 13301 of the California Water Code states in part: "*When a regional board finds that a discharge of waste is taking place or threatening to take place in violation of the requirements or discharge prohibitions prescribed by the regional board or the state board, the board may issue an order to cease and desist and direct that those persons not complying with the requirements or discharge prohibitions (a) comply forthwith, (b) comply in accordance with a time schedule set by the board, or (c) in the event of a threatened violation, take appropriate remedial or preventive action.*"

39.    Section 13267(b) of the California Water Code states: "*In conducting an investigation specified in subdivision (a), the regional board may require that any person who has discharged, discharges, or is suspected of discharging, or who proposes to discharge waste within its region, or any citizen*

CEASE AND DESIST ORDER NO. R5-2006-0130                                                    - 9 -
CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
MULE CREEK STATE PRISON WASTEWATER TREATMENT PLANT
AMADOR COUNTY

*or domiciliary, or political agency or entity of this state person who has discharged, discharges, or
is suspected of discharging, or who proposes to discharge waste outside of its region that could
affect the quality of waters of the state within its region shall furnish, under penalty of perjury,
technical or monitoring program reports which the regional board requires. The burden,
including costs, of these reports shall bear a reasonable relationship to the need for the report and
the benefits to be obtained from the reports. In requiring those reports, the regional board shall
provide the person with a written explanation with regard to the need for the reports, and shall
identify the evidence that supports requiring that person to provide the reports.*"

40.    The Discharger owns and operates the facility subject to this Order.  Monitoring reports and other
       technical reports are necessary to determine compliance with the Waste Discharge Requirements
       and with this Order.

41.    The issuance of this Order is an enforcement action by a regulatory agency and is exempt from the
       provisions of the California Environmental Quality Act, pursuant to Section 15321(a)(2), Title 14,
       California Code of Regulations.

42.    On 8 December 2006, in Rancho Cordova, California, after due notice to the Discharger and all
       other affected persons, the Regional Water Board conducted a public hearing at which evidence
       was received to consider a Cease and Desist Order.

43.    Any person affected by this action of the Regional Water Board may petition the State Water
       Resources Control Board to review the action in accordance with Section 2050 through 2068, Title
       23, California Code of Regulations.  The petition must be received by the State Water Resources
       Control Board, Office of Chief Counsel, P.O. Box 100, Sacramento, CA, 95812-0100, within 30
       days of the date on which the Regional Board action took place.  Copies of the law and regulations
       applicable to filing petitions are available at www.swrcb.ca.gov/water_laws/index.html and also
       will be provided upon request.

**IT IS HEREBY ORDERED** that, pursuant to Sections 13301 and 13267 of the California Water Code,
the California Department of Corrections and Rehabilitation, its agents, successors, and assigns, shall
implement certain measures, and identify and implement facility improvements, in accordance with the
scope and schedule set forth below to ensure long-term compliance with WDRs Order No. 5-00-088 or
any revisions to those WDRs.

Each document submitted under this Order shall bear the following certification signed by the
Discharger:

       *"I certify under penalty of law that I have personally examined and am familiar with the
       information submitted in this document and all attachments and that, based on my knowledge and
       on my inquiry of those individuals immediately responsible for obtaining the information, I believe
       that the information is true, accurate, and complete.  I am aware that there are significant
       penalties for submitting false information, including the possibility of fine and imprisonment."*

1.    With the exception of Discharge Specification No. B.1 of WDRs Order No. 5-00-088 (pertaining to
      the dry weather inflow to the wastewater treatment plant) the Discharger shall **immediately** comply

CEASE AND DESIST ORDER NO. R5-2006-0130                                                    - 10 -
CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
MULE CREEK STATE PRISON WASTEWATER TREATMENT PLANT
AMADOR COUNTY

with all aspects of WDRs Order No. 5-00-088. Prior to **31 January 2007**, the Discharger shall not exceed a monthly average dry weather influent flow of 782,000 gpd (i.e., the flow generated in August 2006). As of **31 January 2007**, the Discharger shall not exceed a monthly average dry weather influent flow of 740,000 gpd (i.e., the WDR flow limit). As of **30 August 2007**, the Discharger shall not exceed 85% of the flow measured in August 2006. As of **30 January 2008**, the Discharger shall not exceed 75% of the flow measured in August 2006. If the *Flow Meter Calibration Report*, as required by item No. 13 in this Order, shows a different influent flow value for August 2006, then the August 2007 and January 2008 influent flow reductions shall be based on the revised calculated flow.

2.  The Discharger shall **immediately** begin reporting all sanitary sewer overflows and any overflows from any treatment, storage, or disposal component in compliance with the Standard Provisions and Reporting Requirements (an attachment to the WDRs). In particular, this requires verbal notification within 24 hours of a spill, and a written spill report within 14 days. The Discharger shall also notify the Office of Emergency Services (OES), the County Environmental Health Department, and the California Department of Fish and Game as appropriate.

3.  By **30 January 2007**, the Discharger shall submit and immediately implement a *Spill Contingency Plan* containing the interim measures necessary for preventing unauthorized discharges to surface watercourses from the effluent storage pond. The Spill Contingency Plan shall remain in effect until all elements of the Long Term Wastewater Facilities Upgrade have been completed. The Spill Contingency Plan must, at a minimum, consider additional water conservation measures to reduce wastewater flows, provisions for transporting wastewater offsite for disposal, and provisions for temporarily increasing the capacity of the storage reservoir. The cost and funding mechanism for each contingency measure must be identified. The Spill Contingency Plan must identify the selected alternatives and for each alternative, specify all necessary materials, staffing, and equipment required for implementation.

Sprayfield Improvements

4.  The Discharger shall **immediately** begin monitoring spray disposal areas on an hourly basis when the disposal areas are used, and the results shall be included in the monthly monitoring report. Evidence of erosion, field saturation, irrigation runoff, or the presence of nuisance conditions shall be noted in the report.

5.  By **30 April 2007**, the Discharger shall submit a *Sprayfield Improvement Report and Management Plan* showing that it has made improvements and implemented measures to comply with all prohibition and specifications required by the WDRs. The report at a minimum shall (1) explain how the sprayfields will be managed to prevent runoff into surface water drainages and/or into the buffer areas; (2) describe all physical improvement (i.e., tailwater control ditches, berms, etc.) made to the sprayfields to prevent tailwater runoff from entering Mule Creek and its tributaries, and clearly show that no other improvements are necessary to prevent tailwater from entering Mule Creek; (3) describe all improvements (i.e., capping off of sprinkler heads, etc.) that have been made to ensure that tailwater, wetted areas from irrigation, and spray mist from the sprinkler heads does not encroach within the 100-foot buffer zone from creeks and drainages; (4) describe fully how the water cannons will be managed to prevent ponding, spray drift outside the boundary

CEASE AND DESIST ORDER NO. R5-2006-0130                                          - 11 -
CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
MULE CREEK STATE PRISON WASTEWATER TREATMENT PLANT
AMADOR COUNTY

of the sprayfields, and overflow into surface waters; (5) describe how the sprayfields that are within the firing range will be managed and inspected at the same frequency as the other sprayfields; (6) provide a map showing the locations of all sprayfields, irrigation lines, spray heads and their relationship to all surface drainage course and creeks, and all physical improvements made to control tailwater runoff; (7) describe what improvements/measures that have been made/implemented to allow access to all sprayfields, such that the sprayfields can be properly inspected and maintained; (8) show that vegetation surrounding each sprinkler head has been removed so that the head functions properly and can be easily inspected and maintained; (9) describe how vegetation will be managed in the future such that spray irrigation sprinklers and piping can be inspected and maintained to prevent saturated conditions and tailwater runoff; (10) explain the methods for turning on and off the spray irrigation system; and (11) show that all tailwater collection systems are out of seasonal waterways.

6.  By **30 April 2007,** the Discharger shall submit a *Staffing Analysis Report* for the wastewater storage and disposal system.  The analysis shall include a review of current staffing levels, allocation of staff tasks, an analysis of whether current staff allocation is adequate, and if necessary, describe the shortfalls and make recommendations for future staffing needs.  If the analysis indicates additional staff are necessary, then the report shall also include a *Staffing Contingency Plan* describing the steps the Discharger shall take in the short term and long term to assure that it has enough staff to perform the necessary operation and maintenance activities associated with the wastewater storage and disposal system.  If the analysis indicates additional staff are necessary, then the *Staffing Contingency Plan* shall also contain a proposed timeline for acquiring the necessary staff.

Flow Reductions

7.  By **30 December 2006,** the Discharger shall submit a report describing the installation of water cannons around the effluent storage reservoir.  The report shall describe the number of cannons installed, the expected disposal rate, how the cannons will be managed to control spray drift outside of the reservoir, and an operating plan (i.e., when the cannons will be operated, how long each day, the conditions that will prevent operation, etc.)

8.  By **30 August 2007,** the Discharger shall submit a report showing that it has reduced the influent flows (measured at the flow meter after the clarifier) by 15% in relation to flows measured in August 2006.  The report shall describe the improvements made or actions taken and shall show that this is a permanent flow reduction.

9.  By **30 January 2008,** the Discharger shall submit a report showing that it has reduced the influent flows (measured at the flow meter after the clarifier) by 25% in relation to flows measured in August 2006.  The report shall describe the improvements made or actions taken and shall show that this is a permanent flow reduction.

Treatment Plant Improvements

10. By **30 January 2007,** the Discharger shall submit a report certifying that it has installed an alarm feature on the filter belt press wet well to notify WWTP staff of potential overflows of the wet well.

11.  By **30 March 2007**, the Discharger shall submit an *Effluent Flow Meter Installation and Calibration Report*. The report shall (1) certify that a new effluent flow meter has been installed after the clarifier, is operational, and is accurately recording effluent flows from Mule Creek State Prison, (2) provide the location where the meter has been installed, (3) demonstrate that the flow meters used to monitor flows from the Prison, Preston, and the Department of Forestry have been independently calibrated by a third party such that all flow meters are accurately recording influent and effluent flows, and (4) provide standard procedures for the treatment plant operators to use when taking and recording flow measurements. The report shall also provide recalculated estimated influent flow data for the months of May through February 2007, and provide the percentage that the flow meter was off during the May 2006 through February 2007 flow monitoring events.

12.  By **30 April 2007**, the Discharger shall submit an *Operation and Maintenance Plan* (O&M Plan) for the wastewater treatment and application facilities. A copy of the O&M Plan shall be kept at the facility for reference by operating personnel. Key personnel shall be familiar with its contents. The O&M Plan shall provide the following:

     i.  Operation and Control of Wastewater Treatment - A description of the wastewater treatment equipment; operational controls; treatment requirements/effluent limitations; flow diagrams including valve/gate locations; operation of the treatment systems during normal operation, by-pass, shut-down, and draining procedures; potential operational problems including a troubleshooting guide.

     ii.  Sludge Handling - A description of the biosolids handling equipment, operational controls, control tests and observations related to process control, and potential operational problems including a troubleshooting guide, and disposal procedures.

     iii.  Personnel - Recommended staffing requirements, staff qualifications, training requirements and schedule, and operator certification requirements.

     iv.  Maintenance – Maintenance procedures, equipment record system, scheduling and use of the maintenance record system, inventory system, special tools, warranty provisions and expiration dates, maintenance cost and budgeting system, and maintenance schedule of all equipment including lubricants, filters, etc.

     v.  Emergency Response – A description of the vulnerability analysis including emergencies such as power outage, severe weather, or flooding. An equipment and telephone list for emergency personnel and equipment vendors. Coordination procedures with fire, police, and health department personnel, and an emergency operating plan.

     vi.  Safety – A general discussion of the hazards of collection systems, mechanical equipment, explosion, pathogens, oxygen deficiencies, chemical and electrical hazards, etc.

     vii.  Appendices – Shall include flow diagrams, valve/gate locations, a copy of the WDRs and Standard Provisions, miscellaneous form samples, manufacturers manuals, and a list of reference materials.

13.  By **30 March 2008**, the Discharger shall submit an Influent Flow Meter Installation and Calibration report. The report shall certify that (a) an influent flow meter has been installed upstream of the oxidation ditch such that combined flows from all three facilities can be accurately

CEASE AND DESIST ORDER NO. R5-2006-0130                                          - 13 -
CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
MULE CREEK STATE PRISON WASTEWATER TREATMENT PLANT
AMADOR COUNTY

measured prior to any biological treatment process, (b) provide the location at which the flow
meter has been installed, (c) demonstrate that the flow meter has been calibrated by an independent
third party and is accurately reading influent flows, (d) provide standard procedures for treatment
plant operators to use when taking and recording flow measurements, and (e) provide a schedule
for annual recalibration of all influent and effluent flow meters.

Groundwater Monitoring

14.  By **1 February 2007**, the Discharger shall submit a *Groundwater Monitoring Well Installation
Workplan*. The workplan shall describe the installation of sufficient wells to allow evaluation of
the groundwater quality upgradient and downgradient of the sludge drying areas, effluent storage
pond, and disposal fields. The workplan shall conform to items listed in Section 1 of Attachment A
to this Order (*Items to be Included a Monitoring Well Installation Workplan*).

15.  By **15 July 2007**, the Discharger shall submit a *Groundwater Monitoring Well Installation Report*
that describes the installation of groundwater monitoring wells installed per Regional Water Board
staff's approval of a *Groundwater Monitoring Well Installation Workplan*. The well installation
report shall contain items found in the second section of Attachment A.

16.  Beginning with the **Second Quarter 2007**, the Discharger shall comply with the groundwater
monitoring and reporting requirements contained in Attachment B of this Order.

Long Term Improvements

17.  By **30 June 2007**, the Discharger shall submit a *Reservoir Seepage Evaluation Report* that
provides the results of an evaluation to determine whether effluent is seeping from the dam or any
other locations around the effluent storage reservoir. The report shall describe the methods that
were used in determining whether effluent is seeping. If it is determined that effluent is seeping
from the storage reservoir, then by **1 October 2007**, the Discharger shall submit a *Seepage
Improvement and Containment Report*. The report shall describe what improvements will be made
to stop the seepage of effluent, and/or describe how the wastewater will be contained to the
seepage areas to prevent discharges to surface waters. The report shall also provide timelines for
proposed improvements.

