# EXHIBIT W

RESEARCH SERVING CALIFORNIA



# CPRC REPORT

# **Understanding California Corrections**

*Joan Petersilia*

**A Policy Research Program Report**



## CALIFORNIA POLICY RESEARCH CENTER
### UNIVERSITY OF CALIFORNIA

Copyright © May 2006
by the Regents of the University of California

All rights reserved

## California Policy Research Center

1950 Addison Street, Suite 203
Berkeley, CA 94720-7410

Phone: (510) 642-5514
Fax: (510) 642-8793
Publications ordering information: (510) 642-9328
Program and publications information: www.ucop.edu/cprc
E-mail: cprc@ucop.edu

▶ Fully a third of California inmates are nonviolent recidivists who have never served a prior adult sentence for a violent crime. At least statistically, these individuals may not warrant the expensive resources involved in subjecting them to mandatory parole supervision.

Ultimately, the totality of the facts should inform policy decisions for the state, not political arguments based on a statistic or two that suggests a "tough" or a "reformist" position. For that matter, the goals of ensuring public safety and running effective, efficient prisons are not ultimately in opposition; most people would agree that one cannot occur without the other.

## Suggestions for Change

Analysis of the broad structures of California's correctional system also suggests several core areas where policy change is needed if the move toward correction *and rehabilitation* is to make sense. Some of these problems and suggested solutions were highlighted in reports by the Little Hoover Commission in 2003[186] and the Deukmejian Independent Review Panel in 2004.[187] These repeated calls for change in the same areas are not accidental, are not necessarily partisan in their import, and certainly are not intended to be an academic exercise. Other states provide more effective, more intelligent, and less expensive correctional services to their citizens. California's system can benefit by moving in that direction, even though reform will require breaking through institutional inertia. Correctional officials in the Schwarzenegger administration have made that a top priority.

At the broadest policy level, the following basic changes should be part of the move toward rehabilitation:

▶ Restore some level of discretion to sentencing and release decisions so that inmates see the value of responsible behavior and the state can deny early release to inmates considered particularly dangerous. The "presumptive sentencing" model suggested by the Independent Review Panel in 2004 might be one viable approach.[188]

▶ Prioritize the delivery of programs that will help address inmates' profound and widespread problems with substance abuse, inadequate education, and lack of job skills. The politically expedient effort to cut or deprioritize such programs because they "coddle criminals" has been extremely short-sighted and ultimately threatens public safety.

▶ Employ parole supervision selectively and in a more concentrated way, so that it targets the most likely reoffenders. End or dramatically reduce the imposition of parole on those who are least likely to reoffend, which wastes resources and provides a negligible benefit to public safety.

▶ Prosecute serious crime when possible rather than using technical violations as a quick fix. Move away from the catch-and-release approach and inmate churning to the greatest extent possible.

▶ Develop program changes on the basis of solid research and empirical evidence that suggest the effectiveness of whatever modifications are implemented. Rigorously designed studies that demonstrate the effectiveness of particular programs in reducing recidivism will increase public support for such programs and, more importantly, improve the odds that the programs will enhance public safety. Requiring rehabilitation programs to collect information on the scope and quality of the services they deliver can also bolster their effectiveness and credibility. California drive-by correctional policy changes, where sentencing, incarceration, and parole policies have been modified because of legislative whims and public anxieties, must come to an end.

Both the Little Hoover Commission and the Deukmejian reports contain detailed proposals for implementing these basic changes, and other variations on these approaches could also be effective. The important thing for policymakers to understand is that the decision to embrace a rehabilitative approach is not simply a game of semantics, but represents a structural change. Those who have studied what it takes to successfully reform public institutions say three things are necessary: resources, commitment, and time—with time being the most important. Frederick Hess, who has written books on educational reform, says it takes a minimum of five years to accomplish observable reform,[189] and RAND puts the time at eight years.[190]

> **We must enact policies that treat incarceration more like a serious and profound break with ordinary life and less like a temporary administrative detour. Such a change would require everyone involved with the correctional system . . . to take more seriously the moral choices of offenders.**

California must continue down a path of profound and transformational change. We must enact policies that treat incarceration more like a serious and profound break with ordinary life and less like a temporary administrative detour. Such a change would require everyone involved with the correctional system—particularly the inmates, but also the staff, who have the potential to help or hinder the rehabilitative process—to take more seriously the moral choices of offenders. In such a system, real consequences flow from the choices an individual makes while incarcerated. Rehabilitation is a weighty commitment to make for California's prisons. It can only be implemented in a substantive and meaningful way if the fundamental structures of corrections—the sentencing framework, the level of in-prison programming, and the nature of parole supervision—are configured so they actually reflect that commitment.

# EXHIBIT X

<u>October 26, 2006 Presentation by State Senator Jackie Speier to the Little Hoover Commission</u>

# Why Prison Reform Doesn't Happen

The California prison crisis is like a ship slowly taking on water. We know where the leaks are and we know they have to be plugged, or eventually the ship will sink. Plans to plug the holes have been drawn up in detail. Unfortunately, the ship is not under the command of a captain who can unify the crew to get the work done. Consequently, the ship is dangerously close to sinking. In real terms, the bow goes up in June 2007 when the overcrowded prison is forced to tell counties it can no longer accept new commitments.

It would truly be a tragedy of failed leadership if the June 2007 shut down order is issued.

It is already a bureaucratic embarrassment that the bold steps of prison management reform have been mere tiptoes, even though the path to be taken was mapped out in the 2004 Deukmejian Report and most recently in Professor Joan Petersilia's document, <u>Understanding California Corrections.</u>

Here is a quick thumbnail on the key reforms needed to keep our prison system afloat:

ONE. Reduce overcrowding by ending the practice of recycling inmates who commit purely technical parole violations; send incarcerated illegal immigrants to other states; move non-violent, low risk women to community correctional facilities. Put the severely mentally-ill in

1

facilities separate from the general prison population. Put the sickest inmates in a prison hospital designed to provide care.

TWO. Employ high technology in the parole system, as Florida has done, to reduce crime and recidivism by requiring certain parolees and to wear a GPS anklet or bracelet that allows them to be monitored 24 hours per day. We could probably save $1 billion per year within a few years simply by adopting the Florida reforms. My legislation last year, SB 619, authorized the use of GPS surveillance of parolees and probationers. I followed up this year with SB 1178, which mandates the use of GPS on all high-risk sex offenders. The Governor signed the bill last month, so we are moving forward.

THREE. Given that 95 percent of inmates will be released from prison within five years, it is critical that rehabilitation efforts affect as many inmates as possible. But, only seven percent of inmates receive alcohol treatment although 42 percent have a high need for treatment. Worse yet, only 2.5 percent of inmates with a serious need for drug treatment actually receive treatment during their time in prison. Again, California recycles rather than rehabilitates men and women who have broken the law. The Governor signed my SB 1453 last month—this bill provides realistic incentives for inmates to enroll in in-prison drug treatment programs and to keep their treatment going during parole. Again, we are going in the right direction. But it is a small step.

<u>Why haven't most of the reforms needed taken place?</u>

I would remind you that I appeared before this Commission on January 27, 2005 to state rather flatly that the Governor's proposed reorganization plan for the Department of Corrections " wasn't ready for prime-time." It was a change in name only.

Secretary Hickman and his successor, Secretary Woodford, both resigned this year. And that is unfortunate, because they experienced all the birth pains without the birth of true reform.

I would like to remind you of the insights of Judge Steve White, the former Inspector General, who stated the following at a 2004 Senate hearing on prisons: *The Department of Corrections is an immense organic entity with no center to it, no leadership, no structure that stands on principle. It has an organization that doesn't work except in ad hoc and informal and let's-make-it-go-aways that have been largely managed on local levels—that is to say in the respective prisons—by virtue of collaboration between the wardens and the CCPOA.*

*The CCPOA has a mission of its own, and it has a fairly narrow scope. The department has a very large mission. It's statutory and it's constitutional. It's a very wide scope. The CCPOA has managed, through its leadership talents, its ability to amass political monies, and its sheer competence to move the department off of its larger comprehensive role and refocus the department on the CCPOA's ground.*

*Unless you do something different than what normally is done in the wake of these events, is that there will be great focus, there will be great saber rattling, there will be sincere*

*commitments. Heads will roll, butts will get kicked, and three months later, when you're not looking, it will be back to the way it was. I know this to a certainty.*

Commissioners: the lack of a management center cited by Judge White has worsened since 2004. We still have the CCPOA and CDCR at odds. But now we Robert Sillen, the federal receiver in charge of a $1.2 billion prison health care system as well as the added pressures from several federal court orders.

The Schwarzenegger Administration prison team has been unable to centralize control. The current management system is frayed by the following eight pressure points:

1. As just noted, a court-ordered federal receiver has taken over control of the prison health care system. The system suffers from high vacancy rates among medical personnel; a lack of computerized medical records and pharmaceutical controls; poor morale; professional incompetence; unsanitary work conditions; poor facilities; questionable medical contracts with outside providers; lack of disease control measures in overcrowded living quarters; and a negative commingling of inmates that counters good care efforts (mentally ill mixed with level III and IV inmates; geriatric inmates mixed with young inmates, etc.).

2. Treatment of mentally-ill inmates is also subject to a federal court order that, among other things, dictates the hiring of competent professional who will receive appropriate compensation.

4

3.  Judge Thelton Henderson is threatening to slap sanctions on the department if it does not regain control of its prisons.

4.  The Administration and the union (CCPOA) are negotiating an expired labor contract that has a dramatic effect on prison operations. Currently, in the vast majority of cases, it is the union, not the prison warden, who determines what officer works where and when. The contract provides for constant shut downs through the work-grievance process. And the lucrative contract ensures that guards earn more than college professors.

5.  The CDCR says it will run out of space in June 2007 and, as a result, will be forced to refuse commitments from county jails. Legislative efforts to relieve overcrowding failed for political reasons. Overcrowding could lead to riots, or a disease outbreak. Overcrowding increases inmate-guard tensions and that leads to lockdowns which, in turn, cause rehabilitation programs to be shut down. The Governor has set into place a procedure to send inmates to prison in other states, an emergency effort to reduce overcrowding. This move may help if it survives legal challenges. In fact, I understand that as many as 19,000 inmates want to leave California, presumably for private prisons where they hope conditions will not be as bad as they are here.

6.  Reform progress is hampered by the lack of automated data systems and comprehensive analytical models to help CDCR be more efficient in managing inmates and resources.

7. The federal court mandates and overcrowding are fueling spending    at the department at record levels. Health care is $1.2 billion and rising. The specter of building more prisons could add $3 billion more in costs. The Correctional Budget is the greatest threat now confronting California taxpayers. But let me interject this key point on the need to spend money. Prison expert Professor Joan Petersilia has already identified the steps that need to be taken to get CDCR spending under control. But Joan Petersilia has thrown up her arms…having done all that she can do….to show us the way…I will deliver her message to you today: WE DON'T NEED TO THROW MORE MONEY AT THE OVERCROWDING PROBLEMS…SIMPLY PUT…DON'T RUSH TO BUILD MORE PRISONS UNTIL WE EMBARACE THE ALTERNATIVE SOLUTIONS AT HAND! I will repeat them: parole reform and rehabilitation directed at those inmates who can be helped. Stop the recycling of inmates.

8. The CDCR suffers from decades of poor morale that has manifested itself in a work culture that embraces the status quo rather than the pursuit of excellence. The department is a like a baseball team on a 20-game losing streak. The players expect to lose. However, I believe the will to win is still alive, we just need a few well placed home runs. There were some hits yesterday at a hearing I chaired involving several department whistleblowers connected with the department's Office of Substance Abuse Programs. They had provided me with information that I subsequently turned over to the Inspector General. Next week there will be full disclosure about how contracting practices at this program were in violation of state contracting law. Perhaps, as much as $6 million was misspent at this very small arm of CDCR. More significantly, the department overall

spends $2.6 billion annually on contracts in a manner than may be inconsistent with state contracting rules. My sense is that Secretary Tilton will follow through on making immediate corrections. The whistleblowers are giving a thumbs up to management reforms that are less than a month old. It's an important start.

As I have stated, the core elements of corrective actions to reduce overcrowding and lower recidivism are identified in Professor Petersilia's <u>Understanding California Corrections</u> (May 2006, California Policy Research Center). But there is no political will to push for the reforms in the Petersilia plan and instead, we are confronted with the following typical scenario:
Two years ago a work group of legislative staffers and CDC director Jeanne Woodford and her top medical people and met several times to identify actions needed to stabilize medical costs. Woodford said it was critical to...

- construct a geriatric prison near a major metropolitan area to house the oldest and sickest inmates, especially those with chronic health care needs;
- separate the mentally ill from the general prison population.

Same old story. We know what to do, we just don't do it unless a federal court order is involved.

One of the Deukmejian Report's top recommendations was the formation of a citizen's commission to oversee progress on prison reform. The former governor believed, and rightly so, that if the public eye was not focused on what needed to be done, it would not get done...and he was right...we've turned a blind eye to date on prison reform.

7

The chief blinder is fear! Elected officials are afraid of appearing to be weak on crime...that is, any effort to help an inmate, whether it be sentencing reform, the establishment of clean medical facilities, or the use of taxpayer funds to erase illiteracy, anything positive for the inmate can be viewed as negative for the victims of crime. Punishment still dominates the majority of legislative rhetoric.

