PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California  94964
Telephone: (415) 457-9144

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
AMY WHELAN Bar No.: 215675
LORI RIFKIN Bar No.: 244081
SARAH M. LAUBACH Bar No.: 240526
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington  98104
Telephone: (206) 447-0900

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, | No.:  Civ S 90-0520 LKK-JFM |
| Plaintiffs, | **SUPPLEMENTAL DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO CONVENE A THREE - JUDGE PANEL TO LIMIT THE PRISON POPULATION** |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants | Hearing Date: June 4, 2007 |
| | Time:          11:00 a.m. |
| | Location:    Courtroom 4 |
| | Judge:        Hon. Lawrence K. Karlton |

I, Jane E. Kahn, do hereby declare as follows:

1.      I am an attorney admitted to practice law in California and an associate in the law firm Rosen, Bien & Galvan, one of the counsel of record for plaintiff class in this case. I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify. I make this declaration in support of Plaintiff's Motion to Convene a Three Judge Panel to Limit the Prison Population.

2.      On May 4, 2007, Special Master Keating provided plaintiffs' counsel and defendants' counsel with the draft Seventeenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, Part C, ("17C") dated May 4, 2007. Both parties were given 30 days to file objections to the draft report. On May 8, 2007 co-counsel Michael Bien requested that Deputy Special Master Matthew Lopes confer with Lisa Tillman, Deputy Attorney General, regarding an expedited schedule for filing objections to the draft 17C in order to permit the use of this critical and most recent report in this Motion and at the June 4, 2007 hearing before this Court. Mr. Lopes informed Mr. Bien that he spoke to Ms. Tillman on May 8, 2007 regarding plaintiffs' request for an expedited schedule; Ms. Tillman informed Mr. Lopes that she would confer with her client and provide a response. On May 10 and May 15, 2007, Mr. Lopes informed Mr. Bien that Ms. Tillman had not yet responded to his request. On May 17, 2007, Mr. Bien attempted to confer with Ms. Tillman by phone and left a message regarding plaintiffs' request. Ms. Tillman sent an email refusing plaintiffs' request to expedite the deadline for objections to the draft report noting that: "At this time, I do not see any need to accelerate my clients' responses to the draft seventeenth round report, part c, nor do I desire to shorten the time of my clients' due consideration of that draft report." In response, Mr. Bien informed defense counsel that "our request to accelerate the comment period for plaintiffs and defense counsel was intended to permit the Special Master to file the final report before the June 4 Hearing and allow the parties to make reference to the factual findings and recommendations of that report in the supplemental briefing which is due May 24." Attached hereto as **Exhibit A** are true and correct copies of the Tillman and Bien email exchange dated May 17, 2007. The delayed

1  response by Ms. Tillman precluded the use of critical information contained in the draft 17C

2  for this Court's hearing on May 21, 2007.  Plaintiffs notified defense counsel of their intent to

3  cite and quote from draft 17C and provided defense counsel with an opportunity to file

4  objections to the draft 17C by May 23, 2007 which would be included with this filing.  *Id*.

5  Defense counsel has filed no objections as of May 23, 2007.  The Special Master's monitoring

6  reports also contain exhibits, which are expert evaluations of individual *Coleman* class

7  members conducted during the monitoring tours.  These evaluations include clinical

8  information and recommendations.  To my knowledge, defense counsel has never objected to

9  any information contained within the exhibits to a monitoring report.  While we are citing to

10 the draft 17C Report and Exhibits in this declaration and related pleadings, we will not be

11 attaching the draft report or its exhibits to this declaration as an exhibit.  When the 17C Report

12 is filed with the Court, we will provide the Court with corrected page references or any other

13 changes, as applicable.

14 **I.     DELAYS IN ACCESS TO HIGHER LEVELS OF MENTAL HEALTH CARE**

15       **A.     ASH CLOSURE**

16       3.     Since the December 11, 2006 hearing before this Court, access to higher levels of

17 care for the *Coleman* class has significantly deteriorated. Despite the expanding mental health

18 caseload population within California Department of Corrections and Rehabilitation

19 ("CDCR"), which topped 32,000 mental health inmates in January 2007, Atascadero State

20 Hospital ("ASH") restricted new admissions of CDCR (2684) patients in mid-January 2007

21 due to staffing shortages. The loss of these critical acute and intermediate care beds at ASH has

22 exacerbated existing problems with delays in access to all other higher levels of care for

23 *Coleman* class members, including access to acute care beds ("APP"), enhanced outpatient

24 beds ("EOPs") , and mental health crisis beds ("MHCBs").    The closure of ASH to new

25 admissions from CDCR is evidenced by the dramatic reduction in ASH's 2684 population

26 from 133 patients in January 2007 to 80 patients by May 2007.  The loss of this critical

27 inpatient resource of acute and intermediate beds has an impact on the availability of acute care

28 beds and MHCBs for inmates housed throughout the CDCR.  *See* Docket 2227 (Supplemental

Declaration of Jane E. Kahn in Support of Plaintiffs' Motion for Emergency Relief Regarding Defendants' Denial of Access to Inpatient Psychiatric Beds in DMH State Hospitals) at ¶¶ 2-10. The DMH bed shortages have created a backlog throughout the entire mental health delivery system, and have endangered the *Coleman* class. Docket 2227 at ¶¶ 11-16.

**B.    MHCB SHORTAGES RESULT IN USE OF UNSAFE ALTERNATE SITES**

4.    The Special Master has found that access to mental health crisis beds is also severely deficient and as a result, many institutions rely "on their local OHUs, or even worse alternative settings, all characterized by inadequate physical conditions and staffing, rather than promptly transferring inmates to MHCB units elsewhere." Docket 2082 (Sixteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols) at 416. OHUs are unlicensed infirmaries that do not provide twenty-four clinical staffing to inmate-patients admitted to these housing units. Any inmate admitted to an OHU who requires crisis level of care must be transferred to an MHCB within 24 hours of that determination. Revised Program Guide, 15-5-27 [Docket 1753]. Current MHCB shortages have resulted in inappropriately long placements in OHUs. Other alternative settings used by institutions when MHCBs were unavailable included holding cells, administrative segregation units, and contraband cells. Docket 2082 at 416. The Revised Program Guide does not permit the use of these "alternative settings" at all for *Coleman* class members, in need of any type of evaluation, observation or treatment. The Special Master noted that the limited supply of MHCBs available to mental health clinicians were insufficient in the overcrowded prison system because a "byproduct of population growth was a steady risk in self injurious behavior, both real and feigned, among seriously mentally disordered inmates, who felt substantially more vulnerable and threatened in overcrowded conditions". Docket 2140-3 at 107 (Seventeenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols).

5.    On May 8, 2007, defendants provided plaintiffs' counsel with a copy of the updated "Navigant Consulting" statistics which set forth defendants' current evaluation of the

supply and demand for mental health beds at all levels of care.  Attached hereto as **Exhibit B** is

a true and correct copy of that study, dated March 2007.  The study is based on Fall 2006

population projections.  On page 35 of the report, Navigant compared the current need for beds

with the "supply/planned" number of beds in the system.  Because Navigant included

"planned" beds, however, the bed shortages are severely under-reported in most categories.

