**EXHIBIT L**

COLEMAN

V

SCHWARZENEGGER

ROUND XIX

CSP—LAC

**MONTHLY PRIVATE VS CONFIDENTIAL CONTACTS IN AD SEG**

| MONTH | NUMBER OF CONTACTS AT CELL FRONT | % OF CONTACTS AT CELL FRONT | NUMBER OF PRIVATE CONTACTS | % OF PRIVATE CONTACTS |
|---|---|---|---|---|
| April '07 | 417 | 51% | 401 | 49% |
| March '07 | 775 | 60% | 512 | 40% |
| February '07 | 460 | 53% | 402 | 47% |
| January '07 | 640 | 55% | 520 | 45% |
| December '06 | 610 | 52% | 573 | 48% |

**INDIVIDUAL CONTACTS:**
(90% compliance required)

**Reason for any non-compliance:**
  ➢ Weekly CM compliance has not been a problem, per se. However, the problem is in getting 70% of the inmates into a private setting. (Note: 49% were seen in a private setting, and the remaining 51% of CM contacts for the month of April were done at cell door). Space limitations in A4 and A5 contribute to the deficiencies.
  ➢ It should be noted that in March 2007, there was a higher number of CM contacts conducted at cell front as a result of numerous custodial lock downs.

**Corrective actions taken to address any non-compliance:**
  ➢ Given space limitations, it is unlikely that additional modules (which constitute "private settings") will be provided.

## AD-SEG IDTT'S

| MONTH | # OF IDTT'S HELD | # DONE WITH CCI PRESENT | CCI COMPLIANCE RATE | # DONE WITH C-FILE PRESENT | C-FILE COMPLIANCE RATE |
|---|---|---|---|---|---|
| '07 April | 104 | 104 | 100% | 104 | 100% |
| '07 March | 94 | 87 | 92.5% | 87 | 92.5% |
| '07 February | 93 | 93 | 100% | 93 | 100% |
| '07 January | 107 | 107 | 100% | 107 | 100% |
| '06 December | 91 | 81 | 89% | 81 | 89% |

**MAINTAINING APPROPRIATE REQUIREMENTS OF IDTT:**

**Notes Regarding CCI Attendance:**
  ➢ CCI attendance in A4 has been consistent over the past 3-4 months.
  ➢ IDTTs on A5 have had regular CCI attendance and participation.

# EXHIBIT M

**California Department of Corrections and Rehabilitation**
**In-Fill Bed Plan**
**January 2007**

| Institution | In-Fill Beds Total | # Beds Per Security Level | Security Level | Proposed Health Care Space (Sq. Ft.) |
|---|---|---|---|---|
| ASP | 1190 | | | |
| | | 190 | ASU[1] | 2970 |
| | | 400 | L-II[2] | 5946 |
| | | 600 | L-I | 8920 |
| CAL | 590 | | | |
| | | 190 | ASU | 2126 |
| | | 400 | L-II | 4254 |
| CCC | 400 | 400 | L-II | 5256 |
| CCI | 875 | | | |
| | | 475 | ASU | 8971 |
| | | 400 | L-II | 8971 |
| CEN | 590 | | | |
| | | 190 | ASU | 1779 |
| | | 400 | L-II | 3560 |
| CIM | 400 | 400 | L-II | 8025 |
| CMC | - | - | - | - |
| CMF | 440 | 440 | L-II | 19555 |
| COR | - | - | - | - |
| CRC | 200 | 200 | L-II | 1474 |
| CTF | - | - | - | - |
| CVSP | 990 | | | |
| | | 190 | ASU | 1925 |
| | | 400 | L-II | 3850 |
| | | 400 | L-II | 3850 |
| DVI | - | - | - | - |
| FSP | - | - | - | - |
| HDSP | 350 | 350 | ASU | 4646 |
| ISP | 365 | | | |
| | | 175 | ASU | 1723 |
| | | 190 | L-III | 1723 |
| KVSP | 400 | 400 | L-II | 3783 |
| LAC | 664 | | | |
| | | 264 | SATU[3] | 5178 |
| | | 400 | L-II | 10357 |
| MCSP | 400 | 400 | L-II | 6918 |
| NCWF | 380 | 380 | RC[4] | 5693 |
| NKSP | 1940 | | | |
| | | 1140 | RC | 17300 |
| | | 400 | L-II | 8650 |
| | | 400 | L-II | 8650 |

[1] ASU= Administrative Segregation Unit
[2] L= Level I, II, III

[3] SATU= Substance Abuse Treatment Unit
[4] RC= Reception Center

| Institution | In-Fill Beds Total | # of Beds Per Security Level | Security Level | Proposed Health Care Space (Sq. Ft.) |
|---|---|---|---|---|
| PBSP | 550 | | | |
| | | 150 | ASU | 2360 |
| | | 400 | L-II | 4772 |
| PVSP | 600 | | | |
| | | 400 | L-II | 5292 |
| | | 200 | L-II | 2646 |
| RJD | 600 | 600 | L-II | 10134 |
| SAC | 264 | 264 | SATU | 4365 |
| SATF | 150 | 150 | ASU | 2320 |
| SCC | 400 | 400 | L-II | 4962 |
| SOL | 190 | 190 | ASU | 3340 |
| SQ | - | - | - | - |
| SVSP | 400 | 400 | L-II | 17349 |
| WSP | 1350 | | | |
| | | 950 | RC | 12097 |
| | | 400 | L-II | 6048 |

Source: CDCR In-Fill Bed Plan, January 2007

2

# EXHIBIT N

*Senate Budget and Fiscal Review—Denise Moreno Ducheny, Chair*

# SUBCOMMITTEE NO. 4                        **Agenda**

**Michael J. Machado, Chair**
**Robert Dutton**
**Christine Kehoe**



### Thursday, April 12, 2007
### 10:00 a.m. or Upon Adjournment of Session - Room 112

### Consultant:  Keely Martin Bosler

| **Item** | **Department** | **Page** |
|---|---|---|
| 5525 | California Department of Corrections and Rehabilitation | 2 |
| | 2007-08 Governor's Infill Prison Bed Construction Plan | 5 |
| | Critical Infrastructure for Infill Bed Plan | 9 |
| | Reentry Beds – Capital Outlay | 11 |
| | *Coleman* Ordered Mental Health Capital Outlay | 13 |
| | *Plata* Related Medical Care Capital Outlay | 20 |
| | *Perez* Related Dental Care Capital Outlay | 24 |
| | *Farrell* Related Minor Capital Outlay | 26 |
| | San Quentin Condemned Inmate Complex | 28 |
| | Correctional Officer Training Academy | 30 |
| | Other Capital Outlay | 32 |
| | Maintenance and Equipment | 43 |
| | Information Technology Issues | 48 |
| | Capital Outlay Staffing | 50 |
| | Local Assistance Infrastructure Issues | 52 |

# 5525    California Department of Corrections and Rehabilitation

## Background

**Background.**    The California Department of Corrections and Rehabilitation (CDCR) is responsible for the incarceration, training, education, and care of adult felons and non-felon narcotic addicts, as well as juvenile offenders.  The CDCR also supervises and treats adult and juvenile parolees, and is responsible for the apprehension and re-incarceration of those parolees who commit parole violations.  The department also sets minimum standards for the operation of local detention facilities and selection and training of law enforcement personnel, as well as provides grants to local governments for crime prevention programs.

The department operates 33 adult prisons, including 11 reception centers, a central medical facility, a treatment center for narcotic addicts under civil commitment, and a substance abuse facility for incarcerated felons.  The CDCR also operates eight juvenile correctional facilities, including three reception centers.  In addition, CDCR manages 13 Community Correctional Facilities, 44 adult and juvenile conservation camps, the Richard A. McGee Correctional Training Center, and 202 adult and juvenile parole offices.

In 2005, the CDCR was created pursuant to the Governor's Reorganization Plan 1 of 2005 and Chapter 10, Statutes of 2005 (SB 737, Romero).  All departments that previously reported to the Youth and Adult Correctional Agency were consolidated into CDCR.  The departments consolidated into the current CDCR are: the Youth and Adult Correctional Agency; the California Department of Corrections; the California Youth Authority; the Board of Corrections; the Board of Prison Terms; and the Commission on Correctional Peace Officers' Standards and Training.

**Prison Overcrowding and "Bad" Beds.**    The California prison system is currently overcrowded, which has resulted in the activation of over 16,000 "bad" beds, which are bunks on dayroom floors and gyms.  This means that about 10 percent of the prison population is currently housed in "bad" beds.  Some of these beds have been in operation for decades.  "Bad" beds impact prison operations on many levels.  They make it more difficult for prison officials to maintain safe conditions for prison staff and inmates and reduce the space available for inmate programs.  Furthermore, the overcrowding of the prison facilities has overburdened the basic infrastructure of the institutions resulting in sewage spills and shortages of safe drinking water.

The overcrowded conditions are projected to worsen over the next several years as the population continues to grow.  Over the past 20 years, the state inmate population has grown at an average annual rate of 5 percent.  If this trend continues, the LAO indicates that the state prison system will be deficient 152,900 beds by the year 2022.

**How are Inmates Housed?**  Inmates in state prison are housed according to classification levels. An inmate's classification level is based on the inmate's commitment offense, in-institution behavior, and other factors.  Inmates are assigned a classification level of I through IV.  A Level I classification is the lowest-risk inmate that typically has a less serious commitment offense.

---

Lower-risk inmates (Level Is and IIs) are typically housed in dorm-style housing, while higher level inmates are typically housed in celled housing. A large portion of the inmates in "bad" beds are lower level inmates. However, at reception centers, where classification levels are often mixed, this may not be the case.

**LAO Gap Analysis.** The LAO has performed a gap analysis that compares the state's current permanent prison bed capacity (excluding "bad" beds) to the prison population. This analysis finds that the current prison system does not have the right mix of beds to safely house the current prison population. For example, the state prison system is currently deficient dormitory beds for Level I and Level II inmates (the majority of these inmates are in "bad" beds). The prison system is also deficient beds in the highest-security celled housing for Level IV inmates and beds in celled housing at reception centers. The LAO finds that the prison system does have a surplus of beds in celled housing appropriate for Level III inmates, but a large portion of this housing is in older prisons that have unique security concerns as compared to the new Level IV celled housing units. The following table summarizes the LAO's gap analysis:

| LAO Inmate/Security Housing Unit Gap Analysis - Men | Surplus/ Deficit (-) |
|---|---|
| Level I | -7,524 |
| Level II | -7,237 |
| Level III | 8,386 |
| Level IV | -6,324 |
| Reception Center | -4,350 |
| Special | 857 |
| Total | -16,192 |

**2006 Special Session.** On June 26, 2006, the Governor called a special session of the legislature on prison overcrowding and recidivism. The Governor offered the following proposals in an attempt to help address the overcrowded conditions:

- **New Prison Construction.** $1.2 billion from lease-revenue bonds and $11.7 million from the General Fund for the construction of two new prison facilities (9,000 new beds).
- **Construction of Beds at Existing Prisons.** $2.5 billion from lease-revenue bonds and $238 million from the General Fund to construct over 16,000 beds at existing prisons, re-activate the Northern California Women's Facility as a male reception center, and convert female beds at the California Rehabilitation Center to male beds. These funds would also be used to support the construction of additional medical space at existing prison facilities.
- **Re-Entry Program Facilities.** $2 billion from lease-revenue bonds to construct re-entry facilities and authorize CDCR to enter into a lease for a state or city/county operated inmate housing facility.
- **Transfer of Inmates Out of State.** Legislation and $2.1 million from the General Fund to transfer inmates with Immigration and Customs Enforcement holds to out of state prisons (private and public).
- **Female Community Correctional Centers.** Legislation to authorize contracts for up to

4,500 beds in local community correctional centers.
- **Male Community Correctional Facilities.** Legislation to authorize contracts for 4,000 beds in local community correctional facilities.
- **Southern California Training Academy.** Legislation to allocate $55 million from lease-revenue bonds and $6.9 million from the General Fund to construct and staff a new correctional officer training academy in Southern California.

On August 30, 2006, the State Senate passed the following components of the Governor's special session proposal along with some other proposals:
- **Construction of Beds at Existing Prisons.** SB 10xx (Machado) authorized $606 million in lease-revenue bonds and appropriated $312 million from the General Fund for the construction of 5,340 prison beds and to address various infrastructure issues at existing prisons.
- **Parole Reentry Challenge Grant.** SB 11xx (Machado and Runner) appropriated $25 million from the General Fund for competitive grants to counties to reduce the recidivism rate of parolees.
- **Transfer of Inmates Out of State.** SB 12xx (Machado) authorized the department to transfer inmates out of state on a voluntary basis.
- **Female Community Correctional Centers.** SB 9xx (Speier) authorized the department to enter into contracts for up to 4,500 beds in community facilities for female inmates.
- **Information Technology Advisory Committee.** SB 8xx (Bowen) established an advisory committee to CDCR to assist in the development and implementation of enterprise-wide integrated information technology systems for the department.

The State Assembly did not act on these pieces of legislation and, as a result, the Legislature did not pass any of the Governor's proposals to address overcrowding and recidivism during the special session.

**Governor's Emergency Proclamation.** The Governor declared a State of Emergency on October 4, 2006, citing that California's prisons are beyond capacity and that action needed to be taken immediately to remedy the situation. Soon after the declaration, the department entered into contracts with several private prisons outside of the state to house volunteer inmates. To date, the state has transferred 358 inmates out of state to private prison facilities in Arizona (279) and Tennessee (79). The Governor's budget proposal contemplated transferring 994 inmates in the current year and 2,260 inmates in the budget year to correctional facilities out of state. The total cost of these contracts is estimated to be $31 million General Fund in the budget year, but the administration proposes to offset these costs with savings from not housing the inmates in state institutions of about $20 million. Therefore, these contracts are projected to cost about $10 million General Fund in the current year. These costs are projected to grow to $13 million General Fund in the budget year.

