PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California  94964
Telephone: (415) 457-9144

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
AMY WHELAN Bar No.: 215675
LORI RIFKIN Bar No.: 244081
SARAH M. LAUBACH Bar No.: 240526
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington  98104
Telephone: (206) 447-0900

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN,

      Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.,

      Defendants

)
)
)
)
)
)
)
)
)
)
)
)

No.:  Civ S 90-0520 LKK-JFM

**DECLARATION OF ERNEST GALVAN IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO CONVENE A THREE-JUDGE PANEL TO LIMIT THE PRISON POPULATION**

Hearing Date:  June 4, 2007
Time:  11:00 a.m.
Location:  Courtroom 4
Judge:  Hon. Lawrence K. Karlton

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| CDCR | California Department of Corrections and Rehabilitation |
| DJR | Daily Jail Rate |
| EID | Electronic In Home Detention |
| EOP | Enhanced Outpatient Program |
| FRMSC | Female Residential Multi-Service Centers |
| ICDTP | In-Custody Drug Treatment Program |
| PSAP | Parolee Substance Abuse Program |
| PSC | Parole Service Centers |
| PV-RTC | Parole Violator Returned to Custody |
| RMSC | Residential Multi-Service Centers |
| SASCA | Substance Abuse Services Coordination Agencies |
| SATCU | Substance Abuse Treatment Control Units |
| YACA | Youth and Adult Correctional Agency (predecessor of the California Department of Corrections and Rehabilitation) |

I, Ernest Galvan, declare:

1.     I am a member of the Bar of this Court and a partner of the firm Rosen, Bien & Galvan, LLP, one of the counsel of record for the plaintiff class (hereinafter "Plaintiffs"). I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify. I submit this declaration in support of Plaintiffs' Supplemental Brief in Support of Motion to Convene a Three-Judge Panel to Limit the Prison Population.

2.     For approximately the past three years, I have had participated in and had primary responsibility for many issues concerned the monitoring and enforcement of remedial orders in *Valdivia v. Schwarzenegger*, No. Civ. S-94-0671 LKK/GGH (E.D Cal.), a class action lawsuit concerning parole revocation processes brought on behalf of a class of all California parolees both in and out of prison or jail custody. Before the remedial orders were issued in *Valdivia*, I worked on preparation of the *Valdivia* case for trial in 2001 and 2002. I participated in the remedial plan negotiations and drafting that led to the settlement of the case and the entry of the *Valdivia* Permanent Injunction in March 2004. After March 2004, I have had primary responsibility for negotiation of policies and procedures to implement the requirements of the *Valdivia* Permanent Injunction, including but not limited to the increased use of remedial sanctions as alternatives to returning alleged parole violators to prison. I had primary responsibility for the *Valdivia* Plaintiffs' motion for contempt and an order enforcing the *Valdivia* Permanent Injunction in April 2005, when the Secretary of the then-named Youth and Adult Correctional Agency ("YACA") (now California Department of Corrections and Rehabilitation) ("CDCR") abruptly prohibited the use of remedial sanctions in lieu of parole revocation. After the Court issued an order on June 8, 2005, finding that the cessation of remedial sanctions violated the *Valdivia* Permanent Injunction, I have had primary responsibility for meeting and conferring with CDCR regarding the reestablishment of remedial sanctions programs. I had primary responsibility for the negotiation and drafting of the April 3, 2007 Stipulation and Order Regarding Remedial Sanctions in *Valdivia*, which sets forth some initial steps regarding gradual phased reestablishment of some remedial sanctions programs. During the above-referred to negotiations, I have participated in discussions and

exchanges of documents that have included, among other things, information on available remedial sanctions programs, the difference between remedial sanctions programs authorized and actually implemented, the obstacles to implementation, the uses of risk assessment tools and violation matrixes to inform revocation decisions, and the possibility of early discharge from parole for some segments of the parole population.

3.  I have reviewed the recent representations made by CDCR officials in court filings opposing referral to a three-judge panel to limit California's prison population in the *Plata* litigation regarding purported efforts to reduce the population through changes in parole policy, and increased use of remedial sanctions and alternatives to parole revocation.  I have reviewed the following declarations all filed on May 16, 2007 in *Plata v. Schwarzenegger*, No. 01-1351 TEH (N.D. Cal.): Declaration of Scott Kernan In Support of Defendants' Report in Response to the Court's February 15, 2007 Order, and Exhibits A and B; Declaration of Deborah Hysen In Support of Defendants' Report in Response to the Court's February 15, 2007 Order; Declaration of Kathryn P. Jett In Support of Defendants' Report in Response to the Court's February 15, 2007 Order; Declaration of Joan Petersilia In Support of Defendants' Report in Response to the Court's February 15, 2007 Order.  Copies of the declarations of Mr. Kernan and of Dr. Petersilia will be attached to the Declaration of Lori Rifkin in Support of Plaintiffs' Supplemental Brief in Support of Motion to Convene a Three-Judge Panel to Limit the Prison Population as Exhibits J and K, respectively.  (On May 21, 2007, substantially similar declarations by the same declarants were filed in opposition to the motion for appointment of a three-judge panel in *Armstrong v. Schwarzenegger*, Civ. No. 94-2307 CW (N.D. Cal.).)  Based on my experience regarding CDCR's efforts to establish remedial sanctions in *Valdivia*, I believe that the above listed declarations contain statements regarding the use of remedial sanctions, which, while well-intentioned and sincere, are overly optimistic regarding CDCR's ability to reduce the prison population through parole reform in a way that could promptly relieve the impact of overcrowding on persons with severe mental illness in the *Coleman* class.  The factual basis for this belief is present in more detail below.

