**EXHIBIT E**

# RATE OF FELON PAROLEES RETURNED TO CALIFORNIA PRISONS

## CALENDAR YEAR 2006

Department of Corrections and Rehabilitation

Offender Information Services Branch

Estimates and Statistical Analysis Section

Data Analysis Unit

Sacramento, California
April 2007

Reference Number: PVRET-2

# STATE OF CALIFORNIA

## DEPARTMENT OF CORRECTIONS AND REHABILITATION

**JAMES TILTON**
*Secretary*

**K. W. PRUNTY**
*Undersecretary*

### ADULT OPERATIONS

**SCOTT KERNAN**
*Chief Deputy Secretary*

**LEA ANN CHRONES**
*Director (A),*
*Division of Adult Institutions*

**THOMAS HOFFMAN**
*Director,*
*Division of Adult Parole Operations*

**STEPHEN F. CHAPMAN, Ph. D.**
*Assistant Secretary,*
*Office of Research*

**L. J. CARR, Ph. D.**
*Chief, Offender Information Services Branch*

### DATA ANALYSIS UNIT

◆

**LORI ASUNCION**
*Staff Services Manager I*

**STEPHEN KRIMETZ**
*Associate Information Systems Analyst*

**MARCIA BRADY-JOHNSON**
*Research Analyst II*

**CYNTHIA SMITH**
*Research Analyst II*

1515 S STREET          SACRAMENTO, CA  95814          TELEPHONE: (916) 445-1310

Internet: http://www.cdcr.ca.gov/ReportsResearch/OffenderInformation.htm
Email: http://www.cdcr.ca.gov/ReportsResearch /ContactDAU.asp

Data Analysis Unit
Estimates and Statistical Analysis Section
Offender Information Services Branch

Department of Corrections and Rehabilitation
State of California
April 2007

# RATE OF FELON PAROLEES RETURNED TO CALIFORNIA PRISONS

## TABLE OF CONTENTS

Page

**Table 1**   Total Felon Parolees Returned to California Prisons (CY 1976-06) .................. 1

**Table 2**   Male Felon Parolees Returned to California Prisons (CY 1976-06) .................. 2

**Table 3**   Female Felon Parolees Returned to California Prisons (CY 1976-06) ............... 3

Definitions and Formulas ........................................................................................................ 4

Contact Person:

*Cynthia Smith*
*Research Analyst II*
*Data Analysis Unit*

*Internet  http://www.cdcr.ca.gov/OffenderInfoServices/Reports/OffenderInformation.asp*
*Intranet  http://intranet/ois/html/population_reports.html*
*Telephone (916) 327-4568*

PVRET-2

Data Analysis Unit
Estimates and Statistical Analysis Section
Offender Information Services Branch

Department of Corrections and Rehabilitation
State of California
April 2007

### TABLE 1
### TOTAL FELON PAROLEES RETURNED TO CALIFORNIA PRISONS
### NUMBER AND RATE* PER 100 AVERAGE DAILY POPULATION (ADP)**
### CALENDAR YEAR 1976 THROUGH 2006

| CALENDAR YEAR | AVERAGE DAILY FELON PAROLEE/PAL POPULATION** | TOTAL FELON PAROLEES RETURNED (PV-RETs) | | TOTAL FELON PAROLEES RETURNED WITH A NEW TERM (PV-WNTs) | | TOTAL FELON PAROLEES RETURNED TO CUSTODY WITHOUT A NEW TERM *** (PV-RTCs) | |
|---|---|---|---|---|---|---|---|
| | | NUMBER | RATE* | NUMBER | RATE* | NUMBER | RATE* |
| 1976 | 15,302 | 2,233 | 14.6 | 1,255 | 8.2 | 978 | 6.4 |
| 1977 | 14,428 | 2,031 | 14.1 | 1,243 | 8.6 | 788 | 5.5 |
| 1978 | 12,401 | 2,585 | 20.8 | 1,574 | 12.7 | 1,011 | 8.2 |
| 1979 | 10,455 | 2,558 | 24.5 | 1,362 | 13.0 | 1,196 | 11.4 |
| 1980 | 11,061 | 2,995 | 27.1 | 1,393 | 12.6 | 1,602 | 14.5 |
| 1981 | 11,883 | 3,885 | 32.7 | 1,772 | 14.9 | 2,113 | 17.8 |
| 1982 | 13,609 | 6,009 | 44.2 | 2,231 | 16.4 | 3,778 | 27.8 |
| 1983 | 18,223 | 8,435 | 46.3 | 3,160 | 17.3 | 5,275 | 28.9 |
| 1984 | 24,390 | 11,409 | 46.8 | 3,988 | 16.4 | 7,421 | 30.4 |
| 1985 | 28,888 | 16,311 | 56.5 | 5,042 | 17.5 | 11,269 | 39.0 |
| 1986 | 33,615 | 23,849 | 70.9 | 5,790 | 17.2 | 18,059 | 53.7 |
| 1987 | 39,878 | 31,597 | 79.2 | 6,390 | 16.0 | 25,207 | 63.2 |
| 1988 | 50,054 | 42,424 | 84.8 | 8,410 | 16.8 | 34,014 | 68.0 |
| 1989 | 58,731 | 51,016 | 86.9 | 11,040 | 18.8 | 39,976 | 68.1 |
| 1990 | 69,164 | 54,379 | 78.6 | 14,070 | 20.3 | 40,309 | 58.3 |
| 1991 | 80,905 | 57,344 | 70.9 | 16,010 | 19.8 | 41,334 | 51.1 |
| 1992 | 87,940 | 52,871 | 60.1 | 17,939 | 20.4 | 34,932 | 39.7 |
| 1993 | 90,628 | 54,681 | 60.3 | 19,150 | 21.1 | 35,531 | 39.2 |
| 1994 | 93,536 | 62,480 | 66.8 | 17,009 | 18.2 | 45,471 | 48.6 |
| 1995 | 102,181 | 69,884 | 68.4 | 17,454 | 17.1 | 52,430 | 51.3 |
| 1996 | 109,659 | 75,419 | 68.8 | 17,435 | 15.9 | 57,984 | 52.9 |
| 1997 | 115,299 | 85,497 | 74.2 | 17,593 | 15.3 | 67,904 | 58.9 |
| 1998 | 122,981 | 87,645 | 71.3 | 17,385 | 14.1 | 70,260 | 57.1 |
| 1999 | 129,709 | 87,729 | 67.6 | 17,064 | 13.2 | 70,665 | 54.5 |
| 2000 | 134,821 | 89,346 | 66.3 | 16,016 | 11.9 | 73,330 | 54.4 |
| 2001 | 136,932 | 88,806 | 64.9 | 14,531 | 10.6 | 74,275 | 54.2 |
| 2002 | 136,133 | 85,551 | 62.8 | 14,363 | 10.6 | 71,188 | 52.3 |
| 2003 | 131,693 | 78,058 | 59.3 | 15,703 | 11.9 | 62,355 | 47.3 |
| 2004 | 128,501 | 76,565 | 59.6 | 17,840 | 13.9 | 58,725 | 45.7 |
| 2005 | 131,087 | 80,935 | 61.7 | 19,755 | 15.1 | 61,180 | 46.7 |
| 2006 | 133,118 | 89,872 | 67.5 | 20,777 | 15.6 | 69,095 | 51.9 |

Note:  Components may not add to totals due to independent rounding.

**\*These rates should not be considered to be CDC's recidivism rates.**

\*\*The Average Daily Felon Parolee/PAL Population (ADP) includes the average daily population of felon parolees supervised in California, plus the average daily felon parolee-at-large (PAL) population.  California releases to parole who were under supervision in other state and absconded from supervision were included in the PAL population prior to 1988

\*\*\*Beginning in 1988, the Total Felon Parolees Returned to Custody Without a New Term includes parolees who were returned to CDC custody pending a revocation hearing.

PVRET-2

Data Analysis Unit
Estimates and Statistical Analysis Section
Offender Information Services Branch

Department of Corrections and Rehabilitation
State of California
April 2007

## TABLE 2
### MALE FELON PAROLEES RETURNED TO CALIFORNIA PRISONS
### NUMBER AND RATE* PER 100 AVERAGE DAILY POPULATION (ADP)**
### CALENDAR YEAR 1976 THROUGH 2006

| CALENDAR YEAR | AVERAGE DAILY MALE FELON PAROLEE/PAL POPULATION** | MALE FELON PAROLEES RETURNED (PV-RETs) | | MALE FELON PAROLEES RETURNED WITH A NEW TERM (PV-WNTs) | | MALE FELON PAROLEES RETURNED TO CUSTODY WITHOUT A NEW TERM*** (PV-RTCs) | |
|---|---|---|---|---|---|---|---|
| | | NUMBER | RATE* | NUMBER | RATE* | NUMBER | RATE* |
| 1976 | 14,394 | 2,189 | 15.2 | 1,222 | 8.5 | 967 | 6.7 |
| 1977 | 13,632 | 1,982 | 14.5 | 1,212 | 8.9 | 770 | 5.6 |
| 1978 | 11,750 | 2,510 | 21.4 | 1,538 | 13.1 | 972 | 8.3 |
| 1979 | 9,882 | 2,472 | 25.0 | 1,325 | 13.4 | 1,147 | 11.6 |
| 1980 | 10,392 | 2,901 | 27.9 | 1,354 | 13.0 | 1,547 | 14.9 |
| 1981 | 11,098 | 3,725 | 33.6 | 1,714 | 15.4 | 2,011 | 18.1 |
| 1982 | 12,684 | 5,730 | 45.2 | 2,141 | 16.9 | 3,589 | 28.3 |
| 1983 | 17,009 | 8,040 | 47.3 | 3,022 | 17.8 | 5,018 | 29.5 |
| 1984 | 22,731 | 10,796 | 47.5 | 3,814 | 16.8 | 6,982 | 30.7 |
| 1985 | 26,793 | 15,414 | 57.5 | 4,778 | 17.8 | 10,636 | 39.7 |
| 1986 | 30,959 | 22,343 | 72.2 | 5,433 | 17.5 | 16,910 | 54.6 |
| 1987 | 36,589 | 29,537 | 80.7 | 6,042 | 16.5 | 23,495 | 64.2 |
| 1988 | 45,738 | 39,583 | 86.5 | 7,919 | 17.3 | 31,664 | 69.2 |
| 1989 | 53,616 | 47,399 | 88.4 | 10,341 | 19.3 | 37,058 | 69.1 |
| 1990 | 62,872 | 50,408 | 80.2 | 13,194 | 21.0 | 37,214 | 59.2 |
| 1991 | 73,191 | 53,017 | 72.4 | 14,994 | 20.5 | 38,023 | 52.0 |
| 1992 | 79,465 | 49,122 | 61.8 | 16,862 | 21.2 | 32,260 | 40.6 |
| 1993 | 82,012 | 50,678 | 61.8 | 17,935 | 21.9 | 32,743 | 39.9 |
| 1994 | 84,854 | 57,457 | 67.7 | 15,767 | 18.6 | 41,690 | 49.1 |
| 1995 | 92,896 | 64,216 | 69.1 | 16,217 | 17.5 | 47,999 | 51.7 |
| 1996 | 99,403 | 68,816 | 69.2 | 16,057 | 16.2 | 52,759 | 53.1 |
| 1997 | 104,198 | 78,040 | 74.9 | 16,181 | 15.5 | 61,859 | 59.4 |
| 1998 | 110,528 | 79,724 | 72.1 | 15,831 | 14.3 | 63,893 | 57.8 |
| 1999 | 116,264 | 79,734 | 68.6 | 15,472 | 13.3 | 64,262 | 55.3 |
| 2000 | 120,493 | 81,313 | 67.5 | 14,574 | 12.1 | 66,739 | 55.4 |
| 2001 | 121,979 | 81,383 | 66.7 | 13,379 | 11.0 | 68,004 | 55.8 |
| 2002 | 121,200 | 78,535 | 64.8 | 13,240 | 10.9 | 65,295 | 53.9 |
| 2003 | 117,412 | 71,779 | 61.1 | 14,409 | 12.3 | 57,370 | 48.9 |
| 2004 | 114,630 | 70,472 | 61.5 | 16,309 | 14.2 | 54,163 | 47.3 |
| 2005 | 116,837 | 74,133 | 63.4 | 18,118 | 15.5 | 56,015 | 47.9 |
| 2006 | 118,219 | 82,315 | 69.6 | 18,917 | 16.0 | 63,398 | 53.6 |

Note: Components may not add to totals due to independent rounding.

**\*These rates should not be considered to be CDC's recidivism rates.**

**The Average Daily Felon Parolee/PAL Population (ADP) includes the average daily population of felon parolees supervised in California, plus the average daily felon parolee-at-large (PAL) population. California releases to parole who were under supervision in other states and absconded from supervision were included in the PAL population prior to 1988.

***Beginning in 1986, the Total Felon Parolees Returned to Custody Without a New Term includes parolees who were returned to CDC custody pending a revocation hearing.

PVRET-2

Data Analysis Unit
Estimates and Statistical Analysis Section
Offender Information Services Branch

Department of Corrections and Rehabilitation
State of California
April 2007

## TABLE 3
### FEMALE FELON PAROLEES RETURNED TO CALIFORNIA PRISONS
### NUMBER AND RATE* PER 100 AVERAGE DAILY POPULATION (ADP)**
### CALENDAR YEAR 1976 THROUGH 2006

| CALENDAR YEAR | AVERAGE DAILY FEMALE FELON PAROLEE/PAL POPULATION** | FEMALE FELON PAROLEES RETURNED (PV-RETs) | | FEMALE FELON PAROLEES RETURNED WITH A NEW TERM (PV-WNTs) | | FEMALE FELON PAROLEES RETURNED TO CUSTODY WITHOUT A NEW TERM *** (PV-RTCs) | |
|---|---|---|---|---|---|---|---|
| | | NUMBER | RATE* | NUMBER | RATE* | NUMBER | RATE* |
| 1976 | 908 | 44 | 4.8 | 33 | 3.6 | 11 | 1.2 |
| 1977 | 796 | 49 | 6.2 | 31 | 3.9 | 18 | 2.3 |
| 1978 | 651 | 75 | 11.5 | 36 | 5.5 | 39 | 6.0 |
| 1979 | 573 | 86 | 15.0 | 37 | 6.5 | 49 | 8.6 |
| 1980 | 669 | 94 | 14.1 | 39 | 5.8 | 55 | 8.2 |
| 1981 | 785 | 160 | 20.4 | 58 | 7.4 | 102 | 13.0 |
| 1982 | 925 | 279 | 30.2 | 90 | 9.7 | 189 | 20.4 |
| 1983 | 1,214 | 395 | 32.5 | 138 | 11.4 | 257 | 21.2 |
| 1984 | 1,659 | 613 | 36.9 | 174 | 10.5 | 439 | 26.5 |
| 1985 | 2,095 | 897 | 42.8 | 264 | 12.6 | 633 | 30.2 |
| 1986 | 2,656 | 1,506 | 56.7 | 357 | 13.4 | 1,149 | 43.3 |
| 1987 | 3,289 | 2,060 | 62.6 | 348 | 10.6 | 1,712 | 52.1 |
| 1988 | 4,316 | 2,841 | 65.8 | 491 | 11.4 | 2,350 | 54.4 |
| 1989 | 5,115 | 3,617 | 70.7 | 699 | 13.7 | 2,918 | 57.0 |
| 1990 | 6,292 | 3,971 | 63.1 | 876 | 13.9 | 3,095 | 49.2 |
| 1991 | 7,714 | 4,327 | 56.1 | 1,016 | 13.2 | 3,311 | 42.9 |
| 1992 | 8,475 | 3,749 | 44.2 | 1,077 | 12.7 | 2,672 | 31.5 |
| 1993 | 8,616 | 4,003 | 46.5 | 1,215 | 14.1 | 2,788 | 32.4 |
| 1994 | 8,682 | 5,023 | 57.9 | 1,242 | 14.3 | 3,781 | 43.5 |
| 1995 | 9,286 | 5,668 | 61.0 | 1,237 | 13.3 | 4,431 | 47.7 |
| 1996 | 10,258 | 6,603 | 64.4 | 1,378 | 13.4 | 5,225 | 50.9 |
| 1997 | 11,101 | 7,457 | 67.2 | 1,412 | 12.7 | 6,045 | 54.5 |
| 1998 | 12,452 | 7,921 | 63.6 | 1,554 | 12.5 | 6,367 | 51.1 |
| 1999 | 13,444 | 7,995 | 59.5 | 1,592 | 11.8 | 6,403 | 47.6 |
| 2000 | 14,328 | 8,033 | 56.1 | 1,442 | 10.1 | 6,591 | 46.0 |
| 2001 | 14,953 | 7,423 | 49.6 | 1,152 | 7.7 | 6,271 | 41.9 |
| 2002 | 14,934 | 7,016 | 47.0 | 1,123 | 7.5 | 5,893 | 39.5 |
| 2003 | 14,281 | 6,279 | 44.0 | 1,294 | 9.1 | 4,985 | 34.9 |
| 2004 | 13,871 | 6,093 | 43.9 | 1,531 | 11.0 | 4,562 | 32.9 |
| 2005 | 14,250 | 6,802 | 47.7 | 1,637 | 11.5 | 5,165 | 36.2 |
| 2006 | 14,899 | 7,557 | 50.7 | 1,860 | 12.5 | 5,697 | 38.2 |

Note: Components may not add to totals due to independent rounding.

