# EXHIBIT I

1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                   EASTERN DISTRICT OF CALIFORNIA

9

10    JERRY VALDIVIA, ALFRED YANCY,
      and HOSSIE WELCH, on their own
11    behalf and on behalf of the class
      of all persons similarly situated,
12                                              NO. CIV. S-94-671 LKK/GGH
              Plaintiffs,
13
          v.                                         O R D E R
14
      GRAY DAVIS, Governor of the State
15    of California, et al.,

16            Defendants.
                                         /
17

18        Plaintiffs, on behalf of themselves and a class of

19    California parolees, filed this action on May 2, 1994,

20    challenging the constitutionality of parole revocation

21    procedures by the California Board of Prison Terms ("BPT") and

22    the California Department of Corrections ("CDC").  This matter

23    is before the court on plaintiffs' motion for an order to show

24    cause why defendant Hickman should not be found in civil

25    contempt of the court's Permanent Injunction Order.  I decide

26    the motion based on the papers and pleadings filed herein and

                                   1

1   after oral argument.

2                    **I.**

3           **PROCEDURAL BACKGROUND**

4      On June 13, 2002, plaintiffs were granted partial summary

5   judgment on their claim that California's unitary parole

6   revocation hearing system violated their due process rights

7   under <u>Morrissey v. Brewer</u>, 408 U.S. 481 (1972) and <u>Gagnon v.</u>

8   <u>Scarpelli</u>, 411 U.S. 778 (1973). <u>See</u> <u>Valdivia v. Davis</u>, 206

9   F.Supp.2d 1068 (E.D. Cal. 2002) ("June 13th Order").  The court

10   held that California's parole revocation system violated the Due

11   Process Clause of the Fourteenth Amendment by "allowing a delay

12   of up to forty-five days or more before providing the parolee an

13   opportunity to be heard regarding the reliability of the

14   probable cause determination." <u>Id.</u> at 1078.

15      On October 18, 2002, the court ordered the defendants to

16   file a proposed remedial plan addressing the violations

17   identified in the June 13th Order.  On March 17, 2003, the

18   defendants provided plaintiffs with their proposed Valdivia

19   Remedial Plan ("VRP"), to which plaintiffs filed two objections.

20   While the parties continued to engage in settlement negotiations

21   over remaining claims not adjudged, defendants requested that

22   the court provide guidance as to the sufficiency of their VRP.

23   The court in response examined the VRP and ordered that

24   defendants file a revised remedial plan to meet specific

25   criteria. <u>See</u> Order dated July 23, 2003.  On August 21, 2003,

26   the defendants filed a revised VRP.  In November 2003, before a

1  final hearing on the revised VRP, the parties filed a Stipulated

2  Proposed Order for Permanent Injunctive Relief.  Pursuant to

3  their settlement negotiations, the proposed order required

4  California's BPT and the CDC to develop and implement new parole

5  revocation processes to remedy pervasive constitutional

6  violations in the State's then-existing procedures.  The revised

7  VRP was referenced in and attached to the proposed permanent

8  injunction order.  The parties sought preliminary approval from

9  the court that the settlement was sufficiently fair, reasonable

10  and adequate, and that it justified issuing notices to the class

11  and scheduling a final hearing.  See Fed. R. Civ. P. 23(e).  The

12  parties made their preliminary showing of fairness via a joint

13  Stipulated Motion for Preliminary Approval of Class Action

14  Settlement, filed on November 24, 2003.  On March 9, 2004, the

15  court granted the parties' permanent stipulated injunction and

16  granted final approval of that Stipulated Permanent Injunction

17  on March 17, 2004 ("Order").

18     The plaintiffs now allege that the defendants are in direct

19  violation of specific terms of the Permanent Injunction.

20                              **II.**

21                          **STANDARD**

22     A district court has continuing jurisdiction to enforce its

23  injunction.  Crawford v. Honig, 37 F.3d 485 (9th Cir. 1994).

24  The movant has the burden of proving by clear and convincing

25  evidence that the defendants are in violation of the court's

26  order.  Wolfard Glassblowing Co. v. Vanbragt, 118 F.3d 1320,

                              3

1  1322 (9th Cir. 1997).  To be enforceable by contempt, the

2  injunction must clearly describe prohibited or required conduct.

3  Gates v. Shinn, 98 F.3d 463, 468 (9th Cir. 1996).  A defendant

4  should not be held in contempt for actions that "appear[] to be

5  based on a good faith and reasonable interpretation of the

6  court's order . . . ." Vertex Distributing, Inc. v. Falcon Foam

7  Plastics, Inc., 689 F.2d 885 (9th Cir. 1982).

8                              **III.**

9                           **ANALYSIS**

10      On April 11, 2005, defendant Roderick Hickman, Youth and

11  Adult Correctional Authority Secretary, issued a memorandum

12  ("Hickman Memo") to state parole agents with a directive

13  prohibiting the use of certain remedial sanctions in lieu of

14  probation revocation.  Decl. of Ernest Galvan ("Galvan Decl."),

15  Exh. 2.  The memorandum provides, in relevant part, that:

16  "Electronic In-Home Detention ("EID"), Community Correctional

17  Reentry Centers ("Halfway Back" Program) and the Substance Abuse

18  Treatment Control Units ("SATCU") were clearly designed to

19  provide intermediate sanctions in lieu of parole revocation

20  . . . . Effective immediately, these programs will no longer be

21  used."[1]

22      Plaintiffs contend that the change in policy and practice

23  as commanded by the Hickman Memo is in direct contravention of

24  

25      [1] SATCUs are residential facilities, often within prisons or
    jails, into which parolees can voluntarily accept detention for a
    period of up to 90 days in lieu of parole revocation.  See Cal.
26  Health & Safety Code §§ 11560, 11561, 11563.

                              4

1  this court's Order.  The Permanent Injunction, they argue,

2  created procedures for, and ensured the use of, remedial

3  sanctions in place of parole revocation and imprisonment when

4  parole officers determine that such measures will best benefit

5  both the community and the parolee.  According to plaintiffs,

6  the Hickman Memo effectively obliterates the remedial sanctions

7  provisions.  In response, the defendants acknowledge that a

8  remedial sanctions plan is contained in the VRP.  They argue,

9  however, that the court may not find them in violation of the

10  Permanent Injunction because remedial sanctions are not part of

11  that Order.  I examine the parties' contentions below.

12  **A.    PLAIN READING OF THE PERMANENT INJUNCTION**

13       The court must first determine whether the language of the

14  Permanent Injunction Order incorporates remedial sanctions as

15  contended by plaintiffs.

16       As a general matter, principles of state law govern the

17  interpretation and enforcement of settlement agreements.  Jeff

18  D. v. Andrus, 899 F.2d 753, 759 (9th Cir. 1989); see also Gates

19  v. Rowland, 39 F.3d 1439, 1444 (9th Cir. 1994) ("The rules of

20  contract interpretation of the situs state govern interpretation

21  of the consent decree.").  "This is true even when the

22  underlying cause of action is federal in nature."  United

23  Commercial Ins. v. Paymaster Corp., 962 F.2d 853, 856 (9th Cir.

24  1992).

25       California law dictates that "[t]he language of a contract

26  is to govern its interpretation[] if the language is clear and

5

1  explicit . . . ." Cal. Civ. Code § 1638. The intention of

2  parties must therefore be gathered from the plain language on

3  the face of contract. Pacific States Corp. v. Hall, 166 F.2d 668

4  (9th Cir. 1948).

5      Section IV of the permanent injunction, entitled "Policies,

6  Procedures, Forms, and Plans," sets forth the prospective and

7  mandatory requirements for defendants. Paragraph 11(a) directs

8  the defendants to "develop and implement sufficiently specific

9  Policies and Procedures" to ensure compliance with "all of the

10  requirements of [the permanent injunction] Order." It specifies

11  that "[t]he Policies and Procedures will provide for

12  implementation of the August 21, 2003 Remedial Outline (attached

13  hereto as Exhibit A), as well as the requirements set forth

14  below in Paragraphs 12-24." PI Order, ¶11(a). As indicated by

15  the language, the VRP is indeed attached to the order.

16  Accordingly, the plain language of the Permanent Injunction

17  clearly and explicitly incorporates the VRP and orders the

18  defendants to comply with and implement it.[2] Defendants are

19  therefore bound by the terms of the VRP.

20  ////

21

22      [2] Paragraph 12 reiterates that the Policies and Procedures
   shall ensure that, in addition to the Remedial Plan Outline, the
23  requirements set forth in paragraphs 13-24 are met. The
   requirements in those paragraphs concern the parolee's appointed
24  counsel's ability to adequately represent the parolee,
   confidentiality of parolee's files, transparency and communication
25  between the involved parties during the parole revocation process,
   and evidence used at the probable cause and final revocation
26  hearings.

6

1  **B.    THE FOUR CORNERS RULE**

2        Despite the plain language of the permanent injunction

3  incorporating and directing compliance with the VRP, defendants

4  insist that, because remedial sanctions "are not mentioned in

5  the body of the injunction" itself, they cannot be a part of the

6  Order under the "four corners" rule. Def's Opp. Br. at 5.

7  Defendants' understanding of the four corners rule is mistaken.

8  It is well-established that reliance upon references or

9  documents expressly incorporated in a settlement agreement for

10  construction purposes "does not in any way depart from the 'four

11  corners' rule." United States v. ITT Continental Baking Co.,

12  420 U.S. 223, 238 (1975)(construing agreement containing consent

13  order and attached appendix as three "parts of the same

14  agreement" under "four corners" rule). Rather, the terms

15  contained in a document attached to an injunction bind the

16  parties just as much as the terms contained in the injunction

17  itself. See California v. Campbell, 138 F.3d 772, 783 (9th Cir.

18  1998) (holding that enjoined defendants bound by terms of

19  document attached to injunction); see also Davis v. City and

20  County of San Francisco, 890 F.2d 1438, 1450 (9th Cir. 1989).

21        Further, although Rule 65(d) of the Federal Rules of Civil

22  Procedure provides that every order granting an injunction

23  "shall describe in reasonable detail, and not by reference to

24  the complaint or other document, the act or acts sought to be

25  restrained . . .," the rule does not necessarily preclude

26  incorporation by reference. State of Cal., on Behalf of

7

1  California Dept. of Toxic Substances, 138 F.3d 772 (9th Cir.

2  1998).

3       The Ninth Circuit has explained that "the rationale behind

4  the incorporation-by-reference language in Rule 65(d) [i]s a

5  safeguard to 'ensure adequate notice to defendants of the acts

6  prohibited.'" Id. at 783 (quoting Henry Hope X-Ray Prods., Inc.

7  v. Marron Carrel, Inc., 674 F.2d 1336, 1343 (9th Cir. 1982)).

8  Here, it cannot be said that the defendants were unaware of the

9  incorporation and contents of the VRP, since the Stipulated

10 Order for Permanent Injunction, including the VRP, were

11 submitted by the parties themselves pursuant to their settlement

12 negotiations.[3]  The Order's reference to and attachment of the

13 VRP therefore conforms with the "four corners rule" as well as

14 with Rule 65(d).

15 **C.    THE VRP AND REMEDIAL SANCTIONS**

16      As contended by the plaintiffs, a review of the VRP

17 demonstrates that remedial sanctions are included at nearly

18 every step of the new revocation process created by the parties

19 pursuant to their settlement negotiations.  The VRP is a six-

20 ───────────────

21      [3]  Other evidence unambiguously demonstrates the defendants'
     own understanding that remedial sanctions are part of the Permanent

22   Injunction.  The defendants posted class member notices, approved
     by the court, in every jail, prison and parole office in

23   California.  The short notice explicitly states that, "[u]nder the
     agreement, by early 2004, some parolees will be sent to community-
     based programs, instead of prison."  Galvan Decl., Exh. 8,

24   attachments.  The longer notice provides that "the Permanent
     Injunction will require many changes in the revocation system,"

25   including that "the BPT and CDC will use alternatives to parole
     revocation, such as treatment in the community, for some parolees

26   who would otherwise be arrested on parole violation charges."  Id.

                                      8

1   page document along with a flow chart.  The second section of

2   the VRP, entitled "Remedial Sanctions," provides that, "as part

3   of the overall reform of the revocation process, the Parole and

4   Community Services Division of the Department of Corrections

5   will begin using remedial sanctions/community based treatment

6   . . . ." VRP at 1.  It explains that "some of the remedial

7   sanctions/community based treatment programs that will be used

8   are the Substance Abuse Treatment Control Units, Electronic

9   Monitoring, Self-Help Outpatient/aftercare programs, and

10  alternative placement in structured and supervised

11  environments." Id.  Emphasized in bold and capital letters, the

12  VRP provides that if, shortly after the alleged parole violation

13  occurs, "remedial sanctions are deemed inappropriate and a

14  parole hold is placed on the parolee, a probable cause

15  determination/review will take place . . . ."  According to the

16  VRP, officials will then again consider remedial sanctions

17  during the probable cause determination.  That procedure was

18  apparently put into place "in an attempt to take a second look

19  at those individuals who have been placed into custody to

20  determine if the 'present danger to public safety' concern still

21  exists or if remedial sanctions/community based treatment is

22  possible at th[at] juncture." Id. at 2.  If remedial sanctions

23  are deemed inappropriate, the parolee is given notice of charges

24  and a probable cause hearing shall be conducted within ten

25  business days of when the notice is provided.  The VRP explains

26  that remedial sanctions/community based treatment must again be

1  considered twice before the probable cause hearing. VRP at 3,

2  4.[4]  Finally, the "Deputy Commissioner/Parole Administrator

3  shall have the complete range of options to resolve the case,"

4  including "remedial sanctions/community based treatment." Id. at

5  5.

6      Accordingly, pursuant to its mandatory language, the

7  permanent injunction requires that defendants (1) consider

8  remedial sanctions throughout the new parole revocation process,

9  and that the remedial sanctions include (2) "the Substance Abuse

10  Treatment Control Units, Electronic Monitoring, Self-Help

11  Outpatient/aftercare programs, and alternative placement in

12  structured and supervised environments." VRP at 1.

13  **D.    PERMANENT INJUNCTION VIOLATIONS**

14      Having concluded that the permanent injunction clearly

15  requires the remedial sanctions procedures as set forth in the

16  VRP, I now examine whether the directives in the Hickman Memo

17  violate the court's Order.

18      The Hickman Memo creates a new policy and practice which

19  prohibit the consideration and use of Electronic In-Home

20  Detention ("EHM"), Substance Abuse Treatment Control Units, and

21  ————————————————

22      [4]  Specifically, the VRP states that "On or before the fourth
    business day, the Unit Supervisor must review the report and
23  . . . consider whether or not remedial sanctions/community based
    treatment is appropriate in lieu of proceeding with referral to the
24  Board of Prison Terms with a recommendation that the parolee be
    returned to prison." Id. at 3.  "The revocation packet is reviewed
25  by the Parole Administrator [on or before the 4th business day] to
    determine whether or not there is a sufficient basis for the case
26  to move forward and whether or not remedial sanctions/community
    based treatment is appropriate at this juncture." Id. at 4.

1  Community Correctional Reentry Centers ("CCRCs") as sanctions in

2  lieu of parole revocation.  The prohibition of the use of the

3  first two remedial sanctions offends the Permanent Injunction's

4  mandate that SATCUs and Electronic Monitoring be considered and

5  used when appropriate.  The Order provides that these two

6  programs "*will* be used," VRP at 1(emphasis added).  Defendants

7  respond that any conflict between the memorandum and the

8  permanent injunction is inconsequential because they will

9  "retool" these programs and may offer them to parolees upon

10  their release from prison, even before a parole violation

11  occurs.  Def's Oppo. at 9.  Although such a policy is laudable,

12  it is no substitute for that required by the permanent

13  injunction.  The VRP explicitly states that the SATCUs and

14  Electronic Monitoring "will" be used in the manner described

15  therein, thus indicating a requirement or command and

16  eliminating any choice or discretion as to the matter.

