# EXHIBIT L

**Chase Riveland**
**Office of the Special Master**
*Valdivia v. Schwarzenegger*

5714 Deer Harbor Rd.
Box 367
Deer Harbor, WA 98243
Tel: (360)376-2870
Fax: (360)376-2879
E-mail:
riveland@rockisland.com

July 4, 2006

VIA EMAIL

Benjamin T. Rice                    Michael Brady
Deputy Attorney General            Project Manager
1300 "I" Street                    Litigation Management Unit
PO Box 944255                      California Department of Corrections
Sacramento, CA 94244-2550          and Rehabilitation
                                   1515 K Street, Suite 520
                                   Sacramento, CA 95814

RE: *Valdivia v. Schwarzenegger*

Dear Mr. Rice and Mr. Brady:

This letter is to confirm our discussion at the joint meeting in Sacramento on June 26, 2006. Defendants have not succeeded in using remedial sanctions as described in the Stipulated Order for Injunctive Relief, and plans to date do not demonstrate a reasonable probability of meeting that goal. We agreed that the Defendants are to prepare a new remedial sanctions plan, to be presented to the Special Master and the Plaintiffs' attorneys no later than November 30, 2006.

That plan should include any changes in programs, policies, or courses of action that meet the spirit and the projected numbers of the original remedial sanctions plan. It may include any of the programs currently in use, as well as others CDCR would like to propose. The plan must include specific details concerning the programs to be offered; the populations for which they are designed; the logistics required to design, fund, contract for, and oversee the programs, including training of BPH and DAPO staff in using them; and anticipated timelines for each of those steps.

It is my intention that CDCR's departments have the opportunity to determine a plan most workable for them. You are encouraged to seek input from the Special Master's team and Plaintiffs' attorneys as you draft the plan, and I anticipate we will have joint

discussions after you have submitted it in November. I expect that this deadline will provide sufficient time. If CDCR does not submit a plan by that time, or it does not account for an adequate number of programming slots and sufficient means to establish and operate them, I will recommend to the Court that CDCR be ordered to generate such a plan on a short timeline thereafter.

I look forward to working with you on this.

Sincerely yours,

/s/ *Chase Riveland*

Chase Riveland
Special Master

CC: Ernest Galvan: Rosen, Bien & Asaro
    Michael Bien: Rosen, Bien & Asaro

# EXHIBIT M

**EDMUND G. BROWN JR.**
Attorney General

*State of California*
**DEPARTMENT OF JUSTICE**



1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: (916) 445-9555
Telephone: (916) 445-4979
Facsimile: (916) 324-5205
E-Mail: Katherine.Nelson@doj.ca.gov

February 7, 2007

*Via Electronic Mail*

Virginia L. Morrison, Deputy Special Master
One Cedar Avenue
Kentfield, CA 94904

Nancy M. Campbell, Deputy Special Master
8232 Hansen Road NE
Bainbridge Island, WA 98110

Chase Riveland
Riveland Associates
5714 Deer Harbor Road, Box 367
Deer Harbor, WA 98243

RE:     *Jerry Valdivia, et al. v. Arnold Schwarzenegger, et al.*
        USDC-ED Case No. 2:94-CV-0671 LKK GGH P

Dear Counsel:

Pursuant to agreements reached at the December 15, 2006 all-parties meeting, Defendants hereby submit to the special masters the attached informational bulletin from CDCR regarding programs and services currently available to and/or plans to provide programs and services to California's parolee population. This informational piece in no way obligates Defendants to provide the programs or services described in the document either through the Valdivia lawsuit or otherwise unless previously ordered by the Court. On February 15, 2007, Defendants will provide the special masters with a remedial sanctions plan.

If the special masters disagree with Defendants interpretation of the December 15

February 7, 2007
Page 2

agreement, Defendants ask that the special masters return the document to Defendants with
instructions clarifying the special masters expectations regarding this informational piece.

Thank you for your prompt attention to this matter.

Sincerely,

*/s/ Katherine Kylin Nelson*

KATHERINE KYLIN NELSON
Deputy Attorney General

For    EDMUND G. BROWN JR.
Attorney General

KKN:kp

CC:    Ernest Galvan, Esq.
       Michael Bien, Esq.
       Donald Specter, Esq.

30217961.wpd

# Division of Adult Parole Operations
## Informational Report to the Special Master

## February 6, 2007

### Purpose

The following is a broad overview of programs and initiatives that the Department of Adult Parole Operations (DAPO) is currently and/or plans to engage in to achieve its mission. This informational update is provided upon request of the Special Master in the Valdivia lawsuit. Its purpose is to provide the Special Master's team and plaintiffs' attorneys with adequate information to understand the many activities that DAPO is engaged in.

The programs and activities described here are meant to foster improved parolee adjustment; as a secondary effect, they often serve to prevent the need for revocation. Some programs are currently used as remedial sanctions; some will be newly used for parolees facing possible revocation as well as other parolee populations. Others support the objectives of improving behavior and thereby reducing recidivism but fall outside the remedial sanctions required by Valdivia. Their inclusion here is for information only and does not indicate agreement that they fall within the purview of this lawsuit.

This document will describe the programs and their uses in general terms. Most detail concerning funding, contracting, training, implementation, and measurement will be described in a separate document, the revised Remedial Plan scheduled for submission to the Special Master's team and plaintiffs' attorneys in February 2007.

### Overview and Philosophy

In Fiscal Year (FY) 2005/06, the California Department of Corrections and Rehabilitation (CDCR) embarked upon a substantive change in philosophy and direction. It began to formally recognize the connection between its public safety role and the need to provide offenders with the skills and treatment necessary for successful reintegration into their communities. CDCR began to refocus on rehabilitation through programming and the implementation of evidence-based practices.

According to the US Department of Justice Bureau for Justice Statistics, California leads the nation in the percentage of offenders returned to prison for parole violations. This population represents approximately 60 percent of all admissions to California prisons. The DAPO is committed to reducing recidivism by implementing proven evidence-based practices. Through accurate assessment parolees can be matched to effective interventions that are designed to modify behaviors that decrease a parolee's chance of recidivating. We believe we can achieve

the delicate balance of maintaining public safety while assisting offenders to successfully reintegrate back into their communities and thus, reduce the recidivism rate.

In support of its renewed emphasis on rehabilitation, CDCR's FY 2006/07 budget contains 52.8 million dollars in funding for new or expanded programming for adult offenders. All funded programs support recidivism reduction and community reintegration. Funded programs fall within four phases of a continuum of services: community (prior to commitment to the CDCR), institution, structured reentry, and community reintegration. Programs are initiated at different stages in an offender's re-entry process. The most effective strategy to facilitate rehabilitation is a continuum of services from incarceration through parole. These programs represent a first step toward the goal of developing a delivery system which offers a continuum of services, periodic outcome evaluations, and constant adjustments in programming throughout the duration of the offender's commitment to the criminal justice system.

The Division of Adult Parole Operations (DAPO) is committed to achieving the CDCR mission by enhancing community safety through providing a period of supervision and incentives following an offender's release from state prison. The mission of DAPO is to maximize public safety and facilitate effective re-entry through the utilization of evidence-based programs, services, and practices designed to assist an offender's reintegration into the community. Effective reintegration into the community is accomplished through the accurate assessment of the risk and needs of the offender population, strategic intervention, and a balanced approach to parole supervision and discharge practices. To achieve our mission, DAPO combines an array of program resources with the commitment of dynamic and motivated parole staff, service providers, law enforcement, local and state governments, and communities.

DAPO's goals include implementing:

- Risk and needs assessment tools that provide accurate and timely information about services needed for community adjustment and required level of supervision
- The use of graduated sanctions and positive reinforcement
- Decisions, programs, and parolee oversight based on evidence of decision-making and practice

Methods to achieve these goals include:

- Educating parole staff regarding the use of evidence-based recidivism reduction strategies and alternatives to revocation;
- Changing the culture within DAPO to reflect a balanced approach to public safety and rehabilitation;
- Modifying decision-making about revocation/continuation of parole so that it relies on a decision-making matrix – recognized as nationwide correctional best practices – and providing organizational support for its use
- Including a cross section of DAPO professionals, subject matter experts, case-working Agents, Parole Agents' Association of California (PAAC) leadership and the Board of Parole Hearings (BPH) supervisors and staff in the development and implementation of these objectives

## Proposed New Programs and Initiatives

### Graduated Sanctions/Parole Violation Matrix

In an effort to implement an effective approach to recidivism reduction, DAPO is developing a decision-making matrix to assist the Agent of Record (AOR) and his/her supervisor when confronted with a parolee that has violated the terms of parole or committed a new offense. The matrix will provide more consistent decision making and provide an array of actions that should be taken when adjudicating parole violations.

The DAPO will draw on the experience of other jurisdictions that have successfully implemented similar matrixes. This will begin immediately. Once designed, the matrix will be piloted at selected sites throughout the state. The tentative date for a regional pilot project is fall 2007.

### Community-Based ICDTP

The DAPO has developed a new In-Community ICDTP methodology that allows parolees to participate in the same treatment program while remaining in the community. Rather than utilizing local jails, community facilities are used. This is beneficial because it avoids incarceration which is both expensive, difficult to find secure facilities that have space and eliminates the problem of restrictions in secure settings that do not support treatment strategies. It should also be easier to site the programs in a wide range of communities throughout the state. Although ICDTP facilities may not be located in all counties, they will be able to serve parolees from virtually any community in the State. The DAPO and the BPH are also exploring policy changes to permit more parolees to participate in such programs outside their home counties (see New Policies and Procedures, below). Adding the community ICDTP will create access for parolees in all Regions of the State.

### Community Based Coalition

Currently, the Los Angeles area has a large population of homeless parolees which will be targeted for services. In an effort to address the problems of this population, the DAPO has partnered with the Community Based Coalition (CBC) in developing a collaborative pilot program between the DAPO and CBC to provide housing and support services for parolees in Los Angeles. This program is still in the developmental stages and may be used for parolees facing revocation or for other parolee populations. The CBC will provide services such as housing, family and group counseling, case management services, substance abuse counseling, community outreach and referrals to partner agencies that will provide employment readiness and job placement, life skills development, treatment and recovery services and assistance with transportation. These services shall be provided by the contractor on a referral basis. The CBC shall provide and/or refer parolees to licensed residential and transitional housing facilities that will serve both male and female participants in non-coed environments. The length of stay shall not exceed 180 days. Case management, including individual case assignments, development of

individual service treatment plans, development of discharge plans that include culturally appropriate peer support, family engagement and reunification, independent community living arrangements, both transitional and permanent aftercare, and community outreach partnerships are all aspects of the CBC.

The goal of the CBC is to provide services to approximately 500 parolees annually. It is anticipated that 250 residential and transitional housing beds will also be available to parolees in need. This program will assist DAPO in addressing the issue of homeless parolees who have shown to be at a high risk of re-offending and being returned to prison.

| Title: Community Based Coalition | Division/Unit: DAPO |
|---|---|
| Contact Person: Fred Haywood | Phone: 327-4451 |

| Issue Number: (For Reducing Recidivism BCP Only) | Positions | Funding (in thousands) |
|---|---|---|
| | 6.0 | $4,000 |

Do you have positions to fill?  YES  X   NO _____   If yes, identify each position separately on the chart shown below.  Add more rows if necessary.

| Classification | Location | Position # | 607# | Effective Date (Date position was effective in BCP/Finance Letter) | Date Position Filled (Date employee started) If position is not filled, but work is being completed through the use of temp help or overtime, indicate below and attach supporting documentation. |
|---|---|---|---|---|---|
| AGPA | Region II | 061-935-5393-200 | 06-03286 | 7/1/2006 | Not filled |
| AGPA | Region II | 061-935-9353-201 | 06-03289 | 7/1/2006 | Not filled |
| AGPA | Region III | 061-983-5393-200 | 06-02220 | 7/1/2006 | Not filled |
| AGPA | Region III | 061-983-5393-201 | 06-02254 | 7/1/2006 | Not filled |
| AGPA | Region IV | 061-984-5393-200 | 06-01844 | 7/1/2006 | Not filled |

Do you have purchases to make?  YES _____   NO  X   If yes, identify each purchase separately on the chart shown below.  Add more rows if necessary.  For Reducing Recidivism BCP, make sure that purchases are made to the correct PCA Code.

| Purchase | PCA Code Charged to | Amount Approved in BCP | Purchase Order # | Actual Cost of Purchase |
|---|---|---|---|---|
| | | | | |

Do you have contract funding?  YES  X   NO _____   If yes, identify each contract separately on the chart below. Add more rows if necessary.  For Reducing Recidivism BCP, make sure that purchases are made to the correct PCA Code.

| Contract Issue | Target Date for Contract Implementation | PCA Code Charged to | Amount Approved in BCP | Amount included in Contract in FY 2006-07 | Projected Cost in FY 2006-07 |
|---|---|---|---|---|---|
| The Service Contract Section released the Invitation for Bid on the Department of General website on 12/8/06. The bidders conference will be held on 1-4-07 with the bid opening date of 2-5-07. | 2/20/2007 | 30207 | $3,345,024 | | $3,345,024 |
| | | | | | |

Are there any issues that will delay implementation of this program:  YES _____   NO  X   If yes, specify the issues, how they will be addressed, and any major activities here.  The bidders' conference was held on January 4, 2007.  The bid opening date for this project will be extended until February 5, 2007 due to additional questions/concerns that raised at the bidders' conference.  The anticipated start date for this project is February 20, 2007.

## Existing Programs to Be Expanded to Include Parolees Facing Revocation

The following are programs that may be made available to parolees in the revocation process:

**Parolee Services Network**

The Parolee Services Network (PSN) provides substance abuse treatment and recovery services for eligible parolees (felons and civil addicts) in Alameda, Contra Costa, Fresno, Kern, Los

Angeles, Marin, Napa, Orange, Riverside, Sacramento, San Bernardino, San Diego, San Francisco, San Mateo, Santa Clara, Solano, and Sonoma. Counties. The PSN is a collaborative program among the DAPO, Department of Alcohol and Drug Programs, 17 county alcohol and drug programs, case management providers, and community-based organizations. Each parole district maintains a listing of available programs located in their immediate area that provide the parolee population with services.

Current funding for FY 2006/2007 is $11,183,092 for 991 program slots. PSN is fully staffed and operating. There are no plans to expand this program, but it will be made available to parolees facing revocation.

DAPO staff has been trained on all PSN policies and procedures which were disseminated via the CDCR network and during classroom instruction given at the unit level.

**Parole Service Centers**

The Parole Service Centers (PSC) are used as a residential option for eligible parolees. The PSCs provide transitional housing, community resources, life skills, and support services. The PSC provides services to newly paroled inmates with no available resources, as well as homeless parolees, and parolees seeking stability. They have also been used to support parolees who have completed remedial sanctions such as ICDTP and who need additional support. The PSC program has an initial placement of 90 days, not to exceed one year. PSCs will now be made available to parolees facing revocation.

