**EXHIBIT U**

# THIRD ANNUAL REPORT ON THE
# MENTAL HEALTH SERVICES CONTINUUM PROGRAM
# OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND
# REHABILITATION—PAROLE DIVISION



**Submitted to**
**The California Department of Corrections and Rehabilitation**
**Division of Parole**

**Prepared by**
**The UCLA Integrated Substance Abuse Program**
**Neuropsychiatric Institute**
David Farabee, Principal Investigator
Dave Bennett, Analyst
David Garcia, Analyst
Uma Warda, Statistician
Joy Yang, Study Coordinator
June 30, 2005

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION

**J.S. Woodford**
**Undersecretary**

**Joe McGrath**
**Chief Deputy Secretary**
**Adult Operations**

**Jim L'Etoile**
**Director**
**Division of Adult Parole Operations**

**Marilyn Kalvelage**
**Deputy Director**
**Division of Adult Parole Operations**

**Judy Harris**
**Associate Director**
**Division of Adult Parole Operations**

**Distributed by the:**
**Division of Adult Parole Operations**
**1515 S Street, Rm 212 North**
**Sacramento, CA 95814**
**(916) 327-4612**

MHSCP 3rd Annual Report

# TABLE OF CONTENTS

Preface                              iii

**Executive Summary**                                                    1

I.     **MHSCP: Historical Context and Overview**
       A. Background                                          5
       B. Program Design and Description                      6
II.    **Impact Evaluation**
       A. Identification and Assessment of Eligible Inmates   9
       B. Clinic Attendance                                  11
       C. Characteristics of MHSCP and Non-MHSCP Parolees    14
       D. Trends in Data Quality                             15
       E. Reduction in EOP Parolee Caseloads                 15
III.   **Outcome Evaluation (12-Month Return to Custody)**
       A. Comparisons by MHSCP Participation Status          16
       B. Time in Program                                    20
IV.   **Cost Analysis**                                           21

V.    **Conclusions**                                            21


**References**                                                          23


**Appendix A:** Figures 7 & 8 (Survival Curves)                         24
**Appendix B:** Trends in PATS Data Quality                             27

## PREFACE

*In May of 2002, the California Department of Corrections and Rehabilitation—Parole and Community Services Division (in consultation with the Research Branch) selected the Integrated Substance Abuse Programs (ISAP) at the University of California, Los Angeles to conduct a process and outcome evaluation of the Mental Health Services Continuum Program (MHSCP). The MHSCP, according to its design, was to be applied to all eligible inmates released on or after October 1, 2000. This report summarizes findings from the third year of this evaluation, and is submitted pursuant to the approved scope of services which calls for an annual report on or before June 30th of each project year.*

## Executive Summary

### Background

In 1954, the California Department of Corrections and Rehabilitation established the Parole Outpatient Clinic (POC) program to assist parolees with mental health problems and, as a consequence, reduce recidivism rates among this population. Since its inception until October 1, 2000, parole agents were primarily responsible for referring parolees to the POCs for services. Referrals would be made if the parolee had a history of mental illness (usually indicated by the receipt of mental health services while in prison), or if the parole agent perceived that the parolee showed signs of mental instability. However, under this approach a substantial proportion of otherwise eligible parolees were either not identified or not provided appropriate services.

To enhance the Department's ability to identify and treat mentally ill parolees, the Mental Health Services Continuum Program (MHSCP) was developed by the Parole and Community Services Division (P&CSD) in July of 2000. According to its design, the MHSCP was to be applied to all eligible inmates released on or after October 1, 2000.

The purpose of this report is to summarize the results of UCLA's ongoing process and outcome evaluation of the MHSCP.

### Program Design and Description

The MHSCP was designed to reduce the symptoms of mental illness among parolees by providing timely, cost-effective mental health services that optimizes their level of individual functioning in the community thereby reducing recidivism and improving public safety.

The MHSCP is designed to include:

- Pre-release needs assessment of paroling mentally ill inmates.

- Pre-release benefits eligibility and application assistance.

- Expanded and enhanced post-release mental health treatment for mentally ill parolees.

- Improved continuity of care from the institution's Mental Health Service Delivery System to the community-based parolee outpatient clinics.

- Increased assistance for successful reintegration into the community upon discharge from parole.

- A standardized program in all four-parole regions.

According to the MHSCP design, regional Transitional Case Management Program—Mental Illness (TCMP-MI) social workers are to conduct face-to-face assessments with eligible inmates within 90 days of the inmates' EPRD, and update this assessment information within 30 days of the inmates' EPRD. The TCMP-MI social worker then merges the assessment information into the Parole Automated Tracking System (PATS) database. This information is verified by the TCMP-MI liaison and forwards this information to the appropriate POC headquarters. Once received, a POC-MHSCP liaison consults with the inmates' parole agent of record (AOR) and

schedules an initial appointment. For EOP parolees, this appointment is scheduled to occur within 3 working days of release; for CCCMS parolees, the initial appointment is scheduled to occur within 7 working days of release.

In general, the jurisdictions of the TCMPI-MI social workers are divided into northern and southern regions, with Kern County Department of Public Health serving as the headquarters for the northern region, and the University of California at San Diego serving as the headquarters for the southern region. Some exceptions to this regional approach (e.g., including San Quentin State Prison in the southern region) were made to achieve balance between the regional caseloads and to reduce costs.

Upon leaving the institution, parolees return to one of four parole regions (typically based on the county of commitment). The headquarters for these regions are located in Sacramento (Region I), Oakland (Region II), Los Angeles (Region III), and Diamond Bar (Region IV).

**Impact Evaluation**

Except where otherwise indicated, the current evaluation focused on inmates who were released from prison between July 1, 2001 and December 31, 2003 (N= 49,667). Highlights of this portion of the evaluation are summarized below:

*Pre-Release Assessments*

- Overall, 57.0% (up from 51.4% in the previous annual report) of the eligible pool of releases in the study sample had received a face-to-face assessment prior to release, and the percentage of inmates who are assessed has increased over time. Another important consideration is the time between the date that an eligible MHSCP inmate appears on the Offender Information Services (OIS) List and the date that he or she is released. For the current study sample, 14.3% of the MHSCP-eligible inmates appeared on the OIS List within 45 days of release. In such circumstances, the TCMP social workers are able to conduct face-to-face assessments with only 17.8%. When inmates appear on the OIS List with at least 45 days before their actual release date, they are approximately 3.5 times more likely to be assessed (63.5%).

- For parolees who had appeared on the OIS List at least 45 days prior to release, assessment rates increased from 40.9% from July 1, 2001 to December 31, 2001 to 70.9% for those released between July 1, 2004 to December 31, 2004.

*Parole Outpatient Clinic (POC) Attendance*

- Inmates who were assessed prior to release were significantly more likely to attend a POC at least once than those who did not receive a pre-release assessment (66.2% versus 50.8%, respectively).

- The average number of POC sessions attended was 6.5 (SD=9.2), and ranged from 1 to 254 sessions. Overall, TCMP-assessed parolees attended a significantly greater number of POC sessions (mean=4.4) than non-assessed parolees (mean=3.3 sessions). The same analysis excluding those who never attended a POC shows that TCMP-assessed parolees attended approximately the same number of POC sessions as non-assessed POC clients (means: assessed=6.6 sessions; non-assessed=6.4 sessions).

- Controlling for the effects of other background variables, receiving a pre-release assessment by a TCMP-MI social worker was associated with a 90% increase in the likelihood of attending a POC at least once following release from prison.

*Characteristics of MHSCP and Non-MHSCP Parolees*

- As found in the first two annual reports, the likelihood of an inmate's being assessed prior to release did not appear to be systematically related to his or her background characteristics. In other words, assessments are not conducted on inmates who are considered "best bets," nor are they biased toward those who are most impaired.

## Outcome Evaluation

The analyses in this section focus on offenders who were released between July 1, 2001 and December 31, 2003. This cohort was selected to allow us to examine the effects of the MHSCP transitional process after one year of implementation, while still allowing a minimum of 12 months at risk in the community.

- The likelihood of being returned to custody (for any reason) during the first 12 months following release from custody was associated with being younger, male, African-American, having been initially committed for a property crime, and having more serious mental health problems.

- After controlling for these five background variables (and parole region), receiving a pre-release assessment by a TCMP social worker was associated with a 19% reduction in the likelihood of being returned to custody within 12 months; having one or more POC contacts following release was associated with a 37% reduction in recidivism risk.

*Time in Program*

- Based on data on OIS-listed CCCMS/EOP releases from July 1, 2001-December 31, 2003 (N=32,327), 42.4% had no POC contact, 13.7% had one POC visit, 18.9% had 2-4 POC visits, 10.4% had 5-8 POC visits, and 14.6% had nine or more.

- Consistent with previous research, our analysis revealed a strong relationship between the number of POC sessions attended and recidivism risk. Specifically, the greater number of POC contacts a CCCMS/EOP parolee has, the less likely he or she is to be returned to prison. For example, 37.2% of parolees with 9 or more POC contacts were returned to custody within 12 months, compared to 70.4% of parolees with no POC contacts.

## Cost Analysis

- Based on the reduced number of incarceration days, we estimate that pre-release assessments conducted by TCMP-MI social workers resulted in savings of $2,194 for each EOP parolee and $712 for each CCCMS parolee, relative to non-assessed parolees.

- Regarding the cost savings associated with POC attendance, we calculated that having one or more POC contacts following release was associated with savings of $5,998 per EOP parolee and $3,224 for each CCCMS parolee, relative to those with no POC contact.

MHSCP 3rd Annual Report

**Conclusions**

The current evaluation has focused on the impact of the MHSCP on those inmates who were OIS-listed, but these offenders only account for 57% of eligible releases overall. This percentage has increased, however, from 58.6% of those released between July 1, 2001 and December 31, 2001 to nearly 73% of those released between July 1, 2004 and December 31, 2004. As we have indicated in previous annual reports, the overall effectiveness of the MHSCP program depends on the ability of the California Department of Corrections and Rehabilitation to further increase the percentage of eligible inmates who appear on the OIS list prior to being released on parole.

Among eligible offenders who were identified on the OIS list prior to release, the TCMP process continues to show promising results, both with regard to increasing the likelihood of attending a POC upon release as well as reducing the likelihood of being returned to custody. Specifically, after controlling for background characteristics, we found that receiving a pre-release assessment by a TCMP-MI social worker was associated with a 90% increase in the likelihood of attending a POC at least once following release from prison. In turn, parolees who attended a POC following release from prison were 37% less likely to be returned to prison within 12 months than parolees who did not attend a POC. Similar trends were found when predicting how long parolees remained out of prison.

Because receiving a TCMP-MI assessment and attending a POC were both related to significantly fewer days in prison during the 12 months following release, we conducted a basic analysis comparing the cost savings associated with avoided re-incarceration days (within 12 months) by TCMP-MI pre-release assessment and POC participation. These analyses revealed that pre-release assessments conducted by TCMP-MI social workers produced annual savings of $2,193.80 for each EOP parolee and $712.36 for each CCCMS parolee, relative to non-assessed parolees. Similarly, attending a POC following release was associated with an annual savings of $5,998.30 per EOP parolee and $3,243.90 for each CCCMS parolee, relative to not attending a POC. This result is consistent with findings in the broader offender rehabilitation literature showing that the greatest savings can be achieved by targeting the most seriously impaired offenders (Andrews, Bonta, & Hoge, 1990; Knight et al., 1999; Wexler, Melnick, & Cao, 2004).

In Year 4 of this evaluation, the UCLA evaluation team will report on its findings regarding the impact of the reduced EOP parolee caseloads. The final report will also include findings from interviews with parole unit supervisors and POC clinicians regarding their perceptions of the MHSCP program and how it can be further improved.

## THIRD ANNUAL REPORT ON THE MENTAL HEALTH SERVICES CONTINUUM PROGRAM OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS—PAROLE DIVISION

The purpose of this report is to summarize the results of UCLA's process and outcome evaluation of the MHSCP during the first three years of implementation. Specifically, this report describes the historical context of the MHSCP project, effectiveness of the program with regard to ensuring continuity of mental health services for eligible parolees, and the association between MHSCP program participation and 12-month recidivism outcomes.

## I.      MHSCP: Historical Context and Overview

### A.  Background

The research findings regarding the relationship between mental illness and crime vary considerably—often as a function of the definitions used and the populations studied. Not surprisingly, the associations between mental illness and crime tend to be more pronounced when studied among the general population. For example, according to one analysis of the Epidemiologic Catchment Area (ECA) data from the early 1980s (N>10,000), people with serious mental illness (i.e., Axis I diagnoses) were more than five times as likely to report engaging in violent behaviors as those without serious mental illness (see Monahan, 1996). In contrast, an attempt to predict general and violent recidivism among parolees from a maximum-security inpatient psychiatric unit showed that psychotic parolees were less likely than non-psychotic (but mentally ill) parolees to be rearrested for any offense, and equally likely to be rearrested for a violent offense (approximately 70% at three years post-release; Villeneuve & Quinsey, 1995). Similarly, Hodgins and Cote (1993) found that the criminal careers of mentally disordered and non-mentally disordered offenders differed little. However, the combination of antisocial personality disorder (ASP) and serious mental illness was associated with a significant increase in the frequency of non-violent arrests.

Other researchers have suggested that the presumed association between mental illness and criminality is an artifact of the use of arrest records as a proxy for actual offenses. Mentally ill offenders may be more vulnerable to detection and arrest than non-mentally ill offenders. Therefore, they are more likely to be cycled through the criminal justice system for minor offenses (Teplin, 1984). A possible moderating variable in these studies is the effect of post-release mental health services. If, in fact, serious mental illness is associated with risk of recidivism, then the ongoing provision of needed psychiatric services to mentally ill parolees should result in improved functioning and fewer arrests. Indeed, several studies have supported this relationship. In one study of post-release mentally ill offenders, recidivism was directly related to the receipt of fewer services that the clients reported they needed (Solomon, Draine, & Meyerson, 1994). More recently, Berecochea and Liu (1999) found that, among mentally ill parolees in California, each additional parole outpatient clinic service was associated with an increase of 21 days on parole (i.e., reduced risk of recidivism).

While the research findings regarding mental illness and criminality appear somewhat inconsistent, the association between substance use comorbidity and crime, particularly violent crime, is not. In

a study of hospitalized psychiatric patients (N=101), alcohol and cocaine abusers were significantly more likely to have homicidal ideation and homicidal plans (Salloum et al. 1996). Moreover, in a recent study of involuntarily admitted psychiatric patients with severe mental illness (N=331), Swartz et al. (1998) found that, whereas a diagnosis of schizophrenia or another psychotic disorder was not predictive of serious violence, the interaction of medication non-adherence and substance dependence was associated with a more than two-fold increase in the likelihood of committing violent acts, relative to those with either of these problems alone.

**The Mental Health Services Continuum Program**

In 1954, the California Department of Corrections established the Parole Outpatient Clinic (POC) program to assist parolees with mental health problems and, as a consequence, reduce recidivism rates among this population. Since its inception until October 1, 2000, parole agents were primarily responsible for referring parolees to the POCs for services. Referrals would be made if the parolee had a history of mental illness (usually indicated by the receipt of mental health services while in prison), or if the parole agent perceived that the parolee showed signs of mental instability. However, under this approach a substantial proportion of otherwise eligible parolees were either not identified or not provided appropriate services.

