PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California  94964
Telephone: (415) 457-9144

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
AMY WHELAN Bar No.: 215675
LORI RIFKIN Bar No.: 244081
SARAH M. LAUBACH Bar No.: 240526
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington  98104
Telephone: (206) 447-0900

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN,

      Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.,

      Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No.:  Civ S 90-0520 LKK-JFM

**PLAINTIFFS' CORRECTED
SUPPLEMENTAL BRIEF IN SUPPORT
OF MOTION TO CONVENE A THREE-
JUDGE PANEL TO LIMIT THE
PRISON POPULATION**

Hearing Date:    TBD
Time:
Location:        Courtroom 4
Judge:           Hon. Lawrence K. Karlton

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| ALOS | Average Length of Stay. |
| APP | Acute Psychiatric Program.  A 150-bed acute inpatient unit operated by the Department of Mental Health inside the California Medical Facility. |
| ASH | Atascadero State Hospital.  A state mental hospital operated by the Department of Mental Health in Atascadero, California. |
| ASU | Administrative Segregation Unit. |
| BCP | Budget Change Proposal. |
| BPH | Board of Parole Hearings. |
| C-file | Central File. |
| CCC | Consolidated Care Center. |
| CCCMS or 3CMS | Correctional Clinical Case Management System.  CCCMS is the name for the largest CDCR mental health program, which currently houses 26,000 inmates with mental illness who live in general population housing units alongside non-mentally ill inmates.  CCCMS inmates are generally given medication management, and a meeting with their case manager every 90 days.  A few also participate in groups. |
| CCCPOC | Committee To Continue a Centralized Parole Outpatient Clinic. |
| CCRC | Community Correctional Reentry Center. |
| CCWF | Central California Women's Facility, a prison located in Chowchilla, California. |
| CDCR | California Department of Corrections and Rehabilitation. |
| CIM | California Institution for Men.  A prison in Chino, California. |
| CIW | California Institute for Women.  CIW is a prison in Corona, California, with a planned MHCB. |
| CMF | California Medical Facility.  A prison in Vacaville, California. |
| CMC | California Men's Colony.  A prison in San Luis Obispo, California. |
| COMPAS | Correctional Offender Management Profiling for Alternative Sanctions |
| COR | California State Prison-Corcoran.  A prison in Corcoran, California. |
| CRIPA | Civil Rights of Institutionalized Persons Act, 42 USC § 1997 *et seq.* |
| CSH | Coalinga State Hospital.  A state mental hospital operated by the Department of Mental Health in Coalinga, California. |
| CSP | California State Prison. |

i

| | | |
|---|---|---|
| 1 | CTC | Correctional Treatment Centers. CTCs are licensed inpatient units inside prisons. Mental Health Crisis Beds operate inside Correctional Treatment Center Units. In addition to Mental Health Crisis Beds, most CTCs also include medical beds. |
| 3 | DAPO | Division of Adult Parole Operations. |
| 4 | DCHCS | Division of Correctional Health Care Services. This is the Department in CDCR headquarters that manages medical and mental health care. |
| 6 | DJR | Daily Jail Rate. |
| 7 | DMH | Department of Mental Health. |
| 8 | DOF | Department of Finance. |
| 9 | DTP | Day Treatment Program. |
| 10 | DSW | District Social Workers. |
| 11 | DVI | Deuel Vocational Institute. A prison in Tracy, California. |
| 12 | EID | Electronic In Home Detention. |
| 13 | EOP | Enhanced Outpatient Program. EOP programs are sheltered treatment programs that house severely mentally ill inmates. There are currently approximately 4,100 EOP inmates. Because these inmates are unable to function in a general population setting, they live in segregated housing units. They are given 10 hours each week of therapy or other "structured therapeutic activities." EOP inmates meet weekly with their case managers. |
| 17 | FRMSC | Female Residential Multi-Service Centers. |
| 18 | GACH | General Acute Care Hospital. These are licensed hospital units within a prison. They are licensed by the California Department of Health Services. CDCR has these units at CIM, CMC, CMF and Corcoran State Prison. |
| 20 | ICDTP | In-Custody Drug Treatment Program. |
| 21 | ICF | Intermediate Care Facility. ICF programs are "intermediate" inpatient care programs. These programs are operated by the state Department of Mental Health. There are currently ICF programs at Salinas Valley State Prison, the California Medical Facility, Atascadero State Hospital, and Coalinga State Hospital. Inmates in these programs have frequent clinical contact, 24-hour nursing care and 20 or more hours of therapy and treatment each week. Inmates generally spend 6-12 months in these programs. |
| 26 | IDTT | Interdisciplinary Treatment Team. A treatment team composed of, at a minimum the primary clinician, psychiatrist, correctional counselor and the inmate patient, as well as licensed psychiatric technicians and custody officers. This team makes admissions decisions, formulates and approves things. |

| | |
|---|---|
| KVSP | Kern Valley State Prison.  A new prison in Delano, California.  KVSP has an MHCB unit. |
| LAC | California State Prison, Los Angeles County.  This is a prison in Lancaster, California. |
| LAO | Legislative Analyst's Office. |
| LOU | Locked Observation Unit.  An unlicensed Outpatient Housing Unit that is currently operating as a de facto MHCB at California Men's Colony. |
| MCSP | Mule Creek State Prison.  A prison in Ione, California. |
| MHSDS | Mental Health Services Delivery System.  The name given by Defendants to their entire mental health system. |
| MHCB | Mental Health Crisis Beds.  MHCB units are licensed inpatient units inside many California prisons where mentally ill inmates who are suicidal or experiencing another kind of mental health crisis can be admitted and treated for up to 10 days.  MHCBs are generally located inside a Correctional Treatment Center. |
| MSH | Metropolitan State Hospital.  A state mental health hospital operated by the Department of Mental Health in Norwalk, California. |
| NKSP | North Kern State Prison, a prison in Delano, California. |
| NSH | Napa State Hospital.  A state mental health hospital operated by the Department of Mental Health in Napa, California. |
| OHU | Outpatient Housing Units.  Unlicensed infirmaries inside many CDCR institutions that provide treatment for medical and mental health conditions. |
| OST | Out of State Transfer Program. |
| PAII | Parole Agent II. |
| PBSP | Pelican Bay State Prison.  A prison in Crescent City, California. |
| POC | Parole Outpatient Clinic. |
| PPP | Parole Planning and Placement.  This is a pre-release planning program run by the Division of Adult Parole Operations. |
| PSA | Parole Services Associate. |
| PSAP | Parolee Substance Abuse Program. |
| PSC | Parole Service Centers. |
| PSH | Patton State Hospital.  A state mental health hospital operated by the Department of Mental Health in San Bernardino, California.  This is the only state hospital that houses female 2684 patients. |

| | |
|---|---|
| PSU | Psychiatric Services Unit.  These are psychiatric treatment programs providing Enhanced Outpatient Program level of care to inmates with a Security Housing Unit term. |
| PV-RTC | Parole Violator Returned To Custody. |
| PVWNT | Parole Violator With New Term. |
| RC | Reception Center.  This refers to designated prisons or housing units within prisons where inmates are classified and processed when they first arrive in the CDCR. |
| RJD | R.J. Donovan Correctional Facility, a prison in San Diego, California. |
| RMSC | Residential Multi-Service Centers. |
| RTC | Return To Custody. |
| SAC | California State Prison, Sacramento.  A prison located in Sacramento, California. |
| SASCA | Substance Abuse Services Coordination Agencies. |
| SATCU | Substance Abuse Treatment Control Units. |
| SHU | Security Housing Unit.  This is a segregated high-security housing unit for inmates who have committed serious infractions while in prison or who have been "validated" by the CDCR as belonging to a gang.  There are male SHU units at Pelican Bay State Prison (from which all inmates with serious psychiatric conditions are excluded), Corcoran State Prison, and California Correctional Institute.  There is a SHU for women at Valley State Prison for Women. |
| SQ | San Quentin State Prison, a prison in San Quentin, California. |
| SSA | Social Security Administration. |
| SSI | Supplemental Security Income. |
| SVP | Sexually Violent Predators. |
| SVPP | Salinas Valley Psychiatric Program.  The free-standing DMH-run unit on the grounds of Salinas Valley State Prison that has ICF beds. |
| SVSP | Salinas Valley State Prison.  A prison in Soledad, California. |
| TCMP-MI | Transitional Case Management Program for Mentally Ill. |
| YACA | Youth and Adult Correctional Agency (predecessor of the California Department of Corrections and Rehabilitation |

# TABLE OF CONTENTS

TABLE OF ABBREVIATIONS................................................................i

TABLE OF CONTENTS .....................................................................v

TABLE OF AUTHORITIES ................................................................vii

INTRODUCTION ...............................................................................1

    The Plata Receiver's Report on Overcrowding .............................3

    AB 900 Worsens The Crisis ...........................................................4

    A Prisoner Release Order Will Be An Effective Remedy To Address The Ongoing Constitutional Violations ................................6

STATEMENT OF FACTS ...................................................................7

I.    The Overcrowding Crisis Continues To Worsen Conditions For The Coleman Class ..........................................................................7

    A.    Overcrowding Has Worsened Since December 2006 By Every Measure ...........................................................7

    B.    Overcrowding Prevents The Delivery Of Constitutionally Adequate Mental Health Care In The CDCR And Results In Grave Harm To The Coleman Class ......................................8

        1.    Bed shortages result in inappropriate placements and lack of access to care...................................................9

        2.    Staffing shortages make provision of Constitutional mental health care impossible ...............................11

        3.    The suicide rate continues to rise ................................13

II.    The "Remedial Measures" Promised By Defendants Will Not And Cannot Address The Effects Of Overcrowding On The Coleman Class ........................14

    A.    Even Assuming Defendants' Plans All Are Successful, Overcrowding Will Continue At Levels That Prevent Delivery Of Constitutional Levels Of Mental Health Services .....................................15

    B.    Defendants' Construction Plans And Prison And Parole "Reforms" Will Not Remedy Defendants' Constitutional Violations.........................16

        1.    Assembly Bill 900.......................................................16

            a.    New State Prison Beds.......................................17

            b.    Re-entry Beds ....................................................19

            c.    Out of State Transfers ........................................20

        2.    Parole "Reforms" ......................................................21

C.    Overcrowding Will Continue To Prevent Delivery Of Mental Health Services Because AB 900 Will Expand The Prison Population And Thus Worsen Understaffing ................................. 22

III.    Defendants Continue To Engage In Practices That Needlessly Increase The Number Of Mentally Ill Individuals In Prison ................................. 23

A.    Failure To Provide Appropriate Mental Health Treatment Services To Parolees ................................................................. 23

B.    Returns To Custody Of Mentally Ill Parolees For Reasons Primarily Relating To Unmet Mental Health Needs ................................. 24

C.    Failure To Implement Remedial Sanctions Programs ................................. 24

D.    Failure To Implement Pre-Release Planning ................................. 25

THIS COURT SHOULD CONVENE A THREE-JUDGE PANEL FOR ENTRY OF APPROPRIATE PRISONER RELEASE ORDERS ................................. 26

I.    The Prison Litigation Reform Act's Requirements For Convening A Three-Judge Panel To Consider Limits On The Prison Population Are Satisfied And This Court Should Refer This Matter To Such A Panel ................ 26

