## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.

    Plaintiffs,

       vs.                          No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

## SPECIAL MASTER'S RESPONSE TO
## COURT'S MAY 17, 2007 REQUEST FOR INFORMATION

On December 11, 2006 Plaintiffs, through their counsel, moved for an order to convene a three-judge panel to limit the prison population pursuant to 28 U.S.C. §2284 and 18 U.S.C. §3626(a)(3). On December 12, 2006, the Court heard initial arguments on the motion and continued the matter for further argument on June 4, 2007. On May 3, 2007, the Court ordered the parties to file supplemental briefs on or before May 24, 2007. On May 17, 2007, the special master was ordered to provide, on or before May 31, 2007, the following information to the Court:

> "(1) The current inmate population in the California Department of Corrections and Rehabilitation (CDCR);
>
> (2) The current size of the plaintiff class;
>
> (3) What percentage of the plaintiff class is being provided with necessary mental health services with presently available resources, including but not limited to staff, beds, and programming space; and
>
> (4) Whether a reduction in total inmate population will affect the answer to question number (3) and, if so, what level of total inmate population reduction

would be required to allow the provision of constitutionally adequate care to all members of the plaintiff class." (See order dated May 17, 2007.)

In response to the Court's May 17, 2007 order and its specific queries, the special master responds as follows:

## I. Current inmate population

As of May 11, 2007, approximately 162,848 male and 12,141 female inmates were housed in CDCR facilities, for a total prison population of 174,989 inmates. (Defendants' Supplemental Brief in Opposition to Plaintiffs' Motion for Referral to a Three-Judge Panel, May 24, 2007.) These figures, like the population numbers submitted in the Plata receiver's report on the impact of overcrowding on healthcare services, are based on the defendants' spring 2007 population projections and are approximations. (See Exhibit A.)

## II. Current size of the plaintiff class

In response to a request for information, defendants reported the size of the California Department of Corrections and Rehabilitation's (CDCR's) Mental Health Service Delivery System caseload as of May 25, 2007 to be 32,958. (See Exhibit B, at p R-4.) That figure represents slightly less than 19 percent of the total inmate population. The population count provided by defendants was broken down as follows:

| Level of Care | Population |
|---|---|
| Correctional Clinical Case Management System (3CMS) for outpatient inmate/patients housed in the general population: | 28,154 |
| Enhanced Outpatient Program (EOP) for outpatient inmate/patients housed generally in separate residential units: | 4,054 |

Psychiatric Service Units (PSUs) for outpatient
   inmate/patients requiring a high level of custody
   at an EOP level of care:                 301

Department of Mental Health (DMH) programs for
   inmate/inpatients in need of acute or intermediate
   inpatient treatment               449

The figures and the accompanying breakdown omit some important elements of
the caseload, including inmate/patients referred for a Mental Health Crisis Bed (MHCB)
level of care because they are suffering from severe decompensation or are a danger to
themselves or others. A substantial proportion of these inmate/patients are at a high risk
for suicide. They are typically housed in a MHCB unit, where they can receive around-
the-clock monitoring and intensive case intended to stabilize them for return to CDCR's
less intensive outpatient programs. Over the past three years, however, the number of
inmate/patients referred to a MHCB level of care has regularly and significantly exceeded
the number of MHCBs available in CDCR, resulting in the placement of inmate/patients
in need of a MHCB level of care in a variety of temporary housing alternatives, which
often lack the heightened monitoring and treatment essential to the MHCB level of care.
These alternative placements include Outpatient Housing Units (OHUs), which are
infirmaries for the temporary housing of inmate/patients with minor illness or awaiting
transfer within 72 hours to a licensed facility elsewhere; Mental Health Outpatient
Housing Units, recently developed specifically to provide temporary housing, also for up
to 72 hours, for mental health inmate/patients awaiting transfer to a MHCB; and a variety
of other structures ranging from clinical holding cells to administrative segregation cells
to telephone-booth-sized interview stalls typically placed in corridors. Most of these
alternative placements lack suitable staffing and/or the physical configuration needed for

the continuous monitoring or intensive treatment provided in a MHCB unit. While strict

time limits on their use are prescribed in both departmental and local policies, they are

not consistently observed.

Because required records on the use of these alternative placements are

poorly maintained in many institutions, it is difficult for defendants to provide accurate

figures on the number of inmate/patients confined in them from day to day. Between

MHCBs, OHUs, MHOHUs and other alternative placements, some 300 to 350 seriously

mentally ill inmate/patients are confined in one or another of these facilities on any given

day, but are not included in the tally provided above. Another anomaly in defendants'

caseload calculation is the exclusion of some 35 female inmate/patients in DMH inpatient

acute and intermediate programs at Patton State Hospital. Inclusion of these two

categories would bring the total mental health caseload to approximately 33,300

inmate/patients.

