PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California  94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
AMY WHELAN Bar No.: 215675
LORI RIFKIN Bar No.: 244081
SARAH M. LAUBACH Bar No.: 240526
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington  98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN,

     Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.,

     Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No.:  Civ S 90-0520 LKK-JFM

**SECOND DECLARATION OF LORI RIFKIN IN SUPPORT OF PLAINTIFFS' CORRECTED SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO CONVENE A THREE JUDGE PANEL TO LIMIT THE PRISON POPULATION**

Hearing Date:    TBD
Time:
Location:          Courtroom 4
Judge:             Hon. Lawrence K. Karlton

I, Lori Rifkin, hereby declare:

1.    I am a member of the Bar of this Court and an associate of the firm Rosen, Bien & Galvan, LLP, one of the counsel of record for the plaintiff class (hereinafter "Plaintiffs"). I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify. I submit this declaration in support of Plaintiffs' Corrected Supplemental Brief in Support of Motion to Convene a Three-Judge Panel to Limit the Prison Population.

2.    Attached hereto as **Exhibit A** is a true and correct copy of the Declaration of James Austin, Ph.D In Support Of Plaintiffs' Supplemental Reply Brief, filed May 29, 2007 in *Plata v. Schwarzenegger*, N.D.Cal. No. C01-1351 TEH. In addition to his more than thirty years of experience in correctional planning and research, Mr. Austin was recently appointed to the CDCR Expert Panel on Adult Offender Recidivism Reduction Programs. Ex. A ¶ 2.

*3.*    Mr. Austin's Declaration comments on California's plan to increase the capacity of the state prison population in terms of its expected effects on the overcrowding crisis. Ex. A ¶ 6. Mr. Austin concludes that "the state's 'plan' to reduce overcrowding is not a plan, as that term is normally understood. It is deficient in that there are no detailed supporting documents, data analysis or time [sic] timetables that show how the CDCR can meet the massive and unprecedented construction timelines set forth in Defendants' Response." *Id.* ¶ 7. Mr. Austin further states that he does "not have confidence that the state will be able to stabilize the growth of the prison population or achieve any significant reductions in the prison population in the next few years." *Id.* Moreover, "[e]ven if it does, the CDCR estimates that the prison population will be essentially unchanged in 2009." *Id.*

4.    Mr. Austin also disputes the magnitude of the projected prison population reductions that defendants claim will be the effect of their prison "reforms." *See* Ex. A, ¶¶9-19.

1

2      I declare under penalty of perjury under the laws of the State of California and of the

3  United States that the foregoing is true and correct.  This declaration was executed this 1st day

4  of June 2007 at San Francisco, California.

5

6  Dated:  June 1, 2007

7                                                          */s/ Lori Rifkin*
                                                       Lori Rifkin
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1  PRISON LAW OFFICE
   DONALD SPECTER #83925
2  STEVEN FAMA #99641
   ALISON HARDY #135966
3  BRITTANY GLIDDEN #224658
   General Delivery
4  San Quentin, CA  94964
   Telephone: (415) 457-9144
5  Facsimile: (415) 457-9151

6  SHAWN HANSON #109321
   CAROLINE MITCHELL #143124
7  50 Fremont Street
   San Francisco, CA 94105
8  Telephone: (415) 983-1000
   Facsimile: (415) 983-1200
9  Attorneys for Plaintiffs

10 BINGHAM McCUTCHEN
   WARREN E. GEORGE #53588
11 Three Embarcadero Center
   San Francisco, CA 94111
12 Telephone: (415) 393-2000
   Facsimile: (415) 393-2286

13

14                     UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF CALIFORNIA
15

16                                              No. C01-1351 T.E.H.

17  MARCIANO PLATA, et al.,                     **DECLARATION OF JAMES
                                                AUSTIN, Ph.D IN SUPPORT OF
18                Plaintiffs,                    PLAINTIFFS' SUPPLEMENTAL
                                                REPLY BRIEF**
19

20  v.

