FUTTERMAN & DUPREE LLP
MARTIN H. DODD (104363)
160 Sansome Street, 17th Floor
San Francisco, California 94104
Telephone: (415) 399-3840
Facsimile: (415) 399-3838
martin@dfdlaw.com

*Attorneys for Receiver*
Robert Sillen

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

AND THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>   *Plaintiffs*,<br><br>   v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>   *Defendants*. | Case No. C01-1351 THE (N.D. Cal.)<br><br>**RECEIVER'S SUPPLEMENTAL REPORT RE OVERCROWDING** |
| RALPH COLEMAN, et al.,<br><br>   *Plaintiffs*,<br><br>   v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>   *Defendants*. | Case No. CIV S-90-0520 LKK JFM P (E.D. Cal.) |

Receiver Robert Sillen submits this Supplemental Report Re Overcrowding, and accompanying Declaration of John Hagar, in response to this Court's Orders, dated February 15, 2007 and June 6, 2007.

**A.   Summary Of Key Features Of The Receiver's Report Re Overcrowding.**

In his original Overcrowding Report, filed herein on May 14, 2007, the Receiver set forth in detail a history of the overcrowding crisis in California's prisons; described the manner in which overcrowding exacerbated the failings in the prison health care delivery system; and then discussed how overcrowding – and the State's inadequate and inconsistent responses to that

1

overcrowding – are currently interfering with the Receiver's mission to bring the medical care delivery system up to constitutional standards.

In particular, the Receiver identified five "Crowding Related Obstacles" that were and are interfering substantively with his efforts to bring the prison health care system up to constitutional standards in a timely fashion.

1) Overcrowding is interfering with the Receiver's ability to recruit, hire and retain competent medical personnel. The overwhelming number of prisoners needing care at the prisons, existing staffing shortages and inadequate clinical space are just a few of the consequences of overcrowding that make developing a competent medical staff a daunting challenge.

2) For many of these same reasons, overcrowding will make hiring competent managerial and executive staff more difficult.

3) One of the consequences of overcrowding has been extraordinary movement of prisoners between and among the prisons. A downstream effect of this movement is the need for many more correctional and clinical staff to manage reception center and inter-prison transportation procedures insofar as they relate to health care. That staff is currently lacking and, as a result, the rapidity of movement between prisons is continuing to create chaos in the health care system.

4) There is a dire need for additional clinical space and medical beds in the prisons because the existing capacity has been swamped by the number of inmates in the system. Until additional and adequate clinical space is constructed to accommodate the real needs of the prison population, the Receiver's work will be made significantly more difficult.

5) The overcrowding crisis has also interfered with the Receiver's ability to provide medical support services. Large numbers of prisoners needing care in outlying and remote areas often mean that CDCR must contract out for services that can, and should, be provided internally. Looking outside the prisons is in turn stressing local community health care systems. Similarly, overcrowding means inadequate space for

2

programs such as telemedicine that, if properly used, could result in better care at less cost.

The Receiver also emphasized in his Report that overcrowding creates "procedural" obstacles to the work he and his staff are undertaking. He highlighted six areas to illustrate how the day-to-day work of the Receivership is hampered as a result of overcrowding.

1) The State has responded to overcrowding by attempting to transfer prisoners out of state. The Receiver has endeavored to cooperate with this process. But, because of litigation, the passage of AB 900 and other factors, the transfers have started, and stopped, and started again, resulting in inefficiencies and frustration.

2) The State has responded to overcrowding by so-called "mission changes" and "yard flips" which result in large numbers of prisoners and different classes of prisoners being moved between prisons. Staff resources that the Receiver could allocate elsewhere are being consumed by the need to monitor and respond to mission changes and yard flips.

3) Overcrowding has resulted in increasing numbers of prisoner disturbances and "lockdowns" by prison authorities in response. Because of the heightened security measures associated with lockdowns, medical care to the inmates is delayed and made substantially more time-consuming and cumbersome.

