
FUTTERMAN & DUPREE LLP
MARTIN H. DODD (104363)
160 Sansome Street, 17th Floor
San Francisco, California 94104
Telephone: (415) 399-3840
Facsimile: (415) 399-3838
martin@dfdlaw.com

*Attorneys for Receiver*
Robert Sillen

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

AND THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCIANO PLATA, et al., <br><br>  *Plaintiffs*, <br><br>  v. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br>  *Defendants*. | Case No. C01-1351 THE (N.D. Cal.) <br><br> **DECLARATION OF JOHN HAGAR IN SUPPORT OF RECEIVER'S SUPPLEMENTAL REPORT RE OVERCROWDING** |
| RALPH COLEMAN, et al., <br><br>  *Plaintiffs*, <br><br>  v. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br>  *Defendants*. | Case No. CIV S-90-0520 LKK JFM P (E.D. Cal.) |

I, John Hagar, declare as follows:

1. I am currently the Special Master in *Madrid v. Tilton* and have been engaged as Chief of Staff for Receiver Robert Sillen in the *Plata* case. I make this declaration in support of the Receiver's Supplemental Overcrowding Report. The facts set forth herein are based upon my own personal knowledge or upon information and belief based upon my investigation into the issues below.

2. In my capacity as Chief of Staff for the Receiver, I have general operational oversight of most of the ongoing activities of the receivership and regularly confer with the Receiver and other staff members regarding those activities to ensure that the Receiver's goals and directives are being implemented.

3. The Receiver filed his Report Re Overcrowding on or about May 15, 2007. Beginning during the week of May 21, 2007, I received briefings from members of the Receiver's staff about overcrowding-related problems that required our immediate attention and which we had not known about at the time the Overcrowding Report was filed. To address these issues, the Office of the Receiver was forced to remove staff from *Plata*-specific remedial tasks. After discussing these problems with the Receiver, the decision was made to file a supplemental overcrowding report to provide specific examples of how overcrowding, and the disorganized response of the California Department of Correction and Rehabilitation ("CDCR") to overcrowding, renders more difficult the Receiver's efforts to bring the delivery of medical services in California's prisons up to constitutional standards. On Wednesday June 6, 2007, I met with the CDCR officials responsible for the mission changes described in this declaration to verify that the information which I had gathered was completely accurate.

4. In his Report Re Overcrowding, the Receiver discussed a number of overcrowding-related problems that negatively impact the delivery of medical services. For example, in the discussion concerning the velocity and scope of prisoner movement, the Receiver commented on the serious problems that arise when the CDCR institutes "mission changes" and "yard flips" without considering the impact on the delivery of health care.

1

The Receiver also expressed concern about the impact of the CDCR's plan to implement AB 900 programs calling for a significant increase in the number of level II male prisoners, but without necessary additional staffing or appropriate clinical space to accommodate the increase. As part of that discussion, the Receiver also opined that, as planned by CDCR, the construction of "infill" beds may not in fact lead to any decrease in CDCR "ugly beds." In addition, the Receiver expressed concern about AB 900 projections for a proliferation of community re-entry facilities. As noted by the Receiver, "[g]iven the record in this case, the Receiver must assume that adding more CDCR institutions will increase the cost and the time necessary to implement the [Receiver's] Plan of Action."

5. In the course of the past several weeks, as explained below, several incidents have occurred which provide specific examples of: (a) the damaging impact of mission changes (whereby CDCR plans create situations in which the delivery of basic medical, mental health, and dental services is rendered far more difficult due to movement of significant numbers of inmates that results in sudden increases of prisoner/patients at selected institutions without necessary staffing increases); (b) the real life consequence of CDCR plans to increase level II beds for male inmates – a sizeable increase in female prisoners transferred into and assigned to "ugly beds;" and (c) serious systemic problems relating to delivery of medical care within the State's Community Correctional Facilities ("CCFs"). A summary of each incident with references to exhibits is set forth below.

<u>The Conversion of the California Rehabilitation Center ("CRC") at Norco to an All Male Level II Prison</u>

6. CRC, known as the "San Quentin of the Southern Region" among CDCR health care personnel, is composed primarily of wooden barracks and support buildings constructed prior to World War II. Until a recently announced conversion, CRC provided rehabilitation services to male and female drug offenders. In a memorandum dated April 25, 2007 (a true and correct copy of which is attached hereto as Exhibit 1), the CDCR announced that CRC would transfer its female population and, thereafter, would house

2

only male offenders. We understand that the CDCR plans to house Level II male offenders at CRC. A CDCR Weekly Beds Meeting Action Plan, dated March 28, 2007 (a true and correct copy of which is attached as Exhibit 2), indicates that the transfers of the women inmates from CRC were contemplated as early as February 2007 and an action step regarding such transfers states: "Requires Receiver's Review." However, the Receiver was not provided the opportunity for engagement concerning this process, and the details were not fully understood until a hastily arranged meeting which took place on May 24, 2007. By that time, the movement of hundreds of female prisoners from CRC had already begun.

