# EXHIBIT 7

**City of Coalinga**



Claremont Custody Center
185 W. Gale Avenue
Coalinga, CA 93210

Phone (559) 935-0851
FAX    (559) 935-0951
email: ccc@coalinga.com
www.coalinga.com

April 10, 2007

Mr. Terry Dickinson, Correctional Administrator-Support Services
Community Correctional Facilities Administration
1515 S Street, Room 212-N
Sacramento, CA 95814

RE: Current Urgent Medical Needs & Issues

Dear Mr. Dickinson,

On Monday, February 26, 2007, Registered Nurse (RN) Garcia from Pleasant Valley State Prison (PVSP) informed our Nurse Tollison (LVN), here at the Claremont Custody Center (CCC), that PVSP would no longer be supplying the TB test to CCC staff. RN Garcia stated that this directive came from the Assistant Warden, Mr. Jim Maddingley.

This action creates a financial burden for CCC in that this is not covered within our facility contract with the California Department of Corrections & Rehabilitation (CDCR). Since this facility opened in 1990, CDCR has been supplying TB testing to the CCC staff. At first, Avenal State Prison, our first HUB, supplied the test and then PVSP, our following and current HUB, has continued to supply the testing until now.

Because the Claremont Custody Center (CCC) is not a medical treatment center, CDCR must realize that our facility does not have the authority, let alone the funding, to purchase the necessary testing supplies required.

Recently, our facility experienced an influenza outbreak. Back in September, 2006, Claremont Custody Center was informed by PVSP that it was not the State's responsibility to vaccinate the inmates housed here. As a result, CCC experienced a large outbreak of the influenza virus, which included not only inmates, but staff as well. At the time of the outbreak, it was a concern to not only PVSP, but also to the Public Health Department. This outbreak became such a concern that PVSP authorized the influenza vaccination for CCC staff.

It is my understanding that TB testing of staff is a mandatory requirement and it has been a well-known past practice to rely on CDCR for the TB testing. My research assistant, Ms. Edwards, conducted thorough interviews with all public Community Correctional Facilities (CCF's). It seems that the practice is to for the HUB facilities to send out enough TB supplies to test the inmates and the CCF staff. As such, I fail to understand why PVSP denies the TB testing supplies to Claremont Custody Center for staff.

Due to this recent directive, CCC must request from the Community Correctional Facility Administration (CCFA) funding to provide the testing for the Claremont Custody Center staff or request that CCFA intervene and instruct PVSP to provide the TB testing supplies for the staff to the Claremont Custody Center. Our facility Nurse will administer the testing.

It is a common practice for CDCR to send the Claremont Custody Center (CCC) inmates that require TB medication. As such, I believe that the potential for a person to contract TB is high. Therefore, by denying the TB testing to CCC staff, CDCR would be exposing the public to another potential health hazard—and of course they will also be exposing inmates, CCC staff and other staff, in addition to CDCR staff that work at Claremont Custody Center. Because TB is considered to be a public health concern of great importance, one would think that CDCR and CCFA would do everything they could to aid in the prevention of its spread.

If PVSP had wanted to discontinue the TB testing for CCC staff, the proper and ethical course of action would have been to notify CCC in plenty of time to allow the City of Coalinga to find other options and resources. Instead, PVSP has just arbitrarily stopped supplying the TB testing. As a direct result of this action by PVSP, CCC is unable to comply with CDCR mandatory testing at this time.

Once again, I must stress that TB testing for staff is not funded in the current contract between the State and the Claremont Custody Center. Therefore, any suggestions you might have on how the Claremont Custody Center and the City of Coalinga can obtain the funding and TB supplies needed would be greatly appreciated.

Sadly, this current action by PVSP staff seems to be reflective of a potential animosity felt toward CCC staff. Even more regrettable is the treatment shown by PVSP Medical staff toward their own inmates. Previously, when CCC was contracted to house 391 inmates, our facility was only allowed to send a maximum of 10 inmates per week to PVSP for medical and dental problems.

Claremont Custody Center Medical employees and staff are forced to watch in silence as PVSP Medical denied medical attention to other additional inmates. Often only the sickest were able to be sent to PVSP Medical for care. Oftentimes, inmates with toothaches were forced to wait with swollen gums and/or intense pain for numerous weeks before receiving adequate medical care, including antibiotics. Now that our inmate population has been increased to 491, Claremont Custody Center is unfortunately still only allowed to send a maximum of 10 inmates per week to PVSP for medical or dental treatment.

