**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

RALPH COLEMAN, et al.

    Plaintiffs,

      vs.                  No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.

    Defendants

**SEVENTEENTH MONITORING REPORT OF THE SPECIAL MASTER**
**ON THE DEFENDANTS' COMPLIANCE WITH**
**PROVISIONALLY APPROVED**
**PLANS, POLICIES AND PROTOCOLS**

**PART C**

J. Michael Keating, Jr., Esq.
Special Master
2351 Sussex Drive
Fernandina Beach, FL 32034
(904) 491-7157
Fax: (904) 491-7158
June 11, 2007

# TABLE OF CONTENTS

## INSTITUTIONAL SUMMARIES

California Correctional Center (CCC)......................................................................4

California Correctional Institution (CCI) ..............................................................9

California Institution for Men (CIM) .....................................................................19

California Institution for Women (CIW)................................................................35

California Rehabilitation Center (CRC) ................................................................45

California State Prison, (CSP/Corcoran) ..............................................................50

Calipatria State Prison (CAL)................................................................................61

Centinela State Prison (CEN) ................................................................................67

Central California Women's Facility (CCWF) ......................................................75

Chuckawalla Valley State Prison (CVSP).............................................................84

Deuel Vocational Institution (DVI) .......................................................................89

Folsom State Prison (Folsom) .............................................................................104

Ironwood State Prison (ISP)................................................................................110

Kern Valley State Prison (KVSP) ........................................................................112

North Kern State Prison (NKSP)..........................................................................122

Pelican Bay State Prison (PBSP).........................................................................135

Valley State Prison for Women (VSPW) ..............................................................141

Wasco State Prison (WSP) ...................................................................................150

**SUMMARY** ........................................................................................................161

**RECOMMENDATIONS** ...........................................................................................181

**EXHIBITS**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    Plaintiffs,

      vs.                       No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

## SEVENTEENTH MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS

## PART C

This report provides the third installment of the 17th round review of the California Department of Corrections and Rehabilitation's (CDCR's) compliance with the plans, policies and protocols provisionally approved by the court in mid-1997. While the court formally approved the bulk of the revised Program Guide containing enhanced standards for mental health care applicable in all CDCR institutions in March 2006 and the defendants published their plan for the adoption of the new guidelines in April, much of the summer was consumed in a struggle to obtain sufficient additional mental health staffing to implement them effectively. That effort succeeded during the special legislative session at summer's end, but the 551 additionally allocated permanent and temporary mental health positions took months to appear at the institutional level, and the recruitment of clinicians to fill them still proceeds extremely slowly.

1

Part C focuses on the 18 CDCR institutions not covered in Parts A and B of the 17th round report and addresses four different categories of institutions. The first category, women's institutions, includes California Institution for Women (CIW), Central California Women's Facility (CCWF) and Valley State Prison for Women (VSPW). The second category includes four institutions whose principal function is the reception and processing of inmates newly arriving in CDCR or returning to the department on charges involving parole violation(s), namely, California Institution for Men (CIM), Deuel Vocational Institution (DVI), North Kern State Prison (NKSP) and Wasco State Prison (WSP).

The third category contains the only three institutions in CDCR with Security Housing Units (SHUs), including California Correctional Institution (CCI), California State Prison, Corcoran (CSP/Corcoran) and Pelican Bay State Prison (PBSP). The last and largest category contains eight institutions, all characterized by relatively few mental health programs and small Mental Health Services Delivery System (MHSDS) caseloads. This group includes five desert facilities, where caseload inmates are not supposed to be sent because of the deleterious impact of high heat on individuals on many prescribed psychotropic medications. The desert institutions include California Correctional Center (CCC), Calipatria State Prison (CAL), Centinela State Prison (CEN), Chuckawalla Valley State Prison (CVSP) and Ironwood State Prison (ISP). Three other institutions in this category are California Rehabilitation Center (CRC), which has a small co-ed population and no administrative segregation unit; Folsom, which lacks an Outpatient Housing Unit and sends its inmates in crisis next door to California State Prison, Sacramento (CSP/Sac); and Kern Valley State Prison (KVSP), which opened in

2

2005 and has developed only slowly its mental health staffing and programming, opening its MHCB unit, for example, only on the eve of the monitor's mid-2006 visit.

In contrast with the institutions represented in the first two installments, which each covered fairly similar mental health programs and populations, the eighteen institutions whose compliance is reviewed in this report include collectively the whole array of components of CDCR's mental health services delivery system. Every aspect of mental health treatment is represented among these institutions, from the Correctional Clinical Case Management System (3CMS) to Enhanced Outpatient Programs (EOPs) and Mental Health Crisis Bed (MHCB) units, as well as access to Department of Mental Health (DMH) acute and intermediate inpatient programs and the delivery of mental health programming in Outpatient Housing Units (OHUs), administrative segregation, Security Housing Units (SHUs) and Psychiatric Services Units (PSUs).

The general format for this report repeats the one adapted in the first two installments. An institutional summary of compliance for each covered CDCR institution is provided, including a description of current staffing and staffing vacancies; a list of resolved Corrective Action Plan (CAP) problems when appropriate; discussion of the institution's progress, or lack of progress, in meeting requirements related to quality management, medication management, mental health input into the disciplinary process and transfers to more intensive levels of mental health care; identification of as yet unresolved problems cited in the institution's CAP and targeted for elimination; and a brief summary of the institution's overall performance during the monitoring period. A comparative analysis of compliance among all 18 covered facilities follows, along with recommendations gleaned from the analysis.

3

As in the past, administrators and mental health staff at the visited institutions cooperated fully with the monitoring process. Also, while the data collected and findings discussed in this report are the product of many members of different monitoring teams, references to various monitors throughout this report will be singular rather than plural. Clinical judgments of the monitor's psychiatric experts are explicitly attributed to an expert.

### California Correctional Center (CCC)
Paper Review

CCC's long-vacant sole psychiatry position was covered adequately by an estimated one to three hours of telemedicine per month. One of two allocated psychology positions was vacant. It was covered by contractual staff for just six weeks. The three psych tech positions and a clerical position were filled long-term. Medical technical assistant (MTA) functional vacancies were reduced to 25 percent by contractual coverage. Two of four positions in the pharmacy were vacant but covered by contractors. Only two caseload inmates, both treated at the correctional clinical case manager system (3CMS) level of care and housed in general population, were at CCC.

Quality Management:

Quality management was slightly more consistent than during previous monitoring periods. The local governing body was comprised of two administrators who met nearly every month. The quality management committee met monthly and its members spanned health care disciplines. The warden was the only custody member of the quality management committee. There was no mental health subcommittee. Documents showed that four quality improvement teams (QITs) were active during the monitoring period. None concerned or impacted mental health services. There were too

few mental health clinicians to have peer review. Suicide prevention committee meetings occurred approximately monthly and had interdisciplinary membership. Agendas included suicide prevention information and the status of caseload inmates at CCC.

Medication Management:

Medication continuity was typically good, but there may have been a problem with timely renewal of medication orders. A nursing audit found full compliance on general medications being renewed timely and delivered within a day of the order during one quarter, but at only a 70 percent rate during the second quarter. Mental health staff reported that they reliably received information from bus screenings about the small number of inmates who arrived on psychotropics. They hand-carried the necessary paperwork (through ordering and filling). Staff previously described a reasonable procedure designed to sustain medication continuity when inmates' housing changed, but the audit results may not have been sufficiently reliable.

Typically, mental health staff was informed of an inmate's first-time medication non-compliance. Nursing audits found only one inmate who met the non-compliance criteria and he reportedly was seen timely. A psychologist reportedly participated in telemedicine appointments, obtained informed consent and hand-carried medication orders through the process. Staff reported that all psychotropics were ordered direct observation therapy (DOT). Nursing staff reported no difficulty with proper administration of the small number of DOT orders. HS orders were permitted by policy but rarely needed.

