evaluations were timely. Staff attributed the discrepancy to inmates being out to court, but lack of substantiation prevented verification.

      a. Partial Compliance

Timeliness of clinical responses to urgent referrals improved with a response rate of 87 percent within a week and the rest within three weeks according to the monitor's sample of urgent cases.

Rescheduling of cancelled case manager appointments was accomplished within two weeks in about 87 percent of cases. Case managers who missed weekly contacts in administrative segregation often did not make another attempt within the same week. There was no improvement in rescheduling cancelled psychiatric appointments, with about 76 percent rescheduled within two weeks, but a significant number took up to five weeks, and some were dropped altogether. In several instances psychiatrists repeatedly cancelled appointments causing gaps of several months between appointments. When inmates were moved, their need for psychiatric contact was not communicated to the psychiatrist in their new housing. Custody and mental health staff compensated to some extent by implementing procedures to reschedule appointments that were cancelled by lockdowns.

Medical records problems with loose filings were corrected in the general population and the reception center. However, missing documents and unavailability of medical records continued to be problematic, although less so than during the preceding monitoring period. A staff audit found that in 81 percent of cases, requested charts were available or the patient had transferred. Records were least readily available in the reception center and the OHU. Staff opined that charts were unavailable because they

were being used by other clinicians or the patient was new or had recently arrived as a parole violator.

IDTT meetings continued to lack psychiatric participation. A staff audit found 70 percent psychiatric participation in IDTT meetings in the general population and 80 percent in administrative segregation.

There was no group therapy for the 16 3CMS inmates in general population. Treatment plans for these 3CMS inmates complied with requirements for the documentation of symptoms and diagnoses but were short on clinical interventions sufficient for individually-driven treatment. Most plans had no more than two interventions. Two plans reviewed by the monitor's expert failed to record services needed, although the case manager adequately documented the patient's problems and needs which resulted in his receiving appropriate services including parole planning.

In administrative segregation, the timeliness and frequency of IDTT meetings were problematic. Only 43 percent occurred on time and most were late by weeks or months. Updates were not routinely undertaken and were overdue in about half of cases. The meetings observed by the monitor were of excellent quality.

Psychiatry contacts in administrative segregation generally occurred at least monthly. Case manager contacts were below standard in frequency and had declined during the monitoring period. Most were conducted at cell-front. Review of inmate histories showed that 18 percent of inmates had weekly case manager contacts at least 90 percent of the time. Most had one or two-week gaps and some had large gaps between contacts.

b. Non-compliance

In administrative segregation, diversion of psych techs to non-mental health tasks left only one of eight psych techs assigned to rounds for 360 inmates, resulting in weekly rounds for all inmates and daily rounds for caseload. Missed rounds were frequent. Documentation showed 26 days of incomplete administrative segregation rounds during the monitoring period. Because three verification reports were not submitted, the reports produced may not have captured all missed rounds. There was no indication of any administrative response to these omissions.

Mental health screening of inmates placed in administrative segregation screening was completed for less than half of inmates. Audits showed a continuing decline. Psych techs were instructed to suspend this task as of January 2006 and case managers assumed it, but screening remained non-compliant.

Other CAP Issues:

In administrative segregation units, most officers carried micro shields. Cut-down kits were stored on first floors only. They were incomplete. None had ambu-bags, disposable airways or gloves and some lacked face shields. Access to some kits was hampered by their storage behind locked gates. Interviewed staff could gain access but could not identify documentation of equipment availability or the person responsible for it. The kits were incomplete, with none containing ambu-bags, disposable airways or gloves, and some not containing micro shields. No training plans were provided.

Institutional Summary:

Vacancy rates in mental health clinical positions were significant. After figuring in the use of contractual staff, functional vacancy rates in psychiatry and

psychology were 25 and 36 percent, respectively. The effects were particularly harmful to the services delivered in reception, administrative segregation and the OHU.

Quality management did not progress. QITs were chartered but did not function. Medication audits were flawed. Peer review was not conducted. The suicide prevention subcommittee met but did not fulfill its purpose. DVI's ability to implement suicide prevention measures or learn from bad outcomes was limited.

Medication management was generally substandard with a few isolated exceptions. Initial psychiatric assessments were late. Renewals were timely. Responses to medication non-compliance and referrals made to mental health remained were deficient.

The use of mental health assessments in the disciplinary process needed improvement. A staff audit found that assessments provided relevant information but hearing officers considered it in only about ten percent of their dispositions. Reportedly staff followed the revised sexual misconduct protocol.

DVI under-referred to DMH and to MHCBs. Only five referrals were made to DMH in 18 months. Referrals to MHCBs dropped by more than half during the monitoring period, down to 25 percent of those who met criteria, although admissions to MHCBs elsewhere increased. Transfers to MHCBs were late in about 35 percent of cases. Staff reported that inmates returned from MHCBs often were insufficiently stabilized and required readmission to the OHU.

Physical conditions in the OHU were cramped and dirty. Admissions increased and lengths of stay continued to exceed timelines in 26 percent of cases, with some extreme outliers. Only two patients among the longest stays were referred to

MHCBs. Failure to refer to MHCBs resulted in longer lengths of stays in the OHU, where unacceptable in-cell conditions and lack of out-of-cell time prevented adequate long-term treatment. Increasing frequency of OHU re-admissions and rising restraint use attested to this problem.

The demand for medical beds in the OHU led to placement of suicidal inmates in overflow cells with one-to-one direct observation in administrative segregation. During the six-month period preceding the monitoring visit there was one suicide in a holding cell in the infirmary and a self-injury in an OHU overflow cell. Two suicides in 2004 did not prompt local CAPs. Reports of compliance with suicide five-day follow-up were inconsistent, and documentation suggested compliance in the 35 to 50 percent range.

DVI did not transfer caseload inmates from the reception center within court-mandated timeframes. Placement rates for EOP inmates in reception declined. About 42 percent of transfers were untimely. Expedited transfer of EOP inmates was employed erratically. For 3CMS inmates, transfers were untimely in 21 percent of cases, although the rate of placements improved.

Treatment of caseload inmates in administrative segregation did not meet Program Guide requirements. EOP inmates were not removed to a hub unit within 30 days. Fewer than half of IDTT meetings and treatment plan updates were timely. Fully 82 percent of case manager contacts were untimely and most were made at cell-front. Psych tech rounding was non-compliant, as psych techs were diverted to medication-related tasks. There was no indication that missed rounds elicited any administrative response.

DVI had not fully implemented emergency response requirements. Most officers carried micro-shields, but cut-down kits were incomplete and stored on only the first floor. No information was offered on staff training.

### Folsom State Prison (Folsom)
Paper Review

The recent hiring of a full-time psychiatrist reduced the psychiatric vacancy rate to 33 percent. One of three allocated psychiatry positions was vacant; a long-term contractor provided part-time coverage of the vacancy. One of seven case manager positions was vacant. A psychologist had been redirected to DCHCS, but it was unclear whether that resulted in a second functional vacancy. One vacant case manager position was fully covered during only half of the monitoring period. Of three allocated psych tech positions, one was vacant; it was not covered by contractual staff. In nursing, one position of 18 was vacant; MTAs had a 16 percent vacancy rate among 24 positions.

Folsom's MHSDS population comprised 549 3CMS and five EOP inmates. Of that number, 49 3CMS and three EOP inmates were housed in administrative segregation. Caseloads were large, ranging from 121 to 154.

Quality Management:

The local governing body had the required membership and continued to meet quarterly. The membership of the quality management committee was multidisciplinary. The committee met monthly and chartered QITs. Documentation was silent as to whether QITs comprised the collective expertise needed. QITs excluded line staff earlier. Eleven QITs were active during the monitoring period. They addressed a wide variety of issues, including the MHTS, initial mental health evaluations of new arrivals, medication continuity, referral tracking, IDTT attendance, treatment plans,

RVRs that involved mentally ill inmates, screenings in administrative segregation and suicide prevention follow-up.

