**<u>EXHIBIT E</u>**

EXHIBIT E

Duel Vocational Institute (DVI)

June 29, 2006 – June 30, 2006

1.    Inmate A

This mainline inmate's chart was reviewed as part of a study of treatment plans. The MH-2 was created on 4/11/06. The IDTT consisted of a case manager, a supervising Ph.D., and a CC I. The diagnosis was Psychotic Disorder NOS. The clinical assessment was adequate and contained good support for the diagnosis and a description of several problems including mild auditory hallucinations and poor medication compliance in the past. The only interventions listed included case management and possible medication. A perusal of the progress notes revealed that numerous problems had been uncovered and were being actively dealt with through various specific interventions. In addition, as was typical of mainline patients, his parole date was approaching soon and the case manager was creating a foundation for aftercare planning. The patient had been seen twice since the IDTT meeting, and three times by the psychiatrist.

Assessment:

Inadequate treatment plan. The "real" treatment plan was contained in the very good documentation in the progress notes.

2.    Inmate B

This mainline inmate's chart was reviewed as part of a study of treatment planning. The MH-2 was created on 4/11/06 with an addendum to a previous treatment plan. The diagnosis was bipolar one disorder NOS. Primary symptoms were paranoia and irritability. There were two addenda from the original treatment plan from 5/26/05. There had been no change in the patient's mental status and no interview associated with this addendum. The original treatment plan called for case manager contacts and medication if needed. Church was also recommended along with the possibility of NA and AA. The inmate had been seen twice by the case manager since the IDTT meeting and three times by the psychiatrist. The clinical documentation was very good and contained an explication of the inmate's problems and the interventions made by the case manager, including parole planning.

Assessment:

Inadequate treatment plan.

3.    Inmate C

This inmate was at the EOP level of care and his UHR and inmate history were reviewed. He arrived in December 2005 and his EOP chrono dated from then. He was on medication. On 12/20/05 he had an MH-7 which demonstrated emotional immaturity, psychotic symptoms, PSA, and decreased intellectual functioning. His diagnosis was psychotic disorder NOS and the GAF was 50. The plan was to place him in the EOP program with weekly visits, get a Quick-test, and a psychiatric referral. There were no

further progress notes during December 2005 but the inmate history demonstrated several EOP follow-up visits with his case manager.

His actual date of arrival was 12/15/05 from the county jail, on Risperdal, Cogentin and Benadryl. He received a bridge order on the same date for 30 days. Pursuant to the psychiatric referral by the case manager, he saw the inmate for the first time on 1/13/06 (28 days) and prescribed Risperdal 2 mg HS, Cogentin .5 mg HS, and Benadryl 50 mg HS. The progress note indicated that he had looked under-medicated and therefore the psychiatrist increased his Risperdal from one to 2 mg. There was a 3/21/06 revisit when his Risperdal was increased again to 1 mg a.m., 2 mg HS. Benadryl was increased to 50 mg BID. He entered administrative segregation on 3/15/06 and there were subsequent psychiatric notes on 3/30/06 and 4/19/06.

There were good IDTT notes and an adequate pre-ICC note. It reconfirmed that he had been seen at least weekly since his MH-7.

Assessment:

Adequate medication continuity in reception.
Delayed response to psychiatric referral.
Adequate contacts on a more than weekly basis.

4.      Inmate D

This inmate was in the EOP program in the reception center and his chart and inmate history were reviewed for weekly contacts. He arrived on 1/30/06 on Seroquel. He was referred by a correctional officer on 2/1/06 on an emergency basis for command auditory hallucinations. He was seen the next day and made an EOP inmate, after being admitted to the OHU. He was regarded as mentally ill and at high risk for homicide or assaults. He received his first psychiatric visit at that time and was placed on Seroquel and Remeron. Following his discharge from the OHU, he was seen on 2/10/06 for his first EOP group. On 2/24/06 psychiatry added Trileptal and increased his Seroquel to 300 mg BID. A review of his chart revealed that he arrived on 1/30/06 reporting that he was on Seroquel. He never received this medication in the county jail, and after arriving at DVI, he received no continuity medical order. He wound up in the OHU two days later. A referral to psychiatry was made on 2/23/06. He was seen one month later by psychiatry on 3/21/06.

A review of his inmate history confirmed that he has had 16 EOP follow-up visits in the ten weeks since he was made EOP, or 1.6 contacts per week.

Assessment:

Appropriate number of contacts for an EOP inmate.
Delayed psychiatric response to referrals.

5.     Inmate E

This EOP inmate arrived on 12/6/05 and was placed in the OHU on the next day. He was seen at that time by a psychiatrist and was discharged on 12/8/05. Inexplicably, his 31-question screen was accomplished after his discharge from an OHU for mental health purposes. He was followed up for two days by a case manager. He was followed as an EOP on a weekly basis until 1/6/06 when an EOP chrono was issued. It revealed that he had 1.7 EOP case manager contacts per week and was seen an average of 1.4 times per week during a five-week stint in administrative segregation. Referrals to psychiatry were made on 5/20/06 and 6/1/06 by MTAs, but as of 6/29/06 he had not been seen.

Assessment:

Adequate case manager contacts for an EOP inmate and more than weekly contacts in administrative segregation.
Delayed psychiatric response to referrals.

6.     Inmate F

This inmate arrived on 3/3/06 from MCSP, and arrived again on 3/16/06 on Paxil and Zyprexa. He received a bridge order on 3/3/06 and a mental health referral. The order was written for 30 days for Zyprexa 15 mg HS, Prozac 40 mg Q. a.m., Vistaril 75 mg concentrate TID prn for agitation. On 3/8/06, his Zyprexa was changed to Abilify 50 mg Q. a.m. and his Prozac was increased to 50 mg Q. a.m. On 3/15/06, he overdosed on Vistaril and was placed in the OHU for one day. He was made C3MS at that time and subsequently made EOP on 3/29/06. While the records and inmate history were very confusing and non-congruent, it appeared as though he was sent to APP from the MHCB at Cor following an incident in which he cut his neck in a suicide attempt. He was subsequently returned to DVI where he appeared to have overdosed. At the time of his initial placement at DVI, he was housed in administrative segregation for reasons that were not clear from the record. He was initially seen by psychiatry on 3/8/06. From 3/16/06 to 6/29/06 he received 20 contacts, or 1.4 per week, by both case management and psychiatry.

Assessment:

Good med continuity on entry.
Sufficient case manager contacts in administrative segregation at 1.4 per week

7.     Inmate G

This inmate was a 60-year-old man who paroled in early to mid-November 2005 and as returned to DVI on 11/17/05 on a parole revocation related to his unstable mental illness. On entry, he was placed in OHU on suicide precautions and made EOP. He also received an RVR on his first day back in custody for resisting officers. The mental health

assessment noted that this inmate had chronic bipolar condition with an acute exacerbation of manic symptoms at the time.

While in OHU on this admission, this inmate was moved to a quiet cell after three days and moved to a videocamera-observed cell two days after that. Throughout this time, his order was for suicide precautions. Although the order did not specify the intervals for nursing checks, staff interviews confirmed that such checks were expected to be every 15 minutes. Documentation of nursing checks, however, sometimes occurred at that interval, sometimes every 30 minutes, and much longer gaps were not uncommon.

This inmate was discharged on 11/23/05. DVI customarily checked on all OHU discharges for two days, and this was accomplished by a psych tech, who noted no acute distress in the inmate.

This inmate was readmitted to OHU four days later on 11/29/05, again on suicide precautions. The autopsy indicated he was admitted because he was urinating and defecating on the floor. That afternoon, he was moved to a quiet cell. When the monitor reviewed the chart months later, it was missing the admission assessment although a note indicated it was completed, all nursing checks, and all videomonitoring checks. It was unclear whether these should have been expected. The video camera was running because a tape was recorded. It was unclear whether officers were watching the video camera, although this was common CDCR practice at the time.

The incident report and autopsy both showed that at 7:00 the following morning, the inmate was found with *rigor mortis*, suggesting that no one had checked on him in at least four hours, or had checked in such a cursory way that they did not detect he was dead. The autopsy showed the cause of death as cardiac arrhythmia due to ASHD.

As noted above, documentation was either not done or was obscured. When plaintiffs asked for the videotape, they were provided only a few hours of it. When the monitor asked to view it, she was told no staff onsite could get into the evidence room. There also was no indication of any administration response. Staff reported that there was no review by the Emergency Response Review Committee and no Suicide Prevention Committee review. Mental health staff were unaware of any other action taken to examine these irregularities and ensure that suicide precautions were provided well in the future.

