**EXHIBIT J**

EXHIBIT J

Wasco State Prison (WSP)

May 31, 2006 – June 2, 2006

1. Inmate A

This 25-year old inmate was designated as requiring 3CMS level of care. He was screened on 4/6/06 and found "negative." On 5/9/06, he was seen by a psychologist secondary to a request for medication because the inmate was "depressed." He was diagnosed with depressive disorder and was apparently made 3CMs level of care on the same day. On 5/13/06, he was seen by a psychiatrist, diagnosed with mood disorder and was ordered Seroquel.

There was no MH-2 found in the record. There was no documentation of an IDTT to review the diagnosis or the level of care designation. Some documentation likely was not yet filed in the record.

Although there were few records in the chart, the quality of the records was adequate. The MH-3s included pre-printed information but additional information was included to supplement.

Assessment:

It appeared likely that some documentation had not yet been filed in the record. The quality of the existing records was generally adequate although the use of preprinted forms diminished the overall usefulness of the records.

2. Inmate B

This 25-year old inmate was designated as requiring 3CMS level of care. Apparently he had arrived at WSP in February 2005 with some previous history in CDCR as a 3CMS patient.

An MH-2 was completed on 3/3/05 indicating that the patient was diagnosed with bipolar disorder and polysubstance dependence. The MH-2 included a list of the inmate's strengths, target objectives and intervention techniques, all done very well.

There were no progress notes in this record beyond 4/15/05 and he apparently paroled to Region I on 5/25/05. He re-entered the institution on 4/26/06. There were no records in the chart since his arrival back at the institution.

Assessment:

The quality of the existing documentation in this inmate's record was adequate. A problem with the timeliness of filing within the record appeared to be present and this would affect the usefulness of the record as a source of information for clinicians working with this inmate.

3.  Inmate C

This 42-year old EOP inmate apparently arrived at WSP in January 2006. Although the initial screening was apparently negative, he was seen for additional evaluation on 1/30/06. At that time, he appeared disorganized and poorly groomed and was characterized in interview as characterized as "loose and tangential." Based on this presentation, he was diagnosed with psychotic disorder NOS. He was subsequently prescribed Zyprexia and Vistaril. It appeared that the Zyprexia was discontinued in early February 2006 when the inmate complained of side effects. Notes through February 2006 appeared to indicate that he remained quite psychotic. On 3/3/06, the note indicated that he was "alert and cooperative" and that he "was fairly organized and intact." Notes through 5/23/06 indicated that he remained stable on Olanzapine.

This inmate had been at EOP level of care since at least 2/15/06. He was apparently due to parole within the next few months, by August 2006. A pre-release assessment was completed in May 2006. There was documentation in the record to suggest that the inmate had been seen weekly by a case manager since February 2006. There was no treatment plan in the record and it was not clear that this inmate's case was reviewed by an IDTT.

The notes included the use of a pre printed "check box" form with some additional information included. The quality of the notes appeared adequate.

Assessment:

This inmate appeared to have been appropriately identified as requiring EOP level of care. Although he had been stabilized on medication, it was clear that he would benefit from involvement with a full EOP program. This inmate likely should have been identified as requiring an expedited transfer. It appeared that the decision had been made to retain the inmate in this setting until his parole.

4.  Inmate D

This 26-year old inmate apparently returned to prison in early April 2006 after paroling in May 2005. He had a history of diagnosis of bipolar disorder. Upon return to prison he was diagnosed with mood disorder and was prescribed Seroquel which appeared to have had a positive effect, per the existing notes.

There was an MH-7 form completed on 4/19/06 with an "initial treatment plan," although it was quite brief. There was no additional treatment plan in the record. There was no indication that this inmate's case had been considered by the IDTT

Assessment:

This inmate had recently returned to the facility following violation of parole. His initial mental health needs were identified and documented in an appropriate manner. There was no indication that this inmate's case had been considered by the IDTT and, with the exception of an "initial" plan completed on an MH-7 form, there was no current treatment plan within the record.

