Physical plant, environmental and treatment conditions in the OHU were substandard. Many potentially dangerous objects were present. Stays in the OHU while awaiting MHCB placement were overly long. The quality of psychiatric treatment and documentation varied widely. Psychiatrists evaluated inmates only if medication-related issues arose. Progress notes were more informative than in the past.

The long-standing dispute between custody and nursing over responsibility for supervising OHU inmates persisted. CRC began drafting procedures but still needed to address custody duties, use of restraints and inmate property. Custody observation of inmates on suicide watch appeared to have improved. Direct observation occurred more consistently, and supervisory checks of inmates on suicide watch occurred more frequently.

Reception center transfers of 3CMS inmates were timely. EOP inmates were transferred to CIM and CIW within one day of identification and were tracked while at those institutions. Of the 17 male EOP inmates who went to CIM, four were transferred subsequently within the 60 day timeframe; four had lengths of stay lasting from 73 to 95 days; and the remaining nine were at CIM fewer than 60 days. Of the seven female EOP inmates transferred to CIW, one was transferred subsequently within 60 days; one stayed for 86 days; and the remaining five were at CIW fewer than 60 days. Other CAP Issues:

Psychiatric contacts were erratic. Timely initial and follow-up assessments were not made consistently. Fewer than half of inmates on psychotropic medication received psychiatric follow-up timely, according to monthly staff audits.

Fewer than half of IDTT meetings were attended by a psychiatrist. Slightly more were attended by correctional counselors.

CRC's heavy reliance on contract psychiatrists led to poor continuity of care. Lack of adequate psychiatric supervision or peer review allowed poor psychiatric medication management practices to continue uncorrected. Many psychiatrists' progress notes were poor, omitted critical information and lacked treatment or medication change rationales.

As of February 8, 2006, CRC had trained 784 of 828, or 94 percent, of staff in the amended CPR policy and 95 percent in the use of a micro-shield. Untrained staff was away from CRC.

CRC had implemented the amended emergency medical response policy and revised post orders. All units had cut-down tools, gloves, protective jumpsuits and face shields. Practices were not fully compliant. All housing unit officers were required to inventory the unit's emergency response kit upon reporting to their posts, but there was no procedure to supervise compliance or collect inventory logs from housing units. Not all emergency response kits were kept in a separate locked box. Several signatures were missing from inventories. Some logs recorded erroneously that inventories were complete. Some officers did not carry micro-shields. There were no emergency responses involving caseload inmates during the monitoring period

Institutional Summary:

The lack of permanent line psychiatry staff at CRC adversely affected quality management and medication management functions, and made psychiatric contacts erratic. Other disciplines were well-staffed.

Quality management infrastructure was in place but solid, long-term progress was hampered by lack of multidisciplinary participation on key committees. Peer review was limited to psychologists. Medication continuity was sustained for arriving and transferring inmates, but use of a single pill line per gender led to non-compliance problems. High volume of referrals and attendant follow-up frustrated efforts to respond to medication non-compliance. Practices related to informed consent, laboratory testing, DOT and HS medication were substandard. Paroling inmates were supplied with their medications.

Transfers to MHCBs were slow due to a lack of beds. Stays in the OHU were long and marked by inconsistent quality and quantity of psychiatric treatment. Nursing and custody were still in discord over responsibility for OHU inmate supervision. Transfers of 3CMS and EOP inmates from reception center were generally timely.

Most staff was trained in CPR. The amended emergency medical response policy was implemented.

### California State Prison, Corcoran (CSP/Corcoran)
May 8, 2006 – May 11, 2006

Staffing levels changed little during the monitoring period. Among supervisory mental health positions, 5.79 of 9.79 positions remained vacant including positions for a chief psychiatrist, a supervising psychiatrist and two senior psychologists.

There were 7.8 line psychiatrist positions open. After coverage by contractors, there were 21.21 vacancies in psychology and 3.5 in social work. One of four senior psych tech positions was vacant. Among psych techs there were 17.59 vacancies with coverage by contractors.

One of four supervisory nursing positions in mental health was vacant. For line nursing staff, 15 of 32 positions were vacant. A full-time Keyhea coordinator position was also vacant.

The equivalent of 1.5 office supervisory position and two office tech positions were open. In addition, two office tech positions had been diverted from mental health. Seven recreational therapist positions were open.

Institutional population at the time of the monitor's visit was 5,242 inmates, of whom 1,107 were on the mental health caseload. There were 406 inmates in administrative segregation, including 115 3CMS inmates. There were over 210 EOP inmates at CSP/Corcoran and approximately another 45 to 55 who were housed in the administrative segregation hub unit and the SHU.

Issues Resolved:

Inmates in need of higher levels of care were transferred to DMH.

Inmates in need of stabilization were sent to the MHCB.

The restraint log was complete, although practices regarding the use of restraints required further improvement.

RVR documentation consistently referred to the mental health assessment as having been considered at the hearing, reported its content and explained its use in findings and dispositions.

Psych techs made rounds in the SHU.

Quality Management:

The quality management committee met at least twice monthly and covered a broad range of issues. According to minutes, approximately 60 percent of members attended.

The mental health quality management subcommittee met twice monthly with one exception. Attendance was low, particularly by custody staff and non-mental health disciplines, but improved after a warden's directive. Minutes indicated consideration of important issues including UHR availability, IDTT schedules, medication non-compliance, audits of EOP and 3CMS treatment, MHCB indicators, access to DMH, suicide prevention and the sexual misconduct protocol.

Separate peer review committees were formed for psychologists and psychiatric social workers and were comprised of three members of the discipline who reviewed medical records and provided feedback. There no peer review among psychiatrists due to low staffing, but a protocol was developed.

The suicide prevention committee met monthly with all members in attendance. Minutes showed discussion of individual cases and topics including increased alcohol and drug-related assaults on officers and development and posting of suicide prevention flyers.

Two large staff audits found an 85 percent concordance rate between MHTS and UHR entries in November 2005 and a 91 percent rate in March 2006. Reportedly, staffing shortages curtailed audits and QITs during the monitoring period.

Medication Management:

Newly arriving inmates received orders and administration of medications within 24 hours of arrival in 83 percent of surveyed cases, according to an audit. To prevent expirations of psychotropic medication orders, a psychiatrist reviewed lists of expiring orders and UHRs and wrote bridge orders for up to 30 days without patient contact.

A procedure to notify yard clinics of inmate intra-institutional transfers was not followed during mass relocations, leading to discontinuity.

Response to medication non-compliance declined due to turnover among MTAs and LVNs and general staffing pressures in mental health. Cheeking and hoarding were problematic in the SHU and the administrative segregation unit.

The pharmacy dispensed medication orders within 24 hours, but high turnover among contractors slowed the processing of orders from some locations.

Informed consent was filed in only half of a sample of 22 UHRs of inmates treated at the EOP level of care.

Laboratory testing of psychotropic medication blood levels followed protocols, but in practice psychiatry shortages undermined reliability in practice.

There was no central record of inmates with DOT orders nor clinical review of use of DOT versus NAM orders. A QIT on the topic was inactive. DOT was followed for EOP inmates in general population and in administrative segregation. Although supervisors observed medication administration in the SHU, found good compliance with DOT and had about 40 percent of the caseload on DOT orders, non-compliance was common. Informational chronos were written when medication misuse was detected. Non-compliance was addressed in SHU IDTT meetings when possible.

On average three to four new Keyhea petitions were initiated each month. In May 2006, 42 inmates had current Keyhea orders, with 26 of them initiated during the monitoring period. Documentation and tracking was inconsistent. Some denials of Keyhea orders were attributed to staffing difficulties and inconsistent availability of a full-time Keyhea coordinator.

HS medication was administered after 8:00 p.m.

Pharmacy records demonstrated that 99 percent of inmates who were paroled with current medication orders signed for and received a medication supply upon release.

Mental Health Assessments for the Disciplinary Process:

CSP/Corcoran was in compliance in this focus area. From September 1, 2005 through March 31, 2006, there were 1,767 RVRs issued, of which 331 were issued to 3CMS inmates and 55 were issued to EOP inmates. None were issued to inmates in the MHCB. Mental health assessments were requested for 33 3CMS and for all EOP inmates who incurred charges or a total of 64 inmates. Eleven cases were still pending, four were dismissed and three were found not guilty. Of 46 RVRs resulting in a finding of guilt, mental health factors were cited in 30 cases. This resulted in reductions in loss-of-credit time and losses of privileges. Sanctions were not mitigated in six cases in which mental health factors were considered. One case made no reference to mental health factors and did not reduce any penalties.

