and response to the emotional aftermath of this event were excellent (see Exhibit I, Case Review 7).

Institutional Summary:

VSPW had significant vacancies among mental health staff and only marginal success in covering vacancies with contractors.

Quality management programs continued to drive progress in many areas. Three CAP problems were resolved and others approached compliance. QITs were used effectively, and peer review was well-developed.

Medication continuity was generally sustained. VSPW had a system in place for monitoring medication refusals and noncompliance, although audits were too limited in scope to ascertain how well the system was working. The number of inmates taking mood-stabilizing medications continued to dwindle, and related audits were incomplete. DOT and HS orders were in use. A supply of medication was distributed to 85 percent of paroling inmates.

The use of mental health assessments in the disciplinary process needed improvement. Hearing officers did not always consider the results of mental health assessments. Few 3CMS inmates were referred for mental health assessments.

VSPW transferred inmates to MHCBs promptly. The OHU was busy. Lengths of stay often exceeded 72 hours. The operations of the OHU needed improvement, as did five-day follow-up of inmates who were discharged.

Caseload inmates in the reception center and EOP inmates in general population were transferred within mandated timeframes.

EOP inmates in administrative segregation and SHU were offered nearly ten hours of treatment a week, but too many mental health contacts were made at cell-front.

VSPW was non-compliant with daily rounds in administrative segregation.

### Wasco State Prison (WSP)
May 31, 2006 – June 2, 2006

The functional vacancy rate among all mental health and ancillary positions at WSP was 20 percent.  Contractors covered vacancies only in line psychiatry positions.

Approximately one third of supervisory mental health positions were vacant.  The senior psychiatrist and chief psychologist positions were filled, but the chief psychiatrist and one of three senior psychologist positions were vacant.  A new chief psychiatrist was about to be appointed pending approval from headquarters.

Among line staff, 4.5 of six psychiatry positions were vacant, for a vacancy rate of 75 percent.  Use of 2.5 contractors reduced the functional vacancy rate to 33 percent.  Vacancies among psychology positions numbered 4.5 out of 17.5 positions for a vacancy rate of 26 percent.  All four psychiatric social worker and four psych techs positions were filled.

The sole recreational therapist position and two of three psychometrist positions were vacant.

Ancillary staff positions were almost fully covered.  There were no vacancies among medical transcribers, office assistants, senior RNs and RNs, and only

half of one vacancy out of 5.5 office tech positions. Three of five pharmacy positions were filled by contractors.

The supervising laboratory technician position was filled, but two of three line positions in the laboratory were vacant. One was covered by a contract phlebotomist. Nursing staff were diverted often for blood draws.

Among 33 MTA positions, 12 were vacant. Employment of nine contract nurses reduced the functional rate to nine percent.

In May 2006 WSP housed 6,147 inmates. Caseload was comprised of 1,597 inmates of whom 1,486 were 3CMS and 111 were EOPs. Among the 3CMS, 1,343 were in reception, 76 were in mainline and 67 were in administrative segregation. There were 90 EOPs in reception center, 20 in administrative segregation and one in mainline.

Issues Resolved:

Multidisciplinary staff provided orientation for contract psychiatrists.

Individualized treatment plans were formulated in IDTT meetings.

Suicide five-day follow-ups occurred.

Psychotropic medication orders were renewed timely.

Quality Management:

The quality assurance process at WSP continued to function. The local governing body and mental health subcommittees conducted well-attended regular meetings documented by informative minutes, although membership and attendance at suicide prevention committee meetings showed slippage following the departure of the senior psychologist who chaired the committee.

QITs addressed specific issues, but peer review in psychiatry and psychology remained deficient.

Medication Management:

Medication management was hindered by staffing shortages in psychiatry, the laboratory and among MTAs.

For newly arriving inmates with verifiable prescriptions for psychotropic medication, orders were renewed for 18 of 19 inmates or 95 percent within eight hours of their arrival in one audit. Among those, first dosages were actually received by day's end in 79 percent of cases.

Continuity of medication on intra-institutional transfers remained problematic, particularly in light of WSP's reception function. An April 2006 audit found no medication discontinuity for only 52 percent of inmates transferred to other housing within WSP. Nursing staff attributed the problem to inconsistent use of form 154, which informed nursing staff of inmate moves. Remediation efforts remained unsuccessful.

Institutional audits found timely medication order renewals in 94 percent of cases. Staff reported maximum lengths of 30 days for bridge orders but confirmed that 180-day orders were being written.

Institutional operating procedures for follow-up on medication non-compliance were not consistently followed. Problems included improper MAR documentation and untimely scheduling of follow-up appointments, probably due to understaffing in psychiatry. Only 39 percent of inmates who required a follow-up psychiatric appointment were seen within a week of referral. A May 2006 audit found

appropriate documentation of pill line "no shows" in 50 percent of cases, and appropriate documentation of refusals in only 20 to 30 percent of cases.

Problems with pill lines continued, probably due to MTA shortages and gang-related security restrictions. The institution reported that all medication except in the MHCB unit was NAM. Input from MTA and RN supervisors cast doubt on whether medication administered in pill lines or cell-front was consistently being ingested.

Medication rooms in Facilities B and D were not yet operating. Because of lockdowns in Facility D, medication was dispensed at cell-front. MTA supervisors reported that unit officers often did not accompany them onto tiers for administrations. Medication was passed through the side or under the door to the inmate. Poor lighting in cells impaired observation of whether medication was actually ingested.

The institution did not maintain an adequate system for tracking the ordering, completion and review of laboratory testing for patients on psychotropic medication. At the time of the monitor's visit, there had been no recent audits of the ordering and completion of testing.

Medical staff attributed the considerable backlog in completion of testing to staffing shortages among psychiatrists and laboratory technicians. About 150 laboratory samples per day were processed by one supervising laboratory technician, one staff technician and one contract phlebotomist. Other reported hurdles included scheduling and escorting difficulties for inmates in reception center and availability of just one computer for the entire laboratory staff.

Facility audits found problems with timely administration of new DOT and NAM medication orders by the end of the following day. Compliance was achieved

153

in about 50 percent of cases. The institution reported that medication was administered exclusively DOT only in the MHCB unit, and all other medication was NAM.

Medication was administered HS only in the MHCB unit.

Mental Health Assessments for the Disciplinary Process:

From February 1, 2006 to May 17, 2006, 950 RVRs were issued at WSP. Of these, 194 or 20 percent were issued to caseload inmates among whom 35, or 18 percent, received assessments. Hearing officers used the assessments in their findings and dispositions.

Transfers:

From January 1, 2006 to May 30, 2006, 30 inmates were identified as requiring DMH intermediate or acute inpatient care through a process similar to that employed in the Coleman unidentified needs assessment.

