**EXHIBIT A**

EXHIBIT A

California Correctional Institution (CCI)

April 3, 2006 - April 4, 2006

1.    Inmate A

This 32-year-old SHU inmate was receiving 3CMS services. Psychiatric technician notes were present and summarized daily rounds. Those rounds were not performed on seven days between 12/24/05 and 1/1/06.

A 12/16/05 case manager note indicated that this inmate refused an individual session. The most recent treatment plan was dated 1/20/06 and was generic in nature.

A psychiatrist evaluated this inmate on 1/13/06. The inmate was described as having a Bipolar Disorder and was seen at the cellfront because he refused to come out of his cell. He did not want medications. He was again seen by the same psychiatrist on 2/24/06 following a self-referral. He was requesting single-cell status. An IDTT was probably going to be scheduled to further assess his request.

There were no further progress notes present in his UHR, although it was our understanding that the backlog of filing was one to two months.

Assessment:

Due to the backlog of filing, it was unclear whether Program Guide guidelines were being followed.

2.    Inmate B

This 34-year-old EOP SHU inmate's chart was reviewed. A 12/1/05 psychiatric evaluation indicated this inmate's presentation was consistent with Schizophrenia and a Depressive Disorder NOS. Seroquel and Prozac were prescribed. A legible and clinically useful note was present.

Documentation of mental health rounds was also present. It showed rounds occurred generally three to five times per week. Weekly case manager contacts were documented and they occurred at the cellfront. The most recent treatment plan was dated 7/5/05.

A case manager note was dated 12/10/05. On 12/26/05, Inmate B was admitted to the OHU due to suicidal thinking. During that two-day admission, there were three psychiatrist's notes. Five-day follow-up visits were also documented following discharge.

The psychiatrist appropriately adjusted Inmate B's medications on 12/30/05 and recommended single-cell status.

Five-day follow-up was again initiated on 1/11/06. The inmate's case manager interviewed him at cellfront on 1/13/06. A consultation occurred on 1/15/06. That doctor diagnosed Malingering but did admit this inmate to the OHU as a precautionary measure. Another five-day protocol was initiated and implemented 1/18/06.

Another psychology contact occurred on 1/20/06. A psychiatrist also assessed Inmate B on 1/20/06 and again diagnosed Schizophrenia. Medications, including Haldol, Benadryl, Depakote and Zyprexa, were continued. The plan was to taper off Wellbutrin and start Zoloft. The inmate was to be seen again in two weeks. The psychiatrist follow-up occurred on 1/24/05. Zyprexa was decreased and a Haldol taper was started. The plan was to see the inmate again in three weeks.

The psychiatrist again evaluated this inmate on 2/9/06 due to side effects from medications. Blood work was reviewed by the psychiatrist. Medications again were appropriately adjusted.

A psych social worker evaluated this inmate on 2/14/06 in response to a psych tech referral. She also consulted with the psychiatrist, who again adjusted this inmate's medications.

A suicide risk assessment, related to another OHU admission, was completed on 2/16/06. Five-day follow-up again was initiated.

The psychiatrist evaluated this inmate on 2/24/06 and provided a good clinical summary in a progress note. Progress notes by the clinical case manager and the psychiatrist were present for the next three weeks.

Assessment:

This inmate was appropriately assessed to require an EOP level of care. He received frequent treatment within the SHU, but needed transfer to a PSU. His treatment plan was not updated in a timely fashion. There was also no documentation relevant to efforts to expedite his transfer to a PSU.

3.    Inmate C

This 34 year-old SHU 3CMS inmate received MHSDS services in the SHU and in the administrative segregation unit. A 11/11/05 psychiatrist note indicated his presentation was consistent with a Psychotic Disorder NOS. Medications included Risperdal, Cogentin and Remeron.

A 11/16/05 IDTT note reported that this inmate was stable on medications. Interventions were generic in nature, including medications and 90-day case manager contacts.

It appeared that this inmate was in the administrative segregation unit in November 2005 and was seen by his case manager in weekly contacts. A case manager contact occurred on 12/6/05 and evaluations by psychiatrists were documented 12/15/05 and 1/18/06. He was reported to have attacked his cellie three times, which apparently was related to his current SHU term. The presence of auditory hallucinations was also reported. He was

single-celled by 1/18/06. Psychiatrist notes were written on 2/3/06, 3/14/06, and 3/28/06. The most recent case manager note was dated 2/25/06.

Assessment:

This inmate was receiving mental health services consistent with Program Guide requirements, although his treatment plan was generic in nature.

4.    Inmate D

It appeared that the most recent treatment plan for this 26-year-old inmate was dated 6/14/05. He was housed in the SHU and assessed to require 3CMS services.

A psychiatrist evaluated this inmate on 10/19/05. The inmate's presentation was consistent with an Adjustment Disorder. Medications were not prescribed. The plan was to see him again in four weeks. The same psychiatrist reported on 11/4/05 that this inmate's presentation was consistent with a Major Depressive Disorder with Psychosis. Remeron was prescribed.

By 11/5/05 this inmate was housed in the SHU for slashing and beating up someone. Documentation of SHU mental health rounds, which occurred three to five times per week, was present.

On 11/18/05 the psychiatrist added Geodon to this inmate's antidepressant medication. The medications were increased by the same psychiatrist on 12/20/05. In the meantime, a case manager progress note was documented 12/13/05.

A second psychiatrist evaluated this inmate on 1/13/06. Medications were continued and appropriate laboratory work ordered. A 1/17/06 case manager note was present as was a 2/28/06 follow-up note by the ordering psychiatrist. Laboratory results were described as being within normal limits.

Assessment: This inmate was receiving an appropriate level of mental health care. However, the mental health sessions did not appear to address issues related to his current SHU term.

5.    Inmate E

This 29-year-old man was diagnosed as having a Schizoaffective Disorder. The most recent treatment plan was dated 12/9/05 and was generic in nature. The next update was scheduled for 3/9/06.

A weekly case management contact form was predominately a check-off mental status examination summary. It was completed on the inmate's stay in the administrative segregation unit. Documentation of psychiatric technician rounds was present. A 1/30/06

group therapy note indicated that this inmate was an active participant in an anger management group.

A psychiatrist note was dated 11/7/05 and indicated this inmate was stable. The plan was to see him again in three weeks. A psychiatrist wrote on 2/7/06 that this inmate's presentation was consistent with a Bipolar I disorder, which was currently asymptomatic. A second psychiatrist agreed with this assessment as documented in a 3/3/06 note. She saw this inmate at cellfront on 3/28/06 related to a self-referral.

Assessment:

This inmate was seen consistent with Program Guide requirements. Documentation of his clinical course was sparse because case manager contact was documented primarily on a check-off mental status examination assessment. It was not clear why the inmate had not had his planned treatment plan review although, because of the reported filing backlog, this may have been conducted but documentation not yet filed.

6.    Inmate F

This inmate was housed in the SHU due to a battery on staff and was serving three life sentences. He was diagnosed as having a Major Depression in partial remission and an Adjustment Disorder with mixed conduct and mood symptoms.

Weekly case manager contacts were documented on a form. Psychiatric technician rounds were also documented on a regular basis.

A psychiatrist evaluated this 44-year-old man on 1/13/06. Inmate F declined "appropriate antipsychotic treatment." The same psychiatrist wrote on 3/8/06 that this inmate was very paranoid. Seroquel was increased. The plan was to see him again in one week.

The most recent treatment plan was dated 3/28/06. Interventions were not recorded, but they were present on the preceding plan dated 12/13/05. A 3/30/06 IDTT progress note indicated that this inmate continued to require 3CMS.

Assessment:

This inmate was being seen consistent with Program Guide requirements. The treatment plan was generic as were his case manager progress notes.

7.    Inmate G

This 3CMS inmate was housed in SHU. He was diagnosed with Mood Disorder on an MH4 dated February 2005.

The MH2 dated 5/11/05 noted target behaviors that included "agitation" and "problematic sleep patterns." The recommended interventions, however, indicated only the staff assigned but not the specific treatment activities.

Since November 2005, the inmate was seen by a case manager on 12/30/05 and 2/12/06. Progress notes were brief. They consisted primarily of assessments of the inmate's mental status and there were no obvious activities in connection with the goals cited in the target behaviors section.

This inmate had been seen by the medical doctor at least twice in this monitoring period:

Psychiatric technician rounds appeared not to have been done on eight days between 12/26/05 and 1/9/06.

Assessment:

This inmate appeared to be placed appropriately at the 3CMS level of care. He had regular contact with his case manager. Although the treatment plan included problems that would appropriately be addressed through periodic contact, the plan did not specify the methods through which these issues were to be addressed. Notes from periodic case manager contacts did not clearly indicate that the initially cited problems were revisited in these periodic contacts.

8.      Inmate H

This 3CMS inmate was housed in SHU, though it appeared he was housed in administrative segregation prior to December 2005.

The MH2 dated 12/30/05 included a diagnosis of mild Depression and Anxiety.    The section on target behaviors and interventions was essentially blank, however.

The inmate was seen by his case manager on 12/5/05, 12/20/05, and 3/17/06.  He was seen by a psychiatrist on 12/30/05 and 3/17/06.   There is no documentation of psych tech rounds on 13 days in December 2005 and on 1/9/06.

