PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
AMY WHELAN Bar No.: 215675
LORI RIFKIN Bar No.: 244081
SARAH M. LAUBACH Bar No.: 240526
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　　Defendants | No.: Civ S 90-0520 LKK-JFM<br><br>**PLAINTIFFS' RESPONSE TO SUPPLEMENTAL SUBMISSIONS RE OVERCROWDING**<br><br>Hearing Date: June 27, 1007<br>Time: 10:30 a.m.<br>Location: Courtroom 1<br>Judges: Hon. Lawrence K. Karlton<br>　　　　　Hon. Thelton E. Henderson |

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| ASH | Atascadero State Hospital. A state mental hospital operated by the Department of Mental Health in Atascadero, California. |
| BPH | Board of Parole Hearings. |
| CCC | Claremont Custody Center. CCC is a Community Correctional Facility in Coalinga, California. |
| CCCMS | Correctional Clinical Case Management System. CCCMS is the name for the largest CDCR mental health program, which currently includes approximately 28,000 inmates with mental illness who live in general population housing units alongside non-mentally ill inmates. CCCMS inmates are generally given medication management, and a meeting with their case manager every 90 days. A few also participate in groups. |
| CCF | Community Correctional Facility. |
| CCFA | Community Correctional Facilities Administration. |
| CDCR | California Department of Corrections and Rehabilitation. |
| CIW | California Institute for Women. CIW is a prison in Corona, California, with a planned MHCB. |
| CMF | California Medical Facility. A prison in Vacaville, California. |
| CMC | California Men's Colony. A prison in San Luis Obispo, California. |
| COMPAS | Correctional Offender Management Profiling for Alternative Sanctions |
| CRC | California Rehabilitation Center. A prison in Norco, California. |
| CTC | Correctional Treatment Centers. CTCs are licensed inpatient units inside prisons. Mental Health Crisis Beds operate inside Correctional Treatment Center Units. In addition to Mental Health Crisis Beds, most CTCs also include medical beds. |
| DAPO | Division of Adult Parole Operations. |
| DMH | Department of Mental Health. |
| EOP | Enhanced Outpatient Program. EOP programs are sheltered treatment programs that house severely mentally ill inmates. There are currently approximately 4,100 EOP inmates. Because these inmates are unable to function in a general population setting, they live in segregated housing units. They are given 10 hours each week of therapy or other "structured therapeutic activities." EOP inmates meet weekly with their case managers. |
| FRMSC | Female Residential Multi-Service Centers. |
| ICDTP | In-Custody Drug Treatment Program. |

| | | |
|---|---|---|
| IDTT | | Interdisciplinary Treatment Team. A treatment team composed of, at minimum, the primary clinician, psychiatrist, correctional counselor and the inmate patient, as well as licensed psychiatric technicians and custody officers. This team makes admissions decisions, and formulates and approves treatment plans. |
| IFB | | Invitation for Bids. |
| Ironwood | | Ironwood State Prison. A prison in Blythe, California. |
| MCSP | | Mule Creek State Prison. A prison in Ione, California. |
| MHSDS | | Mental Health Services Delivery System. The name given by Defendants to their entire mental health system. |
| MHCB | | Mental Health Crisis Beds. MHCB units are licensed inpatient units inside many California prisons where mentally ill inmates who are suicidal or experiencing another kind of mental health crisis can be admitted and treated for up to 10 days. MHCBs are generally located inside a Correctional Treatment Center. |
| OST | | Out of State Transfer Program. |
| POC | | Parole Outpatient Clinic. |
| PSC | | Parole Services Center. |
| RC | | Reception Center. This refers to designated prisons or housing units within prisons where inmates are classified and processed when they first arrive in the CDCR. |
| RMSC | | Residential Multi-Service Centers. |
| SAC | | California State Prison, Sacramento. A prison located in Sacramento, California. |
| SQ | | San Quentin State Prison, a prison in San Quentin, California. |
| SSA | | Social Security Administration. |
| SSI | | Supplemental Security Income. |

-ii-
PLAINTIFFS' RESPONSE TO SUPPLEMENTAL SUBMISSIONS RE OVERCROWDING, NO.: CIV S 90-0520 LKK-JFM

Plaintiffs submit this brief in response to the Receiver's Supplemental Report Re Overcrowding, Docket No. 2265, filed June 11, 2007 ("Receiver's Supp. Rpt.") and the Special Master's Response to Court's May 17, 2007 Request For Information, Docket No. 2253, filed May 31, 2007 ("5/31/07 Special Master Response"). The information provided by the Receiver and the Special Master underscores the need for corrective action regarding the prison population by this Court, and a three-judge panel, as soon as possible. Plaintiffs make four main points:

