PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
AMY WHELAN Bar No.: 215675
LORI RIFKIN Bar No.: 244081
SARAH M. LAUBACH Bar No.: 240526
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN,

        Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.,

        Defendants

No.: Civ S 90-0520 LKK-JFM

**DECLARATION OF MICHAEL W.
BIEN IN SUPPORT OF PLAINTIFFS'
RESPONSE TO SUPPLEMENTAL
SUBMISSIONS RE OVERCROWDING**

Hearing Date:  June 27, 2007
Time:         10:30 a.m.
Location:     Courtroom 1
Judges:      Hon. Lawrence K. Karlton
               Hon. Thelton E. Henderson

I, Michael W. Bien, declare:

1.     I am a member of the Bar of this Court and a partner of the firm Rosen, Bien & Galvan, LLP, one of the counsel of record for the plaintiff class (hereinafter "plaintiffs").  I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify.  I submit this declaration in support of Plaintiffs' Response to Receiver's Supplement Report Regarding Overcrowding.

2.     I have reviewed the "Receiver's Supplemental Report Re Overcrowding," (Docket No. 2265 in *Coleman*) and the accompanying "Declaration of John Hagar in Support of Receiver's Supplemental Report Re Overcrowding" (Docket No. 2266), both filed June 11, 2007.

3.     The Receiver's Supplemental Report includes a section titled "Problems With the Delivery of Medical Care in CCFs [Community Correctional Facilities]," which notes that "[b]oth AB 900 and the CRC conversion contemplate the placement of additional prisoners into community beds," reports on problems in bringing care at these facilities up to "constitutional standards," and concludes that "the establishment of yet more CCFs may well jeopardize the medical health of all prisoners assigned to community correctional facilities." (Receiver's Supplement Report at 7-16, quoted language at 7:17-20, 9:20, 9:23-24.)

4.     The evidence that the Receiver provides regarding the dysfunctional relationship between the California Department of Corrections and Rehabilitation ("CDCR") and community-based providers of the above-reference CCF confirms the concerns that plaintiffs' counsel raised in Plaintiffs' Supplemental Brief in Support of Motion to Convene a Three-Judge Panel to Limit the Prison Population (Docket No. 2251) regarding the prospects for defendants' proposed parole reforms to result in any near-term population reductions.  The Declaration of Ernest Galvan in Support of Plaintiffs' Supplemental Brief in Support of Motion to Convene a Three-Judge Panel to Limit the Prison Population recites the recent history of parole reform efforts, including efforts ordered by this Court in *Valdivia v. Schwarzenegger*. (Docket No. 2242.)  I have also participated directly in the *Valdivia* remedial sanctions process, and have personal knowledge regarding the recurrent delays and failures of

1  CDCR's efforts to establish community-based alternatives to incarceration.

2      5.      The letters between the community-based Claremont Custody Center and CDCR

3  that Mr. Hagar attaches to his Declaration at Exhibits 7-11 constitute a stark and very recent

4  example of poor relations between CDCR and community-based providers that was also

5  documented in the above-cited Galvan Declaration (Galvan Declaration ¶¶ 7, 21.)  Mr. Hagar's

6  Exhibit 7 is an April 10, 2007 letter from the Claremont Custody Center Facility Director to a

7  CDCR official, describing for five single-spaced pages numerous acts and omissions by CDCR

8  that imposed unreasonable dangers and costs on the community-based provider, including the

9  abrupt termination of TB test support, and arbitrary limits on the number of program

10  participants who could be sent for medical and dental care to the CDCR prison assigned to

11  provide such care to the community-based facility.  The abrupt denial of TB testing described

12  in the letter illustrates CDCR's history of failure to demonstrate concern for the welfare of the

13  communities in which it seeks to place inmates.  The facility director wrote:

14           Therefore, by denying the TB testing to CCC staff, CDCR would
15           be exposing the public to another potential health hazard—and of
         course they will also be exposing inmates, CCC staff and other
16           staff, in addition to CDCR staff that work at Claremont Custody
17           Center.  Because TB is considered to be a public health concern of
         great importance, one would think that CDCR and CCFA would do
18           everything they could to aid in the prevention of its spread.

19  (Hagar Declaration, Exhibit 7, April 10, 2007 Letter at Page 2, lines 2-7.)

20      6.      In light of this history of abusing community providers, it is not surprising the

21  CDCR's recent efforts to secure community-based alternatives to prison for parole violators

22  have failed.  Just one day after the Receiver filed its report, plaintiffs' counsel in *Valdivia*

23  received an email notification from CDCR's counsel that CDCR's Invitation for Bids (IFB) for

24  150 In-Custody Drug Treatment Beds (ICDTP) in Los Angeles County had received not even

25  one single response.  A true and correct copy of this email is attached hereto as **Exhibit 1.**  The

26  150 ICDTP beds in Los Angeles County were to be the first significant milestone in

27  implementation of an April 3, 2007, Stipulation and Order Regarding Remedial Sanctions,

28  attached to the Galvan Declaration at Exhibit O.  With no bids having been received, and the

1  deadline only six weeks away, it appears unlikely that CDCR will achieve this first critical step

2  to expansion of remedial sanctions programs.

3      7.      Other CDCR commitments to increase community-based alternatives to

4  incarceration have also been slipping away in recent days.  On May 31, 2007, I attended a

5  meeting with CDCR officials, including the Director of Adult Parole Operations, Thomas

6  Hoffman, regarding implementation of the April 3, 2007 Stipulation and Order Regarding

7  Remedial Sanctions.  During the May 31, 2007 meeting plaintiffs' counsel was informed of the

8  following recent delays and setbacks in remedial sanctions implementation, among others:

9          (a)  CDCR officials disclosed that they were delaying the establishment of the

10         Female Residential Multi-Service Center (FRMSC) program (discussed in Paragraph 30

11         of the Galvan Declaration as part of the April 3, 2007 Stipulation and Order Regarding

12         Remedial Sanctions).  CDCR officials stated that they had held a "Bidder's Conference"

13         regarding CDCR's Request for Proposals to establish the FRMSCs, and that based on

14         feedback from the bidders, CDCR was withdrawing its Request for Proposals, delaying

15         startup of the program, and significantly reducing its size.

16         (b)  Plaintiffs' counsel asked for a report on the "special efforts" to secure

17         remedial sanctions programs "in underserved areas of Region IV," required by the April

18         3, 2007 Stipulation and Order, Galvan Declaration, Exhibit O at page 3, line 20, page 4,

19         line 15.  Region IV includes the counties of Riverside, San Bernardino, Imperial,

20         Orange and San Diego.  CDCR officials reported that their efforts to secure bids for the

21         Parolee Services Center (PSC) in Riverside and San Bernardino Counties had resulted

22         in no bids.  CDCR officials reported that they had attempted to remedy the situation by

23         reissuing the new invitation at a higher price, but that the Department of Finance had

24         rejected the increase in price.  CDCR officials informed plaintiffs' counsel that the

25         Riverside County sheriff's department had rejected a 120-bed ICDTP program, and that

26         CDCR had not yet decided whether to approach private bidders, despite an April 1,

27         2008 deadline for all 1800 ICDTP program slots.  Similarly, CDCR reported negative

28         results from San Bernardino County.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(c)  Plaintiffs' counsel asked whether the set of interim instructions to the field regarding use of remedial sanctions, required under the April 3, 2007 Stipulation and Order (Galvan Decl. Ex. O at pages 4-5) had been distributed to hearing officers of the Board of Parole Hearings (BPH), who have final decision-making authority over many parolee diversions.  The BPH personnel present said that the interim instructions had not been distributed, despite the requirement that they be distributed to the field "as soon as possible" after April 3, 2007.  (Galvan Decl. Ex. O at page 5, line 15.)  The Department of Adult Parole Operations had only received the instructions the day before the meeting, on May 30, 2007, and then only by posting on an internal website, with no evidence of physical distribution or training.  CDCR officials at the meeting admitted that many parole agents do not use computers because their labor agreements do not require them to.

(d)  CDCR officials admitted that none of their efforts to site ICDTP program slots in county facilities had yet included any of the "dual diagnosis" beds for persons with mental illness and substance abuse problems, required by the April 3, 2007 Stipulation and Order.  (Galvan Dec. Ex. O at page 7, lines 10-14.)  CDCR officials stated their intention to wait until they issued Invitations for Bid for private ICDTP contractors before actively seeking "dual diagnosis" beds.

(e)  Regarding the parole violation decision matrix promised in the Declaration of Scott Kernan filed with this Court on May 24, 2007 (Docket No. 2238), ¶ 20, the head of CDCR adult parole, Thomas Hoffman, reported that he had only just identified potential contractors for a pilot matrix program, and had not yet secured authorization to fund the contract.

