Ronald Yank, No. 041200
Gregg McLean Adam, No. 203436
Jennifer S. Stoughton, No. 238309
**CARROLL, BURDICK & McDONOUGH LLP**
Attorneys at Law
44 Montgomery Street, Suite 400
San Francisco, CA 94104
Telephone:    415.989.5900
Facsimile:    415.989.0932
Email:        gadam@cbmlaw.com
              jstoughton@cbmlaw.com

Benjamin C. Sybesma, No. 103380
Christine Albertine, No. 141033
**CALIFORNIA CORRECTIONAL
PEACE OFFICERS' ASSOCIATION
LEGAL DEPARTMENT**
755 Riverpoint Drive, Suite 200
West Sacramento, California 95605-1634
Telephone:    916.372.6060
Facsimile:    916.372.9805
Email         ben.sybesma@ccpoa.org
              christine.albertine@ccpoa.org

Attorneys for Amicus Curiae
California Correctional Peace Officers' Association

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCIANO PLATA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ARNOLD SCHWARZENEGGER, *et al.*, <br><br> Defendants. | No. Civ C 01-1351 TEH (N.D. Cal.) <br><br> **AMICUS CURIAE CCPOA'S BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO CONVENE A THREE JUDGE PANEL TO LIMIT PRISON POPULATION** |
| RALPH COLEMAN, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ARNOLD SCHWARZENEGGER, *et al.*, <br><br> Defendants. | No. Civ S 90-0520 LKK-JFM (E.D. Cal.) <br><br> Date:  June 27, 2007 <br> Time:  10:30 a.m. <br> Place: Ctrm 1 <br>        Robert T. Matsui <br>           United States Courthouse <br>        501 I Street, Sacramento, CA |

CBM-SF\SF355862.1

**AMICUS CURIAE CCPOA'S BRIEF ISO PLAINTIFFS' MOTION TO CONVENE A THREE JUDGE PANEL**

# TABLE OF CONTENTS

**Page**

I  INTRODUCTION ................................................................................................. 1

II  THE OVERCROWDING CRISIS ............................................................................. 2

III  THE STATE'S INABILITY TO MEANINGFULLY ADDRESS OVERCROWDING RENDERS A THREE-JUDGE PANEL TO CONSIDER POPULATION CAPS AS THE ONLY MEANINGFUL SHORT AND MEDIUM TERM SOLUTION BEING CONSIDERED THAT CAN ACTUALLY RELIEVE OVERCROWDING ............................. 5

    1.  The day-to-day impact of overcrowding at California's prisons is getting worse, not better. ........................................................................ 6

    2.  Spread of communicable diseases. ......................................................... 6

    3.  Staffing shortages exacerbate the overcrowding problem. ..................... 8

    4.  Out-of-state inmate transfers. ................................................................. 9

IV  CONCLUSION .................................................................................................. 10

# I

## INTRODUCTION

*Amicus curiae* California Correctional Peace Officers' Association ("CCPOA") continues to support Plaintiffs' Motion to Convene a Three-Judge Panel to Limit Prison Population. As it did in its December, 2006 *amicus briefs* filed in both cases, CCPOA supports an inmate population cap because the continuing overcrowding creates increasingly unsafe conditions for inmates and employees in all of California's prisons, including the men and women in Bargaining Unit 6, for whom CCPOA is the exclusive representative.[1] Nothing has changed for the better since CCPOA's last submission to the Courts in December 2006. CCPOA shares the Plaintiffs' and the Plata Receiver, Robert Sillen's, belief that Defendants lack the ability and institutional capacity to effectively address overcrowding or even to fully recognize the enormity of the problem. California's prisons have been so overcrowded, and for so long, that Defendants appear to have acquired a mindset that overcrowding levels of 200% are an acceptable norm— perhaps explaining the State's woeful failure to take meaningful steps to address the roots of the problem.

