PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
AMY WHELAN Bar No.: 215675
LORI RIFKIN Bar No.: 244081
SARAH M. LAUBACH Bar No.: 240526
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>　　　Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　Defendants | No.: Civ S 90-0520 LKK-JFM<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' PLAN REGARDING PAY PARITY FOR DMH STAFF PURSUANT TO THIS COURT'S MAY 23, 2007 ORDER AND REQUEST FOR ADDITIONAL ORDERS** |

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| APP | Acute Psychiatric Program. A 150-bed acute inpatient unit operated by the Department of Mental Health inside the California Medical Facility. |
| ASH | Atascadero State Hospital. A state mental hospital operated by the Department of Mental Health in Atascadero, California. |
| ASU | Administrative Segregation Unit. |
| BCP | Budget Change Proposal. |
| CCC | Consolidated Care Center. |
| CCCMS | Correctional Clinical Case Management System. CCCMS is the name for the largest CDCR mental health program, which currently houses approximately 28,000 inmates with mental illness who live in general population housing units alongside non-mentally ill inmates. CCCMS inmates are generally given medication management, and a meeting with their case manager every 90 days. A few also participate in groups. |
| CDCR | California Department of Corrections and Rehabilitation. |
| CMF | California Medical Facility. A prison in Vacaville, California. |
| CMC | California Men's Colony. A prison in San Luis Obispo, California. |
| CIM | California Institution for Men. A prison in Chino, California. |
| CRIPA | Civil Rights of Institutionalized Persons Act, 42 USC § 1997 *et seq.* |
| CSH | Coalinga State Hospital. A state mental hospital operated by the Department of Mental Health in Coalinga, California. |
| CTC | Correctional Treatment Centers. CTCs are licensed inpatient units inside prisons. Mental Health Crisis Beds operate inside Correctional Treatment Center Units. In addition to Mental Health Crisis Beds, most CTCs also include medical beds. |
| DMH | Department of Mental Health. |
| DOF | Department of Finance. |
| EOP | Enhanced Outpatient Program. EOP programs are sheltered treatment programs that house severely mentally ill inmates. There are currently approximately 4,100 EOP inmates. Because these inmates are unable to function in a general population setting, they live in segregated housing units. They are given 10 hours each week of therapy or other "structured therapeutic activities." EOP inmates meet weekly with their case managers. |
| ICF | Intermediate Care Facility. ICF programs are "intermediate" inpatient care programs. These programs are operated by the state Department of Mental Health. There are currently ICF programs at Salinas Valley State Prison, the California Medical Facility, Atascadero State Hospital, and Coalinga State Hospital. Inmates in these programs have frequent clinical contact, 24-hour |

|       |        |                                                                                                                                                                                                                                                                                                                                    |
|-------|--------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|       |        | nursing care and 20 or more hours of therapy and treatment each week. Inmates generally spend 6-12 months in these programs.                                                                                                                                                                                                       |
|       | LAO    | Legislative Analyst's Office.                                                                                                                                                                                                                                                                                                      |
|       | LOU    | Locked Observation Unit. An unlicensed Outpatient Housing Unit that is currently operating as a de facto MHCB at California Men's Colony.                                                                                                                                                                                          |
|       | MDO    | Mentally Disordered Offenders.                                                                                                                                                                                                                                                                                                     |
|       | MHSDS  | Mental Health Services Delivery System. The name given by Defendants to their entire mental health system.                                                                                                                                                                                                                         |
|       | MHCB   | Mental Health Crisis Beds. MHCB units are licensed inpatient units inside many California prisons where mentally ill inmates who are suicidal or experiencing another kind of mental health crisis can be admitted and treated for up to 10 days. MHCBs are generally located inside a Correctional Treatment Center.              |
|       | MSH    | Metropolitan State Hospital. A state mental health hospital operated by the Department of Mental Health in Norwalk, California.                                                                                                                                                                                                    |
|       | NSH    | Napa State Hospital. A state mental health hospital operated by the Department of Mental Health in Napa, California.                                                                                                                                                                                                               |
|       | OHU    | Outpatient Housing Units. Unlicensed infirmaries inside many CDCR institutions that provide treatment for medical and mental health conditions.                                                                                                                                                                                    |
|       | PBSP   | Pelican Bay State Prison. A prison in Crescent City, California.                                                                                                                                                                                                                                                                   |
|       | PC 2684| Penal Code Section 2684. The section of the penal code that refers to CDCR patients referred to Department of Mental Health hospitals for treatment.                                                                                                                                                                               |
|       | PSH    | Patton State Hospital. A state mental health hospital operated by the Department of Mental Health in San Bernardino, California. This is the only state hospital that houses female 2684 patients.                                                                                                                                 |
|       | PSU    | Psychiatric Services Unit. These are psychiatric treatment programs providing Enhanced Outpatient Program level of care to inmates with a Security Housing Unit term.                                                                                                                                                              |
|       | SHU    | Security Housing Unit. This is a segregated high-security housing unit for inmates who have committed serious infractions while in prison or who have been "validated" by the CDCR as belonging to a gang. There are male SHU units at Pelican Bay State Prison (from which all inmates with serious psychiatric conditions are excluded), Corcoran State Prison, and California Correctional Institute. There is a SHU for women at Valley State Prison for Women. |
|       | SVP    | Sexually Violent Predators.                                                                                                                                                                                                                                                                                                        |
|       | SVPP   | Salinas Valley Psychiatric Program. The free-standing DMH-run unit on the grounds of Salinas Valley State Prison that has ICF beds.                                                                                                                                                                                                |
|       | SVSP   | Salinas Valley State Prison. A prison in Soledad, California.                                                                                                                                                                                                                                                                      |

