**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.**

    **Plaintiffs,**

    **vs.**                 **No. CIV S-90-0520 LKK JFM P**

**ARNOLD SCHWARZENEGGER, et al.,**

    **Defendants.**

**SPECIAL MASTER'S REPORT AND RECOMMENDATIONS ON
DEFENDANTS' ENHANCED OUTPATIENT TREATMENT PROGRAM
IN RECEPTION CENTERS**

On May 2, 2006, defendants were ordered to prepare and file a plan to provide adequate mental health care to inmates requiring an enhanced outpatient level of care and remaining in reception centers of the California Department of Corrections and Rehabilitation (CDCR) institutions for periods longer than 60 days. Defendants prepared their plan and filed it on July 1, 2006. Commendably, they implemented it for all EOP inmates, and not merely for those whose stays exceeded 60 days, in the seven designated institutional reception centers where the program was ordered to be rolled out initially.

The defendants' plan requires institutional reception centers to satisfy the following standards for treatment of their EOP inmates:

- Upon inmate identification of need for EOP level of care, immediate assignment of a clinical case manager to maintain oversight of the inmate throughout his reception center placement, track his transfer status and establish liaison with custody and classification staff to facilitate placement.

1

- Weekly face-to-face contact between case manager and inmate to provide therapeutic counseling, answer questions, and consider referral to other therapy programs.

- Structured therapeutic activities for all inmates, for a minimum of one hour per day, five days per week, out of cell. This may include case manager contacts, individual therapy, group activities and pre-release planning. Groups shall follow a rotating schedule of sessions, with enrollment based on referral by the case manager. Groups shall range in size from five to 25 inmates. Referral to any group should entail consideration of the specific needs of the individual inmate. A list of options for group topics is provided in the plan.

- Re-entry planning for all inmates with imminent release dates, i.e. within 60 to 120 days, provided by clinical staff. Such planning to follow pre-release planning, and should cover review of pertinent mental health or medical conditions, recommendations for follow-up treatment, referrals to appropriate programs and services, applications for federal and state entitlement benefits, initiation of conservatorship proceedings if necessary, liaison with parole outpatient program staff, liaison with family members and significant others, and screening for inpatient placement.[1]

- To the extent possible, designated or clustered housing for EOP inmates in reception center.

- Adequate treatment space.

- Adequate staffing.

The defendants' plan does not address the purpose of interdisciplinary treatment teams within the EOP reception center treatment paradigm, nor does it address the timing and frequency of IDTT meetings, nor any special concerns in treatment plans for inmates with imminent release dates. This has left the institutions to devise their own

---

[1]The CDCR implemented recently a pre-parole process for securing federal and state benefit entitlements and community based continuity of care. This process may overlap to some extent with the re-entry planning for EOP inmates in reception centers, described above. In addition to assisting with securing benefits, this process also provides a liaison between prison staff and the Division of Adult Parole Operation's Nursing Consultant, Program Review (Medical Placement Coordinator) for identifying and referring inmates in need of medical and/or in-patient mental health services upon release from incarceration. The target population for this process is inmates who are to parole within 210 days, including inmates who are mentally disabled. The process expressly provides for screening of members of the Coleman plaintiff class, among others, for eligibility.

EOP reception center IDTT agendas, timeframes and schedules. Although the defendants' plan includes inmate re-entry planning, it does not require any process to identify those inmates who have imminent release dates in order to target them for the delivery of timely individualized re-entry planning. Staffing of the programs is left largely to the discretion of the institutions, with no designation of clinical disciplines which must be represented in the program or what staff-to-inmate ratios should be maintained. Treatment space is also not elaborated upon in the plan.

Defendants were ordered on October 20, 2006 to implement their plan no later than January 1, 2007 in reception centers at California Institution for Men (CIM), Deuel Vocational Institute (DVI), San Quentin State Prison (SQ), North Kern State Prison (NKSP), Wasco State Prison (WSP), California State Prison, Los Angeles County (CSP/LAC), and the Richard J. Donovan Correctional Facility (RJD). The special master was ordered to monitor the programs and report to the Court by June 30, 2007 on whether the program should be extended to any other CDCR reception centers.

The monitor and expert examined EOP programming at the seven reception centers from April through June 2007. This report summarizes the monitor's findings on the institutions' compliance with the plan. It concludes with a summary of the institutions' performance and the special master's recommendations. Unless otherwise expressly stated, all discussion in this report refers to programming for only EOP inmates in reception centers, and not to EOP inmates in administrative segregation, mental health crisis beds, outpatient housing units or other forms of specialized programming. References to "the program" are to any of the seven designated institutions' respective programs for treatment of EOP inmates in their reception centers.

Although the data collected and discussed in this report is the product of several different monitoring team members and experts, references to the various monitors and experts are reduced to the singular "monitor," "monitor's expert" or "expert." Clinical judgments of the monitor's psychiatric experts are explicitly attributed to an expert.

**California Institution for Men (CIM)**
April 2, 2007 – April 4, 2007

CIM initiated its program in February 2007. It was essentially non-functional at the time of the monitor's visit.

Census:

On April 4, 2007, there were 23 EOP inmates in Central Facility and 122 EOP inmates in East Facility, making CIM's the largest EOP reception center population among the seven institutions.

