# EXHIBIT B

# PAGES 1-50

# Introduction

Research shows that effective correctional programs reduce recidivism by changing offender behavior. When correctional agencies provide rehabilitation programs to the appropriate participants in a manner consistent with evidence-based programming design, offenders change. Examples of the several kinds of rehabilitation programs that reduce recidivism[a] include:

- In-prison "therapeutic communities" for drug-involved offenders.[b]
- Vocational education for prisoners and parolees.[c]
- Cognitive behavioral treatment in prison and in the community.[d]
- Intensive community supervision programs that emphasize the delivery of rehabilitation treatment services, not just surveillance.[e]

Based on the reduced recidivism that offenders experience with these programs, other states, including Kansas, Michigan, Ohio, Oregon, Pennsylvania, and Washington, offer a full menu of rehabilitation programs and services to their offender populations.[f]

But California does not. Although the state spends hundreds of millions of dollars on adult offender programming, it does not offer its offenders a **full menu** of rehabilitative programs targeted toward reducing their recidivism. Perhaps this is why California's adult offender recidivism rate is one of the highest in the nation (Fisher, 2005).

We believe that there are several factors that contribute to the state's rehabilitation programming problems. Some of these factors have to do with the nature of the programs themselves, while others have to do with aspects external to the programming environment.

---

a        Aos, Miller, & Drake (2006); Petersilia (2005); MacKenzie (2006); and Friedman, Taxman, & Henderson (2007)
b        Inciardi, Martin, & Butzin (2004); Harrison & Martin (2001); Taxman & Bouffard (2000); Martin, Butzin, Saum, & Inciardi, (1999); Simpson, Wexler, & Inciardi (1999a), (1999b); Inciardi, Martin, Butzin, Hooper, & Harrison (1997)
c        Gerber & Fritsch (1994)
d        Andrews, Zinger, Hoge, Bonta, Gendreau, & Cullen (1990); Andrews & Bonta (1998); Lipsey & Wilson (1993); Landenberger & Lipsey (2005); National Institute on Drug Abuse (NIDA) (2006); NIDA (1999); Simpson, Joe, & Broome (2002)
e        Petersilia & Turner (1993a); (1993b); Taxman (2002); Marlowe (2003); Thanner & Taxman (2003)
f        Werholtz (2007); Schrantz (2007)

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

## A Summary of Our Findings

- **The state of overcrowding in CDCR prison facilities makes it difficult for offenders to access rehabilitation programs.** Because it does not have enough room to house its offenders, the CDCR uses previously intended program space as living space for prisoners. Additionally, frequent lockdowns cause program cancellations.
- **The CDCR treats offenders who successfully complete rehabilitation programs and positively manage their behaviors in the same manner as those who do not.** The CDCR does not have sufficient positive reinforcements for offenders who successfully complete rehabilitation programming and who comply with prison rules and parole conditions.
- **The CDCR does not assign offenders to programs based on risk-needs assessments.** In most cases, the CDCR assigns offenders to rehabilitation programs on a first-come, first-served basis. The CDCR is currently piloting a risk-needs assessment tool with its prison population. The CDCR does use a risk-needs assessment tool with its parole population, and is currently in the process of validating the instrument.
- **The CDCR does not have automated behavior management (case) plans for each of its offenders.** Because it does not use risk-needs assessments to assign offenders to programs, the CDCR also has not developed an integrated behavior management plan for each of its offenders. Additionally, because the CDCR lacks an adequate technology infrastructure, even if it were to create case plans for each of its offenders, it would not be able to share the information between institutions and divisions in an automated fashion.
- **The CDCR does not offer a sufficient quantity of evidence-based rehabilitation programs designed to reduce recidivism to its adult offenders.** The CDCR does not offer a core set of rehabilitation programs to its adult offenders. The CDCR does offer a large amount of programs and activities to its adult offenders, but not enough of these are evidence-based rehabilitation programs.
- **The CDCR does not measure the quality or effectiveness of its adult offender programs.** The CDCR does not ALWAYS measure program outcomes. Additionally because it does not assess risks and needs FOR ALL INCOMING PRISONERS OR EXITING PAROLEES, it cannot measure program effectiveness in reducing recidivism.
- **The CDCR has begun to focus on offender reentry issues and initiatives, but it needs to expand those efforts.** The CDCR has recently created a $54 million dollar focus on reentry initiatives. The CDCR needs to expand this focus to include fortifying informal community support structures and increasing the role that family members and other support structure members play in offender programming.
- **The CDCR does not have a graduated parole sanctions policy to provide community-based alternatives to incarceration for parolees who violate their parole conditions.** California laws constrain the CDCR to incarcerate parole violators who may be better served by community-based sanctions. CDCR parole agents do not have structured guidance as to how to deal with parole violators.

INTRODUCTION

## California's Historical Perspective

The complexity of California's correctional problems mean that solving them will not be as easy as it may seem. Others have tried in California and met with mixed results. Since 1990, more than a dozen commissions and other groups have proposed solutions to the problems in California's adult correctional system.[g] Yet the problems persist. To understand why, it is helpful to examine certain aspects of California's recent correctional history. Figure 1 shows the record of California's recidivism rates from 1977 through 2004. In this figure, one can see that California's recidivism rates have risen steadily since the late 70s.

*Figure 1: California Department of Corrections Historical Recidivism Rates, 1977-2004[h]*



What does this mean? What has caused this dramatic increase in California's recidivism rate? To answer those questions, we first need to define what we mean by the term "recidivism rate." Recidivism rates are typically measured by tracking the activities of a group ("cohort") of prisoners who were released in a given period for several years after their releases. Traditionally, recidivism rates are based on three-year tracking periods. During these tracking periods if an offender is returned to correctional custody for any reason, he or she is considered to have recidivated. Returning to correctional custody includes (a) being arrested for a new crime and being sentenced to jail, (b) being sent back to state prison for violating a parole or probation condition, and (c) being arrested for a new crime and being sentenced to a new term in state prison. The recidivism rates in Figure 1 include all three of these circumstances. For our purposes, we do not consider (b) to be an accurate measure of recidivism, unless the offender committed a new crime, which resulted in a parole or probation violation. We believe that true recidivism is defined as (a) and (c)—

---

g       See Appendix A.
h       The recidivism rate shown in this chart is based on "first releases to parole." This means that the cohort consists of prisoners who were experiencing their first release to parole and does not include parole violators who were being re-released. Excluding parole violators decreases the overall return-to-prison rate.

3

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

ex-offenders being returned to local jail or state prison because they have been convicted of committing new crimes. As we will discuss later in the report, we believe that offenders who violate parole or probation conditions should be considered or treated differently than those who commit new crimes.

Having defined recidivism both in terms of how it has been measured in Figure 1, and how we believe it should be measured, **we believe that the greatest contributor to California's high adult offender recidivism rate has been California's shifting public sentiment**. California's voting public and lawmakers have been chiefly responsible for creating the correctional crisis that California is now experiencing.

This is not to excuse the offenders. These men and women have been found guilty of violating the laws of the state. They have been convicted of offenses ranging from burglary to drug possession to homicide. They have destroyed the lives of many of their victims, their victims' families, their own families, and, of course, themselves. They are responsible for their actions and the consequences of those actions. While offenders must be held accountable for their actions, they are not responsible for determining the consequences of those actions. The state correctional system is. And the state correctional system is a political construct, meaning that ultimately California's citizens determine the consequences of crime in the state. They also determine, through the political process, what resources the state will spend in dealing with the consequences of crime.

In the late 1970s, California began to "get tough on crime," which led to the passage of its current Determinate Sentencing Act (DSL) in 1976. This law eliminated much of the discretion in sentencing and has led to more offenders being locked up for longer periods of time. Continuing in the get tough on crime theme, in 1994, Californians approved the "Three Strikes and You're Out" ballot initiative (Proposition 184), which changed the law so that offenders convicted of three felonies would effactually be sentenced to life imprisonment, resulting in more offenders being locked up for longer periods of time. In fact, between the passage of the DSL in 1976 and 2007, California has passed 80 additional laws resulting in "tougher" sentences (Little Hoover Commission, 2007). These laws have led to more offenders being locked up for longer periods of time.

---

### California's Determinate Sentencing Act (DSL)

Perhaps one of the most significant long-term causes of California's explosive growth in its prison population was the passage of California's Determinate Sentencing Act (DSL) in 1976, whereby offenders sentenced to state prison would receive a set term from the judge and would not be subject to release by a parole board. As a result of this change, prisoners were no longer provided with incentives to manage their behaviors and complete their rehabilitation programs to earn earlier releases. Instead they were required to serve their entire sentences, minus any time they received as credit for participation in work incentive programs. This change in law was intended to address the ineffective prison rehabilitation programs and claims of disparate treatment lodged by some of California's prisoners. But after several decades of experience under this law, the evidence shows that the DSL has not achieved its desired effect, as sentencing patterns show great variation by county and even courtroom (Little Hoover Commission, 2007). What the DSL has been associated with, however, is a positive increase in California's recidivism rate. No longer able to earn early releases from a parole board for good behavior, offenders stopped managing their behavior positively, which led to increased incidences of violence in prisons, which led to an increased number of lockdowns, which led to less access to rehabilitation programming for California's prisoners. Additionally, as offenders were no longer eligible to earn early release credits for participation in rehabilitation programs, they stopped attending them. As offenders stopped attending programs and California's budget priorities changed, California's elected officials began cutting funding for rehabilitations in prisons.

---

California's correctional agency responded to the public's get tough on crime sentiment (and their lawmaker's directions) by building more and larger prisons to "warehouse" the ever increasing numbers of offenders being sentenced under California's tougher crime laws. As Figure 2 shows, the CDCR is currently responsible for providing services to 319,492 adult offenders in its prison and parole systems—172,385 (54%) are located in the CDCR prisons, 123,781 (39%) are on parole supervision, and 23,326 (7%) are in other populations, including non-CDCR facilities or programs (e.g., Federal prison or jail).

*Figure 2: California's Adult Offender Population*

## CDCR Adult Offender Distribution

[Bar chart showing: Prison 172,385; Parole 123,781; Other 23,326]

Source: CDCR (Weekly Population Report, April 23, 2007)

5

Californians got tough on crime and more and more offenders went to prison. During this time period, the public spent more on incarcerating offenders and less on rehabilitating them. As Figure 3, shows, the percentage of money spent on rehabilitation programming ("Employment/Training") for prisoners is 5%, compared to the 45% that is spent on "Security."

*Figure 3: California Annual Costs to Incarcerate a Prisoner*



Source: California Legislative Analyst's Office, January 31, 2007

## Putting the "R" into CDC-R

Research shows that public sentiment is now moving in a different direction. The voting public is clearly in favor of a move away from the "punishment only" model that dominated California sentencing and corrections polices for more than a generation. For example, a poll commissioned by the National Council on Crime and Delinquency (NCCD) and conducted by the Field Research Corporation found that most Californians (63%) favored using state funds to rehabilitate non-violent offenders both during their incarceration periods and after they were released (Krisberg, Craine, and Marchionna, 2004). By contrast, only 8% of those surveyed preferred a system based solely on punishing offenders. A clear majority (59%) felt that the experience of prisons increased recidivism and 67% believed that the lack of appropriate life skills is the major factor in the continued criminal behavior of parolees. A more recent national poll by NCCD and Zogby International found results similar to those from the California survey (Krisberg and Marchionna, 2006). A national sample of likely voters felt that it is very important to provide prisoner reentry programs that emphasized job training (81%), drug treatment (79%), mental health services (70%), and access to affordable housing (59%).

In both polls, the public expressed interest in *expanding* rehabilitation programming for offenders. Citizens now believe that rehabilitation programs for offenders can make communities safer and will cost less in the long term.

In response to the change in public sentiment and shifting legislative priorities, in 2005, California changed the name of its correctional agency from the California Department of Corrections (CDC) to the California Department of Corrections and Rehabilitation (CDCR). Along with the new name came a new mission statement: *"To improve public safety through evidence-based crime prevention and recidivism reduction strategies."*

At long last, it appeared that California was back in the business of providing rehabilitation programming to its adult offenders. But, as Table 1 shows, nearly 50% of all California prisoners, who were released in 2006, were not assigned to **any** rehabilitation program, which might improve their behaviors, or **any** job assignments, which might improve their life skills, during their most recent prison sentences.

