# EXHIBIT C

# PAGES 51-100

## Making it Work in California

The road to correctional reform is littered with thousands of pages of reports written by well-meaning people with good intentions. These reports often present good information, solid support, and well-developed conclusions, but fall short in the area of implementation. We recognized this common pitfall and devoted a considerable amount of time to making sure that this report is different.

## Identified Barriers

The first step that we took to make this report useful was to identify several barriers that we believe will either prevent or hinder our recommendations from being fully implemented in California. We provide a complete list of those barriers in Appendix J—Implementation Requirements, but provide a summary here.

Essentially, the barriers we identified can be classified into four categories: (a) legislative, (b) structural, (c) cultural, and (d) societal (or community).

Legislatively, California must change the laws that contribute to offenders' lack of access to and motivation for participating in rehabilitation programming. Unless California reduces overcrowding, offenders will not have the space or safe environment they need to participate in the rehabilitation programs. And, until California provides its offenders with motivation to become involved in and successfully complete rehabilitation programs, they will continue to "do their time," likely getting worse, but certainly not getting better.

Structurally, the CDCR must take the necessary steps to improve the alignment of its organizational infrastructure to its stated mission. It must redraw its organizational chart to centralize programming policy, while making it easier for unit-level leaders to make decisions. It must tear down the silos between departments and create cross-functional teams that work together to solve the organization's challenges. It must also enhance and build up its technology infrastructure to support offender information sharing, automated behavior plan (case) management, and computer-based programming delivery.

Culturally, the CDCR must develop its employees to ensure that they are qualified to deliver and support adult offender rehabilitation programming. The CDCR must also train them to identify and manage the prisoners and parolees based on the assessment of risk and needs, in the context of a behavior management plan. It must ensure that all staff, correctional and programming, are working together to provide rehabilitation programs and services to offenders so that those offenders, when released, are less likely to return.

From a societal perspective, the CDCR must continue to foster, nurture, and expand partnerships with local governments and community-based organizations to provide seamless delivery of programming and services between prison- and community-based providers. And communities must realize that they can be either part of the solution to California's correctional crisis or part of the problem.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

Expected Positive Outcomes

*Is it possible to quantify the benefits of implementing our recommendations?*

The simple answer to that question is *it depends.*

As anyone familiar with estimating potential impacts will state, quantifying potential benefits (or costs) depends largely on the extent to which the interventions are fully implemented. We have proposed a comprehensive package of recommendations, some of which California can implement faster than others. On one side of the implementation spectrum are those recommendations that organizational development consultants refer to as "low-hanging fruit"—those policy and practice changes that the CDCR can implement relatively quickly. Included in this group are activities like: piloting a static risk assessment, continuing to develop internal and external research capability, and developing a parole sanctions matrix. On the other side of the spectrum are those recommendations that will take longer to implement—recommendations that require labor contract negotiations or the enactment of new laws. Included in this group are activities like adopting and validating a criminogenic needs assessment instrument, enacting legislation to expand the system of positive reinforcements for program participation, and measuring program outcomes to improve program fidelity. California will realize the benefits of implementing our recommendations in direct relationship to the speed in which it puts them into practice.

In addition to the implementation factor, another variable that will influence the impact of our recommendations is the public sentiment that we have alluded to throughout this report. Although research shows that the voting public now feels that the CDCR should be rehabilitating its offenders, recent California legislation, like AB 900, which provides for $7 billion dollars to be spent on constructing additional prisons over the next several years, belies that sentiment. History shows that public sentiment on crime policy changes with the prevailing winds. The unfortunate truth about correctional policy is that oftentimes it is driven more by newspaper headlines than rigorous research. One only has to consider how the Willie Horton story in 1986, torpedoed rehabilitation reform to understand the importance of public sentiment on correctional policy. Some of our recommendations propose diverting some prisoners who are now sent to prison to community sanctions and others propose no longer supervising some parolees who are now being monitored by parole agents. Correctional experts and criminologists say that these are the right measures to take. But the most important questions are: *Is the public ready for these offenders to return? Would California's political leaders have the collective resolve to continue reforming its correctional system should even one of these diverted parolees or no longer supervised "ex-parolees" commit a headline grabbing crime?* We cannot answer those questions.

52

However, having provided those caveats, we believe that if California were to implement all of our recommendations, it would reduce the number of prison beds that it needs, thereby reducing the amount of money it spends on corrections. Table 9 summarizes our estimates. We provide details of these estimates in Appendix E.

*Table 9: Total Costs and Savings of Proposed Programming and Population Reduction Strategies*

|  |  | Costs | Dollar Savings | Bed Savings |
|---|---|---|---|---|
| Costs | Cost of Prison Programs | $120,637,519 - $124,236,131 |  |  |
|  | Cost of Parole-Community Corrections | $450,000,000 - $468,750,000 |  |  |
|  | *Total Costs* | *$570,637,519 - $592,986,131* |  |  |
|  | + 10% increased CA costs* | $57,063,752 - $59,298,613 |  |  |
|  | *Net Costs* | *$627,701,271 - $652,284,744* |  |  |
| Bed Reduction Savings | Prison Bed Savings |  | $803,283,000 - $906,268,000 |  |
|  | Recidivism Savings |  | $45,181,579 - $90,379,636 |  |
|  | *Total Bed Reduction Savings* |  | *$848,464,579 - $996,647,636* |  |
| Offsets | Current Budget Funding for Prison and Parole Programming |  | $340 000,000 |  |
|  | *Total Current Spending* |  | *$340,000,000* |  |
|  |  |  |  |  |
|  | *Total Savings* |  | *$1,188,464,579 – $1,336,647,636* |  |
|  | **Net Savings** |  | **$560,763,308 – $684,362,892** |  |
|  |  |  |  |  |
|  | *Beds saved through population reduction* |  |  | *38,000 – 44,000* |
|  | *Beds saved through recidivism reduction* |  |  | *2,200 – 4,400* |
|  | **Overall Bed Savings** |  |  | **41,200 – 48,400** |

*A preliminary estimate of the increased costs for funding correctional programs in California compared to the rest of the country. See Gordon et. al. (2007).

Overall, our recommended strategies would reduce the number of prison beds that California needs by 42,000 to 48,000 beds per year. The result would mean an annual savings of between $848 and $996 million. New investments in prison and community programming should cost between $628 and $652 million a year. A significant portion of these costs, or $340 million a year, which the CDCR now spends on programs, could ultimately be used to offset these new expenditures. In total, all these new strategies could save California between $561 and $684 million a year.

We also believe that if California implements our recommendations, it will establish an accountable and credible correctional system. It is no secret that the Federal judiciary is giving serious consideration to appointing a Federal Receiver to run California's correctional system, as it already has with the states' correctional healthcare system. By adopting and implementing our recommendations, California will demonstrate by its actions, not just its words, that it is capable of resolving its current correctional crisis on its own. We have provided solutions to California's correctional problems that are evidence- and experience-based. We have provided a roadmap that other states have used to (a) improve their correctional cultures; (b) reduce the overcrowding and violence in their prisons; and (c)

provide their offenders with viable rehabilitation programs and services. Consequently, as prisoners receive more and better rehabilitative and treatment services prison security also improves. When custody challenges are minimized the prison becomes a safer environment for all corrections personnel.

## Incremental Implementation

As we close the first part of this report, we believe that the keyword to keep in mind is incremental. We recognize the natural desire of people to want to fix things rapidly and we urge speed where speed is called for. But we also urge caution when venturing into uncharted territories for the organization. The CDCR is the nation's largest correctional agency. It has many internal parts and external stakeholders; its information systems are not networked in most cases, making the sharing of offender information problematic at best; and it has two large employee labor unions with several thousand members each, which adds complexity to changing work assignments or expanding existing roles. The CDCR has a great deal of work to do to explain to its staff throughout the organization why these reforms are needed. If staff members do not understand why it is important for them to do what is required and how doing so will make them more effective, the CDCR will not be able to implement most of these recommendations. In light of these considerations, pilots should be used whenever possible to work out the flaws and engender buy-in when launching new initiatives. Using pilots means going slower than we are sure some would like, but experience teaches us that when attempting to transform organizations, leaders really only get one time to get it right. It is worth taking the time to get it right.

In terms of risk assessment, while piloting the COMPAS in prison, the CDCR could also quickly develop and begin piloting a static risk factor instrument to determine the risk to reoffend levels of all of its prisoners using existing data, and supplementing it as needed. This would provide the CDCR with an alternative method of obtaining a much-needed risk assessment tool, while at the same time giving it more time to validate and customize the COMPAS tool for its future expanded use. In terms of needs assessment, in Appendix D, we identify a few possible instruments that the CDCR could initially adopt, for example the CSS-M to measure criminal thinking/associates, HIQ to determine anger management needs, the static 99 to evaluate sex offender needs, and the TCU or ASI for determining substance abuse needs.

In Appendix K—Implementation Timeline, we provide a rational timeline for implementing all of the Panel's Reform Recommendations over a two-year period of time. We provide here a summary of the major tasks from that timeline.

**Major Tasks:**

1. Adopt Expert Panel Plan and Recommendations
2. Craft and Pass Legislation and Change Policies to Create Access to and Incentives for Program Participation
3. Develop or Adopt and Implement Risk to Reoffend Assessment Instrument
4. Select and Implement Offender Needs Assessment Instrument
5. Begin Assigning Offenders to Appropriate Services Based on Risk and Needs
6. Pilot New Programs

# Part II—The Program Reviews

*In this part of the report, we provide the results of our review of 34 programs that the CDCR has identified as being designed to reduce recidivism.*

## Where California Now Stands

Tables 10 and 11 present an overview of the prison and parole programs and activities that the CDCR offers its adult offender population. In Appendix M we provide more information and analysis regarding these programs.

Table 10: CDCR Adult Offender Prison Program and Activity Participation

| Activity-Program Type | Number of Prisoners Participating | % of Released Prisoners (n=134,148) |
|---|---|---|
| Support Services | 50,019 | 37.3% |
| Bridging Program | 27,791 | 20.7% |
| Academic Education | 24,505 | 18.3% |
| Substance Abuse Treatment | 9,772 | 7.3% |
| Vocational Educational | 8,736 | 6.5% |
| Industries | 4,033 | 3.0% |
| Forestry Training | 3,608 | 2.7% |
| Camp | 3,589 | 2.7% |
| Community Work Crews | 748 | 0.6% |
| Reception Center Permanent Work Crews | 181 | 0.1% |
| Joint Venture | 40 | 0.0% |

Source: CDCR, 2006

Table 10 shows the numbers of prisoners who participated in a CDCR-sponsored program or activity at any time before their release dates in 2006. Most prisoners participated in the Support Services activity. The CDCR assigns prisoners to Support Services to offer them the opportunity to learn skills through on-the-job or vocational training. Support Services assignments enable the prison to operate more efficiently and include positions like porter, food server, and yard crew worker.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*Table 11: CDCR Adult Offender Parole Program and Activity Participation*

| Program Type | Releases | % of all releases (n=113,839) |
|---|---|---|
| Police and Corrections Team (PACT) | 38,261 | 33.6% |
| Substance Abuse Treatment and Recovery (STAR) | 6,205 | 5.5% |
| Substance Abuse Services Coordinating Agencies (SASCA) | 4,440 | 3.9% |
| Parolee Employment Program (PEP) | 4,071 | 3.6% |
| Employment Development Department (EDD) | 3,452 | 3.0% |
| Parolee Service Centers (PSC) | 3,061 | 2.7% |
| Computerized Literacy Learning Centers (CLLC) | 2,496 | 2.2% |
| Parole Services Network (PSN) | 1,485 | 1.3% |
| Bay Area Service Network (BASN) | 1,386 | 1.2% |
| Residential Multi-Service Centers (RMSC) | 943 | 0.8% |
| In-Custody Drug Treatment Program (ICDTP) | 181 | 0.2% |
| Source: CDCR, 2005 | | |

Table 11 shows the numbers and types of programs in which parolees participate. The Police and Corrections Team (PACT) is the program that has the largest parolee participation. Panel Members had the opportunity to visit a PACT meeting in Sacramento. The PACT creates partnerships between local law enforcement and social services agencies to provide parolees with assistance in obtaining substance abuse treatment, transitional living accommodations, employment services, subsistence services, and educational-vocational training.

The data in Tables 10 and 11 provides a baseline for California to begin the discussions about increasing the quantity of programs that the CDCR offers, as well as increasing the numbers of offenders who participate in rehabilitation programs. This is especially important in light of the rehabilitation program requirements required in the recently passed AB 900.

