# EXHIBIT D

# PAGES 101-150

# Appendix F—Expanded Space and Safety Recommendations

This section of the report contains the Panel's detailed recommendations concerning the physical context of CDCR programming.

## Program Space Concerns

The largest barrier that the Panel identified to delivering effective programming in CDCR prison facilities is its current state of overcrowding. CDCR facilities were built to hold 100,000 offenders; however, at the time of this report, the CDCR was currently housing 172,385 offenders in its prisons. Because of this overcrowding situation, there is simply not enough space to conduct effective programming—this applies to both the male and female offender populations. Due to time and budget constraints, we were unable to obtain data concerning specific details as to how the CDCR is utilizing its designated program spaces, although we suspect that some of them are being used to house offenders.

## Physical Safety Concerns

The CDCR tracks the number of prisoner population lockdowns and controlled movement events by each institution. The degree to which the CDCR quickly re-opens the respective facility for prisoner access to programming or allows the non-involved prisoners to attend programs, will impact its ability to support effective program delivery.

*Table E-1: CDCR Adult Institution Lockdown Summary, 2006-2007*

| Mission-Based, Facility Type* | Number of Lockdowns-Controlled Movements | Average Days in Lockdown | Events over 60 Days |
|---|---|---|---|
| **Calendar Year 2006** | | | |
| **General Population Levels II & III** | 169 | 12 | 6 |
| **General Population Levels III & IV** | 114 | 18 | 5 |
| **High Security & Transition Housing** | 134 | 7 | 17 |
| **Female Institutions** | 32 | 3 | 0 |
| | | | |
| **Calendar Year 2007 (January 2007 – April 2007)** | | | |
| **General Population Levels II & III** | 98 | 9 | 0 |
| **General Population Levels III & IV** | 40 | 6 | 0 |
| **High Security & Transition Housing** | 69 | 11 | 0 |
| **Female Institutions** | 16 | 3 | 0 |
| | | | |
| Source: CDCR | | | |
| *Does not include Prison Reception Centers | | | |

Table E-1 provides data concerning the number of lockdown day among the 33 adult prison institutions. Reviewing this data, there appears to be a decreasing trend during Calendar Year 2007, in both the average number of lockdown days, and the number of over-60-day duration lockdowns. The CDCR attributes this to closer monitoring and reporting through its COMPSTAT process, and improved management within each institution.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

The frequency and duration of lockdowns and controlled movement at any given time, among the 33 institutions, is a daily challenge to the CDCR, and one which most California citizens are unaware. Institution lockdowns occur between two and twenty times each month, depending on the custody level of an institution, and can remain in place for approximately three to eleven days, depending on the type of serious incident that occurred. The employees who deliver programming to the prisoners are present five days a week, eight hours each day, with some down time for program audits, training, and program adjustments. The security protocols that the CDCR applies immediately after a serious incident within an institution, in an attempt to ensure safety to prisoners, staff, and the public, causes the prisoners to be absent from their assigned program areas, and away from the program staff. The overcrowding conditions also contribute to the challenge handled by those employees who are ready and able to deliver programming to the prisoners, that is, not enough program space and not enough employees to deliver essential programs to meet the risk needs of the prisoners.

The CDCR should continue its progress in reviewing its lockdown and lockdown lifting protocols, and its controlled movement protocols, at each institution to determine the extent to which prisoner programming can be safely and quickly resumed following a serious incident. This periodic review is a good security practice and supports the ever-changing types of prisoners being housed in a facility within an institution. Where lockdowns are prolonged, CDCR should expect staff to develop alternate delivery methods of programming to housing areas, without serious detriment to program fidelity and without serious interference with security needs.

## Recommendations

In addition to what we have already stated, we offer these recommendations, which are based primarily on the fact the CDCR is overcrowded and violence and safety issues are related to overcrowding in any system. These recommendations are also based on comments from CDCR staff members whom we interviewed who shared with us their perspectives about the negative effect that lockdowns were having on programming in their facilities. ***For staff to be able to appropriately deliver programs and for offenders to be able to fully benefit from them, adequate and safe spaces for programming must be created.*** The CDCR must take steps to reduce the overcrowding in its facilities. If this does not occur, the positive impact of increased and/or more focused programming will be adversely affected.

While it is reducing its overcrowding, there are additional steps the CDCR can and should take to improve staff and offender safety.

First, the CDCR should review assaults, disturbances, and lockdowns by facility to determine which facilities offer a safe environment and which are problematic. Those facilities that the CDCR deems to be safe should be the first facilities where it implements new or improved programs. Those facilities that the CDCR deems to be problematic should be reviewed to determine what steps need to be taken to improve safety in those locations. As those facilities improve their safety levels, the CDCR should implement programming in those facilities that enhances those safety improvements.

102

APPENDIX F— EXPANDED SPACE AND SAFETY RECOMMENDATIONS

Second, experience shows that drugs are often the source of disorder within facilities. Experience at the Pennsylvania Department of Corrections demonstrates that it is possible with the implementation of a comprehensive drug interdiction program to reduce the random positive rate to less than 1%. Such a program would include interdiction (dogs, drug detection devices, and searches of vehicles and everyone who enters the facility); facility searches (cells and common areas); regular random and target drug tests; penalties (loss of contact visiting, loss of visits, and banning from facilities); treatment for those with drug problems; and tracking of various outcome measures. In this regard it must be remembered that visits are the most frequent sources of contraband entering facilities. Most states search visitors and use cameras in visiting areas to attempt to stem the flow of drugs and other contraband into their prisons. Additionally, while it is unfortunate that a few staff get involved in bringing contraband into facilities, it is critical for the safety of all concerned that the CDCR implement measures to limit this potential additional avenue for drugs to enter its system. Regular use of metal detectors on everyone (including staff), random staff pat searches, and use of electronic drug detection devices must be a part of any overall safety program.

Third, the CDCR should begin to use walk-through and hand-held metal detectors throughout its facilities. These tools can aid significantly in reducing the amount of weapons used by offenders. The CDCR can set up stations for these valuable tools at entrances to yards, cell blocks, and work areas.

Fourth, the CDCR should develop a vulnerability analysis (VA) program similar to what is used by the Pennsylvania Department of Corrections. The VA program involves training staff members to routinely assess institutions on a variety of security measures. Trained staff members from *other* institutions conduct the assessment, which differs from a normal review of policy compliance, in that they actually performance test various security systems. This activity, coupled with a policy that requires ongoing complacency drills that test such things as escapes, contraband introduction, prisoner accountability, tool control, etc., can significantly improve staff and offender safety, as well as increase the public safety of surrounding communities.

Finally, if facility reviews reveal that one or more facilities have significant issues, the CDCR should consider the possibility that the issue may be systemic rather than local. In these cases, the CDCR should develop a comprehensive approach to addressing these issues. Other states with similar issues have used staff from other facilities to conduct unannounced lockdowns and searches of problematic facilities. Another best practices approach is to permanently or temporarily transfer and re-assign staff and offenders to different facilities. Both of these approaches have proven to be effective in turning around problematic facilities.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

# Appendix G—CDCR Female Offender Reform

The CDCR Female Offender Reform effort recognizes the importance of developing gender-responsive strategies to address the specific needs of female offenders. The overarching goal of this effort is the development and implementation of a comprehensive gender-responsive female offender rehabilitation and management program. The CDCR encourages policies, programs, and procedures that foster personal growth, accountability, self-reliance, education, life skills, workplace skills, and the maintenance of family and community relationships. The objective is to promote the female offender's successful rehabilitation and reintegration into society and subsequently reduce recidivism.

By providing female offenders with the skills and treatment necessary to break the pattern of criminal activity, the CDCR is improving the female offender's chances of successful reintegration into society and helping to break the intergenerational cycle of incarceration.

## Highlights of Recent Accomplishments

The following are highlights of the accomplishments of the Division of Adult Institutions, Female Offender Programs and Services Female Offender Reform effort:

### Gender Responsive Strategies Commission

In February 2005, the Division established a Gender Responsive Strategies Commission (GRSC) as an Advisory Committee to assess and make recommendations on proposed strategies, policies and plans specific to women offenders. The Commission is comprised of representatives of community, state, local, legislative, and labor organizations; previously incarcerated individuals; staff representing the various disciplines within the CDCR and nationally recognized researchers in the field of female incarceration. Commission meetings are held bi-monthly.

### Adopted Recommendations from the Little Hoover Commission, Senate Resolution 33 Committee, Assembly Bill 90, and the National Institute of Corrections

In March, 2005, the Division adopted the recommendations of the Little Hoover Commission (LHC), Senate Resolution 33, Assembly Bill 90, and the guiding principles of the National Institute of Corrections (NIC) report prepared by Drs. Bloom, Owen, and Covington.

### CDCR Strategic Plan 5.3.6.

In April 2005, the Division developed strategies specific to female offenders that have been incorporated in the CDCR Strategic Plan 5.3.6. These strategies are based both on the data profiles of women offenders and a vision for reducing recidivism by targeting women's pathways to prison.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

## Elimination of Body Searches of Clothed Female Prisoners by Male Staff

On May 26, 2005, the CDCR revised its regulations and eliminated pat searches of female prisoners by male staff members. This was based on studies conducted by the Department of Justice which found that more than 57% of incarcerated females have been sexually or physically abused at some time in their lives, and on case law that established that body searches of previously victimized female offenders by male staff contribute to re-traumatization.

## Phased Housing Plan

In January 2006, the CDCR developed a phased housing plan to shift 4,500 Level I and II female offenders to community-based, smaller facilities (Female Rehabilitative Community Correctional Centers). This will be complimented by provision of "wrap around" services including pre-release planning, gender-specific health care, education, vocation and work programs, as well as substance abuse and trauma treatment.

## Examination of CDCR Classification System for Female Prisoners

In August 2006, CDCR contracted with Dr. Pat Van Voorhis, University of Cincinnati, to examine the CDCR's current classification system in terms of validity, over-classification and assessment of risk/needs relevant to correctional rehabilitation with a focus on gender responsiveness. The formal evaluation of the existing system has been completed. A report was provided to executive staff on December 5, 2006, and the contract was secured for an expert to assist a task group with implementation steps and a design study for validating a new classification model for women offenders.

## Leo Chesney Community Correctional Facility—Trauma-Informed Substance Abuse Treatment Program

This is the first trauma-informed in-custody program funded through the CDCR's female offender reform initiative, as well as the first substance abuse program put into place in a community correctional facility. Gender-responsive services to be provided include substance abuse treatment and education, trauma treatment, life skills, recreational activities, relapse prevention, sober living skills, parenting and transitional planning for continuing care services. Individual, group, and family counseling will also be provided.

