```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF CALIFORNIA
 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                         ---oOo---
        BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE
 4      BEFORE THE HONORABLE THELTON E. HENDERSON, SENIOR JUDGE

 5

 6   RALPH COLEMAN, et al.,

 7          Plaintiff,

 8   Vs.                          CASE NO. CIV. S-90-0520 LKK

 9   ARNOLD SCHWARZENEGGER,
     et al.
10
            Defendants.
11   _____/

12   MARCIANO PLATA, et al.,

13          Plaintiffs,

14   Vs.                          CASE NO. CIV. C-01-1351 TEH

15   ARNOLD SCHWARZENEGGER,
     et al.
16
            Defendants.
17   _____/

18

19                         ---oOo---

20                    REPORTER'S TRANSCRIPT
              WEDNESDAY, JUNE 27TH, 2007 - 10:30 AM
21   RE:  JOINT MOTION HEARING ON PLAINTIFFS' MOTIONS TO CONVENE
                      THREE JUDGE PANEL
22

23                         ---oOo---

24

25   Reported by:                 CATHERINE E.F. BODENE,
                                   CSR. No. 6926
```

**FILED**

JUL 1 0 2007

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

BY _____
        DEPUTY CLERK

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2309

```
1                          APPEARANCES

2                          ---o0o---

3    COLEMAN SPECIAL MASTER:

4            JOSPEH MICHAEL KEATING,
             SPECIAL MASTER
5            MATTHEW A. LOPES, JR.,
             ASSISTANT TO THE SPECIAL MASTER
6            2351 SUSSEX DRIVE
             FERNANDINA BEACH, FLORIDA  32034
7

8
     FOR THE COLEMAN PLAINTIFFS:
9
             ROSEN, BIEN & GALVAN, LLP
10           315 MONTGOMERY STREET, TENTH FLOOR
             SAN FRANCISCO, CALIFORNIA  94104
11           BY:  MICHAEL BIEN,
                  ATTORNEY AT LAW
12
             BY:  JANE KAHN,
13                ATTORNEY AT LAW

14
             BY:  LORI RIFKIN,
15                ATTORNEY AT LAW

16

17   FOR THE PLATA PLAINTIFFS:

18           DONALD HOWARD SPECTER - STAFF ATTORNEY
             PRISON LAW OFFICE
19           GENERAL DELIVERY
             SAN QUENTIN, CALIFORNIA  94964
20
             BY:  DONALD SPECTER,
21                ATTORNEY AT LAW

22

23   PLATA RECEIVER:
                ROBERT SILLEN,
24              RECEIVER, CALIFORNIA PRISONS

25
```

```
 1                           APPEARANCES

 2                           ---o0o---

 3    PLATA SPECIAL MASTER:

 4            JOHN HAGAR, SPECIAL MASTER
              JUDGE'S READING ROOM.
 5            450 GOLDEN GATE AVENUE, 18TH FLOOR
              SAN FRANCISCO, CALIFORNIA  94102
 6

 7    FOR COLEMAN DEFENDANTS:

 8            STATE OF CALIF., DEPT. OF JUSTICE
              OFFICE OF THE ATTORNEY GENERAL
 9            1300 I STREET
              SACRAMENTO, CALIFORNIA  94244
10
              BY:  LISA TILLMAN,
11                 DEPUTY ATTORNEY GENERAL

12            BY:  MISHA D. IGRA,
                   DEPUTY ATTORNEY GENERAL
13

14    FOR PLATA DEFENDANTS:

15            HANSON BRIDGETT MARCUS VLAHOS RUDY, LLP
              425 MARKET STREET, 26TH FLOOR
16            SAN FRANCISCO,  CA  94105

17            BY:  PAUL MELLO,
                   ATTORNEY AT LAW
18

19
              STATE OF CALIFORNIA, DEPT. OF JUSTICE
20            OFFICE OF THE ATTORNEY GENERAL
              455 GOLDEN GATE AVENUE, SUITE 11000
21            SAN FRANCISCO, CALIFORNIA  94102-7004

22            BY:  ROCHELLE C. EAST,
                   SUPERVISING DEPUTY ATTORNEY GENERAL
23

24                           ---o0o---

25
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

```
1                          APPEARANCES

2                           ---o0o---

3

4    FOR CCPOA AMICUS:

5            CARROLL, BURDICK & MCDONOUGH LLP
             44 MONTGOMERY STREET, SUITE 400
6            SAN FRANCISCO,  CA  94104

7            BY:  RONALD YANK,
                  ATTORNEY AT LAW
8
             BY:  GREGG ADAM,
9                 ATTORNEY AT LAW

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

```
 1                    SACRAMENTO, CALIFORNIA

 2              WEDNESDAY, JUNE 27TH, 2007 - 10:30 AM

 3                          ---o0o---

 4         THE CLERK:  All rise.

 5         United States District Court for the Eastern District

 6    and Northern District of California are now in session.  The

 7    Honorable Lawrence K. Karlton and the Honorable Thelton E.

 8    Henderson presiding.

 9         JUDGE KARLTON:  Please, be seated Ladies and

10    Gentlemen.

11         Call the case, Madam Clerk.

12         THE CLERK:  Calling Civil Case S-90-0520, Coleman, et

13    al., v. Schwarzenegger, and Civil S-01-1351 TEH, Plata,

14    et al., v. Schwarzenegger, et al.

15         JUDGE KARLTON:  Counsel, please approach the podium,

16    state your appearance for the record and indicate whether you

17    are arguing.

18         Sir, take one or the other.

19         I see.  All right.  Go ahead.

20         MR. SPECTER:  Donald Specter for the plaintiffs.  I

21    will be arguing.

22         MR. BIEN:  Michael Bien for the plaintiffs in

23    Coleman.  I'll be arguing also, Your Honor.

24         MS. KAHN:  Jane Kahn for the plaintiffs.  I will not

25    be arguing.
```

2

1          MS. RIFKIN:  Lori Rifkin for the Coleman plaintiffs.

2   I won't be arguing.

3          MS. TILLMAN:  Good morning.  Lisa Tillman on behalf

4   of the Coleman defendants.  I will be arguing.

5          MR. MELLO:  Good morning, Your Honors.  Paul Mello of

6   Hanson Bridgett on behalf of the Plata defendants.

7          MR. DODD:  Good morning, Your Honors.  Martin Dodd

8   for Robert Sillen, the Receiver.  I don't anticipate arguing.

9          MS. EAST:  Rochelle East for defendants in the

10  Coleman and Plata.  I will not be arguing.

11         MR. YANK:  Ronald Yank for amicus CCPOA appearing on

12  the side of the moving parties, and I will be arguing.

13         MS. IGRA:  Misha Igra, Attorney General's Office, for

14  defendants in Coleman.  I will not be arguing.

15         MR. ADAM:  Gregg Adam also with amicus CCPOA, and

16  I'll leave the arguing to Mr. Yank.

17         Thanks.

18         JUDGE KARLTON:  Plaintiffs may commence argument.

19         MR. SPECTER:  Thank you, Your Honors.  My name is

20  Donald Specter.

21         JUDGE KARLTON:  Best we got, sir.

22         MR. SPECTER:  I just wonder if there is anything I

23  can do about it.

24         (Microphone adjusted.)

25         I'm appearing on behalf of the plaintiffs in the

3

1    Coleman and Plata case.  With your permission, Mr. Bien and I

2    will split the argument.  He will be concentrating on the

3    Coleman case.  I will give you a general overview and

4    concentrate on the Plata matter.

5         We are here today for two reasons.  First,

6    California's prisons are bursting with more prisoners than it

7    can humanly house.  Prisoners are literally crammed into

8    every available space.  And some of the prisons into which

9    they live are decrepit and have outlived their useful life

10   and are no longer fit for human habitation.

11        The health care system is burdened beyond the

12   breaking point so the fact that prison officials cannot

13   fulfill their constitutional and statutory responsibilities

14   to provide basic health care to prisoners.

15        Upon reception, prisoners are not properly screened

16   for communicable and other diseases.  They do not have

17   regular access to clinicians for their chronic diseases such

18   as diabetes and HIV.  And they cannot get timely access to

19   medical specialists including oncologists.

20        The State of California isn't taking any meaningful

21   steps to respond to what everyone agrees is a crisis of

22   constitutional dimension that is dangerous for prisoners,

23   unsafe for the staff who work in the prison, and is a threat

24   to the general public.

25        JUDGE KARLTON:  May I interrupt for just a moment?

4

1        MR. SPECTER:  Yes, sir.

2        JUDGE KARLTON:  I swore I wasn't going to do this,

3    but looks like I am.

4        Let's assume that the solution to this problem is so

5    radical.  Let's start by saying that just the idea that a

6    federal court would impose a cap on a state prison is itself

7    very radical, I mean so radical that everybody on your side

8    of the table ought to take a deep breath and think about what

9    you're doing.

10        But let's assume that ultimately we agree that

11    something must be done, but we are advised that the only

12    thing that can be done is so radical as to be unacceptable

13    because it creates such a public danger as not to be anything

14    any sensible person would do.

15        What happens?

16        MR. SPECTER:  Well, first of all can I respectfully

17    challenge in some respects the premise.

18        JUDGE KARLTON:  Good.

19        MR. SPECTER:  It is extraordinary relief.  There is

20    no question about that.  And I agree with you that it's

21    extraordinary because when the court has to take over one of

22    the core functions of a state government, it is something

23    that, if not radical, is of great moment and magnitude.

24        But that is not to say it hasn't been done before.

25    And that is where I want to talk a little bit about the

5

1    premise.

2         There are at least two states, to my knowledge, that

3    have done -- that this has been done in before, Grubbs v.

4    Bradley in Tennessee --

5         JUDGE KARLTON:  But nothing -- But the numbers here

6    are so startling.  This is very different.

7         MR. SPECTER:  It is different in magnitude, but it is

8    not different in method.  The same method -- I just want to

9    add when I talk about "methods," that reducing the prison

10   population is something that many other states have done

11   voluntarily.

12        And one of the things that -- one of the pieces of

13   evidence that we will present to you, probably in the form of

14   expert testimony, is how these methods can be accomplished so

15   that it can be done safely and without significant risk to

16   public safety.

17        And I'll give you just a little offer of proof about

18   that.

19        Recently, the National Council For Crime and

20   Delinquency did a Meta-analysis of all the studies that have

21   looked at the effect of early releases from correctional

22   facilities on the recidivism rate.

23        Out of the 15 studies they found, they found no

24   change in the recidivism rate in 14 of those studies, and in

25   one of the studies the rate actually decreased.

6

1          I won't go into the details now, but that analysis
2     also showed that if you do it carefully and with the
3     appropriate services, in other words you screen the prisoners
4     properly and you use the appropriate services, you can have a
5     good effect on public safety, one that would be better for
6     the state than the current system where tens of thousands of
7     prisoners are sent to prison for as little as three or four
8     months at a time.
9          JUDGE HENDERSON:  Let me interrupt you again too --
10    or for the first time on my part.
11          One of the things that troubles me, most people seem
12    to say that AB 900 is okay as far as it goes, it's not
13    enough.  What we really need is a change in the sentencing
14    format for the state.
15          If we were to convene a three judge court, it is not
16    clear to me.  Can a three judge court order a change in the
17    sentencing guidelines and the way prisoners are sentenced in
18    California?
19          MR. SPECTER:  Well, I think that theoretically is
20    possible.  I think the -- Let me go back to the premise of
21    your question which will help me explain my answer.
22          You're right.  AB 900 isn't enough.  And the reason
23    it isn't enough is because just like the prison construction
24    program in the '90's, which built 20-odd prisons and spent
25    billions of dollars doing it to relieve overcrowding, and

7

1    we're here 15 years later at the same point.  And the reason

2    we are is because nobody has done anything to change how many

3    prisoners come to prison, how long they stay, and when they

4    leave in any sort of sense that would reduce the population.

5        If anything, the state -- the prison sentences have

6    become longer and more and more people are getting violated

7    on parole.

8        So unless you change the number of prisoners who are

9    either coming into the system or leaving the system, you

10   can't get a reduction in the population.

11       So one of the ways you can change that is through

12   sentencing reform.  That, however, is a very difficult, a

13   very time consuming process, and one that would not have the

14   kind of immediate effect that we think is necessary in the

15   crisis and emergency situation we're in today.

16       We think that what the three judge court should do is

17   order the state to develop -- Well, first of all, it should

18   have to pick -- determine the constitutional level of

19   overcrowding, which is -- upon which the state can't go.

