PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
AMY WHELAN Bar No.: 215675
LORI RIFKIN Bar No.: 244081
SARAH M. LAUBACH Bar No.: 240526
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>    Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>    Defendants | No.: Civ S 90-0520 LKK-JFM<br><br>**PLAINTIFFS' REPLY REGARDING RELATION OF EXPERT PANEL REPORT TO PLAINTIFFS' MOTION TO CONVENE A THREE-JUDGE PANEL** |

1    On July 3, 2007, in response to defendants' request that the Court take judicial notice of the recent report by the California Department of Corrections and Rehabilitation's Expert Panel on Adult Offender Reentry and Recidivism Reduction Programs ("CDCR expert panel"), this Court ordered the parties to file additional briefing "that addresses how, if at all, the courts should consider the expert panel's report in resolving the pending motions to convene a three-judge court."  7/3/07 Order.

The expert panel's report ("Expert Report") is a plan for a plan to revamp rehabilitative corrections programming in California.  It is not a plan for immediately reducing overcrowding.  Expert Report at 10 ("Solving the overcrowding problem is not the mission of this Panel.")  Defendants assert that because some of the recommendations in this Report may potentially at some point be adopted by another team of experts to recommend to the Governor and Legislature, and because, if eventually implemented, these recommendations may at some point have some uncertain effect on overcrowding, this Court should yet again postpone convening a three-judge panel to consider a prisoner release order.  While plaintiffs would welcome the changes suggested in this report, these currently unadopted, unauthenticated, unendorsed recommendations[1] do not satisfy the need for urgent immediate action to remedy the overcrowding crisis and corollary constitutional violation of plaintiffs' right to adequate mental health care.

In fact, the Expert Report underscores the importance of this Court's referral to a three-judge court for the issuance of a prisoner release order, and provides reassurance to the Court that ordering defendants to immediately implement population reduction strategies is not a radical step.  The Expert Report notes that prison population reduction strategies have been repeatedly identified by the State itself, and the actions the State should take are by now so well-established that the expert panel concluded:

> We agree with the Little Hoover Commission (2007) in that California doesn't need another report outlining correctional reform measures.  What California needs to do is implement some of the

---

[1] *See* Docket No. 2310 (Defs.' Brief) at 3:26-4:8.

>proposals that have already been presented to it. Since 1990, there have been more than a dozen reports published that deal with the crisis in California's adult prison system. The major recommendations made in all of these reports are entirely consistent with the recommendations in our report.

Expert Report at 77 (Appendix A).

Yet, despite the last two decades of proposals by previous expert commissions, the State has done nothing. The CDCR expert panel summarizes numerous previous expert commissions' recommendations to address the population crisis in California prisons. *Id.* Not one of the commissions—convened by the State itself—recommended building more prisons. *See id.* They recommended immediate parole reform, treatment programs, sentencing reform, community re-entry programs, partnerships between state and local agencies, and administrative reforms, but not one recommended prison expansion. *Id.* <u>To date, however, the only significant action actually taken by the State in response to the overcrowding crisis is the passage of AB 900, a prison expansion bill that will only aggravate, rather than remediate, the ongoing constitutional violations. The State has failed to implement a single meaningful reform aimed at reducing the prison population.</u> The State has failed to follow decades of its own experts' recommendations in this area.

Now, instead of action, defendants offer yet another expert panel's report as evidence of the State's purported intent to overhaul its correctional mission to include rehabilitation and reduce recidivism. In their pleadings, however, the strongest position defendants could muster regarding this report is that the Governor's "strike teams"—two more expert panels—will review and recommend some of this expert panel's recommendations to the Governor.[2] *See, e.g.,* Docket No. 2310 (Defs.' Brief) at 2 ("The Report will aid the Strike Team in formulating

---

[2] Indeed, plaintiffs have been informed that these vaunted "strike teams" are set to be dissolved within six months, leading to the inevitable conclusion that they are simply one more example of expert panels convened by defendants in an attempt to avoid both scrutiny and action. Furthermore, it is unclear even to members of the Legislature what powers, duties, and budget have been given to the strike teams, if any. *See* Declaration of Michael W. Bien In Support Of Plaintiffs' Reply Regarding Relation Of Expert Panel Report To Plaintiffs' Motion To Convene A Three-Judge Panel ("Bien Decl."), ¶¶ 2-3 and Exhibit A (Perata-Schwarzenegger Letter, 7/11/07).

