IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

        Plaintiffs,                No. CIV S-90-0520 LKK JFM P

    vs.

ARNOLD SCHWARZENEGGER,
et al.,

        Defendants.            <u>ORDER</u>

_____/

        Plaintiffs are a class of state prisoners with serious mental disorders proceeding through counsel in the remedial phase of this class action lawsuit.  By order filed September 13, 1995, this court found defendants in violation of the Eighth Amendment with respect to the provision of constitutionally adequate mental health care to inmates incarcerated in the California Department of Corrections, now known as the California Department of Corrections and Rehabilitation ("CDCR").  On December 11, 1995, this court appointed J. Michael Keating, Jr. as the Special Master to oversee the development of remedies for the systemic constitutional violation and to monitor implementation of court-approved remedies.  This action has been in the remedial phase for almost twelve years.

        This matter is before the court on plaintiffs' motion to convene a three-judge panel to limit the prison population in the CDCR, pursuant to 28 U.S.C. § 2284 and 18 U.S.C. §

1   3626(a)(3).  The court initially heard argument on plaintiffs' motion on December 11, 2006, after

2   which it continued the hearing to June 4, 2007.  The matter was subsequently continued to June

3   27, 2007, and the court heard oral argument on that day.[1]

4        On July 2, 2007, defendants filed a document entitled, "Defendants' Further

5   Statement Addressing Plaintiffs' Motion to Convene a Three-Judge Panel to Address Population

6   Issues."  Therein, defendants requested that the court take judicial notice of a report to the

7   California Legislature from the CDCR's expert panel on Adult Offender Reentry and Recidivism

8   Reduction Programs entitled, "A Roadmap for Effective Offender Programming in California"

9   (hereafter "Roadmap").  By order filed July 3, 2007, the parties were directed to file additional

10  briefing addressing how, if at all, the court should consider this report in resolving plaintiffs'

11  motion.  That briefing was completed on July 18, 2007.

12                                      ANALYSIS

13  I.  Standards

14       Section 3626(a)(3)(C) of Title 18 of the United States Code authorizes a party to a

15  civil action concerning prison conditions to file a request for a prisoner release order.  As defined

16  by the statute, a prisoner release order "includes any order, including a temporary restraining

17  order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the

18  prison population, or that directs the release from or nonadmission of prisoners to a prison."  18

19  U.S.C. § 3626(g)(4).  A prisoner release order may "be entered only by a three-judge court in

20  accordance with section 2284 of title 28," if other statutory requirements have been met.  18

21  U.S.C. § 3626(a)(3)(B).  A request for a prisoner release order must be accompanied by a request

22  for a three-judge court and "materials sufficient to demonstrate that" the statutory requirements

23  for issuance of such an order have been met.  18 U.S.C. § 3626(a)(3)(C).

24  /////

25  _____

26       [1]  The June 27, 2007 hearing was a joint hearing with the court in <u>Plata v.</u>
<u>Schwarzenegger</u>, Case No. Civ. 01-1351 TEH (N.D.Cal.).  <u>See</u> Order filed June 7, 2007.

A prisoner release order may not be issued unless--

(i)  a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and

(ii)  the defendant has had a reasonable amount of time to comply with the previous court orders.

18 U.S.C. § 3626(a)(3)(A)(i)-(ii).  If these requirements are met, "a Federal judge before whom a civil action with respect to prison conditions is pending who believes that a prison release order should be considered may sua sponte request the convening of a three-judge court to determine whether a prisoner release order should be entered."  18 U.S.C. § 3626(a)(3)(D).  The three-judge court "shall enter a prisoner release order only if the court finds by clear and convincing evidence that –

(i) crowding is the primary cause of the violation of the Federal right; and

(ii) no other relief will remedy the violation of the Federal right.

18 U.S.C. § 3626(a)(3)(E).

II.  <u>Analysis</u>

A.  <u>The Federal Right Sought to Be Remedied</u>

The federal right at issue in this action is the Eighth Amendment guarantee of constitutionally adequate mental health care for individuals with serious mental disorders who are incarcerated in the California Department of Corrections and Rehabilitation.  <u>See</u> <u>Coleman v. Wilson</u>, 912 F. Supp. 1282, 1297-98 (E.D. Cal. 1995) (citing, <u>inter</u> <u>alia</u>, <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994) and <u>Helling v. McKinney</u>, 509 U.S. 25, 31-32 (1993)).

