PRISON LAW OFFICE
DONALD SPECTER Bar No. 83925
STEVEN FAMA Bar No. 99641
E. IVAN TRUJILLO Bar No. 228790
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No. 096891
JANE E. KAHN Bar No. 112239
AMY WHELAN Bar No. 215675
LORI RIFKIN Bar No. 244081
SARAH M. LAUBACH Bar No. 240526
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No. 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No. 158255
LEWIS BOSSING Bar No. 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　　Defendants | No.: Civ S 90-0520 LKK-JFM<br><br>**PLAINTIFFS' MOTION TO COMPEL DISPUTED ATTORNEYS' FEES AND COSTS FROM THE THIRD AND FOURTH QUARTERS OF 2006**<br><br>Date: September 6, 2007<br>Time: 11:00 a.m.<br>Place: Courtroom 26<br>Judge: Honorable John F. Moulds |

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................................i

TABLE OF AUTHORITIES ............................................................................................ii

NOTICE OF MOTION .................................................................................................... 1

INTRODUCTION ............................................................................................................ 1

STANDARD FOR RECOVERY OF ATTORNEYS' FEES AND COSTS ................... 4

ARGUMENT ................................................................................................................... 5

    I.    Work On The Overcrowding Motion Is Reasonable And Necessary To Protect The Interests Of The *Coleman* Class ........................................................... 5

        A.    Plaintiffs' Counsel Received Overwhelming Evidence About Overcrowding From A Wide Variety Of Sources, Including The Governor, The *Coleman* Special Master, The *Plata* Receiver And Defendants Themselves And This Court Agreed That A Three Judge Panel Is Necessary To Address These Issues ................................... 6

    II.    Work On The Motion For A Temporary Restraining Order Regarding Defendants' First Transfer Of 80 Prisoners To An Out-Of-State Facility Was Reasonable and Necessary ........................................................................ 8

        A.    At The Time Defendants Sought To Transfer Eighty (80) Prisoners Out Of State, Defendants Had Not Screened Even One (1) Of The Prisoners For Suicide Risk, Had Not Provided The *Coleman* Program Guide To The Tennessee Prison And Could Not Tell Plaintiffs Or The Special Master Any Details About The Number Or Type Of Mental Health Staff At The Tennessee Prison ........................ 9

    III.    The Discovery Motion ....................................................................................... 11

        A.    Plaintiffs' Discovery Motion Was Necessary Specifically Because Of Defendants' Legally Untenable Position And Refusal To Consider Any Solution Short Of An Absolute Bar On All Discovery ........................................................................................... 11

CONCLUSION ............................................................................................................. 13

# TABLE OF AUTHORITIES

## **CASES**

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*,
  369 F.3d 91 (2nd Cir. 2004) ................................................................................................. 5

*Armstrong v. Davis*,
  318 F.3d 965 (9th Cir. 2003) ............................................................................................. 12

*Case v. Unified Sch. Dist. No. 233*,
  157 F.3d 1243 (10th Cir.1998) ........................................................................................... 5

*City of Riverside v. Rivera*,
  477 U.S. 561 (1986) .......................................................................................................... 12

*Coleman v. Wilson*,
  912 F. Supp. 1282 (E.D. Cal. 1995) ................................................................................... 8

*Daniels v. McKinney*,
  146 Cal.App.3d 42 (1983) .................................................................................................. 4

*Gates v. Gomez*,
  60 F.3d 525 (9th Cir. 1995) ............................................................................................ 3, 4

*Hasbrouk v. Texaco, Inc.*,
  879 F.2d 632 (9th Cir. 1989) ..................................................................................... 3, 4, 12

*InvesSys, Inc. v. McGraw-Hill Cos.*,
  369 F.3d 16 (1st Cir. 2004) ................................................................................................. 5

*Plata v. Schwarzenegger*,
  N.D. Cal. 01-CIV-1351 (TEH) ..................................................................................*passim*

