1  PRISON LAW OFFICE
   DONALD SPECTER Bar No. 83925
2  STEVEN FAMA Bar No. 99641
   E. IVAN TRUJILLO Bar No. 228790
3  General Delivery
   San Quentin, California 94964
4  Telephone: (415) 457-9144

5  ROSEN, BIEN & GALVAN, LLP
   MICHAEL W. BIEN Bar No. 096891
6  JANE E. KAHN Bar No. 112239
   AMY WHELAN Bar No. 215675
7  LORI RIFKIN Bar No. 244081
   SARAH M. LAUBACH Bar No. 240526
8  315 Montgomery Street, 10th Floor
   San Francisco, California 94104
9  Telephone: (415) 433-6830

10 THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
11 CLAUDIA CENTER Bar No. 158255
   LEWIS BOSSING Bar No. 227402
12 600 Harrison Street, Suite 120
   San Francisco, CA 94107
13 Telephone: (415) 864-8848

14 Attorneys for Plaintiffs

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No. 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

15              UNITED STATES DISTRICT COURT

16              EASTERN DISTRICT OF CALIFORNIA

17 RALPH COLEMAN,                          ) No.: Civ S 90-0520 LKK-JFM
                                           )
18        Plaintiffs,                      ) **DECLARATION OF AMY WHELAN IN**
                                           ) **SUPPORT OF PLAINTIFFS' MOTION**
19 vs.                                     ) **TO COMPEL DISPUTED ATTORNEYS'**
                                           ) **FEES AND COSTS FROM THE THIRD**
20 ARNOLD SCHWARZENEGGER, et al.,          ) **AND FOURTH QUARTERS OF 2006**
                                           )
21        Defendants                       ) Date:  September 6, 2007
                                           ) Time:  11:00 a.m.
22 _____  Place: Courtroom 26_
                                             Judge: Honorable John F. Moulds
23

24

25

26

27

28

I, Amy Whelan, do hereby declare under penalty of perjury as follows:

1.    I am an attorney admitted to practice law in California and an associate in the law firm Rosen, Bien & Galvan, LLP, one of the counsel of record for the plaintiff class in this case. I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify. I make this declaration in support of "Plaintiffs' Motion to Compel Disputed Attorneys' Fees and Costs from the Third and Fourth Quarters of 2006."

2.    I conducted the meet and confer sessions regarding disputed attorneys' fees and costs incurred during the third and fourth quarters of 2006. I had several telephone calls with Michael Stone, an attorney for the California Department of Corrections and Rehabilitation during which we tried to resolve all of these disputes. After several such phone calls and written correspondence regarding these amounts, we were unable to reach agreement regarding three categories of work. These include entitlement to any fees and costs for (1) plaintiffs' work on the overcrowding motion or motion to convene a three-judge panel, (2) plaintiffs' work on a temporary restraining order prior to defendants' initial transfer of 80 state prisoners to an out-of-state facility in Tennessee, and (3) plaintiffs' work on the discovery motion filed in July of 2006.

3.    Plaintiffs' counsel seek a total of $94,558.19 in attorneys' fees and costs for these three categories of work. Attached hereto as **Exhibit A** are three charts that summarize the work performed on these three issues. The first chart is a summary chart that lists the total disputed fees and costs by topic. The second and third charts show the disputed fees and costs for the third and fourth quarters respectively, both of which list the timekeepers and hours worked on each disputed category of work.

4.    Prior to submitting every quarterly bill to defendants, I review every time entry in order to exercise billing judgments. I typically deduct time, for instance, that I determine may have been administrative in nature, duplicative of another staff member's work or in some way inefficient. During the meet and confer with defendants' counsel, I also deduct additional time and expenses as an exercise of billing judgment. Accordingly, the hours sought in this motion are only those remaining after extensive billing judgment reductions. Specifically, I

deducted $37,300.30 in attorneys' fees (262.0 hours) and $644.50 in expenses in the third quarter of 2006. I made those deductions either as billing judgments before submitting the detailed time runs to defendants or I made them during the meet and confer process. I also deducted $20,919.60 in attorneys' fees (128.70 hours) and $58.99 in expenses in the fourth quarter of 2006.

5.        Attached hereto as **Exhibit B** is a true and correct copy of the March 19, 1996 Stipulation and Order for Periodic Collection of Attorneys' Fees and Costs in the *Coleman* case. Pursuant to Paragraph 7, "[t]he standard of review to be applied to disputed billing items will be whether the services were useful and necessary to ensure compliance with the Decision and Order dated September 13, 1995."

6.        In the third and fourth quarters of 2006, plaintiffs' counsel spent 280.6 hours developing and working on the overcrowding motion, or $47,097.65 in attorneys' fees at the very highly-discounted rates required by the PLRA. Plaintiffs also spent $4,927.11 in out of pocket expenses related to the overcrowding work. Plaintiffs' attorneys are compensated at Prison Litigation Reform Act ("PLRA") rates for their work on this case, which are far below market value. Pursuant to the PLRA, all of plaintiffs' attorneys are compensated at a rate of $169.50 per hour regardless of experience. For instance, Michael Bien and Donald Specter's 2006 hourly rate was $535.00, several hundred dollars more than their $169.50 hourly rate in this case. At my direction, Pamela Derrico, a senior paralegal in my office, applied 2006 regular market billing rates to the disputed hours at issue in this motion. At market rates, the disputed fees regarding the overcrowding motion would be $90,112.50 (not $47,097.65) or nearly double the amount sought here.

