# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.

      Plaintiffs,

         vs.                        No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.

      Defendants

## EIGHTEENTH MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS

J. Michael Keating, Jr., Esq.
Special Master
2351 Sussex Drive
Fernandina Beach, FL 32034
(904) 491-7157
Fax: (904) 491-7158
July 30, 2007

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| 3CMS: | Correctional Clinical Case Manager System |
| APP: | acute psychiatric program at Vacaville |
| ASH: | Atascadero State Hospital |
| ASP: | Avenal State Prison |
| BMU: | behavior modification unit |
| C-file: | central file |
| C&PR: | classification and parole representative |
| CAP: | corrective action plan |
| CAL: | Calipatria State Prison |
| CC I: | Correctional counselor 1 |
| CC II: | correctional counselor 2 |
| CCAT: | coordinated clinical assessment team |
| CCC: | California Correctional Center |
| CCI: | California Correctional Institution |
| CCWF: | Central California Woman's Facility |
| CIM: | California Institution for Men |
| CDCR: | California Department of Corrections and Rehabilitation |
| CEN: | Centinela State Prison |
| CIW: | California Institution for Women |
| CMC: | California Men's Colony |
| CMF: | California Medical Facility |

CRC:            California Rehabilitation Center

CSATF:          California Substance Abuse Treatment Facility

CSP/Corcoran California State Prison, Corcoran

CSP/LAC:        California State Prison, Los Angeles County

CSP/Sac:        California State Prison, Sacramento

CSP/Solano:     California State Prison, Solano

CTC:            correctional treatment center

CTF:            California Training Facility, Soledad

CVSP:           Chuckawalla Valley State Prison

DCHCS:          Division of Correctional Health Care Services

DHS:            Department of Health Services

DMH:            Department of Mental Health

DVI:            Deuel Vocational Institute

EOP:            Enhanced Outpatient Program

FIT:            focus improvement team

GACH:           general acute care hospital

HDSP:           High Desert State Prison

ICC:            institutional classification committee

IDTT:           interdisciplinary treatment teams

ISP:            Ironwood State Prison

IST:            in-service training

KVSP:           Kern Valley State Prison

LOP:            local operating procedure

| | |
|---|---|
| LVN: | licensed vocational nurse |
| MCSP: | Mule Creek State Prison |
| MHCB: | mental health crisis bed |
| MHOHU: | Mental Health Outpatient Housing Unit |
| MHSDS: | Mental Health Services Delivery System |
| MHTS: | mental health tracking system |
| MPIMS: | Madrid Patient Information Management System |
| MTA: | medical technical assistant |
| NKSP: | North Kern State Prison |
| OHU: | Outpatient Housing Unit |
| PBSP: | Pelican Bay State Prison |
| POC: | parole outpatient clinic |
| PPE: | personal protective equipment |
| PSH: | Patton State Hospital |
| PSU: | psychiatric services unit |
| PTSD: | post-traumatic stress disorder |
| PVSP: | Pleasant Valley State Prison |
| QITs: | quality improvement teams |
| QMAT: | quality management assessment team |
| RJD: | Richard J. Donovan Correctional Facility |
| RVR: | rule violation report |
| SCC: | Sierra Conservation Center |
| SHU: | Security Housing Unit |

SNY:          sensitive needs yard

SPU:          special processing unit

SQ:           California State Prison, San Quentin

SRAC:         suicide risk assessment checklist

SVPP:         Salinas Valley Psychiatric Program

SVSP:         Salinas Valley State Prison

TCMP:         transitional case management program

UCC:          unit classification committee

UHR:          unit health records

VSPW:         Valley State Prison for Women

WSP:          Wasco State Prison

# TABLE OF CONTENTS

**TABLE OF ABBREVIATIONS**

**INSTITUTIONAL SUMMARIES** ........................................................................4

**Service Area A** ...........................................................................................5

    California State Prison, Sacramento (CSP/Sac) ............................................5

    Folsom State Prison (Folsom) ...................................................................14

**Service Area B**...........................................................................................21

    Pelican Bay State Prison (PBSP)................................................................21

    High Desert State Prison (HDSP)...............................................................32

    California Correctional Center (CCC)..........................................................42

**Service Area C** ...........................................................................................47

    Mule Creek State Prison (MCSP)...............................................................47

    Sierra Conservation Center (SCC) .............................................................57

**Service Area D** ...........................................................................................61

    California Medical Facility (CMF)...............................................................61

    California State Prison at Solano (CSP/Solano)............................................74

    California State Prison at San Quentin (SQ) ................................................87

    Deuel Vocational Institution (DVI)..............................................................95

**Service Area E**...........................................................................................95

    California State Prison at Corcoran (CSP/Corcoran) ...................................104

    California Substance Abuse Treatment Facility (CSATF)........................118

    Pleasant Valley State Prison (PVSP)........................................................128

    Avenal State Prison (ASP) ......................................................................134

**Service Area F** ........................................................................................... 141

    Salinas Valley State Prison (SVSP).......................................................... 141

    California Training Facility (CTF) ........................................................... 156

**Service Area G** .......................................................................................... 156

    California Men's Colony (CMC) .............................................................. 169

    Wasco State Prison (WSP) ..................................................................... 179

    Kern Valley State Prison (KVSP) ........................................................... 187

    North Kern State Prison (NKSP)............................................................. 196

**Service Area H** .......................................................................................... 206

    California State Prison, Los Angeles County (CSP/LAC) ........................206

    California Correctional Institution (CCI) ................................................. 220

**Service Area I** ........................................................................................... 230

    California Institution for Men (CIM) ....................................................... 230

    California Rehabilitation Center (CRC) ................................................... 238

**Service Area J** ........................................................................................... 243

    Richard J. Donovan Correctional Facility (RJD) ....................................243

    Ironwood State Prison (ISP) ................................................................... 256

    Calipatria State Prison (CAL)................................................................. 262

    Centinela State Prison (CEN) ................................................................. 268

    Chuckawalla Valley State Prison (CVSP)................................................ 277

**Service Area K** .......................................................................................... 283

    California Institution for Women (CIW)................................................... 283

**Service Area L**........................................................................................... 289

Central California Women's Facility (CCWF) ........................................289

Valley State Prison for Women (VSPW) ...................................................296

**SUMMARY** ...........................................................................................305

**RECOMMENDATIONS** ......................................................................330

**EXHIBITS**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

**RALPH COLEMAN, et al.,**
    **Plaintiffs,**

      **vs.**
                              **No. CIV S-90-0520 LKK JFM P**

**ARNOLD SCHWARZENEGGER, et al.,**
    **Defendants.**

## EIGHTEENTH MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS

       This report covers the monitor's eighteenth round review of the California Department of Corrections and Rehabilitation's (CDCR's) compliance with the plans, policies and protocols provisionally approved by the court in mid-1997. Unlike the preceding monitoring period, for which reports were filed in three installments, this report covers all 33 CDCR institutions. The round included visits to 27 CDCR institutions by teams of monitors and experts, with multiple visits occurring at Avenal State Prison, California Institution for Men, California State Prison at Corcoran, California State Prison, Los Angeles County, California State Prison at Solano, the Richard J. Donovan Correctional Facility and Salinas Valley State Prison. Six other institutions, California Correctional Center, Calipatria State Prison, Centinela State Prison, Chuckawalla Valley State Prison, Folsom State Prison and Ironwood State Prison

were monitored by means of a paper review, which required each facility to file documentation on its compliance with the local corrective action plan and other issues of special focus in this monitoring period.

