the three psych tech positions was vacant throughout the monitoring period. The clerical position was filled.

Registered nurses were short two of 19 positions, and two of 17 MTA positions were vacant. Registry appeared to provide full coverage for these classifications through most of the monitoring period. Medical records had two vacancies among its 11.5 positions. There were no laboratory positions allocated. Pharmacy was short two of its four positions, but these were covered by contractors. Custody staff had a 14-percent vacancy rate, taking into account vacancies and leaves. The MHSDS caseload consisted only of two mainline 3CMS inmates in December 2006.

Quality Management:

Quality management remained limited. The local governing body met monthly but consisted of only the health care manager and the warden. The quality management committee also met monthly for interdisciplinary information sharing. Both lacked systematic problem-solving activity. Mental health topics were discussed only once. Given the limited MHSDS program, there were no mental health subcommittee, QITs, or peer review.

Suicide Prevention:

There were four suicide prevention committee meetings in seven months. Participation was interdisciplinary but erratic, and it was not clear that suicide-related information was covered in every meeting.

Administrative segregation screening improved. Documents showed 97-percent compliance for timely screens and the use of suicide-related profiles. Late screens took up to a week to complete, but staff continued to seek improvements. CCC staff was

proficient with MHTS suicide tracking, with routine input after each suicide-related contact, profile printing for transfers, and the ability to produce various reports.

Staff completed suicide risk assessments during suicide-related outpatient housing unit (OHU) admissions and in many other contacts, according to their self-report and a newly initiated log. Five-day follow-up for very rare MHCB returns reportedly was conducted, but documentation was not retained.

CCC previously established near-perfect compliance in CPR training. Although there was some variation, inventory checks for CPR-related equipment were adequate. There were rare instances when missing equipment was not replaced for a prolonged period. Custody staff immediately initiated CPR and sustained it until an ambulance arrived in the one incident report involving CPR. The paper review was compiled before CDCR instituted welfare checks and emergency drills in administrative segregation.

Medication Management:

Staff reported maintaining the same systems that the monitor found well designed for medication continuity on arrival and housing change, medication renewals, following up medication non-compliance, timely filling of orders and the informed consent process.

Laboratory testing continued to function effectively. A log capturing all MHSDS inmates showed that all necessary lab studies were ordered. Both draws and physician review were timely, with each step completed in three days or less. All psychotropic medications, commonly prescribed to two inmates at any given time, were

delivered DOT without difficulty, according to staff reports. Monitoring previously established that an errors reporting and review process was operational and that there were reasonable systems for identifying and managing Keyhea inmates. There reportedly were no inmates with Keyhea orders and no events of involuntary medication. There was a reasonable HS policy, and there were no inmates with such orders in December 2006. Staff previously described an excellent system of parole medication delivery.

In prior monitoring periods, nursing staff conducted some medication audits, and several showed faulty methodology. None were conducted in 2006. Medication systems appeared to be well designed, but actual performance was undemonstrated on most medication issues.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

Among the 2,204 RVRs written in the monitoring period, only one was issued to an MHSDS inmate, and he received a mental health assessment. Additionally, eight general population inmates were referred for mental health assessments. Clinical staff continued to provide meaningful input. Mental illness was found to contribute in almost half of the assessments, and officers dismissed charges, found the inmate not guilty, or reduced the penalty for each.

Reportedly, there were no RVRs related to self-injury. There were eight indecent exposure RVRs, and all but one had a screening interview. None of the inmates was found to have indicia of mental illness requiring further evaluation. Three were referred to the district attorney, and none was prosecuted. The local operating procedure is detailed and appropriate.

Transfers:

CCC did not refer any inmates directly to acute or intermediate inpatient care at DMH. In the five-month reporting period, five inmates were referred to MHCB and transferred reportedly within hours. Staff provided one-to-one watch in the meantime and did not need to use holding cells, they said. No restraints or seclusion were used. Only four inmates were admitted to OHU, far fewer than in the past. All were discharged timely except one whose stay was five days. The monitor previously found good care delivered in OHU.

Mainline placements or paroles continued to be within time frames. There were 17 inmates identified as 3CMS on-site and three MHSDS inmates sent to CCC. There were no EOP inmates during the monitoring period. Transfers were completed, on average, in 24 days, with the longest taking 41 days. The inappropriate transfers were sent to treating institutions after three to five weeks. There were no excessive lengths of stay in administrative segregation among the three MHSDS inmates who had lived there.

Other CAP Issues:

a. Partial Compliance

Staff transmitted and responded to referrals more timely. A large staff audit found transmission times improved to an average of two days for staff referrals and one day for self-referrals. Average time to response was under five days, and all inmates were seen within two weeks. With previous issues corrected, this area is now compliant.

Administrative segregation rounds declined. Monthly reporting showed three to six missed days nearly every month; there appeared to be no effective plan to cover this task during psych tech absences. Good systems remained in place, however, to

46

provide rounds when administrative segregation went into overflow, which occurred in substantial portions of each month.

### Service Area C

Service Area C includes Mule Creek State Prison and Sierra Conservation Center.

### Mule Creek State Prison (MCSP)
January 1, 2007 – January 3, 2007

MCSP relied heavily on contract clinicians to counter balance a high rate of vacancies in mental health positions. Staff reported that 27 percent, or 22 of 80.5, of mental health positions were vacant in January 2007. Contractual staff covered 86 percent of the vacancies. MCSP's dependence on contractors further drained depleted supervisory resources and compromised the provision of mental health services. One far-reaching impact was reduced treatment continuity. Caseload inmates rarely saw the same case manager and psychiatrist from one visit to the next.

Among staff psychiatrists, 4.5 of seven positions were vacant, with contractors covering the equivalent of 4.1 of the vacancies. Among case managers, 10.5 of 24 clinical psychologist and psych social worker positions were vacant. Contract clinicians provided the equivalent of 12.6 positions, more than covering the vacancies. One of five recreation therapist positions was vacant.

Positions for the chief psychologist and one of two senior psychologists were filled. The institution's chief psychiatrist left in December 2006, and the senior psychiatrist was on extended military leave. The resulting leadership void had negatively impacted psychiatric practices. Psychiatrists did not routinely attend IDTT meetings and were slow to respond to referrals. Medication expiration gaps were reportedly common,

and compliance with informed consent protocols had declined.

Most nursing and clerical positions assigned to mental health were filled. An SRN III position was filled, as were all nine allocated RN positions. Both senior LPT positions were filled, as were 13.5 of 15.5 LPT positions. Only one of 11 clerical positions was vacant.

Two of eight pharmacy positions were vacant, as were four of 20 medical records positions. MCSP was allocated five LVNs, 24.5 RNs, and 21 MTA positions, all of which were filled. A lab assistant position was filled. A half-time senior clinical lab assistant position was vacant.

In January 2007, MCSP's overall inmate census was 3,966, of whom 1,530, or 39 percent, were part of the mental health caseload. Driven by an annual growth rate of 33 percent, the 3CMS population reached 1,257 in January 2007, exceeding the institution's rated capacity of 999 by 26 percent. There were 36 3CMS inmates in administrative segregation. The EOP population, which increased by 14 percent during the monitoring period, stood at 269, with 38 in administrative segregation, 48 in a pilot Level IV SNY and 181 in a Level III SNY. Seven inmates were in MHCBs, and one inmate was in the MHOHU.

Quality Management:

Quality management regained momentum during the monitoring period, but meetings were not multidisciplinary. MCSP's mental health quality management subcommittee met nine times from June to December 2006 and provided a useful forum for discussing program compliance and planning corrective action. The associate warden for health care attended two meetings; custody staff did not participate in the remaining

seven meetings.

The institution routinely audited major components of the mental health delivery system, including medication management practices, MHCB treatment, response to referrals, EOP and 3CMS programs, and mental health input in the disciplinary process. Most audits were well designed and appeared to produce reliable results.

Meeting minutes discussed the formation of two QITs, one on improving the quality of EOP groups in administrative segregation and another on improving UHR access for inmates monitored in administrative segregation pending admission to an MHCB. Neither QIT had issued recommendations as of January 2007.

Suicide Prevention:

MCSP's suicide prevention committee met nearly monthly, but participation was poor. Most meetings were attended by half of the listed committee members. Custody staff attended only three of six meetings. The meetings routinely included a summary of statewide suicide statistics and a review of attempted suicides at MCSP. Meeting minutes documented regular monitoring of other relevant issues, including access to MHCBs, completion of suicide risk assessments, implementation of various risk reduction measures in administrative segregation, compliance with five-day follow-up, and promulgation of a local procedure for tracking the utilization of holding cells in the CTC.

