a drop in compliance with reception center requirements.

SQ did not meet the minimum requirements regarding mental health treatment in the reception center. Staff audits found that compliance with required case manager contacts fluctuated, dropping to a low of 35-percent compliant, down from 80 percent to 90 percent. Staff audits found that timely EOP case manager contacts were 97- to 98-percent compliant. EOP inmates housed in the reception center were not treated in groups. Staff reported that the limitations of staffing as well as the physical plant would make it difficult to fulfill the requirements regarding mental health treatment for EOP inmates in the reception center.

Other CAP Issues:

There were 17 EOP inmates in administrative segregation at the time of the monitor's November visit. Two of the 17 had been endorsed and were awaiting transfer. EOP inmates received about half of the treatment that was offered in administrative segregation. SQ offered, on average, 7.5 to 9.2 hours of group treatment per week to EOP inmates in administrative segregation, but they received 3.6 to 5.3 hours.

In administrative segregation, all EOP inmates had walk-alone yard status, while none of the non-caseload inmates did. The use of walk-alone status was apparently intended to improve compliance with the requirement that EOP inmates receive a minimum of ten hours of treatment per week. The effect of walk-alone status was a decrease in the amount of yard time offered. Staff reported that EOP inmates in administrative segregation were generally offered two hours of structured group yard time per week in walk-alone yards and one hour per week of unstructured outdoor

recreational time. Inmates who did not require walk-alone yards generally had access to eight to nine hours of yard time per week. SQ staff agreed to reexamine the use of walk-alone status for all EOP inmates in administrative segregation as a means of meeting structured therapeutic activity requirements in EOP administrative segregation.

Staff audits found that initial and quarterly IDTT meetings for caseload inmates in administrative segregation were held in a timely fashion in 54 to 57 percent of cases. Staff did not keep track of whether IDTT meetings were attended by a full team. Case managers with 3CMS caseloads in administrative segregation described their workload as unmanageable. Although weekly contacts were made, staff audits found that 28 to 55 percent of them were cell-front. Treatment plans were not individualized.

Staff audits indicated that 97 percent of case manager contacts with condemned 3CMS inmates and 3CMS inmates in administrative segregation were made but that 32 to 47 percent of the contacts were made at cell-front.

Regarding condemned EOP inmates, weekly case manager contacts were not made consistently. Over half of the contacts were made cell-front. The amount of therapeutic activity offered to condemned EOP inmates averaged eight to ten hours per week, but on average, 1.7 to 4.8 hours were received.

Self-referrals and sick call requests to psychiatry did not meet with timely responses, although staff reported that average response times appeared to be shorter.

Discharge planning was in its nascent stages at SQ.


Other Issues:

Emergency responses and the initiation of CPR were problematic. SQ formed a QIT to address the problem. The required training on emergency responses was reportedly completed, but the monitor found that not all officers encountered were in possession of micro-shields.

## Deuel Vocational Institution (DVI)
November 13, 2006 – November 15, 2006

Mental health supervisory positions for chief psychiatrist, chief psychologist and two senior psychologists were filled.

Positions for the OHU psychiatrist and psychologist and for a mainline 3CMS psychologist and .5 psychiatrists were filled. In reception center, the sole psychiatry position, six of ten psychology positions, and two of three social work positions were filled. An additional psychiatry position and four of five additional psychology positions were also filled.

Six of eight psych tech positions were filled. The staff services analyst and medical secretary positions were filled. Of 3.5 allocated office technician positions, 1.5 were vacant.

Reportedly, all mental health vacancies were covered by contractors.

Of the institution's 3,878 inmates, 840 were on caseload. In administrative segregation, there were 424 inmates, of whom 101 were 3CMS and six were EOP inmates. DVI's protective unit housed 319 3CMS inmates and 16 EOP inmates. In reception center there were 338 3CMS and 13 EOP inmates. The OHU held 11 3CCMS inmates and one EOP inmate. Two inmates were in MHCBs; one was from administrative segregation and the other from reception center.

Quality Management:

The quality management committee met regularly and maintained minutes. Meetings of the mental health subcommittee had become irregular following transfer of its administrative coordinator but were resuming at the time of the monitor's visit. Both committees took up a broad range of mental health topics. Staff continued to conduct meaningful supervisory audits. Peer review for case managers was implemented. The institution reported that it had chartered QITs concerning peer review, OHU overflow in administrative segregation, and out-of-cell case manager contacts in administrative segregation. Peer review for case managers has also begun. Audits evaluating the process of medication management and the continuity of medication were, at times, compromised by small sample size.

Suicide Prevention:

The suicide prevention committee continued to meet monthly.

Medication Management:

Timely medication for newly arriving inmates remained problematic. Approximately 80 percent of inmates who arrived with prescriptions had renewals within eight hours of arrival. Only 53 percent actually received medication by the next day.

Medication continuity on intra-institutional transfers occurred timely in only 40 percent of cases.

Medication renewals were timely in 89 percent of cases. Psychiatrists sometimes wrote bridge orders for up to 90 days, with follow-up appointments often delayed for periods of up to six weeks.

Tracking and follow-up of medication non-compliance or "no-shows" were scattered. Recordings in MARs were accurate in only 53 percent of sampled cases.

Follow-up appointments with psychiatrists were timely in only 40 percent of cases.

The institution's history of medication delivery problems during lockdowns may have resolved. A one-day audit found 100-percent compliance during a lockdown.

Laboratory testing was problematic due to staffing shortages in psychiatry and the laboratory. Reported compliance rates were low, at 40 to 57 percent for inmates on an antidepressant, 37 to 40 percent for inmates on antipsychotic medication, and 73 percent for inmates on Valproic acid. Two registry laboratory techs were added to resolve the 14-to 21-day backlog in test orders. Work was in process to hire additional staff and to create additional workspace for the laboratory staff.

No inmates were on Keyhea orders.

No information on supply of parole medications was provided following near 100-percent compliance findings during the preceding monitoring period.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

DVI did not have a local operating procedure on the use of mental health input in cases of sexual misconduct RVRs. Its screening tool ruled out or detected major mental illness, but DVI had no comprehensive diagnostic tool for exhibitionism. No comprehensive evaluations for exhibitionism had occurred.

Staff produced a record of appointments for the screen that covered only the scheduling and completion of contacts but did not cover outcomes of initial or comprehensive evaluations or of measures taken to deal with the behaviors. The tracking process did not allow for review of cases of repeated sexual misconduct. The use of behaviorally based interventions for inappropriate sexual behaviors had not been

implemented.

Three sexual misconduct evaluations were logged in the MHTS between July 11, 2006, and September 5, 2006. Review of one showed that an initial screening was recorded on a preprinted checklist form for a mental status evaluation, with no C-file review. No comprehensive evaluation for exhibitionism was present.

Several mental health assessments found that inappropriate sexual behaviors may have been influenced by mental illness. These findings were noted in the hearing officer's reports but did not result in mitigation of penalties, with rationales explained well in the RVRs.

Of three sexual misconduct violations that were referred to the district attorney, prosecution was pending for two and denied for the third.

Transfers:

Between June 7, 2006, and November 13, 2006, DVI referred 16 inmates to DMH for acute or intermediate care. Four were accepted and transferred, three went to MHCBs in other prisons and had not returned, and one was transferred to an MHCB at Vacaville. Times from referral to transfer for three patients were six, 14, and 27 days. Packets for two referrals to intermediate care had recently been faxed. A DMH coordinator had been assigned.

DVI had difficulty transferring inmates to MHCB beds at other prisons. Only the most severe cases were referred. An audit covering 25 from July 3 through October 2, 2006, found that stays in the OHU exceeded the 72-hour limit in 18 cases, or 72 percent. Average time from OHU admission to order for transfer was 2.18 days, with transfer orders made before the third day in the OHU in 68 percent of cases. Average

time from transfer order to transfer was also 2.18 days, with a range of zero to ten days. Transfers occurred within three days of order in 64 percent of cases.

Many MHCB inmates were returned prematurely, at levels of care not available at DVI. An audit covering July through September 2006 found that half of the 28 inmates returned from MHCB placements had EOP level of care, 32 percent were readmitted to the OHU, and 25 percent were re-referred for MHCB care. Five-day follow-up occurred, but custody follow-up occurred in about 50 to 60 percent of cases.

