In December 2006, SVSP received authorization to establish 41.44 new mental health positions. The allocation included positions for 1.5 staff psychiatrists, two senior psychologists, 11.62 psychologists, 3.9 social workers, 2.8 recreational therapists, a senior psych tech, 9.5 psych techs, 5.62 RNs, and 3.5 clerks.

The degree of realignment among custody and mental health supervisors was remarkable. Between August and December, nearly every mental health supervisor rotated to a different assignment, and the clinical team in the MHCB turned over. Between October and December, the acting chief deputy warden was assigned to that position, vacating the position of associate warden for health care, which was then filled. Three of four yard captains were reassigned. Only the captain of the C yard remained in place. Three key custody positions in the EOP yard turned over.

By December 2006, the vacancy rate among custody staff had risen to 14 percent, up from the rate of four percent reported in the spring of 2006. Of 800 allocated correctional officer positions, 110 were vacant, including six sergeant positions.

SVSP's census in October 2006 was 4,573, which included 538 inmates in administrative segregation. Caseload inmates numbered 1,577, or 34 percent of SVSP's population. By December 2006, the caseload had decreased to 1,484. There were 1,231 inmates on the 3CMS caseload. The EOP had 253 inmates, of whom 63 were in the administrative segregation hub.

SVSP was selected for enhanced monitoring during the current monitoring period. Staff formed two work groups; one addressed medication continuity, the other Keyhea orders. Both groups issued a written report of their activities. SVSP's Keyhea process was improved, but the second work group did not have a lasting effect.

143

SVSP opened a BMU in August 2006. In September, four of eight inmates in the BMU were treated at the 3CMS level of care. The proportion of caseload inmates in the BMU declined by the time of the monitor's October visit, when three of 14 inmates in the BMU were treated at the 3CMS level of care. Two additional caseload inmates had been removed from the BMU, and a third had recently been discharged from the rolls. BMU programming did not resemble written procedures. The BMU was locked down, as was the yard on which it was located, which undermined the use of graduated privilege levels. The monitor's review of C-files found no factors that distinguished inmates placed in the BMU from those who were not selected. Although each inmate had what was termed a treatment plan, the plan was the same for various inmates notwithstanding the stated rationale for placement. Mandated 30-day UCC reviews were not held timely.

Mental health treatment was delivered as planned to BMU inmates. Meetings were held in a confidential setting outside the unit. Inmates were cuffed during mental health sessions. One inmate was considered a program failure because he received two RVRs while in a reception center (see Exhibit L, Case Review 5). He, along with two other caseload inmates, was moved out of the BMU before completing all three levels of the program. A second inmate was the only one of 14 BMU inmates who participated in BMU programming (see Exhibit L, Case Review 2). He reported that he attended one class per week, which was held in the dayroom and lasted for 45 to 60 minutes. This inmate had a significant history of mental illness and below-average intellectual functioning, but the UCC was unaware that he was on the mental health caseload. Before being transferred to the BMU, he was in administrative segregation,

144

where he was receiving group treatment with other inmates who incurred RVRs for sexual misconduct. While in the BMU, he experienced a decline in his adaptive living skills, but they rebounded when he was given a cell mate.

Access to treatment in the yards that housed 3CMS inmates improved but remained problematic. Access to treatment in the general population portion of the EOP improved but not enough to allow the program to meet minimum Program Guide requirements. Concrete gains in the amount of EOP treatment offered were attributed to a better working alliance between custody and mental health staff.

Quality Management:

The mental health quality management committee met weekly. Minutes were kept. Sound audits of key indicators of the mental health service covered a wide range of topics and were sound. Audit results were disseminated to mental health staff. Few staff members participated in quality management activities. Problems identified by audits were solved by the use of short-term action items. Neither managers nor clinical staff perceived the QIT process as useful. The monitor's expert attended a meeting in December. It was a data-driven management meeting.

The quality management process at SVSP needed to mature. The small role played by custody staff in meetings of the mental health quality management committee was unfortunate in light of the contribution that might have been made by the small cadre of custody staff recently assigned to the EOP yard. Custody staff should become active participants, and all mental health staff, not just supervisors, should be involved. QITs should be chartered when warranted. Quality management activities should include a mechanism for staff to identify problems at the level of service delivery

and bring those problems to the attention of higher levels of authority.

Psychologists and psychiatrists engaged in peer review. There was only one social worker on staff, rendering peer review moot. Peer review committees maintained records and held case conferences.

The concordance rate between MHTS contacts and UHR entries remained over 90 percent. MHTS tracking of urgent and routine referrals improved. Staff was aware of the referral timelines in the revised Program Guide and applied them to recent audits. More improvement was needed in triaging, handling, and tracking mental health referrals.

The number of referrals made by non-mental health staff or inmates ranged from 240 to 320 per month. Response time for routine referrals averaged ten days. Urgent referrals were not always seen within 24 hours. In a three-month period, 56 urgent referrals were received. No information regarding response times was available in 15 cases. Response time exceeded 24 hours in one third of the remaining 41 cases. Delayed transmission of referrals triggered by suicidal ideation reported to nursing staff was cited as one reason for dilatory responses to urgent referrals.

Suicide Prevention:

The suicide prevention committee expanded its membership and revamped its activities. The committee met monthly, was attended by the requisite staff, and reviewed mandatory agenda items. The committee was alert to DCHCS initiatives, departmental reports, and dates of upcoming suicide prevention training. The committee identified and addressed local suicide prevention issues. In addition to reviewing audits of five-day follow-up and 24-hour custody observations, incident reports of self-injuries,

and monthly MHCB reports, the committee monitored the implementation of suicide

CAPs and of SVSP's progress toward entering information into MHTS regarding

caseload inmates' levels of risk and history of suicide attempts. The monitor's review of

a small number of cases found that information regarding recent self-injuries or suicide

attempts were not entered into MHTS (see Exhibit L, Case Reviews 11, 12, 13).

   SVSP infrequently used five-day follow-up to monitor inmates discharged

from the MHCB. In a six-month period, only 11 inmates discharged from the MHCB

were scheduled for five-day follow-up and hourly observation by custody staff. Staff

audits found that five-day follow-up was carried out in those cases. Documentation of

custody observations was not returned to a central location, rendering audit results

inconclusive. Staff reported that many inmates evaluated for MHCB admission but not

admitted were followed up for as many as five days after they were evaluated but not

admitted.

   SVSP did not consistently screen inmates who were placed in

administrative segregation or refer inmates who screened positive for a mental health

evaluation. The monitor's review of 14 UHRs of inmates placed in administrative

segregation in August 2006 found no screenings related to that placement for nine of the

14. Nor did the records show that a screening was attempted or refused. In none of the

cases was there documentation that positive results or refused screenings triggered

referrals to mental health. In two cases, positive screening results did not elicit a prompt

evaluation by mental health staff (see Exhibit L, Case Reviews 7, 8). Although a

psychologist attended ICC meetings, documentation in the UHR suggested that missed,

refused, and positive screenings were unknown to that person at the time of the meetings.

No improvement was apparent between August and December 2006. A nursing audit seemed to indicate that some screenings were missed and that not all inmates who refused to be screened were referred to mental health staff for evaluation.

Medication Management:

SVSP did not appear to have a functioning mechanism to manage medication. Procedures seemed to be followed on an ad hoc basis rather than systematically. Audits done by nursing staff shed little light on the current status of medication management. The transition from MTAs to LVNs and a group exodus of several psych techs and nurses to DMH in the fall of 2006 further compromised consistency.

SVSP appointed two work groups related to medication management. They addressed Keyhea orders and continuity of medication. The Keyhea work group overhauled how Keyhea orders were tracked and improved the preparation of psychiatrists called to testify. Improvements that stemmed from a work group on medication continuity were short lived. Improvement was effected by dint of one individual's effort, but there was negligible systemic impact.

Medication continuity remained problematic when inmates were relocated between yards, were released from the MHCB, or arrived from other prisons. Until August, only 40 to 70 percent of new arrivals received a first dose of medication within 24 hours. In October and November, the rate rose to roughly 75 to 80 percent.

Staff presented findings of improved timeliness for renewals of

medication orders, but the validity of their findings was questionable. Audits found that over 90 percent of expiring medication orders were either discontinued intentionally or renewed before they lapsed.   Staff reported that medication orders were discontinued per policy when inmates did not see a psychiatrist, regardless of why they were not seen.

Psychiatry coverage improved. Psychiatrists were no longer rotated to the location with the greatest need. They were assigned to fixed locations and treatment teams. Psychiatrists had not been assigned to particular caseloads long enough for the change to affect treatment. Inmates who were interviewed reported that they were not seen every 90 days and never saw the same psychiatrist twice.

