monitoring period, case managers were not assigned to general population 3CMS inmates. Quarterly case manager contacts did not occur, treatment plans were not timely updated, IDTT meetings were not routinely held, group therapy was not available, and few routine referrals resulted in contact. By January 2007, three full-time case managers were assigned to the mainline 3CMS program and had started to initiate mental health services.

Administrative segregation at KVSP was housed in two free standing units and in a 180-degree designed unit, B1, designated for mental health. Non-caseload inmates were routinely screened within 72 hours of their placement in administrative segregation. Most inmates were placed in holding cells to be screened, although the cells were often located in minimally private areas. Daily psych tech rounds were regularly completed in all administrative segregation units and appropriately documented. A local requirement that custody officers provide escort during daily rounds reportedly compromised confidentiality and reduced interaction between inmates and psych techs.

During most of the monitoring period, the chief and senior psychologists shared responsibility for monitoring caseload inmates in administrative segregation. Shortly before the monitor's visit in January 2007, a full-time contract social worker was assigned to provide case management in administrative segregation. Staff reports and UHRs reviewed by the monitor's expert indicated that caseload inmates in administrative segregation were not consistently seen on a weekly basis (see Exhibit P, Case Reviews 1, 2, 3). Staff reported having limited access to confidential interview space in administrative segregation.

Inmates housed in B1 were offered only two hours a week of outdoor

194

yard. Unit B1 was not equipped with walk-alone yards. Yards attached to the stand-alone administrative segregation units were available to B1 inmates only one day a week.

KVSP did not house caseload inmates in the stand-alone administrative segregation units. Ten caseload inmates were inappropriately placed in the stand-alone units during the monitoring period. Seven of these inmates were removed from the units within 24 hours; the remaining three were removed within two to four days. Another 14 inmates were removed from the stand-alone units within 24 hours of their placement in the MHSDS. Three non-caseload inmates taking psychotropic medications spent less than 24 hours in the stand-alone units.

Mental health staff did not always respond timely to referrals from inmates housed in the stand-alone administrative segregation units. Inmates in the stand-alone units submitted 39 mental health referrals during the monitoring period. Seven, or 18 percent, of these referrals did not elicit a response within seven days.

Staffing shortages continued to undermine KVSP's processes for collecting, routing, triaging, and responding to referrals, which were the sole means of access to mental health services for many caseload inmates. Yard clinics, the initial depository for most referrals, were intermittently staffed. The responsibility for triaging referrals was shifted from clinicians to clerical staff. Referral tracking data were incomplete. A QIT's recommendations for improving referral processes were not implemented.

MHTS data covering the second half of 2006 listed 153 mental health referrals for which referral and appointment dates were recorded. More than half, or 57 percent, of the referrals did not elicit a response within one week. Staff took three weeks

or longer to respond to 20 percent of the referrals.

Staff reported that UHR organization was excellent and that records were consistently available for scheduled mental health appointments. Missing documentation in records reviewed during the monitor's visit pointed to a filing backlog of three to four weeks.

Documentation provided by KVSP indicated that six of its inmates died during the second half of 2006. Four of six deaths were related to medical conditions and occurred in local hospitals. The remaining two deaths occurred at KVSP; one inmate hung himself in his cell, and another appeared to have been killed by his cell mate. The incident reports related to these two deaths were inadequate in that key times were not recorded. In one of these cases, the emergency response appeared to be inadequate in that responding custody and medical staff failed to initiate lifesaving measures (see Exhibit P, Case Reviews 5, 6).

The institution implemented most elements of its heat plan. Heat logs were maintained, heat-risk lists were regularly circulated to housing units, and staff and inmates were familiar with the institutional heat plan. Logs recorded several Stage II heat alerts in July 2006 and one Stage III heat alert when indoor temperatures exceeded 95 degrees in a gym that served as a dormitory. Staff assigned to the gym reportedly did not notify their supervisors, and medical rounds were not performed during the Stage III alert. Staff reported that heat-risk inmates were not housed in the gym at the time.

### North Kern State Prison (NKSP)
November 6, 2006 - November 8, 2006

At the time of the monitor's visit in November 2006, positions for the senior psychiatrist and two of three senior psychologists were vacant. The chief

psychologist position was filled.

In mental health line positions, seven psychiatrist allocations were filled by five persons from the registry and two by state employees.  Among 20.5 psychology positions, there were eight vacancies, including one for medical leave and one assigned to QMAT duty.  Five of these vacancies were filled by the registry.

Both positions for psychiatric social workers and the sole recreational therapist position were filled.  One of four psych tech positions was vacant.

The pharmacy was staffed fully by the registry.  Together, pharmacy and medical records staffing were partially compliant.

As of November 1, 2006, institutional census was 5,501, of whom 5,111 were in reception and 390 in general population.  The MHSDS caseload census was 876, of whom 687 were 3CMS and 50 were EOP inmates in reception, 47 were 3CMS and eight were EOP inmates in administrative segregation, and 74 were 3CMS in general population and ten were in MHCBs.

Quality Management:

NKSP was compliant in quality management for the second successive monitoring period.  Its local governing body, quality management committee, and mental health subcommittee met regularly and recorded minutes. Mental health issues taken up included UHRs, MHCBs, tracking, peer review, case manager contacts, IDTTs, medication management, mental health referrals, EOP transfers, suicide prevention, RVR assessments, therapeutic groups, psych tech rounding, laboratory, and level of care changes.

QITs were ongoing and integrated into institutional supervision as the

primary quality assurance tool. NSKP was partially complaint with use of peer review. Ongoing peer review for psychologists and psychiatric social workers consisted of chart reviews and committee discussion of the results, but peer review for psychiatrists was inconsistent.

Audits were comprehensive and well structured, using adequate sample sizes and appropriate methodology. For the period of April through September 2006, monthly audits examined the presence of required chronos and mental health forms, documentation of required 3CMS and EOP contacts, and attendance at IDTT meetings in reception center, 3CMS, administrative segregation and the MHCB unit. Other monthly audits covered medical records, medication management, suicide prevention five-day follow-up, psych tech rounding, administrative segregation tracking, parole planning, and RVRs. There was, however, a caveat. Monthly audits from April to September 2006 found MHTS/UHR reliability rates ranging from 62 to 87 percent.

Suicide Prevention:

Membership on the suicide prevention committee included representatives of mental health, medicine, nursing, pharmacy, and custody staff, but attendance was poor, sometimes as low as 15 percent. At best, just over half of the members attended. The committee took up multiple MHCB admissions and excessive length of stay, five-day follow-up, and DMH transfer timelines and reviewed suicide attempts.

NKSP began implementation of the plan to reduce suicides in administrative segregation by chartering a QIT comprising mental health and custody, which first met in October 2006. It addressed confidentiality of space for initial screening, announcement of appointments as "health appointments," daily meetings with

the unit sergeant, use of double-celling, identification and retrofit of appropriate "intake" cells, 30-minute welfare checks, prompt implementation of walk-alone yards for newly arriving inmates, and requests for additional administrative segregation officers.

Medication Management:

For newly arriving inmates, medication was ordered within eight hours of arrival in 96 percent of cases but was delivered by the following day in only 70 percent of cases. Arriving inmates on Clozaril experienced discontinuity and decompensation because it was not in the NKSP formulary and was routinely stopped.

Audits of intra-institutional transfers from May through October 2006 found no medication discontinuity in 86 percent of cases.

Medication orders were renewed before expirations in 89 percent of cases.

Audits found that 83 percent of instances of medication non-compliance were documented in MARs but that timely referral and follow-up occurred in less than 20 percent of cases. Non-emergency referrals and reports of medication refusals were retrieved by psych techs from each yard five days per week. Medication refusals were documented by psych techs and delivered to office techs for ducating a psychiatric appointment.

Reportedly, institutional protocol for laboratory testing of blood levels of inmates on psychotropic medication did not comply with Program Guide requirements. Limited data indicated that results of laboratory tests were available to physicians within seven days, but there were no data indicating consistency with which physicians ordered laboratory tests.

Ordering and delivery of HS medication varied by area within the

institution. In reception center, medications ordered "p.m." and HS were delivered simultaneously via a pill line that began at approximately 8:00 p.m. and ended at approximately 9:30 p.m. In the general population, "p.m." medication was delivered at 5:30 p.m. as inmates were going to dinner, and true HS medication was rarely ordered.

