were 576 caseload inmates in the reception center, including 494 3CMS inmates and 82

EOP inmates. There were 352 inmates in administrative segregation, including 120

3CMS inmates and 56 EOP inmates. The MHCB held 13 patients.

Issues Resolved:

> The number of MHCB admissions that lasted longer than ten days was not
> excessive.

> Inmates were no longer subjected to excessively long pill lines.

Quality Management:

> RJD's health care quality management committee met weekly during the

monitoring period. Meetings were generally well attended. The mental health quality

management subcommittee also met weekly. The associate warden for health care

regularly attended the weekly meetings; other custody staff intermittently participated on

an as-needed basis. Staff reported and meeting minutes confirmed that both meetings

served as useful forums for addressing systemic issues impacting RJD's mental health

program.

> The institution audited most unresolved CAP items and components of

medication management. RJD had a number of active QITs, most of which functioned

like standing committees tasked with developing, implementing, and monitoring

strategies to resolve noncompliant CAP items.

> Peer review for psychiatrists was established but was in the early stages of

development. Psychologists and social workers did not engage in peer review.

> The MHTS served as the basis for many audits and was used to track

mental health contacts in all MHSDS programs. Staff continued to rely on supplemental

automated systems to maintain an EOP group roster and to track completion of IDTT

meetings, treatment plans, and mental health assessments. Due to attrition among clerical staff, data entry lagged in some areas, averaging 16 days for EOP group participation and 24 days for mental health contacts in the reception center. The accuracy of MHTS data related to EOP group participation reportedly improved during the monitoring period.

Suicide Prevention:

The suicide prevention committee met monthly and kept minutes. Meetings were poorly attended in that custody staff was typically represented by one person. The meeting format was not consistent with the statewide protocol and mandated review items were not consistently addressed. RJD's March 2003 local operating procedure governing the structure and function of the suicide prevention committee was inconsistent with the statewide protocol.

RJD did not screen all non-caseload inmates admitted to administrative segregation. The monitor reviewed 22 UHRs belonging to non-caseload inmates recently placed in administrative segregation. Nine, or 41 percent, of the UHRs did not contain screens.

RJD implemented parts of CDCR's new plan to reduce suicide risk in administrative segregation. During an inmate's first three weeks in administrative segregation, a paper sign that identified him as being on "intake" status was attached to the cell door. Staff reported that 30-minute welfare rounds were conducted on all inmates on intake status. The completion of welfare rounds was not documented, and compliance with this new requirement could not be confirmed.

Medication Management:

Most areas within medication management improved, though the

institution's continued use of small sample sizes and brief audit periods sometimes compromised the reliability of performance statistics. For example, an audit that spanned two weeks in June and July 2006 showed that nine of twelve new arrivals from other CDCR prisons received medications within 24 hours. Over 90 percent of 80 inmates arriving from county jail during two weeks in May 2006 received medication within 24 hours. A limited audit of intra-institutional transfers found a drop in performance. Medications were continued within 24 hours for 35 of 48 inmates transferred within the institution during five days in May 2006, generating a compliance rate of 73 percent. A similar audit in March 2006 yielded a compliance rate of 83 percent. Medication continuity was sustained when inmates were discharged from the CTC. An audit of all inmates discharged from the CTC to housing units within RJD during May 2006 found that 20 of 21 inmates were administered medications within 24 hours of discharge.

Timely renewal of medication orders improved. In May and June 2006, the institution reviewed 74 MARs for inmates whose medication orders were due to expire. In 64, or 86 percent, of these cases, distributions of medications were not interrupted.

Medication non-compliance was referred to mental health on a more consistent basis. Staff's review of MARs in May 2006 identified 48 cases in which an inmate refused medication for three consecutive days, missed half of prescribed doses during a seven-day period, and/or engaged in hoarding or cheeking. Staff found that 41 of 48, or 85 percent, of these cases were referred to mental health. The audit did not look at whether or not staff responded to the referrals.

Inmates no longer waited in pill lines for excessive periods of time. Staff

observed three pill lines in July 2006. The median wait time was seven minutes, with the longest wait at 22 minutes.

Staff reports and UHRs reviewed by the monitor's expert indicated that blood levels of inmates on mood-stabilizing medications were monitored appropriately in most cases. Laboratory results belonging to reception center inmates were not always obtained in a timely manner.

Institutional audits found that DOT requirements were not consistently followed. The bottom of the pill cup and the inmate's palms and mouth were not checked in about a quarter of the 65 DOT cases observed during the monitoring period.

Keyhea orders were closely monitored and timely renewed. Six Keyhea petitions were successfully renewed during the monitoring period. Two Keyhea petitions were not pursued on advice of CDCR counsel. Two inmates were transferred from RJD prior to completion of the petition process. At the end of August 2006, there were 14 inmates at RJD with current Keyhea petitions in place.

HS medications, which were widely prescribed and administered on all yards, were sometimes distributed before 8:00 p.m. An audit in mid-July 2006 found that two of 12 observed HS pill lines started before 8:00 p.m.

Staff obtained informed medication consent from inmates on an increasingly consistent basis. An audit of 115 UHRs in June 2006 found that 84 percent of prescribed psychotropic medications were accompanied by current and signed consent forms, up from compliance rates of 80 percent in December 2005 and 70 percent in September 2005.

A small audit indicated that parole medications were provided on a

consistent basis. Five of 33 inmates released from RJD during the last week of May 2006 did not sign for prescribed parole medications. It was not clear from the audit results if the parole medications were unavailable to give to the inmate or if the inmate refused to sign for the medications.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

RJD issued no RVRs for indecent exposure during the monitoring period, and staff reported no inmates at RJD with a diagnosis of exhibitionism during the monitor's visit in September 2006. However, the monitor's expert reviewed a case in which a 3CMS inmate in administrative segregation was evaluated and diagnosed with exhibitionism (see Exhibit U, Case Review 7). Managers, apparently unaware of this case, acknowledged that RJD did not have any clinicians who were qualified to provide treatment for exhibitionism.

Transfers:

RJD revitalized its process for monitoring high-risk inmates and referred inmates to all DMH programs during the monitoring period. However, access to DMH programs was often slow and was reported to be particularly difficult for high-security inmates with both medical and mental health illnesses. The log of referrals to DMH was incomplete and difficult to understand.

Staff reported adequate access to APP at DMH. However, referral data suggested that access to acute care remained sluggish. During the monitoring period, RJD generated 13 APP to DMH referrals. Four APP at DMH referrals were rescinded by the institution, and one was rejected by DMH's clinical assessment team. Eight patients were accepted by APP at DMH but waited an average of two weeks to be transferred.

Staff reported that DMH's processes for reviewing and routing referrals to intermediate care were inefficient.  Referrals that were either rejected or wait-listed by one DMH intermediate care program were often redirected to one or more other intermediate care programs. Rerouted referrals were burdensome for prison staff in that they usually required several telephone calls, additional paperwork, and, in some cases, redundant due process proceedings. These additional tasks slowed access to DMH intermediate care.

Access to SVPP was most problematic. Only 40 percent of referrals to SVPP resulted in transfer. The average time lapse between referral and transfer was over three months. Access to the intermediate care programs at CMF and ASH was relatively quick, usually taking less than two weeks. However, a substantial number of the inmates transferred to these programs were first referred to another intermediate program.

In all, 29 patients were referred to intermediate inpatient care at DMH during the monitoring period. Nineteen, or 66 percent, of these referrals resulted in transfer, and three referrals were pending transfer in November 2006. The remaining seven referrals were either rescinded or involved patients who transferred to another CDCR institution or paroled prior to being sent to DMH.

The licensed CTC had 15 beds that were used for MHCBs. Staff reported having adequate access to MHCBs, and temporary holding cells were reportedly not used to monitor patients waiting for MHCBs. However, the monitor's expert continued to find decompensating inmates in administrative segregation, indicating that staff sometimes failed to make clinically indicated referrals to the MHCB (see Exhibit I, Case Reviews 1, 2).

