contact, on average, within 7.2 calendar days. During this visit, the monitor reviewed 20 referrals, a quarter of which were not addressed within a week.

Other Issues:

The institution reported that 200 3CMS inmates were enrolled in 20 groups, including a new group for transitioning from EOP to 3CMS and four post-traumatic stress disorder (PTSD) groups for victims of trauma and abuse. Another 97 inmates had been waiting an average of 60 days to be assigned to groups.

An internal audit found that psychiatrists attended IDTT meetings 99 percent of the time. The IDTT attendance rates for correctional counselors and inmates were 95 percent and 62 percent, respectively.

Staff reported that TCMP counselors did not see all EOP inmates for discharge planning and that the institution was unable to add the names of paroling inmates to TCMP lists. Staff's reported efforts to provide additional discharge planning were not consistently documented in UHRs reviewed by the monitor's expert (see Exhibit V, Case Review 1).

### Valley State Prison for Women (VSPW)
January 22, 2007 – January 24, 2007

VSPW continued to struggle with mental health staffing vacancies, particularly among case managers. A senior psychologist was acting chief psychologist, and all three senior psychologist positions were filled. Supervisors competently managed VSPW's complex array of mental health programs and demonstrated a commitment to addressing ongoing deficiencies.

An April 2006 request for funds to create a senior psychiatrist position was pending. Staff and inmate interviews, as well as UHRs and inmate histories

reviewed by the monitor's expert, revealed problematic psychiatric prescription practices that highlighted the need for psychiatric supervision at VSPW. Antipsychotic medications were inappropriately prescribed to treat agitated, non-psychotic inmates, often without documentation of contact or clinical justification (see Exhibit W, Case Reviews 4, 5, 6). In other cases, medications were changed without clinical rationale, apparently the result of differing prescribing preferences among psychiatrists.

While only two of 5.5 allocated psychiatric positions were filled, contractors covered nearly all of the vacancies. Among case managers, 7.5 of 18.5 allocated clinical psychologist and psych social worker positions were vacant. Contractors covered slightly more than a third of the case manager vacancies.

In December 2006, VSPW received authorization to establish 37.84 new mental health positions, an 88-percent increase in its overall mental health staffing allocation. The new allocations, associated with an increase in the institution's caseload population and implementation of a new treatment program for EOP inmates in the reception center, included positions for 2.5 staff psychiatrists, a senior psychologist and 14 clinical psychologists, a supervisory social worker and psych social worker, a senior psych tech and 8.65 psych techs, 2.75 recreation therapists, 2.44 RNs, and 3.5 clerical workers. While the new positions were welcome and needed, staff worried that nearly doubling the size of the mental health department would exacerbate the institution's shortage of office and program space.

In January 2007, VSPW's total inmate population was 3,806. Of these, 1,004, or 26 percent, were participants in the MHSDS. The 3CMS caseload was stable, with 966 inmates, of whom 748 were in general population, 149 were in the reception

center, 30 were in SHU, 35 were in administrative segregation, and four were in the OHU. Since May 2006, the EOP caseload grew by 52 percent to 38 inmates, including 17 in the reception center, three in SHU, three in general population, and three in the OHU.

Issues Resolved:

DOT protocols were followed.

VSPW's quality management program was fully functional.

Quality Management:

VSPW's quality management program was fully functional, resolving that CAP item, although it will continue to be subject to monitoring. The local governing body, quality management committee, and mental health subcommittee met regularly and kept minutes. The meetings were well attended and provided a useful forum for monitoring and improving the delivery of health care services at VSPW. A mental health quality management subcommittee meeting observed by the monitor's expert was multidisciplinary, well organized, and relevant.

Methodologically sound audits were used to track many aspects of VSPW's MHSDS and directed efforts to comply with open CAP problems. Four CAP items were ripe for resolution.

The institution continued to use QITs effectively, focusing on such issues as the provision of OHU services, improving peer review processes, the distribution of medications in R&R, the development of individualized treatment plans, and prioritizing access to UHRs. Five QITs produced final recommendations during the monitoring period and three QITs were active in January 2007.

Peer review in all three mental health disciplines was well developed, addressing such issues as access to mental health services in the reception center, developing standards for the new EOP program in the reception center, and providing treatment for posttraumatic stress disorder.

Suicide Prevention:

Staff often failed to respond appropriately to suicidal behavior. Suicidal inmates sometimes spent a week or more in safety cells in the OHU without being referred to an MHCB unit. In a combined administrative segregation/SHU unit, it was not uncommon for inmates threatening suicide or making suicidal gestures to be placed in suicide smocks and confined to their cells. In these instances, the inmate's property was removed from the cell and placed on the floor next to the cell door. Potentially suicidal inmates confined to their cells under these circumstances were not always referred to the OHU or an MHCB, were not monitored by mental health or nursing staff, and were not assessed for suicide risk.  The monitor, the monitor's expert, and VSPW staff discussed these practices during the visit.

Internal audits found that staff conducted five-day follow-up of suicidal inmates returned to VSPW from the MHCB at CCWF 85 to 97 percent of the time. Contacts were occasionally missed during weekends.

New arrivals to administrative segregation were placed in identified intake cells.  Nine inmates were on intake status at the time of the monitoring visit. Documentation indicated that intake-status inmates received 30-minute welfare checks during their first three weeks in administrative segregation. Most, but not all, checks were completed at staggered intervals.

Staff had not started producing suicide history reports for transfers or administrative segregation screens.

Medication Management:

Medication continuity was sustained when inmates arrived in the reception center with verified medication orders. Inmates arriving in the reception center with unverified reports of medication treatment were not timely evaluated. According to audit data, on average, such inmates were screened within two days of arrival, evaluated by a clinician within 13 days of arrival, and assessed by a psychiatrist within 32 days of arrival.

Staff reviewed a small sample of new arrivals to general population, 67 percent of whom received prescribed medication without interruption. In light of the small sample size, it was unclear how accurately these findings reflected actual performance in this previously resolved area.

Institutional audits continued to show that medication continuity was sustained when inmates were relocated within the institution. However, the monitor received during January's visit documented and anecdotal evidence of medication disruptions associated with housing moves. Continued scrutiny of this resolved CAP item was warranted.

The institution came into compliance with the timely renewal of medication orders. An internal audit found that 92 percent of psychotropic medications were renewed in a timely manner. This CAP issue will be resolved if compliance is sustained.

Nursing and pharmacy staff closely monitored and routinely referred

medication refusals and noncompliance, but referrals did not result in timely responses. Roughly half of the inmates referred to mental health for medication refusals or noncompliance were seen by a psychiatrist within a week. On average, psychiatrists responded to noncompliance referrals within 16 days.

Prompted by reports of continued noncompliance, VSPW revived a QIT to examine the institution's procedures for monitoring blood levels of inmates taking mood-stabilizing medications. In January 2007, new monitoring protocols for mood-stabilizing and atypical antipsychotic medications were not yet finalized.

DOT protocols were implemented appropriately. This CAP problem is newly resolved.

Keyhea orders were tracked. In January 2007, there was one inmate at VSPW with a current Keyhea order. Two Keyhea certifications were renewed during the monitoring period; none were initiated. One Keyhea order was permitted to expire, and one case was not pursued on advice from CDCR counsel.

HS medications were ordered for 25 inmates. Psychiatrists reported reluctance to use HS orders based on the presumption that the medications would not be administered at or after 8:00 p.m.

Medication was consistently provided to paroling inmates. A staff audit covering the months of May and August 2006 found that 97 percent of paroling MHSDS inmates with current psychotropic prescriptions were given a supply of medication.

Transfers:

Transfers to DMH, a previously resolved CAP item, continued to be rare. The sole inmate referred to DMH during the monitoring period was accepted and

301

transferred within eight days of referral.

VSPW's OHU was inappropriately used to stabilize inmates, and MHCBs, located next door at CCWF, were underutilized. Prolonged OHU admissions, including stays of more than a week in safety cells, did not prompt MHCB referrals.

From May through December 2006, VSPW generated 32 MHCB referrals, an average of four a month. All inmates referred to MHCBs were timely accepted and transferred.

The OHU had ten mental health beds and three safety cells. The average length of stay in the OHU during the monitoring period exceeded 72 hours. Admissions that lasted longer than 72 hours did not consistently prompt MHCB referrals. The safety cells, rubberized rooms equipped with video cameras, were used to monitor suicidal inmates. Medical assistants monitored inmates placed on suicide precautions and watches. Length of stay in the safety cells typically ranged from 48 to 72 hours, with outliers of seven to nine days. VSPW's continued use of video monitoring to supplement suicide watches in safety cells was clinically unwarranted and needlessly compromised patient privacy.

