EXHIBIT A

High Desert State Prison (HDSP)

November 28, 2006 – November 30, 2006

1.    Inmate A

This 30 year old inmate's UHR was reviewed as he had had several admissions to CTC within the past several months. He had been at a 3CMS level of care for the past few months. An evaluation on 1/10/06, when he was at an EOP level of care, indicated that this inmate was incarcerated for possession of cocaine. Within the context of this interview, he reported that he had been in the crisis bed on several prior occasions for threats or attempts at suicide. He had multiple ad seg placements and a SHU term for threatening staff and inmates. He was diagnosed at that time with schizoaffective disorder and antisocial personality disorder.

The UHR documented a fairly consistent history of threatening staff with lawsuits, claiming mistreatment and acting in a demanding and angry fashion toward staff members. He made demands and often reacted with anger and threats when these demands were not met. He previously threatened to "kill" a number of mental health staff. Notes in the UHR consistently presented the clinical opinion that this inmate did not have a major mental illness, but was more likely diagnosed with Substance Dependence and ASPD.

It appeared that this inmate had been in the CTC several times during recent months: 8/29/06 to 8/31/06, 9/14/06 to 9/18/06 and 11/19/06 to 11/20/06. None of the inpatient records for these stays were filed in the UHR. An 11/6/06 progress note stated that this inmate was "stable off medication."

Assessment:

This inmate appeared to have been regularly followed by the mental health services staff. Records indicated a consistent presentation as an angry, demanding and potentially violent individual who was more likely diagnosed with ASPD than any substantial Axis I disorder. He appeared to be receiving appropriate mental health care at the time.

2.    Inmate B

This inmate's case was reviewed as he was an individual who had been placed into the CTC on several occasions.

This 30 year old inmate reportedly had a long history of treatment for mental illness. Records appeared to indicate that this inmate was not within the mental health treatment population at the time of this review. An order for Depakote was discontinued in June 2006 and he had not been prescribed medication since that time. Nonetheless, he was admitted to the CTC in November 2005, January 2006, May 2006, July 2006 and most recently on 11/10/06.

On 7/24/06, he was admitted to CTC after he made several superficial scratches on his wrist and reported that he intended to injure himself; apparently as a result of frustration

with custody staff for failing to grant his request to move to another housing unit. Records indicated that this inmate's primary concerns at that time were safety concerns and that "no psychiatric concerns" were verbalized by the inmate. Reports indicated that the inmate "chronically endorsed suicidality which is contingent upon housing issues." A 7/27/06 note indicated that the inmate informed staff that unless he was allowed to go to "ad seg 7 block" he "would remain suicidal." Diagnoses at that time included Adjustment Disorder with mixed disturbance of conduct and emotion and Paranoid Personality Disorder. A treatment plan completed at that time included a description of problems and target behaviors. Specific interventions were cited and documentation of the staff assigned to complete each intervention was included.

Assessment:

This inmate had a history of "conditional suicide" threats and had resulted in several MHCB placements. He presented as demanding and occasionally threatening. Staff had provided appropriate treatment and his self injurious threats appeared to have been appropriately addressed.

3.    Inmate C

This case was reviewed in light of the fact that this inmate has been placed within the MHCB on several occasions.

This inmate has been incarcerated for his first prison term since May 2006. He had a reported history of drug abuse and homelessness. Several notes in the record referenced difficulties he had with cellies as a result of "acting abnormal." The record also documented past thoughts of suicide.

It appeared that this inmate was placed in 3CMS upon his arrival at HDSP in May 2006. In July 2006, following his third placement in the CTC within three weeks, he was apparently prescribed Prolixin and then released at an EOP level of care. He was then abruptly removed from the MHSDS on 8/22/06.

Assessment:

This inmate had been in the CTC on at least three occasions since June 2006. He was diagnosed with psychosis NOS and prescribed Prolixin, an anti-psychotic medication, in July 2006. Shortly thereafter, on 8/21/06, it appeared that he was abruptly and inappropriately removed from the MHSDS. There was only a very limited note that justified his removal from the MHSDS.

4.    Inmate D

This inmate was seen within the context of an IDTT meeting in the MHCB.

This inmate was incarcerated for the murder of his girlfriend. He had a history of an admission to Atascadero State Hospital in 2002 for depression and suicidality which was apparently attributed to his reaction to his crime. Records indicated that this inmate presented variously as quite psychotic and disorganized and, at other times, as fairly coherent. At times, he smeared feces and "trashed" his cell and possessions.

He arrived at HDSP on 7/24/06 and, a few days later, on 7/31/06, was admitted to the MHCB when he complained of "hearing voices." His medication was adjusted and he remained within the CTC until 7/31/06. Thereafter, he was admitted to the CTC during 10/24/06 to 10/30/06 and was again in the CTC on 11/28/06. He was diagnosed with Borderline Personality Disorder and Schizotypal traits at the time of this latest admission. Prior discharge diagnoses included Major Depressive Disorder with psychotic features.

During an 11/28/06 interdisciplinary team meeting, this inmate was subdued, soft-spoken and poorly groomed, but appeared oriented and able to follow the content of the meeting. There appeared to be a considerable level of controversy among the treatment team participants regarding this inmate's need for a higher level of care. The record appeared to reflect a prolonged consideration as to the veracity of his mental illness. Members of the team emphasized that this inmate was pending an appeal of his murder conviction and that he was likely attempting to establish a history of mental illness. In the end, the team recommended that he be sent to DMH for evaluation.

Two other inmates reviewed by the IDTT had considerable histories of MHCB placements. A substantial portion of the team's discussion of these cases revolved around whether and how the inmates may have malingered symptoms of mental health in order to accomplish some specific goal.

The 11/28/06 IDTT consisted of the psychologist and psychiatrist assigned to the CTC, an RN, CCI and custody officers who worked on the unit. In addition to the Coleman expert, the senior and chief psychologists sat in on the treatment team. Inmates attended and participated in the meeting. The health care records were not available for some of the cases reviewed by the IDTT. Throughout the course of the meeting, nurses administered medications, completed elements of examinations and, in one case, took an inmate's blood pressure while speaking to the committee members.

Assessment:

Review of records and observation of the IDTT process appeared to suggest an unusual level of attention to the possibility that this inmate was malingering symptoms of mental illness. Of concern is the fact that, after approximately six months during which the inmate has been within CTC on several occasions, the decision was made that the inmate required a higher level of care. It would appear that the level of attention to the possibility that the inmate was malingering may have obstructed the process of facilitating this inmate's access to appropriate treatment.

5.    Inmate E

This inmate was seen within the context of an IDTT meeting held in MHCB.

This inmate arrived at HDSP approximately 8/1/06. He apparently had a recent history of a previous prison term and he had "discharged" the CDCR number from that incarceration. He had a history of inpatient hospitalization and a substantial history of substance abuse.

This inmate was diagnosed with edema and phlebitis which had, at times, threatened his leg. Historical notes indicated that this condition improved when he was within an inpatient setting, as he received medical care for these conditions and was less likely to "pace."

This inmate had been within the CTC on 10/29/06, during 11/19/06 to 11/21/06 and was again admitted to the MHCB during the weekend of 11/25/06 to 11/26/06 when he tore his mattress apart and reportedly ingested a portion of the covering. Information regarding the first two placements had not yet been filed in his UHR. Available information suggested that he was quite psychotic through these earlier MHCB placements.

During the 11/28/06 IDTT meeting, this inmate's speech was slurred and, at times, incomprehensible. He appeared quite disheveled and poorly groomed. He arrived at the meeting with his pant leg elevated. The leg affected by phlebitis was very dark and swollen from the knee down. Staff reported that this inmate was on a "high dosages" of psychotropic medication but remained quite disorganized. Records indicated that this inmate was at 3CMS level of care at the time of the interdisciplinary team meeting. Staff reported consistently poor self care, and consistent negative symptoms of Schizophrenia. Within the context of the IDTT meeting, staff acted to increase the inmate's level of care but made no other recommendations.

Assessment:

This inmate had a substantial medical condition that had historically been exacerbated during times that his mental illness was under poor control. The inmate had a recent history of at least two CTC placements within the prior two months. He appeared to clearly require inpatient care as a function of his poorly controlled mental illness in combination with the existing medical condition. The interdisciplinary team failed to recognize the need for acute care and instead elevated his level of care to EOP – an action that would have little immediate effect as he would be required to wait for several weeks to be transferred to an appropriate placement. This case was discussed with supervisory staff.

6.    Inmate F

This inmate, identified by plaintiffs' attorneys as someone who might need a higher level of care, was briefly interviewed. During the interview, he reported experiencing "voices" which instructed him to "kill" himself. He reported that his condition had deteriorated following a change in medication. His prescription for Trileptal was discontinued and replaced with another medication. The inmate reported that, in the time since the medication was changed, he has received two "serious" RVRs and now reported being hesitant to come out of his cell. He reported that previous one-to-one contact with the case manager and participation in groups were "helpful," but that neither of these services was currently available.

Assessment:

This inmate had experienced deterioration in his condition which correlated with a change in medication. He would likely benefit from having his level of care increased to EOP, as he had previously benefited from involvement in regular group and individual therapy.

7.    Inmate G

This 3CMS inmate was placed in ad seg on 4/19/06. Since 7/28/06, case manager contacts were documented on 7/28/06, 8/4/06, 8/11/06, 8/18/06, 8/25/06, 9/1/06, 9/8/06 (at cell-front), 9/15/06, 9/22/06, 9/29/06, 10/12/06, 10/31/06 and 11/3/06.  Weekly summaries of daily LPT rounds covered 7/23/06 to 7/29/06, 7/30/06 to 8/5/06, 8/6/06 to 8/12/06, 8/13/06 to 8/19/06, 8/20/06 to 8/26/06, 8/27/06 to 9/2/06, 9/3/06 to 9/9/06, 9/10/06 to 9/16/06, 9/17/06 to 9/23/06, 9/24/06 to 9/30/06, 10/1/06 to 10/7/06, 10/8/06 to 10/14/06 ("seeing case manager confidentially at his request"), 10/15/06 to 10/21/06 and 10/22/28. Psychiatric contacts were documented on 7/25/06 and 10/24/06. An IDTT was completed on 10/4/06, attended by the inmate's case manager, the Chief Psychologist and a correctional counselor. A psychiatrist did not attend. A 10/4/06 MH-2 retained this inmate in 3CMS with a diagnosis of Depressive Disorder NOS and a GAF of 65. Target problems included mild depression and the intervention called for weekly/PRN CCM contacts and quarterly psychiatric contacts. Remeron 45mg qpm was ordered. Recent MARs recorded consistent medication compliance.

Assessment:

Weekly case manager contacts were documented. However, the pre-formatted progress notes provided little more than boilerplate, check-marked information and extremely sparse narrative ("stable on meds"), and did not indicate where contact occurred. Daily LPT rounds were documented on weekly summaries, which included a brief narrative. Quarterly psychiatric interviews were also documented. In addition, the treatment plan had been updated within the preceding 90 days. However, a psychiatrist did not attend the IDTT. MARs appeared to be well maintained.

