EXHIBIT F

California State Prison at San Quentin (SQ)

October 19, 2006 – October 20, 2006
November 30, 2006 – December 1, 2006

There appeared to be instances in which inmates' clinical conditions appeared to dictate transfers to higher levels of care, but this did not occur within a reasonable time frame, or did not occur at all. There were several instances in which the constitution of the IDTT did not comport with guidelines. Usually, a psychiatrist was not present. Referrals for psychiatric evaluations for new arrivals did not always occur within required timelines. Treatment plans were often rather brief or generic, not individualized. Sometimes they contained recommendations for elements that were not functionally available to the inmate. Clinical case managers generally saw inmates within timeframes prescribed by the Program Guides.

1.    Inmate A

An MH4 assessment on 7/7/06 indicated that this inmate was sentenced to serve five years and eight months from Napa State Hospital for assaulting staff. He attempted to hang himself on the last day at Napa prior to being transferred to CDCR. He had previously been on suicide watch while in jail. The inmate's level of care was elevated to EOP on 7/3/06 and he was identified as DD0 on 9/1/06.

It appeared that he was sent to HDSP for MHCB on 7/7/06 and was discharged on 7/10/06. Upon return to SQ, he was placed into the OHU on 7/12/06. He was placed on suicide precautions on 7/15/06 and on suicide watch on 7/25/06. There were many chronos documenting his refusal of medication.

There was a progress note documenting an IDTT on 7/27/06 in which transfer to DMH was considered. The team decided against this referral, however, because of the inmate's history of "not benefiting" from treatment while at Napa State Hospital. Instead he was "placed on MHCB waiting list."

 The inmate was seen by his case manager ten times in a ten-week period spanning August 2006 through October 2006.

Assessment:

This inmate appeared to have been appropriately placed at the EOP level of care but that was beyond the time within which, per the Program Guides, that transfer should have occurred. He had several OHU admissions during which he was appropriately treated and he received appropriate follow-up. He often refused meaningful clinician contact and medication. There would appear to be some question as to whether he will avail himself of groups offered at the EOP level of care. The IDTT recommended against DMH placement on the basis of his previous behavior while at Napa State Hospital. Of concern, however, was that the team did not act to provide alternative treatment and at least expedited EOP transfer

2.    Inmate B

This inmate had a history of psychiatric inpatient placement at the age of 15 for four days. Records also indicated "at least six" suicide attempts, which have included cutting his wrists and swallowing razor blades, as well as threats. An 11/15/05 chrono documented placement into MHCB at SVSP noting that this inmate had a history of swallowing foreign bodies including a comb, toothbrush and razor. Medical information documents treatment on 11/17/05 for a bowel obstruction. He had previously undergone surgery for this same condition.

Mental health chronos documented that he was at the EOP level of care on 11/17/05 and diagnosed with Adjustment Disorder at that time. An MH-4 on 12/5/05 diagnosed amphetamine-induced Psychotic Disorder NOS. He was moved to the 3CMS level of care on 12/20/05. There were numerous chronos documenting refusal of medication.

A progress note on 1/25/06 indicated that he presented as "extremely depressed," "pale" and "requesting EOP administrative segregation." The note indicated "possible EOP status, follow up weekly." It did not appear that weekly follow-up occurred and he was seen approximately every two weeks.

He was admitted to the OHU for suicide precautions on 8/21/06 and for suicide watch on 8/29/06. He was apparently placed into the MHCB on 8/29/06 and returned to OHU on suicide watch on 9/1/06.

There was apparently another OHU placement on 9/30/06 when he was having symptoms of stomach problems attributed to his swallowing a razor blade. He was "spitting up frank blood." He was assessed as "hearing voices of suicidal ideation."

Assessment:

This inmate had a history of swallowing foreign objects and this had apparently resulted in at least one surgery. He was treated at SVSP on 11/15/05 in an MHCB with a medical consult for a bowel obstruction. Records indicated at least three OHU placements within the past several months, though records regarding these stays were not easily found. He was again placed in the OHU on 9/30/06, had apparently swallowed a razor blade, and was assessed as having "suicidal ideation." There was a substantial history of non-compliance with medication and refusal of interaction with mental health staff.

Of concern was the fact that despite several OHU placements, at least one MHCB placement, and several situations in which he required medical attention for self-injury, he was at a 3CMS level of care. There were no clear notes in the record indicating that referral to a higher level of care had been considered.

3.    Inmate C

This inmate was at the EOP level of care. He was placed into the OHU for observation from 6/21/06 through 6/23/06 and was diagnosed with Schizophrenia at that time. He was

again placed into the OHU on 7/17/06 as a "crisis referral due to hostile or delusional ideation." He was discharged from this placement on 7/20/06.

Notes from 8/7/06 indicated that he continued to be "agitated, delusional, disorganized and pressured." He was diagnosed again as evidencing Schizophrenia and a recommendation was made to send him back to the OHU. He was placed in OHU and the plan, as reflected in an 8/8/06 note, apparently was to transfer him to MHCB. On 8/9/06, a note indicated that he had not been transferred because "C&PR not having full information regarding patient's latest 115." He was transferred to MHCB and returned 8/10/06. Notes at the time of transfer indicated he was threatening, delusional and smearing feces.

He was again in OHU on suicide precautions on 8/16/06. By 8/22/06, he was still paranoid, explosive, and agitated. A note on 8/23/06 indicated that he was "doing better." On 8/24/06 he was seen as "alert, responsive and cooperative."

It was not clear that he had been seen weekly by a case manager. There were notes indicating that he was seen 8/22/06, 8/23/06, 8/24/06 and then 9/3/06. There were no notes indicative of contact from that time until the date of the chart review. Notes from 8/27/06 would appear to indicate that he was on voluntary medication.

Assessment: Despite numerous OHU and MHCB placements from at least late June 2006 through late August 2006, in combination with what appeared to have been steadily deteriorating mental health, it was of concern that there was no obvious attempt to expedite the inmate's transfer to an EOP program. It appeared his condition improved somewhat after 8/20/06. This inmate's transfer should be expedited and, in the event that his mental health deteriorates again, he should be considered for referral to a DMH intermediate level of care.

4.     Inmate D

Inmate D was a 28-year-old general population 3CMS inmate incarcerated for domestic violence and child abuse. He had a history of a seizure disorder and special education. His most recent evaluation, on 6/5/06, cited a history of outpatient psychiatric treatment beginning at the time that he was 12 years of age. Drug abuse began at 13 years of age. There was a history of episodic depressive episodes. He was diagnosed with Major Depressive Disorder and amphetamine dependence.

This inmate was seen at IDTT on 6/27/06. The constitution of the IDTT was not consistent with the Program Guides as no psychiatrist or CC-I was present. The treatment plan appeared to have been developed at that time. It listed anger as the primary symptom and target objectives included "developing skills to cope with anger." Interventions included case management, psychiatric services and access to an anger management group, but notes said he was not eligible to attend this group.

On 7/11/06 the diagnosis was slightly changed and medication added. He was seen by a psychiatrist on 6/12/06, 7/11/06, 7/25/06, 8/22/06 and 11/19/06. Case manager contact occurred on 9/11/06 and 11/29/06. With the exception of the most recent psychiatry note, notes were generally legible

A treatment plan update was completed on 11/20/06. Within this plan, the diagnosis was changed to Major Depressive Disorder. Composition of this IDTT also was not adequate as no psychiatrist was present.

Assessment:

This 3CMS inmate appeared to have had contact with psychiatry and case management staff within timelines that were consistent with Program Guides. The composition of the two IDTTs that considered this inmate's case was not complete as one was lacking a CC-I and both lacked a psychiatrist. Treatment plans were not realistic given that there was a recommendation for inclusion in an anger management group along with a notation that the inmate would not have access such a group. In light of this fact, there were no plans for any alternative treatment with the exception of medication management. He appeared to be at an appropriate level of care.

5.    Inmate E

Inmate E was a 51-year-old inmate who was at the EOP level of care and housed in the reception center, having apparently arrived in early October 2006. An initial evaluation on 11/14/06 noted a history of placement at DMH/CMF in 2005. He was characterized as "internally preoccupied," sleeping little, exhibiting blunted affect, and "perseverating" on persecutory themes. Diagnosis at that time was Psychotic Disorder, Not Otherwise Specified.

He arrived without a current medication order and this inmate was not seen by a psychiatrist until 11/21/06, more than a month after his arrival. He was not prescribed medication at that time after he told the psychiatrist that he "didn't want any medication except Seroquel." He was seen by his case manager on 11/28/06. He was set to parole again on 12/09/06.

Assessment:

Shortly after this inmate's arrival, he was noted to be exhibiting symptoms of psychosis. He arrived without medication and apparently reported a history of being prescribed Seroquel, but there was a significant delay in referring this inmate to a psychiatrist. It would appear that he had been seen by a case manager at appropriate intervals. There was no indication that this inmate had been seen by an IDTT. There was no treatment plan in the record.

6.    Inmate F

This 28-year-old 3CMS inmate was housed on the San Quentin mainline. He apparently returned to SQ in early November 2006 after having left the institution in late June 2006.

At least two evaluations have resulted in diagnoses of Psychotic Disorder NOS; the more recent was very complete and well-documented. The treatment plan included depression as a problem but there were no meaningful interventions listed.

Assessment:

This inmate had only recently returned to prison after having paroled. Though he had been evaluated since his return, there was no meaningful treatment plan in place. It was not clear that this inmate's medications had been renewed since his return.

7.    Inmate G

This 46-year-old 3CMS inmate was housed on the San Quentin mainline. He apparently arrived in April 2006, was diagnosed with Mood Disorder, and was placed into 3CMS care. He was apparently removed from 3CMS care on 6/1/06 though there were no records indicating that his condition was monitored from the time that he arrived until the date of this note. He was returned to 3CMS care on 9/8/06 per an IDTT decision; the composition of the IDTT was within guidelines.

The treatment plan did not include interventions with the exception of case manager and psychiatric contact. He was seen by a psychiatrist on 9/22/06 and was prescribed Depakote. He was also seen by psychiatry on 9/28/06 and 10/26/06. There was a case manager note on 11/20/06.

Assessment:

This inmate was recently returned to 3CMS after having been discharged from treatment in June 2006. The initial discharge from treatment was not well-documented and appeared to have occurred rather quickly following his arrival in prison. The treatment plan did not include meaningful interventions with the exception of medication management. He appeared appropriately placed at this level of care.

