EXHIBIT N

California Men's Colony (CMC)

November 20, 2006 – November 21, 2006

1.    Inmate A

This inmate was referred by plaintiffs' attorneys out of concern that the inmate's mental stability was deteriorating and that he might require an enhanced level of care.

At the time of the referral, this inmate was at the 3CMS level of care. Clinician notes across the preceding year indicated that he was typically seen as evidencing Bipolar Disorder or Depression. Psychotic features, including the presence of auditory hallucinations, were also consistently noted.

He had an early November 2006 Mental Health Crisis Bed placement. When seen by CMC staff, he was characterized as "not doing well" and having deteriorated since he was released from MHCB. Notes from 11/20/06 indicated that the inmate was experiencing auditory hallucinations that included "pejorative content" and that the inmate likely required an EOP level of care. Notes on the next day indicated that he was in the process of being moved to the EOP level of care and would go to IDTT that same day.

Assessment:

This inmate had been noted to evidence a substantial deterioration in his mental health through the month prior to the review. He had a recent history of crisis bed placement. Staff appeared to have been actively involved with the case and to have acted to increase the level of care. Though this inmate may require referral to acute care in the future, the case appeared to have been appropriately managed.

2.    Inmate B

In a letter written on 11/10/06, this inmate's attorneys indicated that he reported being suicidal for several weeks and that he "had been unable to obtain appropriate mental health services."

This inmate has apparently been maintained at 3CMS level of care. A neuropsychological assessment in August 2005 indicated "serious deficiencies in most cognitive domains which were tested" and a "significant deficit in memory that impacts daily functioning." He was diagnosed with Major Depressive Disorder and Antisocial Personality Disorder at that time.

When seen by a clinician in July 2006, the inmate indicated that he was not in any distress and was noted to display normal affect. In August 2006, notes indicated that he had been refusing medications. A note on 9/19/06 indicated that he had "no current symptoms of depression."

There were several notes regarding medication non-compliance in August 2006 and September 2006. A 10/17/06 note indicated that the inmate had been discovered intoxicated and in possession of pruno.

On 11/13/06, this inmate was seen by CMC clinical staff in response to the above mentioned letter from plaintiffs' attorneys. In the interview, the inmate reported that he was not, in fact, suicidal and "suspected that someone wanted to play a game." He was noted to be in no apparent distress at that time.

Assessment:

This inmate received appropriate follow-up in response to a letter from his attorneys in which he had reportedly claimed to be suicidal. Follow-up appeared to indicate that this may not have been the case as the inmate denied suicidality and any knowledge of this complaint.

3.    Inmate C

This patient was interviewed within the context of the IDTT. He reported that he had been in prison for 24 years and had never had a disciplinary charge or participated in the mental health treatment system. Recently, however, significant family members had passed away, he was fired from his job over his tobacco addiction, and he got a charge for "trafficking."

He was in administrative segregation status in the MHCB. Sleeping on cement hurt his back but he appreciated the time to think to himself. He had occasionally talked to a social worker on the yard and more recently considered taking an antidepressant. He expressed suicidal ideation to staff members while in administrative segregation and was therefore sent to the MHCB.

A review of his UHR revealed that there was no independent MHCB chart and all documentation continued to be filed only in the UHR. A chrono admitting him on suicide precautions to the MHCB on 11/14/06 was in the chart. There were multiple unreadable notes, by authors whose names could not be discerned, ostensibly regarding his impending release back to administrative segregation. There were cellfront visits by the case manager. The expert then read the chart in consultation with the clinical director who clarified that the patient had been seen multiple times by psychiatrists, case managers, LPTs, and nursing staff. The only mention of the diagnosis in the chart occurred on 11/17/06, when suicide precautions were discontinued, he was placed on mental health observation, and a provisional diagnosis of Adjustment Disorder was made.

The patient never received a history and physical examination. Nursing staff took vital signs and created a problem list. He had hypertension under good control, a history of tobacco abuse, a CVA in 2000 with full remission, and DJD of the hands.

Assessment:

The inmate was seen by psychiatry within 24 hours and twice per week or more often. The appropriate mental health procedures were used. There was no independent MHCB chart.

4.     Inmate D

The patient was brought to the IDTT at the request of the senior psychologist so that his room could be checked by officers.  He was in a grossly manic state and he yelled delusional material continuously.  He reportedly had been in better clinical shape, but there were reported difficulties getting him to take medications. Officers said his cell was filled with mustard, debris, feces, and other unknown materials.

Questions were raised as to whether the patient was spitting out his Zydis and other psychotropic medications being given to him in the form of concentrates. No nursing notes made any mention of such a possibility. Subsequent interviews with the unit sergeant revealed that it wasn't clear which officer had raised that possibility, but none had written an informational chrono or told the team directly.

A review of his UHR revealed that he was on a Keyhea order.  He had a current order for Lorazepam 1 mg BID crushed, and orders from the date prior to this review included an order to "discontinue previous IM backup." The subsequent order failed to include any intramuscular backup for his Keyhea order should he refuse medications. This oversight was brought to the attention of the clinical director. The patient was also on Haldol and VPA concentrates.

The psychiatrist had reported in team that the patient had become very sedated and he consequently backed off on medication dosages.  There is, however, no indication from any staff and considerable ambiguity regarding the question of possible earlier sedation. The psychiatrist planned to consider an IM trial in light of the ambiguities surrounding medication administration.

The IDTT note by the psychiatrist and also the notes by other clinicians were very good and thorough. Other kinds of documentation in the chart were generally very poor. There were no current nursing observation forms although the inmate was reportedly on suicide precautions often during November.

He had been housed in MHCB for weeks following his return from ASH, where he reportedly had refused medications after seven days. On return, he reportedly looked clinically much like he had when he was sent. There reportedly was a new referral to ASH in process, but it was not documented in notes by the referral team. Prior to leaving the institution, the expert was told that the patient had been accepted again by ASH and would leave within five days.

4

Assessment:

There was poor documentation in the UHR with no free-standing MHCB record. There was no documentation of a history and physical or refusal of it. The lack of an intramuscular backup for Keyhea medication orders was problematic, though the clinical director agreed to quickly resolve this matter.

EXHIBIT O

Wasco State Prison (WSP)

January 8, 2007 – January 9, 2007

1.    Inmate A

Inmate A was reviewed as a result of plaintiffs' counsel's concerns regarding his current functioning.

This inmate was reduced from EOP to 3CMS level of care in September 2006. At that time, he had been waiting for transfer for nearly a year. He was subsequently placed at EOP level of care in December 2006.

A suicide risk assessment from October 2006 noted that the inmate was despondent and had blamed himself for the suicide of another inmate, a newly arrived inmate whom Inmate A had befriended.

The inmate had been consistently seen on a weekly basis by mental health staff. Notes generally consisted of check box mental status examinations with additional notes or narrative. The notes were legible and generally adequate. Most clinical contact was out of cell. Notes across the month prior to the review appeared to indicate that the inmate was continuing to "ruminate" on the other individual's suicide, complained of problems with medications, and reported continuing symptoms including cyclic mood.

No current treatment plan was found within the inmate's record.

Assessment:

This inmate appeared at some risk for self-injury. He requires expedited transfer to an EOP program or, if this cannot be accomplished in a timely fashion, referral to a DMH intermediate care program. Staff were advised of this inmate's need for transfer and continued monitoring.

2.    Inmate B

Plaintiffs' counsel reported that this inmate was serving a term for indecent exposure and had a long history of rule violations for inappropriate sexual behavior. They requested that his case be reviewed for recommendations as to whether he should be included in treatment for exhibitionism.

This inmate was apparently incarcerated for indecent exposure. There was a considerable disciplinary history with many incidents of inappropriate sexual behavior.

Many notes within his record indicated that, because of his propensity for inappropriate sexual behavior, he had been seen by clinical staff with a custody officer present. He had been noted to be confrontational or non-cooperative with mental health staff who have attempted to interview him regarding his inappropriate sexual behavior.

A 7/12/06 assessment indicated that the inmate had no history of exhibitionism outside of prison. The diagnosis from that assessment was "mood disorder" and "rule out

exhibitionism." No subsequent evaluation was found in which the "rule out" was addressed, however.

There were notes indicating that the IDTT had determined that the inmate did not require additional treatment for sexually inappropriate behavior. A 10/18/06 IDTT recommended continuation at 3CMS level of care.

Assessment:

This inmate had a history of indecent exposure that resulted in his being incarcerated. At least one evaluation included Exhibitionism as a "rule out" diagnosis with no adequate follow-up to definitively determine whether this diagnosis was necessary. The Interdisciplinary Treatment Team appeared to have had an insufficient basis for recommending that no treatment for exhibitionism be provided. There had not, to date, been an adequate "comprehensive evaluation for the presence of exhibitionism" and this should be completed prior to the IDTT revisiting the recommendation regarding the need for treatment.

3

EXHIBIT P

Kern Valley State Prison (KVSP)

January 17, 2007 – January 19, 2007

1.    Inmate A

This EOP inmate was housed in the B1 Ad Seg unit.  He was diagnosed with Schizoaffective Disorder, bipolar type.  He was treated with Seroquel 800 mg/day, Zoloft 100 mg/day and Artane 10 mg/day.

