EXHIBIT V

Central California Women's Facility (CCWF)

December 20, 2006 – December 22, 2006

1.    Inmate A

This EOP inmate was housed in the EOP unit. She was diagnosed with Schizophrenia, paranoid type. She was treated with Symbyax 12 mg/25 mg every evening.

This inmate transferred from CIW to CCWF on 6/20/06, after a recent discharge from PSH. She was transferred to PSH from CCWF EOP after exhibiting increasing paranoid delusional thinking, suicidal and homicidal ideation and self-injurious behavior. After her return to CCWF, she was readmitted into the EOP after her initial IDTT meeting on 6/28/06. Progress notes indicated that she was actively involved in group therapy and other unit activities. It appeared that she remained with chronic delusional thinking despite medication treatment. Progress notes also indicated that she would parole within one month of the site visit.

Assessment:

This inmate was appropriately referred and transferred to PSH as clinically indicated.

The medical record was in disarray with possible missing documentation and misfiling making it impossible to determine the frequency of contacts and the course of treatment.

The discharge summary from PSH was not located in the medical record.

The June 2006 MAR reflected that the inmate either refused or did not appear for medications. However, it did appear that medications were available for administration within 24 hours of arrival.

There was documentation that this inmate was involved in group therapy, including education. However, it was not possible to determine the number of hours of involvement from the UHR.

There was no documentation of discharge planning, including a TCMP chrono, for this inmate who will parole within one month.

2.    Inmate B

This EOP inmate was housed in the EOP unit. She was diagnosed with Major Depressive Disorder with psychotic features. She was treated with Risperdal 0.5 mg/day. She was transferred from a county jail to CCWF on 12/7/06. It appeared that she had gone out to court as the medical record indicated that she had previously been housed at CCWF since at least January 2006. However, this was difficult to determine from the condition of the medical record. Progress notes indicated that she initially exhibited significant symptoms of tardive dyskinesia and had complaints of hallucinations. These symptoms gradually improved. The most recent progress notes indicated that she was improved and was compliant with medications. A treatment plan during August 2006 indicated that the inmate would be considered for 3CMS LOC at the next IDTT in November 2006. There

was no November 2006 treatment plan in the record and the inmate remained in EOP at the time of the site visit.

Assessment:

The medical record was in disarray with possible missing documentation and misfiling making it impossible to determine the frequency of contacts and the course of treatment.

The most recent treatment plan was due during November 2006; however, it was not located in the medical record.

It was difficult to determine medication continuity upon return from court as the December MAR was unavailable.

3.    Inmate C

This 3CMS inmate was housed in the administrative segregation unit. She was diagnosed with Depressive Disorder NOS and Amphetamine Dependence. She was treated with Remeron 30 mg/day and Thorazine 150 mg/day.

This inmate was transferred from a county jail to CCWF on 3/15/06. She was subsequently placed into the 3CMS program at CCWF. She was placed into the administrative segregation unit during May 2006 due to enemy concerns. The inmate went out to court reportedly between 6/22/06 and 12/10/06. Upon her return from court, she was returned to the administrative segregation unit. Her most recent progress notes indicated that she complained of auditory and visual hallucinations; her medications were adjusted at that time.

Assessment:

The medical record was in disarray with possible missing documentation and misfiling making it impossible to determine the frequency of contacts and the course of treatment.

There was documentation of medication continuity upon the inmate's arrival from the county jail during March 2006. The December 2006 MAR was unavailable for review to evaluate continuity upon her return 12/7/06 from the county jail.

4.    Inmate D

This 42-year-old inmate had been in prison for more than 20 years. There apparently was no history of mental health treatment prior to the time that she was incarcerated. She had generally been diagnosed with Borderline Personality Disorder but had also been diagnosed with Psychotic Disorder NOS. Medications within the past 12 months included Prozac, Haldol concentrate and IM, Trazadone, Ativan, Vistaril and Risperidone

This inmate's record revealed a history of at least five DMH placements. She returned from PSH approximately 7/27/06. This was apparently her fifth hospitalization.

MHCB admits included 8/8/06 through 8/14/06, 10/12/06 through 10/16/06, and 10/26/06 through 11/2/06. Inpatient records for these periods were found within the record. Although she was apparently out of the MHCB in between those admissions and until the time of the review, there was no evidence of weekly case manager contact within the record.

