EDMUND G. BROWN JR.
Attorney General of the State of California
DAVID S. CHANEY
Chief Assistant Attorney General
FRANCES T. GRUNDER
Senior Assistant Attorney General
ROCHELLE C. EAST
Supervising Deputy Attorney General
LISA A. TILLMAN, State Bar No. 126424
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 327-7872
 Fax: (916) 324-5205
 Email: Lisa.Tillman@doj.ca.gov

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | 2:90-cv-00520 LKK JFM P<br><br>**DEFENDANTS' <u>AMENDED</u> NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT, WITH <u>AMENDED</u> DOCKETING STATEMENT** |
|---|---|

Arnold Schwarzenegger, Michael Genest, James Tilton, Stephen W. Mayberg, Ph.D., the served defendants in this action, appeal to the United States Court of Appeals for the Ninth Circuit

///

///

///

1

from this Court's July 23, 2007 order. That order granted Plaintiffs' motion to convene a three-judge court to consider whether to issue a prisoner release order pursuant to 18 U.S.C. § 3626(a)(3). This Notice of Appeal amends and supersedes the Notice of Appeal filed with this Court on July 27, 2007.

Dated: August 9, 2007

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

DAVID S. CHANEY
Chief Assistant Attorney General

FRANCES T. GRUNDER
Senior Assistant Attorney General

ROCHELLE C. EAST
Supervising Deputy Attorney General


*/s/ Lisa A. Tillman*

LISA A. TILLMAN
Deputy Attorney General
Attorneys for Defendants

CF1997CS0003
30312065.wpd

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

No. CIV S-90-0520 LKK JFM P

ORDER

    Plaintiffs are a class of state prisoners with serious mental disorders proceeding through counsel in the remedial phase of this class action lawsuit. By order filed September 13, 1995, this court found defendants in violation of the Eighth Amendment with respect to the provision of constitutionally adequate mental health care to inmates incarcerated in the California Department of Corrections, now known as the California Department of Corrections and Rehabilitation ("CDCR"). On December 11, 1995, this court appointed J. Michael Keating, Jr. as the Special Master to oversee the development of remedies for the systemic constitutional violation and to monitor implementation of court-approved remedies. This action has been in the remedial phase for almost twelve years.

    This matter is before the court on plaintiffs' motion to convene a three-judge panel to limit the prison population in the CDCR, pursuant to 28 U.S.C. § 2284 and 18 U.S.C. §

1

3626(a)(3). The court initially heard argument on plaintiffs' motion on December 11, 2006, after which it continued the hearing to June 4, 2007. The matter was subsequently continued to June 27, 2007, and the court heard oral argument on that day.[1]

On July 2, 2007, defendants filed a document entitled, "Defendants' Further Statement Addressing Plaintiffs' Motion to Convene a Three-Judge Panel to Address Population Issues." Therein, defendants requested that the court take judicial notice of a report to the California Legislature from the CDCR's expert panel on Adult Offender Reentry and Recidivism Reduction Programs entitled, "A Roadmap for Effective Offender Programming in California" (hereafter "Roadmap"). By order filed July 3, 2007, the parties were directed to file additional briefing addressing how, if at all, the court should consider this report in resolving plaintiffs' motion. That briefing was completed on July 18, 2007.

## ANALYSIS

I. <u>Standards</u>

Section 3626(a)(3)(C) of Title 18 of the United States Code authorizes a party to a civil action concerning prison conditions to file a request for a prisoner release order. As defined by the statute, a prisoner release order "includes any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison." 18 U.S.C. § 3626(g)(4). A prisoner release order may "be entered only by a three-judge court in accordance with section 2284 of title 28," if other statutory requirements have been met. 18 U.S.C. § 3626(a)(3)(B). A request for a prisoner release order must be accompanied by a request for a three-judge court and "materials sufficient to demonstrate that" the statutory requirements for issuance of such an order have been met. 18 U.S.C. § 3626(a)(3)(C).

/////

---

[1] The June 27, 2007 hearing was a joint hearing with the court in <u>Plata v. Schwarzenegger</u>, Case No. Civ. 01-1351 TEH (N.D.Cal.). <u>See</u> Order filed June 7, 2007.

2

A prisoner release order may not be issued unless--

(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and

(ii) the defendant has had a reasonable amount of time to comply with the previous court orders.

