PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California  94964
Telephone: (415) 457-9144

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
AMY WHELAN Bar No.: 215675
LORI RIFKIN Bar No.: 244081
SARAH M. LAUBACH Bar No.: 240526
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington  98104
Telephone: (206) 447-0900

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN,

     Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.,

     Defendants

)
)
)
)
)
)
)
)
)
)
)

No.:  Civ S 90-0520 LKK-JFM

**PLAINTIFFS' REQUEST FOR RELIEF BASED ON THE EIGHTEENTH MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF ABBREVIATIONS ............................................................................... ii, iii

TABLE OF AUTHORITIES ......................................................................................... iv

I.      INTRODUCTION ....................................................................................... 1

II.     FACTUAL BACKGROUND........................................................................ 1

        A.      Excessive Use Of Force Against MHSDS Inmates At Corcoran................ 1

        B.      March 7, 2005 Order Addressing Use of Force Problems at
                Corcoran ..................................................................................... 4

        C.      Plaintiffs' Objection To Draft Version Of 18th Monitoring Report ........... 6

        D.      18th Report Findings ..................................................................... 8

III.    ARGUMENT................................................................................................ 11

        A.      The Coleman Court Considered Impact Of Force Used Against
                MHSDS Inmates On Their Psychiatric Condition .................................. 11

        B.      Eighteenth Report Supports Plaintiffs' Requested Relief ....................... 12

CONCLUSION ......................................................................................................... 14

PLAINTIFFS' REQUEST FOR RELIEF BASED ON THE EIGHTEENTH MONITORING REPORT OF THE SPECIAL MASTER ON THE
DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS, NO.:  CIV S 90-0520 LKK-JFM

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| ASU | Administrative Segregation Unit. |
| CCCMS or 3CMS | Correctional Clinical Case Management System.  3CMS is the name for the largest mental health program in California Department of Corrections and Rehabilitation, which includes approximately 28,000 inmates with mental health disabilities who live in general population or administrative segregation units alongside non-mentally ill inmates.  3CMS inmates are generally provided with medication management and case manager contacts. |
| CDC | California Department of Corrections. |
| CDCR | California Department of Corrections and Rehabilitation. |
| CSP-Corcoran | California State Prison at Corcoran. |
| EOP | Enhanced Outpatient Program.  EOP programs are sheltered treatment programs for inmates with mental health disabilities who require a higher and more intensive level of mental health care.  There are approximately 4,500 EOP inmates.  The Program Guide mandates that EOP inmates should be provided with at least 10 hours per week of structured therapeutic activities. |
| IDTT | Interdisciplinary Treatment Team.  The IDTT is composed of, at a minimum the assigned primary clinician, the assigned psychiatrist, the correctional counselor, the inmate and other staff who have direct knowledge about the inmate.  In consultation with the IDTT, the case manager develops an individualized treatment team for all inmate-patients. |
| MHCB | Mental Health Crisis Bed.  MHCB units are licensed inpatient units inside many California prisons where inmates who are suicidal or experiencing another kind of mental health crisis can be admitted and treated for up to 10 days. |
| MHSDS | Mental Health Services Delivery System.  The name given by defendants to their entire mental health system.  There are approximately 33,000 inmates in the MHSDS. |
| OC Spray | Oleoresin Capsicum spray (OC Spray) is a serious inflammatory agent derived from Cayenne Pepper that causes swelling of the nasal passages and throat and a burning sensation to the eyes and is commonly knows as "pepper-spray." |
| PSU | Psychiatric Services Unit.  These are high security housing units for EOP patients who have been assigned to a Secured Housing Unit.  EOP patients housed in PSUs are provided with a minimum of 10 hours of structured therapeutic activities that are offered  in treatment cages in the unit.  There are different steps in the PSU program and patients have different property privileges associated with the different step levels. |

1

2

SHU       Secured Housing Unit.  This is a segregated high-security housing unit where inmates can be housed for a specific term or indeterminate periods of time in locked down conditions for either in-prison offenses, gang status, or because of safety concerns.  There are three male SHUs, including Pelican Bay State Prison (where inmates with mental health disabilities are excluded), CSP-Corcoran, and California Correctional Institute.  There is a SHU for women at Valley State Prison for Women.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Coleman v. Wilson*,
   912 F.Supp.1282 (E.D.Cal. 1995) .......................................................................11

