# EXHIBIT A

Case 2:90-cv-00520-KJM-SCR     Document 2358-1     Filed 08/09/07     Page 2 of 57

**DIVISION OF ADULT INSTITUTIONS**
P.O. Box 942883
Sacramento, CA 94283-0001



OCT 1 7 2005

J. Michael Keating, Jr.                  Via:    Lisa Tillman
Office of the Special Master                     Deputy Attorney General
285 Terrace Avenue                               Department of Justice
Riverside, RI 02915                              1300 I Street, Suite 125
                                                 P.O. Box 944255
                                                 Sacramento, CA 94244-2550

**RE: CORCORAN CULTURE ASSESSMENT**

Dear Mr. Keating:

Enclosed is the final report of the Culture Assessment conducted at the California State Prison at Corcoran, by the Criminal Justice Institute, Inc.

If you have any questions or are in need of clarification, please contact Timothy Shively, Correctional Counselor II, Division of Adult Institutions, at (916) 322-7957.

Sincerely,

JOHN DOVEY
Director
Division of Adult Institutions

Enclosure

cc:  Mike Knowles
     Kathleen Keeshen
     Doug McKeever
     Michael Stone

# C<sup>J</sup>I

# An Assessment of the Institutional Culture of the California State Prison at Corcoran

Submitted by:

Criminal Justice Institute, Inc.
Middletown, Connecticut
(860) 704 - 6400

August 4, 2005

# Table of Contents

A. Introduction ....................................................................................................... 1
    1. Overview ...................................................................................................... 1
    2. Process ........................................................................................................ 1
    3. Desired Outcomes ...................................................................................... 2

B. Understanding Organizational Culture ........................................................... 3
    1. Definition of Organizational Culture .......................................................... 3
    2. Formal Culture ............................................................................................ 3
    3. Informal Culture .......................................................................................... 3
    4. Formal and Informal Cultures .................................................................... 3
        Figure 1 - Formal and Informal Dimensions of Organizational Culture ...... 4
    5. A Framework for Assessing and Understanding Prison Cultures ............... 5
        Gathering Information ................................................................................... 5
        Organizing Findings and Presenting Results .............................................. 6
        Composite Picture of the Culture ................................................................ 6
        Figure 2 - The Competing Values Framework ............................................ 7
        Culture Types ............................................................................................. 7

C. Preparations ..................................................................................................... 9
    1. Agreements ................................................................................................. 9
    2. Arrangements ............................................................................................. 9
        Conference Call ........................................................................................... 9
        CCPOA Meeting .......................................................................................... 9
        Initial Corcoran Meeting ............................................................................. 10
    3. Gaining an Advanced Understanding of Corcoran ................................... 10
        Overview .................................................................................................... 11
        Physical Layout ......................................................................................... 11
        Figure 3 - Diagram of Corcoran ............................................................... 12

Staffing ............................................................................................................ 13

Figure 4 - Corcoran Organizational Chart ...................................................... 14

Staff Turnover ................................................................................................. 15

Staff Demographics ......................................................................................... 15

Table 1 - Ethnicity of Corcoran Custody Staff and Residents of
Kings County, California ................................................................................. 15

Inmates ........................................................................................................... 15

Table 2 - Ethnicity of Corcoran Custody Staff and Inmates ........................... 16

4.  Modifications to the Assessment Protocol ..................................................... 16

Larger Veteran Assessment Team .................................................................. 18

Longer Site Visit .............................................................................................. 18

Additional Inmate Discussion Groups ............................................................. 18

Number of Staff Focus Groups Increased ...................................................... 18

Health Care Focus Group Added .................................................................... 18

5.  Creating Focus Groups and Selecting Participants ....................................... 19

Table 3 - Corcoran Staff Focus Groups ......................................................... 19


D.  Corcoran's Culture ............................................................................................... 20

1.  Corcoran's Culture: An Overview ................................................................... 20

Yesterday and Today ...................................................................................... 20

Today and Tomorrow ...................................................................................... 21

2.  Six Major Components of Corcoran's Culture ................................................ 22

A.  Dominant Characteristic of Corcoran's Culture ...................................... 22

Dominant Similarities and Differences within the Prison ......................... 23

Table 4 - Dominant Characteristics of Corcoran's Current Culture ......... 24

Figure 5 - Current Dominant Characteristic Profile
for Health Care Staff ................................................................................ 25

B.  Organizational Leadership ...................................................................... 25

Table 5 - Organizational Leadership Dimension Strength
of Corcoran's Current Culture .................................................................. 27

Figure 6 - Current and Preferred All Staff Profiles
for Organizational Leadership .................................................................. 28

C.  Management of Employees ..................................................................... 28

Similarities and Differences in Management of Employees ..................... 29

Table 6 - Similarity of Current Views on Management of
Employees by Prison-wide Groups ................................................................. 29

Table 7 - Differences in Current Views on Management of
Employees Held by Staff on Each Yard ......................................................... 30

D. Organizational Glue - Holding the Prison Together ......................................... 30

Agreement and Disagreement about What Holds
Corcoran Together ........................................................................................ 31

Table 8 - Relative Strength of What Holds Corcoran Together
as Percieved by Ranks and Health Care ........................................................ 32

Figure 7 - Current Profiles for All Staff and Health Care Staff
for Organizational Glue ................................................................................. 32

Figure 8 - Current and Preferred All Staff Profiles
for Organizational Glue ................................................................................. 34

E. Strategic Emphases ........................................................................................ 34

Absence of Prison-wide Strategy Leads to
Creative Approaches Elsewhere ................................................................... 36

Table 9 - Strategic Emphasis at Corcoran as Percieved by
Ranks and Health Care Staff ......................................................................... 36

Figure 9 - Current and Preferred Top Management Profiles
for Strategic Emphasis .................................................................................. 37

F. Criteria of Success .......................................................................................... 37

Predominantly Strong and Universal Desire for Acknowledgement .............. 39

Figure 10 - Preferred and Current Organizational Profiles for
Criteria of Success ....................................................................................... 40

3. Major Competing Values at Corcoran ............................................................... 40

'Custody' versus 'Treatment' ............................................................................ 40

Medical Treatment - Right or Privilege? ............................................................ 42

Praise versus Punishment ................................................................................ 42

Central Office, Corcoran Staff, and Corcoran Inmates ..................................... 43

'Follow the Rules' versus 'Bend the Rules' ....................................................... 44

Culture Mapping - the "Culturegram" ............................................................... 45

Corcoran Culturegram and Key Dynamics ....................................................... 48

Figure 11 - Corcoran Culturegram .................................................................. 48

4. From the Present to the Future ........................................................................ 48

Table 10 - Current and Preferred Culture as Perceived
by All Corcoran Staff ..................................................................................... 49

Figure 12 - Comparison of the Preferred and Current Profiles for Organizational Glue ............................................................................ 50

Figure 13 - Comparison of the Preferred and Current Profiles for Criteria of Success ............................................................................ 50

Figure 14 - Comparison of the Preferred and Current Profiles for Organizational Leadership ................................................................... 51

Figure 15 - Comparison of Corcoran's Current and Preferred Prison Culture ............................................................................ 51

3.  Conclusion ............................................................................ 52


E. Readiness For Change ............................................................................ 53

1.  Commitment to Change ............................................................................ 53

   Table 11 - Preferred Overall Views Held by Staff ............................................. 54

   Table 12 - Preferred Culture Views Held by Security Staff Ranks .......................... 55

   Top Managers and Line Staff ............................................................................ 55

   Table 13 - Managers and Line Staff on the Preferred Culture .............................. 56

   Figure 16 - Managers and Line Staff Preferred Culture ...................................... 57

   Health Care Staff and Correctional Officers .................................................. 58

   Table 15 - Correctional Officers and Health Care Staff Views on the Preferred Culture ............................................................................ 59

   Figure 17 - Correctional Officers and Health Care Staff Preferred Culture .............. 60

   Figure 18 - Correctional Officers and Health Care Staff Preferred Profiles for Dominant Characteristics ............................................... 61

   Figure 19 - Correctional Officers and Health Care Staff Preferred Profiles for Strategic Emphasis ................................................. 61

   Figure 20 - Correctional Officers and Health Care Staff Preferred Profiles for Organizational Glue ................................................. 62

   Summary ............................................................................ 62

2.  Capacity for Change ............................................................................ 63

   Strengths and Concerns ............................................................................ 63

      Workload ............................................................................ 63

      Communications Technology ................................................................ 63

      Physical Capacity ............................................................................ 63

      Central Office ............................................................................ 64

      CCPOA ............................................................................ 64

    Continuity of Leadership ................................................................................ 64

3.  Resource Availability ..................................................................................... 64

4.  Conclusion ..................................................................................................... 65


Appendices ................................................................................................................. 66

1:  The Institutional Culture Assessment Protocol (ICAP) ................................. 66

2:  Assessment Team Members ........................................................................ 67

3:  The Organizational Culture Assessment Instrument - Prisons (OCAI-P) ...... 91

4 (A):  Summary Characteristic Scores - Focus Groups ..................................... 93

4 (B):  Summary Characteristic Scores - Other Groupings of Staff .................. 100

5:  Organizational Culture Types ..................................................................... 107

## A. Introduction

1. Overview

This report provides a summary of an institutional culture assessment conducted at the California State Prison-Corcoran (hereafter referred to as Corcoran), from April 17 through April 26, 2005. The assessment was conducted during a site visit by a seven-person team from the Criminal Justice Institute trained in the use of the *Institutional Culture Assessment Protocol (ICAP)*, a standardized process and instrumentation designed specifically for use in assessing a prison's culture.[1] This report presents the findings, conclusions, and a discussion of the degree to which the prison is ready for change.

Following descriptions of the team's activities, the results of the assessment are summarized and presented in detail. These findings include assessments of the major cultural characteristics of the prison, as well as similarities and differences between various groups of staff and organizational components within the prison. The degree of difference between current sets of staff values, preferred sets of values, as well as between current and preferred sets are also discussed and integrated into the findings derived from observation and dialogue with staff and inmates. Lastly, the institution's readiness for change is discussed, including identification of issues that might hinder or facilitate Corcoran's preparedness to engage in a culture change process.

2. Process

Since the assessment process differs from other types of reviews normally conducted in prisons and jails (e.g., security audits, accreditation reviews) the findings are also quite different. The assessment team collects qualitative and quantitative data and formulates a consensus description of the unique characteristics of the prison's culture by processing comments from staff and inmates, observations of interactions among them, and data provided by the institution and collected during structured discussions with small groups of staff and inmates. The result is a composite 'picture' of the current culture and of a preferred culture at Corcoran — as conveyed by staff and inmates as to how they would like Corcoran's culture to be.

Rather than concluding with a list of specific recommendations or areas that need to be 'fixed,' the assessment is designed to inform staff regarding the perceptions staff hold about the quality of work-life, what staff value, and what they believe contributes to both negative and positive aspects of the prison's culture. At the conclusion of the site visit preliminary findings were presented and discussed at a "close-out" meeting that was attended by approximately 40 individuals including the warden, members of his staff, representatives from the central and regional office, Coleman court monitors, along with the culture assessment team.

---

[1] The ICAP is under development by the Criminal Justice Institute, Inc. through a cooperative agreement with the National Institute of Corrections. See Appendix 1 for a description of the protocol.

other specific individuals or groups of staff. Figure 1 outlines some of the formal and informal dimensions of a prison's culture.

Figure 1

Formal and Informal Dimensions of Organizational Culture

## Dimensions of Organizational Culture

| Formal | Informal |
|---|---|
| • Mission statement | • How things really get done (unspoken rules) |
| • Goals & Objectives | • Subgroups, cliques |
| • Policy & Procedures | • Enacted values |
| • Espoused values | • Attitudes, behavior |
| • Signs, symbols, rituals, ceremonies | • Stories told by staff; legends, myths |
| • Reward system | • Power dynamics; politics |
| • Chain of command | |

Assessing the informal aspects of the prison's culture alerts us to the fact that within rationally designed organizations there may exist a variety of unplanned, organically developed and shared designs for coping; and that subsequent adaptive behaviors may facilitate or impede the attainment of the organization's goals. In prisons, it would seem that the capacity for sub-cultural development is perhaps greater than in other organizations of comparable size and complexity.

