# EXHIBIT A
# Continued

3. Conclusion

Corcoran's current culture is reflected in its staff's values and beliefs. They are rooted in its past. The "jacket" it acquired, when it was first conceived as the prison for the "worst of the worst," is still worn today. Long before the first inmate and first employee arrived, its reputation had been established. Once open, Corcoran experienced turbulent times and disruptive events that reinforced in the public's mind as well as in the minds of many staff both at Corcoran and throughout the Department that Corcoran was indeed "the worst of the worst." Today that image still remains part of Corcoran's cultural fabric, but it is not the whole cloth.

If you work in a prison designed for the "worst of the worst," how do you avoid not thinking of yourself in those same terms? How will employees working in other state prisons or at the Central Office conceive of those who work at Corcoran? How will others interpret their words and judge their actions? In part, the answers to these questions have played a major part in shaping Corcoran's current culture – one in which for all their efforts most are punished and few rewarded.

Corcoran's staff definitely desire a more rewarding and supportive culture that emphasizes consensus building and structure along with flexibility and discretion, but with fewer prescribed dictates. The end result will be a culture in which neither staff nor inmates deserve to be punished just because they happen to work or live at Corcoran. Then, a new Corcoran "jacket" will be written which will tell the story of how it brought out the best in the best.

# E.  Readiness for Change

Bringing about change, even desired change, in a setting where a significant number of individuals and/or subcultures are strongly vested in maintaining the status quo can be a difficult and frustrating experience, particularly when the setting is a prison where strong reactions can occur even when change is well intended.  Maintaining a stable and orderly environment in which institutional security as well as staff and inmate safety is not compromised, while simultaneously changing the culture of the prison, is no easy task and certainly not without risk.

Prisons thrive on stability.  Change is often resisted even when the results to be realized are desired by staff.  Historically, wardens, supervisors and managers have been praised and rewarded for their ability to maintain order, consistency and stability.  A "good" day for many prison administrators is one during which "nothing happened."

For institutions that are running well, in which there is widespread acceptance of mission and purpose, and where the values and beliefs of staff are consistent with those of the Department, stability is a far more desirable outcome than one in which institutional operations are problematic and where the current culture in the prison is unsatisfactory to those who are part of it.  Leading and sustaining change in a prison with longstanding and significant conflicting values is no easy task and certainly not one to be undertaken without recognizing and preparing to manage risk.

The first step towards achieving culture change requires an understanding of how "ready for change" the prison is.  Readiness for change involves two types of readiness.  The first addresses <u>commitment</u> to change, and the second involves <u>capacity</u> for change.  The prison's <u>commitment</u> to change refers to the degree to which the staff are invested in the process of change, which can be lengthy and intensive.  The prison's <u>capacity</u> for change refers to the actual ability of the staff at the prison to change and whether they have the resources required to launch and sustain a culture change initiative.

For instance, as eager and enthusiastic as a prison might be for change, if the capacity for leading and engaging in change activities, while simultaneously managing ongoing prison operation is limited, then the risk/reward quotient might tilt toward a decision that the prison is not yet ready for change.  This section of the report considers Corcoran's commitment to and capacity for change, highlighting examples of its readiness for change.

1.  <u>Commitment to Change</u>

Based on the assessment results, the time is clearly right for culture change at Corcoran.  Staff clearly desire a change in Corcoran's culture and appear cautiously optimistic about participating in a culture change process.  While there were a few exceptions in a few areas of the prison, the similarities in the desire for change are apparent throughout the entire prison.  This agreement on the desire not only for a change but also for very similar types of change forms a very positive foundation upon which to base culture change planning and action at Corcoran.

Comparisons of desired culture change between younger and older staff, between genders, between newer and more veteran Corcoran staff, among all races/ethnicities, all pointed in the same direction. Table 11 presents and compares the preferred culture configuration for Corcoran as desired by specific types of Corcoran staff.

Table 11

Preferred Overall Views Held by Staff

| Staff | Preferred | | | | Degree of Difference |
|---|---|---|---|---|---|
| | Consen | Innov | Prescr | Struct | |
| Hispanic | 34.6 | 16.3 | 18.4 | 30.7 | 1.9 |
| African American | 34.2 | 16.4 | 17.9 | 31.5 | |
| New | 35.8 | 15.6 | 16.9 | 31.6 | 4.4 |
| Veteran | 36.3 | 16.6 | 17.7 | 29.4 | |
| Hispanic | 34.6 | 16.3 | 18.4 | 30.7 | 5.0 |
| Caucasian | 37.1 | 16.1 | 16.1 | 30.6 | |
| Caucasian | 37.1 | 16.1 | 16.1 | 30.6 | 5.9 |
| African American | 34.2 | 16.4 | 17.9 | 31.5 | |
| Younger | 36.2 | 13.1 | 17.5 | 33.3 | 8.0 |
| Older | 36.3 | 16.9 | 17.4 | 29.3 | |
| Male | 36.1 | 15.0 | 18.2 | 30.7 | 9.5 |
| Female | 35.8 | 19.7 | 15.3 | 29.1 | |

The similarities are striking and are confirmed by the relatively small Degree of Difference between each set of scores. ["Zero" representing no difference between two sets of scores.]

A similar pattern emerges upon examination of the desires of security staff groups by rank. Table 12 presents the type of balance in the culture that Correctional Officers, Sergeants, Lieutenants and Captains prefer.

