# EXHIBIT C

SANFORD JAY ROSEN
MICHAEL W. BIEN
ERNEST GALVAN

HOLLY BALDWIN
GAY C. GRUNFELD
JANE KAHN
MEGHAN LANG
SARAH LAUBACH
ANNE MANIA
NURA MAZNAVI
MARIA MORRIS **
THOMAS NOLAN
LORI RIFKIN ***
LOREN STEWART
KENNETH WALCZAK****
AMY WHELAN
SARAH OLSON ZIMMERMAN ****

**ROSEN, BIEN & GALVAN, LLP**

ATTORNEYS AT LAW
315 MONTGOMERY STREET, TENTH FLOOR
SAN FRANCISCO, CALIFORNIA  94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rbg@rbg-law.com

July 18, 2007

VIA EMAIL AND REGULAR MAIL

J. Michael Keating, Jr.
Special Master
285 Terrace Avenue
Riverside, RI  02915

    Re:   *Coleman v. Schwarzenegger*
          Our File No. 0489-3

Dear Mr. Keating:

    Plaintiffs submit the following comments on the draft version of the Eighteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols ("Draft 18th Report").

    Despite significant and troubling problems documented within the Draft 18th Report regarding the failure of correctional officers to provide immediate emergency care to inmates during suicide attempts in contravention of Court Orders and CDCR Policy, the use of unsafe, unlicensed and inappropriate settings for suicide watch, and the continued disproportionate and inappropriate use of force against inmates with mental health disabilities at CSP-Corcoran, the Special Master makes no additional recommendations in the Draft 18th Report. The reasoning offered is that Defendants already face significant obligations. Draft 18th Report at 336-338. Plaintiffs acknowledge the significant challenges facing Defendants at this time and, therefore, request that the Special Master only address the documented disproportionate and inappropriate use of force against inmates with mental health disabilities at CSP-Corcoran with the following recommendation:

    1.     Defendants shall be directed to work with the Special Master, his experts, Plaintiffs' counsel and plaintiffs' expert to:

        a)     Create a Use of Force Policy Handbook that includes specific guidelines related to inmates with mental health disabilities, including but not

*     MEMBER OF THE CONNECTICUT AND THE CALIFORNIA BAR
**    MEMBER OF THE NEW YORK AND THE CALIFORNIA BAR
***   MEMBER OF THE CONNECTICUT, NEW YORK AND THE CALIFORNIA BAR
****  MEMBER OF THE ILLINOIS AND THE CALIFORNIA BAR

J. Michael Keating, Jr
July 18, 2007
Page 2

limited to court-ordered psychiatric medications, suicide attempts, pepper-spraying MHSDS inmates in-cell; the role of the IDTT with emergency use of force;

　　　b)　　Revise all Post Orders for correctional officers assigned to EOP units, 3CMS units, MHCB, SHU and ASUs to include specific references to the Use of Force Policy;

　　　c)　　Provide specialized mental health training, including de-escalation techniques, to all correctional officers and clinicians working in EOP units, 3CMS units, MHCBs, SHU and ASU units;

　　　d)　　Ensure that the Use of Force Incident Report review process is retained and conducted in a timely manner;

　　　e)　　Require that the interdisciplinary team review and make recommendations for all EOP, 3CMS, and MHCB inmates regarding appropriate custodial responses to their behavior. The goal of this process is to provide necessary information to the correctional officers working in the housing units where inmates with mental health disabilities are located to reduce the overall use of force against MHSDS inmates, as well as to reduce the incidence of emergency force against MHSDS inmates.

Plaintiffs also request that the Special Master revise the Draft 18th Report section on CSP-Corcoran use of force as follows:

　　　a)　　On page 116 of the Draft 18th Report it was reported that "No cell extractions were done from April 1 through August 31, 2006". However, within the May 18, 2007 production of Use of Force Incident Reports was a calculated use of force Incident that involved a 3CMS inmate who was cell-extracted on August 16, 2007 after he refused an order to uncover his cell door. COR-04A-06-08-0350.

　　　b)　　On page 117 of the Draft 18th Report "force" is not defined in the following sections and it is unclear what is meant by the term: "Force was used less often: 118 incidents, or 57 percent, were resolved without the use of force. Force was used in 90 incidents, or 43 percent" and "MHSDS inmates were involved in 97 incidents, or 47 percent of total incidents. In 50 of those incidents, involving MHSDS inmates, or 52 percent, force was not used." Plaintiffs request that the Special Master provide further clarification regarding the meaning of "Force" in those sentences.

## BASIS FOR REQUESTED RECOMMENDATIONS

In preparing these comments, Plaintiffs consulted with their expert, Walter L. Kautzky, regarding use of force against inmates with mental health disabilities at CSP-

J. Michael Keating, Jr
July 18, 2007
Page 3

Corcoran. *See* Declaration of Walter L. Kautzky attached hereto. ("Kautzky Dec.") Mr.
Kautzky reviewed the Draft 18th Report sections on CSP-Corcoran, as well as the May
18, 2007 Use of Force and Incident Reports provided to the Plaintiffs by Defendants on
May 18, 2007 (UOF003460 through UOF 003535 and ERUOF 010313 through ERUOF
011223). Kautzky Dec. at ¶ 8. In addition, Mr. Kautzky reviewed the sections of the
Special Master's monitoring reports on CSP-Corcoran and use of force against inmates
with mental health disabilities within the Eighth through the Seventeenth Monitoring
Reports of the Special Master on the Defendants' Compliance with Provisionally
Approved Plans, Policies and Protocols. Kautzky Dec. at ¶ 8 (d).

Mr. Kautzky has previously reviewed the Cultural Assessment Study, the Use of
Force Handbook and Use of Force Review done by Captain Wilken, and the Revised
Program Guide filed 2/3/06. Kautzky Dec. at ¶ 8. Mr. Kautzky has extensive experience
in the areas of use of force, Post Orders, and has specific knowledge about the specialized
mental health training provided to correctional officers working with inmates with mental
health disabilities within the Ohio Department of Corrections. Kautzky Dec. at ¶¶ 6, 7, 9,
10.

## DISPROPORTIONATE USE OF FORCE

The Special Master made several findings in the Draft 18th Report regarding use
of force at CSP-Corcoran. First, he found that inmates with mental health disabilities
comprise only 21 percent of the prison population but were involved in 47 percent of the
total incidents. Draft 18th Report at 106, 116-117. The Special Master has previously
expressed concern when mental health inmates were involved in a disproportionate
number of use of force incidents at CSP-Corcoran. 14th Report at 41. ("Although the
mental health caseload comprised only 25 percent of the inmate population, they were
involved in over half of all incidents involving the use of force.") Years later, after
subsequent Orders, a Cultural Assessment Study and Plan, and four rounds of
monitoring, inmates on the mental health caseload continue to experience
disproportionate use of force. The Draft 18th Report also finds that when an inmate with
a mental health disability is involved in an incident with a correctional officer, he is more
likely to experience force than non-MHSDS inmates. Draft 18th Report at 117.

Equally troubling was the fact that the overall number of use of force incidents
rose by 60 percent, which means that MHSDS inmates experienced more force as part of
that increase. *Id.* Finally, the Cultural Assessment Study and Plan was described in the
Draft 18th Report as collapsed, "devolving from a focus on organizational issues to
discussions about the content and location of vending machines." Draft Report at 107.

The Draft 18th Report did not report on the percentages of emergency versus
calculated use of force against inmates with mental health disabilities, which the Special
Master had focused on in previous monitoring reports. *See, e.g.,* 14th Report at 41
("Information provided subsequently indicated that the overwhelming majority of

J. Michael Keating, Jr
July 18, 2007
Page 4

incidents involving the use of force in CSP/Corcoran were deemed to be emergencies by the custody personnel initiating the application of force, thereby superseding the rules for the calculated use of force, which embrace the bulk of procedures designed to protect MHSDS inmates from abuse when force is utilized."); 15th Report at 143-144 ("86 percent of incidents involving the use of force against seriously mentally disordered inmates occurred on an emergency basis, precluding any opportunity for the intervention of mental health clinicians to calm agitated caseload inmates before force was applied."). Quite obviously, the impact for MHSDS inmates is significant when force is applied without the opportunity for a cooling off period and mental health intervention. Kautzky Dec. at ¶ 18.

However, in our review of the May 18, 2007 package of Use of Force Incident Reports provided to Plaintiffs and the Special Master, which covered a timeframe from August 2006 through February 2007, we note that 87 percent (40 of 46) were emergency use of force incidents[1]. Kautzky Dec. at ¶20. More than 25 percent (12 of 40) of the emergency use of force incidents in the May 18, 2007 package involved use of force against inmates with mental health disabilities within their own cells. Kautzky Dec. at ¶ 13. It is noteworthy that when an inmate is within his cell, correctional officers have the gift of time before they must respond. This time permits a correctional officer to speak with his or her supervisor regarding the situation or to ask a mental health professional to come speak with the inmate to try to stabilize him to avoid the use of force. *Id.*

Thus, despite numerous rounds of monitoring and a Cultural Assessment Process which is dead in the water, inmates with mental health disabilities are subjected to a disproportionate number of use of force incidents, are more likely to experience "force" during an incident than non-MHSDS inmates, and continue to be subjected to emergency force in the vast majority of the incident reports provided by Defendants.

## NEED FOR SPECIALIZED MENTAL HEALTH TRAINING

The May 18, 2007 Incident reports provide texture to the statistics reported in the Draft 18th Monitoring Report.

