PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
E. IVAN TRUJILLO, Bar No. 228790
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 096891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LORI RIFKIN, Bar No. 244081
SARAH M. LAUBACH, Bar No. 240526
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF, Bar No. 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
LEWIS BOSSING, Bar No. 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>    Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>    Defendants | No.: Civ S 90-0520 LKK-JFM<br><br>**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION TO COMPEL DISPUTED ATTORNEYS' FEES AND COSTS FROM THE THIRD AND FOURTH QUARTERS OF 2006**<br><br>Date: September 5, 2007[1]<br>Time: 11:00 a.m.<br>Place: Courtroom 26<br>Judge: Honorable John F. Moulds |

---

[1] This Court issued a minute order on August 20, 2007 changing the hearing date from September 6, 2007 to September 5, 2007.

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 2

    I.    The PLRA Does Not Change The Legal Standard Regarding Plaintiffs' Entitlement To Reasonable Attorneys' Fees And Costs For Post-Judgment Monitoring ............................................................................................................. 2

    II.    Work On Each Category Of Work Was Reasonable, Useful And Necessary To Protect The Interests Of The *Coleman* Class And To Enforce Compliance With This Court's Orders ....................................................... 4

        A.    Each Of The Three Disputed Categories Of Work Was Directly Related To The Underlying Order In This Case And To The Numerous Other Orders Issued By This Court Regarding The CDCR's Mental Health Care Delivery System .......................................... 5

            1.    Work On The Temporary Restraining Order Regarding Defendants' First Wave Of Out-of-State Transfers Was Useful and Necessary To Ensure Appropriate Screening, Adequate Staffing, And General Compliance With the Program Guides At The Tennessee Facility ................................... 6

            2.    Work On The Discovery Motion Was Necessary To Correct Defendants' Assertions That Plaintiffs Are Entitled To No Post-Judgment Discovery Whatsoever And To Ensure Future Access To Discovery Regarding Program Guide Disputes ............................................................................................... 9

            3.    Plaintiffs' Overcrowding Motion Necessarily Addresses Every Aspect Of The September 13, 1995 Order And Is Fully Compensable .................................................................................. 10

    III.    Plaintiffs Do Not Seek Attorneys' Fees And Costs For Time And Expenses Incurred Litigating The Overcrowding Motion In Other Cases ........... 11

CONCLUSION .................................................................................................................. 12

# TABLE OF AUTHORITIES

## Cases

*Armstrong v. Davis*,
318 F.3d 965, (9th Cir. 2003)..................................................................................................11

*Armstrong v. Schwarzenegger,*
CIV 04-2397 CW (N.D. Cal) ................................................................................................2, 11

*City of Riverside v. Rivera*,
477 U.S. 561 (1986) ....................................................................................................................10

*Coleman v. Wilson,*
912 F. Supp. 1282 (E.D. Cal. 1995) .............................................................................. *passim*

*Dannenberg v. Valadez*,
338 F.3d 1070 (9th Cir. 2003) ....................................................................................................4

*Gates v. Gomez*,
60 F.3d 525 (9th Cir. 1995) .........................................................................................................3

*Hasbrouk v. Texaco, Inc.*
879 F.2d 632, 638 (9th Cir. 1989) ........................................................................................3, 11

*Madrid v. Gomez,*
889 F.Supp. 1146 (N.D. Cal. 1995) ............................................................................................9

*McGinnis v. Kentucky Fried Chicken*,
51 F.3d 805 (9th Cir. 1994) .........................................................................................................4

*Plata v. Schwarzenegger,*
CIV 01-1351 TEH (N.D. Cal) ..................................................................................................12

*Rhodes v. Stewart,*
488 U.S. 1 (1988) ..........................................................................................................................4

*Walker v. Woodford,*
454 F.Supp.2d 1007 (S.D. Cal. 2006) ........................................................................................8

*Webb v. Ada County*,
285 F.3d 829 (9th Cir. 2002), *cert. denied,* 537 U.S. 948 (2002) .....................................3, 4

## Statutes

42 U.S.C. § 1997e ..........................................................................................................................3

## Rules

Federal Rule of Evidence 201 .......................................................................................................8

