1  Richard Edwards
   C-30269    A3-140U
2  I.S.P.    P.O. Box 2199
   Blythe, Ca. 92226
3

4  In Propria Persona

5

6

7

**FILED**

SEP 14 2007

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11  IN THE MATTER OF:                    )
                 Prison Overcrowding    )
12                                       )
    IN RE: Richard Edwards et al.,       )
13                                       )
                  V.                     )
14                                       )
15  ARNOLD SCHWARZENEGGER, Governor,et al.,)
                       **Respondent's**   )
16  _____)

2:90cv 0520 LKK JFM

**CASE NO.:** CO1-1351 TEH

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
AMICUS CURIAE**

Honorable Lawrence K. Karlton
District Court Judge

17

18                    **INTRODUCTION**

19     **COMES NOW,** Richard Edwards et al., in Pro Se, and Ex Parte on Amicus Curiae,

20  calling this Honorable Court's attention to some matters which might otherwise

21  escape it's attention (see 264 F. 276,279 ) concerning this Court's Order for the

22  Governor of the State of California to ease the severe overcrowding problem.

23

24     On this Court's previous Orders, the Governor of the State of California, Arnold

25  Schwarzenegger, was specifically ordered to ease the prison and jail overcrowding

26  problem by June 2007. Although the Governor and California Department of Corrections

27  and Rehabilitation ("CDCR") began compliance with these specific orders by

28  removing all overflow inmates from the high security prisons, e.g., Ironwood State

                              1

Prison ("ISP") dayrooms in March and April of 2007, however, in May the Governor and CDCR began re-filling not only the previously emptied overflow beds, but an [additional] 540 newly installed dayroom beds at ISP alone, and a total of 53,000 additional beds across the State, pursuant to an Assembly Bill ("AB 900"), that the Governor signed into emergency law. (See, e.g., State of California, Department of Corrections and Rehabilitation Memorandum, dated May 25, 2007, attachment.) Violating the State Prisoner's Fifth, Eighth, and Fourteenth Amendment rights to the United States Constitution, and Article I, §§15, 17, and 24 of the California Constitution.

It is apparent by the Governor's and CDCR's actions that they have no intention of complying with this Court's Order and Direction's, and instead openly show contempt for this Court. Therefore, this Amicus Curiae Brief is submitted by one not a party to the civil matter currently pending before this Court, but to aid the Court in gaining the imformation it needs to make a proper decision and to urge a particular result on behalf of the public or private interest of third parties, in this case, Richard Edwards et al., who will be directly affected by the resolution of the dispute at bar.

///

///

## MEMORANDUM OF POINTS AND AUTHORITIES

## IN SUPPORT OF AMICUS CURIAE

### A. Enforcing Court Orders Through Contempt Proceedings
### And Other Means; Case Example

In 1984, the Court of Appeal for the Second Circuit, in Badgley v. Varelas, 729 F.2d 894, 902 (2d Cir. 1984 ) ("Badgley I"), characterized as a "disaster"

the persistent violation by the Nassau County Sheriff and the Warden of the
Nassau County Correctional Center ("NCCC") of a consent judgment order limiting
inmate population at the NCCC. Two years later the Court was thus confronted
with a situation of continuing violation of an amended consent judgment order
and discovered that, since the 1984 decision, little if any meaningful action
had been taken to alleviate the overcrowding at the NCCC. See, Badgley v.
Santacroce, 800 F.2d 33, __ (2d Cir. 1986). * * *

                                  *   *   *

The amended consent judgment order slightly increased the inmate population
limit and also incorporates an enforcing mechanism. Paragraph 4 provided that
"the actual maximum in-house population of the NCCC shall not exceed 710 [the
maximum allowable in cells] plus the number of inmates actually housed in
[newly constructed] dormitories." Paragraph 3 established the maximum capacity
of the new dormitory housing as 157. Thus, the judgment contemplated a
maximum in-house population of 867. Paragraph 31 incorporated, with appropriate
numerical adjustments, the remedial provisions ordered by the District Court in
March 1984 in conformity with Badgley I: "The Sheriff of Nassau County must not
deliver any person to the NCCC until the in-cell population is no more than 710
and must not deliver any person who would increase the population above 710, the
Warden of the NCCC must not accept any person until the in-cell population is
no more than 710, and the warden must notify all courts and agencies that send
prisoners to the NCCC for confinement anytime the in-cell population equals or
exceeds 685 for five consecutive days." Paragraph 32 allowed the defendants to
accept, "without regard to the in-house population cap," persons charged with
class A or B felonies and persons held without bail or with bail of $100,000 or
more.

Beginning on October 7, 1985, the county defendants began housing inmates at
the NCCC above the in-cell limit of 710. Since that time, the defendants'

                                     3

record of compliance with the amended consent judgment order was abysmal.
Paragraph 28 of the judgment order required the defendants to provide the
plaintiffs with weekly inmate population statistics. A review of the statistics
for weekday population between October 7, 1985, and March 28, 1986, revealed
that the in-cell maximum was met only fifteen days. The average daily in-cell
population at the NCCC was 732 for November, 712 for December, 746 for January,
739 for February, and 751 for march. On March 17, 1986, the in-cell population
rose to a high of 781; that same day, the total in-house population (including
inmates in dormitories) was 961. Overcrowding in violation of the amended
consent judgment order had been the rule and compliance the rare exception.

