IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, et al.

    Plaintiffs,

      vs.                   No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.


## SPECIAL MASTER'S REPORT AND RECOMMENDATIONS ON DEFENDANTS' AUGUST 2007 SUPPLEMENTAL BED PLAN

For almost eight years from 1998 to 2005, defendants struggled to understand and define their mental health bed needs adequately. Not until well into 2005 with the completion of the Unmet Needs Assessment and the engagement of Navigant[1] consultants to help develop caseload population projections was the California Department of Corrections and Rehabilitation (CDCR) able to identify with some accuracy its need for beds at the residential, crisis care and inpatient levels of care in the Mental Health Services Delivery System. Ever since, defendants have labored to provide the Court with a feasible plan to meet their updated projected bed needs. That effort has been repeatedly challenged by at least a half dozen changes and obstacles, including:

---

[1] The original mental health population projections were prepared by Tucker-Allen in 2002. Tucker-Alan, meanwhile, has become part of Navigant Consulting, and the revised bed needs study is now referred to as the Navigant study.

- An unanticipated surge in overall population that brought the number of prisoners in CDCR to some 200 percent of capacity; the political, financial and operational ramifications of that degree of overcrowding has already been rehearsed at length in other filings in this case related to plaintiffs' motion for the appointment of a three-judge court pursuant to the Prison Litigation Reform Act.

- A long-standing poverty of headquarters personnel trained and able to conduct the staff work essential to the development of a competent blueprint for the provision of needed beds;

- The establishment of the California Prison Receivership with its promise of increased resources and expedited procedures, which, operating on a different timetable, has created some complexity in the division of responsibilities and requires prodigious amounts of coordination; and

- The "Right Prison, Right Mission" movement, which has already brought changes in the mission of several institutions and some large shifts in population.

In addition to these major intervening events, CDCR's early planning efforts were impeded by the discordance among the separate executive departments of State government whose cooperation was essential, a problem alleviated by the Court's inclusion of multiple departments as named defendants in the Coleman case and the Governor's aggressive intervention to create in 2006 a joint administrative vehicle for coordinating the work of necessary government entities. Finally, throughout much of the period from late 2005 until quite recently, CDCR, together with its mental health component, has experienced rapid and continuous turnover in leadership, which inevitably helped demoralize headquarters staff and snarl decision-making.

Other distracting specific developments in mental health included an escalating and critical shortage of available mental health crisis beds and inpatient beds operated by the Department of Mental Health (DMH) for CDCR. The lack of these beds created a crisis that demanded immediate interim solutions that seriously impeded long-range

planning. Simultaneously, the rising mental health caseload population, which now represents nearly 20 percent of the expanding overall population, combined with substantial new allocations of mental health positions, drove vacancy rates among mental health clinicians persistently higher despite recently mandated pay increases.

The crisis caused by CDCR's critical shortage of inpatient DMH and mental health crisis beds in 2005 and 2006 particularly complicated defendants' planning. They needed to provide access as quickly as possible to inpatient DMH and mental health crisis beds while simultaneously anticipating the long-term needs both for beds in these programs and all other categories of residential mental health programs. Over the past 18 months they have done better at providing interim inpatient DMH beds than they have in meeting the need for interim mental health crisis beds. Finding available beds in either of these programs remains a daily challenge that still exceeds CDCR's capability, but the focus in this report is not on these interim measures.

This report looks instead at CDCR's long-range plans for meeting future bed needs in all of its residential, crisis and inpatient programs through Fiscal Year 2011/12. Those plans do not include projected bed needs for inmates in CDCR's Correctional Clinical Case Management System, which provides outpatient mental health services to approximately 28,000 general population inmates, representing roughly 85 percent of CDCR's total mental health caseload. The long-range planning effort that is the subject of this report focuses only on the most seriously mentally ill inmates in CDCR, numbering some 5,100 inmates in June 2007 and projected to swell, according to Navigant's estimates, to some 7,000 inmates by Fiscal Year 2011/12.

**Background to the August 2007 Revisions**

Defendants' original mental health bed plan, which addressed both interim and long-range bed needs, was filed with the Court on April 17, 2006, and was followed shortly thereafter by an evidentiary hearing on the plan's merits and shortcomings. The hearing confirmed that the April plan was based on outdated and understated population figures and contained projections for bed needs at various levels of care in the defendants' Mental Health Services Delivery System that already needed revision. In an order filed on May 2, 2006, the Court provisionally approved defendants' long-range plan for acute and intermediate inpatient care and mental health crisis beds but directed defendants to file within 60 days an amended long-term plan based on more recent overall population projections and a more accurate and updated projection methodology. The hearing and another subsequent order also directed defendants' activity relative to interim measures to meet the critical shortage of inpatient DMH and mental health crisis beds, but the focus in this report, again, is on the long-range elements of defendants' bed plans.

