PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
AMY WHELAN Bar No.: 215675
LORI RIFKIN Bar No.: 244081
SARAH M. LAUBACH Bar No.: 240526
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>　　　　Plaintiffs,<br><br>　vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　　Defendants. | Case No. Civ S 90-0520 LKK-JFM<br><br>**PLAINTIFFS' RESPONSE TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATIONS REGARDING DEFENDANTS' AUGUST 2007 LONG RANGE BED PLAN** |

On September 20, 2007, plaintiffs sent a letter to the Special Master, his team members and defendants' counsel setting forth plaintiffs' concerns and comments regarding defendants' August 2007 Long Range Bed Plan.[1] On September 24, 2007, the Special Master issued his Report and Recommendations (hereinafter R&R) regarding that plan. *See* Docket 2432. The Special Master's report is a comprehensive analysis of defendants' plan that addresses most of the concerns set forth in plaintiffs' September 20th letter. For ease of reference, plaintiffs' September 20, 2007 letter is attached hereto as Appendix A.

Plaintiffs submit this response to raise two additional issues not addressed in the Special Master's R&R and to seek a more specific order regarding one of his recommendations. As set forth in the September 20th letter, however, plaintiffs urge prompt approval of the general Consolidated Care Center (CCC) concept so that badly needed and much delayed construction projects will finally begin. Plaintiffs agree with the Special Master's observations, however, that there are many aspects of defendants' plan that are unproven and problematic and that will therefore require close monitoring throughout the bed design, planning and building stages.[2]

**I.   The Court Should Order Defendants To Provide a Long-range Bed Plan That Meets the Needs of Enhanced Outpatient Programs (EOP) and EOP-Administrative Segregation Programs (EOP-ASU) for Female Prisoner-Patients**

While defendants' August 2007 bed plan, using Navigant population projections, seeks to meet or exceed the bed need for all male outpatient and inpatient programs by 2012, the plan leaves a shortage of female EOP and female EOP-ASU beds. With respect to these shortages, defendants state only that, "[t]he deficiency in female inmate-patient mental health beds shall be addressed in future planning efforts." Docket 2375 at p. 16.

---

[1]   Defendants' August 2007 Supplemental Bed Plan is Docket 2375 through 2375-2 and also consists of several enclosures.

[2]   Plaintiffs incorporate by reference all of the comments and concerns set forth in our September 20, 2007 letter. In particular, we agree with the Special Master's serious concerns that the CDCR will be incapable of assuming control over inpatient bed programs from the Department of Mental Health and his concern that, "if CDCR's experiment with inpatient treatment programs falters, there will be time to invoke other possible alternatives, such as extending DMH's mentoring role, renewing the old DMH contract or even privatizing this component of care." Docket 2432 at p. 13. Indeed, the CDCR has never been able to provide even constitutionally adequate *outpatient* care; its desire to operate all outpatient programs and half of all inpatient programs is therefore a risky experiment that may very well prove devastating to the *Coleman* class.

Defendants' long-range bed plan must provide adequate mental health programs for both male and female *Coleman* class members. Accordingly, plaintiffs request an order from this Court requiring defendants to file a report detailing how they will address the projected shortfall of female EOP and EOP-ASU beds.

## II. Defendants' Must Ensure During the Planning and Design Stages of the Long Range Bed Plan That Prisoner-Patients Will Receive Equal Access to Programs and Services As Required By the Americans' With Disabilities Act (ADA) and Other Controlling Laws

While the CCCs are still very much in the conceptual stage, defendants' plan lacks any detail or commitment to ensure that prisoner-patients are housed in the least restrictive environments and that they are provided equal access to programming and services at the institutions, such as law libraries, vocational programs, jobs, and educational classes. Plaintiffs will continue to object to the CCCs and other mental health programs to the extent that they violate relevant provisions of the ADA and other applicable laws.

Accordingly, plaintiffs urge an order from this Court mandating ongoing and close supervision of the CCC construction plans and programmatic design plans as they are developed. It is imperative that defendants receive expert input regarding programmatic design, treatment space, yard access and security issues from mental health clinicians and experts.

