EXHIBIT A
TO MOTION FOR RECONSIDERATION

Slip Copy                                                                                                                                Page 1
Slip Copy, 2006 WL 2601604 (E.D.Pa.)
(Cite as: Slip Copy)

Bowers v. City of Philadelphia
E.D.Pa.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Lee BOWERS, et al.
v.
CITY OF PHILADELPHIA, et al.
**Civil Action No. 06-CV-3229.**

Sept. 8, 2006.

Angus R. Love, Institutional Law Project, David Rudovsky, Kairys Rudovsky Messing & Feinberg, Philadelphia, PA, for Lee Bowers, Brandon Bucci, Darius McDowell and James Walker.
Lynne A. Sitarski, City of Philadelphia, Law Department, Chief Deputy City Solicitor, Philadelphia, PA, for City of Philadelphia, Leon A. King, II and Sylvester Johnson.

SURRICK, J.
*1 Presently before the Court is District Attorney Lynne Abraham's Motion To Intervene Pursuant To The Prison Litigation Reform Act (Doc. No. 9), Plaintiffs' Memorandum of Law in Opposition (Doc. No. 10), and Defendants' Response to the District Attorney's Motion (Doc. No. 14).[FN1] For the following reasons, the Motion to Intervene will be granted.

> FN1. Defendants' Response advises that Defendants have no objection to the District Attorney's intervention.

## I. FACTUAL BACKGROUND

This case involves allegations by pre-trial detainees in the Philadelphia Prison System ("PPS") of severe prison overcrowding and concomitant dangerous, unhealthy, and degrading conditions. Plaintiffs allege that these conditions and the policies and practices of Defendants violate the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Plaintiffs allege that they are pre-trial detainees who, due to severe overcrowding and lack of adequate facilities, are held at police districts, the Police Administration Building, or at intake units of the PPS.

Federal litigation involving conditions in the PPS has a long and troubling history. The federal litigation commenced in 1982 with the filing of *Harris v. City of Philadelphia,* No. 82-1847 (E.D.Pa.1982).[FN2] In *Harris,* the inmates at the Holmesburg Prison filed a class action complaint against the City of Philadelphia and individual Philadelphia officials, alleging overcrowded conditions that violated the First, Eighth, Ninth, and Fourteenth Amendments. *See Harris v. City of Phila.,* No. Civ. A. 82-1847, 2000 WL 1239948, at *1 (E.D.Pa. Aug. 30, 2000). That litigation led to court-approved consent decrees in 1986 and 1991 as well as a Ten-Year Plan approved by the court in 1996. *Id.* at * 1-4. The litigation also resulted in a series of orders beginning in 1994 and ending in 1999 that approved over 250 policies and procedures in the prisons that were a product of negotiations between the City and the plaintiff class, under the supervision of a Special Master. *Id.* at *4. Throughout the eighteen-year litigation, the various consent decrees and orders mandated various measures in an effort to address the crisis conditions that had developed. These measures included: construction of new detention centers and renovation of old facilities, contracts with private agencies for additional beds for work-release inmates and minimum security pretrial detainees, limitations on the number of inmates in Philadelphia Prison System facilities, a qualified admissions moratorium on admitting additional inmates, implementation of a house arrest/electronic monitoring program for selected inmates, and ultimately, the release of certain non-violent inmates when the maximum allowable population was exceeded. *Id.* at *2-4. In addition, between 1991 and 2000, the City paid a total of $864,000 in penalties for violating court orders. *Id.* at *5. In 2000, a final settlement was approved and federal court supervision of the PPS came to an end. *Id.* at *11.

> FN2. Prison conditions litigation against the City of Philadelphia actually began in the state courts in 1971 with the filing of the *Jackson v. Hendricks* case. *See Jackson v. Hendricks,* 764 A.2d 1139, 1141 (Pa.Commw.Ct.2001).

