# ORIGINAL

**FILED**

NOV 8 2007

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

1

2          EASTERN DISTRICT OF CALIFORNIA

3                    --o0o--

4  RALPH COLEMAN, et al.,        ) Case No. 2:90-cv-00520-LKK-JFM
                                 )
5              Plaintiffs,       )
                                 ) Sacramento, California
6      vs.                       ) Thursday, October 25, 2007
                                 ) 11:37 A.M.
7  SCHWARZENEGGER, et al.,       )
                                 ) Hearing re: motion re:
8              Defendants.       ) discovery disagreements.
   _____)

9

10                TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE JOHN F. MOULDS
11           UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13  For Coleman and Plata        AMY WHELAN
      Plaintiffs:                LISA A. ELLS
14                               Rosen, Bien & Galvan, LLP
                                 315 Montgomery Street 10th Floor
15                               San Francisco CA   94105
                                 (415) 433-6830

16  For Coleman Defendants:      MISHA D. IGRA
                                 Attorney General's Office
17                               1300 I Street, Suite 125
                                 Sacramento, CA   95814
18                               (916) 324-5388

19  For Plata Defendants:        CHARLES J. ANTONEN
                                 Attorney General's Office
20                               455 Golden Gate Avenue
                                 Suite 11000
21                               San Francisco, CA   94102
                                 (415) 703-5500

22

23  For Intervener CCPOA:        RONALD YANK
                                 Carroll, Burdick and McDonough
                                 44 Montgomery Street, Suite 400
24                               San Francisco, CA   94014
                                 (415) 989-5900

25

2507

ii

1   APPEARANCES (Cont.):

2   For Plata Receiver,              MARTIN H. DODD
        Robert Sillen                Futterman & Dupree, LLP
3       (Telephonically)             160 Sansome Street, 17th Floor
                                     San Francisco, CA    94104
4                                    (415) 399-3840

5   Court Recorder:                  (UNMONITORED)
                                     U.S. District Court
6                                    501 I Street, Suite 4-200
                                     Sacramento, CA    95814
7                                    (916) 930-4193

8   Transcription Service:           Petrilla Reporting &
                                         Transcription
9                                    5002 - 61st Street
                                     Sacramento, CA    95820
10                                   (916) 455-3887

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

1

1   <u>SACRAMENTO, CALIFORNIA, THURSDAY, OCTOBER 25, 2007, 11:37 A.M.</u>

2

3       THE CLERK:  Calling Civil Case 90-520-LKK, Coleman v.

4   Schwarzenegger.

5       (Pause - Court and Clerk confer.)

6       THE CLERK:  This is on for a motion regarding

7   discovery disagreements.

8       MR. ANTONEN:  Good morning, Your Honor.  Charles

9   Antonen on behalf of defendants.

10      MS. IGRA:  Misha Igra on behalf of the Coleman

11  defendants.

12      MR. ANTONEN:  I should specify the Plata defendants,

13  Your Honor.

14      MS. WHELAN:  Amy Whelan on behalf of the Coleman and

15  Plata plaintiffs.

16      MS. ELLS:  Lisa Ells on behalf of the Coleman

17  plaintiffs.

18      MR. YANK:  Ronald Yank on behalf of Intervener CCPOA.

19      THE COURT:  All right.  Before we begin this morning,

20  I -- earlier this morning I received a declaration of Martin

21  Dodd, who says he represents the receiver in Plata.  Did the

22  other party -- the other counsel in this Court receive the same

23  document?

24      MR. ANTONEN:  No, Your Honor.

25      MS. IGRA:  No, Your Honor.

2

1      MS. WHELAN:  Your Honor, I did not receive the

2  document, but I knew about it, because I spoke with Mr. Dodd

3  this morning.

4      THE COURT:  I hesitate to attempt to summarize a

5  lengthy declaration, but I think it's fair to say that his

6  indication that the -- that Mr. Sillen stands in a position of

7  supervision of medical personnel in the state prison system

8  such that he should be allowed to be present at, and

9  participate in any inspection involving contact with medical

10  employees of the CDCR.

11      What I'm raising this with you about at he moment is

12  to see whether there is any objection to Mr. Dodd being -- it

13  also says he's not able to appear.  I had my office contact him

14  to see if he would be available for a telephonic appearance

15  this morning in light of the distance between here and San

16  Francisco, which always seems to get longer whether you ask me

17  how long it takes me to get there, or whether you ask an

18  attorney how long it's going to take for him to get up here.

19      The -- but I believe he is now -- he is available,

20  and my first question is, does anyone have any objection to his

21  being allowed to appear telephonically this morning, which

22  would give him the opportunity to both hear what's going on,

23  and to say whatever he thinks needs to be said.

24      MS. WHELAN:  No.  I think it would be good for him to

25  be on the phone.

3

1          MR. YANK:  Sounds great.

2          MR. ANTONEN:  No objection, Your Honor.

3          MS. IGRA:  No objection.

4          THE COURT:  All right.  Now you can call him.

5          THE CLERK:  Okay.

6      (Pause to get Mr. Dodd on the phone.)

7          THE COURT:  Mr. Dodd, good morning.

8          MR. DODD:  Good morning, Your Honor.  Thank you for

9  arranging to have me present.

10          THE COURT:  Well, I should mention to you that I,

11  before calling you, I put the question to all counsel who are

12  here this morning, all counsel who I suspect are known to you,

13  but we have counsel for plaintiffs in Coleman and Plata,

14  counsel for CCPOA, intervener, and counsel for Plata defendants

15  and Coleman defendants, and everybody agreed that it was

16  appropriate for you to be heard in this proceeding this

17  morning.

18          MR. DODD:  All right.

19          THE COURT:  And that's exactly how far we've gotten

20  this morning.  Don't think I've been involved for 45 minutes on

21  this case.  We had another one before it.

22          What's on this morning is a hearing of a motion

23  concerning approximately five discovery disagreements.  Did

24  plaintiffs wish to be heard?

25          MS. IGRA:  Yes, Your Honor.  I also suggest is Mr.

4

1    Dodd is on the phone, maybe we should certainly cover the tour

2    issues first, because he doesn't necessarily -- some of these

3    issues don't pertain to him, the other issues that are being

4    heard today.

5         THE COURT:  Mr. Dodd, once we let you be here, I

6    think you can be here for the whole proceeding if you want.  If

7    you would prefer that we handle it in the manner counsel just

8    suggested, that's fine with me too.

9         MR. DODD:  I think that's fine.  I think there's

10   really only one issue that the receive has any particular

11   interest in, and that has to do with the scope of the tour.

12   And beyond that, I don't know that it's necessary for me to

13   participate.

14        THE COURT:  All right.  Well, why don't we get to the

15   tours first, then, and then you can decide whether to leave us,

16   or stick around.

17        MR. DODD:  All right.  Thank you.

18        MS. IGRA:  The first issue is plaintiff's expert

19   tours, which are scheduled beginning on Monday.  Defendants and

20   I spoke outside in the hallway, and we agreed that the primary

21   issue with these tours is defendant's position that plaintiff's

22   experts will not be able to speak with any counsel -- I'm

23   sorry, any employees, or any staff at the prisons during these

24   tours.

25        It's our position that the tours will not be

5

1    meaningful if we aren't able to gather basic information from
2    staff members in the units about things such as the location of
3    log books, or what types of inmates live in a particular
4    housing unit, or where medical -- or medication lines have
5    been, things like that.

6            And we also point out that any protections that
7    defendants are concerned about during that questioning will
8    already be in place during these tours because their counsel
9    will be present, and can object, or have their input during the
10   tours at any moment if they believe that questioning goes
11   astray in any way.

12           We also think that any arguments that defendants may
13   have later on about admissibility, or things like that, are
14   premature at this point, but this is discovery and that Rule 34
15   dictates that discovery be open, and that it be meaningful.  We
16   cited to one treatise in our brief which talks about how Rule
17   34 offers the broadest sweep of access, inspection,
18   examination, testing, copying, photographing of documents or
19   objects, and we think that being able to reasonably speak with
20   staff and ask questions, and gather information in that way is
21   necessary.

