PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
AMY WHELAN Bar No.: 215675
LORI RIFKIN Bar No.: 244081
SARAH M. LAUBACH Bar No.: 240526
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY–
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> Defendants | No.: Civ S 90-0520 LKK-JFM P <br><br> **THREE-JUDGE COURT** |
| MARCIANO PLATA, et al., <br><br> Plaintiffs, <br> vs. <br> ARNOLD SCHWARZENEGGER, et al., <br> vs. <br> Defendants | No. C01-1351 TEH <br><br> **DECLARATION OF JAMES LONG IN SUPPORT OF PLAINTIFFS' STATEMENT REGARDING DISCOVERY DISPUTE** |

-1-
DECLARATION OF JAMES LONG IN SUPPORT OF PLAINTIFFS' STATEMENT REGARDING DISCOVERY DISPUTE, NOS.: CIV S 90-0520 LKK-JFM P, C01-1351 TEH

I, James Long, declare:

1. I am a Senior Managing Consultant with LECG, LLC ("LECG"), located at 201 Mission Street, Suite 800, San Francisco, CA 94102. I have been retained by counsel to Plaintiffs in this matter. If called as a witness, I could and would testify to the matters set forth herein based upon my personal knowledge.

2. LECG is a multi-disciplinary, international consulting firm with practices in the areas of financial consulting, intellectual property, damages, securities litigation, forensic accounting, and electronic discovery investigation. LECG's electronic discovery experts are highly experienced with retrieving, reconstructing, preserving, and analyzing important electronic evidence. I have ten years of dispute-related technology experience in the areas of data mining, data analysis, data warehousing, relational database management, case management and document management. I have overseen and managed the acquisition, processing, and production of large datasets in over 50 matters, in both state and federal court. Prior to joining LECG, I was a legal technology practice specialist with large national law firms and also a senior consultant in the Forensic and Investigative Services practice at Deloitte & Touche.

3. I have reviewed the Declaration of Defendants' e-discovery consultant, Paul French, and communications between Plaintiffs' and Defendants' counsel provided to me by Plaintiffs' counsel. I have also had discussions with Plaintiffs' counsel, representatives from Bridge City Legal (Mr. French's company), and Mr. French himself, in the presence of Defendants' counsel. It is my understanding that Defendants' counsel has acquired electronic data from approximately 80 custodians within various agencies of the California state government. With regards to Defendants' acquisition and processing of custodian and shared data, I have been informed of the following:

   a) Plaintiffs have requested of Defendants the production of documents in electronic and hard-copy format that are responsive to the issues and/or time periods pertinent to this matter;

b) Defendants' consultant has expended more than 500 hours of work to collect e-discovery data from over 80 custodians and several exchange servers at the California Governor's Office, California Department of Corrections of Rehabilitation, California Department of Finance, and California Department of Mental Health;

c) Defendants' consultant has collected more than three terabytes of electronic data from individual user workstations and over forty gigabytes of electronic data from exchange servers. Defendants' consultant indicates that three terabytes represent a significant amount of data (three terabytes of data represents over three thousand gigabytes of data or over three million megabytes of data). Defendants' consultant has described the volume of data as approximately 7.1 miles tall if printed into paper form and stacked.

d) On November 5, 2007, Defendants' counsel reported that only 27,000 electronic documents (from the overall population of three terabytes) are alleged to be possibly responsive to Plaintiffs' request for production.

e) It is my understanding that, as of the writing of this declaration, Defendants' counsel is still reviewing the aforementioned 27,000 electronic documents to identify documents deemed responsive for production to Plaintiffs.

4.   On Tuesday, November 13, 2007, I participated in a telephone conference with Plaintiffs' counsel (Amy Whelan, Lisa Ells, and Vibeke Martin), Defendants' counsel (Charles Antonen, Paul Mello, Anne Johnson, and Samantha Tama) and a woman named Nicole who was identified as an associate of Mr. French at Bridge City Legal. During that call, I asked general questions about Defendants' data collection, including the way that data was collected, what programs were used, what computers and accounts were imaged, what date ranges were used (and how they were used), and other general questions about the data collection. Nicole was able to answer some of my questions, but could not answer others. One topic that she did

explain, however, was that although Defendants initially gathered more than 3 terabytes of data, much of that data included information that is not responsive in any way to discovery requests (e.g. program files, fragmented files, etc.). Nicole described the remainder of the data as "user data," meaning data that might be responsive to discovery requests. Nicole could not quantify the amount of "user data" garnered from the total 3+ terabytes of data that was originally imaged.

