PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
AMY WHELAN Bar No.: 215675
LORI RIFKIN Bar No.: 244081
SARAH M. LAUBACH Bar No.: 240526
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY – EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>    Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>    Defendants | No.: Civ S 90-0520 LKK-JFM<br><br>*COLEMAN* **PLAINTIFFS' RESPONSE TO ORDER TO SHOW CAUSE REGARDING THE COORDINATED CONSTRUCTION AGREEMENT** |

**INTRODUCTION**

On November 13, 2007, the respective Courts for the four coordinated cases ordered the parties to show cause why the Courts should not approve the coordinated "Construction Agreement" included with the order. *See Coleman v. Schwarzenegger* Docket No. 2522.

While plaintiffs recognize and agree that the Receiver has a far greater likelihood than defendants alone of completing the necessary construction projects for medical and mental health care needs in an effective and timely manner, plaintiffs have serious concerns about the coordination process, the Receiver's performance and reporting thus far, and this Court's ability to ensure that the needs of the *Coleman* class are promptly and fairly addressed by either the Receiver or defendants. At present, there is confusion and uncertainty about all of the Construction projects, resulting in a substantial delay in compliance with this Court's prior and existing orders requiring defendants to construct necessary mental health beds at all levels of care.

The Construction Agreement, as presented, is contractually and procedurally ineffective and should be modified by Court order. Plaintiffs must be accorded meaningful participation in the design and construction processes and must receive mandatory and regular reporting about the construction projects on dates certain. In addition, the Court must require the Receiver to comply with its prior orders to report to the *Coleman* Court and include similar and more stringent requirements in any order approving the Construction Agreement. To the extent that the Receiver can take responsibility for designing and completing medium and long term mental health bed projects, it is of great advantage to the *Coleman* remedial process so long as a mechanism for reasonable input and participation is established and the Receiver regularly reports to the *Coleman* Court in compliance with this Court's orders. The Construction Agreement as it stands, however, and without more detail and commitment from the Receiver, is insufficient to assure plaintiffs' counsel and this Court that the long-delayed needs of the *Coleman* class for additional mental health beds will be addressed and, if they are addressed, whether they will be completed within a reasonable time frame.

**BACKGROUND**

An initial round of six proposed coordination agreements was submitted in *Coleman*, *Plata*, and *Perez* as an attachment to a May 29, 2007 Order to Show Cause. *See Coleman* Docket 2247. Plaintiffs in the three cases filed a consolidated response to those agreements, stating that they did not generally oppose the consolidation of certain functions under the management of the Receiver, but requesting more specific reporting and transparency in the process. *Coleman* Docket 2283 at 2. In particular, plaintiffs expressed concern that the proposals lacked specificity and accountability, and requested that the Court direct the Receiver to propose a plan for accomplishing specific objectives and for reporting on his progress in meeting those objectives before approving the coordination agreements. *Id.*

On June 28, 2007, the three Courts filed an order approving the May 29, 2007 coordination agreements. The Courts directed the Receiver to file quarterly reports in *Coleman* and in *Perez* addressing his progress in the areas covered by the agreements, including details about the degree of completion, date of anticipated completion, and a description of any problems he faced or successes he achieved. *See Coleman* Docket 2300 at 2-3. The Courts ordered that the first progress report was to be filed in *Perez* and *Coleman* on October 1, 2007. *See id*.

No progress report was filed in either case on October 1, 2007, or on any other date thus far.[1] On November 13, 2007, the Courts issued an order to show cause to the parties as to why the consolidated Construction Agreement, which was attached to the order, should not be approved.

---

[1] The Receiver did write in his Sixth Quarterly Report (signed September 25, 2007), however, that he would file his revised Plan of Action with the *Plata* Court on or before November 15, 2007 and that the November 15th report would address his plans for time lines, objectives and metrics of various projects, including the contracting and information technology issues. *See Plata* Docket 866 at 33-34, 41, 45, 58, 68. The Receiver also stated that he intended to file with the *Perez*, *Armstrong* and *Coleman* Courts those sections of his November 15, 2007 Plan that pertain to the Coordination Order. *See, e.g., id*. at 41, 45. While he filed the Status Report in *Plata* on November 15, however, the Receiver has not updated either the *Coleman* or *Perez* Courts in accordance with the June 28, 2007 Court order to provide the first of those quarterly updates by October 1, 2007.

