Raymond F. Patterson, M.D.
15 Battersea Lane
Fort Washington, MD 20744
Telephone: 301-292-3737
Facsimile: 301-292-6272

# REPORT ON SUICIDES COMPLETED IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION IN CALENDAR YEAR 2005

## I. Overview and Introduction

This is the seventh annual report on completed suicides in the California Department of Corrections and Rehabilitation (CDCR), submitted as part of the Special Master's continuing review of the defendants' compliance with court-ordered remediation in Coleman v. Schwarzenegger. It includes the demographic and mental health characteristics of the CDCR inmates who completed suicides during calendar year 2005[1], the time frames for clinical and executive review and documentation of completed suicides, and individual case reviews by the Special Master's psychiatric expert of all inmate deaths that, more likely than not, were the result of suicide.

As in past years, the Coleman Special Master's experts and monitors reviewed information on completed suicides during regular site visits. They examined institutional records on completed suicides and implementation of corrective action plans that had been drawn in response to past suicides. The information generated from their reviews helped to clarify the roles and responsibilities of the institutional and central office staff in the suicide review and prevention process. In addition, plaintiffs submitted letters concerning specific suicides and objections to the classification of some inmate deaths as non-suicides. Many of these objections are discussed in the individual case reviews in Appendix B.

Demographic and mental health characteristics of those inmates who committed suicide are summarized in Tables 1 and 2, respectively. Appendix A summarizes the time frames for clinical and executive review and documentation of completed suicides. Appendix B contains individual case reviews by the Special Master's expert of all inmate deaths by suicide. Appendix C contains a glossary of acronyms used in this report.

The Special Master's expert and the CDCR disagreed on the number of CDCR inmate deaths in 2005 that were the result of suicide. The CDCR reported 36 suicides while the Special Master's expert calculated the number of suicides at 43. Unlike in previous years, the CDCR excluded from its count two suicides by CDCR inmates who were

---

[1] The period covered in this report is specified as *calendar* year 2005, unlike the *fiscal* year period that has been covered typically in the CDCR's reports.

1

housed in California Department of Mental Health (DMH) facilities at the times of their deaths. In its response to the initial draft of this report, defendants stated that they have never included suicides within DMH in their count, and asked that the preceding sentence be withdrawn from this report. Yet historically, CDCR did not differ with this reviewer's inclusion of inmate deaths which occurred within DMH facilities until CDCR published its five-year report on September 8, 2006. In that report, CDCR did not include the deaths of one inmate at California Medical Facility (CMF)/DMH in 2000, two inmates at Atascadero State Hospital (ASH) and one inmate at CMF/DMH in 2001, one inmate at CMF/DMH in 2002, and one inmate at CMF/DMH and one inmate at ASH in 2005. Additionally, CDCR did state in its 2005 Suicide Report that these deaths were reviewed by CDCR mental health staff. But more importantly, it must be remembered that those CDCR inmates who completed suicides while in the care of DMH had no choice between treatment providers. CDCR's responsibility to review the treatment given to those inmates while at DMH is at least as great, if not more so, than its responsibility to review the mental health care given to them within its own system.

In addition, the CDCR modified its initial classifications of five inmate deaths as "suicide" or "undetermined" to non-suicide deaths. Based on the Special Master's expert's review of medical records, coroner's reports, and other documents provided by the CDCR, he concluded that these five deaths were the result of suicides more likely than not. This report covers all 43 deaths and discusses the differences between the CDCR's and the Special Master's expert's conclusions on the five disputed suicide determinations.

To place these figures into context, the number of CDCR inmate suicides in 2004 was 26, which is 12 or 17 fewer suicides than in 2005. The annual suicide rate in United States prisons was approximately 14 per 100,000 in 2001, according to statistics provided by the United States Department of Justice. In CDCR institutions, which had an average daily census of 164,179 in 2005, the inmate suicide rate was 23.14 per 100,000 based on the CDCR's count of 38 suicides, and was 26.2 per 100,000 based on the Special Master's expert's count of 43 suicides.

In this report, the terms "foreseeable" and "preventable" are used as they were in previous reports. They describe the adequacy of the CDCR's suicide prevention policies and procedures, training, implementation and supervision of policies and procedures, clinical judgments, and utilization of clinical and custodial alternatives in order to reduce the likelihood of completed suicides.

