# REPORT ON SUICIDES COMPLETED
# IN THE CALIFORNIAL DEPARTMENT OF CORRECTIONS AND
# REHABILITATION IN CALENDAR YEAR 2005

## Appendix B

## Case Reviews

### 1. Inmate A

Brief History: This 35-year-old Laotian male incarcerated in Salinas Valley State Prison (SVSP) completed suicide on 1/3/05 by hanging. The inmate was in the 3CMS LOC in the MHSDS, was housed in general population, and was the sole occupant of his cell. The inmate was admitted to the CDCR on 4/5/99 via the California State Prison at San Quentin (SQ) Reception Center (RC) after having been convicted of two counts of first-degree murder with a five-year enhancement for the use of a handgun. The inmate was serving a sentence of life without the possibility of parole for each count.

On 1/3/05, a correctional officer (CO) in Facility C, Building C-2, was delivering the morning meals at approximately 8:40 a.m. and approached the inmate's cell, which was dark, and attempted to obtain a response from the inmate. When no response was given, the officer alerted the second unit officer who arrived at the cell and via a flashlight discovered the inmate lying on his back on his lower bunk naked and apparently not breathing. The personal alarm was activated and custody staff, including a sergeant, arrived. The cell was opened, but no one entered until two medical staff and a lieutenant arrived. A review of the time line and documents presented notes the time of discovery by the first officers at approximately 8:40 a.m. The time line indicates that the personal alarm was activated at 8:45 a.m. and that the licensed vocational nurse (LVN) and registered nurse (RN) arrived at 8:49 a.m., with the RN assessing that the inmate was dead. No attempts were made to perform CPR either by the first responding correctional officers or by the medical staff upon their arrival. The California Training Facility (CTF) fire department is noted to have arrived on the scene at 9:00 a.m., and a physician pronounced the inmate dead at 9:08 a.m. The inmate was noted to have had a "thin white rope" tied tightly around his neck, and the RN's observations were that the inmate was lifeless and that his "eyes" were fixed and fully dilated, with no detectable heartbeat, pulse, or respiration. There are also notations that the inmate was last seen alive by correctional officers at approximately 6:30 a.m. when he accepted a sack lunch meal given at that time as standard operating procedure (OP) for inmates who would be eating their meals later in the day.

Monterey County Coroner's report dated 3/3/05 concluded the cause of death was asphyxiation due to ligature strangulation, and the death was classified as a suicide. The toxicology determined that there was no ethanol or other common acidic, neutral, or basic drugs of common abuse revealed by toxicology studies. The coroner's report also indicated that the inmate's cell was in area "regarded as an administrative segregation

unit." The report also notes that there was an empty Zyprexa foil wrap and a suicide note among other articles in the inmate's cell.

The inmate was serving two counts for first-degree murder with an enhancement for use of a handgun. The inmate entered the CDCR on 4/5/99 via SQ RC, was transferred to California State Prison, Corcoran (CSP/Corcoran), and ultimately to SVSP on 11/29/04. As noted, the inmate remained in a county jail for approximately eight years after his arrest in September 1991 until his transfer to CDCR on 4/5/99.

The inmate reported no past history of mental illness or treatment for mental illness prior to his incarceration in the CDCR, including his eight years in the county jail. Bus screening at SQ on 4/5/99 was negative for any mental health pathology, and the inmate was released to general population. The inmate appears to have been functioning appropriately in general population until 8/30/99, when he was admitted to the OHU at SQ because of fears of harm from others and his beliefs that correctional officers were "killing people." He reported that this was all real, and the staff opined that he appeared to be having his first episode of psychiatric pathology. The inmate had requested protective custody because of these fears. The diagnosis was acute paranoid psychosis, and he was prescribed Olanzapine. He remained in the OHU through 9/2/99 and was placed on the 3CMS caseload. The inmate subsequently began refusing medications and was admitted to the CSP/Corcoran MHCB on 1/19/00 with a chief complaint of depressed mood and auditory hallucinations. The inmate was noted to have history of paranoid schizophrenia, and it was also noted that he had stopped his medications in November 1999. On 1/24/00, he was returned to a 3CMS caseload, and his medications were reinstituted. The inmate subsequently refused medications but remained in the 3CMS caseload until 2/26/01, when he was removed from the MHSDS because he had been symptom-free and not taking medications for approximately one year.

During the course of the inmate's incarceration, he had been treated with Wellbutrin, Prozac, Olanzapine, Zoloft, and lastly Zyprexa. He was returned to the MHSDS on 7/18/03 because of the increasing paranoia and complaints of auditory and visual hallucinations. On 7/29/03, an SRAC was completed "for treatment planning" and relied on an interview of the inmate only (the UHR and C-file were not reviewed). The inmate's risk was estimated at negligible risk. On 10/29/03, the inmate had two SRACs completed. One was completed by a social worker who estimated the risk as "moderate risk," and the other was completed by a psychologist who estimated the risk as "low risk"; in each of these suicide risk assessments (SRAs), the data source was the inmate interview only, as neither the UHR nor C-files were reviewed. On 12/27/04, an SRAC was completed and relied on the inmate interview only, and there was no evaluation of level of risk. The last SRA occurred after the inmate had set a fire in his cell on 12/27/04 while housed in administrative segregation. The inmate reported that he set the fire because he was attempting to keep someone from entering his cell and harming him and acknowledged that the "someone" was a hallucination. He was evaluated as presenting an imminent threat to the safety of self and others, and "endangering institutional security." The inmate reported that "Asians" had been locked down for the last couple of weeks and that "two people died in that building last week." He reported that this was

2

part of the reason he set his cell on fire and that he did not feel safe. He was prescribed Zyprexa stat and for 90 days, the case manager (CM) and captain were consulted regarding his placement, and he was returned to administrative segregation with five-day follow-up. The inmate requested administrative segregation because of safety concerns as noted above as well as his having received a 15-month SHU term based on a charge of battery on an inmate on 11/17/03. A mental health assessment completed at that time indicated the inmate was stressed and had a delusional quality; however, the battery charge was assessed as being related to situational and adjustment problems. The inmate received a 15-month SHU and weekly SHU, notes from approximately 3/1/0 through 11/16/04 are adequate. As noted on 12/17/03, the inmate was returned to administrative segregation because of safety concerns.

The last mental health contact for this inmate appears to have been on 12/31/04, which is memorialized in the record and a chart note dated 1/6/05. The clinician's signature is illegible, so it is not possible to derive his discipline other than that the clinician is a CM. The clinician states that the inmate did not intend to harm or kill himself and denied safety concerns. Further, the history of auditory hallucination and visual hallucinations were endorsed, but the inmate reported "none since he started psych treatment this week." He was noted as friendly, smiling, cooperative, with good eye contact and mood within normal limits, as well as thought processes being logical and goal directed. It was noted that the UHR was not available, and the plan was for the inmate to be followed up the following week to complete intake and treatment planning, according to a discussion of the Enhanced Outpatient Program (EOP) LOC. This note was dated 1/6/05 for the 12/31/04 visit, and the inmate completed suicide on 1/3/05.

The inmate was in the Triage and Treatment Area (TTA) from 12/27 thru 12/29/04, not admitted to the MHCB, and was not ordered suicide precautions. The five-day follow-up ordered by the psychologist began on 12/29/04 in Facility D-2; however, with the inmate's move to Facility C on 12/30/04, the five-day clinical follow-up and custody check did not continue. Although he was seen on 12/31/04 according to the entry of 1/6/05, there were no further clinical contacts after that date.

The suicide report makes reference to the inmate not having left a suicide note, which is in contrast to the coroner's report, which indicates that there was a note found in the cell.

The suicide report identified two problems and associated recommendations:

> Problem 1: After arriving at SVSP, inmate did not receive a CM contact or interdisciplinary treatment team (IDTT) for a month in violation of MHSDS program guidelines. There were no CM services available to 3CMS on C yard for the first three weeks of December.
> Recommendation: This reviewer discussed and problem-solved this issue with the chief psychologist and other prison management during the review visit.

> Problem 2: Paperwork for the five-day follow-up did not go with the inmate when he transferred from D-2 administrative segregation unit (ASU) to C-2. Had

this occurred, the inmate would have had mental health contact over the weekend preceding his suicide.

Recommendation: Form a Quality Improvement Team (QIT) to establish a local procedure to ensure that five-day follow-up documentation accompanies any inmate who is transferred between housing units.

In response to the suicide report dated 5/9/05, SVSP submitted a follow-up report on CAP dated 8/12/05, which was reviewed by the SPR-FIT on 8/24/05 and issued on 9/12/05. The response included new-arrival appointments tracking and summary date from March through July 2005 of the time frames for inmates newly arriving or returning to SVSP. The data track the number of days between the arriving inmate seeing a CM and the days from the arriving inmate's arrival to having an IDTT. The time period for inmates arriving at SVSP to see a CM ranged from one day to 32 days, with monthly averages ranging from 6.57 to 23.9 days, with the lower numbers being in the later months of the review period. With regard to time range for arrivals to receiving IDTTs, the range was from one day to 66 days, with monthly averages ranging from 10.33 to 43.28 days, again with the lower numbers being the latter months of the review period. No further analysis of this information or data was provided. With regard to the second recommendation, forming a QIT, the SVSP response indicated that the entire suicide prevention committee was involved in the process; that on 5/31/05, 15 clinicians participated in reviewing operational procedure 22, "Suicide Prevention"; and that it was revised June 2005. It is also noted that during block training, local operating procedure (LOP) 27 is explained to custody and ongoing training is provided to new clinical and medical staff.

**Findings:** This inmate's suicide may not have been foreseeable but appears to have been preventable. The evaluation at the TTA on 12/27/04 after having set his cell on fire for what appear to be psychotic reasons and his management after these events were inadequate. His management included his having been held in a TTA holding cell for two days, his having been administered stat antipsychotic medication (Zyprexa), custody being instructed to conduct Q-15 observations, and the discharge plan including five-day follow-up. It is unclear from the records as to why this inmate was not retained in the MHCB given his presenting history of fire setting based on what appear to be delusional and hallucinatory phenomena, his being given emergency medication, and informal suicide prevention activities, Q-15 minutes observations, and five-day follow-up.

Despite these efforts and inadequate interventions, they failed in that he was not provided with five-day follow-up, his medication compliance was inconsistent, and he was not held in a safe environment while undergoing further clinical evaluation. Additional problems with the overall management include treatment planning, which appears to have been done by individual clinicians rather than a multidisciplinary team as required; SRA, which was based on inmate interview only, without review of the C-files or UHRs; notes indicating UHR unavailable; and failure to assess this inmate after his arrival at SVSP for approximately one month and not until he had set fire to his cell.

4

Lastly, the failure to perform CPR by first responders to the inmate's cell when he was discovered and the declaration by nursing staff that he was dead and did not require CPR are inexcusable. Based on the above reasons, this inmate's death does not appear to have been foreseeable as he did not express overt suicidal or self-harming intent, but it is highly likely to have been preventable had the appropriate assessment evaluation been conducted and serious suicide prevention precautions been taken as suggested by the treatment staff.

The suicide report makes reference to two problems as noted above, however does not identify a number of the areas of concern reflected in this review. These areas include discrepancies in reporting documents regarding the actual time of discovery of the inmate, possible existence of a suicide note, clinical management of the inmate particularly after the 12/27/04 fire, inadequacies of assessments and treatment planning as reflected in documents including SRACs, MH-2s, and progress notes.


**2. Inmate B**
Brief History: This inmate was a 28-year-old Hispanic male who completed suicide by hanging at the High Desert State Prison (HDSP) on 1/11/05. The inmate was the sole occupant of his administrative segregation cell and was not in the MHSDS at the time of his death. The inmate was returned to the CDCR via HDSP on a parole violation on 12/13/04 after he had reportedly called his parole agent and the police reporting people being after him, carrying a rock in his pocket for protection, and the existence of a videotape of him having sex while using methamphetamines.

On 1/11/05, correctional officers conducting an hourly suicide precaution check at approximately 1:00 p.m. in the afternoon discovered the inmate hanging by a bedsheet from the cell vent in his administrative segregation cell. The inmate was on the first day of five-day suicide follow-up as he had been admitted to the CTC from 1/6/05 through 1/10/05. The inmate had been admitted to the "Z-unit," which is a standalone ASU at HDSP, after his return to the CDCR on 12/13/04. This admission appears to have been because he was a validated member of the "Texas syndicate" prison gang, and his referral from administrative segregation to the CTC was because of his reporting suicidal ideation. An SRAC concluded low risk as per the suicide report. There was no medical record (UHR) provided with this inmate's documents, and therefore, the course could not be reviewed by this reviewer. The suicide report references the course as the clinician having the impression that the inmate was a "squared away gang member" who wanted to get out of the Z-unit and go back to the D-unit as the old administrative segregation and that his complaints about suicidality were "manipulative" and/or related to his wanting a change in housing as well as wanting medications for sleep and to calm him down. The inmate remained in the CTC until 1/10/05, when he was returned to administrative segregation; however, he was placed in the D-unit. As noted above, officers conducting an hourly suicide precaution check on D-7 discovered the inmate hanging at approximately 1:00 p.m. The suicide report makes reference to a psychologist attempting to interview the inmate on 1/10/05 but states the inmate reported that he did not need any contact and refused to come out of his cell. The inmate therefore was not seen out of cell

for his first day of five-day follow-up by a clinician and was found later that day hanging by a sheet from the cell vent. CPR was begun by a medical technical assistant (MTA) after the inmate was placed on a stokes litter, according to the suicide report. The inmate was conveyed to a van and subsequently to the CTC, where a physician pronounced him dead on arrival. The inmate was not in the MHSDS at the time of his death, having been removed from the MHSDS in 2003 during a previous admission. His diagnosis while he was on the 3CMS caseload was Bipolar II by history and problems noted were mood instability, poor impulse control, and limited insight. The suicide report makes reference to the inmate having been returned to the CDCR on 12/13/04, a referral generated based on his MHSDS history, and the psychologist seeing the inmate on 12/16/04 per the inmate's self-referral. There is also a reference to a chrono indicating the inmate received a mental health screening on 12/23/04 with referral for further evaluation and reports by staff that the inmate was evaluated on 12/24/04, although there was no documentation in the UHR as referenced in the suicide report. The inmate was not placed on the MHSDS despite his history.

After his return to the CDCR and the above-referenced evaluations, which were not included in the documents, the inmate was evaluated in the CTC for a crisis evaluation on 1/6/05. The suicide report makes reference to the inmate having been evaluated at the CTC and an SRAC concluding that he was at low risk. The inmate was described as "perfectly lucid" and "perfectly candid," but he was stating he would kill himself as a "manipulation," and he was told he would not get medications for sleep problems or anxiety and was admitted to the MHCB. He remained overnight in a safety cell until the next day as reported, displaying hostile mood and continuing to state that he wanted to harm himself. He was seen on 1/8/05 by a psychologist who reported he gave "a bizarre story" involving having used drugs and having sex with his girlfriend that had been secretly videotaped and was being circulated on the internet. The inmate was described as angry, agitated, and demanding, with a small amount of feces smeared across his chest, and later that night, the psychologist was called after the inmate had taken his food port hostage by placing his arm through the food port and refusing to withdraw it. The inmate is reported to have been chewing on his other arm, causing a self-mutilation wound that was subsequently dressed and for which the inmate was given a tetanus shot. At this point, he was offered an antipsychotic medication, which he refused, and was placed in five-point restraints. On 1/9/05, the inmate was noted to have been tearing his bandages into strips and creating a loop at the end of one of his bandages, and when told he would be placed back in restraints, he behaved appropriately. He was also noted as "absolutely rational" by the psychologist who saw him on that day. An IDTT was held on 1/9/05, and despite the inmate's history and his continuing to talk about the secret videotape being circulated on the internet, it was determined that he did not meet the criteria for an Axis I diagnoses, and he was not placed in MHSDS.

