cell as being occupied by a "dummy" rather than an inmate, and this being discovered after the count was completed. This delay in responding to the inmate hanging in his cell is most disturbing and clearly unacceptable.

Lastly, the institutional response by RJD with regard to the suicide report recommendations appears to be disjointed and in some instances unresponsive to the problems identified. There was no subsequent information provided to demonstrate that there had been some review of the quality and appropriateness of the institutional response or the implementation of corrective actions that were identified as not yet completed.

### 15. Inmate O

Brief History: This inmate was a 49-year-old Iranian male who committed suicide by hanging on 6/13/05 in his single cell in the CTC at CSP/LAC. The inmate was at the 3CMS LOC at the time his death. This was the inmate's first admission to the CDCR, which occurred on 2/23/00 via the NKSP RC. The inmate was convicted of murder, first degree (seven counts), and arson of an inhabited dwelling, for which he was serving a life sentence without the possibility of parole.

On 6/13/05, at approximately 11:05 p.m., a CO in the CTC was conducting the 11:30 p.m. count, approached CTC Cell 11, and discovered the inmate appeared to be standing in the shower with his tee shirt and boxers on. The officer noted the inmate appeared to be not moving and activated his personal alarm and summoned medical staff. This officer, MTA, RN, and LPN entered the cell. They discovered the inmate was hanging from a sheet that had been tied to the air vent on the ceiling of the shower room and had another sheet tied from the railing to his left leg. Staff cut the inmate down and began CPR. Additional staff responded to the emergency, the inmate was transported to the TTA, and paramedics arrived at approximately 11:27 p.m. and continued lifesaving efforts until 11:31 p.m., when the inmate was pronounced dead. An autopsy was conducted on 6/16/05 by the Department of the Coroner of Los Angeles County. The cause of death was determined to be asphyxia due to hanging. No toxicology screening was provided in the documents reviewed.

Review of the records indicate this inmate was in the CTC for medical, not psychiatric, reasons, including end-stage renal disease and failure, as well as being status post-angioplasty within the previous week.

This was the inmate's only adult conviction and involvement with the criminal justice system in the United States. The inmate reported he entered the United States approximately four months prior to the commitment of his controlling offense, which occurred on 2/6/96, when the inmate set fire to his family's apartment, resulting in the death of his wife and six children. The inmate had gone to an Iranian newspaper to "tell his side of the story" and indicated that he had attempted to kill his wife on four previous occasions while in Iran. The inmate reportedly informed investigators that he believed his wife was having an affair and making pornographic movies, had tried to kill her in

Iran for his honor, and believed his children were using drugs. He further reportedly told investigators that he intended to kill himself, his wife, and his children because he did not want his children to be orphans. The inmate also reported that he had been hospitalized for mental health treatment while he lived in Iran.

The inmate was admitted to the CDCR on 2/23/00 via the NKSP and transferred to CSP/LAC on 12/27/02. On 4/11/05, he had been transferred to CSP/Corcoran for medical treatment and returned to CSP/LAC on 4/27/05.

During his initial evaluations in April through June 2000 in NKSP, the inmate was diagnosed with suffering from schizoaffective disorder and placed in the MHSDS at the 3CMS LOC. He was prescribed Zyprexa and Prozac, which was consistent with the initial health screening in which he reported he had had treatment prior to his incarceration with these same medications. It is noted that the inmate reported no history of suicidal ideation despite information provided to investigators that he intended to kill not only his wife and children but himself prior to his incarceration. After his transfer to CSP/LAC on 6/9/00, he was referred to a psychiatrist, and his medication was continued.

On 6/13/00, he attempted to overdose on his medications and was transferred to an outside hospital. These medications included Inderal, Klonopin, and Loped, which he had been prescribed for his medical problems, which included hypertension and coronary artery disease. It appears that during this admission, a physician diagnosed this inmate as having hypoglycemia and placed him on insulin. This appears to have been a major concern for the inmate as he subsequently reported that he was not diabetic, had been misdiagnosed, and had been treated with insulin inappropriately for two years. The inmate's anger and disappointment with having been diagnosed as diabetic and being treated with insulin continued and were reflected in a RN note in November 2004 while he was housed in the CTC in which the RN wrote the inmate had written a suicidal statement on the wall and a number of derogatory statements about one of the physicians as well as refusing medications and assessments. This prompted a referral to a psychiatrist, who evaluated the inmate and wrote that the inmate was very angry with a particular doctor and believed this doctor would be responsible for his death because of the prescription of medication to treat diabetes, which he did not have. The psychiatrist opined that the inmate had a fixed and firm paranoid delusional system that included law enforcement, prison staff, medical care, and his original crime. The diagnosis of schizoaffective disorder was continued as the inmate was paranoid, had delusional ideation, denied suicidal ideation, but curiously "showed no evidence of psychosis." The inmate was refusing psychotropic medication as he did not believe he was mentally ill. The inmate appears not to have been taking psychotropic medication since 2001; however, he remained at the 3CMS LOC throughout his incarceration.

When the inmate was transferred to CSP/LAC, he received intake screenings and a psychiatric evaluation, which indicated that the diagnosis of schizoaffective disorder by history was in remission and no psychotropic medication was prescribed. By January 2004, the annual IDTT concluded that he should remain at the 3CMS LOC and continued the diagnosis of schizoaffective disorder. Although the psychiatrist ordered medication,

52

the inmate refused, and there was no attempt at a Keyhea order. Finally, in January 2005, at his annual IDTT, the diagnosis was changed to delusional disorder persecutory type even though the inmate continued to deny mental illness and to refuse medications. The inmate's delusions included his belief that his family was still alive and were related to his belief that his family was being persecuted by varies mafias including the Armenian mafia, Mexican mafia, and Russian mafia. The inmate also continued to have ongoing problems with his beliefs about his medical care, including that medical staff were intending to harm him and that he did not have diabetes and other conditions, and periods of non-compliance with medication and medical treatment.

In March 2005, he was seen by the psychiatrist while he was in the CTC for medical reasons because of non-compliance with his dialysis. By this time, the inmate had been diagnosed with renal failure and was receiving dialysis three times per week in addition to a number of medications for renal and heart problems. The dialysis was conducted at a local hospital where he was transported three times per week and returned to the CTC, where he remained for the last three months of his life. His medical condition was also complicated by hypertension, which was uncontrolled because of poor compliance with his medications, congestive heart failure, and chronic renal failure with anemia. The IDTT met on 3/22/05, noted that the inmate was in the CTC for his medical conditions, but concluded that he was not gravely disabled or a danger to self or others and, by implication, therefore not "Keyheable" despite the inmate's medical complications and continued refusal of medication. There is no mention of competence to make a medical decision or consideration of guardianship.

Although the suicide report indicates that the medical care was adequate given the inmate's medication refusals, there are also references to the inmate refusing his medications because he thought they were "poison." It does not appear from the records that there was consideration of whether the inmate was competent to refuse medical treatment or pursuit of a need of a possible guardianship regarding his medical care. Given that his delusional content included references not only to his family and the mafia but also to his belief that medical staff were trying to harm him, that medications were poison, and that he was not medically or mentally ill, consideration of a guardianship and/or Keyhea order does appear to have been necessary but not pursued.

On 5/26/05, the inmate was again evaluated by the psychiatrist, who indicated the inmate was "questionably Keyheable at this time, could be manipulative." In the 5/26/05 evaluation by the psychiatrist, he indicates, "recommend chief psychiatrist, chief psychologist, and medical department evaluation for possible Keyhea." It does not appear from the documentation that there ever was a collaborative evaluation by the chief psychiatrist, chief psychologist, and medical department regarding this inmate's overall medical and mental health management. The psychiatrist reported that the inmate should be encouraged to comply with his treatment plan, that he was relatively stable and understood the consequences of his actions, and that he should be evaluated further for possible mental health interventions.

The angioplasty that was performed on 6/10/05 occurred because the inmate experienced chest pain on his way back from dialysis treatment, resulting in his being admitted to an intensive care unit (ICU) and having surgery. This was four days before the inmate's death, and it does not appear that he was evaluated by mental health staff after his return.

The last nursing entry in the records provided was on 6/10/05, indicating that the inmate had been admitted to Mercy Hospital. There are no other nursing or medical notes provided regarding his status when he returned to the CTC. The suicide report indicates that after the angiography and stint placement, the inmate returned to the CSP/LAC CTC on 6/12/05, the night before his death. The admitting physician is noted to have added an additional medication to the patient's regimen; however, there was not a progress note or other note provided regarding the assessment of his condition or his mental status upon his return. There is no information provided in the records received indicating any assessment of the inmate's perceptions or thoughts regarding his having had a cardiac event and angiography or the impact of that event on his mental status, particularly given his delusional belief that medical staff were trying to kill him.

The suicide report identified two problems with recommendations as follows:

> Problem 1: System: The inmate was clearly placing himself at risk (i.e., was "a danger to self") by refusing medications for his medical condition. Medical health staff deemed the inmate competent to make his own treatment decisions, despite the fact that the inmate's decisions were based on delusions about medications being poison and refusing them as a detriment to his health. Recommendation: CDCR staff do not have a clear set of guidelines for determining competency to refuse medical treatment. DCHCS to provide training to mental health staff on competency evaluations, Keyhea criteria, and other options for dealing with uncooperative patients, such as obtaining a medical conservatorship per Section 3200 of the Welfare Institutions Code.

> Problem 2: CSP/LAC: There is apparently no indication in the UHR that an interpreter was ever used, despite several notations that the inmate had a limited ability to speak and understand English, which could have contributed further to his resistance to cooperate with medical staff. (This is not the first time that this issue has occurred in relation to a suicide at CSP/LAC. Evidently, it is still a problem.) Recommendation: CSP/LAC must have a policy and procedure for use of the language line for interpretative services and ensure that all mental health and medical staff know how to use it. Create and maintain a log to document use of the language line.

On 1/12/06, Deputy Directors of the DCHCS and DAI approved and provided the QIP submitted by CSP/LAC on 12/15/05 in response to the suicide report of 8/12/05. The response consisted of a 9/12/05 memorandum to managers and supervisors from the warden of CSP/LAC with a subject of "mandatory weekly training topic–week of 9/12/05," which identified the training topic as "equally effective communication."

There was an attached memorandum dated 1/14/04 with the subject "Language Learning Enterprises (LLE) link" and a description of the telephonic interpreting service user's guide. In addition, the agenda for the suicide prevention videoconference of 8/9/05 was included in the submission. This was the complete response to the suicide report recommendations.

**Findings**: This inmate's death does not appear to have been foreseeable as he was not reporting suicidal ideation or intent. The inmate's death very well may have been preventable, however, had he been appropriately assessed and had comprehensive treatment planning by medical, nursing, and mental health been conducted. The suicide report clearly identifies that there was a need for consideration of conservatorship and/or placing this inmate on a Keyhea order. While there are notations that a higher level of care was considered for this inmate, his complex medical and mental health needs, with the clear need for him to be in a higher level of mental health care to facilitate both his mental health and medical functioning, do not appear to have been appropriately recognized by the treatment staff. Indeed, the last progress note by the psychiatrist in May 2005 indicates a need for the chief psychiatrist, chief psychologist, and medical department to come together to assess this inmate's overall need. While there is some reference to "Keyhea-ability," there is no reference or indication that guardianship or conservatorship was ever considered.

This inmate's condition was clearly deteriorating both medically and psychiatrically, and he had, in addition to his long-standing problems, a potentially life-threatening event requiring emergency angioplasty, with return to the CTC approximately 24 hours before he completed suicide. During that time period, despite full knowledge that he had undergone such an event, there is no indication that there was even consideration that he should be evaluated by mental health staff in the CTC to assess the impact of this event on his overall functioning.

The suicide report identifies two problems, one as a "system" problem regarding conservatorships and "Keyhea-ability" and the second as an "LAC" problem regarding communication with inmates with limited ability to speak and understand English and use of the language line. While the CSP/LAC response was to resurrect existing memoranda, no audits or other outcome measures of the actual use of the language line and population at risk were provided. There was no information provided regarding the "system" issues other than an agenda for a suicide prevention videoconference. These responses appear to be inadequate given the potential impact on inmate healthcare.

**16. Inmate P**
Brief History: This inmate was a 38-year-old African American male who committed suicide by hanging on 6/17/05 in his single cell in the EOP at the CMC-East. The inmate returned to the CDCR for his second term on 10/5/01 via the NKSP RC based on a conviction of assault with intent to commit a specific sex offense for which he received a 13-year sentence.

On 6/17/05, at approximately10:42 p.m., a CO was conducting his initial security check of the first floor of Building A after he assumed his assigned post. As the officer approached this inmate's cell, in which he was the sole occupant, the cell window was covered with paper. He made efforts to communicate with the inmate, who did not respond, and the officer contacted the sergeant via institutional telephone. The sergeant responded to the building, and after the cell override lights were turned on, he was able to observe the inmate hanging from a bedsheet attached to the frame of the cell window. The sergeant contacted control, a code one response was initiated, and the emergency transport vehicle (ETV) was dispatched. The sergeant and other officers entered the cell, cut the inmate down, and began CPR. The ETV arrived, and personnel found the inmate to have a slight pulse and continued CPR; the inmate was transported to the CMC-East Medical Clinic. At approximately 11:17 p.m., the inmate was pronounced dead by a physician in the clinic. The inmate's body temperature was taken at 11:30 p.m. and recorded as 89.2 degrees. The time recorded from the discovery of the inmate at 10:41 p.m. until the inmate was cut down and CPR began at 10:46 p.m. was approximately five minutes. The autopsy was conducted by the Office of the San Luis Obispo County Sheriff–Coroner on 6/20/05. The cause of death was reported as asphyxia by hanging (minutes). The toxicology report indicated no common acidic, neutral, or basic drugs detected and no blood alcohol. However, Quetiapine 0.08 mg/L and Sertraline 0.11 mg/L were detected, neither of which was above the effective level.

The inmate had spent two terms in the CDCR, the first of which was September 1992 through December 1999. He had five parole violations during that time period, and the commitment charge was assault with a deadly weapon (not a firearm) with great bodily injury, with a three-year sentence beginning in September 1992. The second term began on 10/5/01, and he died while serving that term. The inmate also appears to have had a very difficult history with references made to his having had 26 arrests as an adult, some period of time committed to the CYA as a juvenile, periods of homelessness, conflicting information regarding his family history with the exception of there being consistency in his reporting that he had at least one daughter who is now deceased, history of substance abuse and alcoholism beginning at a very early age, and a history of treatment for a mental illness. The mental health history appears to have begun when he was a child or adolescent and, by his self-report, he was prescribed Ritalin. The inmate also reported a history of auditory hallucinations at age five and that he suffered trauma as a child via physical abuse. His drug history was reported to include marijuana, alcohol, crack cocaine, LSD, PCP, and methamphetamine. He also had medical problems including hepatitis C and HIV. His mental health history was also remarkable for his reporting a number of suicide attempts beginning at approximately age 22 when he tried to walk in front of a bus, approximately age 27 from an attempted overdose of valium, and approximately age 29 with an attempted overdose of Haldol and alcohol. He also reported a history of psychiatric hospitalization while in the community.

Despite this rather extensive but unsubstantiated history, the inmate denied any past history of treatment for mental illness during the intact screening process in October 2001 at the NKSP RC, and he was cleared for general population. The inmate reported he had an above-knee amputation in the late 1990s after receiving a gunshot wound, and he was

given an <u>Armstrong</u> designation based on this disability. He also reported he was diagnosed as HIV positive in 1994, and he was transferred to CMF on 2/25/02 to the Unit Four program. While at CMF, the inmate did request to see a social worker in the Unit Four program; however, he did not keep the appointment on time, and it was to be rescheduled. He was to be seen in August 2002; however, the follow-up appointment was not documented in the record and appears not to have occurred. The inmate did not come to the attention to mental health staff again until 12/5/03 when he told a Unit Four clinician that his son was being abused by a woman in the community, which resulted in the filing of a mandatory report with Child Protective Services.

Three days later, he met with the Unit Four psychiatrist, and his history of suicidal and violent behaviors, drug use, and a previous diagnosis of bipolar disorder were reported. The inmate also reported that he had been taking Lithium as well as Depakote in the past and that he was currently depressed. The psychiatrist diagnosed him with panic disorder with agoraphobia and prescribed Zoloft, with follow-up in two weeks. Before that could be completed, the inmate was seen for a crisis evaluation in December 2003 by a psychiatrist and was reportedly highly agitated because of his learning that his daughter had been injured in an auto accident. He was subsequently informed that she was okay, and his agitation improved. The inmate was receiving Zoloft and Vistaril during this time period, and he was noted to have been moderately depressed. He was not officially added to the MHSDS until March 2004 while still in the Unit Four program. He was placed at the 3CMS LOC.

