was instituted. An RN and an MTA arrived; the MTA ran to get the automatic external defibrillator (AED), which was applied at 8:27 a.m. and indicated no shock advised such that the inmate was placed on a backboard and transported to the facility "C" clinic, where he arrived at 8:35 a.m. CPR continued, IVs were started, and the AED was used approximately four times in the clinic with no shock advised. Attempts to intubate the inmate were not successful; by 8:41 a.m., an ambulance arrived at the SHU, and the inmate was intubated, placed in the ambulance at approximately 8:50 a.m., and transported to Sutter Coast Hospital, where he arrived at 9:09 a.m. The inmate was not revived and was pronounced dead at 9:18 a.m. The coroner's report was provided by the Office of the Del Norte County Coroner, who determined the immediate cause of death as asphyxia by strangulation by hanging (minutes). A toxicology report indicated no drugs of abuse or alcohol were found in blood specimens.

This inmate entered the CDCR on 5/1/89 via the CIM RC. He was subsequently transferred to CSP/Sac, PBSP, Calipatria State Prison (CAL), and eventually back to PBSP on 3/12/96. Prior to his incarceration, the inmate was a member of a street gang called "F Troop"; commitment offense had to do with him and a co-defendant shooting and killing a man in the neighborhood because he was not a member of the gang. Records indicate the inmate stated he did not do the shooting but would not identify who did and decided to plead guilty to second-degree murder, for which he received a sentence of 15 years to life. He had previous arrests for robbery and assault, as well as carrying a concealed weapon, two days before he was arrested on the commitment offense. After his incarceration in the CDCR, the inmate had a substantial number of RVRs and was a validated associate of the Mexican mafia. Of the approximately 17 RVRs, this inmate had received four charges, including possession of weapons, contraband, assaults on other inmates, and disobeying rule of staff; seven were DA referrals, and of those, he was convicted of inmate possession of a weapon and received a consecutive six-year term in 1999. The inmate placement in the SHU occurred in 2002 based on a riot in the facilities' big yard between Mexican inmates and Black inmates. The inmate was implicated as the shot caller to have planned the attacks and provided weapons, and because of his being validated as an associate of the Mexican mafia, he received an indeterminate SHU term.

This inmate had no mental health history of illness or treatment prior to his commitment to the CDCR. His only contacts with mental health staff, other than through the intake or transfer screening process, were with the BPT for psychological evaluations. Indeed, the BPT psychological evaluations for November 1999 indicated that his developmental history included no prenatal or post-natal complications and that his early development was influenced by his street gang membership as a Southerner. The inmate was known to have begun using marijuana by age 13 and heroin by age 15 but had at least reduced his drug use prior to his CDCR incarceration.

His SHU mental health screening of 10/17/97 indicated the inmate did not meet criteria for inclusion in the MHSDS and did not have any exclusionary criteria preventing an SHU placement. His SHU mental health screening of 3/29/00 indicated identical recommendations, and he was cleared for SHU placement. The inmate had a

documented diagnosis of hepatitis C and was being seen by the chronic care clinic but never was recommended or placed on Interferon, so he did not receive any psychiatric evaluation with regard to the use of Interferon. The inmate had reports and actually sent letters to medical with regard to "bad headaches" that appeared chronic in nature, for which he was prescribed Motrin, and had periodic complaints regarding allergies to "the environment" and skin problems, for which he received Selenium.

The CDCR suicide report makes reference to the inmate having requested to review his C-file with his CC1 approximately two weeks prior to his suicide and, during the course of the review, asking the CC1 whether or not the attorney representing another inmate would have access to his C-file. The response from the CC1 was that the attorney could only have access if the judge ordered it and that there would have to be a very good reason. The inmate would not provide any additional information regarding his concerns or who the other inmate was. Because of the inmate's SHU status, he would not be able to be involved in the program, and to get out of his indeterminate SHU sentence, he would have to renounce and deprogram from his gang affiliation with the Mexican mafia. The suicide report references the inmate asking questions about how to do that but not taking any steps to initiate the process.

The suicide report indicated that all policies and procedures were followed appropriately, and there were no recommendations.

**Findings:** This inmate's suicide does not appear to have been foreseeable or preventable. The inmate had no history of mental illness, mental health treatment, suicidal intent, or suicidal ideation; requested no services; displayed no change in his behavior warranting referral for mental health services; and used a lethal method during the time period when it would be unlikely that he would be discovered immediately.

### 30. Inmate DD

Brief History: This inmate was a 44-year-old Hispanic male who committed suicide by hanging on 9/3/05 in his administrative segregation cell at CSP/Solano. He was single-celled at the time of his suicide and was in the MHSDS at the 3CMS LOC. The inmate returned to the CDCR on 6/4/04 via the NKSP RC, with a four-year sentence after he was convicted of robbery and a parole violation.

On 9/3/05, at approximately 12:10 p.m., a CO was conducting an unclothed body search in the Building Nine shower to facilitate the ASU exercise yard program. When the officer looked into this inmate's cell, he observed the inmate standing on his toilet and thought he was communicating through the air vent with the inmate in the adjacent cell. However, the officer took a second look and realized that the inmate had a piece of white sheet wrapped around his neck and that the other end was tied to the air vent. The officer alerted a second officer, the control booth officer activated his personal alarm device, and a medical code was announced via the institutional radio. An additional officer responded with a cut-down tool, and an emergency cell entry was initiated. The inmate was removed from the cell and placed on the dayroom floor in front of his cell. CPR was

begun, and emergency medical services were contacted by dialing 911. COs continued to provide CPR until the arrival of additional medical staff, and at approximately 12:15 p.m., the CSP/Solano CTC and CMF emergency response unit arrived. By 12:23 p.m., the Vacaville Fire Department Paramedic Unit responded, and additional lifesaving techniques were performed. At 12:35 p.m., the Vacaville paramedics contacted Vaca Valley Hospital, and a physician assessed the inmate's condition by phone and pronounced him dead at that time. An autopsy report was received from the Office of the Coroner, County of Solano, and the autopsy was performed on 9/3/05 and indicated the cause of death as asphyxia (minutes) due to hanging (minutes). Toxicology screen was conducted and revealed that Fluoxetine and Norfluoxetine were present in the central blood sample, both within the effective therapeutic levels.

This inmate has had multiple admissions to CDCR beginning in August 1987, as well as periods of probation and county jail time. The inmate had a history of alcohol, heroin, and marijuana use in his twenties, as well as experimentation with cocaine; however, he denied use of methamphetamine or other drugs.

With regard to mental health history, the inmate has reported that he attempted to commit suicide after his wife died of uterine cancer in 1997. The record indicates that he reported having attempted overdose twice in the month after her death in 1997 and that he also attempted to either overdose or cut his wrist in 2000. The inmate was transferred from the county jail on 6/24/04, and the transfer form from Tulare County Correctional Health indicated the inmate was receiving Effexor, Wellbutrin, and Naproxen. These medications, except Wellbutrin, were continued when he arrived at NKSP. The initial health screening at NKSP indicated he was taking psychiatric medications, was scheduled for an MRI for unsteady gait, and had attempted suicide in the past, and he was referred for a mental health evaluation. On 6/27/04, a progress note indicated the inmate had fallen onto his knees during the morning medication pass, and he complained of weakness to his legs bilaterally and reported, "I overdosed 10 days before I got busted on heroin." He was examined, and the impression was that his falling might have been a secondary reaction to his Effexor. The Effexor was decreased, with a plan to change the Effexor to Paxil. On 6/28/04, a brief mental health screening report indicated the inmate might possibly have a thought disorder, mood disorder, and was experiencing a major depression. He was referred to mental health professionals. The inmate had an MH-7 mental health evaluation on 7/1/04 and was diagnosed with depressive disorder and placed at the 3CMS LOC. On 7/15/04, he saw a psychiatrist, and his Effexor, which had been deceased, was increased and Paxil was continued.

On 8/25/04, he was transferred from NKSP to CSP/Solano, and an initial health screening indicated he was diagnosed with depression NOS, was prescribed Effexor, and had attempted suicide by overdose in 1979. The inmate was noted to report, "I still feel depressed"; however, he denied suicidal or homicidal ideation. On 9/1/04, he had an MH-2 treatment plan, and the IDTT determined that he had depressed mood, decreased attention, and decreased concentration, and diagnosed MDD (provisional), polysubstance dependence, and antisocial personality disorder. On 11/10/04, a routine referral was sent by social worker stating, "inmate is having suicidal thoughts . . . please have him seen

ASAP." The inmate was seen 20 days later, on 11/30/04, by a psychiatrist, who wrote "denied suicidal thoughts, wants EOP program." Neither the social worker nor the psychiatrist completed an SRAC.

On 2/4/05, a Disability Placement Program Verification indicated the inmate had "severe Parkinsonism" and claimed to fall down frequently and be unable to stand for more than 30 minutes. The inmate continued to report pain, dizziness, difficulty standing, and difficulty ambulating, and a progress note by a CM on 3/17/05 indicated the inmate stated, "I'm in pain, and I've been falling down five to six times per day." An SRA was performed on that date because the inmate reported that he felt like "hurting myself" and "taking an overdose of pills." The SRA estimated a moderate risk, and a narrative indicated that the inmate threatened to kill himself due to chronic pain and "not knowing what's wrong." He also indicated that he had a suicide plan of overdosing with pills. He was admitted to a crisis bed on 3/17/05 with diagnoses of major depression and pain disorder. He was also noted to have hepatitis C.

On 3/18/05, he was discharged to Doctor's Hospital of Manteca for a neurosurgical work-up. The diagnostic impression on admission at Doctor's Hospital was "global muscular asthenia with a bradykinetic state suggesting pseudo-Parkinson." It was unclear on admission whether it was a central nervous system involvement, however, two L4 to L5 disk herniations were noted with limited clinical significance. This finding is remarkable because he had an MRI of the lumbar spine on 2/11/05, and the impression from that MRI was that he had L4 to L5 and L5 to S1 degenerative disk disease, with right L4 to L5 foraminal protrusion and stenosis. The neurological examination at Doctor's Hospital was subsequently determined to be essentially within normal limits and the inmate's pain most likely "muscular skeletal in origin." Anti-inflammatory medication, muscle relaxer, physical therapy, and, if necessary, a spinal epidural injection were recommended. The final diagnoses were bilateral internal capsular encephalomalacia, lumbar disk disease, probable hepatitis C, and schizoaffective disorder. The inmate was discharged on Celebrex, Risperdal, Lexapril, and Aggrenox, and returned to CSP/Solano on 3/26/05. The Lexapril was not continued upon his return, and it is unclear whether or not the inmate resumed taking Risperdal and Prozac, which had been prescribed for him prior to his transfer to Doctor's Hospital (see below).

The inmate remained in the MHCB from 3/26/05 to 3/29/05, and discharge summary indicates the inmate "denied that he was depressed but made that claim to get attention to his physical complaint." The discharge diagnosis was depressive disorder NOS, rule out malingering. There was no SRAC during his stay in the MHCB, as per the records reviewed.

On 3/1/05, an urgent referral was sent for a "psychiatrist consult" and stated the inmate stated he was having increased hallucinations that "they want to kill me." The inmate also reported "not sleeping" (past three weeks), and the observation was that the inmate appeared very fatigued and stated he was not receiving any psychotropic medications. The inmate was noted to deny homicidal/suicidal ideation. The inmate was seen by a psychiatrist on 3/4/05 and was described as having low self-esteem, positive suicidal

ideation, hopelessness, sadness, tearfulness, and decreased concentration and nightmares. The psychiatrist also noted that the auditory hallucinations were telling the inmate "he would be killed," and he prescribed Risperdal and Prozac. No SRAC was completed by the referring clinician or the psychiatrist, and the inmate was not placed in a crisis bed or higher LOC.

The inmate was next seen by mental health staff on 4/14/05 based on a referral from medical. The inmate was depressed, reported hopelessness and apathy, and was described as having a "flat and constricted affect." He was in the CTC at this time for medical reasons, and he was started on Remeron and Depakote in addition to his Prozac and Risperdal.

On 5/2/05, a staff referral for psychiatric/psychological services was sent, recommending a psychiatric medication review because the inmate was not coming for psych medications "at all." He was seen on that date by a psychiatrist, who noted that the inmate reported he stopped taking his medications approximately one week prior because "it makes me dizzy" and "I am tired." The psychiatrist renewed the Depakote but discontinued the Remeron and began Celexa, with a plan to see the inmate again in 90 days. On 5/16/05, the inmate reported to his CM "I don't want any medications. They make me fall down." The Valproic Acid level obtained on 5/16/05 was 15.3 ug/ml (well below the therapeutic level of 50 to 125 ug/ml). Valproic Acid level of 5/26/05 indicated "none detected." He saw the psychiatrist on that date, who reported the inmate wanted no medications and wrote, "I feel that we should honor his wishes." The psychiatrist noted that the inmate reported he was depressed but not suicidal. No SRAC was conducted at that time by either clinician.

The inmate was placed in administrative segregation for safety reasons on 7/15/05, reporting he had had a fight with another inmate. He remained in administrative segregation until the time of his death, and although he at one time had a cellmate, he was single-celled at the time of his death. On 7/20/05, the CM indicated that the inmate presented in a "slow but guarded manner," denied suicidal ideation and auditory hallucinations, but noted his behavior "was suggestive of one responding to internal stimuli." The CM decided to refer the inmate for a psychiatric evaluation. On 7/22/05, the psychiatrist entered a note that read, "unknown cell (not in 9-246)." On 7/27/05, the psychiatrist indicated on the referral form, "seen, now denies SI," and increased the inmate's medication, which by this point appears to have been Prozac, Paxil, and Effexor. The inmate was seen by the CM on 7/26/05, who indicated the assessment was based "upon observation" because the inmate "refused to engage at cell front, also refused to do assessment on 7/25/05." The inmate was described as angry, hostile, and with a "reactive affect and was unclear as to whether he had hallucinations or delusions." He was seen the following day by a psychiatrist, who reported that the chart was unavailable and that the inmate stated that he tried to kill himself five days before this appointment. The appointment was on 7/27/05, and he had not reported this information when seen by the CM on 7/26/05, although it was noted he was uncooperative and the evaluation was based on observation only. The psychiatrist noted that the inmate "decides that he does not have suicidal ideation" but described his insight and judgment as fair and conducted

an SRAC. On the SRAC, the psychiatrist noted that the inmate reported a hanging attempt five days ago, "8-9" previous suicide attempts, and a moderate risk for suicide. The reason for the assessment as checked was to "determine the need for referral to the MHCB program." The psychiatrist noted a recent attempt, presence of hopelessness/helplessness, history of poor impulse control, fearfulness for safety, recent trauma, and recent assaultive behavior, and the plan was to refer to the CM for follow-up within 24 hours.

An IDTT was held on 8/2/05 according to a progress note, although there was no MH-2 in the records provided. The progress note indicates a diagnosis of MDD, recurrent, unspecified, and states the inmate was in administrative segregation and taking Prilosec. CM's note on 8/8/05 described the inmate as guarded, depressed/indifferent mood, affect angry, but denying suicidality, hallucinations, and delusions. The note indicates the inmate appeared unwilling to engage and was referred to a psychiatrist for an increase in medications. The referral to psychiatry by the CM was marked urgent. On 8/10/05, the psychiatrist saw the inmate, who stated he gets along "alright" with his cellie and was requesting Seroquel for sleep. The inmate's affect was flat and bizarre, his mood "alright," and it was noted that the inmate was hearing voices like cats saying "it's my turn to kill him" and also heard the voice of "King Midas." The psychiatrist reported the inmate denies SI/HI and "states decreased in SI (to none) since his mood has improved." The assessment was of prominent psychotic symptoms but mood was well controlled, and the plan was to begin Risperdal and Benadryl, continue Prozac, and followup in two weeks.

The inmate was seen again by the psychiatrist on 8/26/05, who reported that the diagnosis is MDD, severe with psychotic features, and the assessment was that the MDD was in partial remission. The psychiatrist noted the inmate had no cellie currently and denied medication side effects, auditory and visual hallucinations, suicidal ideation, homicidal ideation, and paranoia. His affect was described as "blunted and odd," his insight and judgment poor, and impulse control fair. The plan was to continue his current medications for depression and psychosis, CM follow-up for "talking therapy times one," and psychiatric follow-up in four weeks.

The suicide report makes reference to a CM interview on 8/29/05 and states that the CM believed the inmate was stable and that the inmate denied suicidal ideation. The suicide report states that in summary, the inmate was seen for "evaluation intake with case manager in accordance with MHSDS guidelines." Although there was no MH-2 in his chart, there was an IDTT note of 8/2/05 documenting that his annual review was done in a timely manner and that his medications were prescribed with appropriate consent forms signed. The suicide report further states that the only departure from procedure was when, on 3/4/05, the psychiatrist started the inmate on medications and noted a 90-day follow-up instead of 30-day follow-up. The report further indicates, however, that the review of the UHR by a CDCR physician indicated that the inmate had significant pain problems and that generally his pain management appears to not meet the standard of care found in the community.

