been provided but that a QIT in this matter and follow-up custody training had not yet been completed. It was noted, however, that considerable supervision had been applied with regard to Keyhea orders. Another update dated 6/15/06 indicated that Keyhea training for COs was being incorporated into a revised mental health training that would be provided as part of the yearly training requirements and that the training would be expanded to include subject areas specific to CIM, including Keyhea issues, five-day follow-up procedures, LOP training, and other areas that are part of the CAPs or are important for improved quality care.

- Regarding Problem 4: CIM as of 2/8/06 reported that, when the case was discussed among a group of clinicians including a chief psychiatrist, director of nursing, and chief physician and surgeon to ensure appropriate attention to inmate issues between disciplines, regular meetings to coordinate and communicate between the professional disciplines on a weekly basis would occur, and an update of 5/12/06 indicated that management supervisors in the disciplines mentioned continue to meet every week to discuss issues related to MHCB, such that the problem was resolved.

- Regarding Problem 5: As of 2/8/06, the Investigative Services incident number was provided, and an update of 5/12/06 indicated the investigation was ongoing.

**Findings**: This inmate committed suicide while on suicide precautions in a CTC designated LOC. He was housed not in the mental health component (MHCB), but outside of that component, in a licensed CTC. Initial classification of this death was a suicide given that the inmate had ingested toilet paper and brown paper materials while housed alone on suicide precautions.

From the review of the death, the inmate purposely, willfully, and without the assistance of others clogged his throat with massive amounts of paper while on suicide precautions while clearly decompensating and had not received Keyhea-ordered medications. He was noted by staff who were tasked with observing him every 15 minutes to be lying near the door in the same position for several hours without their bothering to open the door or elicit a response from him to determine that he was indeed alive. The ER physician noted rigor and could not open the inmate's mouth, and no one attempted CPR.

This represents an absolute failure of the process for suicide precautions for an inmate who has been designated as a risk for suicide and placed in "safe" housing under clinical and custody observation for just that reason. That this death could be reclassified as an "accident" given the specifics does not appear to be warranted. In my opinion, it is far more likely than not that this inmate committed suicide by ingesting materials during a decompensated mental state, which was well known by the clinicians who were responsible for his care. In that regard, this inmate's death appears to have been clearly foreseeable and preventable as he had been placed on suicide precautions because of an

153

increased risk of self-harm and was not properly managed or observed while on suicide precautions.

In their objections to this report, the defendants requested that this report be revised to state that the notification letter indicated that this death was a reportable death, and that the Special Master would be informed if defendants determined the need for a suicide review. They also asked that this report state that the coroner was not able to classify the death with certainty, and further that the defendants conducted an extensive review, with a Corrective Action Plan, and found, consistent with the coroner's report, that the inmate did not have the intention to die.

This is an egregious case. The defendants cannot deny the fact that this man was on suicide precaution, which requires 15-minute observations, that he died from ingesting enough paper to choke himself to death and, when found, had rigor mortis to the extent that his jaw could not be pulled apart. Insofar as the coroner's findings and conclusions, that point is addressed squarely in the section of the cororner's report quoted above. As stated, the coroner concluded that the obstruction in this inmate's throat was most likely self-induced, and that because the mechanism by which the foreign material was placed there cannot be known with certainty, the manner of this inmate's death was best left as "undetermined" but subject to change if more information is discovered. For the foregoing reasons, this reviewer declines to modify this report as requested by the defendants.

**40. Inmate NN**
Brief History: This inmate was a 49-year-old Caucasian male who died on 6/23/05 due to perforation of his small intestine, while housed at CSP/LAC. The inmate's death was determined to be "unknown (suspected perforated gut from swallowing objects) probably unintentional death." The inmate was at the EOP LOC at the time of his death and was in the MHCB at CSP/LAC from 6/6/05 to 6/14/05. It is unclear from the record where the inmate was housed at the time of his death. No incident reports were provided.

The inmate had a substantial medical record, and based on review of that record, he appears to have been diagnosed with psychosis NOS as well as bipolar disorder. His most recent treatment plan was dated 6/10/05 in the MHCB and indicated that he had been admitted to the MHCB on 6/6/05 and that his diagnosis at that time was bipolar disorder (most recent bipolar) and antisocial personality disorder. His GAF was estimated at 40. The inmate was prescribed Depakote, Geodon, and Artane at that time. The SRAC completed on 6/6/05 indicated the inmate had a history of poor impulse control, affective instability, and poor compliance with treatment or medication. It was noted that he had had two prior Keyheas because of grave disability and that although he "compensates rapidly but remains delusional," it was determined he should be admitted to the MHCB. It was also noted he had a history of chronic renal insufficiency, but there was no history of recent suicidal ideation noted on the form. The inmate appears to have died secondary to swallowing a toothbrush, which subsequently perforated his small

intestine, and it was also noted in the coroner's report that he had a broken lead pencil found in his stomach at autopsy.

The inmate's death was on 6/23/05, and the coroner's report dated 6/26/05 indicated the cause of death as reported above. The coroner concluded, "death is due to Peritonitis Secondary to Small Bowel Perforation from Ingested Foreign Object (toothbrush) found in the abdomen. A broken lead pencil was also found in the stomach. The manner of death is accident."

While the coroner ruled this death an accident, it occurred in an inmate who had a long history of mental illness, who had been diagnosed with psychotic disorder and bipolar disorder, and who swallowed foreign objects resulting in perforation and death.

