# EXHIBIT 1

PERSONNEL SERVICES INITIATIVE
(POA OBJECTIVES A.7, A.8, AND A.8.5.3)

## BACKGROUND AND INTRODUCTION

In the Findings of Fact and Conclusions of Law re Appointment of Receiver ("Findings") filed October 3, 2005, the Court found:

> "Certain obstacles external to the CDCR have hindered the Department's ability to effectively take action regarding medical care...These obstacles are presented by the State of California's civil service system and the related operations of the State Personnel Board ("SPB"), the Department of Personnel Administration ("DPA"), the State budget process, and the collective bargaining obligations of the CDCR with respect to its union-represented employee groups." The Court further found that "...these obstacles do not in any manner excuse defendants, including the Governor, from taking effective action to cure constitutional violations."
> *See* Findings at 25: 18-26.

> "Certain State civil service rules, grounded in the California Constitution and other laws and regulations, place the authority over creating new job classifications, hiring, setting compensation levels, and creating recruitment and retention bonuses within the authority of the State Personnel Board, the Department of Personnel Administration and other agencies, thus preventing CDCR from acting unilaterally in these areas...These requirements have directly affected the CDCR's ability to hire and recruit, because when the CDCR attempts to create new job classifications, or change the salary for an existing position, it generally must endure a lengthy process involving the DPA, SPB and the applicable bargaining unit representatives."
> *See* Findings at 26: 2-11.

Within California State government, there are a number of agencies that are responsible for ensuring individual State departments operate consistent with the State Constitution in all matters, including hiring. These entities, commonly referred to as "control agencies" do just that: control much of the Human Resource (HR) operation of all State departments. In addition to ensuring State law is followed, these agencies are also responsible for *interpreting* California law, and establishing HR policies that each State department is directed to follow. Unfortunately, many of the States' current policies were established many years ago, when the State as an employer had many benefits to offer that most private and many other public employers did not. In effect, the State established policies and practices designed in large part to keep the applicant pool for new State jobs small enough to be managed by the staff within the "control" agencies. Over the years, the State workforce grew, including the workforce for the CDCR. As noted by the Court:

> "Over the past 25 years, the California correctional system has undergone a vast expansion in size and complexity... Since 1980, the inmate population has grown well over 500 percent and the number of institutions has nearly tripled from 12

to 33 ... Currently, the CDCR has approximately 164,000 inmates, 114,000 parolees, and 45,200 employees."
*See* Findings at 4:16-21.

However, the rules and policies established many years before have been continued by the State, despite that fact that they are long outdated and cannot meet the evolving hiring needs of the CDCR. Not surprisingly, as a result, the CDCR has for years suffered a number of serious problems including, as set forth in the Findings, a "lack of leadership," and a "prison culture that devalues the lives of its wards" (*see* Findings at 22:19-20); a "prevailing lack of accountability (*see* Findings at 4:27-28:, as well as the lack of qualified medical staff including medical administrators (*see* Findings at 7-8), physicians (*see* Findings at 8), nurses (*see* Findings at 14), and medical supervisors (*see* Findings at 14).

The CDCR HR operation was, prior to the appointment of the Receiver, chaotic, ineffective, and a barrier to hiring qualified health care personnel. Filling critical positions within CDCR via the convoluted State hiring process, coupled with the remote prison locations and inadequate salaries, presented challenges that the State simply has not been able to meet, despite years of opportunity. For example, the interview and selection processes conducted at the local institutions were highly variable and dependent upon the support of the institution and quality of the management. Many local managers lack the skill to recognize and reliably evaluate the quality of their candidates. Consequently, qualified applicants have been rejected and incompetent applicants hired. Salaries for critical clinical staff, such as physicians and nurses, lagged behind those in the private sector. This coupled with substandard working conditions found in many of the State's prisons resulted in futile recruitment efforts and expanded the clinician vacancy rate to dangerous levels. Distorted job classifications created for inmate care resulted in unsafe practice patterns. For example, the role of Licensed Vocational Nurse (LVN) had been assumed by a Medical Technical Assistant (MTA). MTAs performed dual duties as nurse *and* correctional officer causing confusion in the workplace, divided loyalties and making recruitment of qualified nursing staff even more problematic.

