# EXHIBIT 2

# CONTRACT AND INVOICE PROCESSING INITIATIVE
# (POA OBJECTIVE A.4 AND A.6)

## BACKGROUND AND INTRODUCTION

In the Findings of Fact and Conclusions of Law re Appointment of Receiver ("Findings") filed October 3, 2005 the Court found that "[d]efendants have failed to provide patients with necessary specialty services. Patients with very serious medical problems often wait extended periods of time before they are able to see a specialist due to unnecessary and preventable delay...In one instance a patient with a colonoscopy referral had to wait ten months before his appointment, by the time he was seen the mass in his colon was so large that the colonoscope could not pass through...Even when patients do see a specialty consult, medical staff often do not follow-up on the specialist's recommendations." *See* Findings at 24: 19-28.

The Court (and the State) recognized that problems with the delivery of medical services in California's prisons involved an inadequate infrastructure. In other words, the underlying administrative organizations necessary to deliver adequate health care services in California's prisons simply does not exist. For example:

"Defendants concede that this rapid growth of the correctional system was not accompanied by organizational restructuring to meet increasing system demand and that it requires fundamental reform in a variety of areas, including management structure, information technology and health care services in order to function effectively and in compliance with basic constitutional standards." *See* Findings at 4:22-26.

"Furthermore, central office staff do not have the tools they need to handle the vast quantity of information necessary to manage a billion dollar, 164,000 inmate system... Data management, which is essential to managing a large health care system safely and efficiently, is practically non-existent." *See* Findings at 6:16-25.

A critical component of the CDCR's program for providing specialty care to prisoner/patients is a more than $400,000,000.00 per year health care contract system. The State's inability to procure, manage, and pay for specialty providers, registry personnel, and hospital services provides a classic example of how an inadequate infrastructure lead to the failure to deliver constitutionally adequate medical care. Indeed, problems with State health care contracts reached crisis proportions during the months prior to the creation of the Receivership. Two interrelated factors contributed to the crisis:

1. CDCR utilized, prior to the Receivership, a confusing, duplicative, and overall inadequate three-tier contract procurement and payment system whereby the State personnel responsible for determining appropriate medical providers and negotiating rates were physically located at 501 J Street; the State personnel responsible for verifying insurance, licenses and documents, processing of contracts and ensuring compliance with all State contracting laws and regulations were located at 1515 S Street; and the State personnel

responsible for reviewing provider invoices and paying those invoices were located in thirty-three separate prisons and a number of regional CDCR regional accounting offices.

2. Management Memo 05/04, issued by the Department of General Services ("DGS") on January 26, 2005 ruled that State departments could no longer issue medical contracts for hospitals, medical groups and physicians without formally bidding for these services. The issuance of this Management Memo was due to the Bureau of State Audits April 2004 Report No. 2003-117 "California Department of Corrections: It Needs to Ensure That All Medical Service Contracts It Enters Are in the State's Best Interest and All Medical Claims It Pays Are Valid." This report concluded that CDCR did not adequately ensure that the medical service contracts executed were in the State's best interest, as they were negotiated based on a 30-year-old state policy exemption, an exemption that could not be substantiated due to lack of sufficient documentation required to uphold this policy. In essence, Management Memo 05-04 stopped the approval process of all medical contracts that were not bid (approximately 66% of health care contracts). Unconcerned with or unaware of the impact on inmate-patients' health and lives, no grace-period for emergency cases or on-going services was contemplated by the State officials who implemented the Memo.

As found by the Court in its March 30, 2006 Order re State Contracts and Contract Payments Relating to Service Providers for CDCR Inmate/Patients ("Order re Contracts"), this form of State mismanagement presented:

> [A]nother chilling example of the inability of the CDCR to competently perform the basic functions necessary to deliver constitutionally adequate medical health care. In this instance, the abdication not only threatens the health and lives of inmates but also has significant fiscal implications for the State.

*See* Order re Contracts at 1:25-28.

> Instead of approaching these new requirements proactively, the CDCR and the State's control agencies - the Department of Finance, the Department of Personnel, and the DGS - stuck their collective heads in the sand. The administrative processes required by the new DGS requirements are quite time-consuming and complex. Yet the CDCR and the State's control agencies failed to provide the staffing and training necessary to handle the newly heightened obligations and implement effective fiscal controls over the contracting process.

*See* Order re Contracts at 2:27 to 3:6.

