# EXHIBIT 4

**CLINICAL OPERATIONS INITIATIVE**
**(POA OBJECTIVE C.2, C.6, C.8 AND OBJECTIVE B.12)**

## BACKGROUND AND INTRODUCTION

In the Third BiMonthly Report filed December 2006, the Receiver reported as follows:

> In April 2006, when the Receivership began, the decision was made to allow the State to retain direct management over the daily operation of the prison medical delivery system. Near the end of this bi-monthly reporting period, however, the Receiver made the decision to begin to assume direct management over several elements of the CDCR medical delivery system, including direct management of CDCR physician and nursing operations. Numerous factors precipitated this change of management responsibility, including the following:
> 
> 1. It is increasingly apparent, given existing bureaucratic, political, and fiscal restrictions that no one individual, no matter how talented and dedicated, can manage the CDCR's medical, mental health, and dental programs under the existing state of disrepair. (footnote omitted)
> 
> 2. Conflicts between the orders of numerous pending class actions and the human resources needed to comply with those orders (as well as the resulting lack of long range planning and lack of focus) impede the Receiver's efforts to effectuate changes in the prison medical delivery system.
> 
> 3. Day to day crisis situations have increasingly required time consuming attention from Office of the Receiver personnel; therefore, the assumption of direct management over certain elements of the CDCR's medical delivery system has to some degree already taken place.
> 
> 4. Many critical medical system programs, including medical contracts processing, recruitment, hiring, and human resource transaction processing have in the past been provided by CDCR divisions other than Division of Correctional Health Care Services ("DCHCS"), resulting on occasion in poor service, inadequate staffing, and a lack of responsiveness to remedial plan requirements. The Receiver is convinced that unless and until the Office of the Receiver assumes direct control over the day to day operation of these critical functions, the remedial programs that he implements will not be effectuated in a timely and cost effective manner.

*See Third Bimonthly Report* at 7-8.

In less than a year the Receiver's Plata Support Division has expanded to provide not only a wide range of services which support the Receiver's medical care operation. In addition, it has also assumed, through various coordination agreements, direct management over several critical elements of the CDCR's mental health, Americans with Disabilities Act, and dental operations, including registry contracting, credentialing, and information technology services. While it was not part of the Receiver's original remedial program, the direct management of CDCR operations as they pertain to medical care is now an integral part of the corrective actions initiated by the Receivership. Therefore, while this POA focuses on substantive programs

designed to bring the California prison system's medical delivery up to constitutional standards, it is also necessary to include, in the POA planning process, changes that will be needed to ensure effective operation of the underlying central office support, staffed primarily with State employees.

During the next six months the Receiver will implement three significant organization changes to the CDCR operation which support his remedial programs. Those changes are summarized as follows:

1. Creation of a unit to monitor and manage clinical quality and metrics.
2. Creation of an organization to monitor the transfer of Plata class members out of state, into Community Correctional facilities (CCFs), and re-entry facilities.
3. Creation of an organization that will manage clinical support services including radiology, laboratory, telemedicine, and pharmacy.

Some of this re-organization has commenced, as explained below. All three projects will be underway within the next six months.

Projects 1 and 3 are necessary for the same reasons stated by the Receiver in his Third Bimonthly Report. To summarize, the CDCR has proven incapable of performing the day-to-day operations needed to support a constitutionally adequate medical delivery system. Therefore, staff from the Office of the Receiver now direct the operation of the CDCR's medical delivery system.

