Cassie M. Pierson (SBN 196039)
Legal Services for Prisoners with Children
1540 Market Street, Suite 490
San Francisco, CA 94102
Phone:  415-255-7036
Fax:  415-552-3150
E-mail:  cassie@prisonerswithchildren.org

Attorney for Amici Curiae

IN THE UNITED STATES DISTRICT COURTS
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants<br><br>_____<br><br><br>MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants.<br><br>_____ | Case No.: CIV S-90-0520 LKK JFM P<br>**THREE-JUDGE COURT**<br><br><br><br><br><br>Case No.: C01-1351  TEH<br>**THREE-JUDGE COURT**<br><br>**BRIEF OF *AMICI CURIAE***<br>**Californians United for a Responsible**<br>**Budget and constituent organizations,**<br>**including All of Us or None; The American**<br>**Friends Service Committee; California**<br>**Coalition for Women Prisoners; California**<br>**Families for Inmates; California Prison**<br>**Focus; The California Prison Moratorium**<br>**Project; The Campaign to End the Death**<br>**Penalty – Bay Area; The Central**<br>**California Environmental Justice Network;**<br>**Critical Resistance; The Dolores Huerta**<br>**Foundation; Families to Amend**<br>**California's Three Strikes (FACTS); Free**<br>**Battered Women; The Friends Committee** |

on Legislation of California;
Grandmothers of the Light,
Justice Now; The Justice Policy Institute;
The Labor/Community Strategy Center;
Legal Services for Prisoners with Children;
National Lawyers Guild-Los Angeles
Chapter; Progressive Democrats of Los
Angeles (PDLA); Proyecto Common
Touch; Transgender, Gender-Variant and
Intersex Justice Project; The University of
California Berkeley Graduate Assembly;
and The Youth Justice Coalition – Free
L.A.

**IN SUPPORT OF A PRISONER
RELEASE ORDER TO REDUCE THE
NUMBER OF PEOPLE IN
CALIFORNIA'S PRISONS AND TO
COMPEL SPECIFIC MEASURES TO
IMPLEMENT THAT REDUCTION**

**TABLE OF CONTENTS**

INTEREST OF AMICI CURIAE..........................................................................8

I. INTRODUCTION....................................................................................11

II. BACKGROUND OF THE CASE……………...................................................12

III. PRISON EXPANSION IS NOT A SOLUTION TO THE IMMEDIATE OVERCROWDING CRISIS…………….......................................................................15

IV. AB 900 OFFERS NO SOLUTIONS TO THE OVERCROWDING CRISIS………….18

V. THERE ARE IMMEDIATE AND LONG TERM SOLUTIONS AVAILABLE TO END OVERCROWDING…………………………………………........……………………21

    A. Reforming Parole ……………...............…………………………22

    B. Fully Implementing Proposition 36……………....………………………24

    C. Releasing Elderly Persons………….........................................………28

    D. Changing California's Sentencing Policies………....……………....……………29

    E. Providing Community Programming and Support………....………………..37

VI. CONCLUSION………………………………………………........…..41

# TABLE OF AUTHORITIES

**Federal Cases**

*Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Ca. 1995)

*Plata et al. v. Schwarzenegger et al.*, United States District Court, Northern District of California, Case No. C01-1351 THE

**Statutes**

18 U.S.C. § 3626 (Prison Litigation Reform Act)……………………………………………14

18 U.S.C. §3626(a)(3)(A) (Prison Litigation Reform Act)…….……………...…………......14

18 U.S.C. §3626(b)(2) (Prison Litigation Reform Act)……………………………………....14

18 U.S.C. § 3626(g)(4) (Prison Litigation Reform Act)……………………………………21

California Penal Code §667……………………………………………………………...30

California Penal Code §1170……………………………………………………………28

**Other Sources**

California Progress Report, "New Poll Points Way to Democratic Victory in California," May 3, 2006; http://www.californiaprogressreport.com/2006/05/new_poll_points.html.

Corrections Independent Review Panel, *Reforming California's Youth and Adult Correctional System* 123 (2004); http://cpr.ca.gov/report/indrpt/corr/pdf/from7to11.pdf.

Editors, "Why Would Lockyer Want to Add to UC's Pain? – California's Priorities are Out of Balance, So Prisons See Increases as Higher Ed Suffers," *The Sacramento Bee*, October 8, 2007, B4; http://www.sacbee.com/110/story/417537.html.

Expert Panel on Adult Offender and Recidivism Reduction Programming, *A Roadmap for Effective Offender Programming in California*, June 29, 2007; http://www.cdcr.ca.gov/News/ExpertPanel.html.

Field Research Corporation, Release #2181, March 1, 2006; http://www.field.com/fieldpollonline/subscirbers/RLS2181.pdf.

Furillo, Andy, "Prison-building plan hit: Federal receiver says it will set his health care efforts back by five years," *The Sacramento Bee*, July 11, 2007, A4; http://www.sacbee.com/111/story/266603.html.

Human Rights Watch, *Ill-Equipped: U.S. Prisons and Offenders with Mental Illness* (2003); http://www.hrw.org/reports/2003/usa1003/usa1003.pdf.

Justice Policy Institute, *Employment, Wages and Public Safety*, October 1, 2007; http://www.justicepolicy.org/images/upload/07_10_REP_EmploymentAndPublicSafety_AC.pdf.

Justice Policy Institute, *Proposition 36: Five Years Later*, April, 2006; http://www.justicepolicy.org/images/upload/o6-04_REP_CAProp36FiveYears Later_DP-AC.pdf.

Justice Policy Institute, *Racial Divide: An Examination of the Impact of California's Three Strikes Law on African-Americans and Latinos*, October 2004, by Scott Ehlers, Vincent Schiraldi, and Eric Lotke; http://wwwjusticepolicy.org/images/upload/o4-10_TAC_CARacialDivide_AC-RD.pdf.

Justice Policy Institute, *Still Striking Out: Ten Years of California's Three Strikes* (2004); http://www.justicepolicy.org/images/upload/04-03_REP_CAStillStrikingOut_AC.pdf.

Legal Services for Prisoners With Children, *Dignity Denied: The Price of Imprisoning Older Women in California*, December 2005; http://www.prisonerswithchildren.org/pubs/dignity.pdf.

Legislative Analyst's Office, *Analysis of the 2003-2004 Budget Bill*, Department of Corrections; http://lao.ca.gov/analysis2003/crim_justice/cj_04_5240_anlo3.html.

Legislative Analyst's Office, *2007-2008 Budget Analysis*, "Health and Social Services"; http://www.lao.ca.gov/analysis_2007/health_ss/healthss_anl07.pdf.

Legislative Analyst's Office, *2007-2008 Budget Analysis*, "Judicial and Criminal Justice"; http://www.lao.ca.gov/analysis_2007/crim_justice/crimjust_anl07.pdf.

Little Hoover Commission, *Solving California's Corrections Crisis: Time Is Running Out*, January 25, 2007; http://www.lhc.ca.gov/lhcdir/185/Report185.pdf.

Mariner, Joanne, "Prisons as Mental Institutions: The Mass Incarceration of the Mentally Ill," Oct. 27, 2003, http://writ.news.findlaw.com/mariner/20031027.html

Martin, Mark, "Changing Population Behind Bars: Major Drop in Women in State Prisons, *San Francisco Chronicle*, April 21, 2002, A-5; http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2002/04/21/MN233500.DTL&hw=mark+martin+changing+population+behind+bars&sn=006&sc=625.

Mauer, Marc, Executive Director, The Sentencing Project, "Lessons of the 'Get Tough' Movement in the United States," presented to the International Corrections and Prison Association's 6th Annual Conference, October 25, 2004; http://www.sentencingproject.org/tmp/File/Incarceration/inc_lessonsofgettough.pdf).

National Council on Crime and Delinquency, *"Attitudes of Californians toward Effective Correctional Policies,"*; http://www.nccd-crc.org/nccd/pubs/2004_corrections_attitudes.pdf

National Institute of Justice, "Major Study Examines Prisoners and Their Reentry Needs," by Christy A. Visher and Pamela K. Lattimore, *NIJ Journal*, Issue #258, October 2007; http://www.ojp.usdoj.gov/nij/journals/258/re-entry-needs.html.

Office of Inspector General, *Special Review Into In-Prison Substance Abuse Programs Managed by the California Department of Corrections and Rehabilitation*, February, 2007; http://www.oig.ca.gov/reports/pdf/substanceeabuseprograms.pdf.

Office of the Governor, "Governor Schwarzenegger Issues Statement Regarding Ruling on Prison Overcrowding," July 23, 2007; http://gov.ca.gov/index.php?/press-release/7014/.

