1  FUTTERMAN & DUPREE LLP
   MARTIN H. DODD (104363)
2  160 Sansome Street, 17th Floor
   San Francisco, California 94104
3  Telephone: (415) 399-3840
   Facsimile: (415) 399-3838
4  martin@dfdlaw.com

5  *Attorneys for Receiver*
   J. Clark Kelso

6

7                    UNITED STATES DISTRICT COURT

8         FOR THE EASTERN DISTRICT OF CALIFORNIA

9        AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

10 | RALPH COLEMAN, et al.,                | Case No. CIV S-90-0520 LKK JFM P
11 |         *Plaintiffs,*                 |
   |             v.                        |
12 | ARNOLD SCHWARZENEGGER, et al.,        |
13 |         *Defendants.*                 |
14 | CARLOS PEREZ, et al.,                 | Case No. C 05-05241 JSW
15 |         *Plaintiffs,*                 |
   |             v.                        |
16 | JAMES TILTON, et al.,                 |
17 |         *Defendants.*                 |
18 | JOHN ARMSTRONG, et al.,               | Case No. C 94-2307 CW
19 |         *Plaintiffs,*                 | **NOTICE OF FILING OF RECEIVER'S**
   |             v.                        | **SEVENTH QUARTERLY REPORT**
20 | ARNOLD SCHWARZENEGGER, et al.,        |
21 |         *Defendants.*                 |

22

23        PLEASE TAKE NOTICE that the Receiver in *Plata v. Schwarzenegger*, Case No. C01-

24 1351 TEH has filed herewith his Seventh Quarterly Report.

25

26 Dated: March 14, 2008                    FUTTERMAN & DUPREE LLP

27                                          By:    /s/ Martin H. Dodd
                                                   Martin H. Dodd
28                                                 Attorneys for Receiver J. Clark Kelso

FUTTERMAN &
DUPREE LLP

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

MARCIANO PLATA, et al.                )          No.: C01-1351 T.E.H.

      Plaintiffs,                         )          **RECEIVER'S SEVENTH QUARTERLY**
                                          )          **REPORT**
      vs.                                 )

ARNOLD SCHWARZENEGGER,                 )

et al.                                 )

      Defendants.                         )
                                          )
                                          )

1

**TABLE OF CONTENTS**

2

Page

3    I.    Introduction...................................................................................1

4        A.    Overview of Quarterly Report..........................................................1

5        B.    The Order Appointing Receiver........................................................1

6        C.    *Plata*, *Coleman* and *Perez* Coordination Reporting Requirements..........  ...........1

7        D.    *Plata* and *Armstrong* Coordination Reporting Requirements.............................. 2

8        E.    Integration of Coordination Related Reporting in This Quarterly Report........... 2

9        F.    Master Contract Waiver Related Reporting........................................................ 3

10        G.    The Organization of the Seventh Quarterly Report............................................ 3

11    II.    The Receiver's Strategic Plan..................................................................4

12    III.    Strategic Plan Goals..................................................................... 6

13        Goal 1. Ensure Timely Access to Health Care Services .................................................6

14               *Objective 1.1* Reception/Receiving and Release.........................................7

15               *Objective 1.2* Sick Call.................................................................... 7

16               *Objective 1.3* Improve Emergency Response to Reduce Unnecessary

17               Morbidity and Mortality..................................................................8

18               *Objective 1.4* Establish Staffing and Processes for Ensuring Access to

19               Health Care at each Institution........................................................ 10

20               *Objective 1.5* Establish Health Care Scheduling and Patient-Inmate

21               Tracking System Healthcare Network............................................. 13

22        Goal 2. Establish a Prison Medical Program Addressing the Full Continuum of

23               Health Care Services................................................................. 17

24               *Objective 2.1* Improve Chronic Care Beginning with Asthma................... 17

25               *Objective 2.2* Establish a Comprehensive, Safe and Efficient Pharmacy

26               Program................................................................. 19

27               *Objective 2.3* Improve the Provision of Specialty Care and Hospitalization

28               To Reduce Unnecessary Morbidity and Mortality................................ 22

i

Goal 3. Recruit, Train, and Retain Professional Quality Medical Care Workforce..... 25

    *Objective 3.1a* Recruit Physicians and Nurses to Fill Ninety Percent of

    Established Positions................................................................. 25

    *Objective 3.1b* Establish/Begin to Fill Clinical Executive Positions............ 26

    *Objective 3.2* Establish Professional Training Programs for Clinicians ....... 28

    *Objective 3.3* Establish Medical Peer Review and Discipline Process to

    Ensure Quality of Care................................................................. 30

    *Objective 3.4* Establish Medical Oversight Unit to Control and Monitor

    Medical Employee Investigations.................................................... 32

    *Objective 3.5* Establish Health Care Appeals Process, Correspondence

    Control and Habeas Corpus Petitions Initiative ...................................34

Goal 4. Establish Medical Support Infrastructure ............................................ 36

    *Objective 4.1* Establish Effective Clinical Support Services,

    Including Medical Records, Radiology Services, Laboratory Services

    and Telemedicine ....................................................................... 36

    *Objective 4.2* Establish Clinical Quality Measurement and Evaluation

    Program ................................................................................... 41

    *Objective 4.3* Establish Out-of-State, Community Correctional Facilities

    and Re-entry Facility Oversight Program ........................................... 42

Goal 5. Construct Necessary Clinical, Administrative, and Housing Facilities ......... 44

    *Objective 5.1* Upgrade administrative and clinical facilities at each of

    CDCR's 33 prison locations to provide patient-inmates with appropriate

    access to care............................................................................ 44

    *Objective 5.2* Construct administrative, clinical and housing facilities to

    serve up to 10,000 patient-inmates with medical and/or mental health need... 47

    *Objective 5.3* Finish Construction at San Quentin State Prison .................. 48

IV.    Particular Successes Achieved by the Receiver ............................................. 50

V.      Problems Being Faced by the Receiver, Including any Specific Obstacles Presented
        by Institutions of Individuals ............................................................ 51
VI.     Accounting of Expenditures for the Reporting Period ...................... 51
VII.    Other Matters Deemed Appropriate for Judicial Review.................... 53
        A.   Coordination with Other Lawsuits.................................... 53
        B.   Contract and Invoice Processing ..................................... 54
        C.   Contracts Entered Into by the Receiver to Assist the Receiver's Internal
             Operations and Contracts Entered Into by the Receiver for the Benefit of CDCR. 56
VIII.   Conclusion ................................................................................ 58

# I.

# INTRODUCTION

A.  Overview of Quarterly Report.

This is the Seventh Quarterly Report filed by the Office of the Receiver, the first submitted by Receiver Clark Kelso.  Given the recent change in Receivers, and because Receiver Kelso's Draft Strategic Plan is pending public comment, this report will utilize an interim format somewhat different from the format of prior quarterly reports, as explained below.

B.  The Order Appointing Receiver.

The Order Appointing Receiver ("Appointing Order") filed February 14, 2006 calls for the Receiver to file status reports with the *Plata* Court concerning the following issues:

1.  All tasks and metrics contained in the Plan and subsequent reports, with degree of completion and date of anticipated completion of each task and metric.

2.  Particular problems being faced by the Receiver, including any specific obstacles presented by institutions or individuals.

3.  Particular success achieved by the Receiver.

4.  An accounting of expenditures for the reporting period.

5.  Other matters deemed appropriate for judicial review.

(*See*, Appointing Order at p. 2-3.)

C.  *Plata, Coleman and Perez* Coordination Reporting Requirements.

In support of the coordination efforts by the four Federal Courts responsible for the Health Care class actions pending against the California Department of Corrections and Rehabilitation ("CDCR"), the Receiver also submits quarterly reports to four different U.S. District Court Judges.  An overview of the Receiver's enhanced reporting responsibilities is set forth below.

A Joint Order was issued in 2007 by Judges in *Coleman v. Schwarzenegger* (concerning the mental health care of California patient-inmates), *Perez v. Tilton* (concerning the dental care of California patient-inmates) and in *Plata v. Schwarzenegger*, approving various coordination agreements made between the representatives of the three health care class actions.  (*See*, Order

1

1    Approving Coordination Agreements Attached to Joint May 29, 2007 Order, hereinafter "Joint

2    Coordination Order.")  The coordination agreements call for the *Plata* Receiver to assume

3    responsibility for (1) direct oversight of contracting functions for medical, dental, and mental

4    health care; (2) implementation of the long-term information technology ("IT") system to include

5    the medical, dental and mental health programs; and (3) oversight of pharmacy operations

6    serving the medical, dental, and mental health programs.  (*Id.* at 2.)

7         D.   *Plata* and *Armstrong* Coordination Reporting Requirements.

8         Additional reporting requirements were then placed on the Receiver following his

9    assumption of the management of certain coordinated functions involving the delivery of

10   Americans with Disability Act ("ADA") related services in California prisons on August 24,

11   2007, when the Court in *Armstrong v. Schwarzenegger* adopted the coordination statements.

12   (*See*, Order Approving Coordination Statements Attached to June 26, 2007 Order hereinafter

13   "*Armstrong* Coordination Order".)  The Court further ordered that the *Plata* Receiver file

14   quarterly progress reports as he had been ordered to do in the other cases.  (*Id.* at 2.)

15        E.   Integration of Coordination Related Reporting in This Quarterly Report.

16        Following the Joint Coordination Order and the *Armstrong* Coordination Orders, the

17   overhaul of contracting functions, the implementation of a long-term IT system, and the

18   oversight of pharmacy operations for medical, mental health, dental and ADA patient-inmates

19   have been integrated under the Receiver's remedial umbrella.  As such, when this Quarterly

20   Report iterates the progress and challenges facing reform of contracting functions, IT systems,

21   and pharmacy operations, it is referring to mental health, dental, ADA patient-inmates as well as

22   medical health care patient-inmates. Specifically, the Receiver's Coordination related reporting

23   is set forth in the following sections of this Report: Credentialing and Privileging of Health Care

24   Providers (Section II, Goal 4, Objective 4.2); Contracts (Section VII); Information Technology

25   Update (Section II, Goal 1, Objective 1.5); Telemedicine Reform (Section II, Goal 4, Objective

26

27

28

2

1   4.1); Construction[1] (Section II, Goal 5, Objectives 5.1 – 5.3); and Coordination with Other

2   Lawsuits (Section VII).

3        F.     Master Contract Waiver Related Reporting.

4        On June 4, 2007, the Court approved the Receiver's Application for a more streamlined,

5   substitute contracting process in lieu of State laws that normally govern State contracts in six

6   areas: (1) Medical Records and Management of Patient Care, (2) Clinical Space, (3) Recruitment

7   and Staff Accountability, (4) Emergency Response, (5) Fiscal Management, and (6) Pharmacy.

8   (*See*, Order Re Receiver's Master Application for Order Waiving State Contracting Statutes,

9   Regulations, and Procedures, and Request for Approval of Substitute Procedures for Bidding and

10   Award of Contracts, hereinafter "Master Contract Waiver Order".) The Court approved three

11   alternative contracting procedures—depending on the type and amount of contract at issue—that

12   are streamlined when compared to State procedures yet are designed to be transparent and fair

13   and to obtain, in the Receiver's exercise of reasonable judgment, high quality goods and services

14   at the best price. Part 3 of the Master Contract Waiver Order requires the Receiver include in his

15   quarterly progress reports to the Court, a summary that

16          "(1) specifies each contract the Receiver has awarded during the quarter, (2)
         provides a brief description of each such contract, (3) identifies to which of the
17          six categories of project discussed herein such contract pertains, and (4) identifies
         the method the Receiver utilized to award the contract (*i.e.*, expedited formal bid,
18          urgent informal bid, sole source.)"

19        (*Id.* at 12.)

20        Section VII of this report sets forth this required information. Master Contract Waiver

21   related reporting will be the subject of the final section of this report (Section VII).

22        G.     The Organization of the Seventh Quarterly Report.

23        The Seventh Quarterly Report is organized as follows:

24           1. The purpose and objectives of the Receiver's Draft Strategic Plan "*Achieving*

25              *a Constitutional Level of Medical Care in California's Prisons*" are explained

26              in Section II.

27

28   [1] On February 26, 2008, the Plata, Coleman, Perez, and Armstrong Courts issued a joint order
  approving the construction agreement. (*See*, Order filed February 26, 2008.)

2.  Reports concerning each of the major projects which are in progress concerning each Strategic Plan Goal are provided concerning each Strategic Plan Goal are set forth in Section III.

3.  Successes achieved by the Receiver are explained in Section IV.

4.  Problems being faced by the Receiver, including any specific obstacles presented by institutions or individuals are addressed Section V.

5.  An accounting of expenditures for the reporting period, including a discussion of significant expense reductions relating to the closure of the San Jose Office and the centralization of the Office of the Receiver functions in Sacramento are discussed in Section VI.

6.  Other matters deemed appropriate for judicial review are set forth in Section VII.

## II.

## THE RECEIVER'S STRATEGIC PLAN

A receivership is an extraordinary judicial remedy employed by a federal court only as a last resort when all other attempts to secure compliance with court orders have proven futile. Because it is such an extraordinary remedy, and because federal courts are instructed to employ only as much equitable power as is necessary to cure a constitutional violation, it is incumbent upon the Receiver in this case to move with all possible speed to establish a constitutionally adequate prison medical care system. This is the Receiver's primary order of business.

For the Court's orders to be efficacious, the medical care system established by the Receiver must be sustainable long after federal court supervision has ceased. It is not enough to simply bring CDCR's health care system up to constitutional minimums. The system created must be one that the State itself will be able to maintain long into the future. As the Court stated in its October 3, 2005 Findings of Fact and Conclusions of Law Re Appointment of Receiver ("Findings"), the purpose of the Office of the Receiver is to bring the delivery of health care in California prisons up to constitutional standards and return a stabilized health care system back to the State (Findings at 2:8-13). Therefore, sustainability of the system under State management

4

1 and control must be considered by the Receiver as we formulate our plans for building the
2 foundation.

3      In many respects, the mission is a simple one: Reduce unnecessary deaths and illness by
4 giving patient-inmates (1) timely access to competent medical and clinical personnel who are
5 informed by accurate patient records and supported by appropriate housing, medical facilities,
6 equipment and processes; and (2) timely access to prescribed medications, treatment modalities,
7 specialists and appropriate levels of care.

8      Accomplishing the mission, however, is a huge challenge only because of the current
9 chaotic state of CDCR's medical delivery system. Timely access is not assured. The number of
10 medical personnel has been inadequate, and competence has not been assured. Accurate and
11 complete patient records are often not available when needed. Adequate housing for the disabled
12 and aged does not exist. The medical facilities, when they exist at all, are in an abysmal state of
13 disrepair. Basic medical equipment is often not available or used. Medications and other
14 treatment options are too often not available when needed. Custody resources needed to facilitate
15 access to care and provide the security necessary to deliver health care safely in a prison setting
16 are inadequate, lacking both the personnel and structure to ensure timely access to health care
17 services. Thus the remedial actions necessary to fix these problems are far from simple. Indeed,
18 it is a misnomer to call the existing chaos a "medical delivery system" – it is more an act of
19 desperation than a system.

20      To fulfill this mission, our strategic goals focus on the following:

21     1.  Ensure Timely Access to Care;

22     2.  Improve the Medical Program;

23     3.  Strengthen the Health Care Workforce;

24     4.  Establish Medical Support Infrastructure; and,

25     5.  Build Health Care and Health Care-Related Facilities.