18.  By **30 December 2007**, the Discharger shall submit a Revised Water Balance. The water balance
shall provide three separate calculations, using (a) influent flows that have been reduced by 15%
over the re-calculated August 2006 flow, (b) influent flows that have been reduced by 25% over
the re-calculated August 2006 flow, and (c) the percentage flow reduction that provides the
influent flow which results in sufficient storage and disposal capacity to comply with the WDRs.

The water balances shall be based on all flows entering the wastewater system, 100-year annual
precipitation returns, and compliance with the two-foot freeboard requirement in the effluent
storage reservoir. All assumptions and calculations used in preparing the water balances must be
clearly identified. The water balances shall include consideration of at least the following:

CEASE AND DESIST ORDER NO. R5-2006-0130                                                           - 14 -
CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
MULE CREEK STATE PRISON WASTEWATER TREATMENT PLANT
AMADOR COUNTY

      a.    Wastewater flows from all sources including prison facilities, prison industries, Preston
            School of Industry, and California Department of Forestry;

      b.    Local precipitation data (indicate what weather station was used to obtain the data, and
            indicate what the total annual precipitation is for average and 100 annual year storm events,
            and show how that value was distributed throughout the year, by months, based on
            historical rainfall patterns);

      c.    Infiltration and inflow;

      d.    Local evaporation data;

      e.    Measured evaporation data from any enhanced evaporation system;

      f.    Projected percolation rates for the effluent storage reservoir;

      g.    Irrigation disposal rates that comply with the requirements of the WDRs.

19.  By **30 December 2008**, the Discharger shall submit a *Flow Reduction Evaluation Report* that
     describes the success in reducing influent flows over the previous year. The report shall evaluate
     whether other measures should be taken to reduce flows in to the wastewater treatment plant, and
     if necessary, provide a schedule for implementation.

20.  By **30 January 2008**, the Discharger shall submit a *Long Term Wastewater Facilities Upgrade
     and Financing Plan* for all work and improvements needed to provide adequate treatment, storage,
     and disposal capacity for existing and/or future expansion of Mule Creek State Prison, Preston
     School of Industry, and the California Department of Forestry training facility. The plan shall
     include the following:

      a.  A detailed description of the scope and schedule of all planning, design, and construction,
         including improvements to existing facilities and construction of new facilities as needed to
         accommodate projected future influent flows through at least 2020. A phased expansion plan
         may be proposed; and

      b.  A preliminary capital cost estimate and a financing plan describing how the improvement
         project(s) will be funded.

21.  By **31 December 2008**, the Discharger shall submit a *Report of Waste Discharge* (RWD) to allow
     WDRs to be revised to reflect the proposed upgrades. The RWD shall reflect any comments made
     by staff regarding the *Long Term Wastewater Facilities Upgrade and Financing Plan*. The RWD
     consists of the Form 200 *(Application for Report of Waste Discharge)* and a technical report that
     addresses all items listed in Attachment C to this Order, "*Additional Information Requirements for
     a Report of Waste Discharge for the WWTP.*" The Report of Waste Discharge shall clearly
     reference the groundwater monitoring data collected for the facility and shall demonstrate that the
     proposed improvements are compliant with State Water Resources Control Board Resolution No.
     68-16 (the Antidegradation Policy).

CEASE AND DESIST ORDER NO. R5-2006-0130                                                    - 15 -
CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
MULE CREEK STATE PRISON WASTEWATER TREATMENT PLANT
AMADOR COUNTY

Progress Reports

22. **Beginning with the first quarter of 2007**, the Discharger shall submit a *Quarterly Compliance
    Status Report*. These reports shall describe all work completed during the calendar quarter to
    comply with this Cease and Desist Order; and any new, modified, or renovated component of the
    treatment and disposal system. These reports shall be submitted by the **15th day of the month
    following the quarter for which the report is prepared (e.g., the first quarterly report is due
    by 15 April each year).**

In addition to the above, the Discharger shall comply with all applicable provisions of the California
Water Code that are not specifically referred to in this Order.

As required by the California Business and Professions Code Sections 6735, 7835, and 7835.1, all
technical reports shall be prepared by, or under the supervision of, a California Registered Engineer or
Professional Geologist and signed/stamped by the registered professional.

If, in the opinion of the Executive Officer, the Discharger fails to comply with the provisions of this
Order, the Executive Officer may refer this matter to the Attorney General for judicial enforcement or
may issue a complaint for administrative civil liability.

Failure to comply with this Order or with the WDRs may result in the assessment of Administrative
Civil Liability of $1,000 to $10,000 per day of violation, depending on the violation, pursuant to the
California Water Code, including sections 13268, 13350 and 13385. The Regional Water Board
reserves its right to take any enforcement actions authorized by law.

I, PAMELA C. CREEDON, Executive Officer, do hereby certify the foregoing is a full, true, and correct
copy of an Order adopted by the California Regional Water Quality Control Board, Central Valley
Region, on 8 December 2006.

                                                    _____
                                                    PAMELA C. CREEDON, Executive Officer

Attachments·
Attachment A  - Requirements for Monitoring Well Installation Workplans and Monitoring Well
                 Installation Reports
Attachment B  - Groundwater Monitoring Requirements
Attachment C – Additional Information Requirements for a Report of Waste Discharge

AMENDED
JSK/WSW: 8 Dec 2006

# EXHIBIT Q

EDMUND G. BROWN JR.
Attorney General of the State of California
STACY BOULWARE EURIE
Senior Assistant Attorney General
CATHERINE VAN AKEN
Supervising Deputy Attorney General
VICKIE P. WHITNEY, State Bar No. 145316
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 445-8194
 Facsimile: (916) 324-8835
 E-mail: Vickie.Whitney@doj.ca.gov

Attorneys for Defendants Arnold Schwarzenegger,
Governor of the State of California, California
Department of Corrections and Rehabilitation,
James Tilton, John Dovey, and Steve Westly

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SACRAMENTO

| | |
|---|---|
| CALIFORNIA CORRECTIONAL PEACE OFFICERS' ASSOCIATION, on behalf of itself and its members, CHARLES L. ALEXANDER, Jr., on behalf of himself and all others similarly situated, and SERVICE EMPLOYEES INTERNATIONAL UNION, Local 1000, on behalf of itself and its members,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, in his capacity as Governor of the State of California, CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION; JAMES TILTON, in his capacity as Secretary of CDCR; JOHN DOVEY, in his capacity as Director of the CDCR Division of Adult Institutions; STEVE WESTLY, in his capacity as Controller of the State of California; AND DOES 1 – 10,<br><br>Defendants. | CASE NO: 06CS01568<br><br>DECLARATION OF SCOTT M. KERNAN IN OPPOSITION TO PETITION FOR WRIT OF MANDATE, INJUNCTION AND DECLARATORY RELIEF<br><br>Date:      February 16, 2007<br>Time:     1:30 p.m.<br>Dept:     11<br>Judge:    The Honorable<br>             Gail D. Ohanesian |

////

1

DECLARATION OF SCOTT M. KERNAN IN OPPOSITION TO PETITION FOR WRIT O F
MANDATE, INJUNCTION AND DECLARATORY RELIEF

1    I, Scott M. Kernan, declare as follows:

2        1.    I am currently the Acting Director of the Division of Adult Institutions for the

3    California Department of Corrections and Rehabilitation ("CDCR"), the arm of the State tasked

4    with the operation of California's prisons and correctional facilities.    Prior to my assuming the

5    position I presently hold, it was held by John Dovey under whom I served as the Deputy Director

6    of the Division of Adult Institutions of CDCR.  Mr. Dovey was named in the above-captioned

7    case in his official capacity.  As a result of Mr. Dovey's resignation, the Opening Trial Brief filed

8    by plaintiffs asks that the court regard any forward-looking statement or request as applicable to

9    me in my official capacity rather than Mr. Dovey.

10       2.    This Declaration is submitted in opposition to plaintiffs' Petition for Writ of

11   Mandate, Injunction and Declaratory Relief.  I have reviewed plaintiffs' Opening Trial Brief and

12   the declarations previously submitted by plaintiffs in this matter.  All matters set forth in this

13   declaration are personally known to me and if sworn as a witness in this matter, I could and

14   would testify competently as to all matters set forth in this declaration.

15       3.    On October 25, 2005, John Dovey, as then-Director, Division of Adult

16   Institutions, authored a memorandum in which he declared the CDCR population overcrowding a

17   crisis.  Plaintiffs attached this Memorandum as Exhibit A to the Declaration of Michael L.

18   Jimenez In Support of Petition for Writ of Mandate and Application for Temporary Restraining

19   Order, filed on October 30, 2006.

20       4.    After Mr. Dovey's memorandum, in November 2005, I was reassigned from my

21   position as Warden at California State Prison-Sacramento, to CDCR headquarters to serve as

22   Associate Director, Division of Adult Institutions, in order to oversee the development of

23   alternative solutions to the overcrowding problem. These efforts included a comprehensive

24   analysis of existing CDCR beds, programming space, clinical/mental health space, infrastructure

25   capacities and projected mitigation, additional capacity available within existing in-state private

26   prison facilities, evaluation of potential capacity within the Department of Mental Health and

27   Department of Juvenile Justice, expansion of female capacity in private facilities, expansion of

28   capacity "in-fill" at existing prisons, and analysis of reactivating a previously decommissioned

2

DECLARATION OF SCOTT M. KERNAN IN OPPOSITION TO PETITION FOR WRIT O F
MANDATE, INJUNCTION AND DECLARATORY RELIEF

1  facility in Stockton, California. I developed a proposed Bed Management Plan that

2  recommended a number of solutions and projected cost analyses of these options, including the

3  addition of up to 5000 or more out-of-state beds necessary to bridge the gap before other

4  solutions could be implemented. In addition to evaluating these options a detailed analysis of the

5  anticipated population growth and projected bed shortfall was completed.

6       5.  I provided testimony before the Legislature regarding these efforts in the summer

7  of 2006 and in the Special Session called by Governor Schwarzenegger in August 2006. The

8  Legislature declined to act on any of the proposed recommendations which led to the Governor's

9  Emergency Proclamation on October 4, 2006 (the "Proclamation").

10       6.  In response to the Proclamation, CDCR entered into contracts on October 19,

11  2006, with The Geo Group, Inc. ("Geo"), and the Corrections Corporation of America ("CCA")

12  (hereinafter "the contracts"), for the purpose of temporarily providing out-of-state correctional

13  bed space and services for inmates housed in California's correctional facilities. GEO is

14  currently contracted to provide 1260 beds and CCA, 1000 beds. The GEO beds are located in

15  Indiana and the CCA beds in facilities in Tennessee, Oklahoma, Arizona and Mississippi.

16       7.  CDCR has proceeded with voluntary transfers with 80 inmates currently housed in

17  the Tennessee facility and 235 in Arizona as of January 19, 2007. Based upon the current

18  schedule, the Arizona facility will be fully occupied (560 inmates) by the second week of

19  February if inmate volunteers remain consistent and commensurate medical and mental health

20  screenings remain on schedule. The CDCR Secretary, James Tilton, is evaluating additional

21  steps that may be taken consistent with the Proclamation. CDCR is prepared to negotiate for

22  additional out-of-state beds as authorized.

23       8.  The contracts permit CDCR to mitigate the emergency caused by overcrowding

24  until permanent solutions are implemented, such as the Governor's current reform proposals.

25  Those proposals include, but are not limited to, building additional housing capacity. Based

26  upon my experience in the oversight and development of solutions to the severe overcrowding in

27  California's prisons, the use of out-of-state beds, in my judgment, represents an appropriate and

28  reasonable short-term solution to the existing, urgent prison overcrowding problem.

<div align="center">3</div>

DECLARATION OF SCOTT M. KERNAN IN OPPOSITION TO PETITION FOR WRIT O F
MANDATE, INJUNCTION AND DECLARATORY RELIEF

1    9.    I was directly involved in the negotiation of the contracts for out-of-state beds.

2   The length of these contracts was designated for 3 years with optional extension for 2 additional

3   years. The term of these contracts was specifically determined to coincide with the anticipated

4   period of time it would take to achieve one of the proposed permanent solutions -- to complete

5   "hard" construction at existing prisons or construction of new prison(s). Specific language was

6   included in the contracts to permit for cancellation or reduction of out-of-state beds should other

7   solutions materialize sooner, such as if other reform efforts are successful this year, or

8   construction of additional capacity is completed sooner, or population demands diminish. The

9   out-of-state contracts represent a temporary solution to the existing overcrowding emergency and

10   are not intended to constitute a long-term remedy to overcrowding.

11    10.    I have been directly involved in the development of alternative inmate bed

12   capacity since November 2005. I worked with CDCR's Facility Management Division (FMD),

13   and internal private contractors, in developing proposals to build additional capacity on existing

14   prison property and developed population projections supporting CDCR's request for 10,000

15   beds at two new prisons. I have been advised by public and private experts versed in prison

16   construction that 3-5 years to construct a new prison is extremely aggressive. The reasons for

17   such a construction period include the requirement for environmental studies, addressing

18   community concerns, and common construction delays. In fact, the last prison to be built by

19   CDCR was Kern Valley State Prison (KVSP) which took approximately 5 years to construct.

20    11.    Thus, one of the proposed permanent solutions to severe overcrowding --

21   expansion of capacity at additional prison sites -- is anticipated to take from 18 months to 5 years

22   from the date of legislative authorization to achieve. While the first such beds under a

23   construction of facilities scenario are projected for occupancy at 18 months, the capacity is

24   sequenced over five years and includes significant retrofit of existing prison infrastructure

25   necessary for this "in-fill" construction.

26   ////

27   ////

28   ////

4

DECLARATION OF SCOTT M. KERNAN IN OPPOSITION TO PETITION FOR WRIT OF
MANDATE, INJUNCTION AND DECLARATORY RELIEF

12.  Currently, because of the unprecedented level of California's inmate population and a lack of capacity, as noted in the Proclamation, CDCR is having to house inmates in non-traditional quarters in prison areas never designed or intended for inmate housing such as gymnasiums, dayrooms, program rooms, and triple bunk beds.  As of January 10, 2006, CDCR had approximately 17,000 inmates housed in areas that were not designed of intended for inmate living areas.