I have been a victim of a violent crime. But even with this calling card, I have to be prepared to defend myself against criticism that reform proposals make me soft on crime.

If I am not attacked on the right, I'm sure to be hit on the left. When I proposed that men convicted of rape and murder be sent to other states if they committed their crime while they were in California illegally, I had to defend myself from charges that I was committing a social injustice. And that is why for some legislators, it is easier to do nothing.

In the world of prison reform there many lines to be crossed. Some crossings invoke the ire of the prison guards' powerful union, the CCPOA, or the CCPOA-related group, Crime Victims United. Some reforms anger the ACLU or the Coalition for Public Safety.

Commission members: We need leadership, not lip service. It is unacceptable that we have allowed the federal courts to take over much of our state prison system. But the only noticeable changes in prison reform over the last three years have come from these federal mandates and the

fearless work of Judge Thelton Henderson, Special Master John Hagar and Reciever Robert
Sillen. They cross lines every day.

As proposed by former Governor Deukmejian, we need a public commission to make certain that
California's leaders are up to the task of restoring sound management practices to the business of
incarceration and rehabilitation. And I applaud the Commission for helping cast a public eye on
this failed prison leadership. Yes, a few bills have been signed and an emergency proclamation
has been issued, but as of a few days ago, a record number of adults were in state prisons—more
than 173,000. I ask you, what will it take for California leaders in the public and private sectors
to grasp the severity of the California prison crisis? It affects us all. Thank you.

---

# EXHIBIT Y

August 17, 2006


Governor Arnold Schwartzenegger
State Capitol Building
Sacramento, CA 95814
Attn: Task Force on California Prison Overcrowding

Dear Governor Schwartzenegger,

This letter is a follow-up on the status of CDCR's April 27, 2006 closure of Parole Outpatient Clinic at 600 St. Paul Street, Los Angeles, CA 90017. As you may recall, in October 2005, 50 clinicians wrote to you requesting your help to stop the closure of our psychiatric crisis clinic and the dispersal of clinicians to the parole units. We have since written and spoken with many State Senators, Assemblypersons, and local officials regarding the demise of Region III's central clinic.

Our Region has always had a centralized psychiatric crisis clinic, and it has made sense due to our geography, urban setting, proximity to social services, and the large number of transient patients we serve. In late October 2005, we were abruptly told to dismantle the clinic and to disperse to the outlying parole units by January 1, 2006. We have always been located at the parole units *and* had a central crisis clinic. Despite attempts to have our professional opinions heard, despite a UCLA study providing evidence that Region III POC showed a 20% lower recidivism rate than the rest of the State POC's, and despite an average cost savings of $4 Million per year due to our Region's lowered POC recidivism rates, we were disbanded anyway, in a manner that resulted in illegal and unethical treatment of patients.

The last clinicians left the central clinic on April 27, 2006. The alleged reason for the closure was that the lease was lost to a higher bidder. When several politicians called Mr. L'Etoile inquiring about our disagreement with the move, they were given misinformation and told it was a "done deal" even though we had not yet moved. Since then:

➢ Four months after the closure of our clinic, Youth Authority continues to operate from the same building. POC clinicians continue to retrieve voice mail messages from the old building. The space we occupied is empty, and yet the State continues to pay for an empty building and the phone bill!

➢ Administrators spent more money converting chart rooms and closets into private offices (because clinicians and patients require professional confidentiality) at the parole units, than they hoped to save by moving us out so quickly from the central crisis clinic.

➢ Other rehabilitation programs were dismantled or reduced to make room for POC clinicians at the parole units, i.e. drug programs, vocational and literacy labs.

➢ Region III plans to hire 20 more social workers, psychologists and psychiatrists this year. In January 2007, there will be a wave of new Parole Agents hired in our Region. There is absolutely no space at the parole units for more parole agents or POC clinicians.

➤  We can no longer provide evening or Saturday treatment for employed parolees/patients because the parole units close at 5 pm and are not open on Saturdays.

➤  Many patients are not receiving treatment due to the fragmentation of services, disrupted continuity of care, and the uneven distribution of work.

➤  Sex offender groups are only offered at 2 parole units due to lack of group rooms, enormous caseloads and lack of clinicians at the parole units. Previously, we offered sex offender groups 5 days a week at the central crisis clinic.

➤  Clinical staff morale is extremely low, affecting overall productivity.

Parole Outpatient Clinic clinicians rarely have their professional opinions considered as a part of the goal of reducing the prison population. However, parole is the other half of the CDCR's solution to reduced recidivism, thereby reducing State costs, decreasing the prison population, increasing community safety, and patient wellbeing. We are the "R" in CDCR and must be included in the *systemic* change that Receiver Sillen so penetratingly outlined in his first report to Judge Thelton Henderson.

Please help us to regain a central crisis clinic with "adequate space" so that we can continue to treat our patients in a manner that provides the best outcomes and the best chance of recovery for our mentally ill, violent and sex offender patients.

Please feel free to contact any one of us. We will be happy to meet with you. Attached is a packet outlining our efforts since October 2005. If you would like a copy of the UCLA study, we will forward it to you.

We would appreciate a response to this letter and look forward to hearing from you soon.

Sincerely,

**(Region III clinicians, see attached)**

cc: Judge Thelton E. Henderson
    Receiver Robert Sillen
    Special Master John Hagar
    J. Michael Keating
    Little Hoover Commission
    James Tilton, Secretary, CDCR
    Tom Hoffman, Director of Adult Programs, CDCR
    Marty O'Neal, Region III Administrator, CDCR
    Senator pro Tem, Don Perata
    Senators Gloria Romero, Jackie Speier, Michael Machado, Gil Cedillo
    Nettie Sabelhaus, Appts Director, Senate Rules Committee
    Speaker of the Assembly, Fabian Nunez
    Assemblymembers Todd Spitzer, Rudy Bermudez, Mark Leno
    Unions AFSCME 19, SEIU 1000, UAPD 16.

William Koar, Ph.D.
Staff Psychologist
wkoar @ aol.com

Wayman Blakely, M.D.
Staff Psychiatrist
wayman blakely @ sbcglobal.net

Pamela Jackson, Ph.D.
Staff Psychologist
626-793-7963

Debra Webb, Ph.D.
Staff Psychologist
DAWW @ sbcglobal.net

Amy H. Kim, LCSW
Psychiatric Social Worker
eosscorpio @ yahoo.com
323-397-4980

# EXHIBIT Z

Parole Outpatient Clinic/Alameda
CCCPOC
2444 S. Alameda St., 1st Floor
Los Angeles, California 90058
Phone: 323.238.1620

Mr. Michael Alpert, Chair
Little Hoover Commission
925 'L' Street, Suite 805
Sacramento, California 95814

22 December 2006

Dear Michael Alpert:

This letter is for your consideration related to the proposed hearing(s) on parole reorganization. Its purpose is to address the lack of and pressing need for professional mental health staff in Sacramento who will represent Parole Outpatient Clinic (POC) clinicians statewide and will have meaningful input to decisions affecting those clinicians. Clinicians working in CDCR prisons statewide are and historically have been represented by such staff. Presently, that staff includes a Chief of Mental Health (MD) and two Chief Psychologists (PhDs) under the Division of Correctional Health Care Services. The lack of an equivalent or complimentary upper management representation team for POC clinicians is inherently unjust. In addition, a separate management team is necessary because work-related issues of POC clinicians in the community differ greatly from those of institution clinicians.

Because POC clinical staff is not represented in Sacramento, our staff (including the regional Chief Psychiatrist) has experienced a lack of consideration of our issues and our input has not been sought related to decisions that centrally impact us. When we have attempted to speak on our behalf or to write top CDCR management staff about our concerns, the responses have been superficial with vague, generalized replies that did not address the substance of our concerns. In some cases when we have spoken up, efforts have been made to silence us.

The glaring and inequitable lack of clinical power/representation for POC clinicians in Sacramento has repeatedly resurfaced over the years. However, for POC clinicians in Region III (the greater Los Angeles area), the issue has been notably egregious over the past year as evidenced by clinicians' efforts to retain a centralized, multi-service clinic in downtown LA. These efforts followed a PAROLE management staff decision to close that clinic and assign clinicians to work in parole offices only. Our clinical management team had no effective voice in that decision. The decision was ill-conceived (i.e., not carefully thought through with different reasons for the decision offered over time). Perhaps this type of systemic change is frequent or endemic to a large bureaucracy like CDCR. However, we do not think it necessary.

Historically, the central POC clinic in Region III was unique in the state. It had been open about 50 years and Region III clinicians had divided their time, working with parolees/patients both in the

central clinic and parole offices. The clinic was an effective central hub for servicing large numbers of parolees concentrated in our very dense metropolitan area. Especially for emergency services, it was one of the busiest outpatient clinics of its kind. We were able to offer crisis intervention, ongoing individual and group therapy, medication therapy and referrals for social and medical services under one roof. In addition, teamwork/back-up, peer consultation, supervision and training were available to clinicians. The latter made for a stimulating, rich and supportive work environment for professional staff.

Over the past year, clinicians have written numerous letters to CDCR's top parole management staff with copies to elected state government officials specifically detailing the impact of the closure of our clinic. We made follow-up calls and visited elected state officials to discuss the implications and potential consequences of closing the central clinic, especially in the areas of:

- disrupting services to patients
- jeopardizing community safety
- raising CDCR costs significantly related to projected increased recidivism

The stressful move extended over a four month period. Due to poor planning, lack of understanding of and/or insensitivity to the impact on patients and clinicians, the move led to disrupted clinical services and also undermined ethical handling of the required mass transferring of cases. That is, the move was not handled in a way that facilitated clinicians honoring their ethical standards (integral to professional licensure!) for responsibly transferring cases to other clinicians. In addition, stress for both patients and clinical staff related to the latter was intensified by moving dates that were repeatedly postponed, in part because the dates were set before office spaces for clinicians were made available or built in parole offices!

The effects of the above on the morale of our 57 professional staff (social workers, psychologists and psychiatrists) and nine support staff were deep and far-reaching and we lost professional and support staff to other jobs and retirement related to this move.

To prevent a recurrence of the above, it is important that decisions involving major systemic change with long-term implications and consequences (such as that described) have a scientific, empirical foundation. Too often, parole management has quickly arrived at wrongheaded "solutions" without inviting consultation or input from clinical professionals in the field with their relevant education, license and irreplaceable experience.

Therefore, we propose a team of professional, clinically licensed management staff in Sacramento whose mandate would include the following:

- Oversight and coordination of POCs statewide related to staffing and problems/issues
- Responsibility for and major input regarding proposed solutions to POC problems
- Accessibility and accountability to POC clinicians
- Consultation/feedback system with POC clinicians regarding issues
- Advocacy related to mental health impact (implications, consequences) of proposed solutions to problems on POC clinicians and patients

In view of our department's name change to CDCR with its current mandate to include "Rehabilitation" in its mission, our request for management representation in Sacramento is relevant and timely. We want the inequitable lack of upper management representation for POC clinicians in Sacramento rectified. If acted on, the system change suggested will demonstrate that our professional clinical staff – part of the foundation of CDCR's rehabilitative efforts - is valued and respected and will support quality clinical service delivery.

Thank you for your consideration. We would like to be included in the hearing(s) for parole reorganization. Let us know if support documents (past letters) will be useful.

Committee to Continue a Centralized Parole Outpatient Clinic (CCCPOC)

# EXHIBIT AA



**DENNIS R. YATES**
Mayor

**EUNICE M. ULLOA**
Mayor Pro Tem

**GLENN DUNCAN**
**EARL C. ELROD**
**TOM HAUGHEY**
Council Members

**GLEN ROJAS**
City Manager

## CITY of CHINO

February 7, 2007

Governor Arnold Schwarzenegger
Office of the Governor
State Capitol
Sacramento, CA 95814

Dear Governor Schwarzenegger:

As the Mayor of Chino, I am once again writing to you out of a growing concern for our City and the inmate overcrowding issues we are experiencing in the three prison facilities within our community. My unease on this issue was compounded when we were notified on Monday, January 29 that the State plans to move forward and build two mental health facilities within Chino, which will add an additional 1,020 inmates only exacerbating the current over crowding issues.

As I have stated in my three previous letters to you, these three facilities are already seriously overcrowded and in need of significant repairs, two situations which raise formidable safety concerns for the correctional officers that work at these locations, the prisoners and the citizens of Chino.

In addition, based on the current overcrowding situation our penal facilities are experiencing, an increase in the prisoner population of 1,020, I feel, will result in the addition of 2,000 more inmates, a simply intolerable risk to the safety of our community.

Governor Schwarzenegger, I implore you to come to Chino and personally tour the California Institution for Men (CIM). This issue is so important to our community that the Mayor from Chino Hills, Gwenn Norton-Perry, and myself, as well as our 4th District Supervisor, Gary Ovitt, our School Board President, our Fire Board President and the President of the Inland Empire Utilities Agency will clear their schedules to spend as much time as you need to tour this facility and get a first-hand look at the run down and over crowded conditions. Following the tour, I would like to give you the opportunity to address local residents and hear their concerns about not only the over crowding, but about the mental health facilities slated for our community.



Governor Arnold Schwarzenegger
February 7, 2007
Page 2


Governor Schwarzenegger, I feel that without personally seeing and accessing the situation for yourself, you risk making uninformed decisions, which will only result in further problems for not only the City of Chino but for the entire State. I will follow up with your office myself to schedule this very important tour.