For instance, Navigant reports that there are 130 "supply/planned" male acute beds, but there

are a maximum of 105 acute beds available to the *Coleman* class right now (25 fewer than

Navigant projects).  This means that while the Navigant report lists a current shortage of 64

acute beds, there is really a current shortage of 89 acute beds.  Navigant also assumes that there

are currently 268 MHCBs for men, but a January 19, 2007 "Mental Health Population

Placement Per Institution" report produced by defendants shows that there are really only 228

such beds.  Attached hereto as **Exhibit C** is a true and correct copy of this January 19, 2007

report.  In addition, not even 228 beds are available because the Special Master has identified

in monitoring reports that the number of reported MHCBs do not correspond with the actual

number of available beds within the institutions because a percentage of those beds are

occupied by inmates who require long-term medical care.  *See*, *e.g*. Docket 2140 at 33, 98 [At

LAC, 4 of the 12 MHCBs were occupied by chronic care medical patients; at SAC, 10 of 16

MHCBs were occupied by chronic medical care patients.]  This means that while the Navigant

report shows a current surplus of 12 male MHCBs, there is really a shortage of **at least** 28

MHCBs for men.  The Navigant report also shows current significant shortages of other mental

health beds, including: a shortage of 68 Level IV inpatient intermediate care facility beds for

male inmates; a shortage of 567 EOP beds for male inmates; a shortage of 20 PSU beds for

male inmates; a shortage of 14 EOP Administrative Segregation beds for female inmates and a

shortage of 111 EOP beds for female inmates.  Again, because Navigant compared current bed

need to both "planned" and existing beds, Navigant under-reported the bed shortages in some

categories.

> 6.    During a Policy Meeting on February 1, 2007 defendants reported that there were

a total of 6 inmates system-wide on the MHCB waitlist.  *Coleman* experts expressed disbelief

over this reported number based upon their monitoring tours and the experts related recent information concerning the placement of inmates in need of MHCBs in alternative sites, such as holding cells and administrative segregation units.  The *Coleman* experts noted that prisons often did not contact CDCR headquarters for assistance in transferring these patients to a mental health crisis unit, which would result in their placement on a waitlist.  Furthermore, the *Coleman* experts described a common practice at prisons of retaining patients in the Outpatient Housing Units ("OHU"), unlicensed infirmaries, for extended stays rather than referring them to CDCR headquarters for a mental health crisis bed that did not exist.

7.    The 17C Report includes the following accounts of evaluations done by the *Coleman* experts during the seventeenth round monitoring tours that document numerous examples of *Coleman* class members who were either provided crisis care in an inappropriate setting because of a shortage of MHCBs or who were held in an MHCB for extended stays because of a delayed DMH transfer.  *See*, *e.g.* Kahn Supp Dec, Docket 2227 at ¶ 16 (discussing three patients referred to inpatient beds with extended MHCB stays at CIM while waiting for transfer to a DMH bed).

8.    During the 17th monitoring round, the *Coleman* monitors toured North Kern State Prison and reviewed the cases of eight inmates.  Exhibit G to 17C.  [Inmate A, an EOP inmate reviewed was placed in a holding cell for bizarre behavior for at least one day and was discharged without a treatment team meeting.  When the *Coleman* monitors met him, he had been in the reception center waiting for transfer for several months and the experts found that his "mental health care had been compromised by lack of access to an appropriate EOP program".  Inmate B, a reception center EOP whose transfer had been delayed seven months, was improperly placed in a holding cell for several days in the absence of an available MHCB. The *Coleman* experts found that his transfer to an EOP program should have been expedited and "[p]ending such transfer, he should have been monitored for the need for referral to intermediate or acute care."  Inmate C, an EOP reception center patient was admitted to a holding cell for three days and returned directly to the yard.  The discharging psychiatry note stated that the patient should be considered for DMH referral.  He was readmitted to the

1   MHCB three days later and kept there for 14 days (beyond the MHCB 10 day timeframe).  At

2   some time during his MHCB stay, he was finally referred to DMH.  When the *Coleman*

3   monitors saw him his referral was pending.  Inmate D, an EOP patient was placed in a holding

4   cell and kept there for three days before he was finally transferred to an MHCB.  He was

5   discharged back to a holding cell and then to his housing unit.  His psychiatric medications

6   were discontinued when he returned to his housing unit and he ended up in administrative

7   segregation after he "ran across the day hall and slapped another inmate".]

8       9.      Due to the failure of CDCR to plan for and construct sufficient medical beds for

9   disabled prisoners, aged inmates and prisoners who need long term chronic medical care, the

10  actual number of available MHCBs for psychiatric patients is lower than reported.  The loss of

11  any in-patient resource – be it ASH beds or the reported MHCB beds within institutions –

12  creates grave hardship to the expanding *Coleman* class.  During the seventeenth round of

13  monitoring, the Special Master reported that chronic care medical patients occupied MHCBs

14  that were needed by psychiatric patients with the result that institutions had to resort to the use

15  of inappropriate clinical practices and/or inappropriate clinical placements such as holding

16  cages for suicidal inmates.  *See*, *e.g.* Docket 2140 at 33, 98:  (At CSP-Lancaster, "[t]he CTC

17  had 18 beds, 12 of which were mental health crisis beds.  Only eight or nine of those beds were

18  available for psychiatric patients.  Five chronic care medical patients were housed in the CTC;

19  At CSP-Sacramento, "[a]lthough licensed for 16 crisis beds, the number of crisis beds

20  available for psychiatric use was reduced to 10 or 12 during the preceding monitoring period.

21  By April 2006, the number was further reduced to five or six.  Staff reported that DCHCS had

22  required the admission of several more chronic care patients to the CTC.")  The impact of

23  these shortages on clinical decision-making and access to licensed crisis beds was documented

24  in the Exhibits to 17A. Docket 2140-3 at 24-26; Docket 2140-4 at 35-39.  *See*, *e.g.* Inmate J, an

25  EOP patient, was housed in LAC's administrative segregation at the time of the monitoring

26  visit.  He had attempted suicide multiple times in the preceding six months and had a history of

27  DMH placements.  He had a recent suicide attempt by hanging, where medical notes indicated

28  that he had "redness to neck area with approximately a 1 centimeter laceration near the left

eyebrow". He was placed in a holding cell and was released several days later. A month later, he was found hanging by his neck by a bed sheet attached to his bed frame. He was cut down and transported to the CTC by ambulance but was not admitted. The *Coleman* expert noted in the assessment that "this inmate presented with active psychosis and often acted in an impulsive manner. Staff had failed to prevent an initial incident of hanging and had opted not to place this inmate into the CTC following two incidents in which he hanged himself". *Id.* *See also*, Inmate C, an EOP patient housed at Salinas Valley State Prison was housed in administrative segregation. He was interviewed by the *Coleman* experts in a mesh holding cage that was described as no larger than 30 inches square. A review of his records revealed recent significant mental health decompensation during which time he was first admitted to an MHCB bed for two days. He was discharged and then readmitted to a holding cell for ten days and discharged back to his administrative segregation cell. He was returned to an MHCB bed for three days and returned again to his housing unit. He then attempted suicide by cutting his neck in his cell, and the Incident Report reviewed by the *Coleman* experts indicates that he was first pepper sprayed, and then taken to a holding cell for medical evaluation, where lacerations to the neck and wrists were noted. He was left in this holding cell for more than an hour. He was then placed in another holding cell in the CTC for 1.75 hours, and then placed in a large communal holding cell with a sink and a toilet overnight. In the morning he was moved back to a holding cell and then returned to his housing unit. The *Coleman* experts found that his mental health treatment was inadequate and was "reactive to crises" with "little regard to the whole of his current circumstances." *Id* at 38. Logs of these holding cells were noted to be incomplete and were either missing or scattered throughout the patient's unit health record. *Id* at 39.