**Out of State Inmate Transfer Lawsuit.** On February 20, 2007 a superior court judge ruled that the Governor's plan to transfer inmates to out of state correctional facilities was illegal. The judge found that the Governor's actions violated the Emergency Services Act. The state has appealed the case to the State Appeals Court. Meanwhile, the department has continued to identify inmates that can be transferred out of state.

## 2007-08 Governor's Infill Prison Bed Construction Plan

**Background.** As mentioned above, the Governor called a special session in June of 2006. At this time the Governor proposed $1.2 billion in lease-revenue bonds and $11.7 million in General Fund monies to construct two new prison facilities (9,000 beds). The Governor also proposed $2.5 billion in lease-revenue bonds to construct over 16,000 beds at existing prisons.

In response to these proposals, the Senate approved SB 10xx (Machado) in August 2006 to authorize $606 million in lease-revenue bonds for construction of 5,340 prison beds and to address various infrastructure issues at existing prisons. This legislation died in the Assembly.

**Governor's Budget.** The Governor's budget proposal includes a new Strategic Growth Plan that outlines infrastructure investments for the state. This plan contains $2.3 billion in lease-revenue bonds to construct 16,000 prison beds at existing prisons. This is the same proposal that was made by the Governor in the 2006 special session on corrections.

The following chart summarizes the Governor's infill prison bed plan by bed type:

| Infill Prison Bed Plan by Security Level | Number of Beds |
|---|---|
| Level I and II | 10,420 |
| Level III | 2,223 |
| Level IV | 1,505 |
| Reception Center | 2,090 |
| Total | 16,238 |

These beds would be added at 26 different institutions around the state. Included in these numbers are 2,250 new stand-alone administrative segregation unit beds. Administrative segregation unit beds are used by the department for short-term detention of inmates that must be separated from the general population for the safety of others or for their own safety.

The CDCR estimates that it will activate the prison beds on the following schedule if the proposal is authorized by July 1, 2007:

| Infill Prison Bed Plan Approximate Completion Date | Number of Beds |
|---|---|
| July 1, 2009 | 5,340 |
| July 1, 2010 | 3,270 |
| July 1, 2011 | 4,908 |
| July 1, 2012 | 2,720 |
| Total | 16,238 |

**Governor's Other Proposals Impact Bed Need.** The Governor's budget includes a package of proposals to address overcrowding in the state's prison systems. The Governor's infill prison bed construction proposal should be evaluated in the context of these other proposals. Major components of the Governor's package to reduce overcrowding include the following proposals to reduce the state prison population:

- **Shift Adult Offenders to Jail.** This proposal would change where the sentence for certain offenses are served from prison to jail.
- **Direct Discharge.** This proposal would allow for certain offenders to be directly discharged from prison without parole.
- **One Year Clean Time Discharge.** This proposal would allow for certain offenders to be discharged from parole early after one year of clean time.

The proposals above, if enacted, would mainly impact Level I inmates, thereby reducing the number of dormitory beds needed in state prison.

**Right Mix of Beds Critical.** As mentioned above, the state prison system is currently overcrowded, which has resulted in the need to activate "bad" beds. Furthermore, the LAO finds that the current state prison system does not have the right mix of beds to house its inmate population. These two conditions reduce the safety of the institutions for staff and inmates. When conditions are less safe, programming is reduced. Staff finds that the right mix of beds is critical to improving safety within the institutions.

**LAO Finds Size and Mix Wrong.** The LAO identified several concerns pertaining to how the Governor's package of proposals to reduce overcrowding fit together as a whole. The LAO finds that if all of the Governor's proposals are adopted (bed construction and proposals to reduce the population) it would result in a dramatic surplus of prison beds and would provide the wrong mix of beds for the inmate population. Specifically, the LAO finds that if the Governor's package of proposals were adopted it would result in a significant surplus of Level II and Level III beds, but that the department would continue to have a deficit of Level IV beds.

The LAO recommends approving only the infill projects to add Level IV and reception center beds. This would result in 3,595 additional beds in celled housing units at eight different institutions.

**Timing is Critical.** The LAO recommends that the Legislature carefully consider proposals that will help to relieve overcrowding in the short term, particularly in the next one to three years. The LAO finds that the department will likely exhaust any excess capacity in dayrooms and gyms within this timeframe.

As referenced above, the department estimates that it could have 5,340 beds built within the next two years. This timeline relies on a design-build contract and a streamlined environmental review process. Even under these circumstances, staff finds that the department's assumptions are overly optimistic for several reasons (see below).

**CDCR's Schedule is Optimistic.** The CDCR is exempted by Public Contracts Code 10106(d) from going through the capital outlay process at the Department of General Services. Therefore, CDCR and its Office of Facilities Management oversee all of the capital outlay projects it undertakes, including the infill prison bed construction proposal. Staff finds that the department's Office of Facilities Management does not have the staff to manage all of the projects proposed in the infill bed plan, especially given their current workload (see other ongoing and new infrastructure projects in the rest of the agenda). Furthermore, staff finds that this office has suffered significant staffing reductions since the last wave of prison construction in the 1980s.

The department has indicated that it will need to hire a significant number of new staff to oversee construction of the infill bed projects. The department will need to hire these staff before project teams can be developed. Furthermore, the department has not completed a Project Management Plan, which is a plan used in large capital outlay projects to determine the staff needed to oversee the entire project. Staff recognizes that the department will utilize contracted firms to handle some of this workload, but it is critical that a core state staff is in place to ensure proper oversight and coordination.

Secondly, the department's timeline for constructing the infill beds depends on its core business services functioning in a timely manner, including the contracts, personnel, accounting and legal divisions. As this Subcommittee heard at a hearing on March 15, 2007, the majority of these functions within the department are not operating in a timely manner. The department currently has long delays in its contracting division and the accounting division is not able to pay invoices in a timely manner.

Furthermore, staff finds that the remote location of many of the construction sites means that the department will likely have difficulty finding contractors willing to bid for the contract. This problem has often caused delays for CDCR and other state departments like the Department of Parks and Recreation that have remote properties.

In addition, the department indicates that there are several other steps that need to be taken before construction will start on the infill bed projects. These steps include hiring engineers and architects and establishing project and schedule controls. Staff finds that given the size of these projects it will be critical that the department establish project and schedule controls and hires sufficient staff to oversee these efforts before construction commences. Otherwise, these projects may experience significant cost overruns. (As referenced later in this agenda, several of the department's recent capital outlay projects have experienced cost overruns approaching 50 percent. While a portion of these cost overruns are due to increased costs associated with materials, a large portion of the cost overruns are due to major scope changes that the department did not anticipate.)

Finally, all of the prisons where the department is proposing to build infill housing require major infrastructure upgrades to accommodate the *current* overcrowding. These infrastructure upgrades include waste water treatment, water supply, and electricity capacity. Many of the facilities are currently operating under Cease and Desist Orders from the Regional Water Quality Control Boards. If the "bad" beds are not removed from these housing units, the infill bed

proposal will exacerbate the infrastructure problems. The department indicates that it plans to address the infrastructure issues while it constructs the new infill beds. However, it is not clear whether the infrastructure upgrades will accommodate both the infill beds and the "bad" beds or just the infill beds. Furthermore, if there are delays in these infrastructure projects (which are likely because of the factors listed above) there may be delays in the department's ability to activate new infill housing units.

**Capital Outlay Budget Proposals Lack Detail.** The department has not submitted traditional capital outlay proposals for the infill bed projects. Staff finds that the department has submitted essentially the same package of information that was submitted in August 2006, except that the numbers have been adjusted by 5 percent for inflation. The department has only determined what it will cost "on paper" to build the additional housing units and has not considered site specific issues that make these projects more or less costly. The department indicates that it has only done 11 site assessments for the infill proposal even though they propose to build new housing units at 26 different institutions. The lack of background and site specific work will likely result in large cost overruns and delays in the future as the department starts the construction process and encounters site specific problems.

Furthermore, the lack of detail makes it difficult to determine how the department arrived at the costing of the project. There is very little information on anything about the project except for the number of beds being built. For example, it is not clear whether the department is proposing to build adequate programming space, dining space, and yard space consistent with standards for constructing prisons.

In addition, the LAO finds that the amount budgeted for Architectural and Engineering services is significantly higher than is expected for these projects. Again, the department has not provided sufficient information to justify these expenditures.

**Operational Costs Not Identified.** Furthermore, the LAO finds that the department has not identified operational costs associated with the infill bed proposal. The LAO indicates that the costs to staff and operate these new housing units will likely be in the hundreds of millions of dollars. Staff estimates that the infill proposal will likely require an additional $750 million General Fund to the department's operating costs annually. However, if the "bad" beds are taken down there should be some offsetting savings that will result. Given the current level of overcrowding and the population projections, the department may not take down the "bad" beds even if the new infill prison bed plan is approved.

**Staff Recommendation.** Staff recommends that the Subcommittee hold this issue open.

# Critical Infrastructure for Infill Bed Plan

**Background.**  As mentioned above, the Governor called a special session in June of 2006.  At this time the Governor proposed $238 million from the General Fund to fund critical infrastructure projects and provide CDCR with additional staff to support the infill construction proposal.

In response to these proposals, the Senate approved SB 10xx (Machado) in August 2006 that contained $312 million from the General Fund for various infrastructure projects at existing prisons and for staff to support the infill construction activities.  The vast majority of these infrastructure improvements are needed in order to add additional prison beds to the existing prisons.  This legislation died in the Assembly.

**Governor's Budget.**  The Governor's budget proposal includes $271 million in General Fund monies to address various infrastructure issues at the existing prisons that, for the most part, accommodate the additional prison beds proposed in the infill proposal ($29.5 million is for infrastructure upgrades at institutions where no new beds are proposed for construction).

**All Infill Sites Require Major Upgrades.**  As mentioned above, new beds are proposed at 26 different institutions and every one of these institutions has critical deficiencies in its existing infrastructure.  The chart below identifies the major types of infrastructure deficiencies and illustrates that most institutions have more than one critical infrastructure deficiency:

| Infill Prison Bed Plan Existing Infrastructure Deficiencies | Number of Institutions with Deficiencies |
|---|---|
| Drinking Water | 20 |
| Waste Water Treatment | 18 |
| Electrical | 20 |
| Other | 14 |

Many of the infrastructure deficiencies involve a major upgrade of the existing waste water treatment plant or upgrade to the electrical capacity for the entire institution.  The department has not provided details on how much each of the infrastructure upgrades will cost, but instead has provided only a rough estimate of what, collectively, the infrastructure upgrades at each institution will cost.  Staff finds that the department has submitted essentially the same package of information that was submitted in August 2006, except that the numbers have been adjusted by 5 percent for inflation.  The lack of information on the scope of these projects raises concerns related to the potential for significant cost overruns.

**Is Infrastructure Sized Correctly?**  Another concern raised by the lack of detail provided by the department is the determination of whether the infrastructure upgrades are sized correctly.  For example, is an upgrade to a waste water treatment plant sufficient to support the infill beds, but not sufficient to support the infill beds and "bad" beds.  It is also not clear whether the

upgrades to the electrical system are sufficient to address the future information technology needs of the department (see below). Furthermore, it is not clear that the infrastructure improvements bring the department into compliance with regulatory agencies. Many of the department's institutions are currently operating under Cease and Desist Orders and if the violations are not dealt with the department could face significant penalties or even lawsuits from neighboring communities impacted by the pollution caused by some prisons.

**LAO Recommends Smaller Package.** As mentioned above, the LAO only recommends approving Level IV and reception center housing units that are part of the infill bed plan. Consistent with this recommendation, the LAO recommends approving $46 million for infrastructure improvements at the eight institutions where the department proposes to add Level IV and reception center beds.

**Staff Recommendation.** Staff recommends that the Subcommittee hold this issue open.

# Reentry Beds – Capital Outlay

**Background.** As mentioned above, the Governor called a special session in June 2006. At this time the Governor proposed $2 billion in lease-revenue bonds to construct re-entry facilities and authorize CDCR to enter into a lease for a state or city/county operated inmate housing facility.

In response to this proposal, the Senate approved SB 11xx (Machado and Runner) that appropriated $25 million from the General Fund for competitive grants to counties to reduce the recidivism rate of parolees. The intent of these grants was to fund supportive services that would help parolees transition back into their communities. The legislation died in the Assembly.

**Governor's Budget.** The Governor's budget proposal includes $1.6 billion in lease-revenue bonds or contracting authority to construct up to 7,000 beds in coordination with local governments for inmates nearing their parole date and revoked parolees. These facilities would be designed to provide additional re-entry services for inmates before they are paroled into their communities.

**LAO Finds Details Lacking.** The LAO withholds recommendation on the funding for reentry facilities pending the receipt of key fiscal and operational details regarding these facilities. The LAO notes that research studies suggest that the establishment of reentry beds and programming could benefit public safety by reducing recidivism. However, basic details about this proposal have not been provided including: (1) the basis for the construction cost estimate, (2) proposed programs, and (3) specific facility locations.

The LAO does not recommend approving funding for reentry facilities until more details have been provided. However, they suggest that the Legislature limit any funding in the budget year for these facilities to funding for preliminary plans. This would provide the Legislature with additional time to get information from the department about the scope and cost of these facilities. The LAO estimates that preliminary plans would cost about $45 million General Fund. The LAO also suggests that the reentry facilities may be a good fit for serving short-term parole violators. The LAO sites that parole violators, generally, have a high need for services that could be provided in a reentry facility, including substance abuse, job training, and education. The LAO notes that diverting parole violators from reception centers could also help with the overcrowding at reception center facilities.

**Staff Comments.** Staff finds that dedicated reentry facilities could significantly help in preparing inmates for parole. This mission is more difficult at a "mainline" institution where inmates are separated by classification and not by the amount of time they have left on their sentence before parole. Furthermore, bringing inmates closer to the community where they will parole can help to strengthen family bonds and/or coordinate with community services that will provide a more secure safety net for the inmate upon release.