4.  The population reduction measures described in the Kernan and Petersilia

1  Declarations—the use of risk and needs assessments, violation matrixes, early discharge from

2  parole, and alternatives to re-incarceration of parole violators, have been the mainstays of

3  promises and prescriptions for correction reform in California for years.  Attached hereto as

4  **Exhibit D** is a true and correct copy of Section 7 of the July 1, 2004, report of the Governor's

5  Independent Review Panel on Corrections (chaired by former Governor George Deukmejian),

6  titled "Reforming California's Youth and Adult Correctional System" (hereinafter

7  "Deukmejian Report").  This report can be found on the internet at

8  http://cpr.ca.gov/report/indrpt/corr/index.htm.  Section 7 is titled "Inmate/Parolee Population

9  Management."  In addition to former-Governor Deukmejian, the 2004 Review Panel included

10  other highly respected individuals with considerable experience and impressive credentials in

11  correctional administration.  The Deukmejian Report makes frequent references to previous

12  parole reform recommendations by similarly constituted blue-ribbon panels, including the

13  "1990 report of the Blue Ribbon Commission on Inmate Population Management," and the

14  November 2003, report of the Little Hoover Commission, "Back to the Community: Safe &

15  Sound Parole Policies."  (Deukmejian Report at pages 121, 148, 155.)  The Deukmejian Report

16  notes that many of the parole reforms it describes were previously set forth on such earlier

17  reports.

**Remedial Sanctions Programs**

18

19      5.      I have reviewed Paragraph 20 of the Declaration of Scott Kernan In Support of

20  Defendants' Report in Response to the Court's February 15, 2007 Order in *Plata*, which

21  includes the following assertion under "Alternative Sanction Programs":  "CDCR has program

22  capacity for 4,175 parolees at an annual cost of $82,648,665."  (Rifkin Dec. Exhibit J at page

23  11.)  As described in the detailed discussion below of the history of remedial sanctions

24  negotiations in the *Valdivia* lawsuit, numbers like this are impossible to understand without

25  knowing whether the numbers claimed are for program slots that actually exist and into which

26  parolees can now be placed, or whether they are for program slots that are authorized but not

27  yet funded or built, or a mix of both.  Mr. Kernan's declaration includes the following

28  qualifying language after his statement of program capacity for "4,175 parolees:"  "CDCR

1  recognizes that a number of logistical issues prevent these remedial sanction programs from

2  being filled, however CDCR is committed to addressing and overcoming these obstacles such

3  that these programs will reach capacity." (Rifkin Dec. Exhibit J at page 11.)  If Mr. Kernan's

4  estimate includes a mix of existing and projected program slots, then the impact on

5  overcrowding cannot be estimated without knowing the timeline on which the projected

6  program slots will be funded, put out to bid, and actually built.  Below is a brief summary of

7  the types of delays and obstacles that must be overcome before any projected program slots

8  can have any impact on prison overcrowding.

9         6.      **State Contracting Process.**  The remedial sanctions programs employed by

10  CDCR rely heavily on services provided under contract with counties and private entities.  In

11  the remedial sanctions negotiations in *Valdivia*, described in more detail below, CDCR

12  representatives have asserted that in the ordinary course of state contracting, the "Invitation For

13  Bid" process requires delays on the order of 4 to 5 months of internal state procedure before an

14  Invitation for Bid can be published to potential bidders, plus 2 to 3 months for the state to

15  evaluate bids.

16         7.      **Community Resistance to Contracting with CDCR to Place Parolees.**  As

17  discussed in detail below, CDCR has been unsuccessful in securing any beds for its principle

18  *Valdivia* remedial sanction program, the In-Custody Drug Treatment Program (ICDTP), in the

19  states' most populous county, Los Angeles County.  The plan for this remedial sanction

20  program projected 175 beds in Los Angeles County, using county jail facilities.  Despite

21  CDCR's best efforts, the county has not agreed to host this facility.  In general, community-

22  based treatment for persons accused of violating parole face significant resistance from

23  communities that do not want such facilities in their backyards.  San Bernardino, Riverside,

24  and Orange Counties remained unserved by the ICDTP remedial sanctions programs as of May

25  8, 2007, when Plaintiffs' counsel in *Valdivia* last received information on the scope of the

26  program.  (*See also* First Report of *Valdivia* Special Master, Exhibit J hereto at pages 42-43.)

27         8.      **Harmful Effects of the Start-and-Stop *Valdivia* Remedial Sanctions Process.**

28  Below in this Declaration, I present a brief history of the remedial sanctions programs that

CDCR implemented under the *Valdivia* Permanent Injunction in 2004, then abruptly halted in 2005, and have been struggling to resume ever since. The *Valdivia* Special Master's First Report to the Court, attached hereto as Exhibit J, notes that the "program has also suffered repercussions from stopping and starting:"

> In program development, there is always a period of slower use until programs are fully implemented. Part of this is putting systems, policies, and procedures in place and part of it is gaining trust and belief in the programs on the part of the referring agents, supervisors, and hearing officers. CDCR staff not only needed to mend relationships with entities such as the county jails, they needed to re-educate and engage DAPO and BPH staff.

(Exhibit J, First Report of *Valdivia* Special Master, at page 44.)

9.      **Program Exclusions That Limit the Reach of Remedial Sanctions Programs.** The first report of the *Valdivia* Special *Master* concludes that exclusionary policies likely are partly responsible for limited use of remedial sanctions programs. (Exhibit J, First Report of *Valdivia* Special Master, at page 43.) CDCR limits the use of remedial sanctions by imposing across-the-board exclusionary criteria making the program off limits to individuals with certain criminal histories, registration requirements, accusations of gang participation, or other characteristics, regardless of individual case factors.