**\*These rates should not be considered to be CDC's recidivism rates.**

**The Average Daily Felon Parolee/PAL Population (ADP) includes the average daily population of felon parolees supervised in California, plus the average daily felon parolee-at-large (PAL) population. California releases to parole who were under supervision in other states and absconded from supervision were included in the PAL population prior to 1988.

***Beginning in 1988, the Total Felon Parolees Returned to Custody Without a New Term includes parolees who were returned to CDC custody pending a revocation hearing.

PVRET-2

Data Analysis Unit
Estimates and Statistical Analysis Section
Offender Information Services Branch

Department of Corrections and Rehabilitation
State of California
April 2007

## DEFINITIONS AND FORMULAS USED TO PRODUCE THE ANNUAL RATE OF FELON PAROLEES RETURNED TO CALIFORNIA PRISONS

The annual rate of total felon parolees returned to prison is calculated by dividing the number of California felon parolees returned to prison within the calendar year by the average daily felon parole/parolee-at-large (PAL) population. The result is multiplied by 100 to calculate a rate per 100 average daily population. Similar formulas are used to calculate return rates for specific types of returns. Offenders in or returned from Interstate Parole Units (ISPU) or California Youth Authority parole are not included.

Rate of Total
Felon Parolees           $= \dfrac{(\text{PV-WNTs} + \text{PV-RTCs}) \times 100}{(\text{ADP})}$
Returned to Prison

**PV-WNTs:**  Number of **P**arole **V**iolators Returned to Prison **W**ith a **N**ew **T**erm, i.e., parolees who have received a court sentence for a new crime and have been returned to prison.

**PV-RTCs:**  Number of **P**arole **V**iolators **R**eturned **T**o **C**ustody, i.e., parolees who have violated the conditions of parole and have been returned to prison pending a revocation hearing or to serve parole revocation time.

**ADP:**  **A**verage **D**aily Parole/PAL **P**opulation is the calculated average parolee population per day for the year specified. This figure includes felon parolees supervised in California, plus the average daily felon parolee-at-large (PAL) population. California releases to parole who were under supervision in other states and absconded from supervision were included in the PAL ADP population prior to 1988.

These rates should not be considered to be CDC's recidivism rates. For more information on recidivism, please contact :

Nikki Baumrind
CDC Research Branch
P.O. Box 942883, Rm 450-N
Sacramento, CA 94283-0001
(916) 324-0659
E-Mail: Nikki.Baumrind@cdcr.ca.gov

4

**EXHIBIT F**

State of California

Youth and Adult Correctional Agency

# Memorandum

Date  :  April 11, 2005

To  :  All Parole and Community Services Division Staff

Subject:  **REORGANIZATION OF THE YOUTH AND ADULT CORRECTIONAL AGENCY AND ITS AFFECT ON OUR CURRENT PAROLE ACCOUNTABILITY EFFORTS**

As you are aware, in 2003 the Parole and Community Services Division, under the direction of the Davis Administration, proposed several parole reform programs designed to both provide services to parolees and to reduce recidivism. These programs were continued and expanded, and new programs were proposed, at the beginning of our new Administration. These programs have been referred to as the "new parole model." Electronic In-Home Detention (EID), Community Correctional Reentry Centers ("Halfway Back" Program) and the Substance Abuse Treatment Control Units (SATCU) programs were clearly designed to provide intermediate sanctions in lieu of parole revocation, and were touted as ways to save the state money through reduction in the parolee return rate to prison. Effective immediately, these programs will no longer be used.

I am aware that many of you in the field were encouraged to use intermediate sanctions in lieu of revocation, but due to our early implementation problems, those sanctions were unavailable to you as planned. In addition, I have also received information that these measures were suggested as a way to save money or to reduce return rates, I want to make it very clear to all of you – public safety is our number one priority. Revocation of parolees will continue to be a tool that individual agents and their supervisors should use when public safety is at risk. Decisions on whether or not a parolee should be revoked should never be based on such things as cost factors or convenience.

There are several reasons for the change at this time, none of which are more important than our ongoing commitment to public safety. As you know, the Youth and Adult Correctional Agency is currently in the process of reorganizing to the new Department of Corrections and Rehabilitation. In addition, previous to this proposed reorganization, the Agency adopted its first-ever strategic plan. Our stated goal in our strategic plan was to "...improve public safety through evidence-based crime prevention and recidivism reduction strategies." Our plan spoke of the need to "...use evidence-based research to reduce criminality and victimization."

Page Two

To implement these goals, our reorganization will include the Office of Policy, Planning and Research. The research component of our new organization will be responsible for gathering evidence-based best practices from throughout the nation to determine how we can increase public safety in our communities by effectively adopting measures that have proven successful supervision tools.

As I have said publicly, we will at all times review our current practices, and the practices of others in our field throughout the nation, to replicate and use programs and practices that work, and to eliminate those practices or programs that do not work. At this time, we have no evidence that these three programs, as originally designed and implemented, increase public safety. In addition, these programs have been beset by implementation difficulties due to contract-award disputes and lack of available beds for implementation.

In the near future, as our reorganization takes form, and working together with our stakeholders to include victims' advocates, we will be involved in a comprehensive effort to identify those parole accountability measures that have either been proven or show promise for increasing public safety. However, until that time, intermediate sanctions in lieu of parole revocation, will not be a measure used by this Agency. I urge all of you to continue to focus on the fact that we are entrusted with keeping our cities and neighborhoods a safer place to live and that casework decisions that are made on a daily basis can have a profound effect on people's lives.

Thank you for all of your efforts and hard work. All of you are to be commended for the exceptional job you have done, and continue to do, in protecting the safety of Californians.


RODERICK Q. HICKMAN
Secretary

**EXHIBIT G**

California State Auditor

BUREAU OF STATE AUDITS

# California Department of Corrections and Rehabilitation:

*The Intermediate Sanction Programs*
*Lacked Performance Benchmarks and Were*
*Plagued With Implementation Problems*



November 2005
2005-111

The first five copies of each California State Auditor report are free.
Additional copies are $3 each, payable by check or money order.
You can obtain reports by contacting the Bureau of State Audits
at the following address:

**California State Auditor**
**Bureau of State Audits**
**555 Capitol Mall, Suite 300**
**Sacramento, California 95814**
**(916) 445-0255 or TTY (916) 445-0033**

OR

**This report is also available**
**on the World Wide Web**
**http://www.bsa.ca.gov**

The California State Auditor is pleased to announce
the availability of an on-line subscription service.
For information on how to subscribe, please contact
the Information Technology Unit at (916) 445-0255, ext. 456,
or visit our Web site at www.bsa.ca.gov

**Alternate format reports available upon request.**

Permission is granted to reproduce reports.



# CALIFORNIA STATE AUDITOR

**ELAINE M. HOWLE**
STATE AUDITOR

**STEVEN M. HENDRICKSON**
CHIEF DEPUTY STATE AUDITOR

November 9, 2005

2005-111

The Governor of California
President pro Tempore of the Senate
Speaker of the Assembly
State Capitol
Sacramento, California 95814

Dear Governor and Legislative Leaders:

As requested by the Joint Legislative Audit Committee, the Bureau of State Audits presents its audit report concerning the California Department of Corrections and Rehabilitation's (department) intermediate sanction programs for parole violators, which the department secretary terminated on April 11, 2005.

This report concludes that the department did not establish performance benchmarks or analyze available data for the intermediate sanction programs. As a result, the department was unable to determine whether the benefits it intended to achieve, including saving money, helping parolees integrate into society, and reducing the Board of Parole Hearings' parole revocation hearing caseload, outweighed the risk to public safety the intermediate sanction programs posed. In addition, the department unrealistically assumed that the programs would be filled to capacity on January 1, 2004, the planned implementation date, and would continue to operate at full capacity. The department also experienced unanticipated problems that delayed the programs' implementation. As a result, we estimate that the total savings related to these programs was only $14.5 million—an average $1.2 million per month over a 12-month period—far short of the average $8.4 million per month the department would have had to save to achieve its planned savings of $50.2 million for fiscal year 2003–04 and $100.5 million for fiscal year 2004–05.

Respectfully submitted,

*Elaine M. Howle*

**ELAINE M. HOWLE**
State Auditor

# CONTENTS

**Summary** ......................................................... 1

**Introduction** .................................................... 5

**Chapter 1**

The Department Had No Basis for Determining
Whether the Benefits of Using Intermediate
Sanctions Outweighed the Risk to Public Safety ... 19

Recommendations .............................................. 36

**Chapter 2**

Contracting Problems and Unforeseen Issues
Delayed the Implementation of the Intermediate
Sanction Programs ............................................. 37

**Appendix A**

Other States Use Alternatives to Prison That Are
Similar to California's, but Comparisons of
Recidivism Rates Can Have Little Meaning .......... 47

**Appendix B**

Status of Parole Violators Placed in Intermediate
Sanction Programs and Their Returns to Custody
Since Entering Those Programs .......................... 55

**Response to the Audit**

The California Department of Corrections
and Rehabilitation ............................................. 59

# SUMMARY

## Audit Highlights . . .

*Our review of the California Department of Corrections and Rehabilitation's (department) intermediate sanction programs for parole violators revealed the following:*

☑ *Although the department had data regarding parole violators in the programs, it did not analyze the data or establish benchmarks that it could measure the programs' results against.*

☑ *The department's savings were substantially less than anticipated because its savings estimates were based on unrealistic expectations and the programs were implemented late.*

☑ *To minimize the risk to public safety, less dangerous parole violators were placed in the intermediate sanction programs; however, a small percentage of parole violators were convicted of new crimes during the time they otherwise would have been in prison.*

*continued on next page . . .*

## RESULTS IN BRIEF

Felons on parole from California's adult correctional facilities—which on average numbered 128,000 each day in 2004—are under the supervision of the Division of Adult Parole Operations (parole division) within the Department of Corrections and Rehabilitation (department).[1] Most felons serve a specific number of years in prison, depending on the nature of their crime. Most are released to parole supervision for three years, and they must abide by certain conditions during this time. A parolee who has violated the law or failed to comply with a parole condition may be subject to reincarceration, depending on the seriousness of the parole violation and the judgment of the parole agent.

According to the former deputy director of the parole division, the programs that eventually were established under the department's New Parole Model were intended primarily to fill perceived gaps in the department's parole process. The department hoped to help parolees reintegrate into communities by implementing prerelease programs aimed at matching future parolees to the programs and services they needed and by expanding post-release programs aimed at improving newly released parolees' access to those programs and services, thereby reducing the recidivism rate. The department also planned to implement three intermediate sanction programs that could be used as an alternative to prison for low-risk parolees who commit minor crimes or technical violations of their parole conditions. For two of the intermediate sanction programs, the department hoped to help parole violators improve their behavior and their lives and, in the long term, reduce their chances of returning to criminal activity. The department also anticipated that, by using the three intermediate sanction programs, it could reduce prison costs by reducing the number of parole violators returned to prison.

---

[1] This function was formerly the responsibility of the Parole and Community Services Division within the Department of Corrections. On July 1, 2005, the governor reorganized all departments under the Youth and Adult Correctional Agency, including the Department of Corrections, into the California Department of Corrections and Rehabilitation. For convenience, we use the term "department" to refer to either the former Department of Corrections or the current Department of Corrections and Rehabilitation. Similarly, we use "parole division" to refer to either the current or former parole division.

☑ *Although implementation of the intermediate sanction programs was planned for January 1, 2004, the implementation was delayed due to state hiring and contract freezes, a department leadership change, and unanticipated contracting problems.*

As part of the fiscal year 2003–04 budget act, the Legislature approved the department's use of the Substance Abuse Treatment Control Units (SATCU), Halfway Back, and Electronic In-Home Detention (EID) intermediate sanction programs. The parole division anticipated that the programs would result in savings of $50.2 million in fiscal year 2003–04 and $100.5 million in fiscal year 2004–05. These savings were to come about through the lower cost of maintaining a parolee in one of these programs as opposed to revoking parole and returning the parolee to prison. For fiscal year 2003–04, the department spent $4.9 billion to incarcerate inmates, and in 2003 there were more than 78,000 parolee returns to prison. To reduce the number of parole violators returned to prison, the parole division would place eligible parolees who violated the technical conditions of their parole or committed minor crimes in intermediate sanction programs rather than returning them to prison.

In April 2005, the department secretary (formerly the secretary of the Youth and Adult Correctional Agency) terminated the use of the intermediate sanction programs as alternatives to prison because he saw no evidence that the programs improved public safety. Although the department had data regarding the parole violators in the programs that it could have used to evaluate whether the benefits it wanted to achieve were worth the additional risk to public safety, it did not analyze the data or establish benchmarks such as acceptable failure rates to measure the programs' results. The department subsequently has redesigned the SATCU and EID programs and expects to implement the new versions in November 2005.

The department did not achieve its savings goals because it unrealistically assumed that the programs would be filled to capacity on January 1, 2004, the planned implementation date, and would continue to operate at full capacity. It also experienced unanticipated problems that delayed the programs' implementation. The department's fiscal year 2003–04 savings estimates assumed that 12,000 parole violators would be placed in the programs, but as of December 31, 2004, six months after the end of the fiscal year, only 5,742 had entered the SATCU and Halfway Back programs. We estimate that the total savings related to these participants was only $14.5 million—an average $1.2 million per month over a 12-month period—far short of the average $8.4 million per month it would have had to save to achieve its planned savings of $50.2 million for fiscal year 2003–04 and $100.5 million for fiscal year 2004–05.

Besides reduced recidivism, the department also hoped to reduce the workload of revocation hearings before the Board of Parole Hearings (board).[2] As the result of a lawsuit settlement in November 2003, the board is required to conduct final parole revocation hearings within 35 days after the first day a parolee is detained for revocation proceedings. Thus, reducing the board's hearing caseload would increase the likelihood that it would meet the 35-day deadline. Evaluating the board's compliance with this settlement is beyond the scope of this audit. However, as of December 31, 2004, we observed that the board's hearing caseload would have been reduced by approximately 5,700—the number of parole violators who had been placed in the intermediate sanction programs at least once by that time.

Although the tradeoff may be difficult, achieving the desired benefits of using intermediate sanctions in lieu of returning eligible parole violators to prison requires a willingness to accept the additional risks associated with keeping individuals who are proven to be uncooperative in the community. The parole division minimized the risk to public safety by placing less dangerous parole violators in the programs. Additionally, the intermediate sanction programs were more restrictive than other parolee programs, providing supervision of or strict control over the parole violators placed in them. However, depending on the program, this supervision or strict control occurred between 30 days and an average of 45 days, which is significantly less than the average 153 days a parolee would have stayed in prison for parole violations. Because the parolees participating in these programs were not incarcerated, they were not prevented from committing crimes against the public for as long a period as they were before the programs existed.

Based on our data analysis, of the 2,567 parole violators placed in the SATCU program and 3,175 parole violators placed in the Halfway Back program by December 31, 2004, 128 (5 percent) and 114 (4 percent), respectively, were returned to prison for new convictions during the time they otherwise would have been in prison. Notwithstanding the significance of those crimes to their victims, the percentage of parolees participating in the two programs who were convicted of new crimes is small. An additional 1,732 parole violators placed in the Halfway Back and SATCU programs were returned to prison for committing parole violations during that time. However, the parole division had no benchmarks to determine whether these results were acceptable.

---

[2] As a result of the reorganization on July 1, 2005, of the departments under the Youth and Adult Correctional Agency, the Board of Prison Terms was renamed the Board of Parole Hearings.