17  Therefore, these programs must be made available and be

18  considered throughout the parole revocation process *after* a

19  parole violation occurs.[5]

20

21      [5]  Defendants also assert that the Hickman Memorandum "did not
    supercede the Board of Prison Term's authority under California
22  Code of Regulations, Title 15, sections 2513, 2645 and 2646."
    Defs' Oppo. at 9.  According to them, the BPT retains the
23  discretion to place a parolee in a community program rather than
    revoke probation.  This argument has no merit for two reasons.
24  One, the issue here is not whether the Hickman Memo violates state
    law, but whether it violates the Permanent Injunction.  Second, as
25  plaintiff point out, those sections do not require consideration
    of the remedial sanctions listed in the Permanent Injunction
26  throughout the revocation process.

1    Whether the restriction on the use of Community

2 Correctional Reentry Centers also violates the Permanent

3 Injunction is a closer question.  The VRP mandates the

4 consideration of "Self-Help Outpatient/aftercare programs" and

5 "alternative placement in structured and supervised

6 environments."  Unlike the SATCU and EHD, these other remedial

7 sanctions describe types of programs, rather than specific

8 programs.  Community Correctional Reentry Centers are formal,

9 controlled environments for residential drug treatment, Cal.

10 Penal Code §§ 6250.5(b), 6251, 6253(a),(b), 6258(b), and

11 therefore comport with the requirement for "placement in

12 structured and supervised environments."  However, the Order

13 contemplates that other programs that qualify as structured and

14 supervised environments may also be employed.  It appears, then,

15 that the prohibition of the use of CCRCs does not violate the

16 court's Order as long as the defendants offer other remedial

17 sanctions that are "Self-Help Outpatient/aftercare programs" and

18 "alternative placement in structured and supervised

19 environments."  If they do not, then the removal of CCRCs as

20 available remedial sanctions would result in no "Self-Help

21 Outpatient/aftercare programs" or "alternative placement in

22 structured and supervised environments."[6]  The defendants argue

23 _____

24    [6]  Plaintiffs assert that the CCRCs were the "alternative
placement in structured and supervised environments" included in
defendants' policies and procedures filed to implement the
25 Permanent Injunction.  Pls' Reply at 2.  The language of the
Policies and Procedures does not support plaintiffs' assertion,
26 however.  The language there states only that "[r]emedial sanctions

12

1 that they continue to provide remedial sanctions under these two

2 categories of remedial sanctions.  According to defendants, they

3 will continue to utilize community based programs in the

4 disposition of parole violations when public safety is not

5 endangered.  The issue then is whether any of those programs are

6 suitable under the "Self-Help Outpatient/aftercare programs" or

7 "alternative placement in structured and supervised

8 environments" categories.

9    Defendants first explain that they will use the "Substance

10 Abuse Recovery and Treatment Program" (STAR) which is "an

11 instructional-based education program designed to teach parolees

12 how to address and prevent substance abuse."  Defs' Oppo. at 8.

13 Plaintiffs object that the STAR program is not a residential

14 alternative, but is rather a classroom-based educational program

15 run out of local parole offices.  Pls' Reply at 13.  Apparently,

16 plaintiffs believe that, because the CCRCs are residential drug

17 treatment programs, any replacement program must also be

18 residential.  That position is not grounded on any authority,

19 however.[7]  In their briefs, plaintiffs also object to the

20 defendants' assertion that they will continue to use programs

21 such as "Proposition 36" community treatment centers, Community

22

23 may include but are not limited to" a "Half-way Back Program"
   (CCRCs).  Galvan Decl., Exh. 5 (Policies & Procedures) at 3.
24

25    [7]    The only terms in the Permanent Injunction relating to a
   residential program relate to the requirement that SATCUs, which
26 are residential facilities, be available and considered as remedial
   sanctions.

1  based drug and alcohol rehabilitation centers; Parole Services

2  Network (PSN), Parolee Partnership Program, Narcotics Anonymous,

3  and Alcoholics Anonymous.

4      At oral argument, the plaintiffs conceded that there are

5  no standard definitions for the terms "Self-Help

6  Outpatient/aftercare programs" and "alternative placement in

7  structured and supervised environments" to guide the court in

8  determining whether defendants' new programs are suitable under

9  these two categories.  More importantly, the plaintiffs also

10  conceded that the use of this broad language vests the

11  defendants with discretion in selecting the programs under these

12  two categories.  The plaintiffs do not provide the court with

13  any information about the substitute programs upon which it can

14  find that these programs are inadequate under the Permanent

15  Injunction.  Further, because this court must "accord deference

16  to the appropriate prison authorities," Turner v. Safley, 482

17  U.S. 78, 85 (1987), in their exercise of discretion regarding

18  what types of programs meet the requirements of these two

19  categories, the court will not find defendants in violation of

20  the Permanent Injunction by virtue of the elimination of CCRCs.[8]

21  _____

22      [8]  The plaintiffs object to the defendants' purported use of
    "Substance Abuse Coordination Agencies" (SACAs) as remedial

23  sanctions on the grounds that those programs offer services to
    parolees "graduating from prison substance abuse programs" and are

24  therefore not available to parole violators.  Decl. Of Holly
    Baldwin in Supp. of Pls' Reply, Exh. B at 21.  Defendants do not

25  argue to the contrary.  The defendants are admonished that, if it
    is true that SACAs are not available for parole violators, then

26  they do not qualify as remedial sanctions under the Permanent
    Injunction.

1    As explained above, while removal of the CCRCs does not
2  violate the Permanent Injunction, removal of Electronic
3  Monitoring and SATCUs as available remedial sanctions as
4  explained in the VRP is violative of that Order.  The court,
5  however, does not believe that a contempt order is warranted at
6  this time.  There is nothing before the court indicating that
7  the Hickman Memo was issued in bad faith, rather, the
8  defendants' interpretation of the Permanent Injunction, although
9  erroneous, was arguably reasonable.  Further, it appears that
10 the defendants have substantially complied with the court's
11 Order.  Vertex Distributing, Inc. v. Falcon Foam Plastics, Inc.,
12 689 F.2d 885 (9th Cir. 1982)(explaining that substantial
13 compliance with the terms of a consent judgment is a valid
14 defense to and basis upon which to find against civil contempt).

15                              **IV.**

16                          **CONCLUSION**

17    Plaintiff's motion is GRANTED in part and DENIED in part as
18 follows:

19    1.    The defendants are in violation of the Permanent
20 Injunction Order by virtue of the elimination of the remedial
21 sanctions of Electronic Monitoring and SATCUs;

22    2.    The removal of the CCRCs is not in violation of
23 the Permanent Injunction Order; and

24 ////

25 ////

26 ////

1    3.   Defendants will not be held in contempt.

2    IT IS SO ORDERED.

3    DATED:   June 8, 2005.

                                    /s/Lawrence K. Karlton
4                                   LAWRENCE K. KARLTON
                                    SENIOR JUDGE
5                                   UNITED STATES DISTRICT COURT

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT J

**FILED**

SEP 1 4 2006

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
        DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

VALDIVIA, et al.,

    Plaintiffs,

    vs.

                            No. CIV S-94-671 LKK/GGH

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

                               /

## FIRST REPORT OF THE SPECIAL MASTER
### ON THE STATUS OF
### CONDITIONS OF THE REMEDIAL ORDER

### Background

On May 2, 1994, the *Valdivia vs. Schwarzenegger* class action lawsuit was filed.
The Court certified the case as a class action by order dated December 1, 1994. On June
13, 2002, the Court granted partial summary judgment in favor of the Plaintiffs. On July
23, 2003, the Court ordered the Defendants to submit a remedial plan, with specific
guidance regarding: "...a preliminary probable cause hearing which (1) occurs no more
than ten calendar days after a parolee is taken into custody for an alleged parole violation,
and (2) affords the parolee rights provided by *Morrissey*, including notice of the alleged

1

violations, the opportunity to appear and present evidence, a conditional right to confront adverse witnesses, an independent decision-maker, and a written report of the hearing."

On March 8, 2004, the Court entered a Stipulated Order for Permanent Injunction containing the agreed-upon elements of the settlement terms. On July 1, 2004, the Defendants submitted a variety of policies and procedures to the Court. On June 8, 2005, the Court filed a Stipulation and Order finding violation of the Remedial Plan regarding remedial sanctions.

On August 18, 2005, a Stipulation and Amended Order Re: Special Master Order of Reference was entered; on December 16, 2005, an Order Appointing Chase Riveland Special Master was entered; and on January 31, 2006, an Order was entered appointing Virginia Morrison and Nancy Campbell as Deputy Special Masters.

**Special Master Activities**

During the period since December 16, 2005, the Special Master and Deputy Special Masters were briefed by the California Department of Corrections and Rehabilitation (CDCR) staff, Board of Parole Hearings (BPH) staff, Division of Adult Parole Operations (DAPO) staff, Plaintiffs' and Defendants' counsel, and California Parole Advocacy Program (CalPAP) staff.

The team visited Los Angeles and Yolo county jails and Decentralized Revocation Units (DRUs) at Santa Rita County Jail, San Quentin, Richard McGee, Los Angeles, and Deuel Vocational Institution. We reviewed parole field units in San Francisco, Oakland, Los Angeles, Bakersfield, Visalia, Hayward, and Sacramento; ICDTP programs in San Francisco, Kern County, and Tulare County Pretrial Facility; and ICDTP aftercare programs, contracted through Westcare with Turning Point, in Visalia

2

and Bakersfield. We made several visits to CDCR, BPH, and DAPO headquarters, attending the *Valdivia* Task Force meeting twice, and to the offices of Rosen, Bien, and Asaro. Coordination occurred with the Special Master.

The Special Master met with CDCR Secretary Hickman, Acting Secretary Woodford, and Interim Secretary Tilton.

Special attention has been placed on the data system, due to its importance in measuring compliance, and the history and present status of remedial sanctions, due to the failure of Defendants to make progress on this Remedial Plan-stated requirement.

The team reviewed numerous policies and procedures and other documents provided by Defendants and Plaintiffs—both historical and current—and scanned monitoring reports. The team evaluated data from CDCR's Revocation and Scheduling Tracking System (RSTS) and an information system maintained by CalPAP, and we assessed in depth RSTS's data gathering, analysis, and reporting capabilities and deficiencies.

The team observed "revocation serves," probable cause hearings conducted in person and by telephone, and final revocation hearings, as well as monitoring by Plaintiffs' attorneys and Defendants' first self-monitoring tour. We also observed the delivery of Contra Costa County Drug and Alcohol classes, which form the core of the in-custody stage of the ICDTP program.

A meeting between Defendants' representatives, Plaintiffs' attorneys, and the Special Master's team was held in March 2006. Defendants and Plaintiffs were asked to submit their five "imminently critical issues" prior to the meeting. The issues submitted were as follows:

3

Plaintiffs:

1. Defendants not meeting due process deadlines
2. Remedial sanctions not being implemented by Defendants
3. Inadequate staffing
4. Telephonic probable cause hearings
5. Inadequate system for ensuring effective communication (for special needs parolees)

Defendants:

1. Amount of Plaintiffs' monitoring
2. Telephonic probable cause hearings
3. Remedial sanctions
4. Disagreement over remedies for individual Plaintiffs when Defendants fail to meet the timelines in the Permanent Injunction
5. Defining substantial compliance

Although each of their issues, and others, were discussed, the primary issues discussed at that time were Defendants' internal oversight processes and a plan for monitoring. The Defendants' representatives and the Plaintiffs' counsel decided to develop proposed plans and then negotiate to agreement. This did occur in April 2006, with a plan agreed upon for the remaining quarters of 2006. Key factors in the plan include a decrease in the frequency of Plaintiffs' site monitoring in some areas, Defendants' self-monitoring in some areas (with results being forwarded to the Plaintiffs' representatives) and an increase in some types of information being provided to the Plaintiffs by the Defendants. In all instances, Plaintiffs' attorneys will continue to interview class members.

A joint meeting, held in June 2006, arose out of Plaintiffs' request for a wide range of information to inform the writing of the instant report. The meeting resulted in clarifying information system capabilities, agreeing on provision of some requested

4

information, moving some issues to meet and confer sessions, and identifying issues for further study.

### Information Systems

Defendants maintain several information systems related to the *Valdivia* process. Impressively, early in Remedial Plan implementation, they initiated a thoughtful, thorough approach to data gathering as a component of the Revocation and Scheduling Tracking System ("RSTS"). While Defendants are to be commended for these early steps, as it currently stands, Defendants cannot demonstrate their level of compliance with many components of the Injunction.

Defendants must rely on an information system to guide and structure many of the daily activities that constitute the *Valdivia* process – gathering and communicating parolee-specific information, documenting actions taken so the next may begin, alerting staff to upcoming deadlines, scheduling, and the like. It is part of the fabric of compliance itself. With the high volume of revocations handled, only a solid information system can substantiate that hearings and related processes consistently comport with this Court's requirements and due process. Likewise, a well-functioning information system is a necessary condition for Defendants to demonstrate they are capable of resuming internal oversight without need of court supervision. As will be described below, significant changes to RSTS are critical to this effort.

The existing system does well on several counts. It captures detailed information about individuals, their charges, staff involved in the case, many relevant dates, some key factors about the case, and narrative about the history of its management. Staff at various levels have access to read records and/or to input their own actions in real time, reducing

5

the possibilities for bottlenecks seen in systems that rely solely on clerical staff. Parolees' attorneys have access to view system contents. A number of reports are tailored for different managers' purposes, with some allowing examination of performance standards and time use of individual staff, a parole unit, or a DRU and the parole units associated with it. Some reports either alert a manager, or are available to demonstrate on review, cases approaching a deadline. Aggregate reports were designed to take different looks at the timeliness of *Valdivia* steps in the revocation process. There have been three upgrades since *Valdivia* activities were integrated into the system.

As with all data systems, usage leads to discovery of the limitations of the system. Where predefined fields did not precisely serve a need, different staff adopted different recording methods. Defendants appropriately have attempted training and design measures to correct for these inconsistencies once they were discovered, but the result, for this initial reporting period, is an inability to precisely answer a number of questions bearing on compliance.

In this iterative process, Defendants, Plaintiffs, and the Special Master have discovered several other components requiring attention. Some important data points are not captured (*e.g.*, the date information is sent to CalPAP) and the identification of others is not always clear (*e.g.*, the "date received" appears to refer to the Decentralized Revocation Unit's receipt, but is, in fact, BPH's receipt after the Parole Administrator's review).

Most importantly, significant amounts of information existing in the system and bearing on compliance cannot be accessed by the reports currently in use. Defendants have informed the Special Master that running non-standard reports is a burdensome and

expensive process, and that funds are not available to do so with any regularity. This leaves daily oversight and system analysis for these items to be accomplished by reviewing one at a time what may be hundreds or thousands of records. Other important pieces of information cannot even be identified through that method. Still other reports do not capture whole categories of cases in their totals or their percentage calculations, and that information can only be captured through the above-described laborious method. In both Defendants' and CalPAP data, the missing categories of information tend to be cases where the circumstances vary from the norm and either the parties have not agreed upon methods for calculating the timelines and/or the database cannot track them in a different fashion. Additionally, some categories not captured in Defendants' reports are cases where they argue that good cause exists for exceeding the timeline.