Currently, the DAPO contracts with providers to operate the PSC's. As of January 1, 2007, there are 23 contracts in place with a total of 819 beds statewide. The current annual funding for the 819 beds in FY 2006/2007 is $17,637,165. The DAPO is preparing to release an Invitation for Bids for an additional 216 beds, which will produce a total of 1,035 beds in 07-08. At $59/bed day, that will raise our obligated funding to a total of $22,349,790. Our budget allocation for PSC contracts is $24,531,911, which will allow us to contract for an additional 104 beds.

The DAPO staff has been trained on all PSC policies and procedures which were disseminated via the CDCR network and during classroom instruction given at the unit level.

**Day Reporting Centers**

Day Reporting Centers (DRC) address the needs of parolees at increased risk of violating their parole and/or returning to custody. DRCs are already in place, additional centers are funded, and we are seeking funding for further expansion. This resource will be available to parolees who might otherwise be revoked, among other parolee populations.

The DRC is a voluntary program and is considered a "one-stop" parolee resource center. At the DRC, staff conduct a comprehensive intake evaluation and assessment to determine an offender's needs. The tool used in this process is the evidence-based, "Level of Service

Inventory-Revised" (LSIR) assessment instrument. COMPAS is not an assessment instrument that is used during the violation/revocation process.

A variety of services are offered at the DRC. These services may include, but are not limited to, substance abuse counseling, individual, group, and family counseling, relapse prevention, vocational and employment services, job search skills, educational services, anger management, and life skills. The DRC operates between the hours of 6:00 a.m. and 10:00 p.m., seven days per week. Transitional housing is also available for qualified parolees.

By December 2006 the DAPO had one DRC operational in Fresno County. The DAPO continues to solicit proposals and expects to have DRCs operating in a total of six counties statewide by summer 2007, for a total of 600 program slots.

The current FY 06/07 budget for DRCs is $10,300,000 for 900 slots, of which 200 are currently contracted statewide. CDCR recognizes that the funding reflects use both as a parole supervision tool and as a remedial sanction. DAPO staff has been trained on all DRC policies and procedures disseminated via the CDCR network and during classroom instruction given at the Unit level.

| Title: Day Reporting Center | | | | Division/Unit: DAPO/Program Develop. Unit | |
| Contact Person: Fred Haywood | | | | Phone: 327-4457 | |

| Issue Number: (For Reducing Recidivism BCP Only) | | Positions | Funding (in thousands) |
|---|---|---|---|
| | | 0.0 | $700 |

Do you have positions to fill?  YES___  NO__X__  If yes, identify each position separately on the chart shown below.  Add rows if necessary.

| Classification | Location | Position # | 807# | Effective Date (Date position was effective in BCP/Finance Letter) | Date Position Filled (Date employee started) If position is not filled, but work is being completed through the use of temp help or overtime, indicate below and attach supporting documentation. |
|---|---|---|---|---|---|
| | | | | | |
| N/A | | | | | |
| | | | | | |

Do you have purchases to make?  YES___  NO__X__  If yes, identify each purchase separately on the chart shown below.  Add more rows if necessary.  For Reducing Recidivism BCP, make sure that purchases are made to the correct PCA Code.

| Purchase | PCA Code Charged to | Amount Approved in BCP | Purchase Order # | Actual Cost of Purchase |
|---|---|---|---|---|
| | | | | |

Do you have contract funding?  YES___  NO___  If yes, identify each contract separately on the chart below.  Add more rows if necessary.  For Reducing Recidivism BCP, make sure that purchases are made to the correct PCA Code.

| Contract Issue | Target Date for Contract Implementation | PCA Code Charged to | Amount Approved in BCP | Amount Included in Contract in FY 2006-07 | Projected Cost in FY 2006-07 |
|---|---|---|---|---|---|
| The IFB has been advertised on the DGS web site as of 11-01-06. The bid was opened on 12-06-06. The lowest bidder was Behavioral Interventions. The site inspection was performed on 12-21-06. Contracts is in the process of sending this contract to DGS for final approval. | 1-01-07 | 30207 | $700,000 | $700,000 | $700,000 |

Are there any issues that will delay implementation of this program:  YES__X__  NO___  If yes, specify the issues, how they will be addressed, and any major activities here.  The anticipated activation date for the Day Reporting Center in San Diego may be delayed due to the Contractor requiring additional information.  The new anticipated start date will be February 1, 2007.  The total allocation for this project is $700,000 (half-year funding).  In FY 07/08 the total funding for this project will be $1.4 million.

**Residential Multi-Service Centers**

The Residential Multi-Service Center (RMSC) program was established as part of the Preventing Parolee Crime Program (PPCP) as mandated by Penal Code Section 3068. The RMSC program's primary goal is to reduce parolee failure and a subsequent return to prison by providing a variety of services to homeless parolees and those in at-risk living environments. The RMSC program offers a variety of services to male and female parolees that include housing, drug counseling, literacy training, job preparation/placement, anger management classes, as well as individual and group counseling. The program offers up to six months of residence with participation in a 90-day aftercare program. Parolees will be considered ineligible if they have backgrounds of extreme violence(Penal Code 667.5 (c)), arson, sex offenses (Penal Code Section 290 Registrants), or are in need of medical detoxification.

The RMSC program currently operates ~~fourteen~~ sixteen contracts for a total of ~~522~~ 689 beds in nine separate counties which include Alameda, Fresno, Kern, Los Angeles, Sacramento, San Diego, San Francisco, San Joaquin, and Yolo. An additional 40 beds in Kern and San Francisco are pending contract award.

~~A re-bid opening was conducted on Dec. 18, 2006 for 207 beds. This process would include adding 25 beds in Region I (Bakersfield), 15 beds in Region II (San Francisco) and 167 beds in Region III (Los Angeles).~~ Fiscal Year 2006-2007 contracted funding for these 729 beds totals $12,254,071 (partial year funding on 207 beds). Total funding available for RMSC contracts is $15,289,204. The DAPO anticipates advertising for approximately 46 additional beds prior to the end of the current fiscal year for a total of 775 beds. ~~This would leave 114 beds that can be advertised by DGS for interested bidder once these contracts are finalized.~~

As part of CDCR Female Reform Master Plan, a gender-responsive Female Residential Multi-Service Center (FRMSC) program is in development. A Request for Proposal (RFP) for 75 beds is scheduled to be released February 1, 2007, with an activation date of May 1, 2007. The RFP proposes three 25-bed sites in the counties of Fresno, San Bernardino, and Santa Clara.

DAPO staff has been trained on all RMSC policies and procedures which were disseminated via the CDCR network and through classroom instruction given at the unit level.

**Female Residential Multi-Service Centers**

The objective of the FRMSC program is to promote safe environments where female offenders are treated with dignity and respect and receive gender-responsive services. The program delivers wrap-around services which facilitate successful community living in a crime and drug free lifestyle. Employment services, family relationship counseling, and gender specific services are also provided.

The DAPO currently has a FMRSC bid for contracts in Fresno, San Bernardino, and Santa Clara for a total 75 bed expansion. DAPO has been approved for an additional 500 bed expansion statewide for FY 2007/2008. The approved funding for the 500 bed expansion is $13,000,000.

| Title: Female Residential Multi-Service Center—Gender Specific | Division/Unit: Division of Adult Parole Operations |
|---|---|
| Contact Person:  Fred Haywood | Phone: (916) 327-4451 |

| Issue Number:<br>(For Reducing Recidivism BCP Only) | Positions | Funding (in thousands) |
|---|---|---|
| | 1.0 | $1,670 |

**Do you have positions to fill?** YES _X_ NO____  If yes, identify each position separately on the chart shown below.  Add more rows if necessary.

| Classification | Location | Position # | 8D7# | Effective Date<br>(Date position was<br>effective in<br>BCP/Finance Letter) | Date Position Filled<br>(Cost employee started) If<br>position is not filled, but work<br>is being completed through<br>the use of temp help or<br>overtime, indicate below and<br>attach supporting<br>documentation. |
|---|---|---|---|---|---|
| Associate Governmental Program Analyst | DAPO HQ | 061-025-5393-200 | | October 1, 2008 | N/A |

**Do you have purchases to make?** YES ____ NO _X_  If yes, identify each purchase separately on the chart shown below.  Add more rows if necessary.  For Reducing Recidivism BCP, make sure that purchases are made to the correct PCA Code.

| Purchase | PCA Code Charged<br>to | Amount Approved<br>in BCP | Purchase Order<br># | Actual Cost of<br>Purchase |
|---|---|---|---|---|
| N/A | | | | |

**Do you have contract funding?** YES _X_ NO____  If yes, identify each contract separately on the chart below. Add more rows if necessary.  For Reducing Recidivism BCP, make sure that purchases are made to the correct PCA Code.

| Contract Issue | Target Date for<br>Contract<br>Implementation | PCA Code Charged<br>to | Amount Approved<br>in BCP | Amount Included<br>in Contract in FY<br>2006-07 | Projected Cost in<br>FY 2006-07 |
|---|---|---|---|---|---|
| 25 BEDS | 1-Apr-07 | 30207 | $   1,800,000 | | $       243,750 |
| 25 BEDS | 1-Apr-07 | 30207 | | | $       243,750 |
| 25 BEDS | 1-Apr-07 | 30207 | | | $       243,750 |

**Are there any issues that will delay implementation of this program:** YES _X_ NO____  If yes, specify the issues, how they will be addressed, and any major activities here.   Documents for Request for Proposal forwarded to the Office of Contract Services (OCS) on August 3, 2006.   The mandatory bid process requires approximately 7 months.   The OCS has indicated that the Invitation for Bid (IFB) will be released on February 1, 2007 and that contracts will be awarded by April 1, 2007.  However, additional delays may be encountered as the result of protests and other administrative issues, e.g., issues concerning conditional use permits, result of site inspections, local permits, and CDCR staffing levels.  Although every effort has been made to minimize impediments, many issues which may cause delays in program implementation are beyond the control of the department.  The Program Development Unit received authority to begin the hiring process effective October 1, 2006.  Advertising for the ADPA position via post and bid was completed; the post and bid process failed.  Interviews were held on December 4, 2006; however, none of the candidates were eligible for appointment to an AGPA position.  Advertising for an interchangeable SSA/AGPA position to enhance recruitment efforts began on December 15, 2006.  Amount approved in BCP reflects full year funding.

## Existing Remedial Sanction Programs

### In-Custody Drug Treatment Program

The In-Custody Drug Treatment Program (ICDTP) is utilized by the DAPO and the BPH as an alternative sanction to revocation for parole violators. Once fully implemented, the present ICDTP funding level provides for approximately 500 beds annually. Currently, the DAPO has contracted for 288 ICDTP beds. An additional contract for 150 beds (120 male/30-female) in Region III/ Los Angeles County and for 75 beds (60-male/15-female) in Region IV/Orange County is being sought with an expected start date of July 1, 2007. The 150-bed site in Region III will be of a new "In-Community" design with a private contractor due to the shortage of available jail beds in Los Angeles.

ICDTP is a three-phase 150-day program where the parolee-participant completes a 60-day in-custody Substance Abuse Treatment and Recovery (STAR) program, followed by a mandatory 30-day residential program in the community, followed by a 60-day outpatient program. Placement into the ICDTP is intended for parolees who have committed violations as a result of drug or alcohol related dependency and/or have a need for a period of confinement and treatment to get their substance abuse under control. Participation in this program does not constitute a break in parole and the parolee will remain eligible for discharge consideration after a 12-month continuous parole period.

The DAPO continues to aggressively seek out jail bed contracts with local municipalities in the four parole regions and has also developed a new scope of work to contract with private contractors for in-custody and residential beds (Phases I and II) where jail beds are unavailable. Further, the DAPO has requested an increase to ICDTP funding to deploy a total of 800 beds in all four Regions to include additional female and rural area beds. Once fully implemented, ICDTP will service 4,000 parolee-participants annually.

**Current** - Currently contracted ICDTP Beds are as follows:

| REGION | ICDTP FACILITY | BEDS | ELIGIBLE COUNTIES |
|---|---|---|---|
| REGION I | Kern County Jail | 64 Male | Kern |
| | Tulare County Jail | 50 Male | Tulare, Fresno |
| REGION II | Del Norte County Jail | 20 Male | Del Norte, Humboldt, Lake, Mendocino |
| | San Francisco County Jail | 30 Female | Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo, Santa Clara, Santa Cruz, Solano, Sonoma |
| | Santa Clara County Jail | 100 Male | Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo, Santa Clara, Santa Cruz, Solano, Sonoma |
| REGION III | TBD | | |
| REGION IV | Chula Vista City Jail | 24 Male | San Diego |
| Total Bed Capacity: | | 288 | |

**Expansions** – Additional contracts in Regions III and IV and with county and private contractors are underway. The following table represents the planned expansion in all four Regions of the ICDTP for a total of 800 beds statewide by years end, 2007:

| REGION | ICDTP FACILITY | BEDS | ELIGIBLE COUNTIES | SCHEDULED COMMENCEMENT DATE |
|---|---|---|---|---|
| REGION I | Tulare County Jail | 30 Female | Tulare Fresno, Madera, Merced | July 1, 2007 |
| | Fresno | 30 Male | Fresno | July 1, 2007 |
| REGION II | Del Norte County Jail | 10 Male | Del Norte, Humboldt, Lake, Mendocino | July 1, 2007 |
| | San Luis Obispo | 30 Male | San Luis Obispo, Santa Barbara, Santa Cruz, Monterey | July 1, 2007 |
| REGION III | Los Angeles | 150 Male 30 Female | Los Angeles | July 1, 2007 |
| REGION IV | Orange County Jail | 90 Male 16 Female | Orange | April 1, 2007 |
| | Location and Facility TBD | 90 Male 30 Female | San Bernardino, Riverside | July 1, 2007 |
| Total Expansion Bed Capacity: | | 506 | | |
| Total Statewide Bed Capacity: | | 800 | | |

There have been many obstacles to fully implementing the in-custody ICDTP. County sheriffs have indicated that the reasons they can't contract for ICDTP beds include:

- overcrowded jail conditions,
- a shortage of deputy jail staff,
- and insufficient/non-competitive Daily Jail Rate (DJR) offered by the State.

To date, the DAPO has been successful in contracting for only 288 beds. Further, a shortage of residential community-based program beds for Phase II has prevented expansion in various rural counties.