To enhance the Department's ability to identify and treat mentally ill parolees, the Mental Health Services Continuum Program (MHSCP) was developed by the Parole and Community Services Division (P&CSD) in July of 2000. According to its design, the MHSCP was to be applied to all eligible inmates released on or after October 1, 2000. However, based on a preliminary evaluation of the MHSCP, Bureau of State Audits (BSA; 2001) reported that (1) the program had failed to serve almost 40% of its target population, (2) clinicians were able to meet with their parolees during the scheduled time frame about 54% of the time, (3) the MHSCP database failed to identify almost 39% of the parolees who were eligible for MHSCP services, and (4) the MHSCP database did not allow for tracking of the time clinicians spent on each patient.

The current scope of work proposes a longer-term process and outcome evaluation of the MHSCP approximately two years after the BSA report was released. It is the view of the Department that the P&CSD has since had an opportunity to address these and other implementation issues that mitigated its effectiveness in its early stages.

**B. Program Design and Description**

The MHSCP was designed to reduce the symptoms of mental illness among parolees by providing timely, cost-effective mental health services that optimizes their level of individual functioning in the community thereby reducing recidivism and improving public safety.

The MHSCP is designed to include:

- Pre-release needs assessment of paroling mentally ill inmates.
- Pre-release benefits eligibility and application assistance.
- Expanded and enhanced post-release mental health treatment for mentally ill parolees.

- Improved continuity of care from the institution's Mental Health Service Delivery System to the community-based parolee outpatient clinics.
- Increased assistance for successful reintegration into the community upon discharge from parole.
- A standardized program in all four-parole regions.

**Population Served**

The MHSCP target population consists of parolees who were receiving mental health treatment in the institutions under the Mental Health Services Delivery System prior to release to parole. The MHSCP target population also consists of those parolees who have been in a Mental Health Crisis Bed and those releasing from any Department of Mental Health facility. The criteria for admission to both the institution's and parole's mental health treatment programs is a diagnosis of one or more of the following Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) psychiatric disorders:

- Schizophrenia (all subtypes)
- Delusional Disorder
- Schizophreniform Disorder
- Schizoaffective Disorder
- Substance-Induced Psychotic Disorder (exclude intoxication and withdrawal)
- Psychotic Disorder Due To A General Medical Condition
- Psychotic Disorder Not Otherwise Specified
- Major Depressive Disorders
- Bipolar Disorders I and II
- Medical Necessity (any other major mental illness diagnosis which requires treatment due to the acuity or severity of the illness)

The following mental health designations are used to determine the level of treatment need for inmates/parolees who require mental health services delivered by POC:

1. Correctional Clinical Case Management System (CCCMS) designation requires one or more of the above-referenced DSM IV diagnoses, and:

   - Stable functioning in the community;
   - Global Assessment of Functioning Score (GAF) above 50.

2. Enhanced Outpatient Program (EOP) designation requires one or more of the above referenced DSM IV diagnoses, and:

   - Acute onset or significant deterioration of a serious mental disorder characterized by increased delusional thinking;

- Hallucinatory experiences, marked changes in affect and vegetative signs with definitive impairment of reality testing and/or judgment;

- Dysfunctional or disruptive social interaction including withdrawal, bizarre or disruptive behavior, extreme defensiveness, inability to respond to instruction, provocative behavior toward others as a consequence of a serious mental disorder;

- Impairment of Activities of Daily Living (ADL) including eating, and personal hygiene, maintenance of dwelling, and ambulation as a consequence of a serious mental disorder.

- Global Assessment of Functioning Score (GAF) of 50 or less.

3. Mental Health Crisis Bed (MHCB) designation:

- An inmate experiencing a mental health crisis may be placed in a MHCB for inpatient, treatment and stabilization;

- Length of stay may be up to 10 days, unless the inmate is approved for a longer stay by the chief psychiatrist, or designee;

- Criteria for removal from the MHCB include stabilization and the ability to function in a less restrictive environment; i.e. EOP or CCCMS.

4. Priority of Services:

- EOP inmates

- MHCB inmates

- Department of Mental Health facility releases on medication and receiving clinical treatment

- CCCMS inmates receiving only clinical treatment

- CCCMS inmates not on medication AND who did not receive clinical treatment within six (6) months prior to release will NOT receive services from the MHSCP

According to the MHSCP design, regional Transitional Case Management Program—Mental Illness (TCMP-MI) social workers are to conduct face-to-face assessments with eligible inmates within 90 days of the inmates' EPRD, and update this assessment information within 30 days of the inmates' EPRD. The TCMP-MI social worker then merges the assessment information into the Parole Automated Tracking System (PATS) database. This information is verified by the TCMP-MI liaison and forwards this information to the appropriate POC headquarters. Once received, a POC-MHSCP liaison consults with the inmates' parole agent of record (AOR) and schedules an initial appointment. For EOP parolees, this appointment is scheduled to occur within 3 working days of release; for CCCMS parolees, the initial appointment is scheduled to occur within 7 working days of release.

In general, the jurisdictions of the TCMPI-MI social workers are divided into northern and southern regions, with Kern County Department of Public Health serving as the headquarters for the northern region, and the University of California, San Diego serving as the headquarters for the southern region. Some exceptions to this regional approach (e.g., including San Quentin State Prison in the southern region) were made to achieve balance between the regional caseloads and to reduce costs.

Upon leaving the institution, parolees return to one of four parole regions (typically based on the county of commitment). The headquarters for these regions are located in Sacramento (Region I), Oakland (Region II), Los Angeles (Region III), and Diamond Bar (Region IV).

## II.    Impact Evaluation

While the primary purpose of this evaluation is to examine the impact of MHSCP participation on recidivism, it is also important to assess patient-level data, including background characteristics, program participation, services received, and program discharge status. It is also important to examine the characteristics of the otherwise eligible parolees who were not served by the MHSCP program to determine whether there are any systematic biases in the referral and screening process by which inmates take part in the MHSCP; this cohort will also serve as a comparison group for the outcome evaluation.

It should be noted that the impact evaluation is not directly concerned with determining the effectiveness of the program on recidivism; rather, the focus of this component is to describe the "pipeline" of patient flow and to characterize the continuity of services of MHSCP program participants relative to eligible parolees who do not participate in the program.

It should be noted that, except where otherwise indicated, the analyses below are based upon releases from July 1, 2001 through December 31, 2004. Thus, the primary analysis sample consisted of 48,291 cases. When appropriate, this aggregate sample is divided into seven release cohorts: July 1, 2001-December 31, 2001 (Cohort 1; n=5,670), January 1, 2002-June 30, 2002 (Cohort 2; n=5,578), July 1, 2002-December 31, 2002 (Cohort 3; n=5,865), January 1, 2003-June 30, 2003 (Cohort 4; n=7,473), July 1, 2003-December 31, 2003 (Cohort 5; n=7,741), January 1, 2004-June 30, 2004 (Cohort 6; n=7,945), July 1, 2004-December 31, 2004 (Cohort 7; n=8,019).

## A. Identification and Assessment of Eligible Inmates

According to its design, the initial identification of MHSCP-eligible inmates is based upon monthly listings generated by the Offender Information Services Branch (OISB). The OIS List provides basic information on CCCMS and EOP inmates who are within 120 days of their estimated release date. However, because these estimated release dates are often inaccurate, not all eligible inmates appear on the OIS List. As a result, the sample frame for the present evaluation is limited to those inmates who appeared on the OIS List prior to release.

It should be noted that not all inmates appear on the OIS list prior to release. Over the time period covered by the present evaluation, 67.8% of releases were identified on the OIS list before being discharged from prison (a substantial increase from 51.1% as cited in the previous annual report). However, the percentage of inmates who appear on the OIS list has increased across the five release cohorts evaluated thus far, from 58.6% of inmates released in the July 1, 2001-December 31, 2001 cohort to 72.9% of inmates in the July 1, 2004-December 31, 2004 cohort—a 24% increase over that period. An analysis comparing offenders who appeared on the OIS list prior to

release with those who did not revealed only modest differences between the two groups, with the exception that OIS-listed inmates were less likely to be male (83.5% versus 86.0%; Chi-square [1, N=73,163]=75.9, p<.0001); more likely to be committed for a violent offense (26.9% versus 22.8%; Chi-square [3, N=73,122]=176.4, p<.0001); and more likely to be classified as an EOP (14.2% versus 9.9%; Chi-square [1, N=73,163]=269.3, p<.0001). Because gender, commitment offense, and severity of mental health problems have all been demonstrated to predict recidivism, the findings of this report (which are based only on OIS-listed offenders) should not be generalized to all released offenders with mental disorders.

One of the primary goals of the MHSCP process is to increase the percentage of eligible inmates who are assessed prior to leaving the institution. To determine program effectiveness in this regard, we conducted two sets of analyses using the Parole Automated Tracking System database. In the first analysis, "assessed" was operationalized by whether the TCMP-MI social worker had reported having at least one face-to-face meeting with the OIS-listed inmate prior to release. In the second analysis, we examined the percentages of inmates assessed depending on whether they appeared on the OIS List at least 45 days prior to release.

Overall, 57.0% (up from 51.4% in the previous annual report) of the eligible pool of releases in the study sample had received a face-to-face assessment prior to release, and the percentage of inmates who are assessed has increased over time. Another important consideration is the time between the date that an eligible MHSCP inmate appears on the Offender Information Services (OIS) List and the date that he or she is released. For the current study sample, 14.3% of the MHSCP-eligible inmates appeared on the OIS List within 45 days of release. In such circumstances, the TCMP social workers are able to conduct face-to-face assessments with only 17.8%. When inmates appear on the OIS List with at least 45 days before their actual release date, they are approximately 3.5 times more likely to be assessed (63.5%). Figure 1 shows the trends in assessment percentages over the five release cohorts of interest. Trend lines are provided for overall assessment percentages as well as the assessment percentages for inmates who appeared on the OIS List at least 45 days prior to their release date.

**Figure 1**: Percent of MHSCP-Eligible Cases Assessed Prior to Release (N=71,210)



### B. Clinic Attendance

Once a CCCMS/EOP inmate paroles from the institution, he or she is required to attend a parole outpatient clinic for ongoing assessment, treatment, and case management. According to the MHSCP design, EOP parolees are to appear for an initial appointment within 3 working days of release; CCCMS parolees are to report within 7 working days.

Determining whether a parolee was admitted to a POC within the prescribed time period proved to be a difficult task, given that these appointments are based on the inmates' earliest possible release dates (EPRD). EPRDs are not precise release dates, but rather serve as best estimates of an inmate's anticipated release. As a result, these dates are often inaccurate, occurring well before or after the tentatively scheduled POC intake appointment.

As an alternative approach, we analyzed POC attendance as a dichotomous outcome, categorizing parolees by whether they had at least one POC visit following release versus none at all. In addition, to allow for comparisons across the three years prior to the initiation of the MHSCP program, POC attendance records were extracted from the Clipper database as well as the PATS database, since the latter was only recently adopted and, in many cases, parolee attendance records continued to be entered into the Clipper database even after the PATS database was in place. Thus, for parolees released from 1997 through 2002, POC clinic attendance was determined by the presence of a POC visit in either the Clipper or PATS databases. Figure 2 shows POC attendance rates for the cohorts specific to this evaluation (July 1, 2001-December 31, 2003). The average number of POC contacts (for those who attended at least once) is only shown for the first five cohorts, since the follow-up periods were truncated for the latter cohorts. Overall, these data indicate that the percentage of CCCMS/EOP parolees who attend a POC at least once following release from prison has increased over the last five cohorts since July 1, 2002, from 54.1% to 64.3%; the average number of POC sessions attended generally ranges from 6 to 8.

**Figure 2**: Percentage of CCCMS/EOP Parolees with One or More POC Contacts  (N=48,291)



As indicated in the first annual report, POC attendance (for the combined cohorts) reveals slight but statistically significant variation in POC attendance by parole region. Figure 3 shows a regional distribution of the percentage of releases who had at least one POC contact following release from prison.

**Figure 3**: Percent of Releases with One or More POC Visits by Parole Region (N=48,264)



Although the above variations in POC attendance may reflect actual regional differences in attendance rates, some of the variation may also be an artifact of clinic- and regional-based differences in implementing the new reporting system. Although we have attempted to control for this potential source of bias by combining data from the Clipper and PATS databases, it is possible that the transition from one database to another may have resulted in a temporary suppression of reporting.

**Figure 4**: Pre-Release Assessment by POC Attendance Distributed by Region of Parole (N=48,264)



MHSCP 3rd Annual Report

**The impact of pre-release assessments on POC attendance**. The bivariate relationship between pre-release assessments and POC attendance (defined as one or more visits) reveals that inmates who are assessed prior to release are significantly more likely (66.2%) to attend a POC at least once than those who do not receive a pre-release assessment (50.8%; $\chi^2$ [1, N=48,291]=1,160.2, p<.0001). Not controlling for other differences between the assessed and non-assessed groups, this indicates that receiving a pre-release assessment is associated with a 30% increase in the likelihood of attending a POC at least once after release.[1] This effect appeared to be consistent across parole regions (see Figure 4).

**Predicting POC attendance in a multivariate model**. Because the assessed and non-assessed groups are not randomly assigned, it is important to control for the potentially confounding influences of other variables in order to isolate the effects of the intervention. Table 1 shows the results of a multivariate logistic regression model conducted to test the relationship between the pre-release assessments and POC attendance (as a dichotomous outcome), after controlling for the effects of age, gender, race, commitment offense and severity of mental health problems (CCCMS versus EOP).

**Table 1**: Odds Ratios Predicting Any POC Attendance Among Releases Between July 1, 2001-December 31, 2004 (N=48,280)[2]

| Variables | OR | 95% CI* |
|---|---|---|
| Age | 1.01 | 1.0, 1.01 * |
| Male (ref: female) | 0.79 | 0.75,0.83 |
| African-American (ref: other races) | 0.97 | 0.94,1.01 * |
| Property Offender (ref: other offenders) | 0.90 | 0.86,0.93 * |
| EOP (vs. CCCMS) | 1.00 | 0.95, 1.06 |
| **TCMP Assessed** | **1.90** | **1.83,1.97 *** |

*All predictors were statistically significant at the p<.001 level.

The overall model was statistically significant (-2 Log L=65,155, Chi-Square [df=9]=1,773, p<0001). All of the control variables were significantly predictive of POC attendance. Taken as a single profile, those who attended a POC at least once tended to be older, female, non-property offenders, and have been released to Parole Region I. However, after controlling for these background variables, we find that receiving a pre-release assessment by a TCMP-MI social worker was associated with an 90% increase (compared to 67% and 86% found in the first- and second-year evaluations, respectively) in the likelihood of attending a POC at least once following release from prison.

---

[1] It should be noted that the 30% figure refers to the percent *increase*, rather than the percentage point difference (15.4%) between assessed and non-assessed groups.

[2] This analysis also controls for parole region, though these variables are not shown in Table 1.

MHSCP 3rd Annual Report

## C. Characteristics of MHSCP and Non-MHSCP Parolees

One of the approaches we used to assess the effectiveness of the MHSCP with regard to recidivism involved a comparison between TCMP-assessed and non-TCMP-assessed inmates. Given that the MHSCP is still a relatively new program, we sought to capitalize on the fact that not all eligible inmates are assessed by a TCMP-MI social worker prior to release. Obviously, such an approach assumes that whether an eligible inmate was assessed is essentially a random process (i.e., there are no systematic differences between those who are and those who are not assessed). To verify this assumption, we compared the assessed and non-assessed groups (collapsing across the three cohorts representing releases between July 1, 2001-December 31, 2002) with regard to selected background variables, parole region, and mental health status.