II.    A Prisoner Release Order Will Be Effective In Remedying Ongoing Violations In The Delivery Of Mental Health Care To Class Members ............. 27

A.    A Prison Release Order Will Be Effective Because It Will Reduce The Current Staff-Inmate Ratio And Enable The *Coleman* Remedial Plan To Move Forward ................................................................. 27

B.    Given The Present Situation, A Prisoner Release Order Is The Only Effective Means Of Addressing The Ongoing Violations Of Class Members' Constitutional Rights To Adequate Mental Health Care, And Of Eventually Ending The *Coleman* Case ................................. 28

1.    Defendants refuse to take measures to alleviate the effects of overcrowding on implementation of the *Coleman* remedy ........... 28

2.    A prisoner release order will effect the relief from overcrowding necessary for the *Coleman* remedy ................................. 30

III.    Prisoner Release Orders That Require Defendants To Meet General Population Limits As Well As Specific Reductions Of The Population Of The *Coleman* Class Are Required To Remedy The Violations ........................ 32

A.    A General Population Limit Is Needed To Effect Relief For The *Coleman* Class ................................................................. 32

B.    In Addition To A General Population Cap, A Prisoner Release Order Should Direct Defendants To Specifically Reduce The Population Of The *Coleman* Class ................................. 35

CONCLUSION ................................................................. 36

# TABLE OF AUTHORITIES

## Cases

*Essex County Jail Inmates v. Amato*
    726 F.Supp. 539 (D.N.J. 1989) ..................................................................... 30

*Plata v. Schwarzenegger,*
    No. Civ. C01-1351 TEH (N.D. Cal.) ...................................................*passim*

*Roberts v. Tennessee Dept. of Correction*
    887 F.2d 1281 (6th Cir. 1989) .......................................................................... 31

*Valdivia v. Schwarzenegger*
    No. Civ S-94-0671 LKK/GGH (E.D. Cal.) ............................................... 24, 25

*Williams v. McKeithen*
    963 F.2d 70 (5th Cir. 1992) ............................................................................. 31

## Statutes

18 U.S.C. § 3626 (a)(3) (Prison Litigation Reform Act) ....................................*passim*

28 U.S.C. § 2284 ....................................................................................................... 36

Assembly Bill 900, "Public Safety and Offender Rehabilitation Services Act of 2007,"
    May 3, 2007..........................................................................................*passim*

California Penal Code Section 3001 ......................................................................... 21

PLAINTIFFS' CORRECTED SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO CONVENE A THREE-JUDGE PANEL TO LIMIT THE
PRISON POPULATION, NO.: CIV S 90-0520 LKK-JFM

## INTRODUCTION

In response to this Court's May 4, 2007 Order, plaintiffs have provided additional evidence and argument in support of the motion to convene a three-judge panel to limit the prison population.  The Court also requested a response to the question:  "whether a prisoner release order will be effective to remedy ongoing constitutional violations in the delivery of mental health care to class members, and, if so, what type of prisoner release order would be required to remedy those violations."  5/4/07 Order.

A prisoner release order will be effective in remedying the ongoing Constitutional violations plaguing the *Coleman* class because the key to delivery of appropriate mental health care is recruiting and retaining sufficient clinical staff, and planning and building sufficient hospital beds, treatment spaces and mental health housing units to appropriately house and treat the population.  The evidence before this Court establishes that California can begin to meet the appropriate ratio of staff and mental health beds to address the needs of the *Coleman* class only through an order limiting the overall prison population.  All other measures, including numerous orders of this Court, have failed due to the overwhelming pressure of population growth and defendants' failure to adequately address the crisis.

The type of prisoner release orders that are required to accomplish this necessary goal, assuming the three-judge panel makes the necessary findings, would be the establishment of an overall prison population limit, as well as specific limits on the population of *Coleman* class members, based on the State's ability to provide appropriate staffing and housing to address their needs.  Given the admitted current magnitude of the unconstitutional conditions, and the ongoing pain and suffering of the class, the three-judge panel should also order the State to develop a short-term plan to promptly reduce the prison population by benchmark dates.

Governor Schwarzenegger stated as follows on January 9, 2007:

"Our prisons are in crisis.  We have inherited a problem that has been put off year after year after year.  Last year I called a special session to address the crisis. That session was not successful, so I declared a state of emergency.  It is still an emergency.  Our prison system is a powder keg.  It poses a danger to the prisoners, a danger to the officers…We have thousands of prisoners housed in gymnasiums, TV rooms, dining rooms, hallways, anywhere there is space.  You

1

all know 172,000 prisoners in facilities designed to hold about 100,000.  That is a danger and that is a disgrace."

Governor Schwarzenegger, 1/9/07 State of the State Address, Attached hereto as Exhibit F to Declaration of Lori Rifkin in Support of Plaintiffs' Supplemental Motion to Convene a Three-Judge Panel to Limit the Prison Population ("Rifkin Decl.") ¶ 13.  Five months later, the number of inmates is now up to almost 175,000, but defendants have done nothing that addresses the danger.[1]  California's prisons are still powder kegs, are still a disgrace and will remain so for many more years if the State is left to its own devices.

This Court told defendants at the December 11, 2006 hearing:  "As reluctant as I am, I will do it… You tell your clients June 4th may be the end of the line, may really be the end of the line."  Docket 2078, 12/11/06 Hearing Transcript at 9:4-22.  More than 32,000 *Coleman* class members suffer today in California prisons.  *See* Draft Seventeenth Monitoring Report of the Special Master on the Defendants' Compliance With Provisionally Approved Plans, Policies, and Protocols, Part C ("17C") at 182.[2,3]  Yet, in the face of this Court's warning that the State must act now to address overcrowding in order to remedy Constitutional violations of delivery of mental health care, the State has once again failed.  Defendants have not enacted a single prison reform that will meaningfully impact the delivery of mental health treatment to

[1] *See* Rifkin Decl. ¶ 16, Ex. I at 12. (Defs.' Rpt. in Response to the Court's 2/15/07 Order, filed 5/16/07 in *Plata v. Schwarzenegger* (Defs.' Rpt.)) (stating current CDCR prison population).

[2] Part A of the Special Master's Seventeenth Monitoring Report will be referred to throughout as ("17A"), and Part B as ("17B").  17A was filed with this Court as Docket 2140, and 17B was filed with this Court as Docket 2180.

[3] *See* Supplemental Declaration of Jane E. Kahn In Support of Plaintiffs' Supplemental Brief In Support of Motion to Convene a Three-Judge Panel to Limit The Prison Population ("Supp. Kahn Decl.") at ¶ 2 for discussion concerning use of the Draft 17C Report.

1  the tens of thousands of individuals with serious mental illness languishing in California's

2  prisons. [4]

3  <u>**The Plata Receiver's Report on Overcrowding**</u>

4  Last week, the *Plata* Receiver filed his response to an order from Judge Henderson to

5  report on the manner and extent to which overcrowding is interfering with his ability to remedy

6  the Constitutional violations of inmates' right to medical care.  *See* Rifkin Decl. ¶ 14, Ex. G

7  (2/15/07 Henderson Order); *id.* ¶ 15, Ex. H (Receiver's Report Re Overcrowding ("Receiver's

8  Overcrowding Rpt."), filed 5/15/07).  The Receiver outlines in horrifying detail the manner in

9  which defendants have knowingly and intentionally designed a prison system to warehouse

10  human beings, planning to cram them into prisons at almost double the design occupancy rate,

11  while deliberately failing to provide adequate clinical space to allow for basic minimums of

12  medical and mental health care mandated by the Constitution.  *See* Rifkin Decl. ¶ 15, Ex. H

13  (Receiver's Overcrowding Rpt.) at 025 ("This CDCR policy and practice, for more than twenty

14  years, to limit health care space…to only the base staffing level of the institution, ignoring pre-

15  existing plans to double-cell the prison up to 200 percent of capacity, adversely impacts the

16  daily medical, mental health, and dental operations…"); *id.* at 024 ("[T]he newest CDCR

17  prisons were designed with clinic space which is *only one-half that necessary for the real-life*

18  *capacity of the prisons*")(emphasis in original).  This is true even for the prison defendants

19  opened only two years ago, Kern Valley State Prison, *ten years* after this Court issued its

20  decision in the *Coleman* case.  *See id.* at 027 ("In essence, KVSP was planned, designed, and

21

22  _____

23  [4] The State ignored, once again, the advice of its experts.  *See, e.g.,* Rifkin Decl. ¶ 12, Ex. C
    (1/07 Little Hoover Commission Report)at 49 ("Policy-makers must manage the correctional

24  population…the State should not settle for simply building more cells.  It has done that for
    nearly two decades and the State is still in a crisis."); *id.* ¶ 30, Ex. BB (2/16/06 CDCR Press

25  Release) (quoting Jeanne Woodford, Undersecretary of CDCR, "It is not enough to just build
    capacity, but we must be smart about how we plan."); Declaration of Ernest Galvan in Support

26  of Supplemental Brief in Support of Motion for Three-Judge Panel to Limit Prison Population
    ("Galvan Decl.") ¶ 4, Ex. D (Corrections Independent Review Panel Report) at 121 ("The size

27  of the prison population has resulted in part from tough-on-crime sentencing policies of recent
    decades, but the state has also been widely criticized for fueling the numbers by not doing a

28  better job of preparing inmates to return to society.").

1  subsequently constructed knowing full well that the medical, mental health, and dental space

2  and staffing would be entirely insufficient for the prison's actual population.")

3      Indeed, the Receiver concluded that "Crowding related policies that do not provide

4  adequate clinical and program space are now an accepted practice of CDCR prison planning,

5  as is California's practice of offering inadequate salaries and failing to provide adequate hiring

6  programs which have created crisis levels of shortages of clinical personnel and correctional

7  officers."  Rifkin Decl. ¶ 15, Ex. H (Receiver's Overcrowding Rpt.) at 013.   The Receiver also

8  observed that CDCR's Facility Master Plans fail to address overcrowding driven problems

9  with the delivery of health services, "focus[ing] on corrections, as if medical, mental health,

10  and dental care have no place in prison design, prison construction, or prison management."

11  *Id.* at 016.

12                    **AB 900 Worsens The Crisis**

13      Defendants ask this Court to rely on yet another prison-building plan[5] for 40,000 state

14  prison beds,[6] passed at the thirteenth hour, as a solution to alleviate the overcrowding and

15  Constitutional violations that defendants have deliberately perpetuated for more than twenty

16  years.  Yet, according to the Legislature's own independent consultants, the bill fails to include

17  any timelines, concrete details about construction, or plans for staffing, clinical, or

18  programming space.  *See* Rifkin Decl. ¶ 17, Ex. L (Senate Budget and Fiscal Review

19  Committee Subcommittee No. 4, 4/12/07 Agenda ("4/12/07 Agenda")) at 7-12 (Agenda

20  containing extensive analysis by Legislative Analyst's Office on proposed prison legislation

21  and CDCR activity).  *Moreover, even if every single one of the beds defendants propose were*

22  *constructed, the system would still be at an unacceptable level of overcrowding, exceeding*

23  *what experts have determined to the be the "maximum safe and reasonable capacity." See*

24  Galvan Decl. ¶ 4, Ex. D at 123-124 (Corrections Independent Review Panel Rpt.) (establishing

25

26  _____

27  [5] On April 20, 2007, the Legislature passed Assembly Bill 900.  A summary of the Bill is found in the Receiver's Overcrowding Report.  Rifkin Decl. ¶ 15, Ex. H at 036-041.