## III. Percentage of the plaintiff class being provided with necessary mental health services with presently available resources, including but not limited to staff, beds, and programming space

The Court's focus on three basic resources, each absolutely essential for

the provision of adequate mental health services, reflects the knowledge accumulated in

the long struggle to remedy the faults so glaringly revealed in the trial of this case in the

mid-1990s. All three resources are critical, and each has been impacted seriously by

overcrowding.

Programming space: The Plata receiver traces defendants' lack of

adequate "clinical" space to design decisions made in the 1980s to address proactively

anticipated overcrowding by planning to over-build only some limited and essential

functional areas of the new prisons, not including clinical healthcare space, to accommodate as much as 130 percent of overcrowding. At the same time, the infrastructure, including just water, wastewater, electrical and mechanical components, needed to meet anticipated overcrowding of as much as 190 percent in cells and 140 percent in dormitories was also incorporated in the design of the new facilities. No provisions were included for a similar expansion of clinical space for healthcare beyond the initial 100 percent of capacity. The receiver concludes that, however defendants care to characterize the general level of current overcrowding, "the available clinic space is *one half of what is necessary for daily operations.*" See Receiver's Report Re Overcrowding, Plata v. Schwarzenegger, May 17, 2007, at p. 20ff (italics in the original).

That decision may, indeed, have left the medical side of healthcare with just half a loaf of needed clinical space. The cost to future mental health programming space was even greater. In 1988, when those decisions were reached, defendants were still several years ahead of the mental health catastrophes that eventually exposed the utter dearth of mental health services provided in CDCR's prisons. Not until 1993 did the defendants even begin to concede that some 7.9 percent of the CDCR population might conceivably require some form of mental health treatment. None of the 19 CDCR institutions planned and built in the boom of the 80s and 90s gave any thought to the space that might be needed for mental health purposes. Instead, as the need for much expanded mental health care and the space needed to provide it emerged in the mid and late 1990s, medical and mental health practitioners in CDCR were left to scramble for the clinical space originally designed to meet just half of anticipated medical needs alone.

Clinicians' offices, any sort of interview space, locations for the conduct of group treatment, all were hopelessly inadequate. In secure environments, like administrative segregation units, Secure Housing Units or any locked-down unit, many, if not most, clinical interviews between clinicians and inmate/patients had to occur at cell-front or in those telephone-booth-sized holding cells, known among inmate/patients as "cages," in the corridors of living units in full view and hearing of correctional officers and other inmates. Group therapy, as often as not, was conducted, even in intensive care programs like EOP and PSUs, in dayrooms largely devoid of confidentiality, often surrounded by eavesdropping and kibitzing fellow inmates.

Improvement has occurred over the past dozen years, as the inadequacy of program and treatment space became clearer and the Court more insistent. Trailers began to appear at institutions to provide offices for clinicians to work in; limited all-purpose rooms were more often made available for therapeutic group activities; portions of structures were reconfigured to provide interview and counseling space; and, finally, at California State Prison at Sacramento, a huge new programming facility full of interview cubicles, clinical workers' offices and multiple-sized treatment activity rooms, was constructed and is now being activated. But elsewhere, finding appropriate space for the delivery of individual and group counseling in many units remains incredibly difficult. Each succeeding compliance report over the past two years, for example, has documented the decline in the number of hours of therapeutic activities offered in most institutions to Enhanced Outpatient Program inmate/patients in administrative segregation units, repeatedly attributed to the acute absence of adequate space.

The growing problems reflect the impact of overcrowding. The sheer number of inmates needing all sorts of time out of their cells for all sorts of reasons puts incredible pressure on available space. When gyms, dayrooms and all-purpose rooms are filled with bunks and inmates, past accommodations for the use of these spaces for group activities for mentally ill inmates evaporate. The struggle for acquisition of a meaningful portion of healthcare clinical space, already able to meet just half the medical demand, escalates relentlessly. Access to space, moreover, is aggravated further by the growing dependence on increasingly less available escort correctional officers, who must regularly steer high custody inmate/patients through the physical security barriers to interview and other treatment space. Excessive population, thus, results in a reduction of programming space now occupied by inmate bunks, greater competition for use of the diminishing available space; fewer escorting correctional officers to permit access to the diminishing space; and, ultimately, the increasing frustration and demoralization of clinicians trying to provide the treatment. The lack of programming space is a huge problem.