21  ARNOLD SCHWARZENEGGER, et al.,

22                Defendants.

23

24

25

26

27

28

Decl. James Austin,
Case Number, C01-1351 TEH

1    I, James Austin, declare as follows:

2        1. I received my Ph.D. in sociology from the University of California at Davis in

3    1980. I am currently the President of JFA Institute, a corrections consulting firm. Prior

4    to that, I was the Director of the Institute of Crime, Justice and Corrections at the George

5    Washington University, and Executive Vice President for the National Council on Crime

6    and Delinquency. I began my career in corrections with the Illinois Department of

7    Corrections in 1970 at Statesville Penitentiary. A complete description of my education

8    and experience is contained in my curriculum vitae, which is attached hereto as Exhibit

9    A.

10        2. I have over 30 years of experience in correctional planning and research. Most

11    recently, I was appointed to the California Department of Corrections and Rehabilitation

12    Expert Panel on Adult Offender Recidivism Reduction Programs. I am serving or have

13    recently served, as director for several large research and evaluation programs, most

14    notably: the Correctional Options Evaluation, Justice Reinvestment. I have served as the

15    Chair of the National Policy Council for the American Society of Criminology. I am

16    working in the states of Maryland, Nevada, Texas, Rhode Island, Connecticut, Arizona,

17    Pennsylvania, and Louisiana to safely reduce their prison populations.

18        3. I was jointly appointed by the Department of Justice and the Georgia

19    Department of Juvenile Justice and the Louisiana Department of Youth Services to

20    monitor both of those states' compliance with the issues specified in a Memorandum of

21    Agreement concerning the conditions of confinement in Georgia's youth facilities.

22        4. I have been a consultant for the National Institute of Corrections on jail and

23    prison classification systems. In that capacity I have assisted over 25 states and numerous

24    jail systems develop and implement objective prisoner classification systems. Currently I

25    am developing parole risk guidelines for Texas, Pennsylvania, Kentucky, Maryland,

26    Nevada, Rhode Island, West Virginia and Oklahoma.

27        5. I was named by the American Correctional Association as its recipient of the

28

Decl. James Austin,
Case Number, C01-1351 TEH                    2

1    Peter P. Lejin's Research Award in 1991, and I received the Western Society of

2    Criminology Paul Tappin award for outstanding contributions in the field of criminology

3    in 1999. I am a member of the CDCR's Expert Panel on Adult Offender Recidivism

4    Reduction Programs and was a key author of the Panel's recommendations on reducing

5    the CDCR prison population.

6        6. I have been asked by counsel for Plaintiffs to review and comment on

7    California's plan to increase the capacity of the state prison population in terms of its

8    expected effects on the overcrowding crisis. To undertake this task I reviewed

9    Defendants' Response to the Court's February 15 Order and all the declarations submitted

10   in support of that response. I also reviewed the Receiver's Report and the Declaration of

11   Scott Kernan filed in CCPOA v. Schwarzenneger. I am also generally familiar with the

12   provisions contained in Assembly Bill 900.

13       7. In my opinion, the state's "plan" to reduce overcrowding is not a plan, as that

14   term is normally understood. It is deficient in that there are no detailed supporting

15   documents, data analysis or time timetables that show how the CDCR can meet the

16   massive and unprecedented construction timelines set forth in Defendants' Response. As

17   such, it is not a plan but a series of goals that have no factual basis. The CDCR's goals

18   for construction and implementation of new programs are not likely to be met. I do not

19   have confidence that the state will be able to stabilize the growth of the prison population

20   or achieve any significant reductions in the prison population in the next few years. Even

21   if it does, the CDCR estimates that the prison population will be essentially unchanged in

22   2009. Kernan Declaration at ¶ 22.

23       8. There are many reasons besides the lack of detail to be skeptical that the state

24   will be able to meet its goals. In general, the state proposes four major initiatives to

25   reduce crowding: 16,000 re-entry beds, 8,000 transfers to out-of-state private facilities,

26   8,000 medical mental health beds, and 16,000 -18,000 in-fill beds. With the exception of

27   the 8,000 transfers, none of these measures are designed to reduce the prison population.

28

Decl. James Austin,
Case Number, C01-1351 TEH                    3

1  Instead they will solely increase the capacity of the prison system, and will require

2  commensurate increases in staff, administration and program space.