4) The risk of communicable disease outbreaks in the prisons, as well as their transference to local communities is increased substantially by overcrowding and the attendant rapid movement of prisoners between prisons. The Receiver must devote significant staff resources to protecting against the possibility of disease outbreaks in such circumstances.

5) The extent of overcrowding in the prisons means that the entire health care system – medical, dental and mental health – is increasingly burdened. Because of staffing shortages and the overwhelming number of prisoners needing care, prison staff often must decide with which set of class action remedial orders they will comply at the expense of others. That creates inevitable crises and tensions all their own that must

require Receivership resources to address.

6) Related to the foregoing, the inadequacies in the health care system have resulted in tension and competition between the various providers over resources, space, beds and the like. Although the Receiver, special master in *Coleman* and court representatives in *Perez* and *Armstrong* are meeting regularly in an effort to coordinate their respective functions, overcrowding creates additional burdens on an already stressed system.

The Receiver concluded his Report by recommending that the Court enter three specific orders: (1) require the CDCR to file a report in 15 days, with supporting documentation and a brief executive summary, setting forth the CDCR's plan with respect to the "infill" project, particularly as it relates to the construction of additional clinical and non-clinical space; (2) issue an Order to Show Cause why the Receiver should not assume direct oversight of the correctional officer recruitment and hiring program and require the CDCR to respond in 15 days; and, (3) require the Governor to create a Plan of Action to address the serious correctional problems endemic to the CDCR.

**B. Recent Developments Further Illustrate The Substantive And Procedural Burdens On The Receivership Caused By Overcrowding.**

The consequences of severe overcrowding in the prisons, including specifically the CDCR's disorganized response to overcrowding, have continued to divert the Receiver's resources from his primary task of building a constitutionally adequate health care system. As a result, the Receiver concluded that he should bring to the Court's attention additional information that has arisen since the filing of the Receiver's Report and that further illustrates the impact of overcrowding on his remedial plans. That information is set forth in detail in the Declaration of John Hagar ("Hagar Decl."), filed herewith, and is summarized below.

**1. The "Mission Change" at California Rehabilitation Center ("CRC") Norco To An All Male Level II Prison.**

CRC consists primarily of wooden barracks and support buildings constructed prior to World War II. Until recently, CRC provided rehabilitation services to male and female drug

offenders. In April, 2007, the CDCR announced that CRC would transfer its female population and, thereafter, would house only male offenders. *See* Exh. 1 to Hagar Decl.[1] According to CDCR, more than 600 female prisoners will be removed from CRC by June 28, 2008. An unspecified number will be sent to Community Correctional Facilities ("CCFs") and the remainder will be placed into "ugly beds" (day room floors, hallways, and gyms) at the California Institute for Women ("CIW"), California Central Women Facility ("CCWF"), and Valley State Prison for Women ("VSPW").

Although the CDCR planned these transfers as early as February 2007 and understood that the Receiver's approval and support would be required before the transfers could be accomplished (Exh. 2), the Receiver was not given sufficient notice of the contemplated changes to permit him to provide substantive input on the impact that the changes would have on the delivery of health care. In fact, specific information about the conversion was first provided to the Receiver's staff at a meeting on May 24, 2007. By that time, the movement of hundreds of female prisoners from CRC had already begun.

The conversion could have adverse impacts on the delivery of health care at CRC. The clinical space at CRC is already woefully inadequate and structurally unsound. For example, a new digital x-ray machine purchased by CDCR cannot be installed due to the fact that the flooring at CRC cannot bear its weight. Any additional medical demands at the facility as a result of the influx of Level II inmates may swamp an already stressed health care delivery system. Despite the significant changes contemplated at CRC, CDCR officials have indicated that no provision has been, or will be, made to improve or increase clinical areas at CRC.[2]

Nor have the Receiver and his staff had adequate time to evaluate the impact on health

---

[1] Unless otherwise indicated, all Exhibit references are to the exhibits attached to Mr. Hagar's declaration.