7. According to CDCR, more than 600 female prisoners will be removed from CRC prior to June 28, 2008. An unspecified number will be sent to CCFs and the remainder will be placed into "ugly beds" (day room floors, hallways, and gyms) at the California Institute for Women ("CIW"), California Central Women Facility ("CCWF"), and Valley State Prison for Women ("VSPW"). The Receiver and his staff have not had adequate time to evaluate the impact of these mass transfers on health care delivery at the receiving prisons, but without question the impacts will both be negative and severe. For example, VSPW is already at a crisis stage insofar as efforts to provide medical care are concerned. An influx of new prisoners because of the conversion at CRC may well cause the medical delivery system at VSPW to collapse entirely. Exhibit 3 is an e-mail sent by Dwight Winslow, Statewide Medical Director at DCHCS, reporting on the overwhelming impact of the CRC transfers on the delivery of health care services at VSPW.

8. The conversion at CRC will also result in potentially negative impacts on the delivery of mental health care in the receiving prisons. CRC is currently approved to house 299 Correctional Clinical Care Management System ("CCCMS") female mental health inmates. These CCCMS patients already have been, or soon will be, transferred to CIW, CCWF, or VSPW. However, each of these receiving prisons is already overcrowded with CCCMS patients. As of May 25, 2007, for example, (i) CCWF was operating at 132% of its CCCMS capacity, its Reception Center was operating at 145% of its CCCMS capacity,

3

and its Administrative Segregation Unit housed 24 CCCMS patients; (ii) CIW was operating at 101% of its CCCMS capacity, its Reception Center was operating at 75% of its capacity and its Administrative Segregation Unit housed 89 CCCMS; and, (iii) VSPW was operating at 154% of its CCCMS capacity, its Reception Center was operating at 129% of its CCCMS capacity, its Administrative Segregation Unit held 15 CCMS inmates and its Security Housing Unit housed another 32. *See* Exhibit 4.

9. At the meeting of May 24, 2007 meeting, staff from the Receiver's Office learned that CDCR planned to increase the number of Level II inmates at CRC over and above AB 900 projections. Several years ago, CRC was approved for a dormitory *replacement* project. New 200-bed dormitories were to be constructed. Each newly-constructed dormitory was to replace two older wooden dormitories. The first of the new dormitories is scheduled to be operational in September 2007, the second in March 2008. However, at the meeting on May 24, CDCR officials suggested that the 200-bed dormitories might be "*additional*" beds and *not* replacement beds. Subsequent to May 24th I have met with State officials on two occasions to discuss this problem. On June 6, 2007, I was informed that in fact the replacement dorms will be replacements, not additional housing.

10. The clinical space at CRC is currently woefully inadequate and structurally unsound. For example, a new digital x-ray machine purchased by CDCR cannot be installed due to the fact that the flooring at CRC cannot bear its weight. Nevertheless, the Receiver's staff has been informed by CDCR officials that no addition provisions will be made to improve or increase clinical areas at CRC as a result of the conversion to a men only facility. The additional prisoners to be transferred to the facility threaten to swamp an already stressed health care delivery system at that prison.

<u>Conversion of the Sierra Conservation Center ("SCC") Level III facility to a Level III Sensitive Needs Yard ("SNY").</u>

11. On May 2, 2007, CDCR proposed that SCC be converted from a General Population Level III prison to a Level III SNY. I understand that the driving force behind this mission change is the backlog of Level III SNY inmates in reception centers and

4

DECLARATION OF JOHN HAGAR IN SUPPORT OF RECEIVER'S SUPP. OVERCROWDING REPORT
C01-1351 TEH

Administrative Segregation Units. The Level III facility at SCC, known as "Tuolumne," housed 1,192 inmates as of May 16, 2007. Its design capacity is 500 inmates; so this facility, as of May 16, was at 238.4% of capacity and thus very seriously overcrowded. There were 49 CCCMS inmates housed in the Administrative Segregation Unit, which is in the Tuolumne facility, as well as an unknown number of general population CCCMS inmates. Attached hereto as Exhibit 5 is a true and correct copy of the CDCR's May 23, 2007 Weekly Beds Meeting Action Plan. According to Exhibit 5, the tentative start date to begin moving inmates from SCC is June 25, 2007.

12. The conversion at SCC will result in the movement of more than *one thousand inmates* out of SCC and the arrival of more than *one thousand inmates* into SCC. Each of these 2,000 inmate movements will require Nursing Services to conduct an inmate evaluation or screening. The burden on the health care delivery system will, therefore, be extreme. As of this date, the Office of the Receiver is uncertain whether adequate nursing resources exist at SCC to accomplish the tasks required by this mission change.