This sort of inmate treatment is unfair and cruel. CDCR and CCFA have not updated nor authorized the Community Correctional Facilities to receive necessary funding in order to meet court mandates, such as retaining a Registered Nurse to care for the inmates. However, it is my understanding that the State did allocate funding for our public CCF's for this purpose, but CCFA has kept quiet about that funding. This action does not relieve CCFA of its responsibility to the CCF's simply because they believe that if we do not ask then they do not have to give. Instead, the action only increases CCFA liability to the inmates and the State. Claremont Custody Center (CCC) is still working off of the 1990 contract which only funds a Licensed Vocational Nurse. As a direct result, CCC Medical staff cannot even give an aspirin to the inmates. During our recent quarantine for the influenza outbreak, this practice proved to be an unethical and unsafe practice. Inmates were laid up for days sick—running fevers, coughing, experiencing diarrhea and other flu symptoms—until CCC could convince the Public Health Department and PVSP Medical staff that the inmates housed at CCC needed immediate treatment. PVSP has been designated as the Claremont Custody Center's HUB and is therefore ultimately responsible for the medical treatment of the inmates.

Once Mr. Kohler, from the CDCR Health Division and the Public Health Department, became involved, Dr. Igbinosa, the current Chief Medical Officer (CMO) from PVSP, was kind enough to send doctors and nurses to CCC to treat the inmates. However, the inmates should not have had to wait and suffer due to the inability of CDCR and CCFA to coordinate and create a health care program beneficial to the inmates. Instead, the medical issues of the inmates are ignored. Sadly, the battle between the departments turned into an argument over funding rather than inmate health care. Medical needs of the inmates are ignored while CCFA and CDCR continue to argue over who is going to fund the salary of the Registered Nurse(s) or Physician Assistant(s) and medical transportation issues. As the Director of Claremont Custody Center and on behalf of the inmates housed at Claremont Custody Center, I can no longer wait. CCFA is taking

2

too long to resolve the medical care issues of inmates at the facility. In addition, this practice is causing the State and CCFA unnecessary costs. Quite frankly, it is a waste of taxpayer monies.

Because PVSP Medical policy is to only allow the Claremont Custody Center to send a maximum of 10 inmates per week to them for medical treatment, PVSP often orders CCC Medical staff to send the inmates with infected teeth, stomach pain and other more serious symptoms to the local hospital—Coalinga Regional Medical Center (CRMC)—for treatment. This action costs PVSP and CCC more money than it would have cost to actually fund a Registered Nurse (RN) or Physician Assistant (PA) full-time for an entire week.

In such a scenario, first the ambulance is called. Please note that currently transportation to CRMC is approximately $600.00 per inmate. Then, CCC must pay overtime for officers to ensure coverage of the necessary additional positions required to follow the ambulance to the hospital for security reasons. This cost is not provided for in the contract between the State and CCC. Then, PVSP must also send a team of their officers to relieve our officers. Of course, CDCR officers are paid at a substantially higher rate than CCC officers. Normally, PVSP teams guard each inmate until the hospital determines whether or not the inmate is ill enough to admit—usually about 4 to 6 hours. Nine times out of ten, the inmate is not admitted to the hospital and PVSP staff must then transport the inmate to PVSP to obtain medical clearance from a PVSP doctor to allow the inmate to be housed back at CCC. If clearance is given, the PVSP team then transports the inmate back to CCC. Just think how much money could be saved by either funding a RN for CCC or by transporting the inmate directly to PVSP instead.

I must also question current PVSP policy for accounting for an inmate while they are at the hospital. Even though they have sent a team of officers to relieve CCC officers and they have signed a body receipt, they will not accept the transfer CDCR-135 adding the body to their count. This concerns me because if they are in possession of the inmate body then PVSP should account for the inmate. Instead, they request that we account for the inmate body on our count, despite the fact that we do not have physical possession of the inmate. Until the inmate is actually admitted to the hospital, even though PVSP officers are already guarding the inmate, PVSP will not add them to their count. Of course this procedure varies depending on the Watch Commander in charge at the time that the inmate needs medical care. Acting Captain R. Tuman, our Correctional Counselor II (CCII), is currently working to resolve this issue.