Staff previously described a reasonable procedure to provide a supply of medication upon parole. Audits indicated that it worked. No mental health services delivery system (MHSDS) inmates had been paroled from CCC since 2003.

Mental Health Assessments for the Disciplinary Process:

Among the 1,800 rule violation reports (RVRs) written during the monitoring period, only one was written for an MHSDS inmate, and he received a mental health assessment. Two non-caseload inmates were referred for mental health assessments because of self-injury or bizarre behavior. The mental health assessments provided useful information without excessive use of jargon. Hearing officers documented how the results of mental health assessments contributed to the decisions made in each case. In one case the penalty was mitigated due to mental health factors. Documents did not include any RVRs issued for masturbation or indecent exposure (IEX).

Transfers:

CCC did not refer to the department of mental health (DMH). Three inmates were sent to a mental health crisis bed (MHCB). All were housed in the outpatient housing unit (OHU) less than 72 hours and transferred within 24 hours of referral. In total, 11 inmates were placed in the OHU for mental health reasons. OHU stays were shorter than during the previous monitoring period. Nine inmates were discharged timely; two remained in the OHU longer than 72 hours. One stayed for five days and the second, an unstable enhanced outpatient program (EOP) inmate, lived in the OHU for 17 days. Staff reported that suicide risk assessments were done in the OHU and inmates who returned from MHCBs were seen for five-day follow-up. Documentation

6

was unavailable in three cases because the inmates were transferred. Because of the low number of admissions and rapid transfers, holding cells were not used.

Fewer MHSDS inmates were at CCC than in the past. During the monitoring period, only 14 inmates were designated 3CMS at CCC and six caseload inmates were inappropriately transferred to CCC while already on caseload. Transfers continued to be timely. On average, transfer cases were endorsed in 13 days, with the longest taking 35 days. Transfers were completed, on average, in 25 days, with the longest taking 45 days. All of the inappropriate transfers were sent out within the required timeframe, except for one who was dispatched four days late. Only one case involved an EOP inmate. There were no lengthy stays in administrative segregation.

Other Corrective Action Plan (CAP) Issues:

There was substantial improvement in laboratory testing, CCC's sole remaining CAP item. A log documented that lab tests were ordered for all inmates who needed them. All blood draws were done in seven days or less, except for one inmate who refused repeatedly. Laboratory results were reviewed within the same timeframe. The paper review did not capture practices regarding dosage changes in response to results.

Although response to referrals was generally timely, there were significant lapses. A number of referrals made by staff were not received by mental health staff in a timely manner, including referrals triggered by bus screenings. Mental health staff saw 77 percent of referrals within seven days, and about 97 percent within two weeks. The longest response lapse stretched to eight weeks due to delayed transmission of referrals.

Documents indicated that administrative segregation rounds were done daily with the exception of seven days when rounds were not made due to staff absences. Logs showed that 89 percent of inmates placed in administrative segregation were screened within three days. The remaining screenings took up to six days and occurred when large groups of inmates were placed in administrative segregation at the same time.

A CAP related to a 2004 suicide was carried out. All but a handful of custody staff had been trained in the CPR policy. It appeared that CPR and emergency response equipment was commonly checked and available in the housing units, although documentation showed gaps, and some equipment was occasionally omitted.

Institutional Summary:

Fewer MHSDS inmates were at CCC than in the past. Only 14 inmates were designated 3CMS at CCC during the monitoring period, and six caseload inmates were inappropriately transferred to CCC while already on the caseload. All indications were that CCC maintained its previous levels of compliance and continued to make improvements. CCC did a good job of transferring caseload inmates elsewhere expeditiously and adhered to requirements for lab tests, bringing its sole remaining CAP problem into compliance. Quality management was adequate for a program of its size. A staff audit indicated that renewal of medication orders may have become problematic. Positive bus screenings did not always reach mental health staff, resulting in untoward delays in initial mental health evaluations of new arrivals. Too many screenings of inmates placed in administrative segregation were late and rounds were missed seven times.

## California Correctional Institution (CCI)
April 3, 2006 – April 4, 2006

CCI was successful at obtaining contractual staff to cover vacancy rates of 40 to 54 percent among psychiatrists and psychologists, respectively. Staff at CCI reported that CCI had one senior psychiatry position, which was vacant, and 6.5 staff psychiatry positions, 3.5 of which were vacant but covered by contractors.

Staff reported that the institution had 19.84 staff psychology positions, of which 7.84 were vacant. All but the equivalent of .34 of a psychology position was covered by interns and contractual staff. The positions of chief psychologist and two senior supervising psychology positions were filled. The sole psych social worker position was filled, as were positions for seven psych techs and 11.5 clerical staff. Staff believed that the number of mental health positions allocated was too small in light of the size of the MHSDS caseload and the demands of the institution.

CCI's census was 5,668, with 1,612 MHSDS inmates. In October 2005, CCI's MHSDS capacity was increased to 1,349 and an additional half-time psychology position was allocated. The mental health caseload was 19 percent over its capacity. The MHSDS roster included 42 EOP inmates, 13 of whom were in administrative segregation and nine of whom were in the security housing unit (SHU). There were 115 3CMS inmates in administrative segregation and 178 3CMS inmates in the SHU. The reception center census was 1,090, of which 169 were 3CMS and 12 were EOP inmates.

Issues Resolved:

Medication orders were renewed timely by psychiatrists.

Inmates in administrative segregation and the SHU were administered medication DOT.

9

Medication orders that specified evening delivery were administered in the evening.

Mental health tracking system (MHTS) contact information was considered accurate enough to be useful.

CCI transferred inmates in crisis to an MHCB.

Quality Management:

The mental health quality management committee continued to meet every two weeks. Minutes were kept. Five QITs were chartered during the monitoring period. Psychiatrists remained uninvolved in most quality management activities due to staffing shortages. Numerous CAP items were audited regularly. Audit results were informative and thoroughly documented although some sample sizes were small. Peer review remained infrequent and rudimentary.

A small sample found a 98 percent concordance rate between MHTS and unit health record (UHR) entries. Staff believed that the MHTS was accurate enough to be useful, resolving that problem.

Five-day follow-up contacts were audited monthly. Staff audits found that 94 to 97 percent of five-day follow-up visits were made, with missed contacts attributed to occasional unscheduled leave taken by staff who worked weekends.

Medication Management:

Medication management continued to improve incrementally, as evidenced by the resolution of two CAP items related to the administration of medication. Most audits of medication management were done by nursing staff. Audits were typically broad in scope rather than focused on those issues most germane to MHSDS inmates. More narrowly focused audits were done by mental health staff.

Audits showed that medication was administered DOT to inmates in administrative segregation and the SHU, resolving that CAP item. Medication orders that specified HS evening delivery were administered in the evening rather than in the afternoon, resolving that CAP item.

Mental health staff audited timely medication renewals by psychiatrists on a quarterly basis, with each quarter sampling less than ten percent of the MHSDS cases but including all yards. Based on the results of those audits, the problem of timely renewal of medication orders written by psychiatrists was resolved. Audits found that psychiatrists renewed orders prior to expiration 92 to 100 percent of the time. Bridge orders were rarely used.

Staff audited response to non-compliance with medication quarterly. Many referrals were received by mental health staff, but procedures for making and responding to referrals were not fully implemented.

Blood levels of inmates on mood stabilizers were not monitored appropriately. Lab tests associated with the use of psychotropics were not always ordered when appropriate. A February 2006 status report indicated that compliance rates ranged from 28 to 100 percent.

CCI had no local procedure regarding HS orders. Roughly five percent of the caseload had HS orders. HS medication was reportedly administered after 8:00 p.m.

Staff audits of parole medication found monthly compliance rates of 82 and 98 percent in November and December 2005, respectively. Mental health staff saw nearly every caseload inmate for a pre-parole counseling session before release.