Medication Management:

Medication continuity upon arrival was considered previously resolved. No information about it was provided during the current monitoring period. Staff audits of unknown size and method showed 80 percent compliance with medication continuity when inmates were moved within Folsom. Orders for psychotropic medication were written for as long as 180 days, twice the duration permitted by the Program Guides. Staff provided no information about the renewal of medication orders or about processing time from order to administration. In the past it was commonplace for staff to write bridge orders for expiring medications and to see inmates one to four weeks later. During previous monitoring periods, Folsom did not follow up medication non-compliance in a timely manner. Folsom updated its non-compliance procedure to make it consistent with CDCR standards during the monitoring period, but staff did not report how medication non-compliance was handled in practice.

Staff conducted a small audit of informed medication consent forms and found a compliance rate of nearly 97 percent, which was consistent with the monitor's previous findings. Five inmates had DOT orders at the time of the paper review. Documents did not address whether blood levels of inmates on mood stabilizers were monitored or whether DOT orders were written when warranted and appropriately administered.

Folsom had no inmates with current Keyhea orders at the time of the paper review. There were 190 caseload inmates with HS orders. A staff audit of unknown size

and method found that parole medications were given to all inmates except one who should have received it. No information about pre-release planning was provided.

Mental Health Assessments for the Disciplinary Process:

During the current monitoring period 851 RVRs were issued, 151 of them to 3CMS inmates and eight to EOP inmates. Staff did not indicate how many mental health assessments were requested nor was information provided regarding their use in the disciplinary process.

The disciplinary process was the subject of a QIT. All mental health clinicians at Folsom were retrained in the completion of mental health assessments. Although a QIT examined problems in this area, audits were small in scope and uninformative due to methodological problems. It was unclear whether custody staff were sufficiently attentive to bizarre and uncharacteristic behavior and referred inmates for mental health assessments when warranted; whether clinicians reviewed C-files and interviewed inmates when completing mental health assessments; and whether the content of mental health assessments was adequate.

Transfers:

Folsom did not make referrals to DMH. Having neither an OHU nor a MHCB, Folsom transferred out all inmates needing any type of psychiatric observation. No information about transfers was provided. The monitor reviewed the operational procedure governing holding cell use when inmates were awaiting transfer and found it adequate, but documents did not report the length of time inmates spent in holding cells.

EOP inmates at Folsom at the time of the review had lengths of stay within transfer timeframes and were seen weekly by case managers. Folsom did not

provide information about EOP inmates who had been transferred during the monitoring period or about lengths of stay in administrative segregation.

Other CAP Issues:

At one time, Folsom's suicide prevention follow-up practices had been considered a resolved problem, but issues surfaced during the previous monitoring period. Staff chartered a QIT and identified problems associated with lapses in weekend communications and staffing, but it was unclear whether remedies were attempted or improvements were made. Folsom provided no information about hourly custody observation of inmates who returned from OHUs, MHCBs or DMH.

In response to a CAP stemming from a suicide, Folsom chartered a QIT to address referrals and follow-up practices. Supervisors examined decisions to determine whether clinicians planned follow-up when it was indicated, and staff began to track referrals using the MHTS. It was unclear whether data entry captured both the date of referral and date of receipt. Staff reviewed a brief period and found that on average response dates were eight days after referral dates.

A QIT addressed treatment planning with noticeable improvement in one discrete area. Obstacles to inmates attending their IDTT meetings were examined and remedied, increasing their participation to 63 percent. The QIT did not address the absence of psychiatrists or lack of C-files at IDTT meetings. Printouts provided showed that a large number of treatment plans were written but did not speak to their timeliness or quality.

Several clinical practices in administrative segregation, particularly the screening of new arrivals, were poor or undemonstrated. Folsom had an adequate

procedure for screening inmates placed in administrative segregation and chartered a QIT to address missed screenings. The QIT conducted four audits and found improvement, but appeared to consider the matter closed when the compliance rate rose to 72 percent. The documents provided did not clearly indicate that rounds and case manager contacts were in compliance. Staff described daily rounds practices but did not indicate whether rounds were in compliance and provided no information on weekly case manager contacts, psychiatry contacts or IDTT meetings other than indicating that 91 percent of clinical contacts were made in a private setting.

Institutional Summary:

Folsom reduced its vacancy rate in psychiatry to 33 percent at the close of the monitoring period by virtue of a recent hire. 3CMS caseloads were large, especially for case managers. Documents provided for review were silent on many pertinent topics that were germane to the MHSDS population of 550, 50 of whom were in administrative segregation.

Quality management continued to function. QITs were used often but they sometimes neglected important aspects of a problem or disbanded before a problem was solved. No information regarding the suicide prevention committee was provided but a suicide-related CAP item prompted a higher level of scrutiny regarding referrals and follow-up by mental health clinicians. A QIT on treatment planning resulted in more inmates attending their IDTT meetings but the QIT did not address the absence of psychiatrists and C-files at those meetings.

Medication management needed improvement. Medication was interrupted 20 percent of the time when inmates were relocated within the institution,

while orders for psychotropics were written for 180 days in violation of Program Guide requirements. Folsom's response to non-compliance with medication, handling of DOT orders and laboratory monitoring of inmates on mood stabilizers were open questions.

Although a QIT addressed the disciplinary process as it involved mentally ill inmates, and mental health staff were retrained in how to do assessments, there was no indication of whether or not the purpose of the QIT was fulfilled.

Folsom did not report how many inmates were transferred to an OHU or a MHCB due to psychiatric crises or how long those that were transferred remained in holding cells pending transfer. A QIT addressed five-day follow-up of inmates who returned from higher levels of care, but the level of compliance was not reported. There was no mention of hourly observations by custody staff.

EOP inmates at Folsom at the time of the review had lengths of stay within transfer timeframes and were seen weekly by case managers. Folsom did not provide information about EOP inmates who had been transferred during the monitoring period or about lengths of stay in administrative segregation.

Requirements regarding inmates in administrative segregation were not met and were not addressed in the documents provided. Folsom failed to screen inmates placed in administrative segregation. A QIT on the topic disbanded when compliance reached 72 percent. Documents provided did not clearly indicate that rounds were made daily and that case manager contacts and IDTT meetings were compliant with Program Guide requirements.

## **Ironwood State Prison (ISP)**
Paper Review

ISP's staffing was stable, with both psychiatry positions filled and the only psychology position vacant. The vacant psychology position was covered by three long-term contractors. All three psych tech positions, nursing positions dedicated to MHSDS and clerical positions were filled with the exception of a half-time clerical position. At the time of the paper review, there were nine 3CMS inmates, one was in administrative segregation. Ironwood's mission was reduced significantly during the current monitoring period by the temporary closure of its MHCB.

Quality Management:

The monitor previously found quality management to be functioning adequately. Documents showed that the quality management committee continued to meet monthly and charter QITs when appropriate.

Medication Management:

Little information was reported. Staff did not report substantively on medication continuity, handling non-compliance with medication, delivery issues or informed consent.

ISP reported that all psychotropics were prescribed DOT. DOT administration was previously resolved. Staff audits showed continued compliance. Staff reported that HS medication was prescribed as clinically indicated. At the time of reporting, ISP had no inmates with HS orders. No substantive information about parole medication or pre-release planning was provided.

Mental Health Assessments for the Disciplinary Process:

There were 1,334 RVRs written at ISP, only five of which were issued to MHSDS inmates. All of them received mental health assessments. Information was incomplete but did not indicate that mental health assessments were taken into account. There reportedly were no RVRs written for self-injurious behavior.

Transfers:

ISP made no referrals to DMH. ISP's MHCB was closed through much of the monitoring period. Mental health and nursing staff provided care for ISP inmates at CVSP's OHU and referred any inmates in need of an MHCB through DCHCS's population management unit. No information was provided about MHCB referrals or lengths of stay in the OHU.

It was unclear whether ISP had established a mechanism or conducted five-day follow-up of inmates with suicide-related admissions.

Transfers for 3CMS and EOP inmates had long been compliant with mandated timeframes.