**EXHIBIT F**

EXHIBIT F

Kern Valley State Prison (KVSP)

July 11, 2006 – July 13, 2006

1.    Inmate A

This 3CMS inmate was housed in the MHCB. He was diagnosed with Schizophrenia, paranoid type and Mood Disorder, NOS. He was treated with Risperdal 3 mg/day and Zoloft 100 mg/day.

He was transferred from SAC to KVSP on 11/22/05. He had previously been receiving EOP level of care for several years, but reportedly stabilized, was compliant with treatment and was upgraded to 3CMS on 4/19/05. His medical record indicated that he had a history of chronic paranoid delusional thinking.

Initial progress notes after the inmate's arrival to KVSP indicated that he was psychiatrically stable; however, during April 2006, he began reporting problems with his cellie as well as reporting difficulty with not receiving showers, dayroom or mental health programming. On 5/9/06, he was referred to mental health by a CCI who indicated that he had made a suicide threat. He was seen on the following date by the clinical case manager who indicated that he was having difficulties with his cellie, and he was referred to the psychiatrist. On 5/24/06, he was seen by the psychiatrist when his Risperdal was decreased due to report of medication side effects. This was the last documentation of mental health contact until 7/9/06, when he was admitted to the MHCB after presenting with paranoid delusional thinking regarding demons and his cellie as well as disorganized thinking and behavior and agitation. He was initially placed on suicide watch; this was downgraded to suicide precautions on 7/11/06. At the time of the site visit, he remained with paranoid delusional thinking regarding microphones and bombs. The clinical staff indicated that he had shown improvement in his disorganized thinking since his admission three days prior.

Assessment:

It appeared that this inmate decompensated in general population prior to his admission to the MHCB; however, it appeared that he was seen by the mental health staff at the required frequency prior to his admission.

There was documentation of daily psychiatric clinical contacts in the MHCB. The psychiatrist appropriately increased the inmate's Risperdal to address his continuing psychosis. However, more aggressive interventions may have been indicated if he remained resistant to accepting the recommended medications and dosages.

2.    Inmate B

This EOP inmate was housed in the MHCB. He was diagnosed with Schizophrenia, paranoid type. He was treated with the following medications: Depakote 2000 mg/day,

Risperdal 4 mg/day and Seroquel 400 mg/day. He was on a Keyhea order which was expected to expire during October 2006.

He was transferred from the OHU at San Quentin to the MHCB at KVSP on 7/6/06. His medical record indicated that he was in the process of transfer from CMF to PBSP for eventual parole. It was unclear if he was receiving inpatient care at CMF DMH. En route to PBSP, he reportedly made threats to kill a judge and presented with agitation, kicking and screaming in the van. He was subsequently transferred to Humboldt County Jail where he reportedly gassed corrections officer(s) and was assaultive. A mental health parole evaluation was completed, and he received a psychiatric parole revocation based upon his dangerousness to himself and others.

The inmate was subsequently transferred to EOP administrative segregation at San Quentin where on 6/30/06, he attempted to hang himself. He was monitored in the OHU at San Quentin from 6/30/06 to 7/5/06 when he was transferred to the MHCB at KVSP. He was initially placed on suicide watch. This was downgraded to suicide precautions on 7/8/06. Progress notes indicated that he remained with agitated, threatening behavior, paranoid delusional thinking and disheveled appearance. The treatment team indicated that he would be referred to DMH for stabilization.

Assessment:

The care provided to this inmate in the MHCB at KVSP appeared to be clinically acceptable. There was documentation of daily psychiatric coverage and clinical contact in the MHCB. The treatment team appropriately planned to refer this inmate to DMH for needed stabilization.

3.    Inmate C

This 3CMS inmate was housed in general population. He was diagnosed with Schizoaffective Disorder, depressed type. He was treated with Benadryl 150 mg/day.

He was transferred from Corcoran to KVSP on 7/19/05. The bus screening indicated that he had been removed from the 3CMS program on 9/28/03. It appeared that the inmate was transferred to administrative segregation on or about 2/14/06 when a mental health screening was completed by the psych tech. He was cleared at that time.

A case manager note on 2/23/06 indicated that he was seen in the administrative segregation unit at staff request. At that time, he presented with confusion and auditory hallucinations. He was then referred to the psychiatrist and placed into the 3CMS program. He was seen by the psychiatrist on 2/24/06 when he was treated with Seroquel and Benadryl. Subsequent progress notes showed improvement with minimal symptoms. The last documentation of psychiatric contact was 4/11/06. He was last seen by the psychologist 4/5/06.

Assessment:

The last documented psychiatric contact provided to this inmate occurred on 4/11/06. The interval was greater than 90 days. However, there was no evidence of medication discontinuity.

Of greater concern was the lack of documentation of psychiatric clinical contact on 5/23/06 when his Seroquel was discontinued as per the physician's orders. There was also a physician's order on 6/9/06 when Benadryl was renewed for 90 days without evidence of actual clinical contact.

The last documentation of case manager contact was 4/5/06, an interval greater than 90 days. This was significant as this inmate was transferred from administrative segregation to general population during this time.

It could not be determined if this inmate was seen on a weekly basis by the case manager in administrative segregation as it was unclear when he was released from that unit. There was a lapse in weekly contacts during March 2006.

4.    Inmate D

This 3CMS inmate was housed in general population. He was diagnosed with Major Depressive Disorder. He was treated with Paxil 30 mg/day, Depakote 1500 mg/day and Benadryl 200 mg/day.

He was transferred from Corcoran to KVSP on 12/6/05. He was receiving 3CMS level of care at the time of transfer, and he continued at that level of care after arrival to KVSP. He was seen two days after his arrival by the psychologist. He was seen by the psychiatrist on 1/17/06. He was last seen by the psychiatrist on 4/5/06 when he reported some mood swings.

Assessment:

Although this inmate's medications were continued upon his arrival to KVSP from Corcoran, there was no documentation of actual psychiatric clinical contact or physician's orders present in the UHR. The first documentation of psychiatric clinical contact was on 1/17/06, greater than one month after his arrival at the facility.

The last documentation of case manager contact occurred on 2/27/06, greater than four months prior.

Physician's orders were present for Depakote and an increase in Benadryl on 6/9/06. However, there was no documentation of actual psychiatric clinical contact.

5.    Inmate E

This inmate's UHR was reviewed due to his suicide at KVSP on 3/28/06. He was not included in the MHSDS. He had been in the 3CMS program until 10/22/02 when he was removed from the program at Lancaster.

He had previously received mental health services while housed at Lancaster at the 3CMS level of care. He had previously been treated with Prozac that was discontinued during June 2001. He was transferred from Lancaster to CCI on 10/31/03 where he was not involved in the MHSDS. He was transferred to KVSP from CCI on 2/7/06. The bus screen was negative for mental health concerns. There was no documentation of mental health clinical contact located in the medical record during his KVSP incarceration, including a psych tech screening for his placement in administrative segregation.

A review of the incident reports indicated that on 3/28/06, he was found hanging in the B1 Ad Seg in his cell at 0650. The incident report indicated that he was found on the floor, face down, with a noose around his neck. It described the inmate as "stiff" to such an extent that the staff was unable to easily move him onto the stokes liter. He reportedly did not have a pulse, and his body was cold to the touch. CPR was not initiated. The autopsy report indicated that the inmate died from hanging by suicide.

The investigation summary by the coroner was reviewed. It indicated that the inmate had been housed in building B7 until 3/27/06. On that date, he received a reported threat from prison members of a rival gang. He was then moved to administrative segregation B1 on 3/27/06 for safety concerns as per the C-file. The summary indicated that an officer was assigned to make the morning checks in administrative segregation on 3/28/06. Initially no memorandum was provided by this officer regarding the incident. The coroner later received a fax of an undated memo from the officer making reference to how he conducted his 0100, 0300 and 0500 hour counts, but no visual descriptions of the inmate were made. Counsel with the CDC Office of Internal Affairs was contacted regarding the "vague memo" from the officer and requested further input from him. On 6/8/06, a fax was received from KVSP Internal Affairs presenting another undated memo that was handwritten by the officer indicating that on the morning of 3/28/06, at 0100 and 0300 hours, "nothing unusual was seen that morning" No account of the officer's action(s) for the 0500 count was seen.

Assessment:

The suicide report was not available for review at the time of the visit.