5.   Inmate E

This 30-year old inmate apparently arrived at WSP in November 2005. At the time of his arrival, he was diagnosed with undifferentiated schizophrenia and was placed at EOP level of care. On 2/27/06, he was placed into the infirmary for "bizarre behavior" and was involuntarily medicated for 72 hours. The response to medication appeared to have been positive and there was no attempt to maintain involuntary medication through initiation of a Keyhea proceeding, beyond the initial 72 hours. The inmate's condition apparently improved following this period. He was discharged approximately 3/13/06 with an order for Haldol Decanoate at intervals of three weeks, Seroquel, Haldol p.o. and Depakote. MAR forms in the record did not clearly document that the inmate received medication as ordered, however, and there was no documentation that the inmate received Haldol Decanoate as ordered.

Progress notes appeared to indicate that the inmate was fairly stable, cooperative and maintained fair hygiene through March 2006. By early April 2006, notes were beginning to indicate that his cell and toilet were full of paper and messy and his grooming was marginal. By late April 2006 notes indicated that he was declining medication, behaving in a bizarre fashion, and was noted standing naked at his cell door. On 5/12/06, he was noted to be acting bizarrely, placed his feet into the sink into hot water and required medical treatment for burns. He was placed into the CTC where he remained for seven days before being released.

Assessment:

This inmate had a history of substantial decompensation as a result of medication noncompliance. It appeared that, given this history, an attempt should have been made to maintain the option of involuntary medication by pursuing a Keyhea order following the initial administration of involuntary medication in late February 2006 to early March 2006. He required at least EOP level of care and would likely have been able to have been maintained at that level of care only if his compliance with medication could have been maintained. His placement into EOP should have been expedited

6.   Inmate F

This 27-year old inmate arrived at WSP in July 2005. Upon arrival he was recognized as having a history of psychosis and suicide attempts and was placed at EOP level of care. Notes from July through November 2005 indicated that the inmate was very paranoid, appeared to respond to internal stimuli and was "unkempt." He was placed in

administrative segregation in October 2005 for "fighting with people making threats at him." Notes indicated that he continued to be quite psychotic, was placed into the CTC and was apparently stabilized by the time of discharge. Compliance with medication was characterized as acceptable through this period but, by December 2005, notes indicated that he was refusing medication and speaking in a bizarre fashion. He was referred by custody staff on several occasions for agitation and emotional lability. He was noted to be delusional, confused, and appeared to experience auditory hallucinations through February 2006. He was marginally compliant or non-compliant with medication. He was placed in the CTC in January 2006 for three days, stabilized and again released. There was apparently another suicide "threat" and self-injury in late February 2006. The note on 2/27/06 indicated that the inmate had been "referred to a physician and surgeon, since there are no psychiatrists on site." He was referred to the CTC at that time but there was no discharge summary in the record. Notes by early April 2006, the last in the record, indicated that the inmate was somewhat more stable but still refusing medication.

There was an MH-2 form in this inmate's record from December 2005. The plan included a list of those services that were to be provided, including case management, psychiatric technician rounds, psychiatric services, etc. There was no clear statement of problems or treatment goals. The record included documentation that the inmate was seen at weekly intervals by his case manager.

Assessment:

This inmate was recognized as requiring EOP level of care in July 2005. In the time since, he was consistently psychotic, non-compliant with medication and required at least three CTC placements. Apparently there had been no attempt to initiate a Keyhea order to insure medication compliance. This inmate could likely have been maintained at EOP level of care and may have required involuntary medication. He continued to await transfer to an EOP. His transfer should have been facilitated. In the event of additional episodes of decompensation, staff should have considered initiation of Keyhea and/or referral to a higher level of care.

7.   Inmate G

This inmate was referred by Plaintiffs' attorneys following their interview with the patient in February 2006. At that time he had reported that he had 46 points and was endorsed to MCSP. He reported that he could not read or write and was unable to comprehend the paperwork which he received through various administrative processes.

In his records, this inmate was described as a 27-year-old with a history of left sided stroke at 19 and gastric bypass surgery at 17 as a result of morbid obesity. He had a history of being diagnosed with paranoid schizophrenia. He was designated as requiring services as an individual with developmental disability, D1A classification, and had a known history of being victimized. He had been at EOP level of care since at least August 2005. Apparently he was returned from ICF care at SVPP in July 2005.