Transfers:

Access to acute care at DMH/CMF was good. From December 12, 2005 through May 4, 2006, 34 inmates were referred and transferred to acute care. Of those 34, 16 had returned. Staff received discharge summaries via fax before inmates returned from DMH. Time lapses between referral to acute care and acceptance or bed assignment by DMH ranged from one to 14 days. Once accepted, inmates were moved to acute care within one to six days.

CSP/Corcoran made ten referrals to DMH intermediate inpatient care at Salinas Valley State Prison (SVSP) SVPP between August 2005 to April 2006. Once accepted, inmates were transferred within two to seven days. By May 2006, three inmates had been transferred, one was slated for transfer during the week of the monitor's visit and six were on the SVPP wait list.

There were 23 inmates in the MHCB although CSP/Corcoran generally maintained an informal cap of 16 in an effort to have a psychiatrist-inmate ratio of one to 16. It was staffed with a full-time psychiatrist, a full-time psychologist, a part-time correctional counselor and a complement of nurses and other healthcare staff. Correctional counselors facilitated transfers to DMH when necessary. The full-time correctional counselor position devoted to the MHCB was reduced to part-time during the monitoring period. The recreational therapy position was vacant. MHCB inmates had no access to indoor or outdoor recreation.

The majority of MHCB inmates had expressed suicidal ideation. Staff continued to refer inmates to the MHCB when warranted. According to the emergency room log, of the 281 inmates evaluated for MHCB admission, 82 to 87 percent were admitted and 77 percent were admitted for evaluation and treatment related to suicidal ideation. Lengths of stays in the MHCB ranged from one to 28 days with rare exceptions. According to staff, stays rarely exceeded ten calendar days unless a transfer to DMH or Keyhea process intervened or an admission occurred near a weekend. Another reason for delay was a practice of retaining DMH-bound inmates in the unit involved in the Keyhea process until it was finished.

In daily MHCB rounds, inmates were interviewed by three clinicians in a private office and could request a confidential contact as well. IDTT meetings were held twice weekly. C-files were not brought to the meetings although reportedly they were available for post-hoc review if necessary. Returns of inmates to their housing units were well documented. A staff audit found that of 268 inmates discharged from the MHCB, 92.5 percent were given five-day follow-up.

Holding cells in the emergency room were too small and not equipped with seats. EOP inmates reported that they were sometimes sent to the correctional treatment center (CTC) for punitive reasons, often spending four to five hours, and in some instances as long as 11 hours, in a holding cell. The monitor was unable to confirm these reports during the visit.

The restraint use log was well maintained but entries raised questions about use of restraints. From January 1 to May 10, 2006, six inmates were restrained. Entries for half of those cases suggested that restraints might have been used for punitive reasons or for excessively long periods of time. Times in restraints ranged from 4.1 hours to 44.5 hours.

Psychiatric services unit (PSU) inmates were not transferred within timeframes. Seven EOP inmates with SHU terms were housed in administrative segregation pending transfer to a PSU. The average length of stay subsequent to endorsement was 72 days, with a range of 20 to 131 days. Reasons for delay included no open PSU beds, delays between institutional classification committee (ICC) referral dates and classification services representatives (CSR) endorsements, admissions to MHCB and DMH, and incomplete information on EOP inmates with active SHU cases.

A conversion of one facility from Level IV to Level III triggered scores of transfers into and out of the EOP unit.

Other CAP Issues:

a. Partial Compliance

Many indicators of compliance with EOP treatment requirements remained at or above 90 percent except when staff absences resulted in cancellation of scheduled treatment sessions. The influx of new arrivals to the EOP consumed a large amount of clinical resources and demanded full consideration of housing and other custody issues during IDTT meetings. EOP lacked a full-time psychiatrist who could routinely perform required work. Case manager weekly contacts in general population occurred in about 90 percent of cases. Treatment hours and attendance differed by security status. EOP inmates in the general population received more hours and refused less than EOP inmates in administrative segregation or the SHU. The quality of group treatment and IDTTS was good although some C-files were missing. IDTT meetings were well-attended with active participation.

In the administrative segregation hub unit, a staffing ratio of one to nine was maintained by six case managers and a full-time psychiatrist. Weekly contacts occurred in about 82 to 96 percent of cases. Space limitations made confidentiality impossible. The recreational therapist position remained vacant. Some groups were scheduled during yard time for segregated EOP inmates and lacked continuity. Group members were not visible to each other. The contract psychiatrist did not always attend IDTT meetings. IDTT meetings were timely in about 90 percent of cases.

For 3CMS inmates in administrative segregation, the ratio of case managers to inmates was one to 30. Weekly case manager contacts were made at a rate of 95 to 100 percent, but many were held cell-front due to lack of private interview space. A contract psychiatrist was available primarily on weekends. Weekly staff meetings resumed and were reportedly beneficial. Rates of staff turnover and absences were high during the monitoring period

IDTT meetings for 3CMS inmates in the general population and in administrative segregation were generally not attended by a full team. Some meetings were attended only by a case manager while others were attended by a case manager other than the inmate's. No correctional counselors participated.

Population of 3CMs inmates in the SHU ranged from 475 to 510 between August 2005 and April 2006. Since January 2006 case managers made quarterly contacts in about 90 percent of cases. Psych techs made weekly rounds for caseload inmates. IDTT meetings were timely in 80 percent of cases and lacked full attendance although several observed meetings were of good quality. Staff reported increasing severity of mental illness among SHU inmates and a need for increased treatment

Mental health staffing was more stable for the 250 general population 3CMS inmates. Psychiatric treatment was provided to most via telemedicine. There were four groups. There was no psychiatric representation at IDTT meetings. A staff audit found that 69 percent of cases had current treatment plans. Case manager contacts were timely in 95 to 97 percent of cases.

b. Non-compliance

Timeliness of initial IDTT meetings and mental health evaluations decreased. Initial IDTT meetings were timely only in the general population EOP unit, but less than 60 percent were attended by a psychiatrist. Treatment plans were updated in 90 percent of cases only in administrative segregation.

Lack of confidential treatment space was problematic throughout the institution, particularly in administrative segregation.

The medical records filing backlog was 4.5 feet or about three weeks. UHR availability remained problematic. Medical records were available for ICC and IDTT meetings about half of the time.

Other Issues:

New arrivals to administrative segregation were screened by psych techs within 72 hours in a semi-confidential setting. Inmates who refused to leave their cells were interviewed cell-front. Those who refused altogether were referred to mental health and seen by a case manager.

Psych techs rounded caseload inmates daily and case manager contacts occurred weekly with caseload inmates in administrative segregation. Over half of case manager contacts were made at cell-front, primarily because of a lack of confidential treatment space. Case manager contacts and IDTT meetings in the SHU did not increase. Needed additional staffing positions were allocated but not filled.

The number of documented incidents rose by 60 percent from December 1, 2005 through March 31, 2006. Force was used in about half of reported incidents, down by six percent from the previous rate. Involvement in the MHSDS was not

correlated with use of force.  Reportedly there had been no training in the use of force beyond typical block training.

Institutional Summary:

Four supervisory and 32.5 line mental health positions remained open and not covered by contractors.  Vacancies were also high among psych techs and recreational therapists.

Institutional and mental health quality management committees met regularly but attendance was often low.  Peer review was implemented for psychologists and social workers.  Staffing shortages curtailed auditing and QIT activities.

Medication continuity was sustained for about 83 percent of newly arriving inmates.  For inmates transferring intra-institutionally, continuity was challenged when mass relocations occurred.  Response to medication non-compliance was frustrated by high turnover among MTAs and LVNs and staffing pressures in general.  Cheeking and hoarding were problematic in the SHU and administrative segregation.  High turnover in the pharmacy staff slowed the processing of medication orders.  Informed consent was obtained in about half of cases.  A shortage of psychiatrists hindered use of laboratory testing for blood levels of inmates on mood stabilizing medication.  DOT was not comprehensively recorded or reviewed.  Although delivery protocols were reportedly followed well in the SHU, non-compliance was common.  New Keyhea petitions were initiated, but documentation and tracking were inconsistent.  Some denials of Keyhea orders were attributed to staffing shortages.  HS medications were delivered after 8:00 p.m.  Almost all paroling inmates received a supply of their medications at discharge.