Seven inmates were referred to acute care at DMH's PSH. Available data for six of these referrals showed untimely transfers. Average time from referral to transfer was 9.16 days with a range of five to 15 days.

Twenty one inmates were identified as requiring intermediate inpatient care. Among them twelve, or 57 percent, were referred; six were accepted and transferred. Data available on four of these patients showed untimely transfers with the average time from referral to transfer at 55.7 days, with a range of 44 to 63 days. Five referred patients were awaiting transfer with waits ranging from 21 to 127 days or an average of 98 days. One inmate paroled while awaiting transfer. Two were identified as requiring higher levels of care but no referral or transfer information was available for them.

MHCB unit records showed 92 mental health admissions to the CTC between February 1, 2006 and May 17, 2006. Five of these stays exceeded ten days. A CTC census report dated June 1, 2006 listed 18 rooms in the CTC, of which 16 were licensed and one was "redlined." Six of the rooms were occupied by medical patients with stays ranging from 30 to 471 days. There were four mental health patients in the CTC at the time of the monitor's visit. Limited bed space hindered provision of MHCB level of care and often necessitated alternate housing for these patients. Institutional policy allowed for five holding cells with four-hour limited occupancy pending MHCB admission and three larger cells with toilets for occupancy up to 24 hours.

An institutional audit of EOP weekly clinical contacts during the period from January 30, 2006 to April 14, 2006 found that they occurred and were documented in 765 out of 879, or in 87 percent of cases. A sampling of case records showed that progress notes were generally adequate, utilized printed forms and supplemented them with helpful information

EOP inmates in reception center experienced long waits before transferring to EOP programs, with 30 whose transfer deadlines had already expired. During the monitor's visit, there were 90 EOPs in reception center, up from 74 only three months earlier. Half of them had been there for 60 days or longer, up from 43 percent during the preceding monitoring period. They received weekly case manager contacts but no group or other therapeutic out-of-cell activity. Prolonged retention among these inmates led to deterioration and disciplinary issues for some, which further delayed their transfers until the disciplinary process was concluded (see Exhibit J, Case Review 7). Records indicated that staff did not consistently advocate expedited transfers for these

155

patients. Mental health administrative staff reported ongoing discussions with headquarters about possible addition of interim clinical services to these EOPs.

EOPs also remained in administrative segregation for excessive time periods due to lack of EOP beds in hub institutions. As of May 2006, 21 EOP inmates had been housed in administrative segregation from 31 to 230 days, for a compliance rate of only 17 percent. Seventeen of the 20 EOP inmates in administrative segregation during the monitor's visit had been there longer than 30 days, with outliers exceeding 300 days. Among the 13 transfers during the monitoring period, six occurred within 30 days and seven took from 35 to 150 days or longer. One inmate was out to court and four had been reclassified as 3CMS. Reportedly EOPs inmates in administrative segregation during the monitor's visit were reviewed weekly for referral to intermediate inpatient care. Extended stays in administrative segregation were associated with significant deterioration of some inmates' conditions.

During the monitor's visit, there were 1,343 3CMS inmates in reception. Identification and referrals were late, due largely to staffing shortages. Among inmates in reception whose transfer deadlines had expired, 291 were 3CMS and the remaining 30 were EOPs.

Other CAP Issues:

a. Partial compliance

For newly arriving inmates, IDTT meetings were conducted but were late due to staffing shortages. Psychiatry did not participate. Treatment plans for 3CMS inmates were generally timely but were not individualized and lacked psychiatric participation.

In mainline administrative segregation, confidentiality of mental health care was compromised by lack of clinical space and clinical support correctional officers, although custody officers cooperated with facilitating access.

Documentation of suicide prevention activity in inpatient files improved, but some files remained unavailable.

Unjustified changes of medication orders by different psychiatrists decreased significantly.

Documentation of use of five-point restraints improved. A system for regular auditing was implemented.

There was slippage with documentation of psychiatric contacts in UHRs and completeness of CTC admission records.

b. Non-compliance

For 3CMS patients, no therapeutic groups were offered. Psychiatric referral responses were untimely with an average of 16.6 days from referral to appointment. Medication discontinuity upon intra-institutional housing changes remained problematic, with 48 percent of inmates experiencing missed doses.

Video monitoring continued to be utilized but only as a supplement to direct one-on-one observation. Nursing rounds, not direct observation, were made every 15 minutes for inmates on suicide watch and every 30 minutes for inmates on suicide precaution. Custody officers complied with five-day follow-ups after discharges from MHCBs in 46 percent of cases, a modest improvement over the 35 percent compliance rate recorded during the preceding monitoring period.

Cut-down tools were found present in most housing units and the institution agreed to supply each unit with its own tools. Regular inventories had been completed in all units checked. CPR was used in four instances during the monitoring period. Approximately 35 officers had not been trained in CPR. Reportedly staff returning to work were required to complete any missed in-service training as a condition of return.

Other Issues:

Reception at WSP handled about 140 diagnostic cases per weekday or about 36,400 per year. Staff was comprised of one senior supervising psychologist, 1.5 to two psychiatrists out of the four allocated,11.5 clinicians out of 17 allocated, one psychometrist out of three allocated and one RN for bus screenings. Case managers had caseloads of 117 each plus nine weekly EOP contacts. Clinical support custody staff were assigned. Screening and identification of 3CMS inmates improved and most assessments were completed within timeframes. A significant backlog remained due to staffing shortages. Reportedly, case managers' implementation of flex-time scheduling plus new staff permitted completion of diagnostics within 18 days of arrival in most buildings. Psychiatric coverage was severely problematic.

In administrative segregation, there were 67 3CMS and 20 EOP inmates at the time of the monitor's visit. They were housed in Building D-4 and in overflow in the FAOR building. D-4 had two mental health clinical support correctional officers but FAOR had none, although its custody officers reportedly facilitated delivery of services. Clinical staff was stretched thin without a psychiatrist and with only two case managers and three psych techs. Psychiatric access was provided only by referral line which was

offered once per week. With no psychiatric participation in administrative segregation IDTTs, inmates' medication issues were left unaddressed. The senior supervising psychologist position was vacant, and one psych tech was on sick leave. Staff reported that more psych techs were needed. Case managers' caseloads averaged 33 to 34 3CMS and ten EOP inmates. Reportedly psych techs ran four groups until October 2005, when overflow into the mainline FAOR building began.