Assessment:

Although it would appear that this inmate's contact with his case manager and with the psychiatrist occurred as per current program guidelines, there was some basis to assume that psychiatric technician rounds had not been consistent.  The treatment plan was incomplete.

9.      Inmate I

This EOP inmate was described in the record as "extremely paranoid." Current diagnosis was Psychosis NOS. A psychiatric evaluation on 1/19/06 resulted in a diagnosis of "Bipolar Disorder – Manic versus Schizoaffective Disorder."

The inmate was housed in SHU though he was apparently housed in administrative segregation until approximately January 2006.

The MH2 was dated 2/4/06 and included a diagnosis of Psychosis NOS. There was almost no information recorded regarding problems, target behaviors and interventions. That page was essentially blank.

The inmate was seen on 12/8/05, 12/21/05, 12/25/05, 12/28/05, 1/5/06, 1/11/06, 1/18/06, 1/22/06, 1/24/06, 2/3/06, 2/10/06, 2/17/06, 2/25/06, 3/4/06, and 3/11/06. Only three of those contacts were out of cell. It appeared that all contact by the case manager was at cellfront. There were, however, out-of-cell contacts with other clinicians. Most notes regarding weekly contacts were recorded on a "check sheet" and were thus not elaborative. Most notes checked "refer to psychiatrist for medication," though it did not appear that the inmate was seen weekly for medication consultation.

Psychiatric technician rounds appeared to have occurred on a daily basis with the exception of a period from 1/8/06 through 1/30/06 for which no data were found in the record. Rounds apparently did not occur on 3/10/06 and 3/12/06.

Assessment:

This inmate was consistently thought to be extremely paranoid and delusional, refusing out of cell contact based on beliefs that he would be harmed. He refused medication at times and lab tests necessary to monitor medication levels. Progress notes do not elaborate. His level of care was apparently changed to EOP on 2/4/06. There was no documentation to indicate that the IDTT had considered expedited transfer of this inmate or referral for a higher level of care, which this inmate requires.

10.    Inmate J

This inmate was at the 3CMS level of care. He was diagnosed with Schizoaffective Disorder on 3/16/06. Progress notes indicated he had been seen within 90-day intervals for the past six months or more. He had been seen by a psychiatrist on five occasions since October 2005. Most progress notes were very brief. The last MH2 was completed on 4/12/04.

Assessment:

Inmate J appeared to have been seen at the intervals specified within the Program Guide and was appropriately served at the 3CMS level of care. No current treatment plan was found within the record and progress notes are not informative.

11.    Inmate K

Inmate K was a SHU inmate who was designated as requiring 3CMS level of care. He was diagnosed with Opioid Dependence on 5/30/04 and with a Depressive Disorder on 9/20/05. He was apparently made 3CMS in February 2005. An MH2 completed on 2/11/05 included treatment objectives but interventions were not elaborated, specifying only the discipline responsible for a given part of the program.

This inmate had been seen at least once every 90 days by his case manager. He had been seen at intervals of no more than 90 days by psychiatrists. Progress notes tended to be brief and did not reflect reference to the existing treatment goals.

Assessment:

This inmate appeared to have been seen at intervals consistent with the Program Guides. The treatment plan appeared to include specific treatment goals but notes do not reflect consistent attention to these goals. The inmate appeared appropriately placed at the 3CMS level of care.

12.    Inmate L

This inmate was an administrative segregation inmate designated as requiring 3CMS level of care. He was diagnosed with Psychosis NOS. There was an MH4 dated 12/05/05. An MH2 dated 11/2/05 included target behaviors and individualized goals. Interventions only specified the staff expected to provide various interventions. The progress notes did not reflect regular reference to the treatment goals.

The inmate appeared to have been seen by his case manager and psychiatrist on a very frequent basis (nearly monthly) from October 2005 through February 2006. There were no records in the chart for the month of March 2006, which was likely due to the reported filing backlog.

Assessment:

This inmate appeared appropriately placed at the 3CMS level of care. The inmate had been seen at intervals consistent with Program Guide specifications. Treatment plans included appropriate treatment goals but periodic contacts with clinicians did not reflect routine reference to those goals.

13.    Inmate M

This level I inmate had been designated as requiring 3CMS level of care since approximately 10/20/05. The current diagnosis was Depressive Disorder Not Otherwise Specified. An evaluation was completed on an MH7 on 10/20/05. No treatment plan was found. There was no indication that this inmate had seen his case manager since the

initial evaluation. He had been seen by a psychiatrist in November 2005, December 2005 and February 2006.

Assessment:

It would appear that this inmate was appropriately placed at the 3CMS level of care. It did not appear that this inmate's treatment conformed to the existing Program Guide, however, since no treatment plan appeared in the record and there was no documentation that the inmate had been seen by his case manager since October 2005.

14.    Inmate N

This Level I inmate was designated as requiring the 3CMS level of care. His current diagnosis appeared to be "Adjustment Disorder with Mixed Anxiety and Depression." An evaluation was dated 9/6/05. A treatment plan completed on the same date included specific "problems" to which treatment was to be directed. Interventions, however, consisted only of a list of the practitioners who would be involved in treatment and the frequency with which the inmate was to be seen by each.   It would appear that this inmate had been seen by a case manager at intervals of less than three months and that a psychiatrist had seen this inmate at least once every two months.

The quality of the notes in the record was variable and included some notes (*e.g.*, 9/9/05) that were "preprinted" and contained little information.

Assessment:

This inmate appeared to have been seen at the intervals specified in the Program Guide. The quality of notes was variable and some consisted of "check box" forms with little elaborative information. The inmate appeared appropriately placed at the 3CMS level of care.

15.    Inmate O

This Level I inmate had been at 3CMS level of care since approximately 2/23/06.  There was an October 2003 evaluation that included a diagnosis of "ADHD." On a 3/29/06 MH4, he was diagnosed as "rule out Schizoaffective Disorder" and Antisocial Personality Disorder.

The record contained an MH2 dated 3/29/06 that included a list of "problems." Interventions were specified only in terms of the disciplines that should be providing services and the intervals at which these services were to occur. There was no indication of the nature of the interventions to be provided. Notes reflecting periodic contacts with this inmate included little or no reference to the treatment plan goals.

Assessment:

This inmate was only recently included in the 3CMS treatment population. It would appear that, to date, evaluations and treatment planning occurred within timeframes specified in the Program Guide.

16.     Inmate P

This Level I inmate was designated as requiring the 3CMS level of care. He was diagnosed with Schizophrenia, Paranoid as per an MH7 completed 9/8/05 and an MH4 completed 10/31/05. Although there was a current MH2, dated 10/24/05, it did not include a problem list, target behaviors or proposed interventions.

In the time since 10/31/05, the inmate had been seen twice by a case manager and at least three times by a psychiatrist. Some progress notes were illegible.

Assessment:

The treatment plan dated 10/24/05 was incomplete and, in that respect, not in compliance with the Program Guide. It would appear that the inmate had been seen by the case manager and by psychiatry staff at intervals that were consistent with the Program Guide.

17.     Inmate Q

This Level II inmate had been designated at the 3CMS level of care since at least 10/25/04. The most recent MH4 was dated 10/8/03. It listed the inmate's diagnosis as "deferred." There was an MH2 dated 2/2/06 that specified target behaviors and goals. The listing of interventions only designated the various professional disciplines that were to provide services. It did not elaborate on the nature or progression of the services to be offered. Many of the progress notes in this record consisted of "check boxes," which provided a minimal range of functional information.

It would appear that, from November 2005 through March 2006, professional contact with the inmate occurred as per the existing Program Guide.

Assessment:

The current treatment plan was not elaborative and was incomplete in that interventions were not specified in a meaningful manner. It would appear that contact between this inmate and mental health staff occurred within the timeframes specified in the current Program Guides. The inmate was in need of a current evaluation with a definitive diagnosis.

18.     Inmate R

This Level II inmate had been at the 3CMS level of care since at least 6/7/04. He was diagnosed with Bipolar Disorder. A treatment plan dated 3/16/05 listed target behaviors and objectives. Interventions were specified only in terms of which practitioners were to

provide services to this inmate and did not include the nature of the interventions to be provided.

From September 2005 through March 2006, it would appear that this inmate had been seen nearly once per month by his case manager. There were several illegible entries in the progress notes. It appeared that the inmate was seen by a psychiatrist in September 2005, November 2005, February 2006 and March 2006.

Assessment:

The treatment plan in this inmate's record provided little usable information regarding the nature of the interventions that were to occur. It would appear that the inmate had been seen by mental health staff at intervals consistent with the Program Guide.

19.    Inmate S

This Level II inmate was designated as requiring the 3CMS level of care. Information regarding his diagnosis was not found in this record; some forms may not have been brought into the current volume. The record included a current MH2 with specific target objectives and lists of interventions by practitioner. Progress notes referenced the treatment objectives specified on the MH2.

Progress notes did not clearly document that this inmate was seen within the intervals specified in the Program Guides. Case manager contact occurred on 12/30/05 and on 3/29/06 by a psychiatric intern.

Assessment:

This inmate's record included an MH2 that included target behaviors as well as interventions. In addition, progress notes referred to treatment goals.

20.    Inmate T

This 3CMS inmate was diagnosed with "Anxiety" and "Depression." He had been included in the treatment population since at least May 2005. It would appear that he had been seen by psychiatrists and by his case manager at intervals that were in compliance with the current Program Guide. The current MH2, dated 11/16/05, did not include target behaviors, but a previous MH2 form, dated 5/4/05, did include this information.