- Even if each of defendants' plans worked, they would fail to alleviate overcrowding and the accompanying constitutional violations;

- Defendants' plans to address overcrowding have little promise of success and are largely a "bait and switch" operation that creates more competition for scarce resources, as demonstrated by defendants' actions since the parties filed updates with the Court on May 24, 2007;

- The nexus between overcrowding and the violation of plaintiffs' rights to constitutional mental health treatment is clear;

- Because any order intended to lower the prison population requires referral to a three-judge court, and defendants have failed to remedy overcrowding and their constitutional violations without Court intervention, this Court should make that referral now, regardless of its determination of whether a "*Coleman*-targeted" or "general" remedial approach to overcrowding, or both, are needed.

**A. Even If Each Of Defendants' Plans Worked, They Would Fail To Alleviate Overcrowding And The Accompanying Constitutional Violations**

Plaintiffs have already demonstrated that the purported benefits of defendants' overcrowding remedies are illusory, but the Receiver's Supplemental Report also illustrates the ways in which defendants' clumsy handling of the overcrowding crisis is actually exacerbating the harm. Receiver's Supp. Rpt. at 4-9. None of defendants' proposed plans will make significant reductions in the prison population, even if they were successfully implemented. *See* Docket No. 2238 (Decl. of Scott Kernan In Support of Defs.' Supp. Brief In Opp. To Pls.' Motion for Referral to a Three-Judge Panel ("Kernan Decl.")) at ¶ 23; Docket No. 2251 (Pls.' Corrected Supplemental Brief In Support Of Motion to Convene a Three-Judge Panel to Limit

the Prison Population ("Pls.' Supp. Brief")) at 4-5.  The in-fill beds further strain existing infrastructure and staff resources.  *See id.* at 18-19.  The type of re-shuffling of the prison population that the Receiver describes moves inmates from one bad situation to another, often worse, situation and for the *Coleman* class, these transfers have additional severe destabilizing effects.  *See, e.g.,* Receiver's Supp. Rpt. at 5-6.  Expansion of the prison population to additional types of correctional facilities such as CCFs and re-entry facilities creates additional rather than fewer demands for mental health care treatment.  *See id.* at 7-9.  Even defendants' best-case scenario numbers are evidence that defendants' plans do little to address the overcrowding crisis in real time and real numbers.

**B. Defendants' Plans To Address Overcrowding Have Little Promise Of Success And Are Largely A "Bait And Switch" Operation That Creates More Competition For Scarce Resources, As Demonstrated By Defendants' Actions Since The Parties Filed Updates With The Court On May 24, 2007**

Defendants' plans to address overcrowding are misleading and are already failing. Although A.B. 900 is premised on the promise of replacing "ugly beds" for all inmates currently in CDCR custody, defendants are already proving that promise false.  The Receiver's Supplemental Report and Mr. Hagar's Declaration ("Hagar Decl.") describe defendants' conversion of CRC to an all-male prison and corollary movement of hundreds of female inmates to exactly the type of "ugly beds" that defendants purport to be replacing.[1]  Receiver's Supp. Rpt. at 4-6.  The community beds in which defendants aspire to place tens of thousands of inmates are in fact dangerous and constitutionally inadequate in terms of provision of health care.  *Id.* at 9.  The resources required to bring these community beds into constitutional compliance, including clinical staff and administrative oversight, are already woefully oversubscribed throughout the state.

---

[1] As plaintiffs noted in their supplemental briefing, defendants' population estimates and remedial plans largely omit numbers for female inmates altogether.  Docket No. 2251 (Pls.' Supp. Brief) at 15, FN 12.  Remedial plans implemented at the expense of female inmates are unacceptable responses to the overcrowding crisis.