(f)  Although the use of electronic in-home detention is one of the remedial sanctions programs required in *Valdivia* and included in the April 3, 2007 Stipulation and Order (Galvan Dec. Ex. O at pages 3-4), CDCR did not bring any person knowledgeable about the program to the meeting.  The officials present reported that CDCR had rejected efforts to secure funding to make the program more available by

-4-

1  purchasing cell-phone based equipment so that parolees who cannot afford landline
2  telephone service can benefit from this alternative.

3      8.      On June 11, 2007, I participated in a coordination meeting with the John Hagar
4  (the Receiver's Chief of Staff), plaintiffs' counsel in *Armstrong*, *Coleman* and *Plata,* and the
5  *Perez* Court experts Shulman and Scalzo. Special Master Keating participated by phone.
6  During that meeting, we discussed the six proposed coordination agreements contained in the
7  Court's May 29, 2007 Order, Docket 2247. The proposed agreements between the three cases
8  do not include construction projects and it became clear at both the June 11 and June 12
9  meetings that the Receiver has no present schedule for construction of any new beds, let alone
10 mental health beds.

11     9.      On June 12, 2007, I attended a *Coleman* Policy Meeting in Sacramento. Present
12 at this meeting were representatives from the California Department of Corrections and
13 Rehabilitation ("CDCR"), the Department of Mental Health ("DMH"), the Department of
14 Finance, plaintiffs' counsel, defendants' counsel, Deputy Special Master Matthew Lopes and
15 members of the Court's expert monitoring team. In preparation for the meeting and during the
16 meeting, plaintiffs' counsel asked for updates on the A.B. 900-related construction projects and
17 "strike team" efforts that defendants have proffered as overcrowding solutions in opposition to
18 plaintiffs' motion for appointment of a three-judge panel. We received the following
19 responses, among others:

20          (a)  During the portion of the meeting regarding construction updates, I asked
21     Doug McKeever, Director of Mental Health Programs, Division of Correctional Health
22     Care Services, for an update on the schedule for the construction of the consolidated
23     care centers. Mr. McKeever indicated that there is still no schedule for construction of
24     these mental health beds. Defense counsel indicated that there is not even a plan to
25     come up with that schedule.

26          (b)  Defendants confirmed that the vast majority of allocated headquarters
27     positions remain vacant. They reported that almost all of the new hires have been
28     clerical and support staff in headquarters.

1    (c)  In advance of the meeting, plaintiffs' counsel requested attendance by a

2    representative of the "Facilities Construction Strike Team . . . created in response to

3    Assembly Bill 900 (AB 900)," (Declaration of Deborah Hysen in Support of

4    Defendants' Supplemental Brief in Opposition to Plaintiffs' Motion for Referral to a

5    Three-Judge Panel, filed May 24, 2007, Docket No. 2238, at 1:28-2:1.)  We requested

6    attendance by a member of the Facilities Construction Strike Team because the agenda

7    for the meeting included updates on *Coleman* construction projects at numerous state

8    prisons, including Ironwood, CMF, CMC, Mule Creek, and CIW.  Defendants refused

9    to facilitate or even permit attendance by a member of Facilities Construction Strike

10   Team.  At the meeting, not one of defendants' representatives in attendance could

11   provide any information whatsoever about the status of defendants' "infill" projects.

12   10.    During the portion of the June 12, 2007 *Coleman* meeting regarding re-entry and

13   pre-release planning for *Coleman* class members, CDCR officials present admitted that their

14   long-promised implementation of pre-release benefits planning has stalled.  The following

15   admissions were made regarding lack of implementation of re-entry services and pre-release

16   planning:

17   (a)  CDCR officials reported that their contract for prerelease planning services

18   had fallen through and that they were looking for a new contractor, causing further

19   delays in an implementation that had already been delayed from previously promised

20   and non-delivered implementation dates of January 2007 and end of Summer 2007.

21   (Declaration of Holly M. Baldwin in Support of Pls.' Supplemental Brief in Support of

22   Motion to Convene a Three-Judge Panel to Limit the Prison Population, filed May 24,

23   2007, Docket No. 2243, pages 4:13-5:9.)

24   (b)  CDCR officials reported that they had not completed negotiations with the

25   Social Security Administration of a Memorandum of Understanding regarding the

26   handling of pre-release benefits applications.

27   (c)  CDCR officials admitted that they have not implemented  the pre-release

28   planning component of the Reception Center Enhanced Outpatient Program (RC EOP)

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO SUPPLEMENTAL SUBMISSIONS RE
OVERCROWDING, NO.:  CIV S 90-0520 LKK-JFM

1    plan ordered by this court, to be implemented by January 1, 2007.  Defendants

2    communicated that they have not begun planning, hiring, training, or implementation of

3    this pre-release program.  They stated that they are now waiting for the Department of

4    Adult Parole Operations (DAPO) to develop a new proposal to address RC EOP

5    patients.  However, the DAPO representative who spoke at the meeting reported that

6    DAPO is developing a proposal only for inmates who have 240 or more days before

7    their parole date.  The RC EOP plan requires pre-release planning for inmates with 60-

8    120 days until they parole.  The average parole violator serves a revocation term of just

9    4 months, or 120 days, as compared with the 240 days, or 8 months that would make

10   them eligible for pre-release planning under DAPO's proposal.  (Galvan Decl. Ex. W at

11   page 17.)  Short-term parole violators are the persons most likely to stress the mental

12   health care and medical care system through repeated short-term cycling through the

13   system.  (*See Plata* Receiver's Report re Overcrowding, Exhibit H to Declaration of

14   Lori Rifkin in Support of Plaintiffs' Supplemental brief In Support of Motion to

15   Convene Three Judge Panel to Limit the Prison Population, Docket No. 2240-1, at

16   pages 18-19.)   Defendants' current concept for pre-release planning will specifically

17   exclude many if not most parole violators, in violation of the RC EOP plan.

18        (d)  CDCR officials stated that even when pre-release planning is eventually

19   implemented, the San Quentin reception center will be excluded because of lack of

20   space.

21        (e)  CDCR and DMH officials admitted that they have no plan to include

22   seriously mentally ill inmates housed in inpatient psychiatric facilities run by DMH

23   facilities in pre-release and benefits planning, even when the stalled program is

24   eventually implemented.

25   11.     On June 13, 2007, CDCR filed in Coleman "Defendants' Ex Parte Motion, with

26   Declaration of Deborah Hysen, [Proposed] Order, Re: Extension of Time for Defendants'

27   Response to Court Order of April 17, 2007," Docket No. 2276.  In this pleading, defendants'

28   asked for a 60-day extension of time "to plan the key components of the bed plan."  (*Id*. at

-7-

2:18.) The only stated basis of defendants' request is the need "to lay the groundwork provided by AB 900 and the Facilities Construction Strike Team." (3:11-12.) While defendants represented to the Court in their defense of this motion that AB 900 and the Strike Teams will accelerate planning and construction to ease overcrowding, defendants' motion for extension of time shows that they are being used as yet another excuse to delay construction and necessary relief for the harms that overcrowding inflicts on the Coleman class.

12.     In the *Valdivia* litigation, CDCR has steadfastly held to legal positions that serve to increase the terms served by parole violators, and to aggravate overcrowding. A large portion of persons returned to custody on parole violations are eligible for day-for-day ("1/2 time") credits against their terms if they participate in any work or education programs. In CDCR institutions, even an education program with no classroom component that consists only of filling out workbooks (known as the "Bridging" program) qualifies for day-for-day (1/2 time) credits. Many *Valdivia* class members, however, serve all or part of their time in county jails. Such class members whose parole violations are adjudicated by the Board of Parole Hearings as 1/2 time eligible are surprised to find that they are serving longer terms than expected because CDCR will not give them 1/2 time credit for time in the county jail. Plaintiffs' counsel in *Valdivia* have pointed out that CDCR has ample legal authority to award such credits, yet CDCR steadfastly refuses to do so, tying up both jail and prison beds by needlessly increasing revocation terms, and forcing more direct transfers to CDCR reception centers from jail locations that are full of persons serving needlessly lengthened terms.

13.     On June 12, 2007, plaintiffs' counsel in *Valdivia* received notice from CDCR counsel that CDCR would be unable to meet an agreed-to June 13, 2007 deadline for revised procedures regarding persons with severe mental illness who symptoms prevent them from participating in parole revocation processes. This procedure was to be designed to ensure that such persons receive expedited treatment to restore their competence so that their revocation hearings may proceed in a timely manner, and so that they may be considered for community-based alternatives and mental health treatment. CDCR counsel reported that they had been

1    unable to secure the necessary approvals to provide a plan by the June 13, 2007 deadline.