In their most recent submission, Defendants trumpet "reforms" within Assembly Bill 900, as well as the establishment of two "strike teams" related to construction and rehabilitation, as evidence of the State's efforts to relieve overcrowding since three federal courts first considered Plaintiffs' motion in January. Assuming the State's most recent approach even offers a fix to the manifold, systematic problems plaguing California's correctional system[2]—and CCPOA sides with the Prison Law

---

[1] CCPOA is the exclusive representative, pursuant to the Ralph C. Dills Act (California Government Code §§3512 *et seq.*), of approximately 28,000 correctional officers, youth correctional officers, medical technical assistants, correctional counselors and parole agents in State Bargaining Unit 6 ("Unit 6"). CCPOA is also a recognized supervisor representative for approximately 2,000 supervisors of Unit 6 personnel under the Excluded Employees Bill of Rights Act (California Government Code §§ 3525 *et seq.*).

[2] CCPOA accepts the Receiver's observation of an institutionalized "can't do;" hence, while it is the individual prisons that experience the overcrowding, the overarching problems that permit the overcrowding to compound primarily stem from decisions made at CDCR headquarters.

CBM-SF\SF355862.1

Office and the Plata Receiver in doubting that a build-to-fix approach could ever successfully address overcrowding—Assembly Bill 900, by Defendants' own admission, will take until 2009 to have any significant impact on the overcrowding problem. At the present rate of growth, by 2009 the inmate population is highly likely to be even further ahead of Defendants efforts to reduce overcrowding. Defendants' only short-term approach—an effort to wash their hands of the problem by transferring inmates to privately-run out of state prisons—has been declared illegal by a Sacramento County Superior Court, under both the California Constitution and the California Emergency Services Act (California Government Code §§ 8500 *et seq.*), that Act being the purported authority for the State suspending multiple state laws in order to sign the contracts with the private facilities where inmates were shipped. Even if the State successfully overturns those rulings, Defendants' plan to transfer inmates is a proverbial "band-aid applied to a fracture," since it will do virtually nothing to alleviate the overwhelming strain on the prison system given the enormity of the current inmate population (approximately 172,000), the small number of inmates the Defendants plan to transfer (8,000 by 2009), and the reality that any inmates transferred will be replaced by inmates from county jails as soon as space opens up.

Putting aside Defendants' political rhetoric, from the vantage point of correctional officers, overcrowding and the problems associated with overcrowding have gotten much worse, not better, whether judged by the charts and statistics of state officials or the sobering reality of everyday life in the overcrowded, understaffed prisons. With no other feasible fix or coordinated response from Defendants in sight, an inmate population cap offers the only meaningful short-to-medium term possibility of safer working conditions for CCPOA-represented employees.

## II

### THE OVERCROWDING CRISIS

The overcrowding in California prisons is universally recognized. Governor Schwarzenegger's October 4, 2006 Proclamation (relied on extensively by Plaintiffs) cites

custody levels far above the design capacity of the vast majority of California prisons. (*See* Prison Overcrowding State of Emergency Proclamation dated October 4, 2006 attached as Exhibit "A" to the Declaration of Jennifer S. Stoughton ("Stoughton Decl.")) As Exhibit 2 to the Plata Receiver's Report Re Overcrowding shows, however, California Department of Corrections and Rehabilitation ("CDCR") has long permitted chronic inmate overcrowding to exist without any serious effort to address or even acknowledge the problem. As inmate levels have increased, CDCR has simply adjusted upward its definition of what level constitutes overcrowding. It is a sobering reality that at the majority of the State's thirty-three institutions, 200% overcrowding is now an accepted norm. (*See* CDCR's Monthly Report of Population as of Midnight May 31, 2007 attached as Exhibit "B" to the Stoughton Decl.)

Based on CDCR's own figures and Defendants' admissions, overcrowding has resulted in, *inter alia,* increased inmate-on-inmate assaults, prison gang activity, and inmate-on-staff assaults. (*See* Exhibit "A" to the Stoughton Decl.) Plaintiffs' motion is prompted by disagreements between the parties regarding what to do about the crisis—not whether such a crisis exists.

As grounds for the Courts to order the creation of a three-judge panel, Plaintiffs' Supplemental Briefs point to routine violations of Orders of these Federal Courts, and a litany of day-to-day problems to which California inmates are subjected as a result of overcrowding. Plaintiffs assert that Defendants are simply incapable of remedying these ongoing violations of Plaintiffs' rights.