**TABLE OF CONTENTS**

TABLE OF ABBREVIATIONS.................................................................................................i

TABLE OF CONTENTS ........................................................................................................iii

INTRODUCTION .....................................................................................................................1

ARGUMENT ............................................................................................................................3

    I.    Defendants Have Not Complied With This Court's Order To Immediately Open Beds At Atascadero State Hospital ................................................................3

        A.    Defendants Must Stop Their Ongoing Depletion of *Coleman* Patients At ASH and Begin to Restore The Population To Appropriate Levels...................................................................................4

        B.    The 25 Mental Health Crisis Beds At ASH Should Open No Later Than August 15, 2007 ......................................................................6

    II.    Additional Data Regarding DMH Patient Populations Is Necessary To Monitor Availability Of DMH Beds For The *Coleman* Class ..............................7

    III.    The Proposed Salary Increases Are An Essential First Step, But They Do Not Go Far Enough To Address The Current Staffing Crisis ..............................7

    IV.    Defendants' Staffing Plan Does Not Address The Separate Needs Of The *Coleman* Class, As Ordered By This Court .......................................................10

CONCLUSION .......................................................................................................................13

PLAINTIFFS' REQUEST FOR ADDITIONAL ORDERS ....................................................13

# INTRODUCTION

The Court has repeatedly made clear to defendants the urgency of the staffing crisis at DMH and the dire need to open *Coleman* beds, particularly at Atascadero State Hospital (ASH). At the second oral argument on this motion, the Court focused on immediate pay raises for key staff members: "It seems clear to me that we've got to order starting tomorrow morning at 10:00 that any psychiatrist who is dealing with CDCR patients at DMH will be paid the equivalent of those psychiatrists who are working within the prison system. That only makes sense, that's got to be." 5/21/07 Transcript at 4:16-20. The Court also told defendants, in no uncertain terms, that murky plans without a clear focus on the *Coleman* class, as a separate and distinct category of DMH patients, simply would not suffice: "[T]he Department is going to have to start treating the *Coleman* class and its treatment as a separate problem rather than a problem of the hospitals at large. Not only because that's what I can do, but also because it is a reality. It's a separate kind of problem." *Id.* at 15:11-15.

Two days later, the Court issued an order conveying the same sense of urgency: "It is apparent to this court that steps must be taken *immediately to remedy the staffing shortage at ASH*, at least insofar as that staffing shortage affects members of the plaintiff class, and *to make the full complement of 231 intermediate care beds available to members of the plaintiff class forthwith.*" 5/23/07 Order (Docket 2236) at 4:10-13 (emphasis added). The same mandate applied to the "25 MHCBs to be reopened at ASH." *Id.* at 4, fn. 8. The Order also required a report from defendants stating how they will "forthwith remedy[] the limitation on admissions to ASH caused by the staffing shortage…for the 231 intermediate care beds at ASH." *Id.* at 4:18-21.

1 On June 13, 2007, defendant DMH responded to the Court's Order.[1] The only new part of the June 13th plan is DMH's proposal to provide pay raises to clinicians at Department of Mental Health hospitals that will equal ninety five (95) percent of the pay raises provided to CDCR clinicians in December of 2006. While pay raises are a necessary first step, defendants do not say why ninety five percent will suffice and do not set forth an adequate plan to immediately implement them. Even worse, defendants do not offer *any plan or timeline* to open *Coleman* beds at ASH, as required by the May 23rd Order. Meanwhile, the situation for the *Coleman* class has worsened. There were 56 people waiting for intermediate care facility beds when the Court issued its May 23rd Order; there are now 93 such patients. *See* 5/23/07 Order at 3:7; "Declaration of Amy Whelan In Support of Plaintiffs' Response to Defendants' Plan Regarding Pay Parity For DMH Staff Pursuant To This Court's May 23, 2007 Order And Request for Additional Orders" ¶ 4 (hereinafter "Whelan Decl."). At the same time, the number of *unavailable* intermediate care beds at ASH has jumped from 151 to 164. *Id.* ¶ 3; 5/23/07 Order at 2:19-3:2. As of June 8, 2007, there are only 67 *Coleman* class members housed at ASH, down from 80 only one month ago. *Id.*[2]