Staffing:

Staffing was problematic. A new senior psychologist was aware of program needs and appeared to be doing everything possible to provide as many services as the institution could manage, while also attending to daily crisis management in the program. Staff reported that no mental health and custody staff was hired due to delays in the hiring process in central office, rendering the program essentially nonfunctional at CIM. At least two officers who had provided escorts were assigned to Plata duties and no longer assisted mental health staff. Facility captains, however, were receptive to proposed additional training for eight officers to be assigned to the program. Clerical support was limited, with only one office assistant who had apparently other job duties outside of the program.

Case Manager Contacts:

Placement of newly arriving inmates on clinicians' caseloads normally occurs within 18 days of arrival for inmates who have not been already designated at the EOP level of care, and within a shorter timeframe for inmates who have already been designated at the EOP level. At CIM, placement of newly arriving program inmates on clinicians' caseloads often began two to three weeks after their placements in the institution's EOP reception center program. Delays were attributed primarily to lack of staff and resulting late data entry. As a result, many or all inmates experienced delays of several weeks after their arrival before they received EOP level of care.

Based on reviews of contact tracking data, inmate histories, UHRs and inmate interviews, weekly case manager contacts were occurring after placements on caseloads, despite impediments. Access to case managers during lockdowns was limited according to staff reports, and was non-existent according to inmate reports. Lack of sufficient custody escort staff impaired provision of one-to-one clinical contacts in confidential settings. Clinicians in Central Facility also reported delays in bringing inmates to clinical appointments during the morning and after shift changes, resulting in some contacts taking place in non-confidential settings or at cell front. Staff reported that most case manager contacts in East yard occurred in confidential settings.

Record reviews showed considerable variability in the quality of clinical notes. Although it appeared that inmates were seen on a weekly basis generally, there were periods of no documentation of contacts in records. The UHR filing backlog appeared to exceed one month. After group sessions, ducat sheets were returned to the

office assistant for entry of information into the Mental Health Tracking System, but staff reported a substantial filing backlog for these entries.

Interdisciplinary Treatment Teams:

Required interdisciplinary treatment team (IDTT) meetings were not occurring, reportedly due to lack of space and custody officers. Instead, staff was conducting "case conferences" which provided some opportunity to discuss inmates in the program with other clinicians, but did not satisfy IDTT standards and lacked custody participation. Despite the presence of adequate treatment plans in some instances, there was no evidence that prescribed treatment activities were occurring. Some UHR reviews discovered outdated or missing treatment plans.

Structured Therapeutic Activities:

Groups met on Mondays, Wednesdays, and Thursdays, but over two-thirds of the 145 eligible inmates had no access to structured therapeutic activities. Only 45 inmates, or 31 percent, were attending groups. Staff attributed low group availability to shortages of staffing and space. Generally, groups were ducated by a clinician because there was no support staff to do it. There was little coordination between custody and clinicians on scheduling groups or individual clinical contacts. Staff and inmates also reported that groups frequently conflicted with yard time, and that many inmates elected yard over group, if given a choice. The monitor interviewed seven inmates who reported that the groups had been in operation by that time for approximately five weeks. Some were then attending only their first or second group meetings and reported that they had no other group sessions scheduled. They also reported that during lockdowns escorts were available for medical but not for mental health appointments.

Non-Therapeutic Out-of-Cell Activities:

Outdoor yard was scheduled in East Facility for two hours twice a week and in Central Facility for three hours once a week.[2] Yard access in both facilities was problematic due to safety and security issues such as modified programming or institutional or facility lockdowns, and by Sensitive Need Yard (SNY) use of resources in East Facility. The institution reported plans to construct outdoor yards specific to units where EOP inmates in reception center were housed, with completion anticipated by the end of May 2007. It also reported a plan to install fences to allow simultaneous use of yards by otherwise separated groups of inmates, such as SNY and non-SNY.

Treatment Space:

At the time of the monitor's visit, the program was competing with other institutional programs for unused space. All space identified for the program required renovation and retrofitting. Staff reported that minimum program requirements could not be met without the allocated additional space.

Re-Entry Planning:

Staff reported very limited re-entry planning. The set-up of the system's parole process did not generate and provide inmate release dates to the institution in a prompt and regular fashion. As a result, the institution was not given a timeframe that allowed for in-depth planning for its inmates headed for imminent release. In addition, staff necessary to comply with re-entry requirements had not been hired as of the time of the monitor's visit.

---

[2]Although access to out-of-cell recreational activity is required generally, there is no mandated minimum amount of time for such activity apart from what is considered "consistent with an inmate's custodial classification, work/training assignment, privilege group and security requirements." CALIFORNIA CODE OF REGULATIONS Title 15, art. 2, § 3220.

### Deuel Vocational Institute (DVI)
April 5, 2007 – April 6, 2007

DVI launched its program in March 2007.

Census:

As of April 5, there were 28 inmates in the program, including those designated as SNY inmates.

Staffing:

As of the monitor's visit, one psychiatrist, two psychologists, two escort officers and one licensed psych tech (LPT) were assigned to the program. An additional psychologist was assigned pending the hiring of licensed clinical social workers to work on re-entry activities.

Initial Screening and Evaluation:

A sampling of ten of the 28 EOP inmates in reception center found that for all ten screenings had been completed, and that nine of the ten had been completed on the day after arrival.

Case Manager Contacts:

Weekly case manager contacts were occurring. Review of six inmate charts found three that indicated good to excellent care, and three that indicated inadequate to poor care. UHRs tended to be poorly organized and lacking documentation. Some clinicians reported withholding their notes instead of submitting them for filing, to ensure their availability for subsequent treatment sessions. This practice made necessary documentation unavailable to other clinicians, thereby adversely affecting care. The institution agreed to train clinicians in order to halt this practice.