*Table 1: Number of Program and-or Job Assignments for 2006 Releases*

| # of Assignments | % of Offenders |
|---|---|
| 0 | 49.3 |
| 1 | 21.5 |
| 2 | 16.3 |
| 3 | 8.2 |
| 4 | 3.5 |
| 5+ | 1.1 |
| *Source: CDCR* | |

Table 1 illustrates that despite the change in public sentiment and despite the new mission of the CDCR; almost half of adult prisoners in the California state prison system were completely *idle* during their latest prison incarcerations.

## The Panel and Its Report

In response to the public's desire for offenders to be rehabilitated, the Governor, the Legislature, and the Judiciary have called for improvements in the quantity and quality of rehabilitation programs available to California's adult offenders. This will require doing things differently in *all* areas where adult offenders are concerned—the CDCR, the Legislature, the Judiciary, Law Enforcement, and the Community. It will also require a correctional climate change—from primarily custodial only to a more balanced perspective that incorporates "rehabilitation" into its mission.

In November 2004, the CDCR developed a two-phase strategic plan to reform the agency. Phase 1, which was completed in July 2005, consisted of a major restructuring of the entire agency, including the integration of the former California Youth Authority into the CDCR. Phase 2, which is currently in process, includes providing greater staff training, continuing to seek out community partnerships, and using evidence-based measures and national standards to evaluate the relative strengths or weakness of specific programs.

The CDCR created the Expert Panel on Adult Offender Reentry and Recidivism Reduction (the Panel) to assist with the phase 2 initiatives, specifically to:

1. Review the current programs being offered by the CDCR to its adult offenders and comment on their effectiveness for reducing recidivism, and
2. Make recommendations as to how the CDCR could improve its program offerings, *as well as the organizational culture and environment of the system in which they operate*, to better reduce California's adult offender recidivism rate.

The Panel was established by the CDCR under the legislative authorization found in the Budget Act of 2006-2007, and is composed of nationally recognized experts in the field of corrections and includes experienced correctional agency administrators and leading academic researchers.

The Panel created two sub-committees: the *Program Review Sub-Committee*—to review the current program offerings, and the *Model Program Sub-Committee*—to provide

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

recommendations on improving the current program offerings and the system in which these programs would operate. Our *Report to the California State Legislature: A Roadmap for Effective Offender Programming in California,* is made up of two parts:

- **Part I: The Roadmap**, begins with a discussion of the barriers that must be dealt with, e.g., overcrowding and the prevalent "custodial" culture. It then provides several recommendations for improving the quality and quantity of the programs being offered to California state prisoners and parolees, as well as the measures that need to be taken to improve the system in which these programs operate.
- **Part II: The Program Reviews**, provides our high-level review of 11 of the 34 programs that the CDCR believes are designed to rehabilitate offenders and reduce recidivism. This section begins with a baseline inventory of all adult offender programs that the CDCR is currently operating and concludes with a review of 11 specific CDCR-nominated recidivism reduction (or rehabilitation) programs.

In the Roadmap, we present recommendations based on research that represents a broad range of disciplines including rehabilitation, education, corrections, and organizational development. We also include proposals that within the profession are regarded as best practices and are being used by corrections agencies in other states that have faced situations and challenges similar to California's.

In the Program Reviews, we used the California Program Assessment Process (CPAP)[i] to rate the 11 programs against scales that measured whether or not they possessed the elements that would indicate the *likelihood* of their being able to reduce recidivism.

We believe this report reflects the best of current correctional thinking and practice.

---

i         In 2005, Dr. Ryken Grattet, Professor of Sociology at the University of California, Davis, who served during 2005-06, as acting Assistant Secretary, Office of Research, CDCR, Jesse Jannetta, M.P.P., and Dr. Jeff Lin, researchers from the University of California, Irvine's Center for Evidence-Based Corrections developed the CPAP.

# Part I—The Roadmap

*In this section of the report, we provide detailed explanations of our findings and recommend solutions to the problems that we have identified. We begin with the factors external to the programming environment that are contributing to California's programming problems and conclude with the internal factors.*

## Factors External to the Programming Environment

> *Finding—The state of overcrowding in CDCR prison facilities makes it difficult for offenders to access rehabilitation programs.*

The first aspect of programming that we examined was the physical context. Physical context includes such issues as program space (e.g., treatment beds, classroom seats, etc.) and institutional safety (of program providers, CDCR staff, and offender participants). CDCR facilities were built to hold 100,000 prisoners; however, at the time of this report, the CDCR was currently housing 172,385 prisoners in its prison institutions—California prisons are operating at 172% capacity.

According to the CDCR, 18,000 prisoners are being housed in spaces designed for programs (Hysen, 2007). This is consistent with what we observed when we visited California's prisons and what we were told by the administrators and staff members working at these facilities.

Not only does overcrowding have a negative impact on programming but, according to documents provided to the court by CDCR Chief Deputy Secretary Scott Kernan (2007), "housing inmates in non-traditional quarters presents serious safety concerns for both inmates and correctional staff. The overcrowding of CDCR facilities has led to increased numbers [of] infectious disease outbreaks and riots and disturbances system-wide."

These incidences of violence and other negative consequences of overcrowding degrade the CDCR's ability to consistently operate rehabilitation programs in the prison environment. While lockdowns and controlled movements allow the CDCR to increase the safety of its correctional officers and prisoners, when wardens enact these security measures, they cancel all programming in the affected prison areas. Table 2 provides a summary of the CDCR's adult prison lockdowns in 2006-2007. We provide a detailed list of prison safety improvement recommendations in Appendix F.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*Table 2: CDCR Adult Institution Lockdown Summary, 2006-2007*

| Mission-Based, Facility Type* | Number of Lockdowns-Controlled Movements | Average Days in Lockdown | Events over 60 Days |
|---|---|---|---|
| Calendar Year 2006 | | | |
| **General Population Levels II & III** | 169 | 12 | 6 |
| **General Population Levels III & IV** | 114 | 18 | 5 |
| **High Security & Transition Housing** | 134 | 7 | 17 |
| **Female Institutions** | 32 | 3 | 0 |
| | | | |
| Calendar Year 2007 (January 2007 - April 2007) | | | |
| **General Population Levels II & III** | 98 | 9 | under review |
| **General Population Levels III & IV** | 40 | 6 | under review |
| **High Security & Transition Housing** | 69 | 11 | under review |
| **Female Institutions** | 16 | 3 | under review |
| | | | |
| Source: CDCR | | | |
| *Does not include Prison Reception Centers | | | |

On the parole side, a legacy of budget and policy decisions has created a situation where parole agents have unmanageable case loads of parolees to supervise and community-based program providers have more offenders needing treatment than they can treat. As Petersilia (2005) has shown, fully two-thirds of more than 120,000 California parolees only see their parole agents once every six weeks. This infrequent visitation schedule causes us to wonder how effective this system is at reducing recidivism.

> **Recommendation 1—Reduce overcrowding in its prison facilities and parole offices.**

We recommend that the CDCR reduce overcrowding in its prison facilities to make it easier for offenders to access rehabilitation programming. This will also create a safer environment for correctional officers, program providers, and prisoners. On the parole side, California needs to either reduce the numbers of parolees to which it provides services or increase the funding to the CDCR Parole Division and community-based program and service providers.

We do not believe the only answer to reducing overcrowding is to build more prisons. Experience from other states demonstrates that at some point those responsible for authorizing and funding adult institutions come to the conclusion that they can no longer afford to keep building more prisons. The expenditures become too costly and can force states to the margins of bankruptcy. With California already spending more than $10 billion

10

a year on its correctional system, we believe that it is only a matter of time before this state is forced to consider alternatives besides prison building to solve its overcrowding problem. Solving the overcrowding problem is not the mission of this Panel. To that end, we direct the reader to Appendix A for specific recommendations provided by other groups as to how California may potentially reduce its correctional system overcrowding. Nonetheless, some of the evidence-based programming recommendations that we make will potentially reduce the numbers of prisoners in California prisons. We provide a detailed discussion in Appendix E.

> *Finding—The CDCR treats offenders who successfully complete rehabilitation programs and positively manage their behaviors in the same manner as those who do not.*

One of the best ways to shape behavior is to provide positive rewards for people when they engage in positive activities. In the correctional context this means that if California wants its offenders to participate in rehabilitation programming, it must motivate them to complete rehabilitation programs and positively manage their behaviors.

We believe that the CDCR's current culture is focused primarily on control and punishment and secondarily on rehabilitation. While control and punishment are understandably very important in a correctional setting, correctional agencies need to balance the different aspects of their missions. They need to focus an appropriate amount of attention on the security and order of the prison, as well as rehabilitation.

In the case of the CDCR, we spoke to several wardens who were interested in providing more rehabilitation programs to their prisoners. However, because of California's tough on crime laws, including its Determinate Sentencing Act (DSL), California's adult offenders are minimally motivated to participate in and complete rehabilitation programs. In fact, some legislative features actually *discourage* prisoners from program participation. For example, California does not pay its prisoners who are enrolled in rehabilitation programs (e.g., substance abuse, education), but it does pay its prisoners who have work assignments. Prison hourly pay ranges from $0.08 (prison laborer) to $0.95 (Prison Industries lead worker). Several other states (e.g., Pennsylvania and Ohio) pay prisoners for participating in *either* rehabilitation programs *or* work assignments.

> **Recommendation 2—Enact legislation to expand its system of positive reinforcements for offenders who successfully complete their rehabilitation program requirements, comply with institutional rules in prison, and fulfill their parole obligations in the community.**

On May 2, 2007, California enacted AB 900, the Public Safety and Offender Rehabilitation Services Act of 2007. This legislation requires the CDCR to "determine and implement a system of incentives to increase inmate participation in, and completion of, academic and vocational education [programming]." We believe that with this legislation, California is moving in the right direction toward improving its state of correctional rehabilitation. Aditionally, California enacted Senate Bill 1453 in 2006. This legislation allows the CDCR to discharge offenders after they successfully complete in-prison drug treatment followed by 150 days of residential drug treatment in the community. We recommend that California enact the necessary legislation to *expand* its correctional incentive system to include *all* of the rehabilitation programs that the CDCR offers to its offenders in prison and on parole.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

In accordance with the directives of AB 900, we recommend that the CDCR implement those positive reinforcements that do not require additional legislation. For example, the CDCR could: expand visitation privileges, locate prisoners in prisons closer to their homes, provide long distance phone calls, and issue vouchers for the prison canteens. Parole offices could offer similar reinforcements to parolees who successfully complete rehabilitation programming in the community. Positive reinforcements increase motivation levels, build morale, and improve behaviors. If the CDCR incorporates these kinds of reinforcements into its culture and programs, it will accelerate the integration of rehabilitation into its systems.

Research by Wright, Caspi, Moffitt, and Paternoster (2004) and Taxman, Soule, and Gelb (1999) determined that punishment, particularly severe punishment, does not deter behavior and that it might actually cause offenders to be more defiant. Defiant offenders do not willingly participate in the rehabilitation programming that they need. According to Andrews and Bonta (1998) to effectively influence behavior there must be a ratio of four rewards to one consequence, since rewards serve to "shape" responses to positive actions.

At the correctional system level, if correctional agencies do not motivate offenders to complete rehabilitation programs, fewer offenders will be willing to participate in those programs. At the program level, those programs that do not have positive reinforcement structures or capacities will not effectively shape offender behaviors.

*2a. Award earned credits to offenders who complete any rehabilitation program in prison and on parole.* While California currently provides earned credits to offenders: (a) who the CDCR assigns to conservation camps to fight fires and perform other public service tasks (the California Work Incentive Program or WIP) and (b) offenders who participate in the Bridging Educational Program, offenders who complete other rehabilitation programs do not receive earned credits. With the enactment of AB 900, we anticipate that the CDCR will soon award earned credits for offenders who complete academic and vocational education programs. We recommend, therefore, that California enact laws that would allow the CDCR to award earned credits to offenders who complete *any* rehabilitation program, such as substance abuse treatment or life skills development, in accordance with the terms of their behavior management plans. These earned credits would provide motivation for offenders to participate in and successfully complete their assigned rehabilitation programs to earn reduced sentences. Offenders who participate in quality evidence-based prison programming have lower recidivism rates. We believe that the public safety benefits of adopting this recommendation will be a vast improvement over California's current practice of releasing offenders who have not completed rehabilitation programming.