## Identifying Recidivism Reduction Programs

The CDCR operates more than just recidivism reduction programs and activities, and we provide an in-depth description of those programs and activities in Appendix M. Our mission was focused on rehabilitation programming, which means that we had to develop a means of specifically identifying recidivism reduction programs. To meet our definition of a recidivism reduction program, the programs had to satisfy all three of these criteria:

1. It must conform to our definition of a program. A program is a set of structured services designed to achieve specific goals and objectives for specific individuals over a specific period of time. Programs are typically targeted towards particular problems such as substance abuse or criminal thinking.[ad]
2. It must be a recidivism reduction program, intended to reduce risks to reoffend levels and criminogenic needs scores of offenders—making offenders less likely to commit further crimes. Recidivism reduction programs are those programs that would be judged successful based on their having a positive impact on recidivism by participants.
3. It must be a CDCR-operated or funded program. The CDCR must operate the program directly through its staff or indirectly through a contract provider.

The CDCR Office of Research submitted the initial roster of recidivism reduction programs that they wished us to consider. We gave that roster, along with our filtering criteria, to a group of CDCR managers (adult programs, adult institutions, adult parole, substance abuse treatment, and correctional education). We asked them to review the roster that the Office of Research had submitted to us in light of our filtering criteria and to nominate those programs that should be included in the Nominated Recidivism Reduction Program Inventory (NRRPI). The CDCR managers had nominated 34 programs that they felt met the criteria to be included in the NRRPI.[ae] Table 12 shows the results of this exercise.

---

ad    We used the Pennsylvania Department of Corrections Program Analysis: A Description of PA DOC Programs and an Evaluation of their Effectiveness report for our definition of "program."
ae    The Prisoner Reentry Initiative (PRI) was originally on the list of programs that the CDCR managers nominated for the NRRPI. But the PRI program representatives did not respond in time for us to include the program's information in this report.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*Table 12: CDCR-Nominated Recidivism Reduction Program Inventory*

| **Prison Programs** |
|---|
| Academic Courses |
| Bridging Education Program (BEP) |
| Carpentry Pre-Apprenticeship Program |
| Community Prisoner Mother Program (CPMP) |
| Conflict Anger Lifelong Management (CALM) |
| Drug Treatment Furlough (DTF) |
| Elementary Secondary Education Act (ESEA) |
| Family Foundations Program (FFP)* |
| Inmate Employability Program (IEP) |
| Offender Employment Continuum (OEC) |
| Re-Entry Education |
| S.T.A.N.D. U.P. (Successful Transitions and New Directions Utilizing Partnerships) |
| Substance Abuse Program (SAP) |
| Transitional Treatment Program (TTP) |
| Vocational Education |
| **Parole Programs** |
| Community Reentry Partnerships (CRP) |
| Community-Based Coalition (CBC) |
| Computerized Literacy Learning Centers (CLLC) |
| Day Reporting Center (DRC) |
| Employment Development Department (EDD) |
| Female Offender Treatment and Employment Program (FOTEP) |
| In-Custody Drug Treatment Program (ICDTP) |
| Parolee Employment Program (PEP) |
| Parolee Service Centers (PSC) |
| Parolee Services Network (PSN) |
| Parolee Substance Abuse Program (PSAP) |
| Residential Multi-Service Center (RMSC) |
| Substance Abuse Service Coordinating Agency (SASCA) |
| Substance Abuse Treatment and Recovery (STAR) |
| **Prison & Parole Programs** |
| Employment Re-Entry Partnership (ERP) |
| Incarcerated Youthful Offenders (IYO) |
| SB 618 |
| Transitional Case Management Program-HIV (TCMP-HIV) |
| Transitional Case Management Program-Mental Health Services Continuum (TCMP-MHSCP) |
| *Alternative to incarceration.* |

## Methodology for Surveying Inventory Programs

The Program Review sub-committee worked with a team of researchers from the Center for Evidence-Based Corrections (CEBC) to develop a survey instrument to collect information on each of the 34 programs that the CDCR managers nominated for the NRRPI. (See Appendix N for a copy of the survey.) We designed the survey to gather program information on program characteristics using the approach taken by the Pennsylvania Department of Corrections (2003), as well as to identify the five key program development elements (context, identification, intervention, goals, and linkages) that Krisberg (1980) outlined.

In most cases, if the CDCR was operating a program at multiple sites with multiple providers, then CDCR program management staff nominated the program sites they wanted us to survey. They nominated the sites they believed represented the most "pure" program models. However, for the in-prison Substance Abuse Program (SAP), we surveyed each of the six providers.

We distributed surveys to the program directors, by email and by mail. We included a cover letter from Marisela Montes, Chair of the Expert Panel, with each survey. The cover letters contained instructions for completing the surveys and a list of supporting materials that we wanted the program directors to submit to us along with the survey. The supporting materials included: copies of program manuals, training materials, curriculum materials, and other documentation that would support their responses to the survey items.

The CEBC used the program directors' responses and supporting materials to create the NRRPI. The NRRPI is a comprehensive catalog of pertinent information for each of the 34 nominated recidivism reduction programs. Because of its size, we have placed it in Appendix N of this report. We encourage the reader to review the NRRPI to get an overview of the kinds of rehabilitation programs the CDCR offers its adult offenders.

## Evaluating Recidivism Reduction Programs

The NRRPI contained 34 programs. We conducted a high-level review of 11 of those programs to determine their fidelity to evidence-based programming principles and practices. This review provides information as to whether or not these programs have a high *probability* of producing good program outcomes.

### Selecting a Rating Instrument

We decided to review the 11 programs using the California Program Assessment Process (CPAP). The CPAP is a tool for rating rehabilitative programs according to their conformity with the findings of behavioral research on effective correctional interventions.

A CPAP rating provides two kinds of information on program quality. First, the Effective Interventions Scale assesses the degree to which a program's design incorporates elements that reduce recidivism. Second, the Research Basis Scale assesses the extent and the quality of the research supporting the program's design. This combination of ratings allowed us to determine whether these CDCR programs reflected or were out of step with the eight evidence-based rehabilitation programming practices and principles.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

## Selecting the Programs to Review

The CEBC staff used these criteria to determine which of the 34 programs it would review first:

- Balance between institutional and parole/community programs
- Inclusion of programs specifically for female offenders
- Diversity of program types (substance abuse, life skills, vocational/employment, etc.)
- CDCR program practitioner sense of which programs are the most promising in terms of recidivism-reduction potential

Table 13 shows the 11 programs that we selected to review first and the locations at which they are operated.

*Table 13: 11 Programs Selected for CPAP Review*

| | Program | Site |
|---|---|---|
| **Institutions Programs** | Incarcerated Youthful Offender (IYO) | Centrally administered |
| | Substance Abuse Program (SAP) | SATF-Yard F |
| | Family Foundations Program (FFP) | Santa Fe Springs |
| | Re-Entry Education | Centrally administered |
| | Transitional Case Management Program-Mental Health Services Continuum (TCMP-MHSCP)* | Centrally administered |
| | | |
| **Parole-Community Programs** | Female Offender Treatment Employment Program (FOTEP) | San Diego |
| | Substance Abuse Treatment and Recovery (STAR) | Centrally administered |
| | Parolee Employment Program (PEP) | San Diego |
| | Residential Multi-Service Centers (RMSC) | Stockton |
| | In-Custody Drug Treatment Program (ICDTP) | Centrally administered |
| | Day Reporting Center (DRC) | Fresno |

*\* TCMP-MHSCP was classified as an institutions program in the initial roster of programs prepared by the CDCR Office of Research. It has elements that occur both in the prisons and in the community.*

## CPAP Assessments Methodology

To prepare for the program reviews, the CEBC and CDCR Research staff members, who were assigned to perform the ratings, attended a full day of training conducted by Dr. Ryken Grattet and Jesse Jannetta. The trainers presented the raters with a copy of the CPAP and other instructional materials; informed the raters of the theoretical basis of the CPAP; and conducted a mock rating of a CDCR operated program to familiarize the raters with the process.

After completing the training, Dr. Grattet and Jesse Jannetta organized the raters into five teams of two. One rater was from the CDCR Office of Research and the other was from the Center for Evidence-Based Corrections (CEBC). Dr. Grattet and Jesse Janetta gave each of the teams two or three programs to review.

The raters then reviewed their assigned programs. The raters used a scoring sheet (which can be found in Appendix N) to rate and document assessment scoring decisions. First they reviewed the information contained in the surveys and supporting material that the program directors had submitted and made an initial, independent assessment of the program. Team members then compared their assessment scores and created a list of follow up questions for the program representative. The teams then contacted the program representative via email or by telephone to gather any missing information and to clarify any areas of uncertainty. The teams documented all email communications and transcribed all phone conversations to ensure information accuracy.

Ratings for each program represent the consensus of both members of the rating team. In the event that team members were unable to achieve consensus, Dr. Grattet and Jesse Jannetta mediated scoring disagreements. The teams submitted their final CPAP assessments with corresponding documentation. We reviewed and concurred with their assessments and included that information in this report.

Effective Interventions Ratings

Figure 7 summarizes each program's score on the CPAP *Effective Interventions Scale*, as a percentage of possible points. Six of eleven programs that we rated received 70% or more of the possible points, indicating that many of the CDCR programs were designed with the principles of effective intervention. This is a promising sign that California is moving toward evidence-based practices in its rehabilitation program design. However, the fact that three of the eleven programs rated received less than 50% of the possible points also suggests that there are areas in which the CDCR can improve its program designs to make them more effective.

*Figure 7: Effective Interventions Ratings*



*FFP: Family Foundations Program; IYO: Incarcerated Youth Offenders; SAP-SATF: Substance Abuse Program at California Substance Abuse Treatment Facility-Yard F; TCMP-MHSCP: Transitional Case Management Program-Mental Health Services Continuum; DRC: Day Reporting Center; FOTEP: Female Offender Treatment and Employment Program; ICDTP: In-Custody Drug Treatment Program; PEP: Parolee Employment Program; RMSC: Residential Multi-Service Center; STAR: Substance Abuse Treatment and Recovery*

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

### Research Basis Ratings

Figure 8 summarizes each program's score on the CPAP *Research Basis Scale*, as a percentage of possible points. We gave zero points to four of the eleven programs that we reviewed because they did not have any internal evaluation requirements or methods. When we reviewed the remaining seven programs, only four of those programs scored higher than 27% and the other three scored 13% or lower. This indicates that CDCR programs are not delivered in accordance with evidence-based principles and practices.



*Figure 8: Research Basis Ratings*

*FFP: Family Foundations Program; IYO: Incarcerated Youth Offenders; SAP-SATF: Substance Abuse Program at California Substance Abuse Treatment Facility-Yard F; TCMP-MHSCP: Transitional Case Management Program-Mental Health Services Continuum; DRC: Day Reporting Center; FOTEP: Female Offender Treatment and Employment Program; ICDTP: In-Custody Drug Treatment Program; PEP: Parolee Employment Program; RMSC: Residential Multi-Service Center; STAR: Substance Abuse Treatment and Recovery*

CPAP Assessments Summary

Table 14 summarizes the results of the combined program ratings from the *Effective Interventions* and *Research Basis Scales.* We list the CPAP rating element from each scale on the left side of the chart.