## Female Residential Multi-Service Center

A Request for Proposal is currently being advertised for 575 female parolee beds statewide through a new program entitled the Female Residential Multi-Service Center (FRMSC). The CDCR has been providing services through the Residential Multi-Service Center Program since 1991; however, the programs have not been gender-responsive and served both men and women in one facility. This program has been developed specifically for females and addresses the needs of women through a gender-responsive program model. Gender-responsive services to be provided at the FRMSCs include conducting a risk and needs assessment, development of an individualized treatment plan, substance abuse education, treatment and counseling, trauma treatment, vocational services, life skills development, strengthening of family relationships, coordinated case management, establishment of alumni groups, referral to other agencies as needed and discharge planning.

## Future Expectations

We expect that in 2007, the Division of Adult Institutions, Female Offender Programs and Services will accomplish these initiatives for California's female offenders:

- Create and distribute a Female Offender Master Plan that provides the framework for the programming and management of all female offenders.
- Award contracts and activation of female rehabilitative community correctional centers that house non-serious, non-violent female offenders.
- Design and implement a mandatory, 40-hour specialized, gender-responsive training for all CDCR staff members who work with female offenders.
- Begin the development of a gender-responsive classification system for female offenders.
- Implement an Individualized Treatment and Rehabilitative Plan (ITRP) which combines a risk needs assessment with an individualized case management plan for female offenders.
- Activate the Bonding Mother with Babies program for 20 female offenders and their babies at the California Institution for Women (CIW).
- Fully implement the Parent-Child Visitation program that will work to build and strengthen systems of family support and family involvement during the period of a mother's incarceration at the CIW.
- Complete the Planning and Design Summits that will assist with the development of a Master Plan for the women's substance abuse treatment in institutions and community-based programs.
- Activate the female civil addicts' participation in the community-based Drug Treatment Furlough program.
- Continue to recruit and hire social workers to support the Third Day Visiting program and the Chowchilla Family Bus Express and Family Reunification efforts.
- Review the final report of the Victimization and Female Offenders national expert and develop evidence-based interventions for female offenders based upon the nature of the identified findings of the national expert.
- Activate additional beds at the Drug Treatment Furlough program.
- Activate the Fresno Family Foundation Program.
- Activate the Community Prisoner Mother Program.

CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS

# Appendix H—Arizona Department of Corrections Fast Track Program

## Arizona Department of Corrections

## Fast Track Program

August 14, 2006

### INTRODUCTION

In April 2006, Director Schriro approved a male and female pilot program for 200 minimum custody male inmates at ASPC-Florence / North Unit II and a 200 minimum custody female inmates at ASPC-Perryville / Santa Maria Unit. For the females, it will include all DUI, RTC and "Other" minimum custody Fast Track inmates.

Two Fast Track Workgroups will be established – one for North Unit II and one for Santa Maria Unit. Staff met on a regular basis to discuss the implementation processes, from Initial Intake, needs and discharge planning.

### OBJECTIVE

The primary goal of the Fast Track program is to effectively and efficiently identify inmates for programming and expedited discharge planning who will be serving an incarceration period of six months or less. Once identified, our objective will be to have these inmates undergo an expedient classification, medical, mental health and substance abuse treatment assessment and screening process for identification of basic programming opportunities. Brief, evidence based programs will employ cognitive behavioral strategies that will be provided to the Fast Track inmates, only in a shorter period of time (i.e. Functional literacy/GED, anger management, cultural diversity and domestic violence.) Medical and mental health screening assessments will be used to determine those inmates with physical and/or psychological limitations, medication needs, work assignment limitations and eligibility for programs with agencies such as, ValueOptions and ACCCHS for continuity of care.

### PROCESS

Due to the short incarceration time of Fast Track inmates, brief and basic programming will be available for this population. An initial assessment will be completed at intake by Correctional Officer III staff and Education staff in the following areas: Education needs, substance abuse medical, mental health and classification. The Fast Track facility will finalize the Corrections Plan which will include Cognitive Restructuring and "Pack Your Bags" Discharge planning.

In order to meet our goals and objectives we will begin to outline our assessments into the following priority order, although some of these programs can occur simultaneously.

1

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

(1)    Education programming for an inmate will be based on their need for either, GED, Functional Literacy or both. Inmates will be tested to identify those areas of need for tutorial assistance in order for them to obtain and meet education standards.

(2)    Substance abuse education programming and/or substance abuse treatment programming will be based on the inmates need as well.  This module is a part of the Texas Christian University (TCU), evidence based program that has cognitive restructuring components integrated throughout each module of the program.

(3)    The final priority for programming is release preparation through the "Pack Your Bags" Discharge Planning.  The program components will be increasingly integrated throughout other programming offered in 7x3x3 to help prepare and assists inmates nearing their time to release for reentry back into the community.  Inmates will be assessed by the Correctional Officer III in coordination with a Parole Officer in the areas outlined in the "Pack Your Bags/Discharge Planning. The objective is to provide inmates with the necessary "tools" to help them become civil and productive members of the community and to be successful in their integration.

In addition to the basic programs referenced above, the inmate will be required to participate in work assignments.  Work assignments will be included for the Fast Track population and will be based on inmate skills, work availability and need.

Along with the basic programs will be Self Development/Free Time and Family/Community programming. Each Fast Track unit will offer programs that fall under both categories.   In addition, the units will provide Alcoholics Anonymous, Narcotics Anonymous, Cocaine Anonymous, Crystal Meth Anonymous and Religious Services.

**CONCLUSION**
In order to adequately prepare this population for reentry, we have to first address those needs that contribute to the inmate's criminality and behavior. We will offer basic programs that will directly contribute to the reduction of recidivism, revocation and relapse.

APPENDIX H—ARIZONA DEPARTMENT OF CORRECTIONS FAST TRACK PROGRAM



**ADC Fast Track Placement & Programming**
06/06

1.a.
New admission w/ less than 6 months to serve

Intake Tests
ASUS, TABE, GAMA, BSI, Religous

2.
Inmate completes automated assessments and staff document inmate's personal. Criminal & escape history

AIMS
DI97, DI96, DT06, DT02, AZSAHI subrout.

3.
Initial Classification - determine eligibility for Fast Track facility

4.
Fast Track orientation provided to inmate

5.a.
Education conducts specialized assessment for education program needs and notifies COIII

5.
COIII determines 5x5 (risk/needs), develops 7x3 (Corrections Plan)

5.b
Inmate notified of Corrections Plan expectations and begins working on Plan

6.a.
Medical, Mental Health provide pertinent release plan info for inmates

6.
"Pack Your Bags" release plan forwarded to Community Corrections

7.
OIU coordinates release authorization and notifies inmates of particulars

8.
Inmate reports to Community Corrections

111

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

## ARIZONA DEPARTMENT OF CORRECTIONS
## FAST TRACK CORRECTIONS PLAN

**Inmate Number** _____    **Inmate Name** _____    **Loc Code  B34**

**Custody Level: Minimum____    IR Level: _2    Release Date: 12_ / _20 / _2006**

| 1. Community Intervention Level | Community General Risk Level | Community Violence Risk Level | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *Directions: See DI57 screen.* | | **V1** | **V2** | **V3** | **V4** | **V5** | **V6** | **V7** | **V8** |
| *Find the inmate's "Community* | **G1** | 1 | 2 | 2 | 2 | 4 | 5 | 5 | 5 |
| *General Risk Level" and mark* | **G2** | 2 | 2 | 3 | 3 | 4 | 5 | 5 | 5 |
| *the appropriate level in the* | **G3** | 2 | 2 | 3 | 3 | 4 | 5 | 5 | 5 |
| *appropriate row (G1-G7). Then* | **G4** | 4 | 4 | 4 | 4 | 4 | 5 | 5 | 5 |
| *view the "Community Violence* | **G5** | 4 | 4 | 4 | 4 | 4 | 5 | 5 | 5 |
| *Risk Level" and mark the* | **G6** | 4 | 4 | 4 | 4 | 4 | 5 | 5 | 5 |
| *appropriate column (V1-V8). Find the intersecting point and circle the Risk Level (1-5).* | **G7** | 4 | 4 | 4 | 4 | 4 | 5 | 5 | 5 |

**2. Risk Level:** *If inmate's Risk Level in #1 is 1 or 2 (shaded area above), proceed directly to #4 and enter "None – Risk Lev < 3" in Intervention Strategy column for each program area.  If inmate's Risk Level is greater than 2, proceed to #3.*

| 3. Program Needs | Scoring Criteria | | |
|---|---|---|---|
| *Directions: Review the criteria for each program and circle each program area criteria description "No Need" or "Need" as appropriate.* | **Pgm** | **No Need** | **Need** |
| | **Education** | Time remaining til release < 1 month | TBD by Education staff |
| | **Substance Abuse Education** | Time remaining til release < 2 months | SA referral level (DI83) 1, 2 or 3 & time remaining til release > 2 months |
| | **Anger Managemnt** | Time remaining til release < 1 month | Current violent offense or current violent discipline violation + time remaining til release > 1 month |
| | **Cognitive Restructring** | Time remaining til release < 1 month | Time remaining til release > 1 month |
| | **Domestic Violence** | Time remaining til release < 2 months | Dom Violence conviction & time remaining til release > 2 months |
| | **Cultural Diversity** | Time remaining til release < 1 month | Time remaining til release > 1 month |

# Appendix I—The Important Role of the Community in the Correctional Process

Communities are an often overlooked contributor to continuing recidivism by offenders newly released from prison or parole. Attempts to reduce risk of future criminal behaviors must reach beyond the walls of the correctional agency and embrace the communities from which offenders come and to which they will eventually return.

Communities consist of residents, businesses, families, schools, religious leaders, and others and often define the range of acceptable behavior for the people living within them. Highly disadvantaged communities tend to suffer from more violence and disorder due to sociological, political, and economic factors. An analysis of communities in California shows that there are some communities that have higher numbers of offenders than others. Figure H-1 provides a graphical representation of the number of prisoners released by the CDCR and the counties to which they returned.