20       In other words, it has to limit the population in

21   numerical fashion.  And then the order that we would suggest

22   would be that the court give the state a very short period of

23   time to come up with a plan to limit the population to that

24   number in a temporally responsible way.

25       So, for example, then the state would have the

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

8

1   opportunity to determine whether it's going to limit the

2   number of, for example, parole violators to enter the system

3   or release some of the prisoners who are there early -- a few

4   months early.

5       We have submitted to you a declaration from Dr. James

6   Austin who says that if the legislature, for example, were to

7   increase participation credits for participation in

8   rehabilitative programs and they --

9       JUDGE KARLTON:  There are no rehabilitative programs.

10  Part of the problem is this is a fantasy.

11      They barely have -- I don't mean this

12  disrespectfully, but they barely have enough ability to house

13  people.  They don't --

14      MR. SPECTER:  They don't.  Right.

15      JUDGE KARLTON:  They don't.

16      Where are you going to find the space to institute

17  the kinds of programs that would provide meaningful

18  rehabilitation?

19      You know, I remember so clearly -- I don't want to

20  start with war stories.  We don't know whether rehabilitation

21  will work because nobody has ever tried it in this state.

22      MR. SPECTER:  Well, if you look at the evidence from

23  other states and other jurisdictions it is clear that

24  rehabilitation does work to some extent.

25      Of course, that assumes the programs are operating

9

1    properly and set up properly and the culture of the

2    correctional system is sympathetic to that endeavor.

3         But to get to your question, and I'll assume that

4    what you're saying is true because it probably is, the

5    quickest way to reduce the prison population is to stop the

6    influx of parole violators.

7         Dr. Petersilia submitted a declaration saying that

8    140,000 prisoners enter the system every year.  A good large

9    percentage of those are parole violators who spend, you know,

10   about three or four months on average.

11        There are screening instruments, and we will present

12   testimony for you, that could be used and that have been

13   scientifically validated to determine the risk to public

14   safety based on the offense and the offender to determine of

15   those people who are coming in which ones would present the

16   least risk of danger to the public.

17        That probably is the quickest and easiest way to

18   limit the population.

19        JUDGE HENDERSON:  Let me go back to something you

20   said earlier -- a little earlier.

21        MR. SPECTER:  I didn't say much.

22        JUDGE HENDERSON:  I know.  In keeping with our

23   strategy, we're going to keep doing this.

24        You're going to ask the three judge court, should one

25   be convened, to limit the population.

10

1        MR. SPECTER:  Yes.

2        JUDGE HENDERSON:  Let me say that Judge Karlton and I

3   have not met and talked about what our views are so I'm not

4   speaking for him when I say some of the things I will say.

5        JUDGE KARLTON:  But he probably is.

6        JUDGE HENDERSON:  So you'll ask the three judge court

7   to limit the population.  Let's just say a figure 110,000 or

8   whatever it might be.  Then you're going to ask the three

9   judge court to have the state submit a plan to limit it.

10        It would not surprise me at all should we do that

11   that the plan will not be worth much more than the paper it's

12   written on.  That's been my experience.

13        What does the three judge court do then?

14        MR. SPECTER:  Well, that is one of the problems in

15   institutional litigation.  As you have learned over these

16   many years of forcing a recalcitrant state actor to abide by

17   the constitution and the orders of the federal court.

18        So there are -- As you also know, there are multiple

19   options that can be taken at that point.

20        First, there are a course of sanctions point.  But

21   probably more appropriate is that the court could employ a

22   panel -- If the state -- I'm assuming now, to answer your

23   question, that the state essentially defaults -- de facto

24   defaults on its chance --

25        JUDGE HENDERSON:  Or has an inadequate plan or

11

1   quota.

2         MR. SPECTER:  Which de facto is a default, right?

3         So you find the state has defaulted.  It doesn't come

4   up with anything near adequate.  So your alternatives are to

5   ask them to do it again, which, as we know, just result in

6   many rounds of new plans which are inadequate.

7         You can ask the plaintiffs to prepare a plan, which

8   we would be happy to provide.  You could impanel a group of

9   experts who have done this before in other jurisdictions to

10  come up with a plan, and let the both sides comment on that.

11        And I think those are really the three options that

12  you could have.

13        In either event, either if you appoint your own

14  experts under Rule 76 or let us do it, we would do it with

15  the assistance of people who have done this kind of thing

16  before.

17        So the legal issue that you have to resolve today,

18  and I know you're chomping at the bit -- wrong metaphor --

19  you're considering the possibilities of what will happen if

20  you convene a three judge panel, but the decision you have to

21  make today is a much more limited one.

22        That was addressed, Judge Henderson, in your February

23  15th order, and that has two parts to it.  One is that the

24  court has previously issued a prior order with less intrusive

25  relief, and the second part of that is that the defendant has

12

1   had a reasonable amount of time to comply with that prior

2   order.

3        I don't think there can be any dispute in either of

4   these cases that the courts have issued prior orders for less

5   intrusive relief.

6        I have given up counting the ones that Judge

7   Karlton --

8             JUDGE KARLTON:  70.  Over 70.

9             MR. SPECTER:  Thank you for that information.

10            JUDGE KARLTON:  I am very sensitive to that number.

11            MR. SPECTER:  I'm sure you are.

12        And Judge Henderson, in your February 15th order, you

13   talked about the interplay between those two requirements.

14   And you came out, and I'll try and paraphrase what you said,

15   and it is whether in the context of the cases -- the factual

16   context, enough time has passed so that the court is

17   persuaded that the remedies that it has already ordered will

18   not achieve their desired results without a reduction in the

19   population in a timely manner.

20        And we believe very strongly that there is virtually

21   uncontradicted evidence in this record in both cases to show

22   that time has long since passed.

23        Part of the reason it has long since passed is

24   because prison overcrowding in California is not new.  As

25   both of you know, it has been the norm for the last 20 years.

13

1    And despite the fact that the state has spent billions of

2    dollars to construct new prisons, overcrowding has only grown

3    worse.

4         At this moment 19 -- the prisons are operating at

5    over 200 percent capacity.  And the Governor's proclamation

6    issued last October said 29 of the prisons are extremely

7    overcrowded.

8         And the reason why is what I averted to earlier is

9    because the same sentencing and parole policies that caused

10   the overcrowding 20 years ago are in effect today.

11        So the effects of overcrowding on California's

12   prisons have not only been seen by both of you in the conduct

13   of the cases that have been brought before you, but in the

14   last 15 years various reports have been commissioned and

15   written by various agencies, the Blue Ribbon Commission in

16   the early '90's, the Little Hoover Commission, California

17   Inspector General, and even Governor Deukmejian chaired the

18   Corrections Independent Review Panel, all of whom have found

19   that the overcrowding is serious, it's a threat to the safety

20   of the prisoners and the staff, and that each of these

21   reports contained thoughtful and practical recommendations

22   for change, and in none of those cases were those reforms

23   ever enacted.

24        What is new here is that starting two years ago state

25   officials began to publicly admit that overcrowding was

14

1    causing a crisis, something that I believe had happened long
2    before that.  But in October 2005, John Dovey, who was then
3    the CDC Director of Adult Institutions, warned then Secretary
4    Rod Hickman of the grave dangers that are posed by
5    overcrowding.

6           He stated, quote:
7           "We believe that an imminent and substantial threat
8           to the public safety exists requiring immediate
9           action."

10          The current Secretary, Jim Tilton, has made similar
11   remarks stating, quote:
12          "There is a clear danger in our crowded prisons for
13          staff, inmates and eventually for the community."
14          Secretary Tilton has been candid about the effects
15   that overcrowding has on health care.  Quote:
16          "The overcrowding and lack of treatment space to
17          service additional populations has been a major
18          contributor to court intervention regarding CDCR's
19          health care services delivery."
20          Something with which we agree wholeheartedly.
21          And nine months ago, as I mentioned earlier, the
22   Governor of the state declared a state of emergency because
23   the number of offenders in our prisons created what he called
24   "extreme conditions" that, quote, "caused substantial risk to
25   the safety of the men and women who work inside these prisons

15

1    and the inmates who are housed in them."

2         JUDGE KARLTON:  Let me ask you this question.  The

3    Governor is proposing to ship significant numbers of

4    prisoners out-of-state as a temporary solution to the

5    problem.

6         The argument that is being made to us by you and your

7    folks is, among other things, that clearly not enough people

8    can be processed out to make any difference in the population

9    total.

10        Is that really true?

11        And if it is really true, doesn't that really speak

12   about the efficacy of a three judge court?

13        What could it do?

14        I mean, I don't want to say that the problem is

15   hopeless, but in considering something as radical as what you

16   are proposing -- and I want to keep using that word because I

17   regard it as just that serious -- you have to ask yourself is

18   it going to make any difference?

19        MR. SPECTER:  Well, to answer your first question, we

20   never say anything, to you at least, that we don't believe

21   isn't true.  And I will back that up by giving you some

22   statistics.

23        The CDCR believes that it can transfer 8000 prisoners

24   to out-of-state facilities.  I, myself, have my doubts about

25   whether they will actually ever be able to reach that number.

16

1    But let's say for the moment that they do.

2         Their own population projections suggest that in that

3    same period of time, two years, the population will grow by

4    about 6000 prisoners.  So you have kind of a net increase of

5    2000 or a net decrease of an insignificant number of

6    prisoners from out-of-state.

7         As Mr. Kernan declared in his declaration, that is

8    the only immediate response to the overcrowding crisis that

9    the state is using.  So there isn't much of a response.

10        And to answer the second part of your question, I'm

11   going to have to just make an offer of proof which is that we

12   will present evidence that states have voluntarily --

13   jurisdictions -- states and other jurisdictions have

14   voluntarily and involuntarily solved prison overcrowding

15   crisis by reducing prison populations.

16        States as diverse as Virginia, North Carolina,

17   Minnesota and the like, all by slightly different methods,

18   but all by coming to grips with the fact that you either have

19   to release more prisoners or stop the same amount of

20   prisoners from coming in.

21        And they've all done it safely, and the sky hasn't

22   fallen.  And in many of those states they were done with law

23   and order administrations and legislators.

24        And in New York, for example, I am informed that the

25   prison population has been going down and so has the crime

17

1    rate so --

2         JUDGE HENDERSON:  Let me ask you a question.

3         MR. SPECTER:  I'm just trying to fit in what I'm

4    saying to what you're asking.  Go ahead.

5         JUDGE HENDERSON:  This might be a better time so you

6    can get back to your notes.

7         MR. SPECTER:  Go ahead.

8         JUDGE HENDERSON:  You're arguing that overcrowding is

9    a cause of the constitutional violations in these two

10   cases.

11        MR. SPECTER:  Yes.

12        JUDGE HENDERSON:  There is some dispute between you

13   and defendants over whether it is the cause or the primary

14   cause.

15        Talk about that.  What do we have to find?

16        I don't think anyone disputes that overcrowding

17   doesn't help the receivers and the special masters solve the

18   health and mental health problems.

19        What does it have to be?  Not just the little nagging

20   problem?  What does it have to be?  What do we have to show?

21        MR. SPECTER:  Well, for the decision you have to make

22   today, or whenever you make it, you don't have to decide that

23   issue.

24        That is the issue for the three judge court.  That is

25   clearly spelled out in the statute.

18

1      The only one you have to decide today is the two-part

2 test that I mentioned earlier.

3      JUDGE KARLTON:  We are required to believe that a

4 three judge court may be able to solve the problem.  That is

5 one of the requisites of the statute.

6      MR. SPECTER:  Well, there would be no point in you

7 referring it to a three judge panel if you didn't have some

8 hope that that would be the case, but it is not a legal

9 conclusion you have to make.

10      JUDGE KARLTON:  All right.

11      MR. SPECTER:  In terms of the point about whether

12 it's the primary cause, I think, first of all, I want to make

13 one point.  And that is that the evidence is basically

14 uncontradicted in this case.

15      There is not -- there is not a dispute about the

16 facts here.  The inferences which one may draw from that

17 evidence may be subject to different interpretations, but all

18 of the evidence shows that overcrowding is a severe problem,

19 all of the evidence shows that overcrowding is inhibiting the

20 remedial efforts of both the courts and the Special Master

21 and the Receiver in this case.  And therefore, it is delaying

22 the constitutional remedy.

23      And to my mind, if you can make that link between

24 that it is actually causing, and I think the evidence is

25 clear that it is, then it becomes, for legal purposes, a

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

19

1    primary cause.