1  plans to reconfigure CDCR.")  Defendants did not offer any statements from defendants
2  Governor Schwarzenegger or Secretary Tilton actually adopting and implementing <u>any</u> of the
3  expert panel's recommendations.  Rather, defendants emphasize the preliminary nature of the
4  recommendations, and actively back away from definitive statements about implementation
5  and estimates about how prison population might be affected:  "Once it becomes clear on [sic]
6  the extent to which the recommendations will be adopted and implemented, more precise
7  estimates should be made.  *It is also important to note that the CDCR has neither*
8  *authenticated nor endorsed our* [the expert panel's] *estimates.*"  Docket No. 2310-3 (Decl. of
9  Joan Petersilia) at 4-5 (emphasis in original).
10       Not only have defendants failed to demonstrate a single meaningful action in response
11 to the Expert Report beyond the promise of another panel's review of this panel's work, but the
12 CDCR expert panel itself acknowledges that:  1)  "[s]olving the overcrowding problem is not
13 the mission of this Panel;" and 2) overcrowding must be reduced as a prerequisite to
14 implementing all of the various rehabilitation programming outlined in depth in its Report.  *See*
15 Expert Report at 9-10.  Although the Expert Report does not mention mental health care
16 specifically, it makes findings that overcrowding has eliminated programming and treatment
17 space, prevents programming from actually taking place, reduces the ability of parole agents
18 and community-based program providers to provide services, and creates an unsafe
19 environment for inmates and staff.  *Id.*
20       The answer to the Court's question of how it should consider the expert panels' report
21 in resolving plaintiffs' motion is simple: the Expert Report is further evidence in support of
22 plaintiffs' motion to convene a three-judge panel.  First, the Report does not directly address
23 overcrowding, but instead points out decades of prior experts' recommendations that the State
24 has ignored; second, as with prior such expert reports, defendants have thus far failed to
25 actually adopt or implement even one recommendation in the Report; and third, even if the
26 recommendations were implemented on the most aggressive timeline suggested in the Report,
27
28

they would not be implemented until June of 2009, two years from today.[3] The Expert Report reinforces plaintiffs' arguments that the State has deliberately refused to act to meaningfully address overcrowding, and that building more prisons will not solve the overcrowding problem. The Report de-bunks the myth that keeping inmates in prison for longer periods enhances public safety, explaining that because California currently fails to offer rehabilitative programming, its inmate population leaves prison without being rehabilitated, translating into one of the highest recidivism rates in the country. *See, e.g.,* Expert Report at 1. The expert panel rejects the fear that a strategic reduction in prison population will negatively affect public safety, noting, "[I]t has been widely established by a number of studies, including those conducted by the US Department of Justice and the CDCR, [that] there is no relationship between time served and recidivism. Therefore, releasing prisoners early as a result of earning program credits will not increase their recidivism rates." Expert Report at 92. Moreover, this approach is actually expected to <u>increase</u> public safety, and result in a major cost-savings to the State. *Id.* at 92-93. The CDCR expert panel concludes, "[w]ith California already spending more than $10 billion a year on its correctional system, we believe that it is only a matter of time before this state is forced to consider alternatives besides prison building to solve its overcrowding problem." *Id.* at 10.