/////

/////

/////

/////

B.  <u>Orders for Less Intrusive Relief</u>

This court's September 13, 1995 order identified four broad elements required for a constitutionally adequate prison mental health care system:[2]  (1) proper screening to identify individuals with serious mental disorders both at the time of their admission to CDCR and over the course of their incarceration, <u>Coleman</u>, 912 F. Supp. at 1305; (2) competent staff in sufficient numbers "'to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders,'" <u>id.</u> at 1306-8 (quoting <u>Balla v. Idaho State Bd. of Corr.</u>, 595 F. Supp. 1558, 1577 (D.  Idaho 1984)); (3) timely access to appropriate levels of care, including both beds and programs, and appropriate medication, <u>id.</u> at 1309-13; and (4) an adequate medical record system, <u>id.</u> at 1314-15.  A fifth component of an adequate mental health care system, suicide prevention, was found adequate in design but deficient in implementation due to chronic understaffing, <u>id.</u> at 1315.

Since February of 1996, this court has issued at least seventy-seven substantive orders to defendants in an effort to bring the CDCR's mental health care delivery system into compliance with the requirements of the Eighth Amendment.[3]  Taken together, these orders have contained directives aimed at all of the aforementioned requirements for a constitutionally adequate mental health care delivery system.  In addition, the Special Master and his staff have spent hundreds of thousands of hours working with the parties to develop program guidelines for a constitutionally adequate system and monitoring defendants' implementation of those guidelines.  During the same period of time, the Special Master has filed seventeen semi-annual monitoring reports and fifty-five other reports reflecting the results of these efforts.

---

[2]  As the court noted in that order, in a class action of this magnitude "[f]ocusing on the trees presents the danger of forgetting that what is being examined is the condition of the forest." <u>Coleman</u>, 912 F. Supp. at 1305  n. 28.  Sadly, that cautionary note remains as applicable to the issues at bar as it was twelve years ago.

[3]  <u>See</u> Orders filed February 7, 1996 and onward.  There are simply too many orders to list.

C. <u>Failure to Remedy Violation of the Constitutional Right At Issue</u>

As noted above in section II (B), for more than eleven years this court has issued numerous orders in an effort to bring California's prison mental health care system into compliance with the Eighth Amendment.  Among the most significant of those orders has been the directive to defendants to work with the Special Master and his staff to develop and implement remedial plans for the delivery of constitutionally adequate mental health care to class members.

At the time the remedial phase of this action began, the timelines established for development of plans and protocols were relatively short and the parties met those timelines with little need for adjustment.  The remedial plans and protocols were provisionally approved by this court on June 27, 1997.  Thereafter, the Special Master, his staff, and the parties turned their attention to implementing the system contained in the plans.

Through 2005, the record in this action reflected slow but evident progress toward constitutional compliance.  Between 1997, when the court gave provisional approval to the plans and protocols for delivery of mental health care, and 2005, some prisons in California came into sufficient compliance with the provisionally approved remedial plans and protocols that the Special Master and his staff were able to reduce the number of monitoring visits to those prisons.  Defendants also developed a screening system that provided adequate identification of mentally ill inmates both on admission to, and during incarceration in, the State prison system.  Moreover, while staffing shortages were never completely alleviated, defendants managed, through the use of aggressive recruitment and retention strategies, salary increases, and use of contract staff, to keep the vacancy rate among mental health staff at a nearly acceptable level.

On February 3, 2006, defendants filed a Revised Program Guide for the delivery of mental health care to inmates in the CDCR.  On the same day, the Special Master filed a report and recommendation in which he recommended that the court give final approval to "95 percent of the revised Program Guide that the parties and the Special Master agree to and initiate

1   a process for resolving the five percent of the remaining issues that continue to elude resolution."