*Trustees of Const. Indus. and Laborers Health and Welfare Trust v. Redland Ins. Co.*,
  460 F.3d 1253 (9th Cir. 2006) ............................................................................................ 5

## **STATUTES**

42 U.S.C. § 1997e(d)(1)(B)(ii) .................................................................................................. 4

# NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on September 6, 2007,[1] at 11:00 a.m. or as soon thereafter as the matter may be heard in the United States District Court, 501 I Street, Sacramento, California, before the Honorable John F. Moulds, United States Magistrate Judge, in Courtroom 26, the plaintiff class will and hereby does move this Court for an order determining plaintiffs' entitlement to disputed attorneys' fees and cost for the third and fourth quarters of 2006.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities filed herewith, the supporting Declaration of Amy Whelan filed herewith, the exhibits attached thereto, the pleadings and papers on file in this matter, and such other evidence and arguments as may be presented to the Court at or before the time of the hearing.

# INTRODUCTION

This is a class action lawsuit challenging the adequacy of mental health care throughout the California Department of Corrections and Rehabilitation (CDCR). On September 13, 1995, the Honorable Lawrence K. Karlton issued an opinion finding for plaintiffs on virtually all of the claims advanced in this case. The opinion establishes that plaintiffs are the prevailing party and thereby also establishes plaintiffs' right to collect attorneys' fees for work performed in monitoring defendants' compliance with the District Court's September 13, 1995 Order and with all subsequent remedial orders issued by the Court.

After the September 1995 Order, the parties met and came to agreement on a procedure for the periodic collection of attorneys' fees. The agreed-upon procedure is set forth in a Stipulation and Order for Periodic Collection of Attorneys' Fees and Costs. *See* March 19,

---

[1] Due to a clerical error in the stipulation and proposed order setting the briefing schedule for this motion, the Court's June 24, 2007 Order set September 9, 2007 as the hearing date, which is a Sunday. The parties intended to set September 6, 2007 as the hearing date. Whelan Decl. ¶ 12.

1996 Stipulation and Order for Periodic Collection of Attorneys' Fees and Costs ("Periodic Fees Order"), attached as Exhibit B to the Declaration of Amy Whelan In Support of Plaintiffs' Motion To Compel Disputed Attorneys' Fees and Costs from the Third and Fourth Quarters of 2006 (hereinafter "Whelan Decl."), filed herewith.  Paragraph 4 of the Periodic Fees Order mandates a yearly motion to compel payment of attorneys' fees and costs that remain in dispute between the parties for any quarter in the previous year.  In 2006, plaintiffs and defendants were able to resolve all disputes regarding the first and second quarters, but left attorneys' fees and costs in dispute for the 3rd and 4th quarters.  After several meet and confer sessions and correspondence about these disputed amounts, the parties were unable to resolve them.

The present motion addresses plaintiffs' entitlement to attorneys' fees and costs for three disputed issues: (1) plaintiffs' work on the overcrowding motion or motion to convene a three-judge panel, (2) plaintiffs' work on a temporary restraining order prior to defendants' initial transfer of 80 state prisoners to an out-of-state facility in Tennessee, and (3) plaintiffs' work on the discovery motion filed in July of 2006.  Plaintiffs' counsel has incurred $94,558.19 in attorneys' fees and costs for these three categories of work.[2]  Whelan Decl. ¶ 3 and Ex. A (charts summarizing all disputed time and expenses by timekeeper and category of work).[3]  All of this work was "useful and necessary" to protect the interests of the *Coleman* class as required by the periodic fees order.  Whelan Decl. Ex. B at ¶ 7 ("the standard of

---

[2] Prior to submitting every quarterly bill to defendants, plaintiffs' counsel does a comprehensive review of the bills in order to exercise billing judgments.  During the meet and confer with defendants' counsel, plaintiffs' counsel also deducts additional time and expenses as an exercise of billing judgment.  Accordingly, the hours sought in this motion are only those remaining after extensive billing judgment reductions.  Specifically, plaintiffs' counsel deducted $37,300.30 in attorneys' fees (262.0 hours) and $644.50 in expenses in the third quarter of 2006 and $20,919.60 in attorneys' fees (128.70 hours) and $58.99 in expenses in the fourth quarter of 2006.  Whelan Decl. ¶ 4.