7.        Of the $4,927.11 in expenses related to the overcrowding motion, $4,864.35 consists of Westlaw charges for legal research. My firm regularly bills our clients for Westlaw charges and, in fact, defendants in this case routinely pay for such charges.

8.        Plaintiffs' counsel incurred $12,777.35 in attorneys' fees at PLRA rates and $99.37 in costs related to plaintiffs' motion for a temporary restraining order ("TRO") regarding the initial transfer of 80 prisoners to an out-of-state facility in Tennessee. This work

included 76.1 hours spent preparing the motion and supporting documents, meeting with defendants and the Special Master's team about the transfers and preparing for and attending two hearings before Judge Karlton, one on November 3, 2006 and the other on November 9, 2006.  At my direction, Pamela Derrico, a senior paralegal in my office, applied 2006 regular market billing rates to the disputed hours at issue in this motion.  At market rates, the disputed fees regarding the TRO would be $27,092.50, more than twice the amount of fees sought here.

9.    I reviewed the transcript from the November 9, 2006 hearing before Judge Karlton regarding defendants' initial transfer of 80 prisoners to an out-of-state facility in Tennessee.  There was also a hearing before Judge Karlton on November 3, 2006.  The Special Master clarified at the November 9th hearing that the Tennessee prison had several mental health staff available for prisoner care.  At the time plaintiffs filed the motion for a TRO, however, everyone, including defendants, believed that there was only one psychiatrist at the prison working four hours per week on behalf of 600 prisoners.  A true and correct copy of the transcript from the November 9, 2006 hearing is attached hereto as **Exhibit C.**  The Special Master's clarification regarding the Tennessee mental health staff occurs at pages 6-7.

10.    Plaintiffs' counsel incurred $29,272.40 in attorneys' fees at PLRA rates and $384.31 in expenses related to plaintiffs' July 2006 motion to compel discovery.  At my direction, Pamela Derrico, a senior paralegal in my office, applied 2006 regular market billing rates to the disputed hours at issue in this motion.  At market rates, the disputed fees regarding the discovery motion would be $54,577.00.

11.    The Program Guide is perhaps the most important aspect of the *Coleman* case because it sets forth standards and procedures for every aspect of prison life affecting mental health care.  The Program Guide, for instance, addresses mental health assessments in receptions centers.  It also sets forth standards for the Correctional Clinical Case Management System (CCCMS), Enhanced Outpatient Program (EOP), Mental Health Crisis Bed (MHCB) and inpatient levels of care.  The Program Guide also sets forth standards and procedures regarding the appropriate treatment of caseload and non-caseload prisoners in administrative

1    segregation (AdSeg), security housing units (SHUs), and psychiatric security units (PSUs), as

2    well as policies and procedures for suicide prevention and response, among other topics.

3        12.    When I prepared the stipulation and proposed order setting the briefing schedule

4    for this motion, I accidentally included September 9, 2007 as the hearing date rather than

5    September 6, 2007.  When I negotiated the stipulation with Lisa Tillman and Michael Stone,

6    however, we discussed and agreed that September 6, 2007 would be the hearing date.

7        I declare under penalty of perjury under the laws of California and the United States that

8    the foregoing is true and correct and that this declaration is executed in San Francisco,

9    California on July 25, 2007.

10

11        _/s/ Amy Whelan_____
          Amy Whelan

Exhibit A

## Coleman v. Schwarzenegger

### Summary Of Disputed Fees - 3rd & 4th Quarterly Statements, 2006
### (July 1, 2006 through December 31, 2006)

| Monitoring Work (489-3) | Disputed 3rd Quarter | Disputed 4th Quarter | Disputed Totals |
|---|---|---|---|
| Overcrowding | $ 169.50 | $ 46,928.15 | $ 47,097.65 |
| Discovery | $ 26,749.70 | $ 2,522.70 | $ 29,272.40 |
| Out-of-State | $ - | $ 12,777.35 | $ 12,777.35 |
| Totals: | $ 26,919.20 | $ 62,228.20 | $ 89,147.40 |

| Monitoring Costs (489-3) | Disputed 3rd Quarter | Disputed 4th Quarter | Disputed Totals |
|---|---|---|---|
| Overcrowding | $ - | $ 4,927.11 | $ 4,927.11 |
| Discovery | $ 127.01 | $ 257.30 | $ 384.31 |
| Out-of-State | $ - | $ 99.37 | $ 99.37 |
| Totals: | $ 127.01 | $ 5,283.78 | $ 5,410.79 |

| Grand Totals: | $ 27,046.21 | $ 67,511.98 | $ 94,558.19 |
|---|---|---|---|

Exhibit A to Whelan Decl.