The eighteenth monitoring period found CDCR in the midst of a number of challenging conditions and events. Staffing levels did not keep pace with increased allocations, making already-high vacancy rates even higher. Department of Correctional Health Care Services staff could not concentrate its efforts on staffing issues, as its attention was diverted to managing other problems that arose. One positive development in staffing occurred toward the end of the monitoring period, with an infusion of contract coverage in psychiatry at some CDCR sites.

Overcrowding of CDCR institutions led to an executive declaration of a state of emergency in the prisons in the summer of 2006, which in turn led to the convening of a special legislative session in August 2006. Later in the monitoring period, several hundred CDCR inmates were transferred to out-of-state prisons in an effort to ease the overcrowding, but the effect was minimal in the face of near-double capacity in the institutions. Competition for mental health treatment and clinical office space sharpened with growth in the overall healthcare infrastructure against the backdrop of already overcrowded prisons.

In the meantime, there were mission changes at some institutions. The number of much-needed intermediate level of care beds grew at Department of Mental Health facilities Salinas Valley Psychiatric Program and the Acute Psychiatric Program at the California Medical Facility. However, access was limited for Mental Health Crisis Beds, acute inpatient care beds at DMH facilities, and care in Psychiatric Services Units

for segregated inmates in Enhanced Outpatient Programs. The concomitant over-use of Outpatient Housing Units continued. Access to DMH acute inpatient care reached its nadir at the end of the monitoring period when Atascadero State Hospital imposed significant restrictions on admission of CDCR inmates.

Defendants prepared court-ordered plans to address some of the most serious problems that have been plaguing mental health care in the CDCR. One was a plan to halt a disturbing trend toward higher suicides rates in administrative segregation. Another was a plan to provide mental health services to EOP inmates waiting for longer periods of time in reception centers before their transfers to EOP treatment programs within CDCR. Implementation of these plans continues to unfold, and will be monitored going forward.

As in previous monitoring periods, monitoring focused on staffing levels, quality management, medication management and access to higher levels of care, as well as on institutional corrective action plans. Reporting on the use of mental health assessments in the disciplinary process has been re-focused in this report to concentrate on its application to the discipline of sexual misconduct violations. Although previous reports covered suicide prevention items as they appeared within various focus areas, suicide prevention is covered for the first time as a distinct focus area in this report.

Institutional administrators and mental health staff at the visited institutions continued to cooperate fully with the monitoring process. As in earlier rounds, plaintiffs' and defendants' counsel accompanied monitoring staff during several of the site visits.

The data collected and findings discussed in this report are the product of

many members of different monitoring teams, but subsequent references to various monitors throughout the report shall be singular rather than plural. Clinical judgments of the monitor's psychiatric experts are explicitly attributed to an expert.

The general format of this report includes a summary of compliance for each institution, with discussion on its performance in each of certain areas of focus. Unlike previous reports, this one dispenses with the redundancy of summaries internal to each individual institutional summary. The arrangement of the institutional summaries corresponds with defendants' regional service areas, which typically include a hub institution with a Mental Health Crisis Bed unit for short-term inpatient care and an intensive residential Enhanced Outpatient Program. The service areas also include anywhere from one to four facilities, each of which has a Correctional Clinical Case Management System program in the general population. The report concludes with a comparative analysis of compliance by focus area for all 33 institutions, followed by a section for recommendations derived from the analysis.

The monitor's psychiatric experts compiled numerous case reviews based on interviews with inmates and clinicians, chart reviews, or a combination of these elements, which are included as exhibits in this report. A total of 173 case reviews from 23 institutions are attached to this report. These case reviews are redacted to protect the privacy of inmates.

## Institutional Summaries
### Service Area A

Service Area A includes California State Prison, Sacramento and Folsom State Prison.

### California State Prison, Sacramento (CSP/Sac)
November 6, 2006 – November 8, 2006

CSP/Sac's vacancy rate remained at 40 percent despite the addition of nine positions. Of its 223.78 allocated mental health positions, 88.47 were vacant. As during the preceding monitoring period, contractors covered 30 percent of vacancies. The number of allocated mental health positions increased by more than 80 percent.

The position of chief psychiatrist was filled, but 9.5 of 18.1 staff psychiatrist positions were vacant. Contractual staff covered the equivalent of 3.5 positions. The position of chief psychologist was filled, but the chief was serving as the acting health care manager. Three of nine senior psychology and 23.83 of 44.83 staff psychology positions were vacant. Contractual staff covered the equivalent of 5.2 psychology positions.

Seven of 18 social work positions were vacant. One of three senior psych tech positions and 19.58 of 54.58 psych tech positions were vacant. Four senior registered nurse positions were filled, while 5.56 of 37.27 RN positions were vacant. Four of eight recreational therapist positions were vacant. The position of office supervisor was filled, but 14 of 24 clerical positions were vacant.

CSP/Sac's census was 3,078, of which 1,235 inmates were participants in the mental health services delivery system (MHSDS). There were 165 mainline enhanced outpatient program (EOP) inmates, 62 EOP inmates in administrative segregation, and 178 inmates in the psychiatric services unit (PSU). There were 359 mainline correctional clinical case manager (3CMS) inmates and 74 3CMS inmates in

5

administrative segregation. There were 309 inmates in administrative segregation housing plus an additional142 in the stand-alone administrative segregation building.

The capacity of the administrative segregation hub for EOP inmates was increased by 75 in July. Fewer beds than anticipated were needed due to an institutional classification committee (ICC) finding that many of the case factors were minor, resulting in the release of a number of the segregated EOP inmates to the general population portion of the EOP. A second 96-bed EOP unit opened in July and was fully populated by November 2006. A third 96-bed EOP unit was to open in October 2006, but inmates did not arrive. A 350-bed EOP treatment center was in the design phase.

Issues Resolved:

The opening of a mental health treatment center provided enough suitable treatment space for the EOP program to meet Program Guide requirements, resolving two corrective action plan (CAP) problems.

Quality Management:

Throughout 2006, CSP/Sac reported that it was unable to sustain prior levels of self-monitoring via audits. The local governing body did not meet during the current monitoring period, but the quality management committee continued to meet almost weekly. Minutes were informative, as they recorded attendance and the content of each agenda item. The committee was chaired by the health care manager. The associate warden for health care attended meetings regularly, as did representatives of health care disciplines. The committee received reports from subcommittees and quality improvement teams (QITs) and addressed issues germane to the MHSDS and suicide prevention. The mental health subcommittee usually met weekly and was attended by

many members of the mental health staff representing different disciplines. Informative minutes were kept. Mental health staff appeared to be well informed about quality management activities.

Suicide Prevention:

The suicide prevention committee met monthly and kept minutes. The committee had multidisciplinary membership, but custody and nursing staff did not always attend meetings. Staff attributed low attendance to in-depth clinical discussions held during meetings. The committee addressed local suicide prevention issues and covered all but one required topic. Suicide-related CAPs were known to the committee, which was involved in monitoring the implementation of selected CAP recommendations.

The committee did not review mental health crisis bed (MHCB) admissions related to suicidality. Because it met more frequently, the mental health quality management subcommittee reviewed some suicide prevention items more frequently and more thoroughly than the suicide prevention committee. For instance, compliance with provisions for five-day follow-up and custody observations was reviewed by the mental health quality management subcommittee, which communicated the results to the suicide prevention committee.

Compliance with five-day follow-up subsequent to discharge from the MHCBs or mental health outpatient housing unit (MHOHU) remained low. A QIT was formed. During the three weeks preceding the monitor's visit, compliance reached 100 percent, but it had been well below that level throughout 2006. Staff attributed low compliance rates to high numbers of inmates discharged with orders for five-day follow-

7

up.