Institutional audits covering the last nine months of 2006 yielded an average compliance rate of 65 percent for follow-up of suicidal inmates discharged from the MHCB and OHU. The institution did not track custody checks of inmates discharged from the MHCB, although staff reported inconsistent compliance. The assignment of a

psych social worker in early December 2006 to track and coordinate the follow-up of inmates discharged from the MHCB, MHOHU, and monitoring cells in administrative segregation reportedly improved performance in this area.

MCSP had implemented elements of CDCR's plan to reduce the risk of suicide in administrative segregation. Yellow intake signs were placed on cell doors to identify inmates who had been in administrative segregation three weeks or less. All inmates received 30-minute welfare checks throughout their stay in administrative segregation. Documentation indicated that checks were completed on a staggered schedule in administrative segregation but at regular intervals in the administrative segregation overflow unit. Monthly training for responding to medical emergencies in administrative segregation, including drills related to attempted suicides, was documented.

Institutional audits found consistent compliance with daily psych tech rounds in all administrative segregation units.

Information regarding past and current suicidal behavior was gathered from caseload inmates and entered in the MHTS. However, clerical staff did not know how to compile the information or print suicide histories for individual inmates. Consequently, this information did not accompany inmates transferred from MCSP and was not used as part of the intake process for administrative segregation.

Medication Management:

Medication continuity was not sustained for new arrivals. Staff audits found that 41 percent of new arrivals with current orders received medication within 24 hours of arrival, down from 82 percent during the previous quarter. Audits of continuity

of medication upon intra-facility transfer found a compliance rate of 94 percent. Staff identified pharmacy issues as a primary cause of lapses in medication continuity.

Staff audits of non-compliance with medication found that in a sample of UHRs, 94 percent contained appropriate documentation regarding non-compliance and in 87.5 percent of the cases, non-compliant inmates were subsequently seen by a treatment provider.

MCSP did a small audit of pill lines and found a wait time of 11 minutes. The audit was flawed in that it examined only pill lines on one yard. A nursing supervisor indicated that staff planned to expand audits of pill lines during the next quarter.

A staff audit of the use of DOT administration found that DOT was carried out as ordered over 90 percent of the time. Staff audits found that informed consent was 85-percent compliant, as compared to 92 percent during the previous monitoring period. Regarding HS medication orders, there were 121 caseload inmates with HS orders for psychotropic medication. A staff audit found that over 90 percent of them received medication ordered HS later than 8:00 p.m.

An audit of parole medication indicated that all 30 inmates who were paroled received a supply of medication or signed a refusal. It was unclear whether the audit examined whether all paroling inmates who had current orders for medication were identified.

There were 18 inmates with current Keyhea orders and one inmate with a pending hearing. Staff reported that 21 Keyhea orders were initiated and eight more were denied. Three Keyhea orders expired.

<u>Transfers:</u>

MCSP referred inmates to all DMH acute and intermediate programs. Access to SVPP remained difficult, and access to APP at California Medical Facility slowed during the monitoring period.

From June 1 to December 20, 2006, MCSP generated 17 referrals to APP at DMH. Three referrals were rescinded, and one was pending at the time of the monitor's visit. The remaining 13 referrals resulted in transfers, which occurred on average within 12 days. Five inmates waited two weeks or longer to be transferred to APP at DMH. In seven cases, MHCB staff waited two weeks or longer to submit referrals to DMH.

During the monitoring period, MCSP generated ten referrals to SVPP. One referral was redirected to APP at DMH. One referral was rescinded, and one referred inmate was transferred to DVI. Two inmates were transferred, both within a month of referral. As of December 31, 2006, five inmates were pending transfer and had been waiting 52 to 174 days.

Ten inmates were referred to ASH. One referral was rescinded, one was rejected, and two were pending as of the monitor's visit. Six inmates were transferred within three to 11 days of referral. Two inmates were referred to the intermediate care facility at CMF. One was transferred within 41 days of referrals, and the second within 11 days.

Access to crisis beds remained poor and length of stay was often excessive. MCSP's eight-bed MHCB unit was unable to accommodate the current caseload population. The planned activation of 280 Level III and Level IV EOP beds,

expected to start in January 2007, will exacerbate the shortage of MHCBs. Records reviewed by the monitor's expert indicated that inmates in need of crisis care were not always referred to the MHCB (see Exhibit B, Case Reviews 3, 4, 5).

From June 1 to December 16, 2006, there were 129 MHCB admissions, an average of 29 a month. A third, or 43, of these admissions lasted longer than ten days, and 12 percent, or 16, of the admissions lasted longer than 20 days. In over half of these cases, excessive lengths of stay were related to DMH referrals.

MHCB treatment was largely consistent with Program Guide requirements. A psychologist and psychiatrist completed daily rounds, and multidisciplinary IDTT meetings were held twice a week. Out-of-cell activities were provided by a recreation therapist nearly every day. Inmates in the MHCB did not have access to an outdoor recreation area. Audits completed by the institution during the second quarter of 2006 yielded a 40-percent compliance rate for the completion of suicide risk assessments upon admission to the MHCB. Holding cells in the CTC, sometimes occupied by caseload inmates for up to six hours, were very small and did not have seats.

Faced with a chronic shortage of MHCBs, MCSP activated a six-bed MHOHU and used five cells in administrative segregation to monitor inmates waiting for MHCBs. From June 1 to December 28, 2006, there were 126 admissions to the MHOHU, an average of 18 per month. A third, or 40, of these admissions lasted longer than 72 hours, although the number of excessively long admissions notably decreased toward the end of 2006. Clinical interviews in the MHOHU reportedly occurred at cell-front, affording little to no auditory and visual privacy.

Administrative segregation status inmates could not be housed in the MHOHU, which was located in an SNY housing unit. Five cells in administrative segregation were used to monitor administrative segregation status inmates waiting for MHCBs. Inmates placed in the holding cells were reportedly monitored by custody staff on a one-to-one basis until they were either admitted to an MHCB or returned to their cell in administrative segregation. During the monitor's visit, one inmate had been in a holding cell for less than 24 hours. An officer was stationed at the cell door and documented observations every 15 minutes.

MCSP's use of the holding cells in administrative segregation was problematic in a number of ways. The institution did not track the number or duration of placements in these cells. Records reviewed by the monitor's expert included one case in which an inmate remained in a holding cell for five days on suicide watch and then returned to his cell in administrative segregation (see Exhibit B, Case Review 5). Other inmates placed in holding cells for self-injurious behavior were not referred to the MHCB unit or provided with appropriate follow-up care (see Exhibit B, Case Reviews 3, 4). Inmates placed in holding cells in administrative segregation reportedly received daily clinical contacts, most of which occurred at cell-front. The contacts routinely occurred without the inmate's UHR, which was the focus of a recently chartered QIT.

Other CAP Issues:

The overall compliance rate for responding to referrals within a week fell from 60 percent during the second quarter to 40 percent during the third quarter of 2006. Timely responses to psychiatric referrals from inmates in administrative segregation fell from 87 percent during the second quarter to 60 percent during the third quarter of 2006.

Declining performance was attributed to staff turnover, growing caseloads, and an increase in the number of referrals related to medication non-compliance.

The quality of EOP groups reportedly improved through staff training and the acquisition of better support materials. Mental health clinicians led more than a quarter of all offered groups, far more than were reported during the preceding monitoring period.  EOP inmates had increased access to educational classes and work.

The amount of treatment provided to EOP inmates varied among the programs at MCSP. The Level III program, the oldest among the three, consistently offered EOP inmates ten hours of structured therapeutic activities a week. Existing group treatment space was adequate, but staff worried that there was not enough suitable space to accommodate a planned increase in the program's capacity from 180 to 360 inmates. Case manager contacts occurred in cubicles on the dayroom floor, which afforded inadequate auditory and visual privacy.

The Level IV EOP program, operating at about a third of its intended capacity of 150 inmates, did not offer ten therapeutic activity hours a week. Institutional audits showed an average compliance rate of 69 percent during the second and third quarters of 2006. Noncompliance was attributed to insufficient group treatment space. A new mental health treatment building, scheduled to activate in January 2007, was expected to provide enough treatment space to offer ten activity hours to 150 Level IV EOP inmates.