As of November 14, 2006, out of 757 caseload inmates in reception center awaiting transfer, 207, or 27 percent, were there beyond transfer deadlines. Among them 105, or 21 percent, were designated as out to court or out-to-medical. Delays were attributed to lack of bed availability and significantly greater protective custody inmates in the special processing unit (SPU).

For EOP inmates in reception center, an October 2006 audit found timely transfers in 45 percent of cases, with the longest wait at 99 days. Approximately 80 percent of EOP inmates in reception center had weekly case manager contacts and were seen for medication management but had no other mental health services.

DVI was non-compliant with timely transfers out of reception center to 3CMS and EOP programs.

Other CAP Issues:

Housing logs indicated that heat-alert triggers, ice and water distribution, and shower offers occurred as required, but nursing rounds were not documented fully.

Spot checks for CPR equipment found that some custody officers did not carry mouth shields.

Other Issues:

DVI complied with emergent and urgent referrals but not with routine ones, particularly to psychiatry. It adopted OP 127 in October 2006 to implement the Program Guide referral standards. Institutional data conflicted with the monitor's data analysis. Institutional data covering July 1 through September 30, 2006, found average times of 6.4 days from referral to appointment. Seven referrals, including three caseload inmates, were classified as "urgent" and were reported to have been seen on the same day as the referral. Seventy-two, including 54 on caseload, were classified as "emergent" case manager referrals and were reported to have been seen on the same day as the referral. Reported reasons for delay included movement of inmates and protective custody issues. The monitor's analysis using the institution's tracking system found that 937 of 1,468 routine referrals, or 64 percent, were seen within seven days of the referral and that the remaining 531, or 36 percent, were seen on day eight or later. A number of referrals exceeded 30 days before the inmate was seen.

For caseload inmates coming into mainline from other institutions or from reception center, initial assessments were not completed within five days, and initial IDTT meetings did not occur within 14 days. An institutional audit found that mainline MH-2s were completed timely in 60 percent of cases and that MH-4s were completed timely in 70 percent of cases. IDTT meetings occurred timely in 50 percent of cases.

No psychotherapeutic groups were offered to caseload inmates during the monitor's visit. UHR filing backlog remained problematic but improved. Institutional audits on July 15, 2006, found six inches of unfiled material and four inches one month later.

The facility was old and overcrowded. Some inmate housing conditions were concerning. Inmates reported long periods between clothing exchanges. A large room around the perimeter housed 38 3CMS inmates in a triple-bunk arrangement. They reported that the room had a single toilet, urinal, and shower. Inmates were observed dumping water into a drain from 30-gallon garbage can which they used as a shower supplement. Many windows were broken. Inmates reported that they used blankets to cover windows but that custody officers removed the blankets without replacing them, leaving the area cold and beds unblanketed. An area of the K1 building housing caseload inmates was referred to as "deep seg" or "the dungeon." Its four cells were designed for the apparent purpose of isolation. They had almost no outside light and were illuminated by a single light controlled by an outside switch and turned off at night. Cells were malodorous, in disrepair, and out of officers' ready view. Inmates in these cells likely had no more contact with custody staff than inmates housed in SHU or stand-alone administrative segregation cells and were in much worse condition. Time out of the dorm was limited to approximately 20 minutes twice per day for meals. Several 3CMS inmates reported that they had difficulty in receiving medication after their arrival. Records for two of these inmates (See Exhibit G, Case Reviews 1, 2) suggested delays of two to three weeks from the inmate's arrival or self-referral until being seen by a psychiatrist.

The OHU at DVI had 28 beds, including four "quiet" cells. Physical modifications included covering of vents, modification of windows to prevent access to glass, and the installation of cameras to supplement observation. An overflow building held up to five OHU inmates. Both areas were unclean. Inmates on suicide watch were

typically not held in overflow, had one-to-one observation, and had nursing checks every 15 minutes. Inmates on suicide precaution in overflow had constant observation by one officer per inmate. Overflow cells had no outside windows and were lighted by single light bulbs which presented self-injury risk, and at least one serious suicide attempt had occurred in this area. Two custody officers were assigned to the OHU to assist with access to inmates during second watch. Clothing issues were problematic in that they gave inmates only a mattress and blanket. Incident reports from one attempted suicide noted that the inmate was "unclothed." The monitor observed several inmates who attended the OHU IDTT meeting wrapped in blankets because they had not been given suicide smocks.

The conditions described above were unacceptable. The time has come for DVI to finally resolve these problems. They must be rectified as soon as possible.

The OHU IDTT was ineffective due to lack of participation by many team members and lack of health care records and C-files. The monitor's expert observed a meeting attended by the psychiatrist and psychologist who covered the OHU but not by the California Correctional Institution, nursing staff, and psych techs. Neither the C-file nor medical records were available. No information regarding the inmate's medication was available because, as frequently, the pharmacy database program was not operating. As a result, little functional treatment planning appears to occur at these meetings. Inmates attended and interacted meaningfully with clinical staff. (See Exhibit G, Case Reviews 4, 5, 6).

In administrative segregation, the level of mental health services was concerning. As of November 9, 2006, out of 424 inmates in administrative segregation,

108 were on caseload, including 101 3CMS inmates, six EOP inmates and one MHCB level of care inmate. All of the EOP inmates had been placed there over one month earlier. The earliest date reported for 3CMS was January 3, 2006. Psych tech initial screening and rounding were non-compliant due at least in part to transfer of psych techs to medical supervision. The institution developed new CAP, number 31, to address initial screens. As of November 2006, there was no documentation, for a compliance rate of zero percent. Most clinical contacts with EOP inmates occurred cell-front because of shortages of office space and available escort staff. EOP inmates waited up to 79 days for transfer. Thirty-minute welfare checks by custody were implemented during all three watches. Cells for new arrivals were tagged "intake," with the inmate's name and number on the door. The designated <u>Coleman</u> officer had a welfare-check tracking sheet on which the time of each check was entered and signed. The officer on J and K wings reported that intervals could exceed thirty minutes due to high intake volume, locking and unlocking doors for security reasons, and need for observation by a floor officer for walks on the inner corridor. EOP inmates received an average of 1.3 clinical contacts per week, although two of ten inmates in the sample averaged less than one contact per week, for an overall compliance rate of 80 percent.

EOP inmates in administrative segregation received an average of 1.5 clinical contacts per week, according to findings of an audit.[1] They were offered no groups and limited yard time. An audit in October 2006 found that 68 percent of case manager contacts were cell-front due to lack of space and escorts. Clinicians reported

---

[1] "Average number of contacts" was not an appropriate method of reviewing compliance in this area because it may have misrepresented the consistency of each inmate's weekly contacts and assumed that they were distributed evenly over time.

persistent problems with accessing EOP health care records.

DVI had three reception centers. Reception centers one and two received all levels of inmates except SPU inmates, who went to center three. Inmates in centers one and two who required mental health services were seen in treatment space in reception. SPU inmates were taken out to meet clinicians in the unit. According to institutional data for August 7 through August 18, 2006, 984 inmates received mental health screens, and 178 received further evaluations, for compliance rates of 97 percent for timely screenings and 88 percent for timely evaluations. Weekly contacts for EOP inmates and 90-day contacts for 3CMS inmates occurred timely.

### Service Area E

Service Area E includes California State Prison at Corcoran, California Substance Abuse Treatment Facility, Pleasant Valley State Prison and Avenal State Prison.

### California State Prison at Corcoran (CSP/Corcoran)
August 22, 2006
October 10, 2006 – October 11, 2006
December 11, 2006 – December 12, 2006

The overall vacancy rate among mental health staff at CSP/Corcoran remained high at 28 percent. The vacancy rate among clinical positions, including staff psychiatrists, psychologists, social workers, psych techs, and recreational therapists, was 51 percent. Contractors covered only 19 percent of the vacancies. Staff reported that the department's streamlined hiring process had not reduced delays. At minimum, hiring took two to three months, and approval for hiring above the minimum salary added weeks to the process.

Fewer than half of CSP/Corcoran's allocated psychiatry positions were

filled or covered by contractors. The chief and senior psychiatrist positions were vacant, as were 9.8 of 14.3 staff psychiatry positions. Contractors covered the equivalent of 1.8 positions, leaving a functional vacancy rate of 56 percent in psychiatry.

Two thirds of CSP/Corcoran's clinical supervisory positions were vacant. Nearly half of the case manager positions were filled or covered by contractors. The chief psychologist position was filled, as was one of three senior psychologist positions and one of 2.79 supervising social work positions.