Inmates reported that medication orders frequently expired, that administration errors were common, and that when annoyed, some staff withheld a dose or told the inmate to watch as the inmate's MAR was torn and discarded. They also reported that Seroquel was always crushed even if a pill was manufactured for timed release.

During lockdowns or modified programming, medication was administered at cell-front through a solid door. Inmates inclined to hoard medication or receive medication intended for cell mates who had been moved could easily do so. Staff reportedly relied upon housing locations listed on MARs when administering medication cell to cell rather than upon inmates' photo identification. There were reports that inmates in 3CMS yards were not infrequently handed the wrong pills as well as given 30-day supplies of

anticonvulsants to keep on their persons, although the orders were written by psychiatrists and should have been nurse administered. Some inmates reported that they stopped taking medication in an attempt to avoid becoming involved in more serious problems. Two named problems were undesirable effects of missed doses and untoward events associated with going through the pill line.

Thirteen inmates had current Keyhea orders, in contrast to 34 one year earlier. Staff did not report how many Keyhea petitions were initiated, how many renewals were sought, or the outcomes of Keyhea hearings. Staff reported that no Keyhea orders lapsed inadvertently.

A work group revamped the Keyhea process during the monitoring period. The work group established procedures for communication among treatment providers and psychiatrists who evaluated candidates for Keyhea and testified at hearings. An issue with CDCR legal representation was identified. Staff reported that in two recent cases, their counsel decided not to pursue a Keyhea petition but made no attempt to obtain clinical information that supported the petitions. Staff believed that not obtaining a Keyhea order, or at least petitioning for an order, was clinically contraindicated as well as detrimental to both the well-being of the inmates and the safety and security of the institution.

Staff audits identified problems with policies and procedures regarding DOT orders and response to medication non-compliance. Blood levels of mood stabilizers were not monitored appropriately. Staff audits of HS medication yielded ambiguous results.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

150

Certain aspects of SVSP's method of handling psychological evaluations triggered by RVRs for sexual misconduct were more rigorous than required by DCHCS's protocol, but implementation fell short in other ways. From May 1 to September 6, 2006, 26 cases of indecent exposure were referred to mental health. Screenings were not completed soon after the incident, nor were they reviewed by an IDTT. Instead, a fairly comprehensive assessment that included a review of the inmate's UHR and C-file was done two to four weeks after the incident.

Some of the assessments reviewed by the monitor's expert used boilerplate language to document findings of antisocial behavior. In other cases, the examiner found that the inmate's mental disorder was a factor in sexual misconduct and recommended treatment. Exhibitionism was not diagnosed in any of the cases examined during the monitoring period. EOP and 3CMS inmates in administrative segregation for indecent exposure were eligible to attend a 12-session group, which met seven to ten times before ending in December 2006. A second close-ended group was slated to begin soon.

Transfers:

From June to December 2006, 14 referrals were made to acute care at DMH, with six resulting in transfers and seven rescinded. No outcome was available for the remaining referral. Four of those six transfers were made within 72 hours of acceptance or bed assignment by DMH; two transfers were delayed. It was common for inmates who went to DMH for acute care to reach the appropriate level of care three weeks or longer after they were referred. Log entries suggested that most of that time was spent awaiting either a DMH decision or a bed assignment.

Log entries indicated that staff waited too long to refer to acute care. Only one of the seven rescinded referrals was made within ten days of admission to the MHCB. Four were not initiated until inmates had been in the MHCB for 11 to 18 days. One referral was rescinded because the inmate was determined to be ineligible to go to CMF. A log indicated that he was not referred until day 24 of his MHCB stay. Only one referral was made to intermediate care from July to December 2006.

Despite minor discrepancies between different sources of information, records compiled by staff portrayed a fairly accurate picture of the functioning of the MHCB. Staff monitored several problems that were cited in the past. Inmates in safety cells were provided with no-tear mattresses unless prohibited by a doctor's order. Staff was aware of the moratorium on the use of video monitors for suicide watches and did not use cameras for that purpose, but the local procedure had not yet been revised to reflect that change. A suicide prevention effort that called for thorough evaluation and follow-up of inmates who presented for admission but were not admitted was sustained. Records regarding rejections were compiled and audited as part of MHCB operations. A staff audit found that 90 percent of the time, case managers assigned to the yards were notified when inmates were discharged from the MHCB to their yard.

The number of MHCBs available was difficult for staff to report accurately. The number seemed to hover around seven to nine during the monitoring period, falling far below the former level of 12 to 13 MHCBs. In October, staff reported that during the past six months, six of 13 MHCBs were occupied by inmates whose medical conditions required subacute care, leaving only seven beds for inmates in psychiatric crisis. Early in 2007, staff reported that seven to nine MHCBs were typically

occupied by psychiatric patients.

The MHCB had 110 admissions during the six-month period spanning June to December 2006, an average of 18 per month. While the average length of stay was under ten days, 33 stays were over ten days. One stay reached 72 days. Staff reported that only one inmate was admitted three or more times; he had already been referred to intermediate care.

SVSP lost many MHCB days to administrative delays in moving inmates after they were discharged. Staff audits found that ten of 11 inmates sent by other prisons, and 95 of 99, or 96 percent, SVSP inmates were moved out of the MHCB within 48 hours of clinical discharge. Given the volume of traffic in the MHCB, routine delays in moving inmates after they were discharged, even when the delay was limited to one day, consumed too much of a scarce resource.

Standard CTC procedures resulted in heavy use of both types of cells and many overnight stays in large holding cells. Logs of holding cell use maintained by custody and nursing staff were incomplete. Times in and out of cells were missing from logs of both kinds of holding cells. Documentation regarding nursing checks of inmates who remained in holding cells for over four hours was missing.

Holding cells were occupied by inmates awaiting evaluation for admission to the MHCB. Staff reported that holding cells located in the yards were rarely used after September 2006, but those in the treatment and triage area of the CTC were in use daily and frequently housed inmates overnight. The holding cells in daily use were stand-up mesh cells. Holding cells used overnight were large group waiting rooms that had plumbing and that could be furnished with mattresses.

153

<u>Other CAP Issues</u>:

Staff continued to audit previously resolved problems, such as timely case manager contacts and treatment plan updates. Audits showed that case managers made timely contacts with 3CMS inmates 98 to 100 percent of the time. Annual IDTT meetings for 3CMS inmates continued to be held in a timely manner. Staff made weekly contact with EOP inmates 91 to 97 percent of the time. The conditions under which contacts were made with both 3CMS and EOP inmates at times precluded confidential discussion. Constraints on scheduling and suitable space were impediments to confidential contacts with 3CMS inmates. The size of caseloads and press of other duties forced EOP case managers to make some weekly contacts cell-front and truncated the duration of many.

a. Partial Compliance

Access to care improved in three yards that housed over 1,200 3CMS inmates. Custody staff reportedly facilitated confidential contacts when modified programming restricted inmate movement. The size of caseloads ranged from 111 to 221. The number of groups offered increased to nine. Inmates who had recently attended IDTT meetings reported that their meetings lasted less than five minutes.

SVSP's improved psychiatry coverage strained against the limits of available treatment space in a yard that housed 315 3CMS inmates. Treatment space was available in all yards, but not all of the space in use was appropriate in terms of confidentiality and security. Not surprisingly, yards with more 3CMS inmates had more problems with access to treatment space.

EOP caseloads remained too large despite the addition of a seventh EOP

154

case manager. The amount of treatment provided rose slightly but continued to fall far short of ten hours per week. Seven case managers provided group and individual treatment to 252 EOP inmates distributed between general population and administrative segregation. Caseloads averaged 36. The number of hours of treatment offered per inmate per week rose to six by the end of September. The number and type of structured therapeutic activities offered to general population EOP inmates expanded in October when a newly hired full-time teacher began teaching classes.

b. Non-Compliance

The administrative segregation hub had a capacity of 45 but housed 58 EOP inmates. The nine to one ratio of case managers to EOP inmates was not maintained. EOP case managers covered both general population and administrative segregation inmates. There were anecdotal reports that 30 to 80 percent of EOP inmates in administrative segregation were offered weekly out-of-cell case manager contacts. Staff cited lack of space as the main obstacle to making out-of-cell contacts. In addition to lack of space, too few clinical staff also stood in the way of compliance with the requirements. Too few clinical staff to run groups reduced the number of treatment hours offered to three in July, August, and September. In September, after more clinical staff was added, the number of hours of group treatment offered per week rose to six.