Of the 216 inmates who paroled from July 1 to September 30, 2006, parole medication was issued to over 91 percent.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

NKSP maintained a log of referrals for mental health assessments in connection with sexual misconduct RVRs. It tracked dates and sources of referral, dates of screening, and recommendations. From April to October 2006, 21 cases were referred and screened. Four were submitted to an IDTT, referred for comprehensive evaluations, and diagnosed with exhibitionism. The comprehensive evaluation included relevant history and adequate diagnostic formulation. Most included recommendations for group therapy, which was unavailable at that time due to lack of sufficient numbers of inmates in the same building for such a group. Individual therapy was also recommended but not offered due to lack of trained staff.

The district attorney declined to prosecute the 15 cases of sexual misconduct referred during the monitoring period, several of which involved the same inmate. Charges for several cases against one inmate were pending in court. One case was awaiting the district attorney's decision whether or not to prosecute.

Transfers:

From April 5, 2006, through September 28, 2006, 36 inmates were referred to acute inpatient care at DMH. Two were withdrawn; all others appeared to

have been accepted. Times from referral to acceptance exceeded timelines, but times from acceptance to transfer were usually compliant. Average time from referral to transfer was 3.05 days, with a monthly range of 2.2 days in July 2006 to five days in May 2006.

Of 331 crisis care admissions, 34 were placed initially in MHCBs. The remaining 297 inmates were placed in holding cells from which 99 inmates were later moved to MHCBs. As a result, nearly 90 percent of inmates requiring crisis care were initially placed in holding cell, and 60 percent never reached MHCBs. From April through September 2006, inmates placed in MHCBs remained there for over ten days in 21 percent of cases, with a range of 13 percent during September to 27 percent during April and May.

The monitor observed an IDTT meeting in the CTC at which crisis care for two inmates was considered. A psychologist, psychiatrist, psychiatric social worker, RN, and custody officers who escorted the inmate attended. Inpatient charts but no C-files were present. Discussion was thorough. Inmates participated fully. In one case, the inmate had not stabilized after 12 days in a MHCB and was referred to acute care at DMH. In the other case, although the inmate appeared actively psychotic and transfer to EOP programming was pending, the IDTT decided to release him to his previous housing and did not consider expediting transfer.

Availability of space in the MHCB unit was problematic. Treatment and assessment space consisted of one conference room. Most inmates who received crisis care were never admitted to MHCBs before their release back to housing areas. Instead, holding cells were used extensively but afforded a lower level of care than in the MHCB

unit. Inmates in holding cells were placed on suicide precaution with one-to-one observation. Staff reported implementation of IDTTs for holding cell crisis care inmates during the monitoring period, but concerns over the discrepancies in care level persisted. Treatment teams did not include correctional counselors. Inmates were not evaluated medically at intake. No inpatient records were created. Progress notes were merely filed chronologically with other notes. There were no comprehensive psychiatric evaluations or treatment plans, no access to recreational therapy, and no daily consideration of personal property privileges.

Transfers out of the reception center were untimely. As of November 1, 2006, 687 3CMS and 50 EOP inmates were in reception center. Nine clinicians covered caseloads that ranged from 55 to 140 in EOP, SNY, and substance abuse programming yards. Staff reported that relations between custody and mental health were good to excellent. In reception center, case manager contacts occurred as required for 3CMS and EOP inmates, but initial evaluations and follow-up were not timely for 3CMS inmates. Staff attributed this non-compliance to staffing shortages, custody factors and a steady influx of new arrivals.

The number of EOP inmates dropped to 58, with 50 in reception center and eight in administrative segregation. Dates of endorsement and placement were tracked. Waits for transfers to EOP programs were 30 days or longer for seven inmates, 60 days or longer for 17 inmates, 90 days or longer for 12 inmates, with an outlier at 297 days. In administrative segregation, four EOP inmates had been waiting longer than 30 days, with the longest reported stay at 71 days.

Inmates at the EOP level of care received weekly case management

contacts in 100 percent of cases from April through September 2006, according to an audit of 37 UHRs. Three of the eight EOP inmates in administrative segregation each participated in one group. None of the EOP inmates in reception center attended groups, making the institution non-compliant with the pertinent CAP. The monitor's review found that EOP inmates awaiting transfer received weekly contacts but no additional services. Several of these inmates experienced recurrent and often substantial deterioration while awaiting transfers. There was little effort to expedite transfers, and often, there was no documentation of IDTT consideration of referral to intermediate or acute inpatient care. Reportedly, plans to offer more services were underway.

Other CAP Issues:

As of November 1, 2006, administrative segregation held 47 3CMS and eight EOP inmates. Lengths of stay ranged from one to 353 days. Forty-one, or 74 percent, had been there for 90 days or less. MHSDS inmates were identified within 24 hours of arrival. Daily psych tech rounding continued, and weekly case manager contacts were made. Yard time was inadequate.

The monitor examined UHRs and histories of 17 3CMS inmates in administrative segregation, finding that each had a treatment plan and had been seen timely by a psychiatrist of a case manager. Initial IDTT meetings occurred within seven days of arrival and before inmate classification committee meetings. Correctional counselors and psychiatrists attended IDTT meetings in 97 percent of cases. Follow-ups and treatment plan updates occurred quarterly. One-hour group therapy sessions run by psych techs were offered in anger management, coping skills, and currents events. Twenty-seven inmates were on wait lists, although staff reported that inmates who had

203

declined groups were kept on wait lists.

Space limitations caused group sessions to be affected by other scheduled activities. A sampling of 18 to 19 inmates found that case manager contacts from May through September 2006 occurred out of cell on average 77 percent of the time. The monitor also viewed administrative segregation treatment space, which staff reported to have limited the delivery of mental health services, and found the space inadequate. A custody classification room was also used for IDTT meetings and mental health evaluations. A room equipped with three holding cells was used for group treatment and intake assessments, but their use was deleteriously affected by ambient noise from the dayroom. The institution was considering possible use of space outside of the administrative segregation area, which would require additional custody officer allocations. Reportedly, NKSP was in line to receive 20 exercise modules in 2007.

Mental health referrals were triaged by psych techs, and inmates were ducated for a case manager or psychiatric appointment as indicated. Crisis referrals were triaged and referred to the on-call clinician during the week and to the on-call psychiatrist on weekends.

Routine referrals to case managers and psychiatrists were non-compliant with timelines. For case manager referrals, MHTS data showed an average of nine days to appointment, with a range of eight to 16 days. Emergency referrals were handled within time limitations, but psychiatric response was late, reportedly due to psychiatric staffing shortages.

The monitor's expert observed IDTT meetings of several 3CMS general population inmates. Inmates, their case managers, a senior psychologist, a correctional

204

counselor, and a psychiatrist attended. Correctional counselors rotated attendance at IDTT meetings and therefore were present for meetings concerning inmates outside their own caseloads. Staff reported that psychiatry did not attend usually, indicating non-compliance with the pertinent institutional CAP. UHRs, but not C-files, were available. The meetings were interactive, addressing issues raised by case managers, and inmates were afforded an opportunity to discuss issues of concern.

Other Issues:

An additional 166 custody officers were trained in CPR and use of micro-shields during the monitoring period. Each officer was retrained annually. Training was a prerequisite to returning to work for all custody staff on extended leaves. The monitor's spot check of officers in one housing area found that several were not carrying micro-shields.

NKSP's institutional heat plan was in place. Daily heat-medication listings were provided to housing units, and implementation of heat-abatement measures was documented. Documentation was inadequate in one housing unit. Heat-plan reports for May through October 2006 showed activation of Stage I measures during 90-plus temperatures for 11 days in May, 26 days in June, 31 days in July, 29 days in August, and 18 days in September. Medical rounds were made during six days of Stage II temperatures in July 2006. The monitor's examination of housing logs for those days showed that ice was distributed, showers were available, yard was recalled, and RNs conducted spot checks in two of three units. One unit failed to document activation of the heat plan.

## Service Area H

Service Area H includes California State Prison, Los Angeles County and California Correctional Institution.

**California State Prison, Los Angeles County (CSP/LAC)**
September 27, 2006 - September 28, 2006
November 9, 2006
January 18, 2007 - January 19, 2007

Staff at the institution reported that CSP/LAC's functional vacancy rate in mental health was 24 percent. Positions for the chief and senior psychiatrists and two of 10.5 staff psychiatrists were filled. Despite increased compensation, the amount of contractual coverage was unchanged. CSP/LAC was able to obtain enough contractual coverage to cover the equivalent of two psychiatry positions. The position of chief psychologist was filled, but the chief psychologist acted as health care manager, effectively leaving the chief psychologist position vacant.

The vacancy rate among psychologists and social workers was 30 percent. Two of six senior psychologist and ten of 25 staff psychologist positions were vacant. All five social work positions were filled. The institution's ability to attract case managers to cover vacancies improved. All vacant case manager positions, plus the equivalent of 1.63 positions, were covered by contractual staff.