About a quarter of the admissions to RJD's MHCB exceeded ten calendar days, a rate that has remained fairly constant since July 2003. From April 1 to September 12, 2006, there were 199 discharges from the MHCB, or an average of 37 a month. Lengths of stay exceeded ten calendar days in 51, or 26 percent, of these cases. Six inmates were clinically discharged within ten days but were retained in the MHCB for administrative reasons. Explanations for other stays that lasted longer than ten days were not provided. However, a study completed by the institution in 2005 found that the reasons for excessive length of stay in MHCBs fell into four categories: 41 percent involved inmates who needed a few extra days to stabilize before returning to EOP; 31 percent involved inmates pending admission to DMH; 11 percent involved inmates who threatened suicide whenever discharge from the CTC was discussed or imminent; and 17 percent were due to other reasons, including Keyhea proceedings and impending parole.

MHCB admissions that lasted longer than ten days were closely tracked by the institution and were routinely authorized by the chief psychiatrist or designee in accordance with Program Guide requirements.

Staff expressed no concerns regarding psych and return protocols.

Contrary to CDCR policy, transfers to PSU were postponed by district attorney referrals and disciplinary hearings. In one case reviewed by the monitor, an inmate was endorsed to the PSU at PBSP in mid-May 2005. His transfer was postponed pending the outcome of a district attorney referral and adjudication of an RVR. While waiting to be transferred, he received additional RVRs, and his SHU term was extended from late March 2006 to late January 2007. As of September 2006, re-endorsement to PSU was pending the completion of yet another district attorney referral and disciplinary

hearing. At that point, this inmate had been waiting to be transferred to a PSU program for over 16 months.

From early April to early September 2006, four inmates were transferred to the PSU program at CSP/Sac. The tracking paperwork did not provide the information needed to calculate the number of days between PSU eligibility, i.e., EOP level of care and SHU term, and PSU endorsement. The endorsement date was not provided in one case. In the remaining three cases, the delays between endorsement and transfer were 123 days, 67 days and 49 days, respectively.

RJD did not meet transfer timelines for 3CMS and EOP inmates in the reception center. During the second quarter of 2006, 46 percent of EOP inmates remained in the reception center longer than 60 days, and 25 percent of 3CMS inmates had lengths of stay exceeding 90 days. Only four of 19 EOP inmates identified as needing expedited transfer left RJD within 30 days. In mid-November, RJD's reception center housed 127 EOP inmates, 47 of whom had been there longer than 60 days. Reasons for excessive lengths of stay included statewide overcrowding and missing and expired medical screening and mental health placement chronos.

Other CAP Issues:

            a. Partial Compliance

General population EOP treatment continued to improve. A QIT was chartered to identify the barriers to providing ten therapeutic activity hours a week. The team's final recommendations, issued in November 2006, cited custody-related cancellations as the most significant barrier to consistently reaching the ten-hour goal, followed by mental health staff absences and MHTS tracking inaccuracies. RJD

increased the number of scheduled groups, implemented a more reliable coverage system for clinician absences, and was in the early stages of establishing an educational program in EOP. RJD's strategy for addressing program cancellations related to correctional officer shortages and lockdowns was vague, consisting of unspecific efforts to improve coordination between custody and mental health staffs.

The amount of treatment offered to and received by EOP inmates continued to increase. On average, each inmate was offered 10.25 hours per week by August 2006, up from 9.82 hours in mid-February 2006. The average amount of treatment actually received rose from 6.36 hours per week during the first quarter of 2006 to 7.76 hours during July and August 2006. The problem will be resolved if compliance is sustained over six consecutive months.

The monitor's expert attended a community meeting, four group sessions, and an IDTT review within the general population EOP program. The group activities were well run and elicited active participation from participants. The IDTT demonstrated a useful team treatment planning approach. Inmates participating in the community meeting complained about inadequate access to dayroom and yard.

In administrative segregation, the EOP caseload population remained below the mandated capacity of 63. EOP inmates were seen weekly by a case manager, although there continued to be no record of cell-front versus out-of-cell sessions. UHR audits from April to July 2006 found that 96 percent of EOP inmates were offered weekly case manager contacts. MHTS data from the same period generated a 91 percent compliance rate for weekly contacts. Inmates refused 55 percent of the offered contacts.

UHR audits from April to July 2006 found that 96 percent of 3CMS

253

inmates in administrative segregation were offered weekly case manager contacts. MHTS data from the same period generated a compliance rate of only 80 percent, reportedly the distorted result of tracking anomalies. Almost a third of offered contacts were refused by inmates. Half of all completed contacts occurred at cell-front due to a combination of high caseloads, inadequate escort support, and an insufficient number of holding cells. There were ten 3CMS inmates in the administrative segregation overflow unit, none of whom had access to outdoor yard.

The monitor's expert noted that the holding cells in all administrative segregation units were small, lacked seats, and afforded insufficient visual and auditory privacy, all conditions that discouraged inmate participation in treatment.

RJD improved its performance in following up caseload inmates in the reception center, though flawed audit methodology prevented a precise assessment of the degree of improvement. MHTS audits from the second quarter of 2006 found that 94 percent of EOP inmates had weekly contacts and that 97 percent of 3CMS inmates had quarterly contacts. All "individual" interviews with mental health staff were counted as case manager contacts, which likely inflated these compliance percentages. In contrast, only four of eight UHRs reviewed by the monitor in September 2006 documented quarterly case management of 3CMS inmates in the reception center.

The availability of treatment groups in the reception center also improved. During May and June 2006, 27 EOP group sessions were completed, with an average of three to four groups a week. During this period, an average of one 3CMS group a week was offered in the reception center. Data provided by the institution did not indicate how many caseload inmates participated in the groups.

254

b. Non-Compliance

Institutional audits found that one quarter of the UHRs requested for scheduled mental health appointments during May and June 2006 were not available. Most of the time, health records staff did not know where the unavailable records were located. Medical records staff was unable to keep up with loose filing, which consistently measured more than nine feet. Most mental health paperwork, considered a priority, was reportedly filed in the UHR within two to three days.

Other Issues:

Implementation of the heat plan at RJD improved in some areas and slipped in others. A July 2006 audit and the monitor's tour of housing units in September 2006 confirmed that current heat lists were distributed to housing units. Heat-alert posters were displayed in housing units, and centralized temperature logs were maintained. An institutional audit found that psychiatrists did not consistently distribute heat cards when ordering heat-sensitive psychotropic medications. Monthly heat-incident reports were not compiled and sent to DCHCS during the monitoring period.

Housing units toured by the monitor in November 2006 had on hand required emergency response equipment, including cut-down tools, ambu bags, extra microshields, and PPE kits. Interviewed correctional officers carried micro-shields. The monitor's review of incident reports indicated that emergency responses were sometimes inadequate in that responding staff did not immediately initiate CPR (see Exhibit U, Case Reviews 8, 9, 10).

Work groups focused on two critical issues: the high rate of program cancellations within the general population EOP program and RJD's excessively high

255

threshold for referring inmates to higher levels of care. Each work group met twice prior to the monitor's first visit in September and achieved demonstrable progress by the time of the monitor's second visit in November.

.          Staff reported that the MHTS more reliably tracked offered and received program hours for general population EOP inmates, and MHTS data from the third quarter of 2006 indicated that both performance measures had improved. The institution planned to reclassify certain clerical positions in order to increase salaries and augment supervision. This was a work group recommendation designed to reduce staff turnover and sustain the reliability of MHTS tracking.

          With regard to improving access to higher levels of care, the work group proposed enhancements to progress notes and records used by custody staff to document the daily activities of high-risk inmates. Clinical supervisors periodically completed rounds in EOP buildings, and clinical staff received training regarding DMH referrals. RJD's existing program for tracking high-risk caseload inmates was reorganized into five subcommittees, each focused on a single component of the mental health program. In September, the monitor's expert attended a high-risk committee meeting for the general population EOP program and found it to be an effective means to identify and manage decompensating inmates. However, the monitor's expert also found decompensating inmates in administrative segregation, indicated that still more needed to be done to promote and implement an appropriate threshold for referring inmates to higher levels of care.

### Ironwood State Prison (ISP)
Paper Review

.          New psych tech vacancies caused a staffing decline. The two psychiatry

positions were filled and a consistent set of three contractors essentially covered the one psychologist position. Only one of the three psych tech positions was filled, and clerical staff turnover had an impact. ISP expected to begin the hiring process for a senior psychologist and senior psych tech in January 2007. MTAs, LVNs, and the pharmacy were fully staffed, and RN positions were 90-percent filled.