Daily IDTT meetings were held in the OHU, excluding weekends and holidays. IDTT meetings were routinely attended by mental health and nursing staff, but custody participation was sporadic.

General population EOP inmates continued to be transferred within mandated time frames. Eighty EOP inmates transferred during the monitoring period waited, on average, 18 days.

During January's site visit, two inmates were endorsed for transfer to the

new PSU at CIW, which was scheduled to activate on January 31, 2007. In the case of one of these inmates, VSPW staff had devised a behavioral incentive program to address her history of recurrent self-injurious behavior. The plan, carried out in the SHU, called for enhanced monitoring and property and privilege restrictions that could be incrementally loosened if the inmate reduced her self-injurious behavior. Staff reported that the behavioral incentive program would be discontinued once the inmate was transferred to PSU. Shortly following the monitor's visit, both inmates were transferred to the new PSU.

VSPW continued to meet the transfer timeline for EOP inmates in the reception center. Compliance with the 3CMS transfer timeline declined slightly. In January 2007, about 11 percent of the 149 3CMS inmates in the reception center had been there longer than 90 days. Most of the transfer delays were related to ongoing court proceedings.

Other CAP Issues:

Documentation provided by the institution indicated that EOP inmates in A4, a combined administrative segregation/SHU unit, were offered an average of 14 hours a week of structured therapeutic activities. This CAP problem will be resolved if compliance is sustained. Group sessions in A-4 were held in a private office that was equipped with five holding cells. The holding cells had seats and desks, but solid sides prevented group participants from seeing one another. Staff reported that more group activities could be offered if more space was available. Inmates in administrative segregation and SHU were reportedly offered three to 15 hours a week of outdoor yard. Two escort officers were assigned to the unit, which was reportedly adequate.

Documentation of daily psych tech rounds in administrative segregation, a previously resolved CAP issue, was problematic for the second consecutive monitoring round. Weekly summaries of daily psych tech rounds were not consistently filed in UHRs, and filed summaries were often incomplete.

Weekly case manager contacts in administrative segregation and SHU continued to occur. Institutional audits covering the monitoring period showed that 3CMS inmates in administrative segregation and SHU were seen weekly by a case manager 97 percent of the time. Three quarters of clinical contacts occurred in private settings.

In the general population 3CMS program, a shortage of office and program space and average caseloads of 125 inmates presented daily challenges. Three or more clinicians typically shared an office. Clinicians routinely interviewed inmates in non-confidential public areas, including on outdoor benches. Despite these challenges, 3CMS inmates in general population continued to be seen at least quarterly by their case manager.

IDTT meetings for general population 3CMS inmates occurred within required time frames, but psychiatric participation was sporadic. A psychiatrist participated in roughly three quarters of the IDTT meetings reviewed by staff during the period from April 1 to October 30, 2006. Correctional counselors were assigned to IDTT meetings on a rotating schedule and were often unfamiliar with the inmates being reviewed. C-files were not consistently available. IDTT meetings observed by the monitor's expert ranged from excellent to seriously problematic.

UHR audits completed as part of the institution's peer review process

found that 90 percent of reviewed treatment plans were individualized and showed coherence between diagnosis, treatment goals, and the clinical services provided. If compliance is sustained, this CAP problem will be resolved.

Nearly 100 3CMS inmates in general population were enrolled in groups, including a depression group, two grief and loss groups, a stress and anxiety group, a support group, a sex worker group, and a developmentally disabled group. Throughout the monitoring period, between 30 and 60 inmates were on waiting lists for groups. Group assignments were treatment plan driven.

An institutional audit found that 65 of 70 new arrivals to the reception center were evaluated for the need to request previous records from outside mental health programs. This CAP item will be resolved if compliance is sustained.

Mental health treatment in the reception center complied with Program Guide requirements. Reports provided by the institution and the monitor's review of inmate histories indicated that EOP inmates in the reception center were seen weekly by a case manager. Psychotherapeutic groups were available to caseload inmates in the reception center. Institutional audits showed sustained compliance with timely completion of initial screens and evaluations in the reception center.

### SUMMARY

Staffing:

As of January 31, 2007, vacancy rates among CDCR mental health clinicians remained higher than among other staff classifications. For psychiatrists, psychologists, psychiatric social workers, and psych techs, the vacancy rate was 49.49 percent. Collectively, non-mental health positions had a vacancy rate of 42.01 percent.

Meanwhile, the MHSDS caseload grew to 32,385, up by 812, or 2.6 percent, from January 2006 to January 2007.

Among mental health disciplines, the vacancy rate among psychiatrists throughout CDCR institutions was second only to psych techs, at 49.95 percent. Of the total 301.20 full-time-equivalent psychiatry positions, 150.45 were open. Use of 64.38 full-time-equivalent contractors reduced the psychiatric functional vacancy rate to 28.58 percent.

CVSP and KVSP had no psychiatric vacancies. With use of contractors, CIW, CTF, CEN, DVI, and CSATF were able to cover fully theirs. ASP, CIM, ISP, PVSP, RJD, SCC, VSPW, and WSP achieved good coverage with use of psychiatric contractors, accomplishing functional vacancy rates that ranged from 3.8 percent to 14 percent. Use of contractors permitted CCWF, CMF, CMC, NKSP, and CSP/Solano to achieve partial coverage of their psychiatric vacancies, with functional vacancy rates ranging from 21 to 32 percent. The psychiatric vacancy rate at CSP/Sac was 34 percent, which it did not ameliorate with any contract coverage.

High vacancy rates in psychiatry at CSP/Corcoran, CSP/LAC, MCSP, CCI, HDSP, and PBSP were moderated somewhat with use of contract psychiatrists, but functional vacancy rates remained high, ranging from 40 percent to 72 percent. CRC, Folsom, SQ, and SVSP also had high psychiatric vacancy rates and used no contractors, for vacancy rates of 40 percent at CRC and Folsom, 62 percent at SQ, and 72 percent at SVSP. CCC employed no psychiatrist and no contractors, leaving its psychiatric vacancy rate at 100 percent.

Vacancy rates among psychologists closely followed the rates in

psychiatry, with 832.37 full-time-equivalent positions, of which 410.23 were vacant, for a vacancy rate throughout CDCR institutions of 49.28 percent. Contractors covered 88.17 full-time-equivalent positions, reducing the functional vacancy rate to 38.69 percent.

CDCR institutions were less successful with contractual covering of psychology vacancies than they were with psychiatric positions. The best results were achieved by CMC, CMF, PVSP, and CSP/Solano, where functional vacancy rates in psychology ranged from 12 percent to 20 percent. At CIM, CTF, CAL, CSP/LAC, PBSP, RJD, and SVSP, employment of contract psychologists lowered functional vacancy rates to a range of 21 to 39 percent, with PBSP at the low end of the range and CSP/LAC at the high end. CRC, Folsom, and CSP/Sac had vacancy rates of 35 percent, 37 percent, and 25 percent respectively, but they employed no contract psychologists.

Psychology vacancy rates remained high despite the use of contract coverage at CCI, CCWF, CIW, CSP/Corcoran, CSATF, CEN, DVI, HDSP, ISP, MCSP, VSPW, and WSP. Among these institutions, functional vacancy rates ranged from 40 percent at CIW and CSP/Corcoran to 87 percent at ISP. Another group of institutions, ASP, CCC, CVSP, NKSP, SCC, and SQ, also had high vacancy rates in psychology, ranging from 47 percent to 75 percent. These institutions did not use contractors to fill in their gaps in this area.

Among the CDCR's 166.99 psychiatric social workers, 42.51 percent were vacant, with 70.99 positions unfilled. Contractors covered the equivalent of 37.66 full-time positions, reducing the functional vacancy rate to 19.95 percent.

The effect of employment of contract social workers varied across institutions. SCC was able to fill its social work allocations without employing

contractors. At CCWF, CMC, and CSP/LAC, use of contractors allowed these institutions to achieve full coverage for social work. Other institutions with good contract coverage in this area included CIW, HDSP, PBSP, and RJD, whose functional vacancy rates ranged from seven to 18 percent. Although CIM employed no contractors in this area, its social work vacancy rate was 11 percent.

Other institutions fared less well. Folsom and SQ had social work vacancy rates of 33 percent and 25 percent, respectively, and no contract coverage. Use of contractors at CMF, CSATF, and CSP/Corcoran reduced their social work vacancy rates to 22 percent, 33 percent, and 36 percent respectively, but at SVSP and VSWP, even with use of contractors, functional vacancy rates for social work remained high at 45 percent and 42 percent, respectively.