8.    Inmate H

6

This 3CMS/Medical Necessity inmate arrived at HDSP on 7/12/06 and was placed in ad seg on 8/23/06. Weekly summaries of LPT rounds covered 8/20/06 to 8/26/06, 8/27/06 to 9/2/06, 9/3/06 to 9/9/06, 9/10/06 to 9/16/06, 9/17/06 to 9/23/06, 9/24/06 to 9/30/06, 10/1/06 to 10/7/06, 10/8/06 to 10/14/06 and 10/15/06 to 10/21/06. Case manager contacts were documented on 8/25/06 (inmate declined out-of-cell), 9/1/06, 9/8/06 (at cell-front), 9/15/06 (refused case manager contact), 9/22/06, 9/29/06 and 10/12/06. An IDTT meeting was held on 8/30/06. The meeting was attended by the inmate's case manager, another staff psychologist and a correctional counselor. A psychiatrist did not attend. An 8/30/06 MH-2 retained this inmate in 3CMS with diagnoses of Dysthymic Disorder (early onset), Cannabis Dependence (institutional remission) and ASPD, with a GAF of 60. Target problems included chronic depression and poor interpersonal/social skills. Interventions included weekly case manager at cell-front contact and monthly/PRN CCM one-on-one, and psychiatry PRN. Paxil 20mg qpm was ordered. Physician's orders indicated that Paxil was renewed for 90 days via telephone on 10/5/06. Prior to that, Paxil was ordered on 9/28/06 (no progress note) and 7/23/06. Recent MARs documented consistent medication compliance.

Assessment:

Compliant in that weekly case manager contacts and daily LPT rounds were documented. However, case manager notes contained very little information and it was unclear where contacts occurred. This inmate appeared to be very isolative and it was unclear from progress notes what, if anything, was being done to address this behavior. The treatment plan inappropriately called for weekly cell-front contacts, with monthly/PRN one-on-one interviews. Finally, a psychiatrist did not attend the most recent IDTT.

9.    Inmate I

This 3CMS inmate was placed in ad seg on 6/19/06. Progress notes from 8/4/05 forward documented case manager contacts on 8/4/06, 8/18/06 (resting at bunk), 8/25/06, 9/1/06, 9/8/06 (cell-front), 9/15/06, 9/22/06 (refused case manager contact), 9/28/06 and 10/12/06 (stable on meds). Weekly summaries of LPT rounds covered 8/6/06 to 8/12/06, 8/20/06 to 8/26/06 (friendly but withdrawn), 8/13/06 to 8/19/06 ("I'm fine"), 9/3/06 to 9/0/06, 8/29/06 to 9/2/06, 9/10/06 to 9/16/06 ("I'm fine thank you"), 9/17/06 to 9/23/06 ("I'm fine") and 10/15/06 to 10/21/06.

A 10/31/06 psychiatric note read, "Not seen case manager. Reports stable on meds. Will renew 90 days." An IDTT was held on 9/26/06. Two psychologists attended the IDTT meeting. Neither a psychiatrist or correctional counselor attended the meeting. The inmate refused to attend the IDTT meeting, and the associated MH-2 was blank. A prior treatment plan, dated 6/28/06, retained this inmate in 3CMS with a diagnosis of Major Depressive Disorder (recurrent, in full remission), with a GAF of 68. Target problems included mood instability, poor coping skills and poor interpersonal skills (history of attacking cellmates). Interventions included weekly cell-front case manager contacts, bi-monthly to monthly one-on-one case manager contacts and quarterly/PRN psychiatric contacts. Remeron 30mg qpm was ordered. October's MAR recorded consistent

7

medication compliance. However, this inmate refused medication on 9/9/06, 9/13/06, 9/16/06, 9/18/06 and 9/21/06. He also refused medication on 8/3/06, 8/20/06 and 8/27/06.

Assessment:

Compliant in that weekly case manager contacts and daily LPT rounds were documented. However, case manager notes were extremely cursory and sparse, and the notes, in many cases, did not indicated where contact occurred. The treatment plan inappropriately called for weekly cell-front case manager contacts, with bi-weekly/PRN one-on-one interviews. In addition, the inmate refused to attend the most recent IDTT meeting and a treatment plan was not completed. Lastly, documentation stopped toward the end of October, indicating that there was a four to six week filing backlog.

10.    Inmate J

This inmate was placed in ad seg on 7/14/06. A 7/15/06 31-question mental health screen noted that this inmate was prescribed Remeron and that he needed to be placed in 3CMS. An initial IDTT meeting was held on 8/2/06. Two psychologists and a correctional counselor attended the meeting. A psychiatrist did not attend. The UHR was available, but the C-File was not. The associated MH-2, also dated 8/2/06, placed this inmate in 3CMS/MN with diagnoses of Adjustment Disorder with mixed disturbances of emotions and conduct and ASPD (locked-up since age 12). Target problems included unstable mood, depression and poor judgment. Interventions included psych meds evaluation and management every 90 days and weekly case manager contact, with a focus on staying out of prison upon parole. Remeron 45 mg qpm was ordered.

An IDTT review was held on 10/25/06. Two psychologists and a correctional counselor attended the IDTT. A psychiatrist did not attend, nor did the inmate.  The UHR was available, but the C-File was not. The associated treatment plan continued this inmate in 3CMS with diagnoses of Adjustment Disorder with mixed disturbance of emotion and conduct, and ASPD with a GAF of 66. Target problems included mood instability and the intervention called for weekly CCM contacts and quarterly/PRN psychiatric contacts.

Progress notes documented CCM contacts on 8/14/06 (fine, waved off), 8/21/06 (dismissive from cell, "I'm fine"), 8/28/06 (only concern about Remeron, expired 8/24/06), 9/5/06 (said saw psych one week ago and he renewed Remeron. Haven't had meds in one week), 9/11/06 (Remeron 45mg expired 8/24/06. Recommend renew as soon as possible), 9/18/06 (wants one-to-one contact out-of-cell if possible), 9/25/06 (different pscyhologist, wants to see psychiatrist), undated (new psychologist), 10/2/06 (stable on meds), 10/10/06, 10/16/06, 10/30/06 and 11/6/06.  Weekly summaries of LPT rounds covered 8/6/06 to 8/12/06 ("I'm fine"), 8/13/06 to 8/19/06 ("Thinking about stopping my meds. What should I do?"), 8/20/06 to 8/26/06, 8/27/06 to 9/2/06, 9/3/06 to 9/11/06) (requesting to go back on Remeron, referral sent to mental health), 9/10/06 to 9/16/06 (Remeron restarted at inmate's request), 9/17/06 to 9/23/06, 9/24/06 to 9/30/06, 10/1/06 to 10/7/06, 10/8/06 to 10/14/06 (states meds helpful. Explained that case manager available for confidential counseling at inmate's request.) and 10/22/06 to 10/28/06.

Psychiatric contacts were documented on 8/29/06 (no new order) and 10/3/06 (reduce Remeron). Physician's orders indicated that Remeron 45mg was ordered for 90 days on 5/25/06, renewed for 90 days on 9/12/06 (19 days after the previous order expired), and adjusted to 30mg on 10/3/06.

Assessment:

Compliant in that weekly case manager contacts and daily LPTs rounds were documented. However, it appeared that case manager contacts occurred at cell-front by default and that the inmate had to request out-of-cell interviews. IDTT meetings were timely, though a psychiatrist did not attend and C-files were not available. Lastly, psychiatric staff did not respond timely to staff referrals for a medication evaluation and prescribed Remeron was permitted to expire, leaving the inmate without medication for nearly three weeks.

11.    Inmate K

On 2/22/06 at 12:03 p.m., during an institutional count, this inmate's cellmate said "Hey, I don't think he's playing." At that point, the floor officers noted that this inmate was hanging himself from the upper bunk. The floor officers called the control booth officer, who activated his personal alarm. When responding staff arrived, the cell door was opened and the cellmate was escorted out of the cell. Two officers entered the cell and lifted this inmate to reduce the pressure on his neck. A third officer cut the noose above the knot with a cut-down tool. At that point, the noose was removed from the inmate's neck and he was lowered to the floor. The sergeant called for the Medical Transport Vehicle. The inmate was placed on a stokes litter and two MTAs initiated CPR, employing chest compressions and using an ambu bag (time not noted). The inmate was then lifted onto a gurney, taken to the waiting MTV and transported to the TTA, arriving at 12:15 p.m. CPR was reportedly continued throughout transport. Life support measures were continued until the inmate was pronounced dead at 12:45 p.m.

Assessment:

This case could not be fully assessed because key times were not recorded in the incident report. The housing unit officers who first discovered this inmate hanging from the bunk in his cell did not initiate life-saving measures. Responding MTAs initiated CPR, though the exact time was not noted in the incident report. This inmate was transported to the CTC within 12 minutes of staff discovering him hanging in his cell.

12.    Inmate L

On 1/22/06 at 6:50 a.m., this inmate's cellmate informed the floor officer that he had tried to waken this inmate, only to find him unresponsive. The cellmate was removed from the area and a sergeant and MTA were called. The MTA "immediately responded" and observed through the cell door window that this inmate was lying on his left side on the floor with a pillow under his head. The MTA noted that this inmate's skin was gray and

that his lower extremities were purple. The MTA then used the institutional radio to request the assistance of two other MTAs. The cell door was opened at 6:55 a.m., when the MTA entered the cell and placed his hands on this inmate's right bicep and "shouted his name." This inmate did not respond, and was noted to be cold to the touch and not breathing. The MTA then check for a pulse and did not find one. The MTA attempted to roll this inmate over on his back, noting that he was "completely stiff and extremely cold." Two more MTAs arrived and all three MTAs concluded that this inmate "was deceased and had been for some time." This observation was based upon "the obvious signs of death to include; 'lividity' as evident by deep purple coloring to the lower portions of the body and apparent 'rigormortis' as evident by ridged and fixed positioning of the entire body." At that point, the cell door secured. The on-duty medical doctor was called, responded to the cell and pronounced this inmate dead at approximately 8:30 a.m.

Assessment:

The provided narrative indicated that this inmate had been dead a long time when he was discovered by custody staff, implying that life-saving measures would have been futile. Nonetheless, the emergency response was inadequate in that staff waited five minutes to open the cell door, at which point vitals, breathing and skin temperature were checked. For five minutes, this inmate was presumed to be dead and un-revivable based solely on staffs' observations through the window of the cell door. CPR was not initiated in this case.

EXHIBIT B

Mule Creek State Prison (MCSP)

January 1, 2007 -- January 3, 2007

1.    Inmate A

This 26-year-old inmate was at an EOP level of care. There was a history of mental health treatment since approximately age 13. The inmate had characteristically been diagnosed with Adjustment Disorder and Borderline Personality Disorder. He had also been noted to evidence depression and had occasional incidents of self-injury by cutting his arms.