EXHIBIT G

Deuel Vocational Institute (DVI)

November 13, 2006 - November 15, 2006

1.    Inmate A

This inmate was referred by Plaintiffs' attorneys because of a concern regarding an incident in which he had asked for staff assistance and then hanged himself.

This inmate had apparently been at DVI since prior to 2005. He paroled briefly, then returned to DVI approximately March 2006. He was housed in administrative segregation at that time and was seen approximately weekly by a case manager. Notes from 5/31/06 through at least 6/26/06 indicated that he was very agitated and delusional  He was stating that he was not receiving medication while records indicated that there was an order for Seroquel and Lithium beginning on 5/12/06.

On 8/1/06 at 17:15, the inmate was discovered hanging in his cell. Custody staff cut him down. He was breathing and was transported via ambulance to an outside hospital. Records indicated that he had been seen in response to a self-referral the same day. He was apparently placed in the OHU upon returning from the hospital, transported to an MHCB bed at Pelican Bay State Prison, and returned to DVI on 8/10/06. Mental Health Tracking System records do not clearly indicate that he was seen according to protocol for five-day follow-up, as he was seen on 8/11/06, 8/14/06, 8/15/06, 8/18/06 and 8/21/06; this demonstrates gaps and includes dates he was in OHU.

There was an inpatient record for 8/13/06 through 8/15/06. This record stated that the inmate was placed on the OHU secondary to a threat to hang himself.  During the stay in the CTC he was diagnosed with a mood disorder.

A note on 8/28/06 indicated that the inmate was fairly stable. There was a 9/18/06 3CMS chrono in this inmate's record. There were no treatment plans in the record, though there was a heading "PLAN" on the MH3 that described follow-up. The expert did not find an evaluation on an MH4 or MH7.

Assessment:

Records appeared to indicate that the inmate was stable on medication. There were notes that appeared to indicate that he presented as delusional and paranoid at times. The inmate had been seen regularly by clinicians. It appeared that five-day follow- up may not have been appropriately completed after this inmate returned from an MHCB in August 2006. Progress notes were generally adequate. There was no evaluation on an MH-4 or MH-7 nor was there a formal treatment plan in the record at the time of review.

2.    Inmate B

This 35-year-old inmate was listed at the EOP level of care, but chronos were not found in the record.

Notes prior to 2005 indicated that the inmate often acted in a "bizarre" fashion. In 2004, he was diagnosed with "undifferentiated Schizophrenia." A note on 1/3/05 indicated that

he "had become very agitated, angry and argumentative with his cellies." At that point he was referenced as being at the EOP level of care. On 1/3/05 he "appeared calm, no evidence of hostility or agitation, did not appear to be in a psychiatric crisis."

There was an inpatient record from 4/8/05 where he was admitted to a crisis bed for "bizarre behavior." On that date he was not taking medication. He was apparently released from crisis care on 4/11/05 but notes indicated that he was continuing to evidence "bizarre" talk.

There were no notes in the record from January 2006 until early October 2006. Notes on 10/4/06 indicated that he was "relatively stable" but that he had a history of "many sexually inappropriate behaviors," "loose associations, thought blocking, disorganization." He was placed at an EOP level of care on that date.

Notes on 10/10/06 indicated that the inmate had been diagnosed with Psychosis NOS. An RVR assessment on 10/10/06 listed as a mitigating factor the fact that the inmate's medication had been disrupted. The clinician concluded that the inmate should not be held fully accountable for his conduct. Other notes indicated that the inmate had been "exposing himself" and masturbating openly and he was noted to be "inappropriate with female staff" per psychiatric technician notes for 10/15/06 to 10/21/06.

Notes on 10/23/06 indicated that this inmate was anxious and delusional. His self-care and daily living skills had deteriorated and he was described as smelling of urine. His cell was described as very unkempt. There was another RVR assessment on 10/25/06 that found him not likely fully accountable for his behavior. Notes from this assessment indicated that the clinician was of the opinion that the inmate should be "put up for a higher level of care." Notes on 11/1/06 indicated that he was "increasingly psychotic."

Assessment:

This inmate had been seen weekly by case managers. Since October 2006, it would appear that he had deteriorated steadily until he was noted to be "increasingly psychotic" on 11/1/06. A note on 10/26/06 indicated that the inmate should be considered for referral to a higher level of care. It would appear that clinicians followed this recommendation as the referral database indicated that a referral for intermediate care was faxed on 11/14/06.

3.    Inmate C

This 43-year-old inmate apparently arrived at DVI in August 2006 and was at an EOP level of care at the time of review. There was an MH7 on 8/17/06 that indicated that the inmate was to be changed from EOP to 3CMS level of care. A note on 9/12/06 indicated that the inmate was stable on medication at that time. An MH7 from 9/18/06 indicated a diagnosis of Schizophrenia, paranoid type. Despite the earlier MH7, a 9/19/06 chrono placed him at the EOP level of care and there was no note that accompanied or explained this decision.

3

This inmate was seen by mental health clinicians on 8/10/06 and 8/28/06, seen in ICC on 10/4/06, and seen by clinicians on 10/25/06, 11/1/06 and 11/8/06.

Assessment:

This inmate appeared to be stable on medication. There was some confusion regarding level of care. The notes were adequate but clearly not expansive. There were appropriate assessments in the record but no treatment plan was found.

<u>IDTT meetings in the OHU:</u>

4.     Inmate D

This inmate was returned from a HDSP crisis bed the night prior to the IDTT meeting. He reported that he was sent to the crisis beds after he told custody that he was having difficulty with his cellie. He reported that he never said he was suicidal, that he had told the custody staff that he would likely harm his cellie if he was not moved. Anecdotal information suggested that the inmate spoke to his case manager, who attempted to intervene to assist the inmate in getting a cell move. After this was not successful, the inmate was eventually placed into the OHU and was then transported to HDSP where he remained for at least a couple of days.  His medication was apparently discontinued while he was away. Staff appeared to be of the opinion that this situation might have been remedied if a cell move had been considered.

This inmate had no smock at the time that he was in the committee room. He reported that he was wearing a blanket, which appeared accurate. The inmate reported that in his cell he had the blanket he was wearing and a mattress. When questioned, staff reported that inmates were given smocks when they were available.

5.     Inmate E

This inmate had just returned from PBSP. He had been there for approximately one week in a crisis bed. He had a history of suicide attempts at age 16. He stated that he had been in MHSDS for approximately six years. He additionally acknowledged a history of special education. During the interview, he appeared very vigilant and somewhat cognitively limited.  He was obviously anxious in the setting and, when asked, reported that he was anxious because he had no clothes, as he was in a blanket and no smock. When queried, he reported that he had been in "boxers, t- shirt and socks" while at PBSP and these were taken from him when he returned to DVI and was placed overnight into the OHU. While at PBSP, it was discovered that the inmate had a thyroid deficiency and medication had apparently been initiated. The psychiatrist had a chart from the inpatient stay and no other chart information was present in the meeting.

4

6.    Inmate F

This inmate appeared for the meeting wrapped in a blanket and reported that he had no smock. This inmate reported that he had paroled and was working as an automobile detailer. He was arrested for a parole violation when he failed to report as an arson offender. He reported that he had been at MCSP EOP for mental health stabilization and that his medications were changed at the time that he returned to DVI. He attributed several behavioral incidents to increasing impulsivity and, as a result of a number of behavioral infractions, was apparently facing a possible indeterminate SHU sentence. He reported that he had recently injured his hand when he became angry in an interaction with a clinician and broke a window in his cell. He had been placed into the OHU on suicide watch following this incident, though he denied being suicidal.

Within the context of the committee, this inmate was alert, articulate and evidenced no obvious indication of active mental illness. He described anxiety regarding the probability of being placed into "the dungeon," an area of administrative segregation.

EXHIBIT H

California State Prison at Corcoran (CSP/Cor)

August 22, 2006
October 10, 2006 – October 11, 2006
December 11, 2006 – December 12, 2006

1.    Inmate A

Inmate A was referred by plaintiffs' attorneys, who requested a review of his current level of functioning within the EOP hub. He was described as having multiple MHCB admissions and, through correspondence with the attorneys, had reported ongoing suicidal ideation.

This inmate had a history of special education placement, diagnosis of ADHD and depressive mood. At the time of the expert's review, he was placed at the EOP level of care. He had a history of inpatient mental health treatment at Patton State Hospital.   He was serving 25 years to life as a "third striker" with a history of "assault to commit a specific offense." He had a history of sex offenses involving children. He was a Level IV inmate with a substantial history of involvement with mental health services since his entry into prison, apparently in 2004.  There was additionally a history of polysubstance abuse. Within prison, there was a history of "acting out" including smearing feces, staff assault, homicidal threat and sex offenses. He was prescribed Depakote, Risperidone, Seroquel, Cogentin and Benadryl.

A review of the sixth, and most current, volume of the health care record indicated this inmate had a history of repeated crisis bed admissions since at least 2004.  Admissions generally were precipitated by reports of suicidality and self-injury. This inmate was apparently placed at SVPP from 4/14/05 through 11/23/05. Records included descriptions of this inmate as "regressed," "childlike," "easily peer pressured" and having "extremely poor coping skills." This inmate had lived in administrative segregation since at least June 2006.  Clinicians were of the opinion that administrative segregation placement tended to exacerbate his existing mental health problems.

This inmate had reportedly been placed in the CTC on at least nine occasions since 1/1/06. In them, he reported suicidal thoughts, including auditory command hallucinations that instructed the inmate to hang or to cut himself. On at least one occasion, clinicians remarked that following admission to the hospital it was discovered that the inmate had "no issue, just wanted time out from 4B1 (his housing unit)."  A suicide risk assessment completed in June 2006 indicated that the inmate reported that he "frequently uses the Acute Care Hospital for secondary gain."

Assessment:

This inmate had a considerable history of CTC placement. He had been seen as evidencing auditory hallucinations, mood disorder and impulse control difficulties. This case was discussed with the current MHCB clinician on 1/11/06. This clinician reported that the team was considering recommending re-referral to intermediate care and such a referral would appear to be currently indicated.

2.    Inmate B

Inmate B was referred by plaintiffs' attorneys, who requested a review of his current treatment plan.