This inmate was transferred to KVSP from SVSP on 9/19/05.  His level of care was changed from EOP to 3CMS immediately prior to his arrival at KVSP. This inmate had a history of inpatient mental health treatment at ASH and PSH.  The UHR indicated that he had a history of chronic delusional thinking and psychotic decompensation when medication noncompliant.  It appeared that he was housed in general population at the beginning of the monitoring period on 8/6/06. At some point thereafter he was transferred to administrative segregation in B1. He was admitted to the MHCB from 10/16/06 to 10/24/06 due to agitation with paranoia, suicidal ideation and auditory hallucinations. He was discharged back to the B1 administrative segregation unit at the 3CMS level of care. A case manager contact on 10/31/06 indicated that he was banging his head and that he would be considered for EOP LOC. He was readmitted to the MHCB from 12/4/06 to 12/26/06. At admission, he was decompensated, agitated and smearing feces. Suicidal ideation and disorganized thinking were also noted. He was placed in five- point restraints during his hospitalization.  He was apparently charged with attempted battery on staff.  His level of care was changed to EOP on 12/26/06.

Assessment:

There was documentation of assessment of suicide risk when indicated.

This inmate was appropriately admitted to the MHCB when clinically indicated.

This inmate was appropriately upgraded to EOP LOC due to his symptomatology.

There was documentation of mental health five-day follow-up after MHCB discharge for suicidal reasons.

There was not documentation of weekly case manager contact in administrative segregation.

There was documentation of daily clinical contact with the psychiatrist or psychologist in the MHCB.

This inmate was secluded for 92.7 hours and restrained for greater than 30 hours; these periods were excessive and alternative means of treatment should have been pursued such as DMH referral.

This inmate did not receive ten hours of structured therapeutic activities.

2.    Inmate B

This EOP inmate was housed in administrative segregation in B1. He was diagnosed with Schizoaffective Disorder, depressed type. He was treated with Risperdal 6 mg/day and Remeron 15 mg/day.

This inmate was transferred from ASP to the MHCB at KVSP on 12/13/06. The UHR indicated that he had a history of psychotic behavior with multiple suicide attempts. He was stabilized in the MHCB and was discharged to administrative segregation at an EOP LOC. He was discharged with orders for five-day clinical follow-up and the above medications. The most recent progress note indicated that he was stable and compliant with medications. He was awaiting transfer to an EOP SNY.

Assessment:

This inmate was followed consistently while housed in the MHCB.

The UHR did not document weekly case manager contacts in administrative segregation. This deficiency may have been the result of filing delays.

This inmate did not receive ten hours of structured therapeutic activities.

3.    Inmate C

This EOP inmate was housed in general population. He was diagnosed with Major Depressive Disorder, in remission. He was treated with Remeron 15 mg/day.

This inmate was transferred to KVSP in March 2006 at a 3CMS LOC. He was initially placed administrative segregation in B1. He was admitted to the MHCB from 7/14/06 to 8/10/06 due to dehydration, not eating and refusing laboratory testing. He was referred to DMH due to concerns regarding his discharge to administrative segregation in his fragile state. The DMH referral was withdrawn and he was discharged to general population. This inmate was readmitted to the MHCB from 8/14/06 to 8/23/06 after making a suicide gesture and going on a hunger strike. At the time of discharge, he was reportedly eating and was no longer suicidal. He was discharged to general population with orders for 5-day follow-up and Remeron and Geodon for 30 days.

This inmate was seen in general population by a social worker on 11/1/06 and again on 11/30/06. An increase in depression and anxiety was noted. He was seen by a psychiatrist on 12/5/06. He was not prescribed psychotropic medications at the time and was described as depressed. An IDTT changed his level of care from 3CMS to EOP on 12/5/06. He was last seen by the psychiatrist on 1/17/07. Risperdal was decreased at the inmate's request. He was endorsed to SAC IV SNY EOP during the week of 1/8/07.

Assessment:

There appeared to be a lapse in psychiatric contact following this inmate's discharge from the MHCB in August 2006. Medication orders were permitted to lapse resulting in an increase in symptoms.

It appeared that this inmate was seen at least quarterly while at a 3CMS level of care in general population.

Weekly case manager contacts were not documented following this inmate's placement in EOP in early December 2006. Case manager contact was last documented on 12/19/06, one month prior to the site visit. The inmate reported receiving weekly case manager contacts. Lack of documentation appeared to be the result of filing delays.

This inmate did not receive ten hours of structured therapeutic activities.

4.    Inmate D

This EOP inmate was housed in general population. He was diagnosed with Mood Disorder, NOS. He was not treated with psychotropic medications at the time of the visit.

This inmate arrived at KVSP from NKSP on 10/5/05 at a 3CMS level of care. His level of care was changed to EOP on 1/3/06. He remained in general population at an EOP level of care since that time. He was reportedly refusing prescribed Abilify, which was discontinued on 8/22/06. He remained off psychotropic medications since that time. This inmate was followed consistently by the social worker. He was noted to be primarily focused on family issues. He also reported ill treatment from custody staff and frustration with delays in transfer to EOP. He was initially endorsed to MCSP IV SNY EOP, but was subsequently endorsed to SAC IV SNY EOP on 12/7/06. As of mid-January 2007 his transfer was pending.

Assessment:

This EOP inmate had been waiting to be transferred for more than year. The C&PR reported that the inmate had been endorsed and provided documentation of almost weekly requests for a bus seat. The transfer delay was attributed to a system-wide lack of Level IV SNY EOP beds.

The UHR contained documentation of weekly CCM contacts.

This inmate did not receive ten hours of structured therapeutic activities.
There was not documentation of timely IDTT meetings.

5.    Inmate E

This inmate died at KVSP during the monitoring period. The following information was gleaned from the related incident report.

On Wednesday, 11/22/06 at 2:27 p.m., during a third-watch security check, this inmate's cellmate notified a correctional officer that this SNY/non-MHSDS inmate was unresponsive. The cellmate was removed from the cell, at which point this inmate was noted to be "non-responsive to verbal commands." An officer requested the "Emergency Response vehicle," and a sergeant and two LVNs subsequently responded but a time was not noted. Nursing staff could "find no signs of life," when a doctor was contacted but the time was not noted. Upon arriving at the cell, but again with time not noted, the doctor "could not detect a heartbeat or breath sound and pronounced [the inmate] deceased" at 2:44 p.m. – 17 minutes after the inmate was first noted by correctional staff to be unresponsive.

Assessment:

The incident report Part A1 was inadequate in that it failed to record key times, for example when medical staff responded, when the doctor was contacted, when the doctor responded. The emergency response was inadequate in that life-saving measures were not initiated by first-response correctional staff, responding medical staff or the responding doctor.

6.    Inmate F

This inmate committed suicide at KVSP during the monitoring period. The following information was gleaned from the related incident report.

On Thursday, 6/29/06 at 10:45 p.m., during a security check in ASU no. 2, a stand-alone administrative segregation unit, an officer shined his flashlight into this inmate's cell and noted that he was not in bed. After moving the flashlight beam, the officer noted that this SNY inmate was "hanging by his neck with a cloth noose tied to the air vent located above the toilet area." The officer activated his personal alarm and notified the control booth via institutional radio of a Code 1 medical emergency, at which point an emergency response vehicle (ERV) was called. When responding staff arrived, with time not noted, the cell door was opened and a cut-down tool was used to cut the noose, at which point this inmate was lowered to the floor. CPR was initiated with the assistance of an RN, again with time not noted. Thereafter, the inmate was placed on a gurney, taken to the ERV and transported to the CTC, with time not noted. CPR was continued in the CTC, and then continued by EMT staff from Delano Ambulance Service. EMT arrival time was not noted. After being advised telephonically of this inmate's vital signs, a doctor from the Delano Regional Medical Center Emergency Room pronounced him dead at 11:22 p.m. A CDCR doctor later arrived at 12:40 a.m. and "clinically pronounced" this inmate dead.

Assessment:

The incident report Part A1 was inadequate in that it failed to record key times, for example when custody and medical staff responded to the Code 1 medical emergency, when the cell door was opened, when CPR was initiated, when the inmate was transported to the CTC, and when EMT arrived in the CTC. Therefore, the adequacy of the emergency response could not be fully assessed.

EXHIBIT Q

North Kern State Prison (NKSP)

November 6, 2006 – November 8, 2006

1.    Inmate A

This 50-year-old-inmate was placed at that EOP level of care. His record included notes from an inpatient admission in August 2004 following a suicide threat. Records indicated that this was one of four to six such attempts. An assessment in June 2005 indicated a diagnosis of Major Depression with psychotic features and heroin dependence. There was an apparent history of head trauma, though the exact nature of this injury was not certain.

The most recent treatment plan appeared to have been completed in May 2005 and no updated plan was found in the record. The plan cited problems including long-term substance abuse, history of suicide attempts, history of auditory hallucinations, and depression. Prescribed interventions included psychiatric monitoring and individual therapy. There were no indications of the nature of the therapy that this inmate was to be provided weekly.

It would appear that the inmate had generally been seen weekly since May 2006. Many, if not most, of the weekly contacts included a note stating that the inmate was seen without the medical chart. Weekly contact notes included statements regarding the inmate's condition, the inmate's complaints about his access to medication and various other issues. There was no indication of any ongoing therapy process and this would not appear to be necessary except that it was in the treatment plan. Some recent entries were illegible.

Assessment: This inmate appeared to be stable. He had been awaiting EOP transfer for at least 175 days and was not receiving an appropriate level of ongoing treatment. No current treatment plan was found in this inmate's record. Through the existing treatment plan specified weekly therapy, there was no indication that this was occurring. Rather, the inmate was followed weekly through case manager visits. Access to the medical record appeared to have been problematic as notes indicated that the inmate was consistently seen without the record.

2.    Inmate B

This 24-year-old inmate appeared to have been at 3CMS level of care since at least May 2006. He arrived at the Reception Center in February 2006 probably as a parole violator.