Review of this inmate's records did not reveal evidence that, despite at least three recent referrals to MHCB, the IDTT had considered the need for a higher level of care in the past several months. There was at least one note by a clinician in the inpatient record that mentioned possible return to PSH.

With the exception of a treatment plan found within the records from an inpatient stay, there was no current MH2.

Assessment:

This inmate had been placed in crisis care on at least three occasions since being released from Patton State Hospital in July 2006. There was no evidence that the IDTT had considered the need for a higher level of care. No current treatment plan was found within the record.

5.    Inmate E

This 45-year-old inmate was referred by plaintiffs' attorneys as an inmate who was recently released from EOP. She was apparently serving her first term for arson. In interview, she reported that her commitment offense involved fearing that a particular individual was going to harm her children and so she attempted to set the man's car on fire. She has reported hearing "voices" that tell her to harm herself and that she will not see her children again.

Chronos would appear to suggest that she was placed at 3CMS level of care on 3/24/06, elevated to EOP level of care on 11/2/06, and then apparently returned to 3CMS level of care approximately 11/30/06.

An MH-2 from 5/11/06 included a diagnosis of Major Depressive Disorder with psychotic features. This same treatment plan listed several appropriate target behaviors and three groups. A suicide risk assessment completed 5/11/06 found that she was not currently suicidal.

The inmate attended stress management group in July 2006. Notes from that time indicated that she was continuing to cope with depression.

A note on 8/29/06 indicated that she was doing fairly well but by 10/10/06, she was noted to be increasingly depressed. On 11/2/06, she was seen by a psychiatrist and was characterized as "hopeless" and bothered by voices telling her that she should kill herself and that she would never see her children. She additionally explained that her roommates were "beating her up." A suicide risk assessment, done on 11/2/06, noted that she was requesting to go to EOP.

On Sunday 11/26/06 at approximately 0836, she reported to staff that she felt suicidal and that voices were telling her to kill herself. She was placed into a shower and, approximately one hour later at 0939, a call was made to the on-call doctor. The inmate apparently remained in the shower until at least 1130. She was then given an injection of Haldol and Ativan at the doctor's order. There was no indication that the doctor came to the institution to examine the inmate, however. She apparently remained in the shower until approximately 1455 and was released back to her program after she stated to an LVN who recorded the interaction that she would not harm herself. There was no suicide risk assessment or note from the physician regarding this incident.

When seen for interview, this inmate tearfully reported that she continued to experience voices that instruct her to harm herself and tell her that she will not see her children again. She described being handcuffed and placed into a shower for more than six hours on 11/26/06 and reported that she did not see a psychiatrist or other clinician at that time. She reported that the recent addition of Thorazine had helped her to sleep. The people who shared her cell were supportive.

Assessment:

When seen, this woman was clearly depressed and required an elevated level of care. The crisis care which she received on 11/26/06 was deficient and neglectful. Mental Health administrative staff were asked to review the case.

6.    Inmate F

At the time of the monitoring tour, this 44-year-old inmate was apparently at the EOP level of care. She was apparently placed at 3CMS level of care on 5/1/06. It appeared that she was in crisis care from 6/8/06 through 6/12/06. She was then changed to EOP level of care on 6/15/06, returned to 3CMS level of care on 6/28/06, placed back in EOP level of care on 7/3/06, to 3CMS level of care on 7/19/06, then to EOP in 7/21/06.

In support of some of these changes, there was a case manager note on 6/26/06 indicating that the inmate did not require EOP and IDTT documentation of the decision to transfer her to 3CMS on 6/28/06. A few days later, she was transferred back to EOP with a note on 7/3/06 that the inmate "has feelings of wanting to stab herself." There was documentation of the IDTT decision that the inmate did not require EOP level of care on 7/19/06, though she was apparently returned to EOP for suicide ideations on 7/21/06.

Notes through the time that she had been in EOP indicated steady improvement and consistent participation. There were notes detailing relevant parole planning with the case manager. Notes in the record were not consistently filed in chronological order. With that exception, the clinical notes were consistently adequate.

This record had a very well-done treatment plan completed 8/2/06. There were several relevant target objectives and details regarding interventions by several interdisciplinary team members. IDTT notes generally indicated attendance by appropriate individuals.