18 U.S.C. § 3626(a)(3)(A)(i)-(ii). If these requirements are met, "a Federal judge before whom a civil action with respect to prison conditions is pending who believes that a prison release order should be considered may sua sponte request the convening of a three-judge court to determine whether a prisoner release order should be entered." 18 U.S.C. § 3626(a)(3)(D). The three-judge court "shall enter a prisoner release order only if the court finds by clear and convincing evidence that –

(i) crowding is the primary cause of the violation of the Federal right; and

(ii) no other relief will remedy the violation of the Federal right.

18 U.S.C. § 3626(a)(3)(E).

II. Analysis

A. The Federal Right Sought to Be Remedied

The federal right at issue in this action is the Eighth Amendment guarantee of constitutionally adequate mental health care for individuals with serious mental disorders who are incarcerated in the California Department of Corrections and Rehabilitation. See Coleman v. Wilson, 912 F. Supp. 1282, 1297-98 (E.D. Cal. 1995) (citing, inter alia, Farmer v. Brennan, 511 U.S. 825, 832 (1994) and Helling v. McKinney, 509 U.S. 25, 31-32 (1993)).

/////
/////
/////
/////

3

B. <u>Orders for Less Intrusive Relief</u>

This court's September 13, 1995 order identified four broad elements required for a constitutionally adequate prison mental health care system:[2] (1) proper screening to identify individuals with serious mental disorders both at the time of their admission to CDCR and over the course of their incarceration, Coleman, 912 F. Supp. at 1305; (2) competent staff in sufficient numbers "'to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders,'" id. at 1306-8 (quoting Balla v. Idaho State Bd. of Corr., 595 F. Supp. 1558, 1577 (D. Idaho 1984)); (3) timely access to appropriate levels of care, including both beds and programs, and appropriate medication, id. at 1309-13; and (4) an adequate medical record system, id. at 1314-15. A fifth component of an adequate mental health care system, suicide prevention, was found adequate in design but deficient in implementation due to chronic understaffing, id. at 1315.

Since February of 1996, this court has issued at least seventy-seven substantive orders to defendants in an effort to bring the CDCR's mental health care delivery system into compliance with the requirements of the Eighth Amendment.[3] Taken together, these orders have contained directives aimed at all of the aforementioned requirements for a constitutionally adequate mental health care delivery system. In addition, the Special Master and his staff have spent hundreds of thousands of hours working with the parties to develop program guidelines for a constitutionally adequate system and monitoring defendants' implementation of those guidelines. During the same period of time, the Special Master has filed seventeen semi-annual monitoring reports and fifty-five other reports reflecting the results of these efforts.

---

[2] As the court noted in that order, in a class action of this magnitude "[f]ocusing on the trees presents the danger of forgetting that what is being examined is the condition of the forest." Coleman, 912 F. Supp. at 1305 n. 28. Sadly, that cautionary note remains as applicable to the issues at bar as it was twelve years ago.

[3] See Orders filed February 7, 1996 and onward. There are simply too many orders to list.

4

C. <u>Failure to Remedy Violation of the Constitutional Right At Issue</u>

As noted above in section II (B), for more than eleven years this court has issued numerous orders in an effort to bring California's prison mental health care system into compliance with the Eighth Amendment. Among the most significant of those orders has been the directive to defendants to work with the Special Master and his staff to develop and implement remedial plans for the delivery of constitutionally adequate mental health care to class members.

At the time the remedial phase of this action began, the timelines established for development of plans and protocols were relatively short and the parties met those timelines with little need for adjustment. The remedial plans and protocols were provisionally approved by this court on June 27, 1997. Thereafter, the Special Master, his staff, and the parties turned their attention to implementing the system contained in the plans.

Through 2005, the record in this action reflected slow but evident progress toward constitutional compliance. Between 1997, when the court gave provisional approval to the plans and protocols for delivery of mental health care, and 2005, some prisons in California came into sufficient compliance with the provisionally approved remedial plans and protocols that the Special Master and his staff were able to reduce the number of monitoring visits to those prisons. Defendants also developed a screening system that provided adequate identification of mentally ill inmates both on admission to, and during incarceration in, the State prison system. Moreover, while staffing shortages were never completely alleviated, defendants managed, through the use of aggressive recruitment and retention strategies, salary increases, and use of contract staff, to keep the vacancy rate among mental health staff at a nearly acceptable level.