*Hallet v. Morgan*,
   296 F.3d 732 (9th Cir. 2002) ........................................................................11, 12

## <u>OTHER AUTHORITIES</u>

*Eighth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols* [Docket 1317] ...............................2

*Ninth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols* [Docket 1373] ...............................2

*Tenth Monitoring Report of the Special Master on Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols* [Docket 1446] .......................................2

*Twelfth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols* ("12th Report") [Docket 1553].........2

*Thirteenth Monitoring Report of the Special Master on Defendants' Compliance with the Defendants' Provisionally Approved Plans, Policies and Protocols* ("13th Report") [Docket 1587] ....................................................................................................3

*Fourteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols* ("14th Report") [Docket 1649] ..............................................................................................3, 4, 13

*Fifteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols* ("15th Report") [Docket 1746]...4, 14

*Sixteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols* ("16th Report") [Docket 2081].........4

*Eighteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols* ("18th Report") [Docket 2334] ............................................................................................ *passim*

Draft of the Eighteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols ("Draft 18th Report") ...............................................................................................6, 7, 9

## I.    INTRODUCTION

Plaintiffs bring this Request For Relief Based on the Eighteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols ("18th Report") [Docket 2334] in order to engage this Court's assistance and oversight powers in a critical area where Defendants' failure to adequately implement previous Orders by this Court has resulted in the disproportionate and inappropriate Use of Force against inmates with mental health disabilities at CSP-Corcoran.

Defendants have been provided with a reasonable opportunity to address the serious Use of Force problems repeatedly identified by the Special Master over multiple rounds of monitoring but have failed to adequately do so.  In the overcrowded and understaffed environment at CSP-Corcoran, where correctional officers have not been adequately prepared to make the complex type of decisions that must be made related to Use of Force within a prison environment, the officers continue to resort to inappropriate Use of Force against inmates with mental health disabilities at disproportionate rates.   Provided with little, if any, specialized mental health training to increase their confidence in how to de-escalate the situation, to consult with their supervisors, or expand the involvement of clinical professionals, correctional officers at CSP-Corcoran will continue to respond inappropriately to inmates with mental health disabilities, as documented by the Special Master during many years of court monitoring.

Plaintiffs seek reasonable Orders requiring that Defendants work with the Special Master, his experts, Plaintiffs' counsel and their expert to address this serious, on-going mistreatment of inmates with mental health disabilities.

## II.    FACTUAL BACKGROUND

### A.    Excessive Use Of Force Against MHSDS Inmates At Corcoran

Disproportionate and excessive Use of Force against inmates with mental health disabilities at CSP-Corcoran has been long identified by the Special Master as a problem at CSP-Corcoran.  The Special Master first identified the Use of Force against inmates with mental health disabilities as a concern in early 2001 during the eighth round of monitoring.

*Eighth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols* [Docket 1317] at 84 ("The monitor reviewed incident reports involving seriously mentally disordered inmates and found that most of the reported incidents described repeated and long bursts [of pepper-spray] (up to five or ten seconds each, instead of the one to two second bursts called for in confined spaces in CDC policy), with burst totals reaching over half a minute in some cases and requiring the exhaustion of multiple canisters").  In late 2001, the Special Master found that the excessive use of pepper-spray in incidents involving mental health inmates continued with more than half of the reports involving multiple applications of pepper-spray, "each ranging from seven to 47 seconds in duration."  *Ninth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols* [Docket 1373] at 72.  In May 2002, the Special Master reported that the excessive use of pepper-spray in situations involving inmates with mental health disabilities continued.  *Tenth Monitoring Report of the Special Master on Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols* [Docket 1446] at 91.

In 2003, the Special Master reported more extensively on the improper Use of Force against inmates with mental health disabilities.  *Twelfth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols* ("12th Report") [Docket 1553] at 91-92; 258-259.  The 12th Report documented inappropriate and excessive use of pepper-spray against inmates with mental health disabilities:  "OC spray [Oleoresin Capsicum (OC) spray is a serious inflammatory agent derived from Cayenne Pepper that causes swelling of the nasal passages and throat and a burning sensation to the eyes and is commonly known as "pepper-spray"] was used to stop apparent suicide attempts, compel compliance with ordered blood tests and force inmates to relinquish food trays.  In some incidents, particularly when inmates were held in small holding cells or locked in the shower, excessive amounts of OC spray appeared to have been applied.  In other cases, OC spray was used on an inmate already forced to a prone position on the floor."  *Id* at 92.   The Special Master noted that: "In each of the last four compliance reports,

the monitor has documented and reported critically on pre-planned extractions and the use of OC spray against seriously mentally disordered inmates in CSP/Corcoran." *Id* at 258. Although the Special Master made no recommendation at that time for specific Court oversight, he concluded that he would "recommend the imposition of sanctions to the court if these practices are not improved." *Id* at 259.