Ideally, a prison operates primarily within the formal aspects of its culture, while the informal aspects develop naturally in an organic process reflecting its unique history, individual personalities and specific challenges it faces. It is the informal culture that is frequently of most interest in the assessment process, as it defines the true, inner workings of the prison, and is generally where the root causes of presenting problems lie. Similarly, where staff typically desire change is, in reducing the negative aspects of the informal culture (e.g., favoritism, poor boundaries, lack of staff recognition) in favor of consistency and fairness – attributes associated more frequently with formal aspects of the prison's culture.

Thus, successful correctional leaders must frame the missions of their prisons not only in terms that legitimate it to external constituencies but that also secure the allegiance and commitment of the organization's varied sub-culture groups. Further, correctional leaders must devise strategies that increase the degree of commonality in the taken-for-granted assumptions and understandings that guide staff behavior within the prison. Lastly, leaders

must take all of these varied tacit assumptions and beliefs into account in formulating and implementing policy changes and operational improvements.

5.   A Framework for Assessing and Understanding Prison Cultures

The theoretical grounding of the assessment protocol is derived from the *"Competing Values Framework"* developed by Cameron and Quinn.[2] The framework – which is discussed in detail in this section of the report – provides the foundation of the comprehensive methodology for conducting culture assessments developed and implemented by CJI.

Gathering Information

In order to capture the organizational culture of a prison, three complementary data collection methodologies are utilized. The first approach involves applying the skills of an ethnographer. Trained observers, familiar with prison environments, directly observe prison activities, taking note of its signs and symbols, as well as interactions between staff, between staff and inmates, and between inmates.

The second approach involves conducting structured interviews with staff and inmates. Some of the staff interviews are conducted one-on-one with individual staff members, while others are done in small groups of five to twenty staff, and still others are conducted with five to fifteen inmates. For staff groups, the groups are relatively homogeneous, composed of staff of similar ranks and roles within the prison. These small groups function as 'focus groups,' enabling the assessment team to gather vast amounts of information in a single sitting. At least two members of the assessment team participate in each focus group – one who leads the group process and discussion, while the other is responsible for taking notes and capturing the nuances of the discussion.

A third source of information is derived from the results of administering a validated culture assessment instrument – the *Organizational Culture Assessment Instrument-Prisons (OCAI-P)* – to small groups of staff.[3] This standardized assessment instrument is used to obtain comparative data that helps to determine the extent to which competing values exist in both the overall prison culture and within and between component elements of the prison, as well as between current and preferred aspects of the culture.

These three data collection methodologies complement one another, providing for a comprehensive assessment of the prison's culture as manifested in both its informal and formal aspects. All three data sources are then integrated and organized using a competing values framework to present findings.

---

[2]  Kim S. Cameron and Robert E. Quinn, *Diagnosing and Changing Organizational Culture* (Reading, MA: Addison-Wesley Publishing Co., 1999).

[3]  The *Organizational Culture Assessment Instrument (OCAI)* has been used and validated in businesses and organizations, in both the public and private sectors. With permission from the authors, CJI modified the *Organizational Culture Assessment Instrument (OCAI)* into the *Organizational Culture Assessment Instrument-Prisons (OCAI-P).*

Organizing Findings and Presenting Results

The data gathered from these three sources are compiled by the assessment team and divided into six distinct categories for the purpose of analysis, understanding and presentation.

The six major components of the culture may be described as:

1) What the overall prison is like – its Dominant Characteristics;

2) The style and approach leaders use – Organizational Leadership;

3) The way in which supervisors treat their employees – Management;

4) The bonding mechanisms that holds the prison together – its Organizational Glue;

5) The mission and vision that drives the prison – its Strategic Emphasis; and

6) How success is defined, what gets rewarded and celebrated – its Criteria of Success.

A composite picture of the prison's culture can be derived from ascertaining the nature of these six distinct components of a prison's culture.

Composite Picture of the Culture

Based on observation, discussion, and an analysis of the data from the questionnaires completed by staff participating in the focus groups, the six different culture characteristics can then be used to describe and explain the staff's perception of both the current and preferred cultures of the prison.

Each of these six components of the prison's culture may be viewed as being pulled along two dimensions running perpendicular to one another. These two dimensions – identified as sets of competing values – are:



Stability and Control ⟷ Flexibility and Discretion

Internal, Integrated Focus ⟷ External, Differentiated Focus

Each of these two pairs of competing values represent a set of beliefs, assumptions and core values that compete for prominence. This competition for dominance occurs at all levels and functional areas of the organization. Depending upon the strength of the pull on each of these two dimensions, a graph may be plotted to represent the relative strengths of competing values framework, enabling the assessment team to profile prisons in terms of their location along these continua (see Figure 2).

Figure 2

The Competing Values Framework



## Culture Types

As illustrated in Figure 2, there are distinct organizational culture types at each of the four points of intersect of the two pairs of competing values: the 'consensus' culture type, the 'innovative' culture type, the 'prescriptive' culture type, and the 'structured' culture type. A description of each culture type follows:

> Consensus Culture: A 'consensus' type of culture is characterized by a friendly place to work where people share a lot of themselves. Leaders are thought of as mentors. The prison is held together by loyalty and tradition, with a high level of commitment. There is an emphasis on the long-term benefit of individual development with high cohesion and morale being important. The prison places a premium on teamwork, participation, and consensus.

> Innovative Culture: An 'innovative' type of culture is characterized by a dynamic, entrepreneurial, and creative workplace. People stick their necks out and take risks. Effective leaders are visionary and innovative. The glue that holds the prison together is commitment to creativity and innovation. The emphasis is on being on the leading

edge and being ready for change at every juncture. Success means producing unique and original products and services.

<u>Prescriptive Culture</u>: A 'prescriptive' culture is characterized by a results-oriented, top-down workplace. Leaders are hard-driving competitors. They are tough and demanding. The glue that holds the prison together is an emphasis on following the rules. The long-term concern is on achieving pre-set goals and objectives. Success is defined in terms of meeting those goals and objectives. Outpacing the competition [the Legislature and the Courts] is important.

<u>Structured Culture</u>: A 'structured' type of culture is characterized by a formalized and structured chain-of-command. Procedures govern what staff do. Effective leaders are good coordinators and organizers. The long-term concerns of the prison are stability, predictability, and efficiency. Formal rules and policies hold the prison together.

To varying degrees, each of these four culture types exists within every organization. They reflect the unique ideas, assumptions, orientations and values that members of the organization hold. When applied to the correctional environment, staff express their values and beliefs with regard to the prison both in its current state as well as how they would like it to be, their preferred state. Not only can these expressions of values and beliefs be captured though observation and conversation, they can also be captured by use of the validated structure questionnaire that staff complete with anonymity in small focus group discussions with their peers. Those expressions can then be weighed to determine to what degree of significance each of the four culture types play in their assessment of both the current and preferred cultures, thus providing a greater understanding of the overall organizational culture of the prison and the areas in which staff desire change to occur.

## C. Preparations

### 1. Agreements

The Criminal Justice Institute, Inc., a private, not-for-profit national research and consulting firm specializing in work with prisons and jails, entered into a contract with the California Department of Corrections and Rehabilitation in February 2005 to conduct institutional culture assessments at three prisons. Over the past four years, CJI had developed, refined, and applied its assessment protocol with funding and support via a cooperative agreement with the National Institute of Corrections. Having conducted nineteen culture assessments in fifteen states, CDCR thought that CJI was well qualified to conduct this work and to meet CDCR's desire to better understand why things occur the way they do at different prisons throughout the state.

Working with each of the three CDCR institutions, CJI's goals are to: (1) gain a thorough understanding of the unique culture of each institution and how staff values and beliefs impact behavior and operations, and (2) work closely with institutional staff to begin the culture change process. By better understanding each prison's unique culture, CDCR's goal was to apply that knowledge to improve prison operations.

### 2. Arrangements

#### Conference Call

Initial discussions about the assessment process and requesting institutional information began in mid-February 2005. A telephone conference call was conducted on February 15, 2005 to discuss the assessment process and gather additional information about the presenting issues at Corcoran. Participating in the conference call were representatives from the Criminal Justice Institute (Assessment Team Leader George Camp and Senior Project Manager Shaina Vanek) and officials from the Department of Corrections and Rehabilitation (John Dovey, Susan Hubbard, Mike Knowles, and Rich Subia).

In addition to discussing the assessment process, Chief Deputy Director John Dovey also shared – from his perspective – the primary presenting issues at Corcoran that were likely to have shaped its organizational culture. They were: (1) a series of high-profile incidents covered by both local and national media over the past 15 years some of which resulted in staff being disciplined, while in other instances charged with violation of law and subsequently acquitted of those charges; (2) a large, complex, multi-mission prison containing six separate facilities within it; (3) longstanding, deep seated differences between security and medical staff; and (4) intensive federal court over sight of inmate access to, and quality of, medical and mental health services.

#### CCPOA Meeting

Given the somewhat strained relationship between the California Department of Corrections and Rehabilitation (CDCR) and the California Correctional Peace Officers Association (CCPOA), CJI and CDCR determined that prior to embarking on the assessment proper, a meeting between representatives of CCPOA and CJI would be appropriate. Rich Subia from CDCR's Central Office arranged for the meeting at CCPOA headquarters in West

Sacramento on February 28, 2005. In attendance were Mike Jimenez (CCPOA President), Robert Dean (CCPOA Secretary/Supervisory Coordinator), Javier Gonzalez (CCPOA Chapter President at Corcoran), Rich Subia (CDCR), George Camp (CJI) and Shaina Vanek (CJI).

The purpose of the meeting was to explain the assessment process, provide CCPOA with an opportunity to ask questions of both CJI and CDCR about the project, and gain the cooperation of CCPOA so as to facilitate the on-site assessment work. George Camp reviewed the assessment process, the history of the assessment work, and the goals associated with conducting an institutional culture assessment. He noted that the assessment process is not an audit, but rather a mechanism to understand the values and beliefs that staff hold and how they impact prison operations, services, and programs.

The two-hour meeting was cordial and produced an open and frank discussion of the assessment project. Rich Subia reiterated CDCR's position that a copy of CJI's final report would be provided to CCPOA. At the end of the meeting, CCPOA President Mike Jimenez offered his organization's cooperation and indicated that CCPOA would participate according to the assessment protocol. Corcoran Chapter President Javier Gonzalez affirmed this commitment and offered to assist CJI in any way he could while the assessment team was at Corcoran.

Initial Corcoran Visit

Given the large size and complexity of the institution and that the selection of Corcoran was done by staff from the Central Office and did not include a request for an assessment from the staff at Corcoran, CJI decided it would be beneficial to visit Corcoran in advance of the actual culture assessment. To that end George Camp and Shaina Vanek spent two days (February 28 – March 2, 2005) at the prison meeting with the warden and other key prison officials. While on site, the assessment process was discussed with the warden and his executive staff, giving people a chance to ask questions. A complete tour of the prison was taken with the assistance and guidance of Sabrina Johnson, the warden's Administrative Assistant/PIO and Javier Gonzales, CCPOA Chapter President. Shaina Vanek also discussed with Sabrina Johnson, site visit logistics and the need to receive Corcoran reports and information well in advance of the assessment.

The pre-site visit to Corcoran was very productive providing CJI an opportunity to better understand the layout of the institution, how the large numbers of both custody and non-custody staff were assigned throughout the six facilities, and the diversity of the inmate population and missions at Corcoran. The insights gained during this relatively short visit were invaluable to our ability to plan properly for the assessment and deploy members of the assessment team in the most effective manner. [Having learned the value of the pre-site visit meetings at Corcoran, CJI conducted a similar pre-site visit meeting at both the Central California Women's Facility and Salinas Valley State Prison.]

3.   Gaining an Advanced Understanding of Corcoran

Approximately six weeks prior to the site visit, information about the institution was requested of the warden. It included a description of Corcoran's missions, significant incidents, programs and services, monthly climate reports, use of force incident reports, unit

schedules, staff longevity reports, staff injury reports, staff promotion/transfer summaries, inmate and staff grievance reports, closed and active lawsuit summaries and other institutional data. Based on the information received, a summary description of the prison was prepared and is presented here. The source documents from which this summary was prepared were provided to the members of the assessment team in advance of their arrival at Corcoran.