Table 12

Preferred Culture Views Held by Security Staff Ranks

| | Preferred | | | | Degree of Difference |
|---|---|---|---|---|---|
| | Consen | Innov | Prescr | Struct | |
| Lieutenants & Captains | 35.5 | 14.0 | 17.9 | 32.6 | 5.9 |
| Sergeants | 34.9 | 15.1 | 19.8 | 30.3 | |
| CO's | 38.7 | 13.7 | 16.7 | 30.9 | 6.3 |
| Lieutenants & Captains | 35.5 | 14.0 | 17.9 | 32.6 | |
| CO's | 38.7 | 13.7 | 16.7 | 30.9 | 8.9 |
| Sergeants | 34.9 | 15.1 | 19.8 | 30.3 | |

Again the scores produce a very similar pattern indicating overlapping desires for Corcoran's future throughout all ranks. For these many groups of staff and ranks of staff there is uniform and consistent desire for similar types of change in the culture, which should facilitate the culture change process at Corcoran. However, not every major group of staff feel as similarly as they do. Two examples are presented for consideration in the development of a culture change plan. One of the comparisons is between Corcoran's top managers and their line staff, and the other is between Health Care staff and Correctional Officers.

Top Managers and Line Staff

The degree to which Corcoran's top managers and their line staff desire a similar culture for Corcoran was also examined. Here some differences are apparent, although not inconsistent with what one would expect to occur. Table 13 compares and contrasts the preferred cultural components and the resulting degree to which managers and line staff differ in their desires, and Illustration A graphically displays those same similarities and differences.

Table 13

**Managers and Line Staff Views on the Preferred Culture**

| | Consen | Innov | Prescr | Struct | Degree of Difference |
|---|---|---|---|---|---|
| **Overall** | | | | | |
| Management | 34.7 | 25.7 | 13.9 | 25.8 | 20.1 |
| Line Staff | 36.3 | 15.6 | 17.6 | 30.5 | |
| **Dominant Characteristic** | | | | | |
| Management | 27.7 | 26.3 | 16.5 | 29.5 | 19.4 |
| Line Staff | 27.5 | 16.8 | 24.3 | 31.4 | |
| **Organizational Leadership** | | | | | |
| Management | 39.7 | 19.2 | 10.8 | 30.3 | 15.7 |
| Line Staff | 37.5 | 13.6 | 17.6 | 31.4 | |
| **Management of Employees** | | | | | |
| Management | 35.3 | 25.0 | 15.0 | 24.7 | 22.6 |
| Line Staff | 40.4 | 13.7 | 17.2 | 28.6 | |
| **Organizational Glue** | | | | | |
| Management | 35.3 | 25.0 | 15.0 | 24.7 | 22.6 |
| Line Staff | 40.4 | 13.7 | 17.2 | 28.6 | |
| **Strategic Emphases** | | | | | |
| Management | 30.0 | 31.3 | 15.7 | 22.9 | 27.5 |
| Line Staff | 31.2 | 17.6 | 17.7 | 33.5 | |
| **Criteria for Success** | | | | | |
| Management | 34.3 | 29.0 | 12.1 | 24.6 | 23.8 |
| Line Staff | 43.3 | 17.5 | 11.6 | 27.6 | |

Figure 16

Managers and Line Staff Preferred Culture



Criminal Justice Institute, Inc.

As can be seen, there is a strong, shared desire for the prison to focus on the needs of staff (internally) and to increase teamwork and camaraderie as evidenced by the emphasis placed on these and other values of the 'consensus' culture type. There is a very small degree of difference between the two desired ends as seen in the degree to which the two areas overlap, indicating that line staff and managers agree for the most part on the profile of Corcoran's future culture.

Both management staff and line staff want the workplace to have an increased focus on the people who make the organization work; a place where teamwork and camaraderie are valued and encouraged. Staff from both groups currently felt as if they did not matter as people – either within the institution or in the eyes of those in Sacramento. Comments such as, "We're treated like numbers, one mistake and you're gone," and "they don't acknowledge the great staff that they have here" were frequently heard in both focus groups and in individual interviews with staff at all levels.

Where the two groups do differ, however, is in the way their desires differ with regard to the role the innovative aspects of the culture should play. Not surprisingly managers want a greater amount of flexibility and discretion within the culture, while line staff are content with lesser emphasis on this aspect of the culture. The 'innovative' culture type is characterized by creative problem solving and flexibility in trying new ideas, attributes not inconsistent with profiles of managers and leaders.

The innovative enterprises of the 1990's that sprung up in Silicon Valley are good examples of this type of a culture in which flexibility and individuality are highly valued and risk-taking by employees is encouraged and rewarded.

On the other hand at Corcoran the current culture was often described as "restrictive" and "demanding. " According to staff, "you just don't take risks in this kind of business" said one top manager. The current culture is not forgiving according to staff at all levels. One person commented that, while "the Department has preached taking 'reasonable risks' for years, you just kind of laugh at it [because you know what will happen if you fail]." Some managers, however, do take risks – they just do so "knowing what the consequences may be." Risk-taking is problematic at best.

While differences do exist between managers and line staff, they do not appear to pose limitations on Corcoran's commitment to change. The differences, however, are instructive and should prove helpful to Corcoran as it prepares and implements its culture change plan.

For both groups, however, it is important to note that, in order to move towards a different culture type, it requires that other culture types become less dominant. This being said, the decrease in the 'structured' culture type in both groups' <u>preferred</u> culture profiles should not be interpreted as a desire for less structure or order.

<u>Health Care Staff and Correctional Officers</u>

Given the previously noted differences between Correctional Officers and Health Care staff about Corcoran's existing culture, it is appropriate to examine the degree to which the desired culture may differ between these same two groups of staff to determine if there are conflicts related to each group's commitment to change. Table 14 compares the degree to which the preferred culture component and combined scores differ between these two groups of staff. Figure 17 illustrates the degree to which the combined scores for each of these two groups overlap.