First, the majority of incidents involved emergency force against inmates with mental health disabilities (87 percent). Although Warden Scribner had authored a 2004 Memorandum in the Use of Force Handbook directing officers to use controlled force with all the appropriate protocols, including clinical intervention, when MHSDS inmates were kicking their cell doors, the May 18, 2007 package included numerous incidents where inmates were pepper-sprayed for kicking or hitting their cell doors or windows. See August 16, 2004 Memorandum, UOFO123. Kautzky Dec. at ¶ 13. In those circumstances, there was no immediate threat and the officers should have walked away or requested a mental health professional to assist in de-escalating the incident. *Id.*

---

[1] The 18th round monitoring period for CSP-Corcoran covered August through December 2006.

J. Michael Keating, Jr
July 18, 2007
Page 5

These incidents clearly did not meet the CDCR requirement for use of "emergency force," yet the senior staff reviewing these incidents in the critique process did not question compliance with this basic policy requirement. *Id.* On several of the Incident Reports, the officers justified the use of force because the inmates either threatened to break the cell door windows or had cracked glass in the cell door windows. This fact is quite concerning: either the windows in these high security housing units are too fragile or Corcoran should issue different cups.

Second, in several calculated use of force incidents that occurred within the in-patient units where staff were attempting to administer court-ordered involuntary medications, officers used expandable batons (MEB) during the use of force incident in violation of Use of Force Policy. Kautzky Dec. at ¶ 14. The Incident Commanders were Lieutenants. This is unacceptable and quite concerning given the location, the purpose of the use of force, and the patient's mental health acuity. The expandable baton is used primarily for riot control and can quickly neutralize any therapeutic intent in a cell intervention. Kautzky Dec. at ¶ 20.

Third, the reports failed to adequately document the mental health intervention on several of the calculated use of force reports. One Incident was found out of compliance because an officer was present during the clinical intervention. Kautzky Dec. at ¶ 20.

Fourth, correctional officers did not appear to consider the inmate's level of care or the reasons why the force was required when determining how to respond: whether to attempt to contact an experienced supervising officer before using emergency force; whether to attempt to de-escalate the situation; or whether to contact a mental health professional. So for example, in one incident when an EOP inmate went to an officer and told him that he "wanted to go to the hole", the officer did not even try to talk to him about why (*e.g.*, safety concerns, debts, paranoid) but rather told him to sit down and wait. Although the officer contacted a psych tech, the EOP inmate had begun throwing his shoes across the dayroom floor. The situation escalated at that point, and resulted in the EOP inmate being pepper-sprayed (and injured), put in the "hole", charged with Battery and referred to the DA. Kautzky Dec. at ¶ 17. Similarly, during two incidents in the SHU, officers pepper-sprayed inmates who were threatening suicide. Kautzky Dec. at ¶ 25. The non-therapeutic nature of many of these interactions cannot be over-emphasized. *Id.* Rather than request clinical intervention for inmates who were threatening suicide or barricaded in their cells, officers chose to use emergency force procedures including pepper-spray and cell extractions. *Id.*

Finally, there does not appear to be the level of accountability identified by the Special Master as critical for changes to occur at CSP-Corcoran in the use of force practices against inmates with mental health disabilities. 15th Report at 145. The Cultural Assessment Report noted a problem with the constant turnover of Wardens and top executive staff at CSP-Corcoran. Cultural Assessment Report, August 4, 2005 at 25. One element that the Report identified as critical for embarking on the culture change

J. Michael Keating, Jr
July 18, 2007
Page 6

effort was a commitment that the current Warden would remain at the prison for at least two years and preferably three years. *Id.* at 64. This did not occur. It is unclear whether the new Warden has bought into the culture change effort. The finding in the Draft 18th Report makes this seem unlikely. Draft 18th Report at 107.

More than half of the 46 Incident Reports provided on May 18, 2007, were missing the Level 1 (Incident Manager) and the Level 2 (Warden) reviews which is quite concerning given the importance of this review process for accountability. Some of the available reviews did define failures with the CDCR Use of Force Policy and recommended corrective action. Among the reports that were reviewed, a few significant failures were identified that involved high ranking officers in circumstances that should have warranted careful scrutiny (*e.g.*, during two calculated use of force incidents involving MHCB inmates refusing court-ordered psychotropic medications the Lieutenant Incident Commanders permitted officers to use batons; in a third incident the Lieutenant Incident Commander found the emergency use of force against an inmate with a TENS unit appropriate, but Warden review found that the officer provoked the incident). Kautzky Dec. at ¶ 27. These type of failures by high ranking correctional officers raise serious concerns about the quality of the use of force training provided at all levels, the commitment to procedure and general accountability in the various yards. Kautzky Dec. at ¶ 27.

### CONCLUSION

Defendants have been provided with a reasonable opportunity to address the use of force problems identified by the Special Master over multiple rounds of monitoring. The typical training program provided to correctional officers does not adequately prepare them for the complex type of decisions that must be made related to Use of Force within a prison environment, especially within housing units where inmates with mental health disabilities are located. In an overcrowded and understaffed prison, the decisions become more difficult. With little, if any specialized mental health training to increase their confidence in how to de-escalate a situation, to consult with their supervisors, or expand the involvement of clinical professionals, officers will continue to resort to emergency use of force in most situations.

The training required at CSP-Corcoran is readily available and will provide the correctional staff with the additional tools they need for working with the large MHSDS population located at CSP-Corcoran, in particular within its locked housing units. The recommendations sought by Plaintiffs are reasonable measures that can be implemented at CSP-Corcoran. The training programs have been adopted in correctional systems elsewhere and plaintiffs can readily provide sources for CDCR.

In sum, Plaintiffs request the following recommendation:

1.    Defendants shall be directed to work with the Special Master, his experts, Plaintiffs' counsel and plaintiffs' expert to:

J. Michael Keating, Jr
July 18, 2007
Page 7

     a)    Create a Use of Force Policy Handbook that includes specific guidelines related to inmates with mental health disabilities, including but not limited to court-ordered psychiatric medications, suicide attempts, pepper-spraying MHSDS inmates in-cell; the role of the IDTT with emergency use of force;

     b)    Revise all Post Orders for correctional officers assigned to EOP units, 3CMS units, MHCB, SHU and ASUs to include specific references to the Use of Force Policy;

     c)    Provide specialized mental health training, including de-escalation techniques, to all correctional officers and clinicians working in EOP units, 3CMS units, MHCBs, SHU and ASU units;

     d)    Ensure that the Use of Force Incident Report review process is retained and conducted in a timely manner;

     e)    Require that the interdisciplinary team review and make recommendations for all EOP, 3CMS, or MHCB inmates regarding appropriate custodial responses to their behaviors. The goal of this process is to provide necessary information to the correctional officers working in the housing units where inmates with mental health disabilities are located to reduce the overall use of force against MHSDS inmates, as well as to reduce the incidence of emergency force against MHSDS inmates.

Plaintiffs also request the modifications within the Draft 18th Report regarding cell extractions on page 116 and an explanation for the term "force" on page 117 as discussed above in these comments.

    Please feel free to contact me with any questions regarding these comments.

                        Sincerely yours,

                        ROSEN, BIEN & GALVAN, LLP

                        By: Jane E. Kahn

JEK:kg
Cc:    Matthew A. Lopes, Jr.
       Lisa A. Tillman
       Misha Igra
       Michael Stone
       Coleman Co-counsel
       Special Master's Team
Encl.  Declaration of Walter L. Kautzky

PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
AMY WHELAN Bar No.: 215675
LORI RIFKIN Bar No.: 244081
SARAH M. LAUBACH Bar No.: 240526
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, | No.: Civ S 90-0520 LKK-JFM |
| Plaintiffs, | **DECLARATION OF WALTER L. KAUTZKY IN SUPPORT OF PLAINTIFFS' RESPONSE TO DRAFT EIGHTEENTH MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS** |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants | |

1    I, Walter L. Kautzky, do hereby declare:

2    1.    I am a criminal justice consultant in matters related to the operation and

3    management of jails and prisons and have expertise in the areas of safety and security in

4    prisons. I have been asked by counsel for plaintiffs in this matter to act as a consultant and

5    expert witness on the adequacy of Defendants' current policies, procedures, and practices

6    regarding Use of Force incidents at CSP-Corcoran against inmates with mental health

7    disabilities. I make this declaration in support of Plaintiffs' Response to the draft Eighteenth

8    Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally

9    Approved Plans, Policies and Protocols ("Draft 18th Report"), dated June 18, 2007. I have

10    personal knowledge of the matters stated herein and if called upon as a witness, I could and

11    would be able to competently so testify.

12    **BACKGROUND AND EXPERIENCE**

13    2.    I have a Bachelor Degree in Psychology and Sociology from Regis College in

14    Denver, Colorado, and a Master of Science Degree in Criminal Psychology from Florida State

15    University. I have worked on criminal justice and corrections for nearly forty (40) years with

16    experience in all aspects of correctional operations and administration, including responding to

17    the unique requirements of training correctional staff to respond to inmates with mental health

18    disabilities. In my administrative and consultant duties, I have evaluated prison operations and

19    inspected prisons, including administrative segregation units in California, Colorado, Florida,

20    Hawaii, Illinois, Iowa, North Carolina, Ohio, Oregon, Massachusetts, Pennsylvania, Texas and

21    Washington.

22    3.    I have been a member of the American Correctional Association ("ACA") for

23    over thirty (30) years and serve as a member of a Bureau of Justice Statistics team researching

24    best practices in eliminating prison sexual assault.