**INTRODUCTION**

At issue in this motion is plaintiffs' entitlement to compensation for three categories of work, including: (1) plaintiffs' work on the overcrowding motion or motion to convene a three-judge panel, (2) plaintiffs' work on a temporary restraining order prior to defendants' initial transfer of eighty (80) state prisoners to an out-of-state facility in Tennessee, and (3) plaintiffs' work on the discovery motion filed in July of 2006. Defendants have wrongfully refused to pay for the legal work expended on these issues, and, as to the major category of overcrowding, continue to refuse any payment whatsoever for plaintiffs' counsel's work on this critical issue in 2007.[2]

In all, $94,340.84 remains in dispute between the parties for attorneys' fees and costs incurred for these three categories of work.[3] By filing this motion, however, plaintiffs seek only an order from this Court granting entitlement to compensation for work on the three motions. Plaintiffs do not seek an outright award of the fees and costs detailed in the sealed time runs because the parties have not yet met and conferred about the reasonableness of discrete entries. This is because counsel for plaintiffs and defendants simply set aside all time entries that in any way related to work on each of the three motions and did not conduct a final meet and confer process regarding those entries. *See* Reply Whelan Decl. at ¶ 2. Accordingly,

---

[2] Updated charts summarizing the disputed amounts are attached as Exhibit A to the Reply Declaration of Amy Whelan In Support of Plaintiffs' Motion to Compel Disputed Attorneys' Fees and Costs From The Third and Fourth Quarters of 2006 (hereinafter "Reply Whelan Decl."). As explained in that declaration, plaintiffs' counsel made some slight adjustments to the disputed fees and costs after reviewing the specific time entries at issue here. The net result of those modifications is a difference of $217.35. Reply Whelan Decl. ¶ 3.

[3] For ease of reference, plaintiffs also file under seal, with this reply brief, the actual disputed time entries for each category of work at issue in this motion. *See* Sealed Reply Declaration of Amy Whelan In Support of Plaintiffs' Motion to Compel Disputed Attorneys' Fees and Costs From The Third and Fourth Quarters of 2006 (hereinafter "Sealed Reply Whelan Decl.") at ¶ 2 and Exs. A, B and C. Plaintiffs are filing the excerpted time entries in order to clarify the record and to provide the Court with a sense of the exact time entries at issue between the parties. When defendants filed their opposition, they inappropriately filed copies of plaintiffs' complete billing records for the third and fourth quarters of 2006. Plaintiffs had to seal those records because they contain information that, if publicly disclosed, violates the terms of the *Coleman* protective order. Those records are also largely useless to this Court because they include every time entry for the third and fourth quarters rather than just the disputed time.

plaintiffs seek an Order granting entitlement to compensation for work on these categories of work and ordering the parties to meet and confer regarding the specific amounts to be paid within 30 days of that order.[4]

## ARGUMENT

Defendants present three main arguments why this Court should either deny or reduce the attorneys' fees and costs at issue in this motion, including: (1) that the fees and costs are not compensable because the work was not related to proving a constitutional violation (Docket 2355 at 3); (2) that plaintiffs have not prevailed on the motions (*Id.* at 3), and; (3) that the disputed fees and costs were not "directly and reasonably" incurred or "useful and necessary" (*Id.* at 4).[5] Defendants' arguments are wrong on both the facts and the law.

**I.   The PLRA Does Not Change The Legal Standard Regarding Plaintiffs' Entitlement To Reasonable Attorneys' Fees And Costs For Post-Judgment Monitoring**

As set forth in the *Coleman* Periodic Fees Order, "the standard of review to be applied to disputed billing items will be whether the services were useful and necessary to ensure

---

[4] While the work on the discovery motion and the temporary restraining order regarding out-of-state transfers was finite, plaintiffs' work on the overcrowding motion is ongoing and will remain so for the foreseeable future. Accordingly, plaintiffs seek an order granting entitlement not just to work on the overcrowding motion through 2006, but also for work on that motion moving forward. Defendants, of course, will still have every right to object to the reasonableness of any attorneys' fees and costs sought for work on the overcrowding motion, including objections to particular entries and projects.

[5] Defendants also make additional arguments that do not hold much weight. They argue, for instance, that this Court should deny plaintiffs' fees and costs regarding the overcrowding motion because plaintiffs did not engage in a second meet and confer with defendants after the Court granted the motion seeking a Three-Judge panel. Docket 2355 at 8. There is no requirement for a second meet and confer, and, in any event, it would have been futile as defendants still refuse to pay these fees.