On October 17, 1985, the plaintiffs moved for an order holding the county
defendants in contempt of court for violation of paragraph 31 of the amended
consent judgment order. After a series of hearings, the District Court on
January 6, 1986, concluded that the county defendants had not willfully violated
the judgment, that they had made every reasonable effort to comply with the
population limit, and that it was impossible for them to comply with the
judgment without the assistance of State Officials. The Court therefore denied
the contempt motion, and the inmates appealed. The Court of Appeal reversed.
Badgley v. Santacroce, supra, 800 F.2d 33, __ (2d Cir. 1986.)

The purpose of civil contempt, broadly stated, is to compel a reluctant
party to do what a court requires of him. Because compliance with a court's
directive is the goal, an order of civil contempt is appropriate "only when it
appears that obedience is within the power of the party being coerced by the
order." Maggio v. Zeitz, 333 U.S. 56, 69 (1948). A court's power to impose
coercive civil contempt is limited by an individual's ability to comply with
the court's coercive order. A party may defend against a contempt by showing
that his compliance is "facially impossible." In raising this defense, the
defendant has a burden of production that may be difficult to meet, particularly

4

in cases such as this where the defendants have a history of delay and the plaintiff's needs are urgent.

A classic application of the factual impossibility defense arises when a court orders an individual to produce documents that are not in his possession or control. Similarly, a witness who refuses to answer a grand jury's questions cannot be held in contempt after the term of the grand jury expires, since it is no longer possible for the witness to purge himself of the contempt by testifying. And an inability to comply with an order requiring the payment of money because of poverty or insolvency will generally be a defense to contempt. In all these situations, the contempt is excused because compliance is literally impossible and, as a result, any attempts at coercion are pointless.

However, by contrast, on the undisputed facts in Badgley, supra, (and this Court's Order in California), nothing makes it factually impossible for the Sheriff to cease delivering persons to the NCCC (or CDCR) or for the Warden to refuse to accept such persons until the population requirements of the amended judgment (Order) are met. As the Court noted in Badgley I, if a natural disaster such as fire or disease required the NCCC to be closed, the county defendants would place the inmates elsewhere and would not deliver or accept new prisoners until the crisis ended. The continued violation of the amended consent judgment order is a legal crisis of equal gravity, and it is obvious that the defendants are just as able to decline to deliver and accept new prisoners until this crisis is ended. The terms of the amended consent judgment order automatically operate, whenever the population limit is exceeded, to close the jail's doors as tightly as would fire or disease.

In Badgley I, the defendants also suggested to the District Court that compliance might place them in contempt of the state courts that send them prisoners. As Justice Arthur D. Spatt, Administrative Judge of Nassau County, told the District Court that, if the Sheriff refused to accept prisoners

5

committed to his custody by local criminal courts, he would be in contempt of these courts. Significantly, however, he added that state judges do not commit prisoners to specific facilities and would not direct the Sheriff to take prisoners to the NCCC in light of the federal court's order barring delivery and acceptance of additional inmates. Compliance with the amended consent judgment order has not been shown to pose a risk of contempt of state courts.

Even if a state court would hold the defendants in contempt for refusing to house inmates at the NCCC, or if compliance would otherwise violate state law, Supremacy Clause considerations require that the judgment of the federal court be respected. In any attempt by a state court to hold defendants in contempt for taking actions required by the judgment of the District Court, that judgment would provide a complete defense.

The respect due the Federal judgment is not lessened because the judgment was entered by consent. The plaintiff's suit alleged a denial of their constitutional rights. When the defendants chose to consent to a judgment, rather than have the District Court adjudicate the merits of the plaintiff's claims, the result was a fully enforceable federal judgment that overrides any conflicting state law or state court order. The strong policy encouraging settlement of cases requires that the terms of a consent judgment, once approved by a federal court, be respected as fully as a judgment entered after trial.

The Court of Appeal concluded that compliance with the amended consent judgment must now occur, and the remedial provisions of that judgment must be put into effect. The Court thus allowed a delay of thirty days only to permit necessary notifications to the appropriate court, agency, and police officials.

The Court of Appeal reversed the judgment of the District Court, and remanded the cause with directions to enter forthwith an Order (1) declaring paragraph 31 of the amended consent judgment to be operative thirty days after the date of the Court of Appeal's decision and (2) requiring the county

6

defendants promptly to give notice to all courts, police departments, and other
federal, state, and local governmental agencies that send persons for confinement
at the NCCC that, thirty days after the date of the Court of Appeal's decision,
the NCCC will be unavailable to house additional persons, except to the extent
permitted by paragraph 32.  The District Court is also directed to hold the
county defendants in civil contempt in the event of any subsequent failure to
implement paragraph 31 of the amended consent judgment order and, in that event,
to assess compensatory damages in favor of the plaintiffs of not less than
$5,000 for each person admitted to the NCCC in violation of the amended consent
judgment and to order any additional remedies that may be appropriate.
Badgley v. Santacroce, supra, 800 F.2d 33, __ (2d Cir. 1986.)