Defendants filed the required revised plans in July 2006, to which plaintiffs objected at length. A September report of the Special Master on the revised plans recommended acceptance of the defendants' updated population projections and a directive that defendants submit a final long range plan to meet the projected inpatient bed needs of both male and female inmates. The Court adopted those recommendations on October 20, 2006 and ordered defendants to file within 60 days another version of their plan to meet mental health bed needs. Defendants' next iteration of their plan was

4

duly filed on December 19, 2006. Plaintiffs responded, again at length, on January 16, 2007.

The special master submitted his review of defendants' December 2006 mental health bed plan on February 7. In his report, the special master focused primarily on the two new components of defendants' plan, namely consolidation of the delivery of all CDCR residential, crisis and inpatient programs for male offenders in just eight institutions (seven male and one female) and CDCR's assumption of responsibility for the provision of inpatient mental health services in place of DMH, CDCR's long-time contractor and provider of acute and intermediate inpatient care.

The report expressed deep concern over the proposed separation between CDCR and DMH. While the relationship between DMH and CDCR has long been troubled, CDCR has absolutely no track record of providing inpatient mental health treatment to severely mentally ill inmates. Serious doubts occurred whether prisons generally, much less CDCR's overcrowded and much troubled prisons, could create an appropriately therapeutic milieu for inmate/patients desperately in need of the most intensive level of clinical psychiatric treatment. CDCR was a correctional system in which medical and mental health care and dental services had all been found incapable of meeting even the Eighth Amendment's ban against cruel and unusual punishment.

More disturbing yet, other than simply asserting CDCR's desire to assume responsibility for the provision of inpatient mental health treatment and identifying where among CDCR institutions inpatient acute and intermediate beds might be physically located, defendants' plan offered no roadmap for such an undertaking. Defendants seemed to be

seeking the court's approval for little more than a concept without any adequate basis for an evaluation of the proposed concept.

The second element of defendants' plan proposed the consolidation of CDCR's residential and crisis intervention programs in just eight institutions, some of which, such as California Institution for Men, California State Prison/Los Angeles County, R.J. Donovan Correctional Facility and Salinas Valley State Prison, have had, at best, an erratic history of providing adequate mental health services to their current populations of seriously mentally disordered inmates. How they might acquire sufficient personnel and physical resources to cope with their much expanded caseloads was not articulated.

The Special Master's report ended with a recommendation that the Court schedule a hearing within 30 days, at which defendants might demonstrate the reasonableness and feasibility of their proposals to assume responsibility for the provision of inpatient mental health services in place of DMH and reorganize and consolidate delivery of their existing mental health services.

In a March 27, 2007 Order, the Court deferred decision on the recommended hearing and directed defendants to submit to the special master within 90 days a detailed report on how CDCR's assumption of responsibility for services presently provided to class members by DMH would be accomplished. On April 12, 2007, the special master, while reporting to the court on the status of defendants' interim development of required beds, suggested that defendants also needed to submit expanded planning information on their proposed consolidation of mental health services. The Court adopted the recommendation and on April 17, 2007, ordered defendants to file a supplemental report

by June 15 addressing both CDCR's relationship with DMH and CDCR's consolidation plan.

On June 28, 2007, this Court granted defendants' June 13, 2007 request for an extension of time to file the supplemental report. On August 17, 2007, defendants filed the required report, which the Court referred to the special master on August 23 for review and recommendations within 30 days. The following report responds to this latest requirement.

**The August 2007 Revisions to the Bed Plan**

Some general observations are in order before proceeding to a specific critique. This latest plan of defendants reflects a significantly improved headquarters staffing capability, reflected in more confident bed-need projections, more thoughtful distributions of programs, detailed administrative arrangements for direction of the consolidation undertaking and much better planning for the difficult transition from DMH to CDCR control of inpatient care. (A copy of defendants' August 2007 Supplemental Bed Plan Report and the Navigant projections on which it is based is provided in Exhibit A.)