## III. The Special Master's Fifth Recommendation, Regarding The Construction of Adequate Programming and Treatment Space at Salinas Valley State Prison (SVSP) and California Medical Facility (CMF), Should Be Expedited by This Court

The Special Master's fifth recommendation seeks an order from the Court requiring defendants to file "a development proposal for adequate mental health treatment and counseling space at California Medical Facility and Salinas Valley State Prison" within 120 days of the Court's order approving the bed plan. Docket 2432 at p. 16. Plaintiffs agree that this report is necessary, but urge the Court to expedite both the creation of the plan and the construction necessary to create adequate treatment space at both Salinas Valley State Prison and California Medical Facility.

Taking SVSP as an example, the temporary D-6 unit, which consists of 56 intermediate care facility beds, has been opened since May of 2006, or for nearly a year and a half. There has

never been adequate treatment space for the men housed in that unit, meaning that all treatment (including individualized therapy and group therapy) is provided on the dayroom floor. The D-5 unit, which was activated in April of 2007 and has an additional 56 intermediate care facility patients, similarly lacks programming and treatment space. In contrast, the level IV freestanding ICF unit (the SVPP) has designated rooms for group therapy as well as private clinical offices for individualized sessions.

The temporary units at SVSP are just that—temporary units intended to provide badly needed inpatient beds to the *Coleman* class. Nevertheless, these beds will be online for several years before they can return to general population or other use. It is imperative that patients housed there, and in the temporary units at California Medical Facility (CMF), are provided with adequate programming and treatment space for both group therapy and individualized sessions with clinicians. Accordingly, and because defendants have known about this pressing problem for years, the Court should order defendants to create adequate treatment and programming space at CMF and SVSP by January 31, 2008.

## CONCLUSION

In order to ensure adequate EOP and EOP-ASU programs for female prisoner-patients, to ensure defendants' compliance with the ADA and other applicable laws during the planning and construction phases of the bed plan and to ensure expedited programming and treatment space for prisoner-patients housed at SVSP and CMF, plaintiffs submit the accompanying proposed order to augment the Special Master's other recommendations regarding defendants' August 2007 long-range bed plan.

Dated: September 26, 2007                    Respectfully submitted,

ROSEN, BIEN & GALVAN, LLP


By: */s/ Amy Whelan*
     Amy Whelan
     Attorney for Plaintiffs

3

# **APPENDIX A**

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ERNEST GALVAN

HOLLY BALDWIN
GAY C. GRUNFELD
SHIRLEY HUEY **
JANE KAHN
MEGHAN LANG
SARAH LAUBACH
ANNE MANIA
NURA MAZNAVI
MARIA MORRIS ***
THOMAS NOLAN
LORI RIFKIN ****
LOREN STEWART
KENNETH WALCZAK *****
AMY WHELAN
SARAH OLSON ZIMMERMAN *****

**ROSEN, BIEN & GALVAN, LLP**
ATTORNEYS AT LAW
315 MONTGOMERY STREET, TENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rbg@rbg-law.com

September 20, 2007

**VIA EMAIL AND U.S. MAIL**

J. Michael Keating, Jr.
Special Master
285 Terrace Avenue
Riverside, RI 02915

    Re:    *Coleman v. Schwarzenegger*
            Our File No. 489-3

Dear Mr. Keating:

    Plaintiffs submit the following comments and concerns regarding defendants' Supplemental Bed Report, which was filed with the Court on August 17, 2007 (Docket 2375). We preface these comments and concerns with our observation that the plan is still very much a work in progress. Thus, while defendants' plan is a marked improvement over the one submitted in December 2006, it still lacks concrete construction and planning timelines and, for instance, any supporting evidence that CDCR will be able to create and maintain the infrastructure necessary to operate and control the mental health programs in the Consolidated Care Centers (CCCs).

    Because of the significant bed shortages right now at virtually every level of care, however, and because plaintiffs have already fallen victim to substantial delays in construction and planning (including defendants' delay of projects that were already legislatively approved and funded), plaintiffs' main goal at this point is to ensure that beds will be built as expeditiously as possible. To that end, plaintiffs' urge approval of the general Consolidated Care Center concept, but with an imposition of substantial and ongoing oversight by the Court as the plans move forward.