Despite this long history of federal court supervision

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the PPS, this case, filed only six years after the settlement in *Harris,* has once again raised the issue of prison overcrowding and unconstitutional conditions. The Complaint asserts that conditions in the PPS have worsened, particularly for pre-trial detainees. When the *Harris* litigation commenced in 1982, the prison population had reached approximately 4,300 inmates. *Id.* at *5. In 2000, when the *Harris* litigation concluded, the prison population exceeded 7,000.*Id.* Plaintiffs allege that in the six years since that litigation concluded, the prison population has grown to "8,900 inmates, over 1,000 beyond the rated capacity of the PPS." (Doc. No. 1 at 5.) Plaintiffs further allege that as a result of the overcrowding, "the PPS literally ran out of housing space" and has instituted a policy and practice of holding inmates at the intake/admissions area of the Detention Center ("DC"), the Philadelphia Industrial Correctional Center ("PICC"), and the Curran Fromhold Correctional Facility ("CFCF") until a cell becomes available. They contend that inmates have been held in these areas for up to six days in dangerous and unhealthy conditions. *(Id.* at 6-7.)In particular, Plaintiffs allege that conditions at these facilities include the following: (1) inmates at DC and PICC are held in cells without beds, adequate toilets, or access to showers, are not medically screened, and have no access to counsel; (2) inmates at CFCF are regularly held in cells with up to 25-35 men despite the cell's capacity to hold 5-10 inmates; (3) because of the overwhelmingly large number of detainees, inmates at CFCF often do not receive medical screenings for a week, and inmates with communicable diseases are held in close proximity with others for up to 100 hours; (4) the overcrowding and resulting conditions have made fighting among detainees inevitable. *(Id.* at 7-8.)

*2 Because of these conditions in the PPS intake/admissions areas of the DC, PICC, and CFCF facilities, Plaintiffs allege that the Commissioner of Corrections has instituted a policy of not accepting new inmates from the Police Department, post-preliminary arraignment, when the population of the PPS exceeds 8,750. *(Id.* at 8.) As a result, people who are unable to post bail after their preliminary arraignment are now held at police districts or the Police Administration Building ("PAB") for days while they await admission to the PPS. While being held at the police districts and the PAB, detainees receive only emergency medical care, have no access to phones, family, or legal counsel, no showers, inadequate toilet facilities and inadequate places to sleep. *(Id.)* Plaintiffs claim that "as of July 20, 2006, the PPS was not accepting new inmates and over 300 persons were awaiting admission to PPS, but are being held for days at police districts."*(Id.* at 9.)

Plaintiffs claim that the above-described conditions amount to violations of the Sixth, Eighth, and Fourteenth Amendments in that they are deprived of their rights to counsel, to a speedy trial, to be free from cruel and unusual punishment, to the provision of medical care, and to the right not to be deprived of liberty without due process of law. *(Id.* at 12.)Plaintiffs seek relief in a number of forms. They seek compensatory and punitive damages for their injuries; a declaratory judgment that the practices, policies, and conditions alleged are unconstitutional; a permanent injunction prohibiting the further implementation of these policies and an order requiring Defendants to either provide constitutionally acceptable conditions of confinement or discharge members of the class from custody; and attorneys' fees and costs.*(Id.* at 12-13.)

## II. LEGAL ANALYSIS

### A. Standard for Intervention

District Attorney Lynne Abraham seeks to intervene as of right pursuant to Federal Rule of Civil Procedure 24. Rule 24(a)(1) provides: "Upon timely application anyone shall be permitted to intervene in an action ... when a statute of the United States confers an unconditional right to intervene."Fed.R.Civ.P. 24(a)(1). The District Attorney premises her Motion to Intervene on the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626 which provides:
Any State or local official including a legislator or unit of government whose jurisdiction or function includes the appropriation of funds for the construction, operation, or maintenance of prison facilities, or *the prosecution or custody of persons who may be released from, or not admitted to, a prison as a result of a prisonerreleaseorder* shall have standing to oppose the imposition or continuation in effect of such relief and to seek termination of such relief, *and shall have the right to intervene in any proceeding relating to such relief.*

18 U.S.C. § 3626(a)(3)(F) (emphasis added). The right to intervene in this instance turns on whether the proceedings currently before this Court relate to prisonerreleaseorders as those terms are defined by the PLRA.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### B. PLRA Interpretation

*3 District Attorney Abraham argues that she is entitled to intervene as of right because the Complaint and Motion for Preliminary Injunction seek injunctive relief in the form of an order that would require implementation of constitutional conditions in the PPS or the discharge of members of the Plaintiff class from custody. Abraham maintains that the district attorney's "jurisdiction or function" in Philadelphia includes the prosecution of individuals who may be released or not admitted to a prison pursuant to a prisonerreleaseorder. (Doc. No. 9 at 5-6.) Pennsylvania law provides that "[t]he district attorney shall sign all bills of indictment and conduct in court all criminal and other prosecutions, in the name of the Commonwealth, or, when the Commonwealth is a party, which arise in the county for which he is elected."16 Pa. Cons.Stat. § 1402(a). Abraham maintains that because the named Plaintiffs and potential Plaintiff class members are or were at the time of their detention subject to criminal prosecution by the Philadelphia District Attorney, she qualifies as a government official whose function includes "the prosecution or custody of persons who may be released from, or not admitted to, a prison as a result of a prisonerreleaseorder."18 U.S.C. § 3626(a)(3)(F).