22           As to defendants arguments, so far what we've heard
23   primarily is that if we want to speak with staff during these
24   tours, we should serve deposition notices.  We think that
25   that's a very restrictive reading of Rule 34, and that it will

6

1    not allow us the access that we need to make --

2          THE COURT:  I should perhaps at this point mention to

3    you, counsel, I am quite familiar with the documents that have

4    been filed, and I think with the arguments of the parties.  If

5    we go into a lot of detail in setting forth the arguments,

6    we'll be --

7          MS. IGRA:  Yes, I'm done.

8          THE COURT:  -- we'll be here a long -- much longer

9    time than I want to be here, anyway.

10          MR. DODD:  Judge Moulds, this is Martin Dodd, I'm

11    having a little trouble hearing you.

12          THE COURT:  It was trouble hearing me?

13          MR. DODD:  Yes.

14          THE COURT:  Okay.  Tell me to quit leaning back in my

15    chair and sit up to the microphone, and we'll get it done.

16      (Laughter)

17          THE COURT:  Thank you.

18          MR. YANK:  Are you done?

19          MS. IGRA:  I'm done, Your Honor.

20          THE COURT:  All right.

21          MS. IGRA:  On that point.

22          MR. YANK:  All right.  You've got in front of you the

23    tours that the plaintiffs have requested, and of course, we

24    support that.

25          THE COURT:  Sir, for --

7

1          MR. YANK:  Oh, yeah.  This is Ron Yank of Carroll,
2   Burdick and McDonough on behalf of CCOPA, the intervener.  Hi,
3   Martin.

4          MR. DODD:  Hi, Ron.

5          MR. YANK:  And you also have another set of tours
6   that our team has colorfully called the secret tours, and what
7   our side is proposing is, if you will, full disclosure,
8   everybody gets to go, and everybody get to hear everybody else
9   talk.

10          So I represent bargaining unit members, the custody
11   staff, and I won't bore you with why the Court let us in this
12   case, but our people essentially live and work under the same
13   living conditions that the inmates live under for 24/7, 365,
14   and we're there a mere 2,080 hours per year.

15          We want to be present if they are interviewing our
16   members, some of whom we will be calling as witnesses.
17   Plaintiff's counsel wants to be there if they're interviewing
18   inmates who are obviously class members.

19          Flip it around.  We want to be able, and especially
20   the experts who plaintiffs have retained, to talk to doctors,
21   wardens, et cetera.  For apparently over 10 years that's been
22   going on without any objection from the state defendants.
23   Because of the three judge panel, they suddenly awakened and
24   now they're objecting to something they could live with.

25          We have a three judge panel that has set a trial date

8

1    and where I'm going on this is if we go with the circuit court

2    as opposed to the District Court cited by plaintiffs,

3    discovery -- you're going to be refereeing a ton of stuff, and

4    discovery -- I don't see how it could get done.

5         The most socially, judicially efficient way of

6    proceeding is we all tour together, if we want, and we all sit,

7    or stand and listen to one another pose questions.  This system

8    ain't broke, it's been working for over 10 years, and it ought

9    to continue.  Thanks.

10        THE COURT:  I have a question, sir.  The -- first, I

11   gather that you did not object to the inspection proceedings

12   advocated by your client -- by plaintiff's counsel for their

13   expert inspections?

14        MR. YANK:  To talk to our people, or to anybody else,

15   no, we support it.

16        THE COURT:  So, we've moved on now to what I think of

17   as Item 4, I believe.

18        MR. YANK:  Yeah.  I jumped.  I'm saying --

19        THE COURT:  No, that's fine.  But I just want to make

20   sure.  As to the plaintiff's inspections, what is being

21   proposed by plaintiffs is fine with you?

22        MR. YANK:  Yes.  I'm waving pompoms.

23        THE COURT:  Okay.  The -- I see one problem that is

24   common to both plaintiff's proposed inspections and the

25   problems raised by the defendant's inspections, and that that

9

1    is with three different sets of lawyers claiming to protect

2    three different sets of people, it occurs to me we could end up

3    with something akin to a legally sanctioned food fight and I

4    know that an analogous procedure -- they're not identical,

5    certainly, but an analogous procedure, which has been -- with

6    which I'm reasonably familiar, which is the Coleman tours, the

7    things seem to have been handled in a relatively civilized

8    manner for a long period of time.

9            The -- and I wondered if you had any thoughts about

10   what orders might be necessary to ensure that that continues at

11   least as to the plaintiff's tours, and perhaps as to -- I mean,

12   the plaintiff's inspections, and perhaps as to the defendant's

13   inspections as well.

14           MR. YANK:  I -- you know, you could go on, we could

15   go on for two pages trying to craft an order saying, everybody

16   play nice.  But what I recommend rather strongly as to all the

17   discovery matters before you, and all other potential discovery

18   is -- and I know it's tough, and I'm asking something of the

19   Court, but that you, the Court, delegate somebody and a

20   telephone number where essentially we can call in if there's a

21   problem, whether it's on exchange of interrogatories, or

22   whatnot.

23           It's very kind of the Court to agree to this quick

24   hearing that, you know, both sides asked for, or all three

25   parties asked for, but I'm staring at, I don't know, an inch

1  and a quarter's worth of paper.  I've seen, you know, shorter

2  motions for summary judgment which contain a lot of he said/she

3  said stuff, and I just think if we're not playing nice

4  together, and we need a temporary referee for all of this

5  stuff, I think it would be better if the Court somehow were

6  available by phone.

7       My own take and suggestion, and I would hope --

8  certainly our arrival on the scene is not going to set off the

9  food fight.  It just won't.  And I just think you ought to take

10  a shot with the one-liner that the parties should continue the

11  kind of professional interaction, and not that they have

12  historically in conducting these tours.

13       Again, you know, none of the -- there's no transcript

14  of any of this.  This is so the experts can have some factual

15  basis on which to give an opinion.  Thank you.

16       THE COURT:  I do have one other question for -- on

17  the plaintiff's inspections.  When you're talking about

18  conversations with medical personnel, are you talking about

19  questions that would be asked by the expert, or are you talking

20  about the right to interrogate, or interview, call it what you

21  will, medical personnel regarding the substance of the case?

22       MS. IGRA:  Your Honor, this relates also to what I

23  was going to say in response to your first question, which is

24  how do we maintain order on these tours, and I think the main

25  thing to keep in mind is that the tours really are for the

1 | experts.

2 | I would think that counsel, of course, are there to

3 | observe and to be reasonably informed about where people go,

4 | and will have input into that. But certainly there is not

5 | going to be interrogations by counsel, it's not something like

6 | a deposition, it's no statements that people make are under

7 | oath, or sworn in any way.

8 | Really, the questions are going to relate to the

9 | functioning of the prison where you have basic facts, where are

10 | things located, how does this work, who are these people, what

11 | do you use these spaces for?

12 | So, I would think that if there's a signal from the

13 | Court that these tours should proceed, and should be open, that

14 | counsel will be respectful of that, and will not in any way try

15 | and unduly interfere with that process.

16 | But I do also agree with Mr. Yank's suggestion that a

17 | discovery referee may be a good option -- not even necessarily

18 | for the tours themselves, but because I think given the very

19 | expedited schedule in this case, these issues are going to

20 | repeatedly come up. There have been additional sets of written

21 | discovery served by both parties, and on the intervener

22 | recently, and it may be a good idea generally to have somebody

23 | available who we can go to and seek guidance from on a more

24 | informal basis.

25 | THE COURT: Thank you. Defense counsel has been very

1    patient.  It's your turn.

2         MR. ANTONEN:  Thank you, Your Honor.  I want to say

3    up front, these are sight inspections, not tours, under Rule

4    34.  I --

5         THE COURT:  I think you will notice that they have

6    been described one way by the Court, and they've been -- the

7    other word's been used by the plaintiff's counsel, although I'm

8    quite aware of the tours that have occurred, and the fact that

9    they seem not -- they seem to have been of assistance to the

10   Court rather than a problem.

11        MR. ANTONEN:  Understood, Your Honor.

12        THE COURT:  Okay.

13        MR. ANTONEN:  The -- also I'd like to clarify is that

14   if it was mistaken in the papers, defendants do not exert

15   custody or control over medical staff.  Those individuals

16   report directly to the receiver.

17        And so our objections of plaintiff's interviewing

18   people on these tours relate to CDCR employed staff, such as

19   the wardens, associate wardens that continue to report to

20   Secretary Tilton, medical staff report to the receiver, and to

21   the extent our objection may have been interpreted to apply to

22   medical, we apologize, but that is the receiver's choice, and I

23   will defer to Mr. Dodd as to the receiver's position on that.