5. To address the questions I posed that Nicole could not answer, Defendants' counsel requested that Plaintiffs send such questions in writing. Plaintiffs sent a list of questions to Defendants' counsel on the evening of November 13th, a few hours after our telephone conference. A true and correct copy of that email is attached hereto as **Exhibit A**.

6. On Wednesday, November 14, 2007, Defendants' counsel provided to Plaintiffs' counsel a list of the search terms they said they have used thus far to garner the 27,000 electronic documents that are currently being reviewed by Defendants for responsiveness to Plaintiffs' requests for production. I have reviewed this list of search terms. As explained below, Mr. French told us on November 15th that he used a "DT Search" program to search for responsive documents. The search list that Defendants provided, however, is not in the typical format recognized by the DT Search program. As a result, on November 15, I and Plaintiffs requested the actual search terms utilized by Defendants.

7. On Thursday, November 15, 2007, I participated in a second telephone conference with Plaintiffs' counsel, Defendants' counsel, and representatives from Bridge City Legal, including Mr. French. Using the list of questions provided to Defendants' counsel on November 13, 2007, as a guide, I again inquired into the processing of data collected by Defendants' consultant, and into the identification of "user data" by Defendants' counsel and Defendants' consultant. It is my understanding that, as a result of the data processing performed by Defendants' consultant, Defendants' counsel currently possesses an index of all materials identified as "user data" from the total population of 3 terabytes collected. This index can be understood as a catalogue of all files considered to be "user data," or files that meet such criteria as file type and date range that Defendants' counsel has presumably

specified in response to Plaintiffs' requests for production. Defendants' consultant has indicated that this index was created with a software program called "DT Search," which is a commonly used tool in the e-discovery field.

8. It is my understanding that Defendants have executed electronic discovery of data – from data acquisition to processing to the application of search terms – without engaging Plaintiffs in a collaborative process. This is not typical of electronic discovery processes in federal litigation, where both parties usually reach a mutual agreement with regards to such issues as the derivation of "user data" and the determination of search terms to be used. As a result, Plaintiffs have had little to no control over the identification of 27,000 electronic files (a relatively small population of files to which Defendants' counsel has limited its review of responsiveness) from a significantly larger data population of 3 terabytes.

9. I believe the following steps are necessary for both parties to arrive at a reasonable approach towards the production of materials responsive to Plaintiffs' requests for production:

  a) Defendants should produce to Plaintiffs a reporting of the number of "hits" generated from the population of "user data" by each of the search terms listed on Defendants' counsel's communication dated November 14, 2007. This reporting will allow Plaintiffs the opportunity to better assess the reasonableness of the search terms currently being utilized by Defendants. Based on my understanding of and experience with the DT Search tool used by Defendants' consultant, I believe that this "hits" report can be easily generated and produced without burden to Defendants' resources. In fact, based on the statements of Mr. French, this document may already exist.

  b) Defendants should produce to Plaintiffs the index of "user data" processed by Defendants' consultant. Based on my understanding of and experience with the DT Search tool used by Defendants' consultant, I believe that this index is readily accessible to Defendants, and can be easily provided. If Defendants produced the "hits" report and the index, Plaintiffs would have a better understanding of the reasonableness

of Defendants' searches. I and Plaintiffs' counsel asked Defendants to provide these items during the November 15th phone conference.

c) Using the index of "user data," Plaintiffs will determine whether additional search terms, or modifications to the search terms currently used by Defendants, will be necessary to generate a population of documents responsive to Plaintiffs' requests for production.

d) Plaintiffs and Defendants should mutually consult in good faith with regards to the reasonableness of additions or modifications to the search terms currently being utilized by Defendants. It is very common, in my experience, for parties to collaborate in this way.

e) In the event that additional or modified search terms are identified by the parties during the collaborative process, Defendants should produce, in addition to any documents extracted from the 27,000 electronic files currently being reviewed, the materials identified using the additional or modified search terms.

f) It is my understanding that the parties are engaged in further dispute regarding whether additional electronic data will be gathered from additional custodians. If Defendants gather electronic data from additional custodians, the parties should collaborate on the process of indexing this data and creating search terms to identify responsive materials. As I have stated, it is typical for parties to collaborate in this process from the beginning stages, and this collaboration will avoid the kind of dispute that has now arisen regarding the documents already searched and produced without any opportunity for input from Plaintiffs.