I.  **Approval of the Coordinated Construction Agreement Must Be Conditioned Upon Specific Reporting Requirements on Dates Certain**

The Courts – cognizant of the need to be updated as to the Receiver's progress – created a coordination-related reporting requirement for the Receiver in their June 28 Order. The first report was due on October 1, 2007, almost two months ago. The Receiver has ignored the formal reporting requirement and has failed to provide this Court or plaintiffs' counsel with the information necessary to monitor or evaluate in any way the Receiver's work on consolidated agreements.

Accordingly, plaintiffs request that the Court require the Receiver to abide by the existing Order for Quarterly reports. Because the Receiver failed to file the first report on October 1, 2007, he should be ordered to do so within 10 days of any approval order. He should also be ordered to file regular Quarterly reports on dates certain to ensure accountability. Plaintiffs propose January 1, April 1, July 1 and October 1 of each year.

II. **The Coordinated Construction Agreement Must Include Explicit and Detailed Commitments to Either Comply with or Exclude Existing *Coleman* Orders**

The Construction Agreement addresses three project areas of construction: (1) the San Quentin medical center; (2) temporary and permanent space at existing prisons; and (3) the construction of 5,000 additional medical and 5,000 additional mental health beds. The Receiver's willingness to address mental health missions within projects 2 (building temporary and permanent space at existing prisons) and 3 (building 5,000 new mental health beds), however, remains vague and noncommittal. As to the construction of temporary and permanent space at existing prisons, for instance, the agreement states: "The upgrades anticipated will be primarily medical; however the upgrades will conform to *Armstrong* requirements and *will consider, when possible, some of the additional space needs of the*

*CDCR mental health and dental programs.*" *Coleman* Docket 2522 at 4 (emphasis added).[2] The description of the 5,000/10,000 bed construction project is worded in a similarly vague manner: "*Coleman* representatives" are invited to participate, but there is no mechanism for updating the Court or plaintiffs about the construction projects.

Thus, while the *Coleman* Court in particular is ceding significant authority to the Receiver regarding mental health bed, office and treatment space construction, the Receiver can simply, at his discretion, opt *not* to address space needs for mental health programs. Moreover, the vagueness of the Receiver's commitment means that he could opt not to undertake mental health projects *at any time*, including years into the construction process. This creates a dangerous situation whereby defendants are permitted to ignore existing bed plan orders (pursuant to the Receiver's vague promises that he will assume control of mental health construction) at the same time that the Receiver has no real obligation to move forward with those projects. Plaintiffs and the *Coleman* Court, meanwhile, are left to wonder which projects the Receiver will do, which he will not, and what precious time is being lost waiting for these answers.

These risks, moreover, apply to both medium range and long-range mental health construction projects. For example, will defendants or the Receiver build the 50-bed mental health crisis bed unit at California Men's Colony, which the *Coleman* Court ordered built "as soon as possible" eight months ago? *See* Docket 2173 at 2. As for long-term projects, which of the numerous construction projects set forth in defendants' Supplemental December Bed Plan will be built by the Receiver, on what time frames will they be built, and which projects

---

[2] As to the two prisons for which the Receiver has completed evaluations and issued "Health Care Facility Improvement Program" plans (Avenal State Prison and Correctional Training Facility), mental health and dental projects remain as afterthoughts: "Although the scope of work for the CPR at California's State Prisons does not include providing additional needed clinical or administrative space for the Mental Health and Dental components at the Institution, Vanir has nonetheless been requested by the Receivership to coordinate with these departments and document any unplanned or unmet needs and to additionally determine how and if such needs can be integrated into the plans of the Receivership projects. The planning team has incorporated this request into the planning process and those needs that could appropriately be combined with the projects defined by the medical needs assessment have been included and accounted for within this Facility Master Plan." Plata Dockets 941 at 7 and 942 at 9.

will he leave to defendants? *See* Docket 2375-2. If the Receiver refuses to build any medium or long-range mental health projects, when will he inform the Court and plaintiffs of that fact? Unless and until the Receiver actually commits to build the short-range and long-range mental health office, treatment and bed space, all of the *Coleman* Court orders regarding those projects remain in a dangerous limbo. This cannot stand.

Accordingly, if the Courts approve the coordinated Construction Agreement, plaintiffs request that the following provisions be a part of that order: (1) a requirement that the Receiver issue, by a date certain, more definitive commitments regarding the construction of mental health programming, treatment and office space at existing prisons (Project 2 in the coordinated Construction Agreement); (2) a requirement that the Receiver issue, by a date certain, more definitive commitments regarding the construction of the 5,000 mental health beds, including the number of mental health beds slated for construction, the sites chosen for the beds, the timeline for completion, and the effect the Receiver's commitments will have on existing *Coleman* orders and/or the existing *Coleman* Bed Plan (Project 3 of the coordinated Construction Agreement). As it stands, the Receiver can pick and choose mental health construction programs at his sole discretion and on whatever timeframe he decides. Meanwhile, the various *Coleman* orders regarding both short-range and long-range construction remain in a dangerous and undefined limbo at a time when there are severe bed shortages at nearly every level of care. As a result, neither this Court nor plaintiffs have any idea which *Coleman* Court-ordered construction projects are being addressed by the Receiver, if any, and which will proceed independently.