"Foreseeable" refers to those cases in which available information about an inmate indicates the presence of a substantial or high risk for suicide and requires reasonable clinical, custodial, and/or administrative intervention(s). Assessment of the degree of risk, whether high, moderate, or low to none, is an important component in determining foreseeability. In contrast to a high and immediately visible risk, a "moderate risk" of suicide indicates a more ambiguous set of circumstances that requires significant clinical judgment based on adequate training and a timely assessment to determine the level of risk and the most appropriate and relevant interventions to prevent suicide. These

2

interventions may include but are not limited to changes in clinical level of care (LOC), placement on suicide precautions or suicide watch, and changes in housing, including utilization of safe cells, as well as transfers to higher LOCs. Individuals evaluated as "low risk," "no risk," or "negligible risk" may continue to require some degree of clinical and custodial monitoring and subsequent evaluation, with appropriate notification of clinical staff of the potential for self injury and/or suicidal ideation or activity.

"Preventable" refers to those cases in which the likelihood of completed suicide might have been reduced substantially had some additional information been gathered and/or some additional intervention(s) undertaken, usually as required in existing policy.

In September 2006, the CDCR generated a report on suicides completed in 2005, utilizing the following definitions of suicide:

> <u>World Health Organization (WHO)</u>: Suicide is the result of an act deliberately initiated and performed by a person in the full knowledge or expectation of its fatal outcome.
>
> <u>National Violent Death Reporting System (NVDRS), National Center for Injury Prevention and Control, Centers for Disease Control and Prevention</u>: Suicide is a death resulting from the intentional use of force against oneself. A preponderance of evidence should indicate that the use of force[2] was intentional.

Deaths under the circumstances described below should be classified as suicides:

- A person committed a suicidal act, then changed his mind, but still died as a result of the act.

- A person intended only to injure rather than kill himself, for example, by playing "Russian roulette" voluntarily with a firearm.

- Assisted suicide, including passive assistance to the decedent, for example, by supplying only information or the means needed to complete the act.

- Intentional, self-inflicted death committed while under the influence of a voluntarily taken mind-altering drug.

- Intentional, self-inflicted death committed while under the influence of a mental illness.

Deaths under the circumstances described below should *not* be classified as suicides:

---

[2]Use of force is defined broadly to include drug use.

- The physical consequences of chronic substance abuse, including alcohol or drugs (natural death).[3]

- Acute substance abuse, including alcohol or drugs, with less than a preponderance of evidence showing intent to use the substance(s) against oneself (undetermined or unintentional injury or death).

- Death as a result of autoerotic behavior, for example, self-strangulation during sexual activity (death by unintentional injury).

While there are other definitions of suicide, several of the inmate deaths which the CDCR classified as "not suicide" appear to conform to the definitions of suicide in the sources relied on by the CDCR. These deaths are discussed in the individual case reviews in Exhibit B.

All five inmates involved in controversies over whether their deaths were suicides or accidents were participants in the Mental Health Services Delivery System (MHSDS) at the times of their deaths. One was in a mental health crisis bed (MHCB), three were at the Enhanced Outpatient Program (EOP) LOC (one of whom was in a psychiatric services unit (PSU)), and one was a condemned inmate at the Correctional Clinical Case Management System (3CMS) level of care.

Eight inmates committed suicide by hanging from ventilation grates. Seven of these inmates were in administrative segregation, and one was in a correctional treatment center (CTC) shower. One inmate worker secreted himself in a library, where he committed suicide after closing time. Thirteen suicides were completed in administrative segregation, 12 of which were by single-celled inmates. One inmate completed suicide in a security housing unit (SHU) while single-celled. Of the three inmates who committed suicide in CTCs, one was in an MHCB for suicidal reasons, and the other two were in the CTC for medical reasons. Unlike in 2004, there were two suicides in DMH facilities, one in the Intermediate Care Program (ICP) at Atascadero State Hospital (ASH) and the other in the Vacaville Psychiatric Program (VPP) at California Medical Facility (CMF).

The CDCR improved its suicide prevention program by providing training on cardiopulmonary resuscitation (CPR) requirements. Nevertheless, it was apparent that CPR was performed late in eight suicides and was not performed at all in seven suicides. Under the circumstances of three deaths, CPR was inapplicable. In at least one death, it is unknown whether CPR was performed.

Another effort by the CDCR to improve its suicide prevention program was training staff on the proper use of its Suicide Risk Assessment Checklist (SRAC). That

---

[3] The preferred NVDRS category is shown in parenthesis.

4

notwithstanding, staff completion of the checklist remained problematic. In a number of cases, staff did not perform SRACs according to CDCR policy by failing to

- obtain information that was available in records or via staff referrals and instead relying on only inmates' self-reports;
- assess risk and/or protective factors;
- define an estimate of the risk based on the evaluation as high, moderate, low, or none;
- develop and implement appropriate plans for follow-up evaluation and care; and/or
- transfer the inmate to a more appropriate clinical and custodial setting.