He was discharged back to administrative segregation, and his placement was in the D-unit rather than the Z-unit from which he had been admitted to the MHCB. He was described as pacing and talking to himself and making unusual statements such as "I didn't hurt the baby. I don't like men so go fuck yourself. I am not a child molester," according to the suicide report. The inmate was last seen by a mental health clinician on

1/11/05 for the first of his five days of clinical follow-up when he refused to come out of his cell and was described as being resistant to the contact and stating he did not need it and had no issues. There was no further mental health contact despite his being in administrative segregation, and he was discovered at approximately 1:00 p.m. on 1/11/05 hanging by a bedsheet from the cell vent in his administrative segregation cell.

An autopsy report filed by the Washoe County Coroner's Office dated 1/12/05 reported the final pathological findings as asphyxia due to ligature hanging. In addition, a toxicology screening revealed "none detected" for drugs of abuse as well as alcohol.

Although the record makes reference to a number of screenings and or other mental health contacts, the suicide report indicates that several of these documents were not located in the UHR or did not contain complete information. The suicide report concluded that all policies and procedures were followed and care was appropriate. It further states that during his CDC admission, staff took great care to attempt to understand the rather confusing presentation of the inmate and that his bizarre behaviors were attributed to recent drug abuse. Although the suicide report makes reference to his anxiety about the videotape and that he "did seem to be asking for something else at the time," it states that his primary presentation was of a "rational and somewhat manipulative convict" and that other than asking for a housing move, whatever else he may have wanted was never made clear. Based on the suicide report's conclusion that all policies and procedures were followed and care was appropriate, there were no recommendations and no facility follow-up report regarding any CAP items as none were identified.

**Findings:** Despite the suicide report's conclusion that all policies and procedures were followed and that care was appropriate, it appears that the clinical staff at HDSP did not have a clear understanding of this inmate's pathology. Although he presented with symptoms that may have represented anxiety as well as delusional thinking and had a history of being placed in the MHSDS from previous admissions with considerations of a Bipolar Disorder, it appears that all of his symptoms were attributed to "manipulation" to achieve a different housing status. During his CTC stay, his behavior was determined as bizarre and in such need of control that he was placed in five-point restraints and was offered antipsychotic medication. However, it appears that his length of stay was approximately six days and that the IDTT determined he was not in need of placement on MHSDS but was in need of five-day follow-up. The five-day follow-up was attempted on the first day, and the inmate was uncooperative and refused to come out of his cell for an interview; however, it appears that he was determined to be stable and not at risk. No SRAC was completed at that time, and it does not appear from the documents provided that he was seen by the psych tech as required. The documentation of input by any psychiatrist with regard to his need for medication appears to be limited to his having been offered Haldol while in the CTC based on his behavior. He refused the Haldol, and there was no follow-up evaluation documented by a psychiatrist regarding his overall needs. It is unclear why he was discharged from the CTC after six days rather than continuing to attempt to have a more clear understanding of his mental health

functioning. This inmate reported suicidal ideation and while in the CTC engaged in self-mutilation by chewing on his arm.

While it is not clear whether or not this inmate's death may have been foreseeable, despite his bizarre and self-mutilating behavior, it does appear that it may very well have been preventable had there been better assessment of his changing behaviors, his self-mutilation, his suicidal threat, and a longer length of stay to further evaluate this inmate who, based on his statements and behaviors, may have indeed been psychotic and a greater risk than was appreciated by the staff.

### 3. Inmate C

Brief History: This 39-year-old Caucasian male incarcerated at Centinela State Prison (CEN) completed suicide by hanging on 1/21/05. The inmate was housed in general population and was not receiving care in the MHSDS. The inmate was double-celled at the time of his death and was discovered by his cellmate. The inmate was admitted to the CDCR on 3/9/88 via the California Correctional Institution (CCI) RC with commitment offenses of kidnapping with use of a weapon (handgun), child endangerment, and grand theft. The inmate was serving a life-plus-two-years sentence with a minimal eligibility parole date of 7/16/96.

On 1/21/05, at approximately 3:31 p.m., the inmates on housing unit D-2 were being brought in from yard, and the inmate's cellmate went to his cell and observed Inmate C hanging from the cell vent inside the cell by looking through the cell window. The cellmate then walked to where officers were bringing inmates in from yard and, after the last inmate had entered the unit, told the officer what he had seen. The officer immediately ran toward the cell and was joined by an additional officer where they both observed this inmate hanging from the cell vent. An officer activated his personal alarm, a sergeant and additional officers and MTA responded, and upon their arrival, the officer initially arriving at the cell door informed the sergeant it was a medical emergency; he subsequently ran down to the control booth to get the cut-down tool. Another officer was opening the cell door, and a second cut-down tool had already been retrieved; the inmate was cut down and dragged outside of his cell, and the MTA began CPR. The time line in the incident reports indicates the inmate was discovered at 3:31 p.m. and CPR began at 3:34 p.m., with the inmate being transported to the emergency treatment area at 3:36 p.m., where CPR continued until 3:46 p.m., when the inmate was pronounced dead by a physician. Among the inmate's belongings in his cell was a suicide letter addressed to the prison administration that indicated that his property, as well as the letter, was to be sent to his sister with her name and address. The letter contains personal messages to his mother, sister, and significant other regarding his being sorry for not being better to each of them and his request that they continue to support each other. It also makes reference to his having decided to do what he did because "it just passed a lie into the negative and have to do what I think is best."

An autopsy report by the Coroner's Office of Imperial County indicated that an autopsy was performed on 1/25/05, that the cause of death was determined to be hanging, and that

suicide notes were found. A toxicology report based on a comprehensive drug panel indicated there was no evidence of alcohol or drugs found in the inmate's system at the time of his death.

The inmate had been convicted of kidnapping with the use of a weapon, child endangerment, and grand theft, which involved his having taken a 15 month-old female toddler from her caretaker at gunpoint. The inmate took the toddler away in a vehicle and gave a note to the caretaker demanding $20,000 in ransom money. When the inmate attempted to collect the ransom, he was arrested by police officers, and the toddler was found by passersby in a nearby park. The grand theft conviction was not related to the kidnapping but rather to his having stolen a motorcycle several months prior to the kidnapping for which he was convicted in March 1988 and sentenced to two years in prison, which were added to his life term for the kidnapping. The inmate also had a history of poly-substance abuse, including cocaine, methamphetamines, marijuana, alcohol, and LSD, beginning at approximately age 15 until age 18. He also had a mental health history of having been seen by a psychiatrist during his adolescence and having been twice treated in an alcohol rehabilitation program.

After his admission via CCI in 1988, he was referred to mental health because he had a razor blade in his hand; records are unclear as to whether he actually cut himself on the arm, but he threatened suicide and reported that he heard voices at that time. These events occurred approximately three days after his admission, and he was seen by a psychiatrist within one week of his admission in March 1988, where he reported suicidal ideation and voices. He was diagnosed as "relatively mild paranoid schizophrenia," admitted to the infirmary for three days, prescribed Haldol at very low dosage, and returned to population. Approximately a week later, he cut his wrists and again reported auditory hallucinations. These behaviors lead to his being transferred California Men's Colony (CMC) East in May 1988, where he was evaluated as possibly suffering from bipolar disorder and it was noted that he should be placed in the mental health program; however, there are no mental health notes in the UHR until February 1999, as part of an annual classification review.

In June 1993, the inmate transferred from CMC East to CTF North and was housed in CTF North until June 2004, when the inmate had dropped an "anonymous" letter to staff indicating that his cellmate might be involved in a plan to assault inmates and staff. The cellmate confronted this inmate, the inmate informed staff of his fears of retaliation and harm by the cellmate, and he was placed in administrative segregation for his protection until he was transferred to CEN on 12/21/04. The last clinician contact that this inmate had with regard to mental health issues was the initial health screening performed by an RN on 12/21/04. The only "yes" answer to any other questions was in response to issues about soft contact in his right eye. He answered no to all questions regarding mental health treatment history or needs.

The suicide report concluded that all policies and procedures were appropriately followed and made no recommendations. Therefore, there is no institutional response to any CAP recommendation as there was no CAP.

9

**Findings:** This inmate's completed suicide does not appear to have been foreseeable or preventable based on review of the documents and his mental health and institutional history, as well as the incident report, autopsy findings, and suicide letter.

## 4. Inmate D

Brief History: This 23-year-old Hispanic male incarcerated at Folsom State Prison (Folsom) completed suicide on 1/25/05 by hanging. The inmate was in the ASU, in a single cell and was not receiving care from the MHSDS. This inmate was admitted to the CDCR on 8/15/04 via the North Kern State Prison (NKSP) RC for a violation of probation. His initial commitment was on 10/31/02 for assault with a deadly weapon for which he received a 180-day jail sentence and three years' probation. He was placed in the CDCR in August 2004 because of revocation of his probation after he left a drug treatment facility without permission, and his expected release date was extended from 2/7/05 to 4/29/05 because of his fight with a cellmate in September 2004.

On 1/25/05, at approximately 12:38 a.m., the inmate was discovered by a floor officer conducting the institutional count. The inmate was hanging by a modified bedsheet from the electrical conduit on the ceiling of his cell. He was single-celled in administrative segregation, and the incident report notes that the ceiling is approximately 11 feet seven inches from the floor. The floor officer sounded an alarm on institutional radio, and other officers, as well as the sergeant, watch commander, and an MTA, responded, all by approximately 12:40 a.m. The incident report provides specific detail on how the officer supported the inmate's body, which was suspended approximately four to five feet above the floor, with his head approximately two feet below the ceiling. An officer climbed onto the upper bunk, indicating this administrative segregation cell had an upper and a lower bunk, and from the upper bunk was able to reach above the inmate's head and cut the sheet. Although the incident report offered by the lieutenant indicates that the MTA initiated "life-saving measure," the suicide report makes reference to the MTA's decision not to provide CPR based on the inmate being cold to touch, appearing "gray," and with his "eyes glazed over," with no pulse. Therefore, CPR was not instituted, the inmate was transported to the medical clinic, and a physician declared the inmate dead at 12:52 a.m. The incident report also made reference to the inmate having plastic tied around his wrist, which was discovered when the inmate was cut down at approximately 12:42 a.m. The suicide report also makes reference to there being several letters in the inmate's cell that were addressed to God, with repeated references to "see God" or to be with God; however, the report concluded there was no definite suicide note. The actual letters written by the inmate were not provided in the documents received.

A review of the emergency medical response evaluation and emergency care flow sheet indicates that the initial response was by an MTA and RN at 12:38 a.m. and that in the clinic ER, there was an MTA, RN, and MD. The emergency medical response is authored by the MTA who responded to the scene. Further, the emergency care flow sheet is also authored by the MTA who responded to the scene, and there is no indication of CPR being done on site by first responders, including correctional officers and the

10

MTA, or on arrival to the emergency care area by any staff. Physicians note dated 1/25/05 in the emergency care area indicates that the inmate was found hanging and that this physician was called to the clinic at 12:52 a.m. and arrived at the clinic at 1:15 a.m. The note indicates no CPR was attempted at the time of death at 12:52 a.m. The report also makes reference to the inmate having had two previous suicide attempts, with the last being in 2000, and the inmate having previously been on "psych med" Olanzapine, which was discontinued on 9/10/04. The doctor's order of 9/10/04 indicates d/ced[1] Olanzapine, "hiding meds," and "psych referral." The autopsy performed by the coroner for the County of Sacramento on 1/26/05 determined the cause of death as hanging. Toxicology report determined no alcohol or drugs of abuse were found in blood samples.

Further review of the record indicates that the inmate was first admitted to the CDCR on 8/16/04 via the NKSP RC for violation of probation. This violation occurred based on his receiving a 180-day jail sentence and three years' probation on charge of assault with a deadly weapon in which he had stabbed another person in the back with a pair of scissors at a private party. He was subsequently arrested for possession of a firearm in April 2003 and for being under the influence of a substance in March 2004 with referral to a substance abuse treatment center. He subsequently left the substance abuse treatment center after only four days in March 2004, his probation was revoked, and he returned to the CDCR as noted above. While at NKSP, the inmate engaged in fight with a cellmate in September 2004, lost his good time credits, and his expected release date was moved from February to 4/29/05. The suicide report makes reference to the inmate having been placed in administrative segregation on 12/6/04 until the time of his death despite an investigation at Folsom being unable to substantiate any threats to his safety.

With regard to the inmate's mental health history and treatment since his admission to the CDCR on 8/16/04, a screening report dated 8/18/04 stated there is no indication that the offender suffered from mental illness, and referral to a mental health professional is not indicated.

An initial health screening from 8/16/04 indicates that the inmate answered no to all questions and that the inmate did not appear to have a language problem, and no referrals were required. A Developmental Disabilities Program (DDP) assessment was provided on 8/18/04 indicating the inmate had normal cognitive functioning (NCF) requiring no further services.

The next mental health contact was on 9/7/04 by the on-call psychologist, who described the presenting problem as "confused/disoriented," where the psychologist noted two suicide attempts in the past, with the second being in 2000 when the inmate drank bleach, and also noted a psychiatric hospitalization in 2000. Delusions and suicidal ideations were denied. The psychologist diagnosed the inmate with schizoaffective disorder and a global assessment of functioning (GAF) of 51, with referral for psychiatric medication evaluation. He noted the inmate was seen by a psychiatrist and given medication, but the psychiatrist did not think the inmate needed an MHCB. There are no other notes, orders, or assessments by mental health professionals in the record prior to the inmate's transfer

---

[1] discontinued

to Folsom. There is however a medical report of an unusual occurrence dated 9/25/04, which notes approximately six areas with scratches or abrasions on the inmate's body, five on his chest, and one on his back, and a bruise or scratch to the inmate's forehead. The inmate's brief statement is reported as "just wanted to change out of cell. I wouldn't do it anymore." There does not appear to have been any referral or assessment by mental health staff regarding the inmate's scratches and abrasions or the inmate's statement that implies he did this to himself.

A confidential medical/mental health information transfer–sending institution form from NKSP to Folsom dated 11/8/04 indicated the inmate had no medical/mental health problems. The initial health screening dated 1/9/04 records the inmate answering no to all questions including questions regarding mental illness, having taken medications, or having thought of or attempted suicide. The inmate was released to custody. The inmate next came to the attention of mental health staff on 12/6/04 based on the emergency referral from custody as there were concerns the inmate may have been assaulted on the yard. A progress note that appears to be from a physician dated 12/6/04 indicates the inmate was involved in an altercation and was complaining of swollen and tender knuckles on his right hand, with a plan for an X-ray of the right hand to rule out any new lesions. A note by a social worker dated 12/6/04 indicated that the inmate was referred by the sergeant based on conflicts with his cellmate and that his mood was flat, withdrawn, and guarded. The social worker noted the inmate appeared to be responding to internal stimuli and had poor concentration with no thought disorder evident. The inmate denied hallucinations and being a danger to himself. The assessment was that the inmate appeared to be responding to internal stimuli and that he presented as depressed with psychotic features. The plan was to have an IDTT in absentia (without explanation) and to follow-up in two days as well as consult with another clinician. It is noted that an MH-4 was not completed because the inmate was reluctant to provide history.

An SRAC was completed by the same social worker on 12/6/04, and the source of information was identified as the inmate interview. There was no notation that the UHR or C-file had been reviewed. Only disturbance of mood and affective instability were checked, without any reference to the inmate's past history of suicide attempts or any of the other information in his UHR. There was no evaluation of risk based on the above factors, and recommended plan was no referral needed. The comments included the inmate denied he was a danger to himself or others at this time and "is guarded." There appears to have been no follow-up despite the plan for an MH-4 to be completed in two days. The next notation by a clinician is by a psychologist on 12/16/04 as a clinical summary outline for administrative segregation institutional classification committee (ICC), which indicated the inmate had "no mental health concerns" and noted "poor eye contact." The second clinical summary outline for administrative segregation ICC was done on 12/30/04 and also indicated no mental health concerns. A mental health screening on 12/20/04 for placement in administrative segregation, approximately two weeks after his placement in administrative segregation, indicated the inmate answered no to all questions including any history of receiving mental health services, attempted suicide, etc.