The inmate was admitted on 1/28/04 to the APP after an RVR for mutual combat because he was expressing suicidal ideation. He remained in DMH until 3/9/04, when he was placed in the EOP. His diagnoses were adjustment disorder with depressed mood and substance abuse, and at discharge, the discharging psychiatrist noted that the staff should consider the DTP. One week after he entered the EOP he was transferred to administrative segregation because he had spit on an officer. The following day, he was readmitted to the APP because he was seen in his cell smearing feces and appearing disorganized. It was noted that he denied hearing voices but was "paranoid that his food was being poisoned and would rather eat poo than the food." The psychiatrist was impressed that the inmate was gravely disabled at that point and noted that he was on no medication even though Zoloft was ordered at that time. He remained at the APP from 3/17/04 to 6/4/04. In addition to his being agitated and smearing feces, it was noted that he had placed a cloth around his neck to hang himself as well as a cloth around his "penile area." While he continued on Zoloft in APP, Abilify and Thorazine were also added to his treatment regimen. He was described as having psychotic symptoms including paranoia, disorganized thinking, inappropriate laughter, and "eating feces." When he was discharged on 6/4/04 back to the EOP administrative segregation program, his condition was improved, and he appeared stabilized. He denied suicidal ideation, hallucinations, or paranoid thinking. He returned to the mainline EOP on 6/9/04; however, within one week, his CM noted that he was preoccupied with his medical issues and was experiencing auditory hallucinations. He received an RVR that same day because of mutual combat and was placed back in the EOP administrative segregation program.

57

On 6/16/04, he reported that he wanted to cut his wrist or hang himself in response to auditory hallucinations and was readmitted for the third time to the APP. He reported suicidal ideation, auditory and visual hallucinations, and violent dreams particularly related to his daughter's death. He was referred to the intermediate treatment program; however, because of his previous battery on a peace officer (spitting), his transfer was rejected, and he was discharged from the EOP on 8/11/04. His diagnosis during this admission was changed to MDD, recurrent with psychotic features. He remained in the EOP administrative segregation program and was ultimately transferred to CMC-East on 11/18/04.

The inmate was admitted to an MHCB on 2/12/05. The staff at CSATF considered bipolar disorder or schizoaffective disorder as a possible change in diagnosis; however, he improved and was returned to the CMC-East on 2/17/05. He subsequently returned to the mainline EOP and was prescribed Abilify and Zoloft. He received an RVR on 4/8/05 because he disobeyed an order for a housing change that involved him moving from the third tier to the first tier of the housing unit given that he had an Armstrong disability. He was ultimately placed in a single cell, and when examined for the mental health assessment, he was noted to have impaired judgment and insight, auditory hallucinations, and paranoia. He continued to deny any suicidal ideation or intent.

On 6/15/05, however, custody staff discovered a letter the inmate had written that included potentially suicidal statements. The inmate was questioned by an MTA and denied any current suicidal ideation, voices, or depression. The following day, 6/16/05, at 2:30 a.m., the same letter was again discovered by custody, and the on-call psychiatrist, when consulted, recommended that he be transferred to the MHCB. Later that day, at 10:30 a.m., the IDTT interviewed the inmate, and he said that he had written the letter three days ago but that he no longer was having suicidal thinking. He acknowledged that he had "chronic sadness" because of his medical problems, including his HIV status and the loss of his leg, but that medication was helping him. He returned to EOP housing at 6:00 p.m. that day and met with his CM the following morning, 6/17/05. This meeting took place at 8:30 a.m., and the CM documented that the inmate was "depressed" and had decreased appetite, flat affect, paranoid ideation, and auditory and visual hallucinations. She noted an increase in the inmate's psychotic symptoms but that he denied suicidal ideation and homicidal ideation. She referred the inmate to see a psychiatrist to reevaluate his medication and, in the plan, indicated that she would see him again on 6/21/05. The CM did not complete an SRAC.

The suicide report identified three problems and corrective recommendations:

> Problem 1: CMF1: Rejection of clinically appropriate candidate for VPP placement based on custodial issues, with no subsequent referral to SVPP or other effort to meet clinical need such as appeal (refer also to suicide of Inmate G).
> Recommendation: Ensure staff understands that custody restrictions must not be allowed to interfere with inmates receiving their necessary level of care. Training

to involve staff at the DMH and CMF processes for appealing override in such cases.

Problem 2: CMF2: Violation of MHSDS program guideline for timely (seven days) completion of MH-4 and IDTT entry in MHSDS.
Recommendation: Train CMF Unit IV staff on basic MHSDS program guidelines. Establish procedure for tracking time lines; tie into the rest of the CMF MHSDS tracking system.

Problem 3: System: A mental health referral was made two days in a row by custody who discovered a suicidal letter that the inmate wrote to his aunt. In neither case did mental health staff see the letter, and in both cases, they dismissed the issue and returned the inmate to his housing. Without seeing the letter, the seriousness of the issues was not understood by clinicians who evaluated the inmate.
Recommendation: Develop a procedure at the system level mandating that the staff making a referral should include copies of any materials that may form the basis of the concern, such as suicidal letters, information from C-file suggesting mental illness before entering CDCR, etc.

On 1/18/06, Deputy Directors of the DCHCS and DAI approved the facility implementation of the QIP based on the CAP submitted by CMF on 12/1/05. In their response to Problem 1, CMF provided documentation that there had been three trainings regarding higher LOC referrals as well as copies of higher LOC tracking logs with proof of practice documents for inmates rejected by custody to be re-referred on appeal and, if rejected by the institution, to be referred to a different institution. The eventual outcome of the referral was also noted. With regard to Problem 2, CMF submitted documentation of training held with Unit IV staff regarding basic MHSDS program guidelines and included information that the computer tracking system is in place for Unit Four, providing the same capability as found in MHSDS Units Two and Three. With regard to Problem 3, a memorandum by the Directors of DCHCS and DAI to regional administrators, associate directors, wardens, and HCMs, with the subject "dissemination of critical clinical information that can prompt a mental health evaluation or referral," was provided, although it is undated. This memorandum directs staff on the mechanisms for making emergency and other referrals to convey clinical information directly to clinical staff as well as guidance for the level of clinical response. The SPR-FIT meeting minutes of 12/12/05 were also included with specific reference to Item 200-45: dissemination of critical clinical information memorandum that was anticipated to be approved and disseminated to staff, which appears to be the memorandum previously referenced; however, there is no information as to whether it had or had not been disseminated to staff at the time of this report.

**Findings**: This inmates' completed suicide was highly likely to have been both foreseeable and preventable. The suicide report makes reference to the inmate having written a letter containing statements of suicidal intent that was discovered on two consecutive days by custody staff with referrals to an MTA and a CM. In neither case

was an SRAC conducted nor was the inmate transferred to an MHCB or other safe and higher LOC. The inmate's statement that the letter was "old" and he no longer had those thoughts is in the context of the inmate having variability of symptoms in almost a day-to-day fashion, and his reporting visual hallucinations as a previously unreported symptom. Such statements by the inmate, and the concerns of custody staff to bring it to the attention of clinical staff on two consecutive days underscore the need for conducting SRACs, interviews with the inmate, and review of documentation including UHR, C-file, and in this case, the actual letter by clinical staff. Although the suicide report makes reference to some of these issues, failure to conduct a comprehensive SRAC including review of documents prompting the referral, i.e., the letter itself and discussion with the inmate of the letter by a clinician is not consistent with the CDCR Program Guide.


## 17. Inmate Q

Brief History: This inmate was a 46-year-old Caucasian male who committed suicide on 6/20/05 by strangulation in general population at RJD. The inmate was double-celled at the time and was at the 3CMS LOC in the MHSDS. The inmate was admitted to the CDCR on 6/3/88 after having been convicted on murder in the first degree and assault with a deadly firearm with a sentence of 32 years and four months. He was also convicted of forceful rape, forced copulation, forced sodomy, rape by foreign object, and dissuading a witness; he was sentenced to 43 years on that set of charges.

On 6/20/05, at approximately 1:30 p.m., a CO conducting an unlock for the afternoon yard in Facility 3 heard an inmate yelling man down and responded to cell 218, where he discovered this inmate laying face down in a pool of blood. Other COs responded and notified the control booth officer and the cell door was opened. Officers observed the inmate kneeling face down in a pool of blood and immediately called for the ETV. The sergeant and lieutenant responded and all inmates in the housing unit were ordered to "get down." ISU was summoned via institutional radio and responded as well as additional correctional officers. At approximately 1:35 p.m. the ETV and MTA arrived at the housing unit and began a medical evaluation and determined the inmate should be transported to the TTA. The inmate was transported by the ETV at approximately 1:48 p.m. and arrived at the TTA at 1:50 p.m. A 911 call was placed and paramedics subsequently arrived by ambulance, and transported the inmate to the University of California San Diego Medical Center Emergency Room by 2:30 p.m., where he was pronounced dead. The incident report make no reference to CPR being performed by any of the first responders including the MTA who arrived with the ETV. The suicide report indicates that CPR was begun at approximately 1:48 p.m., after the inmate arrived at the TTA. An autopsy was conducted by the Office of the Medical Examiner, San Diego County, on 6/21/05 and indicated the cause of death was incised wounds of neck due to self-inflicted injury and that the manner of death was suicide. A toxicology screen indicated opiates and morphine were detected in blood and urine samples, as well as methamphetamine and ibuprofen in urine samples.

This was the only admission to the CDCR for this inmate. He had two previous arrests: one in 1982 for resisting an officer in Denver Colorado, and one in 1986 for receiving

stolen property in California. With regard to the commitment offenses, they involved two ex-girlfriends. In one case, he committed various violent and forcible sexual acts against one girlfriend who survived his attacks and reported the incidents to police. In the other instance, he subsequently confronted another ex-girlfriend after using cocaine for a sustained period of time and shot and killed this ex-girlfriend in the presence of her family. He made references to his probation officer that he intended to kill himself when he went to the second girlfriend's home and that the "gun went off." The inmate also was noted to have had an extensive substance abuse history including marijuana, cocaine, and alcohol, and reported that he had been involved in substance abuse treatment in the past. He also was reported to have stated that he was hallucinating at the time of the murder and was suffering from mental illness.

The inmate was admitted to the CDCR via the CIM RC. He was noted to have transferred to Folsom, CCI, CEN, and eventually on 9/22/97 to RJD. The inmate did not have any formal contact with mental health staff until 3/7/03 when he was evaluated by a social worker shortly after he had begun treatment for hepatitis C. He had been screened at CEN and at transfer to RJD with no indication of mental illness by history or currently. The inmate reported that he had been feeling depressed and had a sleep disturbance and associated irritability after starting medication for hepatitis C and a social worker diagnosed him with mood disorder due to a general medical condition (hepatitis C as well as cocaine and heroin abuse.) He was placed in the MHSDS at the 3CMS level of care at that time. A psychiatrist prescribed Zoloft and Vistaril that same month, and an IDTT confirmed the diagnoses suggested by the social worker. The inmate was subsequently prescribed Buspar, Zyprexa and Vistaril which appeared to have a positive impact on the inmate's depression, irritability, and sleep disturbance until 8/4/04 when all medications were discontinued at the inmates' request. The inmate had his annual IDTT in April 2005 and had requested removal from the MHSDS; however, the IDTT continued him at the 3CMS level of care with a plan to remove him from the MHSDS in August 2005 when he would be eligible for such removal, having by that time been off psychotropic medications for one year and without significant symptoms of mental illness. They continued the diagnoses of mood disorder secondary to general medical condition, which was related to his treatment with Interferon for hepatitis C.

The most recent contacts with mental health staff included his being seen by a psychologist on 3/31/05 and the inmate again requesting removal from the MHSDS. His mental status was clear with the exception of the inmate reporting an episodic depression and the psychologist offered diagnoses of dysthymic disorder, cocaine dependence, and antisocial personality disorder. The mood disorder secondary to general medical condition was not included in the diagnoses at that time. His last contact with mental health staff occurred on 6/14/05 when the psychologist's progress note indicates the inmate was seen at the clinic per CC1 recommendation. The inmate reported "that he goes through some mild depression here and there" and further the psychologist noted that he stated "I don't do such a stupid shit to kill myself." The note continues that the inmate states he's doing okay, that he appears to be calm, coherent, and denied hallucinations as well as suicidal and homicidal ideations. The note did not specify why the CC1 had recommended the inmate be seen by mental health staff. The same

psychologist wrote a memorandum dated 6/20/05 indicating the inmate had been seen after referral by the CC1 and "accordingly, _____ was experiencing from depression" [sic]. The note includes a statement that the inmate reported to the psychologist "jokingly, that he is not depressed or suicidal." Curiously, the memorandum states that the inmate denied being suicidal or having any intentions to harm himself or others at the time of the visit but further states that "the case was reported to the direct supervisor as well and to the chief psychologist (A) immediately." There was a treatment plan dated 4/15/05 in which the inmate's diagnosis was reported as mood disorder and "hep-C" and which makes reference to the inmate having untreated depression for the prior 20 years. There is another treatment plan completed at RJD that is undated and includes that the psychologist who saw the inmate on 6/14/05 listed diagnoses as "dysthymic" and polysubstance dependence (institutional remission), as well as antisocial personality and "hep-C."

Medically, the inmate was diagnosed with hepatitis C in June 2000 and began treatment with Interferon. He was also treated for hypertension with Atenolol.

The suicide report identified one problem and recommendation as follows:

> Problem 1:  CPR was not started at the scene nor was first aid applied to the wounds. It was not clear from the documentation of the incident what the condition of the inmate was upon discovery (i.e., whether he had a pulse or respiration. Inmate arrived at the TTA 18 minutes after he was discovered and only then was CPR started).
> Recommendation:  Conduct an in-depth institutional emergency response review committee (ERRC) inquiry into the emergency response.

A memorandum from the Deputy Directors of DCHCS and DAI dated 2/1/06 was sent to the warden and HCM at RJD indicating that the institutional QIP had not been received by that date. The memorandum included information that the executive summary of the suicide report was dated 9/28/05 (although the suicide report itself was dated 9/12/05) and that the facility institutional response was due on 12/28/05.

The QIP response to this inmate's suicide and the suicide report dated 9/28/05 was provided by RJD on 4/25/06 and approved by the Deputy Directors of DCHCS and DAI on 6/6/06. In the response, RJD submitted the ERRC death review report regarding this inmate, which consisted of a summary of the documents describing the response to the inmate's discovery in his cell. Also provided were IST training sheets for the "urgent/emergency response instructor's guide" and a copy of the instructor guide dated July 2004. There is no reference or explanation regarding staff failure to provide CPR or first aid for 18 minutes in response to this inmate's emergency.

**Findings**:  This inmate's completed suicide may have been foreseeable, as there were concerns reported by family members to the institutional staff based on a family visit of 6/13/05 that the inmate was depressed and may have been suicidal. The inmate was seen by a correctional counselor and a psychologist, both of whom reported the inmate

denying suicidal ideation; however, there is no documentation in the record that an SRAC was performed by the psychologist. The suicide report does not make reference to the failure to perform an SRAC in its identification of problems and recommendations. This inmate's suicide may have indeed been preventable had there been a prompt medical response and had interventions including first aid, i.e., attempting to stop the inmate's bleeding wounds, and CPR been initiated by first responders and/or the MTA when the inmate was initially discovered. There was an unacceptable delay of approximately 18 minutes from the time of the inmate's discovery until the inmate arrived in the TTA, which was appropriately identified as a problem in the suicide report.

It appears the facility response to the suicide report recommendation was to provide training and documents that were already available. They did not focus on the failure to provide first aid and CPR to his inmate for approximately 18 minutes or on any form of monitoring the provision of first aid and CPR for any future emergencies where they would be required.

## 18. Inmate R

Brief History: This inmate was a 35-year-old Caucasian male who committed suicide by hanging on 6/23/05 in general population at HDSP. The inmate was double-celled at the time of his death. The inmate was admitted to the CDCR on 4/28/04 via the DVI RC. The inmate's commitment to the CDCR was based on his conviction on murder first degree and two attempted murders for which he received consecutive sentences of 100 years to life with parole and two sentences of 25 years to life with parole plus 22 years for two counts of assault with a semiautomatic firearm, for a total of 172 years to life.