The suicide report identified four problems with recommendations as follows:

>    Problem 1:  On two occasions, clinicians marked psychiatric consultations "ASAP" or "emergent," yet the I/P was not seen for a week in the first case and three weeks in the second.
>    Recommendation:  Form a QIT to determine the causes in the breakdown in the referral process.  Develop an audit to track timely response to mental health referrals as indicated by the acuity of the clinical situation.
>
>    Problem 2:  Inmate was admitted to an MHCB for suicidal ideation, but a comprehensive suicide risk evaluation was not done on admission or prior to his discharge, as required by policy.  At minimum, an SRA that considers the risk factors included on the SRAC must be completed for placement in the MHCB for suicidality and upon discharge for same (see QIP 1 for Inmate BB).
>    Recommendation:  (a) Verify that all MH clinical staff have received their required CDCR seven-hour training on SRA.  (b) Following this, conduct a one-month audit of UHR of all inmates who presents for a suicide risk evaluation to ensure that an appropriate risk assessment, indicating consideration of SRAC risk factors, has been completed in each case.
>
>    Problem 3:  There was no documentation in the record to indicate that the I/P received a five-day clinical follow-up after discharge from the MHCB.
>    Recommendation:  For a three-month period, provide audit of all MHCB discharges where I/P has been admitted for suicidal ideations/behavior to indicate percentage that receives five-day clinical follow-up.  Institution needs to document 100-percent compliance with five-day clinical follow-up.
>
>    Problem 4:  Inmate had significant pain problems that were documented in the UHR via complaints and findings.  Management of his chronic pain problems were intermittent and inconsistent and did not meet community standards of care.
>    Recommendation:  (a) CSP/Solano to review their current process of pain evaluation and management policy and ensure that it meets community standards of care and does not restrict the use of pain medications when medically indicated (specifically including narcotic analgesics).  (b) Conduct a six-month random audit (three UHRs per month) of I/Ps with chronic pain problems, and review in the local pain management committee.

On 4/6/06, the Deputy Directors of the DCHCS and DAI approved the QIP submitted by CSP/Solano on 3/9/06.

- Regarding Problem 1:  CSP/Solano staff report the Chief Psychiatrist is taking responsibility to triage all referrals with the expectation that all ASAP/emergent referrals are to be seen within 24 hours and all attempts made to schedule routine referrals within seven to ten days of receipt.  A QIT has been deferred pending the aforementioned response by the Chief Psychiatrist.  Further, an audit of referrals has been ongoing secondary to a

<u>Coleman</u> item, and the average for responses to routine referral is 7.5 days.

- Regarding Problem 2: CSP/Solano response is that all mental health staff have completed the mandatory seven-hour training, the post-test was reviewed by mental health staff on 1/19/06 and 1/26/06, and documents to that effect were attached. A one-month audit of UHRs revealed both 100-percent compliance and the completion of SRA forms upon referrals/admission and discharge to the CTC/MHCB.

- Regarding Problem 3: No local records were discovered that indicated the inmate was ever admitted to the CTC secondary to suicidal ideation, thus five-day clinical follow-up was neither indicated nor ordered. An audit of discharges of patients admitted to the CTC for suicidal ideation from 1/1/06 to 3/1/06 revealed 100-percent compliance with five-day follow-up.

- Regarding Problem 4: An LOP for pain management was under development to meet community standards, and currently, all pain management cases are evaluated on a daily and ongoing basis by the medical staff. An attached pain management report of reviewed cases was included, and further future reviews will include minutes summarizing random audits of three UHRs. There was no other documentation regarding the QIP, even though the corrective action plan was completed and submitted on April 4, 2007, several identified problems regarding suicide risk assessment, inadequate treatment, and failure to consider referral to a higher level of care were not appropriately addressed.

**Findings:** This inmate's suicide may have been both foreseeable and preventable for a number of reasons. First and foremost, there were several failures in appropriate assessment of this inmate utilizing the SRAC when indicated based on the inmate's statements and changes in behavior. The inmate's statements that he was hearing voices saying that he was going to be killed indicates not only that he was suffering from severe mental illness but also that he had his own death as a frequent component of his thought content.

The CDCR suicide report identifies four problems for staff to address, which focus on the lack of immediate or prompt response to urgent referrals; the admission of the inmate to an MHCB because of suicidal ideation, which is very clearly represented in the records reviewed; the lack of five-day follow-up; and inadequate pain management. While all four of these areas clearly were in need of correction, the quality of the assessments that are reflected in the record, as well as the treatment planning itself (for example, the 8/2/06 note by the IDTT, which provides only one diagnosis and identifies one medication that is not for psychiatric reasons), simply is inadequate and not reflective of a multidisciplinary discussion, which in this case should most certainly have included consultation with medicine for the management of this inmate's severe and persistent

pain. Indeed, the patient repeatedly complained of pain, falling, and other difficulties, including sleep disturbance, depressed mood and affect, and subsequently psychosis.

The CDCR suicide report focuses on this inmate having a mood disorder and appears to have ignored the inadequate medication management on the part of psychiatrists rendering care. There were not only multiple changes in medication, including polypharmacy, with the use of up to three antidepressants at one time in suboptimal dosages, but also an inadequate response to the inmate's decompensation and appearance of psychotic symptoms. Further review of the MARs indicates that the inmate had major compliance problems and multiple refusals of medication, as well as his discontinuation of his medication for several weeks on several occasions, before he was referred to psychiatry for reevaluation. The inmate's reports that he did not want to take medications because it made him dizzy in the presence of his having degenerative disk disease and possibly Parkinson's or pseudo-Parkinson's disease, as well as changes on the MRI, required that there be collaboration between medical and mental health to formulate a comprehensive treatment plan for this inmate. There is no indication in the record that, other than the inmate's one admission to the CTC for mental health reasons, with his subsequent transfer to an outside hospital to address issues of pain management, there was ever consideration by mental health staff that he should be referred to a higher LOC. In fact, the response from CSP/Solano ignores information in the record and states that the inmate did not have an admission to the CTC because of suicidality. DCHCS approved the CSP/Solano QIP.

**31. Inmate EE**
Brief History: This inmate was a 38-year-old Caucasian male who committed suicide by overdose of medication on 9/16/05 in his single cell in the ASU at PBSP. The inmate was in the MHSDS program at the 3CMS LOC at the time of his death. The inmate was admitted to the CDCR for his first adult incarceration on 12/12/94, having been found guilty of second-degree murder, attempted murder, allegation–personal use of a knife, personal infliction of great bodily harm, and petit theft for which he received sentences of life with the possibility of parole, 15 years to life with the possibility of parole, and six years for petit theft. The murder and attempted murder charges were to run consecutively, while the petit theft sentence was concurrent.

On 9/15/05, at approximately 1:30 p.m., an MTA delivered a copy of the chrono that allowed the inmate to have a short beard. The inmate complained to the MTA that he was having back pain; the MTA consulted a doctor, returned to the inmate's cell, and told him the doctor had instructed the inmate to take Motrin and to lie on his back. The inmate replied, "I have Motrin and it doesn't work, they are playing games and it's not working. Here I have 153 pills of Propranolol 40 milligrams, and in one way or another I am going to end this pain." The incident report states that at 1:45 p.m., custody staff were notified by the MTA that the inmate had possibly overdosed on his medication and needed to be removed from his cell for a medical evaluation. An additional officer was called from a different unit, and when the two officers approached the inmate's cell, he had a sheet covering the door but complied with their request to remove the sheet and

submit to handcuffing.  The inmate told the officers he had ingested all of his medications, which consisted of 153 tablets of Propranolol.  The inmate was evaluated by an RN in the rotunda who called the CTC emergency room and was told to send the inmate to the CTC in an ambulance.

The MTA who initially heard the inmate's statement that he would take his Propranolol had left administrative segregation and gone to inform the physician who had seen the inmate that morning of the situation.  There are several incident reports, including one from the CO that states the RN evaluated the inmate in the rotunda, whereas the RN reported that he did not evaluate the inmate but informed the CTC ER RN and was told to take the inmate to the central control gate, where an outside ambulance would pick him up.  The inmate was escorted to the central control gate area, not the CTC.  An ambulance is noted to have arrived on grounds at 1:59 p.m., entered the vehicle sally port at 2:20 p.m., exited the sally port at 2:26 p.m., and arrived at Sutter Coast Hospital at 2:45 p.m.  The CRCR suicide report references interviews with the ambulance personnel, who reported that when they arrived, the inmate was sitting on a milk crate in the "A" yard, was alert and oriented, and initially refused to drink activated charcoal; however, he subsequently agreed when the EMT set up a nasal gastric tube, and the inmate vomited 30 milliliters of a thick black fluid.  An EMT downgraded the emergency from a Code 3 to a Code 2 transport and reported that while en route to the hospital, the inmate had "numerous bouts of seizure-like activity" followed by vomiting.  The inmate had approximately five seizures and then became unresponsive.  Naloxone was given intravenously, but the inmate's condition did not change, and in the Sutter Coast Hospital ambulance bay, the inmate stopped breathing, but continued to have a carotid pulse.  When he entered the hospital emergency room, a full code was initiated because by that time, he had stopped breathing and had no pulse.  The inmate was admitted to the ICU at Sutter Coast Hospital at approximately 5:18 p.m.; however, he subsequently died at approximately 3:04 a.m. on 9/16/05.  There was no autopsy report provided; however, the Death Certificate, dated 9/20/05, stated the cause of death as cardiac arrest, with underlying cause as overdose of prescription medication.  Toxicology results indicated several abnormal findings.

This was the inmate's first incarceration in the CDCR for the offenses as listed in this report.  The circumstances of the offenses as reported by the inmate to his probation officer involved his killing and attempting to kill two men whom he had met and with whom he had decided to use intravenous methamphetamine.  These two men subsequently admitted to the inmate that they were HIV positive and had shared needles.  The inmate became enraged and admitted that he attempted to kill the men because he believed he was going to die anyway.

The inmate had a past history of arrests for forgery, drug offenses, burglary, and escape from a county jail.  He had served jail and prison time in Arizona and Minnesota prior to his incarceration in the CDCR in 1994.  After being admitted to the CDCR at the RJD RC in December 1994, he was transferred to CSP/Corcoran in July 1995, SVSP in December 1996, CMF in December 1997, and PBSP in December 1998.  While at PBSP, he assaulted another inmate with a knife by slashing his throat in August 2000, pled guilty to

assault with a deadly weapon, and received a prison term of nine years to run consecutive to his life prison term. In October 2003, he returned to SVSP, where he remained until his transfer back to PBSP in May 2004. He was returned to SVSP to the SVPP from 3/3/05 to 3/22/05 and subsequently returned to PBSP, where he remained until the time of his death.

This inmate had an extensive mental health history prior to and after his becoming incarcerated in the CDCR. He also had a history of chronic pain and allegedly had attempted to receive an injection from a physician on the day that he committed the instant offenses. He further reported an extensive substance abuse history, including alcohol, marijuana, methamphetamine, cocaine, LSD, and heroin, which began when the inmate was an adolescent with his first admission to a community hospital at age 17 for acute alcohol intoxication. By this time, there was also a history of physical, emotional, and sexual abuse to the inmate as a child by his father, but no evidence of psychosis, with the inmate being diagnosed with conduct disorder, socialized and aggressive type. He also is reported to have spent six months in a psychiatric facility in Montana at age 16 after he had had arrests for burglary and auto theft. Pre-trial evaluations were conducted by psychologists related to the instant offenses, and they diagnosed him with amphetamine intoxication at the time of the offense and amphetamine dependence, antisocial personality disorder, and borderline personality disorder.

The extensive records indicate the inmate first began psychiatric treatment as an outpatient at approximately age 13 after allegations that he had sexually assaulted his sister and stepsister. He reported that he first began taking antidepressants and antipsychotic medications when he was an adolescent, with a reported history of depression, suicide attempts, substance abuse, and hearing voices or noises in his head. While incarcerated in the Arizona State system, the inmate had been prescribed Navane, Prolixin, and Sinequan and had previously been treated with antipsychotics in the Minnesota State system. After entering the CDCR, the inmate was placed in the mental health program in 1995 as a "Category J" inmate (mentally ill). He had been diagnosed as schizoaffective disorder bipolar type, antisocial personality disorder, and borderline personality disorder, as well as indications of dissociative disorder and post-traumatic stress disorder (PTSD).

The inmate was transferred to PBSP on 12/4/98 and, on 8/29/99, assaulted another inmate, resulting in an additional nine-year sentence. He was housed in the PSU on administrative segregation status because he was EOP at the time. The inmate reported to the various staff while he was in the PSU that he had homicidal ideation at various times and also reported panic attacks. In January 2002, he was found unresponsive in his cell, stated that he had "swallowed a bunch of pills 40 minutes ago" and that he believed that he was going to die, and gave instructions on who should claim his body. He was taken to Sutter Coast Hospital at that time and returned to PBSP on the following day to the CTC. He remained in the CTC until 1/14/02 based on his attempting to overdose with Buspar. After that, he was prescribed antidepressants, antipsychotics, and anxiolytics, all under DOT. In November 2003, the inmate again cut himself on his arm, and a psychologist conducted an SRA noting the inmate's history of overdosing and

cutting his wrist in the past as well as his life sentence and medical conditions and mental illness. This event occurred at SVSP, where he remained until May 2004.

After his return to PBSP in May 2004, he was diagnosed with bipolar disorder and in January 2005 reported to mental health staff that he had suicidal ideation. He was referred to SVSP in the SVPP because he was not improving with treatment at PBSP and to clarify his diagnosis. While at SVPP, he reported being involved in satanic cults and having been sent to SVPP to kill a DMH staff member. He was diagnosed with PTSD, bipolar disorder, and antisocial personality disorder and prescribed an antidepressant with his return to PBSP on 3/22/05. After his return to PBSP, he requested his LOC be changed from EOP to 3CMS. By June 2005, a psychiatrist wrote, "he essentially shows no signs of mental illness" and attributed his improvement to the increase in Celexa, adding that the inmate should be considered for change of his LOC to 3CMS. Three days later, the inmate refused to come out of his cell, and a cell extraction team had to extract him and use OC spray to subdue him; however, this was after he had broken his television set and cut himself with glass. He was admitted to the MHCB and placed in five-point restraints. He told the psychiatrist that they had issues with custody, was diagnosed with antisocial personality disorder, and adjustment disorder. In June and July, he continued to exhibit agitation and paranoia; however, on 7/13/05, the PSU IDTT changed his LOC from EOP to 3CMS and indicated that the inmate's mental health issues did not warrant a higher LOC and that the inmate was not cooperating with the program. The inmate was subsequently transferred to administrative segregation, and on 8/17/05, the IDTT diagnosed antisocial personality disorder with psychopathic features and borderline personality disorder. The following day, a psychiatrist evaluated the inmate as being a "Nazi low rider wanna be," diagnosed antisocial personality disorder, and prescribed Wellbutrin. The inmate's last mental health contact was on 9/12/05 by his clinical CM in administrative segregation at cell side as the inmate refused to come out of his cell. He was described as oriented with good cognition and denied suicidal and homicidal ideation or plans to hurt himself.

The inmate's medical condition includes his having been discharged from the Navy prior to his CDCR incarceration because of damage to his shoulder. He was evaluated for his shoulder pain, diagnosed with osteoarthritis, and subsequently diagnosed with a torn meniscus in his right knee (with surgical repair) and lumbosacral disk disease with severe pain, as well as chronic pain syndrome in the thoracic spine and both knees. He had been treated with injections of Demerol and other pain medications. He also had recommendations for an epidural and trigger injections secondary to his chronic pain. The inmate had been seen in July 2005 by a neurologist, who diagnosed chronic low back pain consistent and headaches consistent with right occipital neuralgia arising from his neck and recommended a course of physical therapy, heat massage, an MRI, and an epidural for the lower back. The inmate was also being treated for hypertension with Propranolol, and it is noted that all of his medications were being prescribed as DOT, with the exception of Propranolol and Ibuprofen, which were prescribed as DOT as well as keep on person (KOP) medications. There are discrepancies in the MAR for September 2005, which indicated the inmate was receiving Celexa, Hydroxyzine, Bupropion, Ranitidine, Propranolol, and Ibuprofen. However, the MAR indicates the

113

only medications the inmate actually received in September were Bupropion and Ranitidine, and none of these were indicated as requiring DOT administration.

The CDCR suicide report provides a very comprehensive review of this inmate's long history and substantial mental health and medical records. The suicide report lists six problems and recommendations as follows:

Problem 1: This inmate had a history of overdosing on prescribed medications and swallowing objects, suggesting all of his medications should have been administered by DOT. At the time of his death, most of his medications were prescribed DOT, while two more recently ordered were self-administered. The medication that he overdosed on was ordered twice, once as self-administered and once as DOT.
Recommendation: The current DCHCS medication management policy does not specify that a history of overdose is a requirement for DOT administration. Further, there is no provision for physicians ordering medications for physical conditions to take the psychiatric condition of the I/P into account. DCHCS to consider policy revision.