**Findings**: Despite the coroner's determination that this death was an accident, it is requested that this inmate's death be reviewed by the SPR-FIT. The death review case summary for this inmate dated 6/20/06 indicates the inmate was a 49-year-old male suffering from hypertension, renal insufficiency, hepatitis C, and bipolar disorder. The inmate had a number of indications from laboratory studies on 6/7/05 that he may have been in sepsis, but no septic work-up was conducted. The inmate had been admitted to the CTC on 6/8/05 for psychiatric treatment and suicide watch. Therefore, there was some indication that he was thinking about harming or intending to harm himself. While the Death Review Case Summary indicates that the cause of death is unknown without the coroner's report, the coroner indicates the cause of death as accidental. This should be correlated with the review by the SPR-FIT to determine whether or not the related admission to the CTC for mental health reasons, including suicidal ideation and/or intent, was contributory to the inmate swallowing objects that resulted ultimately in his death. The voluntary and knowing ingestion of objects that may cause injury or death and that subsequently cause death may very well indicate that this inmate's death is a suicide that should go through the full suicide review and reporting process.

**41. Inmate OO**
Brief History: This inmate was a 33-year-old African American male who committed suicide on 7/2/05 by suffocation in his single cell in the PSU at the CSP/Sac. The inmate was at the EOP LOC at the time of his death. The inmate was returned to the CDCR for his third term on 9/26/96 via the RJD RC. The inmate had been convicted of attempted murder and torture and was serving a sentence of 106 years to life. This inmate's death was initially classified as a suicide and subsequently classified as "accidental."

On 7/2/05, at approximately 6:14 a.m., two officers were serving breakfast in the PSU and discovered the inmate lying face down on the floor of his cell, with his head completely wrapped in towels, clothing, shower sandals, tennis shoes, a paperback book, and other objects. The inmate's face was not visible, and the officers have reported that the inmate always slept on the floor at the door. The officer discovering the inmate attempted to obtain a response from him by calling his name and kicking the cell door; however, the inmate did not respond. The third officer arrived, the officers ordered the

door opened, and when they touched the inmate on his shoulder, they noted the inmate felt cold and stiff to the touch. Another officer sounded an alarm, and a sergeant responded to the area. Neither the sergeant nor other officers could get a response from the inmate, and at approximately 6:19 a.m., an RN arrived, and found no pulse and "morbid rigidity." The cell was closed and secured as a crime scene and remained under observation. At approximately 7:15 a.m., a physician arrived, examined the inmate, and pronounced the inmate dead at 7:18 a.m.

A coroner's report was provided by the Sacramento County Coroner, dated 7/3/05, which determined that the cause of death was asphyxia due to exclusion of air. Another significant condition noted was paranoid schizophrenia. A toxicology report was negative for drugs and alcohol.

The review of the copious medical records and other documents indicate this inmate was returned to the CDCR on 9/26/96 after conviction of conspiracy to commit murder first-degree, with term enhanced because of prior felony conviction (serious), resulting in a sentence of 100 years to life plus six years. The inmate had been involved in the criminal justice system beginning as a juvenile, with his commitment to the CYA. His controlling offense, which occurred in 1995, related to him and a co-defendant being involved in a contract to murder another co-defendant's wife and a scheme to scam the co-defendant out of money by reporting they had killed the wife when they had not.

During his first incarceration in 1989, when he was 18 years old, the inmate's full-scale IQ was estimated at 82. The inmate has had a number of diagnoses but during his most recent incarceration was ultimately diagnosed as psychotic disorder NOS versus schizophrenia undifferentiated type and antisocial personality disorder. He had been involved in the EOP LOC beginning in 1996 and had been prescribed a variety of psychotropic medications since that time. He also had had admissions to VPP at CMF and hospitalization at ASH in 1997 to 1998. The inmate had been placed on a Keyhea order for involuntary medications due to grave disability with renewals because of his ongoing mental health dysfunction. The inmate had also been housed in the SHU, as well as PSU, at the time of his death.

In November 2004, the inmate was transferred to the PSU at CSP/Sac and remained there, where he continued to demonstrate non-compliance with his medications since his Keyhea order had expired without renewal, until the time of his death. His medications were discontinued in October 2004, and he refused to participate in the IDTT process, as well as with his clinical contacts. Clinical contacts were conducted at cell front as he refused to come out for out-of-cell appointments. Although there were considerations noted in the record to refer the inmate to the SVPP, the referral does not appear to have ever been actually initiated despite the inmate's continued non-compliance with treatment and medications and his clearly recognized severe persistent mental illness.

This inmate had a history of several assaults on COs beginning in 1998, after he had returned from ASH. He assaulted a CO as battery on a peace officer with significant bodily injury in 1998 and again battery on a peace officer in 2001, as well as possession

156

of an inmate-manufactured weapon and an SHU term, and again for assault on a peace officer in 2002, resulting in an SHU term. At that point, it was determined he would remain in the SHU for an indeterminate term based on his history of assaultiveness to staff, and he was ultimately transferred in November 2004 to CSP/Sac in the PSU because of his assaultive history and his mental illness. It was noted in the CDCR suicide report that the inmate stated to a professional counselor that he was fearful for his safety and of any environment outside of the PSU and therefore would become assaultive if released from the PSU. It was determined that he would remain in the PSU.