The Receiver and his staff have concluded that without establishing an adequate HR infrastructure, it will be impossible to hire and retain the competent clinical staff necessary to bring California's prison healthcare up to constitutional minimal standards. Furthermore, without adequate salaries to attract and retain qualified State clinicians, the CDCR will continue its prior practices of effectively "privatizing the CDCR physician and nursing program by relying on contract registry staff." As noted by the Court, "[t]he CDCR's spending on health care is so poorly managed, that it is tantamount to throwing good (taxpayer) money after bad." *See* Findings at 5:8-10. The Receiver will not duplicate the CDCR's waste; however, to provide appropriate levels of staffing in the prisons, an adequate HR program must first be established.

## NOVEMBER 15, 2007 STATUS OF PERSONNEL SERVICES

Hiring competent health care staff is the Receiver's number one priority. In little over a year, the Receivership has made significant headway in reversing many of the pre-existing conditions that prevented CDCR from hiring qualified clinical staff and in addressing many of the problematic HR matters. Highlights include:

- Quality medical personnel are being attracted by a new salary structure for CDCR medical professionals. As a result, for example, the vacancy rate for Registered Nurses is currently approximately 6 percent.
- 1,050 LVN positions were established with over 600 positions filled. The LVNs replaced MTAs in all institutions, eliminating problems posed by the presence of the dual-role MTA classification.
- A process to enable hiring to occur in one day has been developed, and implemented on a pilot basis. at six institutions
- The process of delineating all CDCR functions for which the Receiver is responsible and establishing a meaningful reporting structure under his direction has commenced with development of an entirely new HR program that is responsible solely for HR activities related to medical professionals and their support staff.
- A separate personnel office and a separate workforce development office have been created and are now partially staffed with specialized units that have taken control of the HR functions previously under the control of CDCR.
- Three Regional Personnel Administrator positions have been established and two of the three have been filled. The existence of HR managers with regional responsibility will provide the oversight and leadership necessary to ensure appropriate hiring activity is being carried out at all institutions and that HR staff are adequately trained to perform their duties proficiently. An assessment has been completed of all 33 institutions and a training plan is in development.
- Workforce Management offices were established in northern and southern California to assist individual institutions with recruitment and filing of clinical vacancies.
- HR positions were established in all 33 institutions to ensure the HR needs of the medical department are met. Once filled, the new staff will be provided thorough training specific to the hiring process and will become the foundation for separating the HR function of the institution medical department from the rest of the institution.
- Workforce Management offices were established in northern and southern California to assist individual institutions to recruit and fill clinician vacancies.
- A thorough and comprehensive position-by-position analysis of the organizational make up of DCHCS headquarters was conducted in preparation for the administrative separation of responsibilities
- Responsibility for pre-employment credentialing of all medical/mental health/dental providers has been consolidated under the Receiver, and is in the process of being fully automated; thereby greatly improving the process to ensure only quality health care professionals are hired. The consolidation of the function came about as a result of discussion and agreement with the Court Experts in the *Coleman* and *Perez* class actions.
- Certain of the State's most time-consuming and cumbersome hiring practices have been changed to streamline the process and provide hiring authorities with more options for hiring the most qualified applicants. For example, the State's examination process was revamped for all licensed clinical State classifications so that all who are successful in the civil service examination are eligible for hire. Previously, only those with the highest scores could be hired; leaving the others to languish on the list, wondering why they were never afforded a hiring interview, not because they were not the best candidates but rather simply because they were lower on the State's employment lists than others. This change has provided hiring authorities a much broader candidate pool from which to