Therefore, on the second day of the Receivership, April 19, 2006, the Receiver assumed responsibility for overseeing the State's compliance with the provisions of the Order re Contracts, including the Court's mandate (1) that "all current outstanding, valid, and CDCR-approved medical invoices" be paid within 60 days of March 30, 2006; and (2) that under the direction of the Receiver, the CDCR and State entities responsible for contracts develop and implement health care-oriented policies and standards to govern the CDCR medical contract management system, considering both the need for timely on-going care and the fiscal concerns of the State.

## NOVEMBER 15, 2007 STATUS OF CONTRACT AND INVOICE PROCESSING INTIATIVE

Under direction of the Receiver, the CDCR's health care contract units have undergone significant changes. For the most part, these changes have focused on five critical problems: (1) resolving the invoice payment crisis; (2) recreating a viable contract processing unit and thereby establishing an infrastructure for future contract processing reform; (3) implementing badly needed information technology; (4) establishing initial programs to better coordinate the contracting process with the clinical and administrative needs of the *Armstrong*, *Coleman*, and *Perez* class actions; and (5) beginning the initial steps to better manage contract costs.

Examples of the more significant contract processing changes which have been implemented during the first eighteen months of the Receivership include the following:

1. Under the direction of the Receiver and his staff, the CDCR paid all outstanding invoices within 60 days in compliance with the Order re Contracts. This effort called for diligence, organization, and constant monitoring, improved coordination between the prisons and CDCR's Central Office, and improved cooperation between health care personnel and accounting/contracts personnel. Once the backlog was eliminated the CDCR has, by and large, remained current with its invoice processing, continuing to rely upon the provision of the Court's March 30, 2006 Order.

2. The previously separate work units which process CDCR health care contracts have been entirely reorganized into the new *Plata* Contract and Invoice Branch ("PCIB"). Refer to Contracts and Invoice Processing Appendix 1 – Plata Contract and Invoice Branch Organizational Chart. More significant changes include the following:

   A. Combining of contract personnel from 1515 S Street with the contracting staff from 501 J Street to establish one streamlined and centralized location, under the direction of the Receivership, for all phases of health care contract processing (completed January 2007).
   B. Commencing a pilot program to merge prison Health Care Cost Utilization Program ("HCCUP") staff into one central office location rather than thirty three separate prisons (completed August 2007).
   C. Commencing a pilot program to merge CDCR regional accounting staff responsible for health care invoice payment from multiple regional accounting offices into one central office location (completed October 2007).
   D. Commencing a pilot program at the California Correctional Institution and California State Prison - Los Angeles County to reach out to additional specialty providers in a effort to improve the scope of covered services available and to improve relations with the specialty providers for these prisons. *See also* Specialty Services Pilot Initiative.
   E. Restructuring the work units which process CDCR health care contracts to provide improved management coverage and operational oversight. Restructuring of a critical State function to this degree has generated a number of very serious management challenges. For example, as of October 2007 PCIB was experiencing a 40% vacancy

rate for the critical Staff Services Manager position, and a 36% vacancy rate in the analytical classifications. Furthermore, almost 70% of the current contract analysts have less than one year of CDCR experience.

3. Procuring, customizing, and implementing, on a pilot basis, a contract specific information technology program called the Health Care Document Management System (HCDMS) and thereafter implementing HCDMS, on a pilot basis, at four institutions: California Medical Facility; Central California Women's Facility; Pelican Bay State Prison; and San Quentin State Prison. As a result, significant improvements in quality control, contract management, and invoice processing time have been achieved at these institutions.

4. Establishing new practices which provide for clinical and administrative involvement by medical, mental health, and dental staff in State procedures for procuring statewide registry contracts. In the past, the rates paid to registry staff were determined by the CDCR's central office without regard of the needs on the part of CDCR medical and mental health officials who were attempting to secure a full time permanent State clinical workforce in the prisons. New practices have been implemented to coordinate registry contract rate negotiations with the appropriate CDCR disciplines, including representatives from the Special Master's Office in *Coleman*.

5. Commencing a process to convert rate negotiations from the prior standard of "Relative Value for Physicians" to a more standardized and manageable "Medicare-based" reimbursement system. In addition, initial work has been completed concerning the development of rate negotiation and analytical tools to be used for negotiating with individual specialty providers and medical groups.

## CONTRACT AND INVOICE PROCESSING INTIATIVE: NOVEMBER 2007 TO NOVEMBER 2010

The primary objective of the PCIB is to process efficient and cost effective direct medical service contracts which provide appropriate and timely care for prisoner/patients. When doing so the PCIB must also provide adequate contract oversight, consistent and timely processing/payment of medical invoices, and it must develop systems which capture relevant cost and utilization data. Two fundamental changes in PCIB operations are needed to reach these objectives:

1. The PCIB itself (in other words, the underlying contract organization) must continue to be structurally reorganized and adequately and appropriately staffed. This future reorganization will consist of two primary elements: (a) the merging of contract and invoicing functions at 501 J Street; and (b) the roll-out of the contracts information technology system (HCDMS) and streamlined processing systems (for both procurement and invoice processing) at all thirty three CDCR institutions through a four stage process.