Project 2, however, is necessary at this time because of three different factors. First, in 2007 the State began to transfer hundreds of *Plata* class members to private prisons in other states, necessitating that the Receiver and his staff become involved in a number of time consuming and expensive operations including the screening of prisoners to be transferred, re-writing and approving the contracts with the private prisons, and inspecting the private prisons [designated by the State as "California Out of State Correctional Facilities" (COCFs)]. Second, the Receiver has uncovered a number of serious problems with the delivery of medical services in California CCFs which house thousands of Plata class members, again necessitating that the Receiver and his staff become involved in a number of additional time consuming and expensive operations including screening prisoners to be transferred to CCFs, approving the contracts with CCFs, and inspecting CCFs. Third, the State has announced plans to build numerous local re-entry facilities. Given the track record with CCFs, and given the fact that Plata class members with a wide range of medical problems will not be excluded from transfer into re-entry facilities, it is necessary to monitor the re-entry program as it rolls out.

## THREE NEW ORGANIZATIONS TO BE CREATED BY THE RECEIVER IN THE NEXT SIX MONTHS

A. Clinical Quality Measurement and Evaluation Unit.

This organization is described in the section regarding the Receiver's Clinical Quality Measurement and Evaluation Initiative.

B. <u>"COCF, CCF and R-entry Oversight Unit," the Receiver's organization to monitor the transfer of Plata class members out of state, into Community Correctional facilities, and into Re-entry Facilities</u>

The COCF, CCF, Re-entry Oversight Unit is managed by Teresa Reagle, the Receiver's Acting Director of Field Support. It will have two primary initial functions:

1. The Unit will establish clinical standards for out-of-State and community prison beds and will conduct the necessary reviews and inspections to ensure compliance with the standards.

2. The Unit will serve as an interface and coordinating agency for the Inspector General's pilot project for monitoring quality of prison medical care.

With consultation from the Office of the Receiver, the Office of the Inspector General (OIG) has proposed a three-phase implementation of the monitoring program. In phase I, the OIG will develop audit instruments for some 26 healthcare functions described in the Court-mandated Health Care Services Division Policies and Procedures. The OIG team will pilot test the instruments at five CDCR facilities and issue a public report following inspections. In phase II, with the consent of the Court, the OIG will assume inspection responsibilities for all CDCR facilities affected by the *Plata* lawsuit. In phase III, at an unspecified time in the future, the OIG would turn over inspection responsibilities to the Receiver/CDCR.

The Receiver will ensure that the OIG has access to all relevant medically-related documents, records, logs, and complaints. The Receiver's staff will share information about their own quality measurement efforts, examples of quality data collected, and plans for future quality initiatives. The Receiver's staff will facilitate efficient data-gathering by the OIG team during on-site inspections. Ms. Reagle's Unit will take the lead concerning these processes.

## COCF, CCF AND RE-ENTRY OVERSIGHT UNIT INITIATIVE: NOVEMBER 2007 TO NOVEMBER 2010

*Six Month Objectives:*

1. Establish an initial baseline or "core," expectation for field compliance with Plata standards for delivery of medical care.
2. Work with the Receiver's legal staff to ensure that COCF, CCF and re-entry contracts contain provisions necessary to ensure compliance with *Plata* mandates.

3. Conduct an initial series of inspections and reviews of all COCFs and 50% of CCFs. Review operating policies, procedures, and practices to ensure the adequacy of the staffing necessary to provide Plata compliance (both clinical and correctional), to ensure the adequacy of facility design, treatment space, access to supplies and maintenance, to verify the adequacy of policies and procedures, to ensure compliance with policies and procedures, etc.
4. Provide initial assistance as necessary to all COCFs and those CCFs inspected concerning policies and procedures which support the delivery of adequate medical care as called for by *Plata* mandates.
5. Receive and manage the medical records of prisoner/patients housed in COCF facilities. Develop policies and procedures to appropriately manage the medical records of prisoner/patients housed in CCFs and re-entry facilities.
6. Establish an audit tool to accurately reflect compliance with medical standards. Implement a program to document deficiencies and require timely corrective action or contract cancellation.
7. Hire initial Unit personnel, including one physician, two registered nurses, one associate Government Program Analyst, two correctional managers, one Office Technician, one Health Records Technician II, and two Health Records Technician I's.
8. Establish agreements with the Court representatives in *Armstrong, Coleman*, and *Perez*, and the CDCR officials responsible for A.D.A., mental health, and dental services delivery to conduct inspections and review in a coordinated, cost-effective manner.
9. Establish liaison with the pilot OIG prison monitoring program and participate in data collection and inspections as necessary.