Office of the Governor, *Budget Proposal, 2007-2008, Department of Corrections and Rehabilitation,* "Summary of Adult and Juvenile Per Capita Costs and Staff Ratios"; http://govbud.dof.ca/pdf/GovernorsBudget/5210.pdf.

Office of the Governor, "Governor Schwarzenegger Joins with Assembly Republicans, Law Enforcement Officials to Warn of Dangers if Felons are Released into Communities," Press Release, September 6, 2007; http://gov.ca.gov/index.php?/speech/7348/.

Office of the Governor, "Prison Overcrowding State of Emergency Proclamation," October 4, 2006, http://gov.ca.gov/index.php?/proclamation/4278.

Rudman, Cary J., and John Berthelsen. *An Analysis of the California Department of Corrections' Planning Process: Strategies to Reduce the Cost of Incarcerating State Prisoners*. Sacramento: California State Assembly Office of Research, 1991.

The Sentencing Project, *Aging Behind Bars: "Three Strikes" Seven Years Later*, Ryan S. King and Mark Mauer, August 2001; http://www.sentencingproject.org/Admin/Documents/publications/inc_aging.pdf

The Sentencing Project, *New Incarceration Figures: 33 Consecutive Years of Growth* (2006); http://www.sentencingproject.org/Admin/Documents/publications/inc_newfigures.pdf.

The Sentencing Report, *Uneven Justice*: *State Rates of Incarceration By Race and Ethnicity*," by Marc Mauer and Ryan S. King, July 2007; http://sentencingproject.org/Admin/Documents/publications/rd_stateratesofincbyraceandethnicity.pdf.

Stanford Criminal Justice Center, *The California Sentencing Commission: Laying the Groundwork*, March 9, 2007; http://www.law.stanford.edu/program/centers/scjc/pdf/Stanford_Exec_Sessions_Report_Recommendations.pdf

UCLA Integrated Substance Abuse Programs, *Final Report of the 2001-2006 SACPA Evaluation*, April 13, 2007; http://www.adp.ca.gov/pdf/SACPAEvaluationReport.pdf.

1

2    Vera Institute of Justice, *Reconsidering Incarceration: New Directions for Reducing Crime*

3    (2007); http://www.vera.org/publication_pdf/379_727.pdf.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTEREST OF *AMICI CURIAE***

*Amicus Curiae* Californians United for a Responsible Budget (CURB) is a broad-based, state-wide coalition of legal services and advocacy organizations, formerly imprisoned individuals and people who work with people in prison, faith-based groups, and others devoted to educating the public about the cause-effect relationships between prison policy and public safety, and seeking to curb prison spending by reducing the number of people in prison and the number of prisons in the state.

These amicus organizations are constituent organizations of CURB:

*All of Us or None*, an organization of people who have suffered felony convictions, which works to build unity and a program of action to effectively combat the many forms of discrimination faced by 30 million people living with felony convictions;

*The American Friends Service Committee* has been working on prison issues for over 50 years in California, with a particular concern for the overuse of incarceration; it has researched and monitored conditions faced by mentally ill offenders and has advocated community alternatives to incarceration, wherever possible, as more effective for the individual and for public safety;

*California Coalition for Women Prisoners,* a grassroots racial justice organization that challenges the institutional violence imposed on women and communities of color by prisons and the criminal justice system;

*California Families for Inmates* is an advocacy organization that assists the local Inmate Family Councils to become a cohesive, effective group through education, exchange of information and research materials.

*California Prison Focus*, an organization working to stop human rights violations, improve medical care and end long-term isolation in California prisons;

*The California Prison Moratorium Project*, based in California's Central Valley, which seeks to stop all public and private prison construction in California and use the money saved from California's prison construction budget to fund and actively pursue alternatives to imprisonment;

*The Campaign to End the Death Penalty – Bay Area*, a membership-driven, chapter-based grassroots organization dedicated to the abolition of capital punishment in the United States;

*The Central California Environmental Justice Network*, a network of environmental justice organizations from throughout California's Central Valley, who have come together to try to find solutions to the ongoing pollution and environmental injustices occurring in the mostly low income and communities of color in the Valley's rural areas;

*Critical Resistance*, a national grassroots organization whose mission is to end society's use of prisons as an answer to social problems in California;

*The Dolores Huerta Foundation*, whose mission is to build active communities working for fair and equal access to resources in low-income communities;

*Families to Amend California's Three Strikes (FACTS),* a statewide organization whose mission is to strive for proportionality in sentencing and fairness in the criminal justice system;

*Free Battered Women*, which seeks to end the re-victimization of imprisoned survivors of domestic violence as part of the movement for racial justice and the struggle to resist all forms of intimate partner violence against women and transgender people;

*The Friends Committee on Legislation of California*, a long-running non-profit action group working to bring compassion and social justice into government by influencing law making in the State Capitol;

*Grandmothers of the Light*, a statewide grassroots organization for the benefit of the children of California's prisoners and the reunification of families broken by incarceration, also working to reform prison policy and abolish the death penalty;

*Justice Now*, a human rights organization that works with women in prison and local communities to end violence against women and stop imprisonment;

*The Justice Policy Institute*, which promotes effective solutions to social problems and is dedicated to ending society's reliance on incarceration;

*The Labor/Community Strategy Center*, based in Los Angeles, which works to decrease the incarceration rates in low-income communities of color;

*Legal Services for Prisoners with Children*, a 30-year-old legal services organization that advocates for the human rights of incarcerated parents and their children and family members;

*National Lawyers Guild – Los Angeles Chapter*, a part of a national human rights bar organization which seeks actively to expose the racism of the criminal justice system and its prisons and to protect civil rights and liberties in the face of persistent attacks upon them.

*Progressive Democrats of Los Angeles* (PDLA) is a chapter of the Progressive Democrats of American that works to redirect resources from the prison-military-industrial-complex to public services such as education.

*Proyecto Common Touch*, which works to protect the due process rights of women on parole or in custody of the California Department of Corrections and Rehabilitation (CDCR);

*Transgender, Gender-Variant and Intersex Justice Project,* whose mission is to challenge and end the human rights abuses committed against transgender, gender variant/gender queer and intersex (TGI) people in California prisons and beyond;

*The University of California Berkeley Graduate Assembly*, which is the student government of UC Berkeley's graduate and professional school students; and, *The Youth Justice Coalition – Free L.A.,* which works to build a youth-led movement to challenge race, gender and class inequality in the Los Angeles County juvenile justice system.

# I. INTRODUCTION

This case raises issues of extraordinary importance for the treatment of all Californians in prison and for all Californians who, like *amici,* are concerned with how we as a society enact justice; with how the State treats those who are deprived of liberty; and with how the prison system affects the budget of the State of California and public safety in our State.

The purpose of this brief is to give the Court a more complete understanding of how the current prison overcrowding crisis can best be resolved. In response to the State's claim that AB 900 is an adequate solution to the crisis, we will show how irrelevant this prison expansion legislation is to the current crisis. In its place, we advocate the adoption of the practical and effective means to address prison overcrowding described herein, measures repeatedly recommended to the State, but which the State has refused to implement. In the face of the State's record of inhumane neglect, this Court should order a substantial reduction in the population of people in California's prisons, place a maximum limit on that population, and order the State to adopt these and similar measures to alleviate this crisis.

## II. BACKGROUND OF THE CASE

Every day overcrowding at California's prisons subjects people in prison to dangerous and inhuman conditions that violate their constitutional and inalienable human rights. Governor Schwarzenegger himself, a defendant in this action, has recognized the continuing crisis created by overcrowding in declaring a State of Emergency. Office of the Governor, "Prison Overcrowding State of Emergency Proclamation," October 4, 2006, http://gov.ca.gov/index.php?/proclamation/4278. As Defendant Schwarzenegger declared at that time, over a year ago, "the crisis gets worse with each passing day…" *Ibid*.