26      These goals encompass virtually all aspects of CDCR's health care delivery system. We
27 are coordinating our planning and implementation with CDCR's mental, dental and health care
28

1    accessibility programs, and as we move increasingly from planning into execution, we should

2    see improvements in CDCR's overall health care program.

3        To conclude, a brief word about implementation strategy is warranted. As reflected in

4    this strategic plan, the Receiver is undertaking an extraordinarily broad organizational change

5    effort within CDCR's health care program. We are touching, changing and improving virtually

6    every element of that program – and in many areas, creating capacity that does not exist at all

7    today. In these circumstances, a proven change methodology is essential. We have adopted, and

8    will continue to follow, the organizational change strategies suggested by the Institute of

9    Medicine (*Crossing the Quality Chasm, A New Health System for the 21st Century*, Washington

10   D.C., National Academy Press, 2001), strategies the Institute considers essential to safe, effective

11   and efficient health care:

12       1.  Redesign of care processes based on best practices.

13       2.  Information technologies for clinical information and decision support.

14       3.  Knowledge and skills management.

15       4.  Development of effective teams.

16       5.  Coordination of care across patient conditions, services and settings over time.

17       6.  Incorporation of performance and outcome measurements for improvement and

18           accountability.

19                                    III.

20                        STRATEGIC PLAN GOALS

21   **GOAL 1.  Ensure Timely Access to Health Care Services**

22       The Receiver's draft strategic plan describes several *new* clinical initiatives designed to

23   ensure that patient-inmates have timely access to medical services, including reception

24   screening, sick call, chronic care, and specialty care.  These initiatives will create standardized,

25   measurable, and reliable access-to-care processes that are amenable to implementation across

26   variations in custody levels and physical plants, and will have a direct and significant positive

27   impact on the day to day medical care provided  to all *Plata* class members.  These initiatives

28

1  will also lead to development of a sustainable scheduling and tracking information system

2  integrating medical, dental, and mental health needs.

3  ***Objective 1.1   Reception/Receiving and Release***

4         The reception center process should provide comprehensive screening on the day of

5  arrival to prison, providing the foundation of care management by establishing identification and

6  timely treatment of high risk patients.  Under the direction of the Office of the Receiver, the San

7  Quentin State Prison reception/intake system was redesigned and implemented in 2006-2007.  It

8  provides integrated medical, dental, and mental health screening on the day of arrival as well as

9  laboratory testing, medication review and administration, and referrals to providers based on

10  national guidelines.

11        The San Quentin State Prison pilot program has reduced sick call volumes in all

12  disciplines, and it has reduced emergency encounters and hospitalizations.  It has significantly

13  improved timeliness of care for and better aligned and allocated available resources.

14        The reception/receiving and release component of the Receiver's new Access-to-Care

15  Initiative will build on the San Quentin State Prison's efforts and the ongoing improvements

16  facilitated there by new pharmacy and laboratory information technology.  Process mapping and

17  workflow redesign at pilot sites in the Southern and Central Regions will complement the San

18  Quentin State Prison work and lead to a standardized change package, similar to the Maxor

19  Guardian Implementation Guide ("cookbook").  Implementation teams will then partner with

20  local leaders and champions on statewide dissemination of the redesigned process.  The most

21  formidable challenge to progress at all the sites will be inadequacies in physical space and

22  environment.  That barrier notwithstanding, the goal is to develop standardized reception

23  screening processes and implement them at each of the major reception center prisons by January

24  2009.

25  ***Objective 1.2   Sick Call***

26        Sick call is the most common method by which an inmate-patient seeks health care.  The

27  current system has two levels of sick call care: nurse and primary care provider.  Both the

28

1 | nursing and primary care provider sick call systems suffer from inconsistencies, delays, and
2 | errors.

3 |     The sick call component of the Receiver's new Access-to-Care Initiative will focus
4 | initially on the process involving the Inmate Request for Services CDCR Form 7362. Using the
5 | same sites as in the reception pilots above, as well as prisons thought to have already established
6 | best practices, the initiative will again focus on developing standardized and measurable
7 | processes that can be implemented statewide and that are amenable to conversion from paper to
8 | electronic format.

9 |     The sick call redesign teams, like the reception center team above, will need custody and
10 | IT participation, project management, quality improvement, and analytic support, and they will
11 | need to engage local leaders and champions. The change methodology used across the reception,
12 | sick call, and chronic care efforts will be the Model for Improvement, including rapid cycle
13 | quality improvement cycles and walk-before-run process redesign.

14 |     The goal is to review sick call processes, forms, and staffing models, redesign them as
15 | needed, and disseminate via a quality improvement initiative involving at least half of CDCR
16 | prisons by January 2009.

17 | ***Objective 1.3  Improve Emergency Response to Reduce Unnecessary Morbidity and Mortality***

18 |     The CDCR currently utilizes a variety of internal medical emergency response systems in
19 | its facilities, which are not comparable to services available in the community. As a result,
20 | CDCR facilities are not prepared to handle basic medical emergencies, resulting in lack of care,
21 | delayed transport, and poor patient outcomes. The Emergency Response Initiative aims to
22 | provide patient-inmates within the California prison system the same level and quality of
23 | emergency medical care as the community receives. The goal is to improve emergency medical
24 | care and response within the prison setting, improve patient-inmate clinical outcomes, and
25 | decrease unexpected deaths due to lack of emergency medical care.

26 |     A statewide Emergency Medical Response System ("EMRS") policy and procedure,
27 | based on American Heart Association and California Emergency Medical Services Authority
28 | System standards and guidelines has been developed to standardize medical emergency response

1    in every prison facility. In addition, a list of all required emergency medical equipment and

2    supplies for the Triage and Treatment Area ("TTA") and standby emergency rooms was

3    developed. To ensure that all emergency response bags contain the appropriate equipment, the

4    department will purchase new emergency response bags for every institution. Institutions will be

5    required to audit the contents of emergency response bags on a regular basis to ensure that

6    equipment is available and in working order at all times.

7        A new Emergency Response Review Committee ("ERRC") policy and procedure has

8    been developed to ensure institutions review medical emergency responses on a regular basis,

9    and develop a plan of action to correct deficiencies related to coordination of emergency

10    response activities. The new policy and procedure establishes accountability and standardized

11    reporting for all institutions. Institutions will be required to establish an Emergency Response

12    Review Committee to review emergency medical response in the institutions prior to

13    implementing the new EMRS policy and procedure.

14        Chuckawalla Valley State Prison and Richard J. Donovan Correctional Facility have been

15    selected as pilot sites for implementation of the new EMRS and ERRC policy and procedure. To

16    facilitate the implementation process, a standardized orientation program regarding the new

17    policies and procedures is being developed for physicians and nursing staff. A pre-

18    implementation audit, to include an evaluation of local facility transport vehicles was conducted

19    the week of March 3, 2008 at Chuckawalla Valley State Prison and Richard J. Donovan

20    Correctional Facility to determine readiness for implementation. It is anticipated that training on

21    the new EMRS policy and procedure will be provided to clinical staff at Chuckawalla Valley

22    State Prison and Richard J. Donovan Correctional Facility no later than March 31, 2008.

23        To ensure that all clinical staff has the requisite skills to provide basic life support in the

24    event of an emergency, a memorandum will be issued to the field requiring that all clinical staff

25    obtain Basic Life Support ("BLS") certification within 10 days of hire. In addition, staff

26    working in the TTA will be required to obtain Advance Cardiac Life Support ("ACLS")

27    certification within 90 days of hire. Credential Smart software will be used to track BLS and

28    ACLS certification on an ongoing basis. To further ensure competency and enhance the clinical

1    skills of staff working in the TTA, the Office of the Receiver is exploring the possibility of

2    collaborating with the Emergency Nurses Association to provide emergency/trauma-nursing

3    skills training for TTA staff.

4        Efforts for the next six months will focus on piloting the new emergency medical

5    response policy and procedure at Chuckawalla Valley State Prison and Richard J. Donovan

6    Correctional Facility, and refining the system in preparation for statewide implementation.

7    ***Objective 1.4  Establish Staffing and Processes for Ensuring Access to Health Care at each***

8    ***Institution.***

9        As discussed in last Quarterly Report, the San Quentin State Prison Health Care Access

10   Unit Pilot was initiated on June 11, 2007, with only a fraction of the total custody personnel

11   necessary based upon a severe statewide shortage of Correctional Officers to fill existing

12   vacancies. At the time, seven new posts (10.55 positions) were activated out of the 62 posts

13   (99.85 positions) identified in the initial staffing analysis. Since the last report, the Office of the

14   Receiver has continued to monitor and assist with the progress of the Health Care Access Unit.

15    San Quentin State Prison has continued to hire officers on a daily basis into non-budgeted

16   positions to meet the demands of patient-inmate access to health care. San Quentin State Prison

17   has at this juncture successfully filled all budgeted Correctional Officer positions existing prior

18   to this augmentation and has more than 50 officers scheduled to start in the next few months.

19   The management team assigned to the Health Care Access Unit at San Quentin State Prison has

20   continued to work on refining specific roles and responsibilities and expanding operations in

21   anticipation of the activation of the remaining 55 posts (89.30 positions) known as Phase Two.

22   The need to utilize non-budgeted positions will be eliminated with the establishment of these

23   89.30 positions. The majority (87 percent) of the Phase Two positions have been allocated for

24   hospital guarding and the transportation of patient-inmates to outside community health care

25   providers. The post orders for these positions have been written and approved by the Office of

26   the Receiver as well as the reconciliation of the listings for budgeted and operational positions.

27   The 55 posts (89.30 positions) of Phase Two were authorized on February 21, 2008, and the full

28   San Quentin State Prison Health Care Access Unit will have all the positions established as of

1   April 1, 2008.  A measuring tool of the Health Care Access Unit's success was developed, but

2   prior to its introduction it was deemed prudent to combine it with a similar tool currently being

3   developed by the Receiver's executive nursing staff.  The Office of the Receiver will continue to

4   monitor the progress of the San Quentin State Prison Health Care Access Unit and remedy issues

5   as they arise.

6            With the San Quentin State Prison Health Care Access Unit underway, the Office of the

7   Receiver began to replicate the project at the California Medical Facility in Vacaville on June 18,

8   2007.  Unlike San Quentin State Prison, the California Medical Facility is charged with the

9   largest and most complex medical and health care missions in the CDCR and therefore entailed a

10  significant amount of work.  After a detailed analysis of custody operations, extensive revisions

11  were necessary to the severely outdated operational procedures and post orders resulting in over

12  a 1,000 pages of new and revised materials.  The listings of budgeted and operational positions

13  for the prison greatly conflicted and required a lengthy process of breaking out positions and

14  then incorporating the new Health Care Access Unit positions.  The detailed reporting structure

15  was extensively reviewed and the operations of the newly activated Mental Health Crisis Bed

16  Unit were integrated.  Upon conclusion of the development of the Health Care Access Unit in

17  December of 2007 it was deemed necessary to compliment the existing custody staff with 65

18  additional posts (104.80 positions) of which 54.24 positions (or 51 percent) were allocated to

19  Medical Guarding and Transportation.  Implementation of the full Health Care Access Unit

20  occurred on February 11, 2008, with the establishment of all positions shortly thereafter on

21  March 6, 2008.  The Office of the Receiver will continue to monitor the progress of the

22  California Medical Facility, Health Care Access Unit, remedy issues as they arise, and introduce

23  the new reporting tool to measure the unit's effectiveness in the coming months as discussed

24  above.

25           As mentioned in the last Quarterly Report, California State Prison - Sacramento was to be

26  the third prison for the Health Care Access Unit roll-out.  After further analysis and given the

27  progress of the Facility Improvement Program, the Office of the Receiver determined to roll out

28  the Health Care Access Units after the Facility Improvement Program has completed Facility

1  Master Plans for new clinical space at each prison. In doing so, the Health Care Access Units

2  will then be able to incorporate the new space in the design of the operational structure. Thus,

3  Avenal State Prison, the first prison to benefit from the Facility Improvement Program began

4  development of the Health Care Access Unit on February 11, 2008, and will conclude in June of

5  2008.

6         By June 30, 2009, complete Health Care Access Units will be established at five

7  additional institutions. Tentatively, those institutions have been identified as the California

8  Training Facility, the California Institution for Men, California Rehabilitation Center, California

9  Institution for Women, and Mule Creek State Prison, all of which have completed Facility

10  Master Plans in place. To the extent possible, the Office of the Receiver will capitalize on the

11  organizational structure resulting from the Preliminary Operational Reviews previously

12  conducted at these institutions. Therefore, developing and implementing the full Health Care

13  Access Units at all institutions will require less work and the plan may be revised to reflect a

14  more robust schedule for completing Health Care Access Units into the 2009/10 fiscal year.

15         Since the last report, Preliminary Operational Reviews have been completed at the

16  California Institution for Men, California Rehabilitation Center, California Institution for

17  Women, Deuel Vocational Institution, California State Prison - Los Angeles County, Kern

18  Valley State Prison, North Kern State Prison, California Substance Abuse & Treatment Facility,

19  Mule Creek State Prison, California Men's Colony, Salinas Valley State Prison, and Centinela

20  State Prison. These reviews continue to bridge the site-specific shortcomings that impede

21  patient-inmate access to care and establish the Health Care Access Unit organizational structure.

22  Information obtained continues to underscore the serious repercussions of the deficient numbers

23  of custody staff to supervise clinic operations and medication administration to patient-inmates.

24  For example, at one level III/IV institution, a facility clinic was left unsupervised while the

25  correctional officer escorted a patient-inmate back to the housing unit. While the officer was

26  away several prisoners attacked and viciously stabbed a rival gang member 13 times while

27  secured within the holding tank in the facility clinic. At another institution, investigators

28  pursuing suspected criminal misconduct in a facility clinic caught patient-inmates stealing

12

1 | syringes and other medical supplies via surveillance cameras. This facility clinic did not have
2 | correctional officer posts allocated for the supervision of patient-inmate movement inside the
3 | clinic areas.

4 | Since the start of the Preliminary Operational Reviews last year the methodology which
5 | the Review Team utilizes has become more detailed and comprehensive. The reviews have also
6 | benefited from the addition of two experienced correctional nurses to the review team. Given the
7 | evolution of this process, the Office of the Receiver has decided to re-review the first seven
8 | prisons with exception of Avenal State Prison (because the full Health Care Access Unit is
9 | currently being completed at Avenal State Prison). These prisons are Sierra Conservation
10 | Center, Wasco State Prison, Ironwood State Prison, High Desert State Prison, California
11 | Correctional Center, California State Prison – Solano, and Richard J. Donovan Correctional
12 | Facility. By July 2008, the initial Preliminary Operational Reviews will have been conducted at
13 | all prisons. By December 2008 all the re-reviews will have been conducted at the seven initial
14 | prisons as well.

15 | ***Objective 1.5   Establish Health Care Scheduling and Patient-Inmate Tracking System***
16 | ***Healthcare Network***

17 | Implementation of the new Receiver's Prison Healthcare Network is underway. The
18 | network has been designed to support clinical systems and provide scalability for future
19 | requirements as required.

20 | The core infrastructure of the wide area network will utilize Cisco internetworking
21 | components. Within the prisons, wireless technology will be leveraged to provide network access
22 | to all healthcare users. Maintenance and support of the network components will be provided
23 | through a maintenance agreement with Cisco and Verizon.

24 | Verizon is currently in the process of installing telecom circuits to all 33 institutions, in
25 | addition to Division of Correctional  Health Care Services ("DCHCS") headquarters at 501 J
26 | Street, all regional accounting offices, mental/dental administration offices, medical records and
27 | the Verizon data center in Torrance, CA. The primary telecom rooms within the institutions are
28 |

13

1  in the process of being reconfigured to support the space and power requirements of our

2  equipment racks and telecom components.