13.  The overcrowding emergency also impacts county jails throughout the state and, ultimately, to the public.  Specifically, CDCR is required to accept felons committed by the courts as passed through county jails as well as parole violators who are required to be reintegrated back into state prisons from county jail facilities.  Many of the county jail facilities have court-mandated or self-imposed population caps, above which they cannot or will not accept inmates.  Currently, many of the county jail facilities are at maximum capacity and will be unable to expand their capacity in the short term.  If CDCR cannot accept felony inmates from county jails, the county jails do not have capacity to retain those inmates in addition to those the counties are required to house.  As a result, it then becomes necessary for the county jails to release inmates back into the public before completing their lawful sentence.  In addition, the county jails, facing their own severe overcrowding, have advised CDCR that parolees suspected of crimes or technical violations (absconding, among other violations) will not be accepted into county jails.

14.  The transfer of inmates to out-of-state facilities will not, by itself, cause any correctional officers to lose their jobs or be otherwise disadvantaged.  CDCR projects current officer vacancies, statewide, at approximately 4,130.  CDCR operates two staff academies, the primary facility being in Galt, California, and the satellite facility at the previously closed Northern California Women's Facility (NCWF) in Stockton, California.  Both academies operating at full capacity could train 2,300 staff per year.  However, often due to recruitment and background issues they are not at full capacity.  It is estimated that 1,500 existing officers are lost through attrition (retirement/other) each year.  Therefore, the prisons will realize a net decrease to vacancies of about 800 per year (2300 – 1500 attrition).  Based upon an approximate current

5

DECLARATION OF SCOTT M. KERNAN IN OPPOSITION TO PETITION FOR WRIT O F
MANDATE, INJUNCTION AND DECLARATORY RELIEF

1 vacancy level of 4,130, it will take about 5 years to fill all of the vacancies under the current

2 academy structure.

3      I declare under penalty of perjury under the laws of the State of California that the

4 foregoing is true and correct and that this Declaration was executed on January 19, 2007, in

5 Sacramento, California.

6

          SCOTT M. KERNAN, Declarant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF SCOTT M. KERNAN IN OPPOSITION TO PETITION FOR WRIT O F
MANDATE, INJUNCTION AND DECLARATORY RELIEF

1

<div align="center">

**DECLARATION OF SERVICE**
(C.C.P. §§ 1010.6, 1011, 1012, 1013)

</div>

2

3        I declare: I am employed in the County of Sacramento, California. I am 18 years of age or older and not a party to the within entitled cause; my business address is 1300 I. Street, Sacramento, California.

4

5        On January 22, 2007, I served the attached

6    **DECLARATION OF SCOTT M. KERNAN IN OPPOSITION TO PETITION FOR WRIT OF MANDATE, INJUNCTION AND DECLARATORY RELIEF**

7    in said cause, by placing a true copy thereof enclosed in a sealed envelope and served as follows:

8    \_\_\_\_    United States mail by placing such envelope(s) with postage thereon fully prepaid in the designated area for outgoing mail in accordance with this office's practice, whereby the

9    mail is deposited in a United States mailbox in the City of Sacramento, California, after the close of the day's business

10

11   XX    Golden State Overnight Service (Overnight Courier)

12   \_\_\_\_    Facsimile at the following Number:

    \_\_\_\_    Personal Service at the below address(es), at the following time(s):

13   XX    Via e-mail by electronically transmitting these documents in Adobe PDF format to the

14   e-mail addresses listed below:

15   to the parties addressed as follows:

16   Gregg McLean Adams
    Carroll, Burdick & McDonough, LLP - SF
17   44 Montgomery Street, Suite 400
    San Francisco, CA 94104-4606
18   Telephone: (415) 989-5900
    E-mail: gadam@cbmlaw.com
19   *Attorney for Plaintiffs*

    Benjamin C. Sybesma, Esq.
    California Correctional Peace
     Officers Association
    Legal Department
    755 Riverpoint Drive, Suite 200
    West Sacramento, CA 95605-1634
    Telephone: (916) 372-6060
    E-mail: ben.sybesma@ccpoa.org
    *Attorney for Plaintiffs*

20

21   Paul E. Harris, Esq.
    Service Employees International Union
22   Local 1000
    1108 O Street
23   Sacramento, CA 95814
    Telephone: (916) 326-4208
24   E-mail: pharris@seiu1000.org
    *Attorney for Plaintiffs*

25       . I declare under penalty of perjury under the laws of the State of California, that the

26   foregoing is true and correct, and that this declaration was executed at Sacramento, California on January 22, 2007.

27

28                                _Toni Melton_
                              **TONI MELTON**

# EXHIBIT R

Data Analysis Unit                                    Department of Corrections and Rehabilitation
Estimates and Statistical Analysis Section                                   State of California
Offender Information Services Branch                                               May 21, 2007
                            WEEKLY REPORT OF POPULATION
                            AS OF MIDNIGHT May 16, 2007

---

                                    TOTAL CDCR POPULATION
                                                    CHANGE SINCE
                          FELON/    CIVIL              05/17/06        DESIGN   PERCENT  STAFFED
                          OTHER     ADDICT    TOTAL    NO.     PCT.    CAPACITY OCCUPIED CAPACITY

| | FELON/ OTHER | CIVIL ADDICT | TOTAL | CHANGE SINCE 05/17/06 NO. | PCT. | DESIGN CAPACITY | PERCENT OCCUPIED | STAFFED CAPACITY |
|---|---|---|---|---|---|---|---|---|
| A. TOTAL INSTITUTIONS | 171,608 | 1,111 | 172,719 | +1,723 | +1.0 | | | |
| | | | | | | | | |
| I.  IN-STATE | 171,255 | 1,111 | 172,366 | +1,370 | +0.8 | | | |
| (MEN, Subtotal) | 159,691 | 798 | 160,489 | +1,174 | +0.7 | | | |
| (WOMEN, Subtotal) | 11,564 | 313 | 11,877 | +196 | +1.6 | | | |
| | | | | | | | | |
| 1. INSTITUTIONS/CAMPS | 164,890 | 1,109 | 165,999 | +946 | +0.5 | 84,653 | 196.1 | 169,272 |
| INSTITUTIONS | 160,430 | 1,109 | 161,539 | +905 | +0.5 | 80,415 | 200.9 | 164,913 |
| CAMPS(CCC & SCC) | 4,460 | | 4,460 | +41 | +0.9 | 4,238 | 105.2 | 4,359 |
| | | | | | | | | |
| 2. COMMUNITY CORR. CTRS. | 6,220 | 2 | 6,222 | +438 | +7.5 | 7,571 | 82.2 | |
| CCF PRIVATE | 2,820 | | 2,820 | -10 | -0.6 | 2,752 | 102.5 | |
| CCF PUBLIC | 2,648 | | 2,648 | +288 | +12.2 | 2,461 | 107.6 | |
| DRUG TREATMT FURLOUGH | 476 | 2 | 478 | +173 | +56.7 | 1,056 | 45.3 | |
| PRIVATE WORK FURLOUGH | 79 | | 79 | -22 | -21.7 | 1,103 | 7.2 | |
| PRISONER MOTHER PGM | 72 | | 72 | 0 | - | 70 | 102.9 | |
| FAMILY FOUNDATION PGM | 66 | | 66 | 0 | - | 70 | 94.3 | |
| WORK FUR. IN CUSTODY | 59 | | 59 | +17 | +40.4 | 59 | 100.0 | |
| | | | | | | | | |
| 3. DMH STATE HOSPITALS | 145 | | 145 | -14 | -8.8 | | | |
| | | | | | | | | |
| II. OUT OF STATE(COCF) | 353 | 0 | 353 | | | | | |
| ARIZONA | 277 | | 277 | | | | | |
| TENNESSEE | 76 | | 76 | | | | | |
| | | | | | | | | |
| B. PAROLE | 123,672 | 1,736 | 125,408 | +9,171 | +7.8 | | | |
| COMMUNITY SUPERVISION | 122,233 | 1,736 | 123,969 | +9,291 | +8.1 | | | |
| COOPERATIVE CASES | 1,439 | | 1,439 | -120 | -7.6 | | | |
| | | | | | | | | |
| C. NON-CDC JURISDICTION | 1,894 | 0 | 1,894 | -71 | -3.6 | | | |
| OTHER STATE/FED. INST. | 499 | | 499 | -28 | -5.3 | | | |
| OUT OF STATE PAROLE | 1,237 | | 1,237 | +7 | +0.5 | | | |
| OUT OF STATE PAL | 74 | | 74 | -42 | -36.2 | | | |
| CYA-W&IC 1731.5(c) | | | | | | | | |
| INSTITUTIONS | 84 | | 84 | -8 | -8.6 | | | |
| | | | | | | | | |
| D. OTHER POPULATIONS | 21,600 | 270 | 21,870 | +419 | +1.9 | | | |
| INMATES | | | | | | | | |
| OUT-TO-COURT, etc. | 2,229 | 53 | 2,282 | +215 | +10.4 | | | |
| ESCAPED | 224 | | 224 | -19 | -7.8 | | | |
| PAROLEES (PAL/RAL) | 19,147 | 217 | 19,364 | +223 | +1.1 | | | |
| | | | | | | | | |
| TOTAL CDCR POPULATION | 318,774 | 3,117 | 321,891 | +11,242 | +3.6 | | | |

---

CHANGE FROM LAST WEEK
   A. TOTAL INSTITUTIONS       +99      +4    +103
      (MEN, Subtotal)          +64      +2     +66
      (WOMEN, Subtotal)        +35      +2     +37
   B. PAROLE                  +267      -8    +259
   D. PAROLEES (PAL/RAL)      -145      -3    -148
This report contains the latest available reliable population figures from OBIS. They have been
carefully audited, but are preliminary, and therefore subject to revision.

Figure excludes institution based camps. Total persons in camps, including base camps, are
  4,546 . Base camp at CMC is included in institution counts.
Report # TPOP-1W.  Questions:       (916) 327-3262   (CALNET) 467-3262.

WEEKLY INSTITUTION/CAMPS POPULATION DETAIL                    MIDNIGHT May 16, 2007

| INSTITUTIONS/CAMPS | FELON/ OTHER | CIVIL ADDICT | TOTAL | DESIGN CAPACITY | PERCENT OCCUPIED | STAFFED CAPACITY |
|---|---|---|---|---|---|---|
| **MALE** | | | | | | |
| ASP  (AVENAL SP) | 7,607 | | 7,607 | 2,920 | 260.5 | 7,710 |
| CCC  (CAL CORRECTL CTR) | 6,136 | | 6,136 | 3,883 | 158.0 | 6,174 |
| CCI  (CAL CORRECTL INSTITN) | 5,831 | 2 | 5,833 | 2,757 | 211.6 | 5,896 |
| CIM  (CAL INSTITN FOR MEN) | 6,545 | 17 | 6,562 | 3,207 | 204.6 | 6,464 |
| CMF  (CAL MEDICAL FACIL) | 3,020 | | 3,020 | 2,307 | 130.9 | 3,316 |
| CMC  (CAL MEN'S COLONY) | 6,589 | | 6,589 | 3,840 | 171.6 | 6,574 |
| CRC  (CAL REHAB CTR, MEN) | 3,190 | 730 | 3,920 | 1,814 | 216.1 | 4,000 |
| CAL  (CAL SP, CALIPATRIA) | 4,231 | | 4,231 | 2,308 | 183.3 | 4,318 |
| CEN  (CAL SP, CENTINELA) | 4,691 | | 4,691 | 2,308 | 203.2 | 4,956 |
| COR  (CAL SP, CORCORAN) | 5,563 | 1 | 5,564 | 3,116 | 178.6 | 5,450 |
| LAC  (CAL SP, LOS ANGELES CO) | 4,573 | | 4,573 | 2,300 | 198.8 | 4,658 |
| SAC  (CAL SP, SACRAMENTO) | 3,201 | | 3,201 | 1,724 | 185.7 | 3,253 |
| SQ   (CAL SP, SAN QUENTIN) | 5,313 | 5 | 5,318 | 3,109 | 171.1 | 5,220 |
| SOL  (CAL SP, SOLANO) | 5,959 | | 5,959 | 2,610 | 228.3 | 6,083 |
| SATF (CAL SATF AND SP - COR) | 7,391 | 2 | 7,393 | 3,424 | 215.9 | 7,593 |
| CVSP (CHUCKAWALLA VALLEY SP) | 4,121 | | 4,121 | 1,738 | 237.1 | 4,292 |
| CTF  (CORRL TRAING FAC) | 7,137 | | 7,137 | 3,301 | 216.2 | 7,127 |
| DVI  (DEUEL VOCATL INSTITN) | 3,821 | 18 | 3,839 | 1,787 | 214.8 | 3,911 |
| FOL  (FOLSOM SP) | 4,086 | | 4,086 | 2,236 | 182.7 | 4,078 |
| HDP  (HIGH DESERT SP) | 4,674 | 2 | 4,676 | 2,324 | 201.2 | 4,706 |
| IRON (IRONWOOD SP) | 4,801 | | 4,801 | 2,200 | 218.2 | 4,809 |
| KVSP (KERN VALLEY SP) | 4,947 | | 4,947 | 2,448 | 202.1 | 4,946 |
| MCSP (MULE CREEK SP) | 3,768 | | 3,768 | 1,700 | 221.6 | 4,009 |
| NKSP (NORTH KERN SP) | 5,431 | 2 | 5,433 | 2,692 | 201.8 | 5,401 |
| PDC  (PITCHESS DETENT CTR-RC) | 51 | | 51 | 0 | - | 1,292 |
| PBSP (PELICAN BAY SP) | 3,452 | | 3,452 | 2,252 | 153.3 | 3,316 |
| PVSP (PLEASANT VALLEY SP) | 5,214 | | 5,214 | 2,308 | 225.9 | 5,112 |
| RIO  (RIO COSUMNES COR CTR-RC) | 426 | | 426 | 0 | - | 250 |
| RJD  (RJ DONOVAN CORR FACIL) | 4,648 | | 4,648 | 3,302 | 140.8 | 5,858 |
| SVSP (SALINAS VAL SP) | 4,767 | 1 | 4,768 | 2,298 | 207.5 | 4,606 |
| SRTA (SANTA RITA CO. JAIL-RC) | 799 | | 799 | 0 | - | 550 |
| SBRN (SAN BRUNO CO. JAIL) | 48 | | 48 | 60 | 80.0 | 60 |
| SCC  (SIERRA CONSERV CTR) | 6,175 | | 6,175 | 3,736 | 165.3 | 6,215 |
| WSP  (WASCO SP) | 5,861 | 18 | 5,879 | 2,834 | 207.4 | 5,717 |
| **MALE TOTAL:** | **154,067** | **798** | **154,865** | **78,843** | **196.4** | **157,920** |
| **FEMALE** | | | | | | |
| CIW  (CAL INST FOR WOMEN) | 2,445 | 12 | 2,457 | 1,326 | 185.3 | 2,687 |
| CRC  (CAL REHAB CTR, WOMEN) | 187 | 284 | 471 | 500 | 94.2 | 780 |
| CCWF (CENT CAL WOMEN'S FACIL) | 4,141 | 3 | 4,144 | 2,004 | 206.8 | 3,943 |
| RIO  (RIO COSUMNES COR CTR-RC) | 20 | | 20 | 0 | - | 20 |
| SRTA (SANTA RITA CO. JAIL-RC) | 2 | | 2 | 0 | - | 20 |
| VSP  (VALLEY SP) | 4,028 | 12 | 4,040 | 1,980 | 204.0 | 3,902 |
| **FEMALE TOTAL:** | **10,823** | **311** | **11,134** | **5,810** | **191.6** | **11,352** |
| **INSTITUTIONS/CAMPS TOTAL:** | **164,890** | **1,109** | **165,999** | **84,653** | **196.1** | **169,272** |