Yours in service,

Dennis R. Yates
Mayor
Chino Pride

Cc:    Ms. Gwenn Norton-Perry, Mayor, Chino Hills
       Mr. Gary Ovitt, Supervisor 4th District
       Mr. Fred Youngblood, Jr., President, Chino Unified School District
       Ms. Tina Revane, President, Chino Valley Independent Fire District
       Mr. John Anderson, President, Inland Empire Utilities Agency
       Mr. Mike Poulos, Warden, California Institution for Men
       Ms. Dawn Davidson, Warden, California Institution for Women

# EXHIBIT BB

· California Home                                                    Thursday, May 24, 2007



**CDCR Home**
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
**About CDCR**
**Divisions & Boards**
**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource
Directory**
**Contact Us**



*California*
# Department of Corrections
## *and Rehabilitation*

search

○ My CA   ● This Site

GOVERNOR
Schwarzenegger
Click to visit the
Home Page

**Communications/Media**

- **Office of Public &
  Employee
  Communications**
- **Press Office Contacts**
- **List of Public Information
  Officers**

**CDCR Media Policies**

- **Adult**
- **Juvenile**

**Featured Links**

- **CDCR Press Release
  Archives**
- **Resources for Media**
- **CDCR Multi-Media**
- **Links Archives**

Press Release 2006

February 16, 2006
Contact: J.P. Tremblay
or Elaine Jennings
For Immediate Release
(916) 445-4950

#### Corrections Official Speaks Out on Importance of
#### Governor's Strategic Growth Plan

##### *Called "Critical to Safety, Welfare of Citizens, Staff, Inmates"*

Sacramento -- Calling the Governor's Strategic Growth Plan "critical to the
safety and welfare of California's citizens, our staff and the inmates who are
sentenced and receive services" from prisons and jails, Jeanne Woodford,
Undersecretary for the California Department of Corrections and Rehabilitation
(CDCR), spoke yesterday at an informational hearing held by the Senate
Committee on Public Safety.

Woodford testified that public policy makers, such as legislators, law
enforcement and other key constituencies, must plan adequately for the future
by taking the necessary steps to expand the capacity of California prisons and
jails.

"As has been expressed many times during the last several decades, the public
demands that our cities and communities be kept safe by removing violent
criminals from our streets," Woodford said. "It is one of our responsibilities to
ensure that California has the necessary capacity to house those offenders who
create an unsafe environment."

With California's prison population at an all-time high and growing, the 33
existing institutions are running out of space. Woodford estimated that the
prison population will be close to 200,000 by 2020, but cautioned that the
projections are very conservative, reflecting an annual growth rate of 1.2
percent over 14 years. The prison population, however, increased 2.4 percent
in 2005.

"It is not enough to just build capacity, but we must be smart about how we
plan," Woodford stressed. She emphasized that the Governor's plan will
provide partnerships between counties and the State. County jails built under
the plan would provide additional capacity dedicated to housing state prison
inmates. These partnerships will address the more than 5,000 inmates who
typically spend fewer than 90 days in prison as well as about 62,000 parole
violators or parolees pending revocation.

The Governor's plan proposes that inmates be returned to county jail for the
last 90 days of their sentence. While there, they would be provided with re-entry
planning and services prior to release.

"The most critical time for inmates leaving prison is from the time of release
through the first six months," Woodford said. By focusing efforts at this critical
time, it would increase the likelihood that parolees will not re-offend and will
prevent additional victimization of citizens.

Woodford stressed that the Governor's plan provides an essential public policy
model for California by providing a more cost-effective model for housing
inmates in the short-term, by providing greater collaboration between county
and state law enforcement agencies, and by providing the framework for an

effective re-entry model. In addition to providing the county-state partnership, the increased jail and prison capacity would free more prison space and allow the expansion of rehabilitation programs.

# # #

Updated: 04/18/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

# EXHIBIT CC

# DO THE CRIME, DO THE TIME?

# MAYBE NOT, IN CALIFORNIA



## JAIL CELL SHORTAGE IS UPSETTING THE BALANCE

**CALIFORNIA STATE SHERIFFS' ASSOCIATION**
**JUNE 2006**

# CALIFORNIA STATE SHERIFFS' ASSOCIATION

### Board of Directors
### 2006-2007
### OFFICERS

| | |
|---|---|
| **PRESIDENT** | **Sheriff Gary Penrod**<br>San Bernardino County |
| **1st VICE PRESIDENT** | **Sheriff Laurie Smith**<br>Santa Clara County |
| **2nd VICE PRESIDENT** | **Sheriff Ed Bonner**<br>Placer County |
| **SECRETARY** | **Sheriff Clay Parker**<br>Tehama County |
| **TREASURER** | **Sheriff Curtis Hill**<br>San Benito County |
| **SERGEANT-AT-ARMS** | **Sheriff Mark Pazin**<br>Merced County |
| **SERGEANT-AT-ARMS, EMERITUS** | **Al Cooper** |
| **IMMEDIATE PAST PRESIDENT** | **Sheriff Bill Kolender**<br>San Diego County |

### DIRECTORS

| | |
|---|---|
| Sheriff Lou Blanas | Sacramento County |
| Sheriff Bob Brooks | Ventura County |
| Sheriff Mike Carona | Orange County |
| Sheriff Jim Denney | Sutter County |
| Sheriff Bob Doyle | Riverside County |
| Sheriff Don Horsley | San Mateo County |
| Sheriff Mike Kanalakis | Monterey County |
| Sheriff Dan Paranick | Mono County |
| Sheriff Mike Prizmich | Amador County |
| Sheriff Gary Simpson | Napa County |

### PRESIDENTS' COUNSEL

| | |
|---|---|
| Sheriff Robert Doyle<br><small>Past President</small> | Marin County |
| Sheriff Bruce Mix<br><small>Past President</small> | Modoc County |
| Sheriff Charles Plummer<br><small>Past President</small> | Alameda County |
| Sheriff Warren Rupf<br><small>Past President</small> | Contra Costa County |

### CSSA Detention Facility Ad Hoc Committee Members
Chair, Sheriff Jim Anderson – Santa Barbara County
Members
Sheriff Ed Bonner – Placer County
Sheriff Mike Carona – Orange County
Sheriff Mark Pazin – Merced County
Sheriff Mike Prizmich – Amador County
Sheriff Mack Wimbish – Kern County

# *ACKNOWLEDGEMENTS*

*The California State Sheriffs Association deeply appreciates the efforts of those who have developed and reviewed this document.  Having conceptualized the need to explain California's crisis in jail capacity, CSSA sought out knowledgeable resources to help bring the concept to life.*

*The research and writing of this document were the work of Suzie Cohen & Associates. CSSA thanks principal consultant / author Suzie Cohen and research director John W. Kohls, Ph.D., for producing a comprehensive, accurate and readable description of the state of California's local detention systems.*

*I also wish to thank the Correctional Standards Authority (CSA) for providing data and statistical information as well as reviewing the draft document for accuracy.*

*Also, a special thank you to Cathy Coyne, CSSA's legislative analyst, who invested innumerable hours reviewing and editing this report.*

*Steven C. Szalay*
*Executive Director*
*June 2006*

# *TABLE OF CONTENTS*

*Page*

*Executive Summary* ............................................... v

*Introduction* ...................................................... 1

*Background* ....................................................... 2
         *Legislators and Judges Determine Who Gets Locked Up*

*Who Is In Local Detention* .................................... 4
         *Jails*
         *Juvenile Facilities*
         *Mentally Ill Offenders*
         *State and Federal Inmates*

*Capacity vs. Need* ............................................. 11
         *Jails*
             *Population Growth Drives Need for Expansion*
             *Additional Factors Affecting Capacity*
             *No Room for Sentenced Inmates*
             *Population Caps*
             *Alternatives To Incarceration*
         *Juvenile Facilities*

*Facility Design as a Function of Efficiency* ............. 22
         *Existing Facilities Need Updating*
         *Program Space*
         *Multiple Populations*
         *Special Needs*
         *Age of Existing Facilities vs. Functional Life Expectancy*

*Costs* ............................................................... 26
         *Construction costs*
             *Tentative Cost Projections For Jail Construction*
         *Operating Costs*
             *Jails*
             *Juvenile Facilities*
         *Where Will, Can or Should the Money Come From*

*What Has Been Done to Address Capacity Deficits* .................. 30
         *Jail Construction and Renovation*

*Juvenile Facility Construction and Renovation*

*Next Steps* ........................................................................................................ **32**


*Appendix I Local Detention Population Overview -- Adult and Juvenile*

*Appendix II Counties with Court Imposed Population Caps*

# EXECUTIVE SUMMARY

*"If you can't do the time, don't do the crime"* is no longer in effect in California. Our public safety system is increasingly unable to effectively meet its mandate to hold criminals accountable for their actions.

Local detention facilities - adult jails and juvenile halls and camps - are the crucial front end of California's correctional system. They're a vital part of every community's effort to protect itself. Without them, community safety disappears. There is no detention of the accused. There is no local programming of the convicted. Law enforcement, probation and parole lose a key consequence to impose for illegal behavior. That's just unacceptable!

In California's local adult system, jail facilities are bursting at the seams. Twelve percent of our jails are more than 60 years old, and nearly half are 30 years old or older. Dangerous crowding is a daily fact of life in many of the state's 460 jails. Simply put, California does not have enough local detention capacity or adequate program space to meet public safety demands.

The consequence is that, in 2005 statewide, *9,148 offenders a month* were given pretrial releases and an additional *9,323 inmates a month* were released early from their jail sentences due solely to lack of jail space.

## The Facts

There are state and federal standards, rules and regulations determining how many people can be housed in each jail and/or cell. When those standards aren't met, inmates sue. In 20 California counties, those suits have resulted in court-ordered population caps. An additional dozen counties have imposed population caps on themselves to avoid the costly litigation that results from crowding. These population caps mean that, when a jail is full, for every new inmate being admitted, someone already in custody has to be released.

In 2005, statewide bookings per month reached a ten-year high -- 106,941 per month (up from 97,589 in 1995).

There are 74,686 rated capacity (RC) jail beds in the state and, in 2005, the average daily population (ADP) of jails was 79,639 inmates -- the highest yearly ADP in history! It would take an additional 4,953 beds to house all the inmates in today's ADP.

The highest one-day jail population count statewide, in 2005, was 87,500 inmates. This means that, with current capacity, during times of peak demand for jail space, the state is short at least 12,800 jail beds.

In 2005, 233,388 individuals *avoided incarceration or were released early from jail sentences due solely to lack of jail space.* It would take 18,471 additional beds to eliminate these pre-trial and early releases.

There are over 285,000 unserved felony warrants and over 2,391,000 unserved misdemeanor warrants in California annually. If only 10% of the felony warrants resulted in someone being incarcerated, another 28,522 beds would be needed to house these felons.

Jails are required to separate the many classifications comprising their populations. Pre-adjudicated offenders have to be separated from sentenced, juveniles from adults, civil commitments from criminals, females from males, gang members from members of rival gangs, and violent offenders from those they might prey upon. Additionally, those who are physically or mentally ill must be provided appropriate housing. Jails are supposed to maintain a "vacancy factor" to allow for these classification separations. At the current ADP, to maintain a 5% vacancy factor for management and classification purposes jails would require 4,000 additional beds.

This is the current state of our jails. These deficits exist today. California is short 66,385 jail beds statewide right now to meet current public safety demands.

Looking to the future, California's inexorable population growth will require 40,943 *new* beds by 2050 to address population growth alone.

These beds would not eliminate early releases or unserved warrants or allow for a vacancy factor. To deal with those existing deficits and achieve a fully functioning jail system by the year 2050, the state would need to add 217,300 jail beds.

In its local juvenile detention system, on any given day California's 125 juvenile halls and camps house between 10,000 and 11,000 youth -- 10,920 per day in 2005. Most of these youth (58.6%) are confined on a court-ordered commitment; the rest are going through the court process.

By the end of 2005, there were a total of 13,575 beds in California's local juvenile facilities. Of these, 8,182 beds were in juvenile halls and 5,393 were in local commitment facilities (camps).

While local juvenile facility capacity is in better shape than it had been (in 1999 the ADP exceeded rated capacity by 400 juveniles), it is still true that, especially in juvenile halls, juvenile capacity is *merely* adequate. On peak population days in the final quarter of 2005, the number of juvenile hall rated capacity beds statewide (8,181) exceeded incarcerated populations (7,560) by only 621 beds.

Like adult detention facilities, juvenile halls require at least a 5% vacancy factor to appropriately manage their populations. On peak days it would take only 243 additional juvenile detainees statewide to drive bed need up to the level of optimum capacity.

In other words, a small increase in the rate of juvenile offending or the number of juveniles in the at-risk population, or both, will produce a deficit in juvenile hall beds.

Juvenile correctional reforms under discussion in the Legislature could make significant new demands on local capacity. Whether or not those changes come to fruition, it is quite certain that, at the conclusion of the current juvenile facility construction program, there will still be counties that need to replace old, outmoded facilities and others that will continue to face chronic crowding problems in their juvenile facilities.

The Chief Probation Officers of California (CPOC) predict a need for approximately 6,800 additional local juvenile detention and commitment beds by 2015. An upward trend in the juvenile crime rate, changes in correctional policy or new legislative initiatives could greatly expand that number.