### C.    DELAYS IN TRANSFERS TO ICF AND ACUTE INPATIENT BEDS

10.    The Special Master has documented the increasing use of improper and dangerous alternative sites in his monitoring reports and found that movement into higher levels of care has been delayed because of insufficient inpatient beds. The Revised Program Guide requires that a patient that is not stabilized within 10 days in an MHCB be referred for

transfer to an inpatient psychiatric hospital.  *See* Docket 1753 (Revised Program Guide, Ch. 5, 12-5-13). At CSP-Sacramento, lengths of stay in the MHCB exceeded ten days in 35 percent of the cases, approximately half of which involved DMH referrals. Docket 2140 at 46.  At San Quentin, the longest OHU stays lasted four to seven weeks and included inmates waiting for transfers to DMH programs and MHCB units elsewhere in CDCR.  *Id* at 55.  In 17C, the Special Master found that "[a]ccess to higher levels of care was generally inadequate.  Lack of bed space stymied movement into beds". 17C Report at 174.  In the Exhibits to 17C, three inmates were reviewed at California Institute for Men who had extended stays in the mental health crisis beds while waiting for transfer to an inpatient bed.  *See* Exhibit B to 17C at 13-17. Inmate A was described as psychotic and delusional and after two weeks in the MHCB he was referred to intermediate care at SVPP.  His transfer was still pending at the time he was reviewed by the experts weeks later.  Inmate B was in the MHCB at CIM for 50 days and had also been referred to intermediate care but was not transferred.  Inmate C was treated by MHCB staff for six weeks while they were waiting for his acceptance in an acute care bed.  In fact, it was unclear what level of inpatient care he had been referred to by the clinicians at CIM.  All three of these patients were housed for extensive stays in the MHCB beds while they waited for transfer to an inpatient bed.  *Id*.  The Special Master found that "[p]risons with poor access to DMH beds, including CIM…relied heavily on holding cells."  17C at 178.

11.    Despite the recognized shortage of mental health crisis beds, defendants currently have insufficient additional MHCBs funded for construction.  The only new mental health crisis beds currently under construction and scheduled for completion and occupancy are the 50 MHCBs at CMF.  Defendants have previously reported during Policy Meetings with the Special Master and plaintiffs' counsel that these beds will be completed by December 2007 and then by March 2008.  In recent documents provided by defendants on May 8, 2007, defendants have provided an update on their construction projects.  Attached hereto as **Exhibit D** is a true and correct copy of Mental Health Program Infrastructure Modification Projects, dated May 3, 2007.  According to this document, the CMF 50-bed MHCB is now scheduled to be occupied by patients in July 2008.

1    12.    On March 27, 2007, this Court ordered defendants to complete and occupy the

2    50-bed mental health crisis bed units at California Medical Facility and California Men's

3    Colony as soon as possible.  Docket 2173.  I have reviewed defendants' construction plans and

4    pending budget requests: the 50-bed CMC MHCB has not been approved at any level of state

5    government.  Even if the project was approved it would take more than four years to complete

6    given the experience of CMF's 50-bed MHCB construction.

**D.    EOP POPULATION REMAIN HOUSED IN RECEPTION CENTERS**
7          **AND "BAD BEDS"**

8    13.    The new reception center EOP program created by CDCR in response to this

9    Court's Order provides for five or less hours of structured therapeutic programming to EOP

10   patients housed in the reception centers for extended stays while they wait for an available bed

11   in an EOP mainline prison.  Docket 1803 [May 2, 2006 Order].  Mainline and ASU EOP

12   programs are required to provide at least ten hours of structured therapeutic programming for

13   EOP patients.  *See* Docket 1753 (Revised Program Guide, 12-4-8; 12-7-8).   EOP patients

14   often decompensate in reception center programs which do not have the staffing or space to

15   provide EOP level of care.  Despite the expansion of the EOP programs at both CSP-

16   Sacramento and Mule Creek State Prison, defendants report that close to five hundred EOP

17   patients are now backlogged in the reception centers where they receive inadequate mental

18   health treatment.  Attached hereto as **Exhibit E** is a true and correct copy of May 3, 2007 data

19   for RC EOP total population (reported 448 EOP patients in 12 CDCR reception centers).

20   14.    The monthly statistical package provided by defendants to Special Master

21   Keating and plaintiffs' counsel, the most recent population data provided for January 19, 2007

22   shows a total EOP population of 3848, with 864 EOPs housed in "bad beds."  The "bad beds"

23   are beds at prisons where there are no EOP services provided.  These 864 patients reflect

24   22.5% of the total EOP population on January 19, 2007, with 484 of them listed in the

25   reception centers and the remaining 380 EOPs housed in 3CMS institutions.  Attached hereto

26   as **Exhibit C** is a true and correct copy of the Mental Health Population – Placement Per

27   Institution Data for January 19, 2007.  The Revised Program Guide requires that EOP patients

28

1    be transferred from these institutions to an EOP program within a specific timeframe (ranging

2    from 21 to 60 days depending on certain factors).  *See* Docket 1753 (Revised Program Guide,

3    Ch. 1, 12-1-13).

4         15.    During the seventeenth round monitoring, the Special Master found that none of

5    the seven institutions with the large 3CMS caseloads met the required timeframes for the

6    transfer of EOP patients to EOP programs within the CDCR.  Docket 2180-1 (Seventeenth

7    Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally

8    Approved Plans, Policies and Protocols, Part B) at 99.  At CSP-Solano, eight of the 22 EOP

9    patients waiting for transfer at the time of the monitoring visit had been waiting longer than 60

10   days, with one waiting for as long as 191 days.  *Id* at 100.  The monitors reviewed the cases of

11   some EOP patients at Solano and found care inadequate for those waiting for transfer to an

12   EOP program elsewhere within the CDCR.  *See*, *e.g.* Exhibit B to 17B:  Inmate G, who had a

13   diagnosis of Schizophrenia, was placed in the MHCB twice at Solano in the same agitated,

14   delusional state.  Both times he was discharged to his housing unit to await his EOP transfer.

15   The *Coleman* monitors noted that Solano's mental health staff was unresponsive to his clinical

16   presentation for three months and that this patient should have been referred for an expedited

17   transfer to an EOP program.  He was not however.  *Id* at 11.  Inmate H was waiting fourteen

18   weeks for transfer to an EOP program at the time he was reviewed by the *Coleman* monitors.

19   His first contact with mental health staff at Solano did not occur until he had been in

20   administrative segregation for weeks.  Half of his case manager contacts in the ASU were cell

21   front, and none of them were confidential.  The psychiatric technician rounds provided to this

22   EOP patient were only documented for one month of ASU placement.  The *Coleman* monitors

23   concluded that the care that he was provided while he waited for his transfer was inadequate.

24   *Id* at 13.  Inmate I, an EOP patient, first came to the attention of mental health staff when he

25   was referred by a custody officer because he was behaving strangely.  He was seen by a mental

26   health clinician who described him as psychotic but did not refer him to the MHCB or to a

27   psychiatrist.  On a second occasion he was again referred to a mental health clinician who

28   described him as psychotic.  He was later admitted to the MHCB because he was floridly

1  psychotic and was ultimately designated as EOP.  During his wait for transfer to an EOP

2  program he was not seen weekly by his case manager.  *Id* at 15.