Staff also finds that these facilities could work well for short-term parole violators that return to prison because of a dirty drug test or other parole violations that carry relatively short recommitment terms. Transporting short-term parole violators to reception centers is inefficient

and does not provide an opportunity for rehabilitative programming, because many short-term parole violators spend their entire sentence at the reception center with extremely limited access to rehabilitative programming.   (Generally, reception centers have very little programming because the goal of the reception center is to classify and process the inmate to determine the best permanent placement for the inmate.)

**Staff Recommendation.**  Staff recommends that the Subcommittee take the following actions:
- Hold this issue open.
- Request that the department submit at May Revision draft guidelines that could guide the development of the reentry facility concept.

# *Coleman* Ordered Mental Health Capital Outlay

## Background

***Coleman* Court's General Approach to Facility Modifications.** The Special Master and the court overseeing the settlement of the *Coleman* lawsuit have taken a multi-pronged effort to improve mental health care facilities within the department. The court has pursued interim and temporary measures to improve mental health care facilities in the short-term. Many of these short-term efforts have already been implemented or are currently being constructed.

However, the department has also been working on a long-term Mental Health Bed Plan that will provide a plan for permanent mental health bed capacity that will provide various levels of care. These beds and facilities will provide a more appropriate place to house the most seriously mentally ill inmates on a long-term basis and provide appropriate housing for inmates needing acute care. A revised version of this plan was submitted to the court in December. The Special Master and the court had some comments on the plan, but for the most part were satisfied by the number and mix of beds put forward in the plan. The department is now setting forth on a plan to construct the beds in the plan.

In addition to building beds to provide more appropriate housing for the mentally ill population in prison, the department is also implementing other court orders to improve suicide prevention. These court orders do not just target the diagnosed mentally ill population in prison, but the entire prison population. In order to comply with this plan, facility improvements are being made to prison facilities across the state.

**Mental Health Bed Plan – December 2006.** The CDCR has developed a Mental Health Bed Plan in response to the October 20, 2006, court order in the *Coleman* lawsuit. The court order directed CDCR to develop a final long range bed plan for the provision of various levels of mental health care, including appropriate beds and programming space for the Enhanced Outpatient Program (EOP) inmate population. Inmates are classified as EOP if they have current symptoms and/or require treatment for the following mental disorders:

- Schizophrenia
- Delusional Disorder
- Schizophreniform Disorder
- Schizoaffective Disorder
- Brief Psychotic Disorder
- Substance-Induced Psychotic Disorder (excludes intoxication and withdrawal)

- Psychotic Disorder Due to a General Medical Condition
- Psychotic Disorder not Otherwise Specified
- Major Depressive Disorders
- Bipolar Disorders I and II

The department submitted a plan to the court in December 2006. This plan expects the following permanent mental health bed capacity to meet the projected mental health population for June 2011:

| Expected Permanent Mental Health Bed Capacity by Type of Bed | Number of Beds | | |
|---|---|---|---|
| | Female | Male | Total |
| **Enhanced Outpatient Program -** Long-term beds for EOP inmates that require significant services to function well. | 297 | 4,488 | 4,785 |
| **Mental Health Crisis Beds -** Short-term licensed beds for inmates in mental health crisis that need intensive 24-hour care.  Length of stay not to exceed 10 days generally. | 25 | 342 | 367 |
| **Acute -** Short-term licensed beds for inmates that require 24-hour mental health treatment to prevent danger to themselves and others.  The average length of stay at this level is two to three months. | 42 | 240 | 282 |
| **Intermediate Care Facility -** Longer-term licensed beds for inmates that need intensive mental health care services.  Length of stay not to exceed nine months. | | 314 | 314 |
| **Intermediate Care Facility - High Custody -** Same as above, but for high custody inmates. | | 312 | 312 |
| **Administrative Segregation Unit -** Housing units for temporary segregation of EOP inmates that are pending investigations, evaluation, and/or disciplinary action.  Similar to regular ASU, but with space to deliver treatment services. | 24 | 752 | 776 |
| **Psychiatric Services Unit -** Housing units for EOP inmates that have been found guilty of an offense committed in the institution, or have been deemed to be a threat to the safety of others or the security of the institution.  Similar to Security Housing Units (SHU), but with space to deliver treatment services. | 10 | 448 | 458 |
| **Total** | 398 | 6,896 | 7,294 |

The department currently operates some mental health beds that it will continue to operate under this plan.  However, in order to meet the requirements of this bed plan the department will need to construct new mental health facilities.  The department plans to build the following new mental health beds to comply with the *Coleman* settlement agreement:

**April 12, 2007**

| New Mental Health Beds to Be Constructed | Number of Beds | | |
| by Type of Bed | Female | Male | Total |
|---|---|---|---|
| Enhanced Outpatient Program | 168 | 2,532 | 2,700 |
| Mental Health Crisis Beds | 3 | 110 | 113 |
| Acute | 17 | 90 | 107 |
| Intermediate Care Facility | | 230 | 230 |
| Intermediate Care Facility - High Custody | | 120 | 120 |
| Administrative Segregation Unit | 15 | 453 | 468 |
| Psychiatric Services Unit | | 256 | 256 |
| **Total** | **203** | **3,791** | **3,994** |

The majority of the beds will be built at the following five prisons, which are referred to as Consolidated Care Centers:

- California State Prison, Sacramento
- Richard J. Donovan Correctional Facility
- California Men's Colony
- California Institute for Men
- California State Prison, Los Angeles County

In addition to these prisons, additional beds will be added to the Salinas Valley State Prison, which already has a significant mental health mission. The California Medical Facility in Vacaville will also continue its mental health mission, but no new beds for this facility are part of the mental health bed plan. In addition, existing housing units will be modified around the state to ensure that most of the other prisons have a limited number of Mental Health Crisis Beds.

The California Institute for Women will be the equivalent of a Consolidated Care Center for the women. However, some new mental health beds will also be built at the other two prisons that house female inmates.

Currently, the department is housing mentally ill inmates at many different institutions. Therefore, the plan has identified 1,749 beds that will no longer be dedicated to mentally ill inmates after the new facilities are constructed. The majority of these beds are at California Men's Colony and Mule Creek State Prison. This will enable the department to return these beds to general population inmates.

**Construction Projects Approved Before December Bed Plan.** In addition to the housing units in the December bed plan, the department is also constructing four other projects that were approved before the December plan. These projects are a 50 bed Mental Health Crisis Bed unit at both California Men's Colony and California Medical Facility, a project to convert general population beds to 150 EOP beds at California State Prison, Los Angeles County, and a 64 bed Intermediate Care Facility at California Medical Facility. The department expects to complete construction of the 50 Mental Health Crisis Beds at the California Medical Facility by December 2007. The 50 bed Mental Health Crisis Bed project at California Men's Colony may be added to the Consolidated Care Center plan for this institution. The other two projects are in the preliminary planning stage.

**Department Revision to Mental Health Bed Plan.** The department recently submitted a summary of the Mental Health Bed Plan that was slightly different than the plan submitted to the court. This plan contained additional housing units for non-mentally ill inmate workers at each of the Consolidated Care Center institutions. The department indicates that because each of these centers will be stand-alone units they will need inmate workers to help maintain the facilities. The department now plans on adding 1,330 additional beds in 270-design celled housing units at the Consolidated Care Center institutions. The department plans to build one inmate worker housing unit (accommodates 190 inmates) at each of the following institutions:

- California State Prison, Sacramento
- Richard J. Donovan Correctional Facility
- California State Prison, Los Angeles County

Furthermore, the department plans to build two new inmate-worker housing units at both of the following institutions:

- California Institute for Men
- California Men's Colony

**Update on Mental Health Bed Projects Approved in 2006 Budget Act.** The 2006-07 Budget Act contained $50.8 million from the General Fund to support various mental health capital outlay projects. Several of these projects were modified or have been permanently cancelled based on the latest Mental Health Bed Plan submitted to the court in December 2006. The following projects were approved as part of the 2006-07 Budget Act and will continue without modifications:

- **Intermediate Care Facility (High Custody) – California Medical Facility.** $3.9 million General Fund was provided for preliminary plans to build a 64 bed facility. Design and environmental review will commence in April 2007.
- **Enhanced Outpatient Program Treatment Space – California State Prison, Sacramento.** $250,000 General Fund was provided for preliminary plans for this project and the plans are complete.
- **Enhanced Outpatient Program Treatment Space – California State Prison, Los Angeles County.** $250,000 General Fund was provided for preliminary plans for this project and the plans are complete.

The following projects were approved as part of the 2006-07 Budget Act and will continue, but with major modifications as per the December 2006 Mental Health Bed Plan:

- **Acute/Intermediate Care Facility/Mental Health Crisis Beds – California Institute for Women.** $2.2 million General Fund was provided for preliminary plans to build a 25 bed facility. Design is underway and environmental review is completed for the 25-bed facility. The December plan added an additional 20 beds to this project. The Legislature was notified of the change in a Finance Letter (dated March 15, 2007) and the department is pursuing the design of the new project with existing funding.
- **Intermediate Care Facility – Salinas Valley State Prison.** $7.9 million General Fund was provided for preliminary plans to build a 128 bed facility. Environmental review for this project is underway. This project has been re-scoped to a 70 bed administrative segregation unit.

The following projects were approved as part of the 2006-07 Budget Act and will not continue:

- **Acute – California State Prison, Sacramento.** $15 million General Fund was provided for preliminary plans for a 350-bed facility. This project was never started.
- **Intermediate Care Facility – California State Prison, Sacramento.** $7 million General Fund was provided for preliminary plans for a 128-bed facility. This project was never started.
- **Enhanced Outpatient Program Treatment Space – Mule Creek State Prison.** $250,000 General Fund was provided for preliminary plans for this project and the plans are complete. However, this project has been canceled.
- **Temporary Intermediate Care Facility – California Medical Facility.** $5.5 million General Fund was provided for working drawings and construction to convert 30 temporary Intermediate Care Facility beds to permanent beds. Working drawings for this project had been started, but the project has now been canceled.
- **Temporary Intermediate Care Facility – Salinas Valley State Prison.** $8.5 million General Fund was provided for working drawings and construction to convert temporary Intermediate Care Facility beds to permanent beds. Working drawings for this project had been started, but this project has been canceled.

Given the various changes to the department's mental health bed plans since the 2006-07 Budget Act was enacted, a significant amount of money should revert to the General Fund. Staff estimates that about $36 million should be reverted to the General Fund.

**Other Court Ordered Capital Outlay Modifications.** The *Coleman* court has ordered other changes to the state prison infrastructure outside of the Mental Health Bed Plan. The department submitted to the court the court ordered Administrative Segregation Unit Suicide Prevention Plan on October 2, 2006. This plan requires the department to create intake cells in Administrative Segregation Units in prisons across the state. The intake cells will be modified to reduce the apparatus the inmate can use to commit suicide. The Legislature was notified in a Finance Letter (dated January 29, 2007) that it needed $2 million General Fund to make modifications to create the new intake cells. The Legislature has not appropriated funds for this project. The department indicates that it has started retrofitting cells by redirecting funds from other department activities.

The *Coleman* court has also required the department to implement an Enhanced Outpatient Program (EOP) for the most seriously mentally ill at Reception Centers. However, the department does not anticipate the need for capital outlay modifications at this time.

### Governor's Budget

**Mental Health Crisis Beds – California Men's Colony.** $3.6 million General Fund is proposed for preliminary plans for the construction of a new 50-bed facility. This proposal will replace the emergency temporary operation of the Outpatient Housing Unit at California Men's Colony as Mental Health Crisis Beds as ordered by the *Coleman* court on May 1, 2006. The total project is expected to cost $55.7 million or $1.1 million per bed to construct these beds.

**Psychiatric Services Unit – California Institute for Women.** $423,000 General Fund is proposed for preliminary plans for the conversion of the East Wing of the Support Care Unit at the California Institute for Women to a 20 bed Psychiatric Services Unit. The total project is expected to cost $4.5 million or $225,000 per bed to convert these beds. This proposal is not part of the December Mental Health Bed Plan, but the *Coleman* court issued a court order in late March directing the department to construct these beds.

### *Issues*

**Court Has Not Approved Plan.** The *Coleman* court has not approved the December 2006 Mental Health Bed Plan. The LAO withheld a recommendation in their Analysis on the mental health bed proposals pending action by the federal court. The department has indicated that the court may reevaluate and make a decision regarding the department's bed plan in the next few weeks.

**Costs High for California Men's Colony Proposal.** The Governor's budget proposal to build 50 Mental Health Crisis Beds is expected to cost $1.1 million per bed. These are extremely high per bed costs. The department indicates that these high costs were expected because the building was scoped as a stand-alone building. The department now proposes to include this project as part of the Consolidated Care Center planned for the California Men's Colony. This is part of the department's December 2006 Mental Health Bed Plan that is currently pending before the court.

**Current Year Funding Should Revert.** As was mentioned above, the 2006-07 Budget Act included $50.8 million General Fund for various capital outlay projects to build mental health beds. A large portion of these projects were amended by the December 2006 Mental Health Bed Plan. Therefore, staff estimates that approximately $36 million should be reverted to the General Fund. The department has not put forward a proposal to revert these monies even though they have indicated that they have stopped planning on several of the projects.

**Department has Redirected Funds.** The department has commenced work on several court ordered projects, including the conversion of the administrative segregation units to prevent suicide. The department indicates that it has commenced work consistent with the court orders. However, the Legislature has not approved monies for this work. Therefore, the department has had to redirect monies from other activities and/or projects to fund these new court-directed projects. The Legislature has not received information about what activities and/or projects the monies have been redirected. Staff finds that this information is critical to legislative oversight and transparency of the budget process, because when the Legislature approved the budget act in 2006 they expected that the funding would be used to support certain activities and projects. The redirection means that some of these activities and/or projects are not being funded in the current year.

**Transparency Needed on Inmate-Worker Beds.** The Mental Health Bed Plan that was submitted to the court did not include a provision for additional inmate-worker beds. As mentioned above, the department recently revised the Mental Health Bed Plan to include a provision for 1,330 additional beds for inmate workers. The department has not provided any details regarding these new housing units, except that they are needed because the mental health

Consolidated Care Centers at five institutions will be stand-alone and will need inmate workers. The department has also indicated that the housing for these inmate-workers will be celled. Generally inmate-workers are lower-level inmates that live in dorm-style housing. Staff finds that additional information is needed regarding these housing units before action should be taken.