10.      **Program Exclusions Directed Specifically At Persons with Mental Illness.** In addition to general program exclusions, CDCR imposes specific exclusions on remedial sanctions programs that keep out persons with mental illness. These exclusions include express exclusion of persons at the Enhanced Outpatient Program (EOP) level of care, exclusions of persons taking psychotropic medications, exclusions of persons who require non-routine medical care, and exclusions of persons who are receiving or have applied for government benefits such as Supplemental Security Income (SSI). (*See* Paragraphs 32 to 35, below.) Although CDCR has recently agreed to review such exclusions, the review process is only beginning, and CDCR admits it is likely to be delayed and limited by the fact that existing exclusions are written into state contracts. (*See* Paragraph 34, below.) In addition, the CDCR relies on county governments to provide many remedial sanctions services under compensation

schemes that place additional burdens on the counties if they provide non-routine medical care,

including psychiatric care, to parolees in their custody.  (*See* Paragraph 36, below.)

### Remedial Sanctions as Alternative to Parole Revocation under *Valdivia v. Schwarzenegger.*

11.    In June 2002, this Court, in *Valdivia,* granted the plaintiff class of parolees'

motion for summary judgment and held that California's then-existing parole revocation

system was unconstitutional.  *Valdivia v. Davis,* 206 F. Supp. 2d 1068 (E.D. Cal. 2002).  In

October 2002, the Court in *Valdivia* ordered the defendants to develop a remedial plan.  In a

status conference statement filed on June 3, 2003, the *Valdivia* defendants described several

steps that Defendants were exploring to address the lack of adequate parole revocation

proceedings.  A true and correct copy of this June 3, 2003 status conference statement is

attached hereto as **Exhibit A.**  This 2003 document includes a step described under the heading

"The Defendants Are Exploring Alternatives Besides Incarceration," which reads in full:

> Early in the revocation process, Parole Unit Supervisors are now
> actively using remedial action other than incarceration for non-
> violent and non-serious offenders who have been charged with
> minor violations. In such cases, alternatives such as continuing
> parole or routing parolees through Proposition-36 programs may
> provide an appropriate alternative to incarceration.  District
> Administrators, likewise, are reviewing cases for such possibilities
> after the eighth day of confinement but before referral to the Board.
>
> Finally, the Board is exploring the possibility of amendments to the
> California Code of Regulations, title 15, § 2646.1, which sets forth
> guidelines for length of confinement for certain parole-violation
> offenses. Specifically, the Board is assessing whether the
> incarceration periods logically and reasonably reflect the violation
> misconduct that is charged. If it is possible to prescribe more-
> reasonable remedial action, it may be possible to increase the
> number of revocation cases that do not proceed to a full revocation
> hearing.

12.    On May 23, 2007, I checked the status of Title 15, Section 2646.1, referred to

above.  According to "History" notations in the regulation available using the Cal. Code Regs

search function at http://www.oal.ca.gov/, Section 2646.1 was last amended on December 20,

2001.

13.    After an initial *Valdivia* remedial plan was rejected by the Court, the *Valdivia* defendants presented a remedial plan in August 2003 that included the use of remedial sanctions as alternatives to parole revocation.  Attached hereto as **Exhibit B** is a true and correct copy of the joint letter to the Court of August 20, 2003, attaching the *Valdivia* Remedial Plan.  This 2003 Remedial Plan recites at page 1 of the "Valdivia Remedial Plan Policy Outline" (after the flow chart) that "There are approximately 100,000 parole violations referred to the Board of Prison Terms each calendar year."  It then includes the following text at the bottom of page 1 and the top of page 2:

REMEDIAL SANCTIONS

As part of the overall reform of the revocation process, the Parole and Community Services Division of the Department of Corrections will begin using remedial sanctions/community based treatment placement in January of 2004.

Some of the remedial sanctions/community based treatment programs that will be used are the Substance Abuse Treatment Control Units, Electronic Monitoring, Self-Help Outpatient/aftercare programs, and alternative placement in structured and supervised environments.

These remedial sanctions are not considered violations of parole because participation in the remedial sanctions program is voluntary and participation in the remedial sanctions program will not make the parolee presumptively ineligible for discharge at 13 months.

The goal is to reduce the number of returns to prison for violations of parole by up to 10% in 2004 and by up to 30% by 2006.

14.    The above-cited "Valdivia Remedial Plan Policy Outline," with its commitment to begin using "remedial sanctions/community based treatment placement" and its prison return reduction goals, was incorporated in the *Valdivia* Stipulated Order for Permanent Injunction Relief, and issued as a permanent injunction by the Court on March 9, 2004.  A true and correct copy of the *Valdivia* Permanent Injunction is attached hereto as **Exhibit C.**

15.    In monitoring implementation and negotiating with *Valdivia* Defendants regarding policies and procedures under the *Valdivia* Permanent Injunction, Plaintiffs' counsel have repeatedly requested information regarding the number and types of parole revocation

1    cases in which the state employed remedial sanctions in lieu of parole revocation.  Defendants

2    have repeatedly stated that their information systems did not track use of remedial sanctions,

3    and so they could not provide the requested information.  Shortly after entry of the *Valdivia*

4    Permanent Injunction, however, the July 1, 2004, Deukmejian Report, attached hereto as

5    **Exhibit D,** described several remedial sanctions programs, and stated their capacity as of 2004.

6    These include: Electronic Monitoring: 1000 Units Planned; "Halfway Back": 792 Beds;

7    Substance Abuse Treatment and Control Units (SATCUs): 1770 Beds (including 600 in Los

8    Angeles).  (Deukmejian Report at pages 158-159.)  This represents a total of 3,562 program

9    slots in the three principal *Valdivia* Remedial Sanctions programs.

10            16.      Attached hereto as **Exhibit E** is a true and correct copy of a document

11    downloaded from the CDCR website at

12    http://www.cya.ca.gov/ReportsResearch/OffenderInfoServices/Annual/PVRET2/PVRET2d200

13    6.pdf, titled "Rate of Felon Parolees Returned to California Prisons Calendar Year 2006."