The department planned to implement the intermediate sanction programs on January 1, 2004, but contracting problems, labor negotiations, and unforeseen obstacles delayed their implementation. The SATCU program implementation, delayed until May 2004, depended on contracts with county jails to provide the 30-day in-custody component of the program. Yet the department found that many county jails were reluctant to contract with the State at the daily reimbursement rate offered or that they lacked space. The EID program implementation was delayed because of contracting problems, including numerous protests of the awarded contracts. Further, after the EID contract was finalized and the program implemented in late 2004, parole agents in the field found numerous equipment problems, and as a result the program never fully materialized before being terminated in April 2005. In contrast, the Halfway Back program was implemented relatively smoothly only one month after the January 1, 2004, deadline, but it did not reach its occupancy goals before being terminated.

## RECOMMENDATIONS

When planning future intermediate sanction programs, the parole division should decide on appropriate benchmarks for monitoring performance, identify the data it will need to measure performance against those benchmarks, and ensure that reliable data collection mechanisms are in place before a program is implemented. After implementing a new intermediate sanction program, the parole division should analyze the data it has collected and, if relevant, use the data in its existing databases to monitor and evaluate the program's effectiveness on an ongoing basis.

The parole division should ensure that the savings estimates developed during program planning are based on reasonable assumptions. If those assumptions change, it should update the savings estimates promptly.

The parole division should consider analyzing the effect programs have had on parolee behavior and should use the knowledge it gains from the analyses to make future intermediate sanction programs more effective. The analysis should include the benefits of adding features to make these programs more effective.

## AGENCY COMMENTS

The department agrees with our recommendations. ■

# INTRODUCTION

## BACKGROUND

Felons released on parole from California's adult correctional facilities are supervised by the Division of Adult Parole Operations (parole division) within the California Department of Corrections and Rehabilitation (department). The department's records indicate that it supervised an average of 128,000 parolees each day in 2004.[3] At the end of the first quarter of 2005, the parole division had 190 parole units within the State's four parole regions. Those regions are shown in Figure 1 on the following page. For the same time period, the parole division had 3,100 staff members and reported 2,100 authorized parole agent positions as of June 30, 2005.

The department also reported, for the first quarter of 2005, that its average annual cost per parolee was $3,364; in contrast, the average annual cost of incarcerating an inmate was $30,929. For fiscal year 2003–04, the total cost to incarcerate adult felons was $4.9 billion, according to the department's Office of Budget Management. Based on published department reports, in 2003 there were more than 78,000 parolee returns to prison. Of these, 20 percent were returned with a new sentence as the result of crimes committed while on parole, with the remaining 80 percent returned for violating their parole conditions, as indicated in Figure 2 on page 7.

---

[3] Parole agents also supervise civil addicts, who are persons convicted of a drug-related crime but diverted from prison to a drug treatment program. However, our report deals only with parolees, meaning those who have been released from prison to supervision.

**FIGURE 1**

## California's Parole Regions



Parole Regions

Region I—covers the entire Central Valley from Bakersfield to the Oregon border

Region II—covers the San Francisco Bay Area and the coastal counties from Ventura to the Oregon border

Region III—covers Los Angeles County

Region IV—covers the San Diego area and southern counties

Source: Division of Adult Parole Operations, California Department of Corrections and Rehabilitation.

California State Auditor Report 2005-111

## FIGURE 2

### Returns to Custody in 2003



Returns to custody
for new offenses
15,203 (20%)

Returns to custody for
parole violations   62,455 (80%)

Source: Data Analysis Unit, California Department of Corrections and Rehabilitation.

Note: These numbers represent a count of the number of returns to prison by parole violators and is a measure of events. A parole violator who returns to prison twice is counted as two returns to prison.

## PAROLE

California is a determinate sentencing state, meaning that most felons serve a specific number of years in prison, depending on the nature of their crime, after which they are released. Most released inmates are placed on parole supervision for three years; however, the parole period for these parolees may be extended up to one year to make up for parole time that was lost due to a parolee's parole status being suspended or revoked.

Felons released from prison are required to report to an assigned parole agent and to abide by the conditions of their parole. The parole agent monitors the parolee's activities, helps the parolee access programs and services such as drug treatment and employment programs, and takes appropriate action if the parolee presents a danger to the public or to himself or herself.

Parole agents rely on their training and experience when assessing the services a parolee needs and the level of monitoring and supervision required. Such factors as severity of current violation, commitment offense, length and severity of criminal history, prior parole violation history, and community resources available

are considered when making recommendations regarding suitable placement in various programs and appropriate sanctions for a parolee who violates parole.

## Parole Violations

A parolee who has violated the law or failed to comply with a condition of parole is deemed to have violated parole and may be subject to reincarceration. Although general conditions of parole exist that are imposed on all parolees, such as reporting to a parole agent, additional conditions may be imposed as a special condition of parole if they are related to the crime for which the parolee was convicted or if reasonably related to potential future criminal behavior.

Although some parolees are convicted of new crimes and returned to prison with a new sentence imposed by a court, many more parolees commit technical violations of their parole or minor violations of the law. These technical types of violations can include failing to report to a parole agent, using alcohol, participating in or associating with a gang, or possessing ammunition for a firearm. The parole agent's response to technical violations may include continuing the parolee on parole with additional conditions imposed. For example, a parole violator might be instructed to begin attending Alcoholics Anonymous meetings if found to have used alcohol in violation of parole conditions. Depending on the circumstances, another response to such a violation might be to place the parole violator in a residential substance abuse treatment program. If progressively restrictive parole conditions are not successful in deterring repeated parole violations, the parole agent may recommend that the violator's parole be revoked and the parole violator be returned to prison.

## Parole Revocation Process

The parole revocation process begins when a parole agent or local law enforcement agency detains a parolee for certain suspected violations of the law or violations of the conditions of his or her parole. If the parole agent, the agent's supervisor, and the district administrator believe that parole should be revoked as a result of the parole violation, the case is referred to the Board of Parole Hearings (board) for review. State law grants

the board full power to suspend or revoke any parole and to order a parolee returned to prison. Based on its review, the board decides whether there is sufficient evidence to revoke parole for technical violations of parole and, if so, an appropriate sentence. The board has various options, ranging from dismissing charges and discharging the parolee to revoking parole and returning the parole violator to custody for up to 12 months. In fiscal year 2002–03, the most current year reported, the board conducted more than 43,000 parole revocation hearings.

For the first quarter of 2005, the department reported that approximately 80 percent of the parole violators returned to prison had been sent back as a result of a parole revocation hearing, many of which were for minor or technical parole violations. The remainder were convicted of new crimes and sent back to prison to serve new terms. Both groups are included in the department's calculation of the State's recidivism rate— the rate at which inmates released from prison are returned to prison, which it calculates at one-, two-, and three-year intervals. Additional information about California's and other states' recidivism rates is presented in Appendix A.

## THE NEW PAROLE MODEL

As part of the fiscal year 2003–04 budget act, the Legislature approved several programs intended to save the State money by reducing the number of parole revocations. The goal of these programs, referred to by the department as the New Parole Model, was to maintain public safety by helping parolees successfully reintegrate into the community and to help parole violators change their behavior. According to the former deputy director of the parole division, the programs that eventually were established under the department's New Parole Model were intended primarily to fill perceived gaps in the department's parole process. The department hoped to help parolees reintegrate into communities and to reduce the recidivism rate by implementing prerelease programs aimed at matching future parolees to the programs and services they needed and by expanding postrelease programs aimed at improving parolees' access to those programs and services.

The department also implemented three intermediate sanction programs that offered an alternative to prison for low-risk parolees who commit minor crimes or technical violations of their parole conditions. The department anticipated that by using the three intermediate sanction programs, it could

reduce prison costs and costs to the State overall by reducing the number of parole violators returned to prison. Therefore, during the fiscal year 2003–04 state budget process it proposed using the intermediate sanction programs as a way to save money.

Components of the New Parole Model included the following:

- *Prerelease planning.* Begun before the felon was released from prison, prerelease planning included a comprehensive, automated risk and needs assessment that matched parolees to programs, allowing parole officers to have a better understanding of the types and levels of services and supervision appropriate for each parolee.

- *Expansion of parolee reentry services.* In partnership with local law enforcement and social services agencies, police and correction teams served as a liaison between field parole staff, local service agencies, and contractors that provide substance abuse treatment, transitional living, employment services, subsistence resources (clothing, meals, and transportation), educational and vocational training, and other services to newly released parolees.

- *Intermediate sanctions.* Intermediate sanctions— the Substance Abuse Treatment Control Units (SATCU), Halfway Back, and Electronic In-Home Detention (EID)—were restrictive programs for parolees who violated the technical conditions of their parole or committed minor violations of the law. Parole violators placed in the SATCU and Halfway Back programs prevented the need for a parole revocation hearing. In addition, the board had to approve placement in programs such as the SATCU and Halfway Back because they were residential. The department originally planned to have the programs in place on January 1, 2004.

## Intermediate Sanctions

The primary subjects of our audit were the three intermediate sanction programs that the department implemented as part of the New Parole Model—SATCU, Halfway Back, and EID. Table 1 summarizes these programs and the eligibility criteria established for each program.

## TABLE 1

### Overview of the Intermediate Sanction Programs

| Program | Eligibility | Program Description | Rehabilitative Benefit |
|---------|-------------|---------------------|------------------------|
| EID | Technical parole violator* who was not convicted or required to register as a sex offender nor had committed certain violations that must be reported to the Board of Parole Hearings. Must have had an operating telephone line and been willing to disable "call waiting" or "call forwarding" telephone features or have the ability to pay for the cost of installing a dedicated telephone line into the residence. | Parole violators were fitted with an electronic monitor, worn on the ankle, that alerted a contractor monitoring service when the parolee wearing the device was not within a defined distance from home. Some were allowed to leave home at set times for work; curfew period was 45 days and could be renewed. Others could be detained 24 hours a day until their revocation hearing. | None |
| ⬛⬛⬛⬛⬛ | ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ | ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ | ⬛⬛⬛⬛ |
| SATCU | Initially, a technical parole violator who had not been convicted of a serious or violent felony and whose primary problem is drug or alcohol dependency. Those who were required to register as a sex offender, had committed violent or serious felonies, or had committed certain violations that must be reported to the Board of Parole Hearings were excluded. In August 2004, eligibility was expanded to include those convicted of serious or violent felonies who currently committed technical, nonserious/nonviolent parole violations. | 30-day lockdown in jail setting for drug treatment education. After release from lockdown, mandatory 90-day aftercare program provided in the community, which could be in a residential program or on an outpatient basis. | Substance abuse education program |
| ⬛⬛⬛⬛⬛ | ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ | ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ | ⬛⬛⬛⬛ |

Source: Division of Adult Parole Operations, California Department of Corrections and Rehabilitation.

* Technical parole violator—a parolee who has committed a minor violation of law or has violated a technical condition of parole.

† Felons who have not been convicted under Penal Code, sections 1192.7(c) and 1192.8 (serious) and/or Penal Code, Section 667.5(c) (violent) for such crimes as murder, carjacking, or kidnapping.

ESATCU = Enhanced Substance Abuse Treatment Control Unit, discussed on page 12.

In addition to the eligibility criteria shown for the EID program, parole violators with certain designations within the department's correctional case management or enhanced outpatient programs were excluded from participating in this program unless approved by specific parole personnel. The parole division initially limited

participation in the SATCU and Halfway Back programs to parole violators whose convictions were nonserious and nonviolent[4], but expanded the eligibility criteria in August 2004. In addition, the programs were opened up to allow parole agents to place parole violators in the programs more than once, based upon case factors and public safety considerations. The expanded eligibility criteria for the Halfway Back program were revised in November 2004.

Although the Enhanced Substance Abuse Treatment Control Unit (ESATCU) program was similar to the SATCU program, it was not part of the New Parole Model and was not available statewide. Therefore, the department did not include the program in its cost savings estimate for the New Parole Model. The department established the ESATCU program to make use of an existing facility that would be partly occupied by inmates in a similar substance abuse program.

### A Broader Range of Options

The addition of intermediate sanctions gave parole agents a broader range of options for responding to technical parole violations without having to revoke parole and return violators to prison. In reviewing the case factors that could determine whether a parole violator should be placed in an intermediate sanction program, the parole agent was to consider, in addition to other factors, the programs and services used by the parolee in the past. Viewed as a continuum, the various parolee programs and services ranged from those offered in the least restrictive environment, such as community Narcotics Anonymous or Alcoholics Anonymous meetings, to those offered in the most restrictive environment, such as a SATCU jail. According to the director of the parole division, the parole agent might first refer the parole violator to the programs at the less restrictive end of the continuum and progress to recommending more restrictive programs if the parolee continued to violate his or her parole or did not appear to function well in the less restrictive environment. However, based on the seriousness of the parole violator's conduct, the parole agent instead might choose to begin the parole revocation process.

Figure 3 provides an overview of the range of options a parole agent might use when determining the course of action to take in response to a technical parole violation.

---

[4] Felons who have not been convicted under Penal Code, sections 1192.7(c) and 1192.8 (serious) and/or Penal Code, Section 667.5(c) (violent) for such crimes as murder, carjacking, or kidnapping.

## FIGURE 3

**Continuum of Program Options for Parole Violators**



Source: Division of Adult Parole Operations, California Department of Corrections and Rehabilitation.

## ELIMINATION AND SUBSEQUENT IMPLEMENTATION OF REDESIGNED INTERMEDIATE SANCTION PROGRAMS

The intermediate sanction programs were in effect until April 11, 2005, when the department secretary (formerly the secretary of the Youth and Adult Correctional Agency) issued a memorandum stating that the intermediate sanction programs would no longer be used as an alternative to parole revocation. Citing public safety as the number one priority, the secretary stated that there was no evidence that these sanctions improved public safety.

After the cancellation of the intermediate sanctions, parolees already in the SATCU program were allowed to continue in the program, including aftercare. In addition, the parole division

issued new guidelines for how the Halfway Back facilities, now called Parole Service Centers, would be used. These centers are now open to eligible parolees on a voluntary basis, and parolees can stay at them for up to one year. Parole violators who were in the Halfway Back program when the program was terminated would, according to the guidelines, continue to receive services until their scheduled release date.

However, the termination of the intermediate sanction programs as an alternative to prison met with opposition. Plaintiffs in a previously resolved lawsuit against the State—*Valdivia v. Schwarzenegger*—took the State back to court, alleging that it had violated the previous settlement agreement wherein intermediate sanctions would be used in place of parole revocation and imprisonment when it was determined "that such measures will best benefit both the community and the parolee." Although the State contended that the intermediate sanction programs were not specifically included in the settlement agreement, the court ruled in June 2005 that the State violated the agreement when it eliminated the SATCU and EID programs, the two intermediate sanctions specifically named in the agreement. The court also found that the Halfway Back program was not specifically named in the settlement agreement; therefore its termination as an intermediate sanction was not a violation of the settlement agreement. According to the director of the parole division, since then the division has redesigned the SATCU program, now called the In Custody Drug Treatment Program, and changed the EID program from a program used in lieu of parole revocation to one that will be used in conjunction with other services. He stated that the department has met with the plaintiffs' counsel, who approved the plan, and he indicated that the department hopes to implement these two programs by the end of November 2005.

## SCOPE AND METHODOLOGY

The Joint Legislative Audit Committee (audit committee) requested that the Bureau of State Audits review how the department handles parole violators under its New Parole Model policy. Specifically, the audit committee requested that we determine how the department classifies parolees in terms of risk, how those classifications are used to determine the treatment of parole violators, the types of parole violations and parolee classifications that qualify for intermediate sanctions, and the types of treatment options available for parole violators.

We also were asked to assess the steps used and the extent to which the department has implemented and monitored its new parole policy, focusing on the intermediate sanction programs, including electronic monitoring, substance abuse treatment control units, and community detention houses. In addition, the audit committee asked us to determine whether the department had established performance measures to measure the efficacy of its parole policy in reducing the recidivism rate. The audit committee also wanted to know the number of parolees who successfully completed their parole before and after the new parole policy changes and the number of parolees who were sent back to prison for parole violations, as well as the violations they committed.

Shortly after the audit committee approved the audit, the department secretary terminated the department's use of the intermediate sanction programs as an alternative to parole revocation and return to prison. The programs we were asked to audit had been operating for 14 months or less when they were canceled, so the data available for our analysis were limited.

The audit committee also asked that we determine whether there is evidence that the new policy resulted in cost shifting from the State to local governments, and whether parole policies vary across regions within the State. Finally, we were asked to compare the State's policies regarding parole violators and the use of intermediate sanctions to those of other states.

To determine the types of treatment options available for parole violators, and the types of parole violations and parolee classifications that qualify for intermediate sanctions, we reviewed applicable state laws, the department's operational manual, and its policies and procedures for the intermediate sanctions. For additional clarification on types of parole violations, we reviewed the laws and regulations pertaining to the board.