Reportedly very little information is captured about disabilities, needs for reasonable accommodation or additional measures to accomplish effective communication, and whether those needs were met. The court in *Armstrong v. Schwarzenegger* – a case in the remedy implementation phase that concerns a variety of reasonable accommodations in prison and parole processes – found in May 2006 that RSTS does not have sufficient tracking capabilities for reasonable accommodations. That court ordered that this aspect of the data system be addressed on a short schedule, and changes reportedly may be extensive. Additionally, the programmed logic for RSTS reports – the descriptions of how it makes its calculations, what a field or report includes or excludes, etc. – is not consistently captured in written documents.

Together, these conditions mean that unreasonable amounts of management time are diverted; any record-by-record, large volume analysis carries the risk of inaccuracy

through human error; reports commonly represent somewhat different information than they appear to; and there is always an incomplete picture. Such a situation is untenable in the context of staffing constraints, the vast volume of revocation proceedings, and the need to gain the confidence of the Court and Plaintiffs in the actual services being delivered as well as the ability to demonstrate them.

Several of the data absences or inconsistencies are described in sections below, and it is not worthwhile to provide a complete catalogue. As a general matter, Defendants' systems cannot, yet need to, demonstrate the amounts of time when cases exceed timelines. In reports of percentages, there should also be absolute numbers for the numerators and the denominator, and the denominator should be clearly defined. At a minimum, each report should define the headings and have a description of what is included and excluded. There must be an ability to report parallel information for excluded cases, even if ultimately they will be treated differently for compliance purposes. As to demonstrating that effective communication was provided to members of the *Valdivia* class, and demonstrating compliance on any other issues common to the *Valdivia* and *Armstrong* remedies, information system changes should be coordinated with those underway pursuant to the *Armstrong* court's order, to avoid unnecessarily duplicative or contradictory effort, and so that the changes serve the purposes of both remedial plans.

In Plaintiffs' "Response to Defendants' Compliance Report," Plaintiffs detailed many data points and questions they see as necessary to a complete analysis of information offered by Defendants and of compliance. In many instances, the Special Master's team has held a similar view. Some of the requested information has been

8

available to the Special Master, and has been taken into account in reaching conclusions; in several other cases, it is appropriate to note where information must remain incomplete for the time being and defer an assessment until the data systems' capabilities are enhanced, which will be the subject of a Recommendation of this Report.

At the outset of this section, I noted that Defendants operate several systems. DAPO maintains the Cal Parole system, which reportedly contains some information that ultimately may have some bearing on some aspects of *Valdivia*. The Special Master's team will be briefed on that system's capabilities in the coming Round. The Institutions Division reportedly does some tracking for revocation extensions and workload impact for transportation, escort, and security provision. CalPAP maintains very detailed *Valdivia*-related computerized records and reports, some with limitations similar to RSTS and some that can report additional, important data and may already be able to produce some information that RSTS cannot. As long as Defendants continue to refine these systems along the lines described, the Special Master has confidence that these systems will serve well and will answer several open questions about compliance.

### Remedial Order Requirements

In the section that follows, I discuss the parties' contentions as to each major component of the Remedial Order and the Special Master's view of the status of compliance. A few items are omitted as they provide specific guidance to ensure the parties' cooperation, which I believe is well established and does not require discussion. With some requirements, as noted below, the Special Master does not have sufficient information to make an assessment at this time.

9

**The Stipulated Order for Permanent Injunction contains the following expectations:**

*Meet periodically regarding policies, forms, and plans; submit policies and procedures to the court no later than July 1, 2004 with full implementation by July 1, 2005*

Plaintiffs and Defendants submitted policies and procedures to the court by the date due, reserving those in dispute and indicating that continued negotiations would be fruitful. They have done this routinely during the period of time leading up to the Remedial Order and subsequent to it. A round of meet and confer meetings began in May 2006 to negotiate policies as yet not formulated or agreed upon. It is my observation that both parties make sincere efforts to work toward responsible solutions.

- There is adequate progress on this requirement.

*Appoint counsel for all parolees by Return to Custody Assessment (RTCA) stage of revocation hearing*

The CalPAP contract with CDCR is notably one of a kind in the nation. Many jurisdictions do not provide attorneys at state expense for any level of revocation hearings. Many other jurisdictions provide them for final hearings only or for unusual cases (such as mentally ill or non-English speaking parolees). The CalPAP program was established relatively quickly given the number of cases being processed and the expansive geography being covered. The contract is a three-year contract, in effect until July 1, 2007. CalPAP currently has more than 200 attorneys statewide, working in conjunction with 11 regional offices. It also operates a detailed database with information on *Valdivia* timeliness and many other facts of interest to observers. The program appears

to be well-managed and is arguably a model program providing consistent representation statewide.

The Defendants have made continuing progress in improving the notification process, the delivery of revocation packets, and the identification to CalPAP of the parolee's location. Analyzing percentages since June 2005, and absolute numbers offered for 2006, Defendants and CalPAP show dramatic and sustained improvement associated with almost every CalPAP regional office. A few showed fluctuation, but none showed substantial backsliding or stagnation for any sustained period.[i] In order to assess substantial compliance, future reports should capture the amount of time to appointment for cases where an attorney was appointed beyond the Injunction's deadline and, at least periodically, an assessment of the reasons.

Data indicate that the number of "late" appointments remains unacceptably high, though there has been significant improvement over time. Additionally, Plaintiffs and CalPAP note that sometimes the packet arrives incomplete at CalPAP. As they point out, these practices make it difficult to appoint an attorney in a timely manner. The appointed attorney then may have difficulty requesting expedited hearings, anticipating accommodations for disabilities, and identifying and producing evidence. Delayed information also results in increased numbers of "add-on" probable cause hearings, limited time for the parolee to consider Return to Custody Assessment offers, and a possible increase in parolees feeling they must request time waivers.

Two key solutions have been proposed for the problem of untimely appointment of attorneys. One is to have a full electronic exchange of materials. The CDCR information systems do not have the capability or capacity to do that at this time.

Defendants have been exploring this option but have encountered numerous hardware and other system obstacles to adopting this technology. They reportedly continue to attempt to address these barriers and have a pilot planned for late 2006. Additionally, CalPAP attorneys note the need for learning hearing dates sooner so that CalPAP may appoint attorneys more timely.

CalPAP provided, and provides, (with assistance of both parties) initial and ongoing training for the contractual attorneys. The curriculum includes revocation procedures, Remedial Order requirements, evidence law, and Americans with Disabilities Act accommodations. Plaintiffs participated in designing the curriculum and have expressed approval for some training sessions and reservations about the quality of others. CalPAP has established quality assurance measures, including evaluation forms for parolees to fill out and an attorney evaluation system.

Interviews with line parole officers and supervisors raise a related issue about legal representation. Although some indicate that they feel disadvantaged due to the parolee having legal representation while they—the parole officers—do not, this did not appear to be a major issue for most officers interviewed.

- With the exception of some tardiness in appointing attorneys, principally because of delays in Defendants providing information to CalPAP, it appears that the program is generally successful. Given the relatively short period of time the CalPAP program has been in existence, the huge geographic area it covers, and the large numbers it serves, the program has been extremely successful in providing representation at the critical levels

of the revocation process. The CalPAP program has been a critical component of the Defendants' progress to date.

### *Expedited probable cause hearing shall be held upon sufficient offer of proof that there is a complete defense to all charges*

Policies are in place requiring expedited probable cause hearings based on the Deputy Commissioner finding sufficient the offer of proof that there is a complete defense to the alleged violations. Plaintiffs have raised concerns about whether this process is functional.

Expedited hearings have been requested rarely, with CalPAP indicating that essentially eight such hearings were held between March 2005 and February 2006. Hearing or review was handled within two days of the request. In total, four cases appear to have been resolved significantly sooner than in usual operations.[ii]

The timelines of the Injunction, as they are designed and implemented, leave limited time for a hearing to be expedited after an attorney has been appointed. In those cases where the attorney appointment is late and/or the packet incomplete, this opportunity is further limited. Plaintiffs have suggested that there should be a mechanism by which a parolee could initiate consideration of an expedited hearing sooner than the time that his attorney is appointed and makes contact with the parolee. I encourage exploration of such a mechanism.

- The Special Master will continue to monitor this.

13

*The parole officer and supervisor will confer within 48 hours to determine if probable cause exists to continue a hold*

In order to comply with other time frames, it appears that this requirement is being met in most instances (93% over an eight-month period, with the exception of extradition cases). Compliance remained at essentially the same level throughout that time, with no improvement noted.[iii] Plaintiffs express concern that Defendants do not provide information regarding the degree of lateness and that the average number of days of lateness has increased.[iv] The Special Master agrees that this information is significant in determining substantial compliance.

RSTS reflects some information about the decisions made at this stage, but it is not fully clear. CDCR maintains that the difference between the number of Probable Cause Determinations and the number of Notices of Rights served equals the number of individual parolees who are not continued in the revocation process. Reviewing the system, however, the numbers and the reasons for dropping holds are not fully discernible.

Interviews of parole supervisors and agents indicate that the results of this consultation are highly dependent upon the philosophy of the parole supervisor. Some supervisors have strong beliefs that remedial sanctions and other alternatives to revocation should be invoked, while others do not believe in the efficacy of such programs. Not surprisingly, the approach to use of remedial sanctions by agents is highly influenced by the philosophy of their supervisors.

At a stage earlier than activity reflected in RSTS, data from Cal Parole show that about one-fourth of the events potentially involving violations are handled by parole agents directly without a hold ever being placed. Parole agents report they rely heavily on

14

DAPO and community-based programs that are outside of those named in *Valdivia* orders and do not require BPH approval for placement. Once the *Valdivia* process is begun by the hold being placed, data show that about one-quarter of holds are released after parole agents recommend it and it is ratified at the agent/supervisor consultation.[v] Some data reflect patterns by parole region that are consistent with ideas about the influence of personal philosophy. In terms of continuing on parole or dismissal, for example, for each region, the percentage of holds with this outcome remained fairly constant month to month. Moreover, while most regions showed percentages in a range similar to each other, one consistently released holds through these mechanisms twice as much as the other regions.[vi]

Most placements in remedial sanctions recognized in *Valdivia* orders are initiated by the agent or during the agent/supervisor consultation. . Policy requires BPH staff to approve placement in the ICDTP program, so among programs currently reported as remedial sanctions, only placements in EID could be disposed of at this step.[vii]

- Substantial progress has been made regarding the parole officer and supervisor meeting within the *Valdivia* time frame. More information is needed to assess the results of this consultation and its impact on the both referral to and use of remedial sanctions.

*If the hold is continued, the parolee will be served actual notice of rights, with a factual summary and written notice of rights, within 3 business days*

Defendants' data system is set up to report any timely good faith attempt at service as completed timely, even when the successful service was beyond required

timeframes. Defendants acknowledge that this practice is not supportable. CalPAP data provide more complete information, though reports do not include information on a few categories of cases.

Analyzing only the acknowledged late notices in seven months of data from both sources, no DRU showed much improvement. Most fluctuated, understandably, and a few – California Institution For Women, Valley State Prison for Women, and the Los Angeles County Jail – worsened on this task over time.[viii]   Plaintiffs have also raised questions about the reliability of the data in that their field observations, at some institutions, suggest a higher frequency of problems.

More information is needed to clarify the frequency of service actually completed timely and to explain the "late" serves and the reasons for the "lateness" before an agreement on a standard for substantial compliance can be reached. Certainly there are instances in which the Defendants may be appropriate in not meeting this timeline, such as illness on the part of the parolee or other unmanageable situations. The definition of unmanageable becomes critical in pursuing substantial compliance.

In a smaller number of cases (668 in seven months), it appears parolees were never served. While several DRUs showed one or two per month, about half showed substantially more, with Los Angeles County Jail (241 total) and California Institution for Men (122 total) at the upper reaches. California Institution for Men, Deuel Vocational Institution, Los Angeles County Jail, and Santa Rita County Jail were much improved in this regard.

Plaintiffs have also raised a number of concerns about whether the quality and conditions of service compromise the effectiveness of the notice and ability to formulate

a defense. For example, Plaintiffs express concern over the quality of the Notice of Rights documents. To substantiate those concerns, they state that, "...in some cases the charge sheet is missing..." and indicate they have observed many. They provide a listing of five cases that exemplify insufficient statements, and some individual case examples of "...charges added after notice..." and "...supplemental charges added..." Other examples discuss deficiencies in the processes for assessing and documenting disabilities and effective communication. Plaintiffs have also criticized the practice, in at least three institutions,[ix] of notice agents asking parolees to sign waivers before an attorney has been appointed, while Defendants describe a number of situations in which they say the practice is acceptable under law and is common practice.

Although each of the noted concerns appears to illustrate a problem, there is no indication of whether they are widespread among the thousands of cases processed. Likewise, these vignettes do not necessarily signify a chronic problem. They do signal the need for further investigation.

- Significantly more information and fine-tuning are needed to satisfy this requirement.

## *Final hearing within 35 days of the placement of the parole hold*

Defendants have concentrated much of their efforts on this requirement and have made exceptional improvements. Starting from a 59-day average to hearing before the Remedial Plan, Defendants have invested tremendous resources and thoughtful, coordinated planning, oversight, and troubleshooting to reach the point where a large majority of revocation hearings are held by the required time. As described above, the

17

exact percentage of timely hearings is uncertain because significant categories are not included in the data, but performance is strong. There are also many fewer hearings held. Before the Remedial Plan, data commonly show 2,000 hearings per month. In the most recent months, hearings dropped to a range of about 1,000 to 1,250.[x] Defendants attribute this to encouraging negotiation about terms and charges, and resolving cases at or before the probable cause hearing.

There are certainly cases where the Injunction's timelines are not met. Considering the volume of actions handled, even a small percentage of noncompliance means there are numerous instances of individual cases exceeding this agreed-upon timeframe, for a variety of reasons. Certainly some reasons for delay are for good cause, in some instances to the parolee's benefit. Observed patterns in reasons for delayed hearings include parolees subject to extradition from other jurisdictions or those thought to be medically or psychiatrically incapable of participating. Parolees ask for extensions, and hearings are postponed for unavailability of participants or for accommodations of disability. There may be supplemental charges discovered later or the parolee may be returned to the process if rejected from a remedial sanction program. Hearings may be held later because the parolee is not in custody or because the charges are sufficiently serious and violent that a choice is made to hold the hearing late, rather than releasing the parolee, when it becomes clear that the timeline won't be met.

The parties agree that there are categories of cases where extended times to hearing are necessary. They have not yet decided on mechanisms to ensure that those hearings are initiated in a reasonable time. They also have not decided on the timelines that should apply. A case in point is the optional waiver, the process by which a parolee

18

may waive *Valdivia* hearings while criminal charges are prosecuted, with an option to reactivate the revocation process at a later time. Since a waiver is invoked after some of the *Valdivia* steps have taken place, the parties are negotiating how long Defendants have to complete the process after a parolee reactivates it. Certainly, a revocation hearing must take place within 35 days of reactivation. The parties are making reasonable progress in determining whether Defendants should be held to timeline shorter than that.

The frequency of occurrence and the length of delay for the above-described reasons are open questions to be documented and analyzed. The acceptability of many of these reasons is hotly contested.

There is a different category of cases that is inappropriately handled, sometimes referred to as 'partial cases.' These hearings are generally initiated timely. In them, however, a parolee's parole is revoked on the basis of some of the charges, while others are deferred for a second hearing in the future. This practice cannot be continued consistent with Defendants' obligation to provide a *final* revocation hearing by the 35-day point.