**Electronic In-Home Detention**

The use of Electronic In-Home Detention (EID) devices provides another remedial sanction program for parole violators. Not only as a remedial sanction, the EID will be used in conjunction with and complement other supervision tools and service referrals. The EID program is used for parolees who commit minor parole or law violations or for those who are pending a Not-In-Custody hearing. The DAPO will amend current EID policy to expand the eligible parolee population and criteria. This expansion will include allowing the placement of an EID unit on a parolee prior to a violation occurring. This will allow the AOR greater supervision and the ability to control behavior which typically results in a violation of parole. Additionally the expansion will authorize the utilization of EDI as a remedial sanction to a previously excluded parolee population. DAPO is also investigating the possibility of contracting cell phone supported vendors to enhance the number of units deployed in the field.

Currently, there are 500 EID units available statewide with an annual program capacity of 4,055 parolees. Existing funding for EID is $1,202,133 annually.

The DAPO staff has been trained on all EID policies and procedures. The training component included documentation of EID placement and actual application of EID units and equipment. The DAPO shall ensure that EID training is incorporated into the DAPO Parole Agent Academy.

**Parolee Substance Abuse Program**

The Parolee Substance Abuse Program (PSAP) is a remedial sanction program composed of a 90-day in-custody educational drug treatment phase followed by a 90-day voluntary community aftercare. The 90-day in-custody phase is an educationally-based cognitive behavioral drug and alcohol abuse rehabilitation program for male parolees at the Folsom Transitional Treatment Facility. The curriculum used is the Deciding, Evaluating, Understanding, Counseling, Educating (D.E.U.C.E.) curriculum model. The model is presented in three 30-day phases, with an evening independent study component.

Currently, there are 200 PSAP beds available; in them, the program is to designed to annually serve 800 male parolees who have committed violations as a result of drug or alcohol related dependency and/or have a need for a period of confinement and treatment to get their substance

13

abuse under control. In addition, PSAP provides parolees completing and/or graduating from the program the opportunity to participate in substance abuse treatment in the community. This phase of the program is managed by the Substance Abuse Services Coordination Agency.

Current funding for FY 2006/07 is $1,111,153 for 200 beds. Funding for each of FY 06/07, 07/08 and 08/09 is $1,111,153, for a total contract of $3,333,459. There are no plans to expand the PSAP operation.

DAPO staff has been trained on all PSAP policies and procedures which were disseminated via the CDCR network and during classroom instruction given at the unit level.

## Existing Programs and Activities That Support Remedial Sanctions

### Risk and Needs Assessments Through a Validated Research-Based Tool

The Parole Planning and Placement (PPP) Program provides proactive involvement, within the institutional setting, in establishing and solidifying parole plans for inmates prior to their release to the community. The PPP team obtains pertinent information about offenders and utilizes this information to complete a criminogenic risk and needs profile, as well as to develop a specific re-entry plan that maximizes a parolee's opportunity to successfully reintegrate into the community. The PPP Program is currently operational within all 33 California state prisons with specifically assigned and funded staff of over 50 sworn and support personnel. PPP staff is responsible for facilitating the re-entry plans of inmates and creating a linkage to community resources and services to assist in stabilizing newly released parolees. The PPP Program has developed a network of local community resources, governmental services, educational opportunities, and treatment programs for parolee referrals and treatment placements.

DAPO recognizes recidivism reduction begins with accurate risk and need assessment prior to release back into the community. DAPO has secured the Correctional Offender Management Profiling for Alternative Sanctions (COMPAS),which is a database/program assessment with the capability to adapt to the dynamic and ever changing needs of the parolee population. (COMPAS) is a nationally recognized risk/needs assessment tool which is by correctional facilities and county jails throughout the country. The utilization of the COMPAS tool will enhance parole supervision by providing parole agents research-based risk and needs assessment data which can be used in post-release program planning.

A basic COMPAS program was used in a pilot implementation program from July 1 through November 30, 2005, by PPP staff to establish a "norm" for the California offender population. Upon conclusion of the COMPAS pilot project and after extensive analysis of its feasibility, a decision was made to incorporate COMPAS into the DAPO's cache of tools in its continuing effort to serve the offender population. The PPP program has continued to work closely with the COMPAS developer, Northpointe, and the DAPO's information technology staff, in order to tailor the COMPAS program to meet the unique characteristics and challenges of the California offender population.

After further technological modifications and enhancements, the COMPAS program was deployed statewide in March 2006. In addition, a template was developed within COMPAS that enabled critical offender information to be captured within this program (i.e., residential information, drug of choice, and registration requirements). This information enables the parole agent to accurately assess supervision levels and determine specific service needs of the offender.

## New Policies and Procedures

The DAPO is committed to developing and implementing policies and procedures that reflect sound judgment, incorporate best-practices, and provide for public safety, while providing benefits and services to assist parolees with reintegration into society. Furthermore, DAPO is committed to obtaining input from key stakeholders when reviewing current policy or developing new policy pertaining to the revocation process.

Current policies are being revised to comply with the *Valdivia* permanent injunction and include the following:

- **County-To-County Transfer Policy:** The DAPO realizes that many of its remedial sanction programs are limited to the parole population located in the immediate program area. DAPO is currently reviewing its Transfer Investigation Request (TIR) policy with regard to parolees in need of a specific program that may not be available within their respective county of last legal residence. The goal is to develop policy that removes the geographic restrictions placed on some programs and increase the accessibility of remedial sanction programs to all parolees. The DAPO is committed to removing obstacles that can restrict a parolee's ability to be placed in a reentry or remedial sanction program, despite its location within California.
- **Change in DAPO Redaction Policy:** The DAPO has been working collaboratively with the Special Master and the plaintiff's attorneys to develop policy and practices that ensure the due process rights of parolees are upheld throughout the revocation process. The DAPO is currently revising its redaction policy with the goal of providing attorneys un-redacted information in a timely manner as necessary to create an appropriate defense for their clients.

## Updated Staff Training

The DAPO is committed to ensuring that all Field Unit Notice Agents (FUNA) and Decentralized Revocation Unit Notice Agents (DRUNA) receive training on all aspects of the *Valdivia* process, to include notice of rights, effective communication, and reasonable accommodation. Additionally, any new training shall incorporate the latest policies and procedures, as well as any additional information regarding disability accommodation equipment usage. Approximately 23 FUNAs and DRUNAs have been recently hired and are in need of the required training. The Americans With Disabilities Act/Revocation Unit is currently coordinating with each Regional Training Coordinator to schedule the necessary training. Initial implementation of the training shall begin in late January 2007.

15

The DAPO is also committed to ensuring staff are continually trained in all aspects of the *Valdivia* Remedial Plan. This training was initially delivered to all DAPO staff in early 2000. However, recognizing the need to ensure that staff is up-to-date on current issues related to *Valdivia*, and standards and practices, the DAPO is currently developing a curriculum with the goal of providing initial, refresher, and updated training to all DAPO staff on *Valdivia* issues within the next 60 days.

## Information Technology Advancements

DAPO understands the importance of utilizing current technologies to enable effective decision-making and modifying inefficient processes that create the inability to maintain due process timelines. Moreover, effective use of technologies enhances the DAPO's ability to comply with all aspects of the *Valdivia* Remedial Plan. The DAPO and the BPH are committed to further enhance the Revocation Scheduling and Tracking System (RSTS) to better meet the *Valdivia* requirements, including demonstrating decisionmaking about remedial sanctions at all related decision points, and demonstrating the actual use of these measures. Additionally, the DAPO and the BPH have initiated a study on the feasibility of Revocation Packet scanning, with the ultimate goal of enabling immediate electronic access to documentation and records required for the revocation process.

### *Revocation Scheduling and Tracking System Program Updates*

On November 13, 2006, the court ordered the BPH and the DAPO to implement a change request to RSTS by May 13, 2008, as recommended by the Special Master. There are approximately 26 change requests at this time. After meetings between the BPH and the DAPO, a decision was made to contract all of the change requests to Riley Consulting, with State staff implementing four of the simple change requests in order to gain experience with the contractors. The Special Master change requests were sent to Riley Consulting for an estimate. The project manager has provided the DAPO and the BPH with an estimate for the Special Master change requests to RSTS in time, schedule and costs.

## Program Evaluation Efforts

Mandated by Penal Code (PC) Section 3068, the California State University, San Marcos Foundation evaluated the major service components of the Preventing Parolee Crime Program (PPCP). These include residential multi-service centers, literacy laboratories, substance abuse education, drug treatment networks, employment readiness, and job placement assistance. The consultant released its report to the Legislature in December 2003. The evaluators found that PPCP participants who met treatment goals had a recidivism rate of 15.5 percent for residential multi-service centers, 25.7 percent for the substance abuse network, 26.5 percent for the literacy program, and between 28.5 percent and 33.1 percent for the two employment programs.
The report indicated that residential programs with wrap-around services such as the multi-service centers show a significant decrease in recidivism rates As stated in the PPCP report, parolees who complete treatment goals re-incarcerate at the rate of 15.5 percent within the first

16

12 months following release to parole, compared to 55.2 percent of those parolees who stay less than a month in a RMSC facility.

Effective July 1, 2006, the DAPO initiated an additional project with the California State University, San Diego Foundation, to evaluate selected programs that have either been in operation or are new program initiatives. This two-year program evaluation will include the ICDTP, Day Reporting Centers (DRC), and the PSC and is tentatively scheduled to be delivered in December 2008.

**Supporting Medically and Mentally Impaired Parolees**

In July 2006 the DAPO implemented a pre-parole program to assist offenders who have medical or mental health challenges and who may not have a family support system in the community. Research has shown that offenders who have physical or mental disabilities are more likely to be homeless and/or live in unstable environments. This program utilizes contracted social workers (benefits workers) within the prisons to apply for and secure federal and state benefit entitlements prior to an inmate's return to the community. Benefit entitlements addressed in this program include Social Security benefits, such as Social Security Supplemental Security Income or Social Security Disability Income, California state-sponsored Medi-Cal benefits, and Veterans Affairs benefits.

The program also utilizes contracted staff within the prisons to plan and coordinate necessary community-based care for inmates in need of medical and/or in-patient mental health services upon release (e.g., hospice, hospital/acute care, skilled nursing/long-term care, board and care/assisted living, in-home health care, dialysis, oxygen [intermittent and continuous], chemotherapy, and medications).

By directing parole services to those inmates who are medically, mentally, or developmentally disabled, enduring a long-term illness, or have reached the age of 65 years or older, the DAPO is taking a proactive parole supervision approach. In collaboration with the California Department of Health Services, the United States Social Security Administration, and the United States Veterans Affairs, the CDCR is also entering into formal agreements with these respective agencies to establish pre-parole benefits. It is estimated that approximately 17,000 or 15 percent of the annual paroling population will apply for services utilizing this program. The DAPO modeled this benefits program from existing programs in other states, with proven success as evidenced by a 2005 federal grant study.

17

**Clinical Services for Mentally Ill Patients**

In July 2006 the DAPO began enhancing the current Mental Health Services Continuum Program and implementing a "reducing recidivism" program which increases the frequency of clinical services to mentally ill parolees and those identified as being at a high risk of re-offending. A total of 60 new clinical positions have been established to provide an increase in services to this population. Staffed within the Parole offices, these clinical staff members are available to the Agents to assist them when dealing with a parolee who is decompensating from mental health issues.

The target population includes all inmates who are within 90 days of release to parole (approximately 17,000). Intervention through increased frequency of clinical services to parolees and specialized treatment will assist the DAPO in improving successful reintegration into the community

**EXHIBIT N**

**California Department of Corrections and Rehabilitation**
**Division of Adult Parole Operations**
**Remedial Sanctions Plan**
**February 15, 2007**

<u>Purpose</u>

On November 17, 2003, Defendants signed the *Valdivia* Injunction and Remedial Plan agreeing that the California Department of Corrections and Rehabilitation (CDCR) will consider the use of remedial sanctions at every step of the revocation process. In its June 8, 2005, order the court directed CDCR to replace the two specifically named programs from the remedial plan, Substance Abuse Treatment and Control Unit (SATCU) and Electronic Monitoring (EM). The CDCR is committed to complying with the court's order. CDCR has established the In-Custody Drug Treatment Program (ICDTP) as a comparative program to SATCU, and the Electronic In-Home Detention (EID) as a program comparable to EM. In response to Chase Riveland's, Special Master, letter dated July 4, 2006, affording CDCR the opportunity to redraft the remedial sanctions portion of the Remedial Plan, the CDCR submits the following Remedial Sanctions Plan.

Currently, the ICDTP is used as a replacement for the SATCU beds and is used exclusively as a remedial sanction in the revocation process. It will continue to be used as such. The program may be modified in some areas as an "In Community" ICDTP to address the shortage of beds in county and state facilities. CDCR recognizes that its current funding and bed availability for ICDTP is less than that established and funded at the time of the April 11, 2005, memorandum. CDCR will obtain funding by transferring funds between the Division of Adult Institutions to the Division of Adult Parole Operations (DAPO) based on the population reductions realized by diversion of parole violators to programs rather than placement in CDCR institutions. With those funds, CDCR will expand the ICDTP to the same level that was in place prior to April 11, 2005, to the extent that there is a population requiring these services. Additionally, the Parolee Substance Abuse Program (PSAP) is used exclusively as a remedial sanctions program. It will now be dedicated as part of the *Valdivia* Remedial Plan.

In addition, the following programs shall dedicate one-half of their available beds to use as remedial sanctions until such time that the CDCR can reach the level of ICDTP beds required by the June 8, 2005, order:

- Parole Service Centers (PSC)
- Residential Multi-Service Center (RMSC)

However, CDCR recognizes that it has an obligation to the citizens of the state of California not to waste resources. If there are more beds available through these programs than are needed for parolees going through the violation process, the CDCR reserves the right to use the aforementioned programs for parolees on general parole supervision. In addition, CDCR recognizes that the programming needs of the parole population may change. CDCR recognizes its obligation to meet and confer with Plaintiffs and/or obtain authority through the Court or

Special Master to modify the ICDPT or EID programs, as required under the Remedial Plan of the Permanent Injunction.

## Definition of Remedial Sanctions

"Remedial Sanction" is defined as the referral to programs in order to address violations of parole as an alternative to incarceration. Programs include, but are not limited to, those contracted by CDCR and those placements in community self-help outpatient/aftercare programs, and placement in structured and supervised environments.

## Graduated Sanctions/Parole Violation Matrix

The DAPO will develop a decision-making matrix to provide Agents of Record with departmentally supported alternatives for the response to violations of parole. To this end, the CDCR has contacted the National Institute of Corrections (NIC) for technical support as CDCR undertakes the process. The NIC has approved the CDCR's request for assistance. The CDCR is committed to establishing a work-group to design and implement a decision-making matrix. A workgroup will be developed within the next 90 days. The matrix is expected to be developed within a year of formation of the workgroup. Once designed, the decision-making matrix shall be piloted at selected sites throughout the State.