**Table 2**: Comparability of Assessed and Non-Assessed Inmates, July 1, 2001-December 31, 2003 (N=48,291)

| Variable | Non-Assessed | Assessed | Total |
|---|---|---|---|
| N | 20,786 | 27,505 | 48,291 |
| Demographics | | | |
|    Gender (% male)** | 81.5 | 85.1 | 83.6 |
|    Age (mean, SD) * | 38.3 (8.8) | 38.6 (9.1) | 38.5 (9.0) |
|    Race/ethnicity** | | | |
|      African American | 37.2 | 36.7 | 36.9 |
|      Hispanic | 19.5 | 18.6 | 18.9 |
|      White | 39.8 | 41.8 | 41.0 |
|      Other | 3.5 | 3.0 | 3.2 |
| Parole Region ** | | | |
|    Region I | 23.6 | 24.6 | 24.2 |
|    Region II | 23.6 | 20.7 | 21.9 |
|    Region III | 27.3 | 26.4 | 26.8 |
|    Region IV | 25.5 | 28.4 | 27.2 |
| Offense Category** | | | |
|    Violent | 24.7 | 28.4 | 26.8 |
|    Property | 35.4 | 33.9 | 34.6 |
|    Drug | 30.8 | 28.2 | 29.3 |
|    Other | 9.1 | 9.5 | 9.4 |
| Mental Health Status** | | | |
|    CCCMS | 78.9 | 80.5 | 79.8 |
|    EOP | 13.2 | 15.0 | 14.2 |
|    None given | 7.9 | 4.5 | 6.0 |

*$p<.001$; **$p<.0001$

As shown in Table 2, the assessed and non-assessed groups showed statistically significant differences on all five background domains. However, it is important to keep in mind that statistical significance is determined not only by the magnitude of differences, but by sample size as well. With large sample sizes such as this, even subtle group differences that are not clinically relevant can be statistically significant. In such cases, it is more appropriate to examine these

group profiles for patterns of differences that appear to reflect systematic biases in selection. Using this approach, we can see that whether an inmate is assessed prior to release appears to be unrelated to his or her background characteristics. In other words, assessments are not conducted on inmates who are considered "best bets," nor are they biased toward those who are most impaired. The profiles in Table 2 indicate that non-assessments tend to occur at random, or at least for reasons external to the inmate. Therefore, non-assessed inmates appear to be a justifiable comparison group for the outcome portion of the present evaluation.

## D.  Trends in Data Quality

Maintaining data quality in the PATS database is critical for both the implementation and evaluation of the MHSCP program. To monitor data quality, a set of items from the PATS database was identified by the UCLA analysts to be monitored over time. These items (as shown in Appendix B) consist of the following:

1.  OIS listed but no TCMP/POC entry
2.  OIS listed but already released
3.  OIS listed without EPRD in PATS database
4.  OIS listed less than 45 days from estimated release date
5.  OIS listed at least 45 days prior to release, but not assessed by a TCMP-MI
6.  Assessment date listed occurs after inmate was released on parole
7.  POC appointment date occurs while offender is still in the institution, and
8.  OIS listed with missing level of psychiatric severity (MHLevel variable indicating CCCMS or EOP status)

As seen in Appendix B, the rates of inconsistencies (and/or logical errors) in the PATS database have dropped substantially since 2001. During calendar year 2003, only three of the items listed above had an error rate exceeding 3%. These are (1) being OIS listed without an EPRD listed in the PATS database (4.0%), (2) being OIS listed less than 45 days prior to release (6.8%), and (3) being OIS listed at least 45 days prior to release but not assessed by a TCMP-MI (14.9%).

## E. Reductions in EOP Parolee Caseloads

One of the policy shifts that occurred in conjunction with the MHSCP initiative was the reduction in EOP parolee caseloads to 40:1. Effective July 1, 2001, EOP parolees are to be contacted by their parole agent on the first workday following release and interviewed by the third workday. In addition, parole agents are to make a home call within six workdays following release, (and four per quarter for the remainder of parole), have two face-to-face contacts per month, two collateral interviews per month, one random drug test per month, and a case review at 30 days following release and every 90 days after that.

Packets requesting data for 1,239 EOP parolees were mailed to 157 unit supervisors on May 31 (76% of all units with EOP caseloads) and June 1, 2005 (24% of all units).  Each packet included a memo from Deputy Director L'Etoile notifying Unit Supervisors about the Evaluation of the MHSCP, a letter from the Principal Investigator requesting copies of four sets of records contained in each EOP file (Face sheet [CDC Form 1503-A], Contact Sheet [CDC Form 1244],

Records of Supervision [CDC Form 1650D], and any Activity Reports [CDC Form 1502] currently in the file), and a list of EOP parolees assigned to the unit.

As of June 21, 2005, 82 units have returned 574 EOP files (46% return rate). Eight EOP cases, for which follow-up telephone calls were made, were transferred to other parole units within the state. In addition, 4 EOPs were discharged from parole and 2 cases were transferred to U.S. Immigration and Naturalization Services units. Parole unit response rates broken down by region are as follows: Region I (Sacramento)—67%, Region II (Oakland)—47%, Region III (Los Angeles)—32%, and Region IV (Diamond Bar)—71%.

### III.    Outcome Evaluation (12-Month Return to Custody)

The three primary outcomes for this evaluation are (1) recidivism, (2) time to recidivism, and (3) correctional costs. It should be noted that *recidivism* is a general term referring to subsequent offending after release. It can be measured in many ways, including self-reported offenses, official arrest records, convictions, or returns to custody. Even among those who are returned to custody, there can be substantial variation in the reasons why (e.g., violation of parole conditions, pending revocation, or for a new offense). For the present evaluation, analyses of recidivism outcomes are based on simple return to custody, regardless of the reason, unless subsequent analyses reveal that alternative recidivism definitions produce substantively different results. In addition, recidivism is based on release cohorts, rather than at the individual level. Consequently, one parolee can account for multiple returns.

Regarding correctional costs, this evaluation includes an estimate of the incremental cost savings associated with avoided incarceration costs with the receipt of the MHSCP transitional services. This evaluation does not include a formal cost-benefit analysis, but rather provided an estimate of correctional costs saved based on the number of days in custody that are avoided as a consequence of participating in the MHSCP. Only correctional cost savings (rather than savings to other agencies or to society) are estimated.

#### A. Comparisons by MHSCP Participation Status

The analyses in this section focus on offenders who were released between July 1, 2001 and December 31, 2003. This cohort was selected to allow us to examine the effects of the MHSCP transitional process after one year of implementation, while still allowing a minimum of 12 months at risk in the community. In the first analysis, we conducted a multivariate logistic regression to predict the likelihood that a CCCMS/EOP parolee would be returned to custody within 12 months of release. To accomplish this, we included six control variables (age, gender, race/ethnicity, commitment offense, parole region, and severity of mental health problems) and the two primary variables of interest with regard to the MHSCP transitional process: (1) whether the CCCMS/EOP inmate was assessed by a TCMP social worker prior to release and (2) whether he or she had at least one POC contact following release.

The results of this analysis are presented in Table 3. The overall model was statistically significant (-2 Log L=42,068, Chi-square [df=10]=1,595, p<.0001). Odds ratio estimates for the seven predictors are shown in Table 3.

**Table 3**: Odds Ratios Predicting 12-Month Return to Custody for July 1, 2001-December 31, 2003 Release Cohort (N=32,324)

| Variables | OR | 95% CI |
|---|---|---|
| Age | 0.98 | 0.98, 0.99 ** |
| Male (ref: female) | 1.35 | 1.27,1.43 ** |
| African American (ref: other races) | 1.28 | 1.22,1.34 ** |
| Property Offender (ref: other offenders) | 1.15 | 1.09,1.20 ** |
| EOP (vs. CCCMS) | 1.25 | 1.17,1.34 ** |
| Parole Region I (vs. IV) | 1.21 | 1.13, 1.29 ** |
| Parole Region II (vs. IV) | 1.10 | 1.02, 1.18 * |
| Parole Region III (vs. IV) | 0.51 | 0.47, 0.54 ** |
| TCMP Assessed | **0.81** | 0.78,0.85 ** |
| Attended POC | **0.63** | 0.60,0.66 ** |

* $p<.01$; ** $p<.001$

We can see that the likelihood of being returned to custody (for any reason) was associated with being younger, male, African-American, having been initially committed for a property offense, and having more serious mental health problems. In fact, according to this analysis, EOP parolees are 25% more likely than CCCMS to be returned to custody within the first year following release. In addition, using Parole Region IV as a reference point, we see that parolees returned to Region I are more likely to be returned to custody within 12 months, while those released to Region III are only about half as likely to be returned to custody during this time frame. However, for purposes of this outcome evaluation, our greatest interest lies in understanding how the MHSCP-related variables are associated with recidivism. After controlling for these five background variables, receiving a pre-release assessment by a TCMP social worker was associated with a 19% reduction in the odds of being returned to custody within 12 months; having one or more POC contacts following release was associated with a 37% reduction in the recidivism risk.

Although we have demonstrated above that TCMP-assessed inmates are more likely to attend a POC than non-assessed inmates, it is interesting to note that receiving a pre-release assessment was also related to recidivism risk *independent* of its role in facilitation subsequent entry to a POC. This apparently independent effect was found in the first-year evaluation as well.

Because recidivism risk has been shown to vary by parole region, additional bivariate analyses were conducted to ascertain the extent to which the effects of pre-release assessments and POC attendance occurred across all four regions. As can be seen in Figures 5 and 6, the patterns are consistent across parole regions, and thus do not appear to be artifacts of regional policy

MHSCP 3rd Annual Report

differences. However, it should be noted that, while the difference between assessed and non-assessed groups is statistically significant overall and for Regions II, III, and IV, the difference was not statistically significant for Region I.

**Figure 5**: Return to Custody (12 Months) by Assessment Status and Parole Region, July 1, 2001-December 31, 2003 (N=32,311)



**Figure 6**: Return to Custody (12 Months) by POC Attendance and Parole Region, July 1, 2001-December 31, 2003 (N=32,311)



Another variable of interest is the length of time a parolee remains in the community prior to being returned to custody (if ever). Our comparison of group means reveals a statistically significant difference in parole days between assessed and non-assessed parolees, as well as between those who did and did not attend a POC upon release. Specifically, we found that parolees who had received a pre-release assessment had an average of 16.7 additional days on parole, and parolees who had one or more POC contacts had an additional 78.5 days on parole (see Table 4).

MHSCP 3rd Annual Report

**Table 4**: Mean Number of Days on Parole by Assessment and POC Attendance*

| MHSCP Variable | No Mean (SD) | Yes Mean (SD) | Difference |
|---|---|---|---|
| Assessed by TCMP-MI | 207.7 (134.1) | 224.4 (134.2) | 16.7 *** |
| Attended POC | 170.0 (134.1) | 250.1 (123.8) | 78.5 *** |

*Maximum number of days is truncated at 366; Means are based on actual days not in custody for all releases, not estimates derived from the proportional hazard model described below; ***p<.0001

Using a proportional hazard model, the next analysis sought to predict the time the length of time CCCMS/EOP parolees successfully remained out of prison after their index release. This analysis allowed us to test for the effects of the MHSCP transitional process on parolees' *survival*, that is, time to first re-incarceration. Consistent with the logistic regression models summarized earlier in this report, this model included age, gender, race/ethnicity, region, and severity of mental health problems as control variables. In addition, the model included whether the inmate had received a pre-release assessment and whether he or she had attended a POC upon release from prison.[3] The results of the full Cox regression appear in Table 5. In addition, Figures 7 and 8 (Appendix A) depict the survival curves for OIS-listed CCCMS/EOP parolees by pre-release assessment status and POC attendance.

**Table 5**: Results of Proportional Hazard Model Predicting Risk of Recidivism Over Time Among CCCMS/EOP Parolees Released July 1, 2001-December 31, 2003 (N=23,573)

| Variables | Parameter Est. | Hazard Ratio |
|---|---|---|
| Age | -0.01 | 0.99 *** |
| Male (ref: female) | 0.30 | 1.35 *** |
| African American (ref: white) | -0.12 | 0.89 *** |
| Hispanic (ref: white) | -0.29 | 0.75 *** |
| Other Race (ref: white) | -0.36 | 0.70 *** |
| EOP (ref: CCCMS) | 0.21 | 1.23 *** |
| TCMP Assessed | -0.11 | 0.90 *** |
| Attended POC | -0.67 | 0.51 *** |

*** p<.0001

---

[3] The number of days parole was fitted by a proportional hazard (Cox) model. The data were right-censored at 366 days.

The parameter estimates in Table 5 represent the magnitude and direction of the effects of the independent variables on the outcome (i.e., days on parole). Parameters with a negative sign indicate a longer time on parole. As in the previous multivariate models, all of the background variables are statistically significant. However, even after controlling for these potentially confounding effects we see that the MHSCP variables remain strongly predictive of days on parole. Specifically, parolees who receive a pre-release assessment by a TCMP-MI social worker have a proportional hazard (recidivism risk probability) of .90 compared to parolees who are not assessed. Likewise, those who attended a POC had a proportional hazard of only .51 that of those who did not attend a POC.

## B. Time in Program

As noted earlier, Berecochea and Liu (1999) found a positive relationship between the number of parole outpatient clinic services and the length of time a CCCMS/EOP parolee remained out of prison. This time-in-program effect has been observed in other studies as well—particularly evaluations of substance abuse treatment.

**Figure 9:**   Return to Custody (12 Months) by Number of POC Visits, July 1, 2001-- December 31, 2003 (N=32,327)



In the current study, we examined the relationship between the number of times a parolee was present for a scheduled POC visit and the likelihood of being returned to custody within 12 months of release. Based on data on OIS-listed CCCMS/EOP releases from July 1, 2001- December 31, 2003 (N=32,327), 42.4% had no POC contact, 13.7% had one POC visit, 18.9% had 2-4 POC visits, 10.4% had 5-8 POC visits, and 14.6% had nine or more. Figure 9 shows 12-month recidivism results across these five groups.

Consistent with previous research, our analysis revealed a strong relationship between the number of POC sessions attended and recidivism risk. Specifically, the greater number of POC contacts a CCCMS/EOP parolee has, the less likely he or she is to be returned to prison. Interestingly, the

greatest decline in recidivism risk occurs for parolees who have attended a POC more than four times (compared to a threshold of one POC visit as found in the first annual report).

## IV.   Cost Analysis

As we have seen above, inmates who have received MHSCP transitional services were less likely than inmates who did not receive these services to have been returned to prison during the 12 months following release. Overall, based on the July 1, 2001-December 31, 2003 release cohort, TCMP-assessed parolees spent an average of 13.5[4] more days on parole during the year following release than did non-TCMP-assessed parolees. Likewise, parolees who attended a POC one or more times following release spent 81.5 more days on parole than did parolees with no POC contact. However, because CCCMS and EOP differ substantially in their incarceration costs, we have calculated number of days on parole separately for these groups (see Table 6).

**Table 6**: Additional Days on Parole and Estimated Correctional Costs by Mental Health Status

| Classification | TCMP-Assessed (Days) | Any POC Contact (Days) | Est. Daily Incarceration Costs | Est. Daily Parole Cost |
|---|---|---|---|---|
| EOP | 26.4 | 72.0 | $93.3 | $9.99 |
| CCCMS | 18.4 | 83.8 | $48.7 | $9.99 |

*Maximum number of days is truncated at 366

To estimate annual correctional cost savings associated with the MHSCP, we assumed daily incarceration costs of $93.30 per day for EOP inmates and $48.70 per day for CCCMS inmates (CDC, 2003). From these figures, we subtracted the estimated daily cost of parole supervision ($9.99), which resulted in estimated daily cost savings of $83.31 for each additional day an EOP parolee remains under community supervision (relative to being incarcerated), and $38.71 for each additional day a CCCMS parolee remains under community supervision. Based on these assumptions, we calculate that pre-release assessments conducted by TCMP-MI social workers resulted in an annual savings of $2,193.80 for each EOP parolee and $712.36 for each CCCMS parolee, relative to non-assessed parolees. Regarding the cost savings associated with POC attendance, we calculated that having one or more POC contacts following release was associated with an annual savings of $5,998.30 per EOP parolee and $3,243.90 for each CCCMS parolee, relative to those with no POC contact.