28  [6] The Bill approves building 53,000 beds in total.  13,000 of these are county jail beds.

CDCR maximum safe and reasonable capacity); *see also* Rifkin Decl. ¶ 16, Ex. J at ¶ 22. (Kernan Decl.) (providing defendants' population estimates for 2008 and 2009).

In short, the Governor's Plan will make the situation worse as it adds beds and buildings but does nothing to address the critical shortages of clinical staff, hospital beds and treatment space necessary to remedy the Constitutional violations.[7]  By expanding capacity without limiting population AB 900 will further delay the remedy – it is part of the problem, not the solution.

Since the enactment of AB 900, defendants have also filed promises of new plans for "meaningful" corrections and parole reform in *Plata* and *Armstrong*.  New distinguished panels of nationally prominent correctional experts have been formed and "strike" teams have been assembled.  But a careful review of the predictions of possible future reforms (most of which have not even been proposed, let alone adopted, funded or implemented), only underscores the importance that this Court act now to refer this issue to the three-judge panel. The critical point is this:  even if every promised reform were funded, enacted and implemented, CDCR's population would still substantially exceed any measure of unconstitutional overcrowding for years to come.   It is undisputed that today's prison population of approximately 175,000 is excessive and must be reduced in order to permit the remedial process to proceed in *Plata* and *Coleman*.  Yet defendants' most optimistic predictions will result in nothing more than a stabilization of CDCR's projected population growth and no meaningful reduction from today's unconstitutional levels.  *See* Rifkin Decl. ¶ 16, Ex. J at ¶¶ 5-22 (Kernan Decl.).

This Court found in 1995 that California's failure to provide a minimal level of mental health care to prisoners with mental illness constituted cruel and unusual punishment in violation of the Eighth Amendment.  More then a decade later, despite numerous Court orders,

---

[7] *See also* Rifkin Decl. ¶ 15, Ex. H at 046 (Receiver's Overcrowding Rpt.).  ("It is easy to talk of constructing prisons and jails.  It is more difficult and expensive to staff correctional institutions with the appropriate clinical personnel and correctional officers.  AB 900, however, is silent about how the jails and prison[ ] beds cited in the bill will be staffed and managed.")

the Constitutional violations persist.  Overcrowding has overwhelmed the remedial process, setting back years of slow but steady progress.  This Court recently stated, "[P]risons are prisons because people have broken the law and they represent a danger to society and the prison's primary function is acting as a prison.  That doesn't mean that you get away with not providing them mental health services."  Docket 2205, 4/23/07 Hearing Transcript at 4:9-14.  The State cannot provide minimally adequate mental health services—to the point where every day tens of thousands of class members are being held in conditions indistinguishable from those this Court found to violate the Eighth Amendment's prohibition against cruel and unusual punishment more than a decade ago.  Plaintiffs come to this Court in a situation even more dire than last November.  Conditions have substantially worsened in the past six months and no plans have been enacted by defendants that will address the crisis of overcrowding in 2007 or 2008, or even 2009 or 2010.

## A Prisoner Release Order Will Be An Effective Remedy To Address The Ongoing Constitutional Violations

A prisoner release order will be an effective mechanism for remedying ongoing violations because it will reduce the population and allow appropriate ratios of clinical staff to *Coleman* class members to be achieved.  The policies and procedures comprising the backbone of a Constitutional mental health services delivery system are in place.  A prisoner release order will finally compel the State to enact meaningful short-term and long-term measures to reduce its prison population and clear the way for this long-promised mental health care system to be fully implemented.  Without population limits, defendants cannot hope to recruit and retain sufficient staff to provide the minimum necessary treatment to the *Coleman* class.  The State's own experts have identified numerous reforms that would yield immediate relief for the *Coleman* class, improve public safety and reduce the ever-increasing burden of the prison system budget on California's tax payers.  The three-judge court should set a general population limit and timeframes for meeting that limit, and also direct defendants to implement reforms specifically aimed at reduction of the population of the *Coleman* class.

1    These are win-win solutions:  California can improve public safety at the same time it

2 remedies the Constitutional violations in its prison system by substantially reducing its

3 population to appropriate and safe levels and respecting the basic human rights and dignity of

4 all of its citizens.

5

6                              **STATEMENT OF FACTS**

7 **I.    The Overcrowding Crisis Continues To Worsen Conditions For The *Coleman*
        Class**

8       **A.    Overcrowding Has Worsened Since December 2006 By Every Measure**

9       Overcrowding continues to overwhelm the CDCR.  The population continues to rise,[8]

10 the staffing vacancy rate continues to soar,[9] and available space continues to shrink.[10]  CDCR's

11 executive and managerial staff continue to turn over at significant rates.  Rifkin Decl. ¶ 15, Ex.

12 H at 018 (Receiver's  Overcrowding Report); *see also* Assembly Bill 900, Section 7.  CDCR

13 institutions have severe infrastructure problems, with water shortages and sewage violations.

14 *See, e.g.,* Rifkin Decl. ¶ 19, Ex. P (Cease & Desist Order re Mule Creek Wastewater Treatment

15 Plant); Rifkin Decl. ¶ 18, Ex. O at 122-23 (CDCR has received notices from regional water

16 board at 6 prisons).  18,500 inmates are housed in "bad" beds, which are bunks in gymnasiums,

17 dayrooms, classrooms and hallways.  *See, e.g.,* Rifkin Decl. ¶ 18, Ex. O at 118 (Governor's

18 2007 CA Five-Year Infrastructure Plan).  As detailed in plaintiffs' opening brief, there is

19 essentially an extreme system-wide lockdown that has been building for years.  Docket 2041

20 (Pls.' Memo) at 9:28; *see also* Docket 2062, CCPOA Amicus Brief filed 12/4/06 at 2:21-22

21

22 _____

23 [8] Defs.' Report filed in *Plata* on May 16, 2007 states that there the total prison population is
   approximately 174,989 inmates.  Rifkin Decl. ¶ 16, Ex. I at 12.  The population was at 173,463
24 inmates as of November 1, 2006.  Docket 2041, Pls.' Memorandum in Support of Motion for
   Three-Judge Panel to Limit Prison Population ("Pls. Memo") at 5.

25 [9] "As of January 31, 2007, 'budgeted' correctional officer vacancies had risen to
   1,915…CDCR officials estimate the actual officer shortage to be somewhere between 2,400
26 and 2,700." Rifkin Decl. ¶ 15, Ex. H at 017 (Receiver's Overcrowding Rpt.).  AB 900, Section
   24 finds that there are over 2,400 correctional staff vacancies.

27 [10] *See, e.g.,* AB 900, Section 29 ("In order to provide prison capacity beyond 2007, it is
28 necessary that this act take effect immediately.")

7

1  ("Double and triple bunking is now commonplace, canceling inmate programs is routine, and

2  lockdowns and limitations on exercise are the norm.")

3      Indeed, the Legislative Analyst's Office ("LAO") notes that "[t]he overcrowded

4  conditions are projected to worsen over the next several years as the population continues to

5  grow."  Rifkin Decl. ¶ 17, Ex. L at 2.  The

6  Governor's 2007 Five-Year Infrastructure Plan states:

7      [M]ale inmate housing capacity will be exhausted sometime in
        2007.  All 33 CDCR prisons are now at or above maximum
8      capacity.  Twenty-nine of the prisons are so overcrowded that the
        CDCR is required to house approximately 18,500 inmates in prison
9      gymnasiums, dayrooms, and program space.  Approximately 1,700
        inmates are sleeping in triple bunks.  The shortage of maximum-
10     security beds has led to increased confrontation between
        inmates…as well as exacerbating the risk of injury to staff.

11  Rifkin Decl. ¶ 18, Ex. O at 118.

12      Defendants themselves candidly admit that the overcrowding of CDCR facilities has

13  caused infectious disease outbreaks, riots, and disturbances system-wide.  Rifkin Decl. ¶ 16,

14  Ex. J at ¶ 3 (Kernan Decl.).  The Receiver confirms that this is the case.  Rifkin Decl. ¶ 15, Ex.

15  H at 035 (Receiver's Overcrowding Report).  Yet defendants have failed to take any actions

16  that will alleviate the avoidable and unnecessary pain, suffering and deaths these

17  unconstitutional conditions will continue to cause this year and for many more years.

18      **B.   Overcrowding Prevents The Delivery Of Constitutionally Adequate Mental
            Health Care In The CDCR And Results In Grave Harm To The *Coleman*
19          Class**

20      Recent reports issued by both the *Coleman* Special Master and the *Plata* Receiver

21  conclusively establish the fact that the overcrowding crisis in CDCR prevents the delivery of

22  Constitutionally adequate mental health treatment to inmates.  *See* 17A, 17B, 17C; Rifkin

23  Decl. ¶ 15, Ex. H (Receiver's Overcrowding Rpt.).  The *Coleman* class is gravely affected by

24  overcrowding, both in terms of the generally deleterious effects of overcrowded conditions on

25  persons with serious mental illness, and in terms of the specific inability of defendants to

26  deliver mental health services given the population overflow, clinical and custody staff

27  shortages, and lack of treatment space that when added together produce the overcrowding

28  crisis.

Plaintiffs have established, and defendants do not dispute, the ongoing failure of defendants to provide appropriate mental health care as mandated by the Constitution and the Program Guide.  *See* Docket 2041 (Pls.' Memo).  These violations include: the shortage of mental health beds at all levels throughout the system; lack of timely access to urgent care for inmates who are decompensating; lengthy and stagnating waiting lists of inmates requiring higher levels of care; medication delays and errors; and horrific seclusion and isolation for thousands of prisoners housed in administrative segregation and other locked down units, leading to increased illness and high rates of suicide.

The recently filed Seventeenth Monitoring Report of the Special Master reports a multitude of deficiencies in mental health treatment stemming from overcrowding, and describes the effects of overcrowded conditions on the *Coleman* class.  These include, for example: "a steady rise in self injurious behavior, both real and feigned, among seriously mentally disordered inmates, who felt substantially more vulnerable and threatened in overcrowded conditions that, from their perspective, were spiraling out of control" (17A at 107); a "crisis in the availability of mental health crisis beds, attributable in large part…to the defendants' increasing population crunch" (17A at 124); an inability to "maintain regular and timely case management contacts at least quarterly with 3CMS inmates" (17B at 101); and "the perception...that pressure on the higher levels of care has become so intense, clinicians in those programs must increasingly accelerate the return to lower levels of care people who are not stable enough to cope successfully" (17B at 103).

In fact, the Special Master concluded that, at this time, in "the deepest winter of CDCR's discontent," defendants are so incapable of complying with already-existing Court orders, "this does not seem the appropriate moment to pile more orders on the barely discernible plate of the defendants."  17A at 137, 132.