Obviously, of course, it is not just the lack of programming space that defines the problem. The inevitable result of severe overcrowding is that everyone also spends more and more time in their cells. General yards are more crowded, less well supervised and increasingly dangerous. There are not nearly enough walk-alone yards to provide statutorily required amounts of exercise for those who by choice or need require them. Gyms are no longer an option for time out of one's cell. Dayrooms share many of the same problems. Work or vocational opportunities shrink in the expanding population. Disturbances occur more frequently, with resulting increases in the number and duration of lockdowns. All inmates must spend increasingly larger chunks of their days in their

cells, or much more dangerously, in one of those triple-bunked "non-traditional" spaces. None of this is conducive to the health and well-being of any inmate, much less a seriously mentally disordered inmate/patient; it inevitably escalates the incidence of mental illness and exacerbates the condition of those already mentally fragile and vulnerable.

Beds: This Court has spent the last three years deeply immersed in the disconnect between the number of beds needed by defendants to provide mental health treatment for CDCR's most seriously mentally ill inmates and the beds available to provide such care. Indeed, the process of defining defendants' needs for such beds goes back nearly a decade to 1998, when it was discovered that the Department of Mental Health (DMH), CDCR's selected contractor for providing inpatient acute and intermediate care, had no facilities of its own in which to provide the level of inpatient care needed by CDCR for its high custody inmates with a history of violence or escape. This led, in turn, to a seemingly endless debate between the agencies over DMH's persistent claim it had, or would shortly have, all of the beds CDCR needed for its high security inmate/patients, punctuated by revelations to the contrary.

Eventually, after many stalled and ineffectual efforts to determine accurately the extent of the need for different levels of mental health care at the various custody levels, defendants finally obtained competent consulting help to develop reasonably reliable population projections for each treatment and security level, out of which eventually emerged plans for developing sufficient beds for high custody intensive inpatient mental health programs within secure CDCR institutions. Sadly, construction of the beds identified as needed to meet defendants' projected needs for acute and

intermediate inpatient care will not be completed until FY2011/12. The issue is further complicated by the defendants' plan to have CDCR, with its shaky history of providing just outpatient mental health care, undertake to deliver the inpatient care now delivered by DMH.

Similarly, defendants cannot expect to meet fully their projected need for beds for inmate/patients in general population Enhanced Outpatient Programs, administrative segregation EOPs, Psychiatric Service Units and Mental Health Crisis Beds until FY 2011/12. Overcrowding may not be entirely responsible for some of the specifics of this problem. Shifts in the nature of the mental health population, with increasing numbers of high custody inmates requiring EOP and inpatient acute and intermediate levels of care, seem to be driving the expansion of some categories of inmate/patients and the contraction of others. Whatever the cause, defendants are facing a four to five-year gap in the availability of sufficient beds to meet the treatment needs of many inmate/patients, who in the meantime are left suffering. This means that, nearly 12 years after the determination that mental health services in CDCR were egregiously unconstitutional, hundreds certainly, and possibly thousands, of CDCR inmates/patients, all members of the Coleman class certified in the early 1990s, are still looking for beds at the level of treatment their mental illness requires.

The inadequacy of beds appropriate to the treatment needs of inmates, particularly at the highest level of treatment needs, is compounded by severe overcrowding. The back-up of inmate/patients awaiting transfer to inpatient DMH programs fills MHCB units, which, in turn, cannot provide crisis intervention to other inmate/patients who need to be stabilized. The failure to stabilize the latter means more

of them will eventually need to be referred for inpatient care, and the unmet needs spiral higher and higher. Not surprisingly, harassed clinicians often choose not to undertake the frustrating struggle for a referral that will not bring movement for weeks or months, and increasing numbers of truly psychotic inmate/patients are trapped in EOPs that cannot meet their needs. In all of this, many of the clinical advances in CDCR's mental health system painfully accomplished over the past decade are slip-sliding away.

Staff: From the initiation of the remedial process in the Coleman case, the parties, the special master and the Court have all recognized staffing as the absolutely essential ingredient for defendants to meet their obligations and resolve the suit. For a while, back in 2002 and 2003, defendants, with aggressive contracting, were able to reduce functional vacancies among clinicians to acceptable levels, and hopes of eventually ending Coleman actually blossomed. In July 2003, the functional vacancy rate among psychiatrists was just two percent, while the same rate among case managers was 2.2 percent. The functional vacancy rate among psychiatric technicians was highest among clinicians at 7.7 percent. Twelfth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, dated December 8, 2003, at pp. 225,226.