3      9.  **Out-of-State Transfers**.  The estimates for the out-of-state transfer program

4  are overly optimistic for the following reasons.  The CDCR reports there are a total of

5  approximately 23,000 CDCR inmates with ICE holds and another 6,000 who may receive

6  a hold in the near future. The CDCR indicates that 8,000 or 28% of the 29,000 target

7  population currently meet complex criteria for being eligible for such a transfer.  Yet they

8  do not provide any detailed data or analysis showing how they arrived at the 8,000

9  number and what number of inmates passed each specific criteria.  For example, what is

10  the number that is not participating in a work or treatment program, is not in minimum

11  custody, and have not received a visit?  Until these numbers are known and the methods

12  used for determining them, it's hard to know if they are valid. At a minimum the CDCR

13  should assume a 20% discount off of the 8,000 estimate given that many of the prisoners

14  who appear to be eligible "on paper" are not. For that reason I would discount by 20% the

15  8,000 projected number.

16      10.  The plan does not recognize that this population will be constantly flowing as

17  prisoners reach their sentence release dates and have to be replaced by other prisoners.

18  Further, some portion of the inmates will be returned to the CDCR for disciplinary,

19  medical or other management reasons. At a minimum the CDCR plan should assume a

20  5% discount for such reasons. I have applied this 5% which produces a 25% total

21  discount on the CDCR estimates or a revised estimate of 6,000 at any given time.

22      11.  In my experience, it is also common that unless the private prisons are

23  constructed in the state, the out-of state transfer option is at best a short-term solution.

24  Connecticut and Washington, D.C., for example, have had to return prisoners from out-

25  of-state facilities due to budgetary, non-compliance with the private contract, and other

26  administrative issues.

27

28

Decl. James Austin,
Case Number, C01-1351 TEH                    4

1       12. **In-Fill Beds**. The term "in-fill" beds refers to those new housing units that

2    will be constructed on the grounds of existing prisons. According to the state's plan,

3    these 16,000 new beds will be used to remove all beds that are currently in gyms, day

4    rooms or other spaces not designed to house prisoners. Mr. Kernan states that there are

5    18,000 prisoners in "ugly beds", leaving 2,000 prisoners to remain in non-housing units.

6    Kernan Declaration at p 5. Because the in-fill beds are expected to replace most of the

7    existing beds, the 16,000 in-fill beds will have no direct impact on the CDCR population.

8    The state proposes to use the vacated space for programs instead of housing. But, some

9    of this space, such as day rooms, is not conducive to the type of rehabilitative

10   programming the CDCR contemplates.

11       The plan also assumes that the CDCR will be successful in hiring significant

12   numbers of additional program staff. There is already a shortage of these staff in the

13   CDCR so it's not clear how the current vacancies will be filled and hundreds of additional

14   new staff hired. In addition, it is not at all certain that local governments are going to

15   cooperate with the CDCR's plan to increase the capacity at particular prisons.

16       13. **Re-Entry Beds**. The idea of constructing and having operational over thirty

17   500 bed re-entry bed prisons anytime soon is naive at best. These facilities are to be sited

18   in urban areas, which would mean mostly in the Southern California counties of Los

19   Angeles, Orange, Riverside, and San Diego, and in the Bay Area. It is going to be

20   extremely difficult, if not impossible, for the CDCR to construct thirty re-entry facilities

21   in urban areas. Experience suggests that many local residents and political figures will be

22   opposed to these beds. Lawsuits and public hearings can be expected to delay the process

23   for years. Further, it will not be possible, in my estimation to constantly fill these beds

24   with soon to be released inmates which is the purpose of a re-entry bed. Assume that

25   inmates who are within four months of their release dates will be transferred to a re-entry

26   bed. To maintain a 16,000 re-entry bed population nearly 50,000 prisoners would have

27

28

Decl. James Austin,
Case Number, C01-1351 TEH                    5

1  to be abruptly transferred to these facilities each year. This is not realistic or pragmatic.

2

3     14. Each Re-entry facility must be fully staffed with custody and program staff.
4  The amount of staff needed to operate the new beds is significant. The CDCR ratio of
5  staff to inmates is 1 to 6. This means that at a minimum the CDCR will have to hire over
6  2,600 additional security staff just for the re-entry prisons. The CDCR has indicated that
7  it already has thousands of vacant security positions. There is nothing in the state's plan
8  suggesting that there is a readily available supply of such staff.

9     15. **Administrative Discharge of Parolees.** The CDCR has issued a
10  memorandum designed to end parole for certain parolees after they complete a 13 months
11  of successful parole. It estimates that the parolee population will be reduced by 2,000-
12  4,000. Kernan Declaration at p. 8. Discharging these parolees who have been free of
13  violations for 12 months will have no impact on the prison population as they are very
14  unlikely to re-admitted to prison for a technical violation. Even if some of these well
15  behaved parolees would be revoked at some later date, the short period of re-
16  imprisonment (three months or less) would have little or no impact on the 170,000 plus
17  inmate population.