[2] The Receiver's staff managed to head off a disaster in the making as a result of the conversion at CRC. Several years ago, CRC was approved for a dormitory replacement project. The plans called for the construction of new 200-bed dormitories, each of which was to replace two older wooden dormitories. The first of the new dormitories is scheduled to be operational in September 2007, the second in March 2008. However, at the meeting on May 24, CDCR officials suggested that the 200-bed dormitories might be "*additional*" beds and *not* replacement beds. Using the new dormitories as additional beds would have meant that CRC exceeded AB 900 projections and would have meant 400 new prisoners within a very short time. The health care delivery system at the prison could not withstand such an onslaught. The Receiver's staff raised this urgent issue with State officials and, fortunately, on June 6, 2007 CDCR officials informed the Receiver that the new dorms at CRC will be replacement beds only and not addition housing.

care delivery at the receiving prisons as a result of the mass transfers of women prisoners from CRC. Undoubtedly, the changes will have significant, negative consequences at the receiving prisons. For example, VSPW is already at a crisis stage insofar as efforts to provide medical care are concerned. An influx of new prisoners because of the conversion at CRC may well cause the medical delivery system at VSPW to collapse entirely. As Dwight Winslow, Statewide Medical Director at DCHCS wrote in an e-mail to the Receiver, dated May 24, 2007:

> ... I got a call form [sic] Dawn Martin at VSPW this am and they are being overwhelmed with the influx of inmates and custody has closed down some of the off site transportation which is now causing a delay in care. She stated that they were at 200% of capacity and that there were inmates on the floors. She does not know how she is going to deliver care to these inmates.

Exh. 3.

The conversion at CRC will also result in potentially negative impacts on the delivery of mental health care in the receiving prisons. CRC is currently approved to house 299 CCCMS female mental health inmates. These CCCMS patients already have been, or soon will be, transferred to CIW, CCWF, or VSPW. However, each of these receiving prisons is already overcrowded with CCCMS patients. As of May 25, 2007, for example, (i) CCWF was operating at 132% of its CCCMS capacity, its Reception Center was operating at 145% of its CCCMS capacity, and its Administrative Segregation Unit housed 24 CCCMS patients; (ii) CIW was operating at 101% of its CCCMS capacity, its Reception Center was operating at 75% of its capacity and its Administrative Segregation Unit housed 89 CCCMS; and, (iii) VSPW was operating at 154% of its CCCMS capacity, its Reception Center was operating at 129% of its CCCMS capacity, its Administrative Segregation Unit held 15 CCCMS inmates and its Security Housing Unit housed another 32. *See* Exh. 4. In light of the existing overcrowding at these facilities, the influx of still more prisoners to these facilities may strain the system to the breaking point.

2. **Conversion Of The Sierra Conservation Center ("SCC") Level III facility To A Level III Sensitive Needs Yard ("SNY").**

On May 2, 2007, CDCR proposed that SCC be converted from a General Population Level III prison to a Level III SNY. Apparently, the reason for this mission change is the backlog

of Level III SNY inmates in reception centers and Administrative Segregation Units.

The Level III facility at SCC is known as "Tuolumne." As of May 16, 2007, it housed 1,192 inmates. Because its design capacity is only 500 inmates, as of May 16, it was at 238.4% of capacity and thus very seriously overcrowded. There were 49 CCCMS inmates housed in the Administrative Segregation Unit in the Tuolumne facility, as well as an unknown number of general population CCCMS inmates. The tentative start date to begin moving inmates from SCC is June 25, 2007. *See* Exh. 5, p. 5.

The conversion at SCC will require the movement of more than one thousand inmates from SCC and the arrival of more than one thousand inmates into SCC. Each of these 2,000 inmate movements will require Nursing Services to conduct an inmate evaluation or screening. The burden on the health care delivery system will, therefore, be extreme.