Problems With the Delivery of Medical Care in CCFs.

13. Both AB 900 and the CRC conversion contemplate the placement of additional prisoners into community beds. Accordingly, during the past several weeks the Office of the Receiver has undertaken to investigate the adequacy of medical care at CCFs and has found serious problems.

14. For example, after receiving telephone complaints about conditions at the McFarland Community Correctional Facility ("MCCF"), the Receiver ordered an unannounced inspection by a team of nurses and a physician. The report prepared by Director of Nursing Operations Jackie Clark (a true and correct copy of which is attached hereto as Exhibit 6) raises not only serious questions about patient care, but also fundamental questions about responsibility, authority, policy, and monitoring at MCCF.

15. The problems at MCCF are not unique. Exhibit 7 hereto is a true and correct copy of a letter from the Facility Director of the Claremont Custody Center ("CCC") to Terry Dickinson, Correctional Administrator-Support Services at CDCR, expressing concern

regarding various medical issues, including: (i) managing an influenza outbreak that spread from inmates to staff; (ii) the "10 inmates per week" limit on referring CCC patients to CDCR for medical or dental needs, regardless of the population at CCC or the seriousness of the medical or dental problem; (iii) the denial of funding to hire needed registered nurses; (iv) the expensive practice of sending CCC inmates to local hospitals via ambulance instead of transferring prisoners to Pleasant Valley State Prison ("PVSP"); (v) the waste of taxpayer funds concerning delayed officer transports; and (vi) the overall scope of practice necessary to deliver adequate care to CCC prisoners. A true and correct copy of Terry Dickinson's response to Exhibit 7 is attached hereto as Exhibit 8.

16. In an e-mail, dated November 15, 2006, (attached hereto as Exhibit 9) the Associate Warden at PVSP stated that the medical care provided between CCC and PVSP "is no where close to being in compliance with *Plata* guidelines or timeframes." Evidence that the problems at CCC are longstanding and have existed for more than five years can be found in Exhibits 9, 10, and 11 hereto.

17. A clear pattern emerges from the foregoing correspondence: (i) the CCF makes a complaint to the Community Correctional Facilities Administration ("CCFA") of the CDCR's Division of Adult Institutions; (ii) a CCFA official responds, informing the CCF that a local prison is the CCF's "medical hub, and that CCFA "cannot determine or authorize the medical/dental treatment of inmates" at any CCF; (iii) the CCC is then referred to the local prison; and (iv) nothing changes – specifically, requests for staffing, improved transportation, improved communication, etc. are simply ignored.

18. After an initial review, the Receiver has concluded that significant changes will be needed to bring the delivery of medical care at CCFs up to constitutional standards. Accomplishing this objective will require very basic and far reaching structural changes with respect to how CCFA manages medical problems. At this point, until basic health care services are provided in CCFs, the establishment of yet more CCFs may well jeopardize the medical health of all prisoners assigned to community correctional facilities.

Summary.

19. From what the Office of the Receiver has learned from the CRC and SCC mission changes, in reality the CDCR's efforts to manage crowding will: (i) create hundreds of additional ugly beds for female prisoners; and, (ii) will exacerbate existing inadequacies in the health care delivery system at selected prisons, while threatening to cause additional problems at other prisons.

20. These problems are deeply rooted and systemic. The correctional officials who plan and effectuate these moves are not doing so in an effort to harm the delivery of health care. Their motives are correctional; for example, both the CRC and SCC mission changes were driven by the pressing need for additional housing for "special needs" male prisoners, inmates who may be victims if left to fend for themselves in general population. Nevertheless, mission changes, yard flips, and prison-to-prison transfers, aggravated by the limited alternatives imposed by overcrowding, is now assuming a size, scope and frequency which may render adequate medical care impossible, especially for patients who require longer term chronic care.

21. When speaking of mass moves and using terms such as "mission changes," it is easy to forget the human consequences of these moves. SCC, for example, has functioned in a low key, organized manner because it provided significant (by CDCR standards) rehabilitation programs for longer term prisoners. Within the next few weeks the prisoners assigned to the Tuolumne Unit will be scattered to a variety of other institutions, most of which have never provided the level of programming available at SCC. A sample of the letters which have been sent to the Receiver from SCC prisoners deeply concerned about the upcoming conversion is attached as Exhibit 12.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: June 11, 2007

/s/
John Hagar

I hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/s/) within this efiled document.

/s/
Martin H. Dodd
Attorneys for Receiver Robert Sillen

8

FUTTERMAN & DUPREE LLP

DECLARATION OF JOHN HAGAR IN SUPPORT OF RECEIVER'S SUPP. OVERCROWDING REPORT
C01-1351 TEH