In other cases, PVSP Medical will direct the Central Transportation Unit (CTU) to pick up the inmate and transport them to the local hospital or PVSP. The CTU is located at North Kern and it generally takes between 4 to 5 hours for them to arrive. Of course once CTU arrives they must stay with the inmate until PVSP or CRMC admits the inmate or returns them to CCC. The CTU ultimately spends approximately 12 to 16 hours on the situations, between travel time and waiting time. The cost for the salaries alone for two transportation officers to and from North Kern would fund the salary of an RN for a week.

Most of the time, Claremont Custody Center (CCC) inmates require only minor medical care. These simple issues could be effectively solved by having a RN onsite at CCC, along with an on-call doctor at PVSP. The majority of these types of emergencies are abscessed teeth, needing inhalers for asthma, stomach aches, and those who generally are faking symptoms in an attempt to just try to get attention. In nine out of ten cases, an RN could have taken the inmate's vitals and symptoms, reported to the CDCR on-call doctor, issued antibiotics, inhalers, or Maalox—or even determined that the inmate was not in need of medical care. Instead, the inmates suffer physically and mentally by having to wait, sometimes days, to be treated. In the one case where the inmate is really in need of emergency medical attention, they might not receive the necessary treatment they because CCC does not have proper medical staff to diagnose and issue medication.

On various different occasions CCC has attempted to address the lack of medical care for inmates at the facility. On January 16, 2002, the then-current Director Mr. Larson wrote a letter to Pamela Prudhomme at CCFA, addressing the inmate medical issues. Director Larson addressed the unreasonable length of time it takes for Central Transportation to respond and transfer inmates for receipt of medical care. Due to a lack of State funding, the inmate medical issues were pushed aside. In June, 2006, I myself

3

addressed the issue of inadequate care provided by PVSP Medical to inmates housed at CCC. Then in August, 2006, I addressed the issue of PVSP Medical not allowing enough PVSP Medical transports to send all inmates in need of medical care. I also asked if CCC inmates would be screened for dental problems, as agreed in the court decision of *Perez vs. Schwarzenegger*, as it seemed like a logical course of action. However, I was informed that CCC inmates were screened by the receiving center. Unfortunately, that did little to assist the 421 inmates already housed at the Claremont Custody Center at that time.

On October 17, 2006, PVSP Medical employees Maureen Mahoney, Lieutenant W. Myers, and Doctor Hernon conducted an inspection of the CCC Medical Department. All agreed that the Claremont Custody Center Medical department does not meet legal standards. Ronald Hansen, former Associate Warden, suggested to his staff that they staff CCC with Registered Nurses. However, due to arguments regarding funding between CCFA and CDCR, nothing has been done.

The Claremont Custody Center and the City of Coalinga cannot provide funding to update the CCC Medical Department unless CDCR or CCFA allocates the funding. Already, CDCR owes the City of Coalinga over two million dollars in unpaid ambulance bills and Claremont Custody Center has incurred in excess of over one million dollars in loss due to CDCR's refusal to update the current contract, which has been in place since 1991.

Another issue that is driving up the cost of the inmate medical care at CCC is failure of reception centers to properly screen inmates before sending them to Claremont Custody Center. Most of the time when inmates arrive at Claremont Custody Center, before the transportation team departs, the facility nurse has already reviewed and accepted or rejected the inmates based on their medical history. Lately, we have been receiving inmates that are not medically approved to be at any CCF. When the nurse reviews the inmate files she is finding criteria such as inmates who are on psychotropic drugs (or have just recently stop taking them), inmates who have seizures, inmates in need of insulin shots, inmates with inappropriate dental classes, and a variety of other mental and medical issues that preclude them from being housed at any CCF. Yet, even on the most obvious cases, I am told that the transportation team cannot take the inmates back. I am told that CCC has to accept the inmate(s) until other arrangements can be made by CDCR on-site staff. This is not acceptable. This practice endangers the inmates, the staff, the general inmate population, the CDCR staff and it disrupts facility operations.