Mental Health Assessments for the Disciplinary Process:

11

From November 5, 2005 through February 2006, 965 RVRs were issued, 355 of them to MHSDS inmates. 3CMS inmates accounted for 335 RVRs and EOP inmates incurred 20. CCI developed and implemented a local procedure for custody staff that seemed to work well. At the direction of the warden, the chief disciplinary officer reviewed all cases in which mental health assessments found that mental illness played a role and decided whether the charge should be adjudicated. Mental health assessments contained relevant information, were useful to hearing officers and made an impact in disciplinary processes involving mentally ill inmates.

The record keeping, screening and evaluation process regarding RVRs issued for sexual misconduct needed improvement. Available records indicated that ten RVRs for sexual misconduct were issued between November 2005 and April 2006. Staff was unable to provide information regarding the status of seven of the ten cases. The remaining three cases had mental health evaluations. One inmate was diagnosed with exhibitionism, one was found not to meet the criteria and the result of one evaluation was pending. The inmate diagnosed with exhibitionism was subsequently transferred to California State Prison- Los Angeles County (CSP/LAC), where it was determined that he did not meet the criteria. Approximately 12 inmates were identified as appropriate recipients of treatment related to sexual misconduct. A clinician who had no specialized training in treating sexual misconduct provided medication management and individual treatment. Group treatment was unavailable due to logistical obstacles.

Transfers:

All three referrals to DMH were made during or shortly before the monitor's visit. Two were in process during the monitor's visit. A third inmate had been referred but remained in the OHU.

CCI transferred six inmates to MHCBs. Although 36 referrals were considered, 22 were removed from the list for clinical reasons.

At the time of the monitor's visit there were three inmates in the OHU. The OHU was staffed by two psychiatrists, representing roughly 30 percent of the psychiatry resources at CCI. The OHU was busy, with 94 admissions, an average of 23 per month, between November 5, 2005 and February 28, 2006. Lengths of stay were usually within timeframes, with just 11 stays lasting longer than three days from August through January 2005. A number of inmates had multiple OHU admissions, but exactly how many was unknown. Restraints were used on occasion in the OHU, but no log was maintained. Anecdotal information also suggested that practices related to the use of restraints needed improvement.

EOP transfers continued to be delayed. Staff attributed transfer delays to lack of beds at receiving institutions. Records listed 23 EOP inmates who were transferred since September 2005. Ten were slated for expedited transfer. Four were transferred within 30 days; six had exceeded deadlines by 29 to 104 days at the time of the monitor's visit, primarily due to lack of beds at CSP/LAC to which they were endorsed. Six more were transferred within transfer timelines.

None of the 12 EOP inmates in the reception center at the time of the monitor's visit had lengths of stay over 60 days. Of 157 3CMS inmates in the reception

13

center, 17 had lengths of stay over 90 days, with the longest stay in excess of nine months.

Other CAP Issues:

A total of 13 mental health groups were offered in all locations with the exception of the reception center, bringing that CAP item into compliance. Group treatment was generally described by inmates in favorable terms. However, the group sessions attended by inmates who were locked down met in a noisy setting that precluded confidentiality and adversely affected the group process. The problem of lack of group treatment will be considered resolved if compliance is sustained.

Caseloads ranged from highs of 150 to 200 in Level I and II yards down to 40 to 50 in high security yards, administrative segregation and the SHU. MHTS audits found that initial mental health evaluations and initial inter-disciplinary treatment team (IDTT) meetings were timely 90 percent of the time. IDTT meetings were not, however, always attended by a full team, as psychiatrists and correctional counselors were often absent. The monitor's expert observed meetings attended by a psychology intern, a correctional counselor and a psychiatrist who was not the treating psychiatrist. Interdisciplinary discussion and participation by inmates were minimal. Confidentiality was undermined by an open door and the presence of people nearby. Central files (C-files) were not routinely available at meetings.

Routine referrals on average resulted in a contact within 7.3 calendar days. Staff reported that emergency referrals were seen the same day and urgent referrals were seen within 48 hours, save for rare exceptions.

Mental health staff reported good working relationships with the custody staff and increased cooperation regarding escorts. However, staff reported that there were not enough officers available to escort inmates to treatment.

Health care records were reportedly unavailable for appointments an estimated 30 to 40 percent of the time. The backlog of filing in medical records was estimated to be about one month.

Other Issues:

Rounds made in the SHU by psych techs were consistent with requirements; rounds made in administrative segregation were deficient. Weekly summaries of rounds were not routinely documented in UHRs. Inmates in administrative segregation were afforded less than the mandated amount of yard time. All outdoor yards in administrative segregation were walk-alone yards. CCI did not have enough walk-alone yards to offer outdoor yard to all inmates in administrative segregation.

Case managers saw caseload inmates in administrative segregation weekly. Records showed that on average 60 percent of weekly contacts were made in a confidential setting and 40 percent were cell-front contacts. Staff attributed the high number of cell-front contacts to staff shortages, lack of escort staff on weekends and inmate refusals. Although two treatment groups were running in administrative segregation, group treatment was not available to all caseload inmates for whom it was clinically indicated.

Cell searches when inmates left for treatment were reportedly commonplace. A high refusal rate for out-of-cell contacts was attributed in part to the timing of cell searches. Staff reported that inmates voiced concerns about missing

15

property, including eyeglasses, which was often lost or unavailable. Staff reported that property restrictions during inmates' first year in the SHU prohibited access to television and radio. Because there was no mobile library, library books were largely inaccessible to SHU inmates.

Regarding emergency responses, staff reported that 39 staff members had not received CPR training as of April 4, 2006. Six were slated to be trained soon after the monitor's visit. The remaining 33 were on extended leave and had not yet returned to work.

The monitor's tour of selected housing units found that ambu-bags, cut-down scissors and mouth shields were available on the units. Inventories done at the beginning and end of watches were co-signed by supervisors. There was no written procedure covering replacement of mouth shields. Staff reported that replacement mouth shields were available in control units, offices and clinics located in the yards.

Institutional Summary:

CCI was successful at obtaining contractual staff to cover vacancy rates of 40 to 54 percent among psychiatrists and psychologists. The caseload was 19 percent over capacity. Although most mental health positions were either filled or covered by contractual staff, there was no senior psychiatrist. Staffing shortfalls were a frequent explanation for non-compliance with Program Guide requirements. CCI attempted to compensate for lowered productivity associated with high security environments by deploying case managers unevenly, concentrating them in high security facilities to the detriment of large caseloads in lower security facilities. Caseloads ranged from highs of 150 to 200 in Level I and II yards down to 40 to 50 in high security yards, administrative

16

segregation and the SHU. Staff believed that the number of mental health positions allocated was too small in light of the size of the caseload and the demands of the institution.

Despite lack of staff, heavy reliance upon contractors and interns and a far-flung site, CCI resolved five CAP problems and brought a sixth into compliance. A total of 13 mental health groups were offered in all locations with the exception of the reception center, bringing that CAP item into compliance. Group treatment was generally described by inmates in favorable terms.

Improvement was evident in three of the four focal areas; the fourth was in compliance. Quality management remained on track but lacked participation by psychiatry and peer review. Medication management continued to improve. CCI's method of incorporating the results of mental health assessments into the disciplinary process stood as an example worthy of emulation. The screening and evaluation process for sexual misconduct RVRs needed improvement. CCI offered treatment for sexual misconduct to inmates who needed it whether or not they were diagnosed with exhibitionism.

CCI improved access to care by sending six inmates to MHCBs but needed to remain vigilant by referring and transferring *all* inmates whose need for treatment exceeded the limitations of an OHU. Inmates whose conditions warranted referral to DMH needed to be referred when clinically warranted. Information regarding the operations of the OHU was incomplete but indicated that it had as many admissions as a typical MHCB.