Other CAP Issues:

Documents showed that a full complement of professionals attended IDTT meetings for all inmates at ISP at the time of the paper review. While a snapshot could not capture practices throughout the monitoring period, it suggested that IDTT meetings were attended by a full team.

Case manager contacts were made weekly in administrative segregation. Staff reported that contacts were made out-of-cell. ISP was previously found to be in compliance with requirements for daily rounds, screening of new placements, and timely

111

IDTT meetings. Documents provided indicated that compliance in those areas was sustained.

<u>Institutional Summary</u>:

ISP managed a very small number of caseload inmates as they awaited transfer. Transfers were accomplished expeditiously and ISP maintained a functional quality management process. The MHCB was closed during the current monitoring period. ISP inmates were treated by ISP staff at CVSP's OHU. No information regarding access to MHCBs or treatment in the OHU was provided to the monitor. Little information was provided about medication management. Those practices that were documented appeared to meet requirements consistently.

With the exception of requirements for IDTT meetings, the only remaining 3CMS CAP item not yet resolved, 3CMS services were operating well. Mental health treatment in administrative segregation was inconsistent in the past, but came into compliance and appeared close to resolution.

**Kern Valley State Prison (KVSP)**
July 11, 2006 – July 13, 2006

KVSP was severely understaffed with a vacancy rate of 43 percent. It employed no contractors. Vacancies were concentrated among case managers. Its chief psychiatrist, chief psychologist and senior psychologist were diverted from supervisory tasks to covering significant vacancies among line clinicians. One of four psychiatry positions, six of seven psychology positions and two of three social worker positions were vacant. The sole psychiatric social worker had been recently hired and was unlicensed. One of two recreational therapist positions, one of five psych techs positions and one of two office tech positions were vacant.

The two case managers were assigned to the newly-activated CTC. The senior psychologist provided case management in administrative segregation units. Without case managers, the institution attempted to triage all referrals and respond to those deemed urgent or emergent but lacked adequate clerical, nursing and clinical staff to succeed. Psychiatrists did not respond to referrals timely. Medications were routinely renewed, sometimes for several months, without patient contact.

Despite use of temporarily-assigned clinicians from other institutions, severe staffing shortages prevented KVSP from providing basic mental health services to most of its caseload inmates. General population 3CMS and EOP inmates were not followed by case managers; initial and annual IDTT meetings were not held; treatment plans were not timely initiated or reviewed; and many referrals did not draw responses. KVSP's 3CMS program was closed to new arrivals

At the time of the monitor's visit, the institutional census was 4,640, including 491 inmates on the MHSDS caseload. Among these, 480 were 3CMS, which exceeded the institution's program capacity by 61 or 15 percent. There were 11 EOP inmates pending transfer. In administrative segregation there were 69 caseload inmates including three EOP inmates and 66 3CMS. Six KVSP inmates along with inmates from elsewhere were in MHCBs.

Quality Management:

Quality management at KVSP remained in an embryonic stage. The mental health quality management subcommittee met only sporadically since activation of the mental health program. As of the monitor's visit, one QIT, on referral routing and processing, had been organized but not yet implemented. Medication management audits

covered January 2006 to March 2006. They were flawed in examining only ten records and failed to examine accurately specific areas of medication management.

Medication Management:

Medication for newly arriving inmates was reviewed and continued. Frequently inmates were not seen by a psychiatrist up to a month after arrival, or orders were not written by the same psychiatrist who approved the continued medication. Nursing staff forwarded medication profiles from inmates' previous institutions to the pharmacy. Institutional audits of times to first doses of psychotropic medication found that 80 percent received first doses by the day following arrival.

Supervisors reported that office staff shortages led to breakdown of appointment-scheduling and tracking of medication renewal with the MHTS. The institution implemented a back-up procedure in which the pharmacy supplied psychiatrists with lists of expiring orders for signature and return to the pharmacy. Although institutional audits found 100 percent continuity with this procedure, it did not examine psychiatrists' evaluations.

An audit of timeliness of follow-up on medication non-compliance found a compliance rate of 70 percent. Staff were skeptical of that finding in light of staffing shortages.

Pill lines were not used. Medication was delivered to housing units by MTAs and nurses. Inmates and staff reported no significant problems.

Institutional audits found compliance with obtaining signed, current informed medication consent forms in 40 percent of cases.

Of three Keyhea proceedings initiated at KVSP, one was approved and two were dropped. Another was initiated at California Substance Abuse Treatment Facility (CSATF) and denied at KVSP, and in December 2005 an inmate already on a Keyhea order arrived. The institution's Keyhea coordinator used a tracking system other than MHTS which had become inoperative because of a database change at the headquarters level.

Staff and inmates reported that HS medication was administered after 8:00 p.m. Forty of 60 inmates on HS medication were housed on "A" yard.

The pharmacy distributed to R & R where paroling inmates signed for them.

Mental Health Assessments for the Disciplinary Process:

The monitor reviewed RVRs that resulted in referrals for mental health assessments. No statistics were provided on the number of RVRs issued. Hearing officers in some cases considered mental health input and dismissed or mitigated charges in a few cases. Some assessments were not attached to, or filed with, completed RVRs. In some cases, hearing officers did not report contents and the conclusions of completed assessments. Some clinicians did not use alternative sources to obtain relevant information on inmates who refused interviews, leaving assessments incomplete. Others used pre-formatted assessment forms or omitted clinical recommendations on penalties.

The institution did not follow the protocol for handling sexual misconduct RVRs. According to an institutional log for November 2005 to May 2006, 23 RVRs for IEX were issued to 18 inmates including eight 3CMS, four EOP inmates and one caseload inmates at an unspecified level of care. IEX was reported consistently. Staff

115

who maintained the log did not know if screens had been done and reported that cases were not reviewed by IDTTs. In five instances, the log indicated that an "IEX" had been submitted but staff did not know what that meant. The monitor's case reviews corroborated these reports of non-compliance.

Transfers:

KVSP opened in September 2005. Since that time it had not transferred any inmates to DMH acute or intermediate programs. Before its CTC was activated on July 1, 2006, 3CMS inmates in need of a higher level of care were either classified EOP and endorsed to be transferred from the institution, or were transferred to a MHCB in another institution.

The CTC opened with 22 beds including 12 MHCBs. The MHCBs were staffed by a psychologist diverted from general population 3CMS, an on-loan psychiatric social worker, a part-time recreational therapist and a part-time psychiatrist. Office workers were understaffed. Psychiatric coverage was consistent. IDTT meetings were held bi-weekly. During the monitor's visit nine inmates were in MHCBs including six from KVSP, two from San Quentin (SQ) and one from North Kern State Prison (NKSP). Two of the KVSP inmates were on one-to-one suicide watch and two were in the process of referral to DMH. Two of the other MHCBs were also on suicide watch. There was no video monitoring. Because the unit had opened one week before the monitor's visit, evaluation of its accessibility was premature.

EOP programming at KVSP had not been activated because of staffing vacancies. Access to EOP programming elsewhere was inadequate. Of the 11 EOP

116

inmates awaiting transfer during the monitor's visit, seven or 64 percent had been waiting longer than 60 days. Reportedly some had waited six months and longer.

No groups were offered to EOP inmates. A full-time recreational therapist provided structured out-of-cell therapy five days per week, although some inmates reported difficulty with obtaining release from their housing to attend this activity. Staff reported that a social worker had been hired and would be conducting weekly contacts with EOP inmates. The space intended for future EOP programming was adequate and larger than program space in most other institutions.

Other Issues:

Mainline 3CMS programming suffered from staffing deficiencies more than any other programming area in the institution. In early March 2006 there were five case managers in 3CMS. Institutionally-reported compliance rates were 88 percent for clinical contacts and 90 percent for IDTT meetings. By late June 2006, the reported compliance rate for clinical contacts dropped to 42 percent, a rate corroborated by the monitor's review of records. Actual clinical contacts were reduced further by breakdowns in the scheduling of appointments and referrals. On March 28, 2006 a completed suicide involved an inmate who had been 3CMS until 2002 but was not on caseload at the time of his death (see Exhibit F, Case Review 5).