Although there was no documentation of psych tech rounds upon the inmate's arrival in administrative segregation, this inmate committed suicide on the early morning of his arrival to the administrative segregation prior to psych tech rounds.

The condition of rigor mortis indicated that this inmate had been dead for several hours. This brought into serious question whether custody rounds in administrative segregation occurred at the required frequency.

6.    Inmate F

Volume two of two of this inmate's medical record was available for review as he committed suicide by hanging on 6/30/06 in the free standing administrative segregation unit two. He was not a participant in the MHSDS at the time of his suicide.

This inmate was transferred from PVSP to KVSP on 1/23/06. The bus screen indicated that he had been in the 3CMS program in 1996, but it did not identify mental health concerns at the time of the screening. It appeared that he was transferred to the administrative segregation unit, possibly for contraband watch, on or about 1/27/06, and the psych tech mental health screening indicated that he had been treated with Elavil in 1996 and that he was "really depressed." He was seen by the psychiatrist on 1/31/06. The note indicated that the inmate wanted to be included in the 3CMS program, but that he did not wish to take psychotropic medications. He denied symptoms of depression or mood swings. A diagnosis of Mood Disorder, NOS by history in remission was provided with no psychiatric treatment recommended and follow-up as needed at that time.

He was again seen on 4/26/06 after return to general population by a psychologist in response to a staff referral due to depressive symptoms. This interview focused upon the inmate's desire for a single cell and recommended that the inmate contact custody regarding this issue. The last mental health entry was on 6/29/06, when a psych tech mental health screening was completed after the inmate was transferred to administrative segregation unit two. The C-file indicated that he was placed in administrative segregation on 6/28/06 due to threats to the security and safety of the institution. Although he indicated that suicide would not be an effective means of solving his problems, the screening was positive for depressive symptoms. The psych tech indicated that the inmate exhibited symptoms that he was experiencing a major depression and that mental health referral was indicated.

The incident report indicated that the inmate was found hanging in his cell from an air vent on 6/29/06 at approximately 2245. Custody cut him down, and the RN found that he had no pulse or respirations. The RN initiated CPR as per the UHR. The incident report was vague regarding whether CPR was initiated by the RN or custody.

Assessment:

A review of the information available did not identify specific areas of concern. The suicide report, autopsy and other summary materials were not available due to the recent occurrence of this incident.

7.    Inmate G

This 3CMS inmate was housed in general population. He was diagnosed with Depressive Disorder, NOS. He was treated with Thorazine 200 mg/day, Cogentin 1 mg/day and Paxil 30 mg/day.

He arrived at KVSP from SVSP on 9/6/05. He was receiving 3CMS level of care at the time of transfer. Progress notes indicated that he was seen consistently by the psychologist and psychiatrist and was reportedly stable on medications.

Assessment:

Informed consent for treatment with psychotropic medications was outdated.

There was documentation of quarterly case manager contacts.

There was documentation of consistent psychiatric contacts with medication continuity.

8.    Inmate H

This 3CMS inmate was housed in general population. He was treated with Risperdal 3 mg/day and Trazodone 200 mg/day. He was diagnosed with Schizoaffective Disorder.

He was transferred from WSP reception center to KVSP on 11/16/05. He was placed into the 3CMS program while housed at WSP. Progress notes indicated that he was seen by the psychologist and psychiatrist and was stable on medications.

Assessment:

Although the inmate's medications were continued upon his arrival to KVSP, he was not seen by the psychiatrist until one month after his arrival.

The last documented psychiatric contact occurred on 2/9/06, a span of five months. There was documentation of a physician order on 3/20/06 for medication renewal for 90 days without documentation of actual clinical contact.

The last documented case manager contact occurred on 2/16/06, five months prior to the visit.

9.    Inmate I

This inmate was an EOP housed on B8 in general population. He had been at KVSP since 10/05/06 and had been at EOP level of care since 1/3/2006. There was an evaluation in the record that was dated 3/7/06 in which the inmate was diagnosed with bipolar disorder mixed and polysubstance dependence in institutional remission. The treatment plan indicated medication management, weekly case management contact, mood anger management group and recreation therapy and "participation in active EOP transfer process."

From January through April 2006, he was seen approximately weekly by a case manager. Very adequate notes written by a case manager during this time essentially described him

as stable and awaiting transfer to Mule Creek. Records appeared to indicate that he was regularly seen by a psychiatric technician in rounds.

The inmate was seen by a case manager only twice in May 2006, on 5/15/06 and 5/17/06, and was seen once by a psychiatrist and once by a case manager in June 2006.

Assessment:

This inmate had been awaiting transfer to an EOP Program for approximately six months. He was receiving only sporadic contact from a case manager and was not receiving services consistent with his designated level of care.

10.    Inmate J

This inmate had been at EOP level of care since at least 1/18/2006. The change from 3CMS to EOP care apparently occurred following a deterioration in his mental health secondary to hoarding medication.   He was housed in administrative segregation in January and February 2006 and was seen in daily psych tech rounds. Notes indicated that he was often seen as "delusional," "paranoid," "irritable" or "manic."

The record did not contain evidence of weekly case manager contact through January and February 2006. He was seen by a case manager on 3/7/06, 3/14/06 and 3/27/06 and noted to be stable on medication. He was seen approximately weekly in April 2006 and seen in the first week of May 2006.   He was not seen from 5/3/06 through 6/22/06 and was then seen again on 6/30/06.   Notes indicated that he remained stable.

Assessment:

This inmate remained somewhat unstable through the preceding several months. The provision of case management services had been inconsistent.  He had not received other appropriate EOP services and had been awaiting transfer to an appropriate EOP program for nearly six months.

11.    Inmate K

This inmate apparently arrived at KVSP in October 2005 and was made EOP in January 2006. Per a progress note on 1/23/06, he was diagnosed with paranoid schizophrenia. His health care record included a treatment plan dated 4/11/06 that listed goals and interventions essentially consisting of recommendations to place him into a formal EOP program.

He was seen by a psychiatrist and had weekly case manager contacts in January 2006. Case manager contacts occurred approximately weekly and were documented through adequate progress notes through the end of April 2006.   It appeared that the inmate was seen twice in June 2006 and had not been seen from 6/21/06 through 7/13/06. Notes appeared to indicate that he remained stable through this period.

There were no notes indicating that he had been seen by a psychiatrist since January 2006. There were physician orders signed in March and April 2006.

This inmate was seen in interview on 7/13/06. He confirmed that he had been awaiting transfer to an EOP program since January 2006. He was seeing a recreation therapist approximately once per week. Although he was ducated for recreation therapy several times per week, he reported that schedule conflicts, "custody issues" or difficulty in getting released from his unit resulted in his missing many of these appointments.

This inmate contact with psychiatry staff had been limited and he reported that he last saw a psychiatrist at an IDTT meeting approximately two months earlier. He reported that he requested to see the psychiatrist since that time but that the ducat was cancelled.

This inmate saw a case manager regularly until early May 2006 when the clinician accepted another job. He had seen a psychologist approximately twice since that time.

This inmate presented as well groomed. He initially appeared quite hesitant in his interactions but appeared to be more comfortable as the interview progressed. He complained about the temperature in the interior of his cell. He was oriented to place and person and appeared able to provide personal information. There was no indication of disorganized thinking or other active symptoms of perceptual disturbance. The range of affect was somewhat restricted.

Assessment:

This inmate had been awaiting transfer to an EOP program since January 2006. It appeared that he had remained essentially stable through that time period. He was not receiving appropriate EOP services.

12.    Inmate L

This inmate willingly participated in the interview. He was adequately groomed. He reported that he had not seen a psychologist or any other mental health case manager since February 2006. He reported that the recreational therapist was ducating him for recreational activities scheduled in the cafeteria but that because of "prison etiquette" this would not have been seen as appropriate by the other inmates and so he declined. It appeared that he had been informed by another inmate of a prohibition against mental health services occurring in the dining room, but he did not elaborate on this belief beyond describing it as "etiquette." This inmate spoke extensively about microbiology as it was relevant to his health. His speech was somewhat rambling and perseverative. There were no obvious patterns of dysfluency. He reported being diagnosed with PTSD, OCD and depression. There appeared to be several ongoing somatic concerns including dehydration and concern over his hepatitis status.