The inmate was placed into the infirmary on 2/12/06 through 2/15/06 secondary to a threat to hang himself which apparently occurred after he lost his job as a porter. On 2/16/06 he was issued an RVR for "disobeying a direct order" and another for "manipulating staff." He apparently refused lock-up and then threatened to hang himself. He was placed in the CTC.

On 3/13/06 he was complaining of being assaulted by his cell mate. Evaluation notes indicated that he was "scared" and "preoccupied" about being "beat up" by his cellie. Apparently he was moved, as a note on 3/16/06 indicated that he was "happy about his new building."

Notes on 3/20/06 indicated that his transfer to an EOP program was being delayed because he had received the three RVRs. Notes on 3/28/06 indicated that he had been "caught selling buspar."

On 4/12/06 he was characterized as "currently stable." Apparently on 4/12/06 he was placed into administrative segregation for "battery on an officer." Notes on 4/13/06 indicated that he was being "retained pending transfer to Corcoran hub." Apparently he was pending a transfer to a PSU program at the time of the monitor's visit.

Records indicated that this inmate had been seen weekly by a case manager. The contacts were documented on pre-printed forms with some additional information included. A note on 2/1/06 indicated that this inmate had been involved in a coping skills group since the previous October and that his behavior in this setting was often inappropriate. With the exception of this involvement and contact with the psychiatrist, there was no indication that this inmate received other mental health services. The inmate's case was considered by the IDTT in April 2006. The record of this meeting indicated that the IDTT did not recommend an alternative level of care at that time. Although the record indicated that the treatment plan was reviewed, no MH-2 form was found in the chart. There was little rationale given for not recommending that this inmate's transfer to EOP be expedited.

Assessment:

This inmate was recognized as requiring EOP level of care shortly after the time of his arrival at WSP in July, 2005. In the time since his arrival, he had received several RVRs for a variety of issues that appeared related to his fear and experience of victimization by other inmates in interaction with his existing developmental disability and mental illness. This inmate's transfer to an appropriate EOP program had been inappropriately delayed for nearly nine months by factors which included the completion of the disciplinary process. Unfortunately, during these delays he has received additional RVRs and then faced placement in a PSU program.

It did not appear that staff appropriately advocated expedited transfer for this inmate. It was not clear that the RVR process resulted in appropriate consideration for mitigation of the penalties resulting from this inmate's disciplinary infractions, especially in light of

the fact that he was not receiving adequate mental health treatment at the time that these incidents occurred. This inmate's placement into an appropriate EOP placement should have been expedited. Review of the disciplinary process and the appropriateness of imposition of a SHU sentence, in light of the probable impact of mental illness and developmental disability on his behavior, also should have occurred.

8.  Inmate H

This inmate's case was reviewed as a result of concerns expressed by plaintiffs' attorneys.

This inmate was placed at 3CMS level of care and had received EOP care for many years before he paroled from SVSP in April 2005. When he paroled, he received his parole medication but no assistance with his application for SSI. Through May and June 2005 plaintiffs' counsel remained in close touch with him while he attempted to complete his SSI application and begin receiving benefits. He was contacted in mid-June 2005 by SSA because he was told that CDCR had failed to send his mental health records. He was apparently re-arrested for indecent exposure and was returned to WSP reception center on 9/19/05. In December 2005 and January 2006 he was issued two RVRs for indecent exposure and was sentenced to additional time through the parole revocation extension process.

His level of care was reviewed in November 2005 by the IDTT and found to be appropriate. On 12/6/05 he was interviewed by a clinician regarding his recurrent indecent exposure and reported that it was due to his bipolar disorder. He stated that "on the outside, I exercise, study, sleep etc. so I don't expose myself to women." He again claimed that his bipolar condition influenced his behavior.

Clinical notes through December 2005 indicated that the inmate was stable. In January 2006 he refused some clinical contacts citing his "brain injury." He was refusing medication in early January 2006 and explained it by stating that he didn't have envelopes so he was refusing medication.