CSP/Corcoran complied with the use of mental health assessments for the disciplinary process.

Access to acute care at DMH/CMF was good and transfers were timely. The MHCB unit was filled over its cap, but stays rarely exceeded ten days and discharged inmates who needed five-day follow-up received it. Rounds were made by three clinicians and IDTT meetings were held twice weekly. Returns from MHCBs were well documented. PSU inmates were not transferred timely.

A well-maintained restraint log raised some questions about possible punitive use of restraints.

Case manager contacts for EOP and 3CMS care were generally compliant. Generally, IDTT meetings for 3CMS inmates in both general population and administrative segregation were not well attended. Generally, timeliness of initial IDTT meetings and treatment plans declined; confidential treatment space was lacking throughout the facility; the filing of medical records was behind by about three weeks; and in administrative segregation, new arrivals were screened by psych techs within 72 hours. Required psych tech rounds and case manager contacts occurred regularly. Incidents rose by 60 percent and force was used in about half of them.

Overall, the delivery of mental health services showed substantial improvement during the monitoring period despite severe staffing shortages.

### Calipatria State Prison (CAL)
Paper Review

Of CAL's small allocation of 1.5 psychiatrist positions, only the half-time position was filled. CAL did not use contractors or telemedicine to cover the vacant full-time psychiatry position. One of three psychologist positions was vacant. A single

contractor provided a varying number of hours, covering from half to nearly all uncovered hours each month. Six psych tech positions were allocated; 3.5 were vacant. Several newly allocated positions had not been established although over six months had elapsed since they were allotted. Staff reported no recruiting efforts were underway to fill long-term vacancies.

CAL apparently had 40 3CMS and five EOP inmates at the time of the paper review, but the documentation provided was inconsistent.

Issues Resolved:

Psych techs made daily rounds in administrative segregation.

Quality Management:

Due partly to the small size of the mental health staff and caseload, CAL did not have a well-developed quality management process. There was no indication that a local governing body or a healthcare quality management committee met, and no materials on QITs were provided in the review documents. The mental health subcommittee and suicide prevention committee generally met twice monthly, but the scope and amount of quality management activity undertaken was not documented. Membership on the committees was multidisciplinary, but attendance was somewhat erratic. The suicide prevention committee recently included reviews of suicide attempts on its meeting agendas. CAL had no peer review due to the small number of clinicians in the facility.

Medication Management:

No audits of medication management were conducted despite some indications of problems. The staff's limited review of cases, discussions in quality

management meetings and reports of medication errors suggested some lapses in medication continuity when inmates were moved within the prison, particularly after discharge from the OHU. CAL did implement an earlier recommendation to record medication errors and had developed a mechanism to respond to medication non-compliance, although no information was provided on whether the latter worked.

Although psychiatrists reportedly wrote DOT orders for patients who were non-compliant with medication, no DOT or HS orders were active at the time of the paper review. During the monitoring period, CAL housed one inmate with a Keyhea order.

Mental Health Assessments for the Disciplinary Process:

The issue of mental health assessments in conjunction with the disciplinary process was ripe for resolution, but inadequate information to resolve the issue was provided. The paper review merely noted that eight mental health assessments were conducted during the monitoring period.

Transfers:

Documents regarding transfers covered a period of 22 weeks. CAL did not refer inmates directly to DMH. Documentation on OHU operations included referrals to MHCBs, admissions, discharges, diagnoses and lengths of stay but omitted some information. Different sources of information were also sometimes inconsistent. Omissions and discrepancies yielded an incomplete picture of MHCB referrals and obscured whether discharge plans included suicide prevention follow-up as warranted.

According to the documents provided, CAL made 21 referrals to MHCBs units elsewhere. Most were initiated timely, but nearly half of them were rescinded after

waits ranging from five to 14 days. According to another document, 11 of 18 inmates referred to a MHCB were actually transferred. Of these 11 referrals, only five were transferred within three days of their admission to the OHU.

One information source showed 39 OHU admissions, roughly comparable with admission notes in earlier monitoring periods. Fewer than half of the cases, 18, were discharged within 72 hours. Of the 21 cases with excessive lengths of stay, a handful exceeded the 72 hour limit by one or two days. Ten had excessive lengths of stay because they were awaiting transfer to an MHCB. Two long lengths of stay involved EOP inmates awaiting transfer who were considered too low functioning for placement outside the OHU. The remaining six probably should have been referred to an MHCB in accordance with Program Guide requirements, but instead lived in the OHU for two to four weeks without a referral to a higher level of care.

Treatment in the OHU did not conform to CDCR requirements. Staff audited five charts and found adequate compliance with admission evaluations and daily contacts by a clinician, but inmates in the OHU were seen only weekly by a psychiatrist. Staff reported that initial IDTT meetings were held but no subsequent meetings were held, regardless of an inmate's length of stay. All of the audited cases reflected that suicide risk assessments were conducted upon admission, but risk assessments were not completed at discharge. Logs and printouts suggested that at least nine inmates admitted for suicidality were not discharged with plans for five-day clinical follow-up or custody observation. Of the 18 inmates discharged with planned five-day follow-up, 90 percent were seen all five days; among the remainder, contacts were missed once during the five-

day period. To date, CAL has not provided documentation on hourly custody observations of inmates discharged from MHCBs or the OHU.

Restraints were applied twice during the monitoring period. In one instance, the duration of the use of restraint exceeded 24 hours. Provided documentation did not indicate whether CAL's use of restraints met applicable requirements.

CAL continued to do a good job of transferring caseload inmates out of the institution. Documents were not completely clear, but it seemed that most or all of the 120 3CMS inmates plus the 28 EOP inmates who were housed in CAL during the monitoring period were either transferred or paroled within mandated timeframes.

Documentation did not indicate whether the tighter 27-day transfer timeline was met when caseload inmates were mistakenly transferred to CAL. The institution received 23 such caseload inmates during the 22 week period covered by the documents. Two exceptions to the transfer timelines involved inmates who had lengths of stay of five and nine months in administrative segregation at CAL. One was at CAL on out-to-court status; the presence of the other was not explained.

Other CAP Issues:

a. Partial Compliance

Staff audits found that 80 percent of referrals generated by bus screenings received a timely response and 81 percent of initial mental health assessments were timely. Some mental health contacts were canceled for lack of interpreter services and not rescheduled for weeks.

Treatment plans were written timely. Only one inmate remained in the institution long enough to need a quarterly case management contact, which was

provided. All inmates remaining at CAL long enough to need an IDTT meeting received one.

The local operating procedure (LOP) did not address emergency or urgent referrals. Documentation indicated that 96 percent of all staff and self-referrals were responded to within a week or less, with the remaining referrals eliciting a response within two weeks.

b. Non-compliance

CAL had an adequate LOP for screening inmates placed in administrative segregation, but staff apparently did not determine whether it had been implemented. Weekly case management contacts in administrative segregation were often missed. Staff audited seven cases, finding only two with weekly contacts. In April 2006 only two inmates had been in administrative segregation long enough to need weekly contacts; neither was seen weekly. Documentation was ambiguous, but it appeared that more than half of weekly case management contacts were refused, did not occur, or occurred at cell-front.

Institutional Summary:

While CAL has long been close to full compliance with the Program Guide, staff erosion, inadequate self-monitoring and self-correction and little responsive development to new requirements seemed to signal declining compliance. The documentation provided for this paper review was sparse.

The use of mental health assessments in the disciplinary process was close to resolution in the preceding monitoring period, but CAL's report that eight mental health assessments were conducted in connection with RVRs during the current

66

monitoring period did not suffice to resolve the issue. Nor did the documentation provided confirm improvements in the remaining three areas, quality management, medication management and timely transfers.

Practices in the OHU were inconsistent with CDCR requirements. Although initial IDTT meetings were held and suicide risk assessments were conducted on admission, no subsequent IDTT meetings for inmates with long lengths of stay occurred, nor were suicide risk assessments done at discharge. Not all inmates discharged from the OHU following a suicide-related admission received five-day clinical follow-up, nor did CAL address the requirement for follow-up observation by custody staff.