Institutional Summary:

The functional vacancy rate among all mental health and ancillary positions was 20 percent. About one third of supervisory mental health positions were vacant. Psychiatry had the most severe vacancy rate at 75 percent. It was the only discipline to use contractors, which helped reduce the functional vacancy rate to 33 percent, but delivery of service was still hampered. The laboratory was poorly staffed in view of the high volume of ordered tests. Ancillary positions were almost fully covered.

Quality assurance at the local governing body and mental health subcommittee levels was functional, but the suicide prevention committee showed slippage following the resignation of its chairperson, a senior psychologist. Peer review for psychiatry and psychology remained deficient.

Renewals of psychotropic medication orders for newly arriving inmates were generally timely, but continuity of medication on intra-institutional transfers remained problematic. Renewals were timely in about 94 percent of cases. Follow-up of medication non-compliance was not consistently implemented, with lapses in documentation of pill-line "no shows" and improper marking of MARs. Except for MHCB inmates, no medication was administered DOT or ordered and administered HS,

159

although there was suspicion of medication hoarding and cheeking. Laboratory testing was inadequately tracked and audits were lacking.

Hearing officers used mental health assessments in their findings and dispositions of RVRs. Transfers to higher levels of care at DMH were untimely for six of seven transfers to acute care and for all patients requiring intermediate care. Half of MHCB stays exceeded the ten-day time guideline. EOP inmates in reception center were not moved to appropriate EOP hub institutions in a timely manner. Half of EOP inmates in reception during the monitor's visit had been there for 60 days or longer. Long stays in reception center led to cases of deterioration and disciplinary problems. EOP inmates often waited for long periods; transfers to institutions were timely in only 17 percent of cases. For 3CMs inmates in reception, identification and referrals were generally late.

The institution was partially compliant in the provision of IDTTs and treatment plans for newly arriving inmates and confidentiality of treatment space in general population programs. The use of five-point restraints improved and psychiatric contacts were documented more often in UHRs. It did not provide therapeutic groups for 3CMS inmates and the follow-up on reports of medication non-compliance remained inadequate.

The institution used video monitoring only to supplement for inmates on suicide watch. Five-day clinical follow-up following discharges from MHCBs were compliant in only 46 percent of cases. Cut-down tools were not present in every unit checked by the monitor.

In reception, caseloads were large. Case managers implemented flex-time scheduling to cover gaps. This innovation plus the addition of some new staff permitted

completion of diagnostics in reception center within 18 days in most cases. Psychiatric shortages remained severe, and transfers deadlines were largely missed.

In administrative segregation, clinical staff was overtaxed and psychiatric help was available only through a referral line that was offered once per week. Medication issues were often left unaddressed. Four groups had been run by psych techs but ceased after activation of the overflow administrative segregation unit.

## SUMMARY

Staffing:

Staffing shortages among supervisory and line psychiatrists and clinicians remained the single most significant barrier to effective delivery of mental health services in CDCR institutions. The newest CDCR institution, KVSP, was severely understaffed with a 43 percent vacancy rate in mental health. With clinicians borrowed from other institutions, KVSP remained unable to provide basic mental health services to most of its caseload inmates. Vacancies were concentrated among case managers, leading to the institution's closure of its 3CMS program to new arrivals. The chief psychiatrist, chief psychologist and senior psychologist were diverted from supervisory tasks to provide direct services. KVSP attempted to triage all referrals and respond to the most urgent cases, but it efforts were thwarted by lack of adequate clinical, nursing and clerical staff. Initial and follow-up IDTT meetings and treatment plans were missed. Referrals went without responses. Orders for psychotropic medication were renewed routinely, sometimes for several months, without patient contact.

At CSP/Corcoran, staffing vacancy rates were high as allocated positions were increased by 65 percent in 2005. Some staff were diverted to cover vacancies

161

temporarily at KVSP and all mental health supervisors resigned. CSP/Corcoran struggled without sufficient supervisors, leading to direct service staff moving into acting supervisory positions. Turnover rates remained high in psychiatry and among contractors, with no supervising psychiatrists. At every treatment level except EOP, all specialty units were staffed by skeleton crews. Four of seven mental health positions in the MHCB were vacant.

After years of stability, mental health staffing at PBSP declined to crisis levels. Vacancy rates were 40 percent in psychiatry and psychology, and 25 percent in social work. Two staff psychologists served as acting senior psychologists. Against this backdrop, problems with the electronic medical records system hindered PBSP's ability to effectuate quality management measures and to meet Program Guide requirements.

Among eight other institutions covered in this report, CCI, CRC, CCWF, DVI, Folsom, NKSP, VSPW and WSP, staffing shortages were most severe among supervising and line psychiatry positions. The average vacancy rate for supervising psychiatrists was 58 percent. There was no contractual coverage for these vacancies. CCI and NKSP could not fill their respective sole supervising psychiatry positions. WSP filled two of its three supervising psychiatry positions.

For line psychiatrists, the average actual vacancy rate was 57 percent. Vacancy rates at the high end of the range for this discipline were at CRC with 100 percent, VSPW with 82 percent, WSP with 75 percent and DVI with 55 percent. Use of contractors reduced the average functional vacancy for line psychiatrist rate to 31 percent, although psychiatry positions at CRC remained severely understaffed with a functional vacancy rate of 70 percent.

162

At CCI, the staff psychiatry vacancy rate was 40 percent. The institution's already-thin supply of psychiatric staff was stretched further with about 30 percent of it consumed by the OHU. As a result, psychiatric participation was insufficient in IDTT meetings and nonexistent in mental health quality management activities. CCI's problems with lack of direction in the use of psychotropic medication and under-use of laboratory testing probably derived from its lack of a senior psychiatrist.

With no permanent line psychiatrists on staff, CRC was unable to address its problems with medication misuse in a meaningful way. Beginning with initial assessments, psychiatric contacts were erratic at best. Only about half of inmates on psychotropic medication were seen for timely psychiatric follow-up. Inmates in the OHU were not seen by psychiatrists unless a medication-related issue arose. Exclusive reliance on contract psychiatrists made for discontinuity of care, or worse.

Psychiatric understaffing at WSP led to problems with follow-up on medication non-compliance, including untimely psychiatric appointments and insufficient documentation. Psychiatrists did not participate in IDTT meetings and treatment plans for 3CMS inmates. Psychiatric coverage in reception center was severely problematic, resulting in missed transfer deadlines.

Psychiatric participation in IDTTs was lacking at DVI. At NKSP, where the line psychiatric vacancy rate was 30 percent, psychiatric response to medication non-compliance declined.

Among supervising psychologists the average vacancy rate was 17 percent. VSPW had the highest vacancy rate in this group, at 50 percent. For line psychologists the average actual vacancy rate was 30 percent. Use of contractors reduced

it to 17 percent. DVI had the highest line psychology vacancy rate at 36 percent with no coverage by contractors.