Assessment:

This inmate appeared appropriately placed at the 3CMS level of care. He had been seen by clinical staff at intervals consistent with the Program Guide.

**<u>EXHIBIT B</u>**

EXHIBIT  B

California Institute for Men (CIM)

May 15, 2006 – May 16, 2006
August 1, 2006

1.    Inmate A

This EOP inmate paroled from MCSP in January. He was back in custody in April. At MCSP he had at least one MHCB admission. He was housed in administrative segregation while treated at the EOP level of care. According to a clinical note he was paroled on 12/2/05.

He arrived at CIM on 4/20/06. He cleared the bus screening but was admitted to the MHCB later that day. According to the bus screening documentation no signs, symptoms or history of mental illness were reported or observed during the bus screening. He was seen by a case manager for a mental health screening the same day, April 20, and immediately sent to the hospital because he expressed suicidal ideation, asked for medication and said he wanted to be alone. A progress note written by the screener assessed his GAF as 15. The screener did a risk assessment and found his level of risk to be high.

He was admitted to the MHCB around 2:30 a.m. on April 20. Medication orders and an admission order were obtained by the nurse at 2:45 a.m. According to SOP at CIM he would have been in holding cells either in central facility or the CTC from 4 p.m. to 2 a.m. He was seen by a psychiatrist the following morning. Orders for Depakote, Geodon and Cogentin were written. Dilantin for control of seizures was also ordered.

In the MHCB he had an IDTT meeting within 72 hours. He was noted as psychotic and delusional. The plan was to prevent decompensation. Over two weeks after he was admitted to the MHCB a referral to a higher level of care was initiated. By 5/15/06 a clinician noted that transfer to intermediate care at SVPP was pending. He remained in the MHCB on 5/17.

Assessment:

The bus screening did not detect a suicidal inmate. [this may not have represented a bus screening issue] He was identified as in need of emergency psychiatric treatment by the mental health screener the day he arrived.

This suicidal inmate was in holding cells for 10 hours before being admitted to a crisis bed. Staff reported that although contrary to local policy inmates in crisis are held for hours in holding cells located in yards before being moved to holding cells located in the hospital.

He was not referred to DMH's intermediate care until he had been in the MHCB over two weeks.

2.    Inmate B

This inmate was in the MHCB at CIM for 50 days. His stay spanned March 3-April 21, 2006. The clinical picture was complicated by injuries he sustained when he was stabbed by his cellie in December. He was referred to intermediate care on April 4, one month into his stay in a crisis bed. He may also have been referred or considered for referral between March 10 and 15.

He remained at CIM at the EOP level of care when his case was reviewed on May 15, 2006. He was housed in administrative segregation.

According to a bus screening he was sent from CRC to RJD on 9/22/05. He was at CRC, however, on 10/5/05. Injury reports dated 10/8/05 were completed at both CRC and CIM. He reported that he was cuffed and thrown on the ground. A number of scratches and abrasions were documented. There was no bus screening done at CIM. Presumably he arrived on 10/8.

At CIM medication was administered first on 10/12/05, four days after he arrived. He was seen in an ICC meeting on 10/12. He was in administrative segregation on that date due to an RVR for battery on staff. A mental health clinician was present at his ICC and reported that he was treated at the 3CMS level of care.

He was seen twice by a case manager during his first month in segregation. A timely IDTT meeting was held. The composition of the team could not be ascertained from UHR records. He had a diagnosis of Major Depressive Disorder, recurrent. At times Schizoaffective Disorder was also listed as a diagnosis or a rule out diagnosis.

Documentation for psych tech rounds was present for 2 or 3 weeks during most of the months he was in administrative segregation. According to the MHTS he was seen by a case manager three times in November, not at all in December (out of the building), twice in January and 4 times in February. Fewer case manager contacts were documented in the UHR for the months of November and February. The UHR did not contain individual case manager contacts for the first two weeks of May.

MARs indicated that he was referred for medication non-compliance in November and December. There was no corresponding mental health documentation that indicated those referrals were received. There were no documented psychiatry contacts in 2006 in the UHR. Nor were psychiatry contacts shown on the inmate history.

A clinical note written in January indicated that he was attacked by his cellie and experienced feelings of fear for weeks afterward. He had a quarterly IDTT meeting in segregation in January. A full team attended. According to the UHR he was seen once by a case manager in February. Psych tech rounds were documented for 2 weeks in February. There was no indication that he was in distress when he was seen in February.

He was stabbed by his cellie in December 2005 and sustained stomach wounds. In March his initial IDTT meeting in the MHCB noted that he was anxious and depressed due to being stabbed. Treatment goals included lowering his anxiety level and fears

about persecution. He was preoccupied with his injuries and at times exaggerated reports of pain. He also exhibited somatic delusions that were closely tied to his injury. Early in his stay he was described as uncooperative, paranoid, delusional, and at times banging his head. Three weeks into his stay he was described as paranoid, with labile mood, and high levels of anxiety. He was found lying on the floor curled or tangled in his blankets on 3/22/06. One month later, at the time of discharge he was described as having linear thought processes and able to communicate normally. He was said to be ready to leave. He was described as uncooperative and having characterological disturbances but those problems were explicitly categorized as not primary.

Around April 21 he was released to administrative segregation at the EOP level of care with a diagnosis of Schizoaffective Disorder and an order for Geodon. After he was discharged to administrative segregation the IDTT reconsidered his need for a higher level of care and decided he did not need it.

All 5 days of follow-up contacts were documented in the UHR. He had an IDTT meeting a few days after he was released from the MHCB.

Assessment:

This inmate's medical record and the treatment he received were characterized by omissions. No bus screening was done and medication was interrupted for four days when he arrived at CIM. This inmate was only seen by a psychiatrist when he was in a crisis bed. IDTT meetings held in administrative segregation were timely; one was attended by a full team. Referrals for non-compliance with medication elicited no response. Required contacts were missed in administrative segregation. Medication orders were written in the absence of patient contact while he was in administrative segregation. Case manager contacts were missed. Documentation of psych tech rounds was incomplete in the UHR.

The UHR did not contain a record of his MHCB stay. He was referred to intermediate care around Day 7, 12, or 30 of his stay. His length of stay in the MHCB was excessive at 50 days.

3.    Inmate C

This inmate arrived at CIM on 2/28/06. When he arrived the bus screener noted a history of psychiatric treatment. The mental health screening was not scored. He went into administrative segregation on March 12. The medical record contained no information on where he was or what treatment he received during his first 12 days at CIM.

This inmate did not come to the attention of mental health staff until an officer made an urgent referral the day he arrived in administrative segregation. The referral stated that he was angry, hostile and threatening toward staff. In administrative segregation a mental health screening was done by psych techs. The results of the screening were negative. He had a diagnosis of Schizophrenia, paranoid type. Psych techs forwarded the officer's

urgent referral to mental health via a log on 3/16. He was scheduled for an appointment on 3/17/06, seen by a case manager and placed at the EOP level of care on that date.

After the first case manager contact on 3/17 he was seen weekly by a case manager. He was not seen by a psychiatrist until he went to the MHCB nearly one month later. An RVR evaluation was done in the middle of the month. He incurred an RVR for doing something to staff.

Staff reportedly orally that he began refusing treatment. He was seen for a weekly contact by a case manager on March 23. He was described as cooperative and grossly psychotic. He expressed delusions about world figures. He was referred for a psychiatric evaluation. He was seen again by a case manager on March 28. He remained delusional but was described as stable. The case manager did not think he needed to be sent to the hospital. He had not been seen by a psychiatrist despite having been referred by the case manager 11 days before.

This inmate did not have an order for medication until he reached the MHCB. The MHTS inmate history showed that he was seen by psychiatry on March 17. Records suggested, however, that the appointment was made but not kept.

He was seen cellfront the week of 4/3/06. That contact was recorded only on a weekly summary sheet of contacts maintained by a mental health supervisor. It was not shown in MHTS or progress notes. As early as 4/4/06 a clinician noted that he needed to be referred to intermediate care.

When seen by mental health staff on 4/11 he was floridly psychotic and delusional. A CCM saw him as worse, malodorous and his level of functioning in decline on 4/11. He may have been informed of mother's death around that time.

He went to the MHCB that day, 4/11. He had an IDTT in the MHCB on April 13, 2006. He was psychotic and disorganized. A referral to DMH was initiated. He remained in the MHCB for the next six weeks.

One month later he remained acutely psychotic. In a note written on May 13, 2006 he was described as paranoid. He expressed the belief that his family was being killed. He was agitated, he perseverated and his speech was pressured. That progress note indicated he was due to parole on 5/16/06. The note said that the IDTT informed the parole department that he needed to be taken to a hospital for a 5150 evaluation.

There was a question about this inmate's whereabouts and whether he went to the hospital at the end of March. A CCM contact wasn't made on 3/28; the reason given was that he was in the hospital. The MHCB log, however, did not show him in the hospital. Staff speculated that he was in a holding cell for a sustained period of time. A check of the ER log showed that he was not in a holding cell in the CTC.

A 12 month Keyhea order was due to expire on May 6, 2006. Emergency involuntary administration of medication was granted for a 10 day period on 4/27/06.