1   Defendants also touted out-of-state transfers as an immediate safety valve for the
2   population crisis: in their supplemental briefing, they promised to transfer up to 300 inmates
3   per month starting in June 2007.  Docket No. 2238 (Kernan Decl.) at ¶ 8.  However,
4   defendants' current plans show only 40 inmates scheduled for transfer in June and none in
5   July, putting them significantly behind schedule and casting doubt on their ability to meet
6   projected numbers later this year.  *See* Declaration of Michael W. Bien In Support Of Pls.'
7   Response To Supplemental Submissions Re Overcrowding ("Bien Decl."), filed herewith, at ¶
8   16 and Ex. 3.  Moreover, the entire process of out-of-state transfers, from the preparation for
9   implementation—which, in addition to CDCR staff and administrators, also requires immense
10  coordination with the Special Master's and Receiver's teams—to the actual staffing resources
11  needed to effect the transfers—including clinical health screenings, attorney visits, and custody
12  staff for cell extractions of involuntary transferees—creates yet more competition for these
13  scarce resources.  *See, e.g.,* Docket No. 2238 (Kernan Decl.) at ¶¶ 9-12.

14   Defendants' promises of parole reform and alternative sanctions are similarly illusory.
15  *See* Docket No. 2238 (Defs.' Supp. Brief In Opp. To Pls.' Motion For A Three-Judge Panel
16  ("Defs.' Supp. Opp.")) at 15-17; Docket No. 2238 (Kernan Decl.) ¶¶ 18-22.   The parole
17  reforms and rehabilitation programs defendants claim will dramatically reduce overcrowding
18  are belied by defendants' continued and current failures to implement parole reforms and
19  rehabilitation programs already required by Court Order in *Valdivia*.  *See* Bien Decl. ¶¶ 6-7, ¶¶
20  13-14; *see also* Second Report of the Special Master on the Status of Conditions of the
21  Remedial Order, attached hereto as Exhibit 2 to Bien Decl.  For example, defendants have
22  recently failed to meet their obligation under *Valdivia* to secure contractors in the Los Angeles
23  region for a mere 150 In Custody Drug Treatment Program community beds required as an
24  alternative sanction for parolees charged with parole violations.  Bien Decl. ¶ 6.  Indeed, the
25  Receiver's Report describes the kinds of experiences community facilities have with CDCR
26  that discourage them from continuing to bid for these types of contracts.  Receiver's Suppl.
27  Rpt. at 8-9; Hagar Decl. at 5-7, Exs. 7 & 8; *see also* Bien Decl. ¶ 4-6.  Defendants also
28  recently disclosed that they are delaying the establishment of remedial sanction beds for

women, have not even initiated the process of trying to find sites for "dual diagnosis" remedial sanctions beds for persons with mental illness and substance abuse problems, and that they have not distributed promised instructions regarding the use of general remedial sanctions to the field. Bien Decl. ¶ 7.

Meanwhile, a cornerstone of defendants' overcrowding plan is to build re-entry facilities throughout the state to house 16,000 inmates. Docket No. 2238 (Defs.' Supp. Opp.) at 14; Docket No. 2238 (Kernan Decl.) at ¶ 14. Even those communities theoretically interested in partnering with CDCR to provide housing and rehabilitative services for the CDCR and parole population are unlikely to do so, given CDCR's history of abruptly pulling funding and crucial support services from community facilities. *See* Bien Decl. ¶¶ 4-6; *see also* Receiver's Supp. Rpt. at 8-9; Hagar Decl. at 5-7, Exs. 7 & 8. Furthermore, demands for remedial sanctions beds in the community will now directly compete with demands for re-entry facility beds. With defendants unable to find even the comparatively small quantities of these beds required in *Valdivia*, re-entry beds are an even more implausible solution.

Another parole-related overcrowding remedy promised by defendants, a parole violation decision-making matrix (Docket No. 2238 (Kernan Decl.) at ¶ 20), remains unfunded and without a contract at this time. Bien Decl. ¶ 7.

Finally, defendants continue to refuse to implement Court-ordered programs that would help reduce recidivism for mentally ill inmates/parolees. For example, defendants do not provide pre-release planning to the *Coleman* class. Defendants represented to this Court that "The Reception Center EOP program is being implemented at Reception Centers systemwide." Docket No. 2238 (Declaration Of Margaret McAloon, Ph.D., In Support Of Defs.' Opp.) at 2. However, at an all-parties' meeting on June 12, 2007, defendants admitted that they have not even begun planning, hiring, training, or implementation for pre-release planning, which is one of the three key elements of the Court-ordered EOP Reception Center plan that was supposed to be implemented by January 1, 2007. Bien Decl ¶ 10. It is also of particular relevance to this motion because implementation of pre-release planning for EOP short term parole violators in Reception Centers would be a key factor in reducing the number of *Coleman* class

1 members who endlessly cycle in and out of the prison system. Defendants also admitted that
2 they have no plans to provide pre-release planning to seriously mentally ill inmates who parole
3 from DMH facilities and that no negotiations are underway between DMH and CDCR to
4 extend pre-release planning or benefits application programs to such patients. Bien Decl. ¶ 10.