2        14.    Attached hereto as **Exhibit 2** is a true and correct copy of the Second Report of

3    the Special Master on the Status of Conditions of the Remedial Order in *Valdivia,* submitted to

4    Court on June 11, 2007.  (*Valdivia* Docket No. 1335.)  Under the terms of the *Valdivia* Order

5    of Reference, the report becomes final if no party files objections within 20 days.  The *Valdivia*

6    Special Master's report focused "almost exclusively on remedial sanctions, mentally ill

7    parolees," and on certain orders regarding information systems.  (Exhibit 2 at 3.)  The report

8    includes the following statements that are pertinent to the representations defendants have

9    made here regarding their efforts at diverting parole violators in to remedial sanctions:

10            (a)  "The Defendants remain out of compliance with the Permanent Injunction

11        provisions regarding remedial sanctions."  (*Id.*)

12            (b).  "Availability [of remedial sanctions] remains very limited."  (*Id.* at 4.)

13            (c).  "ICDTP [In Custody Drug Treatment Program] has 288 beds statewide and

14        they are concentrated in two regions, so that Southern California only has 24 of the beds

15        and none of them are situated in Los Angeles County. Only 30 of the beds are available

16        to women and they are all in one location." (*Id.*)

17            (d)  Defendants' planning efforts for remedial sanctions have "lacked the detail

18        and specificity needed to determine if the numbers cited were sufficient and realistic."

19        (*Id.* at 5.)

20            (e)  "Some programs have exclusionary criteria that severely limit program

21        access."  For some programs, the exclusions bar parolees who have applied for

22        Supplemental Security Income or other governmental assistance, and some programs

23        bar any parolees taking psychotropic medication.  (*Id.* at 6-7.)

24            (f)  "Since the fall of 2006, Defendants have repeatedly failed to provide

25        sufficiently substantive material by agreed-upon timeframes and deadlines, which has

26        resulted in frustration on the part of plaintiffs' counsel and the Special Master.

27        Requested reports, material and information were either late or not presented at all and

28        when plans were presented, they were sometimes subsequently rescinded without

-9-

1    adequate explanation or rationale."  (*Id.* at 9.)

2         (g)  Regarding parolees with mental illness, the report states, among other things:

3    "There has not been a reliable mechanism to ensure that these parolees reach treatment

4    expeditiously. These parolees have not been consistently assessed for readiness for

5    release, and the parties disagree about the standard for release and whether Defendants

6    are obliged to find community-based placements."  (*Id.* at 12.)

7         (h)  CDCR has made inconsistent recommendations regarding its efforts to

8    secure community-based placements for mentally ill parolees:

> A critical component of according "psych returns" due process is
> reviewing them to determine when their mental illness is stabilized
> such that the state no longer has a right to hold them. The Special
> Master relied on the representation that CDCR Interdisciplinary
> Treatment Teams (IDTT) would be responsible for this review.
> Tracking sheets initially recorded recommendations for the level of
> care that these parolees would need if released to the community.
> When such recommendations were no longer included, the Special
> Master's team inquired about their absence. Staff responsible for
> overseeing these cases responded that DAPO [Department of Adult
> Parole Operations] staff initially sought placements consistent with
> the recommendations but, when this was determined to be futile,
> staff ceased recording these recommendations. On multiple
> occasions, CDCR staff from different departments asserted that
> their position was that "psych returns" would only be released if
> they were able to maintain themselves in the community with
> outpatient care. This standard was not negotiated and is more
> stringent than the variety of levels of care originally recorded on
> tracking documents.
>
> In Defendants' objections to the Special Master's draft report,
> Defendants assert that IDTT was never performing a review
> function. This is particularly disturbing as it would imply that the
> Special Master's reliance was misplaced and a critical due process
> obligation was not carried out for more than seven months.
> Defendants aver that the level of care information was provided to
> DAPO informationally and that DAPO was able to place some
> parolees at different levels of care in the community.

     (*Id.* at 13-14.)

1    (i)  Even under scrutiny from the Special Master and plaintiffs' counsel, efforts

2  to stabilize mentally parolees and place them were inconsistent:

> Throughout the last half of 2006, information about the above-
> described activity was difficult to come by. Descriptions were
> provided and questions answered only erratically. Tracking
> information sometimes seemed incomplete or internally
> inconsistent and, too often, updates indicated information had not
> been provided or baseline and ongoing clinical tasks had not been
> done. The result was that the methods used after the August meet
> and confer to expedite parolees into transfers and treatment were
> not sustained consistently. Significant numbers of parolees revoked
> under the psych return process in the last half of 2006 did not reach
> treatment, and/or did not appear to be reassessed for hearing
> participation, for prolonged periods.

11  (*Id.* at 14.)

12    (j)  CDCR's efforts to address the needs of persons deemed incompetent to

13  participate in parole revocation have not been adequate:

> The procedure devoted insufficient attention to placing parolees at
> a level of care needed to accomplish stabilization until such time as
> they are capable of participating in revocation proceedings. Neither
> did it include an adequate mechanism for identifying when parolees
> were well enough to proceed. Additionally, it was issued without
> consultation with Plaintiffs' counsel as required by the Permanent
> Injunction.

19   (*Id.* at 16-17.)  The report notes that CDCR's efforts to address the needs of mentally ill

20  parolees have been "riddled with the issues described elsewhere in this report, including

21  poor communication and missed deadlines." (*Id.* at 17.)

22    15.    As part of their plan to reduce overcrowding, defendants told this Court that up

23  to 300 inmates per month will be transferred to out-of-state facilities during the first four

24  months of the program, beginning in June, 2007, with a total of 5,060 transfers scheduled for

25  fiscal year 2007-2008.  (Declaration of Scott Kernan, Docket No. 2238 (5/24/07), ¶ 8.)

26    16.    On June 5, 2007, I received from defendants a document titled "California Out-

27  of-State Correctional Facility Involuntary Relocation of 680 Active ICE Hold Inmates."

28  "ICE" refers to inmates with active Immigration and Customs Enforcement Holds.  Attached

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO SUPPLEMENTAL SUBMISSIONS RE
OVERCROWDING, NO.:  CIV S 90-0520 LKK-JFM

1  hereto as **Exhibit 3** is a true and correct copy of this chart.  The chart details the out-of-state

2  transfers scheduled for June through September 2007, and shows that in June, only 40 inmates

3  are scheduled for transfer.  In July, no inmates are scheduled for transfer.

4      I declare under penalty of perjury under the laws of the State of California and of the

5  United States that the foregoing is true and correct.

6      Executed this 18th day of June 2007 at San Francisco, California.

7                                    By      */s/ Michael W. Bien*

8                                            Michael W. Bien

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

**Ernest Galvan**

| | |
|---|---|
| **From:** | Nelson, Katherine [Katherine.Nelson@cdcr.ca.gov] |
| **Sent:** | Tuesday, June 12, 2007 9:08 AM |
| **To:** | Michael W. Bien; Ernest Galvan |
| **Cc:** | nancy@nmcampbell.com; Carvo, Dan; Boyd, Russa; riveland@rockisland.com; Vickie Whitney; Jessica Devencenzi |
| **Subject:** | Valdivia: Result from IFB for ICDTP in LA |

All:
The purpose of this message is to inform the parties that no bids were received in response to the IFB for ICDTP in LA. Defendants have contacted those organizations who downloaded the IFB from DGS and/or are current DAPO providers to identify why they did not bid. Defendants found that the IFB for 150 beds was too big. Providers recommended that they make the IFB for a range of beds rather than a fixed number. As a result, Defendants are rewriting the IFB to make it possible for providers to offer fewer than 150 beds. Defendants are also considering alternative methods of program delivery such as allowing the housing provider to also provide the program.

At this time, Defendants believe providers are interested in bidding for this contract and do not believe that this delay will hamper their ability to meet time lines in the remedial sanctions stipulation. DAPO team is working on these issues now and is meeting to develop a time line for the release of the new IFB. I will inform all parties when I have more information.

Katherine K. Nelson
Chief of the CDCR Court Compliance Legal Team
916-323-2929
Katherine.Nelson@cdcr.ca.gov

# EXHIBIT 2



**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

JUN 11 2007

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORN
BY _____
DEPUTY CLERK

**VALDIVIA, et al.,**

    **Plaintiffs,**

    **vs.**

**No. CIV S-94-671 LKK/GGH**

**ARNOLD SCHWARZENEGGER, et al.,**

    **Defendants.**

_____/

## SECOND REPORT OF THE SPECIAL MASTER
## ON THE STATUS OF
## CONDITIONS OF THE REMEDIAL ORDER

### Background

On May 2, 1994, the *Valdivia vs. Schwarzenegger* lawsuit was filed. The Court certified the case as a class action by order dated December 1, 1994. On June 13, 2002, the Court granted partial summary judgment in favor of the Plaintiffs. On July 23, 2003, the Court ordered the Defendants to submit a remedial plan, with specific guidance regarding "...a preliminary probable cause hearing which (1) occurs no more than ten calendar days after a parolee is taken into custody for an alleged parole violation, and (2) affords the parolee rights provided by *Morrissey,* including notice of the alleged violations, the opportunity to appear and present evidence, a conditional right to confront adverse witnesses, an independent decision-maker, and a written report of the hearing."