Defendants' primary defense is procedural, not substantive, and Defendants argue that, under the Prison Law Reform Act, a three-judge panel cannot be appointed in this situation because (1) the statutory basis for referral to a three-judge panel has not been met; (2) any referral to a three-judge panel would be inappropriate in light of Defendants' "current approach" aimed at solving the overcrowding problem; and (3) a population cap is an overly intrusive remedy. Defendants cite their "aggressive and comprehensive"

reform efforts as reason for the Courts to allow them additional time to implement and pursue the reform efforts.

Yet, in the seven months since the Governor's Proclamation, the only visible result of these "aggressive and comprehensive" emergency efforts has been the transfer of 353 inmates to out of state private prisons pursuant to the now-declared-unconstitutional Overcrowding Proclamation. (*See* Exhibit "A" to the Stoughton Decl.) Defendants originally contracted for the transfer of over 2,000 inmates, and in announcements accompanying the Overcrowding Proclamation, pronounced that 19,000 inmates had volunteered to be transferred. (*See* October 4, 2006 Press Release from the Office of the Governor entitled "Governor Uses Executive Authority to Relieve Prison Overcrowding, Proclaims Emergency to Allow Inmate Transfer," attached as Exhibit "C" to the Stoughton Decl.) However, like many of Defendants' projections, the 19,000 proved illusory and the State has now announced it will ship inmates out of state without their permission. (*See* February 2, 2007 Press Release from the Office of the Governor entitled "Statement by Governor Schwarzenegger on Out of State Transfer of Inmates to Relieve Prison Overcrowding," attached as Exhibit "D" to the Stoughton Decl.)

That the State of California—with an economy bigger than all but a handful of countries—has accomplished so little, despite years of an ever-increasing inmate population and acknowledgement on the State's part that overcrowding had reached crisis levels, is astonishing, though hardly surprising given Defendants' track record. In a memorandum dated October 25, 2005, the then-Director of the Division of Adult Institutions, John Dovey, advised the Secretary of CDCR that the historical population high had caused an "imminent and substantial threat" and required "immediate action." (*See* Memorandum dated October 25, 2005 to Roderick Q. Hickman, Secretary of CDCR from John Dovey, Director of Adult Institutions attached as Exhibit "E" to the Stoughton Decl.) Despite this warning, and the dire forecast accompanying it, the inmate population has increased from 165,533 in October 2005, to 171,882 as of May 31, 2007. (*See* CDCR's Monthly Report of Population as of Midnight October 31, 2005 attached as

Exhibit "F" (October 2005 Population statistics) to the Stoughton Decl; s*ee also* Exhibit "B" (May 2007 Population statistics) to the Stoughton Decl.) The only realistic conclusion to be drawn from this institutional inertia is that—regardless of the reasons why—Defendants are incapable of adequately addressing overcrowding.

In his Report Re Overcrowding, the Plata Receiver concludes that overcrowding is far worse than previously described by state officials. (Rec. Rep. at p. 1.) He compares the State's long-term paralysis in providing inmates constitutional-level medical care with its chronic inability to effectively respond to overcrowding. (*Id.* at 2.)

Notably, the Receiver shares CCPOA's concerns re staffing—according to Mr. Sillen there exists "crisis level shortages of … correctional officers." (*Id.* at 8.) A primary theme of CCPOA's first *amicus curiae* briefs was the need for some type of inmate-population-driven, as opposed to budget-driven, staffing matrix, so that a sustainable prison population can be supported by adequately staffed prisons.

### III

**THE STATE'S INABILITY TO MEANINGFULLY ADDRESS OVERCROWDING RENDERS A THREE-JUDGE PANEL TO CONSIDER POPULATION CAPS AS THE ONLY MEANINGFUL SHORT AND MEDIUM TERM SOLUTION BEING CONSIDERED THAT CAN ACTUALLY RELIEVE OVERCROWDING**

CCPOA does not purport to speak to constitutional violations or the question of whether a prisoner release order would remedy constitutional violations or even what such an order would look like. CCPOA, as a friend of the court, broadly addresses the impact of inmate population overcrowding on prison conditions as it observes them through the experiences of its members. CCPOA acknowledges some self-interest in its position—namely a desire to create a safer working environment for the 28,000 plus CDCR employees it represents. Even under "normal" conditions, California correctional custody work, our members' chosen profession, earns its mantra as "the toughest beat in the State." However, when massive overcrowding and chronic understaffing in dilapidated facilities is factored in, the inherent risks in the profession are amplified to dangerous levels.