The salary increases are a start. Without a plan to open beds at ASH, however, which defendants have still failed to produce after three months of briefing, two oral arguments, and three court Orders, the *Coleman* class remains at risk. Defendants have demonstrated over the

---

[1] Plaintiffs have repeatedly pointed out that defendants, who include the Governor, the Department of Corrections and Rehabilitation, the Department of Mental Health, and the Department of Finance, habitually ignore this Court's Orders. Here again, the only defendant that responded to the May 23, 2007 Order is DMH. The other defendants are named parties in this case because they have the power and the responsibility to address mental health issues. The salary and bed crisis at DMH is not just DMH's problem—it is a crisis that will abate only when all defendants take responsibility.

[2] Defendants are required to have 231 intermediate care facility beds available to the *Coleman* class at ASH, 25 mental health crisis beds at ASH, 50 intermediate care facility beds at Coalinga State Hospital (CSH), 30 inpatient beds for female prisoners at Patton State Hospital (PSH) and 10 intermediate care facility beds for men divided between Napa State Hospital (NSH) and Metropolitan State Hospital (MSH). Patton has generally maintained its census of female *Coleman* patients, but ASH, the primary hospital for male *Coleman* patients, has continued to discharge patients without taking in new *Coleman* class members.

past five months that the *Coleman* class is not a priority and that they will not act to remedy the bed shortage crisis in the absence of a Court order. Without a court order, defendants will continue to expel *Coleman* class members from the valuable and life-saving inpatient beds at ASH. Accordingly and as set forth in detail below, plaintiffs seek orders expediting the pay increases, revamping DMH's hiring and recruitment plan and mandating additional staffing and patient data in order to enable ongoing monitoring of these issues.

## ARGUMENT

### I. Defendants Have Not Complied With This Court's Order To Immediately Open Beds At Atascadero State Hospital

The May 23, 2007 Order mandated:

> Within three weeks from the date of this order, defendants shall consider and report to the court on the feasibility of other options for forthwith remedying the limitation on admission of *Coleman* class members to Atascadero State Hospital caused by the staffing shortage, including but not limited to contracting with outside psychiatrists and other necessary psychiatric staff to provide sufficient training for the *Coleman* beds at Atascadero State Hospital.

5/23/07 Order at 5:22-26. In ordering this relief, the Court recognized the importance of the ASH beds to the *Coleman* class: "It is apparent to this court that *steps must be taken immediately to remedy the staffing shortage at ASH*, at least insofar as that staffing shortage affects members of the plaintiff class, and *to make the full complement of 231 intermediate care beds available to members of the plaintiff class forthwith.*" *Id.* at 4:10-13 (emphasis added). A footnote to that sentence made clear that the order also applies "to the 25 MHCBs to be reopened at ASH when the CMF/ASH swap is reversed." *Id.* at 4, fn. 8.

The most egregious omission in defendants' plan is the lack of compliance with this part of the Court's Order. Far from implementing a plan intended to remedy the restriction on ASH admissions "forthwith" and take steps to "immediately" remedy the staffing shortage, defendants continue to offer a snail-paced staffing plan that ignores the urgent need to open *Coleman* beds.

### A. Defendants Must Stop Their Ongoing Depletion of *Coleman* Patients At ASH and Begin to Restore The Population To Appropriate Levels

In defendants' original opposition to this motion, they made bold assertions that "there has been no denial of access to [DMH] services" and that "[t]here has been no 'closure' of ASH to CDCR patients." Docket 2182 at pp. 2:1 and 6:16-18. Since January of 2007, however, defendants have continued to unilaterally decrease the *Coleman* patient population at Atascadero State Hospital without seeking this Court's approval. It is undisputed that ASH is required to have 256 inpatient beds available to the *Coleman* class, which previously included 25 acute beds and 231 intermediate care beds (the 25 acute beds were returned to mental health crisis beds by a second order issued by this Court on May 23, 2007, Docket 2237).