Interdisciplinary Treatment Teams:

At the time of the monitor's visit, the institution had implemented its own schedule for IDTT meetings for once per month. The monitor's review of ten cases found that nine inmates had received completed treatment plans, although some were not completed within 14 days and many were inadequate. To accelerate initial IDTT meetings, Mental Health reported that it planned to begin holding IDTT meetings during a two-day period every two weeks rather than once a month. All program inmates were also scheduled for monthly follow-up IDTT meetings and psychiatric contacts at least once a month.

IDTT meetings were held in the culinary area or a small office which were both appropriately private and confidential. The monitor and expert observed a program IDTT meeting attended by the full complement of staff including the psychiatrist, case manager, correctional counselor II, LPT, assigned correctional officer, and the inmate. It was well run, interactive and patient-focused. Staff reported that UHRs were available in 50 to 75 percent of cases but C-Files were usually not available.

Structured Therapeutic Activities:

Staff reported that unless inmates were scheduled for mental health clinical contacts, they were offered daily psychotherapeutic groups, for a minimum of five hours per week in addition to regular case manager contacts. Review of UHRs and inmate histories, however, did not corroborate the reported compliance with the five-hour weekly minimum, although it was unclear whether documentation deficiencies or actual missed contacts were the reason.

There were two groups offered each day, one for SNY reception center EOP inmates and the other for non-SNY inmates, with the same objectives and procedures. Group participants were clustered as much as possible into one housing unit to facilitate attendance at groups, particularly when security measures were in place. Sessions took place in the dining hall or in the South Dorm, depending on the day and whether it was an SNY or non-SNY group, which afforded confidentiality. Attendance ranged from eight to 20 inmates, depending on the number of EOP inmates in the facility and on security conditions in the prison.

Typically groups entailed a mixture of process and didactic formats. They began with "check-in," when inmates may express needs, concerns or a discussion topic. Next, the group topic of the day was presented, usually via an interesting article or book chapter related to the emotional life of inmates, followed by discussion of the selected topic. Group topics included loss, anger management, coping skills, parole planning, issues in illicit drug use, prison culture and assimilation, re-entry into society, leisure, family issues such as rejection and isolation, daily living skills, medication management, problem solving, stress management, suicide, emotional stability and depression, impulse control, relationship skills, and coping with disabilities. A weekly medication management and education group was offered by a psychiatrist, alternating between SNY and non-SNY. Groups concluded with relaxation exercises, if time permitted.

Non-Therapeutic Out-of-Cell Activities:

Yard was offered to each inmate for two to three hours, one day per week, although security activity sometimes interfered with yard access. Mental health agreed to restructure psychotherapeutic group availability to avoid conflicts with yard time.

<u>Treatment Space</u>:

   Custody offered the use of offices in all housing units for provision of individual treatment to caseload inmates, per a memorandum dated April 2, 2007 from the correctional captains of receptions centers I and II.  Mental Health staff reported that this would have a significant positive impact on mental health care.

<u>Re-Entry Planning</u>:

   DVI was not providing all required re-entry services including construction of individualized plans, at the time of the monitor's visit.  Staff reported that re-entry planning began in IDTT meetings for the most severely mentally ill inmates.  The monitor found that this approach provided useful background information.  EOP transfer lists including parole and release data were provided weekly to case managers, who were expected to begin re-entry planning.  Psychiatrists completed required information chronos for inmates who were taking medication.  The institution reported that it arranged with parole agents to have the most unstable inmates picked up.  Re-entry planning was also the subject of a psychotherapeutic group.

<b><u>California State Prison at San Quentin (SQ)</u></b><br>April 10, 2007 – April 12, 2007

   SQ launched its program in February 2007.

<u>Census</u>:

   On April 9, 2007, there were 24 EOP inmates in the reception center.

<u>Staffing</u>:

   At the time of the monitor's visit, SQ had filled its program allocations of one full time psychologist, one licensed clinical social worker and one LPT.  It also

covered the equivalent of 3.06 correctional officers and .2 correctional counselor II positions with use of overtime staff.

Initial Screening and Evaluation:

Staff reported that arriving inmates with histories of EOP level of care were fast-tracked to the evaluation unit for evaluations within five business days. The institution reported that it expected to complete 90 percent of required initial screenings within one day and the remaining ten percent within two to three days.

A reception center coordinator assisted the unit with identification and ducating of the inmates, made housing recommendations, served as liaison with custody regarding housing choices, and presented the inmates at their initial IDTT meetings. The coordinator reported a list of inmates confirmed as needing EOP level of care to the IDTT supervisor and the group supervisor for assignment of the inmates to individual therapy caseloads and to groups.

An assigned psychologist in the evaluation unit conducted the screenings and evaluations, prepared the initial documentation, and served as the presenting case manager for initial IDTT meetings. Following that, the senior psychologist assigned case managers to inmates, usually within one to two days, who were required to meet with the inmates no later than the beginning of the following week, provide weekly contacts, and present the inmates in future IDTT meetings.

Case Manager Contacts:

SQ had begun weekly case manager contacts with EOP inmates in the reception center during the Eighteenth Monitoring period. The monitor's review of UHRs, un-filed progress notes, inmate histories and completed appointment history

12

records confirmed that weekly contacts were occurring. Generally, contacts took place in a confidential mental health treatment area. Entry of progress notes in UHRS and data into the MHSTS was problematic.