*2b. Replace Work Incentive Program (WIP) credits with statutorily-based good time incentive credits.* Most prisoners in the CDCR are serving sentences that were handed down under California's Determinate Sentencing Act (DSL). California's DSL allows offenders to earn, with some exceptions, as much as a day-for-day "good time" rate (50% reduction), *but only if they are able to receive WIP credits.* While most offenders (with the exception of those serving 3- and 2-Strike sentences, life sentences, and those convicted of violent crimes) are eligible to receive the day-for-day WIP credits, because of program capacity limits, they cannot *access* the WIP-specific programs. In most cases, offenders are assigned to WIP-specific programs on a first-come, first-served basis, which is contrary to the tenet of assigning the right offender to the right program. We recommend, therefore, that the Legislature pass a law that would allow the CDCR to grant good time credits to those offenders who comply with institutional rules in prison. These good time credits would provide motivation for prisoners to manage their behaviors in prison to earn reduced sentences.

*2c. Implement an earned discharge parole supervision strategy for all parolees released from prison after serving a period of incarceration for an offense other than those listed as serious and violent under CPC 1192.7(c) and 667.5(c) criteria.* We recommend that California enact the necessary laws that authorize the CDCR to award parolees with earned discharge credits according to the following schedule and criteria:

- Low risk to reoffend, non-violent parolees could reduce six months off their periods of parole supervision if they actively engaged in community services, remained violation-free, and completed all payments of victim restitution.
- Moderate risk to reoffend, non-violent parolees could be discharged from supervision if, at the end of 12 months, they have achieved stability in housing and employment; successfully completed all treatment requirements addressing their criminogenic needs, have maintained continuous violation-free parole, and have completed all payments of victim restitution.
- Higher risk to reoffend, non-violent parolees who are complying with their treatment requirements and who remain arrest-free for the first year could earn one month off their total parole supervision periods for each arrest-free month they have in the second year.

An earned discharge parole system provides an incentive system that rewards desired behavior and encourages parolees to earn early discharges from parole. The earned discharged strategy is an evidence-based practice that reduces recidivism. Ultimately, agencies that implement earned discharge parole strategies motivate their parolees to participate in their own supervision successes. This strategy will help reduce prison overcrowding as fewer parolees return to prison for parole violations or new criminal convictions.

Please refer to Appendix E for our estimates of the costs and benefits associated with implementing these recommendations.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

## Clearing the Road for Rehabilitation

Before addressing the internal factors, we provide preparatory steps that California must take to make it possible to improve rehabilitation programming in its adult offender correctional system.

### Take an Integrated "Systems" Approach

Changing the way corrections agencies do business is no easy task. Improving rehabilitation programs to reduce recidivism is not simply a matter of identifying those evidence-based programs that produce results. Rather, the greater challenge lies in changing existing *systems* to support the programs so that they can be effectively implemented.[j] This requires energetic leadership that is willing to place equal focus on:

- Evidence-based principles in program and service delivery,
- Organizational re-engineering, and
- Collaboration within and between organizations.

These three essential components are an integrated systems model for correctional agency reform. First, evidence-based principles form the basis for effectively managing and delivering quality rehabilitation programs and services. Next, political and correctional agency leaders must engage in several organizational re-engineering tasks to successfully move from traditional warehousing or custodial practices to evidence-based rehabilitation principles and practices. And finally, collaboration with stakeholders creates more comprehensive and continuous systems changes at both the state and community levels.[k]

We were pleased to see that the CDCR leadership team has already incorporated some elements of all three of these focus areas into its strategic plan. The CDCR has (a) made a commitment to use evidence-based measures and national standards in its programming, (b) begun re-organizing its departments and re-engineering its processes, and (c) made a commitment to seek out and expand its community partnerships. Our intention is to help the CDCR move to the next level of rehabilitation as it considers its missions and values; gains new knowledge and skills; adjusts its infrastructures to support the new ways of doing business; and transforms its staff and organizational culture.

### Consider Three Important Concepts

**T**he person reading this report should keep these things in mind:

- Change in organizations takes time to effect (2-5 years).
- Correctional agencies are part of larger communities.
- Only qualified and appropriately trained staff members should deliver programs.

---

j        Taxman (1998); Sachwald & Tesluk (2205); Friedmann, Taxman, & Henderson (2007); Simpson & Flynn (in press); Simpson (2002)
k        Young, Taxman, & Byrne (2003); Byrne, Taxman, & Young (2003)

*Correctional Change Takes Time*

Because correctional change involves often competing (or at least differing) stakeholders—citizens, administrators, offenders, corrections officers, parole officers, families, legislators, etc.—it often takes a long-time, at least two to five years, for agencies to achieve consistent and sustainable results. Part of this is due to the amount of time needed to build consensus among all parties. But an even greater contributor to the extended time factor is that rehabilitation involves influencing human behavior. Because of this, correctional agencies need to be deliberate and careful when introducing new rehabilitation programs to their offender populations or when modifying existing programs.

Many correctional programs yield poor results not because of program design flaws or targeting mistakes, but because these programs were implemented without a concurrent commitment to measuring and maintaining the quality of these programs. It takes time to continuously measure and improve the quality and delivery of programs. But we believe this is time well-spent. Such an approach makes it easier for offenders to achieve the desired programming outcomes—reduced reoffending rates—and prevents correctional programming from deviating from the evidence-based principles that are effective.

*Correctional Agencies Are Part of the Community*

Most people forget that (except for those serving life without parole or death penalty sentences) all offenders come from and will one day return to the community. One needs to view corrections through the lens of prisoner reentry to understand the importance of rehabilitation programming. As Jeremy Travis (2005) has reminded us, "they all come back." In 2006, the CDCR admitted nearly 142,000 persons to prison and released nearly the same number—134,000. The average prison sentence served in California is 25 months. The fact that the majority of prisoners go back to their communities relatively quickly means that public safety is the responsibility of all community members, not just the correctional agency. When correctional agencies deliver appropriate rehabilitation *treatment* programs in prison and then follow those programs up with aftercare programs and services in the community, they are more likely to reduce recidivism two to three times more than when delivering prison-based programs alone.[l] Other research shows that correctional agencies can enhance the effectiveness of their rehabilitation programming by actively collaborating with communities.[m] Additionally, research by Bloom, Owen, and Covington (2003), shows that female offenders need the assistance of their family members, friends, and community support agencies (e.g., substance abuse, mental health, housing, etc.) if they are to sustain the treatment gains they achieved through participating in rehabilitation programming in prison.

To become productive and contributing members of society, ex-offenders must stay sober, find work, and have safe places to live. An individual who is high, out of work, and living on the streets is not likely to succeed. California must make a financial commitment to help previously incarcerated persons obtain access to and pay for the services they need to be clean, sober, and employable. Without this investment in offenders' survival issues, investments in prison and parole programming alone will not produce the desired recidivism reduction outcomes.

---

l    Aos et. al. (2006); Simpson et. al. (1999a); (1999b); Taxman, Young, & Byrne (2004); Byrne & Taxman (2006)
m    Sampson & Laub (1993); Taxman et. al. (2004)

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

### *Qualified Staff Matters*

Often the difference between success and failure in a program is determined by the staff. In correctional settings there are two general and sometimes overlapping types of staff: (a) security-supervision staff and (b) rehabilitation treatment-programming staff. ***Both staff types must come to respect the role the other plays in the delivery of effective rehabilitation interventions. And, both staff types must work together to ensure that both security-safety and rehabilitation programming objectives are accomplished in a manner that appears seamless to the offender.*** Most agencies need to train their staff members to accomplish these cross-objectives tasks, as they are not normally part of agency traditions or cultures. However, doing so will have a big impact on further aligning the organization's mission to its daily operational practices.

Another important issue is staff qualifications. To be an effective teacher, mental health counselor-clinician, vocational educator, or substance abuse counselor-clinician, the staff member must meet the minimum requirements of state certification for providing these vital services. Correctional agencies cannot allow any shortcuts in this area. Requiring staff members to obtain appropriate certifications helps agencies ensure that their staff members learn the techniques that will assist offenders in progressing through their rehabilitation programs. The CDCR must ensure that it hires high-caliber professionals, who are capable of delivering quality rehabilitation programs and services in the demanding environments of prisons and parole.

Agencies that are committed to rehabilitating offenders continuously develop the technical and organizational development skills of their staff members. We cannot emphasize enough the importance of continuous staff development as a best practice in the corrections industry. Staff members are the delivery agents of rehabilitation programs and services, and, therefore, are critical to programming success.

### Develop Gender and Age Responsivity

Researchers recognize that "generic one size fits all" programming does not achieve uniform recidivism reduction results across special populations. Correctional agencies need to pay more attention to these populations, such as female and youthful offenders, to improve the rehabilitation *treatment* results of these groups.

Correctional agencies have paid minimal attention to female offenders in the areas of predicting their risks to reoffend or the criminogenic needs related to their criminal behaviors. With female offenders representing only 7% of the U.S. prison population, prevailing correctional policies tend to be based on assessment instruments and rehabilitation programs that are geared towards male offenders. For example, the risk assessment tools used by most corrections agencies are largely based on male theories of crime (e.g., social learning and control theories). Bloom et. al. (2003) found that these tools generally ignore the context of female criminality and disregard female-specific risks to reoffend and those factors related to female criminal behaviors.

The same is true for youthful offenders (18-25 year olds). Correctional agencies have geared their assessment instruments and rehabilitation programming offerings primarily toward males in their mid-30s. While less information is readily available on the youthful offender population, California will need to pay more attention to this group as it moves towards a model of reducing recidivism through effective rehabilitation programming.

*Gender-Responsive Programming*

Gender-responsive approaches are multidimensional and based on theoretical perspectives that acknowledge explicitly female offender pathways into the criminal justice system. These approaches address social and cultural factors, as well as therapeutic interventions and provide the foundation for gender-responsive policies and practices (Bloom et. al).

---

### Profile of California's Female Offenders

The average female offender in California is in her late thirties. She is likely to have been a victim of physical or sexual abuse early in life. She is addicted to drugs, often has mental health issues, and most likely was sent to prison for using drugs or stealing to support a drug habit. She also is likely to be a mother and frequently the primary caregiver of young children (Little Hoover Commission, 2004).

The following CDCR data provide an overview of female offenders in California:

- At year end (12/20/06), 11,492 adult females were incarcerated in CDCR facilities.
- The majority (65% or almost 7,000) of all offenders were convicted of non-violent offenses (property and drug violations). 35% percent were convicted of property crimes, with drug crimes representing 30% of the female population.
- Less than 15% of the female prison population are second or third strikers, indicating a shorter criminal career. As of December 2006, only 80 women were serving third strike sentences.
- While in custody, female prisoners continue to be non-violent, with the majority (68%) of all offenders classified in Level I-II designations. 41% percent are classified as Level I, with 27% classified as Level II.
- The median time served in prison by incarcerated women is 13 months.
- The recidivism rate for female felons within two years after release onto parole was 39% as compared with 52% for male felons.

---

The current generation of criminogenic needs assessment instruments that correctional agencies in California use does not measure female offenders' needs. The emerging research on gender-responsive strategies for female offenders provides strong support for correctional agencies to develop assessment instruments that include these gender-specific needs. Since female offenders' pathways differ from male offenders, female offenders have additional needs that correctional programming should address to provide female offenders with the means to become and remain productive citizens. These needs include: abuse, violence, trauma, family relationships, substance abuse, and co-occurring disorders. Our references to "criminogenic needs" in our programming improvement recommendations do not refer to the specific needs of female offenders.

A great deal of work has and is being done within the CDCR to bring its programming of female offenders in line with the new theoretical perspectives and research findings in this area. Appendix G highlights the significant efforts the CDCR is making to continuously improve the assessment and programming of female offenders under its jurisdiction.

For the most part, the recommendations in this report apply equally to male and female offender populations. However, in those cases where research indicates the need to treat female offenders differently, we propose separate recommendations.

17

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

## Age Responsive Programming

Young adults—18-25 years old—present certain challenges for any correctional system. Many of these youthful offenders have previously been in the juvenile justice system, and many of them do not have strong, pro-social support systems in the community. Developmentally, they are in the period of their lives where they have not fully matured psychologically, sociologically, or biologically. This immaturity negatively affects their decision-making, executive functioning, and responses to rehabilitation programming efforts. Because of their previous involvements in the juvenile and-or adult justice systems, they often have not been exposed to the resources in life that tend to guide individuals, such as strong familial relationships, education and-or work, and long-term goals.

Neither California, nor any other state in the nation has devoted much attention to this age group. The average age of offenders participating in rehabilitation programs nationally is 35, which criminologists have acknowledged is towards the end of an offender's active years of criminal behavior. Assessment instruments in existence are not sensitive to the characteristics of this age group, nor have many correctional agencies developed rehabilitation programming for them. To be effective in turning the tide and keeping these youthful offenders from returning to prison, California needs to examine, develop, and enhance its programming for the approximately 21,000 youthful offenders that are admitted to the CDCR every year.