*Table 14: Summary of CPAP Assessments on 11 Rated Recidivism Reduction Programs*

| | Institutions Programs | | | | Parole/Community Programs | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | FFP | IYO | Reentry Education | SAP-SATF | TCMP-MHSCP | DRC | FOTEP | ICDTP | PEP | RMSC | STAR |
| Assesses risk and targets high-risk | ◊ | ◊ | ◊ | ∞ | ◊ | ◊ | ◊ | ◊ | ◊ | ◊ | ◊ |
| Assesses criminogenic needs and delivers services accordingly | ● | ◊ | ◊ | ● | ● | ● | ◊ | ● | ◊ | ◊ | ● |
| Theoretical model clearly articulated | ● | ● | ◊ | ● | ● | ● | ● | ● | ● | ◊ | ● |
| Has program manual and/or curriculum | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| Uses cognitive-behavioral or social learning methods | ● | ◊ | ◊ | ● | ● | ● | ◊ | ● | ◊ | ● | ◊ |
| Enhances intrinsic motivation | ● | ◊ | ● | ● | ◊ | ● | ● | ◊ | ● | ● | ◊ |
| Continuities with other programs and community support networks | ● | ● | ◊ | ● | ● | ● | ● | ● | ∞ | ● | ∞ |
| Program dosage varies by risk level | ◊ | ◊ | ◊ | ◊ | ◊ | ◊ | ◊ | ◊ | ◊ | ◊ | ◊ |
| Responsive to learning style, motivation and culture of offenders | ● | ● | ● | ● | ● | ● | ● | ● | ◊ | ● | ◊ |
| Uses positive reinforcement | ● | ◊ | ● | ● | ● | ◊ | ● | ● | ◊ | ● | ● |
| Staff has undergraduate degrees | ◊ | ◊ | ● | ● | ◊ | ● | ● | ● | ◊ | ● | ◊ |
| Staff has experience working with offenders | ● | ● | ● | ● | ● | ? | ● | ● | ● | ● | ● |
| Staff recruitment and retention strategy | ● | ◊ | ◊ | ● | ● | ● | ● | ◊ | ● | ◊ | ● |
| New staff training | ● | ● | ● | ● | ● | ● | ● | ● | ◊ | ◊ | ● |
| Program director qualifications | ◊ | ◊ | ● | ● | ● | ● | ● | ● | ● | ◊ | ◊ |
| Program data collected and analyzed | ● | ● | ● | ● | ● | ◊ | ● | ● | ● | ◊ | ● |
| Rigor of evaluation studies | ◊ | ◊ | ◊ | ◊ | ● | ● | ● | ● | ◊ | ◊ | ◊ |
| Best practices and/or expert panel recommends | ◊ | ◊ | ◊ | ◊ | ◊ | ◊ | ◊ | ◊ | ◊ | ◊ | ◊ |
| Evaluation study appeared in peer-reviewed publication | ◊ | ◊ | ◊ | ● | ◊ | ◊ | ◊ | ◊ | ◊ | ◊ | ◊ |
| Extent and consistency of evaluation results | ◊ | ◊ | ◊ | ◊ | ◊ | ◊ | ◊ | ● | ◊ | ◊ | ◊ |

Legend: ● Meets criteria  ∞ Partially meets criteria  ◊ Does not meet criteria  ? No data provided

**FFP**: *Family Foundations Program;* **IYO**: *Incarcerated Youth Offenders;* **SAP-SATF**: *Substance Abuse Program at California Substance Abuse Treatment Facility-Yard F;* **TCMP-MHSCP**: *Transitional Case Management Program-Mental Health Services Continuum;* **DRC**: *Day Reporting Center;* **FOTEP**: *Female Offender Treatment and Employment Program;* **ICDTP**: *In-Custody Drug Treatment Program;* **PEP**: *Parolee Employment Program;* **RMSC**: *Residential Multi-Service Center;* **STAR**: *Substance Abuse Treatment and Recovery*

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

**CPAP Assessments Details**

In this section of the report we provide an explanation of the evidence-based practice or principle behind each of the CPAP rating elements. Then, in italics, we provide a summary of the performance of the eleven programs relative to each element.

Assesses Risk and Targets High-Risk

The most effective recidivism reduction programs conform to the risk principle, which states: "Programs should target offenders who are the greatest risk to reoffend." By targeting the highest risk to reoffend offenders, the CDCR can allocate its resources to offenders who present the greatest risk to the public and who are likely to require the most intensive program interventions to prevent recidivism. To receive credit on this rating element, programs must assess offender risk by means of a validated risk assessment instrument, and target program services to the highest risk offenders.

*Only one of the eleven programs assessed with the CPAP conducted or utilized a validated risk assessment instrument. That program, the Substance Abuse Program at the California Substance Abuse Treatment Facility-Yard F, utilizes the CDCR institutional classification score, which is valid for predicting risk of violence within CDCR institutions, although not post-release risk. That program did not use the instrument for the purpose of targeting higher risk offenders. Both within the CPAP programs assessed and in the Inventory generally, informal predictors of potential risk (such as convictions for violent offenses) were usually used to disqualify offenders from programs, rather than to target them for programming interventions. Generally, when CDCR programs target offenders by risk level, it is for the purpose of restricting a program to low-risk offenders. High risk offenders are served only by programs that do not consider risk level at all. The result is a programming environment that offers more programming to low-risk offenders than to high-risk offenders, in direct contradiction to the risk principle.*

Assesses Criminogenic Needs and Delivers Services Accordingly

The most effective recidivism reduction programs conform to the needs principle, which states: "Programs should address criminogenic needs." Criminogenic needs are the deficits an offender faces that have contributed to past offending behavior and are likely to lead to future offending unless they are addressed. These needs are dynamic risk to re-offend factors, ones that are possible to change through effective intervention. To receive credit on this rating element, programs must use a validated needs assessment instrument to determine the criminogenic needs of participants and use that assessment to determine the delivery of services and treatment.

*Needs assessment was more common than was risk assessment among the programs assessed with the CPAP. Six of the eleven programs assessed conduct needs assessments using a validated instrument for the purpose of determining how services should be delivered. The six programs used a variety of instruments, often dictated by the specific program type, such as the Wechsler Adult Intelligence Scale-III and Minnesota Multi-Phasic Personality Inventory-2 mental health assessments utilized by the Transitional Case Management Program-Mental Health Services Continuum. The Contra Costa County Office of Education, which runs both the Substance Abuse Treatment and Recovery program and the In-Custody Drug Treatment Program, developed its own needs assessment instrument, and retained a psychometrician to conduct validation tests for it. Their instrument was the only instrument utilized by more than one of the programs assessed.*

*Among the five programs that did not utilize a valid needs assessment instrument, each used some kind of intake form or checklist to identify offender needs. In the absence of validation, it was not possible to determine how consistent these instruments were, or how accurately and effectively they identified offender needs. The variety of validated and non-validated needs assessment tools in use across these programs is in part the result of the lack of a CDCR-wide needs assessment protocol for offenders, which forces each program to adapt its own approach to assessing needs. These program-specific needs assessments were used primarily to determine how a program should be delivered to participants once they were admitted to a program, rather than to screen eligible participants to determine which of them should be in the program.*

## Clearly Articulates a Theoretical Model

A program's theoretical model posits a cause and effect relationship between the program activities and a reduced likelihood or recidivism. To receive credit on this rating element, the program model must identify a criminogenic need, and it must link the program intervention to addressing that need. Programs do not receive credit for this element if they address only non-criminogenic needs (although they may address such needs alongside criminogenic needs), or if program content does not have a clear relationship to that need.

*Clearly articulated theoretical models were the norm among the eleven programs assessed. Only the Residential Multi-Service Center and the Reentry Education programs did not clearly articulate their theoretical models. Both deliver services or curricula intended to address a variety of potential criminogenic needs, but neither drew a clear relationship between those services and their participant population. Significantly, neither program conducts a needs assessment, contributing to a lack of clarity about the relationship between program intervention and participant need.*

## Has Program Manual and-or Curriculum

Written program manuals and curricula are important means by which the program's theory and content is transmitted consistently to program staff. Programs receive credit for having this material in writing.

*All eleven programs assessed had written program manuals and/or curriculum materials.*

## Uses Cognitive-Behavioral or Social Learning Methods

Cognitive behavioral and social learning approaches have a track record of success in programs to reduce re-offending. Cognitive-behavioral theory posits that offending behavior is the result of patterns of thought that are conducive to criminal behavior. Addressing these criminal thought patterns requires social learning techniques in which the offenders are not only taught different ways of thinking, but how to model them. Pro-social attitudes and behaviors are positively reinforced by program staff. Cognitive-behavioral and social learning methods stress the importance of structure, organized values, roles, rules, responsibilities, and of accountability. A program receives credit for utilizing cognitive-behavioral or social learning methods.

*Eight of eleven programs assessed received credit for employing cognitive-behavioral and/or social learning methods, and a ninth (Reentry Education) employs elements of a cognitively-based curriculum, but the overall program framework does not operationalize the methods sufficiently to receive credit. Based on the programs assessed, it appears that the value of these methods is understood within the CDCR program provider community. It is likely that the quality and the extent of the use of these methods in practice vary considerably*

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*across programs. Determining the degree to which this is the case was beyond the scope of this CPAP assessment project, but devoting resources to doing so would provide valuable additional insight into the quality of cognitive-behavioral and social learning programming in the CDCR.*

## Enhances Intrinsic Motivation

A degree of intrinsic motivation is necessary for an offender to realize lasting behavioral change. Offender motivation for change is likely to fluctuate over the course of program participation and the offender may experience substantial ambivalence about abandoning long-held patterns of thinking. Program staff can play a powerful supporting role in enhancing the motivation of prisoners to change, using a technique called "motivational interviewing." Motivational interviewing is a directive, goal-oriented counseling style intended to elicit offender ambivalence about change in order to effectively resolve it. Programs receive credit if they utilize motivational interviewing techniques.

*Six of the eleven programs assessed reported training staff on motivational interviewing techniques and requiring their use. The more intensive programs in the group, such as residential and therapeutic community programs, were particularly likely to use motivational interviewing.*

## Has Continuities with other Programs and Community Support Networks

Many successful program interventions recruit and use offender family members, community programs and other sources of pro-social support to positively reinforce desirable behaviors. Engaging such support networks can extend the reach, and therefore the effectiveness, of programs in both time and space. Programs receive credit for continuities with community support networks, offender families and other programs.

*All the programs assessed with the exception of Reentry Education received at least partial credit for continuities. Family Foundations Program (FFP), Substance Abuse Program at California Substance Abuse Treatment Facility-Yard F (SATF SAP), Day Reporting Center (DRC), Female Offender Treatment and Employment Program (FOTEP), and Residential Multi-Service Center (RMSC) engage participant family members. The SATF SAP, FFP, Incarcerated Youthful Offenders, In-Custody Drug Treatment Program, and Substance Abuse Treatment and Recovery programs interface with other programs to provide aftercare or follow-up services for program completers. FFP, DRC, FOTEP, Parolee Employment Program, RMSC, and Transitional Case Management Program-Mental Health Services Continuum programs connect clients with community resources such as AA/NA meetings or transitional housing providers. The Reentry Education program funds community liaisons in three cities, which is too limited relative to the entire participant population to receive credit as part of the overall program design, but indicates recognition of the importance of these continuities. Based on this group of programs, the CDCR and its program providers consistently seek to build continuities with other programs and community support networks into their program models.*

## Varies Program Dosages by Risk Level

Dosage refers to the total program exposure, generally measured in hours. The effectiveness of good programs can be diluted when the program is delivered at a low intensity. As a general principle, a higher dosage of programs should be delivered to higher risk to re-offend offenders. Programs receive credit for delivering the program at a higher dosage to higher-risk offenders.

*Since none of the programs assessed risk, we did not give any of the programs credit for this item.*

## Responds to Offender Learning Style, Motivation and Culture

The most effective recidivism reduction programs conform to the responsivity principle, which states: "Programs should be responsive to the temperament, learning style, motivation and culture of offenders." These offender attributes can act in two ways important for program effectiveness. First, attributes such as offender motivation may determine whether an offender is "ready" for the program. An unready offender may be best excluded from a program, despite having the risk profile and criminogenic needs appropriate for participation. Second, once an offender is included in a program, the program will enhance its effectiveness by matching delivery to the different learning styles, temperaments and cultural backgrounds of the participants. While taking all of these factors into account is a tall order for any program, "one size fits all" approaches are less effective than those that have responsivity elements built into their design. Programs do not receive credit if the program is delivered to all offenders in the same manner.

*Nine of the eleven programs assessed received credit for incorporating responsivity elements into their program design. Of the nine, only Incarcerated Youthful Offenders (IYO)  appears to evaluate offender readiness for the program. The other programs that incorporate responsivity elements modify program delivery in response to relevant differences among offenders. In other words, the programs assessed generally considered responsivity factors for participants once they were in the program, not whether they should be in the program.*

## Uses Positive Reinforcement

Programs should use positive incentives. The current research consensus is that positive reinforcement should be applied more than negative reinforcement when trying to effect behavior change. Programs receive credit for building positive reinforcement structures into their program design.

*Seven of the eleven programs assessed had explicit use of positive reinforcement built into their program designs. Examples of positive reinforcement for behavior change included earned privilege systems, added trips or extracurricular activities, or regular verbal praise and encouragement as a performance requirement of program staff. IYO and Reentry Education use graduation ceremonies as positive reinforcements.*

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

## Employs Qualified Staff Members

Formal education is particularly important given that many of the elements of effective interventions that have proven effective (such as motivational interviewing and cognitive behavioral methods) have specialized technical content. Prior experience working with offenders is also valuable, as working with offenders to change their behavior presents unique challenges. Programs receive credit if 75% of staff delivering program services to offenders have undergraduate degrees, if 75% of those degrees are in helping professions, and if 75% of staff have two years of experience working with offenders.