*Figure I-1: Number of Prisoner Releases by California County, 2006*
Source: CDCR



An analysis of the data presented in Figure H-1 shows that a significant proportion of California's prisoners are released in the southern counties of the state. Table H-1, which provides the distribution of all California parolees by county, supports this conclusion.[am]

---

am     The Expert Panel wishes to thank John Hipp, Ph.D. at the Center for Evidence-Based Corrections at UC Irvine for providing the maps and tables used in this appendix.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*Table I-1: Percentage of Parolees by California County, July 1, 2006*

| County | % of CA Parolees |
|---|---|
| Los Angeles | 30.82% |
| San Bernardino | 8.57% |
| San Diego | 7.10% |
| Riverside | 6.42% |
| Orange | 5.90% |
| Sacramento | 4.07% |
| Fresno | 3.87% |
| Santa Clara | 3.79% |
| Kern | 3.70% |
| Alameda | 3.32% |
| All Others | 25.76% |
| *Source: CDCR* | |

## Summary of California Community Data

- **A relatively large number of parolees return to a small number of counties.** The four southern counties of Los Angeles, San Bernardino, San Diego, and Riverside accounted for over half of all parolees (53 percent) on July 1, 2006. The county of Los Angeles alone accounted for fully 30 percent of these parolees.
- **There is some evidence of geographic clustering of parolees in Los Angeles County.** There is some evidence of clustering in the central and south-central parts of the county. In the county overall, the top 1% of the census tracts contained 8.6% of the parolees on July 1, 2006. The top 5% of the census tracts contained 23.5% of the parolees. The top 10% of the census tracts contained 36.5% of the parolees.
- **Prisoners are returning to neighborhoods with higher levels of social and economic disadvantage.** In Los Angeles County, the census tracts with high numbers of parolees have poverty rates over double that of tracts with low numbers of parolees. These high-parolee tracts also have double the proportion single parent households, double the unemployment rate, 43% lower median income, and over double the violent crime rate of low-parolee tracts.

This trend is not unique to California. Eric Cadora and his team from the Justice Mapping Center have studied carefully the migration patterns of offenders in, out, and back into specific high density neighborhoods using Geographic Information Systems (GIS) in several American communities (see www.justicemapping.org). What is clear is that the residential origins of offender populations on probation, in prison, and on parole are not random, but highly concentrated—even more so than crime—in specific neighborhoods and, literally, specific streets.

114

APPENDIX I— SAFE NEIGHBORHOODS SUMMARY

These high-concentration communities need our concerted attention to improve public safety and community well-being. Research has shown that they key to reducing violent crime is collective efficacy, which is defined as social cohesion among neighbors combined with their willingness to intervene on behalf of the common good. Investing in these communities will reduce the demands on the state for correctional and health services by reducing the criminal toxicity of these communities and replacing it with fortitude and capability to address the full range of negative social indicators from violence to unwed pregnancy to high school drop outs (Sampson, Raudenbush, and Earls, 1997). We believe that California should start directing some of its attention and dollars to develop programs and services that will help targeted communities become places that stop producing new offenders and start preventing released offenders from returning to prison. In the long run, we believe that this will help reduce California's recidivism to an even greater degree than spending money on the correctional system will.

# Appendix J—Implementation Requirements

In this section we present information for implementing our recommendations in the current CDCR contexts. As our recommendations are based on general principles and practices, our purpose in this chapter is to apply those principles and practices specifically to the existing situations within the CDCR. This chapter describes the barriers that we have identified to implementing our recommendations in California and proposes solutions to those barriers. We have classified our barriers into four major categories: (a) legislative, (b) structural, (c) cultural, and (d) societal (or community).

## Legislative Barriers and Solutions:

The primary legislative barriers are lack of access to rehabilitation programming and lack of incentives for completing it. California's elected officials need to re-examine their current sentencing laws and system to effectively reduce the numbers of offenders in its currently overcrowded prisons and overloaded parole offices. Building more prisons is not the only answer to this problem. We refer the reader to Appendix A and urge California's leaders to implement some of those previously recommended population management initiatives.

On the incentive side, we cannot stress enough the importance of providing offenders with motivation to complete rehabilitation programs and positively manage their behaviors. Californians need to realize that providing offenders with incentives that will allow them to get out of prison or off of parole early by completing rehabilitation programs or managing their behaviors is not equal to being "soft on crime." Rather, they are a necessary component of successful human behavior modification strategies.

## Structural Barriers and Solutions:

Organizational Structure

The Panel had the opportunity to review two organizational structures in the period of its existence. The first structure that we reviewed in December 2006, was perplexing. It appeared to us that the only decision-maker in the entire organization was the Secretary of the CDCR. Lines of authority and responsibility were so diffused and overlapping that gridlock was the only possible result. This organizational structure was not well-designed and caused problems in administration and the field, especially in the area of efficient and coherent decision-making.

In March-April 2007, the new CDCR Secretary, James Tilton, developed a new organizational structure, which we felt was a vast improvement over its predecessor. However, we believe that there are additional steps the CDCR needs to take to reorganize itself to take full advantage of our recommendations:

- Clearly delineate lines of authority and responsibility from administration to the field. Eliminate overlapping and conflicting responsibilities that occur at multiple locations in the organization. Develop clear lines of communication to facilitate information flow in all directions in the organization.
- Decentralize decision-making to the lowest level in the organization that is capable of making the decision. It should not take three or four high-level administrators to make decisions that could be decided at the operational unit level.
- Establish clear lines of accountability within the organization. Everyone in the organization, from the Secretary down to the entry-level employee, should know exactly what duties and tasks he or she is responsible for and to whom he or she reports.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

- Centralize policy-making in the administration. The administration should determine policies, resolve policy issues, provide direction to field units for implementing those policies, and audit field units for policy compliance. Field unit leaders (wardens, parole office managers, etc.) should be responsible for implementing policies (security, programming, health, mental health, etc) and held accountable for achieving or not achieving policy objectives.
- Consolidate program service functions (academic education, vocation education (work-based), substance abuse treatment, and other program focus areas) under the CDCR Adult Programs Division and give that Division the authority to implement and resolve program policy issues. The CDCR Adult Programs Division should also be responsible for determining which programs will be delivered in which facilities. Additionally, create dotted-line reporting structures from the field units to the CDCR Adult Programs Division. Make the field unit directors accountable to the CDCR Adult Programs Division for delivering and measuring the effectiveness and outcomes of evidence-based programming in their field units.

## Technology Infrastructure

The current state of CDCR's technology infrastructure is insufficient, inadequate, and lacks the basic power, network, and telecommunications capabilities to function as an integrated enterprise. Less than one-third of the facilities and employees in the CDCR are connected to the network. This means that sharing information on offenders' behavior management plans and rehabilitation program process between facilities and across divisions is virtually impossible. Furthermore, the infrastructure within the Institutions not constructed to deliver rehabilitation programming electronically. This means that CDCR offenders don't have access to the latest innovations in rehabilitation programming content and delivery.

In January 2007, the California Department of Finance approved funding for the CDCR's Feasibility Study Report for the Consolidated Information Technology Infrastructure Project (CITIP). The CITIP is a multi-year project whose goal is to significantly increase the number of stations on the network, as well as the bandwidth. However, most of the CDCR's older facilities will need intensive (and time consuming) structural retrofits to be able to use the expanded technology.

We recommend that the CDCR continue on this course of improving its technology infrastructure as it is a critical component for the delivery of effective rehabilitation programming in prison and in the community. We further encourage the CDCR to ensure that all future facilities that it constructs are built with the necessary conduits and security measures to be able to allow staff and program providers in those facilities to take advantage of technological advancements in data management and rehabilitation programming.

## Labor Contracts

As we reviewed current operations and listened to both staff members and affiliated stakeholder groups, it became clear to us that a major obstacle to implementing a more focused and intensified rehabilitation program would be current contract provisions in the CDCR's labor contracts. We believe that to a large degree management rights and responsibilities have been negotiated away in previous contracts and feel that the CDCR and the California Department of Personnel Administration need to make every effort to regain those rights in the current round of negotiations. The process as it currently exists supports only the status quo and discourages management from implementing any innovative or necessary programming. For example, for the CDCR to adopt and implement a new risk to reoffend assessment tool to be able to assign the right offender to the right program

means that it will have to modify the job requirements for some of its staff members. As we understand the current labor environment, it could take the CDCR several months or even years to negotiate the use of an objective risk assessment tool by its correctional officers and probation agents. If true, this would seriously hamper California's ability to reduce its recidivism rate in the foreseeable future, as the assessment of risk and need is the first step in the process of providing effective rehabilitation programming. We strongly recommend that the CDCR leadership work with the labor union representatives to streamline the process for making needed job modifications so that it can more quickly implement those solutions that will improve the organization.

## Cultural Barriers and Solutions:

### Organizational Culture

As mentioned in the report, despite the name and mission changes that added rehabilitation to the CDCR, we found its organizational culture to still be largely "institutional"—focused on incarceration rather than rehabilitation. We understand that to some degree it will take time for the new mission to saturate all areas of the agency, especially considering its size. To facilitate that process, we recommend these activities:

**Focus on CDCR senior managers** (Secretary's office and all senior leadership positions including programming, institutions, parole, research-evaluation, IT, etc.). The CDCR's senior managers must understand and agree with the Panel's key recommendations, especially the underlying principles and practices. Senior management must also agree to:

    (a) a shared organizational vision
    (b) key benchmarks for implementing organizational improvement
    (c) a seamless integration of prison and parole officers in (rehabilitation) programming
    (d) use risk to reoffend (vs. institutional risk) as the primary driver for programming in prison and the community and for parole supervision
    (e) understand and apply the differences between program noncompliance and criminal behavior
    (f) understand how correctional and parole officers can be "agents of change" for offenders
    (g) agree to develop the officers under their authority as agents of change for offenders
    (h) understand and apply the importance of community partners as part of the "solution"

The CDCR's senior managers should be involved in at least a two-day planning session with biweekly meetings for the first six months on these concepts. During this time, they should decide what process they will use to assess their current organizational culture and its readiness to implement these changes. This group should also develop a plan to communicate the results of their work to the organization's employees. It is important that during these working sessions, senior managers are assigned to cross-sectional groups to facilitate systemic improvement.

**Focus on the next level of management** (parole officer chiefs and wardens). Replicate senior management agreements and activities with the next level of management within the CDCR. Report results back to senior management group.

**Develop cross-sectional teams to develop policy and procedures for the organization that support the Panel's recommendations.** It is important to have a cross-sectional team build the new policies and operational procedures for the organization. These teams should involve all levels of the organization and report their findings to the senior management group.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

**Begin coaching and skills development activities for managers and key employees in the organization.**

a. Provide managers with leadership coaching and management skills development. All managers should be trained in and held accountable for using "participatory management practices." These practices will help managers obtain buy-in from their employees on the proposed organizational changes. It will also foster a sense of joint ownership (between the manager and the employee) as the organization progresses through the change process.

b. Provide key employees with skills training for: interviewing offenders, motivating offenders, gaining offender compliance, risk and needs assessments, case planning, managing behavioral contracts, and characteristics and needs special offender types (e.g., drug offenders, sex offenders, aggressive, gang members, etc.). These trainings should be started at the academy level with new staff and continued through periodic refreshers courses throughout the entire career of each employee.