2         And let me tell you in some sense why that is so

3    clear.  Because in these cases, which are about -- we're

4    using the word "overcrowding," but it is not exactly -- it

5    doesn't exactly fit the cases that you're presiding over.

6         It is true that the prisons are overcrowded in the

7    sense that there are not enough places for people to sleep.

8    They've run out of beds.  They've run out of room to put beds

9    for people to sleep.  But this is a case about health care

10   services.

11        And in health care services cases, as you both know,

12   the critical issues are the staffing, which is critical, and

13   the space to support the clinical activities.

14        So in terms of the constitutional violations, it's in

15   some sense a supply and demand issue.  And that is you have

16   all of these prisoners who have a certain demand for

17   services, and the population is so great, the overcrowding is

18   so great that the prison has not been able to supply enough

19   services to meet that demand.

20        And so here -- so that is a direct primary cause of

21   the overcrowding.  It's the same thing.

22        JUDGE KARLTON:  You mean the overcrowding is a direct

23   cause of the failure to provide adequate medical and mental

24   health care?

25        MR. SPECTER:  Yes.  Exactly.

20

1          JUDGE KARLTON:  You said it the other way.

2          MR. SPECTER:  I appreciate the correction.

3          As both the receivers' report and Mr. Keating's

4     report make clear, this overcrowding has also indirect

5     effects which are inhibiting the remedy.

6          In Mr. Keating's report he said that there's

7     literally not enough staff for about a third of the mentally

8     ill population.  And they've been -- I don't know how many of

9     your 70 orders were directed to staffing, but a good

10    percentage of them over the last 15 or so years.

11         And in Mr. Sillen's report he questions whether there

12    will be enough medical clinicians to staff an ever growing

13    prison population with what they need without either

14    bankrupting the state or taking all the doctors away from the

15    communities, which is a scenario that nobody wants to have

16    happen.

17         Does that answer your question, judge?

18         JUDGE HENDERSON:  It does, but it only prepares me

19    for another question.

20         MR. SPECTER:  Okay.

21         JUDGE HENDERSON:  You correctly stated that we must

22    find today in this hearing whether defendant has had a

23    reasonable amount of time to comply with previous court

24    orders.

25         Does that reasonable amount of time begin once

21

1    defendants are on notice that the court has found that

2    there's overcrowding or serious overcrowding or that it is a

3    primary cause, or is that irrelevant in our consideration?

4        MR. SPECTER:  Well, I would say as a legal matter

5    that it is irrelevant.  It is not within the statute.  But

6    even if it were somehow -- It is not within the express

7    language of the statute certainly.  Even if it was somehow

8    implied, the evidence in the record is overwhelming that they

9    have known that overcrowding is causing these problems for

10   many, many, many years.

11       JUDGE KARLTON:  But it's -- Judge Henderson's

12   question really raises a different question, I would think.

13       It is not a question of whether the defendants know

14   that overcrowding has contributed in some significant way to

15   the failure to provide constitutionally adequate care, it is

16   a question of whether or not they know that the courts have

17   so found.

18       I mean, that's the question.

19       Does that make any difference?

20       MR. SPECTER:  I don't really think so.  I don't -- I

21   don't think so.  But even if -- I mean, it is not in the

22   language.  I don't even take it from the language.  But even

23   if it were, Judge Henderson, in your order of Findings of

24   Fact and Conclusions of Law in which you found that there was

25   a need to appoint a Receiver, you alluded to the fact of

22

1    overcrowding in that order.

2          And I think one of the first sentences in your

3    findings was that the prison has grown 500 percent over the

4    last so many years.  I can't remember exactly.  So they're

5    certainly on notice that you've been concerned about those

6    issues.

7          And in terms of the reasonable -- talking about the

8    reasonable time, in your February 15th order you put -- you

9    said that the reasonableness of the time had to be judged in

10   the factual context of the case, and specifically in terms of

11   the harm that is at stake, alluding to the fact that in this

12   case it's uncontested that one prisoner dies every six or

13   seven -- dies needlessly once every six or seven days.

14         And in this particular case, we have the overwhelming

15   evidence to support the notion that a reasonable time has

16   already passed.  And Mr. Sillen's report makes clear that the

17   remedial efforts are being significantly delayed, if not in

18   some cases altogether prevented, from remedying the

19   constitutional violations that exist.

20         Even in terms of his plan of action he says, quote:

21         "Every element of the plan of action faces

22         crowding-related obstacles."

23         And in that sense I believe that when the stakes are

24   so high, the reasonableness of the time has to be shortened.

25         One other point I want to make about the stakes being

23

1    so high flows from Judge Henderson's remarks when he was, I

2    think, ruling from the bench or talking about the issue of

3    the Receivership.

4         You said that the court's authority to remedy

5    constitutional violations was at its highest point when the

6    loss of life itself is a result of constitutional violations.

7         And I think in both of these cases we have that same

8    point.  In Coleman it's not as frequent fortunately, but it

9    occurs in suicide after -- preventable suicide after

10   preventable suicide.

11        And I agree, of course, with your thought that the

12   court's authority is at its highest when those principles of

13   life and death and serious injury are at stake.

14        And it is because that authority is at its highest

15   peak that it appears to me to be a situation where if there

16   is a situation where the court has to take over one of the

17   core state functions of government, in this case determining

18   who should and should not be imprisoned, that this is it.

19        And I think the evidence shows that all of these --

20   all of these -- none of the remedies that are reasonable will

21   ever be taken without court intervention.

22        JUDGE HENDERSON:  I know this is akin to an exercise

23   in abstraction, but indulge me.

24        I agree with your quoting of what I said.

25        MR. SPECTER:  It's always a good technique.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC

24

1          JUDGE KARLTON:  It's safe to assume the judge will

2     agree with you when you are quoting.

3          MR. SPECTER:  I learned that a long time ago.

4          JUDGE HENDERSON:  How do we go beyond that?

5          So I expect the state is going to say that, yeah, but

6     we really haven't had -- We have AB 900, and we're just

7     revving up.  And you're arguing people are dying.  But how do

8     I weigh that?

9          Do I sit here and say:  One, two, three -- six days

10    someone died?

11         And how many days and how many deaths are you

12    weighing against defendants?

13         How do I do that?

14         How does Judge Karlton?

15         How do we say, okay, that's enough deaths?

16         That's an abstraction, but do you have an answer to

17    that?

18         MR. SPECTER:  Part of my answer was in the wisdom of

19    the President who appointed you to the federal bench and the

20    experience you have in making these decisions.

21         Our opinion as counsel for the plaintiffs is that

22    there is no question that there are so many deaths and

23    needless suffering and the harm is so high that it outweighs

24    all of the efforts that the state is going to say about what

25    plans they're going to say that will take years, years, if

25

1    not longer, to implement.

2           And it's unconscionable, I believe, for the state to

3    have not done something immediate and instead embarked on a

4    program of prison construction which is three, five, ten

5    years away.

6           Let me just say while I'm on that point, because they

7    will talk a lot about AB 900, which is our position that

8    we've submitted in the briefs, but I think bears repeating

9    here is that our position is that AB 900 will actually make

10   the situation worse and not better.

11          It will make it worse because it will increase, not

12   decrease, the number of prisoners.  As I said before, this is

13   not a case about where prisoners sleep.  It's a case about

14   the demand and supply for services.

15          So they're increasing the demand for services, but

16   where's the action on the supply side?

17          You know, it will double the number of prisons so

18   that there will be 32 new prisons in addition to the 30-odd

19   ones they have already.  That will make management even

20   difficult.

21          It will create over 10,000 new beds.  And with all of

22   the 7.9 or 5 billion dollars the Governor is spending, all of

23   that legislation, that big piece of legislation in that bill,

24   and all the declarations and evidence submitted by the

25   defendants, where is there something about staffing?

26

1          There isn't anything that I could find.

2          We have a time -- We are at a time when there is an

3    acute shortage of all types of staff, not only the medical

4    staff, but the correctional staff as well.

5          I think Mr. Sillen mentioned in his report that the

6    staffing shortages are so acute that it becomes almost an

7    impossible task to do the simple act of getting a prisoner to

8    his medical appointment.

9          And I think that this is not the first time that

10   evidence of staffing shortages have been brought before you.

11   As you'll remember, Judge Henderson, in the Pelican Bay case,

12   what did they do in 1989 when they opened that prison?

13         There wasn't a doctor.

14         When they opened the prison I believe there was one

15   psychologist to treat thousands of mentally ill prisoners at

16   Pelican Bay.  In the Gates case, Judge Karlton, if you

17   recall, we had a consent decree which required certain

18   staffing requirements at Vacaville.

19         What did they do in response to that case which

20   actually generated the Coleman case?

21         Instead of increasing the staffing, they disbursed

22   these mentally ill, vulnerable prisoners to the far reaches

23   of the state in Pelican Bay, in other newer prisons that have

24   been opening, without psychologists or any real thought to

25   their medical or mental health needs.

27

1      So is it any surprise that in building this -- in

2  doing this construction again the state will have put all of

3  its efforts into building facilities and none of its efforts

4  into increasing the number of staff?

5      No, I don't think so.

6      That shows you why the state's actors, whoever they

7  may be and however well-intentioned and for whatever reason

8  it may be -- maybe it's the contaminated drinking water that

9  is caused by the waste sewage -- whatever the reason, the

10  state's actors are not going to meet the demands of the

11  prisoner population in a constitutional manner without

12  further intervention by this court.  And I think that is

13  pretty clear.

14      The state has had six months, Judge Karlton, from

15  your -- from when we sat here last -- or not sat, but when I

16  stood here last in front of you and you said to them that

17  this is an abomination, this is something that has to get

18  fixed.

19      You said, and I'll quote your words or paraphrase

20  your words back to you:

21      "I will pull the trigger if you don't do something.

22      That's the last thing that I want to do, but I will

23      if you don't do something meaningful."

24      And the state has had that six months to come up,

25  over our strenuous objections, to come up with a responsible

28

1    solution.

2              It has had six months to do what many other states

3    and local jurisdictions have been able to do in the face of

4    rising correctional populations.  They have been able to do

5    that without any adverse impact on public safety.

6              Instead, it chose to do what it has chosen to do for

7    the last 20 years, and that is to just cling to the status

8    quo and wait for the conditions to become so intolerable that

9    the court must take over.

10              Now, we recognize that this is a big step for the

11    courts to take.  It's a smaller step than actually limiting

12    the population because we're only asking today for a three

13    judge panel.

14              But we understand the trepidation that you feel in

15    taking that step.  But it is one that must be done because

16    the Governor and the legislature have essentially abdicated

17    their responsibility to run a constitutionally adequate

18    prison system.

19              Otherwise, the other alternative is more needless

20    death, more suffering with the acute pains of psychosis, more

21    injuries, and as even the Governor and Mr. Tilton agree, more

22    threat to public safety.

23              So unfortunately, we are here today because there's

24    no other alternative, and we request that you grant our

25    motion and refer this case to a three judge panel.

29

1         Thank you.

2         JUDGE HENDERSON:  Thank you, counsel.

3         JUDGE KARLTON:  Mr. Bien.

4         MR. BIEN:  Good morning, Your Honors.  I'm Michael

5    Bien.  I'm going to just follow up on some of the points that

6    Mr. Specter made and attempt to respond to some of your

7    questions.

8         The Coleman case is in a slightly different posture,

9    but certainly in the Coleman case one cannot contend the

10   state has not had sufficient time to address these

11   constitutional violations.

12        In 1991, 16 years ago next week, three men died at

13   Vacaville of heat stroke.  And these men lived in horrific

14   conditions, without appropriate medication monitoring,

15   without appropriate housing for the mental health conditions,

16   with no emergency measures, and they literally died avoidable

17   deaths.

18        It was very easy to fix this problem several months

19   later when we negotiated the injunction, Your Honor,

20   Judge Karlton, before you.  And we fixed it for the whole

21   state.  But that was 16 years ago.  Yet only last week

22   Special Master Keating reported to you about three needless,

23   avoidable deaths of Coleman class members at DVI housed in

24   inappropriate conditions.

25        People are dying, and they're dying needlessly.

30

1          Too much time has passed.  This is a tremendous step.

2   And again, I understand your trepidation.  But I'm going to

3   take you on a little bit and say that I think it would be

4   radical not to act.

5          I think the time has come.  This is a system of

6   checks and balances.  This is a constitutional system that we

7   all live in.  And the role of a federal district court judge

8   is a lonely role and a unique role, but in situations like

9   today there is no one else.