There is no more time for the more than 32,000 *Coleman* class members now warehoused in defendants' prisons. As plaintiffs have amply demonstrated in briefing on this motion, and defendants have not disputed, these tens of thousands of mentally ill inmates are suffering <u>now</u>, in conditions so horrific that defendants cannot even dispute that they clearly violate the Eighth Amendment of the Constitution. During the June 27, 2007 hearing, defendants argued that this Court should not refer this matter to a three-judge court because,

---

[3] In fact, defendants state that "a reasonable estimate for full implementation may take from two to five years. Docket No. 2310-3 (Decl. of Joan Petersilia) at 4. In Appendix J to their Report, the expert panel identifies a host of barriers to implementation of their recommendations that may cause further delay, including legislative, structural, cultural, and societal barriers. Expert Report at 117-22.

1  while defendants do not dispute the Special Master's conclusion that 33 percent of the
2  *Coleman* class are "not getting their needs met…you can look at it as, well, gee in early '90s it
3  was a completely different number.  And now we're looking at over 60 percent getting their
4  needs met…"  Docket No. 2309 (6/27/07 Transcript) at 71-72.  Even were it true that over 60
5  percent of the class is receiving constitutionally adequate mental health treatment, defendants'
6  contention that this is a positive fact that we should all applaud is gravely mistaken.  The
7  *Coleman* class numbers over 32,000 human beings with serious mental illness, locked in
8  prison.  This means that, at minimum, it is undisputed that, twelve years after the *Coleman*
9  decision, approximately 11,000 individuals with serious mental illness—a number similar in
10  size to the original *Coleman* class—are not receiving mental health care at levels the
11  Constitution, and this Court, deem minimally adequate.
12      The Special Master, unlike defendants, expresses dismay at these numbers:

> [N]early 12 years after the determination that mental health services in CDCR were egregiously unconstitutional, hundreds certainly, and possibly thousands, of CDCR inmates/patients, all members of the Coleman class certified in the early 1990s, are still looking for beds at the level of treatment their mental illness requires…Suffice it to say that 11 years and five months after the Court found mental health services in CDCR to be unconstitutional in December 2005, a period of time, incidentally, more than five times the average length of incarceration of CDCR inmates (27 months), defendants cannot meet at least a substantial portion, amounting in some loose amalgam to about 33 percent, of acknowledged mental health needs with current staffing resources. Insufficient intensive mental health treatment beds and a chronic lack of programming space for mental health treatment contribute further to defendants' inability to meet required mental health services.

22  Docket No. 2253, Special Master's Response to Court's May 17, 2007 Request For
23  Information, at 9-14.  While defendants dismissively choose to shrug this failure off with a
24  bizarre "glass half full" mentality, the plaintiff class and this Court cannot afford such a casual
25  attitude toward a violation so grave that it constitutes cruel and unusual punishment, denying
26  minimal mental health treatment to a class of seriously ill people who desperately need it.  It is
27  with this same dismissiveness that defendants attempt to persuade this Court to hold off on the
28  crucial and life-saving process of implementing a prisoner release order, without offering

1  evidence of a single concrete action taken thus far to immediately and significantly reduce the
2  prison population.  Rather, defendants pathetically wave tentative, preliminary, unadopted
3  findings by expert panels in the face of desperate human suffering.
4      The State has taken no meaningful action to address the overcrowding crisis or to
5  remediate its effect on *Coleman* class members.  Suicide rates are soaring,[4] class members are
6  growing more and more desperate, and defendants point merely to more promises for more
7  panels to review more recommendations and recommend their recommendations.  While
8  defendants refuse to act, this Court has no choice but to.

Dated:  July 18, 2007                                  Respectfully submitted,


                                                       */s/ Michael W. Bien*
                                                       Michael W. Bien
                                                       Rosen, Bien & Galvan
                                                       Attorneys for Plaintiffs

---

[4] *See* Bien Decl. at ¶ 4 (The CDCR suicide rate continues at appalling levels in 2007.  In the first six months, CDCR reported 25 possible inmate suicides.  This translates into a projected suicide rate of 29 per 100,000 inmates for 2007, which is double the national average reported by the U.S. Department of Justice.)