2   Special Master's Report and Recommendations on Defendants' Revised Program Guide, filed

3   February 3, 2006, at 4.  By order filed March 3, 2006, the court gave final approval to the

4   undisputed provisions of the Revised Program Guide and ordered their immediate

5   implementation.  See Order filed March 3, 2006, at 1.

6               In spite of the commendable progress described above, defendants' mental health

7   care delivery system has not come into compliance with the Eighth Amendment at any point

8   since this action began.  Several prisons remain notable exceptions to the progress made at

9   others, and delays in access to care at the highest level of need -- mental health crisis beds, acute

10  inpatient care, and intermediate inpatient care -- have plagued the CDCR throughout the course

11  of this litigation.  Moreover, defendants' efforts at long-range planning for the delivery of mental

12  health care continues to be hampered by inadequacies in the capture and collection of data and

13  the use of outdated methodologies to interpret that data.[4]

14              The semi-annual reports of the Special Master filed since March 2006 show a

15  significant and thus very troubling reversal of the progress made by defendants in maintaining

16  adequate staffing and access to necessary levels of care.  In the Sixteenth Round Monitoring

17  Report, filed December 15, 2006, the Special Master reported that "vacancies among clinicians

18  continued to climb during the monitoring period."  See Sixteenth Monitoring Report of the

19  Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and

20  Protocols, filed December 14 and 15, 2006, at 390-96.  The Special Master also reported that

21  "[t]ransfers of inmates to more intensive levels of mental health programming and treatment

22  became increasingly erratic during the monitoring period.  Delays in transfers, especially to the

23  most intensive treatment programs for inmates at the highest custody levels, became endemic. .

24  ."  Id. at 413.

25  ─────────────────
26          [4]  The inability to engage in adequate long-range planning for the delivery of mental
        health care has plagued the CDCR throughout the course of this litigation.

The report on staffing vacancies in the most recent monitoring report is even more grim than the one that preceded it. <u>See</u> Seventeenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, Part C, filed June 13, 2007, at 161-64.  The Special Master also now reports that "access to higher levels of care was generally inadequate" during this monitoring period.  <u>Id.</u> at 174-78.

Similarly, on May 31, 2007, the Special Master reported that programming space, beds for mentally ill inmates, and staffing levels have all been "impacted seriously by overcrowding."  Special Master's Response to Court's May 17, 2007 Request for Information, filed May 31, 2007, at 4-14 ("Special Master's May 31, 2007 Response").  The staffing shortages alone mean that the CDCR only has enough staff "to provide full mental health services to roughly two-thirds of its mental health caseload, or two-thirds of required services to its full caseload, or, probably more realistically, some combination of reduced services to some segments of the caseload that can be covered with a third less clinicians than required."  <u>Id.</u> at 11-12.  While acknowledging the difficulties in quantifying precisely the scope of the unmet mental health needs, the Special Master reports that,

> defendants cannot meet at least a substantial portion, amounting in some loose amalgam to about 33 percent, of acknowledged mental health needs with current staffing resources.  Insufficient intensive mental health treatment beds and a chronic lack of programming space for mental health treatment contribute further to defendants' inability to meet required mental health services.  All three deficiencies are unquestionably exacerbated by overcrowding.

<u>Id.</u> at 14.  With a mental health caseload of almost 33,000 inmates, <u>id.</u> at 2, this level of unmet needs is unconscionable.[5]

The orders of this court issued from 1995 through the present have failed to remedy the constitutionally inadequate delivery of mental health care to CDCR inmates.

/////

---

[5] These recent reports are enough to answer the defendants' contention that the court's recent orders will rectify the slide backward.

1    That failure appears to be directly attributable to overcrowding and the consequent inability to

2    staff the caseload.

3          D.  Time for Compliance

4                    It has been almost twelve years since this court found widespread violations of

5    the Eighth Amendment in the delivery of mental health care to the members of the plaintiff class.

6    As discussed in sections II (B) and II (C) of this order, for more than eleven years this court has

7    issued numerous orders directed at bringing California's prison mental health care system into

8    constitutional compliance, and the system still falls woefully short of meeting the requirements

9    of the Eighth Amendment.  Defendants have had more than sufficient time to comply with the

10   mandate required by the court's 1995 order and the numerous orders issued since then.