[3] Because this dispute concerns entitlement to fees and costs, rather than amounts, the Whelan Declaration includes summary charts of the attorneys' fees and costs incurred for the disputed motions, but does not include the voluminous and detailed billing records showing each time entry.  If the Court wants to review the time entries, plaintiffs' counsel will submit the relevant time records.

review to be applied to disputed billing items will be whether the services were useful and necessary…"). In order to be compensated, plaintiffs must show only that a reasonably prudent attorney would have performed the work at issue here. *Gates v. Gomez*, 60 F.3d 525, 534 (9th Cir. 1995); *Hasbrouk v. Texaco, Inc.,* 879 F.2d 632, 638 (9th Cir. 1989).

(1) <u>Overcrowding Motion</u>: In response to an overwhelming amount of evidence and conclusive admissions by the Governor in an official proclamation about overcrowding and its effect on the *Coleman* class, plaintiffs' attorneys were compelled to file this motion. As set forth in detail below, there is overwhelming evidence that overcrowding prevents defendants from providing constitutionally adequate mental health care and from complying with this Court's orders. The Court agreed with plaintiffs' motion and, on July 23, 2007, granted the motion to convene a three-judge panel to address overcrowding. *See* Docket 2320 at 13 ("After careful review of the record in this action, this court has come, with extreme reluctance but firm conviction, to the conclusion that the overcrowding crisis in the CDCR is preventing the delivery of constitutionally adequate mental health care to the plaintiff class and, therefore, that some form of limitation on the inmate population must be considered.").

(2) <u>Temporary Restraining Order Regarding Out of State Transfers</u>: In November of 2006, defendants gave plaintiffs' counsel and the Special Master two days notice before transferring 80 state prisoners to an out-of-state facility. During emergency meetings, defendants revealed that they had not appropriately screened the prisoners for mental health risk factors, had not provided the *Coleman* Program Guide to the out-of-state facility and had not included any language about the *Coleman* case in the contract with that facility. Plaintiffs' motion was necessary to protect the current and future mental health needs of the transferred prisoners and to ensure compliance with the Program Guide. The motion also established procedures for future transfers, including standardized mental health screenings for all potential candidates. Accordingly, plaintiffs' work on that motion is fully compensable.

(3) <u>Discovery Motion</u>: On March 3, 2006, the Court ordered defendants to implement the Revised Program Guide, but acknowledged plaintiffs' reservation of rights to litigate unresolved disputes about that document. Docket 1773. Plaintiffs recognized that

1 discovery would be necessary to address the factual basis of Program Guide disputes, and
2 requested that formal discovery be reopened under the Federal Rules of Civil Procedure. At
3 the time plaintiffs sought to reopen discovery, defendants took the extreme position that
4 plaintiffs were not entitled to any discovery at all in the consent phase of the *Coleman* case.
5 Defendants refused to state a legal basis for this position and, when presented with a plan to
6 resolve discovery disputes, refused to negotiate at all. Accordingly, the motion was necessary
7 and reasonable to protect the interests of the *Coleman* class.

## STANDARD FOR RECOVERY OF ATTORNEYS' FEES AND COSTS

Plaintiffs are the prevailing party in the *Coleman* case and are entitled to recover reasonable attorneys' fees and costs. As set forth in the *Coleman* Periodic Fees Order, "the standard of review to be applied to disputed billing items will be whether the services were useful and necessary to ensure compliance with the Decision and Order dated September 13, 1995." Whelan Decl., Ex. B at ¶ 7. This criterion comports with current law, which holds that the standard applied to monitoring activities is "whether the services were reasonably performed during the pendency of the consent decree." *Gates v. Gomez*, 60 F.3d 525, 534 (9th Cir. 1995) (citation omitted); *see also* 42 U.S.C. § 1997e(d)(1)(B)(ii) (fees and costs should be awarded when "the fee was directly and reasonably incurred in enforcing the relief ordered for the violation"); *Daniels v. McKinney*, 146 Cal.App.3d 42, 54-55 (1983) (post-judgment fees awarded for work to enforce prior court order, even though court declined to hold defendant in contempt). All work spent enforcing the rights of the *Coleman* class is compensable if it, "at the time rendered, would have been undertaken by a reasonable and prudent lawyer to advance or protect his client's interest..." *Hasbrouk v. Texaco, Inc.,* 879 F.2d 632, 638 (9th Cir. 1989).