Summary of Disputed Fees

7/24/2007

## Coleman v. Schwarzenegger

### Summary Of Disputed Fees - 3rd Quarterly Statement, 2006
(July 1, 2006 through September 30, 2006)

**Monitoring Work (489-3)**

| ROSEN BIEN & GALVAN | Hours Remaining In Dispute After Meet and Confer | STILL IN DISPUTE Overcrowding Hours | STILL IN DISPUTE Discovery Hours | PLRA Rate | Fees Remaining In Dispute After Meet and Confer |
|---|---|---|---|---|---|
| Michael W. Bien (MWB) | 25.00 | 0.50 | 22.50 | $169.50 | $ 4,237.50 |
| Ernest Galvan (EG) | 0.20 | 0.00 | 0.20 | $169.50 | $ 33.90 |
| Jane E. Kahn (JEK) | 26.10 | 0.50 | 23.60 | $169.50 | $ 4,423.95 |
| Thomas Nolan (TN) | 17.70 | 0.00 | 17.70 | $169.50 | $ 3,000.15 |
| Lori E. Rifkin (LER) | 82.90 | 0.00 | 80.60 | $169.50 | $ 14,051.55 |
| Kim Le (KTL) | 0.50 | 0.00 | 0.50 | $160.00 | $ 80.00 |
| Nathan J. Kleiner (NJK) | 5.70 | 0.00 | 5.70 | $160.00 | $ 912.00 |
| Sofia A. Millham (SAM) | 3.50 | 0.00 | 2.00 | $160.00 | $ 560.00 |
| Katherine Johnson-Silk (KJS) | 5.80 | 0.00 | 5.80 | $160.00 | $ 928.00 |
| Sean Donovan (SD) | 0.60 | 0.00 | 0.00 | $150.00 | $ 90.00 |
| **Total Hours:** | **168.00** | **1.00** | **158.60** | | **$ 26,919.20** |
| **Total Amount:** | | **$169.50** | **$ 26,749.70** | | |

**Costs (489-3)**

| | Overcrowding | Discovery | Costs Still in Dispute |
|---|---|---|---|
| Discovery Hearing Costs (Travel) | $ - | $ 127.01 | $ 127.01 |
| **Total:** | **$ -** | **$ 127.01** | **$ 127.01** |

**Total Fees & Costs Still Disputed (3rd Quarter):**    **$ 27,046.21**

Exhibit A to Whelan Decl.

7/24/2007

## Coleman v. Schwarzenegger

### Summary Of Disputed Fees - 4th Quarterly Statement, 2006
### (October 1, 2006 through December 31, 2006)

*Monitoring Work (489-3)*

| ROSEN BIEN & GALVAN | Hours Remaining In Dispute After Meet and Confer | Overcrowding Hours | Discovery Hours | Out-of-State Hours | PLRA Rate | Fees Remaining In Dispute After Meet and Confer |
|---|---|---|---|---|---|---|
| Michael W. Bien (MWB) | 86.30 | 65.30 | 0.00 | 21.00 | $169.50 | $ 14,627.85 |
| Jane E. Kahn (JEK) | 33.30 | 21.40 | 0.30 | 11.60 | $169.50 | $ 5,644.35 |
| Thomas Nolan (TN) | 0.50 | 0.00 | 0.00 | 0.50 | $169.50 | $ 84.75 |
| Ernest Galvan (EG) | 0.80 | 0.80 | 0.00 | 0.00 | $169.50 | $ 135.60 |
| Anne Mania (AHM) | 0.20 | 0.20 | 0.00 | 0.00 | $169.50 | $ 33.90 |
| Amy E. Whelan (AEW) | 1.10 | 1.10 | 0.00 | 0.00 | $169.50 | $ 186.45 |
| Lori E. Rifkin (LER) | 146.60 | 120.20 | 12.60 | 13.80 | $169.50 | $ 24,848.70 |
| Sarah L. Laubach (SML) | 25.60 | 14.30 | 0.00 | 11.30 | $169.50 | $ 4,339.20 |
| Kim Le (KTL) | 1.00 | 0.50 | 0.00 | 0.50 | $160.00 | $ 160.00 |
| Nathan J. Kleiner (NJK) | 19.50 | 14.10 | 0.00 | 5.40 | $160.00 | $ 3,120.00 |
| Sofia A. Millham (SAM) | 38.50 | 31.50 | 0.30 | 6.70 | $160.00 | $ 6,160.00 |
| Katherine Johnson–Silk (KJS) | 1.10 | 0.90 | 0.00 | 0.20 | $160.00 | $ 176.00 |
| Katie Richardson (KMR) | 0.90 | 0.90 | 0.00 | 0.00 | $150.00 | $ 135.00 |
| **Total Hours:** | **355.40** | **271.20** | **13.20** | **71.00** | | |
| **Total Amount:** | | **$ 45,504.35** | **$ 2,234.55** | **$ 11,912.90** | | **$ 59,651.80** |