Custody staff carried out wellness checks, or hourly observations, in conjunction with five-day follow-up. Staff audited compliance monthly. The suicide prevention committee considered whether inmates scheduled for wellness checks could leave their housing units to report to work assignments or other scheduled activities. An audit covering mid-June through mid-October 2006 was compromised by the loss of electronic data. Available information showed that in 133 cases with planned follow-up, wellness checks and corresponding documentation were fully compliant in 71, inapplicable in 22, incomplete in 13, and non-compliant in nine. Data concerning 37 cases was lost.

Regarding mental health screenings in administrative segregation, many were missed or later. Inmates reported, and staff confirmed, that screenings were completed at cell-front, a practice attributed to logistical barriers and inmate refusals. The monitor's review of unit health records (UHRs) found that five of 11 records of inmates recently placed in the stand-alone administrative segregation unit contained neither a mental health screen nor a form used by medical staff to document medical clearance prior to placement. Five records contained mental health screenings, but two were not completed within 72 hours of the inmate's placement in administrative segregation. In one case that was reviewed, an injury report documented that the inmate was exposed to OC spray, but the record did not contain a mental health screening.

Staff reported that whenever a suicide risk assessment checklist (SRAC) was completed, the information was entered into the MHTS. SRACs were completed upon admission to the MHCB or MHOHU and when inmates first arrived at CSP/Sac.

Staff did not use inmate profiles to screen inmates placed in administrative segregation.

Medication Management:

Staff audits found continuing problems with medication continuity when medication orders needed to be renewed and when inmates were discharged from the correctional treatment center (CTC). Documentation of medication administration in the general population portion of the EOP and handling of medication non-compliance were reportedly problematic.

CSP/Sac did not have a protocol for laboratory tests and monitoring blood levels of mood stabilizers. An audit of mood stabilizers was inconclusive due to methodological flaws. There were reportedly 541 inmates with DOT orders, of which 11 were *ad hoc* and the remainder were DOT under a policy that required DOT administration to EOP inmates.

Keyhea orders were not always renewed by psychiatrists when warranted. A QIT was formed. The institution reported that 352 inmates had HS orders and that HS orders were administered after 8:00 p.m.

Sound audits of parole medication found no problems.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

CSP/Sac remained out of compliance with policies pertaining to inmate sexual misconduct. Screenings of inmates charged with sexual misconduct were not always timely. Inter-disciplinary treatment teams (IDTTs) did not review all screenings. Mental health treatment provided to inmates who incurred multiple charges for sexual misconduct consisted of individual counseling, much of which occurred at cell-front. Staff reported that one inmate, who had a current Keyhea order, was in the PSU and had

a diagnosis of exhibitionism, was receiving mental health treatment as of November 2006. None of the mental health assessments done in connection with the many rule violation reports (RVRs) he incurred for sexual misconduct or other forms of misbehavior found that mental health had been a factor in his conduct. All of his cases were referred to the district attorney, but none had been accepted to date.

From June through October 2006, 81 RVRs were issued for indecent exposure. Forty-two of them involved the same eight inmates.

During the same time period, 79 incidents involving indecent exposure were referred to the district attorney's office. As of November, 68 had been rejected, 11 were pending, and none had been accepted.

Transfers:

Access to acute care at the Department of Mental Health (DMH) slowed further. DMH's failure to timely accept referrals and assign bed numbers resulted in long transfer delays. The number of inmates transferred to DMH for higher levels of care remained about the same, but delays lengthened. More stays in MHCBs and the MHOHU exceeded timelines. The average time lapse between referral and transfer to DMH was 15 days, with a range of five to 49 days. From April 17 to October 13, 2006, staff made 36 referrals to DMH; 25 resulted in transfer. Seven referrals were rescinded. Entries for four cases were incomplete.

Staff made 19 referrals to Salinas Valley Psychiatric Program (SVPP) for intermediate inpatient care from April through October 2006. Eleven resulted in transfers, four were pending, data were missing in four cases, and one inmate was discharged to Folsom State Prison rather than sent to Salinas Valley State Prison. Wait

times for the 11 inmates who reached SVPP ranged from 28 to 268 days. Waits of seven inmates ranged from 28 to 83 days, while waits for four inmates were 152, 170, 248, and 268 days, respectively.

There were no referrals or transfers to intermediate care at the acute psychiatric program (APP) at California Medical Facility or at Atascadero State Hospital (ASH).

CSP/Sac had two licensed MHCB units, one in the CTC and one in a renovated gymnasium. The MHCB in the CTC had 15 beds, some of which were occupied by medical patients. The second MHCB, activated in June 2006, had 11 beds. A 20-bed MHOHU was activated in December 2005.

From June 12, 2006 to October 13, 2006, 133 inmates, or an average of 26.6 per month, were discharged from the MHCB units. Lengths of stay exceeded ten days in 57, or 43 percent, of cases. Twelve of the 57 cases with excessive lengths of stay involved referrals to DMH.

The MHOHU was busier, with an average of 98 admissions per month during the same period of time. During those five months, there were 391 admissions, with174, or 45 percent, over four days in duration. Lengths of stay in excess of seven days were common.

The use of holding cells fell sharply. In September, three inmates were placed in holding cells pending admission to the MHCB or MHOHU. One inmate spent three days in a holding cell; the other two spent less than one day. Two of the three were returned to their housing units; one was admitted to the MHOHU.

Staff reported that since a second PSU was activated, transfers to PSU

11

beds were timely.

Other CAP Issues:

      a. Partial Compliance

      The problem of suitable EOP treatment space was resolved by the opening of a new mental health treatment center. As predicted by staff, the expansion of EOP and PSU beds challenged the institution's ability to sustain previous levels of compliance. The amount of treatment provided to each EOP inmate was reduced, and more contacts were made at cell-front. CSP/Sac was able to sustain compliance rates of 90 percent or better with requirements for timely initial IDTT meetings, quarterly IDTT reviews, and weekly case manager contacts for EOP and PSU inmates, as well as for those 3CMS inmates housed in administrative segregation.

      In October 2006, general population EOP inmates were offered at most eight-and-one-half hours of structured therapeutic activity weekly. Due to problems with the MHTS, staff did not report actual numbers of treatment hours received by inmates. A standard EOP weekly schedule included five hours of supervised outdoor recreation time with two to four treatment groups plus an individual case manager contact.

      The ratio of inmates to recreational therapists during supervised outdoor recreation was very high, up to 190 to two. During the site visit, the monitor's expert observed recreational therapy and noted that while five or six dozen inmates were in the yard and receiving credit for participating in recreational therapy, roughly two dozen were participating in activities organized by the recreational therapists.

      Optional activities available to all EOP inmates included Alcoholics anonymous and Narcotics Anonymous meetings, music, or choir and religious services.

A maximum of 27 EOP inmates could attend education classes. Community meetings were suspended.

EOP inmates in administrative segregation received approximately nine hours of out-of-cell structured therapeutic activities per week. Treatment groups that were observed in administrative segregation combined didactic and process-oriented techniques. Clinicians knew the inmates well and were highly skilled. Nearly half of all individual contacts were made at cell-front.

b. Non-Compliance

In the PSU, a staff audit found that 45 percent of contacts were made at cell-front. Most groups offered in the PSU were substandard in quality and involved social and leisure activities. Too many clinical contacts, including monthly psychiatric appointments, were made at cell-front. Inmates were particularly critical of cell-front psychiatric contacts that were made without benefit of a UHR.

Staff and inmates reported that a small but influential number of predatory inmates in the EOP preyed upon vulnerable inmates.

The only group treatment provided to 3CMS inmates during the monitoring period were two groups designed to assist recently discharged EOP inmates with adjustment to new housing placements and the 3CMS level of care.