The EOP administrative segregation hub unit fared the worst, offering an average of 36 percent of inmates ten hours of therapeutic activities a week during the second and third quarters of 2006. Eight holding cells used for group treatment were

55

unable to accommodate the unit's census of 40 to 60 inmates. Escort support was reportedly inadequate. Group sessions and case manager contacts in the EOP hub unit occurred in holding cells located on the dayroom floor, providing little auditory and visual privacy.

The monitor's expert observed IDTT meetings in the Level III and Level IV EOP programs. The multidisciplinary meetings were well organized and discussion among the participants was useful and relevant. UHRs and C-files were available for both meetings. In the Level III building, the IDTT meeting took place on the dayroom floor. Inmates in second-tier cells could watch the meeting, and ambient noise made it difficult for the meeting participants to hear one another at times.

Case managers, faced with growing caseloads of 3CMS inmates with SNY classifications, managed to complete brief quarterly visits but inconsistently followed up on missed appointments. The percentage of general population 3CMS inmates enrolled in groups increased to 23 percent, up from 17 percent during the preceding monitoring period. Most case manager contacts with 3CMS inmates in administrative segregation occurred out of cell on a weekly basis. Contacts occurred in small holding cells with no seats that were located on the dayroom floor.

Protocols for MHSDS inmates charged with disciplinary infractions were not consistently implemented at MCSP. Hearing officers did not document their consideration of mental health input in 13 of 20 RVRs reviewed by the institution during the last two quarters of 2006. Internal audits also found that UHRs did not consistently document the completion of mental health assessments for disciplinary infractions.

Other Issues:

The monitor reviewed two incident reports related to inmate deaths (see Exhibit B, Case Reviews 6, 7). Responding correctional officers did not initiate CPR. In both cases, nursing staff responded quickly and initiated life-saving measures within a few minutes.

### Sierra Conservation Center (SCC)
January 23, 2007 – January 25, 2007

Full staffing was achieved at SCC during the monitoring period. The chief of mental health returned from an off-site assignment at San Quentin in March 2006.

Positions for the 1.5 staff psychiatrists, 6.25 staff psychologists, and five psychiatric social workers were filled. Additional registry staff, including two MTAs, was hired to supplement the delivery of mental health services.

SCC was also allocated 16 new mental health positions, which it was about to begin working on filling.

Quality Management:

The institution established a meaningful quality management structure during the monitoring period. Numerous extensive audits that were designed by the new health program specialist were ongoing.

Suicide Prevention:

Although 35 of the 79 caseload inmates placed in the OHU were on suicide watch or suicide precaution, only three were referred to MHCBs. Many of these inmates remained in the OHU longer than 72 hours. In addition, compliance rates for five-day clinical and custodial follow-up were only 88 percent and 67 percent, respectively.

CPR training was provided throughout the institution. All units

maintained appropriate cut-down tools and personal protective equipment kits. Staff continued to carry micro-shields. The emergency response review committee did not meet regularly during the monitoring period. Reportedly, no incidents requiring emergency response occurred during the monitoring period.

Medication Management:

Newly arriving inmates did not experience interruptions in their medications despite delays of three to four weeks in initial psychiatric contacts via telemedicine. The pharmacy continued standing orders from sending institutions for 30 days. UHR reviews revealed 100-percent compliance with bus screenings.

Medication continuity upon intra-institutional transfers improved to a 92-percent compliance rate with increased monitoring by the institution's compliance coordinator.

Orders were renewed before expirations due to timely psychiatric contacts and a list of expiring orders prepared by the pharmacy. The telemedicine psychiatrist wrote 120-day orders. Medications were not discontinued unless the inmate had been seen by a psychiatrist.

Pill line waiting times exceeded one hour occasionally. Inmates complained that doors to the unit remained locked after medication had been distributed.

Informed medication consent forms were obtained in only 70 percent of cases due to lack of psychiatric annual updating of forms.

Laboratory testing of blood levels of inmates on psychotropic medication was ordered drawn and completed timely.

All medication was administered DOT. No inmates were on Keyhea

orders. Although staff had been trained on the Keyhea process, inmates requiring such orders were transferred timely to MCSP for initiation of the process. A special HS distribution was made no earlier than 8:00 p.m. daily.

Medication was provided to paroling inmates. Only 70 percent of paroling inmates received pre release planning from TCMP. Unlike all other inmates, caseload inmates were excluded from TCMP housing assistance before release and could seek such assistance only through the parole outpatient clinic (POC) after their release

Filled-out MARs continued to show many blank spaces. No audits addressed this problem.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

Mental health assessments were for all EOP inmates who received RVRs. The content and use of written assessments improved during the monitoring period.

SCC maintained a log of sexual misconduct RVRs and related screenings. The monitor found no comprehensive evaluations or treatment groups for exhibitionism and no diagnoses of exhibitionism.

Transfers:

At SCC, referrals to crisis level care in the OHU were considered separately from referrals to MHCBs. Approximately 40 percent of OHU stays for inmates needing MHCB level of care exceeded 72 hours. For inmates at lower levels of care, OHU stays were much longer. Audits covering September through November 2006 found that all OHU admissions were considered for referral to MHCBs or to EOP level of care and that all OHU inmates determined to require MHCB level of care were transferred within 24 hours of that determination. Still, referrals from the OHU to MHCBs were very low.

Although 35 of the 79 inmates placed in the OHU were on suicide watch or suicide precaution, only three were referred to MHCBs. On weekends in the OHU, inmates received one-to-one observation, pending Monday evaluations. Weekend rounds on the OHU were conducted by psych techs rather than psychologist, psychiatrists, or psychiatric social workers.

SCC transferred 44 EOP inmates to EOP programs during the monitoring period. Over 90 percent of general population EOP inmates were endorsed for transfer, and 87 percent were actually transferred within 60 days. EOP inmates received manager contacts at least weekly. However, placement of fragile EOP inmates in the OHU resulted in their being locked down except for one hour of yard three times per week while they awaited transfer. Of the 26 administrative segregation EOP inmates, 82 percent were endorsed, and 29 percent were transferred within 30 days. Reasons for delay included lack of bed space and transportation problems.

Other CAP Issues:

Administrative segregation housed 53 3CMS and nine EOP inmates at the time of the monitor's visit. Psych tech rounds were made at a compliance rate of 94 percent.

SCC relied upon telemedicine for psychiatric contacts and procured additional equipment to offer it on a second yard. Problems remained, with the telemedicine psychiatrist not seeing inmates from three weeks to one month or longer after their arrival. Psychiatric follow-up improved significantly.

Case manager contacts were in compliance. In administrative segregation, contacts often exceeded the required frequency. Staffing increased by the equivalent of

.25 case managers. In overflow situations, additional case managers were assigned. Treatment space remained insufficient.

Initial IDTT meetings were timely, but attendance by psychiatrists and correctional counselors was lacking. Treatment plans were timely. An institutional audit found that quality of treatment plans improved after a QIT on treatment plans was chartered and mental health staff was trained.

Lockdowns no longer impeded access to mental health treatment by interfering with appointments. Inmates experienced waits for mental health appointments of up to one hour exposed to the elements in outdoor areas.

### Service Area D

Service Area D includes California Medical Facility, California State Prison at Solano, California State Prison at San Quentin and Deuel Vocational Institution.

### California Medical Facility (CMF)
January 29, 2007 – January 31, 2007

The overall vacancy rate among mental health staff continued to hover between 20 and 25 percent. Vacancies were concentrated among case managers. One third of CMF's allocated clinical psychologists and social worker positions were vacant. Contractors covered less than half of these vacancies during November and December 2006.

The chief psychiatrist position, vacant during a portion of the monitoring period, was filled as of January 2007. One of two senior psychiatric positions was filled, as were nine of 11.5 staff psychiatrist positions. Contract psychiatrists covered the equivalent of 1.7 positions during November and December 2006.

One of two chief psychologist positions was vacant. All six senior

61

psychologist positions were filled.  Seven of 27 clinical psychologist positions were vacant, with contractors covering the equivalent of 3.1 positions.  One of two supervising psych social worker positions was vacant, as were eight of 18 psych social worker positions.  The equivalent of 3.7 of these vacancies were covered by contractors. Three of five recreation therapist positions were vacant, with contractors covering the equivalent of 1.9 positions.  Positions for a senior occupational therapist and occupational therapist were filled.