Among case managers, 27.21 of 39.21 clinical psychologist positions and 5.4 of 11.4 social worker positions were vacant. Contractors covered the equivalent of 8.7 positions, generating a functional vacancy rate of 47 percent for case managers. One of eight recreational therapist positions was filled; none of the vacant positions were covered by contractors.

Nearly all of the 5.7 SRN II positions and 43.92 RN positions assigned to mental health were filled. All four senior psych tech positions were filled, as were 30 of the 36.6 psych tech positions. Among 21.5 clerical positions, 18 were filled, including 1.5 new supervisory positions.

Beyond the mental health department, only 1.57 of 113.57 nursing positions were vacant. There were 23 medical records positions, of which two were vacant and two redirected to other duties. Contractual staff reportedly covered all of the vacant and redirected positions. Nearly half of CSP/Corcoran's 45.6 MTA positions were vacant. The institution reportedly used contract LVNs and overtime to cover most MTA vacancies. Two of 13 pharmacy positions were vacant; both were covered by contractual staff.

CSP/Corcoran's census on September 14, 2006 was 5,362 inmates, of which 1,150, or 21 percent, were MHSDS inmates. There were 433 inmates in administrative segregation. The number of 3CMS inmates in administrative segregation hovered around 132. In October, the SHU had a census of 1,119.

In September, there were over 200 EOP inmates at CSP/Corcoran. The mainline EOP unit contained around 145 general population inmates. The number of EOP inmates who were housed in either the administrative segregation hub or the SHU fluctuated between 41 and 61. The capacity of the hub was reportedly 54.

In contrast to the previous monitoring period, during which the tumult of converting an EOP unit from Level IV to Level III and a flood in a new EOP treatment building consumed an inordinate amount of resources, CSP/Corcoran enjoyed a return to the status quo.

Throughout the institution, space constraints were a major impediment to access to treatment. CSP/Corcoran was unable to meet Program Guide requirements for the treatment of 3CMS inmates housed in the SHU. Demand exceeded capacity in the MHCB and in the EOP administrative segregation hub. Although the number of caseload inmates was largely stable, with a 12-percent rise in the 3CMS caseload the largest change, a high rate of turnover drove up demand for initial evaluations and initial IDTT meetings.

CSP/Corcoran was selected for enhanced monitoring during the current monitoring period. Staff rose to the occasion, forming several interrelated work groups to address the low rate at which EOP inmates attended group treatment and issuing a report describing impediments to attendance, remedies attempted, and the status of the

problem. In contrast, activities of the cultural assessment team foundered, devolving from a focus on organizational issues to discussions about the content and location of vending machines.

Quality Management:

The local governing body and the quality management committee continued to meet regularly, as did the mental health quality management subcommittee. Most auditing was delegated to a full-time quality management coordinator. A wide range of mental health treatment targets were audited regularly. Audits were informative.

Peer review by psychology and social work continued to consist of teams of three members of the discipline who reviewed medical records and provided feedback to other clinicians. Psychiatrists were not engaged in peer review due to staffing shortages and turnover.

Suicide Prevention:

Five-day follow-up protocols appeared to be followed, with the possible exception of provisions for hourly custody observation. From April through August 2006, a total of 291, or 75 percent, of all cases discharged from the MHCB were accompanied by orders for five-day follow-up. Staff audits found a 93-percent compliance rate but no information regarding custody observations was provided.

Staff reported that suicide risk assessments were completed for approximately 60 percent of the caseload and that the results were entered into the MHTS.

There were lapses in screening inmates placed in administrative segregation. The monitor's review of 19 UHRs of non-caseload inmates recently placed

107

in administrative segregation found that 11, or 58 percent, did not contain a mental health screening related to the most recent placement. Staff acknowledged that inmates transferred from the SHU to administrative segregation were not routinely screened but could not explain non-compliance in several other cases.

Regarding rounds in the SHU, staff reported that audit methodology improved and the results were findings of 100-percent compliance with rounding requirements for caseload inmates and 92-percent compliance for non-caseload inmates.

Medication Management:

According to staff reports, nursing staff audited a number of aspects of medication management, and procedures were reviewed and improved as needed. A QIT was chartered to address the availability of custody staff when medication was administered in administrative segregation and in pill lines.

Medication continuity for new arrivals was audited and found to be 99-percent compliant. No information regarding medication continuity when orders required renewal or when inmates were relocated within the institution was provided.

Response to medication non-compliance remained inconsistent. Remedies underway included more intensive training of registry staff and focusing on non-compliance during IDTT meetings.

Staff established a mechanism to improve monitoring of blood levels of mood stabilizers and the use of Clozaril. The mechanism compensated for the shortfall of staff psychiatrists and followed CDCR protocols regarding the use of those medications. No audit results were yet available.

The handling of DOT orders was improved by better tracking of inmates

who had DOT orders. Audits found 100-percent compliance with DOT procedures, but hoarding remained a significant problem. Remedies included more intensive training of registry staff, the use of informational chronos when hoards were discovered, and distinguishing between actual DOT orders, which numbered 585, and orders for nurse-administered medication, of which there were roughly 1,800.

Staff reported that a review of informed consent was underway. The purpose of the review was to obtain informed consent from inmates whose files did not have a current signed form.

A total of 397 inmates had 628 HS medication orders. Supervisors' spot checks confirmed that HS orders were administered after 8:00 p.m.

Pharmacy records continued to show that 99 percent of inmates who were paroled with current medication orders received and signed for a supply of medication when they were released.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

This was an area of improvement, as CSP/Corcoran was one of the few CDCR prisons working to develop a treatment program for exhibitionism. During the period from July through September 2006, mental health staff received 114 sexual misconduct referrals involving 82 inmates; 64 inmates were referred once; 12 inmates were referred twice; two inmates were referred three times; and four inmates were referred five times. No inmates were screened more than once. Three inmates left the institution prior to screening, and two other inmates bypassed the screening and went directly to a comprehensive evaluation. Mental health staff completed 77 sexual misconduct screenings. Staff's review of tracking logs found that not all incidents

involving indecent exposure were referred to mental health.

Staff acknowledged that screenings were rarely completed within 72 hours of the incident, as required by CDCR policy. In many cases, the mental health department did not receive referrals in time to meet the deadline. Thirty non-caseload inmates and 38 3CMS inmates were screened. Nine EOP inmates and two MHCB inmates were screened. A total of 23 clinicians completed screenings on a rotating basis.

The screening and IDTT review process under referred inmates for full evaluations. Of the 77 inmates screened, six were referred for a full evaluation, and five were diagnosed with exhibitionism. During the first site visit, a sample of screenings and comprehensive evaluations was reviewed by the monitor's expert. Not all inmates cooperated with the screenings and evaluations. C-files were not reviewed in every case. Most screenings that were reviewed were adequate, but a few appeared to have been done by individuals who did not demonstrate familiarity with the purpose of the screening. Some screenings did not consider the diagnostic possibility of a paraphilia or determine whether a comprehensive evaluation was warranted.

Two clinicians were assigned to do comprehensive mental health evaluations. The evaluations were thorough and competently done. Diagnostic impressions were well supported and treatment recommendations made.

CSP/Corcoran did not claim to have a staff member who was qualified to provide group treatment for exhibitionism. A clinician was contracted to provide in-service training to CSP/Corcoran staff on how to screen for, evaluate, and treat exhibitionism. The in-service training was scheduled for after the monitor's visit.

In October 2006, the five inmates diagnosed with exhibitionism were

scattered throughout the institution. Case managers attempted to provide a more intensive level of individual treatment but acknowledged that they did not know how to treat exhibitionism on an individual basis. Staff planned to house inmates diagnosed with exhibitionism in one unit by the end of December 2006 and to treat them in group therapy.

Transfers:

Staff reported good access to acute care beds located at APP at CMF. During the first eight-and-one-half months of 2006, 52 inmates were referred and 49 were transferred to acute care. Three referrals were rescinded. There was a downward drift in the average number of referrals made per month, down from a monthly average of 7.2 early in 2006 to 5.4 per month by August 2006.

Delays in transfer to acute care lengthened. The amount of time elapsed between referral to acute care and acceptance or assignment of a bed by DMH ranged from four to 32 days, over twice the longest wait reported during the previous monitoring period. In 11 cases, or 22 percent, the wait was over one week long. The average wait time between referral and transfer to acute care was nine days.