The level of mental health treatment provided to 3CMS inmates in administrative segregation was similar to that reported in the preceding three monitoring periods. Each week a large number of inmates were seen out of cell, but effort alone could not overcome structural impediments to meeting Program Guide requirements. Case managers had caseloads of 50. Staff reported that 80 3CMS inmates at most could

155

be seen out of cell in one week due to limits imposed by schedules and space constraints. The only group treatment provided to 3CMS inmates in administrative segregation was for inmates who had charges involving sexual misconduct.

Other Issues:

The monitor's review of incident packages related to inmate deaths showed inconsistent emergency responses. In three of five cases, responses appeared to be appropriate. Incident reports of two cases raised questions (see Exhibit L, Case Reviews 9, 10). In one case, first responders did not initiate CPR. It was begun by medical staff six minutes after the inmate was found. In a second case, responding staff did not immediately open the cell door of an inmate who was hanging from the top bunk. Rather, staff alerted a custody supervisor, who, after arriving, assembled an emergency extraction team. After entering the cell, the extraction team secured the inmate with a shield and handcuffs, cut him down, and removed him from the cell. At that point, CPR was initiated. All of these steps reportedly occurred within two minutes of discovery.

### California Training Facility, Soledad (CTF)
October 16, 2006 – October 19, 2006

During the current monitoring period, the functional vacancy rate for allocated mental health positions was nearly 20 percent. Five of 24.5 allocated positions were vacant or occupied by individuals on long-term leave. Historically, CTF enjoyed low staff turnover and a single-digit functional vacancy rate. The 2.5 allocated psychiatry positions were vacant. Two part-time staff psychiatrists together filled one

Case 2:90-cv-00520-KJM-SCR    Document 2334-3    Filed 07/30/07    Page 15 of 51

position, leaving 1.5 positions vacant. The amount of contractual coverage used varied monthly. Contractors covered the equivalent of .25 to 1.8 of the vacant psychiatry positions during the first eight months of 2006.

The sole supervising position in mental health, that of senior psychologist, remained filled, but two of 9.5 staff psychologist positions were functionally vacant. Contractors covered the equivalent of 1.4 psychology positions from January through August. A half-time psych social work position stood vacant without contractual coverage. Two of five psych tech positions were functionally vacant. A psych tech had been administratively reassigned, leaving one position uncovered, and the second position was vacant. Five of six clerical positions were filled.

After adding contractual hours, two of nine pharmacy positions and two of nine medical records positions were functionally vacant. CTF's sole lab position was filled.

The administration reported that 130 of 949 correctional officer positions, or 14 percent, were vacant.

CTF's census was 7,359, with 328 inmates housed in administrative segregation, 30 of them caseload inmates. As of September 2006, roughly 110 MHSDS inmates, historically restricted to the main building via classification overrides, were housed in CTF's outlying north and south facilities. This change, which afforded caseload inmates access to Level I and II housing and a wider variety of work assignments, was followed by a rapid increase in the size of the 3CMS population. By mid-October, the caseload grew to 852, 22 percent over CTF's rated capacity. At the time of the monitor's visit, there were six EOP inmates awaiting transfer, although a few

157

weeks earlier, the EOP census reached 20.

Quality Management:

CTF's institutional quality management committee was reorganized and revitalized in June and again in September. Attendance at quality management meetings was light, but a wide variety of disciplines were represented. The bulk of the committee's agenda was related to medication management. In July, the committee began to plan how to meet medical and mental health needs of inmates housed in the outlying north and south facilities.

QITs were chartered but did not always fulfill their purpose. A long-standing QIT on medical ducats never gathered basic information or issued recommendations. A second long-standing QIT on emergency response drills reported little of its activities and appeared ineffectual. In February, the committee noted a need for better communication between custody and medical staff during emergencies. A suicide CAP written six months later cited an instance of poor communication in which medical staff failed to exercise appropriate leadership as custody staff carried out life-support measures when an inmate was discovered hanging.

The mental health quality management committee chartered QITs and reported regularly to the institutional quality management committee. The committee reviewed the results of a number of routine audits that served as the foundation of the mental health quality management process. A small number of staff members attended meetings, but the key positions were usually represented. Typically, the director of nursing, the captain of the facility that housed most or all of the caseload inmates, a psych tech, and two psychologists attended bimonthly meetings. Mental health staff seemed

well informed about quality management activities and engaged in peer review.

QITs employed a multidisciplinary approach and kept records of their activities. QITs did not always resolve the problems they addressed. A QIT on correctional counselors and C-files at IDTT meetings was active for the better part of a year with little effect. QITs did not always audit problems after procedures were changed to see whether the remedy worked.

Suicide Prevention:

Meetings of the suicide prevention committee were poorly attended and sparsely documented. The committee was scheduled to meet monthly but did not meet in September. At least one captain was present at each meeting, but some meetings were not attended by custody staff representing administrative segregation or in-service training (IST). Not all meetings were attended by health care staff beyond the mental health department. The committee did not track compliance with departmental directives regarding suicide prevention, identify local problems, or follow up on pertinent issues.

A July 2006 suicide had a corresponding CAP that was written by staff in DCHCS and communicated to CTF within 60 days of the date of death. Two problems were noted. First, none of the 114-A documentation related to the inmate's week long stay in administrative segregation immediately prior to his death could be located. Second, a responding officer reported that medical staff concluded that the inmate was deceased without examining him and offered no assistance to life-support efforts that were underway. CTF had not yet prepared a response.

Staff audited screening of inmates recently placed in administrative segregation. Audits that spanned January through June found a compliance rate of 77

percent. The monitor's October review of UHRs of inmates placed in administrative segregation later in the year found a higher rate, but screenings continued to be missed.

The local suicide prevention operations procedure was revised in May 2006. The procedure was not consistent with CDCR directives in all respects, but it did reflect recent department directives regarding which staff should perform suicide watches, and it required direct one-to-one or one-to-two observation during suicide watches. The procedure did not provide for clinical follow-up or custody observation of inmates discharged from the OHU, as opposed to an MHCB. In practice, however, staff used five-day follow-up and custody observations to monitor many inmates who left the OHU.

Under the operations procedure, only those inmates who were returned from an MHCB were required to be observed by custody staff. Those observations were to take place during the 24-hour period when the inmate passed through the OHU following discharge from an MHCB, before being returned to his assigned housing unit. Some categories of inmates could be returned to their assigned housing units and continue their routine activities following release from the OHU, but other categories of inmates had to be housed in a wing used to house new arrivals, which was a locked-down unit, during the follow-up period.

A staff audit of five-day follow-up of inmates released from the OHU found that compliance was close to 100 percent early in the year, but each month, a few follow-up contacts were missed. As the number of follow-up cases rose in May and June, more contacts were missed. In May, four of 45 planned contacts were missed. In June, ten of 50 were missed. Documentation indicated that, in contrast to the operations

procedure, officers frequently observed inmates who were discharged from the OHU and documented those observations. Contrary to departmental directives, not all inmates were discharged to their assigned housing units but instead were housed in an orientation wing to facilitate follow-up. Although documentation of officers' observations was compiled, staff did not review it to determine whether observations were carried out as planned.

CTF staff reported that they had assessed a large proportion of caseload inmates for history of self-injury or suicide attempts and had entered the results into MHTS. Contrary to departmental directive, they used an MH3 to document the work rather than a SRAC. Staff reported that because the MHTS did not contain a field for negative findings, reports erroneously indicated that they had assessed only 27 percent of the caseload.

Medication Management:

Medication continuity was problematic, in part because the pharmacy could not generate an accurate list of expiring orders. That long-standing problem was not solved, but it was remedied for caseload inmates. Although labor intensive, a procedure followed by staff appeared to be effective. Psych techs manually checked a comprehensive list to identify orders for caseload inmates that were nearing expiration. Inmates who were interviewed reported that unintended interruptions in medication were rare. UHRs reviewed by the monitor did not show lapses in orders. According to a nursing audit done in April 2006, it was not unusual for the pharmacy to fill orders one to two days after they were written, particularly if written on a Friday.

Referrals for non-compliance and hoarding were not made consistently.

161

Although there were over 100 inmates with DOT orders in the central facility, DOT procedures were not always followed. Medication was slipped under cell doors in locked-down units. In administrative segregation, nurses could not check inmates' photo identification because it was kept in the officers' stations.

An institutional audit of whether blood levels of mood stabilizers were monitored appropriately was too small to support a conclusion.

Staff audits found that 91 to 99 percent of UHRs sampled contained informed consent for the use of psychotropic medication.

Staff reported that no inmates with Keyhea orders arrived and that none were initiated.