Two of four recreational therapist positions were vacant. The position of senior psych tech was filled. Two of 16 psych tech positions were vacant. All 10.5 office tech positions were filled. The positions of office manager and medical secretary were filled.

In December 2006, CSP/LAC received authorization to establish 36 new mental health positions to be distributed across levels of care and locations, including the new reception center.

206

CSP/LAC converted a second yard to a reception center in December 2006, one year after activation of its first reception center yard. The conversion commenced in mid-December and was slated for completion in January 2007. Roughly 400 3CMS inmates with SNY classification were to be transferred to another prison to make way for the reception center. The conversion was slowed by a viral outbreak during December 2006 and a riot at California Institute for Men that resulted in the transfer of many inmates from California Institute for Men to CSP/LAC. In January 2007, staff reported that roughly two thirds of the 1,100 inmates in the yard undergoing conversion were reception center inmates.

At the time of the monitor's September 2006 site visit, CSP/LAC's census was 4,540, of which 1,517, or 33 percent, were MHSDS inmates. There were 1,180 3CMS and 327 EOP inmates. Three inmates were in crisis beds. The number of caseload inmates in administrative segregation was 241; 59 of them were treated at the EOP level of care. CSP/LAC served as an EOP administrative segregation hub. An additional 157 non-MHSDS inmates were housed in a stand-alone administrative segregation building. By January, the total number of EOP inmates rose to nearly 360.

CSP/LAC was selected for enhanced monitoring during the current monitoring period. Staff formed two work groups. One addressed access to higher levels of care and the other addressed the working alliance between mental health and custody staff in the EOP units. Both groups formed QITs and issued written reports of their activities. The QIT on access to higher levels of care found that mental health staff was unaware that referrals ought to be triggered by clinical need, regardless of bed availability. A series of weekly meetings and a joint training session reportedly improved

communication among staff assigned to the EOP units.

CSP/LAC's administration reported that lockdowns in November 2006 and January 2007 disrupted EOP treatment. Custody staff was redirected from their posts to conduct searches. During the last three weeks of November, there was no inmate movement. EOP inmates then went on a modified program. CSP/LAC was locked down again on January 17, 2007 after weapons were found in administrative segregation.

Quality Management:

Information regarding quality management at CSP/LAC was sparse. Documentation of meetings of the mental health quality management subcommittee indicated that the committee did not meet in June, but beginning in August, it generally met twice per month. Five QITs, two of them connected to work groups, were active during the monitoring period. Four of the five teams included custody staff and treatment providers.

Peer review was conducted by the disciplines of psychiatry, psychology, and social work, but it was atypical and did not focus on clinical issues. At quarterly peer review meetings, four to ten UHRs per case manager were audited using an audit tool that recorded the absence or presence of selected items.

Suicide Prevention:

The suicide prevention committee met monthly between May and October 2006. The composition of the committee was consistent with CDCR requirements, but fewer than half of the members attended. No custody staff attended a meeting observed by the monitor's expert in September. At that meeting, the committee did not review a DCHCS report related to a June suicide in administrative segregation. According to that

208

CAP, custody staff did not notify mental health staff about, or refer, an inmate who was placed in segregation at his own request, despite knowing that he was upset and had a self-inflicted injury. Staff reported that after a handout was distributed to officers, more referrals were made by custody staff posted in administrative segregation.

Attendance at meetings of the suicide prevention committee improved between the monitor's November and January visits. Despite better attendance, the committee did not expand its agenda to include pertinent issues. At subsequent meetings, the committee did not address the department's new plan to reduce suicides in administrative segregation, local problems with psych tech rounds, failure to screen and refer segregated inmates, or Title 15 requirements pertaining to administrative segregation. The emergency response review committee did not meet during the monitoring period, but staff reported that monthly meetings were slated to resume.

CSP/LAC reported that it had implemented CDCR's plan to reduce suicide in administrative segregation, notwithstanding non-compliance with requirements that predated the plan. Psych techs did not routinely screen inmates recently placed in administrative segregation. An audit of August cases found that none of the new arrivals in one administrative segregation building were screened, while half of those placed in a second building were screened. Until December, there was no mechanism in place to notify psych techs when inmates were placed in a third building that served as administrative segregation overflow. Psych tech rounds were done so quickly that staff did not have time to engage inmates in conversation. There were not enough yards to offer all segregated inmates ten weekly hours of outdoor recreation.

Staff reported few lapses in five-day follow-up contacts but did not

209

provide audit results. Lapses were said to be limited to weekends and were attributed to omissions by on-call psychiatrists whose duties included five-day follow-ups.

Medication Management:

Medication continuity remained problematic, as did CSP/LAC's ability to provide adequate documentation of audits. A series of small audits done by staff early in the monitoring period found that new arrivals received medication in a timely manner more often in June than during the preceding two months. In April, 29 percent of audited cases had an interruption in medication. The rate dropped to 20 percent in May. A June audit found that medication continuity was sustained in 90 percent of the cases sampled. No audit results later than June were reported. Although timely medication orders were written when inmates arrived, the pharmacy took three or days or longer to fill them.

There were problems with medication continuity when orders expired and when inmates were relocated within the institution. Staff reported that 66 of 425 referrals made to mental health staff in July concerned expiring orders. In June and August, when mental health staff received 316 and 391 referrals, respectively, just 13 referrals per month were for expiring orders. Small audits of intra-institutional transfers done in May and June found that medication continuity was interrupted in 33 percent of the cases sampled.

Non-compliance with medication did not always trigger a referral to mental health staff, but inmates known to be non-compliant were seen promptly. In May, when 44 referrals for non-compliance were received, mental health staff saw 42 of the inmates within three or fewer days.

Issues associated with pill lines were reportedly a factor in non-

compliance. High temperatures and lengths of pill line waits were two issues. A third was scheduling conflicts between meals and pill lines. Inmates had to go to the dining hall and the pill line during the same window of time. Staff was concerned about consistency in following procedures. When inmates left a long pill line in order to get to the dining hall within the required time frame, they were sometimes prohibited from returning to the pill line after leaving the dining hall.

Four Keyhea petitions were rejected in August 2006 due to flawed paperwork. Staff reported that 213 caseload inmates had DOT medication orders. DOT was used for 23 inmates with Keyhea orders, in locked-down units, and for inmates suspected of cheeking medication.

Staff audits found that informed consent was always obtained by psychiatrists during initial evaluations of inmates. The monitor's review of a small number of UHRs found that 85 percent contained informed consent.

Staff reported that blood levels of mood stabilizers were monitored every six months but provided no additional information on that topic. Staff reported that 180 caseload inmates had HS orders.

Staff reported that the mechanism by which paroling inmates were supplied with medication continued to function as intended.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

CSP/LAC had a local operating procedure that addressed the handling of sexual misconduct but failed to implement it in two cases reviewed by the monitor's expert (see Exhibit R, Case Reviews 10, 11). Logs of mental health screenings were maintained, but no single source of information tracked the process as a whole.

Screenings were often done at cell-front. No screenings triggered a comprehensive mental health evaluation despite significant histories, indicators of compulsive acting out, or diagnoses of exhibitionism found in the two cases cited above. Mental disorder was found to be a contributing factor in some of the mental health assessments done for use in the adjudication of RVRs for sexual misconduct.

CSP/LAC continued to monitor the use of mental health assessments in disciplinary proceedings that involved mentally ill inmates. In a clear violation of confidentiality, inmates were still used to type RVRs in one yard. After an institutional audit found that the quality of mental health assessments had declined and RVRs were issued in connection with self-injurious behavior, more training was provided for custody and mental health staff. In one case reviewed by the monitor, a charge was written for resisting staff when an inmate cut his wrist.

Transfers:

A QIT and a work group addressed issues associated with access to DMH. The QIT's examination of the issue identified several obstacles. Impediments to treatment included lack of awareness that referrals should be made as clinically warranted despite perceptions or indications that beds were unavailable, uncertainty regarding which referral forms to use, and lack of follow-up regarding the status of referrals. At the QIT's recommendation, staff was retrained, and several changes were made. A part-time referral coordinator was designated, office support staff was assigned to record and track referrals, and staff began to consider whether to refer to ASH. It was premature to tell whether these changed made an impact, but in at least one case, they did not. Two cases reviewed by the monitor's expert showed that staff did not refer to DMH when clinically

212

warranted (see Exhibit R, Case Reviews 2, 3). Failure to refer preceded the remedies in one case but followed them in a second. In both cases, referrals to DMH were intended but never made. In the later case, the omission that was not discovered by the tracking system that was part of the remedy designed to improve access to DMH.