There were three administrative segregation 3CMS, eight mainline 3CMS, and no EOP inmates at the time of the paper review.

Issues Resolved:

IDTTs were held timely and with good composition.

Administrative segregation case management took place weekly in a private setting.

Daily administrative segregation rounds were completed consistently.

Quality Management:

Quality management structures were employed toward CTC licensing but did not seem to serve mental health or suicide prevention purposes. The local governing body met for the first time in two years. The quality management committee met monthly or semimonthly. Its membership was a broad range of disciplines including mental health; actual attendance was erratic early in the monitoring period and not captured subsequently. It focused on the many requirements attendant to CTC licensure. QITs were described as working on suicide follow-up and several medication issues, but they showed little forward progress. There was no mental health subcommittee.

Peer review seemed unlikely given the small department, and promised documentation did not materialize.

Suicide Prevention:

        Minutes indicated that the suicide prevention committee met for only half of the monitoring period, and there seemed to be limited suicide-related discussion. Almost no one outside the mental health department participated.

        Administrative segregation screenings needed attention. They were missed 23 percent of the time.  Another 17 percent were late by one day to three weeks, according to the monitor's analysis. No oversight or attempts to improve performance were apparent. Staff did use the MHTS suicide tracking function, printing inmate profiles for screening and recording helpful narrative.

        Custody staff attempted to double-cell administrative segregation intakes quickly and described good practice regarding welfare checks, but a sample week of documentation showed repeated gaps of several hours. All interviewed officers had micro-shields.  Cut-down kits, ambu bag, and PPE kits were easily accessible in each housing unit reviewed. Inventory practice was erratic but demonstrated that equipment was generally checked and available. IST printouts did not clearly show whether sufficient numbers of staff were trained in CPR. Some officers were knowledgeable, although few had experience.  One officer's apparent attitude toward the obligation was concerning.

        There was a completed suicide for which corrective action was needed. The DCHCS review described a flawed emergency response that included delays and incorrectly used equipment. There appeared to be no internal reviews and little attempt to improve practices. Emergency drills occurred on all watches with scenarios that included hangings and use of CPR. Continued delays in officers initiating CPR were apparent in

this documentation.

Medication Management:

Staff described extra measures for some medication practices, but effectiveness was undemonstrated, with DOT the only practice audited to date. Staff said inmates arriving on psychotropic medications usually received a same-day psychiatry assessment. A QIT was chartered to examine medication continuity on housing moves, although described practice was likely adequate for Coleman purposes. A policy to require referral on each instance of medication non-compliance was also newly promulgated.

Pharmacy staff required consent forms before dispensing medication, and mental health staff also exercised oversight, according to staff report. There was no need for lab testing as no inmates were prescribed mood stabilizers during the monitoring period, staff said. All psychotropic medications were prescribed DOT. Medical and nursing supervisors conducted thorough checks of the administration of DOT and nurse-administered medications.

Staff did not describe any process to ensure that Keyhea inmates would be identified on arrival but reported there were none during the monitoring period. Leadership asserted that there was no need for HS orders.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

Mental health input into the disciplinary process seemed to have little impact. Of the 1,909 RVRs written, 11 were issued to MHSDS inmates. All received mental health assessments. Another 13 general population inmates were referred to mental health, but almost all were indecent exposure cases; only two were for bizarre or

259

uncharacteristic behavior.

Mental health staff found that mental illness may have affected the conduct in eight instances. The monitor read these RVRs; inmate interviews were common and clinician input was of varied utility. Hearing officers mentioned the input in only one case and made no link to the outcome. A tracking table, however, indicated that hearing officers dismissed cases or reduced penalties in at least half of the relevant cases, and staff assessed that the input was taken into account in almost every instance. The basis for these conclusions was unclear.

The ten sexual misconduct RVRs received mental health assessments, but no other screenings, evaluations, or IDTT reviews were apparent. In two assessments, staff indicated the inmate needed treatment for this behavior. Staff reported there were no RVRs related to self-injury.

Transfers:

ISP did not refer inmates directly to DMH. ISP had no infirmary or MHCB. Staff expected the CTC to reopen in fall 2007 after renovation and licensure. All inmates needing OHU or MHCB care waited in the clinic or offices, where they were observed but unconfined, until transferred to Chuckawalla Valley State Prison generally within an hour, per staff report.

Chuckawalla Valley State Prison and ISP documents differed as to the number of OHU inmates and lengths of stay. Either 24 or 31 ISP inmates went to OHU in the eight-month monitoring period, and all reportedly were referred to MHCB. All such referrals were initiated timely. ISP documents were inconsistent with one another, but between 30 percent and 50 percent reached MHCB timely, and several more were only a

day or two late. The remaining stays were very lengthy, with several exceeding two weeks and the longest being 57 days. Transportation was timely, and no other causes were noted. Only one referral was rescinded.

Staff did not track or examine the care they delivered in OHU. They reportedly provided one-to-one suicide watch. They said there had been no involuntary administrations of medication and one application of restraints.

Inconsistent population lists raised concerns about whether there was sufficient oversight of the mainline MHSDS population. However, inmates transferred timely or were paroled within that window in those entries that were complete.

All inmates on-site in December 2006 were within time frames. There had been four EOP inmates and 15 administrative segregation 3CMS inmates previously on-site. Mainline 3CMS numbers ranged from 42 to 88. Either seven or 16 of the 3CMS inmates were inappropriately transferred to ISP. They also transferred within their shortened time frame.

There were no extended stays for the 26 MHSDS inmates who lived in administrative segregation during the monitoring period. However, in a December 2006 census, three of five 3CMS inmates had lived there longer than 90 days.

Other CAP Issues:

a. Partial Compliance

EOP inmates generally received weekly contact while they awaited transfer. Of the five such cases, four had consistent contacts, and the other appeared to have been overlooked throughout his time as an EOP.

261

b. Non-Compliance

During the monitoring period, ISP did not have a mechanism in place for five-day follow-up of suicidal inmates released from OHU or returned from MHCB, although reportedly this was rare, and follow-ups were not documented in the UHRs. ISP did not provide information about suicide follow-up in the subsequent monitoring periods.

### Calipatria State Prison (CAL)
Paper Review

Staffing appeared to be nearly identical to that of the last several years, though contracting was somewhat better. There were 1.5 psychiatry positions, with one half vacant and not covered by telemedicine or contracting. For psychologists, there were three positions allocated, and contractors covered the one vacancy. Only half of the six psych tech positions were filled.

Clerical positions were fully staffed, as were all 19.5 RN positions. Just over half of the 26 MTA positions were vacant. The pharmacy was allocated three positions; there was a single lab position and seven employees in medical records. Contractors provided about half coverage for the pharmacy and fully covered the lab at times but provided help for medical records only recently and almost no relief to nursing staff. Custody staff had an 11-percent vacancy rate, taking into account vacancies and leaves.

At the time of the paper review, there were 23 3CMS on the mainline, two EOP mainline inmates, four administrative segregation 3CMS, two administrative segregation EOP inmates, and one OHU inmate, for a total MHSDS population of 33. Staff found that a higher number of inappropriate transfers, increasing INS holds, and the

vulnerable SNY population contributed to larger MHSDS populations.

Issues Resolved:

> Since CDCR policy now permits institutions to discharge MHCB inmates back to CAL, rather than requiring transfer to a treating institution, that CAP item may be treated as resolved.

> Inmates arrived at CAL with adequate health care records.

Quality Management:

Staff conducted no routine audits during the monitoring period. An interdisciplinary mental health subcommittee met twice monthly. The group largely drafted operational procedures in anticipation of implementing new requirements and in response to identified problems. In some cases, it used the QIT structure to do so, although the QITs did not seem to have custody and nursing representatives when their expertise was needed. Problem-solving activity was not apparent. The suicide prevention committee met monthly but had poor participation outside of mental health staff, and its operations were unclear. There was no indication of a local governing body, quality management committee, or peer review. Given the small department and MHSDS population, this may be a sufficient structure, but the existing committees needed to strengthen their activities.

Suicide Prevention:

It appeared that the 23 inmates eligible for suicide five-day follow-up received daily clinical contact, with a few exceptions concluding early, although documents were not fully clear. Staff also reported following for five days inmates of concern even if they did not require OHU treatment. It is troubling that the monitor has never seen evidence of custody follow-up or oversight of those procedures. Clinical staff

made some use of the MHTS suicide tracking function.