Eight institutions had very high vacancy rates for psychiatric social workers that were not offset by any use of contractors. Rates were 75 percent at ASP and DVI, 67 percent at CCI, 50 percent at NKSP and PVSP, and 49 percent at WSP. CTF and CSP/Sac employed no permanent or contract social workers, leaving them with 100-percent vacancy rates in this area.

For all case manager positions, the vacancy rate was 48.15 percent, with 481.72 open positions out of 999.36 total allocations. With contract coverage of the full-time equivalent of 125.83 positions, the functional vacancy rate was reduced to 35.56 percent.

Psych techs had the highest vacancy rate among all mental health positions at 51.93 percent, with 258.29 vacancies among 497.36 positions. For RNs assigned to mental health, the vacancy rate was 24.08 percent, for 58.1 vacancies out of

241.22 positions.

Quality Management:

        Mental health quality management subcommittees audited MHSDS indicators, reported to the health care quality management committee, chartered QITs, and generally served their intended purpose at CCI, CCWF, CIM, CMF, CMC, CSP/Corcoran, CSATF, Folsom, NKSP, PVSP, RJD, SVSP, and VSPW. CCI did a particularly good job of utilizing clinical and custodial expertise and integrating mental health quality management with institutional quality management. Still, a number of these institutions' committee meetings lacked sufficient attendance across the spectrum of disciplines. Their QITs did not include members with the expertise necessary to address problems at hand or to fulfill their charters. Many mental health quality management subcommittees failed to compile adequate documentation or to require QITs or suicide prevention committees to document their activities appropriately.

        SQ reorganized its historically fragmented and largely ineffectual mental health quality management mechanism. Fundamental issues were addressed, and improvements were made. Developments were promising but recent. SCC, despite its caseload of over 600 3CMS inmates, established a meaningful quality management structure during the monitoring period.

        CSATF and SVSP did not use QITs but instead used task groups or action items to resolve problems. CVSP also did not have a mental health subcommittee, but its health care quality management committee was responsive to MHSDS issues, monitoring indicators and remedying problems that cropped up.

        At CSP/Solano, CTF, and ASP, the mental health quality management

subcommittee was more highly developed than the health care quality management committee, although long-standing problems went unresolved at CSP/Solano and CTF after QITs ran their course.

CSP/Sac, MCSP, PBSP, and WSP lost ground from their previously high level of quality management processes. CSP/Sac, MCSP, and WSP's quality management activities declined from their earlier levels, with staffing shortages and institutional flux. Meetings were held irregularly, and no QITs were chartered, although routine audits and supervision remained in place at WSP.

At both MCSP and PBSP, custody staff was less involved in quality management. QITs were fewer and less beneficial than they had been in the past. PBSP's quality management function continued its downward slide and could no longer be considered adequate. Difficulties with electronic medical records and the loss of key staff were factors. At CIW, CRC, CSP/LAC, DVI, and HDSP, where quality management was less developed, problems were similar but more pronounced. Documentation was scant, and audits were chronically flawed. QITs were not used to examine problems or develop recommendations. Participation in quality management activity lacked multidisciplinary representation.

MHSDS inmates were not placed routinely at CCC, CAL CEN, CVSP, and ISP, and consequently, their caseload populations were small, with short lengths of stay, and their need for mental health quality management was reduced. At CVSP, the quality management committee encompassed mental health issues with good results.

Suicide Prevention:

Institutional suicide prevention committees continued to fulfill their

310

mandates at CIW, CMC, CMF, CRC, CSP/Corcoran, CSP/Sac, CSATF, CVSP, Folsom, MCSP, NKSP, RJD, SVSP, and VSPW. Even the best performing committees were hindered by poor attendance, lack of custody and non-mental health membership, and failure to identify pertinent local issues or cover essential agenda items.

Several institutions' suicide prevention committees satisfied *pro forma* requirements in meeting regularly and keeping minutes but fell short of their mission with lack of oversight of standing suicide prevention measures, inattention to new issues, or poor follow-up of suicide-related CAPs. These institutions included ASP, CCC, CIM, CSP/LAC, CTF, CAL, CEN, CCWF, DVI, HDSP, ISP, KVSP, PBSP, RJD, SQ, and WSP.

At CSP/Solano, the suicide prevention committee failed to follow through on suicide-related CAP recommendations. Later in the monitoring period, the committee's functioning improved when custody staff became active participants on the committee and elements of the administrative segregation suicide reduction plan were implemented.

CIM failed to address problems raised by suicides. ISP's suicide prevention practices were weak. At CEN, despite three suicides in three years, there was no suicide prevention committee, reportedly no QIT activity, no audits of administrative segregation screenings, and no follow-up of inmates discharged from the CTC. CCWF lacked appropriate emphasis on following suicide prevention protocols, particularly for inmates in psychiatric crises after hours or in locked-down units.

A group of institutions performed well with five-day follow-up of inmates discharged from an MHCB or, in some instances, returned from DMH or moved from an

OHU. These institutions included CCC, CMF, CSP/Corcoran, CSATF, CTF, CCWF, DVI, KVSP, SVSP, and VSPW. CMF's audits found that five-day follow-up contacts were made in 99 percent of cases during the last six months of 2006. Custody observations were 83-percent compliant from August through December 2006. CCC reported 88- and 67-percent compliance rates for five-day follow-up and custody observations, respectively.

DVI reported that five-day follow-up was carried out, but custody observations were conducted 50 to 60 percent of the time. CSP/Corcoran reported a 93-percent compliance rate with five-day follow-up but provided no information regarding custody observations. SVSP reported 100-percent compliance in 11 cases discharged with planned five-day follow-up and custody observation, but no documentation regarding custody observations was maintained.

At CTF, where few inmates made it to MHCBs, an audit of cases discharged from the OHU found nearly 100-percent compliance with clinical follow-ups, but the degree of compliance with orders for custody observation was unclear. KVSP reported a compliance rate of 98 percent through the monitoring period regarding five-day follow-up but did not track custody observations. CCWF reported that staff continued to conduct five-day follow-up of suicidal inmates discharged from the MHCB to housing units. Tracking information relative to custody checks was disorganized and could not be readily used to assess compliance. VSPW's audits found follow-up compliance rates of 85 to 97 percent, with occasional misses on weekends. No information about custody observations was gathered. CSATF reported that staff audits continued compliance with requirements regarding five-day follow-ups and custody

observations. CCC reported that in rare instances of inmates returning from an MHCB, follow-up contacts were made as required.

Some institutions provided little documentation regarding five-day follow-up and custody observations, while others had low rates of compliance. SQ tracked compliance with planned five-day follow-up of previously suicidal inmates discharged from the OHU. Follow-up by both mental health and custody remained non-complaint. Staff audits covering July through September 2006 found that clinical follow-up was carried out as planned in 33 of 47 cases, or 70 percent. Custody observations were completed in 19 of 46 cases, or 41 percent.

CSP/Solano audited its operations and found problems with both clinical follow-up and custodial observation of inmates discharged from its MHCB. A QIT was chartered and a new mechanism put in place, after which performance by both clinical and custody staff at CSP/Solano improved. HDSP reported 61-percent compliance with five-day follow-up orders and problems with custody observations. WSP reported that custody observations were audited monthly, finding rates of compliance ranging from five to 45 percent across a six-month period. CCI reported that compliance with five-day follow-up was audited in the context of peer review, but it provided no particulars.

Folsom, with few applicable cases, had a detailed and thoughtful mechanism for five-day follow-up. Staff reported that when the mechanism broke down for two days, a QIT was chartered, and the underlying causes of the breakdown were identified and remedied. The monitor's review of individual cases, however, found more lapses in five-day follow-up than were found by institutional audits. Folsom did not audit custody observations. CSP/LAC reported few lapses in five-day follow-up, but no audit

313

results were reported.  Lapses were said to be limited to weekends and were attributed to omissions by on-call psychiatrists.  CSP/LAC reported no information regarding custody observations.  CAL appeared to have carried out five-day follow-up in 23 or perhaps more applicable cases, but documentation lacked clarity.  CAL's documentation made no reference to custody observation.

CSP/Sac, CMC, and MCSP were challenged by their large numbers of MHCB and OHU beds and concomitantly high demand for follow-up.  At CSP/Sac, staff audits found low compliance rates throughout most of 2006, but improved performance brought compliance with clinical follow-up to 100 percent in October.  CMC was in a similar position, with high volume militating against full compliance.  It was unable to make all planned clinical follow-ups.  MCSP reported an average compliance rate of 61 percent for clinical follow-up from April through December 2006.