He had a history of several recent placements into crisis care including 3/10/06 to 3/23/06, 10/24/06 to10/26/06, 10/26/06 to 11/2/06, and 11/8/06 to11/16/06. The record appeared to contain documentation of five-day follow-up following CTC placements. He had been placed into DMH acute care on at least one occasion.

The documentation within the record was generally legible and well-organized. There was documentation that the inmate had been seen by a case manager on a weekly basis. There was a current treatment plan that included goals, target behaviors and a list of groups in which the inmate was to be involved.

Assessment:

It would appear that, in general, this inmate had been appropriately tracked and had received appropriate care. He had had numerous placements into CTC and, once admitted, appeared to have cleared rather rapidly. He appeared to be appropriately diagnosed with Borderline Personality Disorder and, in all likelihood, had been appropriately managed through this regimen of periodic CTC placements. It would appear that the IDTT should have considered referral to a higher level of care, though this may have occurred and was simply not found in the record.

2.    Inmate B

This EOP inmate was incarcerated for lewd acts with a child less than 14 years of age and had a history of placement at Napa and Atascadero State Hospitals between 1999 and 2002.

He had a history of multiple OHU and MHCB placements from August 2006 through December 2006. A lengthy note dated 9/18/06 referred to the possibility that the inmate might require referral for DMH placement, but it did not appear that this recommendation was addressed by the treatment team.

Notes from 11/21/06 and 11/22/06 indicated that the inmate was concerned regarding a pending release from prison. On 12/23/06, he was admitted to the OHU and transferred to MHCB when he reported having suicidal thoughts that involved suffocating himself with a plastic bag. Notes from the IDTT on 12/26/06 did not include a consideration of the possibility that the inmate required a higher level of care.

The inmate was seen briefly at his cell door within the OHU. He reported that he had gone "in and out" of crisis care for several years. He reported depression and concern regarding an impending release, which was to occur in February 2007. He appeared oriented and alert and evidenced clear, well-organized speech.

Assessment:

Despite a series of OHU and MHCB placements, there was no evidence that the IDTT considered this individual for referral for acute or intermediate care. This should have occurred.

The following cases were reviewed because the inmates were placed into holding cells following reports of intended self-injury and were not subsequently placed into the CTC or OHU for crisis care.

3.      Inmate C

Logs indicated that this inmate was placed into a holding cell on 12/12/06. A note from a psychologist on that date indicated that the inmate reported self-injurious behavior and suicide planning. The note indicated the clinician's impression that the inmate presented as "severely depressed" and that "suicide risk is seen to be moderate at this time." A suicide risk assessment was completed on that day and a note from the psychiatrist indicated that the plan was to increase Seroquel. The inmate was apparently not seen again until 1/3/07 when he was seen by a psychiatrist and then by a psych social worker. On that date, the psych social worker noted that the inmate was "very depressed" but characterized him as at "low risk of suicide." The plan at that time was to "monitor two to three times per week."

Assessment:

This inmate should have been placed into a MHCB following the contact on 12/12/06. It appeared that he did not receive adequate follow-up and likely remained at risk for self-injury from that time at least until he was seen on 1/3/07.

4.      Inmate D

This inmate apparently was in the CTC at the end of November 2006 and was placed into a holding cell on 12/23/06. The note from 12/23/06 indicated that he had thoughts of hanging himself. A suicide risk assessment was completed on that same day; suicide risk was characterized as moderate at that time. As of 1/4/07, there were no notes indicating that any follow-up had occurred. .

Assessment:

This inmate was characterized as at moderate risk for self-injury on 12/23/06. It appeared that he did not receive appropriate follow-up.

3

5.      Inmate E

This inmate was noted to have been in the OHU from 10/19/06 through 10/24/06. He was on suicide watch during a portion of this placement. Diagnosis at that time was Adjustment Disorder with depressed mood.

He was placed into a holding cell on 10/26/06 and a suicide risk assessment was again completed.  A psychiatrist's note on that date indicated that the inmate was to be placed into an administrative segregation safety cell and provided with one-to-one observation. A note on the next day indicated that the inmate "still feels suicidal" and that the one-to-one watch was to be continued. The suicide watch was continued daily until 10/31/06.

Assessment:

This inmate was inappropriately placed on suicide watch in an area outside of a Mental Health Crisis Bed for a period of approximately five days. The inmate should have been referred for transfer to an MHCB when it was recognized that he required one-to-one observation.

EXHIBIT C

Sierra Conservation Center (SCC)

January 23, 2007 – January 25, 2007

1.    Inmate A

This 24-year-old inmate was housed in the OHU from 9/18/06 through 9/20/06. He had been at 3CMS level of care since at least March 2006.

In a treatment plan dated 8/17/06, the inmate was diagnosed with Psychotic Disorder NOS and Polysubstance Abuse. The plan included a list of problems and meaningful interventions were listed.

On 9/18/06, the inmate was seen without the health care record. He was reporting suicidal ideation and described the method by which he intended to kill himself. A note indicated the clinician's Assessment that the inmate required admission to the OHU but did not require MHCB admission. The inmate was seen in follow-up by a psychiatrist on 9/19/06. A note from an LCSW on 9/20/06 released the inmate from the OHU.

He was placed on five-day follow-up. There were adequate notes across the five-day follow-up period. In a note on 11/16/06, the clinician documented the inmate's request to discontinue medication because the inmate reported that he "can't get into an aftercare program if he's on meds."

Assessment:

This inmate was identified as potentially self-injurious, was placed in the OHU for approximately three days, and then was released with five-day follow-up. There was no physician evaluation at the time that the inmate was placed into OHU and no indication that the case was considered by the IDTT. Though the progress notes appeared adequate, this was a case of an individual who was considered as possibly suicidal. As such he should likely have been referred for transfer to an MHCB, but there was no documentation of any attempt to move him. The notes from the OHU stay were found in the progress notes and not filed separately.

2.    Inmate B

This 48-year-old inmate had been placed at 3CMS level of care since at least 2/8/06. There was a history of Bipolar Disorder, chronic long-term drug and alcohol abuse, and a thought disorder. An MH-7 from 2/8/06 documented several previous suicide attempts. A treatment plan dated 6/13/06 contained a list of problems, including depression, and a list of interventions, including medication management, clinical contact and "institutional program."

Records of an OHU placement were filed within the body of the progress notes and not in a separate inpatient treatment section. Suicide risk assessments were included in the record. An assessment on 7/24/06 indicated that there was an acute suicide risk but conflicting notes on the same form indicated that the inmate was at low risk for suicide. Nonetheless, he was maintained in the OHU for at least two days. An additional SRA was completed on 7/25/06.

2

He was seen again on 7/27/06 by a clinician, on 8/27/06 and 9/14/06 by a psychiatrist, on 10/16/06 by the case manager, on 10/19/06 and 12/7/06 by psychiatry, and on 12/21/06 by a case manager.

Assessment:

The recommended treatment plan appeared consistent with the level of care and the diagnoses. The crisis care that this inmate received did not meet Program Guide requirements; the inmate was identified as requiring OHU placement for possible suicidality but was not referred to an MHCB. Records of OHU placement should have been separately filed. There was no IDTT consideration of the case following removal from OHU. Staff were concerned enough about this inmate at the time of release that a three-day custody observation was required. It was not clear whether a five-day follow-up was ordered.

3.    Inmate C

This 26-year-old inmate was at the 3CMS level of care. He apparently entered prison in May 2006 with a history of mental health treatment for Bipolar Disorder. An MH7 from 5/26/06 included a diagnosis as "Bipolar depressed." An MH2 dated 7/5/06 listed relevant target behaviors and interventions that appeared appropriate to the diagnosis. Of some concern was the fact that the MH2 indicated "cognitive therapy" and "in vivo exposure" therapy but neither of these interventions were mentioned in the subsequent notes in the record. It appeared that the inmate had been seen as per the Program Guides by a psychiatrist and case manager.

On 7/26/06, he was seen by a telemedicine doctor, who characterized him as "profoundly depressed." The plan section of that progress note called for "immediate hospitalization." The inmate was admitted to OHU on the same date and placed on suicide watch. Suicide risk assessments were completed as required by the Program Guides. The next day's note placed him on "regular issue" and indicated that "EOP and MHCB was considered" but this was apparently not an IDTT consideration. Five-day follow-up was apparently ordered.

Assessment:

This inmate appeared to have been appropriately followed as a 3CMS patient by a case manager and psychiatry. The treatment plan appeared appropriate but progress notes did not indicate that the plan was followed as, for example, cognitive therapy was not clearly documented in the record. The inmate was held in the OHU following a telemedicine psychiatrist recommendation that he should be hospitalized. It would appear that the staff had concerns regarding this inmate as he was placed on suicide watch and discharged with five-day follow-up. He did not receive appropriate crisis care, however, as he was not referred for placement in MHCB and there was no documented consideration of the case by an IDTT.

4.    Inmate D

This 22-year-old inmate had been at 3CMS level of care since approximately September 2006. An MH4 completed on 8/30/06 indicated an Axis I diagnosis of Depressive Disorder Not Otherwise Specified and alcohol abuse. A treatment plan on 10/4/06 included relevant problems and described treatment that was consistent with the identified problem. The treatment plan included "daily events group" and there was no documentation in the record that this had occurred.

The inmate was admitted to the OHU on 8/20/06. A suicide risk assessment was completed on 8/21/06 and he was placed on suicide watch. On that day, he was characterized as not likely suicidal but, rather, "manipulative." The case manager and senior psychologist met on 8/23/06 and decided to discontinue him from OHU.  This was labeled an IDTT. He was placed on five-day follow-up and this was completed.

He was apparently placed into administrative segregation approximately 9/27/06. He reported suicidal thoughts on that date and a note recommended placement in OHU. A suicide risk assessment on that date recommended "crisis bed" placement and he was placed into the OHU on suicide watch. He was apparently kept in the OHU until 10/2/06 and then discharged back to administrative segregation with five-day follow-up, which again was appropriately completed.

An evaluation on 10/6/06 was conducted without the record and the clinician noted "lack of record hampers precise assessment." In this case the clinician had no background on the recent suicide assessments. Nearly all of the notations of the case manager's weekly contacts indicated that the inmate was seen at cell front but also that the "inmate accepted an individual visit." There was a record of an IDTT on 11/8/06 with appropriate representation but no indication of what the team considered. The record included appropriate documentation of rounds by psychiatric technicians.

Assessment:

The records documented timely clinical monitoring by case managers and psychiatrists. The case management contacts in administrative segregation often occurred at cell front rather than in a private setting. Daily rounds were documented. Of concern was the fact that this inmate was seen as possibly suicidal and was placed in the OHU with no recommendation for MHCB transfer.