This inmate was a 41-year old who was apparently found not guilty by reason of insanity at his trial and was placed into Napa State Hospital. Records indicated that the inmate was placed at Corcoran on a "1026" placement as a state hospital patient who was not manageable in the hospital setting. A 4/26/06 assessment indicated that he evidenced no apparent Axis I features and that he presented primarily with Axis II Narcissistic and Antisocial Personality Disorder. In the context of this assessment, the inmate reported that "I don't have a mental illness. I thought I would only spend six months in the hospital. They wanted me to take a plea for three years."

Notes through the period of this inmate's incarceration at Corcoran have generally failed to indicate observation of obvious psychotic symptoms. Meetings with mental health staff appeared to have been marked by a variety of legal complaints and no mental health complaints or evidence of active major mental illness. At times he had been noted to be "agitated" apparently as a result of his frustration over the uncertainty of his current placement. Notes from 5/4/06 indicated that the inmate was "high functioning enough not to require EOP level of care." The inmate had not been prescribed psychotropic medication since at least May 2001 per a report by the case manager dated 9/19/06. On 8/16/06, a note indicated that the inmate requested removal from 3CMS.

A letter by the treating clinician on 9/19/06 indicated that the clinician had provided case management services to the inmate since 6/21/06 and that he "has met the criterion for removal from 3CMS program which includes being medication free for 6+ months and presenting no active symptoms." Further, the note indicated that the inmate "does not demonstrate any symptoms/behavior related to an Axis I disorder, although Axis II features of ASPD are present and predominant." On 8/31/06, the IDTT acted to remove the inmate from 3CMS.

Assessment:

This case was complicated by a previous court determination that the inmate met the criteria for "not guilty by reason of insanity" and required placement in the state hospital. Since placement at Corcoran, notes indicated a consistent clinical picture of an inmate with no active mental illness. Information voluntarily provided by the inmate supported the clinical impression that no major mental illness was present. It would appear that the clinical team acted appropriately in recognizing that this inmate did not present symptoms of major mental illness and this, in combination with his not being prescribed medication for some time, justified the intention to remove the inmate from 3CMS level of care.

3

EXHIBIT  I

California Substance Abuse Treatment Facility (CSATF)

October 2, 2006 – October 4, 2006

1.    Inmate A

Inmate A was referred by plaintiffs' attorneys for a case review. This inmate was housed in the administrative segregation unit and was assigned to 3CMS level of care. Reportedly he had a long history of severe depression and suicide attempts. He was previously referred for ICF placement but reportedly was denied this placement on the basis of his custody status.

A 1995 BPH report indicated that this inmate was convicted in Ventura County in 1979. He was sentenced to two life terms for kidnapping, robbery and attempted murder. He had a history of criminal behavior beginning at age 14 and had been incarcerated as a juvenile and as an adult in Kansas prior to entering California prison approximately 1979. His record included several references to a history of gang affiliation. There were several entries in the medical record that were consistent with injuries from altercations with other inmates. In January 1998, he was stabbed in the neck, injuring his carotid artery. He underwent surgical repair of this injury.

The inmate was initially treated for depression while incarcerated in Kansas in 1977. A chrono from 1984, after the inmate entered CDC, noted that he had made multiple suicide attempts and evidenced "bizarre speech" and social withdrawal. A June 1984 evaluation at CMF resulted in the characterization of the inmate as evidencing "no treatable psychiatric disorder." At approximately this same point in time, the inmate apparently reported that his attempts to involve himself in mental health treatment were motivated by a desire to escape from enemy situations on the yards on which he was housed.

In 2004, he was alleged to have threatened staff and was placed in administrative segregation; this resulted in his missing the first visit with his mother and sister in 25 years. He apparently became depressed, threatened suicide, and was placed in a crisis bed. After being diagnosed with Major Depressive Disorder, he was sent to DMH/CMF where he remained for slightly over one month. He was discharged from CMF with a diagnosis of Adjustment Disorder with depressed mood and Antisocial Personality Disorder. He was referred to EOP upon release from DMH.

The inmate was returned to 3CMS level of care by an IDTT in August 2004 in light of the fact that no major mental illness had been diagnosed. Notes in the inmate's record indicated that he had been quite uncooperative and belligerent toward mental health staff. Staff documented the impression that the inmate might be drug-seeking as he had a prescription for methadone for back pain.

A September 2005 MH2 included an extensive list of problems and specific interventions for both psychiatry and the case manager, which were all reasonable and appropriate to the diagnosis. The most recent treatment plan was dated 9/6/06 and included diagnoses of PTSD, as a result of being the victim of child sexual abuse, and Depressive Disorder NOS. IDTT notes from June 2005, 7/20/06 and 9/6/06 did not indicate any plan to transfer this inmate.

It appeared that this inmate was being seen weekly as an administrative segregation inmate. He was additionally seen by a psychiatric technician for rounds on a daily basis.

The inmate was interviewed in a confidential setting on his housing unit. He was well-groomed, alert and cooperative with the interview. He reported that he has been in contact with Plaintiffs' attorneys. The range of affect was restricted and, at one point in the interview, the inmate became tearful when he spoke of the death of his wife. There were no indications of a thought disorder.

The inmate reported that, while at Salinas Valley in an EOP program, there was a recommendation "by Coleman," likely as part of the Unmet Needs Assessment, that he be transferred to an ICF program. He reported that he was referred but was not transferred, apparently as a result of a custody consideration or no beds being available at DMH/SVPP. He was transferred to CSATF in May 2006 and placed into administrative segregation when another inmate reported that this inmate had revealed a plan to assault staff.

When asked why he believed he required ICF placement, he reported that he needed to be involved in a program to address his history of being a victim of child abuse and he was of the opinion that this program was available at the newly opened ICF program at CMF. He reported that his new psychologist was attempting to facilitate his transfer to an ICF. The inmate reported that he did not shower or go to yard. A review of his 114d revealed that he did, in fact, shower, with occasional refusals, but that he typically refused yard.

Assessment:

This inmate had an extensive history of gang involvement and there was some indication that he had at least occasionally admitted exaggerating mental health symptoms in an attempt to obtain relatively safe placements. Available records indicated that, within the past few months, he had often been belligerent and verbally abusive toward mental health staff. He was prescribed methadone for pain and there have been clinical notes indicating that this inmate was likely drug-seeking. He was adamant about being returned to EOP level of care or DMH. This may be in response to the fact that, following an apparent plan to assault staff, the inmate was placed in and remains in administrative segregation. He did not appear to require referral to ICF but may be appropriately referred to an EOP program. Given his current custody level, he would most likely be placed into a PSU program and this appeared to be an appropriate placement. It would appear that his mental health was being appropriately monitored by mental health staff at the time of review.

2. Inmate B

Inmate B was referred by the plaintiffs' attorneys for review of his current treatment plan and placement.

Inmate B was a 3CMS inmate who was housed in the administrative segregation at the time of the monitoring tour. He was formerly in an EOP level of care and had been placed in crisis care on several occasions for suicide attempts and ideation. He was under a Keyhea order.

An MH-4 dated 3/1/05 indicated that this inmate had a history of mental health services dating from the time he was in the third grade. He additionally had a history of special education. Records indicated at least two suicide attempts by hanging. He was diagnosed with Depressive Disorder NOS, and Psychotic Disorder NOS.

The inmate was apparently placed into a crisis bed on 11/11/05 after reporting to a clinician that he planned to hang himself. A second crisis bed placement occurred on 11/24/05 when he threatened self-injury after being placed into a cell with a cellie. On 2/23/06 he complained of being "angry and depressed" and was diagnosed with "rapid cycling Bipolar Disorder with psychotic features." On 3/3/06 a suicide risk assessment noted that the inmate had "a history of multiple suicide attempts in the last six months." He was referred for placement into EOP on that day.

Notes through May 2006, June 2006 and July 2006 indicated that the inmate continued at an EOP level of care, was seen weekly, and continued to report that he was depressed. He was generally observed to be well-groomed, well-organized and apparently stable. A note from 6/21/06 indicated that he was refusing medication.

Evaluations were prompted by concerns relayed by CDCR headquarters staff; the result was a psychological consultation on 7/13/06 that included the impression that the inmate did not have suicidal ideation. He was characterized as being "consistently well-organized, calm, communicate(s) clearly and doesn't present signs/symptoms of depression." Custody staff apparently reported little indication that the inmate was depressed. Based on this information, the IDTT reduced his level of care to 3CMS on 7/20/06.

Of interest was the fact that, despite the clinical impressions recorded in the 7/13/06 note, the inmate was placed on Keyhea on 8/26/06. Notes written in support of the initiation of the Keyhea appeared to contradict the 7/13/06 impression of the inmate's condition.

In interview, the inmate appeared rather depressed and reported that he was refusing contact with clinicians and that he did not feel that these interactions would be functional. He stated that his initial reason for refusing medication was that he had experienced medication side effects.

4

Assessment:

The clinical impressions recorded in this inmate's record appeared contradictory. Interviewed staff essentially reported the impression that, properly medicated, this inmate was capable of functioning at a 3CMS level of care. In the absence of medication, he was prone to impulsive and rather manipulative behavior. The decision to discontinue the EOP level of care was apparently made, in part, on the basis that this inmate had a history of predatory behavior. This did not appear to be an appropriate basis for this decision. Nonetheless, it appeared likely that, appropriately medicated, this inmate was capable of functioning at a 3CMS level of care. The expert discussed this case with the Chief Psychiatrist and recommended to the inmate that he avail himself of the opportunity to discuss his concerns regarding medication with the assigned psychiatrist.

EXHIBIT J

Pleasant Valley State Prison (PVSP)

September 11, 2006 – September 12, 2006

1.    Inmate A

Plaintiffs' attorneys reported that this inmate was cell-extracted from the CTC on 5/22/06. He had been placed there for suicidality. The inmate reported that he had been threatened with a disciplinary if he attempted to return to the CTC.

At the time of the monitor's visit, this inmate was classified as requiring 3CMS level of care. He had a history of frequent admission to CTC for suicide ideation and claims of being suicidal.

This inmate's most recent MHCB admissions included those from 4/29 through 5/5/06, 5/15/06 through 5/22/06, and 6/5/06 through 6/6/06 . Once admitted, he often verbalized a variety of complaints but mental health staff reported no obvious indication of mental illness. He often refused to interact with clinical staff.