He was placed into CTC on 6/5/06, 7/12/06 and again on 7/19/06. It also appeared that the inmate was placed into a holding cell for crisis care on 7/11/06 and 9/13/06. Notes indicated that the admission on 7/19/06 apparently occurred when the "inmate wanted to get out of administrative segregation and threatened to cut his head because he felt too hot." A note on 7/20/06 indicated the inmate's statement "I was banging my head because it was too hot." He denied suicidal ideation at that time. It was of concern that, despite the number of CTC placements, there was no clear documentation that the IDTT had considered the need for transfer to a higher level of care or other substantive change in the approach to treatment.

It appeared that the inmate had been seen approximately weekly. Most of the records from clinical contacts were check lists with some information added. The most recent treatment plan was dated 9/20/06, when he was diagnosed with Adjustment Disorder. Listed interventions included psychiatric services, case management and involvement in a Coping Skills group. There were some activities listed for the target objective of elevating his mood; these included "read a book, write mom, regular exercise."

Assessment:

Despite the fact that this inmate had been placed into crisis care on several occasions, it was not clear that the IDTT has considered the inmate's need for referral to an EOP program or to intermediate or acute care. Notes from periodic clinical contacts did not clearly reflect that the existing treatment plan had been regularly revisited in these meetings.

3.      Inmate C

This 25-year-old inmate was housed in administrative segregation and was designated as requiring EOP level of care. He had been awaiting transfer to an EOP program for more than 86 days at the beginning of the tour.

It appeared that the inmate arrived at NKSP in late June 2006. On 7/7/06, he was placed into a holding cell after he threatened to "ingest ink." He was discharged to the yard on 7/9/06.

By 7/27/06, the inmate was noted to have shaved his eyebrows, he was refusing medications, and he was appearing "disorganized and bizarre." A note indicated EOP care would be considered. He was placed into holding cell on 7/29/06, then released on 7/30/06. On 7/31/06, he was "seen for his initial evaluation on administrative segregation." He was seen as grossly disorganized and poorly groomed. His cell was dirty with food in the toilet. He was characterized as gravely disabled and was placed into an MHCB the same day and remained there through 8/07/06.

He was again placed in CTC for evaluation on 8/7/06 when he was found to be "depressed and grossly disorganized." Records additionally indicated that he claimed suicidal intent. He was diagnosed with Schizoaffective Disorder. Per the notes, he improved once medication was initiated.

Shortly thereafter, an 8/9/06 treatment plan showed diagnoses of Psychotic Disorder not otherwise specified and Schizophrenia. The only interventions listed were "case management," "medical evaluation" and "current events group x1/week." Target objectives included "increase thought organization and medication compliance." He was in a holding cell again on 8/19/06.

3

Across the six months preceding the expert's review, this inmate had been prescribed a variety of antidepressants and antipsychotic medication. The current medication orders included Risperdal, Consta, Prozac and Cogentin.

The inmate had been seen weekly by a case manager. Notes were recorded on a pre-printed check sheet with additional information included. Psych tech rounds generally occurred daily.

Assessment:

This inmate had been housed in administrative segregation for an extended period while awaiting EOP transfer. There were periodic deteriorations in his mental health that required placement into crisis bed. There was some difficulty in following the continuity of treatment as a result of the difference in the manner in which CTC stays and holding cells were tracked. More recent entries appeared to suggest that the inmate's mental status had stabilized but remained well below optimum. This inmate should be considered for transfer to DMH intermediate care if his transfer into an EOP program cannot be expedited.

4.    Inmate D

This 38-year-old inmate had been housed at NKSP since approximately 11/28/05. He was sentenced to three years in prison for sex with a minor. There was a history of involvement with mental health programs prior to incarceration. He had been awaiting transfer to an EOP program for 231 days as of this review.

At the time of an initial assessment on 12/5/05, the inmate reported previous suicidal thoughts and plans. He was diagnosed with Psychotic Disorder NOS and ETOH abuse. A reevaluation on 3/1/06 indicated that the inmate was "floridly psychotic" and "attending to internal stimuli, confused, inattentive, disheveled, etc." He was placed into a holding cell on 3/1/06 and was released to the yard on 3/2/06.

Notes on 3/17/06 indicated that he was "rambling," "frightened of cellie" and "confused" and that he should be elevated to EOP level of care. A note on 3/24/06 indicated that he was "arguing with cellie." His speech was noted to be tangential and "hesitant" and he was reporting that he "feels threatened." By 4/4/06, notes continued to indicate that he was disorganized at times, his assigned GAF was 30, and he was making little eye contact.

By 4/26/06, notes reported "emotional outbursts," crying and getting into arguments with others "for no reason," etc. On 5/10/06, the inmate appeared to be somewhat more organized but was highly emotional and crying as he discussed experiencing "blackouts" and incidents in which he had arguments with others, felt compelled to pace, etc.

On 5/16/06, the inmate again described his status as "embarrassing and distressing." This theme continued through 6/21/06, when he was described as hopeless and depressed. On

4

8/9/06, there was a note that seemed to describe confusion by a CC-I as to whether the inmate was EOP or 3CMS level of care.

The inmate had been seen weekly for case management. The quality of the notes was generally very good. Many of the weekly contacts included a notation that the chart was not available. No current MH-2 was found within the record.

Assessment:

This inmate's condition had been quite marginal across an extended period as he awaited transfer to an EOP program. He consistently reported feelings of embarrassment and depression; he had often been reported as crying. He had, at times, appeared as quite psychotic, disorganized and confused. Psychotic symptoms appeared to have abated somewhat and, more recently, the inmate presented primarily with depression.

This inmate required a higher level of care. The expert would suggest that this inmate be referred to a DMH intermediate care program if expedited transfer to an EOP program is not available.

5.    Inmate E

This 32-year-old inmate apparently arrived at NKSP in early December 2005. Records indicated that he had been awaiting transfer to an EOP program for 319 days.

There was an evaluation from 10/25/04 that indicated that the inmate was designated as requiring EOP level of care during a prior term. On 1/26/05, another evaluation indicated a recent brain injury. He was again diagnosed with Major Depressive Disorder with psychotic features. Finally, on 12/19/05, he was diagnosed with Manic Depressive Disorder and Alcohol Dependence, institutional remission.

A note on 3/1/05 indicated that he had cut his arm claiming that voices told him it would "make him feel better." He was placed on suicide precautions in MHCB and was apparently released four days later. He was placed at an EOP level of care at CIM and apparently paroled from CIM approximately 5/4/05.

The inmate re-entered prison 12/19/05 at NKSP reception center. He was seeing a clinician weekly as an EOP patient. Initial notes appeared to indicate that he was doing well but by 1/15/06, notes indicated that he was experiencing an increase in auditory hallucinations including voices telling him to harm himself. "Increasing depression" was noted on 1/24/06.

Notes in March 2006 indicated that the inmate seldom left his cell, refusing dayroom and yard. This continued through May 2006 when he was reportedly experiencing "significant paranoia." During June 2006 through August 2006, notes appeared to indicate that the inmate was fairly stable, quiet and coherent but responding only to specific questions.

This inmate was placed into a holding cell on 9/29/06 for crisis care but there was essentially no mention of this within his record. There was no IDTT note indicating the circumstances around the placement into a holding cell. The event was captured only in the holding cell log. There was a five-day follow up sheet in his record.

Notes through 10/31/06 indicated that the inmate appeared stable. Most chart entries indicated that the chart was not available at the time that the patient was seen.

Assessment:

This inmate's mental health had been quite tenuous across more than 11 months as he awaited transfer to an EOP program. There had been at least one crisis placement and this was poorly documented as it occurred in a holding cell and he was not placed into the CTC. This inmate's transfer to EOP should be expedited or he should be considered for placement into a DMH intermediate care program.

EXHIBIT R

California State Prison, Los Angeles County (CSP/LAC)

September 27, 2006 – September 28, 2006
November 9, 2006
January 18, 2006 – January 19, 2006

1.    Inmate A

This inmate was briefly interviewed during a mental health rounds process. He was noted to be a "gasser." The health care record of this inmate was briefly reviewed. He had been seen in a timely fashion by his clinical case manager and by the psychiatrist during past two months. He was also receiving EOP group treatment.

2.    Inmate B

The expert previously interviewed this inmate during the May 2006 site assessment. The inmate again had numerous complaints and allegations concerning his treatment and the treatment of others in the administrative segregation unit.

The health care record of this inmate was briefly reviewed. He was seen on a weekly basis by his clinical case manager for at least the previous two months, although he frequently refused out of cell contacts. The review focused on progress notes written since November 2006. A psychologist wrote on 10/31/06 that this inmate was irritable but had been program-compliant. A psychiatrist wrote on 11/6/06 that this inmate refused to be seen at the cellfront. The plan was to see him again in 30 days or sooner if indicated.

The psychologist described this inmate as becoming increasingly nonresponsive during 11/8/06. The inmate was missing meals but was not on a hunger strike. He was taking showers sporadically. Clinically, he was noted to be declining. An IDTT was scheduled for 11/13/06 for consideration of EOP placement.

On 11/15/06 this inmate was noted to be on a hunger strike. A 11/21/06 note indicated that this inmate refused to participate in the IDTT interview. He was diagnosed as having a Delusional Disorder. This IDTT apparently took place in the CTC where the inmate had been admitted due to the hunger strike. It appears that his level of care remained 3CMS. He apparently was transferred to administrative segregation by 11/22/06. He remained highly isolative and nonresponsive to conversation. His hunger strike reportedly continued.

On 11/22/06 the psychologist described this inmate as having critically decompensated. Another clinician reported on the same date that an EOP protocol would be continued, though the inmate had not been placed in that LOC. An IDTT was scheduled for 11/27/06 to consider an EOP level of care. The inmate was to be checked on a daily basis until then. A different clinician reportedly described this inmate as having been despondent and expressing suicidal thinking. Despite these facts, the 11/27/06 IDTT indicated this inmate's level of care would remain at 3CMS.