Assessment:

It appeared that from late June 2006 through July 2006, the inmate was transferred in and out of EOP on several occasions in what appeared to have been a disagreement between two treatment teams as to whether she required EOP care. As a means of reducing the impact on the inmate that likely resulted from these changes, intervention by supervisory staff should have occurred. The condition of this inmate was improving with EOP treatment and it would appear that the quality of care she was receiving within the EOP was adequate.

7.      Inmate G

This inmate was referred by the plaintiffs' attorneys who reported that she was removed from EOP level of care and she expressed "an ongoing need for EOP services." She was a first-term inmate serving a life sentence for the torture and murder of her adoptive child. She graduated from USC with a BS in accounting and formerly worked as a supervisor. She had repeatedly stated that she wished to go to a state hospital and she may have believed that when she pleaded no contest to a charge of second degree murder that she would be hospitalized.

Review of records revealed that she was, in fact, in EOP for a total of 643 days. She was one of seven women placed into a transition program, which included moving as a group into a transition housing situation. Upon her departure from a formal EOP program, she was placed into housing with the six other women in an area that afforded additional observation by custody staff. They were seen on a frequent basis through this transition.

Assessment:

This appeared to be an inmate who, due to her commitment offense, had good cause to be fearful of placement into a general population area. Available records appeared to indicate that she generally presented as fearful and somewhat depressed. There were some indications in the record that symptoms of mental illness may have been exaggerated in an attempt to remain in the relative protection of EOP. The treatment team appeared to have developed a plan to assist with transitioning this inmate into a 3CMS setting. She was a "lifer." It appeared that this plan was reasonably conceived and that there was an adequate level of clinical supervision accompanying the transition.

Records appeared to indicate that she did not present with indications of thought disorder but with symptoms of anxiety and depressed mood.

8.    Inmate H

This inmate was referred by plaintiffs' attorneys for case review. She had a history of at least seven MHCB admissions from 3/3/06 until 10/19/06. There was a history of self-injury, swallowing objects, etc. She had a long history of hospitalization prior to incarceration and was, in fact, sentenced to prison for assaulting staff at Napa State Hospital. She had consistently been diagnosed with Borderline Personality Disorder.

The inmate was referred by the IDTT for placement into acute care. This referral was apparently rejected and intervention by the CDCR CCAT team appeared not to have been effective in changing this decision. With little other recourse, the team apparently determined that the inmate should remain within the MHCB until the time of an upcoming parole which would involve the inmate being transferred to Patton State Hospital as a Mentally Disordered Offender. She was, in fact, transferred from CCWF to Patton on 12/21/06.

Assessment:

This inmate required a level of care beyond that which was available at CCWF. The Interdisciplinary Treatment Team appropriately recognized this need and acted to refer the inmate to a higher level of care. This request for transfer was rejected by DMH leaving the CCWF team with little recourse but to continue to provide this inmate with inpatient care within the MHCB. Intervention by CDCR's CCAT team was ineffective. The inmate was eventually transferred to DMH as a Mentally Disordered Offender.

EXHIBIT W

Valley State Prison for Women (VSPW)

January 22, 2007 – January 24, 2007

1.    Inmate A

This EOP inmate was housed in the OHU. She was diagnosed with Psychotic Disorder NOS. She was treated with Haldol 20 mg/day and Cogentin 1 mg/day.

This inmate was transferred to VSPW initially during August 2006. Shortly after her transfer, she was admitted to the OHU due to agitation, uncooperative behavior and paranoia. She was monitored on this unit from 8/17/06 through 8/21/06. The clinicians noted her history of treatment at PSH and in the EOP. She was also noted to have a history of medication non-compliance and was placed on a Keyhea order during March 2003. After her discharge from the OHU, she was non-compliant with treatment including appointments and prescribed medications. It appeared that she paroled during September 2006.

She was re-incarcerated at VSPW on 12/5/06 from a county jail. At the time of initial mental health screening, she denied mental health issues and was cleared for general population. No medications were prescribed at the time of intake. On 12/20/06, she was seen by a case manager and she was appropriately placed into the EOP. She was admitted to the OHU on 1/12/07 when she had a presentation similar to that described above. She reportedly was not suicidal at the time of admission and was not placed on suicide precautions or watch. Subsequent progress notes indicated that she remained uncooperative with paranoid delusional thinking, hostility and disorganized thinking. Keyhea was considered; however, she began taking oral medications. At the time of the visit, she was awaiting transfer to the EOP.