On February 3, 2006, defendants filed a Revised Program Guide for the delivery of mental health care to inmates in the CDCR. On the same day, the Special Master filed a report and recommendation in which he recommended that the court give final approval to "95 percent of the revised Program Guide that the parties and the Special Master agree to and initiate

5

a process for resolving the five percent of the remaining issues that continue to elude resolution." Special Master's Report and Recommendations on Defendants' Revised Program Guide, filed February 3, 2006, at 4. By order filed March 3, 2006, the court gave final approval to the undisputed provisions of the Revised Program Guide and ordered their immediate implementation. See Order filed March 3, 2006, at 1.

In spite of the commendable progress described above, defendants' mental health care delivery system has not come into compliance with the Eighth Amendment at any point since this action began. Several prisons remain notable exceptions to the progress made at others, and delays in access to care at the highest level of need -- mental health crisis beds, acute inpatient care, and intermediate inpatient care -- have plagued the CDCR throughout the course of this litigation. Moreover, defendants' efforts at long-range planning for the delivery of mental health care continues to be hampered by inadequacies in the capture and collection of data and the use of outdated methodologies to interpret that data.[4]

The semi-annual reports of the Special Master filed since March 2006 show a significant and thus very troubling reversal of the progress made by defendants in maintaining adequate staffing and access to necessary levels of care. In the Sixteenth Round Monitoring Report, filed December 15, 2006, the Special Master reported that "vacancies among clinicians continued to climb during the monitoring period." See Sixteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, filed December 14 and 15, 2006, at 390-96. The Special Master also reported that "[t]ransfers of inmates to more intensive levels of mental health programming and treatment became increasingly erratic during the monitoring period. Delays in transfers, especially to the most intensive treatment programs for inmates at the highest custody levels, became endemic. . ." Id. at 413.

---

[4] The inability to engage in adequate long-range planning for the delivery of mental health care has plagued the CDCR throughout the course of this litigation.

6

1   The report on staffing vacancies in the most recent monitoring report is even more
2   grim than the one that preceded it. See Seventeenth Monitoring Report of the Special Master on
3   the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, Part C,
4   filed June 13, 2007, at 161-64. The Special Master also now reports that "access to higher levels
5   of care was generally inadequate" during this monitoring period. Id. at 174-78.
6   Similarly, on May 31, 2007, the Special Master reported that programming space,
7   beds for mentally ill inmates, and staffing levels have all been "impacted seriously by
8   overcrowding." Special Master's Response to Court's May 17, 2007 Request for Information,
9   filed May 31, 2007, at 4-14 ("Special Master's May 31, 2007 Response"). The staffing
10  shortages alone mean that the CDCR only has enough staff "to provide full mental health
11  services to roughly two-thirds of its mental health caseload, or two-thirds of required services to
12  its full caseload, or, probably more realistically, some combination of reduced services to some
13  segments of the caseload that can be covered with a third less clinicians than required." Id. at
14  11-12. While acknowledging the difficulties in quantifying precisely the scope of the unmet
15  mental health needs, the Special Master reports that,

> defendants cannot meet at least a substantial portion, amounting in some loose amalgam to about 33 percent, of acknowledged mental health needs with current staffing resources. Insufficient intensive mental health treatment beds and a chronic lack of programming space for mental health treatment contribute further to defendants' inability to meet required mental health services. All three deficiencies are unquestionably exacerbated by overcrowding.

20  Id. at 14. With a mental health caseload of almost 33,000 inmates, id. at 2, this level of unmet
21  needs is unconscionable.[5]
22  The orders of this court issued from 1995 through the present have failed to
23  remedy the constitutionally inadequate delivery of mental health care to CDCR inmates.
24  ////

---

[5] These recent reports are enough to answer the defendants' contention that the court's recent orders will rectify the slide backward.