In late 2003, CSP-Corcoran failed to provide incident reports during the thirteenth round of monitoring because institutional processing and review of the Use of Force incidents were incomplete during that period. *Thirteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols* ("13th Report") [Docket 1587] at 97. However, the 13th Report detailed a new problem that emerged during the monitoring period which required special attention by the Warden: after interviewing EOP inmates who reported that they and others were sometimes denied food, medication and supplies, "[a] review of the 114 log (administrative segregation log of activities) in the EOP administrative segregation unit confirmed that inmates were sometimes denied food and medications based upon behavior related to their mental illnesses." *Id*. The Special Master also reported that custody staff obstructed programs through their hostility to inmates with mental health disabilities and to the mental health clinicians. *Id*. at 261. The Special Master reported that the level of fear and intimidation expressed by the mental health clinicians at CSP-Corcoran had been rarely encountered before by the monitoring teams. *Id*.

In 2004, the Special Master again found significant problems with the Use of Force against inmates with mental health disabilities. *Fourteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols* ("14th Report") [Docket 1649] at 41-42. First, although inmates on the mental health caseload comprised only 25 percent of the inmate population at CSP-Corcoran, they were involved in over half of the total incidents involving use of force. *Id*. Second, the Special Master evaluated the type of incidents, and found that "incidents resulting from non-contact offenses resulted in the use of force against MHSDS caseload almost three times more often than against non-caseload inmates." *Id*. Third, a serious backlog in the reviews of the use of

force incidents existed indicating a lack of accountability.  *Id*.  And finally, the vast majority of the incidents involving use of force were "deemed to be emergencies by the custody personnel initiating the application of force, thereby superseding the rules for the calculated use of force, which embrace the bulk of procedures designed to protect MHSDS inmates from abuse when force is utilized."  *Id*.  Based upon these findings, the Special Master recommended that this Court issue specific orders to address the unabated Use of Force problems at CSP-Corcoran.  This Court's March 7, 2005 Order [Docket 1654] adopted the 14th Report recommendations and is discussed below in section B.

Despite the March 7, 2005 Order and continued monitoring, Use of Force problems at CSP-Corcoran continue to be documented in subsequent monitoring reports.  In 2005, the Special Master reported on CSP-Corcoran's own self-study of Use of Force which concluded that "86 percent of incidents involving the use of force against seriously mentally disordered inmates occurred on an emergency basis, precluding any opportunity for the intervention of mental health clinicians to calm agitated caseload inmates before force was applied."  *Fifteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols* ("15[th] Report") [Docket 1746] at 142-145.  In late 2005, the Special Master continued to document that inmates with mental health disabilities were involved in disproportionate Use of Force incidents.  In the locked housing units where mental health inmates were roughly 32 percent of the population, they were involved in 61 percent of the incidents.  *Sixteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols* ("16[th] Report") [Docket 2081] at 151-152.

**B.    March 7, 2005 Order Addressing Use of Force Problems at Corcoran**

On March 7, 2005 this Court adopted the Special Master's 14th Report recommendations regarding the Use of Force problems at CSP-Corcoran.  This is the only order concerning Corcoran Use of Force that has been issued and it has been ineffective.  It provides as follows:

1    1.    Within sixty days from the date of this order, defendants shall contract for the promised "cultural assessment" of California State Prison/Corcoran (CSP/Corcoran).
2    This study shall be completed within ninety days after it is initiated.

3    2.    Defendants shall forthwith complete and file with the special master its final fact-finding report on allegations of staff misconduct at CSP/Corcoran and a final version of
4    said institution's Use of Force Handbook.