## Overview

Corcoran is a large (942 acres), complex, multi-mission institution with a population of 5,075 offenders ranging from Level I (minimum custody) to Level IV (maximum custody). The institution is situated in Kings County, a rural area of only 10,711 residents deep in the heart of the farming country of the San Joaquin Valley.

Corcoran opened in February 1988. Though it was originally designed to hold 2,916 inmates, the institution currently houses approximately 5,075 male felons. The institution consists of a Level IV cluster of facilities (surrounded by multiple fences including a lethal electric fence) as well as administration buildings, a large dairy operation, and a wastewater treatment plant outside the secured perimeter. Another large CDC-operated facility – the Substance Abuse Treatment Facility or SATF – is located adjacent to Corcoran, providing substance abuse treatment for approximately 6,239 offenders. The two institutions are mutually exclusive, though one can actually see SATF from the Corcoran grounds.

## Physical Layout

The secure portion of the institution is divided into six distinct facilities/yards, each with a separate focus for the type and/or classification of the inmate housed therein. Figure 3 shows the location of and relationship between the major buildings and yards at Corcoran. Each facility functions autonomously with assigned (post and bid) staff, a chapel, classrooms, records office, hearing rooms, interview rooms and other staff space. Control rooms are manned and armed with lethal and non-lethal weapons. Depending on the classification of the offender, outdoor recreation is available either in a large yard surrounded by a fence/cement walls or in secure one- or two-man wire and mesh runs equipped with toilets. Indoor recreation is limited in all of the facilities due to the gymnasiums being converted to provide overflow housing.

Figure 3

Diagram of Corcoran



*Level 1 Yard:* The lowest security level (Level I) is located at the rear of the prison grounds, housing 784 general population offenders. With a double fence with multiple rolls of concertina wire between them, the Level I facility includes a 190-bed therapeutic community program for substance abuse treatment, which became active in 2001.

*4A and 4B Yards:* Moving towards the front of the prison grounds, Facilities 4A and 4B house maximum-security offenders in a 180° design. The majority of inmates housed in these two facilities are Security Housing Unit (SHU) inmates. They are housed in SHU as a result of committing serious rules violations while in general population; their conduct being deemed dangerous to the safety of others within the institution. Inmates requiring protective housing due to their notoriety or high-level gang affiliation are housed in Facility 4A's Protective Housing Unit (PHU). Validated prison gang members (e.g., Nuestra Familia, Nazi Low Riders, Aryan Brotherhood, Mexican Mafia, Black Guerrilla Family, Texas Syndicate, and Northern Structure) are housed in the 4B Facility.

*Prison Hospital and the Security Housing Unit (SHU):* In the 4A/4B area of the institution, an Acute Care Hospital (ACH) provides general acute medical, surgical, medical health crisis, and specialty outpatient services. Working to become re-accredited, the hospital provides services to inmates from SHU, Administrative Segregation Units, and all Corcoran facilities. Corcoran also serves as the hub for Level IV Enhanced Out Patient (EOP) inmates, serving nine other area institutions' needs.

*3A and 3C Yards:* Proceeding towards the front of the prison grounds, Facilities 3A and 3B house high-medium-security general population offenders in a 270° design. The Administrative Segregation (AdSeg) and the Chronic Infectious Disease (CID) Unit are housed in 3A. Facility 3B includes the Orientation Unit, Enhanced Outpatient Program (EOP), ASU overflow, Disability Placement Program, and the Developmentally Disabled Program (DDP).

*3C Yard:* Facility 3C is the final facility located within the secured perimeter, housing high-security general population offenders in a 270° design. Programs in this facility include an Orientation Unit, a Disability Placement Program (DPP), and a Developmentally Disabled Program (DDP).

Staffing

Given the large size and complex sets of missions at the institution, staffing is intensive. In addition to the Warden, the institution has two Chief Deputy Wardens – one for operations and one for administration. Under the Chief Deputy Warden for Operations, Central Services, Health Care (Facility 3B), and Level IV SHU/PHU (Facilities 4A/4B) are overseen. Under the Chief Deputy Warden for Administration, Housing (3A and 3C), Records, and Business Services are overseen. Each facility has a Facility Captain that oversees daily custody and administrative matters. Figure 4 presents Corcoran's current Table of Organization.

Figure 4 -- Corcoran Organizational Chart



## Staff Turnover

Historically, the institution has drawn its staff from surrounding communities within an approximate one-hour's driving time to the prison. From September 1, 2004 to February 28, 2005, fifty-eight staff members transferred (laterally) from Corcoran to other CDC work sites. Thirty staff members were promoted from within the institution; however, specific information about the nature of those promotions was unavailable at the time of the assessment.

In addition, during that same period of time, nineteen staff members were separated from Corcoran. One was discharged for disciplinary reasons, six resigned in good standing, and twelve retired. During the same period of time, fifty-nine staff members were out of work for at least one full day or more due to job-related injuries "industrial accidents" (e.g., pain, muscular strains, deep contusions, etc.) or for stress-related reasons. Four of the aforementioned injuries resulted from an assault by an inmate.

## Staff Demographics

At the time of the assessment, Corcoran employed 2,029 full-time staff, of which 1,322 (65%) were uniformed custody personnel. The ethnic composition of the custody staff was: Caucasian (45%), African-American (5%), Hispanic (45%), and Other (5%). According to U.S. Bureau of the Census data for the year 2000, forty-one percent (41%) of the population of Kings County was Caucasian, eight percent (8%) was African-American, forty-four percent (44%) was Hispanic/Latino, with American Indians, Asians, and Pacific Islanders representing the remaining seven percent (7%) of the county's population.

The ethnic composition of Corcoran's custody staff closely mirrors the composition of the population in Kings County. Table 1 presents the percentages for each population.

**Table 1**

**Ethnicity of Corcoran Custody Staff and Kings County, California**

| Ethnicity | Corcoran Custody Staff | Kings County Population |
|-----------|------------------------|-------------------------|
| Caucasian | 45% | 41% |
| African-American | 5% | 8% |
| Hispanic | 45% | 44% |
| Other | 5% | 7% |

## Inmates

According to information provided by Corcoran staff, an average of 2,545 (50%) of the 5,075 inmates have work assignments. Of the 2,530 inmates without institutional employment, 762 (30%) were restricted from being employed in institutional work assignments due to

their housing assignment in Administrative Segregation or the Security Housing Unit. The number of inmates who participate in behavioral, health, and medical programs was not available.

Behavioral programs are available to inmates at Corcoran and are provided by an external organization (Friends Outside), primarily in the areas of Conflict Resolution and Parenting. Educational programs within the institution include vocational programs (welding, electronics, motor pool), Century 2000 office furniture making, milk processing, computer lab, PIA laundry, PIA dairy, metal fabrications, and horticulture are also components of the work/training programs at Corcoran.

At the time of the assessment, the ethnic composition of the inmate population was: Caucasian (23%), African-American (36%), Hispanic (36%), and Other (5%). The custody staff's ethnic composition does not mirror that of the inmate population as well as it does of Kings County. As can be seen from the data in Table 2, the percentage of Caucasian staff is twice that of Caucasian inmates, Hispanic staff are proportionally larger than for Hispanic inmates, while the percentage of African American staff is significantly smaller than it is for African American inmates.

Table 2

Ethnicity of Corcoran Custody Staff and Inmates

| Ethnicity | Corcoran Custody Staff | Corcoran Inmates |
|---|---|---|
| Caucasian | 45% | 23% |
| African-American | 5% | 36% |
| Hispanic | 45% | 36% |
| Other | 5% | 5% |

4.  Modifications to the Assessment Protocol

Given the size and complexity of Corcoran (and the other prisons scheduled for assessment), CJI felt it prudent to modify its standard assessment protocol in order to adequately address the unique needs of substantially larger prisons than had been previously assessed. To this end, the CJI assessment team modified its standard protocol in five ways.

Larger Veteran Assessment Team

First, the size of the team was increased from the standard four to five assessors to a team of seven, and only individuals with significant experience as culture assessors were permitted to participate in the assessment. This decision proved to be a sound one given

the large physical campus and six distinctly different facilities in operation within the institution. The experienced assessment team included the following individuals:[4]

**George M. Camp, Ph.D. (Team Leader):** As a Principal of the Criminal Justice Institute, Mr. Camp oversees the private, not-for-profit consulting firm that provides consulting services to the field of corrections. His experience in the field of corrections and prison operations ranges from correctional counselor to Director of Corrections in Missouri. He has led and conducted prison consulting projects in 40 states. He oversaw the development of the culture assessment protocol for the National Institute of Corrections. Mr. Camp has led cultural assessment teams at four prisons, and overseen the work at another fifteen prisons. He developed the program to train culture assessors and led that three-day training on two occasions.

**David Marcial, B.S.:** Retired from the Connecticut Department of Correction, Mr. Marcial currently works as a consultant. With over twenty-five years of experience in the field of corrections, he began his career as a correctional officer and rose up through the ranks to attain the position of warden and, eventually, Regional Director. Mr. Marcial has been trained in the application of the *Institutional Culture Assessment Protocol* (ICAP), and has been a team member at one previous assessment of institutional culture.

**Marianne McNabb, M.A.:** Retired from the State of Washington Department of Corrections, Ms. McNabb currently works as a consultant for the National Institute of Corrections on a part-time basis. Involved in the development of innovative training programs on the Prison Rape Elimination Act, she is working on the development of multi-media approaches to training for correctional staff. With a career that has spanned over thirty years, Ms. McNabb has held various positions in both the Washington and Alaska Departments of Corrections, including probation officer, Regional Administrator, and Deputy Director for Institutions. Ms. McNabb has been trained in the application of the *Institutional Culture Assessment Protocol* (ICAP), and has been a team member at four previous assessments of institutional culture.

**Terry Pitcher, M.A.:** Retired from the Michigan Department of Corrections. Mr. Pitcher has over thirty years of experience in the field of corrections. Prior to retirement, he was the Bureau Administrator for health care, but started his career as a correctional counselor. Mr. Pitcher served as a warden for thirteen years, activating four prisons during his career. Mr. Pitcher has been trained in the application of the *Institutional Culture Assessment Protocol* (ICAP), and has been a team member at five previous assessments of institutional culture.

**Margaret Pugh, B.S.:** Retired from the Alaska Department of Corrections, where she served as the Commissioner for eight years, Ms. Pugh has a career that spans over thirty years in the field of corrections. She started her career as a youth counselor, and quickly rose through the counselor ranks to oversee the southeast region of the state. Ms. Pugh has been trained in the application of the *Institutional Culture Assessment Protocol* (ICAP), and has been a team member at one previous assessment of institutional culture.

---

[4] See Appendix 2 for assessment team member resumes.

**Brett Rayford, Ph.D.:** Currently employed by the Connecticut Department of Children and Families, Mr. Rayford oversees the department's operations as they apply to juvenile detention services. With a strong background in clinical psychology and administration, he has held a number of positions in both the public and private sectors over the past twenty-five years (e.g., Assistant Professor at Yale School of Medicine, Director of Health, Mental Health, and Addiction Services in the Connecticut Department of Corrections, and Bureau Chief for the Connecticut Department of Children and Families). Mr. Rayford has been trained in the application of the *Institutional Culture Assessment Protocol* (ICAP), and has been a team member at two previous assessments of institutional culture.

**Shaina Vanek, M.S.:** As a Senior Project Manager at the Criminal Justice Institute, Ms. Vanek oversees the culture assessment work being conducted in the State of California. In a similar role with the National Institute of Corrections, she supervises all aspects of the *Assessment of Institutional Culture* project, as well as a related project entitled *Leading and Sustaining Change*. Ms. Vanek has presented training sessions on the topic of institutional culture and has lead or been a part of fifteen previous assessments across the country.

### Longer Site Visit

The duration of the assessment was increased from four and one-half days to eight and one-half days, including assessment work over a weekend. The eight and one-half day site visit at Corcoran was conducted April 18, 2005 through April 26, 2005. This, too, proved to be a useful adjustment to the protocol, providing an adequate amount of time to cover the expansive grounds and meet with and converse with the large number of staff at the institution.