Table 14

Correctional Officers and Health Care Staff Views on the
Preferred Culture

| | Consen | Innov | Prescr | Struct | Degree of Difference |
|---|---|---|---|---|---|
| **Overall** | | | | | |
| CO's | 38.7 | 13.7 | 16.7 | 30.9 | 30.9 |
| Health Care Staff | 32.0 | 24.6 | 21.2 | 22.2 | |
| **Dominant Characteristic** | | | | | |
| CO's | 32.5 | 14.9 | 20.8 | 31.8 | 41.9 |
| Health Care Staff | 19.1 | 20.9 | 35.7 | 24.3 | |
| **Organizational Leadership** | | | | | |
| CO's | 37.6 | 12.6 | 18.4 | 31.5 | 14.7 |
| Health Care Staff | 38.2 | 18.2 | 19.5 | 24.1 | |
| **Management of Employees** | | | | | |
| CO's | 39.4 | 12.4 | 16.8 | 31.5 | 17.3 |
| Health Care Staff | 40.0 | 20.5 | 12.7 | 26.8 | |
| **Organizational Glue** | | | | | |
| CO's | 44.4 | 11.4 | 15.8 | 28.4 | 59.1 |
| Health Care Staff | 23.6 | 32.7 | 24.1 | 19.5 | |
| **Strategic Emphases** | | | | | |
| CO's | 33.2 | 14.6 | 16.8 | 35.3 | 49.9 |
| Health Care Staff | 28.2 | 32.9 | 23.5 | 15.4 | |
| **Criteria for Success** | | | | | |
| CO's | 45.1 | 16.0 | 11.7 | 27.1 | 12.7 |
| Health Care Staff | 42.7 | 22.3 | 11.8 | 23.2 | |

**Figure 17**

**Correctional Officers and Health Care Preferred Culture**



While there are some differences in the combined scores, it is in the six sets of component scores that the similarities and differences become more apparent. In three of the components (Dominant Characteristic, Strategic Emphases, and Organizational Glue), the differences are significant, while in the three other components the differences are minimal. Figures 18, 19, and 20 reveal the extent to which the scores in the three culture components differ the most.

Figure 18

### Correctional Officers and Health Care Staff
### Preferred Profiles for Dominant Characteristics



Dominant Characteristic - All CO's & Med/MH (Preferred)

Figure 19

### Correctional Officers and Health Care Staff
### Preferred Profiles for Strategic Emphases



Strategic Emphases - All CO's & Medical/MH (Preferred)

**Figure 20**

**Correctional Officers and Health Care Staff**
**Preferred Profiles for Organizational Glue**



Christian Avance Institute, Inc.

The readily apparent differences in the degree to which there are quite different views as to the desired balance in the emphasis that should be placed on the four aspects of Corcoran's culture are consistent with the field work conducted by the assessment team as they observed and listened while on site. These differences require attention and resolution. In many respects they are at the heart of the current tension and conflicting values present within Corcoran as well as between Corcoran and the Central Office and the Courts.

Whether the differences are between the amount of <u>innovation</u> as opposed to <u>structure</u> that is seen in the tension between what should be strategically emphasized (see Figure 19); or the tension between a <u>consensus</u> or a <u>prescriptive</u> culture concerning the dominant cultural characteristic (see Figure 18); or the tension between a <u>consensus</u> or an <u>innovative</u> culture when it comes to determining what will be the bond that holds Corcoran together; they will need to addressed constructively.

<u>Summary</u>

As significant as these differences are, they are not insurmountable. Neither are any of the other value conflicts currently present at Corcoran, or between Corcoran and its external environment. The bottom line is that staff at Corcoran desire to improve the culture. That desire is an essential part of building a firm foundation for commitment to change. The key is to develop a plan through an inclusive process in which the opportunity for everyone to play a role in framing that new culture is assured. In that way, all voices can be heard and understood, and the resulting culture can contain a range of values that may not be identical but that do not conflict to the point of preventing the creation of that desired culture.

2. Capacity for Change

Based on the assessment team's findings, Corcoran has the capacity to engage in and implement institutional culture change; however, there are a number of issues that should be considered and addressed as part of the planning for change process. Some of these factors currently have a greater capacity to support the change process than do others. The relative degree of strength to facilitate change or concern about each item is presented and discussed, but in no particular order of strength or concern.

Strengths and Concerns

*Workload*

To what degree can time and energy be devoted to culture change work at Corcoran while simultaneously addressing current demands? It's a serious question that will require thoughtful analysis. Are one or more of Corcoran's current "missions' not in keeping with creating a cohesive consensus driven culture? Should a realignment of missions occur as part of - or precede - launching into a major culture change effort?

Related to the issue of workload is the question of staff's capacity to address all of Corcoran's missions given the significant number of staff who are transferring to Delano II. Will those vacant positions be filled promptly, and if not, to what degree will having to fill these positions with existing staff working those posts on overtime impede the culture change work?

While we believe that Corcoran does have the capacity to manage its current workload and embark on a culture change "mission," the potential for conflict should be thoroughly assessed in order to produce the best possible plan given the nature of the current situation.

*Communications Technology*

An integral component of any culture change plan is the ability of all staff to rapidly and effectively communicate with each other. The absence of a Local Area Network (LAN) at Corcoran will impede completion of culture change tasks, just as it currently and significantly hampers all forms of written communications. The absence of both hardware and software will have to be overcome until a LAN and email communications are available throughout the prison.

*Physical Capacity*

By all accounts Corcoran's buildings, grounds and infrastructure certainly need repair and require constant maintenance. While culture change can certainly occur in a prison whose physical structures have deteriorated badly, it may make it more difficult to implement the culture change process if those repairs and improvements were not done simultaneously. Corcoran's physical surroundings are part of its culture, and in some ways are visible reminders of its less visible culture needs. Making those much needed improvements will serve to reinforce and expedite Corcoran's capacity for culture change.