25    4.    I have been Director and Deputy Director of several state correctional systems,

26    including North Carolina Department of Corrections, Washington Department of Corrections,

27    Colorado Department of Corrections and Iowa Department of Corrections. I also served as

28    Special Master to Governor John Waihee for the Hawaii Department of Public Safety from

-1-

1   1989 to 1990 and assisted the Governor with the implementation of operational improvements
2   ordered in Hawaii's jail and correctional facilities.

3       5.      I am a criminal justice consultant in matters related to the operation and
4   management of jails and prisons and have expertise in the area of safety and security within
5   prisons. During my career, I worked extensively on use of force issues in North Carolina,
6   Washington State, Iowa and Colorado. I have served as an expert witness in various jail and
7   prison cases. A true and correct copy of my curriculum vitae, expert witness cases and
8   publications are attached hereto as **Exhibit A**.

9       6.      In these various capacities, I have provided training to correctional staff on
10  various topics and have consulted with outside trainers on the most effective training methods.
11  As Director in Iowa, Colorado, North Carolina and Hawaii I examined many of the use of
12  force reports involving inmates with mental health disabilities, especially within segregated
13  housing units to determine the type of specialized training and mental health services that were
14  needed to address the deficits I found or the Federal Court found.

15      7.      I have also been involved in drafting, reviewing and enforcing Post Orders for
16  officers in correctional settings. Post Orders are written directives that define the specific
17  performance requirements for an officer assigned to a specific location or operational area,
18  such as housing, intake, property, perimeter control, control room, kitchen, crisis unit or
19  administrative segregation within the prison or jail. Post Orders both prioritize the specific
20  responsibilities and define specific activities and limits for correctional officers as they carry
21  out the daily custodial activities at that location within the jail or prison. Post Orders provide
22  quality assurance in defining what an officer is required to do in carrying out security services.
23  Post Orders spell out specific obligations to ensure that they are accomplished during the shift
24  and provide direction on what the officer is to do when faced with a certain set of
25  circumstances that are likely to arise in managing inmates at that location. For example, for
26  officers with the responsibility of Incident Commander, their Post Orders would designate their
27  obligations during Calculated Use of Force Incidents. As I suggest below, CSP-Corcoran
28  should be directed to develop specific guidelines requiring direct discussion and interaction

-2-

1  between correctional officers and the clinical staff on the Interdisciplinary Team. The IDTT

2  Use of Force Guidelines should expand the circumstances under which clinical intervention is

3  required before force may be used against inmates with mental health disabilities. Such

4  specific guidelines – such as a clinical intervention before pepper-spray can be used against an

5  inmate with a mental health disability who is "kicking or hitting his cell door" – would be

6  included within the Use of Force Policy and set as a training and policy requirement for

7  officers to follow within the Security Post Order. CDCR would use the Use of Force

8  Guidelines to train correctional officers assigned to supervise 3CMS, EOP or MHCB inmates.

9  The same protocols would be referenced in the Mental Health Post Orders.

10         8.     I have been asked by counsel for Plaintiffs in this matter to act as a consultant

11  and expert witness on the need for additional recommendations from the Special Master to

12  address the documented disproportionate use of force against inmates with mental health

13  disabilities housed at CSP-Corcoran. In that capacity, I have recently reviewed the 46 Use of

14  Force and Incident Reports provided to the Plaintiffs by Defendants on May 18, 2007 (UOF

15  003460 through UOF 003535 and ERUOF 010313 through ERUOF 011223). I was asked to

16  consider whether the actions of the correctional officers were an appropriate response to the

17  inmates with mental health disabilities based upon my considerable experience with other

18  correctional systems. I reviewed both the California Department of Corrections' Critique of

19  compliance at the Incident Manager Review (Level 1) and the Warden's Review (Level 2),

20  which were not provided for half of the reports. Notably the Level 1 and Level 2 Critiques

21  required officers to consider whether they followed the specific policy requirements for either

22  calculated or emergency use of force. The Use of Force Critiques also clearly defined

23  corrective action if officers failed to follow the CDCR Use of Force Policy. I also reviewed

24  the following documents in reaching my conclusion:

25         (a)     Standards for Health Services in Prisons: National Commission on

26  Correctional Health Care, (2003);

27         (b)     Craig Hemmens and Eugene Atherton, Use of Force Current Practice and

28  Policy, (American Correctional Association, 1999);

-3-

1    (c)    Lyn Rader and Jane Haddad, Specialized Mental Health Training For

2  Correctional Officers in Mental Health Units (Ohio Department of Corrections 2000);

3    (d)    Eighth Monitoring Report of the Special Master on the Defendants'

4  Compliance with Provisionally Approved Plans, Policies and Protocols ("8th Report") at 74,

5  84; Ninth Monitoring Report of the Special Master on the Defendants' Compliance with

6  Provisionally Approved Plans, Policies and Protocols ("9th Report") at 63, 72; Tenth

7  Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally

8  Approved Plans, Policies and Protocols ("10th Report") at 79, 91; Eleventh Monitoring Report

9  of the Special Master on the Defendants' Compliance with Provisionally Approved Plans,

10  Policies and Protocols ("11th Report") at 84, 88-89; Twelfth Monitoring Report of the Special

11  Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and

12  Protocols ("12th Report") at 81, 91-92, 258-259; Thirteenth Monitoring Report of the Special

13  Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and

14  Protocols ("13th Report") at 85, 96-97, 261-262, 270; Fourteenth Monitoring Report of the

15  Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies

16  and Protocols ("14th Report") at 24, 41-43; Fifteenth Monitoring report of the Special Master

17  on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols

18  ("15th Report") at 142-145; Sixteenth Monitoring Report of the Special Master on the

19  Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols ("16th

20  Report") at 149, 151-152; Seventeenth Monitoring Report of the Special Master on the

21  Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols ("17th

22  Report") at 50, 59-60; and the Draft Eighteenth Monitoring Report of the Special Master on the

23  Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols ("Draft

24  18th Report") at 104, 107, 116-117.

25    (e)    Revised Program Guide, Chapters 1 through 10, filed 2/3/06 [Docket 1753]. I

26  have previously reviewed the "Cultural Assessment," the "Use of Force Handbook," and the

27  Use of Force Review done by Captain Wilkin provided pursuant to the March 7, 2005 Order. I

28  have also reviewed Plaintiffs' June 1, 2005 Letter to Special Master Keating, Ms. Tillman and

1  Mr. van de Erve, commenting on Defendants' production of documents in response to the

2  March 7, 2005 Order, including the Use of Force Handbook, the Fact-Finding Study,

3  Executive Use of Force Committee Reports.

**GENERAL PRINCIPLES GOVERNING USE OF FORCE ISSUES**

5        9.        In my experience as a director of a number of state correctional systems, I have

6  found that Use of Force incidents are a key indicator of institutional stability. As a result, I

7  personally reviewed all Use of Force incident reports that required medical intervention. I also

8  reviewed the Use of Force incident reports where the Warden questioned staff judgment

9  regarding the level of force utilized against an inmate and required retraining or other

10  corrective action. I recognized that the typical training program for newly hired correctional

11  officers did not adequately prepare the officers for the complex type of decisions that they

12  would have to make related to the Use of Force within a prison or jail environment.

13  Unfortunately, what I learned was that when institutions do not train officers for specialized

14  assignments such as medical, mental health and special housing, the past experience of other

15  correctional officers will fill the training void. Correctional officers often learn on the job from

16  other officers how to respond in Use of Force situations with less than acceptable results for

17  the institution. In overcrowded prisons, correctional officers often receive little, if any

18  specialized mental health training that increases their confidence to de-escalate a situation,

19  consult with their supervisors, or expand the involvement of clinical professions as a standard

20  operating practice. In California's complex and seriously overcrowded system, correctional

21  officers are the front line in the basic delivery of mental health services. The delivery of these

22  services depends on how these correctional officers balance their personal safety in an

23  overcrowded system against the critical service needs of inmates with mental health disabilities

24  whose behavior they often do not understand or appreciate. Following the Cultural

25  Assessment conducted at CSP-Corcoran in 2005, it was reported in the August 4, 2005 Report

26  that at CSP-Corcoran the values of control/security and treatment/rehabilitation seemed to "be

27  significantly more polarized at Corcoran than in other prisons." Cultural Assessment Study,

28  August 4, 2005 at 40. In fact, the reviewers noted that the correctional officers expressed the

-5-

1    belief that providing medical, mental and rehabilitative programs pandered to inmates to whom

2    the officers should not speak "unless they're giving an order." *Id.* at 41. Most concerning in

3    the Study was the finding that: "When staff do interact with an inmate, the culture of the

4    institution makes them feel as if they are doing something wrong – almost as if by having a

5    conversation with an inmate means that s/he is 'siding' with an inmate rather than his/her

6    fellow staff members." *Id.* The most recent work of the Cultural Assessment Team formed at

7    CSP-Corcoran was reported in the Draft 18th Report and involved decisions "about the content

8    and location of vending machines." Draft 18th Report at 107.