Nor is it relevant that plaintiffs' counsel in the *Armstrong v. Schwarzenegger* lawsuit opted to delay resolution of the overcrowding fees and costs in that case. Plaintiffs do note, however, that Mr. Stone mischaracterizes the *Armstrong* stipulation in his declaration. In particular, he represents to this Court that plaintiffs' counsel agreed in *Armstrong* to stay the overcrowding issue until after a decision is rendered. Docket 2355-6 at ¶ 7. In fact, the *Armstrong* stipulation delays the overcrowding fees and costs only until "calendar year 2007." *See* Docket 2356-7. Moreover, plaintiffs' counsel reserved the overcrowding time in *Armstrong* because there was significantly less in dispute and because it was the only category of work contested by defendants (unlike in this litigation). Reply Whelan Decl. ¶ 5.

1  compliance with the Decision and Order dated September 13, 1995." Docket 2326 (7/25/07
2  Whelan Decl.) Ex. B at ¶ 7. This criterion comports with current law, which holds that the
3  standard applied to monitoring activities is "whether the services were reasonably performed
4  during the pendency of the consent decree." *Gates v. Gomez*, 60 F.3d 525, 534 (9th Cir. 1995).
5  All work spent enforcing the rights of the *Coleman* class is compensable if it, "at the time
6  rendered, would have been undertaken by a reasonable and prudent lawyer to advance or
7  protect his client's interest..." *Hasbrouk v. Texaco, Inc.,* 879 F.2d 632, 638 (9th Cir. 1989).

    Defendants' first and second arguments (that plaintiffs should not be compensated because the disputed work was not spent proving a constitutional violation and because plaintiffs were not "prevailing parties"), are premised on defendants' misconception that the PLRA somehow changed the standards for post-judgment monitoring fees and costs. In fact, the Ninth Circuit has found the exact opposite, holding that compensation for post-judgment attorneys' fees and costs is compensable when the "fees were directly incurred in enforcing court ordered relief instituted to correct violations of [plaintiffs'] constitutional rights." *Webb v. Ada County*, 285 F.3d 829, 833 (9th Cir. 2002), *cert. denied,* 537 U.S. 948 (2002). In *Webb*, the Ninth Circuit rejected the exact argument that the *Coleman* defendants make in this motion—that fees are only compensable if plaintiffs prove a constitutional violation. *Id.* at 834-835 (holding that plaintiffs need not prove an actual violation of the Constitution to be compensated for post-judgment work and that such an interpretation "of the PLRA would render the language of subsection (B)(ii) superfluous.").[6] Instead, the fees must be "directly and reasonably incurred in *enforcing* the *relief ordered* for the violation." *Id.* at 834 (emphasis in original) (citing 42 U.S.C. § 1997(e)(d)(1)(B)(ii)). The Court's rationale for reaffirming this standard was squarely based on Congressional intent in passing the PLRA:

>  If a postjudgment fee request could only be granted if the attorney's services were directly linked to a discrete constitutional

---

[6] Although defendants cited another Ninth Circuit opinion in the same *Webb v. Ada County* case, they failed to cite the 2002 decision that squarely rejects their argument that plaintiffs in post-judgment monitoring cases must prove a constitutional violation in order to be compensated for reasonable attorneys' fees and costs.

> violation, fees incurred "in enforcing the relief" that the court had ordered because of demonstrated previous constitutional violations, could not be awarded. To the contrary, when subsections (A) and (B) [of 42 U.S.C. § 1997e(d)(1)] are read together, it is apparent that Congress intended that a plaintiff is entitled to fees incurred in enforcing a judgment entered upon proof that the plaintiff's constitutional rights *had been* violated.

*Webb*, 285 F.3d at 834 (emphasis added).

Moreover, defendants' argument that plaintiffs should not be compensated for this work because they did not "prevail" on the motions is legally wrong. Docket 2355 at 3-4. Defendants cite inapposite cases in this section of their brief that either do not involve post-judgment monitoring fees and costs (*Dannenberg v. Valadez*, 338 F.3d 1070 (9th Cir. 2003); *McGinnis v. Kentucky Fried Chicken*, 51 F.3d 805 (9th Cir. 1994)) or bear no factual relationship to the *Coleman* lawsuit (*Rhodes v. Stewart,* 488 U.S. 1, 4 (1988) (finding that two individual plaintiffs could not be "prevailing parties" because one died and one was released before the District Court issued its order granting relief)).