   In the instant action, this Court ordered the Governor to ease the overcrowding
problems by June 2007, however, not only has the Governor failed to comply, or
even attempt to implement a remedial plan towards this end, the Governor, CDCR,
state courts, police departments, and state governmental agencies have
deliberately and purposefully defied the orders of this Court with disrespect
and contempt; signing and enacting measures that would instead of removing
inmates from the overcrowded California jails and Penal system in an effort to
reduce the population; knowingly and intelligently committed contempt of this
Court by [increasing] by an additional [53,000] plus, new beds, at the already
overcrowded and understaffed prisons across the State of California.

   In California, most prisons are relatively the same in structure:  Each
Facility contains 4 main yards and 1 level one support yard; each of the main
"Yards" contains 5 buildings and a gymnasium; each building contains 100 cells
with 2 inmates per cell, for a total of 200 inmates per building (originally
designed for 100 per building), each yard "Gym" contains approximately 120
inmates, (the gyms are also part of the overcrowding issue), making a total
inmate population per yard, of 1,120, to a number which should only read 500

per yard.  At the present time, with the additional beds (40 inmates per
dayroom) (another overcrowding issue), adds 200 [more] inmates per yard,
bringing a yard total of approximately 1,320 x 4, a prison facility total
(excluding the level one support yard), to approximately 5,280 inmates in a
facility designed to hold 2,000.   The #2,000 must be maintained in order to
facilitate appropriate staffing per capita, safety and security of staff and
inmates, and recreational exercise (out-of-cell) time, for mental and
physical purposes.

However, the inquiry does not end there.  Due to the severity of the
California State Prisons' overcrowding problem, Prisons such as, e.g, Ironwood
State Prison, in Blythe, California, have implemented "split-tier" programs
(Operational Procedural 119) ("OP 119")  Please take judicial notice pursuant
to Fed. R. Civ. P, rule 201; and Cal. Evid. Code, §§1041, 1042: CDCR-OP 119,
dated April 2006; CDCR Memorandum dated May 1, 2006; CDCR Memorandum dated
5/9/06; CDCR Memorandum dated July 27, 2006 re: OP 119's impact on inmate
access to the law libraries; and CDCR Memorandum dated August 16, 2006, re:
OP 119's impact on inmate access to Inmate Legal Assistants and the Split-tier
program; attachments, which severly lengthens inmate's in-cell time, to
approximately 22-23 hours per day, unless assigned to certain "critical
workers" positions, even so, weekend yard access has been completely stopped.

In any event, OP 119, coupled with the overcrowding and staff shortages,
restricts inmate's yard access, exercise, and showers (1 every 2-3 days) to
the point detoriation of inmate's mental and physical health is now of grave
and immediate concern.  See, e.g., Gupta v. Terhune, CV S-00-1095 GEB GGH P,
(2005.)

///

///

///

8

## CONCLUSION

For the above reasons, it is clear that the Governor of the State of California and State Governmental Agencies are deliberately and with clear intentions, defying this Court's Orders and Directions to ease the overcrowding problems by purposefully committing an additional 53,000 plus new inmates to an already volitile situation, compounded with staff shortages, and long lock-in cell time, now brings issues of safty and security and mental and physical health concerns regarding the prisoner's, to this Court's attention when making a proper decision, and to urge this Court to act with full Federal Governmental and Constitutional authority, using State Treasury Funds, to bring swift and just resolution in this matter. The Governor and State Governmental Agencies, including the Wardens, Sheriffs, Courts, Police Departments, and other State , and local Governmental agencies who place prisoner's in confinement in CDCR, should be held in contempt of this Court.

Finally, in this current situation, a fire or natural disaster such as disease would be a catastrophe. Immeadiate action must be taken.

///
///

Respectfully submitted,

Dated;_____,2007

Richard Edwards et al
Pro Se, Ex Parte
On Amicus Curiae

///
///
///
///
///
///
///
///

9

ATTACHMENT

(REVISED 4-27-06)

# IRONWOOD STATE PRISON
# LEVEL I/III GENERAL POPULATION
# DAILY PROGRAM SCHEDULE

The following schedule of program activities will be observed within all facilities of Ironwood State Prison. Deviation or changes in program activities will not be made without the approval at the managerial level of the Captain/AOD. The Warden will be apprised of the change/suspension of programs immediately. Any delay in daily program schedule will be documented in the Daily Activity Report (DAR).