With regard to consolidation, the revised plan defines in detail an organizational structure for the planning, design, development and management of the five new consolidated care centers that are the heart of the plan. The objective of the consolidation approach is to bring together in a limited number of institutions all of the most seriously mentally ill inmates in CDCR who will have ready access to the full array of available residential, crisis and inpatient program resources CDCR possesses. By constructing new mental health facilities designed principally for the delivery of intensive levels of care,

7

the defendants seek to ensure the availability of adequate treatment and programming space. By concentrating programs in fewer institutions in populous locations, defendants hope to be better able to attract clinical and other program staff. There is some hope of combining aspects of the construction of the new facilities in tandem with new Plata beds, which may expedite the construction schedule. The executed plan will reduce reliance on intra-departmental transfers of mental health inmate/patients and allow the return of vacated cells to CDCR's general population.

The revised plan includes two specific changes to the consolidation aspects of the December 2006 plan. Pelican Bay State Prison was scheduled to lose its Psychiatric Services Unit, Enhanced Outpatient Program and Mental Health Crisis Bed unit. Under the revised plan, Pelican Bay State Prison will retain all three of these mental health programs. Thus, the revised plan now includes one female and eight male institutions, where consolidated services will be provided. Earlier, 90 additional acute inpatient beds were scheduled to be placed in California State Prison/Sacramento; in the revised plan, they will be placed at California Institution for Men.

In the December 2006 plan, CDCR was to assume responsibility for all acute and intermediate inpatient programs operated currently by DMH. In the revision, DMH will continue to operate all inpatient programs conducted in California Medical Facility and Salinas Valley State Prison. According to the projections in the plan, by FY2011-12, 426 of CDCR's 866 anticipated inpatient beds, or 49 percent, will be located in those two institutions where DMH retains operational control. The new plan, then, reduces by half December's projected assumption by CDCR of responsibility for the delivery of all inpatient care.

DMH, moreover, will have a key role in the establishment of CDCR's initial inpatient programs. It will participate in the planning and design of program space, the training and mentoring of CDCR administrators of inpatient programs, ensure adequate resources are available for implementing and maintaining the programs and monitor CDCR's assumption of the delivery of inpatient programs. It will have a direct role in the implementation of the first 70-bed intermediate inpatient program by CDCR in California State Prison/Sacramento, including involvement in the hiring of staff, development of protocols and training of clinicians, some of whom will be embedded in existing DMH programs prior to initiation of CDCR inpatient programs. DMH will also undertake a similar role in the initiation of the 90-bed acute inpatient program at CIM.

The effectiveness of this careful mentorship will be tested at California State Prison/Sacramento, where, as indicated, the first inpatient program operated by CDCR will be introduced. This initial pilot program and all that follow will have to conform to all of the licensing requirements currently imposed on DMH, which detail applicable staffing, administrative and physical standards, before becoming operational. DMH apparently has committed to providing significant administrative and clinical resources to help ensure the integrity and quality of the pilot program and its roll-out to the other four CDCR Consolidated Care Centers that eventually will be offering inpatient treatment programs.

### Critique of the August 2007 Revisions

While the revised plan represents in many of its particulars a marked improvement over its December predecessor, it does not yet have the clear endorsement of the special master's experts. Skepticism among them runs high about CDCR's ability

to create and maintain a truly therapeutic inpatient treatment equivalent to those provided by DMH in its hospitals. The experts' skepticism stems from their monitoring experience in this case and elsewhere. They doubt CDCR's capacity to build facilities where therapeutic needs actually predominate; they have witnessed personally (and regularly in at least four of the eight male institutions earmarked for inpatient programs) CDCR's inability to provide consistently adequate levels of quality mental health care in much less intensive departmental treatment programs; they have seen the deleterious effects on the delivery of mental health care of the relentless priority afforded custody over treatment issues and decisions; they are fearful that CDCR will be unable to attract and retain adequate clinical staff to provide effective inpatient treatment; they are distrustful of the department's heavy reliance on medical technical assistants (MTAs) rather than traditional nursing care; and they are extremely concerned about CDCR's ability to find, hire and keep effective hospital administrators sufficiently qualified and experienced to run their new inpatient hospitals and hospital programs in the complex correctional environment. They report that correctional systems elsewhere that have undertaken to provide inpatient mental health care have more often failed to provide quality treatment programs than not. The experts see the high level of custody of many of CDCR's inmate/patients in need of inpatient treatment, which has long frustrated relations between CDCR and DMH, as representing the most serious challenge to a workable balance between the demands of effective treatment and security.