    In the meantime, and to the extent that it is possible to comment on the current plan, plaintiffs submit the following specific observations and objections regarding the

\*     MEMBER OF THE CONNECTICUT AND THE CALIFORNIA BAR
\*\*    MEMBER OF THE WASHINGTON, D.C. AND THE CALIFORNIA BAR
\*\*\*   MEMBER OF THE NEW YORK AND THE CALIFORNIA BAR
\*\*\*\*  MEMBER OF THE CONNECTICUT, NEW YORK AND THE CALIFORNIA BAR
\*\*\*\*\* MEMBER OF THE ILLINOIS AND THE CALIFORNIA BAR

plan. Plaintiffs also reserve our right to object to any findings and recommendations regarding defendants' plan.

### THE COURT SHOULD REJECT CDCR'S ASSUMPTION OF CONTROL OVER ACUTE AND INTERMEDIATE CARE FACILITY (ICF) PROGRAMS

Construction on the CCC projects should begin as soon as possible. Plaintiffs continue to take the position, however, that the Department of Mental Health (DMH) should operate all acute and intermediate care facility beds available to California Department of Corrections and Rehabilitation (CDCR) inmate-patients, including the 90-bed acute unit at California Institution for Men (CIM) and the 70-bed ICF units at CSP-Sacramento (SAC), R.J. Donovan (RJD), California Men's Colony (CMC), CIM, and CSP-Los Angeles County (LAC). While the updated plan has additional detail as to how CDCR will attempt to run inpatient beds (for the first time in its history), there is no reason to believe that CDCR can build, supervise, manage and operate these high level mental health programs on its own. Neither the updated plan nor CDCR's track record of failing to provide adequate care to seriously mentally ill class member provides a basis for the Court to approve this plan. Moreover, despite the plan's promises that the CCCs will be developed based on a "therapeutic milieu," the fact remains that DMH's mission contrasts sharply with that of CDCR. While the former is a health care institution that runs hospitals to treat patients, the latter is a severely overcrowded correctional department with the primary mission of public safety, punishment and, only recently, rehabilitation. CDCR programs treat prisoners, even the seriously mentally ill, as dangerous, and frequently place security concerns over treatment needs. At this late stage of the *Coleman* case, it is not reasonable to approve a long-overdue bed plan that seeks a radical shift in the provision of care to the most seriously-ill members of the *Coleman* class. DMH has a proven track record of developing and operating inpatient beds for CDCR inmate-patients and should continue to do so in the future.

### IF CDCR IS PERMITTED TO OPERATE ANY INPATIENT BED UNITS, DEFENDANTS MUST CREATE AN OBJECTIVE AND DETAILED TRANSITION PLAN, SUBJECT TO COURT OVERSIGHT, THAT WILL ENSURE CDCR'S ABILITY TO ASSUME CONTROL OF INPATIENT PROGRAMS

Although the plan specifies that DMH will continue to run and operate all inpatient beds at Salinas Valley State Prison (SVSP) and California Medical Facility (CMF), including the new intermediate care facility units, defendants still intend to shift control of most inpatient mental health programs from DMH to the CDCR. Again, plaintiffs continue to strongly object to this unnecessary and dangerous transition of control for inpatient psychiatric care. Unless and until CDCR can demonstrate the competence, skill, experience and independence from custodial interference necessary to

meet or exceed the same inpatient programs provided by DMH, the Court should not approve of the transition.

If the CDCR is permitted to assume control over *any* inpatient bed units, however, it is imperative that defendants, in coordination with plaintiffs and the Special Master's team, create a comprehensive and objective transition plan setting forth concrete goals that CDCR must meet prior to operating those units. Defendants have not set forth such a plan even as to the units that DMH will initially run and operate, including the intermediate care facility beds at SAC and the acute program at CIM. As to those projects, the plan specifies that DMH will determine when "CDCR meets the operational criteria" to fully run those inpatient beds. Plan at p. 8. DMH will also be solely responsible for determining when CDCR can assume control of the acute program at CIM: "DMH, as with the SAC ICF program, will initiate primary responsibility for implementing the Acute program at CIM. The DMH shall be responsible for evaluation and determining that CDCR meets the operation criteria both initially and on a follow-up basis as previously outlined for SAC." Plan at p. 8. This is unacceptable. DMH is merely another agency under the control of the defendant Governor and his control agencies. It is the Governor who is proposing the transition from DMH to CDCR. The Governor cannot also be the judge as to whether CDCR is "ready" to take over those units.