In contrast, Plaintiffs argue that the District Attorney's intervention would be premature at this time. (Doc. No. 10 at 5-7.) Plaintiffs suggest that the PLRA envisions a two-stage process for federal court intervention in prison overcrowding cases. *(Id.* at 5.) The first stage, they contend, involves the Court's evaluation of the constitutionality of the prison conditions at issue and court-ordered relief that is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."18 U.S.C. § 3626(a)(1)(A). In the event that such relief is not effective in correcting the violation, the PLRA permits courts to enter a "prisoner release order," defined as "any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison."*Id.* § 3626(g)(4). Prisoner release orders may only be entered, however, when "(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and (ii) the defendant has had a reasonable amount of time to comply with the previous court orders."*Id.* § 3626(a)(3)(A). Plaintiffs contend that the District Attorney's intervention is not appropriate at this time because they are not seeking relief that would effectuate the release of any prisoner. Rather, in keeping with PLRA requirements, Plaintiffs contend that at this time they seek only an Order that would require Defendants to provide constitutional conditions including adequate housing, access to counsel, medical care, and health and safety protections for all pre-trial detainees. (Doc. No. 10 at 2.) Plaintiffs point out that under the PLRA, a prisoner release order may only be entered by a three-judge panel and hence, this Court is not even capable of ordering such relief. *See*18 U.S.C. § 3626(a)(3)(B).

### C. PLRA Caselaw

*4 In making a determination in this case, we must consider the caselaw, legislative history, and statutory text of the PLRA.[FN3]The PLRA took effect in April 1996 and was amended in November 1997.[FN4]*Id.* Since that time, the provision allowing for government officials to intervene has been addressed only by the Fifth Circuit and only in two opinions. In *Ruiz v. Estelle,* 161 F.3d 814 (5th Cir.1998), the court addressed an attempt by two Texas state legislators to intervene in a twenty-five year-old litigation involving Texas prison conditions. As part of its analysis, the court in *Ruiz* assessed whether the final judgment agreed to by the parties, which terminated the federal court's jurisdiction except in several areas including prison population and overcrowding, constituted a prisonerreleaseorder under the PLRA. *Id.* at 821-27.Because the final judgment contained population caps on the number of prisoners allowed to be housed in various prison units, the court found that the judgment had "the purpose or effect of reducing or limiting the prison population" and thus that it was a prisonerreleaseorder within the meaning of the PLRA. *Id .* at 826-27.The two Texas state legislators in Ruiz sought to intervene in the district court to oppose the final judgment. The Fifth Circuit held that § 3626(a)(3)(F) applied, and the legislators were entitled to intervention as of right under that statute.[FN5]*Id.* at 827.

> FN3. We note that principles of statutory interpretation dictate that "[t]he starting point is the language of the statute. If the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

meaning of the text is clear, 'there is no need to ... consult the purpose of [the statute] at all.' " _United States v. E.I. Dupont De Nemours & Co., Inc._, 432 F.3d 161, 169 (3d Cir.2005) (quoting _Cooper Indus., Inc. v. Aviall Servs., Inc._, 543 U.S. 157 (2004)). However, the subsection of the PLRA at issue in this case is not clear on its face. As a result, in addition to the text itself, we look to prior caselaw to illuminate the context in which the statute was enacted and the legislative history to offer insight into congressional intent. _See id._("Where a statute's text is ambiguous, relevant legislative history, along with consideration of the statutory objectives, can be useful in illuminating its meaning.").

FN4. The 1997 amendment changed the text of the PLRA only slightly. Only two changes were made to the subsection on government official intervention: (1) the amendment added the words "including a legislator" in the list of those officials who may intervene-making clear that individual legislators could intervene under this statute-and (2) the amendment changed the phrase "program facilities" to "prison facilities." H.R. Conf. Rep. No. 105-405, at 32 (1997), _reprinted in_ 1997 U.S.C.C.A.N. 2941.