24        Your Honor, the sight inspection -- well, plaintiffs

25   seem to -- there seems to be two different issues that they

1   want to -- that kind of get jumbled in the mix, is informally

2   chatting with people in a hallway, versus formal interviews of

3   60 to 30 minutes in a room being questioned by the experts and

4   the plaintiff's attorney.

5        Rule 34 envisions them looking, smelling, touching,

6   not asking questions.  That's -- to the extent they want to

7   informally chat with people in the hallway, and if the people

8   have the opportunity to say I really would not like to chat

9   with you, I'm under --

10       THE COURT:  I've got to tell you, counsel, I can't

11   imagine anything I'd like better than getting a long distance

12   call from five mad attorneys saying, we can't agree whether

13   this -- what just happened was an informal chat, or an

14   interview, would you please make a ruling.  It ain't going to

15   work.

16       MR. ANTONEN:  I understand, Your Honor.  But the

17   problem posed by plaintiff's requests are -- is that they -- a

18   site inspection is you come and look at the land, you

19   want -- you wander around and see what's there.

20       These interviews, it's a hybrid in that they

21   make -- they appear to make us -- make defendants, to the

22   extent possible, make the warden and associate warden available

23   for an hour on these tours.

24       We've been working cooperatively with plaintiffs to

25   set up these tours, because we understand the discovery

14

1    schedule is expected.

2          THE COURT:   You were talking about the site

3    inspections?

4          MR. ANTONEN:   I'm -- inspections.   I apologize, Your

5    Honor.   I get -- the site inspections.

6          And several of these people listed are not available

7    at these institutions, and to the extent if plaintiffs had

8    brought a deposition, we could have met and conferred on when

9    these individuals would have been available to be deposed.

10   However, this is a site inspection, and to the extent the

11   receiver's office is willing to make their staff available to

12   be interviewed during the site inspection, that's one thing.

13         However, we can't -- we don't know who -- these tours

14   or inspections were done on such a shortened time frame that

15   it's -- I -- what I'm concerned about is plaintiffs will come

16   back and say we want you to inspect again because you didn't

17   have the requisite staff that we wanted to interview available.

18         And while, you know, the -- you could get a call from

19   five attorneys saying, was that an informal chat, or an

20   interview, you also will probably get the same motion as these

21   individuals, we're not available to be interviewed while we did

22   our site inspection.

23         There also is a couple concerns that I'd like to

24   address separate is -- I believe the Court has already done

25   this with how Mr. Yank had complainted the two plaintiffs going

1    on defendant's expert's site inspections.  I'd like to address

2    that at a later time, if that's okay with Your Honor.

3              THE COURT:  Today?

4              MR. ANTONEN:  Yes, today.

5              And the thing is the -- we all understand we're

6    operating under very strict time lines.  Plaintiffs asked for

7    these time lines, and we understand that there's a lot of

8    discovery.  At the initial part of this, defendants asked

9    plaintiff's counsel to agree to a discovery plan that would be

10   entered by this Court so that there would be set parameters as

11   to when inspections would take place, depositions, the amount

12   of interrogatories, the amount of discovery that would happen.

13             Plaintiffs said no.  And so, to the extent we're

14   operating under the Federal Rules of Civil Procedure, the

15   Federal Rules of Civil Procedure apply.

16             And the distinctions I would like to make between the

17   Coleman tours, and the present site inspections are, is that

18   plaintiffs ask on the site inspections to be able to take

19   multiple trips throughout the institution to break -- to not

20   stay on one inspection, and not to have two simultaneous

21   inspections going on at the same time.  I understand that is

22   not permitted in Coleman.

23             We've also -- plaintiffs have also indicated on the

24   site inspection there will be at least -- at least two lawyers

25   for Coleman, two lawyers for Plata, and up to four lawyers from

1   CCPOA.

2        On the Coleman tours, there's only one lawyer

3   permitted from Plata, one lawyer permitted from Coleman.

4        Additionally, the interviews conducted on the Coleman

5   tour are done by disinterested court monitors.  The interviews,

6   according to plaintiffs, will be done by interested court

7   experts.

8        And so, you know, I'm not going to go into our

9   briefs, but we believe the Belcher case is directly on point,

10  is that plaintiffs have not narrowly tailored what the site

11  inspection they want to fit within the definition of Morales,

12  is that they would like to wander around the prisons and chat

13  with people.  To do that, you have to bring a deposition.

14       And finally, Your Honor, the admissibility issues

15  that plaintiffs bring up now is that in the proposed order,

16  plaintiffs had added in paragraph 13 that any objections to

17  plaintiff's impending expert tours, or as I would say, site

18  inspections, not raised in the joint statements are deemed

19  waived.

20       It's the statement by plaintiff's counsel that we

21  could raise them at a later time, but I'd like to point that

22  out in the proposed order, Your Honor, because we believe our

23  objections to the site inspection are proper, that the

24  inclusion of this in the proposed order is not warranted, and

25  it raises a further issue down the road with respect to the

17

1    expert reports that we will be getting from these individuals

2    as to the unsubstantiated hearsay that they will be obtaining

3    from various individuals as to whether the report is ultimately

4    admissible, because the conclusions rest on improper evidence,

5    and so --

6        THE COURT:  Counsel, I trust you're aware of the fact

7    the Federal Rules of Evidence specifically provide that a

8    proper expert may base an opinion upon hearsay to the extent

9    it's appropriate to the field in which he is testifying?

10   That's one of the problems with your Fourth Circuit case.  The

11   other was it wasn't on point with this case, and probably -- I

12   hate to say this about a Circuit Court, but I think it's

13   possible to conclude it's just wrong, but I wasn't there at the

14   time.

15       MR. ANTONEN:  Okay.  Your Honor, I stand -- I'd have

16   to investigate the hearsay.  You know, I believe that

17   there's -- what I'm concerned about is that we're going to get

18   into motions in limine, and that we will be arguing based on

19   the improper site inspections that will taint the entire

20   report, whether it's hearsay, or another objection, I need to

21   think it through, Your Honor.

22       This kind of -- it popped up to me this morning, and

23   I'm not thinking about motions in limine at this point.  But

24   it's a concern I have going on in the future on this.  But we

25   believe that the Morales case is also not on point, Your Honor,

18

1    just because it was a very unique order, and the tours were

2    very tight -- well, the site inspection request was very

3    narrowly tailored, and in this case, the site inspection

4    request is not.

5            THE COURT:  I must admit I'm having some trouble

6    imagining whether you're simply asking that all the site

7    inspections be canceled, or what it is you want.

8            MR. ANTONEN:  Well, Your Honor, we would ask for site

9    inspections.  We have repeatedly told plaintiffs that we will

10   provide site inspections in accordance with the Federal Rules

11   of Civil Procedure.

12           THE COURT:  Thank you.

13           MR. ANTONEN:  And the -- to the extent they can take

14   the interviews -- from the hour long interviews at the

15   beginning and end of each tour, and they would like to -- and

16   site inspection, and conduct the site inspection of walking

17   around the institutions.  Defendants have made the institutions

18   available, we've coordinated the staff to do these things.

19           THE COURT:  Well, there are records kept at these

20   institutions, aren't there?

21           MR. ANTONEN:  Correct, Your Honor.

22           THE COURT:  All right.  Now, how are they going to

23   find out where the records are kept, how did they look at them,

24   and how does the expert know what on earth they're looking at?

25           MR. ANTONEN:  The records are obtainable -- well,

19

1   Your Honor, I was trying to -- before the hearing, I tried to

2   focus with Ms. Whelan as to what the issues are that we have

3   with the request for inspection.  It really is the interviews.

4        To the extent plaintiffs want to review unit health

5   records, we will make them available as much as we can.  To the

6   extent they want to meet with their client class, we'll make

7   that available.

8        However, we've repeatedly informed plaintiffs that

9   this is creating an incredible burden on defendants.  As CCPOA

10  can readily appreciate, prisons are understaffed, and we're

11  making the litigation coordinators available, and we're trying

12  to make it work so that they get a site inspection within the

13  meaning of the rules.