8.   I declare under penalty of perjury under the law of California and the United States of America that the foregoing is true and correct, and that this declaration is executed this 16th day of November 2007 in San Francisco, California.

*James Long* (signature)
James Long

# EXHIBIT A

| | |
|---|---|
| **From:** | Lisa Ells |
| **Sent:** | Tuesday, November 13, 2007 7:46 PM |
| **To:** | 'Charles Antonen'; Paul B. Mello; Anne Johnson; Samantha Tama |
| **Cc:** | Coleman Team - RBG Only; 'Vibeke Martin'; 'JWang@lecg.com'; JLong@lecg.com |
| **Subject:** | Follow up questions re: e-discovery procedures |

Charles,

As discussed in our meet and confer today, I am including below a list of questions from our e-discovery consultants that you agreed to provide answers to since you didn't have anyone on the call who could provide the appropriate information. We ask that you provide us with the answers by tomorrow at 1pm at the latest so that we can accurately inform Ms. Gracey at the 3pm call about what is and is not going to be an issue presented to the Court on Thursday morning.

Thanks,
Lisa

### Identifying Data
1. Were all current custodian computers available?
2. Were former custodian computers available?
3. Please provide a copy of the data/computer/document retention policy for each of the agencies associated with the custodians listed in Plaintiff's RFP.
4. Were all available custodian computers imaged and/or processed for data collection?
5. In addition to custodian laptop and desktop computers, were any other additional media collected and imaged? (e.g., DVD, CD, External Hard Drives, Flash drives, Thumb drives, PDA's, BlackBerry, etc.)

### Collecting Data
6. How was custodian data collected? What technology was used in creating forensic images?
7. How was network file-share data collected? What technology was used in data acquisition?
8. How was network email server data collected? What technology was used in data acquisition? What were the email extraction procedures for Exchange server and Groupwise? Were other email systems identified? If so, what other procedures were executed?
9. What verification procedures were employed to check for completeness and accuracy of all acquired data from all sources? Were any analyses performed to identify potential gaps in time for files maintained by each custodian?
10. Were there any errors detected in the forensic imaging process? If so, how were they addressed? Were error logs maintained?
11. Describe evidence control and chain of custody procedures and documentation maintained regarding electronic evidence.
12. How was access to network data identified? Based on what's mapped on the user computer (network drives mapped as N:\) or what IT network securities permissions allows access to?
13. How is Groupwise email processed? Converted to PST?

### Processing Data
14. Of the forensic images and data acquired, what criteria determined the population of files to extract? (i.e. user data and emails)
    - Were files or e-mail extracted based on a list of file extensions? If so, please provide copy of file extensions considered to be subject to extraction?

11/18/2007

- Were files or e-mail extracted based on signature?
- Were deleted files included in the identification of user data?
- What date range constraints were used to extract user files from forensic images and acquired data? Were dates based upon each user file's creation date, last modified date, last print date, last save date, etc? For emails, were dates based upon sent or receipt date?

15. What was the methodology used to de-duplicate the files contained in the forensic images and acquired data collected from all media?
    - Was de-duplication performed on a per-custodian or across-custodian basis?
    - How was de-duplication of email performed?
16. Upon extraction of user data from forensic images and/or acquired data, what methodology was used to index user data?
    - What application was used to index extracted files?
    - When indexing compressed archives (e.g., .zip, .rar, etc.), were files embedded within the archives individually indexed as well as tied back to the archives?
    - Were encrypted folders, password protected files, or corrupted files identified? If so, what procedures were performed to recover, crack or otherwise load them for review? Were there any files that could not be loaded?
    - Have exceptions reports been maintained throughout the process of indexing files?

**Analyzing / Reviewing Data**

17. Were key word searches applied to the indexed user files and emails to yield a population for review?
    - What key word searches were used?
    - Were key words modified to anticipate various conjugations? (e.g., finan* for finance, financial, financing, etc.)
    - Were Boolean terms and/or fuzzy search term used with the key words?
    - Is there a reporting available to indicate the number of "hits" that each search term yielded from the indexed population of user files and emails?
    - If a file associated with a family group (e.g., emails and attachments, compressed files within an archive, etc.) is yielded from a keyword search filter, would all files from the associated family group be yielded as well?
18. What search engine was used for key word searching?

Lisa Ells
Rosen, Bien & Galvan LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA  94104
Telephone:  415/433-6830
Fax:  415/433-7104
lells@rbg-law.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbg@rbg-law.com <mailto:rbg@rbg-law.com>
IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this

11/18/2007

communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

11/18/2007