### III. Approval of the Agreement Should Be Conditioned Upon Plaintiffs' Meaningful Participation in the Construction Planning and Building Processes

While the coordination process to date has been at least somewhat inclusive of court representatives in each case – an important first step – the coordination process completely excludes plaintiffs from any meaningful participation, monitoring, or comment. In other words, while the Special Master and defendants actively participate in the construction planning efforts, plaintiffs are left to piece together what progress may have been made months

after the fact. Indeed, plaintiffs are the only stakeholders absent from the table during these important coordination discussions and decisions.

### A. The Planning and Construction of Mental Health Treatment, Office and Programming Space at Existing State Prisons (Project 2 of the Coordinated Construction Agreement)

Defendants, in recent months, have deferred compliance with various *Coleman* court orders out of a belief that the Receiver will address them. One example is this Court's previous order requiring defendants to survey the treatment space needs in administrative segregation units necessary to assure that *Coleman* class members in those units would be provided with appropriate treatment and, in turn, to reduce the extraordinarily high suicide rate in these units. Docket 2255 at 4 (requiring defendants to "provide a specific assessment of their space needs [in administrative segregation units] for providing confidential mental health interviews"). Defendants stated that they would address these space needs through the Receiver's treatment space survey process. Docket 2335-3 at ¶ 6 (McKeever Declaration stating, "Item e addresses confidential interview space. The space needs of the Coleman inmates are being addressed in pending coordination efforts with the Receiver.")

The Receiver currently anticipates that his surveys, however, will take two years to complete (until December 2009), with the actual construction to "proceed according to an aggressive, formalized schedule subject to availability of funding." *Plata* Docket 929 at 16. Avenal is the first of 33 prisons to be surveyed for interim construction projects (Correctional Training Facility was the second). These interim projects are critical to the *Coleman* class and the *Plata* class and should be facilitated by all of the Courts. The Construction Agreement, however, does not provide the necessary process to ensure that the *Coleman* Court will be fully

informed about the scope of the interim projects to assure that the needs of the *Coleman* class are fairly and adequately addressed.[3]

The Receiver's "Health Care Facility Improvement Program California State Prisons – Avenal State Prison" demonstrates this problem.  *See* Plata Docket 941.  Although the plan was finalized on *August 28, 2007*, *Coleman* plaintiffs' counsel were unable to gain any information about it until it was filed by the Receiver in *Plata* on November 15.  It has never been filed in *Coleman* or reported on to the *Coleman* Court.  Plaintiffs were completely excluded from the process of developing the plan and had no opportunity to review it for compliance with either *Plata, Perez or Coleman* orders.  In other words, the only parties excluded from this process were the ones for whose benefit the entire project was undertaken.  Plaintiffs were left to review the plan nearly two months after it was finalized and well after they could have provided any meaningful input into the process.  Does the Receiver's Avenal Plan (which thankfully does add two new confidential mental health offices in the administrative segregation unit) provide sufficient treatment and office space to comply with the Court's June 1, 2007 order?  To the extent that the Receiver's Avenal construction plan was unable to address the *Coleman* requirements, for whatever reason, this Court and plaintiffs' counsel should have been promptly so informed.  The Avenal plan also includes a troubling reference to defendants' intention of placing seven treatment modules (holding cages) in the open day room of the administrative segregation unit for group mental health treatment.  *Plata* Docket 941 at 46.  In accordance with this plan, *Coleman* class members would be paraded into the cages in the wide-open administrative segregation area where both staff and other inmates will be able to hear and observe their group therapy sessions.  While the Receiver makes clear that these cages are "not currently a part of [his] scope of work," (*Plata*

---

[3] There is a serious question whether the evaluation of confidential spaces in administrative segregation units should proceed with the Receiver at all.  Defendants could presumably complete all of these assessments within only a few months (at the most), yet defendants have instead chosen to include them as one part of the Receiver's *two year* evaluation process, the primary purpose of which is to assess medical care issues (and *not* mental health).  The *Coleman* class is thus forced to wait two years for evaluations that, if done independently, would realistically take a few months at the very most.