Tables 1 and 2 and Appendix B discuss the instances of these deficiencies in summarized and detailed fashion, respectively.

Although the training efforts described above were ongoing, there continued to be suicides that demonstrated failures in staff adherence to policies and performance standards. As noted in a number of suicide reports, examination of staff performance, referrals to the Professional Practice Executive Committee (PPEC), individual staff counseling, or referrals for formal investigation were recommended. In some instances, facilities acted on these recommendations, while in other instances, they did not.

The CDCR also began its suicide prevention training efforts with training of clinicians by a consultant in April 2005, which was later followed by mandatory video training of all clinicians in 2006.

Continued improvement in the quality of suicide reports was generally consistent. There were some notable exceptions in which specific reports failed to identify significant and substantial failures in the assessment process, treatment planning and referrals to higher LOCs, and/or provision of safe clinical and custodial environments. Several reports identified questionable staff performance and recommended investigative and disciplinary reviews. However, institutional responses typically indicated that investigations were "ongoing," rather than "completed," and any resulting counseling or other disciplinary action was rarely reported. Several of the suicide reports referred to remedial recommendations from earlier suicide reports that addressed the same issues involved in a later suicide in the same institution, indicating the continuing need for corrective training and supervision, as well as disciplinary action when indicated.

All disputed inmate suicide deaths need thorough review via the CDCR Suicide Prevention and Response Focused Improvement Team (SPR-FIT) process. This process

has been designated by the CDCR as the appropriate mechanism for review of inmate deaths that may have been due to suicide.

While adherence to time frames for documentation on completed suicides has improved over the years, deficiencies continued with the timeliness of provision of some documents. Some materials on 2005 suicides were received as late as November 2006, well beyond pertinent time frames. As in past reports, Appendix A provides the CDCR policy-driven timelines for completion of the existing suicide review cycle. As in previous years, the timelines were not met consistently, with frequent delays in responses by facilities in specific cases. Although there is a court order requiring that the CDCR review the institutional remedies that are described in the institutional responses to the suicide reports, no time line exists for the review of such remedies. To date, there have been no performance improvement measures implemented to demonstrate that the remedies are effective and have a positive impact on the delivery of mental health services.

## II. Discussion

This section of this report differs from previous reports in that information is reported for both the CDCR's and the Special Master's expert's calculations of the total number of inmate suicides in 2005. The category cited as "$N = 38$" refers to the 38 undisputed suicides, and the category cited as "$N = 43$" refers to the 38 undisputed suicides plus the five suicides that are disputed by the CDCR.

Tables 1 and 2 summarize the suicides by various characteristics:

## **TABLE 1**

o   Frequency of the 38 undisputed suicides by facility:

| Facility | Count |
|---|---|
| RJD | 4 |
| CMF | 4 |
| CSP/Solano | 3 |
| SQ | 3 |
| SVSP | 2 |
| HDSP | 2 |
| CEN | 2 |
| CSP/Sac | 2 |
| CSP/LAC | 2 |
| CMC | 2 |
| CIM | 2 |
| PBSP | 2 |
| WSP | 2 |
| Folsom | 1 |
| CSATF | 1 |
| ASP | 1 |

| | |
|---|---|
| NKSP | 1 |
| ASH | 1 |
| VPP (CMF) | 1 |

Frequency of the five suicides disputed by the CDCR by facility:

| | |
|---|---|
| CIM | 1 |
| CSP/LAC | 1 |
| SQ | 1 |
| CSP/Sac | 2 |

## TABLE 2

- Single-cell housing
  $N = 38$      $N = 43$
  26 of 38 (68.4%)      29 of 43 (67.4%)

- Inmates incarcerated for sex offenses ("R" suffix)
  $N = 38$      $N = 43$
  6 of 38 (15.8%)      6 of 43 (13.9%)

- Method

  Hanging
  $N = 38$      $N = 43$
  31 of 38 (81.6%)      31 of 43 (72.1%)

  Overdose
  $N = 38$      $N = 43$
  4 of 38 (10.5%)      6 of 43 (13.9%)

  Exsanguination
  $N = 38$      $N = 43$
  2 of 38 (5.3%)      2 of 43 (4.7%)

  Asphyxiation
  $N = 38$      $N = 43$
  1 of 38 (2.6%)      3 of 43 (6.9%)