12

The inmate's last contact with mental health staff occurred on 1/24/05, the day prior to his completed suicide. An MTA contacted a licensed psychiatric technician (LPT), who evaluated the inmate as depressed and having severe anxiety, with racing pulse and chest pounding. She noted that the inmate's pulse was actually "61" according to the MTA, and the inmate stated he did not think he could stay in the cell any longer. The inmate was noted to repeatedly ask to go to general population and for medication. The LPT also noted the inmate denied feelings of self-harm or harm to others. She wrote two referrals, and the suicide report elaborates that this was done to ensure that one would go to nursing and the other to the mental health department to ensure the inmate would be seen the following day. The LPT also wrote a progress note dated 1/25/05 with an addendum noting that the contact actually occurred on 1/24/05. In her note, the LPT also makes reference to the inmate stating "the walls were closing in on him and he couldn't take the cell anymore" and his asking the writer for help in seeing a doctor or someone in psych so "he could talk to someone and get medication." The suicide report makes reference to the LPT having stated that she did not refer the inmate as an emergency to California State Prison, Sacramento (CSP/Sac) because the inmate "calmed down" after being placed in a holding cell and that such referrals to the emergency room at CSP/Sac are "often difficult" because they require the approval of CSP/Sac's on-call psychiatrist.

The suicide report makes reference to the inmate possibly having symptoms of depression and psychotic features prior to his incarceration in the CDCR and references his personal writing with preoccupations with themes of guilt, shame, and violence as well as "ideals such as religious perfection, love, and allegiance to God, country, and family." The inmate wrote many letters to his family, many of which were not sent but are referenced in the suicide report. The suicide report references documentation by the MTA and LPT on 1/24/05 approximately five hours prior to the inmate's suicide, suggesting that the inmate was suffering from an acute panic attack. The suicide report concludes that "in addition to apparently chronic symptoms of depression, anxiety and disorganized thinking the inmate also was coping with stressors, had safety concerns and a pending disciplinary action. Despite coming to the attention of mental health staff both at NKSP and FSP [Folsom], and presenting on at least two separate occasions with depressed mood and psychotic features, he was never placed in the MHSDS, and there were several problems that may have contributed to this event."

The suicide report identified seven problems and associated recommendations:

>    Problem 1: There is repeated failure of follow-through for scheduling an
>    appointment at NKSP RC to conduct an intake evaluation and place the inmate in
>    MHSDS by both the on-call psychologist and the psychiatrist who both saw him
>    on 9/7/04.
>    Recommendation: NKSP: Form a QIT to review procedures at NKSP for making
>    referrals, scheduling, and tracking follow-through on appointments. Include
>    consideration of whether this specific area was a personnel performance issue or a
>    failure of the process.

<u>Problem 2</u>: Failure in the referral process at Folsom by clinicians who saw him 12/6/04 for follow-up evaluation.
<u>Recommendation</u>:  Folsom- Form QIT to review procedures at Folsom for making referrals, scheduling, and tracking follow-through appointments.  Include consideration of whether this specific area was a personnel performance issue or a failure of the process.

<u>Problem 3</u>: An intake evaluation was not completed by Folsom clinician due to the "inmate's reluctance to participate" in the evaluation.  Clinician could have completed the MH-4 based on mental status examination and review of records.  There were clear indications of mental illness.
<u>Recommendation</u>: Folsom- It is recommended that the institution conduct staff training on completing mental health assessments with reluctant or uncooperative inmate/patients (I/Ps) to the extent possible so that they can be placed on the MHSDS when the need is apparent without delay.

<u>Problem 4</u>: Failure by clinicians at both NKSP and Folsom to place the inmate in the MHSDS immediately as a medical necessity in the presence of symptoms of major mental illness, to ensure follow-up.
<u>Recommendation</u>: Case presentation via the Division of Correctional Health Care Services (DCHCS) monthly suicide prevention videoconference with emphasis on review of procedures for placing inmates in the MHSDS on an emergency basis, and generally on accompanying documentation, including chronos.

<u>Problem 5</u>: The mental health screening in Folsom ASU was completed two weeks after placement when it should have been completed within 72 hours.
<u>Recommendation</u>: Folsom formed a QIT on 3/7/05 to address this issue in response to a previous suicide.  A log has been created.  Folsom is to follow through with this QIT and implementation of the CAP.

<u>Problem 6</u>: This reviewer identified two potential problem areas in the emergency evaluations at Folsom.  First, referrals to the ER at CSP/Sac for MHCB admissions appear problematic.  Staff reported difficulties with PRN meds for I/Ps.  LPTs need to make referrals based on clinical needs.
<u>Recommendation</u>: Folsom and CSP/Sac to charter multi-disciplinary QIT including stakeholders from both institutions to address these two issues.

<u>Problem 7</u>: (a) The MTA decided not to conduct CPR.  The standard for basic life support (BLS) for trained medical responders is that CPR is to be initiated unless there is evidence of severe trauma, rigor mortis, or dependent lividity.  CPR is to be continued until a physician pronounces death.  (b) The CDC–837 incident report incorrectly states that "initial life-saving measures were initiated by MTA."
<u>Recommendation</u>: (a) Ensure that this MTA's failure to initiate CPR is reviewed and that appropriate corrective action is taken.  Ensure that all staff understand the requirements of BLS. (b) Correct/amend the incident report to the facts.

14

The suicide report was dated 4/28/05. The response from Folsom as "corrective action plan regarding inmate suicide" was dated 7/1/05 and provided specific responses as follows:

- Problem 1 in NKSP RC.

- Problem 2: Status: 5/6/05, QIT chartered; 5/12/05, QIT meeting held to discuss clinicians' need to document and clinicians' daily logs, office techs (OTs) to follow up, administrative segregation psychologist to notify senior psychologist of inmate leaving administrative segregation and administrative segregation CM to review administrative segregation general population inmate's UHRs before or after administrative segregation ICC. 6/28/05, this specific error was a failure of the process and not a personnel performance issue. 6/30/05, QIT meeting held and audit discussed.

- Problem 3: Status: 5/17/05, mandatory training on assessing reluctant or uncooperative inmates was held with mental health clinicians.

- Problem 4: Status: monthly suicide prevention videoconference held.

- Problem 5: Status: 1/27/05, QIT meeting held to discuss inmates in administrative segregation; 3/23/05, QIT meeting held to discuss administrative segregation screening procedures and LPT documentation; 4/27/05, QIT meeting held to discuss backlog of general population inmates and LPT vacations; 5/18/05, QIT meeting held to discuss seven inmates receiving screenings within five days and 23 inmates receiving screenings after five days; 6/15/05, intake psych interviews memorandum by senior registered nurse-1 (SRN-1) noting custody staff agreement to allocate additional escort officers; 6/6/05, QIT meeting is scheduled.

- Problem 6: Status: 1/27/05, QIT meeting held to discuss administrative segregation inmates; 5/19/05, Folsom emergency referrals to CSP/Sac psychiatrist QIT meeting held to discuss problems; 6/13/05, Folsom emergency referrals to CSP/Sac psychiatrist QIT meeting is scheduled.

- Problem 7: Status: 5/10/05, CAP item number 7 memorandum by SRN-2 addressing CPR and MTA issues.

There are a number of attachments of the various meetings held related to the above recommendations.

On 8/12/05, a follow-up report on CAP for suicide of Inmate D was submitted indicating approval of 7/18/05 CAP submitted by NKSP RC. The NKSP RC corrective action plan indicated the following:

- Problem 1: Corrective action in-service training (IST) to review on-call procedures before process of appropriate documentation and instruction to staff to use written referral forms and document contacts from progress notes, and clinical staff to be instructed to use written referral chronos to schedule follow-up visits and place in the UHR; status: completed 7/13/05.

- Revise on-call progress note to delete pre-printed MH-3 forms for use by on-call clinician; status: completed 6/17/05.

- Once the vacated AISA position for medical systems has been filled, schedule specific training with headquarters (HQ) MHSDS expert; status: hiring interviews have been scheduled with a completion date of 8/15/05.

- Problem 2: Instruct mental health staff to complete LOC placement chrono on general population inmates, make appropriate LOC determination by "medical necessity," and refer before the evaluation when in-depth assessment can be done; status: the training of mental health staff has been scheduled with completion date of 7/20/05; IST sheets as well as the training agenda and revised on-call procedures were included with this documentation.

**Findings:** This inmate's completed suicide appears to have been preventable and was very likely foreseeable. There were a number of problems, the majority of which were identified in the suicide report with regard to the inadequate assessment of this inmate both at NKSP and Folsom. The inadequacies included the lack of review of the UHR and/or C-files in appropriate circumstances; failure to provide timely screenings and assessments; failure to provide follow-up when indicated; lack of documentation or explanation for failure to refer for psychiatric services; and, when psychiatric services were provided, failure to document reasons for discontinuing psychiatric services and medication administration as a part of his treatment. In addition, this inmate clearly had symptoms of chronic mental illness that were not properly addressed; he was never included in the MHSDS; and the statements of the inmate regarding past suicide attempts, apparently self-inflicted scratches, difficulties in interpersonal relationships with other inmates, and his request for assistance in being unable to handle administrative segregation, including requests for medication and to see the doctor, were not appropriately managed. The failure to provide CPR for this inmate by first responders and at the direction of the MTA was also inexcusable.

Lastly, the decision-making process of the LPT and MTA in deciding that the inmate did not require an emergency or urgent referral and to be seen by a psychiatrist or transported to the emergency room at CSP/Sac appears from the documentation to have been based on the fact that the inmate "calmed down" when taken from his administrative segregation cell and placed in a holding cell (only to be returned to the administrative segregation cell in which he was experiencing a panic attack) and the difficulties in the referral process to CSP/Sac. While the suicide report does identify a number of these problems, the facility responses appear to have been designed to provide "training," including training on issues that had been previously recommended after the suicide of a

16

different inmate prior to this inmate's death, and to form "QITs," which were still in the
process of completing their tasks several months after the suicide report was generated.
There does not appear to have been any follow-up evaluation by DCHCS of the
adequacies of the corrective actions put in place by the facilities.

### 5. Inmate E

Brief History: This 52-year-old Caucasian male incarcerated at SQ completed suicide on
2/17/05 by hanging. The inmate was a general population inmate who was not in the
MHSDS. The inmate was readmitted to the CDCR on 12/23/97 at the NKSP RC, having
been convicted on a third-strike offense of grand theft exceeding $400, and was serving a
25-to-life sentence with a minimal eligibility parole date of 4/1/20.

On 2/17/05, at approximately 3:15 p.m., this inmate was discovered hanging in his cell by
a sheet attached around his neck to the metal frame of the upper bunk in his cell. The
inmate was double-celled but was alone in his cell at the time of his hanging. The officer
sounded his alarm, and several officers responded, including a sergeant, unit staff, fire
captain, and an MTA. The inmate was cut down and removed from his cell, and CPR
was begun by the fire captain as the inmate was being transported to the TTA.
Resuscitation efforts continued until 3:55 p.m., when a physician pronounced the inmate
dead. The death of this inmate was investigated as suspicious, and both the Investigative
Services Unit (ISU) and the Marin County Sheriff's Department investigated the death.
During the investigation, a suicide note was discovered that read "whoever finds me tell
all those I love I'm sorry I can't deal with this life anymore," with the inmate's name
written below. An autopsy report was provided by the office of the coroner of Marin
County dated 2/18/05 and indicated the cause of death was hanging with significant
contributing factors including mood disorder (depression), substance abuse, and cirrhosis.
No toxicology screening was requested from the coroner, and none was provided in the
documents received.

This inmate returned to the CDCR, where he was serving a 25-to-life sentence for a third-
strike conviction on charges of grand theft. These charges involved the inmate stealing
items from his employers and his mother and pawning those items with attempts to obtain
money to buy drugs. Based on this conviction, the inmate re-entered the CDCR at NKSP
RC on 12/23/97, and his bus screening and brief mental heath screening were positive for
major depression, resulting in referral to mental health. He was placed in the MHSDS at
the 3CMS LOC in January 1998 and referred for psychiatric evaluation. He was
transferred to CTF in February 1998, and when it was determined by the mental health
staff at CTF that he did not need any further mental health treatment, he was removed
from the MHSDS. He transferred to California State Prison- Los Angeles County
(CSP/LAC) in May 1998, where he remained until his transfer in May 2000 to SQ.
While this was his third-strike conviction, the inmate has an arrest record that dates to
approximately age 20 years beginning in New York and continuing in California. The
suicide report makes reference to his having had numerous arrests and convictions for
drug-related offenses, having served time in New York for attempted burglary, a previous
conviction in California for burglary, serving sentence from November 1989 through July

1995, and his third-strike conviction for which he re-entered the CDCR in December 1997. After his initial involvement with the MHSDS from approximately 1/5/98 through 2/9/98, he received no further treatment in the MHSDS. The inmate did however have significant medical problems including having been diagnosed with hepatitis A, B, and C; cirrhosis; end-stage liver disease; thrombocytopenia associated with his end-stage liver disease; diffuse hemorrhagic gastritis; and spleenomegaly. He had been treated since November 2002 at a community hospital and had his spleen removed in January 2004. The UHR also includes his having a diagnosis of arthritis and chronic back and neck pain secondary to an automobile accident in 1994 and chronic migraine headaches. This myriad of problems resulted in his having several assessments by physicians for pain management, and he had a number of different medications prescribed for pain until 2004 when he was prescribed Celebrex. The UHR and suicide report make references to the inmate expressing that he believed his pain management was inadequate; however, there are also references in a medication administration record (MAR) to an inconsistent compliance with medications. Pain medications were also discovered in his cell after his death, further contributing to concerns about his compliance and possible abuse of pain medications.

This inmate's last mental health contact was with a social worker on 12/22/04 when he was seen in response to the warden's request for an update to assess reaction of inmates' under three-strikes sentences to defeat Proposition 66, a proposal to repeal the three-strikes law. He was noted to present as clear and lucid, and his outlook on the situation was mature and realistic. The social worker concluded that he has experienced no depressive reactions and no suicidal ideation.

A review of this inmate's UHR on-site and discussion with staff indicated there was some difficulty intubating him prior to the arrival of the paramedics because there was no light on intubation equipment; however, when paramedics arrived, they were able to intubate the inmate.

The suicide report concluded that this inmate's suicide was an impulsive act to deal with a crisis that was overwhelming him and described this crisis as having components of his chronic pain, terminal illness, loss of hope that he would be paroled prior to his death, possible debts to other inmates for illegal drugs and medications obtained on the yard, and reluctance to seek help from the MHSDS because of the possible impact on his potential parole.

The suicide report identified three problems and associated recommendations:

> Problem 1: Pain medication was prescribed by several physicians without apparent coordination and/or a comprehensive pain management plan and without addressing his history of substance dependence.
> Recommendation: Train medical staff, especially physicians, on the need for pain assessments, use of pain scale, and making timely referrals for pain management.

<u>Problem 2</u>:  A toxicology report was not requested from the coroner despite the fact that this inmate had significant issues with drugs and medications that may have been a factor in his suicide.
<u>Recommendation</u>: Execute a requested toxicology report from the Marin County coroner.

<u>Problem 3</u>: General population lifer inmates at SQ reported their reluctance to seek assistance from MHSDS when in crisis because they feel negative impact on their parole possibilities if they receive any MHSDS services.
<u>Recommendation</u>: System issue: DCHCS to explore further the issue of general population lifer inmates who may be penalized on their Board of Prison Terms (BPT) parole evaluation if they receive MHSDS and recommend a remedy.

The suicide report was dated 4/28/05.  SQ responded to the suicide report's CAP recommendations on 1/10/06, and the response was approved on 1/26/06.

- Regarding Problem 1:  SQ responded that physicians were trained on 11/30/05 on the need for pain assessment of a pain scale and making timely referrals for pain management and provided verification of IST training.

- Regarding Problem 2:  The Marin County coroner's officer responded to a request from SQ on 10/6/05, indicating that no toxicology sample was saved and a toxicology analysis was not done for this inmate.  SQ noted that in the future, toxicology reports will be requested from the coroner's office at the time of the inmate's death to accompany the autopsy.