On 6/23/05, at approximately 2:30 a.m., a CO conducting a 2:30 a.m. count observed the inmate hanging by the neck from a sheet tied to the light fixture. The officer pronounced a medical emergency by radio, the control booth officer activated his personal alarm, and staff arrived, removing the inmate's cellmate and placing him in a shower and cutting the inmate down, at which time they began CPR. The inmate was transported to the CTC, and an ambulance arrived from the California Conservation Center (CCC). The inmate was intubated, and various IV medications were administered. A pulse was reestablished, and the inmate was transported by helicopter to the Wasco Medical Center Hospital in Reno, arriving at approximately 5:10 a.m. The inmate was transferred to ICU for continuing support; however, his condition deteriorated, and he expired and was pronounced dead by a physician at 11:29 a.m. An autopsy was performed by the Office of the Wasco County Medical Examiner/Coroner on 6/24/05, and the immediate cause of death was reported as hanging and the manner of death suicide. A toxicology screen indicated no substances of abuse or ethanol were detected. Subsequent interview with the inmate's cellmate indicated that the cellmate stated that he had been awakened by an officer closing a shower door in the tier and, upon awakening, observed the inmate hanging and not breathing. When the cellmate was asked what he did next, the cellmate reported, "I got a cigarette and a cup of coffee." The report indicates the cellmate did not attempt to notify staff of this inmate's hanging in the cell.

This was the inmate's first incarceration, and it was related to his having shot and killed his wife and having wounded his wife's boyfriend's sister and two children who were in the family home. When the inmate was admitted to the CDCR, he had already started taking medication for depression while in the county jail and had been reported as having been suicidal. He was placed in the MHSDS at the 3CMS LOC and continued on his antidepressant medication, Lexapro. The inmate's bus screening was positive for depression and treatment with Lexapro when he was referred for mental health. MH-7 and MH-4, completed after the inmate arrived in the RC, stated the inmate reported a history of depression and several suicide attempts. The inmate also reported that he was suicidal when he killed his wife and "ran out of bullets." The inmate described his suicidal history as slitting his wrist when he was 16 years old and attempting suicide twice two days prior to killing his wife, as well as an attempt to hang himself while in the jail. He described a history of substance abuse, including alcohol and methamphetamines. The diagnoses at DVI included MDD, recurrent with psychotic features, and antisocial personality disorder, as well as a history of head trauma.

Although his Lexapro was continued at DVI, when he was transferred to HDSP on 6/1/04, his Lexapro was immediately discontinued by a contract psychiatrist because it was non-formulary. The inmate was seen by the IDTT, which was attended by a psychologist and social worker but not by a psychiatrist, on 6/16/04 and reported that he had not received any psychotropic medications since his transfer to HDSP on 6/1/04. The inmate at that point determined that he did not want to have medication prescribed for him. Despite the absence of a psychiatrist at the treatment team meeting, the inmate did not see a psychiatrist during his stay at HDSP. There had also been a referral by the intake nurse at HDSP on 6/1/04 for him to be seen by mental health within 72 hours, and although the chrono was completed, the mental health office reported that there was no record of receiving the fax and that no appointment was ever scheduled for the inmate to see a psychiatrist based on this referral or the review by the IDTT on 6/16/04.

The inmate did receive at least quarterly clinical CM contacts, and he was enrolled in an anger management group. This group did not meet for several sessions because of a lockdown that began in February 2005; however, it appears to have resumed with one session in April, one in May, and the last on 6/2/05. The inmate is described as having active participation and appropriate cognition, and his mood and affect are described as without normal limits at the last group meeting on 6/2/05. An IDTT progress note of 6/8/05 indicates that the inmate's annual update was reviewed by a social worker and psychologist with no psychiatrist in attendance and that the inmate had been noted as being in remission of symptoms and off medication for one year, with the plan "will remove from MHSDS today but the inmate will finish group therapy."

The suicide report makes reference to the inmate attending a group on 7/16/05; however, the inmate's death was on 6/23/05, and there are no notations in the documents received of a group therapy after 6/2/05.

The suicide report identified three problems with recommendations as follows:

64

Problem 1: Discontinuation of medication upon arrival is a violation of CDCR policy. Inmates who arrive on medication must be continued on those medications until reviewed by a psychiatrist.
Recommendation: Review the local medication management OP to ensure conformance with CDCR policy. Make any necessary provisions. Train nursing and mental health staff on the correct policy.

Problem 2: Although CDC-128C Mental Health Referral Chrono was completed by the RN and was noted to have been faxed that day, the mental health office had no record of receiving this fax, and no appointment was ever scheduled for Inmate _____ to see a psychiatrist for a medication review.
Recommendation: HDSP reports that subsequent to Inmate _____'s arrival, a referral process had been put in place.

Problem 3: Mental health staff further failed to ensure that the inmate was scheduled for a medication review at the time of his intake IDTT (at which no psychiatrist was present).
Recommendation: Ensure that any inmate who arrives on psychotropic medication is scheduled for a face-to-face medication review with a psychiatrist. Train all the clinical staff to initiate a psychiatry appointment for any inmate appearing at initial IDTT who has not already been seen for medication review or continued on medications.

On 1/18/06, the Deputy Directors of the DCHCS and DAI approved the QIP by HDSP dated 11/14/05 in response to the suicide report dated 8/25/05. In response to Problem 1, the staff attached LOP 716 in reference to page five, indicating that the reception and receiving (R&R) nursing staff will verify current medication and obtain medication orders and document them on the physician's order form and that medications will be ordered by the Parole Outpatient Clinic (POC) within eight hours of arrival for a 14-day prescription. LOP 711 is also attached and references that inmates arriving at R&R would have their prescription medications ordered within eight hours of arrival to prevent any interruption in receiving medications. Although not specifically designated in the response, it appears the response to Problem 2 by HDSP facility staff was a copy of the mental health referral for R&R newly arriving inmates and a statement that the mental health department OT collects faxes at 0800 each morning and schedules inmates for evaluation in the time frame required, with audits attached. The audits consisted of ten records each in May and August of 2005. The May audit sample included 3CMS inmates arriving at HDSP mainline, excluded inmates from HDSP RC in the first quarter of 2005, and concluded "deficiencies are rare. No consistently re-occurred deficiencies." No specific CAP was required. For the August audit, the sample with ten inmates arriving to HDSP RC in the second quarter of 2005 estimated that no more than 15 percent of inmates arriving from county jails are on psychotropic medications and concluded that two of the cases that should have been referred to mental health were not, that inmates did not receive medication at R&R, and that "most seriously a deficiency of inmates who arrived on medication … did not get medications renewed, or do not receive the renewed medications," and went on to state that in almost all cases, that problem appears when

they are non-formulary medications. In those cases, no substitute medications were ordered, and in three cases, formulary medications were not renewed without explanation. The corrective action was to have this dealt with by the existing QIT on medication management and nursing would report back regarding the policy of medications distribution at R&R.

**Findings:** The inmate's completed suicide does not appear to have been foreseeable. This inmate's completed suicide may have been preventable had there been appropriate adherence to policy and procedures regarding multidisciplinary treatment planning, completed referrals, and psychiatric assessment. This inmate had a history of MDD and suicide attempts and had been treated with a non-formulary medication at another CDCR institution. After his arrival at HDSP, his medication was discontinued, there was no substitute of any other medication, and he never received a psychiatric evaluation despite his history of suicidality and his having a diagnosis of a severe and persistent mental illness.

The QIP response by HDSP appears to be inadequate, and their internal audit reveals continuing problems with medication management for inmates arriving at HDSP, without any additional documentation to demonstrate that these problems have been adequately addressed. This inmate's care and treatment appear to be inadequate for his mental health needs, he was not properly assessed, and he was removed from the MHSDS despite his history and need for continued mental health care.

## 19. Inmate S

Brief History: This inmate was a 53-year-old African American male who committed suicide by hanging on 6/25/05 in his single cell in administrative segregation at SQ. He was admitted to the CDCR on 3/9/05 via the SQ RC and remained at SQ until his death. His commitment was based on a conviction for inflicting corporal injuring on a spouse for which he received a sentence of two years in state prison. His earliest possible release date (EPRD) was 6/29/05, four days after his suicide. This was the inmate's first incarceration in the CDCR and was based on his having domestic violence toward his third wife and receiving a two-year sentence.

On 6/25/05, at approximately 2:35 a.m., a CO was conducting an institutional 2:30 a.m. count and observed the inmate in his cell sitting on the floor, with a sheet wrapped around his neck and attached to the top bunk. The officer activated his alarm, a sergeant and MTA responded, and the emergency extraction team was assembled and entered the cell. The inmate was cut down, placed on a stokes litter, and transported to the TTA. The MTA performed CPR for approximately five minutes with negative results; the on-duty physician was contacted and pronounced the inmate dead at 3:02 a.m. The list of events in chronological order on the incident report indicates that at 2:40 a.m., the MTA arrived at the cell, the door was opened, and the inmate was given CPR immediately for three minutes; however, it also indicates that at 2:43 a.m., the inmate was transported to the TTA and "CPR is initiated." An autopsy was performed by the Office of the Coroner for the Country of Marin on 6/27/05 and determined the cause of death as asphyxia due to

hanging (minutes). A toxicology screen indicated no common acidic, neutral, or basic drugs detected and no ethanol detected.

There are references to the inmate having a long history of drug dependency, including IV heroin and cocaine dependence. He was noted to have been treated at a residential program in 1976, returned to that program in 1989, received methadone detoxification in 1992, followed by relapse and return to heroin use after that time. There was no known history of mental health treatment, and on his initial health screening, all answers relative to current or past mental health problems were answered no. His rescreening report also indicated that he was not in need of mental health services. He was cleared for general population and had no sick call requests or referrals to mental health during the length of his incarceration.

The inmate did have a history of hypertension and hyperlipidemia and was sent out to an outside hospital on 5/12/05 when he suffered what may have been a blackout or hypertensive episode in his cell. The inmate remained in general population until 4/6/05, when he requested placement in administrative segregation because of concerns that in his previous job as a substance abuse counselor, he may have written reports that resulted in individuals going to jail or prison and he feared for his safety. The inmate was returned to general population on 5/11/05, when the ICC determined that there were no ongoing safety concerns. The following day, he was transported to an outside hospital because of the "blackout" and reported to an officer that he did not want to return to general population because of enemy concerns. After he returned to SQ on 5/15/05, he was again taken to an outside hospital on 5/16/05, with his return the following day and his remaining in the infirmary until 5/26/05. It appears that his hypertension was not being adequately managed, and there is a reference to acute renal failure during one of the two hospitalizations in the outside hospital. The inmate remained in administrative segregation in a single cell from 5/26/05 until his death on 6/25/05. The inmate did have a required initial mental health screening when placed in administrative segregation (although it was not completed within 72 hours, as required for non-MHSDS inmates), and ICC hearings. None of the screenings or hearings detected any evidence of mental illness or need for mental health services.

The suicide report identified one problem with recommendation as follows:

> Problem 1: ASU mental health screening was performed on 4/14/05, eight days after the inmate entered the ASU. The inmate returned to administrative segregation on 5/17/05 and was not screened at all. MHSDS program guidelines require each inmate to be screened within 72 hours each time they are housed in an ASU.
> Recommendation: The ASU mental health supervisor must create and maintain a log of newly admitted inmates and the date they receive mental health screening.

On 1/26/06, the Deputy Directors of the DCHCS and DAI approved the QIP response by SQ that was completed on 1/10/06, in response to the suicide report dated 9/7/05. In response to the identified problem and recommendation, the SQ staff submitted a log for

two months, October and November 2005, indicating each inmate was screened within 72 hours of their arrival in administrative segregation. No further corrective action was requested or provided.

**Findings:** This inmate's completed suicide does not appear to have been foreseeable or preventable. Although there were failures in implementation of program guides by facility staff relative to the timely screening of non-MHSDS newly admitted to administrative segregation for both of this inmate's admissions to administrative segregation, this failure did not appear to have contributed to this inmate's eventual suicide.


### 20. Inmate T

Brief History: This inmate was a 40-year-old Hispanic male who committed suicide by hanging on 6/29/05 in his single cell in Unit Four of CMF. The inmate was admitted to the CDCR via the WSP RC on 5/12/04 after having been convicted of robbery with enhancement for use of a weapon for which he received a sentence of six years.

On 6/29/05, at approximately 9:15 p.m., a CO was securing the U-wing unit for the 9:30 p.m. count and observed the cell window of this inmate's cell as blocked. The officer opened the cell door and observed the inmate hanging by the neck by a white sheet tied to the air vent of his cell. The officer activated his personal alarm, called for assistance via his radio, and lifted the inmate by his waist while awaiting the arrival of other custody officers. A second officer arrived, utilizing the cut tool to cut the inmate down, and he and the first officer placed the inmate on the cell bed. At that time, two MTAs responded and began CPR. The inmate was placed on a gurney and transported to the B1 clinic for further medical treatment. The inmate did not recover and subsequently was pronounced dead at 9:35 p.m. An autopsy was performed by the Office of the Sheriff/Coroner/Public Administrator for Solano County on 6/30/05 and indicated the cause of death as asphyxia (minutes) due to hanging (minutes). There was no toxicology report provided. The inmate did leave a suicide note that read as follows: "I'm just tired! It's time to rest. Vinny I'm sorry I guess I am not that strong please forgive me. Mom. (illegible word). This is not for me I deserve better. So I am going to a better life. Vinny I love you!"

This was the inmate's first term in the CDCR, and he was admitted via WSP RC on 5/12/04. Although his initial health screening did not indicate any evidence of mental health history or current mental illness, an MH-7 completed within a week of his arrival indicated a history of suicide attempt by overdose as well as treatment for depression with medication. He was diagnosed with depressive disorder NOS and placed at the 3CMS LOC. He also reported a history of ADD in childhood and having been diagnosed as HIV positive in 1995. He was initially prescribed Prozac and Trazodone, and subsequently, Seroquel was added to this treatment regimen while at WSP RC. During his incarceration, he was also prescribed Strattera, Celexa, and Remeron for treatment of his mental illness. The inmate was transferred to CMF on 7/27/04, where he remained until his death. The standardized bus screening on 7/27/04 completed on his arrival at

CMF indicated psychiatric problems, treatment for HIV, and his having a history of attempted suicide.

Although the medical records provided to this reviewer included the standardized bus screenings, doctor's orders, MARs, and consent to medications, there were no MH-2 treatment plans or MH-3 progress notes provided in these records. Therefore, the reviewer is unable to provide an opinion with regard to the quality of the documentation. The suicide report states the inmate was diagnosed with adjustment disorder and attention deficit hyperactivity disorder on 5/14/04. The last primary clinician contact, as per the suicide report, was on 4/8/05 and indicated that the inmate participated in scheduled mental health sessions, did not speak with officers between sessions, and was generally functioning well; however, as also stated, the inmate reported symptoms of depression, including crying spells and feeling distressed that it was his birthday and he had not heard from his family. The primary clinician, as per the suicide report, stated the intent to follow up in two weeks; however, no follow-up appointment was scheduled. The suicide report also makes reference to the inmate's last mental health contacts as meeting with his psychiatrist on 5/10/05 and 6/7/05. In the first appointment, the inmate reported increased symptoms of depression, and the psychiatrist increased his antidepressant; in the second appointment, the inmate reported a reduction in depressive symptoms and denied suicidal ideation but also reported decreased concentration, mild agitation, and insomnia such that the psychiatrist increased his dosage of Strattera. The inmate also remained on multiple medications for treatment of AIDS. The suicide report makes reference to the inmate having an incident of mutual combat the day before his suicide with another inmate who owed this inmate money; however, there was no reference in the documents to any RVR or other disciplinary action.

The suicide report identified two problems with recommendations as follows:

> Problem 1: On 4/8/05, the CM wrote that follow-up in two weeks was indicated; however, the follow-up appointment was not scheduled. The system for follow-up appointment scheduling in Unit Four relies on individual clinicians to schedule appointments instead of using a standardized procedure to ensure that follow-up occurs at regular intervals.
> Recommendation: CMF to develop a system to ensure scheduling of appointments with clinical CMs and 3CMS LOC at least every 90 days and more frequently if indicated.

> Problem 2: The documentation never indicated any collaboration between medical and mental health clinical staff, and evidently, this does not routinely occur with these HIV cases although it would seem to provide better comprehensive care.
> Recommendation: Form a QIT with medical and mental health staff from Unit IV to develop a process for collaboration and documentation of such.

On 1/18/06, the Deputy Directors of the DCHCS and DAI approved the QIP response submitted by CMF staff on 10/31/05 in response to the suicide report of 8/24/05. The

response included documentation of a QIT charter titled "medical and mental health collaboration in Unit Four mental health program" and information on the 10/24/05 meeting held by the QIT that determined that modification and implementation of an LOP and the scheduling system that is already in use for Units One, Two, and Three CTC MH inmates were appropriate. Their scheduling system was adapted for use in Unit Four. Further existing LOP for this CTC mental health program to respond to referrals of inmates in need of mental health services was modified to provide medical staff a means to refer inmates to mental health when necessary.