Problem 2: On 6/30/05, a psychiatrist ordered Citalopram 40 milligrams po qam for 180 days and Restoril Caps 50 milligrams po hs and prn for insomnia or agitation for 180 days. Department policy clearly prohibits ordering medications for more than 90 days at a time.
Recommendation: The Chief of Mental Health at DCHCS will determine whether PBSP received a misdirection from DCHCS Pharmacy regarding prescription time lines. If so, the directive will be corrected. If not, refer to the PPEC for review of the individual clinician's actions.

Problem 3: There were inconsistencies between the MARs, pharmacy profile, and physician orders that were of concern. For medications that were ordered DOT, the MAR did not reflect this information. There was a medication on the MAR (Celexa) that was not listed on the pharmacy profile. There were two active orders for Propranolol, one order for DOT (7/13/05) and the other allowing the I/P to carry and self-administer this medication (8/18/05).
Recommendation: The HCM at PBSP has indicated that these discrepancies were due to a problem with the computer program, Madrid Patient Information Management System (MPIMS), that has since been resolved.

Problem 4: The MTA did not stay at cell front after the inmate threatened to take all of his medication. He should have summoned help while keeping the inmate under observation, possibly sounding his alarm.
Recommendation: PBSP has initiated an investigation.

Problem 5: Medical staff made the decision not to send this I/P to the CTC emergency room but instead sent him to the gate to await an ambulance to transport him to an outside hospital. Given that the staff suspected the I/P had

114

swallowed a large quantity of Propranolol and that this presented a life-threatening situation, this decision may have been contraindicated.

Recommendation: PBSP to conduct a detailed review of the emergency response decision-making process in this case and submit recommendations to address any deficiencies.

Problem 6: Medical personnel from the North Coast Emergency Medical Services who responded with an ambulance made the decision to downgrade the emergency from a Code 3 to a Code 2, further delaying needed medical care.

Recommendation: DCHCS to request North Coast Emergency Medical Services to conduct and submit a review of this incident.

On 8/14/06, the Deputy Directors of the DCHCS and DAI reported the Quality Improvement response from PBSP was received on 3/20/05 and approved by the Suicide Case Review Focus Improvement Team. They stated the institution was responsible for three of the six QIP items and the others were the responsibility of DCHCS. Documentation of DCHCS response was attached (see below), and of the three items to be addressed by the institution, two were reported to have pending actions, and a final report would be expected from PBSP when these items were completed. The attached report indicates that with regards to Problem 1 and Problem 2, DCHCS provided a memorandum dated 7/17/06 with the subject "Policies Regarding Duration of Prescriptions of Psychotropic Medications and Directly Observed Therapy Administration" to HCMs, chiefs of mental health, psychiatrists, physicians, surgeons, nurse practitioners, and physician assistants reminding staff of department policies specifying that psychotropic medications may be prescribed for no longer than 90 days and that DOT can be ordered when there is a potential for self-harm or recent history (within the past year) of suicidal ideation, threats, or attempts.

With regard to Problem 6, the Del Norte ambulance patient care record for this inmate was a copy of this inmate's transport to Sutter Coast Hospital without further comment regarding the decision to downgrade the emergency from a Code 3 to a Code 2.

Regarding the facility responses with regard to Problem 3, the HCM provided his explanation that the pharmacy discrepancies were created by a subcontracted portion of the MPIMS, with change management forms having been sent to CorrMedica and a manual system having been put in place until the software program changes are made. A pharmacy technician has also been designated to check the autogenerated interim labels for accuracy. This memorandum is dated 3/1/06. With regard to Problem 4 and Problem 5, the facility response indicated that there are pending investigations for Problem 4 and pending meeting of the ERRC to review the emergency response.

**Findings:** This inmate's suicide appears to have been both foreseeable and preventable. There are a number of policies and procedures that were not followed, and the CDCR suicide report makes reference to several. These include policies and procedures regarding DOT administration of medications, length of time of medication prescriptions, and decisions regarding the emergency medical response and having sent the inmate to a

gate to await the arrival of an ambulance instead of to the CTC for immediate medical attention. The failures most proximal to the inmate's death were the failure to follow the suicide prevention policy and procedure, with the MTA leaving the inmate unattended after the inmate made an overt threat to overdose and end "this pain," and decisions to not transport the inmate immediately to the CTC.

Although the CDCR suicide report makes reference to requesting an explanation from the ambulance service with regard to downgrading the transport from a Code 3 to a Code 2, the response from the ambulance service appears to be totally inadequate, and there is no further information provided with regard to efforts to secure a more appropriate response. Finally the decision-making processes of the MTA and medical staff at PBSP are "pending" further investigation or review, with no further information being provided regarding the results of the investigation or review.

## 32. Inmate FF

Brief History: This inmate was a 24-year-old Caucasian male who committed suicide by hanging on 11/1/05 in his single cell at the RC East Facility at CIM. The inmate was at the EOP LOC in the RC at the time of his death. He was returned to the CDCR via the DVI RC on 6/16/05, having been paroled on 6/29/04 to a residential drug treatment program based on his commitment to the Civil Addict Program at the CRC. He had been committed to the Civil Addict Program at CRC on 3/8/03 for three years, with state prison sentences suspended in lieu of his commitment.

On 11/1/05, at approximately 12:30 a.m., a CO was conducting a security check on the Alpine Lower Tier in the RC at CIM. The officer, when checking the cell that the inmate occupied alone, noticed the inmate kneeling on his knees next to the lower bunk with a piece of torn sheet tied around his neck and attached to the upper bunk bed frame. The officer activated his personal alarm, a sergeant responded along with Code 1 staff, and a Code 3 medical response was requested via the institutional radio. Correctional staff entered the cell and cut the sheet. A MTA responded at 12:32 a.m. and immediately began CPR with the assistance of a CO. At approximately 12:41 a.m., the second MTA and officer arrived, and the inmate was transported to the Minimum Support Facility (MSF) Hospital, where they arrived at approximately 12:52 a.m. At approximately 12:55 a.m., a physician pronounced the inmate dead.

The inmate first entered the CDCR via the CRC on a civil act commitment for three years with state prison sentences suspended after he had been arrested on a series of second-degree burglaries. His history had included methamphetamine use since approximately age 17 and alcohol use since approximately age 13, as well as approximately 15 jail sentences or probations related to drug charges, failures to appear, absconding from probation, and one instance of assault on another man with a pipe after they had both been drinking alcohol. He began the Civil Addict Program in June 2003 and was released in June 2004 to a residential program in Sacramento, but left the program in April 2005, at which time his parole was suspended. He was arrested in May 2005 and

116

returned to prison on 6/16/05, with transfer to CRC for continuation of the Civil Addict Program on 7/11/05.

When he was admitted to DVI RC in 2003, he had been taking Zyprexa and reported both treatment for a history of mental illness and current auditory hallucinations and suicide attempts by cutting himself in the past. His past mental health treatment had been after two suicide attempts by overdose in 1999 and in 2001. He reported that he had been receiving medications while in the county jail, and the medication Zyprexa was continued when he entered the CDCR in 2003. He was diagnosed with substance-induced psychotic disorder, borderline personality disorder, and hepatitis C. He was subsequently diagnosed with schizophrenia chronic undifferentiated type, and his medications were increased. He was at the 3CMS LOC while receiving services in the Civil Addict Program when he arrived at CRC on 7/2/03.

After being found in violation of his parole and returned to CDCR on 6/16/05, the inmate was prescribed Risperdal and Benadryl. He was diagnosed with methamphetamine-induced psychosis with hallucinations and methamphetamine-induced mood disorder, with a history of auditory and visual hallucinations as well as seven past suicide attempts. On 6/29/05, approximately two weeks later, the inmate was transported to an outside hospital after having taken an overdose of his medications, including Risperdal, Benadryl, and Zyprexa, in a suicide attempt. He was returned to custody and on 7/2/05 readmitted to the same hospital after a second overdose of the same medication in a suicide attempt. There appears to have been an error on the mental health screening chrono indicating that the inmate was at the EOP LOC on 7/5/05; however, he was returned to the 3CMS LOC within a few days.

He was transferred to CRC on 7/11/05, with notations that he had a history of mental illness and had attempted suicide but currently was not suicidal and was at the 3CMS LOC. During the mental health screening, the inmate reported he had hepatitis C, was developmentally disabled, and had mental illness; however, a DDP evaluation in July 2003 indicated he had NCF. There is also a report that indicated that the inmate had been diagnosed as developmentally disabled when he was 13 years old. The MH-7 mental health assessment indicated diagnoses of depressive disorder NOS, amphetamine dependence, and borderline intellectual functioning (provisional), and he remained at the 3CMS LOC.

The inmate was seen on 7/25/05 by a psychiatrist, who diagnosed personality disorder NOS and prescribed Risperdal, Celexa, and Buspar. The psychiatrist noted that the inmate reported suicidal thoughts of cutting himself but had "no plan." The psychiatrist did not perform an SRAC at that time. Approximately two weeks later, on 8/6/05, the inmate did cut his wrist with a razor; reported that he was depressed, paranoid, and hearing voices; and was placed in the OHU on suicide watch. Two days later, a psychologist completed an SRAC, noting five previous suicide attempts in addition to his history of substance abuse, mental illness, and poor impulse control, as well as recent suicidal ideation, recent suicide attempt, and being fearful for his safety. The SRAC of 8/8/05 indicates that the source of information was the inmate interview only, without

117

review of the UHR or the C-file; no evaluation of risk was provided; and it appears both referral to a psychiatrist for medical review and crisis bed placement on suicide precaution were checked and then crossed out, with "no" written above them. Additional comments are difficult to interpret but read "I/M to be removed from OHU on crises bed suicidal watch status, C/O to continue to monitor I/M, arrange psychiatry to evaluate I/M, psych medications; arrange transfer."

The CDCR suicide report indicates that a consultation was held with two other psychologists, including the supervising senior psychologist; the inmate was again interviewed; and it was determined he could be returned to a dormitory setting. The psychiatrist also saw the inmate and increased his Risperdal, ordered Prozac, and discontinued Celexa, with a plan for psychiatric follow-up in two weeks. The five-day follow-up was performed from 8/8/05 through 8/12/05, and the inmate was noted to have been depressed and anxious, with "depression improved" on each successive day through 8/11/05, "depression has greatly improved" on 8/12/05, and denial of suicidal ideation on all five days.

An MH-4 mental health assessment and an MH-2 treatment plan were completed by a psychologist on 8/16/05. They indicated that the inmate had poor eye contact, blunted affect, slightly choppy monotone speech, and auditory hallucinations under control on medications but that his mental status was essentially within normal limits in all of the categories. He denied current suicidality. The diagnoses offered an MDD recurrent in partial remission and amphetamine dependence, rule out generalized anxiety disorder/psychotic disorder NOS, schizoid personality disorder traits versus borderline features. A progress note of the same date indicated a plan to schedule an IDTT, which was held on 8/18/05. The IDTT determined that the inmate was stable with no changes in his mental status, with a plan to continue the present program. The IDTT noted "none" with regard to medication issues reported. On 8/23/05, the inmate was seen by a psychiatrist, who discontinued his Risperdal because the inmate complained of dizziness from Risperdal.

-There were three requests for psychiatric/psychological services by staff on or about 8/25/05. The first was dated 8/25/05 and written by a physician who had treated the inmate for self-inflicted cuts and who indicated the inmate was expressing suicidal ideation. The other two were from custody staff, including a sergeant and a CO. The sergeant indicated the inmate expressed suicidal ideation; mentioned more recent attempts; was confused, disoriented, and assaultive; heard things; saw things; imagined things; and was described as "needs to be reviewed for a psychiatric." The CO reported the inmate expressed suicidal ideation, mentioned more recent attempts, and was described as "claimed suicidal, has red marks on neck as if attempting to hang self." There were no notes in the record describing that the inmate was seen by mental health staff based on these referrals; however, he was transferred to the MHCB at RJD for evaluation on 8/29/05. He remained at the MHCB at RJD through 9/1/05, and five-day follow-up was ordered. He appears to have been placed at the EOP LOC during that time period, but there is no other documentation provided for his MHCB admission to RJD and no documentation that five-day follow-up was provided when he returned to CRC.

118

The initial health screening completed on 9/6/05 at CRC indicated that the inmate stated he "can not stay in dorm living! He would hurt himself again." The CDCR suicide report makes reference to the request for psychiatric/psychological services referral by the sergeant, referenced above as being dated 9/6/05, when the inmate returned from RJD.

The senior supervising psychologist entered a summary progress note on 9/6/05 indicating the inmate returned from RJD with no medical file but that they had been informed by RJD on 9/1/05 that the inmate required an EOP LOP. As the inmate has "N number, the inmate had to be returned to CRC where he will be excluded from the Civil Addict Program." The note continues that the pharmacist at CRC consulted the pharmacist at RJD and obtained a medication profile. The inmate was transferred the next day to the MHCB at CIM, with diagnoses of psychosis NOS, personality disorder NOS, and second-degree burns to his legs secondary because he had attempted to hide hot cups of coffee in his socks. This would be the first of six admissions to the MHCB at CIM for this inmate. The dates of subsequent admissions were 9/7 to 9/8, 9/16 to 9/19, 10/4 to 10/7, 10/19 to 10/20, and 10/28 to 10/31. The inmate was diagnosed with schizophrenia undifferentiated type and on each of his short stays reported that he continued to be depressed but not suicidal, so he was placed in an RC on five-day follow-up. For the 9/7 to 9/8 admission, he received follow up on 9/9, 9/10, and 9/11 and denied suicidal ideation on each of those occasions but, when seen on 9/11, had inflicted superficial wounds to his wrist and was readmitted to the MHCB. This pattern was to repeat itself during the next several admissions to the MHCB.

On 10/7/05, the psychiatrist in the MHCB reported the inmate denied suicidal ideation and wrote, "he claimed to be hearing voices and having suicidal thoughts though he denied suicidal ideation." The psychiatrist determined that he "was ready for discharge and in the absence of any acute psychopathology to warrant further hospitalization, he was discharged." At this point, he was discharged to the 3CMS LOC and prescribed Risperdal, Prozac, and Buspar, with five-day follow-up. He received five-day follow-up for one day although the CDCR suicide report indicates that the MHTS indicates he had all five-day follow-up contacts, in addition to seeing a psychiatrist on 10/10, which is not documented in the record. The CDCR suicide report references a number of the contacts in the RC and in the MHCB being conducted without the medical record being available, and it does not appear that SRACs were performed during the MHCB admissions.

On 10/19, the inmate was returned to the MHCB after he made superficial cuts to his arms, abdomen, and face, and the inmate stated, "I use a razor, and it's not that I want to kill myself, but I know that if I cut myself I will be seen; I don't want to go to the hospital here, I want to go to Atascadero, that is where I belong." He was seen the following day and reported that he still felt suicidal to a nurse; however, he was discharged on that same day by a psychiatrist, who indicated the inmate required five-day follow-up. The progress note indicated that the staff were aware that he had been in the MHCB five times in the last two months, and an SRAC was completed and noted that the inmate had a number of static and dynamic factors, but the risk level was indicated as "no risk," with no recommendations.

The CDCR suicide report indicates that the reviewer had access to an audiotape of an interview done on that same date by a psychology trainee that indicates the inmate appeared to have been psychotic, with blunted inappropriate affect and depressed mood and, "somewhat delusional with organized thought processes." The reviewer notes that the tape that she listened to indicated the inmate was "in a turmoil, [with] ongoing delusional belief, and inability to cope with feelings that overwhelmed him." She also makes reference to the inmate cutting himself impulsively and that he didn't intend to kill himself, instead hoped to go to a state hospital, however "seemed to have given this up as a possibility stating 'no matter what I do I won't be able to go to Atascadero State Hospital–I don't fit the criteria.'" The inmate did receive five-day follow-up from 10/21 to 10/25 and denied depression and suicidal ideation, as well as psychotic symptoms; however, on 10/28/05, after being seen by the CM at cell side, it was noted that the interview had to be at cell side because custody and security restrictions prevented a confidential setting such that a full assessment and treatment planning could not be completed. The inmate was seen by a MTA, whom he told, "I feel suicidal, I'm hearing voices telling me to keep my mouth shut, and they yell at me." He was readmitted to the MHCB on 10/28, and remained there until 10/31/05. The inmate both denied and endorsed depression and anxiety, reported that he was having auditory hallucinations, but denied suicidal ideation such that on 10/31, he was determined to have no suicidal ideation or psychosis and was discharged to the RC at the EOP LOC. The inmate hanged himself the following day at approximately 12:30 a.m., which was approximately seven and a half hours after he had been released to custody from the MHCB.