In addition to his well-documented history of mental illness and his assaultiveness against staff, the inmate was noted to have a deteriorating mental status, including his non-compliance with medications and his refusal to participate in any form of mental health treatment. The inmate was noted to wear a "turban," which staff stated was to "keep the voices out." However, it was noted that the turban would get larger and larger and that he would put more materials in the turban because of his mental illness. Despite this and his history of mental health treatment at hospital LOC, he was not referred to the SVPP, which, given his history of assaultiveness and his deteriorating mental health, may have been the most appropriate referral for him.

The CDCR suicide report identified one problem with recommendation as follows:

> Problem 1: Inmate OO was severely mentally ill, unmedicated, and not programming in the PSU. He was often "considered" for referral to a DMH LOC, but no decision to refer was ever made.
> Recommendation: Establish a system to track and followup with inmates who may benefit from DMH placement criteria, which should be reviewed at each IDTT.

On 6/20/06, a death review case summary was submitted indicating that the inmate was a participant in the MHSDS at the EOP LOP but was not receiving medication at the time of his death. It also indicated that his diagnoses were undifferentiated schizophrenia and psychosis NOS but that he was not felt to be a suicide risk at the time of his death, and no significant precipitant or precursory events were noted. The death review also concluded that no policy or systems issues were noted and no medical standard of care issues were apparent, with the conclusion that the case would be closed.

Plaintiffs' counsel submitted letters on 2/13/06 and 3/6/06 stating their concerns regarding this inmate's death. Plaintiffs noted they disagreed with the conclusions of the CDCR suicide report that "there was no indication that this death while indirectly self-inflicted, was intentional" and that the MHCB and ASH admissions from 2000, 2002, 2003, and 2004 were missing from documents provided to plaintiffs. The plaintiffs also made note of the inmate having a Keyhea order instituted in 1997, which expired in 2000 while he was in SHU. The plaintiffs also raised questions as to why the inmate was discharged from ASH in 1998 and quoted the discharge summary as stating, "notification from CDC that Mr. OO no longer qualifies for further treatment at ASH, and therefore, he has to be returned to CDC." The plaintiffs also raised questions about the inmate

157

being changed from EOP to a 3CMS LOC in 1998 at his own request even though he appeared to be disheveled and exhibiting other signs and symptoms of mental illness and about how, after his return to the mainline, he again assaulted a CO and received an SHU term. The plaintiffs raised questions as to why the inmate's Keyhea order was allowed to expire and about some inconsistencies in the medical record indicating that it had indeed been renewed through February 2001. They pointed out that this indicates CDCR's failure to establish an effective centralized Keyhea list. The plaintiffs also made reference to the inmate repeatedly requesting transfer back to ASH and mental health treatment and that he was not referred to a DMH LOC.

The plaintiffs made reference to the staff indicating that the inmate was "cell dweller" in the PSU and that despite his non-participation in treatment and being unmedicated and psychotic, he was not referred to a DMH LOC, in part because of clinicians' failures to review previous medical records. They also made reference to the inmate being retained in indeterminate SHU even though he did not meet criteria for indeterminate SHU, because of the inmate's fear for his own safety and threats to do whatever it might take to return to the PSU.

The plaintiffs also raised questions as to the CDCR suicide report's conclusion that there was no indication that the inmate's death was intentional despite it being the result of his own actions and to a reference that "there had been no changes in his behavior or circumstances, he had money in his account, and was in no greater distress than usual." The plaintiffs state their clear disagreement with this conclusion, particularly with the inmate's request and expectation that he was being transferred to ASH when he was actually transferred to the PSU at CSP/Sac. The plaintiffs also asserted that the inmate was notified that he would never parole from the CDCR, that there was increasing pressure of voices in his head that he stated were related to his turban becoming larger, and that he was discovered with a plastic bag over his face.

These circumstances, particularly with the inmate's history of suicidal ideation and behavior, plaintiffs believed to indicate that the inmate's death was clearly foreseeable and preventable and likely intentional. The plaintiffs requested revision of the CDCR suicide report CAP to address the following: (a) failure to refer the inmate to DMH while he was housed in the CSP/Corcoran hub for ten months when he was refusing all of his cell activities, (b) CDCR's failure to develop and implement an effective Keyhea order tracking system to ensure Keyhea orders are maintained when inmates are transferred, (c) the failure of the PSU clinical and custody staff to coordinate communication when an inmate receives bad news, (d) the failure of PSU clinical staff to identify the risk posed by the plastic bag that was introduced as part of the turban worn by the inmate, and (e) the failure of the PSU clinical staff to review and consider Inmate OO's previous medical records and the decision to refer to SVPP when he was refusing out-of-cell contacts for ten months prior to his transfer to the CSP/Sac PSU. The plaintiffs provided numerous exhibits to support their concerns.

**Findings**: This inmate's death may not have been foreseeable but certainly appears to have been preventable. This inmate was not in the habit in recent years of his life of

158

reporting suicidal ideation; however, he had a substantial history of suicidal ideation and potentially self-injurious behaviors. Without question, his mental health status had deteriorated over the past several years and became even more intensively deteriorated in the weeks prior to his death, with his having received "bad news" that he was not going to be paroled during his lifetime and the observations by staff that his characteristically isolative and non-participatory behavior had become even greater, including the expansion of his "turban." While staff appear to have documented quite readily that his turban was used to deal with his auditory hallucinations, the reality of his increasing the size of his turban included using plastic bag material within the turban, a potentially lethal object did not receive any particular attention by the staff. This inmate's condition had deteriorated and was continuing to do so, and he was suffering from a severe and persistent mental illness in an unmedicated state for which Keyhea orders had been successfully pursued in the past based on his grave disability. It does not appear from the record's review that the staff took this inmate's mental health needs and the escalating intensity of his psychosis seriously other than to admit him to an MHCB LOC and then not properly manage or monitor his condition. To reclassify his death as "accidental" is to ignore his deteriorating mental health functioning, the intensification of his symptoms, and the physiological response of the body to attempt to "breathe" when an airway is unintentionally cut off.