choose to fill vacancies and has allowed applicants to feel they are not wasting their time in applying for a job with CDCR.
- The antiquated process of sending letters to those on lists to ascertain their interest in a specific job has been revamped. Rather than waiting for the return of the letter and suspending the applicant's eligibility for hire should they fail to return the letter, phone calls are now made to applicants which allows for a conversation to take place about such important subjects as; what it's like to work in a prison, what promotional opportunities exist after hire, what the total compensation package includes, the vision of the Receiver for the future of inmate-patient care, etc.
- An expedited pre-employment clearance process has been implemented that removes the responsibility from the applicant for having to secure their own medical and background clearances. Now, those services are available on-site at every institution and can be completed upon making a job offer to an applicant.
- Regional Directors of Nursing and Nurse Consultants assisted the Health Care Managers and Supervising Nurses in the interview and selection of senior level supervising nurses in more than half of the prisons.
- Nurse Consultants reviewed staff assignments at all institutions based on the scope of practice license requirements associated with each assignment and reallocation of nursing positions in each institution was based on license appropriate care.
- A new civil service classification of Receiver's Nurse Executive has been established to put into place a critical civil service nursing management structure.

**PERSONNEL SERVICE'S INITIATIVES: NOVEMBER 2007 TO NOVEMBER 2010**

As explained above and described in detail in prior Quarterly Reports, HR programs have been a Receivership priority. They will remain so during the next 36 months, as described below.

*Six Month Objectives:*

By March 2008, fully implement a system to track credentialing and continuing education requirements for all clinicians to ensure credentialing is completed expeditiously and that 100% of clinicians are appropriately credentialed before providing prisoner/patient care.

Implement a web based solution that provides access to a centralized repository of information relative to the credentials of applicants and staff, including registry and contractual staff as well as civil service employees. The system will provide for automatic notification of all activity relative to the licensure status of CDCR clinicians who are providing inmate-patient care. Tasks to accomplish this objective include:
- Finalize contract with vendor and implement web-based solution
- Develop policies and procedures
- Determine roles and responsibilities of institution credentialing coordinators verses headquarters Credentialing Unit staff
- Develop and issue written policies and procedures
- Train staff on use of the system and the new/revised policies and procedures

Page 4 of 9

- Establish credential "hotline" for questions and/or concerns for existing staff or potential providers.

    By May, 2008 implement an Executive Medical Management team including Nurse Executives and Physician Executives at pilot institutions in order to populate local, regional, and statewide leadership positions with qualified, responsive leaders. This objectives requires the establishment of new classifications and an innovative salary administration program that will ultimately allow for flexible appointment and assignment of individuals in all executive management positions based on levels of responsibility (institution, region, and statewide). The salary administration program for these new classifications will provide flexibility in the salary offered to a given applicant based on tangible criteria such as the specific skills, experience, education, etc. that they bring to the job. The steps in the process include:
- Establish the new classifications through the State Personnel Board and the Department of Personnel Administration (the first classification to be established was Nurse Executive which was officially established effective October 22, 2007. The Physician Executive classification is in the final phase of establishment)
- Develop automated Civil Service Examinations
- Determine methodology for salary setting
- Secure appropriate authority for salary ranges
- Determine which positions (institutions/regions, etc.) will be included in pilot
- Develop and implement a broad net recruitment strategy
- Conduct hiring interviews once employment lists are established
- Make hires into key medical management positions
- Evaluate success of program for pilot institutions
- Make any needed changes to classifications/salary structure/recruitment strategies/examination tool/hiring process
- Roll out department wide

    By May 2008, have a fully functional disciplinary unit that will be responsible for working directly with managers and supervisors within both CDCR headquarters and institutions to provide "hands on" assistance, mentoring and training in the area of employee discipline and supervising employees on probation. The new Plata Support Division HR staff trained as disciplinary specialists will need to address a huge backlog of discipline cases. Once the backlog has been eliminated, they will focus on preventing the need for formal discipline when possible by ensuring employees understand work expectations and that supervisors and managers understand the process for corrective action. Meanwhile, a training module and supervisor's guide to employee discipline is in development.

*Twenty-Four Month Objectives:*

By December 2008, reduce the vacancy rate for primary care providers to no more than 10%.