2. While these contract infrastructure enhancements are being implemented, the Receiver will establish programs to create an adequate statewide specialty provider and hospital

network for more than 170,000 male and female prisoners. The network will serve inmates who are confined to thirty-three prisons and a host of community correctional facilities scattered throughout the State, often in some of the most desolate, remote locations in California.

Two critical considerations will guide the Receiver's contract project over the next thirty-six months:

1. The PCIB restructuring program and the Receiver's plan to establish a statewide network of specialty providers and hospitals must complement each other. Neither can be entirely successful without the other. To complicate matters, both projects represent challenges for which there is no State precedent. Because there is no effective State model to emulate, the POA concerning these changes requires pilots, the services of outside consultants, and thoughtful, time-phased implementation.

2. At this point in time the Receiver remains committed to the goal of establishing an effective health care contract process within State service. For this reason, the Receivership has invested considerable time and resources in securing new information technology, additional contract staffing, and improved working conditions. There are those who urge the Receiver to "privatize" this critical State function, responsible for more than $400,000,000 in annual disbursements. To date, however, the Receiver has chosen to work within the State structure, to the degree possible, and he continues to seek a long-term contract solution which utilizes CDCR employees. This form of solution may take somewhat longer and will certainly present additional challenges; it is, however, consistent with the mission of the Receivership: to correct systemic unconstitutional problems with the delivery of medical care in California's prison and thereafter return the system to the State of California.

The Receiver's first steps in a 36-month program to establish a statewide provider network of specialty providers for California prisoner/patients will consist of two elements. First, the Receiver has concluded that the State lacks the expertise and experience necessary to conduct competent negotiations with hospitals and provider groups to render specialty care to inmate-patients. CDCR staff are untrained, they have been forced to function at unreasonable, low salary levels, they were not provided with minimally adequate information technology (until the Receiver was appointed), and as a result all too often decisions were made concerning hospital contracts on an ad hoc, short term, or politically motivated basis. To summarize, there is no current system which provides a patient-oriented, cost-effective network of specialty care for prisoner/patients. Therefore, the Receivership engaged, effective September 5, 2007, the services of the Chancellor Consulting Group to provide a number of hospital-related contracting services to PCIB, including the following:

1. Prioritizing select hospitals and related physician contract negotiations.

2. Developing standard hospital contract templates.

3. Develop a hospital managed care strategy, including profiles of key hospitals and physician groups that serve inmate populations.

4. Develop analytical tools for hospital, ancillary and physician rate and strategy development.

5. Develop analytical tools for hospital contract performance evaluation.

6. Develop educational workshops for CDCR contract staff.

Second, the Receiver, after extensive consultation with CPR and CDCR staff, has concluded that health care contracting, given the size and scope of the CDCR's operation, requires an independent evaluation by experts in the field of medical contracting and provider networking. To accomplish this, the Receiver, after 19 months of appointment, determined that the State's contracting and payment impediments are more problematic than originally anticipated. External intervention will be necessary if the State is to succeed in improving the contract and payment processes. These are critical components in providing constitutionally acceptable level of medical care to adult inmates.

Some of the issues plaguing the state's ability to improve the contract and payment process are rigid policies/procedures set forth by oversight agencies, assumedly in an effort to "protect" the tax payers. Although conceptually sound, the State's focus often does not mesh well with the delivery of constitutionally adequate medical care or cost effectiveness.

Although CDCR has made attempts to rectify the deficiencies, the Receiver and his staff have concluded that this issue requires outside intervention. Thus a Request for Proposal ("RFP") was released in September 2007 requesting proposals from experienced contractors to assess CDCR's contracting units and develop a plan to provide the steps and resources necessary to improve the overall management and operations. The initial RFP generated NO responses though contacts were made to various firms with known expertise. Bidders were contacted to determine their reluctance in submitting a proposal and their responses ranged from not wanting to deal with the state's bureaucratic processes to their firm is too busy to take on a project of this magnitude.

A revised RFP was released on October 14, 2007 with a submittal date of November 13, 2007. To improve the candidate pool, additional canvassing/marketing was undertaken to attract contractors/firms. These efforts seemed to be successful as several firms have requested clarification of issues/parameters of their role/responsibility and general CDCR operational issues. It is anticipated that some number of firms will respond; however, to be successful, the RFP applicants should have familiarity with the state's bureaucratic process in order to determine which areas can be removed, altered, or improved versus those that require waiver of State law in order to effectuate change.