*Twelve Month Objectives:*

1. Hire secondary staff, two registered nurses, one Associate Government Program Analyst, and four Health Record Technician I's.
2. Audit the remaining 50% of CCFs.
3. Conduct a second, follow-up audit of all COCF facilities.
4. Continue remediation action as necessary.
5. Commence inspection program of re-entry facilities as necessary.

*Twenty-Four Month Objectives:*

1. Physically audit all COCFs, CCFs, and re-entry facilities annually, and on an unannounced basis as deemed appropriate.

**COCF, CCF and RE-ENTRY OVERSIGHT UNIT METRICS**

The COCF, CCF and Re-entry Oversight Unit commenced operation on November 5, 2007, nine days before the filing of the November 2007 POA submission. While an initial pilot version of an inspection template has been developed in conjunction with earlier surprise inspections of CCFs conducted at the Receiver's request, it is premature to produce a complete

set of relevant metrics for this iteration of the POA. Refer to Clinical Operations Initiative Appendix 1 – CCF/Out-of-State and Re-entry Inspection Template. However, a vigorous inspection plan has been established, as explained above, and the inspection tool, as well as baseline requirements, will be set in place during the next six months. The Receiver will provide more detailed information concerning the COCF, CCF and Re-entry Oversight Unit metrics in his Quarterly Reports and future iterations of the POA.

**BARRIERS TO THE SUCCESS OF THE COCF, CCF AND RE-ENTRY OVERSIGHT UNIT**

1. <u>Aggressive Inspection Schedule</u>

    The schedule of inspections set forth above has been set in an aggressive manner because of the Receiver's concern about Plata class members housed out of state and in CCFs. Meeting this schedule will require careful planning, the timely hiring of key personnel, and the prompt implementation of an adequate inspection template.

2. <u>Cooperation with CDCR</u>

    An effective medical inspection program of all facilities where Plata class members are confined will require close coordination with, and cooperation by the CDCR. Thus far, the CDCR's cooperation concerning out-of-state and CCF inspections has been good.

3. <u>Coordination with *Armstrong, Coleman,* and *Plata*</u>

    The cost effective monitoring of out-of-state and CCF facilities, inspections which deal with all of the health concerns of prisoner/patients, will require coordination with the Court representatives in *Armstrong, Coleman,* and *Perez*, and the CDCR officials responsible for A.D.A., mental health, and dental services delivery. Thus far, cooperation and coordination concerning mental health care has been good. Cooperation and coordination concerning dental care has been problematic.

C. <u>Clinical Support Services: The Receiver's unit to manage clinical support services including radiology, laboratory, telemedicine, and pharmacy</u>

   1. *Background and Introduction*

       Many California prisoners suffer from very serious medical problems. Others are aged, and suffer from long term serious and less serious chronic diseases. Given these patient demographics, it will not be possible to deliver constitutionally adequate care unless and until the appropriate clinical support services including radiology, laboratory services, telemedicine, and pharmacy services are available. Prior to establishing the Receivership, all of the above referenced services were suffering from very serious problems. For example, as noted by the Court in the Findings of Fact and Conclusions of Law re Appointment of Receiver ("Findings") filed October 3, 2005:

> The medical records in most CDCR prisons are either in shambles or non-existent …This makes even mediocre medical care impossible. Medical records are an essential component of providing adequate patient care and should contain comprehensive information about a patient that can assist a physician in determining the patient's history and future treatment …The amount of unfiled, disorganized, and literally unusable medical records paperwork at some prisons is staggering… three and one-half feet of loose filing at San Quentin…twelve to eighteen inches of loose filing at Salinas Valley…six to eight feet of loose filing at CSP-Sacramento…At CIM, the records were kept in a 30 foot long trailer with no lights except for a small hold cut into the roof and were arranged in piles without any apparent order…Conditions are some at other prisons as well. At some prisons medical records are completely lost or are unavailable in emergency situations…the CDCR medical records system is "broken" and results in dangerous mistakes, delays in patient care, and severe harm."