The current crisis is the result of the State's longstanding neglect of conditions in its own prisons. Defendant Schwarzenegger himself stated that the crisis "developed over the past 30 years." Office of the Governor, "Governor Schwarzenegger Issues Statement Regarding Ruling on Prison Overcrowding," July 23, 2007, http://gov.ca.gov/index.php?/press-release/7014/. For decades the State has ignored proposals for reforming its prison system and making California communities safer. The Little Hoover Commission in its report a year ago, put it bluntly: "[L]awmakers and government officials have failed to do their jobs…For decades, governors and lawmakers fearful of appearing soft on crime have failed to muster the political will to address the looming crisis. And now their time has run out." Little Hoover Commission, "Solving California's Corrections Crisis: Time Is Running Out," January 25, 2007, i ("*Corrections Crisis*"); http://www.lhc.ca.gov/lhcdir/185/Report185.pdf. In its report to the Legislature this past June, the Panel of Experts hired by the State's own Department of Corrections and Rehabilitation (CDCR) declared: "California doesn't need another report outlining correctional reform measures. What California needs to do is implement some of the proposals that have been presented to it." Expert Panel on Adult Offender and Recidivism

Reduction Programming, *A Roadmap for Effective Offender Programming in California*, June 29, 2007, Appendix A, page 77 ("*Roadmap*"); (the Expert Panel lists the previous reports at Appendix A, pages 78-79).[1]

Faced with the threat of Federal intervention in the crisis, Legislative leaders and Defendant Schwarzenegger (the so-called "Big Five") met in secret where they negotiated the largest prison expansion in history, later presenting this deal to the Legislature as a *fait accompli*. The legislation, known as AB 900, was enacted without any hearings, debate, or deliberation. There was no opportunity whatsoever for considering alternatives, including the meaningful proposals for substantive change recommended by the State's own Expert Panel. In fact, the bill's language was not even printed and available to legislators before they voted to approve this pact, a mere 24 hours after the deal was made public. Despite the massive spending of $15 billion called for in this deal, to be financed by the issuance of State bonds, there was no provision for a vote by the people of California.

There is substantial evidence that Californians reject prison construction as any solution to the prison crisis. The last two times Californians were asked to approve prison construction bonds, in 1990 and 1996, they rejected them by a substantial margin. In order to avoid losing yet another vote, the Big Five chose to use lease revenue bonds as the funding mechanism for AB 900  This huge construction plan calls for building some 53,000 new prison and jail cells over the next decade or so.

Ignoring two decades' worth of proposals for meaningful changes to the State's prison system, AB 900 cannot be considered a serious solution for the immediate overcrowding crisis in

---

[1] The CDCR website has links to different sections of the *Roadmap* at Hhttp://www.cdcr.ca.gov/News/ExpertPanel.htmlH. The citations herein will contain sufficient information to allow the reader to determine which link to use to access the information cited.

California's prisons.  Nor does it address the concerns of the Plaintiffs or the Court.  Given AB 900's extremely long horizon, even if fully implemented people in prison in this State will continue to endure dangerous, inhumane, and illegal conditions for years into the future.  In fact, by requiring lengthy and expensive construction projects AB 900 allows overcrowding to continue and worsen.   There are meaningful steps, already recommended to the State by experts in the field, described herein, steps that the State can take immediately to effectively respond to this crisis.  Because the State has shown its unwillingness or inability to address this ongoing crisis, the Court must step in to protect the rights of the 173,000 people in State custody.  The only way to protect those rights, at this point, is for this Court to order a substantial reduction in the population of people in California prisons and impose a strict limit on the number of people there.

Under 18 U.S.C. §3626 this Court has the authority to enter a prisoner release order reducing or limiting the prison population if a previous order for less intrusive relief has been entered and the defendant has had a reasonable amount of time to comply with that order ((a)(3)(A)), and the court has found that "the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right" ((b)(2)) .

The record will show that the provisions of §3626(a)(3)(A) are satisfied here by the series of court orders addressing deteriorating conditions in State prisons.  Over a decade ago this Court held that "seriously mentally ill inmates in the California Department of Corrections daily face an objectively intolerable risk of harm as a result of the gross systemic deficiencies that obtain throughout the Department," *Coleman v. Wilson*, 912 F. Supp. 1282, 1316 (E.D. Ca. 1995).  In

the twelve years since *Coleman*, the Court has tried numerous ways to effect relief for the Plaintiff class.  However, the risk of harm has only grown in the face of overcrowding.

Given the State's past and continuing neglect of this growing crisis through failure to comply with settlement decrees and refusal to adopt recommendations of its own experts, there is no remedy available to this Court other than a substantial population reduction and a strict limit on the numbers of people in California prisons.  In order to insure compliance with those limits and insure that this crisis is not repeated in the future, the Court should also fashion its own plan for reducing the population below those limits.

In sections III and IV *amici* rebut the State's contention that AB 900 renders these orders unnecessary because it is a fully adequate solution to the continuing violations of the rights of those in prison.  In the following section (section V) we advocate several measures that will meaningfully reduce the population in State prisons and thus alleviate the overcrowding crisis without compromising public safety.

## III. PRISON EXPANSION IS NOT A SOLUTION TO THE OVERCROWDING CRISIS

Shortly after entering office, Defendant Schwarzenegger appointed an expert commission to study and report its findings on the State's long-criticized Department of Corrections (as it was then titled).  That commission, headed by former Governor George Deukmejian, issued over 200 recommendations, but chief among them was this: "The key to reforming the system lies in reducing the numbers." Corrections Independent Review Panel, *Reforming California's Youth and Adult Correctional System* 123 (2004);

http://cpr.ca.gov/report/indrpt/corr/pdf/from7to11.pdf.   Three years later, the Legislature and Defendant Schwarzenegger appear to have completely rejected this recommendation by enacting AB 900, which offers as the purported solution to the State's crisis a huge increase in the

numbers of people in prison.  As history shows, prison expansions do not reduce prison

populations.

Overcrowding in California's prisons has not been driven by crime rates or related to

public safety.  Studies establish that imprisonment is not an effective or sustainable way to

reduce crime.  *See, e.g.*, The Sentencing Project, *New Incarceration Figures: 33 Consecutive*

*Years of Growth* 1 (2006) ("Despite falling crime rates since 1991, the rate of incarceration in

prison has increased by more than 50% since that time…as a result of changes in sentencing

policy and practice…[such as] 'three strikes'"),

http://www.sentencingproject.org/Admin/Documents/publications/inc_newfigures.pdf; Justice

Policy Institute, *Still Striking Out: Ten Years of California's Three Strikes* 4, 27 (2004)

(discussing the impact of Three Strikes law on the size and scope of California's prison

population, and emphasizing that "[t]here is no evidence of a crime reduction benefit, either

between counties or states, attendant upon the Three Strikes law")

http://www.justicepolicy.org/images/upload/04-03_REP_CAStillStrikingOut_AC.pdf; Vera

Institute of Justice, *Reconsidering Incarceration: New Directions for Reducing Crime* 13, 16

(2007) (concluding that "criminal justice policymakers appear to have placed undue emphasis on

incarceration" given that "[t]he impact of incarceration on crime is limited and diminishing"),

http://www.vera.org/publication_pdf/379_727.pdf.  Rather, as reported by the State's own Little

Hoover Commission, the current crisis is largely the result of California's singular reliance on

the CDCR. *Corrections Crisis* ii (2007).  The state has failed "to tap the resources of other

agencies," such as those providing education, job training, and housing opportunities, in order to

truly improve public safety. *Ibid.*

While the State has attempted to couch AB 900 as a prison "reform" package, building new prisons does not alter the prison system in any meaningful way.  History teaches us that increasing the number of prison beds only leads to more people in prison. In 1882 Folsom Prison was built partly in response to arguments that San Quentin had become decrepit and overcrowded, only to become immediately overcrowded itself.  Since that time, California has undertaken expansion after expansion, resulting in rising numbers of people in prison, increasingly poor conditions, and steady growth in the percentage of the overall state budget spent on prisons. (See for example, Rudman, Cary J., and John Berthelsen. 1991. *An Analysis of the California Department of Corrections' Planning Process:  Strategies to Reduce the Cost of Incarcerating State Prisoners.*  Sacramento:  California State Assembly Office of Research.). Prison building has consistently failed to alleviate overcrowding, while steadily increasing the financial burden on California taxpayers.

Most recently, the opening of Kern Valley State Prison at Delano II on June 1, 2005, shows the futility of trying to build your way out of an overcrowding crisis.  In May 2005 there were 163,074 people in prison in California's prisons. Delano II's new 5,160 beds were immediately filled and exceeded, and by the end of the year there were 167,958 people in prison in California, an increase of 4,884 in 7 months.  Two years later, the prison system is still at 200% of design capacity, with 172,971 people in prison as of May 31, 2007.

The Little Hoover Commission called for real changes in the prison system, stressing the effectiveness of altering sentencing and parole policy.  These policy initiatives have been successfully implemented in over two-dozen other states to reduce overcrowding.  The Commission calls on Defendant Schwarzenegger and the Legislature to lay out plans that include strategies and timetables for reducing overcrowding, rather than "settl[ing] for simply building

more cells." *Corrections Crisis* Cover Letter.  Ignoring these recommendations by its own

Commission, the State in AB 900 sets no specific timetable or milestones to show progress in

relieving overcrowding, nor does it call for alternative solutions, which could actually reduce

prison overcrowding rapidly and economically.  The State cannot build its way out of this crisis;

the only solution is meaningful change in policies that determine the size of the prison

population.  Without this Court's intervention to institute those meaningful changes that will

reduce the numbers of people in California's prisons, the population will continue to grow

indefinitely.