3          Technical teams representing the Office of the Receiver have begun a series of meetings

4  with the CDCR IT team to discuss opportunities to collaborate on aspects of the network

5  implementation. Specific areas of proposed collaboration include co-utilization of the wide area

6  network backbone and a combined email directory for both organizations.  The current schedule

7  has initial institution connectivity beginning in June 2008 and completion on all institutions by

8  the end of the first quarter 2009.

9  **Patient Identity Management**

10         In November 2007, the Office of the Receiver engaged the services of Just Associates of

11  Centennial, CO to conduct a high level assessment of the current CDCR processes and systems

12  used to manage inmate identification and healthcare information. The objective of the

13  assessment was to inform the Office of the Receiver's decision on whether there was a need to

14  implement an enterprise master patient-inmate index ("EMPI") as part of the clinical data

15  repository and portal solution. The purpose of an EMPI is to: a) manage patient-inmate identity

16  and demographic information; and b) reliably and accurately link patient-inmates to their

17  respective electronic health information. Over the course of three weeks in November 2007, the

18  Just Associates team interviewed several CDCR staff, including Enterprise Information Systems

19  ("EIS") staff and the ID Control Unit staff, and conducted site visits to six institutions.  Their

20  report is attached as Exhibit 1.

21         In any multi-site healthcare provider organization such as the CDCR, the ability to

22  identify and link patient-inmate information regardless of treatment location contributes to high

23  quality, efficient patient-inmate care. What the Just Associates team discovered were the

24  crippling inefficiency of systems and processes, inconsistent IT and health record management

25  practices, ever increasing reliance on error-prone manual efforts to complete tasks, and an IT

26  environment that is "an act of desperation." They also noted that almost all healthcare and

27  custody processes are dependent upon two systems (Distributed Data Processing System

28  ("DDPS") and Offender Based Information System ("OBIS")) which are antiquated, utilize

14

1    hardware which is no longer manufactured or supported, and for which there does not appear to
2    be any disaster recovery plan.

3           Given the significant risk associated with the continuing viability and availability of
4    DDPS and OBIS, Just Associates recommended that the implementation schedule for the
5    Strategic Offender Management System ("SOMS"), CDCR's proposed replacement system for
6    DDPS and OBIS, be shortened significantly. In addition, they recommended that the Office of
7    the Receiver not only implement an EMPI, but also an admission, discharge, transfer system
8    similar to ones utilized by hospitals to manage patient-inmates. The Office of the Receiver has
9    moved forward with the above mentioned recommendations. For example, Initiate Systems of
10   Chicago, IL has been selected to implement an EMPI as part of the clinical data repository. At
11   the same time, the Receiver and his staff are working with CDCR IT officials on a project to
12   accelerate the procurement of SOMS software and system integration resources. The Receiver
13   will report further on these developments in his next Quarterly Report.

14   **Clinical Data Repository**

15          In October 2007, the Office of the Receiver issued a Request for Proposal ("RFP") for a
16   clinical data repository and portal solution. The goal of the project is to store patient-inmate
17   health information, such as current medications, lab results, encounter history, problems, etc., in
18   a standardized manner and make this information available to providers at the point-of-care.
19   Justin Graham, MD, the Office of the Receiver's Chief Medical Information Officer, and Glen
20   Moy, Director of Health Information Integration, subsequently conducted a bidders
21   teleconference to provide potential bidders with background information regarding the Office of
22   the Receiver and the challenges it faces, as well as additional details regarding the desired
23   solution and corresponding requirements. In the end, 20 vendors submitted proposals in response
24   to the request. The proposals were reviewed over a three week span by a proposal review
25   committee that consisted of members of the Office of the Receiver's IT team, a representative
26   from the *Coleman* case, CDCR staff, and nationally-recognized expert in health IT retained by
27   the Office of the Receiver to assist it during the selection process.

28

15

The Proposal Review Committee subsequently selected six potential solutions to evaluate further and invited the respective vendors to interview with the Office of the Receiver. The six vendors selected were 3M Health Information Solutions, Accenture, Allscripts Healthcare Solutions, Emergis, IBM, and Medicity. The Office of the Receiver conducted in-person interviews over the course of four days in December 2007 in its San Jose office. The interviews involved vendors meetings with three separate evaluation committees: a) executive committee consisting of senior management from both the Office of the Receiver and CDCR and representatives from the *Coleman* and *Perez* cases; b) clinical user committee consisting of CDCR clinical staff (e.g., physicians, dentists, nurses, psychiatrists, etc.) from a variety of institutions throughout the state; and c) technical committee consisting of members of the Office of the Receiver's IT team, a representative from the *Coleman* case, CDCR staff, and nationally-recognized expert in health IT retained by the Office of the Receiver.

After the interviews, each of the committees submitted their respective recommendations to the Office of the Receiver's IT team. The solution stack proposed by both Accenture and IBM was the first choice of all three committees, followed by 3M and Allscripts. The team subsequently conducted due diligence activities in January and February 2008 – meeting with vendor product teams, performing site visits, interviewing current and former product managers, etc. On February 28, 2008, the Office of the Receiver issued a notification of award to IBM, indicating that it had been selected to deliver the clinical data repository and portal solution, pending the successful completion of contract negotiations. The Office of the Receiver is currently in contract negotiations with IBM.

**Patient Scheduling and Tracking**

As noted above, the Receiver's draft strategic plan describes several new clinical initiatives designed to ensure that patient-inmates have timely access to medical services, including reception screening, sick call, chronic care, and specialty care. Scheduling of initial and follow-up visits is now done by a variety of clinicians and support staff using a mélange of unconnected computers and paper forms, lists, and calendars. The first task of the Office of the Receiver's clinical redesign teams will be to simplify and standardize cumbersome and

1    inconsistent workflows and paper forms. The expertise of the Office of the Receiver's

2    information technology and project management leaders will be vital to supporting and

3    integrating the teams, which will progress along parallel tracks in an effort to accelerate

4    improvements in these critical processes.

5          One specific goal of the new Access-to-Care Initiative is to develop a sustainable,

6    integrated, patient-centric scheduling and tracking information system that conforms to best

7    practices; reflects efficient workflows for medical, dental, and mental health care; and integrates

8    with the Receiver's other IT endeavors. The Healthcare IT Executive Committee ("HITEC"),

9    with representation from medical, dental, and mental health services and the *Plata, Coleman,*

10   *Perez,* and *Armstrong* courts, will provide guidance and oversight for this project. HITEC has

11   already developed a list of functional requirements for the scheduling and tracking system.

12         Development of efficient scheduling and tracking processes will first require mapping the

13   interdependencies of reception, sick call, chronic care, and specialty care, identifying current best

14   practices, and then streamlining those practices while still using a largely paper system. Once the

15   clinical teams have worked at several pilot sites to improve and integrate these core processes,

16   the Office of the Receiver's team and HITEC will choose an IT solution and implement this

17   solution at the pilot sites prior to statewide deployment.  Progress at this accelerated pace will

18   require devotion of significant time by the statewide, regional, and local leaders, formation and

19   training of the redesign teams, hardware, software, and additional expertise and resources for

20   process redesign, rapid cycle quality improvement, change management, and new application

21   training.

22   **GOAL 2**      **Establish a Prison Medical Program Addressing the Full Continuum of**

23   **Health Care Services**

24   ***Objective 2.1  Improve Chronic Care Beginning with Asthma***

25         The Asthma Initiative aims to eliminate preventable patient deaths due to undiagnosed or

26   uncontrolled asthma.  More broadly, the Asthma Initiative will introduce the Chronic Care

27   Model and all of the elements required to implement care management for the other major

28   chronic care conditions.

1   On January 25, 2008, Health Management Associates (HMA) was contracted to conduct

2   a comprehensive assessment of the CDCR Adult Institution's health care system as it relates to

3   chronic diseases and, specifically, asthma screening and treatment.   Based on findings from this

4   assessment and in collaboration with the Office of the Receiver, HMA will refine its previously

5   submitted implementation plan for an asthma care quality improvement system.   The

6   implementation plan will include specifics on how this Chronic Care Model can be adapted for

7   use in improving other chronic illnesses with high prevalence in CDCR Adult Institutions.

8   To date, HMA has established teams with expertise in asthma, chronic care, and

9   correctional health care and has visited seven of the eight prisons to be included in the

10   assessment phase of the project.   The prisons selected represent the diverse levels of security,

11   geographic region, inmate gender, and availability of IT that exist in the CDCR Adult

12   Institutions.   The assessments identified prison-specific barriers and opportunities to improving

13   asthma care including variations in operational processes and resources among prisons

14   At each of the assessments, the HMA team provided the Institutional staff with an

15   overview of clinical asthma management and engaged the clinicians to participate in the Asthma

16   Initiative as leaders in making high-yield practice changes to improve care.   Administrators,

17   direct care providers, correctional staff, and inmates participated in interviews with HMA staff.

18   The assessment included a review of reception and release policies, medical records, quality

19   improvement, information systems, medication and pharmacy policy and practices, patient-

20   inmate self-management policies and practices, sick call, health care transportation, primary

21   care, diagnostic testing, specialty care, urgent/emergent onsite care, offsite emergency care,

22   infirmary care, hospital care, medical dorms, and chronic care management and monitoring.   An

23   assessment was also conducted on the programs for provider education, correctional staff

24   education, and inmate education related to chronic disease and specifically, asthma.

25   HMA has also been conducting an administrative level assessment to identify

26   systemwide barriers and opportunities to improving chronic care.   They conducted a focus group

27   of Office of the Receiver executives and clinical leaders on January 29, 2008, and conducted

28   individual interviews with executives and clinical leaders on March 11-12, 2008, in order to

1    identify the current systemwide methods of monitoring clinical care and disease management

2    and current levels of accountability. Their findings will be used to develop a planning

3    framework for the chronic disease initiative.

4         In late March and early April, HMA will present the findings and implications from the

5    administrative and operational assessments to the Receiver's Asthma/Chronic Care Team. The

6    briefing will include written recommendations for establishing a feasible and effective

7    systemwide change process. On April 15, 2008, HMA will submit the final report at a half-day

8    working session to discuss, prioritize and sequence the system changes to be undertaken. The

9    findings from this meeting will be used to develop the phase II (pilot sites), and phase III

10   (spreading change throughout the system) activities of the Asthma/Chronic Care Initiative.

11   HMA will also meet with the CDCR pharmacy management team (Maxor). The refined

12   proposal, evaluation plan, and project budget will be submitted in May 2008.

13   ***Objective 2.2   Establish a Comprehensive, Safe and Efficient Pharmacy Program***

14        A.     Maxor is in the process of transitioning each institution to a uniform pharmacy

15   information management system, GuardianRx. This system offers a verifiable data source for

16   medication profiles and Medication Administration Records ("MAR") statewide, a common

17   formulary, a common system of operations, and a significant boost in inmate medication safety.

18   The nursing medication delivery process is linked to the Maxor GuardianRx system

19   implementation as nurses depend on the system's timely output of data for medication

20   administration. The Maxor system produces an MAR, which is used to administer the right

21   medication and dosage, to the right patient-inmate, at the right time, through the right route. The

22   redesign of the medication delivery process includes medications for mental health and dental

23   patient-inmates.

24        The Maxor conversion team is now fully staffed with three project managers, three nurse

25   consultants, one analyst, and one office technician.

26        The Maxor conversion team recognizes the importance of including the users during the

27   planning and implementation phase. The team is providing clarification and constant emphasis

28   on the broad multi-stakeholder interdisciplinary team approach to pharmacy conversion, in

1   addition to promoting institutional ownership of project results so as to build institutional
2   capacity to sustain change over the long-term. The concepts of continuous learning and rapid
3   cycle improvement have been incorporated into the fundamental core of the project.
4   Representatives from Nursing Services participated in the development of the Maxor Guardian
5   Implementation Guide ("cookbook") to create a standardized approached to implementing the
6   GuardianRx system at prison facilities throughout the state.

7           A Guardian pre-implementation institution nursing assessment has been piloted at
8   California Conservation Center and High Desert State Prison.  The purpose of the assessment is
9   to identify institutional medication management infrastructure, process, and nursing services
10  management and training capacities prior to the conversion team dropping in for the 8-week on-
11  site formal planning process.

12          Phase one conversion has been accomplished successfully at four institutions (Mule
13  Creek State Prison, California State Prison - Sacramento, Folsom State Prison, and California
14  Men's Colony) with minimal negative impact to patient-inmate care delivery.  Work is being
15  done to prepare Mule Creek State Prison for phase two conversion, which involves implementing
16  the GuardianRx System in all nursing medication delivery areas. An accelerated time
17  timeline/schedule for full statewide system deployment involving concurrent institutional
18  conversions in all three regions has been developed.  It is anticipated that GuardianRx will be
19  fully implemented statewide by June 2009.  The Pharmacy Conversion Master Schedule is
20  attached as Exhibit 2.

21          The next six months will focus on implementing GuardianRx in the pharmacy at
22  California State Prison - Corcoran, California Substance Abuse Treatment Facility, Central
23  California Women's Facility, Valley State Prison for Women, California Conservation Center,
24  High Desert State Prison, Chuckawalla Valley State Prison, Ironwood State Prison, San Quentin
25  State Prison, and California Institution for Women.

26          B.      During this reporting period, Maxor has continued to implement components of
27  the *Roadmap* adopted by the Court for improving the pharmacy system.  Detailed monthly
28

1  | summaries have been submitted to the Office of the Receiver on a regular basis and are attached
2  | as Exhibits 3 - 7. Key operational accomplishments during this reporting period include:
3  | (1) The Monthly Pharmacy & Therapeutics Committee meetings continued to address Disease
4  | Medication Management Guidelines ("DMMG") formulary review and maintenance, therapeutic
5  | interchange opportunities and the review and development of system-wide pharmacy policies
6  | and procedures. DMMGs developed include HIV, Acute and Chronic Seizure, Gastroesophageal
7  | Reflux Disease, Peptic Ulcer Disease, and Hepatitis C and Schizophrenia. (2) The pilot testing
8  | and implementation of the GuardianRx® system at Folsom State Prison and Mule Creek State
9  | Prison was completed as well as implementation at California Men's Colony and California State
10 | Prison - Sacramento. A coordinated system rollout strategy involving multi-disciplinary training
11 | and preparation for all aspects of the medication management process was developed and
12 | refined. Group training sessions were developed and implemented for Pharmacists-in-Charge in
13 | advanced preparation for GuardianRx® conversion. A detailed schedule for GuardianRx®
14 | conversion was developed, coordinated, and approved. (3) The CDCR Formulary was made
15 | available to CDCR providers through *Epocrates®*, a web-based service designed to ensure that
16 | the latest formulary and medication related information is readily available to prescribers and
17 | pharmacists. (4) A protocol and data collection tool for evaluating the implementation of the
18 | Asthma Medication Management Guidelines has been developed. The data collection form is
19 | currently being pilot tested by Clinical Pharmacy Specialists in selected facilities. (5) Maxor
20 | assisted the Office of the Receiver with requesting and evaluating proposals for pharmaceutical
21 | wholesaler services. The selected vendor was engaged by the Office of the Receiver to provide
22 | pharmaceutical products to all CDCR facilities and the new contract was effective February 1,
23 | 2008. (6) Maxor worked with the Office of the Receiver, CDCR, and the Department of General
24 | Services on the review of sites for the proposed centralized pharmacy facility, and, developed a
25 | proposed request for proposals for automation needs for the facility. (7) Maxor initiated a
26 | special comprehensive effort to improve medication management and pharmacy operations at
27 | San Quentin State Prison, in conjunction with other pilot improvement projects underway at that
28 | facility. Maxor has hired and placed an experienced Pharmacy Operations Manager on site, as

21

1   well as a Maxor Pharmacist-in-Charge to replace the registry Pharmacist-in-Charge formerly

2   assigned to the facility. The tested and proven Guardian implementation processes have been

3   initiated with San Quentin State Prison nursing and other staff. (8) A comprehensive staffing

4   pattern assessment has been updated through February based on workload and related data.