#TPOP-1, Page 2

```
WEEKLY INSTITUTION/CAMPS POPULATION DETAIL                   MIDNIGHT May 16, 2007
                                FELON/     CIVIL            DESIGN    PERCENT    STAFFED
MALE   INSTITUTIONS             OTHER      ADDICT   TOTAL   CAPACITY  OCCUPIED   CAPACITY
```

| MALE INSTITUTIONS | FELON/ OTHER | CIVIL ADDICT | TOTAL | DESIGN CAPACITY | PERCENT OCCUPIED | STAFFED CAPACITY |
|---|---|---|---|---|---|---|
| ASP (AVENAL SP) | 7,607 | | 7,607 | 2,920 | 260.5 | 7,710 |
| CCC (CAL CORRECTL CTR) | | | | | | |
| Camps | 2,009 | | 2,009 | 1,908 | 105.3 | 2,029 |
| Level I | 1,529 | | 1,529 | 867 | 176.4 | 1,557 |
| Level II | 1,512 | | 1,512 | 608 | 248.7 | 1,503 |
| Level III | 1,086 | | 1,086 | 500 | 217.2 | 1,085 |
| CCI (CAL CORRECTL INSTITN) | | | | | | |
| Level I | 1,608 | | 1,608 | 617 | 260.6 | 1,237 |
| Level II | 1,235 | | 1,235 | 640 | 193.0 | 1,648 |
| Level IV | 809 | | 809 | 500 | 161.8 | 832 |
| SHU | 698 | | 698 | 500 | 139.6 | 700 |
| Reception Ctr | 1,481 | 2 | 1,483 | 500 | 296.6 | 1,479 |
| CIM (CAL INSTITN FOR MEN) | | | | | | |
| Level I | 2,565 | | 2,565 | 1,620 | 158.3 | 2,760 |
| East - Reception Center | 1,078 | 2 | 1,080 | 400 | 270.0 | 990 |
| Reception Center - Central | 1,409 | 14 | 1,423 | 547 | 260.1 | 1,304 |
| Reception Center - West | 1,493 | 1 | 1,494 | 640 | 233.4 | 1,410 |
| CMF (CAL MEDICAL FACIL) | | | | | | |
| Level I | 148 | | 148 | 117 | 126.5 | 177 |
| Level II | 365 | | 365 | 200 | 182.5 | 400 |
| Level III | 2,507 | | 2,507 | 1,990 | 126.0 | 2,739 |
| CMC (CAL MEN'S COLONY) | | | | | | |
| East | 3,744 | | 3,744 | 2,425 | 154.4 | 3,720 |
| West | 2,845 | | 2,845 | 1,415 | 201.1 | 2,854 |
| CRC (CAL REHAB CTR, MEN) | 3,190 | 730 | 3,920 | 1,814 | 216.1 | 4,000 |
| CAL (CAL SP, CALIPATRIA) | | | | | | |
| Level I | 285 | | 285 | 208 | 137.0 | 408 |
| Level IV | 3,946 | | 3,946 | 2,100 | 187.9 | 3,910 |
| CEN (CAL SP, CENTINELA) | | | | | | |
| Level I | 381 | | 381 | 208 | 183.2 | 408 |
| Level III | 4,310 | | 4,310 | 2,100 | 205.2 | 4,548 |
| COR (CAL SP, CORCORAN) | | | | | | |
| Level I | 871 | | 871 | 492 | 177.0 | 876 |
| Level III | 338 | | 338 | 1,100 | 30.7 | 2,373 |
| Level IV | 3,038 | 1 | 3,039 | 628 | 483.9 | 1,044 |
| SHU | 1,306 | | 1,306 | 872 | 149.8 | 1,133 |
| PHU | 10 | | 10 | 24 | 41.7 | 24 |
| LAC (CAL SP, LOS ANGELES CO) | | | | | | |
| Level I | 335 | | 335 | 200 | 167.5 | 400 |
| Level III/IV | 1,747 | | 1,747 | 1,600 | 109.2 | 3,080 |
| Reception Center | 2,491 | | 2,491 | 500 | 498.2 | 1,170 |
| SAC (CAL SP, SACRAMENTO) | | | | | | |
| Level I | 350 | | 350 | 192 | 182.3 | 368 |
| PSU | 159 | | 159 | 192 | 82.8 | 192 |
| Level IV | 2,692 | | 2,692 | 1,340 | 200.9 | 2,693 |
| SQ (CAL SP, SAN QUENTIN) | | | | | | |
| Level I | 6 | | 6 | 115 | 5.2 | 251 |
| Level II | 1,824 | | 1,824 | 937 | 194.7 | 1,643 |
| Condemned | 609 | | 609 | 637 | 95.6 | 637 |
| Reception Center | 2,874 | 5 | 2,879 | 1,420 | 202.7 | 2,689 |
| SOL (CAL SP, SOLANO) | | | | | | |
| Level II | 3,342 | | 3,342 | 1,410 | 237.0 | 3,608 |
| Level III | 2,617 | | 2,617 | 1,200 | 218.1 | 2,475 |
| SATF (CAL SATF AND SP - COR) | 7,391 | 2 | 7,393 | 3,424 | 215.9 | 7,593 |
| CVSP (CHUCKAWALLA VALLEY SP) | | | | | | |
| Level I | 383 | | 383 | 208 | 184.1 | 408 |
| Level II | 3,738 | | 3,738 | 1,530 | 244.3 | 3,884 |
| CTF (CORRL TRAING FAC) | | | | | | |
| Central-II | 3,066 | | 3,066 | 1,391 | 220.4 | 3,127 |
| North-II/III | 2,951 | | 2,951 | 1,400 | 210.8 | 2,880 |
| South-I | 1,120 | | 1,120 | 510 | 219.6 | 1,120 |
| DVI (DEUEL VOCATL INSTITN) | | | | | | |
| Level I/II | 686 | | 686 | 225 | 304.9 | 677 |
| Reception Center | 3,135 | 18 | 3,153 | 1,562 | 201.9 | 3,234 |
| FOL (FOLSOM SP) | | | | | | |
| PSAP | 187 | | 187 | 129 | 145.0 | 200 |
| TTP | 68 | | 68 | 131 | 51.9 | 203 |
| Level I | 402 | | 402 | 200 | 201.0 | 424 |
| Level II | 1,543 | | 1,543 | 480 | 321.5 | 787 |
| Level III | 1,886 | | 1,886 | 1,296 | 145.5 | 2,464 |

#TPOP-1A

WEEKLY INSTITUTION/CAMPS POPULATION DETAIL

MIDNIGHT May 16, 2007

| MALE INSTITUTIONS | FELON/ OTHER | CIVIL ADDICT | TOTAL | DESIGN CAPACITY | PERCENT OCCUPIED | STAFFED CAPACITY |
|---|---|---|---|---|---|---|
| HDP (HIGH DESERT SP) | | | | | | |
| Level I | 386 | | 386 | 200 | 193.0 | 400 |
| Level II | 125 | | 125 | 0 | - | 120 |
| Level III | 694 | | 694 | 200 | 347.0 | 620 |
| Level IV | 2,880 | | 2,880 | 1,624 | 177.3 | 2,996 |
| Reception Center | 589 | 2 | 591 | 300 | 197.0 | 570 |
| IRON (IRONWOOD SP) | | | | | | |
| Level I | 306 | | 306 | 200 | 153.0 | 400 |
| Level III | 4,495 | | 4,495 | 2,000 | 224.8 | 4,409 |
| KVSP (KERN VALLEY SP) | | | | | | |
| Level I/II | 373 | | 373 | 200 | 186.5 | 700 |
| Level IV | 4,574 | | 4,574 | 2,248 | 203.5 | 4,166 |
| MCSP (MULE CREEK SP) | | | | | | |
| Level I/II | 360 | | 360 | 200 | 180.0 | 792 |
| Level III | 2,438 | | 2,438 | 1,000 | 243.8 | 2,287 |
| Level IV | 970 | | 970 | 500 | 194.0 | 930 |
| NKSP (NORTH KERN SP) | | | | | | |
| Level I | 182 | | 182 | 208 | 87.5 | 408 |
| Level III | 607 | | 607 | 200 | 303.5 | 380 |
| Reception Center | 4,642 | 2 | 4,644 | 2,284 | 203.3 | 4,613 |
| PDC (PITCHESS DETENT CTR-RC) | 51 | | 51 | 0 | - | 1,292 |
| PBSP (PELICAN BAY SP) | | | | | | |
| Level I | 308 | | 308 | 200 | 154.0 | 392 |
| Level III/IV | 2,037 | | 2,037 | 996 | 204.5 | 1,815 |
| SHU | 1,107 | | 1,107 | 1,056 | 104.8 | 1,109 |
| PVSP (PLEASANT VALLEY SP) | | | | | | |
| Level I/II | 284 | | 284 | 208 | 136.5 | 558 |
| Level III/IV | 4,930 | | 4,930 | 2,100 | 234.8 | 4,554 |
| RIO (RIO COSUMNES COR CTR-RC) | 426 | | 426 | 0 | - | 250 |
| RJD (RJ DONOVAN CORR FACIL) | | | | | | |
| Level I | 307 | | 307 | 200 | 153.5 | 400 |
| Level III | 1,975 | | 1,975 | 1,100 | 179.5 | 2,177 |
| Reception Center | 1,989 | | 1,989 | 900 | 221.0 | 2,179 |
| IV-SNY | 377 | | 377 | 1,102 | 34.2 | 1,102 |
| SVSP (SALINAS VAL SP) | | | | | | |
| Level I/II | 358 | | 358 | 200 | 179.0 | 640 |
| Level III/IV | 4,409 | 1 | 4,410 | 2,098 | 210.2 | 3,966 |
| SRTA (SANTA RITA CO. JAIL-RC) | 799 | | 799 | 0 | - | 550 |
| SBRN (SAN BRUNO CO. JAIL) | 48 | | 48 | 60 | 80.0 | 60 |
| SCC (SIERRA CONSERV CTR) | | | | | | |
| Camps-Men | 2,131 | | 2,131 | 2,010 | 106.0 | 2,010 |
| Level I | 1,250 | | 1,250 | 618 | 202.3 | 1,378 |
| Level II | 1,602 | | 1,602 | 608 | 263.5 | 1,634 |
| Level III | 1,192 | | 1,192 | 500 | 238.4 | 1,193 |
| WSP (WASCO SP) | | | | | | |
| Level I | 292 | | 292 | 200 | 146.0 | 296 |
| Level III | 442 | | 442 | 250 | 176.8 | 475 |
| Reception Center | 5,127 | 18 | 5,145 | 2,384 | 215.8 | 4,946 |
| MALE TOTAL: | 154,067 | 798 | 154,865 | 78,843 | 196.4 | 157,920 |
| | | | | | | |
| FEMALE INSTITUTIONS | | | | | | |
| CIW (CAL INST FOR WOMEN) | | | | | | |
| Institution | 1,887 | 12 | 1,899 | 792 | 239.8 | 1,967 |
| Reception Center | 221 | | 221 | 214 | 103.3 | 400 |
| Corr Trt Ctr | 17 | | 17 | 0 | - | 0 |
| Camps-Women | 320 | | 320 | 320 | 100.0 | 320 |
| CRC (CAL REHAB CTR, WOMEN) | 187 | 284 | 471 | 500 | 94.2 | 780 |
| CCWF (CENT CAL WOMEN'S FACIL) | | | | | | |
| Institution | 3,372 | 3 | 3,375 | 1,633 | 206.7 | 3,162 |
| Reception Center | 754 | | 754 | 356 | 211.8 | 766 |
| Condemned | 15 | | 15 | 15 | 100.0 | 15 |
| RIO (RIO COSUMNES COR CTR-RC) | 20 | | 20 | 0 | - | 20 |
| SRTA (SANTA RITA CO. JAIL-RC) | 2 | | 2 | 0 | - | 20 |
| VSP (VALLEY SP) | | | | | | |
| Institution | 3,270 | | 3,270 | 1,580 | 207.0 | 3,132 |
| Reception Center | 704 | 12 | 716 | 356 | 201.1 | 708 |
| SHU | 54 | | 54 | 44 | 122.7 | 62 |
| FEMALE TOTAL: | 10,823 | 311 | 11,134 | 5,810 | 191.6 | 11,352 |
| | | | | | | |
| INSTITUTIONS/CAMPS TOTAL: | 164,890 | 1,109 | 165,999 | 84,653 | 196.1 | 169,272 |

#TPOP-1A, PAGE 2

Data Analysis Unit  
Estimates and Statistical Analysis Section  
Offender Information Services Branch  

Department of Corrections and Rehabilitation  
State of California  
May 21, 2007  