## Alternatives to Incarceration

Not only do local corrections agencies need more facility capacity, they also need additional ways to ensure communities' public safety. While existing alternatives to incarceration help relieve some of the pressure of crowding, they are not appropriate for everyone. Moreover they are often circumvented by inmates because those programs would be longer -- as well as harder -- to complete than jail time.

Research and best practices show significant success with correctional day reporting centers (DRCs). DRCs provide all or partial day custody along with intensive treatment, counseling, life skills, vocational readiness and educational remediation services that effectively reduce recidivism and link offenders to positive support in their communities. Sheriffs and chief probation officers across California are investigating these proven alternatives to incarceration because day reporting centers allow them to actively supervise lower-risk, non-violent offenders while freeing up jail space for the high risk offenders who should be housed and programmed in the more secure jail environment.

### *What Does All This Mean?*

One obvious conclusion is that jails must have added space to house pre-adjudicated inmates and the most dangerous sentenced offenders for the full term of their court-ordered sentences.

Jails also have to be able to provide the behavioral and educational programs, counseling and other treatments that will interrupt jail inmates' criminal careers and help correct their offending behavior.

In addition jails need still more beds to address the growing demand for specialized housing for medically or mentally ill offenders and other special populations.

The Legislature and taxpayers statewide must keep the already tenuous condition of California's jails from becoming much worse. We have to keep the already dramatic bed-and-program-space deficit from becoming a public safety disaster.

In order to do that, California:

- must construct a large number of additional jail beds,

- must be prepared to add juvenile facility capacity,

- must renovate and retrofit existing jails and older juvenile facilities to continue their useful lives,

- must have space in all local detention facilities in which to provide the behavioral and educational programs, counseling and other treatments that interrupt offenders' criminal careers and help correct their offending behavior,

- must have space in which to address the growing demand for specialized housing for medically or mentally ill offenders and other special populations, and

- must develop additional, viable, proven alternatives to incarceration as well as alternative kinds of facilities to most safely and cost effectively manage offender populations.

This study's best estimate is that it will cost nearly five billion dollars ($4,913,160,000) between now and 2050 to construct just the new jail space needed to stay abreast of California's projected population growth. Significantly more dollars will be required to deal with early releases and unserved warrants, renovate and upgrade existing facilities, address juvenile facility needs, and create viable alternative interventions.

We won't be able to do all this work -- and won't need all this money -- at once. What we do need is a plan, the will to put the plan into action, and a consistent funding stream aligned with the steady growth in the demand for detention capacity.

We need to switch to a proactive 'continuous growth' model for jail and juvenile facility construction and abandon the 'periodic crisis' model that produces the kinds of deficits in which we now find ourselves.

No sheriff, no jail commander, no chief probation officer wants to release people from custody before their time is served or before they appear in court. Doing so means offenders are not held accountable and public safety is compromised.

We must restore the balance between 'doing the crime' and 'doing the time.' That balance is vital to holding offenders accountable for their criminal behavior.

We can't afford to ignore this problem. Jails and juvenile halls are critical components of the state's justice system. We Californians must ensure they have adequate capacity to do their jobs. Our safety and quality of life depend on it.

# __INTRODUCTION__

Infrastructure is the underpinning of life in California.  The quality of life in every community is built on the physical environment in concert with the community's health, education and safety.

Land use; clean air; clean water; dams, dikes and levies; roads, streets and transit; parks and libraries; schools and hospitals; courts and correctional facilities -- all critical -- and all interrelated.  The idyllic community doesn't stay idyllic if asbestos is poisoning its children.  The high priced neighborhood doesn't hold its property values if crime runs rampant in and around it.

Public safety is in everybody's interest. Public safety is everybody's business.  Public safety comes from public and private interaction and takes a complex mix of planning, precaution, vigilance, caring, compassion, enforcement and accountability for a community to be and to stay safe.

There is no one way to guarantee a community's safety, but there are plenty of ways to undermine it.  Not planning, not preparing, not taking care of the infrastructure of the community are sure to undercut safety and quality of life.

Why should you care about jails?  What do they have to do with you?

- Jails are paid for by taxpayer dollars.  Every taxpayer is a part-owner in local detention facilities.
- Jails and juvenile facilities reflect the community's interest in being safe by getting dangerous law breakers off the streets.
- Every person in jail or juvenile hall before or during trial and found not guilty comes home to the community reflecting his/her experience in jail.
- Every person sentenced to a jail or local juvenile facility comes back to the community within a year.

Public safety is everyone's business.  Supporting improvements for jails is not some kind of 'gift' to inmates in the jails.  It is a benefit for law-abiding citizens.  Holding people accountable for their actions as well as providing resources to ready them for their eventual release back to the community is in our best interest.  We should all be local corrections advocates.

The California State Sheriff's Association is committed to taking the lead in advocating for enough properly designed, efficiently operated jails and local juvenile facilities to correct the existing deficit and keep up with California's population growth of 5 to 10 million people every decade.  We want every Californian to be safe to enjoy the best of life in the Golden State.

In this report, we show that support for local corrections facilities is in all of our interest.

1

# __BACKGROUND__

Some facts to consider:

- Cities and counties operate 335 booking and short term holding jails (they can detain offenders for no longer than 96 hours).
- Over 327,000 people are booked into these jails annually.[1]
- Sheriffs run 125 jails that house arrestees awaiting and going through the court process and serving court-ordered jail time. -- Type II, III and IV jails.
- These jails booked over 1,283,290 adults (an average of 106,941 per month) in 2005.[2]
- County probation departments operate 125 local juvenile halls and commitment facilities.
- In 2005, 108,560 juveniles were booked into these juvenile halls (an average of 9,046 per month).[3]
- During 2005, local detention facilities delivered detention and correctional services to an average daily population of 79,639 pre-adjudicated and sentenced adult offenders and 10,923 pre-adjudicated and committed juvenile offenders.[4]

While adult and juvenile offenders found guilty of committing the most egregious offenses and those with the most entrenched criminal histories are generally remanded to state-level adult and juvenile correctional facilities (prisons), each of these offenders spends time in a local detention facility before being transferred to the California Department of Corrections and Rehabilitation (CDCR).

Public safety demands that California's jails and local juvenile facilities be able to safely and securely house and program every kind of detainee, from the first-time arrestee through the most violent repeat criminal.

## *Legislators and Judges Determine Who Gets Locked Up*

Local detention facilities do not determine their own populations. The administrators of these facilities have nothing to say about which offenders or how many come to them. Legislators pass the laws that say who should be locked up. Judges sentence people convicted of breaking those laws. Jails and juvenile facilities take those who are sent their way and seek to manage these offenders as safely and effectively as possible.

Every time the Legislature passes a bill creating a new crime or a sentence enhancement, it affects local corrections.

---

[1] Corrections Standards Authority/Board of Corrections, 2004 Legislative Report, *Local Corrections in California*, pg. 8
[2] Corrections Standards Authority Jail Profile Survey Fourth Quarter 2005
[3] Corrections Standards Authority Juvenile Detention Profile Survey, Fourth Quarter 2005
[4] Corrections Standards Authority Jail Profile and Juvenile Detention Profile Surveys 2005

Every time a Board of Supervisors or City Council enacts an ordinance requiring a curfew or a ban on particular behaviors, it is affecting local corrections.

Often these policy and legislative decisions are made without the slightest consideration for their correctional implications. And, just as often, the desired public safety benefit of the law or ordinance or policy is thwarted because there is no more room in the local jail or juvenile facility for those who break these new rules.

One only has to note that there are more than 2.67 million unserved arrest warrants extant in California today to understand the dilemma. Jails don't have enough room for the offenders they have and can't simply manufacture the space to house more.

Here is an example of the effect a legislative action can have on local correctional populations. In 1997, the Legislature began providing counties with a fiscal incentive to treat criminally delinquent minors locally versus incurring a "sliding scale fee" for committing those offenders to the California Youth Authority. Since then, local juvenile facilities' populations have increased dramatically, not only in response to the "sliding scale," but also because some courts have increased their use of "juvenile halls as commitment facilities for certain minors deemed to need secure care, as well as education, treatment and program opportunities that can best be provided locally with the participation of family members."[5]

Ongoing legislative consideration of the possibility of transferring responsibility for state parolees (adults and/or juveniles) to the local level is driving counties to explore strategies for expanding their correctional capacity, as well as their service delivery networks and partnerships. With just a stroke of the pen, the Legislature and Governor would have a profound and enormous impact on local jails and juvenile facilities.

---

[5] Corrections Standards Authority/Board of Corrections, 2004 Legislative Report, pgs. 22-23

3

# WHO IS IN LOCAL DETENTION?

### Jails

There are *79,630 people in county jails every day.* Eighty-seven (87) percent are male and most are adults. Although a large number of offenders are sentenced to county jails, space limitations have forced counties to put many of these sentenced offenders in alternatives to confinement or simply to release them before the end of their sentences. As a result, the majority of people in jail (67 percent) are pre-sentenced, i.e., arrestees and those going through the court process.

It has become harder to keep sentenced offenders in jail as sheriffs have had to devote more and more of their severely limited jail capacity to pre-adjudicated offenders. Communities need their jails to be able to carry out the sentences of the court, not release offenders before their sentences are over.

In 2005, more than three-quarters (78 percent) of jail prisoners were in custody for felony offenses. More than 24,760 of these inmates (30 percent) required maximum security housing. Eleven (11) percent of jail inmates were illegal/criminal aliens.

People who come to jail have a variety of medical and mental health issues. Many are indigent or homeless, without access to medical care. Many use and abuse drugs. Jails do their best to address these issues through the current stock of 1,002 medical treatment beds and 3,095 mental health treatment beds, as well as through in-house programming and treatment services and in liaison with community providers. But again, much more is needed.

Nearly every jail in the state needs more treatment and program space and professional support to appropriately work with the people in custody.

### Juvenile Facilities

On any given day, between 10,000 and 11,000 of California's youth are in custody in local juveniles halls and camps around the state -- 10,920 a day in 2005. Most (58.6 percent) are confined on a court-ordered commitment; the rest are going through the court process.

Among the young people in custody, the typical detainee is male (85 percent) between 15 and 17 years old (77 percent). Two out of three are in custody for felony charges and an average of one out of every twelve youth booked each month (8.7 percent) has been arrested on a weapons-related charge.

Assessments of juvenile detainees generally reveal a picture of troubled youth with multiple problems, including substance abuse (77 percent) and serious mental health

4

issues (42 percent).[6]    Among the juveniles in local custody in 2005, 3,400 were receiving treatment for open mental health cases and 1,219 required and were receiving psychotropic medications.[7]

### Mentally Ill Offenders

Jails and juvenile detention facilities across the nation have seen dramatic increases in the number detainees who are mentally ill.  Many of these offenders also have drug and alcohol-related diagnoses that exacerbate their mental illness.

Studies repeatedly confirm that a growing number of jail inmates suffer from severe mental illness and that schizophrenia, major depression, bipolar disorder and other mental illnesses often result in impaired judgment and criminal behavior.

Nationally it is estimated that at least 16 percent of jail inmates are mentally ill.  This translates into more than 12,000 seriously mentally ill inmates in California's jails.

According to the Pacific Research Institute, California's annual jail and probation costs for mentally ill offenders exceed $300 million a year.[8]

Mental illness impacts not only the affected individuals and their families, but also local corrections and society as a whole.  In a costly cycle of incarceration, release and re-incarceration, mentally ill people come to jails and local juvenile facilities time and time again for crimes that grow out of their mental illness.

At the urging of the California State Sheriff's Association, in 1998 the Legislature established the Mentally Ill Offender Crime Reduction Grant (MIOCRG) program in response to the concern that jails are among the primary (or only) treatment facilities for an increasing number of mentally ill adults. The MIOCRG program, which ran from 1998/99 through 2003/04, tested, determined and documented 'what works' in reducing recidivism among mentally ill offenders.

Thirty projects in 26 counties, involving more than 8,000 adult offenders, produced a wealth of evidence about what works.  All of the following were shown to have a positive effect, reducing re-arrests and returns to custody.

- Enhanced assessment and more comprehensive understanding of therapeutic needs in jail;
- The provision of quick and reliable services designed to ameliorate the effects of mental illness while in custody;

---

[6] CPOC Needs Assessment reference to 2003 National Council on Crime and Delinquency (NCCD) survey of mental health needs of youth in local detention
[7] See Appendix 1 for tables providing an overview of the size and characteristics of the local jail and juvenile facility populations and comparing current populations with those in local detention in the year 2000.
[8]  California Board of Corrections, Mentally Ill Offender Crime Reduction Grant Program report to the Legislature, December 2004, page 2

- More complete after-jail systems of care designed to ensure adequate treatment and support; and
- After-release monitoring to ensure that additional illegal behavior, mental deterioration, and other areas of concern were quickly addressed.

MIOCRG participants were booked less often, were convicted less often and were convicted of less serious offenses when they were convicted than were those not in the program. Fewer participants than offenders in the comparison group served time in jail and, when they did serve time, they were in jail for fewer days than non-program inmates.

Program participants learned to comply with medication regimens, stay sober, return to school, find jobs, manage their money, and in some cases live independently and/or reunite with their families.

The MIOCRG Program reduced many participants' involvement in the criminal justice and acute-care hospitalization systems and provided the opportunity -- for some, the first ever - to maintain crime-and-drug-free lives in the community.[9]

That's the good news -- very good news indeed. Jails, mental health agencies and communities learned what worked. They came together and made a real difference in the quality of life and public safety in their communities.