3        16.    Recent reception center data provided during the 19th round monitoring tour at

4  CSP-Lancaster to Ivan Trujillo, plaintiffs' counsel, document the institution's increasing

5  inability to transfer reception center EOPs to EOP programs within Program Guide

6  timeframes.  The Revised Program Guide mandates that EOPs housed in reception centers

7  must be transferred to an EOP mainline program within 60 days of referral to that level of care.

8  *See* Docket 1753 (Revised Program Guide, Ch. 1, 12-1-13).  Attached hereto at **Exhibit F** is a

9  true and correct copy of Reception Center Data, Daily Snapshot: 1/1/07-4/24/07, provided to

10  the Special Master and plaintiffs' counsel during the 19th Round LAC Tour on 5/15/07.  On

11  February 1, 2007, 28.8% of the EOPs in the reception center at CSP-Lancaster had stays

12  greater than 60 days, while on April 24, 2007, at least 46.5% of the EOP patients had stays

13  greater than 60 days.  *Id*.  EOP patients housed in the reception centers and in prisons without

14  EOP programs receive inadequate mental health treatment and often experience significant

15  decompensation.  For example, a 21 year old inmate who arrived at CSP-Lancaster reception

16  center was made EOP a few weeks later and was described as catatonic at the time he was seen

17  in the clinic.  Exhibit B to 17A (Docket 2140-4 at 20-21).  He continued to be described as

18  bizarre, delusional, and medication non-compliant.  When interviewed during the monitoring

19  visit, the inmate reported that his parole date was just a few months off and he would not be

20  transferring to an EOP program before his release.  *Id*.  The monitors found that his care was

21  inadequate and he should have been expedited for transfer to an EOP or to DMH.  *Id*.

## II.    MENTAL HEALTH STAFFING SHORTAGES IMPACT QUALITY OF CARE

23        17.    The impact of staffing vacancies in the CDCR mental health programs has forced

24  institutions to triage the care that they can provide within their own mental health programs

25  with "planned reduction in services" to enable institutions to provide mental health services to

26  those inmates with the greatest need.  For example, at CSP-Sacramento where there were

27  significant clinical and custody staffing vacancies, "[f]ewer group sessions were offered to

28  3CMS inmates during the monitoring period due to safety and security concerns, prolonged

-11-

1   lockdowns and the redirection of mental health staff related to activation of the new MHCB

2   unit." Docket 2140 at 47.  The Special Master also found that CSP-Sacramento's ability to

3   provide adequate mental health care to EOP inmates in their administrative segregation unit

4   was also seen as likely to be challenged by the activation of new EOP and PSU beds.  *Id*.

5   These necessary EOP, PSU and MHCB beds were activated despite the staffing vacancies at

6   CSP-Sacramento and "[a]dministrators expressed concern about the possibility of across-the-

7   board service reductions in all programs as the institution struggled to accommodate its new

8   and expanding programs." *Id*. at 41-42.  The Special Master noted in his most recent report on

9   conditions within CDCR that "[t]he clinical staffing shortage is not only serious; it is

10  worsening.  Since the end of the 17th monitoring period, the rate of vacancies has grown from

11  critical to catastrophic proportions.  As of early 2007, vacancies…hovered at the rate of fifty

12  percent." 17C at 182.  Given the increase in the mental health caseload, which the Special

13  Master described as exceeding "program capacity of 28,691 by 3,691 or 12.8 percent," he

14  concluded that "CDCR may realistically provide full mental health services to only about 56

15  percent of its mental health caseload population." *Id* at 182-183.  CSP-Sacramento, simply

16  cannot improve or even maintain its ability to provide mental health services to 3CMS or EOP

17  patients with an ever growing mental health population and increasing staffing vacancies.

18          18.     On February 6, 2007, Lisa Tillman, Deputy Attorney General, provided Special

19  Master Keating and plaintiffs' counsel with staffing and vacancy rates at CSP-Sacramento and

20  Mule Creek State Prison.  Attached hereto as **Exhibit G** is a true and correct copy of the

21  Staffing and Vacancy Charts for CSP-Sacramento and Mule Creek State Prison.  I have

22  reviewed these staffing vacancy documents and I am well aware of the plans at both prisons to

23  expand their mental health programs to include significant additional EOPs patient.  CSP-

24  Sacramento has also added additional crisis beds, EOP administrative segregation beds and

25  Psychiatric Service Unit beds.  Mule Creek State Prison has almost doubled its EOP beds since

26  January 2007 without creating the necessary additional treatment space for these patients.

27  According to this data, at Mule Creek State Prison, 14 of the 33.5 clinical positions for the

28  EOP programs were vacant.  These Mule Creek EOP beds are designated for Sensitive Needs

1    EOP patients who require protective housing and have been housed in administrative

2    segregation units system-wide (some for months to years) waiting for this program to expand.

3    According to this data, at CSP-Sacramento, there are 89 of 192 clinical positions vacant

4    throughout the EOP, MHCB, PSU, ASU and 3CMS clinical programs.   Recent staffing data

5    received from defendants indicates that the Mule Creek EOP program is staffed for 510 EOP

6    patients but no additional treatment and office space has been built or requested to

7    accommodate the expanded EOP population except for a single trailer.  Attached hereto as

8    **Exhibit H** is a true and correction copy of Enclosure II (Corrected) Information Requested,

9    April 20, 2007 Coleman Policy Meeting, at p. 2.

10         19.    Defendants compile monthly staffing vacancy data for the Special Master and

11    plaintiffs' counsel in addition to the staffing data provided in response to specific requests at

12    Policy Meetings.  (*e.g.* CSP-Sacramento and Mule Creek State Prison mental health program

13    expansions discussed above in ¶13.)  The monthly statistical package provided by defendants

14    to the Special Master and plaintiffs' counsel on April 19, 2007, includes staffing vacancy date

15    reported for February 28, 2007.  Attached hereto as **Exhibit I** is a true and correct copy of the

16    Statewide Summary for MHSDS Hiring Activity Report and Individual Institution Reports.

17    This data indicates that for all positions allocated, there is an overall vacancy rate of 42%.  *Id.*

18    The vacancy rates for clinical positions system wide within CDCR range from a high of 73%

19    for medical technical assistants to 42% for social workers.  *Id.*  Fourteen of the CDCR prisons

20    had vacancy rates higher than 50% including Avenal State Prison (63.96%), Deuel Vocational

21    Institute (64.14%), Calipatria State Prison (54.12%), California Correctional center (59.18%),

22    Centinela State Prison (53.72%), Chuckawalla Valley State Prison (62.13%), Pleasant Valley

23    State Prison (54.25%), CSP-Lancaster (51.34%), Salinas Valley State Prison (58.14%), San

24    Quentin State Prison (53.87%), Sierra Conservation Center (54.48%), Substance Abuse

25    Treatment Facility (53.22%), Valley State Prison for Women (61.46%) and Wasco State Prison

26    (52.35%).  *Id.*  Although new positions have been allocated to implement the Revised Program

27    Guide and to meet new population figures, these significant vacancy rates illustrate the Special

28    Master's concern that "[i]ncreasingly, the allocation of additional positions does not solve the

1  defendants' chronic and growing mental health staffing problems."  16th Report, Docket 2081

2  at 396.