**Plan is Complicated and Confusing.** Staff finds that the department must complete a significant number of capital outlay-type projects to comply with *Coleman* court orders. Staff finds that the department's current information regarding these projects is disjointed and confusing. For example, the department is pursuing projects in the December Mental Health Bed Plan, but it is also pursuing projects approved before the bed plan and other projects that do not augment permanent bed capacity. The sheer number and diversity of the different projects that the department is undertaking makes it difficult to track. Staff finds that the department needs to improve its tracking of these projects, which would improve the transparency of the department's efforts to comply with the *Coleman* settlement. For example, the department could prepare one document that contains all of the *Coleman* related projects, including when and where they were authorized, what funding has been provided, and the status of each project.

### Recommendations

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Deny the proposal to fund preliminary plans for the 50 Mental Health Crisis Beds at the California Men's Colony, with the understanding that this project will likely be part of a larger Consolidated Care Center proposal in the future.
- Approve the proposal to fund preliminary plans for the 20 Psychiatric Services Unit beds at the California Institute for Women.
- Request that the department prepare a proposal to revert monies at May Revision for the capital outlay projects approved in 2006 that are no longer being pursued.
- Request that the department and DOF provide information regarding where the monies have been redirected from to fund *Coleman* court directives in the current year.
- Request that staff, LAO, DOF, and the department work on an annual report that tracks all of the mental health capital outlay projects being pursued so that transparency can be improved.

## *Plata* Related Medical Care Capital Outlay

**Background.** The federal court-appointed Receiver took over medical care at CDCR about one year ago. Since that time, the Receiver has undertaken several initiatives to improve medical health care within the prisons. One of these initiatives is to commence planning for 5,000 multi-purpose medical beds including beds appropriate for geriatric inmates, terminally ill inmates, and inmates with mobility issues at up to seven sites across the state. Those sites under consideration include:

- California Men's Colony
- California Institution for Men
- California State Prison, Sacramento
- Richard J. Donovan Correctional Facility
- California State Prison, Los Angeles County
- Deuel Vocational Institution
- California Medical Facility
- Fred C. Nelles Juvenile Correctional Facility (this facility is now closed)

In order to plan for the construction of 5,000 medical beds, the Receiver's office is conducting a survey of the prison population to determine what type of specialized housing and treatment space is needed. The Receiver's office has not completed this survey to date and in his most recent quarterly report to the court has indicated that this effort has been hindered by a lack of reliable data on the burdens of chronic disease and physical impairment in the prison population. The Receiver indicates that this survey data is critical to properly planning for facility and medical care needs and has retained a consultant that will help in developing an assessment tool that can be used to assess inmate health and assign them to levels of care. The Receiver estimates that the consultant will complete their work by July 2007.

**500 Correctional Treatment Center Bed Project.** The Receiver had launched a project to identify and secure 500 additional Correctional Treatment Center-type beds within 180 days. This effort was undertaken in an effort to reduce the department's current overuse of expensive acute beds and beds in community hospitals. The Receiver had determined that many inmates could be more appropriately and less expensively treated when recovering in alternative housing. After surveying viable options for identifying 500 additional Correctional Treatment Center-type beds in the short run, the Receiver has decided to fold this project into the overall 5,000 bed project.

**San Quentin Project.** In addition to the efforts above, the Receiver's office has also started a pilot project to address physical plant deficiencies at California State Prison, San Quentin. The plan includes three phases and is estimated to cost $175 million. The first phase will include various projects to "create space" for longer term projects, improve level of services in Neumiller Infirmary Building, and create temporary structures to provide basics to San Quentin medical personnel. The first phase includes the following projects:

- **Personnel Office**. A personnel office will be constructed to support recruitment and hiring of medical, mental health, and dental staff at the institution. The Receiver's office indicates that conceptual design for this building is complete and that working drawings are being developed.

- **Replacement Parking Spaces.** San Quentin currently does not have adequate parking for its staff or escort vehicles to transport inmates to medical appointments off prison grounds. The Receiver's Office has indicated that additional parking spaces have been added and placed into service.
- **Relocation of Walk Alone Yards.** Walk alone yards in the Upper Yard will be relocated to the "C" Yard to make room for temporary clinical offices and examination areas in the Upper Yard. The Receiver's Office indicates that documents are being prepared to solicit construction bids.
- **Medical Supply Warehouse.** A new central warehouse will be constructed to replace the current system that houses medical supplies in more than four spaces on the institution's grounds. A conceptual plan has been developed for a medical warehouse, but a decision has been made to integrate the medical warehouse into the development of a main warehouse at San Quentin.
- **Trauma Treatment Area Renovations.** The Trauma Treatment Area in the Neumiller building will be relocated from the northern entrance to within the building's core on the first floor. Renovation and construction is currently underway and should be complete by May 2007. This will provide four trauma treatment areas for patients and provide more adequate space for personnel.
- **Ventilation Upgrades to North Block.** The Receiver has initiated a plan to improve air ventilation in North Block and increase the overall cleanliness of the North Block.
- **Expansion of West and East Block Rotundas for Sick Call.** This project will make use of space in the rotundas of East and West Blocks for expanded clinical areas for sick call. Currently, medical personnel are using converted cells that are inadequate. Designs are currently being developed to utilize the rotundas.
- **Other Upgrades.** The Receiver also proposes to make various other upgrades to clinical space in the North Block, Adjustment Center, and Gym. These upgrades are currently being developed. Trailers have also been procured and are in use for office space for medical care personnel.

The second phase of the Receiver's San Quentin Project includes the following:
- **Primary Care/Specialty Medical Services Modular in Upper Yard.** These modular units will be put in place after the "walk alone" yards are moved to "C" yard to augment the inadequate medical treatment space in the Neumiller Building. These modular units will be used until a permanent Central Health Services Building can be constructed. Planning for this project is in the final stages.
- **Minor Remodel of Medical Records Unit.** Minor changes will be made to the existing Medical Records Unit until a permanent Central Health Services Building can be constructed. Modifications are currently being planned.
- **Minor Remodel of Receiving Modular.** Reception of new inmates is currently conducted in modular buildings at San Quentin. Minor changes will be made to provide additional space for mental health screening and medical personnel.

The third and final phase of the San Quentin Project involves the construction of a new Central Health Services Building at San Quentin. The current plan is to raze Building 22, one of the oldest buildings in Marin County, and construct a new building in its place. The majority of Building 22 is not being used by the prison because of seismic issues. The new facility would

include a 50-bed correctional treatment center, a reception center, and treatment space for mental health and dental clinicians. The concept design is in its final phase and environmental work for this project has commenced. In a Finance Letter (dated March 15, 2007) the Legislature was notified that $492,593 General Fund was transferred, from the $100 million in unallocated funds set aside to be directed by the Receiver in the 2006-07 Budget Act, for environmental impact documents related to the construction of a new Central Health Services Building at San Quentin.

**Governor's Budget.** The Governor's budget proposal includes $1 billion in lease-revenue bonds for construction of specialized beds, treatment space, and program space for health care services. The administration indicates that these funds will be set aside until cost estimates of specific projects become available from the court-appointed Receiver in *Plata v. Schwarzenegger*.

The Receiver, in his most recent report to the court, indicates that there is general agreement among the court appointed experts in the *Coleman* and *Perez* lawsuits that the Receiver should take the lead on the construction of the 5,000 medical beds, including clinical space and treatment centers.

**Most Bond Funding Premature.** The Receiver has indicated, in his most recent report to the court, that the survey of inmate needs is critical before planning can commence on new health care beds. The Receiver does not expect that the survey will be complete before July 2007. It will likely take some time after the survey is complete to develop a plan for the beds, including developing the types of beds that are needed. Therefore, staff finds that it is premature to expect that funding will be needed to construct new facilities in the budget year. (The exception may be the San Quentin Project where considerably more planning has been completed.)

The LAO withheld recommendation in their Analysis on the $1 billion in lease-revenue bonds for medical facilities because no specific projects had been submitted to the Legislature. Since the LAO Analysis was released, the administration has come forward with some details regarding the San Quentin Project. However, to date information commensurate with what would be included in a capital outlay budget change proposal has not been received.

Furthermore, the LAO recommends that the Legislature only provide funding for site acquisition and preliminary plans. The LAO indicates that this approach may require direct General Fund appropriations to initiate projects and in future years the Legislature could authorize lease-revenue bonds to finance the construction of these projects.

**$1 Billion Likely Not Enough.** Even though bond funding may be premature, staff finds that the $1 billion in lease-revenue bonds for specialized beds, treatment space, and program space for health care services will likely not be enough to cover all of the projects needed to comply with the settlement agreements. Specifically, preliminary plans to comply with the *Perez* lawsuit alone are estimated to cost about $1.4 billion. Staff estimates that the costs associated with the mental health bed plan are also likely to be over $500 million. Furthermore, development of a capital outlay plan to comply with the *Plata* lawsuit is still being developed and the costs are largely unknown.

**How Will Construction Proceed?**  To date, the Receiver has contracted directly for support in developing capital outlay projects needed for compliance with the *Plata* settlement.  These projects are currently in the planning stages, but it is unclear whether they will proceed to construction through the normal state capital outlay process.  The Receiver has indicated that he intends to employ the design-build process for construction of the Central Health Care Services Building at San Quentin.  This process generally requires special authorization by the Legislature and allows the state to contract with one firm to both design and build a facility.  The Receiver has also indicated that to the extent possible his office plans on following other state processes regarding capital outlay, including complying with environmental regulations, prevailing wage, and reporting to the Public Works Board.  However, because of the unique position and power of the Receiver there is some uncertainty about how this process will work.

The LAO recommends that, to the extent practical, the Legislature apply its standard budgetary processes to carefully review and act upon capital outlay budget requests submitted to it in behalf of the Receiver.  The LAO finds that the Legislature continues to bear the responsibility, under the State Constitution, to appropriate funds and to enact an annual budget to support state programs.

**Staff Recommendation.**  Staff recommends that the Subcommittee take the following actions:
- Hold this issue open.
- Request that staff, the LAO, DOF, and the department request additional information on the San Quentin Project from the Receiver to determine what level of funding is appropriate for this project in the budget year.
- Request that staff, the LAO, DOF, and the department request to work with the Receiver to develop a standardized process for proceeding with capital outlay projects to ensure adequate information for the Legislature to provide fiscal oversight.

## *Perez* Related Dental Care Capital Outlay

**Background.** In December 2005, the department entered into a Stipulated Agreement to settle the *Perez v. Hickman* lawsuit claiming inadequate dental care in state prisons. This Agreement lowered the ratio of inmates to dentists from 950 inmates to one dentist to 515 inmates to one dentist. Additional treatment space is needed to accommodate this higher level of staffing.

The 2006-07 Budget Act included $1.7 million General Fund to the department to develop capital outlay plans to add additional dental treatment and office space to implement the *Perez* settlement. The department indicates that $500,000 was utilized to plan for treatment and office space at the first seven institutions where the new lower inmate to dentist ratio is being implemented.

**Finance Letter.** A Finance Letter (dated March 29, 2007) proposes $15.1 million General Fund for preliminary plans for dental treatment and office space at the following seven prisons:

- Avenal State Prison
- Calipatria State Prison
- Centinela State Prison
- Chuckawalla Valley State Prison
- Ironwood State Prison
- Kern Valley State Prison
- Folsom State Prison

These are the first seven institutions where the new lower inmate to dentist ratio is being implemented. The total cost of these projects is estimated to be $285 million.

**Details Lacking.** Staff finds that the department is requesting money for preliminary plans in the construction of seven major capital outlay projects. However, very little information has been provided to describe these projects. Staff has not received information commensurate with what is typically included in a capital outlay budget change proposal. Furthermore, the department has not submitted a Space Needs Study that was the basis for these proposals.

**Coordination Needed.** The Receiver has made numerous findings regarding the lack of adequate treatment space and program space for medical care. However, at this time, the Receiver has not developed a plan for addressing these space shortfalls at most of the institutions. (The Receiver is currently working on the San Quentin Project to address deficiencies at this institution as a pilot project.) As mentioned earlier in this agenda, there has been agreement among the experts in the three major health care lawsuits (including *Perez*) that the Receiver will take the lead on the construction projects to build 5,000 additional beds and the necessary clinical and treatment space. Staff finds that these projects have not been coordinated with efforts by the Receiver, because at this time the Receiver has not developed plans to address the space shortfalls at these institutions. Coordination is needed to ensure that the space at the facilities is best used to meet the collective needs of medical, mental health, and dental care in the most efficient manner.

**Projects Should Be Scheduled Separately.** Staff finds that these seven major capital outlay projects are proposed as one mega project. Staff finds that it would be easier to track if these projects were scheduled separately and tracked separately in the budget document.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:

- Hold this issue open.
- Request that the department provide additional detail on the scope of the projects, including the Space Needs Study developed.
- Request that staff, the LAO, DOF, and the department request to work with the Receiver and other court appointed experts in the *Perez* and *Coleman* lawsuits to determine the best way to proceed with these projects to ensure coordination among the lawsuits.

## *Farrell* Related Minor Capital Outlay

**Background.** In 2004, the state settled the *Farrell* lawsuit that alleged poor conditions of confinement and lack of treatment services for youth housed in Division of Juvenile Justice institutions. Beginning in 2005-06, the department started implementing reforms as stipulated in a Consent Decree in the following seven functional areas:

- Mental Health
- Sex Behavior
- Disability
- Education
- Medical Care
- Safety and Welfare

The department has developed remedial plans for each of these areas, which has required the addition of a significant number of new staff. The current juvenile institutions do not have adequate or appropriate space to house these staff and/or space for these staff to deliver programming.