14    According to these CDCR statistics, the number of parolees returned to prison on parole

15    violations alone (shown in the PV-RTC column) dropped from 62,355 in 2003 to 58,725 in

16    2004 (a decrease of 5.8%), the first year of *Valdivia* implementation.  In 2005, however, the

17    number of returns to custody for parole violations alone increased to 61,180 (an increase of

18    4.2% over 2004), and then increased again in 2006 to 69,095 (an increase of 12.9% over 2005).

19    (The CDCR's Spring 2007 Population Report, attached hereto as Exhibit W, gives slightly

20    different figures for parole returns, reporting an increase of 3.9% from 2004 to 2005 and 12.7%

21    from 2005 to 2006.  Exhibit W hereto at page 3.)

22            17.      On or about April 8, 2005, after one of a series of meet and confer sessions

23    regarding *Valdivia* implementation, Plaintiffs' counsel was contacted by a reporter from the

24    Los Angeles Times regarding a new decision by the California Department of Corrections to

25    abandon the use of remedial sanctions as alternatives to parole violations.  This press contact

26    was the first notice Plaintiffs' counsel received of this decision.  We later received a copy of a

27    Memorandum dated April 11, 2005, from the then-Secretary of the CDCR's predecessor

28    agency, the Youth and Adult Correctional Agency, announcing that the programs announced as

part of the "new parole model" were now prohibited for use as remedial sanction alternatives to incarceration.  A true and correct copy of the April 11, 2005 Memorandum is attached hereto as **Exhibit F.**  The Memorandum includes the following statements:

> As you are aware, in 2003 the Parole and Community Services Division, under the direction of the Davis Administration, proposed several parole reform programs designed to both provide services to parolees and to reduce recidivism.  These programs were continued and expanded, and new programs were proposed, at the beginning of our new Administration.  These programs have been referred to as the "new parole model."  Electronic In-Home Detention (EID), Community Correctional Reentry Centers ("Halfway Back" Program) and the Substance Abuse Treatment Control Units (SATCU) programs were clearly designed to provide intermediate sanctions in lieu of parole revocation, and were touted as ways to save the state money through reduction in the parolee return rate to prison.  Effective immediately these programs will no longer be used.

As noted above, during the 2005 calendar year in which this Memorandum was issued, parole violation returns increased 4.2% from the 2004 level, according to the CDCR statistics attached to this declaration as Exhibit E.  During the next calendar year, parole violation returns to prison increased 12.9% to reach 69,095, according to Exhibit E.

18.    The April 11, 2005 Memorandum claimed that the administration was terminating remedial sanctions because "we have no evidence that these three programs, as originally designed and implemented, increase public safety."  (Exhibit F, hereto at page 2.) the California State Auditor later determined that the stated reason for the decision was not complete, in that the administration failed to use the evidence available to it regarding the impact of these programs.  Attached hereto as **Exhibit G** is a true and correct copy of the November 9, 2005 report of the California State Auditor, titled "California Department of Corrections and Rehabilitation: the Intermediate Sanction Programs Lacked Performance Benchmarks and Were Plagued With Implementation Problems."  The report states at page 2 (and in more detail at pages 19-36) that the administration had evidence on the programs but did not analyze it:

> In April 2005, the department secretary (formerly the secretary of the Youth and Adult Correctional Agency) terminated the use of the intermediate sanction programs as alternatives to

> prison because he saw no evidence that the programs improved
> public safety. Although the department had data regarding
> the parole violators in the programs that it could have used to
> evaluate whether the benefits it wanted to achieve were worth
> the additional risk to public safety, it did not analyze the data
> or establish benchmarks such as acceptable failure rates to measure
> the programs' results.

(Exhibit G at page 2)  The Report provides further analysis of the administration's failure to use the evidence it had collected regarding remedial sanctions, under the heading "The Department Had No Basis for Determining Whether the Benefits of Using Intermediate Sanctions Outweighed the Risk to Public Safety" at pages 19-36.  The Report also notes the many contracting delays that prevented full use of remedial sanctions even before the April 11, 2005 termination.  (Exhibit G at pages 37-46.)

19.    At the time of the April 11, 2005 termination of remedial sanctions, the administration was under political pressure regarding parole policies.  Victims' rights groups had purchased television time for ads that accused the Governor of making parole decisions that endangered public safety.  Attached hereto as **Exhibit H** is a true and correct copy of a printout from The Sacramento Bee's internet service of an article titled "Parole Overhaul Scrapped," dated April 12, 2005, describing the political pressures brought against the so-called "new parole model," and the resulting decision to abandon it.

20.    In response to the April 11, 2005 memorandum terminating remedial sanctions programs, Plaintiffs' counsel immediately demanded that the Memorandum be rescinded, and when Defendants refused to do so, moved for an order enforcing the *Valdivia* Permanent Injunction.  In opposing Plaintiffs' motion, Defendants took the position that the remedial sanctions portions of the *Valdivia* Remedial Plan were drafted for informational context only and were not binding on them.  Attached hereto as **Exhibit I** is a true and correct copy of this Court's June 8, 2005 order in *Valdivia*, finding, among other things, that the above-quoted April 11, 2005 Memorandum violated the *Valdivia* Permanent Injunction, and that two of the specific programs the Memorandum prohibited, Electronic In Home Detention, and Substance Abuse Treatment Control Units, "must be made available and be considered throughout the parole revocation process *after* a parole violation occurs."  (Order at 11:17-19.)

-10-

21.     Plaintiffs' counsel has met and conferred with CDCR officials numerous times in the two years since June 8, 2005 to attempt to undo the damage done to remedial sanctions efforts by the April 11, 2005 Memorandum's prohibition on their use.  Restoration of remedial sanctions has been exceedingly slow, and only partially successful.  I have participated in most of these meetings.  CDCR officials have informed us that they rely primarily on contracts with counties and community-based private service providers to create and operate remedial sanctions programs.  The sudden withdrawal of support for the programs in April 11, 2005 contributed to an atmosphere of distrust, in which such service providers are hesitant to contract with CDCR in light of the risk that another sudden policy shift will leave them with empty programs.  The first report of the *Valdivia* Special Master, filed with the *Valdivia* Court on September 14, 2006 (*Valdivia* Docket No. 1302), stated at page 42:

> The elimination of the Substance Abuse Treatment Control Units and the CCRC/Halfway Back program strained relationships with several county jails.  Jails that housed these programs were impacted without notice by loss of revenue and disruption in staffing and programs.  This has made the establishment of programs that require jail beds more challenging for CDCR.