We determined how the department classifies parolee risk, and how those classifications affect the treatment of parole violators, by reviewing state regulations and the department's operations manual to identify the classification levels of parolee risk and the criteria used to assign a risk classification level to a parolee. We also interviewed parole division staff to determine how a parolee's risk classification affected placement in an intermediate sanction program.

To assess the extent to which the department was able to implement its parole policy and intermediate sanction programs and whether parole policies varied across regions within the State, we interviewed parole division staff and reviewed policies for the intermediate sanction programs, the department's contracts with program service providers, and program utilization data. We also evaluated significant problems that occurred during the implementation phase of the intermediate sanction programs.

To determine whether performance measures existed for the intermediate sanction programs, we reviewed department policies and contracts with program service providers. In addition, we interviewed certain parole division program administrators to determine how they would measure the success of each program.

To accomplish the intent of the audit committee to evaluate the effectiveness of the intermediate sanction programs, we determined the number of parolees who participated in an intermediate sanction program and whether they completed their parole or were sent back to prison for parole violations or new crimes. We made this determination by analyzing data as of March 31, 2005 (for the Halfway Back program and the jail component of the SATCU program), and May 31, 2005 (for the SATCU program aftercare), that the department had collected from program service providers. We also analyzed as of May 20, 2005, the most recent available data at the time for the ESATCU program and data from the department's Offender-Based Information System as of May 31, 2005—the most recent full month at the time of our fieldwork. We determined that the records supporting the status of parole violators contained in the department's Offender-Based Information System and the program data were sufficiently reliable for the purposes of our analysis by first obtaining an understanding of how the information is compiled and then testing it as necessary.

To determine whether there is evidence that the new policy resulted in cost shifting from the State to local governments, we reviewed how programs were funded and whether new activities were imposed on local governments. We found that the intermediate sanction programs were totally funded by the State. For example, the department paid $59 per day per participant to the local jails that chose to contract with the department for the 30-day jail component of the SATCU program. Therefore, we did not find evidence that the programs resulted in cost shifting to local law enforcement.

Finally, to compare the State's policy regarding parole violators and the use of intermediate sanction programs to those of other states, we selected a sample of eight states—Florida, Maryland, Michigan, New York, Texas, Vermont, Washington, and Wisconsin—some of which were cited in the Little Hoover Commission's November 2003 report as examples of states with parole reforms. Using publicly available information and interviews with correctional officials from those states, we gathered information specifically related to whether they use intermediate sanctions for parole violators in lieu of revoking their parole. We present this information and a comparison of the factors these states use in calculating their recidivism rates as well as their most currently reported recidivism rate in Appendix A. ■

Blank page inserted for reproduction purposes only.

# CHAPTER 1

## *The Department Had No Basis for Determining Whether the Benefits of Using Intermediate Sanctions Outweighed the Risk to Public Safety*

### CHAPTER SUMMARY

The secretary of the California Department of Corrections and Rehabilitation (department) terminated the use of the intermediate sanction programs as alternatives to parole revocation and return to prison because he saw no evidence that the programs improved public safety. The department's Division of Adult Parole Operations (parole division), which oversaw the intermediate sanction programs, had collected some data on these programs but had not established performance benchmarks or analyzed the data. As a result, the parole division did not know whether the increased risk to public safety associated with allowing parole violators to stay in communities rather than returning them to prison was worth the benefits it wanted to achieve.

The parole division believed that implementing the intermediate sanction programs would result in savings of $50.2 million in fiscal year 2003–04 and $100.5 million in fiscal year 2004–05. However, these savings estimates were not fully realized because the department did not take into account that a ramping-up period was needed before the programs reached full capacity. Also, for a number of reasons, none of the programs were implemented on time, as we discuss further in Chapter 2. Thus, we estimate that for parole violators placed in the Substance Abuse Treatment Control Units (SATCU) and Halfway Back programs by December 31, 2004, the department saved only $14.5 million.

In addition to saving money, the intermediate sanction programs were intended to help the Board of Parole Hearings (board) comply with the terms of the Valdivia settlement agreement by reducing the board's caseload. A reduced caseload would help the board meet the 35-day deadline for hearing parole revocation cases that was established by the agreement. The parole division also hoped that participating parole violators would benefit from the drug and alcohol counseling and other services they received while in the

SATCU and Halfway Back programs, resulting in a reduction in the State's recidivism rate—the rate at which inmates released from prison are returned to prison.

Although the parole violators in the intermediate sanction programs were subject to heightened supervision, it was for a shorter duration than the average of 153 days they would have spent in prison had they been returned. Because the parolees participating in these programs were not incarcerated, they were not prevented from committing crimes against the public for as long a period as they were before the programs existed. In fact, of 3,175 parolees who entered the Halfway Back program by December 31, 2004, 114—nearly 4 percent—were returned to prison as a result of new crime convictions during the period they otherwise would have been in prison. The SATCU program had similar results.

The parole division minimized the risk to public safety by placing less dangerous parole violators in the programs and by designing the programs to provide strict control or close monitoring of the participating parole violators.

## THE PAROLE DIVISION DID NOT ESTABLISH BENCHMARKS TO EVALUATE THE INTERMEDIATE SANCTION PROGRAMS

*On April 11, 2005, the department secretary terminated the use of the intermediate sanction programs explaining that there was no evidence that the programs, as originally designed and implemented, increased public safety.*

Although the parole division had gathered data about the intermediate sanction programs, it did not analyze the data to evaluate the programs' impact on public safety. In addition, the parole division did not establish benchmarks to evaluate the programs, such as acceptable return to custody rates for participants. Therefore, the parole division was unable to evaluate whether the additional risk to public safety inherent in the intermediate sanction programs was worth the benefits that it wanted to achieve—for example, saving the State money.

On April 11, 2005, the department secretary terminated the use of the intermediate sanction programs as alternatives to revoking parole and returning parole violators to prison. In the memo announcing the termination of the programs, the secretary stated that there were several reasons for the change, the most important of which was the department's ongoing commitment to public safety. The secretary went on to explain that there was no evidence that the intermediate sanction programs, as originally designed and implemented, improved public safety, and he stated that the programs had been beset by implementation difficulties due to contract award disputes and a shortage of available beds.

*Although the parole division had gathered data about the intermediate sanction programs, it did not analyze the data to evaluate the programs' impact on public safety.*

The secretary also stated that the agency recently had adopted its first-ever strategic plan, with the stated goal of improving public safety through evidence-based crime prevention and strategies to reduce recidivism. To implement its goals, the agency, as part of its reorganization, planned to establish an office of policy, planning, and research that would be responsible for gathering evidence-based best practices from throughout the nation to determine how the agency can improve public safety by effectively adopting measures that have proven to be successful supervision tools.

### The Parole Division Had Certain Data Available for the Intermediate Sanction Programs That It Could Have Analyzed

Although the parole division had data available about the intermediate sanction programs, it did not use these data to evaluate the programs. The director of the parole division says the department encourages its program managers to collect program data that can be used for future research, but it does not conduct its own research and evaluations of new programs that are funded by the Legislature; rather, it contracts with outside agencies to perform such work because the analyses are often complex and long-term in nature. For example, the parole division had parolee data about the SATCU program because the contracts required the service providers to collect detailed data on participating parolees in an electronic format. These data included identifying information about each participant, their program entrance and exit dates, and reasons for exiting. Until December 2004, similar data for the Halfway Back program existed only as paper copies of individual contractors' monthly invoices, rather than in electronic format. Beginning in December 2004, Halfway Back program contractors were asked to complete a data collection form that the parole division had designed. When the programs were terminated, the parole division had not compiled the data from the earlier invoices and used them to evaluate the Halfway Back program.

The department also had data in its large database[5] of inmate and parolee information that the parole division could have used to determine whether parolees who participated in the intermediate sanction programs committed new crimes or parole violations. But it did not use the data for this purpose and had no plans to perform such an analysis. According to the director of the parole division, the division did not have the mechanisms in place to provide any meaningful data other than the gross number of parolees placed in the programs and the rate of

---

[5] The department maintains inmate and parolee information in its Offender-Based Information System.

return to custody as of a given point in time. Moreover, the parole division indicated that it was advised that it was too early to evaluate the programs.

> *Monitoring the programs using established benchmarks would have provided information relevant to the secretary's decision to terminate the programs.*

However, as the department secretary stated, the department has an ongoing commitment to public safety, so it should have established benchmarks and monitored the programs' impact on public safety against them. This monitoring would have provided information relevant to the secretary's decision to terminate the programs, such as whether the percentages of parolees in the programs who were convicted of new crimes or who committed parole violations when they otherwise would have been in prison were within acceptable limits. In addition, had the parole division established benchmarks for what it considered success, such as a minimum number of parole violators completing the programs, and analyzed the available data—similar to what we have done for this report—the secretary could have used the analyses in deciding whether terminating the intermediate sanction programs was the best choice. Finally, by defining benchmarks before implementing the programs, the parole division could have determined whether it needed additional data to measure against the established benchmarks. In addition to the analyses we present later in this chapter, Appendix B presents the short-term results of parole violators who were placed in the Halfway Back, SATCU, and Enhanced Substance Abuse Treatment Control Unit (ESATCU) programs.

### A Department Contractor Determined That It Was Too Early to Evaluate the New Parole Model

In December 2004, the department contracted with the University of California, Irvine (university) to assess the readiness of the New Parole Model for evaluation, to determine whether program outcomes and impacts could be measured, and to identify short- and long-term outcomes for each program. Among other tasks, the contract specified that the project was to begin that month and continue through June 30, 2007, when the university was to present its findings to the Legislature and the department. However, according to the director of the parole division, the university's researcher advised that such an evaluation was not feasible because the programs had not yet been implemented fully. Consequently, according to the university's researcher responsible for overseeing the project, at that time, the university and the parole division agreed to focus on a different program.

At the time the intermediate sanction programs were terminated in April 2005, the university had not started its assessment of them. The fiscal year 2004–05 budget act provided $650,000 for the

department to spend for establishing performance measures and evaluating the effectiveness of various prison and parole programs. The department is using the funds to help establish a research center at the university, where the university will evaluate juvenile and adult prison programs, including rehabilitation, parole, and reentry programs, and will provide information that it believes could help department officials make policy decisions.

## LATE IMPLEMENTATION AND UNREALISTIC EXPECTATIONS PREVENTED THE INTERMEDIATE SANCTION PROGRAMS FROM ACHIEVING DESIRED SAVINGS

The intermediate sanction programs did not reach anticipated participation levels because of late implementation and unrealistic expectations, so the savings were far less than had been projected. As we discuss in Chapter 2, none of the intermediate sanction programs were implemented as planned by January 1, 2004, so parole violators could not be placed in the programs as early as had been intended. The Halfway Back program began in February 2004; the SATCU program began in May 2004; and the Electronic In-Home Detention (EID) program never fully materialized and thus did not contribute to the savings that the parole division originally had anticipated it would provide. In addition, the parole division's savings estimates for both fiscal years were based on having 900 beds for the Halfway Back program and 1,316 SATCU jail beds—2,216 total beds. No contracts were made for approximately one-quarter of those beds.

*In calculating its savings estimates, the parole division did not take into account the fact that there would be a ramping-up period during which occupancy in the programs would increase gradually.*

The parole division's expectation that the programs would be fully occupied by the first date of implementation was unrealistic. In calculating its savings estimates, the parole division did not take into account the fact that there would be a ramping-up period during which occupancy in the programs would increase gradually. Instead, the parole division's estimates assumed full capacity from the beginning.

The parole division estimated that it would save $50.2 million in fiscal year 2003–04 by placing 4,000 parole violators in the EID program or the Halfway Back program and 8,000 in the SATCU program. For fiscal year 2004–05 the parole division estimated savings of approximately $100.5 million—twice that of fiscal year 2003–04, based on placing 8,000 parole violators in either the EID program or the Halfway Back program and 16,000 in the SATCU program. This was despite the fact that the inmates who occupied the facilities that the parole division planned to use for the Halfway Back program would need to be moved out of those facilities

gradually. Some beds would not be available for the program until the transition was complete. Additionally, after the program was available for use, parole agents had to establish a pipeline of eligible parole violators willing to be placed in the Halfway Back facilities.

As a result, by the end of June 2004, parole violators occupied 473 of the 634 beds available to them, while the remaining beds in the Halfway Back facilities were still occupied by inmates. The transition was complete by November 2004, nearly 10 months after the Halfway Back program was implemented. Although most of the beds were filled, the program operated at 82 percent to 91 percent capacity through April 2005. It was impossible for the parole division to attain its estimated savings goals because the facilities never reached 100 percent capacity. Figure 4 shows the transitioning out of inmates and placement of parole violators in the Halfway Back facilities from February 2004, when they were first available for use, through April 2005.

## FIGURE 4

### Beds Occupied by Inmates and Parole Violators in Halfway Back Program Facilities February 2004 Through April 2005



Source: Community Correctional Reentry Centers facility counts and occupancy rates collected by the California Department of Corrections and Rehabilitation.

Note: Occupancy data is for the last reported date in the month.

The parole division assumed that it would have 900 beds available for the Halfway Back program; however, only 792 beds were available between February and June 2004. Because one contractor terminated its contract on June 30, 2004, this number was reduced to 747 and stayed at that level until the program was terminated. In a letter to the parole division to terminate its contract, the contractor indicated that it was experiencing financial problems and was concerned about the effect the facility's shift from an inmate population to a population of "unmotivated and incorrigible parolees" would have on staff and community safety.

The SATCU program got off to a slow start and never reached full capacity, even though the number of jail beds available was significantly less than the 1,316 beds the parole division estimated it would need to reach its savings goal. As we discuss in Chapter 2, the parole division had difficulty contracting for SATCU jail beds because some counties were not willing to accept the daily jail rate offered and others lacked space.

Parole agents began placing parole violators in the SATCU jails statewide in July 2004, and occupancy gradually increased over time. However, of the 930 SATCU jail beds available by March 30, 2005, only 656, or 71 percent, were occupied. Figure 5 on the following page shows the monthly occupancy for the SATCU jails.

A substantial percentage of the jail beds available for the SATCU program—70 percent—were located in a large detention facility in Los Angeles County. According to the director of the parole division, having a single large facility serve such a large geographic area was problematic for parole agents wanting to refer parole violators to the SATCU program because of the need to transport them long distances to this facility. The department intended that the facility serve two of its four parole regions, regions III and IV, and part of region II, which constitutes a significant portion of the State. A map of the State with the department's parole regions is shown in the Introduction on page 6.

**FIGURE 5**



**Occupancy of SATCU Jail Beds
July 2004 Through April 2005**

Source: SATCU jail occupancy rate reports from the California Department of Corrections and Rehabilitation.

Note: Occupancy data shown is for the last reported date in the month.

### Although the Parole Division Did Not Calculate the Savings Resulting From the Intermediate Sanction Programs, We Estimated That They Were Substantially Less Than Anticipated

The low occupancy of the SATCU and Halfway Back programs occurred despite the fact that the parole division had expanded the eligibility for both programs to include some serious and violent offenders, and the Halfway Back program was expanded further to include parole violators eligible for Proposition 36 programs.[6] As a result of the implementation problems and the gradual utilization that occurred, only 2,567 parole violators had been placed in the SATCU program as of December 31, 2004, and only 3,175 had been placed in the Halfway Back program, far short of the 12,000 the parole division estimated it would need to meet its projected savings for the second half of fiscal year 2003–04.

---

[6] Proposition 36 was passed by voters in 2000. Effective July 1, 2001, its intent is to divert nonviolent defendants, probationers, and parolees charged with simple drug possession or drug abuse offenses from incarceration into community-based substance abuse programs. The SATCU program required participants to spend 30 days in jail; therefore, the eligibility criteria for the SATCU program excluded parole violators eligible for Proposition 36 services.

The parole division did not evaluate the data it had about the Halfway Back and SATCU programs, so it was unable to calculate the savings achieved by the programs. It was apparent, however, that the savings were substantially less than anticipated because of the delays in implementing the programs and placing parole violators in them. Using the parole division's estimates and data about the programs and the participants, we estimated that for the 5,742 parole violators placed in the programs by December 31, 2004—2,567 in the SATCU program and 3,175 in the Halfway Back program—the department saved $14.5 million—$7.4 million and $7.1 million, respectively. The savings equates to an average $1.2 million per month over a 12-month period, far short of the average $8.4 million per month it would have had to save to achieve its planned savings of $50.2 million for fiscal year 2003–04 and $100.5 million for fiscal year 2004–05. Table 2 compares our estimate of the cost of using the intermediate sanction programs to the parole division's estimated cost of returning the parole violators to prison.