Some facilities have improved more rapidly and maintain greater success at regularly meeting revocation hearing timeframes than others, though the distinction narrows to a few percentage points once the process reaches this step. In CalPAP data, the most improvement in timeliness is visible in the regions associated with CalPAP offices designated as California Institution for Men, Los Angeles County Jail, R.J. Donovan Correctional Facility, High Desert State Prison, and Wasco State Prison. A few others fluctuate, and only Pitchess Detention Center appears to be stagnating at a lesser

19

level.[xi] In the most recent months provided, CalPAP data show a modest but continuing decline that bears continued observation.[xii]

CalPAP's most recent data -- the period of June 1 through June 30, 2006 -- show that, of the 1,105 final revocation cases reviewed, 1,064 were in compliance with expected timeframes (96%) and 41 were not in compliance. Of the 41, 7 cases were late 3 days or less. CalPAP's data show 99.45% of the cases closed that month -- whether through accepted offers, accepted dispositions at probable cause hearings, or revocation hearings -- were completed within 35 days.[xiii] For the reasons discussed above, these figures do not capture certain categories of cases, so they do not give the full compliance picture. However, they serve to illustrate, in general terms, the strength of Defendants' work on this requirement.

- Overall, there is very good progress on this requirement. Substantially more information is needed to fully assess this issue.

*Final revocation hearings are to be held within 50 miles of the alleged violation*

- The Special Master did not review this topic during this period, but will do so in upcoming periods.

*By July 1, 2004, an assessment of availability of facilities and a plan to provide hearing space for probable cause hearings*

The Defendants have accomplished a great deal in a relatively brief period of time. They report that probable cause and final revocation hearings have been held in more than 100 different locations statewide.

20

To accomplish this, Defendants created 13 Decentralized Revocation Units (nine at CDCR reception centers and four on a contractual basis at high-volume county jails). They arranged, and in some instances contracted, for space for attorney interviews and hearings. New construction was necessary in many of the county jails. Defendants arranged for access to, or installed, telephone and fax lines in jails in 57 of California's 58 counties. Special arrangements had to be made with the CDCR transportation unit to transport parolees from county jails to the appropriate DRUs, and this is how hearings are managed in the one remaining county where Defendants do not have access to phone lines. Given the difficulty in negotiating with 58 units of government, the CDCR has done a remarkable job of pursuing this requirement.

During the month of August, the Los Angeles County Board of Supervisors decided not to continue the contract with CDCR for jail beds for inmates. The present contract ends in January 2007. That loss would probably not affect the number of parolees being held pending revocation who also have concurrent pending criminal charges, as the county would be bound to continue to hold them until the new charges were resolved. Reportedly, Los Angeles County Jail is willing to continue to hold parolees pending revocation for the period of time it takes to complete the revocation process—but only up to 35 days. CDCR staff indicate they are working on a contingency plan to house those parolees if the negotiations change from the present plan.

- Defendants appear to be compliant with this requirement.

*By July 1, 2005, probable cause hearings shall be held no later than 10 business days after service of charges and rights*

With this process that has been in place for a shorter time than other components of the Injunction, Defendants have shown marked improvement.

Plaintiffs and Defendants have differences of opinion as to the number of days required from the placement of the hold to the probable cause hearing and the timing for cases subject to optional waivers or a parolee's request for postponement. Plaintiffs and Defendants disagree on the interpretation of the "…no later than 10 business days after service of charges…" clause. Defendants interpret it to mean 13 business days after the hold is placed (the maximum time allowed for service plus the maximum time from service to hearing named in the Injunction) – largely to preserve the quality of the investigation, because of practical obstacles presented by negotiated time parole agents have to complete reports, and because of the extraordinary expense in reprogramming the computer system to accommodate variable times -- while Plaintiffs are calling for a literal interpretation of the language.

Based on the measurements using Defendants' timeline definition, the great majority of cases receive timely probable cause hearings and there has been continuing improvement over time.[xiv] There is insufficient information to make any assessment according to Plaintiffs' definition. In any event, precise numbers are uncertain because some factors make timeliness appear better than it is, while other factors probably under-represent timeliness.

On the positive side for Defendants, the Special Master's initial review of raw data indicates that some compliance figures are likely better than they appear because a

significant number of timely hearings were incorrectly counted as untimely in the system. However, the data probably present an overly optimistic picture, Plaintiffs argue with some merit, by including relayed phone conversations as completed hearings. Also, Plaintiffs and the Special Master's team have identified some cases with internally contradictory information, so those cases' timeliness is in question.

A much greater amount of information is unknown and could skew the data in either direction depending on its volume. As described above, the data do not capture potentially large categories of information. There are also an unknown number of hearings that were skipped but recorded as completed because, during the reporting period, RSTS required such an entry to be able to record the next procedural step; Defendants note that this practice actually operated to their detriment. All of these factors leave timeliness totals with great uncertainty.

The highest percentage of untimely cases occurs at the women's facilities (Central California Women's Facility, California Institution for Women, Valley State Prison for Women) and, not surprisingly, at those facilities with the highest volume of hearings (Los Angeles County Jail and California Institution for Men).[xv]

The greatest improvements are seen at California Institution for Men, Los Angeles County Jail, North Kern State Prison, R.J. Donovan Correctional Facility, San Quentin State Prison, and Wasco State Prison. A few DRUs' timeliness fluctuates, but there is no sustained backsliding apparent.[xvi]

A variety of reasons for the untimely hearings is apparent, at least some of which are for good cause. However, it is presently impossible to determine the numbers attributable to good cause and those caused by factors that need to be remedied. As the

23

data appear currently, the length of time, at least for some cases, is troubling, with *averages* up to 43 days, and much longer for extradition cases. Those institutions having the greatest difficulty in this regard are Central California Women's Facility, High Desert State Prison, Santa Rita County Jail, Valley State Prison for Women, and Wasco State Prison.[xvii] The data are also not able to demonstrate, without unreasonable effort for the Defendants, how often untimely cases occur close to, or remote from, the deadline--a significant question.

There is also substantial disagreement about whether probable cause hearings may be conducted by telephone while preserving due process rights. When Defendants initiated probable cause hearings, a substantial number were conducted by telephone as an interim means of meeting the requirement. Too many were not hearings at all, but serial conversations with the parolee's attorney conveying information between the Deputy Commissioner and the parolee (so-called "cell phone hearings"). Defendants phased in a plan of providing hearings with the Deputy Commissioner connected by phone to the parolee and counsel in a room with access to telephone translation service and a fax machine for any documentary evidence. The Special Master's team understands that, as of April 2006, all locations have access to this arrangement or in-person hearings and the serial conversations method has been eliminated.

Defendants are operating, and propose long-term, to conduct hearings by telephone in 29 counties in which the hearing volume is so low, or the distance to be traveled so great, that in-person hearings are thought to be too burdensome. The Special Master's data review indicates that this involves fewer than 200 hearings per month (commonly about 3% of the hearings held).[xviii] Defendants propose to offer such parolees

the choices of a telephone hearing or an in-person hearing with the understanding that the latter might be provided as much as five business days after it is requested.

Plaintiffs have expressed strong reservations about this plan, noting the barriers to Deputy Commissioners' ability to assess parolees' testimony and credibility in the absence of nonverbal communication and limits on how effectively parolees with psychiatric and communication impairments express themselves over the phone. Plaintiffs are concerned about complications in presenting live witness testimony. This topic reportedly was the subject of previous party negotiations; the results have been described in differing ways which have not yet been reconciled to the satisfaction of the Special Master. Plaintiffs also note that observed practice in the field is not always consistent with policy, with lack of familiarity and individualized decision-making preventing the plan from being realized as intended and potentially compromising parolees' rights.

Both parties assert that case law supports their positions. CalPAP leadership indicates it believes the telephone method satisfies due process, particularly with the representation by an attorney.

The Special Master is mindful of the concerns raised by all parties and is concentrating monitoring efforts on this topic. A conclusion is premature at this time, but I anticipate completing an assessment and working with the parties on this issue during the next Round.

- There is adequate progress toward compliance on probable cause hearings. Substantially more information is needed to fully assess this issue.

25

*Complete implementation of policies and procedures by July 1, 2005*

Although policies and procedures have not been implemented completely, there has been substantial progress toward this goal. Defendants and Plaintiffs continue to meet and confer on those policies and procedures in dispute.

- There is adequate progress on this requirement.

*Counsel shall have timely access to all non-confidential reports, documents, and field files; if additional evidence that the State intends to rely on is identified after attorney appointment, the evidence shall be provided to the attorney as soon as practicable before the hearing*

Access to non-confidential information has been the subject of lengthy dispute, litigation, and negotiation. While much of the dispute has been resolved in principle, the parties continue to work through issues in the application of the agreements, which are still new and unsettled. Policies and procedures on-point remain in negotiation with some subsections hotly contested.

CDCR has conducted staff trainings. It developed and implemented policies to allow CalPAP attorneys access to the complete revocation packet, with some redaction, and access to the parolee's field file either at the parole field office or through the Deputy Commissioner at the hearing. Plaintiffs have observed instances of redaction of what they describe as non-confidential information and note at least one institution where local policies appear to vary from the central policy, raising concerns that local practices may more broadly undermine implementation of this requirement. Defendants indicate that they recently clarified a field directive to address concerns Plaintiffs raised. Defendants acknowledge the need to change a DAPO policy that allows parole agents to redact any

witness' name, and they assert that they have drafted a revised policy. Plaintiffs express doubt as to whether CalPAP attorneys review field files sufficiently often. There is also a question about whether review during the hearing is sufficient for preparing a defense.

In terms of providing evidence identified after attorney appointment, neither Plaintiffs nor the Special Master have knowledge of whether there is policy and procedure and how this is operating in practice.

- The Special Master did not review this topic during this period, but will do so in upcoming periods.

_Defendants shall develop and implement policies and procedures for designation of information as confidential consistent w/ requirements of due process_

The parties previously sought orders in this area, with particular emphasis on access to mental health records and criminal identification and information sheets. As discussed above, policies and procedures remain in negotiation. A protocol for access to mental health records reportedly remains in draft form more than a year after the Court's order.

- The Special Master's team did not assess, during this term, the success or any remaining issues related to this requirement, but will do so in upcoming periods.

27

*Defendants shall develop training, standards, and guidelines for state appointed counsel*

Defendants developed, along with CalPAP staff and Plaintiffs' attorneys, standards and guidelines with commensurate training packages. Plaintiffs call for a few additional topics to supplement the existing standards and guidelines.

The Special Master is informed that all CalPAP attorneys have been trained prior to their representing parolees, and receive continuing training from McGeorge Law School staff. CalPAP staff have developed a training video for new attorneys, and when enough new attorneys are available, they participate in a three-day training session that includes lectures, mock hearings, and other activities. All new attorneys attend hearings with a "mentor" before they represent parolees at hearings themselves. CalPAP staff attorneys investigate complaints from parolees regarding the attorneys, monitor through their information system the timeliness of attorney actions, and sit in on hearings to observe the attorneys' performances. Some attorneys who have been found to be lacking in ability or attentiveness have had their contracts cancelled, and some others have received remedial training.

It is equally important that the standards, guidelines, and features of the current program structure be sustained. The parties are engaged in meet and confer sessions designed to memorialize the functions and processes essential to administering this program and to providing effective representation to parolees. As the parties are discussing, the standards should encompass expectations for attorney selection, ongoing training, and quality improvement. They must provide for staff in sufficient numbers and with sufficient qualifications to coordinate regionally and statewide, oversee attorney activities, provide guidance on evolving issues and policies, perform quality control,

28

provide flexible response to changes, and coordinate with CDCR and county jail operations. They must provide sufficient staff for clerical support to manage and distribute parolee information, communication, and documents on a grand scale; issue subpoenas; track information; and coordinate a variety of activities. Attorney, administration, and clerical staffing levels should be calculated based on known workload demands, anticipated growth, and regional distribution. Standards should define sufficient information systems and other infrastructure sufficient to carry out all of the above functions and others likely to arise. Administrator involvement in CDCR's policymaking and internal oversight has been invaluable and should be continued.

The Special Master strongly encourages the effort to define and establish standards for attorney panel administration and parolee representation, as it is so central to the *Valdivia* remedies.

- There is adequate progress on this requirement.

*Defendants shall assure that parolees receive effective communication throughout the process*

The responsibility for identifying and/or accommodating the special communication needs of parolees, and communicating those needs sequentially through the revocation process, lies with:

> the parole agent of record
> the Field Unit Notice Agent or Decentralized Revocation Unit Notice Agent
> the CalPAP attorney representing the parolee
> the Deputy Commissioner holding the probable cause hearing
> the Deputy Commissioner holding the final revocation hearing

> ➢ the parolee him- or herself

The required process includes a review of the field file; completion of specific forms and attaching documentation of the nature of the need; a review of possible disabilities and assessment of comprehension difficulties with the parolee at the time of serving the notice, with related documentation; a notification of any disabilities to the attorney; a review by the attorney; and further review by the Deputy Commissioners at the probable cause and final revocation hearings.

Problems noted by Plaintiffs include failures to timely refer to source documents substantiating need; to use translation assistance, including sign language, for notice service; to properly assess and record relevant information; to transmit relevant information, including source documents, to the appointed CalPAP attorney or to provide it on a timely basis; and in the Deputy Commissioner's review of the parolee's accommodation needs at one or both of the hearings.

There is little tracking available to document whether accommodations were provided when needed. The Special Master understands that the *Armstrong* court found in recent months that CDCR's tracking systems are inadequate in this regard, and that the court found this results in systematic failures to provide effective communication to the population with those special needs, a finding that clearly has relevance to a determination of whether the effective communication requirement of *Valdivia* is being met.

The Special Master has not been informed of any source tracking whether effective communication occurred during notice. CalPAP data provides a window into two discrete aspects of effective communication. CalPAP examines attorney-client

interviews and tracks whether translation, including sign language, is provided. In that particular report, recent months show occasional lapses, particularly with sign language; there is insufficient information to determine the scope of the problem. Additionally, CalPAP says it collects attorney reports of instances when the attorney identifies a previously unrecognized need for accommodation, and occasions when an identified accommodation initially was not provided, including the amount of time required to remedy that.

The Special Master's team observed thoughtful assessment by hearing officers in probable cause and revocation hearings at several institutions, but the team has not yet fully examined these issues.

- The Special Master has insufficient information to assess this issue. The team will continue to review it in the coming Rounds.

### *Forms provided to parolees are to be reviewed for accuracy, simplified, and translated to Spanish*

Defendants indicate they have revised and simplified the forms used in the revocation process and have recently revised them further, although at least the Spanish language forms are not finalized and have not been put to use. Plaintiffs have remaining concerns about whether those revisions are adequate and whether expert assistance is required, and they assert that they have not seen alternative formats and Spanish-language translations. Both parties note an ongoing difficulty in that older versions of forms sometimes remain in use in the field.

- This issue bears further monitoring.

### *Upon written request, parolees shall be provided access to tapes of revocation hearings*

Logs indicate that Defendants received 535 tape requests in 2006 and that the great majority (76%) were answered within two weeks, with all but a handful answered within a month. The outliers only took up to 10 days longer, although it appears that about 4% were not sent a response. There are, however, some inconsistencies that call some of these figures into question. Defendants state that presently there is no backlog in responding to such requests.

Plaintiffs have not quantified their concerns for the Special Master but describe recording quality problems and delays in receipt as persistent. Logs suggest problems are rare, with only two recorded cases of replacing tapes for poor quality and 16 occasions when Defendants were unable to produce a tape, almost always because a several-year-old hearing tape had been purged or it was a type of hearing that is not recorded. Plaintiffs also are concerned that, unlike most other areas, Defendants apparently have not begun generating policies and procedures for this Injunction requirement.