## Remediation of Parole Violations

A violation of parole can be addressed either through placement of a Penal Code (PC) Section (§) 3056 hold or through parole action at the unit level. When a violation of parole occurs, the CDCR must make a determination whether to address the violation through the formal revocation process or whether the violation can be dealt with at the unit level. Direction to a program at the field level should be considered direction to a remedial sanction, despite the fact a PC § 3056 hold has not been placed. Direction to a program at the unit level will now be tracked and reported through the *Valdivia* process. The remedial sanction programs available at this juncture are also available throughout the revocation process. In the event that a parolee accepts referral to a remedial sanction program at the unit level, the parolee shall be Continued-on-Parole (COP) and voluntarily placed into the program.

The California Code of Regulations, Title 15, Division 2 § 2616 and PC § 667.5 and 1192.7 require certain violations to be directed to the Board of Parole Hearings. CDCR shall continue to submit mandatory referrals to the Board of Parole Hearings pursuant to current policy and procedure.

## Programs Used Exclusively as Remedial Sanctions

### In-Custody Drug Treatment Program

The ICDTP is reserved for parolees in the revocation process. Referral to the ICDTP can be made throughout the revocation process as an alternative to revocation for parole violators. The program is intended to assist parolees who have committed parole violations as a result of drug

and/or alcohol related dependency. ICDTP is a 3-phase, 150-day program wherein the parolee-participant completes a 60-day in-custody substance abuse treatment and recovery program, followed by a mandatory 30-day residential treatment program in the community, followed by a 60-day outpatient program.

The current fiscal year (FY) 06/07 budget for ICDTP is $24,206,449 which provides for approximately 513 beds; of which, 288 beds are presently contracted for statewide.

An additional 75 beds (60 male and 15 female) are being negotiated with Orange County that will serve parolees in Orange, Riverside, and San Bernardino Counties. It is anticipated that these additional beds will be operational by December 2007.

A newly developed "In-Community" ICDTP contract is being advertised via an Invitation for Bid (IFB) for 150 beds (120 male and 30 female parolees) in Los Angeles County. It is anticipated that these beds will be operational by August 2007. This IFB solicits private bidders to provide a secured community-based facility that affords the same program components as the county jail ICDTP. Funding for these 513 beds is included in the current ICDTP budget.

CDCR shall contract for an additional 800 ICDTP beds that will provide a mix of jail-based and private beds statewide. Contractors will be sought in metropolitan areas as well as in smaller municipalities that will serve multiple counties and will maximize statewide program coverage. Once fully implemented and operational, ICDTP will provide approximately 1,313 beds statewide.

Until the community-based ICDTP beds are fully operational, CDCR will use the Parole Service Center (PSC) and RMSC programs as remedial sanction. Every PSC and RMSC bed will be available with first priority as a remedial sanction. PSC and RMSC program space left vacant from lack of remedial sanctions use will be used as a parole supervision tool during this interim time. However, at the time ICDTP is fully implemented, a priority will no longer be given to using these programs as remedial sanctions as compared to using them as a supervision tool. Further, PSC and RMSC will no longer be considered a remedial sanction program promised under the Remedial Sanctions Plan of the Injunction as replacement for the SATCU beds.

**Parolee Substance Abuse Program (PSAP)**

The PSAP is a remedial sanction intended to assist parolees who have committed parole violations as a result of drug and/or alcohol related dependency. The program is composed of a 90-day in-custody educational drug treatment program, followed by a 90-day voluntary community aftercare. The 90-day in-custody portion of the program is designated for male parolees at the Folsom Transitional Treatment Facility. PSAP consists of cognitive and behavioral drug/alcohol abuse rehabilitation in a secure environment. Following completion of the in-custody portion of the program, parolees are afforded the opportunity to participate in substance abuse treatment within the community.

The current FY 06/07 budget for PSAP is $1,111,153 for 200 available PSAP beds, with the goal of serving 800 parolees annually

**Parole Service Centers**

The PSC provides parolees with a variety of services, including, but not limited to, individual, group, and family reunification counseling, substance abuse relapse prevention, batterer's program, and community reentry planning. Although this program can be used as a parole supervision tool, the program also serves as a remedial sanction because it provides services to assist parolees who struggle with alcohol and substance abuse.

The current FY 06/07 budget for PSCs is $25,467,169 for 1,140 beds statewide. As outlined in this plan, one-half (570) of these beds will be dedicated to the revocation process until such time as the ICDTP is fully operational.

**Residential Multi-Service Centers**

The RMSC program is intended to reduce parolees' return-to-custody by providing a variety of services to homeless parolees and parolees living in high-risk environments. The program offers parolees residential services for up to 6 months, including participation in a 90-day aftercare program. The RMSC program offers services to male and female parolees including, but not limited to, substance abuse counseling, anger management classes, individual and group counseling, and employment preparation and placement.

The RMSC also offers programs specifically directed toward the female parolee population. The Female Residential Multi-Service Centers (FRMSC) delivers wraparound services as described above; however, the program is tailored to meet the unique needs of female parolees.

There are currently 14 Multi-Service Centers in 9 counties throughout the State. The current FY 06/07 budget for RSMC is $1,600,000 for 70 female beds and $15,289,204 for approximately 775 male beds, of which 522 are presently contracted. As outlined in this plan, one-half (296) of these beds will be dedicated to the revocation process until such time as the ICDTP is fully operational.

**Electronic In-Home Detention**

EID devices provide another casework tool for DAPO's parole agents. The use of EID shall be based upon the need to impose a curfew special condition of parole due to behavior that warrants more intensive parole supervision. The use of EID should be in conjunction with, and compliment, other supervision tools and service referrals.

EID shall be used for parolees who commit minor violations of parole or law, or for those who are pending a Not-In-Custody hearing. Additionally, parolees designated to be in the Correctional Clinical Case Management System (CCCMS) and/or Enhanced Outpatient Program (EOP) who are cleared by a Parole Outpatient Clinic (POC) clinician may participate.

The DAPO shall implement new policies that allow utilization of EID for parolees previously excluded due to their commitment offense and/or criminal history.

4

The use of EID devices may be used as a remedial sanction and when a situation necessitates enhanced supervision for public safety purposes.

The current FY 06/07 budget for EID is $1,202,133 for 500 units. Of these 500 units, DAPO will reserve half the budgeted units (250) strictly for use as a remedial sanction.

## Self-Help Outpatient/Aftercare Programs and Alternative Placement in Structured and Supervised Environments

CDCR has the ability to place parolees in community-based treatment. Programs that meet this requirement are Substance Abuse Treatment and Recovery (STAR), DRC, and Narcotics Anonymous/Alcoholics Anonymous, or other self-help program. These programs serve a dual purpose: they can be used as a parole supervision tool or they can be used as a remedial sanction. The CDCR cannot commit to the number of program beds strictly available for remedial sanctions. Any parolee who meets program eligibility may be considered for placement in a CDCR program as a sanction for a violation of parole.

Due to public safety concerns and parolee needs the CDCR is continually assessing both its programs and contracted services to ensure that they reflect best practices. The court, in oral argument and in its June 8, 2005, Order reinforced the State's authority to use discretion to select what types of programs meet the requirements of these two categories. Therefore, these programs are designed to be flexible to allow for the development or augmentation of existing programs that best serve the needs of the parolee population.

The following is a description of "dual purpose" programs which are currently available for use both as remedial sanctions and as casework services tools.

### Substance Abuse Treatment and Recovery

The STAR program is a remedial sanction intended to assist parolees who have committed parole violations as a result of drug and/or alcohol related dependency. The STAR program provides a 30-day education based program which offers proactive methods to prevent substance abuse relapse. Curriculum components include relapse prevention, recovery from addiction, anger management, and health education.

The current FY 06/07 budget for the STAR program is $2,198,346 for 400 slots. CDCR recognizes that the funding reflects use, both as a parole supervision tool and as a remedial sanction.

### Day Reporting Centers

The DRC is a community-based program which can be used as a parole supervision tool or as an alternative to incarceration when a parolee has violated the terms of his or her parole because the DRCs provide services which address the core reason for the violation of parole. DRC staff develops an individual plan for each parolee to address the needs and services necessary to increase the parolee's success on parole. These services include, but are not limited to, substance

abuse counseling, individual, group, and family counseling, relapse prevention, educational and employment services, sober living, and anger management/life skills education.

The current FY 06/07 budget for DRCs is $10,300,00 for 900 slots. CDCR recognizes that the funding reflects use both as a parole supervision tool and as a remedial sanction.

## Fair Consideration/ Equal Access

In an effort to provide equal access to remedial sanction programs, the CDCR's county-to-county transfer policy will remove geographic restrictions placed on remedial sanction programs and increase the accessibility of remedial sanctions programs to all parolees. The county-to-county transfer policy will allow female parolees access to remedial sanction programs throughout the State.

CDCR shall ensure equal access to remedial sanctions for parolees with disabilities, as outlined in the *Armstrong* Remedial Plan and Americans with Disabilities Act.

## Compliance Measurement

In order to accurately and adequately track compliance with the requirements of the *Valdivia* Injunction and Remedial Plan, the CDCR is dedicated to implementing tracking tools which are necessary to measure compliance.

Changes in the Revocation Scheduling and Tracking System (RSTS) are necessary to document those cases where a parolee is referred to a remedial sanction program at the unit level and continued on parole as an alternative to incarceration. CDCR believes that necessary modifications can be made to RSTS to more effectively track the consideration of remedial sanctions at little or no cost to the State. The CDCR currently utilizes CalParole to document cases where a parolee is continued on parole and a Board of Parole Hearing referral is not warranted.

6

**EXHIBIT O**

1  BINGHAM, McCUTCHEN LLP
   KAREN KENNARD – 141925
2  KRISTEN A. PALUMBO – 215857
   Three Embarcadero Center
3  San Francisco, California 94111-4067
   Telephone: (415) 393-2000
4
   PRISON LAW OFFICE
5  DONALD SPECTER – 83925
   General Delivery
6  San Quentin, California 94964
   Telephone: (415) 457-9144
7
   ROSEN, BIEN & GALVAN, LLP
8  MICHAEL W. BIEN – 096891
   HOLLY M. BALDWIN – 191317
9  ERNEST GALVAN – 196065
   315 Montgomery Street, 10th Floor
10 San Francisco, California 94104
   Telephone (415) 433-6830
11
   Attorneys for Plaintiffs
12

13                    UNITED STATES DISTRICT COURT

14                    EASTERN DISTRICT OF CALIFORNIA

15

16
   JERRY VALDIVIA, et al.,                    No. Civ. S-94-0671 LKK/GGH
17
          Plaintiffs,
18                                            STIPULATION AND ORDER
   v.                                         REGARDING REMEDIAL
19                                            SANCTIONS
   ARNOLD SCHWARZENEGGER, et al.,
20
          Defendants.
21

22

23

24

25

26

27

28

PDF created with pdfFactory trial version www.pdffactory.com

1    THE PARTIES, THROUGH THEIR RESPECTIVE COUNSEL, HEREBY STIPULATE
     AS FOLLOWS:
2

3    WHEREAS:

4        1.    On March 9, 2004, after notice to the class, receipt of objections, and a

5    fairness hearing, the Court approved a Stipulation for Permanent Injunctive Relief in this

6    matter (the *Valdivia* Permanent Injunction"), requiring among other things that "as part of

7    the overall reform of the revocation process, the Parole and Community Services Division

8    of the Department of Corrections will begin using remedial sanctions/community based

9    treatment," including "the Substance Abuse Treatment Control Units, Electronic

10   Monitoring, Self-Help Outpatient/aftercare programs, and alternative placement in

11   structured and supervised environments." *Valdivia* Permanent Injunction, Exhibit A at 1.

12   Defendants set forth a specific goal for remedial sanctions, "to reduce the number of returns

13   to prison for violations of parole by up to 10% in 2004 and by up to 30% by 2006." *Id.* at 2.

14       2.    On June 8, 2005, after notice and a hearing, the Court ruled that "the

15   permanent injunction requires that defendants (1) consider remedial sanctions throughout

16   the new parole revocation process, and that the remedial sanctions include (2) 'the

17   Substance Abuse Treatment Control Units, Electronic Monitoring, Self-Help

18   Outpatient/aftercare programs, and alternative placement in structured and supervised

19   environments.'" (June 8, 2005 Order at 10:7-12.) The Court held that the *Valdivia*

20   Permanent Injunction's "reference to and attachment of the VRP [or *Valdivia* Remedial Plan

21   at Exhibit A]… conforms with the 'four corners rule' as well as Rule 65(d)" and found that

22   Defendants "were in violation of the Permanent Injunction Order by virtue of the

23   elimination of the remedial sanctions of Electronic Monitoring and SATCU." (June 8, 2005

24   Order at 8:12-14; 15:19-21.)

25       3.    Defendants have stated their intention to replace SATCU with In-Custody

26   Drug Treatment Programs ("ICDTP") and Electronic Monitoring with Electronic In-Home

27   Detention ("EID"). Whether and to what extent these new programs are appropriate

28

PDF created with pdfFactory trial version www.pdffactory.com

1   substitutes, and are being implemented in a manner that substantially replaces what was lost

2   when SATCU and Electronic Monitoring were eliminated has not been determined.

3        4.     On July 4, 2006, the Special Master directed Defendants to "prepare a new

4   remedial sanctions plan, to be presented to the Special Master and the Plaintiffs' attorneys

5   no later than November 30, 2006." Specifically, the Special Master stated that "the plan

6   should include any changes in programs, policies or courses of action that meet the spirit

7   and projected numbers of the original remedial sanctions plan," and that "the plan must

8   include specific details concerning the programs to be offered; the populations for which

9   they are designed; the logistics required to design, fund and contract for, and oversee the

10  programs, including training of BPH and DAPO staff in using them; and anticipated

11  timelines for each of those steps."

12       5.     The parties disagree as to the scope of Defendants' obligations pursuant to the

13  Court's June 8, 2005 Order and the *Valdivia* Permanent Injunction, and reserve all rights to

14  resolve this disagreement either with the assistance of the Special Master dispute resolution

15  process or through litigation. The parties agree, however, that certain steps must be taken

16  immediately to ensure timely compliance with the remedial sanctions provisions of the

17  *Valdivia* Permanent Injunction. Defendants contend that the steps recited herein may bring

18  them into substantial compliance with the June 8, 2005 Order. Plaintiffs disagree, and in

19  any event, believe that full compliance with the Permanent Injunction is the important

20  target.

21       6.     The parties have been meeting and continue to meet regularly with the Special

22  Master concerning remedial sanctions. The Special Master joins in the parties' request that

23  the Court enter this Order, in furtherance of the remedial process.