---

[4] This average is based on all OIS-listed parolees released between July 1, 2001-December 31, 2003, including 1,369 (out of 19,809) for whom CCCMS/EOP status was not specified.

## V.    Conclusions

The current evaluation has focused on the impact of the MHSCP on those inmates who were OIS-listed, but these offenders only account for 57% of eligible releases overall. This percentage has increased, however, from 58.6% of those released between July 1, 2001 and December 31, 2001 to nearly 73% of those released between July 1, 2004 and December 31, 2004. As we have indicated in previous annual reports, the overall effectiveness of the MHSCP program depends on the ability of the California Department of Corrections and Rehabilitation to further increase the percentage of eligible inmates who appear on the OIS list prior to being released on parole.

Among eligible offenders who were identified on the OIS list prior to release, the TCMP process continues to show promising results, both with regard to increasing the likelihood of attending a POC upon release as well as reducing the likelihood of being returned to custody. Specifically, after controlling for background characteristics, we found that receiving a pre-release assessment by a TCMP-MI social worker was associated with a 90% increase in the likelihood of attending a POC at least once following release from prison. In turn, parolees who attended a POC following release from prison were 37% less likely to be returned to prison within 12 months than parolees who did not attend a POC. Similar trends were found when predicting how long parolees remained out of prison.

Because receiving a TCMP-MI assessment and attending a POC were both related to significantly fewer days in prison during the 12 months following release, we conducted a basic analysis comparing the cost savings associated with avoided re-incarceration days (within 12 months) by TCMP-MI pre-release assessment and POC participation. These analyses revealed that pre-release assessments conducted by TCMP-MI social workers produced annual savings of $2,193.80 for each EOP parolee and $712.36 for each CCCMS parolee, relative to non-assessed parolees. Similarly, attending a POC following release was associated with an annual savings of $5,998.30 per EOP parolee and $3,243.90 for each CCCMS parolee, relative to not attending a POC. This result is consistent with findings in the broader offender rehabilitation literature showing that the greatest savings can be achieved by targeting the most seriously impaired offenders (Andrews, Bonta, & Hoge, 1990; Knight et al., 1999; Wexler, Melnick, & Cao, 2004).

In Year 4 of this evaluation, the UCLA evaluation team will report on its findings regarding the impact of the reduced EOP parolee caseloads. The final report will also include findings from interviews with parole unit supervisors and POC clinicians regarding their perceptions of the MHSCP program and how it can be further improved.

MHSCP 3rd Annual Report

## References

Andrews, D.A., Bonta, J., & Hoge, R.D. (1990). Classification for effective rehabilitation: Rediscovering psychology. *Criminal Justice and Behavior, 17,* 19-52.

Berecochea, J., & Liu, R. (1999). *Seriously Mentally Disordered Offenders and Recidivism.* Sacramento, CA: California Department of Corrections.

Bureau of State Audits (2001). *Department of Corrections: Though Improving, the Department Still Does Not Identify and Serve All Parolees Needing Outpatient Clinic Program Services, but Increased Caseloads Might Strain Services.* Sacramento, CA: California State Auditor. (2001-104).

California Department of Corrections (2003). *CDC Facts.* Sacramento, CA: Author.

Knight, K., Simpson, D.D., & Hiller, M.L. (1999). Three-year reincarceration outcomes for in-prison therapeutic community treatment in Texas. *The Prison Journal, 79(3),* 337-351.

Monahan, J. (1996). Mental illness and violent crime. *Research Preview.* Washington, DC: Department of Justice.

Salloum, I.M., Daley, D.C., Cornelius, J.R., & Kirisci, L. (1996). Patterns of suicidality and alcohol use in alcoholics with major depression. *Alcoholism: Clinical & Experimental Research, 20(8),* 1451-1455.

Swartz, M.S., Swanson, J.W., Hiday, V.A., Borum, R., Wagner, R., & Burns, B.J. (1998). Violence and severe mental illness: The effects of substance abuse and nonadherence to medication. *American Journal of Psychiatry, 155(2),* 226-231.

Teplin, L. (1984). Managing disorder: Police handling of the mentally ill. In L.A. Teplin (Ed.), *Mental health and criminal justice* (pp. 157-175). Beverly Hills, CA: Sage.

Villenueve, D.B., & Quinsey, V.L. (1995). Predictors of general and violent recidivism among mentally disordered inmates. *Criminal Justice and Behavior, 22(4),* 397-410.

Wexler, H.K., Melnick, G.D., & Cao, Y. (2004). Risk and prison substance abuse treatment outcomes: A replication and challenge. *The Prison Journal, 84 (1),* 106-120.

MHSCP 3rd Annual Report

**Appendix A:**
**(Figures 7 & 8)**
**Survival Curves Predicting 12-Month Recidivism as a Function of TCMP Assessment**
**and POC Attendance**

MHSCP 3rd Annual Report

**Figure 7: Estimated Survival Function for TCMP Pre-Release Assessment**



MHSCP 3rd Annual Report

**Figure 8: Estimated Survival Function for One or More POC Contact**



**Appendix B:**
**Trends in TCMP Data Quality**

MHSCP 3rd Annual Report

**Inconsistency Report**

| Inconsistency | 2001 | % | 2002 | % | 2003 | % | 2004 | % |
|---|---|---|---|---|---|---|---|---|
| OIS listed but no TCMP/POC entry | 0 | 0.0 | 1 | 0.0 | 0 | 0.0 | 3 | 0.0 |
| OIS listed but already released | 147 | 0.2 | 31 | 0.0 | 321 | 0.4 | 426 | 0.6 |
| OIS listed w/out EPRD in TCMP/POC | 4034 | 5.3 | 2423 | 3.2 | 1684 | 2.3 | 1430 | 2.2 |
| OIS listed < 45 days from EPRD | 2856 | 3.7 | 2827 | 3.7 | 2277 | 3.1 | 2559 | 3.9 |
| OIS listed w/ > 45 days from EPRD and no assessment | 5161 | 6.8 | 7143 | 9.3 | 8216 | 11.2 | 5729 | 8.7 |
| Assessed entry during parole term | 48 | 0.1 | 91 | 0.1 | 134 | 0.2 | 284 | 0.4 |
| POC appt. during institution term | 144 | 0.2 | 358 | 0.5 | 1008 | 1.4 | 1171 | 1.8 |
| OIS listed w/ missing MHLevel in TCMP/POC | 2652 | 3.5 | 1016 | 1.3 | 1415 | 1.9 | 1339 | 2.0 |
| **OIS population** | **12976** | | **16299** | | **18738** | | **20399** | |

**EXHIBIT V**

# STATE OF CALIFORNIA
## BUDGET CHANGE PROPOSAL - COVER SHEET
### FOR FISCAL YEAR    2007/08
DF 6 (WORD Version)(REV 01/06)
*Please report dollars in thousands.*

**Department of Finance**
**915 L Street**
**Sacramento, CA  95814**
**IMS Mail Code: A-15**

| BCP # | PRIORITY NO. | ORG. CODE 5225 | DEPARTMENT California Department of Corrections and Rehabilitation |
|---|---|---|---|
| PROGRAM 25, 50 | ELEMENT | COMPONENT | |

TITLE OF PROPOSED CHANGE
Reception Center Enhanced Outpatient Program Services (Coleman)

SUMMARY OF PROPOSED CHANGES

**This BCP is a Workload Request based on G.C. 13308.05.**

This proposal requests $2,794 million in current year; and $5,127 million along with additional clinical and custody staff to be assigned to Reception Centers to deliver treatment to individuals who have been identified in mental health evaluations as having a serious mental disorder resulting in a serious level of impairment in functioning. Funding is necessary to implement the Reception Center Enhanced Outpatient Program in order to comply with Federal Court mandates.

|  | Current Year | Budget Year | BY+1 |
|---|---|---|---|
| Dollars (Thousands) | $2,794 | $5,127 | 5,119 |
| Positions | 67.7 | 67.7 | 67.7 |
| PYs | 33.7 | 66.2 | 66.2 |

| REQUIRES LEGISLATION | CODE SECTION(S) TO BE AMENDED/ADDED | BUDGET IMPACT—PROVIDE LIST AND MARK IF APPLICABLE |
|---|---|---|
| ☐ YES ☒ NO | | ☒ ONE-TIME COST    ☐ FUTURE SAVINGS<br>☒ FULL-YEAR COSTS  ☐ REVENUE<br>☐ FACILITIES/CAPITAL COSTS |

| PREPARED BY Ron Metz (916) 324-9690 | DATE 07/31/06 | REVIEWED BY Nancy Leonard (916) 323-9568 | DATE 12/5/06 |
|---|---|---|---|
| DEPARTMENT DIRECTOR *Debbie McKinney* | DATE *1/4/07* | AGENCY SECRETARY | DATE *01/04/07* |

DOES THIS BCP CONTAIN INFORMATION TECHNOLOGY (IT) COMPONENTS?    YES ☐  OR  NO ☒
IF YES, DEPARTMENT CHIEF INFORMATION OFFICER SIGNATURE              DATE

FOR IT REQUESTS, SPECIFY THE DATE SPECIAL PROJECT REPORT (SPR) OR FEASIBILITY STUDY REPORT (FSR) WAS APPROVED BY THE DEPARTMENT OF FINANCE.

DATE    PROJECT #        FSR ☐    OR    SPR ☐

IF PROPOSAL AFFECTS ANOTHER DEPARTMENT, DOES OTHER DEPARTMENT CONCUR WITH PROPOSAL?
☐ YES    ☒ NO        ATTACH COMMENTS OF AFFECTED DEPARTMENT, SIGNED AND DATED BY THE DEPARTMENT DIRECTOR OR DESIGNEE

## DEPARTMENT OF FINANCE ANALYST USE
### (ADDITIONAL REVIEW)

ORIGINAL SIGNED BY
ZLATKO THEODOROVIC

CAPITAL OUTLAY ☐    OTROS ☐    FSCU ☐    OSAE ☐    CALSTARS ☐

STATE OF CALIFORNIA
**BUDGET CHANGE PROPOSAL- FISCAL DETAIL**
**STATE OPERATIONS**

~~-46 (REV 03/05) Alternative
ase report dollars in thousands

PAGE #:           1
Printed:      01/04/07      time:      16:21:41
Data source  :W:\TEMP\NPOP1214.DBF
Report Location:W:\TEMP\FSCLDT~1.RP1
Report Form  :02DF46Plcy/FnLt/Whl/PY#slv2_3

| BCP # | 5999ED | | DATE | 01/04/07 | TITLE | RC EDP SVCS |
|---|---|---|---|---|---|---|
| PROGRAM | ( Consolidated ) | | ELEMENT | | COMPONENT | |

| PERSONNEL YEARS | PYs CY | PYs BY | CURRENT YR.($,000) | BUDGET YR.($,000) |
|---|---|---|---|---|
| TOTAL S & W | 34.4 | 67.7 | $1,869,699 | $3,672,581 |
| SALARY SAVINGS | -0.7 | -1.5 | -$34,070 | -$66,491 |
| NET TOTAL S & W | 33.7 | 66.2 | $1,835,629 | $3,606,090 |
| STAFF BENEFITS | -- | | $722,566 | $1,415,451 |
| OASDI | | | | |
| HEALTH INSURANCE | | | | |
| RETIREMENT - Industrial | ( | whole | ) ( | ) ( | |
| RETIREMENT - Safety | ( | dollars | ) ( 235,597) | ( 459,534) |
| RETIREMENT - Peace Officer | ( | | ) ( | ) ( | |
| RETIREMENT - Other | ( | | ) ( 156,904) | ( 310,607) |
| WORKERS' COMPENSATION | ( | | ) ( 250,539) | ( 489,174) |
| IDL, NDI, UI (incl in W.C.) | ( | | ) ( 79,526) | ( 156,136) |
| **TOTAL PERSONAL SVCS** | | | $2,558,195 | $5,021,541 |
| **OPERATING EXPENSES AND EQUIPMENT** | | | | |
| GENERAL EXPENSE | | | 15,965 | 33,667 |
| PRINTING | | | 3,507 | 7,449 |
| ~~MMUNICATIONS | | | 3,384 | 7,183 |
| TAGE | | | 1,561 | 3,331 |
| INSURANCE | | | 515 | 1,112 |
| TRAVEL - IN STATE | | | 7,134 | 15,066 |
| TRAVEL - OUT OF STATE | | | | |
| TRAINING | | | 3,223 | 6,806 |
| FACILITIES OPERATIONS | | | 60,126 | |
| UTILITIES | | | | |
| CONSULTING & PROFESSIONAL:Interdepartmental | | | 990 | 2,114 |
| CONSULTING & PROFESSIONAL:External | | | | |
| CONSOLIDATED DATA CENTERS | | | | |
| Health and Welfare Data Center | | | | |
| Stephen P. Teale Data Center | | ( | ) ( | ) |
| DATA PROCESSING | | ( | ) ( | ) |
| EQUIPMENT | | | | |
| DEBT SERVICE | | | 125,303 | |
| OTHER ITEMS OF EXPENSE (see Supplemental Info sheets) | | | 14,097 | 28,731 |
| **TOTAL OPERATING EXPENSES and EQUIPMENT** | | | 235,805 | 105,459 |
| SPECIAL ITEMS of EXPENSE | | | | |
| **TOTAL STATE OPERATIONS EXPENDITURES** | | | $  2,794,000 | $  5,127,000 |

PAGE III-2a

VAL2007 100001

| SOURCE OF FUNDS | APPROPRIATION NO. | | | | | |
|---|---|---|---|---|---|---|
| | ORG | REF | FUND | | | |
| GENERAL FUND | 5225 | 001 | 0001 | $ | 1,544,074 | $  2,916,391 |
| SPECIAL FUNDS | 5225 | | | $ | | $ |
| HEALTH CARE FUND | 5225 | 002 | 0001 | $ | 1,249,926 | $  2,210,609 |
| FEDERAL FUNDS | 5225 | 001 | 0890 | $ | | $ |
| OTHER FUNDS - Bond | 5225 | 001 | 0001 | $ | | $ |
| OTHER FUNDS - IWF | 5225 | 001 | 0917 | $ | | $ |
| OTHER - Spcl Deposit | 5225 | 001 | 0942 | $ | | $ |
| OTHER (Lease Paymnt) | 5225 | 003 | 0001 | $ | | $ |
| OTHER Lottery Educ | 5225 | 001 | 0831 | $ | | $ |
| REIMBURSEMENTS | 5225 | 501 | 0995 | $ | | $ |
| GENERAL FUND, PROP98 | 5225 | 011 | 0001 | $ | | $ |
| CORR TRNG FUND | 5225 | 001 | 0170 | $ | | $ |

| LOCAL ASSISTANCE SOURCE OF FUNDS | APPROPRIATION NO. | | | $ ( | ) | $ ( | ) |
|---|---|---|---|---|---|---|---|
| | ORG | REF | FUND | | | | |
| GENERAL FUND | 5225 | 101 | 0001 | $ | | $ | |
| SPECIAL FUNDS | 5225 | | | $ | | $ | |
| FEDERAL FUNDS | 5225 | | | $ | | $ | |
| OTHER FUNDS | 5225 | | | $ | | $ | |
| REIMBURSEMENTS | 5225 | 601 | 0995 | $ | | $ | |