### 1. Bed shortages result in inappropriate placements and lack of access to care

Indeed, in the six months this Court provided defendants as a last chance, the provision of mental health treatment has deteriorated even further, fulfilling the warning of the Special

9

1  Master of "CDCR's seeming slouch toward catastrophe." 17A at 137.  As this Court found in

2  its May 23, 2007 Order, "defendants do not have enough acute psychiatric beds to meet the

3  needs of class members, and…severe staffing shortages at Atascadero State Hospital (ASH)

4  are rendering unavailable at least 151 of the 231 intermediate care beds that are supposed to be

5  available to CDCR inmates in need of intermediate inpatient care at ASH." 5/23/07 Order at

6  2:18-3:3 (footnotes omitted).  The Court also found that "[t]he consequences of an insufficient

7  numbers [sic] of intermediate care beds include, but are not limited to, the use of MHCBs

8  and/or acute psychiatric beds for inpatient stays far in excess of that for which those beds were

9  intended." *Id*. at 3:3-6.  The bed shortage resounds throughout the CDCR, and the Special

10  Master recently noted the "increasingly desperate need for acute and intermediate inpatient and

11  mental health crisis beds in CDCR."  Docket 2186 at 9-10.

12  During the Seventeenth Monitoring Round, the Special Master found a pattern of

13  inmates waiting in MHCBs for prolonged periods of time because of insufficient beds at higher

14  levels of care.  Supp Kahn Decl. ¶ 4-12.  He provided examples of two inmates at CIM who

15  were in MHCBs for more than six weeks after being referred for transfers to inpatient beds.  *Id.*

16  at ¶ 10.  Inmates throughout the system face similar waits, not only in MHCB beds, but also in

17  Outpatient Housing Units (OHUs), which are unlicensed infirmaries developed as a coping

18  mechanism for the shortage of MHCB beds.  *Id.*  at ¶ 4-9.  The Special Master described the

19  grave consequences of inappropriate placements and lack of access to mental health beds:

20      Prisons with poor access to DMH beds…relied heavily on holding cells…Along
        with three bad outcomes at DVI, documentation compiled at NKSP highlighted
21      the pitfalls associated with the use of holding cells.  NKSP's records show that of
        75 inmates [that] were placed in holding cells… 33 percent were in a holding cell
22      longer than two days and 62 percent never made it into an MHCB.  Some of
        these inmates shuttled between holding cells and their housing units on multiple
23      occasions without ever having been fully evaluated by a clinician or their case
        being reviewed by an IDTT.  At DVI, an inmate self-inflicted lacerations while
24      in a holding cell located in administrative segregation, a second inmate
        committed suicide by hanging in a holding cell located in the infirmary and an
25      EOP inmate whose death was attributed to cardiac arrest died while on a 15-
        minute watch protocol but whose body was not discovered for hours.
26  17C at 178-79.

27  The use of these dangerous holding cells because of the shortage of appropriate beds is

28  widespread throughout CDCR institutions.  The Special Master's 17th Round Reports are full

1  of examples of decompensating inmates placed in such barbaric locations.  For example, an

2  EOP patient housed in an administrative segregation unit as Salinas Valley State Prison was

3  interviewed by the Special Master's team in a mesh holding cage where he was being held that

4  was described as no larger than 30 inches square.  Supp. Kahn Decl. at ¶ 9.  He had been

5  moved back and forth between holding cells, an MHCB unit and administrative segregation,

6  despite a serious suicide attempt, and *Coleman* experts found that his mental health treatment

7  was inadequate.  *Id.*[11]

### 2.  Staffing shortages make provision of Constitutional mental health care impossible

10  Recruitment of clinical staff to fill the stunning vacancies in the CDCR system has been

11  a dismal failure.  Not only have defendants miserably mismanaged the recruitment process, but

12  even if they had performed well, it is doubtful that they could succeed in filling all of their

13  vacancies.  Staffing is the linchpin of mental health care.  As the Special Master recently

14  stated:

> The principal problem identified in this report is the lack of adequate mental health staff in the CDCR institutions…The clinical staffing shortage is not only serious; it is worsening.  Since the end of the 17th monitoring period, the rate of vacancies has grown from critical to catastrophic proportions.  As of early 2007, vacancies among allocated positions for psychiatrists, case managers (psychologists and psychiatric social workers) and psych techs hovered at the rate of fifty percent.

19  17C at 181-82; *see also* Supp. Kahn Decl. ¶ 19 (clinical vacancy rates at fourteen CDCR

20  prisons above fifty percent).  The staffing shortage has forced a "planned reduction in services"

21  whereby institutions attempt to triage care to provide mental health treatment to those inmates

22  with the greatest need.  Supp. Kahn Decl. ¶ 17.  This results in a severe drop in services not

23  only to EOP inmates who are not in crisis or acute care beds, but also to CCCMS inmates, who

---

25  [11] Another consequence of the bed shortage is frequent movement of inmates between

26  institutions:  "Overcrowding creates increased prisoner movement as correctional officials struggle to manage crowding by transferring prisoners from institution to institution in a constant search for "open" beds.  This form of crowding driven movement adversely impacts

27  on health care delivery in at least six important ways."  Rifkin Decl. ¶ 15, Ex. H at 15-16

28  (Receiver's Overcrowding Rpt.).  These "prisoner moves" exceeded 170,000 in the first quarter of 2007 alone.  *Id.*, Ex. H at 17.

1    make up the majority of the *Coleman* class.  *Id.*  They are subject to delays in treatment,

2    insufficient monitoring, missed or erroneous medications and are thus, more likely to

3    decompensate and require higher levels of care.

4         Without staffing, all the treatment space and beds in the world cannot satisfy the

5    Constitutional demand for adequate mental health treatment.  The Special Master concluded

6    that "[w]hile the CDCR's ability to fill its clinical positions has languished, its mental health

7    caseload population has expanded.  By early 2007, it reached 32,385 inmates, which exceeds

8    program capacity of 28,694 by 3,691 or 12.8 percent.  In the context of the functional clinical

9    vacancy rate of 36.5 percent, this means that the CDCR may realistically provide full mental

10   health services to only about 56 percent of its mental health caseload population."  17C at 182-

11   83.  Even the headquarters staffing, which is critical to the ability of CDCR to recruit new staff

12   and manage delivery of mental health treatment, has a vacancy rate of "a devastating 70

13   percent."  *Id.* at 183.  The Special Master continued:  "As reiterated in virtually every *Coleman*

14   compliance report filed over the past decade, staffing is the absolutely essential and

15   indispensable ingredient for defendants' meeting the Program Guide requirements.  It is true

16   today more than ever.  The extraordinary present need for recruitment and hiring requires an

17   extraordinary response…Vacant positions do nothing to improve the delivery of mental health

18   services in the institutions of the CDCR."  *Id.* at 185-86.

19        In fact, the severe staffing shortage reverberates through every component of the mental

20   health delivery system.  The Special Master found, for example, that at CSP-Lancaster, "[t]he

21   overall quality of EOP treatment was undermined by turnover among case managers and the

22   scarcity of psychiatrists… Decisions to retain or discharge inmates seemed to be contingent on

23   extra-clinical considerations."  17A at 35-36.  On December 26, 2006, an inmate at CSP-

24   Lancaster committed suicide after he was improperly removed from the EOP program.  Supp.

25   Kahn Decl. ¶¶ 25-26.  The clinical notes stated that he was medication non-compliant, had

26   signs of active psychosis and had attempted suicide.  After being removed from the EOP

27   program, this inmate was being retained in the EOP housing unit in a secluded plexi-glass cell

28   without EOP care.  He had been in the cell for many weeks awaiting transfer to a mainline bed.

The CDCR Suicide Report notes that the case manager's decision to remove the inmate from the EOP program for reasons unrelated to clinical need and that the inmate was in inappropriate housing due to bed shortages. *Id.*

The significant custody officer shortages also have a dramatic impact on CDCR's ability to provide Constitutionally adequate mental health care and programming to the *Coleman* class. Supp. Kahn Decl. ¶¶ 20-21. Defendants recently stated that "while correctional officers now must respond to the increased security concerns and maintain watch over an increasingly dangerous prison population, they are not able to assist the Receiver's efforts in addressing the inmates' medical concerns by escorting inmates to medical appointments, for instance." Rifkin Decl. ¶ 16, Ex. J at ¶ 3 (Kernan Decl.). Custody officers are integral to the provision of mental health treatment as well. For example, custody escorts move *Coleman* class members housed in administrative segregation housing units from their cells to the treatment areas. Supp. Kahn Decl. ¶ 20. When housing units do not have adequate custody staffing, clinical contacts are likely to occur cell-front rather than in a confidential setting. *Id.* Access to mental health beds for suicidal inmates can also be delayed because of custody staffing shortages. *Id.* During a recent monitoring tour at CMF that plaintiffs' counsel attended, clinical staff reported that they often waited hours with patients they had referred to a crisis bed for a custody escort to the MHCB. *Id.* One clinician described her patient sitting cuffed for several hours on a dayroom floor while he waited to be transported to the crisis bed. *Id.*

### 3. The suicide rate continues to rise

The suicide rate in the CDCR continues to escalate and is an indication of the depression, hopelessness and suffering of inmates throughout the CDCR who are kept in dangerous housing conditions and receive inadequate mental health care. Supp. Kahn Decl. ¶ 22. Between January 1 and April 30, 2007, defendants have reported 16 suicides and two additional deaths of EOP patients that are currently under investigation as possible suicides. This is a larger number of suicides than was reported during of the same period in 2006, when 14 suicides were reported by the CDCR. Fourteen of the 18 possible suicides in 2007 were

13

1   *Coleman* class members.  The 2007 suicide rate for the four month period from January

2   through April is 27.8 per 100,000 inmates, which is approximately double the national state

3   prison suicide rate and an increase over the record high rates of 2005 and 2006.  *Id.* ¶¶ 22-24.

4   　　　Meanwhile, overcrowding and understaffing contribute to defendants' inability to

5   comply with necessary provisions of suicide prevention in administrative segregation units.

6   Supp. Kahn Decl. ¶¶ 27-33.  For example, defendants do not currently provide the existing

7   administrative segregation population with necessary outdoor exercise and out of cell time.  *Id.*

8   ¶ 28.  Defendants admit a massive shortfall of at least 565 small management yards that are

9   necessary to provide exercise space for inmates housed in administrative segregation units

10  today, and have a plan to possibly complete the construction of these yards *by the end of 2012*

11  *or 2013*.  *Id*.  The Special Master has rejected the five year plan, stating, "That is simply too

12  late."  *Id*.  In the meantime, inmates with serious mental illness are deprived of outdoor

13  exercise or weeks on end.  *Id*.  Administrative segregation units without proper yards had

14  multiple suicides in 2006.  *Id.*

15  
16  **II.    The "Remedial Measures" Promised By Defendants Will Not And Cannot Address
        The Effects Of Overcrowding On The *Coleman* Class**

17  　　　On February 15, 2007, Judge Henderson ordered defendants in *Plata* to report within 90

18  days "each specific, concrete measure the State has taken, is taking, or is planning to take, that

19  is expected to result in a reduction in the number of inmates confined in state prisons by March

20  1, 2008…and by March 1, 2009…and the amount of the reduction expected to result from each

21  such measure by March 1, 2008 and March 1, 2009, respectively."  Rifkin Decl. ¶ 14, Ex. G at

22  4 (2/15/07 Order).  On May 15, 2007, defendants filed their response and outlined two sets of

23  measures, those found in Assembly Bill 900 and  those characterized by defendants as

24  "administrative changes to its parole policies."  Rifkin Decl. ¶ 16, Ex. I at 5 (Defs.' 2/15/07

25  Report).  Defendants submitted a similar response on May 21, 2007 to the *Armstrong* Court,

26  which is also considering a motion for a three-judge panel.  Rifkin Decl. ¶ 16.