The intervening years have been marked by substantial additions of allocated clinicians to meet higher standards of care for the expanding relative size of the mental health caseload within the steadily rising overall population. But, here again, the growth of the resource has not matched the rise in demand, and earlier gains have dissipated. As of April 30, 2007, vacancy rates among allocated positions for

psychiatrists, case managers (including psychologists and psychiatric social workers) and psychiatric technicians hovered in the mid-40 percent range (See Exhibit C):

| Position | Allocations | Vacancies | Vacancy Rate |
|---|---|---|---|
| Psychiatrists | 310.65 | 134.90 | 43.43 % |
| Case Managers | 1,002.38 | 441.44 | 44.04 % |
| Psych Techs | 498.36 | 219.52 | 44.05 % |
| **Total:** | **1,811.39** | **795.86** | **43.94 %** |

With use of independent contractors, CDCR reduced the functional vacancy (the number of clinicians available after vacancies are subtracted from allocations and contracted services are added) among psychiatrists to 6.25 percent; among case managers to 23.84 percent; and among psych techs to 20.36 percent. (See Exhibit D.) The overall functional vacancy rate among mental health clinicians in April 2007 was 19.86 percent.

While CDCR's ability to fill allocated mental health positions has diminished, the mental health caseload population continued to expand, reaching as indicated above, some 33,300 inmate/patients. The capacity of defendants' Mental Health Services Delivery System is 29,314, which means that the actual census exceeds capacity by some 3,986 inmate/patients or 13.59 percent. "Capacity" in this context refers primarily to the availability of clinical staff to provide the level of care required for each category of mental health care. When the functional vacancy rate among clinicians of 19.86 percent is added to the 13.59 percent surplus of inmate/patients over capacity, CDCR ends up with sufficient staff to provide full mental health services to roughly two-thirds of its mental health caseload or two-thirds of required services to its full caseload,

or, probably more realistically, some combination of reduced services to some segments of the caseload that can be covered with a third less clinicians than required..

The staffing figures also mean that 39.65 percent of all psychiatric services in CDCR in April 2007 were provided by contractors, as were 26.5 and 29.7 percent, respectively, of all case managers and psychiatric technicians' services. For lots of reasons, including the length and duration of provided services and problems of selection, orientation and supervision, contracted services are not the equivalent of services provided by full-time clinical employees.

Nor is this the full measure of defendants' mental health staffing deficiencies. The staffing situation among mental health managers and staffing personnel at the Division of Correctional Health Care Services headquarters in Sacramento is even worse. A substantial and much-needed allocation of staff in mid-2006 raised the number of mental health headquarters positions to 129. As of early 2007, the vacancy rate among those positions was a devastating 70 percent. This means that, to a large extent, the management and leadership for mental health services must be provided at the institutional level.

This discussion does not even address the endemic shortages of escort correctional officers, nursing staff, clerical and records keeping personnel, pharmacy staff and lab technicians described more appropriately and fully in the Plata receiver's report.

Given the inadequacies of programming space, program beds and mental health staffing, it is clear that a significant portion of the MHSDS caseload is not receiving the necessary mental health services spelled out in the revised Program Guide and accepted by the parties and Court as the measure of constitutionally adequate

services. Quantifying accurately the precise percentage of the caseload whose services are inadequate is more difficult. In the first place, the inadequacies described herein are not spread evenly throughout CDCR. The actual and cumulative impact of all these inadequacies in any particular institution depends on the facility's physical location, history, local overall and mental health leadership and other imponderable factors, such as the adequacy of the pool of mental health clinicians available in California to fill the ever expanding needs of CDCR and DMH.

Most prisons with large complex mental health caseloads and programs handle staffing shortages by assigning the bulk of clinical resources to programs providing the most intensive care and using whatever may be left over to staff the larger population with the lightest treatment needs in the outpatient 3CMS program. The risk is that the scarcity of services for these inmate/patients will eventually generate greater demand for the more intensive programs. In other facilities, especially those without MHCB units, local mental health administrators must struggle to find adequate beds, housing and treatment resources for seriously mentally ill inmates, often suicidal, who cannot be placed in the MHCB environment they need. The scarcity of MHCB, EOP and inpatient DMH beds mean long waiting lists for admission, usually in the only local beds where such inmate/patients can be kept, but at the expense of other local inmate/patients with needs of their own.

It is difficult, then, to place any precise quantitative label on the extent of unmet mental health needs. Suffice it to say that 11 years and five months after the Court found mental health services in CDCR to be unconstitutional in December 2005, a period of time, incidentally, more than five times the average length of incarceration of CDCR

inmates (27 months), defendants cannot meet at least a substantial portion, amounting in some loose amalgam to about 33 percent, of acknowledged mental health needs with current staffing resources. Insufficient intensive mental health treatment beds and a chronic lack of programming space for mental health treatment contribute further to defendants' inability to meet required mental health services. All three deficiencies are unquestionably exacerbated by overcrowding.