18     16. **Reductions of the Population through Programs to Decrease Recidivism.**
19  Dr. Joan Petersila in her declaration states that the number of parolees returned to custody
20  can be reduced by 10% through the use of rehabilitative programs. There are several
21  reasons why this estimate is incorrect. First, the data she cites in her declaration show a
22  change in the rate of recidivism – not an absolute reduction in beds – none of which
23  approach the 10% level. For this reason the Expert Panel is using a much lower estimate.
24  Second, under the best of circumstances it would take two to five years to design and
25  begin to operate rehabilitative services. Currently, the CDCR has no capacity to do so.
26  Third, even if 8,100 parolees do not violate their parole and are not returned to prison, the
27  reduction in prison beds would only be about 2,000, since on average parolees only spend

28

Decl. James Austin,
Case Number, C01-1351 TEH                    6

1    three months in prison. Fourth, in order to obtain a 10% reduction in readmissions for the

2    approximately 81,000 parole violators returned to prison each year, they would all have to

3    participate in and complete an effective treatment program with adequate follow-up

4    services on parole. To my knowledge, there is no state that has reduced its recidivism rate

5    at such a level for such a large number of prison releases based on treatment.

6        17. Finally, as noted above, I am a member of the Expert Rehabilitation Panel

7    that Dr. Petersilia chairs. Dr. Petersilia states that if the panel's recommendations are

8    implemented there will be a 10% reduction of recidivism and in turn a reduction in the

9    prison population. I believe that Dr. Petersilia is being unduly optimistic that the state can

10   implement what I expect to be the Panel's recommendations. While not yet final, they

11   currently would require statutory changes, for example in good time credits, that the

12   legislature has so far shown itself unwilling to make.

13       18. **Decision-Matrix Reform:** Mr. Kernan states that through the use of a

14   "decision-making matrix" the CDCR will be able to tailor sanctions for parole violations

15   more closely to the needs of the offender and thereby reduce recidivism. The CDCR has

16   not started this project yet, and it will only begin as a pilot project at the end of this year.

17   Kernan Declaration at ¶ 19. Even if successful, the state only predicts a reduction in

18   1,920 bed days, which will only yield a reduction of 5 beds (1920 bed days divided by

19   365 days = 5 beds).

20       19. **Alternative Sanctions.** The alternative sanctions beds mentioned in Mr.

21   Kernan's declaration is realistic and can be achieved very quickly. If properly

22   implemented these types of sanctions could and should have a positive impact on the

23   prison population. However, as Mr. Kernan notes very few of the alternative placements

24   are being used so to date, so one must question the CDCR's ability or capacity able to

25   expand its alternative prison bed capacity.

26       20. **Effective Population Reduction Strategies.** Instead of trying to build its way

27   out of the current overcrowding crisis, the state would be better advised to adopt

28

Decl. James Austin,
Case Number, C01-1351 TEH                    7

1    strategies that have proven effective in reducing the prison population both in the

2    California and other states and not increasing the harm to the general public.  A reduction

3    in the population can only be accomplished by limiting the number of prisoners who enter

4    the prison system and/or modestly reducing the amount time they are incarcerated (2-3

5    months per eligible prisoner) which modestly increases the number of prisoners who are

6    released.  There are effective strategies for doing both that will not increase the risk to

7    public safety.  For example, a far more practical and effective approach would be to

8    change good time laws so that prisoners statutorily received good time, get program

9    credits for participating in effective programs, and to divert technical parole violators who

10   do not otherwise pose a risk to public safety.  If done properly and made retroactive to the

11   current prisoner population, the Expert Panel estimates that the prison population would

12   be lowered by approximately 40,000 inmates in two years.

13        I declare under penalty of perjury that the foregoing is true and correct and that this

14   declaration was executed in Malibu, California on May 27, 2007

15

16

17                                          /s/
                                    JAMES AUSTIN, Ph.D

18

19        I hereby attest that I have on file all holograph signatures for any signatures

20   indicated by a "conformed" signature (/S/) within this efiled document.