It is also important to underscore that the mission changes contemplated at SCC (and elsewhere) have real-life consequences for the affected inmates. The Receiver has received an outpouring of letters from inmates who believe that they have benefited greatly from the rehabilitation programs at SCC and who are now fearful that they will be sent to facilities that lack the same kind and quality of programming. *See* Exh. 12.

### 3. Problems With the Delivery of Medical Care in CCFs.

Both AB 900 and the CRC conversion contemplate the placement of additional prisoners into community beds. In anticipation of these changes, the Office of the Receiver has undertaken to investigate the adequacy of medical care at CCFs and has found serious problems.

For example, after receiving telephone complaints about conditions at the McFarland Community Correctional Facility ("MCCF"), the Receiver ordered an unannounced inspection by a team of nurses and a physician. The report from that visit, prepared by Director of Nursing Operations Jackie Clark, raises a number of serious questions about not only patient care, but also fundamental questions of responsibility, authority, policy, and monitoring. See Exh. 6 to Hagar Decl. Just a few of her observations and conclusions are set forth below:

> 1.   . . . There are no on-site clinical staff to identify and respond to emergency medical issues from 8:00 p.m. to 8:00 a.m. seven days a week.

* * *

> 4. There is no physician backup or oversight for the [nurse practitioner]. This factor and the clinical competency issues of the NP has [sic] resulted in the mismanagement of inmates medical problems.
>
> 5. Record keeping by [the private prison operator] staff is incomplete. There is no tracking system in place to track and follow[] chronic patients. There is no tracking system in place that tracks the inmates being sent out for medical (routine or emergent).
>
> 6. The arrangement with [North Kern State Prison] for emergency transfer of patients after hours is not adequate. There have been unnecessary and dangerous delays concerning the transfer of inmates who required urgent medical care.

Exh. 6, pp. 3-4.

The problems at MCCF are not unique. For example, in April 2007, the Facility Director of the Claremont Custody Center ("CCC") wrote a five-page, single spaced letter to Terry Dickinson, Correctional Administrator-Support Services at CDCR, to voice detailed concerns regarding various medical issues, including: (i) managing an influenza outbreak that spread from inmates to staff; (ii) the "10 inmates per week" limit on referring CCC patients to CDCR for medical or dental needs, regardless of the population at CCC or the seriousness of the medical or dental problem; (iii) the denial of funding to hire needed registered nurses; (iv) the expensive practice of sending CCC inmates to local hospitals via ambulance instead of transferring prisoners to Pleasant Valley State Prison ("PVSP"); (v) the waste of taxpayer funds concerning delayed officer transports; and (vi) the overall scope of practice necessary to deliver adequate care to CCC prisoners. *See generally* Exh. 7. Indeed, the available evidence indicates that these and other problems in the medical delivery system within the CCC system are of longstanding.[3]

Mr. Dickinson's one-and-a-half page response to the CCC Facility Director's letter is worthy of lengthy quotation for what it reveals about the bureaucracy and inaction characteristic of the CDCR medical delivery system.[4] He writes:

> This is in response to your letter to me dated April 10, 2007, in which you express concerns for medical needs for inmates and staff and request additional Registered Nurses at the Claremont Custody Center (CCC).

---

[3] *See, e.g.,* Exh. 9 (E-mail from Assoc. Warden in Nov. 2006, stating that CCC "is no where close to being in compliance with *Plata* guidelines or timeframes.") *See also* Exhs. 10 and 11.
[4] The Receiver is not criticizing Mr. Dickinson. Instead, the Receiver focuses on the response because it provides a window into the CDCR/State's "trained incapacity."