There is no logical reason why the inmates could not return with the transportation team and be transported to PVSP. PVSP is only six miles away and they have adequate medical staff, who are equipped to deal with the inmate medical needs until the medical status and housing needs of the inmate(s) can be reevaluated. Unfortunately, it is my understanding that once again, political and funding issues prevent simple solutions and increase costs. Once the inmates have be inappropriately classified for CCC intake, they have to be retained at CCC until our Facility Captain can make arrangements with the transportation unit to have the inmates transferred back to the facility they came from. This practice is a waste of State funding and taxpayer dollars.

Surely CDCR has adequate training to assist CDCR staff in understanding what the medical criteria is for housing inmates at CCF's. The training would be less costly than the current practices and the cost of the mistakes being made. However, it seems as though no person in CDCR can be held responsible to carry out their job duties. CDCR and CCFA have completely taken the medical care of the inmates out of the hands of the CCF's by withholding funding for adequate medical staffing and enforcing dangerous policies that prevent proper medical care for inmates. Therefore, because there is nothing I can do to correct the problem, I must now turn directly to CCFA for assistance.

As the Director of the Claremont Custody Center (CCC), I am requesting that CCFA provide additional funding to CCC for a Registered Nurse (RN) and/or Physician Assistant (PA)—also known as Family Nurse Practitioner (FNP). I will expect responding correspondence from CCFA within 30 days of the date of this letter. Please do not force me to make this a public issue by not responding or ignoring this request. Many of the requests that I have sent to CCFA have never been answered and I have no knowledge as to whether the issues are being considered or if they have just been thrown in the trash.

4

Again, I implore that you please do not ignore this issue. It is one that will not go away. Please note that I have attached the current local and state government wages for RN's and PA's.

Claremont Custody Center currently has 2.5 positions allocated for LVN's. I would prefer to have or add positions of Physician Assistant and Registered Nurses. Once CCFA decides which positions they will allow us to have, I will send a job description and a draft indicating the change in the current budgeted salaries with a Budget Change Proposal (BCP) for CCFA approval. However, until CCFA informs me of what positions they will approve I see no logical reason for completing the BCP beforehand. It has been past experience that when Claremont Custody Center and other CCF's complete the time consuming and costly process of BCP completion, we never hear the result of the BCP. As such, I am not going to waste time filling out a BCP if CCFA only intends to throw it in the trash or misplace it where it will never be found again. However, once CCFA acknowledges the problem and indicates which position(s) are available, we will complete and provide a BCP within 30 days.

If the funding has already been pre-allocated for medical staff, as stated in the job application online, then a formal State BCP should not be necessary. I believe that a cover letter with a financial page indicating changes should be adequate. However, the Claremont Custody Center shall await CCFA's instructions with regard this matter,

I do realize that this issue has created a problem for CCFA staff. I am aware of the extra time and effort that they will have to expend and I am truly sorry. However, it would be neglectful of me as a Facility Director to ignore the medical needs of inmates. Simple humanity dictates taking action in this unfortunate situation.

Should you have any questions or require any further information, please feel free to contact me at (559) 935-0851, extension 203, or via cellular telephone at (559) 942-6237. Thank you for your immediate attention to this matter. I greatly appreciate it and look forward to hearing from you soon.

Yours truly,

*June Robinson*

Ms. June Robinson
Facility Director

JR/de

Attachments:   Copy of 11/15/06 e-mail: "Medical: Claremont Custody Center Follow-up to site visit"
Copy of Memo to N. Comaites dated August 4, 2006
Copy of State Memo to C. Krupp from N. Comaites dated June 6, 2006
Copy of Memo to N. Comaites dated June 1, 2006
Copy of State Memo to Carl Larson from Pamela Prudhomme dated February 25, 2002
Copy of 2-page Memo to Pamela Prudhomme dated January 16, 2002

cc:   Ms. Joyce Hayhoe, Assistant Secretary—Office of Legislative Affairs
Mr. Stephen Julian, City Manager—City of Coalinga
Ms. Pamela A. Prudhomme, Chief—CCFA
Ms. Geri Garcia, Associate Governmental Program Analyst—CCFA
Mr. Russ Tuman, CCI / (A) Facility Captain
Dr. Igbinosa, CMO PVSO

5

California LaborMarketInfo, Data Library                                       Page 1 of 1