CCI continued to demonstrate compliance with temporal Program Guide requirements, such as timely quarterly case manager contacts, timely IDTT meetings and weekly case manager contacts with caseload inmates in administrative segregation. Quality, however, was often compromised by cell-front contacts, lack of suitable treatment space, lack of confidentiality, lack of psychiatric coverage, absent treatment team members, poor access to C-files and UHRs and incomplete or missing documentation of recent treatment.

Psychiatrists infrequently attended IDTT meetings, nor were they involved in quality management activities. Roughly 30 percent of the psychiatry resources were dedicated to the OHU. Too many psychiatry contacts made in high security settings were made cell-front. Two medication management problems persisted, including a lack of guidance on the use of HS orders and under-use of lab tests to monitor the use of psychotropic medication. Both issues might reasonably be attributed to lack of a senior psychiatrist and the use of contractual staff to compensate for a 40 percent psychiatric vacancy rate.

Rounds made in the SHU by psych techs were consistent with requirements; rounds made in administrative segregation were deficient. Weekly summaries of rounds were not routinely documented in UHRs. Inmates in administrative segregation were afforded less than the mandated amount of yard time. CCI did not have enough walk-alone yards to offer outdoor yard to all inmates in administrative segregation.

CCI needed more psychiatric supervision, better psychiatric practices and a reduction in the size of caseloads in lower security yards. A collaborative examination

of treatment space and schedules in locked-down units was needed to determine the frequency with which confidential contacts, including group meetings, occurred and the number of inmates that can be treated effectively.

## California Institution for Men (CIM)
May 15, 2006 – May 16, 2006
August 1, 2006

Psychiatry was fully staffed or covered, but psychology was short-staffed. CIM had one vacant psychiatry position, which was covered by a contractor. There were 3.9 vacant line and supervisory psychology positions. Only one was covered by a contractor. There was no contractual coverage of one vacant recreational therapist position, 1.9 vacant psych tech positions or 1.3 clerical positions.

Following increases at the end of 2005, the size of the MHSDS caseload remained constant between January and May 2006. In May the caseload census stood at 1,460 inmates, 166 at the EOP level of care. Roughly one third of 314 inmates in administrative segregation were on the mental health caseload. There were 31 EOP and 67 3CMS inmates in administrative segregation.

CIM was swamped by demands that exceeded the physical and operational capacity of the institution. Three areas with serious impact on the most severely mentally ill inmates at CIM were a focus of monitoring attention. Staff devoted intensive efforts to: (1) The provision of mental health treatment in administrative segregation; (2) conditions in the MHCB and access to higher levels of care; and (3) tracking lengths of stay of caseload inmates in the reception center. Progress was made in all three areas, but did not achieve lasting or systemic improvement in two of the three areas.

In administrative segregation the working relationship between mental health and custody staff improved. More inmates were seen out-of-cell. In the MHCB staff identified critical problems and began to address them. Staff made more referrals to higher levels of care and more referrals resulted in transfers. Tracking of EOP inmates in the reception center improved but was not sustained due to inadequate staffing. The number of inmates transferred to receiving institutions remained low but a larger proportion was moved when staff tracked the cases more carefully.

Quality Management:

Quality management showed little improvement and the mental health quality management committee did not meet every month, and meetings were poorly attended. Following a change in leadership the committee met twice monthly. Beginning in April the committee reviewed quarterly audits of medication management and tallies of referrals to higher levels of care. QITs were not well documented. Four QITs were concluded during the monitoring period. They addressed new arrivals with Keyhea orders, MHTS, psychiatry follow-up and credentialing of MHCB staff. Some QITs disbanded without issuing a clear recommendation or conclusion. Two active QITs addressed problems in administrative segregation and in the MHCB. They did not use the standard QIT process, but functioned rather as management meetings. All three disciplines continued to conduct peer review. Peer review by psychologists was well developed and well documented.

The suicide prevention committee met monthly. The composition of the committee was deficient, and meetings were poorly attended. Some were held without nurses or MTAs. Custody staff did not attend until March. Beginning in March the

associate warden for healthcare attended, but was the sole custody representative. After

March, documentation improved and the committee was more active. The agenda was

expanded to include matters of importance to the institution. Logs of custody

observations and safety concerns associated with MHCB admissions were on the agenda.

Routine reviews of serious self-injuries and suicide attempts were more attentive. A

suicide driven CAP recommendation regarding the administration of involuntary

medication in the MHCB was issued late in 2005. Staff did not systematically collect

data on its implementation. In May there were anecdotal reports of continued problems.

The suicide prevention committee needed to review its mandate, cover all relevant topics

at meetings, beef up its composition and improve attendance.

Medication Management:

Medication management at CIM progressed in that staff performed audits

relied less on anecdotal accounts of lapses. Nursing staff conducted a series of large

audits of medication management. Audit results that applied to the entire population at

CIM or included enough caseload inmates to support a conclusion were reported to the

monitor in the context of the CAP.

Medication continuity upon arrival was problematic. An audit of 75

caseload inmates for whom orders were written in R&R found that 64 received

medication on the day of arrival or the following day. Nine orders written by

psychiatrists did not reach the pharmacy. Staff attributed the problem to an abbreviated

pharmacy schedule and too few nurses in R&R to write orders.

An audit of medication continuity when inmates were relocated within the

institution was small. In 13 of 17 cases medication was administered without

21

interruption. In one case it was administered the following day. In three cases there was no medical administration record (MAR) at the new location.

Medication orders were renewed in a timely manner, and informed consent was obtained. In 11 of 78 cases the psychiatry note did not document a rationale for a change in medication.

CIM did not have a functioning mechanism to detect and respond to non-compliance with medication. Referrals were not consistently made, received and filed in records. For unclear reasons, staff routinely body-searched minimum security inmates as they waited in the pill line.

MARs were filed in medical records more reliably but they were incomplete or illegible. A staff audit of 75 cases found that a MAR for the previous month was filed in each. However, fewer than half were complete and legible.

The Keyhea coordinator reported that it was difficult to compile an accurate list of inmates who had Keyhea orders. Staff attributed the problem to the lack of a statewide list, lack of notification by sending institutions and problems with the bus screening. There were anecdotal reports that correctional officers were not willing to implement Keyhea orders when asked to do so in the MHCB.

Staff did not know how many caseload inmates on medication were released on parole. A small audit found that four of five inmates who paroled signed for a supply of medication when they were released.

Transfers:

CIM referred many more inmates to higher levels of care after the May 2006 monitoring visit. From November 2005 through April 2006, a period of 24 weeks,

staff made 75 referrals to DMH; 39 to acute care and 36 to intermediate care. During the ten weeks between May 15 and August 1 there were 64 referrals to DMH.

Access to acute care was poor. During a six month period just 19 of 33 inmates (57 percent) referred to acute care at DMH/Vacaville were actually transferred there. Acute beds at Atascadero State Hospital (ASH) were not accessible. Six referrals were made to acute care at ASH; none resulted in transfer. Staff reported that an acute care referral to ASH required more information and was more time consuming to complete than one made to the DMH acute care program at California Medical Facility (DMH/CMF). The coordinated clinical assessment team (CCAT) team redirected some of the acute care referrals made originally to ASH. Some acute care cases were sent to intermediate care.

Access to DMH intermediate care was better. During a six month period, 30 of 36 inmates referred were transferred. ASH took 29 inmates. Nine referrals were initially rejected but successfully appealed. The DMH intermediate program at Salinas Valley State Prison (SVPP) accepted all five referrals, but only one inmate was transferred. Four remained at CIM on a wait list. SVPP took 18 and 35 days to communicate decisions regarding two of the referrals.

Mental health staff took too long to complete referrals. Cited in the past for the delayed completion of referral paperwork, CIM tracked time elapsed between the clinical decision to refer and completion of a referral. That information was not available at most other institutions. Completion of paperwork for acute referrals took 13 days on average. Intermediate referrals were completed in approximately 20 days. After the May site visit, staff completed one third of all referrals within three days. Those referrals did

not require case factor information. The remainder, the 70 percent that did require case factors, were completed within 14 days. Dilatory responses to requests for case factor information were one source of delay. In July staff reported that case factor information had been provided more promptly since May.