Administrative segregation at KVSP was housed in two free-standing units and in a third 180-degree designed unit, B1, which was designated to have inmates on the mental health caseload. Screens were completed at cell-front within 72 hours of placement, but refused screens did not prompt referrals.

The only regular case management service in the three administrative segregation areas was provided by the senior psychologist because the regular administrative segregation psychologist had been redirected to the MHCB unit. Psychiatric service was provided by a psychiatrist who also covered other areas. Recreational therapy was offered to EOPs three to six hours per week and was well received. Four psych techs made daily documented rounds. Interactions between inmates and psych techs seemed adequate for monitoring inmates' conditions.

Inmates in B1 had not received yard time for several weeks, following a decision to use the limited amount of walk-alone yards for inmates in the stand-alone units. Lack of yard time plus the absence of regular clinical contact or other out-of-cell activity led to 3CMS inmates remaining in their cells for several weeks at a time. High temperatures and problems with in-cell ventilation exacerbated these stressful conditions.

IDTT meetings occurred weekly in B1. The monitor's expert observed a meeting attended by the psychiatrist, the senior psychologist acting as case manager on the unit, the newly-hired but unlicensed social worker and two unit officers but no correctional counselor. Health care records, but no C-files, were available but used minimally. Much of the meeting was devoted to psychiatrist-inmate interactions about medication. This implied that IDTT meetings served as a substitute for one-to-one psychiatrist-inmate contact. Many 3CMS inmates expressed difficulty with the lack of case management services and frustration after repeated requests for clinical meetings or services. Clinicians at the meeting acknowledged the lack of responsiveness to self-referrals, provided information on the staffing shortages and informed inmates of the unlikelihood that that individual services would be available. Without other options, case

118

managers and the psychiatrist tended to suggest medication dosage increases or initiations in response to inmate self-reports of increased mood disturbances or anxiety.

The monitor's expert interviewed several EOP inmates during psych tech rounds in B1. These inmates expressed concern over lack of case manager contacts for periods of several weeks. Interactions between psych techs and inmates were positive.

Staff described a process for the collection and triage of referrals from the housing units for forwarding to the mental health office where a second triage and the scheduling of appointments would take place. However, staffing shortages undermined this process. Triage nurses were re-routed to the newly-opened CTC. Diversion of mental health supervisory staff to direct-service roles caused delays or preemptions of triaging. Lack of sufficient case management staff led to cancelled appointments. MHTS data revealed that average time for referrals completed between March 1, 2006 and June 25, 2006 was 8.1 days. Average time for self-referrals during the same period was 15.4 days. It was concerning that MHTS data showed no completion for 47 of 705 referrals during that period, particularly because many of those referrals had been initiated in early March 2006.

The monitor reviewed 141 requests for referral to mental health services that had not been processed. At least 21 of them appeared urgent, expressing escalating depression, hopelessness, severe exacerbation of psychiatric symptoms, etc. These requests had been made between June 3, 2006 and July 9, 2006 and consisted largely of self-referrals plus some new arrivals, medication non-compliance cases and referrals from medical and custody. Because of staffing shortages, none of these requests had been processed nor were they likely to be responded to in the near future, according to

119

the responsible staff person. Many of the self-referrals bore signatures indicating that they had been received, yet fewer than five had been triaged.

KVSP did not comply with heat plan requirements. Several housing units lacked up-to-date lists of inmates on heat-risk psychotropic medication. Temperature logs were not maintained consistently. Ventilation systems in many areas were unreliable and malfunctioned during extreme heat, according to inmates and correctional staff reports.

Institutional data reported, and interview corroborated, that all correctional officers had been trained on the most recent CPR protocols and the use of micro-shields. Some control rooms lacked extra micro-shields or had none at all.

Institutional Summary:

A severe mental health staffing shortage, particularly among case managers, was the most serious and pressing problem facing KVSP. It prevented the institution from delivering required mental health services in a pervasive and disturbing way. Supervising mental health staff were redirected to fill gaping holes in clinical coverage. Referrals, including urgent ones, went without responses. IDTT meetings were not held, and timely treatment plans were not initiated. Lack of office staff led to breakdown of appointment-scheduling and tracking of medication renewals. General population 3CMS and EOP inmates were not followed by case managers. EOP services were not available; no group therapy was offered to EOP inmates and case manager contact was erratic. The 3CMS program was forced to stop taking new arrivals. Less than half of 3CMS inmates received minimally-required quarterly contact. In all of the three administrative segregation housing units, the only case management was provided

by the senior psychologist. In the mental health B1 administrative segregation unit, yard time or other out-of-cell activity for 3CMS inmates was almost nonexistent

Institutional quality assurance processes remained at a preliminary stage of development. Audit methodologies had not been worked out.

Medication orders for newly arriving inmates were timely in about 80 percent of cases, although psychiatry appointments were often late. Medication renewals were accomplished with the implementation of a back-up system by pharmacy, but tracking and scheduling of appointments for renewals broke down due to office staff shortages. Medication was delivered to housing units and pill lines were not used. Keyhea, HS and parole medication procedures were implemented.

Mental health assessments for the disciplinary process were not used consistently or appropriately, although in a few cases hearing officers reduced penalties or dismissed charges based on clinical input. The new sexual misconduct protocol was not followed.

No inmates had been transferred to DMH acute or intermediate care since KVSP opened in September 2005. Its CTC was activated on July 1, 2006 and 12 out of 22 total beds were designated as MHCBs. Clinical staff was largely diverted from other areas in the institution.

General population 3CMS care was stretched thin with five case managers for 414 inmates. Significantly less than half of 3CMS inmates received regular quarterly clinical contacts.

Administrative segregation had a borrowed senior psychologist, who provided the only regular case management services there, and shared one psychiatrist

with other areas.  In the B1 mental health unit, yard time was scarce.  IDTTs relied heavily on medication initiations and increases, given the shortage of resources for implementing other options.

Referrals were not being triaged and processed, including those for urgent cases.  Staffing shortages were the cause.

Heat plan requirements were not met.

Correctional officers had been trained on up-to-date CPR protocols and carried micro-shields, but some control rooms had insufficient micro-shields or none.

### North Kern State Prison (NKSP)
April 18, 2006 – April 20, 2006

Positions for the senior supervising psychiatrist and two of the 6.5 line psychiatry positions were vacant.  Contractors covered the equivalent of 1.5 line psychiatry positions, for a functional vacancy rate of eight percent among them.

Among psychologists the chief and all three senior positions were filled. Sixteen of the 20 line psychologist positions were filled, and the equivalent of approximately 1.5 contractors were employed, for a functional vacancy rate of 12 percent among line psychologists.

Both of the psychiatric social worker positions, all five of the RN positions, all four of the psych techs and the sole recreational therapist position were filled.  Two of the three psychometrist positions were open.

Increased workloads for pharmacy staff resulted from the large number of prescriptions for MHSDS inmates.  The institution was struggling with understaffing in its pharmacy to keep up with these demands.

The mental health quality management subcommittee appointed a new peer review coordinator at its February 2006 meeting. Monthly peer review was conducted for case managers and clinicians, but none was conducted for psychiatry.

The institution had QITs on medication management, translation services, MHCB treatment and return of inmates, RVR process, medical records and MHTS/UHR reliability. Ongoing audits covered UHRs, peer review, MHTS, medication management, referrals, laboratory procedures, MHCBs, RVR mental health assessments, parole planning, EOP transfers, access to care, heat cards, medical appeals, administrative segregation, 3CMS programming, reception center, referrals to DMH and mental health assessment for sexual misconduct incidents.

Recent institutional audits showed correlative reliability rates of MHTS with UHRs ranging from 70 to 82 percent. Case manager contact progress notes, psychiatry notes, MH-2s and MH-4s had the lowest correlation rates, which staff attributed to the filing backlog. A QIT was established to troubleshoot the problem.