This inmate reported that he received his medication regularly but had not seen a psychiatrist for some time. He reported that he has not seen a case manager since February 2006 although MHTS records indicated that he had been seen as recently as the week of 5/14/06. He indicated that his last appointment with a psychiatrist occurred about 2.5 months earlier and resulted in a "run in" with the psychiatrist which arose over his concern regarding his hepatitis status.

Assessment:

This inmate exhibited mild active symptoms of mental illness. He was awaiting transfer to an appropriate EOP program. His contract with his case manager had been sporadic and it appeared that his medication regimen had not been appropriately monitored by a psychiatrist.

13.    Inmate M

It appeared that prior to this inmate's arrival at KVSP, he had been at 3CMS level of care. Notes of August 24, 2005 indicated that he was delusional, disorganized and paranoid. On 9/28/05 he was noted to have been on a hunger strike. On 10/24/05, he requested that the IDTT remove him from 3CMS. He was then removed, probably inappropriately, in October 2005. This inmate arrived at KVSP from PVSP on 1/11/06. By 1/30/06 he was noted to have been on a hunger strike. He was placed into administrative segregation on 4/28/06 for threatening staff and was referred to MHCB approximately 5/7/06 as "gravely disabled with hostile intentions toward staff." He was placed back into 3CMS in May 2006 and almost immediately began asking to be removed from the mental health program. A note on 5/10/06 indicates that the inmate's cell was "messy." On 6/13/06, and after having been on a huger strike for nearly six weeks and having lost 46 pounds during that time, he was placed into the MHCB and involuntarily medicated. He was placed at EOP level of care on 6/16/06. After admission to the MHCB, he "started eating all his meals and asked for food and fluid," he denied hearing voices and denied the intent for self-harm. On 6/19/06 he reported that his food and water were poisoned. The attempt at obtaining a Keyhea order was dropped on 6/20/06.

After being released from the CTC, this inmate was seen by the psych tech for five-day follow-up. There was no indication in the health care record that the inmate had been seen by a psychologist or psychiatrist since leaving the CTC.

Assessment:

It appeared that, following an extended period of deteriorating mental health that included substantial weight loss, this inmate was appropriately placed into the MHCB and involuntarily medicated. The attempt at obtaining an order to maintain this medication was unfortunately dropped when the inmate began eating and taking fluids following this initial medication. The initial five-day follow-up to his CTC placement

appeared to have been appropriately completed. He had not received weekly case manager or psychiatric contact in the time since his release.

This inmate had been resistant to involvement in mental health services but clearly required ongoing monitoring and would likely have benefited from appropriate medication.   He should have been retained at EOP level of care and transferred to an appropriate EOP program.

**EXHIBIT G**

EXHIBIT G

North Kern State Prison (NKSP)

April 18, 2006 – April 20, 2006

1.    Inmate A

This inmate file was reviewed because he was identified in a letter from plaintiffs'
counsel as having been placed into a holding cell on "observation status" for exhibiting
bizarre behavior.  He had been designated as EOP since at least February 2006.  On
2/8/06 he was diagnosed with schizophrenia and psychosis NOS.  Records indicated a
history of poor medication compliance   He had a history of at least two psychiatric
inpatient placements as well as outpatient mental health treatment prior to the time that he
entered prison.

There was an MH-7 in his records dated 2/8/06.  There was no MH-2 in this inmate's
record.

This inmate apparently arrived at the reception center in October 2005 and was identified
as requiring 3CMS level of care shortly after that time.  By 1/31/06 notes indicated that
the inmate was not getting the Zyprexa that had been prescribed. A note on 2/24/06
indicated that the inmate was "decompensated due to lack of meds" and noted that he had
been prescribed Zydis and Abilify but the "MAR was missing."  He was apparently
placed into a "holding" cell on 2/24/06.  Notes indicated that he was discharged by the
psychiatrist who saw him on 2/25/06.  Apparently there had been no IDTT for this
inmate.  Notes on 2/27/06 indicated that there were "hygiene" problems and that the
inmate was having conflicts with other inmates. He was apparently placed in the CTC
from 3/15/06 through 3/22/06 and diagnosed with Psychosis NOS.  He had been non-
compliant with medication in the yard, began taking medication once in CTC and
"reconstituted."  He had been seen approximately once per week by a case manager and
had not received other EOP care.

Assessment:

This inmate's mental health care had been compromised by lack of access to an
appropriate EOP program, an apparent lack of medication continuity which occurred
when he was not provided with prescribed medication, and lack of appropriate IDTT
review following a placement into a "holding cell."  He had not been transferred into an
appropriate EOP program in a timely manner.

This inmate's record did not include a treatment plan.

2.    Inmate B

This 36 year-old inmate was an EOP who had been in administrative segregation for at
least 72 days at the time of the monitor's visit.  Records indicated that he has been at
EOP level of care since at least February 2004.  It appeared that he entered the reception
center, probably as a re-commitment, in November 2005.  A reception center evaluation
diagnosed bipolar disorder in November 2005.  Notes indicated that, by 12/04/05 he was
refusing medication and was "heading out of control" in his own words on 12/14/05.  His

medication compliance was marginal through February 2006 and there were periodic references to deterioration. By 3/1/06, notes indicated that he was feeling suicidal and was reporting previous suicide attempts. He was placed into a holding cell in the absence of an available CTC bed on 3/1/06. Staff requested MHCB placement from Sacramento on 3/3/06. The inmate was then in CTC from 3/3/06 through 3/20/06. Notes since the time of placement indicated that he continued to be only partially compliant with medication, refusing some and taking others. Per report, he did attend some weekly groups. It appeared that he was seen approximately weekly by the case manager and was not provided with other EOP services. Rounds appeared to be occurring as per policy

The record contained an MH-2 completed during the inmate's CTC placement.

There was an MH-2 in the record dated 3/22/06 that included a description of target behaviors and target objectives. There were short-term intervention plans included under "interventions."

Assessment:

Apparently this inmate had been awaiting transfer to an EOP program since his arrival at NKSP reception center in November 2005. Throughout this period, he had been inconsistently compliant with medication and, as a result, he had apparently functioned within a less-than-optimal range with occasional periods in which he was at substantial risk for self-injury. Involvement in the full range of services available from an EOP program would likely have been of benefit in increasing his compliance with medication, or at least would have provided an environment in which the need for a higher level of care could have been better assessed and more actively pursued. His transfer to an EOP should have been expedited. Pending such transfer, he should have been monitored for the need for referral to intermediate or acute care.

It did not appear that this inmate's refusal of medication was appropriately followed up by psychiatric staff.

3.    Inmate C

This 50-year old inmate was at the EOP level of care. He arrived at the reception center on 2/17/06 with a history of mental illness that appeared to date from his childhood. By 2/21/06 notes indicated that he was refusing medication. Notes from 2/21/06 indicated that he was acting "bizarre.' In interview he was delusional and spoke of bizarre religious themes. By 2/28/06 he was continuing to refuse medication, was admitting that he spoke to God. He was placed into a holding cell on 3/3/06 and returned directly to the yard on 3/6/06. A note from a psychiatrist on 3/6/06 stated the belief that the inmate should be considered for DMH referral secondary to limited understanding of instructions and poor compliance with medication. He was apparently re-admitted to the CTC on 3/9/06 and discharged on 3/ 22/06. Notes from around 3/10/06 again stated that the inmate would be considered for DMH. This inmate had been seen approximately weekly

by a case manager as an EOP patient and had not received other EOP services. He was referred to DMH on 3/20/06 and was apparently pending acceptance.

Assessment:

This EOP inmate was not transferred into an appropriate EOP program in a timely fashion and, while awaiting such transfer his condition deteriorated. He had not received a full range of appropriate EOP services. His placement into a holding cell occurred in the absence of appropriate CTC bed space and there was no indication that his case was appropriately followed by an IDTT upon his release from the holding cell. As in most cases, case manager involvement and IDTT review had not routinely occurred until the inmate was transferred from the holding cell into a CTC bed.

At the time of the monitor's visit, the staff had appropriately initiated a transfer to an acute care program.

4.    Inmate D

This 33-year-old inmate had been designated as requiring EOP level of care since at least February 2006. He was diagnosed with schizoaffective disorder on 3/9/06 during the reception center mental health evaluation. He was apparently placed into a holding cell on 3/3/06 after reporting "I woke up with a strangling feeling and saw tubes coming out of my mouth." He was released from the holding cell approximately three days later. He was re-evaluated for placement into a MHCB on 3/17/06 and because of lack of CTC bed space, was placed into a holding cell at that time. He was discharged directly to the yard on 3/20/06. An order was written on 3/17/06 for inmate injection of Geodon if he refused Geodon PO. The inmate was sent back to the yard on 3/20/06 and all psychiatric medication was discontinued on 4/3/06. Subsequent to the discontinuation of medication, this inmate was placed into administrative segregation after he "ran across the day hall and slapped" another inmate. Although he was diagnosed with schizoaffective disorder he was not prescribed medication. Contact with the case manager occurred approximately once per week and there were no other EOP services offered to this inmate.