A note written on 1/10/06 quoted the inmate as reacting to being confronted regarding indecent exposure by stating, "Nothing will be done to me anyway, I will continue to do this if I want."

There was a well documented assessment, i.e. sexual misconduct screening,) of the inmate in the record dated 1/10/06. This evaluation resulted in a diagnosis of psychotic disorder NOS and antisocial personality disorder NOS. The examiner recommended that the treatment team consider the need for a comprehensive mental health evaluation for diagnosis and treatment plan recommendations.

Notes in February 2006 indicated that he was refusing to take his medication and that he had been refusing since December 2005. His mental status was stable at that time. The inmate's condition appeared to have continued to be stable. He had periodically made

mild threats such as "having a pen would help to keep him from hurting himself." He had written a number of 602s for various reasons and corresponded with his attorneys.

Assessment:

This inmate appeared appropriately diagnosed with primary features of antisocial personality disorder. He had been consistently uncooperative with mental health treatment. While reporting the desire for "treatment" for indecent exposure, he had also stated his intention to continue the behavior. A comprehensive evaluation for the appropriateness of a diagnosis of "exhibitionism" should have occurred. Considerations should also have been given to addressing these behaviors through the imposition of custody-based behavioral interventions.

3CMS - FAOR Building

9.    Inmate I

This 3CMS inmate was being held in the FAOR building. His initial administrative segregation IDTT meeting occurred on 1/18/06. He had one case manager contact following the IDTT in January 2006, four case manager contacts in February 2006, five in March 2006, four in April 2006 and four in May 2006. His second IDTT meeting occurred on 4/12/06 and he was seen by psychiatry on 4/13/06. He had an emergency psychiatric consult on 5/15/06 and was in the CTC on 5/16/06. A CTC IDTT meeting was completed on 5/17/06. He was discharged the same day. The required five-day follow-up after discharge was completed on 5/22/06.

Assessment:

Partially compliant. This inmate's initial IDTT meeting was completed as required. He was seen within required time frames by his case manager and received a five-day follow-up after CTC discharge occurred. However, there was no documentation of an initial mental health evaluation upon his placement in administrative segregation in his inmate history.

10.    Inmate J

This 3CMS inmate was admitted into administrative segregation on 3/3/06. His initial administrative segregation mental health evaluation was completed on 3/9/06. He was seen by his case manager four times in March 2006. His administrative segregation IDTT meeting was completed on 3/15/06. He saw a psychiatrist on 3/29/06 and also had four weekly contacts with his case manager during April and May 2006.

Assessment:

Compliant. This inmate's initial mental health evaluation and IDTT meeting were completed timely and he was seen as required by his case manager.

11.    Inmate K

This 3CMS inmate was placed in administrative segregation on 4/18/06. His initial administrative segregation mental health evaluation was completed on 4/25/06. The administrative segregation IDTT meeting occurred on 4/26/06 and a case manager contact was completed on 4/27/06. Weekly case manager contacts occurred in May 2006.

Assessment:

Compliant. This inmate's initial mental health evaluation and IDTT meeting were completed timely and he was seen as required by his case manager.

12.    Inmate L

This 3CMS inmate was placed in administrative segregation on 9/19/05, was admitted to the CTC on 9/20/05 and was discharged on 9/27/05. A five-day post-discharge follow-up occurred and was completed on 10/2/05. He was seen by a case manager on 10/4/05 and was evaluated on 10/5/05. His IDTT meeting was also completed on 10/5/05. He had four weekly case manager contacts in October 2005, four in November 2005 and four in December 2005. His 90-day IDTT meeting was completed on 1/4/06. All required weekly contacts occurred in January, February, March, April and May 2006. He was seen by psychiatry on 1/4/06, 1/20/06, 4/21/06 and 5/2/06. A third 90-day IDTT meeting was held on 3/29/06.

Assessment:

Compliant. This inmate was seen timely for IDTT meetings and case manager contacts. A five-day follow-up occurred following CTC discharge.