CAL continued to transfer most caseload inmates out within required timeframes. Most referrals made to mental health were responded to within one week, but 20 percent of initial contacts with newly arrived inmates were late. CAL needed to improve access to interpreters and see all new inmates within five days.

### Centinela State Prison (CEN)
Paper review

CEN depended upon contractors to provide most of its mental health treatment. The .75 psychiatry position remained vacant but a shifting array of contractors covered the vacancy during most months. This required several physicians per month. There was much turnover among them. CEN did not use telemedicine. One of three allocated psychology positions was filled. A group of several steady contractors covered both vacancies during half of the monitoring period, but only one vacancy was covered during the other half. At the end of the monitoring period, the functional vacancy rate for

psychiatrists and case managers approached 100 percent. Only one individual was on staff and there was no supervisor in any discipline.

A supervising nurse and three registered nurses were dedicated to the MHSDS; one was on leave. The recreational therapist position had long been vacant. Four of six psych tech positions were vacant and the amount of contractual coverage was negligible. CEN's clerical positions were fully staffed.

Staff reported that contractors largely covered nursing and pharmacy vacancies. CEN had 27.5 registered nurse positions, six and one-half of which were vacant or uncovered due to leaves. Ten of 32 MTA positions were vacant or uncovered due to leaves. In the pharmacy four of seven positions were vacant. All positions in the laboratory were filled. Medical records had three vacancies among 21.5 positions. At the time the documents were produced, 35 3CMS inmates were housed in CEN, five of them in administrative segregation and two in the CTC.

Quality Management:

The local governing body appeared to have met once. The healthcare quality management committee met every other month. Membership was interdisciplinary, and mental health matters were on the agenda regularly. The mental health subcommittee held its formative meeting. While other disciplines attended, no custody staff was present. Despite several known problems, no issues that addressed caseload inmates were the subject of QITs during this or the previous monitoring period. Peer review was extended to psychiatrists and involved some contract psychologists, but it strayed outside the parameters typical of peer review.

68

The suicide prevention committee met monthly.  Membership included nurses and classification staff, but some important members were missing.  Discussion centered on case reviews of suicide-related CTC admissions, but excluded other topics pertinent to suicide prevention.  Deficiencies identified in one suicide-related CAP were not on any agenda provided.

Medication Management:

Medication continuity on arrival, renewal of orders and intra-institutional moves was not demonstrated in the documents provided, although a reasonable policy on the last was provided.  Staff reported that they saw all inmates following a first instance of medication non-compliance, but no audit to confirm that report had been conducted.

An audit of renewal orders, lab orders and consent forms found that only 52 percent of audited inmates received medication within a day of the medication order. Some delays between orders and administration were as long as 17 days. Apparently, no action was taken in response to that finding. Only one inmate needed laboratory testing, but it was not ordered. Informed medication consent forms were filed in 90 percent of the sampled UHRs.

Staff received further training in DOT, but implementation had not been reviewed.  Reportedly, there were no inmates with current Keyhea orders at CEN during the monitoring period. Documentation showed that nearly 25 percent of inmates at CEN had HS orders. CEN had a well-designed procedure to ensure that paroling inmates received a supply of medication upon release. A log seemed to show that the procedure worked, but no audits had been done.

Mental Health Assessments for the Disciplinary Process:

There were 1,453 RVRs written during the monitoring period. One was issued to an EOP inmate; it was dismissed. No RVRs were issued to inmates in the CTC. Seven were issued to 3CMS inmate. All seven 3CMS and 15 non-caseload inmates, who were referred for a mental health assessment in conjunction with a RVR, actually received assessments. Mental health assessments improved in that clinicians reviewed required files and did not complete assessments for inmates on their own caseload. Some assessments seemed to have been completed without benefit of an interview with the accused inmate. In most assessments, the language was helpful and accessible, while a few contained incriminating statements that were superfluous to finding.

The warden issued ongoing guidance to hearing officers. In all but one of the relevant cases, hearing officers referred to the results of the mental health assessment as part of the evidence weighed. Penalties were reduced or dismissed based on the assessment in two cases. Sanctions in three more cases were mitigated but the changes appeared unrelated to the mental health assessments.

No RVRs apparently were written for self-injurious behavior. Staff reported that CEN adopted the sexual misconduct protocol at the end of the monitoring period.

Transfers:

CEN did not refer inmates to DMH. There were 20 MHCB referrals, two-thirds of whom were transferred within timeframes or rescinded. A spike of lengthy waits, taking up to 15 days, occurred in one month; otherwise, delays lasted only one or two days.

There were 53 CTC admissions for mental health reasons. Few inmates had more than one admission, but a large proportion, 34 percent, had excessive lengths of stay, with the longest stay reaching 31 days. CEN actually reduced excessive lengths of stay in the CTC during the monitoring period. Many lengthy stays were accounted for by inmates awaiting transfers to a MHCB, EOP inmates considered too fragile to await transfer outside the CTC and inmates whose stays were only a day or two longer than ten days. Approximately 13 percent of inmates with excessive lengths of stay should have been referred to an MHCB. The longest stay in this group was nine days.

Audits found that inmates generally were seen on the day of their admission to the CTC, but only half were seen by a clinician daily, while 15 percent never saw a clinician during their stay. One inmate was not seen during a 15-day stay. Several of the longest stays may have been resulted from the lengthy hiatus between contacts. These omissions were attributed to a dysfunctional CTC licensing requirement, which reportedly prevented contractors from providing treatment unless they were credentialed in the CTC.

Mental health treatment in the CTC was inadequate. According to a staff audit, 60 percent of cases had a suicide risk assessment upon admission and only 20 percent had a risk assessment upon discharge. Just 58 percent of inmates with lengths of stay over 72 hours had an IDTT meeting. CEN reported that alternative holding cells were not used. While CEN had not yet updated its video monitoring policy, staff affirmed that the correct procedures were in place throughout the monitoring period.

Documentation of five-day follow-up documentation continued to reflect problems. None of the cases reviewed were compliant with clinical and custody follow-

up requirements. Documents suggested that inmates who should have been seen for five-day follow-up were often missed. Some first day follow-up contacts were missed. Few cases were followed-up all five days. Custody observations were commonly documented for only a portion of one shift, or there was no documentation of hourly checks. The administration reportedly attempted multiple methods to increase awareness of these obligations, and staff designed chronos for the different steps, but these measures did not achieve the desired result.

Seven caseload inmates were inappropriately sent to CEN during the monitoring period. Lengths of stay were not discernible for those seven. All told, 199 3CMS and 11 EOP inmates were housed in CEN during the monitoring period. All inmates on site at the time of document production had lengths of stay within mandated timeframes except one who was there for medical treatment. All were transferred or paroled within timeframes, except for two 3CMS inmates whose stays were extended by 14 days or less. None of the five 3CMS inmates living in administrative segregation at the time of document production had been there longer than 90 days.

Other CAP Issues:

a. Partial Compliance

Staff audits revealed poor response times, up to two weeks, for urgent referrals early in the monitoring period, but that was remedied later in the period and the improvement was sustained. One MHTS referral report indicated that 82 percent of referrals were seen within one week, and 92 percent were seen within two weeks. Response times to the remainder stretched to six weeks.

The monitor's review of documents on the screening of inmates admitted to administrative segregation indicated that 95 percent were completed within a day, but the remaining cases were screened weeks or months after placement. This finding was troubling because the lack of a screening was a factor in two suicides at CEN. Although CEN had reasonable policies and procedures, this issue needed better oversight. The issue was not on the agenda of the suicide prevention committee nor, apparently, had it attracted the attention of supervisors, managers or administrators.

b. Non-compliance

Necessary improvements in initial mental health contacts and weekly case manager contacts in administrative segregation did not occur. For several monitoring periods, CEN had been unable to demonstrate that EOP inmates received weekly contacts. Inmate history reports showed multi-week gaps in almost half of the 11 EOP inmates that were at CEN during the monitoring period. Only one EOP inmate had an IDTT meeting.