Quality Management:

Institutional compliance in the area of quality management remained varied. It declined overall at PBSP. At CCI, psychiatric participation in quality management suffered due to staffing shortages.

A few institutions, CAL, CEN, CCWF and CVSP, lacked active local governing bodies for quality assurance. At CCC, Folsom, NKSP, VSPW and WSP local governing bodies were active. NKSP's local governing body was particularly active in taking up mental health issues including policy and procedural changes for MHCBs, suicide watch and prevention, seclusion and restraints

Apart from CAL, quality management committees were active at the other institutions, including CCC, CRC, CSP/Corcoran, CEN, CCWF, CVSP, DVI, Folsom, ISP, PBSP and VSPW.

Mental health subcommittees were not active in a few institutions. CCC had no suicide prevention subcommittee while KVSP's was newly-formed and met sporadically. CIM's suicide prevention subcommittee was poorly attended but improved following a change in leadership. Poor attendance at CSP/Corcoran improved after the warden's directive but key members still did not attend regularly. In most institutions, mental health subcommittees were active, notably at CCI, CAL, CEN, CCWF, CVSP, CRC, Folsom, NKSP, VSPW and WSP.

A few suicide prevention subcommittees faltered while most functioned well. At WSP, the suicide prevention subcommittee regressed with the departure of the

164

psychologist who chaired it. CVSP's suicide prevention subcommittee appeared to duplicate operations of the mental health subcommittee and by 2006 almost no non-mental health staff participated in it. Composition, attendance and agenda were lacking at CIM, but improved during the monitoring period. Suicide prevention subcommittees functioned well at CCC, CSP/Corcoran, CIW, CRC, CAL, CEN, DVI and Folsom.

Appropriate chartering and use of QITs escaped the reach of several institutions including CIM, CIW, CAL, CEN, CVSP, DVI and KVSP. QITs at CIW failed to identify problems. Staff there were already over-burdened attempting to meet minimum program requirements and did not believe that QIT participation under the circumstances was a priority. At CIM, QITs were prematurely disbanded without producing useful conclusions or recommendations. In practice, they functioned more as management meetings than quality assurance activity. Despite known problems at CEN, no QITs were chartered. Effective use of QITs at CSP/Corcoran declined in the face of more pressing demands on the institution. Folsom's QITs suffered from lack of clarity and participation by line staff.

Other institutions utilized QITs more effectively, including CCC, CCI, CRC, CCWF, Folsom, ISP, NKSP, VSPW and WSP. CCI chartered five new QITs during the monitoring period. QITs at CCWF improved since the preceding monitoring period and useful CAP-related studies were undertaken. NKSP also had several useful QITs and audits.

For the most part, advances were made with peer review across institutions. It was not used at DVI and was implemented only infrequently and

rudimentarily at CCI. There were too few psychiatrists and psychologists at WSP, and too few clinicians at CCC, CCI and CAL, to engage in peer review.

Peer review at CIM was conducted well in psychiatry, psychology and psychiatric social work. It was implemented at CCWF for case managers. CSP/Corcoran revamped its peer review procedure by implementing separate committees for psychologist and psychiatric social workers, but not for psychiatrists due to staffing shortages. NKSP appointed a new coordinator and implemented monthly peer review for case managers and clinicians. Peer review was conducted well at VSPW and CRC and expanded since the preceding monitoring period at CEN.

Institutional audit capabilities and results varied. Audits of medication management were flawed at DVI and KVSP, where testing was unfocused and samples were too small. At PBSP, audit results were unclear and failed to describe methodologies employed. Audit practices and results were more successful at CSP/Corcoran and NKSP which both audited concordance between MHTS and UHRs. NKSP chartered a QIT to follow up a problem identified by a concordance audit. VSPW and CCI both audited CAP items, although some audits samples at CCI were too small.

Medication Management:

A majority of institutions were compliant with most aspects of medication management. Medication non-compliance and laboratory testing were exceptions, with a clear majority of institutions non-compliant in these areas. Staffing shortages accounted for the most glaring deficiencies.

Continuity of Medication: For newly arriving inmates at CIM, DVI, KVSP and NKSP, receipt of first doses within 24 hours occurred from 64 percent to 80

166

percent of the time. CIM was at the low end of the range, due in part to shortages among nursing staff. At CCC, CIW, CSP/Corcoran, CAL, CVSP, CRC, Folsom, VSPW and WSP, compliance rates for new arrivals were higher, ranging from 83 percent to 90 percent.

On intra-institutional transfers, CIM, CAL, NKSP, PBSP and WSP had compliance rates ranging from 52 percent to 76 percent, with WSP at the low end of the range. Continuity on internal transfers were somewhat better at CIW, CVSP, CRC, DVI, Folsom and VSPW, where compliance rates ranged from 80 percent to 83 percent.

Medication renewals: Medication renewals were late at NKSP and particularly at KVSP where the renewal system broke down because of severe staffing shortages. Orders were received within one day in only 52 percent of cases at CEN, with some waits as long as 17 days. Rates for timely renewals were better at CCI, CIM, CSP/Corcoran, CVSP, DVI, VSPW and WSP with compliance rates ranging from 90 percent to 94 percent. Bridge orders were appropriately and effectively used to avoid gaps. High turnover among contractual staff in the pharmacy at CSP/Corcoran slowed processing of orders.

Medication Non-Compliance: Most institutions were non-compliant in responding to medication non-compliance by inmates. Compliance rates for CCWF, CIM, CAL, CSP/Corcoran, CRC, DVI, KVSP, NKSP, PBSP and WSP ranged from 39 percent to 70 percent, with WSP at the lowest end of the range and KVSP at 70 percent compliance. Staffing was insufficient at CRC to handle its large volume of referrals for non-compliance. At CSP/Corcoran, high staff turnover among MTA and LVN

contractors led to inconsistency in responses. Mental health staffing pressures in general exacerbated the problem.

A smaller number of institutions including CCC, CCI, CIW, Folsom and VSPW performed better in responding to medication non-compliance but weaknesses and uncertainties were still found. At CCI many procedures which should have been implemented were not. Although VSPW had appropriate procedures in place, it was unclear whether they were working optimally.

Pill lines: Some institutions remained non-compliant with correct use of pill lines. At WSP staffing shortages among MTAs and gang-related security concerns led to problems with pill lines and cell-front administration in two yards. CRC was able to offer only a single pill line for each gender which led to medication non-compliance. Pill lines were not used at all at KVSP which was the most short-staffed among the institutions. Pill lines were more successful at CCC, CCWF, CIW, NKSP and VSPW.