Assessment:

Nearly every link in the mental health care chain was broken in this case. This inmate did not receive the treatment he needed at CIM nor was he effectively referred to a higher level of care. He decompensated and remained acutely psychotic. He had not stabilized after five weeks in the MHCB. In light of the fact that he had been psychotic for weeks or months the discharge plan written by MHCB staff, which was to call his parole agent to pick him up and take him to a hospital for a commitment evaluation, was inadequate and unsafe.

An unscored mental health screening allowed this inmate to go undetected for 12 days after he arrived at CIM. Despite an urgent referral by an officer, an RVR involving misconduct toward staff and indicators of mental disarray this inmate was not referred to the MHCB for several weeks.

Various staff members were unable to elicit an adequate response to this case. An officer's urgent referral was not treated as such. Observations of psychosis, placement at the EOP level of care nor a case manager's referral to psychiatry resulted in a psychiatric contact. Treating clinicians' beliefs that he ought to be referred to acute and intermediate care met with similar inaction.

Ten days after it was made the referral to DMH's intermediate care was rescinded by CIM because his parole date was near. MHCB staff who treated him for six weeks, however, were under the illusion that he was waiting for an acute care bed when in fact he was never referred to acute care. Treating clinicians in administrative segregation believed he had been referred to intermediate care upon their recommendation but did not know the referral was rescinded.

The medical record was fragmented. Sources of information were inconsistent with one another. Important information was missing. The UHR did not contain information regarding referrals to higher levels of care. Consequently, none of his treating clinicians, those in the MHCB or administrative segregation, knew to what level of care he had been referred or the status of the referral.

4.    Inmate D

Both volumes of the UHR and all inpatient records were available for review. The records appeared to be complete and well organized. Due to time constraints the review was abridged. This case appeared to be that of an inmate who gets into fights that lengthen his stay in the reception center. He did not appear to have a psychotic disorder or poor cognitive functioning.

This inmate had six MHCB admissions between September 2005 and April 2006. He may have been released and returned to custody during that time. At the time of the May site visit he was on reception center status at CIM.

According to a log of MHCB admissions he was in the MHCB on the following dates: 9/29-10/3, 10/10-10/12, 12/7-12/8, 12/11-12/13, 1/26-1/30, and 3/16-3/17. He may have been in and out between September and November 2005.

In September 2005 he was discharged from the MHCB at CIM with orders for Risperdal, Zoloft and Depakote. His medication regimen changed over time. In March he had orders for Seroquel, Lithium and Wellbutrin.

A discharge summary for the MHCB admission of 3/16-3/17/06 reported that he was well known to mental health staff. He was treated at the EOP level of care. He preferred being in the hospital and therefore smeared feces in an attempt to convince staff he was mentally ill. He was described as having cluster V traits. He also may have hypertension. His diagnoses were Depression NOS, Adjustment Disorder, depressed mood, rule out malingering and Polysubstance Dependence. The summary stated "There did not appear to be any objective signs indicating a mood or psychotic disorder." He was discharged with orders for Seroquel 400 bid, Lithium 600 bid, Wellbutrin 150 bid, crushed, He was placed on DOT. Five day follow-up was planned. He was slated to be seen by a psychiatrist and medical staff within one week of discharge.

It was not unusual for this inmate to become angry at staff, act out and incur RVRs. He was housed in segregation due to a recent RVR for battery on staff. A medical report indicated that on 2/6/06 he reported to a member of the medical staff that he stuck his foot through a grill gate in a medical location, officers closed the gate on his foot and sprayed him with OC spray. He was decontaminated. A scratch on his shin and redness in his eyes were noted by medical staff. He was released to custody staff.

His release date was moved back due to RVRs. Most recently he was due to be released in February but incurred an RVR. According to a progress note written on 5/2/06 his release was imminent. A case manager note indicated that his parole officer was called and the inmate discussed discharge plans with staff.

Weekly psych tech rounds and weekly case manager contacts were documented in the UHR. A mental health evaluation done in connection with an RVR was summarized in the UHR. It appeared to be based upon his history and current presentation. IDTT meetings appeared to be timely. They were attended by a full team. Records of his crisis bed treatment at CIM were present. It appeared that he was treated by multidisciplinary staff. He was typically seen daily by a member of each discipline. Medication was administered and monitored via labs.

Assessment:

This inmate did not need a higher level of care. An abridged review of the UHR suggested that mental health treatment was responsive to his presentation. Required mental health contacts were made in administrative segregation. A mental health evaluation done for disciplinary purposes provided relevant information. IDTT meetings in administrative segregation were attended by a full team. There was no indication that he had been seen by TCMP staff. Discharge planning was minimal.

**EXHIBIT C**

EXHIBIT C

California Institute for Women (CIW)

April 27, 2006 – April 28, 2006

1.    Inmate A

DOB: 4/18/83. This inmate came from CRC and was in the OHU at CIW from 11/22-11/28/05. Her medical record remained in the active files at CIW at the time of the site visit in April 2006. According to an OBIS report she went out to court on 1/13/06 and did not return. The case was selected because she stayed in the OHU longer than three days and had a subsequent overnight admission to the OHU. Her first stay spanned the Thanksgiving holiday.

A note written at CRC indicated that she was sent to the OHU at CIW because she punched a wall and expressed the belief that doing so would stop voices she heard. An IDTT meeting was held in the OHU the day following her arrival. Geodon was initiated. Staff believed she might have been suffering from a mood disorder associated with substance abuse. For the next four days she was seen daily by a psychiatrist on call. The four notes were identical to one another. They indicated she was not suicidal that she reported no hallucinations and she exhibited fair insight and judgment.

When seen by the staff on 11/28/05 she was described as improved and ready for discharge. An IDTT meeting was held. She was diagnosed with an unspecified mood disorder and slated to return to CRC. She was on a regimen of Geodon and Trazodone. Two days later, while she was at CRC, staff found that she had written delusional material.

An IDTT meeting was held at CRC. She was disorganized during the meeting. Staff reported she had tried to exorcise another inmate the night before. She was believed to be a danger to others. She was referred back to CIW for EOP treatment. She was transferred that day.

The day she returned to CIW on 11/30/05 she was seen in the reception center by a psychiatrist. She was placed in the OHU but there was no intake note dated 11/30. She spent the night in the OHU. The first documented contact in the OHU was an IDTT meeting held 12/1/05. She admitted she had embellished her symptoms. She also reported that Geodon was helpful. She was discharged to the EOP on that date.

She was removed from the OHU and housed in the EOP. She was seen for 5 days of follow-up. On the first day of follow-up, 12/2/05 she voiced delusional beliefs. She also refused medication. According to records of five-day follow-up contacts she continued to voice delusional and persecutory beliefs. Beyond routine five- day follow-up contacts she was seen by a case manager and a psychiatrist during her first five days in the EOP. She was slated to attend ten groups, three of which were community meetings and three of which were for recreational therapy or leisure activities. There was no indication in the UHR of whether or not she attended any group sessions.

Two weeks after coming to the EOP she reported derogatory auditory hallucinations when seen for her weekly case manager contact. She was reportedly caught banging her head by an officer. She was referred to the OHU. She was admitted and stayed

overnight. There were no entries associated with the OHU stay in the UHR. She was seen for follow-up for five days. A note from the fourth day indicated that she appeared to be responding to internal stimuli and that her presentation and affect were odd and inappropriate.

Later UHR entries written after she returned to the EOP reported events that transpired prior to her OHU admission. Her roommate said she was up all night, kicked her locker and scratched her own face. The roommate felt threatened. There was a scuffle. An RVR was written on 12/11/05 for mutual combat between her and her roommate. Part C of the disciplinary packet indicated that a mental health assessment was done by mental health staff. No corresponding documentation was in the UHR. Part C noted that the assessment said the inmate would have difficulty understanding the disciplinary process and representing her own interests. It also said that mental health was not a factor in her behavior. A staff assistant was assigned and met with her 24 hours before the hearing. The narrative in Part C went on to say that she was not on a list of people with a TABE score below 4 and or on a list of people with learning disabilities. Further the narrative documented that "Subject read to this Senior Hearing Official a portion of the RVR to demonstrate she can read and understands the charges against her." She pled guilty, was found guilty and lost 62 days.

There was no copy of the mental health assessment done for disciplinary purposes in the UHR. A copy of the assessment attached to the disciplinary packet was reviewed. No relevant clinical information was written on the form. The clinician answered the first question N/A, checked "no" on questions two and three and signed the form.

Five days after she left the OHU for the second time she was seen by a psychiatrist. She was noted as compliant with medication and having better insight. A diagnosis of Schizoaffective Disorder was noted. Nearly two weeks later, on 1/5/06 she was seen by a psychiatrist at the request of a staff member. She complained that Geodon gave her headaches. She also expressed ideas of reference and reported auditory hallucinations. She was noted to be intermittently non-compliant with medication. Dosages of Geodon and Trazodone were increased. Depakote was added to her regimen. She was seen by psychiatry for follow-up one week later. She was seen weekly by her case manager.

The only MARs available in the UHR showed that she took medication from 12/23/05 to 12/31/05 and 1/5/06 to 1/13/06.

Assessment:

Deficits in the UHR included missing MARS and no record of her second OHU stay. Despite incomplete documentation in the UHR five major problems were apparent in this case.