5 **C. The Nexus Between Overcrowding And The Violation Of Plaintiffs' Rights To Constitutional Mental Health Treatment Is Clear**

6

7 It is undisputed on the record before this Court that defendants are failing to provide
8 constitutionally adequate mental health care. *See, e.g.,* 5/31/07 Special Master Response at 12-
9 13 ("Given the inadequacies of programming space, program beds and mental health staffing,
10 it is clear that a significant portion of the MHSDS caseload is not receiving the necessary
11 mental health services spelled out in the revised Program Guide and accepted by the parties
12 and Court as the measure of constitutionally adequate services.")[2] In fact, the Special Master
13 has estimated that defendants do not provide minimally adequate mental health care to
14 between 33 and 44 percent of the identified mental health caseload population. (5/31/07
15 Special Master Response at 13-14 (33 percent); Docket No. 2274 (Seventeenth Monitoring
16 Report of the Special Master on the Defendants' Compliance With Provisionally Approved
17 Plan, Policies, and Protocols, Part C) at 182-83 (44 percent)).

18 Yet defendants continue to argue that there is no nexus between the dangerous level of
19 overcrowding (the existence of which they do not dispute) and the deficiencies in mental health
20 care for the *Coleman* class (which they also do not dispute). Docket No. 2238 (Defs.' Supp.
21 Opp.) at 18. This defense is unsupported by, and inconsistent with, the evidentiary record.

22 Both the *Coleman* Special Master and the *Plata* Receiver recently filed reports clearly
23 identifying overcrowding as an insurmountable obstacle to the provision of adequate health
24 care in California's prison system. The Special Master describes how overpopulation,

25

---

26 [2] *See also* Bien Decl. ¶¶ 9-10 (Defendants have no schedule nor plan for construction of new mental health beds, have failed to make significant hires for headquarter positions, remain
27 drastically understaffed, and have no implementation plans for pre-release planning for *Coleman* class members).
28

understaffing, and lack of space relentlessly escalate the scope of defendants' violation of plaintiffs' constitutional right to mental health care.  *See* 5/31/07 Special Master Response.  The Receiver documents, through the example of CRC, how defendants' attempts to deal with the overcrowding crisis continue to have negative effects on the delivery of mental health care.  Receivers' Supp. Rpt. at 6:11-24.  The Receiver has also detailed how the cumulative demands of dealing with the day-to-day effects of the overcrowding crisis have overwhelmed the administrators of the prison system to such a point that they are unable to manage the delivery of health care services.  *See also* 5/31/07 Special Master Response at 16-17 ("Over the past 11-plus years, much has been achieved, and many of the achievements have succumbed to the inexorably rising tide of population, leaving behind growing frustration and despair.")

Defendants themselves have admitted that overcrowding prevents them from providing constitutional levels of mental health care.  Governor Schwarzenegger cited CDCR's high suicide rate and the lack of appropriate beds and space for mentally ill inmates as part of his justification for declaring a state of emergency due to severe overcrowding.   Docket No. 2038 (Decl. of Michael W. Bien In Support Of Pls.' Motion To Convene A Three Judge Panel To Limit the Prison Population), ¶ 2, Ex. A at 5-6.  Responses by defendants to inmates' administrative appeals ("602" forms) throughout the system cite overcrowding as the reason they are unable to provide appropriate yard and exercise, as well as treatment groups and therapy—all of which are integral parts of a constitutional mental health delivery system.  *Id.*, ¶ 22.  Repeatedly, defendants have cited lack of adequate beds and treatment space, lack of adequate staff, lack of adequate funding and resources, and increasingly dangerous and violent conditions as justifications for their failure to provide constitutional mental health treatment.  *See, e.g.,* Docket No. 2039 (Decl. of Jane E. Kahn In Support of Pls.' Motion to Convene a Three Judge Panel to Limit the Prison Population), ¶¶ 6-10.

Defendants' suggestion that there is no nexus is absurd.  In fact, it is exactly this unwillingness by defendants to address overcrowding and the ways in which it impedes remedial action that has created the crisis defendants, the plaintiff class, and the Court must face today.