On March 8, 2004, the Court entered the Stipulated Order for Permanent Injunctive Relief ("Permanent Injunction") containing the agreed-upon elements of the settlement terms. On July 1, 2004, the Defendants submitted a variety of policies and procedures to the

Court. On June 8, 2005, the Court filed an order finding violation of the Remedial Plan regarding remedial sanctions.

On August 18, 2005, a Stipulation and Amended Order Re: Special Master Order of Reference was entered; on December 16, 2005, an Order appointing Chase Riveland Special Master was entered; and on January 31, 2006, an Order was entered appointing Virginia Morrison and Nancy Campbell as Deputy Special Masters.

The Special Master filed his first report on September 14, 2006, which included the following recommendations:

1. Defendants shall provide additional resources to make information system application changes for the purposes of data collection, analysis, aggregation, and management reports, and other modifications as needed by the Special Master and the Court, with input from Plaintiffs. The effort should be coordinated with the information system changes underway pursuant to the *Armstrong* court's order. To the extent that Defendants determine that certain of these functions can best be accomplished by modifying the DAPO information system, sufficient resources shall also be made available for that purpose.

Planning for these changes shall be initiated within 60 days of this order. Defendants shall provide to the Special Master and Plaintiffs periodic reports on the progress of these changes; the first of these shall be due six months after the date of this order, and every six months thereafter until the Special Master determines the improvements are complete. The system changes shall be completed within one year and six months of this order.

2. Defendants shall institute and maintain the infrastructure needed for self-monitoring, staffed by subject matter experts working in a department outside of the departments being reviewed. The infrastructure shall include staffing and resources sufficient to conduct site visits, assessments, and quality improvement efforts at the Decentralized Revocation Units, contracted jail facilities, contracted legal services for parolees, CDCR and non-CDCR facilities providing remedial sanctions, and other facilities and services falling under the auspices of the *Valdivia* remedies.

These recommendations were adopted by order of this Court on November 13, 2006.

## Special Master Activities

Since the filing of the First Report of the Special Master on the Status of Conditions of the Remedial Order, two key topics have dominated activity in *Valdivia* implementation: remedial sanctions and issues arising from parolees' mental illness. The parties and the Special Master's team have engaged in extensive planning and negotiation in these areas. In addition, the Special Master or Deputy Special Masters participated in Plaintiffs' monitoring tours or Defendants' self-monitoring, or conducted their own visits, to: Mendocino, Napa, Sonoma, Marin, San Joaquin, Sutter, Solano, and Glenn county jails; Pitchess Detention Center; and California Institution for Men. The Special Master's team met with information technology staff the *Valdivia* Task Force and Extradition Unit staff, and observed training for Deputy Commissioners.

This report will focus almost exclusively on remedial sanctions, mentally ill parolees, and activities in response to the Court's November 13, 2006 orders, and will not address in any detail other aspects of implementation. Newly developed information received from the parties subsequent to the May 4, 2007 draft of this report is not being included and will be incorporated in the next report.

## Remedial Sanctions

The Defendants remain out of compliance with the Permanent Injunction provisions regarding remedial sanctions. They have never demonstrated compliance in this area and it has been most seriously in question since an April 11, 2005 announcement that certain programs would no longer be used. It is undisputed that the Permanent Injunction requires that remedial sanctions must be considered throughout the parole revocation process, and must be available and used. When looking at the replacement programs for those named in

3

the Court's orders (ICDTP for SATCU and the new version of Electronic In-Home Detention replacing 2005's Electronic Monitoring) – as well as the programs offered to satisfy requirements for self-help outpatient/aftercare and for alternative placement in structured and supervised environments -- what remains in dispute is whether they are sufficient in terms of quantity and the nature of the options offered, and whether they will be meaningfully used and available to this population. Final agreement has not been reached on these issues but some interim agreements are in place.

Availability remains very limited. ICDTP has 288 beds statewide and they are concentrated in two regions, so that Southern California only has 24 of the beds and none of them are situated in Los Angeles County. Only 30 of the beds are available to women and they are all in one location. As at the time of the June Order, EID is not in use as a remedial sanction. The Parolee Substance Abuse Program (PSAP) has 200 beds. Residential Multi-Service Centers (RMSC) and Parolee Service Centers (PSC) have not yet been used as remedial sanctions, but PSC's have 819 slots and RMSC's have 689 slots in nine locations distributed reasonably well across the state; not all slots will be available as remedial sanctions as assignments to these programs come from multiple sources.

By letter dated July 4, 2006, the Special Master requested that the Defendants develop a new remedial sanctions plan to be presented to Plaintiffs' attorneys and the Special Master by November 30, 2006. Defendants were instructed to:

"...include any of the programs currently in use, as well as others CDCR would like to propose. The plan must include specific details concerning the programs to be offered; the populations for which they are designed; the logistics required to design, fund, contract for, and oversee the programs, including training of BPH and DAPO staff in using them; and anticipated timelines for each of those steps."

4

Defendants were encouraged to seek input from the Special Master and Plaintiffs' counsel throughout the drafting of the plan. To that end, the Special Master's team met with the Plaintiffs' counsel on October 18, 2006 and convened a joint meeting with parties on November 8, 2006. During the remainder of November, the Special Master's team reviewed and commented on Defendants' draft plans. Defendants were unable to meet the November 30, 2006 deadline and were granted an extension until December 4, 2006.

The proposed plan of December 4, 2006 named existing drug treatment programs (ICDTP, PSAP, Parolee Services Network, and Substance Abuse Treatment and Recovery). It did not fund any new slots in them, but did propose measures aimed at opening beds that had never been used as remedial sanctions. The EID program was being used for parolees but not as a remedial sanction and the plan reactivated electronic monitoring units for use as remedial sanctions. Additionally, it gave access to other programs for parolees which heretofore reportedly had not been open to parolees charged with violations. These programs included:

- Parole Service Centers (PSC)
- Day Reporting Centers (DRC)
- Residential Multi-Service Centers and Female Residential Multi-Service Centers (RMSC)

The plan lacked much of the expected detail and specificity. There were gaps in the ability to assess the numbers of program slots, how they would be funded and made operational, whether they were accessible to those who needed them, and how the programs would be used in good faith.

The plan lacked the detail and specificity needed to determine if the numbers cited were sufficient and realistic. It evidenced no discussion of how many program slots might

5

be needed in any of the programs for parolees facing revocation. In terms of what was available, the Division of Adult Parole Operations (DAPO) indicated that the programs listed above, other than ICDTP and EID, collectively had 4,233 beds and/or program slots per day for all populations who use them. It remained unclear if these programs had vacancies, how many of those slots could be used as remedial sanctions, and how the programs would accommodate this new population of parolees. ICDTP – the drug treatment program seen as the replacement for the SATCU program named in the June 8, 2005 order - - was offering fewer slots than what was proposed in 2004. Of equal significance, it was unclear that even the number in the plan could be made available. Primarily because of contracting difficulties, ICDTP only had 288 beds in operation in December 2006, which is an increase of only 24 beds over a seven-month period. Parolees in the two Southern California regions continued to go unserved and women parolees, the mentally ill, and the disabled continued to have limited ICDTP options. California Department of Rehabilitation and Correction's (CDCR) effort to expand the number of ICDTP beds located in jails had not been successful. To its credit, CDCR suggested modifying ICDTP to begin treatment either in a community facility or a jail bed, to increase contracting opportunities.

Other issues undermined confidence in availability and usage. For programs offered to parolees upon their release from incarceration, such as "re-entry programs," to parolees generally on supervision, and newly to parolees as remedial sanctions, it remained unclear how Defendants would accommodate the remedial sanctions population without any intended program expansion. Some programs have exclusionary criteria that severely limit program access. For example, parolees who have applied for Supplemental Security Insurance or other governmental assistance or are pregnant are excluded from an RMSC or

6

FRMSC. In another example, at least some ICDTP's exclude parolees taking psychotropic medication, or having serious mental illness generally; this means that there is no ICDTP available to parolees in all of Southern California.

Programs likely cannot be offered in all counties, and the issue of limitations on inter-county transfers of parolees was not adequately addressed. Details regarding how the plan would be operationalized were insufficient. Timing was uncertain. Moreover, there was no indication of how staff and parolee attorneys would be informed and encouraged to use these programs for remedial sanctions, undermining the possibility of their effective adoption. The document asserted the principles of staff training, fair access, and program evaluation, but provided no plan for them *per se*.

The plan also did not capture some elements of CDCR's strategy. These included a decision-making matrix that supports parole agents, their supervisors, and Board of Parole Hearings (BPH) deputy commissioners in making reasoned, consistent judgments about programs and violations according to policy and effectiveness criteria, which had been discussed in joint meetings.

Despite its weaknesses, the plan did identify some new ways to approach the lack of viable remedial sanctions for parolees facing revocation and made commitments to some important principles.