### 1. The day-to-day impact of overcrowding at California's prisons is getting worse, not better.

Overcrowding adversely affects all inmates and all correctional employees. As the Governor's Proclamation acknowledged back in October 2006, double and triple bunking is now commonplace, canceling inmate programs is routine, and lockdowns and limitations on exercise are the norm. (*See* Exhibit "A" to the Stoughton Decl.) It admitted that the State was housing "more than 15,000 inmates in conditions that posed substantial safety risks," and that CCPOA-represented employees were experiencing greater difficulty controlling large inmate populations. (*Id.*) As this union explained before, such conditions foster discontent among inmates and present serious safety concerns to both inmates and staff. CCPOA also wrote before of the disproportionate suffering of inmates with mental health issues because overcrowding necessarily thins staffing ratios and adversely affects the ability to provide the necessary additional quality of custody normally needed for inmates with mental and medical health needs.

The Courts may legitimately ask why would the much written about "prison guards" union care about inmates? First, we emphasize that the identified safety concerns are real, and correctional officers are paying a physical price—CCPOA has no higher obligation than to the employees it represents. Second, and aside from safety concerns, is a fundamental interest going to the very essence of correctional work. That is, correctional staff are either going to be dehumanized by witnessing the current conditions, or, in the alternative, will have the kind of empathy the Federal Courts desire in correctional personnel, but will suffer from their inability to change the conditions they witness. Each alternative is, CCPOA posits, of profound cost to employees. For these reasons too, therefore, it energetically supports the convening of a three-judge panel.

### 2. Spread of communicable diseases.

The Governor's Proclamation acknowledged that overcrowding creates an increased risk of the spread of communicable diseases. (*See* Exhibit "A" to the Stoughton Decl.) This is hardly surprising: 200% overcrowding means there are twice as many

1  inmates in the system than the system is designed to hold. With so many inmates packed
2  into limited shared space, the substantial risk for transmission of infectious illnesses is
3  obvious, and so too an increased, substantial risk to the health and safety of CDCR
4  employees.

5  Statewide, CCPOA is becoming more and more aware of outbreaks of Methicillin-Resistant Staphylococcus Aureus ("MRSA") among staff and inmates. Defendants have failed to take relatively straightforward precautions to protect against the spread of MRSA among its employees. For example, Defendants have failed to implement the recommended practices set forth by the Center for Disease Control ("CDC") and/or the Federal Bureau of Prisons ("FBP"). Both of these organizations provide universal precaution standards specifically aimed at protecting employees against the spread of MRSA. CDC and FBP guidelines outline personal hygiene and isolation standards for inmates who have been infected with MRSA, as well as guidelines for the sanitization of linens and common areas to ensure the containment of any MRSA infection. In contrast, Defendants routinely permit inmates with MRSA to shower in common areas and allow inmates to launder their bed linens in cell toilets with only standard issue prison soap, all the while refusing even to inform employees of MRSA infected inmates. This despite the fact that correctional officers are required, as part of their routine custodial job duties, to be in constant contact with inmates.

At Folsom State Prison ("FSP") instances of MRSA among staff have become so pervasive as to oblige CCPOA to file a lawsuit under California Labor Code §§ 6400 *et seq*. in the San Francisco Superior Court seeking declaratory and injunctive relief: *California Correctional Peace Officers' Association, et al. v. Matthew C. Kramer (Warden), State of California, et al.*, Case No. CGC-07-463194. (*See* Complaint for Injunctive and Declaratory Relief filed on May 8, 2007 in Case No. CGC-07-463194, attached as Exhibit "G" to the Stoughton Decl.) Plaintiffs are aware of at least four correctional officers at FSP that have become infected with MRSA. (*Id.*) One

correctional officer was hospitalized for approximately thirty (30) days and forced to have surgery due to the severity of the infection. (*Id.*)

By continuing to ship inmates out of state at increased levels, Defendants are undertaking a high-risk strategy of transferring inmates with communicable diseases and fostering conditions that could lead to a disease outbreak at the prisons at both ends of the transfer. In his Report re Overcrowding, the Receiver noted this very problem in relation to overcrowding and the constant transfer of inmates throughout the California prison system. (Rec. Rep. at p. 30)

### 3. Staffing shortages exacerbate the overcrowding problem.

Both Plaintiffs and the Receiver focus on the problem of how staff shortages contribute to the overcrowding crisis. Staff shortages impact inmates with medical and mental health needs more than the general population because of the heightened custodial needs associated with these inmates.