As described in plaintiffs' supplemental brief in support of this motion, between January and May, defendants reduced the *Coleman* population at ASH from 133 to 80 patients. *See* Docket 2167; Supp. Kahn Decl. ¶ 10 and Exs. E & F. At a *Coleman* policy meeting on June 12, 2007, defendants reported that, as of Friday, June 8, 2007, there were only 67 *Coleman* class members at ASH. Whelan Decl. ¶ 3. In light of DMH's alarming trend over the past five months of discharging *Coleman* patients from ASH without accepting new admissions of those patients, plaintiffs' counsel asked DMH representatives at the June 12th meeting whether they intend to keep any minimum or steady number of CDCR patients. The representatives responded that have no such intention. *Id.* Those representatives also reported that, as of the week of June 4, 2007, ASH had a waitlist of 97 patients, but that not one person on that list was a *Coleman* class member. *Id.* Of course, there are no *Coleman* class members on the waiting list because CDCR clinicians have been informed that ASH is closed and have stopped referring. Whelan Decl. ¶ 2-3. When plaintiffs' counsel asked during the meeting if

DMH would accept patients into ASH off of this waitlist before accepting *Coleman* class members, DMH representatives responded that they would. Whelan Decl. ¶ 3.[3]

Defendants, in other words, still refuse to recognize their responsibility to the *Coleman* class and still refuse to ensure the availability of life-saving inpatient psychiatric beds. In an apparent effort to justify their refusal to accept *Coleman* class members into ASH, they disingenuously argue that no such patients are on the ASH waiting list. CDCR clinicians have not referred patients to ASH, however, because they have been told, in no uncertain terms, that ASH is closed. Meanwhile, the CDCR-wide waiting list for intermediate care facility beds was 93 patients as of June 8, 2007. Whelan Decl. ¶ 4. If defendants continue to act as they have over the past four months, this waiting list will get longer as defendants continue to discharge *Coleman* patients from ASH. This Court can not allow that to happen.

Accordingly, plaintiffs respectfully request additional orders from the Court mandating that all defendants act together to identify appropriate referrals to ASH on a monthly basis. In order to ensure appropriate focus on *Coleman* class members, at least twenty-five (25) percent of monthly admissions to ASH must be *Coleman* patients.[4] The Court should order defendants

---

[3] Plaintiffs will not recount the devastating effects that the loss of ASH beds has on the *Coleman* class. *See generally,* Docket 2226 at 3-5 (Supplemental Brief) ("Defendants' failure to make precious ASH beds available to the *Coleman* class translates into dire choices faced by mental health care providers every day in the CDCR system…Because there are severe shortages of acute and intermediate inpatient beds throughout the system and long waiting lists for all higher levels of care, clinicians are forced to hold patients in mental health crisis beds (or other inadequate programs) far beyond the maximum 10-day treatment program intended for those beds. They then are faced with daily serious ethical dilemmas as to which of several seriously ill patients who need inpatient psychiatric care should be admitted, whether other patients who are in the psychiatric hospital should be discharged before they are truly stabilized and whether the patient at CMF (who the DMH staff can personally evaluate) should have priority over the equally critically ill patient at another CDCR prison who is on a waiting list for inpatient care."); *see also* Docket 2227 at ¶¶ 3, 7 and Ex. D (Supp. Kahn Decl.).

[4] When DMH began restricting admissions to ASH in January of 2007, it explained to the Special Master that DMH was using the following prioritization of referrals: (1) Mentally Disordered Offenders and Sexually Disordered Offenders who reached their parole date; (2) Not Guilty By Reason of Insanity referrals; (3) CDCR referrals, and; (4) Incompetent to Stand Trial referrals. *See* Docket 2167 at ¶ 5 and Ex. B (3/23/07 Kahn Decl.). Plaintiffs believe that this prioritization of patients remains in effect or, in any event, that CDCR patients remain toward the bottom of this list. Whelan Decl. ¶ 6.

to have at least 150 *Coleman* class members at ASH by January 1, 2008, with the full 231 intermediate care patients by June 30, 2008.  Defendants should also add 50 *Coleman* beds at either ASH or Coalinga State Hospital by June 30, 2008.

### B. The 25 Mental Health Crisis Beds At ASH Should Open No Later Than August 15, 2007

On May 23, 2007, the Court ordered "the twenty five beds at Atascadero State Hospital that were included in the swap shall be returned to use as mental health crisis beds for *Coleman* class members."  5/23/07 Order at 3 (Docket 2237).  Before this order was issued, defendants committed to open the 25 beds at ASH "subject to the availability of staff."  Docket 2214 at 2.  At the *Coleman* policy meeting on June 12, 2007, plaintiffs' counsel asked defendants when they intend to open the 25 mental health crisis beds at ASH.  Defendants could not respond to this question, stating only that they would open the unit when they had enough staff to run it.  Whelan Decl. ¶ 5.