SQ also designated a particular case manager to serve inmates requiring a higher level of therapeutic service, for example, inmates who had had multiple mental health crisis bed or outpatient housing unit admissions while in the program. This case manager offered additional mental health services that were tailored to these inmates' needs. At the time of the monitor's visit, no inmates in need of this case manager's services were identified.

Interdisciplinary Treatment Teams:

Program IDTTs were initiated on April 11, 2007 and were scheduled for weekly meetings. Staff reported that within the ensuing month all current inmates and any entering the program within the following two weeks would have an IDTT meeting. The monitor's expert observed the first program IDTT meeting and found that staff needed clarification about the roles of the team and its members.

During a subsequent visit to SQ on June 13, 2007, the monitor's expert observed a well attended IDTT meeting, with a psychiatrist, presenting staff psychologists, a correctional counselor I, the reception center EOP coordinator and inmates present. The meeting was interactive and geared toward developing efficacious treatment plans for the duration of the inmates' stays in the program. Medical records were available in all cases. C-files were missing for some, but the correctional counselor brought an information sheet for those inmates whose C-files were unavailable. Participants appeared to be aware of their roles in the program IDTT. Presenting

psychologists were highly knowledgeable about the inmates and their mental health histories. Staff reviewed with inmates their levels of care and housing status, and asked them to express any concerns, which were then addressed or explained. The psychiatrist reviewed the medical records and addressed medication concerns. Psychiatry consultations were set up during the meeting for some inmates. Fundamental pre-release planning information was also made available.

Structured Therapeutic Activities:

Staff reported beginning program psychotherapeutic groups on February 5, 2007, rather than a month earlier, because of delays in identifying and assigning clinical staff and treatment space for program use.

At the time of the monitor's visit, SQ was meeting the minimal hourly requirement for structured therapeutic activities. The program had access to both dedicated and shared space for providing required individual and group treatment. Psychotherapeutic groups in the program were co-led by clinical psychologists and LPTs. The institution reported that all groups, including those focused on daily living skills, specific issues or group process, or those dealing with arrivals or departures, were geared toward assisting members with developing interpersonal skills. Group topics included medication education, symptom management, communication skills, anger management, stress management, substance abuse treatment, distress tolerance and emotional regulation, support on health issues, family issues and other personal difficulties, decision-making skills, and re-entry and parole planning. Group leaders were expected to use a psycho-education approach by teaching cognitive and behavioral skills including

dialectical behavior therapy skills, to utilize supportive interventions when clinically appropriate, and to promote healthy group dynamics.

Non-Therapeutic Out-of-Cell Activities:

Mental health and custody staff reported that inmates in the program were allowed access to outdoor yard on Mondays and Thursdays between 10:30 a.m. and 12:30 p.m. On the other five days, these inmates were allowed access to showers, telephones, canteen and the day room. Assigned custody staff reported that if yard access was not possible on a Monday or Thursday (usually for security reasons), inmates in the program were allowed alternate activities such as showers or telephone use within the housing unit.

Treatment Space:

The program had been assigned work space with offices for three clinicians in the R&R area, where initial screening and comprehensive evaluation were completed. Staff reported that availability of this work area was anticipated within three to four weeks following the monitor's visit.

Re-Entry Planning:

At the time of the monitor's visit, psychologists and social workers were providing some assistance to inmates with several aspects of re-entry planning, but no systematic, structured re-entry program suited to address individual inmate needs had yet evolved. Staff reported difficulty obtaining meaningful and useful dates of inmates' releases, which custody and clinical staff was working to resolve. During the monitor's visit, the institution committed to formulating and developing its re-entry planning component of the program. Staff reported that psychologists and social workers were

15

developing a format for re-entry planning that would contain required program elements

and would be submitted to mental health management for review.

## North Kern State Prison (NKSP)
April 17, 2007 – April 19, 2007

NKSP launched its program in February 2007.

Census:

On April 16, 2007, there were 48 EOP inmates at the North Kern State

reception center.

Staffing:

NKSP reported hiring one psychologist and two LPTs for the program.

Transfers were pending for a licensed clinical social worker to work on re-entry planning,

and for a recreational therapist. Positions for custody officers had been allocated but not

filled, pending a meeting with the correctional officers' union.

Initial Screening and Evaluation:

Reportedly, initial evaluations had improved significantly, but they were

non-compliant at the time of the monitor's visit. Data presented showed that the failure

to comply with the institution's 18-day timeframe for screening and evaluations was

attributable to significant staffing changes, vacations, holidays and sick leaves.

Case Manager Contacts:

Review of UHRs and inmate histories of ten of the 48 program inmates

confirmed that weekly case manager contacts were occurring as required. Progress notes

were filed and current in UHRs.

Interdisciplinary Treatment Teams:

   Initial and follow-up IDTT meetings were occurring, although some exceeded the required 14- and 30-day respective timeframes. Four observed meetings were well organized and interactive, with all required staff and inmates present.

Structured Therapeutic Activities:

   EOP inmates housed in the main EOP housing areas D-4 and B-4 had access to groups four days per week. Participation was documented appropriately. The five-day requirement for structured therapeutic activities, including weekly case manager contacts, was met. Staff reported that 95 percent of program inmates in D-4 and 90 percent of program inmates in B-4 participated in groups.

Non-Therapeutic Out-of-Cell Activities:

   Inmates in the program were receiving outdoor recreation time, albeit less than the time received by general population inmates in the institution.

Treatment Space:

   Lack of space significantly impeded access to care. The institution was attempting to address this problem at the time of the monitor's visit. Staff reported that use of the chapel for structured therapeutic activities was authorized by the warden and facilitated by the yard captain.