## Factors Internal to the Programming Environment

In this section of the report, we provide several recommendations that address the internal causes of California's rehabilitation programming problems. We base our recommendations on eight key evidence-based principles and practices (Figure 4).  Our recommendations operationalize these principles and practices so that California can deliver a core set of effective rehabilitation programs to its adult offenders.

*Figure 4: Eight Evidence-Based Principles and Practices*

1. **Target Highest Risk Offenders.** Correctional agencies should provide rehabilitation treatment programming to their highest risk to reoffend prisoners and parolees first. Provide other types of rehabilitation programs to low risk to reoffend prisoners or parolees.
2. **Assess Offenders Needs.** Correctional agencies should assess the criminogenic needs (dynamic risk factors) of their offenders using research-based instruments. The goal of programming should be to diminish needs.
3. **Design Responsivity into Programming.** Programming should account for individual offender characteristics that interfere with or facilitate an offender's ability and motivation to learn.
4. **Develop Behavior Management Plans.** Individual programming should occur in the context of a larger behavior management plan developed for each offender, which will include the priority and sequence of treatment programs, the means for measuring treatment gains, and the goals for a crime-free lifestyle.
5. **Deliver Treatment Programs using Cognitive-Based Strategies.** Research has consistently determined that cognitive-behavioral treatments are more effective than any other form of correctional intervention because these treatment types address criminal thinking and behaviors in offenders. The therapeutic community treatment model, which uses cognitive-based treatment strategies, is a highly effective method for treating alcohol and other drug dependencies.
6. **Motivate and Shape Offender Behaviors.** Programming should include structure or capacity for rewarding positive behavior in addition to punishing negative behavior.
7. **Engender the Community as a Protective Factor Against Recidivism and Use the Community to Support Offender Reentry and Reintegration.** Programming should involve the offender's immediate family members and the social service agencies in the community to which the offender will be returning. The state should empower the community—families, neighborhoods, religious and cultural institutions, businesses—to reduce crime through deliberate efforts that assist offenders under correctional control and provide support to reduce criminal behavior.
8. **Identify Outcomes and Measure Progress.** All programs should have identified outcomes and integrated methods for measuring progress toward objectives. The system should use performance measures to evaluate progress and inform improvements.

*We reiterate that rehabilitation programming alone is not the solution to California's correctional crisis. California must adopt the rehabilitation programming improvement recommendations that we provide in conjunction with the other measures we have proposed, if it is to reduce recidivism and increase public safety.*

19

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

## The California Logic Model

Figure 5 is a visual representation of the eight evidence-based principles and practices, which we call our California Logic Model.[n] We refer to this model as we provide our remaining recommendations so that the reader can conceptualize where each recommendation fits in the overall process.

*Figure 5. California Logic Model*

The California Logic Model is a detailed, sequential description of how California should apply the eight evidence-based principles and practices and what effective rehabilitation

California Logic Model



programming (including treatment) would look like if California were to implement our recommendations. We provide a full-sized version of the California Logic Model in Appendix B.

---

n       Special thanks to Heather Yates at the Pennsylvania Department of Corrections for working with the Expert Panel to create the California Logic Model.

> *Finding— The CDCR does not assign offenders to programs based on risk-needs assessments.*

Research shows that offenders with different levels of risk to reoffend respond differently to rehabilitation programming. Yet, the CDCR is not currently using a risk-based assessment tool to assign offenders to rehabilitation programming. We found that in many instances, the CDCR assigned offenders to programs on a first-come, first-served basis, regardless of risk level. The probability of the right offenders receiving the right programs using this approach is extremely low. Research also shows that programs that target appropriate offenders are more likely to reduce recidivism.[o]

**Recommendation 3—Select and utilize a risk assessment tool to assess offender risk to reoffend.**



We recommend that the CDCR select and utilize an objective tool to assess offenders' risk to reoffend levels, in both the prison and parole systems. Such an instrument would allow the CDCR to identify which offenders should be assigned to rehabilitation programming.

_____

o        Lowenkamp & Latessa (2005); Lowenkamp, Latessa, & Hoslinger (2006)

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*3a. Adopt a risk assessment instrument for the prison population.* In June 2007, the CDCR implemented a pilot of the Correctional Offender Management Profiling for Alternative Sanctions (COMPAS) instrument in 4 of its 12 Prison Reception Centers to assess the risk to reoffend levels of it incoming prisoners. The COMPAS is an objective risk and needs assessment instrument.[p] We commend the CDCR for taking this step to assess the risk to reoffend levels of its offenders, however, we recognize the difficulty of implementing a complex risk to reoffend assessment tool like the COMPAS in the prison population, especially considering the lack of networked computer resources in the CDCR's prison facilities. Therefore, we recommend that the CDCR also pilot a static risk factor instrument in four additional prisons. The CDCR could develop this instrument fairly quickly by using most of the data it is already collecting to determine institutional risk. We provide examples of several static risk assessment instruments in Appendix D.

*3b. Utilize the COMPAS or similar assessment tool for the parole population.* In 2005, the CDCR began to use the COMPAS assessment tool to determine the risk to reoffend among its parole population and is currently validating the results. We recommend that the CDCR adopt the COMPAS if it is valid and the CDCR staff find it useful.

> Drs. David Farabee, UCLA, and Sheldon Zhang, San Diego State University, were awarded a contract from the CDCR to help validate the COMPAS instrument and make it more user-friendly and better suited for use in the CDCR setting. The CDCR anticipates receiving the COMPAS validation study preliminary results in fall of 2007.

*3c. Develop a risk assessment tool normed for the female prisoner and parolee populations.* Research shows that when correctional agencies assess female offenders with instruments designed to assess the risk to reoffend levels for male offenders, they often receive invalid results. We recommend, therefore, that the CDCR adopt an instrument, that it norms and validates for female offenders, to assess their risk to reoffend levels.

> Dr. Pat Van Voorhis has been working with the CDCR to develop a gender responsive trailer to the COMPAS and plans to provide it to the CDCR by mid-July 2007.

*3d. Develop a risk assessment tool normed for the young adult prisoner and parolee populations.* Currently the risks-needs assessments tools have not been normed or validated for youthful offenders (18-25 years old) that have unique characteristics. As with the female offender population, the CDCR needs to pay more attention to this population and develop a normed and valid instrument for these offenders.

*3e. Norm and validate all the selected risk assessment instruments for the CDCR's adult offender population and validate these tools at least once every five years.* To ensure that it is accurately predicting outcomes, we recommend that the CDCR validate and norm its risk to reoffend assessment tools on the California offender population at least once every five years using a standard research-based methodology that compares projected outcomes to actual results.

---

p        Details of COMPAS can be found at http://www.northpointeinc.com/

*3f. When assigning rehabilitation treatment programming slots, give highest priority to those offenders with high and moderate risk-to-reoffend scores.* The first principle of evidence-based rehabilitation programming is: target the highest risk offenders. This is because research shows that **high and moderate risk to reoffend prisoners and parolees achieve the greatest gains in recidivism reduction**.[q] The explanation for this is that high and moderate risk to reoffend prisoners and parolees have greater deficits in pro-social skills and criminal thinking and achieve higher levels of improvement from rehabilitation *treatment* programs. Additionally high and moderate risk to reoffend prisoners and parolees have higher base rates of offending so increasing their pro-social skills and reducing their criminal thinking produces greater returns, or "bang-for-the buck." Because rehabilitation *treatment* resources are often limited, we recommend that the CDCR allocate its rehabilitation *treatment* programming slots first to its high and moderate risk to reoffend prisoners and parolees.

*3g. Provide low risk offenders with rehabilitation programs that focus on work, life skills, and personal growth rather than rehabilitation treatment programs.* Low risk to reoffend prisoners and parolees have low base rates of offending behavior, fewer criminogenic needs, and generally stronger support systems (Andrews and Bonta, 1998), which means that their needs for more expensive rehabilitation *treatment* programs are minimal or nonexistent. In fact, the largest known test of the "target the highest risk" principle found that when corrections agencies provided intensive rehabilitation treatment programs to higher-risk offenders, those offenders experienced significant recidivism reductions, but when the agencies provided those same intensive rehabilitation treatment programs to low-risk offenders, those offenders experienced either a very minimal reduction or even an increase in recidivism (Lowenkamp et. al., 2006). Therefore, we recommend that the CDCR provide its low risk offenders, who have such needs, with rehabilitation programs that focus on work, life skills, and personal growth, such as vocational or educational programming, but not rehabilitation *treatment* programming.

*3h. Provide short-term prisoners with reentry services and reintegration skills training rather than rehabilitation treatment programs.* Most credible rehabilitation treatment programs require the offender to participate for at least 4 months to gain any measurable and sustainable benefit from the program. (Hubbard et al., 1989; Hser et al., 2001; Simpson, Joe, and Brown, 1997). However, as Table 3 shows, there are nearly 70,000 "short-term" prisoners who spend only a few weeks or months in prison before the CDCR releases them. Regardless of risk to reoffend level, these prisoners simply do not have the time to participate in or benefit from rehabilitation *treatment* programs. This group of short-term prisoners needs a different kind of rehabilitation programming. We recommend that the CDCR offer this group of prisoners rehabilitation programs and services that develop their community reintegration and reentry skills. The CDCR can conduct most of these types of programs within a 30-60 day time frame, and the offenders can continue them, if appropriate, in their communities.[r] The CDCR may also want to consider a fast-track rehabilitation program such as the one used by the Arizona Department of Corrections (see Appendix H). This would be another way for the CDCR to match the right offender to the right rehabilitation program—based on the offender's length of stay.

---

q       Andrews & Bonta (1998); Latessa, Cullen, & Gendreau (2002); Taxman (2006)
r       In the treatment literature, researchers generally recognize that individuals could benefit from short periods of motivational readiness to prepare for treatment (NIDA, 1999; Knight, Hiller, Broom, & Simpson, 2000).

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*Table 3: CDCR Admissions and Lengths of Stay by Admit Type*

| Admission Type | N | % | Current Average Length of Stay (ALOS) |
|---|---|---|---|
| **Total Admissions** | 141,881 | 100% | 11.4 mos |
| **New Court Felony Conviction** | 50,708 | 36% | 18.3 mos |
| No Probation Violation | 36,176 | 26% | 23.0 mos |
| Probation Violation | 14,532 | 10% | 8.6 mos |
| **Parole Violators – Total** | 91,173 | 64% | 8.7 mos |
| New Court –Felony Conviction | 21.936 | 16% | 19.5 mos |
| **Technical Violators** | 57,728 | 41% | 4.0 mos |
| Technical Violators Reinstated | 11,509 | 8% | 0.6 mos |
| **Other Key Groups** | 18,752 | 13% | |
| Two Strikes | 17,280 | 12% | 56 mos |
| Three Strikes | 334 | 0% | 240 mos |
| Life Sentences – No 2 or 3 Strikes | 1,138 | 1% | Life |

*Source: CDCR*

**Short-Term Prisoners**

> *Finding— The CDCR does not assign offenders to programs based on risk-needs assessments.*

Objective, standardized instruments, rather than subjective judgments alone, are the most effective methods for determining the programming needs that should be targeted for each offender.[s] By using objective risks-needs assessment instruments, CDCR personnel can determine the strength or "level" of each need in an offender. The CDCR can use this information to match the right offender to the right rehabilitation program and also determine the offender's rehabilitation program sequence. Ideally, the CDCR should assign high to moderate risk to reoffend offenders to the programs that target their primary, or strongest, criminogenic need areas first. Effective programs target multiple, specific factors (Lowenkamp and Latessa, 2005). ***The more criminogenic needs that a program targets in an offender, the greater the rate of recidivism reduction he or she experiences.***

**Recommendation 4—Determine offender rehabilitation treatment programming based on the results of assessment tools that identify and measure criminogenic and other needs.**



We recommend that the CDCR assess the criminogenic needs of high to moderate risk to reoffend prisoners and parolees and the life skills and personal development needs of low risk to reoffend offenders. (Figure 6 lists the seven criminogenic needs areas.) After identifying the risk to reoffend levels of its adult offender population, the CDCR should select and begin using a battery of criminogenic, self-administered needs assessment tools to determine the criminogenic needs levels of high to moderate risk to reoffend prisoners and parolees: (a) when they enter prison, (b) after they complete rehabilitation programming, (c) when they are assigned to parole supervision, and (d) periodically during their time in the correctional system. Measuring the criminogenic needs levels of offenders at these times

s       Grove & Meehl (1996); Andrews & Bonta (1998); Latessa et. al. (2002); Taxman, Crospey, Young, & Wexler (2007)

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

will allow the CDCR to determine if the programs are effectively reducing those needs. The CDCR also needs to select non-criminogenic needs instruments to identify and measure the other needs of its low risk offenders. The CDCR should develop a risks-needs matrix to provide its staff with standard rehabilitation programming recommendations guidelines. We provide a list of recommended criminogenic needs assessment tools in Appendix D.