*Seventy-five percent of staff delivering program services had undergraduate degrees in six of eleven programs surveyed. In five of those six programs, 75% of staff degrees were in a helping profession. 75% of the staff had at least two years of experience working with offenders in all ten of the programs that were rated on this item. (Transitional Case Management Program-Mental Health Services Continuum could not provide the information necessary to rate this item.) There was no program that failed to meet both the undergraduate degree and the experience working with offenders criteria. It appears that the CDCR program division values experience with offenders more than formal education.*

## Has a Staff Recruitment and Retention Strategy

Programs will be much more effective in recruiting a staff that meets CDCR's preferred standard if they have an explicit strategy for recruiting individuals with the desired qualifications. A staff retention strategy to keep staff members in the program is also important. Heavy staff turnover interferes with the consistency of program delivery and can cause deterioration in quality of even the best-designed programs. Programs receive credit for having an explicit strategy to recruit and/or retain staff.

Seven of the eleven programs assessed had a strategy for either staff recruitment, staff retention, or both. Retention strategies were more common than recruitment strategies, and many of the recruitment strategies put forth by programs seemed to be standard hiring processes.

## Trains New Staff

Staff training is vital for the consistent delivery of program services in accordance with the program model and is particularly important for new staff members. Written training materials facilitate the translation of the program model into practice. Conversely, the absence of such material raises red flags regarding the quality of staff training. Programs receive credit for providing training for new staff that includes written training materials.

*All but two of the programs assessed received credit for new staff training. In the two programs that did not receive credit, there was no distinct training for new staff. Instead, new staff receive their training by attending regularly held training sessions with the staff already in place.*

## Employs Qualified Program Directors

The qualifications and degree of involvement of a program director impacts the likelihood of program effectiveness. Programs receive credit if the program director was involved in the development of the program, which provides him or her with greater knowledge of the program model, if the program director has experience working with offenders, and if the program director has a degree in social work or a related field.

*Three of the programs assessed had program directors who met all three criteria, and another four had program directors who met two of the three criteria. No program had a director who did not meet any of the criteria. For the five programs with program directors who met only one of the three criteria, that criterion was experience working with offenders.*

## Collects and Analyzes Program Data

Evidence-based practice requires not only evaluating evidence collected in other contexts when deciding what program approach to adopt, but collecting and using evidence once a program is in place. Programs should measure performance and use that information for continuous improvement. Effective measurement must be built into a program from the start in order to produce the most accurate and useful data for program evaluation and improvement.

Programs receive credit if they:

1. Collect data to monitor program performance.
2. Include individual level data on participation.
3. Identify the program eligible population.
4. Forward data for analysis by a non-program entity.

*Five of the eleven programs assessed met all four of the criteria. Substance Abuse Treatment and Recovery (STAR), Parolee Employment Program, and Day Reporting Center (DRC) were able to meet all criteria except for identifying the program eligible population, which was not possible due to the way in which participants are referred to them. Residential Multi-Service Center (RMSC) met all criteria except the forwarding a data for analysis by a non-program entity. Transitional Case Management Program-Mental Health Services Continuum (TCMP-MHSCP) does not gather data to monitor program performance, nor does it collect individual-level data. Reentry Education met only the first of the criteria.*

## Bases Programs on Research

There are two ways of looking at the strength of the research basis of a program model. The first is the extent of that research basis: has it been evaluated multiple times, have those evaluations met the standards of publication for peer-reviewed journals, and have the outcomes of those evaluations been consistently positive, or have they been mixed? The second is the rigor of the research that has generated the evidence: have the research studies on program outcomes had sufficiently strong designs to create confidence that any differences in recidivism between program participants and non-participants are the result of the program, and not other differences between participants and non-participants?

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*Four of the eleven programs assessed had no research basis to rate, so far as the raters could determine. Three programs (STAR, RMSC and In-Custody Drug Treatment Program (ICDTP)) had evidence only from the evaluation of the Preventing Parolee Crime Program (PPCP) conducted by a team of researchers from San Diego State University, lead by Dr. Sheldon Zhang. STAR and RMSC are component programs of PPCP, and the evaluation found a relationship between participation in each and a reduced likelihood of re-incarceration within 12 months of release from prison. The study was reasonably well-designed, and the results were published in a peer-reviewed publication. The performance of STAR and RMSC was assessed relative to a comparison group of parolees who did not participate in any PPCP programs. However, the study was of PPCP as a whole, not of the individual programs within it. This comparison group may or may not be similar to STAR or RMSC participants. The research basis for ICDTP is even more tenuous, consisting of the examination of STAR in the PPCP evaluation, as ICDTP is based in part on the STAR curriculum. The persuasiveness of the evidence in favor of all three programs would be much stronger had they been evaluated individually, comparing results for participants against a comparison group of parolees eligible for those programs specifically.*

*TCMP-MHSCP and DRC were evaluated individually, with reasonably strong research designs, although the DRC evaluation was of the program operated in Chicago, not the Fresno DRC. Female Offender Treatment and Employment Program has multiple positive evaluations of comparable strength of design to the TCMP-MHSCP and DRC evaluations.*

*The most thoroughly evaluated program model is the Substance Abuse Program at the California Substance Abuse Treatment Facility-Yard F. The best study showing positive results for the in-prison therapeutic community model is a quasi-experimental design, a stronger design than that used by any of the other CPAP-assessed programs.  There have been multiple positive evaluations of the model, including in peer-reviewed publications, and it has been recommended by expert and best practices bodies. However, there have also been negative and no effect evaluations of the model, including one in California. The best research consensus on this program model is that it is not very effective unless the program is followed by post-release aftercare. This is currently something that in-prison Substance Abuse Programs, in cooperation with Substance Abuse Service Coordinating Agency, try to facilitate, but participation in aftercare is voluntary, and research by the UCLA Integrated Substance Abuse Program (ISAP) indicated that participation rates in aftercare are low.*

If the eleven programs assessed by the CPAP are any indication, the research evidence on CDCR programming is not extensive. What is unknown about the effectiveness of this group of programs is far more than what is known, and directing more research resources to these programs is warranted.

## CPAP Program Reviews Conclusion

The CPAP assessments that we conducted on the eleven identified recidivism reduction programs provide grounds for optimism concerning program content. Most of the programs that we reviewed contain program design elements that are in line with "what works" research for effective adult offender rehabilitation programming. Only three of the eleven programs that we reviewed scored poorly overall: Incarcerated Youthful Offenders (IYO), Reentry Education, and Parole Employment Program (PEP). IYO's low scores validate our recommendation that the CDCR needs to devote more attention to developing age-responsive programming for its youthful offenders. The low scores in the Reentry Education program and PEP highlight the importance of our recommendations to ensure that parolees have the necessary reentry programs that will give them the skills they need to be successful in the community—maintain sobriety, locate housing, and obtain employment. The CDCR needs to improve the quality of these critical offender programs, especially in light of the fact that the PEP operates in all 33 of the CDCR's adult prisons.

While we uncovered good news regarding program content, program placement did not fare as well. As we have mentioned before, the CDCR has only recently begun piloting a validated risk to re-offend assessment tool with its prison population, but has been using such an instrument with its parole population for more than two years. Continued and expanded use of these tools will help the CDCR program staff assign offenders to programming based on risk to re-offend and criminogenic needs levels. We provide additional details of the CPAP program reviews in Appendix N.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

# Part III—Next Steps and Conclusion

## Next Steps

We are pleased to be a part of the process of helping California improve its adult offender rehabilitation programming and have presented our roadmap of recommendations to guide the CDCR down the path of using evidence-based principles and practices with its prison and parole offender populations.

We believe that this report is just the first step of the journey. In this chapter we present recommendations for future projects and-or activities that the CDCR should engage in to continue to make progress in this important undertaking.

**Complete CPAP Assessments.** This Panel was able to complete CPAP assessments for 11 out of the 34 identified CDCR Recidivism Reduction Programs. We propose that the CDCR complete assessments for the remaining 23 programs and issues a report of its findings to the Legislature.

**Focus on Academic Programming.** In a future phase of this project, we believe the Panel should spend more time evaluating and commenting on the CDCR's academic program offerings. Because of our time limitations, we did not feel that we were able to give the academic programs the amount of attention that they warranted. Therefore, we propose that future Panel activities focus on academic programs.

**Develop Benchmarks that Assist with the Implementation of AB 900.** We recognize that many of the activities that the CDCR is now mandated to perform as a result of the passage of AB 900 are activities that other agencies in other states have successfully completed. We propose that a future Panel partners with the CDCR to help it implement these requirements. The future Panel could use its experiences and expertise to help the CDCR implement these requirements with fewer mistakes and greater efficiency.

**Help CDCR Establish "High-Powered" Implementation Teams.** As we have stated, we believe that the CDCR's progress has been hindered by the existence of "silos" within its organizational structure. As part of the future implementation phase of this project, we would like to work with the CDCR to help it establish targeted implementation teams comprised of leaders from diagonal slices of the CDCR department that cuts across existing silos. These teams would be empowered by the Secretary of CDCR and granted broad authority to implement the changes called for in our recommendations. The Panel's role would be to help create these teams and then to advise them as needed.

**Analyze Support Infrastructure.** We propose that a future Panel consult with the CDCR leadership team to analyze its support infrastructure in light of its current mission and objectives. The Panel would then help the CDCR create a support infrastructure that reflects organizational best practices and is better suited to implement our recommendations.

**Help CDCR Develop Capacity to Perform QA and Evaluation on a Continuing Basis.** Several of our recommendations are built on the concept of "continuous improvement." A necessary component of continuous improvement is measuring quality. We propose that future Panel activities include teaming with the CDCR's Office of Research to help its staff members develop the internal skills and tools they will need to perform quality assurance measurements and to perform process and outcome evaluations on all of the CDCR adult offender programs.

**Assist with Outcome Evaluation of Spending of $54 Million Reentry Initiatives Budget**. We propose that a future Panel work with the CDCR to evaluate the outcomes of the spending decisions made in accordance with the $50 million reentry initiatives budget. If new programs were implemented as a result of this spending, the Panel could assist with the evaluations of those programs. At the conclusion of the evaluation period, the Panel should issue a report to the Legislature describing its findings.

**Refine Population Projections and Financial Estimates.** We propose that a future Panel work with the CDCR to obtain the information and develop the appropriate models to refine information concerning the impacts of our recommendations on future CDCR populations and budgets.

**Assist with the Development of RFPs for Future Research Studies.** We believe that at some point in the future, the CDCR will need to conduct, multi-year research studies to determine the effectiveness of its key adult offender rehabilitation programs. We propose that a future Panel assist the CDCR with developing requests for proposal (RFPs) for qualified research entities to conduct these studies. The Panel could also serve as an independent entity to help the CDCR interview and select the appropriate research entities.

**Provide Additional Recommendations for Prisoners with Long Lengths of Stay.** California has a large number of prisoners who have been or will be incarcerated for long periods of time. We think that a future Panel should study this population and then provide the CDCR with rehabilitation and reentry programming recommendations that would address the specific needs of this often neglected group of adult offenders.

**Provide Additional Recommendations for Parolees Reentering their Communities.** Most of our attention for this report was focused on the CDCR's prison system. We feel that a future Panel should look at the CDCR's parole system and provide the CDCR with additional recommendations on how to improve the quality of rehabilitation programming delivered in the community, as well as to suggest ways for improving the manner in which programs are delivered in the community.

**Produce a Detailed Implementation Plan that Operationalizes Our Recommendations.** We provide a high-level implementation plan in this report. We propose that a future Panel work with the CDCR to develop a detailed implementation plan. The Panel can help the CDCR integrate the plan into its existing strategic plan and review annually the progress that the CDCR is making toward accomplishing plan objectives.

## Conclusion

We believe that with this *Report to the California State Legislature: A Roadmap for Effective Offender Programming in California*, we have provided guidance to California for improving its adult prisoner and parolee rehabilitation programming and reducing its recidivism rate. The public deserves and the offenders need the opportunity to receive the rehabilitation programming and services necessary to help them make a successful and long-term transition to the community.