**Use the train-the-trainer model where key employees become "experts" in areas of focus and then train other employees.** These trainers should be the first level supervisors in the prisons and parole offices for staff graduating from the academies. In addition to training others, the experts should focus working on problem cases.

**Select parole and prison sites that desire to implement the panel recommendations.** Begin work on the implementation plan using a team composed of a cross section of employees from within the organization, as well as selected community partners.

## Employee Development

As the CDCR continues its work to provide quality rehabilitative programming to offenders it should not assume that its employees are prepared to deliver and supervise this work. As we have mentioned elsewhere, an effective correctional system is the result of a well-trained workforce. Whether the training relates to custody or treatment responsibilities, the critical nature of employee development can make or break a correctional system.

Traditionally, and usually as a condition of employment, correctional employees participate in both pre-service and in-service training programs. Commonly, more highly developed or specialized training is provided on a variety of subject areas. Employee attendance at conferences, workshops, and seminars regularly benefit the employee, as well as the agency. Moreover, we recommended that employees engage in continuing education at post-secondary institutions and trade schools, which will better prepare them for working in their particular disciplines. And, of course, some professionals such as clinicians, counselors, and others are required by law to complete a designated number of continuing education units annually.

In addition, we recommend that the CDCR consider the training opportunities provided by the U.S. Department of Justice, National Institute of Corrections, and the Office of Justice Programs. These two federal agencies often provide specialized training and/or technical assistance at little or no cost to the government participant. Universities, non-government organizations, and some for-profit groups are also good training resources.

The challenges of providing employee training can be expensive and times consuming, however, the benefits of making professional development a priority are considerable. On the other hand, the effects of not focusing on personnel training can be disastrous. Quality management principles dictate that tasks should be "done right the first time." This cannot be achieved without the investment of well-organized and well-delivered staff training. To deliver the training, a host of full-time and adjunct training personnel will be needed. Most correctional systems depend on a train-the-trainer model in order to save costs.

As the new or redesigned programming is integrated into the CDCR, the requirement for employee preparation will be enormous. For instance, conducting effective risk assessments will require talented and well-trained employees to perform this obligation. Employees will also have to be comfortable with and competent in the use of technology since many offender programs are computer-based, such as GED preparation and testing. In fact, information technology is the cornerstone for many effective training programs and so the CDCR will need to ensure that its employees have developed skill in this competency area. Deploying sound curricula of professional enrichment may be important in other ways. For instance, litigation may be avoided, or at least mitigated, if mistakes are minimized. Often, law suits are based on "failure to train" standards. In many instances, the standard is not just "to train," but "to train adequately."

By addressing all of these considerations with its employees, the CDCR will solidify its position to offer effective programming to its adult offender population and reduce their rates of reoffending.

## Quality Assurance

Changing the organizational culture in order to implement evidence-based principles is a complex process involving dozens of intermediate objectives. In order to realize the goal of reducing recidivism, each organizational change objective must align with the principles, and the change must be maintained over time. An effective Quality Assurance Plan can serve as a roadmap for maintaining fidelity to the principles.

A comprehensive quality assurance plan is an invaluable tool in implementing evidence-based practice. The plan provides a clear blueprint of the organization's goals and how they will be achieved. In the implementation phase, the plan allows stakeholders to track progress, maintain accountability, and keep a multi-faceted project on track. In the Maintenance phase, the plan encourages ongoing learning, professional development, and high standard of performance. Quality assurance should be incorporated into the implementation of evidence-based practice from the outset, with the goal of creating a "culture of quality" in the organization.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

## Societal (or Community) Barriers and Solutions:

The Panel wishes that it had been given more time to prepare its report. Had that been the case, then we would have spent more time looking at this very important area of correctional programming. As such, we urge the CDCR to continue to foster, nurture, and expand its partnerships with local governments and community-based organizations to provide seamless delivery of programming and services between prison-based and community-based providers. We recommend that it continues to include family members and other community members in the rehabilitation process of its offenders. And finally, and probably most importantly to released offenders, we recommend that roadblocks to finding meaningful employment be addressed.

To those community leaders and local agency administrators who are reading this report, we urge you to reach out to the CDCR to develop proactive and collaborative methods for working with offenders while they are still in prison to help ensure that once released, they become productive and contributing members of your communities. Particular attention needs to be paid to providing transitioning offenders with access to programs and services that will help them maintain their sobriety, find places to live, and obtain employment. If communities are able to help the CDCR provide these critical things to offenders, then they will become a real part of the solution to California's correctional crisis.

# Appendix K—Implementation Timeline

In this section of the report we provide a two-year schedule for implementing the Panel's major recommendations. As we mentioned at the beginning of this report, correctional change doesn't happen overnight and California's leaders will need to take deliberate steps to ensure that they provide the CDCR with the sufficient support it needs to effectively move in this direction—this includes necessary legislation, required funding, and most of all, adequate time. We note that although we present a two-year implementation timeline, we do not expect that California will begin to realize the benefits of those changes within that short time frame. Those who have studied what it takes to successfully reform public institutions say that of the three things necessary for success: resources, commitment, and time, time is the most important. Frederick Hess (1999), who has written books on educational reform, says it takes a minimum of five years to accomplish observable reform and RAND (2006) puts the time at eight years.

Our implementation plan identifies six major tasks that can be accomplished in two years. Within each major task, we list a series of sub-tasks. Each sub-task includes the agency(s) or entity(s) that will be primarily responsible for completing the task, as well as a recommended completion time frame.

Implementing the recommendations of this report will require the full commitment not only of the CDCR, but also the Governor's Office, and the Legislature. In particular, the Governor's Office and Legislature must quickly develop and pass new legislation over the next few months that will create meaningful incentives for prisoners and parolees to participate in and complete rehabilitative programs. As we have already stated, if offenders don't have access to rehabilitation programs or incentives for completing them, then California cannot expect to reduce its recidivism rates. Therefore, the top legislative priority should be to pass the laws needed to remove these two external barriers.

We believe that this implementation plan provides a pragmatic strategy for implementing our recommendations and will allow the CDCR to integrate sound rehabilitation based policies, practices, and programs into the fabric of its operations, both in prison and in the community.

## Major Task 1: Adopt Expert Panel Plan and Recommendations
*(July 2007 – October 2007)*
This major task group is designed to lay the basic foundation for California to begin transforming the CDCR. In this task group, the CDCR needs to conduct a number of briefings with state and local agencies and stakeholder organizations, whose cooperation and commitment are essential for the recommendations to succeed. In these briefings, the CDCR and available Panel members need to present the findings of the Panel, as well as the recommendations. Subsequent to these briefings, the Legislature and Governor's office need to reach an agreement to adopt the Roadmap and begin the process of ensuring that offenders have access to and incentives for completing rehabilitation programming.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

## Major Task 2: Craft and Pass Legislation and Change Policies to Create Access to and Incentives for Program Participation

*(October 2007 – June 2009)*

This group of task presumes that the Governor's Office, Legislature, and CDCR Secretary have agreed to implement the Panel's recommendations. In this group of tasks the Governor's Office and Legislature will be crafting and passing the necessary legislation to create access to and incentives for rehabilitation program participation. At the same time, the CDCR will be drafting policy changes to implement graduated parole sanctions. Once the new legislation and policies are adopted and codified, the CDCR would begin applying these new measures to its adult offenders who qualify. As part of the legislative process, lawmakers will have to determine whether or not they will apply these new laws retroactively, and if so, to what extent.

## Major Task 3: Develop or Adopt and Implement Risk to Reoffend Assessment Instrument

*(October 2007 – June 2009)*

In this major task group, the CDCR will either develop or adopt a risk to reoffend assessment instrument to use with its adult offenders. The CDCR has sufficient data in its current information systems to quickly adopt and begin using a relatively straightforward risk to reoffend assessment instrument. Coupled with activities in Major Task 4, these steps serve as the foundation for matching the right offender to the right program.

## Major Task 4: Select and Implement Offender Needs Assessment Instrument

*(July 2007 – June 2009)*

Because the CDCR is currently using the COMPAS with its parole population and plans to begin piloting the COMPAS with its prison population in June 2007, this major task group can begin immediately. The CDCR needs to make a quick decision on whether it plans to rely exclusively on the COMPAS or try another instrument. In either case, the CDCR must begin assessing all appropriate prisoners and parolees using the selected needs assessment instruments. Also included in this task group is validation of the COMPAS instrument that is currently being used in the CDCR Parole Division.

## Task 5: Begin Assigning Offenders to Appropriate Services Based on Risk and Needs

*(September 2007 – June 2009)*

In this group of tasks, the CDCR will begin assigning prisoners and parolees to rehabilitation programs and services based on their risk to reoffend levels and needs assessment results. Concurrent with assessment-based assignment, the CDCR will also need to evaluate its rehabilitation programs and terminate those that don't meet the criterion for evidence-based programming and expand and add those that do. We recommend a common program curriculum that can be consistently offered system-wide.

## Major Task 6: Pilot New Programs

*(February 2008 – June 2009)*

In this final group of tasks, the CDCR will develop new programs as their assessment instruments indicate. These new programs must be based on "what works" or "promising" research. It will also be essential that an experimental design with random assignment be part of the pilots for these programs.