10         My clients have no one else to turn to.  Public

11  officials in California have sworn to uphold the same

12  constitution as you have, and yet they are knowingly and

13  continuously violating the Constitution in the way and manner

14  that they operate California prisons.

15         The Congress, when it passed the Prison Litigation

16  Reform Act, did not choose to exclude from federal district

17  courts the power to address overcrowding.  In fact,

18  explicitly left in the statute a procedure for addressing the

19  kind of problem that we face here today.

20         Certainly Congress limited procedurally the issuance

21  of such an order.  Congress asked that we all step back and

22  carefully consider the need for the order.  Congress

23  established the three judge panel requirement, which is a

24  requirement of several other federal laws, to assure that a

25  federal district judge was not acting alone in this situation

31

1    and was careful and that this situation is given the kind of

2    grave and serious attention that both of you are doing here

3    today.

4            But the fact that the PLRA, which was in itself a

5    radical limitation on the power of federal courts in prison

6    litigation, left in this provision and set up an explicit

7    procedure for how these issues should be addressed is an

8    indication that this is not a radical step, this is not

9    something beyond the law, it is something the law provides

10   for.  And that you are being very careful in assuring that

11   the standards are met and the procedures are followed.

12           The effect of overcrowding on the mentally ill, I

13   think, is kind of a double whammy.  And I think it is

14   something that Mr. Keating's report pointed out very clearly.

15           Overcrowding not only is the primary cause of the

16   on-going constitutional violations in the Coleman case

17   because it makes it so much harder to ever hire enough staff,

18   build enough hospital beds, and find enough treatment space,

19   but it also actually increases the incidents of mental

20   illness.

21           The stress, the violence, which is undisputed, the

22   Governor himself made those findings in his proclamation,

23   create a cycle of isolation.  More people are locked down.

24   More people are deprived of education and opportunities to

25   work.  There are more riots.

32

1          This is from Mr. Kernan's declaration in opposition

2     to the motion.  He states that riots have been caused by

3     overcrowding.  Lock downs have been caused by overcrowding.

4     Infectious disease, which is also found by the Receiver,

5     Mr. Kernan agrees.  The system is out of control.

6          These stressors not only exacerbate mental illness in

7     the Coleman class, but it actually expands the class.  More

8     and more people are seeking the need and the support of

9     mental health care.  The people who are already in the class

10    are going to have higher levels of illness.  So we're really

11    in a spiral caused by overcrowding that is going to make the

12    remedy even more remote.

13         You've talked, Your Honor, about how many years we've

14    been here and how many more years we have to go.  I'm here to

15    say today that the only way that we can bring this remedial

16    process back to where it should be, the only way we can make

17    progress is if you make the referral to the three judge panel

18    and if the panel takes action to limit the population.

19         I also think that the concerns this court has

20    expressed today and in prior hearings about public safety are

21    important, are required by the PLRA, and, of course, are the

22    duty that all of us have when we're dealing with a prison

23    case.

24         And I think, though, that the idea that this -- that

25    a cap on the population will somehow be a danger to public

33

1   safety assumes that public safety is being protected in any
2   way by the California system today.

3          I think the findings of the Governor and Secretary
4   Tilton and all the evidence before you shows just the
5   opposite.  Overcrowding is having a terrible effect on public
6   safety.

7          When mentally ill parole violators are arrested, sent
8   to prison, left in a reception center untreated for the
9   average term of three months and then released, does that
10  help public safety?

11         When there's no pre-release planning, when there's --
12  when parole services are so limited, we all know that the way
13  the system is operating right now is no benefit to public
14  safety.

15         In fact, we have a danger of infectious disease.
16  Another issue of public safety.  We have pollution from
17  overcrowded prisons.

18         So I think that the idea that public safety weighs on
19  one side versus the other of this decision, I think, is a
20  false dichotomy.  Public safety can be benefited and will be
21  benefited if the court makes this referral and if the
22  population cap is imposed.

23         I think that we're a long way from asking the three
24  judge panel to make sentencing decisions for California,
25  Judge Henderson, or to take over this primary function.

34

1    I think that we should assume that if a population

2  cap is imposed that the state will step up to the plate and

3  do the things that they themselves have planned to do for

4  many years.

5    Governor Schwarzenegger had a plan to reduce

6  population.  It's all written out.  Secretary Tilton had a

7  plan last summer to reduce population.  Governor Deukmejian's

8  Commission had a plan to reduce population.

9    You don't have to and you will not be asked to, and

10  the three judge panel should not say that we're going to make

11  these decisions for California, we're going to decide who

12  should be early released or who shouldn't go to prison.

13    That's their job.  And that should always be their

14  job.  And it is only after a failure that we would ask the

15  court to step in and actually take those functions.

16    I guess I feel that the public officials here, as

17  many times as they've disappointed me, know what has to be

18  done.  They are the experts on corrections.  They're the

19  experts.  They've impaneled a very distinguished group of

20  experts to look at these issues.  But I can tell you that

21  nothing has happened and nothing will happen unless the

22  referral is made.

23    And you asked, Judge Henderson, aren't they going to

24  say AB 900 is going to fix everything, parole reform is going

25  to fix everything.

35

1          We've put in evidence in our supplemental papers

2     filed the last few weeks of what's been going on in the last

3     few months in the areas of parole reform.

4          I'm lead counsel in the Valdivia case.  And we also

5     have -- I can tell you that nothing is changing.  It doesn't

6     make any sense.  They don't see any connection between

7     implementing the court orders in Valdivia and reducing

8     overcrowding.

9          They are unable to find 150 drug treatment beds in

10    L.A. County.  150 beds.  There has not been a remedial

11    sanction drug treatment bed in L.A. County since this court

12    found that they were required under Valdivia in the spring of

13    2005, two years ago.  They have not been able to do that.

14         Now, can they do it?

15         I think they can.

16         When they're told that there is a cap, I think that

17    they will actually take the steps necessary.

18         What are the radical steps necessary to do that?

19         They may actually have to pay more than $50 a day for

20    a bed.  They may have to raise it to 60 or 70.  They got no

21    bidders for beds.  They're going to have to do some things

22    that they've been unwilling to do.

23         They may have to implement the parole reforms they've

24    been talking about since 2001.  They're not doing them.  But,

25    you know, again we saw in the declarations filed in this

36

1    motion an intent to take these steps.

2         JUDGE KARLTON:  Let me interrupt.  I'm going to do

3    something else which I told my people I would not do which is

4    to raise the whole Valdivia question.

5         Mr. Specter suggests that parole reform is a needed

6    element of reducing the population.  I think that's what

7    you're saying as well.  That's an entirely different case

8    that's dealing with that.

9         What relationship, if any, should this court -- maybe

10   the answer is it is not our business, it's the three judge

11   court's business to see how these cases interact.  Maybe

12   that's right.  I don't know.

13        What's your position?

14        MR. BIEN:  The reason -- Defendants introduced not

15   only in their opposition to this Coleman overcrowding motion,

16   but in front of Judge Henderson in Plata, they put in their

17   evidence of their intent to institute parole reform.  That's

18   a defense that they're raising to this motion.

19        And I'm just responding saying great, I would like

20   you to do that, but I haven't seen any.  Even when there have

21   been court orders, they have not.

22        So I'm not saying that this is an answer to

23   overcrowding.  What I'm saying is that without this court's

24   -- these courts' referral, without the establishment of a

25   three judge panel, these defendants are incapable of doing

37

1    things, including things that they've been ordered to do.

2         You know, I think that they need the referral in

3    order for them to do what their own experts have said.  In a

4    few days their expert panel is going to issue a report.  This

5    is the panel -- one of the panels they talked about.

6         And they say, well, wait for this report, and then

7    wait for our strike team.  They have a construction strike

8    team and a rehabilitation strike team.  By the way, they have

9    very distinguished people on those teams.  It is a credit to

10   California the people they brought together.

11        But they're telling you they are going to come up

12   with a plan for proposals, for ideas that haven't been

13   adopted, funded, implemented.  I mean, I think those

14   resources will be part of the solution, but there's no

15   evidence this state will act unless and until this court

16   acts.  And I think the evidence is exactly to the contrary.

17        And I think that, you know, one more group of experts

18   to tell them what they should be doing is just one more

19   group.  You can go back in history and see the exact same

20   reports.

21        So I think, Judge Karlton, you said is it -- is this

22   a futile referral.  In other words, will the three judge

23   panel have the ability to do anything?

24        I think they will.  And I think, again, if they first

25   establish through an evidentiary process what is the

38

1    constitutional level of housing that this system can handle.

2         I also would suggest that there should be an effort

3    to reduce specifically the Coleman population.  There are

4    things that should be looked at.  And I know the state as

5    part of their proposals have focused on that.

6         From that point on, there are a lot of things that

7    the state can choose from in order to achieve compliance for

8    the population cap.

9         If their plans of building new prisons come to

10   fruition, and if they're able to staff those new prisons and

11   hire people, then the cap will be adjusted.  But the evidence

12   right now is the system is horribly overcrowded and people

13   are suffering.

14        Nothing that they are proposing is going to take

15   effect for years and years.  So again, if they're really able

16   to implement all these plans, then the cap will come off

17   quicker.  But the cap needs to be imposed now.

18        And this court, Judge Karlton, you have issued so

19   many orders.  And Special Master Keating has, you know,

20   turned us down recently when we asked for more orders.  He

21   said, "What's the point?"  "What's the point of more orders

22   when they can't comply with the existing orders?"

23        To some extent I think that makes our case.  In other

24   words, the power -- This court has done everything it can

25   through its normal process of enforcement orders, yet the

39

1   violations persist.  Something different needs to be done.

2   If you want to call it radical, something different needs to

3   be done to address this problem.

4       And the reason something different needs to be done

5   is we haven't been addressing the real cause of the

6   constitutional violations.  The real cause is overcrowding,

7   it needs to be addressed.

8       JUDGE KARLTON:  Actually, I want to come back to what

9   Judge Henderson asked because there are a lot of causes for

10  the reason that the Coleman class exists, including the

11  state's judgment about what to do with state hospitals and

12  all those other things.

13      An element clearly, and I don't think the state will

14  deny it, is the overcrowding, but it is an element of an

15  overall problem.  Is that enough to justify referral to a

16  three judge panel?

17      Judge Henderson raised that with Mr. Specter, I'm

18  raising it with you.  Is that enough, if it is an element?

19      MR. BIEN:  We think we've demonstrated in the record

20  before the court that it is more than an element.  We think

21  it is the primary cause.  That is really the burden -- that

22  is really an issue if the state is going to take that

23  position that they'll have to litigate before the three judge

24  panel.

25      JUDGE KARLTON:  All right.

40

1          MR. BIEN:  But we think the record here is where is

2     the evidence to the contrary?

3          I think the only thing the Attorney General has

4     argued in Coleman is that there is some other cause, and they

5     said it's "administrative problems," that's the cause.

6          There is no citation to evidence.  There's no record.

7     No declarant that says -- You know, Mr. Kernan doesn't come

8     in and say, "I'm incompetent, that's the reason we're having

9     all these problems."  I don't think he is incompetent.  I

10    think there are a lot of extremely competent people in the

11    prison system, but I think they've been given a job that's

12    impossible.

13         If you have to take everyone in the door, and you're

14    not allowed to release anyone until some extraordinary time

15    in the future, and you're provided with no resources for

16    rehabilitation, then they're faced with these kind of

17    horrible choices.

18         So they solve the problem, as the Receiver in his

19    report discovered, by changing the definition of overcrowding

20    every few years.  That's how they solve the problem.

21         They cannot do it on their own.  And I think that's

22    the message loud and clear.  So I think that though we didn't

23    have to prove it to you, I think there is no evidence on the

24    other side.

25         We think the cause of these problems is overcrowding

41

1    right now.  And perhaps the history of Coleman maybe is good

2    evidence of that.  Your Honor, we were really making

3    progress.  I sincerely believe that.

4              JUDGE KARLTON:  I do too.

5              MR. BIEN:  I believe that we were making progress.

6    The people were coming closer to compliance with the various

7    standards that we agreed to.  We were starting to literally

8    have meetings and talk about what we called the "end game,"

9    how do we get to final compliance, what the measures should

10   be.

11             That's out the window.  I mean, the last few reports

12   from Special Master Keating have pointed out that conditions

13   are worsening, and they're worsening rapidly.