11         E.  Whether A Prisoner Release Order Should Be Considered

12                   For the reasons set forth in sections II (A), (B), and (C), this record amply reflects

13   the showing required by 18 U.S.C. § 3626(a)(3)(A)(i)-(ii).  This court therefore turns to

14   consideration of whether a prisoner release order should be considered.  See 18 U.S.C. §

15   3626(a)(3)(D).  In this regard, assuming any showing is required at this stage, the standard is

16   whether a release order may be appropriate.  The final decision will rest with the three-judge

17   panel.

18                   There is no dispute that prisons in California are seriously and dangerously

19   overcrowded.  The Governor of California has repeatedly and eloquently noted the public

20   emergency caused by overcrowded prison conditions, and the CDCR's website contains several

21   photographs of overcrowding at five of the State's prisons taken in August 2006.[6]

22                   In June 2004, an independent panel appointed by Governor Schwarzenegger

23   found significant overcrowding in the CDCR.  See June 2004 Report of the Corrections

24   Independent Review Panel at 123-25, Ex. D to Declaration of Michael W. Bien in Support of

25   _____

26         [6]  See http://www.cdcr.ca.gov/communications/prisonovercrowding.html

1   Plaintiffs' Motion to Convene a Three Judge Panel to Limit the Prison Population.  The panel

2   discussed three different levels of population capacity:  design capacity, operable capacity, and

3   "maximum 'safe and reasonable' capacity."  Id. at 123-24.  It observed that "operable capacity,

4   which takes into account space needed for effective programming in addition to safety and

5   security, is greater than design capacity, but far less than maximum safe and reasonable

6   capacity."  Id. at 124.  "Maximum 'safe and reasonable' capacity" is defined as "the maximum

7   number of inmates who can safely and reasonably be housed in the prison system.  Id.[7]   The

8   panel reported that the CDCR had determined that the "maximum safe and reasonable capacity

9   of the State's male prisons is 137,764 male inmates."  Id. at 124.  Based on the April 2004

10  population figures available to the panel, it found that the prison system then exceeded the

11  maximum "safe and reasonable" capacity of the system for male inmates by 4,000 inmates and

12  exceeded the "operable capacity" of the prison system by 30,000 inmates.  Id.[8]

13          By early 2006, the impact of severe prison overcrowding on the remedial efforts

14  in this case was becoming evident in the record.  See, e.g., Fifteenth Monitoring Report of the

15  Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and

16  Protocols, filed January 23, 2006, at 396-97 ("Whatever progress was reported in the preceding

17  round of review, or in the early part of the current review, in the timeliness of transfer of

18  [Mental Health Services Delivery System] ("MHSDS") inmates out of reception into general

19  population has been largely cancelled by the recently escalating growth in the overall CDCR

20  population and the concomitantly increasing number of MHSDS inmates in reception.").  Since

21  then, the impact of overcrowding has become even more clear.  See, e.g., Special Master's

22

23          [7]  The plaintiffs' contention that defendants have attempted to meet the overcrowding
    issue by redefining the measure of crowding is not without apparent justification.

24

25          [8]  The Roadmap, filed by defendants on July 2, 2007, also describes the California prison
    system as "dangerously overcrowded" and its first recommendation is that the CDCR "reduce
    overcrowding in its prison facilities and parole offices."  Roadmap, at viii, 10.

26

1   Supplemental Report on the Status and Sufficiency of Defendants' Interim and Long Term Plans

2   for the Provision of Acute and Intermediate Inpatient Beds and Mental Health Crisis Beds, filed

3   September 11, 2006, at 11 ("The sudden addition of an unanticipated 1,300 inmates to a

4   correctional system perilously close to 200 percent of its design capacity and a commensurately

5   overstressed mental health care delivery system operating way beyond its capacity represents an

6   unexpected, projection-rattling variable.").