# ARGUMENT

## I. Work On The Overcrowding Motion Is Reasonable And Necessary To Protect The Interests Of The *Coleman* Class

Through the third and fourth quarters of 2006, plaintiffs' counsel spent 280.6 hours developing and working on the overcrowding motion, or $47,097.65 in attorneys' fees at the very highly-discounted rates required by the Prison Litigation Reform Act (PLRA).[4] Plaintiffs also incurred $4,927.11 in expenses for this work, including $4,864.35 in Westlaw charges and $62.76 in other expenses.[5] Defendants dispute all fees and expenses on the overcrowding motion. On July 23, 2007, Judge Karlton granted the underlying motion and ordered that the overcrowding crisis be referred to a three-judge panel for consideration of available remedies, including a population restriction. Docket 2320.

---

[4] Plaintiffs' counsel are compensated at PLRA rates for their work on this case, which are far below market value. Pursuant to the PLRA, all of plaintiffs' attorneys are compensated at a rate of $169.50 per hour regardless of experience. For instance, Michael Bien and Donald Specter's 2006 hourly rate was $535.00, several hundred dollars more than their hourly rate in this case. At market rates, the disputed fees regarding the overcrowding motion would be $90,112.50 (not $47,097.65) or nearly double the amount sought here. Whelan Decl. ¶ 6.

[5] Westlaw charges are compensable: "Neither tradition nor statutory usage distinguishes computer-based legal research costs from attorney's fees." *Trustees of Const. Indus. and Laborers Health and Welfare Trust v. Redland Ins. Co.*, 460 F.3d 1253, 1258 (9th Cir. 2006) (citations omitted); see also *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 369 F.3d 91, 98 (2nd Cir. 2004) ("If [the firm] normally bills its paying clients for the cost of online research services, that expense should be included in the fee award."); *InvesSys, Inc. v. McGraw-Hill Cos.*, 369 F.3d 16, 22 (1st Cir. 2004) ("[C]omputer-assisted research should be... reimbursed under attorney's fee statutes…so long as the research cost is in fact paid by the firm to a third-party provider and is customarily charged by the firm to its clients as a separate disbursement."); *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1257-58 (10th Cir. 1998) ("Reasonable expenses incurred in representing a client in a civil rights case [such as Westlaw charges] should be included in the attorney's fee award if such expenses are usually billed in addition to the attorney's hourly rate."). Plaintiffs' counsel regularly bills their clients for Westlaw charges and, in fact, defendants in this case routinely pay for such charges. Whelan Decl. ¶ 7.

A. **Plaintiffs' Counsel Received Overwhelming Evidence About Overcrowding From A Wide Variety Of Sources, Including The Governor, The *Coleman* Special Master, The *Plata* Receiver And Defendants Themselves And This Court Agreed That A Three Judge Panel Is Necessary To Address These Issues**

Plaintiffs' counsel have long observed and understood the dangerous effects overcrowding in the state prisons has on *Coleman* class members. After receiving information from many sources, including class members, prison tour reports, the Special Master's team, the *Plata* Receiver and defendants themselves, plaintiffs' counsel determined that severe overcrowding in the prison system prohibits defendants from providing constitutionally adequate mental health care to the *Coleman* class.