| PRISON LAW OFFICE | Hours Remaining In Dispute After Meet and Confer | Overcrowding Hours | Discovery Hours | Out-of-State Hours | PLRA Rate | Fees Remaining In Dispute After Meet and Confer |
|---|---|---|---|---|---|---|
| Donald Specter (DS) | 12.90 | 8.10 | 0.00 | 4.80 | $169.50 | $ 2,186.55 |
| Ivan Trujillo (IT) | 2.30 | 0.30 | 1.70 | 0.30 | $169.50 | $ 389.85 |
| Jessica Bol (JB) | 0.50 | 0.00 | 0.00 | 0.00 | $160.00 | $ 0.00 |
| **Total Hours:** | **15.70** | **8.40** | **1.70** | **5.10** | | |
| **Total Amount:** | | **$1,423.80** | **$288.15** | **$864.45** | | **$ 2,576.40** |
| **Totals:** | | **$ 46,928.15** | **$ 2,522.70** | **$ 12,777.35** | | **$ 62,228.20** |

| ROSEN BIEN & GALVAN COSTS | Overcrowding | Discovery | Out-of-State | Costs Still in Dispute |
|---|---|---|---|---|
| Catherine Bodene - Transcripts | $ 62.76 | $ - | $ 99.37 | $ 162.13 |
| Westlaw | $ 4,864.35 | $ - | $ - | $ 4,864.35 |
| Travel (to Coleman Hearing) | $ - | $ 257.30 | $ - | $ 257.30 |
| **Total Costs:** | **$ 4,927.11** | **$ 257.30** | **$ 99.37** | **$ 5,283.78** |

**Total Fees & Costs Still Disputed (4th Quarter):    $ 67,511.98**

# Exhibit B

ORIGINAL



ORIGINAL
**FILED**

MAR 19 1996

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
        DEPUTY CLERK

LODGED

MAR 7 1996

JACK L. WAGNER, CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
CY

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| RALPH COLEMAN, et al., | No. CIV S-90-0520 LKK JFM |
|     Plaintiffs, | |
| v. | STIPULATION AND ORDER |
| JAMES GOMEZ, et al., | FOR PERIODIC COLLECTION OF ATTORNEYS' FEES AND COSTS |
|     Defendants. | |

This matter comes before the Court on the parties' request to authorize an informal process through which compliance fees may be resolved periodically.  The parties by their undersigned counsel do stipulate and the Court having considered the matter hereby Orders as follows:

1.   Plaintiffs' counsel will submit quarterly statements to defendants' counsel for fees and costs incurred in obtaining and monitoring compliance with the Court's decision and order of

Stip & Order for
Attys Fees & Costs

1

672

September 13, 1995.  The statements will itemize the time spent, subject activity, applicable attorney and other personnel billing rates, and costs and expenses with sufficient particularity to allow the defendants and the Court to identify which efforts were or were not useful and necessary to ensure compliance with the court's order.  The first quarterly statement of each year will identify the billing rates plaintiffs' counsel seeks for that year. Unless and until defendants dispute any of the fees or costs requested, the billing statements submitted by plaintiffs' counsel shall not include declarations or other supporting pleadings.  Such declarations or other supporting pleadings shall be prepared only for and at the time of filing any Motion to Compel.

2.    Upon receipt of plaintiffs' statement each quarter, defendants will have thirty days in which to respond with their objections and the bases therefore.    As to disputed items, including the proposed billing rates in the first quarterly statement, plaintiffs' and defendants' counsel are required to meet and confer within thirty (30) days after defendants have notified plaintiffs of any disputed item(s).    If the parties are able promptly to resolve any part or all of the fee disputes, counsel shall immediately prepare a stipulated order for payment of the fees not subject to defendants' objections.  Both sides shall sign the Order and present it to the court for entry.  Defendants shall have forty-five days from the entry of the Order to pay the undisputed fees.  Interest on these fees and costs will run from the thirty-first day following defendants' receipt of plaintiffs' statement, accruing at the rate provided by 28 U.S.C. §1961.

3.    If Defendants refuse to sign any Stipulated Payment Order, or unreasonably delay the process described in Paragraph 2, above, plaintiffs' counsel may submit directly to the Court an unstipulated form of Order for collection of fees that are not disputed, together with a certification of counsel under penalty of perjury setting forth the relevant facts and circumstances. Defendants' counsel may respond within five court days of receipt of the proposed Order and certification.  Plaintiffs' counsel may reply within two court days after receipt of defendants' response, if any.  The Court will rule on plaintiffs' application without conducting a hearing unless it considers such a hearing necessary, and will issue plaintiffs' proposed Order or another appropriate Order unless defendants show a reasonable basis for disputing the fees and expenses  plaintiffs have claimed to be undisputed.  If any party determines that systematic problems in the meet and confer process have arisen, that party may move for further modification of this process, by noticed motion made pursuant to the Federal Rules of Civil Procedure and the Rules of this Court.

4.    Plaintiffs will file a yearly motion to compel payment of disputed items, if necessary, not later than sixty (60) days after the parties meet and confer with respect to the statement covering the fourth quarter of each year.  If defendants opposed any billing rates plaintiffs' counsel will bring a motion to compel on this issue following the first quarterly statement of each year.

5.    In the event that an unusually large number of hours or a significant issue is in dispute, plaintiffs may bring

1  a quarterly motion to compel on those issues alone. Any such
2  quarterly motion to compel will be filed no later than thirty (30)
3  days after the parties have met and conferred on the quarterly
4  statement at issue. Such motions will be briefed and heard on the
5  usual schedule provided by the local rules.