Other Issues:

Intervals between case manager contacts were longer than 90 days for 3CMS inmates. There were fewer than ten hours per week of structured therapeutic activities in the EOP and PSU units and greater frequency of cell-front contacts.

The monitor found that housing units had new emergency response kits

that contained cut-down tools, ambu bags, and extra micro-shields. All officers who were interviewed possessed a micro-shield. They reported receiving annual training in CPR that included instruction in the use of micro-shields and ambu bags. Review of incident reports involving inmate deaths indicated that staff responded quickly and appropriately to emergencies.

### Folsom State Prison (Folsom)
Paper Review

Staffing was excellent in almost every discipline, although Folsom had struggled with it during the monitoring period. By December 2006, both psychiatry positions were filled, as were all seven case management positions. Licensing was pending for two of the psychologists. Two of three psych tech positions were filled, as were a similar number of clerical positions.

Medical technical assistants (MTAs), medical records and pharmacy each had only one vacancy. The lab was fully staffed. Eighty percent of RN positions were filled. Custody experienced a 24 percent vacancy rate.

The MHSDS population included six EOP inmates living in mainline, 55 administrative segregation 3CMS inmates, and 618 3CMS inmates. Folsom had been scheduled to convert a significant portion of the population to sensitive needs yard (SNY), but that change had been suspended indefinitely. Folsom experienced a large influx of prisoners which required substantial staff time for screening and evaluation. Caseload numbers grew by approximately 30 percent.

Issues Resolved:

Mental health tracking system (MHTS) entry was accurate.

MHCB referral tracking included necessary dates, including dates of

return.

Psychiatrists prescribed HS medications.

Quality Management:

Folsom performed well in implementing quality management. All structures were well established and well composed and conducted meaningful work with demonstrated results. All three committees met often with multidisciplinary representation and covered detailed, quality-based information. The local governing body received reports from the quality management committee, which reviewed reports from the mental health subcommittee. The subcommittee discussed reports from QITs and suicide prevention focus improvement teams (FITs), peer review, audits, and related follow-up plans.

Folsom made good use of the QIT process to solve identified problems, design procedures for new mandates, and measure compliance to ensure that good practices were sustained. Many issues were addressed through the QIT structure. Problem-solving discussions, audits, and remedies for poor results were evident. Reportedly, clinical line staff, clerical staff, and other departments participated widely in QITs. In some instances, issues were dropped, QITs were closed before issues were resolved, and some records were difficult to follow.

Peer review was well established for all disciplines. It examined timeline compliance and quality questions, providing detailed analysis of deficiencies. The number of charts reviewed was insufficient for some of the questions posed.

Suicide Prevention:

Suicide Prevention Committee minutes reflected good discussion,

information sharing, and problem solving on critical matters, including reviewing completed suicides, planning for corrective actions in response, detailed case reviews, and review of new Division of Correctional Health Care Services (DCHCS) directives. While screening new administrative segregation placements improved, the practice was not clearly solidified, and staff did not use suicide-related inmate profiles. Audits documented better performance after QIT-initiated remedies, but the QIT closed out while results were at only 64 percent, and there was variable practice subsequently. Screening refusals were extremely rare. Folsom used well-designed procedures to identify MHSDS inmates moved to the unit.

Custody staff adopted the requirements to conduct welfare checks and to prepare for, train, and equip themselves to perform CPR. Intake signs were posted, and sample welfare check documentation, together with staff interviews, indicated that it was well done and that extra measures had been taken to ensure close oversight. Only a handful of custody staff remained to be trained in CPR, and a wide variety of health care staff were CPR certified. Memos repeatedly reinforced staff's obligation to provide CPR. Emergency drills were conducted monthly on each shift and involved CPR and several scenarios likely to arise from mental health issues. All interviewed custody staff had micro-shields. Ambu bags and cut-down kits were on multiple tiers, and officers knew how to access them easily. Inventories showed erratic practice but generally demonstrated that equipment was checked often.

Clinical staff worked through QITs to ensure that suicide risk assessments were completed at an extraordinary level and inmate profiles were printed for transferring inmates. Staff also demonstrated reasonable facility with the MHTS suicide tracking

function. There were detailed and thoughtful systems for suicide follow-up, but staff's audit results differed from the monitor's, and custody follow-up had not been reviewed. Staff's audits found only two single-day breakdowns, and a QIT acted to remedy the underlying causes. However, in the monitor's review, six follow-ups were uncertain, and five either started late, showed gaps in contacts, or ended early.

There was a completed suicide during the monitoring period. Several internal bodies conducted reviews. There was excellent implementation of the DCHCS corrective action plan, which emphasized referral practices, sufficient documentation, timeliness of initiating emergency response, and proper use of the defibrillator. DCHCS discovered an additional issue with a 2004 suicide, and Folsom similarly worked to resolve it. Staff appeared to administer CPR adequately in all other incidents requiring it, according to the monitor's review of incident reports. The emergency response review committee examined these incidents and made reasonable recommendations for improved practice.

Medication Management:

Much of medication delivery practice was undemonstrated. There was no proof of practice for medication continuity on arrival, renewals, times from order to delivery, reporting of errors, and DOT. Studies lacked clarity or were inadequately structured concerning medication continuity on housing moves, laboratory testing, and follow-up on non-compliance.

Medications sometimes expired in administrative segregation, according to psych techs. A QIT discussed measures to minimize this, but it was not clear whether they were implemented. Folsom had an appropriate policy for following up medication

non-compliance. Staff had not examined whether all relevant inmates were referred and seen timely. Consent forms were present in 93 percent of UHRs in a staff audit of small size but adequate methodology.

A substantial number of inmates had DOT orders. Folsom had ceased Keyhea oversight, which was a troubling development. There were at least 190 orders for HS medications, suggesting that psychiatrists were exercising their clinical judgment in this regard. There was an excellent method for ensuring that paroling inmates received their medication, and a sound audit found full compliance.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

Disciplinary hearing officers' decisions were affected by mental health input, although few cases went through the assessment process. There were 1,436 RVRs issued during the monitoring period. Of those, 303 were written for 3CMS inmates but only 12 were referred for mental health assessments. Another two general population prisoners were referred for bizarre or uncharacteristic behavior. EOP inmates received 11 RVRs, but two of them were not assessed as required.

Most assessments provided useful information in clear language. In the two cases where mental illness was thought to contribute, the hearing officer dismissed or mitigated the penalty because of the input. Staff conducted routine audits of all MHSDS assessments but had not focused on whether bizarre or uncharacteristic behavior was being overlooked, or on whether clinicians routinely interviewed the inmate and reviewed the UHR and central file (C-file), or on the quality of mental health input. There were no RVRs written for self-injuries, and although clinical staff were familiar with the screening and evaluation protocols for sexual misconduct, documents did not clearly

demonstrate that these always took place.

Transfers:

Folsom did not refer inmates directly to DMH. All inmates needing observation or inpatient treatment were sent to CSP/Sac and reportedly were kept in the clinic, in R&R, or in an administrative segregation holding cell on one-to-one watch until transport. A log showed 68 such referrals in the eight-month monitoring period. All were completed the same day, according to staff.

Timeliness of EOP transfers was moderate. All but one of the EOP inmates on site in December 2006 were within time frames. There were 40 cases completed by placement, level of care downgrade, or transfer to court or to MHCB with no return. Of them, 78 percent were timely. Most of the remainder were extended by less than one month, and the longest case transferred within six months.

Among the 173 3CMS inmates in administrative segregation during the monitoring period, 42 percent lived there beyond 90 days. Longer stays typically concluded by seven months, but a small percentage stretched up to two years. A total of 17 EOP inmates lived in administrative segregation, and three were there as long as 90 days.