Most of the nursing positions assigned to mental health were filled.  An SRN II position assigned to mental health and all nine allocated RN positions were filled, as were 18 of 21.7 psych tech positions.  Beyond the confines of the mental health department, nine of 36 nursing positions were vacant.  Only five of 60 MTA positions were vacant, exclusive of 16 vacant MTA positions that were being converted to other nursing classifications.

Two of nine laboratory positions were vacant, as were 2.4 of 23.4 pharmacy positions.  All 17 positions allocated to medical records were filled.  Ten mental health positions, including a staff psychiatrist, three clinical psychologists, five psychiatric social workers, and a psych tech, were allocated to Unit IV.  Positions for 2.5 clinical psychologists and three psych social workers were vacant, with contractors covering the equivalent of 4.1, or 75 percent, of those vacancies.  Unit IV staff provided case management to 153 3CMS inmates, 12 3CMS inmates housed in an administrative segregation overflow unit located within Unit IV, and 60 caseload inmates in CMF's medical hospital, 16 of them treated at the EOP level of care.

At the end of January 2007, the census at CMF was 3,030.  A total of

1,268, or 42 percent, of the inmates at CMF were on the mental health caseload. There were 564 EOP and 687 3CMS inmates. There were 73 EOP and 42 3CMS inmates in administrative segregation, plus 16 EOP and 44 3CMS inmates in CMF's medical hospital.

DMH converted 25 acute care beds to MHCBs to provide crisis care and to stabilize inmates sent by CDCR prisons other than CMF. The number of acute care beds operated by DMH at Vacaville was reduced to 105. A DMH hybrid unit, within which both MHCB treatment and acute care were provided, contained 17 inmates.

As previously reported, two wings formerly used by CMF were given over to DMH to expand the number of intermediate care beds. Each wing had a capacity of 32 to 36. One wing had been in use as an intermediate care facility for months. Activation of the second wing, originally scheduled for January 2007, was slated for May or June 2007.

A 50-bed CTC was under construction, with an anticipated completion date at the end of 2007 and an estimated activation date in March 2008. A wing of CMF's hospital that became an OHU in March 2006 continued to provide medical treatment to SQ's reception center inmates. Staff reported that planned conversion of a second wing of the hospital to a 21-bed licensed elder care facility had been cancelled at the direction of the receiver appointed in the Plata case.

Quality Management:

The mental health department continued to improve its quality management process. More audits of selected program indicators and CAP issues were done. A standards and compliance coordinator did most audits. Audits were informative.

The mental health quality management committee met monthly. Meetings were attended by mental health and nursing staff. Custody staff did not attend the meeting, but they were active participants on QITs and attended other meetings at which quality management issues were addressed. Recommendations were acted upon, and local procedures were reviewed and revised as recommended. A new QIT was chartered to solve problems associated with ducating 3CMS inmates. Thirteen QITs were active during the monitoring period. Three QITs sunset after their missions were accomplished.

The disciplines of psychiatry and psychology continued to engage in peer review. Peer review was documented.

CMF did not use the MHTS.

Suicide Prevention:

The suicide prevention focus improvement team met monthly save for one month when the meeting was cancelled. Minutes were kept and, agendas covered all required areas as well as addressing a number of local suicide prevention issues, including suicide attempts, self-injuries, and practices that were introduced recently to reduce the risk of suicide in administrative segregation.

From June 26, 2006, through January 31, 2007, there were nine serious suicide attempts or self-injuries, two suicides at CMF proper (i.e. excluding the DMH units), and two suicides in the DMH units. Incident reports reviewed were replete with typographical and other errors. Many failed to record the time of events during emergency responses. An October CAP written subsequent to a June suicide listed eight deficiencies, among them poor documentation in the incident report, lack of response to signs of depression and decompensation, inadequate risk assessments, lapse of a Keyhea

order, poor management of chronic medical conditions, and single-cell housing.

Among the changes CMF made in response to the CAP were increased vigilance regarding need for higher levels of care and improved tracking and documentation of Keyhea orders. In addition, all inmates currently in single-cell housing were reviewed and their number reduced. Inmates placed on single-cell status subsequently were evaluated to determine whether they needed a higher level of care.

Suicide prevention measures also focused on inmates returning from DMH. Procedures were tightened to improve detection of inmates discharged from DMH, which was required to administer SRACs prior to discharges. CMF's consistency in carrying out planned five-day follow-up improved. Staff audits that spanned the last six months of 2006 found 99-percent compliance for the 23 to 36 inmates per month that required five-day follow-up upon release from DMH.

Staff formulated and carried out a plan to improve practices associated with hourly custody observations. Enhanced supervisory review, on-the-job training and immediate remediation of lapses were associated with improved performance. Monthly audits found that custody observations were 83- to 95-percent compliant from August through December. A log showed lapses in roughly 14 of 161 cases. Most lapses were minor, such as one to three missed hours or one page of documentation not filed. The OHU that served SQ medical patients had one pertinent case but did not comply with the requirements regarding hourly observation.

One suicide prevention issue was not addressed by the suicide prevention committee or suicide-related CAPs, although it was well known to staff. Valid risk assessments were difficult to do when inmates were interviewed on an *ad hoc* basis, as

65

most at-risk inmates were. Typically, those interviews were done in the B-1 clinic. Long-standing complaints by staff notwithstanding, the clinic lacked a confidential interview area. Inmates were assessed by mental health staff in the middle of the busy clinic. Conversation was difficult at times. Confidentiality was not expected.

There were two suicides in DMH units at CMF in January 2007. One of the suicide victims had made a near-lethal attempt while in the MHCB at DMH six weeks earlier. The incident report of the December 2006 suicide attempt omitted the times at which actions were taken during the emergency response. Staff did not respond promptly to blocked sightlines when inmates covered the windows of cell doors.

Medication Management:

No audits of medication continuity, DOT administration, or parole medication were available. Expiration of medication orders written for caseload inmates appeared to be rare. Non-compliance remained a focus of attention during the monitoring period. Mental health staff was not notified promptly when inmates in administrative segregation were non-compliant with medication. The problem of timely response to non-compliance was more complex when it involved 3CMS inmates housed in general population. Many parts of the mechanism for handling non-compliance were faulty, spurring the formation of a QIT.

Peer review in psychiatry meshed with selected aspects of medication management, including informed consent, documented rationales when polypharmacy was used, consistency between target symptoms and medication orders, and matching medication classes with diagnoses. Small samples audited under the auspices of peer review yielded compliance rates of at least 90 percent in those four areas. Lab work was

audited via peer review, but monitoring blood levels of mood stabilizers had not been audited during the past six months. Peer review audits of lab work associated with the use of atypical antipsychotics found that improvement was needed in monitoring glucose levels of inmates taking Zyprexa and Clozapine. Labs for lipid screens had been done in the past six months in 21 of 24 cases.

CMF had 64 inmates with current Keyhea orders. Improved tracking of Keyhea orders was identified as a problem in a suicide-related CAP. CMF's tracking improved, but staff discovered a related problem. During the last six months of 2006, 42 orders were renewed, three orders were initiated, and 13 orders were allowed to expire or were rejected on the advice of CDCR's office of legal affairs. Clinical staff pointed to several cases (See D, Case Review 2) in which Keyhea orders were clinically indicated but not pursed for legal reasons.

According to the director of nursing, no audits of parole medication were done but the procedure met Plata requirements and was working well. CMF staff reported that TCMP staff saw paroling inmates twice monthly. A number of inmates were missed because they had recently come from another prison. CMF mental health staff added them to the list used by TCMP and facilitated the work of TCMP staff. The monitor's expert reviewed four UHRs belonging to EOP inmates whose release dates were imminent and found that none had chronos documenting TCMP contact. In two cases (See Exhibit D, Case Reviews 2, 5), CMF staff helped inmates develop discharge plans.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

CMF's log of RVRs written for sexual misconduct was complete, showing

MHSDS status, RVR outcome, and information regarding district attorney referral for each case. CMF kept a file of all mental health evaluations and provided it for review. Approximately 21 inmates accounted for 38 RVRs; one additional inmate incurred 17 RVRs for sexual misconduct.