CSP/Corcoran rarely referred to intermediate inpatient care. During the first nine months of 2006 four inmates were referred. All were accepted, but none had been transferred at the time of the monitor's October visit. Staff attributed the dwindling number of referrals to long wait lists for beds at SVPP and lack of information about the Level III intermediate care beds available at APP at CMF.

The MHCB was located in one of the four wings of the general acute care hospital (GACH). The capacity of the MHCB was 23. The census often exceeded the

capacity. Eight safety cells located in an adjacent medical wing were used for overflow. MHCB operations were reportedly strained by high demand and inadequate staffing.

Staffing patterns were not optimal, lengthening some stays and compromising the quality of treatment. Two part-time psychiatrists temporarily assigned to CSP/Corcoran when the MHCB expanded from 16 to 23 beds left during the monitoring period. A full-time correctional counselor position formerly devoted to the MHCB was split between two correctional counselors who alternated coverage at twice-weekly IDTT meetings. Staff reported that slowed custody processing was a factor in long lengths of stay in the MHCB. The recreational therapy position remained vacant. MHCB inmates still had no access to indoor or outdoor recreation regardless of treatment plan or length of stay.

A second factor implicated in lengthening MHCB stays was problems with the Keyhea process. Staff reported that a number of petitions had to be resubmitted because they were initially denied or slowed by the office of legal affairs. Staff complained that the threshold applied to petitions was too high.

The MHCB unit was busy. From April through August 2006, there were 388 admissions to the MHCB, an average of 78 per month. Referrals from other prisons accounted for 27, or seven percent, of admissions. A total of 66, or 17 percent, of admissions involved inmates who had been admitted to the MHCB two or more times during the past six months. Excluding cases involving DMH referrals and Keyhea petitions, 38, or ten percent, lasted longer than ten calendar days.

All inmates admitted to the MHCB were required to surrender their clothing and wear a tear-resistant smock whether or not they were currently or had ever

112

been suicidal. A decision regarding restoration of clothing was made during the initial IDTT meetings. New mattresses were ordered for the MHCB. Five-day follow-up was ordered for 75 percent of all inmates discharged from the MHCB.

Holding cells located in the emergency room were approximately the size of a telephone booth. Seats were installed a few days prior to the monitor's October visit.

Other CAP Issues:

a. Partial Compliance

A high rate of turnover among caseload inmates in concert with shortages of staff psychiatrists and lack of suitable treatment space continued to impede the delivery of mental health treatment and prevent CSP/Corcoran from meeting Program Guide requirements. Nonetheless, staff audits showed that CSP/Corcoran continued to sustain compliance with most timeline requirements regarding initial mental health evaluations, IDTT meetings, and case manager contacts.

Twenty Level IV EOP inmates remained after the conversion to level III; five of them were endorsed to CSP/Corcoran because they were treated with Clozaril. Staff was concerned about co-mingling Level IV EOP inmates with lower functioning, lower-security level EOP inmates.

Caseloads in the general population portion of the EOP ranged from 27 to 31. The same psychiatrist had been assigned to the caseload since March 2006. He regularly attended IDTT meetings and helped improve continuity of treatment. Case managers made weekly contacts and convened timely IDTT meetings with EOP inmates housed in the general population EOP unit. Staff audits spanning April through August found compliance rates of 90 and 98 percent, respectively, for weekly case manager

113

contacts and timely IDTT meetings. The composition of IDTTs remained out of compliance. IDTT meetings were not attended by a psychiatrist 24 percent of the time, and 16 percent did not have a correctional counselor on the team.

The administrative segregation hub for EOP inmates was taxed beyond its capacity of 54 for much of the current monitoring period. The census rose as high as 64, and the rate of inmate turnover was high. The mandated staffing ratio of one case manager per nine inmates was not always maintained. A recreational therapist position had been vacant over one year. One psychiatrist covered the EOP inmates in the hub plus approximately 250 3CMS inmates in the SHU. Staff reported that he was a long-term contractor who participated in IDTT meetings and was readily available to staff seeking consultations about EOP inmates in administrative segregation. Notwithstanding these myriad difficulties, staff audits found that case manager contacts and timely IDTT meetings for EOP inmates in administrative segregation were 95- to 99-percent compliant from April through August 2006.

Attendance at group treatment by EOP inmates in both the mainline and administrative segregation was a focus of several interrelated work groups. During the current monitoring period, ten hours of group treatment per week were offered to each inmate by borrowing group leaders from other areas, including nursing. Work groups identified and remedied myriad barriers to attendance, but the results of those efforts were difficult to gauge due to confounding introduced by the imposition of a new search procedure. Clothed and body searches were conducted on the way to and from mental health appointments. Staff reported that the new procedure was developed with due consideration of its likely effect on participation in treatment.

Provision of mental health treatment to 3CMS inmates in administrative segregation was fraught with difficulty. The rate of turnover among clinical staff was high. Many clinical contacts were made at cell-front. Treatment space, escorts, and confidentiality were problematic. Staff reported that approximately 25 percent of the caseload was seen by a case manager on alternate weeks and 25 percent were seen cell front. Unable to meet Program Guide requirements, staff resorted to triaging, giving priority to caseload inmates newly placed in administrative segregation. Psych techs made daily rounds.

The number of 3CMS inmates housed in the SHU ranged from 480 to 503 between April and August 2006. Five case managers and the equivalent of two full-time psychiatrists were assigned to the SHU. Staff could not meet the revised Program Guide requirement of monthly case manager contacts with all 3CMS inmates. Lack of clinical staff was the main obstacle. Availability of escort officers continued to be a factor in access to care but progress was evident. Schedules were modified to optimize access, and no mental health appointments were cancelled due to lack of escorts.

Case manager duties in the SHU included covering ICC meetings two days per week, performing mental health assessments in connection with RVRs, evaluating instances of sexual misconduct, and responding to 602 appeals. In light of their inability to meet the requirements, staff triaged, affording contacts with newly placed inmates, case manager visits, and IDTT meetings highest priority. Staff audits found that in June, July, and August, 51 to 55 percent of caseload inmates in the SHU were seen monthly by a case manager. Quarterly IDTT meetings were in compliance for 43 to 49 percent of cases. As in the past, IDTT meetings were infrequently attended by a

full team. Although curricula were developed and groups were run in the past, group treatment was not offered to EOP or 3CMS inmates in the SHU due to lack of clinical staff.

Staff assigned to the 250 mainline 3CMS inmates were spread thin and were unable to sustain group treatment. Caseloads ranged from 99 to 136. One case manager worked three-quarter time, and one also covered inmates in the GACH and supervised screenings and evaluations in administrative segregation. All psychiatry contacts were made via telemedicine. Quarterly case manager contacts were made and IDTT meetings were held timely, but quality of care suffered. Inmates were absent from 31 percent of IDTT meetings. Fifty percent of IDTT meetings did not have a correctional counselor, and 81 percent did not have a psychiatrist in attendance.

b. Non-Compliance

Availability of UHRs was a chronic problem. Staff audits found that medical records were available most often for contacts made with mainline EOP inmates but least often for contacts with the caseload in the administrative segregation hub, where they were available just 39 percent of the time. UHRs were available for 45 percent of ICC meetings.

Other Issues:

CSP/Corcoran's use of force review committee continued to meet weekly. A supervisor representing the mental health department attended. Further staff training and corrective actions were undertaken at the direction of the committee.

No cell extractions were done from April 1 through August 31, 2006. In that time period, CSP/Corcoran reported a total of 208 incidents. That number was

116

consistent with the frequency of incidents reported during the prior four months, when the number of incidents rose 60 percent over the previous level, climbing from 110 to 184. Force was used less often; 118 incidents, or 57 percent, were resolved without the use of force. Force was used in 90 incidents, or 43 percent. This represented a reduction in use of force in comparison to rates of 56 and 50 percent reported during two earlier monitoring periods

Patterns in the use of force involving MHSDS inmates were consistent with those reported during the two previous monitoring periods. MHSDS inmates were involved in 97 incidents, or 47 percent of total incidents. In 50 of those incidents involving MHSDS inmates, or 52 percent, force was not used. In 47 incidents, or 48 percent, force was used.

These statistics recited above indicate a four-percent spread between use of force in incidents involving MHSDS inmates and use of force involving all inmates at CSP/Corcoran. How rates of the use of force against MHSDS inmates compare to rates of the use of force against non-MHSDS inmates will be monitored and reported in the upcoming twentieth monitoring period.