CTF rose to the challenge of administering medication to caseload inmates in the north and south facilities. Pill lines were reportedly long. A QIT recommended construction of a second pill window. The institution planned to follow the recommendation. There were anecdotal reports that medication continuity was disrupted when inmates were relocated to and from the outlying facilities.

There was no audit of whether a supply of medication was given to inmates who left on parole. Staff believed that the mechanism worked.

CTF paroled upwards of 250 caseload inmates annually. Mental health staff facilitated the work of TCMP counselors and correctional counselors by scheduling appointments and obtaining medical records that would be needed during contacts. Staff reported that TCMP counselors were at the institution two days each month and were scheduled to see 20 to 30 caseload inmates each visit. Staff audits found that earlier in the year, TCMP counselors saw all or nearly all of the inmates on their lists. In recent

162

months, however, as many as one third of the inmates scheduled were not seen. TCMP counselors did not leave chronos in UHRs to document contacts.

<u>Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations</u>:

RVRs issued for sexual misconduct were vanishingly rare at CTF. The disciplinary process for caseload inmates was unchanged. Several aspects of the process were not audited.

Improvement was needed in two areas. Referrals for mental health assessments were made for only ten of 125 3CMS inmates who incurred disciplinary charges. Among these ten cases, mental illness was deemed a factor in three, was referenced by the hearing officer in one, and appeared to affect the disposition in none. Hearing officers needed to consider mental health findings and improve documentation.

<u>Transfers</u>:

According to DCHCS, four beds in the OHU were intended for psychiatric use. Records of psychiatric admissions were not well organized. During the first eight months of 2006, available information indicated that there were, on average, 14 to 15 psychiatric admissions to the OHU per month, with a range of seven to 20. It appeared that CTF made 13 to 15 referrals to MHCBs between March 1, 2006, and September 14, 2006. It appeared that six to eight inmates were transferred to crisis beds. In June, one inmate waited seven days for an MHCB to become available. Some referrals were rescinded when inmates' conditions improved during the wait for a crisis bed.

During that time, the median length of stay in the OHU ranged from one

to four days. In May, June, and August, half of all cases, 23 of 47, had lengths of stay in excess of three days.

At least eight inmates were admitted to the OHU three times or more between January and October 2006. Multiple admissions were most frequent in July, August, and September. During that period, access to crisis beds was poor. According to CTF staff, inmates referred to an MHCB were wait-listed and given numbers between 15 and 20. Staff also reported that the wait list numbered 60 to 70 at times.

CTF staff reported that they adopted the position that they would have to manage psychiatric crises as best they could on-site. They indicated that the most difficult cases for them to manage were those of inmates with multiple OHU admissions and multiaxial diagnoses that drove self-destructive or other impulsive behaviors that typically subsided before an MHCB became available, only to erupt at a later date.

The four OHU cells used for psychiatric patients were unlike cells used for medical/surgical patients. OHU cells were barred, had cement beds, had a mesh window screen, and were located apart from other cells in a small corridor that was closed off from the main corridor of the OHU. The cells were often kept dark. The officer's post was beside a row of windows that opened onto two of the four cells. There were direct lines of sight into two cells.

Cells used for medical treatment were larger and better lit, and had metal frame beds, call buttons, and doors that opened onto the main corridor. In addition to a small number of single cells, there were two four-bed dormitories for medical use. On occasion, pressure for psychiatric beds required mental health staff to move a psychiatric inmate into a medical/surgical cell. Staff reported that holding cells were neither needed

164

nor used.

As reported above in the section on suicide prevention, CTF's local operations procedure for suicide prevention was revised in May. The procedure followed DCHCS directives regarding which personnel performed suicide watches and permitted one-on-two direct observation during suicide watches. Staff assigned to the OHU reported that inmates on suicide precautions were observed at 15-minute intervals. The local procedure did not require staggered observation intervals. CTF did not use cameras in the OHU. Staff reported that restraints were rarely used, therefore the referral log showed no recent entries.

In addition to two levels of observation, suicide watch and suicide precautions, the OHU carried out what was termed psych observation. Custody staff reported that all inmates in the OHU remained on psych observation for the duration of their stay unless they were moved to a cell typically occupied by inmates there for medical reasons. In practice, psych observation meant that mental health staff specified intervals at which the officer posted in the OHU ought to observe OHU inmates. One or two hours were the typical intervals. Although local procedures stated that clothing and property were determined by a physician, in practice, all inmates in the OHU, regardless of their level of observation, were issued a strong blanket, boxers, and a tee shirt. They were allowed minimal or no personal property. Restrictions on eating utensils were ordered by mental health staff as clinically warranted.

Records regarding transfers of EOP inmates were complete. During the first 9.5 months of 2006, CTF identified 40 inmates as needing the EOP level of care and transferred 25 out. Seven were not transferred because other events intervened. Eight

165

transfers were pending in mid-September. Four improved and were designated 3CMS, one went to DMH, and two were paroled.

Of the 25 inmates transferred to prisons with EOP units, 11 waited longer than 60 days. In six cases, the 60-day time limit was exceeded by no more than ten days. Lengths of stay in five cases were much longer, ranging from 85 to 149 days. CTF's census reached a high of 22 in August but dropped to seven, then to five, during the monitor's October visit.

At the time of the monitor's visit, two EOP inmates had been awaiting transfer for three and four months. The remaining three were designated as needing the EOP level of care less than 60 days before, most within the past 30 days. Despite lengthy stays and a flurry of transfers, it was apparent that the C&PR was attentive to particular cases, effectuated expedited transfers, and was knowledgeable about systems issues regarding EOP transfers.

Monthly staff audits found that as many as half of the EOP inmates were not seen weekly by a case manager.

Other CAP Issues:

CTF continued to audit resolved CAP items as well as selected indicators of mental health treatment on a rotating schedule. Audits included quantitative and qualitative indicators. The results of some audits underreported compliance rates because the criteria used were more detailed and rigorous than indicated by the results when they were reported independently of the methodology.

For instance, a staff audit of annual IDTT meetings found a compliance rate of 60 to 70 percent, while an MHTS report indicated that 93 to 96 percent were in

compliance. The reason for the discrepancy was that the staff's audit included whether the treatment plan was individualized to the extent that group treatment was considered, whereas the MHTS reported whether annual meetings were timely.

According to staff audits and MHTS reports, mental health staff attended initial ICCs and documented their participation in UHRs. Initial mental health evaluations and initial IDTT meetings were timely, as were annual IDTT meetings.

A staff audit that sampled cases in April, May, and June 2006 found that 71 to 88 percent of quarterly case manager contacts were timely. Consideration of group treatment for 3CMS inmates was documented in 60 to 70 percent of treatment plans. Mental health staff reported that six weekly groups were held and that the capacity of a room used for group treatment had not been fully exploited. Monthly lists compiled by staff indicated that roughly 60 to 80 3CMS inmates were enrolled in group treatment at any one time.

Although they were held timely, the quality of IDTT meetings was problematic despite a QIT that addressed general population IDTT meetings. A psychiatrist and the inmate's case manager attended, but correctional counselors and C-files were not routinely present. The monitor's expert observed that numerous telephone calls were necessary to elicit the attendance of the correctional counselor whose turn it was in the rotation, that meeting began late, and that no C-files or information about the inmates were provided by custody staff. Some inmates who were ducated for the IDTT meeting were unable to gain access to the waiting room of the clinic in which the meeting was held. The monitor observed that in administrative segregation, IDTT meetings did double duty as sessions for psychiatric treatment. The meetings were held in a group

167

office. Two members of the custody staff sat at nearby desks engaged in other business, some of it conducted via telephone, contributing to the IDTT meeting intermittently. When queried, staff reported that circumstances observed at the IDTT meetings held in both locations were typical.

Inmates reported that they waited six months to two years for group treatment. Many described a "one size fits all" approach to treatment and said that mental health treatment often did not focus on their particular problems. Progress notes in a small sample of UHRs reviewed by the monitor's expert were in many instances bereft of clinical or individualized information. They documented the date on which the inmate was seen and noted that he was stable and in no distress.

Case manager contacts were made weekly in administrative segregation. Staff audits found that over 80 percent were made cell-front. Those that were made out of cell were held in conditions that precluded confidentiality. Obstacles to confidential out-of-cell contacts included escorts and space. The monitor's tour of the administrative segregation units and subsequent discussions with staff pointed to the conclusion that the obstacles could be overcome by making relatively minor changes in the current arrangements.

Other Issues:

The monitor found that inventories of emergency equipment maintained in housing units were current and accurate. Emergency response kits contained flex masks, a recent replacement for ambu bags. All custody staff encountered save one were in possession of a micro-shield; one person kept the shield in a nearby lunchbox.