Logs of referrals to DMH for acute and intermediate care were poor. Staff attempted to improve the records immediately before the site visit. Some improvement was evident by the end of the year. CSP/LAC more often referred to higher levels of care, but referrals were initiated too late, and staff took too long to complete them, particularly those directed to intermediate care.

Records indicated that from May through the end of 2006, 14 referrals were made to acute care provided by DMH. During the first four months of the monitoring period, from May through August, eight inmates were referred to acute care, four were transferred and two referrals were rescinded. No information was recorded regarding the remaining two. In the three cases for which information regarding transfer time was available, access to acute care was slow. Eight to 25 days elapsed between referral and assignment of a bed number, and 20 to 36 days elapsed between referral and transfer.

Although staff initiated referrals somewhat earlier, access slowed between September 1 and the end of the year, when six referrals were made to acute care. On average, referrals were made three to 15 days after admission to the MHCB. During that time period, DMH's response time averaged 35 days from receipt of a completed referral to assignment of a bed number. Transfers were effectuated within five days of the assignment of a bed number, which was not compliant with the requirements.

CSP/LAC made more referrals to intermediate care but transferred fewer

inmates. From May through September, 18 inmates were referred to intermediate care but only two went. Time taken to complete referrals was unusually long, ranging from 30 to 85 days. Of the two inmates who went to intermediate care, one was accepted within seven days; the other decision took 57 days.

The CTC had 20 beds, ten of which were reportedly designated MHCBs. Medical patients in need of long-term nursing care were housed in the CTC. Documentation was inadequate, but available information suggested that from May to September 2006, there were 55 admissions to the MHCB. The number of admissions per month ranged from 12 to 16. Lengths of stay ranged from one to 42 days. Excluding inmates awaiting transfer to DMH, four stays exceeded ten days in length, and one spanned a long holiday weekend.

Access to the MHCB remained a concern. Impediments to access during the monitoring period included medical patients in MHCBs, reliance upon holding cells for procedural reasons regardless of bed availability, and an apparent bias against admitting certain inmates on the part of at least one staff member, who perceived them to be manipulative. During the November visit, the monitor received a report regarding a documented incident in which a psychiatrist had written a note that advised barring a particular inmate from admission to the CTC regardless of prevailing circumstances. Review of a UHR and discussions with staff indicated that this same staff member had inappropriately attempted to influence other members of the staff to limit or deny treatment, including medication or admission to the MHCB, to inmates who were perceived as manipulative (see Exhibit R, Case Review 8).

Documentation of the use of holding cells for psychiatric purposes was

poor. Although there were only four chronic medical patients in the CTC at the time of the monitor's visit, staff reported that during the monitoring period, there had been as many as 13, with numbers at times impinging upon the availability of MHCBs. Two holding cells and two holding tanks in the CTC were used regularly. Holding cells and holding tanks were used when there were no beds available in the CTC and as ordered by physicians on call. Physicians on call reportedly ordered placement of inmates in holding cells pending face-to-face evaluation. Because of their distance from the prison, physicians on call were reportedly reluctant to come in to evaluate candidates for MHCB admission, which staff found disconcerting in light of a policy requiring face-to-face evaluation. As reported in the section on suicide prevention, missed five-day follow-ups were also attributed to physicians on call during the weekend.

Treatment in the MHCB was not individualized. Treatment teams ordered restrictions on property, clothing, and the use of safety mattresses for inmates who were not suicidal. Inmates in the MHCB were seen daily by either a psychologist or a psychiatrist. IDTT meetings were held, but correctional counselors did not routinely participate. An IDTT meeting observed by the monitor's expert was not attended by a treating psychiatrist.

CSP/LAC improved its tracking of caseload inmates in the reception center. Between May 1 and September, 957 of 959 new arrivals had a bus screening; 20 percent of the screenings were positive. Timely mental health evaluations were done, resulting in 13 percent of the new arrivals being enrolled in the MHSDS. Of 157 3CMS inmates, 79 percent were moved within 90 days. Staff examined the reasons for delay and found missing chronos and other processing glitches in 60 percent of the delayed

215

cases. Staff identified 16 EOP inmates during that time, ten of whom had lengths of stay

over 60 days. Clinical staff recommended expedited transfers for three inmates, one

3CMS and two EOP inmates. Only one transfer was expedited. In that case, an EOP

inmate was moved in 27 days. The other EOP inmate slated for expedited transfer had

been in the reception center longer than 60 days. The 3CMS inmate slated for expedited

transfer remained in the reception center over 90 days. In both cases, the clock was still

ticking.

Other CAP Issues:

CSP/LAC housed 350 to 360 EOP inmates. Approximately 270 were in

the general population. About 60 were in the administrative segregation hub, and about

20 were in the reception center. In the past, a number of concerns were voiced regarding

operations of the general population EOP units. Staff addressed some of them during the

current monitoring period, while others were raised once again. Concerns included

scheduling and coverage of EOP treatment groups, the working alliance between custody

and mental health staff, and questionable behavior by a small number of officers toward

staff and inmates in certain buildings during certain watches. Those concerns will be

addressed following the report on the status of EOP treatment provided to general

population inmates at CSP/LAC.

Inmates who were interviewed commented favorably on the amount of

structured therapeutic activity offered and the quality of group treatment. Some said that

they wished more of the treatment was more closely related to their mental health needs

216

rather than emphasizing recreation. A practice of housing both new admissions and inmates leaving the EOP in cells with lexan-covered doors was reported by inmates. Some voiced concerns about the possible effects of premature discharge from the EOP followed by three weeks of social isolation on an inmate who committed suicide in the EOP in December.

CSP/LAC isolated new arrivals from other inmates and confined them to cells with lexan-covered doors until their initial IDTT and UCC meetings were held. Inmates who were discharged from the EOP to the 3CMS level of care were housed in the same manner pending transfer out of the unit. This anomalous practice had a deleterious effect on some newly arrived EOP inmates. Social isolation and spare treatment for five to ten days after arrival was contraindicated for inmates who had waited a long time to reach the EOP, as well as for those whose developmental disabilities elevated the risk that their levels of functioning could deteriorate in isolation.

In November, access to treatment in the EOP was impeded by a lockdown and the redirection of officers for three weeks. Subsequently, the EOP units were on modified programming status. Staff reported that at least 12.5 hours of structured therapeutic activities per week were offered to EOP inmates in the general population; at least 8.5 of those hours were group treatment as opposed to leisure or recreational therapy groups. Staff audits found that due to a high refusal rate, 41 to 75 percent of EOP inmates in the general population units participated in at least ten hours of therapeutic activities per week.

Despite a QIT that addressed confidential case manager contacts during the previous monitoring round, many weekly case manager contacts were not

confidential. A staff audit found that 50 to 87 percent of inmates in one general population EOP building were not offered the option of meeting with their case managers in a setting that afforded confidentiality.

The quality of IDTT meetings observed by the monitor's expert was adequate, but the meetings did not conform to Program Guide requirements. A psychiatrist was present but not the treating psychiatrist. One inmate was unknown to the case manager who presented his case to the IDTT. A lieutenant and a correctional counselor were present at all meetings, but custody staff who knew the inmates and could provide pertinent observations regarding daily functioning was present at just one IDTT meeting. Medical and C-files were available at the meeting.

Two of three concerns raised previously were addressed by staff during the current monitoring period. A QIT, active since March, was revising local operational procedures regarding group treatment in the EOP. Second, the matter of communication between mental health and custody staff was the subject of a work group and a QIT. Staff reported that a series of weekly meetings and a day long joint training session improved communication among staff assigned to the EOP. Plans for a second joint training session and regularly scheduled bimonthly meetings were not realized. Third, there continued to be anecdotal reports that certain officers behaved inappropriately toward inmates on the third watch. In contrast, there appeared to be widespread agreement that officers on the second watch handled mentally ill inmates skillfully and that there was a good working relationship between custody and mental health staff in administrative segregation.

Staff raised several issues regarding psych tech duties. Psych techs made

218

twice daily rounds in the EOP units. Staff and inmates alike voiced the opinion that twice daily rounding was valuable. That practice was discontinued in connection with the use of overtime. Psych techs did not attend IDTT meetings held for general population or segregated EOP inmates, nor did they consent to lead groups to cover for leaders on leave. Reportedly, some of these issues were subject to discussions with their union.