Administrative segregation officers said they attempt to house new arrivals with cell mates in the most visible cells. Expected forms were posted, and staff was familiar with welfare check requirements, but documents contained lengthy recording gaps and raised the possibility of missed cases. Staff demonstrated routine inventory checks, but missing equipment sometimes was not replaced for extended periods. Cut-down kits, ambu bags, and PPE kits were available on the units. Some staff did not carry their micro-shields, though some were stored with cut-down kits.

At least 91 percent of custody officers had been trained in CPR. CAL had appropriate routines to require training on return from leave. In each incident requiring CPR, reports showed custody and health care staff initiated and sustained CPR jointly with reasonable skill.

Medication Management:

Staff initiated most medication audits in this monitoring period. A small number of inmates required medication on arrival, but fewer than half received it timely. The audit captured only one housing move, and medication followed timely, but other documents noted two such cases that were problematic, including one with a two-week lapse. On the other hand, 87 percent of inmates' medications were renewed timely.

The audit identified three cases of medication non-compliance; only one saw a psychiatrist timely. Staff did not distinguish whether all such referrals were made. Only 81 percent of medication orders reached the inmates within a day, and MTAs reported that several-day delays were common. Consent form completion was somewhat better at 85 percent. When audits revealed moderate or poor results, follow-up analysis

was sporadic.

There were no audits of lab testing or DOT practices. Pharmacy printouts showed all psychotropic medications as DOT. While the litigation coordinator was named as the Keyhea coordinator, staff seemed unaware of any procedures to ensure that an arriving Keyhea inmate would be identified. HS medication orders reportedly were rare, but staff schedules permitted distribution at the appropriate time. There continued to be a useful error reporting and analysis system. Staff acknowledged that parole medication distribution was erratic, and they described plans to improve it.

Although discharge planning was treated at one time as a resolved CAP item, staff said that TCMP had not been on-site in years, and there was no indication that CAL staff did any prerelease planning.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

There were 854 RVRs, four of which were issued to 3CMS patients. There were no referrals for mental health assessments on the basis of bizarre or uncharacteristic conduct, a decline from preceding monitoring periods. One inmate on MHCB status received two RVRs, but they were not provided for the monitor's review. In the past, the monitor found that hearing officers worked well with mental health input. Staff reported no RVRs for self-injury.

Although CAL had an adequate sexual misconduct policy, clinical staff had not yet implemented the screening and evaluation procedures. Interviewed custody staff were aware of the requirements, and the monitor reviewed 13 related RVRs, five of which were referred to the district attorney with no outcomes yet determined.

Transfers:

CAL did not transfer any inmates to DMH. Staff referred 20 inmates to MHCB in this nine-month period. About one-third of those referrals were initiated late, some as much five to ten days into the OHU stays. Two referrals were rescinded after a week's wait. Only seven, or 39 percent, of the transfers were completed timely, with the longest time to transfer at 17 days.

Of the 72 OHU admissions, 20, or fewer than one third, were discharged within time frames. Many of the extended stays were inmates referred to MHCB. Admissions extended only by a day or two, although some of the EOP inmates stayed in OHU far longer than one month. Other extended stays should have been referred to MHCB, according to the Program Guide. Staff conducted a limited review of OHU charts and found good practice on IDTTs and treatment plans. Staff did not examine any other aspect of OHU treatment. Staff confirmed that they conducted one-to-one watches for inmates awaiting OHU admission and for admitted inmates with suicide watch orders. Use of restraints was limited and subject to very thorough review, particularly in a case where practice risked an airway obstruction. Staff reported that only one inmate waited for an OHU bed for a few hours in a holding cell.

All 3CMS and EOP inmates in January 2007 were within time frames. During the monitoring period, another 172 3CMS and 37 EOP inmates transferred or paroled timely, except three 3CMS whose placements were completed within five months. There were no excessive lengths of stay in administrative segregation among the 36 MHSDS inmates who had lived there.

The number of inappropriate transfers to CAL continued to climb to 34

266

inmates. Most typically, staff said, these were inmates prescribed psychotropic medications but not enrolled in MHSDS. CAL completed these inmates' processing on-site and consequently, fewer than half transferred within the 30-day deadline, though CAL seemed to use good systems to expedite these cases.

Other CAP Issues:

      a. Partial Compliance

A routine audit showed that staff continued to fulfill screening and 3CMS requirements, except for difficulty in accessing translators. Administrative segregation rounds were conducted in the main building, the stand-alone unit, and in overflow, with very rare exceptions. Initial administrative segregation IDTTs were timely, and no inmates were in the unit long enough to require an update, according to a large staff audit. Staff continued to self-monitor previously resolved items.

      b. Non-Compliance

Only 70 percent of EOP inmates saw a case manager weekly, according to inmate histories. Among the rest, there were repeated or multiple-week gaps in treatment, and a few had almost no contact.

Administrative segregation screening was undemonstrated. There was a local operating procedure, but it omitted mention of clinical follow-up on refusals. Staff apparently had never exercised oversight, and there was no material indicating whether the procedure was followed reliably. Administrative segregation case management was also problematic. A large staff study found poor compliance on weekly contacts.

The monitor previously found major operational problems with MHTS, and reportedly, none of the current clerical staff had been trained in its use.

Other Issues:

      The CAL BMU had been in operation since August 2006 with a policy consistent with others in CDCR. There had been nine men in the BMU, and none were in MHSDS. Out-of-cell time was confined to one hour per weekday of yard time as all meals and programming were conducted in cell and there was no dayroom time. There was little difference between the phases, and phase changes were initiated by request rather than on a routine schedule. Staff observed that inmates were working to satisfy the requirements, but no inmate had yet reached phase III or been released from the program.

### Centinela State Prison (CEN)
Paper Review

      Although a high number of vacancies remained in clinical positions, fewer contract psychiatrists provided a greater number of hours each, thereby improving continuity and coverage. The sole .75 psychiatry position had been vacant long-term, but contractors covered it in all but one month, and by fall 2006, two contractors were consistently on-site. CEN did not use telepsychiatry.

      A psychologist began to assume leadership responsibility, a helpful addition in a program staffed by myriad contractors. Two psychologist positions were vacant. Contract coverage was much more variable, relied on more individuals, and did not cover the vacancies. The recreation therapist position had been vacant long-term. Of six psych tech positions, four were functionally vacant, with only one FTE contract-covered at best. On the other hand, a supervising nurse and three registered nurses were dedicated to the MHSDS program, and all clerical positions were filled.

      Registered nursing was fully staffed, and 93 percent of MTA/LVN positions were filled. Pharmacy and the laboratory were operating with just over half of

their allocations, but medical records staffing was at 86 percent and custody staff was at 90 percent after taking leaves into account.

In December 2006, there were no EOP inmates and 23 3CMS inmates, nine of them in administrative segregation and one in the CTC. The MHSDS population had decreased in each recent monitoring period. However, many more MHSDS inmates were sent to CEN, contrary to the Program Guide.

Issues Resolved:

EOP inmates no longer awaited placement for inappropriate lengths of time in the CTC.

Quality Management:

CEN seemed to lose ground on quality management and, most importantly, did not have the suicide prevention oversight it needed, particularly in the context of three suicides in recent years. The local governing body and health care quality management committee operated in preceding monitoring periods, but with no minutes provided, it was unclear whether that activity had continued. On the other hand, the warden had instituted a semimonthly meeting to address a variety of court compliance issues, drawing on contributions by many departments.

No mental health subcommittee was ever established. While a mental health staff meeting appeared useful, it did not function as a quality improvement group, did not meet regularly, and did not include other departments. Peer review ceased, and there were no reported QITs.

Suicide prevention oversight was limited. CEN's nurses and classification staff conducted case reviews of suicide-related CTC admissions. These meetings were discontinued midyear, and no other suicide prevention committee activities had taken

269

place in several years. In December 2006, staff agreed to institute this committee and created a schedule of required participation for custody leadership.