Few institutions, even among the group with the highest rates of compliance, demonstrated implementation of the policy requiring hourly custody observation during the first 24 hours following release from an MHCB or, when warranted, from an OHU.  Only CCC, CMF, CSATF, and DVI compiled and audited records of custody observations.  CTF compiled but did not tally or audit records of custody observations in order to ascertain compliance.

Medication Management:

Medication Continuity for Newly Arriving Inmates:  Newly arriving inmates did not experience discontinuity with their medications at over half of institutions.  First medications after arrival were generally timely at ASP, CCC, CCWF, CIM, CMC, CRC, CSP/Corcoran, CSATF, CVSP, ISP, LAC, NKSP, PVSP, SCC,

VSPW reception center, and WSP. There was some slippage at CMC, probably due to its shortage of psychiatrists.

A smaller but significant group of institutions was unable to provide medication to its newly arriving inmates in a timely manner. These institutions included CCI, CIW, CAL, DVI, KVSP, MCSP, PBSP, RJD, SVSP, and VSPW. Compliance rates at DVI and PBSP ranged from 50 to 60 percent. Although MCSP remained non-compliant in this respect, it reduced its rate of non-compliance by approximately half since the preceding monitoring period.

Medication Continuity on Intra-Institutional Transfers: Fewer than half of institutions were compliant with medication continuity on intra-institutional transfers. Compliance rates were good at CCC, CCWF, CSATF, MCSP, NKSP, PBSP, PVSP, SCC, and VSPW. PBSP used bridge orders routinely. SCC's improvement in this area since the preceding monitoring period was attributed to its compliance coordinator's diligence. At PVSP, continuity was inconsistent on transfers from yards to administrative segregation. Institutions that were non-compliant on intra-institutional transfers included CCI, CIW, CAL, CVSP, DVI, KVSP, CSP/LAC, RJD, SVSP, SQ, and WSP. DVI's rate was particularly low, at 40 percent.

Medication Order Renewals: Renewals of orders were timely at a majority of institutions, including ASP, CIM, CMF, CRC, CTF, CAL, CVSP, NKSP, PVSP, RJD, SQ, SCC, and VSPW. There was no discontinuation of inmates' medications absent psychiatric contact at SCC. SQ revised its LOP to limit ordinary bridge orders to 30 days, and to 14 days if written without inmate contact. DVI's data showed compliance with timely renewals, but it used 90-day bridge orders. Although the

pharmacy at CTF did not maintain a list of expiring orders, psych techs checked manually for expirations. Once orders reached the pharmacy at PBSP, they were filled, and medication was administered within 24 hours in 87 to 100 percent of cases.

Renewals were untimely at CSP/LAC, CSP/Sac, CSATF, CCWF, Folsom, KVSP, PBSP, SVSP, and WSP. At both Folsom and PBSP, expirations were particularly problematic in administrative segregation. Expirations were attributed to lack of sufficient psychiatric staffing at CSATF and PBSP.

Medication Non-Compliance: Responsiveness to medication non-compliance was another area in which most institutions failed to comply with guidelines. Generally, CCC, CIW, CMF, CRC, Folsom, and RJD complied, but ASP, CCWF, CIM, CSP/Corcoran, CSP/Sac, CSP/Solano, CSATF, CTF, CAL, DVI, PBSP, VSPW, and WSP did not.

Pill Lines: Lengths of pill lines and waits were appropriate at CCWF, MCSP, PVSP, and RJD, but waits were overly long at ASP, CIW, CRC, CTF, CSP/LAC, SCC, and WSP. At SCC and CTF, waits exceeded one and two hours, respectively.

Informed Consent: A clear majority of institutions, including Folsom, CCC, CMF, CSP/Corcoran, CTF, CAL, CEN, MCSP, ISP, CSP/LAC, and RJD, complied with respect to obtaining informed medication consent forms from inmates on psychotropic medications. CRC and SCC did not meet Program Guide requirements in this area.

Laboratory Testing: Laboratory testing of blood levels for inmates on psychotropic medications was compliant at a relatively small number of institutions, including CCC, CCWF, CMF, CSP/Corcoran, CSATF, PVSP, RJD, and SCC, although

316

test results were not returned timely at PVSP and RJD. A new mechanism at CSP/Corcoran to compensate for its shortage of psychiatrists showed promise.

Laboratory testing was non-compliant at ASP, CCI, CSP/Sac, CSP/Solano, CSATF, CEN, CVSP, DVI, NKSP, PBSP, SQ, and SVSP. Non-compliance was attributed to lack of staffing in the laboratories at PBSP and DVI, as well as lack of psychiatric staffing at the latter institution.

DOT Medication Administration: Numerous institutions, including CCC, CAL, ISP, KVSP, PVSP, and SQ, ordered all medication to be administered DOT. CSP/Sac did so for all of its EOP inmates. Institutions compliant with DOT procedure included Folsom, CCC, MCSP, CSATF (except in MHCB), and VSPW. CRC ordered DOT administration only for inmates who had histories of medication non-compliance. Implementation of DOT improved at CSP/Corcoran, but hoarding was still problematic. DOT was not properly implemented at CEN, CMC, CSP/Solano, CTF, PBSP, RJD, and SVSP.

Keyhea Process: Keyhea process was used appropriately at CMC, CSATF, Folsom, MCSP, PBSP, PVSP, RJD, and VSPW. Several other institutions used it improperly or not at all. These included CIM, CMF, CSP/Solano, DVI, MCSP, SCC, and SVSP.

Most institution used HS medication orders appropriately, including CCC, CCI, CIM, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CAL, Folsom, MCSP, NKSP, PBSP, SCC, and VSPW. Institutions that were non-compliant with HS medication orders included CRC, CSP/Solano, PBSP, RJD, SVSP and WSP.

Parole Medications: Institutional compliance with provision of

317

medications to inmates leaving the institution improved significantly. A clear majority of institutions performed well in this respect, including CCC, CCI, CIM, CMF, CRC, CSP/Corcoran, CSATF, CSP/LAC, CSP/Sac, CTF, CEN, CVSP, Folsom, KVSP, MCSP, NKSP, RJD, SQ, SCC, VSPW, and WSP. Only CAL was found non-compliant in this area.

<u>Mental Health Assessments for Use in the Discipline of Sexual Misconduct Violations</u>:

At most institutions, inmates who had received sexual misconduct RVRs were screened for exhibitionism. Screenings were being implemented at CCC, CCI, CIM, CMF, CMC, CSP/Corcoran, CSP/Sac, CSATF, CEN, HDSP, ISP, KVSP, LAC, NKSP, PBSP, SVSP, SQ, and SCC.

At CMC, CSP/Sac, CSP/Corcoran, and SVSP, screenings were done late, beyond the 72-hour timeline. At CSP/Sac and SVSP, screening results were not reviewed by an IDTT. At CSP/LAC, screenings were often conducted at cell-front, and none triggered further evaluation despite some inmates' significant histories that were positive for exhibitionism. At CSP/Solano, not all inmates were referred for screenings, and those who were referred were often screened late. Inmates were not screened for exhibitionism at CAL, CVSP, DVI, Folsom, CSP/Solano, and PVSP.

Inmates who were diagnosed with exhibitionism were referred for comprehensive evaluations at CIM, CMC, CSP/Corcoran, and PBSP. However, these institutions were outnumbered by those that did not provide comprehensive evaluations for exhibitionism following a positive screening finding. Comprehensive evaluations were not conducted at CAL, CVSP, DVI, HDSP, ISP, PVSP, and SCC, nor were evaluation findings taken into account at CSP/Sac.

Relatively few institutions were able to provide specialized treatment for exhibitionism to inmates who tested positive for this disorder. Treatment was provided at CSP/Sac, although it was in the form of cell-front individual counseling rather than by group therapy. At PBSP, two treatment groups were running, and inmates were encouraged to discuss any diagnoses of exhibitionism with their case managers. CCI offered non-specialized treatment for exhibitionism and hired a regional consultant for assistance in developing more specialized treatment. SQ was in the process of developing a collaborative treatment effort with CMF. The monitors' review found that no treatment for exhibitionism was offered at CSP/Corcoran, DVI, HDSP, NKSP, RJD, and SCC, although CSP/Corcoran hired a contract clinician to provide in-service training to staff on how to screen, evaluate, and treat exhibitionism.