On at least one occasion, the record was not available to the clinician conducting a follow-up assessment and the lack of access likely contributed to an incomplete assessment on 10/6/06. Records of OHU placements were filed with other progress notes and this created difficulty.

4

EXHIBIT D

California Medical Facility (CMF)

January 29, 2007 – January 31, 2007

1.    Inmate A

This inmate's home institution and where he had recently been treated could not be deduced from his UHR. He had been at SQ as recently as 1/15/07 and was at CMF on 1/29/07. According to a DMH discharge summary, this EOP inmate was treated at DMH from 11/14-12/4/06. Over five years ago he had been treated at DMH. Prior admissions to DMH were listed as 4/3/01 to 4/23/01, 6/2/01 to 6/7/01 and 9/1/01 to 9/10/01. All DMH admissions, including the most recent, were precipitated by suicidal ideation and depression.

When discharged from an MHCB he had diagnoses of Depressive Disorder NOS, Polysubstance Dependence, Borderline Personality Disorder and a GAF of 45. Discharge medication orders were Seroquel 400 hs, Remeron 15 hs, and Depakote 1500 ER hs.

This inmate was moved from an unknown location on or around 12/20/06, when he was described in the UHR as being "ready to go." At that time his diagnoses were Polysubstance Abuse, Induced Mood Disorder and Borderline Personality Disorder.

He was seen for five-day follow-up at CMF from 1/11/07 to1/15/07. The UHR indicated that he was admitted to SQ's OHU where he was on suicide precautions on 1/15/07. He was seen for five-day day follow-up a second time at CMF on 1/19/07.

Assessment:

In light of the poor documentation in the UHR at the time it was reviewed, conclusions must be considered qualified, as they were drawn on the basis of incomplete information. Documentation found in the UHR was so poor that admissions and discharges to and from OHUs, MHCBs and DMH, as well as movement between SQ, CSP/Solano and CMF could only be surmised.

This inmate's diagnoses changed significantly between his first and second admissions to an MHCB or another treatment unit. During his first admission he was treated and discharged with a medication regimen that was inconsistent with his diagnoses.

The paucity of documentation in the UHR posed a significant disadvantage to treatment providers, particularly in light of changes in either this inmate's presentation or his diagnoses. Five-day follow-up was completed as planned on at least one occasion.

2.    Inmate B

This EOP inmate had diagnoses of Schizoaffective Disorder, Bipolar Type, Dysthymic Disorder, ASPD and Personality Disorder NOS. He also had several serious medical conditions and a history of head trauma. He was due to be released to the community within the next two months, on 3/7/07.

He was prescribed Abilify, Haldol Decanoate and Lithium. Blood levels of Lithium, lipids and glucose were monitored but psychiatrists did not respond to a sub-therapeutic Lithium level, to elevated lipids or the development of diabetes.

This inmate was under a Keyhea order until 12/26/06 when it expired because CDCR's Office of Legal Affairs declined to support a renewal on grounds of having received insufficient notice to prepare the case. The order was allowed to expire although, in the opinion of his treatment providers, an order was needed. According to the UHR, this inmate stated, "If I'm not on Keyhea, I won't take medication."

This inmate was reluctant to attend group treatment for reasons associated with his mental disorder. Hours of group treatment scheduled, delivered, received and refused were documented intelligibly in the UHR. An individualized treatment plan modified the customary EOP schedule of treatment in light of his needs. He was seen more frequently for individual contacts. His case manager documented a great deal of planning associated with release to the community.

Assessment:

The expiration of this inmate's Keyhea order was clinically contraindicated.

There was no TCMP chrono in the UHR. CMF staff did extensive discharge planning for this impaired inmate.

The treatment plan was updated quarterly and was individualized; it was modified appropriately given this inmate's poor participation in group treatment.

Informed consent was obtained and lab tests were done as required but prescribers failed to take appropriate action after obtaining abnormal results.

3.    Inmate C

This EOP inmate's release date was imminent. He was not doing well and apparently had not done well for six months or longer. In April 2006 his condition was deteriorating and he was placed in administrative segregation. In November 2006 he was described as "mentally unstable" and a "danger to others." He had been in the EOP at CMF since at least 11/20/06. He was under a Keyhea order that extended to 5/15/07.

A progress note dated 1/16/07 indicated that this inmate attended most group sessions, was medication compliant and discussed his imminent parole with his treatment provider. He was also described as more cooperative, with brighter mood and laughing. At the same time he was described as disorganized, tangential and experiencing auditory hallucinations. Just one week earlier, on 1/11/07, he was described as "extremely disorganized."

Assessment:

Discharge planning for this inmate who was under a current Keyhea order and who reported symptoms consistent with a poorly controlled psychosis was sorely lacking. TCMP did not appear to have done any discharge planning. CMF staff attempted to develop a discharge plan but resorted to a plan that called for the C&PR to notify a parole officer that the inmate needed to be picked up upon release.

UHR documentation that described this inmate as deteriorating and unstable raised the question of whether or not he received mental health treatment as clinically warranted during the eight months between April 2006, when his condition deteriorated and he was placed in administrative segregation, and 11/20/06, when he was placed in the EOP. Based upon the documents reviewed, he appeared to have needed earlier, more intensive treatment.

4.    Inmate D

This EOP inmate had a release date of 2/20/07. He had a diagnosis of Psychotic Disorder NOS. Based upon documents reviewed, he appeared to be quite ill at the end of January 2007.

Brief history of treatment: In April 2006 he was treated in the CTC at NKSP. He was at the 3CMS level of care in June 2006 and was seen monthly. At that time he was treated for Schizophrenia with Risperdal Consta.

He arrived at the EOP in October 2006. His initial and quarterly IDTT meetings were timely, full teams attended and treatment plans were individualized. When he first arrived he was offered ten hours of structured therapeutic activities per week but refused two and received eight.

A recent progress note captured the flavor of his presentation well. "My mood today is institutionalized. They took my TV away. I try to be forgiveful (*sic*). Nothing has any meaning."

In January 2007, staff discussed the limits of confidentiality with him after another staff member reported that he verbalized a threat toward an officer. No further action was taken. UHR notes indicated that this inmate was delusional but was relevant and cooperative most of the time. He discussed a discharge plan regarding either a board and care home or living with his parents.

Assessment:

EOP treatment after he arrived at CMF met Program Guide requirements. There was no indication that TCMP met with this inmate to develop a discharge plan. Given that his release date was one month away and his cognitive functioning was poor, he needed a residential placement but was unlikely to find his way to one.

5.    Inmate E

This EOP inmate was to be released in March 2007.  He had diagnoses of Psychotic Disorder in partial remission, Adjustment Disorder with mixed anxiety and depressed mood, by history.

Documentation of his enrollment and attendance in group treatment in the EOP was complete and intelligible.  He was enrolled in over ten hours of group sessions per week for the past three months.  His attendance at group sessions was low due to social withdrawal, paranoia and auditory hallucinations.  He was prescribed Thorazine 200 am 600 hs, Zydis 20 hs, Risperdal Consta 50 IM q 2 weeks, Depakote 250/5 ml solution or 1000 bid and Clonazepam 1 bid crush in water.

Documentation in the UHR contained numerous references over time to actions his case manager took to help him procure a place in a residential treatment program that he had been in before.

Assessment:

The mental health treatment provided to this inmate was well documented but fell short of being treatment plan driven.

Discharge planning by CMF staff was sustained over a period of months and involved helping him gain admission to a residential treatment program.

6.    Inmate F

This inmate died from unknown causes during this monitoring period. The following information was gleaned from the related incident report.

On 8/24/06 at approximately 1:00 a.m., while completing an inmate count on I-3 (EOP administrative segregation), the floor officer approached this inmate's cell. The light was on in the cell and this inmate was lying on his bed. The officer, uncertain if the inmate was breathing, contacted the unit sergeant.

The sergeant arrived in I-3 and advised the watch commander that he intended to unlock the cell door (time not noted). Two floor officers and the sergeant entered the cell (time not noted). One of the floor officers found no pulse or breath. The sergeant notified the watch commander, who, in turn, notified medical staff in B1 clinic. An MTA and an RN responded to I-3 with a gurney (time not noted). The inmate was transported to the B1 clinic, where he was pronounced dead at 1:35 a.m.

Assessment:

The emergency response in this case was inadequate. After finding this inmate unresponsive in his cell, neither custody nor nursing staff initiated life support measures.

In addition, the incident report was inadequate in that it did not record time of actions (e.g., when the unit sergeant arrived on the unit and requested permission to enter the cell, when the cell door was opened or when nursing staff arrived in the unit).

7.    Inmate G

According to CMF's documentation, this inmate died "under suspicious circumstances" during the monitoring period. The following information was gleaned from the related incident report.

On 8/6/06 at 12:45 p.m. (erroneously recorded as 1:45 p.m. in the incident report), floor officers assigned to housing unit M-2 (EOP wing) responded to calls of "man down". The inmate was found lying on the floor of his cell. The cell door was opened and his cell mate was directed to stand at the back of the cell. The responding officers noted blood on the cell door and found this inmate unresponsive and not breathing.

The B 1 clinic was called and medical staff reportedly arrived on unit M-2 at 12:47 p.m. A sergeant and nurse initiated CPR (time not noted). Code 1 responders arrived in the unit, lifted the inmate onto a gurney and transported him to B 1 clinic (time not noted). CPR was continued during transport. He was pronounced dead at 1:20 p.m.

Assessment:

The incident report was inadequate in that it failed to record the time CPR was initiated, leaving the reader to infer that CPR was started shortly after medical staff arrived. Nor did the incident report record when the inmate arrived in B 1 clinic. Responding officers did not initiate CPR.

A typographical error made it appear that this inmate was discovered in his cell 25 minutes after he was pronounced dead.

EXHIBIT E

California State Prison, Solano (CSP/Sol)

September 19, 2006
October 10, 2006 – October 11, 2006
November 1, 2006 – November 3, 2006

1.    Inmate A

This inmate had been awaiting transfer to an EOP for over four months. His UHR contained only records from the last several months. He had diagnoses of Schizophrenia and Antisocial Personality Disorder.

According to clinical documentation from Sacramento County he was arrested on 10/7/05. He arrived at DVI's reception center on 2/9/06. The bus screening noted that he needed to be seen as soon as possible by mental health. At DVI he was placed at the 3CMS LOC. He did not want to take medication.

There was no bus screening in the UHR. Staff consulted a mental health data base and reported orally that he arrived on 3/23/06. The earliest mental health note in the UHR was dated 3/21/06. He was assessed as having drug induced psychosis by history, in remission and not in need of medication.

On 4/24/06 an officer referred him because he reported that someone was out to get him and he would get them first. His initial IDTT meeting was held on 4/26/06. He was retained 3CMS LOC while noting he was functioning at a GAF level of 53. On 5/2/06 he was seen by a social worker, reported auditory hallucinations and was seen by a psychiatrist. On 5/2/06 orders for Risperdal were written and informed consent was obtained.