Following admission on 5/15/06, he was uncooperative or verbalized only custody complaints. Notes indicated that by 5/22/06, he was primarily diagnosed with a personality disorder. Upon being informed that he was to be discharged from CTC, he apparently refused to leave the CTC and an extraction team was assembled. Upon the arrival of the extraction team at cell-front, the inmate apparently left the cell voluntarily, obviating the need for an extraction. He was again placed into the infirmary on 6/5/06 and was discharged on 6/6/06 with a primary diagnosis of Antisocial Personality Disorder.

Since 5/5/06, this inmate had been seen by clinicians on 5/28/06, 5/31/06, 6/18/06, 7/23/06, 8/6/06, 8/23/06 and 9/8/06. He refused the last two appointments with his case manager and was seen at cell-front. Notes indicated that he presented as mildly depressed and agitated.

Assessment:

This inmate had a history of claiming suicidality, being admitted to the CTC, improving rapidly, and then being released. He had been primarily diagnosed with Antisocial Personality Disorder. Available records would indicate that though he was threatened with cell extraction on 5/22/06, physical extraction was obviated when the inmate left the cell voluntarily. The expert could find no records to indicate that the inmate had been told that disciplinary action might take place in the event that he returned to CTC. It appeared that he was receiving appropriate mental health care.

2.    Inmate B

Concerns of plaintiffs' counsel involved letters they had received in which this inmate reported severe paranoia and anxiety as well as thoughts of self-harm. In a letter to the Plaintiffs' attorneys on 8/31/06, this inmate reported that his mental state had continued to deteriorate. He reported that he had stopped eating due to his anxiety and he requested transfer to a higher level of care.

2

A reception center evaluation in May 2006 indicated that this inmate had a history of several suicide attempts and was diagnosed with "mood disorder" at that time. Other records indicated a history of erratic behavior, violence and lability.

This inmate was seen on several occasions from May 2006 to July 2006 for urgent referrals. At these times, he complained of anxiety and that his medication was not effective. On 7/18/06 he was characterized as drug-seeking, as he requested Artane, and was diagnosed with "mood disorder not otherwise specified." When the inmate was seen again on the same day, the psychologist remarked that the inmate was "seeking an increase in Wellbutrin."

On 8/3/06 he was seen after the officer on the unit reported that this inmate was "spinning out" over concerns regarding his housing. A note on 8/18/06 cited the inmate's history of mood instability and reported that the inmate was "increasingly irritable, paranoid" and experiencing loss of sleep. This note included a recommendation that the inmate be considered for EOP. A note on 8/31/06 appeared to indicate that the IDTT intended to recommend that his level of care be increased to EOP.

Assessment:

This inmate had a history of rather impulsive behavior, anxiety and depressed mood. Information found within his record indicated that the IDTT intended to increase his level of care from 3CMS to EOP. Discussion with mental health staff confirmed this intent. This change appeared well-advised.

3.    Inmate C

This inmate was referred by plaintiffs' attorneys, who indicated that the inmate had reported being placed into a holding cell in the CTC for 13 hours while awaiting mental health crisis care. Records indicated that he was admitted to CTC on 6/28/06 following his superficially scratching his wrists and claiming suicide ideation. He remained in the CTC until 7/6/06 and was discharged with a diagnosis of Depressive Disorder NOS.

At the time of the CTC admission, the inmate had reported that he had colon cancer but this was apparently not the case; a CT scan appeared to confirm this on 8/22/06. He had been seen by medical staff at least once for "chest pain." Notes through mid-August 2006 indicated that the inmate expressed concern regarding impending cancer surgery.

Notes from mental health clinicians indicated that, since the CTC discharge, this inmate was seen as somewhat dysphoric but functioning adequately. He refused some case management appointments.

3

Assessment:

The inmate appeared to have been appropriately followed by mental health staff. Records indicated that he was placed in the CTC. He was likely held in a holding cell within the CTC for some time prior to being placed in a room as this had been the facility's policy in the absence of available beds.

Information in his record suggested that this inmate appeared to have fixated on the thought that he has cancer. He has experienced other disturbing medical symptoms and this may be related to the existing presentation of dysphoric mood. Although he had been seen for a CT scan, which apparently indicated that he did not have cancer, it was not clear whether the results were discussed with him. At the time of the monitoring visit, the Health Care Manager was informed of this situation and agreed to insure that this inmate received appropriate feedback regarding his medical condition and that his mental health status be appropriately followed.

4.     Inmate D

Plaintiffs' attorneys expressed concern regarding this inmate's report that, upon being discharged from the CTC on 5/23/06, he was informed that he would not be allowed to return due to his recurrent exhibitionism.

This inmate had a history of numerous incidents of exhibitionism at PVSP and received at least eight disciplinary write-ups for this behavior. There were several notes from early 2006 that indicated that the inmate has insisted that he be seen only by female staff. Records indicated that he has reacted quite negatively when these wishes were not followed.

Notes indicated consideration of whether the inmate was appropriately diagnosed with Exhibitionism. In these discussions, the clinician cited the belief that the "true exhibitionist" "wants to produce fear or some sort of negative emotion in their victim." The discussion noted that, in contrast, this inmate had professed the belief that "his sister's childhood friends, the neighbor woman, and the Juvenile Hall and CYA female employees took extraordinary means to see his penis and that they enjoyed seeing it." Based on the above, the IDTT apparently determined that the inmate did not evidence Exhibitionism.

The inmate had several CTC admissions and has engaged in exhibitionism within that setting. On 5/23/06, an IDTT note in the inpatient record indicated that the IDTT was held "to formulate a specific treatment plan as it relates to this inmate's history of manipulating the mental health system for secondary gain." Notes indicated that "the inmate had been in CTC on four occasions, each admission after he claimed suicidal ideation." In discussing the possible response to what was seen as manipulative behavior, notes indicated that "It was also decided that if, in the judgment of mental health staff the inmate threatened suicide in an attempt to manipulate the system, a 115 will be written per program guidelines."

Assessment:

This inmate had a history of sexual assault and numerous acts of exhibitionism in prison. It would appear there was clinical consideration of exhibitionism, resulting in the opinion that this diagnosis was not indicated. There was not, however, a centralized, clearly ordered evaluation, including information from a central file review, etc.

Though the IDTT considered the available information and determined that the diagnosis was not indicated, some assumptions regarding the diagnosis of exhibitionism may not be appropriate. The emphasis on the technical accuracy of the application of the exhibitionism diagnosis does not appear as critical as arriving at a means of decreasing the behavior both from the standpoint of limiting the inmate's accrual of disciplinary time and reducing staff exposure to the behavior.

The inmate evidenced patterns of behavior that may be amenable to treatment through procedures that limit the opportunity to engage in the behavior or which would allow staff members to anticipate and to avoid providing the inmate with the opportunity to shock them. The use of cognitive behavior therapy, such as that ordinarily provided in a group setting to individuals appropriately diagnosed with exhibitionism, should also be considered.

EXHIBIT K

Avenal State Prison (ASP)

September 19, 2006 – September 21, 2006
November 15, 2006

1.    Inmate A

Inmate A was housed in administrative segregation with a designation for EOP level of care. He was apparently incarcerated for his first term with prior arrests for drug possession. His release date was set at 4/24/10.

He was placed into MHCB on 6/5/06 following a suicide threat. At the time of this admission, he was characterized as delusional, and was diagnosed with Paranoid Schizophrenia. On an MH2 dated 6/28/06, the inmate was diagnosed with Bipolar Disorder and Polysubstance Abuse on Axis I. The plan specified that the inmate was "anxious, paranoid" but the interventions consisted only of a list of the professionals who were to provide services. The most recent MH-4 included a diagnosis of Polysubstance Abuse.

The inmate was seen by a case manager on 6/20/06 and 7/14/06. He was seen by a psychiatrist on 6/31/06, 7/20/06 and 7/28/06. The record included no notes between 7/28/06 and the date of the case review.

The inmate's level of care was changed from 3CMS to EOP on 6/7/06 during his OHU stay. Notes indicated that he was reduced to 3CMS through an IDTT recommendation on 6/28/06 though other records indicated that he remained as EOP at the time of the monitoring tour. There was little explanation as to why the reduction in level of care was deemed appropriate. There was no clear documentation of discussion regarding LOC in the record.

Assessment:

More recent notes appeared to indicate that this inmate was stable without medication. There were, however, no notes in the record across a period of more than one month. The inmate's level of care was apparently changed from EOP to 3CMS approximately three weeks after he was elevated to EOP. There was not an adequate explanation as to why this change in level of care was initiated and the inmate was never transferred to an EOP program. Given the absence of current information within this inmate's record, it was not possible to determine the appropriateness of his current care.

2.    Inmate B

This inmate was a 21-year-old first-termer convicted for assault with a deadly weapon and due to parole in October 2006, approximately 11 days after the expert's review. He was housed in administrative segregation since 9/18/06 at the EOP level of care.

He had a history of "Borderline" behavior including burning himself with cigarettes. On 2/15/06, he was diagnosed with Mood Disorder NOS. The record contained a TABE score of 2.6.

2

He was seen on 7/12/06 and 7/18/06, then placed in the MHCB, following suicidal threats, from 7/19/06 to 7/20/06, 7/24/06 to 7/31/06, and 8/11/06 to 8/25/06. His level of care was changed to EOP during the second admission. By the inmate's report in an interview, he was reacting to fears of being harmed on the yard and not, in fact, contemplating suicide. Despite the series of inpatient admissions, the record did not include clear documentation that the inmate was considered for transfer to a higher level of care. He was seen for five-day follow-up after the last admission.

The next contact documented was an MH2 dated 9/18/06, which indicated a diagnosis of Major Depressive Disorder, recurrent mild. The treatment plan included no specification of target behaviors and reported "increase sleep, med stabilization" as objectives. The interventions included only a list of services and the individuals who were responsible. Notes indicated that the treatment plan was discussed by the IDTT on 9/19/06.

When seen in interview, this inmate was adequately groomed, well organized and thoroughly cooperative. He was a rather slightly built individual who cited his primary reason for MHCB placement as his ongoing concerns regarding safety issues. He reported that he would parole 11 days after the interview. He reported that he had ceased taking his medication several days prior and complained that he had experienced tremors, which were evident, but "felt better" since stopping the medication. The range of affect was full and appropriate to the context. Speech was clear and the range of vocabulary was consistent with average cognitive ability.