Progress notes indicated that a DMH referral was initiated on 12/1/06, but the expert later learned that the paperwork for DMH referral was never implemented.

This inmate had multiple complaints about custody issues related to his hunger strike. He was noted to be wheelchair-bound. On 12/5/06 this inmate was still sleeping on the floor. He apparently remained on his hunger strike. An EOP level of care was strongly recommended by the covering contract psychologist.

A 12/21/06 progress note indicated that the inmate should be considered for DMH transfer or EOP until stabilization occurred. The plan was to discuss his case at an IDTT on 1/8/07. A referral to the psychiatrist for medication assessment was initiated.

The inmate was again seen by the psychologist on 12/30/06 with the same treatment plan documented.

A psychiatrist indicated that she saw this inmate during 1/9/07 for a 60-day follow-up; the inmate's level of care remained 3CMS. He was noted to be medication compliant. No mention was made in this note of this inmate's clinical deterioration. It was unclear whether the UHR was available at the time of this visit, especially in the context of this progress note.

A 1/11/07 progress note indicated little clinical change. The psychologist noted that this inmate had been endorsed for transfer although it appeared that this was based on custody reasons in contrast to clinical reasons. The expert later learned from the psychologist that this note was meant to indicate significant clinical improvement to the extent that a change from 3CMS level care was no longer indicated. It was unclear why the paperwork for DMH transfer was never initiated by this psychologist.

Assessment:

It is very concerning that appropriate steps were not made to increase this inmate's LOC during December 2006 and January 2007 despite progress notes indicating that such a change was indicated.

3.    Inmate C

This inmate, who was briefly interviewed during the mental health rounds process, complained of a lack of access to both the psychiatrist and clinical case manager. A quick review of his health care record indicated that he was being seen on a weekly basis by his clinical case manager, but generally these contacts were at cell-front. He did have timely interviews with psychiatrist, although this inmate was clearly dissatisfied with his prescribed medication.

4.    Inmate D

This inmate, who was observed during the mental health rounds process in the administrative segregation unit, had flooded his cell and appeared psychotic. His clinical appearance was consistent with information provided by one of the mental health

clinicians. He apparently had been referred to DMH, although the status of this referral was not clear.

The health care record of this inmate was quickly reviewed. This inmate had clearly been psychotic for at least six weeks. The last progress note referencing a DMH referral was dated 8/15/06. In January 2007, staff reported that this inmate had not been referred to DMH. He reportedly responded to psychotropic medications and had clinically improved.

5.    Inmate E

This inmate's health care record was reviewed at the request of plaintiffs' counsel, with a focus on notes written since November 2006.

Psych tech rounds were documented during the weeks of 11/13/06 and 11/20/06. A 11/14/06 progress note indicated that this inmate was depressed and anxious. He had multiple complaints regarding custody issues. Ten days later he continued to be agitated regarding custody issues such as loss of property and not receiving mail. Inmate E apparently had cut himself on his left forearm. One week later he was noted to be more euthymic and relaxed. Inmate E continued with multiple complaints.

Clinical contacts on 11/27/06 and 11/30/06 indicated that this inmate was again having behavioral problems, which were apparently related to his cutting behaviors. On 12/1/06 this inmate appeared to be clinically stable.

Psych tech rounds were documented during the week of 12/11/06. This inmate again cut his forearms around 12/11/06 and he apparently had wrist restraints related to his cutting behaviors. He reported not feeling well during 12/12/06. A note by the psychiatrist on 12/12/06 described this inmate as slightly disheveled. Seroquel was continued. The plan was to see him again in two weeks.

A suicide risk assessment checklist was completed on 12/17/06. The inmate's level of care was unchanged following this assessment. He was seen on the same date by the psychiatrist who reported that Inmate E had been superficially cutting his forearms for three to four days. The inmate denied suicidal thinking. His presentation was consistent with an Adjustment Disorder, Polysubstance Abuse and an Antisocial Personality Disorder. He was to be seen by his clinical case manager in one to two days. Psychiatric follow-up was scheduled for one week.

An RVR mental health assessment was completed during 12/20/06. Inmate E was assessed to be competent to proceed.

A 12/28/06 psychiatrist note indicated the presence of an Adjustment Disorder. This inmate was compliant with his medications. He was to be seen again in 60 days.

During 12/29/06 this inmate reported that he was not coming out of his cell anymore. He appeared to be much less needy and helpless.

A 1/2/07 progress note described Inmate E as attempting to manipulate custody and mental health staff with his self-mutilating behaviors. His Seroquel was discontinued by the psychiatrist related to its abuse potential. This inmate continued to refuse mental health contact. He reportedly persisted in making "outlandish requests." The plan was to consider a consult for removing this inmate from 3CMS.

A quick review of this inmate's UHR indicated that he had been assessed in the past to require an EOP level of care. Diagnoses have included Schizophrenia, Schizoaffective Disorder, Personality Disorder, and Polysubstance Dependence.

Assessment:

This inmate's differential diagnosis included a major mental disorder and a personality disorder. Staff appeared to be focusing on the personality disorder aspect of this diagnosis. Discharge from the caseload would not be appropriate. It would be useful for the clinician to summarize past CDCR treatment and to formulate a revised treatment plan in the context of that history and current problems.

6.    Inmate F

The health care record of this inmate was reviewed at the request of plaintiffs' counsel, with a focus on notes written since November 2006. A 11/2/06 note indicated that this inmate was refusing out of cell contact. He denied any current complaints. He appeared suspicious.

A 11/7/06 case manager note indicated that an IDTT was completed but Inmate F had refused to attend. He was retained in 3CMS for ongoing observation and treatment. His treatment plan indicated the diagnosis of Adjustment Disorder and suspicious and sad moods. The treatment plan was very generic in nature. Inmate F apparently was not receiving any medications despite the treatment plan including medications as ordered.

Inmate F denied any mental health symptoms during his meeting with his case manager on 11/7/06.

Inmate F saw his case manager at the cellfront on 11/15/06 due to a lockdown. The note described little change. This inmate was described as being uncooperative with the case manager on 11/29/06, although he was described by custody staff as interacting with custody staff and other inmates. A 11/30/06 note indicated that the inmate was pending a transfer to RJD. Little change was noted during 12/7/06, 12/13/06 and 12/19/06. He continued to be uncooperative. He was described as "doing okay" on 12/28/06.

Psychiatric technician rounds were documented for each of the weeks from 11/14/06 through 12/25/06.

A 1/4/07 case manager note indicated that this inmate reported at the cellfront "doing all right" and denied any mental health concerns.

Records from one year earlier indicated diagnoses of Pedophilia, a Depressive Disorder NOS and rule out Malingering.

Assessment:

This inmate has been receiving a 3CMS level of care consistent with Program Guide requirements.

7.    Inmate G

The health care record of this inmate was reviewed at the request of plaintiffs' counsel, with a focus on notes written since November 2006. A 12/12/06 note indicated that this inmate stated he was seen at the request of DCHCS. He was a 43-year-old African-American male who appeared to be depressed. He denied suicidal thinking but did admit to feeling helpless and hopeless. There was not a history of a suicide attempt. There was no planned intervention documented by the social worker.

A 12/28/06 contract psychologist note indicated that Inmate G wrote to Sacramento stating that he was suicidal, which precipitated a mental health assessment. He described the correctional officers being "at war with him." He had filed grievances alleging the correctional officers were spitting in his food and taking things from his cell. Symptoms were consistent with the presence of a Major Depressive Disorder.

This inmate's level care was changed to 3CMS and a referral to the psychiatrist was made when the inmate was transferred to mental health housing. An informal IDTT with a psychiatrist was initiated. The treatment plan described this inmate as being very appropriate, polite and grateful. His presentation was consistent with a Major Depressive Disorder and a personality disorder. The expert did not find any other progress notes in the UHR.

Assessment:

Based on documentation, this inmate's initial plan was not implemented.

8.    Inmate H

This EOP Ad Seg inmate had a reported history of self-mutilation and threats of suicide, including several incidents in which he tied strips of cloth around his neck. On some occasions he apparently caused injury to himself by tying the other ends of these strips to solid objects, then jumping from beds or other objects. An MH-4 from 3/17/05 indicated that "he is viewed by custody and free staff as behaving in a manipulative and hostile fashion at various times."

He returned to LAC from SVPP placement from 7/18/05 through 1/5/06, discharged with a diagnosis of Mood Disorder NOS and Antisocial Personality Disorder. The discharge indicated that his behavior was "reasonably contained" during this lengthy SVPP stay but that he was noted to evidence "mood lability, suicide threats and assaultive behavior." At the time of discharge from a subsequent CTC placement, on 4/24/06, he was "reduced" to 3CMS level of care based, in part, on the fact that the discharge from SVPP did not include diagnosis of a major mental illness. He was diagnosed with no Axis I condition and placed into the LAC CTC and given an Axis II diagnosis of "mixed Personality Disorder with Antisocial Borderline and Histrionic Features" on Axis II. Several record entries would suggest that various clinicians have viewed this inmate as "manipulative" and that there have been attempts to control the inmate's access to medication or to other treatment.