Assessment:

It appeared that the medical record was either not available or not reviewed at the time of incarceration in December 2006 as this inmate was cleared for general population despite her significant mental health history.

There was documentation of daily Monday through Friday psychiatric coverage in the OHU.

Although this inmate remained in the OHU greater than 72 hours, this appeared to be the more appropriate placement at VSPW while she was awaiting EOP placement.

There was documentation of psychiatric presence in the OHU IDTT meetings; however, there was not documentation of CC-I presence.

This inmate was appropriately referred for EOP LOC.

2.    Inmate B

This EOP inmate was housed in the OHU. She was diagnosed with Schizophrenia, paranoid type. She was treated with Prolixin 7.5 mg/day.

This inmate was transferred from a county jail to VSPW on 12/13/06. She was seen in the R&R by the psychiatrist and psychologist on the day of arrival due to agitation; she reported that she had not received medications for five days prior. The mental health screen was completed on 12/14/06 and the inmate was referred for further evaluation. On 1/16/07 an MH7 was completed, and the inmate was recommended for EOP LOC.

On 1/19/07, she was admitted to the OHU for observation after presenting with a black eye and evidence of self-injurious behavior. Subsequent progress notes indicated that she was initially paranoid and agitated. She then began to show improvement after a change in medications from Haldol to Prolixin. She was awaiting transfer to the EOP at the time of the visit.

Assessment:

There was documentation of medication continuity upon arrival to the facility.

This inmate was seen timely when she presented in the R&R in crisis with agitation.

She was appropriately admitted to the OHU for stabilization. Although she remained in the OHU for greater than 72 hours, this appeared to be the appropriate setting at VSPW for monitoring of this inmate while awaiting EOP transfer. There was documentation of the necessary participants in the OHU IDTT meeting.

3.    Inmate C

This EOP inmate was housed in the SHU. She was diagnosed with Bipolar Disorder. She was not treated with psychotropic medications at the time of the visit.

This inmate was transferred from CCWF to VSPW on 12/19/06. She was transferred for SHU placement. A review of her UHR indicated that she was treated with Geodon, Wellbutrin and Vistaril at the time of her transfer. She had a history of suicide attempts and poor impulse control. The inmate continued to report symptoms of agitation, auditory hallucinations, intermittent suicidal ideation and possible auditory hallucinations. The treating psychiatrist eventually discontinued all of the inmate's psychotropic medications, and there was discussion of downgrading her to 3CMS. She was last treated with Haldol, but the inmate refused this medication, and it was also discontinued.

Assessment:

The discontinuation of this inmate's medications without consideration of alternative medications was of concern. This was a common practice at this facility and it did not appear to be based upon sound clinical judgment.

It did not appear that this inmate was appropriately evaluated for suicide risk and transferred to the OHU when she presented with possible suicidal ideation.

In case reviews 4, 5 and 6, Haldol appeared to have been utilized for chemical restraint, a practice that was contraindicated, dangerous, and punitive rather than clinical in purpose.

4.      Inmate D

This inmate was in general population and was not in the MHSDS. She was given Haldol 10 mg intramuscular by one of the psychiatrists on 11/9/06. There was no documentation of clinical contact or justification for the administration of this medication.

5.      Inmate E

This inmate was in the 3CMS program. She was administered Haldol 10 mg intramuscular on 11/21/06 by one of the psychiatrists while she was housed in the A4 administrative segregation unit. The progress note indicated that the inmate shouted profanity at the psychiatrist as he was leaving the unit. He indicated that she became agitated after he "approached her with questions." There was no documentation that this inmate exhibited psychotic behavior or clinical indication for the treatment of an antipsychotic medication against her will. She was not on a Keyhea order.

6.      Inmate F

This inmate was not a participant of the MHSDS. She was given Haldol 5 mg oral with an order for intramuscular if she refused the oral medication on 5/13/06. There was no documentation of clinical contact by the psychiatrist nor evidence of justification for treatment with an antipsychotic medication.