1  That failure appears to be directly attributable to overcrowding and the consequent inability to
2  staff the caseload.
3      D.  <u>Time for Compliance</u>
4          It has been almost twelve years since this court found widespread violations of
5  the Eighth Amendment in the delivery of mental health care to the members of the plaintiff class.
6  As discussed in sections II (B) and II (C) of this order, for more than eleven years this court has
7  issued numerous orders directed at bringing California's prison mental health care system into
8  constitutional compliance, and the system still falls woefully short of meeting the requirements
9  of the Eighth Amendment. Defendants have had more than sufficient time to comply with the
10 mandate required by the court's 1995 order and the numerous orders issued since then.
11     E.  <u>Whether A Prisoner Release Order Should Be Considered</u>
12         For the reasons set forth in sections II (A), (B), and (C), this record amply reflects
13 the showing required by 18 U.S.C. § 3626(a)(3)(A)(i)-(ii). This court therefore turns to
14 consideration of whether a prisoner release order should be considered. <u>See</u> 18 U.S.C. §
15 3626(a)(3)(D). In this regard, assuming any showing is required at this stage, the standard is
16 whether a release order may be appropriate. The final decision will rest with the three-judge
17 panel.
18         There is no dispute that prisons in California are seriously and dangerously
19 overcrowded. The Governor of California has repeatedly and eloquently noted the public
20 emergency caused by overcrowded prison conditions, and the CDCR's website contains several
21 photographs of overcrowding at five of the State's prisons taken in August 2006.[6]
22         In June 2004, an independent panel appointed by Governor Schwarzenegger
23 found significant overcrowding in the CDCR. <u>See</u> June 2004 Report of the Corrections
24 Independent Review Panel at 123-25, Ex. D to Declaration of Michael W. Bien in Support of

---

[6] <u>See</u> http://www.cdcr.ca.gov/communications/prisonovercrowding.html

8

1  Plaintiffs' Motion to Convene a Three Judge Panel to Limit the Prison Population. The panel
2  discussed three different levels of population capacity: design capacity, operable capacity, and
3  "maximum 'safe and reasonable' capacity." Id. at 123-24. It observed that "operable capacity,
4  which takes into account space needed for effective programming in addition to safety and
5  security, is greater than design capacity, but far less than maximum safe and reasonable
6  capacity." Id. at 124. "Maximum 'safe and reasonable' capacity" is defined as "the maximum
7  number of inmates who can safely and reasonably be housed in the prison system. Id.[7] The
8  panel reported that the CDCR had determined that the "maximum safe and reasonable capacity
9  of the State's male prisons is 137,764 male inmates." Id. at 124. Based on the April 2004
10 population figures available to the panel, it found that the prison system then exceeded the
11 maximum "safe and reasonable" capacity of the system for male inmates by 4,000 inmates and
12 exceeded the "operable capacity" of the prison system by 30,000 inmates. Id.[8]
13         By early 2006, the impact of severe prison overcrowding on the remedial efforts
14 in this case was becoming evident in the record. See, e.g., Fifteenth Monitoring Report of the
15 Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and
16 Protocols, filed January 23, 2006, at 396-97 ("Whatever progress was reported in the preceding
17 round of review, or in the early part of the current review, in the timeliness of transfer of
18 [Mental Health Services Delivery System] ("MHSDS") inmates out of reception into general
19 population has been largely cancelled by the recently escalating growth in the overall CDCR
20 population and the concomitantly increasing number of MHSDS inmates in reception."). Since
21 then, the impact of overcrowding has become even more clear. See, e.g., Special Master's

---

[7] The plaintiffs' contention that defendants have attempted to meet the overcrowding issue by redefining the measure of crowding is not without apparent justification.

[8] The Roadmap, filed by defendants on July 2, 2007, also describes the California prison system as "dangerously overcrowded" and its first recommendation is that the CDCR "reduce overcrowding in its prison facilities and parole offices." Roadmap, at viii, 10.

9

Supplemental Report on the Status and Sufficiency of Defendants' Interim and Long Term Plans for the Provision of Acute and Intermediate Inpatient Beds and Mental Health Crisis Beds, filed September 11, 2006, at 11 ("The sudden addition of an unanticipated 1,300 inmates to a correctional system perilously close to 200 percent of its design capacity and a commensurately overstressed mental health care delivery system operating way beyond its capacity represents an unexpected, projection-rattling variable.").