5    3.    Within thirty days from the end of each month, defendants shall provide to the special master a copy of incident reports at CSP/Corcoran involving the use of force
6    against Mental Health Delivery System (MHSDS) caseload inmates, as well as a copy of said institution's Institution Head Use of Force Review Form with a notation on the
7    disposition for each incident reviewed during the preceding month.
    March 7, 2005 Order ¶¶ 5-7. [Docket 1654].
8

9    Defendants contracted for An Assessment of the Institutional Culture of the California

10   State Prison at Corcoran, which was completed and provided to Special Master Keating and

11   Plaintiffs' counsel on October 17, 2005.  Declaration of Jane E. Kahn in Support of Plaintiffs'

12   Request for Relief Based on the Eighteenth Monitoring Report of the Special Master on

13   Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols ("Kahn

14   Dec.") ¶ 2, **Exhibit A** (Assessment of the Institutional Culture of the California State Prison at

15   Corcoran, Criminal Justice Institute, August 4, 2005).

16   Defendants also provided the final fact-finding report on allegations of staff misconduct

17   at CSP/Corcoran and the CSP/Corcoran Use of Force Handbook to Special Master Keating and

18   Plaintiffs' counsel, which Plaintiffs' counsel reviewed and critiqued.  Kahn Dec ¶ 3, **Exhibit**

19   **B**.  (June 1, 2005 Kahn Letter to Special Master Keating, DAG Tillman and Staff Counsel Van

20   de Erve).

21   The Assessment of the Institutional Culture of CSP-Corcoran conducted by the

22   Criminal Justice Institute included observations which help explain the difficulty in resolving

23   the Use of Force problems at CSP-Corcoran.  The assessors found that the competing values of

24   "control and security" and "treatment and rehabilitation" that shape the culture at a prison were

25   "significantly more polarized at Corcoran than in other prisons."  Kahn Dec., **Exhibit A** at 40.

26   At Corcoran, the assessors found that this polarization increased conflict among the various

27   staff members who held the competing values (typically custody versus medical, mental health,

28   teaching staff).  *Id.*  The impact on staff and their interaction with inmates was significant:

"[w]hen staff do interact with inmates, the culture of the institution makes them feel as if they are doing something wrong – almost as if by having a conversation with an inmate means that s/he is 'siding' with an inmate rather than his/her fellow staff members." Id. at 41. The assessors concluded that the value conflicts were not insurmountable, however, because Corcoran staff wanted to improve the prison environment. *Id*. The prison's capacity for change was predicated on a number of critical factors: (1) the time and energy that staff can devote to the culture change work at Corcoran while addressing their current work demands; (2) the ability to overcome the communications and physical plant limitations; (3) the ability to improve the relationship between Central Office and Corcoran; and (4) the need for continuity of leadership. *Id*. at 63-65. The assessment team noted that "[o]ne of the most critical pieces in determining a prison's capacity for change is the degree to which its prison's leaders will be in place to both plan and implement the culture change process." *Id.* at 64. Staff had reported to the assessment team that there had been thirteen wardens in the eighteen years since the prison had opened and that the constant turnover of wardens had resulted in a leadership vacuum. *Id.* at 26. The assessment team concluded that it was essential that Central Office, the Warden, and ideally the Chief Deputy Wardens make a commitment that they will remain in place for at least two years and preferably three years, in order for "**a successful change effort.**" *Id.* at 64 (emphasis added). However, Warden Scribner, who participated in the Cultural Change Assessment process, was replaced less than a year after the completion of the Assessment. Kahn Dec. ¶ 6. Now, more than a year and a half later, the Assessment Study and Plan is described by the Special Master as: "**foundered, devolving from a focus on organizational issues to discussions about the content and location of vending machines.**" 18th Report at 107 [Docket 2334] (emphasis added).

## C.    Plaintiffs' Objection To Draft Version Of 18th Monitoring Report

Although the draft version of the Eighteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols ("Draft 18th Report") documented disproportionate Use of Force against inmates with mental health disabilities at CSP-Corcoran (inmates with mental health disabilities were only 21

percent of the prison population, but were involved in 47 percent of total incidents), the Draft Report made no recommendation regarding Use of Force at CSP-Corcoran.  Draft 18th Report at 117, 336-339.