### Additional Inmate Discussion Groups

The standard one to two inmate focus groups was increased to three focus groups in order to ensure that a representative sample of inmates was represented across all of the different facilities/yards.

### Number of Staff Focus Groups Increased

The standard five staff focus groups were increased to twenty-two focus groups, with many of the groups being facility-specific (e.g., consisting solely of staff from a particular yard). This was helpful to the team's work in that it provided a means of illustrating differences between facilities, as described later in this report.

### Health Care Focus Group Added

In addition, a focus group was added for medical and mental health treatment staff from the second and third watches. This group was formed because of statements made about tension between the roles and objectives of medical staff and custody staff. The separate focus group provided health/mental health care staff with the opportunity to share their unique experiences, beliefs and values.

5.  Creating Focus Groups and Selecting Participants

In advance of the team's arrival at Corcoran, complete personnel rosters were provided to CJI. From these lists, CJI used a computer-based random selection process to choose staff assigned to the different areas and watches for inclusion in the focus groups.

The names of those 22 focus groups and the number of staff who eventually participated in each are presented in Table 3.

### Table 3
### Corcoran Staff Focus Groups

| Focus Group | Participants |
|---|---|
| Managers (Deputies, Associates, Department Heads) | 14 |
| Second Watch Security Officers from Facility 3A | 8 |
| Second Watch Security Officers from Facility 3B | 9 |
| Second Watch Security Officers from Facility 3C | 7 |
| Second Watch Security Officers from Facility 4A | 10 |
| Second Watch Security Officers from Facility 4B | 11 |
| Second Watch Security Officers from the Level 1 Facility | 5 |
| Institutional Mixed Support/Line Staff | 14 |
| Counselors and Teachers from the Level 1 Facility | 2 |
| Counselors and Teachers from 3B | 4 |
| Counselors and Teachers from 3C | 9 |
| Counselors and Teachers from 4B | 8 |
| 3A/3B/3C First Line Security Supervisors (Sergeants) from Second and Third Watches | 11 |
| 4A/4B First Line Security Supervisors (Sergeants) from Second and Third Watches | 8 |
| Lieutenants and Captains | 13 |
| Third Watch Security Officers from Facility 3A | 9 |
| Third Watch Security Officers from Facility 3B | 9 |
| Third Watch Security Officers from Facility 3C | 9 |
| Third Watch Security Officers from Facility 4A | 11 |
| Third Watch Security Officers from Facility 4B | 11 |
| Third Watch Security Officers from the Level 1 Facility | 8 |
| Medical/ Mental Health Treatment Staff | 11 |
| **Total** | **201** |

The *Organizational Culture Assessment Instrument-Prisons (OCAI-P)* was administered during each of the focus groups.[5]

---

[5]  See Appendix 3 for a description of the OCAI-P.

# D. Corcoran's Culture

### 1. Corcoran's Culture: An Overview

Corcoran is large and complex. While in prison-years its history is relatively short, it has experienced more controversy than most. Conceived of, opened, and serving as a place for "the worst of the worst," it has not always brought out "the best in the best." Corcoran's past forged and framed its current culture, and today the competing values of its staff, as well as the competition between the values held by Corcoran staff and the values held by the Central Office, the Legislature, the Governor, the Courts, and the media, are competing for dominance of its culture.

### Yesterday and Today

Corcoran's culture is very much a product of its past. Even though in prison years, the prison is relatively young, having opened in 1988, it has accumulated an abundance of notoriety with which it is still saddled.

First, the staff at the institution have an 'inherited history' stemming from past incidents. Since the early 1990's, staff at Corcoran have been the subject of investigations and inquiries regarding allegations of inmate mistreatment and suspicious deaths. Many of these incidents received significant local and widespread national media attention, including primetime news magazine coverage by CBS's 60 Minutes. Articles ran in the local papers (LA Times, Fresno Bee, etc) and on the local edition of the evening news after each of these incidents. In the public's eye Corcoran quickly became synonymous with a prison out of control, where lawlessness was the law.

These incidents included allegations that:

- Upon getting off a Department of Corrections' bus at Corcoran, officers beat the inmates because they had beaten staff at the prison from which they had just been transferred;

- To punish an inmate, staff deliberately placed him in a cell with a known sexual predator with the assumption that the inmate would be raped;

- Staff placed rival gang members on the same small exercise yard knowing they would fight, having placed bets on the outcome of those fights. [In one instance an inmate who was attempting to harm another inmate was shot and killed by the armed officer overseeing the exercise yard.]

The distrust staff have of outsiders finds its origin in the investigations of these allegations of staff misconduct which, almost without exception, staff believe were unfounded. Staff point out that those charged with crimes were acquitted and that had all the facts surrounding the allegations been conveyed in the media, charges against staff would never have been brought in the first place. As a result of these incidents and subsequent investigations by the FBI and others, suspicion, distrust, and resentment still exists at the institution today. One employee stated, "Even if you were not here when this stuff happened, you feel it. People are standoffish."

Staff weathered the storms that surrounded these events, but the 1990's became a defining time for the institution. Though the staff who were reportedly involved in one of these incidents were acquitted of any wrongdoing, staff noted that, "The acquittals didn't make the news." The institution had already developed a reputation — a "bad reputation that still persists to this day," according to one manager. A sergeant affirmed this point stating, "I heard about these incidents when I worked at other institutions. It's what people think about when they think of Corcoran."

This reputation and the resultant stigma of working at what some called an "infamous prison" — has had a significant influence on the culture of the institution. Staff within the institution withdrew; they withdrew from the outside world and from one another. They became wary and distrustful of one another during the mid 1990's when these events were occurring, wondering if they would be next on the list of staff suspected of wrongdoing. This lack of trust was reinforced when veteran staff heard from new recruits that they were told at the Training Academy to, "keep their eyes open" for veteran officers who do not follow policy. Such statements reinforced already suspicious veteran officers' beliefs not to trust anyone other than veteran staff with whom they had worked closely. Consequently, new officers felt like outsiders until accepted into the fold.

Moreover, staff members are still considered to be "new" employees five, sometimes six years into their employment at Corcoran. This can be attributed to the lack of trust, as seen in the following comments shared by staff: "you only trust people you know well," and "you're professional and courteous to people who are new, but they have to earn your trust." Some staff even voiced concern about talking with members of the assessment team, with one outspoken person commenting, "You gotta be careful about what you say. I'm nervous just talking to you guys."

<u>Today and Tomorrow</u>

The current forces that significantly influence the culture are related to external stakeholders and their control and influence at the prison. Though many stakeholders exist, staff feel their presence primarily through the Department's Central Office ('Sacramento') and often directly via the media. Comments often heard such as, "we get threats from Sacramento all the time" and "anything we do turns into something bad by the media" were typical and frequent.

Staff at all levels feel as if their workplace is a very punishing environment, where "risks aren't to be taken" and "mistakes get disciplined" swiftly and harshly. One manager commented that the Department is "extremely unforgiving," while another said that "Corcoran is so punitive that it's the only place where the Department shoots their wounded." There was a pervasive sense among staff that the institution was managed through intimidation, and the fear of being punished for actual or alleged wrongdoing, intentional or unintentional was ever present. Whether it was Sacramento mandating that wardens not exceed their budgets, or "be fired," or a top manager sending a directive out to his/her staff with the implicit message to "get it done no matter what," staff at every level of the institution felt as if their best strategy for survival was to keep their heads down to avoid admonition and only follow written instructions.

Thus, both the past and the present serve to perpetuate a culture where staff feel unfairly criticized by Sacramento and the media. In response, staff have created islands (yards)

within the prison, withdrawing for comfort and safety into small groups isolated from both senior staff and the inmates on those yards. Understanding these issues is key to understanding and addressing Corcoran's culture.

2. Six Major Components of Corcoran's Culture

As noted earlier in this report, the culture of a prison may be examined in terms of six major components of its total culture. They include: 1) its dominant characteristic; 2) organizational leadership; 3) management of employees; 4) organizational glue; 5) strategic emphasis; and 6) criteria of success. Each of these six aspects of Corcoran's culture are discussed and examined in this section of the report.

A. Dominant Characteristic of Corcoran's Culture

This cultural characteristic refers to that aspect of the prison culture that is most pervasive, and may be described in terms of how the workplace is defined by those who work in it. Not unlike most prisons, staff at Corcoran have created a culture that relies heavily on structure and order. However, what is unique about Corcoran is the nature and degree of the impact that forces outside the prison have played in shaping and defining its culture. Investigations by law enforcement agencies and by internal investigators from the Central Office in Sacramento, the presence of federal court monitors, and more recent mandates from the Central Office have left and continue to leave an indelible mark on Corcoran's culture.

Corcoran has felt the impact of these intrusions. Sanctions for non-compliance frequently follow in what is perceived in many instances to be arbitrary and unfair. Sanctions come swiftly when orders are not followed. The sources of these admonitions are seen as emanating from the media, the legislature, the courts, and from the Central Office in Sacramento. While the media's impact is felt directly by all staff, the other sources impact the culture via the chain-of-command as messages are transmitted directly to the Warden and then cascade through the organization, ending with the line correctional officer. Not surprisingly then, feelings of being unfairly punished become part of the relationships between correctional officers and inmates with whom correctional officers have more contact than any other staff group at the prison.

Staff view 'Sacramento' as the most powerful source of these messages, in that the department has the authority not only to generate new policies and protocols that they as staff must institute and operationalize at the prison but also to sanction employees. The warden, executive staff and managers feel this burden directly, and in turn convey these messages to their staff.

"I can't tell you how many times we've heard we're going to be fired around here," one higher-ranking staff member said — with nods and words of agreement from others present. "Sacramento focuses on what isn't happening as opposed to seeing what is happening."

The pressure to accept additional mandates (new "missions) or make new procedures work is high. Another staff member explained that when the warden, along with all other wardens, was recently told by a high ranking Sacramento official that any warden who

went over his/her budget would be fired was not only saying "get it done no matter how you have to do it – legally or illegally," but also was reinforcing to all staff the message (that they already believe to be true) that if you don't do what we say, we're going to punish you as severely as we can. As a consequence, getting the job done has come to mean, "do it," even if corners have to be cut and security procedures compromised. If the job does not get done – regardless of the reason – staff explained that punishment comes swiftly and harshly, "you're gone, out the door around here."

Line staff are constantly aware of the possibility of punishment, as are supervisors and managers. So how does this culture of punishment and perceived intimidation affect staff – particularly the line staff who feel the brunt of most of it?   As one supervisor put it in concluding a set of instructions to staff "don't screw up, I ain't going out backwards" [referring to being fired by his/her supervisor]. Feelings of helplessness, frustration, and resentment arise and become part of the core of the prison's culture.

Moreover, it adversely impacts the inmates, especially with regard to their relationships with line staff with whom they have the most direct contact. As a result, both line staff and inmates create barriers and distance between each other and look to themselves for support, encouragement and comfort. Inmates gang up in the middle of the yards, while staff group up on the perimeter of the yards. In fact, without exception the inmates used the same words as staff did to define Corcoran's culture. The inmates shared many of the same feelings and experiences as did the line staff with whom they spend the most time. The inmates just replaced 'Sacramento' with 'cops' or correctional officers. Their perception of the prison mirrored that of staff to a tee; they believed that they were constantly "being judged unfairly – even though [they] were judged already" by the court. One inmate commented that, "officers think they are our personal punishers."

On the whole, staff and inmates alike sense impending punishment from someone or something bigger and more powerful than they.  For inmates, it is the correctional officers; for officers and other line staff, it is their supervisors; for supervisors, it is managers and so on. When staff and inmates work and live in a culture such as this, they begin to feel disconnected and powerless to change things because the task just seems too immense to handle on their own. As a result, they retreat to their smaller groups and subcultures.

This is not to say that all staff feel disheartened and victimized daily. To the contrary, many staff, and inmates, appeared very resilient.  Staff seemed to find hope and satisfaction in the small 'successes' that they experienced nearly every day. After explaining all that was wrong with the prison, staff would comment, "but I like my job and I like working here." Similarly, inmates would say there are "worse places to do time." In some ways, having an 'us against them' attitude provided staff and inmates a common adversary. As one manager explained, "if Sacramento treated us well, I don't know if we'd be as bonded as we are. We help each other cope with where we are."