### Central Office

While the Department of Corrections is fully committed to supporting significant culture change activities at Corcoran, the relationship between the Central Office and Corcoran requires attention and repair if the culture change process is to be successful. Much attention has already been devoted to documenting the concerns and desires of Corcoran's staff. In as much as one of the major cultural shifts at Corcoran involves its relationship with the Central Office, it will be incumbent upon both Corcoran and the Central Office to better understand each other.

Listening carefully to each other is the first step. Lessening the prescriptive elements of the relationship between them may take more time, but it certainly is very doable. In any event it is critical that these issues be addressed not only in order to improve the relationship, but also to support and encourage a less prescriptive and more consensual set of relationships between elements within Corcoran's own chain-of-command.

### CCPOA

In sharp contrast to the current differences between the Central Office and CCPOA headquarters, the relationship at Corcoran between CCPOA's leadership and prison managers is quite constructive and very respectful. The professional relationship between the warden and the chapter president has helped to set and maintain this tone. While each party has their own agenda, they have demonstrated they can work together harmoniously and productively while still serving their individual agenda.

Even though neither prison managers at Corcoran nor the CCPOA chapter requested that Corcoran's culture be assessed, both willingly engaged in the assessment and each contributed extensively to an uninhibited assessment process. Given these observations and experiences, Corcoran should engage CCPOA and the other bargaining units in the formulation and implementation of a culture change plan. By doing so, Corcoran's capacity for change is increased dramatically. In fact, without that form of team building and consensus decision-making (which we already know is desired by all staff) little of value is likely to come of any culture change efforts, or for that matter of any other initiative.

### Continuity of Leadership

One of the most critical pieces in determining a prison's capacity for change is the degree to which its prison's leaders will be in place to both plan and implement the culture change process. Before embarking on a culture change effort, commitments from the Central Office and from the Warden, and ideally from the Chief Deputy Wardens that they will remain in place for at least two years and preferably three years, is essential to a successful change effort. This issue should be aired and resolved to everyone's satisfaction prior to beginning the change process.

3. Resource Availability

Several resources are available to assist Corcoran in planning and implementing a culture change plan. First, some of the assessment team members will return to the prison to discuss with staff the findings presented in this report and to begin working with staff to

develop a culture change plan to meet Corcoran's unique needs. They will continue to provide support and guidance to Corcoran over the next twelve months.

Second, the National Institute of Corrections offers a range of programs specifically designed to assist prisons in their culture change efforts. These programs represent a major commitment by NIC in assisting the field of corrections to address culture-based issues. They include a Leading and Sustaining Change project in which a consultant experienced in organizational change management and the impact of culture on an organization works closely for a year or more with the warden and staff both in developing them as change leaders and managers as well as assisting them in the development of culture change process and plan. Other NIC supported programs include a three-day program in which a consultant works with key staff to better understand their prison's culture, gain consensus for change, and to begin a process to create a Positive Prison Culture. A third NIC funded initiative involves the use of a consultant to assist the prison develop a strategic plan aimed at addressing value conflicts within the prison's culture.

Third, as much culture change work has been undertaken in a variety of private sector organizations for a number of years, and more recently in public sector organizations, a wealth of knowledge and experience has accumulated. Practitioners and academicians have written extensively of their experiences as consultants assisting others in the change process, and as leaders of organizations that embarked on and successfully brought about significant change. These consultants and practitioners, and their writings could be tapped.

4.  Conclusion

The Department and CJI are committed to helping Corcoran make lasting changes in its culture. However, the process of culture change does take time and an equally strong commitment from the prison's leadership and staff. Change does not happen because someone from the outside says it should; change happens because the staff within the prison buy into the process of change and see the inherent benefit in a fundamental shift in the core values of the prison.

# EXHIBIT B

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO

HOLLY BALDWIN
ERNEST GALVAN
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

ROSEN, BIEN & ASARO, LLP
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

June 1, 2005

J. Michael Keating, Jr.
Special Master
285 Terrace Avenue
Riverside, RI 02195

Lisa A. Tillman
Deputy Attorney General
1300 I Street
P.O. Box 944255
Sacramento, CA 94244-2550

John van de Erve
Legal Affairs Division
1515 S Street
P.O. Box 942883
Sacramento, CA 94283-0001

Re:    Coleman v. Schwarzenegger
       Our File No. 489-3

Dear Michael, Lisa and John:

It is clear from plaintiffs' review of defendants' materials provided on Use of Force in response to the March 5, 2005 Court Order, that new training and additional Use of Force Guidelines are needed. Custody officers require training and specific guidelines to assist them in managing and communicating with mentally ill inmates so that situations do not escalate into use of force, administrative segregation placements and criminal prosecution. Clinicians also require training and specific guidelines concerning their critical responsibilities in the process.

California Department of Corrections' Use of Force Policy, as set forth in the Fact-Finding Report, defines types of force to be used by correctional officers against inmates. (Fact-Finding Report at p. 58.) There is no reference in this policy how to manage mentally ill or developmentally disabled inmates who might not respond immediately to commands that they may not have the ability to comprehend or who might appear oppositional because of their disabilities. Emergency force is defined in

J. Michael Keating, Jr., et al.
June 1, 2005
Page 2

this policy as: **force used when the behavior of the inmate constitutes an immediate, serious threat to the safety of staff, visitors, and other inmates or to institution security**. Between January and August 2004, 85% of the emergency use of force incidents involved mentally ill inmates in Corcoran's Units 4A and 4B, who were approximately 25% of the population of those units. (See Attachment A, Chart of Reported Incidents Involving Use of Force.) As will be discussed further below, the Use of Force Handbook and the Fact-Finding Investigation do not address this disproportionate emergency use of force against mentally ill inmates. Again, there must be additional training for custody staff that addresses this problem.