9         10.   I have specific knowledge about the specialized mental health training provided

10   to correctional officers working with inmates with mental health disabilities within the Ohio

11   Department of Rehabilitation and Corrections. I consulted with the Ohio Department in March

12   2006 and directly observed the correctional officers working with inmates with mental health

13   disabilities at several institutions, including in administrative segregation units. This

14   specialized mental health training is extensive and is provided to correctional staff prior to their

15   placement within any institution where inmates with mental health disabilities are housed.

16   Ohio found that a specialized three-week training program was required for all correctional

17   officers before they could be expected to de-escalate situations or appropriately respond to

18   inmates with mental health disabilities. This training included mental health and custody staff

19   to ensure collaboration in the management and treatment of inmates with mental health

20   disabilities. I was impressed by the absence of control issues and the obvious teamwork

21   demonstrated by the correctional officers and clinicians working directly within the highest

22   security mental health units at Southern Ohio Correctional Facility. Movement to and from

23   inmate activities was coordinated by a large number of correctional officers who were not

24   dressed in standard uniform and did not openly display any weapons, such as batons or pepper

25   spray. I was assured that non-lethal weapons were available if needed and approved by a

26   supervising officer. This was true even in the high security areas where I observed activities in

27   progress. The mental health training provided to the correctional staff included de-escalation

28

1  techniques and treatment planning with trained mental health staff to avoid utilizing physical

2  and non-lethal force.

3      11.    I have reviewed the Revised Program Guide, which includes a statement that "a

4  mental disorder does not necessarily excuse individual responsibility and accountability."

5  Revised Program Guide, 12-1-1. However, the Revised Program Guide is silent on any

6  commitment to train correctional officers to understand how mental health disabilities and

7  prescribed medications can affect comprehension, problem-solving and behavioral response.

8  Without that understanding, the correctional officer's actions can undermine the ongoing

9  treatment provided to the inmates with mental health disabilities. The Ohio training included

10  training on the impact of inmates with mental health disabilities on correctional operations by

11  providing correctional and clinical staff with time to discuss examples where a "management

12  problem" might occur (*e.g.*, an acute episode of a mental health disorder, isolating behavior,

13  limited social skills, greater vulnerability, inability to follow directions or answer questions

14  easily, poor hygiene or unusual behavior). While I understand that *Coleman* mandates some

15  basic training in the signs and symptoms of mental illness, my review of these use of force

16  reports supports a clear need for expanded and additional training for officers supervising

17  inmates with mental health disabilities at CSP-Corcoran.

18      12.    When evaluating use of force incidents the following factors are important to me:

19  (a) the location of the incident (in cell, on the yard);  (b) the inmate's level of care (EOP,

20  3CMS, MHCB); (c) the type of force (emergency or calculated);  (d) weapons used (baton,

21  pepper-spray, 40 mm gun, physical force); (e) precipitating factor for force (cell fight, yard

22  fight, provide mental health services); and (f) accountability processes. I will discuss these

23  areas in greater detail below.

24      **A.    Location of the Incident**

25      13.    When an inmate is secured in his cell, correctional officers have the gift of time

26  before they must respond. The correctional officer can ask a mental health professional, such

27  as a psych tech, psychologist, psychiatrist, or social worker, to come speak with the inmate and

28  try to stabilize him. Among the May 18, 2007 Incident Reports were a group of incidents

-7-

1  involving mental health inmates who were either kicking the cell doors or hitting the cell

2  windows. The officers responded by pepper-spraying the inmates. In those circumstances,

3  there was no immediate threat and the officers should have walked away or requested a mental

4  health professional to assist in de-escalating the incident. These incidents clearly did not meet

5  the CDCR requirement for the use of "emergency force": When the behavior of the inmate

6  constitutes an immediate and serious threat to the safety of staff, visitors, other inmates, or

7  institutional security. Use of Force Handbook, UOFO142. Yet senior staff reviewing the

8  incidents in the critique process did not question compliance with this basic policy

9  requirement. *See, e.g.*, COR-04B-07-02-0088 (EOP threw liquid out door, began striking

10 window. CO pepper-sprayed); COR-04B-07-01-0007 (EOP became upset by photos taken of

11 his cell, hit cup against window and would not stop. CO pepper-sprayed). COR-04B-07-01-

12 0018 (3CMS hit cell door window, and would not stop. CO pepper-sprayed). More than 25

13 percent (12 of 40) of the emergency use of force incidents in the May 18, 2007 package

14 involved inmates with mental health disabilities housed in their own cells. Oftentimes in the

15 reports that I reviewed it appeared that the correctional officers – who did not walk away from

16 situations when the inmates appeared agitated – escalated the situation or responded by using

17 the pepper-spray as "punishment." As part of the Use of Force Handbook, Warden Scribner

18 issued a Door Kicking Policy which prohibited staff from using emergency force when inmates

19 with mental health disabilities are kicking their cell doors. UOFO123. According to the

20 August 16, 2004 Memorandum, in those instances, the officers were directed to handle the

21 situation as "controlled use of force with all the appropriate protocols, including the use of

22 clinical intervention when Mental Health Delivery Systems Inmates (CCCMS or EOP) are

23 involved." *Id.* This is the appropriate manner in which to handle these types of situations,

24 however, subsequent Wardens appear unaware or unwilling to implement this sound policy.

25      14.    Another type of in-cell incident occurred within the Mental Health Crisis Units at

26 CSP-Corcoran. *See*, COR-OCS-07-01-0010; COR-0CS-07-01-0015; COR-0CS-07-02-0097;

27 COR-0CS-07-02-0098. In this in-patient mental health unit, little, if any clinical intervention

28 was provided to these inmates prior to the application of force. Furthermore, during two of the

-8-

1    incidents, the incident commanders overseeing the calculated use of force allowed correctional

2    officers to use their Monadnock Expandable Baton (MEB) during the cell extraction process.

3    These Incident Commanders were high ranking officers – Lieutenants – who permitted the

4    unauthorized use of these weapons. *See*, ERUOFO10805; ERUOFO10855 (The Institutional

5    Executive Review found the Use of Force Incidents out of compliance because the MEB is not

6    an approved weapon during a cell extraction.)  The expandable baton (MEB) is used primarily

7    for riot control and could neutralize any therapeutic intent in a cell extraction.  CSP-Corcoran

8    must address its broad application of "emergency" use of force when inmates are locked in the

9    cell.  If custody officers were appropriately trained and supervised to appropriately limit the

10   "emergency" use of force, there would be more opportunities for mental health clinicians to

11   intervene, incidents would be videotaped and fewer inmates with mental health disabilities

12   would be subject to unnecessary and excessive force.  In my opinion, pepper-spray and

13   physical force is being used far too often at Corcoran against inmates with mental health

14   disabilities when they are safely secured in their cells.[1]

15          **B.    The Inmate's Level of Care**

16          15.    When I reviewed use of force incidents as director of state correctional systems, I

17   noted when an inmate was a participant in the mental health delivery system.  If the inmate was

18   housed in a program equivalent to the Enhanced Outpatient ("EOP") unit within CDCR, there

19   was an expectation that correctional and clinical staff would work together to develop an

20   appropriate interdisciplinary treatment team approach to that inmate, including a treatment plan

21   that addressed the inmate's ability to understand and response to correctional orders.  Although

22   inmates with mental health disabilities were expected to follow the rules and regulations within

23   the state correctional systems where I worked, the goal of the interdisciplinary treatment team

24   approach was to ensure that the correctional officers working within these mental health

25

26   [1] Several of the Incident Reports justify the pepper-spraying of inmates hitting their windows
     because of the fear that inmates will break the cell windows with their State-issued cups. This
27   is quite concerning: either the windows in these high security units are too fragile or Corcoran
     should issue different cups.
28

DECLARATION OF WALTER L. KAUTZKY IN SUPPORT OF PLAINTIFFS' RESPONSE TO DRAFT EIGHTEENTH MONITORING REPORT OF
THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS,
NO.: CIV S 90-0520 LKK-JFM

1  housing units were well informed about these inmates' capacity to comply with orders and

2  directions.  Accommodations were required at times based upon information provided through

3  the interdisciplinary treatment team's input.

4          16.    The Revised Program Guide provides for the Interdisciplinary Team approach

5  for all inmates with mental health disabilities regardless of their housing (3CMS, EOP, SHU,

6  ASU, PSU). *See, e.g.,* 12-3-8 to 12-3-10.  The correctional counselor is required to attend and

7  custody officers are encouraged to attend and provide information. *Id.*  The treatment plan

8  developed includes identified problems and treatment objectives and should identify the

9  treatment services and other institutional services designed to impact the identified problems

10  and achieve individual treatment objectives. *Id.*  Utilizing this process to increase the

11  cooperation between mental health and correctional staff in addressing the disproportionate use

12  of force against inmates with mental health disabilities may prove fruitful.  The importance of

13  communication between correctional staff and treating clinicians regarding inmates' significant

14  health needs has been recognized by the National Commission on Correctional Health Care in

15  their Standard P-A-08, which sets for the requirements for communications with special needs

16  patients for mental health clinicians and correctional officers.  The Standard notes that

17  compliance indicators include: "Correctional staff are advised of inmates' special needs that

18  may affect housing work, and program assignments; **disciplinary measures**; and admissions

19  to and transfers from institutions.  Such communication is documented." P-A-08, 15.