Plaintiffs have already been deemed "prevailing parties" in this lawsuit. The appropriate standard for attorneys' fees and costs at this post-judgment stage of the litigation is established by the periodic fees order in this case ("whether the services were useful and necessary to ensure compliance with the Decision and Order dated September 13, 1995") and controlling law. *See, e.g.*, *Webb*, 285 F.3d at 834 (the fees must be "directly and reasonably incurred in *enforcing* the *relief ordered* for the violation.").

**II. Work On Each Category Of Work Was Reasonable, Useful And Necessary To Protect The Interests Of The *Coleman* Class And To Enforce Compliance With This Court's Orders**

Defendants also argue that plaintiffs should not be compensated for work on the three disputed categories of work because that work was not "directly and reasonably incurred in enforcing the [September 13, 1995] Decision and Order" and also was not "useful or necessary to ensure compliance" with that order. Docket 2355 at 4-5. Defendants argue that the underlying decision in this case "did not address re-opening discovery a decade after trial, out-of-state transfers, or overcrowding." Docket 2355 at p. 4. Defendants essentially argue, in other words, that because the underlying order in this case did not contain the exact words

-4-
PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION TO COMPEL DISPUTED ATTORNEYS' FEES AND COSTS FROM THE THIRD AND FOURTH QUARTERS OF 2006, NO.: CIV S 90-0520 LKK-JFM

"out-of-state transfers," "overcrowding" or "discovery," plaintiffs are not entitled to compensation for work on these issues. In fact, each category of work in dispute here is directly related not just to the original September 13, 1995 decision, but also to numerous other orders issued by this Court.

### A. Each Of The Three Disputed Categories Of Work Was Directly Related To The Underlying Order In This Case And To The Numerous Other Orders Issued By This Court Regarding The CDCR's Mental Health Care Delivery System

The September 13, 1995 *Coleman* Order set forth six general aspects of prison mental health systems that Courts evaluate to determine constitutionally adequate mental healthcare:

> In the context of this lawsuit, the objective component turns on whether the mental health care delivery system operated by defendants is so deficient that it deprives seriously mentally ill inmates of access to adequate mental health care. To analyze that question, the courts have focused on the presence or absence of six basic, essentially common sense, components of a minimally adequate prison mental health care delivery system. [citations omitted]…The six components are: (1) a systematic program for screening and evaluating inmates to identify those in need of mental health care; (2) a treatment program that involves more than segregation and close supervision of mentally ill inmates; (3) employment of a sufficient number of trained mental health professionals; (4) maintenance of accurate, complete and confidential mental health treatment records; (5) administration of psychotropic medication only with appropriate supervision and periodic evaluation; and (6) a basic program to identify, treat, and supervise inmates at risk for suicide. [citations omitted].

*Coleman v. Wilson,* 912 F. Supp. 1282, 1298 and fn.10 (E.D. Cal. 1995). After analyzing these elements, this Court found that the CDCR's system was deficient in several respects, including inadequate mental health screening, problems with staff (including staffing shortages and competency issues), problems with the delivery of mental health care, issues with medical records, and problems with suicide prevention.[7] *Id.* at 1305-1315. In the intervening years since the September 13, 1995 Order, this Court has issued "at least seventy-seven substantive

---

[7] The Court found that although defendants' suicide prevention plan was adequate in theory back in 1995, it could not be implemented at that time due to chronic understaffing. *Id.* at 1315.

orders to defendants in an effort to bring the CDCR's mental health care delivery system into compliance with the requirements of the Eighth Amendment…Taken together, these orders have contained directives aimed at all of the aforementioned requirements for a constitutionally adequate mental health care delivery system." 7/23/07 Order at 4 (Docket 2320).

Defendants characterize plaintiffs' work on the overcrowding, discovery and out-of-state transfer issues as completely separate and distinct from the underlying orders in this case. In fact, each one of those categories directly relates to those orders and to ongoing and essential aspects of this case. As such, the work is fully compensable.