## SCHEDULE

| | |
|---|---|
| 2200 | First Watch Custody Staff on duty.  All housing Units on deadlock. |
| 2215 | Alarm Test. |
| 2320 | Out count. |
| 2350 | Institutional Positive Count. |
| 0145 | Out count. |
| 0230 | Institutional Negative Count. |
| 0330 | Culinary wake-up. |
| 0400 | Culinary release, Kitchen Workers. |
| 0415 | Out count. |
| 0500 | Institutional Count (Line Server wake up A-Facility) |
| 0515 | Post master pass list and distribute DMS. |
| 0545 | Institutional wake-up. |
| 0600 | Second Watch Custody Staff on duty. |
| 0605 | Release of Vocation/Academic/I. P. Crews to breakfast meal and assignments. (Monday thru Friday Only) Release General Population on (S/S/H). |
| 0615 | Vocation and Industrial work locations begin processing through work change. |
| 0630 | Academic Students in class.  Release remainder of general population to breakfast. |
| 0645 | Work-change completes early workers processing.  Notification to Program Sergeant. (Monday thru Friday Only) |
| 0815 | Breakfast meal completed. (Phones commence) |
| 0830 | A.M. Yard release.  All except C-Status.  Upper tier even days.  Lower tier odd days.  A1A assigned Only (S/S/H). |
| 0835 | Dayroom Release All except C-Status.  Upper tier even days.  Lower tier odd days.  Dayroom Activities Begin. (Showers Commence)  A1A assigned Only (S/S/H) |
| 0945 | A.M. Yard/Dayroom inline/unlock/outline. |
| 1030 | Academic Students escorted to Dining Rooms for lunch. |
| 1100 | Academic Students escorted to Class. (Monday thru Friday Only) |
| 1130 | Culinary Workers and Voluntary Yard Inline Only. (Mon-Fri).   Close Custody Yard Recall (Inline Only), (S/S/H Only).  Yard/Dayroom inline/unlock/outline. (S/S/H) |
| 1145 | Recreation Equipment Recall Dayroom activities cease / recall. (Monday thru Friday Only) |
| 1200 | A.M. Yard recall. (Showers and Phones Continue) (Monday thru Friday Only). Close Custody picture I.D. Count and Level I Count. |
| 1230 | P.M. Worker Release.   Close Custody Yard release or upon completion of count. (S/S/H) |
| 1245 | P.M. Yard Release. All except C-Status.  Lower tier even days.  Upper tier odd days.  A1A assigned Only (S/S/H) |
| 1250 | Dayroom Release All except C-Status.   Lower tier even days.  Upper tier odd days. Dayroom Activities Begin.  A1A assigned Only S/S/H |

| 545 | Vocation/Academic release. (Monday thru Friday Only)   Voluntary Yard Inline Only. |
| 400 | Third Watch Custody Staff on duty. |
| 415 | Outline only for tier that has Yard / Dayroom. (Mon-Fri) *A1A assigned Only (S/S/H)* |
| 430 | C Status yard release (1 1/2 hour). (Monday thru Friday Only) |
| 530 | Recreation Equipment Recall. P.M. Yard/Dayroom voluntary in-line only. |
| 545 | Afternoon showers and phone calls completed.  Dayroom activities cease / recall. |
| 600 | P.M. Yard Recall.  Work-Change closes. |
| 610 | Alarm Testing. |
| 630 | Institutional Standing Count. |
| 635 | Evening meal release, or upon completion of institutional standing count. |
| 800 | Night Yard release MSF only. |
| 815 | Scheduled phone calls resume in buildings. |
| 830 | Yard Release for A1A assigned only, or upon completion of meal. |
| 835 | Dayroom release for A1A assigned only. |
| 000 | P.M. Yard & Dayroom inline/unlock/outline.  (A1A assigned only) |
| 045 | Dayroom Recall.  Evening showers completed.  Recreation Equipment Recall. |
| 100 | Night Yard recall.  Phones completed (Including MSF).  All inmates return to assigned cells. |
| 130 | Institutional Positive Count. |
| 200 | End of 3rd Watch. |

*April 27, 2006*

JERRICK OLLISON
Warden (A)
Ironwood State Prison

Revision Date:

State of California                                                    Department of Corrections and Rehabilitation

# Memorandum

Date  :   May 1, 2006

To    :   All Staff
          All Inmates

Subject:   OPERATIONAL PROCEDURE 119

Effective May 15, 2006 the revised Operational Procedure (OP) 119 will be
implemented. The new OP119 has the Warden's signature date of May 1, 2006. The
24 hour clock schedule has a date of April 27, 2006. Until this date please continue to
utilize the current OP.

If you have any questions regarding this procedure, please contact R. Woolever,
Administrative Assistant, at extension 5006.

S. J. RYAN
Chief Deputy Warden
Ironwood State Prison

State of California                                                    Department of Corrections and Rehabilitation

# Memorandum

Date  :   5/9/06

To   :   All Staff
         Ironwood State Prison

Subject:   **OPERATIONAL PROCEDURE 119 CLARIFICATION**

In an effort to establish a controlled environment that allows for inmate programming as well as institution security, Operational Procedure 119 (OP 119) was recently adopted establishing a uniform procedure for the daily operations of Ironwood State Prison.   On May 1, 2006 Custody Staff and the Men's Advisory Committee (MAC) were given a copy of the April 2006 version of OP 119 in an effort to ensure efficient transition into the new procedures that become effective May 15, 2006.     Staff and the MAC have requested clarification on the following issues prior to the implementation of the OP. This memorandum provides clarification to the issues that have been identified.  The changes will be incorporated into the next revision of the OP.