Their concerns about the consolidation aspect of the revised plan include the sparse crisis intervention beds left available elsewhere throughout CDCR's other 24 institutions, particularly at reception facilities with a history of need for such beds and

institutions with large numbers of outpatient mental health caseload inmate/patients in

high custody housing, like California State Prison/Corcoran with a caseload of 450 to 500

outpatients in its Security Housing Unit. They think that the transportation savings

projected for consolidation will be eaten up by the widespread new need to transfer

decompensating outpatient mental health caseload inmates to more intensive residential

treatment programs. They worry about the impact of the transition to consolidated

programs on already attenuated clinical staff in those other 24 institutions. They are

concerned that the large general population Enhanced Outpatient Programs, with up to

720 inmate/patients, and the administrative segregation Enhanced Outpatient Programs,

with up to 125 inmate/patients, envisioned for the consolidated care centers may simply

outstrip defendants' capacity to provide adequate staff and programming space. A

similar concern relative to the need for adjustment to a vastly larger scale also exists for

the two new 50-bed mental health crisis bed units inching toward completion at

California Medical Facility and California Men's Colony.

  There are, moreover, some critical caveats in the report. The timeframe provided

in the report, carefully labeled as "SAMPLE," show a Fiscal Year 2012/13 date for

"facility activation" (see pp. 11 and 12 of Exhibit A). The text of the report (at p. 10)

notes the need to "stagger" the opening of each consolidated care center a minimum of

six months. Subsequent discussion among parties and counsel indicate that the required

six-month interval separating the activation of each completed consolidated care center

will stretch out the full implementation period to January 2014, assuming the accuracy of

the projected 59-month schedule for the design and construction of the new facilities.

(See Exhibit B, an e-mail message to the special master from defendants' counsel, dated

September 20, 2007.) The report also notes that at the time of its composition, no Legislative authority to construct any of the five consolidated care centers existed. (See Exhibit A, p. 10, footnote 11.)

Finally, defendants' revised plan cites the expectation or hope that coordination with the Plata receiver's construction plans may expedite all or portions of the planned construction of the consolidated care centers. Preliminary review of the receiver's bed need projections suggests that the bulk of his anticipated needs involve the provision of relatively low custody beds, while the vast majority of mental health beds scheduled for inclusion in the new consolidated care centers will be for seriously mentally ill and high custody inmate/patients in Level III and IV general population, administrative segregation and security housing unit programs. This fundamental dichotomy in custody levels may limit the potential for the coordinated construction of the new medical and mental health facilities.

**Conclusions**

Having rehearsed all of these shortcomings in defendants' revised plan, it is, nonetheless, imperative that the plan go forward without further delay. There is surely no constitutional bar to CDCR's proposal to assume responsibility for the delivery of inpatient mental health care or consolidating its mental health treatment programs in a few, as opposed to many, institutions. On the other hand, objections to defendants' present and preceding bed plans on the part of plaintiffs, experts, special master and the Court all reflect a decade of accumulated experience and frustration that justifies fully concerns about CDCR's ability to generate and implement this latest plan effectively. It is also clear that CDCR's inability heretofore to obtain the Court's approval to proceed

with its overall plan has impeded pursuit of the funding necessary for construction of the treatment beds scheduled to be housed in the department's consolidated care centers, without which it cannot hope to meet the level of care required by the Eighth Amendment and the orders of the Court.

As with the Court's approval of so many earlier plans in the long history of the Coleman case, judicial approbation here signals only the beginning of yet another episode of extended and intensive oversight. Delivery of the presented plan has a formally projected gestation period of seven years. One could hardly be faulted for assuming actual implementation of all aspects of this ambitious plan is unlikely to occur within a decade. While that leaves plenty of time for parties, special master and the Court to address the difficulties and shortcomings identified briefly in this report as the plan proceeds, some recommendations need to be made now so that their strictures and prescriptions can be incorporated here at the beginning. The vista of a decade of continuing oversight is a daunting prospect, but the long gestation allows for adjustments further down the road. For example, if CDCR's experiment with inpatient treatment programs falters, there will be time to invoke other possible alternatives, such as extending DMH's mentoring role, renewing the old DMH contract or even privatizing this component of care.

CDCR needs to understand fully the implications of its acceptance of responsibility for the development and operation of mental health hospitals within its institutions. Obviously, the department will need to comply with all licensing requirements currently imposed on DMH inpatient facilities. In addition, it is critically important that CDCR seek, obtain and maintain accreditation with the Joint Commission

on Accreditation of Healthcare Organizations. The procurement and initial maintenance of this licensing and accreditation for each CDCR-operated inpatient program should be made an indispensable precondition for ending DMH's mentoring relationship with CDCR. CDCR, moreover, cannot be expected to obtain and retain licensing and accreditation without finding, vetting, hiring and appropriately compensating qualified, experienced *bona fide* hospital administrators to manage its inpatient program and facilities. This will require a salary structure not currently available in CDCR, as well as, most likely, a national search.