While DMH should certainly oversee and participate in the transition of these programs to CDCR control if such a transition is permitted, it is essential that plaintiffs, the Special Master's team and the Court have an active roll in this process from the beginning. Because CDCR's ability to create the necessary infrastructure to manage and operate inpatient psychiatric programs is undemonstrated and untested, defendants should be required to meet specified and objective benchmarks (as determined by the Special Master and/or experts in the field) before assuming control of any of these programs. Final approval of this aspect of the bed plan—the transition of control of ICF and APP programs to CDCR from DMH—should thus be explicitly conditioned on the development of an objective and specified transition plan that will be subject to approval by plaintiffs' counsel, the Special Master's team, and the Court. That transition plan must set forth detailed licensing, staffing and operational goals that CDCR staff must reach before they are permitted to assume full control of any of the inpatient programs.

### THE CDCR HAS NEVER HAD THE INFRASTRUCTURE TO RECRUIT, HIRE, AND OPERATE ITS EXISTING MENTAL HEALTH PROGRAMS AND THIS PLAN DOES NOT EXPLAIN HOW IT WILL NOW ASSUME THE MASSIVE ADDITIONAL BURDEN OF THE CCCS

Defendants concede that "staggering" of CCC projects will be necessary due to limited staffing resources and because there may be a "limited number of qualified design and construction professionals available to complete [the CCCs], given the numerous

J. Michael Keating, Jr.
September 20, 2007
Page 4

major capital outlay construction projects underway in California during this time frame." Plan at p. 11. Defendants also concede that "the CDCR does not currently have the managerial and executive staff classifications that have similar training and responsibilities to DMH." Plan at Enclosure IV, p. 2.

Plaintiffs are deeply concerned that the CDCR will be unable to recruit and hire the necessary design, construction, managerial and executive staff to build and eventually run the mental health care programs detailed in the CCCs. Indeed, the Special Master's earlier concern about this point still exists—"In a mental health headquarters currently staffed with no more than half a dozen planners, managers and supervisors, all of them struggling heroically to manage CDCR's existing outpatient and residential mental health programs, who will plan and direct the creation of an 866-bed inpatient mental health program within the CDCR during the next four years?" Docket 2133 at p. 16. While this plan provides some additional detail about the structure that CDCR will strive to create, it remains to be seen whether those are feasible goals. Plaintiffs are also concerned that defendants' plan to create a duplicate managerial and executive staff structure within the CDCR rather than expand the already existing structure within DMH will create waste and inefficiency, thereby prompting the legislature to reject the current plan.

### DEFENDANTS' TRANSITION OF ANY EXISTING MENTAL HEALTH BEDS OR PROGRAMS BACK TO GENERAL POPULATION USE MUST BE CONDITIONED ON COURT APPROVAL

Defendants explain in the updated plan that the net result of the Consolidated Care Center construction will be the return of 92 General Acute Care Hospital (GACH) beds and 1,644 existing mental health beds to the CDCR for custody or medical bed use. Plan at p. 14. Because defendants will be under extreme pressure to transfer beds back to general population use due to severe overcrowding, the plan should prohibit defendants from taking any mental health beds offline or transferring any beds back to custody or medical use, until defendants can demonstrate to the Court that they are able to meet the needs of the *Coleman* class without these resources.

### THE NEWLY CONSTRUCTED CCCs MUST COMPLY WITH THE STANDARD OF CARE IN THE MENTAL HEALTH COMMUNITY

Although defendants' plan mentions that the CCCs will be based on a "therapeutic milieu," the plan does not make any commitment to design and build the ICF facilities with a "treatment mall" or adopt a "recovery model" for these facilities. These newly constructed mental health facilities must comply with the current standards of care in the mental health community, including the use of the treatment mall model for inpatient mental healthcare. That level of care is currently provided at Atascadero State Hospital (ASH) and Patton State Hospital (PSH), the primary facilities providing inpatient mental healthcare to male and female prison-patients. Plaintiffs will continue to object to any

J. Michael Keating, Jr.
September 20, 2007
Page 5

newly-created inpatient projects that do not meet or exceed the programs currently provided at both ASH and PSH.