FN5. A primary issue in the _Ruiz_ case was whether the PLRA, as amended in 1997, intended individual legislators to have a right to intervene in prison overcrowding cases. The Fifth Circuit considered the express language of the amended PLRA-which, as previously noted, added the words "including legislators" to the list of government officials who could intervene-and recognized that the amendment was enacted as a response to the lower court's denial of the right to intervene to these same legislators. The Fifth Circuit concluded that the statute, as amended, clearly grants individual legislators the right to intervene. _Ruiz_, 161 F.3d at 818-19. While this particular issue is not before us, we note that the PLRA, in this amendment and, as will be discussed _infra_, in its entirety, was constructed as a response to federal court decisions.

The Fifth Circuit again interpreted § 3626(a)(3)(F) of the PLRA in _Castillo v. Cameron County_, 238 F.3d 339 (5th Cir.2001). In _Castillo_, the court determined that a court order that continued prior injunctive relief including prison population caps was a prisoner release order within the meaning of the PLRA. As a result, the court permitted the state, which was no longer a party to the action, to appeal the court's order pursuant to § 3626(a)(3)(F)'s grant of standing to "[a]ny state or local official ... whose jurisdiction or function includes the appropriation of funds for the construction, operation, or maintenance of prison facilities ... to oppose the imposition or continuation in effect of [prisoner release orders]."§ 3626(a)(3)(F).

The Fifth Circuit's jurisprudence on this matter is instructive on a number of issues. It emphasizes the broad meaning attributed to prisonerreleaseorders under the statute to include any action by the court ordering or approving of a reduction or limitation on the population of a prison. With this in mind, the Fifth Circuit readily granted individual legislators and the state the right to intervene in cases involving such court actions. Considering these cases and the text of the PLRA itself, it is clear that were this Court to engage in any action that either set population caps, ordered a reduction in population at particular prison facilities, or limited the admission of inmates to prisons, we would be engaging in a "prisonerreleaseorder" as that term is defined by the statute, and government official intervention would be appropriate.

*5 However, these Fifth Circuit cases offer little insight into the particular problem that we address in the instant Motion, that is, whether the right to intervene becomes operative even before the court has taken any action that could be construed as a "prisonerreleaseorder." The case before us, while it comes with a long history in this court, is new. We have taken no action in this matter at this point other than to schedule a hearing on the pending Motion for Preliminary Injunction filed by Plaintiffs. At issue here is the appropriate timing of government official intervention in a case in which various kinds of relief are sought but which at base alleges severe overcrowding that has lead to other unconstitutional conditions. Because the case law provides little help in deciding this issue, we next look to legislative history and a close textual reading of the statute to inform our decision.

### D. Legislative History

Like the caselaw, the legislative history is limited on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

this particular subsection of the PLRA. What is clear is that the PLRA subsection providing for government officials to intervene in prison overcrowding cases was enacted as a direct response to two Third Circuit opinions in the *Harris* litigation that denied the district attorney the right to intervene.[FN6] In *Harris v. Pernsley*, 820 F.2d 592 (3d Cir.1987), the Third Circuit concluded that the district attorney was not entitled to intervene as of right in the prison litigation. The court held that under Federal Rule of Civil Procedure 24(a)(2) the district attorney's statutory duties under Pennsylvania law did not create a sufficient legal interest in the litigation to require intervention as of right. *Id.* at 601-602 ("[W]e decline to equate the District Attorney's function as the spokesperson for Pennsylvania's interest in criminal prosecutions with the responsibility for policing the entire criminal justice system."). In response to this decision, Pennsylvania enacted a statute in 1988 that "purport[ed] to confer automatic standing on the district attorney in prison litigation under which prisoners might be released or not admitted."[FN7] *Harris v. Reeves*, 946 F.2d 214, 217 (3d Cir.1991). Thereafter, the district attorney again attempted to intervene in the prison overcrowding litigation based upon this new Pennsylvania statute. In *Harris v. Reeves*, the Third Circuit again rejected this second attempt finding: (1) that intervention as of right exists under Rule 24(a)(1) when a statute of the United States confers such a right and not when a state statute does and (2) that the Pennsylvania statute's attempt to confer automatic standing did not alter the powers and duties of the district attorney so that the reasoning of *Harris v. Pernsley* still applied to preclude intervention. *Id.* at 222-24. It is apparent that Congress, by enacting § 3626(a)(3)(F) of the PLRA, sought to ensure intervention as of right for certain government officials in prison overcrowding cases by creating a federal statute that could be relied upon under Rule 24(a)(1).