14       However, if we're looking at the big picture issue,

15  is that it is the interviews that we have the issue with.  To

16  the extent plaintiffs would like the UHR's, they can also do a

17  request for production to defendants as well, and we could try

18  to expedite that.

19            THE COURT:  A what?

20            MR. ANTONEN:  A request for production of documents.

21            THE COURT:  No, what was the UHR?

22            MR. ANTONEN:  The unit health records, Your Honor.

23            THE COURT:  Thank you.  Okay.

24            MS. IGRA:  Your Honor, could I just respond to one

25  point?

1          THE COURT:  Yes, you may.  I would caution you all,

2     though, we're spending way more time --

3          MS. IGRA:  Yeah, we should move on, but --

4          MR. DODD:  And excuse me, but I would like to have a

5     few moments to let the Court know why I'm on the line.

6          THE COURT:  Thank you, sir.

7          MS. IGRA:  Yes, Your Honor.  Thank you.  I appreciate

8     the Court's cognizance that this is not a monitoring tour.  I

9     would like to point out that monitoring tours are ongoing.  We

10    have an exit call for San Quentin today, and on Monday we start

11    in at Sac.  So our prisons are being visited by the monitors,

12    and by plaintiff's counsel, and by the experts, all

13    simultaneously.

14          And so what's happening is these 10 tours will

15    certainly disrupt the running of the prison, but to also have

16    these inspections distract staff from their duties, we're also

17    concerned about that.

18          With regard to Rule 34, certainly plaintiffs are

19    entitled to broad inspections, they can measure, they can

20    photograph.  They can review information on site, but we're

21    concerned that they don't interview defendant's agents where

22    defendants haven't had any ability to speak with these people.

23    We're unsure who they want to talk to, so we can't tell them

24    that you might be approached by attorneys and experts.  We

25    don't have -- nobody has identified just who will be expected

1    to speak with them.

2          In addition, during the Coleman tours, the monitors,

3    and the attorneys, the one attorney from Coleman, and the one

4    attorney from defendant's side, they don't stray from the

5    beaten path.  They stay together, and they don't step through a

6    door and informally interview someone, and we're concerned that

7    that may happen as well.

8          THE COURT:  All right.  I think you're covering

9    ground that your co-counsel covered, and it's covered in the

10   material.

11         MS. IGRA:  Thank you, Your Honor.

12         THE COURT:  Yes.  Thank you.  Mr. Dodd?

13         MR. DODD:  Yes.  Thank you, Your Honor.  And I want

14   to emphasize that what I'm about to speak about is a very

15   narrow piece of this issue.

16         THE COURT:  I'll forgive you for that.

17         MR. DODD:  The receiver has taken the position from

18   the beginning that he has no objection to counsel, or the

19   experts, I should say, from the expert coming in and talking

20   with medical staff on these site inspections, and in fact, when

21   the original inspection demand showed up, there were about four

22   prisons involved, and we very quickly undertook to find

23   somebody who could attend those inspections.

24         They've now morphed into about 10 different

25   inspections, some of which are identified as primarily Coleman,

1    some of which are identified as primarily Plata, some a

2    combination of the two.

3         What we're concerned about is that we want to have a

4    representative of the receiver present when those discussions

5    with medical staff are taking place, and don't want to have

6    them take place without a representative of the receiver there.

7         We are undertaking to try to see if we can have

8    somebody available at all of these prisons, but we had

9    anticipated that because some where about Coleman, not Plata,

10   that we didn't necessarily have to be concerned about that.

11   Now it appears that maybe we do have to be concerned about

12   that.   So there's the logistical problem that we may have, just

13   at the last minute to sort of have to try to find somebody else

14   to go cover these inspections, the additional ones.

15        Thee's a second related problem, and that is that

16   initially when the first demand was made, there was going to be

17   understood there would be one expert attending these

18   inspections.

19        Now it appears that at least at some of the prisons

20   there will be two experts, and so we're concerned that while

21   medical personnel A is being talked to by one expert, that

22   another expert's going to go off to talk to somebody else, and

23   if we only have one representative there, then that sort of

24   violates the agreement that I thought we had worked out with

25   the plaintiff's counsel that, you know, we had no objection to

23

1    any of the interviews, as long as the receiver's representative

2    was there and could listen in, and take notes on what questions

3    were asked.

4         All we want to do is just make sure that if

5    statements that are made, or factual statements, things that

6    personnel may comment on, that we at least know what those are

7    so that if necessary we need to weigh in at some point about

8    the accuracy or inaccuracy of those statements that we had

9    someone there listening.

10         I don't think that plaintiff's counsel has an

11   underlying objection to our presence, and not, you know,

12   talking to people without our presence.

13         But because there now appears that we may need to

14   have somebody at the prisons we didn't anticipate, it just may

15   create a problem, and we'll try to see if we can get somebody

16   there, but I must insist that if anybody's going to be talking

17   to medical personnel, we just want to not -- we don't want that

18   to happen without a receiver's representative there.

19         That's the sum and substance of the, I think rather

20   small dispute between us and plaintiff's counsel.

21         THE COURT:  Since I hear your feet headed for the

22   door --

23         MR. DODD:  No, I may stick around to listen in about

24   this issue with the defendant's inspection as well, because --

25         THE COURT:  That's exactly what I'm concerned about.

24

1        MR. DODD:  All right.

2        THE COURT:  Because I gather defendants are taking

3   the position that since they own the store, they can look on

4   the shelf to see what's there.

5        MR. DODD:  Right.  Our position -- the receiver has

6   from the get-go in this proceeding has said, listen, we'll

7   cooperate with everybody, but we want to make sure that

8   everybody, you know, if we're cooperating, or with one side,

9   that the other side knows about it, then has the opportunity to

10  cooperate -- will cooperate with them as well.

11       So, our position would be the same.  If some expert

12  wants to interview medical staff from either side, then we want

13  somebody there.

14       THE COURT:  Is that a problem?

15       MS. WHELAN:  Your Honor, it's not a problem with a

16  reservation, if I could just comment on it.  But first, can I

17  just clarify the record, which might explain something, which

18  is that originally we were working with defendant's counsel and

19  these tours were spread out over a two-week period in

20  recognition that our expert tour report deadline is coming up

21  on November 9th.

22       At defendant's request, we scheduled all of the tours

23  instead during a one week period, and we had a conversation

24  during a meet and confer where they asked us to do that, and we

25  said okay, we can stick to that one week if we can do multiple

25

1    tours.  Is that okay?  Yes, that's okay.

2         So we recognize that it's a burden to the receiver's

3    office, it's certainly a burden to defendants and their staff,

4    but it's done in recognition of the justifiably expedited

5    schedule in this case which is based on urgent issues.  So I

6    just wanted to clarify that it was done during a meet and

7    confer, and as a result of that.

8         As for the --

9         THE COURT:  Well, how are you going to fix it is my

10   concern?

11        MS. WHELAN:  Well, as for the receiver, there are two

12   issues with the receiver.  First, there are some tours that

13   were noticed as Coleman tours that the receiver has not yet

14   determined whether or not he can staff it.

15        THE COURT:  Excuse me.  Are you talking about tours

16   taken under the auspices of the Coleman Special Master or are

17   you talking about tours that are also called site inspections

18   that are being done in the context of this case?

19        MS. WHELAN:  Yes.  I'm not talking about the

20   regularly scheduled Coleman tours, which I understand the

21   receiver does not attend those tours, and I don't think ever

22   has attended those tours.  I'm talking about the noticed tours

23   in this case.

24        As to the tours where Mr. Dodd knows that the

25   representative will be present, we agree that if the experts

1    decide that they need to split up at any moment, that they will

2    not question any medical staff outside the presence of that

3    person.

4            The real problem that we have is that there are some

5    tours where we don't know if there will be a receiver

6    representative at all.  And so for those tours, we would like

7    to continue to work with the receiver's office about how to

8    come to an agreement about how questioning will occur.

9            THE COURT:  That's fine, except at some point, when

10   the case gets to me, when there's unavailability and no

11   solution forthcoming, how are you going to tell me that so we

12   can do what we need to -- whatever might need to be done to fix

13   it?

14           MR. DODD:  If I may, Your Honor.  I mean, I have

15   spoken with the receiver's office to see if we can, in fact,

16   staff these additional site inspections that we hadn't

17   anticipated having to staff, and you know, if we can, then

18   there ought not to be a problem, because what I'm hearing

19   plaintiff's counsel say is that under the agreement that we had

20   reached, which is they won't talk to anybody without the

21   receiver's representative there.