Docket 941 at 44) the *Coleman* plaintiffs would have vehemently objected to these cages before the plan became final (and will do so formally before the Court). Indeed, the *Coleman* Special Master has explicitly identified exposed treatment cages as a serious problem. When discussing CSP-Lancaster's administrative segregation program in the 17th monitoring report, the Special Master noted the following under a "Non-compliance" heading: "Nine more programming cells were added but their location precluded visual and audio privacy." Docket 2140 at 37. He also referred to this problem again in the "summary" section of his report. Docket 2143-3 at 131.

The Avenal plan demonstrates the problems that will arise if the Receiver is permitted to proceed with *Coleman* mental health planning without being held accountable to plaintiffs or the Court regarding those plans. Without a clear commitment from the Receiver about these projects, including which *Coleman* orders he will comply with and which ones he will not, there is no way to ensure adequate and timely compliance with outstanding orders. The first two of the Receiver's plans (regarding Avenal and Correctional Training Facility) make no representations either way as to whether the Receiver will address the needs of the *Coleman* class or oversee compliance with *Coleman* Court orders. Nor does the coordinated Construction Agreement do anything to fill this void.

### B. The Planning and Construction of 5,000 Mental Health Beds (Project 3 of the Coordinated Construction Agreement)

Similar problems exist for defendants' long-term bed planning efforts, which were included in their August 2007 supplemental bed plan (Docket 2375), approved by this Court on October 18, 2007 (Docket 2461). Defendants' plans include, in relevant part, the creation of "Consolidated Care Centers" at five prisons, including CSP-Sacramento (SAC), Richard J. Donovan Correctional Facility (RJD), CSP-Los Angeles County (LAC), California Institution for Men (CIM) and California Men's Colony (CMC). Docket 2375-2 at 2. Defendants will also continue to have significant mental health programs, including inpatient programs, at California Medical Facility (CMF) and Salinas Valley State Prison (SVSP). *Id.* The Receiver, however, is only at the preliminary stages of identifying potential construction sites for medical and mental health beds. If his final sites differ from those of the *Coleman* defendants, what

1 will happen to defendants' long-range bed plan, which projects will move forward, and which
2 ones will be halted?  Perhaps even more important, where will the *Coleman* class be left if the
3 Receiver chooses to abandon mental health bed planning efforts in the future, either because of
4 budgetary or other barriers?

5     Accordingly, the Courts should approve the coordinated Construction Agreement only
6 if plaintiffs' counsel are permitted to meaningfully participate in the construction process,
7 including accompanying the court representatives on site visits of proposed Consolidated Care
8 Center construction sites (long-range projects) and construction-related visits to current CDCR
9 prisons (medium-range projects).  Plaintiffs also request to be present at key construction
10 planning meetings to ensure that defendants and/or the Receiver comply with all relevant
11 orders regarding particular prisons or programs.  Plaintiffs suggest that the Court direct Mr.
12 Babcock to work with the parties to ensure plaintiffs' efficient and meaningful participation in
13 this process.

14 **CONCLUSION**

15 If the Courts approve the coordinated Construction Agreement, plaintiffs respectfully
16 request that the following orders be included:

17     1.    As to the prior coordination agreements, approved by the Court on June 28,
18 2007, the Receiver shall file the first Quarterly report within 10 days.  He shall file all future
19 Quarterly reports on January 1, April 1, July 1 and October 1 of each year.  Quarterly reports
20 about the construction agreement should now be included in this schedule;

21     2.    As to the coordinated Construction Agreement, the Receiver shall file, by a date
22 certain, more definitive commitments regarding the construction of mental health
23 programming, treatment and office space at existing prisons (Project 2 in the Coordinated
24 Agreement);

25     3.    The Receiver shall also issue, by a date certain, more definitive commitments
26 regarding the construction of the 5,000 mental health beds, including the number of mental
27 health beds slated for construction, the sites chosen for the beds, the timeline for completion,
28

and the effect the Receiver's commitments will have on existing *Coleman* orders and/or the existing *Coleman* Bed Plan (project 3);

4. The Receiver and other court representatives shall include plaintiffs' counsel in the construction planning process for both medium range and long-range projects, including site visits, periodic construction planning meetings, and other key events in the construction process. Plaintiffs suggest that the Court direct Mr. Babcock to work with the parties to ensure plaintiffs' efficient and meaningful participation in this process.

Dated: November 26, 2007

Respectfully submitted,

ROSEN, BIEN & GALVAN, LLP

*/s/ Amy Whelan*
Amy Whelan
Attorneys for Plaintiffs