  Peritonitis
  $N = 38$      $N = 43$
  0      1 of 43 (2.3%)

- History of suicidal behavior
  $N = 38$      $N = 43$
  27 of 38 (71.1%)      31 of 43 (72.1%)

- History of past mental health treatment
  $N = 38$      $N = 43$
  32 of 38 (84.2%)      37 of 43 (86.0%)

- Housed in infirmary, MHCB, OHU, PSU, or DMH
  $N = 38$      $N = 43$
  5 of 38 (13.2%)      7 of 43 (16.3%)

- Housed in administrative segregation or SHU
  $N = 38$         $N = 43$
  14 of 38 (36.8%)         14 of 43 (32.6%)

- Inmate on Keyhea order for involuntary medication
  $N = 38$         $N = 43$
  1 of 38 (2.6%)         4 of 43 (9.3%)

- Concomitant severe or life threatening medical illness
  $N = 38$         $N = 43$
  12 of 38 (31.6%)         15 of 43 (34.9%)

- On MHSDS caseload at time of death
  $N = 38$         $N = 43$
  24 of 38 (63.2%)         29 of 43 (67.4%)

- Age range
  $N = 38$         $N = 43$

  | | $N=38$ | $N=43$ |
  |---|---|---|
  | Under 18 | 0 | 0 |
  | 18-30 | 12 of 38 (31.6%) | 12 of 43 (27.9%) |
  | 31-40 | 11 of 38 (28.9%) | 12 of 43 (27.9%) |
  | 41-50 | 8 of 38 (21.1%) | 10 of 43 (23.3%) |
  | 50+ | 7 of 38 (18.4%) | 9 of 43 (20.9%) |

- Race
  $N = 38$         $N = 43$

  | | $N=38$ | $N=43$ |
  |---|---|---|
  | Caucasian | 19 of 38 (50.0%) | 20 of 43 (46.5%) |
  | Hispanic | 11 of 38 (28.9%) | 11 of 43 (25.6%) |
  | African-American | 4 of 38 (10.5%) | 8 of 43 (18.6%) |
  | Native American | 2 of 38 (5.3%) | 2 of 43 (4.7%) |
  | Asian | 1 of 38 (2.6%) | 1 of 43 (2.3%) |
  | Iranian | 1 of 38 (2.6%) | 1 of 43 (2.3%) |

- Gender
  $N = 38$         $N = 43$
  Male     38 of 38 (100%)     43 of 43 (100%)
  Female   0                    0

- Indications of inadequate treatment (including, e.g., canceled appointments not rescheduled, referrals not responded to, past medical records not reviewed, unsupported diagnoses, non-compliance with treatment without reassessment, assignment to inappropriate LOC, failure to provide five-day clinical follow-up, failure to provide immediate CPR)
  $N = 38$         $N = 43$

9

29 of 38 (76.3%)            32 of 43 (74.4%)

In addition to the examples of inadequate care listed above, other indices of inadequate care include insufficient communication among clinical, medical, and custodial staffs; failure to review documented histories in medical records, central files, and/or referral forms; and failure to provide adequate and timely screenings and assessments of inmates on intake and/or placement in administrative segregation, admission, or transfer to other facilities, and/or on referral for assessment of suicide potential to clinicians in CTCs or other clinical settings. The finding that 74.4 to 76.3 percent of completed suicides in 2005 involved some measure of inadequate treatment or intervention is consistent with findings of 76.9 percent for 2004 and 74.2 percent for 2003. These rates of inadequate treatment for suicides that occurred during the period from 2003 through 2005 represent a marked increase over the 45-percent rate of inadequate treatment that was found for suicides that occurred in 2002. In addition, there were documented concerns about the need for assessment of inmates who demonstrated significant mental illness, past suicidal behavior, or the presence of suicidal ideation or statements for placement in higher LOCs. There also continued to be inmates who were not considered for referrals to higher levels of care or placed on the mental health caseload, despite indications of their need for mental health interventions and/or psychotropic medications.