- Regarding general population lifer inmates at SQ and their reluctance to assist MHSDS services, minutes of the SPR-FIT subcommittee were provided for 4/18/05 and 4/25/05.  The 4/18/05 minutes reference this CAP item, with an action plan "to review prior suicide data and see how many were lifers and whether or not they were receiving MHSDS services" and recommendations to discuss the issue of videoconferences to educate clinicians and the chief psychologist.  The 4/25/05 minutes update the "lifer issue" with the following statement: "the data from 2004 presented, it does not appear that there were any noticeable differences between the number of lifers in the general population versus mental health."  The item was closed.  There was also a suggestion that "this group be given copies of suicide reports so they could see the context of the CAP items and also see what localized CAP items typically look like."

**Findings:** This inmate's death does not appear to have been foreseeable or preventable as he did not request any mental health services and he did not appear to staff to be in need of referral for such.  The suicide report CAP addresses the need for corroboration and consistency of physicians for pain management via training (which appears to have been done but not audited), consistency on requesting toxicology reports from the coroner's

office (which appears to have been put into place), and examination of reluctance of
general population lifers to seek MHSDS services (which does not appear to have been
adequately addressed based on the documentation submitted).

## 6. Inmate F

Brief History: This 29-year-old Caucasian male incarcerated at CSP/Sac completed
suicide on 3/5/05 by hanging. The inmate was housed in a single cell in administrative
segregation and was not receiving services from the MHSDS. The inmate was initially
incarcerated in the California Youth Authority (CYA) in 1992, when he was 16 years old
and sentenced to 25 years to life for murder. He was admitted to the CDCR via Deuel
Vocational Institution (DVI) RC on 7/17/94, when he was 18 years old, having been
determined to be a poor candidate for rehabilitation in the CYA.

On 3/5/05, at approximately 1:00 a.m., two officers making the one-o'clock-hour
institutional count discovered this inmate hanging by his neck from the air vent by an
inmate-manufactured noose in his administrative segregation cell of which he was the
sole occupant. The officers contacted the administrative segregation sergeant and the
institutional radio air control booth officer; subsequently, the unit alarm was activated.
At approximately 1:16 a.m., two sergeants and the watch commander arrived on the unit,
the cell door was opened at 1:17 a.m., and the inmate was cut down and placed on the
stokes litter and rolled out of the unit. The inmate was then moved by motorized cart to
the emergency room, with arrival at approximately 1:20 a.m., and CPR was started at that
time. The fire department arrived at the yard at approximately 1:59 a.m., and CPR
continued for the next three minutes, until a paramedic pronounced the inmate dead.

This inmate was serving a 25-year-to-life term for the murder of his 15-year-old former
girlfriend, which occurred in May 1991. Records indicate the inmate admitted to
committing the offense because of his former girlfriend's interfering with his relationship
with a new girlfriend, resulting in his inviting her to his home, striking her with a baseball
bat, and then strangling her. This was the inmate's first offense, second arrest, his first
arrest having been for public intoxication and falsely identifying himself to a peace
officer. The records indicate he is noted to also have a substance abuse history for
approximately five years prior to his arrest, including marijuana, PCP, LSD,
methamphetamine, and sniffing various substances including gasoline, rubber cement,
glue, paint, etc. The records from CYA indicate that he had evidence of possible
attention deficit disorder (ADD) and significant drug use that may have caused some
residual brain damage. Mental health pathology was assessed as consistent with
significant borderline personality pathology. He was also noted to be brutally abusive to
staff, threatening to injure or kill staff members and flashing satanic signs at them. While
at CYA, he was diagnosed with intermittent explosive disorder, conduct disorder-
undifferentiated type, severe, multisubstance abuse disorder, organic personality
disorder-explosive type, borderline personality disorder, and antisocial personality traits.
A DDP evaluation in September 2003 indicated NCF, no further services needed.

This inmate was never placed in the MHSDS and, despite the diagnoses rendered at CYA, was assessed by CDCR as having no history of mental health issues with the exception of significant substance abuse, as per the suicide report. However, mental health pre-screening report dated 7/21/94 done at DVI RC indicated the inmate was suffering from a major depression, and referral to mental health was indicated. He received a mental status examination on 8/18/94 in response to these findings that determined diagnoses of (1) inhalant abuse (in remission), (2) organic personality disorder–explosive type, and (3) fetal alcohol syndrome, with a GAF of 51. The inmate received one subsequent session with the psychologist who had opined these diagnoses, with no other follow-up. Based on these two assessments, the inmate was not referred for psychiatric services and was cleared for general population.

The inmate was transferred from DVI RC on 9/19/94 to CSP/Sac and on 7/18/95 received an "interim visit and report" by a psychiatrist who opined that he had a history of alcohol, LSD, and methamphetamine abuse with no history of referral or psych problems and concluded "no psych symptoms now." In August 1997, it was noted that he "refuses to show up for BPT."

The inmate was transferred from CSP/Sac to CSP/Corcoran on 9/14/04, and his history of hunger strike was noted; however, on the initial health screening, he reported no signs or symptoms of mental illness according to the suicide report. The inmate received a mental health screening on 9/17/04 for placement in administrative segregation that indicated major depression, and he was referred for further evaluation; however, this evaluation did not take place. The suicide report indicates that the clinician assigned to the evaluation did not complete it because the inmate was no longer in administrative segregation; however, the inmate returned to administrative segregation on 1/12/05, and once again, a mental health screening indicated need for further mental heath evaluation, which was done on 1/26/05. At that time, the inmate was cleared for administrative segregation with no mental health needs indicated according to the suicide report because neither of these evaluations or chronos were in the UHR. The suicide report indicates that the clinicians involved were interviewed as the source of this information. A health screening of 9/14/05 was negative with the exception of the inmate reporting he was allergic to Haldol, which should have alerted medical staff that he had some experience with antipsychotic medication in the past.

There is also reference to a note on an inmate's request for interview form found in the inmate's cell after his death stating "please put this message along with rest of my property and send to ____ [his father]," as again quoted in the suicide report but not provided in the documents reviewed. The suicide report also references the inmate having been placed in administrative segregation on 1/11/05 and having an interview with ISU regarding possible violence against staff, and an investigation was ongoing. The inmate subsequently received a rule violation report (RVR) for refusing to take a cellmate on 2/18/05. The suicide report indicated that the inmate had been ordered to assault a staff member as a part of his responsibilities as a member of the Aryan Brotherhood Prison Gang and that he had indicated he was refusing this order. The suicide report concluded that there was a delay in providing CPR but that there was no

21

violation of current policy, and further, that all other policies and procedures appear to have been followed.

The suicide report indicated one problem, with recommendation as follows:

> Problem 1: When placed in administrative segregation in September 2004, the inmate was screened and referred for a further mental health evaluation that was not completed.
> Recommendation: The mental health supervisor at CSP/Sac determined that this was an individual issue, and she has already taken corrective action with the clinician in question.

The chief psychologist from CSP/Sac responded by memorandum on 5/18/05 to the recommendations from the suicide report dated 4/18/05. In her response, the chief psychologist indicated that the failure of the clinician to conduct a follow-up evaluation based on the mental health screening of 9/14/04 was due to the individual clinician's misinterpretation of policy. She further indicated the staff member had been retrained to ensure any referrals are promptly followed up regardless of where the inmate is housed.

**Findings:** This inmate's completed suicide does not appear to have been foreseeable but may have been preventable. The 20-minute delay from the time of discovery until the start of CPR was an inordinately long period of time, and it cannot be determined whether the inmate may have survived had CPR been started promptly when he was discovered. There were a number of concerns when reviewing this inmate's record with regard to documentation that was not provided in reported evaluations and chronos or to follow-up evaluation during the course of this inmate's incarceration. The inmate did however receive a mental health evaluation and clearance in January 2005, according to the suicide report, for placement in administrative segregation and was seen by medical staff the day prior to his suicide because of reported "possible hunger strike." The referral to mental health was not completed prior to the inmate's death the following morning.

### 7. Inmate G

Brief History: This inmate was a 25-year-old Caucasian male who completed suicide by hanging at CMF on 3/12/05. The inmate was at the EOP LOC at the time of his death. The inmate was admitted to the CDCR on 12/1/04 after pleading guilty to three counts of lewd or lascivious acts on child by force, violence, duress, menace, and fear and to one count of annoying or molesting a child under 18. He was serving a 24-year sentence on these convictions.

On 3/12/05, at approximately 11:00 a.m., an officer conducting a security check in the L-3 EOP housing unit at CMF discovered the inmate sitting on his floor with his eyes closed, with both of his hands touching the floor. The officer also observed that there was a white noose around the inmate's neck and that the other end of the noose was tied to the metal shelf attached to a cell wall. The officer notified other officers on the unit,

one of whom activated his personal alarm and announced the emergency via the institutional radio as he ran to retrieve a cut-down tool. Other officers responded to the emergency, the inmate's cell door was opened, and the noose was cut from around the inmate's neck. He was lowered to the floor, and officers began CPR. He was then transferred to the B-1 medical clinic for further evaluation and treatment and was pronounced dead after he did not respond to more life-sustaining efforts, at 11:26 a.m.

An autopsy was completed by the coroner's office of Solano County on 3/14/05 and indicated the cause of death as asphyxia due to hanging. Toxicology studies were performed on blood and urine submitted for drugs and alcohol and revealed no blood-level alcohol and no other common acidic neutral or basic drugs detected. The screen however did reveal fluoxetine 0.23 ml/L (potentially toxic range 1-7 ml/L), noifluoxtine 0.37 ml/L (potentially toxic range unknown), and trazodone 0.09 ml/L (potentially toxic range 4-15 ml/L).

The inmate entered the CDCR on 12/1/05 via the SQ RC for his first term in the CDCR. His sentence was eight years with sixteen years of enhancements for a total of 24 years with a minimal eligibility parole date of 1/12/24. The records indicate that this was the inmate's first incarceration and was related to a complaint by the inmate's adopted mother alleging that the inmate had committed child abuse on his four-year-old daughter. Based on the probation officer's report summary of offense, the inmate is reported to have admitted a number of sexual activities with his daughter from the time that he changed her diapers when she was a baby until he was arrested on these offenses. The adopted mother also reported that the inmate had himself been molested at an early age and adopted at age three. She also reported several incidents beginning at approximately age five at which the inmate is alleged to have had inappropriate sexual contact with other children and a history of viewing child pornography on the internet.

Upon his arrival at SQ RC, he received a mental health assessment on 12/2/04 in which he reported he received a psychiatric treatment and hospitalization for an aspirin overdose and for a self-inflicted laceration of his arm. Records indicate that these events may have occurred during his adolescence at approximately aged 15 or 16, with subsequent outpatient counseling until age 17. Prior to his admission to the CDCR, he had been prescribed Lithium and Zyprexa in the county jail, and he reported to at least one evaluator that he attempted suicide while in the jail. Although he denied current suicidal ideation on the initial health screening at 12/1/04, he was admitted to the OHU at SQ because of suicidal ideation and stated that he might kill himself due to his not receiving his medication. The MH-7 on 12/2/04 reported this information, and a brief mental health screening on 12/8/04 indicated the inmate endorsed questions of intent to harm himself, depression, and thought disorder. He also reported auditory hallucination while in the OHU on 12/1/04, which had included his voice telling him he should kill himself and other voices as a "loud roar" telling him he is no good and should kill himself. On 12/2/04, a psychologist completed an SRAC that indicated the source of information was the inmate interview only without inclusion in the UHR or C-file. The SRAC found a moderate risk of suicide on 12/2/04. The inmate was discharged on 12/3/04 to continue with the RC intake process. On 12/8/04, he was re-admitted to the OHU, again

presenting with suicidal ideation and voices telling him to kill himself. An SRAC completed 12/8/04 also relied on the inmate interview only as the source of information, identified no protective factors and a history of multiple psychiatric hospitalizations secondary to suicidal ideation and attempt, with a recommendation for crisis bed placement on suicide precaution. An additional SRAC done on that same date, 12/8/04, also relied on the inmate interview as the source of information, identified ten protective factors, gave no evaluation of risk, and indicated a plan to refer to a psychiatrist for medication review and crisis bed placement on suicide watch. The inmate was discharged from the OHU on 12/10/04 back to the RC. His medications at that time included Zyprexa, Prozac, and Lithium.

This inmate's treatment course is rather difficult to follow based on the records presented, but it appears that he returned to RC housing on 12/10/04. The suicide report makes reference to his having been admitted to the OHU on 12/7/05 after returning from a crisis bed admission. That admission could not be located in the records. From 1/7/05 through 1/13/05, the inmate appears to have remained in the OHU and was subsequently transferred to an MHCB at California State Prison at Solano (CSP/Solano) on 1/14/05. He returned from CSP/Solano on 1/18/05 to the SQ OHU, was then placed at the EOP LOC on 1/19/05 with five-day follow-up, but returned to the SQ OHU on 1/20/05 and remained there until 1/23/05 when he was transferred to the Pleasant Valley MHCB Program. He apparently was discharged back to the SQ OHU on 1/28/05 but returned to the CSP/Solano MHCB on 2/5/05. He was then referred to the DMH acute care program at CMF on 2/14/05.

On 2/14/05, the inmate was admitted to the DMH at VPP located at CMF. The hospital admission record indicated that he was admitted because of depression and suicidal thoughts and had a history of four hospitalizations and private psychiatric hospitals during his adolescence. He was also described as having many characteristics of a "psychopath" and as being fearful of general population because of his commitment offense. Diagnosis at the time of his discharge were bipolar II disorder moderate, most recent episode depressed with psychosis in near remission, borderline personality disorder, and GAF of 45. The acute psychiatric program staff referred the inmate on 2/23/05 to the ICP at DMH because of his history of having three MHCB admissions in the past two months. The ICP rejected the inmate from participation in that program because of his close custody status.

The inmate engaged in creating an abrasion to his wrist on 3/6/05 and told the staff he was depressed and having thoughts of killing himself. He was placed in a strip cell for that day, responded to treatment, and reported no further symptoms. He was informed that he would be returning to the CDCR at the EOP LOC at CMF. According to a progress note in the UHR, the inmate was interviewed on 3/11/05 by a psychiatrist. The psychiatrist assessed the inmate as having a mood disorder with psychosis and indicated a plan to transfer into the L3 EOP program. Nursing notations from DMH indicate the inmate was transferred on that day, 3/11/05. This was the last progress note by a mental health clinician that could be located in the records.

24

The suicide report makes reference to the inmate having been transferred on 3/11/05 at approximately 4:30 p.m. to unit L3 and placed in a locked cell in the back of the unit used for new intakes to EOP as well as administrative segregation overflow. The suicide report indicates also that the UHR did not have any notations of contacts with this inmate by mental health staff and that although staff believed the inmate received his medications, the MAR could not be located. The suicide report also indicates that custody staff performed routine checks every 30 minutes; however, the inmate was discovered hanging the next morning at approximately 11:00 a.m. on 3/12/05.

The suicide report makes reference to a number of diagnoses, including those listed above on the discharge summary from his DMH admission as well as others contained in other documents within the UHR, including pedophilia, female preference and limited to incest; personality disorder not otherwise specified (NOS); and alcohol abuse, chemical cocaine abuse, cannabis abuse, and LSD abuse all by history. The inmate was classified as a sexual offender and did have an R suffix.

The suicide report identified two problems and recommendations as follows:

> Problem 1: MAR for L3 was not available to document whether the inmate was given his medication the evening he was transferred to the new unit.
> Recommendation: Produce the MAR and/or other documentation to prove that inmate received his medication on Friday 3/11/05 and the morning of Saturday 3/12/05. If documentation cannot be produced, conduct an audit of timeliness of medication for housing transfers and new admissions. If compliance is below 85 percent, initiate a QIT, and submit a plan for improvement.

> Problem 2: System issue: inmate discharged from DMH to EOP on a Friday and transferred later in the day, making it unlikely that he had any clinical contact after discharge.
> Recommendation: Discuss the issue of transiting inmates from DMH to lower levels of care on weekends, in the DCHCS SPR-FIT.

CMF submitted a CAP regarding Inmate G on 8/15/05 in response to the suicide report dated 5/18/05.