On 2/1/06, a final report on the QIT response was approved by the Deputy Directors of the DCHCS and DAI in response to a 12/6/05 submission by CMF indicating that a final QIT was held on 11/18/05 and developed an LOP for inmate referral tracking and follow-up. Also provided was a tracking log maintained in the computer system at CMF to verify implementation of scheduled appointments for this inmate and Inmate P, who had committed suicide earlier in 2005. Lastly, the attached LOP entitled "processing of inmate referrals for mental health services" was provided to document inmates referred to medical staff for mental health services, and IST sign-in sheets were attached regarding training for EOP and 3CMS staff.

**Findings**: This inmate's completed suicide does not appear to have been foreseeable or preventable, based on the documentation provided, including the suicide report and the QIP responses by CMF. Although there was a lack of provision of mental health documentation in the records received, the references provided in the suicide report and in the facility response to the suicide report appear to have adequately addressed the mental health needs for this inmate as well as the problems identified in the suicide report. The failure of follow-up by the clinical CM two weeks after the last appointment as per the referenced progress note, given the two subsequent appointments with the treating psychiatrist, does not appear to have contributed to this inmate's completed suicide.

### 21. Inmate U

Brief History: This inmate was a 48-year-old African American male who committed suicide by drug overdose on 6/30/05 in his EOP cell at CSP/LAC. The inmate was double-celled at the time of his death, and his cellmate was in the cell when he was discovered. The inmate reentered the CDCR under a new CDCR number on 5/25/02 after he was convicted of murder first degree with special circumstances and sentenced to life without the possibility of parole.

On 6/30/05, at approximately 5:15 a.m., a CO conducting a security check observed the inmate in his cell sitting slumped over on a toilet. The officer asked the inmate if he was okay and received no response. The office then banged on the cell door and several times attempted to engage the inmate, but received no response. The officer then activated his personal alarm device, and subsequently, a sergeant and other staff arrived. The cell door was opened, and the inmate's cellmate was removed from the cell as he had been sitting on the top bunk during this whole incident. An MTA arrived, entered the cell, and

assessed the inmate, and the inmate was subsequently placed on a stretcher. The MTA began to perform CPR on the inmate, which continued as the inmate was transferred to the central infirmary emergency room. After the inmate arrived at the CTC, 911 was called, the Los Angeles County Fire Department arrived and declared that the inmate was "unsalvageable," and CPR was stopped. A physician was notified, and the inmate was pronounced dead by that physician at 5:45 a.m. An autopsy report was filed by the Department of the Coroner, Los Angeles County, on 7/1/05 and attributed the cause of death to acute Trazodone intoxication. The toxicology report indicated Trazodone levels of 8.8 ug/ml in heart blood and 8.3 ug/ml in femoral blood. The manner of death was recorded as suicide. The suicide report makes reference to a handwritten suicide note that was found in the inmate's cell and a letter sent to plaintiffs' attorney in the Coleman lawsuit dated 6/29/05. The report indicates the letter contained "detailed description of a suicide plan, including the inmate's admission that he had collected at least 5600 mgs of Trazodone during the previous weeks and would use that medication as a vehicle for suicide."

The inmate had been incarcerated in the CDCR under a different number (E- -----) in 1989 based on a conviction on charges of robbery, burglary, and assault with great bodily harm for which he initially was given a four-year suspended prison sentence, county jail time for one year, and a three-year probation, which was revoked because he was arrested for battery. He entered the CDCR in 1989 and was subsequently paroled in 1991. He however did not report for parole appointments and was returned to SQ as a parole violator in 1998. He remained at SQ until released in 1999 but was returned again in 1999 and 2000 on the same charges and as a parole violator. He obtained a first strike for battery in 1989 and several potential felony strike convictions between 1989 and 2001 and received an "R" suffix as a sex offender for arrest for indecent exposure, attempted rape, and sodomy. The inmate's conviction for murder first degree with special circumstances involved his having murdered, raped, and brutally beaten a woman in a parking lot in 1981 after he responded to a "room for rent" advertisement in a local newspaper.

The inmate reported a history of child abuse that included physical, emotional, and sexual abuse by his mother and a brother resulting in his running away from the family home between ages six and 11. He also reports beginning a long history of alcohol and substance abuse, which included alcohol, cocaine, methamphetamine, heroin, and LSD. The inmate received "unsatisfactory discharges" from both the Army and the Marines as he had enlisted under different names and social security numbers because of his substance abuse.

With regard to the inmate's mental health history, he reported that he had not received treatment for any mental health problems prior to 1994 despite his history of childhood abuse and substance abuse. He reported he had three suicide attempts prior to incarceration, in 1989, 1994, and 1996. After his admission to the CDCR via the NKSP RC, he was diagnosed with depression and placed in the MHSDS at the EOP LOC on 6/10/02. He was prescribed Trazodone and Paroxetine and continued in the EOP after he was transferred to CSP/LAC on 12/26/02. Although his diagnosis remained depressive

71

disorder, he was prescribed not only Trazodone but also Seroquel, Cogentin, and Benadryl for reasons that are not clear.

This inmate was an active participant in the EOP as well as attending education classes and job assignments while he was incarcerated at CSP/LAC; however, the two weeks prior to his death, he began refusing EOP groups and other meetings as per the suicide report. According to the suicide report, the inmate had clinician contacts on June 22, June 27, and June 29, the last being with his CM in which it was stated he developed a "distrust of the regular case manager." The suicide report references the inmate having told his CM that he had made three prior suicide attempts, including two overdoses related to feelings regarding his abuses in childhood. The suicide report references the inmate having made many attempts to discuss his personal issues with several clinicians during the two weeks prior to his suicide and that, during the last week of his life, "he had eight clinical and educational contacts with five different clinicians." He was characterized as having ongoing suicidal ideation with no current plan or intent during this last week of his life. The inmate may have been aware that he was scheduled to have an IDTT on 6/30/05, which would "most likely" recommend an LOC change to 3CMS. There is a progress note referenced in the suicide report dated 6/22/05 with this clinician indicating the inmate spoke of suicidal ideation "due to Doctor XXXX speaking so negatively, I felt so discouraged I never seen anyone be so negative. The program has really been let down. I don't care, she said." The note goes on to indicate the inmate was contemplating suicide and was aware that the CM thought he might be able to make it on the mainline, i.e., change in LOC to 3CMS.

After the inmate's death, there was found a handwritten note described as having "some measure of finality" by an attending physician that was not provided to this reviewer but referenced in the suicide report as including information that had been mailed to the *Coleman v. Davis* Committee, attorney of record, and indicating where the inmate's personal property should be sent. The suicide report quotes the note as stating "with extreme sacrifice, comes extreme change; my purpose, my choice, my life I freely give." The suicide report indicates that the DCHCS was contacted by the plaintiffs' counsel indicating that he had what appeared to be a suicidal letter from this inmate that was mailed on 6/29/05, including the intended method of suicide and an affirmation that the plan would be carried out after he mailed the letter. The suicide report also states that a psychologist sent a letter to a sergeant on the afternoon following the death of the inmate in which the psychologist reported the conversation he had with the cellmate of the inmate stating that the inmate had given away property to other inmates on 6/29/05.

The suicide report identified three problems and recommendations as follows:

> Problem 1: Primary clinician observed in June that inmate was becoming more depressed but evidently did not consider doing an SRAC.
> Recommendation: All clinicians were to be trained in April 2005 on recognizing suicide risk. They should all at CSP/LAC have had this training and have clinicians in this unit repeat it.

> Problem 2: Actions and comments of some clinicians may have compromised
> patient confidentiality.
> Recommendation: Subject to investigation.
>
> Problem 3: This inmate had a remote history of serious suicide attempts by
> overdose. DOT orders may have made it more difficult for this inmate to hoard a
> lethal dose of his medications.
> Recommendation: Train psychiatrists on circumstances to consider under which
> they might prescribe DOT.

Plaintiffs' counsel submitted a letter to the CDCR dated 8/31/05 regarding this inmate's
completed suicide. In the letter, the plaintiffs' counsel identify three areas of concern: (1)
The inmate did not receive timely emergency medical care once he was discovered
unconscious in his cell from a drug overdose, (2) the inmate repeatedly requested
treatment for his traumatic childhood sexual abuse, which clinicians noted but did not
treat, and (3) the inmate had a significant suicide attempt history from drug overdoses,
spoke about suicide and his prior attempts in the week before the suicide, and was not
appropriately assessed. The plaintiffs' counsel continue in the letter that men with
symptoms such as this inmate currently receive treatment within the DTP, which at that
time had open beds; however, the inmate was not referred to this higher LOC.

On 3/10/06, the Deputy Directors of the DCHCS and DAI approved the report on
implementation of QIP for this inmate's suicide as submitted by CSP/LAC staff on
11/29/05. In their memoranda, the Deputy Directors indicated that there were two items
missing: (1) verification that SRA training has been completed for all clinicians who
missed the 4/20/05 training, and (2) verification that SRA training has been repeated for
clinicians on the EOP unit where this inmate was housed at the time of his death. The
submission from CSP/LAC was in response to CAP items one, two, and three, included
IST sign-in sheets for a class on suicide risk management, and indicated that CAP item
number two, Category II (CAT II) investigation, had not been completed within the 60-
day requirement. On 8/17/06, the Directors of DCHCS and DAI approved a subsequent
submission by CSP/LAC that included a listing of names of clinicians who had
completed the SRA training.

**Findings**: This inmate's death was very likely to have been both foreseeable and
preventable. The inmate clearly had deterioration in his mental health functioning over at
least the two-week period prior to his death. He expressed his concerns regarding
confidentiality, increased thoughts of his childhood sexual abuse, and distress with regard
to interventions or lack thereof by his clinicians. The suicide report appropriately
identifies that no SRAC was performed by clinicians in June prior to his death, despite
their being very much aware of his increase in depression. The suicide report however
does not make reference to the need for referral to a higher LOC for this inmate,
particularly given his increased thoughts and discussions regarding his childhood abuse
and concerns regarding compromised confidentiality with his primary clinician. The
suicide report does make reference to the inmate having a history of overdose and suicide
attempts and suggests that DOT orders may have been indicated. The Program Guide

require DOT for all psychotropic medications administered, and this inmate was in an EOP in which the medications were administered on the unit. The suicide report does not make reference to any failures in the appropriate monitoring of DOT for this inmate. There were clearly failures in the assessment and treatment of this EOP inmate, who reported increased symptomatology to his clinicians and concerns regarding lack of confidentiality and was allowed to hoard such levels of medication that he was able to successfully end his life. The responses from CSP/LAC consist essentially of training of staff on already existing policy and procedures and do not adequately address staff deficiencies in performing the appropriate assessment, monitoring, and treatment for an inmate who had serious and persistent mental illness with increases in symptomatology in the two weeks prior to this death. Further, the lack of providing the mental health notes, records, and treatment plans for this inmate to this reviewer is inexplicable.

Lastly, the failure to provide timely CPR is not cited as a problem in the suicide report despite CPR apparently not being provided for at least ten minutes after the inmate was discovered. The failure of the prompt provision of CPR in an inmate who was discovered as unresponsive again is inexplicable.


**22. Inmate V**
Brief History: This 26-year-old Hispanic male committed suicide by hanging on 7/6/05 in his single cell in administrative segregation at the CSP/Sac. The inmate was admitted to the CDCR on 5/30/03 via the DVI RC, based on his conviction of five counts of aggravated battery on a custodial officer and one count of battery/gassing a custodial officer for which he received a sentence of three years for each count, to run concurrently, for a total of three years.

On 7/6/05, at approximately 4:35 a.m., a CO in the administrative segregation EOP hub at CSP/Sac discovered this inmate lying on the floor of his cell with a noose around his neck. The noose was made of a sheet and tied to the upper bunk, and the officer activated his personal alarm. The correctional staff responded, retrieved the cut-down tool, and performed an emergency medical extraction, entering the cell. The inmate although unresponsive was restrained, placed on a gurney, and transported to the A-facility emergency room, and an RN provided "medical treatment" while awaiting the arrival of paramedics. The records indicate that CPR was started at 4:55 a.m., approximately 20 minutes after the inmate was discovered, and the inmate was subsequently pronounced dead by a paramedic at 5:09 a.m. An autopsy report by the Coroner for Sacramento County stated an autopsy on 7/7/05 determined the cause of death as hanging and final classification as suicide.

This inmate was incarcerated on a three-year sentence for five counts of aggravated battery on a custody officer and one count of battery/gassing a custody officer, which was his controlling offense and occurred in a county jail. He was initially arrested in November 2002 for masturbating on a median strip of a road, charged with indecent exposure and a violation of PC290, and sentenced to 36 months' felony probation. While he was in jail for this offense, he committed battery on a custodial officer on 12/9/02 as

he threw urine on the officer. He was transferred to ASH as incompetent to stand trial, restored to competency, and returned to court in May 2003. He was subsequently convicted and sentenced to three years for each count, to run concurrently. He had been on probation for misdemeanor sexual battery that occurred in March 1999. He entered the CDCR via DVI RC, with an earliest possible parole date (EPPD) of 10/6/05; however, he had a pending court case for additional charges involving battery to staff in the CDCR. There was also the possibility that he would be deported after an Immigration and Naturalization Service (INS) investigation.

The inmate had a significant mental health history, which appears to have been related to his having used methamphetamine, resulting in a hospitalization in 1999 for suicidality. The inmate had a substantial history of substance abuse, including methamphetamine, marijuana, heroin, and alcohol, beginning at approximate age 17. Although the inmate had been hospitalized at ASH, as noted above, these records were apparently not requested by any clinician in the CDCR. The inmate was prescribed Zyprexa and Benadryl in jail, and his medications were continued after he entered the CDCR. He was placed in the MHSDS at the 3CMS LOC. His LOC was changed to the EOP on 12/8/03 after he had had a "suicide attempt" that involved his jumping over a railing on his tier in which he broke his nose. He was subsequently transferred to the CSP/Sac administrative segregation EOP hub on 12/11/03 and then released to mainline EOP on 12/18/03. The inmate reported voices telling him to kill himself in August 2004 and had a brief OHU stay; however, he appeared to be functioning in the EOP appropriately until March 2005, when he was placed in the OHU on suicide precaution. He was not actually housed in the OHU but was housed in a "ZZ cell," which is a wet cell used for overflow when the OHU is full, from 3/25/05 to 3/27/05. This again was in response to the inmate reporting that he was hearing voices commanding him to kill himself, and he indeed had marks on his neck from wrapping a sheet around his neck. The inmate subsequently had an IDTT on 5/19/05 that indicated that he did not require a DMH referral.

On 6/3/05, the inmate stated to a psych tech that he was suicidal and then spit on the psych tech and kicked a custody officer. The inmate was referred for a psychiatric evaluation; however, there is no documentation in the record that a psychiatric evaluation was actually conducted. The inmate was placed in the OHU on 6/3/05 and referred to an MHCB on 6/5/05, but he was not admitted. The inmate appears to have been housed in a "ZZ cell" from 6/4/05 to 6/6/05.

On 6/15/05, he was placed in the OHU and subsequently, on 6/18/05, admitted to the MHCB. He was described by the psych tech on 6/16/05 as suicidal and unstable. He remained in the MHCB until 6/23/05, when he was returned to administrative segregation. Although a five-day follow-up was ordered and implemented, he was returned to the OHU on 6/25/05 because he had reported he was suicidal and had spit on a correctional officer. An SRAC was completed by a psychiatrist but relied on the inmate interview only and did not include a review of the UHR or C-file. The psychiatrist determined that no referral was needed, and the inmate was returned to administrative segregation on 6/26/05. Five-day follow-up was ordered; however, it was conducted for only three days, ending on 6/29/05 without explanation.

75

The inmate was seen for his RVR mental health assessment by a psychologist on 6/27/05, who indicated that the UHR was not available and based her determination solely on the inmate's self-report regarding his assaults on staff on 6/3/05 and 6/25/05. Despite the inmate having been admitted to the OHU on those same dates, the psychologist appeared to be unaware of these admissions and did not incorporate the UHR or C-file information in her assessment. The inmate reported that he "wanted to kill myself since last month" and "voices make me want to kill myself" on 7/2/05 when he was again admitted to the OHU based on his resisting staff and his statements. The inmate reported that he had not been taking his medication for several days, although this is not noted on any of the MARs. No SRAC was completed based on this admission and his reports of voices making him want to kill himself. He was seen by a psychiatrist on 7/5/05 at cell side "due to time constraints," and the psychiatrist opined that he was "almost whimsical with his mental health" but noted his insight was little to none. There was no comment with regard to suicidality, and the inmate was found hanging the next morning. The suicide report makes reference to the inmate being seen at cell side frequently because of "institutional need" and, as referenced above, "due to time constraints." There appears to have been no consideration of referring this inmate to a higher LOC despite his clearly deteriorating status. Notably, the inmate had a difficult time in prison and received RVRs related to battery, mutual combat, and attempted battery, with his having possible a SHU term imposed on 5/26/05. He had been endorsed for PSU on 5/30/05. He had been admitted to the CDCR because of his gassing and assault on correctional staff in the local county jail. The inmate had an expected parole date of 10/6/05; however, INS had placed a hold on the inmate, and it was anticipated he would have been deported to Mexico upon his release.