The CDCR suicide report makes reference to this inmate possibly having had one IDTT on 10/31/05, during his sixth MHCB admission, but that is only documented in an IDTT logbook, which notes that the IDTT was held "in absentia," without the inmate's presence. The reviewer for the CDCR suicide report also notes that she interviewed one of the psychiatrists, who reported that a DMH referral could not be considered "for someone who said he was not suicidal." The MHTS indicates that the inmate was not seen for an IDTT during the entire period that he was housed at CIM either in the MHCB or the RC, from 9/7/05 until his death on 11/1/05. The reviewer for the CDCR suicide report also indicates that although it is customary to double-cell inmates released from the MHCB in specific cells in the RC on the Alpine Unit, this inmate was single-celled because custody "had enough room," and that the Custody Suicide Prevention Log Sheet for 10/31/05 to 11/1/05 could not be located. The last count prior to this inmate's discovery was noted at 11:30 p.m. The reviewer also noted that the custody staff informed her that all the staff assigned to the Alpine Lower Unit on that night were relief officers, with one exception.

The CDCR suicide report identified six problems with recommendations as follows:

> Problem 1: The MHCB lacked continuity of care and cohesive treatment to address underlying causes of self-destructive behaviors. There were no documented IDTTs, treatment plans (MH-2), or SRACs completed.

Recommendation: (a) All I/Ps admitted to the MHCB must be seen in an IDTT to develop a discharge plan that addresses ongoing treatment needs and coordinate with the receiving treatment team/unit upon discharge to assure continuity of care. (b) Verify that ALL clinical staff have completed the required seven-hour SRA training provided by the CDCR on 4/20/05.

Problem 2: UHR was never reviewed at any time by MHCB staff at CIM although CIM is the RC in charge of difficult-to-access inmates. MHCB staff must make every effort to obtain clinical information necessary to make informed treatment decisions.
Recommendation: Charter a QIT to develop a procedure for obtaining UHR information for previous inpatient records for current MHCB admissions. As part of this QIT, create a log and conduct audit to ensure that information from records is available to MHCB staff.

Problem 3: No DMH referral was made when the current LOC was clearly inadequate to prevent repeated frequent MHCB admissions due to the inmate's suicidal ideation and self-harm behaviors.
Recommendation: The MHCB psychiatrists and psychologists who decided not to refer this I/P to a higher LOC will be referred to the DCHCS PPEC, which will determine whether this is an individual practice issue or system issue and make recommendations. CIM and/or DCHCSC will follow PPEC recommendations.

Problem 4: Documentation of custody suicide prevention follow-up hourly checks was missing.
Recommendation: Develop and train an LOP that follows CDCR policy for custody suicide follow-up wellness checks and documentation.

Problem 5: A mental health placement chrono placing the inmate at the EOP LOC was written on 7/5/05, at DVI. Despite this, the inmate was transferred to CRC at the 3CMS LOC.
Recommendation: Determine whether this chrono was in the C-file and whether the DVI Classification and Parole Representative (C&PR) noted it when endorsing the inmate to CRC.

Problem 6: While at DVI RC, the inmate had two suicide attempts by overdose (6/29/05 and 7/2/05) requiring transfer to an outside hospital. His LOC was changed to EOP on Tuesday 7/5/05, but the inmate was transferred to CRC at 3CMS on the following Monday, 7/11/05.
Recommendation: DVI: The current process is reportedly that the mental health office updates the C&PR regarding LOC changes on Mondays. In this case, the LOC used to determine the initial evaluation was changed less than a week before the inmate transferred. DVI needs to develop a process for immediate notification of the C&PR in cases such as this where previously determined LOCs change to a higher LOC, in case the inmate has already been assigned an LOC, as was likely the case here.

On 7/27/06, the Deputy Directors of the DCHCS and DAI provided the report from CIM dated 5/8/06 and received by DCHCS on 6/19/06. In their QIP response to the CDCR suicide report dated 1/26/06, CIM staff reported that with regard to Problem 1, a one-month audit was conducted of MH-2s and SRACs. For IDTT (MH-2) notes, staff reported a compliance rate of 92 percent; the presence of SRACs was a compliance rate of 79 percent, with one psychiatrist who works on a back-up basis accounting for the majority of the variance in that audit. The four psychiatrists assigned to the MHCB have a collective compliance above 90 percent. The psychiatrist with decrepit practices was referred for further training. DCHCS replied to the CIM that they should continue the audit on the back-up psychiatrist who accounted for most of the variance to ensure that training provided was effective and submit results to the audit when the compliance rate of 90 percent is reached or exceeded. On 7/21/06, CIM provided additional response, which indicated the same information but included in their response that the problem was resolved. There was no additional information to indicate any further audit of the back-up psychiatrist as requested in the DCHCS reply.

With regard to Problem 2, CIM provided documentation for audits for the months of April and May 2006 regarding UHRs sent/number of requests. For the month of April, the average percentage of records received that were requested was 26 percent. For the 11 days audited in May, the average percentage of charts received that were requested was 39 percent. CIM provided a list of reasons as to why they did not get UHRs in the MHCB. Memoranda were also provided regarding staff responsibility to obtain UHRs when inmates are "pulled from load out buses" (dated 4/21/06), the process regarding list for medical charts (dated 4/10/05), and medical records subcommittee meeting notes (dated 4/25/06) regarding efforts by the subcommittee to continue to work on this problem, which appears to be a component of a recommendation for a QIT. DCHCS provided a required follow-up regarding QIP Number 2 (to continue to monitor chart availability in the MHCB until 100 percent compliance is reached and submit a report with results). In their 7/21/06 response, CIM stated "update 7/15/06 final recommendations from this QIT were requested and will be forwarded once they are sent through the QNC [Quality Nurse Consultant]" and "update 8/15/06 still awaiting for final approval from the QNC and governing board."

With regard to Problem 3, CIM submitted on 6/13/06 a memorandum by the senior psychiatrist and chief psychologist stating that members of the IDTT had been interviewed regarding this inmate's committed suicide and that the interviews indicated that the members of the IDTT had met on the case several times and found no clinical indication to refer the inmate to DMH. That memorandum further states that the decision not to refer the inmate to DMH was not made by a single member of the IDTT but was collectively made by the all IDTT members. Further, in the updated memorandum, dated 7/21/06, with regard to this problem, CIM states, "update 7/15/06 the clinician has not yet completed the Focus Peer Review; once completed, the outcome will be forwarded to the PPEC" and "update 8/15/06 the clinician has been referred to the PPEC and her cases are waiting review."

122

With regard to Problem 4, CIM submitted an LOP dated 5/5/06 updating the LOP of 2/18/04 to clarify five-day suicide prevention efforts for mental health and custody. DCHCS in their approval required additional follow-up for this problem to provide a signed copy of the OP and to provide documentation of training. In their 7/21/06 follow-up, CIM states, "update 7/15/06–the training for correctional officers has yet to be completed" and "update 8/15/06 training has taken place in most of the housing facilities and should be completed institution-wide by the next update."

With regard to Problem 5, DVI provided their response on 4/27/06 and stated that the identified problem implies "that the C&PR endorsed Inmate _____ to CRC at the 3CMS level of care." According to the C&PR and assistant C&PR, that information is correct, and the C&PR's office claims that they were well aware of the inmate's EOP LOC and that as a result and per procedure, the inmate was en route scheduled for court-mandated drug treatment at CRC.

With regard to Problem 6, DVI reports that the claim that the Mental Health Department only notifies the C&PR's office on a weekly basis is incorrect and that such notification takes place daily. They report that a summary of all inmates designated as EOP is given to the C&PR's office weekly but that this is a secondary notification, which follows the EOP chronos that are delivered each business day.

There was no other information provided with regard to the CDCR suicide report or the facilities' responses.

**Findings:**  This inmate's death was both foreseeable and preventable. The CDCR suicide report very correctly identifies that there were a number of failures by staff to follow established policies and procedures in several different areas, including the provision and documentation of multidisciplinary treatment planning at CIM; application of the criteria for referral to a higher LOC at DMH, including overt statements by a psychiatrist that the inmate was not appropriate for referral because the inmate stated he was "not suicidal"; the failure to obtain adequate information or even bother to request UHRs; the failure to provide SRACs and, when provided, to rely on the inmate's self-reported information only; and the apparent complete lack of consideration that this inmate's condition was progressively deteriorating and that he clearly could not function in an RC environment, none of which are addressed by facility staff.

The breakdowns in communication between DVI and CRC could indicate a policy issue regarding inmates with an "N" number committed for treatment at CRC, but the response by DVI simply states that the assumptions made by DCHCS are incorrect and does not address the issue of the inmate's need for an EOP LOC or alternatives that may or may not be available within the system. The CDCR suicide reviewer had access to additional information, including audiotapes, and her reporting of those tapes clearly provides information regarding the deteriorating condition of this inmate. CIM's responses that IDTT discussions and the decisions regarding referrals were "collectively" made does not help dismiss the failure in treatment but indeed expands those failures to include multiple staff members who appear to have been totally ignorant of their clinical responsibilities to

an inmate who was unable to function in the designated environment and who seemed himself to have had the best insight; namely, that he needed to be in a hospital.

### 33. Inmate GG

Brief History:  This inmate was a 45-year-old Hispanic male who committed suicide by hanging on 11/1/05 in his single cell in the EOP at RJD.  The inmate returned to the CDCR on 8/9/04 based on a third-strike conviction for possession of heroin, for which he was serving a 25-years-to-life prison term.  He was in the MHSDS at the EOP LOC at the time of his death.

On 11/1/05, at approximately 8:08 a.m., a CO, while performing her duties, discovered the inmate hanging in his cell.  The officer activated her alarm, relayed to her partner, and called the ETV to the housing unit.  The control officer opened the cell door.  The two correctional officers initiated the cut-down procedure, placed the inmate on the floor, and got no response from him.  The sergeant and additional COs arrived on the unit and moved the inmate in front of the cell, where the sergeant initiated CPR.  At 8:10 a.m., the ETV arrived with a CO and an MTA.  The MTA and sergeant continued CPR, and the inmate was placed in the ETV and transported to the TTA, where they arrived at approximately 8:17 a.m.  At approximately 8:30 a.m., the American Medical Response paramedics arrived, and they continued lifesaving measures until approximately 8:40 a.m., when the inmate was pronounced dead by a physician.  There appears to have been a problem with a defibrillator that did not work in the housing unit because of a low battery; however, CPR continued until the inmate was pronounced dead.  An autopsy was provided by the Office of the Medical Examiner for the County of San Diego and indicated that the cause of death was hanging and the manner of death was suicide.  The toxicology report indicated that alcohol at 0.15 percent, Diphenhydramine at 0.14 mg/L, Bupropion, and a Bupropion metabolite were detected in the inmate's blood specimens.  The vitreous humor also detected 0.19 percent alcohol.

The incident reports and other information indicate that, at approximately 7:40 a.m. on 11/1/05, this inmate informed one of the housing officers that another inmate in a particular cell wanted to harm her.  The inmate reportedly stated to the officer that this other inmate knew that he had thoughts about "ending my life and he has mentioned to me regularly that why don't I take L out as well."  The officer asked the inmate if he was going to put that in writing; the inmate responded yes but also wanted the officer to accompany him to confront the other inmate.  The inmate was told to go to breakfast and that they would talk, and the inmate then went to breakfast.  The inmate arrived at the dining hall late and was told that he could not have breakfast because he was late.  However, a lieutenant instructed staff to give the inmate two sack lunches to make up for breakfast, but the inmate became very angry, loud, and verbally hostile and threw the bag lunches on the floor.  According to the CDCR suicide report, the inmate was overheard in the dining hall to say, "I'm dying today, I'm killing myself anyway"; however, it is unclear as to whether or not any staff overheard this comment or if it was reported by other inmates to staff.  The inmate was described as still angry when he returned to the housing unit, but according to one inmate, this inmate had told an officer to "get my

124

doctor, I'm going to kill myself." The incident reports continue that the inmate returned to the housing unit at approximately 7:50 a.m. and went to his cell. The cell was opened by the officer he had spoken to earlier, and he gave her a note written in Spanish on a piece of cardboard informing her which inmate wanted to kill her. The reports continue that the officer and this inmate went to the other inmate's cell, and the officer asked the other inmate if there was a problem either with her or with this inmate. The other inmate is alleged then to have tried to reach out of his cell and grab this inmate by the shirt, the officer with him signaled to the control booth officer to close the other inmate's cell, this inmate was returned to his cell, and the cell was closed. The officer contacted her sergeant and informed him of what had occurred, and the sergeant advised the officer to bring the inmate to the program officer as well as having her partner handcuff the other inmate and bring him to the program officer. The report then states that the officer went back to this inmate's cell at approximately 8:05 a.m. to deliver mail and found him with the sheet around his neck; she yelled to a control booth officer, and the emergency response began. The CDCR suicide report also makes reference to an inmate porter actually discovering this inmate hanging and notifying the officer, who subsequently came to the cell and began the emergency response process.

This was the inmate's eighth felony conviction, which resulted in a third strike with a sentence of 25 years to life based on his having been convicted of possession of a ten-dollar bag of heroin. The inmate returned to the CDCR on 8/9/04 via the SQ RC for his final incarceration. He was transferred to WSP on 1/25/05 as a holdover, with his arrival at RJD on 1/26/05, where he remained until the time of his death.

The inmate had a substantial and chronic substance abuse history, including heroin and alcohol since approximately age 13, and had been involved in methadone programs as well as mental health programs. He reported a history of being hospitalized at San Jose Valley Medical Hospital on two or three occasions and that he had treatment with Wellbutrin, Seroquel, and Paxil. He reported that he had attempted suicide by attempting to hang himself as well as overdosing on sleeping pills in 2001, as well as a suicide attempt by an overdose of Seroquel while housed at SQ in November 2004. In August 2004, while at the SQ RC, he received intake screening and mental health evaluation and reported symptoms of depression, including feelings of hopelessness and worthlessness, as well as suicidal ideation, such that a psychologist diagnosed him with schizoaffective disorder, depression and polysubstance dependence and he was placed in the 3CMS LOC. His attempted suicide by overdose of Seroquel at SQ occurred in November 2004, and he was transferred to an outside hospital because his condition had deteriorated. However, he did recover and was returned to the OHU, and the inmate reported to his psychiatrist that he had fully intended to kill himself and that "it was just a matter of when, not if."

While at SQ, he informed staff that he had hopes the three-strikes law would be overturned and that if it was not, he would kill himself by overdosing on medications. The staff at the OHU in SQ initially referred the inmate to an MHCB, then performed an SRAC and determined that the inmate had improved such that he was discharged to population with a diagnosis of major depression. He was however considered for the

EOP LOC. However, later in November 2004, he was referred by an associate warden because of concerns that he may have been suicidal, and a psychologist performed an SRAC and determined that he had a number of risk factors, including the defeat of Proposition 66 and his long sentence, and he was again admitted to the OHU and placed on suicide precautions. He reported to the psychologist and to other clinical staff that he had had suicidal thoughts his whole life and tries to deal with it.

On 1/26/05, he arrived at RJD after a brief stopover at WSP and reported his mental health and suicide history. He was at the 3CMS LOC and on 6/24/05, the IDTT met and changed his diagnoses to schizoaffective disorder depressed type, polysubstance dependence, and antisocial personality and placed him at the EOP LOC.

The records indicate the inmate had been assaulted on 5/15/05, which resulted in rib fractures and a vertebral fracture, and he was treated at the University of California at San Francisco (UCSF) Trauma Clinic. The inmate also requested a liver biopsy on 5/25/05, which was not done. He requested this biopsy because of his hepatitis C status, and the biopsy was scheduled but then cancelled on 6/21/05 because the physician believed that the inmate had recently attempted suicide. On 6/22/05, another physician evaluated him at the Hepatitis Management Program and reinstated his eligibility for a liver biopsy. The inmate was placed in administrative segregation based on this assault, and the records indicate it may have been for three days; however, he was sent to an outside hospital shortly after the assault occurred and, when he returned, was in administrative segregation for what appears to be an extended period. He was at the EOP LOC by this point; however, his attendance at groups had deteriorated markedly, and the records reviewed indicated that his last group attendance was 5/6/05 prior to the assault on 5/15/05 and that he did not attend groups for several months until his final group attendance on 10/31/05, the day prior to his suicide. The records also indicate that he had inconsistent compliance with his medications, with multiple refusals, particularly in June and July 2005, but better compliance in August and September.