In objecting to this report, defendants asked that the reviewer withdraw any findings and conclusions that this inmate's death should not have been reclassified as accidental. Defendants have misread this reviewer's findings and conclusions, and have overlooked the context from which they were drawn. The reviewer's findings were derived from consideration of not only the circumstances at the time of the inmate's death, but also from a review of the inmate's mental health history and treatment leading up to the time of his death. The reviewer's clinical analysis of all of that evidence indicates that it is more likely than not that this inmate died as a result of suffocating himself. For this reason, the reviewer declines to modify this report as requested by the defendants.

**42. Inmate PP**
Brief History: This inmate was a 45-year-old African American male who died from an overdose of Methadone on 9/2/05 in the condemned unit (East Block) at SQ. Initially, this inmate's death was reported as "committed suicide by overdosing on his medication on 9/2/05 at SQ State Prison" in a notification of the inmate's death on 10/18/05 by the Office of Legal Affairs of CDCR. Subsequently, the SPR-FIT reviewed this case and determined that it was an accidental overdose of Methadone and not a suicide. Rather than providing a suicide report, a CDCR death report was distributed on 1/26/06, as well as autopsy findings and the medical record. In addition, this reviewer had the opportunity to review the inmate's record and interview staff during a regular <u>Coleman</u> site visit. Also, the plaintiffs' counsel submitted letters on 1/13/06 and 3/6/06 regarding their concerns that this inmate's death was not classified as a suicide by CDCR.

On 9/2/05, at approximately 10:25 a.m., a CO was conducting the shower program in the East Block, and as he approached the cell solely occupied by this condemned inmate, the

officer observed the inmate laying on his right side on the floor with his head facing the cell sink. The officer asked the inmate if he wanted a shower, received no response, and noticed that the inmate's eyes were open and appeared to be staring at the officer. The officer called a second housing officer to the location to help verify if the inmate was breathing, and the officers determined that the inmate remained unresponsive. They subsequently activated their personal alarms and informed officers of "man down," and a sergeant and other responding staff, including an MTA, arrived. They called to the inmate and still received no response, and an emergency medical extraction was performed. An attempt was made to place the inmate in handcuffs as per policy; however, the inmate's arms were stiff and could not be brought together. The inmate was removed from the cell and placed on a stokes litter, and the MTA determined the inmate had no pulse or respirations. The MTA began CPR as the inmate was transported to the TTA, where he was examined and pronounced dead by a physician at 10:27 a.m. An autopsy report was provided by the Office of the Coroner, which stated that the autopsy was performed on 9/6/05 and the cause of death was acute narcotic (Methadone) toxicity. The coroner's report determined that the death was a consequence of "could not be determined." A toxicology screen determined that the following drugs were found in the femoral blood sample: (1) Acetaminophen 14.9 mg/L; (2) Lidocaine 0.18 mg/L; (3) Methadone 0.93 mg/L (potentially toxic 1.0 to 4.0 mg/L); (4) EDDP (Methadone) metabolite 0.21 mg/L (potentially toxic not known, although the effective level is less than 0.10 mg/L). In his investigative report, the coroner indicates that the attending doctor at SQ knew the inmate and believed that he received one dose of each of his medications including Methadone, Flexeril, Cymbalta, and Lydaderm (Lidocaine patch) at one time and that the inmate had to verify that he successfully took this medication, "but it was not impossible for him to have not taken the medication and held it for an intentional overdose, but it was unlikely." In addition, the investigative report indicates the inmate was "3CMS, meaning he had regular behavioral evaluations." The coroner includes the fact that "he had two previous suicide attempts." The pathologist who conducted the autopsy also expressed his opinion that "this overdose was probably due to the decedent accumulating or saving his regular dosage so as to double up and get a bigger 'hit,' although a toxic or idiosyncratic reaction can not be ruled out." The CDCR death report stated, "a subsequent search of the inmate's cell yielded several Methadone tablets plus open plastic packaging with several more, supporting this hypothesis." The coroner's report, however, states, "a subsequent search of the cell found no drugs." The SQ ISU completed a more thorough search of the inmate's cell, which yielded "eight empty Methadone dosage packages . . . and three loose pills, that was [sic] identified as 5 mgs Methadone . . . ."

This inmate entered the CDCR for his only prison term on 3/15/90, being brought directly to SQ as he was a condemned inmate. The inmate's commitment offense of first-degree murder with special circumstances was based on the rape and death of a woman with whom he had solicited a ride and who was subsequently found dead on a golf course. Although this was the inmates' only prison term, he had been convicted of other offenses, including possession of stolen property, vandalism, battery, drug possession, and possession of dangerous weapons, and had been sentenced in the county jail for several terms. He was also reported to have had a history of alcohol abuse, including

160

daily alcohol use in the early 1980s for a short period of time, to have used cocaine daily in the 1980s, and to have experimented with marijuana.