- Update all existing advertisements and recruitment material with new physician salary rates.
- Implement new salaries for physicians.
- Working closely with a consulting firm, develop and implement focused recruitment and hiring plans for primary care classifications
  o Visit and present media program regarding CDCR medical career opportunities at medical schools
  o Send letters of opportunity to all appropriately licensed/certified physicians and mid level practitioners
  o Attend all recruitment events
  o Finalize plan to utilize marketing firm to address image of a career in correctional medicine
  o Assess success of pilot centralized hiring model for physicians and correct any deficiencies prior to permanent implementation and expansion to mid level practitioners and physician supervisors
  o Work with academic institutions to tap major Internal Medicine and Family Practice residency programs in California. This will be a joint effort between CDCR clinicians and academic faculty to educate physicians about and recruit them to correctional medicine. This partnership recruitment effort will include presentations at medical Grand Rounds.
- Conduct job and salary analysis for primary care providers and make appropriate adjustments to both how they are used within correctional medicine and at what rate they are to be compensated.
- Develop and implement a loan repayment program (LRP) to pilot at select institutions as an incentive to recruit and retain qualified physicians. Tasks to obtain this objective include:
  o Determine at which institutions the LRP will be offered
  o Develop policy and procedures for administering the LRP
  o Market availability of program
  o Assess success of program
- Fill the one vacant (of three) Regional Personnel Administrator position to oversee the hiring activities of all institutions and to work hand in hand with the Regional and Statewide Medical Directors to ensure their hiring needs are addressed timely and appropriately. Develop clearly delineated roles, responsibilities and accountabilities among headquarters, regions, and local institutions.
- Redesign and fully implement a hiring model utilizing a central list canvassing process for recruitment and regionally based hiring of physicians and mid-level practitioners. Streamline and coordinate hiring so that multiple vacancies and candidates, interested in more than a single facility can be "matched." The primary components of this system will include the following:

- Regional vacancies identified by input from the field, regional staff, and HR department
- Centralized and regional canvassing of the employment list
- Regional screening of applications and CVs for desirable candidates
- Regional coordination of credentialing with the HR staff for screened applicants
- Assembly of regional hiring panel to include Chief Medical Officers and the Regional Medical Director to interview applicants to determine competency
- Site visit of the facility, where the applicant has expressed interest in working, including an introduction to the CMO or Chief Physician and Surgeon who can discuss the specifics of their facility.
- Completing the "Offer and Acceptance" of employment the day of the site visit
- Offering selected candidates the option to obtain the required pre-employment TB clearance on-site rather than from their personal physician.
- Justification required of the local CMO for candidate rejections

By December, 2008 reduce the number of vacancies in all nursing classifications to no more than 10%. To accomplish this objective, the following activities are required:
- Conduct gap analysis of one-day expedited hiring process at six pilot institutions and develop plan to correct deficiencies.
- Expand the one-day expedited hiring model to include all institutions, including providing training to all HR and medical staff who are involved in the process.
- Attend all appropriate recruitment events
- Visit nursing schools to discuss nursing careers within CDCR
- Centralize the hiring process of all nurses at the regional level with the participation of the Institution and Regional Director of Nursing.
  - Develop standardized nursing hiring practices and procedures, including a resource manual for all Directors of Nursing, Health Care Managers and HR staff
  - Provide overview of hiring process to Directors of Nursing and Health Care Managers.
  - Nursing vacancies identified by region with input from regional staff, and HR department
  - Regionalized canvassing of the employment list
  - Regional screening of applications for desirable candidates
  - Regional coordination of license verification with the HR staff for screened applicants
  - Assembly of regional hiring panel to include Institution Director of Nursing and Regional Director of Nursing to interview applicants to determine competency
  - Site visit of the facility, where the applicant has expressed interest in working
  - Completing the "Offer and Acceptance" of employment the day of the site visit
  - Offering selected candidates the option to obtain the required pre-employment TB clearance on-site rather than from their personal physician.
- Standardize orientation program for all new hires.
- Establish Regional Personnel Office on pilot basis to carry out all HR processing activities for 3-5 institutions, including benefits and payroll administration
  - Identify location and secure space
  - Establish and fill positions

By August 2009, Establish a new Executive Heath Care Manager classification who will be the Chief Executive Officer for the entire health care administrative operation for an institution/region and at the Statewide level in order to effectively coordinate all administrative activities of the health care delivery system.