It is premature, given the work which needs to be completed by these consultants, to establish a detailed program which will address, in necessary detail and on a statewide basis, changes in current practices that will be effectuated during the next thirty-six months to establish

an adequate network of specialty providers and hospitals. Furthermore, the nature, scope, and location of the network may need to change as the construction of medical beds proceeds Nevertheless, the following can be said: the Receiver intends to have in place a statewide network of specialty providers and hospitals that will serve all of California's inmate-patients within the next thirty-six months and most likely sooner. This system will provide prisoners with access to the needed specialty services within the appropriate time standards, including those mandated in the *Plata* stipulated injunctions, and it will be operated with significantly improved cost controls compared to the existing system established by the State.

To the degree possible, the time-phased objectives of this aspect of the Receiver's contract reform program is set forth below. The Receiver anticipates providing the Court with more detailed and developed information after the consultant reports are received and evaluated, most likely in the form of a progress report on this Plan of Action. In the interim, efforts will continue and in some cases they will be intensified to provide timely specialty care to all prisoner/patients. While a long term sustainable fix is not possible now, prison by prison improvements will continue to be sought; including pilot project. (*See e.g.* the Specialty Services Pilot at CCI/LAC Institutions.

*Six Month Objectives:*

Phase 1: Complete and stabilize implementation at the four initial pilot institutions: Four institutions were selected to participate in the pilot of the computerized HCDMS contract and invoice systems. The four pilot institutions were: Central California Women's Facility; California Medical Facility; Pelican Bay State Prison and California State Prison, San Quentin. Staff at these institutions received the equipment and training needed to allow them to process and approve healthcare invoices electronically, and to negotiate, process and approve contracts within their delegated authority. As the pilot project progressed, it became clear that systemic change needed to take place before the pilot could be rolled out statewide. The invoice receipt, scanning, and indexing functions, originally the responsibility of the various CDCR Regional Accounting Offices, were taken over by the PCIB and performed centrally in Sacramento. The invoice review and adjudication functions, originally performed locally at each institution, were also taken over by the PCIB and performed centrally in Sacramento. Both of these changes involved the establishment of an organization, the development of policies and procedures, the hiring and training of staff, and the resolution of labor relations issues.

Phase 2: Roll out to six additional institutions: Phase 2 is identical to Phase 1 and is anticipated to include: California Correctional Institution; Folsom State Prison; California State Prison, Los Angeles County; California State Prison, Sacramento; California State Prison, Solano and Valley State Prison for Women. Based on our assessment of the readiness of specific institutions to convert to the new system, it is possible that one or more of the above institutions will be move to a later phase, to be replaced with one of the below.

*12 Month Objectives:*

<u>Phase 3: Roll out to eleven additional institutions:</u> Phase 3 is identical to Phase 2 and is anticipated to include the following eleven institutions: California Correctional Center; California Institution for Women; California State Prison, Corcoran; California Substance Abuse Treatment Facility and State Prison at Corcoran; High Desert State Prison; Ironwood State Prison; Kern Valley State Prison; Mule Creek State Prison; North Kern State Prison; Pleasant Valley State Prison and Wasco State Prison.

<u>Phase 4: Roll out to the final 12 institutions:</u> Phase 4 is identical to Phases 2-3 and is anticipated to include the remaining 12 institutions: Avenal State Prison; Calipatria State Prison; Centinela State Prison; California Institution for Men; California Men's Colony; California Rehabilitation Center; Correctional Training Facility; Chuckawalla Valley State Prison; Deuel Vocational Institution; Richard J. Donovan Correctional Facility at Rock Mountain; Sierra Conservation Center and Salinas Valley State Prison.

<u>Establish an administrative support unit to develop and implement policies, procedures and training materials to support the roll out schedule and on-going operation of the health care invoice and contract processing functions</u>: A Support Services Unit will be established to develop and maintain training material and to provide training to staff at institutions and headquarters on both the existing contract processes, and the new HCDMS contract and invoice processes. This unit will also be responsible for the development and maintenance of policies and procedures required in order to provide staff the necessary tools to perform their job functions. Implementation of a web-based solution for providers to access standardized exhibits, documents and other pertinent information will be developed and maintained by this unit.