*See* Findings at 20:17 to 21:16.

As found by the Court, healthcare providers do not operate in a vacuum. Without essential clinical support services, physicians and nurses are unable to provide diagnoses and treatments to their patients. Functional healthcare systems have a set of ancillary support services that are core to delivery of patient care. These services include pharmacy, clinical laboratory services, enterprise imaging (radiology), and health information management (HIM). Competent healthcare administrators recognize that these clinical operations drive utilization and quality, have a significant effect on morbidity and mortality, and that they require careful management in coordination with clinical leadership.

Unfortunately, consistent with all other matters regarding healthcare in California's prisons, these clinical operations and, consequently, prisoner/patients, have suffered from years of neglect, incompetence, and mismanagement. In most cases, each institution has been left to fend for itself in these areas without any leadership from Sacramento. Meanwhile, patients continue to suffer and die because clinicians cannot obtain timely lab results, radiology studies, or medical records. At the same time, countless taxpayer dollars are probably being wasted as expensive imaging and lab studies are repeated because the originals cannot be found.

One aspect of clinical operations, pharmacy operations, was found to be in crisis early in the Receivership, and is the subject of a separate section of this report. *See* Maxor Pharmacy Services Initiative. However, since the last iteration of the Plan of Action in May, the Receiver has grown increasingly concerned that operations of clinical laboratory services, radiology, and health information management may also be near the breaking point. Now that the Receiver has established his remedial team and hired experts to direct the remedial programs that will be necessary to address problems with clinical support services; and now that remedial programs are underway concerning certain more severe problems (such as the hiring of clinical staff and the improvement in the controls over contract processing and invoice processing)have been addressed with remedial programs that are proving to be effective to some degree, the Receiver has established as a new priority related to new clinical support remedial programs. To manage this process, he will, over the course of the next six months, establish a Clinical Support Services Division.

It must also be emphasized that before establishing a proposed remedial plan, the Receiver needed to determine the specifics of the problem. If no one knows exactly what is wrong, it will not be possible to develop a fix. In fact, the depth and scope of medical delivery problems in the CDCR are so serious that no one with the State of California could inform the Receiver with any accuracy about the nature of the problems themselves. Therefore, prior to launching any remedial effort that relates to clinical support services the Receiver was forced to utilize his staff of experts to examine the nature of the underlying problems. The level of administrative disarray and the resulting waste of public funds has proven to be far worse than anticipated, as explained below.

2. *Summary of Receiver's Initial Findings Re Clinical Support Services*

Radiology

The scope of imaging services required by the CDCR patient population includes plain film radiology, CT, MRI, ultrasound, nuclear medicine, dental radiology (digital and plain film), and angiography, as well as emerging imaging modalities, such at PET and SPECT scans. Currently the CDCR performs approximately 175,000 imaging and radiology procedures annually, the majority of which (92%) are done in-house. General film radiology is the most common medical imaging procedure performed (150,100 exams/year), followed by MRI (7,123), ultrasound (7,098), CT (4,753), and mammography (4,142). Also, CDCR estimates that 3 million dental radiographs are taken each year (an astronomical figure subject to verification).