## IV. AB 900 OFFERS NO SOLUTIONS TO THE OVERCROWDING CRISIS

AB 900 does not provide immediate or even long-term solutions to overcrowding.  This

legislation is solely a prison expansion measure, calling on the state to build 53,000 new prison

and jail beds over ten years, at a projected cost of $15 billion for construction and debt service

alone.  This sum does not include any money for the operating expenses of new prisons.  As

noted by Judge Thelton Henderson in his "Order Granting Plaintiffs' Motion to Convene Three-

Judge Court," July 23, 2007, "AB 900 fails to address the critical component of staffing – made

even more critical by the undisputed fact that California's prison system is currently severely

understaffed in terms of both medical and correctional officers…" *Plata et al. v.*

*Schwarzenegger et al.*, United States District Court, Northern District of California, Case No.

C01-1351 THE.[2]  The bill's failure to make any provision for future staffing is yet another

example of the State's failure to address the underlying causes of overcrowding.

_____

[2] The added costs for staffing the new prison construction will be more than $1.6 billion per year,
calculated by multiplying the added number of people in State prisons (40,000) times the per
capita cost for each person of approximately $40,000.00. This per capita cost figure is less than
last year's (2006-2007) per capita expense of $41,966, while Defendant Schwarzenegger
estimated the costs for 2007-2008 at $44,339.  Office of the Governor, *Budget Proposal, 2007-*

AB 900 will have no immediate effect on prison overcrowding.  The bill provides financing for future building of prisons, with a timeline laid out in years, rather than weeks or months.  This will not improve conditions at all for the tens of thousands of people currently in prison living in unsafe conditions due to overcrowding.  Moreover, according to Robert Sillen, the court-appointed Federal Receiver for prison health care, AB 900 will set back efforts to bring constitutional medical care to the prison system by five years.  The bill, he concludes, is "going to be problematic for our job, it's going to take us longer to do our job, and it's going to cost more." Andy Furillo, "Prison-building plan hit: Federal receiver says it will set his health care efforts back by five years," *The Sacramento Bee*, July 11, 2007, A4; http://www.sacbee.com/111/story/266603.html.  Cataloguing the problems with AB 900's reliance on construction, he concluded that the legislation is "not a fix," but a political "charade." *Ibid.*  Even Defendant Schwarzenegger's own Secretary of the CDCR recognizes the futility of expanding a system that is failing.  "I already believe," he said, "the prisons are too big to manage."[3]Rather than trying to build its way out of this crisis, the State must take immediate measures that will actually relieve overcrowding.

Other states faced with similar situations, including Montana, Colorado, Florida, Texas, and Washington, have successfully and expeditiously relieved overcrowding by capping prison populations. Without a cap on the prison population, combined with specific mechanisms for achieving this cap, the problem of overcrowding will grow worse over the decade or more it takes for the state to attempt to implement AB 900.

---

*2008, Department of Corrections and Rehabilitation,* "Summary of Adult and Juvenile Per Capita Costs and Staff Ratios," CR 6; http://govbud.dof.ca.gov/pdf/GovernorsBudget/5210.pdf.

[3] Don Thompson, Associated Press, "Governor's Cuts Could Mean Some Criminals Avoid Prison Time," *The Valley Times*, January 13, 2008, A3.

It would be much more efficient and economical for California to dedicate its resources to a plan addressing the causes of overcrowding than to continue building prisons that will themselves soon be overcrowded.  Unfortunately, while the State misleadingly presents AB 900 as a prison reform bill that supports rehabilitation and reentry programs, it provides no funding or staffing for *existing* programs.  In fact, less than one percent of the funds to be borrowed under AB 900 ($50 million of the $7.8 billion) are earmarked for rehabilitation and reentry programs at all, and those programs are vague and undefined.  This miniscule funding will not pay for the extra staffing and other resources needed to make such programs effective on the scale required to address the overcrowding crisis.  This mammoth construction program actually replaces genuine innovations, as became clear when Defendant Schwarzenegger dropped his proposals for new parole and sentencing policies upon its enactment.  AB 900 is not a credible "reform" measure; it will only expand a failed system.

The CDCR's Expert Panel found that other states had "come to the conclusion that they can no longer afford to keep building more prisons.  The expenditures become too costly and can force states to the margins of bankruptcy." *Roadmap* Part I, page 10.[4]   The Panel concluded that soon California would also be "forced [by fiscal constraints] to consider alternatives besides prison building to solve its overcrowding problem." *Ibid*.  That time has come.  The history recounted in section IV above shows the futility of the State trying to build its way out of prison overcrowding.  The projected new capacity under AB 900 will be exceeded as soon as new beds

---

[4] Huge construction costs like those in AB 900 soak up funds that would otherwise go for rehabilitation and reentry of those in prison.  The continually increasing share of the budget that goes to pay to keep people in prisons in this State certainly impacts other state services as well.  As just one example of this impact, *The Sacramento Bee* declared, "Prisons are sucking the life out of higher education in this state."  "Why Would Lockyer Want to Add to UC's Pain? – California's Priorities are Out of Balance, So Prisons See Increases as Higher Ed Suffers," *The Sacramento Bee*, October 8, 2007, B4; Hhttp://www.sacbee.com/110/story/417537.htmlH.

become available.  AB 900 fails to address the overcrowding crisis, instead perpetuating the conditions that caused it.  It allows the State to once again defer the meaningful changes to alleviate this intolerable situation.  Moreover, AB 900 will divert financial resources away from those needed changes as well as other State programs in education, health care, housing and job training that will enhance public safety by strengthening our communities.  For these reasons, as part of its order in this case, the Court should bar implementation of AB 900.

## V.  THERE ARE IMMEDIATE AND LONG TERM SOLUTIONS AVAILABLE TO END OVERCROWDING

The State is aware of a variety of ways to solve overcrowding.  Defendant Schwarzenegger's proposals for early release and summary parole, while inadequate to alleviate overcrowding, point the way toward meaningful change.[5]  Other measures that substantively address overcrowding include alterations in parole and sentencing policy aimed at reducing population over the long term; and housing, job training and other re-entry programs to support the transition of people in prison back home.  The State's own Little Hoover Commission's Corrections *Crisis* report identifies "Immediate Opportunities to Address Overcrowding," including reducing the number of people placed on parole, expanding earned early discharge of some people in prison, and empowering judges to utilize truly community-based programs instead of imprisonment.  AB 900 does not address any of these means for effectively reducing overcrowding.

In this section *amici* lay out meaningful solutions for alleviating overcrowding, including changing California's parole and sentencing policies, compassionate release of elderly people from prison, fully funding voter authorized Proposition 36 which provides for treatment rather

---

[5] These proposals must be approved, and therefore may never be implemented.

than prison for some individuals convicted of drug offenses, and the provision of meaningful community support for those released.  Each of these recommendations lies within the authority of this Court, as the Prisoner Litigation Reform Act defines a "prisoner release order" as "any order…that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison." 18 U.S.C. §3626(g)(4).

Unlike the substantial added costs AB 900 imposes on Californians, according to the State's Expert Panel there will be substantial cost savings for California taxpayers from instituting programs like those we urge the Court to include as part of its order.  Further, the Panel believes that these programs could be instituted within a relatively short period of time, about two years. *Roadmap* Part I, page 54.   Rather than embarking on a lengthy and expensive prison expansion program that will only *increase* the number of people in California's prisons, the State should be required to implement these substantive changes immediately to alleviate the current crisis and help make our communities safer.

## A.  Reforming Parole

Changing California's parole policies is perhaps the most immediate and meaningful mechanism for reducing the number of people in prison in California.  Repeatedly recommended to the State, change in parole policy is long overdue as a remedy for overcrowding.

California has the highest rate in the nation of people being returned to prison for parole violations.  We currently send nearly 70,000 people to prison every year in this state, not for new offenses, but solely for violations of parole. *Roadmap* Part I, page 48 (this figure is for 2006). Sixty-four percent of California's new prison admissions are for parole violations, as opposed to 36% for new felony court convictions — "nearly the exact opposite of most other states." *Ibid.*

The policy of imprisoning people for technical parole violations has no impact on public safety: "[T]here is no evidence to support that the current practice of locking up offenders for technical parole violations…reduces crime." *Ibid*. In fact, as the Expert Panel concluded, "[P]lacing low risk offenders on parole supervision has the opposite of its effect — instead of recidivism rates decreasing, they increase." *Roadmap* Part I, page 42. (The Panel notes that California's recidivism rates "have risen steadily since the late 70s [3].). Moreover, as the Panel found, repeated imprisonment not only makes reintegration more difficult, it disrupts and damages families and community. *Roadmap* Part I, page 47. In sum, there is no benefit and much harm from the current State policy. To alleviate this problem the Panel recommends that California should adopt the policy that other states have implemented and not place everyone on parole supervision upon release. *Roadmap* Part I, page 41.