5   Recruitment activities for the period have focused on filling three Pharmacy Operations Manager

6   positions and hiring pharmacy technologists to assist in staffing three Guardian implementation

7   teams. All three Operations Manager positions were filled by the end of January 2008, and five

8   experienced pharmacy technologists were hired in February 2008. (9) Quarterly Pharmacist-in-

9   Charge meetings were held for skills development and training in new policy and procedure

10   implementation issues, processes and forms for formulary additions and non-formulary requests,

11   reviewed controlled substances procedures and forms and medication error and adverse drug

12   reaction reporting processes. (10) Contract, purchase and inventory monitoring efforts continue

13   to yield results by avoiding unnecessary costs due to out-of-stock orders, ensuring that the

14   correct contracted items are purchased and that credits for returned items are recorded whenever

15   possible. Approximately $7.9M in cost avoidance activities have been documented to date.

16   ***Objective 2.3   Improve the Provision of Specialty Care and Hospitalization to Reduce***

17   ***Unnecessary Morbidity and Mortality***

18        The long-range goal of the Specialty Services Coordination Pilot is to develop and

19   implement policies and practices that will reduce cancellations and missed appointments,

20   eliminate backlogs, and improve provider relations with an end result of providing timely access

21   to specialty services for all patient-inmates at the California Correctional Institution and

22   California State Prison – Los Angeles County. The major focus during this reporting period has

23   been to identify factors contributing to the backlog of specialty service appointments that are

24   provided offsite.

25        During this reporting period California State Prison – Los Angeles County has made

26   progress in reducing the number of cancellations for offsite specialty service appointments.

27   There has been a gradual decline in overall cancellations; however, the number of cancellations

28   due to patient-inmate refusals has declined significantly since implementing the Pre-

1    Confirmation Appointment Form. The form is used to confirm that an inmate wishes to be

2    transported to the specialty service appointment, thus, reducing the number of last minute

3    cancellations due to patient-inmate refusal. In addition, custody and medical staff are working

4    together very well so that Nursing Services is notified ahead of time when a specialty services

5    appointment must be cancelled due to lack of transportation. While cancellations due to patient-

6    inmate refusals and lack of transportation have declined at California State Prison – Los Angeles

7    County, cancellations due to reasons beyond the control of medical staff continue to be an issue.

8    The top reasons for specialty services appointment cancellations at California State Prison – Los

9    Angeles County are: (1) provider cancellation; (2) inclement weather; (3) patient-inmate

10   quarantine (e.g., Norovirus); and (4) patient-inmate paroled or transferred to another institution.

11           Medical and custody staff continues to work together in a cohesive manner to resolve

12   issues related to offsite specialty service appointments. Hiring of additional staff and ongoing

13   training has directly affected the success of this project. The majority of positions allocated to

14   the specialty services function are filled. Staff turnover and use of time off during this reporting

15   period has been minimal at California State Prison – Los Angeles County and efforts to more

16   effectively utilize clerical and nursing staff continue. Training was provided to staff on the new

17   Interqual Outpatient Criteria, and as a result, the quality of information provided on the Request

18   for Services ("RFS") form has improved significantly.

19           The number of cancellations at California Correctional Institution continues to be an

20   issue. The most significant problem appears to be high staff turnover, particularly in institution

21   leadership positions. The Health Care Manager, Chief Medical Officer, Director of Nursing, and

22   Correctional Health Services Administrator have all changed since the last report. In addition,

23   there has been a complete turnover in specialty staff, with the exception of the Utilization

24   Management nurse. As a result of high staff turnover, new processes such as the Pre-

25   Confirmation Appointment form could not be implemented on a consistent basis. This has led to

26   a higher number of offsite appointment cancellations due to patient-inmate refusals. To minimize

27   the impact of high staff turnover at California Correctional Institution, cross training is being

28

23

1   provided to specialty service staff. The goal is to ensure there is trained back-up staff in the event
2   of planned and unplanned absences or vacancies.
3       Compounding the problem of high staff turnover is the fact that most of the physicians at
4   California Correctional Institution are registry staff.  A backlog in patient-inmates waiting to
5   been seen by a physician has been reduced by holding additional doctor lines after hours and on
6   weekends.  Clearing up the backlog in patient-inmates waiting to see a physician has increased
7   the volume of RFS' at California Correctional Institution; however, the institution recently hired
8   two additional staff physicians and registry staff has become more stable, resulting in improved
9   access to care.
10      In spite of provider willingness to see patient-inmates, California Correctional Institution
11  does not have enough vans to transport patient-inmates to offsite appointments, and patient-
12  inmate refusals continue to be a concern.   Other reasons for offsite appointment cancellations at
13  California Correctional Institution are: (1) provider cancellation; (2) patient-inmate quarantine;
14  (3) inclement weather; and (4) patient-inmate paroled or transferred to another institution.
15      California Correctional Institution has had some success in reducing cancellations due to
16  lack of transportation vans.  Medical and custody staff meet on a regular basis to explore ways to
17  utilize the limited number of vans they have more efficiently.  Specifically, custody is working
18  with scheduling staff to try and "cluster" appointments so that more inmates can be transported
19  to offsite appointments at one time.
20      The RFS process is being examined to identify all areas where the process is not in
21  compliance with established turnaround times, areas where the process could be improved, and
22  areas where departments require additional education.  An educational meeting with yard staff is
23  scheduled for mid-March 2008 to discuss the importance of the RFS process and review
24  expectations.  In addition, a meeting will be held with key physicians to determine educational
25  needs for physicians working with specialty services and utilization management. As was the
26  case with California State Prison – Los Angeles County, California Correctional Institution has
27  seen a dramatic improvement in the quality of information on the RFS since training was
28  provided on the new Interqual Outpatient Criteria.

1    During the next several months the Specialty Service Team will continue to review and

2    analyze cancellation trends, with focused effort on patient-inmate participation in specialty

3    service appointments. The team will attempt to identify a better method for identifying patient-

4    inmates that have transferred or paroled prior to their scheduled specialty service appointment,

5    and continue meeting with custody staff to maximize offsite transportation capacity.

6    **GOAL 3    Recruit, Train, and Retain Professional Quality Medical Care Workforce**

7    ***Objective 3.1a Recruit Physicians and Nurses to Fill Ninety Percent of Established Positions.***

8    The Plata Workforce Development (PWD) Branch continues to build its infrastructure to

9    implement recruitment and retention strategies to attract and hire quality health care

10    professionals. The Branch call center received 1,712 calls and 396 e-mails during this reporting

11    period (September 1, 2007, to February 29, 2008) from potential applicants. These calls and e-

12    mails have been generated from advertisements, recruitment events, and referrals.

13    The centralized physician hiring process was implemented in September 2007 and has

14    resulted in 55 physician, 7 Chief Physician and Surgeon, and 9 Chief Medical Officer hires for a

15    total of 71 physician appointments statewide. This process has expedited the hiring of

16    physicians into locations statewide; and because interviews are conducted at the Regional level,

17    with participation from the Chief Medical Officer from the institutions with vacancies, rather

18    than requiring the applicants to interview multiple times if they are interested in working at

19    multiple institutions; it has resulted in a better experience for the applicants.

20    Substantial progress has been made through February 2008 to recruit and fill clinical

21    vacancies. The statewide vacancy rates in the noted clinical classifications are as follows:

22    Physician and Surgeon -- 272 positions authorized, 224 filled for a vacancy rate of 17.6 percent;

23    Nurse Practitioner – 77 positions authorized, 50 filled for a vacancy rate of 36 percent; Physician

24    Assistant – 15 positions authorized, no vacancies exist; Registered Nurse – 1651 positions

25    authorized, 1522 filled for a vacancy rate of 7.8 percent (includes Mental Health); Licensed

26    Vocational Nurse – 1123 positions authorized for a vacancy rate of 22 percent.

27    In January 2008, Hodes Communications was awarded a marketing contract to assist the

28    PWD Branch in developing a logo, collateral marketing materials, placing advertisements in

1  professional periodicals, and conducting mass mailers. A microsite has also been developed,

2  www.changinghealthcare.org, which has simplified the internet interface with applicants

3  allowing them easy access to online civil service testing. Further development of this site is in

4  progress. Future plans include posting all job openings at this site with links to information

5  about the community where the institution is located and other pertinent information such as

6  state benefits, etc. A mass mailer is also planned for release during March 2008 that will be sent

7  to all licensed California physicians.

8        In February 2008, the PWD team of professional nurse recruiters staffed a recruitment

9  and hiring event at the California Medical Facility in Vacaville. A total of 126 potential

10  candidates attended, and 34 Registered Nurses ("RN") and 14 Licensed Vocational Nurses

11  ("LVN") were hired on site. This event was successful, with onsite civil service testing made

12  available to those nurses who did not yet have civil service eligibility, as well as providing a half

13  dozen interview panels to interview attendees on the spot. Tuberculin skin testing was also

14  offered to those candidates who were offered a job the date of the recruitment event, thereby

15  speeding up the hiring process and making the pre-employment clearance process easier for the

16  applicants.

17        Pharmacy recruitment continued to be a major focus during this reporting period with

18  recruiters attending four major pharmacy recruitment events and presenting Pharmacist job

19  opportunities at four of the six Pharmacy schools in California. As a result, seven pharmacists

20  and 37 pharmacy technicians were hired during this reporting period.

21        Eligible lists for several key classifications have grown significantly during this reporting

22  period with approximately 1,097 individuals currently on the LVN eligible list, 2,891 on the RN

23  eligible list, and 275 on the Physician and Surgeon eligible list. Departmentwide, 233 LVNs and

24  192 RNs were hired during this reporting period.

25  ***Objective 3.1b Establish / Begin to Fill Clinical Executive Positions.***

26        The Receiver has established three separate broad classifications which encompass

27  assignments at the institution, regional, and statewide level. Incumbents in the three

28  classifications, Nurse Executive; Medical Executive; and Chief Executive Officer, Health Care,

1  will be responsible for developing and sustaining an effective program for the collaborative

2  delivery of medical care to incarcerated patient-inmates.  This medical management team will

3  also be responsible for on-going evaluation of the quality of medical care delivered and for

4  identifying and implementing any corrective actions needed to ensure the quality of medical care

5  meets constitutional standards.  The development of the Chief Executive Officer classification

6  required coordination with the CDCR's Chief Deputy Secretary for the DCHCS as this

7  classification will be responsible for the administrative functions of the entire health care

8  delivery system, including mental health and dental services as well as medical care.

9       The Nurse Executive classification was adopted by the State Personnel Board on

10  October 22, 2007; the Medical Executive on January 22, 2008; and the Chief Executive Officer

11  on March 4, 2008.  The testing tool that will be used to administer the civil service examinations

12  for the Nurse Executive has been developed and is currently under review by the subject matter

13  experts.  The testing tool for the Medical Executive is close to completion and work will soon

14  begin on the tool for the Chief Executive Officer.

15       A "grid" methodology has been developed for determining an appropriate salary for each

16  applicant who is offered a position which takes into consideration both the level of responsibility

17  (institution, regional, statewide) and the applicant's individual experience, education, and special

18  skills.

19       On March 4, 2008, the court representatives for the health care class action cases agreed

20  to the following three pilot sites (1) San Quentin State Prison; (2) California State Prison -

21  Sacramento/Folsom State Prison; and (3) Mule Creek State Prison where this medical

22  management model will be established and evaluated, to determine the appropriate salary band

23  for all three classifications, and to finalize the development of the testing tool.

24       To determine the appropriate salary band, a RFP was issued in December 2007 to solicit

25  proposals from firms interested in conducting competitive market salary surveys.  Three

26  consulting firms responded to the RFP; and after evaluating the proposals, the Receiver awarded

27  the contract to Cooperative Personnel Services ("CPS").  CPS is a governmental agency

28  committed to improving human resources in the public sector and has a reputation for employing

27

1    highly qualified, professional staff who offer a full range of human resource products and

2    services to public agencies and non-profit organizations.  Prior to its establishment in 1985, CPS

3    was a unit of the California State Personnel Board.  CPS will conduct a Total Equivalent

4    Compensation study of both salaries and benefits in the public and private sector hospitals.  CPS

5    will complete its findings and salary recommendations by the end of April 2008.

6         Once the salary bands have been determined, discussions will take place with the

7    Department of Personnel Administration to determine if they will authorize the salary band and

8    the methodology for setting individual salaries.

9         Some marketing of the Nurse Executive has been undertaken by the development of an

10   informational flyer which was distributed at the Association of California Nurse Leaders annual

11   conference in mid-February.  Additionally, the Bernard Hodes Group was commissioned to

12   develop branding and marketing materials for physician recruitment.  It is anticipated that some

13   of the same marketing tools will be applicable to these three new classifications as well.

14   *Objective 3.2  Establish Professional Training Programs for Clinicians*

15        In an effort to maintain and enhance the level clinical competencies with educational

16   programs, the Office of the Receiver will establish a Continuing Medical Education ("CME")

17   Committee.  The primary objective of the CME Committee is to obtain accreditation for CDCR

18   as a CME provider, recognized by the Institute of Medical Quality ("IMQ") and the

19   Accreditation Council for Continuing Medical Education.  The CME Committee will evaluate

20   continuing education for all of the CDCR licensed independent practitioners.

21        The CME Committee was established and held its first meeting in mid-February, at

22   which time members and a chairperson were selected.  The committee membership consists of

23   representation from each licensed practitioner group, i.e. physician, psychiatrist, nurse,

24   psychologist, physician assistant, etc., providing healthcare services within CDCR.  This 6-

25   month objective was completed within the project timeframe.

26        Administrative support for the committee will be provided by the Clinical Operations

27   Support Branch – Interdisciplinary Professional Development ("IPD") Unit.  The IPD Unit will

28   conduct administrative support activities to assist the committee with developing a charter and

1  maintaining the appropriate functional structure required to meet IMQ accreditation standards.

2  In addition to assisting the committee in obtaining accreditation, the IPD Unit will have

3  responsibility for the operation and administrative aspects of the educational program for all

4  licensed practitioners within CDCR.

5         The goal of obtaining CME accreditation is anticipated to take approximately 18 months.

6  Prior to submitting an application to the IMQ, the Office of the Receiver must insure compliance

7  with all accreditation requirements.  The CME Committee and IPD Unit will evaluate the

8  feasibility of accomplishing this objective through existing resources or with the assistance of an

9  outside consultant.

10         The lack of a standardized orientation program for clinical staff leaves new employees at

11  the mercy of a dysfunctional system and resulting in dire consequences for patient-inmates in

12  prisons.  Orientation for new health care staff is directed by individual institutions using a variety

13  of materials with no standardized curriculum or process.  There is no mechanism to evaluate

14  whether newly hired nurses and other health care staff are oriented in a timely and effective

15  manner, and there is no formalized preceptor or proctoring program in place.