Table 1: Parole Counts for Parole Statuses (Parolee, PAL, PRTC, PENDREV)  
by Parole Region and Units for May 16, 2007  

| REGION 1 PAROLE UNITS | PAROLEE | PAL | PRTC | PENDREV | PRTC AND PENDREV | TOTAL POP | PRTC & PENDREV AS A PERCENT OF TOTAL POP |
|---|---|---|---|---|---|---|---|
| AUBURN | 586 | 52 | 73 | 60 | 133 | 771 | 17.3 |
| BAKERSFIELD #1 | 665 | 57 | 104 | 31 | 135 | 857 | 15.8 |
| BAKERSFIELD #2 | 553 | 82 | 87 | 16 | 103 | 738 | 14.0 |
| BAKERSFIELD #3 | 503 | 61 | 96 | 32 | 128 | 692 | 18.5 |
| BAKERSFIELD #4 | 502 | 101 | 120 | 23 | 143 | 746 | 19.2 |
| BAKERSFIELD #5 | 548 | 59 | 110 | 27 | 137 | 744 | 18.4 |
| BAKERSFIELD #6 | 516 | 75 | 87 | 25 | 112 | 703 | 15.9 |
| BAKERSFIELD #7 | 553 | 100 | 105 | 26 | 131 | 784 | 16.7 |
| CERES | 554 | 76 | 70 | 42 | 112 | 742 | 15.1 |
| CHICO | 514 | 47 | 72 | 27 | 99 | 660 | 15.0 |
| COALINGA ST. HOSP. | 18 | 0 | 0 | 0 | 0 | 18 | 0 |
| FRESNO #1(METRO) | 642 | 74 | 151 | 46 | 197 | 913 | 21.6 |
| FRESNO #2(RURAL) | 746 | 83 | 150 | 49 | 199 | 1,028 | 19.4 |
| FRESNO #3 | 734 | 57 | 172 | 48 | 220 | 1,011 | 21.8 |
| FRESNO #4 | 692 | 77 | 183 | 39 | 222 | 991 | 22.4 |
| FRESNO #5 | 661 | 61 | 178 | 52 | 230 | 952 | 24.2 |
| PRE6 | 711 | 88 | 176 | 63 | 239 | 1,038 | 23.0 |
| GOLD COUNTRY #1 | 395 | 41 | 38 | 28 | 66 | 502 | 13.1 |
| HANFORD | 714 | 75 | 172 | 60 | 232 | 1,021 | 22.7 |
| KERN COUNTY JAIL | 68 | 1 | 5 | 1 | 6 | 75 | 8.0 |
| TULARE CO ADLT PRTR | 52 | 0 | 1 | 0 | 1 | 53 | 1.9 |
| MADERA | 630 | 50 | 143 | 45 | 188 | 868 | 21.7 |
| MARYSVILLE | 656 | 81 | 129 | 67 | 196 | 933 | 21.0 |
| MERCED | 639 | 69 | 137 | 79 | 216 | 924 | 23.4 |
| MODESTO | 449 | 78 | 80 | 51 | 131 | 658 | 19.9 |
| MODESTO #2 | 575 | 63 | 78 | 39 | 117 | 755 | 15.5 |
| OROVILL1 | 499 | 43 | 57 | 15 | 72 | 614 | 11.7 |
| REDDING | 671 | 40 | 143 | 25 | 168 | 879 | 19.1 |
| RED BLUFF | 617 | 57 | 124 | 16 | 140 | 814 | 17.2 |
| REDDING #2 | 592 | 64 | 109 | 15 | 124 | 780 | 15.9 |
| SAC FLORIN | 477 | 59 | 61 | 72 | 133 | 669 | 19.9 |
| SAC NATOMAS | 626 | 68 | 69 | 77 | 146 | 840 | 17.4 |
| SAC NORTH | 676 | 36 | 41 | 66 | 107 | 819 | 13.1 |
| SAC SOUTH | 528 | 67 | 66 | 63 | 129 | 724 | 17.8 |
| SAC METRO #1 | 595 | 69 | 51 | 95 | 146 | 810 | 18.0 |
| SAC METRO #2 | 387 | 89 | 83 | 90 | 173 | 649 | 26.7 |
| SAC METRO #3 | 190 | 6 | 40 | 27 | 67 | 263 | 25.5 |
| SAC METRO #4 | 471 | 53 | 44 | 58 | 102 | 626 | 16.3 |
| STOCKTON #1 | 686 | 88 | 132 | 70 | 202 | 976 | 20.7 |
| STOCKTON #2 | 404 | 78 | 135 | 67 | 202 | 684 | 29.5 |
| STOCKTON #3 | 555 | 51 | 95 | 45 | 140 | 746 | 18.8 |
| STOCKTON #4 | 590 | 98 | 114 | 58 | 172 | 860 | 20.0 |
| VISALIA #1 | 648 | 90 | 124 | 30 | 154 | 892 | 17.3 |
| VISALIA #2 | 751 | 102 | 167 | 42 | 209 | 1,062 | 19.7 |
| WOODLAND | 575 | 58 | 81 | 66 | 147 | 780 | 18.8 |
| HWB & NP UNITS | 0 | 1 | 1 | 0 | 1 | 2 | 50.0 |
| DEPORTED | 1,036 | 22 | 0 | 0 | 0 | 1,058 | 0 |
| PENDING DEPORT | 1,102 | 281 | 10 | 7 | 17 | 1,400 | 1.2 |
| TOTAL REGION 1: | 26,552 | 3,128 | 4,464 | 1,980 | 6,444 | 36,124 | 17.8 |

Report Name: Parole. See also main.pgms(parole)

**EXHIBIT S**

Data Analysis Unit
Estimates and Statistical Analysis Section
Offender Information Services Branch

Department of Corrections and Rehabilitation
State of California
May 21, 2007

Table 1: Parole Counts for Parole Statuses (Parolee, PAL, PRTC, PENDREV)
by Parole Region and Units for May 16, 2007

| REGION 2 PAROLE UNITS | PAROLEE | PAL | PRTC | PENDREV | PRTC AND PENDREV | TOTAL POP | PRTC & PENDREV AS A PERCENT OF TOTAL POP |
|---|---|---|---|---|---|---|---|
| ATASCADERO SH | 536 | 0 | 23 | 1 | 24 | 560 | 4.3 |
| ATAS SEX VIOL PREDA | 3 | 0 | 0 | 0 | 0 | 3 | 0 |
| BERKELEY #1 | 360 | 59 | 63 | 25 | 88 | 507 | 17.4 |
| BERKELEY #2 | 438 | 85 | 85 | 43 | 128 | 651 | 19.7 |
| CONCORD #1 | 515 | 48 | 69 | 35 | 104 | 667 | 15.6 |
| CONCORD #2 | 495 | 60 | 73 | 35 | 108 | 663 | 16.3 |
| DALY CITY | 613 | 58 | 69 | 36 | 105 | 776 | 13.5 |
| EUREKA | 608 | 63 | 91 | 41 | 132 | 803 | 16.4 |
| FAIRFIELD | 618 | 96 | 76 | 36 | 112 | 826 | 13.6 |
| FAIRFIELD#2 | 262 | 38 | 35 | 19 | 54 | 354 | 15.3 |
| HAYWARD | 738 | 79 | 121 | 43 | 164 | 981 | 16.7 |
| DEL NORTE COUNTY JA | 22 | 0 | 0 | 0 | 0 | 22 | 0 |
| SANTA CLARA COUNTY | 81 | 1 | 0 | 1 | 1 | 83 | 1.2 |
| SAN FRANCISCO CO JA | 25 | 1 | 1 | 0 | 1 | 27 | 3.7 |
| OAKLAND #1 | 500 | 101 | 103 | 65 | 168 | 769 | 21.8 |
| OAKLAND #2 | 506 | 50 | 82 | 41 | 123 | 679 | 18.1 |
| OAKLAND #3 | 424 | 163 | 91 | 47 | 138 | 725 | 19.0 |
| OXNARD | 585 | 111 | 126 | 29 | 155 | 851 | 18.2 |
| REDWOOD CITY | 541 | 73 | 71 | 48 | 119 | 733 | 16.2 |
| RICHMOND | 516 | 91 | 90 | 43 | 133 | 740 | 18.0 |
| SALINAS #1 | 624 | 69 | 89 | 32 | 121 | 814 | 14.9 |
| SALINAS #2 | 597 | 77 | 93 | 26 | 119 | 793 | 15.0 |
| SANTA CRUZ | 469 | 81 | 72 | 29 | 101 | 651 | 15.5 |
| SF#1(DOWNTOWN) | 472 | 115 | 100 | 45 | 145 | 732 | 19.8 |
| SF#2(MISSION) | 3 | 0 | 1 | 0 | 1 | 4 | 25.0 |
| SAN FRANCISCO #3 | 407 | 102 | 99 | 50 | 149 | 658 | 22.6 |
| SAN FRANCISCO #4 | 443 | 111 | 113 | 50 | 163 | 717 | 22.7 |
| SAN JOSE #1 | 673 | 98 | 52 | 37 | 89 | 860 | 10.3 |
| SAN JOSE #2 | 632 | 86 | 41 | 20 | 61 | 779 | 7.8 |
| SAN JOSE #3 | 499 | 87 | 60 | 36 | 96 | 682 | 14.1 |
| SAN JOSE #4 | 673 | 104 | 80 | 27 | 107 | 884 | 12.1 |
| SAN JOSE #5 | 577 | 76 | 63 | 39 | 102 | 755 | 13.5 |
| SAN JOSE #6 | 536 | 76 | 62 | 27 | 89 | 701 | 12.7 |
| SAN JOSE #7 | 383 | 66 | 61 | 34 | 95 | 544 | 17.5 |
| SAN LEANDRO | 502 | 68 | 87 | 46 | 133 | 703 | 18.9 |
| SAN LUIS OBISPO | 510 | 49 | 83 | 24 | 107 | 666 | 16.1 |
| SANTA MARIA | 696 | 46 | 115 | 28 | 143 | 885 | 16.2 |
| SANTA ROSA #1 | 493 | 55 | 53 | 33 | 86 | 634 | 13.6 |
| SANTA ROSA #2 | 567 | 65 | 62 | 33 | 95 | 727 | 13.1 |
| UKIAH | 564 | 56 | 64 | 28 | 92 | 712 | 12.9 |
| VALLEJO #1 | 554 | 64 | 83 | 49 | 132 | 750 | 17.6 |
| VENTURA #1 | 563 | 81 | 131 | 25 | 156 | 800 | 19.5 |
| VENTURA #2 | 516 | 111 | 78 | 27 | 105 | 732 | 14.3 |
| DEPORTED | 2,402 | 5 | 0 | 0 | 0 | 2,407 | 0 |
| PENDING DEPORT | 802 | 379 | 2 | 3 | 5 | 1,186 | 0.4 |
| TOTAL REGION 2: | 23,543 | 3,304 | 3,013 | 1,336 | 4,349 | 31,196 | 13.9 |

----2----

Data Analysis Unit                                    Department of Corrections and Rehabilitation
Estimates and Statistical Analysis Section                          State of California
Offender Information Services Branch                                    May 21, 2007

Table 1: Parole Counts for Parole Statuses (Parolee, PAL, PRTC, PENDREV)
by Parole Region and Units for May 16, 2007

| REGION 3<br>PAROLE UNITS | PAROLEE | PAL | PRTC | PENDREV | PRTC<br>AND<br>PENDREV | TOTAL<br>POP | PRTC &<br>PENDREV<br>AS A<br>PERCENT OF<br>TOTAL POP |
|---|---|---|---|---|---|---|---|
| ANTELOPE VALLEY | 645 | 60 | 59 | 6 | 65 | 770 | 8.4 |
| ANTELOPE #2 | 620 | 78 | 88 | 5 | 93 | 791 | 11.8 |
| ANTELOPE #3 | 612 | 119 | 59 | 12 | 71 | 802 | 8.9 |
| COMPTON #1 | 727 | 97 | 45 | 5 | 50 | 874 | 5.7 |
| COMPTON #3 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| EL MONTE #1 | 618 | 125 | 58 | 9 | 67 | 810 | 8.3 |
| EL MONTE #2 | 481 | 115 | 51 | 14 | 65 | 661 | 9.8 |
| EL MONTE #3 | 589 | 107 | 47 | 9 | 56 | 752 | 7.4 |
| EXPOSITION #1 | 659 | 225 | 77 | 11 | 88 | 972 | 9.1 |
| EXPOSITION #2 | 632 | 205 | 51 | 10 | 61 | 898 | 6.8 |
| HARBOR | 834 | 154 | 68 | 11 | 79 | 1,067 | 7.4 |
| HUNTINGTON PK #1 | 266 | 26 | 42 | 4 | 46 | 338 | 13.6 |
| HUNTINGTON PK #2 | 539 | 192 | 80 | 8 | 88 | 819 | 10.7 |
| HUNTINGTON PK #3 | 415 | 164 | 50 | 5 | 55 | 634 | 8.7 |
| HUNTINGTON PK #4 | 484 | 145 | 66 | 4 | 70 | 699 | 10.0 |
| HUNTINGTON PK #5 | 558 | 137 | 56 | 6 | 62 | 757 | 8.2 |
| INGLEWOOD #1 | 528 | 111 | 40 | 6 | 46 | 685 | 6.7 |
| INGLEWOOD #2 | 661 | 134 | 52 | 2 | 54 | 849 | 6.4 |
| INGLEWOOD #3 | 536 | 189 | 47 | 4 | 51 | 776 | 6.6 |
| INGLEWOOD #4 | 567 | 141 | 42 | 4 | 46 | 754 | 6.1 |
| INGLEWOOD #5 | 536 | 128 | 49 | 4 | 53 | 717 | 7.4 |
| INGLEWOOD #6 | 631 | 144 | 55 | 3 | 58 | 833 | 7.0 |
| LONG BEACH #1 | 683 | 125 | 34 | 8 | 42 | 850 | 4.9 |
| LONG BEACH #2 | 702 | 114 | 48 | 10 | 58 | 874 | 6.6 |
| LONG BEACH #3 | 878 | 142 | 77 | 14 | 91 | 1,111 | 8.2 |
| LONG BEACH #4 | 741 | 97 | 48 | 4 | 52 | 890 | 5.8 |
| MID-TOWN #2 | 570 | 153 | 75 | 6 | 81 | 804 | 10.1 |
| NORTH LONG BEACH | 743 | 102 | 59 | 5 | 64 | 909 | 7.0 |
| NORTH EAST #1 | 502 | 125 | 49 | 5 | 54 | 681 | 7.9 |
| PASADENA #1 | 819 | 195 | 73 | 3 | 76 | 1,090 | 7.0 |
| PASADENA #2 | 680 | 172 | 68 | 5 | 73 | 925 | 7.9 |
| PASADENA #3 | 682 | 125 | 73 | 14 | 87 | 894 | 9.7 |
| POMONA #1 | 511 | 139 | 75 | 14 | 89 | 739 | 12.0 |
| POMONA #2 | 679 | 101 | 105 | 21 | 126 | 906 | 13.9 |
| SANTA FE SPGS #2 | 632 | 140 | 51 | 8 | 59 | 831 | 7.1 |
| SANTA FE SPGS #3 | 697 | 158 | 70 | 5 | 75 | 930 | 8.1 |
| SAN FERN VAL #1 | 448 | 131 | 30 | 3 | 33 | 612 | 5.4 |
| SAN FERN VAL #2 | 651 | 77 | 34 | 2 | 36 | 764 | 4.7 |
| SAN FERN VAL #3 | 659 | 89 | 39 | 2 | 41 | 789 | 5.2 |
| SAN FERN VAL #4 | 561 | 67 | 52 | 2 | 54 | 682 | 7.9 |
| SAN GABREL VAL#1 | 640 | 82 | 65 | 10 | 75 | 797 | 9.4 |
| SAN GABREL VAL#2 | 588 | 143 | 61 | 7 | 68 | 799 | 8.5 |
| SAN GABREL VAL#3 | 566 | 111 | 62 | 8 | 70 | 747 | 9.4 |
| SILVERLAKE #1 | 208 | 45 | 41 | 4 | 45 | 298 | 15.1 |
| SILVERLAKE #2 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| SOUTH CENTRAL #1 | 620 | 159 | 42 | 6 | 48 | 827 | 5.8 |
| SOUTH CENTRAL #2 | 635 | 104 | 52 | 3 | 55 | 794 | 6.9 |
| SOUTH CENTRAL #3 | 572 | 89 | 59 | 5 | 64 | 725 | 8.8 |
| SOUTH CENTRAL #4 | 608 | 96 | 49 | 5 | 54 | 758 | 7.1 |
| SOUTH CENTRAL #5 | 555 | 93 | 52 | 4 | 56 | 704 | 8.0 |