> *[In Santa Clara County's Mental Health Court] all are mentally ill, some so severely that they bring their "voices" to court. Many have been bouncing for years from court to jail to treatment and then, back to jail.*
> *The goal here is to break the cycle by stabilizing their lives.*
>
> Sacramento Bee
> May 15, 2006

The not so good part is two-fold. First, when the MIOCRG Program grants ended, counties were forced to discontinue key program elements for lack of ongoing funding. Some of the Mental Health Courts and after-jail support could not be sustained with existing resources. Increasing jail crowding meant jails were hard pressed to continue housing mentally ill inmates in separate treatment units, and budget problems meant mental health agencies had to pull back the grant-funded intensive counseling they had been providing in jails. Having learned what worked made it all the more disheartening to not be able to sustain the hard won victories. However, as this report goes to press, CSSA and other organizations have convinced the Governor and legislature to appropriate $45 million for a MIOCRG II Program for FY 2006-07.

The second downside is that, despite a groundswell of evidence that it was and still is needed, there has been no comparable effort to test or implement strategies related to mentally ill *juvenile* offenders. Although a 2003 NCCD survey of mental health care in California's local juvenile justice system showed that at least 42 percent of youth in detention had "serious mental health issues" and 30 of the 45 counties surveyed reported they did not have an appropriate selection of services available for youth with

---

[9] op. cit., pages 15 - 56

mental health issues,[10] the state has not yet initiated a juvenile mentally ill offenders crime reduction effort.

Mirroring the NCCD survey, a preliminary juvenile justice gap analysis report, provided to the Legislature on December 1, 2005, found that

> ...mental health issues (including treatment, facilities, staff and appropriate jurisdiction) comprised the single most critical gap in juvenile justice services. It was clear from the frequency with which they were identified, and the priority ranking accorded them that gaps in mental health services are a primary concern. Without exception, every county -- large, medium or small, from Imperial to Del Norte and including large Los Angeles County, small Trinity County, and every other county in between -- described mental health service capacity related to either at risk youth, juvenile offenders or most frequently both, as a significant, if not their most significant, gap.[11]

That gap analysis and CPOC's juvenile facility needs assessment found that the most common unmet need was locked facilities for seriously mentally ill youth.

Counties may have no options but to build and operate the needed secure detention/ treatment facilities themselves.   In a 2006 Needs Assessment study, the Chief Probation Officers of California (CPOC) estimate that county probation departments will require 6,800 juvenile detention and commitment beds by 2015 and 3,400 of those should be targeted for mental health and drug abuse treatment.[12]   They will need the state's help to get that done.

### State and Federal Inmates

County and city jails in California work with the state and federal governments to house prisoners under certain circumstances.

The state and/or federal prison systems sometimes ask local jails to house certain of their inmates for a period of time for 'protective custody' or while the prisoner is going through a court or parole violator proceeding.   There are also more formal, contract arrangements by which local jails provide housing to state and/or federal sentenced inmates to help relieve pressure on the state / federal system and/or to address other public safety demands.

In calendar 2005, the California Department of Corrections and Rehabilitation (CDCR) contracted with 15 counties and two cities (Oakland and Santa Ana) for a total of 29,435

---

[10]   Hartney, C., McKinney, T., Eidlitz, L. and Craine, J.  NCCD Focus: A Survey of Mental Health Care Delivery to Youth in the California Juvenile Justice System: Summary of Findings, September 2003
[11]   CDCR, Division of Juvenile Justice, Juvenile Justice Reform Second Quarterly Report to the Legislature, December 2005, page 2
[12]    Chief Probation Officers of California, Facilities Needs Survey, February 2006 (47 counties reporting representing 89% of the state population)

7

jail bed days, approximately 2,453 jail bed days per month or 80 jail beds per day statewide.[13]  The local jails housing state inmates were:

| State Contract Inmate Days in 2005 | | | | |
|---|---|---|---|---|
| Jurisdiction | Inmate Days | | Jurisdiction | Inmate Days |
| Alameda | 6,469 | | Sacramento | 4,955 |
| Del Norte | 116 | | San Benito | 31 |
| Fresno | 729 | | San Diego (Wk. Furl.) | 424 |
| Imperial | 344 | | San Mateo | 443 |
| Kern | 244 | | Santa Ana P.D. | 95 |
| Los Angeles | 14,934 | | Tulare | 211 |
| Madera | 160 | | Yolo | 149 |
| Napa | 28 | | Yuba | 72 |
| Oakland P.D. | 26 | | | |
| | | | Total State Contract Days | 29,430 |

Obviously, the great majority of contracted beds were in the Los Angeles, Alameda and Sacramento County jail systems.  Note that, of the counties contracting to hold state prisoners, only three -- Fresno, Kern and Los Angeles -- are operating under court imposed population caps.

In the 2004/05 federal fiscal year (from October 2004 through September 2005), California jails in 18 counties and two cities (Oakland and Santa Ana)  held federal prisoners for a total of 43,297 jail bed days, approximately 3,608 jail bed days per month or 118 jail beds per day statewide.[14]

As indicated by the table on the following page, the majority of bed days used by the federal government were located, in descending order, in Los Angeles, San Bernardino, Sacramento, the Santa Ana (City) Police Department jail, Fresno, Alameda, Imperial, Kern, Yuba and San Diego Counties' jail systems.   Immigration and Naturalization System (INS) use of local jail beds to detain illegal immigrants may account for the large number of bed days in such jurisdictions as Fresno, Imperial, Kern, Santa Ana, and San

---

[13]  Corrections Standards Authority / Board of Corrections Jail Profile Survey, State Contracted Inmates 2004-2005
[14]  Corrections Standards Authority / Board of Corrections Jail Profile Survey, Federal Beds 2004 - 05

Bernardino. The presence of federal courthouses in Los Angeles, Alameda and Sacramento may explain the very high bed usage in those jurisdictions as well.

Note that, of the counties contracting to house federal inmates, five -- Fresno, Kern Los Angeles, San Bernardino and Yolo Counties -- are operating under court imposed population caps.

| Federal Contract Inmate Days in 2004-2005 | | | |
|---|---|---|---|
| Jurisdiction | Inmate Days | Jurisdiction | Inmate Days |
| Alameda | 3,846 | Oakland P.D. | 408 |
| Fresno | 4,030 | Sacramento | 5,195 |
| Humboldt | 2 | San Bernardino | 6,781 |
| Imperial | 3,001 | San Diego Wk. Furl. | 1,600 |
| Inyo | 192 | San Mateo | 87 |
| Kern | 2,630 | Santa Ana P.D. | 4,151 |
| Los Angeles | 8,680 | Sutter | 8 |
| Madera | 9 | Tulare | 347 |
| Marin | 186 | Yolo | 154 |
| Napa | 0 | Yuba | 2,180 |
| | | Total Federal Contract Days | 43,487 |

The contracts by which local jails house state prisoners generate reimbursement in accordance with what is called the Daily Jail Rate (DJR). The DJR is based on each jurisdiction's actual costs, does not include booking fees and is subject to specific guidelines. The DJR had been $59/per day until recently; however, as part of the 2005 Budget Act, the daily rate has become $68.22 per inmate per day. It is capped at 95 percent of the state's average cost for housing inmates in state facilities, excluding the cost of non-routine medical care.

While the DJR does not cover the full cost of supporting an inmate in local detention and although the state is often slow to make the contracted payments, contract arrangements have produced benefits to local detention facilities. In some instances, contracts have enabled jails to make use of beds they could not otherwise afford to operate. The contracts have provided the dollars necessary to pay for staff and programming for which county dollars were not available. This inter-system cooperation has been a win/win with both the state and local jurisdictions benefiting.

However, this mutually beneficial relationship may be difficult to sustain. The relentless increases in the numbers of local offenders in jail -- and the resulting jail overcrowding -- may force counties to eliminate existing contracts, leaving the state and federal systems without needed beds and the counties without the vital revenue that has helped maintain jails and related services.

# *CAPACITY VS. NEED*

### *Jails*

California lacks sufficient local detention capacity and adequate program space to meet even the current, let alone future, public safety demands.   It has been 20 years since the last comprehensive jail construction bond program.

That effort was very successful, adding 42,000 much needed local jail beds.  However, since those beds were built in the 1980s, the state's population has ballooned.  Jail capacity has not kept pace.  In 1999, the State Board of Corrections projected a need for more than 55,000 additional jail beds. To date, only 6,150 new beds have been added since 1999.

Jails are bursting at the seams. Dangerous crowding is a daily fact of life in almost all of California's jails.  There are 74,686 rated capacity (RC) jail beds in the state.[15]  In 2005, jails' average daily population (ADP) was 79,639 inmates -- the highest yearly ADP in history!

> *Jail officials say the average daily population at the [Sonoma County] jail has increased three times faster than the general population since 1990, chiefly because inmates are spending more time incarcerated and because many are repeat visitors.*
>
> *Sonoma County Press Democrat*
> *January 25, 2006*

What the difference between rated capacity and average daily population means is that on the typical day, jails lacked space for more than 4,900 inmates.

Having 4,900 more inmates than available beds is a serious jail-capacity problem, but it is only the tip of the iceberg in terms of the overall capacity deficit.

The highest one-day population count statewide, in 2005, was right around 87,500 inmates.  This means that, under current conditions, during times of peak demand for jail space, the state is short at least 12,800 jail beds.

### *Population Growth Drives Need for Expansion*

Growth in the jail population is related directly to the growth in the general population. California's general population is projected to grow at a steady rate for at least the next half century.  It becomes very clear that we have a problem.  If we're going to maintain a statewide local detention system of adequate capacity and appropriate efficiency, we must pay attention to the growth in the general population and, with it, the at-risk population.

---

[15]  CSA data, current to April 2006

Look for example at tiny Calaveras County. Development already underway in its town of Copperopolis is slated to add 3,000 homes in the next three years and more than 40,000 in the next 30 years. The entire county's population was 45,939 in 2004; it is expected to be at least twice that 2030.[16]

The Calaveras County jail is one of the smallest in California. A court order limits the jail to holding 65 people each night - 56 men and nine women. The Sheriff says the County needs 100 beds now and 200 by 2020. [17] By 2050, Calaveras will need many more.

> *CROWDED HOUSE -- Lack of space at Calaveras County Jail results in hundreds of prisoners a year being released. Sometimes even violent felons are released.*
> *The Record*
> *November 13, 2005*

The State Department of Finance population projections, illustrated by the following graphic, results in about the straightest, most consistently upward-sloped line one will find in any social research. This steady and reliable growth in the general population makes it overwhelmingly clear that our current jail capacity shortfall can only get worse -- a lot worse -- and that is likely to happen very soon.



Coupling population growth projections with historical data regarding incarceration rates provides a striking picture of the inexorable increase in needed jail beds up to the year 2050.

CSA data indicates that, between the years 2000 and 2005, the incarceration rate has varied relatively little -- from 2,111 per 1,000,000 people in the general population to 2,224 per 1,000,000.

---

[16] "In Calaveras, development out leaps jumping frogs," Sacramento Bee, May 1, 2006
[17] "Crowded House: Lack of Space at Calaveras County Jail results in hundreds of prisoners a year being released," The Record, November 13, 2005

| Incarceration Rates: 2000 through 2005 | | | |
|---|---|---|---|
| Year | General Population | ADP | Incarceration Rate |
| 2000 | 33,871,648 | 75,340 | 0.002224 |
| 2001 | 34,441,561 | 73,824 | 0.002143 |
| 2002 | 35,088,671 | 75,156 | 0.002142 |
| 2003 | 35,691,442 | 75,340 | 0.002111 |
| 2004 | 36,271,091 | 76,939 | 0.002121 |
| 2005 | 36,810,358 | 79,639 | 0.002163 |

The most conservative estimate of future bed needs, (i.e., one that will most probably be on the low side) would make use of the lowest recent incarceration rate -- the .002111 that occurred in 2003. As shown in the table below, using this assumption, California will need 82,845 jail beds by the year 2010. By 2020, 92,565 beds will be needed, and by 2050, we will need 115,629 beds.[18]

| Projected Data: 2010 through 2050 | | | |
|---|---|---|---|
| Year | Projected General Population | Estimated Incarceration Rate | Projected ADP |
| 2010 | 39,246,767 | 0.002111 | 82,845 |
| 2020 | 43,851,741 | 0.002111 | 92,565 |
| 2030 | 48,110,671 | 0.002111 | 101,555 |
| 2040 | 51,538,596 | 0.002111 | 108,791 |
| 2050 | 54,777,700 | 0.002111 | 115,629 |

In other words, 40,943 <u>new</u> beds will be needed by 2050 (i.e., projected bed need of 115,629 minus the 2005 rated capacity of 74,686 = 40,943 beds), under the most conservative circumstances.

These projections are based on the following, *very conservative*, assumptions.

- There will be no increase in the incarceration rate.

---

[18] Based on California Department of Finance (DOF) population projections

13

- The projections relate to the ADP and not peak demand which in 2005 was 10% higher than the ADP.
- There *will continue to be significant releases due to lack of space.*
- There will be *no significant reduction in the number of unserved felony warrants.*
- There will be no increase in the current crime rate; and
- There will be no policy or legislative changes affecting the use of jail beds for new or additional populations (like parolees, for example).

Remember - California needs over 4,900 additional beds to eliminate *current* jail crowding (on a typical day) and 12,814 additional beds to accommodate *current* peak population days.

In other words, our jails are already thousands of beds short of being able to fully address their public safety functions and the shortfall will get worse as the population continues to grow.