3  **III.    CUSTODY SHORTAGES AFFECT MENTAL HEALTH ACCESS**

4          20.      The Receiver notes that "CDCR officials estimate the actual officer shortage to

5  be somewhere between 2,400 and 2,700."  Receiver's Report Re Overcrowding at 12.  The

6  significant custody officer shortages have a dramatic impact on CDCR's ability to provide

7  constitutionally adequate mental health care and programming to the *Coleman* class.  Custody

8  escorts are required to move *Coleman* class members housed in administrative segregation

9  housing units from their cells to the treatment areas – either the individual holding cages where

10  case managers see their inmate-patients for their one-on-one visits or to the group holding cage

11  areas where group therapy sessions are run.  When housing units do not have adequate custody

12  staffing the clinical contacts are likely to occur cell-front rather in a confidential setting.

13  Access to mental health beds for suicidal inmates can also be delayed because of custody

14  staffing shortages.  During a recent monitoring tour at CMF on April 17-19, 2007, clinical staff

15  reported during a staff meeting attended by the *Coleman* monitors and plaintiffs' counsel that

16  they often waited hours with patients that they had referred to a MHCB for a custody escort.

17  One clinician said that her patient sat cuffed for several hours on a dayroom floor while he

18  waited to be transported to the crisis bed.  I have accompanied the *Coleman* monitors on

19  numerous tours of administrative segregation units where inmates are held in the holding cages

20  on dayroom floors or in adjacent areas while they wait for clinical staff to arrive to assess them

21  for admission to a crisis bed or to conduct a treatment group.  I have observed the time-

22  consuming process of moving each of these patients individually from their cell down the tier

23  to the holding cages.  In addition to moving patients to group or individual treatment sessions,

24  custody officers are required to move inmates out to their yard, showers, or legal visits.  In

25  other clinical settings, such as the MHCBs and EOPs, the shortage of adequate custody staffing

26  also impacts on the provision of mental health care.  For example, at California Men's Colony,

27  the Special Master noted, "[t]he need for more custody staff in the MHCB was no less critical

28  than the need for more clinical staff.  Of the 23.3 correctional officer positions requested to

-14-

1    provide custody coverage in the temporary MHCB unit, 10.4 were approved."  Docket 2140 at

2    20.  At CSP-Lancaster the Special Master found that weekly case manger contacts with the

3    EOP patients were often not made in a confidential setting because  "[i]nsufficient custody

4    coverage was reported to be a significant factor."  *Id* at 36.  At Mule Creek EOP patients were

5    not receiving their ten hours of treatment per week "in part to a lack of escorts".  *Id* at 70.  At

6    RJD, staff shortages were severe among custody staff and this shortage in the EOP program

7    "contributed to missed yard time, cancelled shower schedules and a lack of laundry services."

8    *Id* at 74.  According to the Special Master, in RJD's EOP, "[i]nmates and staff reported that

9    inmates were locked in their cells 23 hours per day".  *Id* at 82.

10        21.    On February 22, 2007, plaintiffs' counsel, defense counsel, Deputy Special

11   Master Matthew Lopes and his experts and representatives from CDCR and DMH toured D-6,

12   the temporary DMH unit located within Facility D at Salinas Valley State Prison.  We met with

13   patients housed in D-6 who expressed their distress over the continued lack of any outside yard

14   in their treatment program.  After the tour of the unit, we met in a conference room to discuss

15   our observations.  Vic Brewer, Executive Director of SVPP, reported during that meeting that

16   there were continuing obstacles to instituting yard for the D-6 patients, including the

17   insufficient number of CDCR custody officers stationed in the control room of the unit (which

18   determines how many patients can go to yard and at what frequency they can be escorted

19   outside).  Defense counsel has recently informed Special Master Keating and plaintiffs'

20   counsel that yard which was scheduled for the DMH patients on April 2, 2007, had been

21   cancelled because of "significant staff shortages".  Attached hereto as **Exhibit J** is a true and

22   correct copy of Tillman email dated April 4, 2007.  Defense counsel assured Special Master

23   Keating that "[t]his yard will remain available, subject to the availability of sufficient

24   correctional officers."  *Id*.  No further updates on whether yard has in fact been regularly

25   provided to the DMH patients housed within the prison facility have been provided.

26

27

28

## IV.    SUICIDE RATES WITHIN CDCR

22.    The suicide rate in the CDCR continues to escalate and is an indication of the depression, hopelessness and suffering of inmates throughout the CDCR who are provided with unsafe housing conditions and inadequate mental health care.  Under my supervision, paralegals in our law firm track all CDCR suicides in a database.  We add the name of each inmate who commits suicide and other key data relevant to the suicide to the database when we receive suicide notifications, medical records, and suicide reports from the defendants.  We also cross-check our data base against the Special Master's and defendants' annual suicide reports, and make adjustments to our tracking data where necessary.  According to our current tracking log, which does not count several deaths whose cause is currently reported to be unclear (cases which may upon further review turn out to be additional suicides), in 2005, plaintiffs counted 41 suicides in the CDCR (while CDCR counted 38[1]).  National suicide rates reported by the Bureau of Justice Statistics are based on the rate per 100,000 inmates, with the national state prison suicide rate figured at 14 per 100,000 as reported by the Bureau of Justice Statistics Special Report on Suicide and Homicide in State Prisons and Local Jails, which was issued by the U.S. Department of Justice in August 2005.  My staff calculated the CDCR suicide rate for 2005 by taking the ratio of 2005 suicides to the total average 2005 population

---

[1]The CDCR reported number may now be higher.  For example, CDCR originally informed Special Master Keating and plaintiffs' counsel that an EOP inmate death on November 29, 2005 was a homicide.  Many months later, CDCR conducted a review of this death and concluded that it was not a homicide but rather a self-inflicted drug overdose death.  The Suicide Report provided to the Special Master and plaintiffs' counsel states that the Coroner's Report found that this EOP patient died of a drug overdose of his prescribed medications.  According to the Suicide Report, this patient was not programming, was socially isolated, had poor insight, had been referred to the Salinas Valley Psychiatric Program for inpatient care and been placed on the waiting list at the time of his death.  The patient was medicated under a Keyhea Order because he was not medication compliant and likely hoarded his medication in order to take the deadly overdose.  In the Suicide Review documents, nursing staff described the process by which he could have "cheeked" his medication which required the patient to place paper between his lip and gum to hold the medication which was dispensed in powdered form.  Despite this description, the CDCR reviewer concluded that this overdose was either "accidental" or "suicidal".

of CDCR inmates (41/165,602) and multiplying that ratio by 100,000.[2]   The resulting CDCR rate per 100,000 is 24.76, which rounds up to 25 per 100,000, which is almost double the national prison suicide rate reported by the U.S. Department of Justice in August 2005.

23.     In 2006 CDCR reported there were 41 suicides.  Plaintiffs, through the above-described process, count 43 suicides, including three which are medication overdoses where the inmate-patients had previous suicide attempts by medication overdoses.  My staff calculated the CDCR suicide rate for 2006 by taking the ratio of 2006 suicides to the total average 2006 CDCR population (43/170,166)[3] and multiplying that ratio by 100,000.  The resulting CDCR rate per 100,000 is 25.3 per 100,000.

24.     Between January 1 and April 30, 2007, defendants have reported 16 suicides and two additional deaths of EOP patients that are currently under investigation as possible suicides.  This is a larger number of suicides reported during these first four months of 2007 than was reported during the first four months of 2006 when 14 suicides were reported by CDCR.  Unlike previous years where a significant percentage of the suicides included inmates not on the mental health caseload, all but four of the 18 possible suicides in 2007 were inmates on the mental health caseload or referred for mental health treatment.  The 2007 suicide rate for the four month period from January through April based upon 16 suicides is 27.8.[4]

25.     On December 26, 2006, an inmate who had been removed from the EOP program at CSP-Lancaster committed suicide.  This inmate had been retained in the EOP

---

[2] The average population in 2005 was 165,602 (calculated by averaging the total CDCR population of 163,247 on January 5, 2005 and the population of 167,958 on December 28, 2005).