The 2006-07 Budget Act included $12.5 million General Fund to fund minor capital outlay projects to increase the programming and office space to start the implementation of the *Farrell* reforms. The department indicates that the majority of this funding was utilized to purchase portable units to provide temporary treatment space and classroom space. The department has also expended about $5.7 million ($2.9 million federal funds) to upgrade the telecommunications switch at each juvenile institution to accommodate the additional space. The department indicates that it is also funding an architect to design a new 280 bed core treatment facility and has indicated that in the future hopes to site one of these facilities in both Northern California and Southern California.

**Finance Letter.** A Finance Letter (dated March 29, 2007) requests $5 million for preliminary plans, working drawings, and construction for various minor capital outlay projects to increase programming space and office space for new staff to implement the *Farrell* implementation plans. The department indicates that $3 million is needed to supplement money provided in the current year to make modifications at seven Behavior Treatment Programs. The remaining $2 million is needed to renovate space for additional treatment space, classrooms, office space, and medical treatment space.

The proposal includes budget bill language to exempt these projects from state law that limits minor capital outlay projects to $400,000 or less. The budget bill language would allow the department to fund minor capital outlay projects to comply with the *Farrell* lawsuit that cost up to $600,000.

**Details Lacking.** Staff finds that very little information has been provided to describe these projects. Information on individual projects has not been put forward. Furthermore, the per foot costs for renovating the new Behavior Treatment Programs has more than doubled in cost since initial planning. However, no information has been provided to describe why these costs have doubled. Furthermore, it is unclear whether this request, combined with the funding provided in the current year, meets the space requirements of the remedial plans.

**Subcommittee No. 4**                                          **April 12, 2007**

**Staff Recommendation.**  Staff recommends that the Subcommittee take the following actions:
- Hold this issue open.
- Request that the department provide additional details on where the new modular units were placed and what needs they met, including what has been done to improve conditions at the Herman G. Stark Youth Correctional Facility (this facility was supposed to be the focus of the department's reform during the current year).
- Request that the department provide additional details on what the new funds will support including where additional classrooms, etc., are needed within the system and whether this is adequate to meet the space requirements of the remedial plans.

# San Quentin Condemned Inmate Complex

**Background.** The 2003-04 Budget Act authorized $220 million in lease-revenue bonds for the design and construction of a new Condemned Inmate Complex for condemned male inmates at California State Prison, San Quentin. The original project was designed to provide 1,408 beds which were projected to meet the department's condemned inmate population needs through 2037. However, because of increased costs related to this project cost containment measures were taken in September 2005 to: (1) eliminate one housing unit, thereby reducing the number of beds by 18 percent; and (2) change the project scope for warehouse and maintenance support space from the construction of freestanding buildings to the conversion of existing dormitory buildings. Even with these cost containment measures, it was recognized that the project had a 6 percent budget deficiency in September 2005. The preliminary plans for this project were approved by the Public Works Board in November 2005.

There are currently 604 condemned inmates at San Quentin. The capacity of the current condemned housing is 634 beds. The new Condemned Inmate Complex would provide 1,152 beds.

**Governor's Budget.** The Governor's budget proposal includes $116.5 million in lease-revenue bonds to address additional funding needed to complete construction of the Condemned Inmate Complex at California State Prison, San Quentin. This is a 53 percent increase in estimated costs, since 2003, despite reducing the size of the project.

**Project is Expensive.** The LAO finds that the costs for this project will be nearly twice the cost of other high security beds. The main reasons for these higher costs are due to the location of the project. In particular, engineering requirements are more challenging at San Quentin because of the instability of the soil. Also, labor and materials are more expensive in the Bay Area than other potential sites for such a facility. This project is estimated to cost $300,000 per bed to construct. This is considerably higher then other high security beds.

**Environmental Impact Report Caps Population at San Quentin.** The LAO finds that the Environmental Impact Report that was developed for this project restricts the total number of inmates that can be housed at San Quentin to 6,558. The LAO finds that this limit may prevent the department from using all of the cells being vacated with the relocation of the condemned inmate population to a new Condemned Inmate Complex. Furthermore, the Receiver is currently pursuing the San Quentin Project that includes the construction of a 50-bed correctional treatment center, which may bring the total population at San Quentin closer to the cap.

**LAO Recommends Moving Project.** The LAO recommends that the Legislature cancel the condemned housing project at San Quentin and use the remaining funding authorized to build additional prison capacity for condemned and maximum-security inmates at a lower cost per bed elsewhere. This could include: (1) building a new condemned inmate complex at an existing prison or at a new site, or (2) constructing new Level IV capacity and moving condemned inmates to Level IV housing at an existing prison. The LAO indicates that some states house condemned inmates with other Level IV population in a single facility and suggests that this

could also be an option.

The department indicates that the unique site specific costs that could be avoided if the Condemned Inmate Complex was built at another prison are about $33 million. The department indicates that these costs are less than the land acquisition and waste water treatment facilities that may need to be acquired or expanded to meet the needs of a new condemned housing unit. Staff finds that the costs associated with adding additional housing units for the condemned inmate population should not be any different from the department's infill bed plan, where the department has not needed to acquire additional land.

Furthermore, the department indicates that moving the Condemned Inmate Complex to another institution would most likely delay the start of construction by two years. The department estimates that it will be ready to go to construction during the upcoming budget year if the project is built at San Quentin.

**Staff Comments.** Staff finds that there was considerable debate regarding moving the Condemned Inmate Complex to an alternative site in 2003 when the project was authorized. A drawback that surfaced during this debate was that moving the condemned population to a remote prison facility would make it more difficult for specialized legal representation to have access to the condemned inmate population. State law allows for automatic appeals and habeas corpus appeals for all condemned inmates.

Furthermore, there would likely be local community opposition to moving the condemned inmate population to any other location in the state.

**Staff Recommendation.** Staff recommends that the Subcommittee hold this issue open.

# Correctional Officer Training Academy

**Background.** Currently, the department operates one main correctional officer training academy called the Richard A. McGee Correctional Training Center located in Galt. The department is also currently utilizing the Northern California Women's Facility in Stockton as a satellite training facility. Between the training facility in Galt and the satellite facility in Stockton, the department currently has the capacity to train 2,520 cadets annually. The department was provided $58 million to fund these expansions in the current year. The basic training academy in Galt will graduate 250 cadets on April 20, 2007.

The department is also developing collaborative relationships with the California Community College Chancellor's Office to pilot the delivery of basic academy training to students enrolled in four community colleges (Santa Rosa, Napa, Fresno, and Susanville). These efforts help to improve the recruitment of citizens living near CDCR institutions. These pilots have, or will, produce about 135 new correctional officers this year.

The department estimates that it will need about 4,600 additional adult correctional officers in the budget year. This number may increase further based on actions taken by the Receiver to ensure that custody staff is available to deliver health care services in a safe manner. The number may also increase if additional housing units are constructed as proposed in the Governor's infill prison bed plan. The department reports that it currently has 1,780 correctional officer vacancies. (This does not include correctional classifications with supervisory responsibilities.)

**2006 Special Session.** As mentioned above, the Governor called a special session in June of 2006. At that time, the Governor proposed $55 million from lease-revenue bonds and $6.9 million from the General Fund to construct and staff a new correctional officer training academy in southern California. In response to this proposal, the Senate approved SB 10xx (Machado) in August 2006 to authorize $7.2 million General Fund for planning to establish a new training academy for correctional officers in southern California. (This funding was also proposed to fund per diem costs for correctional officer cadets that would be displaced from the relocation of cadets currently utilizing the abandoned Northern California Women's Facility for training.)

**Governor's Budget and Finance Letter.** The Governor's budget proposal includes $105 million in lease-revenue bonds to acquire land, develop preliminary plans and working drawings, and construct a new correctional officer training academy in southern California. The Governor's budget also includes $29.9 million in General Fund monies to support these efforts. The department indicates that it has assumed the allocation of $17.5 million for the acquisition of 100 acres for the site of the new academy.

**Details Lacking.** Staff finds that the department is requesting funding for a major new facility. However, very little information has been provided to describe this project. Staff has not received information commensurate with what is typically included in a capital outlay budget change proposal. In addition, the department has not identified a site for the academy, which makes it difficult to estimate actual costs of acquiring land or constructing the facility.

Furthermore, the estimate of the cost of this proposal increased from $58 million in the Governor's budget proposal to $135 million in the detail provided to the Legislature on February 8, 2007. Staff has not received information to justify this increase and has not received information on the ongoing operational costs of this facility. The LAO withholds their recommendation until additional information is provided on the construction and operational costs of the academy.

**Correctional Officers in Demand.** Staff finds that the department needs to recruit more correctional officers. The department currently has over 1,700 vacancies, which adversely impacts department operations. A high number of vacant correctional officer positions reduce safety at the institutions for staff and inmates. High vacancies also contribute to high levels of staff burnout due to large amounts of overtime that must be worked. Furthermore, the Receiver has indicated, in his most recent report, that he plans to create health care access teams because of a lack of custody staff available to accompany inmates to medical appointments. In addition, other operations within the institution, including visiting and programming, can be adversely impacted by a lack of custody staff.

**Southern California Academy May Improve Recruitment Efforts.** The LAO finds that having an academy in Southern California may help the department recruit more officers and fill its vacancies. The department indicates that it is difficult to recruit cadets from southern California who may be unable or unwilling to move and be away from their families for the 16-week academy. Staff concurs with these findings.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Hold this issue open.
- Request that the department provide additional information on the proposal, including information on the basic components of the facility.

# Other Capital Outlay

## 1.    Waste Water Treatment Plant Upgrades

**Background.**   Overcrowding at the adult institutions has significantly impacted existing infrastructure systems, most notably, wastewater systems.  These systems are often required to operate at or above the maximum intended capacity, resulting in an increased health and safety risk to CDCR staff, inmates, the public, and the environment.  Overcrowding the prison sewage and wastewater systems has caused the discharge of waste beyond treatment capacity, resulting in sewage spills and environmental contamination.  These spills can contaminate groundwater drinking supplies and place the public's health at risk.  Furthermore, the department's wastewater issues have already resulted in multiple fines, penalties, and notices of violation to the CDCR from environmental control agencies (mainly the Regional Water Quality Control Boards).  The department has been issued fines and wastewater violations at the following facilities, among others:

- California Men's Colony
- Deuel Vocational Institution
- California Correctional Center/High Desert State Prison
- Mule Creek State Prison

**Governor's Budget and Finance Letter.**  The Governor's budget proposal and a Finance Letter (dated March 29, 2007) propose funding for the following Waste Water Treatment Plant (WWTP) upgrades:

- **California Correctional Center/High Desert State Prison.**  The Governor's budget proposal includes $28.9 million General Fund for working drawings and construction for a project to make major upgrades to the WWTP that serves both of these prisons.

  The Finance Letter proposes $22.6 million General Fund in additional funding for this project to expand the scope of the project to meet the Regional Water Quality Control Board's Waste Discharge Requirement (WDR) permit requirements.  This facility is currently operating under a Cease and Desist Order issued by the Board in July 2005 and the Governor's January proposal did not account for all of the upgrades needed to meet the WDR permit requirements.  Specifically, the new project scope includes construction of an additional storage pond, the lining of five existing storage ponds, doubling of acreage needed to spray effluent, and the demolition and replacement of five support buildings.  Total costs for this project are now estimated to be $54.6 million.  Of this total, $3.2 million was appropriated in 2005-06 and 2006-07.

- **Deuel Vocational Institution.**  The Finance Letter proposes to revert $25 million General Fund allocated for the construction of a new WWTP at this prison in 2006-07 due to delays with this project.  The Finance Letter also proposes an additional $37 million General Fund so that construction of this project can continue in the budget year.  Based on the most recent construction estimates for this project, costs have increased by

over 40 percent since last April. The department indicates that it is currently operating this plant under a Cease and Desist Order issued by the Regional Water Quality Control Board and that the delays in the project will make it impossible to meet the Board's compliance schedule. Total costs for this project are now estimated to be $40 million. Of this total, $3.1 million was appropriated in 2005-06 and 2006-07.

- **California Correctional Institution.** The Finance Letter proposes $8.7 million in lease-revenue bonds for increased construction costs related to major upgrades of the WWTP at this prison. Funding for this project was first allocated in 1997-98. The department indicates that there have been major increases in the construction costs since the estimate for this project was completed in January 2005. Total costs for this project are now estimated to be $29.5 million. Of this total, $20.8 million was appropriated in 2005-06 and in several other previous budget years.

- **Chuckawalla Valley State Prison/Ironwood State Prison.** The Governor's budget proposal includes $5.7 million General Fund for working drawings and construction to rehabilitate the WWTP that serves both of these prisons.

  The Finance Letter proposes to reduce the amount provided in the Governor's budget by $4.4 million General Fund due to scope changes that require additional preliminary plans and working drawings before construction can commence. This proposal results in a request of $550,000 for additional preliminary plans and $724,000 for working drawings in the budget year. The revised proposal would replace the existing trickling filter system with an oxidation ditch and total costs for this project are now estimated to be $24.7 million. Of this total, $455,000 was appropriated for preliminary plans in 2006-07.

- **Sierra Conservation Center.** The Finance Letter proposes to revert $11.8 million General Fund allocated in 2005-06 for construction of a new effluent disposal system that includes a pumping station, a pipeline, and a new reservoir. The Finance Letter also proposes an additional $18.8 million General Fund so that construction of this project can continue in the budget year. This project went out for bids in May 2006. All of the bids exceeded the state's estimate, especially the bids related to the construction of the reservoir. Total costs for this project are now estimated to be $21.2 million. Of this total, $2.4 million was appropriated in previous budget years starting in 1998-99.

- **Centinela State Prison.** The Governor's budget proposal includes $5.5 million General Fund for construction of various upgrades to the WWTP at this prison.

  The Finance Letter proposes to increase construction-related costs for this project by $896,000 General Fund. The department indicates that this funding is needed for fire sprinklers in a chemical building and other electrical upgrades not identified in the initial preliminary plans. Total costs for this project are now estimated to be $7.4 million. Of this total, $988,000 was appropriated in 2005-06 and 2006-07.