A true and correct copy of the First Report of the *Valdivia* Special Master is attached hereto as **Exhibit J.**

22.     In September 2005, CDCR informed Plaintiffs' counsel that they would replace the Substance Abuse Treatment Control Unit (SATCU) remedial sanctions required by the *Valdivia* Permanent Injunction with a new program called the In Custody Drug Treatment Program (ICDTP).  In a September 2, 2005 policy memorandum CDCR announced that the establishment of 575 program slots statewide.  A true and correct copy of the ICDTP memorandum is attached here at **Exhibit K.**  Although the policy memorandum announced 575 program slots, the attached detail charts showed that only 264 slots were actually contracted-for.  (Exhibit K at Bates No. 10/27/05 264.)  These slots were only in certain parts of Northern California and the Central Valley.  (*Id.*)  No ICDTP program slots were available in the most populous regions of the state, including the counties of Los Angeles, Orange Riverside, San Bernardino, Imperial, and San Diego.  (*Id.*)  CDCR has been trying to secure an

1  estimated 175 remedial sanctions beds in Los Angeles County since approximately spring 2005

2  without success.  (Exhibit J hereto, First Report of the *Valdivia* Special Master at page 42.)  As

3  of May 23, 2007, to our knowledge there are still no ICDTP program slots in the above-listed

4  Southern California counties, except for 24 program slots recently established in Chula Vista

5  (San Diego).  Even the 264 program slots that were established have been underused because

6  of failures of planning in implementation, including failures to work with field parole agents to

7  ensure that the headquarters designed programs would meet local needs.  (Exhibit J hereto,

8  First Report of Valdivia Special Master, at page 44.)  Parolees from the very populous areas

9  not served by ICDTP could not be assigned to out-of-county program slots due to strict

10  enforcement of CDCR rules requiring parolees to be placed in  the county where they resided

11  prior to conviction.  This limit affects women especially because only 30 of the 264 beds were

12  available to women, and these female beds are all located in San Francisco.

13      23.     Also in September 2005, CDCR informed Plaintiffs' counsel that it would re-

14  establish Electronic In Home Detention as required by the June 8, 2005.  Defendants did not,

15  however, reestablish the program at the same level that it existed before the April 11, 2005

16  termination of remedial sanctions.  The first report of the *Valdivia* Special Master stated that

17  the "original Electronic-In-Home Detention program had 1,000 units, while the redesigned

18  program has 500 units."  (Exhibit J hereto at page 42.)  The *Valdivia* Special Master noted that

19  one year after re-implementation, these Electronic-In-Home Detention units were only rarely

20  being used as alternatives to parole revocation.  (Exhibit J hereto at page 46.)

21      24.     In July 2006, the *Valdivia* Special Master gave written notice to CDCR that

22  "Defendants have not succeeded in using remedial sanctions as described in the Stipulated

23  Order for Injunctive Relief, and plans to date do not demonstrate a reasonable probability of

24  meeting that goal."  A true and correct copy of the above-quoted notice is attached hereto as

25  **Exhibit L.**  The notice directed CDCR to provide a new remedial sanctions plan no later than

26  November 30, 2006.

27      25.     CDCR provided a draft plan in December 2006.  The plan included funding for

28  only 500 ICDTP program slots (75 fewer than in the 2005 ICDTP plan, and many fewer than

1   the number of program slots in the SATCU program before the April 11, 2005 termination).

2   Moreover by December 2006, there were still only 288 ICDTP program slots actually in

3   operation (the 264 from 2005 plus 24 in Chula Vista), and still none in the counties of Los

4   Angeles, Orange, San Bernardino, Riverside and Imperial.  The *Valdivia* Special Master

5   informed the parties in a December 13, 2006 conference call that the plan was not acceptable

6   and set a February 15, 2007 deadline for a new plan.

7        26.     On February 7, 2007, CDCR presented the *Valdivia* Special Master with an

8   "informational" letter and description of remedial sanctions options, with a cover letter stating

9   that provision of the information "in no way obligates Defendants to provide the programs or

10  services described in the document either through the Valdivia lawsuit or otherwise unless

11  previously ordered by the Court."  A true and correct copy of the February 7, 2007, letter is

12  attached hereto as **Exhibit M.**

13       27.     In the informational document provided to the *Valdivia* Special Master,

14  Defendants admitted that:

15           There have been many obstacles to fully implementing the in-
             custody ICDTP.  County sheriffs have indicated that the reasons
16           they can't contract for ICDTP beds include:
             - overcrowded jail conditions.
17           - a shortage of deputy jail staff,
             - and insufficient/non-competitive Daily Jail Rate (DJR) offered by
18           the State.

19  (Exhibit M at page 13.)