**TABLE 2**

### Estimated Savings from Using Intermediate Sanctions Rather Than Parole Revocation as of December 31, 2004
#### (Dollars in Millions)



| Intermediate Sanction Program | Number of Parole Violators Placed in Program as of December 31, 2004 | Parole Division's Estimated Cost to Return Participants to Prison | Estimated Cost of Using the Intermediate Sanction Programs | Net Estimated Savings from Using Intermediate Sanction Programs |
|---|---|---|---|---|
| SATCU | 2,567 | $19.8 | $12.4 | $ 7.4 |
| Halfway Back | | | | |
| **Total Savings** | | | | **$14.5** |

Sources: Bureau of State Audits' analysis of California Department of Corrections and Rehabilitation data and budget documents.

The costs shown in the table do not account for the additional costs to local law enforcement agencies associated with locating and arresting the parole violators who were returned to custody, obtaining convictions for those returned for new crimes, the costs to the Board of Parole Hearings (board) for holding revocation hearings for those who were returned for parole violations, and the costs to victims of the parole violators who were convicted of new crimes. Furthermore, the savings figures do not account for benefits that are not quantifiable, such as the impact that the Halfway Back and SATCU programs may have had on the future behavior of participants, which we discuss in the next section.

## THE INTERMEDIATE SANCTION PROGRAMS HAD OTHER MEANINGFUL BENEFITS

In addition to the cost savings, the parole division hoped that parole violators would benefit from services they received while in the SATCU and Halfway Back programs to help them reintegrate into society and complete their parole terms successfully, resulting in a lower recidivism rate. Although there was no rehabilitative aspect to the EID program, the SATCU and Halfway Back programs provided participants with an array of services, such as drug and alcohol counseling, life skills management, and employment counseling.

> *The SATCU and Halfway Back programs provided participants with an array of services, such as drug and alcohol counseling, life skills management, and employment counseling.*

The department believes that the benefits provided by such services, such as improvement in an individual's quality of life, are not measured easily and require analysis of data collected over a long period of time. It planned to hire a contractor to study the long-term effects of the New Parole Model and the individual programs on the behavior of parole violators. The tables in Appendix B show that for two of the three intermediate sanction programs, as of May 31, 2005, the percentage of participants who were reincarcerated was double or more among those who did not complete the programs, compared with the percentage among those who completed the programs. These results suggest that some participants who were successful may have improved their behavior within the time period we reviewed. Although these results are short term, the parole division could use this type of information to establish a baseline of performance and compare that baseline against results at future points in time.

In addition, the intermediate sanction programs were seen as a way to help reduce the workload of parole revocation hearings before the board. Parolees facing parole revocation have the right to a hearing before the board. As a result of the settlement of the Valdivia lawsuit against the State, the board is required to conduct final revocation hearings within 35 days after the first day a parolee is detained for parole revocation. According to court documents detailing the settlement agreement, historically, parolees had spent up to 45 days or more in jail awaiting a hearing before the board.

Under the New Parole Model, eligible parole violators could agree to be placed in an intermediate sanction program in lieu of continuing with the parole revocation process. As part of their agreement, the parole violators waived their right to a board hearing, thereby avoiding the risk that the board would revoke

*Placing parole violators in the intermediate sanction programs was not only a way to save money, but was also a way to reduce the Board of Parole Hearings' caseload.*

their parole. Therefore, placing parole violators in the intermediate sanction programs was not only a way to save money, but was also a way to reduce the board's hearing caseload, increasing the likelihood that it could meet the 35-day deadline. Evaluating the effect of the intermediate sanction programs on the board's hearing caseload was outside the scope of our audit. However, because the approximately 5,700 parole violators who entered the Halfway Back and SATCU programs by December 31, 2004, waived their right to a parole revocation hearing, the board's caseload potentially was reduced by that number.

## THE INTERMEDIATE SANCTION PROGRAMS PROVIDED LESS SUPERVISION THAN PRISON, AND SOME PAROLE VIOLATORS IN THESE PROGRAMS COMMITTED CRIMES

Inherently, there is an increased risk to public safety by placing parole violators in programs that are shorter in duration than the time they otherwise would have spent in prison. The parole division minimized this risk by limiting placement in the programs to parole violators who committed minor violations of their parole or the law—those it believed would be less likely to commit serious crimes. However, parole violators in the intermediate sanction programs were supervised closely for fewer than the average 153 days they would have spent in prison had they been returned, so they could commit other parole violations and crimes sooner than if they had been returned to prison.

### Parole Violators in the Intermediate Sanction Programs Were Under Less Supervision Than Prison Would Have Provided

Although the intermediate sanction programs provided supervision of the parole violators who participated in them, they allowed participants to remain in communities and thus provided less supervision than prison would have provided. Moreover, 1,081 of the 2,567 participants in the SATCU program did not attend the required aftercare services after being released from jail. As a result, the additional oversight that the aftercare services would have provided did not occur for many SATCU participants, and they may have been unsupervised until they were located and returned to custody for not completing the program or placed in the program again. Of the 1,081 participants, 83 were returned to custody for committing a new crime and 346 were returned to custody for violating their parole within the 153-day average time frame they would have otherwise spent in prison if the SATCU program did not exist. We discuss this in more detail in a subsequent section.

The SATCU program was designed for parole violators whose primary problem is drug or alcohol dependency. The department's Office of Substance Abuse Programs (OSAP) manager responsible for the aftercare contracts explained that many of these parole violators may be in the throes of detoxifying from drugs or alcohol during the 30 days they spend in jail as the first component of the SATCU program. She believes the 30-day substance abuse program provided to them in jail was less effective for participants who are detoxing.

After the parolees participating in the SATCU program were released from jail, they were ordered to attend the 90-day aftercare component of the program, which was provided by agencies in the community. In a letter to the parole division, the chief of the OSAP indicated that residential care has been demonstrated to be most effective. It is also more expensive, however, so most participants were referred to nonresidential aftercare. Additionally, according to the letter, to improve the success rate for those referred to nonresidential aftercare, transportation to the aftercare service providers should be provided. According to the OSAP's records, many of those who were referred to nonresidential aftercare programs did not receive transportation.

Consequently, as Figure B.2 in Appendix B shows, after spending time in a SATCU jail, 46 percent of these parolees did not participate in the aftercare portion of the SATCU program. The aftercare agencies were required to report parolees who were referred to them but did not show up as scheduled. However, it is reasonable to believe that many parolees released from SATCU jails resumed their use of drugs or alcohol and that some may have committed other crimes before being tracked down by their parole agents.

Similarly, the Halfway Back program required participants to reside in a closely supervised halfway house for a specified number of days; the parole division expected the average stay to be 45 days. However, after completing the Halfway Back program, the participants were released and returned to regular parole supervision. Parolees in the EID program wore electronic monitoring devices on their ankles as a special condition of parole; however, they were not supervised as closely as parolees in either the 30-day jail component of the SATCU program or the Halfway Back program because they were allowed to remain in their residences and go to and from their jobs. When they completed the 45-day program, the ankle devices were removed and the special condition of parole ended. Table 3 compares the number of days parole violators were supervised in the intermediate sanction programs to the average number of days they would have spent in prison.

*After completing the 45-day Halfway Back program, the participants were released and returned to regular parole supervision.*

**TABLE 3**

### Length of Supervision in Intermediate Sanction Programs Compared With Average Time in Prison for Violating Parole



| Intermediate sanction program | Length of intermediate sanction program | Average time in prison for parole violation (in days) | Number of days supervision in community is less than time served in prison for parole violation |
|---|---|---|---|
| SATCU | 30 days in jail | | |
| | 90 days in unsecured community aftercare programs | 153 | 123 |
| BPU | 30 to 45 days in closely supervised residential facility | | |
| Halfway Back | Average 45 days in closely supervised residential facility | 153 | 108 |

Source: California Department of Corrections and Rehabilitation.

### The Parole Division Minimized the Risk to Public Safety by Placing Less Dangerous Parole Violators in the Intermediate Sanction Programs

Programs that involve keeping parolees who have histories of not following the rules of their parole out of prison create the opportunity for them to commit additional parole violations or new crimes and thus increase the risk to the public. To limit this risk, the parole division designed the intermediate sanction programs to provide supervision or strict control of the parole violators who participated in them. Although the parole division later allowed some parole violators with histories of serious and violent offenses who had committed technical, nonserious, or nonviolent parole violations to enter the programs, parole agents considered not only their previous offenses but also their recent behavior, including the nature of their parole violations, when deciding whether to recommend placing a parolee in an intermediate sanction program. Only nonviolent parolees who had committed minor violations of their parole or the law were initially considered eligible for an intermediate sanction program.

### Although Intermediate Sanction Programs Increase the Public Safety Risk in the Short Term, This Risk Must Be Weighed Against the Desired Benefits

In the short term, intermediate sanction programs are less effective than prison at preventing crimes, but this risk must be weighed against the benefits of using such programs.

Approximately one-third of the parole violators placed in the SATCU or Halfway Back programs were returned to prison as the result of a new conviction or parole violation during the 153 days they otherwise would have spent in prison. Table 4 shows the number of parolees who were returned to custody within 153 days of entering these two programs—the average time the parole division estimates they would have spent in prison had they been returned to prison rather than placed in an intermediate sanction program.

However, as the table shows, of the 37 percent of parolees placed in the Halfway Back program who were returned to prison within 153 days of entering the program, only 4 percent were returned because they had committed new crimes. The result is similar for the SATCU program. Thus, notwithstanding the significance of those crimes to their victims, the percentage of parolees participating in the two programs who were convicted of new crimes is small. In the long term, the parole division hoped that the SATCU and Halfway Back programs would help parolees change their behavior for the better.

**TABLE 4**

Parole Violators Placed in an Intermediate Sanction Program as of December 31, 2004, and Returned to Custody Within 153 Days of Placement



| Intermediate Sanction Program | Number Placed in Programs as of December 31, 2004 | Number Who Were Convicted of a New Crime | Percentage Returned for Committing a New Crime | Number of Parolees Returned to Prison or to Parole Division for a Parole Violation | Percentage Returned for a Parole Violation | Total |
|---|---|---|---|---|---|---|
| Halfway Back | 3,175 | 114 | 3.6% | 1,048 | 33.0% | 1,162 |

Sources: Bureau of State Audits' analysis of program provider data collected by the California Department of Corrections and Rehabilitation and data from its Offender-Based Information System.

Although the tradeoff may be difficult, achieving the desired benefits of using intermediate sanction programs in lieu of returning eligible parole violators to prison requires a willingness to accept the additional risks associated with keeping individuals who are proven to be uncooperative in the community. Also, to evaluate whether the intermediate sanction programs adequately protected the public, the parole division would need to know how many parolees committed parole violations and how many were convicted of new crimes during the time they otherwise would have been in prison. The parole division did not establish

*Achieving the desired benefits of using intermediate sanction programs in lieu of returning eligible parole violators to prison requires a willingness to accept the additional risks associated with keeping individuals who are proven to be uncooperative in the community.*

failure rates in terms of percentages of parole violations and new crime convictions, such as those shown in Table 4, that it could use as benchmarks to determine whether the programs were operating with acceptable risk to the public.

It is reasonable to assume that the department, as well as the Legislature, which authorized the use of the intermediate sanction programs, understood that the cost of crime cannot always be valued, especially the cost of crimes against persons. However, without knowing the nature and extent of additional risk associated with keeping parole violators in the community, the parole division could not evaluate the success of the intermediate sanction programs appropriately.

In addition to knowing the overall failure rate of the intermediate sanction programs, knowing the failure rates of those who completed a program versus those who entered a program but did not complete it would have been useful information for the parole division to consider when evaluating the programs. Of 2,766 participants who left the Halfway Back program by March 31, 2005, the last month of data before the intermediate sanction programs were suspended, 1,160 completed the program and 1,606 did not complete it. Table 5 shows that 69 percent of the participants who did not complete the Halfway Back program were returned to custody at least once from the time they entered the program through May 31, 2005, while 29 percent of those who completed the program had returned to custody by then. Table B.1 in Appendix B shows the status of all 2,766 Halfway Back program participants who entered the Halfway Back program for the first time by December 31, 2004, and exited for the first time by March 31, 2005.

### TABLE 5

**Halfway Back Participants Placed by December 31, 2004, Who Were Returned to Custody at Least Once by May 31, 2005**



| | Participants Who Completed the Halfway Back Program | | Participants Who Did Not Complete the Halfway Back Program | | |
|---|---|---|---|---|---|
| Total returned | 332 | 28.6% | 1,107 | 68.9% | 1,439 |
| Returned for new conviction | 55 | 4.7 | 204 | 12.7 | 259 |

Sources: Bureau of State Audits' analysis of program provider data collected by the California Department of Corrections and Rehabilitation and data from its Offender-Based Information System.

It is interesting to note that of the 1,439 participants who were returned to custody by May 31, 2005—332 of whom completed the program and 1,107 of whom did not—1,162, or 81 percent, were returned to custody within the 153-day average time frame that they would have spent in prison if the intermediate sanction programs did not exist.

Table 6 shows that the SATCU program had similar results, although the results are less dramatic than those for the Halfway Back program. Specifically, of 2,527 participants who exited the SATCU jail component by March 31, 2005, and had exited SATCU aftercare by May 31, 2005, 1,094, or 43 percent, were returned to custody at least once by May 31, 2005. Of the 1,094 returned to custody, 812, or 74 percent, are those shown previously in Table 4 as having returned within the 153-day time frame. Table B.2 in Appendix B shows the status of all 2,527 SATCU program participants who entered the program for the first time by December 31, 2004, and exited for the first time by May 31, 2005.

## TABLE 6

### SATCU Participants Placed by December 31, 2004, Who Were Returned to Custody at Least Once by May 31, 2005



| | Of Those That Completed the SATCU Program | | Of Those That Did Not Successfully Complete the SATCU Program | | Totals |
|---|---|---|---|---|---|
| Total returned | 61 | 14.6% | 1,033 | 49.0% | 1,094 |
| Returned for parole violation | | | | | 870 |
| Returned for new conviction | 7 | 1.7 | 217 | 10.3 | 224 |

Sources: Bureau of State Audits' analysis of program provider data collected by the California Department of Corrections and Rehabilitation and data from its Offender-Based Information System.

Because we used May 31, 2005, as the cutoff for our analysis of the status of participants who exited the Halfway Back or SATCU programs for the first time, we could not evaluate the effectiveness of the programs more fully. Specifically, for participants who completed a program and were not returned to custody by May 31, 2005, we were unable to determine how long they successfully continued on parole, or whether they successfully completed their parole periods. However, using the data it had, the parole division could have done an analysis similar to ours, and

then could have measured the results against benchmarks such as a percentage of participants who did not return to custody within a specified time period after completing a program.

As we discussed in the Introduction, in addition to the EID, Halfway Back, and SATCU programs, the department implemented an Intermediate sanction program called the Enhanced Substance Abuse Treatment Control Unit (ESATCU) program in March 2004. The department established the ESATCU program for different reasons than for establishing the other intermediate sanction programs. It established the ESATCU program to make use of an existing facility that would be occupied partly by inmates in a similar substance abuse program. The program was not available statewide, so the department did not consider it a part of its New Parole Model. However, the ESATCU program had potential rehabilitation benefits similar to those for the Halfway Back and SATCU programs, although it could serve only 800 parolees annually.

Because the ESATCU program was an intermediate sanction program used as an alternative to prison, it had the same public safety issues as the other three programs. Participants were monitored closely in a correctional facility for 90 days and then released, which meant that, on average, they were released 63 days sooner than if their parole had been revoked. Table 7 shows that 89 percent of the participants who did not complete the ESATCU program because they were removed from the program were returned to custody at least once from the time they entered the program through May 31, 2005. In contrast, 37 percent of those who completed the program had returned by then.

**TABLE 7**

**ESATCU Participants Placed by December 31, 2004, Who Were Returned to Custody at Least Once by May 31, 2005**



| | Cases in Which Who Completed the ESATCU Program | | Cases in Which Who Did Not Complete the ESATCU Program | | Totals |
|---|---|---|---|---|---|
| Total returned | 125 | 37.1% | 49 | 89.1% | 174 |
| Returned for violation | | | | | |
| Returned for new conviction | 15 | 4.5 | 9 | 16.4 | 24 |

Sources: Bureau of State Audits' analysis of program provider data collected by the California Department of Corrections and Rehabilitation and data from its Offender-Based Information System.

Of the 174 participants who returned to custody, 75 were returned within 153 days of entering the program, including 73 participants who committed parole violations and two who were convicted of new crimes. Table B.3 in Appendix B shows the status of all ESATCU participants as of May 31, 2005.