- There is adequate progress on this requirement. Substantially more information is needed to fully assess this issue.

### *Parolee's counsel shall have the ability to subpoena and present witnesses and evidence under the same terms as the State*

In February 2006, CDCR developed and implemented a policy that allows CalPAP attorneys to subpoena witnesses on behalf of parolees. CalPAP assumed responsibility for the process in early 2006. Plaintiffs point to a number of practices as

32

obstacles to witness subpoenas and presentation, as well as presenting parolees' evidence, and thereby treating it as on terms unequal to the State.

- The Special Master's team did not assess this requirement during this term, but will do so in upcoming periods.

*At probable cause hearings, parolees are to have the ability to present evidence to defend or mitigate the charges or proposed disposition*

CDCR policies require the Deputy Commissioner to allow the parolee and the parolee's counsel to present evidence to refute or mitigate the charges, and to show why incarceration may not be necessary. This was accomplished well in the hearings the Special Master's team observed.

Plaintiffs have raised concerns that each of the following may compromise parolees' ability to present evidence: untimely notice of charges, untimely attorney appointment, redaction of documents used in revocation proceedings, times when parolees are not permitted to be present in the hearing, telephonic hearings, "cell phone hearings," and times when hearing officers may exercise their discretion inappropriately.

- This bears continued monitoring.

*Hearsay evidence must be limited by parolees' confrontation rights under controlling law. Defendants are to preserve this balance in hearings and to provide case law-based guidelines and standards.*

Defendants developed policies and procedures regarding *Comito* and provided training for the Deputy Commissioners and parole field staff. Plaintiffs assert that training content was flawed, that ongoing oversight is insufficient, and that this results in

inconsistent application of the *Comito* standard. CalPAP, similarly, has disagreed with how *Comito* is applied. Defendants acknowledge the need for further training and guidance, and those plans are noted below.

Interviews with CDCR parole agents and supervisors reveal that many uncertainties and misinformation regarding hearsay information and *Comito* requirements remain. They also indicated that Deputy Commissioners' application of *Comito* varies depending upon their background and length of tenure, believing that less experienced Deputy Commissioners apply it too strictly, inappropriately limiting parole agents' speaking in hearings and excluding valid information. Parole agents and supervisors say they find the variation in how the standard is applied confusing and frustrating.

Defendants report plans for detailed guidance, in the form of a scripted template to follow in each hearing where such an objection is raised, and further training for existing Deputy Commissioners and new hires. Plaintiffs' counsel and Defendants also met in 2006 to negotiate changes in policy.

- The Special Master will continue to observe this issue.

*On or before the fourth business day, the Parole Administrator shall review the packet to determine whether the case is sufficient to move forward and whether remedial sanctions may be appropriate*

Although the dates and results of Parole Administrator action are recorded in the data system, neither is the subject of a report that could demonstrate compliance, remedial sanctions referrals, or trends. Plaintiffs also assert that more recording is necessary as parolees' attorneys and BPH staff need the benefit of the Parole

34

Administrator's thinking when they are formulating a defense or assessing terms or remedial sanctions.

ICDTP referrals, and many possible EID referrals, must be approved by BPH. California Administrative Code, title 15, section 2616, delineates a long list of offenses and behaviors that must be reported to BPH. If the parolee's alleged violation or prior crime is identified in section 2616, the Parole Administrator must refer to BPH, so most recommendations are not actually disposed of at this step. How many potential cases might not require reporting to BPH requires further exploration.

The Special Master's team has undertaken a study of trends apparent in a statistically significant sample of cases, which will likely include impressions of Parole Administrator functions.

- This topic bears further monitoring.

### Defendants shall maintain staffing levels sufficient to meet all obligations under the Order

Defendants assert that their allocated positions are sufficient to meet the *Valdivia* mandates as long as some hearings by telephone are permitted. They indicate that they used a detailed method to assess workload patterns to support the need for the positions and to create a formula for staffing and further growth. Defendants have increased staffing significantly each year of the implementation of the new revocation process and large numbers of additional staff were requested and approved in the 2006-2007 budget.

The Special Master has not reviewed Defendants' methods for determining the sufficiency of staffing allocations to date. The Special Master's team understands that

Defendants intend to conduct a workload assessment in the near future, and we will seek further information on that study's methodology.

At present, vacancy rates are acceptable. After factoring in temporary coverage, primarily by retired annuitants, the functional vacancy rate for all BPH *Valdivia* positions is only 11%. Vacancies are not particularly concentrated by region or within any staffing category, except among the highest leadership.[xix] Institutions Division reports no vacancies among its officers and sergeants supporting *Valdivia* processes, and DAPO reports only 4% vacancies in *Valdivia*-specific positions, with all confined to one staffing category.

It seems that a problem is—and has been—filling and retaining staff in urban areas due to high cost of living and in some rural areas due to lack of qualified applicants or candidates considering the areas unattractive. Reportedly, the staffing category most at risk for being insufficient is Deputy Commissioner, the position responsible for Return to Custody Assessments and for holding hearings. Defendants have sought allocation increases annually and provided coverage by retired annuitants and by redirecting staff between regions.[xx] Hiring additional Deputy Commissioners and providing an academy for them is anticipated in summer and fall 2006. The greatest proportion of vacancies appears at the highest leadership levels and, while they are covered by staff in an acting capacity, this remains troubling.

Despite paying higher salaries than local probation, parole offices are typically functioning with vacancies. Parole supervisors indicate there is no shortage of viable candidates. Rather, departmental hurdles such as the length of time to complete the background and medical review, which can take up to six months, and the lack of a light

duty protocol, substantially hinder hiring qualified candidates and filling temporary vacancies. Moreover, if an Academy class comes available, supervisors report that lateral transfers from institutions sometimes displace candidates who are in the review process and may more closely fit the supervisors' hiring priorities.

Plaintiffs' documents indicate observed shortages in multiple locations, though the number and types are not always specified.

At present, it is not practical to assess whether Defendants' workload-based calculations, and subsequently funded positions, are adequate for fulfilling *Valdivia* requirements. The Special Master has not observed any deficiencies that appear to be caused or exacerbated by understaffing. Since sufficient numbers of staff, with appropriate expertise and training, are critical to all aspects of compliance – and staffing failures can derail compliance in dramatic and lasting ways -- the team will continuously assess for signs that staffing is inadequate to the task.

- This bears continued monitoring.

### *Monitoring by Plaintiffs—"reasonably necessary"*

Plaintiffs' and Defendants' representatives agreed, following negotiations in April 2006, to a monitoring schedule for the last three quarters of the year that includes fewer and more brief monitoring visits by Plaintiffs' attorneys, and more information provided by Defendants to the Plaintiffs, the scope of which is being determined. Defendants will also implement a trial model of self-monitoring. Defendants, during the last two quarters of the year, will replace Plaintiffs' monitoring teams with CDCR monitoring teams in some locations, reporting results back to the Plaintiffs' representatives and the Special

Master. At those locations, the Plaintiffs will spend one day at the site interviewing parolees only, to assure continued representation of their clients.

I observed the first self-monitoring effort at Santa Rita County Jail in July 2006. The CDCR monitoring team appeared to do a thorough job of observing serves, probable cause hearings, final revocation hearings, and the attendant paperwork. Members of the team also traveled to the Hayward parole office and interviewed staff at all levels there to examine the *Valdivia*-related processes. An advantage of the self-monitoring process is that the monitoring team members were able to make on-the-spot improvements or enhancements as they observed the processes. Presumably, if the self-monitoring proves to be successful, it can be expanded in future quarters.

- There is good progress on this requirement. The Special Master's team will continue to evaluate the self-monitoring.

*Agreed-upon mechanism for addressing concerns regarding individual class members and emergencies*

Defendants investigate such concerns raised by Plaintiffs, CalPAP, and others who may raise them. Defendants track only those complaints raised by Plaintiffs, and summary documents[xxi] indicate there were 400 such complaints in the preceding year, and average response times generally were well under two weeks.

Defendants found that slightly less than ½ of these complaints were unfounded. The remainder generally were handled by acting to ensure that the requested action happened, most commonly conducting overdue hearings, scheduling revocation hearings after an optional waiver had been taken and reactivated, providing hearing tapes, and

38

releasing parolees when time had been served. Defendants assert that a large majority of these cases had been discovered internally and rectified by the time they looked into Plaintiffs' complaints, and they do not recall any instance where a hearing had fallen through the cracks and had not been scheduled by the time they investigated. A fairly small number (about 7% of the total) resulted in dismissed charges when timelines had been missed, with almost all such cases occurring by summer 2005.

Defendants determined that about 10% of the total complaints were outside the scope of *Valdivia*, issues such as legal mail, county jail services, mentally disordered offenders, civil addict hearings, housing in the appropriate facility, special conditions of parole, time calculation, electronic monitoring, hearing officer neutrality, and extradition and interstate cases. With these complaints, Defendants report that they investigate or forward the information to appropriate offices, but do not provide a response to Plaintiffs. These complaints are included in the totals reported as "resolved" or "unfounded." It is an open question whether each of these categories is, in fact, outside *Valdivia*.

The parties have had much less success in determining appropriate remedies, if any, for individual parolees when a process fails. Counsel report extensive negotiations with little progress.

- There is some progress on this requirement. The Special Master's team will likely assist in negotiations in upcoming periods.

### Appeals

All agree that the previous Appeals office's processes were not timely enough to be effective. That office was closed, although the current budget reflects positions

39

allocated for a new Appeals office. Defendants inform the Special Master that that office will only review appeals from prisoners with life sentences.

Plaintiffs object to effects of the current system relying solely on state court *habeas* petitions for any parole revocation appeals. They object that attorney representation is not paid for, except for appeals on the basis that information was inappropriately withheld as confidential. Plaintiffs raise the issues that the *habeas* process is also untimely, that state courts sometimes are not an option procedurally and jurisdictionally, that state courts sometimes apply incorrect standards, and that treatment of such writs can be a circular series of deferrals.

Defendants argue that case law states there is no Constitutional requirement to provide any appeals process and neither does this Court's Injunction require it. They believe that the state court system adequately responds to writs of *habeas corpus* filed by *Valdivia* class members.

The idea of funding CalPAP representation on an appropriately defined set of writs is one that merits consideration.

- The Special Master's team did not sufficiently review this issue, and focus will be placed on it in upcoming periods.

*Revocation Extension proceedings*

All parties recognize difficulties with this process. Plaintiffs report observing some CDCR classification staff serving revocation extension notices without following all procedures, particularly those meant as disability and/or effective communication protections. The staff also gave the impression they did not have sufficient knowledge of

40

*Valdivia* processes.[xxii] Plaintiffs are also concerned that there is no process to ensure that the parolee is represented by the same attorney as in prior proceedings.

Defendants trained staff and CalPAP attorneys in revocation extension procedures initially, though they note that they have not consistently provided follow-up training when processes and requirements changed. They acknowledge problems with notice and other aspects of the extension process. They assert that they have a work group revising policies and procedures, and they intend to subsequently retrain classification and clerical staff and to review these issues during self-monitoring tours.

The Institutions Division reports that it developed a tracking program; Plaintiffs say they have observed and been informed that the program is not operational. The system has never been integrated with RSTS, and Defendants report an intention to add revocation extension tracking capability to RSTS. Disagreements have surfaced about whether *Valdivia* timelines apply given that the liberty interest may differ since the parolee is already in custody.

- The Special Master's team did not assess this requirement during this term, but will do so in upcoming terms.

*Remedial Sanctions*

Pursuant to this Court's June 8, 2005 order, Defendants developed replacement programs for the Substance Abuse Treatment Control Units (SATCU, substance abuse treatment) and Electronic In-home Detention (EID, electronic monitoring). The number of spaces available for program participants has changed, as has the design of the

41

programs. Further, staff do not fully make use of the beds available and they have never approached full occupancy.

The original Electronic In-Home Detention program had 1,000 units, while the re-designed program has 500 units. There were 996 jail beds available in the SATCU program. The number of jail beds in the replacement program, ICDTP, is currently 264.[xxiii] Some of the ICDTP reduction is attributable to the program redesign, but most resulted from CDCR's inability to interest counties in contracting for program services.

Since spring of 2005, none of the ICDTP beds have been available to the very large parole populations in the two Southern California regions. CDCR continues to negotiate with several jails in Region IV (San Diego and environs) to develop an additional 136 beds in that region, and with the Los Angeles County Jail for an additional 175 beds. The likelihood of the Los Angeles County beds coming to fruition is tenuous given the recent actions of the County Board to terminate state contracts for other beds.

The causes of the reduction in available program places in the substance abuse treatment program include:

a.   The elimination of the Substance Abuse Treatment Control Units and the CCRC/Halfway Back program strained relationships with several county jails. Jails that housed these programs were impacted without notice by loss of revenue and disruption in staffing and programs. This has made the establishment of programs that require jail beds more challenging for CDCR.

b.   Compounding this challenge is the higher rate the federal government will pay jails for bed spaces. The federal rate of reimbursement of $100 per day is significantly higher than the CDCR rate of $68.22 per day. Thus, jails sometimes choose to contract with the federal agencies that reimburse at that higher rate.

c.   The overall population of CDCR has increased significantly in recent years. This population increase is also affecting county jails, which house substantial numbers of CDCR-sentenced prisoners, as

well as increased jail populations. Since the program is premised upon using secure jail beds and there are fewer empty beds, it is more difficult for CDCR to contract for ICDTP beds.

d.    CDCR's budget for drug treatment beds reportedly was cut in half.[xxiv]

The design of the current program is also responsible for a drop in usage for the following reasons:

a.    The number of exclusions is increased for ICDTP compared to SATCU. Where SATCU only excluded certain sex offenders, the ICDTP adds eight additional restrictions, including ruling out admission for any parolees with violent felonies. Local facilities impose additional restrictive criteria. For example, some local facilities will not accept members of certain gangs.[xxv]

b.    Lack of a consistent assessment process leaves the referral decision largely in the hands of the parole supervisor, and the amount of referrals reportedly is tied to his or her correctional philosophy. Supervisors promoting rehabilitation appear to encourage their staff to use remedial sanctions and other community and DAPO sanctions prior to revocation. Supervisors seeing punishment or incapacitation as more effective reportedly do not encourage as many alternatives to revocation.

c.    The program was re-designed from a 30-day stay in secure custody to a 60-day stay in secure custody.[xxvi] The length of time for the aftercare component has changed from 90 days of largely outpatient services to a combined 30-day residential aftercare and 60 days of non-residential care. The increased time in secure and community residential care has resulted in fewer parolees being able to move through the program, so the beds are not available as quickly for new referrals. Also, CalPAP attorneys and Defendants indicate fewer parolees are willing to accept these conditions when recommended since the time they would serve in the program often exceeds that which they would serve if simply returned to prison.

d.    With SATCU, the parole agent could immediately place a parolee in the program and it did not require BPH approval, which created greater parolee acceptance of this option. Depending on the jurisdiction, adding BPH approval can result in moving a parolee from the local community back to an institution for as long as four weeks. None of this time is counted against the parolees' term and, consequently, parolees change their minds about entering the program.

e. According to parolees and staff, the treatment modality of the drug and alcohol program generally is not reinforced by the custodial staff in the jail. Thus, parolees who enter the program receive inconsistent messages that inhibit treatment efforts and can contribute to program failure.