24       THEREFORE, IT IS HEREBY ORDERED THAT:

25  I.  In Custody Drug Treatment Program (ICDTP)

26       A.     Defendants have stated that their goal is to establish 1800 ICDTP beds.

27  Plaintiffs have not agreed that there is any evidence that 1800 ICDTP beds is the

28  appropriate number to ensure that ICDTP is made reasonably available at all stages of the

PDF created with pdfFactory trial version www.pdffactory.com

1  parole revocation process. Defendants represent that approximately 288 ICDTP beds are

2  currently operating as of March 16, 2007. Defendants shall make every effort to make 1800

3  ICDTP beds available for use as remedial sanctions no later than April 1, 2008. In the

4  interim, Defendants shall take the following steps:

5       B.    Defendants shall make every effort to have 150 ICDTP beds operational and

6  available for use as remedial sanctions for parole violators in Los Angeles County no later

7  than August 1, 2007, including at least 30 ICDTP beds designated for female parolees.

8       C.    Defendants shall make every effort to have 90 new ICDTP beds operational

9  and available for use as remedial sanctions in Orange County no later than November 1,

10  2007, including at least 30 ICDTP beds designated for female parolees.

11       D.    In addition to the 528 ICDTP beds discussed above (288 existing plus 150 in

12  Los Angeles County plus 90 in Orange County), Defendants shall take all steps necessary to

13  ensure that they reach 1800 beds by April 1, 2008 in a phased manner. Defendants shall

14  phase in the remaining 1272 beds with the following targets: by November 1, 2007, 424

15  additional beds anywhere in the state; by January 1, 2008, 200 additional beds anywhere in

16  the state; by February 15, 2008, 200 additional beds anywhere in the state; and the balance

17  of 448 beds by April 1, 2008. With the addition of these beds, by April 1, 2008, there shall

18  be no fewer than 400 ICDTP beds per Region, and no fewer than 40 ICDTP beds designated

19  for female parolees in each Region. Defendants represent that they are making and will

20  continue to make special efforts to secure ICDTP beds in underserved areas of Region IV.

21       E.    The figures in this section are not intended to establish any set ratios of male

22  to female beds.

23       F.    Defendants shall periodically report to the Special Master and Plaintiffs'

24  counsel on their efforts to secure the ICDTP beds described herein with the first report due

25  June 1, 2007, and with reports as needed thereafter, and at least every 60 days.

26

27  II.  Electronic In Home Detention (EID)

28       By May 1, 2007, Defendants shall have 500 EID units operational, with 250 of

PDF created with pdfFactory trial version www.pdffactory.com

1  these units dedicated to use as remedial sanctions, and the remaining 250 available for use

2  either in parole supervision or remedial sanctions. CDCR will provide the minimal level of

3  telephone service required for EID as described in DAPO policy no. 07-06 at the discretion

4  of CDCR.

5

6  III. Interim Use of Residential Multi-Service Center (RMSC), Female Residential Multi-

7          Service Center (FRMSC), and Parolee Service Center (PSC)

8       A.     While Defendants are building their ICDTP capacity leading up to 1800 beds

9  by April 1, 2008, Defendants shall make existing and proposed RMSC, FRMSC and PSC

10  beds available for use as remedial sanctions in the manner set forth below.

11       B.     Beginning immediately, and during the above-described phase-in period for

12  ICDTP, Defendants small make one-half (1/2) of all RMSC, FMRSC and PSC beds

13  available as remedial sanctions.

14       C.     Defendants represent that they are making and will continue to make special

15  efforts to secure RMSC, FRMSC and PSC resources in the underserved areas of Region IV.

16       D.     The parties shall meet and confer, on or before April 30, 2008, as to whether

17  and to what extent, the RMSC, FRMSC and PSC programs shall remain available as

18  remedial sanctions.

19       E.     The intent of this section is not to give RMSC, FRMSC, and PSC the same

20  status under the *Valdivia* Permanent Injunction that ICDTP and EID may have.

21

22  IV. Distribution of Policy and Procedure Information

23       A.     Defendants shall undertake to announce, publicize and train the management

24  and staff of DAPO and BPH regarding the availability of ICDTP, RMSC, FRMSC, and PSC

25  beds, as well as EID units for use as remedial sanctions in two phases: an immediate

26  interim phase, and a long-term phase.

27            1.     <u>Interim Memorandum to Field</u>.  By March 30, 2007, Defendants shall

28  provide Plaintiffs' counsel and the Special Master with a draft interim communication to the

PDF created with pdfFactory trial version www.pdffactory.com

1 field regarding the availability of ICDTP, RMSC, FRMSC, and PSC beds and EID Units for
2 use as remedial sanctions, including all information that Defendants believe is necessary to
3 facilitate immediate use of these programs as remedial sanctions, including but not limited
4 to a statement the above-listed programs are available as remedial sanctions, attachment of
5 existing policy and procedure documents regarding their use, existing inclusionary and
6 exclusionary criteria, and lists of the program names, contact information and numbers of
7 beds. The interim memorandum shall also include information regarding other readily
8 identifiable existing programs that are available as remedial sanctions, and a statement as to
9 what populations they are available for, including but not limited to the Department of
10 Addiction Recovery Services SASCA aftercare programs for qualified parolees, the
11 Community Based Coalition (CBC) program in Los Angeles County, and DAPO Day
12 Reporting Centers. The Interim Memorandum to Field shall also include appropriate
13 preliminary information on inter-county transfers, as discussed at Section VI.A, below.
14 Plaintiffs' counsel shall respond to this document no later than April 3, 2007, and
15 Defendants shall distribute it to the field and to the parolee defense panel as soon as possible
16 thereafter.

17          2.    <u>Long-Term Memorandum to Field.</u> Defendants have represented that
18 they intend to undertake revisions to ICDTP, EID, RMSC, and PSC policies and procedures
19 to facilitate their use as remedial sanctions, including but not limited to reviewing and
20 reconsidering exclusionary criteria to make the programs more widely available.
21 (Defendants represent that FRMSC policies and procedures have not yet been written, and
22 will be written to comport with the principles stated here.) By May 1, 2007, Defendants
23 shall provide Plaintiffs' counsel and the Special Master with a draft long-term memorandum
24 to the field regarding the availability of ICDTP, RMSC, and PSC beds, as well as EID
25 Units, for use as remedial sanctions. The long-term memorandum shall also include
26 information regarding other readily identifiable existing programs that are available as
27 remedial sanctions, and a statement as to what populations they are available for, including
28 but not limited to the Department of Addiction Recovery Services SASCA aftercare

PDF created with pdfFactory trial version www.pdffactory.com

1    programs for qualified parolees, the Community Based Coalition (CBC) program in Los

2    Angeles County, and DAPO Day Reporting Centers. The Long-Term Memorandum to

3    Field shall also include information on inter-county transfers, as discussed at Section VI.A,

4    below. Plaintiffs' counsel shall respond to this document no later than May 15, 2007. The

5    parties shall meet and confer on May 31, 2007 regarding the Long-Term Memorandum.

6    Defendants shall make all reasonable efforts to distribute it to the field and to the parolee

7    defense panel no later than July 2, 2007.

8         B.    Defendants shall also develop, after consultation with Plaintiffs' counsel and

9    the Special Master, no later than August 15, 2007, an implementation and training plan to

10    assure that remedial sanctions are reasonably considered at each stage of the parole

11    revocation process, and are appropriately and fairly available to parolees.

12         C.    Defendants agree to evaluate remedial sanctions programs. The inclusion of

13    this requirement is not a concession by Defendants that evaluations or their criteria are

14    within the scope of the *Valdivia* Permanent Injunction.

15

16    V.  Graduated Sanctions/Parole Violation Matrix

17         Defendants have represented that they are investigating the development and use of

18    a decision-making matrix to provide DAPO and BPH decision-makers with CDCR

19    supported and community-based alternatives to incarceration for response to violations of

20    parole. Defendants shall report to the Special Master and Plaintiffs on the progress and

21    results of this investigation no later than July 1, 2007, and periodically thereafter as

22    necessary, but at least every 60 days until completion of the matrix investigations or

23    resulting matrix implementation.

24

25    VI.  Fair Consideration/Equal Access

26         A.    County to County Transfer Policy

27         The interim and long-term memoranda described above at Section IV.A shall include

28    appropriate statements of the remedial sanctions county-to-county transfer policy. The

PDF created with pdfFactory trial version www.pdffactory.com

1   Memoranda shall explain that temporary placement of out-of-county parolees in remedial

2   sanctions is not restricted by the 5% limitation on out-of-county transfers. The Memoranda

3   shall expressly state that an otherwise eligible parolee shall not be excluded from a remedial

4   sanctions program based solely on the unavailability of that program in his or her county of

5   residence or Parole Region. The interim and long-term memoranda shall direct decision-

6   makers to inquire about the availability of an appropriate program anywhere in the state and

7   provide directions for ascertaining availability of a placement and effecting an out-of-

8   county placement. The appropriateness of a county to county transfer is within the sole

9   discretion of the CDCR.

10          B.      Parolees with Mental Disabilities.

11          In establishing the 1800 ICDTP beds referred to above in Section I.A, above,

12   Defendants shall make every effort to secure 20 beds in each region targeting the needs of

13   parolees with dual diagnoses of mental illness and substance abuse. These efforts shall be

14   documented in the periodic reports described above at Section I.F.

15   VII. Unresolved Subjects

16

17          Among the remedial sanctions subjects that are as yet unresolved, the parties agree

18   to engage in further negotiations on the following topics and to file a Status Report with the

19   Special Master on said negotiations by September 1, 2007. Among the remaining disputes

20   are whether and to what degree the issues below are within the scope of this case.

21          A.      Alternative Placement in Structured and Supervised Environments:

22   Clarification regarding Defendants' currently funded, currently operating, and proposed

23   CDCR and community-based residential programs available to DAPO and BPH staff for use

24   as remedial sanctions.

25          B.      Self-Help Outpatient/Aftercare Programs: Clarification regarding Defendants'

26   currently funded, currently operating, and proposed CDCR and community-based Self-Help

27   Outpatient/Aftercare Programs available to DAPO and BPH staff for use as remedial

28   sanctions.

STIPULATION AND ORDER REGARDING REMEDIAL SANCTIONS, No. Civ, S-94-0671 LKK/GGH                    7

1      C.      Parolees with Disabilities: Defendants' plan to provide remedial sanctions to

2    parolees with disabilities that are the same or equivalent to remedial sanctions available to

3    parolees without disabilities, including the removal of any and all blanket exclusions of

4    parolees from remedial sanctions based on disabilities or past or present participation in the

5    Disability Placement Program, Developmental Disability Program, or mental health case

6    load.

7      D.      Female Parolees: Defendants' plan to provide remedial sanctions to female

8    parolees that are the same or equivalent to remedial sanctions available to male parolees,

9    including the availability of PSAP or programs providing equivalent benefits to female

10   parolees.

11     E.      Implementation, Training, and Supervision: Defendants' plan, including

12   timeline, for updating policies and procedures regarding remedial sanctions, conducting

13   remedial sanctions training for DAPO and BPH decision-makers, and the development of a

14   system by which every DAPO and BPH decision maker is able to determine the availability

15   of remedial sanctions statewide on any given day.

16     F.      Compliance Measurement: Defendants' plan, including timeline, for the

17   modification of information systems, including RSTS and CalParole, to track the

18   consideration of remedial sanctions at each stage of the parole revocation process.

19     G.      Parolee Defense Counsel: Defendants' plan to provide to parolee defense

20   counsel all policies and procedures circulated to DAPO and BPH decision-makers regarding

21   the availability of remedial sanctions statewide , including the eligibility and exclusionary

22   criteria for each program.

23     H.      Remedial Sanctions Programs to Address the Needs of Parolees with Severe

24   Mental Illness:  The parties have discussed and continue to discuss the problems of parolees

25   with severe mental illness whose violations are linked to their mental illness or unmet

26   mental health needs.  Plaintiffs' position is that in order to be successful and meaningfully

27   available, the remedial sanctions program must include some programs specifically directed

28   at parolees with current functional impairments at levels comparable to those required at

PDF created with pdfFactory trial version www.pdffactory.com

1    Enhanced Outpatient Program, Mental Health Crisis Bed, and Department of Mental Health

2    Levels of Care in CDCR Adult Institutions.

3

4         This Stipulated Order shall be binding on the parties as of the date it is fully

5    executed by them, regardless of whether it has been entered by the Court as of that time.

6    The provisions of this Order shall remain in full force and effect until further order of this

7    Court.

8    IT IS SO STIPULATED.

9

Dated:   April 2, 2007                    ROSEN, BIEN & GALVAN, LLP

10

11                                        By    /s/ Michael W. Bien
                                                 Michael W. Bien
12                                               Attorneys for Plaintiffs

13

14   Dated:   April 2, 2007                    OFFICE of the ATTORNEY GENERAL
                                               of the STATE OF CALIFORNIA
15

16                                        By    /s/ Katherine Nelson
                                                 Katherine Nelson
17                                               Deputy Attorney General

18                                               Attorneys for Defendants

19

20   The Special Master has reviewed this Stipulation and adopts its terms as a Recommendation

21   to the Court.

22   Dated: April 2,  2007                 By    /s/ Chase Riveland
23                                               CHASE RIVELAND
                                                 Special Master
24

25

26   IT IS SO ORDERED.

27   Dated:   April 3, 2007

                                          LAWRENCE K. KARLTON
28                                        SENIOR JUDGE
                                          UNITED STATES DISTRICT COURT

STIPULATION AND ORDER REGARDING REMEDIAL SANCTIONS, No. Civ. S-94-0671 LKK/GGH        9

PDF created with pdfFactory trial version www.pdffactory.com

**EXHIBIT P**

**Ernest Galvan**

| | |
|---|---|
| **From:** | Boyd, Russa [Russa.Boyd2@cdcr.ca.gov] |
| **Sent:** | Thursday, May 17, 2007 10:15 AM |
| **To:** | Ernest Galvan; Maria Morris |
| **Cc:** | Katherine Nelson; Ossmann, Joseph; Luzzi, Trey; Macias-Price, Lori |
| **Subject:** | remedial sanctions criteria matrix |
| **Attachments:** | Exclusionary Criteria Chart (2).doc |

Dear Ernie and Maria:

Attached is the matrix DAPO staff generated which includes the **existing** remedial sanction program inclusionary/exclusionary criteria. As we update the program criteria to conform with our stipulation and order on remedial sanctions, the matrix will also be updated. For example, once the PSAP, ICDTP, and EID P&Ps are updated and finalized, CDCR will modify its program matrix to include the updated criteria for each program.

Please contact me if you have any questions.