/////////////  E N D  of  CONSOLIDATED DISPLAY  /////////////        PAGE III-2b

VAL2007 100002

CONTINUATION Sheet **Adult Corr & Rehab Ops**
BCP# *5999EO*                    DEPARTMENT *CORRECTIONS & REHAB*

Page: 3
Printed: 01/04/07   time: 16:21:41
**FISCAL YEAR** 2007 - 2008

| PROGRAM Adult Corr & Rehab Ops | | ELEMENT | | COMPONENT | |
|---|---|---|---|---|---|
| PERSONNEL YEARS | PYs CY | PYs BY | | CURRENT YR. $$ | BUDGET YR. $$ |
| TOTAL S & W | 17.7 | 34.7 | | $1,026,112 | $2,002,006 |
| SALARY SAVINGS | | | | -$3,717 | -$5,782 |
| NET TOTAL S & W | 17.7 | 34.7 | | $1,022,395 | $1,996,224 |
| STAFF BENEFITS | -- | -- | | $427,143 | $834,839 |
| OASDI | | | | | |
| HEALTH INSURANCE | ( | whole | ) ( | 130,652) | ( 256,022) |
| RETIREMENT - Industrial | ( | dollars | ) ( | ) | ( ) |
| RETIREMENT - Safety | ( | | ) ( | ) | ( ) |
| RETIREMENT - Peace Officer | ( | | ) ( | ) | ( ) |
| RETIREMENT - Other | ( | | ) ( | 250,539) | ( 489,174) |
| WORKERS' COMPENSATION | ( | | ) ( | ) | ( ) |
| IDL, NDI, UI (incl in W.C.) | ( | | ) ( | 45,952) | ( 89,643) |
| TOTAL PERSONAL SVCS | | | | $1,449,538 | $2,831,063 |

OPERATING EXPENSES AND EQUIPMENT

| | | |
|---|---|---|
| GENERAL EXPENSE | | |
| PRINTING | 11,790 | 24,880 |
| COMMUNICATIONS | 3,218 | 6,869 |
| POSTAGE | 3,363 | 7,148 |
| INSURANCE | 1,561 | 3,331 |
| TRAVEL - IN STATE | 515 | 1,112 |
| TRAVEL - OUT OF STATE | 3,572 | 7,602 |
| TRAINING | | |
| FACILITIES OPERATIONS | 1,665 | 3,541 |
| UTILITIES | 46,000 | |
| CONSULTING & PROFESSIONAL:Interdepartmental | | |
| CONSULTING & PROFESSIONAL:External | 990 | 2,114 |
| CONSOLIDATED DATA CENTERS | | |
| Health and Welfare Data Center | ( ) | ( ) |
| Stephen P. Teale Data Center | ( ) | ( ) |
| DATA PROCESSING | | |
| EQUIPMENT | 7,765 | |
| DEBT SERVICE | | |
| OTHER ITEMS OF EXPENSE (see Supplemental Info sheets) | 14,097 | 28,731 |
| TOTAL OPERATING EXPENSES and EQUIPMENT | 94,536 | 85,328 |

SPECIAL ITEMS of EXPENSE

| TOTAL STATE OPERATIONS EXPENDITURES | $ 1,544,074 | $ 2,916,391 |
|---|---|---|

PAGE III-2a

VAL2007 100003

CONTINUATION Sheet **Adult Corr & Rehab Ops**
BCP# *5999EO*    DEPARTMENT *CORRECTIONS & REHAB*

Page: 4
Printed: 01/04/07    time: 15:21:41
**FISCAL YEAR** 2007 - 2008

## Adult Corr & Rehab Ops

| SOURCE OF FUNDS | APPROPRIATION NO. | | | | | | |
|---|---|---|---|---|---|---|---|
| | ORG | REF | FUND | | | | |
| GENERAL FUND | 5225 | 001 | 0001 | $ | 1,544,074 | $ | 2,916,391 |
| SPECIAL FUNDS | 5225 | | | $ | | $ | |
| HEALTH CARE FUND | 5225 | 002 | 0001 | $ | | $ | |
| FEDERAL FUNDS | 5225 | 001 | 0890 | $ | | $ | |
| OTHER FUNDS - Bond | 5225 | 001 | 0001 | $ | | $ | |
| OTHER FUNDS - IWF | 5225 | 001 | 0917 | $ | | $ | |
| OTHER - Spcl Deposit | 5225 | 001 | 0942 | $ | | $ | |
| OTHER Lease Payment | 5225 | 003 | 0001 | $ | | $ | |
| OTHER Lottery-Educ | 5225 | 001 | 0831 | $ | | $ | |
| REIMBURSEMENTS | 5225 | 501 | 0995 | $ | | $ | |
| GENERAL FUND, PROP98 | 5225 | 011 | 0001 | $ | | $ | |
| CORR TRNG FUND | 5225 | 001 | 0170 | $ | | $ | |

| LOCAL ASSISTANCE SOURCE OF FUNDS | APPROPRIATION NO. | | | $ ( | ) | $ ( | ) |
|---|---|---|---|---|---|---|---|
| | ORG | REF | FUND | | | | |
| GENERAL FUND | 5225 | 101 | 0001 | $ | | $ | |
| SPECIAL FUNDS | 5225 | | | $ | | $ | |
| FEDERAL FUNDS | 5225 | | | $ | | $ | |
| IER FUNDS | 5225 | | | $ | | $ | |
| REIMBURSEMENTS | 5225 | 601 | 0995 | $ | | $ | |

PAGE III-2b

VAL2007 100004

Fiscal Detail Continued
**DETAIL OF PERSONAL SERVICES**    ***Adult Corr & Rehab Ops***

| *Proposed New* | POSITIONS | | | AMOUNT (,000) | |
|---|---|---|---|---|---|
| **CLASSIFICATION** | **CY** | **BY** | **SALARY/RANGE** | **CY** | **BY** |
| Corr Counselor II-Spec | 0.9 | 1.4 | 6216 - 7550 | 74,337 | 115,635 |
| Corr Ofcr | 16.8 | 33.3 | 3508 - 5712 | 929,376 | 1,842,156 |
| Pay Differentials | - | - | | 8,451 | 16,749 |
| Premium Holiday Pay | - | - | | 13,948 | 27,466 |
| **TOTAL SALARIES AND WAGES** | 17.7 | 34.7 | [[[[[[[[]]]]] | $ 1,026,112 | $ 2,002,006 |

PAGE III-3

\*
\*
\*

**SUPPLEMENTAL INFORMATION**
*Please report dollars in thousands.*
IDENTIFY ALL PROPOSED ITEMS WHICH FIT INTO THE CATEGORIES LISTED BELOW.    SEE INSTRUCTIONS

| | **CURRENT YEAR** | **BUDGET YEAR** | **BUDGET YEAR + ONE** |
|---|---|---|---|
| EQUIP - | | | |
| S-In | 7,765 | | |
| S-Ex | 990 | 2,114 | |
| ONE-TIMES (ONE-TIMES incls EQUIP & CONTRACTS) | | 7,765 | |
| FULL-YR | | | |
| OTHR Items | 14,097 | 28,731 | |

\\\\\\\\\\\\\    E N D   of   PROGRAM:    *Adult Corr & Rehab Ops*

PAGE III-4

VAL2007 100005

CONTINUATION Sheet **Adult Corr'l Health Care**
BCP# *5999EO*    DEPARTMENT *CORRECTIONS & REHAB*

Page: 6
Printed: 01/04/07    time: 15:21:41
**FISCAL YEAR** 2007 - 2008

| PROGRAM *Adult Corr'l Health Care* | | ELEMENT | COMPONENT | |
|---|---|---|---|---|
| PERSONNEL YEARS | PYs CY | PYs BY | CURRENT YR. $$ | BUDGET YR. $$ |
| TOTAL S & W | 16.7 | 33.0 | $843,587 | $1,670,575 |
| SALARY SAVINGS | -0.7 | -1.5 | -$30,353 | -$60,709 |
| NET TOTAL S & W | 16.0 | 31.5 | $813,234 | $1,609,866 |
| STAFF BENEFITS | | | $295,423 | $580,612 |
| OASDI | | | | |
| HEALTH INSURANCE | | ( whole | ) ( | ) ( |
| RETIREMENT - Industrial | | dollars | ( 104,945) | ( 203,512) |
| RETIREMENT - Safety | | | ( ) | ( ) |
| RETIREMENT - Peace Officer | | | ( 156,904) | ( 310,607) |
| RETIREMENT - Other | | | ( ) | ( ) |
| WORKERS' COMPENSATION | | | ( ) | ( ) |
| IDL, NDI, UI (incl in W.C.) | | | ( 33,574) | ( 66,493) |
| TOTAL PERSONAL SVCS | | | $1,108,657 | $2,190,478 |
| **OPERATING EXPENSES AND EQUIPMENT** | | | | |
| GENERAL EXPENSE | | | | |
| NTING | | | 4,175 | 8,787 |
| COMMUNICATIONS | | | 289 | 580 |
| POSTAGE | | | 21 | 35 |
| INSURANCE | | | | |
| TRAVEL - IN STATE | | | | |
| TRAVEL - OUT OF STATE | | | 3,562 | 7,464 |
| TRAINING | | | | |
| FACILITIES OPERATIONS | | | 1,558 | 3,265 |
| UTILITIES | | | 14,126 | |
| CONSULTING & PROFESSIONAL:Interdepartmental | | | | |
| CONSULTING & PROFESSIONAL:External | | | | |
| CONSOLIDATED DATA CENTERS | | | | |
| Health and Welfare Data Center | | | | |
| Stephen P. Teale Data Center | | | ( ) ( | ) |
| DATA PROCESSING | | | ( ) ( | ) |
| EQUIPMENT | | | | |
| DEBT SERVICE | | | 117,538 | |
| OTHER ITEMS OF EXPENSE (see Supplemental Info sheets) | | | | |
| TOTAL OPERATING EXPENSES and EQUIPMENT | | | 141,269 | 20,131 |
| SPECIAL ITEMS of EXPENSE | | | | |
| TOTAL STATE OPERATIONS EXPENDITURES | | | \| $    1,249,926 | \| $    2,210,609 |

PAGE III-2a

VAL2007 100006

CONTINUATION Sheet **Adult Corr'l Health Care**
BCP# 5999EO          **DEPARTMENT** *CORRECTIONS & REHAB*

Page:            7
Printed:    01/04/07    time:    15:21:41

**FISCAL YEAR**    2007 - 2008

## Adult Corr'l Health Care

| SOURCE OF FUNDS | APPROPRIATION NO. | | | | | | |
|---|---|---|---|---|---|---|---|
| | ORG | REF | FUND | | | | |
| GENERAL FUND | 5225 | 001 | 0001 | $ | | $ | |
| SPECIAL FUNDS | 5225 | | | $ | | $ | |
| HEALTH CARE FUND | 5225 | 002 | 0001 | $ | | $ | |
| FEDERAL FUNDS | 5225 | 001 | 0890 | $ | 1,249,926 | $ | 2,210,609 |
| OTHER FUNDS - Bond | 5225 | 001 | 0001 | $ | | $ | |
| OTHER FUNDS - IWF | 5225 | 001 | 0917 | $ | | $ | |
| OTHER - Spcl Deposit | 5225 | 001 | 0942 | $ | | $ | |
| OTHER Lease Payment | 5225 | 003 | 0001 | $ | | $ | |
| OTHER Lottery-Educ | 5225 | 001 | 0831 | $ | | $ | |
| REIMBURSEMENTS | 5225 | 501 | 0995 | $ | | $ | |
| GENERAL FUND, PROP98 | 5225 | 011 | 0001 | $ | | $ | |
| CORR TRNG FUND | 5225 | 001 | 0170 | $ | | $ | |

| LOCAL ASSISTANCE SOURCE OF FUNDS | APPROPRIATION NO. | | | $ ( | ) | $ ( | ) |
|---|---|---|---|---|---|---|---|
| | ORG | REF | FUND | | | | |
| GENERAL FUND | 5225 | | | $ | | $ | |
| SPECIAL FUNDS | 5225 | 101 | 0001 | $ | | $ | |
| FEDERAL FUNDS | 5225 | | | $ | | $ | |
| 'ER FUNDS | 5225 | | | $ | | $ | |
| .MBURSEMENTS | 5225 | 601 | 0995 | $ | | $ | |

PAGE III-2b

VAL2007 100007

CONTINUATION Sheet  *Adult Corr'l Health Care*
BCP# 5999EO

| | | |
|---|---|---|
| | Page: | 8 |
| | Printed: 01/04/07 | time: 15:21:41 |

DEPARTMENT  *CORRECTIONS & REHAB*                    **FISCAL YEAR**  2007 - 2008

Fiscal Detail Continued
**DETAIL OF PERSONAL SERVICES**        *Adult Corr'l Health Care*

Proposed New

| CLASSIFICATION | POSITIONS | | | AMOUNT (,000) | |
|---|---|---|---|---|---|
| | CY | BY | SALARY/RANGE | CY | BY |
| Staff Psychologist, CF-Clinica | 5.5 | 11.0 | 4498 - 5904 | 355,278 | 710,559 |
| Clinical Soc Worker, CF, Safet | 5.0 | 10.0 | 3321 - 4139 | 231,634 | 463,266 |
| Psych Techn (Safety) | 5.7 | 11.0 | 2887 - 3795 | 236,524 | 456,447 |
| Recr Therapist | 0.5 | 1.0 | 2891 - 3599 | 20,151 | 40,303 |
| **TOTAL SALARIES AND WAGES** | 16.7 | 33.0 | [[[[[[[]]]]]] | $ 843,587 | $ 1,670,575 |

*
*
*

PAGE III-3

**SUPPLEMENTAL INFORMATION**
*Please report dollars in thousands.*
IDENTIFY ALL PROPOSED ITEMS WHICH FIT INTO THE CATEGORIES LISTED BELOW.        SEE INSTRUCTIONS

| | CURRENT YEAR | BUDGET YEAR | BUDGET YEAR + ONE |
|---|---|---|---|
| EQUIP - | | | |
| PS-In | 117,538 | | |
| PS-Ex | | | |
| ONE-TIMES (ONE-TIMES incls EQUIP & CONTRACTS) | | | |
| FULL-YR | | 117,538 | |
| OTHR Itms | | | |

\\\\\\\\\\\\\\\\    E N D  of  PROGRAM:        *Adult Corr'l Health Care*        PAGE III-4

VAL2007 100008

# CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
## BUDGET CHANGE PROPOSAL
## FISCAL YEAR 2007-08
## RECEPTION CENTER ENHANCED OUTPATIENT PROGRAM SERVICES

## A. NATURE OF REQUEST

This proposal requests additional clinical and custody staff to be assigned to Reception Centers (RC's) to deliver treatment to individuals who have been identified in mental health evaluations as having a serious mental disorder resulting in a serious level of impairment in functioning. These individuals require placement into designated mainline housing units with intensified levels of outpatient treatment (EOP's), however such placements are either unavailable or inappropriate due to the individual's imminent return to parole status. Therefore, interim treatment of these cases in the RC's at a level commensurate with EOP care has been mandated by the Federal Court, and is deemed to be clinically necessary for two primary reasons:

- The stress of initial incarceration in the RC can exacerbate mental illness; clinical intervention during this process can substantially reduce suffering and reduce chances of further clinical deterioration. This can reduce the potential for self-injurious behavior or need for crisis care.