27  　　　Defendants' Response to Judge Henderson's Order is a stark admission of the State's

28  inability to address the crisis without the intervention of a three-judge court.  No measures

14

PLAINTIFFS' CORRECTED SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO CONVENE A THREE-JUDGE PANEL TO LIMIT THE
PRISON POPULATION, NO.:  CIV S 90-0520 LKK-JFM

have been instituted by defendants since December 2006 that have limited the prison population; in fact, it has continued to grow.  The heart of defendants' proposals is yet another prison building boom, enacted without sentencing or parole reforms.  Nothing has been included to address the critical staffing shortages.  The underlying answer to Judge Henderson's questions is that even if every proposal is adopted, funded and successfully implemented at a record pace, CDCR will remain just as dangerously overcrowded in March 2008 and March 2009 as it is today.

> **A.** **Even Assuming Defendants' Plans All Are Successful, Overcrowding Will Continue At Levels That Prevent Delivery Of Constitutional Levels Of Mental Health Services**

Defendants do not claim that their long term massive building projects or their shorter term "reforms" will reduce overcrowding to a level that will permit the *Coleman* process to remedy the ongoing Constitutional violations for the plaintiff class.  Current *Coleman* bed plans, for example, speak to 2012 as the year that the supply of mental health beds may meet the demand.  Exhibit A to Docket 2091, Defs.' Final Long-Range Bed Plan.  Most of those projects, however, are now delayed or on hold.  *Id.*

In their recent filing with the *Plata* Court, defendants project that, accounting for their parole "reforms" and out-of-state transfers, in March 2008, CDCR will house 159,939 male inmates in-state, and in March 2009, CDCR will house 162,674 male inmates in-state.[12]  Rifkin Decl. ¶ 16, Ex. J at ¶ 22 (Kernan Decl.).  CDCR's recently published Spring 2007 Population Projections predict 164,599 male inmates and 12,200 female inmates (176,799 total) in March 2008, and 168,347 male inmates and 12,634 female inmates (180,981 total) in June 2009.  Galvan Decl., Ex. W at 27, 31.  Even assuming the validity of defendants' optimistic forecast of their population reduction strategies, the best case scenario for 2008 and 2009 still puts CDCR significantly in excess of the 137,764 "maximum safe and reasonable capacity" of the

---

[12] Defendants provide no explanation of how they derived these figures.  Defendants also apparently ignore the female inmate population, despite the fact that as of May 16, 2007, CIW was at 185 percent of design capacity and CCWF was at 206 percent of design capacity. Rifkin Decl. ¶ 21, Ex. R at 2 (CDCR Population Data as of 5/16/07).

CDCR's male prison system as determined by the Corrections Independent Review Panel. *See* Galvan Decl. ¶ 4, Ex. D at 124. Meanwhile, according to defendants' "Estimated Construction Schedule for Infill Bed Plan," not a single "infill" bed will be activated by March 2008. Rifkin Decl. ¶ 15, Ex. H at 385 (Ex. 20 to Receiver's Overcrowding Rpt.). In fact, the first "infill" bed is scheduled for activation in January 2009. *Id.*

Defendants further concede that CDCR will remain in a State of Emergency through 2009, even if all of CDCR's plans come to fruition in the most expeditious manner. Rifkin Decl. ¶ 16, Ex. J at ¶ 23 (Kernan Decl.). Thus it is undisputed that CDCR will remain at dangerously overcrowded levels for years to come and the State has come forward with no plans to address the crisis in 2007, 2008 and well into 2009.

Defendants' proposals do not address the fundamental deficiency that must be included to remedy the ongoing Constitutional violations. As the Special Master stated, "staffing is the absolutely essential and indispensable ingredient for defendants' meeting the Program Guide requirements." 17C at 185. Appropriate staffing can never be achieved without reducing the population. AB 900 increases the population but fails to address staffing.

### B. Defendants' Construction Plans And Prison And Parole "Reforms" Will Not Remedy Defendants' Constitutional Violations

Defendants' recently enacted prison construction bill, as well as the proposed prison and parole "reforms," will never remedy the ongoing Constitutional violations. Numerous political, legal and practical obstacles stand in the way of defendants' plans and therefore it is unreasonable to rely on defendants' optimistic projections based on ideas that have not even been proposed, let alone approved, budgeted or implemented.

#### 1. Assembly Bill 900

The resounding answer to the question of whether any remedial measures taken by defendants in recent months will relieve the effects of overcrowding on the provision of mental health treatment is "No." Despite repeated recommendations from multiple bi-partisan commissions, the recent legislation enacted by the State, Assembly Bill 900 ("AB 900"), ignores parole and sentencing reform, and focuses on long-term building and short-term "in-

16

fill" housing.[13]  *See* Rifkin Decl. ¶ 12 (Recommendations including establishment of sentencing commission, parole reform, and implementation of remedial sanctions made in reports of Little Hoover Commission 1/98, 11/03, 2/05, and 1/07 reports; report of National Council on Crime and Delinquency, Task Force on California Prison Overcrowding, 8/06; report of Corrections Independent Review Panel 6/04; report of Blue Ribbon Commission on Inmate Population Management 1/90.)  The bill's much-touted 53,000-bed increase is itself an illusion, with a complete lack of timeframes or deadlines for the building process, and much of the new prison expansion contingent upon first completing steps in a dubious "infill" process that crams more prison beds into already-existing prisons—resulting in further harm to the *Coleman* class.

Most important, AB 900 does nothing to address the ongoing violations in the delivery of mental health care.  In fact, by expanding the prisons it makes it even less likely that adequate clinical staffing and hospital beds to address the needs of the *Coleman* class will ever be obtained.

### a.  New State Prison Beds

This legislation calls for building 40,000 new state prison beds[14] on an unspecified timeline, and provides very little additional detail.  *See* Rifkin Decl. ¶ 17, Ex. L at 8 (4/12/07 Agenda)("There is very little information on anything about the project except for the number of beds being built.  For example, it is not clear whether the department is proposing to build adequate programming space, dining space, and yard space consistent with standards for constructing prisons.").   Moreover, while this Court has witnessed repeatedly throughout the years the inability of defendants to complete any building project in an efficient and

---

[13] "Infill" is the term chosen by defendants to characterize the beds they intend to construct at already-existing prisons after identifying space that they can "fill in" at those prisons.

[14] These new beds fall into three categories:  "Infill;" Re-entry; and Health Care.  Reentry and Health Care beds appear to be part of the construction of new facilities.

expeditious manner,[15] this Bill specifically requires significant additional delays.  It provides for two overall phases of building, the first with 24,000 beds, and the second with 16,000 beds. The second phase cannot start until the first phase is substantially complete.  AB 900, Section 22 (requiring a three-member panel to determine that thirteen conditions have been met before phase two funds may be released).  Within the first phase, there are additional sub-phases that must be completed in order for the next to start.

The CDCR's own building timeline puts completion of the first 1,600 "infill" beds no earlier than January 2009, and the first phase of 4,000 "infill" beds completed no earlier than May 1, 2009.[16]  *See* Rifkin Decl. ¶ 15, Ex. H at 385 (CDCR Estimated Construction Schedule for Infill Bed Plan).  That means that, even in the "best-case" scenario, the first new beds in the system—aimed explicitly only at moving inmates presently in "bad" beds—would not come online until 2009.[17]

The LAO concluded that CDCR's schedule is "optimistic;" the CDCR "does not have the staff to manage all of the projects proposed in the infill bed plan…The department's timeline for constructing the infill beds depends on its core business services functioning in a timely manner [and]…the majority of these functions within the department are not operating in a timely manner."  Rifkin Decl. ¶ 17, Ex. L at 7 (4/12/07 Agenda).  The LAO also determined that "the remote location of many of the construction sites means that the

---

[15] *See, e.g.,* 17C at 178 ("Delays in the construction, completion, staffing and occupancy of CIW's new MHCB unit spanned at least three years.  The physical plant was essentially completed by April 2005, two years behind schedule, but was not slated to open to patients until February 2006.")

[16] Construction of at least 4,000 "infill" beds is required by Section 22 of AB 900 before funds can even be released for the second phase of defendants' building plan.  Thus, even on defendants' optimistic schedule, this will not happen for another two years.

[17] In fact, defendants' timeline for construction of both "infill" and new beds is overly optimistic.  Acting Director of Adult Institutions for CDCR stated in a sworn declaration in February 2007 that a 3-5 year timeline for constructing a new prison "is extremely aggressive," and the first new beds ("infill" beds) will not be available for at least 18 months.  Rifkin Decl. ¶ 16, Ex. J at 4:15-25 (Decl. of Scott M. Kernan in Opposition to Petition for Writ of Injunctive and Decl. Relief, *CCPOA v. Schwarzenegger*).

1    department will likely have difficulty finding contractors willing to bid for the contract." *Id.*

2    Additionally:

> [A]ll of the prisons where the department is proposing to build infill housing
> require major infrastructure upgrades to accommodate the *current*
> overcrowding…If the 'bad' beds are not removed from these housing units, the
> infill bed proposal will exacerbate the infrastructure problems…Furthermore, if
> there are delays in these infrastructure projects (which are likely…) there may be
> delays in the department's ability to activate new infill housing units.[18]

7    *Id.* at 7-8 (emphasis in original).  The Receiver and the LAO identify many additional

8    deficiencies in defendants' "infill" bed plan, noting especially that it ignores real life clinical

9    requirements for delivery of care and that it focuses on building beds at the wrong custody

10    levels for CDCR needs.  Rifkin Decl. ¶ 15, Ex. H at 041-046 and ¶ 17, Ex. L at 5-6.  The

11    Constitutional violations cannot and will not be remedied with more prisons and more beds.

12    More beds will lead to more prisoners and make achieving the remedy in *Coleman* even more

13    difficult.

### b.  Re-entry Beds

15        AB 900 also proposes to site and construct 16,000 re-entry beds at 500-bed facilities

16    throughout the State (requiring a minimum of 32 re-entry facilities).  There are serious

17    obstacles identified by the LAO to the timely construction of these beds.  Rifkin Decl. ¶ 17,

18    Ex. L at 11 (4/12/07 Agenda).  Most significantly, the reentry beds are to be sited *only* in cities

19    or counties that request a reentry program and propose a location.  AB 900, Section 16

20    (6271(b)).  But the State has been  hard-pressed to find cities or counties willing to contract

21    with the State for only a few hundred beds for parole drug treatment or other rehabilitation

22    programs.  *See* Declaration of Ernest Galvan in Support of Pls.' Supp. Motion to Convene a

23    Three-Judge Panel to Limit Prison Population ("Galvan Decl.") ¶¶ 7, 8, 21, 36.  Given this

24

25

26    ───────────────

27    [18] Defendants have recently delayed timelines on much smaller construction projects due to
overcrowding-related barriers.  *See* Rifkin Decl. ¶ 17, Ex. M at 33 (5/9/07 Agenda) (LAO
notes that because facilities are so crowded and there is not sufficient room to relocated

28    inmates, construction must be done piecemeal, forcing longer timelines for completion).

history, it is doubtful that these facilities will be built in a timely fashion.[19]  Moreover, as the

Receiver points out, "each facility will require on-site health care staff to deliver needed care.