**IV.  Effect of a reduction of total inmate population on answer to question number (3) and level of total inmate population reduction required to provide constitutionally adequate care to all members of the plaintiff class.**

From all of the foregoing, it is easy to conclude that defendants' ability to provide required mental health services would be enhanced considerably by a reduction in the overall census of CDCR. Determining the level of reduction needed to achieve equilibrium between the need for and an adequate supply of services, however, is no easier to calculate than the precise extent of the existing disequilibrium.

The impact of a reduction of population on staffing seems easy to discern. If the percentage of the caseload census in the overall population is a predictable 19 to 20 percent, the ratio of clinicians to inmate/patients should improve directly in proportion to the decline in overall population and begin swiftly to ameliorate the impact of high vacancy rates among clinicians. An estimate based on the current overall ratio of staff to caseload (roughly one clinician for 23 caseload inmate/patients) might suggest that a reduction of approximately 9,500 caseload inmate/patients (29 percent of the MHSDS caseload) would lead to an acceptable staff ratio (roughly one clinician for 16 caseload inmate/patients).

Reduction of the caseload by 9,500 inmate/patients would require an overall population drop of 50,000 inmates, but even such a decline in the overall population would probably not raise staffing resources into equilibrium with the mental health caseload. Clinicians cannot be spread out evenly like butter over the MHSDS caseload. Staffing ratios are much more intensive in MHCB units, PSUs, EOPs, administrative segregation units and reception centers than they are in general population 3CMS programs. Some 425 of CDCR's 1,002.38 allocated case mangers serve the 28,154 3CMS inmate/patients in general population and administrative segregation, while the remaining 575 attend to the treatment needs of the some 4,600 inmate/patients in MHCB units, PSUs and EOPs. Thus, the impact of a population cut on mental health staffing depends more on the nature of the program cut than the overall numbers of inmates diverted. Even the release of 100,000 inmates would likely leave the defendants with a largely unmitigated need to provide intensive mental health services to program populations that would remain undiminished by a reduction of some 19,000 3CMS inmates. This would suffice to cover just the functional vacancy rate among case managers. Only a targeted release of seriously mentally ill inmates will serve quickly to reverse current deficiencies, especially of bed and program space. Still, the most seriously mentally ill inmate/patients in CDCR are unlikely to be among those released pursuant to any of the provisions of defendants' Assembly Bill 900.

With few exceptions, much the same analysis is applicable to defendants' need for beds and programming space at the most intensive levels of mental health treatment. Problems related to programming space may seem more amenable to amelioration, but remember that none of CDCR's institutions was designed to provide

any treatment space for mental health inmate/patients. The need for beds and programming space, again, are most imperative for those most desperately mentally ill caseload inmate/patients, few of whom will be likely candidates for release under the defendants' plans or a court-ordered cap. Even draconian population reductions will have only limited impact on these inmate/patients currently suffering most egregiously from restricted access to needed mental health treatment. Unhappily, there is no clear answer to the inquiry about the level of overall population reduction will allow the provision of constitutionally adequate care to all members of the plaintiff class.

### V.  Conclusion

The impact of any reduction in the overall inmate population on the delivery of mental health services will also depend on a number of factors not addressed here, including the effective organization and competency of CDCR's custody, healthcare, mental health and overall management; the stability, quality and morale of mental health staff; and the ability of the executive and legislative branches of state government to sustain over the long haul the plethora of reform measures adopted in the present crisis.  Many of these issues have been addressed in the submissions on overcrowding submitted in Plata and the voluminous pleadings of parties in Coleman.

Each of the disparate elements of healthcare currently the subject of various pending federal court intervention, including medical, dental and mental health services and the application of the Americans with Disabilities Act, has had its own unique history and development. As one of the earliest of this quartet of cases to be decided and launched on its remedial quest, Coleman has the richest history of waxing and waning accomplishments. Over the past 11-plus years, much has been achieved, and

many of the achievements have succumbed to the inexorably rising tide of population, leaving behind growing frustration and despair.  While this report certainly strikes no optimistic or encouraging note, it is a useful reminder that there is no judicial *deus ex machina* that will free the Court, the special master, the receiver, the parties or counsel from the continuing and perhaps interminable struggle ahead to drag CDCR into constitutional compliance until the State of California re-thinks the place of incarceration in its criminal justice system.

Respectfully submitted,

/s/ J. Michael Keating, Jr.

J. Michael Keating, Jr.
Special Master

May 31, 2007

17