21

22                                          /s/
                                    Donald Specter

23

24

25

26

27

28

Decl. James Austin,
Case Number, C01-1351 TEH                    8

EXHIBIT A

# James Austin

## MAJOR POSITIONS HELD

| | |
|---|---|
| 2003 – Present | *President, The JFA Associates*, Washington, D.C. |
| 1999 -2003 | *Research Professor and Director, Institute for Crime, Justice, and Corrections*, Department of Sociology, The George Washington University, Washington, D.C. |
| 1982 - 1998 | *Executive Vice President* National Council on Crime and Delinquency San Francisco and Washington, D.C. |
| 1974 - 1982 | *Research Associate* National Council on Crime and Delinquency San Francisco |
| 1970 - 1974 | *Correctional Sociologist* Illinois Department of Corrections Joliet, Illinois |

## EDUCATION

| | |
|---|---|
| B.A. | 1970, Wheaton College, Wheaton, Illinois, Sociology |
| M.A. | 1975, De Paul University, Chicago, Illinois, Sociology |
| Ph.D. | 1980, University of California, Davis, California, Sociology |

## RELEVANT PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2002 – present | *Director*,  Justice Reinvestment Initiative, Council of State Governments. |
| 1998 – Present | *Director,* Correctional Options Program (Bureau of Justice Assistance, U.S. Department of Justice) |
| 2005 – 2006 | *Director,* Review of Escapes from the Bureau of Prisons Community Correctional Centers in the District of Columbia.  (DC Criminal Justice Coordinating Council). |
| 2003 – 2006 | *Director*, Assessment of Sexual Assault in the Texas Prison System. (National Institute of Justice). |
| 2002 – 2006 | *Director,*  Parole Guidelines System Project, Maryland Parole Commission.  (Baltimore Open Society Institute). |
| 2003 – 2006 | *Director*,  Validation Study of the Alameda County Juvenile Detention Risk Assessment System (Alameda County, California). |

| 2002—2006 | *Independent Expert*, Office of Youth Development, Louisiana Department of Public Safety and Corrections, Jointly Appointed by State of Louisiana and U.S. Department of Justice, Civil Rights Division |
|---|---|
| 2003-2004 | *Director,* Evaluation And Redesign Of Systems For Berks County Pretrial And Sentenced Populations. (Berks County, PA). |
| 2003 | *Juvenile Corrections Expert*, US Department of Justice, Civil Rights Division, California Youth Authority. |
| 2002 | *Juvenile Corrections Expert*, US Department of Justice, Civil Rights Division, Santa Clara County Detention Center. |
| 2002 – 2003 | *Director*, Validation of the Pennsylvania Parole Guidelines. Pennsylvania Board of Probation and Parole. (Pennsylvania Commission on Crime and Delinquency). |
| 2001 – 2003 | *Director,* Development of the Kentucky Parole Risk Assessment System. Kentucky Parole and Pardon Board. |
| 1998 – 2004 | *Monitor*, Georgia Juvenile Justice Corrections System, Jointly Appointed by State of Georgia and U.S. Department of Justice, Civil Rights Division. |
| 1997 - Present | *Director*, National Technical Assistance Program for External Prison Classification Systems (Oregon, Wisconsin, Virginia, Tennessee, Texas, Oklahoma, and Montana) (National Institute of Corrections) |
| 1996 - Present | *Director,* National Technical Assistance Program for Internal Prison Classification Systems (Washington State, Oregon, Missouri, South Dakota, Connecticut, Colorado, and Florida) |
| 1996 - 1999 | *Director*, National Survey of Juveniles in Adult Correctional Facilities (Bureau of Justice Assistance), GWU. |
| 1996 - 1999 | *Director,* National Multi-Site Boot Camp Evaluation (Adult and Juvenile) (National Institute of Justice), GWU. |
| 1995 - 1999 | *Director*, Evaluation of "Three Strikes and You're Out" Laws in California and Nationally, (National Institute of Justice), NCCD |
| 1996 - 1999 | *Director*, National Survey of Privatization in Corrections (adult and juvenile facilities) (Bureau of Justice Assistance), NCCD. |
| 1992 - 1997 | *Director*, Correctional Options Evaluation (National Institute of Justice and Bureau of Justice Assistance), NCCD |
| 1997 | *Director*, Congressionally mandated evaluation of the D.C. Department of Youth Services Agency (YSA) operations, classification system, staffing levels, physical plant, mental health, information services and program services, (National Institute of Corrections, Bureau of Prisons), NCCD |