> .... As you know, the CCC and all other Community Correctional Facilities (CCF) have limited capabilities regarding medical and dental treatment for inmates.... When it is determined ... that an inmate medical problem exists that cannot be managed in a CCF, the contractor is required to contact the HCM/CMO or Medical Officer of the Day (MOD) at PVSP for direction. The HCM/CMO/MOD will decide the course of medical treatment for the inmate.... The Community Correctional Facilities Administration (CCFA) cannot determine or authorize the medical/dental treatment of inmates at CCC or any other CCF...
>
> The CCFA has submitted the past two years a Budget Concept Statement (BCS) requesting the Department require 24-hour, Registered Nurse (RN) coverage at each CCF/MCCF.... Unfortunately, we have not received funding authority for RN positions.
>
> It is recommended that you directly contact [the HCM or CMO] at PVSP to express your concerns for TB testing, Influenza vaccinations and inmate medical treatment for inmates at CCC. If we receive further information on converting your LVN's to RN's 24 hours a day, we will let you know.... Thank you for bringing up your concerns and feel free to contact me if you have any questions...

Exh. 8.

The net outcome of this perfectly bland response is that absolutely nothing changes – requests for staffing, improved transportation, improved communication, etc. are at best referred elsewhere and, at worst, ignored altogether. It is also worth noting that none of the documentation reflecting the longstanding problems in the CCFs has been shared with the Receiver's Office by CDCR. It is quite possible that the private contractors providing services to the CCFs have never even been notified by CDCR that their medical functions were put into receivership more than one year ago.

After an initial review, the Receiver has concluded that significant changes will be needed to bring the delivery of medical care at CCFs up to constitutional standards. Accomplishing this objective will require very basic and far reaching structural changes with respect to how CCFA manages medical problems. At this point, until basic health care services are provided in CCFs, the establishment of yet more CCFs may well jeopardize the medical health of all prisoners assigned to community correctional facilities.

## CONCLUSION

As discussed above, from what the Office of the Receiver has learned about the mission changes at CRC and SCC, CDCR's efforts to manage the overcrowding problem (i) has created hundreds of additional "ugly beds" for female prisoners; (ii) will exacerbate existing

inadequacies in the health care delivery system, while threatening to cause still others; and, (iii) until basic health care services are brought up to constitutional standards in CCFs generally, the establishment of still more CCFs in response to overcrowding may jeopardize the health of all prisoners housed in such facilities. Mission changes, yard flips, and prison-to-prison transfers, aggravated by the limited alternatives imposed by overcrowding, are now assuming a size, scope and frequency that will clearly extend the timeframes and costs of the receivership and may render adequate medical care impossible, especially for patients who require longer term chronic care.

Dated: June 11, 2007

FUTTERMAN & DUPREE, LLP

By_____/s/_____
Martin H. Dodd
Attorneys for Receiver Robert Sillen

# CERTIFICATE OF SERVICE

The undersigned hereby certifies as follows:

I am an employee of the law firm of Futterman & Dupree LLP, 160 Sansome Street, 17th Floor, San Francisco, CA 94104. I am over the age of 18 and not a party to the within action.

I am readily familiar with the business practice of Futterman & Dupree, LLP for the collection and processing of correspondence.

On June 11, 2007, I served a copy of the following document(s):

**RECEIVER'S SUPPLEMENTAL REPORT RE OVERCROWDING**

by placing true copies thereof enclosed in sealed envelopes, for collection and service pursuant to the ordinary business practice of this office in the manner and/or manners described below to each of the parties herein and addressed as follows:

___ BY HAND DELIVERY: I caused such envelope(s) to be served by hand to the address(es) designated below.

_X_ BY MAIL: I caused such envelope(s) to be deposited in the mail at my business address, addressed to the addressee(s) designated. I am readily familiar with Futterman & Dupree's practice for collection and processing of correspondence and pleadings for mailing. It is deposited with the United States Postal Service on that same day in the ordinary course of business.

___ BY OVERNIGHT COURIER SERVICE: I caused such envelope(s) to be delivered via overnight courier service to the addressee(s) designated.