Access to higher levels of care was also slowed by delays in DMH responses and transportation. Decisions regarding referrals to acute care at DMH/CMF were received in five days on average. In some cases DMH accepted a patient but asked CIM to hold the inmate several days until a bed became available. CIM took six days on average to transport accepted inmates to a DMH facility. Staff reported that some delays were due to inmates being accepted on Fridays. Because transportation arrangements could not be made until Monday they were not moved until Tuesday.

CIM rescinded or elected not to make referrals in many cases. A log of referrals and delays was kept, but the information was not used effectively to speed individual cases or address systemic barriers. Half of the inmates who needed acute care were not referred. The bulk of them, 20, were not referred because they no longer needed acute care. In 13 cases referrals were not made because the inmates' parole dates were imminent. Nine inmates were referred but not transferred to DMH because they paroled. The number of inmates who needed acute care but did not receive it for one reason or another was troubling.

Operations of the MHCB and access to higher levels of care were a focus of attention during the monitoring period. Access to higher levels of care improved during a period of enhanced attention. Operations in the MHCB did not improve.

The number of inmates in crisis beds and their lengths of stay rose. There were 1,176 admissions to MHCBs from November 2005 through July 2006. Licensed for 18 crisis beds, the MHCB portion of the General Acute Care Hospital (GACH) had an average daily census of 31 from November 2005 through April 2006. The average daily census rose to 35 from April through July. The average length of stay increased from six days during the months of November, December and January to 7.65 days in February, March and April. The average length of stay in April was 8.65 days. Stays measured in weeks were not rare. Roughly half of inmates with excessive lengths of stay were referred to DMH. Thirteen percent of inmates admitted to a crisis bed had three or more admissions within a six month period. Roughly 25 percent of them were referred to DMH.

Several factors impeded the provision of mental health treatment in the MHCB. Physical access to inmates placed in the GACH was poor. Clinicians did not make out-of-cell contacts. There were no provisions for out-of-cell time even for inmates who stayed for weeks. Recreational therapists were diverted elsewhere because they were essentially unable to provide services to inmates in the GACH. MTAs were frequently diverted from the hospital to cover pill lines. A written procedure, based on faulty assumptions, required two escort officers to take an inmate out of a cell. Not enough vests were available for staff required to wear them. IDTT meetings were not attended by all disciplines and did not serve their purpose. The working relationship between mental health and custody staff was strained. Teamwork collapsed particularly in the administration of involuntary medication and the use of restraints. In emergencies

that were not life threatening, medical staff was unable to arrange immediate transportation. Conditions in the GACH were unsanitary.

Staff tried to improve conditions in the MHCB by requesting more resources and revamping local procedures. CIM sought a staffing augmentation based on a census of 36. Staff reported that the MHCB was staffed for 18 crisis beds. A QIT chaired by the associate warden for healthcare was formed in March. Staff was revising policies and procedures regarding out-of-cell contacts, tier time for inmates, and escorts. The director of nursing planned to bring in enough contractual licensed vocational nurses (LVNs) to cover pill lines rather than diverting MTAs from the hospital. Recreational therapists were scheduled to return to the MHCB in August. More vests were supplied. Staff reported that the quality of IDTT meetings had improved. Nurses attended most meetings but custody staff was absent. No improvement in the cleanliness of the hospital was anticipated. Only one full time janitorial position was allocated for the GACH.

A new policy regarding the use of holding cells in the hospital was in draft form. Documentation of holding cell use was incomplete. Staff planned to use a holding cell in a yard when an overnight stay by an MHCB inmate was necessary. Staff was concerned about long waits in holding cells located in the hospital as well as in the yards. Available written information and staff reports indicated that holding cells in the hospital were sometimes occupied longer than four hours. It was not uncommon for an inmate, who was sent to the MHCB by a case manager, to remain in a holding cell in a yard for a long time before being taken to the hospital for evaluation. In one case reviewed by the monitor's expert (see Exhibit B, Case Review 1) an inmate who was sent to the MHCB by mental health staff did not reach a crisis bed for at least ten hours.

Cameras were not used to monitor inmates on watch. Local procedures were revised in accordance with the department's moratorium on the use of video monitoring for suicide watch. Inmates on watch were observed one-to-one by a person.

CIM was unable to meet court ordered transfer timelines for caseload inmates. Nor was it able to report accurately lengths of stay for caseload inmates. Tracking EOP inmates in the reception center was one of three areas of focus during the monitoring period. The institution assigned to a correctional counselor the task of tracking how long EOP inmates remained in the reception center. Cases were tracked manually because lengths of stay were recorded inaccurately in the automated system.

A total of 45 EOP inmates were transferred to receiving institutions during the months of May, June and July. Their average length of stay in the reception center was 115 days. Around 30 percent of EOP inmates in the reception center were never endorsed for transfer because they paroled or were awaiting a parole date. Staff did not calculate lengths of stay in those cases although raw data were available. More EOP inmates were transferred when cases were tracked closely. The number of transfers per month rose from five to 24. In May five EOP inmates were transferred. Sixteen were moved in June. In July 24 EOP inmates were transferred. Staff reported that close tracking of EOP cases could not be sustained due to staffing shortages.

Other CAP Issues:

a. Partial Compliance

Access to mental health treatment in administrative segregation improved. Case manager contacts were spotty early in the year. After February all caseload inmates were offered out-of-cell contacts weekly. On average half accepted the offer. EOP

inmates were seen out-of-cell 62 percent of the time. A new procedure dropped the refusal rate for all caseload inmates from 46 percent to 24 percent. A supervising psychologist or designee rather than a correctional officer informed inmates that they had a mental health appointment.

The working relationship between mental health and custody staff improved. Custody staff reported that the number of incidents in administrative segregation decreased. A QIT, staff changes, weekly meetings and detailed record keeping were reportedly beneficial. The QIT functioned as a management meeting rather than adhering to the standard quality management format. Logs of appointments scheduled and completed were maintained by mental health staff. Officers kept logs of how long inmates waited in holding cells for mental health appointments. A July audit found that wait times averaged 29 to 40 minutes.

Psych techs made rounds daily. Staff reported that rounds were missed once between mid-May and August. Review of a small number of UHRs found that documentation of rounds was incomplete. Beginning in May thrice weekly showers for inmates were assured. Inmates also had access to showers located in the yard.

Staff audited access to psychiatric treatment in March and April as directed by the Office of the Inspector General. Results suggested that access was good. Staff at two of three facilities did not provide information needed for the audits. The east facility housed the largest number of caseload inmates but provided the least information. Because audits did not include all of the required data the results were not conclusive, although they suggested compliance.

During March, 204 of 218 psychiatry appointments in the Central Facility were kept; the 14 inmates who were not seen had been transferred elsewhere. Psychiatrists also scheduled 65 inmates for follow-up visits in one week. Sixty-one were seen as scheduled; the remaining four were seen over a week later. The April audit of the Central Facility yielded similar results. Two other facilities did not provide data for the March audit. A small audit of the Minimum Support Facility found that, in a sample of five days, 110 of 124 psychiatry appointments were kept, while one week follow-up appointments were kept in 78 of 85 surveyed cases. The only data provided by the East Facility indicated that one week follow-up appointments were provided as scheduled. A total of 775 psychiatry appointments were scheduled in April. Follow-up contacts were made as scheduled in 140 of 152 cases. The monitor's expert found at least one inmate in administrative segregation who needed to be seen by psychiatry, but was not (see Exhibit B, Case Review 2).