Medication Management:

In 94 percent of cases, newly arriving inmates were provided with bridge orders within eight hours, but only 71 percent of them actually received medication within 24 hours. Because the pharmacy was closed on weekends, inmates who arrived on Friday or Saturday often waited until Monday or later to receive medication.

Intra-institutional transfers were often accompanied by disruptions in medication. Audits of MARs showed a 58 percent rate for continuity on such transfers although MTA audits indicated higher compliance rates.

124

Timely renewal of medication orders was accomplished in 74 to 78 percent of cases according to audit results spanning a four-month period, and in 55 percent of cases according to MHTS data. The institution implemented curative measures including suspension of all medications to align expiration with renewal dates, and the assignment of a psych tech to review MARs and identify inmates with expiring medications.

The institution's medication management overview stated that "psychiatrists may write medication orders for up to 180 days," "bridge orders are written for up to 30 days," and 30-day renewals were written without patient contact. In fact, 90-day orders, the maximum permitted by the Program Guide, were more typical and, according to staff, most bridge orders were for 14 days at the longest.

The institution had procedures to address medication refusals or pill line no-shows, but staff documented such non-compliance on MARs in 71 percent of cases, according to audit results. Once referrals for non-compliance were made, inmates were seen by psychiatrists within seven days in 33 percent of cases. Other audits found that approximately one third of non-compliance referrals by MTAs were mishandled and thus not processed. This issue was being addressed by a QIT. Institutional audits also found that during a four-month period MARs were filed timely in 91 percent of cases but only 62 percent of them were complete and legible.

In the reception center medication was delivered by pill line in non-administrative segregation areas. Staff reported improved efficiency and reduced medication-related appeals.

Times from order of laboratory tests to review were decreased according to an audit. There was no audit tool in place to measure ordering within timeframes.

Institutional audits reported consistently that signed medication consent forms were obtained in at least 90 percent of cases.

According to staff, all medication administered in pill lines was administered DOT, except in administrative segregation where it was passed through the cuff port and observed DOT through the cell front or by having the inmate removed from his cell. Staff were trained in a local operating procedure that required administration in compliance with Plata directives. No formal medication administration audits were conducted. "Stat" medications were administered typically within an hour and could be delivered anywhere in the institution if necessary.

According to the institution's log, since December 18, 2005, 32 Keyhea processes were initiated. Of these, nine resulted in involuntary administration of medication; two were pending further proceedings after certification hearings, and one was denied after the hearing. Except for the two that were pending, other involuntary medication orders were discontinued at or prior to conclusion of the initial 72-hour period following the initial order.

There were 356 orders for HS medication but in practice there was no distinction among administration of HS, p.m. and bid medications. All were delivered during the last medication pass of the day which was no earlier than 7:45 p.m. There was no data on the number of inmates on psychiatric orders for HS medication because the institutional tracking system did not distinguish between medical and psychotropic medication.

Policy required that each paroling inmate receive a 30-day supply of medication but compliance was achieved in only 76 percent of cases. Impediments were late receipt of the parole list in the pharmacy and failure of the R & R officer to deliver the supply to the inmate.

Mental Health Assessments for the Disciplinary Process:

From December 2005 through March 2006, a total of 422 RVRs were issued, including 21 to EOP inmates and 109 to 3CMS inmates. Mental health assessments were ordered for all EOP and nine of the 3CMS inmates.

The monitor reviewed nine of the 31 RVRs issued to 3CMS inmates during February 2006. In eight of these, described behaviors would be considered "bizarre, unusual or uncharacteristic," and in one case were equivocal. The monitor also reviewed ten RVRs issued from December 2005 through February 2006 in which mental health assessments were completed. The RVRs contained each inmate's MHSDS status. Clinicians' reports were expressed in lay terminology and responded to pertinent queries.

The monitor also reviewed for timeliness 15 mental health assessments completed from December 2005 through February 2006. Thirteen were timely. One untimely RVR was re-issued and re-heard because no assessment was completed before the original hearing. Anther untimely RVR offered no explanation of why the assessment was not completed until six months after the incident.

In all cases reviewed, hearing officers noted the existence of the assessment and clinicians' findings in their introductory remarks, but fewer than all accounted for clinical input in their findings and dispositions or stated whether or how the input affected penalties imposed. One hearing officer wrote that the inmate "did not offer

any evidence of diminished capacity," suggesting confusion of use of mental health assessments in the disciplinary process with the insanity defense. Also, institutional RVR procedure did not require clinicians to indicate which documents they examined and/or considered as part of their evaluations. Mental Health agreed to implement a system to require such documentation and the institution acknowledged that further training in the RVR procedure was warranted.

NKSP's sexual offense tracking program documented seven sexual misconduct screens since January 2006, six of which the monitor reviewed.[1] All were considered by IDTTs and none was referred for comprehensive evaluation. The screening tool required the assessing clinician to form a clinical impression comprised of a statement of the inmate's DSM-IV diagnoses, ability and willingness to participate in mental health treatment, whether the diagnosed disorder was in remission and a conclusion as to whether the inmate's mental disorder contributed to his sexual misconduct. The range of clinical recommendations included IDTT review, placement in MHSDS with proposed level of care, psychiatric medication evaluation, case management and follow-up, more comprehensive health evaluation and custody measures. Completed sexual misconduct screenings were distributed to the chief of mental health and the inmate's IDTT, and were filed in the inmate's UHR.

Transfers:

---

[1] The screening tool documented inmate level of care, a behavioral description, DSM-IV diagnoses, medication compliance, current mental health status including a general description of mood and affect, speech, perceptual disturbance, sensorium, cognition, impulse control, judgment, insight and reliability, symptoms documented in UHRs and sources of information such as UHRs, C-files, staff reports and confidential clinical interviews.

Transfers out of the institution to higher levels of care occurred irregularly and slowly. Since November 1, 2005, the institution made 27 referrals to DMH at CMF. No requests for transfer were rejected, six were pending and six were withdrawn. No transfer dates were found for two inmates who were accepted. The remaining 13 inmates were transferred within seven to 31 days following referral, with one transferred in seven days and ten within 20 to 31 days.

The MHCB unit's staff included a full time psychiatrist and full time psychologist. At the time of the monitor's visit four of the ten inmates housed in the MHCB unit had been waiting from 18 to 26 days for transfer to DMH. Three of these four inmates were referred to DMH within seven to 13 days after being placed into a MHCB. Among the other six inmates, three had been there for one day; two for four days; and one for five days. Five additional inmates were placed in various holding areas while awaiting transfer. Under a local operating policy, these inmates in holding areas were provided with one-to-one or two-to-one observation and were given less than full issue.

From November 9, 2005 to April 6, 2006 there were 148 MHCB admissions with 29 exceeding ten days who were not awaiting transfer to acute or intermediate care. Accordingly, approximately 80 percent of MHCB inmates not awaiting transfer to DMH were in MHCBs for ten days or less.

Staff reported that inmates identified as requiring MHCB placement but for whom no beds were available in the MHCB unit were placed in one of seven holding cells used as MHCB overflow. A psychiatrist was assigned to monitor these inmates' conditions. From March 1, 2006 to April 12, 2006, 75 inmates were placed in holding

cells. Staff indicated that when these cells were all occupied, available cells in housing areas were used. At the time of the monitor's visit, all seven holding cells and MHCBs were full. Sixty seven percent of such placements lasted up to two days; and the rest lasted longer. Approximately 38 percent of inmates in holding cells went to MHCBs, while the rest were released back to the yard.

The clinical process and evaluation of the need for higher levels of care for inmates in holding cells was different from that for inmates housed in a MHCB. Inmates' placement in holding cells for crisis care did not appear to have been tracked in the MHCB log, but was tracked in a separate "holding cell" log. Although inmates in holding cells were seen by an RN at 30-miute intervals and by a psychiatrist daily, generally they were not seen by a case manager. Typically IDTT review did not occur until the inmate had been moved from the holding cell to a MHCB, and in some cases inmates were moved in and out of holding cells several times without being seen by an IDTT. Local operating procedure, however, required that an IDTT must determine whether an inmate awaiting transfer to a MHCB was sufficiently improved and stabilized to return to his housing unit. During the monitor's visit, the institution revised its procedures for holding cell placements pending MHCB placement to allow such alternative measures as custody supervision pending placement in a MHCB or on suicide watch.