Assessment:

This inmate had been designated as requiring EOP level of care and was awaiting transfer into an appropriate EOP program. He had not received appropriate EOP care while awaiting this transfer. On at least two occasions, he was placed into a holding cell in the absence of an appropriate CTC bed. It did not appear that an appropriate IDTT review of this placement occurred. While diagnosed with schizoaffective disorder and with a recent history of placement into a holding cell for psychotic behavior he apparently assaulted another inmate in an unprovoked fashion. Despite this event and the inmate's history of noncompliance with medication, there was no attempt to initiate involuntary medication and no explanation in the record as to why no such intervention was considered.

5.    Inmate E

This 51-year old inmate was designated at EOP level of care and had been awaiting transfer from NKSP to an EOP program for 162 days at the initiation of the monitor's visit. He apparently arrived at the reception center in October 2005 and was diagnosed with schizophrenia, paranoid, in a December 2005 evaluation. He had been at EOP level of care since approximately 12/23/05 per a progress note on that date. He had a history of anxiety and impulsive behavior prior to incarceration. There was a history of inpatient hospitalization and prior prison terms with psychiatric treatment. He was admitted to the CTC from 12/23/05 through 12/27/05 and characterized as anxious and evidencing a mood disorder. Notes indicated that he continued to evidence signs of substantial anxiety with paranoid thoughts through January 2006. A 3/16/06 note indicated further deterioration and decompensation that apparently accompanied a change in medication, characterized as an "unexpected change.". There were no notes in the record since 3/30/06. This inmate had been seen at intervals of approximately one week by the case manager. On at least one occasion, a note indicated that the inmate was seen only at cell front as a result of time constraints.

Assessment:

This inmate had been awaiting EOP level of care for over 162 days at the time of the monitor's visit. He had not received adequate, i.e. EOP, care while awaiting this transfer and, likely as a result, his mental health had been unstable.

It appeared that the inmate had been seen weekly by a case manager.

6.    Inmate F

This inmate was referred by plaintiffs' counsel for review. He was at EOP level of care and had been housed within the administrative segregation unit apparently for safety reasons for over 150 days. This inmate had a reported history of having been placed in mental hospitals outside of prison and was, in fact, removed from a mental hospital and returned to prison. He had been placed in MHCB on at least two occasions, for five days on 1/17/06 and for 12 days on 3/13/06.

A review of his records from mid-February 2006 through the time of the monitor's visit revealed that the inmate had been characterized as generally compliant with medication and generally appropriately groomed. He had periodically become quite agitated, kicking doors, etc. He was delusional and paranoid and this appeared to have continued though several different medications that had been administered through this period. From 1/24/06 through 3/29/06, the inmate was seen weekly, with two exceptions, by the case manger. Except for those dates during which the inmate was housed in MHCB, it appeared that he was seen in daily rounds by psych techs.

Assessment:

This inmate remained rather unstable through the period since his arrival at NKSP despite apparently active medication consultation from psychiatry staff. The inmate had been in need of EOP treatment since his arrival and had not been transferred. He appeared to have been an appropriate referral for intermediate care. This case was discussed with the senior psychologist on 3/20/06. The staff were to formally consider referral of this inmate to DMH or to an intermediate care program

7.    Inmate G

This inmate was designated as requiring EOP level of care and was housed in administrative segregation. He had been in the facility awaiting transfer to an EOP program for more than 134 days. There was no evidence that this inmate had been placed in crisis beds since he had been at NKSP. He was diagnosed with Psychosis NOS and substance dependence. There was a history of previous psychiatric hospital placement in 2003 and 2004. Notes indicated that he was expected to "parole from ad seg." Notes in January 2006 indicated that he was generally compliant with medication. He was seen as anxious and exhibited evidence of auditory hallucinations which he verbalized during visits with his case manager. The 1/13/06 note indicated that the inmate's condition appeared to be "deteriorating." He appeared to be functioning fairly well adaptively but continuing to exhibit symptoms. He had been seen weekly by a case manager and was not provided with other EOP services. The inmate had generally been seen daily by psychiatric technicians.

Assessment:

This inmate had been awaiting transfer to an appropriate EOP program for over 134 days at the time of the monitor's visit. Though compliant with medication, he had continued to experience active symptoms of psychosis and would likely parole without receiving the potential benefits of involvement in an EOP program.

8.    Inmate H

This inmate was referred by plaintiffs' counsel. Records indicated that the inmate had transferred from the institution on 4/5/06.

**EXHIBIT H**

EXHIBIT H

Pelican Bay State Prison (PBSP)

April 17, 2006 - April18, 2006

Generally:

The following case reviews were based upon a flawed records system. Staff believed that a nearly complete history of recent mental health treatment was recorded in the UHR, but in fact it was not. Medication orders were no longer filed in UHRs routinely although in some cases they were found there. Most orders were stored only electronically. A second important omission was the absence of clinical information written by a treatment provider. Staff possessed different levels of competence in use of the MPIMS, particularly the "save" function for the narrative portion of progress notes. Some UHRs were filled with paper that showed only inmate name, clinician name, and date of contact. The substance any clinical encounter was missing. Staff explained that a common error in saving and printing the MPIMS contact document resulted in the printing and filing of a piece of paper virtually empty of meaningful content.

1.    Inmate A

This inmate was treated at the 3CMS LOC. Information in his UHR suggested that he had been housed in administrative segregation for at least one year.

He was discharged from the caseload in May 2005. Staff reported orally that in accordance with SOP he was moved from the unit that housed caseload inmates and placed in building A-6, a new ASU. His behavior triggered custody staff referrals in August and October. When he was having trouble functioning in August he was seen cell-front by a mental health clinician. He was resistant to coming out for a meeting. The clinician determined that his behavior posed a discipline problem for custody staff but he was not in need of mental health follow-up.

He was not seen again until October when he was again referred by custody staff. He had reportedly urinated several times in his cell. Once again he was resistant to talking with mental health staff. The clinician determined that he seemed to be "rather disassociated" and possibly experiencing a thought disorder. He was added to the 3CMS roster at that time.

A timely IDTT meeting was held. It was attended by a full team. Documentation associated with the meeting and treatment planning was complete and filed in the UHR. His treatment plan showed that he had a diagnosis of Adjustment Disorder with anxiety. Despite monthly treatment team meetings held to review the treatment plan no further information regarding a diagnostic formulation, his response to medication or review of his clinical status was found in the UHR.

Medication orders for Zoloft were continuous from November 2005 through June 2006. He was treated by two different psychiatrists. After returning to the caseload he was first seen by a psychiatrist in the context of his initial IDTT meeting. Orders for Zoloft were written at that time. Review of the UHR showed that he had last taken Zoloft in March 2005.

Although he was seen four times by psychiatry there was no meaningful evaluation. Documentation of psychiatry contacts was cursory. Whether viewed cumulatively or in isolation psychiatry contacts provided little to no clinical information. He was seen only once by psychiatry in an individual confidential setting. A psychiatry note written in March indicated that he might be developing a thought disorder and exhibiting a disassociative reaction. It was unclear whether the psychiatrist observed signs of a disorder or whether the language was carried over from the previous entry made by a case manager. The other psychiatrist who saw him elicited very little clinical information despite having the advantage of seeing him individually in a confidential setting. He or she renewed the order and noted that the inmate had refused an office visit in the past but was seen in an office on that date.

There was almost no documentation of his clinical presentation or his level of functioning during the past five months. Psych tech rounds were documented by a weekly summary filed in the UHR. Frequency of case manager contacts was reported differently by different sources of information. Case manager contacts were lightly documented in the UHR. They did not occur weekly. Many notes did not indicate whether the contact was made cell front or in an office. One note indicated that he refused to come out and the case manager went to his cell, exchanged a few words and discerned that he was doing well enough. A different note from an out of cell contact also indicated he was doing well enough. In contrast, a QA utilization query indicated that he was seen weekly by a case manager between 1 November 2005 and the end of March 2006. An MHTS inmate history showed that he was seen nearly every week by a case manager. It also showed that he attended 3 group sessions in March but only one additional session since November.