13.    Inmate M

This 3CMS inmate was housed in administrative segregation. An initial administrative segregation mental health evaluation was done on 12/12/05. His IDTT meeting was completed the same day. He had two weekly case manager contacts in December 2005, four in January, five in February and four in March 2006. An IDTT meeting occurred on 3/8/06 and he was seen in a psychiatry line on 3/14/06. He was released on parole but returned to WSP on 4/13/06 and was seen by a case manager on 4/17/06 and 4/26/06. An administrative segregation mental health evaluation was also completed on 4/17/06. He saw a psychiatrist on 4/19/06 and an IDTT meeting also occurred on the same day. He was again seen for a psychiatric consultation on 4/27/06 and had four weekly case manager contacts in May 2006.

Assessment:

Partially compliant.

This inmate's initial mental health evaluation and IDTT meeting were completed timely. He was not seen for all required consultations by his case manager in December 2005, but was seen as required in all subsequent months.

3CMS - D4 Building

14.    Inmate N

This 3CMS inmate was admitted into administrative segregation on 11/16/05. He was seen by a case manager on 11/17/05 and his administrative segregation mental health evaluation was completed. He was seen by psychiatry on 11/22/05 on the day of his IDTT meeting. A case manager contact occurred on 11/23/05. He had five case manager contacts in December 2005, and was also seen that month by a psychologist and by psychiatry on an emergency basis on 12/06/05. He was seen in a regular psychiatry line on 12/12/05. He had four weekly case manager contacts in January, four in February, five in March, four in April and four in May 2006. He had one IDTT meeting on 2/22/06 and another on 5/17/06.

Assessment:

Compliant. This inmate was seen timely for an initial evaluation and his IDTT meetings, and was subsequently seen by his case manager regularly, as required.

15.    Inmate O

This 3CMS inmate was placed in administrative segregation on 4/24/06 following a parole violation. His initial administrative segregation mental health evaluation was completed on 4/15/06, the date of his first case manager contact. He was seen by psychiatry on emergency referral on 4/28/06. His IDTT meeting was completed on 5/3/06 and he had four weekly case manager contacts in May 2006.

Assessment:

Compliant. This inmate was initially evaluated and his IDTT meeting occurred timely. He was seen by his case manager regularly, as required.

16.    Inmate P

This 3CMS inmate had been in administrative segregation since 5/21/04. Examination of the period beginning 12/1/05 showed that he had four weekly case manager contacts, his IDTT meeting and a psychiatry contact in December 20005. He had four weekly case manager contacts and saw a psychiatrist in January 2006, as well as four weekly case manager contacts and one psychiatry consultation in February 2006. He was seen by a

case manager five times in March 2006. An IDTT meeting occurred on 3/15/06. He had four case manager contacts in both April and May 2006 and was seen twice by psychiatry in April 2006, including once on an emergency basis on 04/13/06.

Assessment:

Compliant. This inmate was seen regularly by his case manager and required IDTT meetings occurred.

17.  Inmate Q

This 3CMS inmate was housed in administrative segregation. His administrative segregation mental health evaluation occurred on 2/14/06 and his IDTT meeting occurred on 2/15/06. He had two weekly case manager contacts in February, five in March, four in April and four in May 2006. He was seen in a psychiatrist's line on 3/22/06 and an IDTT meeting occurred on 5/10/06.

Assessment:

Compliant. This inmate was seen for required consultations by his case manager and required IDTT meetings occurred.

18.  Inmate R

This 3CMS inmate was housed in administrative segregation. Following his discharge from the CTC on 2/28/05, he was placed back in administrative segregation. The required five-day post-discharge follow-up occurred and ended 3/3/06. He was seen by a case manager the same day. His administrative segregation IDTT meeting occurred on 5/15/06 and he had four case manager contacts in March and two in April 2006. Following an emergency case manager contact on 4/13/06, he was re-admitted to the CTC that same day and discharged on 4/20/06. The required five-day post-discharge follow-up occurred and ended on 4/25/06. He had four case manager contacts in May 2006.

Assessment:

Compliant. This inmate was seen for required consultations by his case manager and required IDTT meetings occurred. He had a five-day follow-up upon discharge from the CTC.