New arrivals who should have been seen by mental health were not consistently identified, referred and seen in a timely manner. Staff audits showed that ten percent of new arrivals who were referred, were never seen by mental health staff. Only 11 percent of initial mental health evaluations were timely, according to staff audits. Nurses who occasionally covered R&R received further training, but staff audits continued to find a small number of inmates who were not referred by bus screeners. Some initial mental health contacts were made anywhere from one to eight weeks after arrival, but precise figures on the dates of arrival, and contact were not provided. Initial IDTT meetings were held late 90 percent of the time; few were attended by a psychiatrist.

Case management contacts in administrative segregation occurred weekly for about 40 percent of eligible inmates, about the same percentage reported during the preceding monitoring period. IDTT meetings apparently had recently commenced, but none was held timely.

Other Issues:

Documents affirmed that CPR and suicide response equipment was present on all housing units. The documents listed cut-down kits, micro-shields, PPE kits and inventories but did not include ambu-bags. Staff reported that the vast majority of staff had been trained in the CPR policy, and a reasonable plan for ensuring training when the remaining employees return to work was in place. Staff wrote that there were no incidents that required, or might have required, CPR during the monitoring period.

Institutional Summary:

CEN had well-established practices for identifying and transferring MHSDS inmates expeditiously. Inmates often did not receive the required mental health treatment while awaiting transfer. Some care was untimely; some was simply not provided. CEN did not keep current with new requirements for suicide prevention, medication management and more intensive oversight in administrative segregation. Clinical and custody follow-up and observation of inmates discharged from the CTC or MHCBs was either poorly documented or inconsistently carried out.

CEN had a number of well-designed policies and procedures but they did not ensure adequate practices. Audits sometimes revealed problems without producing a remedial response. QITs or corrective actions should have addressed such areas as timely bus screening referral, initial mental health contacts, screenings, case management

contacts and IDTT meetings in administrative segregation as well as clinical contacts in the CTC, but documentation indicated that CEN did not confront known problems.

## Central California Women's Facility (CCWF)
March 8, 2006 – March 10, 2006

Staffing vacancies were concentrated among clinical staff at CCWF, with partial coverage by contractors. Of 9.5 psychiatry positions, five were vacant. Coverage by 1.75 full-time contractors brought the functional vacancy rate for psychiatrists to 24 percent.

Among 21 psychologist positions, 15 were filled. With use of three full-time contractors, the functional vacancy rate for psychologists was 14 percent. Of 7.5 psych social worker positions, two were vacant and one was covered by a contractor.

Total institutional population was 3,776 including 1,057 inmates in the MHSDS caseload. Of the 984 3CMS, 13 were in administrative segregation and 146 were in reception. There were 68 EOP inmates, including one in administrative segregation and five in reception. Five inmates were in MHCBs.

Quality Management:

There was no documented activity of the institution's local governing body from August 1, 2005 to January 21, 2006. The institution's overall healthcare quality management committee was well constituted and met several times during the monitoring period, with minutes documenting its activity.

The mental health subcommittee was also well constituted, had regular meetings and kept minutes during the entire monitoring period. It covered all institutional CAP issues, chartered appropriate QITs, reviewed completed team efforts and issued directives resulting from them. Minutes did not reflect any process for

consideration of non-CAP mental health issues.

Use of QITs and intuitional studies improved significantly during the monitoring period. Meaningful and useful QITs were chartered and completed, and CAP-related institutional studies were undertaken. Chartered and completed QITs covered conflicts between ducats and UHR availability, procedures for timely processing of medication orders, continuity of medication and custodial completion of computer tracking for RVRs. Institutional studies covered timeliness of inmate self-referrals, frequency of psychiatry contacts for 3CMS, total number of psychiatry contacts for 3CMS inmates per quarter, relative percentages of routine versus non-routing psychiatry contacts, frequency and number of case manager contacts for 3CMS inmates per quarter, relative percentages of routine versus non-routine case manager contacts, extent of medication non-compliance, documentation of medication compliance in psychiatric progress notes, and reception center screenings and evaluations.

Peer review for case managers was implemented and scheduled quarterly. Peer review audit protocols allowed for examination of 3CMS programming, treatment plans and quality of progress notes. Minutes showed decisions to re-design the chart audit tool, audit charts at the rate of one per year per inmate and increase accuracy of results.

Medication Management:

The institution evaluated only 17 newly arriving inmates with verified medication orders. It provided no information on psychiatric visits and subsequent renewals.

The institution did not provide any data on medication discontinuity on intra-institutional housing changes. Audits measured only time lapses between orders to first doses, which remained non-compliant since mid-2004.

An audit found a medication non-compliance rate of 40 percent. A quality assurance report stated that only 82.4 percent of psychiatric notes on non-compliant inmates addressed the non-compliance.

Pill lines were compliant.

No information on informed medication consent was made available to the monitor.

Laboratory testing and results on use of Lithium and Tegretol showed improvement over poor past performance, but no information was supplied with respect to testing for use of Depakote. No laboratory studies were done for inmates started on new medication or in reception center.

DOT therapy was implemented, including in administrative segregation where medication was administered in-cell with a correctional officer present. Minutes of a suicide prevention committee meeting cited one incident of cheeking and several overdoses but no investigation. In addition, pharmacy reported one or two cases of hoarding per week.

Four Keyhea orders were initiated with one resulting in an order. Three had been initiated during the preceding monitoring period, resulting in a total of four inmates on a Keyhea order at the time of the monitor's visit. Since the preceding visit, two orders were renewed and none lapsed. There were no denials of orders after hearings, nor were there any institutional decisions not to seek Keyhea orders on advice

of counsel. No inmates left the institution before scheduled hearings. From September 1, 2005 to February 1, 2006, seven patients were involuntarily medicated in 16 separate instances.

The institution had no inmates on HS orders and no LOP provision for the distribution of HS medications.

No information on parole medication was made available to the monitor.

The institution remained compliant with the use of heat cards.

Mental Health Assessments for the Disciplinary Process:

Of 1,694 RVRs issued during the monitoring period, 588 were issued to 3CMS and 23 were issued to EOP inmates. The institution reported that all of the EOP inmates received assessments but was unable to quantify how many 3CMS inmates received assessments. The mental health subcommittee reviewed RVR process and concluded that it was operating appropriately and appropriate logs continued to be maintained. No other data or documentation was made available for the monitor's examination.

Transfers:

Of the nine referrals to DMH acute or intermediate care during the monitoring period, three were rejected and none was rescinded. Time lapses between referral and acceptance were long, averaging 10.7 days with a range one to 21 days. Average time from referral to transfer was 8.7 days with a range of six to 15 days, with half of waiting times attributed to transport to PSH. Lengths of stay in the MHCB unit for inmates awaiting transfer to DMH averaged 8.9 days, approximately double that of two to three years earlier.

CCWF under-referred to acute and intermediate care based largely on perceived futility.  Discussion among the EOP director and his staff during an IDTT meeting indicated that four or five good candidates for PSH had not been referred.  Staff was discouraged by rejections of several patients whom they thought should have been accepted but remained in MHCBs for long periods.  Staff believed that the CCAT yielded to rejections by PSH too readily.

During the monitoring period there were 85 MHCB admissions including 33 from CCWF, 26 from CIW, 25 from Valley State Prison for Women (VSPW) and one from CRC.  Of the 33 CCWF inmates, four had stays longer than ten days and two were awaiting DMH transport.  Of the 26 from CIW, six had stays longer than ten days, two were sent to PSH, one was transferred to VSPW and three were returned to CIW.  Of the 25 from the VSPW, six had stays longer than ten days, one patient was admitted to PSH, one was rejected and four were returned to VSPW.

According to MHCB census data, daily population in December 2005 averaged five inmates with a range of two to eight.  In January 2006 it averaged seven with a range of five to nine.  In February 2006 daily it averaged four with a range of one to six.

Other CAP Issues:

a. Partial Compliance

Efforts to improve timeliness of responses to self-referrals improved with use of a log, but remained somewhat non-compliant with timelines.  Data showed that all self-referrals were seen within an average of 7.3 days, and that all referrals were seen within an average of 6.8 days.

Timeliness of medication renewals and deliveries was not adequately measured. An audit gauged only times from renewal to first dose, which had been non-compliant since mid-2004.

Ninety five percent of EOP inmates were offered ten hours of structured therapeutic activity per week.

Psychiatry attendance at IDTT meetings slipped but custody attendance increased. Evaluations and treatment plans were completed within 14 days for 86 percent of 3CMS inmates.