Informed Consent: A few institutions, CSP/Corcoran, DVI and KVSP had low compliance rates for obtaining from inmates correct informed medication consent forms. Compliance rates ranged from 30 percent to 50 percent, with DVI at the low end of the range and declining. CSP/Corcoran was at the high end of that range, but non-compliant for its EOPs. Compliance rates for informed consent were significantly higher among CIM, CSP/Corcoran, CEN, CVSP, CRC, Folsom, NKSP and PBSP. CEN and CRC each had 90 percent compliance rates, and Folsom had the highest at 97 percent.

Laboratory Testing: A majority of institutions fell short on laboratory testing of inmates' blood levels of psychotropic medication. Staffing shortages in

psychiatry and laboratory staffing were frequent causes. DVI regressed during the monitoring period due in part to its laboratory's heavy reliance on contractors who required much oversight. At WSP and CSP/Corcoran laboratory testing was not completed timely or adequately due to staffing shortages. WSP also did not track ordering, completion or review of test results. CCI, CEN and VSPW were also non-compliant in this area.

Laboratory testing was better at CCWF and NKSP, both of which improved during the monitoring period, and at PBSP.

DOT: A few institutions including CRC, CSP/Corcoran, PBSP and WSP continued to use DOT improperly. CSP/Corcoran did not have a record or clinical review of DOT use although in practice it was followed for EOP inmates in both general population and administrative segregation. Although many DOT orders were written, DOT misuse was common. Cheeking and hoarding were a problem in the SHU and in administrative segregation despite supervisors' reports of good compliance with DOT practices. PBSP also had a persistent problem with cheeking and hoarding. Staff were generally confused about when to use pill lines and when to bring inmates out of cells. CRC used DOT for all medication administration, regardless of whether it was ordered or the inmate had a history of cheeking or hoarding. The rate of DOT compliance at WSP was about 50 percent. At CEN staff were trained but actual practice was not checked. CAL did not use DOT.

CCC, CCI, CCWF, CVSP, DVI, Folsom, ISP and NKSP were generally compliant with DOT practices.

169

Keyhea: Orders for involuntary medication were used little or not at all at a few institutions including CCC, CIM, CEN, CVSP, Folsom and DVI. Keyhea process was used at CIW, CAL, CCWF, CSP/Corcoran, KVSP, NKSP, PBSP and VSPW. The streamlined process at PBSP had many inmates on Keyhea orders. At CSP/Corcoran, Keyhea orders were used extensively but staffing problems, including limited availability of a Keyhea coordinator, led to gaps and inconsistencies in documentation.

HS: Some institutions continued to misuse HS medication orders or not use them at all. There were no HS orders at CAL, CCWF, CCC and CRC. At the last institution, the psychiatrist did not order medication HS because the evening pill line began at 7:00 p.m. NKSP failed to distinguish among HS, p.m. and bid orders by delivering all of them on the last medication pass of the day, which reportedly occurred no earlier than 7:45 p.m. CCI had no local HS procedure although the five percent of its inmates who were on HS orders received them after 8:00 p.m. At WSP, medication was administered HS in only the MHCB unit. The number of HS orders at DVI dropped significantly but implementation practices improved.

Medication was ordered and delivered HS at CIW, CEN, CVSP, Cor, Folsom, ISP, KVSP, PBSP and VSPW, although there was contradictory information on CIW's ability to do so.

Parole medication: A few institutions including CIW, CAL and DVI continued to lag in effectively providing parole medication. DVI also needed to address the sufficiency of its release planning.

Most institutions improved in the area of pre-release planning and parole medication. These included CCC, CCI, CIM, CEN, CVSP, CSP/Corcoran, CRC, DVI,

NKSP, PBSP and VSPW. Compliance rates ranged from 75 percent to 98 percent although logging and auditing were lacking at PBSP. CCI had mental health staff see every caseload inmate for pre-parole counseling before release and had the highest reported compliance rate in this area.

Mental Health Assessments for the Disciplinary Process:

There was a broad range of institutional compliance with use of mental health assessments for the disciplinary process.

Referral rates for 3CMS inmates who received RVRs were extremely low at CIW, CSP/Corcoran, DVI, NKSP and VSPW, where they ranged from four to 13 percent. CCWF and KVSP did not provide any quantification on this aspect of RVR process to the monitor.

Mental health assessments at CIW and KVSP lacked sufficient appropriate content. Many clinicians did not respond to the questions referred to them, including the central inquiry as to whether the inmate's mental condition was impaired at the time of the violation. Mental health staff rarely reviewed C-files because they were not available. In administrative segregation, inmates' own case managers often prepared their assessments, raising questions of assessment objectivity. At KVSP, clinicians did not consult other sources for information when inmates refused interviews. Some used pre-formatted forms or omitted clinical recommendations on penalties. At DVI assessments were generally good except for one glaring exception.

Assessments were disregarded in the hearing and disposition phases of RVR process at several institutions. Cases often were decided without taking clinical input into account at DVI, ISP, KVSP and VSPW where, according to the tracking log,

171

clinical input was used in only 65 percent of cases. Penalties were insufficiently reduced and charges were not dismissed in appropriate cases at KVSP and VSPW.

At several other institutions hearing officers failed to account for clinical input, or disregarded it in their dispositions. At CIW one hearing officer repeatedly used boilerplate language in his dispositions that was inconsistent with the content of the case. One such decision stated that the hearing officer did not concur with the clinician's assessment and found the inmate guilty of the violation. The monitor's review of RVRs at DVI found that only ten percent of decisions reflected consideration of assessments. Clinical input was missing altogether at NKSP. At KVSP some assessments were not appended to accompanying RVRs or were not filed with completed ones.

CRC and CSP/Corcoran maintained their compliance with use of mental health assessments in this area, although the latter institution referred for assessment relatively few of its 3CMS inmates who received RVRs. At CCC, CEN and ISP all 3CMS inmates who received RVRs were referred for assessments. They were consistently ordered and completed timely at CSP/Corcoran, CCWF, CVSP and NKSP.

Clinical assessments contained sufficiently thorough content at CCC, CCI, CSP/Corcoran, CEN, CCWF, CVSP, DVI, NKSP and VSPW. At VSPW over four fifths of assessments found that mental illness had contributed to commission of the violation. Assessments at CEN had notably clear language and useful content.

Hearing officers considered clinical input in their deliberations at CCC, CCI, CEN, CVSP, CSP/Corcoran, NKSP and WSP. Hearing officers appropriately reduced penalties or dismissed charges at CCC, CCI, CEN. At CSP/Corcoran 65 percent of guilty findings were accompanied by penalty reductions based on clinicians'

recommendations. Hearing officers' decisions accounted for clinical input appropriately at CCC, CSP/Corcoran, VSPW and WSP, although at VSPW there were relatively few penalty reductions. Only one hearing officer in NKSP was found continuing to mishandle RVR process as a diminished capacity legal defense.