Psychiatry coverage in the OHU during a holiday was sufficiently cursory that pertinent clinical information was not gathered. When normal operations resumed OHU staff were quick to discharge the inmate based upon insufficient information. EOP staff were

insufficiently responsive to her apparent psychosis. Neither mental health nor custody staff fulfilled the RVR requirements. She was not referred to an MHCB.

In retrospect it is evident that this inmate was experiencing a psychotic process that was not recognized and treated appropriately by CIW staff for over a month. She remained psychotic in the EOP for over one month. During that time she had a fight with her roommate and incurred an RVR.

Her seven-day stay in the OHU spanned a holiday. Insufficient information regarding her condition was gathered while she was in the OHU. Her psychosis went unrecognized due to cursory psychiatry contact made by a contract psychiatrist and lack of opportunity for EOP staff to observe her behavior. Even after she went to the EOP, had an altercation, was readmitted to the OHU and returned to the EOP treatment did not meet her needs. Salient facts were either unknown or were not considered. Psychiatry contacts were infrequent during a period when she was delusional.

Disciplinary proceedings ran counter to the intent of the policy regarding adjudication of severely mentally ill inmates. First, the mental health assessment fell short of its purpose of providing relevant information to the hearing officer. The assessment did not report that she was psychotic and had two recent OHU admissions. Language in the disciplinary packet however suggested that the hearing officer may have been told that her comprehension and ability to advocate for herself were poor. The hearing officer's independent determination that she was able to comprehend adjudication and advocate for herself based upon the officer's knowledge of her reading comprehension was baseless.

2.    Inmate B

This inmate was serving her first term in prison. She had a bus screening and a full mental health evaluation at CIW on 9/22/05. She had at least two OHU stays. Her first stay spanned 10/18/05 to 10/29/05. The second was in April. OHU records were missing or so impoverished in content that they were uninformative. Her medical record contained no information about what precipitated her admissions to the OHU. One note referred to more than two OHU admissions.

Records indicated that this inmate had been at CIW for seven months. She was admitted to the OHU soon after she arrived at CIW. She was discharged from the OHU to the EOP. For three months she was treated at the EOP level of care. She was released to the 3CMS level of care in January and remained there roughly ten weeks. She experienced a crisis in April and was admitted to the OHU. Once again she was discharged to the EOP. Her IDTT meeting in the EOP was observed on 4/28/06.

That IDTT meeting was attended by a full team. The medical record and the c file were available. Interdisciplinary discussion took place before and after the inmate's appearance. The inmate was well prepared for the meeting. She participated actively. The meeting served its purpose and appeared to be therapeutic to her.

This inmate was treated for Bipolar Disorder NOS. Social impairment and mood swings were targets of treatment. Staff observed that her reports of symptoms were inconsistent and she sometimes exaggerated them. She appeared to be on a medication regimen that was satisfactory in November and December. She reported mild to moderate distress and took an interest in events around her. She reported feeling stressed and hyper because she was locked in her cell while on reception center status toward the end of November.

While in the EOP she was seen weekly by her case manager in December but only two contacts were documented in January. In December she was scheduled to attend ten groups weekly. Five groups had a specialized focus, such as coping/loss, relationships, self esteem, and surviving trauma. The balance of the groups were community and recreation groups. There was no record of whether she attended group treatment. The most recent records of group treatment in the UHR dated from October. Staff reported that due to a computer upgrade records of EOP treatment were unavailable in recent months.

In January she voiced many complaints related to her medication regimen. She also reported mood swings and sleep disturbance. Several changes in medication were made in response to her reports. Risperdal was discontinued after she refused it. Seroquel was tried and discontinued. A trial of Trilafon was initiated. She remained on Effexor and Lithium.

A Lithium level was ordered and blood drawn on 1/19/06. Results were obtained the same date. Her level was within the therapeutic range. Although she had been on Lithium since she arrived in September no other levels were found in the UHR. An order for a level was written on 4/18/06. No results were in the UHR when it was reviewed ten days later.

She was discharged from the EOP to the 3CMS level of care around 1/26/06. A 3CMS IDTT was held in a timely manner. It was attended by a full team.

Assessment:

Mental health treatment did not appear to meet Program Guide requirements. On a positive note IDTT meetings were attended by a full team. An IDTT meeting that was observed during the site visit was of high quality. Her regimen was adjusted in response to her reports.

Records of treatment were incomplete. Some records were not filed in the UHR. Documentation that was present omitted important clinical information.

Use of the OHU was inappropriate. This inmate remained in the OHU for 11 days. She was not referred to an MHCB. The reason for her long length of stay could not be discerned from the record. Nor was it possible to learn why she was admitted to the OHU in October or April. Missing documentation regarding the crises that precipitated

her admissions to the OHU put treatment providers at a disadvantage. Records of her participation in EOP groups were not available. Case manager contacts in the EOP were usually held weekly but there were occasional misses.

Monitoring blood levels of a mood stabilizer was inconsistent. The first level was ordered over three months after she began taking Lithium. On one occasion results were received the same date they were ordered. On another occasion no results were filed in the UHR 10 days after a level was ordered.

3.    Inmate C

Volume 2/2 of the UHR and an inmate history generated by MHTS were reviewed. Concordance between the two for the months of February, March and April was high with the exception of entries for medication orders.

This inmate arrived at CIW in June 2005 from VSPW. At CIW she was treated at the EOP level of care. She appeared to be doing well from November through April with the exception of her low rate of participation in group treatment. She did not attend half of the groups in which she was enrolled.

She had diagnoses of Major Depressive Disorder, recurrent, severe with psychotic features and PTSD. For at least the past nine months she was treated with Paxil, Remeron and Risperdal. According to the UHR her regimen changed recently. Remeron was discontinued and Wellbutrin was initiated. That change was not reflected on the inmate history.

She was seen weekly by her case manager and monthly by a psychiatrist from November through April. IDTT meetings were held quarterly. Meetings were attended by a full team.

According to the MHTS inmate history she was scheduled to attend 54 groups during the month of March. Nearly half of the group meetings, 23, were cancelled. She attended 14. Eight of the 14 were community meetings or recreation therapy groups. She did not show up for 17 sessions. The month of February showed a similar pattern. She attended an average of 4.5 group sessions each week. She was enrolled in 62 groups; 28 were cancelled. She attended 18 and elected to miss 16.

Assessment:

Mental health treatment met Program Guide requirements but group treatment was weak in the EOP. Nearly half of the groups she was scheduled to attend in February and March were cancelled. Due to cancellations and refusals she attended three to five hours of group sessions each week.

The MHTS medication record did not reflect a change in her regimen that was made two weeks before.

4.    Inmate D

This inmate was treated at the EOP level of care. Her discharge from the EOP to the 3CMS level of care precipitated an overnight stay in the OHU and readmission to the EOP.

When she was discharged from the EOP to 3CMS level of care around 1/3/06 her discharge diagnoses were Bipolar I, most recent episode manic, in partial remission, Polysubstance Dependence, PTSD (inactive) and Panic Disorder without agoraphobia. Her GAF was 55 at time of discharge. The IDTT of 1/3/06 associated with her discharge from the EOP was attended by a full team. Mood swings were identified as a target of continued treatment.

The EOP treatment team began preparing her for discharge to the 3CMS level of care in December 2005. Early in December she reported she was stressed by life in the EOP and worried about stressors in the mainline. Her mood was noted as stable. She was discharged to 3CMS early in January but not moved to the mainline until mid-January. She was on the yard for only a few hours before expressing suicidal ideation and being admitted to the OHU. She said she felt overwhelmed. Back in the EOP she continued to report feelings of worthlessness and auditory hallucinations throughout February. She was admitted to the OHU around 3:30 p.m. on the 12/17/05. She expressed suicidal ideation and felt overwhelmed. She remained in the OHU overnight and was discharged to the EOP. She remained in EOP at the time of the April site visit.

There was good concordance between the MHTS inmate history and the UHR for mental health contacts in February, March and April. Medication orders were not consistent between the two records.

In the EOP she was seen by her case manager most weeks but there were occasional misses. She was seen monthly by psychiatry. She had an IDTT meeting in the OHU and another one shortly after she returned to the EOP. IDTT meetings were held in July and September 2005. A quarterly IDTT meeting was missed in December 2005.

She was maintained on Lithium, Zoloft, and Risperdal in September, October and November. After she was found to have a toxic Lithium level in November her regimen was changed. Lithium levels were monitored frequently. Results were typically available within three days of being ordered. Her level was therapeutic in September but too high in November. Records of when the abnormal results were reviewed were inconsistent but all indicated that blood was drawn within three days of the order and results were received and reviewed within four days of the order. The result that showed a high level was initialed by a physician on 11/15/05, the day it arrived at the institution. A different piece of paper indicated that her physician reviewed the abnormal results 3 days after they were received by CIW. She was seen immediately by her psychiatrist and Lithium was discontinued. She was not in apparent distress. She was seen again by psychiatry one week later. She reported racing thoughts and exhibited signs of mania.

She went through several changes in her medication regimen in December, January and February. Abilify and Trileptal were initiated. Seroquel was added to the regimen in February.