**D. Because Any Order Intended To Lower The Prison Population Requires Referral To A Three-Judge Court, And Defendants Have Failed To Remedy Overcrowding And Their Constitutional Violations Without Court Intervention, This Court Should Make That Referral Now, Regardless Of Its Determination Of Whether A "*Coleman*-Targeted" Or "General" Remedial Approach To Overcrowding, Or Both, Are Needed**

This Court asked the Special Master to evaluate the effect of a reduction of total inmate population on the provision of necessary mental health services to the plaintiff class. 5/17/07 Order. The Special Master noted the crippling effects of overcrowding on defendants' provision of mental health care, and concluded that the impact of any reduction in overall inmate population on the delivery of mental health services will also depend on a number of other factors. *See, e.g.*, 5/31/07 Special Master Response at 16-17. The Special Master also found that "[o]nly a targeted release of seriously mentally ill inmates will serve quickly to reverse current deficiencies, especially of bed and program space." *Id.* at 15. Plaintiffs agree that an overall general population cap is a necessary, but not sufficient, remedy for the *Coleman* class. In their supplemental briefing, plaintiffs suggested that the three-judge panel consider a multi-pronged approach that would combine general population reduction strategies and population reduction strategies targeted specifically at the *Coleman* class.[3] Docket No. 2251 (Pls.' Supp. Brief) at 35.

Based on the conclusions of the Special Master and Receiver that overcrowding presents an insurmountable barrier to the provision of adequate health care, as well as the

---

[3] As plaintiffs noted in their Supplemental Brief, defendants have a variety of options available to reduce the population of the *Coleman* class. Pls. Supp. Brief at 35. These include: actual implementation of meaningful pre-release planning, including benefits applications, for *Coleman* class members; provision of adequate mental health care to parolees; eliminating practices in prison that discriminate against inmates with mental illness, resulting in the exclusion of *Coleman* class members from substance abuse, education and vocational programs and comparatively lengthier incarcerations (*see* Docket No. 2238, Declaration of Joan Petersilia In Support of Defs.' Supp. Brief In Opp. To Pls.' Motion For Referral To A Three-Judge Panel, at ¶ 9); establishing remedial sanctions directed at or at least inclusive of parolees with serious mental illness charged with parole violations; reform of defendants' practices of revoking parolees with mental illness for technical or minor violations related primarily to unmet mental health need, and of extending parole revocations based on behavior relating primarily to unmet mental health need; and establishment of mental health courts throughout the state.

1 evidence of defendants' failures both to effectively alleviate overcrowding and to comply with
2 *Coleman* Court Orders for delivery of mental health care, this Court and the three-judge panel
3 should follow a three-pronged approach to remedying the violations of plaintiffs' rights to
4 mental health care.  The three prongs are: 1) a general population cap; 2) population reduction
5 strategies specifically targeting the *Coleman* class; and 3) enforcement of existing Court orders
6 to implement the Revised Program Guide and other Court orders regarding adequate mental
7 health care including bed plans, staffing increases, and suicide prevention.  The Special Master
8 accurately observed that the impact of population reduction is tied to defendants' further
9 actions to actually implement reforms.  5/31/07 Special Master Response at 16.  Conversely,
10 the success of defendants' efforts to provide constitutional mental health treatment is tied to
11 reducing the population and freeing up resources.  The three prongs of this approach will work
12 in concert to create the conditions necessary for remedying the violation of the right to
13 constitutional mental health care.

14 It is clear that without any Court-ordered reduction in prison population, whether
15 overall or in the *Coleman* class, the rights of the *Coleman* class will continue to be egregiously
16 violated, and the failure to provide minimal mental health treatment will continue to have
17 deadly effects.  It is equally clear that the State's current "solution" to overcrowding will
18 neither succeed nor substantially remedy the overcrowding crisis.  Under the PLRA, any order
19 "that has the purpose or effect of reducing or limiting the prison population" is a prisoner
20 release order, and must be issued by a three-judge panel. 18 U.S.C. § 3626 (g)(4).  It is time
21 for this Court to refer this matter to the three-judge panel, so that the process of determining
22 the appropriate relief can move forward.

24 Dated:  June 18, 2007                                    Respectfully submitted,

26                                                                           */s/ Michael W. Bien*
                                                                              Michael W. Bien
27                                                                           Rosen, Bien & Galvan
                                                                              Attorneys for Plaintiffs