Given the lack of detail and needed specificity, the proposal was not viewed by the Special Master or Plaintiffs' counsel as an adequate plan. This was a serious failure given the length of time Defendants had been in violation, as well as the time they had had to develop a viable plan. A conference call was held on December 13, 2006 between the Special Master and the senior leaders of CDCR to impress upon them the seriousness of the

7

continued failure of the department to develop a viable remedial sanctions plan. Senior CDCR leadership committed to producing a viable remedial sanctions plan.

The deadline for the revised remedial sanction plan was set for February 15, 2007. The Special Master team worked with CDCR staff in person, telephonically, and electronically to attempt to assist them in the creation of a remedial sanctions plan that addressed the shortcomings described above and either equaled or exceeded the commitments of the original plan.

Defendants submitted a revised plan on February 16, 2007. Plaintiffs' attorneys, Defendants and the Special Master's team met jointly on February 27, 2007 to discuss and negotiate the Defendants' proposed plan. The revised plan was somewhat more descriptive of funding sources for programs. At the February 27, 2007 meeting, the defendants proposed a new, more flexible funding mechanism for the largest remedial sanction program. The funding mechanism was not described in the written revised plan because agreement had not been reached with the Department of Finance. That agreement was reached and was effective as of February 27, 2007. The plan provided some greater specificity regarding numbers of beds or services available, expanded its commitment for ICDTP beds, and temporarily assigned priority placement to this population for the RMSC and PSC programs. It increased accessibility by removing some exclusionary criteria for some programs and easing inter-county transfers, albeit with insufficient detail in the plan. It described the creation of a decision-matrix for violations.

On the other hand, it withdrew some of the useful features of the previous plan and carried forward some of the deficiencies. It still lacked the clarity and specificity needed for Plaintiffs' counsel and the Special Master to believe the proposed plan was adequate,

8

viable, and met or exceeded the commitments of the original plan contained in the remedial order.

Since the fall of 2006, Defendants have repeatedly failed to provide sufficiently substantive material by agreed-upon timeframes and deadlines, which has resulted in frustration on the part of Plaintiffs' counsel and the Special Master. Requested reports, material and information were either late or not presented at all and when plans were presented, they were sometimes subsequently rescinded without adequate explanation or rationale. Much of this may have been due to the fact that several staff intimately involved in the project management of *Valdivia* during this period were relieved and not replaced or not replaced in a timely manner.

Plaintiffs' counsel, understandably frustrated by the slippage in committed information or actions, particularly regarding remedial sanctions, presented to the Special Master and Defendants a draft Stipulation and Proposed Order on March 8, 2007 outlining the "...actions to which we seek Defendants' explicit commitment..." concerning remedial sanctions.

Defendants, Plaintiffs' counsel and the Special Master met on March 15 and 16, 2007 to negotiate the elements of the proposed stipulated order, with a further meeting with all parties on March 23, 2007 to negotiate specific remaining differences. The Stipulation and Proposed Order Regarding Remedial Sanctions was negotiated and signed by the Court on April 4, 2007.

While the parties have not reached agreement as to the scope of the Defendants' obligation to provide remedial sanctions, the parties did reach agreement in the stipulated order regarding several key items and steps that need to be taken within specific

9

timeframes. By agreement, the ICDTP beds will be increased from 288 to 1,800 beds in less than a year and there are indications that at least some prior contracting obstacles can be overcome. Most notably, this expansion, by adding a community-based model, would increase the existing ICDTP sixfold and would slightly exceed 2004 plans. The stipulated agreement and subsequent order state that Defendants will develop 20 beds for dual diagnosis (mental illness and substance abuse) parolees in each of the four regions, beginning to address a very difficult and underserved population. In this expansion, there are also beds designated for women in a large, populous region where ICDTP has not been available.

The agreement commits to using between 250 and 500 electronic monitoring units for this population. This is a substantial increase, as they essentially have not been used for remedial sanctions in the last two years, although it is considerably fewer than were contemplated in 2004. There is also a plan to use existing parole programs as remedial sanctions while the ICDTP program is being expanded, including dedicating one-half of the program slots in the Residential Multi-Service Center, Female Residential Multi-Service Center, and Parolee Service Center programs during that time. Access to all programs should be improved by policy changes allowing inter-county transfers when programming is not available in parolees' home areas.

As required by the stipulation and order, an interim memorandum to the field was completed by the Defendants and sent to the Special Master and Plaintiffs counsel by the March 30, 2007 deadline. The memo and attachments outline the programs currently available for remedial sanctions, their purposes and inclusion and exclusion criteria, and program contact information, and include statements endorsing referrals for remedial

10

sanctions. The memo was not released to the field quickly thereafter, as negotiated; as of this writing, it had not been released. A more comprehensive memorandum – another feature of the Stipulation -- has been drafted and the parties are scheduled to negotiate its contents on May 31, 2007 and thereafter.

The parties achieved the level of detail and specificity desired in some areas of the remedial plan through the stipulated order. More will be necessary as continued negotiations address access regionally and by special populations, the nature and scope of structured and supervised environments and self-help outpatient/aftercare programs available, and development of particular programs and strategies. Likewise Defendants must demonstrate that they have methods of program tracking and evaluation. There is progress in reaching agreement on a viable remedial sanctions plan. A number of outstanding questions regarding plan outcomes and implementation require resolution.

## Mentally Ill Parolees

The parties concentrated on two somewhat overlapping issues related to parolees' mental illness: (1) revocations pursuant to Cal. Code of Reg., Title 15, Section 2467.1 and related provisions; and (2) due process for parolees unable to participate in revocation proceedings by virtue of their mental illness.

The parties had long been in conflict over the means by which revocations were handled under the above-cited regulation, referred to as "psych returns." In 2005 and 2006, the parties had "meet and confer" sessions, information requests were exchanged, and Defendants convened a multi-division task force to attempt to improve practices. Absent demonstrable change, on June 15, 2006, Plaintiffs' counsel issued a Notice of Violation.

11

The regulations permit revocation on the basis of "...conduct indicating that the parolee's mental condition has deteriorated such that the parolee is likely to engage in future criminal behavior." (Cal. Code of Reg., Title 15, Section 2616(a)(14)) Such revocations are automatically for the maximum term – 12 months, ineligible for good-time earning – but the parolee may be released before that time if he or she is found to no longer meet the standard that supported the revocation. Inherent in this regulation is the idea that the parolee is being returned to prison for the purposes of treatment.

Plaintiffs' counsel cites myriad bases for these practices violating constitutional and state law. In short, these regulations as applied do, in fact, raise substantial due process concerns. The regulations' standard permitting revocation is, itself, troubling. There is significant risk that such parolees would not be served their notices of charges and rights, or would not understand them, and could not participate meaningfully in their own defense. Plaintiffs' counsel contend that CalPAP attorneys have difficulty accessing psychiatric evaluations. The purpose of the revocations – treatment – is undermined by the uncertainties of care provided in county jails; deficiencies in care in CDCR Reception Centers and other facilities, as documented in *Coleman v. Schwarzenegger*; and difficulty accessing Department of Mental Health (DMH) treatment, particularly with questions raised as to the legal bases for either system to retain custody. There has not been a reliable mechanism to ensure that these parolees reach treatment expeditiously. These parolees have not been consistently assessed for readiness for release, and the parties disagree about the standard for release and whether Defendants are obliged to find community-based placements. Defendants, with some merit maintain that the local communities are responsible for funding the care and treatment of such parolees released to the community –

12

not the CDCR. Limited resources for mentally ill in most California communities frequently result in this being a "catch-22".

The Special Master's team convened "meet and confer" sessions on these issues in August and October 2006. Defendants represented that they planned to cease revoking parolees under this regulation after a reasonable period to determine alternative measures and prepare guidance for staff. They planned to reconvene their task force to address the outstanding issues for extant and future populations.

In fairly short order following the initial meet and confer session, Defendants identified a set of parolees in custody under these provisions and expedited their transfer into treatment programs at four mainline facilities with complex mental health programs. Some were placed in Department of Mental Health (DMH) intermediate care. The exception was a small number who remained in county jails with pending local charges; their mental health treatment is unknown. CDCR clinical staff at the four institutions reportedly were educated about these patients' unique needs and encouraged to emphasize community adjustment during treatment.

A critical component of according "psych returns" due process is reviewing them to determine when their mental illness is stabilized such that the state no longer has a right to hold them. The Special Master relied on the representation that CDCR Interdisciplinary Treatment Teams (IDTT) would be responsible for this review. Tracking sheets initially recorded recommendations for the level of care that these parolees would need if released to the community. When such recommendations were no longer included, the Special Master's team inquired about their absence. Staff responsible for overseeing these cases responded that DAPO staff initially sought placements consistent with the

13

recommendations but, when this was determined to be futile, staff ceased recording these recommendations. On multiple occasions, CDCR staff from different departments asserted that their position was that "psych returns" would only be released if they were able to maintain themselves in the community with outpatient care. This standard was not negotiated and is more stringent than the variety of levels of care originally recorded on tracking documents.