CCPOA raised concerns about staffing shortages in its original filings in these cases; specifically, the union's belief that a population cap, in and of itself, will not fix the overcrowding problem. CCPOA believes that, while potentially a step in the right direction, a population cap would only work if it were implemented in tandem with staffing reforms given the severe staffing shortage plaguing CDCR. For example, even if the prison population was at "normal" levels, CDCR would still have 3,000-4,000 Unit 6 positions vacant. Due to the extreme state of overcrowding, these already short-staffed conditions are exacerbated and have resulted in CDCR routinely ordering mandatory overtime of up to eight extra hours a day for correctional officers. This adversely affects, among other things, the eating and sleeping patterns of employees, and physically compromises those who work in arguably the most difficult working environment in the state. The prolonged understaffing crisis has also adversely impacted correctional officer training.

Accordingly, even if the prison population was not severely overcrowded, the present level of understaffing would still have an adverse impact on the quality of inmate

custody. An additional three or four thousand correctional officers would only bring California up to a ratio of approximately one officer to six inmates, whereas the national average is close to one officer to four inmates. Structurally, a great part of the problem is that staffing is supply driven, i.e., by budget, rather than demand driven, i.e., by inmate population levels. As a result, when budgetary problems arise, staffing levels are often the first area to suffer.

With respect to long-term solutions, CCPOA believes that understaffing adversely impacts correctional staff and inmates as much as overcrowding and that inadequate staffing effectively leads to the same cutbacks associated with over crowding described above. Thus, adequate staffing is essential to ensure that inmates receive a level of custody that complies with CDCR's legal obligations. CCPOA believes that the only way to ensure adequate staffing is to develop and implement some form of standardized staffing matrix. A staffing matrix would require a certain number or correctional officers depending upon the prison population. Such a solution would not be a straight inmate/officer ratio, but instead would take into account factors such as the custody level of the inmate population. After all, Level Four inmates create greater custody needs, i.e., increased staffing, than do Level Two inmates.

### 4. Out-of-state inmate transfers.

Far from being able to reduce the prison population under the significant threat of action by one or more of three different Federal Courts, the State has stood unable to prevent an increase in inmate levels. (See Exhibit "A" to the Stoughton Decl. (stating current prison population.)) Of all the resources available to the State, its only proposed short term solution to the overcrowding problem has been to ship inmates to private out-of-state prisons.

As touched on previously, this plan has not only been remarkably unsuccessful, but it also has been ruled illegal under the California Government Code and the California Constitution. On April 2, 2007, Judge Gail Ohanesian issued a judgment in *California Correctional Peace Officers' Association, et al. v. Schwarzenegger, et al.*,

Sacramento County Superior Court case No. 06CS01568 on her February 20, 2007 Order finding the Governor's October 4, 2006 Prison Overcrowding State of Emergency Proclamation illegal under the California Emergency Services Act, and finding the transfer of inmates to private out-of-state prisons unconstitutional under article VII of the California Constitution. The State is in the process of appealing Judge Ohanesian's Order and Judgment and on May 17, 2007, the Third District Court of Appeal issued an Order staying the judgment pending the appeal.

CDCR has indicated that it will resume transferring inmates this month. It appears that the State will resort to involuntary transfers of all inmates, given the lack of any additional volunteers. (*See* Exhibit "D" to the Stoughton Decl.) At no point, however, has the State addressed the possibility that given an adverse ruling by the Court of Appeal, Defendants' only proposed short term solution, the transfer of inmates, may be foreclosed.

## IV

### CONCLUSION

In the absence of any evidence that the State has the capability to address, or even structure, a coordinated response to the calamitous problems created by prison overcrowding, an inmate population cap offers the only meaningful short-to-medium term possibility of safer working conditions for CCPOA-represented employees.

Dated: June 18, 2007

CARROLL, BURDICK & McDONOUGH LLP

By /s/ Jennifer S. Stoughton
Ronald Yank
Gregg McLean Adam
Jennifer S. Stoughton
Attorneys for Amicus Curiae
California Correctional Peace Officers' Association