The Court made clear in its other May 23, 2007 order (Docket 2236) that defendants' obligations applied with the same force and effect to the 25 mental health crisis bed unit at ASH.  5/23/07 Order at fn. 8 ([t]his order will also apply to the 25 MHCBs to be reopened at ASH when the CMF/ASH swap is reversed.").  Similar to their unfocused plan to reopen the intermediate care facility beds at ASH, however, defendants do not set out a timeline to open the MHCBs and do not commit any concrete staffing resources to those beds.  This simply will not do. Defendants should be ordered to open five mental health crisis beds each week for five weeks.  If defendants are unable to meet these goals, they should be ordered to file a plan that sets forth a similarly aggressive schedule to open these beds.  Defendants should also make

every effort to ensure that referrals and admissions to this unit are not unduly restricted by security and custody concerns, which must be applied on a case-by-case, individualized basis.[5]

## II. Additional Data Regarding DMH Patient Populations Is Necessary To Monitor Availability Of DMH Beds For The *Coleman* Class

The May 23, 2007 Order requires defendants to file monthly reports "of referrals, pending referrals, rejections, and transfers of inmates from any level of outpatient mental health care to any level of inpatient mental health care, and from any level of inpatient mental health care to a different level of mental health care." 5/23/07 Order at 6:16-19. The report must also contain a "complete list of all class members currently waiting for transfer to any level of DMH hospital care." *Id.* at 6:19-20.

Defendants filed the first monthly report on June 13, 2007. *See* Docket 2277-2, Attachment A. While the information in that report is essential, plaintiffs respectfully request that defendants be ordered to include the following additional information in those reports: (1) a "snapshot" report, as of the first day of every month, showing the breakdown of patients at each DMH hospital by commitment category, and; (2) monthly discharge, referral and admission data for each DMH hospital by commitment category. This information will help to focus defendants on the *Coleman* class as required by the May 23, 2007 Order, and will also provide a context for DMH's ongoing discharge of *Coleman* patients.

## III. The Proposed Salary Increases Are An Essential First Step, But They Do Not Go Far Enough To Address The Current Staffing Crisis

Rather than establish pay parity for the four categories of staff identified in the May 23, 2007 order, defendants will "offer pay parity with the pay scales approved by the court in its

---

[5] In Section II of this brief, plaintiffs request additional patient data from DMH hospitals in order to enable appropriate monitoring of *Coleman* beds. The MHCB issue at ASH illustrates another reason why this data is necessary—it is impossible to determine whether defendants can open *Coleman* beds at ASH without knowing how many patients ASH is admitting on a monthly basis. Defendants have shown no sense of urgency about opening ASH beds for the *Coleman* class. Without overall patient admission and discharge data, there is no way to tell if ASH is admitting zero patients on a monthly basis, a few non-*Coleman* patients, or many non-*Coleman* patients.

December 15, 2006 order minus 5% for **ALL** DMH staff in *Coleman* classes at DMH institutions."[6]  Docket 2277-2 at 1 (emphasis in original).  Defendants represent that it will take the Department of Personnel Administration (DPA) "30 to 60 days" to negotiate the new rates with the various bargaining units and to issue a pay letter.  *Id.* at 2.

Defendants' proposed plan, if implemented immediately and if done in conjunction with the other steps outlined below, is an essential first step to addressing the staffing and bed shortage crisis.  Only time will tell if these raises are enough, however, and plaintiffs reserve their right to seek further relief if this step (95% of CDCR salary levels) proves inadequate.  In the meantime, and in order to ensure retention of incumbent staff and to hasten immediate recruitment of new staff, additional orders are necessary.

First, defendants must utilize the waivers and expedited processes used in December 2006 for CDCR clinician pay raises.  For example, the Court's December 15, 2006 Order provided for the waiver of certain state law provisions in order to effectuate the CDCR clinician pay increase in an expedited manner.  The Court ordered waiver of California Government Code Sections 3516.5 and 3517, provisions that provide for meet and confer sessions with unions and other employee organizations about laws affecting members' employment.[7]  *See* Docket 2083 at 2:1-4 (12/15/06 Order) (also ordering waiver of California Government Code Sections 19816, 19826, 19829, 19832, and 19836, as well as California

---

[6] Because defendants did not define "*Coleman* classes" anywhere in the plan, plaintiffs' counsel sought clarification of this term in an email dated June 15, 2007.  Whelan Decl. ¶ 7 and Ex. B.  Defendants responded to that email on June 19, 2007.  *Id.*  That response clarified that all of the staff members listed in defendants' monthly "DMH Staffing and Staffing Vacancies Report" will receive the raises.  *Id.* ¶ 7 and Ex. C.  Defendants also clarified in that response that the raises would apply to both incumbent and newly hired staff.  *Id.*

[7] *See, e.g.*, Cal. Gov. Code § 3516.5 ("…the employer shall give reasonable written notice to each recognized employee organization affected by any law, rule, resolution, or regulation directly relating to matters within the scope of representation proposed to be adopted by the employer, and shall give such recognized employee organizations the opportunity to meet and confer with the administrative officials or their delegated representatives as may be properly designated by law…").