Re-Entry Planning:

   NKSP had no structured re-entry planning function in its program, but offered post-release information via a psycho-education group. Staff anticipated the commencement of required re-entry planning once the licensed clinical social worker was hired.

Other Areas:

The warden, chief deputy and associate wardens, health care manager, custody captains, correctional counselors II &III, classification and parole representative, and standards and compliance coordinator met weekly to disseminate information on EOP inmates to administrative, custody and support staff, discuss transfer status and delays, and identify inmates requiring expedited transfer.

### Wasco State Prison (WSP)
May 2, 2007 – May 4, 2007

WSP began its program in February 2007. Although the program was generally well structured and developed, in approximately half of cases, access to care was inadequate or late, particularly for EOP inmates arriving from administrative segregation. Treatment planning, medication management and clinical contacts were poor.

Census:

On May 2, 2007, there were 71 EOP inmates in the reception center.

Staffing:

At the time of the monitor's visit, allocated program positions including two psychologists, two licensed clinical social workers, two LPTs, 7.4 correctional officers and .3 Correctional Counselor IIIs were filled. The social workers were being trained to handle clinical case management, re-entry and psychotherapeutic activity responsibilities.

<u>Case Manager Contacts</u>:

Reviews of sample cases found that weekly case manager contacts were occurring, and that case manager and psychiatric notes tracked closely inmate histories in the mental health tracking system and were of adequate quality.

<u>Interdisciplinary Treatment Teams</u>:

Review of a sample of files verified that initial IDTT meetings were occurring timely for those inmates who were placed directly into the EOP reception center program upon their arrival. Among other inmates, a large number were treated for months without treatment plans.

Among those who had treatment plans, most were inadequate in that they were generic and insufficiently individualized. A lesser number were very good, with appropriate selection of group therapies.

The institution was non-compliant with follow-up IDTT meetings at 30-day intervals. Treatment plan updates were not found.

<u>Structured Therapeutic Activities</u>:

Psychotherapeutic groups were offered to all program inmates beginning in February and March 2007. They were conducted by social workers and LPTs under supervision of program psychologists. Staff reported that the required minimum of five-hours per week was offered, but the monitor was unable to verify this because of data-related problems. Participation was rarely documented in the MHTS. Group offerings included anger management, self-esteem, institutional coping and re-entry planning. Recreation therapy was also available.

The program clinical director established a continuum of group modalities that was intended to facilitate appropriate placement of inmates with varying tolerances for group modalities.  Some low-functioning and treatment-resistant inmates were placed in a three-hour group treatment classification, while other comparatively high-functioning and stable inmates were placed in a five-hour group classification.  IDTTs matched and assigned inmates to groups in the following categories:

>Higher Functioning:  inmates who have normal affect, are able to communicate verbally, possess social skills and are capable of intermingling with other inmates.

>Moderate Functioning:  inmates who have some level of psychosis, but are capable of maintaining themselves in a group setting.

>Lower Functioning:  inmates who are severely depressed, have difficulty functioning in a group setting, have poor or no communication or social skills, or are unable to "sit still."

>"Not-ready-for-group":  inmates who verbally reject group participation, or for whom groups are clinically contraindicated or inappropriate.

This classification process is not part of the defendants' plan.  It raises concern that some inmates will receive less than the required amount of structured therapeutic activity, or will be excluded from it altogether, as a by-product of placement into the two lower-functioning categories.

Non-Therapeutic Out-of-Cell Activities:

Although staff reported that inmates in the program were receiving more than ten weekly hours of yard and day room time, the available schedule indicated that they were receiving from eight to ten hours.

Individual Treatment Space:

        Staff reported adequate available treatment space for existing program population levels.

Re-Entry Planning:

        Re-entry planning had not begun other than informally through psycho-educational elements of the program.  Supervisors and social workers were in the early stages of designing an individualized re-entry program that conformed to program requirements.

## California State Prison, Los Angeles County (CSP/LAC)
### May 15, 2007 –May 17, 2007

        CSP/LAC began its program in March 2007.  Supervisory staff reported an inability of the MHTS to track comprehensively all required information.  In addition, there were staffing shortages and turnovers, as well as transition difficulties which arose out of relocating all EOP inmates from C-5 to D-2.  Collectively, these factors affected scheduling adversely and exacerbated space shortages.

Census:

        There were 69 EOP inmates in reception center at LAC on May 11, 2007.

Staffing:

        At the time of the monitor's visit, there were 2.5 case managers plus 1.5 contract case managers, and .25 substance abuse counselors in the program.  There was also access to existing psychiatric services.

Initial Screening and Evaluation:

        The monitor's review of seven of the 69 inmates in the program on May 15, 2007 corroborated the institution's reported 100 percent compliance rate on

screenings. It also corroborated the institution's reported compliance rate of 94 percent

for reception center mental health evaluations (MH7s) during March 2007.

Case Manager Contacts:

        Each inmate was assigned a case manager. Case reviews corroborated

reported rates of 93 to 100 percent compliance with required weekly contacts from March

4, 2007 to May 6, 2007. Case managers maximized use of the counselors' offices or

private rooms in the educational program building, or used semi-private areas screened

off by cubicle partitions in day rooms. Staff reported that cell-front contacts occurred

only when inmates refused to leave their cells or during lockdowns.