*Figure 6: Seven Criminogenic Needs Areas*

Research has demonstrated that varied combinations of these seven criminogenic needs (dynamic risk factors) drive criminal behavior in male offenders:

1.  Educational-vocational-financial deficits and achievement skills
2.  Anti-social attitudes and beliefs
3.  Anti-social and pro-criminal associates and isolation for pro-social others
4.  Temperament and impulsiveness (weak self-control) factors
5.  Familial-marital-dysfunctional relationship (lack of nurturance-caring and-or monitoring-supervision)
6.  Alcohol and other drug disorders
7.  Deviant sexual preferences and arousal patterns

The concept of criminogenic needs means that research shows that the offender population has a higher prevalence of these behaviors than does the general population. Therefore, the presence of these needs in a person may very well indicate a tendency toward criminal activity. The key to understanding the importance of these criminogenic needs is the fact that they represent a constellation of characteristics or circumstances. The mission, of course, is to divert the offender from adverse behaviors and to replace them with healthy alternatives.

*4a. Do not assess the criminogenic needs of low risk to reoffend offenders (identified using the tools in recommendation #3).* As mentioned in recommendation 3g, low risk to reoffend prisoners and parolees are not likely to have criminogenic needs and are not positively affected. In fact, many are negatively affected by participation in rehabilitation *treatment* programs. We recommend that the CDCR not use its limited resources to assess the criminogenic needs of low risk offenders. Instead, these CDCR should select needs instruments that identify and measure the work, life skills, personal growth, and other programming needs of this population and assign them to rehabilitation programs based on those assessments.

*4b. Utilize additional evidence-based tools to supplement criminogenic needs assessments.* General risk assessment instruments (e.g., LSIR) don't make distinctions between kinds of behavior assessed. This becomes especially important when dealing with special populations—e.g., violent offenders and sex offenders. Therefore, we recommend that the CDCR investigate and then utilize additional evidence-based tools to supplement the criminogenic needs assessments given to its high and moderate risk to reoffend prisoners and parolees. We provide examples of these additional tools in Appendix D.

> *Finding—The CDCR does not have automated behavior management (case) plans for each of its offenders.*

The behavior management planning process is an important evidence-based practice and is an integral step in matching the right offender to the right program *in the right order*. The behavior management plan links the assessment process to rehabilitation programming and ensures continuity of rehabilitation programs and services between the prison, parole system, and other community-based providers. At the heart of a behavior management plan is a behavioral contract, which is a dynamic tool that provides for continuous and seamless measurement of program and service delivery to prisoners and parolees. Risk-based assignments to rehabilitation programming require behavioral contracts to ensure that offenders and correctional agency staff agree to the desired offender outcomes.

**Recommendation 5—Create and monitor a behavior management plan for each offender.**



We recommend that the CDCR create a behavior management (or case) plan for each of its adult offenders in prison and on parole. The CDCR should actively monitor these plans to keep track of the progress that offenders are making toward achieving their rehabilitation programming objectives. The CDCR should design these behavior management plans to identify and change the criminal behavior patterns of the offenders.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

Behavior management planning includes these major tasks:

1. Administer the objective risk-needs assessment tools at the prison Reception Center to identify the programming needs of the prisoners while in prison or at the parole office to identify the programming needs of parolees being released to parole supervision.
2. Develop a behavior management plan based on the risks and needs levels identified in step 1.
3. For prisoners: Update the behavior management plan as the prisoner (a) completes assigned programming in prison, (b) fails to comply with the plan requirements, or (c) periodically completes a new risk-needs assessment.
4. As prisoner prepares to transition to the community (parole), update existing behavior management plan to include additional programming required for the offender's successful reentry into the community
5. For parolees: Update the behavior management plan as the parolee (a) completes assigned programming in the community, (b) fails to comply with the plan requirements, or (c) periodically completes a new risk-needs assessment

CDCR staff and program managers (in prison and in the community) who actively review the behavior management plans of their offenders, as well as pre- and post-program tests and risk-needs assessments, will be able to measure treatment gains and update or modify rehabilitation program requirements as needed. Behavior management plans provide the CDCR with the ability to keep track of prisoners and parolees as they complete their assigned rehabilitation programs, comply with institutional rules, and fulfill their parole obligations.

> *Finding—The CDCR does not offer a sufficient quantity of evidence-based rehabilitation programs designed to reduce recidivism to its adult offenders.*

The effectiveness of rehabilitation services depends on the quality, quantity, and content of the programs. Each program should have written manuals and curricula that outline each session. Studies have found that such programs are better managed and achieve better outcomes (NIDA, 2006). Focusing on a small set of programs allows correctional agencies to establish quality programs, put in place quality assurance procedures to measure program outcomes, and hire and train qualified staff to deliver the programs effectively. Research on a national and international basis concludes that programs focused on the six major offender programming areas, when implemented appropriately, do reduce recidivism. An example of that research is the Washington State study by Aos, et al. on page 31.[t]

**Recommendation 6—Select and deliver in prison and in the community a core set of programs that covers the six major offender programming areas— (a) Academic, Vocational, and Financial; (b) Alcohol and other Drugs; (c) Aggression, Hostility, Anger, and Violence; (d) Criminal Thinking, Behaviors, and Associations; (e) Family, Marital, and Relationships; and (f) Sex Offending.**



We recommend that the CDCR select and deliver a core set of evidence-based rehabilitation programs that covers the six major offender programming areas.

---

t        While we have identified those programs that work based on research, there are also "promising" programs that are showing evidence to be working, but have not yet accumulated a sufficient body of rigorous research.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

These programs should:

1. Be directed at reducing the seven criminogenic factors listed in Figure 6 that were identified in high and moderate risk to reoffend prisoners and parolees during the criminogenic needs assessment process;
2. Be directed at addressing the other needs of low risk to reoffend, female, and short-term prisoners and parolees; and
3. Be cognitive behavioral-based,[u] where appropriate, including the use of the therapeutic community model for substance abuse rehabilitation programs.

Because the introduction of evidence-based programming is a complex objective, we recommend the following approach:

1. Initially put in place one core program from each of the six major offender programming areas (see Appendix D, for examples of programs being operated in other states).
2. Measure processes and outcomes and revise programs to achieve program fidelity.
3. Once fidelity has been achieved in one program from each of the six major offender programming areas, make adjustments to those programs to create at least two levels of programming based on responsivity factors, such as:
   a. Match offender to programming based on responsivity factors (e.g., assign lower cognitive level offender to behaviorally-driven group, rather than higher functioning, cognitive based group).
   b. Match offender to staff based on responsivity considerations (e.g., Spanish speaking, gender, cognitive level, interests, etc.).
   c. Match staff to programs that they are most suited to deliver (e.g., training, education, personality, interests, skills, strengths-weaknesses, etc.).
4. Measure processes and outcomes of programs with added responsivity levels and revise programs to achieve program fidelity.
5. Put in place additional programs from each of the six major offending programming areas.
6. Measure processes and outcomes of additional programs and revise programs to achieve program fidelity.

---

[u]      Based on the research (Andrews & Bonta, 1998; NIDA, 1999, 2006; Lipsey & Landenberger, 2006; Landenberg & Lipsey, 2005), corrections agencies should use cognitive-behavioral (CBT) strategies in most of their rehabilitation treatment programs. The well-respected Therapeutic Communities program model now adopts CBT within its therapeutic setting to help offenders learn new skills and behaviors.

# Washington State Case Study

The recent work done by the Washington State Institute for Public Policy, a research arm of the Washington State Legislature, reinforces the recommendations in this report. The Institute was asked to determine if there were evidence-based policy options to reduce future prison construction. The Institute reported that in the area of correctional programming, effective correctional programming reduces crime and saves money. Table 4 shows the results.

*Table 4: Effects of Evidence-Based Programming on Criminal Recidivism and Net Costs*

| Adult Offender Programs | Effect on Recidivism Rate | Benefits Minus Costs (per participant) |
|---|---|---|
| Cognitive/behavioral skills training in prison or community. | -6.3% | $10,299 |
| Drug treatment in prison. | -5.7% | $7,835 |
| Drug treatment in the community. | -9.3% | $10,054 |
| Sex offender treatment in prison with aftercare. | -7.0% | -$3,258 |
| General education in prison (basic education or post secondary). | -7.0% | $10,669 |
| Vocational education in prison. | -9.0% | $13,738 |
| Employment and job training in the community. | -4.3% | $4,359 |
| *Source: Aos et al.* | | |

*Note: This table reflects average effects based on multiple studies in each program type. "Effect on recidivism rate" considers criminal measures such as arrests and convictions but does not include technical violations (personal communication with Steve Aos, May 25, 2007). The effect on recidivism rate may be higher if technical violations were included. The effect on recidivism is measured as the percent change in re-arrests and re-convictions for program participants in the experimental group relative to a comparison (control) group that did not receive the treatment. "Benefits Minus Costs" is calculated as the sum of the benefits to crime victims plus the benefits to taxpayers minus the marginal costs of the program compared to the cost of the alternative program. Benefits to crime victims account for between 48% and 69% of total benefits. See Exhibit 4 in Aos et al. for more details.*

As Table 4 shows, research demonstrates that effective programming reduced recidivism and saved money. The one exception, from a cost benefit perspective, is sex offender treatment in prison with aftercare. Because of the intensity of the treatment, sex offender programs cost more than other programs, which means that they cost more than they save. Policy makers have to ask themselves, is the 7% crime reduction worth the added cost to offer such programming? Washington State policy makers concluded that it was and continue to provide cognitive-based sex offender treatment to its offenders in prison and in the community. The positive reductions in recidivism rates shown in the Table 3 are not additive. Offenders who have completed several rehabilitative programs are not likely to have reduced rates that are the accumulation of each program's estimated reductions. More importantly the programs **must demonstrate fidelity to the evidence-based principles to achieve the desired outcomes**. Maintaining quality standards in the implementation and ongoing operations of these types of programs is key to achieving the desired outcomes.

Besides the studies conducted by the Washington State Institute for Public Policy, other evidence-based research and guidelines show that correctional institutions can achieve even stronger results when they INTEGRATE all of these core risk reduction programs AND (a) automate their behavior management plan systems, (b) use sound cognitive protocols, and (c) systemically reinforce planned outcomes through a system-wide offender earned incentive system (Taxman, Shepardson, and Byrne, 2004).

Because of the measurable results that correctional organizations are achieving when implementing these programs, correctional institutions in Arizona, Iowa, Illinois, Maine, Missouri, Oregon, Pennsylvania, Washington, and Wisconsin, to name just a few, are incorporating these active elements into their next generation of correctional programming.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

## Overview: Cognitive Behavioral Therapy

Cognitive Behavioral Therapy (CBT) is a type of psychotherapy derived from behavioral and cognitive psychological models of human behavior:

- Behavior therapy is based on the clinical application of theories of behavior such as learning theory; people learn how to change behavior with such therapy.
- Cognitive therapy is based on the clinical application of the role of cognition, or the process of perceiving, interpreting and attributing meaning to events, in emotional disorders. Cognitive therapy focuses on thoughts, assumptions and beliefs.

CBT draws from both models and it is based on the idea that people's thoughts cause feelings, not external things, like people, situations and events. Its aim is to modify everyday thoughts and behaviors to positively influence emotions. CBT is considered an effective evidence-based treatment widely used to treat mental disorders. CBT has been demonstrated as effective in over 375 studies for the treatment of mental health issues such as: anxiety disorders, generalized anxiety, panic, phobias, obsessive-compulsive disorder, post traumatic stress disorder, bulimia, depression, and marital distress. It is also used to treat more severe and enduring conditions such as: psychosis, schizophrenia, anger control, pain, adjustment to physical health problems, insomnia, and organic syndromes such as early stage dementia. CBT is used with groups of people as well as individuals.

CBT's role in prison and parole populations is sometimes as a component of substance abuse and mental health treatment programs although many other programs include substance abuse problems, sex offenses and unstable mental illness in the exclusion criteria. Wilson, Bouffard, and Mackenzie's (2005) review of quantitative empirical evidence regarding cognitive behavioral programs in correctional settings found cognitive behavioral programs to be effective at reducing recidivism. Landenberger and Lipsey (2006) provide details on the specific elements or combination of elements necessary for a successful cognitive behavioral program which includes programs that focus on high risk offenders, tend to have outside researchers involved in the work, and use a specific manual or approach. These programs fare well in reducing recidivism.