In this report we advocate a system of identifying needed rehabilitative programming, implementing those programs, and measuring the fidelity of their implementation and outcomes in relation to their effectiveness. We believe that California will realize two important benefits from a public policy perspective: (a) the CDCR will be more transparent and accountable for a mission that is in line with the public's expectations, and (b) a significantly larger number of the several hundreds of thousands of prisoners who enter California prisons will return to their communities more prepared to be law abiding citizens.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

# Appendix A—Reports Previously Published Reports on California's Correctional Crisis

### Summary of Previous Reports

We agree with the Little Hoover Commission (2007) in that California doesn't need another report outlining correctional reform measures. What California needs to do is implement some of the proposals that have already been presented to it. Since 1990, there have been more than a dozen reports published that deal with the crisis in California's adult prison system. The major recommendations made in all of these reports are entirely consistent with the recommendations contained in our report. In fact, a review of these 15 reports by Panel co-chair Joan Petersilia revealed that all of the reports recommend essentially the same ten things, which are:

1. Stop sending non-violent, non-serious offenders to prison. This particularly pertains to technical parole violators, who could better be served in community based, intermediate facilities.
2. Once in prison, use a standardized risk and needs assessment tool to match resources with needs and determinate appropriate placements for evidence-based rehabilitation programs.
3. Develop and implement more and better work, education, and substance abuse treatment programs for prisoners and parolees.
4. Reform California's determinate sentencing system to reward prisoners for participating in rehabilitation programs and allow the system to retain prisoners who represent a continued public safety risk.
5. Move low risk prisoners to community-based facilities toward the later part of their sentences to foster successful reintegration and save more expensive prison-based resources. Sub-populations, such as women, the elderly and the sick, are ideal candidates.
6. Create a sentencing policy commission or some other administrative body that is authorized to design new sentencing statutes into a workable system that balances uniformity of sentencing with flexibility of individualization.
7. Reform California's parole system so that non-serious parole violators are handled in community based intermediate facilities and more violent parole violators are prosecuted for new crimes.
8. Create viable partnerships between state and local corrections agencies that would expand sentencing options, enhance rehabilitation services, and strengthen local reentry systems. Suggestions have been made that include Community Corrections Acts (to get greater funding for local criminal justice initiatives) and a Community Corrections Division of the CDCR charged with developing alternatives.
9. Evaluate all programs and require that existing and newly funded programs are based on solid research evidence.
10. Promote public awareness so that taxpayers know what they are getting for their public safety investment and become smarter and more engaged about California's prison system.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

**List of Previous Reports**

*Blue Ribbon Commission on Inmate Population Management (1990)* established by the California legislature in 1987, chaired by Grover Trask (District Attorney Riverside County). It issued its final report in 1990 with 38 recommendations. Recommended alternative sanctions, and more programming, reentry programs.

*Prison Population and Criminal Justice Policy in California (1992).* California Policy Seminar. Frank Zimring and Gordon Hawkins. Analysis of the recent expansion of California prisons and alternative policy responses.

*Crime and Punishment in California: Full Cells, Empty Pockets, and Questionable Benefits (1993).* California Policy Research Center, Joan Petersilia describes the growing problem of parole violators in California prisons.

*Putting Violence Behind Bars:  Redefining the Role of California's Prisons* (1994). The Little Hoover Commission found that the State's sentencing system was unduly complicated and inequitable to both victims and offenders and there was little distinction between the way violent and non-violent criminals were handled.  The Commission recommended that the State create a sentencing commission to develop a sentencing structure that protects public safety, tailors the punishment to fit the crime, addresses the needs of victims, fosters responsibility in prisoners and balances costs with benefits.

*Estimating the Effect of Increased Incarceration on Crime in California (1995).* California Policy Research Center, Franklin Zimring and his authors describe the impact of increased prison populations on crime rates in California.

*Minimizing Harm as a Goal for Crime Policy in California* (1997). California Policy Seminar Report. Edited by Edward Rubin, with analysis and chapters by Zimring, Greenwood, Petersilia, Skolnick, and others. Purpose was to draw on the work of leading criminologists to consider ways to address the critical problems facing California criminal justice system.

*Beyond Bars: Correctional Reforms to Lower Prison Costs and Reduce Crime (1998).* The Little Hoover Commission found that state and local correctional systems were not integrated and that the State's response to offenders needed to include an expansion of local sanctions and community correctional facilities for low-level offenders. The Commission also recommended expanding programs for prisoners and parolees, developing separate facilities for parolees returned to custody who are most likely to re-offend and re-evaluating the organizational structure of parole.

*Challenges of Prisoner Reentry and Parole in California (2000)*. Joan Petersilia, California Policy Research Center. Describes the unique challenges of California's prisoner reentry problem.

*Back to the Community: Safe and Sound Parole Policies* (2003). Little Hoover Commission found that the State's parole policies resulted in far too many parolees returning to overcrowded prison facilities for technical violations. The Commission proposed expanding evidence-based rehabilitative programs for prisoners and parolees and recommended policy-makers review the sentencing laws that place every offender on parole following incarceration.

*Breaking the Barriers for Women on Parole* (2004). The Little Hoover Commission studied the unique barriers facing the more than 10,000 women in California's prisons and 12,000 women on parole.

APPENDIX A—REPORTS PREVIOUSLY PUBLISHED REPORTS ON CALIFORNIA'S CORRECTIONAL CRISIS

*Governor's Plan to Reorganize the Youth and Adult Correctional Agency* (2005). Corrections Independent Review Panel: Reforming California's Youth and Adult Correctional System ("The Deukmejian Report"). The Commission reviewed Governor Schwarzenegger's plan to reorganize the Youth and Adult Correctional Agency into the Department of Corrections and Rehabilitation. This reorganization, which the Commission supported, placed a renewed emphasis on rehabilitation for prisoners and parolees.

*Understanding California Corrections*, California Policy Research Center (2006). Joan Petersilia wrote a primer on the California corrections system, from arrest through release on parole and return. She recommended greater emphasis on in-prison and parole planning, presumptive sentencing or a sentencing commission, and a return to indeterminate sentencing.

*Task Force on California Prison Crowding,* National Council on Crime and Delinquency (2006). This report offers policy and program options to address the severe problems in California prisons.

*Reducing the Incarceration of Women: Community Based Alternatives,* National Council on Crime and Delinquency (2006).This report describes effective treatment for women in prison in California.

*Solving California's Corrections Crisis: Time is Running Out* (2007). The Little Hoover Commission studied the correctional crisis facing California from a financial expenditure perspective.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

**Appendix B—Full-Sized California Logic Model**

## California Logic Model



*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

# Appendix C—Recommendations for Incorporating Evidence-Based Practices in the CDCR

| Principles of Effective Intervention, "What Works" | Recommendations (recommendation # corresponds with logic model) | Research Evidence & Best Practices | Measurement/QA |
|---|---|---|---|
| | Select and utilize an actuarial risk assessment tool to assess offender risk by screening | **Research known limit of the "risk principle": found that the provision of intervention to low risk offenders has been associated with an increase in recidivism** ... | risk level data by individual offender<br><br>overall risk score by individual offender ... |
| | *Example Risk Assessment Tools* | **The largest known effect of the "risk principle"** ... | |
| **Need Principle**<br>What Should be Targeted? Crime-producing needs<br><br>Effective programs target multiple factors related to re-offending that can be changed:<br>Anti-social attitudes<br>Anti-social associates<br>Personality & temperament<br>Familial factors<br>Education/Vocation<br>Substance abuse | Select and utilize a needs assessment battery<br><br>Develop & implement a case planning process<br><br>*Example Needs Assessment Tools* | **Research on length of time/treatment in OJS & recidivism rates?**<br><br>Targeting criminogenic needs is the most highly supported and powerful principle of effective intervention, demonstrating the most robust correlation with recidivism reduction (.55)<br><br>Programs that target criminogenic needs reduce recidivism by 20%, programs that target non-criminogenic needs reduce recidivism by only 5%<br><br>5% reduction in recidivism when more than 25% of program targets were criminogenic, 10% increase in recidivism when 25% or fewer of program targets were criminogenic.<br><br>6% reduction in recidivism when need factors were assessed, no reduction when need factors were not identified. | aggregate needs data for entire population<br><br>criminogenic profile for each individual offender (with scores in each domain area)<br><br>assessment & reassessment dates<br><br>total "protective score"/strengths for each offender |
| **Compliance & Reinforcement Principle**<br>Can offenders be motivated to change behavior?<br><br>Effective programs are responsive to individual differences in motivational levels, personality traits, levels of cognitive/intellectual functioning, and demographic variables by matching offenders to appropriate treatment groups and staff facilitators. | Select & deliver an evidence-based menu of standard program offerings<br><br>*Example Programs & Major Domain Areas*<br><br>Develop and administer an incentive system to reward program compliance/completion and good behavior<br><br>*Responsivity Factors & Example Responsivity Assessment Tools* | **9% reduction in recidivism when ...**<br><br>**9% reduction when role plays and modeling ...**<br><br>**9% reduction when cog-behavioral program, no reduction when/no model**<br><br>Research on use of reinforcers...<br><br>Best practices other states (NY named time study, etc.)... | # of sessions attended<br><br>client satisfaction indicators<br><br>clinical observation & feedback results (use of reinf)<br><br>program retention data ... |
| **Fidelity & Agency Development**<br>Is Treatment Achieving the Desired Effect?<br><br>Effective programs ensure therapeutic integrity by continually monitoring service delivery processes in areas such as program development, organizational culture, staff selection and training. Outcome measures are also tracked and evaluated to determine whether or not the program is achieving its desired effect. | Create a permanent advisory entity to advise the CDCR and monitor implementation of the recommendations<br><br>Develop performance measures - outcome and process, quantitative and qualitative, for all programs and agency goals | **9% reduction in recidivism when supported by community, 2% increase in recidivism when community does not provide treatment/program ...**<br><br>9% reduction in recidivism when follow-up data was collected, 4% reduction when program did not collect data<br><br>6% reduction in recidivism when internal quality assurance mechanisms were in place, 1% reduction when internal QA was not conducted | average daily population<br><br>% completed by type of discharge (success, failure)<br><br>variance in recidivism (by region, facility, staff member)<br><br>recidivism outcomes - arrest, conviction, commitment, revocations (technical and convicted)<br><br>other outcomes - drug use, housing, emp, family, educ<br><br>gap between ideal and current cultural environment by area (Likert Organizational Climate Survey)<br><br>staff evaluations w/feedback on offender interaction |

83

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

# Appendix D—Resources for Implementing Recommendations in the CDCR

## Assessment Tools, Programs, & Other Resources

### ● General Risk Assessment Tools (examples)

Salient Factor Score (SFS) (static prediction)

Level of Service Inventory (LSI-R), (LS/CMI), & (LSI-R:SV)

Risk of Reconviction Scale (ROC) - New Zealand

Correctional Assessment and Intervention System

Correctional Offender Management Profiling for Alternative Sanctions (COMPAS)- Northpointe Inst for Public Mgt, Inc.

Offender Intake Assessment (Motiuk/CSC '97)

Statistical information on Recidivism (SIR) - Nuffield '82

Wisconsin Risk/Need Assessment Scale - Arling & Lerner '79

Community Risk/Needs Management Scale

Client Management Classification System (NIC '83)

#### Violent Risk Assessment Tools

Violence Risk Appraisal Guide (VRAG) - Quinsey et. al.

Violence Risk Scale (VRS) - Wong & Gordon '06

Dynamic Risk Appraisal Scale (DRAS) - Quinsey et. al.