# Appendix K—Implementation Timeline

| Tasks | Responsibility | 2007 J | A | S | O | N | D | 2008 J | F | M | A | M | J | J | A | S | O | N | D | 2009 J | F | M | A | M | J |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Major Task 1: Adopt EP Plan and Recommendations** | | | | | | | | | | | | | | | | | | | | | | | | | |
| 1.1 Brief Governor, Key Legislators, CDCR Senior Managers, Labor Unions, Federal Courts, Appropriate Boards, Panels, and Commissions, and Media on report recommendations. | EP/CDCR | X | X | | | | | | | | | | | | | | | | | | | | | | |
| 1.2 Brief Key County and Local Governments and Community Groups on report recommendations. | EP/CDCR | X | X | | | | | | | | | | | | | | | | | | | | | | |
| 1.3 Refine implementation plan based on feedback received in briefings. | CDCR/EP | | | X | X | | | | | | | | | | | | | | | | | | | | |
| 1.4 Governor's Office and Legislature reach agreement to adopt and implement legislative recommendations in report: access (overcrowding) and incentives (earned credits). | LEG/GOV | | | X | X | | | | | | | | | | | | | | | | | | | | |
| 1.5 CDCR Secretary agrees to adopt and implement non-legislative recommendations in report. | CDCR | | | | X | X | | | | | | | | | | | | | | | | | | | |
| 1.6 Determine budget and secure funding pool to support report recommendations. | GOV/LEG/CDCR | | | | | X | | | | | | | | | | | | | | | | | | | |
| **Major Task 2: Craft and Pass Legislation and Change Policies to Create Access and Incentives for Program Participation** | | | | | | | | | | | | | | | | | | | | | | | | | |
| 2.1 Draft graduated parole sanctions guidelines policy. | CDCR/EP | | | | X | X | X | | | | | | | | | | | | | | | | | | |
| 2.2 Draft and pass legislation for earned program credit and good time credit incentives. | LEG/GOV/CDCR/EP | | | | X | X | X | | | | | | | | | | | | | | | | | | |
| 2.3 Apply new graduated parole sanctions. | CDCR | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 2.4 Apply no supervision policy to low risk parolees. | CDCR | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 2.5 Apply new earned program credits to offenders who successfully complete rehabilitation programs. | CDCR | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 2.6 Apply new good time credit incentives to offenders who positively manage their behaviors. | CDCR | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 2.7 Apply early parole termination for low risk parolees. | CDCR | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 2.8 Measure recidivism rates. | CDCR/EP | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X |
| **Major Task 3: Develop or Adopt and Implement Recidivism Risk Assessment Instrument** | | | | | | | | | | | | | | | | | | | | | | | | | |
| 3.1 Develop recidivism risk instrument. | CDCR/EP | | | | X | X | | | | | | | | | | | | | | | | | | | |
| 3.2 Develop criteria for applying risk results to offenders to determine program placement. | CDCR/EP | | | | X | X | X | X | | | | | | | | | | | | | | | | | |
| 3.3 Train CDCR staff at prison reception centers. | CDCR | | | | | X | X | X | | | | | | | | | | | | | | | | | |
| 3.4 Apply risk assessment to selected new admissions. | CDCR | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 3.5 Apply risk assessment to existing prison population. | CDCR | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 3.6 Evaluate and monitor risk assessment data. | CDCR/EP | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 3. Validate COMPAS. | CDCR | | | | | X | X | | | | | | | | | | | | | | | | | | |
| **Major Task 4: Select and Implement Offender Assessment Instruments** | | | | | | | | | | | | | | | | | | | | | | | | | |
| 4.1 Review COMPAS and other needs assessment tools. | CDCR/EP | | | | X | X | | | | | | | | | | | | | | | | | | | |
| 4.2 Select appropriate needs assessment tools. | CDCR/EP | | | | X | X | X | | | | | | | | | | | | | | | | | | |
| 4.3 Pilot needs assessment instruments as needed. | CDCR | | | | | X | X | X | | | | | | | | | | | | | | | | | |
| 4.4 Implement needs assessments on selected prison and parole admissions. | CDCR | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 4.5 Evaluate and monitor needs assessment data and program outcomes. | CDCR/EP | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X |
| **Major Task 5: Begin Assigning Offenders to Appropriate Services Based on Risk And Needs** | | | | | | | | | | | | | | | | | | | | | | | | | |
| 5.1 Develop certification standards for existing programs. | CDCR/EP | | | | X | X | | | | | | | | | | | | | | | | | | | |
| 5.2 Identify existing certified treatment services-programs. | CDCR | | | | X | X | X | | | | | | | | | | | | | | | | | | |
| 5.3 Develop procedures for assigning offenders to program services based on risk and needs assessment. | CDCR/EP | | | | X | X | X | | | | | | | | | | | | | | | | | | |
| 5.4 Terminate ineffective programs. | CDCR | | | | | X | X | X | | | | | | | | | | | | | | | | | |
| 5.5 Assign offenders to rehabilitation programs based on risk and needs assessment data. | CDCR | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 5.6 Expand effective prison programs as needed. | CDCR | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X |
| 5.7 Expand effective parole programs as needed. | CDCR | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X |
| 5.8 Conduct process and outcome evaluations of expanded programs. | CDCR/EP | | | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X |
| **Major Task 6: Pilot New Programs** | | | | | | | | | | | | | | | | | | | | | | | | | |
| 6.1 Develop new programs. | CDCR/EP | | | | X | X | X | X | | | | | | | | | | | | | | | | | |
| 6.2 Develop evaluation criteria. | CDCR/EP | | | | X | X | X | X | | | | | | | | | | | | | | | | | |
| 6.3 Issue RFPs as needed. | CDCR | | | | | | | X | X | | | | | | | | | | | | | | | | |
| 6.4 Select two new prison and two new community programs to pilot. | CDCR/EP | | | | | | | X | X | | | | | | | | | | | | | | | | |
| 6.5 Fund service providers. | CDCR | | | | | | | | | | | | | | | X | X | | | | | | | | |
| 6.6 Implement new programs. | CDCR | | | | | | | | | | | | | | | | | | | X | X | X | | | |
| 6.7 Conduct evaluations. | CDCR/EP | | | | | | | | | | | | | | | | | | | | | X | X | X | X |

Legend: EP—Expert Panel; CDCR—California Department of Corrections and Rehabilitation; LEG—Legislature; GOV—Governor's Office

125

CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS

# Appendix L—Detailed CDCR Adult Offender Profile Information and Tables

## CDCR Adult Offender Distribution

The CDCR is currently responsible for providing services to 321,222 adult offenders in its prison and parole systems. As Figure 2.1 shows, 172,385 (54%) are located in the CDCR prisons, 123,781 (39%) are on parole supervision, and 23,236 (7%) are in other populations, including non-CDCR facilities or programs (i.e., Federal prison or County jail).

*Figure L-1: California's Adult Offender Population*



Source: CDCR (Weekly Population Report, April 23, 2007)

## CDCR Adult Offender Cohorts

Although Figure L-1 suggests that there is really only one adult offender population that is distributed into three large categories, that isn't exactly the case. When considering the overall CDCR adult offender population, there are actually four ways to look at it:

1. those admitted to prison (an "Admissions Cohort"),
2. those in prison (an "In-Prison Cohort"),
3. those on parole (an "On Parole Cohort"), and
4. those released to parole (an "Exit Cohort").

This is important because, as we will discuss later, one of the first questions that needs to be answered when discussing effective offender programming is: *What are the offender's needs?* The answer to that question provides the basis for the "rehabilitation" of the offender. Thus, if the offender population was truly monolithic as Figure L-1 suggests, it would be easy to describe the average needs of the adult offenders in the CDCR. However, the answer is not that simple, because each of the four cohorts listed above has different risks and needs profiles. For example, on average, people committed to prison for violent crimes serve longer prison terms than those committed for nonviolent or drug crimes. Because it takes longer for violent offenders to be released from prison, their representation in an Exit Cohort is lower than that of nonviolent or drug offenders.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*While this distinction may on the surface appear to be self-evident and, therefore, trivial to discuss, the fact of the matter is that the differences between In-Prison and Exit Cohorts accounts for some of the greatest discrepancies in the figures cited by those who argue that offenders are not a particularly dangerous or serious group (they tend to use Admissions or Exit Cohorts) and those who argue that the majority of offenders are dangerous and serious career criminals (they tend to use In-Prison Cohorts).[an]*

From a programming standpoint, the answer of *"Which parole or prison population is being considered?"* has important implications. If the public perceives released offenders as people who have many needs, yet pose little risk to public safety, they are more likely to be sympathetic to their circumstances and urge their lawmakers to invest in rehabilitation and work programs. But if the public believes that most released offenders are dangerous and serious career criminals who present a great risk to public safety, they are more likely to urge their lawmakers to invest resources in law enforcement and surveillance activities.

Given its importance for programming considerations, we felt it was important to provide a snapshot of all four of the CDCR's adult offender cohorts. We have presented this data in Figures L-2 – L-9. *Please note: the data used for these tables came from 2006 CDCR offender records, while the data at the beginning of this chapter came from April 2007 CDCR offender records. As the CDCR population is continuing to grow, there is a slight discrepancy when comparing the total numbers between the two data sources.*

*Figure L-2: CDCR Adult Offender Cohorts*



Source: CDCR (2006 Admissions and Exit Data, December 31, 2006
In-Prison and On Parole Data)

Figure L-2 provides a comparison of the number of offenders in each of the cohorts.

---

an      See Tonry (1995) for a full discussion.

APPENDIX L— DETAILED CDCR ADULT OFFENDER PROFILE INFORMATION AND TABLES

## Admissions Type

The first aspect of the adult offender population that we examined was admissions type. In California, there are two ways to enter the CDCR adult prison system. The first way is through a criminal court conviction. In this category are either Offenders with New Court Convictions or Parolees with New Court Convictions (parolees convicted of new crimes). The second way is through a technical parole violation. In this category are Parolees with Technical Violations (parolees who have violated one or more of their parole conditions). Figure L-3 displays our findings.

*Figure L-3: Admissions Type Distribution*



Source: CDCR (2006 Admissions and Exit Data, December 31, 2006 In-Prison and On Parole Data)

As Figure L-3 shows, 149,294 offenders (86.8%) in the In-Prison Cohort were admitted to prison because of new court convictions (offenders with new court convictions plus parolees with new court convictions). But only 71,915 offenders (50.7%) in the Admissions Cohort and 69,250 offenders (51.6%) in the Exit Cohort were admitted to prison because of new court convictions. This tells us two things. First, nearly 50% of the offenders in the Admissions and Exit Cohorts were admitted to prison due to technical parole violations, not because of new court convictions. Second, parolees with technical violations spend less time in prison than offenders and parolees with new criminal convictions.

Data provided by CDCR shows that two-thirds of the offenders admitted to prison in 2006 were parole violators. The new court conviction group reflects only 36% of new prison admissions, and even within this group a sizeable number (10%) are probation violators. **Put differently, nearly 70% of all 2006 prison admissions were people who failed to satisfy their probation or parole obligations.** Any improvement in these existing failure rates would have a large impact on reducing the CDCR prisoner population.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*Figure L-4: Length of Stay Comparison*



Source: CDCR 2006

Figure L-4 compares the average lengths of stay (LOS) of parole violators and offenders with new court convictions. Parole violators' LOS when returned to prison are an average of just four months. (This large group churns quickly in and out of California prisons and occupies 20,000 beds on any given day.) On the other hand, the LOS for offenders released in 2006 as a result of a new court convictions was an average of 29.1 months.