14             The reason is not because of lack of orders.  The

15   reason is not because of lack of effort or will.  The reason

16   is overcrowding.  There are just too many people to handle

17   and not enough -- they're not able to hire the clinicians.

18             You said in a hearing we had recently are there

19   enough doctors to meet all these empty vacancies of DMH,

20   CDCR, and Mr. Sillen said the same thing in his reports.

21             You know, I will tell you what the ratio is of M.D.s

22   for this population and we'll make you meet them, but by the

23   way I'm not sure there will be any doctors left in the

24   communities -- in some of these rural communities to serve

25   anyone else.

42

1          I think California has to face up to this issue and

2     make some decisions.  And unfortunately, everyone has said we

3     want Judge Henderson and Judge Karlton to tell us we must do

4     this.  And until they tell us we must do this, we're just

5     going to allow it to go on.

6          I can't wait any longer because my clients are

7     suffering and dying.  I think that we need to act and the

8     time has come.

9          Thank you.

10         MR. YANK:  Ronald Yank here on behalf of amicus

11    CCPOA.

12         I stand before you to speak to the issue of remedy.

13    I had at least the opportunity to sit back and try and take a

14    deep breath.  And I'm going to speak to the issue of remedy

15    by discussing not AB 900, but its ancestors after briefly

16    telling you, Judge Karlton, for the first time, and reminding

17    Judge Henderson why CCPOA is in front of you as an amicus,

18    and why of all things we're here on the side of the

19    plaintiffs and the Prison Law Office.

20         The answer is inmates deserve a decent place to live

21    and decent living conditions, and our members deserve a

22    decent place to work and decent working conditions.  And by

23    golly, they happen to be the same place.

24         Granted, the inmates are there 24/7 and my clients

25    are there one-third of that time, but there is a mutuality of

43

1    interest.  End of that.

2         AB 900, the way it got passed, you would think I and

3    my clients would be standing in front of you waving pompoms.

4    "Let's build more prisons.  More members for us.  Hurrah."

5         But my clients, represented by CCPOA President Mike

6    Jimenez, who is here, and Executive Vice President Chuck

7    Alexander, collectively became convinced a long time ago that

8    we, the State of California, are not going to go build our

9    way out of the crisis we've got.  It takes meaningful

10   sentencing reform.  And what 900 at the end did was just dump

11   that.

12        Early on, working with Senator Romero and some, you

13   know, of the State's best and brightest, there were talks of

14   sentencing reform.  And the original bill, the way it looked

15   would have created a Sentencing Reform Commission, much like

16   the Base Closure Commissions -- or Commission.

17        And the legislature, in passing that act, would have

18   done what the federal legislature did on base closures.

19   Instead of bringing up one base at a time legislatively to be

20   closed, they kind of threw it to a commission, and then they

21   all would have had some cover.

22        That didn't happen here, and instead all we got is

23   the build the heck out of it.

24        So what can a three judge panel do?

25        Just issue a blanket order and wait for a plan?

44

1    I suppose.

2        And maybe the plan, you know, while that court is

3   thinking of doing it, maybe the plaintiffs will come up with

4   a plan.  But I think actually because the interests of public

5   safety are involved, and I appreciate how the two of you have

6   got to be so concerned with what people are going to think

7   about the federal courts and public safety and the

8   interaction and so on, I think an order can go out to the

9   Governor to cap population.

10       And it could have, I don't know, a month's delay,

11  whatever it is.  And I think an order could lie, certainly it

12  could be part of this suggested order, that he appoint the

13  very kind of commission that AB 900 or its ancestors had

14  contemplated.

15       And that he would receive, you know, advice and

16  guidelines from that commission about who to be sentenced,

17  who to go, in fact, to state prison, who, in fact, to get

18  revoked on parole, and who not.

19       And I guess to some degree, I'll state it baldly, I'm

20  talking about sentence reform through the backdoor.  But I

21  think that kind of order can issue.

22       JUDGE KARLTON:  Mr. Yank --

23       MR. YANK:  Sure.

24       JUDGE KARLTON:  Mr. Sillen has reported there are

25  2000 vacancies today among guards.

45

1            MR. YANK:  Yes.

2            JUDGE KARLTON:  How could that have happened?

3            MR. YANK:  Look, I mean I was in Judge Wilken's court

4    about three weeks ago.  And Judge Wilken posed a series of

5    questions.  I said, "I got talk to my client," "Got to talk

6    to my client."  It is embarrassing.  This is the gang that

7    can't shoot straight, it's never shot straight.

8            Mr. Dovey's order -- or proclamation in October '65,

9    with that came a heads up to the union and all kinds of

10   high-ranking department people saying that we're going to

11   have to be making some quick judgments, some quick moves, and

12   heads up, be prepared.  And to us we were told to get ready

13   to meet and confer quickly about a bunch of proposed changes.

14           I'm kidding you not, because I put on the

15   arbitration, six months passed before they did anything.  And

16   what they did was issue an order freezing our members' rights

17   to transfer from one institution to another, and they did it

18   without ever talking to us.

19           They're not -- Mr. Sillen, who I guess is

20   contemplating maybe asking you to let him take over hiring,

21   he's laid out all the reasons.  And all we can do is applaud

22   and say ditto.  They have a big problem in hiring.  How it

23   ever got that way is beyond me.

24           You know, they could go partner with the union.  You

25   could have, you know, Secretary Tilton and Mike Jimenez give

46

1    a joint radio or TV pitch.  That would have a lot of, I

2    think, PR sex appeal to protect, you know, prospective

3    employees.

4          But anyhow, the short answer is it's the gang that

5    can't shoot straight, and it won't bother us one darn bit if

6    this court, using the Receiver, ends up saying take over

7    hiring for these folks.

8          Now, let me just return back to this commission.  I

9    don't think -- I don't think the federal three judge panel

10   can say whatever the commission says goes.  You know, comity,

11   whatever.  That doesn't seem to work.  That wouldn't become

12   law.

13         But then it can order the Governor to look at those

14   recommendations.  And what the heck, why wouldn't he follow

15   those recommendations in ordering Corrections to not accept

16   into prison people in this, that, and the other category.

17         And I would hope at that point, if it's a good enough

18   commission, if the Governor essentially takes up the three

19   judge panel's suggestions, proposals, whatever, at that point

20   the legislature then, whether they're big law and order folks

21   or whatever, they know that it's way too expensive for the

22   Governor and Corrections centrally to be figuring out all the

23   local people coming in.  And might well at that point, the

24   legislature, adopt the very recommendations of said

25   commission so that local judges, local probation officers,

47

1    and the rest, you know, could achieve what amounts to

2    sentencing reform through the front door.

3         Whether it's through the backdoor, through a three

4    judge panel, telling the Governor here's some of the things

5    you should take into consideration and maybe you want a bunch

6    of bright people to suggest how you do it, or that's the way

7    it's going to be unless the legislature, in fact, creates

8    true sentencing reform so that our local judges and the local

9    folks can get it done, that's the only answer.  We're not

10   going to build our way out of it.

11        Thank you.

12        JUDGE KARLTON:  Who speaks for defendants?

13        MR. MELLO:  Good morning again.  Maybe it's

14   afternoon.  Paul Mello of Hanson Bridgett again on behalf of

15   the Plata defendants.

16        JUDGE KARLTON:  You know what, hang on a second.

17        (Judge Karlton and Judge Henderson confer.)

18        JUDGE KARLTON:  Proceed, counsel.

19        MR. MELLO:  First of all, a couple introductory

20   points.  This is not Valdivia, number one.

21        Number two, I don't think AB 900 is the status quo.

22   And you've received a lot information on AB 900.  And I'm not

23   going to go back to 1989 or even documents that we filed and

24   presumably Your Honors and your staff have read.  But AB 900

25   is not status quo.  It's historic.  No administration has

48

1  ever been able to push through a deal like AB 900 before

2  where the legislature and the Governor's Office came

3  together.

4      With respect to the reason that it is heavy on

5  construction, because you can fund construction through lease

6  revenue bonds.  You can't fund staffing through lease revenue

7  bonds.  That's one issue.

8      I also feel like we've gotten incredibly far afield

9  here.  We're talking about sentencing commissions.  We're

10  here today to decide whether or not the PLRA permits the

11  convening of a three judge panel in Plata.  At least that's

12  why I'm here.

13      And I think some background and context is important

14  here.  We've got a whole lot of background from back to 1991

15  where I'm not sure that there was a crowding problem.  But we

16  received a lot of background, but I think first of all Plata

17  is not a prison overcrowding case.  There is no allegations

18  of prison overcrowding in the case.

19      Plata is a case about the constitutional delivery of

20  health care at the CDCR adult institutions.

21      Number one, prior to plaintiffs filing the three

22  separate motions to convene three judge panels in Plata,

23  Coleman and Armstrong, wherever Armstrong is, this issue had

24  never been raised formally as an allegation as one of the

25  causes for the unconstitutional delivery of health care in

49

1 | Plata, and/or as the only way to remedy that particular

2 | issue.  Nor has there ever been an order in Plata

3 | specifically directed at crowding.

4 | In fact, plaintiffs didn't file --

5 | JUDGE KARLTON:  Counsel, I don't want to speak for

6 | Judge Henderson, but the fact of the matter is, if I

7 | understand PLRA, we can't issue an order concerning crowding

8 | because no matter what we do it turns out to be a release

9 | order under the PLRA.

10 | Is that wrong?

11 | MR. MELLO:  No.  I think your understanding is

12 | correct.  But I think what's telling is the fact that

13 | plaintiffs never brought up the issue of overcrowding in a

14 | formal way until November 13th, 2006, which happened to be

15 | about five weeks after the Governor issued the emergency

16 | proclamation to address the crowding crisis.

17 | Maybe Mr. Yank can appreciate this, but this truly is

18 | the old labor law adage, no good deed goes unpunished.  The

19 | Governor attempted to convene a special session of the

20 | legislature to deal with crowding.  Didn't work.  Did an

21 | emergency proclamation.  Didn't work.

22 | I also find it a bit disingenuous for the CCPOA and

23 | the unions to be up here arguing in favor for prison cap

24 | when, in fact, one of the immediate things that can help deal

25 | with this issue is the out-of-state transfer of prisoners,

50

1    and they're objecting to that.

2          Talk about not jibing.  It doesn't jibe to me.  If we

3    can transfer some out and relieve some of the pressures

4    relating to crowding, it just doesn't make sense to me.

5          I think it's also important to state, and we still it

6    is loosey-goosey, what are plaintiffs asking for here?

7          They're never really clear.

8          Are they talking about a general population cap?

9          Are they talking about specific caps directed at the

10   member class?

11         It's unclear.  They keep pushing it off to, "Well,

12   we'll talk about that at the three judge panel level."

13         But I think we need to all be clear here.  The

14   plaintiffs are asking for a prisoner release order.  And in

15   the Coleman brief that was filed on May 29th, I think it is

16   document 2239, I think they hint at what they're asking for

17   when they cite to the Corrections Independent Review Panel

18   and they cite to the 137,000 figure.

19         So, I mean, defendants would like to know.  Are

20   plaintiffs really suggesting that we should release 37,000

21   felons?

22         JUDGE KARLTON:  Are you happy to let us go to the

23   three judge court and they'll tell us?

24         MR. MELLO:  Absolutely not.  But I think plaintiffs'

25   request for relief, even in seeking the motion for the three

51

1    judge panel, they had to be specific as to what they were

2    asking for.  And they haven't been specific.

3          JUDGE HENDERSON:  They're asking for a three judge

4    panel.  That's all this is.  Anything about relief is

5    irrelevant to this hearing.

6          MR. MELLO:  I don't think so.  I think they have to

7    actually --

8          JUDGE HENDERSON:  Let me read to you what I

9    understand.

10         MR. MELLO:  Okay.

11         JUDGE HENDERSON:  We have to consider 1, whether the

12   court has previously entered an order for less intrusive

13   relief, et cetera.

14         2, whether the defendants have had a reasonable

15   amount of time to comply with the previous court order.

16         If those two conditions are met, we are authorized to

17   convene a three judge court.

18         JUDGE KARLTON:  And the judge believes that a three

19   judge panel may grant significant relief as to the

20   constitutional question.  That's all that this is about.

21         JUDGE HENDERSON:  That's all this is about.

22         MR. MELLO:  Understood.

23         But there was a great deal of time spent on that very

24   issue in the last hour-and-a-half so I thought I would

25   address it because there was a lot of discussion on

52

1    sentencing commissions.