7          Following the initial hearing on the instant motion, the court continued the matter

8   for six months.  See Order filed December 12, 2006.  That continuance was for the purpose of

9   allowing the State to develop its own solution to the overcrowding crisis.  During that six month

10  period, the California Legislature enacted Assembly Bill 900 ("AB 900"), and the bill was

11  signed into law by Governor Schwarzenegger.  The legislation calls for, inter alia, construction

12  of 24,000 new prison beds in Phase I of its implementation, and 16,000 new prison beds in Phase

13  II.  Defendants aver that 12,000 of the Phase I beds "will be completed in 2009."  Declaration of

14  Deborah Hysen in Support of Defendants' Supplemental Brief in Opposition to Plaintiffs'

15  Motion for Referral to a Three-Judge Panel, filed May 24, 2007, at ¶ 8.  Construction funds for

16  Phase II are tied to progress in specific areas, including construction, rehabilitation programs,

17  management planning, and parole review.  The legislation also calls for transfer of 8,000 inmates

18  to out of state prisons by March 2009, with continued transfers as needed until July 2011.

19  Defendants contend that the passage of AB 900 renders unnecessary and inappropriate referral of

20  this matter to a three-judge panel.

21          As of May 11, 2007, the prison population in California totaled 174,989 inmates,

22  of which approximately 162,848 are male and 12,141 are female.  See Special Master's May 31,

23  2007 Response, at 2.  Defendants estimate that the male prison population in California[9] will be

24  159,939 male inmates in March 2008 and 162,674 male inmates in March 2009.  Declaration of

25

26          [9]  These numbers do not include inmates who will be transferred out of state.  See Kernan
    Declaration, at ¶ 23.

1  Scott Kernan in Support of Defendants' Supplemental Brief in Opposition to Plaintiffs' Motion

2  for Referral to a Three Judge Panel, filed May 24, 2007, at ¶ 22.  The record suggests there will

3  be no appreciable change in the prison population in the next two years.

4  　　　　Defendants plan to add 12,000 prison "in-fill" beds by 2009.  See Hysen

5  Declaration, at ¶ 8.  According to defendants, "[i]n-fill beds will provide additional capacity at

6  existing prisons in a way that ensures proper facilities, support and services."  Id.  It is not at all

7  clear, however, that an additional 12,000 beds, even if timely completed, will alleviate the

8  population crisis.  As noted above, in June 2004 the independent panel on corrections found that

9  a male inmate population of approximately 141,000 exceeded by 4,000 the "safe and reasonable"

10  capacity of the California prison system and by 30,000 the system's "operable" capacity.  The

11  male prison population projected for March 2009 is over 162,000 inmates and exceeds the

12  population analyzed in the 2004 report by approximately 21,000 inmates, or 9,000 more inmates

13  than new beds planned.   Moreover, of course, this utterly fails to address the critical question of

14  staffing.

15  　　　　AB 900 provides for the construction of 8,000 medical and mental health beds as

16  a "high priority."  Hysen Declaration, at ¶ 10.  Defendants, however, are unable to adequately

17  staff the mental health beds that presently exist and are experiencing severe staffing shortages at

18  every level of the mental health care delivery system.  See Seventeenth Monitoring Report, Part

19  C, at 161-64.  From all that presently appears, new beds will not alleviate this problem but will

20  aggravate it.

21  　　　　AB 900 also includes provisions for rehabilitation programs and planning.  See

22  Declaration of Joan Petersilia, Ph.D. in Support of Defendants' Supplemental Brief in

23  Opposition to Plaintiffs' Motion for Referral to a Three-Judge Panel, filed May 24, 2007.

24  Defendants have formed an Expert Panel and a Rehabilitation Strike Team to review existing

25  rehabilitation programs and make recommendations for improvement of those programs.  Id. at

26  ¶¶ 3-5.  Defendants "anticipate" that "if CDCR fully implements" these recommendations, the

1   rate of parolees returning to custody could decrease by as much as 10%, or 8,100 inmates.  Id. at

2   ¶ 10.

3          Plaintiffs challenge, inter alia, the representations made by defendants concerning

4   the impact of this provision of AB 900 on prison overcrowding.  To this end, plaintiffs have

5   presented the declaration of an individual with thirty years in corrections planning and research

6   who is a member of the Expert Panel referred to in Dr. Petersilia's declaration.  See Declaration

7   of James Austin, Ph.D. in Support of Plaintiffs' Supplemental Reply Brief, filed June 1, 2007.  In

8   his declaration, Dr. Austin contends, inter alia, that Dr. Petersilia's estimate is incorrect for a

9   number of reasons and that even if 8,100 parolees do not violate their parole that will only save

10  2,000 beds per year.  Austin Declaration, at ¶ 16.  Dr. Austin also opines that "under the best of

11  circumstances it would take two to five years to design and begin to operate rehabilitation

12  services."  Id.