The Governor's office, for instance, was an essential source of information regarding the overcrowding crisis. In October of 2006, the Governor issued an emergency proclamation about the crisis, finding that, "conditions of extreme peril to the safety of persons and property exist in the 29 CDCR prisons identified [in the proclamation], due to severe overcrowding, and [] the magnitude of the circumstances exceeds the capabilities of the services, personnel, equipment, and facilities of any geographical area in this state." Docket 2038, Ex. A. The Governor also referred to the overcrowding crisis three months later during his State of the State address:

> Our prisons are in crisis. We have inherited a problem that was put off year after year after year. Last year I called a special session to address the crisis. That session was not successful, so I declared a state of emergency. It is still an emergency. Our prison system is a powder keg. It poses a danger to the prisoners, a danger to the officers…We have thousands of prisoners housed in gymnasiums, TV rooms, dining rooms, hallways, anywhere there is space. You all know 172,000 prisoners in facilities designed to hold about 100,000. That is a danger and that is a disgrace.

Docket 2240, Ex. F.

Details about overcrowding and its dire effects on the *Coleman* class were also repeatedly documented in the *Coleman* Special Master's monitoring reports, which were issued both before and after the date plaintiffs initiated this motion. If there was ever any doubt of the deleterious effects of overcrowding on mental health care or the *Coleman* class, the Special Master's reports abolished that doubt and created a concrete link between overcrowding and

the CDCR's floundering mental healthcare delivery system. *See, e.g.,* Docket 1746 at 421 ("long waiting lists for these beds [MHCBs, PSUs and DMH inpatient beds] mean that suicidal and other seriously mentally ill and violent inmates lack access to clinically necessary levels of monitoring and treatment."); Docket 1969 at 2 ("[T]he severe shortage of intermediate inpatient and mental health crisis beds…left critically mentally ill inmates languishing in horrific conditions without access to immediately necessary mental health care."); Docket 2140 at 124 (there is a "crisis in the availability of mental health crisis beds, attributable in large part…to the defendants' increasing population crunch"). In the final installment of the Seventeenth report, the Special Master focused on the sister problem to overcrowding, severe mental health staffing shortages. Without sufficient staff, there is no way to provide constitutionally adequate mental healthcare to the ever-expanding *Coleman* class:

> The principal problem identified in this report is the lack of adequate mental health staff in the CDCR institutions…The clinical staffing shortage is not only serious; it is worsening. Since the end of the 17th monitoring period, the rate of vacancies has grown from critical to catastrophic proportions. As of early 2007, vacancies among allocated positions for psychiatrists, case managers (psychologists and psychiatric social workers) and psych techs hovered at the rate of fifty percent.

Docket 2274 at 181-82. In other words, just as the class increased to the highest level in the history of the *Coleman* case, staffing levels reached all-time lows.

Because plaintiffs' counsel coordinated the *Coleman* overcrowding motion with a similar motion in *Plata v. Schwarzenegger,* N.D. Cal. 01-CIV-1351 (TEH) (regarding prison medical care), the *Plata* Receiver also investigated overcrowding and became a valuable source of information for later briefing. The Receiver issued a report in May of 2007, for instance, that outlined in horrifying detail the manner in which defendants have knowingly and intentionally designed a prison system to warehouse human beings, planning to cram them into prisons at almost double the design occupancy rate while deliberately failing to provide adequate clinical space to allow for basic medical and mental health care mandated by the Constitution. *See Plata* Docket 673 at 20 ("Th[e] CDCR policy and practice, for more than twenty years, to limit health care space…to only the base staffing level of the institution,

ignoring pre-existing plans to double-cell the prison up to 200 percent capacity, adversely impacts the daily medical, mental health, and dental operations…"). The Receiver also observed that CDCR's Facility Master Plans fail to address overcrowding-driven problems with the delivery of health services, "focus[ing] on corrections, as if medical, mental health, and dental care have no place in prison design, prison construction, or prison management." *Id.* at 11.

Finally, defendants themselves have been a constant source of information about the overcrowding crisis and its link to constitutionally inadequate mental health care for the *Coleman* class. This Court held more than a decade ago that "[t]he obligation to provide for the basic human needs of prisoners includes a requirement to provide access to adequate mental health care." *Coleman v. Wilson*, 912 F. Supp. 1282, 1298 (E.D. Cal. 1995). The provision of that care is impossible in a system now so flooded that defendants, at the time the overcrowding motion was filed, could not commit to building adequate numbers of mental health care beds any sooner than 2011! *See, e.g.* Docket 1969 at 27 (plan for beds now scheduled for completion no earlier than 2011).

In light of the overwhelming evidence about overcrowding from a variety of sources, including class members, defendants, the Special Master's team, and the *Plata* Receiver, it was not simply reasonable for plaintiffs' counsel to file the overcrowding motion, it was necessary. Moreover, by granting the motion, the Court has already agreed that the motion was reasonable and necessary and therefore fully compensable.

## II. Work On The Motion For A Temporary Restraining Order Regarding Defendants' First Transfer Of 80 Prisoners To An Out-Of-State Facility Was Reasonable And Necessary

Defendants also dispute $12,777.35 in fees at PLRA rates[6] and $99.37 in costs related to plaintiffs' motion for a temporary restraining order ("TRO") regarding the initial transfer of 80 prisoners to an out-of-state facility. Specifically, plaintiffs' counsel spent 76.1 hours preparing

---

[6] At plaintiffs' attorneys' market rates, the disputed attorneys' fees for the TRO would be $27,092.50, more than twice the amount of fees sought here. Whelan Decl. ¶ 8.

1   the motion and supporting documents, meeting with defendants and the Special Master's team
2   about the transfers and preparing for and attending two hearings before Judge Karlton, one on
3   November 3, 2006 and the other on November 9, 2006.  Whelan Decl. ¶ 8.  All of this time
4   was reasonable and necessary to protect the interests of the *Coleman* class and to enforce
5   compliance with the *Coleman* Program Guide.

**A. At The Time Defendants Sought To Transfer Eighty (80) Prisoners Out Of State, Defendants Had Not Screened Even One (1) Of The Prisoners For Suicide Risk, Had Not Provided The *Coleman* Program Guide To The Tennessee Prison And Could Not Tell Plaintiffs Or The Special Master Any Details About The Number Or Type Of Mental Health Staff At The Tennessee Prison**

10  On November 1, 2006, defendants informed plaintiffs' counsel and the Special Master
11  that they intended to transfer eighty (80) CDCR prisoners to an out-of-state prison in
12  Tennessee within 48 hours.  Docket 2017 ¶ 2.  Plaintiffs' counsel learned during the course of
13  the day that the transfers were potentially dangerous to the *Coleman* class in several ways.
14  Despite the fact that the Program Guide applies to *all* CDCR prisoners and not just *Coleman*
15  class members, for instance, defendants had not conducted any mental health screenings of the
16  80 prisoners for suicide or other risk factors despite the obvious stress that a transfer might
17  cause.  Docket 2017 ¶ 13.  Defendants also failed to include any language about *Coleman* in
18  the contract with the Tennessee facility, failed to provide the facility with copies of the
19  Program Guide and, as of one day before the transfers were to occur, could not say how many
20  or what type of clinical mental health staff would be available in the out-of-state prison.
21  Docket 2017 ¶¶ 13-14.  The Special Master sent a letter to defendants on November 1, 2007
22  raising serious concerns about defendants' screening procedures.  *Id.* at ¶ 3 and Ex. A.  More
23  specifically, the Special Master wanted defendants to exclude any non-*Coleman* caseload
24  prisoners with recent or serious suicide attempts, former patients at EOP, MHCB, PSU or
25  inpatient levels of care and prisoners with prior *Keyhea* orders.  *Id.*
26  On November 2, 2006, the day after defendants gave notice of the imminent transfers,
27  the parties had phone calls to discuss these serious issues.  Docket 2017 ¶ 13-14.  During that
28  call, defendants could not say whether they had complied with the Special Master's screening

1 provisions, could not say what clinical staff were available at the Tennessee prison, admitted
2 that they had not yet provided the prison with a copy of the Program Guide, and failed to
3 provide any real details about mental health care at the out-of-state facility or the prison's
4 ability to comply with the Court-ordered Program Guide.  *Id.*  During a second phone call later
5 that same day, defendants provided some additional information about the transfers, but still
6 failed to exclude former caseload prisoners from the list as requested by the Special Master.
7 Defendants also reported that the only mental health clinician at the prison was a single
8 psychiatrist providing care to 600 prisoners for only four hours per week.[7]  *Id.*  Despite these
9 serious problems and the risk they posed to existing and future *Coleman* class members,
10 defendants would not agree to halt the imminent transfers, prompting plaintiffs to file the
11 motion for a TRO and preliminary injunction.

12 Plaintiffs' motion was necessary to protect the interests of the *Coleman* class and to
13 ensure defendants' compliance with the Program Guide.  Indeed, as a direct result of this
14 motion, the Court issued significant orders that protected both the initial and subsequent waves
15 of transferred prisoners.  The Court ordered defendants to send a mental health clinician on the
16 first plane and to conduct appropriate screenings and file reviews of the transferred prisoners
17 upon arrival.  Docket 2025.  The Court also mandated that defendants immediately return any
18 prisoners identified as *Coleman* class members or who had other risk factors identified by the
19 Special Master.  *Id.*  As for future transfers of prisoners, the Court prohibited defendants from
20 transferring any other prisoners out of state who had not been properly screened for suicide
21 risk and other mental health factors.  *Id.*  Finally, defendants were ordered to appear at a
22 second hearing to provide additional information about out-of-state transfers and the effects on
23 the *Coleman* class.  *Id.*

---

[7] The Special Master clarified at the hearing on November 9, 2006 that the Tennessee prison actually had additional mental health staff available.  At the time plaintiffs filed this motion, however, everyone, including defendants, believed that there was only one psychiatrist at the prison working four hours per week on behalf of 600 prisoners.  Whelan Decl. ¶ 9.

1   Defendants created a dangerous situation for prisoners when it sought to transfer them
2   out-of-state without appropriate mental health screening and before ensuring that the outside
3   facilities had the knowledge and staff to comply with the *Coleman* Program Guide. Plaintiffs'
4   counsel had no choice but to file the motion for a TRO and defendants should be ordered to
5   pay for the associated attorneys' fees and costs involved in that motion, all of which are
6   compensable.

## III.    The Discovery Motion

Defendants also dispute $29,272.40 in attorneys' fees at PLRA rates[8] and $384.31 in expenses related to plaintiffs' July 2006 motion to compel discovery. Whelan Decl. ¶ 10.

On March 3, 2006, the Court ordered defendants to implement the Revised Program Guide. Docket No. 1773. The Court acknowledged that plaintiffs reserved their rights to address several disputed items and set a Status Conference to discuss the manner and timing by which remaining unresolved issues concerning the Revised Program Guide would be addressed. *Id.* Plaintiffs recognized that discovery would be necessary to address the factual basis of Program Guide disputes, and requested that formal discovery be reopened under the Federal Rules of Civil Procedure. On May 25, 2006, Judge Karlton referred this issue to this Court. Docket 1822. In the intervening months before a status conference statement was due, plaintiffs and defendants were able to reach agreement about several other Program Guide issues, but some disputes remained. *See* Docket 1826 at 1-4 (setting forth the issues that the parties were able to resolve).

### A.    Plaintiffs' Discovery Motion Was Necessary Specifically Because Of Defendants' Legally Untenable Position And Refusal To Consider Any Solution Short Of An Absolute Bar On All Discovery

At the time plaintiffs' counsel filed the motion to obtain discovery regarding disputed Program Guide issues, defendants took the extreme position that plaintiffs were not entitled to

---

[8] At plaintiffs' attorneys' market rates, the disputed attorneys' fees for the discovery motion would be $54,677.00. Whelan Decl. ¶ 10.

1 any discovery whatsoever during the monitoring phase of the *Coleman* case. Docket 1828 at 5
2 (Defendants 6/2/06 Discovery Conference Statement) ("[T]he post-trial status of this case
3 makes any sought discovery untimely under the Federal Rules of Civil Procedure, Rules 26
4 and 30…Indeed, the discovery phase of *Coleman* ended years ago with the completion of the
5 trial and entry of judgment. The discovery statutes do not provide for discovery during the
6 remedial phase of a class action suit.").

7     The Ninth Circuit has clearly held that prevailing plaintiffs are "entitled to recover a
8 reasonable attorney's fee for every item of service which, *at the time rendered,* would have
9 been undertaken by a reasonable and prudent lawyer to advance or protect his client's
10 interest…" *Hasbrouk v. Texaco, Inc.*, 879 F.2d 632, 638 (9th Cir. 1989) (emphasis added); *see*
11 *also, Armstrong v. Davis*, 318 F.3d 965, 971 (9th Cir. 2003) (applying *Hasbrouk* to prisoner
12 civil rights cases). The Program Guide is perhaps the most important aspect of the *Coleman*
13 case because it sets forth standards and procedures for every aspect of prison life affecting
14 mental health care. Whelan Decl. ¶ 11 (Program Guide addresses mental health assessments in
15 receptions centers; the Correctional Clinical Case Management System (CCCMS), Enhanced
16 Outpatient Program (EOP), Mental Health Crisis Bed (MHCB) and inpatient levels of care; the
17 appropriate treatment of caseload and non-caseload prisoners in administrative segregation
18 (AdSeg), security housing units (SHUs), and psychiatric security units (PSUs), and; suicide
19 prevention and response, among other topics). Nevertheless, at the time plaintiffs developed
20 and filed the discovery motion, defendants refused to produce any evidence about the disputed
21 sections of the Program Guide. In light of this extreme position, plaintiffs had no choice but to
22 file a motion seeking to establish the "fundamental right of plaintiffs' counsel to conduct
23 reasonable and focused discovery." Docket 1826 at 5 (Plaintiffs' Discovery Conference
24 Statement); *see also City of Riverside v. Rivera*, 477 U.S. 561, 581 (1986) ("The government
25 cannot litigate tenaciously and then be heard to complain about the time necessarily spent by
26 the plaintiff in response.").

27     On September 28, 2006, Magistrate Judge Moulds declined to reopen discovery
28 generally, but stated that he would consider doing so in "a specific factual and legal context."

Docket 1988 at 3.[9]  Plaintiffs have thus succeeded in making discovery available to the class as a tool in resolving Program Guide issues.  The work was reasonable and necessary on behalf of the *Coleman* class and is thus fully compensable.

## CONCLUSION

For all of the reasons stated above, plaintiffs' counsel seeks compensation for the reasonable attorneys' fees and costs spent on the overcrowding motion, the motion for a temporary restraining order regarding defendants' initial transfer of 80 prisoners to an out-of-state facility and the motion seeking to reopen discovery regarding disputed Program Guide issues.  Plaintiffs' attorneys have already made extensive billing judgment reductions to the 3rd and 4th quarter bills, leaving $94,558.19 in compensable, but unpaid attorneys' fees and costs for these three categories of work.

Plaintiffs request that the Court issue an order finding that the above-described disputed professional services and costs are compensable under the applicable legal standard, in that the work performed and the costs incurred were useful and necessary to protect the rights of the *Coleman* class, and ordering the parties to complete a meet and confer regarding the amounts to be paid within 30 days of the Court's order.

Dated:  July 25, 2007                           Respectfully submitted,

                                                 */s/ Amy Whelan*
                                                Amy Whelan
                                                Rosen, Bien & Galvan
                                                Attorneys for Plaintiffs

---

[9] Judge Moulds also denied plaintiffs' request to receive all of the *Coleman* tour binders without prejudice, thereby leaving this issue open for future resolution.  Docket 1988 at 4.