6          6.    Interest on any disputed amount, will accrue at the
7  rate provided by 28 U.S.C. §1961 from the thirty-first (31st) day
8  following defendants' receipt of the billing in which the items in
9  question appear.

10         7.    The standard of review to be applied to disputed
11 billing items will be whether the services were useful and
12 necessary to ensure compliance with the Decision and Order dated
13 September 13, 1995.

14         8.    So long as the plaintiffs' counsel submit quarterly
15 billing statements to the defendants in a timely fashion in
16 accordance with paragraph one of this Order, all compensation
17 requested by the plaintiffs for monitoring compliance with the
18 decision and order will be awarded, now and in the future, at the
19 rates current at the time the billing statements are submitted to
20 the defendants instead of at historic rates.

21
22
23
24
25
26
27
28

1        9.    Defendants shall pay the full amounts ordered paid,

2  with any legal interest owing, no later than forty five (45) days

3  after the date each payment Order is entered by the Court.  If

4  payment is not voluntarily made by the 45th day, counsel for

5  plaintiffs may obtain said amount by writ of execution upon state

6  funds and/or other appropriate accounts by certification under

7  penalty of perjury that voluntary payment has not been made.

8      We do so stipulate.

Dated: 2/29/96

Donald Specter
Counsel for Plaintiffs

Dated: 3/6/96

William Jenkins
Deputy Attorney General
Counsel for Defendants

IT IS SO ORDERED.

Dated: 3/14/96

Lawrence K. Karlton, Chief Judge
United States District Court

Stip & Order for
Attys Fees & Costs

5

Exhibit C

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF CALIFORNIA

3                    ---oOo---

4    BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7         Plaintiffs,

8    Vs.                        CASE NO. CIV. S-90-0520 LKK

9    ARNOLD SCHWARZENEGGER,
     et al.,

10

11        Defendants.                    **RECEIVED**

12    _____/          NOV 1 4 2006

13                                       **Rosen Bien & Asaro**

14

15

16                    ---oOo---

17

18              REPORTER'S TRANSCRIPT

19        THURSDAY, NOVEMBER 9TH, 2006

20        RE:  FURTHER HEARING ON TRO

21

22                    ---oOo---

23

24

25    Reported by:              CATHERINE E.F. BODENE,
                                CSR. No. 6926

```
 1                        APPEARANCES

 2                        ---o0o---

 3

 4    FOR THE PLAINTIFF:

 5            ROSEN, BIEN & ASARO, LLP
              155 MONTGOMERY STREET, EIGHTH FLOOR
 6            SAN FRANCISCO, CALIFORNIA  94104

 7            BY:  MICHAEL BIEN,
                   ATTORNEY AT LAW
 8

 9

10

11    FOR THE DEFENDANTS:

12            STATE OF CALIFORNIA, DEPT. OF JUSTICE
              OFFICE OF THE ATTORNEY GENERAL
13            1300 I STREET
              SACRAMENTO, CALIFORNIA  95814
14
              BY:  LISA TILLMAN,
15                 DEPUTY ATTORNEY GENERAL

16

17

18

19                        ---o0o---

20

21

22

23

24

25
```

1

1          SACRAMENTO, CALIFORNIA

2       THURSDAY, NOVEMBER 9TH, 2006 - 9:30 A.M.

3                    ---o0o---

4      THE CLERK:  All rise.

5      Court is in session.

6      The Honorable Lawrence K. Karlton is presiding.

7      THE COURT:  Be seated for a moment.  We have to get

8  Mr. Keating on the phone.  He is not going to be here this

9  morning.

10      Just hang on a second while we do that.

11          (Brief pause.)

12      THE COURT:  Good morning, Michael.  Can you hear me?

13      SPECIAL MASTER KEATING:  Yes, Judge, I can.

14      THE COURT:  We can hear you just fine.

15      Counsel, approach the podium, state your appearance

16  for the record, remain at the podium.

17      MS. TILLMAN:  Good morning, Your Honor.  Lisa Tillman

18  on behalf of the defendants.

19      MR. BIEN:  Good morning, Your Honor.  Michael Bien

20  and Jane Kahn on behalf of the plaintiff class.

21      THE COURT:  The record will reflect that the

22  defendants have filed the report.

23      I take it you've got a copy of it, Mr. Bien?

24      MR. BIEN:  Yes, I did, Your Honor.

25      THE COURT:  Have you had a chance to look at it?

2

1            MR. BIEN:  Yes, I have.

2            THE COURT:  All right.  I am -- I want you to convey

3     to your clients the Court's gratitude that they have taken

4     the Court's order seriously and have responded appropriately.

5            Whether it is going to be enough in the long run is

6     something we will have to work out I suppose today, but it is

7     clear they were serious and they reacted appropriately, which

8     brings me to the first matter that neither of you, I'm sure,

9     wants to talk about, but I do.

10            I did not include the portion of the proposed order

11    dealing with paying the people who went because I had no idea

12    what it was all about.  If you tell me you need an order from

13    me to do that, I will, of course, give you such an order.

14            MS. TILLMAN:  I would appreciate that, Your Honor.  I

15    can provide that if you like.

16            THE COURT:  Yeah.  Okay.

17            Mr. Bien, what is your response to the reasons that

18    we're here today?

19            MR. BIEN:  We also appreciate the efforts that

20    California made to send the clinicians to Tennessee to do all

21    this work.  And again, I think the most important thing to

22    come out of this is to make sure that it's done before the

23    next transfer.

24            THE COURT:  I agree with that.

25            I assure you, the State must agree with that as well.

3

1    This is a very difficult thing to do the way we did it.

2         Go ahead.

3         MR. BIEN:  I think there are some additional steps

4    that need to be taken with Tennessee, and we've learned from

5    that collectively, and there are some additional steps that

6    we can do rapidly to assure the remaining transfers that need

7    to take place can get rolling.

8         And I think that -- that as I understand from the

9    defendant's pleading, that they're right now working with

10   Tennessee to make sure that they understand the Program Guide

11   Requirements.

12        Following from that, it's clear from our conversation

13   with the Tennessee officials, which we had on Tuesday -- they

14   were on this conference call that occurred, Your Honor, on

15   Tuesday -- that they, at least in my opinion, need to augment

16   the staffing to meet Coleman Program Guide Standards because

17   they don't have seven day a week.

18        THE COURT:  My understanding -- perhaps it might be

19   easier for you, before you continue, Mr. Keating why don't

20   you report for the record what you told me about your

21   conference call and what your evaluation of the situation is

22   as of now.

23        SPECIAL MASTER KEATING:  Your Honor, relative to the

24   elements of the assessment that you required going to

25   Tennessee, I think the documents provided by the State

4

1   address most of those issues pretty clearly.

2          There are some questions or observations I will make

3   relative to those, but I'll hold off on those for the moment.

4          The other thing that came out of the conference call

5   between representatives of Correctional Corporation of

6   America and CDCR officials and parties here and counsel,

7   indicated that the department folks had sent to CCA in

8   Tennessee at their headquarters copies of the Program Guides

9   and other applicable policies relative to the mental health

10  caseload, and that they were reviewing that to determine what

11  provisions they would need to observe that they were not

12  presently observing under their application of their own

13  internal standards which are based on the American

14  Correctional Association Standards of the National

15  Correctional Health Care Standards to determine what policy

16  issues might be needed and/or resources might be required as

17  well.

18         We have not yet heard.  From the materials that were

19  provided, it appears there is going to be a larger telephone

20  conference between CDCR and CCA to talk through whatever

21  differences there are and the extent to which any resources

22  may be required.  And both I think from the -- from the

23  contracts that have been provided and reviewed, the CCA

24  contractors will be required to provide whatever resources

25  are necessary to meet the Program Guide Requirements and

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

5

1   other requirements of CDCR relative to the mental health

2   caseload inmates.

3          That is scheduled for later -- or for Thursday.  And

4   out of that presumably will come whatever amendments to the

5   contract are required or whatever further resources need to

6   be identified and provided by the contractor.

7          And also there has been discussion of some of my

8   experts perhaps getting to the facilities themselves and

9   looking at them, and that's something that we're willing to

10  do.

11         THE COURT:  Let's hold off on that for the moment,

12  Michael.  I think you and I and Matt have got to discuss the

13  feasibility of that --

14         SPECIAL MASTER KEATING:  Fine.

15         THE COURT:  -- as an initial matter.  Whether it is

16  at all possible as an on-going matter, which, off the top of

17  my head without having thought about it very much, seems to

18  me just very, very difficult to ask you to do unless you

19  establish an entirely new staff whose business is going

20  around the country examining the facilities.

21         But we may have to do something, which I'm not clear

22  what that is yet, and we may have to ask the parties in due

23  course after we see what shakes out to advise us as to their

24  judgments about the matter.  And they will have to make a

25  motion, if the plaintiffs believe that's necessary, and the

6

1    defendants disagree -- and I'm not suggesting that's going to

2    be either of your positions -- then we'd have to work that

3    out.

4         But right now I think we're going to have to let

5    things shake out a little bit and see where they are before

6    we start doing anything else.

7         I was a little bit concerned and still am a bit

8    concerned, Michael, about the limitations on staff

9    appropriate to mental health patients.

10        Of course, it is important for us to recognize that

11   at least, if we can, we're going to ensure that there aren't

12   any mental health patients there.  That is not to say that

13   given the fact that about 20 percent of the population at

14   some point suffers discernable mental illness that we may not

15   get some.

16        I want to ask the State something about that.

17        Well, why don't you talk a little bit about

18   personnel, then we'll talk about the next issue.

19        Michael, what are they proposing or what do they have

20   on hand?

21        SPECIAL MASTER KEATING:  When I wrote my November 1st

22   letter, Your Honor, which has been sort of a central document

23   here, I was under the impression that they had just the four

24   hours a week contract services of a psychiatrist.

25        In our conversation on Tuesday, it became clear, also

7

1    from the documents provided by the State since the original

2    TRO was filed, it has become obvious they also have a

3    full-time licensed case worker clinician who is full-time,

4    that is to say he works five days a week.

5         That does not provide the 24-hour coverage required

6    for people who are in Ad. Seg., but it is a substantial

7    addition over and above what the original documents had

8    indicated was just the four hours of contracted psychiatric

9    services.

10        So there is more.  And I would assume that out of

11   this meeting, if there is a requirement to cover 24-hours of

12   people in Ad. Seg., they're going to have to provide that.

13        THE COURT:  Let's talk a little bit.  My

14   understanding, Miss Tillman, but I'm not sure this is what

15   the State contemplates -- I don't mean to be cutting you out,

16   Mr. Bien, but I'm just trying to understand where we are --

17   people who have indicia of mental illness in the recent

18   past -- relatively recent past are not going.  That's the

19   State's commitment as I understand it, correct?

20        MS. TILLMAN:  In terms of, again, using the criteria

21   indicated in Mr. Keating's letter of November 1, yes.  And

22   that's why we've done the additional screenings.

23        THE COURT:  My second question is what happens to

24   someone who has gone, who appears to be a perfectly

25   appropriate person to have gone, and who then gets sick?

8

1        Is he going to be shipped back or is he going to be

2    treated there?  What's -- or do we know?

3        MS. TILLMAN:  I know during the conversation, in

4    which Mr. Keating and Mr. Bien were present for on Tuesday

5    with CCA, the question came up what if someone suddenly

6    decompensated and needs acute care.

7        CCA responded that acute care is within an hour away.

8    Apparently, they're within an hour's drive of the University

9    of Tennessee Medical Center.  And I think they also indicted

10   that they were within 20 minutes of another care center.  So

11   should there be an acute need, they can definitely get that

12   person to the right provider within a very appropriate time

13   frame.

14       Obviously, there no intent to continue to house an

15   ill person who needs mental health care in that Tennessee

16   facility.  Once they're stabilized, the intent is to bring

17   them back to California so that they can have continued

18   monitoring under the Program Guide Standards they deserve.

19       THE COURT:  Mr. Bien, your view as to the adequacy of

20   that apparent plan?

21       MR. BIEN:  What I heard on the phone, you know, from

22   CCA sounded good in terms of the location of the prison and

23   their contracts.  What we'd like to see, and I think that's

24   what's being developed, are some actual written policies and

25   procedures that reflect the standards.

9

1          We think that -- that even in the screening process,

2     no matter what screening process goes on --

3          THE COURT:  Someone is going to get missed.

4          MR. BIEN:  As you see in this group, if you looked at

5     the list, people that they did send with the screening

6     process did have a relatively recent history of mental

7     illness.

8          I'm not -- I don't know if that is good or bad.

9     Really depends on the adequacy of the facility on the other

10    side.  And we'd like these people to be able to go and stay

11    so I think it is important that it not be a knee jerk

12    reaction that they are put on a plane.

13         THE COURT:  You know, this is a very complicated

14    problem.  It sounds to me that the State is doing its best to

15    make a reasoned judgment about what to do, and until I see

16    some evidence that they need intervention by the Court or the

17    Special Master, I don't -- I don't propose to make an order

18    other than that what the State seems to be doing makes sense

19    to me.

20         That's -- Michael, am I off?

21         SPECIAL MASTER KEATING:  No, Your Honor.  I think

22    what they've learned in this first round, and at a

23    substantial cost, is some of the ways of applying the

24    criteria that were not applied, you know, initially to this

25    group that went.  And I think it's simple enough to fix, and

10

1    the Department can fix it before they go out.

2         As to what happens when they get there, I think it's

3    the responsibility of the Department to make sure that there

4    are available resources in Tennessee, through their

5    monitoring of the contract and its terms, that there are

6    resources to deal with the emergencies and resources to

7    intervene and make assessments and evaluations quickly that

8    might result in the return of individuals.

9         Other than that, I think -- I'm not sure what else we

10   can do.

11        THE COURT:  That sounds right to me as well.

12        Miss Tillman, as to the people who are going to

13   Indiana next -- I mean, we've learned a whole bunch of things

14   from Tennessee.  We've got to start alerting them early on

15   about what the criteria and protocols are.

16        You're nodding your head.

17        MS. TILLMAN:  That has been accomplished.

18        THE COURT:  I'm sorry?

19        MS. TILLMAN:  That has been accomplished.

20        THE COURT:  Good.

21        Do we know about what happens to emergency situations

22   in Indiana or are we still working that out?

23        MS. TILLMAN:  I haven't been in contact personally

24   with GEO of Indiana, but I will endeavor to find out.  If I

25   need to bring Mr. Bien into that conversation, I'm happy to

11

1    do so.

2            THE COURT:  All right.

3            MR. BIEN:  Your Honor, may I?

4            THE COURT:  You certainly may.

5            MR. BIEN:  Here's -- I think that, at least in terms

6    of the conversation we had on Tuesday with Mr. Keating and

7    CCA and the Department of Corrections and the attorneys, it

8    was clear that there are some things that need to be ordered

9    or we need to get a very clear statement that they're going

10   to happen.

11           THE COURT:  Give me an example, Mr. Bien.

12           MR. BIEN:  Well, the contract that they entered into

13   is striking in its lack of reference to mental health care

14   and this case.

15           I don't know if the Receiver is right or wrong, but

16   he redrafted the contract in numerous terms, both in terms of

17   jurisdiction, monitoring.  I don't know if he's right or

18   wrong, but we have a very -- if I was the contractor on the

19   other side, I made one deal with Plata and another deal with

20   Coleman, and they didn't even mention Coleman.

21           And I'm concerned, not now, but let's say it's a year

22   from now, if Mr. Keating wants to get some information or

23   visit a prison, there's an incident, it doesn't provide for

24   any monitoring or even that the Program Guides are

25   acknowledged or anything.

12

1       So I think the contract should be amended, and the

2  new contract with GEO, which, by the way, is a different

3  vendor --

4       THE COURT:  Right.  I'm aware of that.  And I'm

5  sensitive to the fact that the experience that we've had in

6  Tennessee may or may not have anything to do with what

7  happens in Indiana.  And I suspect that the State has got the

8  same awareness, and they're going to have to respond to it.

9       I am concerned -- I mean, clearly the people in

10 Tennessee are now aware, if they weren't before, that there

11 is a case, that there is a Special Master, and that there are

12 protocols which they're going to have to follow.

13      It does seem to me probably good sense, even if it

14 weren't necessary, that there be some contractual

15 acknowledgment, at least in the future cases, and perhaps as

16 well in Tennessee, that this case exists and that the

17 California prisoners in Tennessee will continue to have

18 whatever protections the case has developed.

19      And I would think that the State -- I'm not going to

20 order you to because you seem to be making good progress on

21 your own, making good sense, but I am concerned that there be

22 some contractual -- some acknowledgment in the contractual

23 relationship of the existence of the case and the

24 responsibilities that derive therefrom.

25      Mr. Bien, I don't mean to be saying no to you, just

13

1    no, but if the State -- I mean, I'm going to say something I

2    must say often that nobody ever hears, and that is it is

3    ultimately the State's responsibility to ensure the mental

4    health care of its prisoners.  And when the State is doing

5    well, we ought to be stepping aside and letting them do their

6    job.  Because ultimately, God willing and the river don't

7    rise, some day I'm going to give this program back to them,

8    and hopefully sooner rather than later.

9         Mr. Keating will now be snickering because I've been

10   saying that for years, but this has been for me a very

11   encouraging sign.  I can't tell you.

12        MR. BIEN:  But, Your Honor, the fact is it took

13   judicial intervention.  I mean, I agree.  I really didn't

14   want to get involved in this and had no interest.  There is

15   no ill will on other side either.  They're very busy.  It

16   didn't happen correctly.

17        THE COURT:  I agree.  But there was a real effort, an

18   important effort to correct what had been done.

19        MR. BIEN:  I agree.

20        THE COURT:  We ought to make -- we ought to recognize

21   that.

22        It is my intention, Miss Tillman, unless the

23   plaintiff does something, not to worry you about Indiana,

24   thinking that you've learned from the experience and that

25   you're going to proceed in a somewhat more orderly way.

14

1          Let me assure you, Mr. Bien, that if it turns out

2     that gets frustrated somewhere along the line, the Court is

3     here.

4          MR. BIEN:  Here's my only concern here is that we had

5     discussed in the conference call that we were going to work

6     together with Mr. Keating to revise the screening criteria.

7          THE COURT:  Yes.

8          MR. BIEN:  We also think that -- what I'm afraid of

9     is that without some review point, some report back, that we

10    will not -- we and Mr. Keating will not get information about

11    what's going on.

12         We only found out about this from a third-party, the

13    Tennessee trip.  And so at least you need to, I think, have a

14    reporting back date or ask Mr. Keating to report back about

15    that we've agreed on a process for keeping the parties

16    informed and only come back for an order if necessary.

17         THE COURT:  Mr. Keating, I assume that's what you

18    would be doing anyhow; is that right?

19         SPECIAL MASTER KEATING:  Yes, Your Honor.

20         THE COURT:  So yeah, once again, I don't feel any

21    great need to issue an order.  I expect Mr. Keating to keep

22    me informed, and I expect the State to keep Mr. Keating and

23    you informed.

24         MS. TILLMAN:  We will do so.

25         THE COURT:  I know you will.

15

1          I really believe that.  I'm ready to get off the

2     bench.

3          Thank you very much.  We will stand in recess.

4          MS. TILLMAN:  Thank you.

5          (Off the record at 09:55 AM)

6                    ---o0o---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          REPORTER'S CERTIFICATE

2                               ---o0o---

3
     STATE OF CALIFORNIA  )
4    COUNTY OF SACRAMENTO )

5

6
            I certify that the foregoing is a correct transcript
7
     from the record of proceedings in the above-entitled matter.
8

9

10              IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California on this 13TH day of
11   NOVEMBER, 2006.

12

13

14                              _____

15                              CATHERINE E.F. BODENE,
                                CSR NO. 6926
16

17

18

19

20

21

22

23

24

25

                 CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
                                (916) 446-6360