Other CAP Issues:

a. Partial Compliance

Most aspects of 3CMS treatment were functioning well. Staff continued to monitor relevant tasks closely. The presence of treatment plans improved during the monitoring period, with a QIT chartered to look into the presence of plans, their quality,

and participation in IDTT. Interdisciplinary problem solving improved inmate participation. A series of reliable audits found compliance rates at 84 percent or better. Correctional counselor I (CC I) and psychiatric participation were found in over 90 percent, although audits appeared to be less sound. Treatment plans were present for at least 90 percent of inmates, but plan quality was still unexamined.

Case managers consistently saw EOP inmates weekly, with an 88-percent compliance rate in the monitor's review. EOP IDTTs were timely. Psychiatrists saw these inmates at least at three-month intervals, and most were seen at least monthly.

In administrative segregation, the rate of compliance with weekly case manager contacts was 78 percent, according to the monitor's analysis. There was a question about whether contacts were initiated late for some new placements, but contacts occurred in private settings at an excellent rate. Administrative segregation IDTTs did not fare as well. Only 81 percent of initial IDTTs were held timely. The deficient cases were evenly divided between being a few days late and several weeks late. Only half of the inmates who needed updates received them timely, and all of the late cases were overdue by a month or longer. Management described steps taken to remedy these problems. Psychiatrists saw the great majority of these inmates much more often than the expected 90-day intervals. However, another 16 percent were significantly late.

Staff convened a QIT concerning different aspects of referrals, which resulted in improved follow-up and detailed policy for handling urgent and emergent referrals. Other aspects of the QIT's work appeared to have been dropped. It had not yet examined timeliness of transmission. Printouts suggested that almost half of self-referrals and more than a third of the staff referrals took more than two days to reach the

mental health department. Transmission times appeared to extend up to 24 days. There was limited information from which to discern response timeliness as MHTS data was incomplete. In the subset available, referrals generally were answered within two weeks or shortly thereafter.

b. Non-Compliance

There was no indication of attempts to address deficiencies in pre-release planning.

Other Issues:

Folsom showed good heat-monitoring practices, with the possible exception of Stage III rounds. Heat logs were completed consistently, and watch command daily activity reports showed expected alert activations. Although there was documentation of some MTA rounds during the Stage III alerts, including notes regarding providing ice and showers, it was incomplete. Reportedly, there were no heat-related injuries.

## Service Area B

Service Area B includes Pelican Bay State Prison, High Desert State Prison and the California Correctional Center.

### Pelican Bay State Prison (PBSP)
January 8, 2007 – January 9, 2007

21

The vacancy rate among mental health staff remained high at 27 percent. Contactors covered 20 percent of vacancies. The vacancy rate in psychiatry was higher, reaching 47 percent. The position of chief psychiatrist remained vacant throughout the monitoring period but was filled in January 2007. The position of senior psychiatrist remained vacant. Nearly half of the staff psychiatrist positions, 3.5 of 7.5, were vacant. The amount of contractual coverage was negligible, with six contractors covering the equivalent of 1.5 positions during most of the monitoring period.

The position of chief psychologist was vacant, as was one of four senior psychologist positions. Five of 19.5, or 26 percent, staff psychology positions were vacant. Contractual coverage of psychology vacancies declined to zero during the monitoring period. Contractual staff covered the equivalent of 2.5 positions from June through September 2006. One position was covered in October, but in November, contractual coverage fell to zero.

All eight social worker positions were filled. Three long-term contractors provided additional coverage equivalent to 2.5 full-time positions throughout the monitoring period. One of four recreational therapy positions was vacant. Nine of 26.5 psych tech positions were vacant. None of the vacant positions for recreational therapists or psych techs were covered by contractual staff. Among clerical staff, 3.5 of 15.5 positions were vacant.

Nearly all RN positions were filled, with only 2.7 of 44 vacant. Five of six licensed vocational nurse (LVN) positions were vacant. None of the LVN vacancies were covered by contractors. All 31 MTA positions were filled, although long-term absences created two functional vacancies. Both were covered by contractors. Eight of 28

positions in medical records were vacant, and long-term absences left two additional positions functionally vacant. None of those vacancies were covered by contractors. All seven pharmacy positions were filled. One of two laboratory positions was vacant but was fully covered by a contractor.   ·

PBSP's census was 3,530.  There were 522 MHSDS inmates, including 337 3CMS, 64 EOP, and 122 PSU inmates.  Eight inmates were in the MHCB unit.  Most of the inmates in administrative segregation, 94 of 129, were on the caseload.  Seven MHSDS inmates were in the security housing unit (SHU).

Several matters that were new or notable arose during the monitor's visit. First, custody staff reported that there had been fewer lockdowns during the past three months. The decline was attributed to the new warden's method of dealing with incidents using an incremental rather than a global approach.  He cited the uninterrupted delivery of mental health treatment as one of several high priorities.  Second, there were anecdotal reports of irregular behavior exhibited toward EOP inmates by custody staff.  Third, before the monitor's visit and during the exit conference, plaintiffs' counsel raised the issue of special treatment plans written for selected inmates who repeatedly expressed suicidal ideation and were taken to the CTC for evaluation but were found to have exaggerated or misreported suicidal ideation.  Because no special treatment plans were found in the UHRs reviewed, plaintiffs' counsel provided a copy of one.  The plan permitted the use of holding cells for longer than four hours, contrary to a departmental directive.

Quality Management:

The quality management process, which was sharply curtailed by Madrid

Patient Information Management System (MPIMS) during the preceding 18 months and by the departure of the chief psychiatrist in August, had not rebounded to its prior level by January 2007. PBSP abandoned use of the MHTS with the advent of MPIMS. Staff qualified audit results, saying that they might be based on faulty information due to the shortcomings of MPIMs.

The mental health quality management committee continued to meet weekly. Until August 2006, meetings were well documented and appeared to follow up important matters. QITs were chartered, issued reports, and disbanded. A total of six QITs were active during the monitoring period. Two were chartered to address issues identified during the previous monitoring visit. One addressed the issue of special treatment plans.

After August 2006, the focus of quality management meetings narrowed to management updates. Minutes of meetings held from September through November did not reflect any quality management activities. There was little discussion of key indicators or QIT reports and little follow-up of problems. One QIT stalled. Custody attendance dropped to zero during November.

Suicide Prevention:

The committee was inactive and inattentive to its mission. The committee was scheduled to meet monthly, but half of the meetings were cancelled. The composition was lacking, and attendance was poor. Most meetings were attended by the same handful of mental health staff and a custody captain. Disciplines such as nursing were often not represented. The MHCB report was the main agenda item of most meetings. The report included the number of MHCB admissions and discharges and the

24

number of referrals made to DMH. The committee was attentive to the requirement to track history of suicide attempts using the MHTS. The committee did not track five-day follow-u or custody observations or correct misconceptions regarding pre-screenings for placement in administrative segregation. On occasion, a local suicide prevention issue was raised, but there was no indication that those issues were subsequently revisited.

The administrative segregation suicide reduction plan was partially implemented. The associate warden for health care was involved in developing PBSP's local procedures. The first tier of the administrative segregation unit was used for new arrivals to the unit. All inmates in administrative segregation were observed for 30-minute wellness checks.

Staff reported that a management-level position established to supervise psych techs within the nursing department was essential to compliance, given the many psych tech duties that had accumulated over time. As a matter of standard procedure, psych techs screened all non-MHSDS inmates within 72 hours and documented the screenings in an electronic database. A screening documentation problem noted during the previous monitoring period was solved. According to key indicators reports, during the current monitoring period, zero to eight inmates per month were not screened timely.

Screenings were typically done out of cell in a holding cell located in the rotunda. Screenings were done at cell-front when inmates refused to come out. Staff were attentive to whether screenings were confidential, which depended upon the position of hatches in the ceiling of the rotunda. The position of hatches during clinical contacts was recorded and compiled. By policy, all inmates who refused screening were referred to mental health staff.

Medication Management:

PBSP's ability to monitor medication management faltered due to problems with MPIMS, which could not print out medication administration records (MARs) or aggregate data needed for quality management purposes. During the last eight months of 2006, staff did three audits pertaining to medication management. The audits addressed HS medication, presence or absence of lab tests, and whether UHRs contained documentation of AIMS tests and informed consent.

Staff reported interruptions in medication continuity, particularly when renewals were due. Expirations were attributed to psychiatry vacancies and were reportedly most problematic in the administrative segregation units. Other medication continuity issues reportedly stemmed from physicians' orders that were written late on Friday afternoons.

Inaccurate MARs that recorded the administration of Decanoate medications were reported, potentially making the use of long-acting antipsychotic medication dangerous. There appeared to be issues related to the implementation of medication non-compliance procedures due to variations in what staff viewed as medication non-compliance.

Staff was aware that HS medications were sometimes administered earlier than 8:00 p.m.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

Local procedures for handling inmate sexual misconduct included placement of opaque covers on cell-door windows. Inmates with a history of RVRs for sexual misconduct wore color-coded jumpsuits when out of cell. RVRs for indecent

exposure prompted referrals for mental health screening, IDTT reviews, and, in some cases, a comprehensive diagnostic evaluation.

From April through November 2006, mental health staff conducted approximately 40 screenings, all of which were reviewed by an IDTT. Comprehensive evaluations were completed in 30 cases. Three inmates were diagnosed with exhibitionism. Inmates diagnosed with exhibitionism were reportedly encouraged to discuss related issues during weekly case manager contacts.

Two treatment groups were running. Both were offered to inmates who had incurred RVRs for sexual misconduct. Enrollment was not restricted to those with a diagnosis of exhibitionism. One group, held in the PSU, was open-ended. The second was a six-session group held in administrative segregation. The monitor's expert found that the six-week group was unlikely to have a therapeutic effect.

Transfers:

Complete and accurate information about access to DMH and the MHCB, as well as the operations of the MHCB, was elusive. Most findings were based upon incomplete logs, key indicators reports, related source documents, and oral reports by staff. Staff did not provide logs of restraint use or the administration of involuntary medication, although both interventions were frequent.

Access to higher levels of care provided by DMH was slow. From May through November 2006, PBSP made 27 referrals, on average four per month, to DMH's acute psychiatric program at Vacaville. Four to seven days typically elapsed between referral and receipt of a bed number, except during September, when the average number of days between referral and assignment of a bed number was 17.

Transportation to DMH following assignment of a bed number extended to 13 days in September but was typically less. During the other six months of the monitoring period, transfers were effectuated within one to three days. Transfer timelines exceeded 72 hours during the months of June and July, when transfer times averaged 3.5 and 3.25 days, respectively.

Nine to 11 inmates were transferred to intermediate care. Wait times for a bed at SVPP ranged from a few days to six months.

Ten of the 20 beds in the CTC were MHCBs. The MHCB census averaged seven to eight. Twenty admissions originated outside of PBSP, most from Deuel Vocational Institution and San Quentin. The average length of stay in the MHCB climbed during the monitoring period, with occasional spikes and dips. According to key indicators reports, in May, the average length of stay was 5.5 days. Following a spike in June, when it was 7.6 days, the average fell to 4.5 days in July. Thereafter, the average length of stay was eight to ten days.

Staff reported good access to the MHCB. The MHCB had a number of good practices as well as several questionable ones, among them an unusual suicide watch protocol, the frequency and duration of restraint use, and special treatment plans. All inmates had a psychosocial assessment upon admission and discharge. Mental health contacts were routinely made out of cell. Strip orders were modified to permit a mattress, a no-tear blanket, and a smock. Inmates who were permitted full issue had access to the yard and recreational activities. A correctional counselor facilitated the resolution of personal safety issues and classification matters for inmates sent from reception centers, as well as those in residence at PBSP. PBSP made frequent use of Keyhea orders,

typically initiating eight to 12 petitions each month.

One-to-one suicide watches were reportedly rare. Instead, staff used a three-level suicide watch protocol. All three levels required a physician's order. Staff described the watches as follows: (1) Suicide watch was done by an officer posted at the door of a cell, not a seclusion room, watching one inmate continuously. No camera was used. (2) An intermediate level of monitoring was done in a seclusion room with the use of a camera and 15-minute nursing checks. (3) Behavior checks were defined as hourly nursing observations.

During the previous monitoring period, questions were raised regarding the use of restraints. Despite staff's report that the use of restraints was nearly eliminated, key indicators reports showed 48 uses of restraints during the seven-month period ending in November. In 18 cases, the duration of time in restraints exceeded 24 hours.

A QIT was chartered in April to address the issue of special treatment plans, but it met only twice, in April and August. The QIT did not use a multidisciplinary approach or issue recommendations. The stated purpose of special treatment plans was to reduce the high number of false alarms and MHCB admissions generated by a small number of individuals. The plan that was reviewed by the monitor's expert called for the inmate to be placed in a holding cell near his housing unit for up to six hours unless he recanted his reports of suicidal ideation before six hours elapsed. Plaintiffs' counsel reported that one inmate complained of being left in a holding cell for eight hours.

Other CAP Issues:

Quality of treatment in the PSU and EOP remained a concern. No EOP or

PSU groups were running during the visit because it was an interim period between two sessions. The average number of hours of out-of-cell structured therapeutic activity offered to inmates remained unknown due to shortcomings of the MPIMS. Despite a previous recommendation made by the monitor's expert, staff had not been directed to develop treatment designed to meet the needs of inmates who had exhausted the variety of treatment offerings because of their long tenures in the EOP at PBSP.

Other Issues:

A pilot project to provide enhanced mental health treatment in administrative segregation was underway, but implementation was slowed by a significant increase in the 3CMS census and lack of consistent psychiatry coverage. Renovations to create treatment and office space were underway, with an anticipated completion date in March 2007.

The pilot project included all 3CMS inmates in one administrative segregation unit. The size of the caseload in that unit and its overflow area was reportedly 94 while the capacity of the pilot program was 45. Eight treatment groups were run rather than the nine groups planned. Weekly case manager contacts and use of a levels system continued, unimpeded by construction. Caseload inmates did not receive ten hours of outdoor yard time weekly. Staff reported that the number of recreational cages limited offers of outdoor recreational time to six hours per week.

PBSP's behavior modification unit (BMU) was activated in September 2006. By early January 2007, the BMU housed 33 inmates, three of whom were participants in the MHSDS at the 3CMS level of care. From a custodial standpoint, the BMU was considered general population housing. Inmates housed were not cuffed when

30

attending activities outside of their cells.

The local operating procedure listed several criteria for BMU placement. Inmates with significant disciplinary histories and those found guilty of an offense for which a SHU term had been assessed met the criteria. Inmates who were involved in gangs in the free world or in prison, as well as those who refused to accept a cell mate, also met the criteria.

Inmates were assessed by a unit classification committee (UCC) within 14 days of placement and reviewed monthly thereafter. Contrary to California Department of Corrections and Rehabilitation (CDCR) policy, mental health staff did not participate in the UCC meetings. At the initial UCC meeting, an individualized treatment plan was developed that consisted of so-called behavior modification assignments. Treatment plans listed classes and self-help materials related to anger management, coping with a life sentence, and relapse prevention. Inmates were expected to complete the activities listed in the treatment plan, remain RVR-free, and pass monthly drug tests in order to advance through three privilege steps and return to general population.

Inmates in the BMU were to have access to a minimum of ten hours of out-of-cell time a week, including dayroom, class and showers. Inmates had to remain at each step for at least 30 days. In privilege step one, visits, non-emergency telephone calls, packages, and use of the outdoor yard were prohibited. Canteen allowance was reduced by three quarters. During step two, non-contact visits and one telephone call per month were permitted. The canteen allowance was raised to half of the standard amount. Packages and access to the outdoor yard were prohibited in step two. In step three, access was granted to the outdoor yard and to work assignments, if any were available. Access

to goods and privileges did not change.

In January 2007, 22 inmates in the BMU were in privilege step one. Eight had been retained in step one for two to three months for refusing to accept a cell mate, failing to follow their treatment plans, receiving an RVR while housed in the BMU, or a combination of those factors. Six inmates had moved to step two, and five had advanced to step three. Four inmates graduated from the BMU shortly before the monitor's visit.

PBSP chartered a QIT to review emergency responses and revise local policies and procedures to make them consistent with statewide requirements. The QIT comprised only nursing staff. No custody staff were members.

### High Desert State Prison (HDSP)
November 28, 2006 – November 30, 2006

HDSP's rate of vacancies in mental health positions increased from 37 percent to 44 percent during the monitoring period. Contractors covered half of the vacancies.

HDSP was unable to recruit psychiatrists. Positions for 5.5 allocated staff psychiatrists and a full-time senior psychiatrist were vacant. Contract psychiatrists provided the equivalent of only two full-time positions. Telemedicine was available on three yards and provided an additional 48 hours a month of psychiatric services. No psychiatric coverage was available at HDSP on 17 days during the monitoring period, and psychologists occasionally responded to emergency referrals for psychiatric services.

As for case managers, 11 of 14 allocated clinical psychologist and social worker positions were filled. Contractors covered case manager vacancies, filling the equivalent of 6.6 positions in October 2006. The institution's sole recreational therapist position was vacant, as were 4.5 of six psych tech positions and two of eight clerical

32

positions.

In November 2006, HDSP's overall inmate population was 4,612, which included 513 reception center inmates and four inmates in outside hospitals. A ten-percent increase in monthly reception center intakes propelled a surge in HDSP's caseload population during the monitoring period. Between May and November 2006, the total caseload population increased by 31 percent, and the number of 3CMS inmates in the reception center grew by 55 percent. The 3CMS census was 770 inmates, 19 percent above HDSP's rated capacity of 649. There were 153 3CMS inmates in the reception center. Administrative segregation held 149 inmates, 64 of them 3CMS inmates. Three EOP inmates awaited transfer, and one EOP inmate was temporarily housed at HDSP to attend court proceedings. Seven inmates were in MHCBs.

Quality Management:

Minutes indicated that the mental health quality assurance subcommittee met approximately bi weekly. Less than half of the listed committee members attended the meetings. The meetings routinely addressed audit findings, staffing issues, and the status of active QITs. Other topics relevant to the mental health program were added to the agenda on an ad hoc basis.

QITs were underutilized. The sole QIT that was active during the monitoring period produced a final report in October 2006 that recommended changes to the institution's protocol for medication refusals.

HDSP's mental health staff completed quarterly audits in a dozen or so areas, most of which produced reliable information regarding the status of unresolved CAP items.  During the monitoring period, nursing staff assumed responsibility for

auditing all CAP issues related to medication management. Nursing audits, which encompassed all kinds of prescriptions, frequently utilized sample sizes for psychotropic medications that were too small to render meaningful results.

Peer review was established for psychologists and social workers. The psychology peer review committee met twice and the social work peer review committee four times during the monitoring period. Peer review was not yet initiated for psychiatrists.

HDSP continued to maximize its usage of the MHTS. Staff reported having difficulty with the latest upgrade to MHTS, including ongoing problems identifying newly arrived caseload inmates.

Suicide Prevention:

Minutes indicated that HDSP's suicide prevention committee met monthly throughout the monitoring period. Some of the meetings were attended by as few as half of the listed committee members. The meetings routinely addressed suicide attempts, crisis bed admission, and staff training needs. Other relevant areas were added as needed to the agenda.

Institutional tracking records covering July and August 2006 yielded a compliance rate of 61 percent for follow-up of suicidal inmates discharged from the MHCB. Suicide prevention committee meeting minutes indicated that compliance with custody checks following discharge from the MHCB was also problematic.

Intake screens were not consistently completed in administrative segregation units. Six of eleven UHRs reviewed by the monitor did not contain a 31-question mental health screen.

New arrivals to administrative segregation were placed in identified intake cells. Documentation indicated that intake-status inmates received staggered 30-minute welfare checks during their first three weeks in administrative segregation.

The results of suicide risk assessments were entered into the MHTS. Staff had not started producing suicide history reports for transfers or administrative segregation screens.

Medication Management:

HDSP's inability to recruit psychiatrists compromised nearly every aspect of medication management. Nursing audits utilized insufficient sample sizes and often did not distinguish between psychotropic and other kinds of medications, thereby producing statistically insignificant and/or indecipherable results. Key areas within medication management were not audited.

Medication continuity for new arrivals to the reception center was problematic. Nursing audits found that only 50 to 60 percent of new-arrival inmates received all medications prescribed by the sending institution. Psychiatrists routinely discontinued medications that were not on HDSP's formulary and changed medication regimens that were deemed to be contraindicated, often without written explanation or justification. Medications that were approved by the pharmacy at HDSP were ordered and administered to inmates within 24 hours of arrival 87 to 100 percent of the time.

It appeared that continuity of medications for inmates transferred to HDSP from other CDCR prisons had improved, though a small sample size rendered the audit findings statistically insignificant. Two nursing audits generated a combined sample size of 14 cases, of which 75 to 100 percent received medication within 24 hours of arrival.

Nursing audits suggested that medication continuity was sustained when inmates moved within the institution, though a small sample size compromised the reliability of these findings. Nine intra-facility transfers were reviewed during the third and fourth quarters of 2006, none of which resulted in medication lapses.

HDSP continued to struggle to renew 90-day medication orders in a timely manner. Psychiatrists routinely used 30-day bridging orders to avoid expiration lapses, and it was not uncommon for inmates to receive two 30-day medication extensions without psychiatric contact. Nursing audits utilized small sample sizes and did not distinguish between psychotropic and other types of medications. A review of 19 cases during the second and third quarters of 2006 found that "essential" medications were renewed prior to expiration 67 percent to 100 percent of the time. It could not be discerned if psychotropic medication orders were included in any of the reviewed cases.

Audits of the institution's response to medication non-compliance utilized sample sizes that were too small to produce meaningful results. During the second and third quarters of 2006, nursing staff reviewed four MARs belonging to inmates who had missed doses of psychotropic medication. Half to all of the inmates in these audits were referred to mental health and seen within seven days. A QIT issued a final report in October 2006 that proposed several changes related to the documentation and referral of medication refusal and non-compliance. These changes were summarized in an instructional guide for nursing staff.

HDSP did not audit its system for monitoring blood levels of inmates prescribed mood-stabilizing medications. HDSP's laboratory was not adequately staffed. All blood work related to mood-stabilizing medications was performed by a local

36

hospital.

Psychiatrists rarely ordered DOT, and the mental health department did routinely track documented cases of hoarding, cheeking, trafficking, and overdose. In late November 2006, eight caseload inmates had current orders for DOT. Staff reported that DOT medications were usually administered in pill lines. During lockdowns and in administrative segregation, inmates were not typically removed from their cells to receive DOT medications. Frequently abused medications were routinely administered in crushed or liquid form. The administration of DOT medications was not audited during the monitoring period.

HDSP successfully initiated one Keyhea petition during the monitoring period. This inmate was subsequently transferred from HDSP. In late November 2006, there were no inmates with current Keyhea orders at HDSP.

Only five inmates were prescribed psychiatric medications at HS. In these few cases, medications were reportedly administered at or after 8:00 p.m.


Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

From May 1 to November 20, 200, HDSP issued 17 RVRs for indecent exposure, of which 15 were referred to the local district attorney. None of the referred cases had been accepted by the district attorney as of the end of November 2006. HDSP had not adopted the use of special jumpsuits or cell-door coverings to discourage sexually inappropriate behavior. All inmates issued RVRs for sexual misconduct received a mental health screen and IDTT review. No cases had been referred for a thorough

evaluation, and there were no inmates at HDSP with a diagnosis of exhibitionism during the monitor's visit.

Transfers:

A number of factors combined to restrict access to MHCB and acute and intermediate inpatient levels of care. Poor communication and coordination between MHCB staff and 3CMS clinicians compromised the treatment provided to difficult and often low-functioning caseload inmates. The MHCB treatment team's overemphasis on malingered symptoms resulted in inappropriately rejected referrals, premature discharges, a reluctance to raise level of care to EOP, and an under utilization of DMH acute care.

Nineteen of 20 medical beds in the CTC were occupied by patients with long-term chronic medical conditions, and medical patients with relatively short-term needs were routinely placed in MHCBs. The consequent reduction in MHCB capacity increased pressure on staff to reject outside referrals and reduce length of stay.

Records reviewed and an IDTT meeting observed by the monitor's expert highlighted MHCB staff's high threshold for referring inmates to EOP and DMH and a tendency to discharge poorly functioning inmates (see Exhibit A, Case Reviews 4, 5 and 6).

Referrals to DMH acute care averaged less than one every two months during the monitoring period. From May 1 to November 20, 2006, HDSP made three referrals to DMH acute inpatient care at California Medical Facility, two of which resulted in transfer. Both transferred inmates were timely referred and transported to DMH within 72 hours of receiving bed assignments. Delays between referral and transfer were ten days and 22 days, respectively. The third referred inmate had been awaiting

transfer for seven days at the time of the monitoring tour. No referrals were made to DMH intermediate inpatient programs during the monitoring period.

HDSP's 32-bed CTC included 12 MHCBs. The MHCB admission rate, averaging 25 a month, had not changed since the last monitoring period, an unexpected situation in light of the concurrent surge in HDSP's caseload population. From May 1 through November 20, 2006 there were 165 admissions to the MHCB, of which 80, or 49 percent, were from other CDCR prisons. Six inmates were admitted to the MHCB unit more than twice, and eight admissions lasted longer than ten days.

Staff's audit of MHCB operations found compliance in 11 of 12 reviewed performance areas. The compliance rate for daily psychiatric rounds improved, climbing from 30 percent during the fourth quarter of 2005 to 70 percent during the second quarter of 2006.

HDSP transferred fewer EOP inmates than past in monitoring periods and more consistently met court-ordered transfer timelines. From May 1 to November 4, 2006, HDSP transferred only eight EOP inmates and released one EOP inmate on parole, about 28 fewer transfers than were reported during the preceding monitoring tour. Six of eight EOP transfers were timely. One EOP SNY transfer took 113 days, and a redirected transfer took 82 days. The paroled inmate was released from HDSP two weeks after his level of care was raised to EOP. Two of three pending cases were late, with one at 133 days and another at 63 days.

Reception center intake increased by about ten percent during the monitoring period, averaging 252 inmates a month since May 1, 2006. In mid-November 2006, the reception center held more than 500 inmates. This included 153 3CMS inmates,

of whom 38, or 25 percent, had been in the reception center for longer than 90 days.

Other CAP Issues:

a. Partial Compliance:

Institutional audits from July and October 2006 found that a quarter of initial assessments were not completed within ten days of arrival. Staff attributed noncompliance to increased intakes and the lack of a reliable system for timely identifying new arrivals. Timely completion of initial treatment plans and IDTT reviews neared resolution with an average compliance rate of 88 percent.

Group therapy was available on all four yards at HDSP, though institutional lockdowns and program restrictions caused frequent cancellations and limited inmate participation. From April 1 to September 30, 2006, 43 general population 3CMS inmates participated in 145 group sessions. Another 117 inmates were on waiting lists. Group therapy was not offered to inmates in administrative segregation during the monitoring period.

Daily psych tech rounds were not consistently completed in administrative segregation units. Administrative segregation logs covering the period from May 1 to October 31, 2006, indicated that psych tech rounds were missed on eight days and only partially completed on another five days. Completed rounds were well documented. UHRs reviewed by the monitor contained weekly psych tech summaries, which often included informative narrative.

Weekly case manager contacts occurred in administrative segregation, though nearly all interviews took place at the inmate's cell door. Some treatment plans reviewed by the monitor recommended weekly cell-front case manager contacts

40

supplemented by semi monthly or monthly one-on-one interviews as needed. Not surprisingly, reviewed case manager progress notes were often devoid of information (see Exhibit A, Case Reviews 7, 8, 9 and 10).

Institutional audits and the monitor's review of UHRs indicated that initial IDTT meetings in administrative segregation were timely completed and updated on a quarterly basis. Psychiatrists did not attend IDTT meetings, and C-files were often unavailable.

The institution's review of completed RVRs found that senior hearing officers inconsistently documented their consideration of mental health input in their findings and dispositions.

A transitional case management program (TCMP) social worker resumed regular visits to HDSP during this monitoring period and reportedly contacted 90 percent of paroling MHSDS inmates prior to their release from prison. UHRs reviewed by the monitor documented the completion of TCMP screens, although three of five reviewed records indicated that the paroling inmate was unavailable for interview. In these cases, the screen was based solely on a review of the inmate's UHR and C-file. The institution had not conducted an independent audit of TCMP screens.

b. Non-Compliance

Psychiatrists did not attend IDTT meetings.

Case managers and psychiatrists did not respond to referrals for mental health services in a timely manner. MHTS data covering the months of August, September, and October 2006 indicated that 44 percent of referrals did not prompt contact within a week.

41

Mental health assessments and case manager contacts in the reception center routinely occurred in non-confidential settings. Assessments were conducted at dayroom tables that afforded limited privacy. EOP inmates awaiting transfer were not seen weekly by their case manager, and many completed contacts occurred at cell-front. Non-compliance was attributed to limited office space and inadequate escort support in the reception center.

MHCB patients had limited opportunities to participate in dayroom activities, outdoor yard, and recreation therapy. HDSP's sole recreation therapist position was vacant, and access to out-of-cell activities in the MHCB unit was inappropriately controlled by custody staff.

Inpatient records were not timely filed in the UHR. Staff reported a backlog of loose filing that averaged two to three feet, and UHRs reviewed by the monitor did not contain paperwork from the preceding four to six weeks.

Other Issues:

The monitor's review of incident reports indicated that emergency responses were sometimes inadequate in that staff did not immediately check for vital signs and initiate CPR (see Exhibit A, Case Reviews 11 and 12).

### California Correctional Center (CCC)
Paper Review

Clinical staffing declined somewhat, though little effect was apparent. There were two allocated psychologist positions, one of which was vacant. A contractor provided full-time coverage for a brief period. The psychiatrist position has always been vacant but covered acceptably by telemedicine in one to three hours per month. One of