Approximately 53 cases were referred to the district attorney, but only four referrals involving two inmates had been accepted. The inmate who incurred a total of 17 RVRs accounted for three of the four cases picked up by the district attorney. Both inmates whose cases were prosecuted by the district attorney were among five diagnosed with exhibitionism. Approximately 20 percent of the cases logged had no information regarding the outcome of the district attorney referral, suggesting they were pending at the time of the monitor's visit.

Transfers:

Access to crisis beds was stymied. A previously resolved CAP problem on that issue was reopened. CMF staff reported that a large number of inmates referred to the MHCB operated by DMH were returned within 24 hours after an evaluation found that they did not meet the criteria for admission. CMF and DMH staff reported that inmates who were admitted could, and often did, remain in the MHCBs longer than ten days. Inmates who stayed in the MHCB longer than ten days were automatically converted to acute care status, but the level of care that they received did not change in practice. DMH staff readily acknowledged that treatment provided in the unit did not approach that provided in its other units. DMH staff reported that severe limitations sharply curtailed the treatment provided in the unit that contained both MHCBs and acute care beds.

68

Although the original intent of the 24-hour evaluation period was to identify inmates who were not in need of an MHCB or higher level of care and return them to CMF expeditiously, that provision was not used as intended. Several inmates who were returned to CMF within 23 hours needed a higher level of care. Some inmates were returned to CMF despite a recent history of multiple admissions to DMH or functioning below the minimum level needed to reside in an EOP unit. DMH staff reportedly rarely considered discharging inmates who had multiple admissions, were not fully stabilized, or were low functioning to the intermediate level of care or to other DMH acute care units.

There were two suicides in the DMH units, one a few days before the site visit, the second during the site visit. A review of records indicated that one of the inmates who committed suicide had made a near-lethal suicide attempt six weeks earlier during a stay in the combined MHCB acute care unit. Reportedly, DMH's attempts to discharge him to CMF met resistance. Discussion of that case with DMH staff suggested that suicide watches were not conducted in accordance with widely followed standard procedures.

The monitor's expert attended a treatment team meeting at DMH. The discussion and disposition of cases were consistent with the complaint that the DMH treatment team was not appropriately assessing or treating some inmates sent by CMF and instead discharging them prematurely. A large group of DMH clinicians collectively failed to consider critical clinical issues, did not assess suicide risk even when confronted by physical evidence of recent self-injury, did not consider intermediate care as a treatment option, and inappropriately discharged inmates to lower levels of care.

The team's discussion of one case underlined the lack of attentiveness DMH staff demonstrated toward elevated risk of suicide. In that case, an inmate who was known to DMH staff from a prior admission had been sent from CMF the previous day. He was arrested and incarcerated following a near-lethal suicide attempt that resulted in the death of another person. After admission, he expressed suicidal ideation and caused a gash on his forehead by banging his head, but he was not placed on suicide watch. During the treatment team meeting the discussion and the course of treatment were pointed toward discharging him. A DMH clinician repeatedly questioned the inmate in a leading fashion about whether he wanted to return to CMF so that he would not lose his bed.

Access to higher levels of care, including intermediate care and day treatment, was blocked for inmates with mobility and medical issues. There were a handful of cases in which inmates with medical problems or mobility issues were barred from admission to DMH units in CMF. Their conditions were cited as the rationale for rejection. Alternative units that provided higher levels of care were no longer available at ASH in January for CDCR inmates as ASH was essentially closed to admissions from CDCR. Historically, two units at ASH were open to inmates with mobility impairments who needed treatment at DMH. A psychiatrist who carried the 3CMS caseload on Unit IV as well as covering the B-1 clinic and infirmary was reportedly charged with treating those inmates who remained at CMF because ASH no longer admitted them.

Other CAP Issues:

Despite a high functional vacancy rate among case managers, caseloads were not excessive. Caseloads reportedly ranged from 70 to 125 inmates in mainline

70

3CMS, from 15 to 30 in 3CMS administrative segregation, and from 25 to 29 in the mainline EOP. CMF did not provide caseload numbers for EOP administrative segregation but reported that it maintained the required one-to-nine ratio.

The quality of treatment groups provided in the EOP improved, as did staff's ability to track and audit the amount of treatment provided. To reach the ten-hour weekly minimum, CMF scheduled more than ten hours of structured therapeutic activity in each wing. The number of hours scheduled per week ranged from just over ten in one wing to a high of 22 in another. CMF was unable to meet the minimum requirements but came closest in December. Staff reported that tallies of treatment hours presumed that all groups met for one hour, although groups were scheduled to last 45 to 50 minutes and were occasionally shorter due to late starts, early dismissals, crises, or the administration of medication.

Even in the best performing wing, the average number of hours received per inmate per week peaked at 9.8 in December, rising to that level from two hours below it during the prior month. In the EOP as a whole, in November and December, the lowest average number of hours received per week was 7.26; the highest was 9.8. Refusal rates were not reported for every wing, but those that were reported were less than 30 percent. The improved tracking method enabled staff to record hours of treatment received by each inmate, information that was used to plan treatment for inmates with low participation rates.

The case manager:inmate ratio for general population EOP inmates was 1:35, but case managers were often called upon to make weekly individual contacts for colleagues who were on leave. Staffing allocations did not include relief coverage for

71

vacations or unscheduled leave. Some case manager contacts were perfunctory; others were made at cell-front. Not all case managers documented whether contacts were made at cell-front or in a confidential setting. Inmates continued to be enrolled in groups by tier and cell location rather than by diagnosis or level of functioning.

Inmates who were interviewed commented favorably about the quality of groups, particularly the reduced reliance on videos. Some reported that disparities in levels of functioning, lack of material, and lack of space were problematic. Many reported that they were seen individually in a confidential setting and could raise issues of personal concern if they chose.

In administrative segregation, which was spread through at least four housing units, psych tech rounds were made daily, and case manager contacts were made weekly with few exceptions. In most, but not all, units, case manager contacts were made in a confidential setting. Roughly three dozen 3CMS inmates did not have confidential meetings due to lack of space, escorts, and schedules. No caseload inmates were housed in the Willis unit, and the third tier was not used as housing. Staff reported that psych techs rounded daily and that mental health screenings were completed as required. On the second tier, the monitor observed windowsills, screens, and window-mounted fans covered with bird feces, feather, and deep layers of accumulated grime. When queried, managers reported that the Willis unit was slated to be closed, renovated, and air conditioned, but no dates for renovation or cleaning were specified.

CMF audits found that mental health screenings were completed by nurses or mental health staff within 72 hours of placement. As a matter of standard procedure, many screenings were done by nursing staff in the B-1 clinic, simultaneous with medical

clearance, prior to placement.

In the EOP administrative segregation hub, fewer than ten hours of treatment per week were scheduled in October and November. During the last six months of 2006, the average number of hours of structured therapeutic activities received by the 73 or so segregated EOP inmates ranged from a low of 5.6 to a high of 9.9 hours. Inmates who were interviewed uniformly reported high levels of satisfaction with the groups they attended. The most significant criticism made by several inmates was that having group members with various levels of functioning made some groups less helpful because lower functioning inmates were at times disruptive or non-contributing. The reports of segregated inmates were distinguished from general population inmates in that the former requested more videos during groups. Caseload inmates in administrative segregation reported that they saw their case managers out of cell each week, psychiatrists once per month, and psych techs on rounds every day.

The size of the 3CMS staff increased, and the caseload grew by over 100. Caseloads ranged from 90 to 130. Staff audited the 3CMS level of treatment provided to general population inmates against revised Program Guide requirements. Audits found that initial mental health evaluations, IDTT meetings, and treatment plans were all completed within the required time frames. Treatment plans were not always individualized; staff received more training.

The quality of treatment was compromised by lack of suitable treatment space for individual contacts and by scheduling difficulties. Staff reported that, by necessity clinical meetings in some housing units were held in a closet that contained a microwave oven used by staff. Other treatment sessions were held in a small room

equipped with a toilet. Scheduling constraints shortened IDTT meetings and at times compromised their quality. A QIT was chartered to address a host of problems associated with defects in the ducating mechanism as well as appropriate responses to instances of non-compliance with both medication and scheduled mental health appointments.

Other Issues:

The monitor reviewed incident reports related to deaths that occurred in CMF proper and at DMH between July 2006 and February 2007. The reports contained typographical and other errors (see Exhibit D, Case Reviews 6, 7). None reported a timeline of events. Poor documentation rendered it impossible to determine how long it took staff to respond to emergencies or to initiate CPR. Housing unit officers, typically the first to respond, did not initiate CPR in any case. They alerted supervisory or nursing staff, who usually initiated life-support measures after arriving on the scene.

<u>**California State Prison, Solano (CSP/Solano)**</u>
September 19, 2006
October 10, 2006 - October 11, 2006
November 1, 2006 - November 3, 2006

Staffing allocations reported by CSP/Solano in October differed substantially from those reported in the department's December MHSDS hiring report. The central office report showed 11 psychiatry positions, whereas the institution reported just 4.5. CSP/Solano had five social work positions, but none were reflected in the central office list.

Staffing at CSP/Solano improved, but vacancy rates remained high in psychiatry, psychology, and social work. A staffing crisis in the pharmacy was resolved by November. The institution was allocated 4.5 staff psychiatrist positions plus one chief

74

psychiatrist position. The chief psychiatrist had been on administrative leave for over one year. A psychiatrist on the staff served as the acting chief throughout the monitoring period. Just over half, 2.5 of 4.5, or staff psychiatry positions were filled. Several part-time contractors collectively covered the two vacancies.

The vacancy rate among psychologists and social workers changed little. In October 2006, four of 13 psychology positions were vacant, as were two of five social work positions. Six regular contract psychologists and a regular contract social worker covered 85 percent of those vacancies throughout the monitoring period. One of four psych tech positions and one of 2.5 recreational therapist positions remained vacant. None of those vacancies were covered by contractual staff. Three mental health nurse positions and a senior nurse position were filled. The sole medical transcriptionist position and seven of 7.5 office tech positions were filled.

Staff reported that completion of MDO and Board of Prison Terms reports continued to occupy the equivalent of 2.5 full-time psychologists. One psychologist was assigned to Clark duties, and the equivalent of 1.5 clinicians conducted initial mental health evaluations. Approximately 11 contract and staff clinicians carried the general population caseload; seven case managers had caseloads over 140. Two full-time case managers treated 111 caseload inmates in administrative segregation.

Staffing in the pharmacy improved at the end of the monitoring period, averting a crisis. The sole pharmacist II position remained occupied, and three vacant pharmacist positions were filled by November. Staff planned to augment the four allocated pharmacist positions by retaining enough contract coverage to bring the staffing level up to the equivalent of 4.8 pharmacists. A total of 5.8 pharmacy tech positions were

allocated; 2.8 were filled. The use of contractual coverage that exceeded the allocation deployed the equivalent of eight full-time pharmacy techs on site. A new director of nursing was hired. The amount of nursing oversight exercised by DCHCS increased.

CSP/Solano's census was 6,074. The size of the mental health caseload, 1, 555, exceeded its capacity of 1,199 by 30 percent, as planned by DCHCS. There were 378 inmates in administrative segregation. The number of caseload inmates in administrative segregation, 111, was largely unchanged.

Staff reported that 57 of 674 custody positions were vacant.

CSP/Solano was selected for more intensive monitoring. During the previous monitoring period, acutely mentally ill inmates housed in general population and administrative segregation were not always referred to the MHCB, nor were those who were referred admitted when clinically warranted. Access to the MHCB and identification and transfer of decompensated inmates demanded a swift remedy.

The monitor's expert visited CSP/Solano three times during the monitoring period. A brief preparatory visit was made to discuss the problem and form a work group; it was followed by two monitoring visits made three weeks apart. During the preparatory visit, CSP/Solano staff reported that access to the MHCB and related issues had been addressed and significant improvements made, rendering a work group superfluous. No work group was formed. Subsequently, the monitor's expert found the problems much improved, but more improvement was needed.

Overall, at CSP/Solano, gains were maintained and progress was evident within the context of a wide range of practices, some of which fell below acceptable levels.

Issues Resolved:

> Loose documents were filed promptly in UHRs; the filing backlog did not exceed three days.

> The log of restraint use maintained in the MHCB was complete, showing dates and times of application and release.

> The case managers for MHSDS inmates housed in administrative segregation were backed up by designated clinicians during scheduled leaves.

Quality Management:

The institutional quality management structure largely conformed to statewide directives. The committee met regularly, kept minutes, and received reports from its subcommittees. The mental health quality management committee also met weekly, kept minutes, and forwarded reports. The mental health quality management committee met in the context of a staff meeting. All members of the mental health staff were members of the quality management committee. The disciplines of psychology and social work continued to engage in peer review.

Nine mental health QITs were active during the monitoring period. They addressed lack of treatment space, IDTT meetings, and treatment planning and follow-up for inmates discharged from the MHCB.

QITs documented their activities, did audits, made recommendations, and disbanded, but not all had the breadth of membership necessary to address targeted issues. Some met regularly, while others met rarely. Recommendations did not reliably result in needed changes. For instance, a long standing QIT on pill lines recommended that buildings release inmates to meals on a staggered schedule to prevent hour-long pill

lines. Months later, the recommendation had yet to be carried out consistently. Inmates stood in long lines during heat alerts.

Suicide Prevention:

The suicide prevention committee improved due largely to involvement by custody staff. The committee met monthly, but minutes were sparse. Custody members were proactive, taking the lead on certain issues. The committee kept the institution abreast of changes in suicide prevention practices in administrative segregation.

The committee monitored five-day follow-up and custody observations. Recommendations made by a QIT were implemented and resulted in improvement. There were a number of missed clinical contacts and custody observations, but a new mechanism for immediate feedback to staff resulted in improved compliance during the last three months of the monitoring period.

While the committee addressed several important aspects of suicide prevention, some essential activities were omitted. The contributions of health care and mental health staff needed improvement. The monthly MHCB report omitted information regarding suicide attempts, multiple admissions, and lengths of stay. Recommendations stemming from suicide CAPs were not implemented. Squabbling among members of the medical staff stymied the development of a protocol for pain management. A second recommendation regarding professional practices was not followed.

The accuracy of the MHTS was largely unchanged. The MHTS continued to be used to manage caseloads, to track referrals, and for supervisory purposes. Audits based upon the MHTS yielded different compliance rates, often higher, than those based

upon review of UHRs. Staff reported an 86-percent concordance rate between MHTS and UHR entries.

Medication Management:

During the monitoring period, medication management remained a collection of haphazard practices without oversight or standardized practices and procedures. There were harbingers of change. A crisis in the pharmacy was averted when the sole remaining pharmacist was persuaded not to resign in October 2006. The pharmacy remained over burdened until the end of the monitoring period in November, when it was fully staffed. The addition of a senior nursing supervisor and additional assistance from DCHCS held promise for future improvements in quality management and medication management.

Blood levels of mood stabilizers were not monitored systematically. In 20 percent of the Lithium cases sampled by a staff audit, there was no documentation that blood levels were obtained. Staff audits found compliance rates ranging from 61 to 86 percent for six-month levels of Depakote and Lithium, respectively. Twelve-month levels were higher, at 86 and 78 percent for Depakote and Lithium, respectively.

As in the past, no list of inmates with DOT orders was compiled. Lists of inmates with Keyhea orders or histories of medication misuse, hoarding, or overdoses were not disseminated to staff. Non-compliance with medication did not reliably trigger referrals to prescribers. There were no orders for HS medication regardless of need. CSP/Solano's inability to administer medication DOT or HS in cases of intentional overdose or over sedation was problematic in two cases reviewed by the monitor's expert (see Exhibit E, Case Reviews 17, 23).

<u>Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations</u>:

CSP/Solano finalized its local management plan regarding indecent exposure. Not all cases of indecent exposure were referred to mental health for screening. Clinical staff attempted to address the backlog of indecent exposure cases that accumulated over a period of months. Not surprisingly, the monitor's review found that many evaluations were done long after incidents had occurred. One inmate was diagnosed with exhibitionism. Staff awaited direction from the DCHCS regarding what treatment was to be provided.

Some, but not all, cases involving indecent exposure were referred to the district attorney. No decisions regarding prosecution were reached by November 1, 2006. None of the inmates had, to date, received a SHU term. No security interventions, such as jumpsuits or window coverings, were used to manage indecent exposure.

Overall, CSP/Solano continued to struggle to implement directives regarding the use of mental health assessments in disciplinary processes that involved mentally ill inmates. From June 1, 2005, to October 1, 2006, no inmates who were issued RVRs on other grounds were referred to mental health for an assessment.

<u>Transfers</u>:

From July 1 to October 3, 2006, CSP/Solano made 13 referrals to acute care at DMH, nine inmates were transferred. Three referrals were rescinded while awaiting DMH decisions that were not forthcoming for a week to ten days. DMH took six days or longer to render a decision regarding seven referrals. One referral elicited a decision after 13 days, another after 19 days. After inmates were accepted, transfer to DMH was timely in all but one case, in which the inmate was moved three days after

acceptance.

The CTC had 15 beds, nine of which were designated MHCBs. Four of the seven MHCBs could be, and on occasion were, used for patients who needed medical care. Staff reported feeling no pressure for crisis beds, stating that they had enough to meet the demand.

There were nine MHCB patients on November 2, 2006. Treatment in the MHCB was consistent with most Program Guide requirements. IDTT meetings were held timely, with UHRs, C-files, and a full treatment team present. Multidisciplinary discussion was the rule, inmates participated actively, and some derived therapeutic benefit from their meeting. Use of restraints was excessively long in several cases, one of which was reviewed by the monitor's expert (see Exhibit E, Case Review 22) because nursing staff waited for a physician to come in and write an order to release rather than adhering to behavioral criteria specified in the order to apply restraints.

Information about length of stay and multiple admissions was no longer compiled by MHCB staff and reported monthly to the suicide prevention committee. According to automated lists provided by the institution, five or fewer inmates had three or more MHCB admissions during the three-month period spanning July 1 through October 3, 2006. Ten had lengths of stay longer than ten days. The list showed three cases in which lengths of stay were 21, 28, and 48 days.

A high-priority problem, access to the MHCB, had been addressed by staff shortly after the monitor's visit during the preceding monitoring period and was reportedly improved by mid-September. The monitor's expert concurred with the assertion that inmates in crisis were more likely to be referred to the MHCB and more

likely to gain admission. Two cases in which referrals to the MHCB unit should have been made but were not indicated that more improvement was needed (see Exhibit E, Case Reviews 3, 11).

Documentation regarding transfers of EOP inmates was thorough. On October 10, 2006, there were 10 EOP inmates at CSP/Solano. A log showed that fewer than half, 11 of the 26 most recent transfers, were made within 60 days. After October, the problem of delayed transfers was resolved, with the exception of one case that was delayed by a pending RVR (see Exhibit E, Case Review 1).

The mental health treatment provided to EOP inmates was in some instances inadequate. Clinicians sometimes took as long as three weeks to forward a chrono to the classification and parole representative (C&PR) after changing an inmate's level of care to EOP and did not use a provision for expedited EOP transfers although it was clinically warranted in two cases that were reviewed (see Exhibit E, Case Reviews 3, 16). Custody staff was responsive to recommendations for expedited EOP transfers, setting two in motion during the monitor's visit.

Weekly case manager contacts were missed. After October, staff developed a new procedure to ensure that contacts were made weekly. Several EOP cases, including the two cited above, were marked by multiple failures to respond to signs of acute mental illness or deterioration in functioning, missed weekly case manager contacts, and IDTT meetings that were late or did not fulfill their purpose (see Exhibit E, Case Reviews 2, 19). In a few EOP cases, lapses in medication continuity followed a change in location, successful evasion tactics, and artful persuasion by an inmate who didn't want medication (see Exhibit E, Case Review 1). In another case, a 3CMS inmate

who was later designated EOP did not receive Lithium long after an order was written (see Exhibit E, Case Review 12).

In September, a large number of EOP inmates who had been at CSP/Solano, many of whom had lengths of stay over 60 days after being designated for EOP treatment, were transferred, cutting the number of EOP inmates remaining on-site in half. An inmate who had been designated EOP in February 2006 was transferred to ASH on the first day of the monitor's October 2006 visit. The reason for the eight-month delay in transferring him to an EOP was unknown but could not be attributed to hospitalization at DMH as he had not been at DMH since October 2005. A second EOP inmate with a length of stay in excess of five months was transferred during the October visit.

Three of the 10 EOP inmates at CSP/Solano were awaiting transfer to an administrative segregation hub. Two had been designated EOP 20 and 48 days before.

Other CAP Issues:

Nearly six months after the mental health caseload reached 1,550, 30 percent over its cap, access to treatment and the quality of mental health treatment were inadequate. Caseloads typically numbered 140 to 160. Lack of space was problematic throughout the institution, making the greatest impact on group treatment and on confidential contacts in administrative segregation. Poor medication management, impeded access to treatment in the Level III yards, unreliable ducating, and failure to identify and respond appropriately to some of the sickest inmates were among the major hurdles to reaching an adequate level care.

Less than one percent of the 3CMS inmates were treated in groups. Four

83

groups were formed but did not meet for lack of suitable space. Modified programming and failure to honor priority ducats for mental health contacts stymied access to treatment on the level III yards, where modified programming was in force throughout 2006 save for a few weeks. No escorts were available for mental health appointments. Many psychiatry and case manager contacts were made cell-front.

Staff audited selected indicators of mental health treatment regularly. Among the indicators audited by staff were timeliness of treatment, thoroughness of documentation, informed consent, AIMS testing, and consistency of information recorded in different types of records. Audits were typically adequate in size and method.

Audit results indicated that initial mental health evaluations were timely in 81 percent of cases sampled. Initial IDTT meetings were held on time in 63 percent of cases, while 69 percent of initial treatment plans were completed on time. A small audit of annual IDTT meetings found that 38 of 42, 90 percent, were held on time. In a sample of 45 cases, 76 percent had current treatment plans that had been updated on schedule. AIMS tests were not completed annually. Informed consent was obtained and updated annually in 48 of 78 of cases, or 62 percent.

An institutional audit found that 61 of 66 UHRs sampled contained documentation of quarterly case manager contacts. The compliance rate of 93 percent, when considered apart from contextual factors, suggested that CSP/Solano sustained compliance with Program Guide requirements, having achieved an 88-percent compliance rate during the previous monitoring period and a 93-percent compliance rate during the current one. However, rising caseloads, poor access to treatment associated with prolonged modified programming in one yard, and ducat problems forced clinicians

to resort too often to quarterly visits that were little more than a cursory check-in, many of which occurred at cell-front or in locations that compromised visual or auditory privacy. Under these conditions, a subset of sick inmates got sicker, and clinicians sometimes missed, or failed to respond appropriately to, signs of mental illness. For these reasons, neither supervisory staff at CSP/Solano nor the monitor believed that the problem of quarterly case manager contacts had been resolved.

Mental health referrals were not tracked via MHTS, nor did they elicit timely responses. According to an MHTS report covering July 1 to October 20, 2006, there were 129 referrals to mental health. Nearly half did not show dates when referrals were received or elicited a response. Of the 68 entries that had both dates, 47, or 69 percent, indicated that a referral resulted in a clinical contact within seven calendar days. In one third of cases, responses took 14 days or longer.

Reportedly, access to medical records was good.

Staff reported that non-caseload inmates placed in segregation were screened at cell-front by a psych tech the day of arrival or the following morning. Cell-front screening was necessary due to lack of time, interview space, and escort officers. The monitor's review of records found no documentation that indicated screenings were done or attempted but refused. Caseload inmates were screened by psychologists.

Other Issues:

In administrative segregation, mental health treatment and mandated outdoor recreation were stymied by inadequate space. Segregated inmates on walk-alone status received approximately 1.75 hours of yard time per week because only three yards were available. The institution reported plans to build 20 walk-alone yards beginning in

June 2007, with completion anticipated ten weeks later.

CSP/Solano implemented aspects of the administrative segregation suicide prevention plan on October 31, 2006, soon after receiving it. There were reportedly 11 to 15 new admissions per week. The new intake process included a mandatory three-week initial observation period during which inmates were housed in one of 38 designated intake cells located on the lower level of the tier that afforded the best visibility. Officers checked inmates in intake cells every 30 minutes. Checks included documentation that the inmate was moving and breathing, but a verbal exchange was not mandatory. Supervisory staff reported that officers received emergency medical response training prior to implementation of the plan.

The staff was eager to carry out the suicide prevention plan but raised three concerns regarding implementation. Since no additional staffing allocations accompanied the plan, it seemed likely that the added duties might cut into the availability of escorts to showers, out-of-cell mental health contacts, and the yard. Second, the designation of intake cells resulted in the relocation of long-term, violent administrative segregation inmates to a unit where the doors lacked food ports. Officers had to open cell doors to feed or handcuff inmates. Third, staff was concerned that a sudden surge in the number of inmates placed in administrative segregation might exceed the capacity of the intake cells.

Compliance with requirements regarding emergency response equipment was good. The monitor inspected equipment and inventory records in six housing units. Five of six toured units had all required equipment, including a cut-down tool, an ambu bag, hazmat suits, and extra micro-shields. Inventories were up to date and listed all emergency equipment. One housing unit did not have an extra micro-shield, an omission

86

that was not reflected on the inventory. All officers interviewed were in possession of a micro-shield.

The monitor's review revealed one case in which institutional staff failed to initiate a timely emergency response when an inmate was found unresponsive in his cell after hanging himself. Several inmates wrote to plaintiffs' counsel regarding the emergency response in this case. They alleged suffering reprisals subsequent to claiming that the response was inadequate.

### California State Prison, San Quentin (SQ)
October 19, 2006 – October 20, 2006
November 30, 2006 – December 1, 2006

SQ continued to struggle with its vacancy rate among mental health positions and heavy reliance upon contractual staff. Staff at SQ reported that 34 percent, or 16.5 of 48.7, of mental health positions were vacant in November 2006. Positions for a chief psychiatrist, a senior psychiatrist, three staff psychiatrists, 7.5 psychologists, and four psych techs were vacant. Contractors covered the equivalent of 15.1 positions, reducing the functional vacancy rate to three percent. Turnover among custody and mental health management appeared to have stabilized.

Staffing allocations reported by SQ on November 1, 2006, differed from those reported by the DCHCS on December 31, 2006. In comparison to the DCHCS information, SQ listed three more psychology positions.

SQ's census on October 6, 2006, was 5,173, of which 944 inmates were on the mental health caseload. The reception center housed 391 3CMS and 47 EOP inmates. There were 237 3CMS and three EOP inmates in the mainline. Administrative segregation contained 407 inmates, of whom 28 were EOP inmates and 113 were 3CMS

inmates. Among the 620 condemned inmates, 118 were treated at the 3CMS level of care, and 13 were designated EOP.

Issues Resolved:

> HS orders were written when clinically indicated and administered after 8:00 p.m.

Quality Management:

SQ's quality management process was invigorated by stability in the managerial and supervisory ranks of both custody and mental health staff. Staff adopted a new approach to quality management, local operations procedures were drafted, and sensible methods of tracking information and monitoring performance were established. The monitor's expert observed a meeting of the mental health quality management subcommittee meeting that was well attended and served its purpose. Attendance by custody staff remained low. While these developments were promising, they were recent. Peer review was being revamped.

Suicide Prevention:

A November 2006 meeting of the suicide prevention committee observed by the monitor's expert served its purpose, but overall, SQ needed to devote more attention and resources to suicide prevention. The local operations procedure on suicide prevention had not been revised since 2004. Access to higher levels of care was impeded, transfers of all types were delayed, fewer than all inmates placed in administrative segregation were screened, and screenings were rarely done in a confidential setting. Screening was cited in two suicides at SQ. Mental health treatment provided in administrative segregation and other locked-down units did not approach compliance with Program Guide requirements. EOP inmates in administrative

segregation were not given ten hours of yard time per week.

SQ had begun to implement departmental directives aimed at suicide reduction in administrative segregation. Staff reported that newly placed inmates were designated as having intake status and that 30-minute welfare checks were completed and documented on check-off forms. Implementation and documentation were not yet up to snuff. To record welfare checks, officers checked off boxes next to a preprinted list of times that progressed in half-hour intervals. The monitor observed one inmate who should have been marked as being on intake status who was not. When queried, staff reported that on occasion, particularly when a large number of inmates were placed in administrative segregation during a short period of time, errors of omission were made.

Staff tracked compliance with planned five-day follow-up of previously suicidal inmates discharged from the OHU. Follow-up by both mental health and custody remained non-complaint. Staff audits that spanned the months of July, August, and September found that clinical follow-up was carried out as planned in 33 of 47 cases. Custody observations were completed in 19 of 46 cases. Staff reported that to improve compliance rates, on the job training and an in-service training were provided in October.

Medication Management:

Staff revised the local procedure governing medication management and audited selected indicators. Staff reported that the loss of MTA positions and transition to the use of LVNs was associated with an overall decline in the way medication was managed. The condition of MARs made auditing difficult and clouded the results. Staff audits found deficiencies in the completeness and legibility of MARs with respect to timely administration of medication as well as untimely filing of MARs in UHRs. Staff

reported that the single biggest problem in medication management was pill lines, which were described as unsafe. Reportedly, the efficacy of some lines was hampered by difficult environmental conditions that impinged upon the person administering medication.

Continuity of medication upon arrival and intra-institutional relocations was problematic. Bridge orders were used in an attempt to prevent expirations. Psychiatrists reported that medication was not administered promptly once orders were written. Staff audits found that timely administration following orders continued to improve, with an 82-percent compliance rate since January 2006. Staff audits found that compliance rates for continuity of medication during intra-institutional transfers dropped from 96 percent in January to 67 percent in May 2006.

Staff audits found a 45-percent compliance rate since January 2006 regarding follow-up mental health appointments with inmates who were non-compliant with medication.

SQ's local procedure required DOT medication administration for nearly all MHSDS inmates. Although audits of DOT administration found a 95-percent compliance rate, staff reported that hoarded supplies of medication were still discovered.

SQ was not in compliance with the use of lab tests to monitor the use of mood-stabilizing medications or other psychotropic medications. No audits of informed consent were done.

Tracking of Keyhea orders remained problematic, which resulted in the suspension or lapse of Keyhea orders for two inmates. Staff reported that the condition of one inmate deteriorated after orders for involuntary medication were halted. Staff

audits of non-compliance by inmates with current Keyhea orders found a 55-percent compliance rate since January 2006.

Regarding HS orders, SQ's new procedure was consistent with DCHCS policy. Staff reported that HS orders were written when clinically indicated and administered after 8:00 p.m. That CAP problem was resolved.

Staff reported that despite continued difficulty obtaining accurate information regarding paroling inmates, audits found that 98 percent of caseload inmates who were paroled were given a supply of medication.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

SQ commenced implementation of the department's policy regarding inmate sexual misconduct, in part by seeking assistance from CMF. SQ chartered two QITs, one to address procedural and one to address clinical aspects of the policy.

Transfers:

Access to higher levels of care was impeded and slow. SQ chartered a QIT on November 30, 2006, to attempt to improve communication with and access to DMH. Not all inmates who should have been referred to a higher level of care were referred (see Exhibit F, Case Reviews 1, 2, 3). Staff reported that condemned inmates could be sent to DMH only for acute care, that there was no access to intermediate care for them. Staff reported lengthy delays in transferring inmates to APP at CMF, citing the case of a gravely disabled condemned inmate who remained in the OHU for 56 days. From April though September 2006, transfer times to DMH ranged from four to 27 days. The average time required for transfers was eight days.

SQ made an average of 18 MHCB referrals per month; 72 percent of them

resulted in transfers to an MHCB. The remaining 22 percent of the referrals were withdrawn because the conditions of the inmates improved before they were sent to an MHCB. Of those inmates who went to MHCBs, 21 percent took longer than three days to reach one. Staff reported that some inmates were returned from MHCBs and DMH in short order but without evident improvement in functioning.

From April through September 2006, there were 78 to 101 OHU placements per month. The average daily census in the OHU was 10.7 to 14.5 across these months. One quarter to one third of admissions had lengths of stay over three days. Lengths of stay of ten to 20 days were common, with the longest reaching 49 days. The longer stays were generally attributed to pending transfer to DMH or pending stabilization. Typically, inmates in the OHU were seen once daily by either a psychiatrist or a psychologist.

SQ continued to fail to meet transfer timelines for MHSDS inmates in the reception center but revised its internal goals to conform to the timelines used statewide. There was little change in the rates at which caseload inmates were transferred or paroled from the reception center.

Information provided by the institution indicated that from June through November 2006, SQ met transfer timelines for 20 EOP inmates, missed the deadline for 25, and paroled 51. Regarding 3CMS inmates, 218 were transferred timely, and 129 were not, while 359 were paroled. More EOP inmates were placed in Level IV SNYs.

In the reception center procedures recently adopted by the medical staff reportedly delayed timely screenings and initial mental health evaluations. Staff attributed a high rate of turnover among psychologists assigned to the reception center to