There were lapses in the implementation of the heat plan. Records compiled by CSP/Corcoran documented a number of Stage II heat alerts in July and September. Housing logs in one building did not have entries that showed cooling measures were taken during a State II heat alert.

CSP/Corcoran's compliance with directives regarding emergency equipment appeared to be good. Eight control booths toured by the monitor in October had the required equipment on hand. All officers interviewed possessed a micro-shield

117

and had received CPR training within the past year as part of annual block training.

The monitor reviewed all six incident reports related to inmate deaths during the preceding six months. None raised issues pertaining to emergency responses.

### California Substance Abuse Treatment Facility (CSATF)
October 2, 2006 – October 4, 2006

CSATF sustained its functional vacancy rate of less than ten percent with the use of contractual staff and telemedicine. Staff turnover continued to have a deleterious impact on the delivery of mental health treatment. At the time of the monitor's visit, six of 12 case managers had been working at CSATF for less than nine months. Supervisors continued to spend an inordinate amount of time orienting new staff. Continuous turnover prompted managers to shift clinicians among programs and yards, which resulted in poor treatment continuity.

Three psychiatry positions, 2.5 psychology positions, and three social work positions were vacant. Contractual staff and the use of telemedicine psychiatry covered the vacant positions. Despite a low vacancy rate, caseloads remained high on some yards. Six of 12 case managers carried caseloads larger than 130. Case managers assigned to administrative segregation carried caseloads of 32 to 41.

CSATF expected to receive additional staff allocations related to an anticipated increase in the institution's 3CMS cap. While additional staff was welcome and needed, managers worried that more clinicians would exacerbate current shortages of office and program space and predicted that it would be difficult to fill the new positions given the salary disparity between CSATF and its neighbor institutions, CSP/Corcoran and Kern Valley State Prison.

Salary increases reduced nursing vacancies. The vacancy rate for MTA

positions ranged from 38 percent to 43 percent throughout the monitoring period. The vacancy rate in medical records was high, ranging from 44 to 69 percent. Contractual coverage of vacant medical records positions declined from the equivalent of 5.5 positions in May 2006 to 2.73 in July 2006.

Four of five laboratory positions remained filled throughout the monitoring period, with contractual hours more than covering the sole vacancy. Three of nine pharmacy positions remained vacant, and one position was vacant as a result of extended medical leave. Contractors covered all empty positions.

CSATF's closure to new mental health intakes during 2003 and 2004 lowered the MHSDS population to 963 by July 2004. Slightly more than two years after reopening to intakes of new caseload inmates in mid-2005, the MHSDS population exceeded 1,300, an expansion of 35 percent.

In September 2006, CSATF's overall census was 7,522 inmates. Overcrowding required the conversion of gyms to housing units, most of which were triple-bunked, and the installation of beds in dayrooms. The caseload population was 1,304, 24 percent above its capacity of 1,049. There were 1,284 3CMS inmates. Eight EOP inmates awaited transfer. The MHCB held 12 patients including six from other CDCR institutions. There were 306 inmates in administrative segregation; 113 were 3CMS inmates.

Issues Resolved:

EOP inmates pending transfer were consistently seen on a weekly basis by a clinical case manager.

Quality Management:

CSATF continued its institution-wide quality management activities. The

health care quality management committee, as well as the mental health subcommittee, met regularly. Typically, 50 to 60 percent of the required participants attended mental health subcommittee meetings. QIT activities were not documented in meeting minutes. Audits revealed a number of ongoing and, in some cases, worsening problems.

The health care quality management committee received reports specific to mental health. On occasion, the committee issued recommendations relative to mental health matters, which were monitored and reviewed during subsequent meetings. QITs were not formally chartered. Rather, informal task groups were assigned to examine identified problems.

MHTS information was not as reliable as it was during the previous monitoring period, when audits found that MHTS contact data matched UHR entries about 70 percent of the time. Due to staff turnover and vacancies in clerical positions, contact data were not entered in a timely manner. The accuracy of MHTS data was not assessed during the reporting period.

Suicide Prevention:

The suicide prevention committee met monthly, though meeting minutes indicated that nearly 50 percent of required attendees failed to participate on a regular basis. Participation notably improved in August 2006 following distribution of attendance reminders. The meetings followed CDCR's set format and generally provided a useful forum for raising and addressing issues relevant to suicide prevention. Staff audits found continued compliance with requirements regarding five-day follow-up and

custody observations.

Medication Management:

Audits done by nursing supervisors found that medication continuity was sustained when inmates arrived at or transferred within the institution. However, continuity upon arrival was described by staff as problematic, and anecdotal reports suggested that the pharmacy sometimes failed to timely process new prescriptions and occasionally failed to dispense medications for current orders. Mental health supervisors, only recently made aware of these problems through self-referrals and inmate appeals, planned to charter a QIT to examine these issues.

The rate at which psychiatrists renewed medications in a timely manner fell from 90 percent during the first quarter of 2006 to 70 percent during the second quarter of 2006. Only 60 percent of orders for new, changed, and discontinued medications were accompanied by supporting documentation in progress notes. Slippage in these areas was attributed to turnover among psychiatrists.

Nursing audits indicated that medication noncompliance was consistently and correctly documented on MARs. However, only 53 to 63 percent of documented cases of medication noncompliance were referred to mental health. A low rate of referral was attributed to turnover among nurses and MTAs.

Regarding monitoring blood levels of mood stabilizers, mental health staff reported that completion of non-emergency lab testing was routinely delayed. Staff also reported that lab results were not provided to psychiatrists and lab reports were not filed in UHRs in a timely manner.

Nursing audits found that DOT protocols were consistently followed

throughout the reporting period. However, suicide prevention meeting minutes indicated that DOT protocols were not consistently followed in the MHCB and that inmates throughout the institution were frequently found to have non-therapeutic levels of medication in their blood. A staff audit of 65 UHRs found that informed consent was obtained on a more consistent basis. Current consent forms were found in 77 percent of the audited UHRs, up from an earlier compliance rate of 40 percent.

HS medication orders were written as needed and administered after 8:00 p.m.

A nursing audit found that a supply of medication was given to 93 percent of paroling inmates, slightly down from an earlier compliance rate of 100 percent.

CSATF initiated 12 Keyhea petitions during the current monitoring period. Three petitions were unsuccessful; one was not pursued by CDCR's Office of Legal Affairs, one was rejected in a hearing held at CSATF, and the other was rejected subsequent to a hearing held at a DMH facility. In September, there were five inmates with current Keyhea orders.

There were ongoing problems with the exchange of information among seven satellite clinics.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

CSATF continued to struggle to comply with RVR protocols. Staff audits found that hearing officers continued to fail to properly consider mental health assessments in their findings. There were cases in which hearing officers did not know that a mental health assessment had been completed. Mental health assessments were not consistently filed in C- files.

CSATF continued to review cases of sexual misconduct in accordance with CDCR policy. From April 16 to August 27, 2006, 23 inmates were screened by mental health staff in connection with RVRs for sexual misconduct. One inmate accounted for two cases, and three inmates were each screened twice. All screenings were reviewed by an IDTT, but none were referred for comprehensive mental health evaluations. No inmates were diagnosed with or being treated for exhibitionism.

Transfers:

Access to acute care at CMF deteriorated during the reporting period. Between April 15 and August 15, 2006, CSATF made 15 referrals to acute care for an average of three per month. In over half of these cases, over ten days had passed before referrals were made. Two inmates were transferred to another CDCR prison prior to being sent to DMH. Reportedly, four referrals were rejected because beds were not available at DMH. Eight of nine transferred patients waited longer than two weeks following referral. Two MHCB patients referred to DMH were discharged to EOP programs in other CDCR prisons in order to expedite their transfers from CSATF.

CSATF's 45-bed hospital included 14 MHCBs, 31 medical beds, four safety cells, and two observation cells. From May 1 through August, 2006, there were 121 admissions to the MHCB unit, or roughly 30 a month. One half to three quarters of admissions were CSATF inmates, while the remainder came from other prisons. The MHCB unit routinely operated at or above full capacity. If necessary, medical patients were transferred to area hospitals to make room for MHCB admissions.

Inmates referred to the MHCB were nearly always held in holding cells, either located in a housing unit or in the CTC's treatment and triage area, pending

completion of an admission assessment. The institution did not track length of stay in holding cells. Staff reported that inmates were not held in holding cells overnight pending admission to the MHCB. The institution developed a local operating procedure for monitoring inmates in holding tanks pending admission to the MHCB. To date, all inmates admitted to the MCHB had reportedly received a bed within a few hours.

Lengths of stay in MHCBs were excessive. The percentage of MHCB stays that exceeded ten days dropped from 55 percent during the previous monitoring period to 43 percent during this reporting period. According to a tally of 121 discharges, 52 admissions, or 43 percent, lasted longer than ten days. Lengths of stay were 20 days or longer in 27 cases, 30 days or longer in nine cases, and 40 days or longer in six cases. About 42 percent of the excessively long stays were attributed to DMH referrals, Keyhea processes, EOP transfers, and administrative delays in removing patients who were discharged.

From March through August 2006, 20 inmates were admitted to the MHCB unit twice, and five were admitted three or more times. At least half of these inmates either were referred to DMH, discharged at an EOP level of car, or were the subject of Keyhea certification.

Documentation of initial and follow-up IDTT meetings in the MHCB faltered during the reporting period. The compliance rate for initial IDTT meetings averaged 68 percent. The compliance rate for follow-up IDTT reviews averaged 62 percent during most of the reporting period but surged to 100 percent in August 2006. Poor performance in this area was attributed to turnover among staff psychiatrists and slack documentation practices.

124

An audit of 19 MHCB admissions, completed during the second quarter of 2006, found that suicide risk assessments were not consistently completed. Only six cases, or 32 percent, were assessed for suicide risk upon admission, while 14 cases, or 74 percent, were assessed when discharged.

CSATF did not consistently meet transfer timelines for EOP inmates, although transfer delays slightly declined during the reporting period. In mid-September 2006, CSATF housed nine EOP inmates, one of whom was temporarily housed there to attend court proceedings. On September 13, 2006, there were eight inmates at EOP level of care awaiting transfer from CSATF to EOP programs. One additional EOP inmate assigned to CSATF was out to court. These inmates had been awaiting transfer for 15 to 129 days, including four who had been waiting for more than 30 days. From May 1, 2006, through August 31, 2006, 15 EOP inmates were transferred from CSATF to EOP programs after waiting for periods of 17 to 217 days. It appeared that eight inmates who were designated as requiring EOP level of care left the institution from crisis care and that two inmates paroled while awaiting EOP transfer. The decrease in the number of EOP inmates in combination with a newly implemented audit procedure was accompanied by an increased consistency in weekly case manager visits. Audits across April, May, and June, 2006 indicated that weekly case manager contacts occurred for EOP patients in only 50 percent of the cases. Compliance in this area had reached 100 percent in August and early September.

Other CAP Issues:

a. Partial Compliance

Regarding 3CMS treatment, IDTT meetings were well attended, although

California Correctional Institution participation was inconsistent in some areas and C-files were not always available. The monitor's expert found an observed IDTT meeting to be of high quality. Group treatment was problematic. Wait lists for group treatment remained long. Group sessions were not offered on three of seven yards, affording group treatment to only about five percent of caseload inmates. It was not offered to EOP inmates awaiting transfer.

Case managers did not consistently develop pre-parole plans. Staff audits found compliance rates ranging from 52 to 64 percent. Lack of discharge planning was attributed to staff turnover and lack of focus on parole planning among newly hired staff.

b. Non-Compliance

Large caseloads, turnover, and long-term leaves combined to reduce compliance with Program Guide requirements. Initial mental health evaluations, treatment plans, and IDTT reviews were not timely completed. Compliance with quarterly case manager contacts dropped to 78 percent. Mental health staff response to referrals was often slow.

Staff was unable to collect, triage, assign, and respond to inmate referrals for mental health services within five working days. Finding a solution to this long-standing problem remained elusive, largely due to logistical challenges inherent in implementing a multi step referral process in a sprawling prison with seven yards and over 7,500 inmates.

Staff audits of weekly case manager contacts in administrative segregation yielded an average compliance rate of 58 percent, a significant decline for this previously resolved CAP item. Managers acknowledged that staff turnover had had a negative effect

on mental health services in administrative segregation but believed that audit results were based on flawed audit methodology. Case managers assigned to administrative segregation reportedly barely had time to complete weekly contacts. Average caseloads of 38 inmates left little or no time for extending clinical interviews or increasing frequency of contacts when needed.

MARs, laboratory results, MHCB inpatient records, telepsychiatry orders, and weekly summaries of psych tech rounds were not filed timely in UHRs. In some instances, documentation never reached the UHR. Staff audits found that documentation was often misfiled, but more recent audits suggested that UHR organization had improved.

Other Issues:

Reportedly, lack of adequate office and programming space in four of seven of CSATF's yards hindered the delivery of mental health treatment. Case managers and psychiatrists often competed for limited office space, which routinely disrupted scheduled appointments.

Heat-plan protocols were followed. Records indicated that indoor temperature exceeded 90 degrees for five to six consecutive days in a handful of housing units during a July 2006 heat wave. The indoor temperature reached 96 degrees in one housing unit during that time. Several inmates interviewed by the monitor reported that temperatures inside cells were consistently higher than ambient temperature readings on thermometers that triggered Stage II heat alerts. Inmates also reported that staff did not provide increased access to showers or distribute ice during Stage II heat alerts.

All housing units toured by the monitor had extra micro-shields, a cut-

down tool, an ambu bag, a protective disposable jumpsuit, and current, complete inventory records. Floor and control booth officers in all areas toured carried micro-shields.

CSATF activated a BMU in September 2006. A local set of procedures was developed. At the beginning of October 2006, no inmates had been placed in the BMU.

**Pleasant Valley State Prison (PVSP)**
September 11, 2006 – September 12, 2006

PVSP reported under-allocations in mental health staffing, particularly among supervisors, and problems with recruitment and retention due to compensation levels and competition with other CDCR institutions.

The position of chief psychiatrist was filled on a temporary basis. Of the 4.5 line psychiatry positions, three were filled, and the remaining 1.5 openings were covered by contractors.

Among case manager positions, ten of the 19.5 positions were filled, and seven were covered by contractors, for a functional vacancy rate of 13 percent. The vacancy rate among psych techs was 23 percent, with five of the 6.5 psych tech positions filled.

There were 4.6 vacancies among the 27.6 RN positions, creating a vacancy rate of 17 percent.

Among office tech positions, four of the 6.5 were filled. One office assistant position was open.

As of September 1, 2006, PVSP housed 5,135 inmates. Of these, 1,566 were on the mental health caseload, including 1,424 general population 3CMS, 125 in

administrative segregation, ten EOP inmates and seven inmates in MHCBs. Caseload population capacity of 1,199 was exceeded by 367, although it had fallen by 49 since the preceding monitoring period.

Quality Management:

Required quality assurance bodies and committees were in place and functional. Peer review was active and ongoing.

QITs were meaningful, substantive, and active. They covered new arrivals, pill lines, and timelines for medication order on intra-institutional transfers. One QIT found EOP care inadequate and established a process to address this deficiency by having the same clinician treat EOP inmates without regard to their housing assignments. Another QIT examined and standardized the process for collecting and compiling RVR throughout the institution.

High turnover and vacancies in clerical positions plus problems with the MHTS hindered availability of data essential to the quality management process, such as timeline information. It was not clear whether required management information was accessed and utilized.

Medication Management:

Newly arriving inmates received their medications within one day of arrival and on average were seen on by a psychiatrist within 12.2 days of arrival, for a compliance rate of 95 percent. A spot audit of 67 inmate records corroborated this data.

Medication continuity was maintained through housing changes, except on transfers from yards to administrative segregation II, where audit data showed that in eight of 25 cases, inmates did not receive medication until three to eight days after their

transfers.

Inmates on prescribed medication were seen by psychiatrists at least quarterly.

MTAs referred inmates who missed or refused three consecutive or three of five scheduled dosages. They were trained on completion of MAR forms. Reports referred to findings of improved accuracy of MAR documentation, but supporting audit data were not available.

Problems with long waits in pill lines on the SNY yards were addressed by installing an additional window in the MTA clinic and having inmates go to pill lines by housing unit. Observations indicated that waits in line were reduced to 20 minutes or less, although no relevant audit data was available. Implementation of Plata practices also changed the medication distribution procedures. Reportedly, custody officers began observing pill lines.

Staff reported an existing policy that requires that all psychotropic medication be delivered via DOT.

Audits found consistent ordering of laboratory tests to monitor blood levels of inmates on such psychotropic medications as Depakote and Lithium. Reporting and filing of test results, however, were not timely. MHTS tracking data showed that 17 of 32 test orders for Seroquel and none of the 15 orders for Lithium were in filed in records. For approximately half of dated test orders, the time from order to reading and noting of test results was 30 days or longer.

Facility audits found that, across the period since the previous visit, inmates prescribed psychiatric medication were generally seen by psychiatrists more

often than once every 90 days.

Keyhea petitions were initiated for ten inmates since March 1, 2006. Five were transferred or awaiting transfer for DMH, three were housed at PVSP, and two petitions lapsed during the monitoring period.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

PVSP did not have a local operating procedure for appropriate use of mental health assessments for the discipline of sexual misconduct violations and for related custody practices.

Transfers:

After April 5, 2006, PVSP referred nine inmates to acute care at DMH. Times from referral to transfer ranged from three to 35 days. The institution made no referrals to intermediate inpatient care at DMH.

During the monitoring period, 145 inmates were admitted to MHCBs, including 44 from other institutions. MHCB capacity increased from five to 14 while CSATF staff worked temporarily in the PVSP CTC during a remodeling project. Following completion, the CSATF staff left, but the number of CTC beds occupied by mental health inmates remained elevated, resulting in understaffing. From March 15, 2006, through September 11, 2006, occupancy of CTC beds by caseload patients averaged 8.5 inmates and at times exceeded 14.[2] Lengths of stay exceeded ten days in 41 cases. A holding cell in the CTC was used for MHCB overflow. In at least nine cases, stays were extended because inmates were awaiting transfer to higher levels of care. Two inmates with extended stays were eventually referred for EOP treatment.

---

[2] The average Monday census of mental health occupancies in the CTC from March 15, 2006, through September 11, 2006.

Transfers of EOP inmates were untimely. As of September 9, 2006, seven EOP inmates were awaiting transfer, including two in the CTC. Many of them had been awaiting transfer to SNYs for several months and were not receiving ten weekly hours of out-of-cell activity while waiting.

Other Issues:

In administrative segregation, changes in staff assignments and leadership enhanced continuity of care and inmate-clinician relationships. All required guidelines were met except for psychotherapeutic groups, which were run by psych techs and for which space was in short supply.

As of September 1, 2006, the unit housed 125 3CMS inmates, with a total capacity of 200. Staff was concerned that ongoing growth in the 3CMS administrative segregation population would lead to inability to provide adequate care.

One psychiatrist and four psychologists were assigned to the unit. A team leader instituted bi weekly meetings of psychologists, psych techs, and correctional officers to develop a comprehensive and collaborative treatment team. Matters taken up included the referral process, treatment consideration, medication issues, and custody concerns. All caseload inmates arriving in administrative segregation received an initial IDTT meeting within five to seven days and a follow-up meeting in 90 days or less if treatment modification were indicated. Meetings were scheduled automatically for two days each week. IDTTs were usually composed of a psychiatrist, a psychologist, a correctional counselor 1, and a correctional officer.

The average size of case managers' caseloads in administrative segregation was 45 inmates. From March 16, 2006, to August 29, 2006, out of 1,217

scheduled case manager contacts in administrative segregation, 465 inmates, or 48 percent, requested and received confidential contacts. The rest, 62 percent, refused or were seen at cell-front.[3] Following a reorganization of the unit, 52 UHRs, or 40 percent, were audited for the period of August 2006. The audit found that out of 660 required case manager contacts, 646, or 98 percent, occurred, showing a significant decrease in refusals and/or cell-front contacts.

Each inmate referral to mental health was triaged by a clinician who generated an inmate history and assigned the referred inmate to a case manager. The monitor examined 13 telephone referrals from June through August 2006. Twelve were seen the same day, and the only other one was seen one week later. Of seven inmate self-referrals, four received timely responses, and three did not. Whether supervisors had systematic access to referral tracking data was unclear, but any lack of such access posed a potential risk for hindering responses to referrals.

PVSP was compliant on timely intake assessments for newly arriving inmates. Of the 214 inmates who arrived from March to August 2006, 202, or 95 percent, were seen by a clinician and assessed within ten days.

Nine hundred fifty inmates were indicated for group treatment, which was available to a maximum of 230 inmates, or 24 percent, for whom it was indicated. Forty-one inmates were reportedly on group waiting lists. Group offerings included life sentences, anger management/relaxation skills, stress, and coping, among others. From March 19, 2006 through August 29, 2006, 390 of 788 offers to attend groups, or approximately 50 percent, were refused.

Treatment space was inadequate for all aspects of mental health services,

---

[3] Available data did not distinguish between refusals and cell-front contacts.

and all areas were affected adversely. Mental health staff had access to two therapy rooms outfitted with treatment modules and a conference room that had no treatment cells. Coordination of use consumed time and escort staff resources. The warden approved space reconfiguration that would allow another 256 inmates to participate in groups, thereby raising group availability to 51 percent of indicated inmate need. This modification also provided space for 320 additional individual treatment sessions.

Inside and outside temperatures were logged in the units, collected at the beginning of each month, and kept by the litigation coordinator. The pharmacy generated a list of heat-risk inmates each Monday through Friday and distributed it on daily movement sheets Tuesday through Saturday. The monitor examined housing log entries for the three days in July 2006 when inside temperatures exceeded 90 degrees. Stage II response was activated, with ice water and showers provided.

### Avenal State Prison (ASP)
September 19, 2006 – September 21, 2006
November 15, 2006

The overall vacancy rate for mental health positions was 23 percent. The senior supervising psychologist position was filled, and an additional allocation for senior supervising psychologist was approved.

All line psychiatry positions were filled.

One psychology position was covered by a contractor, for a vacancy rate of 16 percent. All psychiatric social worker positions were filled. Contractors covered most vacancies among case managers.

One of four psych tech positions was vacant. Out of 1.5 full-time-equivalent RN positions, one was filled. All office tech positions were filled.

As of November 16, 2006, inmate population grew to 7,625, including 1,188 3CMS and 14 EOP inmates. In administrative segregation, there were 47 3CMS and seven EOP inmates. Total MHSDS population grew by 161.

Quality Management:

Quality management was non-compliant but improving towards the end of the monitoring period. The mental health subcommittee conducted well attended bi-monthly meetings and reported to the medical quality management committee. It addressed space issues in both general population and administrative segregation, medication continuity with intra-facility moves, staff accountability, and amendment to local operating procedure to notify mental health staff of inmate transfers to other institutions. Audits teams were formed and meeting weekly. An SRN III experienced in medication management audits was hired. Audits were underway on administrative segregation, OHU, EOP, 3CMS, mental health assessments for the disciplinary process, referrals, psychiatry, and medication management. Three office techs were trained at CSP/Corcoran to produce weekly reports in conjunction with UHR audits. A quality management assessment team (QMAT) was assembled and worked on space, staffing, IDTTs, quality management, office tech duties, audits, and MHTS reports.

Suicide Prevention:

The suicide prevention committee function was essentially ended as it was rolled into the mental health quality management subcommittee. Meeting minutes showed no consideration of suicide issues. ASP did not provide any information on suicide five-day follow-up after MHCB or OHU discharges. The monitor's review of the incident report log for March through August 2006 indicated three attempted suicides,

but no documentation was produced to indicate compliance with local operating procedure.

ASP formed a QIT on suicide prevention in the administrative segregation unit to address the new departmental suicide reduction plan. As of November 2006, it reported implementation of all plan requirements including identification of eight orientation cells, 21-day door placards and 30-minute checks for new arrivals, double-celling, monthly emergency response drills, CPR retraining, amendment of the unit's operating procedure, weekly unit case manager notation of psych tech rounds in MH-3s, monthly chart audits, creation of three confidential treatment spaces, and addition of seats to all treatment/holding cells.

The monitor's inspection of the administrative segregation unit found 46 cells with "intake" designations. Thirty-minute check sheets were affixed to intake cell doors and required officers to print their names and initials confirming checks. Officers performing checks were rotated. The monitor's interview of the officer on duty indicated compliance. ASP also ran two test simulation exercises.

Medication Management:

Institutional audits found that 73 percent of inmates arriving with psychotropic medication orders were seen by psychiatrists within 30 days. Those arriving without prescriptions were generally seen later than 30 days unless the assessing clinician referred for a medication evaluation.

Medication continuity improved with increased psychiatric staffing on yards. Bridge orders were no longer use routinely. Institutional audits found that 90.5 percent of orders for psychiatric medication were renewed before expiration, although

staff reported some overlapping of successive orders resulting in extra or inconsistent doses. Medication continuity on intra-institutional transfers was not audited.

Inmates referred for non-compliance were seen within five days in only 48 percent of cases, according to data in records. Despite a local operating procedure for such referrals, there was no standard practice in place. An audit produced unreliable data, and additional training had been initiated

Reportedly, pill lines lasted up to two hours. There were no pill line audits. The institution developed a plan to add a third line in some areas and requested additional LVN allocations to assist with diabetic care and thereby shorten lines.

Times from ordering of laboratory tests to availability of results averaged 30 days, with some improvement on the hiring of a phlebotomist toward the end of the monitoring period. Staffing deficiencies led to delays in filing of test results in UHRs. An audit of laboratory tests for 11 inmates taking Lithium and 13 taking Depakote found that appropriate medication had been ordered for all, but of 31 total test orders, results for only 18, or 58 percent, were in UHRs. An audit also identified possible inconsistencies in physicians' reviews of laboratory test results in 67 percent of cases.

No inmates were on Keyhea orders, and no Keyhea petitions were initiated, even when indicated. No inmates had returned from outside MHCB placements on Keyhea orders. Plans were in place to train a near-full-time psychiatrist in the OHU on Keyhea process and to hire a full time OHU RN to serve as Keyhea coordinator.

Transfers:

Throughout the monitoring period, no transfers to DMH acute or intermediate inpatient care were made from ASP directly or from MHCBs to which its

137

inmates had been referred.  Review of records for inmates with multiple OHU and/or MHCB admissions revealed little evidence of consideration by the IDTT or assigned clinician of the need for higher levels of care.  Two referrals of EOP inmates to DMH acute care were initiated, but records indicated that one was rejected and one was cancelled due to custody issues.  A third referral was initiated during the monitor's visit.

During the monitoring period, 49 MHCB referrals were made.  Of those, 26 were transferred, and 23 were cancelled because of stabilizing while awaiting transfer. All those not transferred were returned to their yards, with 14 returned to 3CMS status and eight classified as requiring EOP level of care.

In the OHU, historic discontinuity of care ended with the addition of a part-time psychiatrist and a full-time psychologist, with coverage seven days per week, and IDTTs that were meeting regularly by the end of the monitoring period.  However, OHU stays exceeding 72 hours were common.

EOP inmates at ASP were provided no therapeutic services except weekly clinical contact and medication management.  Among the 37 inmates designated at the EOP level of care during the monitoring period, five were transferred to EOP facilities, with average time of 38.6 days from endorsement to transfer.  SNY EOP inmates remained at ASP for longer periods due to a shortage of Level II bed space for them. EOP inmates frequently left ASP for MHCBs, returned as 3CMS-designated, and then were reclassified as EOP.  Weekly cases manager contacts were documented in only 66 percent of UHRs reviewed.  An EOP log was initiated to monitor and facilitate contacts. In September 2006, transfers for 20 EOP inmates had been pending for periods of 23 to 123 days, including waits of 30 days or longer for 16 inmates.  By November 2006, the

EOP inmate census dropped to 14.

Other CAP Issues:

Because CAP data was unreliable and could not be verified, the monitor deferred making findings on CAP items until reliable data is available.

Other Issues:

An audit of psychiatric practices from August to October 2006 found improvements. In reviewing 19 UHRs, the audit found that psychiatrists documented each consultation in progress notes, including review of dangerousness to self and/or others, Axis I diagnoses consistent with documented symptoms, appropriateness of medications to diagnostic signs and symptoms, side effects of medications, and timely follow-ups on new medications. It also found that psychiatrists complied with obtaining current medication informed consent forms and with responding to abnormal laboratory test results and medication non-compliance. The audit found further that psychiatrists were non-compliant with drug levels for orders of Lithium and Tegretol and reviewing resulting laboratory studies. All IDTT meetings were scheduled to include a psychiatrist. Telemedicine provided psychiatric and IDTT coverage for two facilities. The other four facilities plus administrative segregation and the OHU were covered by the equivalent of 3.5 full-time on-site psychiatrists.

In September 2006, ASP reported that each day, MTAs or nursing staff collected and delivered mental referrals to DMH. Then, a mental health office tech would schedule consultations with clinicians for next available appointments. A list of referrals during the monitoring period showed dates of completed appointments but not dates when referrals were written or received by mental health, making a timeliness analysis

139

impossible. By the time of the monitor's November 2006 visit, ASP had its staff trained and was entering the required data into the MHSTS, although the system required trouble shooting and complete and reliable data still was not available.

Administrative segregation housed 54 inmates at the time of the monitor's September 2006 visit. Institutional statistics were incomplete and out of date, raising concerns about adequacy of care, including gaps in case manager contacts, cell-front contacts, untimely IDTT meetings, and incompletely documented psych tech rounds from February to July 2006. By the monitor's November 2006 visit, several new team-system audits had been conducted on identification of MHSDS inmates arriving in administrative segregation, initial evaluations, occurrence and composition of initial and subsequent IDTT meetings, occurrence of ICC meetings vis-à-vis IDTT meetings, presence and quality of treatment plans, weekly case manager contacts, daily rounds, group therapy, and other aspects of mental health care in administrative segregation. Non-compliance was found in several of these areas. Treatment space consisting of one small conference room remained a significant problem for the five clinicians working in administrative segregation. One additional very small space that contained a holding cell could be available, but it was shared with nursing most of the day, compromising confidentiality. A team was assembled at the warden's request to identify the additional space and materials necessary to comply with the new suicide reduction guidelines. A work order was submitted to divide one room into three confidential treatment spaces.

Generally, available space for mental health treatment was lacking, and privacy was compromised severely. Educational, chapel, and library space was made available for mental health treatment during open periods. ASP requested from the <u>Plata</u>

receiver modular office space for each yard dedicated primarily to mental health, thereby opening space in the housing units for other health care uses. As of the monitor's November 2006 visit, the institution's health care manager had requested to lease modular treatment/office space units and equipment for placement on each facility. On general population yards, clinical staff utilized the large offices in each of the facility medical clinics.

Heat-risk data showed that during July 2006, high temperatures in several housing units triggered Stage II and Stage III response levels. The log documented that medical staff assessed heat-risk inmates and noted no medical problems. Inmates were advised to increase fluid intake and take cool showers as needed.

As of the monitor's November 2006 visit, ASP had trained 881 custody officers in CPR and had imposed a training prerequisite for all staff returning to work from absences. The monitor reviewed five inmate deaths that occurred from April through June 2006 and recommended their review and assessment by the institutional emergency response review committee, particularly with respect to the use of CPR.

### Service Area F

Service Area F includes Salinas Valley State Prison and California Training Facility.

### Salinas Valley State Prison (SVSP)
September 19, 2006
October 13, 2006 – October 14, 2006
December 13, 2006 – December 14, 2006

The vacancy rate among mental health staff at SVSP declined to 29 percent, down from 43 percent during the previous monitoring period. A contract psychiatrist with experience at SVSP assumed the duties of chief psychiatrist. Four of

seven positions for staff psychiatrists were vacant. All vacant psychiatry positions were covered by contractual staff.

The chief psychologist went out on extended medical leave, and one of three senior psychologist positions remained vacant, stretching supervisory coverage thin. Among case managers, 1.5 of 16.5 psychology positions and three of four social work positions were vacant. Contractors and interns more than covered the vacancies, providing the equivalent of over eight full-time positions. Despite SVSP's ability to cover vacancies with contractors, caseloads in 3CMS routinely exceeded 150, and the institution was unable to meet the required staffing ratio in the EOP administrative segregation hub.

The 2.5 recreational therapy positions were vacant, but two contract LVNs with relevant experience provided recreational therapy in the EOP unit throughout the monitoring period. Six of seven office tech positions were filled for most of the monitoring period. The seventh position was filled in November.

There was an exodus of nurses and psych techs from SVSP to DMH at the end of 2006. Nearly all vacant psych tech, LVN, and RN positions were covered by contractual staff. Over half of the 32 RN positions were vacant. As of September, the position of senior psych tech was filled, as were ten of 12.5 psych tech positions. Thirty MTA positions were slated for conversion to LVN positions. Two MTA positions remained. Positions for the director of nursing and two of three supervising RNs were filled. The third supervising RN position was filled in December.

All pharmacy positions were either filled or covered by contractual staff. There were two functional vacancies among medical records staff.