## Service Area G

Service Area G includes California Men's Colony, Wasco State Prison, Kern Valley State Prison and North Kern State Prison.

### California Men's Colony (CMC)
November 20, 2006 – November 21, 2006

Of CMC's 114.6 allocated mental health positions, 39.1 were vacant. Positions for the chief psychiatrist, chief psychologist, two senior psychiatrists, and four senior psychologists were filled. Of four senior psychologist specialist positions, half of one position was vacant, and of six supervising psychiatric social worker positions, five were vacant.

For the 21.5 line psychiatry positions, 6.25 were vacant, for a vacancy rate of 29 percent. Of the 34.5 line psychology positions, 16.25 were vacant, for a vacancy rate of 47 percent. Among 12.5 line psychiatric social worker positions, 4.5 were vacant, for a vacancy rate of 36 percent.

Of the 11.6 psych tech positions, .6 were vacant, for a vacancy rate of five percent. Half of the eight recreational therapist positions were open. Positions for RNs were filled. The pharmacy was almost fully staffed. Two of the 7.5 office tech positions, or 27 percent, were unfilled.

As of November 2006, CMC housed a total of 6,687 inmates, of whom 1,751 were on the MHSDS mental health caseload. A total of 94 caseload inmates, or 5.36 percent, were in administrative segregation. Inmates classified as EOP numbered 590, of whom 38 were in administrative segregation. Inmates at the 3CMS level of care

169

numbered 1,120, among whom 53 were in administrative segregation. Inmates identified at the EOP level of care numbered 590, of whom 38 were in administrative segregation. The MHCB unit housed 41 inmates, three of whom were designated as for administrative segregation.

Quality Management

The institution's quality management committee and mental health quality management committee functioned appropriately, with regular meetings and involvement of line staff. Peer review was conducted. Line staff was actively involved in QITs that covered HS medication, substance abuse treatment, intake, medication continuity, suicide prevention, and single-cell assignment and annexed office and treatment space in the administrative segregation unit. Audits were conducted in the areas of MHTS reliability and MHCB level of services.

Suicide Prevention:

The suicide prevention committee met monthly, but attendance was inconsistent, particularly by custody staff, and its local operating procedure was inconsistent with statewide protocol. It covered substantive issues including critical program areas, custody and mental health staff concerns, relevant monthly statistics, needed changes in programming, and selected clinical cases at each meeting.

Reportedly, review of all five-day follow-ups could not be accomplished because of high volume, with approximately 2,000 annual admissions and discharges of whom about two thirds were on suicide precaution at some point during their stays.

Medication Management:

Continuity of medication remained similar to the preceding monitoring

period but showed some slippage, probably due to higher vacancies in psychiatry.

Pill line audit results were inconsistent.

Medication errors continued to be handled through the nursing, pharmacy, and therapeutics committee and the pharmacy.

Except in the OHU, no distinction between DOT and nurse-administered medications was made due to staffing and physical plant limitations. A "hybrid" form of administration was used, with correctional officers rather than nurses observing inmates for cheeking. Nursing staff on the first floors of buildings seven and eight passed medication to inmates who were locked in their cells and then observed them through glass. Neither of these practices satisfied DOT protocol. Cases of suspected non-compliance were handled with orders for crushing and floating, liquid concentrates, dissolvable wafers, long-lasting injections, or checking of inmates' blood levels.

From July 1 through October 31, 2006, 14 Keyhea orders were initiated, 23 were renewed, and none expired. One Keyhea hearing resulted in a denial, one request was withdrawn on advice of counsel, and one was dropped due to logistical problems.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

All incidents of indecent exposure were referred to mental health for completion of sexual misconduct screenings. Two clinicians completed all of them using preformatted MH-3s, although compliance with the 72-hour timeline was inconsistent.

Most screens were not reviewed in formal, specially scheduled IDTT meetings but rather by the screening clinicians asking treatment teams in administrative segregation or the OHU if they had anything to add to clinical conclusions.

Comprehensive evaluations included review of C-files, UHRs, history of sexual behavior and fantasies, and a behavioral analysis. The frequency of incidents fell from an average of four to two incidents per month.

Four inmates were identified as meeting criteria for a diagnosis of exhibitionism, one of whom remained at CMC and was amenable to treatment but was due to parole in one month, making it unlikely that he would receive treatment before release.

All incidents were referred to the district attorney's office.

Transfers:

Transfers to acute and intermediate DMH inpatient care varied by DMH facility. Times from referral to transfer ranged from the same day to over 90 days from July 1 to October 31, 2006, when CMC referred 92 inmates to DMH facilities and nine other inmates to other higher levels of care, as discussed below. No referrals to APP Levels III or IV were initiated. As of September 12, 2006, CMC adopted a new "triage" procedure that required referrals to acute inpatient care ASH to be routed through APP for custodial and clinical review. CMC staff also reported that DMH utilized a "deferred acceptance" that was inconsistent with terms of the memorandum of understanding with DMH.

There were 19 referrals to acute care at ASH, with 16 transfers and complete data for 17 referrals. Times from MHCB admission to start of the referral process ranged from five to seven days, and times from start of referral process to completion of referral ranged from two to 27 days. Referrals were completed in seven days or less for 12 of 17 inmates and in nine to 15 days for four inmates. For one inmate,

referral took 27 days, but further inquiry revealed that he had two different referrals within one 27-day period, the first of which was rejected. Two referrals were rescinded, and two lacked transfer dates. Among the remaining 15 inmates, acceptances were logged within one to 13 days of referral. Six were accepted within one day of referral, eight within two to five days, and one after 13 days. Transfers occurred for 12 of the 15 on the day following their acceptance, for two on the third day after acceptance, and for one on the fourth day.

Ten inmates were referred to intermediate inpatient care at ASH, three of whom did not originate in the OHU. Referral times ranged from nine to 90 days, with ten accepted in one to four days of referral and transferred in two to five days of acceptance. Nine actually transferred, and one was rescinded.

CMC referred 37 inmates to acute inpatient care at CMF, all of whom originated in the OHU and 14 or 38.9 percent of whom transferred. Four went to acute care at ASH, and five, or 13.5 percent, were rescinded. No transfer dates were pending for the remaining 14 inmates. Times from initiation to completion of referrals ranged from the same day to 20 days, and from referral to acceptance, the range was three to 30 days. Transfers occurred from one to 37 days following acceptance. Times from start of the referral process to actual transfers to acute care at CMF ranged from 12 to 38 days. For the transfers to ASH, times from referral to transfer took 14 days in each of the four cases, with times of transfers ranging from one to four days following acceptance

Two inmates were transferred to intermediate inpatient care at CMF. No date of admission to the OHU was available for one of them. Times from referral to acceptance of these inmates were 60 and 82 days, respectively, and both inmates were

173

placed on waiting lists.

Six inmates were referred to SVPP. One was rejected and subsequently referred and accepted into acute care by CMF. For the remaining five, there was no OHU admission data for two, and for two of the remaining inmates, referral was begun before their OHU admissions. For the sole remaining inmate, referral began five days after his admission to the OHU. Completion of the referral process took from 17 to 90 days. For the three inmates for whom acceptance dates were documented, one was reportedly accepted earlier than the official referral date. For the remaining two inmates, acceptance dates ranged between four and 11 days after the referral date. Only one of the six inmates referred to SVPP actually transferred, on the day following acceptance. As of the monitor's visit, one was wait-listed, one had paroled, one was rejected, and two had transferred to PSUs at MCSP and CSP/Sac, respectively.

Also during the July 1 through October 31, 2006 period, there were 570 MHCB admissions, or an average of 4.6 admissions and discharges per day, with an average daily census of 32.5 and an occupancy rate of 77.4 percent. The average length of stay was 6.6 days, with a range of one to 61 days. Sixteen percent of admissions remained in the MHCB unit longer than ten days, of which ten percent remained between 11 and 20 days and six percent longer than 20 days. Inmates with repeated admissions accounted for 24.7 percent of all admissions, with most of those having from two to five prior admissions.

In the OHU, there were numerous repeat admissions, with 43 inmates accounting for 141 admissions. Of these 43, there were 30 who had three admissions, representing 15.79 percent of total OHU admissions. Six inmates had four admissions,

which accounted for 4.21 percent of admissions, and five inmates had five admissions, which accounted for 4.39 percent of admissions. One inmate had six and another inmate had eight admissions. Among all OHU admissions, 18 percent were ultimately referred to higher levels of care.

Other CAP Issues:

      a. Partial Compliance

      Shortages of medical records and nursing staff continued to strain the ability of mental health programming to meet the demands of its caseload.

      b. Non-Compliance

      CMC did not offer the requisite ten hours of weekly therapeutic activity for EOP inmates in administrative segregation

Other Issues:

      Staffing for inpatient mental health care at CMC included two psychiatrists, six psychologists, five psychiatric social workers, two recreational therapists, one office tech for MHTS data entry, four senior RNs, 35.4 RNs, four medical transcribers, one pharmacy tech, 15.65 correctional officers, and one physician/surgeon. Most inmates received good mental health care, but treatment for those awaiting transfer to higher levels of care was strained given the physical limitations of the facility.

      CMC's MHCB local operating procedure met or exceeded Program Guide requirements in most respects but needed strengthening on cell-front visits; role clarification for LPTs, RNs, and MTAs; and a procedure for incorporation of inpatient records into UHRs upon discharges. Other areas requiring further development included:

- Tracking the date that an inmate leaves the MHCB unit;
- Admission diagnosis;

175

- Patient interviews, assembly of new ward chart, interview with the patient, physical evaluation including vital signs, and nursing care plan;
- Documentation of history and physical examination within 24 hours;
- Individual treatment plans;
- Aftercare plan/discharge summary;
- One-to-one counseling, group therapy, and rehabilitative therapy;
- Offering all additional RT and other treatment activities as clinically indicated to inmates awaiting transfer to a DMH facility for longer than ten days;
- Quality assurance audits of the implementation of the discharge plan and follow-up care;
- Review of SRACs by the mental health program manager prior to discharge; and
- Transcription of the H&P delivery to the MHCB expeditiously.

CMC's OHU was reopened in June 2006. While most inmates received good mental health care, the severely mentally ill inmates required greater resources than were provided. Many of these had to remain locked down for weeks due to a lack of recreational facilities. Pending construction of additional CTC beds, CMC took the position that it operated an "interim" MHCB program in its OHU in an effort to comply with a court order of April 27, 2006, regarding the provision of MHCB level of care. At the time of the monitor's visit, the OHU had 42 beds with twice-weekly meetings of a skilled IDTT and daily cell-front contacts. Five-day follow-ups were given. The monitor's expert observed IDTT meetings of good quality. All referrals were admitted to the OHU, obviating any need for holding cells and the like.

As of November 6, 2006, administrative segregation at CMC had 47 EOP inmates, 60 percent of whom had been there over 60 days and 36 percent of whom had been there over 90 days. Stays ranged from four to 432 days. Although it served as a hub, only nine of 47 inmates, or 20 percent, had been transferred in from other institutions. Suicide reduction measures included prescreening, placards, and

documentation of 30-minute welfare checks for newly arriving inmates. Cells were very

small and restrictive. Access to the yard was very limited. Only two of eight clinical

positions were filled. Office space was available for only two clinicians and was unlikely

to be remediated pending completion of a long-term reconstruction plan. Treatment

space was also insufficient. Reportedly, these working conditions hampered the

institution's ability to attract and retain staff in the administrative segregation EOP

program. An effort to increase the capacity of two existing group treatment rooms from

seven to nine was on hold. Group offerings for EOP inmates in administrative

segregation included adjustment, considering consequences, coping skills,

communication skills, improved judgment, managing violent behavior, errors in thinking,

current events, meditation, and structured recreation therapy. The monitor observed an

EOP IDTT meeting in administrative segregation and concluded that it met Program

Guide standards. A unit psych tech participated. UHRs were available, but C-files were

not. Inmates attended and participated meaningfully.

Non-administrative segregation EOP inmates at CMC were offered an

average of 15.5 hours of treatment per week, which exceeds the minimum requirement.

An institutional goal was to ensure that all EOP inmates received core group treatment.

Core group offerings covered grooming, exercise, social/cognitive development

activities, and transition programs, including resource management. Other group

offerings included recovery principles, life skills, surviving abuse, coping with mental

illness, sex offender treatment, substance abuse prevention, and management of

symptoms, medication, anger, stress, and depression. Stepdown groups covered 3CMS

orientation, and prerelease groups covered parole planning, relapse prevention and

parenting skills. EOP inmates were also offered four hours of recreation therapy on Fridays and on weekends. From July 6 to November 20, 2006, there were 617 group offerings for 5,393 treatment hours in administrative segregation, 107 sessions for 1,850 treatment hours for ADL/EOP inmates, 101 sessions for 797 treatment hours on C Quad, 2,035 sessions for 43,296 treatment hours on D Quad, and 359 sessions for 6,676 treatment hours in the gym. The monitor observed an EOP group on fact-finding that had developed a survey for EOP inmates covering difficulties with transition from EOP to 3CMS status, problems with the HS pill line, and lack of access to the substance abuse program

In non-EOP administrative segregation programming, CMC remained non-compliant but showed improvement. One-hour groups were offered 30 minutes apart, which enabled inmates to move between sessions. They participated in an average of 7.62 hours of out-of-cell activity per month, although the amount of individual participation varied widely. Lack of sufficient clinical staff caused offerings to be limited. Lack of space exacerbated CMC's difficulties with meeting Program Guide group requirements. The monitor observed a group on print and auditory news media, with five participants in therapeutic modules with mesh on all sides. There was no discussion among the inmates. One inmate stated that he attended several groups a week, including recreation therapy, current events, considering consequences, and improved judgment. He said that most groups, including those facilitated by clinicians, were very loosely organized, with open discussions and little or no structure or curriculum, although most groups entailed "homework." He attributed the problem to fluctuating membership from week to week.

Line staff expressed concern with the large size of 3CMS clinical caseloads, which averaged 196 inmates in general population. Clinicians reported that work space for 3CMS clinicians was very limited. Similar concerns were voiced by clinicians working with EOP inmates. Concern was also expressed about large numbers of inmates requiring neuropsychological assessments and chronic care. Staff also stated that pill lines were longer than reported by the institution, which was impacting medication compliance. Some staff stated that the institution needed a more consistent process for reassignment of clinicians when requested by inmates. They also reported a perception that caseload inmates were not granted parole with the same frequency as non-caseload inmates, and that this led some inmates to try to remove themselves from caseload designation. Finally, concerns were also expressed regarding the lack of support provided to developmentally disabled inmates approaching parole hearing and that insufficiently trained contract clinicians were often assigned to conduct mental health evaluations and work in administrative segregation. They also reported that training on completion of RVRs and sexual misconduct evaluations was needed.

### Wasco State Prison (WSP)
January 8, 2007 – January 9, 2007

Positions for the chief and senior psychiatrists, the chief psychologist, and the three supervising psychologists were filled.

Of six line psychiatry positions, 4.5 were vacant but fully covered by contractors. Among the 17.5 allocated line psychologist positions, 12.5 were filled, and 1.5 were covered by contractors, for a functional vacancy rate of 21 percent.

All four psychiatric social worker positions were filled. Three of four psych tech positions were filled, and the remaining position was covered by contractors.

The sole recreational therapist position was vacant, as were two of three psychometrist positions and half of the sole medical transcriber position. Of 5.5 office tech positions, half of one was vacant. All three office assistant positions were filled.

All five RN positions were filled. Newly hired staff included a line psychiatrist and two line psychologists who had not yet begun working.

WSP received new position allocations for 1.05 psychiatrists, 20.22 psychologists, 5.8 psychiatric social workers, four psych techs, .65 recreational therapists, .82 RNs, one health program specialist I, one office tech, one medical transcriber, .5 limited-term office assistants, 7.4 custody officers, and .30 correctional counselor II (CC II specialists).

As of January 4, 2007, WSP housed 5,751 inmates of whom 1,420 were on MHSDS caseload, including 1,207 3CMS in reception center, 45 3CMS inmates in administrative segregation, and 67 in general population 3CMS, for a total of 1,319 3CMS inmates. There were eight EOP inmates in administrative segregation and 87 in reception center, for a total of 95 inmates at the EOP level of care. Six caseload inmates were in the institution's CTC.

Quality Management:

The institution's quality management functions remained resolved as a CAP item but showed slippage, probably due to the prolonged absence of a staff member. Meetings became irregular. There were no active QITs. Regular periodic audits continued. Audits of medication management used sample sizes that were too small, possibly explaining the variability in audit results in that area. Required management reports were generated and used by supervisors. Peer review for case managers began.

Within the current monitoring period, the facility changed the manner in which audits of medication management and continuity are accomplished.

Suicide Prevention:

WSP's suicide prevention committee held about half of its monthly meetings, with attendance by custody and clinicians. Reportedly, staff worked on revising local operating procedures on suicide prevention, suicide watch, and use of holding cells for inmates awaiting MHCBs and developed a training manual on them for RN and custody staff. From June through November 2006, 181 inmates were discharged from MHCBs following suicide-related admissions. Twenty-four hour custody observation forms were collected by custody staff in only 38 cases, or 21 percent, with a range of compliance from five percent in June 2006 to 45 percent in November 2006.

WSP placed inmates in holding cells for observation pending admission to the MHCB unit for suicidality. Increased MHCB admissions led to increased use of holding cells during the monitoring period. An audit of ten UHRs for inmates in holding cells found all related documentation on file, legible, and complete. However, documentation and recording of suicide-related behaviors in UHRs for inmates admitted to the CTC was incomplete or non-existent.

An increase in suicide watch orders was attributed to the use of new contract psychiatrists. From July 2006 through mid-December 2006, 67 suicide watches were ordered.

Medication Management:

For newly arriving inmates with documented current orders, prescriptions were renewed timely in 100 percent of cases, according to an audit covering July to

September 2006. First doses, however, were administered within 24 hours of arrival in only 77 percent of cases.

For inmates transferred within the institution, an audit covering July to September 2006 found increased medication discontinuity, i.e., missing at least one day's dosage, in 63 percent of cases. Staff attributed the deterioration to the transition from use of MTAs to LVNs.

Timeliness of renewals deteriorated. A small audit of eight files found renewals before expirations in 75 percent of cases. Staff attributed the untimeliness to problems with the computer used in the pharmacy. The institution was also non-compliant with documentation of reasons for medication changes.

Referrals for psychiatric follow-up on medication non-compliance were not processed systematically. Appropriate documentation appeared on MARs in only seven percent of cases. An audit found that only 32 percent of inmates who had refused or failed to appear for medication had been seen within seven days.

Pill lines remained problematic in the reception center due to MTA staffing issues, significant gang presence, and scheduling conflicts with custody activities, despite implementation of medications rooms on all B and D Facility housing units. Reportedly, the evening pill line began as early as 4:30 p.m. and continued until after 6:30 p.m.

Laboratory testing of inmates' blood levels of psychotropic medication was not audited, making assessment of this aspect of medication management impossible.

The pharmacy computer program could not differentiate DOT orders from others.

Orders for HS medication were few, except in the CTC. Psychiatrists were reluctant to order them out of concern that they would be delivered at inappropriate times. There was some indication that HS medication was administered during the earlier pill lines.

Paroling inmates were supplied with their medication, which was dispensed by the pharmacy, taken to R&R, and given to them upon departure. An audit of 30 cases from July through September 2006 found completed documentation in 83 percent of cases.

<u>Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations</u>:

WSP was compliant with the use of mental health assessments in the disciplinary process.

<u>Transfers</u>:

WSP continued having regular IDTT review and identification of potential DMH referrals. During the monitoring period, it considered 34 inmates for transfer to DMH for treatment at a higher level of care. Ten were not transferred ultimately because they stabilized at WSP at the EOP level of care or were transferred to mainline EOP institutions or to an EOP hub. Another two who were accepted were referred to EOP at CMF after their parole had been revoked for psychiatric reasons. Eighteen, or 35 percent, were referred and accepted by DMH, with 11 accepted for acute care and seven for intermediate inpatient care. The transfers to acute care occurred within 15 days of the IDTT determination. Four additional inmates were under consideration for referral to intermediate inpatient care during the monitor's visit.

MHCB space in the six-bed CTC was hindered by increased housing of

chronic medical cases there. From June through December 2006, there were 287 MHCB admissions. Average length of stay was 9.77 days, but 39 stays, or approximately 14 percent, exceeded ten days. A few inmates with coexisting medical conditions experienced long stays of up to 216 days.

Holding cells in the CTC, in B Facility chapel, or in administrative segregation were often used for inmates awaiting MHCB admission. Inmates in holding cells were reviewed by the same IDTT, were tracked on the same database, and received the same treatment as inmates in MHCBs in the CTC. They were seen by clinicians daily, although 30-minute checks did not appear to occur for holding cell inmates outside of the CTC. During the monitor's visit, some inmates in holding cells were handcuffed to prevent self-injury but were not observed constantly. Placements in holding cells in B facility were tracked via a log. Mental health staff documented, among other things, the purpose of the inmate's placement in the holding cell and the required level of observation for guidance of custody staff. However, inmates in administrative segregation holding cells were often released back to the housing area after evaluation by mental health staff. Records for many of these inmates, who were potentially suicidal, failed to note who authorized their release from holding cells and the areas to which they were moved. In addition, many of these inmates were often left in handcuffs for extended periods. Custody staff considered this a discretionary practice for occasions on which they deemed an inmate at risk for self-injury.

Transfers from administrative segregation were delayed due to lack of bed space at hub institutions. The overflow unit was closed. Of the 45 3CMS and the eight EOP inmates in administrative segregation units, two of the EOP inmates had been there

184

longer than 30 days, and three had been there longer than 60 days.

As of January 9, 2007, in reception center, there were 1,035 3CMS and 73 EOP inmates. Transfer deadlines were exceeded for 249, or 24 percent, of the 3CMS inmates and for 19, or 26 percent, of the EOP reception center inmates.

Reception center intake was described by staff as "high." Approximately 125 to 150 cases were processed daily, or 2,200 per month, or 26,400 annually, through reception center diagnostics. Relationships between custody and mental health staff were described by staff as "good." Average caseloads for the 8.5 case managers were approximately 120, plus weekly EOP contacts for ten inmates. Staff reported that psychiatric treatment revocation inmates were coming into the reception center when they should have gone to CMF. Group therapy was not offered to reception center EOP inmates. Staff reported that the EOP treatment team had been organized and that additional custody staff had been hired to provide welfare checks and assist with EOP duties. Frequency of case manager contacts was greater than weekly, and psychiatric contacts occurred at least monthly, based on an audit of case histories of nine of the 19 reception center EOP inmates with Axis I diagnoses. For 3CMS inmates in reception center, however, frequency of case manager contacts fell to less than quarterly, according to the monitor's sample of ten cases. Reportedly, this resulted from increased clinical staff illnesses and lack of experience among newer staff in complying with the quarterly contact requirement.

In administrative segregation, confidentiality of screening and treatment space was partially compliant. Psych techs conducted some mental health screens in only partially enclosed areas in a dayroom. Caseloads for each of the two case managers were

22 to 23 3CMS and four EOP inmates. Some clinical contacts occurred at cell-front, and refusals continued to occur. The monitor reviewed of seven of eight administrative segregation EOP inmate histories. For six of the seven, there had been quarterly IDTT meetings, treatment plans, and current Axis I diagnoses. Case manager contacts occurred at least weekly, and more frequently in several cases, and were regularly reviewed for referral to intermediate inpatient level of care. Psychiatric contacts were nearly weekly from September through November 2006. Audit data found 100-percent compliance. Daily psych tech rounds occurred and were documented, but some inmates had refused contacts.

The monitor also reviewed histories of six of the 45 3CMS inmates in administrative segregation. Weekly case manager contacts were documented. Each had documented IDTT meetings and a current Axis I diagnosis, and five of the six had treatment plans.

Group therapy was not offered to general population EOP inmates. Toward the end of the monitoring period, a large treatment space next to the B facility was remodeled for implementation of reception center EOP programming, with IDTT meetings about to begin.

For general population 3CMS inmates, IDTTs met weekly and had membership of senior and line psychologists, case managers, and CC Is. Psychiatric representation was insufficient. Facility captains and CC IIs attended occasionally. CC Is brought C-files or could supply needed information from their case factor sheets. Audits of 15 cases found that all had Axis I diagnoses, completed treatment plans, and timely case manager contacts. Of these 15 inmates, 14, or 93 percent, were seen within

186

14 days of arrival, and the remaining inmate was seen within 20 days of arrival. The monitor's review of 15 UHRs found group therapy for 14 inmates, or 93 percent, from September through December 2006. Group offerings were limited and non-compliant, reportedly due to staffing shortages. The sole 3CMS case manager's caseload numbered 67 inmates. Documentation of psychiatric contacts was compliant but psychiatric response to referrals was untimely. An audit of 13 UHRs of 3CMS inmates who had been in general population for two or more years found 100-percent compliance with documentation and time frame requirements.

Psychiatric response to emergent and urgent referrals was timely but to routine and self-referrals was untimely.

The institution's heat-alert trigger system was in place. Inside and outside temperatures were recorded daily for housing units, the CTC, and the watch office. Daily lists of heat-risks inmates were distributed except on weekends and holidays. No inside temperatures of 90 degrees or higher were recorded.

Reportedly, filing was current in the medical records diagnostics area but behind in the main medical records area by about two weeks. The time lag was attributed to a significant increase in loose filings coming from the medical clinics, where work had increased.

Five-point restraints were ordered for 17 inmates in the MHCB unit during the monitoring period. Ranges of motion and observations were documented for each inmate. Among five records, ranges of motion were recorded on four patient observation records, and the fifth was documented in the restraint and seclusion record.

### Kern Valley State Prison (KVSP)
January 17, 2007 – January 19, 2007

187

KVSP was severely understaffed, with an overall vacancy rate of 57 percent among mental health positions. Only three of 18 allocated staff psychologist and social worker positions were filled, yielding a vacancy rate of over 80 percent among case managers. Contractors provided little help, covering the equivalent of two of 15 vacant case manager positions. A senior psych tech position was vacant, as were 6.4 of 9.4 allocated psych tech positions. One of 2.65 recreation therapist positions and 4.5 of 6.5 clerical positions remained vacant.

Positions for a chief psychiatrist, chief psychologist, and senior psychologist were filled, although persons in these positions were routinely diverted from supervisory tasks to provide treatment services. All four allocated staff psychiatrist positions were filled.

In December 2006, KVSP received authorization to establish 24 new mental health positions, an 80-percent increase in its overall mental health staffing allocation. The new allocations included positions for five staff psychologists, three social workers, four psych techs, a half-time recreation therapist, three RNs, a health programs specialist and 4.5 clerical workers. Most of the newly allocated positions were vacant.

Nearly half of KVSP's allocated nursing positions were vacant, as were a third of its MTA positions. Six of ten pharmacy positions and two of eight medical records positions were vacant.

In mid-January 2007, KVSP's overall census was 4,902 inmates. The caseload count was 499, ten percent of the prison's population. There were 483 3CMS inmates, 15 percent above the institution's rated capacity of 419. Ten EOP inmates

188

awaiting transfer and six inmates were in MHCBs. There was a total of 366 inmates in administrative segregation, including 60 3CMS inmates and four EOP inmates.

Quality Management:

KVSP's quality management program was minimally functional. The mental health quality management subcommittee met sporadically during the monitoring period. UHR- and MHTS-based audits were not completed. The institution's sole QIT, tasked with improving systems for routing and processing mental health referrals, was inactive during most of the monitoring period. Peer review had not been initiated.

Suicide Prevention:

The Suicide Prevention Committee met monthly but seemed disconnected from systemic issues related to suicide risk. For example, the committee did not monitor implementation of the corrective action plans related to two completed suicides in 2006.

Institutional tracking records covering the last six months of 2006 yielded a compliance rate of 98 percent for follow-up of suicidal inmates discharged from the MHCB. The institution did not track custody checks of inmates discharged from the MHCB.

New arrivals to administrative segregation were placed in identified intake cells. Documentation indicated that intake-status inmates received 30-minute welfare checks during their first three weeks in administrative segregation. The checks were not completed at staggered intervals.

Staff reported that the results of suicide risk assessments were entered into the MHTS and that suicide history reports accompanied inmates transferred from KVSP. Suicide history reports were not used as part of the screening process in administrative

189

segregation.

Medication Management:

Medication management went largely unexamined. Nursing staff audited 27 UHRs in November 2006. The audit results, which were statistically insignificant and indecipherable relative to psychotropic prescriptions, revealed problems with continuity of medication on inmates' arrival at the institution, their movements within the institution, and the renewal of medication orders. All medications were administered at the cell front, and all psychotropic medications were reportedly prescribed DOT. There were 258 inmates with HS medication orders, nearly 200 more than were reported during the preceding monitoring visit. Staff reported that parole medications were routinely distributed. Medication non-compliance protocols were reportedly partially implemented due to staffing vacancies. KVSP did not audit distribution of HS, DOT, or parole medications. No performance data were provided regarding non-compliance protocols or the monitoring of blood levels of inmates prescribed mood-stabilizing medications.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

KVSP's provisions for dealing with sexual misconduct appeared to comport with CDCR protocols, although incomplete tracking records prevented a full assessment of performance. An institutional log of sexual misconduct referrals covering the second half of 2006 indicated that mental health staff screened ten inmates, including one MHCB inmate, five 3CMS inmates, and four non-caseload inmates. The log did not record the date of the incident. As a result, it could not be determined from the documentation if screens were completed within a short time of the incident. In three cases, the dates and outcomes of screens and IDTT reviews were not recorded. Seven

screens were completed and reviewed by IDTTs. None of these cases was referred for a comprehensive evaluation. As of mid-January 2007, no inmates at KVSP were diagnosed with or receiving treatment for exhibitionism.

All inmates issued RVRs for indecent exposure were referred to the local district attorney's office. Other custodial elements of the department's sexual misconduct protocol had not been implemented; jumpsuits and lexan window covers were not available or used.

Transfers:

Access to DMH acute inpatient care was poor. Less than half of referred cases resulted in transfer. DMH referrals often took more than a month to prepare and submit. Incomplete referrals resulted in transfer delays of greater than two months. Long MHCB admissions and excessive use of restraint and seclusion suggested that DMH resources were underutilized.

During the last six months of 2006, KVSP made 12 referrals to acute care with five resulting in transfers to DMH. MHCB staff took an average of 32 days to complete and submit DMH referrals reportedly the result of staff's unfamiliarity with DMH referral protocols. Inmates who reached acute care waited an average of 14 days to be accepted and assigned a bed number. On average, 35 days elapsed between referral and transfer with a range of eleven to 71 days. Three transfers took eleven to 17 days; the remaining two took 66 days and 71 days, respectively. Four of five inmates were transferred within 72 hours of receiving a bed assignment; one inmate was transferred within four days. Five referrals were rescinded, and one was rejected. One inmate was pending transfer to DMH during the monitor's visit and had been waiting nine days.

Staff did not refer any inmates to DMH intermediate inpatient programs during the monitoring period.

KVSP's 22-bed CTC, opened on July 1, 2006, included 12 MHCBs and three isolation rooms. The unit's medical beds were not yet activated. Cells in administrative segregation were occasionally used to monitor inmates who were waiting for an MHCB. Placements in administrative segregation for this purpose reportedly required continuous one-on-one monitoring and never exceeded 24 hours. The number and duration of these placements were unknown as KVSP did not track the use of holding cells in administrative segregation.

From July 1 through December 2006, there were 169 admissions to the MHCB unit, roughly 28 a month. Lengths of stay in the MHCB were often excessive. A quarter of admissions lasted longer than ten days; 13 percent exceeded 20 days. Ten MHCB admissions lasted 35 to 50 days, three lasted between 60 and 90 days, and one admission lasted more than four months. Most of the outliers were related to delayed DMH and EOP transfers.

An MHCB schedule provided for daily clinical and psychiatric coverage. IDTT meetings occurred biweekly. An IDTT meeting attended by the monitor included all necessary participants. A nurse or correctional officer reportedly provided one-on-one monitoring to inmates placed on suicide watch. Three isolation rooms, each equipped with a video camera, were used to monitor agitated inmates. Staff reported that all inmates placed in the isolation rooms received one-on-one monitoring in addition to video surveillance. All inmates, regardless of the reason for admission, wore safety smocks throughout their stay in the MHCB.

MHCB patients were placed in restraint and seclusion for excessive periods of time. Five-point restraints were used on ten occasions, with an average duration of 26.8 hours. Two inmates were placed in seclusion, one for nearly 93 hours (see Exhibit P, Case Review 1).

KVSP rarely met the court-ordered timeline for transferring EOP inmates. Ten of 12 EOP inmates transferred from KVSP during the monitoring period waited longer than 60 days. Four EOP inmates waited a year or more, two waited longer than 200 days, and the rest waited 83 to 143 days. Most delays were attributed to a shortage of EOP beds, particularly Level IV SNY EOP.

An MHTS tracking report for EOP inmates currently at KVSP was outdated and incomplete. Staff reported a data entry backlog of six months. More reliable records maintained by the institution's C&PR indicated that three of ten EOP inmates at KVSP during the monitor's visit had exceeded the 60-day transfer timeline. As of mid-January 2007, length of stays for these inmates were 93 days, five months, and over a year (see Exhibit P, Case Review 4). EOP inmates awaiting transfer were seen by a social worker once a week and a recreational therapist twice a week. Group therapy was not offered to EOP inmates.

Other Issues:

Faced with a 70- to 80-percent functional vacancy rate among case managers, KVSP focused on providing mental health services to MHCB patients, caseload inmates in administrative segregation, and EOP inmates pending transfer. Mental health services for all other caseload inmates primarily consisted of medication management and identifying and responding to emergent referrals. During most of the