In the reception center, staff audits found that timely initial mental health evaluations and treatment plans were completed in the reception center. EOP inmates deemed to be at risk were discussed in a weekly meeting. Staff reported that efforts to develop treatment that was consistent with revised requirements regarding EOP inmates were underway. As of January 2007, EOP inmates were seen weekly by a case manager and daily on rounds. They were afforded three hours of outdoor recreation per week. Staff planned to treat all reception center EOP inmates in groups that met five days per week once conversion of the second reception center yard was complete.

In administrative segregation, staff reported that given scheduling and environmental constraints, they could provide treatment that met Program Guide requirements to a maximum of 60 EOP inmates. Lack of escort staff impinged upon the delivery of mental health treatment when the census neared 60. During the monitor's visit, the census approximated 58 to 60, in contrast to the previous monitoring period, when it reached 80. Staff reported compliance with requirements regarding case manager contacts and IDTT meetings for segregated 3CMS inmates. Not all inmates were offered the requisite ten hours of outdoor recreation time.

Staff reported that nearly all EOP inmates in administrative segregation

were offered 12 to 14 hours of therapeutic activities per week, were seen weekly by a case manager and had quarterly IDTT meetings. Mental health staff was reportedly present at all ICC meetings of caseload inmates. According to a staff audit, correctional counselors' attendance at IDTT meetings declined to 84 percent during one month but rose after their absence was addressed by supervisory staff. Rounds were made, but they were perfunctory, and referrals to mental health were not always made when warranted, as reported in the suicide prevention section. The environment was cleaner than it had been in May. Two inmates seen by the monitor's expert were acutely mentally ill in administrative segregation for weeks rather than being sent to higher levels of care (see Exhibit R, Case Reviews 2, 3).

Other Issues:

　　　　　During the September visit, the monitor found that all units toured had complete personal protective equipment kits for use during an emergency response. Each control tower had a cut-down tool. Inventory sheets were still completed sporadically. Staff who were encountered knew the procedure for replacing emergency equipment, including microshields.

<div align="center">

**California Correctional Institution (CCI)**
October 23, 2006 – October 24, 2006

</div>

　　　　　CCI had 5.5 staff psychiatry positions, two of which were vacant, yielding a vacancy rate of 36 percent. Six contract psychiatrists together covered the equivalent of one position. The position of senior psychiatrist remained vacant. Staff reported that the institution had 21.24 psychology positions, 8.34, or 39 percent, of which were vacant. Contractual staff covered the equivalent of 6.5 positions, reducing the number of uncovered psychology positions to 1.8.

The sole social work position was filled, as were positions for seven psych tech positions and 7.5 office tech positions. One of 4.3 office assistant positions was vacant. The sole associate government program analyst position was filled. CCI had continuing difficulty recruiting and retaining nurses and MTAs, which had a combined vacancy rate of 24 percent.

CCI's census was 5,823, with 1,513 MHSDS inmates. The mental health caseload was 11 percent over capacity. The MHSDS roster included 34 EOP inmates; 11 were in administrative segregation; and three were in the SHU. There were 129 3CMS inmates in administrative segregation and 189 3CMS inmates in the SHU.

Staff reported that more inmates were arriving from Los Angeles County. Staff believed that mental health staffing was under-allocated in light of the size of the MHSDS caseload, the demands of the population, and CCI's far-flung site plan. Growth in the size of CCI's population exerted pressure on housing and treatment space. Dayrooms and gyms were being retrofitted for housing. Mental health staff calculated that 6,000 more feet of treatment and office space were needed to meet treatment requirements.

Lockdowns and modified program status did not adversely impact access to mental health care at CCI. An audit that spanned 18 weeks of the current monitoring period found that just four appointments were cancelled due to lockdown or modified programming.

CCI's BMU opened on October 23, 2006. Most of the inmates slated for transfer to the BMU were from the SHU. Although over ten hours of activities were scheduled per week, the BMU was locked down, which reduced out- of-cell activities to

none. Two of the 17 inmates who were recommended by the ICC were treated at the 3CMS level of care.

Quality Management:

Custody staff, led by the warden, was active in quality management. The institutional quality management committee met monthly rather than weekly, as it had in the past. The committee addressed a wide variety of issues and received reports from its subcommittees and from QITs. Findings spawned recommendations, which led to remedies. CCI's documentation of quality management activities, including audits, continued to yield a reliable and complete picture of the delivery of mental health treatment. The mental health subcommittee continued to function well, but meetings did not always have a psychiatrist in attendance. Case managers met monthly for peer review. Peer review included review of UHRs and focused on eight topics, many of them pertinent to suicide prevention, consistency in documentation, and individualized treatment planning.

Suicide Prevention:

Peer review done by case managers addressed suicide prevention. Cases audited under the auspices of peer review were examined to determine whether all suicide attempts had been reviewed by the treating clinician, and, if applicable, whether planned five-day follow-up was carried out.

Compliance with rounding requirements in administrative segregation and the SHU ranged from 80 percent to 100 percent. Records spanning April through September showed that rounds were compliant at a rate of 92 percent in April, 96 percent in May, 100 percent in June, 80 percent in July, 88 percent in August, and 94 percent in

222

September. Psych techs were diverted from rounds for one day to attend training in the administration of medication so that they could assume duties previously carried out by MTAs.

Staff reported that there were not enough walk-alone yards to accommodate the number of inmates in administrative segregation who required one. Inmates received two 30-minute sessions of tier time per day. Construction of 51 walk-alone yards was scheduled to begin in 2007.

Medication Management:

Medication management audits were driven by Plata requirements. Institution-wide audits of medication management included MHSDS inmates, but samples were not always large enough to serve as a basis for conclusions regarding treatment with psychotropic medication. A second limitation of audits was lack of specificity about variants or problems that were unique to certain locations. Pronounced problems at some locations were masked by the methodology or the sample size. Medication continuity remained problematic, with much variability across locations and time. Audits of medication continuity for new arrivals and intra-institutional relocations, for instance, found compliance rates of zero and 70 percent, respectively. Audits that divided results by location found that psychiatric follow-up visits were made as planned 38 percent and 73 percent of the time, depending upon location.

Baseline laboratory testing for blood levels of Depakote, Tegretol and Lithium was audited. The audit found that testing was compliant with CDCR protocols in 38 percent of cases.

A total of 32 inmates at CCI had HS orders, an unknown portion of whom

were on the mental health caseload. Staff audits confirmed that HS orders were administered after 8:00 p.m. No inmates at CCI had current Keyhea orders. Five orders expired, and one inmate with a current Keyhea order was transferred. Recent audits of the distribution of medication to inmates who paroled suggested that early in the monitoring period, the compliance rate was above 90 percent.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

A total of 55 inmates were screened for exhibitionism from April through October. Four inmates who should have been screened were missed. Two were diagnosed with exhibitionism, bringing the total number of inmates with that diagnosis to 24. Four inmates were receiving treatment of a generic type on a weekly basis. The district attorney declined to prosecute 27 of 37 cases that were referred. Eight referrals were pending, and two were classified as incomplete. Nine inmates accounted for 20 of the cases that were referred, with the number of charges ranging from two to five each.

CCI continued to struggle to provide treatment to identified exhibitionists. A form of enhanced case manager treatment was provided. The regional manager was consulted for assistance in developing a treatment program.

Transfers:

CCI referred and transferred one inmate to intermediate inpatient care at DMH.

CCI had a 15-bed OHU and regularly used two holding cells located in Unit 4B. From May through September 2006, there were 27 to 33 admissions per month to the OHU. The number of suicide watches ranged from four to 22 per month, with 22 to 29 inmates on suicide precautions each month.

From March through August 2006, 20 inmates were admitted to the OHU three times or more. There were no records of whether those inmates were considered for referral to higher levels of care. The average length of stay in the OHU from April 1 through August 31 was 6.2 days. 37 percent of all OHU stays exceeded 72 hours. Forty-one percent of the inmates referred to an MHCB were actually transferred to one. The average length of stay after transfer to an MHCB was ordered was four days.

The OHU was staffed with a full-time psychologist who was assisted by a psychology intern. A psychiatrist was assigned to the OHU only during the morning hours. Psychiatrists served a one-week rotation in the OHU and took call during that week.

Inmates remained in the most frequently used holding cells for as long as three days. The holding cells were used for suicide watch and suicide precautions. CCI did not have suicide-proof smocks. Inmates on watch or precautions were issued paper shorts and a blanket. Staff reported that at times, the temperature in the unit was uncomfortably low. Inmates in holding cells on suicide watch were observed continuously, but those on suicide precautions were checked by a nurse at 15-minute intervals. On the few occasions when two inmates were on suicide watch in the holding cells, one observer watched both. The point of observation did not have a view of a substantial portion of both cells. CCI did not use video cameras for suicide watches.

Restraints were used in a small but unknown number of cases. Documentation and practices regarding the use of restraints were inadequate. Two sources of information, a log and an audit, showed different numbers of cases. Staff audits of range of motion exercises found that documentation was missing or suggestive

225

of poor compliance. Orders for the use of restraint did not conform to accepted
guidelines for timely signatures and renewals.

Transfers to EOP institutions were not timely. A QIT was chartered to
improve compliance with EOP transfer timelines for EOP. In September 2006, staff were
instructed to consider whether expedited transfer was clinically warranted for general
population EOP inmates and to transfer all EOP inmates in administrative segregation to
a hub within 30 days.

Staff reported that the number of EOP inmates awaiting transfer fluctuated
between 15 and 45. During the monitor's visit, 33 EOP inmates were awaiting transfer.
Of these, 13 had stays that exceeded transfer timelines. Lengthy stays were attributed to
lack of beds elsewhere in 11 of the 13 cases. From January 1 through October 23, 2006,
seven inmates were transferred to a PSU, and eight were removed from the PSU transfer
list. One inmate was awaiting transfer. Staff reported that the reception center processed
over 800 inmates per month. A staff audit found that from April through September
2006, EOP inmates in the reception center were seen weekly 90 percent of the time. Staff
was aware of new requirements regarding the mental health treatment of EOP inmates in
reception centers. CCI's draft procedure established a goal of making twice-weekly case
manager contacts with EOP inmates but that goal had not yet been reached. Staff
planned to increase the frequency of contacts to five per week.

Other CAP Issues:

Group treatment was in compliance and will be resolved during the next
monitoring period if compliance is sustained. Six treatment groups with a total
enrollment of 197 were running, and two were scheduled to start in November. During

the monitoring period, 1,172 caseload inmates participated in group treatment. Five groups were cancelled in a Level I yard due to security concerns about a space previously used for meetings.

Caseloads ranged from highs of 150 to 200 in Level I and II yards down to 40 to 50 in higher security yards, administrative segregation, and the SHU. MHTS audits found that initial mental health evaluations and initial IDTT meetings were timely 90 percent of the time. IDTT meetings were not, however, always attended by a full team, as psychiatrists and correctional counselors were absent. The monitor's expert observed a meeting that was attended by a psychiatrist who was not the treating psychiatrist, a psychology intern, and a correctional counselor. Interdisciplinary discussion and participation by inmates were minimal. Confidentiality was undermined by an open door and the presence of people within earshot. C-files were not routinely available at meetings. An audit that spanned June 1 through October 7, 2006, indicated that routine referrals were on average seen in 7.3 calendar days. Staff reported that emergency referrals were seen the same day and that urgent referrals were seen within 48 hours save for rare exceptions.

Time, escort availability, and space constraints stymied meaningful clinical contacts with 3CMS inmates in high-security units. Mounting obstacles revealed by quality management audits were brought to the attention of the warden, who decreed that collaborative efforts between mental health and custody staff would be renewed and strengthened. Audits found that mental health contacts were made out of cell in a confidential setting approximately 45 percent of the time. In one administrative segregation building, use of a space that afforded confidentiality had been discontinued

due to the amount of time it took to escort inmates to the room. Instead, contacts were made in a dining room, where confidentiality was compromised by through traffic. A second time-saving procedure resulted in case managers seeing inmates in administrative segregation in their cells. Compliance with confidential contacts increased to 89 percent during a five-week period following a directive that expanded the window of opportunity for clinical contacts by 90 minutes per day.

Other Issues:

A needs assessment found that the mental health department needed 6,000 square feet of space for offices and treatment rooms for use by over 40 mental health staff distributed across all locations and levels of security. To address those needs, several steps were taken, including conversion of a visiting area and the purchase of three modular units. The mental health staff was slated to occupy a retrofitted mobile building that currently stores C-files.

The schedule of activities in the new BMU indicated that 11.5 hours of programming per week plus shower and yard time were available during step three. Restraints were not to be used when inmates were out of cell. The yard on which the BMU was located was locked down. Staff expressed the intention to have the BMU programming as soon as possible.

Regarding the heat plan, there were lapses either in implementation or in the documentation of actions taken. Lists of inmates at elevated risk during high temperatures were distributed regularly, temperature logs were summarized and reflected heat alerts and actions taken, and inmates were returned from culinary assignments. There were Stage III heat alerts at the end of July. Medical rounds were reportedly made

228

in housing units where temperatures reached or exceeded 95 degrees on July 25, but there was no documentation that medical rounds were made on July 27.

Since April 1, 2006, 547, or approximately half, of CCI's custody staff was trained in CPR, and 543 staff members were trained in first aid. Training was scheduled by birth month. Nearly all staff will have been trained by the end of March 2007. CPR and first-aid training were offered weekly. CCI used the American Heart Association's "Heartsaver First Aid with CPR and AED" and "CPR for Family and Friends" for training, a video-based curriculum with manikin practice and case discussions.

The monitor's review of incident reports related to deaths that occurred in the institution between March and September 2006 found that there were two in which CPR was administered. In one case, on March 16, 2006, a medical emergency was called in at 2:25 a.m., and the inmate was transported to the Level I clinic, where CPR commenced at 2:45 a.m. In the second case, on June 6, 2006, an inmate was observed sitting on the toilet in his cell when staff came to his cell after hearing a cell door being kicked. The inmate collapsed. Once sufficient staff was assembled, he was restrained, removed from the cell, placed on a gurney, and escorted to a clinic. Emergency room custody staff performed CPR. Both incidents raised questions regarding the appropriateness of the actions taken by first responders.

## Service Area I

Service Area I includes California Institution for Men and California

Rehabilitation Center.

### California Institution for Men (CIM)
October 16, 2006 – October 17, 2006
December 7, 2006 – December 8, 2006

Vacancies were few among mental health clinicians.

Staffing allocations for the MHCB were inadequate, with an average daily

census of 36 inmates in MHCBs. Medical records vacancies were significant, with 19 of

47 positions open, for a vacancy rate of 40 percent.

As of October 16, 2006, CIM housed 6,274 inmates, including 1,549 or

24.7 percent, who were on caseload. Among them 168 inmates, or 10.8 percent, required

an EOP level of care. There were 320 inmates in administrative segregation, including

103 or 32 percent, on caseload, 19 of whom required EOP level of care. Population

increases, often sudden due to sweeps for parole violators, exceeded physical and

operational capacity of the mental health program.

Quality Management:

The Mental Health Quality Management Committee had been meeting

monthly, with improving attendance and useful minutes. It was chaired by the chief

psychiatrist/mental health program manager. Topics covered included relevant audits,

QIT progress, peer review results, and issues in Keyhea, MHCB, and administrative

segregation.

Medication management audits had sound methodology. Results were

submitted to the medication management QIT, comprised of medical, nursing and

custody staff, for reporting purposes and resolution.

Peer review was more a team review but useful nonetheless.

Suicide Prevention:

The Suicide Prevention Committee met monthly. Custody staff was not present consistently, and minutes were incomplete.

Medication Management:

For inmates on psychotropic medications who arrived from other CDCR institutions or county facilities, in 90 percent of cases, medication was ordered within eight hours or longer periods were explained by a physician's note. For newly arriving inmates with new orders that resulted from initial screenings, first doses were received by the end of the following day in 75 percent of cases.

Medication continuity following inmate transfers to different housing areas was documented in 62 percent of cases.

Documentation of first doses of new and changed orders that were received on the same day occurred in 71 percent of cases. Providers made progress notes of medication initiations, changes, or discontinuances in 88 percent of cases.

Renewals or discontinuations of expiring medications occurred before expiration in 93 percent of cases.

In instances when the inmate failed to appear, refused one dose of Keyhea medication, refused psychotropic medication for three consecutive days, or missed 50 percent of his psychotropic medication over a seven-day period, staff documented referral for medication follow-up with a primary care physician in 62 percent of cases. Of those documented cases, follow-up counseling occurred within seven calendar days in 45

231

percent of cases.

In 85 percent of cases, staff documented non-compliance, writing their circled initials on MAR space for medication date and time entry, and reason for non-compliance on reverse side of MAR. A health care coordinator was assigned to monitor MARs biweekly for completeness and legibility of nursing documentation. Under a local operating procedure (LOP), nursing staff were notified and trained with respect on any deficiencies. Problems with the MHTS exacerbated medication management records issues.

Prior months' MARs were filed in UHRs in 96 percent of cases, but only 67 percent of entries on MARs were complete and legible.

Informed consent was obtained for each classification of ordered psychotropic medication in 85 percent of cases.

Keyhea process was problematic. Administration of HS orders was documented in 93 percent of cases

CDCR forms for pharmacy and medication supplies were signed by inmates at the time of release in 92 percent of cases.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

Logs for RVRs were incomplete. In a binder of RVRs, the monitor found two issued to 3CMS inmates on report of bizarre or unusual behavior for which mental health assessments had been requested. Other RVRs indicated "clear" mental status when in fact the inmates were on caseload. No assessment was done for one EOP inmate. There was a request to void another RVR issued for self-mutilation.

Transfers:

During the monitoring period, 91 inmates, or approximately 18 per month, were referred to DMH acute or intermediate care. As of the monitor's visit, sixty were accepted and transported to DMH, nine paroled before transport, eight had been given lower levels of care, five were on a wait list, and nine were in process. Three of the acceptances followed appeals of initial rejections. A referral coordinator and clerical staff member processed referrals. Times from referral to acceptance and transfer decreased to 26 days on average.

As of December 2006, there had been 762 MHCB admissions or on average five daily, during the monitoring period. Fifteen inmates were awaiting admission.[4] Average daily census increased from 31 to 34.6, or 16 above licensed capacity. Average length of stay increased by one day to seven days.

Of the 320 CTC admissions from October 1, 2006, to November 30, 2006, 106, or 33 percent, of them were among 58 inmates who had had three or more admissions during the preceding six-month period. The monitor's examination of some of these cases revealed that consideration of the need to refer these inmates to higher levels of care or to expedite their transfers into EOP had not been documented. Approximately 14 percent of CTC lengths of stay lasted longer than ten days. Of these, 44, or 45 percent, were referred to DMH, while the remainder was discharged to lower levels of care. Staff attributed the longer CTC stays to increased symptoms and waits for Keyhea orders and DMH acceptances.

Times for EOP transfers out of reception center decreased to 86 days on average. Early in the monitoring period, EOP arrivals were approximately equaled by transfers out. During the two-month period preceding the monitor's visit, EOP

---

[4] A gastrointestinal virus epidemic had increased CTC medical admissions.

population in reception center ranged from 133 to 182. In August 2006, 44 arrived, 39 paroled, and seven transferred. In September 2006, 50 arrived, 28 paroled, and seven transferred. At the beginning of October and November 2006, EOP reception center populations were 178 and 180, respectively. There were 17 transfers in October and 15 in November, with average stays of 92 and 85 days, respectively. In both months, eight EOP inmates transferred to DMH, and 24 and 30 inmates, respectively, paroled out before transfer. Transfer impediments included transportation difficulties and bed unavailability and population caps at receiving institutions. Often inmates awaiting transfer were not endorsed timely. In October and November, respectively, only 22 of 178 cases and 11 of 180 inmates were endorsed.

Use of holding tanks in reception center continued but not for overnight use. Average use times averaged less than five hours, with a range of one to ten hours in November 2006. Logs were incomplete but had improved by December 2006. Over nine days in November 2006, average time in a holding tank was under five hours, with a range of one to ten hours.

CIM did not track 3CMS transfers out of reception center.

Other Issues:

Reportedly, MHCB staffing was allocated for 18 beds, while the unit served 36 inmates within several different areas, including overflow areas on East yard and Cypress, and sometimes an area of the CTC. The 18 unlicensed beds plus the overflow beds were covered by diverting other staff, which hindered psychiatric attendance at IDTT meetings. From August to October 2006, Cypress housed two inmates and East yard housed up to 12 inmates at a time on three occasions. Reportedly,

234

stays there lasted up to 24 hours, and then inmates were transferred to other crisis beds.

Three to four percent of MHCB admissions were due to suicidal gestures, down from six percent two monitoring visits earlier. It was concerning that inmates were placed in CTC cells without clothing. At the monitor's October 2006 visit, one inmate was observed in his cell with only a blanket draped around his neck. On inquiry, staff reported difficulty locating a smock for this inmate. During the December visit, line staff indicated that concerns over cleanliness and clothing in the MHCB continued but that additional smocks had been ordered and a retrieval problem with the laundry had been addressed.

There were increased efforts to improve MHCB treatment process including a daily report between mental health and custody and custody staff attendance at IDTT meetings. Efforts to improve clinician access to inmates were less successful. More custody staff was needed for escorts of MHCB inmates. Staff reported that problems with escorting inmates to confidential interview areas resulted in at least 75 percent of clinical contact occurring at cell-front.

The monitor's expert's review of IDTT meetings found that they were problematic in several respects. Discussions of diagnoses and treatment planning were inadequate. Staff confirmed that psychiatrists, social workers, and psychologists assessed inmates in only about 40 percent of meetings. Data indicated that from November 6 to November 30, 2006, social workers assessed their caseload inmates before meetings about 70 percent of the time, psychologists about 76 percent, and psychiatrists about 90 percent. Health care records were absent frequently. When available, information on previous hospital stays was missing for several months following discharges from crisis

care, as confirmed by case reviews.

CIM continued to provide enhanced care to high-risk EOP inmates, who were not receiving group therapy and whose referrals to psychiatry were often delayed by several weeks. Each such case was assigned a psychologist for a weekly contact, to expedite transfer, etc. Most reported seeing their clinicians once per week and receiving medication at their cells. They reported out-of-cell time as typically a half hour at breakfast and at dinner and yard time of one to two yours every four days. Yard was frequently cancelled for severe heat or following fights, which had been frequent.

Efforts continued to complete a tracking log for reception center EOP inmates but were hampered by a vacancy in the office tech position, leaving correctional counselors to complete data entry. Tracking was not automated, requiring correctional counselors to obtain information from various sources and sidetracking them from transfer processing duties. As a result, endorsements from CIM slowed significantly.

In administrative segregation, efforts to improve mental health treatment continued. The unit received inmates from California Rehabilitation Center, adjacent camps, and previous SHU inmates returning from parole. Custody and clinical relationships and improvement efforts were affected by a population over 100-percent capacity, physical plant limitations, and staffing shortages. Consistently, there were over 25 EOP inmates and 80 to 100 3CMS inmates awaiting transfer. Clinical staff consisted of 2.5 psychologists, three psych techs, .5 psychiatrists, and a senior supervising psychologist who oversaw clinical operation. Two custody mental health escorts provided access. Clinical activity logs from May to September 2006 showed that 99.6 percent of inmates had weekly contacts. Weekly contacts in a confidential setting

occurred for 70 percent of EOP inmates and 55 percent of 3CMS inmates. To reduce refusals, a new procedure was initiated in mid-June 2006 that required the senior supervising psychologist or his designee to complete an extra early morning round, before the start of psychology and psychiatry lines, to verify inmate attendance at scheduled appointments. Those who refused received an immediate cell-front visit by the senior supervising psychologist or his designee. The refusal rate dropped from 54 percent to 29 percent. A work group to improve strained relationships between custody and mental health found that the problem was related largely to increased administrative segregation population and physical plant. By the December 2006 site visit, problems appeared to be limited to a small number of staff. Weekly meetings stopped since the monitor's October 2006 visit.

Medical records filing improved with ongoing accountability measures for filing loose materials and chart availability. Clinical notes were often marginal and lacking in content. Case reviews found significant use of checklist forms to document clinical interactions. Records of inpatient placements were often in separate inpatient files. Average daily filing backlog in August and September 2006 was three to four days' worth although staff reported higher figures. Deliveries of requested UHRs improved, with a compliance rate of 84 percent, or 7,835 out of 9,303, except during August and September 2006 in the MHCB unit which had a compliance rate of only 39 percent. In some cases, UHRs had not come in for newly arriving inmates or were ducated to another during IDTT meetings. For parole violators returning to custody, UHRs were often unavailable for several weeks while charts were shipped to case records south from the paroling institution before being forwarded to CIM.

237

Staffing deficiencies and long-term sick leaves led to lags in data entry, appointment ducating, and tracking. Supervisors assumed tracking duties until staff returned. In October 2006, a clerical supervisor was added to improve tracking the roughly 70,000 annual mental health contacts. Medical records staff were cross-trained to assist with the MHTS in a more versatile fashion.

Discharge planning continued to lag behind, with relatively few inmates leaving with parole plans.

The emergency response review committee met in August and September 2006 with good attendance. Minutes lacked content and continuity from meeting to meeting.

The monitor's inspection found sealed personal protective equipment (PPE) kits in the housing units. CIM correctional checked housing units monthly to ensure that the PPE kit seals were intact. Results were documented and reported to the facility captain, who forwarded them to the in-service training office. All officers surveyed by the monitor had micro-shields available and knew whom to contact if a PPE kit had been opened.

### California Rehabilitation Center (CRC)
October 12, 2006 – October 13, 2006

California Rehabilitation Center's supervising psychiatrist and psychologist positions were filled. Among the 1.5 line psychiatrist positions, one was filled. With coverage by contractors, the functional vacancy rate for psychiatrists was 15 percent. Nine of ten psychology positions were filled. Use of contractors lowered the functional vacancy rate for psychology positions to six percent.

The sole psychiatric social worker position remained vacant, with no

coverage by contractors. The sole psych tech position was filled.

Five of the six full-time-equivalent office tech positions were filled, and a recent hire was slated to fill the sole vacancy. The senior MTA position was filled. Staff MTAs were down by 5.82 out of 26.82 positions, for a vacancy rate of 22 percent.

All pharmacy and senior nursing positions were staffed. RNs were understaffed, with nine of 28 positions open, for a vacancy rate of 32 percent.

CRC housed 4,748 inmates of whom 1,017 were 3CMS inmates, which exceeded capacity by 118. There were no EOP inmates.

Quality Management:

Quality management infrastructure was in place, with documented monthly meetings of the quality management committee, mental health quality management committee, and suicide prevention committee. Progress was held back by lack of full participation.

A QIT on non-compliance had improved psychiatric participation but lacked medical participation. Peer review was in place for psychologists but not for psychiatrist or social workers due to low numbers.

Suicide Prevention:

The suicide prevention committee held documented monthly meetings and functioned effectively. CRC completed its suicide prevention policy and procedures, which included amending the suicide prevention plan to include OHU officer duties, personal property for inmates on suicide watch, and retrofitting an OHU room for suicide monitoring. The suicide prevention committee recommended meaningful changes to the suicide prevention policy including OHU officers' duties and allowances of inmate

personal property.

Inmates on suicide watch were placed on direct observation by a certified nursing assistant. Video monitoring was not used. Documentation of certified nursing assistant training for suicide watch was inadequate

There was one serious suicide attempt by an MHSDS caseload inmate who was housed in the OHU for medical reasons. He attempted to hang himself in a bathroom in one of the housing units following release from the OHU. Incident reports as to whether this inmate made suicidal statements after his OHU discharge were contradictory. An investigation of this attempted suicide was initiated. Information concerning this attempted suicide has been referred to the Special Master's expert on inmates' suicides and deaths.

Medication Management:

Continuity of medication for newly arriving inmates was partially compliant. Audits found that 100 percent of inmates received medication within 24 hours of arrival. The monitor's review of inmate files found a 75-percent compliance rate for male inmates and a 95-percent compliance rate for female inmates, but that may have been due to the untimely filing of MARs.

Medication continuity upon housing transfers was not audited by CRC, although inmates did not report such disruptions.

Compliance with medication renewal remained resolved. The monitor's review and inmate interviews found no gaps or frequent medication changes. Documentation of rationale for changes in treatment and medication improved.

Although non-compliance with psychotropic medication remained

problematic, CRC had a good system for identification, referral, and follow-up. The chief psychiatrist reported that inmates who were caught cheeking Seroquel or Wellbutrin were referred and offered the options of crushed, changed, or no medication.

An increase in the number of pill lines from three to five, with one for women and four for men, decreased lengths of lines but not the rate of non-compliance. Inmates reported waits of 20 to 30 minutes.

No audits had been performed on laboratory testing for inmate blood levels of psychotropic medication. The monitor's review of records did not reveal sufficient information to draw conclusions on compliance in this area.

CRC was non-compliant with obtaining informed medication consent forms from inmates. Institutional audits were flawed. Inmate reports suggested some improvement in this area although it varied by psychiatrist.

CRC partially complied with DOT protocol. No institutional self-audits had been performed. Inmates reported that custody officers routinely performed DOT at pill lines. During the monitor's visit, the chief psychiatrist clarified that DOT was ordered only for inmates who had histories of non-compliance or hoarding.

No inmates at CRC were on Keyhea orders. No 3CMS inmates were on HS medication orders, although they were clinically indicated in many cases. Many inmates reported sedation after receiving their evening dosages. Evening pill lines occasionally extended past 8:00 p.m.

CRC continued to provide medication to paroling inmates, but it had not audited this area.

241

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

CRC had achieved compliance in this area, which was resolved and not reviewed during the monitor's visit

Transfers:

CRC did not refer inmates in need of acute or intermediate inpatient care directly to DMH but to CIM and California Institute for Women.

Five of the 24 inmates the OHU were referred to MHCBs, with one inmate referred twice, during the monitoring period. All were referred within 72 hours of admission except one, who was referred on the fourth day. Transfers took from one to eight days following referral, but all transfers occurred within 24 hours of acceptance. Dates of acceptances were not tracked. Four EOP inmates were transferred to CIM, 12 were returned to their dormitories, one remained in the OHU for medical treatment, one was moved to CIM, and one had no discharge information. While in the OHU, inmates were seen five days per week by a case manager and received psychiatric responses to referrals.

CRC referred eight female and 42 male EOP inmates to CIM and California Institute for Women timely and tracked them while there. Time for endorsements averaged eight days from referral. Once endorsed, transportation was at the discretion of CIM and California Institute for Women. All of the women and 38 of the men were transferred or paroled within 60 days or before the deadline had passed.

Other Issues:

Heat plan-operation deteriorated. The monitor's review of heat logs and reports for May through September 2006 found that indoor unit temperatures often

reached 104 to 107 degrees. Stage III alerts lasted from six to ten hours. Inmates reported not being informed of heat alerts and not being returned indoors during extreme heat. Some inmates reported that if they tried to reenter the building with their heat cards, some officers refused them. Reportedly, the previous practice of conducting yard during the evening had been abandoned.

Extremely hot indoor conditions and inconsistency in cooling measures were also reported. Medical rounds were not performed consistently during Stage III heat alerts. An autopsy was pending for one 3CMS inmate on heat-sensitive medication who died during a heat alert on a 105-degree day. The stated cause of death was cardiac arrest, but no autopsy report was furnished to the institution. Logs showed that temperatures did not reach Stage II but were unreliable. It was unknown whether he was outdoors on the day in question. Information on this apparently heat-related death has been referred to the Special Master's expert on inmates' suicides and deaths.

### Service Area J

Service Area J includes Richard J. Donovan Correctional Facility, Ironwood State Prison, Calipatria State Prison, Centinela State Prison and Chuckwalla Valley State Prison.

### Richard J. Donovan Correctional Facility (RJD)
August 18, 2006
September 20, 2006 – September 21, 2006
November 13, 2006 – November 14, 2006

RJD slightly reduced its rate of vacancies in mental health positions and continued to utilize contractors effectively. Staff reported that 20 percent of mental health positions, or 23.5 of 115.5, were vacant in September 2006. All supervisory positions but one, a senior psychologist slot, were filled. All clerical positions were also filled.

243

Positions for a half-time staff psychiatrist, 8.5 clinical psychologists, one psych social worker, seven psych techs, and 2.5 recreation therapists were vacant.

In June 2006, following the conversion of one of its general population yards to a reception center, RJD received funding for additional staffing, including five clinical psychologists and a staff psychiatrist. RJD filled some of these new positions and increased the use of contractors throughout the reporting period to cover unfilled positions. By August 2006, contractors more than covered all staff psychiatrist, clinical psychologist, and psych social worker vacancies. Staff reported that contract LVNs covered vacant psych tech positions. However, LVN contract hours were not tracked. Vacant recreation therapist positions were not covered by contractors.

The staffing package for the new reception center also included eight registered nurses, a senior MTA, seven MTAs, a pharmacist I, two pharmacy techs, and a health records technician. Vacancies among RNs increased as allocations rose from 34.51 to 43.21, with 12.21 positions unfilled. Two of the vacant positions were covered by contractors. MTA vacancies significantly increased, with 20.5 of 42.5 positions vacant and six MTAs on extended leave. Contractors reportedly provided the equivalent of 32 FTE positions, more than covering all vacant MTA positions. Three of four pharmacist positions were filled, as were three of 8.4 pharmacy tech positions. Four pharmacy tech positions were hired for a limited term, which was due to expire in January 2007. Updated information regarding medical records staffing was not provided.

In November 2006, RJD's overall census was 4,737 inmates. The caseload population was 1,723, or 36 percent of the prison's population. There were 957 caseload inmates in general population, including 672 3CMS inmates and 285 EOP inmates. There