Audits were of limited utility in demonstrating Program Guide performance. Staff did take extra care to complete the DCHCS chart audits, pulling the few charts available on a frequent basis so as to have a sufficient total number. Variability in recording methods often made results difficult to interpret. Staff designed additional audits aimed at ensuring consistent care among contract psychiatrists. Audits covering Program Guide or corrective action items generally were not conducted or were not well constructed. It was troubling that areas of higher risk and long standing deficiencies, such as suicide follow-up and administrative segregation screening, were not audited.

Suicide Prevention:

CEN had moderate success in remedying issues that arose in completed suicides. There was one death during the monitoring period that was being investigated as a suicide and as a homicide. Corrective actions on 2004 and 2005 suicides had mostly been completed. Staff addressed a remaining issue by instituting a protocol to improve intra-staff communication and response when one staff member has a concern about an inmate. Staff improved administrative segregation screenings, a problem apparent in two of the suicides. In one suicide, officers did not initiate CPR, and application by health care staff was inconsistent with expected practice. There was no demonstration that either of these issues was addressed.

Both clinical and custody suicide follow-up practices were problematic and there has never been oversight. Staff acknowledged that custody practices remained

poor. There were a variety of small-scale problems with clinical follow-up, which, in total, meant there were almost as many problem cases as correctly handled cases. At least 12 percent, or five inmates, and potentially 32 percent of the inmates discharged to the CEN mainline after a suicide-related admission did not receive follow-up. Others started late, were conducted while the inmates were in CTC, ended after too few days, or had gaps in the sequence of contacts. In December 2006, staff created a well-designed contemporaneous review system for custody practices; there was no oversight commitment for clinical practices.

CPR preparation and practice seemed reasonable. CEN previously provided adequate records of CPR training for custody staff. In the only incident employing CPR, an officer did not initiate it reportedly because he believed the inmate was breathing, but MTAs did apply it in time for the inmate to regain consciousness and spontaneous breathing and heartbeat. Other incident reports documented appropriate responses to two inmate hangings in administrative segregation, and neither required CPR. There were reasonable emergency response review committee reviews for each case except the CPR application, reportedly because the inmate was stable enough to leave grounds under a code lower than that which triggers a review. Administrative segregation emergency medical drills were initiated timely, but documentation did not clearly show whether they took place on all shifts in both buildings.

As to new administrative segregation placements, clinical staff printed inmate profiles for use in screening. The MHTS suicide tracking profiles captured reasonable amounts of suicide-related information, according to the monitor's review. Custody staff used the expected signage and had begun welfare checks. Sample

271

documentation showed routine checks occurring at staggered intervals, with occasional missed contacts, particularly at shift change. This was concerning, as suicide attempts are sometimes initiated when inmates know there will be a longer time to detection, such as shift change. The absence of documentation raised the possibility that welfare checks were not completed for all required inmates on some days.

Each building the monitor visited had a cut-down kit and ambu bag, though one building had trouble locating the latter. All interviewed staff had micro-shields. CEN conducted its own audit of emergency response equipment and inventories. Staff found a number of deficiencies and wrote of a plan to remedy them. Facilities varied as to what they inventoried, and no sheets captured all items. They were routinely completed, but missing items were sometimes not replaced for days or weeks.

CEN took extra measures by ensuring that the operational procedure specified requirements for welfare checks, signage, 31-question screens, and morning meetings for new admits; emergency medical drills; and officers' duties to carry their micro-shields and to perform CPR.

Medication Management:

With nurses integral to the mental health program, staff described several oversight mechanisms exercised in daily operations to prevent medication delivery problems. Typically, however, staff did not audit practices or used flawed methods.

Staff attempted to review continuity on arrival and times from order to delivery but was not successful. As to medication continuity after housing moves, there was a good policy outlining responsibilities for escort officers and nursing staff. The medication non-compliance policy called for a referral after a single failure to take

medication.

Consent forms were completed, according to staff audits. Lab testing was problematic, including failure to complete blood draws, they said. DOT procedures were in place, but staff observation of hoarded medication suggested DOT needed improvement. CEN reported no inmates on Keyhea orders; it was unclear whether the Keyhea coordinator routinely checked for such inmates inadvertently sent to CEN. The HS medication policy was adequate. Parole medication tracking was of limited utility.

No remedies for any of the known deficiencies were evident. Staff committed to beginning oversight processes for several of them.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

CEN managed mental health input into the disciplinary process better than many institutions, with procedures carried out well for mental health assessments and sexual misconduct screenings and custody staff mitigating outcomes based on clinical information.

There were 2,361 RVRs written during the monitoring period. Mental health assessments were requested for all 3CMS RVRs, for a total of seven, and for three general population inmates. This was a dramatic drop in general population referrals. Staff documented their inmate interviews, and CEN had previously established that clinicians reviewed C-files and UHRs. Staff found mental illness may have been a factor in three cases, and narrative was very detailed. Hearing officers have previously shown good practice in mitigating such cases, and they dismissed or mitigated two of these cases as well. In other cases, however, clinicians volunteered additional information unnecessary to the requested input, including incriminating statements.

No RVRs for parasuicidal behavior were carried through the disciplinary process. Staff instituted a good policy governing inmates' sexual misconduct, including the required mental health activities. They also documented a thorough assessment in the 14 RVRs provided to the monitor. Those notes routinely referenced IDTTs. None of the men were MHSDS inmates, none had a repeated incident, and the reviewers found no cases indicating symptoms of a disorder. Four of the cases were referred to the district attorney, including one inmate with vascular dementia.

Transfers:

Transfers worsened, with longer waits for MHCBs, more inappropriate MHSDS transfers to CEN, and almost no information about the over 200 3CMS inmates who had been on-site.

CEN did not refer any inmates to DMH facilities. There were 16 MHCB referrals during the eight-month review period. It appeared that two MHCB referrals were rescinded. Information sources varied, so precise numbers were not always discernible. Only three to five inmates reached MHCB timely. The rest involved a combination of late referrals and waits for beds. Times to transfer were typically one to two weeks, but a few inmates waited as much as two months. This was a dramatic decline, as the longest times in the preceding monitoring period became typical during this period. An unfortunate consequence was evident in three inmates who remained on suicide watch four to eight days while on the MHCB waiting list.

CEN had a CTC but no licensed MHCB beds within it. Lengths of stay remained extended, with 75 percent of the 48 admissions exceeding time frames. Only a modest number of those were explained by MHCB waits. While some patients were

discharged only a day late, a substantial number of stays were in double digits, and the longest stay might have been as long as two months. All aspects of length of stay represented a decline from the preceding monitoring period.

CEN was able to greatly improve its CTC mental health services, and inmates no longer went for lengthy periods without being seen. From September 2006 forward, all patients received daily contacts with a psychiatrist or case manager, according to staff audits. Staff designed excellent tracking tools that showed full compliance on timely initial evaluations. Suicide risk assessments were present on admission in 75 percent of the cases but in only 30 percent on discharge. These both represented an improvement over the preceding monitoring period. Staff appropriately made plans to improve those CTC areas showing deficiencies. There were two inmates whose multiple admissions should have triggered consideration of higher levels of care.

CEN used nursing assistants for one-to-one suicide watches. Staff provided the documentation for all 28 cases, and while recording generally was consistent, the cases with unexplained gaps of short or long duration totaled nearly 40 percent. Also, two of these inmates were on suicide watch for three days but not referred to MHCB.

There had been no uses of restraints and only a few uses of the seclusion room, according to staff report. They said they had no need of holding cells pending admission; rather, inmates waited for short periods in exam rooms or clinics.

A total of 218 3CMS inmates had lived at CEN during the eight-month review period, but transfer information was unavailable for most of them. All current 3CMS inmates were within time frames. The 27 inappropriate transfers were transferred

275

out within two weeks. Staff did not provide times to transfer for any of the other 168 3CMS cases. The four EOP inmates were transferred well within time frames.

There were nine 3CMS and no EOP inmates living in administrative segregation in December 2006, and each had been there less than one month. No other length-of-stay information was available for MHSDS administrative segregation residents.

Other CAP Issues:

a. Partial Compliance

Daily administrative segregation rounds continued consistently, and MHSDS inmates saw a clinician within a day of placement, according to staff audits. Staff described good systems to identify and screen new administrative segregation placements, including additional staff in morning meetings, printing inmate profiles, and reviewing UHRs before screening. Staff newly provided an excellent log demonstrating detailed tracking and review.

While this new level of oversight was an important improvement, significant problems remained. The previous issue of timeliness was well addressed, with 90 percent of cases screened timely. However, the remainder appeared to have been missed. Screenings reportedly occurred in a private office. There were widespread refusals, and while it appeared that the clinician follow-up appointments took place, documentation needed to be more consistent.

Administrative segregation case management and IDTT showed a substantial improvement, particularly in the weeks immediately preceding the paper review. Weekly contacts ranged from 67 percent to 100 percent in different sources.

Supervisors said these were always private contacts in an office unless the inmate refused. CEN took extra measures to provide space for mental health staff in this unit, with a dedicated office and plans to clear two other rooms for them. Almost no initial IDTTs occurred timely, but nearly all took place within one month, and some may have been updated, according to staff audits.

Timeliness of bus screening referral responses, initial evaluations and treatment planning declined, according to staff audits. Bus screening referral responses have shown problems long-term without remedy. In the instant audits, emergency and urgent bus screening referrals were handled well, but routine referrals were seen timely in only 73 percent of the cases. When late, few were close to the mark; most were quite delayed, up to nearly a month.

Evaluations and treatment plans were each less than 50 percent in compliance, though timeliness improved somewhat in the most recent months. More mainline inmates than in the past, at least 76 percent, were seen in IDTT meetings. Case managers saw 3CMS inmates at least as often as required by the Program Guide.

b. Non-Compliance

There were four EOP inmates during the monitoring period. None received weekly case manager contact, according to inmate histories. Fulfillment of this requirement continued to decline.

## Chuckawalla Valley State Prison (CVSP)
Paper Review

Staffing continued to improve, with the hiring of a psychiatrist, although CVSP lost ground with psych techs. The 1.5 psychiatrist positions were fully staffed for nearly the full monitoring period. There was one vacancy among the 2.5 psychology

positions and only about .25 FTE in contract coverage. Staff also expected to establish another psychology position in early 2007. Two of the three psych tech positions were vacant. Additional coverage was provided through a combination of overtime, a retired annuitant, and minimal contracting. The clerical positions were filled.

About 90 percent of the 19 RN positions were filled. There was 80-percent coverage for the 24 MTA/LVN positions, which represented a decline. Pharmacy, laboratory, and medical records were fully covered by staff or contractors. Custody vacancies were fairly high, with 24 percent of positions functionally vacant. Inconsistent documents suggested that there were either eight or 16 3CMS inmates living on the mainline, two 3CMS in administrative segregation, and one mainline EOP in December 2006.

<u>Issues Resolved</u>:

There was adequate access to a psychiatrist.

IDTTs were staffed appropriately and conducted timely.

<u>Quality Management</u>:

There were no meetings of the local governing body or quality management committee, reportedly due to lack of staff. The mental health subcommittee did not receive input from other departments, and problem-solving activity was not apparent in the monthly meetings. No QITs were thought necessary. There were too few clinicians for effective peer review.

The suicide prevention committee met monthly with single representatives of custody and nursing. It appeared there was limited suicide-related discussion, although staff did review CVSP's completed suicide within a short time.

278

Despite making little use of the formal quality management structures, there was superior oversight and self-correction in actual practice. Staff monitored continuously for problems and intervened quickly with remedies. Excellent departmental relationships permitted routine joint problem solving. Staff tracked the vast majority of the Program Guide tasks concurrently and routinely reviewed those logs as well as conducting sound and widespread audits. These actions ensured quality service delivery at this institution.

Suicide Prevention:

Welfare checks were potentially problematic. Although staff described a good routine for accomplishing them, a sample of completed sheets suggested days were missed.

Administrative segregation screenings were established, but some practices needed strengthening. Screenings were initiated for 94 percent or better of new placements. When completed, all but two were timely. Staff was checking inmate profiles, but logs indicated this needed more consistency. CVSP experienced a high rate of screening refusals, with a staff audit and the monitor's review showing rates around 55 percent. A log suggested that follow-up contacts did not occur, or were not recorded, in about half of the refusing cases. When five-day follow-up did take place, it was completed within six days.

Staff appeared to make good use of MHTS suicide tracking, printing inmate profiles and recording detailed narrative in some cases.

Nearly all interviewed officers had their micro-shields and were familiar with accessing the cut-down tool, ambu bag, microshields, and PPE kits, which were in a

279

consistent place in each building. Inventorying was an established practice. About 92 percent of custody staff had CPR training, according to training records. There was annual refresher training, and policies were adequate for ensuring that staff returning from leave received any missed training. All interviewed officers were aware of on-site uses of CPR and seemed familiar with the responsibility.

There was a completed suicide during this monitoring period. Clinical staff had seen the inmate multiple times shortly before his death and had follow-up plans, and the emergency response seemed adequate. Both the suicide prevention committee and the emergency response review committee examined the incident quickly and initiated practice changes. The status of implementation of the DCHCS-generated CAP was unclear.

Compliance with five-day follow-up and custody observation following discharge from the MHCB was not demonstrated. Staff described the correct clinical procedures following OHU and MHCB suicide-related admissions but had not retained documentation.

Medication Management:

Monthly medication audits captured almost one third of the MHSDS population for the monitoring period, but there were still too few relevant charts to answer some questions.

Nearly all of the 50 inmates arriving on psychotropic medications saw a psychiatrist the same day, and all were seen within six days, according to a log. Audits captured only two of these inmates, but those received their medication timely. Housing moves posed a greater problem, with 71 percent receiving medication without

interruption. All relevant medications in the audit were renewed timely.

Audits captured only one inmate who was non-compliant with medication. In that case, the referral and response were timely. There was near-perfect compliance in delivering medication within one day of an order, and 94 percent of sampled inmates had consent forms.

Staff developed a sound auditing method for lab tests. The results, on the few applicable cases, showed an 11-day delay for a draw in one case and a two-week delay in the psychiatrist's review in the other case. Staff reported there were no inmates on DOT or HS orders during the monitoring period, though policy and systems permitted HS passes at the correct time. Keyhea oversight was problematic in that staff did not have procedures to identify such inmates accidentally transferred to CVSP. The majority of paroling MHSDS inmates reportedly received their medication, with only one in seven cases missed.

Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations:

CVSP wrote 1,069 RVRs. Only three were issued to 3CMS inmates, and two of those received mental health assessments. No general population inmates were referred for bizarre or uncharacteristic behavior. The assessments appeared to follow procedure and reached reasonable conclusions that mental health was not a factor. Because of this, the monitor could not determine whether input affects hearing officers' decisions.

There appeared to be no RVRs for self-injury. The sexual misconduct operational procedure omitted several features of the plan. There were five relevant RVRs. Mental health staff described carrying out the requirements, but referrals,

evidence of screening, and IDTT review were absent or minimal in some cases. No inmate had more than one such RVR; none were referred for further evaluation. One case was referred to the district attorney, who declined prosecution.

Transfers:

CVSP did not refer directly to DMH. Of 17 OHU admissions during the monitoring period, 13 were referred to MHCB. All but one of the referrals were initiated timely. Half reached MHCB timely; the others transferred in four to 16 days, with waits much reduced after July 2006. Only one referral was rescinded, and it did not involve a long delay. Length of stay was reasonable for OHU inmates discharged to housing. Half met time frames and the other half exceeded them by only a day.

Since CVSP had hired a full complement of psychiatrists, clinicians reportedly were able to see OHU inmates daily. Suicide risk assessments were completed on admission for all suicide-related MHCB referrals. Staff occasionally held an IDTT meeting. Inmates on suicide watch were observed one to one. There was only one use of restraints. OHU admissions were accomplished within one hour, according to staff reports and a log. Findings regarding OHU operations and treatment were based on self-report as little proof of practice or other documentation was available.

There were 111 3CMS and 13 EOP inmates at CVSP during the eight-month monitoring period. All transferred or paroled timely, and all MHSDS inmates on site in December 2006 were within time frames. The number of inappropriate transfers to CVSP increased to 60, doubling the MHSDS population. Most arrived on psychotropic medications, but only some had an MHSDS designation. There was a particularly high influx when CVSP opened its SNY yard. All inappropriate transfers went to a treating

institution timely.

There were no excessive administrative segregation stays among the 36 MHSDS inmates who lived there during the monitoring period.

Other Issues:

Temperature recording practices seemed erratic at times. Additionally, it was not clear that health care rounds were made fully during Stage III alerts.

## Service Area K

Service Area K includes California Institution for Women.

### California Institution for Women (CIW)
February 20, 2007

Vacancy rates, previously high in psychiatry, psychology, and social work but approaching zero in other health care disciplines, skyrocketed due to a large number of newly allocated positions. New positions were allocated in connection with the opening of a PSU and an MHCB.

The positions of chief psychiatrist and senior psychiatrist were filled. There were 8.6 staff psychiatrist positions allocated; of those, 5.5 were vacant. Contractual staff covered approximately 86 percent of the vacant psychiatry positions from August to November 2006.

The chief psychologist position was vacant but filled by an actor. One of two senior psychology positions was vacant. Over half of the psychology positions, 13.62 of 27.47, were vacant, and psychologists who worked the equivalent of 1.5 full-time positions were out on extended leave. Three of the 7.5 psychiatric social work positions were vacant. The amount of contractual coverage used did not approach the number of vacant positions.

Approximately 15 MTA positions were eliminated, while the number of psych tech positions rose sharply. The number of psych techs on staff rose from two to ten, but the number of allocated psych tech positions more than tripled, rising to 17.1 of which 7.1 were vacant. The number of recreational therapist positions allocated increased from one to 4.15, with 3.15 positions vacant.

Office support staff was in short supply. One of two supervisory positions was vacant. Four of 7.5 office tech positions were vacant. Two of five office assistant positions were vacant. Only one of three medical transcriber positions was filled.

CIW's census was 2,657; the size of the MHSDS caseload was 745, or 32 percent of the institution's population, in December 2006. There were 427 3CMS inmates assigned to CIW and 166 unendorsed 3CMS inmates in the reception center. There were 121 EOP inmates; 37 were unendorsed and remained on reception center status. There were 39 inmates in administrative segregation; 19 were 3CMS inmates, and seven were EOP inmates. Nine inmates were in the PSU. Five inmates were in the MHCB; no caseload inmates were in the OHU. The OHU housed four medical patients.

CIW's MHCB opened as ordered on August 15, 2006. The Department of Health Services reportedly granted provisional approval for licensure on August 9, 2006. The ten-bed MHCB was in an 18-bed CTC.

A ten-bed PSU opened on January 31, 2007, in temporary quarters formerly occupied by the OHU. Staff reported that the PSU would eventually be located in the same maximum-security building occupied by the EOP unit. Construction in the PSU unit was reportedly jeopardized by funding issues.

Two more new initiatives were planned. A 20-bed mother-infant program

284

slated to open in January 2007 was in the planning and construction phase. Construction of an acute or intermediate care facility at CIW was reportedly in the planning stages.

Quality Management:

Mental health quality management did not develop. It remained largely a managers' activity. The mental health quality management committee was scheduled to meet twice monthly. The mental health staff was apprised of the results of quality management audits at monthly staff meetings. Audits covered use of the MHTS, suicide watches, transfers to higher levels of care, IDTT meetings, referrals, compliance with various Program Guide requirements, and hours of treatment provided in the EOP unit.

During the monitoring period, local operational procedures were drafted or revised to address suicide prevention in administrative segregation, the new PSU, new requirements regarding EOP inmates in the reception center, and the establishment of a mental health OHU.

Suicide Prevention:

CIW's suicide prevention focused improvement team met monthly. Primary areas of emphasis included timely transfers to higher levels of care, medication management, the RVR process and reception center processing.

Medication Management:

Medication continuity remained problematic. A QIT was chartered to address it. The results of staff audits of medication continuity for new arrivals and intra-institutional transfers found problems at all levels of medication distribution from the pharmacy to actual administration by nursing staff. Documentation was inconsistent, making it difficult for staff to discern the degree to which medication continuity was

285

interrupted or sustained when inmates were moved within CIW. A nursing audit found that a large proportion of MARs were incomplete or illegible.

Staff audits of non-compliance with medication indicated that CIW handled it appropriately. Audits did not examine whether all cases of non-compliance were referred to mental health.

Pill lines reportedly lasted longer than 15 minutes in the EOP unit. EOP treatment groups were at times disrupted by lengthy pill lines.

Transfers:

Access to intermediate care located at Patton State Hospital (PSH) was adequate. Staff reported making several appeals to the coordinated clinical assessment team in cases of rejected referrals or lack of an available bed. CIW transferred 17 inmates to PSH. Transfers took 10.45 days on average.

From May 1 through August 15, 2006, 11 patients were transferred to the MHCB at Central California Women's Facility. Transfers to the MHCB were made on average within 1.18 days, nearly compliant with the 24-hour requirement. No information was provided regarding cases that were not moved within the average length of time.

The MHCB at CIW opened as ordered on August 15, 2006. A provisional license was granted on August 9, 2006. CIW retained use of four beds in OHU for medical use; another part of the OHU was slated to house the PSU.

The MHCB appeared to be functioning at full capacity, with adequate staffing. The MHCB had adequate space for individual clinical contacts, group therapy, IDTT meetings, and staff offices. The average daily census was seven. From August to

November 2006, there were 155 admissions to the MHCB. The average length of stay was 3.4 days. Ten inmates were admitted at least twice.

Inmates on suicide watch were monitored one to one by medical staff in addition to being monitored by a video camera. All MHCB inmates had mattresses but those provided to inmates on suicide watch were thin and reportedly uncomfortable. Supervisory staff agreed to issue more than one suicide-proof mattress as well as extra blankets to inmates on watch.

Restraints were used on four occasions since the MHCB opened. Time in restraints was less than 24 hours. Restraint use was adequately documented, an improvement over former practices.

Supervisory staff reported that on several occasions, more than 10 inmates were admitted to the MHCB and that medical beds were sometimes used for more stable MHCB patients. Plans were in place to move medical patients to outside hospitals if more beds were needed.

The MHCB had three rubberized seclusion rooms. Staff planned to use two of them as holding cells in the event that the MHCB was full. No other cells were used to hold inmates awaiting admission.

Prior to the opening of the MHCB, between May 1 and August 15, 2006, there were 238 OHU placements, with an average length of stay of 2.58 days. The average daily census in the OHU was 2.29.

CIW's compliance with transfer timelines for caseload inmates in the reception center could not be ascertained from the information provided. According to institutional reports, EOP inmates in the reception center were, on average, endorsed in

287

59 days. 3CMS inmates were endorsed, on average, in 53 days and moved within two days of endorsement. No information was provided regarding cases in which time frames exceeded the group averages.

Other CAP Issues:

The EOP continued to limp along. Although over ten hours of groups per inmate per week were scheduled, inmates received only two to three hours of treatment per week. Staff audits found that 46 percent of treatment groups were cancelled. The high rate of cancellations was surprising in light of the self-contained nature of the EOP building.

Lockdowns and other forms of restricted inmate movement were the largest single cause of cancellations. Cancellations were also attributed to malfunctioning air-conditioning units, long pill lines, and space and size constraints imposed by the physical plant. The redirection of clinical staff thwarted some group meetings.

Availability of UHRs for mental health appointments was a chronic problem.

Other Issues:

Six inmates were in the PSU in February 2007. Both the custody and the clinical PSU procedures were in draft form. Psych techs made rounds twice daily during the week and daily on weekends. Inmates were seen for individual clinical contacts for one hour per week and offered nine hours of group treatment per week. There were enough escort officers to facilitate out-of-cell contacts and group therapy. Clinical contacts appeared to be made in a confidential setting. Two walk-alone yards were

located adjacent to the PSU.

CIW reported one heat-related incident for which an inmate received treatment in the OHU in July. That was the only heat-related incident reported during the monitoring period.

## Service Area L

Service Area L includes Central California Women's Facility and Valley State Prison for Women.

### Central California Woman's Facility (CCWF)
December 20, 2006 – December 22, 2006

CCWF continued to struggle to fill allocated mental health positions. The chief psychologist position, vacated during the monitoring period, was temporarily covered by a senior psychologist. Five of 8.5 staff psychiatrist positions were vacant. Two full-time contact psychiatrists provided regular coverage, and a third contractor worked sporadically during the monitoring period.

Among case managers, 7.5 of 18.5 allocated clinical psychologist positions were vacant, as was one of 6.5 psych social worker positions. About half of the 8.5 case manager vacancies, or the equivalent of 4.5 positions, were covered by contractors. Positions for three full-time recreation therapists were filled, as were all allocated clerical positions.

Three of 15 pharmacy positions were vacant. All vacant positions were covered by contractual staff.

CCWF's total caseload population included 1,232 inmates in December 2006. The EOP program remained stable, with 62 inmates, none of whom were in administrative segregation or the reception center. The 3CMS population increased by

289

18 percent, growing from 979 in March 2006 to 1,160 in December 2006. There were 148 3CMS inmates in the reception center and 20 3CMS inmates in administrative segregation. Five inmates were in MHCBs.

Issues Resolved:

> 3CMS inmates had adequate access to group therapy.
>
> Psychiatrists routinely participated in IDTT meetings.
>
> Medications provided to inmates upon their arrival at the institution were documented in the medical record, on a MAR or in the pharmacy database.

Quality Management:

CCWF resolved three CAP problems and achieved compliance in four other areas. Flawed audits prevented a full assessment of several CAP items.

There was no documented activity of the institution's local governing body or health care quality management committee. The mental health quality management subcommittee met regularly and kept minutes throughout the monitoring period. It covered all institutional CAP issues, chartered QITs, and issued directives designed to address identified problems. Institutional studies addressed, among other things, EOP treatment hours, MHCB services, the mental health referral system, and timely completion of initial screens and evaluations in the reception center.

CCWF completed numerous audits, although methodological flaws and inadequate sample sizes often produced unreliable results. Findings related to a number of medication management practices, response to referrals, quarterly case manager contacts, and completion of initial treatment plans could not be used to assess compliance.

Suicide Prevention:

   CCWF needed to place more emphasis on suicide prevention protocols. There were two completed suicides at CCWF during the monitoring period. An executive summary and corrective action plan were produced for the first suicide, which occurred in administrative segregation in June 2006. CCWF had taken steps to implement the corrective action plan, which highlighted the need to reduce cell-front contacts in administrative segregation. New arrivals to administrative segregation were reportedly removed from their cells and screened in a private area. Refused screens reportedly prompted UHR and C-file reviews. Internal audits found that the percentage of clinical contacts held cell-front was reduced to 21 percent after October 2006, down from 66 percent reported during the proceeding monitoring period. An executive report was not yet available for the second suicide, which occurred in general population in October 2006.

   The monitor's expert reviewed one case in which CCWF staff failed to follow suicide prevention protocols, a particularly disturbing incident given the recent suicides. In late November 2006, a 3CMS inmate who threatened to kill herself was handcuffed and placed in a locked shower stall located in her housing unit. An on-call physician telephoned orders for psychotropic medication, which was administered by nursing staff. After spending over five hours in the shower stall, she promised nursing staff that she would not harm herself and was returned to her dorm. Throughout this ordeal, she was not interviewed by mental health staff or referred to the MHCB unit. A suicide risk assessment was not completed, and the on-call physician's intervention was not documented in progress notes (see Exhibit V, Case Review 5).

Staff continued to conduct five-day follow-up of suicidal inmates discharged from the MHCB to housing units within CCWF. Tracking information relative to custody checks was disorganized and could not be readily used to assess compliance.

Medication Management:

Medication continuity was problematic. A staff audit, albeit flawed, indicated that there were gaps in medication continuity when orders were not renewed timely. Inmates also reported that medication orders expired. Psychiatrists no longer renewed medication orders without patient contact, resolving that CAP problem. Inmates arriving at the institution consistently received 14-day extension orders for prescribed medications and were seen by a psychiatrist prior to the expiration of the extension orders. This CAP item will be resolved if compliance is sustained. CCWF reported for the first time that medication continuity was sustained when inmates were moved within the institution. The audit that served as a basis for that report was marred by questionable methodology.

CCWF reported that non-compliance with medication and refusal of medication was rare. Staff audits found that psychiatrists consistently addressed medication compliance in progress notes. Audits of non-compliance found that as many as half of all inmates who were non-compliant with medication were not seen by psychiatry. Audits did not examine whether inmates who did not pick up medication were noted as being non-compliant.

A staff audit found that wait time in pill lines did not exceed 30 minutes. Staff and inmate reports stood in contrast to the audit results, indicating that wait times

292

were longer than that. CCWF had an awning to shade inmates waiting in pill lines.

CCWF's practices regarding the monitoring of mood stabilizers came into compliance. Staff audits found compliance rates ranging from 88 to 93 percent. The monitor's findings based upon review of UHRs also found consistent monitoring. The problem will be considered resolved if compliance is sustained.

HS medication orders were either not written for caseload inmates or not administered.

Transfers:

Access to DMH acute care was sometimes difficult, particularly for inmates with complicated case factors. During the monitoring period, CCWF generated eight referrals to acute care, of which three were rejected. In one of these cases, the inmate remained in the MHCB unit for two months before being transferred to PSH pursuant to mentally disordered offender protocols (see Exhibit V, Case Review 8). In the other two cases, the inmates were discharged from the MHCB and returned to MHSDS programs. Five inmates were accepted and transferred to DMH acute care, all within five days of their referral.

Access to DMH intermediate care continued to be good. All nine referrals to intermediate care generated during the monitoring period were accepted and transfers occurred within four to nine days of referral.

CCWF's skilled nursing facility had eight beds that were used for mental health crisis care. Typically, no more than half of the MHCBs were filled. During the monitoring period, there were 114 MHCB admissions, including 67 from CCWF and a combined total of 47 from CIW and VSPW. Lengths of stay exceeded ten days for 20, or

293

18 percent, of these admissions. Most, or 85 percent, of the admissions that lasted longer then ten days, and as long as 86 days in one case, were associated with inmates discharged to EOP and 3CMS levels of care. The institution had reduced administrative delays for inmates discharged to VSPW and CIW.

Minutes from mental health quality management subcommittee meetings noted an absence of formal IDTT meetings and written treatment plans in the MHCB unit. Daily clinical rounds were reportedly completed in the MHCB unit.

During the monitoring period, CCWF transferred seven inmates to the EOP administrative segregation hub unit at VSPW. All of these transfers occurred within 30 days, with an average wait of two weeks.

Other CAP Issues:

a. Partial Compliance

Institutional audits covering the monitoring period showed that 70 to 75 percent of EOP inmates were offered ten hours of structured therapeutic activities per week, a drop from 95 percent reported during the preceding monitoring period. Slippage in this area was attributed to group session cancellations resulting from clinician absences and custodial issues.

CCWF came into compliance with the completion of daily rounds in administrative segregation, and this CAP item appeared to be close to resolution. An institutional audit covering the period from April 1 to June 30, 2006, found that daily psych tech rounds were documented in 93 percent of reviewed cases, up from 53 percent reported during the previous monitoring round. The problem will be considered resolved if compliance is sustained.

Audit data from October 2006 indicated that CCWF was close to meeting the 14-day timeline for completing initial treatment plans in the mainline 3CMS program. Audit findings from November 2006 were ambiguous, making it difficult to assess progress in this area. In October, 85 percent of reviewed treatment plans were completed within 14 to 15 days. Initial treatment plans reviewed in November were completed, on average, within 15.5 days.

The availability of UHRs for scheduled clinical appointments and IDTT meetings appeared to have declined during the monitoring period. Internal audits completed during the first half of 2006 found that UHRs were provided for 91 percent of all scheduled mental health appointments and that C-files were available for 94 percent of IDTT meetings. This issue was not audited during the second half of 2006, although staff estimated that UHR availability for scheduled appointments had fallen to 70 percent during recent months. The monitor received only 68 percent of the UHRs requested during the monitoring visit. UHR organization was poor in that mental health paperwork was often misfiled or missing. These problems were attributed to staff vacancies and turnover and to policies that restricted when UHRs could be checked out of the medical records department.

b. Non-Compliance

Data produced by the institution indicated that mental heath referrals did not consistently prompt contact within one week, although a precise noncompliance rate could not be gleaned from the provided information. An institutional study found that self-referrals submitted from February 1 to November 30, 2006, resulted in contact, on average, within 10.1 calendar days. Staff referrals from the same period prompted