Many institutions referred cases of exhibitionism to the district attorney, but only a small minority of cases were accepted for prosecution. Institutions making such referrals included CCC (three referred, none accepted), CCI (37 referred, eight pending, two incomplete), CMF (53 referred, two accepted), CSP/Sac (79 referred, none accepted), CAL (five referred but undecided), CVSP (one referred, none accepted), DVI (three referred, one accepted), and HDSP (17 referred, none accepted). All cases were referred for prosecution at CMC, KVSP, and NKSP, but none were accepted for prosecution from NKSP. CSP/Solano referred some of its cases.

Transfers:

Delays increased for access to all DMH inpatient care. In late January 2007, DMH imposed limitations on all acute and intermediate inpatient care admissions, including those from CDCR institutions, to ASH. The reason was staffing shortages,

which were particularly severe in psychiatry. Coleman plaintiff class members in need of acute care at ASH were triaged or redirected to acute or intermediate care at other facilities. This occurred against the backdrop of a "swap" of 25 acute inpatient beds designated as MHCBs at ASH for 25 acute inpatient beds at CMF. The swap was intended to facilitate admission and treatment of Level III and Level IV inmates in need of MHCB care by making MHCBs available at CMF and simultaneously increasing the availability of acute inpatient care beds at ASH. Results of the bed swap fell far short of expectations. Vacancies in the swapped beds persisted at both institutions, as did the shortage of MHCBs throughout CDCR institutions. Defendants proposed converting the S-1 unit at CMF to exclusive use for acute inpatient care and later proposed utilization of the 25 beds at ASH as MHCBs, subject to availability of staff. By order of this Court dated May 23, 2007, the swap was reversed, and the 25 beds at ASH were returned to use as MHCBs for members of the Coleman plaintiff class. Given the persistent difficulties with mental health staffing difficulties, prospects for use of the 25 ASH beds as MHCBs remained dim. Since January 2007, ASH did not house any Coleman plaintiff class members designated as requiring acute inpatient care, and its Coleman population at the intermediate inpatient level of care declined from 133 to 80.

The restrictions on admission at ASH had a trickle-down effect on mental health services throughout CDCR institutions. Inmates awaiting transfers to higher levels of care experienced longer waits in MHCBs, which precipitated longer waits for inmates in OHUs and MHOHUs awaiting transfers to MHCBs. While OHU and MHOHU beds were taken up, inmates in administrative segregation or reception centers could not be moved into them.

To resolve the chronic staffing shortages at ASH and restore access for Coleman plaintiff class members, defendants were ordered on May 23, 2007, to file a plan for pay parity among all DMH psychiatrists, psychologists, licensed social workers, and psych techs providing care to Coleman plaintiff class members, without regard to whether the care was rendered in a DMH or CDCR facility. In addition, defendants were ordered to examine use of contracted mental health professionals to increase staffing levels. Defendants were ordered further to report on the job titles and number of staff required to meet applicable staffing ratios for Coleman inmates, program by program, at ASH, CSH, PSH, Napa State Hospital and Metropolitan State Hospital. Lastly, defendants were ordered to file monthly reports on referrals, pending referrals, rejections, and transfers of inmates from any level of outpatient care to inpatient care and from any inpatient care to any different level of care, including a list of all Coleman plaintiff class members awaiting transfer to any level of DMH care.

DMH: Throughout CDCR institutions, approximately one third of DMH referrals did not result in transfers. At a number of prisons, transfers resulted from only about half of referrals. Poor DMH access was attributed principally to lack of bed availability, resulting in waiting lists and rescission of referrals after improvements in inmates' conditions during long waits for beds. Staff at some institutions delayed referrals or failed to refer when clinically warranted. DMH often took days to communicate decisions on referrals or assignment of bed numbers.

Acute Care: Overall, delays in transfers to acute care lengthened. CSP/Sac reported lapses of 15 days between referrals and transfers, with a range of five to 49 days. Its 36 referrals resulted in 25 transfers; seven were rescinded. PBSP and

MCSP reported delays of four to seven days from referral to assignment of a bed number. At MCSP, transfers were made on average within twelve days, although it waited too long to refer seven of its cases. CSP/Solano referred 13 inmates; nine were transferred, and three were rescinded. SQ's transfer times ranged from four to 27 days, or on average eight days, but some necessary referrals were not made. Staff reported that condemned inmates could be sent to DMH only for acute care and that transfers to acute care at DNH/CMF were delayed, citing the case of a gravely disabled condemned inmate who remained in the OHU for 56 days.

Of DVI's 16 referrals to DMH for acute or intermediate care, four were accepted and transferred, and three went to MHCBs at other prisons, with times from referral ranging from six to 27 days. Both PVSP and SVSP transferred 14 inmates, less than half of their inmates in need of acute care at DMH/CMF. At PVSP, six referrals resulted in transfer, and six were rescinded, with times from referral to transfer ranging from three to 35 days. SVSP transferred six inmates and rescinded seven referrals. At SVSP, inmates referred to DMH/CMF for acute care commonly arrived there three weeks or longer after their referrals, with most of that time consumed awaiting either a DMH acceptance or a bed assignment. SVSP staff waited too long to refer. Of its seven referrals, only one was made within ten days of admission to the MHCB unit, and all were rescinded.

CMF encountered barriers to DMH acute, intermediate, and MHCB levels of care. CMC referred 37 inmates to DMH/CMF, of whom 14, or 39 percent, were transferred. Four of the 37 inmates went to acute care at ASH, and five referrals were rescinded, with lapses of 12 to 38 days from referral to transfer to DMH/CMF.

322

Of 18 inmates sent from WSP to DMH/CMF, 11 were accepted for acute care and seven for intermediate care. Transfers to acute care occurred within 15 days of IDTT determinations. Data suggested that NKSP referred 36 inmates to acute care, with two rescissions. KVSP's late referral practices hampered its access to DMH care, with its 12 referrals resulting in just five transfers. Those inmates who reached acute care waited an average of 14 days for acceptance and a bed number. On average, 35 days elapsed between referrals and transfers, with a range of 11 to 71 days. HDSP failed to make clinically appropriate referrals, applying too high a threshold for referrals.

Access to all DMH care from CSP/LAC was thwarted by late referrals and transports and by failure to refer when clinically indicated. Although staff was retrained; a part-time referral coordinator designated, documentation improved, and referrals to acute care from MHCB stays made earlier, access to DMH slowed from September to December 2006. Referrals from MHCB admissions were made within three to 15 days of admission. An average of 35 days elapsed between DMH's receipt of a referral and the assignment of a bed number.

At RJD, access to DMH programs was often slow and reportedly difficult for high-security inmates. Of its 13 referrals, four were rescinded, and one was rejected. The eight inmates accepted waited an average of two weeks for transfer to DMH.

The GACH at CIM housed 35 to 40 severely mentally ill inmates. CIM had a long history of inability to transfer EOP inmates from reception center in a timely manner. It referred 91 inmates, or approximately 18 per month, to DMH programs for acute or intermediate care but actually transferred 60. Nine inmates paroled before their transfers, eight were reduced to lower levels of care, five were on a wait list, and nine

323

referrals were still being processed at the time of the monitor's visit. Time from referral to transfer decreased to an average of 26 days. Staff attributed excessive lengths of stay in the GACH to increased symptoms, delays in the procurement of Keyhea orders, and late DMH acceptances. CCWF reported difficulty with gaining access to acute care at DMH, particularly for inmates with complicated case factors, to PSH. VSPW referred one inmate to DMH, resulting in a transfer within eight days.

CSP/Corcoran, MCSP, NKSP, and PBSP reported good access to acute care beds at DMH/CMF, with an average of five to six referrals per month in August 2006.

Intermediate Care:    A large number of institutions made no referrals to intermediate care. Those that referred to intermediate care, including CMF, CIM, CMC, CSP/LAC, CSP/Sac, DVI, MCSP, PBSP, and WSP, reported that a relatively small number of referrals resulted in transfers to appropriate levels of care. To increase DMH's ability to provide Level IV intermediate care, two housing units at SVSP were converted to DMH use, and two wings at CMF were converted to intermediate care, although activation of the latter was still incomplete at the end of the monitoring period. Some institutions were able to refer and send a small number of inmates to these new beds, but the wait for access to intermediate DMH, particularly for Level IV inmates, often lasted three to six months. Regularly, CIW was able to place inmates in intermediate care beds located at PSH.

MHCB:    While most prisons with an MHCB unit reported better access to MHCBs, there was no improvement for institutions reliant on MHCB units located elsewhere. At most of these institutions, inmates not transferred to off-site MHCBs were

not referred elsewhere, e.g., to DMH acute care programs. SQ and DVI struggled with high demand for and low supply of OHU beds. Under-referral to off-site MHCBs was attributed to lack of staff and resources to meet time-consuming demands of the referral process and associated documentation. Staff at DVI and SQ, which sent inmates to off-site MHCBs, complained that some were returned within a short time without noticeable improvement. CRC, CVSP, and ISP were exceptions, with CVSP reporting timely access after July 2006.

Most institutions with on-site MHCB units reported improved access. Several documented sharp declines in the use of holding cells, but at CCI, CSP/LAC, NKSP, WSP, KVSP, and CIM, some alternative holding cells were still used due to lack of access to MHCBs and OHU beds. Even among institutions reporting improved or adequate access to MHCBs, such as CSP/LAC, CSP/Solano, RJD, and SVSP, not all inmates in need of MHCB treatment gained admission. Access to HDSP's MHCB was poor. WSP attributed reduced access to its MHCBs to increased dedication of the beds to chronic medical patients. MCSP's MHOHU, which was opened because demand for its eight MHCBs exceeded supply, still had to use five additional cells in administrative segregation for inmates who could not gain access to MHCBs or the MHOHU.

Lengths of stay in MHCBs were excessive except at PBSP and CSP/LAC, where nearly all stays were reportedly less than ten days. Treatment in MHCB units varied widely, with a number of them having idiosyncratic practices, falling short of Program Guide requirements, or imposing unnecessary or inappropriate property or movement restrictions. At PBSP and KVSP, restraint and seclusion were used more frequently and for longer periods of time than at other MHCB units. CCI used restraints

infrequently in its busy OHU but did not document their use adequately or follow departmental directives on restraint orders and range of motion exercises. Five-day follow-up orders and the prohibition on Friday or weekend discharges were regularly observed.

OHUs and MHOHUs: Waits in OHUs and MHOHUs for access to MHCBs were overly long, with at least half exceeding 72 hours. Most long waits were attributed to lack of MHCBs. Inmates' conditions sometimes improved during their waits, causing them to be discharged back to their housing units. OHUs at MCSP, DVI, and CCI were as busy as any MHCB units. Available treatment in OHUs and MHOHUs fell short of that provided in a typical MHCB unit, with lack of sufficient space and clinical and custodial staff.

Use of Holding Cells: CCI, CSP/LAC, KVSP, MCSP, NKSP, and WSP used holding cells to cover overflow from their MHCB or MHOHU beds. SVSP reduced its use of holding cells. WSP's records showed frequent use of holding cells, some located within and some distant from the CTC. In some instances, suicidal inmates were left in holding cells for extended periods of time, some handcuffed and not observed appropriately. At NKSP, logs showed that nearly 90 percent of inmates requiring crisis care were initially placed in holding cells and that 60 percent never reached an MHCB. Routinely, CSP/LAC used holding cells until candidates for admission to the MHCB could be evaluated by a physician. CCI had a 15-bed OHU and regularly used two holding cells. Some inmates remained in holding cells up to three days. Suicide watches and suicide precautions were carried out using a one-to-two ratio, but the vantage point of the observer missed substantial portions of both cells. CIM's GACH, which functioned

much like an OHU, was staffed for 18 but handled regularly 35 to 40 caseload inmates. Limitations of the physical plant and local operational procedures constrained staff ability to provide mental health treatment.

Transfer of EOP Inmates from Mainline or Segregated Units: Many EOP inmates awaited transfers for months under restrictive conditions, while they should have been transferred within 60 days. Transfers were not timely at CSP/Solano, CSATF, CTF, KVSP, PVSP, and WSP. At CSP/Solano, fewer than half of EOP inmates were moved within 60 days, with one taking eight months. Weekly case manager contacts were missed, and in a few cases, signs of acute mental illness elicited no response. In October 2006, many inmates who had been waiting over 60 days were transferred. During a six-month period at CSATF, 15 EOP inmates were transferred, with waits ranging from 17 to 217 days. Compliance rates for weekly case manager contacts improved from 50 percent to 100 percent. At PVSP, some EOP inmates awaited transfers to SNYs for several months and did not receive ten weekly hours of out-of-cell activity. CTF identified 40 inmates as needing an EOP level of care and transferred 25 of them elsewhere, but 11 of those transfers were untimely. KVSP rarely met EOP transfer deadlines. Of its 12 EOP inmates who were transferred during the monitoring period, ten waited longer than 60 days, four waited a year or longer, two waited for over 200 days, and the rest waited from 83 to 143 days. Most of these delays were attributed to a shortage of EOP beds, particularly Level IV SNY beds.

Movement of EOP inmates from hub EOP administrative segregation units drew mixed results; some occurred consistently timely, but many missed the 30-day transfer timeline. At WSP, transfers of its eight EOP inmates from administrative

segregation were delayed due to lack of bed space at hub institutions, with two waiting longer than 30 days and three waiting over 60 days.

Transfer of EOP and 3CMS Inmates from Reception Centers: Reception Centers reported that they transferred 75 to 79 percent of 3CMS inmates to receiving institutions within mandated time frames. CSP/LAC, with a relatively low volume of intakes, reached the highest level of compliance. CIM and CIW continued to fail to compile adequate records regarding lengths of stay in their reception centers. HDSP reported an increase by about ten percent in reception center intakes, averaging 252 inmates per month. By November 2006, the HDSP reception center held 153 3CMS inmates, of whom 38, or 25 percent, had been there longer than 90 days.

Transfer times were less compliant for EOP inmates than for 3CMS inmates. Busy receptions centers like CIM reported that during some months, more EOP inmates were released to the community than were transferred to receiving institutions. Six of the ten EOP inmates at HDSP were transferred timely, and at the time of the monitor's visit, two had stays of, respectively, 63 and 82 days. One EOP inmate awaited transfer to an SNY for 113 days.

At DVI, in November 2006, 207 of 757 caseload inmates, or 27 percent, had been in the reception center beyond transfer deadlines. An October 2006 audit found that 45 percent of EOP inmates in the reception center were transferred timely, with the longest stay reaching 99 days. Approximately 80 percent of the EOP inmates in the reception center received weekly case manager contacts and medication management but no other mental health treatment.

Staff at WSP reported a high volume of intake into reception with

approximately 2,200 inmates processed per month. In January 2007, there were 1,035 3CMS and 73 EOP inmates in WSP's reception center. Transfer deadlines were exceeded for 249 3CMS inmates, or 24 percent, and for 19 EOP inmates, or 26 percent. Staff reported that an EOP treatment team had been organized and that additional custody staff had been hired to provide welfare checks and assist in the fulfillment of requirements regarding the treatment of EOP inmates. Group therapy was not offered, but case manager contacts were more frequent than weekly. Psychiatric contacts were made at least monthly.

CSP/LAC moved 79 percent of its 157 3CMS inmates within 90 days. One of three recommended expedited transfers was made and accomplished in 27 days. EOP inmates in CCI's reception center were seen weekly in 90 percent of cases. CIM was non-compliant with transfer timelines for caseload inmates in the reception center. In October and November 2006, stays for EOP inmates decreased to 86 days on average. RJD also did not meet transfer timelines for MHSDS inmates in the reception center. In mid-November 2006, RJD's reception center housed 127 EOP inmates, of whom 47, or 37 percent, had been there longer than 60 days. Reasons for excessive lengths of stay included department-wide overcrowding and missed and/or expired medical and mental health chronos. According to institutional reports, EOP inmates in the reception center at CIW were endorsed in 59 days on average, while 3CMS inmates were endorsed in 53 days on average.

VSPW continued to transfer general population and reception center EOP inmates within mandated time frames. Eighty EOP inmates were transferred within 18 days on average. Compliance with the 3CMS transfer timelines declined slightly. In

329

January 2007, about 11 percent of the 149 3CMS inmates in the reception center had been there longer than 90 days, with most delays related to ongoing court proceedings.

CAL, CEN, and CVSP received 27, 34, and 60 erroneously transferred 3CMS inmates, respectively. CVSP and CEN reported timely retransfers in all cases, while CAL moved half of the inmates who were sent inappropriately within 30 days.

## RECOMMENDATIONS

High vacancy rates in mental health staffing continued throughout CDCR institutions during the 18th monitoring period. With vacancies highest among psych techs, second highest among psychiatrists, and only moderately better among the other mental health disciplines, all aspects of care were affected. Aggregated actual and functional mental health vacancy rates of approximately 50 and 36 percent, respectively, quantified the single most significant obstacle to compliance with the <u>Coleman</u> Program Guide. Staffing shortages perpetuated overly large clinical caseloads, insufficient out-of-cell therapeutic time and activity, delayed response to medication non-compliance, low levels of participation in quality management, and failures in transfers to higher levels of care, to name a few of the myriad ways that mental health services were frustrated. Although there were some individual institutional exceptions, the now 12-year-long creation of a functional MHSDS program remained unfinished, due in no small part to the CDCR's ongoing staffing problems.

Over time, insufficient mental health staffing has exacted a particularly high toll on the care of the growing EOP population entering CDCR institutions. It has led to ever longer waiting periods for EOP inmates in reception. Inmates languished there without care, leading to an increase in cases of decompensation. These conditions

330

culminated in the court order of May 1, 2006, requiring defendants to develop a plan for providing adequate mental health care to EOP inmates in reception centers. A court order of October 20, 2006, called for the addition of treatment programs for EOP inmates in reception centers at CIM, CSP/LAC, RJD, NKSP, SQ, and WSP and for accelerated implementation of the plan on January 1, 2007.

During the 18th monitoring period, EOP inmates continued to wait for transfers in reception center for excessively longer periods of time. For example, at HDSP, 40 percent of EOP transfers were untimely, with one taking 113 days for a transfer to an SNY. DVI transferred 55 percent of its EOP inmates in reception center untimely. Approximately 80 percent of its EOP inmates in reception center were seen weekly for case manager contacts and medication management, but they received no other mental health treatment. At WSP's reception center, transfer deadlines were missed for 26 percent of EOP inmates, but the institution did not offer these inmates group therapy, an important component of EOP treatment. These statistics exemplify the need for continued vigilance in monitoring the timeliness of these transfers as well as the provision of adequate care during these long waiting periods. Such monitoring is ongoing during the 19th monitoring period and will be covered in a special master's report to be filed at the end of June.

It is now over one year since the special master recommended that defendants develop a plan to reverse the increase in suicides in administrative segregation. Since the defendants' development and implementation of a plan, some progress was made during the 18th monitoring period, but more remains to be done. Approximately half of required small management yards have been completed. The

331

remainder need to be completed within a much shorter time horizon than the five-year completion period projected by the defendants. <u>Coleman</u> monitors have been finding that 30-minute welfare checks are occurring during the first three weeks of inmates' stays in administrative segregation. Yet apparent inconsistencies and documentation gaps in these checks must be resolved. As for modification of intake cells, retrofitting of ventilation screens is reportedly on schedule, although as of April 1, 2007, only 16 percent of cells had been reworked. Effective cell suicide-proofing also requires additional construction. Defendants have reported that they are only now assessing their budget to complete this work. They also have reported some progress with exploring the feasibility of limited personal property for inmates on non-disciplinary stays. More work remains to be done. Defendants need to improve access to inmates' suicide histories, assess their needs for more confidential treatment space, explore ways to reduce long stays in administrative segregation pending resolution of criminal charges, and improve emergency response by enforcing the requirement for staff refresher training in CPR.

The shortage of MHCBs continued through the 18th monitoring period. It was experienced most acutely at institutions that do not have on-site MHCB units and rely on off-site MCHB availability. Some clinicians appeared to have become resigned to this problem. Under the weight of bed unavailability, understaffing, burdensome documentation requirements, and, perhaps most troubling of all, the reportedly unimproved conditions of some returning inmates, clinicians under-referred to off-site MHCBs or did not refer at all. This is a troubling and disheartening situation that has serious implications for suicide prevention, as many inmates who are designated for this level of care are at high risk for suicide. Inmates turned away from MHCBs are housed

in alternative accommodations such as OHUs, MHOHUs, and so-called holding cells, but these accommodations often do not afford the heightened level of treatment and observation that suicidal persons require. Worse yet, many inmates in these MHCB-alternative sites are never moved to actual MHCBs.

There are a few limited signs of relief in sight for MHCB availability. A 50-bed MHCB unit at CMF is slated for completion and activation in early 2008. On May 23, the Coleman court ordered that the 25 beds at ASH that had been included in the failed crisis bed "swap" be returned to use as MHCBs for Coleman plaintiff class members. In the context of the Coleman, Perez, and Plata coordination effort, the coordinating parties have agreed that although the general acute care hospital at CIM should be "de-licensed," the physical plant shall remain open to house 40 MHCBs. It appears that Title 22 of the California Code of Regulations requires that MHCBs be housed in CTCs, which must be licensed in order to operate. One solution might be the conversion of the space into a 40-bed temporary MHCB unit with clinical staffing provided by mental health. The Plata receiver has already agreed to provide nursing staff. Physical improvements to the facility will be needed. With that said, it remains premature to say that the crisis in MHCB availability is passing. This area of concern will be monitored until it finally abates.

Access to acute and intermediate inpatient care at DMH also remained a challenge during the 18th monitoring period. Approximately one third of DMH referrals did not result in transfers; for others, waits from referral to transfer were so long that inmates' conditions improved pending acceptance and transfer, causing those referrals to be rescinded. These factors lend some credence to a perceived futility of referring among

333

clinicians.

DMH access tightened further at the end of the 18th monitoring period

when ASH restricted its admissions. Again, shortages in staffing were the culprit. Since

these restrictions were implemented, the <u>Coleman</u> plaintiff class population at ASH has

dwindled from 133 in January to 80 as of May. No acute-care-level <u>Coleman</u> inmate has

been housed there since January. The ASH admission restrictions have had a trickle-

down effect in the institutions. Already-limited MHCBs are occupied by inmates who

should be transferred to acute inpatient care, while other inmates in need of those

MHCBs are stalled in OHUs, MHOHUs, and holding cells. After a hearing on the

<u>Coleman</u> plaintiffs' motion for emergency relief regarding access to inpatient psychiatric

beds in DMH facilities, defendants were ordered to address the DMH staffing shortage by

preparing a plan for pay parity among mental health staff who treat <u>Coleman</u> class

members, whether in CDCR institutions or in DMH facilities, and to prepare a report

identifying the job titles and number of staff required to satisfy applicable ratios of staff

to <u>Coleman</u> class members in specified levels of care at ASH, CSH, PSH, Napa State

Hospital, and Metropolitan State Hospital. They have also been ordered to report on the

feasibility of other measures to relieve staffing shortages, including employment of

contractors at ASH. In the future, defendants must prepare and file monthly status

reports covering all <u>Coleman</u> class members awaiting transfers to all levels of DMH care.

These orders should serve to focus the defendants' efforts in restoring access to DMH

levels of care for <u>Coleman</u> class members. The solution to opening these higher levels of

care lies in filling the many mental health staffing vacancies. During the balance of the

19th monitoring period and the upcoming 20th monitoring period, access to DMH levels

of care and the necessary staffing component of that goal will be a focal point of the monitoring effort.

On a slightly more positive note, the 18th monitoring period saw an increase in the number of institutions referring inmates for mental health screenings for exhibitionism following RVRs for sexual misconduct. Still, most institutions did not provide comprehensive evaluations for those inmates whose screens were positive for exhibitionism, and fewer still were able to provide treatment for this disorder. Improvements in this area will be sought during the upcoming 20th monitoring period.

The Special Master's Report for the Eighteenth Monitoring Period was distributed in draft form to the parties on June 18, 2007. In response, plaintiffs confined their comments to what they describe as "the disproportionate and inappropriate use of force against inmates with mental health disabilities at CSP/Corcoran."

Plaintiffs state, as a premise to their comments, that the total number of use-of-force incidents at CSP/Corcoran had increased by approximately 60 percent as of spring 2006. The 60 percent figure, however, applied to an increase in all incidents, not only those involving the use of force. Moreover, during the same period, the rate of incidents in which force was used dropped to 43 percent, down from earlier rates of 50 – 56 percent. Thus, while the reported increase in total incidents is somewhat disquieting, the general reduction in use of force in response to those incidents tends to dispel signs of escalating resort to force in order to quell those incidents.

The relatively high number of total incidents and the involvement of mental health inmates at CSP/Corcoran are not entirely surprising, given certain characteristics of this particular institution and its population. This is not to minimize

335

concern regarding use of force at CSP/Corcoran, but to place it within the context of all 33 CDCR institutions and to understand it better.  CSP/Corcoran is the only CDCR institution which has a sizeable mental health caseload population in its secured housing units.  The institution houses a large number of mental health inmates with histories of violence.  It has the highest population in the CDCR of high security level mental health caseload inmates, while it has no Psychiatric Services Unit, nor any in-patient DMH programs for mental health inmates.  It also has one of the largest Enhanced Outpatient Program (EOP) Administrative Segregation Unit hubs in the CDCR, and approximately 500 mental health inmates in its Security Housing Unit.  As of April 14, 2006, CSP/Corcoran housed in its Administrative Segregation unit 138 mental health caseload inmates whose designated level of care was Correctional Clinical Case Manager System (3CMS), and 48 inmates designated at the EOP level of care.  At the same time, it housed 477 3CMS-level inmates in its Security Housing Unit, at 106 percent capacity for that unit.  These population numbers remained high one year later.  As of May 18, 2007, there were 141 3CMS inmates and 60 EOP inmates housed in the CSP/Corcoran Administrative Segregation unit, the latter group at 111 percent of program capacity.  At the same time, there were 469 3CMS inmates in the CSP/Corcoran Security Housing Unit, at 104 percent capacity for that unit.[5]  Thus, over 50 percent of the mental health caseload at CSP/Corcoran was housed in the Security Housing Unit or in Administrative Segregation.  Against this backdrop, it is not surprising that CSP/Corcoran reports a higher rate of incidents than many other CDCR institutions, and that this elevated rate is not necessarily a result of misfeasance or malfeasance on the part of the defendants.

---

[5] Statistics provided by the CDCR Division of Correctional Health Care Services, dated July 3, 2006 and July 1, 2007.

Plaintiffs note correctly that MHSDS inmates made up 21 percent of the population at CSP/Corcoran, but were involved in 47 percent of the total number of incidents during the Eighteenth Monitoring Period. They also note correctly that that the Special Master has expressed concern in past reports about involvement of mental health inmates in a disproportionate number of incidents involving the use of force. Read together, these two assertions suggest that plaintiffs may have misconstrued the term "incidents" in the Report to mean all incidents including those involving use of force. As used in this Report, and as used consistently in past reports of the Special Master, the term "incidents" refers to all incidents, without regard to whether force was used. In addition, these two individually-correct assertions read together also suggest, albeit erroneously, that the rate of use of force against mental health inmates is 26 percent higher (i.e. the difference between 47 percent and 21 percent) than it is for incidents involving all inmates. That suggestion is erroneous because the 47 percent figure is drawn from the total 208 reported incidents, which include the 118 incidents, or 57 percent, in which force was *not* used. Consequently, any inference that force was used against mental health inmates at a 26 percent higher rate than against all inmates or against non-mental health inmates is misleading.[6]

More pertinent to this discussion is the four percent difference between rates of use of force in incidents involving mental health inmates versus those involving all inmates. Although this percentage difference is relatively small, it does not mean that use of force is no longer of concern at CSP/Corcoran. To be sure, institutional review

---

[6] The cell-extraction incident of August 16, 2006, reported in the May 18, 2007 Use of Force Incident Reports cited by plaintiffs, had not been reviewed by CSP/Corcoran senior staff at the time of the monitor's visit, and consequently it was not reported by the monitor.

and the Special Master's monitoring of incidents and use of force remain a serious matter. Any signs of change for the worse must draw timely and meaningful reaction.

In the imminent Twentieth Monitoring Period, the monitor will re-focus on use of force, with examination and reporting to compare force used in incidents involving mental health inmates with those involving non-mental health inmates. Particular attention will be given to Level IV inmate populations, where representation of mental health inmates tends to be disproportionately high, and to the secured housing areas, for example the Security Housing Unit and the Administrative Segregation Enhanced Outpatient Program hub units, where incidents tend to cluster. Attention will also be given to the thoroughness and accuracy of the institutions' examination and recording of incidents. In addition, the use of force at CSP/Corcoran during the Nineteenth Monitoring Period, which ran from March through July 2007, will be covered in the Nineteenth Monitoring Report, which is yet to be completed and circulated among the parties.

The data gathered during the Eighteenth Monitoring Period does not necessarily signal a systemic failure of the existing policy to avoid unjustified use of force at CSP/Corcoran. The more plausible explanation for the higher rate of incidents and use of force in incidents involving mental health inmates may well be a failure of implementation of the policy rather than a flaw in the policy itself. Indications are that the institution has been reviewing and documenting incidents, although there may be room for improvement in this area. In any event, the findings which emanated from the monitor's review of CSP/Corcoran during the Eighteenth Monitoring Period do not call for the far-reaching remedial measures that plaintiffs request. If the monitor's findings in

the upcoming Nineteenth Monitoring Period Report and in the Twentieth Monitoring

Period merit adoption of any of those measures, they or others will be considered and

recommended, as appropriate.

Since the beginning of 2007, <u>Coleman</u> has been in the midst of a dynamic

and perhaps unprecedented period of planning and reporting. That five-month period

saw the filing of parts A and B of the 17th Monitoring Report and the circulation of part

C in draft form. In that period, the special master also filed two reports on the swap of

acute inpatient beds between CMF and ASH, a report on defendants' December 2006

mental health bed plan, a report on plaintiffs' response to the 16th Monitoring Report on

salary enhancements for DMH clinicians, a report on defendants' establishment of

interim inpatient intermediate care beds, a supplemental report on defendants' plan to

prevent suicides in administrative segregation, and a report on overcrowding and the

anticipated effect of out-of-state transfers of CDCR inmates. On or before June 30, 2007,

the special master will be filing his report on EOP services in reception centers, per order

of October 20, 2006.

The end of intensive planning and reporting is not in sight. As a result of

these many reports filed by the special master, there are now myriad orders requiring

defendants to prepare plans and reports. During the next 90 days, defendants must

prepare and file the following plans and reports:

- Defendants' report on the provision of EOP services in administrative
  segregation, including ways to reduce lengths of stay in administrative
  segregation, alternative methods for delivery of mental health treatment, use of
  different housing and/or service models, and their plan for modification of the
  frequency of ICC reviews to every 45 days for inmates held over 90 days, due
  June 7, 2007 (per order of March 9, 2007);

- Defendants' plan to provide pay parity, with scales approved by the order of

339

December 15, 2006, for all DMH psychiatrists, psychologists, licensed clinical social workers, and psychiatric technicians providing care to members of the <u>Coleman</u> class at any state-run facility, due June 13, 2007 (per order of May 23, 2007);

- Defendants' report on the feasibility of other options for remedying limitations on admissions of <u>Coleman</u> class members to ASH caused by staffing shortages, due June 13, 2007 (per order of May 23, 2007);

- Defendants' report identifying job titles and numbers of staff required to provide care to <u>Coleman</u> patients at specified levels of care at ASH, CSH, PSH, Napa State Hospital, and Metropolitan State Hospital, due June 13, 2007 (per order of May 23, 2007);

- Defendants' report on referrals, rejections, and transfers of inmates from any level of care to any inpatient level of care and from any level of inpatient care to a different level of mental health care, due June 13, 2007 (per order of May 23, 2007);

- Defendants' supplemental report that addresses CDCR's relationship with DMH and CDCR's consolidation plan (superseding an earlier ordered report), due June 15, 2007 (per order of April 17, 2007, superseding order of March 27, 2007);

- Defendants' plans and reports on the prevention of suicides in administrative segregation, including

    o Defendants' plan to require each institution to train staff on accurate logging of 30-minute welfare checks and to track and self-monitor compliance with the performance of these checks;

    o Defendants' provision of budgetary figures for the construction of the physical features of the non-stand-alone intake cells;

    o Defendant' report on each institution's capability to provide televisions and/or radios to inmates in administrative segregation;

    o Defendants' status report on the implementation of the suicide history tracking system and a plan to train staff in its use and improve access to suicidal history data at all relevant times;

    o Defendants' assessment of their space needs for providing confidential mental health interviews; and

    o Defendants' documentation that required CPR refresher training was accomplished;

340

due July 30, 2007 (per order of May 31, 2007); and

- Defendants' plan that will satisfy their need for sufficient small management yards to meet Title 15 exercise requirements for inmates in administrative segregation, call for funding and completion of the yards by the end of fiscal year 2008/2009, and include provisions for better utilization of existing small management yards and coordination with available staff, due August 29, 2007 (per order of May 31, 2007).

In addition, there may be orders emanating from the special master's recommendations in his 17th Monitoring Report part C for defendants to devise and implement recruitment and hiring strategies. No objections to those recommendations were interposed.

These plans and reports presage a great deal of intensive study and reassessment for mental health programming for Coleman plaintiff class members not only in CDCR institutions but in DMH programs as well. The task for the parties, particularly defendants, is weighty and far reaching. Because there is so much work to be done, it is now time to focus on defining and implementing the changes that will emanate from these many plans and reports. It is not a time to make additional recommendations that would generate yet further orders imposing more tasks that the parties' resources cannot reasonably be expected to manage. Accordingly, the special master is not submitting formal recommendations for additional orders at this time.


Respectfully submitted,

/s/


_____
J. Michael Keating, Jr.
Special Master


341

/s/

_____
Matthew A. Lopes, Jr.
Deputy Special Master

July30, 2007