He self-referred via an inmate request for interview form 5/6/06. The form was received on May 15. He self referred again via a health care services request form on 5/11/06 and was seen by mental health staff on 5/15/06. He self referred via an inmate request for interview form 7/13/06 and was seen by mental health staff on 7/24/06.

A detailed report of unknown origin entitled "Interim Report" was dated 10/4/05. The report was filed in his UHR. The report stated that this inmate was a "third-termer" recently re-incarcerated for parole violation. It stated that he was due to be released on 10/7/05.

It appeared to be the report of an evaluation done in connection with his impending release from a SHU. The report indicated that he had a history of schizophrenia, antisocial personality disorder, multiple closed head injuries and heroin abuse. He also had hepatitis and diabetes. His significant mental disorder impaired his ability to perceive reality and make reasonable judgments. He has had persecutory delusional beliefs that people stab him. As recently as July 2005 he believed that people came through the walls of his cell at night and bit him. The report stated that he had a significant danger of being a danger to others and due to his mental disorder he currently represented a danger of physical harm to others. At the time of the report his thought was disorganized and he expressed paranoid ideation.

The report concluded with a statement that efforts were to be made to determine which county mental health facility, Sacramento or Alameda, would be most appropriate. It also said efforts were to be made to consider civil commitment or a conservatorship.

He was made EOP on 6/1/06. Mental health staff recommended single cell status. He was treated at the EOP LOC after and housed in administrative segregation in June and July 2006. Psych tech rounds were documented five days per week and summarized weekly through both months. Psych tech notes erroneously indicated that he was treated at the 3CMS LOC. He was seen by a case manager weekly in June, often out of cell. A June 2006 MAR showed a four-day gap in medication administration although orders were continuous.

He was moved to another building due to an incident. After that case manager contacts were not made weekly and the seriousness of his mental illness was minimized. An IDTT meeting held in segregation in July 2006 gave a diagnosis of Mood Disorder NOS. The meeting was attended by a full team.

He was in general population in August 2006. He reported to a psychiatrist who saw him on 8/8/06 that he did not receive medication after he was moved and that he did not need it. MARs supported his report. Medication was not administered after 8/3/06 although orders were continuous. The psychiatrist's note recorded a diagnosis of Mood Disorder NOS, noted that he was treated at the EOP LOC, concurred with the inmate's judgment that he did not need medication and discontinued the orders.

His EOP transfer was deferred due to a pending RVR.

When interviewed he was guarded. He denied distress and reported that he had no problems. He was pleased to be off of medication.

Assessment:

This inmate appeared to have been released while he was psychotic. He appeared to have been rearrested the same day. An evaluation done three days before he was released indicated that discharge planning was not complete at that time.

Documents were missing from the UHR. There was no bus screening from Solano. Whether his initial mental health evaluation and IDTT were timely could not be determined due to incomplete records.

Responses to self referral varied from five days to nine days. One referral form took 11 days to reach the case manager on his yard. Weekly EOP contacts were not documented in the UHR. Notes indicated that he was seen three times in July and twice in August 2006. No contacts were documented for the month of September 2006.
Mental health treatment was sometimes responsive to his need but fell short of being adequate at other times. In May 2006 mental health staff was responsive to his reports of symptoms of psychosis. He was seen immediately by a psychiatrist. Treatment in

administrative segregation did not meet program guide requirements and overlooked the severity of this inmate's mental illness. Psychiatrists who treated the inmate in the general population twice failed to provide adequate treatment because of over-reliance upon self-report and an inadequate review of records of recent treatment. Medication was not administered as ordered. He needed to be moved to an EOP and treated with medication until he left.

2.    Inmate B

This inmate was designated EOP on 9/20/06. A psychiatry note dated 9/1/06 said that he should be considered for EOP.

There was a two year gap in treatment plans between 2004 and April 2006. There was no treatment plan connected with his change to the EOP level of care in September. The treatment plan done in April 2006 was individualized in that it recorded his presentation and target problems on a check list that corresponded to his individual characteristics but the planned interventions were generic. The treatment plan had preprinted interventions to see him every 90 days and prn.

He had orders for Seroquel and Risperdal throughout 2006. With the exception of one or two days when medication was not administered continuity was sustained. He reported a resurgence in auditory hallucinations in December. He reported more symptoms in May 2006. He asked to go back to an EOP in June 2006. Although he consistently reported signs and symptoms of psychosis, paranoia and anxiety for five months he was seen monthly. He was not treated as aggressively as his presentation warranted although psychiatry contacts were frequent and the regimen was changed in response to his reports.

Assessment:

Treatment planning was inadequate for this inmate. An annual update was missed. His treatment plan was not revised when his level of care changed to EOP. The existing treatment plan was generic in its interventions.

After his condition warranted a change in level of care staff took too long to designate this inmate EOP.

Mental health staff did not respond adequately to this inmate's treatment needs as his condition deteriorated over a period of months.

3.    Inmate C

Only Volume II/II of this inmate's UHR was reviewed.

This inmate was designated EOP on 9/13/06. He had a pending RVR that might have been an impediment to transfer.

This inmate had been at CSP/Solano for over two years. He appeared to become increasingly depressed over a period of nine months. He also reported high levels of anxiety and fear. He reported hallucinations in July and was increasingly symptomatic.

His annual IDTT was held on 6/28/06. A case manager and a correctional counselor attended. Major Depressive Disorder, anxiety, a history of trauma and many medical problems were noted. His GAF was assessed as 60. The plan was not individualized. He was treated with Seroquel, Risperdal and Remeron. A clinical note indicated that he could not read or write.

On 7/11/06 a psychiatrist changed his regimen based upon his reports and planned to see him for follow up in one week. He was not seen again by a psychiatrist for over one month. He was seen by a different psychiatrist on 8/16/06 without the UHR. He reported auditory and visual hallucinations at that time. His regimen was adjusted and a note indicated that he needed EOP. That psychiatrist followed up with him weekly for the next three weeks.

A note dated 9/5/06 described him as acutely psychotic. He believed that a man and a woman repeatedly came into his cell to bother him.

An IDTT meeting held on 9/13/06 was attended by a full team. The EOP LOC was recommended. He was described as getting worse. He was seen weekly after that date. A note described him as disheveled, agitated, anxious and helpless.

There was no indication that he was referred to the MHCB to be stabilized.

When interviewed this inmate was anxious. He performed poorly on a mental status test. He was on the verge of tears but was able to exercise control. He reported intermittent visual and auditory hallucinations. He said that he sometimes thought that people were in his cell. His cellie was disturbed by this inmate's reactions to imaginary people. He said he hit another inmate a few weeks ago because he erroneously thought that the person was out to get him. He was very sorry about the incident. He was segregated for several weeks and then returned to general population. He said he was not doing any better and feared that it could happen again with a different person. He also reported being preyed upon by other inmates in another building in the past. He was not forthcoming with particulars. He said it was not happening any longer.

Assessment:

There was a lapse of one month between clinical identification of this inmate's need for EOP treatment and an IDTT meeting at which his level of care changed. He needed expedited EOP processing but mental health staff did not request it.
He should have been referred to the MHCB for stabilization but was not.

The annual IDTT meeting was not attended by a full team. The treatment plan was not individualized. Weekly EOP contacts were made. Psychiatry follow-up was done as planned with the exception of one missed follow-up.

4.    Inmate D

This inmate arrived at CSP/Solano from WSP's reception center on 6/2/06. He was seen for an initial mental health evaluation four days later.

He was in the MHCB from 7/24/06 to 8/3/06. The admission was associated with suicidality. He was discharged to the 3CMS LOC with orders for five-day follow-up and orders for Seroquel, Prozac, Wellbutrin and Pimozide. A copy of records of MHCB treatment was filed in the UHR. Documentation in the UHR indicated that follow-up was completed as planned.

When he arrived from Wasco he was taking psychotropic medication and was 3CMS. He was treated for Tourette's Syndrome with Pimozide and had been for many years. He also Seroquel, Prozac and Wellbutrin for treatment of depression while at Wasco. The IDTT meeting was timely and attended by a full team. At his request he was taken off of all psychotripc medication and discharged from the caseload.

One week later he was referred by staff. He said he erred by going off of medication. He was referred to psychiatry and seen within three days. Medication was restarted. There was no treatment plan associated with his return to the roster.

An undated progress note filed near notes dated 6/25/06 and 7/11/06 said that he reported suicidal ideation. The plan was to refer him for a medication consult and refer him or consider referring him to DMH. No risk assessment was in the UHR.

He was designated EOP on 8/30/06. There was no treatment plan connected to his placement at the EOP LOC. Mental health staff communicated with custody staff regarding his work assignment. A UCC met and changed his assignment.

He was seen weekly by a psychiatrist or a case manager after he was made EOP. Planned psychiatry follow up visits were made on schedule or early. A staff referral in September 2006 resulted in a psychiatry contact within nine days.

Assessment:

Mental health treatment for this inmate met program guide requirements. Intake processing was timely. Although treatment plans were not in the UHR mental health treatment was responsive to his presentation. Weekly EOP contacts were made. Psychiatry notes were detailed and indicated that psychiatrists changed his regimen in response to his reports. Five-day follow-up was completed as planned.

5.    Inmate E

This 3CMS was treated in the MHCB from 6/2/06 to 6/806 and 8/26/06 to 9/5/06. A record of his inpatient treatment was in the UHR. He cut himself and reported that he had problems on the yard.

He arrived at CSP/Solano from RJD on 6/1/06. At RJD he was treated with Paxil for depression. After he arrived at CSP/Solano he was in a dorm in a general population yard for one night and was then admitted to the MHCB. Clinical notes indicated he may have been concerned about his personal safety. He was discharged at the 3CMS level of care with orders for Trilafon and Celexa. For the next two months he was seen once per month by a case manager. Five-day follow-up was completed as planned.

Assessment:

This inmate was referred to the MHCB as clinically warranted. Five-day follow-up was completed. No outpatient treatment plan was written nor was an IDTT meeting held to plan his outpatient treatment.

6.    Inmate F

This inmate was treated for Bipolar Disorder, most recent episode depressed according to a treatment plan done in June 2006. Either he had been housed in administrative segregation for several months or he was in and out of segregation during the first six months of 2006. Medication orders were changed in response to his reports. He took mood stabilizers and had a trial off of medication prior to April 2006. He wanted off of the mental health roster so he could become eligible to go to a camp. He decided that being off of medication was a mistake.

He had orders for Strattera and Abilify in April. There was a four-day gap between medication orders in April 2006.

In July and August 2006, psych tech notes were consistently documented. Only one case manager contact was reflected in the UHR in July 2006. In August three case manager contacts were documented in the UHR. All three were made at cell-front. In July 2006 he refused Abilify and told a psychiatrist he was hearing voices. When he was seen by a psychiatrist in August he reported tactile hallucinations. Medication changes were made in response to his reports. In September he told a psychiatrist he was suicidal. He was unhappy in segregation and wanted to go to the hospital. A suicide risk assessment was done. His level of risk was moderate. He was referred to the MHCB to be evaluated for admission.

He was admitted to the MHCB and stayed for two days. A record of his inpatient treatment was in the UHR. He was discharged with plans for five-day follow-up. During his stay his diagnosis was refined from Bipolar Disorder to Mood Disorder NOS and r/o Bipolar Disorder. His regimen was changed to Depakote and Zyprexa. Five-day follow-up was completed as planned.

An IDTT meeting was held in administrative segregation the day he returned. After he returned to administrative segregation he refused a psychiatry appointment. The psychiatrist learned that the inmate was largely non-compliant with medication. When he was seen two weeks later the inmate said his regimen was better before it was changed. He acknowledged using reports of distress to achieve his goals. The regimen was changed.

Assessment:

This inmate was referred to the MHCB as clinically warranted. He was followed up as planned after he was discharged.

Overall, mental health treatment met his needs although it did not meet Program Guide requirements. Mental health treatment in administrative segregation did not meet Program Guide requirements because weekly case manager contacts were not made and an IDTT meeting was not attended by a full team. Psych tech and psychiatry contacts were made as appropriate.

7.      Inmate G

This case was reviewed previously.

This inmate had a diagnosis of Adjustment Disorder. He was treated with Risperdal and Benadryl before and after his admission to a crisis bed. His medication order expired while he was in administrative segregation. He said that he told MTAs daily for three weeks that he needed the medication. He reported that MTAs wrote his name and number down and promised repeatedly to look into it. He said his symptoms returned incrementally.

Staff concurred with his belief that being off medication for three weeks, being in a locked down situation and the recency of his commitment to CSP/Solano precipitated his admission to a crisis bed. He was admitted when he reported suicidal ideation. He was in a crisis bed for one day and one night. He was discharged with plans for five-day follow-up.

Assessment:

Medication was interrupted in administrative segregation. Staff was unable to reinstate medication for three weeks.

When the case was reviewed in October 2006 a record of his MHCB treatment was in the UHR. Three contacts of planned five-day follow-up were made immediately upon his discharge from the MHCB. Two more contacts were made on days five and seven. Beyond follow up contacts made during the week after his discharge from the MHCB he was not seen by a case manager in July or August 2006. Clinical notes suggested he

changed locations during that time. He was seen once in August and once in September 2006 by psychiatrists. When seen by psychiatrists he was not in distress. Orders were renewed.

He had been at CSP/Solano since December 2005. He was not on the 3CMS roster when he arrived. He had been on Risperdal since April 2006. No outpatient treatment plans were filed in the UHR.

Assessment:

This inmate was referred to the MHCB when clinically warranted. After he was discharged from the MHCB two of five-follow-up contacts were missed but contacts were extended over a period of seven days. Five contacts were made within seven days. Mental health treatment did not meet program guide requirements. This inmate was not added to the MHSDS despite an MHCB admission and treatment with psychotropic medication for nearly six months. Case manager contacts were not made. No treatment plan was written.

8.     Inmate H

This inmate was in the MHCB from 8/28/06 to 8/31/06. A record of his inpatient treatment was in the UHR. His admission followed a series of psychosocial stressors. He was released with a diagnosis of Adjustment Disorder with depressed mood and orders for Remeron. Five day follow up was planned. He was not on the roster prior to his admission. He was discharged at the 3CMS LOC.

He appeared to be housed in administrative segregation in September. Five-day follow-up was completed as planned.

An outpatient treatment plan written within two weeks of discharge showed a diagnosis of Major Depressive Disorder with psychotic features. He had an Axis III diagnosis of several injuries and chronic pain. He was treated with Tramadol. An IDTT meeting was held over one month after he was added to the roster. It did not appear to be attended by a full team.

Progress notes indicated that Remeron was continued after he was discharged from the MHCB but the MAR for September was in the UHR. A September MAR for Tramadol was in the UHR. He complained of side effects and his regimen was changed by a psychiatrist when he was seen at his IDTT meeting in October 2006.

In administrative segregation in September 2006 he was seen twice by a case manager.

Assessment:

A referral of this inmate to the MHCB was made when clinically warranted. Five-day follow-up was completed as planned.

Mental health treatment in administrative segregation did not meet program guide requirements. Weekly case manager contacts were not made. The IDTT meeting was late.

9.    Inmate I

This 3CMS inmate was in the MHCB from 7/31/06 to 8/3/06. A record of his inpatient treatment was in the UHR. He was discharged with a diagnosis of accidental opioid overdose and possible Substance Induced Mood Disorder. He also had a seizure disorder and a history of polysubstance dependence. He was discharged with orders for Paxil and five day follow up.

His treatment plan was updated annually. The IDTT meeting was not attended by a full team. In February 2006 he had diagnoses of Substance Induced Psychotic Disorder, Mood Disorder NOS, Intermittent Explosive Disorder, Polysubstance Dependence, insomnia and seizure disorder. He was treated with Paxil and Seroquel throughout 2006. MARs were present for all months. They showed continuous orders and administration. A small number of doses were missed.

In the general population quarterly case manager and psychiatry contacts were made. He reported little distress. He was discharged from the MHCB to administrative segregation. He remained there less than two weeks.

There was documentation in the UHR that showed five day follow up was completed as planned.

Aside from psych tech rounds he was not seen by mental health staff for nearly three weeks after he left the MHCB. When seen by a case manager and a psychiatrist at the end of August he reported auditory hallucinations but exhibited no signs of a psychotic disorder. Seroquel and Paxil were continued. An IDTT meeting was held over three weeks after he left the MHCB. It was not attended by a full team. He was given diagnoses of Psychotic Disorder NOS and Polysubstance Dependence. The treatment plan was not individualized.

Assessment:

Mental health treatment for this inmate fell short of program guide requirements due untimely contacts and missing members of the IDTT. In general mental health treatment met his needs.

10.    Inmate J

This EOP inmate was housed in the administrative segregation unit. He was diagnosed with Psychotic Disorder, NOS. He was treated with Abilify 30 mg/day, Trilafon 8 mg/day and Zoloft 100 mg/day.

This inmate was transferred from San Quentin to Solano on 11/18/04 when he was receiving 3CMS LOC. Progress notes indicated that this inmate experienced chronic auditory hallucinations and depression, but he reportedly was functioning in general population. He was housed in general population until late October when he was transferred to administrative segregation reportedly due to drug use. While in the administrative segregation unit, he reportedly experienced some increase in symptoms, including an increase in agitation, hallucinations and anxiety, and the medical record indicated that he was admitted to the CTC during mid September; however, the inpatient records were not available for review. He was returned to the administrative segregation unit after discharge. An IDTT on 9/19/06 recommended EOP LOC. At the last documented clinical contact, the psychiatrist indicated that he continued to report auditory hallucinations and paranoia and an unusual affect.

Assessment:

There was documentation of quarterly case manager contacts in general population, weekly case manager contacts in the administrative segregation unit and at least monthly psychiatric contacts in administrative segregation.

This inmate was considered for a higher level of care when he presented with an increase in symptoms. There was confusion regarding whether this inmate was actually admitted to the CTC. There was no information located by medical records regarding his admission, but the UHR indicated that he had recently been released from that unit. Due to the lack of inpatient information, I could not evaluate the care provided to the inmate in the CTC.

11.    Inmate K

This EOP inmate was housed in general population. He was diagnosed with Schizophrenia, disorganized type vs. paranoid type. He was not prescribed psychotropic medications at the time of the site visit.

This inmate had been housed at Solano since 6/13/06 when he was transferred from RJD. The inmate had previously been housed at RJD where he was changed from 3CMS to EOP LOC during April 2006, but was downgraded back to 3CMS during May 2006. He was seen for initial evaluation on 6/15/06 when he presented with paranoia and hostility. At his first IDTT meeting approximately one month later, the treatment team recommended continuation at 3CMS LOC on no medications.

Subsequent progress notes indicated that this inmate presented with increasing paranoia, hostility and oppositional behavior. He was sent to the CTC on at least two occasions regarding his behavior and after having materials in his cell that could be utilized as a noose. He was determined to not be suicidal and was returned to the administrative segregation unit. On 9/7/06, he reportedly had significant worsening in his ADLs and was admitted to the MHCB at that time. The inmate continued to refuse medications and was essentially uncooperative with staff. The inmate was returned to the administrative

segregation unit after three days of hospitalization. Subsequent progress notes indicated that he remained hostile and uncooperative, but the treating clinicians indicated that he did not meet the criteria for Keyhea.

Assessment:

An MH-4 for this inmate was completed and was timely. There was no documentation of psychiatric presence at the 3CMS IDTT meeting. There was documentation of custody presence.

In light of this inmate's symptoms and treatment refusal, Keyhea or DMH placement should have been pursued. This inmate remained in the administrative segregation unit where he remained psychotic, uncooperative and untreated.

There was documentation of at least monthly psychiatric contacts in administrative segregation and of weekly case manager contacts in administrative segregation. It did not appear that this inmate was stabilized during the three days that he was hospitalized in the MHCB.

This inmate was referred to the CTC on more than one occasion; however, he was not admitted initially. The evaluating clinician indicated that the inmate was not suicidal despite having made noose-like materials in his cell and presenting with hostile and paranoid behavior. Admission to the CTC for observation and monitoring was indicated.

12.    Inmate L

This EOP inmate was diagnosed with Bipolar Disorder, NOS and Obsessive Compulsive Personality Disorder. He was treated with Trazodone 50 mg/day and Lithium 900 mg/day.

This inmate had been housed at Solano since 5/24/06. The inmate reportedly experienced the death of his son and had significant difficulties related to this stress. He presented on several occasions in crisis regarding his distress over this situation. There were reports by the psychiatrist that the inmate did not receive his prescribed medications long after they were prescribed. The inmate later was noncompliant for a period of time, but later resumed his medications. He exhibited increasing symptoms of mania, and on 9/13/06 he was recommended for EOP LOC. On 10/5/06, the psychiatrist began a trial of Lithium; the inmate reported that he had not received this medication as of 10/10/06.

Assessment:

The appropriate laboratory testing for treatment of this inmate with Lithium was ordered. There were unacceptable delays in the delivery of prescribed psychotropic medications of up to two weeks. This inmate was appropriately recommended for EOP LOC.

There was documentation of at least quarterly case manager contacts while the inmate was in the 3CMS program and of weekly case manager contacts after he was placed into the EOP.

13.    Inmate M

This 3CMS inmate was diagnosed with Depressive Disorder, NOS and Psychotic Disorder, NOS. He was treated with Geodon 160 mg/day and Celexa 20 mg/day.

This inmate was transferred from DVI to Solano on 8/15/06. He was admitted to the MHCB on the following day, reportedly due to possible suicidal ideation with auditory hallucinations. He also later reported concerns regarding his safety on the yard. He was discharged on 8/22/06 to general population. The only other documentation of clinical contact was on 8/22/06 when he was seen by the CCM.

Assessment:

There was not documentation of five-day follow-up for this inmate after discharge from the MHCB for suicidal reasons. He was appropriately admitted to the MHCB after presenting with suicidal ideation.

Although the inmate's medications were ordered upon arrival to the facility, there appeared to be a lapse in continuity of several days after transfer to the MHCB.

14.    Inmate N

This 3CMS inmate was housed in general population. He was diagnosed with Mood Disorder, NOS. He was treated with Wellbutrin 450 mg/day and Seroquel 300 mg/day.

This inmate was transferred from DVI to Solano on 8/23/06. He was admitted to the MHCB for suicidal ideation on the day of his arrival to Solano. The discharge summary indicated that he expressed suicidal ideation due to his displeasure regarding placement into a dormitory. While hospitalized in the MHCB, he reported auditory hallucinations. Treatment with the above mentioned medications was continued. Upon his release from the MHCB, he was seen for five-day follow-up. The psychiatrist noted that the inmate presented with hostility after he was denied treatment with a benzodiazepine. The most recent psychiatric progress note indicated that the inmate was paroling soon.

Assessment:

There was documentation that this inmate was seen by the TCMP social worker on 9/26/06 regarding discharge planning for a 30-day assessment. There was documentation of five-day follow-up after the inmate was admitted to the MHCB for suicidal ideation, as well as documentation of medication continuity upon the inmate's arrival at the facility.

15.    Inmate O

This 3CMS inmate was housed in general population. He was diagnosed with Major Depressive Disorder with psychotic features. He was treated with Risperdal 4 mg/day, Cogentin 1 mg/day, Zoloft 100 mg/day, Remeron 45 mg/day and Benadryl 100 mg/day.

This inmate was transferred from San Quentin to Solano on 7/3/06. He had been receiving 3CMS level of care prior to his transfer. An IDTT on 7/12/06 recommended continuation in the 3CMS program. Subsequent progress notes described the inmate as exhibiting continued, though stable depressive symptoms; medications adjustments were made to address this.

Assessment:

An MH4 was completed for this inmate within five working days. Although the psychiatrist ordered the inmate's medications upon arrival to the institution, there appeared to be a delay in the inmate receiving his medications as per the MAR. The medications were ordered on 7/3/06, one pm dose was delivered on 7/6/6, no meds on 7/7/06 and then medications were not administered continuously until 7/8/06 in the evening.

There was no documentation of psychiatric presence in the IDTT. Custody was present. There was documentation of consistent psychiatric contacts and of quarterly case manager contacts.

16.    Inmate P

This EOP inmate was housed in general population. He was diagnosed with Schizophrenia, paranoid type. He was treated with Risperdal 2 mg/day and Remeron 15 mg/day.

This inmate was transferred from CCC to Solano on 9/6/06. He had previously been housed at the OHU at San Quentin from 7/19/06 to 7/20/06 due to bizarre behavior and fecal smearing. He was discharged with a diagnosis of Panic Disorder and was not treated with antipsychotic medications. Since his arrival to Solano, he has presented with poor insight regarding his mental illness, hostility, social withdrawal, very poor hygiene, paranoia and medication refusal. He was recommended for EOP LOC on 9/7/06. On 9/26/06, the CCM indicated that she was completing paperwork for DMH intermediate care. On 9/27/06, a psychiatrist indicated that the inmate "may need admission soon to CTC."

This inmate was interviewed in a large 3CMS group. He presented with hostile affect, guardedness and unkempt appearance. Other inmates reported that he had made inappropriate statements to other inmates that might result in him being harmed. The MTA was contacted and reported that the inmate had been refusing his prescribed medications for the past several weeks.

Assessment:

The following comments were noted regarding the care provided to this inmate:
Although this inmate was appropriately referred to EOP and to DMH intermediate care, it
appeared that he was at risk of harm from others or possibly to harm others.  A
recommendation was made to the supervisory staff that this inmate be considered for
either DMH acute care or MHCB care as soon as possible.

Staff did not consider expedited transfer to EOP or to DMH.
Consideration should have been given for the initiation of Keyhea for this inmate.
The MH4 was completed within five  working days, and recommended EOP LOC.
This inmate was not seen on a weekly basis by the CCM after referral to EOP.
This inmate was scheduled for release from prison during December 2006.  There was
documentation of TCMP contact.

17.    Inmate Q

This 3CMS inmate was housed in general population.  He was diagnosed with Psychotic
Disorder, NOS.  He was treated with Seroquel 300 mg/day.

This inmate was transferred to Solano from NKSP where he was receiving 3CMS LOC
on 5/3/06.  He was followed consistently by the psychologist and the psychiatrist.  At the
last psychiatric visit on 9/11/06, the psychiatrist indicated that the inmate was having "too
much sedation after p.m. doses."  He was also described as guarded, but without auditory
hallucinations.

Assessment:

The following comments were noted regarding the care provided to this inmate:
There was documentation that the inmate was seen by the case manager on a quarterly
basis.  He was seen consistently by the psychiatrist with timely medication renewal.
This inmate should have been prescribed Seroquel at HS rather than at p.m.  His sedation
could have been adequately managed by administration at HS rather than decreasing his
dosage to prevent early sedation.  The psychiatrist indicated that he was concerned that
the inmate was more impaired than he presented, yet decreased the dosage of
antipsychotic medication rather than prescribing it at HS.  This practice was noted
throughout CSP/Solano as the facility did not provide HS medication administration.

18.    Inmate R

This 3CMS inmate was housed in administrative segregation.  He was diagnosed with
Mood Disorder, NOS.  He was treated with Seroquel 600 mg/day.

This inmate had been housed at Solano since September 2003.  He had been in the 3CMS
program, but was removed on 10/12/05 after he had been in remission and off
medications for the previous year.  On 8/14/06, he presented with report of command

auditory hallucinations to kill others and had reportedly made a knife and threatened another inmate two weeks prior. He was prescribed Risperdal and was discharged on 8/16/06. He was discharged to the Administrative segregation unit.

On 8/23/06, the inmate reported suicidal ideation to the psych tech and was re-admitted to the MHCB. He remained in the MHCB until 8/29/06 when he was discharged back to the Administrative segregation unit. While in the MHCB, it was noted that the inmate had discontinued his Risperdal; he was then treated with Seroquel. The inmate was discharged with five-day follow-up in administrative segregation. Subsequent progress notes indicated that the inmate was stable in Administrative segregation.

Assessment:

This inmate was appropriately returned to the 3CMS roster after presenting with psychotic symptoms. He was also appropriately admitted to the MHCB after presenting with suicidal and homicidal ideation.

There was documentation of five-day follow-up after the inmate was discharged from the MHCB for suicidal reasons. Although there was documentation of weekly case manager contacts in administrative segregation, it appeared that all contacts occurred at cell-front.

19.    Inmate S

This EOP inmate was housed in general population. He was diagnosed with Major Depressive Disorder with psychotic features. He was treated with Prozac 40 mg/day, Risperdal 5 mg/day and Vistaril 50 mg/day.

This inmate was transferred from RJD where he was receiving 3CMS LOC to Solano on 5/3/06. He was prescribed the above psychotropic medications at the time of transfer. He was seen for evaluation regarding possible MHCB admission on 9/28/06 when he presented with possible suicidal ideation; he was not admitted at that time, and was referred back to his CCM. The inmate continued to present with symptoms of depression, paranoia and intermittent suicidal ideation with intent. The IDTT recommended EOP LOC on 10/18/06.

Assessment:

There was documentation of medication continuity upon arrival to Solano and of quarterly case manager contacts while the inmate was in the 3CMS program. There was no documentation of weekly CCM contacts after the inmate was recommended for EOP LOC. There was documentation of suicide risk assessment when the inmate presented with suicidal ideation.

20.    Inmate T

This EOP inmate was housed in general population. He was diagnosed with Psychotic Disorder, NOS. He was treated with the following medications: Trilafon 16 mg/day, Abilify 20 mg/day, Remeron 30 mg/day and Benadryl 100 mg/day.

This inmate returned from DMH-APP to Solano on 6/1/05. He was sent for psych and return between 5/20/05 to 5/23/05. He returned to Solano and was receiving 3CMS LOC. Progress notes indicated that he was followed consistently by the mental health staff with some medication changes due to medication side effects. He was admitted to the CTC due to suicidal ideation. He was hospitalized for one week and discharged to administrative segregation due to a charge of exhibitionism and public masturbation. He remained in administrative segregation where he began to report an increase in auditory hallucinations that were not amenable to medications. He was placed into the EOP on 10/31/06.

Assessment:

There was documentation of five-day follow-up for this inmate after discharge from the MHCB for suicidal reasons. There was adequate assessment of suicide risk when clinically indicated.

There was documentation of weekly case manager contacts in the administrative segregation unit. It was difficult to determine what percentage of these contacts that occurred out of cell. This inmate had been placed into the EOP program only two days prior to the site visit.

21.    Inmate U

This inmate was sent from SQ and admitted to the MHCB on 8/1/06 with a diagnosis of Psychosis NOS and r/o Bipolar Disorder. A clinical note indicated that he was in the OHU at SQ from 7/27/06 to 8/1/06. Upon arrival at CSP/Solano he was combative and multiple custody staff were required to restrain him. He was in restraints from 8/1/06 to 8/3/06.

He was combative and delusional on 8/1/06 but signed informed consent forms for Risperdal and Haldol. His behavior was wildly inappropriate. His thinking was disorganized and he appeared to be hallucinating. He was seen by a psychiatrist on 8/1/06 at 9:45 and 11:30. He was given Haldol, Ativan and Cogentin stat inmate. The order for restraints was consistent with policy and contained behavioral release criteria. He was seen four times that day by psychiatry. He was described as pulling at the restraints six hours into the restraint period.

He was seen the next morning by psychiatry, 24 hours into the restraint period. He was pulling at the restraints, spitting and seemed to be hallucinating. The order for restraint use was renewed for 24 hours. On 8/2/06 he was given IM Haldol, Ativan and Cogentin stat. Risperdal po was initiated at 5 p.m. on the 8/2/06. ROM exercises were not always done while he was restrained. Nursing documentation indicated when they were done

and when missed, why they were not done. Nursing documentation was complete with pertinent detail regarding behavior and offers of nourishment.

At 7:00 on 8/3/06 the dose of Risperdal was raised and administered. Three hours later the restraint order was discontinued by psychiatry. The inmate remained on one-to-one observation in a safety cell with a smock, blanket and mattress. The safety cell order was for 24 hours.

A toxicity screen and other laboratory tests were ordered. Laboratory results for basic tests were obtained within one day. Results of for a thyroid panel and a toxicity screen were back within three days. A petition for a Keyhea order was initiated on 8/2/06, certified on 8/5/06 and a ten-day order was obtained on 8/12/06.

IDTT meetings were held on 8/3/06, 8/8/06, 8/10/06 and 8/15/06. They were attended by a full team. It was unclear whether he attended the meetings. His treatment plan was individualized. The inmate was described as calm and friendly on 8/3/06 in an IDTT meeting. Over the course of the next few days his presentation varied markedly.

He slowly regained cognitive functions and he remained agitated and irritable for days. He tore up linoleum and flooded cells. He was moved to a safety cell by order of a psychiatrist. He was not a threat to himself but he was a threat to the environment. While in a safety cell he acted out in unpleasant ways. He was in a safety cell for four or five consecutive days. On 8/10/06 suicide watch was down graded to precautions with q 1 hour observations and privileges specified by psychiatry. On 8/11/06 his mood and cognitive functioning were markedly improved. His memory returned gradually.

At different times this inmate attributed his combative behavior to not liking being naked in safety cell, to not getting his mail and to being alone in a cell at SQ. His stance toward psychotropic medication also changed over time. At first he didn't want to take it, complaining of dry mouth and asking if being on them would imperil his parole. Earlier, on 7/3/06 at SQ he had said that his parole date was 9/23/06. Staff at CSP/Solano staff did not know his parole date.

He was discharged from MHCB with orders for Risperdal 3 bid, Haldol 30 tid, Vistaril 50 bid, Benadryl 50 HS and Cogentin 1 bid. He was discharged back to SQ on 8/15/06 at the 3CMS LOC.

Assessment:

This inmate should have been sent from SQ's OHU to a CTC earlier in his OHU stay. Treatment in the MHCB was responsive to his presentation and well documented. Staff made good use of available resources, including medication, restraints, Keyhea, safety cells and IDTT meetings. Orders for watches and safety cells contained release criteria and specified property and privileges. Suicide precautions with one-hour intervals between observations was not consistent with Program Guide requirements.

22.    Inmate V

This inmate was in the MHCB from 8/12/06 to 8/30/06. During that time he was in restraints for 24 consecutive hours.

This inmate came from SQ to the MHCB at CSP/Solano on 8/12/06. He was described as disoriented, disorganized and agitated. Admitting diagnoses of Psychosis NOS and r/o Schizoaffective Disorder were given. He expressed suicidal ideation, scraped his wrist and immersed it in a feces filled toilet bowl.

When he was sent to acute care after 18 days in the MHCB he remained guarded, anxious and disheveled. He was believed to be hallucinating and paranoid. He was treated with Seroquel 400 bid and Buspar 20 bid. He was sent to DMH at CMF for acute care on 8/30/06.

The admission order was consistent with requirements and contained behavioral criteria for release. He was given IM Haldol, ATivan, and Benadryl stat. Orders specified smock and blanket only. Although the physician's order to apply restraints specified behavioral criteria for release, the use of restraints was not discontinued until a doctor wrote the order.

He contracted for safety or self and others on 8/13/06 and was ordered to be released from restraints at 1015. He was moved to a safety cell 8/14/06 at 12:40, still there 24 hours later not out until 8/16/06 at 9:40. In safety cell he was on suicide precautions with q 30 min observations. When moved to a regular cell the observations were stepped down to q 60 minutes. Over the next few days privileges and property were gradually restored. On 8/21/06 his regimen was changed to Seroquel, Vistaril and Buspar.

IDTT meetings attended by full teams were held on 8/15/06, 8/17/06, 8/22/06, 8/24/06, and 8/29/06. Individualized treatment plans considered the possibility that he was exaggerating his reports of distress. Diagnoses of Psychosis NOS and Polysubstance Dependence, drug seeking, were given.

Results of basic labs were obtained in one day.

Assessment:

Nursing care for this inmate was attentive with good documentation. ROM was not done every two hours. ROM exercises were sometimes done more frequently than every two hours but sometimes less frequently. Nursing staff made frequent offers of food, water and bathroom breaks. Suicide precautions with one-hour intervals between observations were not consistent with Program Guide requirements.

23.    Inmate W

This inmate was in the MHCB due to a possible overdose of a mood stabilizer. He had only been at CSP/Solano for a short time at the time of his MHCB admission. A progress note written during his MHCB stay reported a history of "multiple severe suicide attempts." He was considered for referral to DMH.

A clinical note indicated that he came to CSP/Solano from a reception center on 8/31/06. He was in the MHCB from 9/17/06 to 9/26/06. He had an admitting diagnosis of Schizoaffective Disorder, Bipolar Type, Polysubstance Dependence and possible Dilantin toxicity due to overdose. He reported that suicidal ideation preceded his Dilantin overdose.

Beginning on 9/15/06, two days prior to the date of the record of his MHCB admission, he was on suicide watch with constant one-to-one observation and nursing checks q 15. Later that day he was seen again by a psychiatrist who wrote orders for property restrictions during the watch.

Labs were done daily to monitor his Dilantin level, which fell over time.

An order for forced fluids was written on 9/18/06. He was described as pulling out his hydrating IV line on 9/18/06. Restraints were ordered on 9/18/06 at 15:35 when he was described as hallucinating, very paranoid and agitated. A note indicated that staff decided against sedation due to toxicity.

The restraint order included behavioral criteria for release. He was released from restraints on 9/19/06 at 07:30 and started on Risperdal 1 mg pm. The constant watch was stepped down to precautions with q 30-minute checks. He immediately pulled out his IV line. He later said to staff that he himself did not understand his behavior during that episode. A nurse documented ROM every two hours except when he was asleep.

An individualized treatment plan was written. According to documentation in the UHR, IDTT meetings were held on 9/19/06, 9/21/06 and 9/26/06.

He was discharged to administrative segregation on 9/26/06 with the same diagnoses, at the 3CMS LOC and orders for Rispderdal 1 bid, Trilafon eight pm, Artane 2 bid, Benadryl 10 p. m. and orders for 5 day follow-up with a planned psychiatry follow-up within one week.

Assessment:

Regarding the care of this inmate in the MHCB, suicide watch orders and orders for the use of restraints included such essential information as property restrictions and behavioral criteria for release from restraints.

Review of records and discussion with staff found that a physician always writes the order to release a patient from restraints. Nursing staff does not release them even if the behavioral criteria are met.

IDTT meetings were timely. DMH referral was considered. He was not placed on DOT medication despite a history of suicide attempts coupled an overdose that brought him to the MHCB. He was released from the MHCB and moved to administrative segregation, a relatively high risk setting.

24.    Inmate X

This inmate was treated at the 3CMS level of care at CSP/Solano. A TCMP chrono was dated 1/25/06. He was paroled in April 2006, back at DVI in May 2006 and came to CSP/Solano in June 2006.

Before he was paroled, while still in the EOP at CMF, this inmate was treated with Seroquel, Prozac and Gabapentin. He also took Phenobarbital. He was treated for Depressive Disorder, Psychotic Disorder, Alcohol Dependence and Seizure Disorder.

This inmate arrived at CSP/Solano with orders for Seroquel and Prozac. Shortly after he arrived his regimen was changed to Celexa and Lamictal. The progress gave a rationale, for better mood control and because he was still depressed. At an IDTT meeting he said he wanted to go to EOP. He said he needed more help. Subsequently, he was seen nearly monthly because he referred himself or was referred by staff.

In July this inmate self-referred. He said he was in distress, hearing hallucinations and had a "good cellie" who helped him. The case manager consistently assessed this inmate's problems as stemming from a diagnosis of Substance Induced Mood Disorder. Cognitive-behavioral techniques were used in sessions.

In August this inmate told a psychiatrist that he had auditory hallucinations and he requested an order for Remeron. The corresponding progress note described his presentation as organized and not psychotic. The regimen was changed, the dose of Seroquel was raised and Celexa was discontinued in favor of Remeron.

This inmate was seen in September 2006. He was referred by an officer because he was seen pacing all night. He was wearing homemade earplugs and reported that the auditory hallucinations were bad. He was referred to the POD, a telephone order was obtained and his case manager followed-up closely all day in order to have his problems addressed. There were indications that he was non-compliant with medication.

Strangely, a MAR showed he got medication in administrative segregation on 9/27, one day after he was released. Although the MAR showed that the orders were DOT staff reported that it was a default computer setting and it did not mean medication would be administered DOT.

A second TCMP chrono was dated 10/10/06. It indicated he was seen for a 30-day assessment. There was no chrono for a 45, 60 or 90-day assessment.

Assessment:

Intake processing of this inmate was timely. Mental health staff was responsive to his presentation. He seemed to need more intensive treatment than was provided. Discharge planning was inadequate.

25.    Inmate Y

This inmate was in the MHC from 10/30/06 to11/2/06. He was admitted because he told an officer that he was suicidal and he was behaving bizarrely. He was admitted by a psychiatrist on call via a telephone order around 2150 hours. The inmate refused to disrobe and was uncooperative with a nursing intake assessment. He was admitted on suicide precautions. The psychiatrist's order was typical given the conditions, it included a suicide smock and blanket and prohibited clothing. The inmate was strip searched by custody staff but his clothing was returned to him and he was placed in a safety cell on precautions.

Nursing staff called the Watch Commander at 0330 hours and told him that the clothing must come off. Nursing staff also called the psychiatrist on call to report that the inmate was on precautions in a safety cell with his clothing. The watch commander failed to have the inmate or the clothing removed from the safety cell over the course of the next several hours. The psychiatrist came to the MHCB, did a face-to-face evaluation of the inmate and determined that clothing elevated the level of risk. The issue was resolved after the shift change. The Sergeant who was regularly assigned to the CTC during business hours persuaded the inmate to give up his clothing a few minutes after shift change.

The inmate's condition resolved in a manner that suggested he had been intoxicated. He was in the MHCB for less than three days. Suicide precautions were discontinued and he was moved from a safety cell to a standard cell with clothing and property at 1150 on 10/31/06. On 11/1 he said that he was not suicidal. An individualized treatment plan was written and an IDTT meeting was held on 11/2/06; it was attended by a full team. He was diagnosed with Adjustment Disorder and discharged to administrative segregation at the 3CMS LOC. He was placed on five-day follow-up and extended custody observation.

Assessment:

In this case a physician's order regarding clothing restrictions while an inmate was on suicide precautions were not carried out for several hours. Staff reported that the working alliance between healthcare, mental health and custody staff was characterized by a high degree of collaboration during business hours. In this case there was marked lack of collaboration between staff. Reportedly, collaboration after business hours and on weekends was depended upon the working alliances between individuals. Adherence to established procedures was inconsistent enough that not infrequently the treatment needs of the MHCB patients were not met after hours and on weekends. The warden and

associate warden for healthcare were aware of this incident and of the wider problem and planned to address both.