Assessment:

Inmate B did not present with active symptoms of mental illness though he had ceased taking medication several days prior to the interview. He reported that previous threats of suicide had been largely a function of his desire to get off the yard and to remain in what he viewed as a relatively safe environment until his upcoming parole. His record did not include evidence of a clear consideration of his possible need for higher levels of care. Such a referral was probably not indicated but nonetheless should have been considered in light of multiple MHCB placements.

3.    Inmate C

The inmate was apparently housed at CMC-E through May 2006. On 5/21/06, he was diagnosed with Antisocial Personality Disorder, Narcissistic Personality Disorder and Depressive Disorder NOS. Notes on that date indicated that "he has a long history of this personality disordered behavior and has been warned that he would receive an RVR if it continued." Staff characterized the inmate as highly demanding and "manipulative."

The inmate had consistently been at the 3CMS level of care. An MH2 dated 6/20/06 was found in the record. Axis I diagnoses at that time included "Bipolar II Disorder," "Substance Induced Psychotic Disorder" and ""PCP dependence." The MH2 included target behaviors including "dysphoria." The interventions listed on the treatment plan

3

were limited and included "psychologist consult," "IDTT" and "will take meds as prescribed."

He was seen as a new arrival at ASP administrative segregation on 6/14/06, seen in ICC on 6/15/06, seen by a case manager on 6/20/06, 6/29/06 and 7/24/06 and seen by a psychiatrist on 6/22/06 and 7/20/06.

Records indicated that this inmate was placed into the OHU from 8/18/06 through 8/23/06 following self-reported suicidality. Notes indicated that the inmate had repeatedly complained about "not being able to program in a dorm setting" and this appeared likely as the basis of his admissions to MHCB. He had SNY status.

Assessment:

This inmate had a history of claiming suicidality and had been placed into MHCB on more than one occasion. Staff adequately documented the assessment that claims of suicidality were secondary to personality disorder and the desire to avoid dorm living. He appeared appropriately maintained at 3CMS level of care.

4.      Inmate D

Inmate D was sentenced for elder abuse following an incident in which he reportedly struck his father during a "panic attack." He had a history of mental illness prior to incarceration and received SSI secondary to mental illness. He had previously been diagnosed with "amphetamine-induced Psychotic Disorder with auditory hallucinations."

He was admitted to MHCB following suicidal threats on 2/23/06 and remained there until 2/28/06. He was apparently transferred from Avenal to PVSP for MHCB and, while there, was diagnosed with Schizophrenia, Paranoid type. Of interest was the fact that the admission notes indicated the recommendation to "continue with Keyhea medication," but it was not clear that a Keyhea order was in place at that time.

From 6/1/06 until the expert's review on 9/21/06, this inmate had been seen by a case manager on three occasions in June, 6/16/06, 6/21/06 and 6/30/06. He was then apparently designated as requiring EOP care on 7/14/06. While he was seen for five-day follow-up after MHCB placement in August 2006, there was no documentation that this inmate was seen for weekly EOP case manager contacts. He was seen on several occasions by a psychiatrist.

Assessment:

This inmate was awaiting EOP transfer and records did not clearly document that the inmate had been seen weekly by a case manager. The inmate had been placed into MHCB on at least two occasions. There was no information within the record to suggest that the IDTT had considered this case for possible transfer to a higher level of care.

4

5.     Inmate E

This inmate had a history of pre-incarceration placement at Patton State Hospital. Notes from OHU or MHCB admissions indicated an existing diagnosis of Schizoaffective Disorder and a history of safety concerns.

There was a note indicating that the inmate had been placed on suicide watch on 6/6/06. He was admitted to OHU on 8/6/06. A recommendation for elevation to EOP level of care occurred on 8/11/06. He was placed in MHCB at Corcoran on 8/22/06. He was again housed in the OHU at the time of the monitor's visit, the third such placement within the preceding few weeks. This inmate's record did not include documentation of IDTT consideration of the case.

Assessment:

This inmate had a history of multiple OHU admissions.  There was no indication that the case had been considered for higher levels of care.

EXHIBIT L

Salinas Valley State Prison (SVSP)

September 19, 2006
October 13, 2006 – October 14, 2006
December 13, 2006 – December 14, 2006

1.    Inmate A

According to the C-file and associated documentation, this inmate was assigned to the BMU because he refused to racially integrate. He refused to participate in BMU treatment.

This 3CMS inmate was seen by the BMU UCC on 8/23/06 and placed in Step 1, "Cage Your Rage" and Narcotics Anonymous, for refusal to double cell or participate in the Department's racial integration program. He was advised of the requirements to graduate to Step 2. He informed the UCC that he did not believe that he should be in BMU and refused to sign the BMU Step Process, Privileges and Expectations Chrono.

The Custody Classification-Assignments log indicated that a BMU UCC was held on 10/2/06; however, a Classification Chrono 128G was not available for review in the C-File at the time of the October site visit.

A memo from plaintiffs' counsel said he was in the BMU because he refused to double cell and that UHR review showed that he reported history of sexual assault at SVSP and prior. Plaintiffs' counsel reported that he was not referred for a mental health assessment in connection with a charge that was issued when he was refusing a cell mate. Plaintiff's counsel also reported that clinical notes written since he was in the BMU said he felt trapped in his cell, was paranoid and reported hearing voices and being watched on camera.

When interviewed on 10/12/06, he was neatly dressed and well groomed. His thought was relevant and logical. He reported that his regimen was helpful. He described being taken for an emergency mental health appointment around 9/20/06. The signs and symptoms he described were consistent with high levels of anxiety. He said that he felt the walls of his cell closing in. He was evidently stressed by the conditions of the BMU. His report did not suggest a psychotic episode.

He reported that he was allowed out of cell for showers on alternate days and for mental health appointments. He said that mental health contacts were made in a confidential setting. A self-referral resulted in contact with a mental health clinician within one to two weeks. He reported insomnia and weight loss. He said he paced in his cell because he felt nervous.

This inmate's UHR was not reviewed. According to the MHTS, he had a diagnosis of Delusional Disorder. He was medicated with Risperidone, Mirtazapine, and Paxil. He took Risperidone and Cogentin throughout 2006. Mirtazapine and Paxil were added to his regimen in April. He was seen quarterly by a case manager and more frequently by psychiatry. He had an IDTT meeting on 8/24/06.

Assessment:

A 30-day UCC review in the BMU was not held but his case was reviewed after 60 days. The BMU treatment plan/program in which he was enrolled was not obviously related to his reason for placement. This inmate appeared to be functioning adequately in the BMU overall but he had experienced high levels of anxiety and may have had a panic attack. When interviewed on 10/12/06 he did not report symptoms or exhibit signs of paranoia or a psychotic disorder.

Panic attacks are acute episodes that should elicit an immediate response as well as a plan for on-going treatment. His treatment plan should target anxiety and include cognitive behavioral techniques for anxiety management. Mental health treatment should also clarify whether he has a traumatic reaction associated with a history of assault. If diagnostic clarification finds that he has a history of trauma, high anxiety and panic attacks, his risk of self-injury and suicide should be assessed thoroughly and often.

2.    Inmate B

According to the C-file and associated documentation, this inmate was assigned to the BMU because he refused to double cell. He was enrolled in a group called CALM. Progress notes written in his UHR indicated that this inmate consistently said he was afraid to be double celled. He reported his fear in 2004 at Corcoran and in 2006 at SVSP.

During his ASU Program Review on 4/27/06, this inmate was released to Facility C for multiple reasons, among them to evaluate his BMU status. He was placed in the BMU on 8/23/06 for a number of indecent exposure RVRs.

The BMU UCC erroneously listed him as a non-participant in the MHSDS, although he has been on the caseload for over two years. He was not assigned a Staff Assistant. He was was placed in "Cage your Rage" and Narcotics Anonymous for Step 1 upon his agreement to participate in the BMU. The Custody Classification-Assignments log listed the occurrence of a BMU UCC on 10/2/06; however, a Classification Chrono 128G was not available for review in the C-File at the time of the October site visit.

Plaintiffs' counsel reported that this inmate was in the BMU because of two indecent exposure charges. They also reported that he had made three suicide attempts in the past. He reported fleeting suicidal ideation to a psychiatrist on 9/26/06. Plaintiffs' counsel reported that his BMU treatment plan was for NA and "Cage Your Rage."

This inmate was the only one of 15 in the BMU who agreed to participate in BMU treatment groups. When interviewed on 10/11/06 he presented as tentative and shaky. He was disheveled and unkempt. He reported that he attended one session per week in the day room. The session lasted 45 to 60 minutes. He reported that he did not have use of the day room aside from the weekly meeting, he did not have access to the yard, he bathed in his cell because he was reluctant to come out of cell for showers and he went to mental health appointments in an office that afforded confidentiality.

His thought content was relevant and his cognitive concrete. He reluctantly reported that he had daily repetitive thoughts of worthlessness and passive suicidal ideation. He said that he had no intention of injuring himself. He said he was uncertain about whether he would tell someone if he decided to injure himself. He reported that in the past he had not always told people when he felt like hurting himself. He said that the conditions of mental health appointments were not conducive to disclosure. He cited wearing handcuffs during appointments and the presence of nearby bystanders as two impediments to full disclosure. During the interview his reaction to the presence of a group of officers outside the glass walled office indicated that their presence inhibited his conversation.

An officer who knew this inmate during his stay in the BMU reported that the inmate's hygiene had dropped off noticeably. Once he was given a cellmate his hygiene improved.

According to information in his UHR, this inmate had two fairly recent charges for indecent exposure. He exposed himself to mental health staff in an EOP unit in April or May. He exposed himself to CTC staff, possibly in February.

According to the MHTS, he had a diagnosis of Polysubstance Dependence, but that seemed incomplete, as other records showed that his history was significant for Depressive Disorder. He was medicated with Risperidone and Benadryl throughout 2006. The dose of Risperdal was increased in June. Paxil was added to his regimen on 8/23/06. The dose of Paxil was increased in September.

This inmate had a history of treatment for Depressive Disorder and ASPD since at least May 2004. At that time he was in a SHU at Corcoran. His GAF was assessed as 75. Low average IQ was noted. Elsewhere, a TABE score of 4.6 was recorded.

In April 2006, this inmate had an IDTT meeting at SVSP. Diagnoses were Psychosis NOS and ASPD and his GAF was assessed as 65. The meeting was attended by a full team. He was enrolled in a self awareness group. In May, an IDTT meeting changed his diagnosis from Psychosis NOS to Polysubstance Dependence and ASPD. Depressive Disorder went unmentioned. His GAF was assessed as 75. The meeting was attended by a full team.

The frequency of mental health contacts declined sharply for three months but picked up in September. From January through April, while he was in administrative segregation he was seen weekly or more often due to group attendance that addressed sexual misconduct. In May, he was seen once by a case manager and once in an IDTT meeting. In June, he was seen once by mental health staff for a psychiatry appointment. In July he was seen twice, once by a case manager and once by a psychiatrist. He was seen once in August for a psychiatry appointment. In September he was seen twice by psychiatry and once by a case manager.

Assessment:

The UCC erroneously believed that this inmate was not on the mental health caseload. The 30-day UCC review was late. His BMU treatment plan/program did not appear to be related to his reason for placement.

The IDTT's decision to drop affective and psychotic disorders from his diagnoses and retain only substance dependence was incorrect in light of his history and the treatment that was currently being provided.

Mental health treatment met program guide requirements while he was in administrative segregation. He was treated in a group with other inmates who incurred RVRs for sexual misconduct. Mental health treatment was adequate while he was in the BMU in terms of frequency, access and confidential contacts but it did not fully address his clinical need. Diagnostic clarification went in the wrong direction. Further, staff did not fully consider his level of intellectual functioning or his fears regarding double celling and his possible history of sexual assault.

This inmate appeared to be increasingly symptomatic. It was unclear whether he would notify staff if his passive suicidal ideation changed to active or was accompanied by intent. Frequent suicide risk assessments and consideration of his current treatment needs were warranted.

This case was referred to mental health staff and to the associate warden for healthcare with a recommendation that staff immediately assess his level of suicide risk, revise the treatment plan, clarify diagnoses and use this case to see how mental health information might appropriately be used in decisions regarding continued placement or removal from the BMU.

3.    Inmate C

Inmate C was assigned to the BMU because he had two SHUable offenses. He refused in participate in BMU treatment. He was in administrative segregation prior to being moved to the BMU. According to the MHTS he had a diagnosis of Mood Disorder NOS. His medication regimen was recently changed. He was treated with Abilify and Benadryl in August 2006. From January through July 2006 he had orders for Seroquel and Paxil.

He was seen for five-day follow-up immediately prior to being moved to the BMU. He was seen due to an urgent referral on 8/16 and again on 8/18 in response to an inquiry by headquarters. He was seen daily on five-day follow subsequent to the inquiry by headquarters. In May and June he was seen weekly by a case manager. In July he was seen once by a case manager. He was seen by a psychiatrist on three occasions from May through August. He had quarterly IDTT meetings.

This inmate was released from the BMU prior to 10/11/06. Staff reported that he had a history of forcing administrative actions and had done so to get out of the BMU.

A treatment plan written in connection with an IDTT meeting held in administrative segregation on 9/27/06 showed diagnoses of Mood Disorder by history, Personality Disorder NOS by history and a GAF of 65. A full team attended in the meeting.

He was treated with Omeprazole, Abilify and Benadryl. He also took Tramadol. On 9/25/06 he told a clinician that he was receiving medication.

Five mental health contacts were attempted in September. He refused two contacts. A progress note associated with a contact that was made described him as having linear, goal directed cognition and reporting dysphoria.

Assessment:

Mental health treatment was adequate. It appeared to meet his needs.

4.     Inmate D

This inmate was seen by the BMU UCC on 8/31/06. He was placed in Step 1 for Program Failure: two RVRs in the previous six months. The Classification Chrono 128G reported that he expressed disagreement with his BMU placement and refused to accept a cell mate. The UCC placed him in "Cage Your Rage" and Narcotics Anonymous and advised him of the requirements to graduate to Step 2. The 8/31/06 Classification Chrono 128G documented his CCCMS status.

The Custody Classification-Assignments log indicates that a BMU UCC was held on 10/2/06. However, a Classification Chrono 128G was not available for review in the C-File at the time of the October site visit.

According to MHTS he had a diagnosis of Mood Disorder NOS. He did not have orders for psychoactive medication. In July he was in an Anger Management group led by mental health staff. He attended one session. In June he was seen 4 times by a case manager; one of those contacts was made at cell-front because he refused to come out to an appointment. He was also enrolled in "Anger Management" in June but both sessions that were scheduled were cancelled. He had an IDTT meeting in June.

When interviewed on 10/12/06 he was neatly dressed and well groomed. His cognitive processes were logical and well organized. Content was relevant. His mood was euthymic with appropriate affect. He was emotionally well related. He said he had wanted treatment for ADHD but mental health did not treat that condition. Instead he was treated for insomnia and a mood disorder. He said that he had a job assignment on C yard before coming to the BMU. He was surprised to be selected for the BMU. He did not think his selection was objective and refused on principle to participate in BMU activities. He reported that showers were offered on alternate days, no day room or yard time was offered. The only time out of cell was going to the shower. One book was

allowed but the library did not fulfill requests. No canteen was permitted. No privileges were granted.

According to his inmate history he was seen in IDTT meetings in June and September. He had no orders for psychotropic medication in 2006. He was seen by a case manager every two or three months between January and June. In June he was seen three times and refused once. He attended one session of an anger management group in July.

Assessment:

Mental health treatment met program guide requirements according to the inmate history. The decision to discharge him from the MHSDS appeared to be reasonable based upon his current functioning.

5.     Inmate E

This case was reviewed because plaintiff's counsel reported that he was a 3CMS inmate in the BMU. He was removed from the BMU prior to 10/12/06. Plaintiffs' counsel reported that he was in the BMU because he was a program failure. Plaintiff's counsel reported that he incurred two RVRs in the reception center, a fact that was confirmed by SVSP staff's review of his C-file.

UHR review indicated that this inmate had a bus screening at SVSP on 9/5/06. He came from WSP at the 3CMS LOC. He had orders for Paxil, Wellbutrin and Omeprazole. Medication continuity upon arrival could not be discerned due to a missing MAR.

Three days after he arrived he was seen out of cell by a case manager. According to clinical notes he was seen at cell-front on 9/14/06 and made BMU later that day.

He had a timely IDTT meeting attended by a full team on 9/14/06. The treatment plan was individualized. Diagnoses were Bipolar Disorder, Alcohol Dependence in institutional remission and APD. His GAF was assessed as 60. Mood instability was targeted as a problem.

He saw a psychiatrist on 9/26/06. The progress note described him as lucid with affect within normal limits. He reported that his mood was problematic. Zoloft was added to his regimen.

Assessment:

Intake processing was timely. Mental health treatment met program guide requirements with the possible exception of medication continuity. This case raised questions regarding the application of BMU placement criteria to a person who was considered a program failure because he incurred two RVRs while in a reception center.

6.    Inmate F

This case was reviewed during a previous site visit. The following information and conclusions were excerpted from the previous review. When the case was reviewed during the June 2006 site visit this inmate was treated at the EOP level of care.

In June, this inmate was on modified programming, meaning that he had a monthly IDTT meeting and was enrolled in a small number of groups weekly rather than being scheduled to attend ten or more hours of structured therapeutic activity. Based upon the June review, the monitor's expert concluded that treatment in the EOP was inadequate. It was not individualized.

This inmate appeared to be unable to benefit from treatment modalities that depended solely upon spoken English language or auditory processing. His mode and level of functioning on the day he was interviewed suggested that he needed more opportunities to engage in activities that relied upon both nonverbal skills and written language.

The UHR was reviewed and the case was discussed with supervisory staff and revisited in October. After months of having the same case manager, the inmate had been seen by several different case managers in recent weeks. Other than that, there was no appreciable change in his mental health treatment.

Assessment:

The treatment provided to this inmate was not individualized and did not address his clinical needs. The case was again discussed with supervisory staff as an example of inappropriately modified treatment.

7.    Inmate G

Custody records indicated that this inmate was placed in administrative segregation on 8/4/06. A bus screen indicated that this inmate arrived at SVSP from DVI on 7/5/06. The screen was negative relative to mental health issues and paperwork in the UHR indicated that he did not have a history of receiving mental health services.

An 8/5/06 31-question mental health screen indicated that member's of this inmate's family had serious psychiatric/emotional problems, that he had some brief, but not serious, thoughts of killing himself, that he had lost his appetite for two or more weeks, and that he felt other people knew his thoughts and could read his mind.

The screening form did not indicate whether or not the screener, an LVN, referred this inmate to mental health. A 9/21/06 progress note, completed by a case manager over six weeks later, indicated that this inmate was seen in response to an LPT referral. The clinician concluded that this inmate did not meet criteria for inclusion in the MHSDS and that no follow-up was needed.

Assessment:

This non-MHSDS inmate was screened within 24 hours of his placement in administrative segregation. It did not appear that a positive screening result prompted a referral to mental health staff, as the screening form did not document the initiation of a referral. In response to a staff referral, mental health staff saw the 47 days after the positive screening.

8.    Inmate H

Custody records indicated that this non-MHSDS inmate was placed in administrative segregation on 6/26/06. A 6/27/06 31-question mental health screen indicated that the inmate reported a past history of taking antidepressants. The inmate also reported losing his appetite for two or more weeks, believing that he was being poisoned or plotted against, believing that other people were watching or spying on him and experiencing periods during which he was much more active than normal. The screening form did not document whether or not these responses prompted referral to mental health.

Progress notes documented that he met with a case manager during the initial ICC meeting, held nine days later, on 7/6/06. The clinician concluded, "Cleared for stay in administrative segregation. Understand how to access MH services if needed."

The note did not document whether or not the clinician was aware of the positive mental health screen. Nor did it indicate whether or not this inmate's UHR was reviewed or whether or not the inmate was interviewed in a confidential setting. Finally, a weekly summary documented daily LPT rounds during 10/1/06 to 10/7/06. It was not clear why LPT rounds were documented during this week.

Assessment:

This inmate was screened within 24 hours of his placement in administrative segregation. However, it was not clear from the documentation that the positive screen prompted referral to mental health. He did not appear to have had a mental health evaluation. The inmate's ICC meeting was attended by a case manager and documented in the UHR. However, documentation did not suggest that the case manager was aware of the positive screening or evaluated the inmate beyond seeing him in the context of the ICC meeting.

9.    Inmate I

An incident report regarding the suicide of Inmate I indicated that on 3/31/06 at 4:00 p.m., during the evening meal pass in administrative segregation, he was observed hanging from the upper bunk of his cell. The officer's personal alarm was activated, at which point the building sergeant responded. Upon arriving at cell-front, the sergeant notified central control and requested an emergency response vehicle. Two officers reported to the cell front with tactical cell extraction equipment. Officers entered the cell.

An extraction shield was placed against the inmate and the inmate was hand-cuffed, at which point the cut-down tool was used to cut the inmate down.

At about 4:02 p.m., CPR was initiated by the officers. At 4:04 p.m., an LPT arrived with medical staff. The LPT instructed an LVN to pass him the ambu bag, which "did not work". The LPT then instructed an LVN to retrieve an Automated Electronic Defibrillator (AED) machine.

The AED machine arrived at 4:08 p.m., but was not utilized "as there was no pulse or rhythm." The inmate was then removed from the cell, while two officers continued CPR. The inmate was transported to the CTC around 4:14 p.m. He was pronounced dead at 4:22 p.m.

Assessment:

CPR was reportedly initiated within two minutes of this inmate being discovered hanging in his cell. The timeline in the incident report indicated that many steps were completed within a very short time. According to the incident report, the responding officer contacted the sergeant, the sergeant formed an extraction team, the cell door was opened, the extraction team secured the inmate with a shield and hand-cuffs, officers cut the inmate down and began CPR.

10.    Inmate J

According to an incident report, on 3/16/06 at 4:12 p.m., while issuing laundry, staff found this inmate lying on the cell floor, face down in a puddle of blood. His cellmate, who was standing in the corner of the cell, was removed from the cell.

Staff began to respond to the personal alarm on 4:13 p.m. Medical staff arrived at 4:15 p.m and the emergency vehicle arrived at 4:18 p.m. The ambu bag was utilized in the emergency vehicle while en route to the CTC. Staff continued to use the ambu bag after arrival in the CTC. He was pronounced dead at 4:38 p.m.

Assessment:

CPR was not initiated by first-responders. It appeared that CPR was first initiated in the emergency vehicle enroute to the CTC, some six minutes after the inmate was found.

11.    Inmate K

This inmate cut his wrists on 8/19/06. The suicide information section indicated that a suicide risk assessment was completed on 8/21/06, which concluded that his risk code was 1 (low) and that he was discharged from the MHCB with orders for five-day clinical follow-up and 24-hour custody checks.

Assessment:

Information in the MHTS was incomplete or inaccurate regarding a significant recent event.

12.    Inmate L

This inmate cut his wrists on 6/12/06. The suicide information section indicated that suicide risk assessments were completed on 1/13/05 and 10/2/06. In both cases, the risk code was 0 (no risk).

A January assessment was completed related to suicidal ideation and five-day follow-up was ordered in this case. It was unclear why the October 2006 assessment was completed, but may have been during routine case manager contact. The profile did not contain any information relative to this inmate's suicide attempt in June 2006.

Assessment:

Information in the MHTS was incomplete or inaccurate regarding a significant recent event.

13.    Inmate M

This inmate cut his neck on 3/10/06. The suicide information sections indicated that suicide risk assessments were completed on 4/13/04, 6/23/04, 2/28/05, 3/23/06, 3/29/06 and 3/30/06. The risk code was 0 (no risk) during 2004 and 2005, although the 6/23/04 assessment indicated that this inmate had suicidal ideation, intent and a plan, as well as a history of significant risk and attempts.

The most recent assessments, dated 3/29/06 and 3/30/06, yielded a risk code of 3 and indicated that he had been placed in the CTC. It did not indicate, however, that he had, in fact, attempted suicide by cutting his neck.

Assessment:

Information in the MHTS was incomplete or inaccurate regarding a significant recent event.

EXHIBIT M

California Training Facility, Soledad (CTF)

October 16, 2006 – October 19, 2006

1.    Inmate A

This EOP inmate had a diagnosis of Anxiety Disorder, NOS and a history of dependence on methamphetamine. He experienced somatic symptoms of high anxiety. He was treated at the 3CMS sporadically.

Review of his UHR indicated that he was treated for Psychotic Disorder NOS in 1998 but was not on medication and was asymptomatic. He was discharged from the rolls in 2000, as he remained symptom-free and his disorder was considered to be in full remission. He participated in Anger Management in 2005. He self-referred to mental health and was seen on 9/26/06, when he was put back on the caseload at the 3CMS level of care. His GAF was assessed at 62.

This inmate's IDTT meeting was observed on 10/17/06. No correctional counselor attended at first. Numerous telephone calls resulted in a correctional counselor attending the meeting, but without C-file or information about the inmates whose cases were discussed by the treatment team. The correctional counselor did not make a meaningful contribution. A sense developed during the meeting that he needed to leave CTF to get away from a drug problem. Changing his level of care to EOP was not well supported in the discussion or by the record.

Assessment:

The IDTT meeting met Program Guide requirements with the exception of meaningful participation by custody staff and a questionable decision to send a relatively high functioning inmate with situational anxiety to an EOP unit. Input by knowledgable custody staff and clarification regarding this inmate's diagnoses, psychosocial context and his level of functioning might have helped the team fulfill the meeting's purpose.

2.    Inmate B

This inmate was recently made EOP. He was awaiting transfer. Several OHU admissions preceded the change in his level of care from 3CMS to EOP.

He was on the mental health caseload in 2001 and 2003. A very small number of documents associated with his treatment at that time were in the UHR. They indicated that he had problems with impulsivity, attention deficit and substance abuse. There was no indication he was treated for a psychotic or affective disorder.

He was not on the caseload in 2006 when he was placed in administrative segregation. A mental health screening done in administrative segregation in May 2006 found no indicators of mental health problems. He did not come to the attention of mental health staff until around 8/27/06 when he was admitted to the OHU in crisis.

He was sent to an MHCB on 8/31/06. He returned to CTF on 9/7/06. He remained in the OHU for four days. He was discharged at the beginning of the week rather than on

Thursday or Friday. He was discharged to administrative segregation. He responded well to a regimen of Haldol and Cogentin. Ativan and Thorazine were used prn for agitation.

He was admitted to the OHU four more times in September. Lengths of stay ranged from two to four days. He was referred to a crisis bed for a second time. In mid-September he was number 15 on the wait list. Records suggested that he did not go to a crisis bed. Seroquel was added to his regimen of Haldol and Cogentin in September but discontinued in October.

Clinical notes indicated that staff believed that prior to his first OHU admission he drank alcohol for several days and subsequently became disoriented and agitated. Further diagnostic clarification resulted in a diagnosis of frontal lobe damage secondary to multiple head traumas. When in crisis he was unruly, behaved bizarrely and dismantled the built environment. Over time staff perceived a volitional component to the crises. At times he created a disturbance, was admitted to the OHU, discussed his stressors and his choices with staff and then said he was ready to go back to segregation. He did not exhibit signs or report symptoms of a psychotic disorder.

A clinical note said that he incurred a charge for spitting at staff. The C&PR knew the case. The C&PR reported that he was slated for expedited EOP processing and would be moved to an EOP administrative segregation hub as soon as a bed was assigned. A pending DA referral would not be a factor in transfer.

Assessment:

This inmate was not referred for a mental health evaluation in connection with a staff assault that occurred before he was on the caseload. Mental health staff requested expedited EOP processing and reported that his transfer would be worked out via an informal process that would permit him to leave with a pending RVR.

Access to MHCB was good on one occasion but blocked on another. Five-day follow-up was completed as planned.

3.    Inmate C

This inmate was scheduled to be released around 10/18/06. He was not on the caseload until September. He was in the OHU from 9/17/06 to 9/20/06 due to a reaction he had to a severe stressor. At that time he was diagnosed as having a Depressive Disorder, NOS and a GAF of 55. An individualized treatment plan that identified his target problem was written but it did not have individualized interventions, nor did it refer to his imminent release. A suicide risk assessment was completed and his level of risk was documented in the UHR.

He was discharged from the OHU with orders for Paxil and a follow-up contact planned for one to two days later, but he was not seen again until 10/8/06, over two weeks later. His IDTT was observed on 10/17/07.

No TCMP chrono was found in the UHR.

Assessment:

Follow-up was not carried out as planned after this inmate was discharged from the OHU. The 3CMS IDTT meeting was held late and was bereft of meaningful participation by custody staff. The treatment plan was generic in interventions. There did not appear to be any pre-parole planning.

4.     Inmate D

This inmate was due to be paroled within 90 days. No TCMP chrono was found in the UHR.

He was in the OHU from 9/2/06 to 9/5/06. He was distraught about the loss of his girlfriend. He came to the attention of staff because he was wringing his hands, crying and behaving in a manner described only as "bizarre." He was described as child-like.

This inmate was described as having brain damage, below average intellectual functioning, memory problems, insomnia and poor impulse control. He punched himself in the face and head to the extent that officers sounded an alarm and subdued him. He frequently engaged in demonstrations of self injury and was referred to mental health by staff. He pulled his hair and banged his head. He reported that he was illiterate.

He had a provisional diagnosis of Adjustment Disorder with mixed disturbance of mood and conduct.

A CT scan was done around 10/10/06. Results were not yet available.

This inmate came through DVI's reception center in July 2006. A screening found that he had normal cognitive functioning. A psychiatrist in the reception center ordered Risperdal for him. He arrived at CTF on 8/2/06. The bus screener referred him to mental health. The earliest mental health documentation in the UHR was dated 8/10/06. He told the clinician that he did not need mental health treatment. Three weeks after he arrived he was referred by staff.

When he was seen on 8/22/06 he was placed at the 3CMS LOC. A treatment plan was written and an IDTT meeting was held. Borderline Intellectual Functioning, a reading disorder, a history of head trauma, and current mood disorder and a history of psychosis and polysubstance were noted on the plan.

Roughly one month later he told a psychiatrist he had trouble sleeping. Trazodone was ordered. He did not appear to be in distress until October. He was housed in a dorm. He said the conditions were intolerable. Staff discussed whether to remove him from a dorm. It was not until October that he exhibited self-abusive behaviors described above.

He was made EOP on 10/12/06.

Assessment:

The initial mental health contact was late. Response to a referral was timely. A neurological consult was made and completed in a timely manner. His treatment plan was individualized in terms of target problems but did not show individualized treatment strategies. The IDTT meeting fell short of its purpose in that mental health staff did not develop interventions that might have helped this inmate adapt to situational stressors nor discuss alternative housing arrangements with custody staff. This inmate did not appear to have had a 90-day TCMP interview.

5.    Inmate E

This 19 year old inmate arrived at CTF from NKSP on 6/26/06. He was on the mental health rolls. He was referred to mental health by the bus screener. He was seen within 3 days of arrival. The MH2 and MH4 were completed. An IDTT meeting was held one month later. Diagnoses included Adjustment Disorder and psychotic disorder by history. He found Paxil helpful. His regiment of Paxil and Seroquel was continued.

He was in administrative segregation in August because he was the identified victim in a fight. He was slated to be released in one week. A marriage chrono was pending. He was not released as expected. Instead, he remained in administrative seregation through August.

Psych tech rounds were documented. They noted he stopped taking Seroquel. He was not in distress. Another IDTT meeting was held. It was attended by a full team.

While in administrative segregation this inmate was not seen weekly by a case manager. A preprinted form with behavioral descriptors that could be circled was completed weekly by a case manager. Staff reported that few out of cell case manager contacts were made in administrative segregation. None of his case manager contacts in August or September appeared to be out of cell. He was seen by a psychiatrist out of cell. Aside from his feelings of depression there were no untoward events on record until he was admitted to the OHU.

This inmate was in the OHU from 9/2/06 to 9/5/06. He inflicted a superficial laceration on his hand. Notes indicated that he was housed in administrative segregation where he broke a window in addition to cutting himself. A suicide risk assessment found his risk was high.

While in the OHU he was on suicide watch or suicide precautions for two or three days. Observation was documented but the records were difficult to decipher

He was described as highly reactive to perceived slights but showing no signs of a psychotic disorder. He denied suicidal ideation. He was discharged from the OHU with orders for Paxil, Vistaril and Seroquel. Five-day follow-up was planned.

Throughout October in administrative segregation treatment was as it had been in August and September. He was seen monthly out of cell by psychiatry, psych tech rounds were documented and weekly case manager contacts were all at cell-front.

Assessment:

Treatment in administrative segregation did not meet Program Guide requirements. The initial mental health contact was timely. The initial IDTT meeting was late. A full team attended IDTT meetings. An SRAC was used when he was admitted to the OHU.

6.    Inmate F

This inmate arrived at CTF on 10/5/05. He was already on the 3CMS roster. He had a diagnosis of Adjustment Disorder with mixed anxiety and depression. His CTF treatment plan was generic. According to the UHR, he was seen at quarterly intervals in 2006 with the exception of a missed case manager contact in March. Progress notes of case manager contacts indicated that he had been on a wait list for a job for six years and that he found his forced idleness at CTF stressful.

He self-referred to mental health on 9/20/06 and was seen on 9/26/06. He stated that he wanted to go to the EOP. This inmate had a noticeable articulation disorder that affected his spoken language. He demonstrated good insight into the impact of idleness having on his mental health. His presentation was consistent with a GAF of 68 that was recorded early in 2006.

This inmate asked for help before his IDTT meeting of 10/17/06 was convened. The meeting was deferred because a full team was not present, as no correctional counselor could be located.

Assessment:

This is an example of a case in which the C- file and possible action by a correctional counselor would be an important component of an IDTT meeting.

7.    Inmate G

This 3CMS inmate was interviewed in a group on 10/17/06. During the interview his presentation was unremarkable. He responded to questions in a logical and relevant manner.

He was treated for Schizoaffective Disorder. He had a current treatment plan that rested upon an individualized plan written the previous year. One of three quarterly case manager contacts made in 2006 was held at cell-front. Case manager contacts appeared to be welfare checks during which his mental status was assessed.

He was seen more frequently than quarterly by a psychiatrist. MARs indicated that medication orders were continuous throughout 2006. Remeron and Seroquel were administered as ordered. Dosages were adjusted in response to his reports of auditory hallucinations. Informed consent was obtained.

Assessment:

Mental health treatment met Program Guide requirements.

8.     Inmate H

Only Volume III of three was reviewed. It indicated that this inmate had been treated at the 3CMS LOC at CTF for at least two years.

This 3CMS inmate was treated for Dysthymic Disorder. He had chronic pain. He was seen monthly by his case manager. Vistaril was ordered by a psychiatrist. In September staff considered discharging him from the mental health rolls.

His treatment plan, dated 9/27/05, was not revised within 12 months.

Assessment:

Mental health treatment met Program Guide requirements with the exception of lack of timely treatment planning or follow-up on a possible planned discharge from the rolls.

9.     Inmate I

This 3CMS inmate was treated for Major Depressive Disorder with psychotic features. He had a current treatment plan. It was somewhat individualized. Two or three personal characteristics were noted. Mental health interventions were restricted to frequency and an annotation that supportive counseling would be provided as needed. The IDTT meeting held in March was attended by a full team.

Case manager contacts were made quarterly. Progress notes referred to issues raised by the inmate.

According to MARs and orders he was seen quarterly by psychiatry but a progress note written by a psychiatrist was undated. Prozac orders were continuous throughout 2006. It was administered as ordered with the exception of three missed days in January and one or two refusals during July and August.

Assessment:

Mental health treatment met Program Guide requirements.

10.    Inmate J

This 3CMS inmate was treated for Cocaine Induced Mood Disorder with auditory hallucinations. He had a current treatment plan that was somewhat individualized. An IDTT meeting held in August 2006 was attended by a full team.

Orders for Risperdal and Remeron were written throughout 2006. MARs indicated that he did not go to the pill line for many consecutive days and weeks. Non-compliance did not reliably result in referrals to mental health staff.

He was seen quarterly by a case manager and more frequently by psychiatry. Mental health staff did not address his non-compliance with medication.

Assessment:

Mental health treatment was consistent with Program Guide requirements with the exception of lack of referral and response to non-compliance with medication.

11.    Inmate K

This 3CMS inmate was scheduled to be released to the community in November 2006. A TCMP chrono indicated that his UHR was reviewed on 9/21/06 related to his EPRD of 11/17/06 but he was not interviewed.

Review of his UHR showed that he arrived at CTF in January 2005 at the 3CMS level of care. His treatment plan was individualized. A 1/9/06 treatment plan, reviewed by a full IDTT, continued this inmate in 3CMS with a diagnosis of Substance Abuse methamphetamine- induced psychotic disorder. Target problems included occasional paranoia, sleep problems and depressive symptoms.

Interventions included SAP and NA, quarterly psychiatry contacts to improve sleep and quarterly psychology contacts to improve competency and social skills. The treatment plan also identified parole issues.

Quarterly case management contacts were made.

He had medication orders for Risperdal and Benadryl. He was referred and seen for medication non-compliance in February. He was seen and Risperdal was discontinued. In March he asked to be put back on medication. A case manager referred him to psychiatry. He was ducated to be seen 11 days later but did not attend the appointment.

When he was seen three weeks later Benadryl was ordered for 90 days. The order expired in October. A self referral dated 3/6/06 resulted in a contact on 4/7/06.

Assessment:

Mental health staff was not aware of an extended period of non-compliance. Referrals initiated by mental health staff and by the inmate did not result in a timely psychiatry contact. This inmate's UHR was reviewed by TCMP prior to discharge.

12.    Inmate L

This 3CMS inmate was treated for Major Depressive Disorder and Substance Induced psychological disorder. He had a current treatment plan that was recently updated in a timely manner. The IDTT was attended by a full team. He had a treatment plan that was somewhat individualized. The plan was vague regarding how target symptoms would be addressed other than having quarterly mental health contacts and attended NA and AA.

Throughout 2006 he was seen quarterly by a psychiatrist and a case manager and treated with Remeron. Informed consent was obtained. Medication was ordered and administered consistently with the exception of a three day gap between orders in March.

Assessment:

Mental health treatment met Program Guide requirements with the exception of a brief lapse of three days.

13.    Inmate M

This 3CMS inmate was treated for Major Depressive Disorder, in remission.

A recent treatment plan was revised roughly six weeks after its annual due date. It was somewhat individualized. The IDTT meeting held in June was attended by a full team. He was seen quarterly by a case manager and a psychiatrist.

For the past several months he was treated with Effexor. MARs indicated that orders were continuous and it was administered as ordered. Informed consent was obtained.

When interviewed in a group on 10/17/06 he responded to questions logically and relevantly.

Assessment:

Mental health treatment met Program Guide requirements.

14.    Inmate N

This 3CMS inmate was treated for Major Depressive Disorder, recurrent. He had a current treatment plan that was updated annually. The treatment plan was not individualized. It should have included pertinent information that was readily available in the UHR. An IDTT meeting held in April 2006 was attended by a full team.

He was seen at least quarterly by a case manager and a psychiatrist. Orders for Paxil were continuous through the past several months. MARs indicated that it was administered as ordered from March through July with the exception of one blank date. No MARs for August or September were filed in the UHR. Informed consent was obtained in May 2005.

Assessment:

Mental health treatment met Program Guide requirements with the exception of the treatment plan which was not individualized.

15.    Inmate O

This 3CMS inmate had a current treatment plan. The treatment plan was not individualized. It reflected a change in diagnosis from Major Depressive Disorder, moderate severity to Mood Disorder NOS. Both plans noted alcohol abuse. An IDTT meeting held in July was attended by a full team.

He was treated with Paxil. Informed consent was obtained. Orders were continuous since March. Medication was administered as ordered with the exception of a rare refusal or blank date.

He was seen at least quarterly by a case manager and a psychiatrist. His diagnosis in progress notes remained Major Depressive Disorder through March. No rationale for the change in diagnosis was documented. Progress notes did not reflect a change in his presentation.

Assessment:

Mental health treatment met Program Guide requirements with the exception of the treatment plan which was not individualized. A change in diagnosis was not accompanied by a rationale.

16.    Inmate P

This 3CMS inmate had diagnoses of Major Depressive Disorder and Polysubstance Abuse. He was seen at least quarterly by both a case manager and a psychiatrist. His regimen was adjusted in response to his reports. Desyrel was changed to Benadryl at his request in June. In September he was doing will on Benadryl. There were no informed consents in the UHR for either medication.

Case manager progress notes included clinical information. He had a current treatment plan and an IDTT meeting that was attended by a full team.

He was referred to mental health on several occasions for non-compliance with medication, but not until he had missed far more consecutive doses than would by policy trigger a referral.

Assessment:

Mental health treatment met Program Guide requirements with the exception of referrals for non-compliance and lack of informed consent.