Medication orders, which included Benadryl and Ativan, were written on 6/1/06. On 6/2/06, a note from a staff psychiatrist, apparently written in response to the 6/1/06 order by another psychiatrist, stated "please do not give psych meds unless you have first attempted to contact the client's psychologist." Notes indicated that on 8/1/06, the inmate was demanding medication, tied a piece of cloth around his neck, and jumped from his bunk and the cloth broke. A psychiatrist, phoned to provide an evaluation following this incident, declined to come on grounds and stated that he did not want to order medication. The psychiatrist then did not return follow-up phone calls. A nursing supervisor ordered that that the inmate be placed into CTC. Another note indicated that a watch officer then requested that "a doctor come in to evaluate inmate." Records would appear to indicate that the inmate was never evaluated.

There was a fairly lengthy 9/12/06 evaluation by a psychiatrist that diagnosed "lifelong and chronic" ADHD. When the inmate was informed by this psychiatrist that no medication would be prescribed, the inmate became angry and accused the psychiatrist of "conspiracy."

At the time of the monitor's visit, plaintiffs provided a copy of a note in which it was clearly documented that the psychiatrist referenced above had strongly advocated that Inmate H not be placed into CTC under any circumstances.

LAC management had attempted to address this issue by issuing a memo stating that an inmate who made suicidal threats must be returned to the TTA. Some information exists to suggest that even after being instructed that he was no longer to interact with this particular inmate, this psychiatrist interfered with the inmate's treatment.

On 11/9/06, this inmate was interviewed by the expert. The inmate's speech was rapid and he presented as highly labile, crying at times. He provided paperwork in which he alleged he was raped in April 2006. He reported that he was previously at DMH. He was at LAC at the EOP level of care, but it was lowered. He reported that he had been on psychiatric medication for 30 years. The inmate appeared depressed, reported that he had considered suicide at times, showed several cut mark scars on his arms and spoke of "demons." The inmate reported, and staff later confirmed, that a particular psychiatrist

had taken the inmate off medication ordered by other psychiatrists, insisted that this inmate not be admitted to CTC, and had acted to decrease the inmate's level of care. The inmate reported that he was admitted to a crisis bed in the preceding week and then quickly discharged when this psychiatrist intervened.

On 11/10/06, the expert met with the acting chief psychiatrist and the health care manager and informed them of his assessment that one of the staff psychiatrists who was identified to the managers had attempted to prevent treatment for this patient. The expert recommended that this inmate's case be thoroughly reviewed by an interdisciplinary treatment team that includes the chief of mental health, the health care manager and the psychiatrist assigned to the MHCB. The expert recommended that the team obtain any clinical evaluations necessary to make a decision regarding an appropriate treatment plan for this inmate. The team's recommendations should then be thoroughly documented in the inmate's record and the expert would review them on a subsequent visit.

Assessment:

This inmate had a history of manipulative behavior and self-injurious incidents. Clinicians had been somewhat divided regarding whether this inmate should be included in the mental health treatment population. The inmate had been placed at SVPP and returned on the basis of not requiring mental health treatment. He was most commonly seen as having various personality disorders with at least one diagnosis of ADHD.

One staff psychiatrist apparently was active in urging psychiatry staff not to prescribe medications in response to the inmate's threats and gestures. There was at least one incident in which a psychiatrist attempted not to place the inmate into the CTC, though there was no treatment plan recommending that action. It would appear that these attempts occurred, however, and occasionally through indirect and potentially problematic methods.

This inmate's case should be reviewed by the IDTT and, in the event that the IDTT recommends that a plan be developed to limit the unnecessary use of the MHCB, it should be formalized in a plan, with appropriate justification, and included in the inmate's record.

9.    Inmate I

This inmate reported symptoms of PTSD that resulted in his being unable to leave his cell to go to programming or yard. He reported that, as a result, he gained more than 70 pounds.

There was a 4/3/06 MH2 that diagnosed Adjustment Disorder with depressed mood. A 5/1/06 note documented that a rule out diagnosis of PTSD was made. The note indicated that the inmate was anxious regarding placement on C yard "as a result of having witnessed a homicide on that yard several years ago" in 1999. The note stated that the

inmate "clearly sees and remembers what happened." A note on 7/25/06 indicated that "he is doing ok with his mental health needs. Inmate is off medication."

Assessment:

This inmate reported ongoing anxiety and symptoms described as similar to PTSD, which he attributed to having witnessed a homicide. He further reported that his anxiety resulted in his confining himself to his cell. Information from his record indicated that he weighed more than 300 pounds; his previous weight was not available. Though clinicians apparently recognized that this inmate may experience PTSD and listed this as a rule out diagnosis on 5/1/06, follow-up had not occurred. The record indicated that the inmate had been seen only once since May 2006.

10.    Inmate J

This inmate was referred by plaintiffs' attorneys for review because of a reported history of indecent exposure within CDCR and diagnosis of Exhibitionism.

Notes from a 1/15/04 evaluation indicated that the inmate "was transferred from Corcoran with a history of 'compulsive masturbation' with Bipolar Disorder." This MH-4 had a diagnosis of rule out Exhibitionism. A 3/15/05 note indicated that the inmate was being evaluated for suicidal thoughts and that, at that time, he had four pending RVRs for masturbation. This note also indicated an intention to "refer to case manager to increase case manager contacts in order to establish treatment schedule." On 1/9/06, the inmate asked custody staff for a jumpsuit, stating that he felt he would be better able to control his masturbation with additional layers of clothing. A note on 1/16/06 indicated the inmate reported he was "doing much better with extra clothes provided." This improvement in behavior appears to have continued through January and February and the inmate reported he was doing well in controlling his impulses regarding masturbation.

Notes indicated that one clinician attributed an eventual behavioral deterioration to a prolonged stay in ad seg. On 4/26/06, the inmate was noted to be masturbating and "verbally abusive" to a female psychiatric technician attempting to deliver medication. A 7/31/06 note indicated that "throughout the chart there are different diagnoses to be found including 302.40 Exhibitionism." During a 9/7/06 mental health screening following an indecent exposure, the inmate exposed himself to the evaluator and was diagnosed with generalized Anxiety Disorder, Impulse Control Disorder and ASPD. A 9/12/06 note indicated that an IDTT, consisting of a psychiatrist, CC-I and case manager, determined that the inmate did not meet the criteria for treatment.

Assessment:

This inmate had a substantial history of indecent exposure incidents and had often been referenced as evidencing "exhibitionism." It appeared that, at one point, a contract clinician generated chronos with a diagnosis of Exhibitionism and distributed copies of these chronos to inmates including inmate J. Some information existed to suggest that

this chrono was retracted. At the time of the expert's review, this inmate's record did not contain a comprehensive evaluation that would establish whether criteria for a diagnosis of Exhibitionism were met. He benefited from interventions that limited the opportunity to engage in exhibitionism. This inmate required a comprehensive evaluation and an appropriate treatment plan.

11.    Inmate K

Inmate K had a long history of receiving RVRs for exhibitionism, including significant additional prison time based upon prosecution subsequent to those RVRs. He had been requesting targeted treatment for his diagnosed disorder for a considerable amount of time and received a Director's Level decision on 9/13/06 denying his request. Plaintiffs' counsel requested that the monitors review this inmate's treatment plan and make any recommendations as necessary.

Review of his record indicated a lengthy history of diagnosis of Paraphilia and Exhibitionism, including an MH-4 completed 10/21/03. There were other diagnoses of Impulse Control Disorder. He had a history of safety concerns, has been characterized as being of borderline intellectual functioning, and experienced depression.

Recent notes indicated that the inmate consistently requested assistance for exhibitionism and notes appeared to indicate mental health staff agreement. Treatment plans from as long ago as 2004 cited indecent exposure as an issue and notes appeared to indicate that regular contact and work with an individual clinician has been at least partially effective at times.

Inmate K was interviewed on 5/3/06 during the preceding monitoring period. At that time, he described a long history of committing acts of indecent exposure and that was his commitment offense. He reported that he served previous prison terms for burglary and forging checks. By his report, he was committed to prison for eight years and had recently received another four-year term for indecent exposure. He reported that he "hears voices" and that he interacts with an "imaginary friend." He was prescribed Paxil and Risperidone and reported that these medications had not helped control his impulses to masturbate in front of women.

A 6/19/06 MH2 included a recommendation for treatment of anxiety and stress but indicated this inmate "does not meet criterion for treatment of indecent exposure." A 7/6/06 note said the inmate was to "undergo a 30-day evaluation in Delta 2 to resolve some weak differential psycho diagnostic issues and to determine his appropriate level of care." The inmate was apparently placed into EOP at that time and notes indicated he was participating in individualized therapy to address "rational thinking."

Assessment:

This inmate was committed for indecent exposure and received a second term for this behavior. His record included several diagnostic evaluations that cited exhibitionism. It

would appear that this inmate interacted beneficially on a one-to-one basis with clinicians. He repeatedly requested involvement in an appropriate treatment program. Most clinical notes appeared to support his need for such treatment. Despite his behavioral history, previous diagnoses of Exhibitionism, and the lack of any comprehensive evaluation, he was apparently found not to evidence this condition.

The IDTT should review the available diagnostic information and facilitate an appropriate evaluation to determine whether a diagnosis of Exhibitionism is appropriate. Irrespective of the findings, as a member of the mental health population, this inmate should be provided with any available treatment that is likely to prevent his additional accrual of prison time as a result of impulse control issues.

EXHIBIT S

California Institute for Men (CIM)

October 16, 2006 – October 17, 2006
December 7, 2006 – December 8, 2006

1.    Inmate A

This inmate's case was reviewed as a result of the fact that he was placed into the CTC on at least three occasions, 7/3/06, 7/12/06 and 7/21/06.

A discharge note from the 7/12/06 through 7/19/06 CTC placement reported that the inmate was referred for "suicidal ideation and confusion." The inmate had reported that "his cellie was bothering him by asking him about drugs and alcohol." He stated that he wanted to kill his cellie and himself. He was diagnosed with Impulse Control Disorder. The team recommended discharging the inmate to the yard at the EOP level of care.

A note on 7/24/06 indicated that the inmate was admitted to CTC when he complained of being suicidal, then rescinded this claim and reported that he was having trouble getting his medication, became frustrated, and claimed that he was suicidal. He was diagnosed with Schizoaffective Disorder and ASPD. The 7/24/06 note indicated that the IDTT did not think DMH placement was indicated at that time. The note indicated that "they do not feel DMH referral is appropriate as it will reinforce his maladaptive coping skills by utilizing the hospital to deal with stresses on the yard. Thus the team felt it was important to discharge him and not to make a DMH referral."

Notes on 8/14/06 indicated that the inmate appeared fairly stable and that the clinician planned to see him weekly. Notes in September 2006 indicated that the inmate was again seen because he was suicidal and he had cut himself two weeks earlier. When seen he exhibited "pressured speech, shakiness of arms," and grinding teeth. He was transported to the hospital. Notes from 10/2/06 indicated that he was concerned regarding an upcoming parole and had a need for pre-parole counseling.

Assessment:

This inmate was at the EOP level of care. He previously claimed to be suicidal when he became frustrated regarding medication or other issues. The IDTT was of the opinion that referring this inmate to DMH was reinforcing maladaptive behavior. This inmate required EOP level of care; this transfer should ideally be expedited.

2.    Inmate B

This inmate had been placed into the CTC on more than three occasions and there was no evidence that he had been referred for a higher level of care.

A 7/8/05 evaluation in the reception center noted a history of a variety of psychiatric symptoms, mood swings and a history of methamphetamine use. Some history of self-mutilation was also noted.

A Keyhea order was initiated in February 2006 while the inmate was an inpatient. A hospital admission note on 3/6/06 noted a history of several psychiatric medications and

that the inmate had described "going through mood swings." He was diagnosed with Psychosis NOS at that time. The inmate apparently was placed into administrative segregation on 3/15/06 as a result of being a victim of a battery, according to a later clinical note.

He was again admitted to CTC on 5/9/06, and a 5/12/06 note referred to several MHCB admissions and a history of poor medication compliance. There was an additional notation that the inmate's condition "began to improve with resumption of medication." There was a late June CTC admission and, on 6/21/06, the IDTT recommended referral for ICF placement.

An admission on 7/5/06 occurred when the inmate reported that he was suicidal. He had been scheduled to parole but refused to sign paperwork regarding a restraining order. His diagnosis continued as Psychosis NOS. There was a note indicating that the inmate was considered for DMH referral on 7/11/06 but "it is unclear if the inmate will continue to stay at CIM because his parole would be revoked or he will be released soon."

Notes on 7/31/06 indicated that the inmate was not allowed to report to the clinician's office secondary to safety concerns. This also occurred on 8/8/06.

Assessment:

This was an inmate with recurrent deterioration that has apparently occurred as a result of medication non-compliance. Though some notes indicated that clinicians have been of the opinion that the inmate might be exaggerating symptoms, there were no comprehensive evaluations of this inmate's clinical condition that addressed this possibility. On 6/21/06, there was an indication that the IDTT recommended intermediate care placement. It appeared that this referral may not have occurred, however, apparently because the inmate was believed to be close to parole or release. Clinical notes from June, July and August were of marginal to poor quality, often consisting of preprinted forms with a minimal amount of information recorded. On some occasions, for example, on 8/21/06 clinicians utilized a pre-copied SOAP note that included the "a" section preprinted with "no change from dx of record warranted."

3.    Inmate C

This 35-year-old inmate was characterized at the time of record review as requiring an EOP level of care.

Information from the inpatient record indicated that this inmate was admitted to the CTC on 11/2/06 because of "irrational behavior" including an inability to carry on meaningful interactions and vague somatic complaints. He was released from this hospitalization with a diagnosis of Adjustment Disorder NOS. He was admitted again on 11/5/06 complaining of a skin problem and genital pain. He denied suicidal ideation at that time. He was discharged with a diagnosis of Delusional Disorder and Adjustment Disorder and prescribed Risperidone and Paxil. An IDTT at that time recommended against referral to

3

DMH. A third admission occurred on 11/17/06. He was characterized as having made a suicidal threat in an attempt to get his perceived medical problems treated in the hospital. When admitted for a fourth time on 11/20/06, he continued to present with somatic complaints that were evaluated by medical staff with no underlying condition diagnosed. He was diagnosed with Psychotic Disorder NOS. He was admitted again on 12/3/06. Presentation at this admission included claims of suicidal intent, racing thoughts and depressed mood.

Though some notes suggested that this inmate was at the EOP level of care, there were no recent placement chronos in the record. There were essentially no entries in the progress notes section of the inmate's file with the exception of the documentation from five-day follow-up assessments and these consisted of "check box" forms completed by the psychiatric technicians. There was no documentation that this inmate had been seen for weekly contact as an EOP inmate. There was no indication that the IDTT had considered this inmate's need for a higher level of care since early November 2006 despite at least three additional admissions.

Assessment:

This inmate had been admitted to the CTC on at least five occasions. Though an IDTT considered the need for referral to a higher level of care in November 2006 and decided that such referral was not indicated, there was no documentation to suggest that this possibility had been revisited despite three additional CTC admissions. Data for only one of the five CTC admissions was within the health care record and the rest of the information was contained only in the separate inpatient record. Case managers' access to the health care record would thus have very incomplete access to information regarding this inmate's history of suicidal threats and the variations in diagnostics which were apparent from review of the inpatient record. There was no indication that this inmate was seen by a case manager on a weekly basis.

4.    Inmate D

This 30-year-old inmate had been admitted to the CTC on at least five occasions since 6/16/06. Records indicated that, at times, admissions occurred when the inmate was considered suicidal. At other times, it appeared that he was admitted because he was "disorganized," "poorly groomed," etc. This inmate's health care record did not include records from the two most current inpatient placements. There was no documentation of IDTT consideration of referral for intermediate or acute care.

This inmate was generally diagnosed with Bipolar and/or Schizoaffective Disorder and typically denied that he was suicidal. Notes indicated he had been generally noncompliant with medication.

He had previously been at EOP level of care during May 2003. It seems likely that he left CDC in 2003 and returned approximately in June 2006. He was cleared for general

population on 8/29/06, then placed in 3CMS, and then elevated to EOP care on 9/29/06. He remained as EOP subsequently.

An MH-2 on 8/31/06 resulted in a diagnosis of Mood Disorder NOS. The treatment plan recommended only "meds" and "3CMS case management." A treatment plan written on 9/21/06 reported a diagnosis of Psychotic Disorder NOS. The current treatment plan was a largely preprinted form calling for "tier rounds," "meds" and "EOP."

There were few, and perhaps only one, substantive progress notes from the case manager. Though notes appeared to indicate that the inmate was at the EOP level of care, there was not documentation of weekly case manager contact. The record included a number of preprinted forms used for five-day follow-up and completed by psychiatric technicians; these notes constituted the majority of the notes in the record.

Assessment:

This inmate had been placed into the CTC on at least five occasions since June 2006. The health care record did not contain information regarding the two most recent CTC placements. Notes within the record provided little evidence that this inmate had been followed in a meaningful fashion by the case manager and the IDTT. This inmate likely required a higher level of care.

5.      Inmate E

This 38-year-old inmate was at the EOP level of care at the time of review. He had a substantial history of psychiatric treatment from age 17, including inpatient placement at Metro, ASH and the county hospital in San Bernardino. He made several apparent suicide attempts including cutting his wrists in 1995, attempting to hang himself in 2000, attempting to overdose in 2000, and threatening to jump from the tier in 2003.

The inmate was placed at the EOP level of care in September 2003, then reduced to 3CMS level of care in October 2003 with a diagnosis of Schizoaffective Disorder, Polysubstance Abuse and Alcohol Dependence. He was again placed at an EOP level of care in April 2004.

He was admitted to CTC on 3/30/04 and discharged 4/7/04. Though he claimed at that time that he was suicidal "all the time," notes indicated that he was refusing medication and refusing involvement in groups. Notes characterized him as "extremely demanding to get his own infantile needs met but shows no responsibility in looking at his own contributions to his interdistress." He was admitted to CTC on 5/15/04 when he had fashioned a noose with the intent to kill his cellie.

He was admitted to CTC on 10/20/06 for depression, suicidal ideation and "questionable history of auditory hallucinations." He was characterized as "highly manipulative." An additional impression was that the inmate "does not show any real evidence of suicide risk." Notes on 10/25/06 indicated that this inmate was at the EOP level of care and in

5

administrative segregation and it would appear that he had been EOP for some time prior to this date. There were no notes in the record to indicate that the inmate was seen weekly by a case manager. There was a psychiatric contact note on 11/28/06. On 11/30/06, he was again admitted to CTC for "suicidal ideation" and stayed until 12/4/06.

Assessment:

This inmate had multiple admissions to CTC over the past two years, including at least two admissions since October 2006. The records from the most recent CTC placements were in an inpatient file but there were no copies in the UHR. UHR documentation since July 2006 included notes from a psychiatrist, "check sheets" completed by psychiatric technicians, apparently as part of the suicide follow-up process, and a very limited note by the case manager. There was no clear documentation of weekly case manager visits or any to indicate that this inmate had been considered for higher level of care. The quality of the notes, in combination with the absence of inpatient records, render the UHR marginally useful to the assessment process.

6.    Inmate F

This 23-year-old inmate was designated at the EOP level of care in September 2006. He was additionally characterized as DD1.

This inmate was placed in the CTC on 6/3/06, 7/23/06, 8/4/06, 9/15/06, 10/10/06, 10/28/06, 11/7/06, 11/12/06 and 11/27/06. During the last-mentioned admission, he was prescribed Risperidone and Depakote and notes documented poor compliance with prescribed medication. He was diagnosed with Mood Disorder NOS. Though the record contained several notes indicating IDTT review, many were marginally legible. The records for the last three CTC admissions did not clearly indicate that the inmate was considered for placement into a higher level of care.

As to contacts outside the CTC, an RVR evaluation on 8/2/06 indicated the clinician felt the inmate was psychotic and was a danger to others; transfer to CTC was recommended. There were notes by a psychologist on 9/15/06, 10/16/06, 10/17/06 and 11/17/06. The last three notes and the signature of the writer were illegible. A suicide risk assessment was completed on 11/17/06. There were additional notes on 11/28/06, 11/29/06, 11/30/06 and 12/1/06, which apparently were five-day follow-up after a suicide-related admission.

Assessment:

Legibility of charting for this inmate was marginal. It did not appear that this inmate was seen weekly by a case manager and the check sheets used for the case manager's notes had little useful information. There were regular contacts with psychiatrists and psychiatric technicians. It was not clear that despite the number of referrals for crisis care, consideration was given to referring this inmate for acute or intermediate care. This inmate required at least an EOP level of care and his transfer should be expedited.

6

7.    Inmate G

This inmate was observed at a CTC IDTT on 12/7/06, having been placed in CTC the evening before. When seen in committee, he was agitated regarding the physical conditions of his housing unit, other inmates' use of drugs, and staff harassment of inmates. He reported that he would rather die than live on that unit. The members of the CTC IDTT interviewed the inmate and it appeared obvious that they had little if any previous contact with him. The health care record was not present at the meeting and, when asked, staff reported that they had not requested it. There was considerable speculation regarding the inmate's diagnosis, etc.

The inmate's UHR indicated that he was seen by a psychiatrist on 11/27/06 and was diagnosed with Psychosis and prescribed Seroquel and Trazadone. He had been seen without the UHR on 10/2/06 and expressed the same concerns regarding the living conditions on his assigned housing unit.  He was in the CTC from 9/17/06 through 9/19/06 for suicide ideation and was diagnosed with Bipolar Disorder with psychosis and a seizure disorder. He was seen by a psychiatrist on 8/23/06, 9/8/06 and 9/21/06.

There were no notes in the record from 3/27/06 to 8/23/06; this apparently reflected the fact that he left the institution on parole and returned to the institution in August 2006. This inmate had been in the CTC for two stays in 2005, from 8/1/05 to 8/2/05 and from 12/8/05 to 12/12/05.

Assessment:

Previous diagnostic information and a history of CTC placements were within this inmate's health care record. Clinicians at the 12/8/06 IDTT did not have access to this information, which may have been critical to the manner in which this inmate was treated. The inmate was at a 3CMS level of care but it appeared that he should be considered for placement in EOP.

7

EXHIBIT T

California Rehabilitation Center (CRC)

October 12, 2006 – October 13, 2006

1.    Inmate A

This 3CMS male inmate was diagnosed with Schizoaffective Disorder, depressed type. He was treated with Lithium 600 mg/day. He was transferred to CRC from CMC on 9/27/06. He was seen for an initial mental health contact on 10/3/06. The inmate was followed consistently by the mental health staff. However, at his IDTT meeting on 10/12/06, he reported that he had not received his Lithium since his day of arrival.

Assessment:

The appropriate laboratory testing for treatment with Lithium had not been conducted.

An MH4 was completed within five working days of arrival.

There was documentation that psychotropic medications were ordered upon the inmate's arrival to the institution; however, the MAR and inmate both indicated that there was a lapse in medications after his initial dosage upon arrival.

The IDTT included the necessary participants.

2.    Inmate B

This 3CMS female inmate was diagnosed with Depressive Disorder NOS. She was treated with Effexor XR 150 mg/day and Vistaril 50 mg/day. It appeared that she had been housed at CRC since 2003. She was previously on the mental health caseload and was removed from the caseload on 12/9/03. On 6/23/06, she submitted a request for evaluation after reporting depressive symptoms. She was seen on the same day by a psychologist. She was seen the next week for follow-up when she was referred to the psychiatrist. An MH4 was completed on 7/6/06, and the inmate was added to the mental health roster on that same date. She was seen by the psychiatrist on 7/19/06, and she was treated with the above-mentioned medications. Subsequent progress notes indicated that the inmate showed gradual improvement in her depressive symptoms. She was last seen on 10/6/06 when she had a panic attack. She was evaluated by the psychiatrist, and her medications were adjusted.

Assessment:

This inmate was seen promptly after self-referral and appropriately re-admitted to the 3CMS program. She was seen more frequently than every three months by the case manager.

The IDTT meeting did not include psychiatric participation.

3.    Inmate C

This 3CMS male inmate was diagnosed with Schizophrenia. He was not treated with psychotropic medications at the time of the site visit. He was transferred to CRC on 12/5/05 from RJD where he was receiving 3CMS LOC. Progress notes indicated that he was followed consistently by the psychiatrist and the psychologist. There were several referrals from the MTA indicating that the inmate was found cheeking or not showing for the pill line. Attempts at changing medications and clinical interventions were followed by continued non-compliance. On 8/15/06 the inmate indicated that he did not wish to continue his psychotropic medications, and

his medications were discontinued on that date. The psychiatrist indicated that the inmate did not meet Keyhea criteria at that time. The most recent clinical contact was documented on 9/11/06 when the case manager reported that the inmate was stable off medications and was working in the kitchen.

Assessment:

There was documentation of quarterly case manager contacts and of near-monthly psychiatric contacts. An annual IDTT meeting was not due at the time of the site visit.

4.  Inmate D

This 3CMS female inmate was diagnosed with Mood Disorder NOS. She was treated with Remeron 15 mg/day and Vistaril 50 mg/day. She was transferred from VSPW on 4/25/06. It appeared that she was not treated with psychotropic medications at the time of transfer. An MH-7 was completed on 5/8/06 and she was continued in the 3CMS program. She was seen for initial psychiatric evaluation on 5/16/06 when she was treated with Seroquel. This medication was changed to Risperdal due to medication side effects. There were several other medication changes due to complaints that medications were ineffective or caused side effects. At the last clinical appointment the inmate reportedly was doing well on the above medications.

Assessment:

There was no documentation of psychiatric presence in the IDTT meetings. The MH7 was completed within 14 days. There was documentation of quarterly case manager contacts and of monthly psychiatric contacts with appropriate medication management.

5.  Inmate E

This male 3CMS inmate was diagnosed with Bipolar Disorder NOS. He was treated with Buspar 30 mg/day and Topamax 100 mg/day. He was transferred from CIM to CRC on 3/9/06. Progress notes indicated that the inmate was seen frequently in response to staff reports of manic-like symptoms, including hyperactivity, impulsivity and potentially self-injurious behavior. During this time, he was treated with Risperdal and Effexor. Several suicide risk assessments were completed and indicated that he was at low risk for self-harm. The inmate was assaulted by another inmate and he was transferred to another dormitory. His disruptive behavior resulted in frequent clinical contacts with the case manager. He was seen by the psychiatrist on 6/8/06 when Effexor and Risperdal were discontinued and Seroquel and Buspar were started. The inmate continued to exhibit psychotic symptoms and stopped taking Seroquel. On 9/26/06 he was seen by another psychiatrist who noted his continued manic symptoms. Topamax was started at that time.

Assessment:

This inmate exhibited manic symptoms for several months. During this time he was treated with Effexor, an antidepressant medication that can cause mania in inmates with Bipolar Disorder. Despite this, the psychiatrist continued to treat the inmate with this medication. When he was seen by another psychiatrist, he was treated with the appropriate anti-manic medication with reported resolution of his symptoms.

There was documentation of case manager contacts that occurred more frequently than quarterly and occurred as clinically indicated.

On 4/24/06 the dorm officer made a crisis call to mental health regarding this inmate, and the UHR indicated that one of the psychologists attempted to evaluate this inmate over the phone. This practice was clinically inappropriate and unacceptable.

6.      Inmate F

This female 3CMS inmate was diagnosed with Bipolar Disorder NOS. She was treated with Wellbutrin 300 mg/day and Depakote ER 1000 mg/day.  Her bus screen was completed on 5/25/06. She was not prescribed psychotropic medications at the time of transfer. An MH7 recommending continuation in the 3CMS program was completed on 6/6/06. She was seen by the psychiatrist on 6/13/06 when the above medications were ordered. Subsequent progress notes indicated that she presented with intermittent affective symptoms but was essentially stable at the last visit.

Assessment:

The appropriate laboratory testing for treatment with Depakote was conducted.

There was documentation of quarterly case manager contacts and of intensive psychiatric follow-up on a monthly basis.

An MH7 was completed within 14 days.

An IDTT meeting included the necessary participants.

EXHIBIT U

Richard J. Donovan Correctional Facility (RJD)

August 18, 2006
September 20, 2006 – September 21, 2006
November 13, 2006 – November 14, 2006

1.     Inmate A

This EOP inmate was briefly observed in administrative segregation.  His speech was very pressured and tangential in nature. Staff stated that he historically responded to psychotropic medications, which were reportedly recently restarted.

This inmate had been in administrative segregation since at least 4/24/06. He was described as being manic during an IDTT held on 5/17/06. A 5/28/06 MH-4 described this inmate as demonstrating manic symptoms. He was diagnosed with Schizoaffective Disorder, bipolar type, Bipolar Disorder, recurrent and Antisocial Personality Disorder. During a medical appointment on 8/18/06 related to an inguinal hernia, a surgeon noted that he was agitated and needed to see a psychiatrist relevant to his psychotropic medications. On 9/15/06, this inmate was involuntarily medicated due to being a potential threat to himself.

Clinical case manager notes and psychiatrist notes were present with a frequency consistent with Program Guide requirements.  IDTT meetings apparently occurred on 6/7/06, 6/20/06 and 9/19/06. Progress notes documented daily psych tech rounds.

Assessment:

This inmate was clinically not doing well and needed to be considered for a higher level of mental health treatment.

2.     Inmate B

This EOP inmate was briefly observed in administrative segregation.  His cell was filled with torn unused toilet paper, which he stated was to be used as a canvas for his future artwork.

This inmate was placed in administrative segregation on 9/5/06 related to safety concerns and a possible unexpired SHU term. A 9/19/06 psychiatric progress note, which was difficult to read, indicated that this inmate was refusing medications and appeared actively psychotic. The plan was to watch and evaluate.  Involuntary meds would be considered if his condition deteriorated further.

Assessment:

This inmate was obviously psychotic and needed to be considered for a higher level of mental health treatment.

3.     Inmate C

This EOP inmate was briefly interviewed in administrative segregation. He stated that he had been advised by the Prison Law Office that Coleman monitors would see him concerning prolonged delays related to his transfer to an SNY/EOP program.  He

reported that he was scheduled to parole within the next week and that he did not have a place to live when released from prison. He was recently given an application form for Social Security disability benefits. A psychiatric technician confirmed the accuracy of the inmate's statements.

Reviewed progress notes indicated that efforts had been made to address some of this inmate's issues related to living outside of prison. An 8/10/06 progress note indicated that this inmate planned to live at a friend's house upon release. During a clinical interview on 9/6/06, he reportedly indicated that he had worked out various discharge issues including entitlements and POC.

Assessment:

Staff confirmed that this inmate's complaint about transfer delays was valid. However, his impending parole rendered the issue moot. This inmate received discharge planning counseling. However, his prognosis seemed poor given the information in progress notes.

4.      Inmate D

During a group interview, this general population 3CMS inmate reported that he was not meeting with his clinical case manager every 90 days. He also reported having medication continuity problems, including medication renewals without psychiatric contact.

UHR documentation indicated that this inmate was not prescribed psychotropic medication. He last met with a psychiatrist on 10/19/06, at which time he was not demonstrating psychotic symptoms. Before that, he saw a psychiatrist on 5/4/06.

He last met his case manager on 7/27/06 and was noted to be high-functioning.

Assessment:

As reported during the interview, this inmate had not been seen by his case manager within the proceeding 90 days. UHR documentation indicated that his report relative to medication continuity problems was inaccurate.

5.      Inmate E

During a group interview, this general population 3CMS inmate did not voice any complaints regarding his mental health treatment.

UHR documentation indicated that this inmate was last contacted by his case manager on 8/17/06. He last met with a psychiatrist on 8/21/06 and his treatment plan was updated 5/8/06. Prescribed medications included Lexapro, which he received on a regular basis.

Assessment:

This inmate's 3CMS treatment was consistent with Program Guide requirements.

6.      Inmate F

This EOP ASU inmate was seen at the request of plaintiffs' attorneys related to reported suicidal ideation and emotional distress. Per his report, psych techs were unresponsive to his requests for mental health treatment and the institution had not responded to written grievances.

This inmate was described by staff as very demanding and dissatisfied relevant to access to medical care. Reportedly, he was currently satisfied with his present treatment.

UHR documentation indicated that this inmate was prescribed Wellbutrin and Neurontin. The UHR documented frequent case manager contact, LPT rounds and access to group therapies, although documentation relevant to group therapy and LPT rounds was sporadic. There were numerous progress notes during July 2006 from various clinicians, including a psychiatrist. Medication management and suicide risk assessments were completed and a high-risk team review was conducted during this period.

He was interviewed again by the high-risk team on 8/2/06, at which time he reported getting his medications and was noted to be stable and appropriate for an EOP level of care. He was last seen by a psychiatrist on 9/1/06, when he was diagnosed with Bipolar II Disorder.

An MHTS inmate contact history confirmed access to both ASU group therapies and frequent clinical case manager contacts.  It was not uncommon for this inmate to refuse group treatments.

Assessment:

This inmate was receiving an appropriate level of mental health treatment.

7.      Inmate G

This inmate's level of care was changed from EOP to 3CMS on 4/4/06. He was housed in administrative segregation at a 3CMS level of care throughout the review period.  The most recent diagnoses included Bipolar Disorder, NOS, Polysubstance Dependency and Antisocial Personality Disorder.  He was treated with Vistaril 100 mg/day.

Progress notes indicated that he was seen consistently by ASU staff.  It appeared that he had periods of anxiety and agitation related to his confinement in ASU for which PRN medications were prescribed. He consistently requested more yard time with occasional threats of self harm.  Staff initially planned to admit him to the MHCB, though it

appeared that he was observed in the TTA and later returned to administrative segregation. A related suicide risk assessment found moderate risk.

Subsequent progress notes indicated that this inmate had periods of screaming and pounded on air duct pipes. Staff indicated that he was not allowed to leave his cell when he presented with this behavior. He was seen on several occasions in the TTA due to feeling "claustrophobic." He was returned to his cell after these assessments. The most recent progress notes indicated that he remained focused on more out of cell time. There was no evidence of recent psychosis.

His participation in group therapy was placed on hold due to his "sexually inappropriate behavior" toward female staff. A psychology note dated 6/2/06 indicated that he repeatedly masturbated in front of female staff, but that he had not received an RVR related to this behavior since December 2005. There was at least one clinical evaluation located in the medical record that indicated that this inmate had exhibitionism.

Assessment:

This inmate was evaluated by clinical staff and diagnosed with exhibitionism. Despite this, he was not provided treatment for this disorder. Supervisory staff acknowledged that RJD was unable to provide therapy for exhibitionism due to a lack of appropriately trained clinicians. This inmate's other mental health concerns appeared to have been adequately addressed.

8.    Inmate H

On 10/28/06 at 9:40 p.m., a housing officer responded to reports of an unresponsive inmate. Upon arriving at the cell-front, the officer noted that this inmate was sitting on the lower bunk with his head laying on the storage cubicle. The floor officer instructed the control booth officer to radio for an Emergency Transport Vehicle (ETV). An MTA and correctional officer arrived in the unit in the ETV at approximately 9:45 p.m., when the cell door was opened. The cellmate was placed in handcuffs and removed from the cell. This inmate was placed on the floor and checked for vital signs. The MTA started CPR for which time was not noted, and instructed staff to call 911. As the MTA conducted CPR, the inmate was placed on a gurney, rolled to the ETV and transported to the Triage and Treatment Area, arriving at around 9:52 p.m. Medical staff was informed that a hypodermic needle and brown tar-like substance was found in his cell and the MOD was notified. Medical Response 911 personnel arrived at around 10:05 p.m. and assumed resuscitation duties. The inmate was pronounced dead at 10:31 p.m.

Assessment:

The emergency response was inadequate. The responding officer did not open the cell door or initiate CPR upon discovering this inmate unresponsive in his cell. Staff waited for an MTA to arrive with an emergency transport vehicle, which took at least five minutes. At that point, the cell door was opened and CPR was initiated.

9.    Inmate I

On 9/8/06 at 2:10 p.m., an officer was notified via institutional radio that an inmate was down on a baseball field and that the Emergency Transportation Vehicle was needed. Responding staff noted that the inmate's breathing was shallow and that he had a weak pulse. When medical staff arrived, at approximately 2:20 p.m., an MTA noted that the inmate had no pulse, started chest compressions and directed staff to get the gurney from the ETV. The MTA, with the help of officers, than placed in the inmate on a gurney and into the ETV. Once in the ETV, the MTA re-started chest compressions and an officer provided emergency breathing with an ambu bag. The ETV arrived at the TTA at approximately 2:25 p.m. An outside ambulance was called at 2:30 p.m. and arrived in the TTA around 2:45 p.m. An RN reported that CPR was continued until paramedics arrived, at which point the paramedics continued CPR. The inmate was pronounced dead at 3:03 p.m.

Assessment:

The emergency response was inadequate in that responding officers did not initiate life-saving measures. Staff waited for an MTA to arrive with an emergency transport vehicle, which took ten minutes. At that point CPR was initiated.

10.    Inmate J

On 9/1/06 at approximately 2:05 a.m., staff responded to an inmate yelling "man down." When an officer responded to the cell-front, the cellmate indicated that this inmate "was cold." When observed by the officer through the cell window, this inmate was noted to be "motionless and pale in color." The watch commander was contacted. At 2:07 a.m., the cell door was opened. The cellmate was handcuffed and escorted from the cell. A sergeant arrived at 2:08 a.m., observed that the inmate was motionless, entered the cell and checked for a pulse. The temperature of the inmate's body was described as "cold to the touch and his arm was severely stiff as it appeared that rigor mortis had begun." At 2:10 a.m., an MTA arrived, evaluated the inmate and determined that he was deceased. An RN arrived at 2:21 a.m., evaluated the inmate and informed the medical officer of the day of his findings. The MOD pronounced the inmate dead at 2:21 a.m. Later that morning, a medical examiner determined that this inmate was strangled and died as a result of suffocation.

Assessment:

The emergency response was inadequate. Responding officers declined to commence life-saving measures, as it was determined by a lieutenant that rigor mortis had set in. Responding medical staff consisting of an MTA and RN concurred with the lieutenant and chose not to initiate life-saving measures. The inmate was pronounced dead via telephone by the MOD 16 minutes after the inmate was found unresponsive in his cell.