Following the initial hearing on the instant motion, the court continued the matter for six months. See Order filed December 12, 2006. That continuance was for the purpose of allowing the State to develop its own solution to the overcrowding crisis. During that six month period, the California Legislature enacted Assembly Bill 900 ("AB 900"), and the bill was signed into law by Governor Schwarzenegger. The legislation calls for, inter alia, construction of 24,000 new prison beds in Phase I of its implementation, and 16,000 new prison beds in Phase II. Defendants aver that 12,000 of the Phase I beds "will be completed in 2009." Declaration of Deborah Hysen in Support of Defendants' Supplemental Brief in Opposition to Plaintiffs' Motion for Referral to a Three-Judge Panel, filed May 24, 2007, at ¶ 8. Construction funds for Phase II are tied to progress in specific areas, including construction, rehabilitation programs, management planning, and parole review. The legislation also calls for transfer of 8,000 inmates to out of state prisons by March 2009, with continued transfers as needed until July 2011. Defendants contend that the passage of AB 900 renders unnecessary and inappropriate referral of this matter to a three-judge panel.

As of May 11, 2007, the prison population in California totaled 174,989 inmates, of which approximately 162,848 are male and 12,141 are female. See Special Master's May 31, 2007 Response, at 2. Defendants estimate that the male prison population in California[9] will be 159,939 male inmates in March 2008 and 162,674 male inmates in March 2009. Declaration of

---

[9] These numbers do not include inmates who will be transferred out of state. See Kernan Declaration, at ¶ 23.

10

Scott Kernan in Support of Defendants' Supplemental Brief in Opposition to Plaintiffs' Motion for Referral to a Three Judge Panel, filed May 24, 2007, at ¶ 22. The record suggests there will be no appreciable change in the prison population in the next two years.

Defendants plan to add 12,000 prison "in-fill" beds by 2009. See Hysen Declaration, at ¶ 8. According to defendants, "[i]n-fill beds will provide additional capacity at existing prisons in a way that ensures proper facilities, support and services." Id. It is not at all clear, however, that an additional 12,000 beds, even if timely completed, will alleviate the population crisis. As noted above, in June 2004 the independent panel on corrections found that a male inmate population of approximately 141,000 exceeded by 4,000 the "safe and reasonable" capacity of the California prison system and by 30,000 the system's "operable" capacity. The male prison population projected for March 2009 is over 162,000 inmates and exceeds the population analyzed in the 2004 report by approximately 21,000 inmates, or 9,000 more inmates than new beds planned. Moreover, of course, this utterly fails to address the critical question of staffing.

AB 900 provides for the construction of 8,000 medical and mental health beds as a "high priority." Hysen Declaration, at ¶ 10. Defendants, however, are unable to adequately staff the mental health beds that presently exist and are experiencing severe staffing shortages at every level of the mental health care delivery system. See Seventeenth Monitoring Report, Part C, at 161-64. From all that presently appears, new beds will not alleviate this problem but will aggravate it.

AB 900 also includes provisions for rehabilitation programs and planning. See Declaration of Joan Petersilia, Ph.D. in Support of Defendants' Supplemental Brief in Opposition to Plaintiffs' Motion for Referral to a Three-Judge Panel, filed May 24, 2007. Defendants have formed an Expert Panel and a Rehabilitation Strike Team to review existing rehabilitation programs and make recommendations for improvement of those programs. Id. at ¶¶ 3-5. Defendants "anticipate" that "if CDCR fully implements" these recommendations, the

11

1  rate of parolees returning to custody could decrease by as much as 10%, or 8,100 inmates. Id. at
2  ¶ 10.
3        Plaintiffs challenge, inter alia, the representations made by defendants concerning
4  the impact of this provision of AB 900 on prison overcrowding. To this end, plaintiffs have
5  presented the declaration of an individual with thirty years in corrections planning and research
6  who is a member of the Expert Panel referred to in Dr. Petersilia's declaration. See Declaration
7  of James Austin, Ph.D. in Support of Plaintiffs' Supplemental Reply Brief, filed June 1, 2007. In
8  his declaration, Dr. Austin contends, inter alia, that Dr. Petersilia's estimate is incorrect for a
9  number of reasons and that even if 8,100 parolees do not violate their parole that will only save
10  2,000 beds per year. Austin Declaration, at ¶ 16. Dr. Austin also opines that "under the best of
11  circumstances it would take two to five years to design and begin to operate rehabilitation
12  services." Id.
13        The Roadmap, filed by defendants on July 2, 2007, "provides an assessment of
14  the state of correctional programming in California's adult prison and parole systems" and
15  "includes recommendations intended to guide California in creating a model rehabilitation
16  programming system." Roadmap, at vii. The panel suggests that if all of the recommendations
17  contained in the Roadmap are adopted, "the state may significantly reduce the large number of
18  parolees who are currently violating their parole conditions and being returned to prison." Id. at
19  xiv. The Roadmap also contains recommended "strategies that would reduce the number of
20  prison beds that California needs by 42,000 to 48,000." Id. The Roadmap contains a two year
21  timeline for implementing its major programming recommendations. Id. at 54 and Appendix K.
22  Indeed, "resolving" prison overcrowding is described as a "precondition" to these efforts. Id. at
23  xv.
24        It is clear that the Roadmap represents a preliminary, rather than an advanced,
25  stage of implementation of this aspect of AB 900. See, e.g., Decl. of Joan Petersilia in Support
26  of Defendants' Additional Briefing On Plaintiffs' Motion to Convene Three-Judge Court, at ¶

12. While parts of the Roadmap may be appropriate for consideration by a three-judge court, neither it, nor any of the other material presented by defendants, contain a sufficiently immediate response to the crisis in prison overcrowding that is presently preventing the delivery of constitutionally adequate mental health care to members of the plaintiff class.

Review of the record before this court shows that, through AB 900, the State of California has responded to the prison overcrowding crisis with legislation that requires the construction of thousands of beds to increase the capacity of the prison system, development and staffing of rehabilitation programs to reduce recidivism, and transfer of 8,000 inmates out of state. For the reasons discussed supra, none of these efforts will have any appreciable impact on the severely overcrowded prisons in California for at least two years, if then.

As the Special Master reported on May 31, 2007, "[o]ver the past 11-plus years, much has been achieved, and many of the achievements have succumbed to the inexorably rising tide of population, leaving behind growing frustration and despair." Special Master's May 31, 2007 Response, at 17. Given the almost twelve years that this case has been in its remedial phase, and given the constitutional considerations at stake, the direction in which the State has at present chosen to go by enacting AB 900 simply fails to address in any timely way relief from the overcrowding crisis and its attendant impact.

After careful review of the record in this action, this court has come, with extreme reluctance but firm conviction, to the conclusion that the overcrowding crisis in the CDCR is preventing the delivery of constitutionally adequate mental health care to the plaintiff class and, therefore, that some form of limitation on the inmate population must be considered. For all of the foregoing reasons, plaintiffs' motion will be granted and the court will forthwith request the convening of a three-judge panel pursuant to 18 U.S.C. § 3626(a)(3) and 28 U.S.C. § 2284.

In accordance with the above, IT IS HEREBY ORDERED that plaintiffs' November 13, 2006 motion to convene a three-judge panel to limit the prison population is granted pursuant to 18 U.S.C. § 3626 (a)(3)(A). The Clerk of the Court is directed to serve a

copy of this order on the Chief Judge of the United States Court of Appeals for the Ninth Circuit. Moreover, for purposes of judicial economy and avoiding the risk of inconsistent judgment, the court recommends that the instant case be assigned to the same three-judge panel requested by the court in Plata v. Schwarzenegger, Case No. CIV 01-1351 TEH (N.D. Cal.). The court wishes to again observe that overcrowding is the State's problem and in the interim, the court again urges the State to find its own solution to the crisis.

DATED: July 23, 2007.

/s/ Lawrence K. Karlton
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
## AMENDED CIVIL APPEALS DOCKETING STATEMENT

PLEASE ATTACH ADDITIONAL PAGES IF NECESSARY.

| TITLE IN FULL: | DISTRICT: Eastern | JUDGE: Lawrence K. Karlton |
|---|---|---|
| Ralph Coleman, et. al. | DISTRICT COURT NUMBER: | 2:90-cv-00520 LKK JFM P |
| V. | DATE NOTICE OF APPEAL FILED: August 7, 2007 | IS THIS A CROSS-APPEAL? ☐ YES |
| Arnold Schwarzenegger, et. al. | IF THIS MATTER HAS BEEN BEFORE THIS COURT PREVIOUSLY, PLEASE PROVIDE THE DOCKET NUMBER AND CITATION (IF ANY): | |

**BRIEF DESCRIPTION OF ACTION AND RESULT BELOW:**
Class action suit concerning mental health care to state prison inmates. Judgment entered 1995.

**PRINCIPAL ISSUES PROPOSED TO BE RAISED ON APPEAL:**
Whether the District Court properly granted Plaintiffs' motion to convene a three-judge panel pursuant to 18 U.S.C. Section 3626(a)(3).

**PLEASE IDENTIFY ANY OTHER LEGAL PROCEEDING THAT MAY HAVE A BEARING ON THIS CASE (INCLUDE PENDING DISTRICT COURT POST-JUDGMENT MOTIONS):**
Plata v. Schwarzenegger, U.S.D.C. (N.D. Cal) Case No. C01-1351 TEH
Armstrong v. Schwarznegger, U.S.D.C. (N.D. Cal) Case No. C94 2307 CW

**DOES THIS APPEAL INVOLVE ANY OF THE FOLLOWING:**
☐ Possibility of settlement
☐ Likelihood that intervening precedent will control outcome of appeal
☒ Likelihood of a motion to expedite or to stay the appeal, or other procedural matters (specify)
   Likelihood of motion for emergency stay of district court's order.

☐ Any other information relevant to the inclusion of this case in the Mediation Program

☐ Possibility parties would stipulate to binding award by Appellate Commissioner in lieu of submission to judges.

## LOWER COURT INFORMATION

Page 2 of 2

| JURISDICTION | | DISTRICT COURT DISPOSITION | |
|---|---|---|---|
| FEDERAL | APPELLATE | TYPE OF JUDGMENT / ORDER APPEALED | RELIEF |
| ☒ FEDERAL QUESTION<br><br>☐ DIVERSITY<br><br>☐ OTHER (SPECIFY) | ☐ FINAL DECISION OF DISTRICT COURT<br><br>☐ INTERLOCUTORY DECISION APPEALABLE AS OF RIGHT<br><br>☐ INTERLOCUTORY ORDER CERTIFIED BY DISTRICT JUDGE (SPECIFY):<br><br>☒ OTHER (SPECIFY):<br>Post-Judgment Order | ☐ DEFAULT JUDGMENT<br>☐ DISMISSAL / JURISDICTION<br>☐ DISMISSAL / MERITS<br>☐ SUMMARY JUDGMENT<br>☐ JUDGMENT / COURT DECISION<br>☐ JUDGMENT / JURY VERDICT<br>☐ DECLARATORY JUDGMENT<br>☐ JUDGMENT AS A MATTER OF LAW<br>☒ OTHER (SPECIFY):<br>Order Granting Plaintiffs' Motion to Convene a Three-Judge Court. | ☐ DAMAGES:<br>SOUGHT $_____<br>AWARDED $_____<br>☒ INJUNCTIONS:<br>☐ PRELIMINARY<br>☐ PERMANENT<br>☐ GRANTED<br>☐ DENIED<br><br>☐ ATTORNEY FEES:<br>SOUGHT $_____<br>AWARDED $_____<br>☐ PENDING<br><br>☐ COSTS: $_____ |

## CERTIFICATION OF COUNSEL

I CERTIFY THAT:
1. COPIES OF ORDER / JUDGMENT APPEALED FROM ARE ATTACHED.
2. A CURRENT SERVICE LIST OR REPRESENTATION STATEMENT WITH TELEPHONE AND FAX NUMBERS IS ATTACHED(SEE 9TH CIR. RULE 3-2
3. A COPY OF THIS CIVIL APPEALS DOCKETING STATEMENT WAS SERVED IN COMPLIANCE WITH FRAP 25.
4. I UNDERSTAND THAT FAILURE TO COMPLY WITH THESE FILING REQUIREMENTS MAY RESULT IN SANCTIONS, INCLUDING DISMISSAL OF THIS APPEAL.

_[signature]_  Signature

8-8-07  Date

## COUNSEL WHO COMPLETED THIS FORM

| NAME: | Lisa A. Tillman, Deputy Attorney General |
|---|---|
| FIRM: | Office of the Attorney General |
| ADDRESS: | 1300 I Street, Suite 125<br>Sacramento, CA 95814 |
| E-MAIL: | Lisa.Tillman@doj.ca.gov |
| TELEPHONE: | (916) 327-7872 |
| FAX: | (916) 324-5205 |

\* THIS DOCUMENT SHOULD BE FILED IN THE DISTRICT COURT WITH THE NOTICE OF APPEAL \*
\* IF FILED LATE, IT SHOULD BE FILED DIRECTLY WITH THE U.S. COURT OF APPEALS \*