On July 18, 2007, Plaintiffs submitted to the Special Master comments on the Draft 18th Report.  Kahn Dec. ¶ 4 , **Exhibit C**, (Plaintiffs' July 18, 2007 Comments on Draft 18th Report, attached Declaration of Walter L. Kautzky).  Plaintiffs' expert, Walter L. Kautzky, reviewed the Draft 18th Report, earlier monitoring reports by the Special Master, Use of Force and Incident Reports provided to Plaintiffs by Defendants on May 18, 2007 , the "Cultural Assessment of CSP-Corcoran", the "Use of Force Handbook", and "Use of Force Review" and other relevant documents. **Exhibit C**,  Kautzky Dec. at ¶ 8.  Mr. Kautzky has worked in criminal justice and corrections for nearly forty (40) years with experience in all aspects of correctional operations and administration, including responding to the unique requirements of training correctional staff to respond to inmates with mental health disabilities.  **Exhibit C, Kautzky Dec. at ¶ 2.**  Mr. Kautzky has been Director and Deputy Director of several state correctional systems and has worked extensively on Use of Force issues in those systems. *Id.* at ¶¶ 4, 5.  As Director of Corrections for Iowa, Colorado, North Carolina and Hawaii, Mr. Kautzky examined many of the Use of Force reports involving inmates with mental health disabilities, especially within segregated housing units, to determine the type of specialized training and mental health services that were needed to address the deficits that he or the Federal Court found. *Id.* at ¶ 6.  Mr. Kautzky has specific knowledge about the specialized mental health training provided to correctional officers working with mental health disabilities within the Ohio Department of Rehabilitation and Corrections based upon his consultation with the Ohio Department in March 2006 and his direct observation of correctional officers working with inmates with mental health disabilities at several Ohio institutions. *Id.* at ¶ 10.  Based on Mr. Kautzky's expertise, experience, analysis and opinion, Plaintiffs requested the following remedial measures:

1.     Defendants shall be directed to work with the Special Master, his experts, Plaintiffs' counsel and Plaintiffs' expert to:

a)     Create a Use of Force Policy Handbook that includes specific guidelines related to inmates with mental health disabilities, including but not limited to court-ordered psychiatric medications, suicide attempts, pepper-spraying MHSDS inmates in-cell, the role of the IDTT with emergency use of force;

b)     Revise all Post Orders for correctional officers assigned to EOP units, 3CMS units, MHCB, SHU and ASUs to include specific references to the Use of Force Policy;

c)     Provide specialized mental health training, including de-escalation techniques, to all correctional officers and clinicians working in EOP units, 3CMS units, MHCBs, SHU and ASUs;

d)     Ensure that the Use of Force Incident Report review process is retained and conducted in a timely manner;

e)     Require that the interdisciplinary team review and make recommendations for all EOP, 3CMS and MHCB inmates regarding appropriate custodial responses to their behavior.  The goal of this process is to provide necessary information to the correctional officers working in the housing units where inmates with mental health disabilities are located to reduce the overall use of force against MHSDS inmates, as well as reduce the incidence of emergency force against MHSDS inmates.

**D.     18th Report Findings**

The Special Master filed the 18th Report on July 30, 2007 and denied Plaintiffs' requested remedial measures finding that:

"data gathered during the Eighteenth Monitoring Period does not necessarily signal a  systemic failure of the existing policy to avoid unjustified use of force at CSP/Corcoran.  The more plausible explanation for the higher rate of incidents and use of force in incidents involving mental health inmates may well be a failure of implementation of the policy rather than a flaw in the policy itself."
18th Report at 338 [Docket 2234].

Although the Special Master acknowledged that there has been an increase in incidents at CSP-Corcoran by 60 percent, he noted that the percent of incidents where force was utilized had declined.  *Id* at 335.

The Special Master found that the "relatively high number of total incidents and the involvement of mental health inmates at CSP/Corcoran are not entirely surprising, given certain characteristics of this particular institution and its population."  18th  Report at 335 [Docket 2234].  CSP/Corcoran is described in the 18th Report as the "only CDCR institution

1   which has a sizeable mental health caseload population in its secured housing units." *Id*. at

2   336. However, according to the CDCR's own data, on June 8, 2007, 34% (482 of 1400) of

3   CSP-Corcoran secured housing unit ("SHU") was on the mental health caseload, compared to

4   60% (165 of 274) of the California Correctional Institution SHU on the mental health

5   caseload. Kahn Dec. at ¶ 5, **Exhibit D** (June 8, 2007 Health Care Placement Unit Data re

6   Mental Health AdSeg/SHU/PSU). In both of these high security institutions, a significant

7   percentage of their SHU population includes mental health inmates. CSP-Corcoran, however,

8   has its own unique history of documented disproportionate and inappropriate Use of Force

9   against inmates with mental health disabilities that cannot be explained or excused merely by

10  the significant number of mental health inmates within its locked units. Contrary to the

11  suggestion by the Special Master, Plaintiffs do not assume that the higher rate of incidents at

12  CSP-Corcoran or the disproportionate Use of Force against MHSDS inmates is necessarily the

13  result of "misfeasance or malfeasance" on the part of custody officers. 18th Report at 336.

14  Rather, Plaintiffs have identified in their Comments on the Draft 18th Report and the Kautzky

15  Declaration the need for additional training, supervision, and guidance required at CSP-

16  Corcoran to ensure that correctional officers and mental health staff have the knowledge and

17  tools for working with the large MHSDS population located in the harsh and overcrowded

18  conditions of CSP-Corcoran, especially within its locked housing units.

19      The 18th Report refers to a four percent difference between rates of Use of Force in

20  incidents involving mental health inmates versus those inmates not on the mental health

21  caseload. 18th Report at 337 [Docket 2234]. This four percent difference is calculated based

22  on the total incidents where force was used (90) and comparing the number of incidents

23  involving inmates with mental health disabilities (47/90 or 52%) with those inmates not on the

24  mental health caseload (43/90 or 48%). *Id*. at 117. With this comparison, MHSDS inmates

25  comprise 4 percent more of the force incidents. However, a more appropriate comparison

26  involves the analysis of the total incident reports for MHSDS inmates (97) and those MHSDS

27  incidents where force was used (47/97 or 48%) compared to total incident reports for non-

28  MHSDS (111) and those non-MHSDS incidents where force was used (43/111 or 39%). *Id*.

With this comparison, the data reveals that MHSDS inmates experience force 48% of the time when involved in an incident as compared to non-MHSDS inmates who experience force 39% of the time. Thus, not only is an MHSDS inmate more likely to be involved in an incident – the 18th Report documents that MHSDS are only 21% of the prison population, but comprise 47% of the total incidents - but, once an MHSDS inmate is involved in an incident, he is far more likely to experience force than non-caseload inmates. *Id.* Non-MHSDS inmates were only involved in 53% (111/208) of the total incidents, although they are approximately 79% of the prison population. Once a non-MHSDS inmate becomes involved in an incident, he is significantly less likely to experience force. *Id.*



| Likelihood of Use of Force During Incidents[1] | | | | |
|---|---|---|---|---|
| | MHSDS | | Non-MHSDS | |
| | Total | Percentage | Total | Percentage |
| Population | 1150 | 21.4% | 4212 | 78.6% |
| # of Incidents | 97 | 46.6% | 111 | 53.4% |
| Force Used | 47 | 48.5% | 43 | 38.7% |
| No Force Used | 50 | 51.5% | 68 | 61.3% |



Use of Force - MHSDS v. Non-MHSDS

----

[1] The data used in these charts was provided in the 18th Report at 106, 117 [Docket 2334].

## III.    ARGUMENT

**A.    The Coleman Court Considered Impact Of Force Used Against MHSDS Inmates On Their Psychiatric Condition**

This Court found that inmates with mental health disabilities were "treated with punitive measures by the custody staff to control the inmates' behavior without regard to the cause of behavior, efficacy of such measures, or impact of those measures on the inmates' mental illnesses." *Coleman v. Wilson*, 912 F.Supp.1282, 1320 (E.D.Cal. 1995).   In evaluating whether Defendants' policies and practices governing the use of force against inmates with mental health disabilities violated constitutional standards, this Court noted "there is nothing of record suggesting a penological justification for the distinction between inflicting physical as contrasted with mental injury.  Thus, there is no dispute that these weapons are used on inmates with serious mental disorders without regard to the impact of those weapons on their psychiatric condition and without penological justification." *Id* at 1323.  This Court's findings on Use of Force against inmates with mental health disabilities recognized the detrimental effect of such force on the inmate's mental health.  *Id.*

Less lethal forms of force have been monitored and limited when used against inmates with mental health disabilities.  *Hallet v. Morgan,* 296 F.3d 732, 747 (9th Cir. 2002).  The limited use of pepper spray against inmates with mental health disabilities was approved by the Ninth Circuit when used sparingly and for limited purposes.  *Id.*  The *Hallet* Court also reviewed the prison's Use of Force policies and found them constitutional:  Defendants had authorized the use of pepper spray approximately 20 times, yet it had actually been used only once;  staff were properly trained in the use of pepper spray;  staff could not employ it without first being personally subjected to it; and **the use of pepper spray was carefully considered in advance of authorization, restricted and confined for limited purposes, and used only very sparingly**.  The Court found that "[a]lthough professionals disagree with respect to the appropriateness of using pepper spray for managing the behavior of mentally ill inmates, [the Prison's] approach to its use does not seem to be unreasonable."  *Id.*

The review of Use of Force at CSP-Corcoran, including the "emergency" use of pepper-spray against MHSDS inmates when they are locked in their cells and during suicide attempts, supports Plaintiffs' request for remedial measures that will provide correctional officers and mental health staff at CSP-Corcoran with the requisite training to appropriate respond to inmates with mental health disabilities. **Exhibit C**, Kautzky Dec. ¶¶ 13, 17, 25, 27. Corcoran's policies and practices do not meet the *Hallet* standard.

## B. Eighteenth Report Supports Plaintiffs' Requested Relief

The 18th Report found that inmates with mental health disabilities comprise only 21 percent of the prison population, but were involved in 47 percent of the total incidents. 18th Report at 106, 116-117 [Docket 2334]. Even more concerning is the 18th Report finding that an MHSDS inmate is more likely to experience force during an incident with an officer than an inmate not on the mental health caseload (48 percent versus 39 percent). *Id*. at 117. The 18th Report made no findings on the percent of MHSDS incidents that involved emergency Use of Force.

On May 18, 2007, Defendants provided the Special Master and Plaintiffs' counsel with forty-six (46) Use of Force Incident reports which were reviewed by Plaintiffs' expert, Mr. Kautzky. These Incident Reports covered a timeframe from August 2006 through February 2007.[2]

Plaintiffs asked their expert, Walter Kautzky, to review the 46 Incident Reports and to consider whether the actions of the correctional officers were an appropriate response to the inmates with mental health disabilities based upon his considerable experience with other correctional systems. **Exhibit C**, Kautzky Dec. at ¶ 8. The May 18, 2007 Incident Reports provide texture to the statistics reported in the 18th Report [Docket 2234].

Although the 18th Report did not make any findings on the percent of Incident Reports that involved emergency Use of Force, the vast majority (87 %) of the May 18, 2007 Incident

---

[2] The 18th round monitoring period at CSP-Corcoran covered August through December 2006.

Reports involved emergency force against inmates with mental health disabilities.  **Exhibit C**, Kautzky Dec. at ¶ 20.  The initial decision made by correctional officers when deciding whether to use force is whether the circumstances warrant an emergency Use of Force.  *Id.* at ¶ 18.  Emergency force is appropriate when the behavior of the inmate constitutes an immediate and serious threat to the safety of staff, visitors, other inmates or institutional security.  *Id.*  If the "immediate, serious threat to safety" does not exist, then the application of force must comply with the requirement for "calculated use of force."  *Id.*   In those circumstances, a supervisor must first approve the Use of Force; a cooling off period must be provided to the inmate; a mental health consultation must be provided with the goal of de-escalating the confrontation; the tactical team must be briefed; and the incident must be video-taped including the mental health consultation.  *Id.*  CDCR emergency Use of Force does not require any review or pre-approval by a supervisor, any possible intervention by clinical staff or any cooling off period by the inmate and should only be used in those circumstances that truly meet the definition.  *Id.*

In the May 18, 2007 package of Incidents, more than 25 percent (12 of 40) of the emergency Use of Force incidents occurred when inmates with mental health disabilities were in their cells.  **Exhibit C**, Kautzky Dec. at ¶ 13.  Among these were incidents where mental health inmates, including EOPs, were kicking or hitting their cell doors or windows.  *Id.*  The officers responded by pepper-spraying the inmates.  *Id.*  Senior staff who reviewed the incidents in the critique process did not question compliance with the basic policy requirement for emergency force.  *Id.*   In those particular circumstances, there was no immediate threat, officers had the "gift of time" and should have walked away or requested a mental health professional to assist in de-escalating the incident.  *Id.*  Instead, it appeared at times that correctional officers – who did not walk away from the situation when the inmates appeared agitated – escalated the situation or responded by using pepper-spray as "punishment."  *Id.*

The Special Master has repeatedly raised concerns regarding the percentage of emergency Use of Force incidents at CSP-Corcoran.  *See, e.g.* 14th Report at 41 ("Information provided subsequently indicated that the overwhelming majority of incidents involving the use

of force in CSP/Corcoran were deemed emergencies by the custody personnel initiating the application of force, thereby superseding the rules for calculated use of force, which embrace the bulk of procedures designed to protect MHSDS inmates from abuse when force is utilized.");  15th Report at 143-144  ("86 percent of incidents involving the use of force against seriously mentally disordered inmates occurred on an emergency basis, precluding any opportunity for the intervention of mental health clinicians to calm agitated caseload inmates before force was applied").

The Incident Reports revealed other problems at CSP-Corcoran including inappropriate use of batons during calculated Use of Force incidents to provide court-ordered psychiatric medications, lack of accountability on custody line staff and its supervisory staff,  inadequately documented clinical intervention for calculated Use of Force, failure to involve the interdisciplinary treatment team in identifying appropriate disciplinary measures, and lack of specialized mental health training for correctional officers to assist them in the use of de-escalation techniques.  **Exhibit C**, Kautzky Dec. at ¶¶ 10, 14, 16, 22, 23, 25, 26 and 27.

The May 18, 2007 Use of Force Incident Reports confirm that custody personnel over-utilize emergency force against inmates with mental health disabilities which prevents the very safeguards developed to protect these inmates from abuse when force must be used. Furthermore, these Incident Reports raise serious concerns about the quality of the Use of Force training provided at all levels, the commitment to procedure and general accountability in the various yards.  **Exhibit C**, Kautzky Dec. at ¶ 27.

## CONCLUSION

Despite focused attention on Use of Force at CSP-Corcoran by both the Special Master and this Court, disproportionate and inappropriate Use of Force against inmates with mental health disabilities remains a serious problem.  Mentally ill inmates at the prison remain more likely to become involved in an incident with a correctional officer and, during that incident, are more likely to experience force (physical, batons and pepper-spray).  The May 18, 2007 Incident Reports confirm that the type of force experienced by mentally ill inmates is

predominately "emergency" Use Of Force, oftentimes in situations where officers have the "gift of time" and could request the intervention of a mental health professional or could attempt to de-escalate the situation if properly trained.

Further monitoring and reporting will not solve this persistent problem. Many years have passed with no significant improvement by any measure. For the reasons stated above and contained in the Declaration of Walter L. Kautzky, Plaintiffs respectfully request that the Court enter the following remedial orders designed to speed Defendants' compliance where there has been repeated failure to comply:

1.    Defendants shall be directed to work with the Special Master, his experts, Plaintiffs' counsel and Plaintiffs' expert to:

a)    Create a Use of Force Policy Handbook that includes specific guidelines related to inmates with mental health disabilities, including but not limited to court-ordered psychiatric medications, suicide attempts, use of pepper-spray against MHSDS inmates in-cell, and the role of the IDTT with emergency use of force;

b)    Revise all Post Orders for correctional officers assigned to EOP units, 3CMS units, MHCB, SHU and ASUs to include specific references to the Use of Force Policy;

c)    Provide specialized mental health training, including de-escalation techniques, to all correctional officers and clinicians working in EOP units, 3CMS units, MHCBs, SHU and ASU units;

d)    Ensure that the Use of Force Incident Report review process is retained and conducted in a timely manner;

e)    Require that the interdisciplinary team review and make recommendations for all EOP, 3CMS or MHCB inmates regarding appropriate custodial responses to their behaviors. The goal of this process shall be to provide necessary information to the correctional officers working in the housing units where inmates with mental health disabilities are located to reduce the overall Use of Force against MHSDS inmates as well as to reduce the incidence of emergency force against MHSDS inmates;

f)      Defendants shall provide a status report to the Court within sixty (60) days of this Order on their compliance with the requirements of this Order.

Dated: *August 9, 2007*                Respectfully submitted,

*Jane E. Kahn*

Jane E. Kahn
Rosen, Bien & Galvan
Attorneys for Plaintiffs

PLAINTIFFS' REQUEST FOR RELIEF BASED ON THE EIGHTEENTH MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS, NO.: CIV S 90-0520 LKK-JFM