Dominant Similarities and Differences within the Prison

While there is some variation in how different groups of staff perceive the relative intensity of the Dominant dimensions of the prison's current culture, there are more similarities than differences.  In particular, the 'prescriptive' scores of the participants in all 22 focus groups reflect a very tight pattern (Standard Deviation = 5.8) around the

mean score (29.5) for all groups. [See Appendix 4 (A), page 94 for a list of mean scores for all groups on the Dominant Characteristics component of Corcoran's culture.]

There is a general belief that rules and order (the 'structured' component of the culture) are strong and important, and that the 'prescriptive' aspect of the culture is also a major and negative, component. Of note, however, is that Health Care staff, as opposed to other groups of staff, view the 'prescriptive' component in a positive light, as opposed to the negative way in which other staff perceive it. Health Care staff perceive a dominant and a <u>constructive</u> role being played by mandates from the courts and the Central Office with regard to providing inmates timely access to health care and to delivering quality health care services to them. Therefore, as opposed to top managers, Captains and Lieutenants, and Correctional Officers, Health Care staff prefer the 'prescriptive' element of the prison culture to remain as strong in the future as it is now. Table 4 presents the current and preferred values for the Dominant Characteristics of Corcoran's culture according to all staff, as well as to just the top managers, Captain/Lieutenants, Correctional Officers, and Health Care staff.

### Table 4
#### Dominant Characteristics of Corcoran's Current Culture

|  | Current | | | |
|---|---|---|---|---|
|  | Consensus | Innovative | Prescriptive | Structured |
| All Staff | 15.8 | 16.4 | 30.2 | 38.1 |
| Top Managers | 16.8 | 9.4 | 26.8 | 47.0 |
| Captains/Lieutenants | 10.0 | 13.5 | 37.5 | 39.1 |
| All CO's | 16.3 | 19.1 | 28.3 | 36.4 |
| Health Care | 9.1 | 10.9 | 34.1 | 45.9 |

Note that while the Captains and Lieutenants perceive the 'prescriptive' aspects of the current culture to be greater than the other groups do, that the Health Care staff are the only one of the five groups that <u>preferred</u> to see an increase in its influence. Graphically, the Health Care staff's current and <u>preferred</u> dominant culture components are compared in Figure 5.

Figure 5

Current and Preferred Dominant Profiles for Health Care Staff



Criminal Justice Institute, Inc.

Thus, the dominant characteristics of Corcoran's culture fall into the 'structured' and 'prescriptive' quadrants because stability and control are perceived as more important than flexibility and discretion. As a consequence, the 'consensus' and 'innovative' aspects of the culture are perceived as far less dominant in Corcoran's current culture.

B.  Organizational Leadership

Leadership refers to the style and approach that permeates the prison from the warden on down and generally reflects the warden's values and vision. Because of the relatively rapid turnover of wardens at Corcoran and because of the very strong presence of Sacramento in directing and mandating what occurs at Corcoran, staff tend to perceive Corcoran as being led by Sacramento.

Thus at Corcoran, staff view prison leadership as extending beyond the warden and the top managers. Moreover, they feel as if the true direction and leadership of the institution is coming mostly from outside the institution through Sacramento and the missions and mandates they impose on Corcoran. The warden and his executive staff are seen as both filters for and conductors of what is transmitted from Sacramento — sometimes shielding staff from the full brunt of those mandates, other times passing mandates down and insisting that they be met at all costs.

Because the warden and his executive staff spend so much time in a reactive/responding posture, staff have learned to get by on their own. Comments such as "we don't need any leaders," and "we know how to do our jobs" were often heard from staff. Many staff with whom the assessment team spoke felt as if two separate cultures

existed within the prison – one behind the perimeter fence and another in the administration building, or the "white house" as some staff referred to the building outside the perimeter fence where many of the senior staff offices are located. This disconnect is reinforced by the very size and complexity of the prison and is reflected in the way in which staff identify most closely with a specific "facility or yard" [3A, 3B, 3C, 4A, 4B, and Level1] in which they work within the prison. It also results from the relatively rapid turnover of the most senior executive staff and the feeling on the part of those staff who work in one of those six "facilities" that they very infrequently see top staff in the facilities in which they work.

Staff reported to the assessment team that there had been thirteen wardens in the eighteen years since the prison opened in 1988, some lasting only a few months on an interim basis. [While there had only been six wardens, staff were counting those six wardens as well all acting or interim wardens.] This constant turnover of wardens – and frequently top executive staff as well – has resulted in the staff learning how to function within the institution "in spite of the leadership." One staff member likened the transition of leadership to a family:

> The prison is like a woman with children (us staff) who
> frequently re-marries (a warden). And so we have had
> many step-fathers (new wardens). We're like the kids who
> have to figure out how to deal with the demands of a new
> daddy (warden) every few years.

This pattern has been relatively constant over the life of the institution. While staff for the most part relate positively to the current warden and identify with him, they are somewhat reluctant to get too far into his "car" for fear that he will not be at Corcoran much longer. Staff who knew him professionally all thought he was "a good man" who came to the institution to "do the right thing." One high-ranking custody staff member said, "All the other wardens came to fix us. This warden came here to work with us." They see something different in this warden that provides a glimmer of hope.

However, all Corcoran staff do not share that same positive feeling – especially staff who do not know the warden or who have not met either him or members of the executive team. As one staff member commented, "I've been here for 15 years and have never spoken to a warden." Even though many staff profess that they "don't need leaders" to tell them what to do, they still want their leaders to show interest in them and their work. "A warden should go on the yards and see how staff are doing" rather than just "coming in [only] to see if we're reading on post."

Contributing to this leadership vacuum is the belief of staff that the warden and other ranking staff will not be at Corcoran very much longer. This conclusion is based on more than just idle chatter. Statements and actions of senior staff clearly indicate their intention to either retire or transfer/promote shortly. In addition to such intentions, there is the ever-present likelihood that a leader will be removed from his or her position if she/he displeases their supervisors in Sacramento.

Not surprisingly, the strongest cultural component of organizational leadership in Corcoran's current culture is its 'prescriptive' element. This perception was dominant in

eighteen of the twenty-two staff focus groups and, with one exception, held true in all of the twenty-seven clusters of staff that were created for analytical purposes.    [See Appendix 4 (A), page 95 and Appendix 4 (B), page 102 for a list of the mean scores for all groups on the Organizational Leadership component of Corcoran's culture.]

This pervasive belief reflects the dominant role of the external environment, and more recently of the Central Office in shaping Corcoran's culture. Staff pointed to numerous examples of being told what to do by Central Office or by the courts, but rarely did they feel they had been told why it was important to do.   Statements like "they add another mission to our list" of things to accomplish, "assuming we can get it done," but never thanking us for doing it."  Table 5 presents the mean scores for several major employee groups in which the 'prescriptive' dimension of Organizational Leadership is given the greatest weight of the four components, with the exception that Health Care staff give "structure" slightly more weight than they do the 'prescriptive' elements of Organizational Leadership within Corcoran's current culture.

**Table 5**

**Organizational Leadership Dimension Strength
Of Corcoran's Current Culture**

|  | Current | | | |
|---|---|---|---|---|
|  | Consensus | Innovative | Prescriptive | Structured |
| All Staff | 19.0 | 21.5 | 33.9 | 26.1 |
| Top Managers | 24.3 | 19.0 | 31.3 | 25.3 |
| Captains/Lieutenants | 24.8 | 23.2 | 33.8 | 18.2 |
| All CO's | 17.4 | 22.6 | 35.2 | 24.8 |
| Health Care | 19.2 | 22.8 | 31.3 | 26.7 |

Just as the current culture for the most part emphasizes the 'prescriptive' aspects of leadership it also places the least emphasis on building consensus.  The degree to which staff are currently dissatisfied with the 'prescriptive' aspects of leadership is made clear visually by examining the graph that portrays the degree to which staff prefer a culture in which consensus building is a far stronger component of Organizational Leadership than mandates from above (see Figure 6).

Figure 6

Current and Preferred All Staff Profiles
for Organizational Leadership



### C. Management of Employees

Those aspects of the culture that relate to how employees are managed are expressed and seen at Corcoran in terms of the major management units within the prison. Those units, or facilities or yards as they are referred to at Corcoran, function in many respects as nuclear families within the prison as a whole. Each yard takes pride in being the most challenged and most successful in meeting its obligations. Core groups of lieutenants, sergeants, and officers seek out each other and bid for posts on those yards based primarily on the friendships, alliances, allegiances they have formed with each other.

Staff represented their desire to see managers show more interest in them as employees. Staff wanted more than an order or directive telling them to do something. They want to know _why_ they had to do it. Staff often made comments along the lines of, "CDC does a lot of things but never gives [us] why." When staff do not know the reasons behind something, human nature causes them to make up the 'whys.' The resounding sentiment among staff — and inmates as well, for that matter — centered around this desire to understand the rationale for new policies or changes in the rules:

> If someone were to tell me why something is being done, I
> can understand it. If I can understand it, I can believe in it.
> If I believe in it, I can do it.

In addition to wanting explanations from their managers and supervisors, staff wanted to be treated fairly, a value that for the most part they felt was absent from the current

culture. A workplace in which managers treat employees even handedly seemed remote to many staff. This lack of fairness was conveyed in many ways, but one example makes the point.

While the assessment team was on site, staff frequently made their points with analogies that included major roles for different types of vehicles. Whether staff were referring to "busses," "trucks," or "who was riding in whose car," the team came to understand that staff had a lexicon for staff members who do not pull their own weight within the institution (e.g., "trucks") or who are favored in some way (e.g., "he's riding in X's car."). Though the terminology elicited some humorous reactions, the stories were not meant to be funny. These examples of favoritism toward some employees and a lack of fairness to many were a serious concern. Many staff were frustrated at what they perceived to be a lack of disciplinary action against some staff ("trucks"), who were not doing their jobs, because they were "in the right person's car." Staff clearly wanted their employee management decisions to be based on fairness and equity, not favoritism and nepotism.

<u>Similarities and Differences in Management of Employees</u>

Juxtaposed to the staff who work on each of those individual yards are prison-wide groups of staff who work in all areas of the prison. Staff in these five groups (Top Managers, Captains/Lieutenants, Sergeants, Correctional Officers, and Health Care) view the management of employee component, of the current culture, quite similarly. The average scores for each of these five groups of staff are presented in Table 6, along with the range in values of those scores. The total maximum variation between the highest and lowest score on each of the four dimensions is 31.2.

Table 6

Similarity of Current Views on Management of Employees
by Prison-wide Groups

|  | Current | | | |
|---|---|---|---|---|
|  | Consensus | Innovative | Prescriptive | Structured |
| All Staff | 29.3 | 14.7 | 26.6 | 30.0 |
| Top Managers | 28.0 | 15.0 | 29.0 | 28.0 |
| Captains/Lieutenants | 27.1 | 14.5 | 30.9 | 27.5 |
| Sergeants | 31.4 | 13.9 | 34.5 | 20.2 |
| Correctional Officers | 31.1 | 15.2 | 22.4 | 31.3 |
| Health Care | 26.4 | 12.7 | 29.1 | 31.8 |
| Range of Values = 31.2 | 5.1 | 2.5 | 12.1 | 11.6 |

A different picture emerges when the maximum rage in values is calculated for the six groups of line staff (CO's, Counselors, and Teachers) assigned to each of the six yards. As can be seen in Table 7, the total range in values for the six groups of staff is 67.9, more than twice that for the prison-wide groups of staff. Thus, each yard was more different than similar to the other yards, with staff conveying more varied assessments of management of employees depending upon where they worked.

Table 7

Differences in Views on Management of Employees
Held by Staff on Each Yard

|  | Current | | | |
|---|---|---|---|---|
|  | Consensus | Innovative | Prescriptive | Structured |
| All Staff | 29.3 | 14.7 | 26.6 | 30.0 |
| L1 Staff | 39.6 | 11.5 | 8.5 | 40.5 |
| 3C Staff | 26.8 | 12.0 | 28.2 | 32.9 |
| 4B Staff | 27.1 | 14.5 | 30.9 | 27.5 |
| 3B Staff | 32.2 | 11.6 | 22.9 | 33.3 |
| 4A Staff | 31.2 | 21.2 | 26.4 | 21.2 |
| Range of Values = 67.9 | 16.4 | 9.7 | 22.5 | 19.3 |
| 4A Staff | 31.2 | 21.2 | 26.4 | 21.2 |

We conclude from these results, that the management of employee aspect of the current culture varies according to the management practices on each of the yards, as opposed to how one rank manages another rank.

Furthermore, of the six components of the total culture, the management of employees produced the smallest shift from the current culture to the preferred culture. Thus, for the most part, staff are satisfied with the management they have within each yard. The quality of staffs' relationships with their supervisors and the frequency of contact with them have a significant positive influence on staff's degree of satisfaction with the existing workplace.

D. Organizational Glue – Holding the Prison Together

This component of the culture refers to the bonding mechanisms that hold the prison together. When custody staff (Correctional Officers, Sergeants, Lieutenants, and Captains), were asked what the "glue" was that held the institution together, the most common answer was "we do." While within Corcoran's culture, each group felt they were the ones that were holding the place together, the "what" that was holding the

prison together was by and large found in relying on enforcing the rules and maintaining the chain-of-command. The warden expressed his sentiments about the role correctional officers play in holding Corcoran together when he said, "they're out there seeing the problems, keeping the inmates from killing each other."

What was universally important to all staff was that if a new rule or procedure was conveyed, it wouldn't be followed unless it was put "in writing," because "if it wasn't in writing, it might not exist." The culture of fear and retribution is so pervasive that staff felt that if they implemented a different procedure that was not in writing and something went wrong they would be left out to hang by themselves because those that transmitted the new directive might deny its existence.

On the other hand, while one might conclude that the rules being referenced were those that were codified in written policy and procedure, it was not always totally clear that was the case. In some instances staff readily admitted that the rules had to be broken if you were to do everything that was asked of you to do. In the end, the staff felt they were holding it together, relying on written rules to protect themselves while at the same time improvising on their own as they saw necessary.

Thus, it's not so much about policies and procedures holding the prison together; rather it is about how staff rely on and support each other within their 'silos,' thereby maintaining some sort of stability and control in an environment that is constantly in flux as a result of interventions by external stakeholders. In many ways, staff cling to the structures they have developed in the 'silos' (on the yards) within the prison - because that is where they have each other on which to rely. As noted earlier, this phenomenon of 'bonding through adversity' permeates the institution. As one manager explained it, "If Sacramento treated us well, I don't know if we'd be as bonded as we are."

Agreement and Disagreement about What Holds Corcoran Together

This perception of the current culture permeates the entire prison. In all of the 22 staff focus groups, except two, the "structure" aspect of the culture was perceived as the most significant element in holding Corcoran together. Corcoran employees viewed the current organizational glue as being dominated by the 'structure' aspects of the culture. The two groups, each of which rated it as the second most important aspect of the bonding mechanism, were the correctional officers working the 2nd watch in 3B who ranked the 'consensus' aspect of the bonding as most important, and the Health Care staff who gave slightly greater weight to the 'prescriptive' aspects of bonding than they did to "structure."

An examination of all the groupings of staff produced similar uniformly consistent patterns of perception of what holds Corcoran together. Table 8 presents the mean scores for the Organizational Glue component of Corcoran's culture for all staff, Managers, Captains/Lieutenants, Sergeants, Correctional Officers, and Health Care staff.

Table 8

### Relative Strength of What Holds Corcoran Together as Perceived by Ranks and Health Care

|  | Current | | | |
| --- | --- | --- | --- | --- |
|  | Consensus | Innovative | Prescriptive | Structured |
| All Staff | 19.5 | 13.2 | 23.2 | 44.6 |
| Top Managers | 22.1 | 11.6 | 25.3 | 41.0 |
| Captains/Lieutenants | 13.2 | 12.4 | 27.9 | 46.5 |
| Sergeants | 16.2 | 17.0 | 20.2 | 46.6 |
| Correctional Officers | 23.5 | 14.0 | 19.5 | 43.0 |
| Health Care | 8.2 | 6.4 | 44.5 | 40.9 |

Of particular note is the difference in the way in which the current culture's organizational glue is perceived by Health Care staff as opposed to the other groups. Graphically, the difference is portrayed in Figure 7.

Figure 7

### Current Profiles for All Staff and Health Care Staff for Organizational Glue



Criminal Justice Institute, Inc.

Health Care staff clearly view the 'prescriptive' aspects of the culture as holding the prison together. Their reliance on the federal courts, their monitors, and the support of the Central Office for inmate access to quality health care plays a very significant part in holding things together for them. Absent those external interventions, they might find doing their job extremely difficult if not impossible.

While relations between health care staff and correctional officers have improved as measured by improvements in timely access to care, a significant divide remains between many of the security staff and health care staff because of the belief held by most security staff that inmates are not entitled to the level of health care (and other programs and services as well) that the courts and others say they should receive. This fundamental disconnect between "treatment" and "custody" plays out in all functional areas of the prison, and represents a conflicting value of the highest order.

As will be seen in the discussion that follows about what is emphasized strategically at Corcoran, no comprehensive strategy has been developed at Corcoran because the purpose of imprisonment and the job of corrections is viewed as fundamentally different by the Department's leadership and Corcoran's staff. Dictating what it should be to the staff at Corcoran may have changed some behavior, but it has not begun to touch the beliefs and values held by the vast majority of staff at Corcoran.

This disconnect is not easily resolved. It is intense and longstanding. On the other hand, it is encouraging to note that staff throughout the prison are desirous of finding more consensual mechanisms to hold the prison together. Figure 8 depicts the currently held views of staff about what holds the prison together (emphasizing the 'structured' aspects) as opposed to how they prefer it to be held together with the emphasis on the consensual aspects of the culture.

Figure 8

**Current and Preferred All Staff Profiles
for Organizational Glue**



Criminal Justice Institute, Inc.

E.  Strategic Emphases

This cultural characteristic refers to the primary values, purpose and mission of the prison as perceived by staff. Yet staff were not entirely clear as to what Corcoran's overall mission was, let alone the rationale for Corcoran having that mission. While the formal mission does exist and appears on that portion of the CDC website that describes Corcoran, not a single member of the staff referenced it during the entire time the assessment team was at Corcoran. During the site visit it was on display in only one place in the prison and that was on the office door of one of the Associate Wardens. The formal mission reads:

> *CSP-Corcoran is committed to ensuring and instilling the public and inmates' families with the confidence that CSP-Corcoran is committed to providing the best medical, mental health, education, vocational, and self help programs for all inmates confined to Corcoran. CSP-Corcoran not only meets this commitment by providing it's employees with the proper training, tools, and safe working environment, but also by encouraging ideas and collaboration between all departments.*

Strategic emphasis for Corcoran could certainly be derived from this mission statement, but except for the health care staff, the feelings, thoughts, and actions of most staff run

along an entirely different line of reasoning. Many, if not most, staff believe that the primary purpose of prison is to punish as reflected in this sampling of comments:

> *Why should prisoners receive more than they received before they came to prison?*
>
> *We're just wasting money on them.*
>
> *They don't deserve half of what we have to give them.*

Other staff members likened the operations of the institution to "controlled chaos." They described it as "the most complex, fast-moving place in the universe." So much has been going on at the prison that staff were not able to clearly define the mission of the institution. Depending on who one asked, Corcoran has between eighteen and "somewhere around three hundred" missions. Every new mandate from Central Office or the courts was viewed as being "another mission to carry out."

On another level, Corcoran does have a 'can-do' attitude. Staff take great pride in being able to "handle anything they throw at "us," and handling "what nobody else [in other institutions] can handle." One person exemplified this pride in the following comment:

> *We're basically a conduit. We get missions that come down from headquarters without any input from us on how it will affect us and we're asked to do something that is very problematic. It happens all the time. Yes, we carry out the mission.*

Though proud of their institution and all that they are able to accomplish, that pride does not diminish the frustration over so much being demanded of them and the threat of adverse action if they do not meet those demands. One line staff member said, "They try so much here it hurts!"

Multiple "missions" are a fact of life at Corcoran and some of them run counter to the views of many staff. Moreover, some of those missions may be at odds with one another. For example, is it possible for a single high security prison to successfully serve as an intensive medical and mental health treatment facility while simultaneously serving as a major Administrative Segregation facility? With staff consumed with responding to the prescriptive direction from the Courts and the Central Office, and implementing new policies and procedures to avoid sanctions, it has made developing a cohesive strategic plan with input from all staff a very low priority. This same conclusion was articulated by the warden, who explained that both he and his executive staff "haven't had time to plan." Like his staff, most of his time is spent reacting to what is handed down to him by the Central Office and the Courts.

Until the differences between Corcoran's official mission and the beliefs and values held firmly by many staff are reconciled, progress will be slow. Given the resistance to management's prescriptive approaches, a more interactive dialogue and approach will be required. Explaining why and listening closely to the views of others is essential if change is to occur.

Absence of Prison-wide Strategy Leads to Creative Approaches Elsewhere

Both as a whole as well as within almost every sub-group of staff, Corcoran places strategic emphasis most heavily on the formal rules and paramilitary procedures and processes, not unlike most prisons, but to a greater degree than most.

Corcoran in many respects exemplifies and places great pride in representing itself as a paramilitary organization. This sentiment is expressed verbally with references to being at war and for the need to always be prepared to respond to an assault. The uniforms worn by correctional officers, sergeants, and lieutenants are neat and worn with pride. They look as combat ready as any prison worker could and symbolize the high degree to which structure and order are valued.

While still emphasizing structure and order, the prison as a whole lacks a strategic plan. Ranks of staff, other than the top management, appear to develop their own creative plans of action as reflected in their view that innovation is given greater weight in their perception of the current culture. Table 9 presents the strategic emphasis mean scores on the four dimensions of the culture.

Table 9

**Strategic Emphasis at Corcoran as Perceived by Ranks and Health Care**

|  | Current | | | |
|---|---|---|---|---|
|  | Consensus | Innovative | Prescriptive | Structured |
| All Staff | 17.0 | 18.9 | 22.1 | 42.5 |
| Top Managers | 21.9 | 9.8 | 23.3 | 45.0 |
| Captains/Lieutenants | 13.1 | 24.3 | 25.7 | 36.9 |
| Sergeants | 17.1 | 25.8 | 25.8 | 31.3 |
| Correctional Officers | 18.0 | 20.0 | 18.8 | 43.3 |
| Health Care | 14.1 | 22.3 | 33.6 | 30.0 |

The greater weight given to the 'prescriptive' dimension by the Health Care staff is consistent with how they viewed other dimensions of Corcoran's culture. Clearly they view the mandates from the Courts and from the Central Office as providing the most strategic direction to them.

With the exception of the Health Care staff, the "structure" dimension is given the most weight, yet it is interesting to note how relatively strong the 'innovative' dimension is viewed by each group other than by the prison's top managers. These perspectives may reflect the constraints under which top managers feel they are currently operating at Corcoran, but less so for others further down the chain-of-command who in order to get

things accomplished seem to be relying on their own experiences to be creative and innovative in planning and conducting business within their own ranks.

It is also instructive to note that the top managers desire greater change in strategic emphasis than any of the other groups in that the degree of difference for them between the current culture and the preferred culture is 59.3. The dramatic difference can be seen in Figure 9.

**Figure 9**

**Current and Preferred Top Management Profiles
for Strategic Emphasis**



## F. Criteria of Success

The types of behaviors and achievements that are valued and rewarded by a prison greatly affect staff morale and staff's satisfaction with the workplace. They are major determinants of the culture.

When the issue of recognition was brought up in both the focus groups and individual interviews, it was often met with a question being lobbed back at the assessor: "what recognition?" Others commented that "my reward is payday" or "I know I've done a good job when my team and I walk out those gates safe at the end of the day." Others felt that their reward was when "other staff want to work with me" or "a supervisor wants me on his/her staff." They did not immediately identify any formal means of recognition for outstanding employee performance at Corcoran.

Performance appraisals are often used as a means of evaluating employees and recognizing good performance, so this was another area of inquiry by the assessment

team. We learned that staff do not consider the performance appraisal process as meeting the need for recognition. Many staff noted that they had not received a performance appraisal in years. One person noted that s/he had worked at the institution for nine years and had received only two evaluations of his/her performance during that timeframe.

Moreover, when staff did receive an evaluation, many of them were conducted by someone other than their direct supervisor. One person shared a story that highlights this point:

> Supervisors, who don't even know you, are evaluating you. They base it on what's in your file and your training record. That's it. I got my evaluation back and learned that I was 'dinged' for not having completed all of my annual training. I was a few hours short because the training, that I was scheduled to go to and showed up for, was cancelled. On top of that I got a Letter of Instruction placed in my file!

Other staff across departments and ranks shared similar experiences. Comments such as "evaluations are generic, fill in the blank," and "evaluations are pretty pointless; they're a joke" were commonplace.

Even promotions were not viewed as a desirable reward for exemplary performance – at least by custody staff. As a result, many officers do not promote to the rank of sergeant (nor do sergeants promote up to lieutenant and so on). The underlying reason for this lack of desire to promote has to do with the lack of pay incentives to do so. As a correctional officer who works a regular forty-hour workweek and an occasional overtime once every week or two, can easily bring home an annual salary higher than that of a sergeant. The same applies for a sergeant with enough seniority to secure one or two regular double-shifts per week; s/he can make more than a lieutenant. A Captain at the institution described this phenomenon:

> I went from being a lieutenant to a captain, and my salary went down $30,000 that year. My tax preparer asked 'what the heck happened?!' I said, 'I got promoted, couldn't you tell?!'

This is not to say that qualified and respected staff do not promote, because they do (as the story above demonstrates). What it does show is that pay – especially overtime pay – is valued and appreciated by staff. One staff member explained that the California Correctional Peace Officers Association (CCPOA) has worked hard to get pay raises that reflect the challenges and dangers associated with the job of custody staff: "we're not getting paid for what we do but for what we might have to do."

But recognition means more than just a paycheck for staff. Though there are some formal systems for rewarding staff (e.g., recognition plaques for teachers and letters of appreciation from the wardens office for exemplary staff), staff at Corcoran do not identify them as being rewards. Put another way, they do not feel those tokens of reward are meaningful or that they signify that they are valued as staff members when

they receive these 'rewards.' What staff really want are the informal 'attaboys' and 'attagirls' that come from the heart of the person paying the compliment. Rather than "looking for the negative" and being "told of all the things that we did wrong," staff want to work in an environment where the small victories and achievements are celebrated; a place where there is not necessarily a need for celebration beyond thanking others for being good colleagues.

The assessment team while on site witnessed an example of the latter during the week. The staff from the 3B Facility had a potluck cookout. Everyone brought a different dish, and gathered around the large grill with their heaping plates of food, talking, laughing, and genuinely enjoying each other's company. There was not a formal reason for holding the cookout, but it meant a lot to staff who were there. The feelings of teamwork and camaraderie were almost tangible.

Predominantly Strong and Universal Desire for Acknowledgement

Throughout the prison, staff perceive that the criteria of success are rigid and remote and reflect an absence of personal praise and recognition when jobs are well done. Further, they desire genuine recognition from both their peers and their supervisors at Corcoran. To what degree they are desirous of such rewards and recognition from those outside Corcoran is not totally clear.

What is clear is that all staff are making a very strong statement that they want the institution to change its criteria of success from being reactive and punishing to emphasizing and rewarding staff based upon teamwork and commitment to the good of the institution. This shift can be seen in Figure 10 in which current and preferred Criteria of Success shift dramatically from the 'structured' to the 'consensus' aspect of the culture.

**Figure 10**

**Preferred and Current Organizational Profiles
for Criteria of Success**



### 3. Major Competing Values at Corcoran

There are a number of competing values present at Corcoran driving and shaping the culture as a whole. These are the 'tugs' and 'pulls' that staff feel, and then influence by reinforcing one side or the other of the value in question. Three sets of competing values are discussed. They are: (1) Custody vs. Treatment; (2) Praise vs. Punishment; and (3) Follow the Rule vs. Bend the Rules. Each of the three sets of competing values is related to the other two, but for the purposes of discussion they are presented separately.

#### 'Custody' versus 'Treatment'

There are two schools of thought with respect to the primary focus and purpose of Corcoran as a prison. The first school of thought relies on the principles of control and security being paramount to the success of the institution, whereas the other school of thought revolves around success being achieved through the provision of treatment and rehabilitation services to inmates. Though the two values are not mutually exclusive in the field of corrections as a whole, they do seem to be significantly more polarized at Corcoran than in other prisons.

For example, if one were to subscribe to the philosophies of control and security at Corcoran, s/he would not be likely to place an equal value on educational and treatment programs for inmates because such programs would be perceived as "pandering" to inmates and representative of relaxed security controls. This was heard in both the focus groups and in the individual interviews conducted with Corcoran staff, with many expressing either resentment or frustration over what they felt was too much attention being paid to

inmates who "don't deserve [it]." One staff member felt that s/he was "more of a cabana boy/girl than a cop" because s/he felt the philosophy of the Department had shifted towards "catering to [inmates]" rather than being firm with them.

In general, staff who subscribed to the values of security and control believed that a safe institutional environment would be best achieved by restricting the movement and activities of inmates. The impact of this philosophy was clearly felt by the inmates at Corcoran, who were often quite cynical when asked about the programs that they are involved in as part of their treatment programs. One inmate summarized these sentiments with the following comment:

> Programs? What programs? [Staff] think we're 'programming' as soon as we walk out of our cells. There are no incentives [to better ourselves] and they are taking away all the options that are left.

Another inmate commented, "This is the Department of Oppression, not the Department of Correction," when discussing his experience at the institution and his desire to get into a substance abuse class. Other inmates echoed these sentiments, many of who longed for a chance at rehabilitation. "Give us hope," one inmate said, "tell us that we are redeemable."

Though there are many reasons for the lack of meaningful programming opportunities for inmates at the institution (e.g., limited financial and human resources, overcrowding, lack of programming space, etc), this dichotomy exists well beneath the surface of the institution and is deeply imbedded in the culture. It is representative of how staff view inmates and how they believe inmates should be treated while incarcerated at Corcoran. They should have restricted movement and should not speak to inmates unless they're "giving an order."

There are staff in the institution, however, who subscribe to the competing philosophy that says that the success of the institution is best achieved through the provision of treatment programs and rehabilitation services to inmates. The belief in this philosophy was held by staff at all levels and throughout all areas of the institution, but espoused to a much lesser degree than the dominant philosophy. The strongest support for treatment and rehabilitation came, not surprisingly, from teachers, chaplains, and staff regularly working within the medical and mental health treatment areas of the institution. Direct treatment providers were probably at the furthest end of this spectrum, believing strongly in their duty to provide quality healthcare services to their inmate 'patients.'

Those who place higher value on security and control view with suspicion those who subscribe to this philosophy of treatment. There is a pervasive belief that, if a staff member talks to inmates, s/he must be an "inmate-lover" or a "hug-a-thugger". When staff do interact with inmates, the culture of the institution makes them feel as if they are doing something wrong - almost as if by having a conversation with an inmate means that s/he is 'siding' with an inmate rather than his/her fellow staff members. This 'us against them' position results in some staff feeling as if they have to operate 'on the down-low' or clandestinely when talking with inmates because it goes against the dominant cultural value.

Despite this, a good number of staff do talk with, and work to provide inmates with opportunities for programming when possible. One correctional officer summed up the value that s/he saw in saying,

> Look, I know that an inmate who's involved in programs and out of his cell is going to be a lot more cooperative than an inmate who's bored and locked down, banging on the doors. Good programs mean good security.

Numerous exchanges and encounters between staff and inmates were respectful, easy-going, and quite affable. They occurred throughout the institution – from interactions between squad and non-validated inmate gang members, to interactions between custody staff and inmates on lockdown in the SHU. When asked why s/he treats inmates with respect when the culture is not supportive of such behavior, a correctional officer replied, "I will treat them like a human being; I will treat them like an inmate when they act like one."

Medical Treatment – Right or Privilege?

One overarching mission at Corcoran that touches on all areas of the prison is to deliver quality healthcare in a timely manner to all inmates. While security staff know that this is a high priority of the warden, the Department and the Courts, and staff report improvements in inmate access to care, there remains a deep and broad divide concerning staff's views about what the standard of care should be.

While acting as a vehicle for inmates to gain access to adequate healthcare and mental health services, these court cases and their resultant corrective action plans and mandates are perceived by staff as just another external entity that "tells [them] what to do." [The Courts are depicted in the culturegram as a triangle – or wedge – that forces "more missions" upon staff to carry out and more procedures and rules to follow.] A large proportion of staff are extremely frustrated by the reactive nature of the institution and the Department with respect to these medical lawsuits. Upset and voicing his opinion on the matter, one custody officer said, "This department is driven [more] by fear of lawsuits than a concern for safety of staff and inmates."

Moreover, many custody and non-custody staff are resentful of what appears to them to be unlimited inmate access to health care, believing that inmates do not deserve it. Comments such as, "if my family doesn't have this good of care, why should an inmate?" and "if an inmate didn't have healthcare as a free person, he shouldn't get it here on the inside" were often heard from staff. This resentment is part of a broader set of competing values concerning the purpose of imprisonment – is it for punishment or as punishment.

Praise versus Punishment

As discussed earlier in this report, one of the driving influences of the institutional culture at Corcoran is the pervasive fear of being punished but never being acknowledged for a job well done. Numerous comments were made and stories told by staff to make this point. Some of those comments are presented here:

- "We save a guy's life, and then we're told of all the things we did wrong."

- "We know we're getting the job done, but it's not being recognized. Only the bad gets seen."

- "The court monitors were out here last month, and not one negative thing about medication management was found.  We did a really good job. But that wasn't in their report of findings."

- "Corcoran is an island. We have administrators that have been sent to Corcoran as punishment."

- "No one is going to support you."

- "This is not Burger King - You can't have it your way." (sign in the kitchen)

- "You get punished for admitting an error."

- "This has been going on so long here that it's normal.  It's contagious."

- "I want to get out and I don't care if it affects others."

- "It takes up a lot of my time being angry and upset.  It's made me want to leave CDC."

- "What they need to do is, if someone screws up, they need to be consistent in how they deal with it."

Similar sentiments were conveyed by inmates:

- "There is an exaggerated response to everything; it comes from [them] loathing us."

- "I'm trying to do my time as positive as possible but I'm getting a lot of negative feedback from staff"

- "They only feed us negativity; this creates negativity."

- "Absolute power corrupts absolutely."

Central Office, Corcoran Staff, and Corcoran Inmates

Generally, the formal expectation is that the way to get the job done is through the formal policies and procedures (e.g., via the Departmental Operating Manual or "DOM"). At Corcoran, however, these very same policies and procedures have also been viewed and interpreted as mandates "pushed down [their] throats" by people in Central office who do not understand what it takes to operationalize them at the local level.

The assessment team repeatedly heard from staff from all areas of the institution – from staff in inmate records to custody supervisors – that they had little influence or control over the demands placed on them by Central Office.  They feel as if they are constantly responding to or acting on orders from Sacramento, with many staff expressing significant frustration over the amount of work associated with doing so.  One senior staff member summed up his/her experience with this:

> I get an e-mail from central office telling me one thing to do.  Then I get that same memo sent to me by fax.  Then I get a hard copy in the mail.  I have to compare them all to

> *make sure they all say the same thing. And then I have to*
> *make sure it gets done.*

Other staff throughout the institution made similar comments on this theme of Corcoran being responsive to the external demands of the Central Office in Sacramento. "I've never worked anywhere like here," said one mid-level manager; "You work so hard to do so little."

The directives from Central Office were often described as being "time consuming [to implement]," "frustrating," "always changing." They were clearly a source of aggravation for staff, but the thing that bothered staff most – including top managers – was their perception that Central Office never asks them for their input in helping to create or design the new policies that are likely to affect them. The following comments from staff underscore these sentiments:

- "Sacramento changes things on limited information. They don't know how they affect people."

- "Sacramento writes policies but they don't know what we do here."

- "Sacramento needs to get on the same page as the lieutenants, sergeants and correctional officers."

As a result of not being included in decisions that will affect them, staff feel that 'Sacramento' does not "get it." Going deeper into the analysis of staff's perceptions, many have inferred that Sacramento does not care about them and, ultimately, that they are not valued as employees enough for Sacramento to be "bothered with asking for [their] opinions."

## 'Follow the Rules' or 'Bend the Rules'

The anxiety staff feel over the pervasive fear of being punished or getting into trouble leads to another identifiable set of competing values at Corcoran; a set of values related to how the daily work gets done within the institution. In any prison, policies and procedures are representative of the formal culture promulgated by the department as a whole; then there's how things *really* get done on a daily basis. At Corcoran, this was seen in the competing philosophies and values of staff: they either got it done 'by the book' or they 'found a way' to get it done.

- "If we did everything the way it was written, we'd never get the work done in an eight-hour period."

- "It looks good on paper, but you can't make it work."

- "There's policy, but we still gotta get things done."

- "You have to cut some corners in order to do the work."

- "We have too many missions here and nobody ever asks us how to do things the best way. They just tell us and we have to do it and that means we cut corners to get everything done."

- "Things here are wishy-washy and fly-by-the-seal-of-your pants. Policy changes overnight. I need to understand things."

- "When things change so often I can't lead. Hell, I don't know what to do sometimes!"

- "Staff is never settled here." (inmate comment)

- "If we don't get it in writing, we don't do it."

- "Policies are followed when they want to. There is no character behind policy." (inmate comment)

- "Rules only apply as they want it to on a day-to-day basis." (inmate comment)

- When asked about what makes Corcoran tick, one staff member replied, "I don't know, I never heard it tick."

- "This is a working prison, but not a working organization."

- "You keep asking about the organization, there's no organization here."

- "There's always the feeling the wheel will fall off tomorrow."

- "I don't agree with all the policies but I do my job."

Culture Mapping – the "Culturegram"

As eluded to in this report thus far, an institution's culture consists of much more than the roles and position titles that are formally defined on the table of organization and in operational manuals. It is composed of a complex system of interpersonal relationships, group dynamics, and associated attitudes and actions – all of which are centered on individual belief systems and the personal values that members of that organization hold. Given this reality of human behavior, the characteristics of modern organizations make the development of subcultures virtually inevitable. Hierarchy, segmentation and specialization create groupings of people who face problems unique to them and who may interact intensely with each other but have little or no interaction with members of other groupings.

One way to conceptualize institutional culture is as clusters of small, overlapping circles.[6] A common institutional culture can be found at the intersections of the organization's subcultures and consists of what is common among them. Thus, institutions can be placed along a continuum according to the relative degree of unity-fragmentation among their subcultures. Where there is tight clustering and much overlap, there may be a unitary institutional culture, but where the area of overlap is small there is little justification for attribution of an institutional culture.

This section of the report will first demonstrate how various groups and members within the institution affect the dynamics within the institution and its culture, as demonstrated through an example of such a diagram. Secondly, it will identify the distinct subculture groups at Corcoran, the unique dynamics that exist between the groups, as well as illustrating how their competing values and beliefs influence and contribute to the institutional culture at the institution.

---

[6] John van Maanen and S. J. Barley, A Cultural Organization: Fragments of a Theory, pp. 31-55 in P. J. Frost, et al. (eds.) Organizational Culture. (Beverly Hills, CA: Sage Publications, 1985).

*Corcoran Culturegram and Key Dynamics*

In Corcoran's 'culturegram' presented in Figure 11, there are two primary clusters of dynamics that influence the culture – those that occur externally (outside of the institution) and those that occur internally (within the boundary of the institution). Both have an equally strong impact on the way Corcoran operates, as well as on how the institutional subcultures have developed over time. These dynamics will be described in this section of the report. Overall, the culturegram characterizes the institutional culture as a number of independent subcultures operating adjacent to one another, tied together by the overarching court mandates related to medical and mental health treatment for the inmate population, yet exuding many of the same sets of beliefs and values.

**Figure 11**

**California State Prison - Corcoran Culturegram**



Criminal Justice Institute, Inc.

First, the external entities with influence on the institutional culture of Corcoran are shown as grey boxes on the upper left-hand side of the culturegram. Central Office ("Sacramento"), the California Correctional Peace Officers Association (CCPOA), the legislature, and the media each apply some pressure to the institution, whether as a function of their status in the CDC hierarchy ('Sacramento' and the legislature) or as an external entity that has power as a result of its influential membership (CCPOA) or the attention of the public (media).

Often with differing agendas and competing values, these key groups are frequently in direct competition and opposition to one another, creating a somewhat chaotic external dynamic that negatively influences the prison as a workplace. This is represented by the red 'starburst' at the center of these four bodies.

Each of the four bodies have significant influence and – to differing degrees – bearing on Corcoran's organizational culture. These four groups were the source of significant frustration and irritation for both line staff and administration, with managers feeling the brunt of the pressure. As an example, comments such as, "we get threats from Sacramento all the time," and "anything we do gets into something bad by the media," were frequently heard from staff throughout the institution, including managers. There is a pervasive sense of being 'dumped on' by Central Office. One manager summed this sentiment up in the following comment:

> Corcoran always gets the end of the rope. We get the
> worst inmates. We get the staff [nobody wants] transferred
> to us, yet we're still understaffed. And we get thrown to the
> media all the time.

This pressure and the demands that Central Office places on managers and institutional leadership is represented by the three red lightening bolts coming from 'Sacramento' and striking the management, as depicted in the culturegram. This results in significant feelings of stress and tension on the part of the warden, his executive team, and top managers as they are forced to cope with all of the various missions and tasks that are required of them, as leaders and, ultimately, of the Corcoran staff. The potential for swift punishment is always omnipresent, as discussed earlier in this report; a continuous threat of being reprimanded hanging over their heads and resulting in a great deal of tension and anxiety. One high-ranking non-custody staff member commented, "they bombard us daily; my stress level is a nine out of ten."

Given the numerous demands and considerable influence of the external environment, the management at Corcoran spends much of their time reacting to and dealing with those outside forces despite the threat of punishment and the resultant stress that they feel. This phenomenon is depicted in the culturegram by the management's placement outside the institutional boundary. With huge demands on their time coming from outside the institution, many managers felt there was great value in – in their words – "protecting" their staff from these external dynamics and influences. Many managers told the assessment team that they took pride in creating a somewhat sheltered environment for their staff, hoping that by doing so, they would be able to shield them from the same frustrations that they experience as managers.

Despite these efforts, however, staff at all levels feel the influence of external power brokers and do not feel protected. In fact, they feel the same threat of admonition and punishment as their managers do. Moreover, they expressed irritation at what they perceive to be a lack of understanding about what their jobs are really like. Whether speaking with a CO, a medical staff member, or someone in the personnel department, the assessment team repeatedly heard comments along the lines of "they don't understand my job," and "they don't have any idea what it takes to do my job here [at Corcoran]." The term 'they' referred

not only to those outside the institution, however, but also to anyone outside of their unit or – in some cases – the building in which they worked.

Feeling remote from the Department as well as from the managers of the prison has led staff to identify more closely with what is familiar to them - the six facilities/yards (3A, 3B, 3C, 4A, 4B, and Level 1) in which they have developed their own ways of getting things done. Three factors contribute and perpetuate the existence of these zones: (1) the physical boundaries that separate these self-contained yards; (2) staff's need for stability and security; and (3) staff's need for support and affirmation.

Staff become accustomed to working with one another and often bid for posts based on "who [they] get along with" and a desire to work with others who share values and beliefs similar to their own. They chose where they want to work because they "trust the guys [they] work with" in a housing unit after working with them for ten years.

All of this goes into creating and reinforcing the manner in which each yard functions and which is defined more by its informal mechanisms and systems of "getting things done" than by the prison's formal rules and structures and the Department's directives.

4. <u>From the Present to the Future</u>

Staff want their opinions to be taken into consideration and to be a part of a larger team. They also yearn for the camaraderie at the local level as well. As mentioned earlier in this report, staff at Corcoran have been the subjects of multiple investigations and inquiries regarding inmate treatment and suspicious deaths. The lack of trust staff have for one another – and any outsider to the institution – as a result of these incidents and the subsequent investigations by the FBI still exists at the institution today. Staff members are still considered to be "new" employees five, sometimes six years into their employment at Corcoran. The staff at the institution are very slow to trust others, with many making comments along the lines of, "you only trust people you know well," and "you're professional and courteous to people who are new, but they have to earn your trust."

Clearly staff do not want to live and work in the current culture any longer than they have to. The present is not what they want the future to look like. Whatever aspect or component of the culture one examines, whatever the rank of staff, or area of the prison in which they work, the current culture and competing values within in it do not make for the type of work place staff desire.

Table 10 compares the current culture with the preferred culture. The relative importance of each of the four culture types (Consensus, Innovative, Prescriptive, and Structured) according to each of the six components of the culture, as well for the culture as a whole are presented. If the preferred score is larger than the current score, it is shown in "**bold blue**." If the preferred score is smaller than the current score it is shown in "*red italics*."

Table 10

Current and Preferred Culture as Perceived by All Corcoran Staff
(N= 202)

| | Current | | | | Preferred | | | | Degree of Difference |
|---|---|---|---|---|---|---|---|---|---|
| | Consen | Innov | Prescr | Struct | Consen | Innov | Prescr | Struct | |
| Organizational Glue | 19.5 | 13.2 | 23.2 | 44.6 | 39.2 | 15.1 | 17.6 | 28.7 | 56.9 |
| Criteria of Success | 19.0 | 16.3 | 18.1 | 47.0 | 41.5 | 18.5 | 12.1 | 28.5 | 50.7 |
| Leadership | 19.0 | 21.5 | 33.9 | 26.1 | 37.5 | 13.6 | 17.2 | 32.3 | 49.3 |
| All Six Components | 19.9 | 16.8 | 25.7 | 38.1 | 36.1 | 16.3 | 17.6 | 30.5 | 32.4 |
| Strategic Emphasis | 17.0 | 18.9 | 22.1 | 42.5 | 31.4 | 18.8 | 18.5 | 31.7 | 28.9 |
| Dominant Characteristic | 15.8 | 16.4 | 30.2 | 38.1 | 28.5 | 17.1 | 23.6 | 31.3 | 26.9 |
| Management | 29.3 | 14.7 | 26.6 | 30.0 | 38.5 | 14.9 | 16.9 | 30.2 | 19.3 |

The composite scores indicate a desire to shift the culture from one characterized predominantly by its 'structured' and 'prescriptive' attributes to one that emphasizes 'consensus' and deemphasizes the 'prescriptive' and 'structured' portions of the culture. This shift is consistent, although in varying degrees. In all six of the individual components of the culture, there is a move away from the 'prescriptive' nature of the current culture to a more 'consensus-based' culture in the future.

The degree to which the intensity of a shift is desired from the current to the preferred is measured in terms of the Degree of Difference score, which reveals that three of the components (Organizational Glue, Criteria of Success, and Organizational Leadership) are viewed as being in more need of attention than are the other three components. The significance of the desired change in these three components can also be seen graphically in Figures 12, 13 and 14.

As is clearly evident, staff generally desire less emphasis on stability and control and greater emphasis on the values of flexibility and discretion, compared to their view of the current organizational culture. The current profile shows a strong emphasis on the values associated with the 'structured' culture type, while the preferred profile shows a distinctly predominant emphasis on the values associated with the 'consensus' culture type. The current profile's emphasis on the 'structured' culture reflects the staff's perception that the formal culture of the institution – as reflected in missions and associated Departmental mandates – are the driving force behind what occurs at Corcoran.

As seen in Figure 15, staff's desire to be valued and listened to is reflected in their preferred culture profile, which is weighted heavily towards the 'consensus' culture type. This current lack of trust discourages staff, making for a more difficult working environment. This desire is seen in the significant shift in the preferred culture profile towards the 'consensus' culture type, which focuses on flexibility and a concern for people.

Figure 12

Comparison of the Preferred and
Current Profiles for Organizational Glue



Figure 13

Comparison of the Preferred and
Current Profiles for Criteria of Success



Figure 14

## Comparison of the Preferred and Current Profiles for Organizational Leadership



Figure 15

## Comparison of Corcoran's Current and Preferred Prison Culture