The documents provided by defendants pursuant to the March 5, 2005 Court Order clearly show the need for additional training and guidelines for use of force at Corcoran. Providing combined training for clinical and custody staff in alternatives to physical force when inmate-patients do not respond immediately to a custody command, including de-escalation techniques, would provide custody with the necessary tools for working with mentally ill inmates. (See Kaufman Declaration at 163; See Koson Depo at 442-44.) This was a major issue litigated at trial and resulted in the Court's finding that the defendants' use of force policy had resulted in the violation of the Eighth Amendment rights of members of the plaintiff class. Coleman v. Wilson, 912 F.Supp. 1282, 3123 (E.D.Cal. 1995)

The Coleman Court was concerned about the use of force against mentally ill inmates who were often punished without regard for their mental illness. In discussing the punishment of mentally ill for their acting out behavior, the Court noted that Magistrate Moulds "found that such treatment was the result of inadequate training of the custodial staff so that they are frequently unable to differentiate between inmates whose conduct is the result of mental illness and inmates whose conduct is unaffected by disease". Coleman v. Wilson, 912 F.Supp 1282, 1320 (E.D.Cal. 1995) In evaluating whether the use of tasers and 37mm guns against members of the Coleman class was excessive force the Court noted:

> "[t]here is nothing of record suggesting a penological justification for the distinction between inflicting physical as contrasted with mental injury. Thus, there is no dispute that these weapons are used on inmates with serious mental disorders without regard to the impact of those weapons on their psychiatric conditions, and without penological justification." (at 1323.)

Plaintiffs reviewed the Use of Force Handbook, Fact-Finding Relative to Staff Misconduct at Corcoran, and Executive Use of Force Reports provided by Lisa Tillman on May 12, 2005 and May 27, 2005 with the Court's concerns in mind.

J. Michael Keating, Jr., et al.
June 1, 2005
Page 3

## I.    Use of Force Handbook

### a.    General Comments

The "Use of Force Handbook" is not a "Handbook", nor is it a useful reference guide for line staff at Corcoran State Prison. It is a collection of memos on various topics that have been issued by Central Office and local Corcoran staff over the past six or seven years. No attempt has been made by Corcoran administrative staff to incorporate the various memos on a topic into a single clear institutional policy. In fact, the "Handbook" does not even include the Use of Force Memorandum approved by the Court in its January 14, 1999 Order.

In reading the "Handbook", one must refer back and forth between memos on the same issue in order to discern current policy because later memos on a policy do not contain the complete policy but rather reference earlier ones. For example, the first section entitled, Use of Force Review Committee, includes six memos dating back to 1998 that govern the local institutional review of use of force incidents. The most recent memo refers to sections in earlier ones, noting that the sections are superseded or clarified. (See April 23, 2004 Memo to Regional Administrators and Wardens, p.1 and 2.) An earlier memo referred to in the 2004 memo also refers back to earlier memos. (See February 14, 2001 Memo to Wardens at p. 1, 2 and 3). One must read all of the memos to understand the policy in this area. How would this compilation be useful?

Corcoran must create an actual Use of Force Handbook by defining clear policy statements and including only relevant memoranda. Finally, the Use of Force Handbook must include the Use of Force Policy Memorandum approved by the Court in its January 14, 1999 Order.

### b.    Mental Health Section

The Mental Health Section of the Use of Force Handbook is inadequate and incomplete. It does not address the disproportionate use of force against mentally ill inmates that has been documented at the institution. Indeed, Warden Scribner's Memo, dated August 2004, included in this section makes no mention of this concern. Until the institution acknowledges the problem, a solution cannot be developed.

The Mental Health section must set forth the requirements that attach when custody decides to use calculated force, including a clear description of the required pre-force confidential clinical intervention.

During the April 27, 2005 Corcoran Exit, the Coleman monitors reported that the clinical intervention during calculated use of force was very weak. They recommended that mental health staff work on a clear protocol for use during calculated use of force incidents. The protocol developed should be included in this section.

The Mental Health section should set forth a use of force protocol when custody officers are confronted with inmates during "suicide attempts". Under what

J. Michael Keating, Jr., et al.
June 1, 2005
Page 4

circumstances, **if any**, is emergency force appropriate when an inmate refuses to relinquish a noose or other material that he is threatening to hang himself with? Should officers use OC spray before entering a cell to cut down an inmate during a suicide attempt? These issues must be addressed in this section of the Use of Force Handbook.

In addition, as discussed above and based upon the review of the Fact-Finding Report and the Use of Force Reports submitted, custody officers require additional training and/or specific guidelines in de-escalating situations with EOP and CCCMS inmate-patients that should be incorporated into this section of the Use of Force Handbook.

Finally, Corcoran developed a Corrective Action Plan in September 2004 to address their disproportionate use of force against MHSDS inmates. (Attached to John Dovey letter to Michael Keating, dated September 24, 2004.) This CAP included a number of action plans with completion dates that have passed, including the following:

1.    Combine local operating procedures and policy memos into a reference book for line staff. (Is that the Use of Force Handbook?) This reference book should clarify current policy and procedures and not merely include all policy memos and existing local operating procedures. As discussed above, the Use of Force Handbook does not address the disproportionate use of force against MHSDS inmates, including the emergency use of force, and other important mental health issues.

2.    Modify the existing mental health referral form to include the date of the mental health follow-up subsequent to the use of force incident and whether or not the inmate has been compliant with his mental health programming.

3.    QIT to establish a process to follow-up on inmates involved in multiple use of force incidents. Process will include timetables and accountability. (Completion Date of September 20, 2004.)

A modified mental health referral form is included in the Use of Force Handbook. The form does not include any instructions as to how it should be utilized. Was there training for custody staff on the use of this form? Any instructional memos? In the Use of Force Reports provided to Mr. Keating and plaintiffs, the mental health referral form was either missing or incomplete.

The Process for Follow-up on inmates with multiple use of force incidents developed through the QIT should be incorporated into the Mental Health section of the Use of Force Handbook.

II.    **Fact-Finding Relative to Staff Misconduct Contended by ASU EOP Hub Inmates**

The Fact-Finding Study, which plaintiffs initially objected to because it was conducted by supervisory staff working in the same units where the staff misconduct was

J. Michael Keating, Jr., et al.
June 1, 2005
Page 5

alleged, was self-serving, superficial and clearly not independent. The major conclusion of the Fact-Finding Study conducted at Corcoran was that custody staff was **not** using disproportionate force on MHSDS inmates housed in 4A and 4B of the SHU. (Fact-Finding at page 83.) This conclusion is **not** supported by the evidence (See Chart of Reported Incidents Involving Use of Force, Attachment A.)

In reaching their faulty conclusion, defendants relied on the percentage of MHSDS inmates in each SHU unit who were involved in a use of force incident, rather than the percentage of MHSDS inmates of total use of force incidents. This dramatically affects the conclusion. For example, in 4A for the month of January 2004, there were 240 CCCMS inmates housed in the unit. Of these, six CCCMS (2%) were involved in a use of force incident. Defendants report that since only 2% of the CCCMS population was involved in use of force incidents, use of force was not disproportionate. **However, among the SHU population in 4A, there were 7 use of force incidents with 6 of them involving CCCMS inmates. Therefore, in January 2004 in 4A, CCCMS were involved in 86% of the use of force incidents.** This is the relevant calculation for the inquiry done by defendants. As is evident by reviewing the summary chart below which contains the data for January through August 2004, there is a clear pattern of disproportionate use of emergency force against MHSDS inmates housed in the SHU.[1]

| UNIT | January - August, 2004 | | |
|---|---|---|---|
| | 4A | 4B | All Units |
| Unit Population | 1013 | 1024 | 2037 |
| Unit MHSDS Population | 240 | 276 | 516 |
| % MHSDS in Unit | 24% | 27% | 25% |
| Reported UOF Incidents | 48 | 48 | 96 |
| Reported UOF Incidents Involving MHSDS Inmates | 39 | 41 | 80 |
| % Reported UOF Incidents Involving MHSDS Inmates | 81% | 85% | 83% |
| Emergency UOF Incidents | 41 | 44 | 85 |
| Emergency UOF Incidents Involving MHSDS Inmates | 33 | 39 | 72 |
| % Emergency UOF Incidents Involving MHSDS Inmates | 80% | 89% | 85% |

---

[1] See Complete Chart attached hereto as Attachment A.

J. Michael Keating, Jr., et al.
June 1, 2005
Page 6

The data collected and reported on in the Fact-Finding Study conclusively supports such a finding for each of the months reported on and for both 4A and 4B. In addition, 85% of the **emergency** use of force incidents involved MHSDS inmates. (See, Attachment A.) Corcoran must address the results of this Fact-finding Report, especially the clear finding that custody officers use force against MHSDS inmates in the SHU at a disproportionate rate. The force used is **emergency force,** which means that a clinical person who might be able to defuse a situation and stop the use of OC spray or physical force is not brought into the situation. The first point at which Corcoran must assess custody behavior is the point at which officers are determining that emergency force is warranted. We believe, based upon our review of the limited Use of Force Reports provided to plaintiffs, that custody officers require additional training in how to determine whether an incident requires emergency force, as well as how to de-escalate incidents before resorting to emergency force. The impact of these use of force incidents ---the immediate psychological affect of the force on the mentally ill inmate and the long-term psychological impact through additional segregation placement and DA referrals--- are not recognized as part of the decision-making by custody staff and must be seriously weighed in the decision.

## III.    Review of Executive Use of Force Committee Reports

At Corcoran State Prison, there is clear evidence provided by defendants that mentally ill inmates housed in the SHU experience emergency use of force at a disproportionate rate as compared to non-caseload inmates. Furthermore, MHSDS inmates were **three** times as likely to experience use of force when they were involved in incidents resulting from non-contact incidents than non-caseload inmates. (Special Master's Fourteenth Monitoring Report at 41.) This data clearly indicates that custody staff need further training in working with mentally ill inmates. Plaintiffs have reviewed the initial sample of Use of Force Reports provided by defendants and they provide guidance in the type of combined custody/clinical training that Corcoran should be initiating around use of force issues.

Physical force and OC spray is used disproportionately against mentally ill inmates at Corcoran in circumstances where custody officers could have avoided force through the use of verbal persuasion or other de-escalation techniques. This is particularly true in evaluating the Use of Force Reports written for EOP patients, who were then removed from mainline EOP, placed in administrative segregation, issued RVRs, and referred to the District Attorney for prosecution, after incidents where they did not respond to an order and things quickly escalated.

The second use of force situation where staff training seemed inadequate involved inmates who were threatening suicide and had shoelaces or other clothing items around their necks, but were not hanging. In those circumstances, the officers OC sprayed these inmates in what appeared to be a punitive fashion.

J. Michael Keating, Jr., et al.
June 1, 2005
Page 7

Finally, the use of force against MHSDS inmates at Corcoran remains primarily emergency force, as evidenced by the 2005 Use of Force Reports provided by defendants. (All 8 of the Use of Force Reports provided on May 27, 2005 were emergency.) Custody training is needed that will assist officers in evaluating when use of force can be delayed to enable the intervention of clinical staff who may more effectively de-escalate a situation, thereby eliminating the need for force against a mentally ill inmate. Clinical training is needed that will clarify the role of the clinician in the calculated use of force situation, including an emphasis on the clinician's responsibility to delay use of force where use of force against a particular mentally ill inmate will be psychologically harmful. A process should be created for supervisory review when clinical staff recommend against use of force based upon mental health concerns, yet custody staff wish to proceed.

Specific examples from the Reports provided are discussed below:

### Use of Force Report, COR-03B-04-04-141

This inmate is an EOP/DDP inmate who is described in the incident report as having a history of refusing orders from one officer, but complying with orders if two officers are present. This inmate was lying on the cement step of the Medical clinic when an officer noticed him during an escort and ordered him to crawl to the side to make way for the escort. The inmate stood fully upright and refused to move. When the officer put his hand on him, he struck away the officer's hand. At that point, the situation escalated, and he was taken down to the ground, put in cuffs and placed in administrative segregation. This EOP/DDP inmate was charged with Battery on a Peace Officer, which was referred to the District Attorney on 3-6-04.

Staff was reportedly aware that this DDP/EOP inmate would easily comply with an order if two officers were present, yet he was ordered to move by one officer. After the inmate struck away the officer's hand, it was still possible to de-escalate the situation, however, custody officers have not been trained to evaluate behavior from a mental health or developmental disability perspective.

Finally, this incident could have been written up as Disobeying a Direct Order rather than Battery on a Peace Officer. Instead, this incident will result in placement in administrative segregation, a possible SHU term and additional prison time.

### Use of Force Report, COR-03B-04-02-0103

This inmate is an EOP patient who was observed as he exited the dining hall and started to walk close to the fence along the yard walkway. An officer ordered him to exit the out of bounds area and walk on the yellow line close to the center of the walkway. He failed to comply with the order numerous times and continued to walk towards his housing unit. As he walked toward another officer, the officer ordered him to stop, which he did. The officer started the body search, but the inmate started twisting his upper body

J. Michael Keating, Jr., et al.
June 1, 2005
Page 8

to the left while simultaneously moving his left elbow toward the officer's mid-torso. The inmate was thrown to the ground and put in handcuffs. He sustained abrasions on both knees and his left elbow. He was issued an RVR for Attempted Battery on a Peace Officer, which was referred to the District Attorney for felony prosecution. He was placed in the EOP Hub.

Again, de-escalation tactics here might have avoided this confrontation, which resulted in an administrative segregation placement and DA referral for this EOP patient.

## Use of Force Report, COR-3B-04-02-0109

This EOP patient had been removed from his cell by staff after telling them that he was hearing voices telling him to flood the tier and smear feces on himself. He was first taken to the clinic but removed and put in a holding cell after spitting at staff. In the holding cell he slipped out of his cuffs, and urinated on the floor. He then removed his laces, spit at the Lieutenant and Psych tech, and the officers used emergency force on him to cuff him up. The Report found emergency use of force unwarranted, stated that he had never told staff that he was suicidal. Presumably if he had said he was suicidal, the use of OC spray would have been justified. We discuss the lack of standards for the use of OC spray in these circumstances below.

When this EOP patient was eventually discharged from the MHCB, he was placed in the EOP Hub, charged with Aggravated Battery on a Peace Officer and DA referred for prosecution.

## Use of Force Report, COR-OCS-05-02-0083

This CCCMS inmate was meeting in an IDTT and became agitated when his doctor told him that he would be placed on court ordered medication (Keyhea Order). He became more agitated as the doctor attempted to explain why and stood up to leave and kicked his chair. The chair came off the floor and struck the table where the doctor and social worker were sitting. The officers grabbed the inmate who resisted by pulling away. One of the officers struck his elbow against the wall and the inmate's head hit the wall. He required seven sutures.

This inmate was charged with Attempted Battery on a Non-Peace Officer (the clinician) and Battery on a Peace Officer. They were referred to the DA for prosecution.

There are many questions about how this communication with the patient was handled, however, most disturbing is the decision to write-up and refer for prosecution the incident that occurred during this clinical meeting with this patient who meets the standards for court-ordered involuntary medication.

J. Michael Keating, Jr., et al.
June 1, 2005
Page 9

## Use of Force Report, COR-03B-04-03-0190

This CCCMS inmate became agitated in his cell and made racial comments about staff allowing white inmates to come out to pick up trash. An officer attempted to counsel him on his behavior and ordered him to submit to handcuffs. He reluctantly complied and was escorted to the unit office where he refused to control his disruptive behavior. Presumably his disruptive behavior continued to be his racial comments. It was determined that he should be escorted to the Program Office for a cooling off period and when he was being escorted, he broke free of the officer's grasp, and turned to face him. The officer used physical force to take him to the ground and to control him. The inmate sustained a small abrasion to his lower back.

In this circumstance, officers' removal of this inmate from his cell escalated the situation. Given the agitated state that he was in when he was removed from his cell, it was appeared unlikely that removal would de-escalate the incident. In fact, removal seemed designed to cause a confrontation.

## Use of Force Report, COR-04B-05-04-0200

This EOP ASU inmate was housed in his cell and had refused to return his food tray. After he cracked his front cell window, he failed to comply with an order to stop hitting the window and cuff up. He continued to hit the window. He was OC sprayed. Then he submitted to handcuffs and was removed from the cell to the holding cell. During the escort he attempted to head butt and kick the officer. He was forced to the floor and OC sprayed again. He was rehoused in his cell.

This EOP inmate was charged with Attempted Battery on a Peace Officer, which was referred to the DA for prosecution.

The explanation for the emergency use of force was that he had broken the window. There is no indication that mental health was contacted at any point during this entire incident, which resulted in two OC spraying incidents and a physical force. Again, this removal from his cell, rather than permitting him to cool down in his cell until mental health could arrive, seemed ill-advised.

## Use of Force Report, COR-04B-05-04-0181

According to the report, the Sgt. in the EOP Hub unit had removed this EOP inmate from his cell for a cooling off period and counseling because of some disruptive behavior. As above, plaintiffs question the decision by custody to remove MHSDS inmates from their cells in the segregated housing units who are acting "disruptive" for "cooling off periods". These removals and escorts back to their cells seem to be highly charged times when a confrontation can occur between the MHSDS inmate, who may be actually experiencing a mental health decompensation. Plaintiffs believe that custody should be contacting mental health for consult at the point that MHSDS inmates are acting "disruptive" and require removal from their cells for "cooling off".

J. Michael Keating, Jr., et al.
June 1, 2005
Page 10

During the inmate's escort back to his cell, he twisted his upper body to the left so that he was facing one of the officers. As the officers were attempting to regain control of him, one of the officers dispersed a three-second burst of OC spray, and the two officers used force to bring him down to the floor. He was returned to his cell.

This EOP patient was reportedly upset because yard had been cancelled. Again, no mental health intervention had been utilized initially when this inmate had become upset over the change in the schedule. The response to his body movements seem extreme given the two officer escort team and appears to ignore the impact of force on seriously mentally ill inmates. Additional training for officers working in this unit would help them approach this situation more effectively.

## Use of Force Report, COR-03A-05-04-0180

This CCCMS inmate housed in SHU was being escorted to the exercise yard when he said, "You shave your head then grow balls." The inmate stopped the escort, and the officer grabbed his arm and collar and returned him to his cell. This was the first use of force against this inmate. Once in his cell, the inmate started banging his cuffs against the cell window. He ignored an order to stop, grabbed a small rock and hit the window again and cracked the glass. This inmate was sprayed twice with OC spray. He cuffed up, was removed from his cell, decontaminated and returned to his cell.

Clearly this inmate was agitated even as he was being escorted on the yard. No mental health was contacted at any point during this intervention, although he appeared in need of mental health intervention. There was no need for an emergency use of force; this inmate was in his cell.

## Use of Force Report, COR-03B-04-03-0186

This EOP inmate was being processed for administrative segregation when he threatened suicide in a holding cell in the 3B Program Office. A psych tech examined him and he denied any intent to harm himself. Half an hour later an officer observed him with a shoelace around his neck that was tied to the grate at the top of the holding cell. When the officer told him to stop his actions, he told the officer he had to do it. The officer sprayed him in the face with OC spray, which had little effect on him. He continued to put pressure on the ligature and bent his head lower. The officer waited for other staff to arrive to open the cell door at which time they placed him in restraints with no resistance.

This use of force was found appropriate. Pepper-spraying inmates attempting suicide, rather than removing them from the cell is routine practice at Corcoran. In this case, removal was clearly an option.

Plaintiffs request clarification of Corcoran's policy regarding custody response to inmates threatening suicide, as well as inmates making preparations for an attempt. If the inmate-patient is hanging, the cell should be immediately entered. Unfortunately,

J. Michael Keating, Jr., et al.
June 1, 2005
Page 11

according to several Suicide Reports, custody officers have delayed entering the cell to effectuate a rescue until they have pepper-sprayed the inmate – presumably to see if he is "faking" the attempt. There must be a clear policy about use of force in these circumstances.

In the other cases reported in this packet, the use of OC spray appears punitive. (See, COR-03A-05-01-0042: CCCMS, DD2 inmate sprayed in the face with OC after twisting a piece of blanket around his neck and telling staff they would have to come in his cell and get him; COR-04B-05-02-0066, EOP inmate in holding cell before being escorted to ACH for suicidal ideation, tied pant leg of jumpsuit around neck and attempted to tie other end to holding cell door, Sgt ordered him to stop or he would OC spray him, inmate refused and he was sprayed in the face; COR-03A-05-04-0180, 3CMS inmate housed in ASU covered his windows and officers ordered him to remove coverings, submit to cuffs and exit cell. He uncovered a portion and told them they would have to come get him. He began wrapping a towel around his neck and the two offices OC sprayed him)

We hope that these comments are instructive as Corcoran addresses the use of force problems that exist at the institution. Custody officers who work in housing units where mentally ill inmates are housed must both facilitate their access to mental health care **and** respond to them appropriately when behavioral issues emerge that may be related to their mental illness and may prevent them from responding appropriately to a custody command. These dual custody roles do not operate in a vacuum – escorting MHSDS patients to their assigned group and individual clinical contacts provides benefits that are undermined when these same patients are subjected to excessive use of force, placed in administrative segregation and prosecuted for behavior that often results from a confrontation that could have been avoided. Clinical staff must receive training on their critical role in calculated use of force including clear guidance regarding their ability to delay use of force by custody against an MHSDS inmate where use of force would be harmful to the inmate's mental health.

Please feel free to contact plaintiffs with any questions about these comments.

Sincerely,

ROSEN, BIEN & ASARO, LLP

By: Jane E. Kahn

JEK:ts

J. Michael Keating, Jr., et al.
June 1, 2005
Page 12

cc:     Matthew A. Lopes, Jr.
        Kerry Hughes
        Dennis Koson
        Jeffrey Metzner
        Ray Patterson
        Melissa Warren
        Coleman Co-counsel