20  Standards for Health Services in Prisons, 2003 (emphasis added).

21          17.    The Incident Reports provided on May 18, 2007 evidence that correctional

22  officers at Corcoran respond to 3CMS, EOP or MHCB inmates in a manner that does not take

23  into account mental health concerns, rarely involve a "cooling off" period or the intervention

24  by a mental health clinician.  Many of the in-cell incidents described above did not require

25  emergency use of force and the quick resort to pepper-spray within the housing units where

26  inmates with mental health disabilities are housed indicates that correctional officers and their

27  supervisors do not have an understanding and appreciation for the validity and complexity of

28  mental health issues.  For example, in one report, an EOP inmate housed in the mainline

1    approached an officer on the dayroom and stated: "I do not want to be here anymore and I

2    want to go to the hole". *See*, COR-03B-07-01-0001. The officer did not talk to the EOP

3    inmate about why he wanted to go to the hole (*e.g.*, safety issues with his cellie, debts,

4    delusions) but rather told him to sit down which the EOP inmate did. The officer contacted the

5    psych tech about the inmate's unusual behavior and then observed the EOP inmate throwing

6    his shoes across the dayroom floor. The officer ordered him to "get down" but the inmate did

7    not comply and instead threw a chair. The officer took out his pepper-spray and again ordered

8    the EOP inmate to "get down," but the situation escalated with the EOP inmate throwing

9    objects in the direction of the officers. The officer pepper-sprayed him and put him in cuffs.

10   Well-trained correctional officers in a mental health housing unit would have spoken privately

11   to this inmate using de-escalation techniques to defuse the situation while they waited for

12   mental health staff to come to the unit. Another option would be to have offered assurance of

13   safety by moving the disruptive EOP inmate to a holding cell after consultation with a

14   supervising officer. This would likely have avoided any use of force. Although the EOP

15   inmate did not hurt the officers, he threatened them, was subjected to force himself (and was

16   injured) and ended up with a DA referred charge of Battery.

17       **C.**     **Type of the Force (Calculated versus Emergency)**

18       18.     The initial decision made by correctional officers when deciding whether to use

19   force is whether the circumstances warrant an emergency use of force. Emergency Force is

20   appropriate when the behavior of the inmate constitutes an immediate serious threat to the

21   safety of staff, visitors, and other inmates or to institutional security. UOFO142. If the

22   "immediate, serious threat to safety" does not exist, then the application of force must comply

23   with the requirement for "calculated use of force." If staff determines that a calculated use of

24   force is warranted certain conditions must be met including: the supervisor must give

25   approval; a cooling off period must be provided to the inmate; a mental health care

26   consultation must be provided to de-escalate the confrontation; the tactical team must be

27   briefed; and the incident must be videotaped. Emergency use of force against inmates with

28   mental health disabilities precludes any review or pre-approval by a supervisor, any

1  intervention by clinical staff or any cooling off period by the inmate and should only be used in

2  those circumstances that truly meet the definition.

3      19.    The Special Master has repeatedly raised concerns regarding the percentage of

4  emergency use of force incidents versus calculated use of force incidents at Corcoran State

5  Prison. In the 15th Report, he noted that in November 2005, "86 percent of incidents involving

6  the use of force against seriously mentally disordered inmates occurred on an emergency basis,

7  precluding any opportunity for the intervention of mental health clinicians to calm agitated

8  caseload inmates before force was applied." 15th Report at 143-144; 14th Report at 41 ("the

9  overwhelming majority of incidents involving use of force in CSP/Corcoran were deemed to

10  be emergencies by custody personnel initiating the application of force, thereby superseding

11  the rules for the calculated use of force, which embrace the bulk of procedures designed to

12  protect MHSDS inmates from abuse when force is utilized.")

13      20.    When I review use of force against mentally ill inmates, I also review the

14  percentage of incidents involving inmates with mental health disabilities, as well as the

15  percentage of those incidents that occurred on an emergency basis. In the May 18, 2007

16  package, 87 percent (40 of the 46 Incidents) were designated as emergency incidents. In

17  addition, although I was not provided with the videotapes for the six calculated use of force

18  incidents, in my review of these reports I did not find that the description of the clinical

19  intervention provided sufficient detail to determine whether clinical staff made a reasonable

20  effort to intervene. One incident was found not compliant at the Institution Head Review

21  because custody staff was in the immediate area during the clinical intervention. COR-0CS-

22  07-01-0010. A number of the reports did not include any documentation by a clinician despite

23  the summary which stated that clinical intervention was provided. Calculated use of force to

24  assist clinical staff in administering court-ordered involuntary psychiatric medications and

25  other medical procedures should be a last resort, and should only occur after significant clinical

26  intervention. Again, the clinical intervention in the involuntary medication calculated use of

27  force incidents that I reviewed was not well documented. See, COR-OCS-07-01-0015; COR-

28  OCS-07-01-0010 (not in compliance); COR-OCS-07-02-0097; CCOR-OCS-07-02-0098. The

-12-

Special Master noted the inadequacy of the clinical interventions preceding the application of force during calculated use of force incidents at CSP-Corcoran in his 14th Report. 14th Report at 41. At that time, no training had been provided to clinical staff on their role in these interventions nor did the policy guidelines address this role. *Id.* at 42. My review of the recent calculated use of force incidents does not indicate any meaningful change since the 14th Report. I was quite concerned to review two calculated use of force Incidents which were found not compliant at the Institution Level Review because correctional officers used extendable batons (MEB) during the cell extractions that occurred within the Mental Health Crisis Bed units. The Incident Commanders, Lieutenants in both cases, were either unaware or improperly supervised their cell extraction teams and permitted the officers to utilize an expandable baton (MEB) used primarily for riot control, during the cell extraction. The MEB is used widely for crowd control and could quickly neutralize any therapeutic intent in a cell extraction. These two Incidents raise serious concerns for me regarding the ability to sustain accountability with Use of Force standards from the top down to line staff.

### D.    Weapons Used (Batons, Pepper Spray, 40 MM Guns, and Physical Force)

21.    The majority of the Incident Reports that I reviewed involved the use of physical force, pepper spray, and extendable batons (MEB). The Special Master reported in the Draft 18th Report that CSP-Corcoran reported no cell extractions between April 1 and August 31, 2007, and reported a total of 208 incidents.[2] The exact details of these incidents were not provided, however, it was reported that the total number was consistent with the prior four months, "when the number of incidents actually rose 60 percent over the previous level."

---

[2] However, contrary to this report, I reviewed one calculated use of force report that involved a 3CMS inmate who was cell-extracted on August 16, 2007 after he refused an order to uncover his cell door. COR-04A-06-08-0350. The inmate finally uncovered his cell door, but was then ordered to cuff up so that he could be put on property restriction. After he refused the second order despite clinical intervention, a cell extraction team was assembled and the Sgt. discharged his MK-46 pepper-spray into the inmate's cell hitting him in the back and head area. The inmate eventually complied with the orders to cuff up. He was taken to the hospital for further evaluation. The justification for the incident notes that the inmate delayed a peace officer in the performance of his duties by refusing an order.

1   Draft 18th Report at 117. Overall, 57 percent of the incidents were resolved without resorting

2   to force (although the Draft 18th Report does not define force and it is unclear whether pepper-

3   spray is considered force by the Special Master in these reported statistics.) *Id.* Nevertheless,

4   the Special Master found that among inmates with mental health disabilities 52 percent of their

5   incidents were resolved without resorting to force as compared to 57 percent of the total

6   incidents. In other words, having a mental illness at CSP-Corcoran made an inmate more

7   likely to experience force by a correctional officer during an incident. The Special Master also

8   found that inmates on the mental health caseload at CSP-Corcoran comprise only 21 percent of

9   the total prison population, but were involved in 47 percent of the total use of force incidents.

10  *Id.* at 106, 116-117. Thus, not only were inmates with mental health disabilities involved in a

11  disproportionate number of force incidents, but during these encounters with correctional

12  officers they were more likely to experience "force". These two reported statistics clearly

13  support the need for additional, specialized mental health training for correctional officers at

14  CSP-Corcoran.

15          22.     In a properly operating system where correctional officers are well trained, the

16  use of de-escalation techniques and clinical interventions are favored and commonplace

17  because they diminish the use of all weapons, including Oleoresin Capsicum (OC) spray and

18  reduce burdensome decontamination procedures. OC is a serious inflammatory agent derived

19  from Cayenne Pepper that causes swelling of the nasal passages and throat and a burning

20  sensation to the eyes. Pepper-spray, as it is commonly called, does not vaporize as quickly as

21  other agents such as CS (Orthochlorbenzalmalononitrile) or CN (Chloroacetophenone). The

22  Montana Use of Force Policy referenced in Hemens and Atherton's Use of Force: Current

23  Procedure and Policy at 198, indicates that incapacitation can last up to 45 minutes. I have

24  experienced residual discomfort in my nasal passages from exposure to pepper-spray lasting

25  more than a day despite external flushing of my eyes and nasal passage and fresh air.

26          23.     As described above in paragraph 21, two different Lieutenants operating as

27  Incident Commanders permitted correctional officers to utilize batons during two calculated

28  force incidents involving inmates within the Mental Health Crisis Bed Units at CSP-Corcoran

-14-

1   in January 2007. *See*, COR-0CS-01-0010; COR-0CS-07-01-0015. Although the Institution

2   Reviews correctly found that these weapons were not permitted during a cell extraction, the

3   fact that correctional officers used these batons within the in-patient units during two different

4   calculated use of force incidents to provide severely decompensated inmates with their court-

5   ordered psychotropic medications is particularly disturbing.

6       **E.    Precipitating Factor for Use of Force**

7       24.    In my review of the 46 Incident Reports it did not appear to me that correctional

8   officers considered the factors that I have discussed so far in making a determination whether

9   to de-escalate a situation, contact an experienced supervising officer before using emergency

10  force, or use a skilled mental health worker to de-escalate a situation. Force is improperly used

11  at Corcoran against inmates with mental health disabilities to provide them with necessary,

12  emergency mental health services. I have already discussed the calculated use of force

13  incidents, which occurred within the Mental Health Crisis Bed units, which were either non-

14  compliant incidents or had no clear documentation of the mental health intervention provided

15  to the inmate who was refusing his medication. The correctional officers assigned to the

16  hospital units may require specialized training in hospital restraint procedures and use of force.

17      25.    Two other Incident Reports involved inmates who were threatening to commit

18  suicide. *See*, COR-04B-07-01-0030; COR-04A-06-10-0471. The Special Master reviewed the

19  use of force against inmates with mental health disabilities in 2003, where more than half of

20  the incidents involved the use of pepper-spray, "sometimes in troubling circumstances. OC

21  spray was used to stop apparent suicide attempts, compel compliance with ordered blood tests

22  and force inmates to relinquish food trays." 12th Report at 92. In the first Incident Report that

23  I reviewed, the officer ordered the inmate to take off the noose around his neck, which he

24  refused, and the officer then pepper-sprayed him in the face. Then a cell extraction team

25  removed him from his cell. COR-04B-07-01-0030. In the second incident the inmate was

26  agitated, showed some officers a razor and threatened to hurt them. He then asked to speak

27  with the Sergeant who went to his cell. At some point, the inmate threatened suicide. At no

28  time did any officer contact mental health professionals for assistance. The reviewer found the

1   incident not compliant because the Sergeant opened the food-port without another officer

2   present. The Sergeant told the inmate he would pepper-spray him if he attempted to injure

3   himself and when the inmate made a sweeping motion, the officer sprayed him. COR-04A-06-

4   10-0471.   Again, regardless of the reason officers are at cell front, the use of force at CSP-

5   Corcoran against inmates with mental health disabilities appears to be evaluated with the same

6   lens. In situations where an inmate is refusing mental health care that has been prescribed or is

7   needed, the need for meaningful clinical intervention is heightened. The non-therapeutic

8   nature of many of these interactions cannot be over-emphasized. Rather than request clinical

9   intervention for inmates who were threatening suicide or barricaded in their cells, officers

10  chose to use emergency force procedures including pepper-spray and cell extractions. *See*,

11  COR-04B-06-12-0561; COR-04B-07-01-0030; COR-04A-06-10-0471. Training that will

12  provide correctional officers with an understanding of the mental health issues, as well as the

13  impact of use of force on the mental health stability of Coleman class members may help

14  reduce the quick resort to emergency tactics within the housing units.

15      **F.    Accountability**

16      26.    CSP-Corcoran's commitment to accountability imposed on custody line staff and

17  its supervisory staff was recognized as critical to addressing the persistent use of force

18  problems documented at the prison during multiple rounds of monitoring. 15th Report at 145.

19  The Cultural Assessment Report noted a problem with the constant turnover of Wardens and

20  frequent top executive staff, and made mention that staff reported that the current Warden

21  would not be at Corcoran very much longer. Cultural Assessment Report, August 4, 2005 at

22  25. Unfortunately this proved true. Among the elements identified in the Summary as critical

23  for embarking on the culture change effort was a commitment that the current Warden would

24  remain at the prison for at least two years and preferably three years. *Id.* at 64. This did not

25  occur, and it appears, based on the Draft 18th Report, that the Cultural Assessment Plan for

26  Change is stalled. As discussed above, Warden Scribner's Policy Memorandum prohibiting the

27  emergency use of force against inmates with mental health disabilities who kick their doors

28  appears to have been either ignored, or rescinded by subsequent administrations.

-16-

1    27.    My own review of the Incident Reports provided on May 18, 2007, indicates that

2    the commitment to accountability at CSP-Corcoran has deteriorated. First, twenty-three (23)

3    of the 46 Incident reports did not include the Institution Head and Executive Review of the

4    Incident Reports. These reports are more than four months old, dating from January and

5    February 2007. Two of these reports involved calculated use of force incidents within the

6    Mental Health Crisis Bed unit that occurred on February 21, 2007. COR-0CS-07-02-0097;

7    COR-0CS-07-02-0098. Second, several of the incident reports indicate failures by high

8    ranking correctional officers that raise serious concerns about the quality of use of force

9    training provided at all levels, the commitment to procedure, and general accountability in the

10   various yards. Two incidents involve the use of the batons during calculated use of force

11   incidents on inmates requiring court-ordered psychotropic medications in the Mental Health

12   Crisis Bed Units. A third incident involved a 3CMS inmate with physical disabilities who was

13   ordered to leave his TENS unit in his cell and became upset and asked to see the Sergeant. The

14   officer perceived his actions as a threat and he was physically subdued. COR-04A-06-10-

15   0433. Although the Incident Commander, a Lieutenant found the force appropriate, upon

16   review it was found out of compliance by the Warden who felt that the correctional staff had

17   escalated the situation to warrant the Use of Force. In the particular case, the inmate had a

18   chrono to take his TENS unit to the yard. The incident occurred in October 2, 2006, but the

19   review was not completed until January 29, 2007.

20                                    **CONCLUSION**

21   28.    Despite extensive monitoring over the years, the use of force against inmates

22   with mental health disabilities at CSP-Corcoran remains disproportionate and inappropriate

23   and has not improved in any significant way. Emergency use of force by correctional officers

24   remains the norm in situations where other options are available or where the intervention of

25   mental health clinicians might have prevented the use of force. Accountability at all levels is

26   critical to reverse this pattern and the data indicates that it is not effective: the percentage of

27   use of force incidents involving inmates with mental health disabilities remains

28   disproportionately high; high-ranking correctional officers do not follow basic Use of Force

-17-

1    Policy requirements; and CSP-Corcoran has not done (or provided) the Executive and

2    Institutional Level Reviews for half of the Reports produced on May 18, 2007. It is my belief

3    that unless CSP-Corcoran engages in additional remedial measures the use of force problems

4    identified by the Special Master in his monitoring reports on CSP-Corcoran will not improve.

5    I recommend the following remedial steps:

6        (a)    CSP-Corcoran shall be directed to create a Use of Force Policy Handbook that

7    includes specific guidelines related to inmates with mental health disabilities, including but not

8    limited to court-ordered psychiatric medications, suicide attempts, pepper-spraying MHSDS

9    inmates in-cell; the role of the IDTT with emergency use of force;

10        (b)    CSP-Corcoran shall be directed to revise all Post Orders for correctional officers

11    assigned to EOP units, 3CMS units, MHCB, SHU and ASUs to include specific references to

12    the Use of Force Policy;

13        (c)    CSP-Corcoran shall be directed to provide specialized mental health training,

14    including de-escalation techniques, to all correctional officers and clinicians working in EOP

15    units, 3CMS units, MHCBs, SHU and ASU units;

16        (d)    CSP-Corcoran shall be directed to ensure that the Use of Force Incident Report

17    review process is retained and conducted in a timely manner;

18        (e)    CSP-Corcoran shall be directed to require the interdisciplinary team to review

19    and make recommendations for all EOP, 3CMS, or MHCB inmates involved in any emergency

20    use of force incident. The goal of this process is to provide necessary information to the

21    correctional officers working in the housing units where inmates with mental health disabilities

22    are located to reduce the overall use of force against MHSDS inmates, as well as to reduce the

23    incidence of emergency force against MHSDS inmates.

24        29.    I am available to work with Defendants, Plaintiffs and the Special Master to

25    further develop any additional remedies to address use of force concerns at CSP-Corcoran.

26    //

27    //

28    //

The foregoing is based upon my own personal knowledge, except where stated to be based upon information and belief. If called upon to do so, I could and would so testify. I do so declare under penalty of perjury of the laws of the State of California and the United States of America that the foregoing is true and correct and that this declaration was executed this 17TH day of July 2007, at Des Moines, Iowa.

Walter L. Kautzky

-19-
DECLARATION OF WALTER L. KAUTZKY IN SUPPORT OF PLAINTIFFS' RESPONSE TO DRAFT EIGHTEENTH MONITORING REPORT OF

# EXHIBIT A

Attachment A

WALTER L. (KIP) KAUTZKY
3301 Southern Woods Dr.
Des Moines, Iowa 50321
(515) 256-1957 (H)      (515) 778-6231 (C)

## OBJECTIVE

Advance best practices that improve public safety and advance government
service and accountability in state and county correctional systems

## EXPERIENCE

CRIMINAL JUSTICE CONSULTANT                    February 2006 to present

- Evaluate and research on criminal justice issues for legal teams representing plaintiffs or defendants in matters related to the operation and management of jails and prisons
- Assist legal teams as an expert witness for evaluation and court testimony regarding correctional issues.
- Assist security firms in developing and improving technology and specifications for effective prison security systems

LAMBERTI FOUNDATION – CHIEF EXECUTIVE OFFICER         February 2003 to January 2006

- Manage correctional service and business operations through Bridges of Iowa program to transition long term offenders to community
- Integrate Lamberti Foundation services with Institute for Social and Economic Development and other foundations
- Implement statewide strategy for foundation investment in advanced corrections model supported by community mentors
- Maximize income from property holdings for reinvestment in correctional services.

IOWA DEPARTMENT OF CORRECTIONS                  July 1997 to January 2003

Director – policy and operations management with Governor and Legislative leaders to manage a growing prison (8500) and community corrections population (25000) within declining budget limits.

- Work with executive, legislative and community leaders to improve accountability of Iowa's community and institutional corrections system
- Resolve federal and state conditions and services lawsuits
- Expand direct mental health services to high security correctional offenders.
- Construct three new prisons and 3 new community residential facilities

NORTH CAROLINA DEPARTMENT OF CORRECTION         May 1992 to March 1997

- Deputy Secretary (1992)- work with executive, legislative, community leaders, and DOC staff to provide correctional services to 21000 institutional and 105000 community offenders
- Work with Sentencing Commission to develop structured sentencing policy
- Assistant Secretary (1993)- Contract and manage out of state housing for 1800 inmates
- DOC manager of 10,000-bed construction program
- Plan and execute inmate construction of two separate 500 bed facilities

- Manage design build finance process for private correctional facilities.

CRIMINAL JUSTICE CONSULTANT                      December 1990 - May 1992
- Private Correctional Facility Company developed for investment banker
- Train senior correctional executives for National Institute of Corrections
- Market correctional design services for Henningson, Durham, and Richardson

HAWAII DEPARTMENT OF PUBLIC SAFETY               November 1989-December 1990

- Special Master to Governor John Waihee
- Execute operational improvements ordered in state jail and correctional facilities
- Negotiate court ordered changes between legislative executive and judicial branches

COLORADO DEPARTMENT OF CORRECTION               January 1987-November 1989
Executive Director-Responsible to Governor Roy Romer for state correctional agency
- Develop interagency initiative for rational sentencing policy
- Negotiate legislative policy changes for mentally ill inmates
- Expand community corrections facilities statewide

WASHINGTON DEPARTMENT OF CORRECTION             January 82-January 87
- Deputy Secretary – policy and operations management in growing correctional agency under Governors John Spellman and Booth Gardner
- Director of Prisons-Manage policy and operations in 14 facilities
- System wide facility renovation and construction -$159 million program
- Restore state control to Washington State Penitentiary

NORTH CAROLINA DEPARTMENT OF CORRECTION         March 71-December 81

- Deputy Director of Prisons operating 81 facilities housing 16000 offenders
- Coordinate legislative policy governing prison operations
- Plan and execute system wide educational, mental health, work training grants
- Operational management of 11 regional correctional facilities
- Mental health practitioner providing clinical services for offenders

INSTRUCTOR, UNIVERSITY OF GEORGIA 1966-1968

## MILITARY BACKGROUND

| | | |
|---|---|---|
| Commander | Joint Services Stockade, Korat, Thailand | 1970-1971 |
| Operations Officer | U.S. Disciplinary Barracks, Ft. Leavenworth, Kansas | 1969-1970 |

## EDUCATION

| | | | |
|---|---|---|---|
| Master of Science | Criminal Psychology | The Florida State University | 1966 |
| Bachelor of Arts | Psychology | Regis College, Denver, Colorado | 1965 |

## CONTINUING EDUCATION

| | | | |
|---|---|---|---|
| National Institute of Corrections | Executive Training Program (ASCA) | | 2002, 2003 |
| Private Prison Investment Strategies | World Research Corporation | Dallas | 1996 |
| Harvard University, Kennedy School of Government | State and Local Program | | 1987 |

Suemik Company, LTD, San Diego, Ca   Management of Construction Delay Claims    1984
American Management Association, Hamilton, NY - Management Course                    1975
University of North Carolina School of Business, Chapel Hill, NC - Executive Institute    1978


## PROFESSIONAL AFFILIATIONS

American Correctional Association                       National Institute of Corrections (Lecturer)
Association of State Correctional Administrators    North Carolina Correctional Association
American Management Association                      Iowa Correctional Association


## COMMUNITY ACTIVITIES

Hurricane  Emergency Volunteer                  Migrant Worker Assistance Program
Community Resource Developer                     Food Bank Volunteer

**Attachment B**

**Expert Witness Cases:**          **W. L. Kautzky**

Young v. John Ashcroft, Harley Lappin, et. al.
Civil Action CV-03-1308-BR
Unites States District Court:  Western District of Oregon
Expert Witness for Plaintiff    2004

Mark Jordan v. Federal Bureau of Prisons
Civil Action 03-2320
United States District Court:    District of Colorado
Expert Witness Deposed for Plaintiff 2005

Waldrup V. Jewett
Cause No. H-01-1902
United States District Court:    Southern District of Texas
Deposed and at Trial: Expert Witness for Plaintiff    2005

Barbee V. Jefferson County
Matter ID: 04419-004992
United States District Court: Western District of Washington
Expert Witness for Jefferson County - Jury Verdict for Jefferson County

Goff v. Branstad
73F .3d 174, 175 (8th Circuit 1995)
United States District Court; Southern District of Iowa
Expert Witness for Defendant Implementing Court Order

Thomas Tom v. Babbitt
Civil Action No. 94-K-1242 (D. Colo.)
U.S. Magistrate Judge for Ute Indian Reservation
Served as Expert for Defendant at site and report regarding design and operation of Detention
Facility in Towoac, Colorado 1995

Ramos v. Colorado Department of Correction
1983 10th Circuit 152 713 F.2d 546 Case Number:82-1544 Case Number 82-1531, 82-1544
Decided:06/15/1983 1oth Circuit Court of Appeals
United States District Court: District of Colorado
Expert Witness for Defendant in Compliance Hearings 1989

Coleman v. Schwarzenegger
Civil Action S-90-0520 LKK JFM P
United States District Court: Eastern District of California
Expert Witness for Plaintiff Class -- Mentally Ill inmates in California Department of Corrections

Estate of Rentz, et al. v. Spokane County
U.S.D.C. Eastern District
Case No. CV-05-83-AAM

Expert Witness Deposed for Plaintiff

James Q. Wilkinson, Plaintiff vs. Eldon Vail, et al.
USDC, WD Cause No. CO5-5656 JKA
Thurston County Superior Court Cause No. 05-2-02407-8
Expert Witness Deposed for the State of Washington

Billy Soza Warsoldier, Plaintiff v. Jeanne Woodford, Director of the California Department of
Corrections, et al.
United States District Court for the Central District of California
District Court No. CV 04-02233-RSWL
United States Court of Appeals for the Ninth Circuit No. 04-55879
Expert Witness for the Plaintiff

Misty Ford v. U.S. Department of the Interior
Bureau of Indian Affairs
Case Number Not Assigned
Expert Witness for Plaintiff

Estate of Tyler M. Shaw v. Asotin County
Verified Claim for Damages
Expert Witness for Plaintiff

Armstrong v. Schwarzenegger
Case No. 94-2307 CW
Reply Declaration in Support of Plaintiff's Motion for Enforcement and Further Remedial Orders

William Rentz v. Spokane County
Case No. CV 05083-LRS
Declaration in Support of Plaintiff

Abdullah Al Kidd v. Alberto Gonzales, Attorney General of the United States et al.
Case No. CV05-93-EJL
Expert Witness Report for the Plaintiff

Kari Sundstrom, Andrea Fields, and Lindsey Blackwell v. Mathew J. Frank, et al.
Case No. 06-C-0112
Expert Witness for the Plaintiff

**Attachment C**

**Publications by W. L. Kautzky**

Washington State Department of Corrections An Overview of Current System Challenges
and Opportunities
Chapter on Prison Operations and Conditions in a collaborative statewide study
Washington State Department of Correction published by the Office of the Governor
2005

Preventing Sexual Assault in Jails and Juvenile Institutions - Building Blocks for a Model
Program Research team member with Colorado Department of Public Safety completing
publication to assist correctional agencies in managing sexual assault. Site based
research in progress. National Institute of Justice 2005

Sentencing Policy --Balancing Iowa Corrections Services and Demand
Presentation and materials published by the Des Moines Register 2001

Emerging Correctional Service Issues in Iowa
Paper published for presentation to the Iowa Bar Association June 2001

Iowa Sentencing Models   Policy paper published for presentation to the Joint Legislative
Sentencing Commission April 1999

Operation of the Adak Island Naval Air Facility as a Correctional Facility: Challenges
and Development Strategies Report prepared for Economic Research Associates and
published for the Aleut Indian Tribe Board of Directors 1997

Managing Change in a Correctional System
Chapter and training material published for presentation to the National Institute of
Corrections 1990

The Correctional Challenge in Hawaii
Special Master Report published for presentation to the Hawaii Legislature 1990

Aloha Time – The Hawaii Correctional System in Transition
Article and materials presented as a case study – National Institute of Corrections 1990

Correctional Intervention in North Carolina – A System in Responsive Transition
Article and materials presented to the United States Commission on Civil Rights 1986

Public Policy—Management of Maximum Security Disruptive Inmates
Report prepared for presentation to U. S. District Court in case involving the design and
construction of Intensive Management Units in Washington State 1989

# EXHIBIT D

# Mental Health Adseg/SHU/PSU

June 8, 2007

| | | MH POPULATION IN AD SEG | | | AD SEG CAPACITY | MH PERCENT OF AD SEG* | | |
|---|---|---|---|---|---|---|---|---|
| | | EOP | CCCMS | TOTAL | | EOP | CCCMS | TOTAL |
| ASP | II | 3 | 54 | 57 | 175 | 1.71% | 30.86% | 32.57% |
| CAL | I,IV | | 6 | 6 | 300 | 0.00% | 2.00% | 2.00% |
| CCC | I,II,III | | 1 | 1 | 175 | 0.00% | 0.57% | 0.57% |
| CCI | I,II,III,IV | 6 | 118 | 124 | 327 | 1.83% | 36.09% | 37.92% |
| CCWF | | | 27 | 27 | 61 | 0.00% | 44.26% | 44.26% |
| CEN | III | 1 | 2 | 3 | 350 | 0.29% | 0.57% | 0.86% |
| CIM-RC | I | 16 | 65 | 81 | 356 | 4.49% | 18.26% | 22.75% |
| CIW | | 2 | 77 | 79 | 56 | 3.57% | 137.50% | 141.07% |
| CMC | I,II,III | 28 | 47 | 75 | 226 | 12.39% | 20.80% | 33.19% |
| CMF | I,II,III | 34 | 40 | 74 | 164 | 20.73% | 24.39% | 45.12% |
| COR | I,III,IV | 58 | 148 | 206 | 460 | 12.61% | 32.17% | 44.78% |
| CTF | I,II | | 42 | 42 | 228 | 0.00% | 18.42% | 18.42% |
| CVSP | I,II | | 2 | 2 | 175 | 0.00% | 1.14% | 1.14% |
| DVI | I,II | 2 | 46 | 48 | 303 | 0.66% | 15.18% | 15.84% |
| DVI-RC | I,II | 2 | 73 | 75 | 303 | 0.66% | 24.09% | 24.75% |
| FOL | III | | 61 | 61 | 138 | 0.00% | 44.20% | 44.20% |
| HDSP | I,III,IV | 1 | 47 | 48 | 343 | 0.29% | 13.70% | 13.99% |
| ISP | I,III | | 6 | 6 | 175 | 0.00% | 3.43% | 3.43% |
| KVSP | I,IV | 6 | 69 | 75 | 396 | 1.52% | 17.42% | 18.94% |
| LAC | I,III,IV | 61 | 135 | 196 | 450 | 13.56% | 30.00% | 43.56% |
| MCSP | I,II,III,IV | 29 | 50 | 79 | 175 | 16.57% | 28.57% | 45.14% |
| NKSP-RC | I,III | 6 | 54 | 60 | 175 | 3.43% | 30.86% | 34.29% |
| PBSP | I,IV | | 53 | 53 | 246 | 0.00% | 21.54% | 21.54% |
| PVSP | I,III | 2 | 138 | 140 | 350 | 0.57% | 39.43% | 40.00% |
| RJD | I,III | 50 | 86 | 136 | 350 | 14.29% | 24.57% | 38.86% |
| SAC | I,IV | 83 | 114 | 197 | 406 | 20.44% | 28.08% | 48.52% |
| SATF | II,III,IV | 8 | 86 | 94 | 325 | 2.46% | 26.46% | 28.92% |
| SCC | I,II,III | 6 | 45 | 51 | 175 | 3.43% | 25.71% | 29.14% |
| SOL | II,III | 2 | 104 | 106 | 350 | 0.57% | 29.71% | 30.29% |
| SQ-RC | I,II | 3 | 65 | 68 | 379 | 0.79% | 17.15% | 17.94% |
| SVSP | I,IV | 41 | 197 | 238 | 439 | 9.34% | 44.87% | 54.21% |

Mental Health and HIV numbers are as accurate as the information

provided by the respective DDPS identifier systems.

R2-1

Health Care Placement Unit
6/8/2007

*Ad Seg Capacities do not include "overflow." Therefore, MH Percent of Ad Seg may be artificially inflated.

COR Ad-Seg EOP housing is located in the SHU.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| VSPW | 7 | 13 | **20** | 76 | 9.21% | 17.11% | **26.32%** |
| WSP-RC *I,III* | 8 | 33 | **41** | 175 | 4.57% | 18.86% | **23.43%** |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Totals** | 465 | 2104 | **2569** | 5504 | 8.45% | 38.23% | **46.68%** |

| | MH POPULATION IN PSU | | | PSU CAPACITY | MH PERCENT OF PSU | | |
|---|---|---|---|---|---|---|---|
| | EOP | CCCMS | TOTAL | | EOP | CCCMS | TOTAL |
| PBSP *I,V* | 121 | 0 | **121** | 128 | 94.53% | 0.00% | **94.53%** |
| SAC | 174 | 1 | **175** | 192 | 90.63% | 0.52% | **91.15%** |

| | MH POPULATION IN SHU | | | SHU CAPACITY | MH PERCENT OF SHU | | |
|---|---|---|---|---|---|---|---|
| | EOP | CCCMS | TOTAL | | EOP | CCCMS | TOTAL |
| COR *I,III,IV* | 1 | 481 | **482** | 1400 | 0.07% | 34.36% | **34.43%** |
| VSPW | 0 | 36 | **36** | 44 | 0.00% | 81.82% | **81.82%** |
| CCI | 4 | 161 | **165** | 274 | 1.46% | 58.76% | **60.22%** |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Total** | 5 | 678 | **683** | 1718 | 0.29% | 39.46% | **39.76%** |

Mental Health and HIV numbers are as accurate as the information
provided by the respective ODPS identifier systems.                    R2-2                    Health Care Placement Unit
                                                                                                6/8/2007

"Ad Seg Capacities do not include "overflow." Therefore, MH Percent of Ad Seg may be artificially inflated.

COR Ad-Seg EOP housing is located in the SHU.

# EXHIBIT E

# CVBT
CENTRAL VALLEY REGION

Current    Premium    Archives    About CVBT    Policies    Advertising
Webcasts    Letters to the Editor    Lighter Side    Jobs!    Headlines by Email    Free Classifieds


Find Jobs
Post a Resume
careerbuilder.com


Serving all communities for over 79 years.
Yuba College
Clear Lake Campus
Woodland Community College
www.yccd.edu


GREAT VALLEY CENTER

O·C·S

## People in the News

STOCKTON
July 27, 2007 12:01am

• **New bankers for the Central Valley**
• **Culinary science professor attains high honor**

• **Ashley Swearengin**, 35, of Fresno, has been appointed to the Commission for Economic Development. She has served as executive director for the Office of Community and Economic Development at California State University, Fresno since 2000.

Ms. Swearengin has also served as chief operating officer of the Fresno Regional Jobs Initiative since 2003 and lead executive for the California Partnership for the San Joaquin Valley since 2006. Previously, she was director of the Central Valley Business Incubator from 1993 to 2000 and development coordinator for the law firm Baker, Manock & Jensen from 1995 to 1998.

ooOoo

• **Josh Guthrie** has joined River City Bank of Sacramento as vice president and business development officer.

With more than 11 years of experience in the finance industry, Mr. Guthrie most recently was assistant vice president and associate client manager for Bank of America, where he managed a portfolio of high profile business clients and actively acquired new businesses.

Before working for Bank of America, he worked for Wells Fargo for seven years, managing business clients and facilitating lines of credit and commercial real estate loans.

ooOoo

**Klaus Tenbergen**, culinary science professor at California

Lighter Side


Brent Gill's China
A travelogue in chapters

Letters from Laskin


Public Policy Institute of California


AMERICA SUPPORTS YOU
Our Military Men & Women


American Cancer Society




Central Valley Report

BAKERSFIELD COLLEGE
FOUNDED 1913


Premier Guide
Local Search Made Easy

**Foreclosed Homes For Sale**
Find Homes - 50% Below Market Value. Search Now For Free!
www.foreclosure.com

**Central Valley Jobs**
New jobs posted daily for the Central Valley region of CA
Fresnobee.com/jobs

**Fixers & Foreclosures**
Free List by E-mail for Sacramento, Placer and El Dorado county
mustsellhomes.com

Ads by Google
Cal State Fresno
Probate Attorney
Probate Lawyer

Get targeted ads on your site with **Google** AdSense 

State University, Fresno and a master baker, has earned the Master Certified Food Executive (MCFE) certification from the International Food Service Executives Association

Since he began his career as an apprentice baker in Germany, Mr. Tenbergen has become a certified master baker in Germany, South Africa and the United States, operated a fine-dining restaurant in Peoria, Ill., and owned a bakery/coffee shop in Pretoria, South Africa.

He joined the Fresno State faculty in December, where he has worked with the Food Science Department to establish a university program in Culinology, which blends culinary arts and food science.

ooOoo

• **Derral Adams,** 59, of Fresno, has been appointed warden of California State Prison, Corcoran. He has served as acting warden since 2006 and previously served as warden of the Substance Abuse Treatment Facility at California State Prison, Corcoran from 2000 and 2006.

From 1995 to 2000, Mr. Adams served as chief deputy warden for the Central California Women's Facility, where he also served as acting warden in 2000. Previously, he was a correctional administrator during the opening of Wasco State Prison in 1990 and continued in this position until 1995.

Prior to working in corrections, he was a construction manager for Yancey Construction from 1976 to 1977 and Sweda Construction from 1977 to 1979.

ooOoo

• **Steven Brown,** 60, of Chico, has been appointed to the State Board of Fire Services. He has served as the fire chief of the Chico Fire Department since 1995.

Previously, Mr. Brown held several positions with the California Department of Forestry and Fire Protection from 1964 to


Ashley Swearengin


Josh Guthrie


Klaus Tenbergen