### 1. Work On The Temporary Restraining Order Regarding Defendants' First Wave Of Out-of-State Transfers Was Useful and Necessary To Ensure Appropriate Screening, Adequate Staffing, And General Compliance With the Program Guides At The Tennessee Facility

As set forth in detail in plaintiffs' opening brief, defendants informed plaintiffs' counsel and the Special Master on November 1, 2006 that they intended to transfer eighty (80) CDCR prisoners to an out-of-state prison in Tennessee within 48 hours.[8] Docket 2017 ¶ 2. This information was alarming for several reasons, including the fact that defendants failed to include any language about *Coleman* in the contract with the Tennessee facility, failed to provide the facility with copies of the Program Guide and, as of one day before the transfers were to occur, could not say how many or what type of clinical mental health staff would be available in the out-of-state prison. Docket 2017 ¶¶ 13-14. The Special Master sent a letter to

---

[8] Defendants' opposition blurs the critical distinction between notice of a general plan to employ out of state transfers, and actual execution of the plan. Defendants assert that because Plaintiffs knew about the general out-of-state transfer plan in September, there was no need for urgent action in November. Docket 2355 at 7. Defendants' logic on this point is faulty. Plaintiffs agree that they knew *generally* about the out-of-state program and that Don Specter of the Prison Law Office, in particular, was involved in negotiations about that program. Indeed, the fact that Mr. Specter was involved in the process made it even more disturbing that defendants failed to notify plaintiffs' counsel about the first, actual transfer of prisoners until 48 hours before the transfer was set to occur. As Mr. Specter's declaration shows, he was actively engaged in negotiations about the out-of-state transfer program as of late October and had already notified defendants about problems with the program, including that it violated the Americans With Disabilities Act (ADA) and that the contract with Tennessee violated the *Coleman* injunction. Docket 2355-4 ¶¶ 4-6.

defendants on November 1, 2007 raising serious concerns about defendants' screening procedures to ensure that prisoners with a current or historic diagnosis of mental illness or suicidality were excluded. *Id.* at ¶ 3 and Ex. A. On November 2, 2006, the day after defendants gave notice of the imminent transfers, the parties had phone calls to discuss these serious issues. Docket 2017 ¶ 13-14. During those calls, defendants were unable to confirm that they had complied with the Special Master's recommended screening provisions, could not identify the number or type of clinical staff available at the Tennessee prison, admitted that they had not yet provided the prison with a copy of the Program Guide (let alone explained the relevant requirements), and were unable to provide any meaningful information about mental health care at the out-of-state facility or the prison's willingness and ability to comply with the Court-ordered Program Guide. *Id.* During a second phone call later that same day, defendants provided some additional information about the transfers, but had still failed to exclude prisoners with a history of mental illness from the list as requested by the Special Master. Defendants also reported that the only mental health clinician at the prison was a single psychiatrist providing care to 600 prisoners for only four hours per week.[9] *Id.*

In other words, defendants' first transfer of prisoners out-of-state threatened to export, along with those prisoners, the very problems that plaintiffs, the Special Master and this Court have sought to correct over the past decade. Plaintiffs reasonably feared that the inadequate screenings would result in dangerous transfers, that there would not be adequate mental health staff to treat and monitor the California prisoners and that the prison would not otherwise meet Program Guide requirements both because they were not contractually obligated to do so and because they had not been trained on those policies and procedures. Each one of these issues (staffing, screening, training, and implementation of the Program Guide) was specifically

---

[9] The Special Master clarified at the hearing on November 9, 2006 that the Tennessee prison actually had additional mental health staff available. At the time plaintiffs filed this motion, however, everyone, including defendants, believed that there was only one psychiatrist at the prison working four hours per week on behalf of 600 prisoners. Docket 2326 (7/25/07 Whelan Decl.) ¶ 9.

required by this Court's original September 13, 1995 Order and by subsequent remedial orders. Moreover, defendants' unproven assertion that no *Coleman* class members were part of the first transfer is misleading and irrelevant. First, the *Coleman* class is broader than the MHSDS caseload and includes persons who are rightly or wrongly removed from the MHSDS program.[10] Defendants did *not* exclude this group (former caseload prisoners) from the out-of-state program despite Mr. Keating's request that they do so. Second, the Program Guide applies to *all* CDCR prisoners and not just *Coleman* class members, yet defendants had not completed appropriate screenings of the Tennessee-bound prisoners and had not ensured that there would be appropriate care and staffing in place for prisoners who would become *Coleman* class members while they were in Tennessee. Defendants' failure to provide the Program Guide to Tennessee staff and failure to ensure appropriate mental health staffing also meant that the out-of-state prison was unlikely to comply, for instance, with special requirements of rounding for California prisoners placed in administrative segregation or for prisoners placed on suicide watch.

Finally, and as explained in plaintiffs' opening brief, the Court issued significant orders in response to plaintiffs' motion that protected both the initial and subsequent waves of transferred prisoners. Docket 2025 (defendants were required to immediately send CDCR mental health clinicians to the Tennessee prison, to conduct appropriate screenings and file reviews of the transferred prisoners upon arrival, to immediately return any prisoners identified as present or former *Coleman* class members or who had other risk factors identified by the Special Master, and were prohibited from transferring any other prisoners out-of-state who had not been properly screened for suicide risk and other mental health factors). Plaintiffs' motion

---

[10] Defendants request that this Court take judicial notice of an October 12, 2006 letter from CDCR General Counsel Bruce Slavin. Federal Rule of Evidence 201 prohibits the Court from taking judicial notice of any fact unless it is either generally known or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see also Walker v. Woodford,* 454 F.Supp.2d 1007 (S.D. Cal. 2006) (Court may not take judicial notice of any matter that is in dispute). The October 12, 2006 letter is not an appropriate document for judicial notice and this Court should reject defendants' request.

also established, over defendants' objection, the Court's and the Special Master's jurisdiction over out-of-state facilities and procedures; representatives of the Special Master's team have since toured the Tennessee and other out-of-state facilities. Plaintiffs and the Special Master continue to monitor the out-of-state transfer program pursuant to *Coleman* and defendants agree that such monitoring is reasonable and compensable. Indeed, although defendants objected to plaintiffs' work on the temporary restraining order, they did not object to subsequent work monitoring the out-of-state facilities, participating in phone calls about those facilities and otherwise ensuring appropriate staffing levels and compliance with the Program Guide at those facilities. Reply Whelan Decl. ¶ 4.

### 2. Work On The Discovery Motion Was Necessary To Correct Defendants' Assertions That Plaintiffs Are Entitled To No Post-Judgment Discovery Whatsoever And To Ensure Future Access To Discovery Regarding Program Guide Disputes

The September 13, 1995 Order in this case specifically envisioned the creation of a Program Guide to establish policies and procedures intended to provide constitutionally adequate mental healthcare:

> Requiring development of remedial plans is the method most often employed by district courts faced with systemic constitutional deficiencies because it is an efficacious way to both "cure[ ] ... constitutional deficiencies and minimize[ ] intrusion into prison management." *Madrid v. Gomez,* 889 F.Supp. 1146, 1280 (N.D. Cal. 1995). That process seems to this court to represent both a sensible and legally appropriate way of proceeding if the findings are otherwise upheld.

*Coleman*, 912 F. Supp. 1304-1305. Plaintiffs' attorneys are obligated to ensure that defendants' policies and procedures, as set forth in the Program Guide, dictate constitutionally adequate mental healthcare. The discovery motion targeted these issues directly.

At the time plaintiffs' counsel filed the motion to obtain discovery regarding disputed Program Guide issues, defendants took the extreme position that plaintiffs were not entitled to any discovery whatsoever in connection with any litigation over the Program Guide. Docket 1828 at 5 (Defendants' 6/2/06 Discovery Conference Statement) ("[T]he post-trial status of this case makes any sought discovery untimely under the Federal Rules of Civil Procedure, Rules

-9-

26 and 30… Indeed, the discovery phase of *Coleman* ended years ago with the completion of the trial and entry of judgment. The discovery statutes do not provide for discovery during the remedial phase of a class action suit."). Thus, although plaintiffs contested policies and procedures set forth in the Revised Program Guide, defendants argued, in essence, that plaintiffs would have no access whatsoever to any documents, materials or data used by defendants to establish those policies and procedures. In light of this extreme position, plaintiffs had no choice but to file a motion seeking to establish the "fundamental right of plaintiffs' counsel to conduct reasonable and focused discovery." Docket 1826 at 5 (Plaintiffs' Discovery Conference Statement); *see also City of Riverside v. Rivera*, 477 U.S. 561, 581 (1986) ("The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response."). On September 28, 2006, Magistrate Judge Moulds declined to reopen discovery generally, but stated that he would consider doing so in "a specific factual and legal context." Docket 1988 at 3.[11] Plaintiffs have thus succeeded in making discovery available to the class as a tool in resolving Program Guide issues and established a procedure for taking discovery and litigating Program Guide disputes in the future. The work was reasonable and necessary on behalf of the *Coleman* class and is thus fully compensable.

### 3. Plaintiffs' Overcrowding Motion Necessarily Addresses Every Aspect Of The September 13, 1995 Order And Is Fully Compensable

As mentioned above, the September 13, 1995 Order sets forth six components of a constitutionally adequate mental healthcare system. This Court's July 23, 2007 Order granting plaintiffs' overcrowding motion established the obvious link between the overcrowding crisis and the components of a constitutionally adequate mental health care system: "[T]he overcrowding crisis in the CDCR is preventing the delivery of constitutionally adequate mental health care to the plaintiff class and, therefore, some form of limitation on the inmate

---

[11] Judge Moulds also denied plaintiffs' request to receive all of the *Coleman* tour binders without prejudice, thereby leaving this issue open for future resolution. Docket 1988 at 4.

population must be considered." Docket 2320 at 13. Thus, defendants' argument that the overcrowding motion bears no relation to the "Decision and Order" in this case is bizarre. Docket 2355 at 4. The overcrowding motion necessarily incorporates every aspect of the original *Coleman* decision as well as numerous subsequent orders issued by this Court, including appropriate screening and intake of prisoners, adequate mental health staffing levels, the provision of timely and adequate mental health care (including medications), and appropriate suicide prevention policies.

Defendants also argue that plaintiffs should not be compensated for the overcrowding work because the motion is still pending. Docket 2355 at 5 ("the motion for a three-judge panel is pending appeal, so whether or not it will ultimately be useful and necessary to compliance with the Decision and Order is presently unknown."). Again, however, defendants misstate the legal standard for post-judgment compensation. Plaintiffs are "entitled to recover a reasonable attorney's fee for every item of service which, *at the time rendered,* would have been undertaken by a reasonable and prudent lawyer to advance or protect his client's interest…" *Hasbrouk v. Texaco, Inc.*, 879 F.2d 632, 638 (9th Cir. 1989) (emphasis added); *see also, Armstrong v. Davis*, 318 F.3d 965, 971 (9th Cir. 2003) (applying *Hasbrouk* to prisoner civil rights cases). Regardless of the ultimate result of the overcrowding motion, which could take years to fully unfold, plaintiffs reasonably filed the motion to address the very heart of the *Coleman* case, defendants' inability to provide constitutionally adequate mental health care.[12]

### III. Plaintiffs Do Not Seek Attorneys' Fees And Costs For Time And Expenses Incurred Litigating The Overcrowding Motion In Other Cases

Defendants also accuse plaintiffs of double-billing them for work on the overcrowding motion because similar motions were filed in the *Armstrong* and *Plata* lawsuits. Docket 2355

---

[12] Defendants also argue that plaintiffs should not be compensated for the overcrowding work because the referral to the three judge panel is a procedural rather than substantive victory. Docket 2355 at 9. Again, this argument ignores the standards for compensation set forth in the periodic fees order and controlling case law.

at 10. Defendants cite no evidence for this outrageous position, which falsely accuses plaintiffs' counsel of unethical billing practices.

In fact, plaintiffs' counsel did not (and never would) double-bill defendants for work on the overcrowding motions. Reply Whelan Decl. ¶ 6. On the contrary, while plaintiffs' counsel necessarily shared information such as legal research (which makes the billing *more* efficient, not *less* so), they split the overcrowding motions efficiently between the two primary firms working on them. *Id*. The work on the *Armstrong* overcrowding motion was completely separate from the *Coleman* work and was billed to defendants through the *Armstrong* quarterly billing process. *Id*.

Defendants also argue, again without any explanation or evidence, that they should not be liable for fees and costs incurred reviewing *"Plata* documents and gathering information from the Receiver." Docket 2355 at 10. Because the *Coleman* and *Plata* cases were consolidated for the overcrowding motion, however, and because there is overlapping evidence between the two cases, it was reasonable for plaintiffs in *Coleman* to review and utilize overcrowding information gathered by the Receiver. Reply Whelan Decl. ¶ 7.

## CONCLUSION

For all of the reasons stated above, plaintiffs request that the Court issue an order finding that the above-described disputed professional services and costs are compensable under the applicable legal standard, in that the work performed and the costs incurred were useful and necessary to protect the rights of the *Coleman* class, and ordering the parties to complete a meet and confer regarding the specific amounts to be paid within 30 days of the Court's order.

Dated: August 21, 2007                    Respectfully submitted,

                                              */s/ Amy Whelan*
                                              Amy Whelan
                                              Rosen, Bien & Galvan
                                              Attorneys for Plaintiffs