Page 8 of the OP regarding Night yard activity hours indicates the hours for night yard to be *1830 hours to 2100 hours, A1A assigned workers only (Excluding close custody inmates.)* This is not to be interpreted that all Close Custody inmates do not get night yard. Besides the regularly scheduled times with their respective tier, CLOSE B assigned A1A inmates are eligible for yard or dayroom from 1830 hours until 2000 hours (7 days a week). After 2000 Hours, A1A Assigned CLOSE B inmates can be in their respective dayroom until 2045 (7 days a week).

CLOSE A Inmates are not eligible for yard or dayroom after the 1600 hours Yard Recall. However, on the weekend CLOSE A assigned A1A inmates are eligible for Yard/Dayroom until the 1600 Yard Recall.

The schedule of activities described in Attachment B of OP 119 is amended to allow for an inline/unlock/outline during the PM yard.

| 1345 | On Monday through Friday this is the time the Vocational/Academic assignments release.   The 1345 inline is mandatory for those inmates who a returning from their assignment whose tier does not have yard/dayroom. <br> A voluntary inline/ unlock (into cell) will be completed 7 days a week. |
|------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 1415 | An (out of cell) unlock/outline for the tier that has yard/dayroom (Mon-Fri) or for A1A assigned workers (SSH) will be completed. |

Sincerely,

*Original Signed by:*
*S. J. Ryan (4)*

Derrick Ollison
Warden (A)

State of California                                                Department of Corrections and Rehabilitation

# Memorandum

Date  :    July 27, 2006

To    :    All Concerned Staff
           Ironwood State Prison

Subject:    **ADDENDUM TO DOM SUPPLEMENT §53060**
            **LIBRARY AND LAW LIBRARY**

Effective immediately, the following shall be implemented and adhered to. This
information shall be incorporated into DOM SUPPLEMENT §53060, during the next
scheduled annual revision period of January 2007.

This addendum shall <u>add</u> to the current Section 53060.10, INMATE ACCESS TO LAW
LIBRARIES, Page 3, with the following:

Assisting Other Inmates:

An inmate is allowed to assist another inmate with the preparation of his
legal documents as stipulated in Johnson v. Avery (89 S. Ct. 747) and
CCR, Title 15, §3163. The establishment of Operational Procedure #119, GENERAL
POPULATION YARD PROCEDURES, was created to establish a controlled
environment to ensure institutional security, whereas, yard access is based on a tier
rotation schedule. Due to the tier rotation schedule, inmates wishing to assist another
inmate while in the library must both be housed on the same tier.

This addendum shall be in effect as of the date of approval, indicated below. If you have
any questions regarding this addendum, please contact the Administrative Assistant at
extension 5006.

DERRICK OLLISON                                         Date of Approval    8/7/06
Warden (A)
Ironwood State Prison

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date    :    August 16, 2006

To      :    Inmate Legal Assistants
             All Facilities
             Ironwood State Prison

Subject:    **INMATE LEGAL ASSISTANTS AND THE SPLIT-TIER PROGRAM**

As a result of Operational Procedure (OP) #119, GENERAL POPULATION YARD PROCEDURES, the split-tier program was established to provide a controlled environment to ensure the safety and security of the institution. The split-tier program was designed to control the number of general population inmates on the yard at any one time. Because of stipulations set forth by OP #119, it was necessary to establish the following addendum to the Department Operations Manual (DOM), §53060.10, INMATE ACCESS TO THE LAW LIBRARIES:

**Assisting Other Inmates:**

> **An inmate is allowed to assist another inmate with the preparation of his legal documents as stipulated in Johnson v. Avery (89 S.Ct. 747) and CCR, Title 15, §3163. The establishment of Operational Procedure #119, GENERAL POPULATION YARD PROCEDURES, was created to establish a controlled environment to ensure institutional security, whereas, yard access is based on a tier rotation schedule. Due to the tier rotation schedule, <u>inmates wishing to assist another inmate while in the library</u> must both be housed on the same tier.**

The CCR, Title 15, §3163, Assisting Other Inmates, states that when an administrative action prevents direct communications between inmates, such as the split-tier program, inmates must return legal paperwork to the respective owner. CCR, Title 15, §3163, reads in part:

**Assisting Other Inmates:**

> **"All papers must be returned to the respective owners when either inmate is transferred to another institution <u>or when other administrative action prevents direct communications between the inmates.</u>"**

Currently, there are inmates assisting inmates on opposite tiers that <u>wish to work together in the law library.</u> Due to OP #119, and the Addendum to the DOM, §53060.10, inmates assisting other inmates on the opposite tier will have until October 1, 2006, to either find an assistant who lives on their same tier or arrange for one party to re-house on the same tier. Inmates NOT wishing to work together in the law library may continue to assist one another while housed on opposite tiers.

If you should have any questions or concerns regarding this information, you may contact me via Inmate Request for Interview.

*Linda Oyas*

Linda Oyas
Senior Librarian
Ironwood State Prison

CC:       Associate Wardens
          Facility Captains/Lieutenants
          Librarians

State of California                                                                Department of Corrections and Rehabilitation

# Memorandum

Date  :  May 25, 2007

To  :  All Staff
All Inmates
Ironwood State Prison

Subject:  **EMERGENCY BEDS**

As many of you are aware due to overcrowding within the California Department of Corrections and Rehabilitation and the increase of incarcerated felons. The Department currently is out of beds. As a result of this overcrowding, Ironwood State Prison has been mandated to activate 540 additional Emergency Beds on Facility 'B', 'C' and 'D'.

Recently, Governor Arnold Schwarzenegger signed Assembly Bill (AB) 900 (Soloria), a historic piece of legislation that will provide 53,000 additional beds to our adult State prison's and jail system's, while at the same time stressing the need to provide rehabilitative services to the inmate population.

Although this is not an immediate relief, it is a monumental step to help with the overcrowding. Unfortunately, Ironwood is also one of the 33 Adult Institutions that is faced with a shortage of staff which further complicates a lot of issues as related to running "normal program". As the Warden of this institution, it is important to me that you all know I'm very aware and sensitive to the increase in the inmate population as it affects each of us (both Staff and Inmates). My Management Team has been working hard to develop a plan which will allow us to run some program for the population, keeping in mind the Safety of all Staff and the Inmate population. Approximately 60 days ago, we began revising Operational Procedure #119, which will outline programs for the inmate population. Additionally, we are implementing a new "Rolling Modified" program, which will dictate if we are short on staff by a certain number, what programs will be conducted and which will be modified. We anticipate implementing this change around June 15, 2007.

I appreciate your patience and understanding during these difficult times. As far as staffing shortages, it is my hope we will have some relief in the very near future. I, along with my Management Team will continue to work towards resolutions to issues, as soon as they are brought to our attention, in an effort to continue to operate this institution safely.

DEBRA DEXTER
Warden (A)
Ironwood State Prison

EXHIBIT 'A'

EXHIBIT 'A'

Honorable Judge Thelton Henderson
United States District Court
450 Golden Gate Ave.
San Fransisco, Ca. 94102

May 13, 2007

RE: California Governor's proposed plan to
    ease prison over-crowding.

Your Honor,

   I'm writing you concerning the Governor's proposed plan to reduce the prison population
and ease over-crowding. It is a complete sham and does nothing but increase the prison
population and create an even larger, more corrupt, and extremely powerful Union!
   To give but one immeadiate example of the scam being perpetrated by the Governor...
in Ironwood State Prison, on A-Facility, all the housing units have 40 bunks in their
dayrooms, each housing 38 inmates. This "plan" was implimentated May 7, 2007 and completed
May 10, 2007, although the bunks have been in the dayrooms since approximetely Nov.-Dec.
2006 and had already been housing inmates prior to this!
   With this recent addition of inmates to an already crowded prison has added to the over-
crowding, not reduced it!
   The Governor mentions adding 40,000 new beds but at no time has he mentioned removing
those inmates housed in all the gyms and dayrooms throughout the State prison system, and
dismantling those bunks so that CDC may never house inmates in those areas again.
   Nor has the Governor mentioned sentencing reform when in fact all the experts and top
Penalogists state that sentencing reform must be addressed in order to reduce the prison
population. Why has he failed to do so?!
   The Governor would have you believe, Your Honor, that he and the CCPOA Union are at
odds with each other when in fact the opposite is true!
   Consider this, adding 40,000 new beds to an already large prison system will create the
largest, most powerful Prison Industrial Complex in the entire world!! With a Union (CCPOA)
that would have enormous political power!
   You see Your Honor, adding 40,000 beds is roughly eight (8) prisons, which would then
need to be manned, which means the closed guard Academy in northern California would be
re-opened and a new southern California guard manufacturing Academy would have to be opened.
With all those new guards the CCPOA Union would become even bigger and more corrupt than it
already is!
   So they benefit from this so-called "plan" by our Governor which goes to prove that
rathur than be at odds with one another, the Governor and CCPOA Union are in fact working
together, albeit covertly, to scam the taxpayers out of more money, and more importantly,
to disrespect your Court by lying to you Your Honor! They have no intention of reducing the
prison population and in fact, they want it to increase and stay over-crowded!
   Your Honor, are you aware that an entry-level guard earns approximetly $30.-$35. an
hour? They earn roughly $25. an hour at their Academy. Does a Federal Corrections Officer
earn that much? These people promote violence and exaggerate violence so as to scare the
voters and Politicians into giving them what they want, more power and more money!
   "Absolute power corrupts and Power corrupts absolutely!" That quote is absolutely true
where the CCPOA Union, CDC, and the Governor are concerned!
   We, the public, need your help Your Honor. Please do not be fooled by their attempt to
pacify you with a farce of a plan that is designed to fail. Please step in, the taxpayers
need you, with the full force of the Federal Court to shut down this corruption and bring

some sanity to this out-of-control system. It has gone on way too long, this continual building of prisons, to the detriment of our once vaunted Educational system and our Health Care and the care of our elderly and disabled.

Surely Your Honor, you are aware of the fact that the Prison Budget has increased every year for the past two decades yet the programs; Educational, Vocational, and recreational, have been discontinued in the prisons! Here's an example Your Honor, there are five Vocations listed (on paper) for A-Facility in Ironwood State Prison yet only one is currently opened and that class (Landscaping) is cancelled more often than not.

Where does the money go that is alloted for these classes? My guess, the Guards' enormous pay and overtime, along with their lucrative sick pay benefits package.

Your Honor, the 38 inmates in each buildings' dayrooms are being made to share 2 toilets. 2 toilets per 38 inmates!!

The Governor intends to present to you a part of the "plan" to send 8,000 inmates out-of-state against their will.

Your Honor, are you aware that last year (2006) the Governor, CDC, and the CCPOA Union sent inmates to a Facility in Tennessee, alot, if not all, from Ironwood State Prison. When the California inmates were released to the yard the other inmates all attacked the California inmates! A major riot whereby all California inmates were hurt. Yet there was no media coverage of the event. Why was this hidden from the public? Because it shows not only a major flaw, but deception as well, in the Governor's actions.

That deception, and major flaw, are prevelant in this "plan" he is trying to decieve this honorable Court with.

I've enclosed two articles with this Your Honor. One from June 2005 stating that the opening of Delano II prison is perhaps "the most controversial prison project in California history." And one from June 2006 where the Governor's spokesperson, Margita Thompson, says, "the State Prison's are in a "crisis" and the Administration has undertaken "a substantial good-faith effort" to comply with the assorted Federal Court orders...".

Your Honor, this scam the Governor is trying to present you will be the "most cont... controversial prison project" ever and will do nothing to solve the problem at hand. And, this Administration's past record shows what they think of "good-faith efforts". They do nothing in good-faith!

Your Honor, please step in and take control, fix this corrupt prison system, restore to this State fairness and justice.

I thank you for your time, help, and understanding in this very important matter

Respectfully,

SAN FRANSISCO CHRONICLE JUNE 1, 2005

# Why open prisons and close schools?

*By Eric Mar and Dawn Ligaya Williams*

Without a ribbon-cutting ceremony, inspiring speeches or champagne toasts, today marks one of the most controversial opening days for any state project in the last 25 years. Today, the notorious Delano II prison, a $750 million gift from the state to the prison guards' union, will open.

As California unwraps its 33rd state prison — what the Los Angeles Times called perhaps "the most controversial prison project in California history" — we are simultaneously being forced to close schools, libraries and hospitals. Where are our priorities?

Several statewide polls of likely voters have all found the same thing: Californians consistently identify prison spending as the budget item they most want cut in this time of crisis.

Other states nationwide have decided to close prisons. But in California — where we imprison more people than any other state except Texas, according to the federal Bureau of Justice statistics — the Department of Corrections will spend an additional $100 million per year, every year, to operate a new prison that Californians don't need, can't afford and don't want.

Meanwhile, Education Week ranked California 44th in the nation in per-pupil spending — more than $600 per student below the national average. Study after study shows that investing in education pays huge dividends over paying to imprison. So why do our schools suffer billions in underfunding, while prison spending swells to rival the percentage of our state budget spent on higher education?

Underfunding education means schools are closing, class sizes are increasing, teachers and support staff are being laid off, basic supplies and books are lacking, extracurricular activities are no longer affordable and after-school programs have been drastically reduced.

According to California State University's own survey, undergraduate fees at the system's campuses have increased 76 percent in three years, and graduate fees for programs such as teacher education, social work and nursing have more than doubled. But, rather than hiring more teachers, buying new books or reinstituting music and art programs, Gov. Arnold Schwarzenegger proposes hiring 1,575 new prison employees. The bulk of these employees will be guards at Delano II.

Last year, public schools sacrificed $2 billion based on the governor's promise to avoid future cuts. Now, the governor has famously broken that promise. Since being elected by blasting Gov. Gray Davis' disastrous policies — of which Delano II stands as a prime example — Schwarzenegger promised real change. Instead, he has taken $2 billion from schools and done little more than change the name of the Department of Corrections to the "Department of Corrections and Rehabilitation" while at the same time reducing rehabilitation funding. San Francisco's four school closures and Oakland's potential 12 closures are among the costs of the governor's drive to lock people up. Our education budget gaps ($69 million in San Francisco for example) are, in a sense, the result of paying the bills to operate Delano II for the next 8½ months.

A real vision for California's future would include:

▶ Immediate moratoriums on education funding cuts, fee increases for higher education, and prison expansion and construction.

▶ Full implementation of the New Parole Model to reduce parole violations and offer means for re-entry into society. According to the Department of Corrections' own estimates, this would reduce the prison population by at least 15,000 people.

▶ Taking advantage of that population reduction to close five prisons, as outlined by Californians United for a Responsible Budget, would create a direct savings of more than $500 million a year. Schwarzenegger, in his 2004-05 budget, recognized that closing prisons is the most effective way to cut prison costs. The resulting savings could then be returned directly to the education and social service budgets that truly make Californians healthy and safe.

Delano II must be the last prison foisted upon our future.

> *Our education budget gaps are the result of paying to incarcerate more people than safety requires.*

*Eric Mar is president of the San Francisco School Board and a teacher at San Francisco State University. Dawn Ligaya Williams is a teacher at East Oakland Community High School. Both are commissioners appointed by Californians United for a Responsible Budget, a statewide coalition committed to reducing the prison population and closing state prisons.*



Sacbee: Politics

# Report: Prison reform derailed

## Governor's top aide, union blamed for loss of leadership.

By Andy Furillo -- Bee Capitol Bureau

Published 12:01 am PDT Thursday, June 22, 2006
Story appeared on Page A1 of The Bee

Gov. Arnold Schwarzenegger's promise of "fantastic prison reform" has been undermined by his chief of staff reopening lines of communication earlier with the state's powerful correctional officers' union, a court-appointed special master states in a report made public Wednesday.

By conducting meetings with the California Correctional Peace Officers Association, Schwarzenegger's chief of staff, Susan Kennedy, prompted the resignations of two Cabinet-level prison secretaries, "confused" the correctional agency's top leadership about who was in charge and sent signals that the "zero tolerance" policy of barring wrongdoing among officers was a thing of the past, Special Master John Hagar wrote in his report.

"Integrity and remedial plan efforts must begin at the top, and then percolate down," Hagar wrote in his 36-page report, dated Tuesday. "Beginning January 2006, however, it appears that the requisite leadership has been absent from the governor's office. Evidence before the special master indicates that the governor's office may have given the code of silence in California's prisons a new lease on life."

Hagar said he is planning to conduct public hearings in San Francisco federal court on July 12 as a result of "these disturbing developments."

Kennedy did not respond to a request for comment on the Hagar report. The Governor's Office issued a statement by spokeswoman Margita Thompson saying that the state's prisons are in a "crisis," and quoting from a recent inspector general's report that says the administration has undertaken "a sustained good-faith effort" to comply with the assorted federal court orders governing prison operations ranging from health care to use of force, internal discipline and its mental health system.

"Much remains to be done," Thompson's statement says, "but only by having open lines of communication can we see the reforms through to completion."

A spokesman for the CCPOA, however, fired back that the special master's report borders on "lunacy," especially in blaming the union for the February resignation of former Department of Corrections and Rehabilitation Secretary Rod Hickman.

"We are not running the show," union spokesman Lance Corcoran said. "This is something of a gut-punch. I find it amazing that Mr. Hagar would have written this."

State Sen. Gloria Romero, D-Los Angeles, co-chairwoman of the Legislature's joint legislative oversight committee on corrections, said Hagar made "a fundamental mistake" by blaming Hickman's departure or any of the system's troubles on Kennedy. Romero said Hickman, who resigned of his own volition, quit "because he failed as a leader."

"When Susan Kennedy came in, one of the smartest things she did was open the door and say, 'Yes, you've got to talk to the union,' " Romero said.

Steve Fama, attorney with the Prison Law Office, which brought the original lawsuit that led to the appointment of Hagar as special master in 1995 by U.S. District Court Judge Thelton E. Henderson, said the state prison system has become a national "pariah" as a result of the union's "undue influence."

1  **PROOF OF SERVICE**

2  <u>Declaration of Service by Mail</u>

3

4  I, <u>Richard Edwards et al.</u>, declare that I am over the age of eighteen

5  (18) and that I (am/am not) a party to this action. On _____,

6  <u>2007</u>, I deposited a copy of the following document(s):

7

8  **AMICUS CURIAE BRIEF**

9  **WITH MEMORANDUM OF POINTS AND AUTHORITIES**

10  **AND EXHIBIT**

11

12  in a sealed envelope with postage prepaid into the United States mail

13  outlet via an authorized California Department of Corrections employee

14  at Ironwood State Prison, in Riverside County, Blythe, California, and

15  addressed as follows:

16

17  1) Clerk of the U.S. District Court          2) Edmund G. Brown, Jr.
      c/o Lawrence K. Karlton                       State Attorney General
18    U.S. District Court Judge                     300 South Spring Street
      Eastern District of California                North Tower, 5th Floor
19    1130  O Street  #5000                         Suite 5001
      Fresno, Ca. 93721                             Los Angeles, Ca. 90013
20

21

22

23  I declare under penalty of perjury by the laws of the State of

24  California that the foregoing is true and correct (pursuant to 28 USCA

25  §1746(2)).

26

27  Date: _____          Signature _____

Richard Edwards et al
Pro Se, Ex Parte
On Amicus Curiae

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)