Another element of the mentorship ought to include the development by CDCR, with DMH help, of the equivalent of DMH's Strategic Planning process that employs regular, structured program reviews with a focus on treatment goals, facility and staff development and accreditation. Development of the process should embrace the articulation of an adequate set of goals, an acceptable action plan for the accomplishment of identified goals and a workable review and remedial process. Termination of DMH oversight should not occur until these elements are in place and CDCR is able to utilize the process usefully in managing its inpatient programs.

While the revised plan recites DMH's considerable commitment to the delivery of direct treatment services and mentoring functions, a memorandum of understanding attesting to the commitments and incorporating them in an interagency agreement between the two entities needs to be agreed to and submitted to the Court for review and approval.

In many of its aspects, defendants' plan for the consolidation of its treatment services is in reality a plan for a considerable expansion of programs and beds for a

14

rapidly growing segment of its mental health caseload, namely those most seriously

mentally ill inmate/patients who often represent significant security risks, whether they

be in administrative segregation or security housing units, crisis beds or inpatient

treatment programs.  The expansion will require still more infusions of both clinical and

custody staff; clinical staffing ratios for inpatient care call for more intensive clinical

treatment than CDCR's current residential and crisis programs require.  To meet the need

for additional staffing, CDCR needs to plan its recruitment and retention strategies far

more effectively than they have heretofore.  They need to figure out how to do so and

submit a plan to the Court for approval.

    While the consolidated care centers promise new and specifically treatment-

oriented environments, an important number of mental health treatment programs with

intensive levels of treatment will continue to operate in CDCR institutions that have long

struggled to provide adequate programming and counseling space, including California

Medical Facility and Salinas Valley State Prison. Defendants need to provide appropriate

information on plans to expand or otherwise make available to programs in these

facilities adequate treatment space.

    Also, more attention should be focused on the needs of those institutions left with

few or no mental health crisis beds.  Such planned retrenchments ought to be based on an

analysis of the number of admissions of outpatient or non-caseload inmates to existing

mental health crisis units over the past year, the reasons for their placement, their average

length of stay, their level of care on discharge and/or their placement on a Keyhea order.

In the absence of such supporting data, the reduction and/or elimination of mental health

crisis beds in reception centers, the Central Valley and facilities left with large outpatient caseloads, such as California State Prison/Corcoran, needs further justification.

### Recommendations

The Court should approve defendants' revised August 2007 bed plan, thereby obviating the need for an evidentiary hearing on the plan. While the revised August 2007 plan provides defendants with more than enough to accomplish as expeditiously as possible, the conclusions just recited suggest the need for the submission of some additional planning documents, including:

- Timeframes for meeting and procuring for all CDCR-operated inpatient programs applicable State licensure and accreditation by the Joint Commission on Accreditation of Healthcare Organizations;

- A plan for the recruitment and compensation of hospital administrators to develop and run CDCR's overall inpatient treatment program and the specific institutional inpatient programs in its consolidated care centers;

- Preparation of a memorandum of understanding on DMH's mentoring and direct service obligations under the revised plan for integration in an inter-agency agreement;

- A plan identifying anticipated clinical and custody staffing needs and a program for providing the personnel required to recruit, vett, hire and retain adequate staffing;

- A development proposal for adequate mental health treatment and counseling space at California Medical Facility and Salinas Valley State Prison.

- An analysis justifying the reduction and/or elimination of mental health crisis beds in the revised August 2007 plan in the 29 CDCR institutions that are not scheduled to deliver consolidated care.

The defendants should be required to provide the additional planning documents relative to these issues within 120 days of the Court's order approving the plan.

16

It is tempting to urge the Court to commit the special master's growing cohort of experts to a more active role in defendants' articulation and implementation of their long-range bed plan. That would be a mistake, because it would forever taint and discredit the experts' responsibility for independently monitoring the effectiveness of defendants' policies and procedures. The role assigned to the special master and his experts for the past dozen years has been to assess defendants' success in delivering adequate mental health treatment programs, identify failures, recommend changes and evaluate their effectiveness. It is a frequently frustrating task, and a painfully slow one, but it is a process that respects the notion of judicial restraint and looks to the institutional patient to heal itself. On the other hand, CDCR's formidable undertaking to consolidate its mental health treatment services and take over the provision of inpatient mental health care from DMH creates inescapably a critical need for close and continuing monitoring that will last for years.

Respectfully submitted,


J. Michael Keating, Jr.
Special Master



Matthew A. Lopes, Jr.
Deputy Special Master

September 24, 2007