### DEFENDANTS SHOULD BE ORDERED TO EXPEDITE PLANNING AND CONSTRUCTION OF ALL NON-CCC BED PLAN PROJECTS

Defendants' plan makes clear that several construction projects will move forward at sites that are not CCCs, including: (1) the 64-bed ICF project at SVSP; (2) the 64-bed ICF project at CMF; (3) the Enhanced Outpatient Program (EOP) and EOP-ASU projects at SVSP; (4) the 45 bed acute/ICF program at California Institution for Women (CIW), and; (5) the EOP and EOP-ASU projects at CIW. Plan at p. 6, fn. 7. According to an updated construction chart provided by defendants on September 17, 2007, the SVSP 64-bed unit is 9% complete with a completion date of January 2009. Construction has not started on the CMF 64-bed project and the preliminary plans are not even slated for completion until July of 2008. The remaining projects are not even in the preliminary planning stages.

Defendants also reported during the September 18, 2007 policy meeting that they have halted all construction on the program space for the temporary D-5 and D-6 units at SVSP (those units have a total of 112 ICF beds). The D-6 unit has been running for nearly two years and the D-5 unit has been running for several months, yet neither program has ever had adequate treatment or programming space.

Given the ongoing uncertainty of the CCC projects and any coordination with the Receiver, an order approving this plan should include mandates that defendants pursue all available ways to expedite construction, recruitment, hiring, and licensing of all non-CCC construction projects, including outsourcing appropriate work to third parties.

### DEFENDANTS SHOULD BE ORDERED TO EXPEDITE PLANNING AND CONSTRUCTION OF THE CCCS WHETHER THEY ARE COORDINATED WITH THE RECEIVER OR PROCEED ON AN INDEPENDENT TRACK

Because defendants' admit that they currently lack the infrastructure to design, build, obtain licensing and eventually operate the CCCs, defendants' plan includes only a vague completion date for the CCCs. Moreover, the plan is fraught with contingencies and seemingly endless explanations as to why additional delays may occur. Defendants make clear that the legislature has not yet approved any part of the plan, for instance, that construction of each CCC will have to be "staggered" at least 6-12 months and that it will take at least 5 years to build each CCC (with at least 6 or 12 months added or subtracted from that estimate depending on the size of the CCC). Plan at p. 10 and fn. 11. In the best case scenario, which assumes no planning or construction delays, this suggests that it

J. Michael Keating, Jr.
September 20, 2007
Page 6

will take defendants a minimum of 7 years to build the CCCs but more likely 9-12 years. Plaintiffs are deeply concerned about this timeline.

It is possible that defendants will coordinate the CCC projects with the *Plata* Receiver's construction of medical beds. It remains to be seen if such coordination will expedite construction. If the Receiver refuses to coordinate medical and mental health construction projects, defendants run the risk not only of embarking on very slow construction projects, but also directly competing with the Receiver for scarce executive and managerial staff resources necessary to plan, build and eventually operate these programs. Plaintiffs are deeply concerned about the seemingly endless possibilities for delay and, perhaps even more serious, the possibility that defendants will be unable to hire and recruit the necessary staff to design, operate and build the CCCs. Accordingly, an order approving this plan should include mandates that defendants pursue all available ways to expedite construction, recruitment, hiring and licensing, including outsourcing appropriate work to third parties.

An order requiring expedited planning, hiring, recruitment and construction phases is also imperative in light of the current and foreseeable bed shortages. Over the <u>next two years</u>, the most severe shortages of beds will be as follows according to the new Navigant report at page 41 (Enclosure I to defendants' updated bed plan):

| TYPE OF BED | CURRENT | FY 2007/2008 | FY 2008/2009 | FY 2009/2010 |
|---|---|---|---|---|
| Male EOP | -270 | -370 | -454 | -520 |
| Male acute | -64 | -52 | -59 | -65 |
| Male ICF Level IV | -29 | -49 | -5 | -20 |
| Male EOP-ASU | -9 | -42 | -59 | -72 |
| Female EOP | -112 | -138 | -160 | -179 |
| Female EOP-ASU | -13 | -15 | -16 | -17 |

### THE PLAN DOES NOT PROVIDE LICENSING DETAILS REGARDING THE NEWLY CONSTRUCTED CCCs

While the plan is silent as to what licenses defendants will obtain to run the CCCs, Doug McKeever reported at the September 18, 2007 *Coleman* policy meeting that defendants would obtain the appropriate acute, ICF or CTC licenses for all programs. Plaintiffs request that these licensing commitments be a part of the approved plan.

### THE PLAN DOES NOT PROVIDE SUFFICIENT FEMALE ENHANCED OUTPATIENT PROGRAM (EOP) AND ENHANCED OUTPATIENT PROGRAM-ADMINISTRATIVE SEGREGATION BEDS

Defendants explain that as of 2012, the only bed shortages that will remain are female EOP and female EOP-ASU beds. The Navigant report (Enclosure I to the Plan) details the following shortage of these beds over the next five years: **2007** (-138 EOP and -15 EOP-ASU); **2008** (-160 EOP and -16 EOP-ASU); **2009** (-179 EOP and -17 EOP-ASU); **2010** (-26 EOP and -3 EOP-ASU), and; **2011** (-39 EOP and -3 EOP-ASU). Defendants state only that, "[t]he deficiency in female inmate-patient mental health beds shall be addressed in future planning efforts." Plan at p. 16.

When questioned about this issue at the September 18th policy meeting, defendants reported that these beds were not addressed in the plan because they are still trying to move 4,000 female prisoners to community facilities. Once this occurs, defendants intend to convert the emptied general population units to female EOP and EOP-ASU programs. As far as plaintiffs are informed, however, the legislature rejected defendants' plan to move 4,000 female patients to community placements. Defendants should be ordered to report on this issue and, if the community beds are unlikely to be approved, should be ordered to produce a report within 60 days detailing how the CDCR will address the projected shortfall of female EOP and EOP-ASU beds.

### DEFENDANTS' PLAN DOES NOT ADDRESS OR EXPLAIN HOW PRISONER-PATIENTS WILL RECEIVE EQUAL ACCESS TO PROGRAMS AND SERVICES AS REQUIRED BY THE AMERICANS' WITH DISABILITIES ACT (ADA) AND OTHER CONTROLLING LAWS

While the CCCs are still very much in the conceptual stage, defendants' plan lacks any detail or commitment to ensure that inmate-patients are housed in the least restrictive environments and that they are provided equal access to programming and services at the institutions, such as law libraries, vocational programs, jobs, and educational classes. Plaintiffs will continue to object to the CCCs and other mental health programs to the extent that they violate relevant provisions of the ADA and other applicable laws.

Related to this point, plaintiffs urge the Special Master to recommend ongoing and close supervision of the CCC construction plans and programmatic design plans as they are developed. It is imperative that defendants receive expert input regarding programmatic design, treatment space, yard access and security issues from mental health clinicians and experts.

J. Michael Keating, Jr.
September 20, 2007
Page 8

## PLAINTIFFS OBJECT TO THE REMOVAL OF MHCBs FROM CSP-CORCORAN

Plaintiffs do not object to the removal of the EOP and EOP-ASU units at COR, but do object to defendants' planned closure of the MHCBs. Plaintiffs detailed the reasons for this objection in our January 16, 2007 filing regarding defendants' December Bed Plan. *See* Docket 2111 at pp. 18-20. Plaintiffs continue to oppose the removal of mental health crisis beds from COR as long as the SHU remains at that prison, as long as COR continues to house a large number of CCCMS patients in harsh administrative segregation units and as long as COR maintains its intense Level IV general population units. It is imperative that Corcoran staff members (both mental health and custody) have access to immediate crisis bed placements for inmates at Corcoran who decompensate in the SHU, administrative segregation and general population units.

Sincerely,

ROSEN, BIEN & GALVAN, LLP

By: Amy Whelan

AW:aw

cc: Matthew A. Lopes, Jr. (email only)
Lisa A. Tillman (email only)
Misha Igra (email only)
Michael Stone (email only)
Coleman Co-counsel (email only)
Special Master's Team (email only)