FN6. In describing this section of the PLRA, the House Report, citing the Third Circuit's opinion in *Harris v. Pernsley,* states:
Courts, particularly federal courts, have excluded some state officials, such as district attorneys, from having any say about the disposition of such cases by concluding that these officials have no right to intervene as parties under the current law embodied in Federal Rule of Civil Procedure 24(a)(2), which requires that the intervenor have an "interest" in the case. But completely apart from the "interest" rationale, Federal Rule of Civil Procedure 24(a)(1) requires that a party be allowed to intervene if he has been granted such a right by statute. Subsection (d) establishes such an explicit right to intervene for affected law enforcement officials.
H.R.Rep. No. 104-21, at 27 (1995), 1995 WL 56410.

FN7. The statute provides:
The district attorney shall receive written notice of, and shall have automatic standing and a legal interest in, any proceeding which may involve the release or nonadmission of county prisoners, delinquents or detainees due to the fact, duration or other conditions of custody. In addition to the district attorney's rights in such a proceeding, the district attorney may seek any equitable relief necessary to protect the district attorney's interest in the continued institutional custody and admission of county prisoners, delinquents or detainees.
18 Pa. Cons.Stat. § 1108.

*6 In addition to making clear that this subsection of the PLRA was in direct response to cases like those in the Third Circuit, Congress also made clear its intent to have this subsection broadly interpreted and applied by the courts. House Report No. 104-21 explains the rationale for allowing certain government officials to intervene in prison overcrowding cases. "Law enforcement officials who arrest, prosecute, or incarcerate criminals are permitted, under this new provision, to challenge any relief that would affect their localities, asserting the significant public safety concerns arising from such relief." H.R.Rep. No. 104-21, at 27 (1995), 1995 WL 56410. In addition, the Report indicates that *"[t]he provisions of this subsection should be construed liberally* so as to grant standing to a member of Congress, a governor, a member of a state legislature, or a member of a local unit of government, whose representative constituency is affected by such court-ordered relief." *Id.* (emphasis added). In addition to this indication of congressional intent, an early version of the statute, also included in House Report No. 104-21, included similar language in the subsection on government official intervention: "Standing shall be liberally conferred under this subsection so as to effectuate the remedial purposes of this section." *Id.* at 53. Thus, Congress made it clear that it was enacting § 3626(a)(3)(F) in direct response to federal courts who had denied

intervention in the past and that it intended this statute to alleviate the problem and be liberally construed by future courts.

### E. Statutory Interpretation

In addition to the legislative history on the PLRA, the language of the statute itself and particularly the subsection at issue in this Motion suggests that district attorney intervention is to be permitted at all stages of a litigation that truly deal with prison overcrowding. The text of § 3626(a)(3)(F) does not specify the timing of the intervention. Rather, it indicates that certain government officials "shall have standing to oppose the imposition or continuation in effect of such relief and to seek termination of such relief, and shall have the right to intervene in any proceeding relating to such relief." 18 U.S.C. § 3626(a)(3)(F). Because the District Attorney is seeking to intervene in this case prior to a hearing on Plaintiffs' Motion for Preliminary Injunction and not in response to a specific order of the Court, we will focus on the final portion of the subsection, providing the right to intervene in proceedings "relating to such relief."

Clearly, given the context of the standing provision in the section on prisoner release orders, the "relief" referenced in the final sentence is a "prisoner release order." We note again that this term is broadly defined by the statute itself to include "any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison." Id. at § 3626(g)(4). Moreover, as mentioned above, the Fifth Circuit cases on this subsection have determined that consent decrees and orders continuing prior injunctive relief that includes prison population caps are "prisoner release orders" within the meaning of the PLRA. See supra pp. 7-8.

*7 In addition, the phrase "any proceeding relating to" is expansive in nature. In dealing with the Employment Retirement Income Security Act (ERISA) and determination of laws which are preempted by it, many courts, including the Supreme Court, have assessed the meaning of the phrase "relates to" or "relating to." See, e.g., Shaw v. Delta Airlines, Inc., 463 U.S. 85, 96-97 (1983); McMahon v. McDowell, 794 F.2d 100, 106 (3d Cir.1986). In Shaw, an ERISA action, the Court explained that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan."[FN8] Id. at 96-97 (emphasis added). In explaining the phrase "relates to," the Court referred to the Black's Law Dictionary definition of the term: "Relate. To stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." Id. at 98 n. 16 (citing Black's Law Dictionary 1158 (5th ed.1979)).[FN9] In addition, the Court noted that it was appropriate to give effect to the plain language meaning of the phrase "unless there is good reason to believe Congress intended the language to have some more restrictive meaning." Id. at 97.

> FN8. We note that in recent years, the Supreme Court has backtracked somewhat on its liberal interpretation of this phrase for ERISA purposes. See Cal. Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc., 519 U.S. 316, 335 (1997) (Scalia, J. concurring) ("[A]pplying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else."). While the common sense definition of the phrase may no longer be appropriate for ERISA because of the potential for limitless application of that law that might result from a liberal interpretation, in the PLRA context, we face no such concerns since a liberal interpretation will, at most, mean the grant of standing to certain government officials throughout a prison overcrowding litigation and cannot be expanded beyond that.

> FN9. We note that the Sixth Edition of Black's Law Dictionary includes the same definition. See Black's Law Dictionary 1288 (6th ed.1990). However, this term was not included in the Seventh and Eighth Editions of the Black's Law Dictionary.

Therefore, in assessing the meaning of "proceedings relating to [prisoner release orders]," in the PLRA, we will give the phrase "relating to" to its common sense meaning. In this case, Congress did not express any intention for the phrase to have a more restrictive meaning. In fact, the opposite is true. The legislative history suggests that Congress intended this subsection to be liberally interpreted and, indeed, in this case, such a reading is both "true to the ordinary meaning of 'relate to,' and ... gives effect to the 'deliberately expansive' language chosen by Congress." District of Columbia v. Greater

*Washington Bd. of Trade,* 506 U.S. 125, 129 (1992) (citations omitted) (discussing the common sense definition of "relates to" in ERISA). Accordingly, we conclude that proceedings relating to prisoner release orders include proceedings that have bearing on or have some association with that form of relief.

### F. Application to the Instant Litigation

In this case, we are compelled to conclude that the District Attorney is entitled to intervene as of right even at this early stage of the litigation. The Complaint and Motion for Preliminary Injunction detail allegations of inhumane conditions that are a direct result of overcrowding in the prison intake units. In addition, the overcrowding is itself alleged to be an unconstitutional condition given that prisoners are held in numbers that far exceed the maximum capacity of the holding cells, precluding many from sitting or sleeping for 72 hours at a time. (Doc. No. 2 at 5.) As Plaintiffs point out, the Supreme Court has noted that "confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment." *Bell v. Wolfish,* 441 U.S. 520, 542 (1979). While Plaintiffs maintain that they do not, at this point, seek relief that would constitute a prisonerreleaseorder under the PLRA, if proven, these allegations would certainly have a bearing on and could lead to the certification of a three-judge panel to provide relief that orders the reduction or limitation of the prison population. In light of the nearly twenty-five year history of this litigation in the federal court and the alleged failure of the City to take steps to alleviate the problem, we seriously question whether a court order requiring implementation of constitutionally acceptable conditions would have any potential to put an end to the matter. Given the common sense meaning of the phrase "relates to," the legislative history indicating Congress's intent for broad, liberal interpretation of the standing provision of the PLRA, the history of prison overcrowding litigation in this City and in this District, and the serious nature of Plaintiffs' allegations in this case, we are compelled to conclude not only that the District Attorney has a right to intervene in this matter at this stage but that such intervention is prudent. We are prepared to deal expeditiously with this case and see no reason to exclude a party at this stage of the litigation when she may very well play an active role in its resolution.

Accordingly, we will grant the District Attorney's Motion to Intervene.

*8 An appropriate Order follows.

AND NOW, this 8th day of September, 2006, upon consideration of District Attorney Lynne Abraham's Motion To Intervene Pursuant To The Prison Litigation Reform Act (Doc. No. 9), it is ORDERED that the Motion is GRANTED.

IT IS SO ORDERED.

E.D.Pa.,2006.
Bowers v. City of Philadelphia
Slip Copy, 2006 WL 2601604 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.