22           The real issue is that if we're just simply unable on

23   such short notice to have somebody travel to, you know,

24   whatever prison to be there, and that, I think, is the concern.

25   Had we ben asked about these tours, or site inspections, you

27

1   know, in advance, we might have had more -- we certainly would

2   have had more opportunity to sort of plan for this, but it's

3   come up at the last minute, and there is this problem.  But

4   I -- you know.

5         And so we're trying to see if we can get somebody

6   there.  We're making efforts to do that, but we just don't know

7   yet whether, in fact, someone will be able to be at all of

8   them.

9         THE COURT:  All right.  I want you all to do your

10  best to fix this.  I am not particularly shocked that we're

11  having a problem like this.  Mr. Yank, you are not the only one

12  who is aware of the fact that there's a fairly early trial date

13  and a lot being done at the last minute.  I can assure you I

14  didn't keep this job for 25 years by not paying attention to

15  district and circuit judge's trial dates.

16        So -- but this type of confusion is the kind of thing

17  that's likely to happen at this time in a case when we're

18  moving in a hurry.

19        I'm -- Mr. Dodd, I'm going to ask you to do your best

20  to work this out with plaintiff's counsel.  If you can, great;

21  and if you can't, please contact -- I kind of want both of you

22  to contact my office and set up a telephone conversation and

23  we'll figure out something to do.

24        MR. DODD:  All right.  That's fine.

25        THE COURT:  All right.  Thank you for your appearance

1  today, and thank you for appearing as the 500 pound gorilla,

2  and at least talking to us very nicely.

3       MR. DODD:  All right.  Well, thank you.  And if you

4  need to speak with me any further, I will be around, so

5  simply -- you know, you can call the -- our main number, which

6  is 415-399-3840 and have somebody find me.

7       THE COURT:  Yep.  I have all your data on the upper

8  left-hand corner of the documents you filed.

9       MR. DODD:  All right.  And then hopefully I would be

10  able to get back to plaintiff's counsel later on today, or

11  tomorrow perhaps with an answer as to all of this.

12      THE COURT:  Well, you may want to stay for a moment,

13  I don't know.

14      MR. DODD:  Okay.

15      THE COURT:  But I want to hear from defendants.

16      MR. DODD:  Ah.

17      THE COURT:  Because I'm worried about their expert

18  inspections.

19      MR. DODD:  Okay.

20      THE COURT:  And whether you really want a -- the

21  power to proceed in secret to do this, or whether it's going to

22  be performed in a manner comparable to what the plaintiffs are

23  proposing for their expert inspection.

24      MR. ANTONEN:  Your Honor, I believe our briefing as

25  to -- I understand we're laboring under shortened time, I think

29

1    our briefing sets out our position, is that there is nothing in

2    the Federal Rules of Civil Procedure that requires defendants

3    to notify plaintiffs that we will be conducing site inspections

4    at our own facilities.

5           However, we will, in accordance with the agreement

6    with the receiver, notify the receiver that we will be -- if we

7    endeavor to interview medical staff --

8           THE COURT:  Sir, if your position is only that

9    there's nothing to authorize it, I would ask you if you found

10   anything that said that I can't order you to perform your site

11   inspections for experts who intend to testify at trial in this

12   case to proceed in the presence of all parties.

13          MR. ANTONEN:  It's hard to disprove a negative, Your

14   Honor.  I --

15          THE COURT:  Well, no, I -- I'm not talking about a

16   negative.  I'm talking about something that says affirmatively,

17   I can't do it, because if --

18          MR. ANTONEN:  We have not come across any --

19          THE COURT:  I have to tell you it strikes me that it

20   makes all the sense in the world so that you don't start your

21   depositions of experts saying, well, you know, what day did you

22   go to this prison, what did you look at, how many halls did you

23   walk down?

24          Material that I trust counsel will know if they've

25   been present, just as you will know if you've been present at

1    their site inspections, or their expert's site inspections,

2    which I suspect you would think would be an advantage in

3    conducting an expert deposition.  But I can't see why an

4    advantage in that area is going to do any good for you in the

5    other -- in your site inspections, other than make them longer

6    and make the depositions later taken much more torturous.

7         MR. ANTONEN:  Your Honor, the -- in my years of

8    private practice, in site inspections of this kind, they never

9    notified plaintiff's counsel.  I understand plaintiffs have

10   provided authority in the briefs as to why they should be

11   permitted to attend, however, those inspections dealing with

12   destroying evidence, testing evidence and that it made sense in

13   those circumstances to have both counsel present.

14        In these circumstances, we don't feel it's warranted,

15   and does my co-counsel have any comments?

16        MS. IGRA:  Well, Your Honor, if an expert happens to

17   be an employee, they certainly can go to their place of

18   business, and again, my experience is from private practice.

19   If you'd like to come to my client's business, you can

20   certainly come to my client's business, but you can't keep him

21   out of the store, as you put it, my client can see what's on

22   their shelves.

23        THE COURT:  I understand that.  But I must admit, I

24   cannot imagine why it is any burden to you to proceed in a

25   manner similar to the way the plaintiffs are proceeding.  He

1 | may have experts who are already in place that at least you
2 | will proffer as evidence, as experts at trial.
3 |         MR. ANTONEN:  Your Honor --
4 |         THE COURT:  But I don't see why it's not a net gain
5 | for everybody in this matter if you proceed in the parallel
6 | procedure.  That's disregarding the fact that the person who
7 | really worries me in this is Mr. Yank, because he's probably
8 | going to tell me that he has more -- a clearer right to be
9 | present when you're talking to members of his organization in a
10 | litigation context than plaintiffs do in these circumstances.
11 | But I think this accomplishes it for everybody.
12 |         MR. ANTONEN:  The other concern that's raised, Your
13 | Honor --
14 |         THE COURT:  By the way, I didn't mean to be putting
15 | words in your mouth on that one.
16 |         MR. YANK:  I'm happy to be the bad guy, Your Honor.
17 |         THE COURT:  What?
18 |         MR. ANTONEN:  The -- and part of the site
19 | inspections, plaintiffs do request confidential meetings with
20 | their clients throughout this, and request defense counsel be
21 | excluded.
22 |         To the extent plaintiffs are allowed to come on
23 | defense counsel's expert tours and review communications
24 | between defense counsel and our client, we feel that that's --
25 | you can't have it both ways.

32

1          THE COURT:  Counsel?

2          MS. WHELAN:  Your Honor, we have a right to speak

3    with our clients, and what we have done is we've --

4          THE COURT:  No, I understand why you're -- you have a

5    right which you're asserting, but I'm wondering whether

6    you're -- whether you think that in this case sauce that --

7    what's sauce for the goose is sauce for the gander.

8          Are you willing to allow them to confer with persons

9    who are not members of the medical staff, but members of CDCR

10   staff during their site inspections if otherwise you're there

11   to be present for the expert tour?

12         MS. WHELAN:  Yes, we -- I think we're talking about

13   two different things.  First is while people are touring

14   around, going into housing units, we have no objection to

15   experts talking to our clients with defendant's counsel there

16   listening in.

17         Thee's a separate thing that we've requested, which

18   is interviews with our clients, and reviews of their files also

19   while we're there.

20         So we have no objection to defendants being there as

21   the entire group is moving around going from housing unit to

22   housing unit.  Somebody might say, you know, sir, you live in

23   here, can you tell me how this works, how this happens?  We

24   have no objection to that.

25         MR. YANK:  Do I understand that defense counsel is

33

1    raising the hypothetical that while there's an expert tour of

2    their experts, defense experts, counsel might want to talk with

3    the assistant warden privately?  We don't have -- at least

4    CCPOA has no problem with that.

5         MS. WHELAN:  No.  If they want us to have a private

6    aside with somebody who is their client, then we are not going

7    to insist to be present during that, if it's an attorney/client

8    communication.  Experts' conversations with people are not

9    privileged.

10        THE COURT:  Anything further for the defense?

11        MR. ANTONEN:  I don't think so, Your Honor.

12        THE COURT:  Well, thank you for the clarification on

13   that.

14        Are we done with the -- well, at least with the

15   argument on the site inspections for plaintiff's experts and

16   site inspections for defense experts?

17        MR. ANTONEN:  I believe so, Your Honor.

18        THE COURT:  All right.  Thank you.  The ball is back

19   in play to this Court.

20        MS. WHELAN:  I'll move on to the rolling production

21   issue, and I don't know if Mr. Dodd might want to -- oh, I

22   guess he's left us.

23        MR. DODD:  No, I'm still here.

24        MS. WHELAN:  Oh, okay.

25        MR. DODD:  I haven't left.

34

1          THE COURT:  All right.  Mr. Dodd, anything out of

2    that that you want to be heard on?

3          MR. DODD:  No.  I'll -- I don't think so.  On the

4    additional issues here, I don't think there's much that I can

5    participate in, and then I'll underscore that I'm trying to see

6    if I can find somebody to be at these other inspections.

7    So --

8          THE COURT:  Thank you very much.  I appreciate your

9    participation today.

10          MR. DODD:  Once again, thank you, Your Honor, for

11    calling me up so quickly.

12          THE COURT:  Well --

13          MR. DODD:  I will be back in touch with everybody.

14          MR. ANTONEN:  Bye.

15          THE COURT:  All right.

16          MS. WHELAN:  I think defendants want to proceed first

17    on the rolling discovery issue, because it's their issue.

18          THE COURT:  Okay.

19          MR. ANTONEN:  Thank you, Your Honor.

20          We've raised this issue before the Court, and to

21    notify the Court that we've been undertaking great efforts to

22    respond to plaintiff's discovery.  We have consistently

23    informed plaintiff that we are moving this as fast as we can,

24    because we understand that there's a quick trial date in this.

25          We've retained an e-discovery vendor and we are --

35

1          THE COURT:  I have read your material too, sir.

2          MR. ANTONEN:  I know.  I understand, Your Honor.

3          And we've brought a representative from our e-

4    discovery vendor here today to answer any questions you may

5    have about the process because it's -- there's multiple steps

6    that are involved, and it's not as -- it's not the typical

7    discovery when I started practicing where you have a couple of

8    file cabinets, you can review them in a couple of hours and be

9    ready to go, is that we've imaged 80 peoples' computers, you

10   know, there's -- if you had boxes stacked up 7.2 miles tall.

11   You know, we're moving as quick as we can.

12          All we're asking is, is that we can -- we have until

13   November 1st in accordance with plaintiff's proposed order to

14   come up with a concrete schedule for when we're going to do the

15   rolling production.

16          We've tried to meet and confer with plaintiffs on

17   this issue to prioritize.  Plaintiffs have given us six names

18   of individuals they would like deposed.  We have moved those

19   individuals to the front of the list, and we are going to start

20   reviewing their documents as soon as possible.

21          THE COURT:  I don't understand something about this.

22          MR. ANTONEN:  All right.

23          THE COURT:  You've imaged the computers.  I assume

24   that means you have taken the data in that computer and reduced

25   it to a disk.

1        MR. ANTONEN:  Correct, Your Honor.

2        THE COURT:  Okay.  Why don't you give them the disk?

3        MR. ANTONEN:  Your Honor, there is -- it needs to be

4   index, searched and reviewed in that these individuals -- it

5   took a complete picture of their hard drive, and so there is

6   documents that are not relevant to plaintiff's discovery

7   request.  There's highly privileged information on those

8   computers that need to be reviewed by attorneys and processed

9   so that it's in usable form.

10       THE COURT:  And you'll tell them by November 1st when

11  you can get around to it?

12       MR. ANTONEN:  No, Your Honor, we are continuing --

13  it's a rolling production.  It's that we -- our discovery

14  responses are due today.  We are responding to plaintiff's

15  discovery.  The documents as plaintiffs point out in their

16  papers are late, they're not late, Your Honor.  Today is the

17  response date, and we are producing documents to plaintiffs.

18  We will continue to be producing documents to plaintiffs.

19       What we will be producing on November 1st is a

20  schedule of those productions so that the plaintiffs understand

21  what they will be receiving by such a date.  If plaintiffs

22  would like things moved up, certain -- say if they were

23  interested in remedial, the re-entry beds over in-fill beds, we

24  can prioritizes individuals who would have relevant information

25  about re-entry beds in the review process, so plaintiffs will

1   receive them before anyone about in-fill.

2          If plaintiffs are interested in seeing documents from

3   Department of Finance instead of Department of Mental Health

4   First, we're willing to move them around in the review process

5   because the documents themselves will be ready to be reviewed

6   by next, I believe, Friday, and that we will -- attorneys will

7   finally be able to start clicking through them to review what

8   is privileged, what is responsive.

9          And we're -- what we're looking at is just the review

10  cycle as to how do -- we understand we have a December 20th

11  discovery cutoff.  We will be producing documents up to

12  December 20th.

13         We have, again, seven -- you know, seven miles tall

14  of boxes of paper if we printed it all out, and so -- but we

15  want to -- we understand plaintiff's -- we're working under

16  very tight time constraints, and so we want to be as open, and

17  as transparent, and as helpful, frankly, to make sure that they

18  get what they need, but recognizing the tremendous burdens that

19  we're also operating under as well.

20         MS. WHELAN:  Your Honor, we do not object to a

21  rolling production in theory, but they have asked us to agree

22  to a rolling production that has no details at all.  They have

23  not told us when they will produce the first document to us,

24  they have not told us when they will produce the last document

25  to us.  They have not told us -- one thing we asked for in our

38

1   proposed order, at the very least, is that we at least be

2   provided with a concrete schedule for production by November

3   1st.   That at least will then allow us to be able to figure out

4   if that schedule is going to work, given the deadline sin this

5   case.

6            We know that they have imaged 80 peoples' computers.

7   We have repeatedly asked them if they would tell us who those

8   people are so that we can sit down with them together and

9   prioritize those people together so that the rolling production

10  is done in a way that both parties agree.

11           They refuse to tell us those people.   They state that

12  they are going to expedite six people who we stated.   The six

13  people that we specified happened during an informal

14  conversation about people who we are thinking -- who we were

15  thinking at that point we might depose.

16           They know whose computers they have imaged.   It's not

17  some secret.   We will find out whose computers they've imaged

18  at the time that they give us documents.   So all we are

19  proposing is that they give us that information so that the

20  parties can sit down, come up with a priority together, and

21  come up with a rolling schedule together that make sense in

22  light of the deadlines in this case.

23           MR. ANTONEN:   Your Honor, the hesitation on providing

24  the lists is based on this, is that under Rule 26(f), normally

25  in these cases for e-discovery you get an initial meet and

39

1    confer where you can set out a joint discovery plan as to whose

2    computers are going to be imaged, what the roll-out schedule is

3    going to be, how it's going to be conducted.

4         We asked plaintiffs to do a meet and confer, or to do

5    a Rule 26(f) conference before you before all this started.

6    Plaintiffs said no.

7         THE COURT:  So you're doing this to get back at them?

8         MR. ANTONEN:  No, Your Honor.  What we're doing is

9    we're operating as best as we can.  How we picked the

10   individuals is that those individuals had documents responsive

11   to plaintiff's discovery requests, and some of the individuals

12   may have -- may turn out not to have responsive documents, or

13   may turn out to only have privileged documents.  And so, it's

14   prejudicial to turn the lists over to them.  However, Your

15   Honor --

16        THE COURT:  Well, sir, what's prejudicial about that?

17   If you assert a privilege, you're going to have to give them a

18   privilege list, and when that happens, you'll be giving the

19   same names of the same people.

20        MR. ANTONEN:  Correct, Your Honor.  The hesitation we

21   have is we've tried at the outset recognizing the tight time

22   lines to try to organize this, and so we've asked plaintiffs,

23   even though we're not willing to give you the list, could you

24   specify the discovery responses you would like prioritized,

25   because we can do it that way as well.

1      THE COURT:  Sir, my problem is this, and I -- if I

2 understand you correctly, you got thrown in to today's hearing

3 with less than a lot of notice, so I'm not completely surprised

4 that you're having some difficulty getting up to speed.

5      But what is the reason -- what reason is there for

6 not giving them the information concerning the people involved?

7      The other possibility is you might have missed

8 somebody, and they might be able to tell you who you've missed.

9      MR. ANTONEN:  Your Honor, we -- we hesitate providing

10 the list of plaintiffs.  We're willing to provide it to the

11 Court for review in camera if you're concerned that we're

12 not -- if we pick low-level people, Your Honor.  We picked the

13 people that we felt had the most highly relevant responsive

14 documents, and so we're -- you know, we're willing to provide

15 it -- if you're concerned that defendants -- we're again, not

16 trying to be obstructionist, Your Honor, we're just trying to

17 move as quick as we can.

18      THE COURT:  Well, my concern was that it sounds as if

19 you're either acting in bad faith, or you're coming in here

20 with your heels dug into the ground and saying, try to make me

21 move, and your latest suggestion is the best way to get you to

22 move is for me to take a list of 80 people I never met and try

23 to figure out what it means, and that's going to add to the

24 time.  It's not going to speed things along.

25      MR. ANTONEN:  I understand, Your Honor.

41

1    THE COURT:  Okay.  Is there anything further on the

2  question of the production of documents?

3    MS. WHELAN:  No, Your Honor, just that we're open to

4  meeting and conferring about what the schedule will look like.

5    THE COURT:  Well, you may well want to.  I'm going to

6  give you a hint about what's going to happen in the order,

7  because it may give you an opportunity to find other ways to

8  work.  But I suppose I shouldn't be shocked that this case is

9  trying my patience at the moment, because I thought when the

10  judges asked me if I'd undertake this that it might try my

11  patience.

12    The discovery request -- excuse me, the inspection of

13  documents is to be completed by December -- by November 1st.

14  Defendants will -- by November 1st the defendants will produce

15  for inspection and copying the documents requested unless prior

16  to that date there is filed with the Court an agreement of

17  plaintiff and defendants to some other schedule for production.

18    The date for response remains October 25th, as it is

19  30 days from the order of the District Court -- excuse me, the

20  order of the three judge court.

21    The -- counsel, you said the defendants are filing

22  their responses to the discovery request today?

23    MR. ANTONEN:  Correct, Your Honor.

24    THE COURT:  A copy of that is to be filed with the

25  Court also.

1          MR. ANTONEN:  Correct, Your Honor.

2          THE COURT:  Today.

3          MR. ANTONEN:  Your Honor, in light of the ruling,

4     defendants will make available the list in meet and confer with

5     plaintiffs if that will --

6          THE COURT:  Well, I told you what the ruling is.  If

7     you guys can work it out, bless you all.

8          MR. ANTONEN:  Okay.

9          THE COURT:  Now, what else do we have left today?

10         MS. WHELAN:  Their -- I don't remember if this is our

11    issue or yours, so you can go first if it's yours.

12         MR. ANTONEN:  Okay.

13         MS. WHELAN:  We have an issue with Phase 1 and Phase

14    2 discovery, which I hope we will be able to come -- I suspect

15    we can come to agreement with each other, so I don't know how

16    much of the Court's time -- but there have been disputes about

17    whether certain requests for production and interrogatories

18    refer to the Phase 1 or Phase 2.

19         THE COURT:  Well, how much time do you folks need?

20    If you think you have a chance of resolving it, I assume that

21    means you don't want me to tell you to go out in the hallway

22    and see if you can fix it now and I'll be here for another five

23    minutes.

24         So how much time do you need?

25         MS. WHELAN:  Well, I guess I'd want to know if you

1  agree.

2        MR. ANTONEN:  Yeah.  I think we kind of -- I think

3  the positions are pretty clear, and we can, I think, resolve it

4  right now, actually, Your Honor, is that --

5        THE COURT:  You mean between yourselves or with the

6  Court?

7        MR. ANTONEN:  Oh, no, no.  With -- I think it's ripe

8  for hearing, frankly, at this point.

9        THE COURT:  Okay.

10        MR. ANTONEN:  And the --

11        THE COURT:  Now, that takes us -- does that complete

12  the tasks today?

13        MS. WHELAN:  There will be one other issue, the

14  Crawback issue we have resolved, and is no longer a party.

15        THE COURT:  You have resolved it.

16        MS. WHELAN:  Yes.

17        THE COURT:  Okay.

18        MR. ANTONEN:  Yeah.  This is the last issue, Your

19  Honor.

20        THE COURT:  Yeah.

21        MR. ANTONEN:  It deals with -- the issue involves

22  Phase 1 and Phase 2 is how the Court had defined it.  What

23  we're concerned about is that plaintiffs have through the meet

24  and confer process, informed us that they will not be

25  responding to certain discovery requests which we summarized in

1    Appendix A --

2            THE COURT:   Um-hmm.

3            MR. ANTONEN:   -- to the joint statement.   What our

4    concern is, is that these interrogatories and requests for

5    production do relate to Phase 1 and not Phase 2, and that they

6    relate to the second prong as to whether there would be any

7    less intrusive relief available.

8            The reason why they relate to the second prong is we

9    need to understand the type of relief that plaintiffs are

10   seeking to obtain from the three judge court, and in order for

11   us to be able to determine if there's lesser intrusive relief

12   available, requiring defendants to present evidence

13   demonstrating plaintiffs have not proven there is lesser

14   intrusive relief available, is difficult, if not impossible,

15   unless you know what plaintiffs are actually asking for.

16           And so, by the -- that's the crux of defendant's

17   concern.   And additionally, with a lot of these discovery

18   requests, is that they're follow-up to discovery the plaintiffs

19   have agreed are Phase 1, such as, you know, Interrogatory No. 1

20   says do you seek a prisoner release order?   If yes, please

21   state -- if response to Interrogatory No. 1 is in the

22   affirmative, please describe with specificity the prison

23   release order that plaintiffs seek in this matter.

24           We feel that these issues, plaintiff should be

25   responding to at this time, and that we have removed

45

1   from -- the other defendants acknowledge that there was

2   discovery propounded before the bifurcation order that came out

3   that asks plaintiffs, do you contend there will be no adverse

4   impact on public safety?

5         And defendants have voluntarily agreed that those

6   deal with Phase 2.  However, plaintiff -- we believe

7   plaintiff's view Phase 2 as too broadly in these respects, and

8   also, I'd like to clarify, Your Honor, that defendants are not

9   objecting to plaintiff's discovery request to the extent they

10  have applied to Phase 2.

11        Plaintiffs -- we just pointed it out that to the

12  extent plaintiffs -- it was kind of -- it's the same issue,

13  good for the goose, good for the gander.  Under plaintiff's

14  logic, we felt that they would -- that these would be

15  impermissible.

16        Apparently, it's not -- again, I want to just

17  restate, defendants will not be raising objections based on

18  these interrogatories that they relate to Phase 2 issues.  And

19  so, to the extent plaintiffs have put in the proposed order,

20  defendants shall respond.

21        You know, we feel that it's too broad, because the

22  issue dealt with does it relate to a Phase 2 issue?  Defendants

23  have never said that these relate to Phase 2 issues, is that

24  our position was under plaintiff's encapsulation of what

25  concerned Phase 3, these would also fall.

1        THE COURT:  Thank you.

2        MS. WHELAN:  Your Honor, Phase 1 is defined as

3   overcrowding is the primary cause of the -- in this case,

4   Eighth Amendment violations, and the second part of it is no

5   other relief, other than a prison release order will remedy the

6   violations.

7        To take defense counsel's example, if they're -- I

8   believe the question is, do you believe that a prison release

9   order is required?  That has been explicitly set out as a Phase

10  2 issue by the three judge court's bifurcation order.

11       And "other relief" necessarily means relief other

12  than a prison release order.  So any question --

13       THE COURT:  Is there anything -- having read the

14  statute -- often a scary project -- is there anything that

15  isn't a prison release order?

16       MS. WHELAN:  I'm not sure.  That is something that is

17  also very broad in the order.  But whether or not plaintiffs

18  contend that a prison release order is necessary, we've already

19  told defendants, well, our answer would be yes, or we wouldn't

20  be before the Court, obviously.  But the bifurcation order is

21  that certain other parties can only participate in discovery

22  about those issues in a particular phase of this litigation,

23  and those parties are not involved in Phase 1.

24       So discovery on these issues has been precluded by

25  the three judge panel in Phase 1.

47

1          THE COURT:  So I gathered from what I'm hearing from

2     both of you, that the -- excuse me if I was dense, but I

3     thought I was going to hear some discussion of the fact that

4     there had been ra proche mont [sic] on these issues.  But it

5     sounds as if you're just exactly at the same position you were

6     when this was noticed for hearing today.

7          MR. ANTONEN:  Correct, Your Honor.

8          MS. WHELAN:  It sounds like that.

9          THE COURT:  Okay.  Thank you.  The matter is

10    submitted and thank you all for an interesting morning.

11         MS. WHELAN:  Your Honor, there's one more item, which

12    is expedited responses moving forward.  This is something that

13    we asked for in light of the upcoming discovery deadline, and

14    is something that we would ask for for both sides, and we are

15    open to it not necessarily being 15 as opposed to 30, but

16    something that will expedite responses so that we can

17    streamline these issues and make sure that we're not caught up

18    still arguing about motions to compel when the discovery

19    deadline hits.

20         MR. ANTONEN:  Your Honor, defendant's concern is, is

21    that plaintiff's request does not pertain to their own

22    discovery.  Defendants have served discovery on plaintiffs that

23    are due November 4th and 6th.  The only discovery mentioned in

24    there was defendant's discovery, the discovery plaintiff's had

25    served on defendants, and additionally, defendants have already

1    just recently served additional discovery on plaintiffs.

2         And so, to the extent plaintiffs are willing to

3    equally bear the burden of expedited review, defendants are

4    willing to meet and confer on this, but if it's a one-sided

5    deal, defendants oppose.

6         THE COURT:  Well, I gather you're talking about

7    whether it should apply to previously served discovery?

8         MR. ANTONEN:  Correct, Your Honor.

9         MS. WHELAN:  Your Honor, we have discovery responses

10   due on November 5th, which is very soon, so we did not seek to

11   expedite those to 15 days, because that time has already

12   expired.

13        Defendant's discovery responses, we did seek to

14   expedite one set of pending discovery responses that defendants

15   have now that were served very recently, I believe last week.

16   We -- so we sought to expedite those and discovery responses

17   moving forward including what is now -- has since been served.

18        THE COURT:  All right.  What discovery --

19   disregarding the discovery which has a response date of today,

20   what discovery requests do you have pending from the defendant

21   which you request material from the defendants?

22        MS. WHELAN:  You mean what have they served on us

23   since then that's pending?

24        THE COURT:  I'm going to ask you that next, but --

25        MS. WHELAN:  Okay.

1          THE COURT:  -- if you want to answer that first,
2     that's fine.
3          MS. WHELAN:  I believe that they -- we received
4     requests for production and interrogatories from defendants on
5     October 4th and October 5th.
6          THE COURT:  So those are due --
7          MS. WHELAN:  So they're due on or about --
8          THE COURT:  -- October 3rd?
9          MS. WHELAN:  Well, those are the ones that I was
10    speaking of that are due on or about November 5th.  They
11    served -- we served --
12         THE COURT:  What else do you --
13         MS. WHELAN:  They served interrogatories and requests
14    for production on the Plata plaintiffs I believe this past wee
15    on Wednes -- yesterday, or Tuesday.  So those are pending.  And
16    we also served discovery on them on October 17th, which we
17    would want expedited.
18         I might be missing some.  I know they've served
19    discovery on the CCPOA since this time.
20         MR. YANK:  We support what's goose -- you know,
21    reciprocity.  We're happy to speed it up if they're speeding
22    that up, et cetera.
23         MS. WHELAN:  And Your Honor, maybe to be clear, that
24    primarily what we're asking to speed up is responses so that we
25    can quickly identify what disputes the parties are going to

1   have so we can meet and confer about them.  We understand it

2   may not be possible to speed up things like actual productions

3   of documents, but we would also meet and confer about those.

4   But primarily, what responses we are going to receive or give.

5          THE COURT:  Well, the October 17th discovery is due

6   November 16th.

7          MS. WHELAN:  That one we asked to be expedited in our

8   papers by one week.

9          THE COURT:  And that's a response that you'll be

10  making, or that defendants are making?

11         MS. WHELAN:  That's defendant's response.

12         THE COURT:  So are you only asking that one set be

13  expedited?

14         MS. WHELAN:  That was the set at the time we wrote

15  the motion that was pending.  There have since been more

16  served, so we're asking that it apply also to the one served

17  both by us and to us.

18         THE COURT:  Do you have a problem with those?

19         MR. ANTONEN:  As long as there's reciprocity for all

20  discovery outstanding, Your Honor, we understand plaintiff's

21  position.  If plaintiffs --

22         THE COURT:  Well, I must admit that that adds some

23  charm for me because when the cutoff dates were set in this

24  case, I wasn't -- I was not consulted concerning motion dates,

25  and obviously, the motion dates don't make any -- don't work at

51

1    all.

2         (Pause)

3         THE COURT:  My problem is I think I'm hearing

4    agreement from you, but I haven't got the agreement clear

5    enough.

6         MS. WHELAN:  As to the requests that were served on

7    October 17th, which were both interrogatories and requests for

8    production, we have asked that defendants expedite their

9    responses by one week.

10        THE COURT:  So --

11        MS. WHELAN:  As to all other pending discovery

12   between us, except the requests that we have to answer by

13   November 5th, we are asking that both parties expedite their

14   responses.

15        THE COURT:  And by expediting, you mean within 15

16   days from service?

17        MS. WHELAN:  Right.

18        MR. ANTONEN:  We would -- again, we feel it should

19   apply to all discovery.  We believe 15 day is too short just

20   due to the amount of document review that's going to have be

21   done with site inspections and everything else.  So we would

22   respectfully request 25, or 21 to the extent that that's the

23   other -- because I believe plaintiffs said they were willing to

24   go between 20 and 30.

25        MS. WHELAN:  Your Honor, we're just asking that the

1   baseline be changed, and we would continue to meet and confer

2   about different deviations between 15 and 30 days for all of

3   these requests.  We're just asking that the basic deadline of

4   the rules be -- that the default change.

5            THE COURT:  And you're willing to make that 21 days,

6   which has the advantage of --

7            MS. WHELAN:  You mean as the default, or just moving

8   forward?

9            THE COURT:  What's the difference?

10            MS. WHELAN:  You mean, would I agree that the default

11   could be 21 days instead of 15?  Is that what you're asking?

12            THE COURT:  Yes.

13            MS. WHELAN:  Yes, I agree.

14            THE COURT:  Okay.

15            MR. YANK:  Same here for CCPOA.

16            THE COURT:  Thank you very much.  All right.  And the

17   exception would be the October 17th date which will be November

18   9th, still.

19            MR. ANTONEN:  Which I believe is still 21 days, Your

20   Honor, correct?  Is that what --

21            MS. WHELAN:  The day we asked for I think is about 21

22   days.

23            THE COURT:  Okay.

24            MR. ANTONEN:  And Your Honor, would that impact also

25   the discovery that defendants have already served on

1   plaintiffs?  I understand the ones that are due on the 2nd and
2   the 5th may be treated differently.  However, the ones that
3   were served on plaintiff's counsel in Plata earlier this
4   week --

5            THE COURT:  Yeah.  I'm going to ask plaintiff's
6   counsel to send me a copy of the dates that apply to all
7   outstanding discovery and the dates that would apply to
8   discovery served from tomorrow onward, and you'll fax a copy,
9   or electronically transmit a copy of that to defense counsel,
10  and do the same with my chambers, and unless I hear from -- a
11  scream from defense counsel, I'll incorporate that into the
12  order.

13           Okay.  If for some reason or other, counsel, you
14  believe that that's not been properly worded, then get me an
15  order.

16           And Mr. Yank, if you want to -- if you're getting
17  brutalized in some way I don't know, let me know.

18           MR. YANK:  We're good.

19           THE COURT:  All right.  Anything further?

20           MS. WHELAN:  That's all, Your Honor.

21           MR. ANTONEN:  No, Your Honor.

22           MS. IGRA:  No, Your Honor.

23           THE COURT:  I thank you for that 40-minute hearing.

24      (Laughter)

25      (Whereupon the hearing in the above-entitled matter was

54

1    adjourned at 12:59 p.m.)

2                            --o0o--

3                          CERTIFICATE

4        I certify that the foregoing is a correct transcript, to

5    from the electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8    *Patricia A Petrilla*                    November 6, 2007

9    Patricia A. Petrilla, Transcriber

10   AAERT CERT*D-113

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25