The annual suicide rate per 100,000 inmates in CDCR since 1998 has been as follows:

    1998 - 22 suicides in a population of approximately 158,159
            Completed suicide rate of 13.9/100,000

    1999 - 25 suicides in a population of approximately 160,970
            Completed suicide rate of 15.5/100,000

    2000 - 15 suicides in a population of approximately 160,855
            Completed suicide rate of 9.3/100,000

    2001 - 30 suicides in a population of approximately 155,365
            Completed suicide rate of 19.3/100,000

    2002 - 22 suicides in a population of approximately 158,099
            Completed suicide rate of 13.9/100,000

    2003 - 36 suicides in a population of approximately 155,722
            Completed suicide rate of 23.118/100,000

    2004 - 26 suicides in a population of approximately 163,346
            Completed suicide rate of 15.9/100,000

    2005 - Population of approximately 164,179
            Completed suicide rate for 38 suicides of 23.145/100,000
            Completed suicide rate for 43 suicides of 26.2/100,000

## III. Summary of Observations and Recommendations

The suicide rate for inmates incarcerated in the CDCR has ranged from a low of 9.3 per 100,000 in 2000 to a new high of 23.145 or 26.2 per 100,000 in 2005. The rate for 2005 is higher than for any previous year, whichever number of suicides is used. The national suicide rate provides a standard against which to measure the CDCR's success in dealing with suicides and to assess the adequacy of its suicide prevention efforts. While the rate of suicides in CDCR appears to have fluctuated between relatively low and significantly higher rates in alternating years from 1998 to 2005, the average annual suicide rate during that period ranged from 16.75 to 17.14 per 100,000, taking into account the two different calculations for 2005. The national average for suicides in correctional institutions during the same time period was estimated at 14 to 17 per 100,000.

Based on the definitions of suicide used in this review and the information that was, or should have been, available to clinical staff, between 74.4[4] and 76.3[5] percent of the completed suicides in 2005 were foreseeable, preventable, or both. While the CDCR's suicide prevention process has improved, as noted in this and past reports, there continued to be significant substantive inconsistencies and inadequacies in the application of policies and procedures and in staff performance with regard to suicide prevention and management.

Analysis of the case reviews provided in Appendix B allows for some generalizations. Once again, many of them are consistent with conclusions reached in earlier annual reports on suicides in the CDCR.

- o Unlike in 2004, when there were three suicides by women in the CDCR, there were no suicides by women in 2005.

- o In eight, or 18.6 percent, of the 43 suicide cases reviewed, there were delays in the immediate initiation of CPR. In seven, or 16.3 percent, of the cases reviewed, CPR was not conducted at all. There were three cases in which CPR was determined to be not applicable or not indicated based on these inmates' conditions at the times of discovery. There continued to be a serious problem with the appropriate application of CPR. On June 9, 2005, the Coleman court entered an order giving defendants 60 days to "develop and implement a policy that establishes clearly and unequivocally a requirement for custody staff to provide immediate life support, if trained to do so, until medical staff arrive to initiate or continue life support measures, irrespective of whether the obligation to do so is part of the particular custody staff member's duty statement." Of the eight

---

[4] Based on the CDCR's count of 36 completed suicides in CDCR institutions plus two suicides by CDCR inmates in DMH facilities.
[5] Based on the Special Master's expert's review of the five inmate deaths that the CDCR determined not to have been suicides.

11

suicide cases in 2005 in which CPR was administered late, two occurred after the August 9, 2005, time line for implementation of the immediate life support policy. However, all seven suicide cases in 2005 in which CPR and/or first aid were not performed at all occurred before August 9, 2005.

o The failure to provide an appropriate emergency response was not limited to CPR. The case reviews illustrate that in one case, an inmate who had ingested an overdose of medication was sent to the gate to await an ambulance for transfer, rather than taken to the ER for gastric lavage. This inmate "coded" on the way to the outside hospital. In another case, although CPR was initiated, paramedics arriving on the scene subsequently discovered foreign material (paper) in the inmate's throat such that they could not establish an airway, which rendered the earlier CPR effort utterly futile. In a third instance, an inmate was discovered in a pool of blood in his bunk and was ordered to the ER by nursing staff, with no efforts to locate the source of the bleeding or stop it.

o As reported in the past, clinicians continued to fail to utilize information available in unit health records (UHRs) or central files (C-Files) or through custody referrals. Had such information been reviewed by mental health clinicians during interviews with inmates, it could have alerted mental health staff in several instances to inmates' relative potential for suicide. Reliance on inmates' self-reporting was inadequate. Failure to screen inmates in confidential settings continued to limit the adequacy of information that clinicians were able to elicit when completing SRACs and intake assessments of inmates on admissions or transfers to (particular) facilities. Untimely administration and inadequate completion of SRACs remained problematic in several of the cases reviewed.

o The crisis in the availability of MHCBs, which became evident in early 2005, led to the spreading use of "alternative" and supposedly "temporary" housing in Mental Health Outpatient Housing Units (MHOHUs), Outpatient Housing Units (OHUs), and a variety of other holding cells for suicidal inmates for whom no bed was available in an MHCB unit. Defendants' dependence on these alternative placements emerged as a factor in a number of suicides in 2005. In addition, an increasing failure by clinicians to refer inmates who were clearly decompensating and in need of treatment at more intensive LOCs contributed to several successful suicides in 2005.

o Inmates are placed on Keyhea orders because they are a danger to themselves or suffer from grave disability. They require special attention when their conditions are deteriorating and/or they are expressing suicidal or self-harming ideation, behavior, or intent. One of the 38 inmates whose death the CDCR acknowledged as a suicide was on a Keyhea order at

ASH, a DMH facility, at the time of his suicide. However, of the five inmates whose deaths the CDCR determined were not suicides, three were on Keyhea orders at the times of their deaths. The Keyhea order for one had been allowed to expire by the time of his death. Of the 43 inmates whose suicides are covered in this report, six died as a result of self-administered medication overdoses. Five of those six inmates were in the MHSDS at the times of their deaths, and several were receiving their medications via either Direct Observation Therapy (DOT) or nurse-administered delivery.

- The June 9, 2005, order referred to above also required the defendants to develop a plan for mitigating the suicide risk posed by the large-mesh ventilation screens in administrative segregation cells in which mentally ill inmates were housed. The effect of that order was not apparent in 2005. Of the 43 suicides, 13 occurred in administrative segregation, 12 of them involving inmates who were single-celled. Seven of these utilized the large-mesh ventilation screens to hang themselves, underscoring the importance of implementing the order with respect to modification of such types of screens.

- While these annual reports have chronicled continued improvement by the CDCR in the suicide review process, some aspects of the review process clearly need further attention, including the identification of and distinction between facility and departmental issues and documentation of efforts to achieve the objectives, goals, and outcomes for corrective actions that had been specified in the CDCR Suicide Response Review Process, whether they be institutional or departmental. Also problematic were the timeliness and adequacy of facility responses to the corrective action recommendations contained in the department's suicide review. Just about any recommendation that required an expenditure of funds or the allocation of resources was left largely untouched at the institutional level. On the other hand, departmental reviews were often thoughtful and well-crafted by clinicians who clearly understood both the responsibilities and limitations that clinicians were likely to encounter at the facility level. In some of the reviews, however, supervising clinicians seemed to simply ignore failures at the facility level, while some facility responses focused solely on CDCR's failures to the exclusion of their own.

Review of the suicides among CDCR inmates in 2005 served primarily to confirm the findings and observation of the Special Master's preceding annual report on suicides in 2004. Many of the recommendations in the earlier report need to be repeated and implemented, including the following:

1. All of the elements of the suicide review process already in place at both the institutional and departmental levels, including follow-up to corrective action plans (CAPs) and submission to the Special Master of

      documentation on the outcome of investigations of staff misconduct, negligence, and errors, need to be fully implemented.

2. Intensified staff training efforts are needed on procedures for the initiation and supervision of Keyhea orders and guardianships or conservatorships for inmates in need of such support. This should include particular emphasis on the need to monitor closely inmates with Keyhea orders about to expire to ensure their continued receipt of necessary support and/or transfer to more appropriate LOCs.

3. Several inmate suicides in 2005 reinforce the need for clinicians to monitor suicidal inmates more closely and, where appropriate, aggressively refer decompensating suicidal inmates, especially those at Level III and IV custody levels, to DMH programs. The cases also point out the need for providing appropriate crisis-level care until such transfers to DMH programs can be achieved.

| NUMBER | CDC# | FACILITY | DATE OF DEATH | AGE | RACE | METHOD | HOUSING | LOC | R-SUFFIX | MEDICAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | SVSP | 1/3/2005 | 35 | Asian | Hanging | Single | CCCMS | N | N |
| 2 | | HDSP | 1/11/2005 | 28 | Hispanic | Hanging | Single (Ad/Seg) | None | N | N |
| 3 | | CENT | 1/21/2005 | 39 | Caucasian | Hanging | Double | None | N | N |
| 4 | | FOL | 1/25/2005 | 23 | Hispanic | Hanging | Single (Ad/Seg) | None | N | N |
| 5 | | SQ | 2/17/2005 | 52 | Caucasian | Hanging | Double | None | N | Y |
| 6 | | SAC | 3/5/2005 | 29 | Caucasian | Hanging | Single (Ad/Seg) | None | N | N |
| 7 | | CMF | 3/12/2005 | 25 | Caucasian | Hanging | Single | EOP | Y | N |
| 8 | | NKSP | 3/13/2005 | 52 | Caucasian | Exsanguination | Double | None | N | N |
| 9 | | SOL | 4/13/2005 | 51 | Hispanic | Hanging | Library | CCCMS | N | N |
| 10 | | CSATF | 5/13/2005 | 43 | Caucasian | Hanging | Single | CCCMS | N | N |
| 11 | | CENT | 5/21/2005 | 21 | Hispanic | Hanging | Single (Ad/Seg) | None | N | N |
| 12 | | CMF | 5/27/2005 | 31 | Caucasian | Hanging | Double | EOP | N | N |
| 13 | | SQ | 6/9/2005 | 28 | Caucasian | Hanging | Single (Ad/Seg) | None | N | N |
| 14 | | RJD | 6/11/2005 | 24 | Caucasian | Hanging | Single (Ad/Seg) | None | N | N |
| 15 | | LAC | 6/13/2005 | 49 | Iranian | Hanging | Single (CTC) | CCCMS | N | Y |
| 16 | | CMC | 6/17/2005 | 38 | African American | Hanging | Single | EOP | Y | Y |
| 17 | | RJD | 6/20/2005 | 46 | Caucasian | Exsanguination | Double | CCCMS | Y | Y |
| 18 | | HDSP | 6/23/2005 | 35 | Caucasian | Hanging | Double | CCCMS | N | N |
| 19 | | SQ | 6/25/2005 | 53 | African American | Hanging | Single (Ad/Seg) | None | N | N |
| 20 | | CMF | 6/29/2005 | 40 | Hispanic | Hanging | Single | CCCMS | N | Y |
| 21 | | LAC | 6/30/2005 | 48 | African American | Overdose | Double | EOP | Y | N |
| 22 | | SAC | 7/6/2005 | 26 | Hispanic | Hanging | Single (Ad/Seg) | EOP | N | N |
| 23 | | RJD | 7/25/2005 | 30 | American Indian | Hanging | Single (CTC) | EOP | N | Y |
| 24 | | CMC | 7/29/2005 | 51 | Caucasian | Overdose | Single | None | N | Y |
| 25 | | CIM | 7/31/2005 | 44 | Caucasian | Hanging | Double (Ad/Seg) | CCCMS | N | Y |
| 26 | | ASH | 8/4/2005 | 41 | Caucasian | Hanging | Single (ASH) | ICP (hosp) | N | N |
| 27 | | SVSP | 8/6/2005 | 20 | Hispanic | Hanging | Double | None | N | N |
| 28 | | ASP | 8/17/2005 | 54 | Caucasian | Hanging | Single (Ad/Seg) | CCCMS | N | N |
| 29 | | PBSP | 8/30/2005 | 36 | Hispanic | Hanging | Single (SHU) | None | N | N |
| 30 | | SOL | 9/3/2005 | 44 | Hispanic | Hanging | Single (Ad/Seg) | CCCMS | N | Y |
| 31 | | PBSP | 9/16/2005 | 38 | Caucasian | Overdose | Single (Ad/Seg) | CCCMS | N | Y |
| 32 | | CIM | 11/1/2005 | 24 | Caucasian | Hanging | Single | EOP | N | N |
| 33 | | RJD | 11/1/2005 | 45 | Hispanic | Hanging | Single | EOP | N | Y |
| 34 | | WSP | 11/27/2005 | 28 | Caucasian | Mech. Asph. | Single (CTC) | MHCB | Y | N |
| 35 | | SOL | 12/4/2005 | 40 | American Indian | Hanging | Single (Ad/Seg) | CCCMS | N | Y |

| INMATE | CDCR | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| DEATHS | | INITIALLY CLASSIFIED AS SUICIDE, OR CHANGED FROM SUICIDE TO NOT SUICIDE | | | | | | |
| 36 | CMF | 12/10/2005 | 34 | Caucasian | Overdose | Double | EOP | N | N |
| 37 | CMF | 12/12/2005 | 37 | African American | Hanging | Single (VPP) | Hosp | Y | N |
| 38 | WSP | 12/16/2005 | 61 | Hispanic | Hanging | Double | None | Y | N |
| 39 | CIM | 5/16/2005 | 57 | African American | Mech. Asph. | Single (Max Ward) | MHCB | N | Y |
| 40 | LAC | 6/23/2005 | 49 | Caucasian | Peritonitis | Unknown | EOP | N | Y |
| 41 | SAC | 7/2/2005 | 33 | African American | Asphyxiation | Single (PSU) | EOP | N | N |
| 42 | SQ | 9/2/2005 | 45 | African American | Overdose | Single (Cond) | CCCMS | N | N |
| 43 | SAC | 11/29/2005 | 56 | African American | Overdose | Double | EOP | N | Y |

| Number | CDC # | Mental Health History | Suicide History | Keyhea | MHCB/DMH | 5 Day Follow-up | CPR | Suicide Report | 60 Day Cap | 90 Day Report | For/Prev. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | Y | N | N | N | N | N | Y | Y | Y (late) | Y |
| 2 | | Y | Y | N | N | Y | Y | Y | N/A | N/A | Y |
| 3 | | Y | Y | N | N | N/A | Y | Y | N/A | N/A | N |
| 4 | | Y | Y | N | N | N/A | N | Y | N/A | N/A | Y |
| 5 | | Y | N | N | N | N/A | N | Y | Y | Y | Y |
| 6 | | Y | N | N | N | N/A | Y | Y | Y | Y (late) | N |
| 7 | | N | Y | N | N | N/A | Y (late) | Y | Y | Y | Y |
| 8 | | Y | N | N | N | N/A | N | Y | N | Y | Y |
| 9 | | Y | Y | N | N | N/A | N | Y | N | N | N |
| 10 | | Y | Y | N | N | N/A | Y | Y | N | N | Y |
| 11 | | N | N | N | N | N/A | Y (late) | Y | N/A | N/A | N |
| 12 | | Y | Y | N | N | N/A | Y | Y | Y | Y | Y |
| 13 | | Y | Y | N | N | N/A | Y | Y | Y | Y | Y |
| 14 | | Y | Y | N | N | N/A | Y (late) | Y | Y | Y (late) | Y |
| 15 | | Y | Y | N | Y | N/A | Y | Y | Y | Y (late) | Y |
| 16 | | Y | Y | N | N | N/A | Y | Y | Y | Y | Y |
| 17 | | Y | N | N | N | N/A | N | Y | Y | Y | Y |
| 18 | | Y | Y | N | N | N/A | Y | Y | Y | Y | Y |
| 19 | | N | N | N | N | N/A | Y (late) | Y | Y | Y (late) | N |
| 20 | | Y | Y | N | N | N/A | Y | Y | Y | Y | Y |
| 21 | | Y | Y | N | N | N/A | Y | Y | Y | Y (late) | Y |
| 22 | | Y | Y | N | N | N/A | Y (late) | Y | Y | Y | Y |
| 23 | | Y | Y | N | N | N/A | Y | Y | Y | Y | Y |
| 24 | | N | N | N | N | N/A | Y | Y | N/A | N/A | N |
| 25 | | Y | Y | N | N | N/A | Y (late) | Y | Y | Y | Y |
| 26 | | Y | Y | Y | Y | N/A | Y | Y | Y | Y | Y |
| 27 | | N | N | N | N | N/A | Y | Y | N/A | N/A | N |
| 28 | | Y | Y | N | N | N/A | Y (late) | Y | Y | Y (late) | Y |
| 29 | | N | N | N | N | N/A | Y | Y | N/A | N/A | N |
| 30 | | Y | Y | N | N | N/A | Y | Y | Y | Y | Y |
| 31 | | Y | Y | N | N | N/A | N/A | Y | Y | Y | Y |
| 32 | | Y | Y | N | N | N/A | Y | Y | Y | Y (late) | Y |
| 33 | | Y | Y | N | N | N/A | Y | Y | Y | Y (late) | Y |
| 34 | | Y | Y | N | Y | N/A | Y | Y | Y | Y (late) | Y |

| INMATE DEATHS | DCR INITIALLY CLASSIFIED AS SUICIDE | | | OR CHANGED FROM SUICIDE TO NOT SUICIDE | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 35 | Y | Y | N | N | N/A | Y (late) | Y | Y | Y (late) | Y |
| 36 | Y | Y | N | N | N/A | N/A | Y | Y | Y | Y |
| 37 | Y | Y | N | Y | N/A | Y | Y | Y | Y | |
| 38 | Y | N | N | N | N/A | Y | Y | Y | Y | Y |
| 39 | Y | Y | Y | Y | N/A | N | Y | Y | Y | Y |
| 40 | Y | Y | Y | N | N/A | Unknown | N | N/A | N/A | Unknown |
| 41 | Y | Y | N | N | N/A | N | Y | Y | Y | Unknown |
| 42 | Y | Y | N | N | N/A | Y | N | Y | Y | Y |
| 43 | Y | Unknown | Y | N | N/A | N/A | N | N/A | N/A | Unknown |