- Regarding Problem 1: The memorandum from CMF indicates that there was an attachment that was a copy of the MAR showing that the inmate had received his medication as ordered on the morning of 3/12/05 and that he did not have orders for medication in the evening.

- Regarding Problem 2: CMF proposed a revision in their LOP to read as follows: The MHSDS will ensure safety and continuity of care for inmates released from DMH. No inmate will be released from any DMH program on a Friday, Saturday, Sunday, holiday, or day before a holiday if they were admitted for reasons of suicidal ideation, gestures, or attempts. At any other time, the clinician releasing the inmate from a DMH placement will confer with the receiving

treatment teams, primary CM, or CMF clinical liaison to establish an appropriate plan for post-DMH discharge follow-up. The memorandum concludes with a statement that the revised LOP was awaiting approval by the CMF health care manager and would be presented in the SPR-FIT meeting scheduled for 8/18/05. This corrective action plan was approved by the SPR-FIT on 9/27/05 as per memorandum dated 10/17/05.

**Findings:** This inmate's completed suicide does not appear to have been foreseeable but may have been preventable. The inmate had a very complex history of suicidal ideation and behaviors as well as depression with psychotic features. In addition, the record indicates his ongoing difficulties with his guilt regarding his conviction for sexual abuse of his daughter, loss of his family, and serious concerns regarding his commitment offense and the possible impact on him from other inmates. There were a number of efforts to attempt to provide treatments in the most appropriate setting for him, and he eventually did receive hospital LOC at the acute psychiatric program (APP) program at DMH in CMF. Of greatest concern is the referral for intermediate care placement and his being determined to be inappropriate for such placement based on "Close A" custody status. The availability of appropriate treatment settings for inmates with such custody restrictions is an area for further review and should be appropriately developed within the CDCR and DMH. This inmate's not being transferred to an intermediate level of care and initially being transferred to an EOP LOC "after hours" may be the most concerning aspects contributing to preventability.

Generally, the documentation in this inmate's record was adequate; however, there were three areas of concern: (1) The initial difficulty in locating the MAR to determine whether or not the inmate received medications as prescribed after his transfer to CMF. The CMF response indicates the inmate was not prescribed medications in the evening; however, review of the doctor's orders and the MAR indicate he was indeed prescribed Abilify 20 mg in the evening as well as Buspar 10 mg QIDPRN for anxiety and Trazodone 100 mg Q evening PRN for sleep. The MAR indicates that he did receive both Abilify and Buspar on the evening of 3/11/05. There is however no nursing notation as to the reasons for his having been given the Buspar PRN for anxiety on that evening. (2) The SRAC provided at SQ frequently relied on the inmate interview only, without review of the UHR or C-file, and did not consistently assign a level of risk to the inmate. These are areas that are in need of further improvement by clinicians in fully completing a SRAC. (3) Inconsistencies in documentation of the assigned diagnoses for this inmate. The diagnoses appear to have varied from facility to facility without inclusion of diagnoses that had been assigned during previous clinical assessments, treatment plans, and discharging documents.

## 8. Inmate H

Brief History: This 52-year-old Caucasian male completed suicide by massive hemorrhage from a self-inflicted wound at the NKSP RC on 3/13/05 at approximately 3:12 a.m. The inmate was double-celled in general population and was not receiving services in the MHSDS. The inmate was readmitted to the CDCR via the NKSP RC on

26

3/11/05, having been convicted of taking a vehicle without the owner's consent, theft from an elder/dependent adult, and attempting to prevent the victim from prosecuting, resulting in a three-year term with a three-year enhancement for a total six-year prison sentence.

On 3/13/05, at approximately 3:12 a.m., a CO assigned to Facility B, Building 1, heard a "man down" call coming from the area of this inmate's cell. The cell was occupied by this inmate and his cellmate. The officer responded to the area, discovered this inmate lying on a lower bunk of the cell, and notified the control booth officer, who made a radio transmission of a possible suicide in "bunker 1." Two sergeants arrived at the building and directed staff to activate the unit alarm, and the cell was opened. The cellmate was removed from the cell and ordered to sit at a dayroom table. An MTA entered the cell and observed this inmate mumbling and incoherent. Prior to arrival of the MTA, one of the sergeants asked the inmate where he was bleeding from as blood had been noticed on the inmate's hands, upper torso, and mattress, and the inmate responded, "I can't breathe, I need air." The inmate arrived in the ER at 3:35 a.m., his handcuffs were removed at the request of an RN, and an IV was started at 3:40 a.m. It was during this time that a laceration to the antecubital area of his right arm was noticed, measuring approximately one centimeter in size, and was noticed as dry, with no visible act of bleeding. It was also noted that the inmate's clothing, bedsheet, and towel under his buttocks were saturated with blood, with some blood clots noted.

The MTA and sergeant requested the NKSP fire department be summoned and notified the NKSP emergency room nurse of the situation. The MTA continued to "monitor the inmate's condition and determined that he had a pulse." The NKSP fire department arrived at 3:31 a.m., placed the inmate on a gurney with his mattress and bedding, and transported him to the NKSP emergency room, where it was determined that the inmate had arrested and was in need of CPR, which was performed by medical staff. The Delano Regional Medical Center (DRMC) ambulance was contacted at 3:37 a.m. and arrived at 3:56 a.m., was directed to the emergency room, took over lifesaving treatment, and transported the inmate to DRMC at 4:23 a.m. The inmate was pronounced dead on arrival by physicians at DRMC at 4:40 a.m.

During the investigation of this inmate's death, as it was initially believed to be a possible crime scene, a note was found in the cell secured to the wall next to the lower bunk where the inmate had been found. The note stated, "do not resuscitate, no extraordinary measures, no life-support," with the inmate's name and number, and was dated "13 March 2005." There was also an additional half-page letter found on the desk that stated, "all the system wants from me is a body to send to prison, something to make the conviction statistics look good. Okay fine but that doesn't mean that I am required to participate. It is the right of every adult to be absent. The system can send this body to prison for all I care. I've got somewhere better I can be. My emergency contact is significant other, possession of my will ____ " (name of his longtime friend). The note went on to request that letters be returned to this friend as well as money placed on the inmate's books and a request that the inmate's mother be contacted. There were two letters found discussing the inmate's suicide plans, with one addressed to his mother and

the other to his longtime friend, both of which give detailed descriptions of his being unable to be incarcerated for such a long period of time, comments about funeral service and musical request, the difficulties of prison life, and his plan to commit suicide since he was sentenced.

An autopsy was performed at the Corin County coroner's facility on 3/14/05. The cause of death was determined to be cardiovascular shock due to massive hemorrhage due to perforation of the antecubital vein of the right arm. The toxicology study was also done and determined no blood alcohol or common acidic, neutral, or basic drugs detected. In addition, examination of the inmate's body discovered a razor blade found stuck to his back due to a large amount of blood the inmate had lost from the punctured defect. The matter of death was determined to be suicide.

The inmate returned to the CDCR via the NKSP RC on 3/11/05 to begin serving the six-year prison sentence as referenced above. The inmate had a long history of incarceration in both local jails and state prisons as well as periods of probation and parole. The inmate's first CDCR term began in June 1993 with a 16-month sentence for burglary. His CDCR number was H-[-----] at that time, and the records indicate he paroled seven times from 1993 to 2000 before discharging from that number. His "H" number was discharged in April 2000. The inmate was subsequently arrested on his current commitment offenses on 10/4/04, and his parole was again violated. He was subsequently convicted of the above-referenced charges and sentenced on 3/4/05, with his return to the CDCR on 3/11/05.

The inmate never received care or treatment in the MHSDS during his incarcerations under the CDC number V-[-----]. He received initial health screenings in August 2003 as well as March 11, 2005, remarkably by the same RN. In addition, he received a brief mental health screening in September 2003 during his previous incarceration. All of the health screenings and the brief mental health screening he received were negative for any history of treatment for mental illness, current symptoms of mental illness or complaints, and suicidal ideation or suicidal behaviors currently or in the past. The brief mental health screening after his admission on 3/11/05 was not completed prior to his suicide.

The inmate's cellmate was also interviewed during the suicide review process by CDCR staff and reported that this inmate told him that he had brought a razor blade into the facility in his Bible. The cellmate also reported this inmate was very angry with his attorney for convincing him not to accept a plea bargain for a lesser sentence than he ultimately received and that he was angry with himself because he had been on parole for less than a year before his return to prison. The cellmate described being awakened by coughing at approximately 3:00 a.m. on 3/13/05, this inmate telling him that he was having trouble breathing, and the cellmate smelling blood and feces. He also reported this inmate told him he was losing a lot of blood, and that prompted the cellmate to begin yelling, "man down."

The suicide report identified several problems and associated recommendations in the area of the emergency response upon discovery of this inmate in medical distress, as follows:

> Problem 1: The immediate first-aid response to a patient who is exsanguinating is to identify the bleeding and apply pressure to site. There is no documentation that custody staff provided first aid to the inmate. However, common requirements for the custody response are not clear.

> Problem 2: The record does not document the length of time between the arrival of custody and the arrival of the MTA, the first medical responder. The MTA determined that the patient had a pulse and had become incoherent. There is no documentation that the MTA made any effort to control the hemorrhage by applying first-aid measures or to improve vital organ perfusion by placing patient in a position that would improve vital organ perfusion. Any licensed medical staff should have applied pressure to the wound.

> Problem 3: Documentation at the CTC was inadequate to determine whether an IV line of adequate size was started and whether adequate fluid resuscitation was provided. Standard of practice would be two large-bore IVs with rapid administration of at least one liter of crystalloid. It was also unclear whether or when the cardiac monitor was started, which should have been within a minute or two of CPR and the IV.

For all three of the problems the recommended corrective action is as follows:

> Recommendation 1: Request an investigation into the entire emergency response.

> Recommendation 2: Documentation of initiation of investigation.

There is no CAP submitted by NKSP in response to the recommendations to the suicide report dated 8/25/05 for this inmate's death.

On 9/1/05, plaintiffs' counsel submitted a letter to the Deputy Attorney General and CDCR Legal Affairs Division regarding their concerns and issues related to this inmate's suicide. The letter references the suicide report completed on 8/25/05 not complying with the required time frames for the review process, without explanation for the delay, and the report does not reference the 6/9/05 court order requiring custody staff to provide CPR (emergency life support to inmates). Further, the letter details plaintiffs' concerns with regard to emergency response failures including the sergeant who was the first responder requiring the inmate to show his hands and handcuffing the inmate but not attempting to locate the source of the bleeding or stop the bleeding or provide any other emergency care. Plaintiffs' counsel also make reference to the MTA arriving when the inmate had a pulse and labored breathing and was moving his arms and mumbling, and the MTA's failure to attempt to discover the source of the blood, stop the bleeding, or apply any first-aid. Further, the fire captain who arrived and described the inmate as

29

bleeding profusely from his lower torso area was engaged in transporting the inmate. Plaintiffs were concerned with regard to the inmate arriving at the NKSP ER 23 minutes after he was first discovered by the sergeant and by that time having no pulse or respiration, being unresponsive, and his skin being pale and cold to touch. Plaintiffs' counsel acknowledged that the CAP called for an investigation into the entire emergency response and that such a serious investigation is warranted as well as that "appropriate disciplinary action must be taken, if warranted." The plaintiffs' counsel, in their letter, also make reference to the suicide report not clearly establishing the emergency response requirements for custody staff nor addressing the training issues necessary for implementing the new emergency response policy for custody staff. Plaintiffs' counsel also state their concerns that the suicide report written nearly three weeks after the 6/9/05 court order to implement the CPR policy fails to set forth the legal obligation and state further the suicide CAP "must direct NKSP to provide a clear directive to their custody staff about their new legal requirement to provide CPR and other necessary emergency services, if trained to do so."

**Findings:** This inmate's completed suicide, while not foreseeable as the inmate did not report any suicidal ideation or intent, despite the information learned after his death from his letters and from interviews with family and friend, was clearly preventable. The failure in the emergency response, appropriately identified in the suicide report, is both grotesque and unacceptable. This inmate was clearly alive, had vital signs, and was responding physically and verbally when he was discovered by custody and the MTA. The failure to attempt to locate the source of bleeding and to stop the bleeding for over 20 minutes until the inmate arrived at the NKSP emergency room unresponsive and without vital signs is inexcusable. The UHR, although very brief for this inmate's less than three-day admission from the time of admission to NKSP RC and his completed suicide, does contain a one-page document that is to be completed by the first responder (MTA). This document indicates that health care staff were notified at approximately 3:12 or 3:13, as the actual number is written over and illegible, and that the MTA responded at 3:15. If this arrival time is approximately correct, it indicates that the MTA arrived approximately three minutes after the time the inmate was discovered and a minimum of 20 minutes passed before the source of bleeding was discovered and further measures were taken at the emergency room. The suicide report is also correct in identifying that once the inmate did arrive in the emergency room, only one IV was started and that appears to have been started with a 20-gauge needle that would not allow for the most rapid influx of the most appropriate fluids, including crystalloid, to attempt to stabilize the inmate's cardiovascular system. Although the defendants produced a table including an entry stating "Investigation by OIA completed 1/3/06, closed 2/2/06 to hiring authority for action 2/8/06 five individuals," as referenced above, it did not substitute as, or amount to, a response from NKSP to the CAP recommendation in the suicide report.

## 9. Inmate I
Brief History: This 51-year-old Costa Rican male completed suicide by hanging on 4/13/05 at approximately 6:50 p.m. in the library at CSP/Solano. The inmate was

admitted to the CDCR on 11/6/85 via the California Institution for Men (CIM) RC after having been found guilty of second-degree murder and sentenced to 15 years to life.

On 4/13/05, at approximately 6:00 p.m., staff at CSP/Solano determined that Inmate I of Facility 2 was unaccounted for during the 5:30 p.m. institutional count. At approximately 6:15 p.m., all inmates were recalled from areas in the facility in preparation for an institutional emergency count, and simultaneously, first research of Facility 2 was being conducted to attempt to locate this inmate. At approximately 6:30 p.m., the positive identity emergency count of Building 7 indicated this inmate was still unaccounted for. At approximately 6:35 p.m., custody staff began searching the education "B" building, and at approximately 6:50 p.m., the inmate was discovered hanging by what appeared to be a bedsheet from a cage approximately one foot off the ground with an overturned stool near his feet in this law library area. At approximately 6:52 p.m., the staff responded to the medical emergency alert, cutdown scissors were retrieved, and an MTA began to check the inmate for vital signs. At 6:55 p.m., an ambulance was called and arrived at 7:05 p.m.; the inmate was carried down the stair where Vacaville fire department paramedics conducted an EKG and discovered no cardiac activity. At approximately 7:12 p.m., the paramedics contacted a Vacaville medical doctor, who pronounced the inmate dead at that time. There is no indication from the incident report that there was any attempt at CPR by any staff responding to the inmate's discovery. The inmate had been employed as a library clerk, and the records indicate he may have hidden in the library after it closed for the day at 2:40 p.m.

An autopsy report was filed by the office of the coroner for Solano County and indicated that an autopsy on 4/4/05 determined the cause of death as asphyxia due to hanging. The report also indicated that blood and urine specimens were submitted for toxicology, but those results were not provided in the documents received. A suicide note was discovered in his belongings, although it was not provided in the documents reviewed. The note was dated April 2005, was addressed to his family, and stated that he was "sorry for everything," was "a very tired man," and had love for his relatives. There is also a postscript after his signature of his request to be buried with a copy of *Ficciones* by Jorge Luis Borges.

The inmate was serving a 15-year-to-life sentence on a second-degree murder conviction and entered the CDCR on 9/18/85. Records indicate that he shot and killed his ex-brother-in-law with a handgun because the victim had not been paying child support to the inmate's sister. At the time, the inmate was a solar technician in the U.S. Navy and had served in the Navy since 1981 after entering the United States at age nine and becoming a naturalized U.S. citizen at approximately age 12. The inmate had no previous incarcerations.

The inmate had a history of depression with suicidal ideation prior to being admitted to the CDCR, and both prison-term reports indicate that he had been seen for psychological counseling on a number of occasions during his adolescence and early teens. While at the CIM RC, he reported having been seen for mental health treatment in 1978, when he was approximately 24 years old, and while in the Navy it was reported he was

hospitalized for "depression with suicidal ideas." He also received treatment in the county jail prior to his admission to the CDCR, including use of an antidepressant. After admission, the inmate was prescribed Elavil, and his depressive symptoms were thought to be more from his recent incarceration and life term rather than a more chronic mental disorder. The inmate was transfer to CMC-East on 12/27/85; classified as "category K," described as an old designation for supportive care status; and continued at CMC-East until 3/10/94, when he was transferred to Richard J. Donovan Correctional Facility (RJD). He was subsequently transferred to CCI–II for less than six months, until his transfer to CSP/Solano on 6/4/97. He remained at CSP/Solano until his death and remained in general population with the exception of two administrative segregation stays at CSP/Solano.

His diagnosis at CMC-East was dysthymia, and in 1991, his category K designation was changed to category U–recovered from mental illness. He was subsequently recategorized as category J–partial recovery from mental illness with impaired functioning, with a diagnosis of bipolar disorder, mixed type, in 1991. At that time, he began taking Lithium, and in 1993, his diagnosis was changed to cyclothymia. Records indicate the inmate participated in mental health programs and supportive group therapies as well as taking antidepressants while he was at CMC-East and RJD. He appears to have been placed in the MHSDS in 1996, with a diagnosis of major depressive disorder (MDD), recurrent, moderate, without psychotic features at the 3CMS LOC; however, based on his request, he was removed from the 3CMS LOC on 9/13/96. After his transfer to CCI, he continued to participate in a group for lifers. He was not a participant in the MHSDS when he was transferred to CSP-Solano; however, on 3/26/01, he was evaluated for depressive symptoms associated with medical problems related to a back injury that he had received. He had been treated with psychotropic medication, apparently Elavil, which has often been utilized for assistance in pain management. In May 2001, he was placed back on the MHSDS at the 3CMS LOC and given a diagnosis of MDD, recurrent, and a GAF of 65 and was prescribed Paxil and Buspar. His diagnosis, GAF score, and treatment with medications remained essentially consistent until the time of his death. Records indicate there was no change in his overall presentation other than for him to be seen as in partial remission or complete remission at various times, with the exception of some "mild obsessive signs" in January 2005 prompting a diagnosis of obsessive compulsive personality disorder. This prompted an increase in his Paxil from 20 mg to 40 mg per day. He was seen by a psychiatrist on 1/14/05 and CM on 1/21/05, and it was at that time the psychiatrist increased his Paxil from 20 mg to 40 mg and offered a diagnosis of obsessive compulsive personality disorder and his CM noted that he had no mental health complaints. He was scheduled for a 90-day follow-up. On 2/2/05, he refused his psychotropic medications and stated he was discontinuing both prescriptions. Following this refusal, the inmate was seen on 2/4/05 by a psychiatrist, who found him to be irritable, with a "conspiratorial view of things" but with no evidence of depressed affect or mood.

The psychiatrist noted he denied suicidal and homicidal ideation as well as any hallucinatory experiences. The psychiatrist discontinued his medications and informed

the patient of possible rebound symptoms; however, no follow-up appointment was scheduled.

The inmate is described in the records reviewed as participating in treatment, having work assignments including his last assignment as a library clerk, and receiving very few RVRs. He is known to have received two RVRs for failure to report to work and approximately ten RVRs for refusing to submit a urine sample when he was chosen for a random drug-screening program.

The inmate was scheduled for a BPT appearance on 4/14/05, the day following his death.

The suicide report identified one problem with recommendation as follows:

> Problem 1: Inmate was able to hide in the law library for several hours before he was discovered missing, and then it took over an hour more to find him.
> Recommendation: CSP/Solano-S and I conducted a review and made changes to the library closing procedure. Reviewers observed that furniture had been rearranged to make it more difficult for an inmate to hide. An Office of Investigative Affairs (OIA) investigation is reportedly being initiated and will be tracked by DCHCS.

On 1/18/06, a report on implementation of quality improvement plan (QIP) for suicide of Inmate I was approved based on the submission by CSP/Solano of 11/30/05. This report was in response to the suicide report dated 9/7/05. The CSP/Solano response indicated that there had been no policy or procedural changes in security measures and that measures had been taken to ensure that current policies and procedures be adhered to as well as post orders. The staff identified several items including the watch commander's failure to notify the Vacaville police department of the emergency count, inability to find a signed copy of the duty statement for the librarian, post orders dated 2002 and 2004 with acknowledgment forms that were not signed or reviewed, and the inmate being able to hide in the library area when the building was cleared and all inmates were not accounted for. The actions taken in response to these identified problems at the facility included issuing a memorandum to all watch commanders reiterating the notification of police policy, obtaining a signed duty statement as of October 2005, updated post orders as of February 2005, as well as having acknowledgment forms signed and reviewed, and the procedure to collect all state identification cards and work card when inmates enter the building, to be returned upon exit of the building, for inmates in the education and law library areas.

**Findings:** This inmate's completed suicide does not appear to have been foreseeable or preventable. Although the inmate had a history of treatment in the MHSDS, he decided to stop his antidepressant medications approximately three months prior to his death. He left a suicide note indicating that he had made a decision to end his life in lieu of his long prison term. He was scheduled for BPT review the following day; however, the impact of the scheduled review cannot be determined from the documents that are available. The corrective action on ensuring the inmates are unable to secrete themselves in

33

unsupervised areas of the institution such as the law library appears to have been an appropriate response at both the central and facility levels.

### 10. Inmate J

Brief History: This 43-year-old Caucasian male incarcerated at the California Substance Abuse Treatment Facility (CSATF) completed suicide on 5/13/05 by hanging. The inmate was in the 3CMS LOC in the MHSDS and was housed in general population– orientation. The inmate was readmitted to the CDCR, for his fourth time, on 11/10/04, having been convicted of a charge of cruelty to animals as his third strike, and was serving a term of 25 years to life.

On 5/13/05, at approximately 2:40 a.m., the CO was conducting the 3:00 a.m. security checks when he observed the inmate hanging at the bottom of his bunk between the toilet and the lower bunk. The officer activated his alarm and notified staff of the incident. Staff arrived, the cutdown tool was used to free the inmate's body, and he was placed on a stokes litter. Medical staff arrived in the emergency room van, and an MTA and RN began CPR. The inmate was transported to the correctional treatment center, and CPR continued. The on-call medical officer of the day was contracted and pronounced the inmate dead at 3:12 a.m. While the suicide report indicates that two COs began CPR until arrival of the MTA and RN at 2:53 a.m., the actual incident report indicates that CPR was not started until the MTA and RN arrived. The suicide report acknowledges discrepancies in the time lines.

An autopsy report completed by the office of the sheriff–coroner for King's County indicates an autopsy was performed on 5/13/05 and indicates the cause of death as asphyxia due to soft ligature strangulation. A toxicology indicated that a blood alcohol level of 0.02 percent was detected (legal limit 0.08 percent for motor vehicle operation) and that the body was negative for drugs of abuse.

A letter apparently offered by the inmate dated 5/13/05 and addressed to "Pastor Bill" was also provided in the documents reviewed. This letter indicates the inmate read a book authored by the addressee, as well as the inmate having read "straight through the Bible, old testament and new, cover to cover." The inmate indicates that he is hopeful that the pastor can help him answer some questions because "my salvation will depend on your answers." The inmate then describes his life experiences including his military service, drug use, prison terms, and his marriages, including the death of his son in utero. This inmate also reports his belief that he had "serious delusions" involving his girlfriend, "vampires," and his being the "5th horsemen." He continued that his delusions included his belief that he was "an immortal," that the vampire had entered his dog, and that his dog was the anti-Christ. He makes reference to voices convincing him that he had to make a sacrifice so that he bludgeoned his dog to death, chopped off her head, and drove a wooden stake through her heart. The inmate concludes this letter with eight questions regarding the Bible, God, Jesus, and prophets. Although the inmate ends his letter with "I look forward to hearing from you," postscript states, "Will suicide damn one's immortal soul?"

The inmate was admitted to the CDCR on 11/10/04 as noted above. The charge of cruelty to animals included his having beaten and decapitated his dog, related to self-reported paranoid delusions and auditory hallucinations. It is also noted that he had been drinking heavily over several days before killing his dog by decapitation and afterwards driving a wooden shard into her chest to prevent her from coming back to life. The inmate's criminal justice history appear to have begun at approximately age 22 and included arrests for assault, with his first incarceration at age 24 for stabbing a person at a party for which he received a six-year term. During this incarceration, the inmate entered the CDCR via Wasco State Prison (WSP) RC, and his diagnosis was schizoaffective disorder. He was being treated with Abilify, which was being reordered, and his history of past psychiatric hospitalizations, including hospitalization at Walter Reed Military Hospital while he was in the military after a suicide attempt with explosives, his psychiatric history beginning in late adulthood while he was in the U.S. Army, and his treatment history with medications, was all noted. It was also noted he had a history of hypersexuality, hyperactivity, and family mental illness. Despite the reports of his having a suicide attempt while in the military, the inmate denied during the RC process any current intent to harm himself. While at WSP RC, his Abilify was increased, and he was placed at the 3CMS LOC in the MHSDS. The record also indicates that psycho-social stressors included receiving bad news, three strikes, and sex offender, with a notation that he was being evaluated currently for "R" suffix.

The inmate was seen by a psychiatrist on 2/15/05 who indicated the inmate was seen "at the door" and reported feeling okay and improving in symptoms on Abilify, Wellbutrin, and Vistaril. The psychiatrist described the inmate as "a little depressed" on that day and continued to diagnosis this as a bipolar disorder with psychotic features versus mood disorder with psychotic features. The plan was to follow up in 90 days. On 4/26/05, the inmate was again seen by a psychiatrist, who reported the inmate was "feeling alright" and had a decrease in auditory hallucinations and depression but complained of decreased sleep. The inmate denied suicidal and homicidal thoughts and reported feeling anxious at times. The inmate next transferred to CSATF on 5/4/05. He was seen on 5/10/05 for initial mental health evaluation, SRA, and treatment plan. The diagnoses offered were psychotic disorder NOS and amphetamine dependence with a GAF of 64 on the mental health assessment, as well as the treatment plan.

This was the last contact by mental health staff the inmate had prior to his completed suicide on 5/13/05.

The suicide report makes note of the orientation unit in which the inmate was housed as a locked unit but does not have a provision for psych tech rounds as is the case in ASUs or SHUs.

The suicide report indicated that all policies and procedures were followed at the institutional level and that there were no corrective action items or recommendations at the local level. However, the suicide report does indicate there were a number of systems

issues. The suicide report identifies problems and recommendations at the system level as follows:

> Problem 1: System: The inmate was on orientation status following his arrival at CSATF. The programming in this unit is essentially that of a locked unit like ASU, but there are no enhanced mental health services such as rounds. Recommendation: Determine extent to which such locked units exist in all institutions. Discuss this issue at the department-level SPR-FIT, and forward recommendations to the Mental Health Subcommittee (MHS).

> Problem 2: System: The inmate's personal property was returned to his family before this review was conducted and therefore was not available. This has happened at other institutions as well. Recommendation: DCHCS to provide instructions to institutions, particularly investigative services, regarding protocol for suicide reviews, including instructions to retain inmate property until review is complete.

> Problem 3: System: A close examination of the emergency response was hampered by discrepancies in or unavailability of exact times of staff interventions. This frequently occurs in other cases as well. Recommendation: SPR-FIT to discuss recommending a department-level review of procedures for documenting emergency response including time lines.

All of these recommendations are made as "system" recommendations that involve DCHCS and SPR-FIT. There was no response from DCHCS or SPR-FIT included in the documents reviewed in response to the system recommendations of the suicide report. Defendants have requested that the latter comment by this reviewer be withdrawn on the ground that a Corrective Action Plan response was sent in March 2006. That action by the defendants, however, is not responsive to this reviewer's concern that system-related recommendations be addressed, which more appropriately should have come from DCHCS or SPR-FIT.

**Findings**: This inmate's suicide does not appear to have been foreseeable; however, it may have been preventable. While the suicide report identifies problems to be corrected at the system level, it does not identify a need to clarify at the local level the discrepancies in documentation with regard to the initiation of CPR. Conflicting documents indicate that CPR was started by correctional officers prior to the arrival of medical staff as well as not being started until the arrival of medical staff and the inmate's placement in the ER van. The document that appears to be most immediately relevant to this issue is the incident report completed by the CO who first discovered the inmate. In that report, it indicates that CPR was begun by medical staff when they arrived. Assuming this is correct, there was a delay in the initiation of CPR from the time of discovery at 2:40 a.m. until the time of medical staff arrival at 2:53 a.m. This matter should have been identified as a problem and further documentation required resolving the issue. If indeed CPR was not started until the arrival of medical staff, there was a 13-minute delay from the time of discovery to the time of initiation of life-saving

procedures, and therefore, this death may have been preventable. The second item of concern that was not identified in the suicide report is the lack of participation by a psychiatrist at the treatment plan of 3/10/05. It appears that the inmate was seen by a clinician, who completed an MH-4, MH-2, and SRAC all in the same day without any input from any other clinicians. Therefore, at minimum, the treatment plan was not multidisciplinary. Lastly, the suicide report does identify "system" issues, and there is no response provided in the documents reviewed regarding the problems identified and the need for systemic approach at the central level. There is no explanation for the lack of response in a timely manner by DCHCS.

**11. Inmate K**
Brief History: This 21-year-old Hispanic male, incarcerated at CEN, completed suicide on 5/21/05 by hanging. The inmate was in administrative segregation in a single cell and was not receiving services in the MHSDS. He was admitted to the CDCR via the WSP RC on 3/19/03. He was serving a first term after having been convicted of receiving stolen property, carjacking, evading a peace officer, assault with a deadly weapon, and kidnapping, resulting in an eight-year sentence. This sentence was based on a plea agreement, and a firearm enhancement was dropped based on that agreement.

On 5/21/05, at approximately 6:30 a.m., a CO in the ASU was distributing the morning meal and discovered this inmate hanging from the air vent in his cell. The officer informed the sergeant, and the building alarm was activated. At approximately 6:32 a.m., the cell was opened, and the inmate was cut down, with the inmate being handcuffed. After the inmate was handcuffed, his pulse was checked by an officer, and at 6:35 a.m., an MTA arrived and started rescue breathing. An outside ambulance was called, and by 6:38 a.m., the inmate was moved to a medical cart and transported to the CTC, where he arrived at 6:41 a.m. The outside ambulance arrived at the facility by 7:00 a.m., and by 7:10 a.m., a physician pronounced the inmate dead.

The MTA provided CPR during transport to the CTC, and nursing staff continued providing CPR after arrival at the CTC. During his stay in the CTC, attempts were made to start an IV line, which were unsuccessful, as well as to establish intubation and defibrillation. The on-call physician was contacted by telephone at 6:50 a.m. and remained on the telephone until his arrival at 7:20 a.m., apparently en route to the facility. The physician and the El Centro Regional Medical Center were contacted by paramedics at 7:10 a.m. and ordered CPR discontinued.

An autopsy conducted by the Office of the Medical Examiner of San Diego County and dated 5/24/05 indicated the cause of death as hanging. A toxicology report indicated there was no alcohol in the blood specimen and no common drugs of abuse detected.

This inmate was admitted at the CDCR via the WSP RC on 3/19/03 for his first term. As a result of a plea agreement, the firearm enhancement was dropped; however, he was serving an eight-year sentence for the charges as stated above and had served more than two years of his sentence. The inmate had received the mental health screening after his

37

admission in March 2003 at WSP RC, which was negative for any mental health pathology. The inmate did not receive any mental health services after being cleared at WSP RC for general population and was transferred to CSP/Corcoran in May 2003 and subsequently to CSATF-II on 7/11/03. Based on information received regarding possible drug contraband to be introduced into the facility, the inmate was placed in administrative segregation at CSATF-II on 12/28/03. Charges were filed, and he was out to court on several days in January and March 2004, with his eventual release from administrative segregation on 3/24/04. He, however, did return to court in April, May, and June 2004 on the same charges. In November 2004, a riot occurred at CSATF-II, and this inmate was issued an RVR and placed in administrative segregation for which he was eventually found not guilty. On 4/5/05, the inmate was moved to WSP RC en route to CEN, where he arrived on 4/7/05. On 5/18/05, the inmate requested placement in administrative segregation for safety reasons as he believed there was a threat to his life. He committed suicide on 5/21/05, three days after having been placed in administrative segregation.

The suicide report makes reference to this inmate having been seen by a psych tech on 5/19/05 and being referred to a clinician on 5/20/05, based on the inmate's request to see a specific Hispanic psychologist. The suicide report references that the psychologist was unavailable on 5/20/05, and a late entry progress note of 5/23/05 recorded the inmate having been seen by an LPT and denying any "emergency" and "no symptoms or issues were recorded." A review of the LPT note of 5/23/05 indicates that the note was a late entry for 5/20/05 and stated that the inmate was asking to see "Ph.D." The inmate is noted to respond "no" as to whether or not this was an emergency and denied suicidal ideation to the writer. The inmate indicated, "I'll only talk with a doctor," and the writer notes that this information was reported to the psychiatrist, including her uneasy feelings of the inmate being evasive. The inmate was scheduled for a psychologist line for 5/20/05. There is no explanation as to why the inmate was not seen on 5/20/05 on the psychologist line. The inmate committed suicide on 5/21/05.

The suicide report makes reference to the referral appointment being scheduled for 5/23/05 with the Hispanic psychologist requested by the inmate. The inmate was placed in administrative segregation on 5/18/05 after reporting threats to his life; however, there is no reference to these concerns in the psych tech's note or the referral to the psychologist. The suicide report makes reference to the inmate never being evaluated by a licensed mental health professional beyond a level of basic screenings.

The suicide report indicates that all policies and procedures in effect at the time were followed, and there were no recommendations.

**Findings:** This inmate's suicide does not appear to have been foreseeable or preventable. While there are concerns with regard to the inmate having requested a referral to a specific Hispanic psychologist, according to the documents reviewed, written after the inmate's death, the request was not reported as an emergency such that the psych tech and the mental health staff scheduled an appointment for 5/23/05. Unfortunately, the inmate committed suicide on 5/21/05, after his request of 5/20/06 to be seen by a specific Hispanic psychologist.

**12. Inmate L**

Brief History: This 31-year-old Caucasian male, incarcerated at CMF, completed suicide on 5/27/05 by hanging. The inmate was receiving care and treatment at the EOP LOC in the MHSDS at the time of his death. The inmate was admitted to the CDCR via RJD on 6/30/93 after having been convicted of involuntary manslaughter and aggravated mayhem for which he received a sentence of life with parole plus 11 years.

On 5/27/05, COs conducting a 5:00 p.m. hour unit unlock observed this inmate hanging with an inmate-manufactured noose suspended from the cross member of the upper bunk. One of the two officers discovering the inmate announced "man down," and the other officer made a radio announcement requesting medical and custody staff. After entering the cell, one of the officers attempted to untie the noose; however, the second officer arrived with a cut-down tool, and the inmate was cut down. Custody officers began to administer CPR after the inmate was cut down, and an RN and licensed practical nurse (LPN) arrived. The advanced life support machine was administered to the inmate, and based on the readings, staff continued to administer CPR while the inmate was transported to the medical emergency room. The inmate's cellmate was placed in handcuffs and escorted to a custody holding cell as these procedures took place. At approximately 5:44 p.m., the inmate was pronounced dead by a physician. During the course of treatment in the ER, Epinephrine and Atropine were administered, and other lifesaving procedures were pursued.

A coroner's report was filed by the Office of the Coroner County of Solano, which indicated an autopsy was performed on 5/31/05 that determined the cause of death as asphyxia due to hanging, which was self-inflicted. No toxicology studies were provided with the records reviewed.

This inmate was admitted to the CDCR at RJD on 6/30/93 after having been convicted of aggravated mayhem plus involuntary manslaughter. The inmate received a life-with-parole sentence plus 11 years and was eligible for parole after 11 years. The court recommended placement in a medical facility within the CDCR, and after admission via RJD RC, the inmate was transferred to CMF on 9/15/93, where he remained until his death. The inmate's crime included the killing of his father when the inmate was 18 years of age. The suicide report gives a detailed history of the inmate having been intoxicated on methamphetamine on the day of the offense and references that both he and his father were intoxicated at that time. The suicide report also makes reference to the inmate having suffered extreme physical, sexual, and psychological abuse by his father, ultimately resulting in his killing his father while intoxicated. The inmate had previous arrests in 1990 for driving dangerously and in 1991 for battery against his father while defending his younger brother from abuse.

The inmate has an extensive mental health history, much of which is reported in the suicide report based on a psychological evaluation done in June 1993 during his trial. The extreme abuses he suffered from his father were reported as well as suicidal feelings

and at least one suicide attempt at approximately age 16. The inmate received therapy and medication and was diagnosed with bipolar disorder. There were also descriptions of his alcohol, marijuana, and methamphetamine abuse. The inmate was also diagnosed with borderline personality disorder. After being admitted to the CDC, he was classified as a category "J," i.e., inmate with mental illness who was later admitted to the EOP LOC within the MHSDS. In addition to his having been reported as "having a history of suicidal ideations," he also engaged in self-injurious behavior (cutting). He remained in the EOP until November 2003, when he was transferred to the Salinas Valley Psychiatric Program (SVPP) (intermediate care), where he remained for approximately seven months and appeared to have benefited from the treatment; he was subsequently returned to the CMF EOP in June 2004. He appears to have been discharged from the SVPP because of his having secreted razor blades in his room and having stated to another inmate that they should take a nurse hostage. He was initially in the VPP 6/9/04 until 6/28/04, when he was returned to the EOP. After return to the EOP, the inmate received an RVR in July 2004 for mutual combat with another inmate; however, the mental health assessment completed by the clinician indicated mental health issues were a factor, and the sanction was reduced to an administrative reprimand. He remained in the EOP after his return from the SVPP in June 2004.

While in the VPP, the inmate's diagnoses included major depression, post-traumatic stress disorder, and personality disorder NOS, and his medications included Wellbutrin, Geodon, and Neurontin. These diagnoses were identical with those while he was in the DMH inpatient program from 11/19/03 to 6/9/04. At the time of his death, the inmate was prescribed Seroquel, Wellbutrin, Effexor, Buspar, and Vistaril.

Progress notes and data on participation in EOP structured therapeutic activities indicate the inmate was refusing at least 70 percent of offered structured therapeutic activities, had some inconsistency in taking his medication, and was noted to be sleeping during the day and refusing to come out of his cell until the p.m. medications. This documentation continues from January 2005 until the time of the inmate's death. By 3/25/05, the CM progress notes indicate the IDTT determined that the inmate would be an excellent candidate for "DTP [day treatment program] referral at this time." The plan indicates the inmate is waiting for day treatment admission. The suicide report makes reference to CM notes in April suggesting that "if the inmate did not improve his motivation enough to "qualify" for the DTP, he should be referred to 3CMS." Even though the inmate, according to the CM's progress notes, would be an "excellent candidate" for intermediate care or day treatment and the plan was to refer him, it appears that he was never referred to either program. The inmate's CM changed the week before his death, and the suicide report makes reference to the new CM not being aware of the recommendations for referral. In addition to these issues, the inmate's medications were being modified during the month of May 2005, his Wellbutrin was decreased nine days before his suicide, and his Buspar had been stopped from 5/19/05–5/26/05, the day before his suicide, for unknown reasons.

The inmate was seen by a CM on 5/26/05 and reported to his CM, "I'm not suicidal right now, but I will be over the weekend." The CM goes on to state that the inmate was seen

because he appeared depressed, he was asking for a medication change the day before, and "he said that he was sure he would be suicidal over the weekend." The CM assessed that the inmate appeared to be somewhat less depressed than the day before "though he stated that he has little will to live." The assessment goes on to say, "feels that he isn't suicidal at the moment but he stated that he could guarantee that he would become suicidal soon." The CM's plan was to contact the on-call physician, and the physician stated that he would look at the inmate's current medication. The on-call physician did indeed see the inmate on 5/26/05 and noted that he had no chart and, in the progress note, indicated that the inmate was being seen because he was raising issues of wanting Wellbutrin back for depression. The inmate also told the psychiatrist that his Buspar had stopped on May 19th and that he didn't know why it was stopped. The psychiatrist notes that the inmate stated to the CM "I'm not suicidal now, but I will be over the weekend." The psychiatrist indicated the inmate had "no specific suicidal ideation now" and assessed the inmate as experiencing unresolved depression and anxiety, with a plan "willing to re-order Buspar." There is no indication in the records reviewed that an SRAC was performed by any clinician nor was the inmate referred to a crises bed LOC. There was also no documentation in the UHR that medications were administered after 5/10/05, which the suicide report indicated was "most likely a problem with the documentation"; however, no additional documentation was provided.

The suicide report makes reference to this inmate being a "star programmer at SVPP" but that he did not engage in the activities offered on the EOP unit, with consistent complaints about his medication and no evidence of a referral to either an ICP or a DTP as was referenced in the progress notes and recommended by the IDTT. The suicide report also concluded, "he should have been transferred to a higher level of care, in accordance with the six-month-old recommendation by his IDTT."

The suicide report identified three problems with recommendations as follows:

> Problem 1: Inmate was recommended for DMH inpatient placement six months before he died, but a referral was never made. There was no system in place for assuring that a timely referral would actually be done following IDTT recommendation.
> Recommendation: Create a system for tracking referrals. Paperwork for a DMH referral should be completed within a week of the IDTT recommendation. Responsible clinician must be held accountable for completing the referral within one week.

> Problem 2: This inmate clearly needed a high level of care, but for some inexplicable reason, transfer to a DMH inpatient program was contingent upon the inmate first improving his participation in the outpatient EOP. Inpatient treatment is a higher level of care and is indicated for severely mentally ill inmates such as Inmate _____ who are not doing well in the EOP (note that mental illness and intellectual functioning are independent constructs). This reasoning by CMF staff is incomprehensible and violates the MHSDS guidelines. Department policy is clear that DMH programs are a high level of care and the criteria for referral

should not depend on inmate improving his performance in an outpatient program in order to be referred to an inpatient program. This inmate should have been referred by the IDTT without delay.

Recommendation: Provide remedial training to all clinical staff on the criteria for referral for inmates between LOCs, emphasizing that the severity of the illness and clinical need is the only real criterion. Program participation should never be a criterion or reason to change to either higher or lower level of care.

Problem 3: As with the previous CMF suicide (3/12/05), the most recent MAR was not found, and there was no documentation that this inmate received any medications after 5/10/05.

Recommendation: Produce the MAR and/or other documentation to prove that Inmate _____ received his medication after 5/10/05. If documentation cannot be produced, conduct an audit of timeliness of medications for housing transfers and new admissions. If compliance is below 90 percent, initiate a QIT, and submit a plan for improvement (this is the same as the cap for [- -----] and can be the same QIT).

On 12/1/05, the DCHCS issued a memorandum that the QIP by CMF submitted on 10/31/05 had been approved. The QIP submitted by CMF was in response to the suicide report dated 8/11/05. The documentation submitted by CMF included the following:

- Regarding Problem 1: Documents representing the tracking grid that has been in place since May 2005 were provided, and each program is able to track referrals via this process; in response to Problem 2, remedial training was provided to clinical staff regarding the criteria for transfer to a higher level of care, specifically to the DMH DTP. It was also stressed that the DTP is a higher LOC than the EOP; in response to Problem 3, a copy of the MAR for May 2005 was provided that indicated that the inmate did receive his prescribed medication after 5/10/05.

**Findings**: This inmate's death appears to have been both foreseeable and preventable. The records indicate and the suicide report references the inmate's history of having chronic suicidality. There are also references to the level of participation and improvement he demonstrated while in the SVPP at the intermediate care level and the change in his participation when he returned to CMF at the EOP LOC. Despite his lack of participation, his inconsistency in taking his medications, and his clearly decompensating condition, he was not transferred to a higher LOC. This is more egregious since the staff at CMF appeared to have recognized his declining condition but somehow determined that a part of the criteria for referral to a higher LOC required his greater participation at a lower LOC i.e., the EOP. As the suicide report clearly identifies, this is grossly inconsistent with program guides and with good clinical judgment. The failure to make a referral, the lack of communication between case CMs, and the failure to conduct an SRAC also may have contributed to this inmate's death.

While the suicide report makes reference to several of these areas, it does not appropriately identify that an inmate who was reporting (based on his history and knowledge of his own decompensation) his belief that he would become suicidal within days did not receive any change in treatment other than for a psychiatrist to reorder Buspar. While CMF does provide a response to the suicide report, which includes a tracking system and training that are appropriate, the submission of the MAR as being responsive to the suicide report recommendations is misleading. Review of the MAR that was provided indicates that the inmate did not in fact receive all of his medications after 5/10/05 because he was refusing his Effexor from 5/15/05 through the day of his death, and this is documented in the notes/comments section of the MAR as either "refused Effexor" or "no Effexor" without any evidence in the UHR that a referral was made or that there was any attempt to modify or counsel the patient or make medication changes based on his refusal. The patient reported his Buspar abruptly stopped on 5/19/05 and was not reordered after that date until, as referenced in the report, 5/26/05. There is also no explanation in the record for this discontinuation. Therefore, not only do we have an inmate who was decompensating, had been refusing 70 percent or more of his programmatic activities, and had refused to meet with his CM on two previous appointment meetings but met with his CM on the day before he committed suicide, we also have poor medication compliance and medications for anxiety being discontinued for reasons unknown. There were multiple failures in the care and treatment of this inmate.


## 13. Inmate M

Brief History: This inmate was a 28-year-old Caucasian male, who committed suicide by hanging on 6/9/05 in his single cell in administrative segregation at the SQ RC. He was returned to the SQ RC on a parole violation on 5/24/05 after his arrest on charges of domestic violence. His underlying offense was disregarding public safety for which he received a two-year-and-four-month sentence and was incarcerated initially on 3/28/02. The inmate was a general population inmate and was not receiving services in the MHSDS at the time of his death.

On 6/9/05, at approximately 11:05 p.m., the CO conducting a security check in the Carson Section in the ASU discovered the inmate standing in front of his door at the cell bars. The officer asked the inmate if he was alright, and when the inmate did not respond, he banged on the cell bars and shined his flashlight, observing the inmate was hanging. The officer activated the alarm, and the cell extraction team was assembled. At 11:07 p.m., an MTA arrived at the cell. The cell door was opened, and the inmate was given CPR for approximately five minutes and was transported to the TTA. The on-call physician was contacted, and the inmate was pronounced dead at 11:22 p.m. On 6/13/05, an autopsy was performed by the Office of the Coroner, County of Marin, which stated the cause of death as asphyxia due to hanging (minutes). Toxicology screen revealed no common acidic or basic drugs and no blood alcohol level. A suicide note was found in the inmate's cell addressed to his mother and father and stating that he was sorry that he never amounted to the son that they both deserved and going on to express his regret and decision to end his life because of his painful life. It continues as to how he wants his

ashes disposed and states, "I'm doing this because I have too." The second page, which appears to be addressed to his friends, states they should remember how "off the hook I lived my life" and that he was always "full throttle."

This is the inmate's second CDCR term, the first having been served under a different CDCR number [(------)], with his release from the system on 1/23/01. The second commitment offense was disregarding public safety, which occurred on 3/28/02 and resulted in his receiving parole on 5/25/03, with subsequent return to custody on 11/25/03 because of violation of parole. He paroled again on 7/22/04 but was returned to custody on 5/24/05 secondary to an arrest for domestic violence against his girlfriend.

The inmate appeared to have had no mental health history prior to his first adult incarceration in 1997; however, during his incarcerations, he had been diagnosed with polysubstance dependence and borderline personality disorder and had been prescribed Paxil. He had also been placed in the 3CMS LOC in 1999 and discharged from that LOC in February 2000. He did have a history of prior suicide attempts including one in 1991 when he inflicted superficial cuts to his arm and a second in 1999 as an attempted hanging in the Nevada County Jail because of problems between him and his parents. He also has a history of polysubstance abuse, including methamphetamine, marijuana, heroin, mushroom, ecstasy, and LSD, as well as alcohol abuse or dependence.

When he returned to custody on 5/24/05, the confidential transfer of medical information from the county jail indicated no medical or mental health problems and no medications. The initial health screening dated 5/24/05 indicated the inmate had no history of mental health problems or current mental health issues. He was cleared for general population. On 6/8/05, the inmate completed a healthcare services request form (sick call request) and wrote at the top "emergency please help RCADS" (the inmate was in the RC administrative segregation at the time.). The inmate stated the reason for requesting healthcare services from mental health was because "I pc'd up because I just wanted to go home. I changed my mind and I'm going back to general population. I gotta be crazy for this knowing harms waiting for me. Please house me EOP in the hospital so that I don't get hurt or have to hurt anyone defending myself. I just want to go home please. Please help me please." This request was noted as received on 6/9/05 at 7:00 a.m. There is no indication that the inmate was seen prior to his discovery at approximately 11:05 p.m. on that same day. There is a notation on the initial inmate suicide report on 6/10/05 that the inmate did receive a psychological screening on 5/27/05. This document does not appear to be included in the records provided.

According to the suicide report, the inmate had been placed in administrative segregation on 6/7/05 after he had approached a lieutenant, informing him that he had enemy concerns related to a prior incarceration with inmates who might presently be housed at SQ. The suicide report also references the movement log and indicates the psych tech rounds had been completed on that day and hourly cell checks had been completed by officers on 6/9/05 through 6/10/05, covering the time period when this inmate hanged himself. The inmate when discovered had no vital signs, and his temperature was recorded as 88.2 degrees.

44

The suicide report identified two problems and associated recommendations as follows:

> Problem 1: Inmate _____ had submitted a request on a healthcare services request form (CDC-7362) to be seen by mental health, requesting that he be placed in the EOP. Inmate _____ wrote in bold letters, "emergency please help me." The request was received at 0700 by nursing staff more than 18 hours prior to his suicide. There was no documentation that he was seen.
> Recommendation: Review procedures for responding to inmate request for mental health services. Determine why this request was not acted upon in a timely manner. Develop more effective procedures for responding to inmate requests. Conduct training for appropriate staff regarding responses to inmate requests for mental health services.
>
> Problem 2: It appears Inmate _____ may have been dead longer than one hour, based on his body temperature at the time of discovery (FIC).
> Recommendation: Initiate a review with custody and medical to determine if in light of the body temperature, the required custody rounds had been properly conducted and logged.

The SQ report on its implementation of the QIP in response to the suicide of this inmate was approved on 1/26/06 by the Deputy Directors of the DCHCS and Division of Adult Institutions (DAI) and included the 12/1/05 response by SQ staff. Their response indicated that with regard to Problem 1, a QIT had been formed to study the problem and formulate more effective procedures for responding to inmate requests and to conduct the training on those procedures. This resulted in LOPs that were developed to respond to inmate requests and training for staff. The procedure directs that designated medical personnel receive a referral indicating an inmate is in need of "emergency" and/or "immediate" attention. The medical staff person will interview the inmate or have the inmate immediately referred to the TTA or some other qualified clinician. It further directs that if the staff member concludes that there is imminent danger to self, the staff person should notify the TTA immediately and ensure the inmate is under staff supervision until the inmate is brought to the TTA for evaluation. Finally, the procedure indicates that if the matter is routine, it will be treated in a normal manner for routine referrals. With regard to Problem 2, the SQ staff estimated that the time of death for his inmate was approximately 6.8 hours before the time of the temperature measurement at 11:15 p.m. using the Glaisper Equation that was outlined in the response. The response indicated that a memorandum dated 9/26/05 entitled "Carson Section Administrative Segregation Security Checks" documents a review by custody staff into the issue of properly conducting and logging custody rounds and, further, that a followup investigation had been initiated.

**Findings:** This inmate's death does not appear to have been foreseeable; however, it may have been preventable had there been appropriate clinical responses and custody rounds. While the suicide report identifies two problems, it does not make reference to any interviews with the psych tech making rounds on the day of the inmate's death. The

inmate sent an emergency request to mental health on the day before his death (which was received with no evidence of a response), and the psych tech made rounds on the day of his death, which was at least an opportunity for the inmate to alert the psych tech to his acute distress. While there may be an explanation for why this did not occur, the suicide report is silent on any attempts to interview the psych tech and determine the quality of the rounds that were made on that day. There was no additional information provided with regard to the investigation of custody rounds referenced in the suicide report and response by SQ staff.

**14. Inmate N**
Brief History: This inmate was a 24-year-old Caucasian male, who committed suicide by hanging on 6/11/05 in his single cell in administrative segregation at RJD RC. The inmate entered the CDCR on 5/19/05 following an arrest on 3/24/05 for oral copulation while he was on probation from a guilty plea on 1/16/02 to a charge of threatening crime with intent to terrorize. He received a three-year sentence on the original charge (threatening crime with intent to terrorize) and was granted probation, which he violated, resulting in his incarceration on 5/19/05.

On 6/11/05, at approximately 9:12 p.m., a CO who was preparing for the 9:30 p.m. institutional count reviewed the 6:00 p.m. count and discovered a discrepancy indicating that cell 126 was shown as empty. The CO who was reviewing the 6:00 p.m. count directed another CO to "go and re-check cell 126," and the first CO responded, "There is not an inmate in that cell, only a dummy." It was at this point that the CO preparing for the 9:30 p.m. count went to the cell to "check for myself" and discovered the inmate hanging. The MTA reported, "the body was still warm and not rigid, skin was pale, eyes opened and fixed, and there was no responsiveness. There was no movement or respiration, and no carotid pulse was present." The MTA then initiated CPR and directed transfer of the inmate to the TTA. The inmate was transported to the TTA, with arrival at approximately 9:23 p.m. At approximately 9:39 p.m., an ambulance arrived and transported the inmate to Grossmont Hospital, where an emergency room physician pronounced the inmate dead. The officer subsequently discovered a handwritten note in the cell window that read, "the skin heads can not get me where I am going HA! HA!" An autopsy was conducted on 6/12/05 by the Office of the Medical Examiner, County of San Diego, and determined the cause of death to be hanging and the manner of death suicide. The toxicology report was positive for Citalopram only.

The inmate's criminal justice history appears to have begun in November 2001, when he was arrested and subsequently charged with threatening with intent to terrorize and stalking. This was reported as being related to his stalking and sending threatening letters to a 22-year-old woman who worked as a security guard at a fast-food restaurant. The inmate pled guilty to one of the two charges and was given a jail term of 270 days and formal probation for five years, with ultimate release from jail custody on 5/5/02. Prior to his arrest on charges of oral copulation on 3/24/05, the inmate had multiple violations of his probation and was remanded to jail custody on three occasions. During the course of his probation, the inmate was required to receive mental health treatment; however,

county mental health placed him on a "do not treat" list because of his belligerent and inappropriate behavior, and he refused to comply with psychiatric medication treatment. The inmate was remanded to the CDCR on 5/19/05, and the suicide report makes reference to his having been housed in nine different cells located in four different buildings during the 23 days from his admission until his death on 6/11/05.

The mental health history described in the suicide report as having been obtained from the C-file included the inmate having psychological problems since early childhood, a reported history of bipolar disorder, distorted sexual preoccupation including sexual sadism, and "fascination" with reading books about various serial killers. There are also references to his having reported hearing voices and behaviors that were belligerent and inappropriate. The inmate had been non-compliant with court-ordered mental health treatment, including psychological counseling and psychiatric medications. During this probationary period, the inmate absconded to Maryland and was subsequently hospitalized in a state mental hospital in Maryland and prescribed Depakote. There is also a reference to the inmate having reported he was hospitalized in Maryland because of a suicide attempt.

On 5/19/05, an initial health screening was completed by an RN that indicated the need for a psychiatric referral within 72 hours based on the inmate reporting that he had bipolar and seizure disorders and was taking Topamax, Lexapro, and Depakote. Also, emergency care flow sheets were completed on 5/27/05 and 5/29/05. The first indicates that the inmate had a seizure and the second that the inmate's cellmate had beaten him up. In addition to the mental health screening chrono dated 5/31/05 indicating a need for referral for further evaluation, a DDP screening completed on 5/31/05 reported no need for further evaluation. The records also include a note by a psychologist dated 5/25/05, stating the inmate was seen in ICC on that date and was listed as general population; however, he was taking psychotropic medications. Although the inmate was determined to be released on that date to general population housing by the ICC, a psychiatric staff referral request form was completed and submitted for a psychiatric follow-up. Review of the doctor's order sheets indicate that on 5/19/05, Topamax and Depakote were ordered for this inmate. The MARs indicate that in June, the inmate had refused Depakote for seven days, and the MARs were blank for two days for the first 11 days in June, indicating the inmate received Depakote for only two of 11 days in the month of June. With regard to Topamax, he appears to have received Topamax seven of the first 11 days in June. The MAR for May was not provided. The suicide report references the May MAR and indicates the inmate received his psychotropic medications from 5/19/05 to 5/25/05 and from 5/30/05 to 5/31/05 but was not offered his medications from 5/26/05 to 5/29/05.

During the course of his incarceration from 5/19/05 until his death on 6/11/05, there is no documentation that he was ever seen or evaluated by a psychiatrist. His medications were ordered on admission by a medical officer, and despite there being three referrals for a psychiatric evaluation, he does not appear to have been seen by a psychiatrist despite his history and his having been received at RJD RC on psychotropic medications. He also does not appear to have been placed in the MHSDS despite his history and his

having active treatment for mental health reasons. The inmate's last contact with mental health staff was with a psych tech, as stated in the suicide report, in which the inmate endorsed that he had been taking antidepressants, that he was not thinking of killing himself, and that killing himself would not be effective in solving his problems, and his adaptive functioning was rated as "fair." The inmate was cleared for general population, and no referral for further evaluation or review of his psychiatric medications was made at that time.

The suicide report makes reference to the mental health tracking system (MHTS) having numerous errors regarding the inmate's location; the appointment with the psychologist on 5/25/05 being at the cell door, which "was not the case"; and the MHTS having no referral history, no missed appointment history, and no prescription history. As per the records received and as stated in the suicide report, no mental health assessment was completed after the inmate's arrival in the CDCR despite there being three referrals for further mental health assessment, including psychiatric assessment regarding his medication prescriptions. He therefore had no diagnosis and was not included in MHSDS.

The inmate was placed in administrative segregation on admission to RJD because he had been in segregated housing at the San Diego County Jail. He was placed in a least three different cells between 5/19/05 and 5/25/05, when he was seen at ICC and released to the general population–RC. The suicide report makes reference to inmate segregation records for some of this period of time not being located for review. After being placed in general population, he was placed in a least five cells, and the suicide report indicates that custody staff believe this number of moves not to be unusual while mental health staff indicated that the movement history exceeded the norm and made it difficult to find and follow up with referrals made for this inmate. On 6/10/05, the inmate was returned to administrative segregation at his own request, for safety reasons, as he had identified "skin heads" as making threats to him. This placement was the day before he completed suicide.

Although this inmate was never formally assessed by mental health staff after he was admitted to the CDCR, the suicide report offers opinions with regard to diagnosis, based on information found in the C-file and inmate's responses to the routine mental health screening administered on 5/31/05, that include MDD recurrent with psychotic features (provisional) rule out schizoaffective disorder, sexual sadism, and antisocial personality disorder with borderline features.

The suicide report identified five problems and recommendations as follows:

> Problem 1: MHTS data for this inmate contained numerous inaccuracies.
> Recommendation: Form a QIT to conduct a concordance study of the MHTS with the UHRs to evaluate accuracy of data. Audit five UHRs in each program for one month, and compare with inmate history on MHTS.

Problem 2:  Lack of any follow-up on referrals that were made for mental health and psychiatric (medication) evaluations.
Recommendation:  (a) Conduct a focus audit to assess the scope of this problem. (b) Determine if problem is systemic or clinician specific.  (c) If problem is systemic, convene a QIT to recommend changes for improvement.  (d)  If problem is clinician specific, provide appropriate supervision to improve performance.

Problem 3:  Prescribing psychotropic medication to an inmate who is not placed in the MHSDS.
Recommendation:  (a) Conduct a focused audit to determine the scope of this problem.  (b) Establish a procedure to ensure that all inmates who are prescribed psychotropic medication are also designated as being in the MHSDS.  (c) Provide training to all RNs and physicians/psychiatrists regarding requirement to place inmates in MHSDS on psych medications.

Problem 4:  No referral was made to mental health staff by medical staff when symptoms of extreme fear and anxiety were noted during treatment of this inmate in the TTA.
Recommendation:  Provide training to the TTA staff regarding the policy and procedure for referral of inmate for mental health crises evaluation.

Problem 5:  Failure by custody officer to actually identify inmate as hanging, delaying initiation of rescue action.
Recommendation:  The institution should initiate a review of this incident.

On 2/13/06, Deputy Directors of the DCHCS and DAI provided a report on implementation for QIP for suicide of Inmate N.  This correspondence was in response to the suicide report dated 8/12/05 and included a CAP from RJD dated 12/9/05.  The CAP indicates the outcome and/or progress of findings as follows:

- Regarding Problem 1:  Audits for both 3CMS and EOP I/Ps utilizing UHR and MHTS data were provided.  The staff reported that significant differences in results were related to differences in methodologies regarding UHR studies versus MHTS studies, difficulties of the MHTS capturing the same percentage of data, and chronic staffing shortages and training deficits for MHTS OTs.  The staff reported that they have ongoing efforts to hire and maintain staff with training and that corrective action will include the ability to hire a permanent supervisor as well as having a long-range less viable software system and hardware capability.

- Regarding Problem 2:  The MHTS supervisor reports that current referrals are made within two to three days upon receipt and completed appointments continue to vary from 70 to 80 percent by audit.  The staff conclude, "if however a referral is not received there is no means of capturing that referral and no means of auditing this."

- Regarding Problem 3:  Staff report a focused audit shows 2.3 percent of inmates/patients prescribed psychotropic medication for psychiatric diagnoses had not yet been placed in MHSDS program, and staff provided memoranda that were sent to all psychiatrists regarding (1) placement in the MHSDS and (2) treatment criteria for the levels of care.

- Regarding Problem 4:  Staff responded that training for nursing staff at the TTA was discussed and agreed to be undertaken by the SRN-II "starting this week and next."

- Regarding Problem 5:  Staff reported that an investigation is ongoing, according to the HCM, and that the custody officer involved had been assigned to alternative duty in the mailroom pending the outcome of the external investigation.

There were a number of attachments provided by RJD staff including specific information on referrals to be sent to specific individuals rather than through the OTs and correspondence to a CDCR official regarding the investigation and instructions directed at psychiatrists.  There were no further responses from HQ regarding completion of training and the investigation regarding the custody officer.  The custody officer was subsequently fired while on AWOL status.


**Findings**:  This inmate's completed suicide appears to have been foreseeable and preventable.  The suicide report appropriately identifies a number of failures by local staff with regard to providing an appropriate and timely mental health assessment of this individual's mental health needs.  Despite his having come into a facility on psychotropic medications and there being available information with regard to his past history, including a past history of mental health treatment as well as suicidal behavior, the referrals initiated for him were never completed.  In addition, there were lapses in the provision of medication to this inmate, as reflected on the MARs, at least one of which resulted in his having an emergency medical appointment related to possible seizure in which the inmate reported he had not been receiving his medication.  Further, the inmate had been moved many times during his short stay in the CDCR without clear explanation, which also further compromised the mental health staff's ability to locate and pursue appropriate assessment of this inmate.

The suicide report clearly identified that based on information that should have been available and reviewed by appropriate mental health staff, this inmate very likely suffered from severe and persistent mental illness, with adjustment difficulties including safety concerns that he expressed to custody, and at times was not offered medication appropriately.

As has been identified in the suicide report problems and recommendations, one of the most striking deficiencies in this inmate's care and treatment was the CO identifying the