The suicide report makes reference to several inmates reporting hearing the inmate "screaming that he was suicidal shortly before he was found hanging and that officers ignored the screams." The suicide report indicates that this was referred for further investigation.

The suicide report identified eight problems and recommendations as follows:

> Problem 1: Three hundred twenty-two days in administrative segregation unit. He had a SHU term since August 2004 but was not endorsed to PSU until 5/31/05. He may have benefited clinically from calmer environment. Recommendation: CSP/Sac to review reasons for this inmate's length of stay in the ASU and make recommendations, if any, to reduce this problem. May be done in a QIT.

> Problem 2: Inmate should have been referred to DMH in June after multiple CTC/OHU visits and frequent suicidality as per policy. Furthermore, ASU EOP staff did not follow procedures to routinely review I/Ps as required by the unidentified needs assessment (UNA) project. This inmate had been determined to meet criteria in 12/04 and then was removed from the list without going through HQ review in 3/05.

Recommendation:  Provide remedial training to staff and take disciplinary action as indicated.  Maintain a tracking system for IDTT reviews of DMH criteria.

Problem 3:  (a) Inmates placed in OHU awaiting MHCBs can be returned to unit upon decision of a single clinician, while if they were actually placed in MHCBs an IDTT would be required for release (similar to Mule Creek State Prison [MCSP] case in 2004). (b) It is advisable for inmates placed in OHU for suicidality to have a full five-day follow-up.  If the inmate returns to the OHU during the five days, the clock starts over when released again.
Recommendation:  Department OHU policy is currently under development.  In the interim, CSP/Sac to form a QIT to create a local procedure to ensure that at least two clinicians consult on decisions to remove inmate from OHU in cases where the OHU placement was due to lack of MHCB availability and that a five-day follow-up is performed.

Problem 4:  SRAC was not completed most times when indicated, and when it was, it was based entirely on inmates' self-report.
Recommendation:  Provide training to all clinicians to remind of policy of when to complete SRAC and that SRAC must be based on at least two sources of information.  If UHR is not available, seek collateral source such as other staff.

Problem 5:  It was very difficult for the reviewer to determine when the inmate was housed in ZZ cells as OHU overflow.
Recommendation:  CSP/Sac has implemented a procedure for tracking the ZZ cell placements.   Staff are also directed to note location of inmate contacts.

Problem 6:  Several inmates claim that Inmate V was screaming to officers that he was suicidal.
Recommendation:  This had been referred for investigation.

Problem 7:  The inmate was frequently seen cell side, reportedly due to lack of custody escorts.
Recommendation:  The supervisor is now tracking cell side versus confidential clinical contacts and addressing any obstacles.

Problem 8:  RVR mental health assessment was done without UHR and was based on evaluation of present status, not evaluation of behavior at the time of the RVR.
Recommendation:  Training for RVR clinician to remind of purpose of evaluation and to seek collateral information if UHR is not available.

On 1/25/06, the Deputy Directors of the DCHCS and DAI approved the QIP submitted by staff at CSP/LAC dated 10/4/05.  The staff at CSP/LAC responded to the recommendations as follows:

- Regarding Problem 1:  The facility staff report the inmate's extended stay in administrative segregation of 322 days was based on a DA referral and the inmate's refusal to have it heard by institutional staff, the RVR, and insufficient PSU beds.

- Regarding Problem 2:  The staff report the CM found none of the UNA criteria applicable on 11/29/04, and on 12/4/04, the inmate was on a reduced program and therefore did not meet the UNA criteria.  Further, the staff report that the IDTT members determined that the inmate did not warrant a referral.

- Regarding Problem 4:  An SRAC memorandum and IST sign-in sheets were provided.

- Regarding Problem 7:  The staff report the inmate was seen by the CM in a confidential setting more than 75 percent of the time.  Also, with regard to Problem 7, a summary of confidential and non-confidential CMs' contact in administrative segregation EOP during the months of August, September, and October 2005 was provided, indicating a range of 56 to 61 percent of contacts being provided in a confidential setting and 38 to 44 percent of contacts being provided in a non-confidential setting.

There were additional documents provided by the staff at CSP/SAC, including the administrative segregation EOP staffing agenda of 11/1/05, IST training on policies and procedures already in existence, logs of weekly review of EOP potential referrals to an intermediate LOC, and draft LOPs regarding the use of "a standardized process to provide treatment for inmates temporarily housed for custodial observation" in response to Problems 3 and 5 of the suicide report.

**Findings**:  This inmate's suicide appears to have been both foreseeable and preventable. This inmate reported increases in his symptomatology that appeared not to have been recognized by clinical staff, SRACs were not performed as per policy, he had an extended stay in administrative segregation without explanation, and despite there being a focus on identification and referral of inmates who were in need of a higher LOC as per the UNA study, he was not referred to a higher LOC.  There were a number of areas identified in the suicide report and from the records reviewed indicating that he had not received appropriate assessments and was housed in "ZZ" holding cells, because of lack of availability of OHU and/or MHCB beds, as well as reports by inmates that this inmate was screaming to officers that he was suicidal without response by COs.  Several of these items have been noted in the suicide report, and the issue of officer conduct has been referred for further investigation.  There is no further information provided to this reviewer regarding the status of that investigation or corrective actions other than the CSP/LAC response, which appears to be inadequate and based largely on training of staff for policies and procedures that were already in existence.  There does not appear to be any component of the suicide report that indicates a need for supervision and/or investigatory actions regarding clinical staff in relation to RVR mental health assessment

and other assessments that were based solely on the inmate's self-report rather than on a review of appropriate records and documents and consultations with custody staff.

**23. Inmate W**
Brief History: This inmate was a 30-year-old American Indian male who committed suicide by hanging on 7/25/05 in the CTC at RJD. The inmate was assigned to the dormitory at the time of his death and had been admitted to the CTC because of severe asthma. He was also in the MHSDS at the EOP LOC. The inmate had been admitted to the CDCR on 10/22/04 via the RJD RC after a plea agreement to charges related to his participation in the murder of a parolee he had met while in prison in Arizona. The inmate received an eight-year sentence and remained at RJD throughout his incarceration in the CDCR.

On 7/25/05, at approximately 1:25 a.m., an MTA was conducting a check of the inmates in the medical wing of the CTC and saw this inmate hanging in his assigned medical cell. The MTA yelled for help and was assisted by two other MTAs, who relieved the pressure from the inmate's neck and cut the oxygen tubing by which he was hanging from the cage surrounding the television in his room. CPR was begun, and one of the MTAs announced the emergency situation by radio, resulting in additional staff responding to the scene and bringing a CPR cart. IV Epinephrine was given, correctional officers responded, and an ambulance responded by approximately 1:40 a.m. CPR and other lifesaving efforts continued until approximately 2:17 a.m., when the inmate was pronounced dead via telephone by staff at the Grossmont Medical Center Emergency Room. An autopsy report by the Office of the Medical Examiner for the County of San Diego indicated that an autopsy was performed on 7/25/05 and that the cause of death was hanging, with the manner of death suicide.

This was the inmate's first incarceration in the CDCR, with charges as noted above. His minimum adjusted release date was 3/16/10. The circumstances of the offense indicate that he participated in the beating and drowning of a parolee whom he had met while he was incarcerated in Arizona. It is unclear from the record as to the reason for his incarceration in the Arizona Prison System. The inmate gave a history of substance abuse, including marijuana and alcohol, and there are references to his having been a dealer of methamphetamines, with denial in the record that he used methamphetamines himself. With regard to his past mental health history, the record indicates that he reported having been placed in special education as a child because of ADD, attempted hanging during his adolescence, and a psychiatric hospitalization in Arizona. Records from this reported psychiatric hospitalization were not provided in the documents received for review.

After he entered the CDCR, the inmate received a mental health screening on 10/25/04 that indicated the need for a referral for further mental health evaluation as the screening suggested a possible thought disorder and a major depression. He was seen on 10/27/04, and an MH-7 was completed that indicated that he did not meet the criteria for inclusion in MHSDS. He did report having been treated in the past with Seroquel for insomnia and

diagnoses of adjustment disorder, polysubstance dependence, and antipersonality disorder, but was not placed in the MHSDS. The inmate continued to complain of insomnia and was seen by a psychologist on 12/13/04, who referred him for psychotropic medication review and a reassessment. On 1/14/05, he was seen by a psychiatrist, who placed him in the MHSDS as meeting the criteria for mental health treatment as "medical necessity." He was seen by a different psychiatrist on 2/10/05, who reported the inmate was no longer taking Remeron, as had been prescribed for him, and was requesting removal from the 3CMS LOC. The psychiatrist opined he was stable and would be discussed with the Chief Psychiatrist for removal from the 3CMS LOC with plans for no follow-up. On 2/14/05, the inmate was removed from the MHSDS, stating medical necessity was no longer applicable.

Although the inmate had reported auditory and visual hallucinations and constant anxiety related to his fear of impending asthma attacks (the inmate's mother died at the age of 35 from an asthma attack), he was not placed in MHSDS until 1/14/05, as noted above, and medication was begun. The medication, Remeron, was discontinued on 1/24/05 because the inmate was refusing the medication. Since his admission, the inmate was being treated for severe asthma and had several trips to Alvarado Community Hospital to attempt to stabilize his asthmatic condition. He had reported his fear of dying from an asthma attack, as his mother had, to several clinicians and eventually was admitted to the CTC on 6/6/05 after he had been hospitalized at Alvarado Community Hospital from 5/30 through 6/6/05. His first admission to the CTC was on 3/10/05, for medical reasons, i.e., control of his severe asthma. He was never admitted to the CTC for psychiatric management; however, he was followed by both medical and psychiatric staff for his asthma and changing mental status.

After being admitted to the CTC on 3/10/05, he was seen by a psychiatrist on 4/5/05 based on a referral from medical staff and was described as having symptoms of paranoia related to his medical condition as well as anxiety and depression. Even though the psychiatrist in the CTC determined that the inmate needed supportive follow-up and a treatment plan was instituted to assist him, the inmate was not in the MHSDS at that time. The inmate was returned to the MHSDS on 5/20/05, to the 3CMS LOC as "medical necessity," when he was seen by a psychiatrist who determined he was agitated and angry and also prescribed Seroquel. The inmate agreed initially to take the Seroquel but subsequently refused it. While in the CTC, the inmate's behavior was aggressive, belligerent, and threatening to staff, including "lunging" at an officer. He received three RVRs for disruptive behavior and threatening staff, and they were all reduced to CTC-128-B Counseling Chronos. However, the progress notes continued to describe the inmate as irritable, paranoid, depressed, agitated, belligerent, and tearful.

After the inmate was returned from Alvarado Community Hospital during the first week of June, he was being followed jointly by mental health and medical staff for his asthma and steroid dependence. In addition to his medication refusals, paranoia, irritability, and conflicts with staff, the records indicate he had been prescribed steroids at 60 to 80 milligrams per day, as well as oxygen. He was described as having ripped out his IV on 6/28/05, splashing bodily fluids into a CO's eyes, with subsequent evaluation by a

80

psychiatrist, who described his condition as deteriorating on 7/8/05. The psychiatrist saw the inmate on that date because of medical referral to assess the inmate's competency to sign a "do not resuscitate" (DNR) statement. The psychiatrist went on to describe the inmate as being overall paranoid, hyperventilating, throwing food, and "verg[ing] on being delusional," although the psychiatrist did not find evidence of hallucinations or suicidal ideation. The psychiatrist opined that the inmate was probably not competent with regard to the request for a DNR statement but also noted that a Keyhea order for involuntary medication administration should be considered if the inmate became "more violent." The psychiatrist indicated on 7/20/05 that the inmate might be suffering from a steroid-induced mood disorder but that the treatment modalities were limited because of his medical condition; however, at that time, the inmate was prescribed Zydis and Lamictal. The inmate was seen the following day, on 7/21/05, when the psychiatrist changed his diagnosis from "Medication Induced Mood Disorder" to "Steroid Induced Rage," noting the inmate's insight and judgment were very poor and the inmate was even more agitated, with labile mood. The inmate was described as "banging his head" and reporting that he was "losing it." He was placed at the EOP LOC at that time, and his GAF was estimated at 30. He remained in the CTC primarily as a medical patient, with psychiatric complication, and there was no change in his housing to a CTC cell used for psychiatric management of patients.

On 7/25/05 (after the inmate's death), the psychiatrist wrote an addendum to his note of 7/21/05 indicating the inmate had been seen the previous Thursday and was agitated and possibly in need of restraints; however, on that Friday, he was calmer, no restraints were necessary, and the charges of splashing bodily fluids on the CO were discussed. Despite the inmate being returned to the MHSDS while in the CTC, at first at the 3CMS LOC and subsequently, four days prior to his death, at the EOP LOC, the only mental health professional who saw the inmate during his CTC stay was his psychiatrist. He did not receive any evaluations by psychology or social work and did not have any mental health evaluations such as an MH-4 or a treatment plan such as an MH-2. He was assigned no CM, and the CDCR suicide report makes reference to mental health staffing at CTC believing that they were following policy appropriately.

The CDCR suicide report stated that the psychiatrist reported he had consulted with the attending physician regarding the inmate's increased steroid prescriptions and the steroid-induced rage diagnosis; however, there was no documentation in the record indicating such discussion. The reviewer who prepared the CDCR suicide report indicated this was beyond the scope of their expertise, and it was recommended that the matter be referred for medical review. The CDCR suicide report states the CDCR medical reviewer found that the inmate received appropriate medical care and medications for his severe asthma. The records further indicate that the inmate refused the medications (Zydis and Lamictal) that the psychiatrist had ordered on 7/21/05 through the time of his death; however, nursing staff did not notify the psychiatrist of the inmate's refusals.

The suicide report identified four problems with recommendations as follows:

Problem 1: Inmate was placed on psychotropic medications without being placed in the MHSDS.
Recommendation: (a) Train all psychiatrists on procedure for placing I/P in MHSDS. (b) Run MHTS compliance reports weekly to verify that all inmates receiving psychotropic medications are in the MHSDS.

Problem 2: MHSDS inmates housed in the medical wing at the CTC were only seen by a mental health clinician in response to referrals from medical staff. Inmates shall be provided mental health services per program guidelines as mandated by their designated LOC, no matter where they are housed.
Recommendation: (a) Develop an LOP for providing MHSDS services and continuity of care to MH inmates in CTC medical beds. (b) Train staff and implement LOP. (c) Conduct an ongoing audit of inmates in medical beds to insure that MHSDS inmates needing services receive them.

Problem 3: The psychiatrist was unaware that the inmate was refusing his medications during the last four days of his life. Nursing staff MUST follow medication management policy of advising psychiatrists/physicians of medication refusals.
Recommendation: (a) Ensure that all nursing staff who administer medications in the CTC are trained on the medication refusal documentation and referral policy. (b) Audit CTC MARs for two months to ensure compliance.

Problem 4: While the inmate had not been found to be at risk for self-harm, he demonstrated increasingly problematic behavior that appeared beyond his control. A more effective response, such as documenting consultation between psychiatrists and the attending physician and placement in an MHCB, appears to have been warranted.
Recommendation: Refer the psychiatrists who were treating Inmate _____ in the CTC to the institution's PPEC for a comprehensive review of the psychiatric/medical management of this case.

On 2/13/06, the Deputy Directors of the DCHCS and DAI approved the QIP submitted on 11/29/05 by RJD. This QIP was in response to the suicide report dated 10/24/05, and RJD made reference to the response being an "initial" letter, noting that the final results of some of the audits would not be completed for an additional three to four weeks. In their response, RJD stated the following: First, (a) all psychiatrists were retrained on the procedures for placing I/Ps in the MHSDS, with enclosures, and (b) compliance reports were being run weekly by the supervisor of the MHTS to verify that all inmates receiving psychotropic medications were in the MHSDS, and final results would be forwarded in one month. Second, they suggested LOPs for continuity of care to mental health inmates in CTC beds were provided, that staff in the CTC had been trained on the suggested LOP, and that a weekly audit was being conducted in the CTC to ensure that MHSDS patients in medical beds were receiving mental health care, with final results to be forwarded in one month. Third, IST had been done by the supervisory nurse regarding the medication management policy, a two-month audit of the CTC MARs had begun, and the results

would be forwarded in one month.  Fourth, a psychiatrist on the Executive Committee of the Medical Staff was currently conducting an in-depth review of the care rendered by the CTC psychiatrist to this patient, and the results would be discussed at a Peer Review Committee, but whether or not this information could be shared outside the committee would have to be clarified by the "State Attorney."  There was a follow-up note on 1/25/06 from RJD to DCHCS indicating that the staff were "still struggling" with patients being started on medication and not placed in MHSDS and that the tracking program had been "leaderless and understaffed," which has also contributed to the problem.  There were no other documents forwarded with regard to the results of audits prior to the preparation of this report.

**Findings:**  This inmate's death appears to have been foreseeable and preventable.  While the suicide report makes reference to a number of failures on the part of staff to follow established CDCR policy regarding the mental health treatment of inmates in need of treatment, including medication management, assessment and treatment planning for inmates at the 3CMS or EOP LOC, and the need for placement of inmates in MHCBs based on their overall conditions, there are a number of other areas that are not clearly identified in the CDCR suicide report.  This inmate's condition was clearly deteriorating after having been admitted to the CDCR.  He expressed his fears of possibly dying of asthma as had his mother, and despite those fears and his reporting of symptoms of depression, anxiety, and paranoia, in addition to his escalating and disruptive behaviors, he was not provided with proper assessments or documented consultation between medical and psychiatric staff, nor was he placed at a higher LOC when his condition continued to deteriorate and he was refusing psychotropic medications.  The psychiatrist provides an opinion that the inmate had both a "Mood Disorder" and subsequently "Steroid Induced Rage," and had indeed been prescribed, four days prior to his death, both an antipsychotic and a mood-stabilizing medication, which he refused.  The GAF at that time was estimated at 30, but he was not transferred to an MHCB, where he would have had limited access under observation to the mechanism he used in his suicide.  This inmate utilized the oxygen tubing, which he braided, and then hanged himself from the cage around the television.  MHCBs do not have caged televisions, and had he been transferred to a crisis bed, the inmate would have received not only timely assessments of his current functioning but an IDTT to formulate treatment planning.  None of this was done, and although the inmate was not reporting overt suicidal ideation, he had requested a "Do Not Resuscitate (DNR)" approval so that if he was found unresponsive, there could not be medical efforts to save his life.

These factors together strongly suggest that had this inmate had appropriate assessments, treatment planning, and placement in a safe environment, i.e., a crisis bed cell, while such assessments and treatment were continuing, his death may indeed have been prevented.  Lastly, the medical record provided for this review by the CDCR did not include the CTC notations that are referenced in the CDCR suicide report; however, fortunately, this reviewer was able to review those records onsite during a regular <u>Coleman</u> site visit.

**24. Inmate X**

Brief History: The inmate was a 51-year-old Caucasian male who committed suicide by injection of heroin on 7/29/05 in his single cell in general population at the CMC-East. The inmate was admitted to the CDCR on 11/13/79 via the CMF RC. He was convicted of murder in the first degree and sentenced to 25 years to life with a two-year enhancement for killing a man whom he believed had stolen drugs from him. He also received two years for possession of a firearm by a prohibited person.

On 7/29/05, at approximately 5:55 a.m., a CO went to the inmate's cell, in which he was the single occupant, to wake him up for an early work call and observed the inmate lying in a fetal position on the cell floor. The officer could hear the inmate snoring, called his name, but got no response. The officer notified two additional officers that she could not wake up the inmate, and when the officers entered the inmate's cell, they could hear him snoring but could not arouse him. The situation was reported to a sergeant who instructed the officers to declare a medical emergency and summon the ETV. While awaiting medical transport, the officers noted a hypodermic syringe laying in a small amount of bloody vomit near the inmate's head. There were also two pieces of folded paper taped on the cell wall near the door. The fire captain and the ETV crew arrived at approximately 6:07 a.m., repositioned the inmate on the floor outside the cell, and began CPR, which included rescue breathing and chest compressions. There was no notation in the incident report that the inmate had stopped breathing; however, he was described as unconscious and transported to the East Medical Clinic, where he arrived at approximately 6:22 a.m. The CMC Emergency Room record indicates that the inmate had no pulse and was gasping for air when the ETV staff arrived, and by the time of his arrival at the emergency room, he had no spontaneous breathing and no pulse. The inmate was also given Narcan 1 amp in addition to being intubated.

At 6:46 a.m., a physician pronounced the inmate dead as "all medical resuscitation efforts failed." Subsequently, an ISU officer inspected the cell and read the two pieces of paper, which were determined to be "suicide notes." The "two" pieces of paper actually were four suicide notes. Two of the notes were addressed to the inmate's sons and described his being sorry about how things were, his being proud of them, and his wanting to thank each of them for various things they had done. The notes also made reference to his being "99% sure that I have liver cancer" based on a consultation with a specialist at Stanford University. He also encouraged his sons to take care of each other and expressed his love for them. The other two notes were notes to the custody staff, indicating that he didn't "have the strength left to fight" and "this is what happens when a man looses all hope." He also asked that his family be notified and provided telephone numbers to contact them. An autopsy report was performed by a pathologist from the San Luis Obispo County Sheriff Coroner's Office on 7/29/05, with a subsequent toxicology testing, and indicates that the cause of death was acute heroin toxicity (minutes). While there were a number of other findings, including cardiomegaly, pulmonary edema and congestion, cirrhosis, obesity, and diabetes mellitus, there was no indication from the autopsy report that this inmate had cancer.

The inmate's controlling offense appears to be his only incarceration in the CDCR. After being admitted to the CDCR via CMF, he was transferred to SQ and suffered a gunshot

wound to the leg in August 1982 because of a yard incident. He subsequently transferred to CTF in May 1984, CMC-East in April 1992, MCSP in October 1996, returning to CMC-East in March 1998, where he remained until his death by overdose on 7/29/05.

The UHR provides considerable information on the inmate's medical history, including his having hepatitis C, referral for a psychiatric evaluation regarding the possible use of antiviral treatment, fatty changes in the liver with no evidence of cirrhosis, and hypertension, in addition to diabetes mellitus and chronic neck pain. There were no screenings for mental health problems in the records for any of his transfers, and none would have been required with the exception of his last return to CMC-East in March 1998. The records indicate psychological reports for the BPT had been completed at various times, and in September 1994, the inmate had been diagnosed with amphetamine dependence in remission and substance abuse NOS (marijuana and valium) in remission, as well as an antisocial personality disorder. He also received the psychiatric consultation referenced above on 12/17/03, with diagnoses of amphetamine abuse in remission, hepatitis C, hypertension, and non-insulin-dependent diabetes mellitus. It was noted that the inmate denied ever having made a suicide attempt prior to or subsequent to his incarceration. The inmate was not in the MHSDS at the time of his death and appears to have never received mental health services other than for prison term evaluations and a psychiatric consultation noted above. The inmate is noted to have participated in substance abuse prevention programs after his incarceration until approximately 2004, when he no longer participated in those programs.

The inmate received an RVR on 7/5/05 for possession of methamphetamine, which was associated with methamphetamine being found in the side of a calculator that an officer had seen taken from the inmate's cell. The inmate references the charges in his two notes to custody staff, and the suicide report makes reference to various statements found in the inmate's cell after his death in which he appeared to be formulating a defense. The inmate received four previous RVRs for an attempted stabbing in 1984, swearing at staff in 1987, threatening staff in 1989, and falsifying work records in 1990. There are references in the records to the inmate having been a member of the Aryan Brotherhood earlier in his incarceration, as well as allegations of having used methamphetamine while incarcerated.

The suicide report makes reference to the inmate having received the RVR, his estrangement from his wife and problems with his son, and his belief that he had cancer as possible precipitating issues to his suicide. There was also a report by the Chief Psychiatrist at CMC raising a possibility that the inmate may have been delusional in his belief that he had cancer as part of a Depressive Disorder; however, the reviewer states that there was insufficient evidence to conclude that the inmate's belief was delusional or that he was depressed. The suicide report concluded that all policies and procedures were followed and there were no recommendations or findings.

**Findings:** This inmate's suicide does not appear to have been foreseeable or preventable. While there are a number of factors that are reflected in the CDCR suicide report, as well as in the records reviewed and, importantly, in the suicide notes that he left for his sons

and custody staff, there do not appear to be any factors that would have identified this inmate at moderate or high risk to commit suicide, and appropriate life-sustaining efforts were reflected in the documents reviewed.

### 25. Inmate Y

Brief History: This 44-year-old Caucasian male committed suicide by hanging on 7/31/05 in his doubled cell in administrative segregation at CIM. The inmate was returned to the CDCR for his third prison term via the DVI RC on 4/26/05. He was convicted of assault with force and great bodily injury and sentenced to two years with a minimum expected release date of 1/1/06.

On 7/31/05, at approximately 12:15 p.m., two officers who were making rounds in preparation to re house inmates returning from the yard in administrative segregation observed this inmate, who was alone in his two-man cell, hanging by a torn sheet from the cell's air vent. One officer yelled, "man down" and requested the cut-down tool and an MTA. At approximately 12:16 p.m., an additional officer arrived with a cut-down tool, the cell door was opened electronically, and the officers entered the cell. The inmate was cut down, taken out of the cell, and placed on a tier floor. An MTA arrived on the tier, checked the inmate's vital signs, determined that he did not have a pulse, and requested the custody officers to call for a medical code three response. Neither the MTA nor the officers began CPR at that time. An additional officer arrived with a stokes litter, the inmate was carried down to the first-tier officer's station, and CPR was initiated by MTAs. By 12:30 p.m., the medical transportation team arrived, and the inmate was transported to the emergency medical treatment area of the CIM Hospital, with CPR continuing en route. The medical transportation team arrived at the CIM Hospital at approximately 12:44 p.m., CPR continued with additional lifesaving measures, and at 1:01 p.m., a physician pronounced the inmate dead. An autopsy was conducted by the Coroner's Division of the San Bernardino County Sheriff's Department on 8/2/05, and although it makes reference to the "history of death" and the postmortem examination, including that the inmate was found hanging and that the inmate committed suicide, it does not give a formal cause of death and references a toxicology report that was not included. In addition to the hanging and ligature mark around the inmate's neck, the report makes reference to four stab wounds in the inmate's right upper abdomen. The coroner's report also makes reference, based on interviews of CDCR staff, to the fact that the inmate's cellmate had gone to the yard that morning, had been stabbed while in the yard, and upon returning, the cellmate made the "man down" announcement. The report goes on to state that CDCR staff may have opined that this inmate's cellmate was to have killed him and because the cellmate did not kill this inmate, the cellmate was stabbed in the yard. There was no immediate explanation for the four stab wounds to this inmate's abdomen that are referenced in the coroner's report.

This was the inmate's third incarceration in the CDCR, which began on 4/26/05. He had been previously incarcerated on two different CDCR numbers from August 1980–March 1987 and February 1993–September 1999. The controlling offenses for those commitments were not provided. During his previous incarcerations, he has also been

charged with possession of a weapon in 1980 and two assaults by a prisoner in 1981 and 1983. During his current incarceration, he was placed in the CIM ASU because of a charge of battery on an inmate with a weapon that occurred the day before. The inmate had been transferred from DVI to the California Rehabilitation Center (CRC) on 6/13/05 and then from CRC to CIM administrative segregation on 6/29/05, where he remained until his death. The investigation was ongoing at the time of the preparation of this report regarding the events at CRC as well as this inmate's stabbing prior to his suicide at CIM.

The San Joaquin County Correctional Healthcare Services transfer sheet indicated the inmate had a history of mental health treatment and hepatitis B and C. He was prescribed Wellbutrin and Seroquel. Initial health screening on 4/26/05 also indicated "psych," the same medications, "depression," and a psych referral. An RC MH-7 dated 5/12/05 indicated the inmate had a history of ADHD, a suicide attempt in 1998 where he cut both wrists, hospitalization at Saint Joseph's Hospital after that attempt, and a history of methamphetamine and alcohol abuse. The inmate reported that he hadn't abused methamphetamine since 1996 but continued to abuse alcohol. He also reported violent behavior and "impulse control anger problems." It was also noted on the MH-7 that the inmate believed that he was seriously mentally ill due to his abuse of drugs, regretted his life of crime, and had a history of abuse by his father and problems in school. He was referred for a medication evaluation. The inmate was again placed on Seroquel and Wellbutrin and remained at a 3CMS LOC. He was transferred to CRC on 6/13/05, and an MH-4 assessment and an MH-2 treatment plan were completed. His diagnosis was changed to mood disorder NOS, and his Wellbutrin and Seroquel were continued. The notes at DVI indicate the inmate had a history of serious suicide attempts by cutting, and they also expanded the diagnoses to psychotic disorder NOS and MDD with psychosis. He remained at the 3CMS LOC, and on 6/27/05, the IDTT discussed the possibility of the inmate having groups, but the inmate was "not sure" that he wanted to participate. After his transfer to CIM, there are no notations in the documents providing that the inmate was seen by a psychiatrist, and indeed, the suicide report indicates the inmate was scheduled for psychiatric appointments on 7/18/05 and 7/25/05 but refused those appointments. The inmate also did not receive case management weekly appointments while in administrative segregation, and the suicide report makes reference to referral from the psych tech on 6/30/05 after his being placed in administrative segregation.

Despite the inmate having been clearly identified as having a significant mental health history, including suicide attempts, no SRAC was completed by any of the clinicians who saw him at any of the three institutions. Indeed, after his arrival at CIM, not only did the psychologist who completed the MH-7 document the 1998 suicide attempt and hospitalization but the inmate himself reported attempted hanging on 6/28/05, the day before he was transferred to CIM. The inmate's last formal contact with mental health staff appears to have been on 7/12/05, when the inmate's MH-2 was completed and the IDTT noted his two suicide attempts, again without completing an SRAC.

The suicide report identified six problems and recommendations as follows:

Problem 1: Attending clinicians were at times unaware of mental health history, in part due to unavailability of UHRs.
Recommendation: (a) CIM reports that since this suicide, UHRs are once again maintained on the unit and are available to clinicians. (b) Conduct audit of percentage of clinical contacts for which UHR was available for a two-month period.

Problem 2: No formal SRACs were completed for the inmate at any of the three institutions where he was housed, despite the inmate's reports of a history of serious attempt, recurrent suicidal ideation, and continued presentation of other risk factors.
Recommendation: Train staff on the requirements for using the SRAC whenever an inmate states he is suicidal.

Problem 3: Inmate did not have weekly CM contacts as per 3CMS ASU program guidelines. Inmates are not ducated for appointments.
Recommendation: (a) Provide written procedures for scheduling 3CMS appointments in ASU. (b) Demonstrate that inmates are seen weekly at a confidential setting. Conduct audit.

Problem 4: Despite documentation of ongoing affective instability and suicidal ideation, inmate was not considered for a higher LOC such as EOP.
Recommendation: Explain process of considering higher LOC, and conduct a two-month audit of how many such inmates are considered and referred.

Problem 5: One clinician reported in a note that the inmate had attempted suicide but did not follow up in anyway.
Recommendation: The institution reports that this clinician has been disciplined.

Problem 6: Inmate had unexplained stab wounds, and his cellmate also had stab wounds.
Recommendation: The institution is reportedly conducting an investigation.

On 2/2/06, the Deputy Directors of the DCHCS and DAI approved the QIP submitted by CIM on 1/17/06 in response to the suicide report of 10/14/05. In their response, CIM indicates the following:

- Regarding Problem 1: UHRs are now maintained on the unit and available to clinicians, and the audits of 12/19/05 and 1/10/06 indicated UHRs were available 43.5 percent of the time. They further indicated the audit will continue until 75-percent compliance for three months in a row is achieved.

- Regarding Problem 2: All clinicians received the required April 2005 statewide training on SRA and verification that they understand the requirement for use.

- Regarding Problem 3: CIM staff report that until staffing increases, physical plant modifications, or capping the mental health population at administrative segregation, it is unlikely administrative segregation 3CMS patients will be seen weekly in a confidential setting as per guidelines. They provided a copy of "Administrative Segregation Daily Procedures" dated 8/2/05. They also indicated they prioritized and see EOP inmates every week in a confidential setting. An audit of 3CMS clinical contacts at administrative segregation from 12/12/05–1/3/06 was conducted, and inmates were seen either in a confidential setting or at cell front 82 percent of the time each week. Of this 82 percent, 30 percent were seen in a confidential setting. They conclude all 3CMS inmates are seen at least every other week.

- Regarding Problem 4: CIM reports that IDTT meetings are held weekly at which administrative segregation psychologists present new intakes, problem medications, and those being considered for a higher LOC. An audit from 12/5/05–1/10/06 indicated 17 or18 patients were designated EOP in administrative segregation; three had LOC increases from 3CMS to EOP; two I/Ps were referred to DMH; and one I/P is pending completion of DMH paperwork. CIM also reports that the MHSDS program guide is its primary source document for establishing procedures to identify and implement higher LOC referrals for mental health inmates. They also report that CIM has one of the highest referral rates to DMH, with a monthly average of 15 referrals by clinicians, with 11 referrals per month being sent to DMH and about seven accepted and transported each month.

- Regarding Problem 5: CIM reports the clinician involved was issued an employee counseling record and removed from working in this setting.

- Regarding Problem 6: CIM reports that the investigation remains ongoing.

On 6/15/06, CIM sent a supplemental document regarding the QIP for this inmate's suicide and commented specifically on Problem 1 with regard to an audit. They reported that the May audit had not been completed but that a 6/15/06 audit had begun and that results of a 30-day sample would be forwarded.

With regard to Problem 2, they reported a 5/12/06 attachment of training rosters of staff on use of the SRAC and that two additional trainings were conducted.

With regard to Problem 3, the CIM reported that as of 5/12/06, activity logs were maintained on CM contacts and that from January 2006–April 2006, 99.5 percent of I/Ps in administrative segregation were seen for weekly visits and 43.7 percent of these were seen in a confidential setting. It was also reported that 47 percent of I/Ps ducated for

individual sessions refused those session per week. They further reported that based on their capacity, an estimate of 62 mental health inmates in administrative segregation is accurate but that their average population of MHSDS inmates in administrative segregation is 125. There was no additional information provided regarding Problems 4, 5, and 6.

**Findings:** This inmate's suicide appears to have been both foreseeable and preventable. The CDCR suicide report accurately reflects that there were multiple failures in following CDCR policy and procedures and program guides. These failures are appropriately reported in the suicide report, which includes failings such as improper assessments, including SRACs, individualized treatment planning, consistency between clinicians with regard to diagnoses, and poor medication management. In addition, CM contacts were not held appropriately, access to UHR was inadequate, and psychiatric appointments were missed and not properly rescheduled despite the inmate's consistent refusals of the prescribed psychotropic medications. After the inmate's suicide, there appear to have been a number of discussions with regard to individual clinician performance, including disciplinary action, as well as the lack of collaboration between clinical and custody staff regarding this inmate's ongoing issues. As reflected in the CDCR suicide report, investigations are continuing. The CIM QIP in response to the suicide report indicates serious deficiencies in the delivery of services, and the CIM response indicates that these deficiencies are at the facility and central offices levels, with multiple areas in need of improvement.

### 26. Inmate Z

Brief History: This inmate was a 41-year-old Caucasian male who committed suicide by hanging on 8/4/05 in the ICP at ASH of DMH. The inmate entered the CDCR on 10/30/02 via the SQ RC for his first term, having pled guilty to kidnapping, inflicting corporal punishment, and oral copulation, for which he was sentenced to ten years in state prison.

On 8/4/05, at approximately 11:15 p.m., a unit shift lead (psychiatric technician) was doing rounds in the ICF and noticed that this inmate appeared to be sleeping on the floor. The shift lead immediately came back to the room and noticed a thin sheet around the patient's neck. The thin sheet was hanging from the lock loop on the locker. A "red light" was activated, the ligature was cut with shears, and the patient was removed from the room to the hallway. The patient was examined, staff were unable to get vital signs, and CPR was initiated. The patient was transported via emergency cart to the urgent care room, where a physician initiated a code, and an ambulance on grounds subsequently transported the patient to the ER; however, the patient could not be revived and was pronounced dead at 11:47 p.m. by a physician. An autopsy was performed by the San Luis Obispo County Sheriff Coroner's Office on 8/8/05. The pathologist determined that the cause of death was asphyxia by hanging (minutes). The toxicology report indicated that the only drug found in the peripheral blood sample was Carbamazepine at 2.0 mg/L, which is below the effective level. No common acidic, neutral, or basic drugs or blood alcohol were detected.

This was the inmate's first incarceration in the CDCR; he was admitted through the SQ RC on 10/30/02 for a ten-year prison sentence. The instant offense involved his having beaten, threatened, and subsequently raped and sodomized his wife. He then kidnapped his wife; however, he was taken into custody without incident. The kidnapping, according to the patient, was to take his wife to his mother's house in Tennessee. The inmate was known to the police because of having been taken by them for a 72-hour hold for a mental health evaluation prior to this event and for the inmate also calling the police on the day of the offense to complain about his neighbor being involved with his wife. The inmate was transferred from SQ to CMF on 12/6/02 and subsequently on 4/30/03 to ASH. He returned to CMF on 12/10/03, CTF on 9/15/04, CSATF (MHCB) on 11/3/04, and the APP on 12/12/04. He was subsequently admitted to the ICP ASH on 2/16/05, where he remained until his death on 8/4/05.

This inmate had a long history of mental health treatment beginning at approximate age 32, when he was hospitalized at the Middle Tennessee Mental Health Institute, with approximately ten hospitalizations from 1996 through June 2000. This patient received inpatient and outpatient care, as well as having been housed in a boarding home between hospitalizations. In addition to his mental illness, he also suffered from alcohol dependence, marijuana and cocaine abuse, hypertension, and diabetes mellitus.

Prior to being admitted to the CDCR, the inmate had been hospitalized at ASH for an evaluation. He arrived at SQ on 10/29/02, and the initial health screening done on 10/30/02 indicated the inmate had a past history of hospitalization, medication utilization, and current mental health problems, but he denied a history of suicidal thoughts or attempts and current thoughts of harming himself or others. When seen by a psychiatrist the next day, the inmate was diagnosed with bipolar I disorder and prescribed Valproic Acid and Zyprexa. He was placed at the 3CMS LOC in the MHSDS. Over the course of this first two years in the CDCR, the inmate was admitted to the OHU at SQ, transferred to CMF, and placed on a Keyhea order because of poor compliance with medication and grave disability; by 4/30/03, he had been admitted to ASH with a diagnosis of schizophrenia, bipolar type and alcohol abuse.

After his return to CMF in December 2003, the inmate acknowledged that he had been treated in the past for mental illness and currently was receiving mental health care for mental health problems, but he denied any suicide history and current danger to himself or others. In March 2004, the IDTT decided to remove him from the EOP and place him at the 3CMS LOC. On that same date, the inmate had received an RVR for attempting to hit another inmate with a chair, and he was placed in administrative segregation. This charge was eventually reduced to a counseling report rather than an administrative segregation placement, and while he remained at the 3CMS LOC, the IDTT considered him for transfer to ASH.

His CM contacts and medication via Keyhea order continued; however, in September 2004, he was transferred to CTF, where he denied any current mental health problems. Notably, his Keyhea order that was set to expire in April 2004 was extended through

April 2005. He appeared to have remained stable until November 2004, when he was seen by a psychologist as an emergency and was described as singing, throwing food on the floor, and exhibiting rambling and disorganized speech. He appeared to be in an acute manic phase and was transferred to the MHCB program at CSATF, where he remained until 12/12/04, when he was transferred to the APP and continued to display acute manic symptoms. His condition did not stabilize during his stay in the APP, and he was subsequently transferred to ASH on 2/16/05. He remained grandiose with pressured speech and poor judgment and in complete denial of his having a mental illness, and his diagnoses on admission to ASH were changed to bipolar I disorder manic severe with psychotic features, along with personality disorder NOS.

The suicide report makes reference to the last treatment team review, indicating that the treatment team planned to target the inmate's psychiatric symptoms, medication management, substance abuse treatment, assaultive behavior, self-injurious behavior, self-care, independent living, deviant and sexual impulses and behaviors, interpersonal skills, and leisure and recreational skills. Finally, the suicide report references the inmate having been continued for an additional year through April 2006 on his Keyhea order for involuntary medication.

While the records of his ASH admission from February 2005 were not provided, the suicide report describes several entries from 6/13/05 through 8/2/05. Generally, these entries indicate a change in the inmate's functioning as he reported both physiological and mental health symptoms. The suicide report makes note of there not appearing to be any "direct indicators of suicidal thinking" but also states that the inmate's comment on 7/22/05, in which he stated "he did not commit his crimes and would not be able to live with himself if he had, reflects the guilt and self-hatred he was experiencing."

The suicide report identified one problem with recommendations as follows:

> Problem 1: DMH ASH staff identified the design of the lockers as flawed for suicide prevention purposes.
> Recommendation: DMH ASH plans to remove the lock unit from the lockers and replace them with a secured combination lock (i.e., one that is part of the locker). They also plan to make these lockers mobile so patients are not able to use the lockers for support in hanging. ASH is also completing a root cause analysis of the suicide.

On 1/18/06, the Deputy Directors of the DCHCS and DAI approved the QIP submitted by the Executive Director of ASH with enclosures of Department of Health Services Review and Plans of Correction and attachments for ASH dated 10/31/05. In the Revised Plan of Corrections, problems with missing or outdated documentation in the patient's chart were identified as (1) no nursing care plans for self-management of assaultive behavior or control of deviant sexual impulses/behaviors; (2) no nursing care plan for self-harm was present; (3) nursing care plans present in the chart were expired; (4) no nursing care plan for priapism (opened 6/13/05); (5) no seclusion/restraint debriefing forms related to the patient acting out aggressively toward others, requiring restraints on

3/28/05, 5/10/05, and 7/24/05; (6) the acuity outcome monitoring log contained no entries between 6/7/05 and 8/2/05; (7) p.m. weekly sponsor notes by a pre-licensed psychiatric technician dated 4/1/05 to 4/7/05 and 7/7/05 lack a co-signature; (8) no initial 24-hour RN assessment and no monthly RN assessments completed on the patient while on Unit 4 as the patient was assigned to a nurse on extended leave. The plan of correction regarding these documentation problems included review of nursing procedures with program five RNs; patients with suicide listed as a focus of treatment to remain on the increased risk patient identification list until determined by the IDTT that suicide is no longer a treatment focus; and monitoring via appropriate chart audits, training records, nursing care plans, administrative directives, and nursing procedures with program five nursing staff to be conducted. The corrective actions were to be completed by 11/24/05, and the plans of corrections were to be reviewed by 12/9/05.

**Findings:** This inmate's suicide may have been both foreseeable and preventable. While the suicide report makes reference to the physical plant risk by having lockers that could facilitate inmates strangling themselves, as occurred in this case, and the CAP put in place by ASH to replace and modify the hardware of the lockers is appropriate, the suicide report does not identify the failure to perform the suicide risk assessment on this inmate who had a suicide history. ASH appropriately makes reference to nursing care plans that were not included in the documentation or do not address identified problems, and their CAP again appears to very appropriate to address those issues. The suicide report does make reference to the inmate's statement of not being able to live with himself if he had done what he was convicted of doing, which should have been a trigger for further suicide risk assessment and investigation, particularly in light of his changing behavior within the last few weeks of his life. Other than this deficiency, the root cause analysis done by ASH staff was excellent.

### 27. Inmate AA
**Brief History:** This inmate was a 20-year-old Hispanic male who committed suicide by hanging on 8/6/05 at SVSP where he was double-celled. The inmate entered the CDCR via the CCI RC on 4/28/04 for his first CDCR term. The inmate was convicted of attempted murder, assault with a firearm, kidnap in commission of a carjack (two counts), and first degree burglary, and was sentenced to three consecutive life sentences plus enhancements (96 years and eight months to life).

On 8/6/05, at approximately 2:26 p.m., two COs were conducting the shower program in this inmate's unit and discovered the inmate hanging from the light fixture by a noose made from a sheet and his underwear. One officer activated his personal alarm and ordered the control booth officer to open the cell. The two officers entered the cell and lifted this inmate, and one officer removed the noose from around the inmate's neck. The inmate was placed on the floor outside of his cell, and the Correctional Sergeant called for the emergency response vehicle (ERV) at approximately 2:28 p.m. The sergeant requested the ambu bag, and medical staff entered the unit and started CPR. The medical staff and COs continued CPR, lifted the inmate onto a stretcher and took him to the ERV at approximately 2:42 p.m. At approximately 3:37 p.m., a physician from Natividad

Medical Center pronounced the inmate dead. It appears from the time line in the incident report that it was approximately three minutes, from 2:26–2:29 p.m., from the time of discovery of the inmate hanging to the start of CPR by medical staff. COs did not attempt CPR prior to arrival of medical staff. The inmate was transported by the ERV to the CTC TTA. There were two suicide notes, one of which was in the inmate's pocket and addressed to his mother and another in his cell and addressed to his cellmate. Records indicate that the inmate's cellmate is wheelchair-bound and was being assisted in the shower at the time of the inmate's suicide. The inmate's note to his cellie was written in Spanish, and a translation was provided that indicated the note was addressed to "joker" and began with a statement "well homey while you know I'm gone I'll wait for you over there I hope its not soon I wish you the best in your appeal and you can get out soon." The note made references to other inmates and hopes by this inmate that they will remember him. The letter to his mother was included in the documents and included many goodbyes to his family and friends, love for his mother and other people, and a request for a certain song for his funeral; the letter also stated he did not want his family to be sad but to remember him. An autopsy report was provided by the Office of the Coroner of the Monterey County Sheriff Coroner's Office. The autopsy was performed on 8/9/05 and indicated the immediate cause of death as asphyxia due to hanging. The toxicology study was conducted and indicated no common acidic, neutral, or basic drugs detected.

This was the inmate's first adult incarceration in the prison system and involved him and a co-defendant firing shots from a 9 mm weapon at other young men playing basketball while yelling, "Van Owen Street" (his gang). One of the victims was wounded but not killed, and the inmate and his co-defendant drove away and abandoned their vehicle. The inmate was hiding behind a home and was discovered by the home owner. The inmate then drew his gun on the home owner and the home owner's son and forced them to drive him approximately six blocks away, where he got out of the car and fled on foot. The inmate was identified by his co-defendant and subsequently arrested without incident. He was subsequently charged and convicted on all counts, as noted above. The inmate was 18 years old at the time of this offense and had one prior arrest as an adult for possession of marijuana, for which he received 30 days' jail time.

On arrival at CCI RC on 4/28/04, the inmate was administered the initial health screening and answered no to all questions. No mental health referral was generated. There was no MH-7 RC assessment in the records provided. The inmate did have a second initial health screening with his transfer from CCI to SVSP on 6/8/04, which was again negative for any history of mental illness or mental health treatment or current indication of mental health problems or treatment including suicidality or use of medications. The inmate was never involved in the MHSDS at any LOC.

During his incarceration, the inmate received one RVR for "willfully resisting staff with use of physical force" for leaving his cell during modified program conditions (lockdown) without authorization; when told to return to his cell going to two other cells and exchanging contraband later identified as soups and soap; and being restrained by officers as he attempted to go to a third cell. During this stay at SVSP, the facility had

been on modified program (partial lockdown) or hard lockdown status for all but four days during mid-June. The inmate did receive information that his appeal had been filed and that his sentence was going to be reduced by approximately ten years. The inmate was allowed to move to a cell with a cellmate whom he had known on the street and who was paraplegic, and it appeared that they had a good relationship. The inmate's long sentence indicated that he would not be eligible for parole until he was approximately 75 years old, and his working with an appeals attorney as well as the Mexican Embassy resulted in only a potential ten-year reduction in his sentence. Of note, the inmate committed suicide ten days after receiving this information regarding only a ten-year reduction in sentence.

The plaintiffs' counsel submitted a letter on 9/1/05 making reference to this inmate's suicide and concerns that, based on their review of the records, CPR had not been initiated by custody officers after cutting the inmate down. The plaintiffs state, "time is of the essence in implementing the 6/9/05 order" regarding CPR by first responders who were trying to do so.

The suicide report reports states that all policies and procedures appeared to have been followed, and there was no recommendation for corrective action.

**Findings:** This inmate's suicide does not appear to have been foreseeable or preventable. There was no history of mental illness or suicidal intent or ideation prior to or after incarceration, and the inmate appears to have very carefully worked out his plan to hang himself when his cellmate was out of the cell during a regular medical shower activity. He did not request any assistance from mental health staff, and there were no indications apparent to anyone that he was in need of assistance. His not having more relief from the appeals process for his long sentence at his young age may very well have been the immediate precipitating factor in his suicide. The plaintiffs are correct that custody staff did not initiate CPR when the inmate was discovered; however, it is unclear as to whether the difference of three minutes before initiation of CPR by medical personnel after his discovery would have made the vital difference. Nevertheless, the suicide report should have identified the failure to provide CPR in compliance with the court's order as a problem for which SVSP should have provided a corrective action.

### 28. Inmate BB

Brief History: This inmate was a 54-year-old Caucasian male who committed suicide by hanging on 8/17/05 in his single cell in administrative segregation at Avenal State Prison (ASP). The inmate was at the 3CMS LOC in the MHSDS at the time of his death. The inmate was readmitted to the CDCR via the DVI RC for his fourth prison term on 12/15/98 after his conviction for first-degree burglary while still on parole. He was serving a 22-year sentence for his second-strike conviction.

On 8/17/05, at approximately 7:45 a.m., the inmate was found hanging in his cell by an officer who was collecting breakfast trays. The inmate was seen lying on his bunk and was unresponsive to a knock on his door; what appeared to be a white string behind his

head was stretching upward toward the upper bunk. The inmate was lying on the lower bunk with his upper torso and head leaning up against the corner walls. The inmate was the sole occupant of his cell. The officer notified his sergeant and the administrative segregation MTA of a medical emergency, the sergeant and an additional officer arrived, and the emergency medical removal of the inmate was performed. When entering the cell, an officer placed handcuffs on the inmate's wrists and, using the cut-down scissors, cut the sheet above the knot that was tied to the upper bunk bed frame, and the inmate was lowered to the bed. The officers and MTA then placed the inmate on a stokes litter, and the MTA checked for vital signs. The inmate was carried down the stairs on a stretcher, placed on a waiting gurney, and wheeled out of the back of the unit, where CPR was started by the MTA and officer. The inmate was transported to the CTC emergency room, where he arrived at approximately 7:55 a.m., with CPR continuing in progress during transport. CPR was continued for another five minutes, and the inmate was pronounced dead by a physician. Upon search of the inmate's cell, there were a number of letters discovered, including one addressed to his children, stating his love for them, apologizing for his lifestyle and for causing them hardships and pain, and asking for their forgiveness. The second letter was addressed to his mother and father and again expressed his love and his apologies for not writing; thanked them for their support; and mentioned how he missed his parents and his family, his boredom and frustrations at being in prison, and his statements that he was at the end of his hopes. He also however made requests for writing materials and noted his being moved to different yards because of changes in the prison and his intent to get the 800 number to make reservations for visiting the following week. He also wrote a letter to his significant other expressing his love and his apologies for the pain and hardship that he has caused her and closing with his love for her "yesterday, today and even more tomorrow." His last letter was to a friend whom he had told he would call on the phone but had "messed that up" but wanted to resume calling every two weeks instead of once per month. A coroner's report was received regarding autopsy for this inmate, which was conducted on 8/18/05. The cause of death was determined to be cardiorespiratory arrest (minutes) due to asphyxia (minutes) due to ligature strangulation (minutes). Toxicology study revealed zero blood alcohol level and no positive findings on a blood drug screen.

This was the inmate's fourth CDCR commitment, begun on 12/15/98 when he was readmitted, on a second strike for first-degree burglary and also violation of parole, via the DVI RC. The inmate's previous commitments were for one year or less in 1984, 1988, and 1996, all relating to theft, forgery, burglary, and controlled substance crimes. He was placed on parole after short sentences and returned to the community. After he was returned via DVI RC, he was transferred to Pleasant Valley State Prison (PVSP) for three years, Folsom for two years, and finally to CSP/Solano on 5/27/04. When the inmate was at CSP/Solano, he was placed in administrative segregation on three different occasions because of safety concerns that were believed to be related to drug debts that he had incurred on the yard. His last administrative segregation placement was from 4/25/05 to 5/25/05, when he was transferred to ASP, where he remained until his death on 8/17/05.

The inmate had a long history of substance abuse, including marijuana and heroin. The inmate appeared to have no history of mental health problems or treatment for mental illness until his incarceration in the county jail in the fall of 1998 related to his commitment offense. He reportedly cut his wrist because he feared he would receive a life term, and on admission via DVI, the inmate's health screen was positive for his having reported being prescribed Sinequan and the suicide attempt. He had no history of hospitalizations and no history of mental health treatment on any of his previous admissions. Despite the initial health screening on 12/15/98 that was positive and his having been placed on Sinequan by a physician at DVI, a mental health screening the following day determined that he was not in need of mental health treatment, and no referral was made. Fortunately, the physician who prescribed Sinequan did refer for a psychiatric consultant, and the inmate was seen on 12/24/98 when it was determined that he should be included in the MHSDS at the 3CMS LOC as medical necessity. The records indicate the inmate was transferred from DVI to SCC in January 1999, where he was continued at the 3CMS LOC with diagnoses of adjustment disorder with suicidal ideation, and polysubstance dependence. His adjustment disorder was determined to have resolved, and by February 1999, he was reportedly removed from the MHSDS. Confirmation of this removal from the MHSDS was dated 12/19/00.

The inmate next came to the attention of mental health staff at CSP/Solano when he reported suicidal ideation secondary to receiving information that his common-law wife had met someone new, and he was admitted to the MHCB with a diagnosis of major depression, recurrent, and was prescribed Effexor and Benadryl. He remained in the crisis bed from 11/2/04 to 11/22/04, and a psychiatrist described the inmate as having a flat and depressed affect, poor appetite, and sleep problems and changed his medication but did not perform an SRAC. The inmate subsequently reported to his CM that he continued to feel depressed and that he had "passed out four times" after having been placed on Effexor. He subsequently began refusing Effexor, and it was discontinued.

A note by a psychiatrist on 2/15/05 indicates the inmate had stopped taking his Effexor "approximately two months before and was feeling fine." The inmate denied suicidal ideation and homicidal ideation and appeared stable, and all medications were discontinued. An IDTT a week before, on 2/8/05, indicated the psych meds had been discontinued at that time. The CM notes of 2/16/05 and 2/23/05 indicate "meds ok." Those same CM notes indicate negative current suicidal ideation, and the 2/23/05 note indicates negative mental health complaints. These clinicians appear to have been unaware that on 2/21/05, the inmate was sent out to Queen of the Valley Hospital for treatment after an attempted suicide by overdose on Tylenol. The discharge summary from Queen of the Valley Hospital stated the inmate reportedly took 72 325-mg acetaminophen tablets over the course of 2/19/05 and 2/20/05 and reported he left a suicide note. The inmate reported to Queen of the Valley Hospital staff that he had stopped taking his antidepressant in November 2004 because of GI intolerance and poor appetite and that he had taken the Tylenol because "he would still like to die." He was discharged on 2/23/05 with diagnoses of possible acetaminophen overdose and depression and referred for psychiatric follow-up. On that same day, he was seen by his CM, who indicated negative current suicidal ideation, "meds ok," and negative for mental

97

health complaints. He was admitted to the CTC upon his return from Queen of the Valley Hospital on 2/23/05 and subsequently transferred to administrative segregation on 2/24/05. The inmate appears to have never seen a psychiatrist again after his admission to the MHCB on 2/23/05 while he was at CSP/Solano. He was not prescribed medications, and it does not appear that he was considered for a higher LOC despite his continued complaints of depression and dysphoric mood. Notes continued to indicate that he had no suicidal ideation or intent both before and after his Tylenol overdose. No SRACs were done at CSP/Solano. Although he was initially placed in the general population in February 2005, he was returned to administrative segregation for safety reasons on 4/25/05. His safety concerns were reportedly because of his owing drug debts while in the yard secondary to his continuing heroin use.

The inmate was transferred to ASP on 5/25/05, and the transfer information sheet indicated he was at 3CMS LOC and had a suicide history. The RN who conducted the general medical screening recommended that he be seen within 72 hours; however, he was not seen until eight days later, on 6/2/05, by a psychologist.

After his arrival at ASP, the inmate was seen on 6/2/05, and an MH-4 mental health assessment was conducted by the psychologist. The MH-4 indicated the inmate was serving a third term. The psychologist described the mental health symptoms as currently in remission, his psychotropic medication in the last three years as Sinequan when he received mental health treatment at CSP/Solano while incarcerated, and the plan was to remove him from the 3CMS caseload by December 2005. The diagnosis given was major depressive disorder single episode moderate in full remission and a GAF of 75. An MH-2 treatment plan was completed on 6/8/05 by the same psychologist as well as a CC1 with no psychiatrist in attendance that provided essentially the same information, with the mental status being checked as within normal limits and no apparent suicidality or violence risk.

This was the inmate's last contact with mental health staff with the exception of his having been seen on psych tech rounds in administrative segregation from 8/14/05 to 8/16/05. The psych tech note indicates that the inmate stated he was "ok" and "alright," that he denied suicidal ideation, that his mood appeared within normal limits, that his affect was appropriate, and that his thought content was within normal limits, and no mental health concerns were identified.

The suicide report identified four problems and recommendations as follows:

> Problem 1: CSP/Solano and ASP: No comprehensive SRA was completed at any time that the inmate was evaluated for suicide risk or for MHCB discharge planning. At minimum, SRA that considers the risk factors included on the SRAC must be completed upon evaluation for placement in MHCB for suicidality and upon discharge from same.
> Recommendation: (a) Verify that all MH clinical staff have received the required CDCR seven-hour training on SRA. (b) Following this, conduct a one-month audit of UHRs of all inmates who present for a suicide risk evaluation to ensure

that an appropriate SRA, indicating consideration of SRAC risk factors, has been completed in each case.

Problem 2: CSP/Solano:  Inpatient records from two MHCB stays at CSP/Solano were not filed in the UHR when the inmate was transferred to ASP; therefore, this information pertaining to this inmate's suicide risk was not available to staff at receiving institution.
Recommendation: (a) Locate the missing files. (b) Establish QIT to create a process to ensure that inpatient files are incorporated into the UHR as soon as I/Ps are discharged from the CTC. (c) Audit ten percent of UHRs I/Ps' discharges from the CTC for the past two months to see if inpatient records were filed.

Problem 3: CSP/Solano:  During his last two weeks in the ASU prior to being transferred to ASP in May 2005, the inmate did not receive required weekly CM contacts.
Recommendation: (a) Conduct an audit of ASU CM contacts for three months, and report percentage compliance. (b) If below 85 percent, determine reason. (c) Provide solution, and continue audit.

Problem 4: ASP:  Inmate was referred for a MH evaluation "within 72 hours" by RN upon arrival but was not seen for eight days.
Recommendation: ASP:  Describe their process of following through on MH referrals, and conduct audits demonstrating the referrals to MH are received, scheduled, and completed in a timely manner.  If further results are inadequate, a QIT should be established to troubleshoot the process and propose a solution, which must then be demonstrated as effective by subsequent audits of at least one-month duration.

On 4/12/06, the Deputy Directors of the DCHCS and DAI approved the QIP for both ASP and CSP/Solano.  The QIP response from ASP was received on 1/31/06, and the QIP response from CSP/Solano was received on 3/6/06.  Further documentation was requested from CSP/Solano and was received 3/21/06.  The 4/12/06 approval letter indicates that missing inpatient records from CSP/Solano were received, but only cover sheets were included in the documents provided, and copies would be forwarded if requested.  In a response from ASP, sign-in sheets verifying participation of training of ASP clinical staff for the CDCR seven-hour training on SRA was conducted; however, it was noted that several doctors had started after the training, and they were being provided training via VHS tape.  In addition, an audit from 11/1/05 to 11/29/05 indicated that 50 percent of the time, an SRAC could not be found in the UHR for inmates admitted for suicidality.  Another audit was to be conducted on 1/1/06 to ensure compliance.  With regard to Problem 4, the ASP response indicated that the RN assigned to R&R sends a list of newly arrived 3CMS inmates and that list is cross-checked with DDP daily download to ensure all inmates are identified.  The inmate was identified at R&R, and the 72-hour referral was made.  "There is no evidence of referral chrono"; the response goes on to say that the inmate was seen in five working days from his arrival.  ASP also stated

that the referrals for psychiatrist/medication averaged ten working days "due to the well documented lack of psychiatric coverage at Avenal State Prison."

The response from CSP/Solano to the recommendations include the following: With regard to Problem 1, (a) all mental health staff completed the required seven-hour training on 9/27/06, and (b) an audit from 12/15/05 to 1/28/06 of 29 inmates admitted to the MHCB secondary to suicidal ideation revealed that 19 of those inmates were CSP/Solano inmates and that all 19 (100 percent) had completion of the SRAC forms on admission and discharge. There was no comment on the other ten inmates admitted from other institutions.

With regard to Problem 2, the CSP/Solano response was that (a) copies of the inmate's records were attached and originals were sent by overnight mail to ASP on 1/31/06; (b) current policy and Title 22 require that inpatient records are completed within 14 days of discharge and incorporated into the UHR; and (c) of 49 admissions from 1/1/06 to 2/28/06 to the CTC, an audit of six charts (12 percent) showed that inpatient records were appropriately filed in the UHR.

With regard to Problem 3, the CSP/Solano response was that weekly contact of administrative segregation CMs is approximately 90-percent compliant and a continued audit will examine CM contacts. The response continues that on a review of CM contacts for this inmate, CM contacts did occur on a weekly basis on 4/27, 5/6, 5/11, 5/16, and 5/25/05.

No additional information or data were provided prior to the completion of this report.

**Findings:** This inmate's death may have been both foreseeable and preventable. Although it is documented in the record that the inmate reported no suicidal ideation, this documentation includes notes written by a CM on the day that the inmate returned from an outside hospital after attempting to overdose on Tylenol. The emergency room record at CSP/Solano clearly indicates the inmate stated he took an overdose of Tylenol, received emergency treatment at the emergency room, and was sent out on 5/21/05 with return on 5/23/05 to the CTC. Curiously, on that same date, the CM documents negative suicidal ideation as an administrative segregation visit. The inmate was returned to administrative segregation on 5/24/05.

The suicide report correctly points out that no clinical staff documented an SRAC for this inmate, who had a well-known history of mental illness and suicide attempt while in the county jail and a second suicide attempt while at CSP/Solano. The suicide report also correctly identifies that important information was not sent by CSP/Solano to ASP, including the inmate's CTC admissions; however, there was additional documentation in the UHR of the inmate's past history, which appears to have been unrecognized in the treatment plan completed on 6/2/05, which did not include a psychiatrist.

There are multiple failures in the assessment and treatment process for this inmate and clearly inadequate psychiatric assessment and treatment regarding the inmate's

100

medication management, including what appears to be, from the record, complete unawareness that the inmate had been refusing medications for approximately two months and making complaints about side effects from the medication he was prescribed. He was not reevaluated by a psychiatrist until two months later, but this was not because of any alert generated by nursing staff or the CMs regarding his non-compliance. When he was evaluated, the medication was simply discontinued, and there was no follow-up by psychiatry after that time at either facility. The responses from CSP/Solano and ASP do not adequately respond to the problems and recommendations identified in the CDCR suicide report as to the breakdowns in treatment for this inmate but rather look at a limited sample of records and make reference to training and plans for improvement, including need for additional resources from DCHCS.

Although the suicide report makes reference to the inmate having been last seen alive approximately 35 minutes before his discovery, it is silent on the failure of first responders, i.e., COs to begin CPR when the inmate was discovered and cut down. The inmate was transported from his cell to outside of the unit before medical staff began CPR, which is an unacceptable delay.

The contradictory information regarding the inmate being on medication or off medication and having no suicidal ideation immediately before and immediately after an attempted overdose, as well as the apparent failure to review information in the UHR at both facilities, is completely unacceptable in this inmate's care and treatment.

### 29. Inmate CC

Brief History:  This inmate was a 36-year-old Hispanic male who committed suicide by hanging on 8/30/05 in his SHU cell at Pelican Bay State Prison (PBSP).  The inmate was single-celled at the time of his death and was not a participant in the MHSDS.  The inmate was admitted to the CDCR via the CIM RC on 5/1/89, after pleading guilty to second-degree murder and receiving a sentence of 15 years to life.  He was also convicted of possession of a weapon by an inmate in September 1999 and received a consecutive sentence of six years.

On 8/30/05, at approximately 8:20 a.m., an officer was distributing library books to inmates in the SHU.  As he approached this inmate's cell, of which he was the sole occupant, the officer observed this inmate slumped against the cell door and motionless, with his back toward him.  He also noticed the sheet secured to the cell door approximately six feet off the ground, with the other end of the sheet around the inmate's neck.  The inmate did not respond to the officer, and the officer subsequently notified the control booth officer to activate the alarm and to retrieve the cut-down scissors.  Other officers arrived, and the second officer was able to cut the sheet through the food port, which was supporting the inmate's body weight.  As the sheet was cut, the inmate fell to the floor, and at approximately 8:21 a.m., a sergeant and three MTAs responded to the emergency.  The cell door was opened, and the MTA reported the inmate was warm, was bluish in color, and appeared not to be breathing.  At approximately 8:25 a.m., the inmate was turned over onto his back and discovered to have no pulse or respiration, and CPR