The inmate saw a psychiatrist on 8/29/05, and his medications were in the process of being adjusted. On 9/21/05, the psychiatrist prescribed Paxil for 30 days after which it would be discontinued and Wellbutrin and Benadryl would be provided for the next 12 weeks. He was last seen by a psychiatrist on 10/18/05, and although he was noted to have dysphoric mood, his current treatment plan was to continue with the discontinuation of Paxil, and Wellbutrin was started within the next several days. The inmate had clinical CM weekly contacts, and on 10/26/05, he had a new clinical CM, who noted the inmate continued to express suicidal ideation, was depressed, was not attending groups, and remained isolated in his cell. The plan was to see him each week, and the CM saw him for the last mental health contact this inmate would have before his death on 10/31/05. The case manager reported the inmate stated, "I'm feeling worse because I want to cry but I can't" and "I'm trying to find spiritual peace, but everything reminds me I have a life sentence." The inmate continued to express depressed mood, suicidal ideation, and poor insight and judgment and was withdrawn. The inmate however did attend group on that same day, which was the first time he had done so since approximately May 2005.

126

The CDCR suicide report indicates there were appointments listed in the MHTS that were noted as having occurred for both individual contacts and group therapies but that were not reflected in the UHR. The UHR notations are consistent with regard to lockdowns and/or refusals by the inmate.

The CDCR suicide report identified six problems with recommendations as follows:

Problem 1: This I/P was at high risk for suicide based on his reported suicidal ideation, past attempts, depression, and case factors. EOP staff did not complete an SRAC or address his elevated suicide risk in the treatment plan.
Recommendation: Provide verification that all clinical staff have received the 4/20/05 SRA training.

Problem 2: There were conflicting reports regarding the precipitating events leading to this I/P hanging that need to be clarified.
Recommendation: Conduct a formal investigation into the incident. The warden has reportedly already initiated an investigation.

Problem 3: The CO involved in the incident did not follow protocol for dealing with this suicidal I/P and an inmate who allegedly was attempting to manipulate this suicidal I/P to kill her.
Recommendation: Conduct a formal investigation. The warden has already initiated an investigation.

Problem 4: The MHTS inmate history and UHR documentation showed discrepancies (i.e., the MHTS showed contacts that were not documented in the UHR).
Recommendation: Conduct a two-month audit for concordance between the MHTS inmate history and UHR documentation, and make appropriate changes to ensure reliability of these two systems.

Problem 5: Responding medical staff were unable to use a defibrillator due to a low battery.
Recommendation: Develop and/or follow procedure for routine check of emergency equipment at the beginning of each shift, provide training on this procedure, and create an inspection log.

Problem 6: There were no MAR entries after 10/27/05, although the inmate did not commit suicide until 11/1/05.
Recommendation: Find missing documentation or otherwise determine whether the inmate continued to receive medications and if not, why not.

On 6/26/06, the Deputy Directors of the DCHCS and DAI provided a report on the implementation of the QIP for this inmate and included the response from RJD dated 5/25/06.

- Regarding Problem 1:  RJD provided a roster of mental health staff and sign-in sheets on the SRA training offered 4/20/05 and indicated make-up sessions were offered following receipt of the videotape in June.  There appeared to be approximately 17 staff members who were not listed on the sign-in sheets as having completed the training.

- Regarding Problems 2 and 3:  The office of internal affairs completed an internal investigation and a letter of instruction was given to an employee for minor mistakes committed.  No further administrative or criminal actions were reported.

- Regarding Problem 4:  Facility staff report that there is less than 50-percent concordance for all visits but there is over 90-percent concordance for completed individual appointments.  Concordance for clinician lead groups was 63 percent for completions and 35 percent for missed groups.  Facility staff report their impressions that the vast majority of discrepancies can only be due to either failure of appropriate documentation of group participation or failure of that documentation to reach the UHR and suggest that the purchase, installation, and implementation of an electronic paperless charting system state wide would be the most effective means of achieving reliability of the systems.

- Regarding Problem 5:  Facility staff report that the problem appears to be "unfounded" and cite the notes by the TTA nurse and investigation by a lieutenant that indicated that one shock was discharged automatically and no further shocks were delivered secondary to a non-shockable rhythm.

- Regarding Problem 6:  Facility staff report that the incomplete MAR for October and a blank MAR remained in the UHR and are unaltered, showing ten missed dosages from 10/27/05 p.m. through 11/1/05 a.m.  They conclude that the combination of positive toxicology findings and undocumented spaces on the MARs is most consistent with at least some of those dosages of medication having been given but not documented.  They further report that nursing staff now have rigorous orientation and MARs are reviewed by nursing supervisors daily.

**Findings:** This inmate's death may have been both foreseeable and preventable.  The inmate was a very difficult inmate to treat because of his chronic suicidality; however, policies and procedures are in place that dictate the use of the SRAC, which was not completed according to those policies and procedures.  Further, the statements by the inmate to the CO on the unit, as well as statements the inmate allegedly made in the dining hall about his imminent suicidality, i.e., killing himself that day or informing the officer about the other inmate wanting him to kill her before he killed himself, should have generated an immediate referral to mental health staff for an SRA.  The inmate's agitated condition in the dining hall may also have been an indication that he was escalating and referral to mental health would have been appropriate.

This inmate was very difficult to manage because of his chronic suicidality; his failure to thrive within the EOP, which is demonstrated by his variable compliance with medication administration, which does not appear to have been understood or appreciated by the treatment staff or to have been reported by nursing staff to the psychiatrist as per policy; his failure to attend groups; and his increasing isolation from staff and others. This deterioration in his condition is well documented and should have resulted in a referral to a higher LOC such as DMH.

Lastly, the RJD facility response to the CDCR suicide report recommendations appears to be incomplete in that the requirement for all staff to have training on the SRA process does not appear to have taken place, based on the documentation submitted, while the inconsistencies in the UHR versus MHTS and missing documentation on the MAR in the days prior to the inmate's death do not appear to have been adequately addressed. The pending investigations remain pending at the time of this report and therefore can not be commented upon.

### 34. Inmate HH

Brief History: This 28-year-old Caucasian male committed suicide by mechanical asphyxiation on 11/27/05 in his single cell in an MHCB in the CTC at WSP RC. This was the inmate's first prison term, and he was admitted to the CDCR via the WSP RC on 11/18/05, having been convicted of oral copulation with a child under age 14 by force, violence, duress, menace, and fear. He was sentenced to 15 years to life, with his EPRD, 11/18/20.

On 11/27/05, at approximately 5:58 p.m., a CTC RN observed the inmate lying down on the floor of his cell with his blanket covering his torso area and appearing not to be breathing. The nurse did not see the rise and fall of his chest as in normal breathing, and the inmate was unresponsive to verbal commands. The nurse notified COs of a possible suicide situation, and one of the officers activated his personal alarm. RNs and COs entered the cell, and the two nurses immediately began to perform CPR. The inmate was placed on a gurney and taken to the WSP emergency room with CPR continuing. A Code 3 ambulance was summoned, and paramedics from Kern Ambulance arrived at the CTC and began to assist CPR. A paramedic removed paper cups and toilet tissue from the inmate's throat area. At approximately 6:37 p.m., the inmate was transported to the DRMC by ambulance, and at approximately 7:15 p.m., a physician pronounced the inmate dead. An autopsy report was provided by the Coroner's Division of the Bakersfield, California Sheriff, Coroner, and Public Administrator's office, and indicated an autopsy was done on 11/28/05 that determined the cause of death to be mechanical asphyxia (minutes) due to foreign body airway obstruction (paper and plastic) (minutes) and the manner of death as suicide.

This was the inmate's first incarceration, which began on 11/18/05, nine days prior to his death. The inmate had been convicted of oral copulation with a child under age 14 by force, violence, duress, menace, and fear. The crime was committed with his significant

129

other, who was also his co-defendant.  The inmate entered the CDCR via the WSP RC, and the initial health screening indicated the inmate reported anxiety, being prescribed Ativan and Remeron in the jail, having been treated for mental illness, having a mental health problem, and hearing voices or seeing things that are not there on 11/18/05.  On 11/22/05, he was seen by a psychiatrist, who reported that he had not received his psychiatric medications, including Seroquel, Remeron, and Vistaril, and further reported that the inmate was "hearing voices, [was] depressed, and can't sleep."  He also endorsed a history of substance abuse and a history of suicide attempts; however, it is unclear from the record how many attempts he endorsed.  The psychiatrist diagnosed depression NOS with psychotic features and polysubstance abuse and indicated he should be placed at the 3CMS LOC.  He ordered Seroquel, Remeron, and Hydroxyzine.  The inmate also received a mental health screening on that same date, and the findings indicated that he had a history of taking medications; serious mental problems in the family; past history of attempted suicide because of guilt, uselessness, or sinfulness; feeling spied upon in the past; past suspicions of being followed; past suspicions of telepathic awareness; and past hallucinatory experiences.  The inmate requested protective custody and demonstrated a blunted and inappropriate affect, and the screener recommended further evaluation for thought disorder, mood disorder, and major depression.

On 11/24/05, the inmate presented twice to the TTA:  The first reason is unclear from the documents, and he was returned to his housing unit; however, he was returned to the TTA at approximately 7:25 p.m. and had black eyes and injury to his face.  The inmate stated, "beat myself up."  The inmate had raised some questions about his cellmate assaulting him and whether or not his cellmate had "found out" something about him.  It was determined that the inmate should be admitted to the MHCB on suicide precautions, and he was allowed only a safety blanket and suicide smock.  He was ordered Seroquel, Prozac, and Vistaril; however, on 11/25, the Prozac was discontinued, Paxil was ordered, and his Vistaril was increased.  The order was for suicide precautions; however, the nursing notes indicate that he was on q 30 minutes checks instead of the usual q 15 minutes checks.  His diagnosis in the CTC was depressive disorder NOS, and his GAF was estimated as 20.

The notes indicate the inmate was lying quietly in the CTC and expressed fear of his "cellie," stating, "He knows me now, I don't want to go back to that building or else I will hurt myself."  He reported that he had been assaulted by his cellie, and he had a history of attempting to hang himself and to drown himself in a toilet.  He was seen daily by psychiatry and appeared to be adjusting to the CTC.  He denied suicidal ideation on 11/26/05 but reported he was fearful for his safety if he returned to the same cell.  By 11/27/05, the inmate was described as pacing and restless and, when seen by the psychiatrist, was "very agitated," with depression, anxiety symptoms, and positive suicidal ideation.

That afternoon, the inmate banged his head on his toilet and attempted to put his head into the toilet.  He was placed in a padded cell, taken to the emergency room, where he was examined and returned to the MHCB.  Nursing notes indicate that at 5:00 p.m. on 11/27/05, the inmate took his medication without problem and was given his meal.  The q

30 minute patient observation records for 5:30 p.m. indicate the inmate was lying or sitting and quiet. At 5:58 p.m., the inmate was found unresponsive, and the emergency response was initiated.

The CDCR suicide report makes reference to the inmate having been seen daily by a psychiatrist while in the MHCB, monitored every 30 minutes by nursing staff "in compliance with the institution's policies for suicide precautions," and moved to a padded cell on 11/27/05 after attempting to harm himself by hitting his head on the toilet and trying to drown himself.

The CDCR suicide report identifies one problem with recommendation as follows:

> Problem 1: While video monitoring equipment was available in the safety cell, its use is not outlined in the institution's CTC policies and procedures manual, and staff seemed unclear about it. The tape of this inmate was unusable. Current CDCR policy on video monitoring (7/22/05 memo) requires the institution to have a local policy that includes regular testing of the equipment or functionality (note that this inmate was not on suicide watch so there is no violation specific to this case).
>
> Recommendation: Develop LOP as per department policy, and provide verification that CTC staff is trained on the policy.

On 10/13/06, the Deputy Directors of the DCHCS and DAI provided a report on the implementation of the QIP for the suicide of this inmate and included the QIP that was submitted on 8/2/06 (the plan was due by 5/27/06). WSP staff, in their 8/2/06 memorandum, stated their response was consistent with the WSP RC CTC policies and procedures manual Section 15 on suicide watch and suicide prevention and provided the manual as an attachment. They reported that this manual was in effect at the time of this inmate's suicide and states clearly that "inmate/patients placed on suicide watch are to be observed via continual direct visual contact by staff" and continued, "there is no mention of the use of the video monitoring equipment in the policy and procedure" because it is not used for suicide watch or suicide precaution purposes. They reported that their old VHS video equipment was replaced with a new digital video recording system within days of this suicide when it was discovered that the old equipment was not recording and that the LOP is due for revision in September 2006. The staff quoted the 1/31/06 suicide report noting "that this inmate was not on suicide watch, so there was no violation specific to this case." The staff report that had he been on suicide watch, the video monitoring equipment would not have been used for the watch in any case in accordance with their CTC policies and procedures as referenced above.

Plaintiffs' counsel provided a letter on 12/9/05 with regard to this inmate's suicide and questioned whether or not the inmate was "video monitored." The plaintiffs report that they had been informed the inmate was on suicide precaution but not on suicide watch at the time he died and had not been identified as part of the MHSDS caseload. They requested copies of any videotapes and for each, whether or not videotapes were preserved or destroyed, as well as their current locations.

**Findings:** This inmate's death was both foreseeable and preventable. The inmate was placed in the MHCB on "suicide precautions," and a policy of checks every 30 minutes was instituted as per the WSP policies and procedures. The CDCR policies and procedures require checks every 15 minutes for inmates who are placed on suicide precautions. That having been said, this inmate was placed in the MHCB on suicide precautions and had a history of suicidal behavior, including attempting to hang himself and to drown himself, that was known to staff. Earlier on the day of his suicide, he was noted to have increased agitation and bumped his head on the toilet and attempted to stick his head in the toilet, explicitly to drown himself. This indicates that his condition had escalated, and although he was taken to the emergency room for an evaluation, the only change in his treatment was to place him in a padded cell. This inmate clearly required a new SRAC based on his behavior and a change from suicide precautions to suicide watch as he had attempted to harm himself while in an MHCB on suicide precautions. Both nursing and psychiatric staff were aware of his behavior because nursing staff took him to the emergency room and the psychiatrist ordered the padded cell; however, there was no change in the level of observation such that this inmate was able to use materials given to him at his meal to stuff down his throat and asphyxiate himself. While this mechanism of death is unusual, the mission of the MHCB is to provide a level of safety observation and treatment in accordance with the inmate's needs, which appeared to have been underestimated.

The CDCR suicide report identifies only a problem with there not being an LOP on the use of video monitoring and misses the point that this inmate's condition had changed and that his risk of suicide had escalated, which required a more intensive response to managing his care. It also should be noted that the initial inmate death report dated 11/29/05 states the inmate was at the 3CMS LOC and the initial inmate suicide report dated 11/29/05 indicates that the inmate was at the EOP LOC.

Finally, the emergency room flow sheet and incident report indicate that the two nurses who entered the cell started CPR and continued it as the inmate was transported to the emergency room until CPR was taken over by the EMTs who arrived with the ambulance. It is noted that the EMTs began to remove paper and other materials from the inmate's throat when they attempted to incubate him. There is no comment in the CDCR suicide report or the emergency care record as to whether or not the nurses performed CPR adequately by first assuring they had a clear airway. It appears that the EMTs were able to reach the paper products that were clogging the inmate's throat, but it is not clear whether or not this had to be done with instruments such as forceps or if the materials were within reach of the EMTs' hands. There is no reference to this matter requiring any form of investigation in the CDCR suicide report.

## 35. Inmate II
Brief History: This inmate was a 40-year-old American Indian male who committed suicide by hanging on 12/4/05 in his single cell in the ASU at CSP/Solano. The inmate was in the MHSDS at the 3CMS LOC at the time of his death. The inmate was

readmitted to the CDCR via the DVI RC on 7/29/05 after an arrest for drug paraphernalia and was serving a two-year-and-eight-month sentence.

On 12/4/05, at approximately 3:00 p.m., an LPT was passing out afternoon medications and approached this inmate's cell, observing the inmate kneeling on the floor facing his bed. She knocked on the cell door, received no response, and noticed that the inmate was not moving and had a sheet tied around his neck. She notified the control booth officer, who activated his personal alarm, and an administrative segregation sergeant and two other COs responded to the cell door and initiated an emergency cell entry. The sergeant and officers carried the inmate from the cell and out of the building to the waiting emergency vehicle. The inmate's vital signs were taken by the MTA, who found no pulse or respiration. The automatic electronic defibrillator was readied while two officers began CPR; the defibrillator was used once, with negative results. CPR continued as the inmate was transported to the primary clinic, and the Vacaville Fire Department Paramedic Unit was called, with their arrival at CSP/Solano at approximately 3:10 p.m. The inmate was noted by medical staff to have some cardiac activity, and the inmate was transported to Vaca Valley Hospital at 3:40 p.m.; however, he was reassessed, and a physician pronounced him dead at 3:56 p.m. A search of the inmate's cell discovered what appears to be a suicide note to "fred" that reads in part, "they put me in a 2ft cage and I flipped out! That was on nove. 29th and this is Sunday dec. something. I can't take no more I love you fred I love you fred." An autopsy report was provided by the Office of the Sheriff/Coroner/Public Administrator of Solano County and indicated that an autopsy was performed on 12/5/05 and determined the cause of death as asphyxia (minutes) due to hanging (minutes).

This inmate had four CDCR admissions between May 2003 and his death on 12/4/05. He was transferred from DVI RC to CSP/Solano on 11/8/05, where he remained until his death less than a month later on 12/4/05. The inmate's adult criminal justice history began at approximately age 18; between 1983 and 1997, he was arrested more than 15 times for a variety of offenses, including drug offenses, receiving stolen property, theft, and driving under the influence, and it was suspected that the majority of these offenses were related to his drug use. He reported that he began to drink alcohol at approximately age five and that he was addicted to heroin by the age of ten. He reported having lived in foster care after his mother's death by heroin overdose, as well as being homeless, and reported several psychiatric hospitalizations, suicide attempts, self-mutilations, and multiple incarcerations, including imprisonment in a federal prison, county jails, and ultimately CDCR. The inmate has also reported that he witnessed the death of his wife and two daughters in 2001 in a house fire.

His mental health history dates back to his adolescence, when he was diagnosed with ADHD, and he has also been diagnosed with PTSD related to the deaths of his family, schizophrenia, and bipolar disorder, in addition to polysubstance abuse and dependence. During his admissions to the CDCR, he has also been diagnosed with MDD, recurrent, moderate, mood disorder NOS, polysubstance dependence, borderline personality disorder, opioid-induced psychotic disorder, and antisocial personality disorder. During his prior incarcerations in the CDCR, he had been treated at the 3CMS LOC and went on

133

parole in the POC, which had been arranged for him to receive treatment in Sacramento County.

When the inmate returned to the CDCR in July 2005 via DVI RC, he was again placed at the 3CMS LOC, placed on Seroquel and Zoloft, and diagnosed with psychosis NOS, PTSD, and amphetamine dependence. Additionally, the inmate has suffered from seizure disorder for many years and was prescribed medications for his seizures. While at DVI RC, the inmate continued to have seizures and was sent to an outside hospital for treatment. He also reported suicidal ideation and received an SRAC on 10/29/05 that identified the sources of information as the inmate interview and CO or staff interview but did not provide a review of the UHR or C-file, did not provide an evaluation of risk, but did indicate a plan for referral to the primary clinical CM and referral to psychiatrist for a medication review.

The inmate was transferred to CSP/Solano on 11/8/05, and his diagnoses of psychosis NOS and polysubstance dependence were continued, as well as mood disorder NOS. His Seroquel and Zoloft were continued. On 11/21/05, the inmate was seen on an emergency referral by a psychiatrist because medical staff had reported the inmate was "having break through seizures" after returning from Doctors Hospital. He was described as a 40-year-old Canadian Indian and Lakota-Sioux serving a third term on a second strike. The psychiatrist noted he was depressed, felt jittery, and was seeing "fire, burning flesh, dead bodies." The psychiatrist reported the inmate's long history of instability and "11 to 13 suicide attempts." The psychiatrist diagnosed MDD with psychotic features and referred the inmate to the CTC for an admission assessment. The psychiatrist also completed an SRAC, reported the inmate's most recent suicide attempt was March 2005, and estimated the analysis of risk as a moderate risk. He was seen by a clinician in the CTC, who repeated some of the history and also noted that the inmate was concerned that he found out that he may have been HIV positive and that he had not been taking his Seroquel because it made him feel more depressed. The clinician determined that the inmate appeared depressed, needed his psych medication reviewed/renewed, but did not appear suicidal but depressed and stressed about adjusting to a new institution. The plan was to retain the inmate in the 3CMS and renew his psych medications; however, he was not admitted to the CTC.

The following day, 11/22/05, an IDTT was held, attended by a psychologist and two CCIs, but apparently no psychiatrist. The diagnoses of psychosis NOS, mood disorder NOS, and depressive NOS were retained, but the diagnosis of the psychiatrist who saw him the day before of MDD with psychotic features was not included. The recommendation from the IDTT was that the inmate was "doing good" without further explanation or indication of what services other than medications the inmate was in need of. The IDTT meeting was listed on an MH-3; however, no MH-2 was provided.

Notes in the medical section of the UHR indicate the inmate was seen in the medical clinic on 11/24/05 after custody staff brought him there; he was described as having "bizarre behavior and suicidal gestures." The psychiatrist on call ordered Haldol and

134

Ativan injections but did not personally evaluate the inmate, and no SRAC was completed.

He was next seen by mental health staff on 11/29/05, when he received an RVR. The psychologist who saw him indicated that the inmate stated, "Okay, I won't do anything to hurt myself the next three days" and requested making a telephone call to his wife. He also reported, "I've been in EOP before. I don't know why they don't send me home." The inmate was described as banging his head, punching a desk when he was distressed, and promising not to hurt himself for three days and was told that if he broke his promise, he would have to go to the CTC. He was described as appearing logical and coherent, "depressed, not immediate plans, but S/I." He was referred to the psychiatrist and CM within 24 hours, and the plan was to see him the next day to follow through with the phone call. The same CM wrote a second note, dated 11/29/05, at the same time, 1:30 p.m. The notes are confusing as they both have the same date and time but at the top of the page, they state, "1 of 2" and "2 of 2." They each have a Subjective Objective Assessment and Plan (SOA&P) section. The second note describes the inmate having "a seizure problem and having them a few times a day, reports his medications are Topamax, Dilantin, Phenobarbital, and Seroquel and his history of PTSD, Paranoid Schizophrenia, ADHD and Bipolar." In this note, the psychologist reports that the officers "said he might do something, so threw cone over fence to officer." The officers reported that he might be buying Seroquel on the yard, and the psychologist indicates that he has had "some S/I, S/A March 05–drank pine sol in 2000" and that he has also drunk bleach and antifreeze and attempted to OD on heroin. The SRAC was also completed on that same day by the psychologist, who indicates the inmate as a "mild risk" and "willing to promise for this week–told he be in rubber room if he did anything to break promise." The psychologist stated she agreed to see him Wednesday and Friday of that same week and discussed EOP with the doctor. The psychologist did not see him after this date and apparently did not arrange for any other clinician to see him as well.

The CDCR suicide report indicates that the inmate was seen by a psychiatrist, who found the inmate's affect to be "odd, dramatic" but "did not discuss the inmate's suicidality, note any psychotic symptoms, or make any recommendations." I was unable to locate this note by the psychiatrist as quoted in the CDCR suicide report. The inmate was a transfer to administrative segregation on 11/29/05, after his meeting with his clinical CM. He was not seen by mental health staff prior to his death other than on psych tech rounds.

The note on the psych tech rounds for 12/3/05 indicates no mental health issues under inmate complaints and that he was on psych meds and compliant with meds. The note for the 12/4/05 rounds indicates no mental health issues under inmate complaints, clinician referral "no," psych meds "yes," comply with meds "yes," and then the notation "p.m. medication not given," with a description of the psych tech discovering the inmate at 3:00 p.m., as described earlier in this report.

The CDCR suicide report identifies five problems with recommendations as follows:

Problem 1: The CSP/Solano psychiatrist on call (Psychiatrist A) on the evening of 11/24/05 was called because of the inmate's "bizarre behavior and suicidal gestures" but did not conduct an SRAC, place the inmate on suicide watch, or refer to an MHCB. The inmate spent the night in the TTA and was returned to his housing unit the next morning without ever being evaluated in person by Psychiatrist A. CDCR policy requires that any inmate brought to the attention of mental health clinicians because of suicidal behavior must be assessed face-to-face by a clinician if not admitted to a CTC bed and must be assessed before being returned to housing.

Recommendation: (a) Psychiatrist A will be referred to the DCHCS' PPEC for review. (b) CSP/Solano must develop and train on a local policy that is consistent with CDCR policy to ensure that any inmate taken to a medical clinic (TTA or CTC) for suicidal behavior is evaluated in person by a mental health clinician before being returned to housing.

Problem 2: When the inmate was brought to the TTA on 11/24/05, as noted in Problem 1, Psychiatrist A ordered via telephone "emergency" injectable medications that were highly sedating (the inmate was completely unresponsive for the rest of the night) and included in his order the notation that the inmate was to return to housing once the effects wore off. The documentation did not indicate that the inmate was offered voluntary oral medications, nor did he sign a consent form.

Recommendation: Psychiatrist A will be referred to PPEC for review.

Problem 3: Mental health treatment plan (MH-2) for 11/22/05 IDTT was not in UHR and could not be located by CSP/Solano staff.

Recommendation: Locate this MH-2 and/or determine why it was not in the file. Develop a local plan of correction to maintain timely filing of documents.

Problem 4: Inmate was seen by CM on 11/29/05 due to bizarre, agitated behavior. Clinician formulated a treatment plan to see the inmate the next day. She was ill that week, and the inmate did not see another clinician.

Recommendation: Institute a QIT to develop a system to prevent missed clinical contacts that are important to the current treatment plan.

Problem 5: On 11/29/05, inmate was interviewed by Psychiatrist B on referral from the CM after she evaluated the inmate's risk for imminent self-harm. Psychiatrist B interviewed the I/P, but his note does not include any reference to suicidality (reasons for referral) or that the inmate was assessed for safety.

Recommendation: Refer Psychiatrist B to the HCM for appropriate corrective action.

On 7/27/06, the Deputy Directors of the DCHCS and DAI sent a memorandum to the warden and HCM of CSP/Solano with subject "overdue QIP for suicide of Inmate [II]," directing the QIP reports be provided upon receipt of this memorandum. On 9/27/06, the Directors of DCHCS and DAI provided a report on the implementation of the QIP for the

suicide of Inmate II based on the submission on 8/23/06 of the QIP by CSP/Solano (QIP was due 5/27/06). In their response, CSP/Solano staff reported the following:

- Regarding Problem 1: The PPEC referral had been made, but no information on the outcome was available as it was still pending review and disposition. Despite the response to Problem 1, memoranda from CSP/Solano regarding the PPEC outcome for this suicide case indicate the members reviewed the executive summary and full suicide report and concurred that Dr. A's conduct presented serious practice concerns and that the failure to evaluate this inmate in late November may have contributed to his death in December. The members requested that Dr. A's privileges be restricted to eliminate direct patient care until completion of the pattern of practice review. They also noted that Dr. A continues in the peer review process and that they are working on sending materials to the medical board. In addition, all mental health staff had completed the mandatory seven-hour training on SRA, and the post-test was re-reviewed by all MH staff on 1/19/06 and 1/26/06 (documentation of verification of training was provided).

- Regarding Problem 2: CSP/Solano staff reported referral to the PPEC has been made, and no information or outcome is available: still pending review and disposition.

- Regarding Problem 3: A response was "filing currently up-to-date. Unable to locate missing MH-2." There was no comment on why the MH-2 was not in the file or of any local plan of correction to maintain timely filing of documents. Also, with regard to Problem 3, CSP/Solano provided CTC Policy and Procedure Manual Chapter 3, "Management of Health Records Services File Area," as their local plan of correction.

- Regarding Problem 4: A response was "QIP complete. See attached." Further, with regard to Problem 4, a QIT entitled "Preventing Missed Urgent Contacts" was instituted on 7/20/06, comprised of two psychologist members; however, there was no information on the QIT's results.

- Regarding Problem 5: A memorandum dated 8/3/06 by the CMO/HCM indicated that "Psychologist B" [sic] was counseled by the writer and a supervising clinician on 7/20/06 regarding appropriate documentation and assessment of suicidality.

**Findings**: This inmate's death may have been foreseeable and was most probably preventable had the clinical staff appropriately followed policy and procedures with regard to evaluation of a suicidal inmate. The CDCR suicide report appropriately identifies the failings of specific clinicians to appropriately follow procedures for conducting SRACs when indicated. This inmate had two SRACs on 11/21/05, one in

which the psychiatrist opined that the inmate was a moderate risk and referred the inmate to the CTC and the CTC clinician downgraded that risk and did not admit the inmate to the CTC. Subsequently, the inmate's behavior became increasingly more bizarre, and he continued to report suicidal ideation. The most recent IDTT that is documented in the record occurred the following day and is not documented on an MH-2, but rather on a progress note, and does not document the participation of a psychiatrist to assist in resolution of this inmate's clinical management in the development of the most appropriate treatment approach.

The inmate was subsequently seen by a CM who "contracts" for safety with the inmate and states that she will see the inmate for follow-up visits twice more in that same week and then does not uphold her end of the agreement, and the inmate is not seen by another clinician to conduct any meaningful assessment or SRAC.

The CDCR suicide report makes reference to the inmate being seen on that same day by "a psychiatrist"; however, the QIP from CSP/Solano identifies that a "psychologist" was counseled as part of their QIP. Of the records reviewed, I was not able to locate a note on 11/29/05, other than the CM's two rather confusing notes, by either another psychologist or a psychiatrist, but the CDCR suicide report indicates that this note by a psychiatrist was inadequate. The CDCR suicide report also makes reference to the inmate being seen by a psych tech everyday after his transfer to administrative segregation on 11/29/05; however, the documents provided have notations from the psych tech on 12/3/05 and 12/4/05. In any case, this inmate's condition was deteriorating, and he was placed in administrative segregation and told by the clinician that he would be followed intensively if he agreed to contract for safety. The failure to do so or to arrange for another clinician to see this inmate, as well as the inadequate evaluations and assessments provided to this inmate by mental health staff, may very well have contributed to his death.

### 36. Inmate JJ[2]
Brief History: This inmate was a 34-year-old Caucasian male who committed suicide by overdose of Seroquel on 12/10/05 in his double cell in the EOP at CMF. The inmate was admitted to the CDCR via the CCI on 4/5/05, having been convicted of assault with a deadly weapon with great bodily injury and false imprisonment by violence. He was serving a five-year sentence, with credit for time served, including county jail time and 11 months to restore him to trial competency at Patton State Hospital (PSH).

On 12/10/05, at approximately 8:25 a.m., a CO was placing inmates returning from the morning breakfast meal back into their cells when he opened this inmate's cell to let his cellmate back into the cell. He noticed that this inmate had not changed positions from the first security check he had conducted early that morning and asked the cellmate, "Is your cellie alright?" The cellmate stated that this inmate was in a sound sleep, and when the officer looked closer he discovered the inmate was not breathing. The officer shouted to this inmate and shook his left shoulder; however, he did not respond and was cold and

---

[2] Although the death of Inmate JJ was originally characterized as "undetermined," CDCR later reclassified the death as a suicide in 2006.

stiff to the touch. The officer activated his personal alarm, and notified the control booth and the B1 clinic for a non-responsive inmate via an institutional radio. A sergeant responded to the call and observed the inmate lying on his right side. The sergeant ordered the cellmate to exit the cell, and COs placed the cellmate in handcuffs and escorted him to the front of the tier. Other inmates on the unit were being secured in their respective housing as a different sergeant notified the B1 clinic, and a Code Blue response was required. Nursing staff responded with a gurney, and an RN conducted an assessment of this inmate. The RN requested a physician to respond to the unit, who did and performed a medical examination, pronouncing the inmate dead at 8:30 a.m. The inmate was then removed from his cell and taken with medical staff to the emergency room. Based on the incident report, there were no attempts to provide CPR to the inmate. The body temperature was recorded as 91.8 degrees, and the temperature of the cell was 70.5 degrees. The physician who examined the inmate found "post mortem rigor mortis all over the body and post mortem lividity on dependent parts of the body." He also included on the inmate's death report, "time lapse since death probably more than six hours approx." An autopsy report was provided by the Office of the Coroner, County of Solano, indicating that an autopsy had been performed on 12/12/05 and that the cause of death was acute Quetiapine intoxication (hours). Toxicology screen indicated that Fluoxetine, Quetiapine, and Valproic Acid were detected in a femoral blood sample. The levels were Fluoxetine 0.42 mg/L (potentially toxic 1 to 7 mg/L), Norfluoxetine 0.25 mg/L (potentially toxic not known), Valproic Acid 5.5 mg/L (potentially toxic 150 to 200 mg/L), Quetiapine 8.1 mg/L (effective level 0.19 to 0.63 mg/L, potentially toxic not known). This level was approximately 13 times the maximum therapeutic level. There were no other medications, illicit drugs, or alcohol found in the toxicology screen.

This was the inmate's first incarceration, and he does not appear to have had any previous arrests. The crimes assault with a deadly weapon with great bodily injury and false imprisonment by violence were committed against the inmate's estranged wife as he cut her neck with a pair of scissors as well as cutting her several other times. He also forced her to drive him and his seven-year-old son to an unknown location and held them there for over 12 hours. The inmate was admitted to PSH under Penal Code 1370 as incompetent to stand trial in March 2004 approximately ten months later and remained at PSH for 11 months. He was eventually determined to be competent and convicted as noted above, with this admission to CDCR on 4/5/05, with the EPRD of 7/28/06. He was transferred to CMF on 7/7/05.

When the inmate was admitted to CCI on 4/5/05, the initial health screening indicated he stated he was under a doctor's care; was taking Seroquel, Prozac, Risperdal, and Lithium; had attempted suicide in the past; was hearing voices and seeing things that were not there; and had a mental illness history as well as a current mental health problem. He also reported as part of his medical history that he was "bipolar, manic depression, mental illness, Patton State Hospital. Suicidal"; listed his medications; and included that his mother and father were both dead by suicide. He also reported having seizures and high blood pressure. The inmate reported that he became mentally ill during the same year his father committed suicide, i.e., 1996. Although the inmate did not elaborate during the intake process on his suicide history, while at PSH he made two serious suicide attempts

139

including an overdose of psychotropic medication, which required medical interventions, as well as having been found with a noose wrapped around his neck while lying in his bed. The inmate was placed on suicide observation, and even though he was determined as competent, it was recommended he be housed in a special treatment unit and watched closely during his trial. The staff at PSH cautioned that the inmate remained at high risk for suicide.

Shortly after his arrival at CCI, he was placed in the 3CMS LOC, and upon arrival, his medications were continued. Approximately one week after his arrival, he had a psychiatric evaluation and told the psychiatrist he had made a suicide attempt "two days ago," and he was then placed in the EOP LOC. He received two DDP evaluations and was evaluated as DDO on 4/7/05, indicating that he did not pass or did not take the cognitive test, and was evaluated as NDD on 8/17/05, indicating no referral was needed.

The OHU admission notes actually indicate he was admitted to a holding cell on 4/18/05, the day before the SRAC, and subsequently transferred to the OHU when a bed became available. From the notes, it is very difficult to determine when that actually occurred. He was also referred to an MHCB on 4/18/05 according to the notes; however, after his stay in the holding cell and OHU from 4/18/05 through 5/2/05, it was determined that he was improved and did not require an MHCB. During his OHU course, Depakote was added to his medication regimen, and his diagnosis was changed to schizoaffective disorder. During this stay in the OHU, he had a second SRAC done, which did not identify the source of information, did not provide an evaluation of risk, but did recommend crisis bed placement on suicide watch. A third SRAC was completed on 5/2/05 and did not identify the source of information, indicated there were no protective factors, and estimated his level of risk as no risk at that time. After discharge from the OHU on 5/2/05, he did receive five-day follow-up. The inmate continued in the EOP at CCI until he was transferred to CMF.

After arrival at CMF on 7/7/05, the inmate was diagnosed with schizoaffective disorder, remained in the EOP, and was prescribed Seroquel, Depakote, and Fluoxetine, all of which were to be nurse administered. His last mental health contact was on 12/1/05 with a CM who was not his regularly assigned CM. The inmate's participation in the EOP indicated that in September and October 2005, he refused 23 percent and 58 percent of group therapy contacts and refused 64 percent and 75 percent of rec therapy contacts for those months, respectively. Despite these refusal levels, the rec therapist commented, inmate "has 100 function in RT group in October," and there were no comments regarding his group therapy participation. Summaries of contacts for November and December were not included in the records reviewed. The inmate also had a Valproic Acid level of 48 on 10/17/05, below the therapeutic range. As noted, the inmate's last contact with a clinician was 12/1/05, and he did not receive his regular CCM EOP contact the following week.

The CDCR suicide report makes reference to the inmate having "received all services" at CMF, as well as that the inmate "was reportedly ambivalent about his upcoming parole, maintaining he had lost his family and had nothing to live for."

The CDCR suicide report identified two problems with recommendations as follows:

> Problem 1: There was no MH-7 mental health assessment found in the records from the RC (CCI), although the inmate's care at CCI, the OHU, and EOP was otherwise well documented.
> Recommendation: CCI to form a QIT to determine whether or not this lack of MH-7 documentation was an isolated incident or a system problem. Identify the cause, and make a recommendation to prevent this problem in the future.
>
> Problem 2: At CMF, this inmate was evidently able to hoard a significant amount of Seroquel, suggesting that medication administration has been problematic.
> Recommendation: Staff who pass medications at CMF shall be involved in a training discussion of this case and the need to monitor inmates closely during administration of psychotropic medications.

On 8/16/06, the Deputy Directors of the DCHCS and DAI provided a report on implementation of the QIP for this inmate's suicide, which included reports from CCI dated 6/7/06 and from CMF dated 6/5/06. In their response, CCI indicated that the MH-7 that had not been provided in the records had been recovered from the MHTS. Further, CCI reported that a QIT determined from a "sizable number of randomly selected UHRs" that there is no prevailing deficiency and that the missing MH-7 was an anomaly. They reported that for 50 charts reviewed, only one lacked an MH-7 and that ten charts per month would be reviewed for completeness over the following quarter beginning in June 2006.

With regard to Problem 2, CMF indicated training had been provided for all MTAs involved in the distribution of medication, including instructions on medication administration procedure (specifically, DOT).

**Findings**: While this inmate's death does not appear to have been foreseeable, as he had reported chronic suicidal ideation, his death appears to have been clearly preventable in that he was able to hoard and/or otherwise obtain his medications, most specifically, Seroquel, despite the fact that he was prescribed medications as "nurse administered." The inmate had a well-known and documented history of suicide attempts, including by overdose, and it is a failure to follow this procedure that appears to have contributed to his death. Further, there does not appear to be documentation of appropriate considerations to refer this inmate to a higher LOC given his deteriorating functioning and poor compliance with treatment.

### 37. Inmate KK
Brief History: This inmate was a 37-year-old African American male who committed suicide by hanging on 12/12/05 in the DMH VPP at CMF. The inmate was single-celled in an MHCB at the time of his death. The inmate was admitted to the CDCR for his first

incarceration on 8/20/03 via the CCI RC. The inmate had been convicted of aggravated sexual assault of a child (sodomy) and was sentenced to 15 years to life.

On 12/12/05, at approximately 8:45 a.m., an MTA making security checks in the VPP at CMF checked on this inmate's cell and saw the inmate hanging from his backdoor screen by a piece of cloth tied from the screen to his neck. The MTA reported that he blew his whistle and yelled, "We have a hanger, get the cut-down tool," and that staff responded to the scene. It was reported the inmate was kneeling on the floor, with the cloth tied around his neck having been made from his torn boxer shorts. Staff responding included COs, MTAs, and an RN. The inmate was cut down and handcuffed, and a cervical collar was placed on his neck. The inmate was then moved into the hall, placed on a gurney, and at that time determined to have no pulse or respiration, and CPR was initiated. The inmate was transported to the B1 clinic at CMF, arriving at approximately 8:54 a.m., where the B1 staff continued CPR and other life-support measures, including incubation; however, the inmate did not respond and was pronounced dead by a physician at 9:36 a.m.

This was the inmate's first conviction, and he appears to have had no past criminal justice history. The inmate also appears to have had no past mental health history prior to his incarceration in the county jail, when he reportedly stated that he and family members suffered from schizophrenia. He also reported depression and was prescribed Zoloft as well as Celebrex for pain that is not further described. The inmate was admitted to the CDCR on 8/20/03 via the CCI RC and, during the intake process, based on his reported symptoms and history of treatment in the jail, was diagnosed with schizophrenia and alcohol abuse. He was prescribed Risperdal and Zoloft and placed at the 3CMS LOC. On 12/16/03, the inmate was transferred to CSP/Solano, remaining on his prescribed medications and continuing at the 3CMS LOC. The inmate appears to have been compliant with his Risperdal and Zoloft, as well as Benadryl, which was prescribed p.m. for sleep. When he was transferred from CCI to CSP/Solano, the intake screening indicates he was sent from NKSP RC rather than CCI; however, it also indicates he reported depression, a current mental health problem, being treated with Risperdal and Zoloft, and with regard to thinking about committing suicide or attempt of suicide, the answers initially circled were "yes" and "error," indicating that they were "no." The inmate remained in active treatment at CSP/Solano at the 3CMS LOC; however, he requested that he be placed in administrative segregation for safety reasons based on threats by another inmate, possibly related to his instant offense. The inmate was endorsed to a Sensitive Needs Yard (SNY); however, he remained in administrative segregation for more than five months awaiting a transfer to an SNY.

The IDTT notes that while he was in administrative segregation, he indicated on 4/12/05 that his diagnosis was schizophrenia paranoid type and that he had stopped taking psychotropic medications in November 2004. An IDTT of 7/12/05 gave no diagnosis for the inmate and again indicated that he was not taking any medications. By 10/25/05, an IDTT indicated the diagnosis was schizophrenia paranoid type; however, this was crossed out, and "no diagnosis" was substituted. Despite the inmate having had the diagnosis of a severe and persistent mental illness, i.e., schizophrenia paranoid type, this diagnosis was

dropped, and the inmate was removed from the 3CMS program based on his own request and his not having received medications for almost one year by the IDTT on 10/25/05. The inmate had written to the C&PR requesting information about the delay in his transfer and was informed that his 3CMS status was not a problem and that he was still on the list for transfer.

The CDCR suicide report makes reference to writings found in the inmate's property including a letter to his attorney shortly before his death, indicating that he believed he was being discriminated against because of his sex offense and containing the statement "I'm constantly being threatened by inmates and hate groups from all races most of them going to the same prison I'm going to."

The inmate remained in administrative segregation awaiting transfer and, on 12/6/05, inflicted lacerations to the right side of his neck and to both arms. He was transported to the CSP/Solano TTA at approximately 4:45 p.m., and a note by the physician indicates the inmate "talking about my wife and kids were killed and they are calling me a child molester so I just want to kill myself." The inmate was described as anxious, having wounds on his neck and both wrists, and requiring suturing of the wounds on his wrists, and he was prescribed Benadryl, Ativan, and Geodon. The inmate was transported from CSP/Solano TTA to CMF DMH for the VPP. It was noted that the MHCB at CSP/Solano had not opened because the CTC had not been licensed at that time.

Nursing intake at VPP indicated that the inmate had a "fresh cut" on the right side of his neck and both wrists and reported he had back pain. It was also noted that the inmate claimed to have auditory and visual hallucinations and that his affect was both "flat" and "alert." The inmate's judgment was noted as "poor" and "denial of mental illness" although he was claiming auditory and visual hallucinations. The impression was that he had no signs of psychosis. The inmate reported that he had been in administrative segregation for nine months prior to his transfer to CMF. Nursing notes at VPP indicate that the inmate was sent from CSP/Solano with very little information other than that he had attempted to cut his neck and his last name. The nurse called the Psychiatrist of the Day (POD) after discovering the inmate had open wounds to the right side of his neck as well as one-and-a-half-inch cuts to both wrists. The inmate was sent back to the B1 clinic for medical clearance and sutures, given a tetanus shot, and returned to VPP. Admission note of 12/6/05 at 10:45 p.m. indicates the inmate was interviewed and placed in full restraints. It also indicates the inmate was ambivalent and reported that he would let the staff know if his thoughts or urges "to hurt self worsened." The inmate was removed from restraints and placed in a cell with suicide blanket and boxers at that time. The inmate was seen by the POD and reported that he had heard that all of his family members were dead, that he was imprisoned for 15 years to life on a sex crime, and that he had been in administrative segregation for nine months. It is noted that the inmate "contracted for safety" and was placed on limited suicide watch (LSW). The behavioral restraint and/or seclusion observation checklist at 11:45 p.m. on 12/6/05 noted the inmate was observed every 15 minutes and had been given limited issue of "boxers and suicide blanket." The inmate slept all night and was noted to have awakened at approximately 5:30 a.m. and be pacing. The 7:00 a.m. nursing note indicates that the inmate was

standing at the cell door, awake, alert, and calm, with no behavioral problems exhibited. He remained on LSW. There are q 15 notations from 6:45 until 8:30 a.m. indicating the inmate was resting quietly, received his breakfast tray and was eating, and then went back to resting quietly. At 8:45 a.m., the inmate was discovered hanging by the MTA, as referenced above.

Review of the records indicates that the psychiatrist at VPP wrote that the inmate "states he tried to kill himself because of the news he heard on the tier that a hit was put out on 150 to 300 members of his family in other parts of the US." The psychiatrist noted the inmate was calm after he got medications and stated he no longer wanted to die, but the psychologist concluded that he may have been possibly delusional with ideas of reference. The inmate was noted to deny current suicidal ideation, and the psychiatrist's impressions were to rule out schizophrenia and self-destructive risk. The plan was to place the inmate on low suicide watch with a safety blanket and prn medications. The physician's orders to admit the inmate to DMH indicated limited issue, which included a safety blanket and suicide precautions. A note by a psychiatrist after the inmate's death on 12/7/05 stated that the psychiatrist had been informed of the inmate's suicide and that the limited issue that he had ordered was for a safety blanket or suicide blanket only.

The CDCR suicide report makes reference to information from DMH administration indicating that an MTA filled out a "tag," which is placed outside of the cell with instructions for any specific inmate, that indicated the inmate would have blanket and shorts. This communication also referenced the MTA noting that the psychiatrist on duty ordered a suicide blanket only but that the MTA did not change the tag; however, it also indicates that a nurse on duty had a telephone conversation with the psychiatrist on duty and that there was an agreement for safety blanket and shorts because the inmate had contracted for safety and to preserve the inmate's dignity and privacy. The doctor's order, however, clearly stated suicide blanket only.

The CDCR suicide report identified two problems with recommendations as follows:

> Problem 1: The psychiatrist's order for limited issue (safety blanket only) was not followed. The inmate was allowed to keep his shorts, which he used to hang himself. DMH evidently had a policy of allowing underwear with blanket as minimum issue.
> Recommendation: DMH will take appropriate disciplinary action with the MTA who noted the order and failed to follow it. DMH should also reconsider its policy on limited/minimum issue for suicide watch and issue a clarifying memorandum. Note that CDCR policy calls for suicide blanket and/or suicide smock and suicide mattress. (DMH also plans to create a checklist-style template for admission orders to make it easier for nursing staff to follow them.)

> Problem 2: The inmate's unit staff had to attempt to continue CPR (specifically, chest compressions) intermittently while manually rolling the gurney through the halls to the clinic because it did not get any help from the CMF clinic.

144

Recommendation: The B1 clinic should send a team to any cell front to respond to the emergency, allowing onsite staff to administer CPR until they arrive. CMF to review this incident in the institution's ERRC and recommend corrective actions to ensure B1 staff response to cell front emergencies, including DMH units as per policy. (Note that DMH also plans to install automated emergency defibrillators on its units.)

On 5/23/06, the Deputy Directors of the DCHCS and DAI provided a report on implementation of the QIP for the suicide of this inmate. To that report was attached the DMH memorandum dated 5/8/06 with the subject "Final Report of Suicide Investigation and Corrective Actions." DMH indicated that a root cause analysis was conducted after the inmate's suicide and provided a summary of the inmate's admission to the VPP and the emergency response. The root cause analysis by DMH provided 11 recommendations and an update on the status of each of the recommendations. The recommendations and status are as follows:

Recommendation 1: "After hour procedures for CSP/Solano crisis bed" should be discontinued; with Action Taken: a memorandum was issued 12/12/05 rescinding the agreement with CSP/Solano; and Status: complete. Further DMH HQ approved a recommendation that VPP outside admissions be limited to between 8:00 a.m. and 4:00 p.m.

Recommendation 2: "Inmate-patient brought for admission to the APP (other than S2) without appropriate documentation should not be admitted to the program under any circumstances"; with Action Taken: inmates will not be refused admission in the interest of patient care; however, an incident report will be generated if the UHR does not accompany the patient at admission; and Status: complete.

Recommendation 3: "Physician's orders should be noted correctly and followed as ordered under all circumstances"; with Action Taken: policy and procedural changes to reflect appropriate language regarding I/P having only what a physician actually lists in the order; and Status: complete.

Recommendations 4 and 5: "Job performance issues of those staff involved in the following areas should be addressed through the progressive discipline process 'to correct and bring employee performance back to standard' in the following areas: (a) staff member who noted, but did not follow physician's order dated 12/6/05 at 2300 (noted 12/7/05 at 0015). (b) staff member(s) supervising unit at time I/P placed in cell with shorts. (c) staff member(s) failing to initiate and/or follow CPR protocol per policy"; with Actions Taken: investigation requested and concluded with concurrence with the recommendations for staff disciplinary actions. Status noted that disciplinary actions were in process.

Recommendation 6: "Custody officers from CMF should not interfere or override the clinical direction and/or instruction of DMH SRNs and SMTAs [Senior

Medical Technical Assistants]"; with Action Taken: that the Warden agreed that custody staff will not interfere with the duties and rescue efforts of DMH staff; and Status: complete.

Recommendation 7: "Appropriate CPR procedures must be followed by staff at all times: (a) external defibrillators should be placed in each VPP wing; (b) after placing and training on defibrillators, CPR should be performed by DMH staff on units; (c) B1 clinic should be re-designated as 'responders' to CPR events and respond with crash cart to DMH emergencies." The plan was to install defibrillators between staff and CPR and for CPR trainers to be recertified, with Status: actions taken regarding training, however, with the rejection of B1 clinic staff being designated as responders with preference that I/Ps be transported to the B1 clinic rather than wait for responders to arrive and then transport. Lastly, ADs were ordered for each unit.

Recommendation 8: "I/P 'contracting for safety' should not be the only standard upon which staff relies in evaluating risk for suicide. They recommend a policy be reviewed and staff be trained as appropriate"; with Action Taken: that psychology and social work services review the suicide prevention policy to evaluate the contracting issue and advise on retaining it as a valid means of developing a therapeutic alliance. Status was determined as complete.

Recommendation 9: "Suicide smocks should be issued on all I/Ps who are within the first 24 hours of their admission to the APP, and if at any time they demonstrate suicidal ideation and/or behavior"; with Action Taken: that the suicide prevention program policy was reviewed and amended to reflect that safety smocks will be available on all units for use at the physician's discretion upon admission and at any time during the patient's stay; that smocks were ordered, received, and placed on all APP units; and Status: complete.

Recommendation 10: "Limited issue" versus "Full issue" be clarified and be trained to both clinical and custody staff. Clarification should include some mechanism to ensure that staff avoid in all instances any confusion in the implementation or writing of any "issue" order. Action Taken was to rescind Policy and Procedure Number 701 and change that policy to Nursing Policy and Procedure Number 423. Policy Number 423 was reviewed and retained, and a new, optional, pre-printed physician order form was proposed and approved by appropriate committees to eliminate confusion from medical and nursing staff. Status was indicated as complete.

Recommendation 11: "Physical plant issues which need to be revisited: screens in the cells remain problematic. Lack of adequate lighting systems/controls in the cells remains problematic," with plans for the DMH to purchase material with laser-cut 3/16-inch holes for the back windows of the cells to be replaced with security screens to make it "extremely difficult for inmate/patient to thread material through." In addition, the existing metal screens on the cell doors would

be removed, staff would use flashlights to see into the cells when necessary; with Status for screen materials ordered. A number of administrative directives were also identified as requiring modification to implement the above-referenced recommendations.

**Findings:** This inmate's completed suicide appears to have been both foreseeable and preventable. The inmate was transferred to the VPP (hospital LOC) because of having self-inflicted wounds to the neck and both wrists; the staff at CSP/Solano treated his wounds and indicated substantial changes in his mental status, including statements that his whole family had been killed or contracts had been placed on his family, with references to his having been in administrative segregation for nine months, his sex offense, and other inmates threatening him. He was transferred appropriately to a crisis LOC, but with very limited information being provided to the DMH staff. Even so, the DMH staff received him with full knowledge of his having recently cut himself and appears to have relied on his "contracting for safety" as an indication that he was no longer a risk for suicide. No SRAC was completed by the staff at CSP/Solano or DMH, and CSP/Solano again provided very little information to DMH.

With this set of facts and information, the DMH staff ordered LSW, i.e., 15-minute precautions and suicide blanket. The "confusion" with regard to an inmate newly received, with limited information but fresh wounds that were self-inflicted, being placed on suicide precautions rather than 1:1 suicide watch and being given limited issue, including a suicide blanket and "boxer shorts," represents a breakdown in communication as well as in appropriate safety precautions for an inmate presenting with this set of circumstances. Quite clearly, had the inmate not been allowed to have boxer shorts, he would not have had that means to execute his own death. The complicating issues with regard to DMH staff versus B1 clinic staff from CMF being responsible for initiating and continuing CPR, as well as the problems with communication and staff performance, were clearly identified by DMH and appeared to have been appropriately addressed in their root cause analysis and collaboration with CMF administrative staff.

### 38. Inmate LL

Brief History: This inmate was a 61-year-old Hispanic male who committed suicide by hanging on 12/16/05 in the WSP RC. The inmate was double-celled at the time of his death and was not involved in the MHSDS. The inmate was admitted to the CDCR on 9/21/05 via the WSP RC after he pled guilty to crimes involving continual sexual abuse against his youngest daughter. The inmate was sentenced to a 12-year prison term.

On 10/27/05, at approximately 8:39 a.m., a CO approached this inmate's cell and discovered him hanging by a torn sheet around his neck, with the other end attached to the upper bed frame in his doubled cell. The inmate's cellmate was out of the cell at the time. The CO activated the emergency alarm; received assistance from another officer, who retrieved the cut-down tool from the control booth officer; and after cutting the sheet from the inmate's neck, began CPR. Nursing staff arrived and assisted the officer in performing CPR, and other staff responded to the emergency. The inmate was placed on

147

a gurney and transported to the WSP emergency room. The watch commander called for a Code 3 ambulance at approximately 8:45 a.m., with the ambulance arriving at approximately 9:00 a.m. The ambulance transported the inmate to DRMC, and feedback to the staff was that the inmate's condition was "grave" and that he was on life support. On 10/31/05, a physician pronounced the inmate as brain-dead, and he remained on mechanical ventilation life support, as well as other life-support measures, until 12/9/05, when the family consented to removing the life-support systems. The inmate died on 12/16/05, with the cause of death being reported as brain death and anoxia secondary to hanging. A death certificate was issued by the State of California dated 12/22/05, indicating that the cause of death was anoxic encephalopathy secondary to strangulation.

This was the inmate's first incarceration in the CDCR, which began on 9/21/05, when he was admitted via the WSP RC. The commitment offense involved his having committed sexual acts with his youngest daughter beginning in approximately 1991, when she was 11 years old. The sexual abuse was reported in 1994, and the inmate fled the jurisdiction and was arrested in April 2005 in Arkansas. The inmate was subsequently returned to California and pleaded guilty to sexual offenses against his daughter. The inmate had a past history of conviction on carrying a firearm in public and had received probation.

The initial health screening conducted on 9/21/05 indicated that the inmate was receiving treatment for hypertension and his primary language was Spanish. There are no other positive endorsements other than treatment for hypertension at the time of the initial health screening. The initial health screening was incomplete as the RN completed only part of the form and did not enlist the help of a Spanish-speaking clinician or other assistance. The inmate received a mental health screening on 9/23/05, which indicated the screening was negative for significant symptoms of a serious mental disorder, and the recommendation was for no further evaluation at that time. The inmate also received a DDP evaluation on 9/23/05, which concluded the inmate was NCF, i.e., had passed the cognitive test and was in need of no further evaluation or referral.

The CDCR suicide report indicates that the inmate may have been receiving "psych meds" in the county; however, there is no documentation as to how this information was received. The CDCR suicide report also makes reference to the inmate being in protective custody in the county and to the consideration that the inmate may be in need of an SNY because of his charges. Review of the record also indicates that on 9/23/05, the inmate received a history and physical and that the physician indicated that the inmate's mental status was "abnormal" and that there was a need for a "psychiatric consult"; however, there was no elaboration and no referral generated. The CDCR suicide report also makes reference to interviews with staff, inmates, and a family member, suggesting that the inmate may have been suffering from a "severe depression"; however, the evaluation process does not appear to have identified this issue, other than the physician's comments at the time of the history and physical. The CDCR suicide report summarizes, "overall, the interview data suggest the inmate may have been experiencing a severe depression with paranoid anxiety (i.e., fear) prior to his hanging."

The CDCR suicide report identified two problems with recommendations as follows:

148

Problem 1:  The use of an interpreter is not routinely documented in clinical notes.  For legal purposes, it is essential to know if a non-English-speaking inmate is assessed in his native language.
Recommendation:  WSP:  Issue memoranda to clinicians directing them to indicate in clinical documentation whenever a translator is utilized.  DCHCS:  Address this issue in the SPR-FIT, and make recommendations.

Problem 2:  RN did not complete the initial screening.
Recommendation:  Refer the RN to her supervisor for training and direction on proper documentation.  Ensure that all staff in R&R understand requirement for complete documentation.  "If it isn't documented, it didn't happen."

On 9/27/06, the Deputy Directors of the DCHCS and DAI provided a report on the implementation of the QIP for this inmate's suicide.  The report included a response from WSP dated 8/2/06 documenting the following actions:

- Regarding Problem 1:  A memorandum to all clinicians dated 5/5/06 was issued and received via the standard on-the-job training (OJT) forms, with the memorandum and signed OJT forms attached.

- Regarding Problem 2:  The supervising RN issued a notice dated 2/28/06 to all R&R nursing staff with OJT forms.  The two memoranda referenced above require staff to document when patients do not speak English and whether they interviewed the inmate in the inmate's native language or if an interpreter was used, and a memorandum reminds staff to complete all questions on the initial health screening and use an interpreter if necessary.

**Findings**:  Although this inmate's completed suicide does not appear to have been foreseeable, as there did not appear to be any overt signs of imminent danger to self or understood request by the inmate for assistance, it may have been preventable had there been (1) appropriate completion of the initial health screening by the RN, (2) information received or requested from the county jail regarding the inmate's adjustment and possible treatment at the jail, and (3) elaboration and referral by the physician completing the physical examination regarding comments that the inmate had "abnormal" "psychiatric (mental status)" and need for "psychiatric consult."  Neither the CDCR suicide report nor the response from WSP clarify what the physician meant by these comments and why there was no referral generated when, indeed, the physician indicated the need for such.

The following inmates' deaths were initially reported as suicides and subsequently revised or reported as not suicides:

### 39.  Inmate MM
Brief History:  The cause of this inmate's death was initially reported as unknown but was subsequently determined to require review due to concerns surrounding the manner

of death. The inmate was a 57-year-old African American male who died on 5/16/05 from asphyxia at the Minimum Security Facility Hospital (CTC), Maximum Security Ward, at CIM. The inmate returned to the CDCR on 10/17/96 via the NKSP RC after having pled guilty to robbery second degree and was sentenced to a ten-year term with a five-year enhancement due to prior convictions (second strike).

On 5/16/05, at approximately 12:15 a.m., a CO was making security rounds at the Minimum Security Facility Hospital, Maximum Security Ward, when he observed the inmate lying on the floor close to the door. The officer called the inmate's name, and the inmate did not respond. The officer notified a nurse and sergeant, and they both responded to the Minimum Security Facility Hospital. They opened the cell, and hospital staff entered the room and attempted to revive the inmate with negative results. The inmate was placed on a gurney and transported to the emergency room, where, at approximate 12:40 a.m., he was pronounced dead by the attending physician. The CDCR suicide report makes reference to the sequence of events being "unclear from the varied incident reports" but states that a Code Blue was called and CPR was attempted. Neither the CDCR suicide report nor the incident report state when CPR was begun. The inmate could not be intubated because the emergency room physician stated that the inmate's jaw was so stiff that the physician could not open his mouth.

A coroner's investigation and autopsy protocol were provided by the San Bernardino County Sheriff's Department, Coroner Division. The coroner's investigation indicated that the inmate had been treated at the Riverside Regional Hospital for pneumonia and returned to CIM and placed in the infirmary. The coroner's investigation indicated the inmate had a history of paranoid schizophrenia, chronic obstructive pulmonary disease, hypertension, and asthma. On 5/13/05, the inmate was noted as extremely paranoid and screaming and would not stop such that he was placed in a "hospital room in the psychiatric ward at the prison." The coroner's investigation indicated that the inmate was last seen alive at 9:00 p.m. and that around midnight on 5/16/05, he was found unresponsive in his cell. On 5/20/06, an autopsy was performed and determined there was a foreign body, approximately eight centimeters vertical by five centimeters horizontal by three centimeters thick, lying in the proximal esophageal inlet. The mass was noted to have compressed and occluded the tracheal inlet at the level of the epiglottis. The mass, when removed, appeared to be composed of wadded-up white toilet paper surrounding a core of thin brown paper, and that the location and bulk of the mass were stated to be fatal due to obstruction of the proximal airway. A toxicology report indicated there was no detection of alcohol or drugs of abuse in blood studies conducted.

The CDCR suicide report dated 9/7/05 indicates that this inmate had a long history of mental illness and treatment in the MHSDS at the EOP LOC, as well as in OHU and MHCB housing. The inmate was diagnosed with paranoid schizophrenia in 1972 and had a history of psychiatric hospitalizations at Camarillo State Hospital. He also had been hospitalized at the Riverside County Regional Medical Center because of his chronic obstructive pulmonary disease, asthma, and emphysema. After his return to the CDCR in 1996, the inmate had numerous hospitalizations and treatments for medical as well as mental health problems. It is noted that in May 2005, his psychiatric condition continued

150

to deteriorate, that he was non-compliant with medications, and that a Keyhea order was instituted on 5/12/05. While the autopsy report determined the cause of death was asphyxia (minutes) due to upper airway obstruction by foreign body (minutes) and a contributing cause was schizophrenia, the manner of death was noted as "undetermined." The coroner's report concludes, "it is most likely that this was a self-induced obstruction, probably because he was trying, for unknown reasons, to eat and swallow this paper. It was such a large mass that it got stuck in the back of his throat and caused the Asphyxia. There is no evidence from the autopsy certainly and from the post mortem psychological profile that he would have intended to kill himself by this mechanism. There is no evidence of any struggle or trauma that I would expect to see if another person or persons had forced this mass of paper down his throat. Because the mechanism by which this foreign body got into his throat cannot be known with certainty, the manner of death is best left at this time as undetermined. The determination may change if more information is discovered."

The CDCR suicide report identified five problems with recommendations as follows:

Problem 1: The UHR was obviously not reviewed for mental health history at time of first psychiatric consult for this hospitalized patient, resulting in a very misinformed evaluation. The failure to reinstate this inmate's Zyprexa at that time ultimately resulted in his death.
Recommendation: At minimum, refer to PPEC for review. Take disciplinary action if indicated.

Problem 2: This severely decompensated I/P was housed in an MHCB overflow area rather than in the licensed MHCB area of the facility.
Recommendation: Establish local procedure for I/Ps with the most acute symptoms of mental illness to be placed in licensed MHCB on priority basis, with more stable patients moving to MHCB overflow area.

Problem 3: The Keyhea order was not carried out on two occasions due to custody staff's refusal to participate. Nursing did not evidently take this to a higher level.
Recommendation: Form a QIT to review what happened in this case with regard to following the Keyhea. Provide training to all CTC staff regarding the protocol for enforcing Keyhea orders and custody's role in assisting mental health staff and carrying out involuntary medication orders on all watches.

Problem 4: As he decompensated, this inmate was causing himself injury, such as edema from standing so much and abrasions. Much more aggressive mental health treatment should have been sought by medical (including a more timely second psychiatric consult) and provided by mental health staff. Restraints could have been considered as part of the overall care.
Recommendation: Medical needs to be more aggressive and persistent in requesting mental health intervention, and mental health need to be responsive.

151

Form a QIT to address this issue, and make recommendations for improving overall care with inmates who have both medical and psychiatric issues.

Problem 5: This inmate, on suicide precautions, lay by the door for over two hours, possibly dead, without nursing or custody staff properly observing him. Recommendation: An investigation into the entire incident has been initiated.

On 3/16/06, the Deputy Directors of the DCHCS and DAI provided a report on implementation of the QIP for the death of this inmate. CIM provided documentation dated 2/8/06 as a part of this report. CIM also reported an updated QIP regarding this inmate which, was unsigned and undated but had a reference to "updates for 6/15/06 and noted in italics."

- Regarding Problem 1: CIM staff add to the description of the identified problem, "this issue is in dispute by the institution staff. The psychiatric staff does not believe that failure to reinstate the inmate's Zyprexa was a direct cause that resulted in his death but may have been a contributing factor." Comments regarding this problem include that the next PPEC will consider this issue for action, medical records is in the process of adjusting its practice for off-hours availability of records, and the department is addressing loose filing and other delays in medical records to ensure availability. Further chart audits by the psychiatrist shall be performed to maintain for proof of practice; the psychiatrist has been referred to the PPEC; and the subject psychiatrist, pending action by the Medical Executive Committee and the PPEC in DCHCS, chose to resign on 1/31/06, effective 3/1/06. The undated update referencing 6/15/06 includes an update of 5/13/06 indicating that a peer review process that reviews charts is restarting after a policy and procedure revision; all staff will be reviewed by this committee this year; and as of 6/15/06, the peer review process was about to begin for the calendar year.

- Regarding Problem 2: CIM staff report on 2/8/06, "the area the inmate was placed in was within the licensed area of acute care hospital in station one not in the acute psychiatric area in station four. This placement was a result of his medical, psychiatric and custodial condition and factors." The comments include that the inmate was present within a licensed hospital, the memorandum from DCHCS dated 9/6/05 was attached, and the direction regarding "preliminary language for the operation of an OHU when inpatient beds are not available" was attached as a direction pending establishment of a complete LOP to open an alternative space/OHU. The update as of 5/12/06 indicated that the LOP and memorandum previously were provided and this problem was resolved.

- Regarding Problem 3: The QIT was chartered, and the results of the QIT minutes and documentation of staff training and attendance were provided as of 2/8/06. An update of 5/12/06 indicated that Keyhea training had

152