With regard to mental health history, the inmate reported that he had attempted suicide by cutting his wrists and throat and, on a second occasion, taking poison. The dates of these suicide attempts are not reported in the records reviewed. The CDCR death report makes reference to two mental health evaluations in 1989, prior to his incarceration, indicating that he may have suffered from "a chronic underlying depressive mental illness" and that he was also suffering from an addictive disorder as well as antisocial personality disorder. One of the evaluators opined that he should be treated with antidepressant medication and possibly placed at CMF. The inmate entered the system prior to the establishment of the MHSDS but apparently was examined by a psychologist and psychiatrist in March 1990, who opined that he was not suffering from a mental illness and did not require further treatment. They did make note of his previous two suicide attempts. The CDCR death report makes reference to the inmate having been approached for seven routine mental health interviews between 1990 and June 2005 but notes that he "apparently politely but firmly refused the interview." Notations by staff were that he was alert and organized.

On 7/13/05, an urgent referral was sent by a custody officer that reported the inmate was "incapable/unwilling to care for self," "confused/disoriented/withdrawn," and "poor appetite/sad/fearful/nervous," and in the narrative, described him as "not eating breakfast, confused." In response to this referral, the inmate was seen at cell side, and an MH-4 mental health assessment was completed by the clinician. In the MH-4, the inmate was described as a 45-year-old African American condemned inmate with no previous history of Axis I mental illness, previous cocaine abuse, and other substance abuse diagnoses who was "refusing meals for the last nine days to avoid contact with custody staff. Intensely aggrieved, frustrated mood. Note previously documented as grade A," with a notation of "recent 115" (the inmate's RVR was for falsifying a charge, in which he alleged that he was tripped by an officer on 5/30/05 on his way to the shower).

The medical history includes a reference to cervical back pain, degenerative disk disease, and chronic lower back pain. In the mental status component of the MH-4, the inmate was described as adequately groomed, speech fluent, behavior within normal limits, the cell well organized, his mood frustrated, and appetite poor. It is noted that he is refusing meals "to avoid contact and problems with custody staff," with another statement, "unclear if inmate is litigious or if he is decompensating and paranoid so refusing meals." His thought content is noted as being suspicious of custody staff, his insight poor, his judgment fairly poor, and his attitude cooperative, and he denies current suicidality and has "no documented history of past SA." It was also noted with regard to violence risk that he "denies current ideation." The psychologist provides diagnoses of mood disorder NOS, sexual sadism by history, substance abuse by history, antipersonality disorder by history, degenerative disk disease, condemned inmate grade B, and a GAF of 60 and concludes that the Axis I diagnoses need clarification. There is an accompanying progress note dated 7/13/05 indicating that only Volume Two of the UHR was available and that no mental health history was noted in that volume. In addition to the comments regarding the inmate's problems with custody and the MH-4, the progress notes indicate

161

the inmate "reports aggrieved conclusions about custody staff making false allegation about him to move him off of his usual tier."

On 7/19/05, an IDTT was held, and an MH-4 was completed. The IDTT was attended by the psychologist who completed the MH-4, as well as another psychologist, psychiatrist, and CC1, and his affect was described as restricted and his cognition as "extremely aggrieved about his interaction with custody." His reality content is "unclear," and his thought content is "unclear versus delusional content." This inmate's strengths and weaknesses are stated as being "articulate," "self-advocates," but "poor coping skills." He was placed at the 3CMS LOC as medical necessity and was given a GAF of 60.

On 8/25/05, he was again in ICC, and his appearance had changed in that he was poorly shaved, in obvious back pain, but pleased that his grade A status had been reinstated. It was noted that he "denied danger to self/danger to others, ideation" and that his "judgment/insight [were] good." It was also noted that the inmate had been at an outside hospital since the last ICC, and indeed, he was evaluated once again at UCSF for his continuing back pain, neck pain, and wrist pain, and a medication had been added to his regimen, Cymbalta, an antidepressant that is sometimes used to assist in pain management. The recommendation from UCSF was to begin the Cymbalta at 20 mg and increase it to 40 mg after one week. During this interim, the inmate had also written to the CMO, complaining that he had not received the Cymbalta as of his letter of 8/7/05 and that he was very distressed over this and problems with getting his resource, prescribed as a dietary supplement given his gastrointestinal complaints. A review of the record indicates the Cymbalta was actually ordered on 8/10/05, three days after the inmate's letter, although his visit at UCSF was on 7/25/05.

The plan to see the inmate individually and to clarify his diagnoses and questions about his mental status does not appear to have been effected prior to his death as his next contact with a mental health professional was on 8/31/05, with the psych tech as she was passing out medications. The psych tech made an urgent referral to mental health; in that referral she checked the box for non-compliance and wrote, "non-responsive" and, in the description, wrote, "R" with a circle (i.e. refused) Methadone and "non-responsive to everyone?" The inmate was not seen as per policy; however, a note dated 9/2/05 from the psychologist who received the referral stated that the referral had been received on 9/2/05 in their mailbox, and the clinician was en route to see the inmate when another clinician told him that there was a death in the East Block. The requirement for an urgent referral to be responded to within 24 hours was not met as the inmate had died before the clinician responded to the request.

The CDCR death report concludes that based on the review, "it became apparent that Inmate PP's overall mental health functioning had changed little in the year prior to his death." It goes on to state that "although he had fairly recently been placed in the MHSDS, the nature of distress and whether he even suffered from a serious mental disorder was never clear to the mental health clinicians who interacted with him, and, as was his historical pattern, he declined to participate in any mental health evaluations or interviews." It further states, "the attorney who worked with him the last year of his life

162

stated that Inmate PP's reclassification from grade A to grade B status was 'devastating,' but again, this change appeared to have little overt effect on his overall functioning." The preparer of the CDCR death report indicates that the evidence examined "does not reach the threshold of a preponderance of evidence to indicate that this inmate intentionally took his own life. The evidence carefully examined in this review suggested that Inmate PP died from an unintentional overdose of Methadone for the following reasons:

1. The inmate never voiced suicidal ideation in his entire term in CDCR and gave no indication to anyone contacted that he had suicidal intentions.
2. He was probably not suffering from a mental disorder at the time of his death.
3. Although the coroner's report reported a high level of Methadone, it did not reach the toxic level.
4. Although the inmate had secreted Methadone tablets in his cell, he did not take all of them, suggesting that he was supplementing his prescribed Methadone for pain relief. Had he intended suicide, he would have likely taken all the medication in his possession."

The CDCR death report identified two problems and recommendations as follows:

Problem 1: The elapsed time between the discovery of the unresponsive inmate and the time of the pronouncement of death was only two minutes, which is not credible given the descriptions of events in the CDCR 837.
Recommendation: Provide an explanation and a time line for events in an amended CDCR 837.

Problem 2: The inmate apparently died of an inadvertent overdose of medication, indicating that he was able to hoard medication or obtain it from other inmates.
Recommendation: Nursing supervisor shall review DOT procedures with staff and conduct audits (i.e., observe medication passes) to ensure compliance.

On 4/25/06, the staff from SQ prepared a QIP in response to the CDCR death report recommendations from 1/26/06. In their response, the SQ staff provided the following:

- Regarding Problem 1: A correctional lieutenant completed a memorandum explaining the time line for events on the amended CDCR 837 and documented that the actual time was 12 minutes between the discovery of the unresponsive inmate and the time of pronouncement of death, and the memorandum is attached.
- Regarding Problem 2: A memorandum was provided verifying that the supervisory RN has provided DOT training to nurses and that audits monitoring the medication passes are regularly performed, with attached memo. The attached memorandum indicated that training was provided to 26 MTAs on DOT and that audits were conducted in October, November, and December 2005 and February and March 2006 with 100-percent compliance.

163

The plaintiffs' correspondence, dated 1/13/06 and 3/6/06, as referenced in this report has challenged the CDCR's classification of this death as an accidental overdose rather than suicide. In their responses, plaintiffs contend that the four factors in the CDCR death report utilized by the reviewer as evidence did not indicate that inmate intentionally took his own life and disagreed with references in the medical record and the CDCR death report itself as providing ample evidence to support the finding that the inmate's death was more likely not to have been intentional. The reasons plaintiffs provide for their support of the inmate's death being intentional include (1) even though the inmate never voiced suicidal ideation to any clinical staff or custody staff during his CDCR term, he did report two previous suicide attempts, which is an important clinical fact in assessing the likelihood of future success for suicide; (2) the conclusion that the inmate was probably not suffering from a mental disorder at the time of his death is clearly incorrect based upon the facts discussed in the CDCR death report (in this regard they include the inmate being placed on the mental health caseload, his mental status examinations, his refusing assistance from the investigative employee regarding his RVR for refusing a direct order, his being "unresponsive to everyone," and the urgent referrals that would have required him being seen within 24 hours); (3) although the Methadone level was less than the toxic range listed and therefore he did not intend to take a deadly dose, the plaintiffs state that the toxicology findings indicate that his blood level was above the therapeutic level and that he had been hoarding Methadone during the last week of his life, thus, the plaintiffs' plan states, "the conclusion that it was not intended to be deadly because it was not in a 'toxic' range is ridiculous when viewed in the context of Inmate PP's functioning at the end of his life"; and (4) the conclusion that the three 5 mg tablets of Methadone found on the floor of his cell evidenced that he did not intend to overdose on the eight packages that he did ingest. The plaintiffs state that the purpose of the SPR-FIT, to identify whether clinical or custody failures existed in response to an inmate, failed and that the CDCR death report's "only purpose was to establish that Inmate PP's death was accidental." The plaintiffs further state that if the death/suicide review process is to remain credible and thorough, the SPR-FIT must reassess the death report's conclusions and recommendations and that a review of this and another inmate's death have shaken their confidence in the integrity of the death/suicide review process.

**Findings:** In my opinion, based on my thorough review of the records provided in this matter, including past medical records, the inmate's custody and clinical status as a condemned inmate facing execution in March 2006, and his having a two-to-three-year history of treatment with narcotic analgesics for pain management without abuse to "get high," this death was clearly a suicide. The four reasons given in the CDCR death report in my view are not credible enough to exclude this inmate's death as not reaching a preponderance of evidence as having been suicide. His frustration with his chronic pain and recommendations for more medical interventions, including enhancements with medications, epidurals at UCSF, and other procedures, as evidenced by the medical records and the inmate's letter to the CMO at SQ, are evidence of his declining medical condition and increased pain. In addition, his execution date was approaching, and his final appeal was unlikely to be successful, so he very well may have been preparing for his impending death.

164

However, there was a significant change in his living conditions when he received the first RVR and had to move from his "house," which, based on interviews with staff, had a view of the Bay, to a "house" that had a view of the yard and was a constant reminder that he was in prison, which may have been much more significant than was ever assessed by clinicians or custody. Even after he was found not guilty of the first RVR and his mood was described as "brightened" because his grade A status was being returned, he was told to move to another cell, where he reported he had significant problems with a particular officer.

Mental health staff questioned whether or not he was "setting up" some form of grievance or case or may have been delusional, but the inmate clearly expressed he had some difficulties with the housing change. Notwithstanding that housing assignments are clearly the purview of custody staff, this inmate's condition was deteriorating, and his relationship with custody staff was changing. He expressed this concern, refused to move, and received another RVR, which resulted in his grade A status being taken away and his being returned to grade B status, which meant he would not get back to his "house" or an environment where he did not feel threatened, whether or not those beliefs were legitimate or delusional.

Mental health staff responded to referrals and placed him on the caseload but did not follow through on evaluating him in a very prompt manner for his actual mental health needs.

Even so, custody staff recognized his changes in behavior and sent first a routine referral that appears not to have been answered and subsequently an urgent referral that did result in his being placed on the caseload but amounted to only one clinical interview. This was insufficient, and a psych tech sent an urgent referral, but the response to that urgent referral was not within program guidelines as required.

The CDCR death report does not appear to recognize any of these factors when identifying four elements that, in their opinion, make this more likely "unintentional" than suicide. For those four elements: (1) He never voiced suicidal ideation, but being an individual who is decompensating, withdrawing, and refusing meals and medications and who has had major changes in his environment and life and is facing death does not, in my view, eliminate the possibility that he was feeling more and more boxed in and not receiving assistance that he was asking for in various ways. (2) The argument that he was probably not suffering from a mental disorder at the time of his death seems, in my view, to invalidate the assessment of the clinical staff at SQ who saw him, diagnosed mood disorder, placed him on the caseload, and had at least questions about his mental state that they unfortunately did not follow up on in a timely manner. Custody staff also sent referrals to mental health because of questions about the changes in his behavior. (3) Stating that the coroner's report indicates that the Methadone did not reach a toxic level seems to be a limited interpretation of the coroner's toxicology report and ignores that there were other medications found in the inmate's system and that the inmate may have had some other risk factors that could have caused his death with less than toxic levels

165

even though the levels that he had ingested were greater than therapeutic levels. (4) Granted, he did not take all of the Methadone; however, there were eight opened packets, and he obviously took Ibuprofen and most certainly could have "accidentally" dropped the other three packets or simply passed out before he had a chance to take them all. In my experience, people who overdose on medications don't know the toxic levels and take what they think will do the trick. The pathologist's comment of doubling up to get a better "hit" does not seem consistent with this inmate's utilization of medications since he could have hoarded medications at any time in the past without these other risk factors if all he was trying to do was "get high." A more comprehensive review by SPR-FIT would seem to be appropriate. The defendants have objected to this recommendation on the ground that "mental health reviews and suicide reviews are equivalent reviews, with corrective actions submitted on the findings of both reports" and that "any further review would not likely result in revealing any new problems or result in any new corrective action." The issue, however, is not which form of review would be more appropriate. It is whether the questions surrounding the mental health care that was provided to this inmate, as discussed above, have been recognized and addressed. In this context, a more comprehensive review by SPR-FIT would be more likely to focus on these substantive issues.

### 43. Inmate QQ

Brief History: This inmate was a 56-year-old African American male who committed suicide on 11/29/05 by overdose of psychotropic medications at the CSP/Sac. The inmate was doubled-celled at the time of his death and was at the EOP LOC. The inmate had been transferred to CSP/Sac from CMF on 8/5/99. He entered the CDC on 7/9/90. The inmate had been committed for first-degree murder with special circumstances, and the length of his sentence was life without parole.

On 11/29/05, at approximately 6:05 a.m., a CO was passing out morning beverages and was informed by the inmate's cellmate that this inmate would not wake up. The officer yelled at the inmate several times in an attempt to wake him up, and when he did not respond, the officer informed another CO that the inmate was non-responsive and needed assistance. The cell was opened, the officer placed the cellmate in handcuffs, and he was escorted to a shower and secured. The officer then re-entered the cell, attempted to wake up this inmate, again received no response, and noted that the inmate's body was stiff. The officer alerted a sergeant, and the unit alarm was activated. At approximately 6:06 a.m., an RN entered the cell and observed the inmate lying on his left side, with his arms crossed in front of his head. The inmate's upper extremities were stiff, and the RN could not find any pulse or respiration. The RN told the officer the inmate was deceased. The inmate was subsequently transported on a stokes litter from the second tier to a gurney and ultimately to the emergency room. CPR was not initiated because of "morbid rigidity and no pulse." At approximately 6:56 a.m., a physician in the emergency room pronounced the inmate dead.

The coroner's report indicated that the inmate had acute combined Citalopram and Olanzapine intoxication. Toxicology studies of femoral blood indicated Citalopram at

166

490 mg/ml, with reported therapeutic serum and plasma levels as 9 to 200 mg/ml and Olanzapine 330 mg/ml, with proposed therapeutic range 5.0 to 75 mg/ml.

A brief review of this inmate's record indicates he had a history of schizophrenia undifferentiated type and was on a Keyhea order at the time of his death because of this diagnosis, as well as non-compliance with medications and grave disability. The inmate was noted not to present a danger to others or a danger to himself at the initiation of the Keyhea order; however, the Keyhea order was renewed several times. The inmate's history of mental illness dated back to 1981 and was characterized by delusions, hallucinations, and poor hygiene.

The Executive Summary of Death (Accident versus Suicide) Report, dated 12/18/06, identified two problems:

Problem 1: Inmate was able to hoard medications that were supposed to be DOT, suggesting that nursing and custody staff were not following the proper administration procedures.
Recommendation: Review of nursing care by an HQ nursing Professional Practice Review Committee [sic].

Problem 2: System problem: Inmate was on a waiting list for SVPP as he was in need of a higher LOC, but due to a bed shortage, he was not placed in a timely manner.
Recommendation: The department is currently submitting a bed plan to the court of which the Special Master is aware.

CDCR SPR-FIT initially classified the case as a homicide, but reviewed the case as an accident versus suicide, and eventually, the Coroner's Office determined it was an overdose of medication, which was a suicide.

On 5/8/07, the Directors of DCHCS and DAI issued a report on implementation of a QIP for death (accident versus suicide) of Inmate [QQ], including the nurse consultant program review as recommended to the nursing PPEC. In that report, the Autopsy Report referenced elevated levels of Celexa at 490 mg (therapeutic level 9.0 to 200 mg) and Olanzapine 330 mg (therapeutic level 5.0 to 75 mg) with a statement that the coroner determined the cause of death as "natural versus accident versus suicide." The consultant makes reference to the records stating the inmate had been on a Keyhea order since 1996 and was on the Keyhea Unit in the EOP. While the inmate had been on a waiting list for transfer to a higher LOC and was being seen weekly by his clinical CM, the last visit on 11/22/05 described him as having a slightly flat affect and denying hallucinations as well as homicidal and suicidal ideations. He was, however, isolating himself in his room, was not participating actively in EOP programming, and had been evaluated in the UNA process by Coleman in July 2005 as needing a higher LOC. (The IDTT noted on 7/6/05, "referral process is underway.") The nurse consultant reported his medications were to have been given DOT, and the Olanzapine was given in the dissolvable form, but based on her interview with nurses and psychiatrists, she states they reported, "Even Zydis can be cheeked if the inmate places a piece of paper between the lip and upper gum and then

167

maneuvers the Zydis into that space where it will remain dry." She also noted that the psychiatrist reported the inmate could have saved up enough medication in less than a week to produce the levels found in his blood using this method and that the Celexa was given in pill form. The nurse consultant references the Incident Report time line, which specified that at 6:05 a.m., the CO was told by the inmate's cellmate that the patient would not wake up and that the CO yelled at the patient in an attempt to arouse him and then left to find another CO. When the two returned to the cell, the COs found the inmate's body was stiff. The CO activated his unit alarm and requested that an RN evaluate the patient. At 6:06 a.m., an RN and sergeant entered the cell and determined that there was no pulse or respiration and that the inmate's arm was stiff, and the RN determined the patient was dead. CPR was not performed, and the patient was transported to the A-Facility Emergency Room, where it was noted the inmate was bleeding from the nose and right side of mouth, with a subsequent determination that three 1.5-inch pools of blood were later seen on the floor of his cell. Fourteen minutes later, at 6:20 a.m., the MOD was notified "that patient was found by officers at 0500." The MOD pronounced the patient dead at 6:56 a.m. The nurse consultant identified three problems, including (1) discrepancy between the MOD's progress note and the Incident Report (837A-1) for the time patient was found (2) no documentation by the RN involved in the emergency response, and (3) no evidence of non-compliance with the DOT medication procedure found. The nurse consultant indicated a CAP that included that the DON was to conduct an individual supervisory conference with the RN who responded to the medical emergency to discuss documentation requirements, document the meeting, and place a signed copy in the employee's supervisory file "within 14 days of receipt of this notice." The consultant's report was dated 2/21/07. This was the only additional information received on this inmate.

**Findings**: This inmate's suicide may not have been foreseeable in that he was not reporting thoughts to harm himself or an imminent plan to take his own life. However, his seriously deteriorating condition had been documented in the UHR over the last several months, and he was referred to a higher LOC. This inmate's death appears to have been clearly preventable in that he was under a Keyhea order with DOT-administered medications and yet was able to hoard and store a dissolvable antipsychotic (Zydis) as well as his antidepressant. The "explanation" by clinical staff that this inmate may have been able to hoard such medications by placing paper in his mouth in a precise way to prevent the dissolvable medication from dissolving is inadequate and does not address at all the inmate's being able to hoard an antidepressant. Further, the inmate was found with rigor mortis having already set in, according to the documents, which may have alleviated the necessity for the provision of CPR; however, the records also indicate that the MOD pronounced the inmate deceased approximately 51 minutes after the time line indicates the CO was notified. The time line, however, appears to be confused since the notes also indicate the MOD was notified that the patient was found by officers at 5:00 a.m., more than an hour later than reported in other documents. These are very serious deficiencies, and the CDCR "death review" rather than suicide report does not reference these documentations and/or reporting discrepancies. While the reference to DOT in the death deport is appropriate, there is no indication from the documents received that there was any meaningful corrective action taken regarding failure of staff

168

to properly follow DOT procedures. Further, the reference that a "bed plan" was being submitted to the court does not adequately address this inmate's deteriorating function and the need for him to have been placed at a higher LOC, including MHCB, while awaiting transfer to a DMH program. Given the actual circumstances of this inmate's death, including the failure of treatment staff to appropriately manage his medications via the DOT requirements and his deteriorating condition, for CDCR DCHCS to respond to this death simply as a possible "accident" is unacceptable.