Delineate the administrative functions of a number of pilot institutions whereby the entire business services operation of the medical department (personnel, fiscal, contracts, etc.) are separate from the institution at large and managed within the medical department itself. Currently, this model is in place at San Quentin and will be monitored and assessed on a continuous basis to determine how to best implement in additional institutions and eventually on a statewide basis.

- Determine the success of the Regional Personnel Office operation and decide the future plan of action to expand at additional institutions and eventually statewide, assuming the operation proves successful.
- Recruit and fill positions to perform administrative duties
- Train staff to perform duties of positions

*Thirty-Six Month Objective:*

Conduct job analysis and salary surveys for all clinical classifications in a manner whereby critical classifications that continue to experience staffing shortages will be evaluated to ensure the salary remains competitive, and that the classification and salary assigned to the position truly reflects the duties being performed. Modify job specifications/duty statements to accurately reflect duties and realign salaries to a fair, competitive level.

**PERSONNEL SERVICES METRICS**

- Percentage of credential verifications completed within one day of request, percentage of clinicians fully credentialed prior to providing care, number of clinicians who are appropriately re-credentialed, and percentage of staff compliance with continued education requirements.
- Number of Executive Management applicants, percentage of applicants with requisite skills/experience and the percentage who attain permanent status following the probationary period.
- Percentage of managers and supervisors trained in employee discipline and supervising employees on probation, the number of formal discipline actions taken, the percentage of formal discipline cases that are sustained by the State Personnel Board, and the number of new employees who successfully complete probation.
- Number of primary care physicians hired by location each month, the number of applicants; the percentage of applicants who are successful in the credentialing process and the overall vacancy rate in all primary care positions.
- Number of applicants to the LRP by locations, the number accepted into the program by locations, the number of years that the accepted applicants remain in the LRP by location, the

number who leave the LRP by location and their reason for de-enrollment, the number of participants that remain employed by the CDCR following completion of the LRP, the comparison of vacancy rates at LRP institutions verses non-LRP institutions, and the statewide physician vacancy rate.
- Percentage of nurse applicants that are offered jobs within one day of the interview compared to the goal of 90%; the number of nurses hired and separated each month and the number of nursing vacancies by location.
- Number of Executive Health Care Manager positions established/filled and the success of a system-wide approach to health care administration.
- Number of pilot institutions whose administrative activities are completely under the control of the medical department rather than custody and the success of the model.

## BARRIERS TO THE SUCCESS OF PERSONNEL SERVICES' SIX TO THIRTY-SIX MONTH OBJECTIVES

A number of barriers may impact the timeframes of meeting these objectives:

1. The State's convoluted processes including components of the hiring process that continue to be a hindrance to expeditiously hiring qualified staff in all civil service classifications
2. Non-competitive salaries in numerous classifications, including non clinical positions that support the medical care delivery system. Many of these classifications are "service wide classifications", meaning they are used by most State agencies and any changes to their compensation rate must be negotiated with the respective unions. There may be a reluctance to increase the salaries of these classifications and others that impact other agencies ability to recruit and retain staff should any revised salaries only apply at CDCR and their budget expenditures if applied across the board at all agencies. Concerning some salary issues, the Receiver may need to seek a waiver of State law.
3. The potential lack of cooperation by the "Control Agencies" in areas such as establishing an autonomous administrative operation in each institution and operating as a separate State agency in such areas as conducting critical civil service examinations to fill vacant positions.
4. The CRCR culture continues to be a barrier to change as almost every attempt to remove responsibilities from CDCR to the Receiver, often creating "power struggles" in the central office and certain prisons.
5. Space limitations will make it difficult to secure adequate space at each institution to separate out administrative functions
6. The lack of trained staff to carry out administrative functions
7. Job burnout – change takes much effort and is difficult and frustrating for some staff and can cause morale problems if not managed carefully
8. The convoluted State space allocation process may hinder the ability to establish a Regional HR function.