<u>Establish an internal post review unit to support management oversight of contract and invoice processing</u>: A post review unit will be established to provide management the necessary information to properly oversee the processing of the thousands of contracts and invoices. The unit will be responsible for the random and targeted review of processed contracts to ensure they are executed within the parameters of established policies and procedures, desk manuals, and all applicable state laws and regulations. Random and targeted review of processed invoices will also be performed to ensure that the appropriate verification of services provided was performed, and that the billing was in accordance with the terms of the contract or letter of intent

Given the pending consultant evaluation, it is premature to project the specifics of the contracts POA past twelve months at this point in time. The Receiver anticipates, however, having the information necessary to establish 24 and 36 month projections within the next six months. The Court will be informed of additional contract related projects, as well as specific timelines for those projects in the Receiver's Quarterly Reports and the next iteration of the POA.

## CONTRACT AND INVOICE PROCESSING METRICS

Metrics will be utilized to measure the overall processing timeframes for bid and exempt contracts processed in the HCDMS system and to evaluate overall performance measures. For

example, 90% of bid contracts will be processed through contract execution within 60 days. The metrics to measure processing timeframes for negotiated contracts will be implemented within 90 days. The metric package will include performance measures for both medical specialty services and hospital contracts.

Invoice metrics will be measured by the time it takes to process invoices from receipt through the *Plata* Support Division. 98% of invoices will be processed within 30 days. Future metrics will be implemented to measure the timeframes between specific steps in invoice processing, ranging from receipt through payment.

Because consultants have not yet been retained by the Receiver and no formal reviews have commenced, it is premature to provide more detailed metrics; however, an extensive array of metrics will be required elements of the remedial plans to be implemented. The Receiver will inform the Court concerning the development of metrics for the contracts and invoice processing in his Quarterly Reports and future iterations of the POA.

## BARRIERS TO THE SUCCESS OF CONTRACT AND INVOICE PROCESSING SIX TO THIRTY-SIX MONTH OBJECTIVES

1. Staffing

   As described above, the successful restructuring of PCIB will depend upon the recruitment, hiring, training, and development of a new central office workforce. A host of human resources challenges, including the development of supervisors and managers, the development of a competent analyst workforce, overcoming inexperience, and establishing appropriate work standards must be achieved, and all within a relatively short timeframe. The contract RFP, as explained, will provide a real life answer to the question of whether the State, its rules and its employees, are up to the task of instituting the service-oriented and fiscal contracting reforms necessary to provide constitutionally adequate specialty care to California's prisoners.

2. Information Technology

   As described above, HCDMS was successfully implemented on a pilot basis at four prisons. The basis of this system, Prodagio Contracts and Prodagio Accounts Payable provide numerous benefits including improved accountability, visibility of records, transparency of processing, and access to user information. Without question, the pilot conversion represents a significant step forward; indeed, without HCDMS implementation statewide effective contract management is simply not possible.

   One the other hand, two significant problems remain. First, HCDMS is not as user friendly as it could be, therefore requiring extensive training for the new users. Enhancements will need to be considered during the later phases of the roll-out process.

   Second, for many years the CDCR relied upon a handful of outdated computer programs to provide cost and utilization data concerning inmate-patient specialty care. These

programs, which include the Contract Medical Database (tracks invoice payment history by diagnosis code); Utilization Management (captures patient care by diagnosis code and referrals to outside providers); Census and Discharge Information System (captures patient census data for outpatient hospital services) and the Offender Based Information System (tracks prisoner movement within and between institutions) are not connected in any manner, therefore the information about initial in-prison evaluations, referrals, specialty care rendered, post specialty care follow-up etc. is simply not accessible for either clinical review or systemic tracking. In other words, there is no adequate method to track the continuum of care necessary for appropriate correctional specialty services. It is premature, at this iteration of the POA, to propose a timeline for the long term solution necessary to address this issue. It will, however, be considered for attention after the consultant evaluation described above and during the next thirty-six months.

3. Space and Equipment

In order to effectively roll-out the PCIB restructuring describe above adequate space and equipment must be available at 501 J Street or an alternative central office location.

4. Change and Stabilization

The PCIB central office changes combined with the four-phased prison roll-out described above present the challenge of effectuating change while, at the same time, achieving a degree of stability for staff and managers whereby day-to-day operations continue to provide essential inmate-patient services. Too many changes too soon will serve only to delay the final result. The deadlines set forth above appear to be reasonable and achievable. However, each step of the contract reform process will need to be carefully monitored to ensure that the appropriate structures, controls, and organizational culture are established which enables lasting change.

5. Consultant Evaluations

As mentioned above, the challenges facing the Receiver in order to provide cost effective, efficient, and timely contract processing given the morass of State regulations and other barriers to adequate hospital and specialty services are so significant that, thus far, RFPs for help have not met with a response. It may be necessary to seek a Court waiver of these processes to accomplish these objectives.