Each institution, however, has been responsible for managing its own radiology program, resulting in widely varying methods of service delivery, operation, and cost. Neighboring institutions may have contracts with different radiology medical groups at wildly different rates and levels of service. Some institutions have outdated equipment dating from the 1980's; others meanwhile have purchased new imaging devices, although some lack the expertise, space, and ancillary equipment necessary to install them. Several prisons have purchased and installed new computed radiography imaging systems that may be mutually incompatible with one another. Prisons literally across the street from each other are unaware of and do not share high cost technologies available at one of them. It should be emphasized that the negative effects of the lack of central management and planning are not limited solely to the institutions themselves. Because the CDCR's healthcare information technology infrastructure has suffered from decades of neglect, the current network is insufficient to support a Picture Archiving and Communication System (PACS), and all digital images must be printed and stored as hard copies. Additionally, facilities in extremely remote California locations have had great difficulty recruiting and retaining radiology staff and identifying neighboring radiology groups that can provide timely reads of films.

Clinical Laboratory

A recent survey indicated that annual laboratory testing volumes at the 33 institutions is over 1.2 million bundled tests for both on-site and off-site testing. Eleven prison laboratories are licensed and providing on-site testing services, including chemistry, coagulation studies,

endocrinology, hematology, serology, toxicology, urinalysis and blood banking. These eleven laboratories provide almost 2.2 million individual (non-bundled) tests annually. Five more laboratories provide limited testing of simple tests and point of care tests. The seventeen remaining sites provide sample collection stations only. Fourteen of these sites have no equipment to perform testing and three could be providing testing services but the lack of a Clinical Laboratory Scientist or a designated Laboratory Director is preventing service provision.

Each institution has been responsible for developing its own clinical laboratory program. Consequently, yet again there is no standardization in services. Neighboring prisons may have contracts with different reference laboratories at wildly different rates and different levels of service. Some facilities have outdated equipment dating from the 1980's; others have purchased new analytic equipment that they lack the expertise and equipment to install. Because CDCR's healthcare information technology infrastructure has suffered from decades of neglect, the current network is insufficient to support an enterprise laboratory information system (LIS); in many cases lab results are not being routinely made available to providers who ordered them. Multiple labs provide lab results to clinicians on hand-written scraps of paper, with all the attendant potential for errors due to mistakes in transcription or poor handwriting. There are no standards for testing panels, reference ranges, or alert or panic values. Additionally, facilities in extremely remote California locations have had great difficulty recruiting and retaining qualified laboratory staff and identifying facility space for lab functions such as phlebotomy and pre-analytical processing.

Health Information Management

While the problems identified by the courts and the Receiver reach into almost every element of the medical care system, it is without question, as found by the Court, that the health information management (HIM) system is inadequate to meet the needs of the confined adult population.

Furthermore, the Receiver's staff, as well as the Court representatives in *Coleman* and *Perez*, have expressed the following additional concerns, all of which appear valid:

- CDCR lacks a uniform and standardized health information system.
- The health records departments need better trained and more appropriate staffing.
- A uniform priority system for filing does not exist in all institutions.
- At several institutions each yard has a separate health records unit.
- Duplicative forms are filed in the health record in multiple sections.
- Loose filing is not being completed, resulting in incorrectly packaged health records and delays in treatment. In some facilities the amount of loose filing exceeds <u>16 feet!</u>

Yet again, the CDCR has no functional centralized oversight or management of health care recordkeeping in any of its 33 prisons. Medical recordkeeping, although quite variable from prison to prison, appears, in the Receiver's experience, to be problematic, with frequent anecdotes about the following:

- lost or missing charts;

- misfiled documentation;
- stacks of unfiled paper documents dating back months to years, including over 8 million "orphan documents" collected from various prisons and parole offices;
- hundreds of conflicting and redundant documentation forms that are poorly understood by clinicians.

The above problems have been compounded by an increase in new forms without uniformity among the 33 prisons. For example, in response to several lawsuits filed since 1993 relating to medical, mental health and dental programs, the CDCR has created or is developing more than 30 new forms to document compliance. These new forms increase the workload of health records staff, who must ensure the documents are properly incorporated in the Unit Health Record (UHR). Additionally, there has been a dramatic increase in the pulling and filing of health records for visits and court monitor reviews. The result is a backlog in the updating of the UHRs, and a proliferation of loose documents. Additionally, efforts to protect inmate privacy and compliance with privacy laws present additional challenges. The probability of unauthorized release of confidential inmate health information is increased by the lack of an effective system of maintenance for health records, posing a serious risk of a breach in privacy. Moreover, the above factors have concurrently affected the transfer and receipt of documents by Parole and Community Services Division and Archives. The consequences of error can be significant, with public safety impacted and the ability of CDCR to comply with federal mandates compromised.

Dictation and transcription, one component of the medical record problem, is particularly problematic. CDCR employs approximately 78 full-time, on-site medical transcriptionists, and has approximately 43 more unfilled positions. Because there is no organized management or oversight of this important function, most facilities are unable to provide precise documentation as to their usage of transcription (in transcribed lines/day), but report their average number of monthly documents transcribed as anywhere between 9 and 850. In some cases, CDCR appears to be employing full-time transcriptionists, taking up valuable office space inside prisons, to produce documents at a rate of only 8-10 per month. Meanwhile, there are a number of prisons where the backlog of dictated but un-transcribed notes extends back weeks to months.

On October 16, 2007, the Receiver approved the engagement of a private transcription consultant to assess and redesign the department's approach to dictation and transcription. The consultant is performing a needs assessment, including gathering information on existing transcription requirements and services at each facility. Although her engagement is only just underway, the following preliminary findings have resulted:

- A number of institutions have been routinely in violation of Federal and State patient privacy regulations by emailing confidential patient health documents without appropriate protections such as encryption or password protection;
- Several institutions have full-time transcriptionists but no transcription equipment or transcription services offered;
- Transcriptionists in some institutions are averaging 165 lines transcribed per <u>day</u> (as opposed to an industry average of 300 lines per <u>hour</u>!);

- At San Quentin, where the Receiver authorized outsourcing of transcription as part of emergency remedial efforts, the external transcription provider is not meeting their contractual turn around time of 24 hours 70% of the time;
- Dictation/transcription equipment in many institutions is very outdated and inadequate for its intended uses.

To summarize, the CDCR system of health records management is not efficient and standardized according to best practice and industry standards, and the current allocation of health records staff is inappropriate to meet these responsibilities and challenges. The existing health records management staff in the institutions are overwhelmed. While changes in the provision of health care have resulted in increased clinical staff, there has been no concurrent augmentation of qualified and registered health records staff.

Telemedicine Services

CDCR currently operates a telemedicine program that connects inmates in up to 29 prisons with one of three contracted specialty physician groups as well as a telemedicine hub in downtown Sacramento. Since the program's inception in 1996, there have been about 60,000 telemedicine visits, with approximately 6,200 occurring in Fiscal Year 2006-2007. In comparison, the UTMB telemedicine program provides over 60,000 telemedicine visits per year!

Nevertheless, a cursory review of CDCR Telemedicine by the Receiver's team suggests the program is not providing anywhere near its full capabilities. Less than half of all telemedicine visits are medical in nature (as opposed to mental health). Just 6 prisons (out of 33 managed by CDCR) accounted for more than 80% of all telemedicine medical visits in Fiscal Year 2005-2006. The current system appears to be inadequately staffed, with only one technician available to service 29 widely-dispersed facilities. The technology in use is also outdated, as the system is exclusively dependent on ISDN paired copper wires and analog video equipment.

In July 2007, the Receiver contracted for a telemedicine assessment and road map from consultants with the University of Texas Medical Branch (UTMB) in Galveston's Electronic Health Network, who operate the largest operational telemedicine network in the world. The UTMB engagement is still underway, and a final report is not expected until January 2008. However, some preliminary, informal findings from their assessment so far include:

- Referrals to telemedicine (rather than expensive and difficult transport to off-site specialty providers) are entirely at the mercy of local utilization management staff who, in most cases, have no training, protocols, or criteria to guide them.
- Local telemedicine coordinators often have inadequate training and skills to do their jobs.
- Contracting for specialty services and payment methodologies are not standardized and performance of contracted providers is not appropriately monitored.
- Because CDCR telemedicine equipment uses outdated ISDN connections, it is subject to bureaucratic ineptitude (such as shut down of telemedicine services when a phone bill goes unpaid) and abuse (such as when providers use telemedicine lines to make personal international calls).

- Action on recommendations from specialists seen by telemedicine can be delayed many weeks because no local providers will take responsibility for immediate follow-up.

## CLINICAL SUPPORT SERVICES INITIATIVE: NOVEMBER 2007 TO NOVEMBER 2010

The Receiver and his staff have concluded that there is no one within CDCR or State service with the knowledge and experience to provide appropriate advice and consulting services to develop the statewide strategies and programming necessary to correct these serious problems. Therefore, he has embarked on the following remedial program, the first stage of which will be implemented during the next six months. As explained below, the necessary consulting services efforts are already underway.

*Six Month Objectives:*

1. To reduce inefficiency and improve timeliness of medical care for CDCR's inmate-patients, the Receiver is creating a statewide strategy and implementing centralized operations for enterprise clinical laboratory services. On November 6, 2007, Navigant Consulting kicked off its consulting engagement to do the following:

   - Conduct an operational and risk assessment of the existing laboratory network in which facilities will be evaluated individually in terms of their overall operational infrastructure, and collectively as a network;
   - Render recommendations on the strategic restructuring of the laboratory program in accordance with the mission of the CDCR (and the CDCR's planned enhancements in healthcare, including an overhaul of information systems); and
     o Create a plan with clear priorities, accountabilities and metrics for implementing the project's recommended improvement interventions and for monitoring progress going forward.

   Based on the Navigant recommendations due March 30, 2008, the Receiver expects to propose a plan for remediation of lab services in April 2008.

2. The Receiver intends to improve and enhance the existing telemedicine program and integrate it into the continuum of inmate medical care to provide primary, emergency and specialty care to allow for greater access to inmates while reducing cost of care as well as custody inmate transportation to outside clinical care locations. In July 2007, the Receiver contracted for a telemedicine assessment and road map from consultants with the University of Texas Medical Branch (UTMB) in Galveston's Electronic Health Network, who operate the largest operational telemedicine network in the world. By January 2008, UTMB will complete an assessment of CDCR telemedicine services and a road map to the future with an eye toward telemedicine infrastructure, facilities, staffing and personnel, workflow, operations, and perception of telemedicine. In the interim, the Receiver is taking the following initial steps:

   a. Creating a pilot program to maximize telemedicine utilization at all prisons for one particular clinical specialty (such as dermatology or cardiology);
   b. Hiring a Director of Telemedicine Services to implement the UTMB recommendations;
   c. Beginning the transition from telephone-based ISDN to Internet-based telemedicine video services in concert with the Receiver's IT Initiative;
   d. Allowing a few facilities to pilot usage of telemedicine to provide pre- and post-procedure telemedicine visits for patients requiring off-site hands-on procedures such as surgery or endoscopy;
   e. Beginning to re-evaluate telemedicine contracting methodologies.

*Twelve Month Objectives:*

1. On October 16, 2007, CDCR engaged Sandra Hirsch, a private transcription consultant, to assess and redesign the department's approach to dictation and transcription. The consultant is performing a needs assessment, including gathering information on existing transcription requirements and services at each facility. She will analyze existing processes and create a series of business cases for potential future dictation/transcription alternatives. All of the alternatives will be analyzed with regard to effectiveness, quality, impact on care, elimination of backlogs, standardization of document data, and efficiency. Ms. Hirsch will present CDCR with a strategic plan in April 2008. Based on the contractor's recommendations, the Receiver will create a plan for remediation of dictation and transcription within CDCR no later than June 1, 2008.

2. To improve the quality, efficiency, and timeliness of radiology services delivered to the CDCR's patient population, the Receiver released a Request for Proposals in September to create a statewide strategy for centralizing the oversight, management, and delivery of imaging and radiology services. A vendor finalist has been chosen whose name will be made public once contract negotiations have been completed. If the vendor starts the engagement in January 2008, we expect to have an assessment and strategic plan from our consultants by June 2008. Based on these recommendations, the Receiver will create a plan, with metrics, for remediation of enterprise radiology and imaging services, including dental radiology, by July 2008.

3. To improve health information management, the Receiver released a Request for Proposals on September 24, 2007, to commission a HIM study based on best practices and standards in the industry applicable to our environment, including medical, dental, and mental health records. The selected contractor will develop appropriate HIM remediation plans in preparation for an eventual transition to electronic medical records. The contractor will provide a road map for the system-wide adoption of procedural and technological approaches that will streamline documentation availability and efficiency. The assessment and plan will focus on the following areas: medical record continuity; filing systems; chart structure and forms; chart retrieval and movement; chart analysis/chart deficiency; release of records; metrics; HIM organization and staffing; information technology and HIM software;

policies and procedures; and HIM leadership and governance. Semi-finalists for this engagement have been selected, and vendor should be chosen by December 1, 2007. Based on the contractor's recommendations, the Receiver will create a plan for remediation of health information management within CDCR no later than August 1, 2008.

4. Following the Receiver's review of these reports and agreement among his staff concerning the most effective, timely, and cost efficient manner by which to implement the remedial actions recommended by the consultants, the Receiver will form the Clinical Support Division.

   Because the consultants who have been retained by the Receiver have not completed their reviews, it is premature to provide POA projections past twelve months. The Receiver will inform the Court concerning the development of more detailed long term clinical support planning efforts in his Quarterly Reports and future iterations of the POA.

## CLINICAL SUPPORT SERVICES DIVISION METRICS

Because the consultants who have been retained by the Receiver have not completed their reviews, it is premature to provide clinical support metrics; however, an extensive array of metrics will be required elements of the remedial plans to be implemented. The Receiver will inform the Court concerning the development of metrics for the clinical support operation in his Quarterly Reports and future iterations of the POA.

## BARRIERS TO THE SUCCESS OF THE CLINICAL SUPPORT SERVICES SIX AND TWELVE MONTH OBJECTIVES

1. Aggressive Implementation Schedule

   As apparent, there are several major consulting reviews occurring simultaneously. Once the reports are received and analyzed, the Office of the Receiver will be faced with the task of implementing a number of major remedial programs. Implementing these programs will require significant planning, staff resources, and extensive follow-up give that the ultimate fix involves 33 separate institutions.

2. Coordination with *Armstrong, Coleman,* and *Plata*

   The cost effective implementation of clinical support remedial programs, services that affect the delivery of mental health and dental services will require coordination with, and cooperation by the with the Court representatives in *Armstrong, Coleman,* and *Perez*, and the CDCR officials responsible for A.D.A., mental health, and dental services delivery. Thus far, cooperation and coordination regarding clinical support services across all disciplines has been good.

3. <u>Organizational Culture</u>

   The belief that each prison is solely responsible for clinical support operations is deeply embedded in CDCR institutional culture. Attempting to centralize management of functions such as transcription or lab services may meet passive or active resistance.

4. <u>Lack of Appropriate Management Personnel Classifications</u>

   One reason that CDCR has never been able to centrally manage clinical support operations, such as lab services or health information management, has been the inability to hire healthcare professionals with expertise to provide leadership in these areas. Current personnel classifications, policies, and salaries make it impossible to attract highly qualified applicants who must often be found outside state service.