Obviously, not sending every person back to prison for every violation of parole will mean fewer people in prison, but just how significant would changes in parole policy be in reducing prison population? The Expert Panel estimates that the changes it proposes would reduce the number of people in prison in California by 38,000 to 44,000. It further estimates there would be a net cost savings to taxpayers of $500 – 600+ million dollars. *Roadmap* Part I, pages 53f, Table 9, page 53; and Appendix E (these figures include only the population reductions and cost savings attributable to alterations in parole). This proposed change is a serious, and sensible, response to the overcrowding crisis, one that the State should be ordered to implement as part of a plan to alleviate this crisis.[6]

---

[6] While Defendant Schwarzenegger's proposal points in the right direction of sentencing and parole changes, it falls far short of the substantive reform that is needed and which the Expert Panel recommends.

**B. Fully Implementing Proposition 36**

In November 2000, the people of California voted overwhelmingly to enact Proposition 36, "The Substance Abuse and Crime Prevention Act" (SACPA; herein "Proposition 36"), which became effective July 1, 2001.[7]  Under Proposition 36 those convicted of certain drug offenses are eligible for probation with drug treatment instead of imprisonment. Also eligible for treatment are those on probation or parole who commit certain drug offenses or who violate drug-related conditions of their release.  The legislation mandated an investment of $120 million per year, mostly for treatment programs, for the first five years of the program's operation.

There is no question that Proposition 36 has reduced the population of those in prison and has saved the State enormous sums of money.  From December 2000, to December 2005, while the overall prison population was growing, the number of those convicted of simple drug possession charges dropped 27.4%, from 19,736 to 14,325, and the rate of imprisonment for these offenses decreased from 89 to 58 persons per 100,000 population, a 34.3% decline. Justice Policy Institute, *Proposition 36: Five Years Later*, April 2006, 4 ("*Prop 36 Five Years Later*") http://www.justicepolicy.org/images/upload/o6-04_REP_CAProp36FiveYears Later_DP-AC.pdf.  The impact of Proposition 36 was felt immediately: within a year of its taking effect there was a substantial reduction in the number of women in State prisons.  Referring to this one-year 10% reduction the CDCR itself acknowledged that "the biggest factor [in those numbers] is Proposition 36." Mark Martin, "Changing Population Behind Bars: Major Drop in Women in State Prisons," *San Francisco Chronicle*, April 21, 2002, A-5; http://www.sfgate.com/cgi-

---

[7] The proposition passed with a 61% majority and has become even more popular since, polling 73% support in 2004. National Council on Crime and Delinquency, *"Attitudes of Californians toward Effective Correctional Policies,"* 1; Hhttp://www.nccd-crc.org/nccd/pubs/2004_corrections_attitudes.pdfH (herein "*Californians' Attitudes on Corrections*"; the poll was conducted by the Field Research Corporation).

bin/article.cgi?f=/c/a/2002/04/21/MN233500.DTL&hw=mark+martin+changing+population+be

hind+bars&sn=006&sc=625.  Within a year of this reduction, in February 2003, the Department

of Corrections closed the 800-bed Northern California Women's Facility.

The financial benefits of Proposition 36 have been carefully documented in a series of

annual reports to the State Department of Alcohol and Drug Programs (DADP) by UCLA's

Integrated Substance Abuse Programs.  Retained by the DADP to track Proposition 36's impact

during its first five years, the UCLA researchers issued their final evaluation in April 2007.

Their final cost-benefit analysis concluded that "[t]axpayers saved nearly $2.50 for every $1.00

invested" in the first year of the program and a similar amount for the second year; the return for

those who completed treatment under Proposition 36 was an even greater 4 to 1.  In sum,

Proposition 36 "substantially reduced incarceration costs," by more than $3,500.00 per person

charged under Proposition 36 offenses, for a total savings in prison costs of $218.5 million (plus

$94.3 million in jail costs) in the first year alone. UCLA Integrated Substance Abuse Programs,

*Final Report of the 2001-2006 SACPA Evaluation*, April 13, 2007, 6, 98-99, 116 ("*Prop 36

Evaluation*"); http://www.adp.ca.gov/pdf/SACPAEvaluationReport.pdf.

The State's own Legislative Analyst's Office (LAO) confirms these benefits from

Proposition 36.  In its comprehensive Budget Analysis in February 2007, the LAO concluded,

"[I]ndependent academic evaluations of Proposition 36 and our own separate review of prison

data since its enactment in 2000 have confirmed that the measure has held down growth in the

prison and jail population and resulted in fiscal savings beyond its costs." Legislative Analyst's

Office, *2007-2008 Budget Analysis*, "Judicial and Criminal Justice," D-160;

http://www.lao.ca.gov/analysis_2007/crim_justice/crimjust_anl07.pdf.  The LAO calculates the

net savings to the State from Proposition 36 at $205 million for fiscal year 2002-2003 and $297

million for 2004-2005.  For the latter year the LAO calculated the benefit-cost ratio for the program at 2 to 1, slightly lower than UCLA's figure, but still a healthy return on taxpayers' dollars. LAO, *2007-2008 Budget Analysis*, "Health and Social Services," C-32; http://www.lao.ca.gov/analysis_2007/health_ss/healthss_anl07.pdf.  Coupled with the savings that UCLA calculated for the first year of the program, the total net savings to taxpayers from Proposition 36 totals well over half a billion dollars.  The bulk of these savings result from reduced numbers of people in prison.[8]

Recognizing the substantial public benefit from Proposition 36, the Legislative Analyst's Office recommended that funding for the program in the 2007-2008 budget be maintained at the same level — $145 million — as the previous year's budget, even if it meant that funds had to be shifted from other programs.  LAO, *Analysis of the 2007-2008 Budget*, "Judicial and Criminal Justice," D-160.  The LAO warned that reducing funding for Proposition 36 would in all likelihood increase prison costs. LAO, *Analysis of the 2007-2008 Budget*, "Health and Social Services," C-32.  Flatly rejecting this recommendation and repudiating the unanimous conclusion that Proposition 36 is "a sound investment for taxpayers" and our communities because it reduces the number of people in prison and saves money, Defendant Schwarzenegger proposed a $25 million *reduction* in funds for the program in last year's budget.  *Prop 36 Evaluation* 136.  In the final budget the Legislature cut funding from last year's levels by that $25 million sum (plus the accumulated effects of inflation in reducing the available funds).  This

---

[8] These savings do not include the benefits of enhanced availability of drug treatment and reduced drug usage, as well as increased employment among the program's clients, a result that a recent study has shown to benefit public safety. *Prop 36 Five Years Later* 26; Justice Policy Institute, *Employment, Wages and Public Safety*, October 1, 2007, 3; Hhttp://www.justicepolicy.org/images/upload/07_10_REP_EmploymentAndPublicSafety_AC.pdfH.

reduction will limit the impact that Proposition 36 has on the numbers of people imprisoned, as well as cut back the fiscal benefit to taxpayers from relying on drug treatment rather than imprisonment.

Rather than making counterproductive budget cuts, the State should be looking for ways to further enhance the benefits of Proposition 36 by diverting more people with drug problems to treatment rather than prison.  The UCLA researchers have provided thoughtful guidance here.  In their evaluation they lay out in detail a number of ways to maximize that benefit.  *Prop 36 Evaluation*, Chapter 8, 126-34.  Among the measures they propose are:

1. Providing the same level of treatment to Proposition 36 clients that they would have received had they been referred to treatment through the criminal legal system before Proposition 36 was enacted.

2. Increasing the number of Proposition 36 clients who receive the minimum level of 90 days of care.

3.  Providing the minimum level of care to those who are referred to but do not enter treatment.

4. Extending narcotic replacement therapy treatment to those Proposition 36 clients who report opiates as their primary drug.

The UCLA Evaluation calculates the added cost of fully funding these targeted improvements to the Proposition 36 program at $53.9 million.  *Prop 36 Evaluation* 126.  While this represents an increase in the allocation for this program, Proposition 36's demonstrated record of success in saving costs and reducing the numbers of people in prison warrants implementation of these proposals so that Californians who voted overwhelmingly for this program can reap its full benefit.

**C. Releasing Elderly Persons**

As of December 2004, there were approximately 7,550 elderly persons (55 years of age or older) in State prison.  While this seems a relatively small number compared to the overall prison population, the "graying" of the prison population threatens to undo in the future whatever steps are taken today to reduce the prison population.[9]  In just 15 years this number will exceed 30,000. Legal Services for Prisoners With Children, *Dignity Denied: The Price of Imprisoning Older Women in California*, December 2005, 6, 11 ("*Dignity Denied*"); http://www.prisonerswithchildren.org/pubs/dignity.pdf.

There is no question that "[o]lder prisoners face a unique set of health and safety concerns as they grow old in a system not designed to address their special needs." *Dignity Denied* 7.  Because of their declining health and special needs, the annual cost of imprisoning an older person is "nearly double that of a younger prisoner, approximately $70,000 a year." *Dignity Denied* 7 (as of December, 2005).  The Legislative Analyst calculated the costs as even higher; two to three times that of other people in prison, concluding that "the graying of CDC's population has serious long- and short-term General Fund implications." Legislative Analyst's Office, *Analysis of the 2003-2004 Budget Bill*, Department of Corrections ("*Budget Analysis 2003-2004*"); http://lao.ca.gov/analysis2003/crim_justice/cj_04_5240_anlo3.html (this document is not paginated).  At the same time, studies show that elderly persons represent a low risk of recidivism. *Ibid.*; *Dignity Denied* 7.

For these reasons, in 2003 the Legislative Analyst recommended early discharge to parole for certain older persons currently imprisoned.  If this recommendation had been adopted, the savings for the State would have been substantial: $9 million in that year and significantly

---

[9] The main cause of this trend toward an older prison population is discussed in §V.D. below on Sentencing.

more thereafter.  And, according to the LAO, this reduction in population and these savings would have been accomplished "without jeopardizing public safety." *Budget Analysis 2003-2004.* This recommendation was ignored then, and has been ignored since by the Legislature and Defendant Schwarzenegger.

The same circumstances that led the Legislative Analyst to make her earlier recommendation exist today, except that conditions for the elderly, as for all persons imprisoned in the State's prisons, have deteriorated.  The Court should adopt the LAO's recommendation to discharge elderly prisoners to parole as part of its order to address the overcrowding crisis.

**D. Changing California's Sentencing Policies**

Arguably the major factor in the growth of the prison population has been and remains California's sentencing policies.  According to the Legislative Analyst's Office, the increased imprisonment rates over the past 20 years have been, "driven mainly by changes in sentencing laws…" LAO, *2007-2008 Budget Analysis*, Judicial and Criminal Justice, D-56.

Unless sentencing policies are addressed, the pressure toward overcrowding will continue and intensify.  To achieve long-term reductions in population, the State's sentencing policies need to be changed.  The most effective way to do that is for the Court to appoint a Sentencing Commission whose explicit goal is to reduce the number of people in prison in California.

For the past 30 years the State has pursued a so-called "tough on crime" policy, repeatedly lengthening imprisonment for existing crimes and adding new ones.  In research conducted by the Stanford Criminal Justice Center (SCJC) for the Little Hoover Commission's report last year, the SCJC found that since the enactment of the Determinate Sentencing Act in 1977 (Penal Code §§1170) there have been more than 80 substantive increases in prison sentences.  *Corrections Crisis* 68.  This is a conservative count, because the study was limited in

scope and did not include many provisions of the Penal Code, including those relating to work credits (the SCJC recommended that these provisions be included in future research). *Ibid*. The LHC conclusion was clear and unequivocal: this policy of "toughness" has not improved public safety. "Despite the rhetoric," the LHC declared, "thirty years of 'tough on crime' politics has not made the state safer." *Corrections Crisis* ii.

Obviously, the "get tough" policy "has led to more [people] being locked up for longer periods of time," contributing to the explosion in the State prison population to nearly 173,000 today. *Roadmap* Introduction, page 4.[10]  Changing sentencing policies will point the way to reductions in the prison population.  Proposition 36's alternative to imprisonment for those charged with drug possession is but one example of the alternatives to imprisonment that can more effectively respond to harm in our communities.  Another important example is the treatment of the mentally ill: rather than imprisoning these people, where their condition may well be exacerbated by prison conditions, they should be treated in the community wherever possible.  Such treatment will be both more effective and more cost efficient.[11]  In addition to

---

[10] Nationally, the "get tough" approach has been the major contributor to the five-fold increase in prison and jail populations between 1972 and 2004, giving the United States a rate of imprisonment 5 to 8 times greater than that of most other industrialized nations.  From 1980 to 1996, "when the inmate population tripled, 88% of this rise was a result of changes in sentencing policy…" (Marc Mauer, Executive Director, *The Sentencing Project*, "Lessons of the 'Get Tough' Movement in the United States," presented to the International Corrections and Prison Association's 6th Annual Conference, October 25, 2004, 2; http://www.sentencingproject.org/tmp/File/Incarceration/inc_lessonsofgettough.pdf.

[11] The extent and severity of the problem of imprisoning the mentally ill is described by a Human Rights Watch attorney:

Over the past few decades, the country's prisons and jails have become its default mental health system. Somewhere between two and four hundred thousand mentally ill people are incarcerated, several times more than the number of people living in mental institutions.

The results, from a therapeutic, humanitarian, and human rights perspective, are appalling. "We are literally drowning in patients," explains one California

alternatives to imprisonment, a meaningful earned good time credit system would provide those in prison with incentives and hope, while also reducing their time behind bars.

One of the largest contributors to the explosion in the numbers of people in prison has been the State's "Three Strikes" law, which took effect on March 1, 1994 (see California Penal Code §667). Though similar to other states' policies, California's law is "much more punitive – – and far-reaching" than others. Justice Policy Institute, *Still Striking Out: Ten Years of California's Three Strikes*, by Scott Ehlers, Vincent Schiraldi, and Jason Ziedenberg, (updated September, 2004; herein "*Striking Out*") 3; http://www.justicepolicy.org/images/upload/04-03_REP_CAStillStrikingOut_AC.pdf.

If a person has one felony listed as "serious" or "violent," the law provides for a mandatory doubled sentence for *any* second felony and, with two previous listed felonies, *any* third felony receives a mandatory sentence of 25 years to life. The second and third strikes are not limited to felonies classified as "violent" or "serious." In addition, persons convicted under the law are not eligible for parole until they have served 80% of their sentence, while many others are eligible after serving 50% of their time. *Striking Out* 3.

The impact of three strikes on the size of the prison population has been substantial: as of 2004 over 42,000 persons — more than one in four prisoners — were serving a doubled or 25-

---

prison psychiatrist, "running around trying to put our fingers in the bursting dikes, while hundreds of men continue to deteriorate psychiatrically before our eyes." (Joanne Mariner, "Prisons as Mental Institutions: The Mass Incarceration of the Mentally Ill," Oct. 27, 2003; Hhttp://writ.news.findlaw.com/mariner/20031027.htmlH)

According to the CDCR's figures as of July 2002, 23,439 prisoners were on the prison mental health roster, representing over 14 percent of the California prison population. Human Rights Watch, *Ill-Equipped: U.S. Prisons and Offenders with Mental Illness*, 18 (2003); Hhttp://www.hrw.org/reports/2003/usa1003/usa1003.pdfH.

to-life sentence under three strikes. *Striking Out* 3.[12]  The State witnessed a 22.6% increase in prison population between 1994 and 2003, and "an increasingly larger part of that population is made up of people serving a second or third strike." *Striking Out* 4 (see chart page 5).  Moreover, the three strikes law "has a disproportionate effect on people convicted of non-violent offenses." *Striking Out* 8.  As of 2003 "nearly two-thirds (64.5%) of second and third strikers were serving time in prison for a non-violent offense." *Ibid.*

Despite its severity, the three strikes law has not reduced crime rates. *Striking Out* 12. This is the conclusion of multiple studies which examine the law's impact from a variety of perspectives, including: 1) Analyzing rates of serious crimes in California's largest cities; 2) comparing crime rates between counties with different rates of enforcement of the law; 3) examining the law's success in the selective incapacitation of people defined as "dangerous"; and 4) comparing crime rates in three strike states to those in non-three strike states. *Striking Out* 12-19.  This body of research leads to a simple conclusion: "There is no evidence of a crime reduction benefit" from the law. *Striking Out* 27.[13]

The law's impact on the public coffers, on the other hand, is substantial.  As is to be expected from the increase in prison population and lengths of imprisonment, "three strikes has had a significant fiscal impact in California." *Striking Out* 20.  The Justice Policy Institute

---

[12] Compare this with Georgia that had 5,837 (12.5% of its population) or Washington State with only 260 persons in prison under its law at that time (*Striking Out* 3).

[13] Three strikes' proponents argue that the law's impact can be seen in the lower crime rate during part of the decade following its enactment.  But that fluctuation was part of a national trend; researchers have not found evidence that three strikes independently contributed to it: "Recent analysis of both California and national data demonstrates that the decline in crime in California cannot be significantly attributed to the 'three strikes' law" (The Sentencing Project, *Aging Behind Bars: "Three Strikes" Seven Years Later*, Ryan S. King and Mark Mauer, August 2001, 7 ["*Seven Years Later*"];
Hhttp://www.sentencingproject.org/Admin/Documents/publications/inc_aging.pdfH).

calculates the additional cost at $10.5 billion over the first decade the law was in effect (between March, 1994 and September, 2003), $6.2 billion of which resulted from longer sentences for offenses classified as "non-violent." *Striking Out* 23 (these figures include both prison and jail expenditures).  The additional costs from three strikes will cumulate in the future, as those serving sentences under the law as of September, 2004, will serve a total of an additional 305,304 years compared with the time they would have served had three strikes not been enacted. *Striking Out* 27.  Moreover, the law "has contributed to a rapid aging of the California prison system," evidenced by the fact that in the first 5 years of the law's impact, when there was a decline in new felony admissions to State prison for all age groups between 20 and 35, the proportion of those admissions above the age of 40 increased from 15.3% (1994) to 23.1% (1999). *Seven Years Later* 4.  This "graying" of the prison population will likely be even more dramatic in the future, resulting in increasingly higher total and average costs of imprisonment. *Seven Years Later* 5.  It is estimated that the population of those serving twenty-five-to-life sentences will exceed 30,000 in 20 years, at an annual cost of more than $750 million.  At the same time, because older persons statistically commit fewer crimes, the long term imprisonment provided for in the three strikes law will offer "diminishing returns." *Seven Years Later* 5.

There are collateral consequences from the imposition of harsher sentences.  Perhaps most severe is the damage suffered by the children of people in prison.  The California Research Bureau describes the damage which separation from a parent can inflict on a child, including difficult and painful feelings, and behavioral consequences, which "can be severe, absent positive intervention — emotional withdrawal, failure in school, delinquency and risk of intergenerational incarceration." *Striking Out* 27.  A substantial number of children have been or will be affected in this way.  It is estimated that as of September 2004, there were 46,700

children with parents serving a sentence under the three strikes law. *Striking Out* 26. The harm to them is part of the larger impact that every family with a parent in prison suffers, damage "which can include the loss of financial and emotional support as well as the social stigma of having a family member imprisoned, and the loss of child care which enables other family members to work." *Striking Out* 27. Given the absence of demonstrable benefit from three strikes, this harm is needlessly inflicted.

Perhaps the most severe impact of three strikes is the unequal treatment of different groups. There is, first, geographic disparity. In a recent study the Justice Policy Institute found that "[s]imilarly situated individuals may receive extremely different sentences [under the three strikes law] depending upon where they live." Justice Policy Institute, *Racial Divide: An Examination of the Impact of California's Three Strikes Law on African-Americans and Latinos*, October 2004, by Scott Ehlers, Vincent Schiraldi, and Eric Lotke, 19 (herein "*Racial Divide*"); http://wwwjusticepolicy.org/images/upload/o4-10_TAC_CARacialDivide_AC-RD.pdf. Rather than the simple uniformity in the application of the law its proponents promised, this study found that "the power to determine sentences shifted from the judge…to the prosecutor in the context of charging decisions or plea negotiations. Those decisions have been applied at dramatically different rates throughout the state." *Ibid.*

There is also the disproportionate punishment of African-Americans and Latinos under three strikes, with the result that both groups "are imprisoned under Three Strikes at far higher rates than their white counterparts." *Racial Divide* 2. While African-Americans are 6.5% of the population, they are 30% of the prison population, 36% of second strikers, and 45% of third strikers. *Ibid.* "In the state as a whole and most localities in particular, minorities are treated more harshly at every stage of the system — beginning at arrest and ending, for some of them,

with a sentence under Three Strikes." *Racial Divide* 19.[14]  The conclusion is clear: African-Americans and Latinos "had higher rates of incarceration in general, and under the Three Strikes law in particular." *Racial Divide* 5.[15]  Remedying this inequitable treatment will have a substantial impact on the prison population.

  This Court should begin remedying these inequities in California's criminal justice system by appointing a Sentencing Commission with a specific mandate to reduce the number of people in prison.  Like other measures to reform California's criminal justice system, this proposal has been made and rejected many times in the past.[16]  The CDCR's own Expert Panel renewed the call for a sentencing commission after reviewing reports going back to 1990 and finding that the establishment of such a body was one of the recurring recommendations. *Roadmap* Appendix A, page 77.  Recognizing the harmful effect of politicizing criminal justice policy, recent proposals call for new administrative authorities that operate with some independence from the legislative process.  The Little Hoover Commission, for example, recommends the establishment of a Sentencing Commission with authority to enact sentencing guidelines into law unless vetoed by a majority vote of the Legislature. *Corrections Crisis* vi-

---

[14] The study makes adjustments that rule out the possibility that these disparities are attributable to differences in crime rates among different groups. *Ibid.*

[15] To compare the disproportionate rates of imprisonment between racial groups in individual states and in the United States as a whole, another study calculated for each state and nationally the ratio of imprisonment rates for African-Americans over the rates for whites.  The national average is an African-American imprisonment rate 5.6 times the white imprisonment rate, but in California the African-American imprisonment rate is even higher: 6.5 times the white imprisonment rate. The Sentencing Report, *Uneven Justice*: *State Rates of Incarceration By Race and Ethnicity*," by Marc Mauer and Ryan S. King, July 2007, 11; Hhttp://sentencingproject.org/Admin/Documents/publications/rd_stateratesofincbyraceandethnicity.pdfH.

[16] See Appendix E, "History of Sentencing Commission Proposals in California," in *Corrections Crisis* 63f, which surveys such proposals going back over 20 years; some did not make it out of the Legislature, while those that did were vetoed by the then-sitting governor.

vii.[17]  These proposals recognize that, because of the history of inaction by the Legislature and Governor and the continuing and long term impact of increased sentences already in place, a thorough review of and changes to sentencing policies that focus on reducing the number of people in prison is called for as an integral part of resolving the present crisis.

Among the changes the Commission should be charged to address are:

1) Changes to sentencing policies, such as the three strikes law and its impact on the overall prison population; and

2) The disproportionate impact of policies, especially the three strikes law, on racial and ethnic minorities.

The Commission membership should be diverse and capable, by reason of background, experience, and expertise, of addressing the current deficiencies in sentencing policies — excessive reliance on ever-increasing imprisonment and the inequitable impact of these policies on minorities.  To achieve this goal, the Commission must include those who have been in prison, public defenders, experts in harm reduction, and service providers for people returning home from prison.

Changing California's sentencing policies will be challenging.  But without this change the steps this Court takes to reduce and limit the prison population will face unrelenting pressure.

---

[17] The Commission also recommended that, should Defendant Schwarzenegger and the Legislature fail to enact reform, the task should be turned over to a new independent commission with the power to enact policies into law unless vetoed by the Governor or 2/3 of the Legislature. *Corrections Crisis* iv-v.  See also the recommendation by the American Law Institute for "permanent sentencing commissions with the authority to promulgate sentencing guidelines" (quoted in *Corrections Crisis* 43) and the recommendation for a sentencing commission with authority to enact law subject only to legislative veto in The Stanford Criminal Justice Center's *The California Sentencing Commission: Laying the Groundwork*, March 9, 2007; Hhttp://www.law.stanford.edu/program/centers/scjc/pdf/Stanford_Exec_Sessions_Report_Recommendations.pdf

These policies must be addressed if this Court is to insure an orderly transition to a lower State prison population and protection for the federally–protected rights of those imprisoned there.

**E. Providing Community Programming and Support**

An order releasing people from the State's prisons is essential to alleviating the illegal conditions that exist there.  But this Court needs to insure that those who are released have the necessary support to make an effective transition back into their communities.

People in prison come from families and communities, which are each disrupted by their separation during their imprisonment.  This disruption is only exacerbated by Defendant Schwarzenegger's action in sending people in prison out of state, far from their loved ones, and unable to maintain any meaningful ties to their communities.  As a result, when they are released they face additional challenges.

On the other hand, the State's so-called "re-entry" prisons are not serious efforts to address reintegration into families and communities.  Rather, they are a disguised form of prison expansion, diverting needed funding and public effort from meaningful community alternatives to imprisonment (like Proposition 36).

The Expert Panel emphasizes how important it is to "reach beyond the walls…and embrace the communities from which [people in prison] come and to which they will eventually return." *Roadmap* Appendix I, page 113.  The Panel described ways of mobilizing the broad range of community resources to support those in transition back from imprisonment, resources that include "family members, friends, social service agencies, criminal justice professionals, and a host of other community stakeholders," emphasizing how important it is to "includ[e] family members and other important support members in the [returnees'] actual programming." *Roadmap,* Executive Summary, page xiii; Part I, page 15.  Finally, the Panel identified the

specific kinds of programs that are crucial to successful reentry: "programs and services that will help [returnees] obtain meaningful employment, find suitable housing, support their families, and participate in needed counseling," as well as programs that provide adequate health care and other social services. *Roadmap* Part I, pages 39, 45.  The most important facet of effective re-entry for returnees, according to the Expert Panel, is addressing the obstacles they face in finding employment. *Roadmap* Appendix J, page 122.[18]

In its *2007-2008 Budget Analysis* last year, the Legislative Analyst's Office specifically identified the problem of unemployment of returnees as having been neglected by the State, and made a number of recommendations for ways that job-related programs could be expanded and tailored for greater impact.  In every case, the LAO found that there was a financial benefit to the State in implementing these recommendations. *2007-2008 Budget Analysis* D-102-118. Stubbornly relying on AB 900 as a sufficient response to the prison crisis, the Legislature and Defendant Schwarzenegger ignored all of these recommendations.

There is ample evidence that these recommendations are in line with public opinion in California.  The Expert Panel itself emphasized the growing public support for rehabilitation instead of punishment. *Roadmap* Introduction, page 6.  A state poll of registered voters last year found that a significant majority favored political leadership which "believes we have built enough jails in California and now need to consider alternative ways to rehabilitate non-violent criminals, including treatment programs that help them get back in society." California Progress

---

[18] In a report just released by the National Institute of Justice, three of the top five most requested reentry needs of the more than 900 men in prison sampled were directly related to employment (job training, employment itself, and education). National Institute of Justice, "Major Study Examines Prisoners and Their Reentry Needs," by Christy A. Visher and Pamela K. Lattimore, *NIJ Journal*, Issue #258, October 2007, 31-32; Hhttp://www.ojp.usdoj.gov/nij/journals/258/re-entry-needs.htmlH.  Each of these needs was reported by 4/5 or more of the men sampled.

Report, "New Poll Points Way to Democratic Victory in California," May 3, 2006, 2;

http://www.californiaprogressreport.com/2006/05/new_poll_points.html.[19]  This trend is part of

a national pattern.  Likely voters polled in 2006, for example, "felt that it is very important to

provide prisoner reentry programs that emphasized job training (81%), drug treatment (79%),

mental health services (70%), and access to affordable housing (59%)."  After surveying these

numbers, the Expert Panel concluded: "Citizens now believe that rehabilitation programs for

[returnees] can make communities safer and will cost less in the long term." *Roadmap*

*Introduction,* page 6.

There is an additional reason for enlisting community resources to assist releasees: the

CDCR has a documented history of failure in administering programs for those in the system.  In

its recent review of the CDCR's handling of in-prison drug programs, for example, the Office of

the California Inspector General found significant problems, calling the CDCR's efforts

"ineffective" and "a waste of money," with the State receiving "almost no value" for its

substantial investment in these programs over a period of years because the programs have "little

or no impact."  The sobering conclusion of the Inspector General is unequivocal: the "litany of

problems [with these programs] add up to a $1 billion failure." Office of Inspector General,

*Special Review Into In-Prison Substance Abuse Programs Managed by the California*

*Department of Corrections and Rehabilitation* ("*Review of In-Prison Programs*"), February,

2007, 1, 2, 12; http://www.oig.ca.gov/reports/pdf/substanceeabuseprograms.pdf.  The major

---

[19] A 2006 Field Poll reflects the same attitude: only slightly more than 1 of 3 California voters supported issuing bonds to build more prisons. Field Research Corporation, Release #2181, March 1, 2006; Hhttp://www.field.com/fieldpollonline/subscirbers/RLS2181.pdfH. For more information on Californians' support for rehabilitation over punishment, see the detailed 2004 poll by the National Council on Crime and Delinquency (NCCD), which found that Californians favor rehabilitation over punishment by an 8 to 1 margin, and well over half (56%) think rehabilitating people outside of prison would reduce the state's crime problem (this figure is up from 35% in 1982). *Californians' Attitudes on Corrections* 1.

cause of this failure is clear: mismanagement by the CDCR. *Review of In-Prison Programs* 5. Even more disturbing, the Inspector General found that, despite receiving repeated reports over a period of years that identified the shortcomings in these programs, the CDCR "failed to correct [these] deficiencies." *Review of In-Prison Programs* 12. The cumulative mishandling of these programs led the Inspector General to reject the possibility that they can be reformed. Instead, it concluded that the only alternative is to "remake the system from the ground up." *Review of In-Prison Programs* 5. This record of failure stands in stark contrast to the success of the community drug treatment programs operated under Proposition 36 by the Department of Alcohol and Drug Programs within the State Department of Health and Human Services. As discussed above (§V.B.), there is a chorus of recommendations to expand these programs because of their effectiveness.

Given the record of the CDCR, and because its culture is still "focused on incarceration rather than rehabilitation" (*Roadmap* Appendix J, page 119), it is not prudent to give the CDCR the responsibility for administering the community reentry programs that are needed, or any aspect of the transition to a lower prison population. To do so only invites a similar litany of problems and risks failure in making this transition. Having created the crisis that necessitates these releases, it is the State's responsibility to insure that the returnees are afforded the opportunity and adequately supported in their efforts to successfully re-integrate, and State agencies may be called upon to direct their resources to this end. But the ultimate responsibility for administering their re-entry must be placed in an agency other than the CDCR, an agency that has the capability and confidence of this Court, to which it is accountable.

As we have documented in this brief, there is a body of knowledge and well-documented recommendations for what works. This Court should avail itself of this accumulated wisdom in

including in its order detailed provisions for adequate community programming support for those released from prison as part of its prison release program.  This support should be specifically tailored to meet the needs of the releasees for job training and referral, housing, family support, healthcare, and necessary social services, including drug counseling/treatment.  Only with this support can those who are returning be afforded an adequate opportunity to succeed upon release.  Providing this material support will go a long way to reduce the pressure toward future overcrowding.

## VI. CONCLUSION

The State admits there is a crisis in its prisons, but purports to address that crisis by expanding the system that has failed the people of California.  It is largely the State's "tough on crime" policies that have created this crisis and the systematic abuse of federally protected rights of those in State prisons.  There is persuasive evidence that the people of California reject this approach.  This Court should reject it as well by ordering a reduction in the number of people in prison in California and laying out the steps the State must take to achieve compliance with that order.

It is not enough to simply issue an order to reduce population and then leave it to the State to implement it.  The State's dismal record of neglect of its prisons and those who reside there disqualifies it from deciding how to implement such an order.  Time and again over a period of many, many years the State has ignored its own experts' recommendations, costing Californians substantial sums of money in the process.  This disregard of needed changes continues into the present: up to now the response of the State and Intervenors to this action consists largely of denouncing prison releases in press releases, rather than offering meaningful

proposals to alleviate what they themselves acknowledge is a longstanding crisis.[20]  Defendants tout AB 900 as a "reform" measure that responds to the crisis, but fail to mention that on its enactment Defendant Schwarzenegger dropped any effort at changing parole or sentencing, leaving in their place nothing other than a plan for more prisons.  The bill itself is vague about rehabilitation measures and offers only a pittance to support these undefined programs.  In sum, this legislation is not a reform measure, but a masquerade to distract the public and this Court from the State's continued neglect of its prisons.  This court should therefore bar implementation of AB 900.

Further, turning the implementation of a court order to reduce the number of people in California prisons over to the State risks undermining its goal and its effectiveness.  Instead, what *amici* have proposed in this brief are elements of a comprehensive plan that will alleviate overcrowding in the State's prisons and lower the burgeoning costs of imprisonment, all while enhancing public safety.  Unlike the huge and hugely expensive prison construction program that Defendants offer, the plan we have proposed is more in line with public opinion.  More importantly, the changes we propose are more in accord with the demands of justice, and should therefore be adopted by this Court as an integral part of its order reducing the number of people in California prisons.

Dated: February 7, 2008                                Respectfully submitted,


                                                       __/s/ Cassie M. Pierson_____
                                                       Cassie M. Pierson
                                                       Attorney for Amici Curiae

---

[20] See Office of the Governor, Press Release, September 6, 2007, "Governor Schwarzenegger Joins with Assembly Republicans, Law Enforcement Officials to Warn of Dangers if Felons are Released into Communities"; Hhttp://gov.ca.gov/index.php?/speech/7348/H.