16         The Office of the Receiver and CDCR staff members developed a standardized nursing

17  orientation curriculum, including a train-the-trainer component and standardized facilitator

18  manual.  The curriculum incorporates mandated topics covered in the general orientation for new

19  employees as well as a comprehensive overview of the provision of heath care within the

20  correctional environment, thereby streamlining the required training into a single health care

21  orientation program.  The curriculum has been expanded to include physicians and other allied

22  health professionals and includes a measurement and evaluation component to guide system

23  improvement, accountability, and ensure comprehension and retention of critical subject matter.

24         The original plan for new employee orientation included piloting content and format in

25  five CDCR institutions. The overall delivery approach has been modified based on participant

26  feedback and lessons learned during the first three pilot orientations. In addition, the approach to

27  statewide implementation has been modified to include more institutions.  Specifically, new

28  employee orientation has been expanded to incorporate all institutions within a given region (i.e.

29

1    northern, central, and southern) rather than a limited number of pilot sites. Utilizing a regional

2    approach will allow inclusion of all 33 CDCR institutions in the new orientation program by

3    December 2008.

4         The new health care orientation program has been piloted at the California Medical

5    Facility and California State Prison, Solano. It is anticipated that orientation for the remaining

6    institutions in the northern region will be held March 17, 2008. All new employees who began

7    work in the month of February 2008 will be targeted to attend the new health care orientation

8    program.

9         The preceptor program for nurses will focus on unit-based and role-specific orientation.

10    The employee will be paired with a mentor or "buddy" to facilitate transition into the

11    correctional health care environment. During this mentorship the new employee will be required

12    to demonstrate skill necessary to provide safe and effective care to patient-inmates in the prison.

13    Northern region institutions are being prepared for the preceptor program and meetings with key

14    stakeholders are being held to ensure full cooperation from institution staff. It is anticipated that

15    all new employees hired after February 4, 2008 will be paired with "buddy" to facilitate

16    transition to seasoned employee.

17         The focus for the next six months will be to continue developing and refining the

18    orientation and preceptor programs, while extending implementation to the central and southern

19    region institutions.

20    ***Objective 3.3   Establish Medical Peer Review and Discipline Process to Ensure Quality of***

21    ***Care***

22         The Court found that "repeated gross departures from even minimal standards care"

23    resulted in a shocking number of deaths in the prisons and that peer review of CDCR physicians

24    was either bogus or not done at all. (Findings of Fact and Conclusions of Law, filed October 5,

25    2005, pp. 10-13, 16.)

26         Consequently, in April 2007, the Office of the Receiver filed the Motion for Waiver of

27    State Law re Physician Clinical Competency Determinations to "establish an adequate peer

28    review program which is fair, provides due process through evidentiary hearings, and has teeth to

30

1  enforce peer review determinations." The motion was necessary because the State Personnel

2  Board ("Board") contends that physicians must remain employed in spite having lost their

3  privileges to treat patients after an evidentiary hearing where the physician is afforded the full

4  panoply of due processes. The Board takes this position reasoning the matter must be heard *de*

5  *novo* by the Board so it can make the controlling decision about the physician's clinical

6  competence to remain employed to treat patients.

7      Following a series of brief filed by the Board, plaintiffs, the Union of American

8  Physicians and Dentists, and the Receiver, the Receiver for the second time attempted to fashion

9  an acceptable solution among those with an interest in this matter. Those discussions ended

10 when the Board insisted that it be the entity that determines disciplinary actions *and* privileging.

11 The Receiver revived his motion, stating a core principle: "doctors who are determined through a

12 rigorous peer review process to be unqualified to practice medicine in the prisons will not be

13 permitted to practice medicine in the prisons." (Receiver's Report and Supplemental

14 Memorandum in Support of Motion for Waiver of State Law Re Physician Clinical Competency

15 Determinations, p. 2) On January 22, 2008, the Board filed its opposition.

16     The Receiver met with the members of the State Personnel Board on February 22, 2008,

17 in a personal attempt to resolve the matter. The Receiver discussed the concept of a peer review

18 process administered by the Board where the medical judgments of a group of physicians

19 impaneled by the Board would be respected by the non-clinician Board. On March 5, 2008, the

20 Board responded by not altering its earlier position. More specifically, the Board continues to

21 propose a panel of physicians selected by the Board that would make recommendations, and the

22 Board would continue to weigh the evidence and render its own conclusion about who should

23 practice medicine in the prisons.

24     In a letter to the Board on March 10, 2008, the Receiver reiterated his fundamental

25 concern that medical judgments made by physicians as part of a peer review process should not

26 be reconsidered by non-medical personnel (such as an SPB ALJ or the Board) absent some

27 unmistakably clear procedural error or evident bias. In an effort to accede to the Board's desire

28 to retain power, but in a manner that respects peer review panel conclusions, the Receiver

31

1    informed the Board he believes the right compromise is for the Board to apply the "substantial

2    evidence standard" when reviewing medical judgments by physicians on the peer review panel

3    who are trained to make medical judgments.  The Receiver asked the Board to make a decision

4    in this regard at its next meeting on March 25, 2008.

5            Pending further negotiations with the State Personnel Board and direction from the Court

6    regarding the Receiver's proposal, the Professional Practice Executive Committee ("PPEC")

7    continues to meet routinely and conduct peer review investigations.  Under delegated authority

8    from the Governing Body, the PPEC continues to review allegations of clinical misconduct

9    involving licensed independent practitioners from the dental, mental health, and medical

10   disciplines.   Statewide peer review body since its establishment in June 2005, the PPEC

11   manages the peer review investigation process.  Support staff in this area submit licensing board

12   reports, coordinate peer review informal and evidentiary hearings, and coordinate the transfer of

13   peer review process results into appropriate disciplinary action.

14           From September 2007 through February 2008, the PPEC met 23 times and reviewed over

15   130 allegations of clinical misconduct.  To protect patient safety, the committee took 27

16   privileging actions, restricting or suspending potentially dangerous providers pending further

17   investigation.  In addition, the committee implemented 22 monitoring programs, made 10

18   recommendations for training, and issued 13 credentialing alerts.

19   ***Objective 3.4   Establish Medical Oversight Unit to Control and Monitor Medical Employee***

20   ***Investigations***

21           The Medical Oversight Program ("MOP") is a new collaborative pilot project to improve

22   clinical investigations involving the Office of the Receiver, CDCR Office of Internal Affairs,

23   CDCR Employee Advocacy Prosecution Team and the Office of the Inspector General ("OIG").

24          In December 2007, the Office of the Receiver submitted a letter to the Department of

25   Finance identifying the initial resources required to establish the MOP pilot.  To launch the pilot

26   program by January 1, 2008, a total of 23 positions and $69,580 in equipment costs were

27   approved to conduct investigations on approximately 21 unexpected medical deaths.

28

1    To date, all clinical (4 physicians, 4 nurses), investigative (7 special agents) and legal (6
2    attorneys) positions have been filled, in addition all OIG and administrative positions. The
3    remaining three vacancies existing are administrative support positions which are anticipated to
4    be filled by the end of March 2008. The MOP has achieved 99 percent completion of its initial
5    hiring objective.

6    All staff hired to the MOP pilot received a 4-hour program orientation during December
7    2007. Preliminary training in principles of just culture and investigation techniques was
8    conducted for all MOP clinicians, investigators, inspectors and administrative support staff
9    during February 2008. As an ongoing effort to train MOP staff, monthly training sessions will
10   be conducted to develop clinicians and investigators as trainers. In addition, staff will be
11   scheduled to attend formal training on topics of the science of safety and human factors,
12   techniques of sentinel event review, root cause analysis and investigative techniques in
13   correctional medicine. Once the MOP staff members themselves have sufficient training, they
14   will develop a training schedule to train clinical staff at all of the institutions by the end of the
15   year. The MOP has achieved 50 percent completion rate of its training goal; fulfillment of this
16   goal will be contingent upon the Office of the Receiver securing contract services to conduct
17   training for the trainers.

18   Key program staff convenes weekly to conduct a Medical Central Intake of all cases in
19   which an unexpected death was reviewed by a team of clinicians, investigators and legal
20   advisors. The Intake process is designed to review the facts gathered by the team during an on-
21   site inquiry to determine if an investigation is warranted. Once a formal investigation is opened,
22   the MOP will provide a progress report to the Office of the Receiver within the first 21 days to
23   ensure the overall investigation will be conducted expeditiously.

24   As of February 29, 2008, the MOP pilot conducted on-site inquiries in the review of eight
25   unexpected deaths and one non-death referral. The outcome of these initial inquiries resulted in
26   five cases being formally presented to the Medical Central Intake panel; thus far one official
27   medical investigation was opened and reported within the first 21 day timeframe.

28

33

1       The pilot program is charged with modifying the CDCR Employee Disciplinary Matrix to

2  be clinically relevant. The key MOP management has begun discussions regarding the

3  appropriate clinical misconduct categories that require employee discipline. A core team will

4  convene during March/April to develop modifications to the matrix to incorporate disciplinary

5  categories identified by both the physician and nurse Professional Practice Evaluation

6  Committees. This objective is in the early stage of development; therefore, an accurate

7  assessment of a completion rate cannot be projected. However, the program goal is to complete

8  the project by April 2008.

9       As of February 29, 2008, the pilot program is on track to meet the objectives outlined in

10  the Draft Strategic Plan.

11 ***Objective 3.5  Establish Health Care Appeals Process, Correspondence Control and Habeas***

12 ***Corpus Petitions Initiative***

13       To ensure consistent and timely responses, all inmate health inquiry functions were

14  consolidated under the Litigation Management Unit, Plata Field Operations Division in October

15  2007. A summary of progress is as follows:

16 **Consolidation of Inmate Health Care Inquiry Functions**

17       On February 15, 2008, a pilot program was approved and established to respond to all

18  incoming correspondence related to inmate health care. This includes correspondence directed

19  to the Office of the Receiver, CDCR Headquarters, CDCR Division of Correctional Health Care

20  Services and various institutions. Each piece of correspondence will be triaged by a RN for

21  urgent or emergent issues, researched by a staff member, and responded to within 30 business

22  days. The pilot will be evaluated every 90 days until such time as a permanent policy and

23  procedure is adopted and approved.

24 **Writ of Habeas Corpus Response Pilot**

25       The Writ of Habeas Corpus Response Pilot was implemented in October 2007 to ensure

26  timely and appropriate responses are provided to the court when requested or ordered. The

27  policy outlines a controlled process of obtaining the needed medical documentation, drafting a

28  written clinical evaluation, the development of a Corrective Action Plan ("CAP"), and follow-up

1  on the CAP. Monthly reports are provided to the Office of the Receiver and executive
2  management. A stakeholders meeting was held on January 22, 2008, to discuss and evaluate the
3  pilot. Minor revisions were suggested and incorporated into the policies and procedures. A
4  unanimous decision was adopted to continue the pilot and the next review meeting will be held
5  in May 2008.

6  **Separation of Health Care Appeals from Institution Appeals**

7  Meetings have been conducted with CDCR Executive Staff and Inmate Appeals Branch
8  to discuss the separation of health care appeals from institution appeals. All parties are in
9  agreement with the separation and the re-direction of positions in proportion to the workload;
10  however, a decision is still pending regarding the responsibility of ADA appeals. Staff has
11  completed an analysis of the re-directed workload and prepared a Budget Change Proposal
12  requesting additional positions to establish the Office of Third Level Appeals. Ongoing
13  discussions and meetings will continue to effectuate this change.

14  **Health Care Appeals Task Force**

15  The Health Care Appeals Task Force ("Task Force") met on February 13, 2008 to discuss
16  issues, best practices and recommended changes to the statewide health care appeals process.
17  Currently, staff is drafting the new framework for health care appeals incorporating the
18  recommendations by task force members. The new framework was presented at the Task Force
19  meeting on March 10, 2008. Additional recommendations will be incorporated and forwarded
20  for final review by the Task Force. Upon approval by the Task Force, the recommended
21  framework will be forwarded to the Office of the Receiver for approval. Members of the task
22  force include: Coleman Court Monitor, Office of Court Compliance (Armstrong), Perez Court
23  Monitors, Plaintiff's Attorneys (Prison Law Office and Rose, Bien, & Asaro), Office of the
24  Receiver Staff Counsel, Chief Physician Executive, Chief of Nursing Operations, DCHCS
25  Executive Staff, CDCR Inmate Appeals Branch Chief, CDCR Staff Attorney, and Litigation
26  Management Unit staff.

27  //////////
28  //////////

35

1 | **GOAL 4        Establish Medical Support Infrastructure**

2 | *Objective 4.1   Establish Effective Clinical Support Services, Including Medical Records,*

3 | *Radiology Services, Laboratory Services and Telemedicine*

4 |       The Receiver's work to provide prison healthcare providers with effective clinical

5 | support services continues on track.  For the first time, CDCR's Clinical Support Services

6 | (including health information management, radiology, clinical labs, telemedicine, and pharmacy)

7 | will be organized into a single branch on the organization chart with coordinate management.

8 |       A common theme among the clinical support domains is lack of leadership and central

9 | management.  In most cases these essential clinical programs will need to be rebuilt from the

10 | ground up. Efforts to overhaul the programs listed here have been impeded by a culture that

11 | resists standardization and central control; lack of internal expertise in these highly specialized

12 | healthcare domains; and a complicated and rigid personnel process that makes it difficult to

13 | highly qualified clinical support professionals.

14 |       The Receivership has already demonstrated how leadership and strategic engagements

15 | with external experts can provide substantial benefits to both patient-inmates and taxpayers with

16 | the overhaul of the pharmacy system (see Objective 2.2, Establish a Comprehensive, Safe and

17 | Efficient Pharmacy Program).  Similar models of remediation are under consideration for

18 | telemedicine, health information management, radiology, and clinical laboratories.

19 | **Telemedicine**

20 |       The University of Texas Medical Branch ("UTMB") experts in correctional telemedicine

21 | completed their assessment and telemedicine road map in late January.  Their final report is

22 | attached as Exhibit 8.

23 |       UTMB's analysis confirmed the Office of the Receiver's anecdotal impression that the

24 | CDCR telemedicine program was in great disarray and failing to provide services essential to

25 | reform of the prison healthcare system.  UTMB's major findings include:  no systemwide

26 | leadership to champion and manage the telemedicine program; inadequate staff at all levels;

27 | overly complex and ill-defined management structure; non-existent standardization of processes,

28 | procedures and treatment protocols; excessively cumbersome workflow prone to malfunctions,

36

1 delays, and failure; sloppy record keeping and no means of outcome evaluation and
2 accountability; antiquated paper-driven medical record system; rampant and destructive
3 misperceptions about telemedicine practice; insufficient and outdated telemedicine equipment;
4 obsolete telecommunications connectivity; limited Internet access; inadequate and inappropriate
5 telemedicine practice space; insufficient network of telemedicine providers; and inconsistent and
6 unfavorable contract agreements with external providers.

7        UTMB was also asked to provide a Road Map for remediation of CDCR's telemedicine
8 program so that this essential care delivery modality would be able to deliver on its promise of
9 optimizing healthcare access.   Their major recommendations include:  developing effective
10 centralized management and monitoring for the telemedicine program; creating an enterprise-
11 wide clinical protocol where telemedicine is the principal escalation from primary care;
12 redesigning telemedicine process methods for specialty, mental health, and primary care
13 responsibilities; installing necessary telemedicine hardware; implementing centralized
14 information software; operating a supplemental telemedicine staffing structure; developing a
15 system-wide program to establish, audit, and monitor the network of telemedicine providers;
16 creating centralized telemedicine facilities for providers; developing a process to assure CDCR
17 telemedicine meets accreditation standards;  and operating an ongoing evaluative process to
18 assess activity levels, quality of care, health outcomes, efficiency, and cost effectiveness of the
19 telemedicine program.

20        The Receiver is currently seeking appropriate leadership to execute the UTMB
21 recommendations.  There will be more detail on these next steps in subsequent Quarterly
22 Reports.

23 **Clinical Laboratory Services**

24        In October 2007, an anonymous whistleblower contacted the Receiver (as well as the
25 laboratory licensing authorities at the Centers for Medicare and Medicaid Services) regarding
26 allegations of improper conduct and gross license violations at the California Medical Facility
27 laboratory that significantly compromised patient safety.  The Receiver additionally notified the
28 licensing authorities at California Department of Health Services ("DHS") and engaged Nichols

37

1    Management Group ("NMG"), who investigated and verified these disturbing findings. The

2    California Medical Facility lab was temporarily closed until patient safety could be assured.

3    Under the direction of the Receiver's staff, and with the assistance of local California Medical

4    Facility clinical leadership, NMG and a newly contracted lab medical director began to overhaul

5    all policies, procedures, and processes at the California Medical Facility lab. California Medical

6    Facility recently passed a surprise DHS audit in February 2008, with the inspectors remarking

7    that they were impressed with the corrective actions taken to date.

8           Also in October 2007, the Receiver engaged Navigant Consulting to perform an

9    assessment of CDCR's clinical laboratory services and to create a road map for strategic

10   restructuring of the lab program. During their assessment, Navigant found that California

11   Correctional Institution's lab had been performing testing without valid licensure for nearly 15

12   years. Corrective action was taken immediately, including shutting down California

13   Correctional Institution's lab and sending out all tests to a qualified reference laboratory.

14          Navigant is completing their analysis, and a final report is due from them in April 2008.

15   Preliminary findings suggest that, as suspected, existing clinical laboratory services fail to meet

16   the necessary service requirements to provide safe and adequate healthcare to inmates at the

17   CDCR facilities. They have evaluated six different models for delivering clinical lab services in

18   the prisons. The final three options under consideration are: (1) maintaining laboratories at 'pre-

19   qualified' CDCR facilities with reference services rendered by a commercial laboratory; (2)

20   establishing one 'State-wide' laboratory with several regional 'hubs supporting CDCR facilities

21   in their corresponding region; or (3) only establishing regional 'hubs' (potentially three) to

22   support CDCR facilities in their corresponding region.

23          Complete findings and plans for remediation of the lab system will be presented in a

24   subsequent Quarterly Report.

25   **Diagnostic Radiology**

26          After a competitive bidding process, the Receiver contracted with McKenzie-Stephenson,

27   Inc.("MSi") to perform an assessment and road map for diagnostic radiology services in all 33

28   prisons. MSi kicked off their engagement in late January and have already visited 11

38

1 institutions. MSi is also providing strategic advice on radiology workflow and equipment

2 placement to the multiple construction projects underway, including the 5000 bed project and the

3 facility improvement initiatives. The final report, expected in July 2008, will give a full analysis

4 of CDCR's existing radiology services and plans for ensuring CDCR inmate-patients receive

5 safe, cost-effective and adequate healthcare through radiology that meets community standards.

6 Complete findings and plans for remediation of diagnostic radiology will be presented in a

7 subsequent Quarterly Report.

8 **Health Information Management**

9     The management and maintenance of health records continues to be an area of great

10 concern to the Receiver. An RFP for consultants to perform an assessment and road map for

11 remediation of the health information management ("HIM") program was issued in September

12 2007. None of the six vendors who responded were deemed suitable for the task for a variety of

13 reasons (e.g., insufficient experience with health records; insufficient staff to do the job; potential

14 conflict of interest; etc.).

15     In the interim, the Receiver's IT team requested an assessment of CDCR's inmate

16 identity and location tracking processes and systems from Just Associates (see Strategic Plan

17 Goal 1, Objective 1.5). Because of their extensive background and qualifications in health

18 information management, the Just Associates consultants were asked to comment on their

19 observations of CDCRs HIM staff and processes (report appended as Exhibit 9). Findings

20 include lack of leadership or oversight; failure to adhere to HIM best practices; lack of

21 standardization; insufficient training; and a desperate need for automation of document

22 management and chart tracking.

23     In late March 2008, the Office of the Receiver is planning to issue a revised RFP to

24 combine both assessment and management functions for HIM in a single engagement. The

25 Office of the Receiver will make a stronger effort to solicit proposals to ensure a better selection

26 of competent vendors.

27 ///////////

28 ///////////

39

**Dictation and Transcription**

1

2          Ms. Sandra Hirsch, an expert in dictation and transcription, was engaged by CDCR in

3 October 2007 to evaluate CDCR's dictation and transcription processes and propose solutions to

4 improving efficiency and effectiveness of this essential health records function.

5          In Ms. Hirsch's report to the Receiver in January 2008 (attached as Exhibit 10), she

6 identified multiple areas of waste, inefficiency, and dysfunction within the dictation and

7 transcription processes used by CDCR. For instance, based on the median pay per transcriber

8 plus benefits, CDCR's cost per line of transcription is $1.08. In the transcription industry, the

9 average cost per line is $0.14. On average, CDCR Medical Transcribers transcribe about 400

10 lines per day, compared to the industry average of 200 lines per hour. There is no process in

11 place to assure the quality of healthcare documentation, unqualified staff has been and is still

12 being hired to fill Medical Transcriber positions and there are no standards for dictation,

13 transcription or document types. Medical Transcriber positions are being used to fill Office

14 Assistant, Office Technician, and Health Record Technician roles in medical record units.

15 Medical transcription has inadequate oversight and supervision, and transcribers receive little or

16 no training. Clinical documents are not stored on computers in a useful manner that would make

17 them available to a Clinical Data Repository.

18          In order to achieve the Receiver's desired standards for timeliness, availability, and

19 efficiency of transcribed clinical documentation, there must be a standardized, tightly managed

20 approach to dictation and transcription that encompasses all facilities. As a result of Ms.

21 Hirsch's recommendations, the Receiver believes that centralized in-house transcription with

22 appropriate management and quality assurance, using modern technology, will achieve the

23 desired turn around times, significantly improve document quality and availability, and

24 potentially save CDCR $2 million annually. A task force, including Ms. Hirsch and

25 representatives from IT, Personnel, Plata Support Services, Mental Health, and physician

26 leadership, has been convened to execute on these recommendations.

27 / / / / / / / / / / /

28 / / / / / / / / / / /

40

1  ### *Objective 4.2   Establish Clinical Quality Measurement and Evaluation Program*

2         The Office of the Receiver established a quality-based program to administer the CDCR

3  healthcare credentialing and privileging function.  This unit is responsible for implementation of

4  a credentialing software program to facilitate the initial credentialing, and ongoing tracking of

5  required licenses, certification renewals and continuing education for all licensed independent

6  practitioners practicing within the prison system.

7         In January 2008, the Office of the Receiver secured and finalized a contract with

8  CredentialSmart to develop a web-based solution to integrate and centralize the credentialing and

9  privileging data for the licensed independent practitioners.  The vendor will work with the

10  Credentialing & Privileging Unit to being training staff on the use of the system during

11  March/April 2008.

12         The Credentialing & Privileging Unit began developing program policies and procedures

13  with guidance from the Credentials Committee in December 2007.  As of February 29, 2008, a

14  total of 12 Policies and Procedures ("P&P") were developed; five have been reviewed and

15  approved by the Credentials Committee and disseminated to the institution credentialing

16  coordinators and implemented.  The remaining seven P&P will require further development once

17  the web-based system has been fully implemented.  It is anticipated the training will be

18  completed in April 2008, therefore, the completion of the remaining P&P are scheduled for

19  completion by May 2008.

20         Upon completion of the remaining P&P, establishing the roles and responsibilities of the

21  institution credentialing coordinators versus the headquarters Credentialing & Privileging Unit

22  will begin.  To effectively centralize the credentialing and privileging function to headquarters,

23  the transfer of responsibilities will occur in four phases.  Phase I will begin in June 2008 with the

24  transfer of credentialing data from the existing systems in headquarters and the regions to the

25  web-based solution; and transfer of the roles/responsibilities to the Credentialing & Privileging

26  Unit.  The subsequent three phases will entail: II) Outpatient Housing Units; III) Correctional

27  Treatment Centers; and IV) General Acute Care Hospitals.

28

1    The Credentialing and Privileging Unit anticipates establishing a Credential Hotline to
2    respond to questions and/or concerns for existing staff and potential providers once Phase I has
3    been completed the end of June 2008. Information gathered during the transfer process will
4    provide the Credentialing and Privileging Unit with guidance in developing list of commonly
5    asked questions.

6    The implementation of this goal is anticipated to be fully completed by September 2008.
7    Completion of this goal is contingent upon adequate resources to transfer data from the existing
8    systems to the web-based solution. This will entail a labor intensive effort of data entry activities
9    that must be conducted in addition to the existing workload. The Credentialing & Privileging
10   Unit anticipates the use of overtime and possibly temp help to accomplish this effort in a timely
11   manner.

12   ***Objective 4.3  Establish Out-of-State, Community Correctional Facilities and Re-entry***
13   ***Facility Oversight Program***

14   The California Out-of-State Correctional Facilities Oversight Unit met with Community
15   Correctional Facility contract staff and explained Plata wording for contracts. The contract
16   review for Leo Chesney Community Correctional Facility is pending. The Desert View
17   Community Correctional Facility and McFarland Community Correctional Facility are awaiting
18   renewal with Plata wording to be added.

19   All of the four activated Community Correctional Facility have been initially inspected.
20   An expectation has been discussed with California Out-of-State Correctional
21   Facilities/Corrections Corporation of America management that significant medical events will
22   be reported to the California Out-of-State Correctional Facilities Chief Medical Officer in order
23   to be reviewed. California Out-of-State Community Correctional Facilities/Corrections
24   Corporation of America management has been open and accessible in discussing any standard of
25   care concerns that have been brought up. There are also ongoing monthly formal phone
26   conferences with CCA management as well as the Corrections Corporations of America Chief
27   Medical Officer to discuss care issues and reporting requests. The unit plans to revisit all
28   activated California Out-of-State Correctional Facilities to conduct formal re-inspection and will

42

1 | apply a developed audit instrument which will include specific case reviews at the California
2 | Out-of-State Correctional Facilities.

3 |       The Central Valley Modified Community Correctional Facility was initially inspected on
4 | December 12, 2007. Some practice deficiencies were identified. This initial visit was done prior
5 | to the development of a formal audit instrument by the Community Correctional Facility
6 | Oversight Unit. After the visit a formal inspection tool and process was developed. The unit
7 | plans to return to the McFarland Community Correctional Facility to apply the audit tool during
8 | the first week in April 2008. Deficiencies will be more clearly defined at that time and specific
9 | corrective plans will be requested. That visit will coincide with formal audits at two other
10 | Community Correctional Facilities in McFarland that are operated by the same private contactor.

11 |       On February 5, 2008, the Leo Chesney Community Correctional Facility was inspected
12 | and formally audited with patient-inmate case reviews. During that visit multiple standard of care
13 | issues were identified. The site visit report was shared with the Community Correctional Facility
14 | providers and administrator and with CDCR Community Correctional Facility management. A
15 | corrective action plan has been requested.

16 |       The Community Correctional Facility Oversight unit plans to formally audit two
17 | additional Community Correctional Facilities in Adelanto, California during the 2nd week in
18 | April 2008 to assess Plata compliance. The current plan is to complete six or seven of the 13
19 | Community Correctional Facility audits by the middle of May 2008 with remaining audits to be
20 | planned after that.

21 |       After the Leo Chesney Community Correctional Facility audit, corrective
22 | recommendations were made to the administrator and CDCR providers. The Plata policies,
23 | procedures, and associated appropriate forms were shared with the Community Correctional
24 | Facility. The California Out-of-State Correctional Facilities unit nurse consultants returned to
25 | Leo Chesney to answer questions and conduct onsite training in standards of care. The Leo
26 | Chesney Community Correctional Facility staff have been very receptive to our help and
27 | suggestions and have already demonstrated improvements since the audit one month ago. The
28 | unit staff remains available to assist and will return for a follow-up audit.

1    The support needed to ensure standards of care at other Community Correctional

2    Facilities will be determined after they are audited. It remains to be determined how much

3    additional support will be provided by the CDCR hub facilities associated with the individual

4    Community Correctional Facilities.

5    Medical records policies and procedures are being developed and will be distributed to

6    the Community Correctional Facilities after they are completed and sent for review by the Office

7    of the Receiver.

8    The inspection audit tool has been developed to reflect compliance standards and

9    implement a program to document deficiencies and require timely correction or contract

10    cancellation.. It will be further refined as the planned audits are completed. Corrective plans of

11    actions will be requested based on audit findings.  Based on the Leo Chesney Community

12    Correctional Facility audit which was completed, the corrective plan was requested and will be

13    due on March 25, 2008.  A follow up site visit will be planned within 60 days after the corrective

14    plan is submitted to assess compliance.

15    A liaison with the OIG Prison Monitoring Program has been initiated and input has been

16    provided to the OIG in the development of their audit instrument and process. The initial pilot

17    inspection at Mule Creek State Prison on March 4-5, 2008, was observed.  Future assistance in

18    this process will be provided as directed.

19    **GOAL 5      Construct Necessary Clinical, Administrative, and Housing Facilities**

20    ***Objective 5.1   Upgrade administrative and clinical facilities at each of CDCR's 33 prison***

21    ***locations to provide patient-inmates with appropriate access to care.***

22    As explained in the prior Quarterly Report, the Office of the Receiver initiated a project

23    to construct new clinical and administrative space at each institution in order to provide a safe

24    and appropriate clinical environment for staff and patient-inmates, and increase the ability of

25    medical staff to see more patient-inmates.  On August 28, 2007 the first Facility Master Plan was

26    completed for Avenal State Prison which detailed the construction project with an estimated cost

27    of $27.5 million.  Upon further analysis, the Receiver approved the Facility Master Plan on

28    November 7, 2007, and later filed a Waiver of State Law to facilitate the construction on

44

1    November 27, 2007. The Court approved the Waiver on December 20, 2007 and funding was

2    secured in the Office of the Receiver's current year Program 97 budget. The March 1, 2009

3    completion date was impacted by the waiver process, therefore, the new completion date is July

4    1, 2009. To date two Specialty Clinic trailers have been installed and the isolation rooms have

5    been converted. Vanir Construction plans to complete the following projects during the next

6    three months: Finalize coccidioidomycosis (Valley Fever) mitigation plan; select consultants to

7    complete topographical survey, geotechnical investigation, and civil engineering for projects

8    included in Master Plan; install six mobile clinics; complete design draft for modifications to the

9    Infirmary building; prepare bid documents for Administrative Segregation Clinics; complete

10    relocation of pharmacy to building #395; prepare bid documents for Infirmary conversion and

11    medical supply warehouse; prepare bid documents for complex clinics and modular Health

12    Services Administration building; initiate contract for design/build of Medical Supply

13    Warehouse; and begin construction of Infirmary conversion.

14       On September 5, 2007, the planning of new clinical space commenced at the Correctional

15    Training Facility. The Correctional Training Facility Master Plan was completed and agreed

16    upon by the Warden and Health Care Manager on October 29, 2007. The Receiver reviewed and

17    approved an option plan with an estimated cost of $41.5 million on November 7, 2007.  With

18    the change in Receivers, recently an outside expert was commissioned to review the Facility

19    Master Plan for Correctional Training Facility and make recommendations on the Plan. Once

20    completed, the Correctional Training Facility Master Plan will require approval of Receiver

21    Kelso to grant authorization for implementation of the construction phase. It will take

22    approximately 24 months to complete all construction projects at Correctional Training Facility

23    once construction is approved.

24       On November 5, 2007, planning began at the California Rehabilitation Center. The Site

25    Planning Committee conducted facility assessments and held coordination meetings with CDCR

26    Mental Health and Dental representatives and Court experts from *Coleman* and *Perez* to review

27    progress and coordinate needs. Due to the poor condition of most of the existing health services

28    buildings, combined with their inadequacies, it was determined more cost effective for the State

45

1  to demolish the existing structures and build a new facility inclusive of some space for dental and

2  mental health. The Facility Master Plan was completed and agreed upon by the Warden, Health

3  Care Manager, and a CDCR staff member of the Planning, Acquisition & Design Department on

4  January 28, 2008. The construction projects include: (1) conversion of Building #322 to Clinic

5  Unit #1 and Reception Clinic, (2) demolishment of buildings #448, #456, #458 to construct a

6  new Central Health Building consisting of a Triage and Treatment Area, Infirmary, Specialty

7  Clinic and Clinic Units #2 and #3, (3) "M" modular renovation to enlarge the Central Pharmacy

8  and Medical Records/Appeals space, (4) Medical Supply Warehouse, (5) Clinic Unit #4 modular

9  to include telemedicine and (6) Health Services Administration modular renovation to included

10  added space for additional medical staff. Construction of these projects will cost approximately

11  $70.2 million and take 26 months to complete once authorization for implementation is granted.

12  The California Rehabilitation Center facility Master Plan is also undergoing review and vetting

13  with the outside expert and will be approved by Receiver Kelso upon completion.

14      On December 10, 2007, the Site Planning Committee began assessing clinical space at

15  Mule Creek State Prison. As with the previous assessments, analysis of the existing facility

16  space was completed and multiple coordination meetings were held to define and develop the

17  needed projects. The Facility Master Plan was completed and agreed upon by the Warden,

18  Health Care Manager, and a CDCR staff member of the Planning, Acquisition & Design

19  Department on January 25, 2008. The construction projects include: (1) renovation of the

20  Central Health Services building to improve and expand triage treatment and specialty clinic

21  functions and include an emergency dental triage area, (2) new pharmacy and laboratory

22  building, (3) expansion of facility clinics on Facility A, B, and C, (4) new administrative

23  segregation clinic inclusive of mental health area, and (5) new Health Services Administration

24  building. Construction of these projects will cost approximately $29.3 million and take 18

25  months to complete once authorization for implementation is granted. As with Correctional

26  Training Facility and California Rehabilitation Center the Receiver's outside expert is reviewing

27  the Mule Creek State Prison facility Master Plan before final approval by Receiver Kelso.

28

46

1        In keeping with the aggressive schedule, the planning phase was initiated on February 8,

2   2008, at California Institution for Women and February 11, 2008 at the California Institution for

3   Men.   Assessments at the two institutions are occurring simultaneously and the Facility Master

4   Plan for each institution will be completed by April 1, 2008.  The Site Planning Committee will

5   then launch assessments at three institutions simultaneously; Folsom State Prison, California

6   State Prison - Sacramento, and Richard .J. Donovan Correctional Facility.  On the original

7   schedule filed with court in the Receiver's November POA Richard J. Donovan Correctional

8   Facility was scheduled for March, 2009, but at the request of the Court Expert in *Coleman*, the

9   prison was moved up to April, 2008.

10        The Facility Improvement Construction Initiative, now known as the Construction

11   Upgrade Program, is currently on task to begin planning at two additional institutions, California

12   Conservation Center and High Desert State Prison, by June 2008.

13   ***Objective 5.2   Construct administrative, clinical and housing facilities to serve up to 10,000***

14   ***patient-inmates with medical and/or mental health need.***

15        As part of the plan to bring the level of prison health care services up to constitutional

16   standards as quickly as practicable, the Receiver will supervise the construction of new prison

17   health facilities and housing for approximately 10,000 patient-inmates whose medical and/or

18   mental health condition requires separate housing to facilitate appropriate access to health care

19   services.  Construction will occur on land already owned by the State and under the control of

20   the CDCR. Because existing facilities are operating well beyond their design capacity, the new

21   facilities will be designed to be self-sufficient, full-service institutions for both infrastructure and

22   support service facilities such as food service, laundry and central plant.

23        In order to complete the construction as quickly as practicable, a great deal of the

24   planning for all of the sites will be front-loaded and done in parallel. For each of the sites, the

25   following pre-construction activities must be completed:  (1) Site assessment and selection; (2)

26   California Environmental Quality Act review and evaluation; (3) Infrastructure review and

27   development of remediation plans; (4) Facility planning; (5) Program delivery; (6) Obtaining

28

1  funding; (7) Development of Program Management Plan; and (8) Transition Operational
2  Planning.

3        Specific potential and selected sites will be discussed in future reports. Since it is
4  unknown which sites will pose what obstacles, and how quickly those obstacles can be
5  overcome, we are pursuing preliminary planning on all sites. Whichever site is first ready for the
6  commencement of construction will be where we begin.

7        As stated in the previous report, the Office of the Receiver acquired the services of URS-
8  Bovis Land Lease Company to plan and manage the construction of the needed facilities.
9  Planning sessions to coordinate pre-construction activities occur weekly with representatives
10 from URS-Bovis, mental health, dental, and CDCR. The New Facilities Capital Program Status
11 Report presented to Judge Henderson and Judge Karlton is attached as Exhibit 11.

12       Of particular concern is funding availability. Office of the Receiver staff is working with
13 staff from the Department of Finance and the Office of the Governor to identify potential
14 funding options. Legislation is being drafted to authorize and fund these facilities. Additionally,
15 a waiver for the design portion of the project is being drafted simultaneously to avoid potential
16 delays should legislation fail to move forward.

17 ***Objective 5.3   Finish Construction at San Quentin State Prison***

18       As outlined in the November 2007 Plan of Action, the San Quentin State Prison
19 Construction Project consists of three construction packages. Each construction package consists
20 of one or more projects as described below. These projects continue to progress in a timely
21 manner with the continued involvement of San Quentin State Prison clinical personnel, custody
22 subject matter experts of the Office of the Receiver, representatives of the other class action
23 courts, and representatives from the State Department of Finance. Below is a brief description of
24 each construction package with the status of each project.

25       Construction Package One consists of eight projects, three of which have been
26 completed. Project one, the Personnel Offices, recently completed the bid process which began
27 on December 31, 2007. On January 31, 2008 the contract was awarded to Purdy Builders Inc.
28 The completion date of August 15, 2008 will not be met due to delays in the bidding and contract

48

1   approval process. The new completion date will be six months from the date the contract is
2   approved. Project two, Replacement Parking Spaces, is complete. Project three, Relocation of
3   Walk Alone Yards, is substantially complete and in use. Some minor adjustments are underway
4   and will be completed by April 12, 2008. Project four, the Medical Supply Warehouse, is in the
5   bidding phase. Vanir Construction Management finalized the construction budget with the
6   Office of the Receiver and will open the project bids on March 19, 2008. Construction is
7   anticipated to begin on May 1, 2008 pending the contract approval process. Project five, the
8   Triage and Treatment Area Renovation, is complete. Project six, the Expansion of the West and
9   East Block Rotundas, recently completed the bid process and the project was awarded to BBI
10  Construction. The contract has been approved and the construction is to commence on March
11  17, 2008 with a completion date of November 12, 2008. Project seven, Miscellaneous, Limited
12  Upgrades to the North Block, Adjustment Center and Gym Clinics, has been revised. Upon
13  further analysis, it was determined that because the Primary/Specialty Care Modular is scheduled
14  to be completed in August 2008, the only upgrade of the existing clinics will be the addition of
15  heat in the Adjustment Center clinic. This is scheduled to be complete by September 15, 2008.
16  Lastly, project eight, the Addition of the Re-locatable Trailer for Office Space, is complete.

17          The three projects of Construction Package Two are two-thirds complete. Project one,
18  the Primary/Specialty Care Modular, is proceeding with the manufacture of the modular
19  buildings  and beginning site work, including demolition and utilities. . The modular installation
20  will be complete by August 15, 2008. Projects two and three, the limited and minor remodel of
21  the existing Medical Records and Receiving and Release, are complete.

22          The only project of Construction Package Three, the Central Health Services Facility, is
23  in the final stages of construction documents. The drawings are to be submitted by March 21,
24  2008 for approval. The California Environmental Quality Act process was completed on
25  September 15, 2007. Demolition of Building 22 and the retaining wall reinforcement is nearing
26  completion. It is anticipated that foundation construction will commence by April 15, 2008
27  pending approval of the development drawings. The anticipated date of completion remains
28  April of 2010.

49

# IV.

## PARTICULAR SUCCESSES ACHIEVED BY THE RECEIVER

In the Order Appointing New Receiver, filed January 23, 2008 the Court found that:

> ". . . the Receivership's focus can and must now shift towards long-term reform that will achieve the implementation of a sustainable, constitutionally adequate system of delivering medical care to Plaintiffs – and, not inconsequentially, a system that must ultimately be transitioned back to the State of California's control.  Put another way, the Receivership's overarching goal should be working itself out of existence once delivery of medical care to California's inmates has been brought up to constitutional standards . . . [T]he second phase of the Receivership demands a substantially different set of administrative skills and style of collaborative leadership.  The Receivership must continue to maintain its independence as an arm of the federal courts established to take over state operations, but it also must work more closely at this stage with all stakeholders, including State officials, to ensure that the system developed and implemented by the Receivership can be transferred back to the State in a reasonable time frame.  Such collaboration appears to be more important now than ever, given the current budget crisis faced by the State of California."

Order Appointing New Receiver at 4-5.

Consistent with these findings, during the six weeks following his appointment the Receiver has taken steps to initiate the following remedial actions:

1.  Developed and released for comment a Draft Strategic Plan.

2.  Restructured the Office of the Receiver and the CDCR medical services organization which reports to the Office of the Receiver in a manner more conducive for the implementation of timely corrective actions, and more consistent with State organizational structures (*see* Exhibit 12).

3.  Commenced the planning and implementation of a major new plan of action initiative that will ensure timely compliance with Plata medical services requirements concerning prisoner reception, sick call, chronic disease management, and emergency response.

4.  Reached out to State control agencies and the CDCR in an effort to improve coordination and communication between the State and Office of the Receiver.

50

5. Consolidated all Receivership activities in one office in Sacramento, and closed the San Jose Office, thereby achieving significant savings (*see* Section VI. below).

6. Recruited and hired additional competent State managers, thereby enhancing the Receiver's remedial team.

7. Intensified efforts to obtain funding for two critical health care construction projects: (a) the facility upgrade program; and (b) the construction of needed health care facilities to provide medical and mental health treatment for 10,000 prisoner/patients.

8. Working closely with the Special Master in Coleman, instituted a number of policy decisions which resolved several class action coordination problems which had previously been pending for months. *See* Section VII A. below.

## V.

## PROBLEMS BEING FACED BY THE RECEIVER, INCLUDING ANY SPECIFIC OBSTACLES PRESENTED BY INSTITUTIONS OR INDIVIDUALS

The major challenges facing the Office of the Receiver during the next reporting period can be summarized as follows:

1. Finalizing the Strategic Plan, and thereafter proceeding with implementation.

2. Working with the Administration and Legislature to fund necessary prison health care facilities.

3. Continuing to strengthen the Office of the Receiver's remedial team, especially concerning Information Technology challenges and project planning.

The Receiver has not encountered specific obstacles presented by institutions or individuals during the six weeks following his appointment.

## VI.

## ACCOUNTING OF EXPENDITURES FOR THE REPORTING PERIOD

A.    Expenses.

The total net operating and capital expenses of the Office of the Receiver for the year ended February 28, 2008, were $12,284,774 and $8,376,575 respectively. A balance sheet and statement of activity and brief discussion and analysis is attached as Exhibit 13.

1    B.    Revenues.

2        On January 11, 2008, the receiver requested a transfer of $28.3 from the State to the

3    California Prison Health Care Receivership Corporation to replenish the operating fund of the

4    office of the receiver for the first quarter of the Fiscal Year 2007-2008 and maintain the

5    minimum operating capital on hand to six months. All funds were received in a timely manner.

6        C.    Closure of the San Jose Office and Related Expenditure Reductions.

7        The San Jose headquarters' Office of the Receiver has closed.  This action was taken after

8    a careful review of the Office of the Receiver's programs, activities and budget.  Along with

9    other administrative changes, this will result in substantial savings, create efficiencies and will

10    streamline the operation to better implement the reforms necessary to achieve a constitutionally

11    adequate health care system for California prisons.

12        By establishing the Receiver's headquarters office in Sacramento, the Receiver will be

13    located more closely to the CDCR headquarters office and other State agencies that have a role

14    in providing health care to California prisons.  This will enhance the close coordination critical to

15    the development of a prison health care system that can be transitioned back to the State of

16    California's control as timely and cost-effectively as possible.

17        Staff are currently in the process of coordinating the transition of remaining staff and

18    capital to the Sacramento office.  Efforts are also underway to terminate contracts with vendors

19    for office infrastructure and maintenance services, as well as exploring options for the existing

20    lease agreement in San Jose.

21        Additional administrative decisions will result in operational savings through the

22    consolidation and coordination of activities.  Some contracts and initiatives from the previous

23    Receiver will not be pursued or will be discontinued.  Those contracts and initiatives were

24    deemed duplicative.  The anticipated savings will serve to partially offset the cost of improving

25    the prison health care system.

26    / / / / / / / / / / /

27    / / / / / / / / / / /

28    / / / / / / / / / / /

52

# VII.

## OTHER MATTERS DEEMED APPROPRIATE FOR JUDICIAL REVIEW

## CLASS ACTION COORDINATION INITIATIVE

A.  Coordination with Other Lawsuits.

During the reporting period, regular meetings between the Receiver and the monitors of the *Coleman, Perez,* and *Armstrong* ("Coordination Group") class actions have continued. Coordination meetings were held on September 20, 2007, November 27, 2007, January 15, 2008, and March 4, 2008.  Significant progress has been made during this reporting period.  For example:

1.  An agreement that the Office of the Receiver would assume leadership of the construction of a medical center at San Quentin, additional office, supply and record space at certain CDCR facilities and approximately 5,000 CDCR medical beds and 5,000 CDCR mental health beds was drafted and submitted to the Court for approval. On February 26, 2008, the *Plata, Coleman, Perez*, and *Armstrong* Courts issued a joint order approving the construction agreement.  (*See*, Order filed February 26, 2008 hereinafter "Order Approving Construction Agreement".)  As in prior court orders, the Receiver was ordered to file quarterly reports in each case "concerning developments pertaining to matters that are the subject of the construction agreement." (Order Approving Construction Agreement at 3:1-3.)

2.  The Coordination Group agreed on the design of a governance model for managing health care in the prison system.  The governance agreement was submitted to the Court on March 10, 2008, and the Chief Executive Officer, Health Care class specification for the governance model has been submitted to the State Personnel Board for approval.  California State Prison-Sacramento/Folsom State Prison, Mule Creek State Prison and San Quentin State Prison have been chosen as pilot sites for the governance model.

Other areas of agreement reached during this reporting period include, coordinating nursing and psychiatric technician duties, psychiatric medication management, seclusion and

1 | restraints policy, and emergency response. A supplemental IT Agreement was approved by the
2 | four courts on March 10, 2008.

3 |       B. <u>Contract and Invoice Processing</u>.

4 |      The discussion with follows addresses the requirement that the Receiver in Plata report to
5 | the Judges in Coleman, Perez, and Armstrong concerning his management of the health care
6 | contract and invoice functions.

7 |      Renovations within the Plata Contract and Invoice Branch ("PCIB") to meet the primary
8 | objective of processing cost efficient medical care service contracts and invoices for patient-
9 | inmates in a timely fashion is ongoing. Progress continues in the contract and invoice areas of
10 | the PCIB to provide contract oversight; development and implementation of invoice training to
11 | staff to attain consistent and timely adjudication and payment of medical service invoices in the
12 | Health Care Document Management System ("HCDMS") invoice system, and contracts training
13 | of headquarter and institution staff in negotiating rates for exempt contracts and processing of
14 | contracts in the HCDMS contract system.

15 |      Reorganization was completed on December 31, 2007, to merge contract and invoice
16 | functions at 501 J Street, in addition to incorporating the Health Care Cost and Utilization
17 | Program ("HCCUP") functions. The computerization of all 33 CDCR institutions to enable
18 | access to the HCDMS contract and invoice system is ongoing and based on the four roll-out
19 | phases and IT requirements. Another major change required for the success of the PCIB is
20 | enhancements to the infrastructure to adequately provide a statewide network of medical
21 | specialty physicians and hospital service providers. An RFP was issued and a consultant
22 | obtained fall 2007 to increase the number of medical service providers and provide specialized
23 | negotiations training to CDCR staff in the future. The consultant has successfully completed rate
24 | negotiations with six hospitals to-date.

25 |      The PCIB was successful in the implementation of the computerized HCDMS contract
26 | and invoice system for Phase I which included the four initial pilot roll-out institutions (Pelican
27 | Bay State Prison, San Quentin State Prison, Central California Women's Facility and California
28 | Medical Facility) on February 16, 2007. Following the roll-out of Phase I institutions, the PCIB

1    successfully reorganized and merged contract, invoice and HCCUP staff and functions to support

2    the continued roll-out schedules of contract and invoice processes for the remaining twenty-nine

3    CDCR institutions.

4         The overall health of the PCIB since September 1, 2007 is good as progress has been

5    made in the contract and invoice processing areas to meet the anticipated roll-out schedule of the

6    remaining institutions.  The initial two institutions within Phase II (California State Prison -

7    Sacramento and Valley State Prison for Women) have an anticipated go-live date of March 28,

8    2008, to convert to the HCDMS contract system.  An estimated 149 rate negotiation packages for

9    exempt medical services have been approved by management since August 1, 2007.  Of the

10   contracts that were renewed, approximately 95 percent are paid Medicare (100 percent

11   conversion to Medicare from the previous Relative Value for Physician ("RVP") rate structure),

12   with the remainder paid hourly or other rate methodologies.  101 new contracts were negotiated

13   with approximately 66 percent receiving Medicare, 29 percent paid hourly or via carve-outs, and

14   the remaining 5 percent receiving RVP compensation.   The average processing time for invoice

15   processing for the pilot institutions for the period October 2007 – February 2008 is 29.2 days

16   which includes invoice adjudication, institution review/approval and processing by the Regional

17   Accounting Office.  Accounting processing timeframes comprise the majority of the 29.2

18   processing days, with an average of 43 percent of the overall processing timeframes.  Institution

19   processing timeframes average 32.8 percent; while invoice processing at 501 J Street accounts

20   for 24.2 percent processing days.  Additionally, the volume of monthly invoices processed

21   through the HCDMS increased by 52 percent in February 2008 as compared to October 2007.

22   The PCIB continues to provide HCDMS training to staff to reduce the overall processing

23   timeframes.

24         Phase II for the invoice processing portion went live January 28, 2008, for the two initial

25   institutions (California State Prison - Sacramento and Valley State Prison for Women).  The

26   addition of these two institutions brought to light serious system performance issues which have

27   had a significant adverse impact on staff productivity.  At present, these problems are being

28   investigated by the system vendor; however, progress concerning the correction of the problems

55

1  has been poor. Therefore, the decision was made to stabilize the system prior to expanding the

2  pilot to remaining institutions. The scheduled rollout of invoice processing for the subsequent

3  institutions within Phase II (Folsom State Prison, California State Prison - Solano, California

4  Correctional Center, and High Desert State Prison) may also be impacted by the stability of the

5  HCDMS invoice system that tracks the adjudication/processing of invoices. In addition, the

6  HCDMS contract system still awaits the final version of software that allows the tracking of the

7  contract process steps required to monitor the overall health of the contract area.

8      The administration support unit has successfully implemented web-based access for staff

9  and providers to obtain standardized exhibits and documents. The unit continues to modify and

10  update medical templates on an ongoing basis. The development of invoice processing training

11  documentation was finalized, with the initial training session completed January 31, 2008. The

12  roll-out date for the Phase II training of contract staff is scheduled to commence March 13, 2008,

13  with continued training in HCDMS and detailed training in contract and invoice processes to be

14  rolled-out on an on-going basis to ensure staff are appropriately trained.

15      The post review unit continues to develop and establish the necessary policies,

16  procedures, and review tools to ensure a successful transition to perform internal post reviews.

17  The Post Review Unit is critical to the long-term success of the PCIB to determine if policies and

18  processes are being following appropriately.

19      C.  Contracts Entered Into by the Receiver to Assist the Receiver's Internal Operations

20          and Contracts Entered Into by the Receiver for the Benefit of CDCR.

21      As the Court is aware, the Receiver operates through the auspices of a non-profit

22  corporation, the California Prison Health Care Receivership. The Appointing Order

23  contemplates two distinct capacities in which he functions: those activities necessary for the

24  internal operation of the Office of the Receiver and the California Prison Health Care

25  Receivership as a legal entity separate from CDCR and those functions in which the Receiver

26  has supplanted the Secretary of CDCR with respect to the development and delivery of

27  ///////////

28  ///////////

56

1   constitutional medical care within CDCR and its prisons.[2] These differing capacities have

2   implications for how the Receiver has treated contracts with third parties. A full explanation of

3   the dynamics of the process was noted fully in the last Quarterly Report (Sixth Quarterly Report

4   at Section V, Other Matters Deemed Appropriate for Judicial Review, Pages 100 – 108).

5          On June 4, 2007, the Court approved the Office of the Receiver's Application for a more

6   streamlined, substitute contracting process in lieu of State laws that normally govern State

7   contracts in six areas: (1) Medical Records and Management of Patient Care, (2) Clinical Space,

8   (3) Recruitment and Staff Accountability, (4) Emergency Response, (5) Fiscal Management, and

9   (6) Pharmacy. (*See*, Order Re Receiver's Master Application for Order Waiving State

10  Contracting Statutes, Regulations, and Procedures, and Request for Approval of Substitute

11  Procedures for Bidding and Award of Contracts, hereinafter "Master Contract Waiver".) After

12  issuing the Master Contract Waiver, the Court also issued three supplemental orders authorizing

13  the same substitute contracting processes for contracts entered into in additional areas: the Office

14  of the Receiver's Asthma Initiative (*See*, Order Granting in part and Denying in Part Receiver's

15  Supplemental Application No. 2 for Order Waiving State Contracting Statutes, Etc.), Avenal

16  State Prison (*See*, Order Granting Receiver's Supplemental Application No. 3 for Order Waiving

17  State Contracting Statutes, Etc.), radiology services, clinical laboratory services, nursing

18  leadership development, physician credentialing, and medical specialty services (*See*, Order Re

19  Receiver's Supplemental Contract Waiver Application No. 1).

20         For each contract area, the Court approved three alternative bidding processes, depending

21  on the type and amount of contract at issue. These processes are "streamlined when compared to

22  State procedures [yet] are designed to be transparent and fair and to obtain, in the Office of the

23  Receiver's exercise of reasonable judgment, high quality goods and services at the best price."

24  (Master Contract Waiver at 5.) The three alternative bidding processes are Expedited Formal

25  Bidding Process (utilized on all contracts for $750,000 or more and contracts whose total

26  contract price is estimated to be valued at between $75,000 - $750,000, unless the Office of the

27  _____

28  [2] The Receiver understands that there is not always a bright line between these two sets of
    functions; but they are nevertheless conceptually distinct.

1  Receiver determines that urgent circumstances require the use of the urgent informal bidding

2  process); Urgent Informal Bidding (utilized on any contract whose total contract price is

3  reasonably estimated to be valued at less than $75,000 and for contracts whose total contract

4  price is estimated to be valued at between $75,000 - $750,000 if the Office of the Receiver

5  determines that certain circumstances do not permit sufficient time to utilize the expedited

6  formal bidding process); and Sole Source Bidding (utilized when the Office of the Receiver has

7  determined, after reasonable effort under the circumstances, that there is no other reasonably

8  available source).  The substitute bidding procedures applying to each of the three alternative

9  bidding processes and the Office of the Receiver's corresponding reporting obligations are fully

10  articulated in the Court's Order, and therefore, the Office of the Receiver will not reiterate those

11  details here.

12       As ordered by the Court, attached as Exhibit 14 is a summary of each contract the Office

13  of the Receiver has awarded during this reporting period, including a (1) brief description of each

14  contract, (2) which project the contract pertains to, and (3) the method the Office of the Receiver

15  utilized to award the contract (*i.e.*, expedited formal bid, urgent informal bid, sole source.) (*Id.*

16  at 12.) The vendors engaged by the Office of the Receiver during this reporting period were

17  engaged to assist the Office of the Receiver in the development of several areas, including the

18  Office of the Receiver's Asthma Initiative; pharmaceutical wholesale services; physician

19  credentialing; recruitment and hiring of health care staff; radiology and laboratory assessment

20  services; health care contracting; clinical data; fiscal control; and construction of health care

21  related facilities.

22       Vendors were also engaged by the Office of the Receiver during this reporting period to

23  assist in the operation of the Office of the Receiver's non-profit corporation, the California

24  Prison Health Care Receivership Corporation, including vendors specializing in financial

25  auditing services, phone system maintenance services and legal services.  While such contracts

26  are not governed by the Master Contract Waiver, a list of contracts is provided to the Court for

27  its information.

28

58

# VIII.

## CONCLUSION

My appointment on January 23, 2008, created a risk that the Office of the Receiver might enter a lull in its activities and progress. We have, however, avoided such a lull. To the contrary, as the contents of this report make clear, we have in very short order consolidated the Office of the Receiver's operations, substantially improved coordination with key stakeholders, reorganized the Office of the Receiver's core initiatives into an understandable set of goals and objectives, and, most important, kept those initiatives moving forward without pause. During the upcoming quarter, we will finalize the draft strategic plan and then work with the Administration and the Legislature to generate support and funding for the plan's elements. I believe the roadmap forward is becoming increasingly clear, and as this report demonstrates, we are making steady progress moving down that road.

Dated:  March 14, 2008

J. Clark Kelso
Receiver

59

1

**PROOF OF SERVICE**

2

I, KRISTINA HECTOR, declare:

3      I am a resident of the County of Sacramento, California; that I am over the age of
eighteen (18) years of age and not a party to the within titled cause of action; that I am employed
4    in the Office of the Receiver in *Plata v. Schwarzenegger*.

5      On March 14, 2008 I served a copy of the attached document described as
RECEIVER'S SEVENTH QUARTERLY REPORT on the parties of record in said cause by
6    sending a true and correct copy thereof by electronic mail and on March 17, 2008 by United
States Mail and addressed as follows:

7

8    ROBIN DEZEMBER
Director
Division of Correctional Health Care Services
9    CDCR
P.O. Box 942883
10   Sacramento, CA 94102

11   CHARLES J. ANTONEN
SAMANTHA D. TAMA
12   ROCHELLE EAST
Deputy Attorney General
13   455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102

14

STEVEN FAMA
15   DON SPECTER
ALISON HARDY
16   Prison Law Office
General Delivery
17   San Quentin State Prison, CA 94964-0001

18   PAUL MELLO
Hanson Bridgett
19   425 Market Street, 26th Floor
San Francisco, CA 94105

20

MICHAEL BIEN
21   Rosen, Bien & Galvan
155 Montgomery Street, 8th Floor
22   San Francisco, CA 94104

23   JAY SHULMAN
9647 Hilldale Drive
24   Dallas, TX 75231

25   DR. JOSEPH SCALZO
3785 N. 156th Lane
26   Goodyear, AZ 85395

27

28

60

1   ANDREA LYNN HOCH
Legal Affairs Secretary
2   Office of the Governor
Capitol Building
3   Sacramento, CA  95814

4   ELISE ROSE
Counsel
5   State Personnel Board
801 Capitol Mall
6   Sacramento, CA  95814

7   MATTHEW J. LOPES
Pannone, Lopes & Devereaux, LLC
8   1800 Financial Plaza
Providence, RI  02903

9

10   ALBERTO S. ROLDAN
Counsel
CDCR – Office of the Secretary
11   P.O. Box 942883
Sacramento, CA  94283

12

13   RICHARD J. CHIVARO
JOHN CHEN
State Controller's Office
14   300 Capitol Mall, Suite 518
Sacramento, CA  95814

15

16   MOLLY ARNOLD
Chief Counsel
Department of Finance
17   State Capitol, Room 1145
Sacramento, CA  95814

18

19   LAURIE GIBERSON
Staff Counsel
Department of General Services
20   707 Third Street, 7th Floor, Suite 7-330
West Sacramento, CA  95605

21

22   MATTHEW CATE
Inspector General
Office of the Inspector General
23   P.O. Box 348780
Sacramento, CA  95834-8780

24

25   DONNA NEVILLE
Senior Staff Counsel
Bureau of State Audits
26   555 Capitol Mall, Suite 300
Sacramento, CA  95814

27

28

1  WARREN C. (CURT) STRACENER
   PAUL M. STARKEY
2  Labor Relations Counsel
   Department of Personnel Administration
3  Legal Division
   1515 "S" Street, North Building, Suite 400
4  Sacramento, CA 95814-7243

5  AL GROH
   Executive Director
6  UAPD
   1330 Broadway Street, Suite 730
7  Oakland, CA 94612

8  YVONNE WALKER
   Vice President for Bargaining
9  SEIU Local 1000
   1808 4th Street
10 Sacramento, CA 95814

11 PAM MANWILLER
   Director of State Programs
12 AFSME
   555 Capitol Mall, Suite 1225
13 Sacramento, CA 95814

14 RICHARD TATUM
   CSSO State President
15 CSSO
   1461 Ullrey Avenue
16 Escalon, CA 95320

17 TIM BEHRENS
   President
18 Association of California State Supervisors
   1108 "O" Street
19 Sacramento, CA 95814

20 STUART DROWN
   Executive Director
21 Little Hoover Commission
   925 "L" Street, Suite 805
22 Sacramento, CA 95814

23 ///////////

24 ///////////

25 ///////////

26 ///////////

27 ///////////

28 ///////////

62

1  PETER MIXON
   Chief Counsel
2  California Public Employees Retirement System
   400 Q Street, Lincoln Plaza
3  Sacramento, CA 95814

4

5

6

7
          I declare under penalty of perjury under the laws of the State of California that the
8  foregoing is true and correct.  Executed on March 14, 2008 at Sacramento, California.

9

10

11                 Kristina Hector

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28