Data Analysis Unit
Estimates and Statistical Analysis Section
Offender Information Services Branch

Department of Corrections and Rehabilitation
State of California
May 21, 2007

Table 1: Parole Counts for Parole Statuees (Parolee, PAL, PRTC, PENDREV)
by Parole Region and Units for May 16, 2007

| REGION 3 PAROLE UNITS | PAROLEE | PAL | PRTC | PENDREV | PRTC AND PENDREV | TOTAL POP | PRTC & PENDREV AS A PERCENT OF TOTAL POP |
|---|---|---|---|---|---|---|---|
| VAN NUYS #1 | 575 | 86 | 38 | 8 | 46 | 707 | 6.5 |
| VAN NUYS #2 | 542 | 101 | 39 | 3 | 42 | 685 | 6.1 |
| VAN NUYS #3 | 458 | 71 | 35 | 8 | 43 | 572 | 7.5 |
| HWB & NP UNITS | 2 | 2 | 0 | 0 | 0 | 4 | 0 |
| DEPORTED | 5,850 | 19 | 0 | 0 | 0 | 5,869 | 0 |
| PENDING DEPORT | 2,617 | 944 | 4 | 8 | 12 | 3,573 | 0.3 |
| TOTAL REGION 3: | 39,013 | 7,194 | 2,841 | 352 | 3,193 | 49,400 | 6.5 |

----4----

Data Analysis Unit                          Department of Corrections and Rehabilitation
Estimates and Statistical Analysis Section                         State of California
Offender Information Services Branch                                   May 21, 2007

Table 1: Parole Counts for Parole Statuses (Parolee, PAL, PRTC, PENDREV)
by Parole Region and Units for May 16, 2007

| REGION 4<br>PAROLE UNITS | PAROLEE | PAL | PRTC | PENDREV | PRTC<br>AND<br>PENDREV | TOTAL<br>POP | PRTC &<br>PENDREV<br>AS A<br>PERCENT OF<br>TOTAL POP |
|---|---|---|---|---|---|---|---|
| BUENA PARK | 676 | 107 | 70 | 31 | 101 | 884 | 11.4 |
| EL CAJON #1 | 398 | 74 | 60 | 29 | 09 | 561 | 15.9 |
| EL CAJON #2 | 383 | 85 | 79 | 17 | 96 | 564 | 17.0 |
| EL CAJON #3 | 426 | 55 | 67 | 19 | 86 | 567 | 15.2 |
| EL CAJON #4 | 473 | 32 | 58 | 25 | 83 | 588 | 14.1 |
| CHULA VISTA #1 | 403 | 179 | 82 | 37 | 119 | 701 | 17.0 |
| CHULA VISTA #2 | 508 | 107 | 85 | 21 | 106 | 721 | 14.7 |
| CHULA VISTA #3 | 459 | 69 | 93 | 21 | 114 | 642 | 17.8 |
| CHULA VISTA #4 | 498 | 72 | 100 | 28 | 128 | 698 | 18.3 |
| COSTA MESA | 710 | 72 | 53 | 34 | 87 | 869 | 10.0 |
| EL CENTRO | 290 | 70 | 72 | 33 | 105 | 465 | 22.6 |
| ESCONDIDO | 529 | 77 | 82 | 24 | 106 | 712 | 14.9 |
| ESCONDIDO #2 | 509 | 48 | 85 | 25 | 110 | 667 | 16.5 |
| FONTANA | 664 | 109 | 90 | 34 | 124 | 897 | 13.8 |
| FULLERTON | 635 | 100 | 86 | 36 | 122 | 857 | 14.2 |
| GOLDEN WEST #1 | 711 | 123 | 83 | 40 | 123 | 957 | 12.9 |
| CHULA VISTA CITY JA | 20 | 0 | 2 | 0 | 2 | 22 | 9.1 |
| INDIO | 764 | 125 | 126 | 33 | 159 | 1,048 | 15.2 |
| MORENO VALLEY #1 | 785 | 116 | 102 | 43 | 145 | 1,046 | 13.9 |
| MORENO VALLEY #2 | 629 | 123 | 128 | 34 | 162 | 914 | 17.7 |
| MORENO VALLEY #3 | 587 | 98 | 98 | 33 | 131 | 816 | 16.1 |
| MORENO VALLEY #4 | 734 | 121 | 118 | 37 | 155 | 1,010 | 15.3 |
| MORENO VALLEY #5 | 538 | 80 | 24 | 14 | 38 | 656 | 5.8 |
| MORENO VALLEY #6 | 75 | 2 | 0 | 2 | 2 | 79 | 2.5 |
| OCEANSIDE | 674 | 104 | 116 | 43 | 159 | 937 | 17.0 |
| ONTARIO #1 | 778 | 96 | 86 | 32 | 118 | 992 | 11.9 |
| ONTARIO #2 | 688 | 109 | 96 | 21 | 117 | 914 | 12.8 |
| ONTARIO #3 | 609 | 115 | 84 | 24 | 108 | 832 | 13.0 |
| ORANGE #1 | 555 | 123 | 88 | 19 | 107 | 785 | 13.6 |
| ORANGE #2 | 589 | 90 | 86 | 28 | 114 | 793 | 14.4 |
| ORANGE #3 | 485 | 73 | 71 | 24 | 95 | 653 | 14.5 |
| PALM SPRINGS | 680 | 117 | 118 | 48 | 166 | 963 | 17.2 |
| PATTON ST HOSP | 93 | 0 | 8 | 0 | 8 | 101 | 7.9 |
| RIALTO | 650 | 84 | 112 | 38 | 150 | 884 | 17.0 |
| RIVERSIDE #1 | 587 | 130 | 103 | 51 | 154 | 871 | 17.7 |
| RIVERSIDE #2 | 244 | 17 | 87 | 21 | 108 | 369 | 29.3 |
| RIVERSIDE #3 | 781 | 91 | 69 | 40 | 109 | 981 | 11.1 |
| RIVERSIDE #4 | 737 | 124 | 131 | 49 | 180 | 1,041 | 17.3 |
| SANTA ANA #1 | 571 | 194 | 104 | 41 | 145 | 910 | 15.9 |
| SANTA ANA #2 | 553 | 77 | 84 | 20 | 104 | 734 | 14.2 |
| SANTA ANA #3 | 473 | 131 | 91 | 37 | 128 | 732 | 17.5 |
| SAN BERNARDNO #1 | 705 | 143 | 172 | 44 | 216 | 1,064 | 20.3 |
| SAN BERNARDNO #2 | 647 | 108 | 118 | 42 | 160 | 915 | 17.5 |
| SAN BERNARDNO #3 | 573 | 112 | 141 | 55 | 196 | 881 | 22.2 |
| SAN BERNARDNO #4 | 721 | 126 | 137 | 59 | 196 | 1,043 | 18.8 |
| SAN DIEGO #1 | 536 | 170 | 90 | 41 | 131 | 837 | 15.7 |
| SAN DIEGO #2 | 442 | 113 | 93 | 27 | 120 | 675 | 17.8 |
| SAN DIEGO #3 | 622 | 111 | 83 | 34 | 117 | 850 | 13.8 |
| SAN DIEGO #4 | 168 | 1 | 47 | 5 | 52 | 221 | 23.5 |
| VICTORVILLE #1 | 824 | 89 | 115 | 56 | 171 | 1,084 | 15.8 |
| VICTORVILLE #2 | 873 | 87 | 133 | 39 | 172 | 1,132 | 15.2 |
| VICTORVILLE #3 | 787 | 108 | 110 | 47 | 157 | 1,052 | 14.9 |
| HWB & NP UNITS | 0 | 1 | 1 | 0 | 1 | 2 | 50.0 |
| DEPORTED | 2,907 | 39 | 0 | 0 | 0 | 2,946 | 0 |
| PENDING DEPORT | 1,169 | 594 | 12 | 8 | 20 | 1,703 | 1.1 |
| TOTAL REGION 4: | 33,125 | 5,521 | 4,629 | 1,643 | 6,272 | 44,918 | 14.0 |
| GRAND TOTAL: | 122,233 | 19,147 | 14,947 | 5,311 | 20,258 | 161,638 | 12.5 |

Data Analysis Unit                                    Department of Corrections and Rehabilitation
Estimates and Statistical Analysis Section                                     State of California
Offender Information Services Branch                                             May 21, 2007

Table 2: Parole Counts for Parole Statuses (Parolee, PAL, PRTC, PENDREV)
by HWB, & NP SATCU Programs, Deport & Pending Deport and All Other Parole Units
by Parole Region for May 16, 2007

| REGION 1 PAROLE UNITS | PAROLEE | PAL | PRTC | PENDREV | PRTC AND PENDREV | TOTAL POP | PRTC & PENDREV AS A PERCENT OF TOTAL POP |
|---|---|---|---|---|---|---|---|
| **REGION 1** | | | | | | | |
| NP SAT KERN CO JAIL | 0 | 1 | 1 | 0 | 1 | 2 | 50.0 |
| DEPORTED | 1,036 | 22 | 0 | 0 | 0 | 1,058 | 0 |
| PENDING DEPORT | 1,102 | 281 | 10 | 7 | 17 | 1,400 | 1.2 |
| ALL OTHER UNITS | 24,414 | 2,824 | 4,453 | 1,973 | 6,426 | 33,664 | 19.1 |
| TOTAL REGION 1: | 26,552 | 3,128 | 4,464 | 1,980 | 6,444 | 36,124 | 17.8 |
| **REGION 2** | | | | | | | |
| DEPORTED | 2,402 | 5 | 0 | 0 | 0 | 2,407 | 0 |
| PENDING DEPORT | 802 | 379 | 2 | 3 | 5 | 1,186 | 0.4 |
| ALL OTHER UNITS | 20,339 | 2,920 | 3,011 | 1,333 | 4,344 | 27,603 | 15.7 |
| TOTAL REGION 2: | 23,543 | 3,304 | 3,013 | 1,336 | 4,349 | 31,196 | 13.9 |
| **REGION 3** | | | | | | | |
| HWB-HOLLYWOOD RE | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| HWB-ORION | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| HWB-WORKING ALT | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| NP SAT PITCHESS | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| DEPORTED | 5,850 | 19 | 0 | 0 | 0 | 5,869 | 0 |
| PENDING DEPORT | 2,617 | 944 | 4 | 8 | 12 | 3,573 | 0.3 |
| ALL OTHER UNITS | 30,544 | 6,229 | 2,837 | 344 | 3,181 | 39,954 | 8.0 |
| TOTAL REGION 3: | 39,013 | 7,194 | 2,841 | 352 | 3,193 | 49,400 | 6.5 |
| **REGION 4** | | | | | | | |
| NP SAT PITCHESS | 0 | 1 | 1 | 0 | 1 | 2 | 50.0 |
| DEPORTED | 2,907 | 39 | 0 | 0 | 0 | 2,946 | 0 |
| PENDING DEPORT | 1,169 | 594 | 12 | 8 | 20 | 1,783 | 1.1 |
| ALL OTHER UNITS | 29,049 | 4,887 | 4,616 | 1,635 | 6,251 | 40,187 | 15.6 |
| TOTAL REGION 4: | 33,125 | 5,521 | 4,629 | 1,643 | 6,272 | 44,918 | 14.0 |
| GRAND TOTAL: | 122,233 | 19,147 | 14,947 | 5,311 | 20,258 | 161,638 | 12.5 |

Report Name: Parole. See also main.pgms(parole)

**EXHIBIT T**

# Effect of Early Release from Prison on Public Safety:
## A Review of the Literature

## National Council on Crime and Delinquency
April, 2007

## Significance

Prison crowding is the most critical problem facing the criminal justice system in the US. Several approaches have been undertaken to alleviate this problem, ranging from "front-door" solutions such as reducing prison admissions or reducing the sentence lengths of those admitted, "back-door" solutions of increasing the number of releases from prison through parole release, and finally, through "capacity expansion" or by building more prison. However, the rate of incarceration continues to pose a burden to the prisons and jails.

## Methods

The National Council on Crime and Delinquency (NCCD) conducted an extensive review of published literature on "early release" and "public safety" in March, 2007, for this report. The literature reviewed included approximately 15 peer-reviewed articles, dissertations, state reports, and policy-related and national data reports. The reports used data from 1981 to 2004. This review examines the issue of early release from prison in different geographical settings and at different times and looks at its impact on public safety over the span of 22 years.

## Highlights

No attempt has been made to compare the methods and validity of the studies reviewed. However, these studies contribute to the discourse around early release as an effective strategy to address prison overcrowding and its effect on prisoners and prison staff. In most cases early release is evaluated in terms of its impact on recidivism and public safety.

The cited literature shows:

- The recidivism rates among early release prisoners and those serving full term are comparable.
- In some cases the recidivism rate among the early release groups was *lower* than that of the full-term groups.
- Early release programs are most effective when they are targeted to specific types of offenders: substance abusers or property-related offenses.

**Literature Review on Effect of Early Release from Prison on Public of Safety**

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 1. Sims, B., O'Connell, J., *Early Release: Prison Overcrowding and Public Safety Implications*, Washington (State) Office of Financial Management, 1985. | **Setting: Olympia, Washington** **Summary:** First early release programs to attempt to control inmate population started in 1979. During early release efforts, inmates were paroled early at the discretion of the state Board of Prison Terms and Paroles. Starting in 1982, legislation prohibited early release of inmates convicted of treason, any class A felony, or inmates found to be sexual psychopaths. In 1983 the law was amended to prohibit the early release of inmates legally defined as violent offenders. The study groups was a total of 1,674 inmates released an average of six months earlier than their expected released dates (starting in 1979). | Longitudinal comparison assessment of six different cohorts participating in a court-mandated Prison Overcrowding Reform. The early release cohorts were compared to a historical comparison group. The comparison group includes 1,867 inmates released between July, 1978 and July, 1979. This period is the 12 months immediately preceding the first early release program. **Outcomes:** Effect of early release on public safety, as measured by recidivism rates of early release inmates, is measured at one, two and three years following release and compared with a historical comparison group. | Similar rates of recidivism were found among the early release group when compared to the historical comparison group. Combined recidivism rate (y1-y5) for early release: 12.3% vs. 12.1% for comparison group. The types of offenses committed by early release prisoners were not substantially different than those committed by the comparison group. For example, 28.7% of the offenses committed by early release prisoners who refunded were classified as property offenses, vs. 27.2% of the comparison group. The crime rates in Washington state remained constant from the 1981-1984 periods, thus showing the early release program had no net effect on these rates. |

2

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 2. Berecochea, J.E., Jaman, D.R., *Time Served in Prison and Parole Outcome: An Experimental Study*. California Department of Corrections, Research Unit, No. 2, 1981. | **Setting: California**<br>**Summary:** All male felons who received a parole date during the period from March through August, 1970. Using this list, the authors generated a random assignment of inmates to have their parole advanced by six months. The groups were divided as follows:<br><br>**Total: 1,310**<br>n=637 experimental who had their terms reduced by six months; and n=673 controls who did not. | Randomized study design, where the experimental group (early release) served an average of 31.3 months, while the control group served 37.9, for a difference of 6.6 months.<br><br>Outcomes: most serious disposition at two different time periods: first twelve months following release and the first 24 months. | "A reduction of six months in prison terms has *no statistically significant effect* upon recidivism on parole within the first two years following release". This means that the experimental group (early release) did not differ from the controls in their likelihood of returning to prison (by a court conviction, for a new felony, or as a result of a parole violation short of a new conviction.)<br><br>In California, the periods from 1981-1984 experienced a reduction and then plateau in the crime rates. (Source: CA Criminal Justice Center's Website: http://ag.ca.gov/cjsc/keyfacts.php, accessed, April 5, 2007). |
| 3. Malak, P.A., *Early Release*, Colorado Division of Criminal Justice, 1984. | **Setting: Colorado**<br>**Summary:** 126 early release cases after Supreme Court Ruling People vs. Chavez. In this case, the supreme court ruled that inmates sentenced to the Department of Corrections must be granted good time credit for pre-sentence confinement in local jails. | Case comparison analysis of recidivism rate as measured by re-arrest between early release prisoners and determinate sentence release prisoners during February and March, 1983.<br><br>Re-arrests were measured within eight months of the date of release. Measures: demographics, offenses for which they were sentenced to prison, and prior criminal history. | A comparison of re-arrest rates for those released early as a result of the Chavez ruling shows that those released early were *no* more likely to be arrested for another crime than those offenders not in early release. In fact, only 39% of those released early were arrested as compared to 36% of those serving a full term.<br><br>In Colorado, total index crimes decreased from a peak of 7,773.5 per 100,000 state residents in 1980 to 4,281.5 in 1998. (Source: Crime in Colorado, from the Colorado Legislative Council website: http://www.state.co.us/gov_dir/leg_dir/lcsstaff/ accessed April 5, 2007) |

3

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 4. Leonardson, G., *Results of Early Release: Study Prompted by Passage of HB 685 (1993)*, Montana Board of Crime Control, 1997. | **Setting: Montana** Summary: In 1993 the Montana State Legislature enacted HB 685, which was designed to cap the prison population, in part, by decreasing the average time spent in prison. | Historical information on 667 inmates from 1990-1993. This list contained persons who were in early release program (accelerated good time); regular paroles or sentenced to one of the community-based parole programs. All were surveyed after one year of supervision. | Overall, less than 1/3 of the persons in the study were arrested for a new crime during the one year follow-up period. This percent is close to the historical Montana average of 33.3%. That is, early release did not result in more offenses.  Crime rates in Montana showed a decrease from a rate of 177 per 100,000 populations in 1994 to 132 per 100,000 in 1997, according to the FBI UCR reports. |
| 5. Eisenberg, M., *Release Outcome Study: Early Mandatory Release*, State of Texas Board of Pardons and Paroles, Division of Budget and Planning, 1985. | **Setting: Texas** Summary: A sample of 2,072 cases released from the Texas Department of corrections. 55% of the sample consisted of paroles, 16% were mandatory supervision cases, and 29% were early mandatory release (EMR) cases (EMR utilizes the Board's authority to release selected inmates up to 180 days prior to their mandatory release date). | Systematic review of a sample of cases released from the Texas Department of Corrections between January and June, 1983, and followed for one year. Outcome: no reports of violations, no arrests, convictions or incarceration during the one year follow-up period | The return rate to the department of corrections was similar among the mandatory and early mandatory release cases.  Crime rates: During the year of this early mandatory release period (1983), Texas reported one of the most significant *decreases* in offenses in the 20 years prior. |

4

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 6. Wisconsin Department of Health and Social Services, *Identifying Parole Candidates among Mandatory Release Inmates*, Wisconsin Parole Board, 1984. | Setting: **Wisconsin** correctional facilities<br>Summary: 1,886 inmates who received mandatory release (MR) after being rejected for parole<br>The MR group emerged as part of an effort to identify groups of inmates rejected for parole who, because they exhibit low rates of post release criminal behavior, may warrant more favorable consideration in future parole decisions. | Quasi-experimental cohort design with a one-year follow up.<br><br>Outcome: criminal activity rates of parole and mandatory releases. | This study found that inmates who received the discretionary parole (those in MR but initially rejected for parole, n=1886) were much less likely to be returned to prison for criminal activity than inmates who received a mandatory release (15% vs. 23% respectively) during the one year follow up period.<br><br>Crime rates decreased from 3975 per 100,000 populations in 1984 to 3757 per 100,000 in 1988. FBI, Uniform Crime Report Statistics. |
| 7. Wisconsin Department of Health and Social Services, *Special Action Release: Three Year Follow up*, Wisconsin Division of Corrections, 1985. | Setting: **Wisconsin**<br>Summary: The Special Action Release (SAR) program started in 1981 to reduce crowding in adult penal institution by releasing carefully selected offenders three or more months prior to their scheduled prison discharge.<br>During its initial phase, SAR inmates received a 90-day early discharge. A total of 892 SAR participants with 90-135 days of early release were reviewed. | Case comparison among two different SAR groups:<br>90-day early release (n=606) and 135-day early release (n=286)<br>Post-release behavior was observed over a 6- and 12-month follow up period as follows:<br><br>New sentence: Conviction of new felony offense, criminal parole violation, and technical parole violation. | At 6-month follow up, only 7% of the 135-day SAR group and 6% of the 90-day SAR group had committed felony offenses for which they were convicted and sentenced.<br><br>In this study, *no evidence* was found that early release extension from 90 to 135 days resulted in a disproportionate increase in criminal activity.<br><br>Crime rates decreased from 3975 per 100,000 populations in 1984 to 3757 per 100,000 in 1988. FBI, Uniform Crime Report Statistics. |

5

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 8. Austin, J., Using Early Release to Relieve Prison Crowding: A Dilemma in Public Policy. *Crime and Delinquency,* Vol. 32, No. 4, October 1986: 404-502. | Setting: Illinois, 1980-1983 Summary: Inmates released early (before end of sentence period) and inmates completing term. Population Size: Over 21,000 prisoners, representing over 2/3 of all prison releases were early release. | Longitudinal (30 months), random sample panel design of prison inmates in early release programs and those completing terms (n=1,600). Comparisons: Inmate's prior criminal history, institutional conduct, time served, method of prison release, social and personal characteristics and criminal behavior after release from prison. | Prisoners who were released early did not have higher probability of being arrested or returned to prison than those prisoners serving their full prison term (42% vs. 49% respectively), although the criminality characteristics of the prisoners were different. By 1983 the Illinois prison population had been reduced by approximately 2,500 inmates as a direct result of early release.  Crime rates in Illinois during this period decreased from 800 per 100,000 populations in 1986 to 796 per 100,000 in 1987. FBI Uniform Crime Reports. |
| 9. Austin, J., Boylard, M., *The Effectiveness of Reduced Prison Terms on Public Safety and Cost: Evaluation of the Illinois Supplemental Meritorious Good Time Program.* National Council on Crime and Delinquency, 1993. | Setting: Illinois Summary: The 1990 HB3838, Public Act 86-1090, which took effect in Illinois on July, 1990, made selected inmates eligible for a 180-day early prison release (Supplemental Meritorious Good Time [SGMT]), instead of the 90-day early release.  This study reviewed 4,640 cases of inmates who were awarded an average of 61.7 days of SGMT. | Random review of cases of inmates awarded SMGT by December 1990.  Two main measures of recidivism were used:  Follow-up arrest—those arrested, at least once during the year after release from prison;  Return to prison rate—the proportion of released inmates who were returned to prison including both new sentences and parole violations. | Inmates released via the Supplemental Meritorious Good Time (SMGT) had the *same* recidivism rates as those inmates not released via the SMGT.  Inmates released under the SMGT had lower recidivism rates than those released under regular meritorious good time (out 180 days earlier vs. 90 days earlier).  The vast majority of the re-arrests were for nonviolent misdemeanor crimes.  Crime rates in Illinois during this period decreased from 959 per 100,000 population in 1993 to 886 per 100,000 in 1996. FBI Uniform Crime Reports. |

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 10. Michigan Task Force in Jail and Prison Overcrowding. *Final Report*. March, 2005. | Setting: **Michigan** Summary: Review of Michigan's prison population growth, early release programs and crime trends to propose strategies to effectively address and alleviate prison overcrowding. | Review of statewide crime reports. | County jails have been releasing offenders early since 1982.<br><br>According to the 2003 Michigan Uniform Crime Reports, crime has decreased by 123,897 from 1988 (1,186,140) to 2003 (1,062,407); and the number of arrests have decreased by 85,648 from 1988 (43,148) to 2003 (352,500).<br><br>Crime rates: The *number* of index crime offenses in Michigan generally has been dropping for the last decade: down 29 percent from 1991 to 2004. The concurrent decline in the Michigan crime *rate* (the number of crimes per 100,000 residents—6,138 in 1991 and 4,144 in 2000) closely parallels that of the nation as a whole, for which the rate of serious crime declined every year from 1991 to 2000. (Source: National Institute of Corrections, website: http://www.nicic.org/Features/StateStats/?State=MI#1 accessed April 7, 2007) |

7

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 11. Wagner, D., Baird, C., *Evaluation of the Florida Community Control Program.* National Institute of Justice, 1993. | **Setting: Florida** Summary: The Florida Community Control Program (FCCP) is an intensive supervision, house arrest program that seeks to reduce prison and jail crowding while ensuring public safety. | Case review of 630 Florida Community Control Program (FCCP) offenders in 1985. | During an 18-month follow up, the Florida Community Control Program (FCCP) had *lower* rates of new convictions.<br><br>Only 19.7% of the FCCP group had a new offence, compared to 24.3% of new offenses among those offenders who spent 9-months in prison.<br><br>In Florida, the crime rates reduced from 1188 per 100,000 population in 1993 to 1137 per 100,000 population in 1994. (SOURCE: Florida Statistical Analysis Center. FDLE, (1989-2005). Crime in Florida, Florida uniform crime report [Computer program]. Tallahassee, FL.) |
| 12. Florida Office of the Auditor General. *Performance Audit of the Implementation of Control Release Supervision Administered by the Florida Parole Commission and the Department of Corrections.* Tallahassee, FL, 1994. | **Setting: Florida** Summary: 7,481 inmates released to a term of a court-imposed supervision (probation or community control). As part of the early release decision, the Authority determines whether to impose a term of control release supervision. | Audit review of offender release data from fiscal year 1987-88 through 1992-93. | For the 1991-92 fiscal years, offenders in the Control Release Supervision served an average of 7.7 months in jail and prison prior to release, and were placed on an average term of supervision of 17.6 months.<br><br>60% of these offenders returned to jail or prison as the result of violation of specific conditions of supervisions not because of *new crimes*. |

8

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 13. Zanis, D., Mulvaney, F., Coviello, D., Alterman, A.I., Savitz, B., Thompson, W., The Effectiveness of Early Parole to Substance Abuse Treatment Facilities on 24-month Criminal Recidivism. *Journal of Drug Issues*, Vol 03, No 1, 2003: 223-236. | Setting: Urban jails in **Northeastern United States** (Funded by City of Philadelphia). Summary: 569 offenders who met criteria for substance abuse or dependence; had no other psychiatric disorders; and served at least half of their minimum sentence (for full criteria see article attached). | Self-select case study design. 87% of offenders were paroled to a community-based substance abuse treatment program; and 13% who were early paroled were not enrolled into a substance abuse program.

Measures: Time in substance abuse program; age, gender, race, number of prior convictions, type of substance abuse/dependence, and 2 year follow-up on new criminal convictions. | 78% of the offenders released to the community-based substance abuse treatment program reported *no new convictions* in comparison to 66% of those early release offenders that did not participate in treatment. Furthermore, of those offenders who participated in and completed treatment, only 11.8% were convicted of a new crime vs. 29% who did not complete treatment (e.g., <6mos in treatment). |
| 14. Verbugge, P., Nunes, K., Johnson, S., Taylor, K., *Predictors of Conditional Release among Substance Abusing Women Offenders.* Correctional Service Canada, 2002. | Setting: **Canada** Summary: The sample under study consisted of federally sentenced women who were granted a conditional release between 1995 and 2000 and identified at intake as having substance abuse problems. In this study, conditional release included day parole (halfway homes), full parole and statutory release. | Case review of 483 women offenders who were serving, or had recently served federal sentences under the supervision of Correctional Services Canada (CSC). 73% of the women were released on day parole; 9% were released on full parole and 18% were released at their statutory release date. Outcome: Revocation was defined as a woman having been admitted to federal custody after conditional release and before reaching a warrant expiry. | Approximately one half of the offenders, or 52% successfully completed their sentences in the community or had been successfully living in the community for at least one year post-release when the follow up period ended.

Within those who had had their conditional release revoked, most returned with a miscellaneous, nonviolent offense (these included offenses related to breaches of parole).

Crime rates: In 2001, Canada posted its lowest crime rate in 25 years with 7,655 incidents per 100,000 people. Source: Statistics Canada, 2001, released by the Canadian Centre for Justice Statistics (CCJS). |

9

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 15. Grant, B.A., *Day Parole: Effects of Corrections and Conditional Release Act* (1992). Ottawa, Correctional Services of Canada, 1996. | Setting: **Canada**: Data comes from the National Parole Board and from the Correctional Service of Canada. Summary: A total of 1,087 cases of male offenders who completed day parole in 1990-91 were reviewed. Day parole, for purposes of this setting is defined as release from prison to a halfway house where offenders reside, participate in treatment programs, attend school, work, and look for work and accommodation that will be needed for further full release. These halfway houses may be operated by the Correctional Service of Canada or a Community Residential Centre operated privately on a fee-for-service basis. | Systematic case review of 1,087 male offenders in day parole. Outcomes: New offenses by day parole sample. | Overall, the results of this study indicate that the offenders released prior to their full parole eligibility are less likely to fail than those released after this date. The failure of the day parole sample, as measured by new offenses was about 10% for the one year time period. |

10

# EXHIBIT U

**Office of the Governor**    ARNOLD SCHWARZENEGGER
THE PEOPLE'S GOVERNOR

SEARCH

ADVANCED SEARCH

Home    About Arnold    News    Issues    About Maria    Appointments    Blog    Ask the Governor    Español

# Comprehensive Prison Reform

## REFORMING PAROLE

**RELATED CONTENT**

▶ Comprehensive Prison Reform Issue Page

▶ Tackling Overcrowding

▶ The Governor's Proposal

▶ Enacting Jessica's Law

▶ Reforming Parole

Governor Schwarzenegger's Proposal

**Strengthening public safety**

The current parole system threatens public safety by dedicating resources to irrelevant issues and ignoring violent felons. Only one other state shares California's parole structure. The Governor proposes examining California's parole structure, with the goal of dramatically reducing current caseloads and allowing the state to designate an additional 200 parole agents to enforcing Jessica's Law—which increases parole times for the most serious sexual crimes and mandates lifetime monitoring of convicted felony sex offenders. The Governor's proposed sentencing commission will review California's parole structure and recommend changes.

On the Record

*Professor of Criminology Joan Petersilia: California's Parole System Is The Major Contributor To The Prison Population.* "The state's parole system is the major contributor to the prison population, sending about 70,000 parole violators back to prison each year, according to data compiled by Petersilia, the UC Irvine criminologist. Petersilia's research indicates that about 20 percent of those violators go in and out of prisons without ever committing a violent offense. Many are returned to prison for repeatedly failing drug tests or other parole violations such as failing to notify parole agents of an address change. Each time, they typically serve less than four months in prison and get no rehabilitation." - "California's prison system produces bizarre and dangerous results harmful to inmates and public," San Francisco Chronicle, August 27, 2006

*LAPD Assistant Police Chief George Gascon: Parole Agents Overwhelmed.* "The discussion is always about funding. But when it costs an average of $31,000 a year to keep someone in prison and $3,300 a year to keep someone on parole, and we're doing a very poor job of supervising them, there has to be a little more we can do to make the parole system work…And it's not because parole agents are not doing their jobs. They are overwhelmed.' - "Warrants Out for 7,000 Parole Violators," Pasadena Star-News, July 5, 2005.

*Professor of Criminology Joan Petersilia: Giving Low-Risk Felons A Chance To Shorten Parole Terms Is "Good Policy."* "This is good policy because it adds a carrot to the stick we use so heavily in this state," she said. "The research shows that if you give people incentives, they are more likely to stay involved in treatment and succeed."(On how other states have demonstrated the benefit of giving low-risk ex-felons a chance to shorten their parole terms through good behavior.) - "Gov. signs bill allowing shorter parole for some ex-cons who finish drug programs," Los Angeles Times, October 4, 2006.

*Court Receiver Robert Sillen: An "Effective" Prisons Solution Will "Require Changes" In Parole Policy.* "With most prisons now at 200 percent of inmate capacity, Sillen said an effective solution to overcrowding would require changes in sentencing and parole policies to reduce the number of prisoners." - "Report blasts prison health system," Sacramento Bee, July 6, 2006.

Just the Facts

- *According to the Public Policy Institute of California, the current parole system increases the likelihood that parolees will return to prison. California does not use any intermediate level punishment – if an offender violates parole, they would go back to prison, no matter how minor the violation.* Source: "Who's in Prison? The Changing Demographics of Incarceration," Amanda Bailey, Joseph M. Hayes, Public Policy Institute of California. August 2006.

- <!--[if !supportLists]-->*"California's nearly universal application of parole supervisions standards in sharp contrast to the approach used in most of the rest of the nation. Several other states supervise only certain high-risk prisoners after release. A few states, including*

*Maine and Virginia, have abolished parole supervision altogether. Michigan supervises parolees for only two years, compared to California's three-, four-, or five-year supervision period. Still others, such as Florida, release all inmates through a nondiscretionary process but apply parole supervision to fewer than half of those individuals."* Source: "Understanding California Corrections", Dr. Joan Petersilia, California Policy Research Center, 2006.

- *Between 1991 and 2001, the number of parolees returned annually to California prisons for committing new crimes or other offenses decreased from 16,000 to 14,351 (or 9.2 percent decrease). Within the same timeframe, however, the annual number of parolees returned to prison for violating the conditions of their parole increased from 41,333 to 74,275 – an increase of 44 percent.* Source: "Adult Parole and Probation in California," Marcus Nieto, California Research Bureau. September 2003.

- *The Little Hoover Commission has repeatedly stressed the need for parole reform, calling California's current system "a billion dollar failure."* Source: "The Lynchpin To Parole Reform: A Case Study of Two Parolee Housing Proposals in Redlands, California," Benjamin Singerman, Joan Petersilia, Stanford Criminal Justice Center. Fall 2005.

- *Noted experts in the corrections field, such as Joan Petersilia and Benjamin Singerman, have called for California to revamp its parole system to improve cost efficiency and direct focus on effectively preventing recidivism.* Source: "The Lynchpin To Parole Reform: A Case Study of Two Parolee Housing Proposals in Redlands, California," Benjamin Singerman, Joan Petersilia, Stanford Criminal Justice Center. Fall 2005.

- *A March 2005 study by The Urban Institute found that, while there were small overall differences in recidivism based on supervision status, rates fell substantially when females, individuals with few prior arrests, public order offenders, and those imprisoned for violating a condition of an earlier release were supervised. Parolees in more than one of these categories, mostly relatively low-level offenders, exhibit even lower rearrest rates.* Source: "Does Parole Work? Analyzing the Impact of Postprison Supervision on Rearrest Outcomes," Amy L. Solomon, Vera Kachnowski, Avinash Bhati, The Urban Institute. March 2005.

**EXHIBIT V**

California Home                                                    Thursday, May 24, 2007



CDCR Home
Victims
Visitors
Offenders
Rehabilitation
News
About CDCR
Divisions & Boards
Career Opportunities
Reports & Research
Budget & Regulations
Community Resource
Directory
Contact Us



California
# Department of Corrections
## and Rehabilitation



search
○ My CA    ● This Site

GOVERNOR
Schwarzenegger
Click to Visit His
Home Page

### July 20 Legislative Testimony by CDCR Secretary Tilton

James E. Tilton, acting Secretary of the Department of Corrections and Rehabilitation (CDCR) gave the Assembly's Select Committee on Prison Overcrowding and Construction an overview of the problems facing the state's prison system during its meeting in the Capitol on July 20, 2006.  Previewing issues to be addressed during the Legislature's special session, Tilton emphasized the need to:

1. Build two new prisons to relieve inmate overcrowding in the long term, while finding up to 16,000 new beds as soon as possible for inmates who are being housed in gymnasiums, day rooms and other miscellaneous locations currently.
2. Significantly increase education, vocation, and counseling programs for inmates to provide them with tools to lead productive lives when they leave prison, which would reduce recidivism.

In addition, the Committee was provided with an overview of California's prison population. For more information on Tilton's presentation and to learn "the facts" that dispel the seven most common myths about the state's prison population, please click on the above links.

**Related Resources**

Gov. Schwarzenegger Calls Special Session of the Legislature to Address Prison Crowding, Recidivism

Proclamation by the Governor of the State of California

July 20 Legislative Testimony by CDCR Secretary Tilton

CDCR Progress and Accomplishments

Legislative Testimony by CDCR Secretary Tilton

Dispelling the Seven Myths of California Prisons

Updated: 04/12/2007
Back to Top of Page

2004 State of California. Conditions of Use  Privacy Policy

# CDCR SECRETARY JAMES TILTON PRESENTATION
## TO ASSEMBLY COMMITTEE ON
## PRISON CONSTRUCTION AND OPERATIONS
### July 20, 2006

CALIFORNIA'S OVERALL STATE PRISON POPULATION IS CURRENTLY AT AN ALL TIME HIGH OF APPROXIMATELY 172,000 INMATES.  OUR MALE POPULATION REACHED 159,867

BY 2021, THE DEPARTMENT'S MALE POPULATION IS PROJECTED TO REACH 197,796

THE DEPARTMENT HAS RUN OUT OF TRADITIONAL (CELLED AND DORMITORY) CAPACITY.

INMATES HAVE BEEN FORCED IN NON-TRADITIONAL BEDS (GYMS, DAYROOMS, AND HALLWAYS)

THE DEPARTMENT IS CURRENTLY HOUSING OVER 16,000 INMATES IN NON-TRADITIONAL BEDS—ENOUGH TO FILL UP MORE THAN THREE ENTIRE PRISONS

NON-TRADITIONAL BEDS ARE CONTRARY TO GOOD CORRECTIONAL PRACTICE AND POSE A SAFETY RISK TO OUR STAFF AND OTHER INMATES

BY JUNE 2007, THE DEPARTMENT WILL RUN OUT OF THESE BEDS, WHICH NUMBER 18,572. WE WILL HAVE NO MORE ROOM TO HOUSE FELONS CONVICTED BY THE COURT

TO ELIMINATE THE USE OF NON-TRADITIONAL HOUSING BY 2021, THE NUMBER OF BEDS NEEDED BY THE DEPARTMENT GROWS TO MORE THAN 50,000

DUE TO LACK OF CAPACITY, USE OF PROGRAM SPACE, AND A SHORTAGE OF FUNDING EARMARKED TOWARDS PROVIDING PROGRAMMING TO OUR INMATES, MANY OF OUR INMATES ARE IDLE

INMATE IDLENESS, COUPLED WITH OVERCROWDED CONDITIONS, CREATE VOLATILE SITUATIONS IN OUR PRISONS EVERY DAY FOR OUR STAFF AND OTHER INMATES

BASED ON OVER-OPTOMISTIC ESTIMATES OF COST-SAVING MEASURES DESIGNED TO DECREASE PRISON POPULATION IN THE SUMMER OF 2003, A DECISION WAS MADE TO CLOSE THE DEPARTMENT'S TRAINING ACADEMY

ALTHOUGH THE ACADEMY IS REACTIVATED, THERE CONTINUES TO BE A CHALLENGE TO SUPPLY NEEDED CORRECTIONAL OFFICERS TO KEEP PACE WITH DEMAND

CURRENT ESTIMATES ARE THAT IT WILL TAKE APPROXIMATELY 18 MONTHS UNTIL THE PIPELINE IS FULLY FUNCTIONAL

WE CURRENTLY PROJECT THAT BY OCTOBER OF 2006 OUR VACANCY RATE OF OFFICERS WILL BE OVER 2,400—OR 11 PERCENT OF AUTHORIZED POSITIONS

EVERY MONTH, THE DEPARTMENT RELEASES ALMOST 10,000 PERSONS FROM STATE PRISON—OR OVER 300 INMATES A DAY

THESE PAROLEES, BY LAW, ARE RETURNED TO THEIR COUNTY OF LAST LEGAL RESIDENCE

AN OVERWHELMING NUMBER OF THESE INMATES ARE RELEASED FROM PRISONS LOCATED IN REMOTE AND RURAL AREAS—SUCH AS BLYTHE, AVENAL, CRESCENT CITY, AND CORCORAN—WITH JUST $200 AND A BUS TICKET BACK HOME

AS A RESULT, THERE IS NO EFFECTIVE WAY TO LINK THE OFFENDER BACK TO THEIR COMMUNITY BECAUSE OF THE REMOTENESS OF MANY OF OUR PRISONS

OFFENDERS WITHOUT STRONG TIES OR REENTRY PLANNING ARE MORE LIKELY
TO FAIL ON PAROLE AND RECIDIVATE

CALIFORNIA MUST RETHINK ITS MODEL FOR HOUSING PAROLE VIOLATORS
AND OFFENDERS DUE TO BE RELEASED IN ORDER TO IMPROVE THEIR CHANCES
FOR SUCCESS, WHICH IN TURN WILL IMPROVE PUBLIC SAFETY