### Additional Factors Affect Capacity

There are very good reasons for labeling the estimate of 40,943 beds by 2050 "very conservative." The estimate could easily be increased by 250 percent!

Why? Because there are other realities besides, and in addition to, population growth that greatly exacerbate the problem. Consider the following:

- Currently, *over 18,000 individuals a month in California are not incarcerated or are released early from jail sentences due solely to lack of jail space -- 9,148 are given pretrial release and 9,323 are released early from their sentences;*

- There are *over 285,000 unserved felony warrants* and over 2,391,000 unserved misdemeanor warrants in California annually.

- If, by some means, all of the felony warrants were served over a one-year period, and 10 percent of the warrants resulted in someone being incarcerated, the jail ADP would increase by 28,522 inmates.

- *Bookings per month reached a ten-year high in 2005* -- 106,941 per month (up from 97,589 in 1995).

- It is a key principle of good jail management to maintain some flexibility in inmate housing assignments by keeping a certain small number of beds vacant (e.g., for administrative segregation, conflict management, inmate safety and other purposes). Some experts suggest facilities should maintain a 10 percent vacancy rate. Even using a more conservative 5 percent vacancy factor,

California needs to build about 4,000 additional beds just to have adequate space to appropriately manage the existing ADP of nearly 80,000 inmates. [19]

- Adding the vacancy factor after early releases were eliminated and 10% of the felony warrants were served would require an additional 6,718 beds.

| Number of Beds Required to Fulfill Current Need Given the Current RC of 74,686 Beds | | |
|---|---|---|
| Source of Need | Additional Bed | Beds Needed |
| ADP, 2005 | 4,953 | 79,639 |
| Capacity for Peak Demands | 7,992 | 87,631 |
| No Early Releases | 18,471 | 106,102 |
| 10% of Felony Warrants Served | 28,251 | 134,353 |
| 5 % Vacancy Factor | 6,718 | 141,071 |
| Beds Needed to Fulfill Current Need Minus Current RC of 74,686 beds | | 66,385 |

As the above table demonstrates, one could easily argue that the *current* jail system bed capacity is 66,385 beds short of the *current* need.

This makes it clear that the estimate of 40,943 beds needed by 2050 would allow jails to address only increases in the population. That number of beds would not substantially improve the bare bones functioning of the current jail system. It would not allow for correcting the glaring problems of vacancy factors, unserved warrants and early releases.

On the other hand, if the goal were a *fully functioning system* by 2050, one could estimate the 2050 bed need using the following formula:

- If the current bed need is equal to the current ADP plus the additional 66,385 beds in the above table, the total would be 146,024 beds (or 0.3967% of the general population of California).

- Extrapolating that percentage to the projected 2050 general population yields a predicted need for bed space in 2050 of 217,299 beds.

While the formula and percentages and extrapolation may be complicated, the conclusion is not. If California wants to achieve a fully functioning jail system by the year 2050, it needs to develop capacity to house 217,299 inmates.

---

[19] These conclusions are based on the CSA 2005 Jail Profile Survey 4th Quarter 2005 report

15

**No Room for Sentenced Inmates**

The percentage of inmates who are pre-sentenced has been rising steadily over the past 20 years and is currently at its highest rate in history -- 67 percent. As the number of pre-sentenced people rises while the number of jails beds doesn't, there is less and less space for sentenced inmates. In fact, in 2005 the ADP of sentenced inmates was 2,300 lower than it had been in 1995, even though the overall ADP is over 8,000 inmates higher today than it was in 1995.

We say, "If you can't do the time, don't do the crime" -- but crooks know better. In fact, they're electing to have monetary fines transferred into jail time since they know they'll have to serve only a fraction of their sentences.

> *The Orange County jail system has become the most crowded in the state and the third-most crowded in the country, with about 1,500 inmates released early this year because there were no beds for them.*
> *Orange County Register*
> *October 21, 2005*

Statewide in 2005, *9,323 sentenced inmates per month were released from jail before they completed their sentences.* Or they were put on alternative programs in lieu of custody. In tiny Calaveras County alone, 45 years of sentenced jail time went unserved in 2005 due to early releases.

Inmates may have turned the expression around to, "We won't do the time, so we might as well do the crime."

*Population Caps*

No sheriff, no jail commander, no chief probation officer wants to release people from custody before their time is served or before they appear in court. Doing so means offenders are not held accountable and public safety is compromised.

Why then are inmates being released early? Why don't sheriffs keep every sentenced inmate who is sent to jail *in jail* for their whole sentences? Why are some pre-trial people being released too?

Here's why.

- California lacks sufficient jail beds.
- There are state and federal standards, rules and regulations determining how many people can be housed in each jail and/or cell.
- When those standards aren't met, inmates sue.
- In 20 California counties, those suits have resulted in court - ordered population caps.

> *"We're on the verge of a meltdown," Acting Shasta County Sheriff Larry Schaller said. We need additional space to "help correct a system in which only the most serious felons are held in the main jail, while others are assigned to work-release programs and sent home at night."*
> *Redding Searchlight*
> *January 27, 2006*

- An additional dozen counties have imposed population caps on themselves in order to avoid the inevitable, costly litigation that crowding can and does bring.

The 20 counties with court-ordered population caps account for 64 percent of the statewide average daily population.

What a cap means is that, when the jail is full, for every new inmate being admitted, someone already in custody has to be released.

Of course, jailers make every effort to release only those whose return to the community poses the least risk to public safety. The 'least risk' is not the same as 'no risk,' but jailers are, to the greatest extent possible, using classification and other criteria to determine which offenders to release.

Calaveras County says it "releases people guilty of misdemeanor drug offenses, traffic violations and so on first. But some nights there's only room for people accused of murder, rape and assault. When the crowding is most severe, even violent criminals get released before their sentences are completely served." [20]

To ease jail overcrowding, San Bernardino County has adopted a temporary policy to stop jailing suspects accused of drug offenses, theft, burglary and other nonviolent offenses if they promise to appear in court. Some sex offenders who fail to register with police, a violation of state law, also are booked, cited and released from custody if they promise to show up for their scheduled court hearings. "The sheriff's up against it here," sheriff's spokeswoman Cindy Beavers said. "The sheriff is concerned about the safety of the citizens of this county. At the same time he risks court action if he doesn't address the overcrowding that has left some inmates sleeping on [jail] floors." [21]

Since 2002, Los Angeles County has had to grant early releases to more than 150,000 inmates, most of whom, according to the LA Times, had served only 10 percent of their sentences. [22]

"Guidelines issued by the sheriff spell out which inmates qualify for early release.

> *RELEASING INMATES EARLY HAS A COSTLY HUMAN TOLL*
> *A shortage of beds puts career criminals back on the street, where they often commit new offenses*
> *Mario Moreno should still have been behind bars the night he climbed into the passenger seat of a stolen car with two fellow gang members....Moreno, 18, shot and killed Darrell Dennard, a grandfather who...had just bought a lottery ticket. If not for a chronic shortage of jail beds in LA County, Dennard's killer would have been in jail four more moths....*
> *Moreno joined more than 150,000 county inmates who have been released during the last four years after serving fractions of their sentences. Thousands, like Moreno, committed violent crimes when they would otherwise have been locked up....*
>
> *Los Angeles Times*
> *May 14, 2006*

---

[20] The Record, November 13, 2005
[21] Los Angeles Times, October 27, 2005
[22] "Revamp of Lockups is a Budget Priority," Los Angeles Times, April 18, 2006

17

Those in jail for manslaughter, sex offenses and child abuse, along with violators of gang injunctions, do all their time. For nearly all other convictions, inmates serve a fraction of their sentence. Women usually do no more than 25%. Men serve no more than 10%."[23]

Sheriff Lee Baca asked the County Board of Supervisors for "... $128 million in the 2006-07 budget year -- on top of $150 million the year before -- for a systemwide modernization that would control the violence and end the controversial practice of releasing inmates early to ease overcrowding." [24] "Today, the county has about 19,000 jail beds in use. Baca says he'd need at least 30,000 -- and additional deputies -- to end early releases."[25]

Statewide in 2005, 138,498 sentenced inmates had to be released early due to lack of space. An additional 94,890 pretrial inmates had to be released early for the same reason.

This is a total of 233,388 arrested and/or convicted people who avoided incarceration or were released early because there was insufficient space in jails to legally keep them.

Ninety-eight percent of the releases (all but about 3,300) occurred in counties with population caps.[26]

### Alternatives to Incarceration

It's important to understand that many of the people released early from jail are not just set free. They're still under the constructive custody of the sheriff and, to the extent possible, they're put in alternative programs, such as work release, electronic monitoring, drug court intensive supervision and Proposition 36 drug treatment.

> With Napa County's jail often filled to capacity and beyond ... Supervisors ... approved an expansion of the county's home detention program ... [that] allows qualified inmates to remain at home wearing a transmitter which is monitored by corrections officials 24 hours a day, seven days a week. Individuals must get approval to leave for counseling, work or educational programs ....Participants are required to be inside their homes for at least 100 of the 168 hours in a week.
>
> *Napa Valley Register*

While existing alternatives to incarceration help relieve some of the pressure of crowding, they are not appropriate for everyone. Moreover, they are often circumvented by inmates, because those programs would be longer -- as well as harder to complete -- than jail time.

---

[23] "Releasing Inmates Early Has a Costly Human Toll," Los Angeles Times, May 14, 2006
[24] "Revamp of Lockups Is a Budget Priority," Los Angeles Times, April 18, 2006
[25] "Releasing Inmates Early Has a Costly Human Toll," Los Angeles Times, May 14, 2006
[26] CSA data on early releases in counties with population caps

One obvious conclusion is that jails must have added space to house pre-adjudicated inmates and the most dangerous sentenced offenders for the full term of their court-ordered sentences.

Jails also have to be able to provide the behavioral and educational programs, counseling and other treatments that will interrupt jail inmates' criminal careers and help correct their offending behavior.

In addition jails need still more beds to address the growing demand for specialized housing for medically or mentally ill offenders, and other special populations.

> *The issue of overcrowding at the San Joaquin County Jail isn't something new.... As a way to reduce overcrowding, those convicted of certain nonviolent crimes are given options in place of jail time. There is the alternative work program, in which people are contracted to work at places like the Tracy Airport; home electronic monitoring; and work furlough.*
> *But the frequent guests at the jail know better ... Instead of serving their 30-day sentence in alternative programs -- where they have to serve the entire month -- they opt for the over-crowded jail in a gamble to serve only a fraction of that time before being sent home.*
>
> Inside Bay Area
> January 23, 2006

It is also increasingly clear that alternative kinds of facilities and/or programs must be put in place. For example, research and best practices implemented in other parts of the country show significant success with day reporting centers that provide all or partial day custody along with intensive treatment, counseling, life skills, vocational readiness and educational remediation services that effectively reduce recidivism and link offenders to positive support in their communities.

Day reporting centers enable a progressive array of sanctions that not only hold offenders accountable but also help to maximize jail capacity. Because day reporting centers actively supervise lower-risk, non-violent offenders, they free up jail space for the high risk offenders who should be housed and programmed in the more secure jail environment.

Several California counties including Orange, Sacramento San Diego and Solano, are operating day reporting centers for juvenile offenders and Placer County has recently opened a day reporting center for convicted adults. The California Department of Corrections and Rehabilitation (CDCR) has entered into a contract with a widely respected, well researched organization -- Behavioral Interventions (BI) -- to pilot a day reporting center for California's parolees. BI is also implementing this proven model at the local level in Franklin County, Pennsylvania and Sedgwick County, Kansas and could help California's local sheriffs' and probation departments develop these effective alternatives to incarceration for appropriately screened offenders who would otherwise be crowding local jails and juvenile facilities.

The Legislature and taxpayers statewide must support alternatives to incarceration, like day reporting centers, to keep the already tenuous condition of the state's jails from

becoming much worse. We have to keep the already dramatic bed-and-program-space deficit from becoming a public safety disaster.

### Juvenile Facilities

Juvenile halls and local commitment facilities -- camps and ranches -- administered by county probation departments serve dual purposes. First and foremost, they protect the public from juveniles who are considered too dangerous because of their criminal behavior to remain in the community. And second, within the confined setting, detainees are provided education, rehabilitation and treatment services that offer these youth an opportunity to get their lives back on track.

By the end of 2005, there were a total of 13,575 beds in California's local juvenile facilities. Of these, 8,182 beds were in juvenile halls and 5,393 were in local commitment facilities (camps).

The average daily population of juveniles in local custody in 2005 was 10,923 juveniles. The ADP of juvenile halls was 6,826 while camps held an average of 4,097 committed juveniles per day. (There were another 2,355 juveniles who were considered to be legally detained who were serving their time on home detention; and there were 250 juveniles assigned to alternative confinement programs).

> **Officials Push for Expansion of Cramped Juvenile Hall**
> For the last 17 years, [Sacramento] county's juvenile hall has housed more young people than its official capacity allows. Earlier this year, some 356 juveniles were inside a facility approved for 261 beds.....Probation staff outlined $44 million to $50 million in new programs and new beds needed within 15 years ... By 2015, the county will need 150 more beds at the juvenile hall and 81 more beds at longer term commitment facilities [as well as] a 30-bed treatment unit for offenders with mental health issues, a long-term girls only facility and a 60-bed expansion of the Boys Ranch.
>
> Sacramento Bee
> April 19, 2006

The last decade's decline in the juvenile crime rate coupled with counties' successes with prevention and early intervention,[27] as well as completed construction projects coming on line enabled juvenile hall capacity to exceed halls' average daily populations by 1,356 beds, and camp capacity to exceed camp ADP by 1,296 beds.

Doing the math shows that local juvenile facility capacity is in better shape than jail capacity. But it may be too soon to start celebrating. Crowding is still a problem in many counties. Ten counties -- accounting for almost 60 percent of the entire local juvenile detained population -- reported crowded conditions[28] for six months or more in at least one of their detention facilities in 2004.[29]

---

[27] Many counties programs are funded through the Juvenile Justice Crime Prevention Act (JJCPA)
[28] *Crowding* as defined by title 15, Section 1343, California Code of Regulations, occurs when a facility exceeds the CSA rated capacity (RC) for fifteen or more days during a month.
[29] Chief Probation Officers of California, Needs Survey, February 2006

While local juvenile facility capacity is in better shape than it had been (in 1999 the ADP exceeded rated capacity by 400 juveniles), it is still true that, especially for juvenile halls, juvenile capacity is merely adequate. For example, on peak population days in the final quarter of 2005, the number of juvenile hall rated capacity beds statewide (8,181) exceeded incarcerated populations (7,560) by only 621 beds.

Like adult detention facilities, juvenile halls require at least a 5 percent vacancy factor to appropriately manage their populations. Thus, on peak days it would take only 243 additional juvenile detainees statewide to drive bed need up to the level of optimum capacity.

In other words, a small increase in the rate of juvenile offending and/or the general population and related number of juveniles in the at-risk population will produce a deficit in juvenile hall beds.

In fact, the Chief Probation Officers of California (CPOC) have conducted preliminary assessments of counties' projected bed needs and are estimating that California will need in excess of 6,800 additional local juvenile beds by the year 2015. [30]

---

[30]  ibid

# *FACILITY DESIGN AS A FUNCTION OF EFFICIENCY*

Having adequate and efficient jail capacity is critical for the state as a whole. Jails and local juvenile facilities have to be able to play their role in the continuum of correctional responses to ensure community safety. They can't do that in inefficient, outdated buildings.

### *Existing Facilities Need Updating*

In addition to adding capacity by building new beds, California must also commit to renovating and retrofitting currently existing jails and juvenile facilities.

Why? Because many of the state's older jails and juvenile facilities are linear designs and don't work for today's populations.

Not only are linear facilities staff-intensive and thus more expensive to operate than new generation, podular designs, they also are woefully inadequate for housing mentally ill offenders, inmates with drug and alcohol addictions and/or inmates with major health problems -- a great percentage of today's correctional populations.

### *Program Space*

Linear facilities, as a rule, have no programming space. It has been proven to be vitally important to provide programs and interventions to positively impact offenders' behavior (as well as to efficiently run jails). California's older, linear jails don't have room for the counseling, education, vocational training or other programming and reentry activities that should be offered.

### *Multiple Populations*

Not every jail is the same; not all juvenile correctional facilities look or function alike. Facilities' designs have to reflect the particular jurisdiction, the types of offenders to be housed, the correctional goals to be addressed and the kinds of interventions to be provided.

Nonetheless, all facilities are alike in that they must have enough beds to house the many classifications comprising their populations.

- Pre-adjudicated offenders have to be separated from sentenced.
- Those under 18 must be housed separately from those over 18.
- Civil commitments must be separated from criminals.
- Females must be separated from males.
- Gang members must be separated from members of rival gangs.
- Violent offenders can't be housed with those they might prey upon.

- Offenders who are physically or mentally ill must be provided appropriate housing, often separate from the general population.

And there should be enough beds to meet peak demand within each separate classification and for the facility as a whole.

Remember that, while the jail ADP was 79,639 in 2005, the highest one-day count was 87,531 inmates. That means jails had to fit over 87,500 inmates into the 74,686 beds that comprise California's jail bed capacity -- a trick that would confound even Houdini.

### Special Needs

Further exacerbating the 'form vs. function' strains on local correctional facilities is the fact that, in both adult and juvenile facilities, the need for specialized beds is growing. Mental health capacity, appropriate space for female populations and secure segregation are three of the areas of specialized housing that challenge local jurisdictions.

> *Sheriff Keith Royal said changing numbers at the jail in recent years have left the county open for lawsuits. The jail averages 200 to 220 inmates per day, but the state considers 80 percent to be full, he said, which is 200 prisoners.*
> *The jail was built to house 13 females, but there is now an average of 35 per day, Royal said. Jailers are also having a difficult time meeting state requirements to keep misdemeanor and felony inmates separate.*
> *The Union, Nevada County*
> *February 1, 2006*

While the number of medical beds in adult jails statewide has remained fairly stable over the last seven years (the average number was 1,002 in 2005), the number of occupied beds used for inmates receiving mental health services has increased steadily over the past decade, from 1,329 in 1996 to more than 3,100 in 2005.

In 2003, an estimated 26 percent of the juvenile detention population was identified as having an open mental health services case file; by the fourth quarter of 2005, that number rose to slightly over 31 percent. Additionally, the percentage of juveniles receiving psychotropic medication, and thus potentially in need of specialized housing, rose slightly from 10 percent in 1999 and 10.4 percent in 2003 to 11.2 percent by the end of 2005.

The proportion of female offenders continues to increase. In adult facilities, female offenders grew from 11.6 percent of the population to 13 percent from 1996 through 2003 and to 14 percent by the end of 2005. From 2000 to 2003, the female juvenile population increased from 14 percent to 15 percent, bringing an additional 109 juvenile girls into detention facilities during a one-year period. In the fourth quarter of 2005, girls comprised 17.1 percent of juvenile hall detainees and 10.5 percent of those housed in local juvenile commitment facilities.

Jails and juvenile facilities have to have not only the ability to separate females from males, but also the space and design capacity to provide gender responsive programming in an appropriate environment.    Research has long shown that correctional facilities have to do more than paint their living and program areas pink to have the most correctional effect with females in custody.

An additional stressor on local detention facilities is that both juvenile and adult facility managers report increasing demands on their limited ability to provide secure segregation for inmates and minors who cannot be mixed with the general population in their facilities.

### Age of Existing Facilities vs. Functional Life Expectancy

Under the best circumstances, the life expectancy of a detention facility is approximately 30 years.  Many of California's jails and some of the not-yet-updated juvenile facilities are approaching the end of their functional lives.

Over 12 percent of our jails are more than 60 years old, and nearly half (47.9 percent) are 30 years old or older.

> *The Yolo County Jail was built in 1987 and three years ago reached capacity of about 455 inmates.  "In the past nine to 10 months we have processed 7,000 inmates, Sheriff Prieto said.  And most of our inmates are felons due to drugs....If we could have 1,000 (jail) beds that would be wonderful."*
>
> *Davis Enterprise*
> *November 18, 2005*

By way of example, San Francisco's County Jail #3 was constructed in 1934. San Joaquin County's Honor Farm was opened in 1949.  Los Angeles County's Pitchess East Facility was built in 1954 (and Pitchess North in 1975).  Calaveras County's jail was originally opened in 1963.  Monterey County's Rehabilitation Center came on line in 1971 and the Monterey County Jail was opened in 1976.

Of the state's Type II jails:

- 7 (6 percent) were built in the 1930s and '40s;
- 8 (6.9 percent) were built in the 1950s;
- 21 (18 percent) were built in the 1960s;
- 20 (17 percent) were built in the 1970s;
- 31 (26.7 percent) were built in the 1980s;
- 29 (25 percent) were built in the 1990s; and
- only 2 have been added since 1999.

Local detention facilities are in constant use.  People are walking their halls and flushing their toilets and slamming their doors 24 / 7 / 365.  Jails and juvenile detention facilities

24

are often crowded and deteriorate more rapidly as a result of this extensive use. Years of crowded conditions place severe stresses on their infrastructure, physical plants and fixtures.

Facility obsolescence is also hastened by changes in correctional populations and by emerging best practices. Jails built without program space, for example, find themselves unable to accomplish currently understood best practices in terms of occupying inmates' time with constructive activities and modeling productive behaviors. Juvenile facilities built for low-level young offenders are ill-equipped to securely confine, program and separate violent, gang bangers from one another and from other youth in custody. Facilities built for male offenders may not be able to appropriately house and program the increasing number of women and girls coming into local custody.

As correctional populations change and the validity of evidence-based practices is documented, correctional policy can be adapted to changing circumstances. Correctional facilities, however, are quite literally cast in concrete. They do not -- because they cannot -- change easily, quickly or cheaply.

# *COSTS*

## *Construction Costs*

Even though construction represents less than 10 percent of the total cost of a detention facility over its life span, it is undeniably costly to build new detention capacity.

According to construction managers who have been involved in recent jail and juvenile facility construction, jail construction today costs about $400 per square foot and $120,000 to $150,000 per cell.  Santa Barbara is being told it will cost $250,000 per cell to build that county's much needed additional jail beds.

Juvenile halls construction costs are about 25 percent higher than those for jails because of the additional education and program space required for juveniles.  The roughly $500 per square foot construction cost for juvenile halls equates to a per cell cost of $180,000 to $200,000, including the necessary classroom and program space required by CSA standards.

Construction of commitment space (camp beds), traditionally somewhat less secure than juvenile halls, costs about $80,000 - $90,000 per bed.  By way of example, Sacramento County spent $9,009,700 to add 90 new secure beds to its juvenile hall and $4,914,381 to add two new 30-bed housing units to the Warren E. Thornton Youth Center, one of the county's two juvenile commitment facilities.

The prices of crude oil, lumber and other construction material have been skyrocketing and are not expected to stabilize any time soon.  The cost of materials has increased 30 - 40 percent in the last two years, creating multi-million dollar differences between initial bids and ultimate construction costs.

## *Tentative Cost Projections for Jail Construction*

To get a ballpark estimate of the costs of keeping the adult system functioning at about its current level of capacity, we need to multiply the number of beds projected to be needed by an estimated cost per bed.

The number of beds being talked about here relates only to those it would take to stay abreast of California's projected population growth.

| Conservative Estimate of Costs for Needed Beds* | | | | |
|---|---|---|---|---|
| Need by Year | ADP Beds | Additional Beds | Cost Per Bed | Cost for Additional Beds |
| Current | 79,639 | 4,953 | $120,000 | $594,360,000 |
| 2010 | 82,845 | 3,206 | $120,000 | $384,720,000 |
| 2020 | 92,565 | 9,721 | $120,000 | $1,166,400,000 |
| 2030 | 101,555 | 8,990 | $120,000 | $1,078,800,000 |
| 2040 | 108,791 | 7,236 | $120,000 | $868,320,000 |
| 2050 | 115,629 | 6,837 | $120,000 | $820,560,000 |
| Total Expense to 2050* for 40,943 Beds | | | | $4,913,160,000 |

*Does not include capacity for: 1) peak times, 2) preventing releases due to lack of space, or 3) reduction in the number of unserved felony warrants.

Caution should be exercised in using these cost estimates for the following reasons:

- First of all, they are purposefully conservative.
- Second, they are only as good as the assumptions upon which they are based.
- Third, we don't have a current solid and reliable cost-per-bed estimate.
- Fourth, inflation and the ever increasing cost of construction materials will result in the cost per bed rising steadily over the next half century.
- Fifth, the cost per bed does not include all the infrastructure investment that will be required for new jail construction.

Nevertheless, this analysis makes clear that maintaining the effectiveness of the local jail system will involve continual, substantial costs.

Remember that this nearly five billion dollar amount ($4,957,033,504) does not take into account *current* needs for renovation and upgrading existing facilities to meet existing demands.

In terms of new construction, this figure is *the least* the state can realistically expect to pay over the next 45 years to achieve adequate jail capacity. The actual amount will be affected by inflation, construction costs, changes in the crime and incarceration rates and changes in policy, such as those proposing to house state parole violators at the local level, and others.

27

*Operating Costs*

Staffing and operating costs account for 90 percent or more of the lifetime costs of local detention facilities. These costs are borne by local governments.

*Jail Operating Costs*

County jail operational costs (excluding debt service) more than tripled between 1984/85 and 2001/02, increasing from $446 million in 1984/85 (when there were about 40,000 beds on line) to $1.7 billion in 2001/2002 (by which time there were approximately 73,000 beds on line).

Per capita operational bed costs increased from $11,000 to over $23,000 from 1984/85 to 2001/02, more than a 100 percent increase over 17 years.[31]

The 2003 statewide average cost per inmate per day (ADC) in county jails was $71.27. The highest reported ADC was $138.33 in the Nevada County Jail. The lowest was $26.69 in Del Norte County Jail. [32]

An indicator that the cost of jail operations is increasing is the fact that the California Department of Corrections and Rehabilitation (CDCR) and the Department of Finance (DOF) concurred, in the 2005 budget, to raising the amount the state reimburses county jails for holding state parolees.[33] The Daily Jail Rate (DJR) had been $59 per day. Since approval of the 2005 Budget Act, the new DJR is $68.22 per inmate per day and is capped at 95 percent of the state's average cost for housing inmates in state facilities, excluding the cost of non-routine medical care.

*Juvenile Facility Operating Costs*

Because specific staffing ratios are prescribed for local juvenile facilities, as are intensive programming and state-mandated education, the operational costs for county juvenile facilities are almost twice that of county jails.

CSA reports that operational costs (excluding debt service) for local juvenile facilities "increased from $196 million in 1984/85 (when there were about 9,000 beds on line) to over $620 million in 2001/02 (with 12,000 beds on-line). If only those beds in the CSA Rated Capacity were counted, per capita operational per bed costs rose from $21,000

---

[31]  Corrections Standards Authority/Board of Corrections, 2004 Legislative Report, *Local Corrections in California*, pg. 10
[32]  op. cit., page 11
[33]  Parolees are held in county jails pursuant to PC Section 4016.5

to nearly $51,000 from 1984/85 to 2001/02, an increase of over 100 percent over 17 years (not adjusted for inflation)."[34]

### Where Will, Can or Should the Money Come From?

Like the state, local governments have experienced severe budget problems since the economic recession that began in the early 1990s. Add to this the further handicap laid on counties by the state property tax shift that began in 1992 and it will be crystal clear why counties have not been able to afford costly jail and juvenile facility construction.

To make improvements in their local detention capacity, counties have had to rely on funding from state and federal grants. A very successful bond program in the 1980s raised and expended more than $2.1 billion in state bond revenue and local matching funds for the construction of jails. Current federal and state grants will have increased local juvenile facility capacity 27 percent by 2006/07 when construction will be completed.

In all of these instances, counties have been required to match grant funds and that, in and of itself, has been challenging.

For much of the recent past, neither counties nor the state have been able to afford costly construction projects. There has been no stable funding stream to pay debt service on the bonds needed to finance the renovation of existing jails or the construction of much needed expanded capacity. Counties have been hard pressed to generate dollars to operate new or expanded jails and, in some instances, were unable to immediately open beds that grant funding had allowed them to build.

Proposition 1A, which was approved by the voters in November of 2004, will stabilize local revenue and prohibit unfunded state mandates, but it does not generate any new revenue. It may ensure that whatever is constructed can be operated, but it will not provide dollars to expand the supply of local jail and juvenile facility beds needed to meet the demand created by population growth, crime trends and best practices in public safety.

---

[34] Corrections Standards Authority/Board of Corrections, 2004 Legislative Report, *Local Corrections in California*, pg. 11

# *WHAT HAS BEEN DONE TO ADDRESS CAPACITY DEFICITS*

Almost all of the jail and local juvenile facility construction that has occurred in California in recent decades has been state or federal grant funded under the auspices of the Corrections Standards Authority (CSA), formerly the Board of Corrections.

Since 1997, the Board/CSA administered 107 state and federally funded construction grant projects in 48 counties. Totaling more than $491 million, these grants resulted, or will result, in the addition of 1,755 adult jail beds and 5,389 juvenile facility beds, plus the replacement of 2,221 outmoded juvenile beds, for a net gain of 3,168 beds statewide by 2007.

### *Jail Construction and Renovation*

Some California jails have completed or are in the process of completing renovations and expansions via the current state and federal Construction Grant Program, concluding in 2007. Some jurisdictions are funding jail renovation and construction through local bonds and/or other funding mechanisms.

Nevertheless, the number of beds being added will not make even a dent in California's jail capacity deficits.

As facilities continue to age, cities and counties must repair and remedy older facilities to maintain functional use and existing capacity and create program space wherever possible.

They also have to build new facilities, to accommodate population growth and to provide the program and special needs space increasingly required to protect inmates/ detainees and staff, and to maintain public safety.

### *Juvenile Facility Construction and Renovation*

The current Construction Grant Program -- the first major infusion of construction funds for local juvenile correctional facilities in several decades -- will help increase local juvenile facility capacity and significantly improve conditions of confinement in the counties with funded projects.

At the conclusion of the program in 2007, however, there will be several counties -- Los Angeles among them -- that will still require additional juvenile beds. There will also be a need to retrofit and provide treatment space in older juvenile halls.

The Chief Probation Officers of California are anticipating a need for approximately 6,800 new beds by 2015. An upward motion in juvenile crime trends, changes in

correctional policy and/or new legislative initiatives could greatly expand that expectation.

Regardless of what the Legislature might do in terms of juvenile correctional reforms that will impact local capacity needs, it is quite certain that, at the conclusion of the current construction program, there will still be counties that need to replace old, outmoded facilities and others counties that will continue to face chronic crowding problems.

# *NEXT STEPS*

Planners are often asked, "How many local jail and juvenile facility beds will we need in the year 2010?" The answer is simple -- we will need *all of them*. This is not a joke. California will need every bed it currently has and more.

As of now, there has been minimal planning and there aren't sufficient resources available, to remedy the jail bed deficit. It is vitally important that we do something now to stop what is already a serious problem from becoming much worse.

It makes little sense to allow the adult system to become even more inadequate and overwhelmed as California's population continues to grow.

While the juvenile system is in better shape than the adult system, it would be a mistake to think the work in that arena is done. Failing to plan for the ongoing needs of local juvenile facilities would continue the cycle of building followed by neglect that has placed local juvenile corrections in deficit mode for much of its history.

Thoughtful planning and preparation are critical to keep both the adult and juvenile correctional systems functioning efficiently. It is essential to prepare for the population increases and policy changes that are coming, and also to address the populations and challenges jails and juvenile facilities have now.

California would be well advised to abandon the 'periodic crisis' model that produces the kinds of deficit situations in which we now find ourselves and undertake a 'continuous growth' model, a proactive strategy. We must develop a plan and consistent funding streams aligned with the steady growth in the demand for detention capacity.

We recommend that a panel of subject matter experts be convened to:

1) review the issues,
2) consider the assumptions that should be included in the planning model,
3) develop detailed and reliable estimates of construction costs,
4) establish a projection model,
5) use the model to plan future jail and local juvenile facility construction,
6) develop multiple local and statewide financing strategies and
7) establish statewide implementation goals.

It is possible that California may never catch up in terms of producing and maintaining an ideal local detention and/or corrections system. On the other hand, with careful planning, and the generation of adequate resources, we can hope to keep pace with the ever-increasing demand for additional local detention capacity.

We must address this issue. The chief law enforcement officers in each county, California's sheriffs, take their responsibility to keep the public safe very seriously. But

32

sheriffs can't do it alone. All of us must recognize that local corrections is an important and integral part of each of our communities. We need a strong correctional component to our local infrastructure, just like we need good schools and roads and hospitals and libraries. We must all become advocates for local corrections because corrections infrastructure ensures our community safety.

The California State Sheriffs Association is committed to advocating for a jail and local juvenile facility construction / reconstruction program similar to the very successful jail bond program in the 1980s. That program raised more than $2.1 billion in state bond revenue and local matching funds. Five state bond measures were approved by the Legislature and voters to finance the construction and renovation projects. A similar strategy could and would be successful again.

California's sheriffs will be aggressively advocating for a plan that will provide sufficient funding to begin eliminating overcrowding and early releases at the local level.

We will be encouraging our local public safety partners, our corporate partners and our over 42,000 Associate Members to work with us to convince state Legislators that improving and expanding local detention facilities is a top priority -- important to the quality of life and safety in California and worthy of inclusion in the state's infrastructure package and subsequent bond and legislative measures.

We urge you to join us in the vital endeavor. We ask you to help hold offenders accountable by restoring the balance between doing the crime and doing the time.

**APPENDIX I**

**LOCAL DETENTION POPULATION OVERVIEW -
ADULT AND JUVENILE**

## SUMMARY OF FINDING FROM THE
## 2005 CSA JAIL PROFILE SURVEY REPORT

| SURVEY MEASURES | 2000 | 2005 |
|---|---|---|
| Average Daily Population for the calendar year | 74,937 | 79,639 |
| Current beds meeting the CSA standards | 71,093 | 74,686 |
| Highest one day count for the calendar year | 79,418 | 87,531 |
| Number of bookings for the year | 1,177,205 | 1,283,292 |
| Percentage of males | 87% | 87% |
| Percentage of non-sentenced inmates | 60% | 67% |
| ADP of Sentenced Inmates | 29,929 | 26,454 |
| Percentage of felony inmates | 70% | 79% |
| Percentage of inmates in maximum security housing | 46% | 31% |
| Estimated percentage of inmates who are illegal/criminal aliens | 12% | 11% |
| Number of pretrial inmates released due to lack of space | 52,597 | 99,192 |
| Number of sentenced inmates released early due to lack of space | 128,784 | 155,052 |
| Unserved felony warrants as of the last quarter | 253,361 | 285,216 |
| Unserved misdemeanor warrants as of the last quarter | 1,995,439 | 2,391,801 |
| ADP of inmates housed on contract to the Federal Government | 3,577 | 3,584 |
| ADP of inmates housed on contract to other jurisdiction in CA | 14 | 147 |
| ADP of inmates housed on contract to CDCR | 2,590 | 2,665 |
| ADP of inmates awaiting transport to CDCR | 1,058 | 2,390 |

## SUMMARY OF FINDINGS FROM THE
## CSA JUVENILE DETENTION SURVEY, 2000 and 2005

| SURVEY MEASURES | 2000 | 2005 |
|---|---|---|
| Average Daily Population for juvenile halls for the calendar year | 7,108 | 6,826 |
| Juvenile hall beds meeting the CSA standards | 6,769 | 8,182 |
| Highest one-day population for juvenile halls | 7,805 | 7,692 |
| Average Daily Population for camps for the calendar year | 4,467 | 4,097 |
| Camp beds meeting the CSA standards | 5,033 | 5,393 |
| Highest one-day population for camps | 4,930 | 4,350 |
| Number of juvenile bookings for the year | 10,526 | 9,353 |
| Percentage of males in detention | 85.9% | 84.2% |
| Percentage of pre-disposition juveniles | 68.9% | 58.4% |
| Total ADP of committed youth | 7,992 | 6,866 |
| % of 707b offenders | 725 | 815 |
| Number of youth on home supervision or alternative confinement | 2,927 | 2,616 |
| Number awaiting transfer to CDCR DJJ | 159 | 84 |
| Number of juveniles receiving psychotropic medication | 1,075 | 1,219 |

**APPENDIX II**

**COUNTIES WITH
COURT IMPOSED POPULATION CAPS**

| County | Facility Name | Court Imposed Population Cap Reported by County Sep 2005 | Total Facility ADP Reported by County Sep 2005 |
|---|---|---|---|
| Butte | Jail | U | 530 |
| | | | |
| Calaveras | Jail | 65 | 74 |
| | | | |
| El Dorado | Jail | 243 | 201 |
| | So Lake Tahoe Jail | 158 | 119 |
| | | | |
| Fresno | Main Jail | 1064 | 988 |
| | Satellite Jail | 300 | 217 |
| | North Annex Jail | 1296 | 1272 |
| | South Annex Jail | 688 | 629 |
| | | | |
| Kern | Central Receiving | 292 | 186 |
| | Lerdo MaxMed Fac | 374 | 88 |
| | Lerdo Minimum | 800 | 88 |
| | Lerdo Pretrial | 1232 | 1125 |
| | | | |
| Los Angeles | Century Reg Det | 1945 | 226 |
| | Central Jail | 6800 | 6325 |
| | North Co Correctional | 3400 | 4073 |
| | Pitchess East | 1830 | 1710 |
| | Pitchess North | 1600 | 2605 |
| | Twin Towers | 4192 | 3940 |
| | | | |
| Merced | Correctional Fac | U | 604 |
| | Jail | D | 169 |
| | | | |
| Orange | Intake Release Ctr | U | 801 |
| | J A Musick Facility | D | 1224 |
| | Men's Jail | D | 1354 |
| | Women's Jail | D | 342 |
| | Theo Lacy | D | 2807 |
| | | | |
| Placer | Main Jail | 382 | 369 |
| | Minimum Security | 160 | 160 |
| | | | |
| Plumas | Jail | 67 | 49 |
| | | | |
| Riverside | Banning Correctional | 694 | 659 |
| | Blythe Jail | 125 | 102 |
| | Indio Jail | 353 | 331 |
| | Robert Presley | 1081 | 1079 |
| | Southwest Co Det | 1111 | 1099 |

| | | | |
|---|---|---|---|
| San Bernardino | Glen Helen | 1364 | 1322 |
| | Detention Center | D | 937 |
| | West Valley Det | 3072 | 3530 |
| | | | |
| San Diego | Descanso Detention | D | 376 |
| | East Mesa | D | 497 |
| | George Bailey | D | 1638 |
| | Las Colinas Womens | D | 725 |
| | Central Detention | D | 869 |
| | So Bay - Chula Vista | D | 536 |
| | Vista Facility | D | 263 |
| | | | |
| San Joaquin | Honor Farm | 571 | 438 |
| | Main Jail | 879 | 970 |
| | | | |
| Santa Barbara | Main Jail | 705 | 708 |
| | Honor Farm | D | 247 |
| | | | |
| Shasta | Main Jail | 381 | 385 |
| | | | |
| Stanislaus | Public Safety Center | 0 | 606 |
| | Honor Farm | 0 | 358 |
| | Jail | 396 | 385 |
| | | | |
| Sutter | Jail | 355 | 355 |
| | | | |
| Tulare | Bob Wiley Det Ctr | U | 715 |
| | Men's Corr Fac | D | 301 |
| | Adult Pre-Trial Facility | D | 102 |
| | Jail | 264 | 267 |
| | | | |
| Yolo | Leinberger | 142 | 132 |
| | Monroe Detention | 313 | 294 |

**Source:** *Corrections Standards Authority, Jail Profile Survey, "Court Imposed Caps / Early Releases / ADP for September 2005*