[3] Average population for 2006 is 170,166 (calculated by averaging the total CDCR inmate population as of January 4, 2006 of 167,775 and the population as of December 27, 2006 of 172,557.

[4] The suicide rate per 100,000 inmates for the first four months of 2007 was 27.8 (calculated by annualizing the suicide rate by multiplying it by three, meaning the annual rate would be 48 suicides, then multiplying 48 by 100,000, and diving by average population for the first four months, which is 172,442.  Average population is calculated by averaging the total CDCR inmate population as of May 2, 2007 of 172,328 and the total population as of December 27, 2006 of 172,557.

housing unit in a secluded plexi-glass cell for many weeks, without EOP care, waiting for a

delayed transfer to an appropriate mainline bed.  The CDCR Suicide Report, which I have

reviewed, identified several problems including:  the case manager's decision to remove the

EOP patient from the program for reasons unrelated to his clinical need; the inappropriate

housing of the patient in a secluded cell while he waited weeks for transfer because of over-

crowding; and the inappropriate custody officer's emergency response to the patient who was

lying in a pool of blood.  This inmate-patient had a history of prior suicide attempts.  His case

manager discharged him from the EOP because he had "received maximum benefit" although

it was noted that he was medication non-compliant, had signs of active psychosis and was

diagnosed with a Delusional Disorder, Grandiose Type.  The Special Master reported that at

CSP-Lancaster:

> "[t]he overall quality of EOP treatment was undermined by turnover among case managers and the scarcity of psychiatrists…Due to staff turnover, a large number of inmates in one EOP unit were seen by several case managers during the monitoring period…Decisions to retain or discharge inmates seemed to be contingent on extra-clinical considerations."  Docket 2140 at 35-36.

26.     In discussing the December 2006 Lancaster suicide, the Suicide Report criticized

the removal of the patient from the EOP program because the decision was made without input

from his treatment team, without the patient's presence at his treatment team meeting and by

his case manager for reasons other than related to his treatment progress or level of

functioning.  On December 26, 2006, this EOP patient committed suicide by inflicting severe

wounds to both of his anticubitals (inner side of the elbow).  He had lost a significant amount

of blood when officers found in his cell, alive, rolling side to side, and moaning.  When

officers entered the cell, one officer put a shield on him, while another officer placed him in

handcuffs and a third officer put leg irons on him.  Then, and only then, did the officers

attempt to move him out of his cell onto a Stokes Litter to transport him to the medical clinic.

He was still alive at that time, but shortly thereafter stopped breathing and CPR was initiated

by a medical technician.  He died shortly thereafter.  While he was housed in the isolated cell

in the EOP unit waiting for transfer to a single cell on a mainline yard for over five weeks he

was not provided with appropriate mental health care.  The emergency response by the custody

staff appears to violate this Court's June 9, 2005 Order requiring that "defendants shall develop and implement a policy that establishes clearly and unequivocally a requirement for custody staff to provide immediate life support."

## V.    DEFENDANTS' PLAN TO PREVENT SUICIDES IN ADMINISTRATIVE SEGREGATION UNITS

27.    On June 8, 2006, this Court ordered defendants to develop a plan to address the escalating rate of suicide in the administrative segregation units of the CDCR institutions. Docket 1830.  On October 2, 2006, defendants submitted a plan developed after consultation with the Special Master and his experts, plaintiffs' counsel and their expert, Lindsay Hayes, and several experts hired by defendants.  Docket 1990.  Plaintiffs filed objections to defendants' plan on October 31, 2006 (Docket 2006) and defendants responded on December 1, 2006 with some amended provisions to their plan.  Docket 2061.  On December 18, 2006, the Special Master filed a report on defendants plan and recommended that the Court approve the plan, as amended.  Docket 2084.  Plaintiffs filed a response on December 21, 2006 (Docket 2097) to the Special Master's report and defendants again amended their plan and provided three additional modifications to their plan to address 30 minute welfare checks, the reduction in lengths of stay in ASUs, and the funding of the small management yards.  Docket 2210 at 1-2 (Special Master's Supplemental Report and Recommendation on Defendants' Plan to Prevent Suicides in Administrative Segregation).

28.    Defendants' Plan fails to address the immediate shortage of at least 565 small management yards required to provide the existing administrative segregation population with

their Title 15 required out of cell time.[5]   The Special Master found that "**there is still a significant shortfall of small management yards which will not be remedied for at least five years.  That is simply too late.  Because of the swelling population, the need may be even greater.**"  Docket 2210 at 3-4 (emphasis added). The impact of the shortage of small management yards on *Coleman* class members is significant.  At Kern Valley State Prison the Special Master noted that because of the limited number of small management yards, mental health inmates housed in the administrative segregation unit had not received yard time for several weeks. 17C at 118.  At CSP-Lancaster, the EOP ASU inmates on walk-alone status (requiring small management yards) did not get their required out of cell time nor were EOP inmates provided with the required treatment.  2140 at 37.   ("Many inmates exhibited symptoms of their serious mental illnesses".)    At San Quentin in the administrative segregation units "[y]ard time was not provided to EOP inmates, and while 3CMS inmates were supposed to receive an hour of yard weekly, none reportedly had been provided for weeks preceding the monitor's visit."  2140-2 at 58.  In 2006 there were three suicides in the

---

[5] Defendants have reported to the Special Master and plaintiffs' counsel that they require a total of 1,480 small management yards to meet Title 15 requirements.  Small management yards are essentially "dog runs with toilets".  It is unknown what population figure was used to calculate the number of yards that CDCR required for its ASU population.  It is quite possible that the number required is substantially higher at this point.  In their Plan, defendants stated that they have a specific plan to fund and/or construct 921 of these missing yards in fiscal year 2006/2007.  No report has been provided on the progress of this construction.  Defendants then reported that they have an additional 86 yards under construction and have another 107 designed with construction funds allocated.  During the May 8, 2007 conference call defendants reported that they have requested funding for design of yet an additional 179 yards in the 2008/2009 budget year and reported that they will request funds to construct these 179 yards in 2009/2010.  When asked about when funding will be sought for the remaining needed yards, the following schedule was indicated by defendants during the May 8, 2007 conference call:  In 2009/2010, defendants would request funding for design of an additional 179 yards, and in 2010/2011 will seek funding to construct them.  In 2010/2011, they would also request funding to design the remaining deficit yards and then request funding to build those yards in 2011/2012.  Thus, by the end of 2012 or 2013, defendants hope to complete their construction of the small management yards which they have identified as needing **now** in order to provide inmates housed in their ASUs with minimally required out of cell time.

administrative segregation units at San Quentin State Prison and two suicides in the

administrative segregation units at CSP-Lancaster.[6]

29.    Defendants have recently adopted new suicide prevention practices within their

administrative segregation units, including the provision of 30 minute welfare checks for all

inmates who have been placed within the units during their first three weeks of placement.

Although this is an additional duty that has been imposed on the custody officers working

within these units, and this Court's June 6, 2006 Order directed defendants to seek funding, if

necessary, to implement their Plan, no funding was requested for additional custody staff to

provide the 30-minute welfare checks to inmates housed in administrative segregation units.  In

a  memorandum sent to the Wardens and Associate Directors regarding the 30 Minute Welfare

Checks, staffing concerns are addressed by Director Scott Kernan:

> "Many institutions have expressed concerns about this process in regard to
> workload issues and staffing.  However, it is imperative that institution
> administrators understand that there are no additional staffing resources
> associated with this change."

Attached hereto as **Exhibit K** is a true and correct copy of the December 12, 2006 Memo from

Director Kernan.  In response to reports from *Coleman* monitors that some institutions may not

be appropriately providing the 30-minute welfare checks, the Special Master has recommended

that defendants be required to develop a plan to require each institution to train staff on

accurate logging of 30 minute welfare checks and to track and self-monitor compliance with

the performance of these checks.  Docket 2210 at 10.

30.    The Special Master's Supplemental Report also addressed defendants' inability

to reduce lengths of stay in administrative segregation units – a difficulty related in part to

overcrowding within the CDCR that prevents the movement of inmates housed in the ASUs

for protective custody reasons to appropriate sensitive needs housing.  *Id*. at 6.  Despite

repeated requests by the Special Master to the defendants for data regarding the lengths of stay

---

[6] I have reviewed the Suicide Reports received from defendants and these include 3 suicides
that occurred in the SQ ASU on 2/18/06, 5/22/06 and 12/1/06 and 2 suicides that occurred in
the LAC ASU on 6/14/06 and 8/29/06.

1    in ASUs, in particular for non-disciplinary inmates, defendants were simply incapable of

2    providing this data.  As part of his recommendations, the Special Master has requested that

3    "[d]efendants should be required to include in that report… a breakdown of the numbers of

4    administrative segregation inmates currently awaiting transfer to the sensitive needs yards."

5    *Id.* at 11.

6            31.    Finally, the Special Master notes that "defendants have not conducted their

7    promised assessments of additional resources needed to provide confidential space at each

8    institution." *Id.* at 8.  The importance of confidential clinical contacts has been identified by

9    both the expert suicide panel, as well as by the *Coleman* monitors and has been integrated into

10   the monitoring process and the *Coleman* Program Guide requirements.  The Special Master

11   recommended that defendants work with the *Coleman* experts to assess the care provided in

12   their ASUs because of the seventeenth monitoring report's finding:  "once again, that the

13   delivery of EOP care in the administrative segregation environment remained beyond the

14   capability of most institutions due to constraints of mental health and custody staffing,

15   programming space and scheduling."  Docket 2140-3 at 134.  This lack of programming space

16   in the ASUs, which adversely impacts *Coleman* class members, is the inevitable result of

17   CDCR's policy to design prisons for overcrowding at a level that cannot accommodate the

18   available clinical space.  Receiver's Report: Re Overcrowding at 20-21.

19           32.    On a recent monitoring tour at CSP-Lancaster on May 15-17, 2007, Ivan Trujillo,

20   plaintiffs' counsel was provided with monitoring documents prepared for the Special Master.

21   In these documents the institution reported that case managers were able to conduct their

22   clinical contacts in the administrative segregation units in a private, confidential setting for

23   **only 49% of their caseload in April 2007** because "Space limitations in A4 and A5 contribute

24   to the deficiencies."  Attached hereto as **Exhibit L** is a true and correct copy of Monthly

25   Private vs. Confidential Contacts in Ad Seg, document provided to Special Master and

26   Plaintiffs' Counsel during May 15-17 19th Round Monitoring Tour of CSP-Lancaster.  In the

27   section entitled, *Corrective actions taken to address any non-compliance*, the institutional

28   response was:  "Given space limitations, it is unlikely that additional modules (which

SUPPLEMENTAL DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO
CONVENE A THREE - JUDGE PANEL TO LIMIT THE PRISON POPULATION, NO.:  CIV S 90-0520 LKK-JFM

1  constitute "private settings") will be provided." *Id.*  In March 2007, 60% of the clinical

2  contacts occurred cell-front.  *Id*.

3      33.      Kern Valley State Prison (KVSP), the newest prison built by CDCR, is at 202.3

4  percent of over-crowding since it opened in June 2005 and experiences significant staffing and

5  clinical space shortages.  [*See* Receiver's Report re Overcrowding discussing KVSP as a case

6  study on an overcrowded prison built with insufficient treatment space. Id at 21-22.]  The

7  *Coleman* monitors toured KVSP during the seventeenth round and reported that the institution

8  was "severely understaffed with a vacancy rate of 43 percent".  17C at 112.  As a result of

9  these significant staffing vacancies, "[m]edications were routinely renewed, sometimes for

10  several months, without patient contact."  *Id* at 113.  The care provided to 3CMS and EOP

11  inmates was found inadequate and the Special Master noted that "severe staffing shortages

12  prevented KVSP from providing basic mental health services to most of its caseload inmates".

13  *Id.*  The monitors interviewed some of the EOP patients at KVSP who were waiting long

14  periods of time for transfer.  "These inmates expressed concern over lack of case manager

15  contacts for periods of several weeks." *Id* at 119.  Finally, the monitors reviewed referrals for

16  mental health services, including 141 that had not yet been processed.  "At least 21 of them

17  appeared urgent, expressing escalating depression, hopelessness, severe exacerbation of

18  psychiatric symptoms, etc." *Id.*  There have been two suicides at KVSP in 2006 – one on

19  March 28, 2006 and one on June 29, 2006, both of which occurred in the administrative

20  segregation units.  Defendants have provided their suicide reports for these two suicides, which

21  I have reviewed.  Both inmates had previous history of mental health treatment, as well as prior

22  suicidal ideation, but were not on the mental health caseload at the time of their suicides.

23  Reports from staff and other inmates indicated that the first man exhibited symptoms of

24  depression days before his suicide, including increased isolation, decreased communication

25  with others, slowed gait and speech, preoccupation and worry, and withdrawal from his normal

26  routine.  Despite these increased symptoms, no mental health referral was made.  When he was

27  found hanging in his cell, it was estimated that he had been dead for several hours because he

28  had rigor mortis in his body.  The second man who committed suicide was referred for a

mental health evaluation when he first arrived at KVSP because he reported depression, but after evaluation he was not placed on the mental health caseload. Two months before his suicide, he was again referred to mental health by a custody officer who observed him to be depressed and lost; again, he was not placed on the mental health caseload. The day of his suicide he was placed in one of the super-max, stand-alone administrative segregation units, where he had been housed at another prison and experienced significant decompensation before he was removed.[7]   A psych tech who saw him at the time of his placement the day of his suicide, recalled that he was sad and fearful, but said that he denied suicidal ideation. The suicide evaluator noted that the inmate would have likely been returned to the mental health caseload and removed from the stand-alone ASU once he was evaluated by a mental health clinician. In both suicides, the threshold for a mental health referral was high and these inmates, who exhibited mental health distress prior to ASU placement (which is a high risk time for suicide), were not referred for a mental health evaluation. The significant staff vacancies likely contributed to the institution's failure to provide these men with a mental health referral.

## VI.    IN-FILL PLAN INCLUDES 2,250 SUPER-MAX ASU BEDS

34.    Defendants' January 2007 In-Fill Bed Plan, which is attached to the Receiver's Report re Overcrowding, is criticized by the Receiver for a number of important reasons including for the type of beds proposed and for CDCR's failure to adequately address infra-structure needs where the beds are proposed. Report at 38-39. An additional concern to *Coleman* counsel is the inexplicable inclusion of 2,250 stand-alone ASU beds as part of the In-Fill Plan to remove "bad beds". Attached as **Exhibit M** is a true and correct copy of CDCR In-Fill Bed Plan January 2007; *see also,* **Exhibit N** (Agenda for April 12, 2007 Senate Budget

---

[7] The Special Master has described these "super-max" ASUs in a letter to defendants as: cells with no natural light, with an opening in the door that faces a blank white wall and with a corridor outside the cell door that overlooks the path to just a dozen cells rather than a large dayroom area like in most administrative segregation units. There is no direct natural light and day is barely discernable from night. *See* **Exhibit** O, Special Master's Letter, dated 10/7/02.

Subcommittee Hearing at 5). These stand-alone ASUs are super-max ASUs and this Court has previously ordered CDCR not to house *Coleman* class members because of their sensory deprivation conditions. 10/9/02 Order. The Special Master described these units thus:

> "[t]he sole source of natural light in the cells provides no outside view; the opening in the cell door faces a blank white wall; the corridor outside the cell door overlooks the path to just a dozen cells, not a large common area; there is no direct natural light; and day is barely discernable from night; opportunities to observe the activities of other people are minimal. All of these reductions in stimuli offer fewer opportunities for the cognitive processing of external reality. Such environmental conditions can exacerbate mental and emotional difficulties in a variety of ways, including the loss of external focus, preoccupation with internal stimuli, disorientation relative to time and diminished reality testing."

Attached as **Exhibit O** is a true and correct copy of 10/7/02 Keating letter at 2. Despite the recommendations of the suicide expert panel to address extended stays in the existing ASUs, which would include providing appropriate housing for inmates waiting for transfer to an appropriate protective housing yard, CDCR has proposed to build 2,250 stand-alone ASUs, where *Coleman* class members cannot be placed, as part of their In-Fill Plan. This portion of the In-Fill Plan is a dangerous expansion of units that are harsh, dangerous, and unwarranted at this time.[8]

## VII. EOPS DENIED ASSISTANCE WITH BENEFITS APPLICATIONS

35.    Defendants have reported at policy meetings with the Special Master and plaintiffs' counsel that benefit applications for EOP inmate-patients were not being prepared but that they were "developing" a contract with the Social Security Administration that would permit those applications to be submitted on behalf of EOP inmate-patients prior to their parole. Furthermore, during a February 2007 monitoring tour of DMH facilities, plaintiffs' counsel was informed that CDCR patients in DMH beds receive no pre-release planning, and are instead transferred back to CDCR institutions two days before they parole, where, they are not provided with any opportunity for pre-release planning. Defendants recently informed plaintiffs' counsel that they have no current plans to provide pre-release planning to CDCR

---

[8] There were four suicides in the stand-alone ASUs in 2006: 11/5/06, 7/8/06, 6/29/06 and 6/14/06.

patients in DMH beds.  Attached hereto as **Exhibit E** is a true and correct copy of May 9, 2007

Policy Meeting Documents.  Our office has been contacted by EOP patients after their parole

to the community for assistance with their social security applications.  For example, one EOP

who paroled from Salinas Valley State Prison informed us that he was not assisted with his

application for social security benefits prior to his parole.  He called our office frequently after

he paroled requesting copies of his medical records to submit to the social security office along

with his application.  He was rearrested and returned to Wasco Reception center five months

after he paroled out and was reviewed by the *Coleman* monitors during their seventeenth round

tour of Wasco Reception Center.  The monitors noted that when Inmate H was paroled he

received no assistance with his application for SSI, and that Inmate H was contacted in mid

June 2005 by SSA who told him that CDCR had failed to send him mental health records.

Exhibit J, Inmate H to 17C.  A second EOP patient who was housed in the EOP ASU at

Corcoran was transferred to DVI several days before his parole and paroled out without having

received any assistance filing SSI benefits.  This EOP patient called our office regularly during

his first few months on parole when he was living with his parents and attempting to complete

his application for SSI benefits with no assistance from the Parole Outpatient Clinic or from

his parole agent.

36.    During a recent 19th round monitoring tour of CMF on April 17-19, 2007, which

I attended with *Coleman* monitors, Amy Whelan, plaintiffs' counsel and Michael Stone,

CDCR staff counsel, CMF staff reported that the Transitional Case Management Program for

Mentally Ill (TCMP) does not provide *Coleman* class members with assistance with SSI

applications, although they hoped to do so in the future.  Staff provided no date when this

service would commence.

**VIII.  OUT-OF-STATE TRANSFERS**

37.    In Fall 2006, defendants informed plaintiffs' counsel that they were no longer

sending CDCR inmates to prisons run by the GEO group and cancelled all scheduled transfers

of CDCR inmates to a GEO Group facility in Indiana.  Defendants provided no explanation for

1   this decision.  Defendants' current out-of-state transfer plan does not incorporate or mention

2   the GEO Group.

3       38.    Between October 2006 and February 2007, defendants invested a significant

4   amount of time and personnel resources in the out-of-state transfer program.  For example,

5   defendants took many weeks to develop medical and/or mental health screening forms for

6   inmates, and once defendants developed them, the forms then had to be cleared by the Special

7   Master and his team, and then sent back for further, long-delayed revisions.  Defendants'

8   various policies for out-of-state transfer were often in flux and went through several iterations.

9   For example, after a great deal of time defendants invested working with the New Castle

10  facility run by GEO Group, defendants abruptly announced that no inmates were going to be

11  transferred to this GEO Group facility.  Overall, the process was very disorganized.  After

12  initially representing that there were a sufficient number of inmates wishing to transfer

13  voluntarily out of state, defendants then notified plaintiffs' counsel and the Special Master that

14  after sending fewer than 400 inmates out of state, that they were running out of volunteers for

15  the out-of-state prisons.  Transfers of the inmates to the out-of-state facilities rarely occurred

16  on the schedule provided by defendants, and in the four months the program was in effect, only

17  356 inmates were transferred.

18      39.    On May 14, 2007, plaintiffs' counsel contacted defendants and requested updated

19  information about the out-of-state transfer program, in light of the fact that defendants had

20  announced that they wanted to restart the program.  Plaintiffs requested that defendants provide

21  any updated policies that incorporate the transfer criteria set out in Assembly Bill 900.

22  Attached hereto as **Exhibit P** is as true and correct copy of Laubach 5/14/07 letter.  Plaintiffs

23  requested information regarding the new transfer criteria (which allow for involuntary transfers

24  of mental health inmates), the location of the out-of-state facilities, and whether these elements

25  of the expansion have been reviewed by the Special Master.  To date, defendants have not

26  responded to these concerns.  It is my belief, based on the fall 2006 out-of-state transfer

27  experience and the proposed expansion of the program to include involuntary transfers of

28

SUPPLEMENTAL DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO
CONVENE A THREE - JUDGE PANEL TO LIMIT THE PRISON POPULATION, NO.: CIV S 90-0520 LKK-JFM

mentally ill inmates, that it will be difficult for defendants to implement this out-of-state transfer program in a timely fashion.

40.    Attached hereto as **Exhibit Q** is a true and correct copy of a press release published by the Corrections Corporation of American on May 3, 2007.

I declare under penalty of perjury that the foregoing is true and correct.  This declaration was executed this ___ day of May 2007 at San Francisco, California.


DATED:  ____, 2007                    _____

                                      Jane E. Kahn

SUPPLEMENTAL DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO CONVENE A THREE - JUDGE PANEL TO LIMIT THE PRISON POPULATION, NO.:  CIV S 90-0520 LKK-JFM