- **California State Prison, Corcoran/Substance Abuse Treatment Facility.** The Governor's budget proposal includes $5 million General Fund for construction of

numerous upgrades to the WWTP that serves both of these prisons.

The Finance Letter proposes to increase construction-related costs for this project by $913,000 General Fund. The department indicates that this funding is needed due to significant increases in the cost of equipment needed to complete this project, including electrical equipment. Total costs for this project are now estimated to be $6.5 million. Of this total, $554,000 was appropriated in 2005-06 and 2006-07.

- **Mule Creek State Prison.** The Governor's budget proposal includes $390,000 General Fund for preliminary plans to make numerous upgrades to the WWTP at this prison. This prison was issued a Notice of Violation of its WDR permit requirements by the Regional Water Quality Control Board in September 2006. Total costs for this project are estimated to be $4.9 million.

**Water Use Efficiency Important.** It is unclear whether water use efficiencies have been implemented at all of the institutions listed above. Staff finds that $11 million General Fund was provided in the current year for various maintenance efforts and that some of the funding was provided for flushometers (meters that limit the number of times in an hour an inmate can flush his/her toilet) and other water use efficiency measures. Staff finds that implementing water use efficiencies can be more cost effective than expanding WWTP facilities. However, given the overall magnitude of the overcrowding at some of these institutions, staff finds that water use efficiency will not meet all of the needs of the department. Nevertheless, staff finds that the department should have a policy of pursuing all water use efficiency options before taking efforts to greatly expand an institution's WWTP.

**Costs Out of Control.** The costs of several of the projects listed above have increased significantly since the preliminary planning stage. In some cases the department's estimates have nearly doubled, including the projects at the California Correctional Center/High Desert State Prison and the Deuel Vocational Institution. Staff finds that the department needs to do more to contain costs and ensure that the original scope of the project is accurate before proceeding to preliminary plans and working drawings. Furthermore, more needs to be done to ensure that these projects stay on schedule. Two of these projects, California Correctional Institution and the Sierra Conservation Center projects, were first funded in the 1990s. Staff finds that the same lack of cost controls and schedule controls could impact the infill bed housing plan or other major capital projects that are currently being proposed. Cost overruns on these much larger projects could be significantly more than these WWTPs.

**How Will Facilities be Sized?** The department has proposed infill projects at the majority of the facilities that need WWTP upgrades. Furthermore, the Receiver and the department have proposed building additional beds at some prisons that will further stress the WWTP at certain institutions. All of these upgrades are being designed to accommodate current overcrowding, except for the Chuckawalla Valley State Prison/Ironwood State Prison project. This means that if the department stays in the "bad" beds and also builds the new infill beds and/or health care beds, it is likely that the WWTP upgrades will not accommodate the expanded demands on the infrastructure. The department has indicated that each of these projects pose different challenges for expansion. Furthermore, the department indicates that it plans on issuing change orders to

contracts it has already awarded if the infill beds are approved. Staff finds that issuing large change orders to projects that have already been awarded compromises the state's negotiating position and may significantly increase the costs of the project.

**Specific Project Issues.** Staff has identified the following issues with the projects listed above:

- **California Correctional Center/High Desert State Prison.** The scope of this project has changed dramatically to comply with requirements of the Regional Water Quality Control Board. However, the department finds that it can complete the preliminary plans for the new scope within the funds already appropriated for the preliminary plans. The Legislature has not received a notification to change the scope of this project. Given the major changes to the scope and projected delays it is unclear that construction funding is needed in the budget year. Furthermore, if the Legislature approves the infill bed plan that would add 750 beds to these prisons, this project would have to be further amended. This would result in a further delay to the project or a costly change order.
- **Deuel Vocational Institution.** This project has had significant cost overruns. Staff finds that some of these cost overruns could have been avoided if the preliminary planning for this project had been more accurate and complete.
- **California Correctional Institution.** This project has been delayed significantly. Staff finds that delays in this project have increased the costs of the project. Furthermore, if the Legislature approves the infill bed plan that would add 875 beds to this prison this project would have to be further amended. This would result in a further delay to the project or a costly change order.
- **Chuckawalla Valley State Prison/Ironwood State Prison.** The scope of this project has changed to comply with requirements of the Regional Water Quality Control Board. The Legislature has not received a notification to change the scope of this project. This project can accommodate the additional infill housing being planned for these prisons.
- **Sierra Conservation Center.** Staff finds that it is difficult to understand what is driving the increased costs for this project. Additional information is needed from the department. Furthermore, if the Legislature approves the infill bed plan that would add 400 beds to this prison, this project would have to be further amended. This would result a further delay to the project or a costly change order.
- **Centinela State Prison.** If the Legislature approves the infill bed plan that would add 590 beds to this prison, this project would have to be further amended. This would result in a further delay to this project or a costly change order.
- **California State Prison, Corcoran/Substance Abuse Treatment Facility.** The Governor's infill bed plan includes 150 new beds for the Substance Abuse Treatment Facility. However, additional upgrades may still need to be made to this WWTP given the current deficiencies in overcrowded conditions.
- **Mule Creek State Prison.** If the Legislature approves the infill bed plan that would add 400 beds to this prison, this project may have to be further amended. However, since this project is in the preliminary planning stage, changes could be made relatively easily.

**Staff Recommendations.** Staff recommends that the Subcommittee take the following actions:

- California Correctional Center/High Desert State Prison – Approve funding for working drawings and hold open funding for construction.
- Deuel Vocational Institution – Approve Finance Letter for this project (reversion

language and funding for construction).
- California Correctional Institution – Hold this issue open, pending action on the infill bed plan.
- Chuckawalla Valley State Prison/Ironwood State Prison – Approve the Governor's budget and Finance Letter proposals and request that a scope change be issued for this project.
- Sierra Conservation Center – Hold this issue open pending additional information on what is driving the increased costs for this project.
- Centinela State Prison – Hold this issue open.
- California State Prison, Corcoran/Substance Abuse Treatment Facility – Hold this issue open.
- Mule Creek State Prison – Approve this budget proposal.
- Request that the department provide information on the water use efficiency measure that it has taken at each of these institutions.
- Request that staff, the LAO, DOF, and the department develop and report, by May Revision, on strategies to address cost controls and schedule controls on the department's capital outlay projects.
- Request that the department develop estimates and report by May Revision on what funding and modifications are needed to expand the scope of each of these projects to accommodate infill beds and health care beds that have been identified, where applicable.

## 2.    Sierra Conservation Center - Water Supply Treatment Plant

**Background.**  The Sierra Conservation Center is located in the Sierra Nevada foothills near the town of Sonora.  The center pre-treats raw water from Lake Tulloch for all uses at the center, including drinking, showering, toilets, and kitchen uses.

**Governor's Budget and Finance Letter.**  The Governor's budget proposal and a Finance Letter (dated March 29, 2007) propose funding for a filtration structure for the water supply treatment plant at the Sierra Conservation Center.  The Governor's budget includes $2 million General Fund for working drawings and construction of a filtration structure for the water supply treatment plant at the Sierra Conservation Center.

A Finance Letter proposes to reduce the amount provided in the Governor's budget by $1.8 million General Fund due to delays in the construction of this project.  The total cost of this project is now estimated to be $2.2 million.  Of this total, $151,000 was appropriated in 2006-07 for preliminary plans.

**Is This Proposal Sized Correctly?**  The administration proposes to add 400 beds to the Sierra Conservation Center in the infill bed plan.  It is unclear whether this facility will accommodate additional capacity at this institution.

**Staff Recommendation.**  Staff recommends that the Subcommittee take the following actions:
- Hold this issue open.
- Request that the department develop estimates and report by May Revision on what

funding and modifications are needed to expand the scope of each of this project, if needed.

# 3.    Solid Cell Fronts

**Background.** In order to improve the safety of staff, the department started an effort to retrofit old administrative segregation units with open barred cell fronts and cell doors to a solid cell front design. The solid cell front design reduces the opportunity for gassing or spearing attacks by inmates upon staff.

**Governor's Budget and Finance Letter.** The Governor's budget proposal and Finance Letter (dated March 29, 2007) includes funding for an ongoing project to replace the bar construction of cell fronts in the Administrative Segregation Units with solid cell fronts. This modification will also require modifications to the heating/ventilation system and utilities. The budget and Finance Letter includes funding for the following conversions:

- **California Institution for Men.** The Governor's budget proposal includes $5.6 million General Fund for construction to convert 204 cells and 12 showers.

  The Finance Letter proposes to increase the amount provided in the Governor's budget by $588,000 General Fund due to a revised construction cost estimate. The department indicates that, given the shortage of inmate beds, the department has determined that only one-half of one floor will be available to the contractor to work on at a time. This will lengthen the duration of the construction contract from 12 months to 16 months. Total costs for this project are estimated to be $7.4 million. Of this total, $1.2 million was appropriated in 2005-06 and 2006-07.

- **California Medical Facility.** The Governor's budget proposal includes $4.1 million General Fund for construction to convert 126 cells and 6 showers.

  The Finance Letter proposes to increase the amount provided in the Governor's budget by $438,000 General Fund due to a revised construction cost estimate. The department indicates that given the shortage of inmate beds the department has determined that only one-half of one floor will be available to the contractor to work on at a time. This will lengthen the duration of the construction contract from 12 months to 16 months. Total costs for this project are estimated to be $5.3 million. Of this total, $759,000 was appropriated in 2005-06 and 2006-07.

- **Deuel Vocational Institution.** The Governor's budget proposal includes $504,000 General Fund for preliminary plans to convert 144 cells.

  The Finance Letter proposes to reduce this amount by $99,000 General Fund due to a refined estimate of actual costs prepared by the department. Total costs for this project are now estimated to be $6.4 million.

- **Correctional Training Facility.** The Governor's budget proposal includes $504,000 General Fund for preliminary plans to convert 144 cells.

  The Finance Letter proposes to reduce this amount by $99,000 General Fund due to a refined estimate of actual costs prepared by the department. Total costs for this project are now estimated to be $6.5 million.

**Staff Comments.** Staff finds that gassing attacks on staff should be reduced when new housing units are constructed to accommodate the mentally ill population. Furthermore, the infill housing plan includes several new administrative segregation units, which will allow the department to convert existing administrative segregation units back to general population housing units. Therefore, the overall size of this project may be smaller if the infill bed plan is approved and the mental health bed plan is implemented. However, staff finds that none of the projects proposed for funding in the budget year would receive a new administrative segregation unit in the infill bed proposal.

Furthermore, the department has identified additional changes that may be needed to the two projects proposed for construction in the budget year. These changes may increase the costs of the projects.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Hold open funding for the construction phase at the California Institution for Men and California Medical Facility.
- Approve budget and Finance Letter for preliminary plans phase at the Deuel Vocational Institution and Correctional Training Facility.

## 4.    Small Management Yards

**Background.** The CDCR is required, by a court order from the 1970s, to provide at least ten hours per week of out of cell exercise to inmates in administrative segregation. Historically, the department would accommodate this requirement by releasing 15 to 25 inmates at one time into an exercise yard. The department cites that the increased complexity of the administrative segregation inmate population has made it more difficult to release large groups of inmates without the threat of violence. Therefore, several years ago, the department started to construct small management yards and so far 921 small management yards have been implemented.

The small management yards are approximately 150 square feet and can accommodate two inmates at one time. They are made of a metal fencing-type material and have a combination toilet and sink.

**Subcommittee No. 4**                                                        **April 12, 2007**

**Governor's Budget.** The Governor's budget proposal includes $911,000 General Fund for preliminary plans and working drawings to add 179 small management yards at the following institutions:

- **California Correctional Center –** 20 yards
- **Sierra Conservation Center –** 20 yards
- **California State Prison, San Quentin –** 31 yards

- **North Kern State Prison –** 20 yards
- **Correctional Training Facility –** 38 yards
- **California Correctional Institution –** 50 yards

This proposal does not allocate monies for construction of these yards in the budget year. However, the department estimates that it will cost $7.4 million in total to complete this project. The department proposes to utilize Inmate/Ward labor to complete the construction of these yards.

**Staff Comments.** Staff finds that the department plans on constructing 262 additional small management yards in order to complete the roll out of small management yards at every institution. The department plans on requesting funds for design of these facilities in two additional phases over the next two budget years.

**Staff Recommendation.** Staff recommends that the Subcommittee approve this request as proposed.

## 5.    California Men's Colony Kitchen

**Background.** The kitchen at the West facility of the California Men's Colony was constructed in the 1940s using wood construction. Surveys by engineering firms in 1992 and 1995 found significant water damage had compromised the structure because of the wood construction and the years of use. In addition, two surveys conducted in 2006 found moderate to severe mold infestation in the kitchen and the dining areas. To date, some rooms in the kitchen have been sealed off and are no longer in use because of the high concentration of mold. The department also has indicated that over 25 percent of the floor area is severely affected by water damage.

The West facility currently houses 2,800 Level I and Level II inmates. Inmates have been housed in this facility continuously since 1984 without any major modifications to improve the kitchen facility.

**Governor's Budget.** The Governor's budget proposal includes $10.5 million for working drawings ($258,000 General Fund) and construction ($10.3 million in lease-revenue bonds) to replace the central kitchen at the West facility of California Men's Colony. This project was first funded in 1998 and has been delayed several times.

**Staff Recommendation.** Staff recommends that the Subcommittee approve this request as proposed.

## 6.    Folsom State Prison – Officers and Guards Building

**Background.** In 2002, the department completed a $2.5 million seismic retrofit of the historic Officers and Guards Building at Folsom State Prison. Further modifications are needed to this building before it can be used as office space. The Officer and Guards Building is outside of the secure perimeter of the prison.

Folsom State Prison currently lacks adequate space to accommodate the levels of health care mandated by the federal courts. The prison currently has an administration building that is within the secure perimeter of the prison. The administration building currently houses the Warden's office, records, and other management activities.

**Governor's Budget.** The Governor's budget proposal includes $370,000 General Fund for working drawings to convert the historic Officers and Guards Building at Folsom State Prison in to office space for prison administrative staff and inmate records personnel.

**Staff Comments.** Staff finds that this project will provide for additional space in the current administration building within the secure perimeter that can be converted to health care space. This should reduce the need to build additional space to meet health care space needs.

**Staff Recommendation.** Staff recommends that the Subcommittee approve this request as proposed.

## 7.    Deuel Vocational Institution – Electrical Power Substation

**Background.** The department utilizes groundwater as the water supply source for the institution. The groundwater no longer meets the Department of Health Services' drinking water standards and in 2003 a project was funded to implement a reverse osmosis system to ensure that the groundwater was treated to a level suitable for drinking. Furthermore, the department is also currently planning to make major upgrades to its current waste water treatment facilities. Both of these facilities require additional electrical capacity.

**Finance Letter.** A Finance Letter (dated March 29, 2007) proposes to revert $2.2 million General Fund for working drawings and construction appropriated in 2006-07 for a new electrical power substation to serve the Deuel Vocational Institution. The Finance Letter also proposes to provide $3.9 million General Fund to continue working drawings and construction of this project in the budget year. The department indicates that foundation costs have increased significantly due to a recently completed soils report. In addition, raw materials needed to complete this project, including copper and core steel, have increased from 50 to 80 percent in the past year. Total costs for this project are now estimated at $4.1 million. Of this total, $250,000 was appropriated in 2006-07 for preliminary plans.

**Costs Out of Control.** The costs of this project have increased significantly since the preliminary planning stage. Staff finds that some of the increased costs are due to materials, but the majority of the increased costs are due to a significant change to the foundation required for this facility. Staff finds that the department could avoid these cost overruns if it ensured that the

original scope of the project was accurate before proceeding to preliminary plans and working drawings.

**Staff Recommendation.** Staff recommends that the Subcommittee approve this Finance Letter proposal (reversion and language and funding for working drawings and construction).

## 8.    Sierra Conservation Center – Firing Range

**Background.** Correctional officers in armed posts participate in regular fire arms training. At some institutions all correctional officers participate in regular fire arms training. Some prisons have firing ranges to accommodate this training on site.

The department indicates that the firing range at the Sierra Conservation Center is used for training by the department, as well as local law enforcement.

**Finance Letter.** A Finance Letter (dated March 29, 2007) proposes $361,000 General Fund for preliminary plans for a new pistol and rifle firing range at the Sierra Conservation Center. This is a new project to relocate an existing training facility that is now close to new homes (Shotgun Estates) adjacent to the facility. The total costs for this project are estimated at $8.6 million and would include the construction of a classroom. The current firing range does not include classroom facilities.

**Staff Comments.** Staff finds that the firing range is important to ensuring adequate training for the correctional officers. However, staff also finds that the department is currently pursuing a number of high priority projects to improve the safety for correctional officers within the institutions by relieving overcrowding. It is not clear that the department will have enough internal resources to manage all of the projects it needs to pursue and may need to prioritize.

Staff finds that there may be multiple options that could be pursued that do not include constructing a new firing range at this time. These options include developing a relationship with a regional firing range that will accommodate the department's training needs, traveling to a nearby prison to utilize their firing range, and making modifications to the existing firing range to limit the risks to the nearby property line.

Furthermore, staff finds that additional information is needed regarding the mutual aid arrangement between the department and local law enforcement to share the firing range. It is unclear whether the department is reimbursed by local law enforcement for the use of this facility.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Reject this proposal.
- Request that the department develop and submit an alternative proposal for consideration in future budget years that includes a cost sharing with the local government agencies to help defray the costs of moving this facility.

# 9.    Statewide Project Planning

**Background.**    The department manages a significant number of facilities.    Most of these facilities are old and decaying.  This requires constant vigilance by the department to ensure that the state's correctional system is maintained and can be fully utilized.

**Governor's Budget.**  The Governor's budget proposal includes $2 million General Fund for advanced planning and budget packages for future capital outlay projects.

**Staff Comments.**    Staff finds that the Governor's budget increases the amount of money provided to the department by $750,000 in the budget year.  This increase is justified given the large volume of work projected over the next several years.  Furthermore, the department's current planning is inadequate and does not result in budget proposals that have enough information for appropriate fiscal oversight by the Legislature.  Staff finds that additional monies may improve the department's abilities to provide more detailed plans for future capital outlay projects.

**Staff Recommendation.**  Staff recommends that the Subcommittee approve this request as proposed.

# Maintenance and Equipment

## 1.    Maintenance Funding

**Background.**  The capital facilities of the adult prisons operated by CDCR represent an investment in today's dollars of as much as $20 billion.  Despite having made this significant investment, the state faces a growing backlog of special repair work that now exceeds $200 million.  This is partly the result of an aging prison infrastructure and sustained high levels of overcrowding of facilities but also due to the way that CDCR has managed and organized the responsibilities of keeping its adult institutions in good repair.

**Governor's Budget.**  The Governor proposes $69 million General Fund to augment the department's baseline budget for maintenance, special repairs, and major equipment purchases. Specifically, this budget request proposes to fund the following activities:

- **Special Repairs Program.**  $12 million to maintain the same level of funding for special repairs as was provided in the current year and augment it by $1 million.
- **Parts and Materials Inventory.**  $10 million to ensure that preventive maintenance is not deferred or neglected due to lack of adequate materials or parts.
- **Roof Maintenance.**  $6.4 million to create regional maintenance teams to undertake ongoing preventative maintenance and minor repairs to roofs.
- **High Voltage Maintenance.**  $6 million to perform preventative maintenance of high voltage switchgears, transformers, generators, and distribution networks.
- **Heating and Ventilation Maintenance.**   $5.9 million to create three regional maintenance teams to perform preventive maintenance of heating and ventilation systems all the facilities.
- **Electrified Fence Repairs.**  $3.1 million for electrified fence system repairs.
- **Road and Parking Lot Maintenance.**  $1.6 million to create a pilot project to repair and replace institution roads and parking lots.
- **Fire Alarm Maintenance.**  $1 million to develop maintenance contracts with fire alarm and suppression system maintenance companies.

This proposal does not include any additional positions to carry out the maintenance.  The department indicates that it plans to redirect vacant maintenance positions from the institutions to headquarters to support this budget proposal.

**Maintenance Efforts Not Well Managed or Organized.**  The LAO has found significant problems in the way that CDCR has organized and managed its responsibilities for keeping its adult institutions in good repair.  These problems are aggravating the maintenance and repair problems, contributing to a lack of preventative maintenance and the growing backlog of special repairs of its facilities.  Specifically, the LAO finds the following:

- **Prisons Not Provided Guidance.**  There is a general lack of policy guidance from headquarters to the prisons regarding what maintenance work will be prioritized or completed.  It is up to the Warden at each institution to determine the use of the maintenance allotment provided to the institution.

- **Preventative Maintenance Not Well Tracked or Coordinated.** The department does have an information technology system to track maintenance of its facilities. However, due mainly to lack of staff this system has not been effectively utilized. In addition, nobody at headquarters is trained to analyze the maintenance data that is submitted from the institutions. Furthermore, CDCR does not maintain a list of equipment that needs replaced.

- **Headquarters Authority Fragmented.** Currently the Adult Support Division determines the allocations for maintenance, while the Office of Facilities Management makes funding decisions about large special repair projects. This fragmentation of authority over maintenance undermines the department's effective use of state resources to prioritize funding.

- **State Maintenance Funding Redirected.** Data from the department indicates that many of the adult institutions are not spending all of their maintenance funds on maintenance. Recent data shows that 16 of the 33 institutions diverted more than 10 percent ($4 million) of their maintenance funding to non-maintenance items. This does not include salary savings from vacant maintenance positions.

- **Wardens Have Little Training.** Wardens generally have little training in maintenance issues and are generally not evaluated based on the maintenance of their facilities.

- **Institution Funding Based on Outdated Formula.** The current allocation methodology used to allocate maintenance funds is based on historic allocations. The current formula does not account for the age of the facility, its physical size, its mission, or the number of inmates it houses. Furthermore, the per square foot allocation can vary widely between institutions.

- **Staffing Not Available for Preventative Maintenance.** Generally there is not enough maintenance staff to handle preventative maintenance. Maintenance staff is needed for critical projects that require immediate response. The number of maintenance staff at individual institutions is not consistent with or based on objective measure of their maintenance and repair needs, such as their size, age, or the mission of their facility.

- **Use of Inmate Labor Limited.** Inmate labor is relatively limited for maintenance work because frequently inmates do not have specialized skills needed for some projects and current labor agreements require a staff trade worker to supervise maintenance workers at all times.

**Efforts Underway to Address Maintenance Problems.** The department indicates that it is beginning to improve its management and special repair functions. The department has established a Maintenance Services Branch within the Office of Facilities and Management to improve coordination of maintenance of CDCR facilities. These staff will be tasked with tracking maintenance activities. The new branch will be staffed with redirected vacant positions from the field. The department has also indicated that it intends to contract with a private firm to conduct a comprehensive assessment of the condition of the department's facilities and determine the level of funding and staffing that is needed for deferred, preventative, and corrective maintenance.

**LAO Recommendations.** The LAO makes several recommendations to improve maintenance of the department's facilities. The LAO recommends that the department take the following actions to improve maintenance operations:

- Direct CDCR to revise the formula used to allocate maintenance funding to the institutions. The new formula should account for the age, mission, and inmate population of each institution.
- Direct CDCR to modify the official duty statement of the Associate Warden of Business Services at each prison to make these state officers responsible for overseeing the maintenance budget.
- Move the responsibility for the allocation of maintenance funding from the Adult Support Division to the Office of Facilities Management.
- Direct CDCR headquarters to provide more policy guidance to the institutions on maintenance priorities and strategies.
- Take steps to reduce the vacancy rate for maintenance employees, ensure that future collective bargaining agreements provide more flexibility for the use of inmate labor, and expand maintenance staffing.
- Incorporate juvenile facilities into the department's maintenance tracking system.

Furthermore, the LAO recommends that the Legislature take the following actions to ensure that maintenance efforts at the department are improved:

- Approve the maintenance budget proposal but reduce it by $4 million to reflect a rough estimate of the funding that is currently being redirected by the department to support other purposes.
- Refrain from funding additional maintenance needs until the department has demonstrated improvements in the way it manages and organizes maintenance and special repairs responsibilities.
- Ensure maintenance funding is spent on maintenance by separately scheduling the item within the main support item or adopting budget bill language allocating a specified amount of the department's budget to maintenance.
- Modify state law to require that management audits conducted of wardens evaluate the performance of wardens in the maintenance of the facilities they are managing.
- Request a report that updates the Legislature on the department's efforts to take the actions listed above to improve its maintenance efforts.

**Proposal is Good First Step.** Staff finds that the Governor's budget proposal and the actions that the department has started to take are a good first step to improving maintenance of the state's prison infrastructure. However, staff recognizes that this money will not solve the current backlogs of special repairs that are well over $200 million. Furthermore, staff concurs with the department's plans to employ a consultant to evaluate the current maintenance needs of the institutions. This will provide a good starting point for evaluating future budget requests to solve the department's maintenance problems. Staff recognizes that the solution to this problem will be a multi-year effort.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:

- Approve the maintenance budget proposal less $4 million as recommended by the LAO and request that the department stop redirecting maintenance funding in its base budget.
- Approve budget bill language that ensures that the department expends these funds only on maintenance activities (similar to Provision 22 of 5225-001-0001 of the 2006 Budget Act).

- Request staff, the LAO, DOF, and the department to develop trailer bill language to require that management audits conducted of wardens evaluate the performance of wardens in the maintenance of the facilities they are managing.
- Request that the department provide an update on its efforts to take various actions to improve its maintenance efforts as detailed in the LAO Analysis.

## 2.   Equipment Funding

**Background.**  Similar to maintenance funding, staff finds that equipment replacement has generally been under-funded at the department.  Furthermore, in some cases, a portion of funding that has been provided for equipment replacement has been redirected to support other department activities.  The LAO estimates that a majority of institutions regularly diverted 15 percent of their equipment budget ($3.5 million annually) to other non-equipment activities.  The department's statewide equipment budget in the current year is $23 million General Fund.

**Governor's Budget.**  The Governor's budget proposal requests $23 million General Fund for equipment replacement.  This would double the baseline funding for equipment replacement. Specifically, this request includes:

- Telephone System Repairs/Upgrades - $4.4 million
- DJJ Private Branch Exchange - $1.1 million
- DJJ Cable Plant Replacement - $2.4 million

- Trunked Radio Systems Infrastructure Replacement - $10 million
- Hand-held Radio Replacement - $1.8 million
- Bus Replacement & Modifications - $3.3 million

**Juvenile Investments Need Careful Consideration.**  The LAO has raised concerns about the major investments in upgrading the telecommunications systems at the DJJ institutions ($3.5 million) given the Governor's proposal to reduce by half the DJJ's population.  The LAO finds that making major infrastructure improvements to DJJ facilities that may be closed or abandoned in future years is not a wise use of state funding.  Staff finds that the telecommunications systems at the juvenile institutions are some of the oldest and most out-of-date systems in the state.  Staff finds that these upgrades are needed if the state wants to continue to operate these facilities. Staff also finds that the Legislature approved $5.7 million to upgrade the telecommunications switch at each of the juvenile institutions in the current year.

**Telecommunications Upgrades Impact Information Technology Proposal.**  Staff finds that the department has also proposed major upgrades to the telecommunications capabilities of the department's institutions in the Consolidated Information Technology Infrastructure Project.  It is unclear how this proposal to repair and upgrade the system is being coordinated with the information technology efforts.  Staff finds that more information is needed on how these proposals are coordinated.

**Radio System is Outdated.**  Staff finds that the department's current radio system is outdated and needs replaced.  Of the 27 trunked radio systems that the department has, nearly all of them are over 12 years old and have been discontinued by the vendors.  Furthermore, the number of

hand-held radios employed by the department has increased considerably and the department has not been provided with funding to ensure a regular replacement schedule. Current funding allows for replacement every nine years, which is 50 percent longer than is recommended by the manufacturer. Nevertheless, staff finds that radio usage has increased significantly in the institutions over the last several years. It is unclear what is driving this usage and how the radios are used in the institution.

**Bus Fleet Replacement Proposal is Aggressive.** The department's current fleet of buses is old and outdated and in some cases do not meet current emission requirements. However, staff finds that the department may be able to make changes to these buses to rehabilitate the engines and retrofit them to meet emissions standards instead of the aggressive replacement schedule being proposed by the department. Staff finds that these buses are built to last a long time and can survive for several million miles if properly maintained. Furthermore, staff finds that some school districts keep comparable buses much longer given that there are still 300 buses manufactured before 1977 in use by school districts around the state. The department's oldest bus was manufactured in 1985.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Staff recommends that the Subcommittee hold this issue open.
- Request that the department provide additional information, by May Revision, on the scope of the upgrades proposed for DJJ facilities, including an estimate of sunk costs if these institutions are abandoned.
- Request that the department provide additional information, by May Revision, on how this proposal coordinates with the Consolidated Information Technology Infrastructure Project.
- Request that the department provide additional information, by May Revision, on the policies that impact the role of radios within the institution, including information about why radio usage has increased.
- Request that the department provide additional information, by May Revision, on what funds it needs to replace buses that cannot be retrofitted to meet air standards.

# Information Technology Issues

## 1.    Consolidated Information Technology Infrastructure Project

**Background.**  Currently, most of the department's information technology systems are past their useful life (many were designed and implemented in the 1970s).  Furthermore, the department cannot improve these systems without first addressing serious deficiencies in the telecommunications and electrical infrastructures of the institutions.  The current electrical infrastructure at some prisons will not support the use of additional computer technology.  Furthermore, the department currently does not have the technology to utilize information technology devices (computers) in various places within the institutions outside of the Warden's office.  The institutions generally have very little computing capabilities, records staff often do their work without the assistance of computers, and some institutions were not connected to the Internet until just a few years ago.

**Governor's Budget.**  The Governor proposes $118.5 million General Fund in the budget year to fund the Consolidated Information Technology Infrastructure Project.  The Project proposes to consolidate the department's current information technology infrastructure and provide the basic network infrastructure for planned and future projects to centrally track and update inmate information.  This proposal proposes to put in place the foundation that is needed to run any information technology applications.

The Governor's budget proposes to finance this project using the GS $MART financing program administered by the Department of General Services.  The administration estimates that financing this project could save $86 million in the budget year.  However, the administration has not provided an estimate of what the total project costs will be, including financing costs under a GS $MART financing arrangement.  The administration proposes budget bill language to allow for funding to be reverted when a GS $MART financing arrangement has been made.

**Plan Does Not Employ Latest Technology.**  Staff finds that the goals of the Consolidated Information Technology Infrastructure Project are a necessary first step to implementing any information technology applications.  This Project is akin to building the foundation that is needed to run any information technology applications.  However, staff finds that the department plans on using outdated technology that will take considerable effort to implement at the institutions.  The department's plan is to run cable and fiber optic wiring to every housing unit and treatment space at the institutions.  In the first year the department plans on making sure there is adequate wiring at administrative buildings and in the health care treatment spaces.  However, staff has been informed by the Receiver's office that they do not plan on using cable or fiber optic technology.  The Receiver's office plans on using wireless technology to run their health care information technology programs.  Furthermore, staff has learned that the Receiver's office has already put in place a wireless network for the medical facilities at California State Prison, San Quentin at a cost that is considerably lower than running cable to through the 150 year old buildings at San Quentin.

Furthermore, staff finds that it will take a considerable amount of time before the cable and fiber optic systems are in place because of the considerable capital outlay that will need to be done at each institution to get the wiring to the correct spots at each institution. Staff understands that it would take considerably less time to roll out a wireless network for each institution.

**Project Needs Coordinated.** Staff finds that a significant portion of this project consists of capital outlay-like upgrades to the department's existing electrical and telecommunications infrastructure. Furthermore, as referenced above, the department is also undergoing other projects to upgrade electrical and telecommunications systems at the departments. It is not clear to staff that these proposals have been coordinated to ensure cost effective upgrades that are coordinated and limit the number of times we have to make modifications to the system.

**IT Issues Versus Infrastructure Issues.** Staff finds that some of the work in this proposal will be accomplished by staff in the information technology department and other work will be done by the Office of Facilities Management. Staff has requested that the department provide information on the division of labor proposed in this budget change proposal. Staff has not received this information.

**Staff Recommendation.** Staff recommends that the Subcommittee take the following actions:
- Hold this issue open.
- Request that the department provide additional information by May Revision on why it is not using the latest and most cost effective technology for this information technology infrastructure upgrade.
- Request that the department and DOF develop options by May Revision for using wireless technology for some or all of the infrastructure upgrades.
- Request that the department provide additional information by the May Revision on how it will coordinate the efforts of the Consolidated Information Technology Infrastructure Project with other infrastructure projects to upgrade electrical and telecommunications infrastructure.
- Request that the department provide additional information by the May Revision on the division of labor in this budget proposal between the Information Technology Division and the Office of Facilities Management.

# Capital Outlay Staffing

**Background.** The Office of Facilities Management is responsible for all of the projects outlined in this agenda. This is a significant increase in workload for this office. Furthermore, several of these capital outlay programs are new, complex, and require a great amount of coordination with other programs.

Furthermore, staff finds that the budget documents submitted by the department to fund capital outlay projects are uniformly inadequate and do not provide the Legislature with the information that it needs to provide prudent fiscal oversight.

The department has indicated that the Office of Facilities Management currently has 300 authorized positions. Information has not been provided on how many of these positions are currently vacant and how many staff are in each branch. These positions support operations of five main branches. The branches under the Office of Facilities Management include:

- Telecommunications Branch
- Design Standards and Review Services
- Inmate/Ward Labor Program
- Maintenance Services
- Project Financing and Administration

During the 2006 special session on prison overcrowding, the Governor put forward a proposal to augment the department's internal capital outlay staffing support by $21.7 million in the budget year. A portion of this was included in SB 10xx (Machado), which was ultimately passed by the Senate and failed in the Assembly.

**Governor's Budget and Finance Letter.** The Governor's budget and a Finance Letter (dated March 29, 2007) provide funding for a few small augmentations to the staff within the Office of Facilities Management. These proposals include the following:

- **Inmate/Ward Labor Program.** The budget proposal includes $551,000 in reimbursement funds to support seven positions to manage additional workload associated with the management and supervision of projects undertaken by CDCR's Inmate/Ward Labor Program at juvenile institutions. The department indicates that it has established these positions administratively in the current year and needs $181,000 in additional reimbursement authority in the current year to fund these positions.
- **Training Academy.** The Finance Letter requests $521,000 General Fund to establish five positions to coordinate the development of a correctional officer training academy in southern California.

The department is also requesting additional positions in the Consolidated Information Technology Infrastructure Project, but it is not clear to staff which positions will be assigned to the information technology department and which staff will be assigned to the Office of Facilities Management.

**No New Positions to Support Majority of Proposals.** The administration has not put forward any proposals to augment capital outlay staffing levels at the department given the large number

of new capital outlay programs being proposed in the Governor's budget. Staff finds that the department, in correspondence with the Receiver, has estimated that staffing to address health care capital outlay alone would require 130 additional staff. Furthermore, no additional staff has been requested to support the infill bed proposal, which would be implemented on an expedited schedule that would likely take more staff resources. In addition, no positions have been requested to help implement the doubling of funding provided for maintenance. The department indicates that it is redirecting vacant positions from the field to headquarters to implement this program. While it is unclear to staff what the current 300 positions are responsible for on a daily basis, it is clear that the workload for the Office of Facilities Management will increase significantly if just a small number of the capital outlay budget proposals are approved.

Staff finds that the department has historically relied heavily on outside private contractors for the majority of its capital outlay programs, but it is critical that there is adequate state staff to oversee and direct the work of the contractors. Without adequate oversight, the department may not be able to provide the level of fiscal accountability that is required when public works projects are funded. Furthermore, staff notes that the department is exempt from utilizing the services of the Department of General Services so the CDCR is the only state entity that provides oversight of the work of outside contractors.

**Inmate/Ward Labor.** Staff finds that the department administratively established the inmate/ward labor positions in the current year to meet the needs of projects that were funded last summer. It is unclear to staff why these positions were not anticipated last year when the budget was being deliberated. In the future the department should try and avoid establishing positions administratively especially for efforts that are foreseen. Furthermore, it is unclear whether the department needs its reimbursement authority increased in the current year to fund the new positions.

**Training Academy Positions Do Not Fit.** Staff finds that the department likely needs additional staffing to support this and other capital outlay proposals detailed in this agenda. However, staff finds that the composition of the staffing proposal is not consistent with the current needs of the department in developing a new southern California training facility. The department is requesting a project director, an Associate Governmental Program Analyst, two telecommunications systems analysts, and a correctional sergeant. Given that this project is in the preliminary planning stage it is unclear why two telecommunications systems analysts are needed. These positions may be needed once a more developed proposal has been put together, but in the preliminary plan stage it is not clear why these positions are needed.

**Staff Recommendation.**
- Approve $551,000 in reimbursements and establish the seven positions for the inmate/ward labor program at the juvenile institutions.
- Request that the department provide additional justification for the positions being requested to support the new training academy.
- Request that the department and DOF provide, by May Revision, additional information on what staffing is needed to ensure adequate fiscal oversight of the capital outlay projects being proposed in the Governor's budget.

# Local Assistance Infrastructure Issues

## 1.    Jail Bed Grants

**Background.** The county jails across the state are generally overcrowded. The Sheriff's Association indicates that, in 2005, nearly 20,000 inmates were given pretrial releases or were released early from their jail sentences due to a lack of jail space. Furthermore, 20 of the 58 counties are currently under court-ordered population caps and a dozen other counties have self-imposed population caps. These population caps mean that, when a jail is full, someone in custody has to be released.

**Governor's Budget.** The Governor's budget proposal includes $5 billion to add 45,000 new jail beds statewide, including $4 billion in state lease-revenue bonds and $1 billion in local matching funds. The proposal envisions the following mix of new beds:

- Adult Dormitory Beds – 17,000 beds estimated at $100,000 per bed for a total of $1.7 billion. These beds, with overcrowding, will accommodate 25,500 inmates.
- Adult Jail Cells – 16,500 cells estimated at $200,000 per cell for a total of $3.3 billion. These cells, with overcrowding, will accommodate 24,750 inmates.

The Governor's budget also includes a proposal to shift offenders with sentences of three years or less that have committed certain non-violent crimes from state prison to local jail. The administration estimates that this would result in 25,000 fewer inmates in state prison and the additional jail beds would help to meet this need.

**Role of State Funding for Jail Beds.** Staff finds that there is historical precedence for providing state monies to support local jail construction. However, staff finds that the Legislature should evaluate this proposal in the context of other proposals that provide funding for local law enforcement and crime prevention programs. This Subcommittee has heard testimony from local agencies in opposition to the Governor's proposal to shift offenders with sentences of three years or less to local jails. However, staff finds that the Legislature should consider this proposal in the context of the Governor's proposal to provide state monies to build local jail beds.

**Staff Recommendation.** Staff recommends that the Subcommittee hold this issue open.

## 2.    Local Juvenile Facility Grants

**Background.** For the most part, the Juvenile Justice system in California is managed and funded by local government. Following the arrest of a juvenile, law enforcement has the discretion to release the juvenile to his or her parents or to take the suspect to juvenile hall and refer the case to the county probation department.

Generally, probation officials decide how to process the cases referred to them and about one-half of the cases referred to probation result in the filing of a petition with the juvenile court for a

hearing. Judges declare the juvenile a ward of the court almost two-thirds of the time. The vast majority of wards (over 98 percent) are placed under the supervision of the county probation department. These youth are typically placed in a county facility for treatment (such as juvenile hall or camp) or supervised at home. Other wards are placed in foster care or a group home.

**Governor's Budget.** The Governor's budget proposal includes $500 million to build local juvenile facilities, including $400 million from state lease-revenue bonds and $100 million in local matching funds. The administration estimates that these funds will build 5,000 new juvenile beds at a cost of $100,000 per bed.

The Governor's budget also includes a proposal to stop intake at the state Division of Juvenile Justice (DJJ) for certain offenders and transfer certain offenders currently housed at DJJ back to their county of commitment.

**LAO Recommendation.** The LAO recommends that the Legislature reject the proposal to allocate $400 million in state lease-revenue bonds to construct additional local juvenile facilities. The LAO finds that the current proposal to provide additional resources to build local juvenile facilities was not based on an independent validation of the needs of local law enforcement.

Furthermore, the LAO finds that the current county juvenile justice system has a surplus of beds in both juvenile halls and camps of about 4,000 beds. The LAO recognizes that some modifications may be needed, to existing space at the county level, to modernize and provide for more specialized treatment space, but they indicate that this can be done for less than $100,000 per bed.

**Staff Comments.** Staff finds that even though there is a surplus of beds at the local level for juvenile commitments, it may not be the right mix of beds. Generally, juvenile halls are not utilized for longer term commitments of youth. The average stay in these facilities is relatively short and the population is transitory, which makes it an environment that is difficult to deliver meaningful programming and consistency. Some counties have developed ranch facilities or youth centers that provide a more stable environment for delivering rehabilitative programming and education. However, staff understands that many of these facilities are filled.

Furthermore, staff finds that, in general, there are very few treatment facilities at the local level to serve the mentally ill youth population. Some of the youth being housed at DJJ that would be transferred back to the counties have mental disorders and significant behavioral issues. Most counties do not currently have placement options that would easily accommodate these youth.

Furthermore, staff finds that some communities may not need to build additional institution type settings, but may be better served by expanding its network of group homes and foster care placements. It is important that there be a continuum of placement options for local probation and courts to ensure the best possible placement for a youth based on their needs and risk level.

**Staff Recommendation.** Staff recommends that the Subcommittee hold this issue open.