20       28.     On February 16, 2007, CDCR presented the *Valdivia* Special Master with a new

21  remedial sanctions plan.  Again, ICDTP was to be funded at a lower level than even the 2005

22  plan provided for (513 slots instead of 575), and actual ICDTP slots available were still stuck

23  at only 288 statewide, with no slots in Los Angeles, Orange, Riverside, San Bernardino and

24  Imperial County.  The new plan, however, included the temporary use of several other

25  programs as remedial sanctions until additional ICDTP program slots could be established.  A

26  true and correct copy of the February 15, 2007 draft plan is attached hereto as **Exhibit N.**

27       29.     The parties in *Valdivia* have continued to meet and confer on the re-

28  establishment of remedial sanctions programs.  Many issues remain in dispute regarding the

-13-

scope of such programs.  On April 2, 2007, the parties submitted a Stipulation and Proposed Order to the Court regarding an agreed-upon set of steps and timetable for re-establishing some remedial sanctions programs by April 2008.  A true and correction copy of the Stipulation and Order—approved by the Court on April 3, 2007--is attached hereto as **Exhibit O.**  The timeline for implementation of the ICDTP remedial sanctions program is at pages 2-3, and can be summarized in the following table.  Under this timeline, the program need not reach the target of 1800 program slots until April 2008, and need not even exceed 428 program slots until November 1, 2007.

| Date | Additional Program Slots Due By This Date | Total Number of Program Slots By This Date | Locations |
|------|------|------|------|
| As of April 2, 2007 | | 288 | Kern, Tulare, Del Norte, San Francisco, Santa Clara |
| Aug. 1, 2007 | 150 | 438 | Los Angeles County |
| Nov. 1, 2007 | 90 | 528 | Orange County |
| Nov. 1, 2007 | 424 | 952 | Anywhere |
| Jan. 1, 2008 | 200 | 1152 | Anywhere |
| Feb. 15, 2008 | 200 | 1352 | Anywhere |
| April 1, 2008 | 448 | 1800 | Anywhere |

30.     The April 3, 2007 Stipulation and Order provides for "interim" use of an uncertain number of other program slots as remedial sanctions during the timeline described above for expansion of ICDTP.  (Exhibit O, Stipulation and Order at page 4.)  The programs for "interim" use are the Residential Multi-Service Centers (RMSC), not-yet established, but projected Female Residential Multi-Service Centers (FRMSC), and Parole Service Centers (PSC).  The Stipulation and Order provides that ½ of program slots in those programs be "available as remedial sanctions."  (Exhibit O, Stipulation and Order at page 4, lines 12-13.) We have not been able to determine exactly how many program slots this represents because

we have received different estimates from CDCR at different times.  When estimating program slots, CDCR often switches back and forth between the number of slots "authorized" and the number of slots that actually exist and are available for parolees.  As noted above regarding the ICDTP program, these numbers are often very different:  513 ICDTP beds are authorized; but only 288 actually exist.  For the Parole Service Center (PSC) beds, for example, CDCR's February 15, 2007 remedial sanctions proposal (Exhibit N hereto), used the "budgeted" program size, 1,140 beds, in claiming that 570 beds (1/2 of 1,140) will be "dedicated to the revocation process."  (Exhibit N at page 4.)  In CDCR's February 6, 2007 "Informational Report to the Special Master," (Exhibit M hereto), however, CDCR states as to Parolee Service Centers:  "As of January 1, 2007, there are 23 contracts in place with a total of 819 beds statewide," and thus only 410 such beds would be available for use as remedial sanctions.  (Exhibit M at 6.)  (We had also received information that only 685 Parole Service Center beds were available.)  Based on what CDCR is authorized to provide, the Female Residential Multi-Service Centers (FRMSC) is a 75-bed program.  As of May 24, 2007, however, Plaintiffs' counsel are not aware that even one FRMSC bed actually exists.

31.    The April 3, 2007 Stipulation and Order includes a modest beginning to target remedial sanctions programs to persons with mental illness.  The Stipulation and Order provides at page 7:  "In establishing the 1800 ICDTP beds referred to above in Section I.A, above, Defendants shall make every effort to secure 20 beds in each region targeting the needs of parolees with dual diagnoses of mental illness and substance abuse."  There are four parole regions, meaning that CDCR's commitment extends to using their best efforts to secure 80 dual diagnosis beds statewide by April 1, 2008.  The parties were not able to reach agreement on any additional efforts to target remedial sanctions programs to persons with severe mental illness, and documented this lack of agreement in the Stipulation and Order at pages 8-9 under "Unresolved Subjects."  (Exhibit O hereto at pages 7-9.)

**Exclusionary Criteria The Limit Impact Of Remedial Sanctions of Population of Persons with Severe Mental Illness**
.

32.     CDCR establishes eligibility and exclusionary criteria for remedial sanctions programs many of which operate to exclude parolees with mental illness from such alternatives to parole revocation.  While CDCR has agreed to reconsider some of the exclusionary criteria as part of the April 3, 2007 Stipulation and Order Regarding Remedial Sanctions (Exhibit O, hereto), this reconsideration process is only now beginning.  On May 16, 2007, I received from CDCR staff counsel a matrix of existing "Inclusionary/Exclusionary Criteria for Valdivia Remedial Sanctions Programs, May 2007."  A true and correct copy of this matrix  is attached hereto as **Exhibit P.**  The table below lists exclusionary criteria regarding persons with mental illness that are found in Exhibit P:

| Program | Parolees Excluded From Program |
|---|---|
| Electronic In-Home Detention | "Parolees classified as Second Strikers, High Risk Sex Offenders, or **Enhanced Outpatient Program participants** are ineligible for Electronic In-home Detention monitoring." (emphasis added). |
| Parolee Substance Abuse Program (PSAP) | "Currently prescribed psychotropic medication and/or in immediate need of medical or dental treatment." "Currently designated as Enhanced Outpatient Program (EOP) |
| Residential Multi-Service Centers (RMSC) | "Parolee is receiving, or has applied to receive, Supplemental Security Insurance or other governmental subsistence payments" |
| Santa Clara County Jail In Custody Drug Treatment Program (ICDTP) | "Non-routine medical needs*" "*Local jail restrictions" |
| Chula Vista County Jail In Custody Drug Treatment Program (ICDTP) | "No one requiring psychotropic medication*" |

| Program | Parolees Excluded From Program |
|---------|-------------------------------|
| | "*Local jail restrictions" |
| Tulare County Jail In Custody Drug Treatment Program (ICDTP) | "No EOP cases" |
| | "No psychiatric or medical requiring on-going transport to special care facilities" |
| | "No cases which require ongoing medical treatment or cases which would be a burden to jail staff" |

33.     In addition to these express exclusionary criteria, Exhibit P also states that program placements in the Substance Abuse Services Coordination Agencies (SASCA), require that the parolee "must have completed one of" several listed in-prison or parole substance abuse programs.  (Exhibit P at page 12.)  I am informed and believe that many of these prerequisite programs in CDCR prisons have been and remain largely unavailable to persons with severe mental illness, due to express exclusions, and/or the practice of deeming EOP inmates to be "booked" for a full day in the EOP program so that they cannot be assigned to in-prison programs.

34.     As noted above, the April 3, 2007 Stipulation and Order requires Defendants to reconsider some of these exclusionary criteria.  On May 1, 2007, Plaintiffs' counsel in *Valdivia* received a letter from CDCR counsel stating CDCR's intention to remove some of the exclusionary criteria.  A true and correct copy of this May 1, 2007 letter is attached hereto as **Exhibit Q.**  The May 1, 2007 letter makes clear that changes in criteria cannot be immediate because the criteria are included in existing contracts with service providers.  The May 1, 2007 letter states:

> The Stipulation and Order also references the work the State is undertaking to revise ICDTP, EID, RMSC, and PSC policies and procedures, including but not limited to reviewing and reconsidering exclusionary criteria to make the programs more widely available.  Please note that the proposed memorandum does include some revisions to the RMSC and EID policies. Exclusionary criteria for ICDTP, RMSC, and PSC are included in provider contracts, and the State cannot change them unilaterally. The State will request that contractors accept amendments revising the criteria.  If contractors are unwilling to do so, the State will ensure that as contracts expire, to the extent possible the new

1
2

> contracts contain the revised criteria.  It should be noted, however, that the ICDTP contracts with local jails are individually negotiated, and those entities may not always accept the State's terms.

3
4
5
6
7
8
9
10
11
12
13
14
15
16

35.     On May 8, 2007, my office received from CDCR copies of existing contracts between CDCR and providers of some remedial sanctions programs.  These documents confirm that exclusion of the mentally ill is written into many of these contracts.  For example, the contract between the state and service providers for the above-referenced Parolee Substance Abuse Program (PSAP) at Folsom State Prison repeats the exclusionary language referred to above from Exhibit P, excluding parolees at the EOP level of care.  A true and correct copy of an excerpt of this contract (redacted to remove address information), with a term though June 30, 2010, is attached hereto as **Exhibit R**.  Similarly, the contracts for the 729 Residential Multi-Service Center (RMSC) beds around the state also repeat the exclusionary language referred to above from Exhibit P, excluding parolees who are receiving, or have applied for SSI or other assistance.  An example of this language in the contract for 25 beds in Fresno County, with a term through June 30, 2008 (redacted to remove address information) is attached hereto as **Exhibit S**.

17
18

**Daily Jail Rate Procedure for Non-Routine Medical Care**

19
20
21
22
23
24
25
26
27
28

36.     The First Report of the *Valdivia* Special Master noted that one of the obstacles to CDCR's remedial sanctions program is the relatively low rate at which CDCR compensates counties for housing alleged parole violators in remedial sanction beds, compared to the rates available for housing federal prisoners.  (Exhibit J hereto at page 42.)  Defendants have admitted that the Daily Jail Rate is an obstacle to establishment of remedial sanctions programs.  (*See* Paragraph 27, above.)  The California State Auditor also identified the low daily jail rate as a factor impeding use of remedial sanctions.  (Exhibit G hereto at page 4.)  In addition to the relatively low daily rate, the CDCR's written policies impose special requirements on counties in order for them to receive compensation for "non-routine medical expenses", which is defined to include "psychiatry," in the CDCR's Daily Jail Rate Manual,

-18-

the 2007/2008 version of which can be found on the internet at

http://www.corr.ca.gov/communications/docs/DJRM-07-08.pdf.  An excerpt (pages 10-11) of

this Daily Jail Rate Manual is provided here as **Exhibit T.**

### Parole Violation Matrix

37.    I have reviewed Paragraph 19 of the Kernan Declaration in *Plata* regarding the

use of a "Decision-Making Matrix" in which Mr. Kernan states that "DAPO anticipates that a

decision-making matrix will be ready for a pilot deployment by the end of 2007."  (Rifkin Dec.

Exhibit J at page 11.)

38.    Parole violation matrixes are not new, but rather have been included in several

previously stated plans for reducing the numbers of persons returned to prison on parole

violations.  The 2004 Deukmejian Report attached hereto as **Exhibit D**, includes the following

text at Appendix A, page 158, regarding the state's 2001 plan for a "matrix":

> **The New Parole Model**
> In September of 2001 the Parole and Community Services Division
> created its new parole model to address recidivism issues. The
> model focuses on non-serious/non-violent offenders as they are
> thought to pose the least risk to the community if they are offered
> alternative sanctions to incarceration. The basic components of the
> model are the following:
> •Violation matrix. This is a structured system for providing
> clear guidelines to decision making for parole violations.

39.    The 2004 Deukmejian Report also includes representations regarding the then

imminently expected implementation of a parole violation matrix.  Under the heading,

"Implementation of the department's new parole model has been slow," the 2004 Deukmejian

Report states at pages 147-148 regarding the then-current status of the violation matrix:

> The violation matrix is another important component of the new
> parole model. Still being developed by the parole division, the
> violation matrix will guide parole agents in making decisions about
> what sanctions, including treatment alternatives to re-incarceration,
> to impose for particular violations. Parole agents will use the
> violation matrix to match a parolee's violation against a graduated
> range of increasingly strident sanctions. According to officials,
> changes to the violation matrix are pending approval by the
> division's deputy director. [footnote omitted] It is risky to begin
> less-restrictive sanctions, such as drug treatment in the place of re-

incarceration, without first using risk-assessment to determine who is appropriate for various programs.

40.    On December 15, 2006, I conducted a meet and confer session in *Valdivia* with CDCR officials, during which CDCR officials represented that a decision-making matrix would be ready for implementation in a matter of weeks or months, and would assist in the use of remedial sanctions programs.  CDCR subsequently dropped discussion of the matrix from further negotiations, and only reluctantly allowed mention of "investigating the development and use of a decision-making matrix" in the April 3, 2007 Stipulation and Order Regarding Remedial Sanctions.  (Exhibit O hereto at page 6.)  The Stipulation and Order provides for a report of "results of this investigation" no later than July 1, 2007.

**California Penal Code Section 3001 Administrative Discharge.**

41.    The Declaration of Scott Kernan states that CDCR believes that it can achieve the discharge of between 2,000 and 4,000 persons from parole supervision in the next 12 months due to a May 15, 2007 administrative directive to parole agents about who should and should not be retained for the full parole term under Section 3001 of the California Penal Code. (Rifkin Dec. Exhibit J at pages 9-10.)  Mr. Kernan's declaration does not predict what, if any, reduction in prison population would result even if the predicted decrease in parole population were to occur.  Not all persons on parole supervision return to prison.  The Declaration of Dr. Joan Petersilia states that "66% of California parolees return to a California prison within 3 years of their release."  (Rifkin Dec. Exhibit K [Petersilia Dec. ¶ 5].)  Assuming that parolees are equally likely to return to prison during each of the three years, and assuming that persons who were discharged under Section 3001 were as likely to return to prison as were the general parole population, only 22% of the 2,000 to 4,000 people whom Mr. Kernan hopes to discharge would have returned to prison during the next 12 months.  That is only a population reduction of 440 to 880 persons.  The actual reduction is likely to be smaller, taking into account Mr. Kernan's statement that early discharge is available only for persons "who have been compliant with the terms of their parole" for a certain period.  (Rifkin Dec. Exhibit J

1  [Kernan Declaration ¶ 17].)  Such persons are likely to face a lower risk of returning to prison

2  than does the general population.  Hence the eventual impact on the prison population of 2,000

3  to 4,000 early discharges in the next twelve months is likely to be smaller than the 440 to 880

4  beds one would predict based on Dr. Petersilia's estimate of the overall recidivism rate.

5      42.    The early discharge statute that Mr. Kernan refers to, Penal Code Section 3001,

6  has been on the books in various forms since 1978.  The May 15, 2007 Memorandum attached

7  to the Kernan Declaration as Exhibit B, reiterates what has already been the law in California

8  for many years, that persons who serve a certain time on parole (12 months or two years,

9  depending on the type of sentence served), shall be discharged unless the Board of Parole

10  Hearings approves the CDCR's recommendation to retain the person on parole.  In other

11  words, the Memorandum large tells parole agents to follow the law, which they are presumed

12  to have always done anyway.

13      43.    As is true of the remedial sanctions program, and the parole violation matrix,

14  early discharge from parole has been a mainstay of previously promised parole reforms.  For

15  example, the 2004 Deukmejian Report recommended "early discharge of low-risk parolees"

16  using a "risk and needs instrument" like the one referenced in the Kernan Declaration.

17  (Deukmejian Report, Exhibit D hereto at pages 150-151.)

18      44.    Parolees with mental illness are more likely than other parolees to have incurred

19  parole violations that would exclude them from the type of early discharge program described

20  by Mr. Kernan.  The Third Annual Report on the Mental Health Services Continuum Program

21  of the California Department of Corrections and Rehabilitation-Parole Division reviews

22  research on recidivism of persons with mental illness and notes that "Mentally ill offenders

23  may be more vulnerable to detection and arrest than non-mentally ill offenders.  Therefore,

24  they are more likely to be cycled through the criminal justice system for minor offenses."

25  (Third Annual Report at page 5.)  An excerpt of this report is attached hereto as **Exhibit U.**

26      45.    In support of a recent Budget Change Proposal for Reception Center EOP

27  funding, CDCR reported the results of research regarding "of Cases Pending EOP Placement."

28  Attached hereto as **Exhibit V** is a true and correct copy of the "Justification" section of this

-21-

Budget Change Proposal describing the research project.  The document notes of the parole

violators studied that "Their parole violations were also likely related to their mental illness,

and treatment planning should address the community maladjustment issues."  (Exhibit V

hereto at Bates No. VAL2007 100011.)

46.    Attached hereto as **Exhibit W** is a true and correct copy of the "Spring 2007

Adult Population Projections 2007-2012," downloaded from the CDCR website at

http://www.bpt.ca.gov/ReportsResearch/OffenderInfoServices/Projections/S07Pub.pdf.  (The

errors in pagination in the first few pages of this document, i.e., the omission of even-

numbered pages until page 8, are in the original.)  The Spring 2007 Adult Population

Projections note a "decrease in discharges from parole" during 2006, and project a decrease in

discharges from parole for the future.  (Exhibit W at page 4.)   This document projects further

increases in numbers of persons returned on parole violation charges alone (i.e., those without

new court-imposed sentences).  Tables 7 and 8 of the document, at pages 35 and 36 show

movements of males and females, respectively, in and out CDCR institutions for fiscal years

2005/06, and projected through fiscal years 2007/08.  For each fiscal year, the numbers of

persons returned on parole violations alone (shown as PV-RTC, Parole Violators Returned to

Custody) have increased or are projected to increase:  from 66,359 (60,793 males and 5,566

females) in fiscal 2005/2006 to 70,983 (65,019 males and 5,964 females) in fiscal 2006/07, to

73,119 (67,019 males and 6,103 females) in fiscal 2007/08.

I declare under penalty of perjury under the laws of the State of California and of the

United States that the foregoing is true and correct.

Executed this 24th day of May 2007 at San Francisco, California.


By    /s/ *Ernest Galvan*
Ernest Galvan