## RECOMMENDATIONS

When planning future intermediate sanction programs, the parole division should decide on appropriate benchmarks for monitoring performance, identify the data it will need to measure performance against those benchmarks, and ensure that reliable data collection mechanisms are in place before a program is implemented. After implementing a new intermediate sanction program, the parole division should analyze the data it has collected and, if relevant, use the data in its existing databases to monitor and evaluate the program's effectiveness on an ongoing basis.

The parole division should ensure that the savings estimates developed during program planning are based on reasonable assumptions. If those assumptions change, it should update the savings estimates promptly.

The parole division should consider analyzing the effect programs have had on parolee behavior and should use the knowledge it gains from the analyses to make future intermediate sanction programs more effective. The analysis should include the benefits of adding features to make these programs more effective. ■

# CHAPTER 2

## *Contracting Problems and Unforeseen Issues Delayed the Implementation of the Intermediate Sanction Programs*

### CHAPTER SUMMARY

After the signing of the fiscal year 2003–04 budget, the Division of Adult Parole Operations (parole division) within the California Department of Corrections and Rehabilitation (department) planned to implement the intermediate sanction programs by January 1, 2004. Although the parole division took steps to establish each program in the months before January 2004, unforeseen obstacles, contracting problems, and labor negotiations caused delays in beginning the Substance Abuse Treatment Control Units (SATCU) and Electronic In-Home Detention (EID) programs. As a result, the SATCU program was not implemented until May 2004, and the EID program was delayed until November 2004. The EID program also was plagued by equipment problems that, according to a parole division regional administrator, caused the program to lose credibility with the department's field parole agents.

Although the Halfway Back program did not experience contracting problems, it was delayed until February 2004 due to the need to reach an agreement with the labor union regarding the Halfway Back policy. The department also needed time to phase out the inmate population in the Halfway Back facilities and transition to a parole violator population. Because of the delays in implementing these programs, as we discussed in Chapter 1, the department did not achieve the cost savings it had projected for fiscal year 2003–04.

### UNFORESEEN FACTORS HAMPERED EARLY PLANNING EFFORTS

The parole division began efforts to implement the intermediate sanction programs shortly after passage of the fiscal year 2003–04 budget, with a goal of implementing the programs in January 2004. However, during the latter half of 2003, planning for the implementation of the intermediate sanction programs was hampered by unforeseen factors, such as a change in

*A change in department leadership and a hiring and contracting freeze caused a degree of uncertainty to be present during the planning activities for the intermediate sanction programs.*

department leadership and a hiring and contracting freeze. These and other factors caused a degree of uncertainty to be present during the planning activities that took place during this period.

In particular, shortly after the administration changed with the new governor in November 2003, the department director resigned and the parole division's deputy director was moved into the position of acting department director and later acting chief deputy. The loss of the deputy director may have disrupted the planning process because he had created the programs and other department staff were left to oversee their implementation during his five-month absence (he returned in May 2004).

In addition, soon after the administration change, the governor issued, in November and December 2003, two executive orders calling for a hiring and contracting freeze. The parole division's acting deputy director at the time stated that there initially was uncertainty about whether the contracting freeze applied to the department's efforts to implement the intermediate sanction programs. Although the parole division later received exemptions from both freezes, the hiring freeze contributed to the delay in implementing the SATCU program. We discuss this further in the next section.

According to the parole division's acting deputy director at the time, the department was under pressure to implement the intermediate sanction programs by January 1, 2004, because the fiscal year 2003–04 budget act reflected the department's estimate of the cost savings the programs would achieve, and those savings would not be realized if the programs did not start on time. In addition, the department was under some legal pressure to get the programs under way because the SATCU and EID programs were included in the remedial plan of the Valdivia settlement agreement. These programs were intended to reduce the Board of Parole Hearings' caseload and allow it to conduct the remaining hearings within the shortened time limits established in the agreement.

The parole division's acting deputy director at the time indicated that the division conducted weekly meetings to discuss the status of implementation and conferred weekly with regional parole administrators to discuss their efforts, such as negotiating contracts with county jails for the SATCU program.

## UNANTICIPATED CONTRACTING DELAYS AND ADMINISTRATIVE OBSTACLES IMPEDED THE TIMELY IMPLEMENTATION OF THE SATCU PROGRAM

In order to implement the SATCU program, which entailed a 30-day in-custody education component followed by up to 90 days of aftercare, the parole division first needed to establish contracts with county jails, which proved to be more problematic than the parole division had anticipated. The parole division indicated that it began to solicit county jails as early as September 2003. As illustrated in Figure 6 on the following page, the new administration imposed a contracting freeze in late 2003, but the department learned from the Department of General Services in mid-December that interagency contracts, such as those with county jails, were exempt from the freeze.

*According to the department's acting director at the time, the parole division underestimated other obstacles associated with being dependent on the jails for the SATCU implementation.*

However, according to the department's acting director at the time, the parole division underestimated other obstacles associated with being dependent on the jails for the SATCU implementation. For example, he stated that some counties were not willing to contract for the $59 daily rate the parole division pays. The parole division learned that others were not willing to contract because they lacked space. In one instance, a parole division manager indicated that a county jail agreed to contract with the parole division, but never accepted SATCU parolees because of a delay in hiring staff and budgetary concerns. This manager also stated that some jails were too far away geographically to provide the maximum benefit to the program, while others wanted to negotiate different terms. As a result of these obstacles, contracts with county jails were not in place by the scheduled January 1, 2004, implementation date and, in fact, were approved at varying times throughout that year. As shown in the text box on page 41, only two jail contracts had been approved by March 2004, and the department had six jail contracts in place for the SATCU program by November 2004.

## FIGURE 6

### Events Leading to Delays in Implementing the SATCU Program

**Aug. 2003** | **September Through December 2003** | **January Through April 2004** | **May Through July 2004**

Parole division develops draft SATCU policy.

Department prepares the scope of services for jail contracts. Parole division solicits jails but soon discovers that some jails are unwilling to contract with the State.

August 2, 2003—Governor signs fiscal year 2003-04 budget (provides funding for the intermediate sanction programs).

November 2003—The administration changes with new governor.

Valdivia settlement signed.

November 19, 2003—Executive order institutes hiring freeze.

December 5, 2003—Executive order institutes contract freeze.

December 12, 2003—Department learns that interagency contracts, such as the SATCU county jail contracts, are exempt from contract freeze.

Labor negotiations reach impasse in March 2004.

The department's Office of Substance Abuse Programs (OSAP) and parole division meet to discuss their roles and responsibilities for the SATCU program aftercare.

January 2004—OSAP contacts the substance abuse agency provider and verbally authorizes them to provide aftercare for the SATCU program.

January 1, 2004—Planned implementation.

January 23, 2004—Department is granted an exemption by the Department of Finance to enter into contracts for the direct care, treatment, safety, and security of the inmate and parole population, such as those needed for SATCU aftercare.

Parole division begins conducting roundtable discussions on the SATCU program in July 2004.

All regions begin using the SATCU program by July 2004.

OSAP and parole division finalize an agreement regarding SATCU aftercare after May 1, 2004.

May 7, 2004—Policy issued and program is available for use.

Late May 2004—Acting department director returns to position as parole division deputy director.

July 1, 2004—Hiring freeze and contract freeze lifted.

---

**Locations and Approval Dates
for SATCU Jail Contracts**

Del Norte County—March 9, 2004

Los Angeles County—March 25, 2004

Kern County—April 20, 2004

Santa Clara County—May 7, 2004

San Francisco County—August 19, 2004

Tulare County—November 9, 2004

---

The parole division also needed to enter into a contract for drug education classes for parolees during their 30-day jail stay. Like the jail contracts, this contract was exempt from the restrictions imposed by the contracting freeze because the contractor was another government agency, the Contra Costa County Office of Education (CCCOE). The Department of General Services approved the contract in April 2004.

In addition to establishing contracts for the in-custody component of the SATCU program, the parole division needed to establish providers for the aftercare component. According to the parole division's acting deputy director at the time, the parole division's original intention was to obtain a competitively bid contract with a new provider for aftercare services. However, because the department was under pressure to implement the programs quickly and because of the contracting freeze, the department instead decided to ask Substance Abuse Coordination Agency (substance abuse agency) providers, with whom it had existing contracts, to provide aftercare services. These providers were already under contract with the department's Office of Substance Abuse Programs (OSAP) to provide residential and nonresidential substance abuse services to inmates and parolees through a variety of department programs.

As noted in Figure 6, according to the substance abuse agency's program manager at OSAP, the providers were contacted and verbally authorized to provide aftercare for the SATCU program in January 2004. The substance abuse agency's providers began accepting parolees in May 2004, before the contract amendments were in place, but the department was not able to get the necessary contract amendments approved until May 2005 because it had to prepare a written justification of its decision not to seek competitive bids that then had to go through various layers of departmental and Department of General Services' review and approval. Therefore, this delay did not affect the implementation of the SATCU program.

Several other actions also had to occur before parolees could enter the SATCU program. First, the parole division had to issue a policy describing how the program was to be used, parolee eligibility criteria, and specific job duties for parole division staff. Because the SATCU program would add duties for parole agents, the parole division could not develop the SATCU policy without negotiating these job duty changes with the parole agents' labor

*Because the SATCU program would add duties for parole agents, the parole division could not develop the SATCU policy without negotiating these job duty changes with the parole agents' labor union.*

union. Thus, as shown previously in Figure 6, the parole division developed the SATCU program policy memo in December 2003 and subsequently met with the labor union that represents parole agents (labor union) to discuss the impact the new policy would have on the terms and conditions of employment for employees concerned. By March 2004, the negotiations had reached an impasse, with the two parties unable to agree on a solution. Once an impasse is reached, state law allows the department to implement any or all of its last, best, and final offer. The parole division issued the SATCU policy memo on May 7, 2004.

Development of the policy also required the parole division to reach an agreement with OSAP, which was responsible for oversight of the substance abuse agency's contract providers. As shown in Figure 6, OSAP and parole division staff met to discuss the roles and responsibilities for the SATCU program aftercare in March 2004 and finalized an agreement on May 1, 2004.

Even after the SATCU policy was issued, it was not until July 2004 that all the regions began to use the SATCU program because, according to the SATCU program manager, county jails and the CCCOE needed to hire and train staff. In addition, the SATCU program required the department to hire additional parole agents to coordinate and manage the delivery of SATCU services. However, because the hiring freeze was in place through the end of fiscal year 2003–04, the parole division could not hire parole agents until the Department of Finance approved its request for an exemption, which the department requested in November 2003. Subsequently, the first SATCU parole agent was hired in May 2004. County jails needed to hire staff to guard the parole violators during their 30-day jail stay, and the CCCOE needed to hire staff and obtain security clearance for them to enter the county jails. In addition, the parole division conducted regional roundtable discussions with representatives from the parole division, the county jails, substance abuse agency providers, and the CCCOE representative for each region, regarding their roles and responsibilities.

## THE EID PROGRAM NEVER FULLY MATERIALIZED

Because of contracting delays and equipment problems, the EID program never fully materialized before the department secretary terminated it. By late 2003, the department appeared to be on track to implement the EID program as planned. Specifically, as shown in Figure 7 on page 44, the parole division drafted a scope of work for electronic monitoring services in October 2003, made the invitation for bid (IFB) available to prospective bidders

on November 24, 2003, and selected the lowest-bidding vendor on January 12, 2004, pending a demonstration of the vendor's electronic monitoring equipment to ensure that it complied with all the requirements in the contract scope of work, such as having a proximity tamper—an alarm that would trigger if the electronic monitoring unit were taken away from the body yet remained connected. The parole division's demonstration determined that the vendor's equipment did not have a proximity tamper. Subsequently, in late January 2004, the department informed the vendor that it had failed the equipment demonstration and, because of that, was disqualified from the contract. The parole division's second choice of vendor for this contract passed the equipment demonstration, but the department later received two protests to the contract award. Specifically, the vendor that previously failed the equipment demonstration claimed that its equipment did meet the contract requirements. Another vendor also protested the award, claiming that the second vendor did not use the latest generation of equipment, as specified in the IFB, and that the bid was not signed by an individual authorized to execute contracts.

Because of the time it would have taken to defend the two protests simultaneously, the parole division instead put out a new IFB in April 2004 and selected a new vendor, which passed the equipment demonstration in May 2004. However, the second contract award also was protested, causing further delays. Specifically, another bidder claimed that the selected vendor did not provide services to the minimum number of law enforcement agencies required by the IFB. In July 2004, the Department of General Services ruled not to uphold the protest. As a result of these protests, as noted in Figure 7 on the following page, the EID contract was not finalized until August 2004, and because additional delays occurred after that, the EID program was not available for use until much later in the year than planned.

*Besides the contracting delays, the EID program was not immediately implemented due to administrative issues, such as training field staff to use the program and equipment.*

Besides the delays in contracting process, the EID program was not immediately implemented due to administrative issues, such as the need to develop the program's policy, negotiate workload implications with the labor union, and train field staff to use the program and equipment. Although the parole division previously had drafted an EID policy, the policy could not be finalized until after negotiations with the labor union took place. As noted in Figure 7, negotiations with the labor union took place between March and May 2004, at which time they reached an impasse. As we mentioned earlier, this allowed the department to implement any or all of its last, best, and final

FIGURE 7.

## Activities That Delayed Implementation of the EID Program

| Aug. 2003 | September Through December 2003 | January Through March 2004 | | December 2004 Through April 2005 |
|---|---|---|---|---|

**August 2, 2003**—Governor signs fiscal year 2003–04 budget (provides funding for the intermediate sanction programs).

Parole division drafts EID contract language; releases the invitation for bid (IFB) on November 24, 2003, and schedules product demonstration with the lowest bidder.

**November 2003**—Administration changes with new governor.

Valdivia settlement signed.

**November 19, 2003**—Executive order institutes hiring freeze.

**December 5, 2003**—Executive order institutes contract freeze.

Between August and November 2004, the parole division and the contractor work together to develop an implementation and training plan to train parole agents in the use of the EID equipment.

EID contract is approved by the Department of General Services in August 2004.

Second lowest bidder passes the product demonstration, but the parole division receives two protests to the proposed awards in early 2004.

**January 2004**—Lowest bidding vendor is selected but fails product demonstration.

**January 1, 2004**—Planned implementation

Labor negotiations take place between the parole division and the labor union from March to May 2004, at which time an impasse is reached and made official on July 24, 2004.

Lowest bidder passes product demonstration in May. Parole division sends letter of intent to award in June 2004, but the proposed bid award is subsequently processed. In July 2004, Department of General Services decides not to uphold the process.

Parole division releases a new IFB to prospective bidders on April 1, 2004.

**Late May 2004**—Acting department director returns to position as parole division deputy director.

**July 1, 2004**—Hiring freeze and contract freeze lifted.

| August Through November 2004 | | December 2004 Through April 2005 |
|---|---|---|

**November 29, 2004**—Policy issued and program is available for use.

The number of EID units in use peaks at 139 in April 2005.

Parole division receives complaints of EID equipment problems from parole agents in the field.

**April 11, 2005**—Intermediate sanction programs terminated.

offer. However, the Department of Industrial Relations, which mediated the impasse, did not officially declare that no agreement could be reached between the parties until July 24, 2004.

After the approval of the EID contract in August 2004 and through November 2004, the parole division and the contractor worked together to train a certain number of parole agents from parole units located throughout the State in the use of the EID equipment, with the expectation that they would train the remaining parole agents in their units. All training was completed by November 15, 2004, and the parole division issued the EID policy on November 29, 2004.

*One of the parole division's regional administrators stated that the EID program lost credibility with the parole agents who were supposed to use it because they found the equipment hard to use and not always accurate.*

Although the policy was issued on November 29, 2004, the contractor's status reports show that as of January 28, 2005, only 34 of the 1,000 electronic monitoring units that were distributed to parole units statewide were in use. By April 8, 2005, three days before the agency secretary terminated the EID program, only 137 units were in use. One of the parole division's regional administrators stated that the EID program lost credibility with parole agents because they found the equipment hard to use and not always accurate.

The parole division first attempted to resolve the equipment problems with the contractor in late December 2004, when only three electronic monitoring units had been activated. To resolve installation difficulties, the contractor agreed to provide installation instructions in the form of a sticker that could be attached to the electronic monitoring equipment, and to develop tips to help the participants in the program prevent false alarm signals. Even with these improvements, the parole division continued to receive the same and other complaints from parole agents. As a result, in February 2005, the parole division conducted its own test of the equipment and found that the alarm signals were unreliable. The equipment problems and the subsequent perception that had developed among parole agents that the equipment was unreliable, as well as other concerns, led the department to formally terminate the contract in May 2005, by which time the EID program already was terminated.

## THE HALFWAY BACK PROGRAM WAS IMPLEMENTED RELATIVELY SMOOTHLY, BUT DID NOT REACH OCCUPANCY GOALS

The department was on track to implement the Halfway Back program by January 2004, but due to the need to finalize negotiations with the labor union, implementation occurred

just one month later. The parole division decided to use existing contracts for the Halfway Back program. These contracts were with Community Correctional Re-Entry Centers (reentry centers) that provided services such as job search skills and placement, substance abuse treatment, and stress control training to inmates nearing parole in a residential setting outside of prison. The parole division planned to transition the inmates out of the reentry centers and gradually replace them with parolees from the Halfway Back program.

In late 2003, the parole division developed the Halfway Back policy, which described eligibility criteria and the roles and responsibilities of parole division staff. The parole division initiated discussions on the Halfway Back policy with the parole agents' labor union in December 2003. Unlike the union negotiations for the SATCU and EID programs, the negotiations between the parole division and the labor union were successful, producing an agreement on the Halfway Back policy. However, the agreement was not finalized until January 30, 2004, and the policy was issued February 6, 2004. Despite the relatively smooth implementation of the Halfway Back program, as we discussed in Chapter 1, the program did not serve as many parolees as was originally estimated.

We conducted this review under the authority vested in the California State Auditor by Section 8543 et seq. of the California Government Code and according to generally accepted government auditing standards. We limited our review to those areas specified in the audit scope section of this report.

Respectfully submitted,

*Elaine M. Howle*

ELAINE M. HOWLE
State Auditor

Date:   November 9, 2005

Staff:   John Baier, CPA, Audit Principal
         Debra L. Maus, CPA
         Jenner Holden
         Susie M. Lackie, CPA
         Alysha Loumakis-Calderon
         Lea Webb

# APPENDIX A

## *Other States Use Alternatives to Prison That Are Similar to California's, but Comparisons of Recidivism Rates Can Have Little Meaning*

We were asked to look at whether other states use intermediate sanctions as an alternative to parole revocation and return to prison when responding to parole violations. As part of our audit, we selected six states cited in the Little Hoover Commission's 2003 report on California's parole policies—*Back to the Community: Safe & Sound Parole Policies*—as having developed alternatives to prison (Florida, Maryland, Michigan, Washington, Wisconsin, and Vermont) and two additional states with large populations (New York and Texas). For each state, we focused on its policies regarding parole violations and the various programs and sanctions available to respond to those violations. Using publicly available information and interviews with these states' correctional staff, we assessed whether each state had programs specifically for parolees who commit technical violations of their parole that are used as an alternative to parole revocation and subsequent return to prison. Based on our assessment, four of the states we reviewed currently have such a program for parole violators; Vermont, Washington, and Wisconsin do not.[7] In addition, we found that none of the states that have these programs formally evaluate or study them to determine effectiveness. We summarize the states' programs in Table A.1 on page 49.

In addition, we requested information from these eight states regarding their recidivism rate, which is the rate at which released inmates commit another offense within a given time frame. However, there is no uniform definition of the factors that should be included when calculating a recidivism rate. What the state is measuring—for example, how well its parole programs are working to provide public safety by rehabilitating offenders—influences the factors it uses to define recidivism. Consequently, the factors used to calculate recidivism rates can

---

[7] For one state, Florida, we could not determine whether it had programs it uses as alternatives to parole revocation and return to prison because it did not respond to our requests for information.

vary from state to state, making meaningful comparisons among states difficult. We display the factors used by California and the other states we reviewed in Table A.2 on page 53.

## DIFFERENT STATES' INTERMEDIATE SANCTION PROGRAMS HAVE SIMILAR CHARACTERISTICS

For the states we reviewed, including California, the most restrictive sanctions are focused on dealing with parolees who have violations associated with substance abuse. Those states with specific sanctions for substance abuse—California, Maryland, New York, and Texas—require participants to spend time in a jail or secured facility for a set period, during which they must participate in substance abuse programs. California's Substance Abuse Treatment Control Units (SATCU) program required the shortest amount of time in jail, 30 days; Maryland and Texas have the longest, with stays of six months. These states also have an aftercare treatment program, but only Texas requires that the first part of its aftercare program be in a residential facility, after which participants continue in an outpatient treatment program.

None of the states we reviewed had halfway house programs similar to California's, but a few states—Michigan, New York, and Texas—have other residential programs for parole violators. Each program houses parole violators in a secured facility and provides them services during their stay. Texas and Washington have halfway house/work release programs for parolees, including parole violators, but they are not regarded as intermediate sanctions because they are not used in lieu of a return to prison.

Two states—Maryland and Michigan—have electronic monitoring programs similar to the program California uses. In these two states, the monitoring period typically is up to three months, although Michigan can use the sanction for up to the amount of time remaining in the parole period after the violation occurs. Vermont plans to pilot an electronic monitoring program for parole violators soon. Texas, New York, Wisconsin, and Washington have, or plan to have, an electronic monitoring program that they use as an additional tool to supervise parolees, but do not consider the electronic monitoring as an alternative to parole revocation. Finally, Florida's Web site indicates it has an electronic monitoring program, but it did not respond to our inquiries regarding how the program was used.

## TABLE A.1



### Comparison of States' Alternatives to Prison for Parole Violators

| | | |
|---|---|---|
| **[blacked out]** | | |
| **[blacked out]** | | |
| Electronic In-Home Detention (EID) | Parole violators were fitted with an electronic monitor, worn on the ankle, that alerted a contractor monitoring service when the parolee wearing the device was not within a defined distance from home. Some were allowed to leave home at set times for work; curfew period was 45 days and could be renewed. Others could be detained 24-hours-a-day until their revocation hearing. | No |
| Halfway Back | A closely supervised residential program providing treatment and education programs that focused on employment needs, substance abuse, stress management, victim awareness, computer-supported literacy, and life skills. Parole violators had limited ability to leave the facility and, if employed during their stay, were required to pay 25 percent of their salary to the program. | No |
| Substance Abuse Treatment Control Units (SATCU) | 30-day lockdown in a jail setting for drug treatment education. After release from lockdown, a mandatory 90-day aftercare program, which could be in a residential program or on an outpatient basis, was provided in the community. | No |
| *These programs were terminated on April 11, 2005. Subsequently, the department issued new guidelines for the Halfway Back program, now called Parole Service Centers, which are open to eligible parolees. The SATCU and EID programs were redesigned and the department hopes to implement the new programs by the end of November 2005.* | | |
| **[blacked out]** | | |
| *Wisconsin suspended its Alternative Sanctions program for parole violators in 2001. Currently, it does not have any programs for parole violators that can be used as alternatives to parole revocation and return to prison.* | | Not applicable |
| **[blacked out]** | | |
| Substance Abuse Treatment Program | Intended for nonviolent, substance abusing parole violators, this six-month program is in a jail setting with a mandatory intensive outpatient aftercare program for three months. Successful completion allows parole violator to return to parole; unsuccessful completion usually means a return to prison. A parole violator may be placed in this program multiple times during the parole period. | No |
| Electronic Monitoring | Used for parole violators who have not been convicted of a violent crime, the monitoring period is up to three months as determined by parole agent. This sanction can be renewed, but if a violation occurs during the monitored period, the parole violator may be returned to prison. | No |
| **[blacked out]** | | |
| Technical Rule Violation (TRV) Centers | In a 75-day period of confinement in a leased secured facility, participants work on completing their education and perform jobs in the facility or as part of public work crews. Substance abuse treatment is mandatory for all participants. Upon successful completion of the TRV program, participants are returned to parole supervision. Parole violators who refuse to participate or do not successfully complete the program are returned to prison. Technical parole violators who have not been convicted of sex offenses or are not identified as high risk are eligible for placement and can be placed in the program multiple times. | No |
| Electronic Monitoring | The amount of time for this sanction is determined by parole personnel and is usually for 90 days but can be for the remaining parole period. Failure to complete the monitored period can result in return to prison or placement in a TRV center. This program is used most often to address violations of a less serious and/or less violent nature. | No |
| **[blacked out]** | | |
| Electronic Monitoring | Based on our review of Florida's publicly available information, it uses electronic monitoring. However, Florida did not respond to our requests for additional information. Therefore, we could not determine if it is used as an alternative to parole revocation and a return to prison for its parole violators. | Unknown |

*continued on the next page*

| | | |
|---|---|---|
| **New York** *(continued)* | | |
| Willard Drug Treatment Campus | 90-day intensive residential substance abuse treatment program conducted in a secured facility. After graduating the residential program, participants are required to participate in a six-month intensive treatment program as a condition of parole. Participants who are unsuccessful in the residential program are usually returned to prison; graduates who violate the conditions of parole receive sanctions consistent with their violation. The program can be repeated more than once during parole period. When the program is used as an intermediate sanction, eligibility is limited to parole violators with an identified substance abuse history. | No |
| High Impact Incarceration Program (HIIP) | The HIIP is a jail-based substance abuse treatment program primarily for technical parole violators with no record of violent crimes or sex offenses. Operated by local jails under contract with the state, participants are confined in a local jail setting for 30–60 days and receive vocational and educational training, substance abuse counseling, and are required to perform community service. A required outpatient aftercare program provides counseling support and job placement. Parole violators who successfully complete the program are released back to parole; unsuccessful parole violators are held for a parole revocation hearing. A parole violator can be placed in the program more than once. | No |
| **Texas** *(continued)* | | |
| Intermediate Sanction Facilities | Technical parole violators are detained in local or private jails for 60 days and not longer than 180 days, and receive such services as education, cognitive restructuring skills, life skills training, and community service restitution. Any offender with technical violations is eligible for placement into the intermediate sanction facilities program. Violators who successfully complete their time in the facility are released back to parole supervision; violators who are unsuccessful usually have their parole revoked and are returned to prison. | No |
| Substance Abuse Felony Punishment Facility | Intensive substance abuse treatment program for parole violators, other than those with convictions for sexual offenses, who have a history of substance abuse. Eligible violators first go through the parole pre-revocation process but are diverted into the program, which is carried out over an average six-month stay in a secure facility run by a private vendor. Actual time spent in this initial phase of the program and subsequent phases is based on offender progress and needs. Violators who successfully complete the initial program are released to parole and beginning an aftercare program for three months before returning to parole and beginning an aftercare program for an additional 12 months on an outpatient basis. Violators who are unsuccessful in the initial program complete the revocation process and return to prison. Violators who are unsuccessful in the aftercare component of the program may receive additional treatment or return to prison, based on the seriousness of subsequent violations. | No |
| **Vermont** | | |
| *Currently, Vermont has no programs specifically for parole violators that are regarded as alternatives to parole revocation and a return to prison. However, as of July 2005, it has plans to provide electronic monitoring in a pilot program that includes nonviolent offenders who might otherwise be incarcerated for violating the conditions of their parole.* | | Not applicable |
| **Washington** | | |
| *Washington does not typically return its parole violators to prison for technical violations only. However, it is possible that an offender convicted of sexual or violent offenses would return to prison for technical violations.* | | Not applicable |

## THE LACK OF A UNIFORM DEFINITION FOR RECIDIVISM MAKES A MEANINGFUL COMPARISON OF THE RECIDIVISM RATES AMONG STATES DIFFICULT

Although recidivism can be a useful indication of the effectiveness of a parole program, a comparison of the recidivism rates that various states report must be viewed with caution. Broadly defined, recidivism is a return to criminal activity or violation of parole terms after previous criminal involvement. The recidivism rate is one of the useful measures state correctional departments employ to determine how well programs are working to keep offenders from returning to prison, because it tells how soon after his or her release from prison the released inmate commits another offense.

What a state chooses to measure with its recidivism rate will influence the factors a state includes in its rate. For example, if a state chooses to use its recidivism rate to measure an offender program's success in terms of saving money by reducing prison costs, it might use only those factors that include a return to prison. Our review of the reported recidivism rates for California and seven other states (Florida, Maryland, Michigan, New York, Texas, Vermont, and Washington) found some variation in the definition of the recidivism rate.[8]

The calculation of recidivism rates typically uses one or more factors, including:

- Released inmate/parolee with a new arrest.

- Released inmate/parolee with a new conviction.

- Released inmate/parolee committed to prison for a new offense.

- Released inmate/parolee return to prison for parole violations.

- Released inmate/parolee returned to prison pending a parole revocation hearing.

The factors used to define recidivism will have an impact on a state's reported recidivism rate. These factors can track whether a new offense occurred and, if so, what kind of offense it was.

---

[8] Wisconsin, the other state we reviewed, does not calculate its recidivism rate, according to its correctional staff.

For example, new arrests are a very broad measure of crime, but an arrest does not confirm that the parolee actually committed an offense. New convictions indicate that a new offense did occur but may not indicate the seriousness of the offense. New commitments to prison, a very narrow measure of crime, indicate that a relatively serious new offense occurred. For some states, including California, parole revocations can indicate that a new crime or criminal activity occurred, but they also can indicate that a technical violation of the parole process occurred. California defines recidivism as a return to prison by a parolee for any reason. We present California's three-year reported recidivism rate, as well as the reported recidivism rates of the seven other states we reviewed and how those rates are defined, in Table A.2.

To calculate its recidivism rate, a state tracks a group of individuals released from prison during a specific period over a period of time. The number of those individuals who meet the state's definition of a recidivist within that period of time, divided by the total number in the group released originally, is the recidivism rate. In calculating its recidivism rate, California determines the number of individuals who have been returned to prison. In California, a parolee can be returned to prison, and is considered a recidivist, for any of four reasons: (1) placement in a substance abuse treatment control unit[9] in a correctional facility as a result of parole violation(s) related to substance abuse; (2) to serve court-ordered time for a new felony conviction; (3) to await a revocation hearing by the Board of Parole Hearings on charges of violating the rules or conditions of parole; or (4) to serve revocation time for parole violations, including technical violations of the parole process, such as failure to inform the parole agent of a change of residence or employment, as well as violations involving criminal activity, such as drug use or possession. Most California offenders are subject to three years of parole supervision after release from prison, so California uses a three-year post-prison follow-up period and calculates a recidivism rate at the one-year, two-year, and three-year intervals. The follow-up period ends once an offender completes parole, so California does not count post-parole offenders who are returned to prison for a new conviction in its recidivism rate.

---

[9] These substance abuse treatment control units referred to here are related to a SATCU-like program that does not include aftercare and is not used in lieu of prison.

## TABLE A.2

### Methods Used to Calculate the Recidivism Rate for Eight States

| State | Rate | Population of Released Inmates | Time Frame | Events Counted as Recidivism |
|---|---|---|---|---|
| California | 59.2% | ☑ Inmates released to supervision* <br> ☐ Inmates discharged† (Not applicable) | Released: 2001 <br> Tracked: Three years | ☑ Return to prison (new sentence) <br> ☑ Return to prison (parole violation) <br> ☑ Return to prison pending hearing <br> ☐ Reconviction |
| _[redacted]_ | | | | |
| Maryland | 25.5% | ☑ Inmates released to supervision <br> ☑ Inmates discharged | Released: 2001 <br> Tracked: Three years | ☑ Return to prison (new sentence) <br> ☐ Return to prison (parole violation) <br> ☐ Return to prison pending hearing <br> ☐ Reconviction |
| _[redacted]_ | | | | |
| New York | 40.1% | ☑ Inmates released to supervision <br> ☑ Inmates discharged | Released: 2000 <br> Tracked: Three years | ☑ Return to prison (new sentence) <br> ☑ Return to prison (parole violation) <br> ☐ Return to prison pending hearing <br> ☐ Reconviction |
| _[redacted]_ | | | | |
| Vermont | 51.0%§ | ☑ Inmates released to supervision <br> ☑ Inmates discharged | Released: 2000 <br> Tracked: Three years | ☐ Return to prison (new sentence) <br> ☐ Return to prison (parole violation) <br> ☐ Return to prison pending hearing <br> ☑ Reconviction |
| _[redacted]_ | | | | |

Source: Published reports and interviews with department administrators from the states presented in table.

* Released from prison to some type of supervision (parole, community custody, etc.); policies vary among states.

† Discharged directly from prison without supervision or discharged after completing a supervision period; policies vary among states.

‡ Michigan tracks its parolees up to four years. Therefore, some parolees released to parole in 1999 may have completed their parole before the end of 2003.

§ Vermont uses a recidivism rate that accounts for all reconvictions, regardless of whether or not the conviction resulted in the parolee being resumed to prison.

In contrast, Florida's recidivism calculation does not count offenders returned to prison for parole violations or offenders returned pending a revocation hearing. Based on this factor in isolation, we would expect Florida's reported recidivism rate to be lower than California's, because California's rate would include a count of offenders returned to prison for parole violations and returned pending a revocation date. This difference in the types of offenders included in the calculation points out one of the many possible factors that make a meaningful comparison nearly impossible.

Another important factor that makes it difficult to compare recidivism rates among states is the length of the period tracked, typically the length of the parole supervision period. The typical parole period in California is three years; most offenders released to parole are required to adhere to parole rules and conditions for three years before they can be discharged from parole supervision. Another state may have a shorter supervision period, meaning that the group being tracked for recidivism calculation purposes is required to follow the rules imposed under supervision for a shorter period. We believe it is reasonable to assume that this factor in isolation could cause the recidivism rate to be lower in states with shorter supervision periods.

Finally, the choice of which of the offenders released to parole should be included in the calculation can result in differences in recidivism rates. For example, Florida's reimprisonment recidivism rate counts only offenders released to parole from their original prison term; it does not count an offender who was in prison for a parole violation, released back to parole, and subsequently reimprisoned. California counts all offenders released to parole.

# APPENDIX B

## *Status of Parole Violators Placed in Intermediate Sanction Programs and Their Returns to Custody Since Entering Those Programs*

As part of this audit, we were asked to determine the current status of parole violators placed in intermediate sanction programs and to determine how many were returned to prison after entering one of these programs.

Each program began during 2004. At the time of our review, the latest available data were as of May 31, 2005. Because the programs lasted for up to 120 days, we decided to track all participants entering after each program's opening through December 31, 2004. For each program, contracted service providers collected information for the Department of Corrections and Rehabilitation (department) on which parole violators participated. We then tracked each parole violator's status in the department's database. We present information for the Halfway Back, Substance Abuse Treatment Control Units (SATCU), and Enhanced Substance Abuse Treatment Control Unit (ESATCU) programs. The Electronic In-Home Detention program was never implemented fully, so we did not include it here.

In each of the following figures, we show the number of parole violators placed in the program and, of those, the number who completed the program and the number who did not by March 31, 2005, the last month of data before the intermediate sanction programs were suspended. For the SATCU program, we also show the number who participated in aftercare programs and the number who did not. In addition, we show the status of all the parolees who participated in the programs as of May 31, 2005.

The figures show that the programs had consistent results. For example, the percentages of participants who completed the programs and were incarcerated on May 31, 2005, were much lower than the percentage for those who did not complete the programs.

## FIGURE B.1

### 3,175 Parolees Entered Halfway Back Between February and December 2004



**Exited program as of March 31, 2005**
2,766 (87%)

**Outcomes for 2,766 Parolees Who Exited**

Completed program
1,160 (42%)

Did not complete program
1,606 (58%)

**Status as of May 31, 2005**

Deceased
2 (0%)

On parole
711 (61%)

Absconded from parole
69 (6%)

On parole
699 (44%)

Deceased
5 (0%)

Discharged
146 (9%)

Absconded from parole
214 (13%)

Sources: Bureau of State Audits' analysis of program provider data collected by the California Department of Corrections and Rehabilitation and data from its Offender-Based Information System (OBIS).

Note: The number of On parole is understated by the number of parolees whose parole status was restored on or before May 31, 2005, but because there is a lag in recording parole reinstatements, OBIS did not reflect the change on May 31, 2005. Conversely, the number of On parole is overstated by the number of parolees who absconded from parole on or before May 31, 2005, but because of a lag in recording parole suspensions, OBIS did not reflect the change on May 31, 2005. Also, as a result of the lag in recording, the number of Absconded from parole is overstated by the number of parolees whose parole status was restored on or before May 31, 2005, and understated by the number of parolees who absconded on or before May 31, 2005. We did not attempt to determine the net effect, if any, of the understatement and overstatement. While the numbers shown in the figures may change, it is unlikely that the lag would significantly affect the percentages shown.

## FIGURE B.2

### 2,567 Parolees Entered SATCU Between May and December 2004



Sources: Bureau of State Audits' analysis of program provider data collected by the California Department of Corrections and Rehabilitation and data from its Offender-Based Information System (OBIS).

Note: The number of On parole is understated by the number of parolees whose parole status was restored on or before May 31, 2005, but because there is a lag in recording parole reinstatements, OBIS did not reflect the change on May 31, 2005. Conversely, the number of On parole is overstated by the number of parolees who absconded from parole on or before May 31, 2005, but because of the lag in recording parole suspensions, OBIS did not reflect the change on May 31, 2005. Also, as a result of a lag in recording, the number of Absconded from parole is overstated by the number of parolees whose parole status was restored on or before May 31, 2005, and understated by the number of parolees who absconded on or before May 31, 2005. We did not attempt to determine the net effect, if any, of the understatement and overstatement. While the numbers shown in the figures may change, it is unlikely that the lag would significantly affect the percentages shown.

## FIGURE B.3

### 392 Parolees Entered ESATCU Between February and December 2004



Sources: Bureau of State Audits' analysis of program provider data collected by the California Department of Corrections and Rehabilitation and data from its Offender-Based Information System (OBIS).

Note: The number of On parole is understated by the number of parolees whose parole status was restored on or before May 31, 2005, but because there is a lag in recording parole reinstatements, OBIS did not reflect the change on May 31, 2005. Conversely, the number of On parole is overstated by the number of parolees who absconded from parole on or before May 31, 2005, but because of a lag in recording parole suspensions, OBIS did not reflect the change on May 31, 2005. Also, as a result of the lag in recording, the number of Absconded from parole is overstated by the number of parolees whose parole status was restored on or before May 31, 2005, and understated by the number of parolees who absconded on or before May 31, 2005. We did not attempt to determine the net effect, if any, of the understatement and overstatement. While the numbers shown in the figures may change, it is unlikely that the lag would significantly affect the percentages shown.

*Agency's comments provided as text only.*

Department of Corrections and Rehabilitation

**Memorandum**

Date :    October 19, 2005

To:    Elaine M. Howle
       State Auditor
       Bureau of State Audits
       555 Capitol Mall, Suite 300
       Sacramento, CA 95814

Subject:    **RESPONSE TO DRAFT REPORT**

The California Department of Corrections and Rehabilitation (CDCR) has reviewed your draft audit report entitled "California Department of Corrections and Rehabilitation: The Intermediate Sanction Programs Lacked Performance Benchmarks and Were Plagued With Implementation Problems."

The CDCR concurs with the report's recommendations.

We appreciate the attention to accuracy and detail that your staff put into the process. Your staff has been professional and at all times available to discuss the issues. Please extend our appreciation to those who participated in this review.

The CDCR is committed to making further improvements by addressing the issues presented in the report. If you have any questions, please contact me at 323-8001.

*(Signed by: J. S. Woodford)*

J. S. WOODFORD Undersecretary
California Department of Corrections
   and Rehabilitation

Attachment

## RESPONSE TO BUREAU OF STATE AUDITS (BSA) DRAFT REPORT

### Chapter 1

**BSA Recommendation #1:** When planning future intermediate sanction programs, the parole division should decide on appropriate benchmarks for monitoring program performance, identify the data it will need to measure performance against those benchmarks and ensure that data collection mechanisms that allow data to be collected in a format that is readily compiled are in place before a program is implemented. After implementing a new intermediate sanction program the parole division should analyze the data it has collected and if relevant, use the data in its existing data bases to monitor and evaluate the program's effectiveness on an on going basis.

*CDCR's Response: By definition the CDCR does not currently have intermediate sanction programs. Nor does the CDCR have any foreseeable plans to reinstitute any intermediate sanction programs. The Division of Adult Parole Operations (DAPO) has designed the new In Custody Drug Treatment Program and the Electronic In-Home Detention Program to comport with evidence based research to reduce recidivism. DAPO is currently training parole staff and plans to implement the use of the new programs upon completion of the training.*

*The DAPO agrees with this recommendation, and will proceed with its implementation. It is a basic practice of good program management to decide on appropriate performance benchmarks and identify, collect, and analyze the data necessary to measure performance against those benchmarks. The DAPO already utilizes this practice to a great extent in its programs, and will undertake to ensure that it does so in every applicable instance.*

*Some of the division's existing databases are somewhat limited in their ability to provide and compile relevant information, but to the extent that they have information which can be useful in analyzing program effectiveness, the DAPO does use them for that purpose, and will continue to do so in a more systematic manner.*

*Timeline:*
*60 day status report due December 31, 2005. The DAPO will coordinate its efforts to begin identifying performance benchmarks and processes to collect data to measure performance against those benchmarks.*

*6 month status report due April 30, 2006. The DAPO will be able to define the benchmark and will explore a system of collecting data to verify program success.*

*1 year status report due October 31, 2006. The DAPO will begin reviewing data collected to determine program effectiveness. The DAPO will work within the confines of the department's ability to utilize existing databases or modifying data collection practices to capture the information needed to measure success.*

*Responsible person for implementation: DAPO Director*

**BSA Recommendation #2:** The parole division should ensure that the savings estimates developed during program planning are based on reasonable assumptions, and if those assumptions change, should promptly update the savings estimates.

*CDCR's Response: The Division of Adult Operations (DAPO) concurs with this recommendation. It should be noted that DAPO did use reasonable assumptions during the program planning process and adjustments were made to estimated savings projections during the budget development (first opportunity) process. In the future, DAPO will ensure that any discussion with senate budget committee staff or researchers includes reasonable projections or estimates, to include updating or reassessing projected savings in a timely manner.*

*This should further ensure that reasonable program planning assumptions will continue and any changes to those assumptions that impact savings estimates will be promptly updated and included in the next budget development process.*

*Responsible person for implementation: DAPO Director*

**BSA Recommendation #3:** The parole division should consider analyzing the effect programs have had on parolee behavior and should use the knowledge it gains from the analyses to make future intermediate sanction programs more effective. The analysis should include the benefits of adding features to make these programs more effective.

*CDCR's Response: The Division of Adult Operations (DAPO) agrees with this recommendation from the BSA. However, it must be pointed that analyzing the effects that programs have had on parolee behavior is a lengthy and sophisticated process that requires the expertise of professionally trained program researchers. Any given program is only one factor in the life of a parolee, and it may easily be outweighed by other factors, such as participation in other programs, environmental factors, and background issues. Determining the impact of a specific program is a process that requires careful study, and cannot be done specifically. Such evaluations must be specifically funded and must be active beginning with the planning stage for each program.*

*In a similar way, adding features to enhance effectiveness must also be done carefully. The type of research that is required to analyze the need for specific features may be even more sophisticated than what is needed for overall program evaluation.*

*On a more basic level, it is often possible to add features in the early or middle stages of a program's life in order to enhance parolee participation or success in the program. For example, transportation assistance may be added to some programs in an effort to increase "show" rates. However, adding features to improve effectiveness in terms of outcomes will require input from professional evaluators.*

*Timeline:*

*60 day status report due December 31, 2005. The DAPO will coordinate its efforts to begin identifying performance benchmarks and processes to collect data to measure performance against those benchmarks.*

*6 month status report due April 30, 2006. The DAPO will be able to define the benchmark and will explore a system of collecting data to verify program success.*

*1 year status report due October 31, 2006. The DAPO will begin reviewing data collected to determine program effectiveness. The DAPO will work within the confines of the department's ability to utilize existing databases or modifying data collection practices to capture the information needed to measure success.*

*Responsible person for implementation: DAPO Director*

cc:  Members of the Legislature
Office of the Lieutenant Governor
Milton Marks Commission on California State
  Government Organization and Economy
Department of Finance
Attorney General
State Controller
State Treasurer
Legislative Analyst
Senate Office of Research
California Research Bureau
Capitol Press

**EXHIBIT H**



**The Online Division of The Sacramento Bee**

This story is taken from Crime at sacbee.com.

# Parole overhaul scrapped

## Victims' groups say the system is woefully flawed.

**By Andy Furillo -- Bee Capitol Bureau**
**Published 2:15 am PDT Tuesday, April 12, 2005**

The Schwarzenegger administration junked the core of its parole overhaul plan Monday, discarding electronic monitoring and halfway houses as untested and possibly dangerous alternatives to reincarceration.

Youth and Adult Correctional Secretary Rod Hickman issued a memo to the state's 3,000-plus parole employees announcing the termination of the new parole model, saying that effective immediately, the Department of Corrections' yearlong emphasis on the alternative parole sanctions - community-based drug treatment, as well as electronic monitoring and "halfway back" programs - "will no longer be used."

"At this time, we have no evidence that these three programs, as originally designed and implemented, increase public safety," Hickman's memo said.

Until corrections officials obtain proof that the programs work, "intermediate sanctions in lieu of parole revocation will not be a measure used by this agency," Hickman said in his memo.

The renewed emphasis on reincarceration for parolees appears to represent an implicit acknowledgment that the system that has been in place for more than a year posed a threat to public safety - as its critics in the state's ranks of parole agents had charged.

"I don't know that it was and I don't know that it wasn't," Hickman said in an interview Monday. "We just want to make sure that any program we roll out increases public safety. That's the intent of everything we're doing in parole. And if I have a program that's not increasing public safety ... we've got to revisit it."

The Bee reported in February that last year, the new parole model resulted in 2,529 fewer parolees returned to prison on technical parole violations than in 2003. At the same time, 2,141 more parolees went back to prison after committing new crimes - a correlation that parole agents throughout the state said was directly related to the new parole policy.

The administration came under fire Monday from groups that said the alternative sanctions had been bungled from the start.

They said drug treatment and "halfway back" beds were never fully funded, that the electronic monitoring program was delayed by contract disagreements and that all three programs served a woefully inadequate number of offenders to be truly effective.

Dan Macallair, executive director of the Center on Criminal and Juvenile Justice in San Francisco, said the retreat signals that meaningful changes in the parole system - key to cutting the state's 162,000 prison population and, ultimately, costs in the $7 billion correctional system - have been all but shelved.

"So far, most of the Schwarzenegger administration's reform efforts have been rhetoric, not reality," Macallair said. "I don't know where they will go from here. I don't want to say correction reform in California is dead. But it's dying."

Macallair accused the administration of backing down from the politically influential prison officers' union, whose leadership has been harshly critical of Gov. Arnold Schwarzenegger and Hickman.

In recent weeks, victims' rights groups ran a television advertisement - funded by the prison cops' union - that hit the Republican governor hard on the fewer reincarcerations produced by the new parole model.

Pulling back the program did little to assuage their criticisms.

Schwarzenegger's detractors also have blasted the governor's release of more than 90 life-term inmates, his $90 million budget cut in rehabilitation funding in the prisons, the administration's consolidation of three parole review boards into one and its freeing of an untold number of reincarcerated parolees who weren't afforded timely Board of Prison Terms hearings.

"There's no faith in this administration," said Don Novey, the former president of the California Correctional Peace Officers Association and now a political consultant to the union. "He just doesn't get it."

Hickman responded that "this governor, this administration, has been the only administration in the last few to take on the correctional challenge, to look at what's going on in in regards to the safety of Californians and to attempt to do something proactive about it."

Victims' rights groups, on the eve of their annual march on the Capitol scheduled for today, welcomed Schwarzenegger's decision to abandon the parole plan. But they still oppose key elements of the administration's corrections overhaul.

Topping the list for Harriet Salarno, the president of Crime Victims United of California, is Schwarzenegger's approval of 94 releases for life-term inmates in a year and a half, compared to only six in five years under the previous administration of Gray Davis.

"That is the most disturbing," said Salarno, whose daughter was slain in 1979 by a man who was sentenced to 15 years to life in prison and is eligible for parole. "These lifers committed heinous, heinous crimes and they are dangerous to society. We need to protect public safety first."

The victims' groups also are fuming about the prison system's reorganization - approved Monday by the state Senate - that consolidates the youth, adult and drug offender parole boards into one panel.

Christine Ward of the Crime Victims' Bureau called the consolidation "a really bad plan."

"We think the three boards all need to be independent," she said. "We need independent commissioners to make sure they're working best for everybody."

On Monday, a mobile billboard funded by the correctional officers circled the Capitol, accusing Schwarzenegger of "attacking firefighters, teachers, nurses and cops," making it clear that criticism of the governor's prison policies will continue.

"Their first message to the people should be for public safety, not some great economic game plan," ex-CCPOA President Novey said of the administration. "That's the number-one charge of government, to protect the public."

**About the writer:**

- The Bee's Andy Furillo can be reached at (916) 321-1141 or afurillo@sacbee.com.

Go to: Sacbee / Back to story

This article is protected by copyright and should not be printed or distributed for anything except personal use.
The Sacramento Bee, 2100 Q St., P.O. Box 15779, Sacramento, CA 95852
Phone: (916) 321-1000

Copyright © The Sacramento Bee