With the exception of some procedural issues, many parole staff who do use the ICDTP program typically like it and believe it provides a needed service for parolees. However, for others, one of the most significant impediments to successful implementation is the way the program was created. It is viewed as having been created by headquarters staff without regard to local needs. Reportedly, there was little input from the field, no piloting in the field, and the current design is a single model to be applied everywhere. Field offices handle different types of criminal behavior and vary as to the number and quality of resources available. Recognizing this, field staff often cited ways a modified program would better fit their environment. Allowing for variation would likely result in greater program usage.

This program has also suffered repercussions from stopping and starting. In program development, there is always a period of slower use until programs are fully implemented. Part of this is putting systems, policies, and procedures in place and part of it is gaining trust and belief in the programs on the part of the referring agents, supervisors, and hearing officers. CDCR staff not only needed to mend relationships with entities such as the county jails, they needed to re-educate and engage DAPO and BPH staff. This is illustrated by Defendants' occupancy figures, showing that, even with the reduced number of beds available, it took several months of operation before more than half of those beds were filled, and occupancy remains at slightly more than 80% for the most recent month reported.[xxvii]

44

The Special Master hopes these comments will serve as a guide as Defendants redesign their Remedial Sanctions plan.

The cause for the reduction in Electronic In-Home Detention units is less clear, and program usage is extremely low. Several contributors are apparent. The program has been redesigned to serve a higher risk parolee, and it requires significant effort for a parole agent to put it in place. This is particularly unattractive for a sanction that will remain in place for only 45 days. The potential for the program is tied in part to the nature of the local parole population. Few parolees meet the eligibility requirements in large urban centers, as there is a highly transient parolee population and they rarely have home-based telephones, a requirement of the program. In smaller communities where parolees are more likely to live with a family with a home-based phone and a willingness to modify phone service, the program is more applicable. This is an example where greater regional variation would better serve program usage.[xxviii]

Generally accepted information nationally has shown that such programs normally result in increasing the number of revocations rather than serving as an effective tool for reducing the need for them. Although conceptually electronic monitoring could be used as an alternative to incarceration, its potency is actually in making supervision more stringent. This trend is evidenced in the use of electronic monitoring in California, with parole agents and supervisors saying they use the units, not always as an alternative to revocation, but as an enhancement for a parolee who is not under consideration for revocation.

All of these challenges have impacted program usage. Available data capture a fairly low number of referrals, as remedial sanctions appear to have been used for ten to fifteen percent of the parolees with a parole hold.

Proposition 36-initiated programming is the most used, at about ten percent of the holds placed. ICDTP was the subject of less than two percent of the holds since its initial use in December. Defendants state that they are using self-help outpatient/aftercare programs and structured and supervised environments, but these are not tracked, at least not specific to the parole violator population, so it is impossible at this time to determine how frequently these methods are used. Data documented only *one* referral for Electronic In-Home Detention, although Plaintiffs cite a memo indicating 59 units were in use. This may be in part because Defendants' reportedly usual practice is to order Electronic In-Home Detention prior to any hold being placed, which would occur outside the *Valdivia* process.

Virtually all alternative placements (95-98%) are disposed of at the Return to Custody Assessment and Probable Cause Hearing steps. Printouts show 7,497 referrals to Proposition 36 beds, 772 referrals to ICDTP, and 1 referral to Electronic In-Home Detention. Of those, only 102 Proposition 36 and 38 ICDTP decisions were made at Revocation Hearings.[xxix]

Defendants have been asked, and agreed, to develop a new remedial sanctions plan, to be submitted to the Special Master and Plaintiffs' attorneys no later than November 30, 2006. In that letter, I stated: "That plan should include any changes in programs, policies, or courses of action that meet the spirit and the projected numbers of the original remedial sanctions plan. It may include any of the programs currently in use,

as well as others CDCR would like to propose. The plan must include specific details concerning the programs to be offered; the populations for which they are designed; the logistics required to design, fund, contract for, and oversee the programs, including training of BPH and DAPO staff in using them; and anticipated timelines for each of those steps." Once the plan is submitted, the efficacy of it will be negotiated with the Plaintiffs.

- Progress has been negligible in this area and significantly more is needed to satisfy this requirement.

### Interpretation Issues

As the requirements above have been implemented, issues of interpretation and effect have surfaced. Some are discussed above. The following items have been raised in the parties' communications, often based on observation during at least one monitoring visit, and often framed as a need both for a substantive correction and for memorializing in policy and procedure. The parties are engaged in ongoing 'meet and confer' sessions on policy and procedure formulation, which are reportedly fruitful.

As such variables as scope, substantiation, and full or partial resolution, or progress toward the same, are unknown to the Special Master, these issues are noted here solely for the Court's awareness of the range of possible issues in the case to date. The Special Master expresses no opinion and makes no recommendation to the Court concerning them at this time. Those issues are:

- Parolee timeliness waivers, including whether parolee attorneys are requesting them at a reasonable rate and whether hearings are resumed after a reasonable time

- Parolee rights waivers before being appointed counsel

- The handling of notice and the timing of hearings when there are supplemental charges determined after the original charges have been served

- Whether parolees may be removed while fearful witnesses testify, subject to the parolee's attorney's examination, but not the parolee's direct confrontation

- Postponements beyond deadlines because subpoenaed state witnesses do not appear

- Whether there are sufficient provisions for attorney-client communications to be confidential in some locations

- Parolees not being served and not having hearings because physical or mental illness renders them unavailable or unlikely to understand the proceedings, including whether this judgment is made reasonably, the length of time that is added, and mechanisms to ensure the process is restarted as soon as practicable

- Length of time to hearing when a parolee is subject to extradition or is allowed to remain "not in custody"

- Whether state employees and witnesses will be provided with attorney representation during hearings

- Transportation challenges in making parolees available

- Deputy Commissioners and attorneys conducting telephone or in-person hearings without the parolee

- Adequate notice to parolees of the dates of their revocation hearings

- Ensuring consistent provision of written decisions after hearings to attorneys and parolees

- Status of civil addicts in relationship to *Valdivia*

- Status of "cooperative parolees" -- that is, those received for supervision under the Interstate Compact for Adult Offender Supervision -- in relationship to *Valdivia*

- Time calculation issues, such as denial of work time credits if a parolee on revoked status remains in a non-CDCR facility

- Exclusion of parolees with disabilities from remedial sanctions such as the Parolee Substance Abuse Program

- Whether providing psychotropic medication is an obligation for carrying out effective communication with mentally ill parolees

## Relationship to Other Cases

In practical terms, a variety of issues in *Valdivia v. Schwarzenegger* arguably overlap with concurrent remedial orders in *Coleman v. Schwarzenegger* and *Armstrong v. Schwarzenegger. Coleman*

Defendants have not submitted to the Special Master any positions about the potential relationship of the practices in these lawsuits. Plaintiffs maintain that these areas overlap between *Coleman* and *Valdivia*:

- Pre-release and discharge planning
- Mentally ill parolees' technical violations
- Psychiatric revocations
- Remedial sanctions, overcrowding, and reception centers

Pre-release and discharge planning: Plaintiffs argue that CDCR's failure to provide mentally ill inmates who have impending paroles with adequate pre-release planning and treatment, as well as post-release services, results in their being immediately vulnerable to revocation, especially for being unable to obtain appropriate housing or treatment for mental illness in the community. Plaintiffs argue that CDCR's actions or omissions led to these violations and that a subsequent revocation proceeding is therefore fundamentally unfair, making it a *Valdivia* issue.

49

The Special Master declines to adopt Plaintiffs' view. The complained of practices concern services provided or omitted by staff outside DAPO and BPH and outside due process procedures and provision of remedial sanctions. While Plaintiffs seek to require services that are arguably much needed, *Valdivia* is not a source mandating them.

Technical violations: Plaintiffs also say that Defendants send some mentally ill parolees back to prison essentially for being mentally ill. Plaintiffs say that Defendants revoke a large number of these patients' paroles on technical violations as a substitute for their genuine reasons, and that the parolee behaviors underlying the revocations spring from the lack of treatment resources in the community.

Again, while there is ample reason to believe there is great need for more community mental health treatment, Plaintiffs' argument appears to be based, not in *Valdivia* mandates, but in judgments about the quality of decisions that are within DAPO and BPH discretion. As such, the Special Master is not convinced that this is a matter for the *Valdivia* court.

Psychiatric revocations: Under Title XV, DAPO and BPH staff may give a mentally ill parolee a one-year revocation term on the basis that his/her mental illness is not in remission and makes him/her likely to commit a crime ("psych returns"). This presupposes that the revocation is for purposes of treatment while incarcerated, and the full term must be served unless a CDCR clinician certifies mental health improvement sufficient for earlier release. Plaintiffs' counsel, on June 15, 2006, sent notice to Defendants that Plaintiffs believe Defendants are in violation of the *Valdivia* Permanent Injunction by continued use of the psychiatric return process. In August 2006, Defendants

told all parties that they had decided to cease using the psych return process. Some issues remain, however, as staff have not yet been notified of the change in policy and some parolees may continue to be revoked under these provisions for a time, and Defendants have a number of parolees currently in custody under these terms.

Plaintiffs state in their notice: "… the psychiatric return process presents serious due process concerns, and results in severely mentally ill parolees being placed in dangerous and life threatening situations. Both procedural problems in the psychiatric return process, and the use itself of psychiatric returns given the lack of adequate mental health care in the prison system, implicate the underlying concerns of the Permanent Injunction…"

The Plaintiffs' notice continues: "Defendants' current psychiatric returns practices are rife with procedural defects that directly violate specific terms of the Permanent Injunction:

- Withholding psychiatric evaluations from parolees' appointed counsel;
- Failure to timely serve mentally ill parolees with notice of charges;
- Failure to hold timely revocation hearings for mentally ill parolees;
- Failure to provide mentally ill parolees the opportunity for meaningful participation in revocation hearings; and
- The systematic exclusion of parolees with serious mental illness from remedial sanction programs."

The basis for these latter allegations is as yet unclear. A BPH review identified 44 parolees revoked under these terms in 2005, and examining them gives an initial indication of the handling of these cases. They were not concentrated in any particular parole units or regions.

Notice showed some of the problems inherent in this process. Five men apparently were never served and notes indicate another three impressed the notice agent

as not understanding what had transpired. The charges seven men received in the notice of rights concerned actions other than the psych return provisions. These were revised by the RTCA step and, while one cannot determine whether the parolee was independently advised of this, attorneys had the information when they usually receive the cases. Attorneys say they routinely receive the mental health evaluations and reports.

Many of these probable cause hearings were held substantially beyond timeframes. About 61% were held timely, with most of the remainder experiencing lengthy delays of one week to 2½ months. Occasionally, it appeared that the probable cause hearing did not occur. One cannot determine much about contributors to these delays.

The Parole Outpatient Clinic clinician does not participate at this step and, consequently, this step often contributes little. Patients who are in or nearing an acute state when returned to custody wait a minimum of 35 days for treatment, unless they decompensate and are sent to an inpatient unit. It seems advisable to reconsider clinician testimony at the probable cause hearing, routinely expediting the revocation hearing, or some other method to reduce what appears to be known and preventable lengths of time.

Only 64% of these parolees' revocation hearings were either held timely or concluded at the probable cause hearing step. Eight more were unnecessary, though three parolees were held over several weeks before the decision was made. The remaining hearings were held from 10 days to 7 weeks late. Most late hearings were not explained, but there were occasional, troubling cases where Parole Outpatient Clinic staff unavailability or failure to supply an evaluation delayed hearings up to two months after the deadline.

As to outcomes, one quarter of these cases were dismissed and this occurred at several stages of the process. The rest were given the full year term, with one exception, and defendants report that only two of these parolees were released before serving the full year.

Certainly, it is undisputed that such parolees may or may not get treatment – the purpose of the revocation – depending on their length of stay in Reception Centers, which are staffed only for screening and not for treatment. It also appears that clinicians commonly are not familiar with the assessments needed to determine whether the parolees are stabilized sufficient for release, so there is a substantial risk that these parolees are held for months longer than necessary.

In late August, Defendants convened an interdisciplinary task force to address several issues affecting the patients currently held under psych return provisions. Defendants committed to identifying all current and future cases; improving access to treatment; determining evaluation standards for clinicians to apply; evaluating all such patients; and addressing a variety of issues related to ongoing evaluation, patient release, and community placement. Defendants committed to routine communication practices on-point with the Special Master and Plaintiffs' counsel.

- The Special Master's team has not yet examined this issue sufficiently. We have neither a clear sense of the numbers of *Valdivia* class members involved nor their impact on resolving *Coleman* issues. This will be a priority issue in the coming term.

53

Remedial sanctions, overcrowding, and reception centers: The complex questions of the rapidly expanding prisoner and parole revocation populations, and the reasons for this, have implications for, and impact on, the *Valdivia* and *Coleman* classes. With reports of substantial staffing vacancies in the system, it is predictable that most classification, clinical, and custody processes are not prepared to keep pace with the volume. As assigned beds become impacted in CDCR, predictably prisoners will spend longer periods in Reception Centers, which, as noted, do not provide treatment according to *Coleman's* levels of care for mentally ill prisoners and parolees awaiting revocation or serving revocation terms.

While the numbers have not yet been established, observers note it is common for mentally ill parolees to incur technical violations resulting in short revocation terms; under current CDCR conditions, it is increasingly likely that those terms are too short for them ever to transfer to a facility offering their needed level of care during that term, and that such a cycle commonly repeats.

Whether and how much the use, or lack, of remedial sanctions contributes to population pressures in Reception Centers, or can alleviate them, is an open question of great significance, as is the question of how best to provide programming that meets the mandates of both lawsuits, the objectives of correcting parolee behavior and increasing successful paroles, and patients' clinical needs.

- Again, the Special Master's team has not yet examined this issue sufficiently. This will be a priority issue in the coming term.

54

### *Armstrong*

*Armstrong* governs reasonable accommodations in a broad array of processes, services, and programs for CDCR prisoners and parolees. Quite a number of *Armstrong* and *Valdivia* remedial plan requirements or interpretations are of a similar nature. The Special Master has not undertaken a detailed comparison to determine whether there are nuanced differences in these provisions.

Most broadly, *Armstrong* requires CDCR not to discriminate against disabled persons. Discrimination in the parole revocation arena may take the form of excluding the disabled parolee, delaying a hearing or other process, or not providing a reasonable accommodation such that a parolee is limited in accessing, understanding, or participating in the process.

*Armstrong* employs a number of detailed methods to ensure that protections are provided and documented. Both cases require tracking for different categories of parolees with disabilities or difficulty communicating or participating, and informing parolees' counsel of these issues. Both recognize the need for relevant policies and procedures, simplified forms, and requiring that revocation hearings be held within 50 miles of the violations alleged.

A key requirement common to both cases is an obligation to provide equally effective communication to parolees with conditions that limit their ability to understand and participate in written and oral communication. This may involve, for example, parolees with vision or hearing impairments, speakers of languages other than English, those with limited literacy, and those with impaired comprehension by virtue of developmental disability or mental illness. *Armstrong* also requires staff to document the

methods used for effective communication and an assessment that the parolee understood.

The accommodation and effective communication requirements apply at all stages of the revocation process – notice, attorney interviews, hearings, and remedial sanctions. As noted, Plaintiffs were successful in recently establishing with the *Armstrong* court that the absence of an effective tracking mechanism results in systematic failures to provide effective communication. As described in detail in the Remedial Order Requirements section above, Plaintiffs have numerous concerns about effective communication procedures at all steps and about reasonable accommodations requiring delayed hearings. They also object to exclusions from remedial sanctions programs, either by physical layout, program design, or by local policy, and they issued a Notice of Violation in January 2006.

- The Special Master has reviewed these issues only to the extent described above and will monitor implementation ongoing.

## Summary

The past two years in this case may best be characterized as a period of exceptional and steady progress. Massive changes have been made in brief periods of time. Plaintiffs' attorneys and Defendants have generally worked cooperatively toward identifying problem areas and working through to potential solutions.

56

It appears that significant progress has been made in *Valdivia*, particularly in addressing the clear constitutional due process violations. Certainly representatives of both parties must share in the credit for that progress.

Dedication and personal investment in implementing *Valdivia* requirements well are evident among key personnel throughout BPH, DAPO, Institutions Division, and CalPAP. Staff take a quality improvement approach to the work, continuously assessing for successes and deficiencies and taking thoughtful, well-reasoned steps in response. They anticipate and plan for staffing, auxiliary staffing, physical plant, data needs, and other impacts--a critical component of success. Similarly, interviews with line parole officers and supervisors suggest that they are doing their best to make the process work.

Also notable is the CDCR creation of the *Valdivia* Task Force, a group whose membership includes representatives from all parts of CDCR who have even a tangential interest or role in managing *Valdivia* requirements. The Task Force meets weekly, serves as a means of keeping all informed of progress and issues, troubleshoots problems, develops strategy, coordinates the different parts of the organization, and brings department-wide resources to bear as needed. The Task Force benefits from contributions from Parole and Institutions Case Records, Facilities Management, Enterprise Information Systems, Transportation, Court Compliance Unit, Office of Legal Affairs and the Attorney General's Office, ADA Compliance Unit, and the California Correctional Peace Officers Association.

Successes have been accomplished in an unsettled environment. In 2006, there have been personnel changes in the offices of CDCR's Secretary, Undersecretary,

Director of Adult Operations, Director of Adult Parole Operations, Executive Director of the Board of Parole Hearings, as well as others, and multiple times in some of these positions. Many of the present occupants of these positions are in "Acting" status. Such leadership turmoil often leads to stagnation in an organization, but it appears that the *Valdivia* Task Force has been able to help provide stability for the efforts of those responsible for meeting the requirements of the *Valdivia* Remedial Order. This detailed project management on the part of CDCR seems to have maintained the progress toward resolution of *Valdivia* issues.

It is highly recommended that the *Valdivia* Task Force be continued and supported by the CDCR administration.

The CDCR has also made remarkable progress in a brief period of time in addressing the logistical challenges inherent in establishing the capability to hold timely hearings across the state. Thirteen Decentralized Revocation Units have been built, equipped, and networked and staff have designed and carried out a transportation system between these facilities and county jails. County jails have been equipped with telephone and fax lines to conduct telephone hearings; space has been acquired from counties for hearings and attorney interviews; and telephonic translation services have been made available when an in-person translator is not available. Large numbers of staff have been hired and trained. Existing staff in multiple divisions have been given a wide variety of trainings in *Valdivia* requirements and the relationship to their duties, and procedures have been implemented to enhance coordination and information sharing across these divisions. Substantial numbers of forms, policies, procedures, guidelines, and training

materials have been developed and efficiencies were gained through processes such as computerizing subpoena issuance.

The provision of counsel through CalPAP and the meeting of the due process deadlines have improved much more than would be anticipated just a year into full implementation. Concurrently, there are notable vignettes of failure to be fully compliant with the timelines of the Remedial Order, as well as quite a number of open questions as to whether, in practical application, what is provided is substantively sufficient. Yet, both parties should be pleased that a unique and responsible system has been established and is performing very well overall.

Recent agreed-upon revisions to the monitoring plan, to include a venture into self-monitoring on the part of the Defendants, provides some expectation of movement toward compliance. It will also serve well as a key to sustaining a compliant system and to demonstrating the ability to fully assume responsibility for the system without need of court supervision once other requirements have reached substantial compliance.

Data collection, primarily data from RSTS and the CalPAP information systems, is unusually sophisticated for an early effort. Yet, there are significant improvements yet to be made and these are critical to reaching and tracking remaining goals, to demonstrating compliance more fully, and to future sustainability. The reliance on paper-based revocation packets has presented challenges in informing all concerned on a timely basis, while maintaining the expected timeframes. The State has explored and is encountering multiple obstacles to instituting electronic packets, though it anticipates introducing a pilot in summer 2006 as part of a CDCR-wide five-year planning project. Although not likely to be a near-term solution, the eventual migration to dominantly

electronic packets would greatly enhance timely communication and ease the ability to meet timeframes.

Remedial sanctions, as required by the Remedial Order, are non-existent in most areas of the state, and have limited use in other areas of the state. CDCR does manage a number of programs that are primarily serving inmates transitioning out of prison. It is possible that some of the spaces in those programs or the expansion of those programs to serve as alternatives to revocation could be easily used. Certainly the exploration of alternatives so as to meet the spirit of the remedial sanctions portion of the *Valdivia* Remedial Order should be undertaken. A new plan was requested of the Defendants in a July 4, 2006 letter and is anticipated by November 30, 2006.

The Special Master's team will concentrate during the next term on assisting in the development of definitions of substantial compliance (quantitative and qualitative); reviewing the issues stated earlier that require enhanced monitoring; assessing the anticipated new Remedial Sanctions Plan; and encouraging continued improvement in those critical due process areas.

### Recommendations

The Special Master makes the following recommendations:

1. Because of the critical need to structure compliance activities, demonstrate compliance, and exercise effective internal oversight, Defendants must provide additional resources to make information system application changes for the purposes of data collection, analysis, aggregation, and management reports, and other modifications as needed by the Special Master and the Court, with input from Plaintiffs. The effort should be coordinated with the information system changes underway pursuant to the *Armstrong* court's order, to avoid unnecessarily duplicative or contradictory effort, and so that the changes serve the purposes of both remedial plans on the issues they have in common. To the extent that DAPO and BPH determine that certain of these functions can best be accomplished by modifying DAPO's information

60

system, sufficient resources must also be available for that purpose. Major modifications will be needed in RSTS and likely in other databases.

Planning for these changes must be initiated within 60 days of this order. Defendants must provide to the Special Master and Plaintiffs periodic reports on the progress of these changes; the first of these should be due six months after the date of this order, and every six months thereafter until the Special Master determines the improvements are complete The system changes must be completed within two years of this order.

2. To establish and demonstrate the state's ability to fully assume responsibility for overseeing *Valdivia* policies and procedures long-term, the state must institute and maintain the infrastructure needed for self-monitoring, staffed by subject matter experts working in a department outside of the departments being reviewed. There must be staffing and resources sufficient to conduct site visits, assessments, and quality improvement efforts at the Decentralized Revocation Units, contracted jail facilities, contracted legal services for parolees, CDCR and non-CDCR facilities providing remedial sanctions, and other facilities and services falling under the auspices of the *Valdivia* remedies.

Although not a formal recommendation, the Special Master recognizes that some factors have been key to Defendants' successes to date. First is the use of an interdisciplinary and interagency structured approach to the oversight of implementing and institutionalizing the *Valdivia* remedies, with participation from agency and department representatives with authority sufficient to enact, and make budget decisions about, agreed-upon changes, policies, and practices. Equally important is a well-structured system of providing attorney representation that includes coordinated statewide coverage; an adequate number of attorneys, administration, and support staff; initial and ongoing attorney training; close oversight of attorneys, including quality improvement; information systems and other infrastructure sufficient for coordination of the panel and oversight of its activities; flexible response to program changes; coordination with CDCR and county jail operations; and program administrators serving

in an integral role in CDCR's interagency oversight and in party negotiations of policy and implementation issues.

CDCR is highly encouraged to continue interdisciplinary and interagency oversight, and administration of attorney representation with the features described.


Respectfully submitted,

DATED: September 11, 2006

_/s/_Chase Riveland

Chase Riveland
Special Master

62

[i] Special Master's analysis of reports titled RAD Important Dates Report Summary 12/05-4/06; Valdivia Time Frame Violations Date Assigned Over 6 Days, 1/05-12/05

[ii] Special Master's analysis of email from Mary Swanson to parties' counsel dated 6/14/06, forwarding analysis by John Dirks of expedited probable cause hearings and revocation hearings

[iii] These numbers and observations are based on comparison of the reports titled Closed Case Summary from 9/1/05 through 4/30/05

[iv] Defendants' Compliance Report, dated May 5, 2006, pp. 6-8

[v] Special Master's analysis of the reports titled Monthly Workload from 9/1/05 through 4/30/05 – number of parolees in columns COP (continue on parole) and Dismiss at this step, as a percent of total holds

[vi] Monthly Workload (separate report run for each month spanning 9/05-4/06, printed 5/11/06); Plaintiffs' analysis of same, tested by Special Master

[vii] These numbers and observations are based on Special Master's analysis of the reports titled Monthly Workload from 9/1/05 through 4/30/05 and interviews with Rick Winistorfer, Rhonda Skipper-Dotta, Michael Brady, and Katherine Nelson

[viii] Numbers and observations based on interviews with various Defendants and on the Special Master's analysis of the following reports: NOR Timeliness by DRU from 9/1/05 through 2/28/06 (each month's reports run on 3/10/06), NOR Timeliness by DRU from 3/1/06 through 3/31/06 (run 4/28/06), RAD report titled Valdivia Time Frame Violations Notice of Charges Over 3 Days from 1/05 through 12/05 (unknown run date, probably in Feb. 2006, Special Master used only data from 6/05 forward), and RAD report titled Valdivia Time Frame Violations Notice of Charges Over 3 Days from 1/06 through 4/06 (run 5/25/06)

[ix] Plaintiffs' Response to Defendants' First Compliance Report pp. 33-34, citing April and May 2006 monitoring reports

[x] CalPAP report: REVOCATION HEARINGS OVER 35 DAYS (separate reports run for each month spanning 4/06-6/06, printed July 28, 2006)

[xi] Special Master's analysis of CalPAP reports titled RAD Over 35 Day Valdivia Time Frame Compliances from 12/1/05 through 3/31/06

[xii] CalPAP report: REVOCATION HEARINGS OVER 35 DAYS, Reporting Period June 1-30, 2006; dated July 28, 2006

[xiii] CalPAP report: REVOCATION HEARINGS OVER 35 DAYS, Reporting Period June 1-30, 2006; dated July 28, 2006. This latter report does not distinguish whether cases closed at a step earlier than a revocation hearing were completed timely for that step, as long as they were completed by the 35-day point.

[xiv] Special Master's analysis of reports titled PCH Statistics – All DRUs (separate reports run for each month spanning 9/05-1/06, printed 2/7/06), (separate reports run for each month spanning 2/06-4/06, printed 5/30/06)

[xv] Id.

[xvi] Id.

[xvii] Defendants' Compliance Report Exhibit F

[xviii] Special Master's analysis of reports titled Remote PCH Sites (Counties) dated 10/05, 11/05, 12/05 and 4/06, and spreadsheet file-named PCH Expansion Chart

[xix] Special Master's team analysis of organizational charts provided in July 2006

[xx] Defendants' Compliance Report pp 22-23, Exhibit V

[xxi] Discussion in this section is based on Defendants' Compliance Report pp. 24-25 and telephone conference with Dan Carvo, June 14, 2006

[xxii] Plaintiffs' Response to Defendants' First Compliance Report pp. 34-35

[xxiii] Defendants' response to request for information from Deputy Special Master Campbell, dated May 24, 2006

[xxiv] Defendants' Compliance Report p. 26

[xxv] See DAPO Memorandum of May 7th 2004, re: Policy 04-13 which describes SATCU and DAPO Memorandum of September 2nd, 2005 re: Policy 05-13 and Local Jail contracts from Kern County and Tulare Pretrial Facility

[xxvi] See DAPO Memorandum of May 7th 2004, re: Policy 04-13 which describes SATCU and DAPO Memorandum of September 2nd, 2005 re: Policy 05-13

[xxvii] Defendants' Compliance Report Exhibit Z

[xxviii] This information comes from interviews with parole agents by Deputy Special Master Campbell and Special Master Riveland

[xxix] Referrals numbers in the preceding two paragraphs are based on the Special Master's analysis of the reports titled Monthly Workload from 9/1/05 through 4/30/05

# EXHIBIT K

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date  :  September 2, 2005

To  :  Regional Parole Administrators          Policy No: 05-13
       District Administrators
       Unit Supervisors

Subject:  **POLICIES AND PROCEDURES FOR THE IN CUSTODY DRUG TREATMENT PROGRAM**

At the direction of the Youth and Adult Correctional Agency, the California Department of Corrections and Rehabilitation (CDCR), Division of Adult Parole Operations (DAPO), was tasked with redesigning the Substance Abuse Treatment Control Unit to enhance public safety for parole violators who require substance abuse intervention. Effective September 1, 2005, the DAPO will implement the In Custody Drug Treatment Program (ICDTP).

Placement into the ICDTP is intended for parolees who have committed violations as a result of drug or alcohol related dependency and/or have a need for a period of confinement and treatment to get their substance abuse under control. This will not constitute a break in parole and the parolee will remain eligible for discharge consideration per Penal Code (PC) Section 3001.

The ICDTP will operate under Health and Safety Code Sections 11561 (male), and 11563 (female) which allow the Board of Parole Hearings (BPH) to place a person in an in-custody drug treatment program for up to 90 days when there are reasonable grounds to believe that he or she is addicted or habituated or in imminent danger of being addicted or habituated to controlled substances or alcohol. The law further states that no parolee may be placed in such a program against his or her will.

The ICDTP will utilize existing personnel and resources to create a more structured and successful drug treatment program for parolees in need of rehabilitation. The ICDTP components include a 60-day in-custody, educationally based, drug treatment phase immediately followed by a mandatory 30-day residential aftercare treatment phase and transitions into a 60-day community based treatment phase.

The 60-day in-custody component of the ICDTP will be accomplished by establishing contracts between municipalities and the DAPO (Attachment A). The Contra Costa County Office of Education (CCCOE) will provide an enhanced education based Substance Abuse Treatment and Recovery (STAR) program Monday through Friday to parolees housed in the ICDTP facilities. The CCCOE curriculum will include:

- ◆ Process of Addiction
- ◆ Framework for Recovery
- ◆ Twelve-Step Methodology

- ◆ Anger and Violence
- ◆ Life Skills Management
- ◆ Family Dynamics

* CDC 1617 (3/89)

**10/27/05 256**

Regional Parole Administrators
District Administrators
Unit Supervisors
(Policies and Procedures for the In Custody Drug Treatment Program)
Page 2

- Addiction Self Assessment
- Assertive Communication
- Developing Healthy Relationships
- Chemical Dependency/Family
- Disease Concept of Addiction
- Relationships: Myths/Styles
- Understanding the Emotional Self
- Community Transition Planning
- Rage, Recidivism and Recovery
- Dysfunctional Family Roles
- Adult Children of Alcoholics
- Anger: Creating New Choices
- Increasing Self Esteem
- Behavior Modification
- Drugs and Violence
- Commitment to Change
- Community Resources
- Psychopharmacology
- Pathway to Change
- Anger Reduction
- Relapse Prevention
- Motivation
- Addictive Relationships
- Cognitive Restructuring

The 30-day residential aftercare treatment program component will be provided by community based organizations contracted through the Substance Abuse Services Coordinating Agency (SASCA) in each of the four parole regions. The SASCA contractor will also provide case management services to the parolee while housed in the in-custody program.

Upon completion of the 30-day residential aftercare treatment program, the SASCA contractor will refer the parolee to community based programs; i.e., Alcoholics Anonymous, Narcotics Anonymous, free services in nonresidential clinics, alumni aftercare groups, for a mandatory 60 days of participation, and notify the Agent of Record (AOR) of the program location(s). The AOR will approve of and monitor performance in the 60-day community based treatment phase portion of aftercare.

## INCLUSIONARY CRITERIA

Placement into ICDTP requires a parolee to have a nexus to current substance abuse and/or a history of substance abuse related criminal or violation offenses. Providing this criterion is met, the following may also be considered on a case by case basis:

- Prior conviction of a "serious felony" as defined in PC Section 1192.7(c).
- Diagnosed under Correctional Clinical Case Management System who fit local custody criteria.

## EXCLUSIONARY CRITERIA

Parolees who meet the following criteria shall not be considered eligible for ICDTP placement:

- Prior conviction of a "violent felony" as defined in PC Section 667.5(c).
- Current violation(s) being referred is/are found in the California Code of Regulations, Title 15, Division 2, Section 2616(a)(14).
- ICDTP local facility restrictions; i.e., psychiatric, medical, validated gang members.

Regional Parole Administrators
District Administrators
Unit Supervisors
(Policies and Procedures for the In Custody Drug Treatment Program)
Page 3

- Parolees required to register under PC Section 290.
- Reside in counties where residential aftercare treatment services are not available.
- Pending court date at the time of Unit Supervisor (US) recommendation for ICDTP placement.
- Parole violators arrested in a county outside of their own except when the ICDTP facility would be the same as his or her own county (Attachment B).
- Active United States Immigration and Naturalization Service holds, Interstate cases or Civil Addict cases.
- Have less than 120 days remaining on parole.

## SUPERVISION LEVEL OF PAROLEES

Parolees will be maintained on the caseload of the AOR while in the ICDTP. Once submitted to the US, the case will remain on "active" status and will be reduced to minimum supervision for the remainder of the 60 days of "in-custody" phase. Once the parolee is released from the 60-day ICDTP, the parolee will return to their previous classification, unless otherwise stipulated by the US. During the 30-day residential aftercare treatment phase and subsequent 60-day community based treatment phase, the parolee will be maintained at the designated supervision level unless stipulated by the US.

## DISCIPLINARY ISSUES

Parolees shall be referred to the BPH for willful failure to follow instructions, and/or participate in the ICDTP in-custody, residential and community aftercare treatment phases of the program. During the 60-day in-custody phase, the ICDTP Parole Agent (PA) II will notify the AOR of program failures/disciplinary issues via an Activity Report (CDCR 1502). During the 30-day residential aftercare treatment phase, the SASCA will notify the AOR directly within 24 hours of program failures/disciplinary issues. During the 60-day community based treatment phase, the AOR will be required to monitor and provide disciplinary action based on supervision specifications. The AOR will be responsible for disciplinary actions through all phases of ICDTP. The AOR and US will have discretionary authority on non-willful program failures.

## RELEASE PROCEDURES

Parolees will be released from the ICDTP facility following successful completion of 60 days in-custody at the ICDTP facility. Release dates must occur Monday thru Friday; i.e., if the 60th day occurs on Saturday or Sunday, parolee is to be released prior to the weekend. The ICDTP PA II will remove the PC 3056 parole hold and ensure parolees are released on the appropriate release date. The ICDTP PA II will further coordinate the post release recommendations with the SASCA and STAR staff and notify the AOR of the 30-day residential aftercare treatment program. The SASCA contractor is responsible to arrange for transportation from the ICDTP facility to the residential aftercare treatment provider location.

Regional Parole Administrators
District Administrators
Unit Supervisors
(Policies and Procedures for the In Custody Drug Treatment Program)
Page 4

## LINES OF RESPONSIBILITY FOR ICDTP ELIGIBLE CASES

**Agent of Record:**

When a violation occurs, the AOR will evaluate all case factors and recommend an appropriate sanction. When ICDTP is determined to be the appropriate sanction, the following procedures will apply:

- Case conference with the US within 24 hours of PC 3056 parole hold.
- Complete Charge Report (CDCR 1502b) and submit to US for probable cause determination within 48 hours.
- Submit ICDTP Referral Package (refer to page 6) recommending placement into a local ICDTP within 6 business days.
- Monitor ICDTP progress and provide disciplinary action based on further violations.
- Approve of and monitor performance in the 60-day community based treatment phase.

**Unit Supervisor:**

- Confirm that the AOR applied the criteria appropriately when conferencing the case.
- Determine whether the ICDTP is an appropriate sanction for the parolee.
- Make a probable cause determination within 48 hours of PC 3056 parole hold and immediately forward field file to the Notice Agent for Americans with Disabilities Act review and notice of charges. (Notice Agent will notify parolee of charges within three business days following PC 3056 parole hold).
- Make appropriate entries in Revocation Scheduling and Tracking System.
- Review Violation Report, stamp or write "ICDTP" on top of CDCR 1676 Charge Sheet and forward to appropriate Decentralized Revocation Unit (DRU).

**Valdivia Parole Administrator:**

- Maintain communication with the ICDTP PA II regarding available bed space at area ICDTP facilities.
- Review violation referrals to determine eligibility and ensure all necessary documentation is attached.

**Decentralized Revocation Unit Staff:**

- Forward Valdivia Parole Administrator's recommendation and ICDTP referral package to the Deputy Commissioner (DC) at the Return to Custody Assessment for review. If approved, case will be scheduled for a Probable Cause Hearing (PCH) for final approval.
- At the conclusion of the PCH, prepare a list of DC approved ICDTP placements.
- Fax list of DC approved ICDTP placements to CDCR Transportation, ICDTP PA II, and Institutional Health Care Services.

Regional Parole Administrators
District Administrators
Unit Supervisors
(Policies and Procedures for the In Custody Drug Treatment Program)
Page 5

- Deliver the placement list, along with ICDTP referral package, to Institutional Case Records (excluding Los Angeles and Santa Rita County Jails).

**Note:** The BPH has the sole authority to approve placement into the ICDTP. Any cases disapproved for placement shall continue in the revocation process.

**Transportation Unit:**

Upon faxed receipt of the approved ICDTP placement list, the Transportation Unit will:

- Fax to the ICDTP PA II and Institutional Case Records confirmation of the scheduled transport date from the DRU to the ICDTP facility.
- Transport parolees from the DRU to the appropriate ICDTP facility within five business days following BPH action.
- Process ICDTP parolee participants for intake into ICDTP facility in accordance with local booking procedures.

**Institutional Case Records:**

Upon receipt of approved placement list and ICDTP referral package, Case Records will:

- Utilize established procedures to prepare the parolee(s) for transportation to the ICDTP Facility, within five business days following the BPH action.

**ICDTP Parole Agent II:**

The ICDTP PA II will coordinate and manage the overall delivery of services to parolees at the ICDTP facility, to include:

- Review daily facility bookings to determine ICDTP bed availability and notify Parole Administrator at DRU of available beds.
- Monitor and verify parolee participation, including each parolee's conduct and compliance with conditions of parole.
- Verify all parolee CDCR numbers and names.
- Conduct an orientation to incoming parolees regarding the ICDTP.
- Provide the CCCOE/STAR instructor(s) with a list of ICDTP parolees in the facility.
- Maintain constant communication with the SASCA and STAR instructor regarding parolees' participation, progress, post release recommendation and any program failures.
- Notify AOR of program failures/disciplinary issues via an Activity Report (CDCR 1502) during the 60-day in-custody phase.
- Coordinate the post release recommendations with the SASCA and STAR staff and notify the AOR of the approved program/location.
- Ensure parolees are released on the appropriate release date.

Regional Parole Administrators
District Administrators
Unit Supervisors
(Policies and Procedures for the In Custody Drug Treatment Program)
Page 6

- Perform jail liaison duties that include tracking in and out of custody movement.
- Meet with the jail commanders to discuss problems no less than one time per month.
- Prepare a daily movement sheet and fax to the Regional Offender Based Information System operator.
- Assist SASCA with transportation of parolee from the ICDTP facility to the 30-day residential aftercare treatment program as needed/available.

**Substance Abuse Services Coordinating Agency:**

- Provide case management to parolees during the 60-day in-custody phase and 30-day residential aftercare treatment phase.
- Coordinate the post release recommendations with the ICDTP PA II and STAR staff, and identify appropriate 30-day residential aftercare treatment program.
- Provide/arrange transportation for parolee from the ICDTP facility to the 30-day residential aftercare treatment program.
- Notify AOR within 24 hours of program failures/disciplinary issues during the 30-day residential aftercare treatment phase.
- Refer the parolee to a mandatory 60-day community based treatment program and notify the AOR of the program/location.

**Assistant Regional Administrator or Designee:**

- Supervise the ICDTP PA II.
- Ensure ICDTP beds are operating at capacity.
- Maintain communication with the Valdivia Parole Administrator on issues related to the ICDTP.

## ICDTP REFERRAL PACKAGE:

- Charge Sheet (CDCR 1676), (Attachment C)
- Legal Status Summary (CDCR 188), (Attachment D)
- Parole Violation Disposition (CDCR 1244), (Attachment E)
- Central Office Calendar Decision (BPT 1130), (Attachment F)
- Charge Report (CDCR 1502b), (Attachment G)
- Witness Determination (CDCR 1654), (Attachment H)
- Notice of Return to Prison (CDCR 1018), (Attachment I)
- Placement Acknowledgement Form (CDCR 1420) – Blank, (Attachment J)
- Notice of Rights (BPT 1100), (Attachment K)
- Request for Witnesses (BPT 1100(b)) (Attachment L)
- Notice and Request for Assistance at Parole Proceeding (BPT 1073), (Attachment M)
- Supporting/evidentiary documents, if applicable; i.e., police reports, lab results, etc.
- Absconders Waiver, if applicable (BPT 1102), signed by the parolee, (Attachment N)

**10/27/05 261**

Regional Parole Administrators
District Administrators
Unit Supervisors
(Policies and Procedures for the In Custody Drug Treatment Program)
Page 7


Training related to the ICDTP Policy and Procedures will be made available to parole agents
per the contract agreement. If you have any questions, please contact Ken Skolnik, Program
Manager, DAPO, at (916) 327-4541, or Karen Johnson, Associate Governmental Program
Analyst, DAPO, at (916) 324-0962.


JIM L'ETOILE
Director
Division of Adult Parole Operations

Attachments

cc:  K. Skolnik
     K. Johnson

Regional Parole Administrators
District Administrators
Unit Supervisors
(Policies and Procedures for the In Custody Drug Treatment Program)
Page 8


bcc:  M. Kalvelage
      J. Harris
      G. Rodriguez
      F. Haywood
      R. Ambroselli
      W. Bulda
      D. Stone
      M. Phillip
      G. Lehman
      D. Kenneally
      C. D'Arcy
      M. Brady
      J. Van De Erve
      K. Nelson
      J. Rodriquez
      L. Sauceda
      L. Macias-Price

ATTACHMENT A

**Contracted ICDTP Facilities Effective September 1, 2005:**

| CONTRACT LOCATIONS | BED ALLOCATIONS | STAR TEACHERS (Ratio Aprox 30:1) | PA II SUPERVISION (Ratio Aprox 60:1) |
|---|---|---|---|
| **Region I** | | | |
| Kern County Jail – Lerdo Facility<br>17695 Industrial Farm Road<br>Bakersfield, CA 93308 | 64 | 2 | 1 |
| Tulare County Adult Pre-Trial Facility<br>36650 Road 112<br>Visalia, CA 93277 | 50 | 2 | 1 |
| *Total* | *114* | *4* | *2* |
| **Region II** | | | |
| Del Norte County Jail<br>650 Fifth Street<br>Crescent City, CA 95531 | 20 | 1 | 1 |
| San Francisco County Jail<br>425 7th Street<br>San Francisco, CA 95035 | 30 | 1 | 1 |
| Santa Clara County Jail<br>701 S. Abel Street<br>Milpitas, CA 95035 | 100 | 3 | 2 |
| *Total* | *150* | *5* | *4* |

**Proposed ICDTP Facilities After September 1, 2005:**

| CONTRACT LOCATIONS | BED ALLOCATIONS | STAR TEACHERS (Ratio Aprox 30:1) | PA II SUPERVISION (Ratio Aprox 60:1) |
|---|---|---|---|
| **Region III** | | | |
| Location and Facility Contractor TBD | 175 | 6 | 4 |
| *Total* | *175* | *6* | *4* |
| **Region IV** | | | |
| Location and Facility Contractor TBD | 68 | 2 | 1 |
| Location and Facility Contractor TBD | 68 | 2 | 1 |
| *Total* | *136* | *4* | *2* |

| | |
|---|---|
| Total statewide bed allocations effective Sep. 1, 2005 = 264 | |
| Total proposed bed allocations after Sep. 1, 2005 =    311 | |
| Total statewide bed allocations  = | *575* |

10/27/05 264

ATTACHMENT B

# IN CUSTODY DRUG TREATMENT PROGRAM MATRIX

| ELIGIBLE COUNTY | DECENTRALIZED REVOCATION UNIT | 60-DAY ICDTP / STAR FACILITY | 30-DAY RESIDENTIAL SASCA AFTERCARE CONTRACTOR | 60-DAY COMMUNITY BASED PROGRAM |
|---|---|---|---|---|

### REGION I

| | | | | |
|---|---|---|---|---|
| Fresno County | Wasco State Prison | Tulare Co Adult Pre-Trial Facility | WestCare | NA, AA, Etc. |
| Kern County | Wasco State Prison | Lerdo Jail Facility | WestCare | NA, AA, Etc. |
| Tulare County | North Kern State Prison | Tulare Co Adult Pre-Trial Facility | WestCare | NA, AA, Etc. |

### REGION II

| | | | | |
|---|---|---|---|---|
| Alameda County * | Santa Rita County Jail | Santa Clara County Jail | CenterPoint | NA, AA, Etc. |
| Contra Costa County * | San Quentin State Prison | Santa Clara County Jail | CenterPoint | NA, AA, Etc. |
| Del Norte County | San Quentin State Prison | Del Norte County Jail | CenterPoint | NA, AA, Etc. |
| Humboldt County | San Quentin State Prison | Del Norte County Jail | CenterPoint | NA, AA, Etc. |
| Marin County * | San Quentin State Prison | Santa Clara County Jail | CenterPoint | NA, AA, Etc. |
| Napa County * | San Quentin State Prison | Santa Clara County Jail | CenterPoint | NA, AA, Etc. |
| San Francisco County* | San Quentin State Prison | Santa Clara County Jail | CenterPoint | NA, AA, Etc. |
| San Mateo County * | Santa Rita County Jail | Santa Clara County Jail | CenterPoint | NA, AA, Etc. |
| Santa Clara County * | Santa Rita County Jail | Santa Clara County Jail | CenterPoint | NA, AA, Etc. |
| Santa Cruz County * | Santa Rita County Jail | Santa Clara County Jail | CenterPoint | NA, AA, Etc. |
| Solano County * | San Quentin State Prison | Santa Clara County Jail | CenterPoint | NA, AA, Etc. |
| Sonoma County * | San Quentin State Prison | Santa Clara County Jail | CenterPoint | NA, AA, Etc. |
| * Females from County | Valley State Prison Women | San Francisco County Jail | CenterPoint | NA, AA, Etc. |

### REGION III

| | | | | |
|---|---|---|---|---|
| Los Angeles County | Los Angeles County | TBD | Walden House | NA, AA, Etc. |

### REGION IV

| | | | | |
|---|---|---|---|---|
| Orange County | Calif. Institution for Men | TBD | Mental Health Systems | NA, AA, Etc. |
| Riverside County | Calif. Institution for Men | TBD | Mental Health Systems | NA, AA, Etc. |
| San Bernardino County | Calif. Institution for Men | TBD | Mental Health Systems | NA, AA, Etc. |
| San Diego County | RJ Donovan State Prison | TBD | Mental Health Systems | NA, AA, Etc. |