*Russa Boyd*
*Staff Counsel, Office of Legal Affairs*
*(916) 324-1980*

1

5/21/2007

INCLUSIONARY/EXCLUSIONARY CRITERIA
FOR
VALDIVIA REMEDIAL SANCTIONS PROGRAMS
May 2007

| Program | Criteria |
|---|---|
| Community-Based Coalition | Inclusionary:<br><br>• Open to all parolees with the exception shown below.<br><br>Exclusionary:<br><br>• If the Community-Based Coalition is located near places where children frequent, parolees who are required to register pursuant to California Penal Code (PC) Section 290 will not be permitted into the program. |
| Day Reporting Centers | Inclusionary:<br><br>• Open to all parolees with the exception shown below.<br><br>Exclusionary:<br><br>• If the Day Reporting Center is located near places where children frequent, parolees who are required to register pursuant to PC Section 290 will not be permitted into the program. |
| Electronic In-Home Detention | Inclusionary:<br><br>• Those parolees classified as Control Service, High Control, or High Service.<br>• Parolees who commit minor violations of parole or the law.<br>• Civil Addict Parolees.<br>• Interstate Cases.<br>• Gang members.<br>• Serious and/or violent offenders.<br>• Sex Offenders not designated as High Risk Sex Offenders <u>and</u> not on a Global Positioning System.<br><br>Exclusionary:<br><br>• Parolees classified as Second Strikers, High Risk Sex Offenders, or Enhanced Outpatient Program participants are ineligible for Electronic In-home Detention monitoring. |

2

INCLUSIONARY/EXCLUSIONARY CRITERIA
FOR
VALDIVIA REMEDIAL SANCTIONS PROGRAMS
May 2007

| Parolee Service Centers | Inclusionary: |
|---|---|
| | <ul><li>Parolees who have a past or current violent felony convictions pursuant to PC Section 667.5(c) (reviewed on a case-by-case basis).</li><li>Parolees who have a current felony conviction pursuant to PC Sections 1192.7(c) and 1192.8 (reviewed on a case-by-case basis).</li><li>Civil addict commitments (N numbers).</li><li>Parolees with misdemeanor holds (reviewed on a case-by-case basis).</li><li>Parolees who are designated high notoriety (reviewed on a case-by-case basis).</li><li>Parolees who have a restraining order/court order and/or victim notification in the county of the facility (reviewed on a case-by-case basis).</li><li>Street gang members (reviewed on a case-by-case basis).</li></ul><br>Exclusionary:<br><ul><li>Parolees with pending parole violations (Exception: Not-in-Custody parolees will be reviewed on a case-by-case basis).</li><li>Parolees who are required to register pursuant to PC Section 290.</li><li>Parolees who have a current or prior conviction for arson pursuant to PC Sections 451(a), 451(b) and 451.5.</li><li>Parolee with felony holds.</li><li>Parolees with pending felony criminal charges.</li><li>Validated prison gang members.</li><li>Parolees currently in need of detoxification.</li><li>All interstate parolees.</li></ul> |

3

INCLUSIONARY/EXCLUSIONARY CRITERIA
FOR
VALDIVIA REMEDIAL SANCTIONS PROGRAMS

May 2007

| Parolee Substance Abuse Program (PSAP) | **Inclusionary:**<br>• Prior conviction of "a serious felony" as defined in PC Section 1192.7 (c).<br>• Diagnosed under Correctional Clinical Case Management System and fits local custody criteria.<br><br>**Exclusionary:**<br>• Eligible for Proposition 36 placement on the current violation.<br>• Pending criminal charges in court.<br>• PC Section 290 registration, except for indecent exposure, which shall be reviewed for suitability.<br>• High notoriety case.<br>• Convicted of an offense included in PC 667.5(c).<br>• Convicted of escape, attempted escape, or aiding an escape with force. Also, convicted within the last five years of escape, attempted escape, or aiding an escape from a secure perimeter. Escapes from and failure to return to work furlough are not excluded.<br>• Convicted for PC Section 241 (Punishment for assault; assault against peace officer or other public safety provider, process server, etc.).<br>• Convicted for PC Section 245(d) (assault with a deadly weapon or instrument or instruments, assault on a peace officer or firefighter).<br>• Received a sentence of life imprisonment within the past 20 years.<br>• Validated prison gang members or associates.<br>• Protective custody needs (enemies, etc.); released from Security Housing Unit (SHU) or those in SHU within six months prior to release.<br>• Guilty disposition in prison disciplinary proceedings or convicted in court of predatory sexual activity while incarcerated.<br>• Active felony hold or warrant unless the hold or warrant expires prior to the projected Parole Substance Abuse Program release date.<br>• Due to possible escape risk, potential felony hold for any of the following:<br>   • PC Section 207 (kidnapping)<br>   • PC Section 210.5 (false imprisonment – hostage-taking)<br>   • PC Section 214 (Training robbery)<br>   • PC Section 217.1 (Attempts to kill public officials)<br>   • PC Section 220 (Assault with intent to commit mayhem, rape, etc.)<br>   • PC Section 241 (Assault)<br>   • PC Section 245 (Assault with a deadly weapon)<br>   • PC Section 451(a) (Arson the causes great bodily injury)<br>   • PC Section 667.5(c) (Violent felonies)<br><br>**Health and Disability Criteria**<br>• Using insulin.<br>• Currently in a methadone treatment program.<br>• Currently prescribed psychotropic medication and/or in immediate need of medical or dental treatment.<br>• Currently designated as Enhanced Outpatient Program (EOP).<br>• Has a Developmentally Disabled designation of DD-3. |
|---|---|

4

**INCLUSIONARY/EXCLUSIONARY CRITERIA**
**FOR**
**VALDIVIA REMEDIAL SANCTIONS PROGRAMS**
**May 2007**

| | |
|---|---|
| Residential Multi-Service Centers | **Inclusionary:**<br>• Homeless, indigent, or those in an "at-risk" or unsafe environment.<br>• Willing and able to participate in the program.<br>• Physically, medically, and mentally able to care for themselves.<br>• Willing and able to work.<br>• 180 days remaining on parole.<br>• Parolee with less than 180 days remaining on parole may be admitted on a case-by-case basis.<br><br>**Exclusionary:**<br>• Parolee is receiving, or has applied to receive, Supplemental Security Insurance or other governmental subsistence payments.<br>• Parolees with any conviction for PC 667.5 offense.<br>• Parolees with a conviction for PC Section 1192.7(c). (Except those which also fall under PC Section 667.5) shall be considered on a case-by-case basis.<br>• Parolees who are pregnant.<br>• Parolees who are required to register pursuant to PC Section 290 (sex offender) or PC Section 457.1 (arson).<br>• Other history of sex offenses and arson shall be on a case-by-case basis.<br>• Any case factors that would endanger others.<br>• Parolees who are validated gang members will be reviewed on a case-by-case basis.<br>• Other screening criteria as addressed in the terms of the contract. For more information the referring agent should contact the Parole Agent (PA) II at the appropriate Residential Multi-Service Center. |
| Substance Abuse Treatment and Recovery Program | **Inclusionary:**<br><br>• Open to all parolees<br><br>**Exclusionary:**<br><br>There are no exclusionary criteria. |

5

INCLUSIONARY/EXCLUSIONARY CRITERIA
FOR
VALDIVIA REMEDIAL SANCTIONS PROGRAMS
May 2007

| In-Custody Drug Treatment Program (ICDTP) Facility | Criteria |
|---|---|
| Kern County Jail | **Inclusionary:**<br><br>Placement into ICDTP requires a parolee to have a nexus to current substance abuse and/or a history of substance abuse related criminal or violation offenses. Providing this criterion is met, the following may also be considered on a case by case basis:<br><br>• Prior conviction of a "serious felony" as defined in PC Section 1192.7(c).<br>• Diagnosed under Correctional Clinical Case Management System who fit local custody criteria.<br><br>**Exclusionary:**<br><br>• Prior conviction of a violent felony as defined in PC Section 667.5(c).<br>• Current violation(s) being referred is/are found in the California Code of Regulations, Title 15, Division 2, Section 2616(a) (14).<br>• Parolees required to register under PC Section 290.<br>• Reside in counties where residential aftercare treatment services are not available.<br>• Pending court date at the time of Unit Supervisor (US) recommendation for ICDTP placement.<br>• Parole violators arrested in a county outside of their own except when the ICDTP facility would be the same as his or her own county (Attachment B).<br>• Active United States Immigration and Naturalization Service hold, Interstate cases or Civil Addict cases.<br>• Have less than 120 days remaining on parole.<br>• No Bloods *<br>• No Northern Hispanics *<br>• No Protective Custody, Homosexuals and Mobility Impaired due to their vulnerability *<br>• Staff Assault history considered on a case-by-case basis * |

* Local jail restrictions

6

INCLUSIONARY/EXCLUSIONARY CRITERIA
FOR
VALDIVIA REMEDIAL SANCTIONS PROGRAMS
May 2007

| ICDTP Facility | Criteria |
|---|---|
| Del Norte County Jail | **Inclusionary:**<br><br>Placement into ICDTP requires a parolee to have a nexus to current substance abuse and/or a history of substance abuse related criminal or violation offenses. Providing this criterion is met, the following may also be considered on a case by case basis:<br><br>• Prior conviction of a "serious felony" as defined in PC Section 1192.7(c).<br>• Diagnosed under Correctional Clinical Case Management System who fit local custody criteria.<br><br>**Exclusionary:**<br><br>• Prior conviction of a "violent felony" as defined in PC Section 667.5(c).<br>• Current violation(s) being referred is/are found in the California Code of Regulations, Title 15, Division 2, Section 2616(a) (14).<br>• Parolees required to register under PC Section 290.<br>• Reside in counties where residential aftercare treatment services are not available.<br>• Pending court date at the time of Unit Supervisor (US) recommendation for ICDTP placement.<br>• Parole violators arrested in a county outside of their own except where the ICDTP facility would be the same as his or her own county (Attachment B).<br>• Active United States Immigration and Naturalization Service hold, Interstate cases or Civil Addict cases.<br>• Have less than 120 days remaining on parole.<br>• There are no additional criteria at this site to date. The jail just wants to know if there are any issues with a particular parolee (example: released from Pelican Bay). * |

* Local jail restrictions

7

INCLUSIONARY/EXCLUSIONARY CRITERIA
FOR
VALDIVIA REMEDIAL SANCTIONS PROGRAMS
May 2007

| ICDTP Facility | Criteria |
|---|---|
| Santa Clara County Jail | **Inclusionary:**<br><br>Placement into ICDTP requires a parolee to have a nexus to current substance abuse and/or a history of substance abuse related criminal or violation offenses. Providing this criterion is met, the following may also be considered on a case by case basis:<br><br>• Prior conviction of a "serious felony" as defined in PC Section 1192.7(c).<br>• Diagnosed under Correctional Clinical Care Management System who fit local custody criteria.<br><br>**Exclusionary:**<br><br>• Prior conviction of a "violent felony" as defined in PC Section 667.5(c).<br>• Current violation(s) being referred are found in the California Code of Regulations Title 15, Division 3, Section 2616(a) (14).<br>• Parolees required to register under PC Section 290.<br>• Reside in counties where residential aftercare treatment services are not available.<br>• Pending court date at the time of Unit Supervisor (US) recommendation for ICDTP placement.<br>• Parole violators arrested in a county outside of their own except when the ICDTP facility would be the same as his or her own county (Attachment B).<br>• Active United States Immigration and Naturalization Service hold, Interstate cases or Civil Addict cases.<br>• Have less than 120 days remaining on parole.<br>• Violence including battery and assault *<br>• Arson *<br>• Validated prison or street gang member *<br>• Escape history or known flight risk *<br>• Protective custody status *<br>• Prior Santa Clara County history level 3/4 housing (prior level 2 security housing will be reviewed on a case-by-case basis *<br>• Non-routine medical needs * |

* Local jail restrictions

8

INCLUSIONARY/EXCLUSIONARY CRITERIA
FOR
VALDIVIA REMEDIAL SANCTIONS PROGRAMS

May 2007

| ICDTP Facility | Criteria |
|---|---|
| San Francisco County Jail | **Inclusionary:**<br><br>Placement into ICDTP requires a parolee to have a nexus to current substance abuse and/or a history of substance abuse related criminal or violation offenses.  Providing this criterion is met, the following may also be considered on a case by case basis:<br><br>• Prior conviction of a "serious felony" as defined in PC Section 1192.7(c).<br>• Diagnosed under Correctional Clinical Care Management System who fit local custody criteria.<br><br>**Exclusionary:**<br><br>• Prior conviction of a "violent felony" as defined in PC Section 667.5(c).<br>• Current violation(s) being referred is/are found in the California Code of Regulations Title 15, Division 2, Section 2616(a) (14).<br>• Parolees required to register under PC Section 290.<br>• Reside in counties where residential aftercare treatment services are not available.<br>• Pending court date at the time of Unit Supervisor (US) recommendation for ICDTP placement.<br>• Parole violators arrested in a county outside of their own except when the ICDTP facility would be the same as his or her own county (Attachment B).<br>• Active United States Immigration and Naturalization Service hold, Interstate cases or Civil Addict cases.<br>• Have less than 120 days remaining on parole.<br>• Pregnant females are okay through their first trimester but not accepted past the first trimester. (This is a female ICDTP.) * |

* Local jail restrictions

9

INCLUSIONARY/EXCLUSIONARY CRITERIA
FOR
VALDIVIA REMEDIAL SANCTIONS PROGRAMS
May 2007

| ICDTP Facility | Criteria |
|---|---|
| Chula Vista City Jail | **Inclusionary:**<br><br>Placement into ICDTP requires a parolee to have a nexus to current substance abuse and/or a history of substance abuse related criminal or violation offenses. Providing this criterion is met, the following may also be considered on a case by case basis:<br><br>• Prior conviction of a "serious felony" as defined in PC Section 1192.7(c).<br>• Diagnosed under Correctional Clinical Care Management System who fit local custody criteria.<br><br>**Exclusionary:**<br><br>• Prior conviction of a "violent felony" as defined in PC Section 667.5(c).<br>• Current violation(s) being referred to/are found in the California Code of Regulations, Title 15, Division 3, Section 2616(a) (14).<br>• Parolees required to register under PC Section 290.<br>• Reside in counties where residential aftercare treatment services are not available.<br>• Pending court date at the time of Unit Supervisor (US) recommendation for ICDTP placement.<br>• Parole violators arrested in a county outside of their own except when the ICDTP facility would be the same as his or her own county (Attachment B).<br>• Active United States Immigration and Naturalization Service hold, Interstate cases or Civil Addict cases.<br>• Have less than 120 days remaining on parole.<br>• No gang members *<br>• No one requiring psychotropic medication *<br>• On medication other than psychotropic, the parolee needs to have 60 day supply - no infirmary or doctor on site. *<br>• Medical issues that arise needing ongoing care. * |

* Local jail restrictions

10

INCLUSIONARY/EXCLUSIONARY CRITERIA
FOR
VALDIVIA REMEDIAL SANCTIONS PROGRAMS
May 2007

| ICDTP Facility | Criteria |
|---|---|
| Tulare County Jail | **Inclusionary:**<br><br>Placement into ICDTP requires a parolee to have a nexus to current substance abuse and/or a history of substance abuse related criminal or violation offenses. Providing this criterion is met, the following may also be considered on a case by case basis:<br><br>• Prior conviction of a "serious felony" as defined in PC Section 1192.7(c).<br>• Diagnosed under Correctional Clinical Case Management System who fit local custody criteria.<br><br>**Exclusionary:**<br><br>• Prior conviction of a "violent felony" as defined in PC Section 667.5(c).<br>• Current violation(s) being referred to/are found in the California Code of Regulations Title 15, Division 2, Section 2616(a) (14).<br>• Parolees required to register under PC Section 290.<br>• Reside in counties where residential aftercare treatment services are not available.<br>• Pending court date at the time of Unit Supervisor (US) recommendation for ICDTP placement.<br>• Parole violators arrested in a county outside of their own except when the ICDTP facility would be the same as his or her own county (Attachment B).<br>• Active United States Immigration and Naturalization Service hold, Interstate cases or Civil Addict cases.<br>• Have less than 120 days remaining on parole.<br>• No validated prison gang members, including Bulldogs or Southern Hispanics. Self-claimed gang member "drop outs" considered on a case-by-case basis. *<br>• No EOP cases. *<br>• No psychiatric or medical requiring on-going transport to special care facilities. *<br>• No cases which require ongoing medical treatment or cases which would be a burden to jail staff. * |

11

INCLUSIONARY/EXCLUSIONARY CRITERIA
FOR
VALDIVIA REMEDIAL SANCTIONS PROGRAMS
May 2007

| Substance Abuse Services Coordination Agencies (SASCA) | SASCA placement is principally for the purpose of continuing care (aftercare) for parolees who have completed inmate substance abuse treatment programs. SASCA placements are available as remedial sanctions under the following criteria: |
|---|---|



Inclusionary

- Parolee must have completed one of the following: an in-prison therapeutic community substance abuse program (SAP), Drug Treatment Furlough (DTF), Female Offender Treatment and Employment Program (FOTEP), Community Prisoner-Mother Program (CPMP), Family Foundations Program (FFP), Parolee Substance Abuse Program (PSAP), or other program approved by the Division of Addiction and Recovery Services.
- Parolee must be within 180 days of the end of his or her most recent placement in one of the above programs for a SASCA aftercare placement.

Exclusionary

- Parolees who have already utilized at least 180 days of SASCA-funded treatment.

12

**EXHIBIT Q**

**STATE OF CALIFORNIA—California Department of**          **ARNOLD SCHWARZENEGGER, GOVERNOR**
**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**OFFICE OF LEGAL AFFAIRS**
**PAROLE TEAM**
1515 K Street, 6th Floor
Sacramento, CA 95814
www.cdcr.ca.gov

May 1, 2007

Rosen, Bien & Galvan, LLP
315 Montgomery Street, 10th Floor
San Francisco, CA 94104

Dear Ernest Galvan:

Enclosed please find the State's proposed long-term memorandum to the field regarding the use of remedial sanctions in lieu of parole revocation. This memorandum is provided as required by Section IV, Subsection 2 of the Stipulation and Order Regarding Remedial Sanctions, signed by Judge Lawrence Karlton on April 3, 2007 under *Valdivia v. Schwarzenegger*.

As required by the Stipulation and Order, the proposed memorandum declares that Residential Multi-Service Centers (RMSC), Parolee Service Centers (PSC), In-Custody Drug Treatment Program (ICDTP), Electronic In-Home Detention (EID), and other programs are available for use as remedial sanctions in lieu of parole revocation. The proposed memorandum also includes information on inter-county transfers of parolees for the purpose of placement in remedial sanction programs.

The Stipulation and Order also references the work the State is undertaking to revise ICDTP, EID, RMSC, and PSC policies and procedures, including but not limited to reviewing and reconsidering exclusionary criteria to make the programs more widely available. Please note that the proposed memorandum does include some revisions to the RMSC and EID policies. Exclusionary criteria for ICDTP, RMSC, and PSC are included in provider contracts, and the State cannot change them unilaterally. The State will request that contractors accept amendments revising the criteria. If contractors are unwilling to do so, the State will ensure that as contracts expire, to the extent possible the new contracts contain the revised criteria. It should be noted, however, that the ICDTP contracts with local jails are individually negotiated, and those entities may not always accept the State's terms.

The State intends to revise the program criteria as follows:

*Residential Multi-Service Centers and Parolee Service Centers*
*DAPO Policy No. 07-08 (RMSC) and No. 05-11 (PSC) will be modified as follows. The Eligibility Criteria and Exclusionary Criteria in those policies are hereby replaced with the following:*

*Exclusionary Criteria*
*All persons subject to the jurisdiction of DAPO shall be eligible for placement in the RMSC and PSC with the exception of:*

- *Parolees unwilling to participate in program.*
- *Parolees who are designated high notoriety may be excluded on a case by case basis.*
- *Parolees who are required to register pursuant to PC 290 (sex offender) or PC 457.1 (arson).*
- *Other history of sex offenses and arson may be excluded on a case-by-case basis.*

Mr. Stewart
Page 2

- *Parolees with any conviction for an offense under PC 667.5(c) may be excluded on a case by case basis.*
- *RMSC referrals with less than 180 days remaining on parole may be admitted on a case-by-case basis.*
- *Parolees with pending felony criminal charges.*
- *In custody parolees with pending local misdemeanor charges which could result in county jail time.*
- *Parolees currently in need of detoxification.*
- *Case factors indicating that the parolee would be a danger to others. Examples could include but are not limited to parolees who are documented as enemies of persons in the program, parolees against whom a current program participant has a restraining order, parolees with rival gang affiliations, etc.*
- *Parolees who are CDCR validated gang members will be reviewed on a case by case basis.*
- *Parolees who, with ADA accommodations, have limitations that prevent them from participating in the program.*

### In-Custody Drug Treatment Program
*DAPO Policy No. 05-13 is hereby modified as follows. The Eligibility Criteria and Exclusionary Criteria in that policy are hereby replaced with the following:*

### Exclusionary Criteria
*All persons subject to the jurisdiction of DAPO shall be eligible for placement in the ICDTP with the exception of:*

- *Parolees unwilling to participate in the program.*
- *Parolees who are required to register pursuant to PC 290 (sex offender) or PC 457.1 (arson).*
- *Parolees with any conviction for an offense under PC 667.5(c) may be excluded on a case by case basis.*
- *Civil Narcotic Addicts (Note that Civil Addicts are not Valdivia class members.)*
- *Parolees having less than 120 days remaining on parole*
- *Parolees who, with ADA accommodations, have limitations that prevent them from participating in the program.*

We look forward to your review of the enclosed document and to receiving your written comments. As provided in the Stipulation and Order, we are scheduled to meet and confer on this document on May 31, 2007.

Sincerely,

/s/ Russa Boyd

RUSSA BOYD
Staff Counsel
Office of Legal Affairs
(916) 324-1980

Mr. Stewart
Page 3

cc:

K. Nelson
C. Riveland
G. Morrison
N. Campbell
T. Luzzi
B. Lewis
D. Carvo
D. Cano
C. Buffleben
J. Monday
G. Lehman
T. Hoffman
L. Macias-Price

# EXHIBIT R

STATE OF CALIFORNIA
**STANDARD AGREEMENT**
STD 213 (Rev 06/03)



| AGREEMENT NUMBER |
| --- |
| **C05.074** |
| REGISTRATION NUMBER |

1. This Agreement is entered into between the State Agency and the Contractor named below:

STATE AGENCY'S NAME

California Department of Corrections and Rehabilitation / Folsom Transitional Treatment Facility

CONTRACTOR'S NAME

Center Point, Inc.

| 2. The term of this Agreement is: | January 1, 2006 | through | June 30, 2010 |
| --- | --- | --- | --- |

3. The maximum amount    **$4,499,901.00**
   of this Agreement is:    Four Million Four Hundred Ninety Nine Thousand Nine Hundred One Dollars

4. The parties agree to comply with the terms and conditions of the following exhibits which are by this reference made a part of the Agreement.

|  |  |
| --- | --- |
| Exhibit A – Scope of Work | 18 ~~20~~ pages |
| Exhibit B – Budget Detail and Payment Provisions | 4 pages |
| Exhibits B.1 through B.6 – Budget Proposal and Summary | 6 pages |
| Exhibit BB.1 – Non-Expendable Equipment | 1 page |
| Exhibit C* – General Terms and Conditions | GTC 1005 |

Check mark one item below as Exhibit D:

|  |  |  |
| --- | --- | --- |
| ☒ | Exhibit - D Special Terms and Conditions (Attached hereto as part of this agreement) | 12 pages |
| ☐ | Exhibit - D* Special Terms and Conditions | |
| | Exhibit E – Additional Provisions | 8 ~~9~~ pages |

*Items shown with an Asterisk (\*), are hereby incorporated by reference and made part of this agreement as if attached hereto. These documents can be viewed at www.ols.dgs.ca.gov/Standard+Language*

**IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto.**

| CONTRACTOR | California Department of General Services Use Only |
| --- | --- |
| CONTRACTOR'S NAME (If other than an individual, state whether a corporation, partnership, etc.) <br> **CENTER POINT, INC.** | |
| BY (Authorized Signature)     DATE SIGNED(Do not type) | |
| PRINTED NAME AND TITLE OF PERSON SIGNING <br> Sushma D. Taylor, Ph.D., Chief Executive Officer | **APPROVED** <br> FEB 6 2006 |
| ADDRESS | DEPT OF GENERAL SERVICES |

| STATE OF CALIFORNIA | |
| --- | --- |
| AGENCY NAME <br> CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION | |
| BY (Authorized Signature)     DATE SIGNED(Do not type) <br> 1/17/06 | |
| PRINTED NAME AND TITLE OF PERSON SIGNING <br> Karen V. Smith, Chief, Service Contracts Section | ☐ Exempt per: |
| ADDRESS | |

P. O. Box 942883
Sacramento, CA 94283-0001

VAL2007 14940

Center Point, Inc. and                                          Agreement No. C05.074
California Department of Corrections and Rehabilitation

Group activities, which actively engage participants in confronting the individual values and behaviors contributing to their substance abuse and criminality, shall be small enough to promote participation and provide for the safety and security of the participants. To this end, such groups shall have no more than 18 participants as evidenced on group activity rosters.

Didactic groups, seminars and community meetings organized to provide habilitative and rehabilitative services, substance abuse education, and social and recreational activities may be of any size but shall be small enough to promote learning and allow for positive interaction among the participants. Activities which are counted toward the requirements for minimum intensity activities must have a Contractor program staff person physically present at all times. Participation is recorded on group activity rosters.

Life skills activities are work assignments for participants that support the day-to-day facility operations (i.e., culinary, laundry, porter, etc.). The Contractor shall be responsible for the TTP inmate work assignments, organizing the critical work crew, monitoring the inmate workers, and maintaining a database for the inmate work assignments. The database shall track compliance with the Folsom State Prison (FSP) procedures of inmate work assignment and routinely provide reports to the FSP. The Contractor shall work in cooperation with the custody staff to implement life skills activities.

The scope of activities for the TTP includes the following service elements:

- Habilitative and Rehabilitative Services
- Counseling – Individual/Family/Group
- Collateral Services
- Advocacy and Referral
- Social and Recreational Activities
- Substance Abuse Services Planning
- Optional Self-Help Group Participation
- Life Skills Curriculum and Job Assignments
- Vocational Counseling, Assessment and Curriculum
- Intensive Transitional Drug Treatment and Education

**F. Technical Services of the TTP**

1. Inmate Screening, Referral, and Recruitment

   The CDCR staff and designated contracted TTP staff are responsible for screening and referral of inmates to the TTP at the facility. Outreach and recruitment efforts may also be conducted within reception centers and other institutions. The OSAP CC or designee shall assist the institution and coordinate the process of referrals to openings within the facility. As openings become available within the TTP, inmates shall be referred to these openings on a voluntary or involuntary basis.

   The TTP Contractor shall participate in identification and referral of inmates through program presentations and recruitment efforts within the institution and other institutions designed to solicit voluntary participation in the program.

   The following are the criteria and the exclusions for referral to the TTP:

   - A history of substance abuse;
   - A classification score and administrative determinants appropriate to the facility where the TTP is located;

7

VAL2007 14948

Center Point, Inc. and
California Department of Corrections and Rehabilitation

Agreement No. C05.074

- At the time of placement, participant must have 150 days to serve, but not less than 90 days to serve;
- Volunteers for participation shall be given priority for placement to the extent possible;
- Inmates with a disability who are eligible shall not be excluded from participation in the program pursuant to the Americans with Disabilities Act (ADA) of 1990, (42 U.S.C. 12101 et seq.), which prohibits discrimination on the basis of disability;
- Correctional Clinical Case Management System (CCCMS) inmates are eligible program participants;
- Medical can be managed in the facility without ongoing medical/dental care (no injectable insulin dependants, no developmentally disabled inmates;
- Not housed in a Security Housing Unit at any time during the last year as a result of an incident involving assault and/or battery with force sufficient to cause serious injury or possession of a weapon;
- Not housed in a Protective Housing Unit at any time during the last year;
- Not certified by a Criminal Activities Coordinator as a member or associate of a prison gang;
- No active or potential felony holds for any jurisdiction which could result in an increase in sentence length;
- No conviction of arson within the last ten (10) years;
- No court conviction within the last ten (10) years for walk-aways from Community Correctional Re-Entry Centers (CCRC) and no more than two walk-aways from CCRC (two walk-aways would exclude the participant);
- No convictions within the last ten (10) years for attempted/forced/aiding in forced escape or escape from secure perimeter, escape from a camp, road camp, or outside work crews;
- No pending revocation;
- No assault listed under Penal Code (PC) 241 or assault with a firearm listed under PC 245(d);
- No PC 290 (any conviction not listed on this document refer to PC Section 290) or R suffix offenses (PC Sections 220, 261, 262, 264.1, 266(b), 285, 286, 286.5, 288, 288(a), and 289);
- No predatory homosexual behavior while incarcerated;
- No violent felonies listed under PC 667.5(c) convictions;
- No active or potential United States Immigration and Naturalization Service holds, unless the hold shall expire prior to their parole date; and
- Not currently enrolled in psychiatric Inpatient or Enhanced Outpatient Program services.

2. New Employee Orientation

New hires into the TTP Contractor's program shall receive initial orientation to CDCR laws, regulations, policies and procedures equivalent to the orientation training required of new CDCR employees pursuant to CCR Title 15, Section 3435.

3. Cross Training

The TTP Contractor will receive an initial and annual cross training by consultants supplied and funded by OSAP. The cross training is designed to bring together custody and substance abuse program services staff to identify and foster an understanding of their unique individual missions within the institution and how they can work together to achieve both unique and common goals.

8

VAL2007 14949

**EXHIBIT S**

STATE OF CALIFORNIA
## STANDARD AGREEMENT
STD 213 (Rev 06/03)

| AGREEMENT NUMBER |
|---|
| P04.0042 |
| REGISTRATION NUMBER |

This Agreement is entered into between the State Agency and the Contractor named below:

STATE AGENCY'S NAME
California Department of Corrections and Rehabilitation

CONTRACTOR'S NAME
**Turning Point of Central California, Inc.**

2.  The term of this          July 1, 2005                                        through          June 30, 2008
    Agreement is:             or upon approval whichever occurs last.

3.  The maximum amount        $ 1,505,904
    of this Agreement is: **One Million Five Hundred Five Thousand Nine Hundred Four Dollars**

4.  The parties agree to comply with the terms and conditions of the following exhibits which are by this reference made a part of the
    Agreement.

| | |
|---|---|
| Exhibit A – Scope of Work | 19 pages |
| Exhibit A-1 - Activity Report (CDC Form 1502) | 1 page |
| Exhibits A-2 through A-4 - Data Collection Forms | 5 pages |
| Exhibit B – Budget Detail and Payment Provisions | 1 page |
| Exhibit B-1 through B-7 - Bid Proposal, Rate Sheets, Worksheet and Non-Expendable Equipment | 10 pages |
| Exhibit C* – General Terms and Conditions | GTC 103 |
| Exhibit D – Special Terms and Conditions (Attached hereto as part of this agreement) | 12 pages |
| Exhibit E – CDC Additional Provisions | 5 pages |
| Exhibit F – Line Item Budget Guide – October 2002 | 37 pages |
| Attachment 1 - Authorization for Security Clearance | 1 page |

Items shown with an Asterisk (*), are hereby incorporated by reference and made part of this agreement as if attached hereto.
[?]e documents can be viewed at www.ols.dgs.ca.gov/Standard+Language

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto.

| CONTRACTOR | California Department of General Services Use Only |
|---|---|
| CONTRACTOR'S NAME (if other than an individual, state whether a corporation, **Turning Point of Central California, Inc.** | |
| BY (Authorized Signature)                    DATE SIGNED(Do not type) 5-19-05 | **APPROVED** |
| PRINTED NAME AND TITLE OF PERSON SIGNING **J. Jeff Fly, Chief Executive Officer** | **JUN 16 2005** |
| ADDRESS | DEPT OF GENERAL SERVICES |

| STATE OF CALIFORNIA | |
|---|---|
| AGENCY NAME California Department of Corrections and Rehabilitation | |
| BY (Authorized Signature)                    DATE SIGNED(Do not type) 6/1/2005 | |
| PRINTED NAME AND TITLE OF PERSON SIGNING Janet E. Miura, Assistant Deputy Director, Office of Contract Services | Exempt per: |
| DRESS | |

**VAL2007 17466**

## SCOPE OF WORK

### RESIDENTIAL MULTI-SERVICE CENTER

The Contractor agrees to provide the California Department of Corrections and Rehabilitation (DCR), Parole and Community Services Division (P&CSD) with a Residential Multi-Service Center (RMSC) and all program service components in accordance with this Agreement and local city, county, and State regulations. The facility location shall be located in the following county:

| COUNTY | BEDS |
|--------|------|
| Fresno | 25 |

## I. PROGRAM INTRODUCTION

The RMSC will provide housing, substance abuse services and independent living skills to at-risk parolees to assist in their transition and adjustment back in to the community. Each RMSC shall provide a stable residence for both male and female parolee participants and also address the needs of its residents.

The RMSC shall include, but is not limited to the following:

➢ A licensed alcohol and drug program co-ed residential facility that will service both males and female parolee participants. The length of stay for parolee participants will be up to one hundred eighty (180) days. On a limited basis, some parolee participants may have an extension in the program for up to one year with prior written approval. The facility must provide twenty-four hour awake supervision, seven days a week. The facility may also be occupied by other clients other than just DCR referrals;

➢ Provide effective casework management, including individual case assessments, development of services/treatment plans, development of discharge plans which shall include independent community living arrangements and aftercare.; and

➢ Provide on-site counseling and referral services, including but not limited to substance abuse counseling, life skills, employment development, literacy, medical services, transition to independent living and aftercare services.

## II. DEPARTMENT OF CORRECTIONS RESPONSIBILITIES

A. Determine eligibility for parolee-participant placement.

B. Track program referrals on a monthly basis.

C. Review the Contractor's invoices for accuracy and reimburse for services received.

D. Monitor contract compliance through site visits, Program Quality Reviews (PQR) and audits.

E. Assign a Parole Agent Liaison to provide field supervision of parolee-participants and facilitate DCR support (i.e. parolee grievance process, case management reviews, facility monitoring, etc).

F. DCR/P&CSD Headquarters, Program Development Unit Administration, is the designated DCR Contract Manager for this agreement.

VAL2007 17467

Turning Point of Central California, Inc.
California Department of Corrections and Rehabilitation

Agreement Number: P04.0042
Exhibit A

    G. The DCR reserves the right to remove any parolee-participant from the program when necessary.

    H. Schedule and facilitate Quarterly Meetings with DCR Program and Contract staff.

## III. CONTRACTOR RESPONSIBILITIES

The Contractor shall provide residence and services to parolees and administer the operation of the program in accordance with the conditions detailed in this Agreement. The Contractor shall:

    A. Assume full responsibility to supervise contractor staff and operate the facility in accordance with all applicable laws, regulations and contractual requirements.

    B. Provide housing, sustenance, supervision and services for all parolee-participants including making reasonable accommodations for participants with disabilities, as appropriate.

    C. Develop the parolee-participant's Orientation Program Handbook within 30 days of the approved award. Handbook must be reviewed and accepted by DCR.

    D. Furnish the facility with equipment and furnishings.

    E. Provide and coordinate all parolee-participant activities and community outreach efforts.

    F. Provide daily inspections of food services, sleeping quarters, and weekly inspections of the entire facility to assure compliance with this contract.

    G. Provide a drug-free work environment for the safekeeping, care and program needs of the parolee-participants and program staff.

    H. Provide the DCR with an organizational chart containing clear lines of chain of command.

    I. Develop and implement written policies and procedures for administrative, personnel and operational activities.

    J. Notify in writing to the DCR any resignation, reassignment or dismissal of any required personnel identified under "Staffing Requirement" within seven (7) calendar days of the action.

    K. Ensure that experienced personnel are made available immediately if any employee of the contractor is unable to perform assigned duties due to vacation, illness, dismissal, resignation or other factors that are beyond the Contractor's control. The hiring process shall not exceed thirty (30) days from the date of vacancy.

    L. Attend mandatory quarterly meetings facilitated by the DCR Program Manager for the purpose of providing program updates and program related training.

    M. Develop and establish a "Parolee Income and Trust" system to track parolee income and trust account with the DCR's approval.

## IV. PAROLEE-PARTICIPANT SCREENING CRITERIA

Parolees will be placed into the program for a period of up to 180 days and on a case-by-case basis up to one year with prior approval from the Parole Agent Liaison. The DCR will have the final decision regarding program placements and retains the right to remove parolees from the program at any time. Parolee placement is voluntary and shall meet the following criteria:

    A. Homeless, indigent, or in an "at-risk" environment;

    B. Willing and able to participate in the program;

    C. No history of violence, arson, sex offenses (PC Section 290 Registrants);

    D. Physically and mentally able to care for themselves;

2

VAL2007 17468

Turning Point of Central California, Inc.                             Agreement Number: P04.0042
California Department of Corrections and Rehabilitation                     Exhibit A

    E.   Willing and able to work; and

    F.   Is not receiving or has not applied to receive Supplemental Security Insurance (SSI).

## V. FACILITY REQUIREMENTS

    A.   <u>General</u>:   The Contractor will provide a facility suitable for 24-hour supervised housing for eligible adult male and female parolee-participants. The Contractor shall have documented evidence that shows the facility is in compliance with all applicable building, sanitation, health, safety, fire codes, city and county zoning ordinances. The Contractor must have a Conditional Use Permit (CUP) or equivalent in effect at all times during the term of the contract.

        The total occupancy shall not exceed the authorized capacity as set by the fire inspector for the respective facility and/or as set by the CUP (if applicable). The Contractor's facility must be of ample size to accommodate all participants, employees and the assigned parole agent. If the Contractor utilizes additional facilities to provide required services, (i.e., counseling services, etc.,) each facility must meet all clearances and codes as stated below.

        Should substance abuse counseling be provided at the Contractor's facility, the facility must be licensed by the State Department of Alcohol and Drug Programs (ADP) to operate as a residential facility as defined in Title 9 of the California Code of Regulations. The ADP License shall remain valid throughout the term of the contract.

    B.   <u>Pest Control</u>:   The contractor shall provide for daily documented pest control inspections and shall maintain monthly pest control services to ensure the facility is free of insect and rodent infestation. Documentation of pest control services will be maintained at the facility and made available to DCR staff upon request.

    C.   <u>Housing</u>: All parolee-participants must be housed at a single facility, if licensed as co-ed by ADP, facilities may be adjacent to each other. Parolee-participant housing may be dormitory style or individual rooms (not to exceed six persons per room). Rooms must meet all State ordinances and DCR regulations for minimum space requirements. A minimum of 50 square feet of sleeping space shall be provided each parolee-participant of which no more than four square feet is closet space. In addition, pursuant to DCR regulations, policy, and procedures, up to six cubic feet must be provided for allowable personal property, excluding designated work clothing and shoes.

        Each participant's sleeping quarters shall include a bed frame, box spring and mattress, and pillow; supply of clean bed linens; towel; chair; locker; closet or dresser for participant clothing and authorized personal property. Mattresses and pillows shall be replaced as they wear out or are damaged. The facility must provide an adequate number of full service bathrooms in accordance with minimum Board of Corrections (BOC) standards. These standards include item-to-parolee ratios such as: toilets (1:8), urinals (optional-1:8), sinks (1:8) and showers (1:8). The facility must also provide a day room for living activities such as studying, writing, reading and viewing television (20 square feet per parolee-participant). The area shall have proper lighting, heating and ventilation. In accordance with Penal Code 1208, the Contractor shall operate in compliance with all appropriate state and local building, zoning, health, safety, and fire statutes, ordinances and regulations.

    E.   <u>Food Service and Dining Area</u>:

        The dining room and food service areas shall include a room that contains tables and benches or chairs sufficient in size to allow participants to dine at one or two seating per meal. This room may be used for multiple purposes when not in use for dining. The facility kitchen, dining room, food storage area, equipment, appliances, furnishings and cabinetry, as well as all food

3

**VAL2007 17469**

(

**EXHIBIT T**

# DAILY JAIL RATE MANUAL

### For Reimbursements

### Under

### Section 4016.5 of the Penal Code

### Section 1776 of the Welfare and Institutions Code



## California Department of Corrections and Rehabilitation

## Fiscal Year 2007/08

A list of unallowable costs is indicated below. An explanation of each cost is contained in Appendix VI, Glossary of Definitions.

| UNALLOWABLE COSTS | |
|---|---|
| Advertising | Home detention |
| Booking costs, including classification costs | Equipment that meets or exceeds the county or city's capitalization policy |
| Capital assets | Facility lease or use costs |
| Commissary costs | Fines and penalties |
| Communications or radio services, outside of the jail facility | Insurable losses |
| Contingencies | Interest and other finance costs |
| Contributions and donations | Legal expenses |
| Depreciation costs | Meals for guests |
| Elected official's salaries and benefits | Non-routine medical expenses |
| Encumbrances | Non-routine pharmaceutical expenses; i.e., prescriptions |
| Inmate Programs (vocational, educational, rehabilitative, etc.) | Transportation outside of the county lines, excluding transportation to a State facility |
| Loans for capital improvements | Lease from the county or from the city government for jail space. |
| Work furlough | |

 **NOTE:** Unallowable costs must be included as both a direct cost and then removed as an unallowable direct cost on Lines 12-17 on the DJR Computation Schedule. This will ensure that the correct percentage of allowable indirect costs is calculated and applied to the DJR.

## F.   NON-ROUTINE MEDICAL/DENTAL AND MISCELLANEOUS EXPENSES

1.   Non-Routine Medical/Dental Expenses:

Definition:

"Non-routine medical expenses" refers to medical services provided to an individual for a specific condition or specialized care, such as those that typically requires a specialized physician (e.g., dermatology, psychiatry, cardiology, endocrinology, neurology, oncology, etc.).

Non-routine medical expenses are unallowable as a direct cost in the DJR calculation, and must be billed by the city or county directly to HASS, via the appropriate DAPO Regional Headquarters Office. (See Chapter VI, CDCR Claims Processing.)

NOTIFICATION REQUIREMENTS AND AUTHORIZATION FOR TREATMENT:

Please refer to **Chapter VI, Claims Processing, for specific documentation requirements.**

If a State parolee in the custody of the city or county requires non-routine medical care after being received, the city or county must provide verbal notification to the Unit Supervisor of the respective parole unit within 24 hours. Additionally, within three consecutive days of an emergency non-routine medical need, the city or county must provide written notice to the State for a determination whether to release the State's parole hold or remove said inmate from the care of the city or county. Notification shall be directed in writing to the appropriate Unit Supervisor.

The Unit Supervisor will immediately forward such notice, including the specific nature and level of medical services required, to the respective District Administrator.

The District Administrator shall forward pertinent details to the DAPO Headquarters Health Care Coordinator for evaluation and disposition.

The District Administrator will communicate the final determination to the Unit Supervisor, who will be responsible for authorizing treatment and continuing a parole hold or removing the effected parolee from the city or county jail, as appropriate.

Non-routine medical needs of a non-emergency nature require written pre-authorization from the DAPO, and shall be processed in a manner similar to that of an emergency medical need.

**Failure to meet notification requirements and authorization for treatment shall nullify the obligation of the State to accept financial responsibility for any parolee requiring non-routine medical care.**

**The State will not compensate the city or county for the cost of housing inmates, including medical cases, beyond the scheduled day of transport who are confirmed by the city or county as "ready to transport" and unavailable on the scheduled day, unless such delays are beyond the control of the city or county.**

| EVENT | RESPONSIBILITY | ACTION |
|---|---|---|
| Parolee in custody requires non-routine medical care. | City or county | Within 24 hours, must provide verbal notification to the Parole Unit Supervisor re: required medical care. |
| Parolee in custody requires emergency non-routine medical care. | City or county | Within three consecutive days, must provide written notice to the State re: emergency care. |
| Notification of non-routine medical care received. | Parole Unit Supervisor | Forward notice to the District Administrator. |
| Notification of non-routine medical care received. | District Administrator | Forward notice to DAPO Health Care Coordinator for evaluation and disposition. |
| Final determination established as to whether to release parole hold or remove inmate from the care of the city or county. | District Administrator | Communicate determination to Parole Unit Supervisor. |
| Final determination communicated from District Administrator. | Parole Unit Supervisor | Either authorize treatment and continue parole hold, or remove parolee from city or county care. |