- Many of these individuals have very short-term commitments that necessitate expedited placements into treatment to increase their potential for successful re-integration into the community.

This Budget Change Proposal (BCP) requests the positions, equipment and facility operations funding to implement the Reception Center Enhanced Outpatient Program in order to comply with the Federal Court mandates court order dated May 1, 2006. The Division of Healthcare Services is requesting $2,794,000 and 34.4 positions (33.7 PY's) for FY 2006-07, and $5,126,000 and 67.7 positions (66.2 PY's) ongoing.

## B. BACKGROUND/HISTORY

In July of 1994 the California Department of Corrections, now California Department of Corrections and Rehabilitation (CDCR) initiated its Mental Health Services Delivery System (MHSDS) in response to the then pending *Coleman* Federal Court case. The first step was the initiation of Reception Center (RC) evaluations of inmates entering the prison system. The original staffing component for this process only allocated staff for the screening and clinical assessment of inmates, as it was anticipated that all individuals requiring treatment would be transferred to placement institutions for appropriate care within 45 to 60 days. Since that time all treatment programs at mainline institutions have been implemented, however the anticipated waiting period prior to transfer has been greatly extended due to the influx of cases entering or returning to the system. A backlog of approximately 500 individuals at RC's awaiting placement into Enhanced Outpatient Program (EOP) beds has accumulated as existing mainline programs have reached maximum capacity. Although additional program beds are planned for implementation on or before January 1, 2007, concern has been expressed by the Federal Court overseeing the delivery system that some augmented treatment services should be provided to individuals whose placement in EOP is delayed beyond the anticipated 60 day processing period. On May 2, 2006, Judge Karlton ordered that, within 90 days from the date of his order (due July 31, 2006), CDCR file a plan for providing adequate mental health care for these individuals, refer to Attachment A for the Court Order. Since that time, the court has approved the plan but required an earlier implementation date of January 1, 2007. This budget proposal seeks funding for the positions identified in that plan as necessary to meet the court requirement, refer to

VAL2007 100009

Attachment B for the plan submitted by CDCR and Attachment C for the identified positions in the plan.

## C. STATE LEVEL CONSIDERATIONS

Additional RC treatment resources to address the mental health needs of inmates in RC's will not only be responsive to the Court mandate, but also have long-term benefits for California. To be most effective, mental health services should be implemented immediately upon identification of need for EOP level of care (i.e., seriously impaired level of functioning due to mental illness). All inmates facing initial placement into prison on long-term commitments experience high levels of stress, particularly in the current severely overcrowded prison conditions. Those with serious impairments to functioning as a result of a mental disorder may quickly deteriorate in the face of such stress, requiring placement into much more intensive and expensive inpatient hospitalization, rather than retention in outpatient services within the prison system. Individuals returned to custody for short-term parole violations can represent an aggravated threat to the community if the mental disorders contributing to those parole violations are not addressed with augmented clinical services during their brief re-incarcerations.

## D. FACILITY/CAPITAL OUTLAY CONSIDERATIONS

As opposed to mainline EOP's, no separate housing space will be required for this population, due to differences in RC processing and the constant turn-over of inmates rotating thru these units. To the extent feasible at individual institutions, and to facilitate medication distribution, heat plan monitoring, and access to Clinical Case Manager contacts, inmates with the EOP designation will be housed or clustered in close proximity to one another. Treatment space will be provided in existing classrooms, visiting areas, dining rooms, or other available space, perhaps during evening hours if necessary.

## E. JUSTIFICATION

### Research of Cases Pending EOP Placement

Since the existing Mental Health Services Tracking System does not track inmates in RC's awaiting placement, a new data file was needed to assess various parameters of this population. Specific information researched includes institution, release date, commitment status (e.g., New Commitment, Parole Violator Returned to Custody), date received, and committing county. The following data was accumulated on the RC population at a specific point in time (June 21, 2006). Although the individuals in RC's change from day to day, it is believed the overall data depicted is a representative sample.

A total of 530 inmates were identified, although 18 of those did not have data available regarding commitment status or release dates (presumably because they were very recent arrivals without full data entry as yet). Thus, the analysis that follows considers only the 512 inmates with adequate data. Some findings from that data:

- Approximately 60% of the inmates had been in the Reception Center in excess of 60 days. This projects to a total of approximately **300 such cases** (the target population requiring treatment per the Court order).

- 123 of the 512 inmates had less than 60 days remaining prior to their scheduled release date (retention of these inmates in an RC treatment program might be preferable to transfer to avoid discontinuity of short term care). Another 74 inmates had between 61 and 120 days remaining prior to release.

VAL2007 100010

- 200 inmates were parole violators returned to custody on technical violations, meaning their treatment status was based upon their status at the time of previous parole. Their parole violations were also likely related to their mental illness, and treatment planning should address the community maladjustment issues. (Only one case was designated "Psych Return," although many of the 200 might qualify for this designation when new procedures are implemented.)

- 63 inmates were in "pendrev" status, meaning their parole revocation proceedings had not been concluded, and they could not be transferred, even with an available EOP bed. Most of these (53) had been in custody less than 60 days. It can be projected that the majority of these will have less than 60 days remaining to be served once their parole violation hearings are concluded.

- Approximately 85% of the inmates were at five RC's (CIM 136, WSP 107, RJD 97, NKSP 64, and SQ 40). These are the sites with the greatest need for program implementation.

## Implications for Treatment Planning

Although the clinical profiles (i.e., diagnosis and level of functioning assessment) of all individuals requiring EOP care are consistent, there are significant differences in treatment needs related to the type of commitment and time to be served. Parole violators with only a few months to be served require assistance in community adjustment issues which have contributed to their failure on parole. New commitments facing substantial periods of incarceration have a greater need to develop coping mechanisms to adjust to the prison environment over the long term. While it is sound clinical practice to initiate treatment at the soonest possible time in all cases, those individuals returning to society, where they may represent a threat to others, require a higher level of dedicated resources. Consequently, a "one size fits all" approach to treatment planning is not appropriate for all patients in this population, even though they may clinically have much in common.

## Reception Center Treatment Plan

Several levels of clinical service are felt to be necessary to meet the needs of this population, and bring compliance with the Court order. The levels include:

1. Basic medication (existing service)
   All inmates placed into EOP level of care in RC's are currently reviewed by a psychiatrist in the intake process for medication needs, and prescriptions are provided as needed. This service as currently provided should be adequate for this population and must be continued.

2. Clinical Case Management (new service)
   Immediately upon the identification of need for EOP level of care, a clinical case manager (CCM) will be assigned to establish and maintain clinical oversight of the patient throughout their RC placement. The CCM (either a clinical psychologist or licensed clinical social worker) will have at least one face-to-face contact with the patient weekly to monitor symptoms (this may include observation during group therapy sessions), respond to questions, provide therapeutic counseling, and consider referral to other therapy programs (noted below). Additionally the CCM will track the individual's transfer status and establish liaison with custody and classification staff to facilitate placement.

3. Structured Therapeutic Activities (new service)
   At the 5 RC's with the preponderance of inmates (CIM, RJD, NKSP, WSP and SQ), regularly scheduled therapy groups will be held on a daily basis. A minimum of one group per day, five days per week, with varying content will be offered. Patients will be enrolled into various group activities based upon CCM assessment of individual need, related to both individual symptoms as well as commitment status. Options will include:

VAL2007 100011

- *Orientation to prison living* – Individuals with impaired mental abilities who are placed into the over-crowded prison environment require assistance in understanding and adapting to institutional rules, and gaining access to available services. These individuals are also susceptible to being preyed upon by more aggressive inmates. This therapy group provides an orientation to prison life, offers coping mechanisms for personal safety, and allows for patients to ask questions and vent frustrations involved in their adaptation to their new environment.

- *Hygiene and Grooming* – Teaches basic grooming skills such as bathing, hair care, dental care, shaving, cleaning one's clothes, etc.

- *Medication Management / Symptom Management* – Helps the individual understand their symptoms and the relationship between alleviation of them and adherence to prescribed medication regimen.

- *Anger Management / Conflict Resolution* – Teaches ways to recognize and control anger, to deal with feelings and conflicts in an effective manner, and to practice resolving conflicts in calm and reasonable ways.

- *Assertiveness Training* – Teaches ways to communicate assertively but non-aggressively. Didactic teaching techniques and practice sessions are utilized.

- *Problem Solving* – Helps individuals verbalize many of their daily problems and helps them solve these issues in an effective manner utilizing a logical approach.

- *Stress Management* – Teaches methods of reducing stress. Emphasis is be placed on defining daily stressors, learning how stress affects mental health and daily functioning, ways to reduce stress in general, and specific methods (e.g., progressive relaxation, meditation) to reduce unavoidable stress.

- *Depression Group* – Teaches the symptoms of depression, how these symptoms affect mood, ways to improve mood through simplified cognitive behavioral techniques, information of how adherence to prescribed medication can decrease depression, and education about how being depressed affects daily life.

- *Social Skills* – Teaches basic social transactions, such as how to initiate a conversation, how to end a conversation, how to pick up internal and external social clues, how to respond appropriately to others, etc.

- *Daily Living* – Teaches skills such as how to ride public transportation, how to shop for clothes and groceries, how to prepare simple meals, and how to manage money.

- *Leisure Development and Leadership* – Teaches activities that could become hobbies or long term leisure activities, such as board games, reading books, playing team sports such as volleyball, and developing interest in an area such as nature or collecting. Leisure leadership skills focus on how to initiate a leisure activity (e.g., obtain a board game, arrange an area to play, invite friends to play, how to start a game, etc.)

- *Goal Planning / Achieving* – Assists in development of lists of goals they would like to achieve and then focus on teaching simple steps to follow to achieve as many as possible. Focus also on development of realistic goals.

- *Criminal Thinking Group* – Emphasizes the difference between anti-social and pro-social thinking and problem solving; stresses development of empathy for victims of crimes; describes benefits of crime avoidance.

- *Family Issues* – focus on stressful experiences associated with spousal abuse, childhood physical and sexual abuse, separation from offspring and loved ones, dysfunctional relationships, parental responsibilities, etc.

- *Substance Abuse* – Provides education on substance abuse; emphasizes alternatives to illegal substances, effects of same on mood, behavior, cognitive processes; develops plan for relapse prevention.

A rotating schedule of group sessions will be established and enrollment will be based upon referral by the CCM, taking into consideration specific clinical needs of the individual inmates.

VAL2007 100012

All inmates will be referred to at least one group, more commonly to several. Groups can range in size from 5 to 25 inmates.

4. Re-entry planning (new service)
   Individuals with short (60 to 120 days) release dates will, in addition to the above services, receive additional pre-release planning, including the following:
   - Review of pertinent mental health or medical conditions (e.g., allergies, special dietary needs, and chronic diseases), criminal and legal history, or cognitive or functional impairment (e.g., developmental problems, insufficient education or language barriers) that could affect adjustment and treatment.
   - Recommendations for follow-up treatment, including medications and recommendations for specific scheduled structured therapeutic activities.
   - Referrals to appropriate programs and services, including substance abuse programs, education, and job programs.
   - Enrollment in available financial support programs, including Medi-Cal, Medi-Care, SSI, Veterans Administration, etc.
   - Initiation of Conservatorship proceedings where the patient meets criteria.
   - Liaison with Parole Outpatient Program staff with reporting instructions and planning for continuity of care.
   - Liaison with family members and significant others with who may provide living options to the individual upon release.
   - Screening for need for inpatient placement per Penal Code 2962 (Mentally Disordered Offender).

Despite the wide range of types of services provided to individuals with different needs, it is anticipated that all inmates at the EOP level of care in RC's will receive a *minimum of 5 hours of therapeutic services per week*. This will include CCM contacts, individual therapy, group activities, and pre-release planning. Each clinical staff person will be expected to provide at least one group therapeutic activity (one hour or more each) per day.

## Staffing
The recommendation is to approve all levels of additional services as described above, and approved by the Court. Specific staffing allocations for the proposed programs are difficult to accurately project given the significant drop in the backlog of cases that is anticipated with the implementation of the new mainline EOP programs, and the wide range and ever changing numbers of cases in the RC's. This will require flexibility in clinical responsibilities from location to location, dependent upon size of the population. For example, a small site (e.g., all women's institutions, HDSP) might not require any additional staff. Intermediate level institutions (e.g., DVI, CCI, LAC) might assign one position responsibility for providing *all* clinical activities in addition to many pre-release activities. The five largest sites will have a greater complement of staff with specialized clinical responsibilities. A certain baseline staffing (at least one full time CCM) is required for most programs, even though the staff/patient ratios might not ordinarily justify a full staff position. Needed adjustments to staffing levels will be reviewed on an ongoing basis, and adjusted bi-annually as with other services within the MHSDS.

A workload assessment identifying the need for clinical staff can be found in Attachment D.

Proposed custody staffing will provide escort and custody coverage for implementation of the EOP programs. Correctional Officer allocations are tied to the number of cases, as well as the design of the institution, utilizing the Prevalence Mix ratio. Program needs for these new cases will now be required to be assessed by the Interdisciplinary Treatment Team (IDTT) which is comprised of clinical, custody and classification staff. It is anticipated that it will take approximately 30 minutes

*What is the proces.*

VAL2007 100013

per initial interview to assess each EOP inmate for their program needs. Inmates will then be required to be assessed every 90 days thereafter or whenever there is a level of care/program/custody change. This follow-up review takes approximately 15 minutes per case. Correctional Counselor II's (Specialist) will provide for the increase in workload, as well as the skill level required to carry out this process.

A workload assessment identifying the need for custody staff can be found in Attachment E.

### Equipment and Facility Ops

Treatment space identified by The California State Prison – Los Angeles will require approximately $25,000 in upgrading their cooling system to ensure the continuity of care to heat risk inmates in compliance with Coleman mandates. Wasco State Prison and the California Institution for Men will require the purchase of holding cells for escorts to be placed in group areas at an approximate cost of $15,000 and $6,000 respectfully. Additionally, it will be necessary to purchase television/DVD players for programming. The equipment/facility ops costing is in Attachment F totaling $60,126.

## F. OUTCOMES AND ACCOUNTABILITY

The Reception Center Enhanced Outpatient Program is a Court ordered program that will be subject to ongoing review by the Court Monitor. Adherence to program goals and effective utilization of budgeted staff will additionally be monitored on an ongoing basis by CDCR mental health unit Quality Management Assistance Team. Staff specifically allocated for this purpose has been established in the FY 06/07 budget and are currently being filled. They will have responsibility for monitoring all elements of the Mental Health Services Delivery System, including the RC / EOP program. Periodic reports of program compliance and quality improvement measures will be issued to both local and state-wide mental health program managers. Hiring for the program positions will commence immediately upon the establishment of the positions in the FY 07/08 budget.

## G. ANALYSIS OF ALL FEASIBLE ALTERNATIVES

1) Provide additional services only for inmates who have been in RC's for 60 days or longer. This option would strictly comply with the Court order but would not address the significant issues (see section A above) that argue for the immediate delivery of treatment to ease the transition to institutional placement, reduce the likelihood of exacerbated symptoms of mental illness, and provide needed re-entry planning and care for short-term parole violators.

**Pro:** The choice of this alternative would initially reduce the cost of treatment.

**Con:** This option would result in much higher costs long term, due to need for higher levels of care for individuals going into crisis conditions, or returning to prison due to the lack of attention to community adjustment issues.

2) Implement the current proposal.

**Pro:** The choice of this alternative would comply with the order of the Federal Court, provide the needed clinical services of these inmate patients, and reduce the potential for long-term costs associated with the ongoing litigation of the Coleman case.

**Con:** This option requires additional funding at a time when the inmate population is growing and the State of California budget constraints are causing legislators to consider reducing State governmental funding.

VAL2007 100014

## H. TIMETABLE

As required by the court order dated May 1, 2006, implementation will begin January 1, 2007.

## I. RECOMMENDATION

Approve Alternative 2.  Allocate the funding necessary to fully fund implementation of the Reception Center Enhanced Outpatient Program.

VAL2007 100015

# Attachments

A. Court Order dated May 1, 2006

B. Plan for the Mental Health Treatment of Enhanced Outpatient
Program Inmates in Reception Centers

C. Position Distribution

D. Workload Assessment  - Clinical

E. Workload Assessment – Custody

F. Equipment/Facility Ops Costing

VAL2007 100016

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

      Plaintiffs,

        vs.

ARNOLD SCHWARZENEGGER, et al.,

      Defendants.

No. CIV S-90-0520 LKK JFM P

ORDER

/

By order filed March 3, 2006, defendants were directed to respond to the second and third objections raised in plaintiffs' February 3, 2006 objections to the special master's fifteenth round monitoring report. On March 17, 2006, defendants filed their response, and on March 21, 2006, plaintiffs filed a reply to defendants' response. This matter was heard before the undersigned on April 27, 2006. Michael Bien, Esq., appeared as counsel for plaintiffs. Lisa Tillman, Deputy Attorney General, appeared as counsel for defendants.

    In one of the objections at issue, plaintiffs seek enforcement at nine institutions of the court's prior orders requiring daily rounding by psychiatric technicians in administrative segregation and other locked down units. After consideration of the briefs filed by the parties and the oral report of the special master at the April 27, 2006 hearing, and good cause appearing, plaintiffs' objection will be overruled.

1

VAL2007 100017

Plaintiffs' second objection centers on the percentage of mentally ill inmates awaiting treatment in California Department of Corrections and Rehabilitation (CDCR) reception centers. Plaintiffs contend that the number of such inmates is approaching unconstitutional levels and they ask that defendants be required to create treatment programs for enhanced outpatient inmates in CDCR reception centers. After consideration of the briefs filed by the parties and the oral report of the special master at the April 27, 2006 hearing, and good cause appearing, defendants will be directed to file within ninety days a plan for providing adequate mental health care for inmates in reception centers who have been identified as requiring an enhanced outpatient program (EOP) level of care who remain in reception centers for longer than sixty days.

In accordance with the above, IT IS HEREBY ORDERED that:

1. Plaintiffs' second and third objections to the special master's fifteenth round monitoring report are overruled; and

2. Within ninety days from the date of this order, defendants shall file a plan for providing adequate mental health care for inmates in reception centers who have been identified as requiring an enhanced outpatient program (EOP) level of care who remain in reception centers for longer than sixty days.

DATED: May 1, 2006.

/s/Lawrence K. Karlton
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

2

VAL2007 100018

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

Plaintiffs,

vs.

GRAY DAVIS, et al.,

Defendants.

No. CIV S-90-0520 LKK JFM P

ORDER

By order filed May 2, 2006, defendants were directed to file within sixty days an amended long term plan for provision of acute and intermediate care and mental health crisis beds and within forty-five days a plan for interim provision of intermediate inpatient beds and mental health crisis beds. Plaintiffs were granted a period of ten days in which to file and serve a response to the interim plan. Defendants timely filed both plans. Thereafter, plaintiffs filed objections to both the interim plan and the amended long term plan.[1] In a separate order, also filed May 2, 2006, defendants were directed to file within ninety days a plan for providing adequate mental health care to inmates in reception centers identified as requiring an enhanced

---

Defendants filed a response to plaintiffs' objections to the amended long term bed plan in which they declined to offer a formal response to plaintiffs' specific objections unless directed to do so by court order. (Defendants' Response to Plaintiff's Objections to Amended Long Term Bed Plan, filed July 21, 2006.)

1

VAL2007 100019

outpatient program level of care and remaining in reception centers longer than sixty days. Defendants also timely filed that plan, and plaintiffs have filed objections thereto.

On September 11, 2006, the Special Master filed a report on the status and sufficiency of the three plans. The report contained four recommendations for action by the court. The parties each filed a response to the supplemental report. Thereafter, the Special Master advised the court that, in light of the parties' responses, he would propose some modifications to his September 11, 2006 recommendations. By order filed October 5, 2006, the Special Master was directed to file his modified recommendations within three days, and the parties were given three days thereafter in which to file and serve responses to the modified recommendations.

On October 10, 2006, the Special Master filed his revised recommendations. On October 13, 2006, the parties each filed a response to those revised recommendations. After review of all of the relevant documents herein, and good cause appearing, the revised recommendations will be adopted in full. All objections thereto are overruled.

In accordance with the above, IT IS HEREBY ORDERED that:

1. The revised recommendations of the Special Master filed October 10, 2006 are adopted in full.

2. The program population projections in the revised and updated Navigant Study are approved. Defendants shall contract with Navigant Consultants to conduct annual population reviews and updates of their projections for mental health program populations from 2007 through 2009. Thereafter, defendants may obtain such population projections services through the normal contract bidding process. The Navigant service contract shall be controlled and supervised by the California Department of Corrections and Rehabilitation's (CDCR) Division of Correctional Health Care Services rather than the CDCR's Division of Legal Affairs. The Special Master, and such of his experts as he may assign to the task, shall work with the

2

VAL2007 100020

defendants and Navigant to improve the projections and ensure that all necessary data is collected to make future projections as accurate as possible.

    3.  The Special Master shall monitor closely the swap of acute inpatient beds between California Medical Facility and Atascadero State Hospital and any delays in the transfer of seriously mentally disordered inmates to mental health crisis beds within 24 hours of a clinical referral and report to the court in writing on these two issues within ninety days.

    4.  Within sixty days from the date of this order defendants shall file a final long range plan for the provision of acute and intermediate inpatient beds, as well as a plan for the provision of enhanced outpatient program (EOP) beds, for all seriously mentally ill male and female CDCR inmates clinically determined to be in need of those levels of care.  These consolidated plans shall meet or exceed the program population projections contained in the approved Navigant study and shall include a process for regular updates of bed need projections and ongoing planning for new mental health beds based on subsequently revised projections.  Defendants' plan shall also address the feasibility of a "Design and Build" approach for the construction projects specified in the consolidated plan and shall coordinate the use of such an approach with any related Design and Built efforts in the <u>Plata</u> case.[2]  Defendants' consolidated plan shall include a timetable, budget planning and resource allocations to meet projected populations by June 30, 2011.  The consolidated plan shall also include construction of the 50-bed mental health crisis bed unit at California Men's Colony proposed in defendants' revised interim bed plan.

    5.  Defendants shall accelerate implementation of their plan for new EOP treatment programs in CDCR Reception Centers so the proposed programs become operational by January 1, 2007.  Defendants shall add treatment programs for EOP inmates in the Reception Center at California State Prison, Los Angeles County, in addition to the five reception centers

---

<u>Plata v. Schwarzenegger</u>, 01-cv-01351 TEH (N.D. Cal.).

3

VAL2007 100021

enumerated in the original plan. The Special Master shall monitor the added EOP services provided in the six institutions covered in the plan and report to the court by June 30, 2007 whether the program needs to be extended to any other CDCR Reception Centers.

6. Defendants' interim plan for the temporary establishment of 76 inpatient intermediate Department of Mental Health (DMH) beds in the D-5 and D-6 units at Salinas Valley State Prison and 30 beds in the P-3 Wing at California Medical Facility is approved. The Special Master shall review these programs, as well as the other intermediate inpatient DMH programs opened in California Medical Facility and Salinas Valley State Prison pursuant to the defendants' interim plan and report to the court by March 31, 2007 on the defendants' success in implementing these interim programs.

DATED: October 20, 2006.

4

VAL2007 100022

Plan for Mental Health Treatment of
Enhanced Outpatient Program Inmates in Reception Centers
July 2006

### Background

In July of 1994 the California Department of Corrections and Rehabilitation (CDCR) initiated its Mental Health Services Delivery System (MHSDS). The first step was the initiation of reception center evaluations of inmates entering the prison system. The original staffing component for this process only allocated staff for the screening and clinical assessment of inmates, as it was anticipated that all individuals requiring treatment would be transferred to placement institutions for appropriate care within 45 to 60 days. Since that time all treatment programs at mainline institutions have been implemented, however the anticipated waiting period prior to transfer has been greatly extended due to the influx of inmate/patients entering or returning to the system. A backlog of inmates at reception centers awaiting placement into Enhanced Outpatient Program (EOP) beds has resulted, as existing mainline programs have reached maximum capacity. On May 2, 2006, Judge Karlton ordered that, within 90 days from the date of his order (due July 31, 2006), CDCR file a plan for providing adequate mental health care for these individuals. This plan is in response to that order.

The combined leadership of the 12 reception centers and the Division of Correctional Health Care Services (DCHCS), along with representatives from Classification Services Unit and Health Care Placement Unit, met by teleconference and in person on several occasions through May and June of 2006 in order to assess the problem, review the needs and numbers of the identified population, and develop the following plan. It should be noted that the Court Order requires CDCR to provide "...*adequate* mental health care for inmates in reception centers who have been identified as requiring an enhanced outpatient program (EOP) level care..." Due to staffing and treatment space limitations, Defendants cannot provide the same level of care as provided in existing mainline EOP's. However, Defendants will provide an adequate level of care for these inmates awaiting placement into EOP beds and, as indicated in a previously-submitted plan, intend to activate additional EOP beds by January 1, 2007. Therefore, the following plan diverges in some important aspects (e.g., number of hours per week of treatment and separate housing units) from the current EOP requirements. This plan exceeds the Court's requirement of care for those EOP inmates who have stayed in reception beyond 60 days by requiring the initiation of treatment immediately upon EOP designation, rather than after a period of 60 days.

### Research of Cases Pending EOP Placement

Since the existing Mental Health Services Tracking System does not track inmates in reception centers awaiting placement, a new data file was needed to assess key features of this population. Information researched included institution, release date, commitment status (e.g., New Commitment, Parole Violator Returned to Custody), date received, and committing county. This data served as the basis for the plan noted below.

### Implications for Treatment Planning

Although the clinical profiles (i.e., diagnosis and level of functioning assessment) of all individuals requiring EOP care are consistent, there are significant differences in treatment needs related to the type of commitment and time to be served. Parole violators with only a few months to be served require assistance in community adjustment issues that have contributed to their failure on parole. New commitments facing substantial periods of incarceration have a greater need to develop coping mechanisms to adjust to the prison environment over the long term. While it is sound clinical practice to initiate treatment at the soonest possible time in all cases, those individuals who will soon be paroled

VAL2007 100023

require a higher level of dedicated resources to ensure their successful integration into society. Consequently, a "one size fits all" approach to treatment planning is not appropriate for all patients in this population, even though they may clinically have much in common.

## Increase of EOP Beds

Between July 1, 2006 and January 1, 2007, CDCR's EOP bed capacity will realize a net increase of 487 beds. This increased availability for EOP placements should substantially reduce the backlog of inmates at reception centers awaiting these placements. The timing of the activation of these beds and the impact on the reception center EOP population cannot be stated with certainty at this time due to two significant variables: (1) the need to recruit and train staff for the programs, and (2) the large number of inmates at mainline institutions awaiting these placements.

## Need for Additional Reception Center Resources

The increase in available beds for EOP placements will substantially reduce the current backlog of reception center EOP inmate/patients held beyond 60 days. Nonetheless, there remains a need to implement additional treatment resources in the reception centers for individuals requiring this level of care immediately upon their identification (normally within 18 days of arrival) for two important reasons, as noted below:

- The stress of initial incarceration in the reception center can exacerbate mental illness; clinical intervention during this process can substantially reduce suffering and reduce chances of further clinical deterioration. This can reduce the potential for self-injurious behavior or need for crisis care.

- Many of the EOP level individuals in reception centers have very short-term commitments that necessitate expedited placements into treatment to increase their potential for successful re-integration into the community.

The provision of additional resources in reception centers for the expedited care of EOP-level inmates will result in cost-savings by requiring fewer in-patient placements and/or eventual re-commitments to prison.

## Reception Center Treatment Plan

All inmates placed into EOP level of care in reception centers are currently reviewed by a psychiatrist in the intake process for medication needs, and prescriptions are provided as needed. In addition to this existing clinical service, three additional levels of service will be provided, as described below.

1. Clinical Case Management

   Immediately upon the identification of need for EOP level of care, a clinical case manager (CCM) will be assigned to establish and maintain clinical oversight of the patient throughout their reception center placement. The CCM (either a clinical psychologist or licensed clinical social worker) will have at least one face-to-face contact with the patient weekly to monitor symptoms (this may include observation during group therapy sessions), respond to questions, provide therapeutic counseling, and consider referral to other therapy programs (noted below). Additionally the CCM will track the individual's transfer status and establish liaison with custody and classification staff to facilitate placement.

2. Structured Therapeutic Activities

   At the five reception centers with the preponderance of inmates (California Institution for Men, Richard J. Donovan, North Kern State Prison, Wasco State Prison and San Quentin), regularly scheduled therapy groups will be held on a daily basis. The remaining seven reception centers with smaller populations will provide a less structured treatment array, but **all sites will provide**

2

opportunities for a minimum of one hour per day, five days per week of out-of-cell therapeutic activities. Patients will be enrolled into various group activities based upon CCM assessment of individual need, related to both individual symptoms as well as commitment status. Options will include:

- *Orientation to prison living* – Individuals with impaired mental abilities who are placed into the over-crowded prison environment require assistance in understanding and adapting to institutional rules, and gaining access to available services. These individuals are also susceptible to being preyed upon by more aggressive inmates. This therapy group provides an orientation to prison life; offers coping mechanisms for personal safety, and allows for patients to ask questions and vent frustrations involved in their adaptation to their new environment.

- *Hygiene and Grooming* – Teaches basic grooming skills such as bathing, hair care, dental care, shaving, cleaning one's clothes, etc.

- *Medication Management / Symptom Management* – Helps the individual understand their symptoms and the relationship between alleviation of them and adherence to prescribed medication regimen.

- *Anger Management / Conflict Resolution* – Teaches ways to recognize and control anger, to deal with feelings and conflicts in an effective manner, and to practice resolving conflicts in calm and reasonable ways.

- *Assertiveness Training* – Teaches ways to communicate assertively but non-aggressively. Didactic teaching techniques and practice sessions are utilized.

- *Problem Solving* – Helps individuals verbalize many of their daily problems and helps them solve these issues in an effective manner utilizing a logical approach.

- *Stress Management* – Teaches methods of reducing stress. Emphasis is be placed on defining daily stressors, learning how stress affects mental health and daily functioning, ways to reduce stress in general, and specific methods (e.g., progressive relaxation, meditation) to reduce unavoidable stress.

- *Depression Group* – Teaches the symptoms of depression, how these symptoms affect mood, ways to improve mood through simplified cognitive behavioral techniques, information of how adherence to prescribed medication can decrease depression, and education about how being depressed affects daily life.

- *Social Skills* – Teaches basic social transactions, such as how to initiate a conversation, how to end a conversation, how to pick up internal and external social clues, how to respond appropriately to others, etc.

- *Daily Living* – Teaches skills such as how to ride public transportation, how to shop for clothes and groceries, how to prepare simple meals, and how to manage money.

- *Leisure Development and Leadership* – Teaches activities that could become hobbies or long term leisure activities, such as board games, reading books, playing team sports such as volleyball, and developing interest in an area such as nature or collecting. Leisure leadership skills focus on how to initiate a leisure activity (e.g., obtain a board game, arrange an area to play, invite friends to play, how to start a game, etc.).

- *Goal Planning / Achieving* – Assists in development of lists of goals they would like to achieve and then focus on teaching simple steps to follow to achieve as many as possible. Focus also on development of realistic goals.

- *Criminal Thinking Group* – Emphasizes the difference between anti-social and pro-social thinking and problem solving; stresses development of empathy for victims of crimes; describes benefits of crime avoidance.

3

VAL2007 100025

- *Family Issues* - focus on stressful experiences associated with spousal abuse, childhood physical and sexual abuse, separation from offspring and loved ones, dysfunctional relationships, parental responsibilities, etc.
- *Substance Abuse* – Provides education on substance abuse; emphasizes alternatives to illegal substances, effects of same on mood, behavior, cognitive processes; develops plan for relapse prevention.

A rotating schedule of group sessions will be established and enrollment will be based upon referral by the CCM, taking into consideration specific clinical needs of the individual inmates. All inmates will be referred to at least one group, more commonly to several. Groups can range in size from 5 to 25 inmates.

3. Re-entry planning

In addition to providing the above therapeutic activities, additional clinical staff will provide individuals with imminent (60 to 120 days) release dates the following pre-release planning:

- Review of pertinent mental health or medical conditions (e.g., allergies, special dietary needs, chronic diseases), criminal and legal history, or cognitive or functional impairment (e.g., developmental problems, insufficient education or language barriers) that could affect adjustment and treatment.
- Recommendations for follow-up treatment, including medications and recommendations for specific scheduled structured therapeutic activities.
- Referrals to appropriate programs and services, including substance abuse programs, education, and job programs.
- Application for federal and state benefit entitlements, such as; Medi-Cal, Medi-Care, Supplemental Security Income, and Veterans benefits. This will be accomplished by referring potentially eligible inmates to contracted social workers within each prison. The contracted social workers will be hired as a result of CDCR's recently approved funding to establish a "Pre-Parole Process for Securing Federal and State Benefit Entitlements and Community Based Continuity of Care". The contract will be managed by the CDCR Division of Adult Parole Operations, and has a planned implementation date of February, 2007.
- Initiation of Conservatorship proceedings where the patient meets criteria.
- Liaison with Parole Outpatient Program staff with reporting instructions and planning for continuity of care.
- Liaison with family members and significant others who may provide living options to the individual upon release.
- Screening for need for inpatient placement per Penal Code 2962 (Mentally Disordered Offender).

## Housing Unit / Treatment Space

While mainline EOP inmate/patients are provided separate housing units, no separate housing space will be given to this population because of the reception center processing function and the constant turn-over of inmates rotating thru reception. To the extent feasible at individual institutions however, and to facilitate medication distribution, heat plan monitoring, and access to CCM contacts, inmates with the EOP designation will be housed or clustered in close proximity to one another. Treatment space will be provided in existing classrooms, visiting areas, dining rooms, or other available space, perhaps during evening hours if necessary, as determined by each institution.

4

VAL2007 100026

## Staffing

At this time, specific staffing allocations for this proposed program are difficult to accurately project given the significant drop in the backlog of cases that is anticipated with the implementation of the new mainline EOP programs, and the wide range and ever changing numbers of cases in the reception centers. Defendants will permit flexibility in clinical responsibilities from location to location, dependent upon size of the population. For example, it is reasonable to expect that a small site (e.g., all women's institutions, High Desert State Prison) might not require any additional staff. Reception centers with somewhat larger populations (e.g., Duel Vocational Institution, California Correctional Institution, California State Prison, Lancaster) might assign one position responsible for providing *all* clinical activities in addition to many pre-release activities, and the five largest sites will need a greater compliment of staff with specialized clinical responsibilities. A certain baseline staffing is required for most programs, even though the staff/patient ratios might not ordinarily justify a full staff position.

We will continue to evaluate any resource needs related to this plan and any funding or positions it is determined necessary to implement this plan will be requested through the annual budget process, with hiring and implementation expected to begin in July 2007.

Despite the wide range of types of services provided to individuals with different needs, **it is anticipated that all inmates at the EOP level of care in reception centers will receive a *minimum of one hour of therapeutic service per day, 5 days per week*. This will include CCM contacts, individual therapy, group activities, and pre-release planning. Each clinical staff person will be expected to provide at least one group therapeutic activity (one hour or more each) per day.**

## Implementation Schedule

Upon approval of this plan by the Court, any funding or positions determined necessary to implement this plan will be requested through the annual budget process, with hiring and implementation expected to begin in July 2007.

5

VAL2007 100027

## POSITION DISTRIBUTION
### FOR
### ENHANCED OUTPATIENT PROGRAM - RECEPTION CENTERS PLAN

CCI (12 current cases) *N.R.*
  1.0 Staff Psychologist
  .5 Psychiatric Technician
  0.8 Correctional Officers

CIM (136 current cases)
  1.0 Staff Psychologists
  2.0 Licensed Clinical Social Workers
  1.0 Recreational Therapist
  2.5 Psychiatric Technicians
  8.0 Correctional Officers
  0.4 Correctional Counselor II (Specialist)

CIW (3 current cases)
  No additional staff

CCWF (1 current case)
  No additional staff

RJD (97 current cases)
  2.0 Staff Psychologist
  2.0 Licensed Clinical Social Worker
  2.0 Psychiatric Technicians
  6.7 Correctional Officers
  0.3 Correctional Counselor II (Specialist)

DVI (40 current cases)
  1.0 Staff Psychologist
  1.0 Licensed Clinical Social Worker
  1.0 Psychiatric Technician
  2.3 Correctional Officers
  0.1 Correctional Counselor II (Specialist)

HDSP (3 current cases)
  No additional staff

LAC (20 current cases) *N.R.*
  1.0 Staff Psychologist
  0.5 Psychiatric Technician
  1.4 Correctional Officers

NKSP (64 current cases)
  1.0 Staff Psychologist
  2.0 Licensed Clinical Social Worker
  1.5 Psychiatric Technician
  4.4 Correctional Officers
  0.2 Correctional Counselor II (Specialist)

SQ (40 current cases)
  1.0 Staff Psychologist
  1.0 Licensed Clinical Social Worker
  1.0 Psychiatric Technician
  2.3 Correctional Officers
  0.1 Correctional Counselor II (Specialist)

VSPW (7 current cases) *N.R.*
  No additional staff

WSP (107 current cases)
  2.0 Staff Psychologist
  2.0 Licensed Clinical Social Worker
  2.0 Psychiatric Technicians
  7.4 Correctional Officers
  0.3 Correctional Counselor II (Specialist)

*Total Additional Clinical Staff (67.7)*
  **11.0 Staff Psychologists**
  **10.0 Licensed Clinical Social Workers**
  **1.0 Recreational Therapist**
  **11.0 Psyciatric Technicians**
  **33.3 Correctional Officers**
  **1.4 Correctional Counselor II (Specialist)**

# RECEPTION CENTER ENHANCED OUTPATIENT PROGRAM
## WORKLOAD ASSESSMENT / STAFFING FORMULA

| STAFF | TASK | TIME (hrs.) PER TASK | FREQUENCY (per mo.) | TOTAL TIME (hrs. per mo., for a treatment population of 30 inmates) |
|---|---|---|---|---|
| STAFF PSYCHOLOGIST | Intake Assessment (includes review of clinical evaluations, past treatment compliance, commitment information) | 1 | 15 (new admissions per month) | 15 |
| | Individual Clinical Interview / Development of Initial Treatment Plan | 2 | 15 | 30 |
| | Group Therapy Sessions (includes preparation, follow-up, and actual group session) | 2 | 40 (2 groups per day, 5 days per week) | 80 |
| | IDTT Review | .25 | 30 | 7.5 |
| | Case Management Contacts (e.g., counselor discussion, custody contacts, review of transfer status) | .25 | 30 | 7.5 |
| | Release Planning / POC liaison | .5 | 15 (paroles per month) | 7.5 |
| Total | | | | 147.5 (one position) |
| LCSW | Conduct pre-release review of central file, parole file, unit health record for past community placements and problems | 1 | 15 | 15 (paroles per month) |
| | Contact community members regarding above information | 1 | 15 | 15 |
| | Process applications for financial support for community treatment | 4 | 15 | 60 (assumes 15 paroles per month) |
| | Initiate Conservatorship proceedings as appropriate | 8 | 2 | 16 (assumes 2 paroles per month qualify) |
| | Participate in ongoing patient observation, clinical assessment and treatment | 1 | 40 (assumes 2 contacts per day) | 40 |
| | IDTT reviews | .25 | 30 | 7.5 |
| Total | | | | 153.5 (one position when total population exceeds 40 inmates) |

VAL2007 100029

| STAFF | TASK | TIME (hrs) PER TASK | FREQUENCY (per mo.) | TOTAL TIME (hrs. per mo.) |
|---|---|---|---|---|
| Recreational Therapist | Conduct intake assessment of recreational history and interests; develop individual recreation plan | 2 | 15 | 30 |
| | Schedule and supervise unit and individual recreational activities; observe and record interactions | 2 | 60 (3 goups per day, 5 days per week) | 120 |
| | IDTT reviews | .25 | 30 | 7.5 |
| Total | | | | 157.5 (one position when total population exceeds 120 inmates) |
| Psychiatric Technician | Review and assist in activities of daily living (personal hygiene, cell cleanliness, eating, social relationships) | 4 hrs. daily | 20 | 80 |
| | Assist in inmate/patient movement to and from programs and activities | 1 hr. daily | 20 | 20 |
| | Assist in group therapy and recreational activities | 2 hrs. daily | 20 | 40 |
| Total | IDTT reviews | .25 | 30 | 7.5 |
| | | | | 147.5 (one position when total population exceeds 30 inmates) |

**Staffing Formula:**

10-30 Inmates   =   1 Psychologist + 0.5 Psychiatric Technician

31-60 Inmates   =   1 Psychologist +  1  LCSW + 1.0 Psychiatric Technician

61–90 Inmates   =   1 Psychologist +  2 LCSW + 1.5 Psychiatric Technicians

91-120 Inmates   =   2 Psychologist +  2 LCSW + 2.0 Psychiatric Technicians

121-150 Inmates  =   2 Psychologist +  2 LCSW +  1 Recreation Therapist + 2.5 Psychiatric Technicians

Attachment E

**CALIFORNIA DEPARTMENT OF CORRECTIONS & REHABILITATION**
**Division of Adult Institutions**
**Reception Centers**

Program 25
*Fiscal Year 2006/2007*
*Position Costing*

**Correctional Officers**

| | # of Cases | Ratio | Positions |
|---|---|---|---|
| CCI | 12 | 14.4 | 0.8 |
| CIM | 136 | 17.1 | 8.0 |
| CIW | 3 | | |
| CCWF | 1 | | |
| RJD | 97 | 14.4 | 6.7 |
| DVI | 40 | 17.1 | 2.3 |
| HDSP | 3 | | |
| LAC | 20 | 14.4 | 1.4 |
| NKSP | 64 | 14.4 | 4.4 |
| SQ | 40 | 17.1 | 2.3 |
| VSPW | 7 | | |
| WSP | 107 | 14.4 | 7.4 |
| | | Total PYs | 33.3 |

**Correctional Counselor II (Specialist)**

| | # of Cases per Month | Initial Interview Time (minutes) | Interview Time in Hours (# of cases * 30/60) | Positions (hours/173.3) |
|---|---|---|---|---|
| CCI | 12 | 30 | 6.0 | 0.0 |
| CIM | 136 | 30 | 68.0 | 0.4 |
| CIW | 3 | 30 | 1.5 | 0.0 |
| CCWF | 1 | 30 | 0.5 | 0.0 |
| RJD | 97 | 30 | 48.5 | 0.3 |
| DVI | 40 | 30 | 20.0 | 0.1 |
| HDSP | 3 | 30 | 1.5 | 0.0 |
| LAC | 20 | 30 | 10.0 | 0.1 |
| NKSP | 64 | 30 | 32.0 | 0.2 |
| SQ | 40 | 30 | 20.0 | 0.1 |
| VSPW | 7 | 30 | 3.5 | 0.0 |
| WSP | 107 | 30 | 53.5 | 0.3 |
| | | | Total PYs | 1.4 |

VAL2007 100031

# CALIFORNIA DEPARTMENT OF CORRECTIONS & REHABILITATION
## Division of Adult Institutions
### Reception Centers
#### Program 25
##### Fiscal Year 2006/2007
###### Equipment/Facility Ops Costing

| | How Many | Cost per Unit | Holding Cells | Television/ DVD Equipment | Cooling System Upgrade | Total Cost |
|---|---|---|---|---|---|---|
| **CIM** | | | | | | |
| | 6 | 1,000 | $6,000 | | | $6,000 |
| | 3 | 250 | | $750 | | $750 |
| | 9 | 25 | | | | $0 |
| Subtotal | | | $6,000 | $750 | $0 | $6,750 |
| **CCI** | | | | | | |
| | 1 | 25 | | | | |
| | 1 | 250 | | $250 | | $250 |
| Subtotal | | | $0 | $250 | $0 | $250 |
| **CIW** | | | | | | |
| | 1 | 250 | | $250 | | $250 |
| Subtotal | | | $0 | $250 | $0 | $250 |
| **CCWF** | | | | | | |
| | 1 | 250 | | $250 | | $250 |
| Subtotal | | | $0 | $250 | $0 | $250 |
| **RDJ** | | | | | | |
| | 7 | 25 | | | | $0 |
| | 3 | 250 | | $750 | | $750 |
| Subtotal | | | $0 | $750 | $0 | $750 |
| **DVI** | | | | | | |
| | 3 | 25 | | | | $0 |
| | 3 | 250 | | $750 | | $750 |
| Subtotal | | | $0 | $750 | $0 | $750 |
| **HDSP** | | | | | | |
| | 1 | 250 | | $250 | | $250 |
| Subtotal | | | $0 | $250 | $0 | $250 |
| **LAC** | | | | | | |
| | 1 | 250 | | $250 | | $250 |
| | 1 | 25 | | | | $0 |
| | | | | | $25,000 | $25,000 |
| Subtotal | | | $0 | $250 | $25,000 | $25,250 |
| **NKSP** | | | | | | |
| | 5 | 25 | | | | $0 |
| | 2 | 250 | | $500 | | $500 |
| Subtotal | | | $0 | $500 | $0 | $500 |
| **SQ** | | | | | | |

VAL2007 100032

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
|  | 3 | 25 |  |  |  | $0 |
|  | 2 | 250 |  | $500 |  | $500 |
| Subtotal |  |  | $0 | $500 | $0 | $500 |
| **VSPW** |  |  |  |  |  |  |
|  | 1 | 250 |  | $250 |  | $250 |
| Subtotal |  |  | $0 | $250 | $0 | $250 |
| **WSP** |  |  |  |  |  |  |
|  | 7 | 25 |  |  |  | $0 |
|  | 3 | 250 |  | $750 |  | $750 |
|  | 15 | 1,000 | $15,000 |  |  | $15,000 |
| Subtotal |  |  | $15,000 | $750 | $0 | $15,750 |
| Total Cost |  |  | $21,000 | $5,500 | $25,000 | $51,500 |
| Tax |  |  |  |  |  | $3,991 |
|  |  |  |  |  |  | $55,491 |
| Shipping |  |  |  |  |  | $4,635 |
| **Grand Total** |  |  |  |  |  | $60,126 |