In essence AB 900 calls for a new set of institutions to be included in the existing Federal

Court remedial plans."  Rifkin Decl. ¶ 15, Ex. H at 045 (Receiver's Overcrowding Rpt.).  In

*Coleman*, as in *Plata*, this major prison expansion will increase the cost and time necessary to

bring the CDCR into compliance with Constitutional standards of health care.  *See id.*

### c.  Out of State Transfers

Defendants claim they will transfer up to 8,000 inmates to out-of-state facilities

pursuant to AB 900 by March 2009.  Rifkin Decl. ¶ 16, Ex. J at ¶ 7 (Kernan Decl.).  However,

the out-of-state transfer program has proven a dismal failure and has little chance of

meaningfully alleviating the overcrowding crisis.  Even assuming the State manages to

overcome the obstacles of the state court litigation that has blocked any transfers for months,

the CDCR has run out of volunteer prisoners for the program and does not have contracts in

place or policies and procedures to permit the OST program to move forward.  An involuntary

transfer program, which requires appropriate due process, the appointment of counsel and

additional medical and mental health screening procedures, raises a host of new challenges,

none of which have been addressed by CDCR.  Supp. Kahn Decl. ¶¶ 37-40.

Finally, even if and when the out-of-state transfer process is resumed, it is likely to have

little direct effect on the *Coleman* class.  Patients at the EOP level of care are excluded from

the program and are unlikely to be transferred, and it is uncertain whether the Special Master

would approve involuntary transfers for patients even at the CCCMS level of care unless

assurances are in place that they will receive appropriate care at the contracted out of state

prisons.  Supp. Kahn Decl. ¶¶ 37-40.

---

[19] Many locales that are already home to CDCR facilities are already resisting any further
expansion.  *See* Rifkin Decl. ¶ 29, Ex. AA (2/7/07 Letter from Mayor of Chino to
Schwarzenegger regarding further prison expansion at CIM).

2.   **Parole "Reforms"**

Although AB 900 is silent about parole reform, defendants recently filed a brief in *Plata* claiming that "Parole reform strategies will also play a large role in the reduction of prison overcrowding…CDCR has implemented immediate parole changes to reward successful rehabilitation." Rifkin Decl. ¶ 16, Ex. I at 10 (Defs.' Rpt). The "reform strategy" defendants describe is actually a memorandum requiring parole agents to follow existing state law (Penal Code Section 3001) for early discharge from parole for persons who meet certain criteria. *Id.* at 10-11.   Defendants promise that based on the "new" practice of following state law, "there will be an additional discharge of between 2,000 and 4,000 parolees from parole in the next 12 months." *Id.* at 11.

This is a reduction of *parolees*, not inmates, and constitutes only at most a 2.5 percent reduction of the parole population which was at 161,638 as of May 16, 2007. Rifkin Decl. ¶ 22, Ex. S (Parole Population, May 16, 2007).  This may result only in a reduction of 440 to 880 actual inmates in CDCR prisons.  Galvan Declaration ¶ 41.  Furthermore, this practice is unlikely to have more than a remote effect on the *Coleman* class, as parolees with serious mental illness have an even higher recidivism rate than general population parolees, for whom the recidivism rate is already an astounding 66 percent. Galvan Decl. ¶ 41; Rifkin Decl. ¶ 6, Ex. A.  Parolees with mental illness are less likely to be candidates for early release because early release requires significant time periods without parole violations.

Defendants have promised before that they would direct parole to follow the law and grant early discharge to eligible parolees.  In fact, they have never fully implemented this state law.  CDCR's most recent population data show a "decrease in discharges from parole" during 2006 and projects a *decrease* in discharges from parole in the future.  Galvan Decl. ¶ 43-46, Ex. W at 3.

The other parole "reforms" defendants cite—a parole violation decision-making matrix and a risk and needs assessment tool—are nothing more than the policies and procedures defendants have been promising to implement since at least 2001.  Galvan Decl. ¶ 37. Although defendants have made representations about their intended implementation of these

parole reforms for more than five years, they have repeatedly failed to put them into practice in any meaningful way.  *See id*. ¶ 37; Declaration of Holly M. Baldwin in Support of Pls.' Supplemental Brief in Support of Motion to Convene a Three-Judge Panel to Limit the Prison Population ("Baldwin Decl.") at ¶ 7.

**C.  Overcrowding Will Continue To Prevent Delivery Of Mental Health Services Because AB 900 Will Expand The Prison Population And Thus Worsen Understaffing**

Regardless of when the physical beds outlined in the Bill could or will be built, empty prisons and beds mean nothing in terms of a remedy for the *Coleman* class.  The unaddressed elephant in the room is the State's inability to recruit and retain clinical or custody staff sufficient to operate even its existing prisons, let alone 50,000 additional beds.  As the Receiver observed, "It is easy to talk of constructing prisons and jails.  It is more difficult and expensive to staff correctional institutions with the appropriate clinical personnel and correctional officers.  AB 900, however, is silent about how the jails and prison beds cited in the bill will be staffed and managed."  Rifkin Decl. ¶ 15, Ex. H at 046.  As Special Master Keating and this Court have repeatedly recognized, staffing is the crucial element in the provision of Constitutional mental health services.  Prison expansion in a system where the clinical vacancy rate is between 36.5 and 50 percent cannot offer hope to the tens of thousands of mentally ill inmates already incarcerated in an overburdened system.  It is absurd to think that CDCR will somehow be able to staff these additional tens of thousands of beds when, according to the Special Master, at present staffing levels it can serve less than 20,000 of its more than 32,000 mentally ill inmates.  17C at 182-183.  Additionally, if the State does succeed in constructing and activating more beds, this means that the staffing pool for both custody officers and clinicians will be spread even more thinly across units and facilities.

AB 900 and the parole "reform" cited by defendants do not prioritize resources for providing mental health treatment to the *Coleman* class.  Most of the construction for AB 900 hinges on successfully constructing a minimum number of "infill" beds.  There is no indication that defendants have designed these "infill" beds to help meet the needs of the *Coleman* class.  In fact, the Senate Budget Committee observed that CDCR plans to build as "infill" beds more

1  stand-alone administrative segregation units, which are units this Court has specifically

2  prohibited defendants from using for *Coleman* class members.  Supp. Kahn Decl. ¶ 34.

3  **III.  Defendants Continue To Engage In Practices That Needlessly Increase The**
       **Number Of Mentally Ill Individuals In Prison**

4
5       Even in the face of dire overcrowding, defendants are actively engaging in practices that

6  needlessly increase the number of mentally ill individuals in prison, and have failed to

7  implement Court-ordered programs that would help reduce recidivism for mentally ill

   inmates/parolees.

8
9       **A.  Failure To Provide Appropriate Mental Health Treatment Services To**
           **Parolees**

10      Defendants have recognized that "[m]entally ill parolees make up the majority of those

11  which are homeless, jobless, most likely to commit a new crime on parole, and cause the most

12  public concern…[T]his group needs specialized care, treatment, and supervision, and without

13  it, are the most likely to be the returning faces and names on the jail rosters, prison counts, and

14  parole caseloads."  Rifkin Decl. ¶ 6, Ex. B at II-9.  Yet defendants have consistently refused to

15  provide the kinds of services and treatment known to break this cycle.  Rifkin Decl. ¶¶ 6-11.

16  Presently, the only mental health treatment defendants provide to parolees is through the Parole

17  Outpatient Clinics ("POC").  POC resources are limited, however, and defendants have

18  repeatedly rejected efforts to enhance staffing and services for POCs.  *Id.*  Defendants found

19  that 10,000 parolees with mental illness were returned to custody during the 2005 calendar

20  year, and "estimated that enhanced POC services through DTP's [day treatment programs] will

21  reduce the RTC [return to custody] rate by 75%."  Rifkin Decl. ¶ 6, Ex. B at II-6.  However,

22  proposals to address these known deficiencies were never funded.  Rifkin Decl. ¶ 6.  In April

23  2006, defendants *reduced* POC services available to parolees, closing the Region III parole

24  outpatient clinic in Los Angeles that had been operating for approximately 50 years.  Rifkin

25  Decl. ¶ 28.

26

27

28

1  **B.   Returns To Custody Of Mentally Ill Parolees For Reasons Primarily
       Relating To Unmet Mental Health Needs**

3  Rather than provide mental health treatment on parole, defendants intentionally return

4  thousands of mentally ill parolees to prison each year for violations related to their mental

5  illness.  Until January 8, 2007, defendants continued to engage in the process of "psychiatric

6  revocation" of parolees with mental illness, which was the practice of returning parolees to

7  custody solely for the purpose of providing mental health treatment.  Rifkin Decl. ¶¶ 4-8.  As a

8  result of negotiations in the *Valdivia* lawsuit, defendants ceased the official practice of

9  psychiatric revocations, admitting that the individuals the State had returned to custody

10 through this practice were being held illegally. *Id.*  However, defendants continue to return

11 more than 6,000 mentally ill parolees to custody each year for technical or minor violations of

12 parole that defendants themselves recognize to be primarily the result of unmet mental health

13 needs.  Rifkin Decl. ¶ 6, Ex. A at 1.  For example, out of 24 seriously mentally ill prisoners

14 serving psychiatric revocation terms whom defendants recently agreed to parole to

15 "appropriate placements" in the community, at least 25 percent were revoked again within

16 three weeks.  Rifkin Decl. ¶ 8.

17 In practice then, California has created a process in which thousands of mentally ill

18 inmates/parolees generally follow a cyclical course of failure within the corrections system.

19 As this group cycles in and out of custody, they serve large stretches of time in CDCR

20 reception centers.  A recent CDCR study found that a "backlog of approximately 500

21 individuals at RC's awaiting placement into Enhanced Outpatient Program (EOP) beds has

22 accumulated as existing mainline programs have reached maximum capacity."  Galvan Decl. ¶

23 45, Ex. V at VAL2007 100009.  Two hundred of the 530 EOP inmates identified were parole

24 violators returned to custody on technical violations, which defendants admitted were "likely

25 related to their mental illness."  *Id.* at VAL2007 100011.

26 **C.   Failure To Implement Remedial Sanctions Programs**

27 Despite Orders in 2004 and 2005 from this Court in the *Valdivia* lawsuit requiring

28 defendants to implement remedial sanctions programs as alternatives to incarceration for

24

1    parolees charged with technical parole violations, defendants have failed to fully implement

2    remedial sanctions.  Galvan Decl. ¶¶ 11-31.  Although defendants recently agreed to a

3    Stipulation in *Valdivia* regarding the re-establishment of remedial sanctions programs, the

4    current timeframe for instituting these programs will not offer any material or immediate relief

5    for overcrowding.  *Id.; see also* Rifkin Decl. ¶ 16, Ex. J at ¶ 20 (Kernan Decl.) ("CDCR

6    recognizes that a number of logistical issues prevent these remedial sanction programs from

7    being filled.")

8         Moreover, the remedial sanctions programs currently in place exclude parolees with

9    serious mental illness, either in a *per se* or case-by-case basis.  Galvan Decl. ¶¶ 32-35.

10   Exclusions of parolees with metal illness from general remedial sanctions programs continue

11   even under defendants' proposal for re-establishing remedial sanctions under the April 2007

12   *Valdivia* Stipulation.  *Id.*  This means that parolees with mental illness who are charged with

13   parole violations currently have little, if any, access to remedial sanctions programs, and this

14   access is unlikely to increase in the future, given defendants' refusal to drop exclusions from

15   general remedial sanctions programs and/or create significant remedial sanctions targeted at

16   mentally ill parolees.  *Id.*

17        **D.    Failure To Implement Pre-Release Planning**

18        Meanwhile, defendants also have failed to implement practices in prisons that would

19   increase the likelihood that mentally ill offenders will succeed on parole, and reduce the more

20   than 66 percent recidivism rate for this population.[20]  *Coleman* class members do not receive

21   meaningful pre-release planning in prison, and are instead released on the day they parole with

22   merely gate money and, hopefully, the required 30-day supply of medication.  They are

23   released directly to parole from every level of care, including the most acute beds, without

24

25

26   [20] The overall recidivism rate for California is 66 percent.  Mentally ill individuals are re-
     incarcerated at a higher rate.  Rifkin Decl.¶ 6, Ex. B at II-9.  Defendants contracted with
27   UCLA to conduct an evaluation of the Department's Mental Health Services Continuum
     Program and the evaluation showed that pre-release assessments significantly reduce
28   recidivism rates. *Id.* at ¶ 6, Exs. A and B.

1 benefits in place or even applications pending, and without a real parole discharge plan, and

2 often, without a parole outpatient clinic appointment scheduled.  Baldwin Decl. ¶¶ 5-17.

3

4

**THIS COURT SHOULD CONVENE A THREE-JUDGE PANEL FOR ENTRY OF APPROPRIATE PRISONER RELEASE ORDERS**

5

6

**I. The Prison Litigation Reform Act's Requirements For Convening A Three-Judge Panel To Consider Limits On The Prison Population Are Satisfied And This Court Should Refer This Matter To Such A Panel**

7   In their opening brief, plaintiffs addressed the PLRA's two requirements that must be

8 satisfied in order for a Court to refer consideration of a prisoner release order to a three-judge

9 panel.  Docket 2041 (Pls.' Memo).  A prisoner release order is appropriate for consideration

10 when:  1) a court has previously entered an order for less intrusive relief that has failed to

11 remedy the deprivation of the Federal right sought to be remedied through the prisoner release

12 order; and 2) the defendant has had a reasonable amount of time to comply with the previous

13 court orders.  18 U.S.C. § 3626(a)(3)(A).

14   Plaintiffs recounted the numerous ways in which this Court has tried to effect relief for

15 the *Coleman* class through its orders, including the appointment of a Special Master,

16 appointing a team of experts to closely monitor mental health treatment in the prison system,

17 approval of the Mental Health Services Delivery System Program Guides and the Revised

18 Program Guide, waiving various state laws in order to expedite delivery of mental health

19 services, and a more than ten-year string of orders regarding the development of short-term bed

20 plans, long-term bed plans, interim bed plans, staffing allocations and qualifications, salary

21 increases, and suicide prevention plans.  Defendants' Opposition brief detailed some of the

22 more recent orders this Court has issued in an effort to induce defendants to create a

23 Constitutionally adequate mental health system.  Docket 2063 (Defs.' Opp.) at 3.  While

24 defendants emphasize the orders of this Court over the last year, they do not dispute the fact

25 that this Court has, for the past twelve years, entered orders less intrusive than prisoner release

26 orders that were aimed at remedying the Constitutional violation in the provision of mental

27 health services to the plaintiff class, and that these orders have failed to remedy this violation.

28

These orders, spanning twelve years since the *Coleman* decision, have given defendants at least a reasonable amount of time to create and actualize a Constitutionally adequate mental health services delivery system.  Moreover, on December 11, 2006, this Court optimistically granted defendants an additional six months to come up with a plan that would effect meaningful change for the *Coleman* class by limiting or controlling the population.  In that time, defendants succeeded only in exacerbating the harm to plaintiffs:  they closed the Department of Mental Health to admission of *Coleman* class members, they failed to engage in reasonable recruitment efforts to fill clinical staff vacancies, and each day, they mismanaged tens of  thousands of inmates with serious mental illness, sometimes with fatal results.

## II.  A Prisoner Release Order Will Be Effective In Remedying Ongoing Violations In The Delivery Of Mental Health Care To Class Members

The remedy for the *Coleman* class has stalled, and overcrowding is reversing the forward progress toward provision of mental health treatment in CDCR.  A prisoner release order that caps the prison population will be effective in remedying these ongoing violations.  Only by limiting the population can the State remedy the Constitutional violations by recruiting and obtaining sufficient clinical staff to address the needs of the class.  Without population limits, defendants can never catch up.  Remedial plans for Constitutional mental health treatment are largely in place and the primary obstacle blocking defendants' ability to actualize those plans is the deadly combination of overpopulation, understaffing, and lack of treatment space that comprises the overcrowding crisis.

### A.  A Prison Release Order Will Be Effective Because It Will Reduce The Current Staff-Inmate Ratio And Enable The *Coleman* Remedial Plan To Move Forward

Since the decision of this Court in 1995, the manner in which CDCR policy provides for the delivery of mental health care services to *Coleman* class members has changed significantly.  In 1997, the Program Guides, a collection of the standards for the delivery of mental health services within CDCR's various levels of health care  and custody settings, was preliminarily approved by this Court.  6/27/97 Order.  In 2002, the parties and the Special Master, recognizing that the original Program Guides were not a sufficient remedy, agreed to

27

revise and update them.  In March 2006, the Court approved the Revised Program Guide.
3/3/06 Order.  The *Coleman* case has succeeded in initiating a culture shift within the prison
system such that many state actors now recognize the duty to provide mental health care to
inmates with serious mental illness.

Although prior to the current state of emergency, defendants had not achieved
compliance with the Program Guide requirements sufficient to end Court-monitoring, many
institutions were moving in this direction.  The overcrowding crisis, which reached
catastrophic levels in the past two years, however, set back the compliance effort and the
remedial process significantly in most institutions and systemically.  The failure to bring the
population under control risks years of progress in *Coleman* towards achieving compliance
with the Constitutional mandate of minimally adequate mental health care for the class.  Orders
from this Court are in place that would provide for adequate levels of staffing, treatment
protocols, and treatment space if defendants could extract themselves from the overcrowding
morass.

    **B.**    **Given The Present Situation, A Prisoner Release Order Is The Only Effective Means Of Addressing The Ongoing Violations Of Class Members' Constitutional Rights To Adequate Mental Health Care, And Of Eventually Ending The *Coleman* Case**

        **1.**    **Defendants refuse to take measures to alleviate the effects of overcrowding on implementation of the *Coleman* remedy**

Defendants have chosen to turn their backs on the rising population crisis for years and
have continued to do so in recent months, even with the possibility of a population cap
looming.  This is not because there are no solutions to the overcrowding problem or because
the State does not know how to solve the problem:  bi-partisan commissions and independent
organizations have been telling the State for years exactly what it could do to prevent and now,
fix, the overcrowding crisis.  *See* Rifkin Decl. ¶ 12.  However, good advice, even in the form
of evidence-based methods, was not enough to overcome politics as usual.  The actual
imposition of a cap holds the promise that these lesser measures did not:  in addition to
safeguarding the Constitutional rights of the plaintiff class, it actually creates a positive
political incentive for the State to enact meaningful and lasting prison reform.  There are a

1  myriad of ways that the State can immediately reduce its prison population that fall short of the

2  specter of releasing murderers and rapists into the streets.[21]  Neither this Court nor the three-

3  judge panel are called upon to determine what those methods are, or which to employ—the

4  State has already done that for itself numerous times.  *See, e.g.,* Rifkin Decl. ¶ 24, Ex. U

5  (Office of the Governor's "Reforming Parole" document citing variety of parole reforms

6  recommended by experts).

7       In the *Coleman* case specifically, the Special Master has recognized that, given current

8  conditions, defendants are unable to comply with existing Court orders aimed at bringing

9  mental health treatment to Constitutionally acceptable minimums, even were they to make

10  good-faith efforts to do so.  The Special Master concluded:

11           None of the most serious problems described in this report is
         new.  All have been blooming over the past two years…Many of
12         them, ranging from inadequate inpatient treatment resources to
         staff recruitment and compensation, are already the subjects of
13         pending court orders.  With so many roiling issues of
         overcrowding, prisoners being transferred out of state, seemingly
14         interminable changes in CDCR's leadership, organization and
         missions, implementation of the new Program Guide, and judicial
15         assumption of control over medical care, this does not seem the
         appropriate moment to pile more orders on the barely discernible
16         plate of the defendants.

17  17A at 132.  Without a prisoner release order, defendants will be unable to implement the

18  Program Guide, unable to employ the appropriate staff-to-inmate ratio, unable to provide

19  minimum mental health care, and unable to prevent the suffering on the level of cruel and

20  unusual punishment that real people in the *Coleman* class are subjected to each and every day.

21       In July 2006, Defendant Tilton told the Assembly's Select Committee on Prison

22  Overcrowding and Construction that by June 2007, the Department will run out of room.

23  Rifkin Decl. ¶ 25, Ex. V.  However, even as CDCR is about to reach maximum population

24

25  _____
  [21] Plaintiffs note that even if defendants developed a plan that included early release of selected
26  prisoners, research indicates no evidence of harm to public safety.  An April 2007 review by
  the National Council on Crime and Delinquency of published literature on "early release" and
27  "public safety" compiled findings from approximately ten regions, noting that most studies
  found no significant difference in rates of recidivism among early release and full-term
28  offenders.  Some studies found lower recidivism rates among early release offenders compared
  to those who served a full term in prison.  Rifkin Decl. ¶ 23, Ex. T at 1.

29

capacity, defendants have refused to act responsibly or Constitutionally.  Instead, the State has gone back to business as usual, pretending that another wave of prison expansion will fix the problem that stems from "[t]he political response to crime and its punishment in California over the past half-century..." 17A at 137.  Although the Special Master warned that "recourse to more of the same is simply a prescription for disaster," defendants have stubbornly refused to change course.[22]  *Id.*  The Receiver observed that "[d]espite spending billions of dollars on construction, the level of overcrowding in California's prison system has not decreased; indeed, despite waves of prison expansion overcrowding has now reached crisis levels." Rifkin Decl. ¶ 15, Ex. H at 014 (Receiver's Overcrowding Rpt.).

> **2.   A prisoner release order will effect the relief from overcrowding necessary for the *Coleman* remedy**

The only means left for protecting the Constitutional rights of the *Coleman* class is a prisoner release order.  In 1989, when a District Court in New Jersey imposed financial sanctions for a county jail's failure to meet a population cap and provide minimum recreation time, the Court noted:

> In so ruling as I have today, I am cognizant that some may perceive that this Courts' action may represent an unwelcome and unwarranted intrusion into the functions that properly belong to the legislative and the executive branches of state and county government.  But, in representing to the Court that they are literally unable to bring the jail into compliance with Constitutional standards, the County defendants have foisted onto this court the necessary role of insuring that the Constitution is upheld.  What the County defendants have done is to blatantly pass the buck to this court by doing nothing but make empty promises. Perhaps, the County defendants' hope that the taxpayers of Essex County will perceive defendants as clothed in pristine raiment while venting their spleen on the judiciary.  While this may be viewed by some as good politics, it is sadly an abdication of the County defendants' responsibilities to the citizenry and to the Court.

*Essex County Jail Inmates v. Amato*, 726 F.Supp. 539, 550 (D.N.J. 1989).

---

[22] Defendants' own expert, Joanne Petersilia, concluded in a 2006 Report, "Understanding California Corrections," that "[Rehabilitation] can only be implemented in a substantive and meaningful way if the fundamental structures of corrections—the sentencing framework, the level of in-prison programming, and the nature of parole supervision—are configured so they actually reflect that commitment."  Rifkin Decl. ¶ 26, Ex. W at 79.

A prisoner release order will not be a miracle pill that completes the entire remedy for defendants' violation of plaintiffs' Constitutional right to mental health treatment. However, it is undisputed that without a remedy for overcrowding, the Constitutional violations cannot be remedied. The purpose of a prisoner release order is to effect enough relief in the overcrowded and understaffed system that the remedial orders and plans already existing in the *Coleman* case can be actualized. Without such an order, the *Coleman* remedial process will remain stalled or will backslide, and avoidable and unnecessary daily pain, suffering and death will be the result.

A prisoner release order would not prevent the State from pursuing its plans to build more prisons, nor from continuing its efforts to comply with this Court's orders to fill staffing vacancies. Any prisoner release order would surely be based on a ratio of inmates, staff, and space. If the State is able to build its proposed prisons, and if the State were able to staff them, as they came online, the population cap would presumably be adjusted. A prisoner release order does not eliminate these cards from the State's hand. What a prisoner release order does do, however, is assure that if and when the State fails to expeditiously build more beds that meet Constitutional standards, the *Coleman* class has a real remedy and is not left warehoused in prisons that provide only punishment without the Constitutional safeguards of treatment. *See, e.g., Williams v. McKeithen*, 963 F.2d 70 (5th Cir. 1992) (where consent decree or stipulation entered setting population limits, district court may assert generally supervisory authority over inmate population limits or staff-to-inmate ratios); *Roberts v. Tennessee Dept. of Correction*, 887 F.2d 1281 (6th Cir. 1989)(Court approves parties' negotiated settlement and lays out specific process state will follow to implement population reduction, including appointment, based on submission by all parties of nominations, of a Consultant for Legal Corrections to recommend total facility population limits for each jail, and non-binding recommendations on how to meet these limits).

III.    **Prisoner Release Orders That Require Defendants To Meet General Population Limits As Well As Specific Reductions Of The Population Of The *Coleman* Class Are Required To Remedy The Violations**

A.      **A General Population Limit Is Needed To Effect Relief For The *Coleman* Class**

Given the breadth of defendants' violation, the size of the plaintiff class, and the fact that the severe systemwide overpopulation, understaffing, and lack of staff have completely overwhelmed the CDCR system, any viable prisoner release order must require defendants to reduce the total prison population.[23] Without relief from the immense pressure of a system at 200 percent capacity, defendants cannot focus on the remedial measures in the *Coleman* case. Part of the provision of minimal mental health care must be the provision of basic humane living conditions. Nobody can afford to ignore the effects that living in a system at 200 percent capacity—which defendants themselves have repeatedly tied to increased agitation among inmates, systemwide lockdowns and failures to provide out-of-cell time, increases in major violence, and outbreaks of infectious disease—have on the mental health of all inmates, and especially on the already-vulnerable *Coleman* class.

Addressing general overcrowding is a pre-requisite for being able to address the effects of overcrowding within the mental health services delivery system and the *Coleman* class. The Receiver found that "overcrowding…adversely impacts on the very process of implementing remedies because overcrowding, and the resulting day to day operational chaos of the CDCR, creates regular 'crisis' situations which call for action…and take time, energy, and person

---

[23] Plaintiffs note that under the PLRA, which directs that a prisoner release order can be considered and entered only by a three-judge court, this Court must make the threshold decision as to whether previous orders for less intrusive relief have been entered and failed to remedy the deprivation of plaintiffs' Constitutional rights; and whether defendants have had a reasonable amount of time to comply with the previous orders. 18 U.S.C. § 3626(a)(3). The three-judge court must then consider whether overcrowding is the primary cause of the violation of the right, and whether no other relief will remedy the violation of the right. *Id.* Plaintiffs anticipate that when the three-judge court is convened, it will take such steps as appointing experts and conducting evidentiary hearings in order to assess what kind of prisoner release order would best serve the *Coleman* class in terms of effecting a population reduction that would remove the barrier to Constitutionally adequate mental health care.

32

power away from important remedial programs."  Rifkin Decl. ¶ 15, Ex. H at 033-034.

Moreover:

> Many CDCR prisons are unable to sustain the basic delivery of medical, mental
> health, and dental services because of limited staffing (clinical and custody) and
> an overwhelming number of prisoner/patients who require care.  Every day,
> many California prison wardens and health care managers make the difficult
> decision as to which of the class actions, *Coleman, Perez, Armstrong* or *Plata*
> they will fail to comply with because of staff shortages and patient loads.

*Id.* at 035.

In addition to freeing overall resources and eliminating general overcrowding-related

pressures and crises, reduction of the total CDCR population will also impact the *Coleman*

class directly in terms of delivery of mental health treatment.  For example, it will:

- free space for treatment, patient interviews, work and educational programs, and
  exercise;

- reduce demand on mental health staff as a result of the reduction of prison "moves"
  outlined by the Receiver, allowing for more treatment and fulfillment of Program Guide
  requirements;

- reduce demand on custody staff, who are an integral part of the delivery of mental
  health treatment;

- result in a decrease of actual inmates with serious mental illness, freeing beds at various
  levels of care and custody levels, and decreasing staff to inmate ratios

- reduce the need for double-celling or dorm placements of inmates whose mental illness
  should preclude them from those placements;

- improve defendants' ability to keep medical records current by decreasing the workload
  created by both population and high inmate movement between prisons;

- allow for delivery of medication at appropriate times of day and at appropriate intervals.

The mental health effects of overcrowding are not limited to the already-identified

inmates with serious mental illness, and every inmate must have access to Constitutionally

adequate mental health treatment if he or she requires it.  Reduction of overall population will

not only free resources to supply mental health care, but, because overcrowding creates a

higher demand for mental health treatment from both inmates with serious mental illness and

33

1   inmates who might otherwise not require mental health treatment, reduction of population

2   should result in a corresponding reduction of the demand for mental health treatment.

3       The Receiver concluded in his report to the *Plata* Court regarding the manner in which

4   overcrowding interferes with efforts to remedy the medical care violations:

5           The manner by which overcrowding is managed will have a fundamental
and perhaps irrevocable impact on the Plan of Action.  For example, if the State's

6   response is limited to effectuating out of state transfers, and thereafter filling
empty beds behind departed prisoners, the overcrowding related challenges to the

7   Plan of Action will only increase and it will take the Receiver longer and it will
cost more to correct the constitutional violation at issue.  Likewise, if the State

8   charges off to construct infill beds in remote locations without adequate support
services space, including adequate clinical space, overcrowding related

9   challenges to the Plan of Action will only increase, and as a result, it will take the
Receiver longer and it will cost more to correct the constitutional violation at

10  issue.  Finally, unless steps are taken to stop the revolving door of a failed parole
system and thereby manage the out-of-control number of prisoner moves, the

11  churning related challenges to the Plan of Action will continue and it will take
the Receiver longer and it will cost more to correct the constitutional violation at

12  issue.

13  Rifkin Decl. ¶ 15, Ex. H at 046-047.  The three-judge panel must determine the degree of

14  specificity with which it must direct defendants to employ population reduction strategies,

15  from imposing a general cap and sanctions for failing to meet it, to requiring plans in target

16  areas of reform from defendants.  But plaintiffs implore this Court to consider the extensive

17  evidence of institutionalized and deliberate overcrowding the Receiver describes in his Report,

18  the failure of defendants to meet Constitutional standards in any area of health care, and the

19  reluctance of defendants, even in the face of possible Court-ordered caps, to enact real

20  solutions—and refer this matter to the three-judge court that can order relief.  This entrenched

21  "learned incapacity" of defendants can no longer be tolerated.

22      The three-judge panel should order the State to develop a plan to immediately begin the

23  reduction of the general prison population at a rate that will begin to alleviate the existing

24  Constitutional violations as soon as possible.  At the same time, the three-judge panel, with the

25  benefit of court-appointed experts and/or an evidentiary hearing, would determine appropriate

26  population restrictions on CDCR by reference to available measures and establish benchmarks

27  that the State would be required to meet.  These measures would take into account, for the

28  *Coleman* class, the standards and ratios established in the Revised Program Guide.

34

**B.    In Addition To A General Population Cap, A Prisoner Release Order Should Direct Defendants To Specifically Reduce The Population Of The *Coleman* Class**

After establishing a population cap, the three-judge panel should order the State to create a plan for meeting that cap.  Effective mechanisms for reducing the prison population both in the short-term and long-term have already been identified by multiple bi-partisan independent commissions.[24]  Some of these mechanisms are aimed at reducing the overall prison population, including the mentally ill, but a number of population reduction mechanisms can be targeted specifically at decreasing the number of mentally ill inmates in CDCR institutions.  This multi-pronged approach would be especially useful if the other District Courts considering motions to refer consideration of a prisoner release order to a three-judge court also decide to do so.

Moreover, standards for determining the maximum allowable population of inmates defendants may house in order to provide Constitutionally adequate levels of mental health care have already been established through the *Coleman* remedial process.  The MHSDS Program Guide sets a maximum inmate to staff ratio, and provides additional standards such as transfer timelines and clinical space requirements that could be used as guidelines for assessing appropriate population limits based on CDCR's available resources.  The three-judge court should also direct defendants to implement reforms specifically aimed at reducing the population of the *Coleman* class.

The number of parolees with serious mental illness is in the tens of thousands.  Even as thousands of inmates with serious mental illness are released onto parole each month, a similarly high number are revoked, and they are revoked both at higher rates and more times per parolee than for parolees without mental illness.  Rifkin Decl. ¶ 6.  Although defendants

---

[24] *See, e.g.,* Galvan Decl. ¶ 4, Ex. D at 121 (Corrections Independent Review Panel Report) (California can reduce the growing cost of managing its adult prison population by addressing three key factors that influence the size of that population—the length of time inmates serve in prison; the training and treatment they receive during incarceration to decrease the likelihood that they will return; and the services they receive during parole to help them remain crime-free and successfully integrate into society.)

1  make much of their efforts of two weeks ago to instruct that the BPH to comply with already-

2  existing law and discharge parolees who meet statutory standards from parole, they have the

3  power to enact real parole reform that would significantly impact the number of *Coleman* class

4  members in prisons.

**CONCLUSION**

6       In sum, this Court has given defendants every possible opportunity to solve the

7  overcrowding crisis on its own.  The price the *Coleman* class would pay for further delay is far

8  too high.  Given current conditions and defendants' failure to act on their own, a prisoner

9  release order is the only effective mechanism for remedying ongoing violations.  It will

10  provide immediate relief and allow for the *Coleman* remedial plan to be implemented.  A

11  three-judge court should set a general population limit and benchmarks for meeting that limit,

12  and also direct defendants to implement reforms specifically aimed at reduction of the

13  population of the *Coleman* class.

14       Accordingly, the motion should be granted, and this Court should convene a three-judge

15  panel, to limit California's prison population, pursuant to 28 U.S.C. § 2284 and 18 U.S.C. §

16  3626(a)(3).

18  DATED:  May 30, 2007                     */s/ Michael W. Bien*
                                          Michael W. Bien