| | |
|---|---|
| 1992 - 1997 | *Director*, National Structured Sentencing Evaluation (Bureau of Justice Assistance), NCCD |
| 1995 - 1997 | *Director*, Congressionally mandated evaluation of the D.C. Department of Corrections operations, classification system, staffing levels, and physical plant, including, comprehensive cost analysis of long-term options for the Lorton Complex, (National Institute of Corrections, Bureau of Prisons), NCCD |
| 1991 - 1997 | *Director*, Design and Implementation of the New York City Department of Corrections Objective Jail Classification System (Consent Decree, New York City Department of Corrections), NCCD |
| 1991 - 1995 | *Director*, Philadelphia Prison System Classification and Population Projections Project (Consent Decree, City of Philadelphia), NCCD |
| 1991 - 1994 | *Director*, Evaluation of Jail Drug Treatment Programs (National Institute of Justice), NCCD |
| 1990 - 1993 | *Director*, Evaluation of the Los Angeles Sheriff's Boot Camp Program (National Institute of Justice), NCCD |
| 1991 - 1993 | *Director*, Design and Implementation of the Cook County Objective Jail Classification System (Cook County Sheriff's Department), NCCD |
| 1990 - 1991 | *Director*, California Assessment of the Overrepresentation of Minority Youth in Juvenile Justice (Office of Criminal Justice Planning), NCCD |
| 1988 - 1992 | *Director*, Experimental Test of Electronic Monitoring Program, Oklahoma Department of Corrections (National Institute of Justice), NCCD |
| 1987 - 1992 | *Director*, Experimental Test of the Prison Management Classification System (National Institute of Corrections and Washington Department of Corrections), NCCD |
| 1986 - 1990 | *Director*, National Jail Classification Project (NIC), NCCD |
| 1985 - 1987 | *Co-Director*, California Youth Authority Parole Risk Study (Packard Foundation and CYA), NCCD |
| 1984 - 1986 | *Co-Director*, Study of Institutional Violence at San Quentin (Consent Decree, California Department of Corrections, NCCD |
| 1982 - 1987 | *Co-Director*, Experimental Study of Juvenile Court Probation Services, Salt Lake City, Utah (OJJDP), NCCD |
| 1983 - 1985 | *Co-Director*, Illinois Department of Corrections Early Release Evaluation (NIJ), NCCD |
| 1980 - 1984 | *Co-Director*, Supervised Pretrial Release Test Program (NIJ/LEAA), NCCD |
| 1981 - 1983 | *Co-Director*, Evaluation of California AB2 Bail Reform Act (OCJP), NCCD |
| 1980 | *Senior Research Associate*, California Alternatives to Incarceration Study (State Legislature), NCCD |

## SPECIAL APPOINTMENTS

| | |
|---|---|
| 2003 | Advisory Committee, The Little Hoover Commission Report on California Prison System |
| 1999- 2003 | Chair, National Policy Committee, American Society of Criminology |
| 1987 - 1994 | Trustee, Robert Presley Institute of Corrections Research and Training |
| 1991 | Governor's Task Force on Prison Crowding, State of Nevada |
| 1988 | Governor's Task Force on Corrections, State of Oregon |
| 1981, 1986 | National Academy of Sciences, National Panels on Sentencing and Prison Overcrowding |

## EXPERT WITNESS/LITIGATION

| | |
|---|---|
| 1987 - 1989 | Office of the Special Masters, Ruiz v. Lynaugh, Evaluation of the TDC Classification System and Inmate Violence

Appointed by Court to produce evaluation report of classification system to determine if inmate violence had been reduced. |
| 1989 - 1991 | U.S. Department of Justice, Civil Rights Division, U.S. v. State of Florida: Florida Department of Corrections, et al., Case No. TCA 86-7330 (N.D. Fla)

Expert Witness Retained by Plaintiffs to determine whether women should be excluded from certain post positions in the DOC. |
| 1990 - 1991 | King County (Seattle, Washington) District Attorney's Office, Hammer v. King County

Expert Witness Retained by Defendants to determine if minority staff was being discriminated against. |
| 1990 - 1991 | Office of the Attorney General, State of Texas, Lamar v. Collins

Expert Witness Retained by Defendants to determine if use of local incarceration rates by selected counties was appropriate. |
| 1991 | Office of the Attorney General, State of Texas, Alberti v. Sheriff of Harris County, et al., No. CA-H-72-1094

Expert Witness Retained by Defendants to determine if use of local incarceration rates by selected counties were appropriate. |
| 1991 - 1992 | U.S. Department of Justice, Civil Rights Division, U.S. v. The Parish of Orleans Criminal Sheriff's Office

Expert Witness Retained by Plaintiffs to determine the appropriateness of excluding females from certain post positions within the jail. |
| 1991 - 1994 | Calvin R. vs. Illinois Department of Corrections. Consent Decree. |

|  | Appointed by Court to produce evaluation of classification system and to implement internal classification system to reduce inmate violence. |
|---|---|
| 1995 | International Fidelity Insurance Co. et al. v. Charles Nobel et al: In the United States District Court of the Southern District of Texas, Houston Division. |
|  | Expert Witness Retained by Defendants to determine the Failure to Appear rates for defendants released on surety bond versus O.R. |
| 1995 | Sandra Herrera, et al., v Pierce County, et al. |
|  | Retained by Plaintiffs to evaluate whether inmates were being properly classified and housed in the local jail. |
| 1995 - 1996 | Montoya v. Gunter, et al. |
|  | Retained by Defendants to determine whether inmate who was killed while incarcerated had been properly classified and housed. |
| 1995 - 1997 | Inmates A,B,C and D v. Illinois Department of Corrections Consent Decree |
|  | Appointed by Court to produce evaluation of the level of control of housing and job assignments by gangs. |
| 1995 - 2002 | USA v. Michigan and Cain v. Michigan Consent Decrees |
|  | Expert witness retained by Defendants to help Department of Corrections reach compliance with court order regarding classification system. |
| 1996 | Rentschler v. Carnahan et al. |
|  | Retained by Defendants to evaluate the impact of crowding at the Colorado maximum security prison. |
| 1997 | Carlos Morales Feliciano v. Pedro Rossello Gonzales Consent Decree |
|  | Retained by Special Master to conduct a comprehensive assessment of the inmate classification system that was designed and partially implemented by the Administration of Corrections. |
| 1998 - 1999 | Southern Ohio Correctional Facility (Civil Action No. C-1-93-436). |
|  | Retained by the Ohio Department of Rehabilitation and Correction to serve as an expert witness on classification issues as they pertain to the Lucasville riot. |
| 1998 - 1999 | Busey et al. v. Corrections Corporation of America |
|  | Retained by CCA to develop an objective classification system for the Youngstown facility and have all inmate's properly classified according to the classification criteria. |

| | |
|---|---|
| 1998 - 2000 | <u>Holloway, et al., v. King County</u><br><br>Retained by plaintiff's counsel to examine the validity of client's claims that sexual harassment of female correctional officers by male inmates was being encouraged by male correctional officers and departmental policy. |
| 2001 | <u>Gartrell et al., v. Ashcroft et al.</u><br><br>Retained by plaintiffs to examine if BOP inmates placed in Virginia Department of Corrections are unnecessarily having their expression of religious freedoms unnecessarily restricted? |
| 2001 - present | <u>Austin, et al., v. Wilkinson, et al.</u><br><br>Retained by defendants to examine the classification process used to assign inmates to the Ohio State Penitentiary – a high maximum security prison. |

## PUBLICATIONS

### Books

| | |
|---|---|
| 1996 | <u>It's About Time: America's Imprisonment Binge</u> (with John Irwin), Second Edition, Belmont, CA: Wadsworth Publishing. |
| 1993 | <u>It's About Time: America's Imprisonment Binge</u> (with John Irwin), First Edition, Belmont, CA: Wadsworth Publishing. |
| 1993 | <u>Reinventing Juvenile Justice</u> (with Barry Krisberg), Beverly Hills, CA: Sage Publications. |
| 1978 | <u>The Children of Ishmael: Critical Perspectives on Juvenile Justice</u> (with Barry Krisberg), |

### Articles

2006    "How Much Risk Can We Take?  The Misuse of Risk Assessment in Corrections."  2006.  Federal Probation. Vol. 70, No. 2: 58-63.

2004    Richards, Stephen C., James Austin, and Richard S. Jones. 2004. "Thinking About Prison Release and Budget Crisis in the Blue Grass State." Critical Criminology: An International Journal, Vol. 12, No.3: 243-263.

2004    Richards, Stephen C., James Austin, and Richard S. Jones. 2004. "Kentucky's Perpetual Prisoner Machine: It's All about Money." Review of Policy Research, Vol. 24, No. 1 (at press).

2003  "Why Criminology Is Irrelevant", <u>Criminology and Public Policy</u>, Vol. 2, No.3: 557-564

2003  "Three Strikes Laws", in <u>Current Controversies in Criminology,</u> Ronald Weitzer, ed., Prentice Hall: Upper Saddle River, NJ.

2003  "The Use of Science to Justify The Imprisonment Binge", <u>Convict Criminology</u>, Jeffrey Ian Ross and Stephen C. Richards, eds., Wadsworth: Belmont, CA.

2003  "Its About Time:  America's Imprisonment Binge", <u>Punishment and Social Control</u>, Aldine De Gruyter: New York, NY.

1999  "Are We Better Off?: Comparing Private and Public Prisons in the United States", <u>Current Issues in Criminal Justice</u>. Vol. 11 (2): 177-201.

1999  "The Impact of 'Three Strikes and You're Out'", <u>Punishment and Society</u>, Vol 1(2): 131-162.

1998  "The Limits of Prison Drug Treatment", <u>Corrections Management Quarterly</u>, Vol. 2, Issue 4, Fall 1998, pp. 66-74.

1996  "The Effect of 'Three Strikes and You're Out' on Corrections" in <u>Three Strikes and You're Out: Vengance as Public Policy</u>, David Shichor and Dale K. Sechrest, eds., Sage Publications: Thousand Oaks, CA.

1996  "Are Prisons A Bargain?: The Case of Voodoo Economics", <u>Spectrum</u>, Spring 1996, pp. 6-24.

1995  "The Overrepresentation of Minority Youths in the California Juvenile Justice System:  Perceptions and Realities" in <u>Minorities in Juvenile Justice,</u> Kimberly Kempf Leonard, Carle E. Pope, and William H. Fyerherm, eds., Sage Publications: Thousand Oaks, CA.

1994  "Three Strikes and You're Out: The Likely Consequences".  <u>St. Louis University Public Law Review</u>, 14, 1, pp. 239-258.

1993  "Classification for Internal Purposes: The Washington Experience" (with Chris Baird, and Deborah Nuenfeldt), <u>Classification: A Tool for Managing Today's Offenders</u>, Laurel, MD: American Correctional Association.

1993  "Objective Prison Classification Systems: A Review", <u>Classification: A Tool for Managing Today's Offenders</u>, Laurel, MD: American Correctional Association.

1986  "Using Early Release to Relieve Prison Crowding:  A Dilemma in Public Policy," <u>Crime and Delinquency</u> (October):404-501

1986  "Evaluating How Well Your Classification System Is Operating," <u>Crime and Delinquency</u> (July):302-321

1985  "Incarceration in the United States:  The Extent and Future of the Problem," <u>The Annals</u> (March):15-30

1983  "Assessing the New Generation of Prison Classification Models," <u>Crime and Delinquency</u> (October):561-576

1982  "Do We Really Want to Get 'Tough on Crime'?"  <u>Corrections Today</u>, Vol. 44, No. 6:50-52

1982  "Bail Reform in California:  The Passage of AB2" (with E. Lemert), <u>Pretrial Services Annual Journal, 1982</u>, Vol V:4-23

1982  "Review of Fatal Remedies:  The Ironies of Social Intervention" (Sam D. Seiber) in <u>Crime and Delinquency</u>, Vol. 20, No. 4:639-641

1982  "The Unmet Promise of Alternatives to Incarceration" (with B. Krisberg), <u>Crime and Delinquency</u>, Vol. 28, No. 3:374-409

1982  "Promises and Realities of Jail Classification," <u>Federal Probation</u>, Vol. 46, No. 1:58-67

1981  "Wider, stronger, and different nets:  the dialectics of criminal justice reform" (with B. A. Krisberg), <u>Journal of Research in Crime and Delinquency</u>, Vol. 18, No. 1:165-196

1980  <u>Instead of Justice:  Diversion</u>, Ph.D. Dissertation, University of California, Davis

## AWARDS

1999  Recipient of the Paul Tappin award for outstanding contributions in the field of criminology, Western Society of Criminology

1991  Recipient of the Peter P. Lejins Research Award, American Correctional Association