___ BY FACSIMILE: I caused said document(s) to be transmitted to the telephone number(s) of the addressee(s) designated.

**NORTHERN DISTRICT SERVICE LIST:**

Andrea Lynn Hoch
Legal Affairs Secretary
Office of the Governor
Capitol Building
Sacramento, CA 95814

Robin Dezember
Director (A)
Division of Correctional
Health Care Services
CDCR
P.O. Box 942883
Sacramento, CA 94283-0001

Bruce Slavin
General Counsel
CDCR – Office of the Secretary
P.O. Box 942883
Sacramento, CA 94283-0001

Kathleen Keeshen
Legal Affairs Division
California Department of Corrections
P.O. Box 942883
Sacramento, CA 94283

FUTTERMAN & DUPREE LLP

RECEIVER'S SUPPLEMENTAL REPORT RE OVERCROWDING
C01-1351 TEH

| | |
|---|---|
| Richard J. Chivaro<br>John Chen<br>State Controller<br>300 Capitol Mall, Suite 518<br>Sacramento, CA 95814 | Molly Arnold<br>Chief Counsel, Dept. of Finance<br>State Capitol, Room 1145<br>Sacramento, CA 95814 |
| Laurie Giberson<br>Staff Counsel<br>Department of General Services<br>707 Third St., 7th Fl., Ste. 7-330<br>West Sacramento, CA 95605 | Matthew Cate<br>Inspector General<br>Office of the Inspector General<br>P.O. Box 348780<br>Sacramento, CA 95834-8780 |
| Donna Neville<br>Senior Staff Counsel<br>Bureau of State Audits<br>555 Capitol Mall, Suite 300<br>Sacramento, CA 95814 | Warren C. (Curt) Stracener<br>Paul M. Starkey<br>Labor Relations Counsel<br>Department of Personnel Administration<br>Legal Division<br>1515 "S" St., North Building, Ste. 400<br>Sacramento, CA 95814-7243 |
| Gary Robinson<br>Executive Director<br>UAPD<br>1330 Broadway Blvd., Ste. 730<br>Oakland, CA 94612 | Yvonne Walker<br>Vice President for Bargaining<br>CSEA<br>1108 "O" Street<br>Sacramento, CA 95814 |
| Pam Manwiller<br>Director of State Programs<br>AFSME<br>555 Capitol Mall, Suite 1225<br>Sacramento, CA 95814 | Richard Tatum<br>CSSO State President<br>CSSO<br>1461 Ullrey Avenue<br>Escalon, CA 95320 |
| Tim Behrens<br>President<br>Association of California State Supervisors<br>1108 "O" Street<br>Sacramento, CA 95814 | Elise Rose<br>Counsel<br>State Personnel Board<br>801 Capital Mall<br>Sacramento, CA 95814 |
| Stuart Drown<br>Executive Director<br>Little Hoover Commission<br>925 L Street, Suite 805<br>Sacramento, CA 95814 | Michael Bien<br>Rosen, Bien & Asaro<br>155 Montgomery Street, 8th Floor<br>San Francisco, CA 94104 |
| Rochelle East<br>Deputy Attorney General<br>455 Golden Gate Avenue<br>Suite 11000<br>San Francisco, CA 94102-7004 | J. Michael Keating, Jr.<br>285 Terrace Avenue<br>Riverside, RI 02915 |

California State Personnel Board
Office of the Attorney General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550

**EASTERN DISTRICT SERVICE LIST:**

California Psychiatric Association
445 S. Figueroa St., 31st Floor
Los Angeles, Ca 90071-1602

SEIU Local 1000
1808 14th Street, Building 1
P.O. Box 160005
Sacramento, CA 95816

Psychology Shield
Theodora Oringher Miller & Richman PC
2029 Century Park East, 6th Floor
Los Angeles, CA 90067

Union of American Physicians and Dentists
595 Market Street, Suite 1400
San Francisco, CA 94105

Matthew A. Lopes, Jr.
Holland & Knight LLP
One Financial Plaza, 18th Floor
Providence, RI 02903

Dated: June 11, 2007

_/s/ Lori Dotson_
Lori Dotson