A second case (see Exhibit B, Case Review 3) raised concerns about whether procedures at CIM ensured the delivery of mental health treatment to inmates who needed it most. In that case, access to treatment was thwarted at many junctures. The inmate was at CIM for roughly 15 weeks, during which documentation indicated he was psychotic for at least 13 weeks. He was not identified when he arrived at CIM. An urgent referral by custody staff did not elicit an adequate response by mental health staff. He was psychotic for days or weeks before being sent to the MHCB. Once there, he was referred to a higher level of care, but the referral was rescinded because he had an imminent parole date. Three days before his release on parole he remained psychotic.

29

The backlog of loose filing of medication records in April was 21 to 25 inches high, roughly equivalent to a lag of six to seven days. A January audit found that 70 percent of medical records requested for appointments were available. Access to medical records was good in administrative segregation. The monitor's expert reviewed UHRs in which documents were missing. By policy, records of MHCB stays and information on referrals to higher levels of care were not filed in UHRs.

The MHTS was used for management reports. Staff reported that early in the monitoring period some contacts were not being entered into the MHTS. Staff believed that MHTS reports accurately reflected contacts by May. Staff scored reception center screenings manually and recently requested an electronic scoring system like the one used at CSP/LAC. They received no response to that or earlier requests for an electronic scoring system. The monitor's expert reviewed a case (see Exhibit B, Case Review 3) in which a mental health screening was not scored. The inmate did not come to the attention of mental health staff until a correctional officer made an emergency referral 12 days later.

Two more cases reviewed by the monitor's expert raised questions about how well CIM's intake process identified inmates in need of mental health treatment. There was no bus screening on file in one case (see Exhibit B, Case Review 2). In the second case, the bus screening did not identify an inmate who was suicidal. He identified himself when he was subsequently screened by mental health on the same day (see Exhibit B, Case Review 1).

b. Non-Compliance

Caseload inmates were not transferred from the reception center within required timeframes.

Other Issues:

CIM's implementation of the heat plan and compliance with orders regarding CPR and emergency responses were examined during the monitor's May visit. Implementation of the heat plan improved but was inadequate in several important ways. Local heat plan procedures were updated in April. Officers were noticeably better informed about the heat plan. Flyers about risks associated with high temperatures were posted in all but one of the housing units toured. Housing units had current lists of inmates who were at risk. Inmates were recalled from yards during heat alerts. At CIM's East Facility, where many EOP inmates were housed, inmates reportedly waited outdoors regularly for their medical and mental health appointments longer than 30 minutes in areas with full sun exposure during heat alerts. In accordance with new local procedures, temperatures were monitored with hand held thermometers that were recalibrated twice annually. Correctional officers were required to check the warmest location in the unit. Monitoring temperatures and using effective cooling measures remained problematic in the East Facility. Although fans were located in the corridor, the solid cell doors impeded air circulation. Temperatures were taken in the corridors but not in cells. Temperatures in the corridors reached 94.7 degrees. During heat alerts inmates were given cold water and more access to showers. Logs did not always note that medical staff was called when Stage III was reached.

Records of temperatures were compiled centrally but heat alerts were not tallied monthly or forwarded to central office. The monitor's examination of temperature

logs found numerous Stage II and Stage III heat alerts in July. Further improvement was needed.

CIM had not yet revised its local procedure in accordance with the department's amended CPR policy. The monitor found sealed personal protective equipment kits in all housing units toured. All officers who were interviewed were in possession of a mouth shield. Staff provided contradictory accounts about procedures for replacing mouth shields.

Of 890 custody staff at CIM, 36 had not been trained on the use of a mouth shield, while 18 had not been trained on the amended CPR policy. Employees who had not been trained were on leave. The in-service training (IST) sergeant said that when employees returned from leave they could not report for duty until IST cleared them. Staff was trained on the amended CPR policy, the use of mouth shields and other required topics.

CIM's emergency response review committee did not meet from September 2005 to March 2006. The committee met monthly after March. Meetings were well attended and lasted one to four hours. The composition of the committee included the warden or warden's designee, the healthcare manager, the health program coordinator or supervising nurse, the chief psychiatrist, a captain and the coordinator of the committee. Minutes provided brief descriptions of each incident and a conclusion on whether timeframes were appropriately met and the requisite forms completed.

Institutional Summary:

CIM remained an institution in crisis. Intensive efforts devoted to three specifically local issues during the period from May to August yielded some

demonstrable benefits but left the institution's ability to sustain the positive changes in doubt. Unlike so many other California Department of Corrections and Rehabilitation (CDCR) institutions, CIM's problems were not primarily related to staffing. Vacancies rose during the monitoring period, but CIM was still able to cover most of them with contractors. The principal remaining staffing issue was whether existing allocations of mental health were adequate; local administrators and staff believed them to be inadequate.

Among the three areas of special institutional focus for the monitoring team at CIM, mental health treatment in administrative segregation, where a combination of enhanced collaboration and new procedures facilitated the delivery of mental health services, seemed to improve. While conditions in the MHCB unit did not improve much between May and August, an increasing number of seriously mentally ill inmates in the unit was both referred and transferred to more intensive levels of mental health care. CIM also demonstrated that it could move caseload inmates out of the reception center more expeditiously. It remains to be seen whether these tentative improvements can be sustained.

Quality management at CIM did not progress during the monitoring period. Meetings were poorly attended; QITs rarely fulfilled their charters; and documentation of quality management activities was inadequate. All three clinical disciplines continued to conduct peer review. The suicide prevention committee met, but custody participation was poor. The committee needed to review its mandate, cover all relevant topics at meetings, beef up its composition and improve attendance.

Similarly, medication management did not improve, although more audits of medication issues were conducted during the monitoring period. Medication continuity on arrival continued to be problematic. On the other hand, medication orders were renewed in a timely manner, and psychiatrists regularly obtained informed mediation consent. CIM did not have a mechanism to detect and respond to medication non-compliance, a major deficiency.

Access to inpatient DMH programs was erratic. Transfers to intermediate impatient DMH care improved, while access to acute DMH programs became increasingly difficult and untimely. Acute beds at ASH were simply inaccessible; anyone in need of acute care needed to be transferred to DMH/CMF. On the other hand, access to intermediate DMH programs was easier, even to intermediate programs at ASH. CIM clinicians often took way too long to make DMH referrals, and classification information needed to complete referral packets was not provided timely. Custody staff often further delayed transporting inmates once they were accepted for DMH programs.

Conditions in the MHCB unit were not conductive to the provision of adequate mental health treatment. The number of inmates in crisis beds and their lengths of stay continued to rise. The relationship between custody and mental health staff in the unit was strained, resulting in the diversion of custody staff to other duties and limited clinical access to inmates. The physical environment was unkempt and shoddy; the hospital was unsanitary, and janitorial services were inadequate.

CIM had not yet revised its local procedures in line with the department's amended CPR policy. Staff, with the exception of personnel on extended leave, had been trained in the revised departmental policy. Sealed personal protective equipment (PPE)

34

kits were found in all housing units, and correctional officers regularly had microshields. After a hiatus from September to March, CIM's emergency response review committee began to meet monthly.

### California Institution for Women (CIW)
April 27, 2006 - April 28, 2006

Functional vacancy rates among psychiatrists, psychologists and psych social workers were higher than in past reviews. One of 6.1 staff psychiatrist positions was vacant and not covered by a contractor. Reportedly, a second vacancy was imminent. A staff psychiatrist served as acting chief psychiatrist. The senior psychiatrist position had been vacant for over a year.

The chief psychologist position was filled, but one of two senior psychology positions was vacant. An additional half-time psychology position had been allocated for the reception center. All 10.35 psychology positions were filled. Beginning in March 2006 limited term contractors covered for two psychologists on long-term leave. Two of the 4.5 psych social work positions were vacant and not covered by contractors.

Two of five psych tech positions were vacant. A new hire was pending to cover the vacant sole recreational therapist position. The senior MTA position and 12 of 14.15 line MTA positions were filled. Nursing was almost fully staffed with just 1.26 vacancies out of 45.26 positions. The pharmacy was fully staffed with four pharmacists and two technicians. Positions for all three office techs, four office assistants, both medical transcribers and seven medical records techs were also filled.

CIW's census included 2,323 inmates, with 887 on the MHSDS caseload at the time of the monitor's visit. There were 763 3CMS inmates, of whom were in

reception. Of 124 EOP inmates, 35 were in reception. There were 25 3CMS and three EOP inmates among the 48 inmates housed in administrative segregation. Four caseload inmates were in the OHU.

Quality Management:

        Mental health quality management languished with the retirement of the psychiatrist who had taken charge of most quality management activities. Supervisory staff continued audits, but clinicians did not identify problems or participate in quality management activities. QITs did not function as intended. Many mental health staff reported that they were overburdened trying to meet minimum treatment requirements and did not consider quality assurance activities to be a high priority.

        The suicide prevention committee met regularly, covered required topics and kept minutes which sometimes repeated language from past meetings. Meetings were poorly attended, particularly by custody staff, RNs, MTAs or psych techs. The committee tracked referrals to higher levels of care, OHU use, self-injuries, five-day follow-up and transfers of EOP inmates to administrative segregation hubs. It reviewed records of monthly cell searches to identify inmates who hoarded medication. It tried to capture and review all cases of self-injury but missed occasional self-injuries that occurred on weekends or did not result in incident reports.

Medication Management:

        Medication management was a work in progress. Staff audits of medication continuity on arrival found widely disparate compliance rates of 33 percent and 90 percent, casting doubt on both findings.

A December 2005 audit of continuity following intra-institutional transfers found no interruption in 50 percent of surveyed cases, while a March 2006 audit found no interruption in 80 percent of cases. Staff reported that lapses of one to two days were common.

Medication non-compliance, an issue previously resolved, was audited and reportedly continued to work well.

Reportedly pill lines were ten to 30 minutes in duration generally. Awnings to shade inmates waiting in line had not yet arrived.

Nursing audits of MARs for completeness, accuracy, legibility and standardized notation found compliance in only ten percent of annotated missed doses. Half were illegible and incomplete. Half of audited UHRs lacked MARs for the prior month. No medication errors had been reported since August 2005.

Three inmates were on current Keyhea orders and four others were at other institutions for a higher level of care.

Contradictory information was reported on HS medication orders. The Director of Nursing reported that HS medication could be administered only in the OHU, but another source reported that CIW had 268 HS orders. Inmates confirmed that HS medication was administered after 8:00 p.m.

Staff reported that 55 percent of paroling inmates with current medication orders received a supply of medication or departure and signed receipts.

Mental Health Assessments in the Disciplinary Process:

37

During the monitoring period out of 810 RVRs, 365 were issued to 3CMS inmates, 54 to inmates in the OHU, MHCB unit or the EOP. Seven mental health assessments were requested and completed for 3CMS inmates.

CIW continued to maintain complete logs and track mental health assessments for the disciplinary process, but the individual assessments often lacked relevant information. Staff reviewed C-files rarely. Case managers in administrative segregation completed assessments for inmates on their own caseloads. Most assessments did not consider or address referral to higher levels of care. In some cases, assessments failed to report salient clinical information or evaluate the extent of impairment of the inmate's mental condition at the time of the offense.

Completed RVR packets indicated a lapse of supervisory oversight in the adjudications. Although hearing officers always noted that assessments were considered, findings often were not used appropriately. One hearing officer made many obvious but apparently undetected errors, which should have been addressed by a supervisor. Most completed RVR packets contained rote language about the assessment that frequently conflicted with other documents in the case. In some cases documentation misstated the content of the assessment. In others the assessment did not address the issue of sanctions, but the hearing officer's documentation stated that he or she concurred with the clinician's findings and accordingly reduced charges or mitigated sanctions.

In one case reviewed by the monitor, the hearing officer rejected the findings of the assessment. The assessment reported that the inmate was undergoing a mentally disordered offender evaluation for likely transfer to Patton State Hospital (PSH) and recommended against additional time to serve, which would obstruct access to more

intensive treatment at PSH. The hearing officer wrote that she did not concur with the assessment and found the inmate guilty.

Transfers:

Out of 17 referrals to DMH for intermediate care from November 1, 2005 through April 14, 2006, 14 were transferred, three were rejected and one was rescinded. The referral log was comprehensive. Access to intermediate care was timely for both endorsed and unendorsed (i.e., reception) inmates. Referrals were made within one or two days of identification of a need for inpatient care. Most were accepted and transferred within one week of identification. Lengths of stay were typically eight to ten weeks with a range of five to 20 weeks. Communication between staff at CIW and PSH on status of referrals was good.

PSH processing took one to five days, typically due to requests for additional information, the unavailability of physicians and/or admissions personnel or a lack of beds. CIW furnished requested information promptly

CIW made 22 referrals to MHCBs from November 1, 2005 through April 19, 2006, more than previously. All were accepted and transferred within 24 hours. Records were complete.

During the same period, there were 373 admissions to the OHU, many for overnight observation and about 20 percent lasting four days or longer. Average length of stay was 2.11 days with a range of several hours to 14 days. DMH referrals accounted for many but not most excessively long stays. Most admission and discharge decisions were appropriate, notwithstanding the OHU's lack of resources. Diagnoses and treatment were hampered by insufficient custody staffing and fragmented psychiatry coverage. The

OHU had six medical and eight mental health beds plus a cell reserved for restraint and seclusion. Nursing call lights in inmate rooms were not operational.   Staffing was inadequate.  Out-of-cell and confidential contacts were almost nonexistent.   Suicide prevention practices were problematic.   Although post orders for suicide watches had been modified they did not fully comply with documentation requirements in the revised policy.  Inmates on suicide watch were monitored one-to-one.  Inmates on suicide precautions were monitored via camera with acceptable monitor picture quality, but the screen was divisible to show up to eight cells simultaneously and staff reportedly assigned one medical assistant to watch up to six cells.  The director of nursing reported that she had addressed the problem of MTAs falling asleep during monitoring and their confusion about obtaining relief coverage.

In an OHU case reviewed by the monitor's expert, the inmate's psychosis went undetected over several days and two admissions.  EOP treatment was not responsive to her condition.  After a physical altercation with her cellmate, which resulted in a RVR, the mental health assessment reported that mental illness had not influenced her behavior and found that she would have no difficulty understanding and participating in the proceedings.  The finding was rejected by the hearing officer (see Exhibit C, Case Review 1).

Although problems with the documentation of restraint and seclusion were previously resolved, documentation was found to be inadequate during the monitoring period.  No central restraint log was maintained in the OHU.  The only documentation was in individual medical records.

All of the four EOP inmates who required transfer from administrative segregation to a hub administrative segregation unit elsewhere were transferred within 30 days. EOP inmates on reception status were housed in the EOP unit with endorsed inmates but had use of a smaller recreation yard and no indoor out-of-cell time, fewer privileges and less treatment, averaging three to four hours per week. Average time for endorsement of EOP inmates to general population was 57 days. Among 72 EOP inmates processed in the reception center, timeframes were exceeded for 13, or 18 percent. Delays ranged from 62 to 103 days. Reasons for delay were within the institution's control in seven cases and not reported for the rest.

Other CAP Issues:

  a. Partial compliance

    Treatment of EOP inmates was inadequate due chiefly to understaffing and limited opportunity for clinical contacts. Staff reported that efforts to demonstrate compliance with the ten-hour minimum therapeutic requirement undermined the quality of group treatment and the accuracy of its compliance accounting. Reception center EOP inmates were offered up to three hours weekly and were not always seen weekly by a case manager (see Exhibit C, Cases Reviews 3, 5). On paper, endorsed inmates were offered ten to 12 hours of group treatment but realistically could participate in only five to seven hours weekly (see Exhibit C, Case Review 3). Groups were very large, ranging in size from 17 to 68, while the number of inmates who reasonably could fit into the largest available group space was 42, and a smaller room for group activity could accommodate fewer than 20. Staff cited pressure to offer at least ten hours weekly of group treatment and provide individual weekly contacts as compromising the quality of

41

treatment. Some groups were too large to be therapeutic. Staff placed inmates in groups based on appraisals of clinical need, but group treatment was not treatment plan-driven. Most groups were didactic, self-help or process oriented, rendering them inaccessible or non-therapeutic to the lowest functioning EOP inmates.

Access to UHRs and the management of information were ongoing concerns. Audits found that UHRs were provided to staff for mental health contacts 86 percent of the time. There were anecdotal reports that the availability of UHRs depended on the location or level of care of the inmate and that filing backlogs were approximately two feet thick. Some UHRs reviewed by the monitor's expert were incomplete, disorganized or contained contradictory information (see Exhibit C, Case Reviews 2, 7). Missing records of OHU or MHCB stays and laboratory tests were problematic. Mental health staff continued efforts to improve information management but remained dissatisfied with the accuracy of MHTS.

b. Non-compliance

The number of inmates in administrative segregation obstructed the delivery of mental health treatment; the population had doubled within the preceding year. During the monitor's visit 28 caseload inmates were in administrative segregation; during the monitoring period a total of 96 caseload inmates were held in administrative segregation.

Inmates reported that psych tech rounds occurred daily, but records indicated occasional gaps of one to two days in rounds. A sampling found that slightly over half of inmates in administrative segregation were seen by a case manager during their stays. Psych tech rounds were made daily, but case manager contacts were no

longer provided weekly due to caseload sizes. IDTT meetings were timely and well attended, but C-files were often missing.

Other Issues:

Eleven custody staff out on long term leave had not been trained in the revised CPR policy and use of mouth shields. Institutional return-to-work policy required completion of in-service training before reporting to a post. All housing units had sealed and inventoried emergency response kits. There was a procedure for replacing used items. Officers had been verbally instructed how to obtain replacement mouth shields. An emergency response review committee met monthly and recorded minutes. There were no incident reports of emergency responses involving caseload inmates.

Institutional Summary:

Vacancy rates among clinical positions were higher than in most recent reviews. Vacancy rates remained near zero in other healthcare disciplines.

Among the four issues of focus for the round, mental health quality management remained a work in progress. Information on the status of some important aspects of medication management was unavailable or contradictory. Only 55 percent of inmates who paroled with current orders for medication signed a receipt indicating that they left with a supply of medication.

The use of mental health assessments in the disciplinary process remained flawed. The quality of most assessments was inadequate quality, and some failed to provide essential information. Hearing officers often misstated, omitted or rejected assessment results and cited irrelevant authority in support of their decisions.

43

At times access to DMH intermediate inpatient care was slowed by delayed communication, but it was better than that available to male inmates. Inmates in need of stabilization were transferred timely to MHCBs. Care provided in the CIW OHU remained inadequate. Psychiatric coverage was fragmented; out-of-cell clinical contacts occurred rarely; and confidential contacts were impossible. Suicide prevention practices were problematic.

EOP inmates were transferred from administrative segregation to a hub institution within 30 days, but the treatment and processing of EOP inmates needed improvement. On average, reception EOP inmates designated for CIW's general population EOP unit were endorsed in 57 days, but 18 percent of cases exceeded timeframes. EOP inmates were housed in the same unit with general population EOP inmates, but they had access to fewer privileges and less treatment.

Resources for the treatment of EOP inmates were reported to be inadequate, despite staff's efforts to operate at the highest possible level. Understaffing and limited opportunity for clinical contacts were cited as major obstacles. Methods used for calculating EOP treatment hours sometimes inflated the number actually offered.

The number of inmates in administrative segregation doubled during the preceding year, making delivery of mental health treatment a challenge. Case manager contacts did not occur weekly due to caseload sizes. IDTT meetings were compromised by missing C-files and the rotation of IDTT duties among correctional counselors unfamiliar with presented inmates. Access to UHRs and the management of information were ongoing issues.

CIW was in compliance with the revised CPR training requirements and maintenance of emergency response kits.

## California Rehabilitation Center (CRC)
April 6, 2006 -April 7, 2006

CRC's sole senior psychiatry position was filled. Its 1.5 line positions were vacant, with the full-time psychiatrist on indefinite medical leave and the half-time position vacant. With use of contractors, the functional vacancy rate was 33 percent.

The senior psychologist position was filled. Two of 12 case manager positions were vacant for a vacancy rate of 17 percent. Contractors covered an average of 11 hours per month. The sole psych tech position was filled. The senior MTA position was filled. Allocations of MTA positions increased from 14 to 21 under Plata requirements. With two MTAs on leave, 2.47 positions were vacant; no contractors were used and the vacancy rate was 21 percent.

Both senior RN positions were filled. With 27 line RN positions including seven new Plata allocations and the use of registry nurses, the functional vacancy rate was four percent. The pharmacy was fully staffed with a pharmacist II, two pharmacists and five pharmacy techs. The equivalent of 1.5 of six allocated office tech positions were vacant.

CRC's total population of 4,624 included 961 inmates on caseload, all of whom were 3CMS. Caseload capacity was exceeded by 62.

Quality Management:

The quality management committee, mental health subcommittee and the suicide prevention committee met monthly and documented activities. The emergency response review committee met monthly and kept minutes. Attendees included the

warden, health care manager, associate warden, chief physician and facility captains. Lack of participation by key persons hampered progress with long-term problems.

QITs addressed pill lines and OHU problems including under-staffing and the conversion of a storage area into a suicide watch room. Lack of psychiatric participation inhibited the institution's ability to address medication misuse and poor OHU practices

Psychologists engaged in peer review, but psychiatrist and social workers did not for lack of numbers.

Case managers were instructed to collect inmates' suicide history information and submit it to office techs for entry into the MHTS.

Medication Management:

Medication continuity for newly arriving inmates was sustained. This was corroborated by the monitor's record reviews. A staff audit of continuity was sound in method but was compromised when 41 of 47 MARs were missing for one month's audit. For the five cases with MARs, new arrivals received medication within 24 hours

For inmates transferred intra-institutionally, a single central pill line, divided only by gender, ensured continuity but caused other problems. Waits for men were long and led to high rates of non-compliance.

CRC had sound procedures for responding to medication non-compliance which were thwarted by high volume of referrals and follow-ups. Non-compliance consisted largely of cheeking of Wellbutrin and Seroquel, both of which were widely used for bartering. Twenty six percent of the exclusively 3CMS caseload had prescriptions for these medications.

Staff audits of the procurement of informed medication consent forms found a 90 percent level of compliance.  Some interviewed inmates reported they had not been informed of reasons for medication and possible side effects.

Despite CRC's system for obtaining timely lab results and reviewing them when the ordering psychiatrist was off site, the monitor's sampling found that only 53 percent of 15 UHRs contained documentation of adequate laboratory studies for the use of mood stabilizing medications.

Use of nurse-administered medication (NAM) and DOT medication orders was confused.  DOT was used for all inmates although policy called for NAM unless DOT was ordered.  Psychiatry did not order DOT in cases with histories of hoarding, cheeking or other medication misuse.  Many orders were written for administration with crushed doses.

The chief psychiatrist believed that HS medication orders were obviated because the evening pill line began at 7 p.m. and because he had concluded that only one or two of his patients would benefit from it in any event.  Some inmates reported problems with sedation.  Evaluation of the need for HS medication orders was needed.

CRC reportedly had a protocol to ensure that paroling inmates were supplied with medication.

Mental Health Assessments for the Disciplinary Process:

This focus area was resolved during the preceding monitoring round.

Transfers:

CRC did not refer any inmates directly to DMH.  Access was through CIM and CIW.

Transfers to MHCBs were frequently delayed due to lack of beds.

47