The monitor's expert participated in five MHCB daily clinical contacts consisting of the psychiatrist and psychologist's joint interview of the inmate. One inmate declined contact and was seen at cell-front by the clinician. Staff-inmate interactions were comprehensive, supportive and clinically appropriate. Clinical

interventions appeared to have been successful, based on a comparison of inmates' conditions with descriptions of their conditions at the times of their admissions. Records reviews indicated that inmates were seen consistently on a daily basis and that notes were generally clearly written and legible.

Timely transfer of EOP inmates out of NKSP was an increasingly serious problem. At the time of the monitor's visit, of 70 EOP inmates 34 had been awaiting transfer for seven to 239 days, including 22 who had been waiting for over 60 days and 14 who had been waiting 90 days or longer.

Once designated as EOP, inmates typically had weekly contact with a case manager and periodic contact with a psychiatrist for medication management but were not provided with out-of-cell therapeutic activity. File reviews indicated a cyclical experience for many EOP inmates with medication non-compliance, decompensation, placement in a MHCB or holding cells, recovery and return to the housing unit, only to resume the same cycle. In some instances, lengthy waits for EOP placement combined with non-compliance with mental health treatment among parole violators in reception resulted in eventual release to the community without any meaningful mental health treatment.

Other CAP Issues:

a. Partial Compliance

Conduct of IDTT meetings in 3CMS improved in frequency and consistency but lagged in attendance. Custody staff were present at only 77 percent of meetings and psychiatry did not participate.

In a few cases MH-2 forms were missing or outdated, and treatment plans failed to specify goals. Progress notes in some instances did not reflect consideration of existing treatment goals during inmate-case manager meetings.

Other Issues:

During the monitor's visit, administrative segregation at NKSP housed 46 3CMS, 15 EOP inmates. Among the EOP inmates, six had lengths of stay of 60 days or more with one outlier at 150 days. Among 3CMS inmates, 17 had stays exceeding 90 days with the longest at 251 days.

The administrative segregation unit was staffed with a senior psychologist, a half-time psychiatrist, two line psychologists with caseloads of 35 each, and 3.5 psych techs. IDTT meetings had been conducted for all, according to institutional data. From November 2005 to February 2006, case manager contacts occurred at cell-front in 45 to 73 percent of cases. Reasons included "gang status," "doing well," "naked," "sleeping," "exercising," "did not want," "showering" and "sleeping." Weekly institutional audit data found 100 percent compliance on psych tech and case manager rounds from October 31, 2005 to February 27, 2006.

A clinician in administrative segregation was responsible for daily review of the list of caseload inmates, communications with the administrative segregation sergeant and identification of new caseload arrivals. The sergeant and custody staff were required to notify psych techs of mental health concerns about newly arriving inmates. Psych techs were required to give all new inmates the Administrative Segregation Unit Inmate Orientation Mental Health Guide and confer with them as needed. On weekends, psych techs were required to discuss new arrivals with the sergeant and check the

132

isolation log. The psychometrist was required to check new inmates, identify those who had not received a mental health screening and/or Clark screening and notify the senior psychologist and administrative segregation clinical psychologist of those needing to be screened. The administrative segregation psychologist was required to perform the screening and submit it to the psychometrist for scoring and tracking.

Approximately 21 administrative segregation inmates were in groups which covered socialization, including tolerance of diverse cultures and beliefs, self-esteem, problem solving and anger management. Materials were scarce but were reportedly "on order." The treatment area held three inmates, and groups convened as space opened up. Yards consisted of morning and afternoon sessions three to four times per week with 12 to 15 members each. Walk-alone yards were accessible on Thursdays and Sundays only. There were 12 "controlled compatible" recreational yard groups among ethnic groups.

During lockdowns, custody staff were generally cooperative in facilitating delivery of mental health services despite constraints. Mental health ducats continued to be prioritized, and senior officers worked with mental health to ensure continuity of care to patients.

Institutional Summary:

With use of contractors, line psychiatry and psychology positions were almost fully staffed with functional vacancy rates of eight percent and 12 percent, respectively. Positions for psychiatric social workers, nurses, psych techs and the recreational therapist were filled. Staffing of ancillary positions fared less well with significant vacancies in pharmacy, medical records and among office techs.

The institutional governing body and its quality improvement committees and subcommittees met and functioned appropriately. Many important mental health issues were taken up. Peer review was conducted for case managers and clinicians but not for psychiatry. QITs were organized for medication management, translation services, MHCB treatment, the RVR process, medical records and MHTS/UHR concordance. Numerous ongoing audits were conducted.

Almost all newly arriving inmates received timely bridge orders but only about 70 percent actually received their medications within 24 hours. Continuity of medications on transfers was less successful with compliance in only about 58 percent of audited cases. Renewals were accomplished timely in about 50 to 75 percent of cases. Medication refusals and no-shows were documented in only about 70 percent of cases, but documented non-compliance was referred and non-complying inmates were seen within seven days in about 33 percent of cases. A QIT was convened to address this problem. Pill lines were used for general population inmates in the reception center. Times from laboratory test orders to review decreased. All pill line medication administration was DOT. All HS, p.m. and bid medications were delivered during the last medication pass of the day which occurred no earlier than 7:45 p.m. Parole medications were dispensed in about three quarters of cases.

Mental health assessments were ordered for nine out of 109 3CMS inmates who received RVRs. Eight of these aptly described behaviors as "bizarre, unusual or uncharacteristic." Assessments were timely in about 86 percent of cases. However, hearing officers often failed to account for clinical input in their findings and dispositions. The institution's sexual misconduct tracking program showed that some

screenings were completed, all of which were considered by IDTTs, though none was referred for comprehensive evaluation.

Transfers to DMH intermediate and acute inpatient care were slow. Of the 13 inmates transferred in the monitoring period, transfers took from seven to 31 days from the time of referral, with one taking seven days and ten taking 20 to 31 days.

Seven holding cells were used for MHCB overflow and were filled at the time of the monitor's visit. Inmates in holding cells received a lower level of care than inmates in the MHCB unit. Clinical interactions with inmates in MHCBs appeared to be comprehensive, supportive and clinically appropriate.

Transfers of EOP inmates were slow, with 22 waiting over 60 days and 14 for 90 days or longer. EOP inmates generally had regular contact with case managers and psychiatrists.

Among ongoing CAP issues, frequency and consistency of IDTT meetings improved. Treatment goals were missing from some treatment plans, and were not considered consistently during meetings between case managers and inmates.

Overall, increasing staffing deficiencies at NKSP seriously eroded the quality and quantity of mental health services provided during the monitoring period.

### Pelican Bay State Prison (PBSP)
April 17, 2006 – April 18, 2006

The chief psychiatrist position was filled. Among the 7.5 line psychiatry positions, two were vacant. With two half-time psychiatrists out on extended leave, the vacancy rate was 40 percent. Use of one contractor reduced the functional vacancy rate to 27 percent.

The equivalent of 6.5 of 16.5 allocated psychology positions were vacant. With two of eight psychiatric social work positions open, the vacancy rate among case managers was 35 percent. While all but one of the vacant case manager positions were covered by contractors, two psychologists were diverted from case management to serve as acting senior psychologists.

Two of four recreational therapy positions were vacant. Six of 25 psych techs were out on extended leave, but contractors covered all psych tech vacancies.

All clerical positions were filled.

Quality Management:

Quality management declined, due largely to documentation difficulties. Although staff continued to track key indicators and to hold quality management meetings, they cautioned that tallies and UHR reviews were inaccurate due to problems with the Madrid Patient Information Management System (MPIMS). MARs had been unavailable for filing in UHRs since July 2006, a problem attributed to MPIMS. Audit results were difficult to comprehend. Write-ups lacked information about methodology.

Medication Management:

Medication continuity for intra-institutional transfers was problematic.

Inmate hoarding and cheeking of medication was a persistent problem, particularly during lockdowns. Nursing staff were aware of the problem and took precautions. Staff reported that medication administration was sometimes unnecessarily laborious and time consuming because information on the type of

lockdown underway was not communicated.  Nurses were uncertain about when to use pill lines or bring inmates out of cells.

Eighty seven percent of UHRs sampled contained informed medication consent forms.

A random sample by staff of 30 UHRs of caseload inmates found that PBSP's laboratory testing protocols complied with requirements in 80 percent of the surveyed cases.

On average, 86 inmates were on Keyhea orders.  Lack of a statewide list hindered identification of inmates arriving with orders.  One to seven new petitions were initiated each month.  During the monitoring period, 53 Keyhea renewals were sought; only one was denied.

There were 385 DOT orders monitored by staff.  Nursing audits found 114 inmates with HS orders.

Nursing staff reported that parole medication distribution continued to work well but was neither logged nor audited.

Transfers:

DMH/CMF accepted all five referrals to acute care between November 1, 2005 and March 31, 2006.  Bed assignments took from two to seven days.  Inmates were transported within two days except in two cases, both of which were completed in under ten days.

There were 23 referrals to DMH intermediate inpatient care; two were rejected.  During one IDTT meeting, staff expressed reluctance to refer to DMH on the rationale that comparable treatment was available at PBSP.

The MHCB unit was staffed for only six inmates/patients. Staff reported that the MHCB census was typically ten but on occasion reached 16. They also reported that nursing, psych tech, recreational tech and office tech allocations and staffing had not kept pace with the MHCB unit's expanding use. The MHCB unit had an average of 33 admissions per month. Of those originating in PBSP, 110 of 135 came from the PSU and administrative segregation. Twenty nine admissions originated outside PBSP. Some medical patients were reportedly sent to local hospitals to accommodate inmates in psychiatric crises. The average length of stay was six days with occasional two-day extensions. There were 22 admissions with lengths of stay over 20 days during the five months preceding the monitor's visit. The use of restraints for over 24 hours with five inmates raised questions about the appropriateness of orders and release criteria. According to institutional data, five-day follow-up was completed in 100 percent of cases.

Other CAP Issues:

Group treatment was inadequate for EOP and 3CMS levels of care in general population and in segregated units.

Staffing shortages were most pronounced in the general population EOP but also hindered group treatment in the PSU. During the monitoring period nine EOP inmates were placed in administrative segregation because no PSU beds were available. Typically inmates were allowed up to four group sessions per week, but quality and attendance at groups declined. Documentation of inmate attendance was sporadic. Attendance varied by the identity of leader and time of day.

Approximately 250 3CMS inmates were in general population. Quarterly psychiatry contacts were made. IDTT meetings were variable in quality. In some yards C-files were not brought to meetings. Group treatment for 3CMS inmates was inaccessible due to lockdowns. Two weekly groups led by psych techs met in the general population yards early in the monitoring period but group treatment for general population inmates was subsequently cancelled due to a series of lockdowns.

The number of caseload inmates in administrative segregation hovered between 60 to 70, but staff reported it sometimes reached 100. Enhanced mental health treatment for caseload inmates in administrative segregation was instituted on March 6, 2006 under <u>Madrid</u> requirements. Nine groups led by psych techs were offered. Up to 45 inmates per week could attend group treatment.

In administrative segregation, weekly case manager contacts occurred regularly but approximately 58 percent of them were held at cell-front. Staff reported that every caseload inmate was offered an out-of-cell contact at least once every ten days. Psych techs made daily rounds. Records omissions precluded accurate audits of whether newly arriving inmates were seen within 72 hours (see Exhibit H, Case Review 3). The monitor's expert's review of one case found perfunctory psychiatry contacts and IDTT reviews. Mental health staff failed to identify or respond to another inmate with an obvious need for more intensive treatment (see Exhibit H, Case Review 1).

The number of 3CMS inmates in the SHU ranged from nine to 30. According to a key indicators report, eleven inmates were moved from the SHU to the PSU and four SHU inmates refused screening. Two screenings yielded positive results. <u>Other Issues:</u>

Access to UHRs and C-files was problematic. Staff reported that because MPIMS was expected to obviate paper records, it was difficult to obtain UHRs from medical records. C-files were rarely brought to IDTT meetings for 3CMS inmates in general population, but were routinely available at EOP IDTT meetings. Some reviewed UHRs contained little clinical information, possibly due to difficulty with saving progress notes documented via MPIMS. Staff reported that lack of recorded information in UHRs hindered audits.

Institutional Summary:

Approximately one quarter of line psychiatry positions were neither filled nor covered by contractors. Case manager vacancies were well covered by contractors but two psychologists were diverted to act as senior psychologists.

Quality management declined. Implementation of the new Madrid patient information system posed challenges to accurate documentation, resulting in inaccurate UHRs and the unavailability of MARs for filing.

Medication continuity was problematic for intra-institutional transfers. Non-compliance remained problematic, particularly during lockdowns. Laboratory testing was nearly compliant. The Keyhea process was used but lack of a statewide list hindered identification of newly arriving inmates with orders. DOT and HS orders were used. Parole medications were distributed but not logged or audited.

The institution's five referrals to acute care at DMH were accepted. Acceptances and transportation were timely. The MHCB unit was overcrowded and understaffed. Average length of stay was six days with occasional brief extensions.

Group treatment was inadequate for EOP and 3CMS levels of care in general population and in administrative segregation. Staffing shortages took their heaviest toll in general population EOP and hindered group treatment in the PSU. In general population 3CMS, quarterly psychiatric contacts were made but IDTT meetings were variable in quality.

In administrative segregation, weekly out-of-cell contacts were non-compliant, with about 58 percent of contacts cell-front. Psych techs made daily rounds. Access to UHRs and C-files was problematic due to the effort to obviate paper records under the new MPIMS. C-files were rarely brought to IDTT meetings. Some UHRs contained little clinical information which hindered audits.

### Valley State Prison for Women (VSPW)
May 23, 2006 – May 25, 2006

VSPW had significant vacancies among mental health staff. The chief psychologist was acting health care manager, and a senior psychologist continued to cover the chief psychologist position, leaving two of four supervisory positions functionally vacant. A budget change proposal to create a senior psychiatrist position had been submitted in the month prior to the monitor's visit. Only one of 5.5 allocated psychiatrist positions was filled, while the equivalent of 1.5 of the 4.5 vacancies was covered by contractors.

As for case managers, eight of 19.5 allocated clinical psychologist and psychiatric social worker positions were vacant. Contractors covered about half of the case manager vacancies. Four of five psych tech positions were vacant, all of which were covered by contract LVNs. Positions for a nurse and recreational therapist were filled, as were all seven clerical positions.

In late May 2006 VSPW's total inmate population was 3,861; 1,020, or 26 percent, were participants in the MHSDS. The caseload included 995 3CMS inmates; 751 in general population, 175 in the reception center, 38 in SHU, 26 in administrative segregation and five in the OHU. The number of 3CMS inmates in general population increased by nine percent since January 2006, while the caseload numbers in all other programs were static during this period. The total number of EOP inmates at VSPW was 25, which included one in general population, six in the reception center, four in SHU, eight in the administrative segregation hub and six in the OHU.

<u>Issues Resolved</u>:

> Mental health assessments for the disciplinary process were tracked and completed timely.

> Medication continuity was sustained when new general population inmates arrived.

> Medication continuity was sustained when inmates were moved within the institution.

<u>Quality Management</u>:

The local governing body met monthly, and the quality management committee and mental health subcommittee met bi-weekly throughout the monitoring period. Minutes were kept and attendees included required participants and ad hoc invitees. A mental health quality assurance subcommittee meeting observed by the monitor's expert was found to be well-organized and relevant to staff's ongoing efforts to monitor, manage and improve VSPW's mental health program.

Mental health staff regularly audited unresolved CAP items and components of medication management. Audits generated useful information and had improved from a methodological standpoint. VSPW chartered QITs to address complex

142

systemic issues and deficiencies brought to the fore by institutional audits. There were five active QITs in May 2006, the most active of which was updating OHU policies and procedures. Peer review was well-developed and sophisticated in all three mental health disciplines, focusing on both quantitative compliance and quality of care.

Medication Management:

Medication continuity was sustained when inmates arrived in the reception center with verified medication orders and inmates were relocated within the institution. Timely renewal of medication orders needed improvement; roughly ten percent were not renewed timely. Audits completed from December 2005 through March 2006 found that medication orders had expired for 16 of 152, or 10.5 percent, of sampled cases.

Staff at VSPW had an unusual practice regarding medication orders for new arrivals to the reception center who reported being on psychotropic medication but for whom no orders were documented. Contrary to local policy, this subset of inmates was not evaluated by mental health staff within 24 hours and referred to a psychiatrist if clinically indicated. Rather, in each case, VSPW requested verification of a current medication order from the sending agency. Audits completed by the institution and the monitor's expert found that outside agencies consistently responded to VSPW's requests within a week or so, and orders were written within 24 hours of receiving confirmation.

VSPW had a system in place for monitoring medication refusals and noncompliance, although it was unclear how well the system worked. An institutional audit found that completed refusal forms and non-compliance reports prompted referrals to mental health. It was unclear from the audit results if all instances of medication non-compliance were, in fact, identified and referred. Inmates referred to mental health for

medication refusal or non-compliance were not always seen by a psychiatrist in a timely manner.

The number of inmates taking mood-stabilizing medications dwindled to 19 during the monitoring period. Staff's audit of the institution's procedure for monitoring blood levels was incomplete. The audit findings did not identify what laboratory tests were ordered or indicate whether or not a psychiatrist responded to abnormal test results.

DOT protocols were implemented appropriately. This problem will be resolved if compliance is sustained.

Keyhea orders were tracked. One Keyhea certification was successfully initiated during the monitoring period. In May 2006 there were two inmates at VSPW with current Keyhea orders.

HS medications, ordered for 30 inmates at the time of the monitor's visit, were administered on all yards as well as in the OHU.

Medication was usually provided to paroling inmates. A staff audit found that 85 percent were given a supply of medication on discharge.

Mental Health Assessments for the Disciplinary Process:

Mental health assessments for disciplinary adjudication were completed timely and tracked accurately. However, the results of mental health assessments were not always considered by hearing officers. From December 2005 through March 2006, 1,135 charges were issued, 357, or 31 percent, of them to 3CMS caseload inmates. Only 13, or four percent, resulted in a referral for a mental health assessment. All 32 charges issued to EOP inmates triggered referrals for assessments.

Mental illness was found to be a contributing factor in 37, or 83 percent, of cases referred for a mental health assessment. The institution's tracking log indicated that hearing officers considered the mental health input in only 29, or 65 percent, of the 45 cases referred for an assessment.

According to VSPW's records, the charge or penalty or both were reduced in just seven, or 15 percent, of the cases for which mental health input was provided. The monitor's review of a sample of 15 cases in which mental illness was found to be a contributing factor was more favorable. Hearing officers took mental health assessments into account in their findings and dispositions in all of those cases.

Transfers:

VSPW referred three inmates to DMH in five months but referred more frequently to the MHCB unit at CCWF. Two inmates were transferred to DMH within one to four days of referral. The third was pending transfer during the monitor's visit and had been waiting nearly a week.

From December 1, 2005 through April 2006, VSPW generated 27 referrals to the MHCB unit at the CCWF, an average of five to six referrals per month. All referrals were accepted, and transfers were timely. Lengths of stay in the MHCB ranged from three to 30 days, with roughly one quarter lasting longer than ten days. Five inmates were admitted to the MHCB unit at CCWF more than once; two of them were subsequently transferred to DMH.

VSPW's OHU had ten beds and four safety cells. From December 2005 through April 2006, 21 inmates were admitted to the OHU three or more times; half of them were subsequently transferred to CCWF's MHCB. During the monitoring period,

145

52 admissions to the OHU had lengths of stay in excess of 72 hours. Some inmates found prolonged seclusion and inadequate access to showers stressful (see Exhibit I, Case Review 3).

VSPW's draft policy and procedure governing OHU operations, which was being revised by a QIT, needed more detail and clarity in critical areas. The draft policy did not adequately delineate the difference between behavioral observation and suicide watch nor did it emphasize that only clinical staff were permitted to order the use of those watch protocols. Access to showers, out-of-cell activities, escort requirements and allowable property and clothing were insufficiently spelled out in the draft procedures. VSPW's continued use of video monitoring to supplement suicide watches in safety cells was clinically unwarranted and needlessly compromised patient privacy.

Five-day follow-up of suicidal inmates discharged from the OHU and returned to VSPW from MHCBs improved but did not rise to previous levels of compliance. Tracking records yielded compliance rates of 87 percent for inmates discharged from the OHU and 96 percent for inmates discharged from MHCBs.

VSPW had the only administrative segregation hub unit for female EOP inmates. In May 2006, it reported eight EOP inmates in the hub unit and four in the SHU. Treatment did not equate to that provided in a PSU. In one case an inmate who was in the SHU but in need of acute care was deemed ineligible to return to DMH. The case was reviewed at the highest levels.

VSPW continued to meet transfer timelines for caseload inmates in the reception center. General population EOP inmates were transferred from VSPW well within the 60-day timeframe.

146

Other CAP Issues:

a. Partial Compliance

An institutional audit found that new arrivals to the reception center were evaluated for the need to request previous records from outside mental health programs. VSPW received less than half of the requested records within 90 days, but received nearly all of the records after sending a second request.

Audits covering the monitoring period showed that IDTT meetings were routinely held on an annual basis, while only 73 percent of initial IDTT meetings were timely. Treatment teams did not include all required disciplines in nearly one quarter of cases audited. C-files were not routinely brought to meetings.

Treatment planning continued to improve. According to audits done in the context of peer review, in 82 percent of cases reviewed, treatment plans showed coherence between diagnoses, treatment goals and the treatment that was provided.

VSPW seemed to handle referrals adequately but improvement was needed. From December 1, 2005 through April 2006, mental health staff responded to 99 percent of urgent referrals within 24 hours. During this period, 88 percent of referrals made by staff elicited a response within seven days, while only 78 percent of self-referrals resulted in timely contact. Staff attributed continued noncompliance to the combined impact of higher caseloads, shifting case manager assignments and vacancies among clerical staff.

In May 2006, roughly one quarter of the 3CMS inmates in general population were enrolled in a total of eight groups. The only space available for general population 3CMS group treatment also served as a pantry, lounge and training room for

staff. Scheduled groups were occasionally cancelled and frequently disrupted by other activities.

In administrative segregation and SHU, the EOP caseload population averaged eleven during the monitoring period. EOP inmates were seen weekly by a case manager, but 46 to 96 percent of the contacts were at cell-front. Staff attributed the high number of cell-front contacts to turnover among supervisory and clinical staff, lack of escort officers and logistical challenges associated with scheduling and coordinating multiple inmate activities. The amount of group treatment offered to EOP inmates averaged 9.4 hours from December 2005 to April 2006, and surpassed ten hours during two months. On average, each inmate received 7.7 hours of treatment per week. Meaningful discussion was conducted in a group session observed by the monitor. The holding cells used for group treatment were arranged in a manner that precluded visual contact among members of the group.

b. Non-compliance

Rounds in administrative segregation were not completed. Contract LVNs, responsible for daily medication passes and mental health rounds in administrative segregation, reportedly did not routinely contact inmates for whom medication was not prescribed. Staff also reported that daily rounds in administrative segregation were sometimes only partially completed when contract LVNs were diverted to perform other nursing duties.

Other Issues:

In May 2006, there was a suicide, the first at VSPW. The monitor's expert reviewed the incident report and found that the institution's emergency procedures

148