This inmate was interviewed briefly in a non-confidential setting on 4/17/06 at the conclusion of a current events group he had attended. Other inmates and staff were present. The group was held in a corridor outside an administrative segregation housing area. Each inmate was in a holding cell.

This inmate was fairly neatly dressed and moderately well groomed. He answered questions readily but did not consider his answers fully. His answers were vague. Some seemed to be confabulated. He seemed eager to please. He was not a good historian. His cognitive functioning was unusual.

He reported he was seen individually about six times in the past few months. He estimated that individual meetings lasted around 30 minutes. Individual contacts were made in a confidential setting. He attended groups often. He said he was satisfied with the treatment. He reported he received medication around 7:30 each evening. He participated actively in the current events group.

Assessment:

Documentation of recent treatment was impoverished in content. It did not yield a coherent picture of his treatment needs nor of his clinical presentation. Medication

continuity was sustained, timeliness and frequency requirements for contacts and meetings were met but clinical interventions lacked focus and substance.

Psychiatry contacts and psych tech rounds appeared to be documented accurately in the UHR. Frequency of case manager contacts was reported differently by different sources of information. Psychiatry evaluations were cursory.

There were suggestions that this inmate had a thought disorder or a cognitive processing problem. Diagnostic clarification was needed after he was added to the caseload and after an initial IDTT meeting was held. There was no indication that staff attempted to distinguish between a psychotic process and an adjustment disorder or an adaptive reaction to environmental presses. Monthly IDTT reviews did not capture clinical information nor did they refer to a need for diagnostic clarification. Documentation of monthly reviews simply recorded that a meeting was held. His case warranted more meaningful quarterly updates for treatment planning more communication among staff regarding his treatment needs.

A referral made by custody staff in a new ASU in August elicited a minimal response by mental health staff. It was deemed insignificant based upon insufficient information. It was not until two months had elapsed and the inmate had urinated in his cell several times that a referral by staff was afforded more weight.

2.    Inmate B

This inmate was treated at the 3CMS LOC. He was housed in administrative segregation as of September 2005. He declined to be interviewed in a non-confidential setting on 4/17/06 at the conclusion of a current events group he had attended.

He had a long standing diagnosis of Depressive Disorder NOS as well as grief associated with a recent bereavement. He also had open legal issues that are of great concern to him and are a source of stress.

According to a progress note his orders for Zoloft and Benadryl expired in August. It was rewritten by a psychiatrist after one week. The orders in the UHR were continuous for that period of time. A medication error was noted in the MPIMs on 10/31/05. He was seen by a psychiatrist because he received 200 mg of Benadryl rather than 100 mg. The error appeared to be a misunderstanding between the psychiatrist and an MTA.

He was seen out of cell weekly refusing only occasionally. Progress notes made during the past several months indicated that he discussed issues of emotional concern with his case manager. Psych tech notes made weekly documented daily rounds. A note indicated that he attended three of four current events groups in March.

He had quarterly IDTTs in September and December 2005 and in March 2006. All three IDTT meetings were attended by a full team. The September plan was individualized. The quarterly updates were MH3 notes that recorded the date, time and participants in the

IDTT meetings. The MPIMS QA report reflected not only quarterly IDTTs but also showed an IDTT meeting held for his annual update on 3/29/06, two weeks after a quarterly meeting.

Assessment:

Mental health treatment met Program Guide requirements and was responsive to his needs. Medication orders may have lapsed for one week. If so the lapse was detected and remedied promptly. No deleterious consequences ensued.

3.      Inmate C

This case illustrated a problem with accurately dated contacts recorded electronically and on paper via MPIMS.

This inmate arrived at PBSP recently. He came from DVI around 2/27/06. He was not on the mental health caseload when he arrived. He was housed first in the A2 orientation unit for GP inmates then moved to the new ASU.

The amount of time that elapsed between his entry into ASU, mental health screening, and scoring of the mental health screening were unknown. Dates were not available in the health records, both electronic and paper. Staff who looked at the UHR deduced that he was screened by mental health in the new ASU around 3/9/06 or 3/10/06. A 31 question screening was completed shortly thereafter. The results of the screening were known on 3/12/06.

The results of the screening triggered an emergency response. It indicated that he had suicide potential and a possible mental illness. He was seen by a clinician from the CTC on an emergency basis in the ASU on 3/12/06. He was not admitted but was diagnosed as having an adjustment disorder. He was seen by a psychiatrist the following day. Remeron was initiated. Progress notes indicated that he told mental health staff he should be a level I inmate but was elevated to level IV because of disciplinary infractions incurred in the county jail. He was angry and depressed.

On 3/15/06 a treatment team determined that he needed to be added to the caseload. He had been moved to the segregation unit that houses 3CMS inmates. He was placed on the caseload by reason of medical necessity.

He had an initial IDTT meeting in segregation on 3/21/06. According to the MPIMS paper filed in the UHR a full team attended the meeting. The plan showed a diagnosis of Adjustment Disorder with anxiety/depression and a GAF of 70. A recent history of suicidal ideation was noted. Problems, target behaviors and treatment objectives were individualized. Interventions were a list of the interventions planned for all caseload inmates in administrative segregation, psychiatric follow-up as needed, weekly CCM contacts and daily psych tech rounds.

Documentation regarding medication was uninformative. There were contradictory notes as well as other discrepancies regarding whether he was on Remeron. There were no orders for Remeron in the order section of the UHR and a psychiatry progress note said that he reported that he was not on medication. But there was an informed consent for Remeron dated 3/13/06. He reported on 4/17/06 during the interview that he was taking medication.

This inmate was interviewed briefly in a non-confidential setting on 4/17/06 at the conclusion of a current events group he had attended. Other inmates and staff were present. The group was held in a corridor outside an administrative segregation housing area. Each inmate was in a holding cell.

When interviewed on 4/17/06 he said that he was attending a group session for the first time. He knew the rules concerning attendance at groups and extra privileges. He said he had not declined to attend and didn't understand why anyone would pass up a chance to come out of their cell. He was neatly dressed and well groomed. His mental status was grossly intact. He answered questions relevantly. His mood was euthymic.

Assessment:

Mental health treatment met Program Guide requirements and was responsive to his needs with the possible exception of a timely response to an inmate in distress in the ASU.

Whether screening, scoring and follow-up in the ASU was timely or not was obscure due to problems with how dates were recorded electronically and on printed documents generated by MPIMS.

4.    Inmate D

This case was selected for review because he had multiple charges for sexual misconduct. Records suggested that he was housed in the general population and treated at the 3CMS LOC at the time of the offenses.

Staff reported that he was charged with indecent exposure on 1/21/06 and 2/4/06. On both occasions he was screened. Screenings were done six days and 11 days after the incidents. Staff reported orally that in accordance with the Freitag remedial plan screenings are not required immediately after incidents of sexual misconduct. IDTT meetings were held in connection with both incidents. No sexual disorder was diagnosed. In the months prior to the charges he complained of sexual side effects of psychotropic medication.

Documentation associated with a recent IDTT meeting showed diagnoses of Schizoaffective Disorder, Bipolar Type and ASPD. He was also described recently as having a Mood Disorder. This inmate had a current Keyhea order. It was renewed most

recently on 4/4/06 for a period of six months. The UHR indicated that concurrent Keyhea orders were issued consecutively since December 2003.

As of April 2006 his regimen was Prozac 40, Benadryl 100 and Geodon 120. Medication orders were no longer written in the UHR due to the use of a new electronic records system. Instead the UHR contained a MPIMs print out showing current medication in the context of a psychiatry note.

He seemed to be more angry and oppositional in September than he was in subsequent months. Late in October he complained of sexual side effects associated with Geodon or Prozac. A psychiatric note dated 10/20/05 noted his subjective reports of painful erections of four hours in duration occurring several times in September and early October 2005. He also expressed concerns about his treatment for HTN and was noted to be somatically preoccupied. He reported no emotional distress. The psychiatrist did not adjust the medication regimen since the most recent episode had taken place about three weeks before. He was advised to notify staff immediately if he had another episode of abnormal erectile functioning to avoid deleterious consequences such as impotence.

Staff reported that he had RVRs for sexual misconduct on 1/21/05 and 2/4/06. He was moved to administrative segregation on 2/4/06. When he was seen next by mental health on 2/9/06 five days after he was charged he declined to come out of cell. He seemed oriented and conversed relevantly. The note did not mention the recent charge. The progress note written the week before his charge, on 2/2/06, indicated that he had major social problems and wanted to refrain from creating problems and incurring RVRs. He was described as having strong litigious and homicidal impulses, dwelling on wrongs done to him and having poor judgment. He lends or rents out property and then becomes embroiled in arguments about the terms of use and payment.

An IDTT met on 3/8/06 to in connection with an RVR he received for sexual misconduct. The team determined that his current treatment met his needs and that no additional issues ought to be addressed. Diagnoses on the MH2 dated 3/8/06 were Schizoaffective Disorder, Bipolar Type and ASPD. It was not possible to discern the team members of the IDTT that met on 3/8/06 from the treatment plan but they were listed on a progress note. It listed the team members present and the conclusion reached by the team. An earlier treatment plan dated 2/15/06 indicated that the IDTT meeting was attended by a full team.

A progress note written early in April 2006 described him and somewhat hostile, uncooperative, and loud. That note showed a diagnosis of Schizoaffective type Schizophrenia (sic). A psychiatry note written in February showed diagnoses of Mood Disorder and Schizoaffective type Schizophrenia. MPIMs notes contained clinical content. He discussed issues of emotional concern with his case manager.

Assessment:

In contrast to other UHRs reviewed in April 2006 at PBSP the record yielded a reasonably coherent account of the cyclic nature of this inmate's mood disorder and his recent history of treatment. Aside from a small number of minor discrepancies in dates of contact an MHTS inmate history reflected the same contacts as recorded on print outs of MPIMs notes.

Mental health treatment met Program Guide requirements. The record demonstrated that his treatment providers were aware of his main issues and treatment was responsive to his presentation.

5.    Inmate E

This inmate was in the MHCB on 4/17/06. He was admitted four days before. His IDTT meeting was observed. No documentation of his treatment in the MHCB was reviewed.

According to his MHTS history he arrived at PBSP from CMF on 7/13/05 for treatment in the PSU. He had a diagnosis of Schizophrenia, paranoid type. He had orders for Risperdal but was reluctant to take medication. He received little treatment during the three months that preceded his admission to the MHCB.

According to an MHTS inmate history between 1/1/06 and 3/25/06 37 group sessions were cancelled. Staff reported that sessions are typically three to 3.5 hours in duration. Roughly eighty hours were lost to cancellations. Two sessions were cancelled because of "Institution," two because of staff meetings, and three because of "custody." Four were cancelled due to holidays, 11 were cancelled because there was no coverage and 15 were cancelled for reasons not specified on the tracking summary.

From 1/1/06 through 2/11/06 he was seen four times by a case manager and once by a psychiatrist. He did not attend any of the group sessions he was offered. He refused to attend three movie group sessions and four orientation sessions. Had he attended all groups offered to him he would accrued approximately 21 hours of group treatment during that 40 day period.

His participation improved during the next 40 days. From 2/13/06 through 3/25/06 he was seen weekly by his case manager and monthly by a psychiatrist. Most weeks he attended a movie group and a writing group. Twice he attended a second movie group during the week. Once he did not attend writing group. His weekly hours of group attendance ranged from a low of three to a high of 8.5 hours plus case manager contacts.

Assessment:

Mental health treatment in the PSU was not adequate. Too many group treatment sessions were cancelled.


6.    Inmate F

This inmate's annual IDTT meeting was observed and his UHR was reviewed. The meeting was attended by the treating psychiatrist, the case manager and a supervisor of correctional counselors.

This inmate was treated at the 3CMS LOC and housed in general population. He had been prepared individually for the meeting y his case manager. He participated actively in the IDTT meeting when queried by his case manager. He also raised two issues of concern of his own initiative.

During the IDTT meeting the inmate reported that he has a diagnosis of Schizoaffective Disorder and Polysubstance Abuse in institutional remission. He has six years remaining of his sentence. He was unassigned and complained he could not get a job. The CCM said there were few jobs on B yard. The supervisor of correctional counselors who was present did not have the c file and did not know the case. He was unable to offer assistance regarding work assignments or transfer to an adjacent yard where work assignments were said to be more plentiful.

During the IDTT the inmate reported that his Seroquel is being crushed. Staff reported that there is a blanket crush order on Seroquel. Seroquel is always administered crushed at PBSP. He said that although he eats when he takes it he often becomes nauseated and vomits it. He was worried that no alternative would be found. He said and his psychiatrist agreed that they went through many trials to find a medication he could tolerate and was therapeutic. The team discussed the problem. He has historically been compliant with medication and remains so. He did not take Seroquel one night recently and had a bad night. He had already discussed that miss it with his case manager.

This inmate was scheduled to meet every 60 days with his case manager. Meetings were held as scheduled.

Assessment:

Program Guide requirements were met with the exception of lack of a C- file at an IDTT meeting. Although staff reported that a procedure for ordering uncrushed Seroquel could be employed on a case by case basis the procedure did not appear to have been used in this case.

7.    Inmate G

This inmate's annual IDTT meeting was observed. It was attended by the treating psychiatrist, the case manager and a supervisor of correctional counselors.

This inmate was treated at the 3CMS LOC and housed in general population. He had been prepared individually for the meeting y his case manager. He participated actively in the IDTT meeting when queried by his case manager.

The inmate reported that he had a diagnosis of Schizophrenia, paranoid type and a history of visual hallucinations. He said he had been waiting to move to A Yard so he could get a job. The issue had been discussed many times with his case manager. The supervisor of correctional counselors who was present at the meeting did not have a C- file and did not know the case. He was unable to offer information or assistance.

Assessment:

The IDTT meeting did not serve its purpose. Despite the presence of a supervisor of correctional counselors, the custody contribution was absent as was the C-file.

8.      Inmate H

This inmate's annual IDTT meeting was observed. His UHR and inmate history were reviewed. The IDTT meeting was attended by a psychiatrist, the case manager and a supervisor of correctional counselors. He refused to attend on the grounds that he did not want to be observed by unknown persons. During the meeting his case manager provided an overview of his treatment.

This inmate was treated at the 3CMS level of care and housed in general population. He had a diagnosis of Psychotic Disorder in remission. He has been resistant to taking medication. He stopped taking Risperdal in September 2005. He has had no medication order since. His reports of symptoms of mental health problems diminished after he stopped taking medication.

He was described as socially withdrawn and striving to avoid other people and staying out of trouble. He was initially angry but began discussing issues of emotional concern with his case manager. He was unassigned. He no longer wanted to receive mental health treatment. As of 10/13/06 he will have been off of medication for 13 months.

The MHTS inmate history showed only two case manager contacts, 12/5/05 and 2/22/06. He was also seen by his case manager on 8/30/05 in response to a referral for non-compliance.

Several referrals for non-compliance were written from July through September. He was seen by both his case manager and his psychiatrist within five days of a referral being made in August. Another referral for non-compliance was made on 9/3/05 and another on 9/15/05. They did not result in contacts until 9/23/05. Yet another non-compliance referral was written on 9/19/05. It reported that he missed Risperdal and Benzotropine 20 times since 8/30/05. His reasons for non-compliance were discussed with his psychiatrist. They evolved over time from blurry vision to unwillingness to go pick up medication.

Progress notes indicated that he discussed issues of emotional concern with his case manager including his future discharge from the 3CMS caseload and his release from

prison.  Progress notes by his case manager and psychiatry were rich in clinical information.  They were made on MPIMS then printed out and filed in the UHR.

Assessment:

Mental health treatment met Program Guide requirements.  For the most part non-compliance with medication was handled appropriately.  Documentation of recent treatment was complete and contained clinical information.

## EXHIBIT I

EXHIBIT I

Valley State Prison for Women (VSPW)

May 23, 2006 – May 25, 2006

1.    Inmate A

Plaintiffs' counsel requested that the monitor review the circumstances surrounding this EOP inmate's recent transfer from DMH to the SHU at VSPW and recommend treatment measures for this inmate pending activation of a PSU at CIW.

In 1992, this 33-year old inmate was sentenced to 15 years to life for second degree murder. Thereafter, she received three additional prison terms related to multiple counts of assault/battery on staff. In September 2004, she attempted suicide and assaulted staff who were attempting to render her aide. At that time, she was noted to "exhibit both Axis I and Axis II symptoms which were severe and reflected extreme Borderline Personality Disorder." Thereafter, she was admitted to Patton State Hospital (PSH) per Penal Code section 1026, "Not Guilty by Reason of Insanity."

During her hospitalization at PSH, this inmate assaulted two staff clinicians. In August 2005, her treatment team noted her assaultive behavior and desire to return to CDCR, asserted that her only Axis I diagnosis was substance abuse and described her psychological disturbances as characterological in nature. The team concluded that her diagnosis and personality structure were not amenable to the conventional forms of psychological and psychiatric treatment offered in a state hospital.

In August 2005, the Deputy Director of DMH requested this inmate's return to CDCR under Welfare and Institution's Code section 7301, which permits such transfers when it has been determined that the patient requires a level of care, treatment and custodial security that is not available within DMH. This request was granted by the Director's Review Board (DRB) and this inmate was returned to VSPW. The DRB approved an indeterminate SHU and requested that she be maintained at an EOP level of care for at least 90 days after her return to VSPW. The DRB, which retained authority over all transfer decisions involving this inmate, further recommended that her treatment plan focus on reducing impulsive behavior. If treatment ultimately rendered her safe to return to DMH, VSPW was to refer her case to DRB for transfer approval.

This inmate's treatment plan, developed by clinicians in VSPW's EOP SHU program, was well-designed for treating borderline personality disorders accompanied by frequent suicidality. The plan called for DOT, frequent i.e. more than once every 30 days, psychiatric monitoring of her compliance with Keyhea medications, daily case manager visits and initiation of ADLs. Despite the heightened level of scrutiny, she took an overdose of medications on 3/1/06. Mental health clinicians and physicians responded appropriately to this incident with more oversight of medication administration. As of the end of May 2006, she had not been in the OHU since 3/22/06.

Staff interviews, including this inmate's treating clinician and the unit's supervisor, revealed that extra staff would be re-directed to the EOP ASU/SHU program to provide services beyond Program Guide requirements, including extra case management contacts.

This inmate, along with other candidates for the new PSU, were undergoing intensive treatment planning which focused on several of her psychological problems and needs. A Behavioral Incentive Program was initiated, which included a tiered system of advancement and privileges based on appropriate behavioral functioning and programmatic compliance.

Assessment:

DMH's and CDCR's decision to send this NGRI patient back to the extraordinarily stressful and anti-therapeutic environment of SHU was unprecedented. Male patients in similar situations would be transferred to DMH acute care or PSU – options not yet available to female patients.

This inmate's treatment plan was appropriate and she was being provided mental health care that exceeded Program Guide requirements for EOP inmates. The new Behavioral Incentive Program in EOP SHU was designed to improve and manage a patient's functioning and program compliance.

2.    Inmate B

The inmate was interviewed at the request of plaintiffs counsel related to concerns regarding her chronic medical placement in the OHU, lack of out-of-cell time and inadequate mental health care.

Documentation in this inmate's UHR and OHU record, as well as interviews with OHU staff, indicated that she was being treated for various medical conditions, including extremely depressed white and red blood cell counts and cancer, for which a bone marrow examination had recently occurred. She was taking fifteen medications, which had resulted in a partial collapse of her immune system. She was on "reverse isolation", often wore a face mask to guard off infections when attending appointments and was ordered by the doctor to avoid contact with other people. Her mental health case manager had given her things to do inside her cell, as she was experiencing significant pain and other difficulties which sometimes discouraged her from leaving her cell. However, she often went to the TV room when others were not there and was encouraged by her clinicians to do that as much as possible.

This inmate had been a participant in the MHSDS since at least April 2006. She was diagnosed with Depressive Disorder NOS, rule out Major Depressive Disorder, PTSD and Psychiatric Disorder associated with a medical condition. She had received suicide risk assessments and numerous mental health contacts. A psychiatrist had discontinued all psychotropic medications, fearing that they might interact with the large number of medical prescriptions – a decision that was fully substantiated in a progress note.

Assessment:

Appropriate mental health and psychiatric care was provided to this medically debilitated patient. Staff was making appropriate efforts to get her out of her cell whenever possible despite her serious medical condition.

3.    Inmate C

This inmate was interviewed at the request of plaintiffs' counsel related to concerns about her potential for suicide and possible need for a higher level of care.

This inmate reported having been in the OHU for a week pending transfer to PSH. She reported having had no access to showers or out-of-cell time, which was making her feel "crazier". She reportedly spent days in a safety cell under similar conditions. Clinically, her thought processes reflected some delusional thinking. The chief psychologist confirmed that the most recent IDTT had recommended transfer to PSH.

Correctional officers in the OHU confirmed that mental health patients in safety cells and regular OHU cells were not afforded routine access to showers unless they were noted to be very disorderly or dirty. Under these circumstances, OHU officers obtained authority from the Watch Commander to offer a shower to the patient. Doctors could also order showers for patients, though this reportedly rarely occurred.

Assessment:

This patient received appropriate assessments and had been referred to PSH for acute care.

Stay in the OHU was excessive in length. If, in fact, she spent days in a safety cell, that would be contrary to the intended use of a safety cell.

OHU patients did not have adequate access to showers.

4.    Inmate D

This EOP ASU/SHU patient, well-known by the monitor's expert, was admitted to the OHU on 5/23/06 for banging her head. She had badly scratched her face and arms and complained that her hair was falling out. She had stopped her medications and was becoming psychotic. After a period of time without medications, this patient was known to have the potential to become violent.

The OHU chart indicated that this inmate was placed on suicide watch upon her placement in the OHU. A medical assistant provided one-on-one monitoring. Haldol concentrate 10 mg q p.m., Cogentin 1 mg q p.m., Thorazine 200 milligrams bid and Zoloft 200 milligrams q a.m. were ordered, as were a safety gown, blanket and mattress. The MAR indicated that the patient took all ordered medications on the prior evening, including Topamax prescribed by a medical doctor. The MAR was blank on the day of the interview, indicating that she had not taken medications.

Assessment:

OHU placement and admission orders were appropriate.

5.      Inmate E

This inmate was interviewed within the context of a PTSD group. She appeared enthusiastic about the group and was within a month or so of parole. She thought that what she had learned in group was valuable as she refused to take medication for her psychological problems. She had a strong substance abuse history and had been getting a lot out of substance abuse groups. She planned to continue her treatment in the community.

The UHR contained a 5/8/06 treatment plan, which listed PTSD group as an intervention. There was very little group documentation in the chart and it was unclear how long this inmate had been assigned to the PTSD group. A number of no-shows were documented during recent weeks.

Assessment:

This patient was appropriately assigned to PTSD group and was receiving appropriate transitional services for continuing such therapy in the community.

6.      Inmate F

This inmate was interviewed in the context of a PTSD group. She reportedly found the group very valuable and it was clear that the group addressed many of her core psychological problems. She reported having been on the PTSD group waiting list for three years after being screened and approved by a therapist. She felt that she was doing much better in terms of agitation and outbursts, and had improved her interpersonal skills. She reported a history of physical, sexual and emotional abuse and was well motivated for therapy. She intended to continue taking the group during the next cycle.

The UHR contained a treatment plan from September 2005, which diagnosed her with PTSD and recommended group therapy for the disorder. Frequent case manager contacts were documented during April 2006 and a 3/2/06 progress note indicated that she had, at times, been disruptive. Group notes were sporadic.

Assessment:

This inmate's presence in PTSD group was treatment plan-driven and clearly beneficial. UHR documentation of group participation was sporadic.

7.      Inmate G

On 5/8/06 at 3:36 p.m., this inmate was discovered hanging by the neck from the top bunk in her cell with a noose made from bed sheets. She had no pulse. Responding correctional officers untied two knots in the noose, lowered her to a supine position on the floor, and initiated CPR. Nursing staff responded to the scene within two minutes, attempted to resuscitate her with a defibrillator, and then continued CPR. A responding paramedic pronounced her dead at 3:56 p.m.

Immediately following this incident, all mental health staff still in the prison were assembled to screen and provide post-traumatic counseling to all inmates living in the housing unit in which the suicide occurred. There were approximately 180 inmates in cells and another 60 inmates assigned to bunks on the dayroom floor; the latter group was taken to a medical clinic for screening and counseling. Five inmates were seen that night for individual counseling and another 50 inmates required follow-up support the next day. Follow-up for many of these inmates was consummated over the next several weeks. Priority was given to EOP and 3CMS inmates. On the day of the suicide, mental health staff met for post-traumatic review, allowing them to process this event. Custody staff were offered "de-briefing" but all declined.

Assessment:

This was an excellent response by custody, medicine and mental health staff to the shock of the first suicide at VSPW.