A handful of inmates discharged to VSPW and CIW were held in MHCBs for over five days. CIW transport delays persisted.

b. Non-Compliance

Psych techs were not completing rounds in administrative segregation.

No suicide watches had been conducted during the preceding year. No restraints were used. In the MHCB unit, cameras remained on for patients who were not on suicide watch. New video equipment was an improvement over the old equipment. There were still male correctional officers staffing the MHCB and watching the video monitors for unexplained reasons. This privacy issue was taken up with members of the warden's executive staff.

Other Issues:

During the monitor's visit there were 984 3CMS inmates at CCWF, including 13 in administration segregation and 146 in reception center. Mental health care was provided by seven psychologists and four social workers, with one "roving" psychologist who covered absences and handled referrals. Clinical caseload sizes ranged

from 77 to 112. There were five psychiatrists whose caseloads ranged in size from 79 for a part-time contractor to 336. Clinical space was sparse. Of 86 general case manager contacts with 3CMS inmates, 38 or 44 percent were cell-front. Twenty-one weekly and bi-weekly groups were running with 224 3CMS inmates participating. Topics included women's issues, trauma and abuse, domestic violence, life skills, anger management, grief management and interpersonal learning. Since September 1, 2005, 292 inmates had been in groups. There were 93 3CMS inmates on wait lists with average waits of 97 days. The monitor and monitor's expert observed groups which were well-run with good participant interaction.

The monitor also attended 3CMS IDTT meetings during the visit. The teams and meetings were well organized, and afforded good interaction among clinicians and between them and inmates. The teams reviewed proposed treatment plans for each inmate fully. They were comprised of a psychiatrist, two psychologists, a correctional counselor and an office assistant/recorder, as were other IDTTs according to staff. Each meeting was attended by the inmate's case manager and a senior psychiatrist. UHRs and C-files were present. Case managers' presentations were comprehensive, covering diagnoses, medication, and patients' activities, concerns, strengths, weaknesses, problems and therapeutic group involvements. Case managers answered inmates' questions and explained their proposed treatment plans and ways to request mental health care and referrals. Inmates expressed their views, concerns and interests in an accepting atmosphere.

One EOP and 19 3CMS inmates were in administrative segregation. None was in an overflow unit. A psychiatrist who was assigned to EOP and the MHCB unit,

plus a 3CMS psychologist, covered administrative segregation. In preparation for the monitor's visit, the institution analyzed eight case management contacts with 3CMS administrative segregation inmates. The monitor's review of six of those contacts plus two others in administrative segregation found that required weekly contacts were not occurring. Psych tech rounds in administrative segregation were non-compliant, as found by an institutional study covering September 2005 to February 2006.

Reception center population grew significantly with 3,081 arrivals between August 2005 and March 2006. Staff reported that reception center inmates in need of EOP services were sent directly to EOP housing. One psychiatrist was assigned exclusively to the reception center. Four of the reception center psychology positions were filled. Case managers saw inmates every 90 days and as referred.

Institutional Summary:

Staffing vacancies among psychiatrists and psychologists were partially covered by contractors for functional vacancy rates of 24 percent and 14 percent, respectively. Psych social worker positions were fully covered.

Although the institution's local governing body was moribund, the quality management committee and mental health subcommittee were well constituted and active. All CAPs were covered and meaningful QITs were chartered and completed. Peer review for case managers was implemented.

Few newly arriving inmates with verified medication orders were evaluated. No information was provided to the monitor on psychiatric contacts, renewals, medication continuity for intra-institutional transfers, informed consent or parole medication. Medication non-compliance was measured at 40 percent by one audit.

Pill lines and heat cards were compliant, but laboratory testing was not. DOT was implemented, including in administrative segregation, and Keyhea orders were initiated. No inmates were given HS orders.

All 23 EOP inmates who were issued RVRs were given assessments. No information was available on how many of the 588 3CMS who were issued RVRs were given assessments. Review of the RVR process by the mental health subcommittee found that it was operating appropriately.

CCWF under-referred to DMH. A third of nine referrals were rejected. Average transfer times exceeded limits for the few referrals that were accepted. Approximately half of MHCB admissions exceeded ten days.

The institution achieved partial compliance with responses to self-referrals but continued to lag in timeliness of responses. Times from medication renewals to first doses remained non-compliant. Ten hours of out-of-cell structured therapeutic activity were offered to 95 percent of EOP patients. IDTTs managed to formulate treatment plans within 14 days for 86 percent of 3CMS inmates, although psychiatric participation in IDTTs declined.

Compliance was not attained in the areas of psych tech rounding in administrative segregation and laboratory studies for monitoring blood levels of inmates on mood-stabilizing medication. No suicide watches had been conducted during the year preceding the monitor's visit. The institution continued to have male correctional officers staffing the MHCB and watching video monitors.

For 3CMS inmates, meaningful well-run therapeutic groups were offered, although wait lists were long. Clinical space was sparse, and 44 percent of clinical

83

contacts were conducted at cell-front. IDTT meetings were well attended and functioned appropriately.

In administrative segregation, weekly clinical contacts were not occurring and psych tech rounding was non-compliant.

Reception center population grew significantly with 3,081 arrivals from August 2005 to March 2006. A psychiatrist was assigned exclusively to reception center, and four psychology positions were filled. Case managers maintained 90-day contacts. According to staff, inmates in need of EOP services were sent directly to EOP housing.

### Chuckawalla Valley State Prison (CVSP)
Paper Review

CVSP had functional vacancy rates of 50 percent for psychiatrists, 40 percent for case managers and 18 percent overall for mental health positions. CVSP was able to remedy a longstanding staffing shortage by hiring a half-time psychiatrist. A second, full-time psychiatry position remained vacant. A contractor provided partial coverage, ranging from 30 to 80 hours per month. The facility did not use telemedicine. One of 2.5 allocated psychology positions was vacant. The small number of contractual hours used covered fewer than half of the open hours. A senior psych tech position was vacant and it was reportedly covered by contractual staff. Both psych tech positions were filled, as were most clerical positions.

Two of 20 MTA positions and two of 15 RN positions were vacant. Both pharmacist positions, one full-time and one half-time, were vacant, but the two pharmacy tech positions were filled. Staff reported that contractors covered vacant nursing and pharmacy positions. The laboratory's only position was filled. One of two allocated

medical records positions was vacant.  At the time of the paper review, CVSP had 12 3CMS inmates, four of whom were in administrative segregation.

Issues Resolved:

Inmates in general population and administrative segregation met with IDTTs that were composed appropriately.

Quality Management:

Documents provided for review suggested that the local governing body had not met. The healthcare quality management committee met monthly.  The mental health subcommittee met monthly but was not attended by members of custody or nursing staff.  Agendas reflected little quality management activity.  No mental health QITs were active during the monitoring period.  There were too few clinicians for peer review.

At monthly meetings of the suicide prevention committee, members were briefed on CDCR's monthly videoconference suicide prevention programs.  Beyond that agenda item, the content of the meeting seemed identical that of the mental health subcommittee.  Participants from outside the mental health department were rarely at suicide prevention committee meetings.  Although a full-fledged mental health quality management process was unnecessary for CVSP's caseload of 12, MHSDS inmates, interdisciplinary collaboration and suicide prevention efforts needed strengthening.

Medication Management:

Audits and logs indicated that inmates arriving on psychotropic medication received it timely and were seen by a psychiatrist within one week.  Audits

sampled few medication order renewals, intra-institutional moves or instances of non-compliance, but those that were reviewed were found to have been handled timely.

Audits found that medication was delivered within a day of a physician's order, although meeting minutes noted a few problems related to orders written on weekends and when inmates were discharged from the infirmary. Audits found that nearly all medication consent forms were complete. Staff provided a log of lab-related functions. It showed appropriate timing in one case and one blood draw delayed by 18 days, but reasonable results and review times in another case. The information provided did not address whether laboratory orders were written in all appropriate cases.

Staff reported that processes were operational for HS medication orders, Keyhea orders, parole medications and DOT. Documents did not include descriptions of these processes. Typically two or three inmates had DOT orders at any given time. It appeared that no inmates at CVSP were subject to a Keyhea order. The number of inmates with HS orders ranged from zero to ten during the monitoring period. Three inmates reportedly paroled during the monitoring period. Staff reported that the two with current medication orders received a supply of medication upon release.

Mental Health Assessments for the Disciplinary Process:

A total of 1,000 RVRs were issued during the monitoring period. None were issued to EOP inmates or inmates in the infirmary. Ten were issued to 3CMS inmates; two were referred for mental health assessments. Indications were that the mental health process and content were adequate. Too little information was provided to determine whether mental health input made an impact. CVSP did not provide information about RVRs issued for self-injury or sexual misconduct.

Transfers:

CVSP did not refer inmates to DMH. There were 24 MHCB referrals. Only one was rescinded. The brief length of stay in the infirmary in that case indicated that it was not rescinded for lack of access. All referrals were made timely but more than half of inmates who went to an MHCB waited longer than 72 hours. Transfers were accomplished timely in 38 percent of the cases and were only one day late for another significant subset. The longest time to transfer to an MHCB was 18 days.

Logs showed a total of 28 OHU admissions, some of which originated at Ironwood State Prison (ISP). Lengths of stay generally exceeded timeframes for OHU inmates not sent to MHCBs, but this situation was rare. In three such cases, one inmate was discharged timely and two were retained up to one week due to concurrent medical issues. OHU treatment did not always include daily contacts by a mental health clinician. Most never saw a psychiatrist. Psychiatry contacts were sometimes made for several days and then occurred intermittently. Inmates generally saw a psychologist daily, but staff audits showed that some inmates had no contact for four-day stretches. Information was insufficient to determine whether suicide risk assessments were done. There was a reasonable procedure governing holding cell use pending admission. Logs showed that the only two relevant cases waited three hours or less.

Twenty caseload inmates were transferred inappropriately to CVSP. Most were already designated as needing the 3CMS level of care upon arrival. Five were on psychotropic medication but their files lacked MHSDS chronos. All 20 were transferred out well within the 30 days. Regarding mainline transfers, there were only two EOP inmates at CVSP during the monitoring period; both were housed in administrative

segregation. Both were transferred within the mandated timeframe, although one was late in reaching an administrative segregation hub. Of the 64 3CMS inmates that were at CVSP during the monitoring period, all current cases had lengths of stay within timeframes and all earlier cases were transferred or paroled timely.

Other CAP Issues:

CVSP had an appropriate policy and reported conducting five-day follow-up in cases that involved suicide-related admissions to the OHU and MHCBs elsewhere in CDRC. Staff reported that they were unable to demonstrate compliance because in all but one case the inmates went to an MHCB unit and did not return. Access to psychiatric treatment improved with the hiring of a half-time psychiatrist but had not yet improved in the infirmary. Responses to referrals were reasonably timely, with 85 percent answered within one week, 98 percent answered within two weeks, with outliers taking up to six weeks to result in contact.

Documentation provided demonstrated sustained compliance with the other requirements regarding screening, evaluation and mental health treatment of 3CMS and EOP inmates in general population and with requirements that pertained to administrative segregation.

CVSP had appropriate policy and procedures governing administrative segregation screenings, but screenings were on occasion missed or delayed. A log showed that 94 percent of cases were screened within three days of placement. Staff screened the remainder within four to seven days and, upon learning of deficiencies, improved their source of information about new arrivals.

Institutional Summary:

CVSP continued to have difficulty attracting contractors and hiring staff to fill vacant positions. One CAP problem was resolved. Compliance appeared to have been sustained on all previously resolved items. Treatment provided in the infirmary was inconsistent, with gaps psychiatric contacts and uncertainties about suicide risk assessments.

Although a full-fledged mental health quality management process may not have been necessary for CVSP's caseload of 12, interdisciplinary collaboration and suicide prevention efforts needed strengthening. The suicide prevention committee needed interdisciplinary membership to devote more attention to examining risk factors and local practices that might enhance prevention.

CVSP was compliant with transfer deadlines. A total of 64 3CMS inmates were transferred within timeframes. Twenty caseload inmates were transferred inappropriately to CVSP. All 20 were transferred out well within 30 days.

### Deuel Vocational Institute (DVI)
June 29, 2006 – June 30, 2006

The use of contractors at DVI helped offset significant vacancy rates in mental health staffing except among psych techs. Of 4.5 allocated psychiatry positions, 2.5 were vacant. Coverage by four contractors reduced the functional vacancy rate to approximately 25 percent. Telemedicine was not used.

DVI had 19 psychology positions. One psychologist was redirected to headquarters, and six line positions remained vacant, for a vacancy rate among permanent staff of 36 percent. Although one of three psychiatric social worker positions was vacant, nearly all case manager vacancies were covered by a stable group of eight contractors. Case managers were concentrated in administrative segregation, where caseloads

averaged 20 to 30 3CMS and a few EOP inmates per case manager. Caseloads in the reception center were much larger at 50 to 70 with several EOP inmates assigned to each case manager. All clerical positions, except a half-time position, were filled.

Accounts of psych tech positions varied. Mental health staff reported three psych tech vacancies out of eight positions, while medical staff reported one vacancy among six psych tech positions.

The use of contractors reduced the near-50 percent vacancy rate among MTAs to a functional vacancy rate of 20 percent. All but three of the institution's 22 RN positions were filled. All medical assistant and laboratory allocations were filled. Pharmacy staffing was nearly full with just a 0.2 vacancy reported.

Reportedly a three percent vacancy rate existed in the custody ranks. DVI's total institutional population dropped to 3,606 while caseload population increased to 735. 3CMS inmates numbered 16 in the mainline, 111 in administrative segregation, 190 in special population and 349 in the reception center. There were 20 EOP inmates in administrative segregation, 13 in special population and 23 in the reception center. In the nine-bed OHU, the census dropped from 14 to seven during the monitor's visit.

Quality Management:

Little changed in quality assurance at DVI during the monitoring period. The mental health quality management committee and the suicide prevention subcommittee held monthly meetings.

QITs were seldom created or active. Most had functioned briefly, without appropriate staff and little effort at remediation. Despite having chartered over 30 QITs,

none was functioning at the time of the monitor's visit. The most recently formed QIT, on out-of-cell contacts in administrative segregation, had been prematurely disbanded.

Medication audits were flawed in that they did not distinguish between general and psychotropic medication, relied on a small sample of charts and may not have been taken from relevant populations.

Peer review was not conducted, reportedly due to union resistance based on concern over how the information would be used.

Suicide prevention committee meetings were attended by representatives of medicine, nursing and custody. Minutes were substantive and showed a broad agenda that ranged beyond suicide prevention. Overdoses and suicide attempts were on the agenda but there was no substantive discussion or documented review of these problems. There was no accurate tracking of overdoses, hoarding and other DOT failures, although staff reportedly discussed these issues in a daily report to the warden. The monitor's expert's review found at least five incidents of serious suicide attempts, including overdoses, cutting and hanging, none of which were known or reported to the suicide prevention committee.

A case of suicide that came to the monitor's attention raised questions about DVI's ability to implement suicide prevention measures or learn from fatal outcomes (see Exhibit E, Case Review 7). The decedent was an EOP patient on 15-minute suicide checks and video monitoring who died of cardiac arrest. He was found in *rigor mortis* indicating a lapse in observations of at least four hours. There were long intervals between observations and questionable documentation, but no administrative response was apparent. The deceased inmate's medical record was missing an admission

assessment and all nursing and video-monitoring checks. Staff reported that there had been no review by the emergency response review committee or the suicide prevention committee. Plaintiffs' counsel requested the videotape, but were provided with only a few hours. The monitor also asked to view the videotape but was told that no staff on site could access the evidence room.

Medication Management:

DVI revised its LOP in light of Plata requirements.

Information regarding medication continuity for new arrivals was scant. Bridge orders appeared to work well, although delays between orders and administration exceeded 24 hours. Times to initial psychiatric assessment were overly long with delays of one month or longer. For unverified medication claims, procedures were lacking.

Timeliness of medication order renewals remained compliant. An audit showed approximately 90 percent of patients received renewals within one day. For transfers within the institution, medication continuity was gauged at 83 percent compliance, although the small sample size made that finding tentative.

Medication non-compliance remained problematic. Audit methodology was poor with an insufficient sample size. Almost no referrals resulted in contact within one week, and most took three to four weeks.

There was a well-established medication error reporting and analysis system. During the monitoring period, medication errors dropped to 13 out of 37,040 doses. Pharmacy intercepted 110 errors and another 38 were caught on technical or administrative intervention.

Informed medication consent forms were obtained less frequently. In a sample of 40 audited UHRs, only 30 percent contained documentation of informed consent.

Lab testing practices were revised to distinguish between initial and follow-up testing and among medication classes. However, performance in this area regressed. Audit methodology and results were both poor, with findings of 25 to 83 percent compliance. Reversion to heavy reliance on contract psychiatrists increased the need for oversight of orders for lab tests and the documentation of lab results.

The number of inmates on DOT increased from two to 64 during the monitoring period. All DOT orders were stamped in red on MARs and were time-limited to prompt review by the provider for renewal or change of administration method. Hoarding was reported an average of two to three times per month.

The use and tracking of Keyhea orders was rare and poorly implemented at DVI. The institution's Keyhea list did not include the reported sole inmate with a current Keyhea order, as well as a second inmate who was on the headquarters Keyhea list.

The chief psychiatrist and senior MTA jointly reviewed all HS orders, which dropped in number from 200 to 77. Correct administration of HS orders improved with use of MTAs working 2:00 p.m. to 10:00 p.m.

A local practice of administering Wellbutrin or Seroquel in holding cells when given to inmates in administrative segregation was used to reduce medication misuse.

Psych techs ordered and shepherded parole medications. A sound audit found that 95 percent of paroling inmates on psychotropic medication received a 30-day supply, while the rest received them via mailings to their parole officers, with a small percentage refusing medication. DVI still had not dealt with release planning.

Mental Health Assessments for the Disciplinary Process:

Approximately 27 percent of a total of 1,017 RVRs were issued to non-caseload inmates. Of these, 233 RVRs were issued to 3CMS inmates and 38 to EOP inmates. Among 59 mental health assessments requested, approximately nine percent of the referrals were 3CMS inmates, about the same percentage as in the preceding monitoring period.

Clinicians followed the process correctly with appropriate input into assessments, as confirmed by staff audits. Hearing officers, however, often failed to consider pertinent clinical input in their decisions. Charges were dismissed in two cases and reduced in another two. In some cases the influence of mental illness on the infraction was apparent, but hearing officers did not take the clinical input into consideration. Staff audits found that hearing officers considered and responded to clinical input in ten percent of files sampled.

Staff reported that they followed the sexual misconduct screening protocol. Penalties for sexual misconduct were imposed infrequently.

Transfers:

Except for five referrals to DMH intermediate inpatient care shortly before the monitor's visit, DVI made no referrals to DMH during the 18 months preceding the visit. Transfers took four to seven days following referrals. At the time of the visit,

pending transfers were less than a week in duration. One patient was transferred timely to DMH at CMF, taking a total of 11 days from identification to transfer. DMH initially rejected, but later accepted, another referral to intermediate inpatient care because of the inmate's protective custody status, which he agreed to waive.

Admissions to MHCB units elsewhere increased while referrals dropped by more than during the monitoring period. About one third of MHCB stays exceeded ten days. DVI referred about 25 percent of inmates who met Program Guide criteria, citing futility for the low rate. Staff reported delays of up to a week in headquarters responses to referrals. When staff did refer, it was often too late for timely transfer, with 41 percent of referrals occurring from three to 11 days into their OHU stays. Acceptance times ranged from same day to 13 days. Late acceptances accounted for about 22 percent of late transfers. All told, timely transfers declined to about 35 percent of referred cases, and worsened after April 2006 with decreasing availability of beds. About two thirds of transfers were completed in eight days or less, and the rest were distributed over ten to 16 days. Transportation was timely.

DVI staff reported that patients were returned from MHCBs in unstable condition, with 13 percent readmitted to the OHU immediately, while half of those were re-referred to MHCBs. Reportedly, inappropriate downgrading of care levels by MHCB staff elsewhere had declined.

OHU admissions increased to an average of 98 per month, up from 85 per month on average during the preceding monitoring period. Stays over 72 hours remained at 26 percent with outliers with much longer stays. Dozens of inmates were in the OHU for weeks continually or by multiple admissions. At least 11 were there for a month or

longer with the longest single stay at 54 days. Only two with the longest stays were referred to MHCBs. There was some modest decrease during the monitoring period in multiple admissions.

There were nine continuous suicide watches in the OHU during the eight months prior to the monitor's visit. At the time of the monitor's visit, the OHU housed seven caseload inmates who were on suicide precautions. From time to time, heavy medical use of OHU beds led to an overflow of caseload inmates into administrative segregation, where they were given one-to-one direct observation with cell-front medication administration. No log of administrative segregation overflow was kept until June 2006. At that time, ten inmates were housed in the overflow unit during a two-week period, with stays ranging from 12 hours to three days. All of these inmates were released to their regular housing after one clinical review.

Incident reports covering the six-month period preceding the monitor's visit showed a completed suicide by hanging in a holding cell on the first floor of the OHU and an attempted suicide by cutting by an OHU overflow patient. This inmate was taken to an outside hospital and subsequently placed in the OHU on suicide watch.

Inmates admitted to the OHU reportedly received case manager and psychiatric contacts five days per week. The monitor observed a failure to make contact with inmates on the day of their admission, even though the admissions were at mid-day and the patient load was relatively light.

Physical plant problems in the OHU were unchanged. The ten regular OHU cells allocated to mental health had been completely retrofitted. There were four designated "quiet cells," two of which had been retrofitted while work on the other two was deferred for funding reasons. The monitor observed one cell that was dark, dirty and

malodorous with flaking cement walls that posed a possible risk for self-injury by cutting. Water from the toilet had overflowed. The combination mattress-pillow was torn in several places with strips of cloth that could be pulled out easily. Although custody procedures required rigorous cleaning, frequent patient moves occasionally precluded such measures. These physically inappropriate cells were used often for suicide watch patients who were moved from the ten regular cells to these safety cells if they became suicidal.

Failure to refer to MHCB units elsewhere resulted in longer lengths of stay in the OHU, where unacceptable in-cell conditions and lack of out-of-cell time precluded adequate long-term treatment. Increasing frequency of OHU re-admissions and the rising use of restraints attested to this problem.

Conflicting reports surrounded the use of five-day clinical suicide follow-up. Supervisors reported follow-up for patients who returned from MHCB units elsewhere, but the follow-up list did not include the names of all suicide-risk OHU admissions. Staff audits concluded that case manager contacts were in compliance, but this conclusion was not supported by the raw data. Documentation suggested that missed contacts were reported as completed. Audit results found custody compliance with follow-up in 35 to 50 percent of cases, but the data gathered did not document the extent of reported non-compliance.

DVI did not meet transfer timelines for caseload inmates in the reception center. DVI continued its practice of not providing dates of endorsement for EOP inmates. In the reception center approximately the same number of EOP inmates were processed as in the past, but compliance with court ordered transfer timelines declined.

97

Ninety three EOP inmates were placed and another 61 paroled before placement. About 42 percent of transfers were untimely with the longest wait reaching 6.5 months. Pending waits were longer, with 48 percent already beyond transfer timeframes and the longest reaching eight months. DVI's procedure for expedited transfers of EOP inmates was still in place but employed erratically.

Transfer times changed little for 3CMS inmates in reception center, with 21 percent of the 467 pending transfers already beyond transfer timeframes. Of transfers already completed, 13 percent were untimely or were paroled after remaining the reception center longer than 90 days. The longest stay for both groups was eight months. CDCR's June 2006 movement of 3CMS inmates out of reception centers resulted in about 30 to 40 more transfers than DVI's usual rate.

Among the 30 3CMS and five EOP inmates in administrative segregation, 27 percent remained there longer than 90 days, comparable to the preceding monitoring period. The longest 3CMS and EOP stays were nine and five months, respectively. During the monitor's visit ten EOP inmates had been in administrative segregation longer than 30 days without being moved to a hub, compared with 39 during the preceding monitoring period. Staff audits found that just 17 percent of EOP inmates in administrative segregation were transferred timely.

Other CAP Issues:

Although screening and evaluation were resolved years ago, the last three semi-annual staff audits found moderate slippage. A staff audit during the monitoring period showed that 99.98 percent of screenings were timely, but a smaller 82 percent of