CCI and CVSP developed effective local operating procedures on RVRs and the use of mental health input. CCI implemented a good procedure for custody staff involvement. It also adopted a summary disposition procedure whereby the institution's chief disciplinary officer review all assessments which found that mental illness played a role in the offense and decide whether charges should proceed or be dismissed before adjudication.

Folsom made an effort to address its past practice deficiencies by retraining staff on completing assessments. It also chartered a QIT to examine the RVR process and initiated audits, although they were not structured correctly and were too limited in scope. It remained unclear whether there was any improvement in custody staff awareness of inmate conduct warranting a mental health assessment; whether clinicians reviewed C-files or interviewed inmates; or whether content of assessments was adequate.

Institutions varied in their compliance with the new sexual misconduct protocol. At KVSP, cases were not reviewed by IDTTs and staff did not know if screens had been completed. Records of sexual misconduct cases at CCI were poorly kept. Treating clinicians had no specialized training in sexual misconduct cases. Because of logistical problems no group therapy in this area was offered.

173

CEN, DVI and NKSP implemented the new sexual misconduct protocol. At NKSP all cases of sexual misconduct were reviewed by IDTTs. Its screening tool was adequate. Clinical recommendations covered a broad range, although no cases were referred for comprehensive evaluation during the monitoring period. No RVRs for sexual misconduct were issued at CCC. CVSP did not provide information on this focus area to the monitor.

Transfers:

Access to higher levels of care was generally inadequate. Lack of bed space stymied movement into beds. Waits of several days for MHCBs and communications about decisions by DMH were commonplace. Delayed access was associated with approximately half of all rescinded referrals at CCI and CIM.

Nearly nothing was known about Folsom's and KVSP's ability to gain access to higher levels of care. Presumably because it did not activate its MHCB unit until just before the monitor's visit, and hence would have referred decompensating inmates to a MHCB unit elsewhere, KVSP provided no information on its transfers to DMH, and Folsom provided none at all

A quantitative description of access to acute and intermediate care at DMH or to MHCBs cannot be derived for this large group of prisons. Incomplete records, sparse reporting, anomalous uses of language, atypical locations and types of treatment and use of holding cells inhibited precise and coherent account of need or actual usage.

DMH:

174

Two Level IV prisons, CSP/Corcoran and PBSP enjoyed the best access to DMH beds, but even for them access to intermediate care was unattainable for months in many cases. Large reception centers, CIM, DVI, NKSP and WSP, had the least access to acute care. The rationale that stays in reception centers were short ended long ago. The sickest inmates were among those with the longest stays in reception centers.

While access to acute care was poor for both CIM and CIW, both had better access to intermediate care than any other institutions. CIM transferred 29 of 36 inmates that were referred to intermediate care to ASH. CIW transferred 14 of 17 inmates referred to intermediate care at PSH. Most referrals made by CIW resulted in transfer within one week of identification and referral, but processing delays of one to five days on the part of PSH were not unusual.

Referrals of women to acute care at PSH were rare. At most, eight female inmates were referred to acute care at DMH. CCWF and VSPW made referrals to acute care beds. The only MHCBs available to female inmates were at CCWF, where staff openly acknowledged that it under-referred to DMH based on perceived futility of doing so. Relations between staff at CCWF and PSH were contentious. The tenor of relations between CCWF and PSH staff may have impeded access to acute care for all of CDCR's female inmates. CCWF made a combined total of nine referrals to acute and intermediate care during a five-month period. Three were rejected and six gained admission. VSPW made three direct referrals to acute care of which two were transferred and one was still awaiting transfer seven days later.

175

VSPW had the only administrative segregation hub unit for female EOP inmates. In May 2006 VSPW reported eight EOP inmates in the hub unit and four in the SHU. Treatment did not equate to that provided in a PSU.

Frustration with referral efforts system-wide further clouded the picture. Lengthy stays, multiple admissions, small numbers of referrals and late referrals pointed to a pervasive pattern of under-referral. Staff at two prisons candidly explained that they did not refer every inmate who needed a higher level of care because the effort was often futile, the treatment they could provide was equivalent or the arduous transfer and transport process was likely to prove counter-therapeutic for the inmate. At other prisons, including CCI, CIM, DVI, NKSP and WSP, as many as half of the inmates who were referred did not reach the intended level of care.

<u>MHCBs and OHUs</u>:

MHCB treatment ranged from adequate, albeit it marred by idiosyncratic practices, to inadequate, with glaring omissions, most notably at CIM. Institutions with high demand and poor access relied heavily upon the use of holding cells to contain inmates in crises. OHU treatment was inadequate across the board, often due to poor access for inmates, lack of staffing and inadequate policy and procedures. OHUs seemed to serve as a reserve from which staff were redirected to cover other posts. Conditions in some OHUs were dangerous, most obviously at CRC and DVI.

MHCB units and OHUs were busy. Most were hard pressed by the level of demand for beds but some handled a volume that far exceeded that at other prisons. CIM and DVI were by far the busiest, averaging 130 and 98 admissions per month, respectively. The physical plants at CIM and DVI were inadequate and poorly

maintained. CIW's OHU and CSP/Corcoran's MHCB unit averaged 57 and 64 admissions per month, respectively. MHCB units at CCWF, NKSP, WSP and PBSP averaged 25 to 33 admissions per month. CCI's OHU was comparable in volume, averaging 23 admissions per month.

Among the better MHCB units, such as those at PBSP and CSP/Corcoran, care was generally good, but questionable practices in such areas as restraint use, suicide watches, out-of-cell contacts and restrictions on clothing warranted scrutiny and correction. Treatment at CIM and CIW was stymied by poor access for inmates and an insufficient amount of clinical and custody staff to run the unit efficiently. The GACH at CIM was unsanitary. The OHU at DVI was dirty and dangerous.

OHUs not only lacked the necessary infrastructure to treat psychiatric patients but routinely housed inmates in crisis longer than 72 hours, collectively using anomalous and unsound practices. As in MHCB units, problems in OHUs included restraint use and out-of-cell contacts, but the variety, number and severity of problems were greater in OHUs. Fundamental lapses in the busy units at CIM, CIW and DVI were reported above. VSPW's OHU used video monitoring intrusively and imposed arbitrary restrictions on showers and clothing. Suicide watches did not conform to requirements at CIW and CRC. DVI's OHU failed to conduct suicide watches according to protocols, provided inadequate treatment, had unfit safety cells and featured a number of ill advised practices.

Five-day follow-up of previously suicidal inmates was not carried out consistently at CSP/Corcoran, which reported a 92.5 percent compliance rate for 177 cases, or at VSPW, which reported compliance rates of 87 percent for inmates discharged

from the OHU and 96 percent for those discharged from an MHCB. PBSP reported 100 percent compliance with five-day follow-up.

CCWF reported an average daily MHCB census of five, seven and four in the months of December, January and February, respectively. CCWF accepted equal numbers of admissions from CIW and VSPW, 26 and 25, respectively, and only slightly more, 33, from within its own walls. CIW and VSPW had large OHUs, with eight and ten beds, respectively, plus holding cells and isolation or restraint rooms. CIW's OHU was much busier than CCWF's MHCB.

Delays in the construction, completion, staffing and occupancy of CIW's new MHCB unit spanned at least three years. The physical plant was essentially completed by April 2005, two years behind schedule, but was not slated to open to patients until February 2006. During that time, CIW staff openly preferred to use their OHU as an MHCB but the number of referrals gradually rose from none at all to three per month. The number of inmates sent to an MHCB, 22, was dwarfed by comparison to the number of admissions to CIW's OHU, 373.

Holding Cells:

Prisons with poor access to DMH beds, including CIM, DVI, NKSP and WSP, relied heavily on holding cells. Documentation of holding cell use was typically lacking, but that compiled by staff at NKSP was most complete. Along with three bad outcomes at DVI, documentation compiled at NKSP highlighted the pitfalls associated with the use of holding cells. NKSP's records showed that of 75 inmates were placed in holding cells, a number that did not include use of holding cells beyond those seven designated as MHCB holding cells, 33 percent were in a holding cell longer than two

178

days and 62 percent never made it into an MHCB. Some of these inmates shuttled

between holding cells and their housing units on multiple occasions without ever having

been fully evaluated by a clinician or their case being reviewed by an IDTT. At DVI, an

inmate self-inflicted lacerations while in a holding cell located in administrative

segregation, a second inmate committed suicide by hanging in a holding cell located in

the infirmary and an EOP inmate whose death was attributed to cardiac arrest died while

on a 15- minute watch protocol but whose body was not discovered for hours.

Reception Center Transfers:

Three reception centers that provided information regarding transfers of

3CMS inmates reported that 80 to 89 percent were transferred within 90 days. CCI

transferred 89 percent of its 3CMS inmates within 90 days. DVI transferred 87 percent

within the timeline although delays were growing, as 21 percent of the 3CMS inmates in

reception during the monitor's visit had been there longer than 90 days. Nearly 20

percent of the 3CMS inmates in WSP's reception center had lengths of stay over 90 days.

CIM was unable to meet court-ordered transfer timelines for caseload

inmates. Nor was it able to report accurate lengths of stay for caseload inmates. The

scope of monitoring at CIM was narrowed to focus on three areas, one of which was

tracking lengths of stay of caseload inmates in the reception center. Cases were tracked

manually because length of stay was inaccurate in CIM's automated system. Around 30

percent of EOP inmates in reception were never endorsed for transfer because they

paroled or had no parole date. More EOP inmates were transferred when cases were

tracked closely. The average length of stay for a subset of 45 EOP inmates was

approximately 115 days. Gains were not sustained due to lack of staff to devote to so

labor intensive a task. No reliable data were available regarding the length of time 3CMS inmates remained in the CIM reception center.

CIW did not provide the information requested regarding transfers of caseload inmates from reception. During the monitoring period, 333 3CMS inmates were processed in the reception center, taking an average of 49 days to be endorsed. CIW did not provide transfer dates, leaving unanswered the question of whether transfer timelines were met.

CCI and VSPW transferred EOP inmates from reception within 60 days. Five reception centers were unable to meet court-ordered transfer timelines for EOP inmates. CIW endorsed 82 percent of EOP inmates to its own EOP unit within 60 days. All EOP reception inmates remained locked down in the EOP unit until they were endorsed. DVI, NKSP and WSP transferred one-half to two-thirds of their EOP inmates within 60 days. Twenty percent of the EOP inmates in reception at NKSP had been there longer than 90 days.

CRC transferred EOP inmates to CIM or CIW within one day of identification and continued to track their lengths of stay at those prisons. During the monitoring period, CRC transferred 17 male EOP inmates to CIM. Four were subsequently transferred within the 60 day timeframe, four had lengths of stay ranging from 73 to 95 days and the remaining nine were at CIM fewer than 60 days. CRC transferred seven female EOP inmates to CIW. One was subsequently transferred within 60 days, one had a length of stay of 86 days, and the remaining five had been at CIW fewer than 60 days.

Only CRC and VSPW met the required timelines for moving inmates deemed in need of EOP care to prisons with EOP units. About three-quarters of EOP transfers from CCI took longer than 60 days, and only four of ten expedited transfers occurred within 30 days.

With the exception of those from CIW, transfers of EOP inmates in administrative segregation to institutions with hub units was slow, with roughly half exceeding the time limit. CIW transferred all four of its EOP inmates in administrative segregation to the hub at VSPW promptly. DVI reported that 83 percent of EOP inmates in administrative segregation were transferred to a hub within 30 days. Ten EOP inmates at DVI had been in administrative segregation longer than 30 days at the time of the monitor's visit. Seven of eleven EOP inmates transferred from KVSP waited longer than 60 days and, in some cases, more than six months. At WSP, 17 of 20 EOP inmates in administrative segregation at the time of the monitor's visit had been there longer than 30 days. Historical data showed that during the monitoring period nearly half of transfers from WSP to EOP hubs exceeded the timeframe.

Restrictive access to PSU beds was attributed to bed availability, slow processing of cases and delays caused by referrals to MHCBs. EOP inmates with SHU terms at CSP/Corcoran waited an average of 72 days after endorsement to be transferred to a PSU. At PBSP, nine EOP inmates were retained in administrative segregation during the monitoring period because no PSU beds were available.

## RECOMMENDATIONS

The principal problem identified in this report is the lack of adequate mental health staff in CDCR institutions. Consistently, the impact of this shortage has

been clear.  Court-mandated standards for mental health programming are not being met because there are insufficient psychiatrists, case managers and psych techs to treat the CDCR mental health caseload population.

        The clinical staffing shortage is not only serious; it is worsening.  Since the end of the 17th monitoring period, the rate of vacancies has grown from critical to catastrophic proportions.  As of early 2007, vacancies among allocated positions for psychiatrists, case managers (psychologists and psychiatric social workers) and psych techs hovered at the rate of fifty percent:

| Position: | Allocations: | Vacancies: | Vacancy Rate: |
|---|---|---|---|
| Psychiatrists | 301.2 | 150.45 | 50 % |
| Case Managers | 990.36 | 481.22 | 48.6 % |
| Psych Techs | 497.36 | 258.29 | 52 % |
| **Total:** | **1,788.92** | **889.96** | **49.75 %** |

        With use of telemedicine and employment of independent contractors, the CDCR managed to cover the equivalent of 235.88 clinical vacancies to reduce the functional clinical vacancy rate to 36.5 percent.

        In addition to these clinical vacancies, there were another 290.92 unfilled positions among the CDCR's 1,016.09 non-clinical mental health staffing allocations, causing a vacancy rate of 28.6 percent for these positions.

        While the CDCR's ability to fill its clinical positions has languished, its mental health caseload population has expanded.  By early 2007, it reached 32,385 inmates, which exceeds program capacity of 28,694 by 3,691 or 12.8 percent.  In the context of the functional clinical vacancy rate of 36.5 percent, this means that the CDCR

may realistically provide full mental health services to only about 56 percent of its mental health caseload population.

Meanwhile, at the Division of Correctional Health Care Services headquarters in Sacramento, the staffing situation for mental health services is even worse. A substantial increase in staffing allocations in mid-2006 brought the number of headquarters positions to 129. As of early 2007, the vacancy rate for those positions was a devastating 70 percent. Most of those who were hired recently elected to work in the regional administrative positions rather than in Sacramento.

As of February 2007, the total number of mental health position vacancies in the CDCR is 1,273.63. This figure includes 889.96 institutional clinical vacancies, 293.67 non-clinical institutional vacancies and 90 headquarters positions.

The problem is not a lack of mental health positions. Plenty of them have been allocated already. The problem is the inability of the CDCR to fill these vacancies which now quadruple the number of CDCR's total allocated mental health positions back in 1995. Of 5.5 positions at headquarters which are dedicated to recruitment for <u>Coleman</u> positions, one is vacant, and the remaining 4.5 are insufficient for handling even a routine level of recruitment activity. According to the chief of the CDCR workplace planning section at headquarters, at least three staff in each of the three regions in the state are needed.

There are several reasons for these widespread mental health vacancies. These reasons begin with bureaucratic obstacles that hinder the prompt establishment of allocated positions at the institutions. There is a lack of personnel in headquarters to shepherd the establishment of already-allocated positions through the Department of

Finance and Department of Personnel Administration maze. The limited mental health hiring personnel presently at headquarters cannot respond to this need; they are already overwhelmed by the 1,270 newly allocated positions which need to be established. It is not clear whether the failure to establish allocated positions within six months results in an abolition of the positions or the need to begin the establishment process all over again. In either case, the outcome is unacceptable and burdens the already-overtaxed human resources staff with yet more bureaucratic tasks.

Reportedly, headquarters' low recruitment support staffing levels are attributable to its own lack of resources to conduct such basic hiring activities as arranging and conducting interviews. Certain features of the qualification-testing process over-eliminate otherwise qualified applicants from consideration. For example, certain questions on the qualification examinations may elicit answers from some applicants as to their preferred work shifts that will automatically cause those candidates to be eliminated. However, these questions are largely irrelevant because the vast majority of clinical staff work occurs during regular business hours. Also, the examinations for psychologists and social workers have not been placed on line.

The defendants' historically ineffective recruitment efforts have not been revamped during the past decade. Every successive recruitment plan has called for a set routine of notices and advertisements, recruitment appearances and events. In 1999, defendants reported that use of a contracted headhunter had been approved. Yet, nothing more was reported of this effort which apparently did not generate any discernible hiring results. While the number of positions has grown with each allocation increase, recruitment efforts have proven no more productive of candidates and actual hires than

before, and clearly have fallen far short of the present task of filling 1,270 positions. Recruitment was concentrated within California, and budgetary constraints limited the use of web-based career advertising and out-of-state travel. Reportedly, the regular weekly meetings dedicated to Coleman recruitment efforts have ceased.

There is confusion surrounding the processing of new hires. The institutions and headquarters have not clarified their respective responsibilities for carrying out the various steps to successful recruitment and hiring. The result is that greatly needed mental health positions lie fallow. The Plata receivership has developed processes for expediting the process of recruitment and hiring. This process should be adopted for hiring mental health staff. Plata personnel will be taking over credentialing for mental health hires. Once implemented, this process should facilitate employment of new mental health practitioners.

As reiterated in virtually every Coleman compliance report filed over the past decade, staffing is the absolutely essential and indispensable ingredient for defendants' meeting the Program Guide requirements. It is true today more than ever. The extraordinary present need for recruitment and hiring requires an extraordinary response. For example, it may require the procurement of a national mental health head-hunting organization with a proven track record or, perhaps, the engagement of a private provider of mental health care in corrections to establish mental health programs in a facility or in facilities where recruitment is especially difficult, such as KVSP, ASP, HDSP or VSPW.

In view of the foregoing, within 60 days the defendants should be ordered to develop a plan, funding proposal and timetable for implementing an effective

185

recruitment capability and strategy. The defendants' response should include but not be

limited to a discussion of the following strategies for improved staffing:

- Streamlining and expediting the process for obtaining approval of Form 607s, which are the formal means of establishing positions.

- Reviewing and streamlining a process for obtaining exemption from operation of Government Code 12439, under which positions which have been vacant for six months are, in effect, abolished or must be re-established.

- Obtaining funding needed to place examinations for psychologists and licensed clinical social workers on line.

- Deleting from the psychiatrist and psychologist examinations any inquiries or questions which needlessly discourage or eliminate otherwise qualified applicants.

- Reconsidering the existing and apparently insufficient budget for recruitment.

- Developing regional recruitment teams.

- Using contracted subject-matter or professional specialty experts to assist in the recruitment process.

- Broadening the scope of recruitments efforts to the national level.

- Reviewing and revising the department's current print advertising and expanding the range of publications in which it appears.

- Resuming the practice of weekly progress reporting on hiring by each institution.

The terrible irony here is that the defendants now have a scale of wages

for mental health clinicians that is at par with the private sector and better than public

employers are offering in correctional facilities anywhere in the country. These enhanced

wages may be useless, however, if the defendants cannot broadcast them effectively on a

national basis. Vacant positions do nothing to improve the delivery of mental health

services in the institutions of the CDCR.

186

national basis. Vacant positions do nothing to improve the delivery of mental health services in the institutions of the CDCR.

Respectfully submitted,

/s/

_____

J. Michael Keating, Jr.
Special Master

June 11, 2007