In February she was enrolled in ten groups per week. Six groups were recreational/leisure or community meetings. She was isolative and did not attend group treatment. She reported high anxiety and auditory hallucinations. She expressed fearfulness about moving to the mainline yard. Her participation in group activities in the month of November was little better. That month she attended four community meetings. She did not attend 16 groups in which she was enrolled. Six groups were cancelled due to state holidays and 21 groups were cancelled due to lockdowns or staff absences.

Assessment:

Mental health treatment was consistent with program guide requirements in some respects but fell short in others. Group treatment was weak in the EOP. Excluding holidays just under half of the groups she was scheduled to attend in November were cancelled. A quarterly IDTT meeting was missed. Her treatment plan did not address her social withdrawal as manifest in poor participation in group treatment over a sustained period of time.

MHTS and UHR records were concordant for contacts but not for medication orders. Blood levels of a mood stabilizer were monitored closely. Abnormal results were handled appropriately.

5.    Inmate E

Only Volume 4/4 of the UHR was reviewed. This EOP inmate, DOB: 11/14/52, was in and out of CIW on at least two recent occasions for short periods of time. She was discharged from CIW to a county in December. She came into CIW most recently in January 2006.

CIW's records on length of stay in the reception center concerning her date of endorsement were incorrect. They referred to a recent but previous incarceration during which she was endorsed on 9/20/05.

She was seen by a bus screener at CIW on 12/31/05. An MH7 and a screening were done by health staff on 1/3/06. She was enrolled in groups in the EOP the following day. She was seen by a psychiatrist within two days of arriving in the EOP. An IDTT meeting was held on 1/31/06.

She had a diagnosis of Schizoaffective Disorder, depressive type. She was medicated with Risperdal and Prozac. She was scheduled to attend 10 group sessions each week. Six sessions were community meetings, leisure activities or recreation therapy. The other

four were specialty groups such as current events, socialization, daily living and problem solving. The UHR did not show whether or not she attended group treatment.

Although on reception center status she was seen weekly by a case manager after she was in the EOP for three weeks. She was not seen between an initial contact on 1/6/06 and a second case manager contact on 1/26/06. She was seen monthly by a psychiatrist.

Medication continuity was sustained when she arrived at CIW. Her first dose was given on 1/1/06. MARs indicated she received all doses in January and February. The March MAR had blanks on 3/12/06 and 3/27/06.

No mental health contacts made in the month of April were filed in the UHR. Medical records staff found no loose mental health filing destined for her record.

Assessment:

Intake processing was timely. Medication continuity was sustained upon arrival. Two dates on the March MAR were blank indicating that medication was not administered. Mental health treatment met program guide requirements with the exception of missed case manager contacts soon after she arrived.

Records of mental health contacts made in April were lost.

6.    Inmate F

This EOP inmate was treated at PSH from May 2005 until 1/10/06. Immediately upon her return to CIW she precipitated a crisis and was treated in the OHU for ten days before being sent to the MHCB at CCWF. She was at the MHCB from 1/24/06 to 1/30/06 before returning to CIW. She experienced a second crisis associated with a depressive reaction in April and was sent to the MHCB. She was seen for five-day follow-up subsequent to both crisis bed stays.

A discharge summary from PSH showed diagnoses of Schizoaffective Disorder, depressive type, PTSD by history, Polysubstance Dependence in full remission in a controlled environment and Borderline Personality Disorder. Her GAF was assessed as 40. She was medicated with Lamictal, Wellbutrin SR and Geodon.

According to the staff's oral reports she is serving a lengthy sentence and is well known to CIW staff. She is alternately high functioning and debilitated by episodes of depression. She is considered a high risk patient. She has a history of suicide attempts, suicidal ideation and experiences a great deal of remorse. In January she voiced a wish to return to PSH to see a person to whom she became attached during her stay. In April she appeared to be experiencing a depressive episode.

She went through the OHU, remaining there for one night when she returned from the MHCB. Medication continuity was sustained when she returned from the MHCB. She refused her medication on eight occasions in February.

Her EOP IDTT meeting was timely. Her treatment plan was individualized. She was seen weekly by her case manager in February and March. No information regarding group treatment in the EOP was in the UHR.

Assessment:

Mental health treatment met program guide requirements with the exception of a lengthy stay in the OHU and a dearth of information about whether she attended group treatment.

7.     Inmate G

Volume 5/5 of the UHR and an inmate history was reviewed. This EOP inmate returned to CIW most recently on 10/25/05. She came from CCWF where she had been in the MHCB. She has been incarcerated for ten years. She had a diagnosis of Schizoaffective Disorder, depressive type. She was treated with Lithium, Geodon and Lamictal. She was also treated for HTN.

She was in the OHU on her way to and from the MHCB in October. Records regarding her reason for admission were incomplete or missing. She may have cheeked Lithium and/or overdosed or reported that she overdosed on it. According to a log she was referred to an MHCB on 10/12, transferred on 10/13 and returned to CIW on 10/25. A note indicated that while in the OHU she was on administrative segregation status and was therefore prohibited from taking a shower. She had however been in the EOP immediately prior to her OHU admission. She was not on administrative segregation status.

After her return to CIW she returned to the EOP. She was seen for the first time by a case manager on 11/17, three weeks after her return. On that date the schedule of groups that is given to all newly arrived EOP inmates was amended to include more specialized groups. She was enrolled in ten group sessions weekly. She was seen weekly by her case manager in December and January. She was seen more frequently than monthly by a psychiatrist.

In February she became psychotic but was not referred to a crisis bed. She was described as delusional, hallucinating, agitated and banging her head. She was admitted to the OHU on 2/2/06. She was seen daily by a psychiatrist. She was discharged after a stay of five days with orders for Geodon, Remeron and Lamictal. She was described as well organized on the day of discharge. She was seen for five-day follow-up. On the fourth day she reported auditory hallucinations that commanded her to hurt herself or others. One week later she continued to report racing thought, poor sleep and visual hallucinations. A trial of Trilafon was initiated. She was doing better by 2/23/06.

There was low concordance between the inmate history and the UHR for the months of November and December. A number of documents were missing from the UHR. There was no MAR for March.

According to the MHTS inmate history she attended ten groups during the last three weeks of February after her return from the OHU. She attended 14 groups in March. Only three were recreation therapy or community meetings. The remainder were specialized groups. She elected not to attend 25 group sessions. Eighteen groups were cancelled.

Assessment:

Due to incomplete and missing documents a coherent history of her recent treatment could not be discerned from the UHR. Treatment providers were at a disadvantage due to missing records. Mental health treatment did not appear to be consistent with program guide requirements.

This inmate was psychotic for two weeks or longer in February. She was treated in the OHU for four to five days but not referred to an MHCB. She appeared to have been on administrative segregation status while in the OHU although she did not come from administrative segregation.

There was a hiatus in weekly case manager contacts when she returned to the EOP. She was offered ten hours of treatment per week in March but attended 3 to 4 sessions weekly. Medication continuity was sustained when she returned from the MHCB. Five-day follow-up was completed.

8.     Inmate H

This inmate had a bus screening on 11/30/05. She was admitted to the OHU shortly thereafter. She reportedly cut herself in a county jail on 11/13/5 and expressed suicidal ideation to staff shortly after she arrived at CIW. She was seen in the OHU by mental health staff on 12/1/05. She was discharged on 12/5/05 with plans for five-day follow-up. A suicide risk assessment was completed.

She was not seen for an intake physical until 12/7/05 but she had a physical in the OHU on 12/2/05.

Five-day follow-up was completed. She experienced side effects and had changes in her medication regimen were made in December and January. She was seen frequently by a psychiatrist. Geodon and Remeron were abandoned in favor of Lithium. A level was ordered and results were obtained within two days. Trazodone was added to her regimen late in February.

An IDTT meeting was held within three weeks of her arrival in the EOP. A second meeting was held three months later. She was seen by a case manager on alternate weeks in December and January. She was seen weekly in February and March.

She was assigned to ten groups in the EOP on 1/3/06 one month after she arrived. There was no information in the UHR regarding her participation in group treatment. There was no direct indication that her reception center processing was expedited.

Assessment:

Mental health treatment met program guide requirements in most respects. Prompt identification and response to this reception center inmate in need of stabilization and EOP care was appropriate. Intake processing was timely. Psychiatry was responsive to her reports. The initial IDTT meeting in the EOP was late. Half of the weekly case manager contacts were made during her first eight weeks in the EOP. The appropriateness of her group treatment was unknown. It appeared that she received expedited reception center processing.

**EXHIBIT D**

EXHIBIT D

California State Prison at Corcoran (CSP/Cor)

May 8, 2006 – May 11, 2006

1.    Inmate A

The UHR of this inmate was randomly selected for review with a focus on progress notes written during the several months. His initial health screening at CSP/CSP/Corcoran occurred during 10/27/05. It was negative from a mental health perspective.

A suicide risk assessment was completed during 12/1/05 with the assessment being negligible risk. A clinician assessed this inmate during 12/1/05. Adjustment Disorder was diagnosed. A 12/8/05 psychiatric consultation indicated a diagnosis of Adjustment Disorder. Medications were not prescribed. He was to be seen again in three weeks.

A third clinician met with this inmate during 12/22/005. The plan was to see him again in two weeks. A MH-2 form was completed during 12/23/05. His presentation was consistent with Depressive Disorder, NOS. A referral to the psychiatrist was made.

A psychiatrist indicated that this inmate was a no-show for his 1/15/06 appointment. The plan was to see him again in 30 days. He was seen by a different psychiatrist during 2/10/06, who continued his 3CMS level of care and documented that medications were not indicated.

An IDDT meeting occurred 2/17/06. The inmate and his case manager were present. Subsequent case manager visits occurred during 3/3, 3/17 and 3/30/06.

Assessment:

This inmate was receiving an appropriate level of care and timely case manager contacts. His initial IDTT meeting was late.

2.    Inmate B

The UHR of this inmate was randomly selected for review, with a focus on progress notes written during the past four months. His initial health screening at CSP/Corcoran occurred during 2/2/05. It was positive from a mental health perspective.

SHU weekly cell contacts by the psychiatric technicians were documented for January, February and March 2006 in the UHR via a monthly summary form.

A note by a psychiatrist during 1/11/06 indicated that this inmate reported having neurofibromatosis and had questions regarding the use of Olanzapine. His case manager met with this inmate during 1/25/06. The plan was to see him on an as needed basis. He was noted to have issues with hostility, suspiciousness and grandiose ideas.

A clinician during 2/1/06 indicated that his level care was 3CMS. He was seen in an ICC for his annual review. He had 269 classification points.

A clinician again met with him during 2/2/06 in order to prepare him for his IDTT meeting, which occurred during 2/9/06.

He was seen on a prn basis during 3/6/06 by a clinician related to his allegations that he had been provoked by custody staff. Another contact occurred during 5/2/06 in response to this inmate's request that he be discharged from 3CMS. He was informed that he would need to not have any new symptoms through June 2006 in order to be considered for discharge.

Assessment:

This inmate was receiving appropriate level of mental health care.

3.      Inmate C

The UHR of this inmate was randomly selected for review, with a focus on progress notes written during the past four months. His initial health screening at CSP/Corcoran occurred during 5/6/05. It was positive from a mental health perspective.

A 12/19/05 note by a clinician indicated that this inmate was seen at the cell front due to his refusal to come out of this cell. He was guarded but responsive to questions. A clinician evaluated this inmate during 12/30/05. His dose of Remeron was increased.

A clinician again saw this inmate at the cell front during 2/8/06 related to his refusal to come out of his cell. His acknowledged feeling depressed. He was encouraged to contact a clinician on an as needed basis.

SHU weekly cell checks by the psychiatric technicians were documented for the month of February 2006.

Additional mental health contacts documented via the MHTS occurred during 4/6/06 in the IDTT meeting that occurred during 4/20/06.

Assessment:

This inmate was receiving an appropriate level of mental health care. Documentation problems probably related to medical records filing were noted.

4.      Inmate D

This inmate was briefly interviewed in one of the walk-alone yards. He stated that during April 2006 he was approved for an override transfer to CMF due to his medical problems. He was unclear the reason that he had not yet been transferred. He reported that he numerous medical problems. He was receiving mental health treatment.

His UHR was reviewed in order to attempt to answer his question regarding a transfer to CMF. A note by his case manager during February 2006 indicated that he was approved by the ICC for single cell status. Notes by his clinical case manager since January 2006 were dated 1/3 and 1/25, 2/8 and 3/30/06. His concerns regarding his medical problems were noted. A note by the psychiatrist was dated 1/18/06. He apparently was scheduled for surgery related to gynecomastia and hemorrhoids.

His report of auditory hallucinations and not receiving psychotropic medications due to liver dysfunction was consistent with review of his UHR. Medical problems included HIV and Hepatitis C. A hemorrhoidectomy was done during 3/24/06.

The medical record was not consistent with his report that he was being transferred to CMF. C-File review did indicate that this inmate had been endorsed to CMF. However, he was endorsed after completing a SHU term related to battery on a correctional officer, who continues to work at CSP/CSP/Corcoran. The reason for his override endorsement to CMF was due to his battery on the correctional officer and not due to his medical condition, which could be adequately treated at CSP/CSP/Corcoran. His transfer is held up related to bed availability of CMF.

Assessment:

This inmate was receiving an appropriate level of mental health treatment.

5.    Inmate E

The health care record of this inmate was reviewed with a focus on progress notes written since January 2006. This inmate was briefly interviewed at the cell front in the administrative segregation unit. He had very pressured speech. The correctional staff reported that this inmate intermittently becomes very manic.

His 10/6/05 initial health screening at CSP/Corcoran was positive from a mental health perspective. He had been receiving an EOP level of care, which was changed to 3CMS during 10/19/05.

By 10/27/06 this inmate was in the administrative segregation unit for resisting staff resulting in the use force. Paxil was being prescribed.

An 11/3/05 progress note indicated that he was been referred to the psychiatrist. His differential diagnosis included Psychosis NOS and Bipolar Disorder with psychotic features. Medical problems included HIV and Hepatitis C.

A psychiatrist evaluated this 35 year-old inmate during 12/8/05. His diagnosis was a mixed state Bipolar Disorder. Zyprexa was prescribed and the dose of Paxil was decreased.

A 12/8/05 note by a clinician indicated this inmate continued to demonstrate pressured speech. He stopped his Zyprexa during 12/15/05. He told a psychiatrist during 1/4/06 that he got angry. He stated that he did not want Zyprexa. He was noted to not be quite stable but refusing medications. Zyprexa was discontinued and Paxil was continued. The plan was to see him again in 30 days.

He refused to attend psych line for medication re-evaluation during 1/10/06. During 2/1/06 he was evaluated by a different psychiatrist, who stated this inmate was cooperative without agitation. His depression was noted to be in remission. Paxil was continued.

Weekly case manager contacts were documented. During 3/24/06 this inmate restated his desire to be receiving an EOP level of care. Paxil continued to be the only psychotropic medication prescribed. His case manager again wrote during 4/20/06 that this inmate did not meet criteria for an EOP level of care.

Assessment:

This inmate's presentation was quite consistent with the presence of a Bipolar Disorder. It is very likely that the use of Paxil, without the use of a mood stabilizer, had caused rapid cycling, i.e. intermittent manic episodes. I recommended to staff that he be re-assessed for the EOP level of care. In addition, Paxil should be discontinued and he should be restarted on a mood stabilizer.

6.     Inmate F

This inmate was briefly interviewed at the cell front in the administrative segregation unit. He stated that he had been attempting for many weeks to be reevaluated by a psychiatrist due to medication issues.

The healthcare record of this inmate was reviewed. His initial health screening at CSP/Corcoran during 8/22/05 was negative from a mental health perspective.

Information obtained from review of the healthcare record and discussion with staff was consistent with the inmate's complaint. A contract psychiatrist was recently terminated due to the nature of the care he had been providing to inmates in this particular administrative segregation unit. Arrangements were made to have this inmate reevaluated by another psychiatrist.

Assessment:

They were clearly problems with the mental health treatment provided to this inmate. He was not seen by a psychiatrist when warranted.

7.     Inmate G

This case was reviewed after officers in the EOP/ SHU identified this inmate as an individual who appeared to maintain his personal hygiene at a less than optimal level and who did not attend groups or other out of cell activities.

Review of the C-file indicated that this inmate was transferred from NKSP/RC to acute care at DMH/Vacaville in January 2006 and discharged to CSP/Cor on 3/17/06 at an EOP level of care. According to the C-file he was committed for first degree burglary and car theft.

While at NKSP, this inmate was issued an RVR for battery on an inmate, an unprovoked attack. An initial ICC was held on 3/31/06, when it was decided that he would be retained in CSP/Cor's EOP/SHU "pending psych review and medical." As of 5/8/06, he remained in there for reasons that were not identified in the C-file.

Review of his UHR indicated that before he was sent to DMH in January the following events transpired. On 12/21/05 he was characterized as "stable on medication." Mood was reported as "euthymic" and affect was flat and restricted. When seen on 1/5/06, he was characterized as evidencing difficulties with self-care and he was being prompted to come out for showers. He was described as "childlike" and evidencing a lack of orientation.

The UHR also indicated that this inmate was sent to CSP/Corcoran from either NKSP or DMH Vacaville on 3/17/06, where he had been treated at the acute level of care since 1/11/06. At the time of an initial mental health examination, he was noted to be delusional, claiming to own the prison, paranoid and evidenced poor personal hygiene. Referral notes indicate that he had been sent to DMH because "he was clearly disabled" and more often than not "malodorous."

Before he was returned from DMH in March, a Keyhea order was sought and granted on 2/23/06. At the time of his discharge, he was characterized as "pleasant and cooperative, mood was euthymic and affect was flat" and his "Judgment was unimpaired."

When he reached CSP/Cor he did not receive medication for several days. When this was discovered, he was placed in the infirmary and medication was administered. He was diagnosed with "chronic undifferentiated schizophrenia."

Psych tech rounds were consistently documented.

When seen during the monitoring visit, this inmate's cell was quite dirty. He was lying in his bed when we arrived at cell front. He rose when his name was called by a correctional officer and he walked to the door. He was very poorly groomed and wearing what appeared to be a dirty tee shirt. His hair appeared unwashed. His speech was slow and eye contact was poor. He was able to report his location but not the date, reporting that it was October. His memory appeared quite impaired.

Assessment:

This inmate appeared to be significantly mentally ill and functioning at a very marginal level. Staff reported that he was designated as developmentally disabled and classified as DD1 or DD2 as per a Clark evaluation. He was likely to remain at an EOP level of care as he was diagnosed with "chronic undifferentiated schizophrenia."

He had a current Keyhea order but medication continuity was disrupted following his return from acute care. At the time of the visit, mental health staff were advised of his presentation. His compliance with medication should be carefully monitored and consideration should be given to a referral to intermediate or acute care in the event that his condition does not improve.

Standard procedures regarding medication continuity for newly arrived inmates and psych tech rounds in administrative segregation were insufficient to trigger an adequate response to this inmate who clearly needed more intensive mental health treatment.

8.    Inmate H

This inmate's record was chosen for review because he was currently refusing most out-of-cell activities.

This 23 year old Vietnamese inmate was treated at EOP level of care. He was serving his first term and was committed for assault with a deadly weapon. He had been in custody of the CDCR system since at least July 2005 and had arrived at CSP/Cor on 11/7/05 from DMH.

Notes indicated that, at the time of his arrival at the San Quentin Reception Center, he was "mute" but was approved for transfer to CSP/Cor the day following that note. He was noted to be unresponsive to questions at the time that he arrived at CSP/Corcoran. On 7/19/06 he was noted to be sitting on his bunk and crying. He was brought to the treatment and triage area of the hospital, where he was noted to be mute.

He was transferred to DMH on 7/20/05, noted to be vomiting upon arrival and was referred to the emergency room, where he was mute and uncooperative. He remained mute and was placed on Keyhea on 8/16/05. He followed directions without hesitation and was seen crying on occasion.

Contact with his family apparently revealed that he had a history of episodic "unresponsiveness to his environment for weeks." There was a period of medication trials while the inmate was at DMH. Notes indicated that by September he was communicating, sustaining eye contact and his grooming had improved. He denied having a mental illness and reported that he "was going through a lot."

A Keyhea petition was granted on 9/22/05 and the inmate remained at DMH into October 2005. At the time of his transfer on 11/7/05 to CSP/Corcoran from DMH, he was described as speaking somewhat hesitantly. He was "spontaneous, somewhat tangential

and perseverative regarding Hepatitis B," which he had never been known to mention before and for which he had not tested positive.

Diagnoses at the time of discharge from DMH included was Psychotic Disorder NOS, rule out Schizophreniform Disorder and rule out Substance Induced Psychotic Disorder. An MH4 completed on 11/7/05, upon his arrival at CSP/Corcoran, noted that the inmate was refusing contact with clinicians at the time and was diagnosed with Psychotic Disorder NOS primarily on the basis of information obtained from the earlier DMH evaluation.

Psych tech notes from early November indicate that he had been refusing medication for "over a week" and was sent to the acute care hospital approximately 11/8/05, likely for involuntary medication. Notes from early December indicated that he was "speaking clearer" and participating in groups.

Through December he attended groups only occasionally. On 12/28/05 he was noted to interact in an abbreviated manner with case manager. Notes from psych tech rounds during this same period indicated that he often refused to acknowledge the psych tech, "presents as paranoid" but was, at times, characterized as "pleasant."

Notes from January indicated that he continued to communicate only occasionally. On 1/26/06, his cell was noted to be untidy but 114s indicated that he was consistently showering and accepting meals. He seldom attended groups through January and February 2006. Notes indicated that he generally refused to acknowledge the psych tech during rounds.

It appeared that the inmate's condition had remained essentially unchanged since January. He seldom went to groups, generally did not acknowledge psych techs during rounds and seldom spoke except briefly to a case manager.

Assessment:

Mental health treatment provided to this severely mentally ill inmate EOP inmate was inadequate. It appeared that this inmate had a history of decompensation and very marginal adaptive functioning that likely accompanied poor compliance with medication. This inmate's medication compliance should be closely monitored. Notes at the time of his release from acute care at DMH following initiation of involuntary medication suggested improved functioning at a point in time when he was medicated.

Referral for administration of involuntary medication should occur as warranted and referral to a higher level of care be made if, in fact, it is not possible to maintain this inmate's functioning at an acceptable level in this setting.

9.    Inmate I

This inmate was referred by the plaintiffs' attorneys. He had a history of writing letters that are characterized as "paranoid" in nature and which reportedly contain obvious references to suicide. He was currently at 3CMS level of care and housed in the SHU. He was reportedly housed in the PSU for several years prior to his SHU placement and described as having a known history of multiple suicide attempts.

A review of records revealed that this inmate was placed in the CTC from 3/21 through 3/23/06 after he complained that officers were going to "beat him up" because he spit on an officer. He was apparently not threatening suicide at that time.

Notes across the past few months indicated that the inmate had made allegations that he was raped by other inmates. His self care and care for his cell were reportedly marginal. His verbal interactions with staff were often remarkable for "rapid" speech and frequent allegations that custody staff place various substances within his food. He was characterized as evidencing other delusional speech at times. This inmate was seen by his case manager on 1/28/06, 1/23/06, 3/21/06, 3/27/06 and 4/5/06. Notes in the record were generally well written.

When he was seen cell front by this writer on 5/10/06 his grooming was appropriate. Speech was rapid but there was no obvious gross disorganization in his thinking. He appeared oriented. His primary complaint was regarding the loss of a radio which had apparently been removed by custody and which he was trying to retrieve.

Assessment:

This inmate appeared to be at an appropriate level of care but control of his psychotic symptoms did not appear to be optimal.

10.    Inmate J

Inmate J was currently designated as requiring SHU housing and was placed at the 3CMS level of care. Custody officers identified him as frequently refusing breakfast. . This inmate's record confirmed that he was refusing breakfast at times. When interviewed he claimed that this was part of an ongoing dispute that he was having with custody staff.

A review of his records revealed that he was seen on psych tech rounds on 4/5, 4/11, 4/19 and 4/26 and 5/4 and 5/9/06.

This inmate arrived at CSP/Cor from SVSP. He reported a chronic pain problem for which, by his report, he has an implanted electrical stimulation device attached to his spine. He has brace-like devices that he claimed to be unable to wear because the institution had taken away the socks that must be worn with the device and he has not been able to re-gain access to them. He produced two CDCR Form 7410s which allow an accommodation for access to a pillow and a mattress. He reported that he has not been able to gain access to those accommodations despite the approval.

This inmate was admitted to a crisis bed around 3/29/06 following a claim that he was suicidal. When interviewed the inmate reported that this occurred as a result of inability to obtain treatment for chronic pain.

The inmate reported a history of depression that was secondary to pain. Although this inmate was critical of the institution for its handling of this requests for accommodation, he reported that mental health services were available and generally adequate.

Assessment:

This inmate appeared to be placed at the appropriate level of care.

11.    Inmate K

This inmate was recently discontinued from suicide watch in the CTC. He was placed at the 3CMS level of care and was currently in the SHU.

This inmate was seen by psych techs on rounds on 4/5, 4/11, 4/26 and 5/4 and 5/9/06.

He was interviewed at cell front by this writer. He reported that he sees a psychologist approximately once per month and that he sees the psychiatric technician daily. He shared a handout on anger management that had been provided to him by the psychiatric technician.

This inmate was very complimentary of the services provided by the psychiatric technician and the case manager. He reported that he does not have access to group treatment but would attend groups if they were available.

This inmate reported that he has experienced "panic attacks" at times as a result of hypoglycemia and no access to prescribed glucose. He reported being prescribed psychiatric medication including Haldol and Benadryl for sleep.

Assessment:

This inmate appeared to be placed at the appropriate level of mental health care.

12.    Inmate L

This was a SHU EOP inmate who was reportedly confined to a wheelchair.

There was an MH-2 that was completed on 6/5/05. At the time that this plan was completed, his presentation appeared to have been within normal limits. There was no thought disorder noted. He was diagnosed with Schizoaffective Disorder NOS. There was a treatment plan in place that listed target behaviors but the interventions were rather generic.

An entry on 6/25/05 indicated that the inmate's appearance, behavior and mood were within normal limits. He was characterized as friendly and outgoing.

On 11/2/05 notes indicated that the inmate was experiencing an increase in stress, anger and frustration. He denied any current suicidal intent at that time.

The inmate's record did not include a current evaluation.

Notes from 11/05/06 indicated that the inmate was concerned about "bed sores." During this time he was refusing out of cell mental health contact at times. On 12/3/05 notes indicated that he was refusing to come out of his cell as a result of fear that the correctional officers would "toss his house."

On 12/22/06 he was not on medication. He was noted to report feeling depressed. He was still complaining of bedsores.

On 1/6/06 there was a note indicating that the inmate had sent attorneys his dentures, catheters and other items.

Review of this inmate's 114 indicated that he had been seen by psych techs weekly from 3/20/06 through 5/9/06. Information from the rounds would appear to indicate that he was accessing showers, going to yard and engaging in other activities.

Through March and April 2006 the inmate was marginally cooperative with attempts by various mental health staff to evaluate him. He was once again diagnosed with Schizoaffective Disorder on 4/21/06.

Assessment:

This inmate's need for treatment had not been sufficiently evaluated. This inmate has been uncooperative with requests that he participate in an out-of-cell evaluation. There was no indication that he had refused medication as it is not clear that medication had been prescribed. He appeared depressed and suspicious and has, at times, acted in a bizarre fashion. He has various medical problems, including bed sores. He required an appropriate evaluation and he should be placed into a CTC or another setting in which it is possible to adequately assess his current level of functioning.