In Defendants' objections to the Special Master's draft report, Defendants assert that IDTT was never performing a review function. This is particularly disturbing as it would imply that the Special Master's reliance was misplaced and a critical due process obligation was not carried out for more than seven months. Defendants aver that the level of care information was provided to DAPO informationally and that DAPO was able to place some parolees at different levels of care in the community.

Centralized staff also began to maintain a list of these parolees that included updates on their clinical conditions and locations, including whether they had returned to parole. Throughout the last half of 2006, information about the above-described activity was difficult to come by. Descriptions were provided and questions answered only erratically. Tracking information sometimes seemed incomplete or internally inconsistent and, too often, updates indicated information had not been provided or baseline and ongoing clinical tasks had not been done. The result was that the methods used after the August meet and confer to expedite parolees into transfers and treatment were not sustained consistently. Significant numbers of parolees revoked under the psych return process in the last half of 2006 did not reach treatment, and/or did not appear to be reassessed for hearing participation, for prolonged periods.

14

Dispute remains about whether all relevant parolees were identified and tracked under this mechanism, whether standards were sufficiently defined and disseminated, and whether mechanisms functioned to timely identify parolees for whom retention in custody was no longer appropriate. Without setting up systems in which the Mastership and Plaintiffs' counsel could have confidence, and without answering some of the core questions it was convened to address, Defendants disbanded the task force, without notice, reportedly in late 2006.

During this period, BPH did undertake reviews and a significant subset of parolees was returned to parole earlier than the 12-month revocation term, according to the Special Master's analysis of tracking materials provided. In March 2007, CDCR leadership directed DAPO and BPH staff to identify community or DMH placements for all parolees in custody under the 2006 psych return procedure. As of this writing, all cases captured in the tracking mechanism had been released except four who were certified as mentally disordered offenders and were awaiting bed availability at DMH. Plaintiffs note, in their objections, that the level of care staff identified as needed before these parolees' release was higher than the level of care to which several were actually released.

Because of the aforementioned questions about the completeness of the tracking mechanism, Plaintiffs are concerned that some parolees may currently be held beyond the time for which CDCR had legal authority to do so. The Special Master's team will work with the parties to determine an adequate means to demonstrate whether any parolees recently subject to psych return regulations are in custody and reasonable information concerning their revocations and current status.

As noted above, the reason proffered for a delay in ceasing use of this regulation was the need to provide staff with alternatives and guidance. It is the Special Master's impression that no new measures materialized in the nearly five months that elapsed. On January 12, 2007, CDCR Secretary Tilton issued a memorandum terminating the return of mentally ill parolees to prison "solely for psychiatric services." It was accompanied by a memorandum summarizing the existing options for DAPO staff and setting an expectation of community placement for much of this population. A BPH memorandum added the outlines of a new hearing procedure for similarly situated parolees.

An open question is the future handling of parolees whose mental illness appears to be the basis of parole violations charged, or arguably caused the violation behavior. The parties disagree as to the likely numbers of such parolees and whether special measures will be needed to recognize them, adjust hold and revocation decisions, and facilitate treatment in the community or in custody.

While the above-described measures addressed problems arising from a regulatory basis for revoking some mentally ill parolees and retaining them in custody, a problem remained for mentally ill parolees facing revocation: some are too ill at the time of their parole holds or thereafter to be able to understand and meaningfully participate in revocation proceedings. The BPH memorandum was a step toward the difficult task of balancing this population's due process and treatment needs. Plaintiffs' counsel objected to the memorandum procedure as insufficiently protecting fair process and unreasonably distributing burdens, as well as on other grounds. The procedure devoted insufficient attention to placing parolees at a level of care needed to accomplish stabilization until such time as they are capable of participating in revocation proceedings. Neither did it include an

16

adequate mechanism for identifying when parolees were well enough to proceed. Additionally, it was issued without consultation with Plaintiffs' counsel as required by the Permanent Injunction.

Defendants' plans on-point in 2006 and 2007 involved several partial proposals lacking in necessary substance. Some promising approaches did not develop or were withdrawn. The project was riddled with the issues described elsewhere in this report, including poor communication and missed deadlines.

In response to the Special Master's request, Plaintiffs' counsel put forward a thoughtful, comprehensive proposal in March 2007. After the rocky start, Defendants and the Special Master's team convened a multidisciplinary group to more fully develop a proposal. Defendants produced a well-constructed, thorough proposal on the timeline requested.

As of late April, party negotiations were proceeding well toward a process that will incorporate:

- increased staff and CalPAP attorney familiarity with mental illness,
- consideration of remedial sanctions at each juncture,
- referrals for emergency treatment at any step,
- expedited transfer to CDCR from county jails where legally permissible,
- placement into levels of care needed for stabilization,
- independent evaluation of ability to meaningfully participate and means to challenge that determination,
- improved information exchange among agency staff and with parolees' attorneys,

17

- close monitoring for change in ability to participate and reliable assessment of same,

- fair interim probable cause determinations, and

- timely resumption of hearings when ability is restored.

Plaintiffs correctly object that there is not yet a sufficient implementation plan for these proposals.

In these areas impacting mentally ill parolees, there is both progress and a number of outstanding questions requiring resolution.

Plaintiffs raised several additional objections concerning mentally ill parolees. They arise out of concerns about the adequacy of treatment while parolees are held pending revocation, treatment while serving revocation terms, pre-release planning, parolee treatment services in the community to prevent parole-prison cycling and to match the identified need for a level of care, and the interrelationship of these issues. Their objections sought further discussion in this report and recommendations for court action. For reasons discussed below, the Special Master declines to do so.

## Information Systems

This Court ordered in November 2006 that Defendants initiate information system changes, aimed at accurately demonstrating compliance, and periodically report on their efforts. Defendants had taken early steps in anticipation of the Court's order, meeting on several occasions with the Special Master's team and Plaintiffs' counsel to elicit input concerning necessary changes.

18

Subsequent to the Court's order, Defendants held weekly meetings for months involving CDCR divisions and internal and external information technology professionals. They defined the scope of the project and created a detailed project management schedule for obtaining funding and contracts in the first trimester of 2007.

The Spring Finance Letter has been submitted. The Feasibility Study Report has been written and approvals have been granted by contracts staff and executive staff; Department of Finance approval is pending. The Information Technology Procurement Plan was initiated later than expected and followed a similar course, with Department of General Services approval pending. Staff have written the non-competitively bid package and identified a funding source; several levels of approvals are still needed. The contract will follow. As of mid-April, most of those tasks, and the full project, are about six weeks behind the original schedule.

Defendants timely met their obligation to report on the progress of this project by providing the above-noted description of their planning meetings and detailed project schedule in early 2007 and by updating the latter document during April 2007. Plaintiffs object to the characterization of these activities and reporting as reasonable. As of the time of the Special Master's draft report, Defendants had met all reporting obligations and worked consistently toward implementing system changes. There were documented delays that bear monitoring, but the degree is not cause for alarm in a project of this scope. The Special Master remains convinced that there is reasonable progress on this requirement.

## Self-monitoring

This Court also ordered in November 2006 that Defendants institute and maintain the infrastructure needed for self-monitoring. Defendants accomplish internal oversight

through several mechanisms: Decentralized Revocation Unit site visits by the Court Compliance Team, *Valdivia* Task Force meetings, and the work of the Quality Control Unit, in addition to routine management at the local and headquarters levels.

The Court Compliance Team operated with only two of its five attorneys for much of the time since the first report of the Special Master, though recent hires have restored the full complement. Staff with backgrounds in DAPO and the Adult Institutions Division also contributed expertise to the unit's daily operations and site visits, though there was significant turnover among the more experienced staff.

Since the first report of the Special Master, Defendants have conducted twelve self-monitoring visits, at times including a related parole unit and/or CalPAP office. Visits are staffed by multiple reviewers with varied expertise. They observe hearings, notice service, and other processes, and interview a range of staff using standardized questions to ensure broad, uniform coverage of *Valdivia* issues. Reviewers collect data and revocation packet documents, and they examine forms and other documents in use onsite.

Reports likewise follow a comprehensive, standard format and attach supporting documents. The reports analyze the data and individual documents, noting where practice deviates from expectations and requiring corrective actions. Plaintiffs frequently state that the Defendants do not sufficiently indicate what is to be done, by whom, and when, in these Corrective Action Plans. They also state that they receive no feedback as to whether that corrective action has indeed occurred.

In addition to the thorough approach and frequent visits, Defendants impressively apply quality improvement principles to their own review process. They frequently reexamine and adjust questions, the scope of the visits, and report formats to increase

20

effectiveness. Most recently, reviewers began looking at the quality of narrative content on audited forms in addition to quantitative aspects.

The other oversight mechanisms are less developed. The *Valdivia* Task Force, a multidisciplinary group drawn from virtually every state department involved in the *Valdivia* process, originally served as the major driving force for designing, implementing, troubleshooting and overseeing *Valdivia* remedies. After the *Valdivia* Project Manager position expired, and with many accomplishments to the group's credit, Task Force activities weakened. A series of leaders served only in temporary capacities, and the group met less often and seemed to address outstanding problems with less vigor. The Quality Control Unit was tasked with reviewing randomly selected electronic revocation process records for compliance issues. There is differing information about whether its activities remained the same in 2006 and 2007 as in prior years.

There is good progress on self-monitoring and reasonable progress on internal oversight overall. Defendants have consolidated the identified issues requiring corrective action into a quarterly "Corrective Action Plan". Plaintiffs' correctly assert that they are provided no feedback as to the actions taken by Defendants to correct deficiencies. Developing a reliable and credible self-monitoring process is essential not only to achieve the trust and confidence of the Plaintiffs and the Court, but to assure continued improvement in the requirements of the Remedial Order. The Special Master team will work with the Defendants to enhance this process over the next term.

## Remedial Order Requirements

In the section that follows, I discuss those components of the Remedial Order in which there has been change and the Special Master's knowledge is sufficient to comment

21

on the status of compliance. Most items will be deferred as the primary efforts of the Special Master's team were targeted at remedial sanctions and mentally ill parolees' issues.

*Meet periodically regarding policies, forms, and plans; submit policies and procedures to the court no later than July 1, 2004 with full implementation by July 1, 2005 / Complete implementation of policies and procedures by July 1, 2005*

Although the majority of policies and procedures have been negotiated, there are a number on which the parties have made limited progress in meet and confer sessions. A definitive list of issues requiring further negotiation will be developed during the upcoming term. The Special Master's team will attempt to define those critical policies and procedures and assist, if necessary, in bringing them to resolution. It is also problematic that, on a few known occasions, Defendants have issued policies and procedures concerning *Valdivia* requirements without having met and conferred with Plaintiffs.

*Appoint counsel for all parolees by Return to Custody Assessment (RTCA) stage of revocation hearing*

The CalPAP contract with CDCR is notably one of a kind in the nation. CalPAP currently has more than 250 contract attorneys statewide, working in conjunction with eleven regional offices. The original contract with McGeorge School of Law was for three years, in effect until July 1, 2007. At the time Defendants initiated efforts for a subsequent attorney representation contract, there was substantial risk that a new contract would not be in place before the extant one expired. Defendants negotiated a one-year contract extension. The Special Master was informed on April 30, 2007 that the contract for the upcoming year was completely finalized. Defendants have committed to beginning immediately on a competitive bidding process for 2008-10.

22

The CalPAP program continues to be well managed and is arguably a model program providing consistent representation statewide. Generally, Plaintiffs' monitoring reports and Defendants' self-monitoring reports indicate that the appointment of CalPAP attorneys is timely. CalPAP data shows timely attorney appointments during the first month of this Round at 81%, a rate much lower than in preceding or subsequent months. During the rest of the Round, timely appointments were stable at a rate of 87-89%.    The parties also indicate that the performance of CalPAP attorneys is compliant with the intent of the Remedial Order. Although there are recorded instances of Defendants providing cases to CalPAP later than agreed and other challenges to timely representation, these tend to be local issues that are fairly quickly resolved between CalPAP and DRU staff.

Plaintiffs' counsel maintain that CalPAP attorneys are being asked to perform additional duties that exceed the terms of their original contract. The Special Master team will follow on these assertions during the upcoming term.

## *Defendants shall develop training, standards, and guidelines for state appointed counsel*

The parties began these negotiations at least as of fall 2006. The parties intended to encompass selection of attorneys for the panel, attorney training and continuing education, office support, quality assurance, independence, and standards and guidelines for representation. While it appears that the current contractor fulfills these functions and principles well, it will be important to memorialize them as Defendants' policies to govern services provided by any entity supplying attorney representation for parolees in the revocation process. The standards, policies, and procedures have not been completed.

## *If the hold is continued, the parolee will be served actual notice of rights, with a factual summary and written notice of rights, within 3 business days*

23

The parties' monitoring reports find that generally service is timely, although frequently Plaintiffs and Defendants disagree over the definition of three business days, particularly when a hold is placed on a weekend or holiday. Plaintiffs state that the order calls for service within three days after the hold, and, if the hold was placed on a weekend or holiday, service should be made on the first business day after the weekend or holiday. Defendants have interpreted the requirement to be three business days after the weekend or holiday.

As described in the Special Master's first report, Defendants' data currently treats timely attempted service as equivalent to timely completed service, so compliance determinations cannot rely on that source. CalPAP data shows the rate of timely service during each month of the Round ranging from 87-91%. These figures did not include several hundred cases each month in which the source material available to CalPAP did not include dates necessary to calculating timeliness, so compliance rates could be as much as several percentage points lower. Timeliness declined in recent months.

### *Counsel shall have timely access to all non-confidential reports, documents, and field files*

CalPAP reports some difficulty in accessing field files in some locations.

### *Parolee's counsel shall have the ability to subpoena and present witnesses and evidence under the same terms as the State*

CalPAP attorneys do issue subpoenas with regularity. Monitoring reports from some areas suggest that occasionally there is confusion as to who should issue subpoenas when the CalPAP attorney desires that a witness for the state be present at the hearing.

*Hearsay evidence must be limited by parolees' confrontation rights under controlling law. Defendants are to preserve this balance in hearings and to provide case law-based guidelines and standards.*

Application of standards from *Comito* and related cases appears to continue to be inconsistent across the state. BPH and DAPO staff have received additional training during this period.

### *Monitoring by Plaintiffs—"reasonably necessary"*

Plaintiffs' and Defendants' representatives agreed, following negotiations in April 2006, to a monitoring schedule for the last three quarters of the year that included fewer and more brief monitoring visits by Plaintiffs' attorneys, more written information provided by Defendants to the Plaintiffs, and the implementation of a trial model of self-monitoring. Monitoring tours by both parties were negotiated and agreed upon for 2007. Where there is self-monitoring, the Plaintiffs spend one day at the site interviewing class members only, to assure continued representation of their clients. Frequently Plaintiffs report that they either do not receive all information promised or that the information is not provided on a timely basis.

### Other Stipulated Order for Permanent Injunction requirements:

- *Expedited probable cause hearing shall be held upon sufficient offer of proof that there is a complete defense to all charges*

- *The parole officer and supervisor will confer within 48 hours to determine if probable cause exists to continue a hold*

- *Final hearing within 35 days of the placement of the parole hold*

- *By July 1, 2004, an assessment of availability of facilities and a plan to provide hearing space for probable cause hearings*

25

- *By July 1, 2005, probable cause hearings shall be held no later than 10 business days after service of charges and rights*

- *Defendants shall develop and implement policies and procedures for designation of information as confidential consistent w/ requirements of due process*

- *Defendants shall assure that parolees receive effective communication throughout the process*

- *Forms provided to parolees are to be reviewed for accuracy, simplified, and translated to Spanish*

- *Upon written request, parolees shall be provided access to tapes of revocation hearings*

- *At probable cause hearings, parolees are to have the ability to present evidence to defend or mitigate the charges or proposed disposition*

- *On or before the fourth business day, the Parole Administrator shall review the packet to determine whether the case is sufficient to move forward and whether remedial sanctions may be appropriate*

- *Defendants shall maintain staffing levels sufficient to meet all obligations under the Order*

- *Agreed-upon mechanism for addressing concerns regarding individual class members and emergencies*

- *Appeals*

- *Revocation Extension proceedings*

## Interpretation Issues:

The following issues were noted in the First Report of the Special Master and

remain the subject of dispute or negotiation.

- Optional waivers, including the appropriate timing for them to be heard after reactivation

- Parolee timeliness waivers, including whether parolee attorneys are requesting them at a reasonable rate and whether hearings are resumed after a reasonable time

- Parolee rights waivers before being appointed counsel

- The handling of notice and the timing of hearings when there are supplemental charges determined after the original charges have been served

- Whether parolees may be removed while fearful witnesses testify, subject to the parolee's attorney's examination, but not the parolee's direct confrontation

- Postponements beyond deadlines because subpoenaed state witnesses do not appear

- Whether there are sufficient provisions for attorney-client communications to be confidential in some locations

- Length of time to hearing when a parolee is subject to extradition

- Issues concerning whether interstate parolees are members of the *Valdivia* class and what protections may be due them

- Length of time to hearing when a parolee is allowed to remain "not in custody"

- Whether state employees and witnesses will be provided with attorney representation during hearings

- Transportation challenges in making parolees available

- Timely provision of all appropriate evidence to parolees' attorneys

- Deputy Commissioners and attorneys conducting telephone or in-person hearings without the parolee

- Adequate notice to parolees of the dates of their revocation hearings

- Charges being split during a revocation hearing, so that some are sustained and others are postponed

- Whether hearings are held within 50 miles of the alleged violation

- What types of remedies and responses are appropriate when the state does not meet its timeline obligations in an individual case

- Status of civil addicts in relationship to *Valdivia*

- Exclusion of parolees with disabilities from remedial sanctions

27

In their objections, Plaintiffs note that the following additional issues have arisen. Extensive numbers of prisoners and parolees must be screened pursuant to recently enacted law concerning sexually violent predators; disputes arise when Defendants allegedly extend a parolee's time in custody in order to accomplish the required screening. Another issue involves whether parolees housed in jails are adequately informed and protected when, in agreeing to a revocation term that involves half-time credit earning, they may not receive the benefit of that time earning as they may serve much or all of the revocation term in jail where half-time is not applied. A third set of concerns arises out of revocation proceedings for prisoners with life sentences.

As with the issues immediately above, the Special Master has insufficient information to resolve the questions of whether they fall within the scope of *Valdivia* and, if so, appropriate mechanisms and remedies.

## Relationship to Other Cases

In practical terms, a variety of issues in *Valdivia v. Schwarzenegger* arguably overlap with concurrent remedial orders in *Coleman v. Schwarzenegger* and *Armstrong v. Schwarzenegger* and potentially other actions. The Special Master team will attempt to clarify the areas of overlap during the upcoming term.

## Summary

"Limited progress" would best describe the period since the submission of the First Report of the Special Master on the Status of Conditions of the Remedial Order. Several key personnel changes (*Valdivia* Project Manager, *Valdivia* Deputy Attorney General, Litigation Project Manager, and other management positions) occurred during this period.

28

Some positions were not replaced – the *Valdivia* Project Manager position no longer exists – were filled temporarily, or were not filled in a timely manner. More than one-half of the attorney positions in the unit responsible for oversight and for policy negotiation were vacant for months. Several of the DAPO and BPH architects of the *Valdivia* process and implementation moved on, leaving substantial deficits in experience and institutional memory. Although it was a helpful step to create a high-level position to oversee and facilitate activities in several lawsuits in their implementation phases, the overall plans for *Valdivia* management, and project management, have not been made clear.

Subsequent to these changes, many agreed-upon deadlines for providing information to Plaintiffs' counsel and the Special Master were missed and documents and plans were far from complete. Accountability for a wide variety of actions and decisions suffered. This resulted in Plaintiffs' counsel and the Special Master's team becoming increasingly reluctant to trust the commitments made by Defendants. Although good will and hard work are widely apparent, absent a management structure and plan, recent patterns are unlikely to be corrected.

Yet, after a much-delayed start, Defendants did take substantial steps to address some problems inherent in managing mentally ill parolees. Defendants agreed to terminate the use of "psych returns" and worked diligently to find community placements for "psych returns" already in the system in 2007. They also made significant progress in negotiating a process for mentally ill parolees who are unable to participate in hearings.

Implementation of key information systems changes is proceeding reasonably, although delays in contracts and funding approvals could be a harbinger of trouble.

29

Defendants embraced self-monitoring and are developing it well. This can serve as an important foundation for managing *Valdivia* implementation and sustaining its processes long-term.

As to the Permanent Injunction's provisions regarding remedial sanctions, the Defendants, appropriately prodded by Plaintiffs' counsel, agreed to a number of plans that—if implemented--will enhance the availability and frequency of use of remedial sanctions. Greater access to remedial sanctions for women and mentally ill parolees; greater flexibility in inter-county use of remedial sanctions; and the addition of dual diagnosis ICDTP beds are but a few of the agreed enhancements.

More will be needed in the coming months. A critical test is whether the Defendants implement their agreed-upon obligations in a timely manner. Related issues remain for negotiation, including fair access and whether the programs satisfy all categories contained in the original Remedial Plan and the Court's June 8, 2005 Order. Defendants' nascent plans for assessing and matching parolee need to programming; reassessing inclusion and exclusion criteria; and supporting educated, consistent decisionmaking will also be key to the meaningful use of remedial sanctions.

Finally, the broader class of parolees deserves the parties' attention returning to other due process considerations. Defendants' initiation of structures and systems was truly impressive. It is not clear, however, that progress has been made since those initial steps. Timeliness of notice and hearing is unknown for a potentially large portion of the class. Possible obstacles to the rights to present evidence, to be heard, and to confront accusers must be examined. Implementation necessarily gives rise to complications that must be

30

addressed. The Special Master expects these to be the parties' focus in the nearest practical term.

According to the terms of the Order of Reference, the parties have reviewed a draft of this report and submitted objections. Some requests for clarification, factual correction, or addition have been incorporated above. Others, where the Special Master did not have sufficient information to assess, or did not agree with, the requested change, are incorporated to inform the Court of the nature of those objections.

The parties raised some objections based on information newly developed or newly provided to the Special Master after the draft report was issued. It is the Special Master's practice to reserve such information for the next Round's report rather than adding information to the instant report that the other party may not have had a chance to consider and comment upon. A small set of Plaintiffs' objections fell outside the scope of the Special Master's understanding of his authority. Finally, some objections raise points that deserve all parties' attention and are best handled through negotiation and internal Defendant decisionmaking at this juncture, rather than through recommendations as requested. The latter three categories of objections are generally not addressed in this report.

While the Special Master does not feel that any court orders are necessary or warranted at this time, two issues bear comment. Efforts have been directed at due process and stabilization for a particular subset of the mentally ill, as described above; that population is likely to be severely and chronically ill. Among them, there will be parolees whose treatment needs exceed CDCR's capacity. As the parties finalize these processes, the Special Master will look for interagency coordination and agreement with the Department

31

of Mental Health to ensure that this population has timely access to that agency's acute and intermediate care programs.

As the Special Master's team returns focus to core due process issues, four institutions are of particular interest. The Los Angeles County Jail, Pitchess Detention Center, California Institution for Men, and California Institution for Women account for a large percentage of the total parole holds and hearings in the state. Failure to provide timely and proper review, notice, and hearings to even a small percentage there may result in a large number of individuals being affected. Due to the large numbers, the amount of harm potentially being done is the greatest. The Special Master plans to encourage CDCR to appoint a small team to work with the Special Master team and the Plaintiffs' counsel to target these institutions to identify and address the practices that are not in compliance with the remedial order.

Respectfully submitted,

_/s/Chase Riveland
Chase Riveland
Special Master

DATED: June 4, 2007

# EXHIBIT 3

# CALIFORNIA OUT-OF-STATE CORRECTIONAL FACILITY
## INVOLUNTARY RELOCATION OF 680 ACTIVE ICE HOLD INMATES
### TARGET FACILITIES: FCC, WTDF, AND TCCF
### 2007/08 SCHEDULE
### Clustered
### ALL CASES MUST BE REVIEWED BY AN INSTITUTIONAL CLASSIFICATION COMMITTEE

| NOTIFY INSTITUTION | Pre-Transfer Processing Medical Mental Health Legal Consult | WEEK TO ICC | WEEK TO CSR | WEEK TO COPY UHR | WEEK TO CALL IN THE # OF INMATES ENDORSED FOR TRANSPORTATION | APPEALS OF COMPLETED | WEEK OF TRANSFER | FROM | TO | NUMBER OF INMATES | TX POOL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Completed | Completed | Completed | Completed | Completed | Completed | Completed | 6/1/2007 | CVSP/ISP | COCF-AZ1 | 40 | 47 |
| 6/4/2007 | 6/18/2007 | 7/2/2007 | 7/9/2007 | 7/9/2007 | 7/16/2007 | 8/6/2007 | 8/13/2007 | ISP | COCF-MS1 | 80 | 114 |
| | 7/9/2007 | 7/23/2007 | 7/30/2007 | 7/30/2007 | 8/6/2007 | 8/27/2007 | 9/3/2007 | CMC[2] | COCF-MS1 | 120 | 140 |
| | 7/23/2007 | 8/6/2007 | 8/13/2007 | 8/13/2007 | 8/20/2007 | 9/10/2007 | 9/17/2007 | AVE | COCF-MS1 | 80 | |
| **TOTAL** | | | | | | | | | | 720 | 883 |

**TARGET POPULATION: Inmates with ICE Holds and no visits in last year.**

1. To include additional inmates processed at CVSP and ISP.
2. To include additional inmates processed at CVSP, ISP, and CEN.
3. To include additional inmates processed at CMC and AVE.

*Note: It will need to be determined if the inmates from footnotes 1 through 3 will be HUBed at the institution that has movement for that week.*

*Note: Staff will identify inmates who are waiving their appeal and will attempt to move 80 inmates from CVSP, ISP, and CEN to TCCF, MS the week of 7/16/07.*