1  Code of Regulations Title 2, Section 599.681).  To prevent further delay, plaintiffs request an
2  order from the Court waiving the same state law provisions for DMH, as applicable.

3        Second, the Court should set a deadline for the issuance of a pay letter.  Defendants
4  cannot implement the raises or advertise for positions at the new salary rates until the pay letter
5  is issued.  Plaintiffs request that it be issued no later than July 31, 2007.  Plaintiffs also request
6  that the pay raises be retroactive to at least April 1, 2007, the date selected by defendants as the
7  effective date of the raise for incumbent psychiatrists and senior psychologists based on their
8  May 16, 2007 Plan.  Docket 2219, Ex. 1 at 2 (Defs' 5/16/07 Plan).[8]  Providing a retroactive
9  effective date for the increases will ensure that additional staff do not leave while defendants
10 navigate through the administrative steps necessary to fully implement the raises.[9]

11       Finally, in order to effectively monitor defendants' progress retaining and hiring new
12 staff members, the Court should order defendants to produce additional information with their
13 monthly staffing data regarding DMH hospitals.[10]  That data currently provides information
14 comparing allocated, filled and vacant positions at all DMH hospitals.  DMH should also be
15 ordered to produce data showing:  (1) the number of staff hired and lost every month at each
16 DMH facility; (2) monthly staffing data for each hospital that shows how many contract and
17 registry staff were utilized in each of the clinician categories and how many hours they worked

---

[8] While it may seem obvious that defendants would immediately advertise at the new rates, history has proven otherwise.  Plaintiffs' counsel learned during the tour of Atascadero State Hospital in February of 2007 that ASH, in the past, was prohibited from advertising for vacant positions (at any rate of pay).  *See* Kahn Decl., Docket 2167 at ¶ 17.  Plaintiffs thus urge, out of an abundance of caution, an order from the Court requiring immediate advertising for the vacant positions at the new rates.

[9] It may be that defendants intend the raises to be retroactive, but the plan is silent on that point.  Plaintiffs urge the Court to order a retroactive effective date particularly if it is not inclined to order waiver of applicable state laws.  Staff are much more likely to endure a long administrative process if they know the raises, when they come, will be retroactive to a reasonable date.

[10] DMH agreed to keep the Court apprised of hiring statistics, but did not say when it would do that or what specific data it would provide.  *See* Docket 2277-2 at 2 ("DMH agrees to report to this Court the progress the implementation of these new salaries will bring on the recruitment and retention at DMH.").

and; (3) updates on the status of Federal Loan Repayment Grants and internship program participation at each DMH hospital. This additional information is necessary to track defendants' progress hiring staff and opening beds. If the raises do not prove adequate and DMH is not able to hire sufficient staff members at a reasonable rate, plaintiffs will seek further relief from this Court.

## IV. Defendants' Staffing Plan Does Not Address The Separate Needs Of The *Coleman* Class, As Ordered By This Court

On May 16, 2007, defendant DMH (and not any other defendant) filed a five-page letter setting forth, as the *Coleman* court-ordered staffing "plan," the techniques it has been using since 2005 to recruit staff, followed by a point-by-point explanation as to why each one of those techniques would fail. That "plan," in other words, regurgitated old and failed hiring strategies and failed to set forth, as ordered by this Court, any specific goals to promptly open the 256 *Coleman*-mandated beds at ASH. 5/16/07 Plan (Docket 2219).

On May 23, 2007, this Court found that plan inadequate and ordered defendants to "consider and report to the court on the feasibility of *other options* for forthwith remedying the limitation on admission of *Coleman* class members to Atascadero State Hospital caused by the staffing shortage, including but not limited to contracting with outside psychiatrists and other necessary psychiatric staff to provide sufficient staffing for the *Coleman* beds at Atascadero State Hospital." 5/23/07 Order at 5:22-26 (emphasis added).[11]

---

[11] In an effort to force defendants to focus on the *Coleman* class and to address the needs of those patients apart from other patients housed at DMH hospitals, the May 23, 2007 Order required defendants to file a report listing the "job titles and number of staff members required, pursuant to applicable staffing ratios, to provide care" for *Coleman* patients in DMH hospitals. *See* 5/23/07 Order at 6:3-4. DMH responded with general staffing ratios, but did not provide a list of job titles and did not explain the exact ratios for each clinician category. Defendants know this information and could have provided it. Indeed, they are required to know it by law and by the CRIPA consent decree. Their decision not to produce a report listing the job titles and the number of staff, as the Court required, is significant because it shows defendants' ongoing refusal to create hiring and recruitment goals based on the *Coleman* populations. For instance, although it is not clear what the exact staffing ratio is for all clinicians, psychiatrists are not supposed to have more than 25 patients in their caseload (or 15 patients if they are new admissions). Applying that ratio to ASH, one can infer that DMH needs approximately 9.2 psychiatrists to care for the 231 *Coleman* patients who are supposed to be housed in ASH intermediate care facility beds. Plaintiffs recognize that there are other hospital-wide structural

(continued . . .)

Rather than comply with this Order and present "other options," defendants simply regurgitated the same plan that was already rejected by this Court: "DMH will continue to utilize the components of the DMH Recruitment and Hiring Plan submitted to the *Coleman* court on May 16, 2007." Docket 2277-2 at 2. As plaintiffs pointed out in their supplemental brief, not one of the proposals in that plan is new, many have failed in the past, and none target the *Coleman* class or remedy as specifically ordered by this Court. *See* Docket 2226 at pp. 8-9. In particular, plaintiffs explained defendants' glacier-paced plan to address the 1,860 staff vacancies throughout DMH. Defendants' "budgeted staffing plan" (which is the exact same plan they submitted to this Court on May 16, 2007), even if 100 percent successful, would only reduce vacancies by 750 positions by July of 2008, leaving 1,110 positions still vacant more than a year from now! As to the 750 positions, DMH explained that it will hire in two phases, including 300 staff between July and December 2007 and 450 staff between January and June 2008. During phase one, defendants hope to hire 10 staff members per month in each of the five state hospitals, or 50 staff in July, 50 in August, 50 in September and so on. During the second phase, 15 staff members will be hired per month per hospital. In addition to the slow pace of these hiring goals, defendants never explained how the hiring would affect the *Coleman* class and their June 13, 2007 filing similarly lacks any focus on *Coleman* beds.

Defendants have been given three opportunities to develop a staffing plan specifically targeted toward opening *Coleman* beds at ASH, yet defendants have repeatedly demonstrated their inability (or refusal) to create such a plan. Accordingly, and in order to maximize the benefit of the impending salary raises, the Court should adopt the Special Master's recommendations regarding streamlined CDCR hiring and recruitment, as contained in the 17C Status Report, and apply those same orders to DMH hiring. As the Special Master noted in

---

(continued from previous page)
staffing issues that are relevant to these ratios, but the ratios provide a general sense of how many staff are needed to care for the *Coleman* class. Defendants could use this data to tailor their hiring plan to the *Coleman* class. Their refusal to do so is consistent with their overall refusal to open *Coleman* beds at ASH.

that report, salary increases are ineffective in the absence of successful hiring and recruitment capabilities:

> The terrible irony here is that the defendants now have a scale of wages for [CDCR] mental health clinicians that is at par with the private sector and better than the public employers are offering in correctional facilities anywhere in the county. These enhanced wages may be useless, however, if the defendants cannot broadcast them effectively on a national basis. Vacant positions do nothing to improve the delivery of mental health services…

Docket 2274-4 at 186. That observation, and the Special Master's accompanying proposals to improve hiring and recruitment, hold just as true for defendant DMH. The Special Master recommended that defendants submit a "plan, funding proposal and timetable for implementing an effective recruitment capability and strategy" within 60 days. *Id.* at 185-186. Plaintiffs urge an order from this Court imposing the same reporting requirement on defendant DMH. As set forth in the Special Master's recommendation, defendants should include in that report a plan that sets forth the following: (1) a streamlined and expedited process for Form 607s (or the DMH equivalent); (2) a streamlined process for obtaining exemption from Government Code § 12439 (or the DMH equivalent); (3) a plan to place examinations for psychologists and licensed clinical social workers online; (4) an analysis of questions on psychiatrist and psychologist examinations that could be purged because they discourage or eliminate qualified candidates; (5) an analysis of the adequacy of the existing budget to recruit DMH staff; (6) a plan to develop regional recruitment teams; (7) the feasibility of using contracted subject-matter or professional specialty experts for recruitment; (8) a national recruitment plan, and; (9) revisions to DMH's current print recruitment materials and a revised list of publications that should advertise DMH positions. *Id.* at 186.

Because salary increases are finally on the way for DMH clinicians, there is a significant opportunity *right now* to tackle the staffing crisis in DMH hospitals, thereby providing essential beds for the *Coleman* class. If defendants have made one thing clear during the course of this motion, however, it is that they will not revamp recruitment and hiring efforts in the absence of a Court order.

# CONCLUSION

Five months after ASH closed admissions for the first time in its history, defendants' proposed pay raises are a key step to curbing the staffing crisis at DMH hospitals. Defendants' overall "plan," however, still fails to address the needs of the *Coleman* class and, most importantly, does not include any commitment or timeline to open *Coleman* beds at ASH. Meanwhile, it is undisputed that the plight of the *Coleman* class is worsening. In a month's time, defendants discharged 13 additional *Coleman* class members from intermediate care facility beds at ASH, reducing the *Coleman* census to an all-time low of 67 patients. At the same time, the overall waiting list for intermediate care beds throughout the CDCR's mental healthcare delivery system increased from 56 to 93 patients. Defendants' salary plan is a start and must be implemented on an expedited timeframe with waivers of applicable state laws. Additional orders are also necessary to open *Coleman* beds at ASH, maximize recruitment and hiring of DMH staff, and to effectively monitor defendants' progress in this time of crisis.

# PLAINTIFFS' REQUEST FOR ADDITIONAL ORDERS

For the reasons stated above, plaintiffs respectfully request that the Court issue the following emergency orders:

1. Defendants shall forthwith adopt and implement salary raises for all DMH staff in *Coleman* positions equal to ninety five (95) percent of the pay raises ordered for CDCR clinicians in December of 2006. The provisions of California Government Code Sections 19816, 19826, 19829, 19832, 19836, 3516.5, 3517, and California Code of Regulations Title 2, Section 599.681 are waived solely for the purpose of implementing the proposed salaries. Defendants shall expedite processing of those raises, which shall be retroactive to April 1, 2007 for incumbent staff, and shall issue the pay letter no later than July 31, 2007.

2. Within 60 days of the date of this order, defendants shall file a report setting forth a detailed hiring and recruitment plan for DMH clinicians. At a minimum, defendants shall include in that report an analysis and plan to do the following: (1) streamline and expedite processing of Form 607s (or the DMH equivalent); (2) streamline the process for obtaining exemption from Government Code § 12439 (or the DMH equivalent); (3) place

-13-

1  examinations for psychologists and licensed clinical social workers online; (4) purge questions
2  on psychiatrist and psychologist examinations that discourage or eliminate qualified
3  candidates; (5) create an adequate budget to recruit DMH staff; (6) develop regional
4  recruitment teams; (7) contract with subject-matter or professional specialty experts for
5  recruitment; (8) recruit on a national level, and; (9) revise and update DMH's current print
6  recruitment materials and the list of publications that should advertise DMH positions.

7      3.   Defendants shall act together to identify appropriate referrals to ASH and to
8  increase the population of Coleman class members at ASH each month. Beginning July 1,
9  2007, at least twenty-five (25) percent of all ASH admissions in a given month must be
10  *Coleman* class members. This admission plan shall remain in place until further order of Court
11  or until ASH fills all of the contracted 231 intermediate care beds with *Coleman* class
12  members. On the fifth day of every month, beginning August 5, 2007, defendants shall file a
13  brief statement with the Court confirming that this admission percentage was reached and
14  stating the number of admissions, by every commitment category, for the previous month.

15     4.   By January 1, 2008, defendants shall have at least 150 *Coleman* class members at
16  ASH and are thereafter prohibited from having any fewer than 150 *Coleman* patients at ASH in
17  any given month. By June 30, 2008, defendants shall have 231 *Coleman* class members at
18  ASH. Defendants shall not reduce the number of *Coleman* beds available at other DMH
19  facilities and DMH shall increase *Coleman* patients at Coalinga or ASH by an additional 50
20  patients on or before June 30, 2008.

21     5.   Defendants shall open at least five mental health crisis beds at ASH each week
22  for five weeks. If defendants are unable to meet these goals, they shall file a plan that sets
23  forth a similarly aggressive schedule to open these beds. Defendants shall also make every
24  effort to ensure that referrals and admissions to this unit are not unduly restricted by security
25  and custody concerns, which defendants must apply on a case-by-case, individualized basis.

26     6.   The May 23, 2007 order regarding monthly patient data is superseded by this
27  order. Defendants shall provide, by the 15th day of every month, the following information:
28  (1) a list of referrals, pending referrals, rejections, and transfers, of inmates from any level of

outpatient mental health care to any level of inpatient mental health care, and from any level of inpatient mental health care to a different level of mental health care; (2) a complete list of all class members currently waiting for transfer to any level of DMH hospital care; (3) a "snapshot" report, as of the first day of every month, showing the breakdown of all patients at each DMH hospital by commitment category, and; (4) monthly discharge, referral and admission data for each DMH hospital by commitment category.

7. CDCR and DMH shall include in their monthly staffing data the following information: (1) the number of staff hired and lost every month at each DMH facility; (2) monthly staffing data for each hospital that shows how many contract and registry staff were utilized in each of the clinician categories and how many hours they worked and; (3) updates on the status of Federal Loan Repayment Grants and internship program participation at each DMH hospital.

Dated: June 20, 2007                         Respectfully submitted,

*/s/ Amy Whelan*
Amy Whelan
Rosen, Bien & Galvan, LLP
Attorneys for Plaintiffs