Interdisciplinary Treatment Teams:

        The program required an initial and at least quarterly follow-up IDTT

meetings for each program inmate. The institution reported compliance at a rate ranging

from 76 percent to 100 percent between March 18, 2007 and April 29, 2007, and at 98

percent at the time of the monitor's visit. Institutional data showed that 20 of the 69

program inmates received initial IDTT meetings within 14 days of placement in the

program. At the time of the monitor's visit, seven inmates had been in the program for

less than 14 days. For another 42 inmates, initial IDTT meetings either missed the 14-

day timeframe or had not yet occurred. Staff reported an expectation of completed initial

IDTT meetings and maintenance of timely follow-up meetings within one to two months.

        The monitor's observations of IDTT meetings found significant

deficiencies including unavailability of UHRs and C-Files for IDTTs, lack of staff

familiarity with inmates, problematic use of day room space which compromised

visibility and confidentiality, and a need for training psychiatry staff and correctional counselors.

The acting chief psychologist and the program senior psychologist agreed to implement follow-up initial IDTT meetings for all inmates whose UHRs and/or C-Files were not available at the initial meeting, within 30 days after the initial meeting or when the records become available, whichever came first. Thereafter, subsequent meetings would be scheduled as required. Supervisory staff also agreed that custody issues raised in IDTT meetings would be documented in order to prompt follow up on such issues in subsequent meetings. Supervisory staff reported that use of appropriate space in the Mental Health building, rather than in the custody area of the dayroom, had been approved and was to begin the week after the monitor's visit. Staff also reported that training for psychiatry was to be undertaken, and that the chief deputy warden would address the correctional counselors' training.

Structured Therapeutic Activities:

Monday through Friday, one hour of psychotherapeutic group therapy was offered to each inmate. Group offerings included anger management, coping skills and mechanisms, drug and alcohol abuse counseling, parole planning, therapeutic community, life style choices, stress management, and cognitive/behavioral techniques. Settings in four rooms in the educational program building were confidential. The institution reported compliance rates at or above 90 percent since the inception of the program, although data presented indicated inconsistency in meeting the weekly five-hour minimum. Apart from a lockdown period during the week of March 26, 2007 to April 1, 2007, a move from C-5 to D-2, and a block move on April 23, 2007, groups were

offered from 4.81 to 5.85 hours weekly.  Reviews of seven of the 69 inmates in the program on May 17, 2007 confirmed the institution's report in this regard.

Non-Therapeutic Out-of-Cell Activities:

Inmates were offered access to yard for 2.5 hours, seven days per week.

Re-Entry Planning:

Individualized re-entry planning consistent with program standards had not been implemented at the time of the monitor's visit.  Staff reported that parole lists had been unavailable to mental health because of deficiencies in the management information system.  Inmates were offered information about parole planning and available resources through a parole planning therapeutic group.  Reportedly, the institution also tried to include re-entry planning in IDTT meetings, particularly for inmates who were set to release within 60 to 120 days.

### Richard J. Donovan Correctional Facility (RJD)
May 30, 2007 - June 1, 2007

RJD launched its program in part in February 2007, and added psychotherapeutic offerings in April 2007.

Census:

On May 31, 2007, there were 78 EOP inmates in the reception center.

Staffing:

RJD assigned four full time-equivalent case managers and one full time-equivalent LPT to the program.  In April 2007, the institution assigned four correctional officers from the training academy and covered two positions with staff overtime hours. At the time of the monitor's visit, the remaining allocated .7 correctional officer and .3 correctional counselors II (specialist) positions were not covered.

<u>Initial Screening and Evaluation</u>:

A sampling of institutional data for ten program inmates found that initial mental health screenings and evaluations were completed within three days of each other. Institutional compliance with timeliness of screenings and evaluations could not be determined because the institution did not provide inmate arrival dates, and because documentation of bus screenings in UHRs was poor.

<u>Case Manager Contacts</u>:

The required minimum compliance rate for weekly case manager contacts was 90 percent. The institution reported that a three-month audit using the MHTS for all EOP inmates in reception center found compliance rates of 90.1 percent for weekly case manager contacts in January 2007, 92.4 percent for February 2007 and 83.3 percent for March 2007, or an average compliance rate of 88.6 percent, making RJD non-compliant at the time of the monitor's visit.

The monitor's case reviews found a two-month UHR filing backlog for some case managers' progress notes, and significant incongruities between inmate histories and UHRs. According to staff, the institution had not completed any recent full studies on congruence between UHRs and the MHTS.

<u>Interdisciplinary Treatment Teams</u>:

The institution reported that it was not yet compliant with IDTT requirements. Supervisory staff reported plans to begin providing IDTT services following the monitor's visit, but they were vague as to IDTT requirements and timelines, and required guidance from central office in this respect.

Structured Therapeutic Activities:

The institution reported that regularly scheduled groups became available on February 5, 2007, but it was not meeting program requirements for structured therapeutic activities at the time of the monitor's visit. The program was designed to offer 25 groups to up to 90 inmates per week when fully staffed, but the institution reported that it was scheduling only 20 groups per week from January to March 2007 due to clinical staff unavailability. Group notes were not consistently documented in UHRs.

The institution reported start-up difficulties with custody that resulted in cancellations of many groups, particularly on Yard 2 where allocated security and escort positions were not filled by permanent officers and could not always be covered by overtime custody staff. Permanent security and escort officers were assigned on Yard 4 on March 12, 2007.

At the time of the monitor's visit, group offerings under development consisted of the following tracks: Monday - focus/goal setting; Tuesday - coping skills, stress management, anger management, and social skills; Wednesday - criminal thinking; Thursday - re-entry; and Friday - weekly review. Staff explained that the focus/goal setting group was geared toward helping inmates identify areas on which they wanted to concentrate during the coming week. The review group was designed to help inmates identify what they had learned during the week. The criminal thinking group focused on pro-social values including responsibility for one's actions. The re-entry group focused on life skills including dealing with interpersonal problems.

Non-Therapeutic Out-of-Cell Activities:

Although staff reported compliance with inmate access to outdoor recreation, inmates reported not receiving outdoor recreation times as scheduled. The monitor was unable to verify the schedule for inmates' access to yards and dayrooms.

Re-Entry Planning:

At the time of the site visit, RJD had not yet implemented individualized re-entry planning for those inmates with imminent release dates. It was not clear whether mental health had access to verified release dates in order to implement re-entry planning, but supervisory staff indicated that they would work with other appropriate staff to generate 30-, 60-, 90- and 120-day notifications as part of their re-entry planning process.

RJD reported that some re-entry services were being offered but not as extensively as mandated, due to unavailability of clinical staff. Pre-release discussions with inmates were conducted in case manager contacts and weekly group sessions, but contacts with outside agencies and processing of applications for government assistance programs had not been initiated. As a supplement to re-entry planning, the EOP reception center supervisor developed an extensive psycho-educational and skill development manual for inmates on re-entry issues and information.

## FINDINGS AND CONCLUSIONS

None of the EOP reception center programs at the seven reviewed institutions had become operational by January 1, 2007 as ordered by the Court, but all had been initiated by the time of the monitor's review. None of the programs was meeting all required standards, primarily because of late starts and lack of staffing and treatment space.

That notwithstanding, significant numbers of EOP inmates in these reception centers were receiving overall better mental health care than had been available to them before promulgation of the defendants' plan. Case reviews found that this generally better care was the result of the program, even though inadequate and poorly documented EOP reception center care continued for significant numbers of inmates. Defendants are to be commended for their initiation of the institutional programs for all EOP inmates in the seven institutions' reception centers, and not only for those whose stays there exceeded 60 days.

Census:

Apart from EOP inmates in administrative segregation, mental health crisis beds, or alternative housing pending admission to mental health crisis beds, on May 25, 2007, there were 463 EOP inmates in the seven reception centers surveyed in this report, representing over ten percent of all EOP inmates in CDCR institutions.

Staffing:

CIM was unable to hire any allocated staff for the program, but assigned limited staff from other programs to initiate program services. With assigned staff, DVI exceeded staffing allocations. SQ and WSP hired their allocated program staff, while NKSP covered staffing requirements by "seconding" staff from other program areas, which adversely affected those areas. CSP/LAC assigned case managers but not other required staff to the program, while RJD assigned a complement of clinical and correctional staff to its program.

In its present configuration, the defendants' plan leaves the allocation of program staffing largely to the discretion of the institutions. Defendants should examine

program staffing needs in order to derive appropriate staffing levels and/or ratios for their plan. Staffing allocations should be shaped with a view toward assembling IDTTs which can accomplish timely individualized treatment plans for all program inmates, and can address re-entry concerns for those facing imminent release dates.

Case Manager Contacts:

Weekly case manager contacts were occurring at CIM, DVI, SQ, NKSP, WSP and CSP/LAC but not at RJD. The defendants' plan refers to the "normal" identification of inmates' level of care within 18 days after arrival at the institution, but it does not require level-of-care identification within any specific timeframe for program inmates. Early identification of program inmates is important. It triggers the assignment of the inmate to a case manager and the occurrence of weekly clinical contacts, an integral feature of the therapeutic process for EOP inmates. The defendants' plan should be revised to include a timeframe for prompt identification of inmate EOP level of care after arrival at the institution.

Interdisciplinary Treatment Teams:

None of the reviewed institutions provided IDTT treatment plans consistently. Although reviewed treatment plans at CIM were adequate, there was no indication that prescribed activities actually occurred. DVI was utilizing interactive patient-focused initial IDTT meetings to develop treatment plans. SQ implemented initial program IDTT during the monitor's visit. NKSP and WSP were holding initial IDTT meetings in their programs, but both CSP/LAC and RJD were not.

Throughout these institutions, many staff members were inadequately trained to implement the IDTT process for appropriate treatment planning. Staff needed

clearer role objectives and supervision to ensure that goals were met. This was particularly true when initial IDTTs were comprised of staff who did not treat the subject inmate and consequently might not comprehend the significance of their input to the formulation of his treatment plan.

The defendants' plan presently contains no timeframes or standards for the use of interdisciplinary treatment teams in the program. Consequently, institutions have come up with their own *ad hoc* IDTT practices that have resulted in inconsistencies among, as well as within, institutions. Without clear directives for the timing and objectives of initial and follow-up IDTT meetings, institutions developed varying practices on the timing of initial and follow-up IDTT meetings. Some required initial IDTT meetings within 14 days of inmate placement in the program while others set a 30-day timeframe. For follow-up meetings, some institutions used a 30-day timeframe and others set the deadline at 90 days. The defendants' plan should be revised to include uniform appropriate standards and timeframes for the IDTT process.

A significant gap in the IDTT process was the lack of any procedure to identify inmates who have imminent release dates, that is, within 60 to 120 days. Timely identification of such inmates is essential to accomplishing the required re-entry planning for these inmates, unlike program inmates who are facing longer sentences and for whom re-entry planning would be, at best, premature. A process for early identification of these inmates should be built into the defendants' plan as part of uniform IDTT process standards.

In addition, because a number of program inmates have relatively brief stays before their release dates, program re-entry planning should be incorporated into the

program IDTT process for these inmates. Only DVI addressed re-entry planning within the IDTT format and attempted to formulate a treatment plan that covered re-entry issues, albeit in a very cursory fashion. Institutions should implement initial and follow-up IDTT meetings with individualized treatment plans that document imminent release dates and schedule re-entry planning within the structure of the EOP reception center program.

Structured Therapeutic Activity:

DVI, NKSP, SQ and CSP/LAC were meeting minimum required structured therapeutic activity hours, while CIM and RJD were not. The monitor was unable to confirm whether WSP was meeting the minimum requirements because of the institution's failure to provide relevant and useful data. Several institutions failed to provide adequate documentation of group therapy activity in UHRs.

Non-Therapeutic Out-of-Cell Activities:

All seven reviewed institutions were offering program inmates non-therapeutic out-of-cell activities, including outdoor recreation and dayroom time, several days per week. The amount of time varied among institutions. Access was subject to safety and security issues such as modified programming and institutional or facility lockdowns.

Re-Entry Planning:

The reviewed institutions were not meeting the minimal re-entry planning requirements of the plan. None was developing individualized and specific re-entry planning for inmates with imminent release dates, as are already required by defendants' plan.

The defendants plan should be revised to require treatment plans for inmates with imminent release dates to address their individualized re-entry needs, and should include the best estimate of the inmate's earliest possible release date.  The defendants' plan should also require training on re-entry planning for staff who serve on IDTTs.  This training should cover, but not be limited to, preparation of inmate applications for federal and state benefits, initiation of conservatorships, liaison with parole outpatient program staff, and screening for in-patient placements.  The process for securing federal and state benefit entitlements and community-based continuity of care should be more clearly defined in the defendants' plan, and related training should cover the handling of all necessary entitlement program authorizations, including but not limited to those for the Social Security Administration and Veterans agencies.

Because the defendants' plan does not provide a method for identification of program inmates who have imminent release dates, such a procedure should be added to the plan.  Preferably, it should be incorporated into the standards and timeframes for the IDTT process, as described above.  Such identification is important because these inmates often are in need of re-entry planning within a short timeframe before their release, unlike their counterparts who face longer sentences and for whom such planning may be premature.

## RECOMMENDATIONS

Generally, the monitor observed that inmates whose care was found adequate had been identified as needing EOP level of care early on.  They received better medication continuity, fewer housing changes, timely and appropriate treatment planning and appropriate clinical services which were ordered and scheduled in their treatment

plans. Conversely, for those inmates whose care was found inadequate, there often had been ambiguous, inadequate, untimely, shifting or inconsistent designations of care levels. Generally, such inmates were found to be clinically unstable and symptomatic early in their stays, and they often incurred multiple MHCB or OHU admissions and five-day follow-up situations.

Initial indications of program performance were encouraging among the group of inmates who received good EOP level of care. These inmates were integrated into the program efficiently and rapidly, and were offered better treatment planning. In several cases, the new mental health treatment plans (Form 7388) were in evidence and were used by the IDTT for initial treatment plans and updates.

None of the seven institutions managed to implement the defendants' EOP reception center plan by the January 1, 2007 deadline. Most began in the February/March 2007 period, meaning that at the time of the monitor's visits in April and May 2007, these programs were still in their earliest stages, occupied with putting together the basics of staffing and space resources. Even so, the institutional programs that were reviewed often managed to provide surprisingly good care for a significant number of EOP inmates despite the newness of these programs and the institution-wide deficiencies in local mental health service delivery systems.

The capacity of the seven institutions to develop consistently effective EOP reception center treatment programs would benefit from greater clarity and specificity in certain elements of the defendants' plan. In view of the foregoing, the special master recommends that within 60 days, the defendants revise and submit for the

special master's review their plan for EOP treatment in reception centers to include the

following features:

- Allocation of necessary staffing and space for each of the seven EOP reception center programs.

- Required initial screening of arriving inmates who have recent histories of EOP designation, to occur within 72 hours of arrival, and initial mental health evaluations to occur within seven days of arrival.

- Specification of timeframes and schedules for initial and follow-up IDTT meetings for every EOP reception center inmate, to continue until the inmate is transferred to a general population enhanced outpatient program.

- Required identification as early as possible of all reception center EOP inmates who have, or might have, imminent release dates, that is, within 60 to 120 days, preferably to be accomplished within the IDTT process. Such inmates should be provided with treatment plans that address their individualized re-entry needs and include the best estimate of the inmates' earliest possible release dates.

- Training of all members of program IDTTs on re-entry planning for inmates who have imminent release dates. The training should cover, but not be limited to, preparation of inmate applications for federal and state benefits, initiation of conservatorships, liaison with parole outpatient program staff, and screening for in-patient placements. The process for securing federal and state benefit entitlements and community-based continuity of care should be clearly defined, and training provided should cover preparation of all necessary entitlement program authorizations, including but not limited to those for the Social Security Administration and Veterans agencies.

Despite the progress that has been made in implementing the institutional

EOP reception center programs in the covered institutions, expansion of the program

system-wide at this time would be premature. The defendants' plan requires greater

refinement, as recommended. The special master will monitor the ongoing efforts at the

seven institutions during the upcoming Twentieth Monitoring Period, and will report on

them in his compliance report.   At that time, system-wide implementation of the program
may be more ripe for consideration.


/s/
_____
J. Michael Keating, Jr.
Special Master


/s/
_____
Matthew A. Lopes, Jr.
Deputy Special Master


June 30, 2007