## Overview: Therapeutic Communities

The therapeutic community (TC) treatment model consists of a therapeutic milieu that addresses the criminal thinking and antisocial behavior of the offender through a combination of social structure (from the residential setting) and the therapy. The TC model provides a holistic approach to assisting offenders to learn new behaviors, values, and attitudes that affect their substance abuse and criminal conduct behaviors. The client-base for TCs is typically those offenders with drug abuse problems as well as social and psychological issues. The design of the TC, originally targeted to address drug addiction, is to treat the whole person through the peer community, and it has evolved to include a variety of additional services relating to family, education, vocational training, and medical and mental health. The residential setting provides a forum for the offender to learn, adopt, and practice pro-social values.

The TC perspective views the substance abuse disorder as a disorder of the whole person, and clients typically either have histories indicating problems with socialization, emotional and cognitive skills, and psychological development or have eroded such skills through drug-addicted lifestyles. Recovery is seen as a process of rehabilitation and relearning or re-establishing healthy functioning, skills, and values, as well as regaining physical and emotional health. For those who never had such skills, the TC offers "habilitation," or learning the skills and values necessary for productive, socialized living.

The TC model for prison environments operates much like those models in the outside community, but tends to be constrained by prison-specific rules and regulations. A dedicated TC unit is usually one in which participants are isolated from the rest of the prison population. Staff are often ex-offenders and frequently graduates of the program themselves. Typically, correctional TCs are comprised of prisoners with substance abuse problems as well as psychological disturbances, especially those demonstrating persistent anti-social behavior. Those with acute psychiatric illness are usually considered unsuitable, as a major tenet of TC is that members must take responsibility for their actions.

Evaluations of in-prison drug treatment TCs in the U.S. show that intensive treatment followed up by after-care is associated with reduced criminality and drug use. DeLeon, Kressel, and Melnick (1997) notes that, based on various experiences with correctional systems, programs, and correction-based drug treatment, a continuum of services is the best strategy for effective TC intervention. The three-tiered process involving TCs through incarceration, work release, and parole are most successful at reducing recidivism and drug use. However, limitations in many TC studies are self-selection and the lack of rigorous experimental designs.

*6a. Develop and offer rehabilitation treatment programs to those offenders with high and moderate risk-to-reoffend scores and lengths of stay (LOS) of six months or more.* As we explained before, high and moderate risk to reoffend offenders achieve the greatest gains in recidivism reduction, because these offenders have greater deficits to overcome in areas of pro-social skills, substance abuse, and criminal thinking. Additionally, as discussed in recommendation 3h, to benefit from rehabilitation *treatment* programming, these offenders would need to participate for at least four months in the program, (Hubbard, et al, 1989), although more ingrained criminal behaviors require at least twelve months of care (Simpson et. al., 1999a and DeLeon et. al., 1997). Therefore, we recommend that the CDCR develop and offer evidence-based, rehabilitation treatment programs only to high and moderate risk to reoffend prisoners and parolees who have lengths of stay of six months or more. Treatment for offenders serving life sentences needs to be assigned based on their release dates.

*6b. Develop and offer rehabilitation programs focused on work, life skills, and personal growth for all low risk to reoffend prisoners and parolees who have LOS of six months or more.* As we mentioned earlier, several studies show that assigning low risk offenders to rehabilitation treatment programs and services increases their recidivism rates. For this reason, we recommend that the CDCR develop and offer rehabilitation programs focused on work, life skills, and personal growth programming for its low risk to reoffend prisoners who have more than a six-month LOS.

*6c. Develop and offer reentry programming for all offenders who have LOS less than six months.* As in the case of the low risk to reoffend prisoners, there are a sizeable number of prisoners admitted to the CDCR through new court convictions who receive relatively short sentences and will spend a short period of time in the CDCR before being released. Typically, any prisoner with a sentence of 16 months or less, who enters prison with three to five months of jail credit, and is able to earn day-for-day work credits, will serve less than six months in prison. These offenders are unlikely to have sufficient time to enter and complete a six-month rehabilitation *treatment* program by the time they complete their reception processing and arrive at their assigned prison facilities. We recommend, therefore, that the CDCR develop and offer reentry programming for this offender population and prepare them for reintegrating into their families and communities. Reentry programming should include access to services that will assist offenders in maintaining sobriety, locating housing, and obtaining employment. As previously noted, the CDCR may want to consider a fast-track program such as used in the Arizona Department of Corrections for this population (see Appendix H).

*6d. Develop and offer "booster" programs before reentry and within the community to maintain treatment gains.* We recommend the CDCR develop and offer "booster" programs to maintain treatment gains. The CDCR should deliver these programs to its higher risk to reoffend prisoners before releasing them from prison. The CDCR should stack these programs on top of core programs (e.g., refreshers on skills acquired during formal phases of treatment) in each of the major offender programming areas. Booster programs should also focus on providing offenders with skills to prevent criminal behavior relapses—i.e., avoiding high risk situations, responding differently, identifying behavioral triggers, etc.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*6e. Assign offenders to programs based on responsivity factors relating to their motivation and readiness; personality and psychological factors; cognitive—intellectual levels; and demographics.* We recommend that the CDCR assign offenders to programs and program providers based on identified responsivity factors and match the offenders to appropriate treatment groups and program facilitators. Research demonstrates that effective rehabilitation programs identify and account for individual differences in motivational and readiness levels, personality and psychological traits, levels of cognitive and intellectual functioning, and demographic variables. Where needed, the CDCR should create and deliver front-end, pre-rehabilitation treatment programs to address motivation and readiness factors in its offender population. Researchers recognize that treatment readiness is a critical area of improving offender outcomes (Finney, Noyes, Coutts, and Moos, 1998; Moos, Finney, Quimett, and Suchansky, 1999; Sia, Dansereau, and Cruchry, 2000; Blakenship, Dansereau, and Simpson, 1999).

*6f. Develop and offer a core set of programs that is responsive to the specific needs of female offenders.* Research demonstrates that female offenders have different rehabilitation programming needs than their male counterparts. We recommend, therefore, that the CDCR develop rehabilitation programming for female offenders that responds to their particular needs.

*6g. Develop and offer a core set of programs that is responsive to the specific needs of youthful offenders.* As previously discussed, youthful offenders have different programming needs that their older counterparts. We recommend, therefore, that the CDCR develop rehabilitation programming for youthful offenders that responds to their particular needs.

In Table 5 we sort the 34 CDCR Nominated Recidivism Reductions Programs into the Six Major Programming Areas to show the progress the CDCR is making toward delivering a full menu of programs to its adult offenders.

34

Table 5: CDCR Nominated Recidivism Reduction Programs and the Six Major Programming Areas

| Six Major Offender Program Areas | CDCR Recidivism Reduction Program |
|---|---|
| **Academic, Vocational, and Financial** | Academic Courses |
| | Computerized Literacy Learning Centers (CLLC) |
| | Elementary Secondary Education Act (ESEA) |
| | Bridging Education Program (BEP) |
| | Re-Entry Education |
| | Community-Based Coalition (CBC) |
| | Community Re-Entry Partnerships (CRP) |
| | Employment Development Department (EDD) |
| | Incarcerated Youthful Offenders (IYO) |
| | Offender Employment Continuum (OEC) |
| | Parolee Employment Program (PEP) |
| | Vocational Education |
| | Inmate Employability Program (IEP) |
| | Employment Re-Entry Partnership (ERP) |
| | Carpentry Pre-Apprenticeship Program |
| **Alcohol and other Drugs** | Parolee Service Centers (PSC) |
| | Residential Multi-Service Center (RMSC) |
| | Drug Treatment Furlough (DTF) |
| | In-Custody Drug Treatment Program (ICDTP) |
| | Parolee Services Network (PSN) |
| | Parolee Substance Abuse Program (PSAP) |
| | Substance Abuse Program (SAP) |
| | Substance Abuse Service Coordinating Agency (SASCA) |
| | Substance Abuse Treatment and Recovery (STAR) |
| | Transitional Treatment Program (TTP) |
| | Transitional Case Management Program-HIV (TCMP-HIV) |
| | Transitional Case Management Program-Mental Health Services Continuum (TCMP-MHSCP) |
| **Aggression, Hostility, Anger, and Violence** | Conflict Anger Lifelong Management (CALM) |
| | STAND UP |
| **Criminal Thinking, Behaviors, and Associations** | Day Reporting Center (DRC) |
| | SB618 |
| **Family, Marital, and Relationships** | Community Prisoner Mother Program (CPMP) |
| | Family Foundations Program (FFP) |
| | Female Offender Treatment and Employment Program (FOTEP) |
| **Sex Offending** | *Currently the CDCR has no sex offender programs for prisoners. Parolees attend parole outpatient clinics. The CDCR has recently established the Sex Offender Management Board to review best practices and develop recommendations to improve management practices for sex offenders.* |

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

> *Finding—The CDCR does not measure the quality or effectiveness of its adult offender programs.*

A commitment to evidence-based rehabilitation programming that works includes determining whether or not the programming being delivered is achieving its stated objectives. This requires correctional agencies to collect programming data from every program delivered and every offender assigned to programming in an automated, systematic, and consistent fashion (Rossi, Freeman, and Lipsey, 1999). This also means that every program that correctional agencies deliver to their adult offender populations (in prison and the community) must have clearly defined outcomes—in other words, each program provider and offender participant should know, before the program begins, what a successful outcome from participating in the program would look like and what they need to do to achieve it.

**Recommendation 7—Develop systems and procedures to collect and utilize programming process and outcome measures.**



If California adopts our rehabilitation programming improvement recommendations, it will be able to offer evidence-based rehabilitation programming to those offenders who would most likely benefit from such programs. But that is just the beginning. To fully benefit from these recommendations, the CDCR will need to develop information systems and operations procedures to ensure that it collects rehabilitation programming outcome data from each program it offers and each offender it assigns to programming. Therefore, we recommend that the CDCR require rigorous outcome and process evaluations from all of its rehabilitation programs to determine (a) the effectiveness of the programs on participants, (b) why and how the programs are producing the results they are obtaining, and (c) how it might improve the programs.

*7a. The CDCR should develop a system to measure and improve quality in its adult offender programming.* We recommend that the CDCR use its programming process and outcome measures data to: (a) determine the effectiveness of its programming as it relates to reducing recidivism or any other stated objective, (b) modify programming that is not achieving desired outcomes; and (c) provide research data for future correctional research projects. This will allow the CDCR to develop a quality assurance system for its offender programming.

*7b. The CDCR should develop the capability to conduct internal research and evaluation that measures and makes recommendations to improve the quality of its programming.* We recommend that the CDCR continue to fund and expand its Office of Research to give it the internal capability of conducting research projects of varying complexity levels. This will give the CDCR the ability to internally measure and improve the quality of its rehabilitation programming by collecting and assessing benchmark data.

*7c. The Legislature should create an independent capability to assist with developing and monitoring the CDCR's quality assurance system.* We recommend that the California State Legislature permanently fund an independent research entity to assist the CDCR Office of Research in: (a) establishing performance measures and outcome objectives for all adult offender programs, (b) analyzing outcome data to measure the effectiveness of all adult offender programming, and (c) recommending cancellation, modification, or addition of programming based on outcome results and current research and best practices. We believe that this is one of the best ways to assure quality assurance in rehabilitation programming. *Such an entity currently exists with the Center for Evidence-Based Corrections at UC Irvine.*

---

The independent Washington State Institute assisted the Washington State Legislature and Washington Department of Corrections in identifying and adopting sound correctional policies and programming based on evidence-based research. It recently published a report on which correctional policies and programs were likely to reduce Washington's prison population. See page 31 for more details.

---

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

> *Finding—The CDCR has begun to focus on offender reentry issues and initiatives, but it needs to expand those efforts.*

Public safety in our communities is the responsibility of all citizens. It is not just the responsibility of the correctional and other justice agencies. Research and experience in recent years helped us realize that the transition from prison to the community is difficult and filled with many obstacles.[v] And, continuity of care is necessary for reducing recidivism.[w] In particular we know that individuals are at higher risks to return to prison shortly after their releases. Offenders require the assistance of their family members, friends, local support systems, and broader communities to sustain the treatment gains they have achieved through their participation in correctional programming.[x] When correctional agencies partner with these support systems in the community, it greatly enhances the ability of offenders to maintain their positive behavioral changes. These partnerships are even more important in light of current research that indicates that ***when offenders participate in treatment in the community after treatment in prison, the results are likely to be two to three times greater than if the person participated only in prison-based programs.***[y]

> **Recommendation 8—Continue to develop and strengthen its formal partnerships with community stakeholders.**



We recommend that the CDCR establish interagency steering committees at both the statewide and community levels to ensure the appropriate coordination of transition services

v       Petersilia (2003); Maruna (2001); Visher & Courtney (2006); Visher & Farrell (2005), Visher, Kachnowski, LaVaigne, & Travis (2004); Visher, LaVaigne, & Farrell (2003); Wilson & Davis (2006)
w       Taxman (1998); Taxman et. al. (2004); NIDA (2006); Butzin, Scarpitti, Nielsen, Martin, & Inciardi (1999); Martin, Butzin, Saum, & Inciardi (1999)
x       Sampson & Laub (2001); Taxman, Byrne, & Young (2002); Byrne & Taxman (2006)
y       Butzin, Scarpetti, Nielsen, Martin, & Inciardi (1999); Harrison & Martin (2001); Martin, Butzin, Saum, & Inciardi, (1999); Simpson et. al. (1999a), (1999b)

for its adult offenders moving from prisons to their communities.

In addition to coordinating transition services, these steering committees should be responsible for:

1. Ensuring that prisoners returning to the community receive access to programs and services that will help them obtain meaningful employment, find suitable housing, support their families, and participate in needed counseling.
2. Creating formal mechanisms and procedures that will assist with and improve information exchange between agencies.
3. Developing formal protocols that will allow agencies to share programming outcomes and offender behavior management program progress amongst themselves.
4. Creating training curricula that will ensure that all program providers and CDCR parole staff are cross-trained.
5. Developing a strategy to educate the public and others (e.g., employers, service providers, and educational institutions) about the importance of being involved in the reentry process of offenders.

*8a. Develop formal reentry plans for those offenders with high and moderate risk-to-reoffend scores.* We recommend that the CDCR develop formal reentry plans (the Ohio Department of Rehabilitation and Correction refers to these documents as Reentry Accountability Plans, or "RAPs" that are administered by Reentry Management Teams or "RMTs"; Washington State's Department of Corrections refers to these documents as Offender Accountability Plans) for all of its high and moderate risk to reoffend prisoners. This reentry plan should addresses specific issues including housing, employment, and aftercare treatment related to their rehabilitation *treatment* programs in prison.[z]

*8b. Provide offenders who have high risks to reoffend with intensive transition services for at least their first 90 days on parole.* In addition to a formal reentry plan, we also recommend that the CDCR provide all of its high risk to reoffend offenders with intensive transition services for a minimum of 90 days after they are released from prison.

*8c. Ensure that transition and reentry programming includes family member participation and addresses family unit integration skills development.* Because healthy family relationships and dynamics are an important aspect of treatment programs designed to reduce reoffending, we recommend that CDCR transition and reentry programming include programs designed to provide offenders with the skills to successfully integrate with their families upon release from prison. These programs should include the participation of the offenders' family members whenever possible.

*8d. Ensure that parole programming and transition services respond to the specific needs of female offenders.* Female offenders face specific challenges as they reenter the community from prison. In addition to the female offender stigma, they may carry additional burdens such as single motherhood, decreased economic potential, lack of services and programs targeted for women, responsibilities to multiple agencies, and a general lack of community support. We recommend that the CDCR ensure that its own internal transition programming, as well as those programs and services delivered by community-based partners are responsive to the specific needs of female offenders.

---

z    Taxman, Byrne, & Young (2003)

CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS

> *Finding—The CDCR has begun to focus on offender reentry issues and initiatives, but it needs to expand those efforts.*

It is important to note that as offenders transition from prison to their communities, reducing their risk to reoffend levels not only involves changing the characteristics and motivations of the offenders, but also involves making changes in the communities—reducing the opportunities for them to commit crimes (Byrne and Taxman, 2005). These scholars note:

> The recent development of offender reentry initiatives has renewed interest in initiatives that target both at-risk offenders and at-risk communities. It is becoming increasingly clear that only incremental, short-term changes in offender behavior should be expected from the full implementation of evidence-based practices in both adult and community corrections. In large part, this is because the treatment research highlighted in these evidence-based reviews focused on individual-level change strategies. If we are interested in long-term offender change, we need to focus our attention on the community context of offender behavior, focusing on such factors as community involvement in crime prevention (Pattavina, Byrne, and Garcia, 2006), collective efficacy (Sampson, Raudenbush, and Earls, 1997), community risk level (e.g., communities with higher proportions of first-generation immigrants, particularly Latinos, will have lower violence levels) and community culture. Our basic premise is supported by a review of the research we cite here: we must develop intervention strategies that recognize the importance of person-environment interactions in the desistance process and incorporate both individual and community change into the model. (Byrne and Taxman, 2005)

Therefore, offender programming in the community must include programs designed to continue to reduce offender risk to reoffend levels, as well as reduce offender opportunities for committing crimes. Parole supervision must include a focus on those opportunities to commit crimes that exist in communities where certain neighborhoods or places present unique risks to safety and access to specific victim pools.

> **Recommendation 9—Modify programs and services delivered in the community (parole supervision and community based programs and services) to ensure that those services: (a) target the criminogenic needs areas of high and moderate risk offenders; (b) assist all returning offenders maintain their sobriety, locate housing, and obtain employment; and (c) identify and reduce the risk factors within specific neighborhoods and communities.**



Currently in the CDCR, parole supervision is based on surveillance and monitoring. Community-based programs and services do not target the factors related to reoffending. We recommend, therefore, the CDCR require that all of its programs and services delivered in the community, including parole supervision, include those activities that will keep offenders from re-offending. These activities include: reducing offender criminogenic needs, helping offenders stay sober, assisting offenders with finding housing and jobs, and reducing the criminal toxicity of offender neighborhoods. Most importantly, the CDCR should focus its parole supervision reducing risk by incorporating behavioral management principles that target behaviors that contribute to criminal conduct (Taxman, Sheperdson, and Byrne, 2004).

*9a. Based on a normed and validated instrument assessing risk to reoffend, release low-risk, non-violent, non-sex registrants from prison without placing them on parole supervision.* We recommend that instead of placing low-risk to reoffend, non-violent, non-sex registrant offenders on parole supervision, the CDCR should develop a "stabilization track" for these offenders. This stabilization track would provide low-risk offenders the opportunity to receive voluntary services in relation to housing, job placement, and referrals to other needed social services. The offenders on this stabilization track would no longer be under the legal authority of the Parole Division and as such would not be subject to having their paroles revoked. California will have to consider how to fund this group, because they will need assistance to obtain the services they need to stay out of prison.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

Several studies show that imposing supervision conditions on those who are not likely to reoffend actually increases their recidivism rates. Table 6 shows the results of several studies of the relative effects of parole supervision on offenders by risk level.

*Table 6: Summary Results of the Effects of Treatment*
*and Parole Supervision on Recidivism Rates by Risk Level*

| Study | Risk to Reoffend Level | Level of Treatment and Supervision | |
|---|---|---|---|
| | | Minimal | Intensive |
| O'Donnell et al (1971) | Low | 16% | 22% |
| | High | 78% | 56% |
| Baird et al (1979) | Low | 3% | 10% |
| | High | 37% | 18% |
| Andrews & Kiessling (1980) | Low | 12% | 17% |
| | High | 58% | 31% |
| Bonta et al (2000) | Low | 15% | 32% |
| | High | 51% | 32% |
| *Source: Andrews and Bonta (2003)* | | | |

As Table 6 shows, placing low risk offenders on parole supervision has the opposite of its intended effect—instead of recidivism rates decreasing, they increase.

Such an effort is not new to the CDCR. Back in the early 1990s, the then California Department of Corrections conducted an experiment to lower the rate of technical violations by providing incentives to the parole regions. It was highly successful. Within two years the revocation rate dropped from 58 per 100 parolees to 35.5 per 100 parolees. Further, the disparity in return rates between parole offices and parole regions was dramatically reduced by 48% and 67% respectively. A key component of this model was to redirect part of the avoided prison expenses to parolee support services (Holt, 1995).

*9b. Focus programs and services on the highest criminogenic needs.* Successful parole strategies must include specific steps directed at reducing the dynamic risk factors related to the criminal behaviors of offenders and those risk factors associated with public safety in the community. We, therefore, recommend that the CDCR targets its parole programming on the criminogenic needs of its high and moderate risk parolees, from highest needs to lowest, based on their objective risk assessments.

*9c. Ensure that community-based providers develop and deliver programming that addresses criminal thinking for male offenders.* Current experience shows that most community-based programs do not address the criminal thinking patterns of offenders. We recommend that the CDCR require all of its community-based service providers to develop and deliver cognitive-behavioral based programming to address these needs.

*9d. Train parole agents how to deal with unmotivated and resistant offenders.* Successful parole programming is enhanced by trained supervision agents. We recommend that the CDCR include courses on how to deal with unmotivated and resistant offenders in its training program for parole agents. This training should include motivational interviewing and engagement skills.

*9e. Train parole agents how to mitigate the community risk factors.* Routine activity theory research indicates that identifying and addressing factors related to the safety of places and access to victims are important considerations for reducing crime. Some geographic locations are criminogenic by virtue of (a) what activities are occurring there, (b) who is congregating there, and (c) what is not be doing there to make those places safe. Therefore, it is extremely important that parole agents become aware of how offenders might access victim pools related to their criminal behavior patterns. We recommend, therefore, that the CDCR train its parole agents in strategies that will help them to identify and mitigate the risk factors in the communities. A great deal of research has been done in this field; please see Appendix I for a summary.

---

## California Penal Code Section 3001 Compliance

California Penal Code (CPC) Section 3001 addresses the statutory requirements to consider prior to discharge from parole. Specifically, parolees initially released from prison after serving a period of incarceration for a non-violent offense, described as a conviction not noted in CPC Section 667.5 (c), (e.g., violent crimes) and who have been on parole continuously for one year since their release, shall be discharged the 30th day after their first year, unless the recommendation to retain them on parole has been made to, and approved by the Board of Parole Hearings (BPH).

Additionally, parolees initially released from prison after serving a period of incarceration for a violent offense, as defined by CPC Section 667.5, and who have been on parole continuously for two years since their release, shall be discharged the 30th day after their second year, unless the recommendation to retain them on parole has been made to, and approved by the BPH.

Continuous parole is defined as a parole period with no interruptions as a result of previous actions taken by the BPH. Previous actions taken by the BPH constitute an assessment of revocation time, credit for time served, suspension of parole with reinstatement with time loss, and retention on parole. Those offenders who are eligible for discharge will be allowed to discharge at the field unit level.

In **May of 2007**, the CDCR Division of Adult Parole Operations (DAPO) issued a statewide memorandum dictating that field units comply with this mandate and added administrative oversight at the field administrator level for review of all cases that were recommended to be retained for final review before forwarding to the BPH.

---

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

> *Finding—The CDCR has begun to focus on offender reentry issues and initiatives, but it needs to expand those efforts.*

States needs to strengthen their communities. Communities provide networks of informal social controls that can prevent offenders from repeating their criminal behaviors. Research emphasizes that informal social controls are more powerful in controlling behavior than formal social control agencies such as corrections, law enforcement, welfare, etc. Informal social controls include families, non-criminally involved peers-associates, communities, religious institutions, civic organizations, etc. (Laub, Sampson, and Allen, 2001).

The families, communities, and religious institutions that define neighborhoods are a critical, but often neglected part of the overall plan to reduce recidivism. The research clearly suggests that solid intervention strategies must recognize the importance of person-to-environment interactions to aid in stopping the cycle of recidivism and to incorporate both individual and community changes into the process (Byrne and Taxman, 2005).

**Recommendation 10: Develop the community as a protective factor against continuing involvement in the criminal justice system for offenders reentering the community on parole and-or in other correctional statuses (e.g., probation, diversion, etc.).**



Most of the recommendations in this report are directed at assisting the correctional system to provide better rehabilitation programs and services that are directed at the individual offender level of change. However, our research over the last several decades reinforces the importance of the community and familial supports as sources of informal social controls. We recommend that California take the lead in developing a system of informal social controls in its communities that thwart criminal values and activities and minimizes victimization.address the offenders' criminogenic needs and ensure that offenders are engaged in services and controls appropriate to those needs (Burke, 2000).

---

### Open Drug Market Interventions

For example, a new gang and drug marketing reduction effort that Professor David Kennedy has ongoing in six communities in the U.S. (High Point, Winston-Salem, Greensboro, and Raleigh, North Carolina; Newburgh, New York; and Providence, Rhode Island) illustrates the strengths in informal social controls. Dr. Kennedy installed a program where law enforcement partners with families of drug dealers and leaders in communities (e.g., religious leaders, civic, businesses, etc.) to address the problem of open drug markets in these communities. The law enforcement agencies and prosecutors assemble a dossier on the offenders' criminal behaviors, including issuing arrest warrants. At an arranged meeting with law enforcement personnel and the offenders' family members, the drug dealers are given a choice, which is reinforced by the families—to stop their criminal behavior or have the warrant served. The families provide support that the offender is a welcome member of the community. In several cities, they have noted the closing of long-standing drug markets because the community is behind the offenders efforts to engage in law-abiding activities. (Kennedy, 2007)

This pilot is one of many across the nation that illustrates the power in the community in reducing, controlling, and eradicating criminal behavior. This is the direction that California should take to strengthen the communities that offenders are most likely to return to. It will serve the general good to improve the social functioning in these communities, which should serve overall to reduce crime in California.

---

*10a. Develop a strategy for ensuring that the community is able to provide the necessary health and social services to prisoners and parolees after they are discharged from the criminal justice system.* By default, in most states, the correctional system has become the largest provider of health services for many communities. Offender populations have significantly higher incidences of substance abuse, mental health concerns, and other debilitating diseases than the general population.[aa] Yet, some of these services are not universally available to the offender when they are released. We recommend that California develop a strategy for providing released offenders with various services that address their health and social needs and reduce their risk of further involvement in criminal behavior.

Table 7 shows which services are available to the offender depending on his or her correctional status. Once the offender leaves the correctional system, then he or she must obtain these services in the community, if they exist. In the cases where the needed services do exist, released offenders often don't have the resources required to obtain them. This leads to the offender become physically or mentally destabilized and often results in him or her being returned to prison after being convicted of committing a new crime or violating one or more parole conditions. We believe that it would be in the best interest of California to ensure that released offenders have access to the medications they need to manage their mental health disorders and-or physical ailments, as well as access to housing and job assistance services.

---

aa      Substance Abuse and Mental Health Services Administration, Office of Applied Studies (2006a); James & Glaze (2006); Maruschak (2004); Hammett, Harmon, & Rhodes (2002); Hammett (2001); Hammett, Harmon, & Maruschak (1999); Beck & Maruschak (2004)

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*Table 7: Services Available to Offender based on Status*

|  | In Prison | On Parole | After Parole Release |
|---|---|---|---|
| **Medical Care for TB-HIV-AIDS** | X | In the community, if available | In the community, if available |
| **Medical Care for Asthma-STDs-Diabetes** | X | In the community, if available | In the community, if available |
| **Assessment for Mental Health Disorders** | X | Referral or by CDCR | In the community, if available |
| **Mental Health Counseling** | X | In the community, if available | In the community, if available |
| **Medications for Mental Health Disorders** | X | In the community, if available | In the community, if available |
| **Assessment for Substance Abuse Needs** | X | Referral or by CDCR | In the community, if available |
| **Substance Abuse Treatment** | X | Referral or by CDCR | In the community, if available |
| **Vocational Education Assessment** | X | Referral or by CDCR | In the community, if available |
| **Vocational Educational Training** | X | Referral or by CDCR | In the community, if available |
| **Assessment for Family Issues** | In the community, if available | In the community, if available | In the community, if available |
| **Family Assistance** | In the community, if available | In the community, if available | In the community, if available |
| **Housing Assistance** | In the community, if available | In the community, if available | In the community, if available |
| **Child Care** | In the community, if available | In the community, if available | In the community, if available |

> *Finding—The CDCR does not have a graduated parole sanctions policy to provide community-based alternatives to incarceration for parolees who violate their parole conditions.*

The ultimate goal of parole supervision is successful completion of parole with no new crimes committed. Compliance with parole conditions is intended to produce reductions in crime by reducing the offender's risk to reoffend. However, there is no evidence to support that the current practice of locking up offenders for technical parole violations (not related to their criminal behavior patterns and/or criminogenic needs) reduces crime. Incarceration is a destabilizing factor for the offender, family, and community, and therefore even short-term interruptions contribute to more negative behaviors in the community,[ab] such as unplanned pregnancies and higher rates of sexually transmitted diseases. Anything that contributes to the removal of individuals from the community has a negative impact, some of which is not measurable. But, Maruna (2001) has shown how difficulties in reintegration are only exacerbated by repeated incarceration periods.

**Recommendation 11—Develop structured guidelines to respond to technical parole violations based on risk to reoffend level of the offender and the seriousness of the violation.**



---

[ab]    Thomas & Torrone (2006); Rose & Clear (1998); Kubrin & Stewart (2006); Thomas & Sampson (2005); Clear, Rose, Waring, & Scully (2003)

CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS

*Table 8: Summary of Graduated Responses Concepts, Relevant Research, and Sanctions*

| Concept | Relevant Research Findings | Sanction Features |
|---|---|---|
| **Certainty** | Increased perceived certainty of punishment deters future deviance (Grasmack and Bryjak 1980; Paternoster 1989; Nochols and Ross 1990). | Defined Infractions Behavioral contract & Written Notification Structured Sanction Menu |
| **Celerity** | Reduction in violations by reducing the interval between violation and sanction (Rhine 1993). Delaying response increases perception that response is unfair or questionable. | Swift Process to Respond |
| **Consistency** | Similar decisions made for similar situations increases compliance due to positive experience (Paternoster et al. 1997). | Behavioral contract Structured Sanction Menu |
| **Parsimony** | No punishment should be imposed that is more intrusive or restrictive than necessary (Tonry 1996). | Structured Sanction Menu |
| **Proportionality** | Level of punishment should be commensurate with severity of the criminal behavior (von Hirsch 1993). | Structured Sanction Menu |
| **Progressiveness** | Continued violations result in increasing stringent responses (Altschuler and Armstrong 1994). | Structured Sanction Menu |
| **Neutrality** | Responses must be viewed as impartial and consistent with rules, ethics, and logic (Burke 1997). | Defined Infractions Behavioral Contract |

*11b. Restrict the use of total confinement for parole violations to only certain violations.*
We recommend that California enact legislation that restricts the use of total confinement (e.g., prison) for technical parole violations to only those violations that are: (a) new felony convictions or (b) technical parole violations that are directly related to the offender's criminal behavior patterns, specific dynamic risk factors, and that also threaten public safety. All other parole violations should result in intermediate, community-based sanctions other than prison.

The most recent data from the US Department of Justice shows that for most states, new prison admissions consists of 71% new felony court convictions and 29% parole violators.[ac] California's new prison admissions, however, consists of 36% new felony court convictions and 64% parole violators, which is nearly the exact opposite of most other states. As mentioned before, part of the disparity between California and other states has to do with the sentencing laws that have been passed in California. For example, in California when a parolee absconds from parole, although it is considered a technical parole violation, state law mandates that the violator be arrested (Petersilia, 2006). In 2006, the CDCR admitted nearly 70,000 parole violators to prison. If California were to begin diverting any percentage of those parolees to community-based sanctions instead of prison, it would have less need for prison beds.

---

ac       Bureau of Justice Statistics, National Prisoner Statistics Series, August 2, 2000.

Currently in California, sanctions for technical parole violations are determined by three entities: (a) California state law, (b) the California Board of Parole Hearings (BPH), and (c) the CDCR Division of Adult Parole Operations. All three of these entities base their parole violation sanctions on the seriousness of the violation, but not on the risk to reoffend level of the violator. We recommend that California develop and implement structured sanctions—based on seriousness of the violation and offender risk to reoffend—for technical parole violators. The sanctions should address the offenders' criminogenic needs and ensure that offenders are engaged in services and controls appropriate to those needs (Burke, 2000).

*11a. Develop a parole sanctions matrix that will provide parole agents with guidelines for determining sanctions for parole violations.* The CDCR Division of Adult Parole Operations (DAPO) determines sanctions for approximately 18,000 (24%) of the CDCR's 75,000 total parole violators. Nearly 16,500 of these are non-technical parole violators and the remaining 1,500 are technical parole violators. We recommend that the CDCR create a matrix that incorporates graduated responses in the parole supervision process that support supervision goals and facilitate successful reentry. Having agency guidelines for responding to parole violations serves multiple purposes. Establishing structured parole guidelines will:

- Allow responses to violations to be more fair and consistent throughout the agency, based on a common set of guidelines that provide a set of options appropriate to offender risk level and the seriousness of the violation. While each individual case must be assessed, responses to violations should be viewed as impartial and consistent with rules, ethics, and logic. Similar decisions made for similar situations increases compliance of parolees, whereas dramatically different responses from officer to officer undermine trust and legitimacy of the system.
- Provide parolees with clear supervision expectations and consequences for violations.
- Hold offenders accountable by responding swiftly and certainly to all violations.
- Support maintaining treatment in the community and pro-social activities when feasible.
- Structure efficient use of time, resources, and delegation of authority.
- Allow the delegation of authority and informed decision-making at all levels of the agency.
- Support the agency and staff working together toward a common purpose.
- Facilitate performance measurement and quality assurance.

The graduated responses approach emphasizes using incentives to shape behavior and is based on the concepts in Table 8.

---

By law, Washington State law does not confine its parole (community custody) violators in prison. Consistent with the principle of just deserts, if parolees commit crimes while on supervision, the state prosecutes them. For non-criminal violations of parole supervision, the Washington DOC created a prescriptive sanctioning grid that specified what punishment was allowed for a range of violations. The grid allows parole officers to return to custody only those high and moderate risk offenders who have committed violations directly related to their criminogenic needs. The WA DOC, through a separate administrative hearing unit, imposes parole sanctions.

---

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

## Summary of Findings and Recommendations

| Finding | Recommendation |
|---|---|
| **The state of overcrowding in CDCR prison facilities makes it difficult for offenders to access rehabilitation programming.** | Recommendation 1—The CDCR must reduce overcrowding in its prison facilities to make it easier for offenders to access rehabilitation programming. |
| **The CDCR treats offenders who successfully complete rehabilitation programs and positively manage their behaviors in the same manner as those who do not.** | Recommendation 2—California must enact legislation that creates a system that motivates its offenders to successfully complete their rehabilitation program requirements, comply with institutional rules in prison, and fulfill their parole obligations in the community. |
| **The CDCR does not assign offenders to programs based on risk-needs assessments.** | Recommendation 3—Select and utilize a risk assessment tool to assess offender risk to reoffend. |
| | Recommendation 4—Determine offender rehabilitation treatment programming based on the results of objective assessment tools that identify and measure criminogenic and other needs. |
| **The CDCR does not have automated behavior management (case) plans for each of its offenders.** | Recommendation 5—Create and monitor a behavior management plan for each offender. |
| **The CDCR does not offer a sufficient quantity of evidence-based rehabilitation programs designed to reduce recidivism to its adult offenders.** | Recommendation 6—Select and deliver in prison and in the community a core set of programs that covers the six major offender programming areas—(a) Academic, Vocational, and Financial; (b) Alcohol and other Drugs; (c) Aggression, Hostility, Anger, and Violence; (d) Criminal Thinking, Behaviors, and Associations; (e) Family, Marital, and Relationships; and (f) Sex Offending. |
| **The CDCR does not measure the quality or effectiveness of its adult offender programs.** | Recommendation 7—Develop systems and procedures to collect and utilize programming process and outcome measures. |
| **The CDCR has begun to focus on offender reentry issues and initiatives, but it needs to expand those efforts.** | Recommendation 8—Continue to develop and strengthen its formal partnerships with community stakeholders. |
| | Recommendation 9—Modify programs and services delivered in the community (parole supervision and community based programs and services) to ensure that those services: (a) target the criminogenic needs areas of high and moderate risk offenders; (b) assist all returning offenders maintain their sobriety, locate housing, and obtain employment; and (c) identify and reduce the risk factors within specific neighborhoods and communities. |
| | Recommendation 10: Develop the community as a protective factor against continuing involvement in the criminal justice system for offenders reentering the community on parole and-or in other correctional statuses (e.g., probation, diversion, etc.). |
| **The CDCR does not have a graduated parole sanctions policy to provide community-based alternatives to incarceration for parolees who violate their parole conditions.** | Recommendation 11—Develop structured guidelines to respond to technical parole violations based on risk to re-offend level of the offender and the seriousness of the violation. |