Proximal Risk Scale (PRFS)

Historical Clinical Risk-20 (HCR-20)

Short Term Assessment of Risk & Treatability (START)

### ● Criminogenic Needs (dynamic risk factors)

Anti-social/proximinal attitudes/beliefs/cog-emotional states

Anti-social associates, social support for crime & isolation from anti-criminal others

Temperamental and personality factors conducive to criminal activity:
- Psychopathy
- Weak socialization
- Lack of empathy, callousness
- Impulsivity, poor self-control
- Restless/aggressive energy
- Egocentrism
- Below ave. verbal intell.
- Taste for risk
- Decision-making skills
- Problem-solving skills

Low levels of educational, vocational, financial achievement

Familial/Marital/Relationship Factors
affection, quality of relationships, supervision/monitoring

Substance abuse

### ● Criminogenic Needs Assessment Tools (examples)

**Anti-social Attitudes, Beliefs, & Associations Assessment Tools:**
- Criminal Sentiments Scale-Modified (CSS-M)
- Criminal Thinking Scales (TCU)
- How I Think Questionnaire (HIT)
- Phoenix Opinion Survey (POS)
- Criminal Expectancy Questionnaire (CEQ)
- Beliefs Inventory
- Pride in Delinquency
- Criminal Neutralizations
- Psych Inventory of Crim Thinking Styles (PICTS)

**Temperamental/Personality Assessment Tools:**
- Psychopathy Checklist-Revised (PCL-R) & (PCL-R:SV)
- Minnesota Multiphasic Personality Inventory (MMPI)
- California Personality Inventory Socialization (So) Scale
- Eysenck Personality Inventory
- Porteus Maze Test
- Multi-dimensional Personality Questionnaire
- GRAS MICK

**Anger, Hostility, Aggression Assessment Tools:**
- Hostile Interpretations Questionnaire (HIQ)
- Novaco Anger Scale

**Batterers/Domestic Violence Tools:**
- Propensity for Abusiveness Scale (PAS)
- Spousal Assault Risk Assessment Guide (SARA)
- Domestic Violence Inventory (DVI)

**Educational Assessment Tools:**
- General Education: TABE, WRAT, Pre-GED, & GED Tests
- Special Education:
  Woodcock Johnson
  Brigance

**Vocational Assessment Tools:**
- Career Ability Placement Inventory
- NCCER, ICDL, NOT! - recognized industry credentials/certification tests

**Substance Abuse Screening & Clinical Assessment Tools:**
- Texas Christian University Drug Screen II (TCUDS II)
- Simple Screening Instrument (SSI)
- Drug Abuse Screening Test (DAST-20) - drug use
- Alcohol Dependence Scale (ADS) - alcohol use
- Leeds Dependence Questionnaire (LDQ) - substance use
- Cut Down, Annoyed, Guilty, Eye-opener (CAGE)
- Addiction Severity Index (ASI) & SA-ASI
- Offender Profile Index (OPI)
- Diag & Statistical Manual of Mental Disorders (DSM IV)
- Internal Classification of Diseases (ICD-10)
- Substance Abuse Questionnaire (SAQ)
- Substance Abuse Subtle Screening Inventory (SASSI-2)
- Global Appraisal of Individual Needs (GAIN) - Dennis '98

**Sexual Offending Risk &/or Needs Assessment Tools:**
- Static-99 & Static-2002
- Sex Offender Needs Assessment Rating (SONAR)
- Stable-2000 & Acute 2000
- Rapid Risk Assessment for Sex Offense Recidivism (RRASOR)
- Sexual Offender Risk Appraisal Guide (SORAG)
- Minnesota Sex Offender Screening Tool-Revised (MnSOST-R)
- Sexual Violence Risk-20 (SVR-20)
- California Actuarial Risk Assessment Tables (CARAT)
- Sexual Adjustment Inventory (SAI)

### ● Responsivity Factors

**Motivational/Readiness**
- Treatment amenability
- Compliance
- Denial in response
- Treatment gain

**Personality/Psychological**
- Psychopathy
- Anxiety
- Depression
- Mental illness/disorders
- Self-esteem
- Sensation seeking
- Sensitivity
- Poor social skills
- Psychological immaturity

**Cognitive/Intellectual Functioning**
- Intelligence
- Concrete vs. abstract thinking
- Problem-solving skills
- Verbal skills
- Learning style
- Communication style
- Educational level
- Cognitive maturity level
- Learning disabilities
- Attention deficits

**Demographic Variables**
- Age
- Gender
- Race
- Ethnicity/culture
- Social background
- Life experiences

### ● Responsivity Assessment Tools

**Motivation/Readiness** (many of these are specific to substance abuse)
- Self-Report/Motivation Orientation Scheme-Self Report (SOS-SR) - Simourd
- Treatment Readiness, Responsivity, and Gain Scale (TRRG:SV) - Serin
- Readiness for Change Questionnaire (RCQ) - Rolnick
- Desire to Help Scale
- Balanced Inventory of Desirable Responding/Paulus Deception Scale
- Client Evaluation of Self & Treatment (CEST) - Texas Christian University
- University of Rhode Island Change Assessment (URICA) - PAD
- Stages of Change Questionnaire (SOC) - Prochaska & DiClemente
- Orientation to Treatment Scale (OTS) - Robinson & Weekes
- Interpersonal Style Scale (ISS) - Serin & Kennedy
- Treatment Evaluation Scale (TES) - Serin & Kennedy
- Adult Self-Assessment Questionnaire (AaSAQ) - Wanberg & Milkman

**Personality Characteristics**
- Jesness Inventory, Interpersonal Maturity Level (I-Level)
- Quay's Adult Internal Management System (AIMS)
- Adolescent Multiphasic Personality Inventory
- Personality Assessment Inventory (PAI)
- House Tree Person Test

**Cognitive/Intellectual Functioning Levels**
- BETA III (IQ)
- WRAT
- TABE

**Mental Health Symptoms/Diagnoses**
- Diagnostic and Statistical Manual of Mental Disorders (DSM IV)
- Carrol Depression Scales-Revised (CDS-R)
- Beck's Depression

### ● Program Examples

**Motivational Programming**
- Brief Motivational Intervention
- Motivational Interviewing
- Motivational Enhancement Therapy

**Criminal Thinking, Skills, & Assoc.**
- Thinking for a Change (Bush, NIC)
- Changing Offender Behavior (Latessa, UC)
- Criminal Attitudes Program (Simourd)
- Choices, Changes, & Challenges
- Moral Reconation Therapy (MRT)
- Rational Emotive Behavioral Therapy (Ellis)
- Criminal Personality Programming (Y & S)
- Reasoning & Rehabilitation
- WI R2P Cognitive Interv. Program (Think)
- Counter-Point (CSC)
- Leisure Skills Program (CSC)
- Cognitive Skills Program (CSC) (R&R)
- Options: A Cognitive Change Program (NIC)
- Strategies for Thinking Productively (Bano)
- Positive Solutions (Nelson)
- Problem Solving Skills (Taymans)
- Social Thinking Skills (Larsen)

**Hostility, Aggression, Anger, Violence**
- Violence Prevention (CSC, PA DOC)
- Anger & Emotions Mgt Program (CSC)
- Aggression Replacement Training (ART)
- Managing Problematic Anger (Kassinove)
- Pathways to Personal Empowerment
- Control Agr & Learning to Manage (CALM)
  (Note: DV programs not proven effective)

**Substance Abuse**
- Crim Cond & SA Treatment: Strategies for Self-Imp & Change (Wanberg & Milkman)
- Breaking Barriers (Graham)
- Whole Vision (Gorski)
- White Bison (Coyhis)
- Healthy Lifestyle (Dudley-Grant)
- Dialectical Behavior Therapy (DBT)
- HISAP, OSAPP, & Choices (CSC)
- DATP (FBOP)

**Education/Employment**
- ABE, GED, & ESL
- Special, Secondary & Post-Secondary Educ
- Correctional Industries & Vocational Educ

**Familial/Marital/Relationships**
- Parenting Skills Program (CSC)
- Living Without Family Violence (CSC)

**Sexual Re-offending**
- RTC/SOTP, Clearwater, & Phoenix Programs (2000)

CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS

# Appendix E—Estimating the Impacts of Our Recommendations

In this section of the report, we present the impact of our recommendations from three perspectives: (a) recidivism reduction, (b) prison and parole population reductions, and (c) financial costs and benefits associated with recidivism and correctional population reductions.

None of the recommendations made by the Panel will have any impact on the number of persons being sentenced by the courts to the CDCR or their sentence lengths. Rather our recommendations will only affect the large numbers of persons who are being returned to custody for violating their parole conditions and the amounts of time served in prison or on parole.

Our estimates are grounded a large number of studies and the experiences of other states that have successfully implemented such reforms without adversely impacting public safety. However, we emphasize that the major recommendations require legislative, administrative, and programmatic changes before California can implement them. The legislature, with the consent of the governor, must modify California's current sentencing laws, which affects how much good time prisoners receive. We are mindful that this may be more difficult to do for offenders sentenced under the state's two and three strikes laws, so we have separated our recommendations accordingly. The CDCR must enact new administrative policies that reasonably restrict the large number of parolees being returned to prison for technical violations. This has been done before in California and is being done in other states. Finally, the CDCR, with proper funding from the legislature, will need to make significant changes in the number and types of programs it offers to prisoners and parolees. First, ineffective programs that hold little, if any, promise of reducing recidivism need to be identified and de-funded as quickly as possible. Next, new and effective programs need to be created. For this to occur, the CDCR will need to re-organize its own operational capabilities as outlined in Appendix J.

It is important to note that these estimates are based on the data that were made available to the Panel by the CDCR as well as the experiences of the other state correctional systems. As such they are preliminary in nature and subject to modification based on further analysis that may be required. Once it becomes clear on the extent to which the recommendations will be adopted and implemented more precise estimates should be made. It is also important to note that the CDCR has neither authenticated nor endorsed our estimates.

Nonetheless, we believe that if California were to implement our recommendations, the state may significantly reduce the large number of parolees who are currently violating their parole conditions and being returned to prison. Further, by expanding its incentive system, the state will encourage prisoners and parolees to participate in and complete programs. This could lower California's projected prison population with no major increase to the parole population. Coupled with the appropriate investments in prison and community based programming, we believe that our plan would increase public safety, reduce crime, and save taxpayer dollars.

## Impact on Recidivism

One of the key objectives of the Panel's recommendations is to lower the CDCR's high recidivism rate. Recidivism rates are typically measured by tracking a cohort of prisoners who were released in a given year and following them for several years. Traditionally, a recidivism rate is based on a three year follow-up period. The three measures of recidivism

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

are (a) re-arrest, (b) reconviction , or c) a return to the prison system for either a new court conviction or a parole violation. California's recidivism rate as measured by the return to prison rate is one of highest in the nation (only Utah has a higher rate). However, this high rate reflects the California Board of Prison Term's and the CDCR's policy of returning to prison a large proportion of parolees that have been revoked for technical violations.[af]

*Figure E-1: California Department of Corrections Historical Recidivism Rates, 1977-2004[ag]*



California's return to prison recidivism rate was not always this high. As shown in Figure E-1, beginning in the late 1970s the CDCR's recidivism rate was much lower (below 30%). What is responsible for the dramatic increase? No single cause can be identified but contributing factors may include: (a) the passage of California's Determinate Sentencing Law (DSL) in 1977, which eliminated discretionary parole statutorily awarded good time credits, (b) the massive expansion of the CDCR population, and (c) the associated construction of "mega prisons"—large facilities designed to house several thousand prisoners. We believe that while it may not be possible to quickly or easily return to the recidivism rates of the late 1970's, it is possible to achieve significant reductions in the current return to prison rate.

Three of our recommendations deal directly with recidivism reduction strategies:

*11b. Restrict the use of total confinement for parole violations to only certain violations.*
The largest reduction in the return to prison rate would occur if the state adopts the recommendation to divert between 44% and 64% of the parolees who are now being returned to prison for non felony criminal behavior and technical violations (see Table E-1). The CDCR could achieve this by developing and implementing a system of graduated responses to parole violations which provides for swift and certain punishments in the

[af]    Petersilia (2006); Jacobson (2003); US Department of Justice, Bureau of Justice Statistics (2001)
[ag]    The recidivism rate shown in this chart is based on "first releases to parole." This means that the cohort consists of prisoners who were experiencing their first release to parole and does not include parole violators who were being re-released. Excluding parole violators decreases the overall return-to-prison rate.

APPENDIX E—ESTIMATING THE IMPACTS OF OUR RECOMMENDATIONS

community.

These reductions in technical violations may seem large to some, yet if accomplished, it would result in California approaching the same percentage of parolees being returned to prison as reported by other states for either a technical or new felony. The most recent data from the US Department of Justice shows that 27% of all admissions to prison consist of parole violators (either technical or new felony crime).

*Table E-1: Technical Parole Violator Diversion Estimates by Type of Return Based on 2006 Admissions*

| Type of Return | Number of Total | Number to be diverted at low end of range | Number to be diverted at high end of range |
|---|---|---|---|
| Those returned to custody but re-released to parole; We estimate that 80 to 100 percent should be diverted. | 12,463 (18%) | 9,970 | **12,463** |
| Type I Administrative Criminal Returns (least serious crimes); We estimate that 40 to 60 percent should be diverted. | 16,617 (24%) | 6,647 | **9,970** |
| Type II Administrative Criminal Returns (crimes of average seriousness); We estimate that 25 to 45 percent should be diverted. | 16,617 (24%) | 4,154 | **7,478** |
| Type III Administrative Criminal Returns (most serious crimes); We estimate that 15 to 35 percent should be diverted. | 9,693 (14%) | 1,454 | **3,393** |
| Administrative Non Criminal Returns; We estimate that 65 to 85 percent should be diverted. | 13,155 (19% | 8,551 | **11,182** |
| Total Parole Violators Diverted from Return To Prison | | **30,776 (44%)** | **44,485 (64%)** |

If California were to divert approximately 35,000 technical violators from re-imprisonment within the CDCR, total admissions would drop from approximately 142,000 to 107,000 (see Table E-2).

But even this reduction would not match the norm of other state prison systems. The third column of Table E-2 shows that if the CDCR were to have the same policies as other states, the total number of admissions would decline to approximately 71,000. This estimate assumes that 40% of the offenders admitted to prison would return after being released on parole (the same rate reported by BJS minus California's data). As shown in Table E-2, were California to reach the national recidivism average, the percent of admissions to prison who are parole violators would be reduced to approximately 20,000 or 29% of all admissions—which is virtually the same as the national rate (27%). We believe that this is a very achievable outcome given the experience of the other states.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*Table E-2 Estimated Impact of Recommendation 9a on Prison Admissions by Type of Admission*

| Admissions Type | Current | | Recommended | | Based on Other States* | |
|---|---|---|---|---|---|---|
| | N | % | N | % | N | % |
| Felony Court | 50,708 | 36% | 50,708 | 47% | 50,708 | 71% |
| Parole Violators | 91,173 | 64% | 56,555 | 53% | 20,283 | 29% |
| Technical | 69,237 | 49% | 34,619 | 32% | 10,142 | 14% |
| New Felony | 21,936 | 15% | 21,936 | 20% | 10,142 | 14% |
| **Total** | **141,881** | **100%** | **107,263** | **100%** | **70,991** | **100%** |

*Based on all states participating in the Bureau of Justice Statistics, National Prisoner Statistics Series, August 2, 2000.*

9a. *Based on a normed and validated instrument assessing risk to reoffend, release low-risk, non-violent, non-sex registrants from prison without placing them on parole supervision.* The second way to reduce returns to prison is to not supervise low risk parolees. Previous studies have shown that imposing parole and probation supervision conditions on those who are unlikely to recidivate serves to actually increase recidivism rates. Table E-2 shows the results of several studies of the relatively effects of supervision on offenders by risk level. Here one can see that supervised low risk offenders have higher recidivism rates. By not supervising them the recidivism rates will actually decrease.

**6. Select and deliver in prison and in the community a core set of programs that covers the six major offender programming areas—(a) Academic, Vocational, and Financial; (b) Alcohol and other Drugs; (c) Aggression, Hostility, Anger, and Violence; (d) Criminal Thinking, Behaviors, and Associations; (e) Family, Marital, and Relationships; and (f) Sex Offending.** The third way for California to reduce its recidivism rate is by offering prisoners and parolees programs that will address and treat their educational, vocational training, mental health, and related criminogenic needs. As offenders receive programming that addresses theses needs, there should be a modest but significant reduction in their criminal behavior.

Table E-3 summarizes the expected return to prison recidivism reductions for each of these three major recommendations. This table is based on the total number of persons who were admitted to the CDCR in 2006 for failing parole for either a new felony conviction or a technical violation. As suggested previously, the largest reduction in the 91,173 now being returned back to prison each year would be persons who have failed parole for technical violations (a reduction of 30,776 to 44,485). In total, the recommendations would reduce the total number of returns to prison by between 35,000 and 50,000 or approximately 39-55%.

APPENDIX E—ESTIMATING THE IMPACTS OF OUR RECOMMENDATIONS

*Table E-3 Estimated Impact of Recommendations of Released Prisoners Being Returned to Prison*

| Return to Prison Recidivism Numbers | Number Per Year | |
|---|---|---|
| Total number of CDCR parole violators admitted to prison in 2006. | 91,173 | |
| Parole violators with new felony convictions | 21,936 | |
| Parole violators admitted for technical violations | 69,237 | |
| **Factor** | **% Change** | **Reductions in Returns to Prison Per Year** |
| 11b. Restrict the use of total confinement for parole violations to only certain violations. | 44%-64% reduction of 69,237 technical violators | -30,776 to -44,485 |
| 9a. Based on a normed and validated instrument assessing risk to reoffend, release low-risk, non-violent, non-sex registrants from prison without placing them on parole supervision (15% of prisoners). | 35% of low-risk prisoners released to parole for the first time do not return to prison | -3,538 |
| 6. Select and deliver in prison and in the community a core set of programs that covers the six major offender programming areas—(a) Academic, Vocational, and Financial; (b) Alcohol and other Drugs; (c) Aggression, Hostility, Anger, and Violence; (d) Criminal Thinking, Behaviors, and Associations; (e) Family, Marital, and Relationships; and (f) Sex Offending. | 5%-10% of the parole violators with a new felony do not return to prison | -1,097 to -2,194 |
| Total Reduction In Parole Returns to Prison | -35,411 to -50,217 or a 39%-55% reduction | |

Source: CDCR Admission data file for 2006

## Impact on Prison and Parole Populations

There are three operational requirements for successful offender programming: (a) adequate program space for the programs to function, (b) the physical locations where the programs are being delivered must be safe, and (c) there must be incentives for offenders to participate. Few of these conditions exist currently within the CDCR.[ah] Space-wise, although we don't have the precise figures, we know that because of overcrowding, designated program spaces have been converted to housing units. From a safety standpoint, there is growing evidence of increased violence and disruptive behavior within the CDCR—the rate of serious incidents increased from 4.7 per 100 prisoners in 1990, to 7.9 per 100 prisoners in 2005 (CDCR, 2006). And in the area of incentives, with California's DSL, there are few incentives for prisoners to participate in meaningful programs as they know that they will be released at the same time as prisoners who do not participate.

In Appendix L, we provided information concerning the CDCR's current population. It should be noted that the CDCR latest projections estimate that by the year 2012, the CDCR's prison population will increase from 172,385 to 190,000, and its parole population from 123,781 to 133,000.

We developed our own estimates of the impacts of our recommendations on the CDCR prison and parole populations. We based these estimates on data provided by the CDCR on admissions and releases for the prison and parole systems. Our estimates only assume a "steady state" environment and do not indicate how our recommendations would impact future sized populations. Again, we note that the CDCR has neither authenticated nor endorsed our estimates.

We believe that if all of our recommendations are adopted, the current prison population
ah    There are some individual facilities that are successfully delivering effective programs, however, systemically, the CDCR has to resolve its issues with space, safety, and incentives.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

would be reduced by approximately 41,000 to 48,000 prisoners and the number of admissions to prison for all parole violators (including new felonies) will be reduced by between 35,000 and 50,000 parolees. We believe that there are three recommendations that deal directly with reducing the offender populations:

**2. Enact legislation to expand its system of positive reinforcements for offenders who successfully complete their rehabilitation program requirements, comply with institutional rules in prison, and fulfill their parole obligations in the community.** The three sub-recommendations of this recommendation must be applied to have the desired population reduction effect. We also note that each component will require new legislation that would modify the current California Penal Code (CPC).

*2a. Award earned credits to offenders who complete any rehabilitation program in prison and on parole.* This recommendation would allow prisoners who complete education, vocational training, and substance abuse treatment programs the opportunity to receive an average of four months off of their prison release dates (including all sentenced felons regardless of their offense or strike levels). It would encourage prisoners (who could benefit) to participate in well-structured and effective rehabilitative programs and thus help lower their reoffending rates. At the same time, prisoners who complete these programs would benefit by having their period of imprisonment reduced.  Virtually all of the other states plus the Federal prison system allow for prison terms to be reduced if a prisoner completes rehabilitative services. Further it has been widely established by a number of studies, including those conducted by the US Department of Justice and the CDCR, there is no relationship between time served and recidivism (US Department of Justice, 2006). Therefore, releasing prisoners early as a result of earning program credits will not increase their recidivism rates. In fact, because they will have participated in effective programming targeted to reduce their criminogenic needs factors, we expect their recidivism rates to decrease. Table E-4 demonstrates the relationship between length of stay and recidivism using CDCR data.

*Table E-4 CDCR Recidivism Rates for First Releases by Time Served, 2000-2002*

| Time Served | Release Year | | | | | |
|---|---|---|---|---|---|---|
| | 2000 | | 2001 | | 2002 | |
| **Total** | 100.0% | 60.6% | 100.0% | 59.4% | 100.0% | 57.3% |
| **0 – 6** | 15.9% | 66.0% | 16.7% | 63.5% | 17.6% | 61.9% |
| **7 – 12** | 37.0% | 62.6% | 35.5% | 62.7% | 33.1% | 60.1% |
| **13 – 18** | 16.9% | 59.0% | 16.6% | 57.7% | 16.3% | 55.7% |
| **19 – 24** | 11.1% | 58.6% | 10.7% | 57.9% | 11.2% | 55.9% |
| **25 – 30** | 4.8% | 55.6% | 5.1% | 54.0% | 5.0% | 52.4% |
| **31 – 36** | 3.6% | 54.9% | 3.9% | 53.4% | 3.9% | 52.5% |
| **37 – 60** | 7.1% | 53.9% | 7.2% | 49.5% | 7.4% | 49.8% |
| **61 +** | 3.5% | 56.1% | 4.2% | 53.5% | 5.5% | 51.0% |

Source: CDCR

APPENDIX E—ESTIMATING THE IMPACTS OF OUR RECOMMENDATIONS

*Impact: Based on an assumption that 50,000 to 56,000 prisoners of a release cohort would complete such a program and receive an average four-month award, the number of beds saved would be approximately 17,000 to 19,000.[ai]*

*2b. Replace Work Incentive Program (WIP) credits with statutorily-based good time incentive credits.* This recommendation would allow offenders to earn good time credits based upon statute, rather than program participation. This would provide more equity and certainty to the punishment being handed out by the courts. Table E-5 shows the numbers of prisoners who are statutorily eligible for day-for-day ("good time") credits and the percentage of their sentences that they are actually serving. Here one can see that on average, prisoners eligible for day-for-day work incentive credits are actually serving over 60% of their sentences when jail credits (the amount time spent in local jails awaiting the disposition of their case(s) and transfers to the CDCR) are added to the calculations (see Table E-5).

If they were receiving day-for-day, their time served in prison would be reduced by a modest 2-4 months. And since Table E-4 shows that there is no relationship between length of stay (at far greater amounts) and recidivism we know this policy would not adversely impact public safety. This conclusion is further buttressed by a large number of studies showing no relationship between length of stay and recidivism rates (NCCD, 2007).

Many other states allow prisoners to receive day-for-day credits statutorily, rather than based on participation in some type of program or work assignment. Indeed before the passage of DSL, California's laws allowed all prisoners to be eligible for parole at 1/3rd of their sentences thru the application of statutory credits. Returning back to that concept would provide more equity and certainty to the punishment being handed out by the courts.

*Table E-5: Percent Time Served For New Court Commitments and Parole Violators with New Terms Only Eligible for Day-for-Day Credits 2006 Releases*

| Good Time Earning Class | Releases | Average Sentence | Jail Credits | CDCR Time | Total Time Served | % of Sentence |
|---|---|---|---|---|---|---|
| 50% | 56,397 | 31 mos. | 7 mos. | 12 mos. | 19 mos. | 61% |
| 20% | 7,632 | 58 mos. | 5 mos. | 42 mos. | 50 mos. | 84% |
| 15% | 5,082 | 63 mos. | 9 mos | 47 mos | 56 mos | 89% |

Source: CDCR 2006 Release File. 1,572 other releases not shown.

*Impact: Assuming that those prisoners now eligible for the WIP day for day credits were to receive them statutorily, the number of prison beds saved would be approximately 14,000. This estimate takes into account the amount of good time that is being revoked by the CDCR for rules infractions. The effects would be even greater if prisoners in the 20% and 15% earning classes who have much longer sentences were to be eligible for the 50% class. Specifically if the 20% earning class was modified to 50%, the long term effects would be approximately 13,000 bed reduction. If applied to the 15% earning class, the bed savings would be approximately 10,000. So if applied to all prisoners, the net effect would be about 37,000 in bed savings.*

---

ai    Table E-7 shows that between 55,000 and 62,000 offenders would be eligible for in-prison programming in a given year. Assuming that 10% (5,500 to 6,200) fail to complete the program, we estimate that approximately 50,000 to 56,000 offenders successfully complete programs.

CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS

*2c. Implement an earned discharge parole supervision strategy for all parolees released from prison after serving a period of incarceration for an offense other than those listed as serious and violent under CPC 1192.7(c) and 667.5(c) criteria.* This recommendation would serve to reduce the time parolees spend on parole supervision based on good conduct and-or program participation. If the recommendations 6a and 6b are implemented, it is likely that the parole population will significantly increase unless similar efforts are enacted to reduce the time served on parole and-or successful parole completion rates are increased. The California legislature recently introduced several bills that would make such reductions possible. For example, Senate Bill 1453 would reduce the period of supervision by six months when a parolee completes a substance abuse program while on supervision. It is estimated that 5,250 parolees would be impacted by this bill, which would reduce the parole population by 2,500. Our recommendation builds upon these bills.

> *Impact: Since these reforms are tied to yet unknown risk levels of the parole population as well as their capacity to meet the behavioral standards, it is not possible to make a precise impact estimate. However, we believe that the parole population would be reduced by approximately 29,000 parolees, based on the assumptions that:*
> - *about 85% of the 67,000 prisoners being admitted to parole for their first release will be in the moderate to high risk to reoffend category (an estimated 57,000 first parole admissions), and*
> - *that at least 50% of them (28,500) will meet the threshold for having their periods of parole supervision reduced by at least a year.*

*9a. Based on a normed and validated instrument assessing risk to reoffend, release low-risk, non-violent, non-sex registrants from prison without placing them on parole supervision.* This recommendation would simply eliminate supervision for low risk parolees.

> *Impact: We believe that approximately 875 prison beds would be saved, based on the assumptions that:*
> - *approximately 15% of the 67,000 first-time admissions to parole being reinstated or re-released are low risk (an estimated 10,000 parolees), and*
> - *35% of them (approximately 3,500) are being returned for technical violations for which they return to prison for approximately 3 months.*

> *More importantly, the projected parole population would decline by approximately 20,000 assuming these low risk parolees currently are being supervised for an average of 2 years.*

*11b. Restrict the use of total confinement for parole violations to only certain violations.* The large numbers of technical violators returned each year represents an ineffective approach to managing non-compliant behavior on the part of CDCR parolees. While we do not expect to completely turn off the technical violation stream without a statutory prohibition, as was done in Washington State, we do believe it reasonable and desirable to considerably reduce the current rate by establishing new policies and implementing an array of graduated parole violation sanctions. By diverting these prisoners from supervision, fewer be returned to prison for technical violations.

> *Impact: Based on an assumption that over a two year period there will be a 44-64% reduction in the return rate for technical violations, the number of persons admitted to the CDCR for technical violations would decline from 69,000 to between 25,000 and 38,500. Of those diverted, 10,000-12,500 would only have been returned to the CDCR for 2 weeks and then re-released to parole.  The number of prison beds saved for this group would be approximately 500 beds.  For the remainder, based on their*

*current average length of stay of three months, the number of prison beds saved would range from approximately 6,500 to 9,500.*

Table E-6 provides a summary of our population reduction impacts. In total the current CDCR prisoner population would be reduced by between 38,500 and 43,500 prisoners–largely by establishing a programs incentive system along the lines adopted by other state prison systems. The parole population would be reduced by between 6,500 and 11,500.

*Table E-6: Summary of Population Reduction Impacts Rounded to Nearest 500*

| Recommendation | Targeted Prison and Parole Releases and Admissions per Year | Approximate Prison Bed Savings | Approximate Impact on Parole Population |
|---|---|---|---|
| 2a. Award earned credits to offenders who complete any rehabilitation program in prison and on parole. | 50,000 – 56,000 prison releases | 17,000 – 19,000 | Adds 17,000 – 19,000 |
| 2b. Replace Work Incentive Program (WIP) credits with statutorily-based good time incentive credits. | 56,000 prison releases in the 50% good time earning class | 14,000 (an additional 23,000 if other earning classes are added) | Adds 14,000 |
| 2c. Implement an earned discharge parole supervision strategy for all parolees released from prison after serving a period of incarceration for an offense other than those listed as serious and violent under CPC 1192.7(c) and 667.5(c) criteria. | 57,000 moderate to high risk parole admissions | Not able to estimate | Reduces 29,000 |
| 9a. Based on a normed and validated instrument assessing risk to reoffend, release low-risk, non-violent, non-sex registrants from prison without placing them on parole supervision. | Low risk parolees | 1,000 | Reduces 20,000 |
| 11b. Restrict the use of total confinement for parole violations to only certain violations. | 31,000 to 44,500 technical parole violators diverted from prison | 6,500 - 9,500 | Adds 6,500 - 9,500 |
| Totals | | 38,500 to 43,500 | Less 6,500 to 11,500 |

How quickly California can achieve these reductions will depend upon a number of options available to the state. If the legislature makes the necessary changes in good time laws for the non-two and three strike prisoners retroactive to all prisoners currently incarcerated, most of the effects would occur within two years. Similarly, if the CDCR were to make administrative changes in its policies toward parole violators, most of the effects would be realized within two years. Changes based on additional and more effective treatment will take many years to realize. It will take several years to develop proper risk assessment systems, start assigning prisoners by risk, and ramp up the needed programs.

## Financial Impacts of Recommendations

In this section we provide preliminary estimates of the costs and savings associated with the recommendations that will impact (a) the number of parolees who are now failing parole supervision and return to prison each year, (b) the amount of time served in prison, and (c) the amount of time served on parole. We have also estimated the costs of adding more programs which are listed as offsets to the prison and parole supervision savings. We estimate the total costs of all the new programmatic initiatives along with the savings associated with prison bed reductions that result from the population management strategies and from reduced recidivism as a result of the programs.

New Program Costs

To calculate the annual cost of delivering program services to prisoners based on their risk and need, the Panel examined total prison admissions during 2006.[aj]  We recommend that the CDCR have enough resources to provide enough programs for the following categories of prisoners:

- Technical Violators: We assume that 50% of all technical parole violators (who all have very short lengths of stay—about three months on average) will receive two months of programming. The cost for an annual program "slot" (six prisoners) is $3,000.
- Prisoners with new court convictions who stay for less than 12 months: We assume that 50% of these prisoners will receive three months of programs. The cost for an annual program slot (four prisoners) is $3,000.
- Long-term prisoners sentenced to 20 years or more, including lifers: We assume that 50% of these prisoners will receive six months of programs. The cost for an annual program slot (two prisoners) is $10,000.
- Prisoners with a low risk to reoffend: We assume that 50% of these prisoners will receive six months of vocational education and life skills training. The cost for an annual program slot (two prisoners) is $4,000.
- Prisoners with a high risk to reoffend and moderate length of stays. We assume that all these prisoners will receive nine months of intensive programs ranging from drug treatment to criminal thinking. The cost for an annual program slot (1.3 prisoners) is $5,000.

As Table E-7 shows, the annual cost for providing these programs is approximately $121-$124 million.

---

aj       Program cost information is based on national estimates.

APPENDIX E—ESTIMATING THE IMPACTS OF OUR RECOMMENDATIONS

*Table E-7: Costs of Providing In-Prison Programs*

| Admission Type | Total Admissions | Eligible Admissions | Program Length | Yearly Cost of Program | Total Cost |
|---|---|---|---|---|---|
| Technical Violator | 24,752 - 38,461 | 12,376 – 19,231 | 2 months | $3,000 | $6,188.000 - $9,615,250 |
| Serving less than 12 months | 31,673 | 15,837 | 3 months | $3,000 | $11,877,375 |
| Sentenced to Life | 1,081 | 541 | 6 months | $10,000 | $2,702,500 |
| Sentenced to 20 years or more | 2,290 | 1,145 | 6 months | $10,000 | $5,725,000 |
| Low risk to recidivate | 7,520 | 3,760 | 6 months | $4,000 | $7,520,000 |
| High needs and high risk to recidivate | 21,568 | 21,568 | 9 months | $5,000 | $80,880,000 |
| (Total Eligible for Programs) | | 55,226 – 62,081 | | | |
| | | | | | |
| In Prison Program Costs | | | | | $114,892,875 - $118,320,125 |
| (Plus additional custody costs of 5%) | | | | | $5,523 - $6,208 |
| **Total In Prison Program Costs** | | | | | **$120,637,519 - $124,236,131** |

In addition to the in-prison resources required to fund these programmatic initiatives, the CDCR also needs to invest heavily in post-prison aftercare. In-prison programming must be followed up in the community in order to achieve the desired reductions in recidivism and the CDCR must also have the resources to create a variety of intermediate sanctions and programs in order to divert the large number of technical violators from prison that we are recommending. We are assuming a variety of programming needs for between 120,000 and 125,000 parolees.[ak] Our funding recommendation includes enough money for an average of six months of intensive programming for all these parolees. At a cost of $7,500 for an annual program slot, the total funding required is between $450 and $469 million. The total funds needed for in prison and community based programming is between $628 and $652 million.

## Savings from Overcrowding Reduction Strategies

Based on the recommendations outlined (summarized in Table E-6), we expect to save between 39,000 and 44,000 beds (see Table E-6). Using the CDCR marginal-overcrowding rate of $20,597 per bed, we expect to save a total of between $803 and $906 million annually.

## Savings from Recidivism Reductions

Based on research, we are assuming an overall reduction in recidivism range of 5 to 10 percent for new felony convictions as a result of these new programming initiatives. The most important result of this reduction is, of course, less crime and fewer victims. There is an added benefit that since fewer people on parole will return to prison for new crimes, the prison system will require fewer prison beds. The estimated result of Recommendation 4 is that between 1,097 and 2,194 parole violators with new felonies do not return to prison (See Table E-3). Assuming an average length of stay of 24 months, this would result in a decrease of between 2,194 to 4,388 beds and an annual budget savings of between $45 and $90 million.

---

ak     In 2006, there were 131,356 admissions to parole (CDCR). We reduced this number by 6,500 to 11,500 based on the expected effects of our population management strategies. See Table E-6.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

Budget Offsets

Though we are recommending significant funding for both in-prison and community-based programming, the CDCR already spends money on these functions that can offset the costs of the programming we are recommending (Again, this will not happen overnight as CDCR would need to hire different kinds of staff, contract with different organizations to provide the services, and generally transition from one set of program designs and priorities to another. This will take time but in the long run the current and planned programmatic budgets of the CDCR can be used to help "pay" for these investments). We estimate that the CDCR currently spends $340 million to deliver a variety of programmatic interventions both in prison and after release to its adult offender populations.[al]

## Financial Summary

Table E-8 summarizes the overall new funding needed for additional prison and community programs, the savings realized through our recommended population management strategies and reductions in recidivism, and the offsets to the new funding that are part of CDCR's baseline budget.

*Table E-8: Total Costs and Savings of Proposed Programming and Population Reduction Strategies*

| | | Costs | Dollar Savings | Bed Savings |
|---|---|---|---|---|
| Costs | Cost of Prison Programs | $120,637,519 - $124,236,131 | | |
| | Cost of Parole-Community Corrections | $450,000,000 - $468,750,000 | | |
| | *Total Costs* | *$570,637,519 - $592,986,131* | | |
| | + 10% increased CA costs* | $57,063,752 - $59,298,613 | | |
| | *Net Costs* | *$627,701,271 - $652,284,744* | | |
| Bed Reduction Savings | Prison Bed Savings | | $803,283,000 - $906,268,000 | |
| | Recidivism Savings | | $45,181,579 - $90,379,636 | |
| | *Total Bed Reduction Savings* | | *$848,464,579 - $996,647,636* | |
| Offsets | Current Budget Funding for Prison and Parole Programming | | $340 000,000 | |
| | *Total Current Spending* | | *$340,000,000* | |
| | | | | |
| | *Total Savings* | | *$1,188,464,579 – $1,336,647,636* | |
| | **Net Savings** | | **$560,763,308 - $684,362,892** | |
| | | | | |
| | *Beds saved through population reduction* | | | *38,000 – 44,000* |
| | *Beds saved through recidivism reduction* | | | *2,200 – 4,400* |
| | **Overall Bed Savings** | | | **41,200 – 48,400** |

*A preliminary estimate of the increased costs for funding correctional programs in California compared to the rest of the country. See Gordon et. al. (2007).

---

al    This figure is an estimate based on the current CDCR budget.

APPENDIX E—ESTIMATING THE IMPACTS OF OUR RECOMMENDATIONS

In this report we recommend strategies that would reduce the number of prison beds that California needs by 42,000 to 48,000 beds. The result would mean an annual savings of between $848 and $996 million. New investments in prison and community programming should cost between $628 and $652 million a year. A significant portion of these costs, or $340 million a year, which the CDCR now spends on programs, could ultimately be used to offset these new expenditures. In total, all of these new strategies combined could save California between $561 and $684 million a year.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*