These admission and release trends have important consequences for the design and application of rehabilitation programs. Most credible treatment programs require at least 3-6 months of participation in what would be considered the initial phase of a well structured program. It is also assumed that the initial phase of rehabilitation should be followed by additional months (usually 3-9) in subsequent and often less intensive services.[ao]

From a programming standpoint, the first implication is that effective programming will have to take into account the differing lengths of stay between offenders admitted due to new court convictions and those admitted due to technical parole violations. Offenders admitted due to new court convictions will have more time to participate in programming in prison because their sentences are longer. The second implication is that because technical parole violators spend less time in prison, the CDCR needs to pay close attention to the programs this group will be receiving in the community.

---

[ao]    For reviews, see Wilson, Gallagher, & MacKenzie (2000) and MacKenzie (2006).

APPENDIX L— DETAILED CDCR ADULT OFFENDER PROFILE INFORMATION AND TABLES

## Offenses

The next aspect that we examined was type of current conviction or offense. For this analysis, we used four different categories of offenses: (a) crimes against persons, (b) property crimes, (c) drug crimes, and (d) other crimes, which we display in Figure L-5.[ap]

*Figure L-5: Offense Distribution*



Source: CDCR (2006 Admissions and Exit Data, December 31, 2006 In-Prison and On Parole Data)

As Figure L-5 shows, there are significant differences between the cohorts when it comes to offenses for which offenders have been convicted. For example, property crimes represent the largest category for offenders in the Admissions and Exit Cohorts (33.6% and 34.8%, respectively). But the largest category for offenders in the In-Prison Cohort was crimes against persons (50.4%). And the largest category for offenders in the On Parole Cohort was drug crimes (31.1%). Programmatically this suggests that once again offenders should be provided with different types of programming based on what stage they are in the correctional system. Figure L-6 illustrates this more clearly.

---

ap    Crimes against persons primarily include homicide, robbery, assault, sex crimes, and kidnapping. Property crimes primarily include burglary, theft, forgery, and vehicle theft. Drug crimes include both sales and possession. Other crimes include escape, arson, driving under the influence, weapon possession, and miscellaneous offenses.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*Figure L-6: Sex Offender Distribution*



Source: CDCR (2006 Admissions and Exit Data, December 31, 2006 In-Prison and On Parole Data)

Figure L-6 provides a closer examination of one specific type of offender; those who are convicted of crimes against persons—sex offenders.[aq] This figure illustrates that while sex offenders only represent 7.4% of the Admissions Cohort, they make up 13% of the In-Prison Cohort. This indicates that sex offenders receive longer sentences than their average non-sex offender counterparts. Research by Becker and Murphy (1998) and Polizzi, MacKenzie, and Hickman (1999) shows that sex offenders have different programming needs than their non-sex offending counterparts. Figure L-6 also suggests that sex offenders will generally have more time to complete treatment programming.

---

aq     For this analysis, sex offenders are prisoners who must register as sex offenders under California Penal Code (CPC) section 290. For details regarding CPC 290, see http://www.meganslaw. ca.gov/registration/law.htm. It is also true that there is no such thing as a "typical" sex offender and their characteristics and treatment needs are highly variable. California recently established the High Risk Sex Offender Task Force to examine current practices and needs, and a series of reports details their findings at http://www.cya.ca.gov/Communications/SexOffenderMgmt.html.

APPENDIX L— DETAILED CDCR ADULT OFFENDER PROFILE INFORMATION AND TABLES

*Figure L-7: Serious or Violent Offense Distribution*



Source: CDCR (2006 Admissions and Exit Data, December 31, 2006 In-Prison and On Parole Data)

Another aspect of offenses that we wanted to examine was the nature of the offense—either serious or violent. Serious offenses are defined by California Penal Code (CPC) sections 1192.7(c) and 1192.8 and include first degree burglary, arson, and furnishing drugs to a minor. Violent offenses are defined by CPC section 667.5 (c) and include murder, rape, and kidnapping. Figure L-7 displays this data. The most noticeable item that this data shows is that most offenders were not convicted of either violent or serious crimes. This should speak to the mixture of programs provided by the CDCR to its offender populations. The next most noticeable item is that 41.4% of offenders in the In-Prison Cohort were convicted of violent crimes, compared to 10.0%, 12.0%, and 8.2% for the Admissions, On Parole, and Exit cohorts, respectively.

## Gender, Race, Ethnicity, and Age

In Part I of the report, we discussed the responsivity principle. Basically, responsivity means that effective rehabilitation programs take into consideration the differences in offender gender, race, culture, age, and other factors and deliver information in ways that best respond to those differences. We provide Figures L-8 – L-10 to give the reader snapshots of the differences in gender, race, and age in the four different offender cohorts.

133

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*Figure L-8: Gender Distribution*



Source: CDCR (2006 Admissions and Exit Data, December 31, 2006 In-Prison and On Parole Data)

Figure L-8 shows that female offenders comprise 10% of the Admissions Cohort, 11.3% of the On Parole Cohort, and 10.2% of the Exit Cohort. However, female offenders represent only 6.8% of the In-Prison Cohort. This suggests that female offenders, on average, spend less time in prison than their male counterparts. Studies of female offenders in California prisons show that they are more likely than male offenders to be incarcerated for drug-related or less serious, nonviolent property crimes. Imprisoned females tend to have fragmented families, other family members involved with the criminal justice system, significant substance abuse issues, and multiple physical and mental health problems.[ar] Typically, females receive relatively short prison sentences and they are soon released into their communities having received few services to address their pathways to crime and even fewer transitional services, setting them up for failure. This means that in addition to providing them with gender-responsive programming in prison, the CDCR will need to ensure that female offenders receive adequate gender-responsive programming in the community.

---

[ar]    Little Hoover Commission (2004), Bloom et. al., and Wolf (2006).

APPENDIX L— DETAILED CDCR ADULT OFFENDER PROFILE INFORMATION  AND TABLES

*Figure L-9: Race and Ethnicity Distribution*



Source: CDCR (2006 Admissions and Exit Data, December 31, 2006 In-Prison and On Parole Data)

Figure L-9 shows that Hispanic offenders comprise the largest group of offenders in all four cohorts. This means that the CDCR will have to ensure that it considers not only cultural responsivity issues when developing its programming, but it will also need to ensure that its program deliverers and providers are fluent in the Spanish language, as well as preparing program materials in Spanish.

*Figure L-10: Age Distribution*



Source: CDCR (2006 Admissions and Exit Data, December 31, 2006 In-Prison and On Parole Data)

Figure L-10 shows that there is very little difference in the average ages of offenders in all four cohorts, although offenders in the In-Prison and On Parole Cohorts are somewhat older than those in the Admissions Cohort. The main programming implication that this data suggests is that the CDCR should ensure that its programming is responsive to offenders in this life stage of their development.

135

## CDCR Offender Programming Needs

### Needs and Participation Levels—In Prison

Even though the CDCR doesn't currently use an objective instrument to assess the criminogenic needs of its adult offender prison population, external research by Petersilia (2006) has indicated that California's offenders have serious educational, vocational and substance abuse-related deficits which contribute to their propensity to return to prison. Yet despite this information, Petersilia (2006) reported that more than half of California's offenders in prison reported in that they had not participated in any rehabilitation programming during their current prison term, compared to 31% nationally.[as]

To evaluate prisoner needs and design effective programming, the CDCR began piloting the COMPAS instrument in 4 of its 13 Prison Reception Centers in June of 2007. The COMPAS is an objective instrument that assesses an offender's risks to reoffend and criminogenic needs.

### Needs and Participation Levels—On Parole

The CDCR's Parole Division began using the COMPAS instrument in February 2005. This represented an advance for California corrections. It was a necessary first step towards matching available parole programs to offenders who can most likely benefit from them. It also allows the Parole Division to assign parolees to differential case loads (e.g., minimum, intensive) based on their statistical risks of reoffending.

The Panel used the COMPAS data that currently exists to assess the needs of parolees in the Exit Cohort. For this report, we analyzed COMPAS data from a sample of parolees released from California prisons between March 2006 and July 2006. The COMPAS data described in the following figures (Figures L-11 – L-18) represent the characteristics of offenders who had been sentenced in court for criminal offenses. Because of certain biases in the data, statistics in these figures are likely to underestimate the actual degree of need in the CDCR parole release population. They should be interpreted as "lowball" estimates of the needs of those released to parole in California.

---

as       It should be noted that the Bureau of Justice Statistics (BJS) data on which Petersilia based her analysis was derived from offender self-reports and is now almost ten years old, which makes the need for an objective needs assessment instrument even more vital.

APPENDIX L— DETAILED CDCR ADULT OFFENDER PROFILE INFORMATION AND TABLES

This sample consisted of 11,140 parolees, representing about 31% of the offenders being released from prison and assigned to parole between March and July 2006. The COMPAS data available for analysis by the Expert Panel were biased in ways that likely result in an underestimation of California parolee needs. Specifically, COMPAS was administered only to prisoners being released from an original sentence and parole violators with a new term (PVWNTs; e.g., those sentenced in court) who had served longer than six months in an institution. COMPAS was not administered to those being released from CDCR camps, re-entry centers, hospitals, and other non-institutional settings; offenders with Correctional Clinical Case Management System-Enhanced Outpatient Program (CCCMS-EOP) status; offenders targeted by the state's Substance Abuse Program (SAP); and offenders pending deportation. In addition, our analysis excluded all parole violators returned to custody (PVRTCs; e.g., those sentenced by the Parole Board), since the Parole Division did not include them in this first round of COMPAS assessments. As excluded offenders with CCCMS-EOP status, those targeted by the SAP program, and PVRTCs are believed to have more serious employment, mental health, and substance abuse needs than average, those included in the analysis are probably less likely to have employment, mental health, and substance abuse problems than those who have been excluded. Thus, all COMPAS-related statistics reported in this chapter are likely to understate the actual degree of need in CDCR parole exit cohorts.

*Figure L-11: Educational Needs of the 2006 COMPAS Sample*



Source: CDCR (2006 COMPAS Data)

137

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*Figure L-12: Vocational and Financial Needs of the 2006 COMPAS Sample*



Source: CDCR (2006 COMPAS Data)

*Figure L-13: Substance Abuse Needs—Offenses of the 2006 COMPAS Sample*



Source: CDCR (2006 COMPAS Data)

138

APPENDIX L— DETAILED CDCR ADULT OFFENDER PROFILE INFORMATION  AND TABLES

*Figure L-14: Substance Abuse Needs and Treatment of the 2006 COMPAS Sample*



Source: CDCR (2006 COMPAS Data)

As Figures L-11 – L-14 indicate, California's offenders releasing to parole have high needs for education, vocational, and substance abuse treatment programming. It is also important to recall that given sampling biases, these needs profiled here probably underestimate the needs of the overall parole offender population (see pages 111 for details). The fact that California's offenders on parole have such high programming needs comes as no surprise to anyone familiar with California or U.S. offender populations. What is perhaps most surprising is the low level of offender participation in rehabilitation programs. For example, just 14% of offenders in this COMPAS sample reported currently being in a formal alcohol or drug treatment program (Figure L-14). We will revisit the issue of current program participation in Appendix M of this report.

*Figure L-15: Prior Aggression, Family Violence, and Weapon Offenses of the 2006 COMPAS Sample*



Source: CDCR (2006 COMPAS Data)

CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS

*Figure L-16: Self and Others' Perceptions and Violent Tendencies of the 2006 COMPAS Sample*



Source: CDCR (2006 COMPAS Data)

*Figure L-17: Relationships with Peers, Gang Involvement of the 2006 COMPAS Sample*



Source: CDCR (2006 COMPAS Data)

APPENDIX L— DETAILED CDCR ADULT OFFENDER PROFILE INFORMATION AND TABLES

*Figure L-18: Criminal Thinking Needs of the 2006 COMPAS Sample*



Source: CDCR (2006 COMPAS Data)

In terms of offender programming needs, in Figures L-14 – L-18, we see that roughly 20%-30% of parolees report having issues related to anger management or temper control. Large percentages have criminal records that reflect these problems; almost 40% have prior arrests or convictions for assault (other than homicide or manslaughter); more than 25% have prior family violence arrests or convictions. Peers are often involved in gangs and criminal activities. Almost 33% report that half or more of their friends have been arrested; almost 15% report that half or more of their friends are gang members. Our data does not provide us with measures of criminal thinking, however, we do note that fairly large percentages of offenders are self-focused—almost 50% feel they need to put themselves first, and almost 30% feel they get into trouble because they do things without thinking. Some perceive crimes as justified or not having injured their victims. About 30% feel that minor crimes don't hurt others; but fewer than 10% feel as strongly about justifying stealing. Only one item on the COMPAS addresses sex offending; 6.1% of offenders indicate a prior sex offense arrest or conviction.

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

### Table L-1: CDCR Gender and Race Distribution

| Attribute | Admissions Cohort N=141,881 | % | In-Prison Cohort N=172,066 | % | On Parole Cohort N=121,156 | % | Exit Cohort N=134,148 | % |
|---|---|---|---|---|---|---|---|---|
| **Gender** | | | | | | | | |
| Female | 14,246 | 10.04% | 11,710 | 6.81% | 13,639 | 11.26% | 13,668 | 10.19% |
| Male | 127,635 | 89.96% | 160,356 | 93.19% | 107,517 | 88.74% | 120,480 | 89.81% |
| **Race** | | | | | | | | |
| Black | 38,534 | 27.16% | 49,521 | 28.78% | 29,033 | 23.96% | 36,057 | 26.88% |
| Hispanic/Mexican | 50,873 | 35.86% | 65,141 | 37.86% | 48,424 | 39.97% | 47,535 | 35.43% |
| White | 46,124 | 32.51% | 47,410 | 27.55% | 37,576 | 31.01% | 44,650 | 33.28% |
| Other | 6,350 | 4.48% | 9,994 | 5.81% | 6,123 | 5.05% | 5,906 | 4.40% |

*Source: CDCR 2006*

### Table L-2: CDCR Age Distribution

| Attribute | Admissions Cohort N=141,881 | % | In-Prison Cohort N=172,066 | % | On Parole Cohort N=121,156 | % | Exit Cohort N=134,148 | % |
|---|---|---|---|---|---|---|---|---|
| **19 – under** | 1,950 | 1.37% | 1,037 | 0.60% | 114 | 0.09% | 345 | 0.26% |
| **20 – 24** | 20,693 | 14.58% | 19,873 | 11.55% | 11,390 | 9.40% | 16,466 | 12.27% |
| **25 – 29** | 27,384 | 19.30% | 30,608 | 17.79% | 23,666 | 19.53% | 26,131 | 19.48% |
| **30 – 34** | 21,243 | 14.97% | 26,801 | 15.58% | 20,060 | 16.56% | 20,938 | 15.61% |
| **35 – 39** | 22,065 | 15.55% | 26,018 | 15.12% | 19,520 | 16.11% | 21,864 | 16.30% |
| **40 – 44** | 20,700 | 14.59% | 25,167 | 14.63% | 18,398 | 15.19% | 20,451 | 15.25% |
| **45 – 49** | 15,402 | 10.86% | 20,537 | 11.94% | 14,354 | 11.85% | 15,363 | 11.45% |
| **50 – 54** | 7,811 | 5.51% | 11,734 | 6.82% | 8,090 | 6.68% | 7,842 | 5.85% |
| **55 – 59** | 3,089 | 2.18% | 5,766 | 3.35% | 3,416 | 2.82% | 3,141 | 2.34% |
| **60 – 64** | 1,006 | 0.71% | 2,552 | 1.48% | 1,326 | 1.09% | 1,054 | 0.79% |
| **65 – 69** | 368 | 0.26% | 1,140 | 0.66% | 500 | 0.41% | 373 | 0.28% |
| **70 – up** | 170 | 0.12% | 833 | 0.48% | 322 | 0.27% | 180 | 0.13% |

*Source: CDCR 2006*

APPENDIX L— DETAILED CDCR ADULT OFFENDER PROFILE INFORMATION  AND TABLES

*Table L-3: CDCR Offenses Distribution*

| Attribute | Admissions Cohort N=141,881 | % | In-Prison Cohort N=172,066 | % | On Parole Cohort N=121,156 | % | Exit Cohort N=134,148 | % |
|---|---|---|---|---|---|---|---|---|
| **Offense Category** | | | | | | | | |
| Person | 33,318 | 23.48% | 86,689 | 50.38% | 31,413 | 25.93% | 29,184 | 21.76% |
| Property | 47,708 | 33.63% | 36,222 | 21.05% | 37,352 | 30.83% | 46,650 | 34.78% |
| Drug | 44,488 | 31.36% | 35,711 | 20.75% | 37,730 | 31.14% | 43,362 | 32.32% |
| Other | 16,043 | 11.31% | 13,350 | 7.76% | 14,564 | 12.02% | 14,773 | 11.01% |
| **2-3 Strike Provision** | | | | | | | | |
| None | 124,267 | 87.59% | 125,899 | 73.17% | 106,198 | 87.65% | 117,780 | 87.80% |
| Two | 17,280 | 12.18% | 37,332 | 21.70% | 14,939 | 12.33% | 16,345 | 12.18% |
| Three | 334 | 0.24% | 8,835 | 5.13% | 19 | 0.02% | 23 | 0.02% |
| **Sex Offender Registration** | | | | | | | | |
| Yes | 10,520 | 7.41% | 22,438 | 13.04% | 9,302 | 7.68% | 9,399 | 7.01% |
| **Lifer** | | | | | | | | |
| Yes | 1,138 | 0.80% | 25,367 | 14.74% | 254 | 0.21% | 77 | 0.06% |
| **Type of Admission/Release** | | | | | | | | |
| New Court Commitments | 50,708 | 35.74% | 108,702 | 63.17% | 62,602 | 51.67% | 48,407 | 36.08% |
| Probation violators | 14,532 | 10.24% | 10,541 | 6.13% | 16,710 | 13.79% | 14,575 | 10.86% |
| **Parole Violators – Total** | | | | | | | | |
| New court | 21,207 | 14.95% | 40,592 | 23.59% | 20,163 | 16.64% | 20,843 | 15.54% |
| Technical violators | 4,505 | 3.18% | 1,879 | 1.09% | 33,298 | 27.48% | 55,481 | 41.36% |
| Technical violators-Continue on Parole | N/A | | | | 5,093 | 4.20% | 9,417 | 7.02% |
| Pending Parole Revocation Hearing | 65,461 | 46.14% | 20,893 | 12.14% | | | N/A | |

*Source: CDCR 2006*

143

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

*Table L-4: Serious and Violent Crime Distribution*

| Attribute | Admissions Cohort N=141,881 | % | In-Prison Cohort N=172,066 | % | On Parole Cohort N=121,156 | % | Exit Cohort N=134,148 | % |
|---|---|---|---|---|---|---|---|---|
| **Current Serious or Violent Crime** | | | | | | | | |
| Missing | 236 | 0.07% | 0 | 0.00% | 151 | 0.11% | 126 | 0.10% |
| No | 111,816 | 78.81% | 82,037 | 47.68% | 108,233 | 80.68% | 91,952 | 75.90% |
| Serious | 15,703 | 11.07% | 18,746 | 10.89% | 14,813 | 11.04% | 14,519 | 11.98% |
| Violent | 14,126 | 9.96% | 71,283 | 41.43% | 10,951 | 8.16% | 14,559 | 12.02% |
| **Current and Prior Serious or Violent Crime Type** | | | | | | | | |
| No Current or Prior Violent-Serious | 89,973 | 63.41% | 56,643 | 32.92% | 76,241 | 62.93% | 87,242 | 65.03% |
| No Current, Prior Violent, No Prior Serious | 9,007 | 6.35% | 10,905 | 6.34% | 6,906 | 5.70% | 8,462 | 6.31% |
| No Current, Prior Serious, No Prior Violent | 12,574 | 8.86% | 13,209 | 7.68% | 9,111 | 7.52% | 12,138 | 9.05% |
| No Current, Prior Violent and Serious | 3,203 | 2.26% | 5,179 | 3.01% | 2,320 | 1.91% | 3,091 | 2.30% |
| Current Violent, No Prior Violent-Serious | 11,517 | 8.12% | 55,957 | 32.52% | 12,407 | 10.24% | 8,932 | 6.66% |
| Current Violent, Prior Violent, No Prior Serious | 849 | 0.60% | 6,232 | 3.62% | 715 | 0.59% | 646 | 0.48% |
| Current Violent, No Prior Violent, Prior Serious | 779 | 0.55% | 4,212 | 2.45% | 525 | 0.43% | 522 | 0.39% |
| Current Violent and Prior Violent-Serious | 281 | 0.20% | 2,637 | 1.53% | 229 | 0.19% | 215 | 0.16% |
| Current Serious, No Prior Violent-Serious | 10,983 | 7.74% | 10,619 | 6.17% | 10,593 | 8.74% | 10,462 | 7.80% |
| Current Serious, Prior Violent, No Prior Serious | 1,658 | 1.17% | 3,665 | 2.13% | 1,218 | 1.01% | 1,466 | 1.09% |
| Current Serious, No Prior Violent, Prior Serious | 728 | 0.51% | 1,664 | 0.97% | 651 | 0.54% | 692 | 0.52% |
| Current Serious and Prior Violent-Serious | 329 | 0.23% | 1,144 | 0.66% | 240 | 0.20% | 280 | 0.21% |

*Source: CDCR 2006*

APPENDIX L— DETAILED CDCR ADULT OFFENDER PROFILE INFORMATION AND TABLES

*Table L-5: Mental Health Code Distribution*

| Attribute | Admissions Cohort N=141,881 | % | In-Prison Cohort N=172,066 | % | On Parole Cohort N=121,156 | % | Exit Cohort N=134,148 | % |
|---|---|---|---|---|---|---|---|---|
| No Mental Health Code | 115,312 | 81.27% | 126,435 | 73.48% | Data not reliable | | 107,636 | 80.24% |
| CCCMS | 23,899 | 16.84% | 40,636 | 23.62% | | | 23,735 | 17.69% |
| Crisis Bed | 237 | 0.17% | 253 | 0.15% | | | 162 | 0.12% |
| DMH | 161 | 0.11% | 480 | 480 | | | 480 | 0.13% |
| EOP | 2,272 | 1.60% | 4,262 | 2.48% | | | 2,447 | 1.82% |
| *Source: CDCR 2006* | | | | | | | | |

Legend: CCMS-Correctional Clinical Case Management System; DMH-Department of Mental Health, EOP-Enhanced Outpatient Program

*Table L-6: First Admission Due to Probation Failure Distribution*

| Attribute | Admissions Cohort N=141,881 | % | In-Prison Cohort N=172,066 | % | On Parole Cohort N=121,156 | % | Exit Cohort N=134,148 | % |
|---|---|---|---|---|---|---|---|---|
| **First Admission Due to Failure on Probation** | | | | | | | | |
| No | 106,446 | 75.02% | 154,806 | 89.97% | 92,411 | 76.27% | 99,736 | 74.35% |
| Yes: Total | 35,435 | 24.98% | 17,260 | 10.03% | 28,745 | 0.24% | 34,412 | 25.65% |
| Yes: First admission due to failing probation; prior admission | 20,903 | 14.73% | 6,719 | 3.90% | 12,035 | 9.93% | 19,837 | 14.79% |
| Yes: First admission due to failing probation; current admission | 14,532 | 10.24% | 10,541 | 6.13% | 16,710 | 13.79% | 14,575 | 10.86% |
| *Source: CDCR 2006* | | | | | | | | |

*Table L-7: Good Time Group Distribution*

| Attribute | Admissions Cohort N=141,881 | % | In-Prison Cohort N=172,066 | % | On Parole Cohort N=121,156 | % | Exit Cohort N=134,148 | % |
|---|---|---|---|---|---|---|---|---|
| 0% credit | 2,771 | 1.95% | 20,353 | 11.83% | 1,819 | 1.50% | 1,481 | 1.10% |
| ½ credit | 111,612 | 78.67% | 70,645 | 41.06% | 93,406 | 77.10% | 108,332 | 80.76% |
| 1/3 credit | 33 | 0.02% | 9,311 | 5.41% | 152 | 0.13% | 41 | 0.03% |
| 15% credit (with base term double) | 156 | 0.81% | 7,201 | 4.19% | 644 | 0.53% | 532 | 0.40% |
| 15% credit | 10,060 | 7.09% | 35,964 | 20.90% | 10,871 | 8.97% | 7,962 | 5.94% |
| 20% credit | 15,773 | 11.12% | 28,167 | 16.37% | 13,947 | 11.51% | 15,476 | 11.54% |
| Unknown | 476 | 0.34% | 425 | 0.25% | 317 | 0.26% | 324 | 0.24% |
| *Source: CDCR* | | | | | | | | |

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

# Appendix M—Detailed CDCR Adult Offender Programs and Activities Tables

## CDCR Adult Offender Programs and Activities

Title 15 of the CDCR Policy states that "every able-bodied person committed to the custody of the Secretary of the Department of Corrections and Rehabilitation is obligated to work as assigned by department staff and by personnel of other agencies to whom the inmate's custody and supervision may be delegated. Assignment may be to a full day of work, education, or other program activity, or to a combination of work and education or other program activity." (Article 3, 3040 (a)). Assignments include Support Services for the institution, Academic and Vocational Education programs, and Substance Abuse programs. Offenders earn credit off their sentences (e.g., day for day) for participation in these programs and activities; some can earn hourly pay for certain job assignments. Parolees also participate in education, vocation and other programs, although they do not earn credits for their participation.

For purposes of this report, we define a "program" as a set of structured services designed to achieve specific goals and objectives for specific individuals over a specific period of time. Programs are typically targeted towards particular problems such as substance abuse or criminal thinking. We consider "activities" to be synonymous with job assignments, such as Support Services or Camps.

## Prison Programs and Activities

Offenders can participate in one or more programs and-or activities during their time in prison; they may also participate in half-time assignments. Approximately three-quarters of offenders are eligible to participate on a given day. Approximately one-quarter are ineligible to participate, primarily due to being in Prison Reception Centers or administrative segregation units. Of those eligible to be assigned, three-quarters actually participate in programs or other activities on a given day.

Table M-1 gives a one day snapshot of adult offenders who were participating in programs and activities on March 10, 2007.[at]

---

at       These include all felons and civil addicts on March 10, 2007; it does not exclude prisoners ineligible for work.

CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS

Table M-1: Snapshot of CDCR Adult Offender In-Prison Cohort
Program and Activity Assignments, March 10, 2007

| Activity-Program Type | Capacity[1] | Total Assignment | Number of Prisoners Participating[2] | % Capacity[3] | % of All Prisoners Participating (n=163,667) |
|---|---|---|---|---|---|
| Support Services | 48,935 | 45,138 | 45,100 | 92.2% | 27.6% |
| Bridging Program | 22,212 | 19,389 | 19,389 | 87.3% | 11.8% |
| Academic Education | 13,422 | 12,105 | 12,045 | 90.2% | 7.4% |
| Vocational Educational | 9,987 | 9,845 | 9,052 | 98.6% | 5.5% |
| Substance Abuse Treatment | 8,601 | 7,621 | 7,491 | 88.6% | 4.6% |
| Industries | 6,428 | 6,011 | 6,011 | 93.5% | 3.7% |
| Camp | 5,048 | 4,677 | 4,677 | 92.7% | 2.9% |
| Community Work Crews | 455 | 306 | 306 | 67.3% | 0.2% |
| Forestry Training | 460 | 306 | 306 | 66.5% | 0.2% |
| Reception Center Permanent Work Crews | 255 | 162 | 162 | 63.5% | 0.1% |
| Joint Venture | 73 | 73 | 73 | 100.0% | 0.0% |

Source: CDCR
[1] Contains both full- and half-time job assignment positions; a prisoner may have two half-time job assignments at any point in time.
[2] A prisoner with more than one job assignment position per program type is counted only once.
[3] Percent capacity is defined as the total number of assignments divided by capacity.

Table M-1 shows that the largest prisoner assignment category is Support Services. Within this category, institutional cleaner, kitchen worker, and janitor are the most frequent job assignments, accounting for a combined total of over 18,000 offenders out of the 45,100 offenders assigned overall to Support Services. Over 30,000 offenders were participating in academic education or Bridging Program (in-cell study) programming. Over 9,000 inmates were participating in vocational education (the largest category being office service and related technology). Approximately 7,500 offenders were in substance abuse programs; 4,600 in fire camps; 6,000 in prison industries (sewing machine operator II was by far the largest category, followed by laundry laborer and worker, and optician).

In Table M-1 we looked at the numbers of prisoners participating on one given day. In Table M-2, we look at an Exit Cohort from 2006 and examine the numbers of prisoners who participated in CDCR programs and activities at any point before their releases that year.

APPENDIX M— DETAILED CDCR ADULT OFFENDER PROGRAMS AND ACTIVITIES TABLES

*Table M-2: CDCR Adult Offender Prison Exit Cohort Program and Activity Assignments, 2006*

| Activity-Program Type | Number of Prisoners Participating[1] | % of Released Prisoners (n=134,148) |
|---|---|---|
| Support Services | 50,019 | 37.3% |
| Bridging Program | 27,791 | 20.7% |
| Academic Education | 24,505 | 18.3% |
| Substance Abuse Treatment | 9,772 | 7.3% |
| Vocational Educational | 8,736 | 6.5% |
| Industries | 4,033 | 3.0% |
| Forestry Training | 3,608 | 2.7% |
| Camp | 3,589 | 2.7% |
| Community Work Crews | 748 | 0.6% |
| Reception Center Permanent Work Crews | 181 | 0.1% |
| Joint Venture | 40 | 0.0% |

*Source: CDCR*
[1] *A prisoner with more than one job assignment position per program type is counted only once.*

Table M-2 shows that Support Services was still the largest prisoner assignment category, followed by Academic Education and the Bridging Program. Slightly more than one-third of prisoners released in 2006 had been in a Support Services assignment. Approximately one-fifth participated in Bridging or Academic Education programs.

Prisoners can have more than one assignment before they are released. Table L-3 shows the distribution of the number of assignments for the 2006 releases. Nearly 50% of released prisoners had no assignments during their prison terms. Another 21% had one assignment. Just fewer than 30% had two or more assignments during their prison terms.

*Table M-3: Number of Program or Job Assignments for 2006 releases*

| # of Assignments | % of Offenders |
|---|---|
| 0 | 49.3 |
| 1 | 21.5 |
| 2 | 16.3 |
| 3 | 8.2 |
| 4 | 3.5 |
| 5+ | 1.1 |

*Source: CDCR*

*CDCR EXPERT PANEL ON ADULT OFFENDER REENTRY AND RECIDIVISM REDUCTION PROGRAMS*

Participation in multiple assignments is highly dependent upon length of stay (LOS) during the prisoner's sentence. Figure L-1 shows the relationship between LOS and the jobs assigned. For those offenders who served 6 months or less, almost 75% were not given any job assignments. Roughly 65% of offenders who served 7 to 12 months had at least one job assignment before their releases. Over 90% of offenders who have served more than 2 years had at least one job assignment.

*Figure M-1: Job Assignment by Length of Stay (LOS)*



Source: CDCR

Another way to examine program participation for released prisoners is by their status as either new admissions or parole violators. Figure M-2 shows the distribution of the number of job assignments by whether the offender was a new admission, a parole violator with a new term, a parole violator returned to custody, or a prisoner released to continue on parole. More than 70% of new admissions released in 2006 received job assignments; for parole violators returned to custody, the opposite was true–almost 70% did not receive a job assignment before they were released from prison.

*Figure M-2: Job Assignment by Release Status*

Source: CDCR

150