2            I think we are here to decide whether or not a three

3    judge panel can be convened and whether those two

4    requirements that Your Honor stated are met.  And so I'll

5    gladly turn to those.

6            And to the first requirement, whether there's been a

7    previous order for less intrusive relief and whether that

8    order has failed to remedy the deprivation of the federal

9    right at issue in Plata which is constitutional delivery of

10   health care, your February 15th, 2007, order continuing this

11   hearing and asking for reports by the defendants and by the

12   Receiver definitely says, I think, that there have been prior

13   orders for less intrusive relief.

14           And the courts, and I think the plaintiffs in moving

15   for the motion to convene in this case, say that it's the

16   stipulation for injunctive relief which was filed in June of

17   2002 and the stipulated patient care order in 2004.

18           And I guess to the extent that the court's statement

19   in that February 15th order is a finding of this court, the

20   defendants would urge the court to reconsider the first

21   requirement is met for the following reasons:

22           First, I think it ignores the procedural posture and

23   the factual history in this case.  The orders appointing the

24   Receiver, the Findings of Fact and Conclusions of Law and the

25   Order of Appointment, they're the culmination of everything

53

1   that occurred before it.  We can't ignore that the
2   Receivership was appointed here.

3          Absolutely can't be done.  The Receivership's order
4   is an extremely intrusive order aimed at ensuring that the
5   CDCR, with the help of the Receiver, who's definitely driving
6   now, to help ensure that the CDCR comes up with a
7   constitutionally adequate health care system.

8          I think to ignore the Receivership orders, these
9   extreme orders that were the culminating orders in this case,
10  it ignores the legislative history of the PLRA, it ignores
11  the spirit it of the PLRA, it ignores the facts in Plata, it
12  ignores the procedural posture of Plata, and frankly, I think
13  it is wrong.

14         Secondly and tellingly, I think, is the fact that the
15  Receiver recently filed a motion to clean up and modify the
16  stipulation for injunctive relief and to clean up and modify
17  the patient care order, the two orders that plaintiffs base
18  this motion to convene a three judge panel on.

19         I think it is important to note that at least
20  provisions of those orders in the Receiver's estimation may
21  be impeding his ability to provide constitutionally adequate
22  health care in CDCR's prisons.

23         So I think that's important.  So I think the relevant
24  orders are the Receivership orders, and they can't be
25  ignored.

54

1          JUDGE HENDERSON:  Let me ask a question.

2          If that's so, where do I put in -- where do I weigh

3   the two years that I met Mr. Hickman and his staff and Jeanne

4   Woodford in which I was trying to crack the whip, and in

5   which I met you during that process and tried to make the

6   corrections and finally had to say it can't be done this way,

7   I'm going to appoint Bob Sillen?

8          Is that irrelevant history?

9          MR. MELLO:  No.

10         JUDGE HENDERSON:  Do we start when Bob Sillen comes

11  aboard?

12         MR. MELLO:  I don't think it is irrelevant.

13         JUDGE HENDERSON:  Tell me how relevant it is, how it

14  weighs with what you said.

15         MR. MELLO:  It is clearly relevant.

16         Defendants' failures in Plata resulted in the OSC,

17  resulted in the hearing regarding the appointment of the

18  Receiver, resulted in the Findings of Fact and Conclusions of

19  Law, and resulted in the appointment of Mr. Sillen.

20         In addition, and I will get to it, the appointment of

21  Mr. Sillen, unlike the failure that plaintiffs state it will

22  be, not that it is, that it will be, it's been successful.

23         He's reported numerous improvements and successes

24  since he came on board.  I don't know how we can ignore those

25  facts and those orders and focus on a stipulated agreement

55

1    between the parties from seven years ago when the world

2    changed on April 16th, 2006, when Mr. Sillen became the

3    Receiver.

4         JUDGE KARLTON:  The problem -- I don't want to speak

5    for Judge Henderson, he can take care of himself.  But, you

6    know, I just can't understand what you are saying.

7         Let me find some other way to put it because this is

8    not --

9         MR. MELLO:  That was frank.

10        JUDGE KARLTON:  -- this is not a cheering section.

11        People are dying.  And the question is with all of

12   their efforts do they believe that it's going to change.

13        That's the issue.

14        Do we believe that?

15        Do we believe now that there's any hope in the

16   absence of a three judge court that we will bring people --

17   we will bring the CDCR into constitutional delivery of

18   medical care and mental care.

19        And if the answer to that is no, then all of the

20   things that we've done for years and years, all of the

21   efforts that we've made have taught us that the answer is no.

22   And to speak about successes -- And, you know, I believe that

23   things in my case -- Certainly there was hope.  As Mr. Bien

24   said, I thought that we were reaching a place where I would

25   finally be out of this.  It is not something that federal

56

1    judges choose to do.

2         And what happened is that the overcrowding has made

3    it impossible, it appears, to adequately reach constitutional

4    levels so that the federal courts can be gone in my case, and

5    I suspect that is what Judge Henderson thinks about his case.

6         That's what's real is that years of orders -- I'm

7    sorry.  You understand where I'm going.

8         MR. MELLO:  I understand.  And I think the gallery

9    does as well, but I think this court, the Plata court asked

10   the Receiver in this case to report what he thought on

11   crowding.  And that report identifies what both Your Honors

12   have stated, which is crowding is one of the complicating

13   factors.  Undeniably it's one of the complicating factors.

14        But Mr. Sillen's report wrote, quote:

15             "Those who believe that the challenges faced by the

16             Plan of Action are uncomplicated and who think that

17             population controls will solve California's prison

18             health care problems are simply wrong."

19             He wrote:

20             "Population limits may help effectuate a more timely

21             and cost effective remedial process.  However, the

22             cure to existing health care problems will be

23             difficult and costly to implement regardless --

24             regardless of population control efforts."

25             Seems like that answers the question.

57

1          A population cap, a prisoner release order isn't

2     going to solve the problem.  It's clearly not the primary

3     cause.  And I know that's a three-judge-panel issue, but I

4     agree with Your Honors.  And I agree with what Judge Wilken

5     said at the hearing on the 7th, that I can't grant a motion

6     to convene a three judge panel unless I think actually that a

7     three judge panel will help.

8          So I think that statement alone warrants the denial

9     of this motion.  That statement plus, I mean -- I know, you

10    know, maybe I'm short sighted, but some of the successes that

11    the Receiver reported just last week in his fifth report,

12    they can't be ignored.  They can't be ignored.

13         What did he report in the fifth report?

14         I'll just say some of them.  You know, he reported

15    that the construction of the triage and treatment center at

16    San Quentin is done and fully operational.

17         He reported that the LVN conversion as of May 31,

18    2007, the MTA to LVN is complete and there are no more MTAs.

19         He reported that the aggressive recruitment practices

20    and salary increases have resulted in the hiring on average

21    of 25 registered nurses a month into the system.  And that

22    these same efforts and the salary increases have resulted in

23    increased physician and surgeon applications.

24         He reported that the Plata Support Division has made

25    incredible progress towards restructuring existing state

58

1    medical care support services functions into a single

2    appropriately organized and managed organization.

3         He reported on the specialty care contracts pilot.

4    He says that it is on schedule and in place at four prisons.

5    This is something real.

6         Maybe -- This is a staffing issue.  On page 24 of his

7    report, this is unbelievable.  This wouldn't happen in the

8    private sector.  He says that the increased salaries have now

9    allowed the CDCR to increase the number of staff and Plata

10   classifications by more than 1000 between October 2006 and

11   May 2007.

12        That's why we can't ignore the Receivership orders.

13   That's why we can't say that the Receiver has failed.  That's

14   why the first requirement isn't met.

15        JUDGE HENDERSON:  Let's put that into context, and

16   you've correctly stated the success.  Seems to me perhaps the

17   most relevant thing about that is that when I appointed Bob

18   Sillen to become the Receiver, and he looked at the best

19   available expert testimony, he said it is going to take

20   three-to-five years to do my job, and I'm here.

21        He got in, and he came back.  And this is on the

22   record, and he said, "Good golly" or something like that --

23        JUDGE KARLTON:  Probably not those words.

24        JUDGE HENDERSON:  Not those words.

25        "This is going to take five-to-ten years.  We're

59

1    farther behind now that we're looking at it."

2         So how do we measure these little successes you've

3    just marched off against the fact that we have a much higher

4    hill to climb?

5         MR. MELLO:  First of all, I don't know what

6    Mr. Sillen thinks, but I don't think the state thinks that

7    those things that I just identified, including the 1000 hires

8    in a seven-month-period are small.

9         Number one.

10        Number two, we just received his plan of action.  It

11   is a comprehensive plan of action that sets forth what he's

12   going to do over the next period of time.  I think we need to

13   let that plan of action -- It's the interim plan of action

14   that was just filed on May 10th, 2007, I think we need to

15   give it a chance.

16        I think we need to give AB 900 a chance.  Not just

17   because I think it and I feel it and I think that the state

18   should be able to have the core function of prisons to the

19   extent we still do, but because --

20        JUDGE HENDERSON:  Say that again.  The state must be

21   allowed --

22        MR. MELLO:  I think they need to be allowed.  The

23   Governor doesn't decide who is sentenced.  That's a

24   legislative function.  Three strikes is the result of the

25   voters of the State the California.

60

1          JUDGE HENDERSON:  Are you here arguing to us that the
2     state hasn't been given a chance to do this?

3          Is that what you're arguing?

4          MR. MELLO:  I'm arguing that the Receivership has not
5     been given an opportunity to fail, and it won't fail in light
6     of everything that we've seen thus far.

7          I'm here stating that historic landmark legislation
8     was just passed to address crowding, which until November
9     13th, 2007, wasn't -- or 2006 wasn't part of this case.  And
10    that those things should be given the opportunity to take
11    root.

12         And that we're already seeing some of the fruit from
13    the tree that is the Receivership when I identified some of
14    those things that we've done.

15         Moreover, the Receiver doesn't even have to come up
16    with his final plan of action or his revised plan of action
17    until November 15th, 2007.

18         That's going to have metrics so we can judge whether
19    or not he's succeeding or failing -- whether or not the
20    Receivership is succeeding or failing.

21         I don't know how we can determine that they failed
22    now or that the defendants have failed in working
23    collaboratively with the Receiver.  I think a couple of
24    things are worth noting.

25         Number one, and I'm sure Mr. Sillen can tell you if

61

1    he thinks otherwise, but I think the relationship and the

2    collaboration with the Receivership has never been better.

3        It's evidenced by the various motions to waive state

4    law that the Receiver has filed to speed up the process, to

5    make his reforms.  Defendants' position on those have been

6    non-oppositions, go right ahead.  Right.  That shows that

7    we're on the same page.

8        I think it is also important to note that there are

9    weekly meetings with very high-level people from the

10   Receiver's staff and the Governor's Office and the State and

11   the strike teams on things like population, out-of-state

12   transfers, AB 900 implementation and construction.

13       I mean these are real evidence of real change.  And I

14   just find it hard to believe that the spirit of the PLRA

15   allows us to ignore the Receivership in Plata.  And I just

16   don't think we can.

17       The second element, and I've already spoken to it,

18   the second requirement, the second thing that must be met

19   before a motion to convene can be granted is that defendant

20   has had a reasonable amount of time.  That's what we're

21   talking about.

22       And unlike the first requirement that says "an order

23   for less intrusive relief," it says "the previous court

24   orders."  And I think we have spoken about it.  And so I

25   won't harp on it again, but I think the previous court

62

1    orders, again, cannot ignore the Receivership and cannot

2    ignore the successes that have occurred.

3            One of the things --

4            JUDGE HENDERSON:  I'm not sure what you just said.

5    Court "orders" plural?

6            MR. MELLO:  Court orders.  The previous court orders.

7            JUDGE KARLTON:  All of them.

8            JUDGE HENDERSON:  All of them?

9            MR. MELLO:  Not all of them, but any significant

10   order.

11           JUDGE HENDERSON:  But the significant ones prior to

12   the Receivership, are you including those?

13           MR. MELLO:  Absolutely.

14           JUDGE HENDERSON:  Okay.

15           MR. MELLO:  But the Receivership order can't be

16   ignored.  I mean, it can't be ignored in this context.  It's

17   just the order in the case.  It's the culminating order.

18   It's the reason that we're here.  It was the extreme measure

19   that this court took.

20           Plaintiffs' counsel spoke of something that you also

21   mentioned in your February 15th order about the statistics,

22   and the finding in the Findings of Fact about one death every

23   six to seven days.  And I think a couple of things are

24   important that, at a minimum, I'd just like to get on the

25   record with respect to that specific.

63

1          First, this quote was the result of testimony by a

2     single witness, Dr. Puisis.  He was cross-examined on that

3     testimony, and it was defendants' position that he was less

4     than clear with respect to that statistic.

5          Secondly, defendants introduced at the hearing the

6     report "To Err Is Human."  And that report said that

7     unfortunately deaths occur in good, bad and other

8     institutions all over.

9          JUDGE HENDERSON:  That wasn't Dr. Puisis' testimony.

10    People die.

11         MR. MELLO:  That was his testimony.

12         JUDGE HENDERSON:  His testimony was that these people

13    are dying, and they shouldn't be dying.  And that's a

14    significant distinction.

15         MR. MELLO:  I think "To Err Is Human" says that those

16    deaths occurred in all institutions throughout the country.

17    It was a report introduced through Dr. Shansky.

18         But I'll continue on.  I think it's also important

19    that Dr. Puisis made that statement over two years ago,

20    prior -- as a result of touring he did in advance of the

21    hearing that happened in May and June of 2005.

22         I think it is also important to note the Receiver has

23    reported that the total number of deaths decreased in the

24    first year of his Receivership.

25         And I think it is also important to note that the

64

1    U.S. Department of Justice in 2007 did a study -- and I can

2    provide it to the court later, called Medical Causes Of Death

3    In State Prisons, which indicated that there were at least 35

4    other states where higher average -- higher annual mortality

5    rates than California, including Pennsylvania, New York and

6    New Jersey.

7        The state is by no means saying that an unnecessary

8    death is appropriate.  What we are saying is that is old

9    testimony, and that the Receivership has decreased the number

10   of deaths, increased the number of clinicians and has taken

11   many other actions to improve the process.  And that the

12   Receivership, as well as AB 900, should be given the

13   opportunity before this court convenes a three judge panel

14   where I think, based upon the Receiver's statement in his

15   Overcrowding Report, where a three judge panel can't grant

16   this motion, can't order a prisoner release order.

17       Thank you.

18       MS. TILLMAN:  Good afternoon.  May it please the

19   court, my name is Lisa Tillman.  I'm here on behalf of the

20   Coleman defendants.

21       We've heard a lot about different cases.  We've heard

22   about Plata.  We've heard about Valdivia.  We're now going to

23   hear about Coleman.  We can probably rattle off a number of

24   other cases that are affecting CDCR and the Governor's

25   Office.  That is one way of looking at this in a certain

65

1    perspective, the number of class actions being brought

2    against CDCR for a variety of issues.

3         However, to view -- properly view plaintiff's request

4    for the convening of a three judge panel on population

5    issues, that request must be viewed within the confines of

6    the Coleman case.

7         Obviously, the plaintiffs brought the Coleman case

8    over a decade ago.  The case concerns and concerned at that

9    time in the early 1990's the delivery of mental health care

10   to a discreet group of inmates, not the overall population of

11   CDCR, but the 19 percent that now exists within CDCR who are

12   in need of mental health care services.  Not just anyone in

13   need of mental health care services, they have to qualify for

14   it by being found to have a severe mental disorder.

15        At the time the complaint was filed, there was no

16   request for relief concerning any other prison conditions

17   such as overcrowding.  In fact, it is not even clear that

18   there was overcrowding back then.

19        JUDGE KARLTON:  Miss Tillman, you know, I hope you

20   know how much I respect you as an attorney.  It's always

21   refreshing to have you in court.  I'll be candid about it.

22        But the issue now is, as I think Mr. Bien fairly

23   stated, overcrowding is a major component of the problem of

24   delivering adequate mental care -- mental health care.  I

25   don't think anybody disputes that.

66

1        Whether it was an issue in the '90's when the case

2    was filed or not, we've learned a lot -- I mean I am speaking

3    for myself, I don't know about you -- about what happened and

4    why it is happening, why people are being -- You know, I used

5    to think the only reason we had mental health cases in

6    California prisons was because we shut down the big state

7    hospitals.

8        It is now clear to me I think the evidence is

9    relatively clear that overcrowding is a contributing factor

10   to people who weren't mentally ill when they got to the

11   prisons and are now in need of health services because of the

12   traumatic circumstances of trying to exist in the system as

13   it is now.

14       MS. TILLMAN:  Even if that is the case, and quite

15   frankly defendants do dispute the impact of overcrowding in

16   terms of it being a primary cause, even if that is the

17   case --

18       JUDGE KARLTON:  All right.  I understand you dispute

19   that that is a primary cause.  But this is important.  Is

20   that enough?

21       If it is a cause -- Let me ask first of all.

22       Do you dispute that it is a cause of the fact that we

23   have at least 19 percent, maybe more, of our state's

24   prisoners are now in need of mental health services?

25       Do you dispute it has any effect at all?

67

1          MS. TILLMAN:  What I have to rely upon, Your Honor,

2     is the fact that when people come into the reception centers,

3     they are given an initial assessment and diagnosis.  And the

4     persons who are coming into the reception center now are

5     found to be so severely decompensated that they are actually

6     a group of inmates that are numbering in excess of the 19

7     percent we find entitled to services on a regular basis which

8     informs me that their problems are problems they come into

9     the system with and might be exacerbated from the lack of

10    community resources for their very conditions.

11         Does it help them that they go into an overcrowded

12    system?

13         Probably not.

14         However, and this is what's very striking to me when

15    I read Special Master Keating's report, he indicates that

16    even if we were to drop the overall population by some

17    100,000 inmates, there would still be, as he puts it, an

18    unmitigated, an unmet need for clinical services, for the

19    staff that they need, at the right places, for the right

20    types of beds, as well as for the number of designated mental

21    health treatment centers.

22         A hundred thousand inmates released and we will still

23    be here in Coleman talking about the delivery of health care

24    services.

25         JUDGE KARLTON:  That may suggest what the three judge

68

1    court will have to do is be much more careful about who's

2    released and how and under what circumstances.

3            But that's --

4            MS. TILLMAN:  See even --

5            JUDGE KARLTON:  That is an issue for the three judge

6    court, not this court.  I am asking you, not telling you.

7            MS. TILLMAN:  I would suggest, though, it indicates a

8    dispute about causation.  If only the targeted release -- As

9    Special Master Keating says, if only the targeted release of

10   severe mentally ill inmates may actually reverse current

11   staff and bed deficiencies and program deficiencies, then is

12   it really the overcrowding of the entire institution that's

13   impacting the ability to provide mental health care, or is it

14   simply the fact that the mental health care system has not

15   been able to come up to snuff and address the needs of the

16   population within the Coleman class.

17           I would suggest it's the latter.  And that's why you

18   see in defendants' papers the consistent concern about the

19   management issues that have come to play into the

20   difficulties of establishing and implementing mental health

21   care.

22           JUDGE KARLTON:  I'm sorry.  I don't mean to dominate.

23           JUDGE HENDERSON:  No.  No.

24           JUDGE KARLTON:  One of the questions which I have

25   raised and I am troubled by is whether or not this is an

69

1    insoluable problem.  But if you had a significant reduction

2    in the numbers of persons -- I'm not suggesting this is what

3    the three judge court will ultimately do -- but in the number

4    of persons who are mentally ill, you could, at least

5    theoretically, arrive at a place in which the numbers left

6    can be treated.

7         Now, that's -- It's bizarre to think that's the way

8    to proceed, that we let sick people out, but if we don't have

9    staff, if we can't possibly treat them -- You know, I issued

10   orders raising pay.  I don't know what else I've done.  It

11   appears that we can't obtain enough staff to provide adequate

12   care.

13         MS. TILLMAN:  But, again, with all due respect to The

14   court, those orders, the most striking orders about bed

15   planning, management decisions necessary to enable bed

16   planning, the management decisions to enable the hiring of a

17   forecasting contractor to start looking at long-term growth

18   plans, the court orders requiring enhanced salaries for CDCR

19   mental health clinicians, as well as pay parity for DMH

20   clinicians, those orders have all been within the last six

21   months to 12 months, particularly the pay orders that the

22   defendants have been very responsive to.

23         So it seems that the defendants, as much as they now

24   have received orders that address some core elements of their

25   issues in implementing a constitutionally adequate mental

70

1   health care system are now being told, "Well, too little too
2   late, go to the Ninth Circuit."

3        JUDGE KARLTON:  You know, nobody is condemning --
4   Well, yes, they are too.  But setting that aside, it is not a
5   question of blame.  This is not an issue of you're bad
6   people.

7        I don't believe that.  I mean, there may be questions
8   of competence, but that's a different issue.  The question is
9   whether or not we can deliver adequate mental health care
10  under the present population press.  That's the question.

11       And when we look at the evidence, doesn't it -- it is
12  certainly suggestive that that cannot be done.

13       MS. TILLMAN:  The evidence is suggestive of the fact
14  that it is being done, quite frankly.

15       What we see is, since 1995, the establishment of the
16  cornerstones of a constitutionally compliant mental health
17  care system.

18       A set of policies and procedures particular to the
19  delivery of mental health care was approved by this Court
20  just last year and is now being implemented on a system-wide
21  basis.  That's the first cornerstone.

22       The second cornerstone, mental health beds.
23  Particular treatment sites for particular types of patients.
24  The defendants have submitted a series of plans in the past
25  year addressing short-term, interim and long-term plans for

71

1  those beds with a December '06 filing on the amended

2  long-term bed plan, the final filing that we've done.

3         And those bed plans, I think, engender finally what

4  the court has been waiting a long time to see, which is the

5  defendant showing a conscious desire to build beds to meet

6  the treatment needs of these patients.

7         The Governor and the legislature have joined in an

8  effort with the passage of AB 900.  Never before have we seen

9  not only CDCR come up with a long range multi-varied approach

10  to bed planning, but it's been joined by the Governor and the

11  legislature passing the historic legislation that will enable

12  a support for that sort of bed planning function.  Plus, the

13  rehabilitative side that has been sorely lacking for the

14  whole range of inmates within CDCR.

15         In terms of the actual delivery of mental health

16  care, what we see in Special Master Keating's report is, as

17  he puts it -- and I want to make sure I get it right -- "At

18  this time there is about 33 percent of the patients with

19  acknowledged mental health needs who are not getting those

20  needs met."

21         You can look at it as 33 percent not getting their

22  needs met, or you can look at it as, well, gee, in early '90s

23  it was a completely different number.  And now we're looking

24  at over 60 percent getting their needs met with present

25  staffing and present bed space despite the changes posed by

72

1    the overall context of overcrowding.

2         So they are somewhat separable.  As much as plaintiff

3    contends that if there is overcrowding, there must be an

4    inability to comply with court orders about mental health

5    staffing, mental health beds, mental health processes and

6    procedures, actually in the past six months what you see is

7    implementation of the program guide, long-term planning and

8    funding for mental health beds.

9         And then you also have additional work with the

10   Receiver on another cornerstone, and that would be data

11   management and recordkeeping.  And lastly, you finally have

12   some idea of staffing.

13        As much as the court in the past ten, 15 years has

14   given orders particular to individual institutions within

15   CDCR, Corcoran, Pelican Bay to get increased salaries, it has

16   only been this past December that we see system-wide enhanced

17   salaries for CDCR clinicians followed by a parity plan for

18   DMH.

19        Combined with that is, of course, the recruitment

20   funds being sought from the legislature for a million dollar

21   contract to ensure appropriate and expedited recruitment.

22        This has all happened within the past six months.

23        JUDGE HENDERSON:  You keep saying that.

24        JUDGE KARLTON:  It is my program.

25        JUDGE HENDERSON:  Okay.  I understand that, but --

73

1            JUDGE KARLTON:  It's the same answer.  Go ahead.

2            JUDGE HENDERSON:  Go on.

3            I guess I know Judge Karlton and I know myself, and

4     I'm looking at the pleadings.  Judge Karlton has been

5     aggressively pursuing this case since 1990.  I have been

6     aggressively pursuing Plata since '01.  And I hear --

7            JUDGE KARLTON:  Here we are.

8            JUDGE HENDERSON:  I hear both of you say, "Oh, but

9     boy, six months ago we really kicked in."  And is that a

10    correct characterization of what you're saying?

11           So now despite the fact that we've really been trying

12    and trying and trying, and issuing 70 orders over this time,

13    but now it's a new day for what reason and we need to wait

14    and see?

15           What has happened in six months that we can't look at

16    this whole history and say it just ain't working?

17           MS. TILLMAN:  I recognize the history of these cases.

18    Having only been on it three years, I certainly respect your

19    tenure on these cases.

20           I think what's important to note is during the

21    history of certainly Coleman, I can't speak to Plata, but

22    certainly Coleman, it started out at ground zero.

23           There was really very little out there in the prison

24    system by the way of mental health care.  So there has been a

25    culture change in the course of this case, and I'm grateful

74

1    to acknowledge that.

2          What we see -- what we see are over the course of

3    this case, a series, now we're up to 18, monitoring reports

4    from Special Master Keating.  Never once a request for an

5    order or recommendation for an order from any of these

6    monitoring reports indicating that the court must issue a

7    particular order addressing overcrowding.

8          What we see are recommendations and particular court

9    orders addressing the cornerstones of a constitutionally

10   compliant system, staffing for the mental health system,

11   mental health bed space, mental health records.

12         JUDGE KARLTON:  But Miss Tillman, the problem at some

13   point -- even people as patient as Judge Henderson, I make no

14   such representation to myself -- have got to say something

15   has got to change.

16         You know, we made great progress.  I'll say to you

17   what I said to others, we were making great progress.  I

18   actually had the delusion that we were getting out -- we

19   would some day get out of this system.

20         And it's clear that in the last year-and-a-half, two

21   years, with all of the work, with all of the effort, there's

22   been a backsliding that's perceptible.

23         MS. TILLMAN:  I think what you also see, as much as I

24   think that you're perceiving a backsliding in compliance,

25   successes, so to speak, by defendant CDCR, what you also see

75

1    is a Governor taking every action possible to address the

2    overall prison issue.

3          What other Governor has issued an emergency

4    proclamation?

5          What other Governor has gone ahead and transferred

6    out-of-state, despite opposition of certain groups,

7    transferred out-of-state inmates to enable better bed space

8    to become available.

9          What other Governor has been able to engage in this

10   bipartisan effort to pass AB 900 with the rehabilitative

11   effect that it will have, the reduced recidivism rate, as

12   well as support for additional beds.

13         What concerns me is that we now have a Governor

14   deeply interested in working with the courts, working with

15   the Special Master, working with the Receiver to engage in a

16   very difficult process and that is prison reform.

17         JUDGE HENDERSON:  I believe what you said.  I would

18   agree.  I believe our Governor is doing and trying to do all

19   of those things.  But isn't the problem that while he is, we

20   have senators saying, "I will never agree to a program that

21   let's anyone get out of jail one day before their sentence?"

22         JUDGE KARLTON:  As if the sentence was magic.

23   Suddenly if you just hold them that one more day, he's going

24   to be rehabilitated.

25         JUDGE HENDERSON:  Isn't that, with the Governor

76

1    apart, our political system, and isn't that the problem?

2          The Governor isn't the problem, but don't we have a

3    system that doesn't allow it?  And don't we have a system

4    that resulted in AB 900?

5          JUDGE KARLTON:  Where we are.

6          JUDGE HENDERSON:  Because I had my clerk pull out

7    press conferences by the Governor.  And there were at least

8    seven where the Governor was asked by members of the press,

9    "Is sentencing reform still on the table?"  "Sentencing

10   reform is still on the table."

11         Is sentencing -- Then sentencing reform is not on the

12   table.  And I believe the Governor wanted it.  But is he

13   victim to a system that won't allow it, and how do we weigh

14   that?

15         JUDGE KARLTON:  And if we believe, if the evidence

16   seems to be very powerful that in each of our areas of

17   concern overcrowding is a significant factor in preventing

18   adequate care -- You know, the Governor and the legislature

19   are free tomorrow to adopt a plan that will make both of us

20   go away.  I promise you.

21         JUDGE HENDERSON:  I'll be gone before you.

22         JUDGE KARLTON:  You only think so.

23         That if the Governor and the legislature were to

24   adopt the plan that meaningfully permitted the treatment --

25   adequate treatment of mental health care tomorrow, I wouldn't

77

1    even consider what is being asked of me.

2        I'm sorry to tell you that, but I wouldn't even

3    consider it.

4        But there's no evidence at all that that's going to

5    happen.  And what there is is evidence overwhelmingly that

6    it's a significant factor in the decompensation of people in

7    their not obtaining adequate treatment.

8        A third of the population -- According to Special

9    Master Keating, a third of the population is getting no

10   adequate care by virtue of -- And the reason is that we don't

11   have staff, we don't have beds, we can't reach all of those

12   people.

13       And Judge Henderson's folks have got the same problem

14   apparently.

15       MS. TILLMAN:  I think there is a distinction between

16   the Plata class and the Coleman class.

17       JUDGE KARLTON:  Forget Plata.

18       MS. TILLMAN:  I think the Ninth Circuit in any court,

19   with all due respect, would be very -- would have a very

20   difficult time releasing Coleman class members.  And I think

21   that is something --

22       JUDGE KARLTON:  Boy, do I agree with that.

23       MS. TILLMAN:  Yes.

24       JUDGE KARLTON:  Do I agree with that.  I don't know

25   how that works out.  I couldn't tell you.

78

1          MS. TILLMAN:  So in terms of the Coleman class is

2     that really an effective remedy?

3          JUDGE KARLTON:  That's a terribly serious question.

4     That is, at least for me, a central issue.  And this hearing

5     has just reaffirmed that there is a problem which cannot be

6     solved in the present system, and it is not apparent to me --

7          JUDGE HENDERSON:  Maybe you reduce others who aren't

8     a member of that class to make the room --

9          MS. TILLMAN:  Right.

10          JUDGE HENDERSON:  -- to take care of that class.

11          MS. TILLMAN:  What we're hearing from Special Master

12     Keating's report is you can't spread the staff around like

13     butter.  So even a reduction of 100,000 inmates out of

14     general population is not going to result in meeting those

15     needs.  That's very thought provoking.

16          JUDGE KARLTON:  You think so.

17          MS. TILLMAN:  Which means that this problem, this

18     issue of the Coleman class members getting appropriate care

19     on a timely basis is not necessarily intertwined in a causal

20     way with overcrowding.

21          JUDGE KARLTON:  That doesn't follow.

22          MS. TILLMAN:  You're still going to have the problem

23     even if you reduce the population by 100,000 inmates.

24          So what we would respectfully ask is rather than -- I

25     have to say this, you know, plaintiffs have suggested that

79

1    rather than do sentencing reform a backdoor way through the

2    PLRA, I took this note, "the quickest way would be to

3    decrease parole violators with risk assessment."

4         Defendants would say that's covered by AB 900.  We

5    would be happy to hear from plaintiffs about their ideas

6    about risk assessment, parole violators, happy to discuss

7    that with them.  But it is covered, and it is certainly not a

8    reason to go to the Ninth Circuit for population caps.

9         The efficacy of the remedy of convening a three judge

10   panel must be viewed not only in the context of the Coleman

11   case and what has been accomplished and what remains to be

12   accomplished in terms of mental health care delivery, but

13   also in terms of what is being sought by the plaintiffs.

14        Plaintiffs brought the Coleman case, and they

15   obtained a Special Master to oversee the development, the

16   establishment, the implementation of a mental health care

17   system.  They brought the Plata case and obtained a Receiver,

18   which brought authority over the medical care system.

19        In short order now they've brought motions seeking

20   the Ninth Circuit to intervene on the issue of the population

21   of CDCR.

22        At some point the individuals who were initially

23   brought in to remedy the situation, the Special Master, the

24   Receiver, must be permitted to go ahead with their work.

25        Introducing yet another group of individuals, however

80

1    respected from the Ninth Circuit, to address population

2    issues might not actually make the picture any more clearer.

3         Defendants respectfully request the plaintiffs'

4    motion be denied.

5         Thank you.

6         JUDGE HENDERSON:  Thank you.

7         JUDGE KARLTON:  Mr. Bien, I want a short response.

8    And Mr. Specter, whatever Judge -- There is a fundamental

9    problem, and that is tying -- I don't know.  There appears to

10   be at least a problem in tying any remedy to relief for the

11   Coleman class.

12        Miss Tillman has made, I think, an argument that I

13   have made to myself about the issue.

14        Tell me.

15        MR. BIEN:  First, I don't think that we need to be

16   afraid of the Coleman class being in our society because they

17   are there in our society every day.

18        The Coleman class goes in and out of prison all the

19   time, and there is many ways of controlling the public safety

20   issues.  And I don't think there is any evidence that the

21   mentally ill are more dangerous than anyone else.  And we

22   will be glad to prove that up to a panel that is considering

23   that.

24        Some of the choices that the state is making on that

25   right today are that they incarcerate people to treat them

81

1    for mental illness.  So, you know, it's not exactly that

2    simple.  And then they release them with no treatment.

3    Parole doesn't have treatment, you know.

4         So I think that there is a lot of things to improve

5    public safety that can be done to reduce -- that would result

6    in reducing the Coleman class in prison.

7         And I think that those are the kinds of ideas that,

8    by the way, are mentioned in AB 900.  There is no funding.

9    There is no plan.  And they're the kind of things we have

10    been talking about with defendants for years and years and

11    years.

12         Things like how about applying for benefits for

13    someone before they are released from prison.  Boy, talk

14    about a radical idea.  They won't do it.

15         How about providing some mental health care when

16    people are on parole?

17         They won't do it.

18         So I think these are some of the things that if they

19    did them, every study shows these people would not go back to

20    prison as quickly, the Coleman class would be reduced,

21    there's a benefit to public safety because rather than going

22    back to prison because you've hurt somebody or are dangerous,

23    you'll stay out.

24         You may need some benefits, you may need some

25    medication, you may need a place to live, and those things

82

1    don't exist right now in our community.  And those are some

2    of the things the state may have to address.

3            But these are strategies that can be used to reduce

4    the population of the Coleman class.

5            JUDGE KARLTON:  Thank you.

6            JUDGE HENDERSON:  Mr. Specter, do you want to

7    respond?

8            MR. SPECTER:  Well, I have two points.

9            One is the combined arguments of the defense counsel

10   that given the current surge of activity in the next six

11   months all of a sudden something is going to be different,

12   and I think you're right to be skeptical about that.

13           And that leads me into my next point, which is

14   Mr. Mello's reliance on the Receiver's activities as a

15   defense to an order that we're seeking today.

16           Mr. Mello takes one line out of a 44-page report and

17   quotes it out of context.  But if you want to talk about the

18   Receiver's report, let's talk about what he says.  And he

19   says in no uncertain terms that -- he identifies four

20   categories of problems that are related to and caused by

21   overcrowding.

22           The facilities are inadequate.  There aren't enough

23   medical beds.  There's not enough clinical space.  There's

24   not enough space for support services such as records,

25   storage and supplies.

83

1          Second, there is inadequate staff.  We have covered

2     that.

3          Third, the reception center process is overburdened

4     by the simple amount of thousands of prisoners being herded

5     into and out of the prison system each month.

6          And finally there's the additional workload driven by

7     overcrowded-related flips of yards that he's mentioned

8     because they can't figure out where to house people because

9     there's not enough space to house people accurately.

10         And finally he acknowledges that every element of his

11    plan of action faces crowding-related obstacles.

12         So it is clear, as I think you both kind of implied

13    that everybody has to agree, even the defendant, the

14    Governor, said that overcrowding is causing these problems.

15         I don't -- And I think the answer to some of defense

16    counsels' statements is that -- and even the Receiver's

17    report, which Mr. Mello quoted, is that certainly

18    overcrowding is not the only problem.  We all agree with

19    that.

20         But we do think that until and unless you solve the

21    overcrowding crisis, you will never, and I mean never, ever,

22    be able to solve these other problems.

23         Thank you.

24         JUDGE KARLTON:  We'll stand in recess.

25         Matter will stand submitted.

84

1                    (Off the record at 12:42 PM)

2                              ---o0o---

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1                        REPORTER'S CERTIFICATE

2                              ---o0o---

3
    STATE OF CALIFORNIA   )
4   COUNTY OF SACRAMENTO )

5

6
          I certify that the foregoing is a correct transcript
7
    from the record of proceedings in the above-entitled matter.
8

9

10                       IN WITNESS WHEREOF, I subscribe this
    certificate at Sacramento, CALIFORNIA on this 9TH day of
11  JULY, 2007.

12

13

14                       _____

15                       CATHERINE E.F. BODENE,
                         CSR NO. 6926
16

17

18

19

20

21

22

23

24

25