13         The Roadmap, filed by defendants on July 2, 2007, "provides an assessment of

14  the state of correctional programming in California's adult prison and parole systems" and

15  "includes recommendations intended to guide California in creating a model rehabilitation

16  programming system."  Roadmap, at vii.  The panel suggests that if all of the recommendations

17  contained in the Roadmap are adopted, "the state may significantly reduce the large number of

18  parolees who are currently violating their parole conditions and being returned to prison."  Id. at

19  xiv.  The Roadmap also contains recommended  "strategies that would reduce the number of

20  prison beds that California needs by 42,000 to 48,000."  Id.  The Roadmap contains a two year

21  timeline for implementing its major programming recommendations.  Id. at 54 and Appendix K.

22  Indeed, "resolving" prison overcrowding is described as a "precondition" to these efforts.  Id. at

23  xv.

24         It is clear that the Roadmap represents a preliminary, rather than an advanced,

25  stage of implementation of this aspect of AB 900.  See, e.g., Decl. of Joan Petersilia in Support

26  of Defendants' Additional Briefing On Plaintiffs' Motion to Convene Three-Judge Court, at ¶

1   12.  While parts of the Roadmap may be appropriate for consideration by a three-judge court,

2   neither it, nor any of the other material presented by defendants, contain a sufficiently immediate

3   response to the crisis in prison overcrowding that is presently preventing the delivery of

4   constitutionally adequate mental health care to members of the plaintiff class.

5          Review of the record before this court shows that, through AB 900, the State of

6   California has responded to the prison overcrowding crisis with legislation that requires the

7   construction of thousands of beds to increase the capacity of the prison system, development and

8   staffing of rehabilitation programs to reduce recidivism, and transfer of 8,000 inmates out of

9   state.  For the reasons discussed supra, none of these efforts will have any appreciable impact on

10  the severely overcrowded prisons in California for at least two years, if then.

11         As the Special Master reported on May 31, 2007, "[o]ver the past 11-plus years,

12  much has been achieved, and many of the achievements have succumbed to the inexorably rising

13  tide of population, leaving behind growing frustration and despair."  Special Master's May 31,

14  2007 Response, at 17.  Given the almost twelve years that this case has been in its remedial

15  phase, and given the constitutional considerations at stake, the direction in which the State has at

16  present chosen to go by enacting AB 900 simply fails to address in any timely way relief  from

17  the overcrowding crisis and its attendant impact.

18         After careful review of the record in this action, this court has come, with extreme

19  reluctance but firm conviction, to the conclusion that the overcrowding crisis in the CDCR is

20  preventing the delivery of constitutionally adequate mental health care to the plaintiff class and,

21  therefore, that some form of limitation on the inmate population must be considered.  For all of

22  the foregoing reasons, plaintiffs' motion will be granted and the court will forthwith request the

23  convening of a three-judge panel pursuant to 18 U.S.C. § 3626(a)(3) and 28 U.S.C. § 2284.

24         In accordance with the above, IT IS HEREBY ORDERED that plaintiffs'

25  November 13, 2006 motion to convene a three-judge panel to limit the prison population is

26  granted pursuant to 18 U.S.C. § 3626 (a)(3)(A).  The Clerk of the Court is directed to serve a

copy of this order on the Chief Judge of the United States Court of Appeals for the Ninth Circuit.

Moreover, for purposes of judicial economy and avoiding the risk of inconsistent judgment, the

court recommends that the instant case be assigned to the same three-judge panel requested by

the court in Plata v. Schwarzenegger, Case No. CIV 01-1351 TEH (N.D. Cal.).  The court wishes

to again observe that overcrowding is the State's problem and in the interim, the court again

urges the State to find its own solution to the crisis.

DATED: July 23, 2007.


LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT