# EXHIBIT 1



# **C**alifornia
# **P**rison Health Care
# **R**eceivership Corporation

## Patient Identification Assessment

## February 6, 2008

### Beth Just
### Linda Bock
### Jim Turnbull

# TABLE OF CONTENTS

I.   Introduction ................................................................. 4
II.  Executive Summary ...................................................... 5
CPR Options ........................................................................ 7
III. Major Findings and Recommendations ..................... 11
A.  Major Process Related Findings ...................................... 11
B.  Major Technology Related Findings ................................ 12
C.  Major Recommendations ................................................ 12
IV. Patient/Inmate Identification ................................... 14
V. Information Technology Observations ..................... 16
VI. Detailed Findings and Recommendations.............. 18
VI. Next Steps .................................................................. 24
VII. Conclusion................................................................. 25
VIII. Contact Information.................................................. 25
IX. Appendices................................................................. 26
Appendix 1:  Correctional Facility Site Visits .............. 27
A.      California Medical Facility .......................................... 27
B.      Deuel Vocational Institution ...................................... 27
C.      CSP-Sacramento ........................................................ 28
D.      Folsom ........................................................................ 28
E.      Wasco Reception Center ............................................ 29
F.      Valley State Prison Reception Center for Women ...... 29
Appendix 2: Support Services Site Visits .................... 30
A.      ID Control Unit ........................................................... 30
B.      Army Depot Health Record Storage ......................... 32
C.      Enterprise Information System................................... 33
    1. Offender Based Information System .......................... 33
    2. Distributed Data Processing System ........................ 34
    3. Strategic Offender Management System .................. 34
    4. Discharged Offender Record Management ............... 35
    5. Security........................................................................ 35
    6. EIS Challenges ........................................................... 35
    7. EIS Discussion............................................................ 36
Appendix 3:  Correctional Facility Process Comparisons ......... 37
A.      Receiving and Release ............................................... 37
    1. Initial Identification of Inmates................................... 37
    2. Reception Center Initial Health, Mental and Dental Screening .............. 38
    3. Discussion .................................................................. 39
    4. Mainline Prison R&R.................................................. 39
B.      Scheduling Medical Services ..................................... 40
    1. Specialty Clinics.......................................................... 41
    2. Scheduling Discussion................................................ 42

CPR Consulting Report
February 6, 2008

C.      Health Information Management (Medical Records)................................ 42
    1. ICD-9 CM Coding & Census ................................................................ 44
    2. Transcription .................................................................................... 45
    3. Locater Systems ............................................................................... 46
    4. Loose Sheet Filing ............................................................................ 46
    5. Health Information Management Discussion ........................................ 47
D.      Laboratory Services ........................................................................... 48
E.      Radiology Services ............................................................................. 49
F.      Pharmacy Services ............................................................................. 49
G.      Central or Case Records ..................................................................... 50
Appendix 4:  Reception Center Flow Charts............................... 51
Appendix 5:  Facility Specific Database Table ........................... 54
Appendix 6:  Sample Scheduling System Data Field
Requirements ...................................................................... 57
Appendix 7:  ISO 27002 Base Standards to Audit ...................... 59
Appendix 8:  OBIS Record Growth[1] ........................................... 62
Appendix 9:  CMF Table of Speciality Services........................... 63

CPR Consulting Report
February 6, 2008

# I.    Introduction

In today's environment, proper identification of patients receiving care within a healthcare organization is a critical and often difficult task.  Providing correctional system healthcare to inmates is a complex and frequently fragmented endeavor. Within the California Department of Corrections and Rehabilitation (CDCR) this task is made more difficult by reliance on antiquated technology, labor intensive manual processes and staff members, who while dedicated, are hampered by the tools with which they work.  The ability to identify and link patient information regardless of treatment location contributes to high quality, efficient patient care. Without the ability to adequately identify the inmates receiving care within the prison system, the organization faces risk of increased adverse outcomes during patient treatment, increased cost of tests when duplicate tests are ordered and risk of non-compliance with regulatory or judicial requirements in addition to increased operational costs.

Just Associates (JA) was contracted by the California Prison Healthcare Receivership (CPR) to conduct a high level assessment of the current state of patient identification by examining the processes and systems used to manage inmate healthcare information and identification.   The objectives of the engagement include documentation of the current systems and processes, identification of the issues within the identity management system and recommendations regarding technology and process improvements required prior to supporting the planned rollout of the clinical information system.

The onsite visits included the ID Control Unit in Sacramento, California Medical Facility in Vacaville, Deuel Vocational Institution in Tracy, CSP-Sacramento and Folsom Prison, Wasco Reception Center in Wasco, the Army Depot Center in Sacramento, the EIS Department in Rancho Cordova and the Valley State Prison for Women in Chowchilla.   The onsite portion of the engagement began November 5th and concluded November 28th.

## II.    Executive Summary

When viewed from 30,000 feet, the information technology environment within the medical care side of the CDCR is not a 'system'…it is *an act of desperation*. The healthcare system in the CDCR is held together by the heroic efforts of the healthcare staff.  A major observation at each facility was the crippling inefficiency of the systems and processes.  The most common solution to inefficiencies appears to be adding more staff to complete mundane tasks.  Inconsistent information technology and health record management practices are pervasive. The efficient provision of health care services is put at risk every day due to the technological environment and the absence of sound information technology and health record management practices.

The CDCR has over 175,000 inmates for which it must provide health assessments, treatment of chronic and acute diseases and conditions and also facilitate timely and accurate transmission of healthcare information across its 33 facilities.  In any multi-site healthcare provider organization (which the CDCR is), the ability to identify and link patient information regardless of treatment location contributes to high quality, efficient patient care.  When multiple patient identifiers reside within multiple databases, or the organization cannot link previous diagnostic and treatment information across these sites, the organization faces risk including:

1. the possibility of significant errors during patient treatment,
2. increased cost of tests when duplicate tests are ordered (average cost of one such repeat test is over $1,100 – cost study performed by Children's Medical Center Dallas),
3. risk of non-compliance with regulatory requirements
4. inability to identify individuals with chronic and/or communicable conditions upon re-incarceration and
5. increased operational costs inherent in multiple patient identifiers.

In the CDCR, these issues become magnified due to the:
- overcrowding in the prisons (increasing the risk of communicable disease transmission),
- high recidivism rate (creating the need to constantly transfer previous health care records to the new prison location),
- high inmate movement rate (OBIS statistics indicate over 14,000 movements per week),
- dependence upon correctional systems (such as OBIS and DDPS), over which the healthcare providers have little or no control,
- high mental health population (>50% of inmates are projected to have a mental health condition) and

CPR Consulting Report
February 6, 2008

- frequent reported use of alias names (and incorrect dates of birth) by inmates.

Due to debilitating technology and record management practices, pulling together a cohesive picture of the inmate's health status is a significant challenge, and currently is near impossible. This puts continuity of care at risk. Yet, in the prison system, there are several characteristics that lend themselves to an optimal environment for providing continuity of care. These include a small captive population with limited rights, "patients" who document their requests for health services, a limited number of external contracted providers, all potential patients are stored in a centralized, common database (OBIS) and services are rationed by limited availability. These and other characteristic are enabling features that can be leveraged in an automated record keeping system.

Almost all healthcare (and correctional) processes are completely dependent upon the Distributed Data Processing System (DDPS) system, a 20+ year old system being run on a proprietary database and hardware that is no longer manufactured or supported. DDPS is utilized to track the location (within and outside the prison) of all CDCR inmates. There is a wide-spread and seemingly mythical belief that this system (as well as OBIS, whose data is maintained by CDCR's ID Control Unit) will continue to function into perpetuity despite the obvious shortcomings. This *is a significant risk issue for the entire CDCR* and impacts the ability to track the location of inmates therefore precludes CDCR's ability to provide quality, longitudinal based healthcare.

In order to address the current shortcomings of OBIS and DDPS, an initiative is underway to develop a replacement system known as SOMS (Strategic Offender Management System). The current timeframe calls for the system to be implemented in early 2013. This *schedule needs to be much more aggressive* in order to reduce the obvious risk to all CDCR processes, including the delivery of health care services.

There must be the commitment and wherewithal to immediately fund and initiate the acquisition and/or development of SOMS. **If this is not possible, it is strongly recommended that the healthcare delivery side of the CDCR begin independent development of an electronic Master Patient Index (MPI).**

Regardless of which direction is pursued, it is recommended that the healthcare services sector of the CDCR immediately begin the process to acquire an independent inmate/patient tracking system. A robust, commercially developed and supported ADT (admission, discharge, transfer), MPI and scheduling system(s) may well meet the needs of the institutions. The volume of "new" patients (inmate persons), the number of new cases and the volume of prisoner transfers is not overly high from a healthcare MPI/ADT standpoint. Off-the-shelf MPI, ADT and Scheduling systems – if flexible enough to customize – will address the most critical information sharing needs for CDCR's healthcare system.

*Just Associates, Inc*
*Confidential and Proprietary*
*Page 6 of 64*

Please see Appendix 8 for OBIS record growth, which is indicative of "admission, discharge and transfer" volumes.

It is encouraging to note that a major initiative is underway to centralize the records of paroled inmates from all facilities at the former Army Depot near Sacramento. While an aggressive time frame is strongly recommended for information technology solutions, an equally aggressive commitment must be made to develop this center into a best-of-class records management program.

Within the scope of the consulting engagement, Just Associates was asked to address issues related to inmate identification, tracking and continuity of care. However, during the engagement it became apparent that both the custody and medical care processes of the CDCR have a _high risk exposure_ due to the OBIS and DDPS applications. Regardless of the option selected to address the identification, tracking and continuity of care issues, Just Associates strongly recommends that a formal security assessment be immediately conducted of the OBIS/DDPS environment. At a minimum, the framework for the study should comply with the recently published ISO 27002 standard:

> _The ISO 27002 standard "established guidelines and general principles for initiating, implementing, maintaining, and improving information security management within an organization". The actual controls listed in the standard are intended to address the specific requirements identified via a formal risk assessment. The standard is also intended to provide a guide for the development of "organizational security standards and effective security management practices and to help build confidence in inter-organizational activities"._

> - The ISO 27000 Directory

A bulleted list of the base standards that should be assessed during an ISO 27002 review is attached as Appendix 7.

## CPR Options
Long term, JA views several options for the CPR to consider:

## Option 1

- Wait for funding and development of SOMS (Strategic Offender Management System) by the custody division of the CDCR per the current schedule (implementation in 2013). Utilize SOMS long term as the MPI and "bed management" function for the healthcare system.
- Under the direction of the Receiver's office, continue to invest in standardized applications (similar to Guardian for pharmacy) in other

patient care ancillary areas, as well as scheduling and the clinical data repository.

**PROS:** This option provides for standardization of a suite of applications that will fit with the future SOMS solution, which should make them easier to support.

It is better than doing nothing.

**CONS:** This option assumes that SOMS will be funded, which is not a sure thing.

Whether or not it gets funded, risk will not be mitigated at all...in fact, it will continue to increase.

## Option 2

- Provide funding and staffing support from the Receiver's office to promote approval and funding of SOMS, and to assist in the design and development of the SOMS suite of applications which would include MPI, scheduling, ADT and "bed management" function for the healthcare system.
- Continue investment in standardized applications (similar to Guardian for pharmacy) in other patient care ancillary areas and the clinical data repository.

**PROS:** There may be more to be gained on behalf of the inmates by combining the resources of EIS with those of the Receiver's office. The initial difficulty of coordinating such an effort may be more than made up for by the long run benefits

**CONS:** This approach would hamper the short terms efforts and projects of the receiver's office.

There is an opportunity cost that would be at risk should the SOMS project not receive approval, even with the Receiver's support.

## Option 3

- With the resources of the Receiver's office, move forward aggressively with the acquisition and implementation of an ADT/MPI, bed management and scheduling suite of applications. Acquisition of an off-the-shelf system that can be easily customizable would be the most expeditious way of addressing this critical need. Complete a data requirements project to ensure customization requirements are identified up front.

CPR Consulting Report
February 6, 2008

- Conduct an immediate security assessment of the OBIS/DDPS environments. In response to the study, take whatever steps are necessary to minimize operational risk to both the custody and medical services of CDCR.
- Continue to deploy standardized ancillary applications per current plans.

**PROS:** Can be undertaken without regard to the status of SOMS. This option provides a second system tracking inmate location in the event DDPS and/or OBIS fail. Applications could be customized to provide required information without the redundant data entry that currently exists. This option also allows CPR to move more quickly to resolve core foundational problems impeding efficient and quality patient care.

**CONS:** This type of application would house some of the identical data to that residing in OBIS and DDPS. This creates a need to compare data to ensure the same information is present in both systems and will require follow-up processes to be instituted to reconcile discrepancies.

Just Associates recommends that CPR move forward with Option 3. It is not ideal to create redundant systems; however inmate tracking is so critical to improving patient care in CDCR, that this must be addressed early in CPR's efforts to improving the healthcare capabilities.

**Discussion:**
Healthcare services can not be provided to inmates without knowing the exact location of the inmate. While this seems a simplistic statement, the current state of health service delivery demonstrates the complexity inherent in properly locating an inmate at a given moment in time. Medication delivery depends on knowing the unit, the cell and the bed in which an inmate resides. Even temporary re-location for administrative and/or disciplinary reasons can disrupt appropriate dispensing of a medication to an individual. The ability to effectively schedule appointments for either internal clinics or with an external provider requires the exact location of the inmate in order to create the ducat that allows the inmate to move internally within the facility. External appointments require complex coordination to ensure appropriate transportation and security is provided.

While understanding where the inmate resides within a facility is important, another challenge faced by the healthcare delivery system is to identify the facility in which the inmate is located and to also provide for those inmates who are temporarily not within a particular facility's walls, but either enroute to a newly assigned facility or receiving healthcare services with a community provider. With a single source of the inmate's location, as would be available with a properly configured ADT system would be of great value.

CPR Consulting Report
February 6, 2008

Implementation of a separate Admission-Discharge-Transfer system requires careful planning of database requirements as well as well thought out processes that account for exceptions as well the norm. Healthcare workers would need to provide registration services in all the R&R units at all facilities. Responsibilities include initiating the record for a new inmate, properly identifying a previous inmate whose record already exists within the ADT, discharging inmates who have been transferred to a new facility, temporary discharges for inmates receiving care in community based hospitals and/or clinics and identifying inmates with chronic diseases. In addition to the initial registration process, the system must also capture inhouse transfers whenever the inmate changes the unit, cell and/or bed he is assigned. How this process would be most efficiently performed requires additional study.

Option 3 includes deployment of an ADT system including inmate location tracking. Most ADT systems have an incorporated bed management system that facilitates up to the minute location tracking. Developing system requirements to meet the California Department of Corrections and Rehabilitation's unique needs is the first step in identification of the appropriate software to facilitate this critical process.

# III. Major Findings and Recommendations

## A. Major <u>Process</u> Related Findings

1. Volume figures for health care visits, requests for care, pending appointments and many other core healthcare statistics were not available. It will be nearly impossible to plan for new systems or processes until adequate workload volumes are obtained.

2. Healthcare forms (and other CDCR forms that influence scheduling of medical care for inmates) abound. The same data is collected over and over again. Many forms were created to address specific information tracking needs resulting from the various healthcare lawsuits.

3. The issuance of the CDC# is manual, fraught with many opportunities for error and is at high risk of being comprised due to the lack of back up (it is a totally manual system). The dispersing of blocks of numbers to the prisons is varied and how the CDC# is actually assigned to an inmate also varies from prison to prison. This is discussed in detail in Appendix 2.A – Support Services Site Visits, ID Control Unit.

4. The ability to correctly identify an inmate does not seem to be an issue. However, the number of times the CDC# is manually recorded and entered into different systems has likely caused substantial errors in the various computer systems in use in the prisons. Please see Appendix 4 – Reception Center Flow Charts. Yellow shaded boxes indicate steps where CDC # is manually recorded.

5. Failure to have an up-to-date location for each inmate impedes timely delivery of medications, adds to the resources required for pharmacy services and may result in inmates missing needed medications and contribute to continued ill health.

6. Prison transfers (especially from reception centers) impede the CDCR's ability to follow through on timely healthcare visits as the prison census system (DDPS) must be manually checked to determine if the inmate is currently still incarcerated at that facility. Refer to Appendix 3.B.2

7. There was little to no evidence of health care service processes being audited for completeness and accuracy. There is a reliance on the staff to never make a mistake.

8. Lack of HIM best practices including onsite record retention practices put significant demand upon already overcrowded office space and inefficient workflow. This contributes to less than optimal working conditions and likely increases errors. HIM is discussed in Appendices 2.B and 3.C.

## B. Major <u>Technology</u> Related Findings

1. There are concerns regarding the adequacy of CDCR's business recovery plan for OBIS and DDPS. It must be determined whether data recovery is truly possible in the event of a disaster causing total system failure. Appendix 2.C has additional information on this topic.

2. Untold number of independent Microsoft Access databases to track appointment scheduling, admittance to inpatient/observation beds, chronic diseases, mental health issues, special needs (chronos) such as canes, lower bunks, medications, allergies, etc. These databases sit on local PC machines, must be manually synchronized in the correct order or data is lost. The different types of MS Access databases do not communicate with one another thereby leading to large amounts of redundancy (and therefore likely significant errors) in data collection. Please see Appendices 3 and 5.

3. Each facility has different core ancillary systems such as systems supporting laboratory and radiology. Ancillary department technology investments appear to have an inconsistent strategy. Although the current investment in ancillary systems technology will lead to improvements across the system, a "best of breed" approach may lead to integration challenges down the road. See Appendix 3 for more detail.

## C. Major Recommendations

Section VI of this report contains a detailed listing of Findings and Recommendations for this project. A high level perspective of the Recommendations includes:

1. Development of data and functional requirements for an MPI, scheduling, inmate location "bed" management and abstracting system to determine the best "off-the-shelf" system that can be quickly obtained. The systems need to be flexible enough to add customized data tracking required in correctional facilities and to enable CDC# cross-referencing/ record linking. (See Appendix 6 for a sample of off-the-shelf vs. custom data collection requirements for a scheduling system.) Biometric capability/support needs to be a prime requirement.

2. Complete a security penetration assessment of OBIS and DDPS. Develop a disaster recovery plan for both of these systems. Provide a daily backup of OBIS and DDPS into a backup database stored on a contemporary platform.

CPR Consulting Report
February 6, 2008

3. Complete an external data analysis of OBIS and DDPS to assess data integrity of key identifiers and key person level demographic identifying fields.

4. Stop the proliferation of different chart tracking systems within each prison and standardized on one system. A chart tracking system will be required for a minimum of 5-7 years until the medical record is fully automated and the need to pull old paper charts is eliminated.

5. Ensure all healthcare technology systems that are being acquired have the capability to store a single "enterprise" healthcare identifier for each patient record (and all electronic transactions) into and out of that system.

6. Develop methodologies to track and/or report workload volumes for clinics, ancillary departments and HIM.

7. Provide workflow and process best practices guidance and training for HIM departments.

8. Begin process redesign efforts in the appointment scheduling, laboratory, radiology, clinic/TTA and HIM as technology is rolled out in these areas. Some process redesign of existing manual processes should also be undertaken until new enterprise wide technology can be implemented.

9. Change management and computer skill training of healthcare staff must be carefully planned to migrate the existing staff members to enthusiastic use of more sophisticated technology.

CPR Consulting Report
February 6, 2008

# IV. Patient/Inmate Identification

One of the major objectives of this consulting engagement is to provide an assessment of patient identification practices within the California Department of Corrections and Rehabilitation. The ability to identify a specific individual and thereby the medical care required at any point in time is hampered by fragmented systems, incomplete data, and lack of a consistent, trusted identifier. Clearly there is a need for a system that provides unique lifetime identification of each individual inmate and one that has the ability to track the location of each individual. Biometric options to enhance patient/inmate identification should be seriously considered as part of this initiative. The identification tool chosen must serve as the cornerstone for linking health information across the various locations within CDCR and a building block of the planned Clinical Data Repository while accurately identifying a given inmate.

The deficiencies of current systems and processes used for inmate identification and tracking are fundamental and are briefly enumerated below:

1. There is no current way to track an individual via a single identifier throughout their lifetime. With the rate of recidivism as high as it is within the male prison population, the majority of inmates have multiple identifiers within the OBIS database. While there is an effort to manually link the various CDC#s assigned to an individual, there is no truly fool proof methodology or technology in place to ensure appropriate linking takes place. It does not appear that any analysis of the data contained in OBIS has been completed that would identify inmates who potentially have CDC#s that have not been appropriately linked. JA was informed that the unique CII# was used to identify improper linkages, but have not been able to confirm the details of the report production and follow-up process. The CII# is stored in a text field in OBIS and there are no edits or validation applied to it, including identification of a duplicate CII# edit at the time of entry.

2. The lack of a unique identifier creates barriers to the ability to access previous healthcare information when an inmate returns to the CDCR and is assigned a new CDC#. This creates issues and delays in treating individuals with chronic diagnosis where treatment delays significantly impact the cost of overall healthcare delivery.

3. In order to deliver health care, whether it is a medication or an appointment with a community provider, the first requirement is to accurately locate an inmate at any given time. The current processes employ many workarounds to locate inmates that are inefficient and, unfortunately, inaccurate for a portion of inmates. The inability to locate an inmate at any point in time impedes the delivery of healthcare services.

4. Inability to electronically link data systems and provide real-time updates cripples the institutions' ability to provide timely healthcare in an efficient manner. The manual synchronization of computers throughout the prisons

CPR Consulting Report
February 6, 2008

that takes place daily uses many productive hours and this waste is dwarfed in comparison to the inefficiencies caused by the inability to have pertinent information routinely available.

5. Access to OBIS and DDPS is restricted by too few workstations in the locations where employees need them to perform assigned tasks. Additionally, the inability to get timely security IDs and passwords so that existing workstations can be used creates additional inefficiencies.

6. An average of 2,000 new case files are added each week to OBIS and over 28,000 "movements" are recorded each week (statistics taken from OBIS summary reports from November 14 – December 21, 2007.) The data in OBIS regarding inmate locations are frequently out-of-date due to the need to limit the DRAD processing ("synching" with DDPS) to twice weekly. Without accurate OBIS information, the HIM department cannot ensure the UHR is at the same location as the inmate.

The use of facility specific Access databases proliferates across the organization. While employees have developed these to fill a specific need (and deserve commendation for doing so), the result is information stored in database silos that is inaccessible, can't be aggregated and serves a single purpose instead of facilitating improved processes via the synergy that can be realized from information exchange.

Because the delivery of healthcare services relies heavily on the data and systems maintained by the custody side of the system, it is necessary to take these systems into consideration in this discussion. Ongoing strategies should be planned with consideration for how the healthcare systems will be integrated with the systems used by the corrections staff.

Patient Identity (MPI) functionality that can enhance the CDR rollout includes:
- Generation and communication to all designated departments and downstream systems of a single unique healthcare identifier.
- Ability to store and utilize in electronic communications all identifiers and multiple key demographic data fields, such as name, gender and date of birth less than one unique record identifier.
- Capability to keep registration, scheduling and downstream system records in sync.
- Standardized front end search for clinicians to locate their patients' records to include an error tolerant search capability.

# V. Information Technology Observations

The main applications, OBIS and, DDPS, are at significant risk due to:
- Technological obsolescence
- Pending retirement of the entire support team
- Inability to hire replacement programmers
- Spare parts for systems no longer manufactured
- Affordable maintenance may not be available

Consequently, to bridge the time until SOMS is developed and implemented, it is essential that a business recovery plan be developed and tested. This plan should consider the acquisition and warehousing of spare HP3000 gear. It is strongly recommended that a data conversion effort be initiated as soon as possible with SOMS in mind. Simply converting the data so it can be read by a more contemporary I.T. architecture would be a sound risk mitigation step.

The CDCR would be well advised to roll out a common infrastructure to all facilities upon which applications can reside. This can be implemented well in advance of SOMS, and perhaps leveraged for other purposes before SOMS is implemented. The current Cisco site survey process is a very positive first step in this direction.

There appears to be little evidence that the issue of data security is receiving adequate attention. A data security assessment is strongly recommended within the CDCR offices as well as at the prison facilities with a penetration study being conducted as soon as possible. A strategy around data security should be developed hand in hand with SOMS, the CDR and the business recovery plan.

When observed from 30,000 feet, the information technology environment within the medical care side of the CDCR is not a 'system'...it is an 'act of desperation'. Multiple applications have been developed by CDCR staff, in order to deal with an unmanageable environment. The lack of standardization across facilities is successfully being addressed in the pharmacy area with the Maxor rollout of Guardian. While the need for this initiative to implement a standard solution is recognized, it sets the stage for the possibility of a 'best of breed' approach which may be difficult to support.

There is evidence that there is a lack of understanding by healthcare workers in the individual correctional facilities relative to the healthcare I.T. strategy. As part of any go-forward initiative this must be addressed in order to gain support for the various initiatives. The healthcare staff members interviewed during the assessment were aware of the need for change, but there is some sense of 'hopelessness' that needs to be overcome.

In addition, at several facilities there is a great deal of personal investment in many of the applications that are being used, primarily Access databases.

CPR Consulting Report
February 6, 2008

Unfortunately, these stand-along home built applications are at risk as support and development resources retire, lose interest, relocate, etc. Despite this, vendor supported applications may meet with resistance based upon personal agendas rather than rational arguments even if these applications could potentially streamline processes.

CPR Consulting Report
February 6, 2008

## VI. Detailed Findings and Recommendations

A common observation throughout each of the sites visited was the crippling inefficiency of systems and processes. The needs of the inmates are met through heroic efforts of the staff, despite the obstacles. The most common solution to these inefficiencies is to add more staff to complete mundane tasks.

CPR's plan to implement a comprehensive and efficient suite of applications to address some of the healthcare delivery challenges will require a detailed and thorough plan to train existing workers, preparing them to embrace this "new world". This plan must also address the need to re-educate displaced or reallocated staff whose continued employment has been guaranteed by CPR's promise that existing staff will not lose their positions due to implementation of technology.

| Finding | Recommendation |
|---|---|
| *Identity Management* | |
| 1. The inmate is not assigned a unique identifier that stays with him/her throughout any incarceration with CDCR. | Implement an MPI to be used for healthcare services that assigns a single identifier and facilitates its use to link data. |
| 2. The CII# is limited to Department of Justice use. | Research legal limitations of CII# and determine if changes could be implemented to allow use of this already present identifier. |
| 3. OBIS is not architected to store and/or use a unique identifier. | Likely not an issue that can be resolved prior to SOMS implementation, unless the CII# field can be reformatted to edit for duplicate entries. |
| 4. CDC#s are issued via a manual system with inadequate quality checking and no back-up processes. | Because identification of the inmate/patient begins with this number, the CPR has an interest in manner of assignment.<br>A. The current manual system needs to be streamlined with checks and balances implemented to ensure that CDC#s are not issued to more than one facility or inmate.<br>B. The logs completed by the facilities at assignment should be audited and a copy of this record kept at ID Control. |
| 5. OBIS linking of CDC#s belonging to a single individual is a manual process. | Complete an external data analysis of OBIS to identify potential duplicate inmate records that have not been linked. |

CPR Consulting Report
February 6, 2008

| Finding | Recommendation |
|---|---|
| 6. The current system for CDC#s is running out of available new numbers for new inmates. There is a plan to change the number structure and implement this new scheme by 2009. | All healthcare systems that use the CDC# will need to be evaluated for their ability to accept and store the new identifier. Those systems that are not able to use this identifier will need modification. When that involves a vendor, it will take additional time to complete. |
| 7. Key identifiers for each inmate are manually entered into many data systems, creating increased opportunities for error. | Implementation of networked systems that transmit identifiers electronically, allowing selection of the appropriate record will minimize these types of identification error. |
| 8. At CMF, outsourced lab tests are manually entered into the LIS, introducing the opportunity for errors. | Investigate security concerns that have prohibited an online interface with the outside lab vendor. Ensure an interface between Quest and the lab system is implemented. |
| 9. The lab systems do not link an inmate across CDC#s. | Ensure pertinent, historical lab values are available via the CDR. |
| 10. Healthcare employees frequently do not know the location of an inmate when attempting to provide services. | Implement software that includes up-to-the-minute inmate location capability. Provide appropriate personnel and process changes that will support accurate information. |
| Information Systems | |
| 11. There are risks inherent in the use of the obsolete technology used by OBIS and DDPS. | The data should be migrated (and backed up daily) to a more contemporary platform as soon as possible to mitigate risk of major system failure. |
| 12. Multiple MS Access databases have been developed to address a variety of data collection and process needs. The prisons have need for traditional health information systems, but have many unique attributes that influence how these systems can be deployed. | Key technology needs include capture of multiple, different identifiers for an inmate, scheduling and registration functionality and inmate location ("bed") management functions. Recommend a data and functional requirements project to be used as a basis for evaluating market available systems and/or need for custom development to address these four key functional needs. |
| 13. Accurate identification of an inmate does not appear to be an issue. | A. The CDR (or an external MPI) needs to include these two |

CPR Consulting Report
February 6, 2008

| Finding | Recommendation |
|---|---|
| However, it is a challenge to link multiple CDC# records and multiple different demographic data points for an inmate. | requirements.<br>B. Any system acquired needs to be "biometric" enabled.<br>C. Complete a data requirements project to identify both off-the-shelf and custom data requirements for MPI type data fields. |
| 14. The scheduling system, IMSATS fails to meet the organizations needs. This is discussed in detail in Appendix 3: Correctional Facility Process Comparisons, B. Scheduling Medical Services. | A. Deploy a new application as part of an MPI implementation that is flexible enough to meet the organization's varied needs.<br>B. Complete a data requirements project to identify both off-the-shelf and custom data requirements for the scheduling and ADT functions required to schedule, wait list, check-in and discharge patient's from clinics, TTA and "inpatient" beds. |
| 15. Separate scheduling systems are used for mental health and dental appointments, making continuity of care more challenging. | Incorporate these services in any new scheduling system. |
| 16. Although there is a critical need for shared disease tracking throughout the CDCR, current tracking is fragmented by facility and by disease category. | Implement a networked system that incorporates disease tracking. |
| 17. Use of MIMAS for chrono tracking is limited because the system is not available via a network. | If the chronos are included in the CDR, access at least to medical staff will be improved. However, the custody staff also has needs for this information which need to be considered in any implementation plans. |
| 18. Use of the Disability & Effective Communication System (DEC) was seen at just one facility. | Explore using this system in R&R at all reception centers. |
| 19. Need for manual synchronization of system with updated DDPS information impedes work functions. | While SOMS may alleviate the need for manual synchronization, alternatives for the proposed CDR and healthcare network should be evaluated. Performing a synchronization check of a new MPI/ADT/bed management system nightly from the centralized DDPS database should be accomplished to identify potential |

| Finding | Recommendation |
|---|---|
| | discrepancies quickly. |
| **Information Technology Support** | |
| 20. The hardware on which DDPS and OBIS reside is no longer commercially available directly from the manufacturer, only through secondary vendors. | Consider purchase and storage of a number of spare parts for these systems as part of the disaster recovery plan. |
| 21. The data security plan for the statewide systems is insufficient and relies on the closed nature of the computer systems (OBIS, DDPS.) | Conduct a penetration study to determine the risk of security breaches. |
| 22. IT security plan is incomplete. | The EIS team needs to develop a disaster recovery plan that is tested appropriately, including a penetration study. |
| 23. Access to both OBIS and DDPS was limited and caused inefficient processes. | Work with the EIS team to improve availability, both with security assignment and in providing appropriate workstations. |
| **Change Management** | |
| 24. There is a perception among the employees of healthcare services that the obstacles to improvement may be insurmountable. | The change process must be managed with attention given to methods to assist employees embrace and support the planned improvements. |
| 25. Employees have a vested interested in the existing MS Access databases, as many have been internally developed. | Ensure the change management strategy addresses transition to standardized systems. |
| **Health Information Management** | |
| 26. There is difficulty ensuring the inmates UHR is at the same location s/he is. | Implement a CDCR-wide MPI system and a CDCR-wide chart tracking system. |
| 27. CDCR doesn't have a true unit medical record as the outpatient and inpatient unit records are kept separately and inpatient records do not follow the inmate to the next institution. | Evaluate the practice of maintaining separate records. It appears that continuity of care could be compromised by this record division. |
| 28. The UHR has been removed from the DORM imaging initiative. | Develop a comprehensive document management plan that incorporates some level of document imaging to augment the electronically captured data housed in the CDR. |

CPR Consulting Report
February 6, 2008

| Finding | Recommendation |
|---|---|
| 29. Record retention practices contribute to space issues within the correctional facilities. | A. Review and modify record retention requirements<br>B. Consider further leveraging and automating the Army Depot record storage center to service as a center for storage and retrieval of all records with necessary courier and electronic transmission capabilities. |
| 30. The planned record filing system at the Army Deport Record Center is fragmented. The UHR is separated by discharged and paroled records and with the paroled records further separated by the month the parole is to be completed. | Consider housing all UHR in strict terminal digit order, using year/month stickers as flags for purging. This type of filing scheme reduces the number of places one must search for a file, thereby reducing the amount of lookup that must be completed prior to filing loose reports. |
| 31. The Army Depot center for health records currently is not equipped or staffed to meet service requirements. | Develop this center into a first class document management center, deploying best practices for acquisition, storage retrieval, retention, record destruction and communication while delivering superior customer service to the 33 institutions it serves. |
| 32. A variety of chart tracking is used by both the HIM departments within the correctional facilities as well as Central Record Departments. | A single record tracking system should be chosen and implemented across the system. It would be most efficient to include the C-File tracking in this initiative. It is imperative that the bar-codes produced by any tracking system be standard and readable by any device within the organization. |
| 33. Coding practices within the correctional facilities are different, references are out of date and personnel are under trained. | A. Evaluate the entire coding process to determine if it is fulfilling a need.<br>B. Consider change to coding problem lists at admission in order to facilitate follow-up medical care. |
| 34. Transcription services are underutilized. There is an existing plan to improve and increase services by implementing a centralized transcription service. | A. Dictated and transcribed documents are often a cornerstone of an Electronic Health Record. The use of dictated services should be further evaluated with a plan developed for increasing use.<br>B. The change to centralized dictation is not trivial and must have a strong communication plan to address |

CPR Consulting Report
February 6, 2008

| Finding | Recommendation |
|---|---|
| | provider issues. |
| 35. Dictation equipment varies in age with some equipment nearing the end of usability. | Plan for equipment replacement as part of the transcription initiative. |
| 36. JA was unable to collect valid statistics regarding volume of work from any of the areas visited. | Implement new manual systems to capture workload volumes until this function can be automated. |
| 37. The skill level within the HIM departments is inadequate to support the planned CDR initiatives. | Increase the number of professionally credentialed staff employed in the HIM departments.   A strong, strategic leader is needed to ensure HIM departmental practices support the clinical information exchange and information management needs for the prison healthcare system. |
| 38. Salary levels of HIM employees are lower than community rates, impacting the organization's ability to recruit quality staff. | Conduct a salary survey and increase levels as appropriate. |

CPR Consulting Report
February 6, 2008

# VI. Next Steps

This report has noted that several initiatives are already underway in an attempt to address the problems identified during this assessment. Examples of current activity include the Cisco wireless assessment, the centralization of offender records at the former Army Depot, and early activity regarding the possible centralization of transcription services to name but a few. In multiple discussions with staff from the Receiver's office as well as those in the field, there is obvious enthusiasm for the ultimate implementation of a common electronic health record. While this is a desirable end goal, the following next steps are recommended to set the stage for such an initiative, as well as to improve and ensure continuity of care for the inmates until the EHR is implemented.

- Review the capabilities of a standard EMPI solution, and based upon this review and the needs of the inmate population, determine whether a robust EMPI solution is needed or if basic MPI, ADT and scheduling solutions are more appropriate at this time. CDCR only requires basic MPI functionality, but core MPI functionality is paramount to the success of any future healthcare information systems rollout. CDCR additionally has several unique data field and data flow requirements that must be addressed as this assessment is undertaken.
- Begin a re-design effort to standardize (to the extent currently possible) processes that support health care delivery across all CDCR facilities. An 'as is' process could be initiated after prioritizing four to five processes that vary widely from site to site.
- Review, update and test the current business recovery plan for the OBIS and DDPS applications and databases. Identify the necessary investments to ensure the viability of these critical applications until replacement applications are successfully implemented
- Review and standardize chart management processes at all facilities, and continue to invest in the Army Depot storage facility to ensure that it becomes a best-in-class resource to the CDCR.
- Recognize that staff training is currently inconsistent across all facilities, and that a standardized EHR solution will require a significant investment in training and change management if optimal results are to be obtained. It is not too early to plan for this need.

CPR Consulting Report
February 6, 2008

## VII. Conclusion

It is worth emphasizing that the prison system has several characteristics that lend themselves to an *optimal environment for providing continuity of care.* These include a small captive population with limited rights, "patients" who document their requests for health services, a limited number of external contracted providers, all potential patients are in a common database (OBIS) and services are rationed by limited availability. These and other characteristics are enabling features that can be easily leveraged in an automated record keeping system. They are also characteristics that a competent lawyer would identify in defense of an inmate who has possibly been harmed due to a break in the continuity of care.

The key to providing continuity of care is the accurate identification of the patient before, during and after each episode of care.

## VIII. Contact Information

Beth Just, CEO/President, Just Associates, Inc.
> Work:  (303) 693-4727
> Email:  bjust@justassociates.com

Linda Bock, Vice President, Just Associates, Inc.
> Work:  (720) 748-2867
> Email:  lbock@justassociates.com

Jim Turnbull, Sr. I.T. Consultant
> Work:  (303) 921-1245
> Email:  JTrunsCO@gmail.com

CPR Consulting Report
February 6, 2008

# IX. Appendices

Appendix 1: Correctional Facility Site Visit Descriptions

Appendix 2: Support Services Observations

Appendix 3: Correctional Facility Process Comparisons

Appendix 4: Reception Center Flow Charts

Appendix 5: Facility Specific Database Table

Appendix 6: Sample Scheduling System Data Field Requirements

Appendix 7: ISO 27002 Base Standards to Audit

Appendix 8: OBIS Record Growth

Appendix 9: California Medical Facility – Table of Specialty Services

# Appendix 1: Correctional Facility Site Visits

## A.    California Medical Facility

California Medical Facility (CMF) provides care to inmates with chronic medical problems.  There are ~3,000 beds that include 155 inpatient mental health beds, 7 acute care beds, 17 hospice beds, 25 ambulatory care clinic beds, 33 Correctional Treatment Center beds and an Outpatient Housing Unit for inmates requiring minimal care.  There is a licensed stand-by Emergency Department where minor complaints are treated with true emergent care needs transferred to local area hospitals.  Inmates with security needs from Level 1 through Level 3 are housed at CMF.  On average, there are 50 admissions and discharges per week, although inmates tend to stay at CMF once they've been transferred into the facility.  The average stay is 24-27 months, with 95% of the inmates eventually released. There is a high rate of return, although the inmate's key identifiers (including CDC#, name, date of birth, etc.) may be different on a return trip.

Tracking inmates with a specific diagnosis, such as diabetes mellitus, TB or HIV is a daunting task, given the current state of automation available within the correctional system.  When an inmate is transferred within the system, those with chronic diagnoses tend to blend in with the general population as there is a lack of connected information providing automated functionality for disease tracking. This causes roadblocks in providing an adequate level of connected care for these inmates.  Currently CMF uses 6-7 different individual MS Access databases to track specific chronic diseases.  These systems are stand-alone applications specific to this institution.

The physicians at CMF who were interviewed for the consulting engagement indicate that it was not their experience that inmates/patients are improperly identified.  Most of their patient population, due to their chronic conditions, is motivated to provide proper identity in order to facilitate care.

Headway appears to have been made in fulfilling and/or catching up on a backlog of Requests for Specialty Services.  See Appendix 9.  These statistics (pulled from their IMSATS database) indicate that from July – November 2007, the volume of specialty service appointments was over 5,400, while only 3,250 requests were made during this same time period.

## B.    Deuel Vocational Institution

Deuel Vocational Institution (DVI) is one of the reception centers for men within CDCR.  This facility houses ~4000 inmates at any particular time, although the accommodations were originally designed to house 1600 inmates.  The lack of space was quite apparent, especially in the HIM department which was so small that the consultants were unable to physically enter the areas where work was performed without jeopardizing the employees' ability to function.  As a reception center the entire population changes approximately every 40 days.  There are

*Just Associates, Inc*
*Confidential and Proprietary*
*Page 27 of 64*

groups of inmates that are permanently assigned to DVI, although the majority are placed at main line prisons once the initial mental, dental and health evaluations are completed. It was related that when treatment for a particular complaint is begun at DVI, that the inmate is placed on a "medical hold" and the treatment must be completed prior to transfer to the mainline prison. Therefore, if the condition is not urgent, treatment may be delayed until the inmate is placed at his permanent location. There is a significant backlog of requests for appointments with outside providers. All treatment decisions must be made with the regulatory requirements for timely medical care in mind.

Both the Chief Medical Officer (CMO) and the Healthcare Manager at DVI are relatively new to the facility. Although the need for change to improve the technology supporting healthcare is recognized by these individuals, significant barriers were identified including substandard physical infrastructure, lack of technological expertise in the employee population, inability of information systems to provide adequate support and training for any newly implemented systems and the culture of the organization that hampers embracing change.

## C.    CSP-Sacramento

Built in 1987, CSP-Sac is a Level IV facility whose population includes a significant volume of inmates with mental health diagnoses. The facility houses ~3400 inmates. Healthcare units within this institution include Correctional Treatment Centers, levels 1 & 2, an Outpatient Housing Unit and a Mental Outpatient Housing Unit as well as the primary care clinics available for routine outpatient care. There is also a Treatment and Triage Area (TTA) where minor health issues are treated. The medical staff component includes a CMO, 7 primary care physicians, ~80 Registered nurses and 40 Licensed Vocational Nurse positions.

One of the challenges and frustrations for medical staff who work at CSP-Sacramento is the backlog of requests for outside medical treatment. There are a limited number of providers contracted to provide these types of services, with over 600 appointments scheduled through March of 2008. The facility is limited by the ability of the outside providers to accommodate all the prison requests.

## D.    Folsom

Folsom is one of the historical prisons within the California Department of Corrections. In operation since the mid 1870's, it currently houses approximately 4000 inmates and is designated a Level 2 & 3 facility. Approximately 80 inmates are transferred on a weekly basis. Folsom is also associated with the Folsom Transitional Treatment Facility, which provides services for drug addiction to both inmates and parolees. In addition to clinics in each cell block, the facility also has a Treatment and Triage Area that has one bed. Lab services provided include specimen collection only, with all samples sent to Quest Lab for completion of the test. Results can be accessed online or via the hard copy which automatically

CPR Consulting Report
February 6, 2008

prints in the lab. Radiology services include routine radiological exams with the exclusion of fluoroscopy, CT, Ultrasounds and MRIs.

## E.    *Wasco Reception Center*

This reception facility, located in the Central Valley, has a population of approximately 5,900 inmates. There are 100-120 daily transfers, both in and out. The population includes a large number of parole violators who arrive without their C-file or healthcare record. On average, inmates stay at Wasco for 90 days. This center is also a hub for processing inter-state transfers, i.e. inmates who are sent to facilities in other states to serve their sentences. Wasco is associated with a Community Correctional Facility in a nearby community and provides the healthcare services to these inmates as well. There is a Correctional Treatment Center unit at Wasco as well as clinics in each yard.

In-house radiology services provided include routine exams with chest x-rays completed in the Receiving and Release area as the incoming inmates are processed. A Siemens x-ray machine is used, but there is no digital capability. This department has developed an internal tracking system for radiology films and dates of service. Schuylab is used for in-house lab tests. These include Chemistries, CBC and UAs. Other lab tests are sent to Foundation Lab for processing. The results from tests sent to Foundation Lab print in the lab department, and then Schuylab is updated to indicate that the result has been received, although the test result is not entered. Test results can be searched for directly in the Foundation Lab database.

## F.    *Valley State Prison Reception Center for Women*

Valley State Prison for Women (VSPW) is a reception center for women that houses approximately 4,200 inmates. This facility is the highest security level prison for women with all four security level inmates in addition to an administrative segregation unit. VSPW has about 400-600 inmates transferring in and out on a monthly basis. Inmates in the reception center portion of the facility generally stay for 75-80 days with the longer term inmates remaining 13 months.

The facility offers community level care for its inmates including special clinics and services. Some of these are offered onsite; others must be accessed directly in the surrounding communities. There is a CTC unit with 20 beds where post-surgical care is provided as well as EKGs, bed rest and wound treatment. Radiology services are provided via a Fuji CR digital system. The system produces films for the radiologist to view and read and is not a PACs system. Schuylab is used for lab scheduling. Specimens are drawn onsite and sent out to Foundation Lab for processing. Results are available online via the Foundation Lab system. Once the test result is returned from Foundation Lab, Schuylab is updated to indicate the test result has been received, but the results are not posted in this system.

# Appendix 2: Support Services Site Visits

## A.    ID Control Unit

The ID Control Unit, based in Sacramento, is charged with maintenance of the inmates' legal records. Included in the specific responsibilities of this unit are the calculation of dates for parole and discharge, issuance of the California Department of Corrections identification number (CDC#) and also serves as the call center for law enforcement and family members who are attempting to determine the location of a specific inmate. Each correctional facility has a local Central Records office that maintains the legal file for each inmate. The unit relies upon the Offender Based Information System (OBIS) as the source of inmate information. This database is used throughout the correctional system as the source of integrated inmate information. Due to technical limitations which will be discussed later, the system often does not reflect an accurate location when the inmate is in transit, which creates difficulty meeting service expectations of the department's customers.

Inmates are identified via a centrally distributed CDC#. The number is used as the primary identifier for an inmate's C-file or legal record, the identification card and the healthcare record. This identifier is comprised of a single alpha character followed by five digits. Alpha characters have occasionally been used to identify a particular type of inmate, resulting in limitations of available free numbers. For example, female inmates are generally assigned numbers beginning with W and X. A "Z" used at the end of the number indicates inmates who have not yet received a sentence, therefore numbers beginning with the letter Z are not used to eliminate confusion. The practice of using a particular letter to code a type of inmate or incarceration further limits a finite supply of available numbers. It is projected that there will be a need to change the numbering system by 2009 to allow for prison system growth. Plans are currently underway to change the CDC# system to allow 2 alpha characters. All databases that currently use and store this identifier will need to be updated to accommodate the numbering change.

Control of CDC# issuance is a totally manual process. The numbers available for assignment are stored in a three ring binder in the ID Control Unit offices. The numbers are primarily distributed in blocks of 100 to a particular reception center, although a mainline prison may also be given a smaller group of numbers. The name of the person and institution receiving the numbers are recorded in the binder and a large "X" placed through the page of numbers to indicate that the numbers have been assigned. It appears that number distribution can be via the telephone or via a faxed copy of the number log sheet, as both practices were observed at the reception centers. There are a number of concerns regarding the CDC# issuance process. First, there appears to be no backup for the three-ring binder. If the book should be lost, damaged, misplaced or otherwise compromised the data would be very difficult to reconstruct. Second, there is no

audit process evident that monitors this manual system for inadvertent issuance of duplicate sets of numbers to different facilities. In addition, the entire process is fraught with opportunity for error as the numbers are verbally transmitted, recorded manually at the individual institutions in log books prior to being given to a particular inmate and eventually entered into OBIS. The ID Control unit does not truly control the CDC#s, as they have no documentation of to whom a specific number has been issued other than by research of OBIS after the number is assigned and entered into OBIS at the facility. This cross-reference checking of issued numbers is not a process used, as the log books at the ID Control Unit do not display any specific inmate information, only the institution to which the number was issued.

The CDC# is valid as an identifier only as long as the inmate has not been discharged. Once the inmate completes the terms of his conviction and parole and does not re-offend within this window, the CDC# is retired. If the individual commits another crime during his parole, the current CDC# remains in use. If the individual is re-incarcerated after they are paroled/"discharged", they will receive a new CDC#. Inmates are not assigned a lifetime single identifier by the California Department of Corrections and Rehabilitation. The lack of a unique identifier that remains with a specific individual for any incarceration creates difficulty in properly identifying an individual and in providing links between historical and current information. This challenge exists for both the legal file and the healthcare record, but may be more acutely felt on the healthcare side as provision of care for chronic conditions is compromised by incomplete historical information.

The identification process used within the prisons to ensure that an inmate is the individual s/he purports to be includes use of Live Scan. Live Scan is a biometric system that electronically records and submits an inmate's fingerprints and confirms identity via the California Department of Justice and the FBI's criminal database. The results sent back to the correctional facility includes the inmate's key identifiers including last name, first name, birth-date, gender and Criminal Identification Index number (CII). The CII is an identifier "owned" by the Department of Justice. While it appears on the legal forms in an individual's case record and is input into OBIS, it is not used as an identifier by the correctional system. JA was informed that there were statutory limitations regarding use of this lifetime identifier by any entity other than the Department of Justice. The field used to store the CII number in OBIS is a text field and is not used for any audit purposes.

Because the importance of linking all of an inmate's records together is recognized, there is an attempt to provide a manual historical link. When it is known that an inmate has prior convictions, the CDC#s are cross-referenced within OBIS. This is accomplished by the previous CDC#s being entered on the current CDC# record. OBIS has the ability to cross-reference up to 10 inactive CDC#s and 4 active CDC#s. The cross-reference is another manual process that is performed by Case Records staff at the individual facility as they are inputting

the inmate's new legal information into the system. No process to routinely search OBIS for previous CDC#s was related or observed; instead the process appears to rely on the C-file containing references to the previous CDC#s. The ID Control unit indicates that OBIS does not allow records with different CIIs to be linked, however despite extensive follow-up this process remains unclear. If errors are identified with inappropriately cross-referenced CDC#s, the cross-reference can be deleted within OBIS. The need for an inmate to have more than one **active** CDC# is very limited, but does occasionally occur in these circumstances:

- an inmate has a dual commitment
- an out-of-state inmate housed in California commits a crime while incarcerated
- a parolee is housed as a "Safekeeper" inmate.

## B.    *Army Depot Health Record Storage*

Health records for inmates who have been released on parole or who have been discharged from the system in the past have been stored at two record centers – one located in the Northern part of the state and one in the Southern portion. The inmate's records were sent to the record center closest to the location of his/her parole. The storage facilities were overcrowded and outside contracted storage was used to increase capacity. In addition, there are records stored in an otherwise unused area of the Sac facility. These records have sustained water damage and must be carefully handled when attempting restoration via copying pertinent information and reconstructing a useable copy.

There is an initiative currently underway to centralize health record storage at the Army Depot Center in Sacramento. This facility is in the process of being set up with shelving to accommodate all the health records for the entire state. To date, the records for the Northern Record Center have been relocated to the Army Depot and are in the process of being sorted and filed. The plan is to store the records of paroled inmates separately from those of inmates who have been discharged.

Prior to assigning the permanent shelf site, each record is being researched in OBIS to determine the current status of the inmate. When the inmate has returned to the prison system for parole violation or for a new crime, the health records are sent to the current prison via a courier system. Prior to sending, the record is updated to reflect the new CDC#, if this identifier has been changed. The location of each record is entered into a separate tracking system, referred to as the C-file tracking system that is also used to locate the C-file. Unfortunately, this is not a centralized tracking system for health records as the Army Depot is the only location to use this system. The ability of staff to research each record in OBIS and to locate the records properly in the C-file system is hampered by lack of access to these systems. At the time of the site visit, there was only one workstation with OBIS installed on it, although others had been requested.

CPR Consulting Report
February 6, 2008

Researching current locations is quite a daunting prospect when comparing the volume of records awaiting this process with the ability to accommodate the lookups via a single computer.

## C.    Enterprise Information System

As part of the consulting engagement, a meeting was held with key EIS staff members who support both OBIS and DDPS. This group is responsible for maintenance of the programs and hardware, security access and routine processing for both systems.

### 1. Offender Based Information System

The Offender Based Information System was developed in 1975 and has been enhanced over the years to accommodate new regulations and user requirements. The operating systems, programming languages and hardware are all outdated by any measure. The system is used to track each inmate for the duration of his incarceration and parole for a particular violation. Although the system accommodates linking of different CDC#s assigned to a specific individual the database is not structured to track this same individual in a unique and consolidated record throughout their life time. Although the lifetime CII# is stored in OBIS, the information is formatted as a text field and not used as an edit for future entries.

The ability of the system to accommodate transfers between facilities is compromised due to the length of processing time required to run a reconciliation process. Instead of completing the Daily Report of Arrivals and Discharges (DRAD) each day, this important process is run only two times per week, due to system constraints. While the DRAD is run, the system is "closed" meaning that the facilities must wait until the system is once again available to record transfers. Both the transfer out from the first correctional facility and the transfer in to the second facility must be entered into OBIS before the system will reconcile this inmate's current location. In reality, the OBIS database is rarely completely accurate regarding all prison population locations as there are always transfers that have occurred but are not yet entered into the system, the system may not have reconciled the discharge with the arrival at the new location. In addition inmates are occasionally in route for a couple of days. JA consultants were frequently told that on any given day, there are 1,500 – 2,000 inmates in a different physical location than what is indicated in OBIS.

A critical issue within the OBIS database is the numbering system. The CDC# is currently comprised of one alpha character plus five numbers. The OBIS support team has developed plans to change the system to allow for 2 alpha characters plus four numbers. The numbering schematics have been developed and the change in the database structure will be completed prior to implementation in 2009.

CPR Consulting Report
February 6, 2008

## 2. Distributed Data Processing System

The Distributed Data Processing System or DDPS is primarily a local inmate tracking system used in each facility. This database began in 1985 and is a Hewlett Packard proprietary turbo image hierarchical database running on an HP 3000 using a MPE/iX Posix operating system. The programming language is COBOL. There is concern that the aging hardware is no longer manufactured, is well out of its warranty period, and no longer supported by the original equipment manufacturer making system failure due to hardware unavailability a very real threat.

DDPS is a distributed system used by all 33 institutions, with several servers located centrally. Each facility's data is backed up to the central servers every evening; the data is processed, and then returned to the field computers. DDPS receives an extract from OBIS each day. Edits are run to identify discrepancies between the systems, with typical error reports containing between 200 to 1000 records that did not match exactly. These reports must then be reviewed and researched manually to determine what data is in error and which system must be corrected to reflect the proper data. JA had the opportunity to review an old, previously worked report. The report contained 272 discrepancies, with only 5 errors reflecting a patient identification error of some sort. One was a keying error of the CDC#, one was an inmate with a known ACA (Also Committed As) and 3 were entries containing the CDC# plus 5 characters of the inmate's last name. These last three appear to be search errors where the individual using the database is actually trying to search the system for an existing inmate rather than completing a data entry function. Additional research would be necessary prior to drawing final conclusions, however.

The mission critical nature of the DDPS application at all CDCR facilities is not reflected in the technology investments and staffing within EIS. The "daily download" from DDPS triggers the synchronization of scheduling activities and is uploaded to multiple stand alone Access databases within each of the facilities. Innumerous correctional and healthcare activities are dependent upon these daily uploads.

Based upon a sample of 18% of the CDCR facilities, it appears that the health care services for the inmates are directly dependent upon this EIS supported application. Consequently, it is critical that business recovery and business continuity plans be put in place to minimize the very real risk of jeopardizing inmate health care services across the state for an extended period of time.

## 3. Strategic Offender Management System

SOMS is the name given to the system being considered as a replacement for OBIS and DDPS. This system is in planning stages with vendor identification, purchase and customization to be completed in the future. The system would be designed to track an individual throughout their lifetime instead of tracking each incarceration as does OBIS. The new system is expected to be developed using

services oriented architecture (SOA) design methodology, with a target date for implementation is December 2012.

## 4. Discharged Offender Record Management

DORM is the name of the imaging system being used to archive discharged inmates legal C-file. The program was planned to include imaging of healthcare records as well. The first healthcare records scanned were loose sheets at the two record centers with ~6.5M sheets scanned. Unfortunately, the forms were not bar-coded to facilitate indexing causing the cost of the system to rise dramatically. In addition, the documents chosen for scanning (loose sheets dating back to the early 1990's) provided little benefit for continuing care. Therefore, the CPR elected to discontinue imaging UHR documents at this time.

## 5. Security

Security for both OBIS and DDPS is centralized although some responsibilities for security assignments have been delegated to IT representatives at the individual institutions. OBIS has between 6,000 and 7,000 users. One individual processes access requests centrally. The passwords must be changed every 35 days. Multiple incorrect entry of a password inactivates the user, who must then be re-activated prior to continued use of the system. DDPS access is handled by the local IT coordinator. When a user has not used an ID for 45 days, it is revoked. If it is not used another 45 days, the ID is deleted but available to be reused in the future. The EIS team does not oversee security for any of the access databases used within each facility.

While limited audits are completed by case records, there are no audits of access by employees to data within either DDPS or OBIS. There appears to be no system to delete access of an employee when they resign or are discharged with CDCR staff feeling that is not a concern due to the inability of such staff to re-renter the facility and gain access to the systems.

## 6. EIS Challenges

The EIS team expressed concerns regarding the challenges of meeting the requirements imposed by lawsuits brought against the California Department of Corrections. The current systems are not flexible enough to provide for the data collection required for reporting regarding these lawsuits. Time consuming tracking systems have been developed, but they take resources away from the basic functions of this department.

There is also concern regarding the new CDC numbering system and the need for all downstream databases to accommodate the new numbers. A third area of concern is the obsolete hardware upon which both OBIS and DDPS reside. A significant amount of resources are expended to keep these systems operational. Finally, concern was expressed regarding the relative age of the EIS team members who support OBIS. The team is nearing retirement age and do not have replacement staff who are knowledgeable about this system.

CPR Consulting Report
February 6, 2008

## 7. EIS Discussion

While data security is a significant concern, the ability of the current systems to function effectively until SOMS is implemented is seriously in question. The HP3000 environment is not on the verge of obsolescence...it is well past it. Support costs will continue to escalate, and there may well be no support available by 2013 when SOMS is scheduled to replace it.

In addition, the OBIS staff is nearing retirement with no one waiting in the wings to replace them. The skill set required is not one that has a rich supply of talent lying around. A strategy to bridge to SOMS is essential; otherwise the system is at significant risk.

# Appendix 3: Correctional Facility Process Comparisons

## A.    Receiving and Release

All inmates enter a correctional institution through the facility's Receiving and Release (R&R) area.  As this is a focal area for proper identification of an individual inmate, the processes employed here warrant further examination.  In general the process was similar for all the facilities visited, but there are variations to be noted.  The processes at the three reception centers will be described first.

### 1. Initial Identification of Inmates

Inmates arrive from county jails either as new offenders, parole violators or inmates who return for a new crime committed while on parole for a previous crime.  Each inmate is accompanied by paperwork from the county jail which identifies him.  When the incarceration involves a newly sentenced crime this paper work includes the Abstract of Justice (AOJ) which contains pertinent identifying information about the inmate, including existing CDC#s and the CII#.  When the inmate is new to the correctional system or when a previous CDC# has been discharged, the inmate receives a new CDC#.  Parole violators being returned to the Correction system normally do not have as much paperwork accompanying them.  For these inmates both the C-file and the healthcare record must be requested from the storage areas.

At DVI, OBIS is researched to identify any current information about the inmate, including whether there is an active CDC#.  When a new CDC# needs to be assigned, the number is retrieved from a log book.  The available numbers are recorded on faxed pages received from Central Records in Sacramento.  These sheets are used to manually record the inmate's last name and the date of assignment.  The CDC# is recorded on the paperwork accompanying the inmate.  At DVI the CDC# is entered into OBIS by records center staff located in the R&R area.

Wasco Reception Center generally does the search of OBIS the day prior to arrival, as the office personnel receive a list of tomorrow's transfers each day.  Searches are done using both the inmate's last name and first name with the dates of birth reviewed to identify the correct inmate's record.  When CDC # is assigned, it is retrieved from a handwritten log of numbers that were assigned by Central Records in Sacramento.  The inmate's name is recorded manually in the log book and the CDC# written on a sticky note that is attached to the AOJ paperwork.  The CDC# is later input into OBIS by the local Central Records staff.  The number is added to any health screening documents created in the R&R area.

VSPW generally receives first time offenders, all who must be issued CDC #.  Again, a manual log is maintained.  Numbers assigned to VSPW by Central Records in Sacramento are written in log books.  Separate books are maintained

CPR Consulting Report
February 6, 2008

for the various types of CDC#s, so that regular CDC#s are assigned separately from Narcotic associated CDC#s. As part of the reception process, a body receipt is typed that includes the CDC#, along with the other inmate identifiers. This information is then faxed to the local Central Records office where it is input into OBIS.

All the reception centers use Live Scan as part of the R&R process. Prints of all fingers are taken and submitted to the Department of Justice to confirm identification. This DOJ database is also linked with the FBI database. Information is returned regarding the inmate's key identifiers, including the CII#. If this is different from the information thought to be correct, follow-up is done at both Wasco and DVI. However, at VSPW, the officers processing the new inmates did not receive information back after the fingerprints were submitted; therefore no identity confirmation was done. Perhaps this lack of a confirmation step is due to the high volume of new offenders routinely processed at this women's facility. After the Live Scan is completed, the inmate's photo is taken and the identification card produced.

DVI uses an internally developed program called LANCE to assist in tracking inmates and any special housing needs. Wasco uses a very ancient Brother word processing system to create bus lists that are then used in processing. At VSWP the custody staff did not indicate that any database was used for custody processing of incoming inmates.

The identification of inmates at the reception centers blends state-of-the-art biometric identification tools with extremely labor intensive manual processes. Adding the correct CDC# to the inmate's OBIS record is a process that goes through many hands, increasing the opportunity for errors to occur. The CDC# and other patient identifiers are manually input into DDPS at each facility. If the data entered into DDPS doesn't match the data entered into OBIS exactly, an error is logged when the reconciliation occurs at the EIS department in Rancho Cordova and each discrepancy must be manually researched and reconciled. Since downloads of DDPS data are used in a multitude of individual databases throughout each correctional facility, any discrepant data is multiplied throughout these systems. The proper identification of inmates at arrival is critical to future delivery of timely and appropriate medical care, as the healthcare systems are recipients of the DDPS data.

## 2. Reception Center Initial Health, Mental and Dental Screening

All incoming inmates are screened in the reception centers to identify current health needs. TB tests are routinely completed at R&R unless there is documentation with the inmate regarding their TB status that falls within time guidelines. When a TB test was administered at the county facility prior to transfer, the test is read by staff in the R&R areas. Inmates generally have some type of health record that accompanies them. The information is reviewed to identify any immediate medical needs. Existing medication orders are reviewed

CPR Consulting Report
February 6, 2008

and may be recopied for review/signature by the facility physician. If meds are needed immediately, they can be provided by the nurse following set protocols. A five point mental health screening, medical and dental screening is completed, with blood work drawn for mandatory syphilis testing. The inmates will be more thoroughly evaluated by physicians at a later time while at the reception center. The health screening at R&R is designed to accommodate immediate needs for medication or treatment and to identify limitations that impact housing assignment, such as the need for assistive devices or lower bunk requirements. If an inmate requires treatment at the time he arrives, he will be transferred to the TTA for additional evaluation.

The nurse at Valley State Prison for Women indicated she uses a system called DEC – Disability and Effective Communication system to research inmates for information on chronic diseases and disabilities. This was described as a statewide custody system with real time access via internet. This is the only place DEC was seen, and the nurse indicated that she heard about the system by sheer serendipity, gaining access to it via her own initiative. In addition, a system called Form Gen 2000 was used to generate the standard health screening forms with pre-print inmate names & CDC #s on the forms.

## 3. Discussion

The striking observation in each of the reception centers visited was the number of times the inmate's primary identifier is manually input into a variety of systems. The databases are predominantly stand alone systems that rely on a once per day update via a download of current DDPS data accomplished either via a file posted on the facility's LAN or via a diskette or thumb drive manually transferred from user to user. Due to the isolation of data within each database any change is not reflected real time and often impacts the ability to deliver timely care to the inmates.

Manual data entry equates to opportunities for errors. Transpositions, keying errors and variances in conventions used to enter the inmate's name and other key identifiers lead to time spent in identifying and reconciling errors. There are undoubtedly errors that are not identified.

High level flow charts that follow the CDC# issuance in the reception centers have been developed and are attached in the appendix. These provide a visual representation of the amount of manual entry of the CDC#. (See Appendices 1 - 3)

## 4. Mainline Prison R&R

The process used for incoming inmates is similar across the institutions. The custody staff identifies the inmates via their picture IDs, compares the inmates with the bus list that arrives with them. Inmates are supposed to have their C-files and their unit health record with them when arriving at a mainline institution. The Unit Health Record (UHR) does not always arrive with the inmate – normally,

CPR Consulting Report
February 6, 2008

there is at least a transfer form from the sending institution that documents known health issues or a "flimsy file" (copies of pertinent health reports) with the inmate. The health information management department of the prison is contacted to follow-up on retrieving the UHR from the sending institution.

The mainline prisons have a nurse assigned to the R&R area. A medical assessment of the inmate is completed prior to finalizing housing assignments. When chronic illnesses are involved, the nurse ensures that appropriate medication is provided. Any emergent needs are sent to the facilities TTA for further evaluation.

The custody staff interviews the inmates and uses the information contained in the C-file during this interview and determination of housing assignments.

## B.    Scheduling Medical Services

Inmates have access to forms to request healthcare services. These request forms (#7362) are available throughout the prisons. Once the form is completed by the inmate, it is placed in locked collection boxes located in each cell block. Requests are collected daily. The process used to actually schedule the inmates varies from facility to facility. Once facility enters the requests directly into the Inmate Medical Services Admission Transfer System (IMSATS) and these are triaged by a nurse to determine which actually need to be seen by a physician and which can be scheduled for an appointment with a nurse. Another facility reviews the handwritten forms, divides them into health, mental and dental requests and triages the requests. Those that are approved for services are then given to the schedulers for scheduling into IMSATS. A process used at Wasco for appointments in the yard clinics appears to bypass IMSATS altogether, as the 7362s are collected and reviewed by the nurse with a hand written schedule created for the physician covering that yard.

The primary computer application used for scheduling medical services is IMSATS. This MS Access database was developed internally and is supported by the Healthcare Division in Sacramento, not the EIS team. To operate effectively, the system must be updated daily via a download from DDPS, as the inmate's location is crucial to the ability to produce the ducat that facilitates inmate movement to the clinics. The system is also used to track an inmate's healthcare requests and to determine if the institution is meeting judicial requirements for providing timely, appropriate medical care. To do this tracking effectively, the appointments must be linked when scheduling, something that is not always possible. When the reports produced from the system don't demonstrate compliance, time consuming audits must be completed to determine if the institution was within the requirements.

Because there is no real time interface from DDPS to IMSATS or from one IMSATS workstation to the next, daily synchronization of each workstation is completed. Synchronization varies from uploading a file posted to the LAN to

CPR Consulting Report
February 6, 2008

manually passing a diskette or thumb drive from worker to worker. It was emphasized in all facilities that the synchronization must be done in a specific order. Individuals are assigned a window of time in which to perform this task. The reported length of time it takes to complete the synchronization varied greatly, from just a few minutes to up to several hours to synchronize all workstations in the scheduling department at CMF. At CMF the synchronization process also includes synchronizing IMSATS workstations (in the correct order) so that appointments scheduled by one employee will be viewable to the employees who synchronize after that. Regardless of the method used to complete synchronization, the need for a real time system where information entered on one workstation is readily available to any other person who might need to view it is apparent. This need also applies to DDPS, whose information drives so many functions required to deliver medical services.

Other systems that were being used within scheduling areas include Cor-Med (Correctional Medical Management System), a system to produce ducats seen at VSPW. A Temporary Medical Release (TMR) system was in use at DVI which generated the Request for Authorization of Temporary Medical Release (form 7252) that is needed prior to an inmate leaving the facility to receive care from an outside provider. Both systems utilize information from DDPS. The radiology department at Wasco uses an internally developed Access database to track the services provided in addition to film tracking.

Mental health services are scheduled directly in MHTS (Mental Health Tracking System) which also houses some of the mental health medical record which is then available online, at least within the specific facility. JA consultants did not have an opportunity to view the dental scheduling system, but were informed that a separate system was in use.

## 1. Specialty Clinics

When possible, medical services for inmates are provided within the correctional institutions. All of the facilities visited had some level of specialty services that were provided by outside providers directly on the campus. However, there is always a need for services that aren't available onsite. No firm volumes of services falling in this category could be discovered. The best estimates are that 90% of the overall healthcare services are provided within the correctional facilities and 10% of care is received from the surrounding community healthcare providers. If one looks at the services that are deemed "Specialty Clinics", i.e. diagnostic tests requiring specialized equipment, diagnostic screening that requires specialty practitioners or surgical interventions and inpatient medical treatment, approximately 30% of these types of services are provided within the campus with 70% requiring the services of practitioners in the community.

When one of the correction department physicians requests outside services for an inmate, the request is screened by a Utilization Management nurse. This screening process varied in the institutions visited and ranged from application of

CPR Consulting Report
February 6, 2008

established protocols to referral for review by MARC, a medical review committee comprised of staff physicians. Once a request for services is approved, it is sent for scheduling. Scheduling outside appointments is a challenge shared by all of the institutions. The lack of available appointment time slots for inmates results in a large backlog of pending appointments. CSP Sacramento indicated that they were fully scheduled for available outside appointments with over 600 pending appointments scheduled through March of 2008. At Wasco, there is also a high volume of pending requests, although the registry employee performing this task indicates the volume has been significantly reduced in the last 6 months. Although firm statistics were not available for the volumes pending, it was indicated at Wasco that approximately 60-70 requests are received daily with only 10-25 inmates sent out for appointments each day.

## 2. Scheduling Discussion

Most of the issues common to the scheduling function revolve around data availability. These issues include:

- Lack of real time data regarding inmate's location
- Daily DDPS synchronization requirements
- Daily synchronization of IMSATS workstations with each other
- Future schedule isn't available to caregivers, causing many phone calls and second requests
- Schedule must be coordinated with ducat system
- Linking of related appointments to demonstrate judicial requirement compliance is manual with many opportunities for errors
- Statistics regarding volume of requests and appointments are not routinely collected. There is some IMSATS capability to produce reports, but it is unclear if all statistics are available via this tool.
- Mental health and dental appointments don't link with IMSATS, causing conflicts with scheduling a specific inmate and with coordinating care.
- Specialty scheduling system at Wasco didn't appear to handle the DDPS uploads correctly.
- Inmates are frequently transferred prior to a routine appointment. Lack of communication regarding the transfer results in last minute effort to fill the allotted timeslot with a different inmate.

These issues could all be addressed by a system with real-time updates of inmate information that can be accessed by appropriate caregivers and other personnel. Unfortunately, because the data isn't linked a multitude of manual work-a-rounds have been implemented that are generally successful in outcome, but extremely labor intensive.

## C.    Health Information Management (Medical Records)

The Health Information Management departments (HIM) share similar functions across all the visited facilities. Core services include Unit Health Record (UHR) retrievals for patient care, UHR transfers for inmates being transferred either in

CPR Consulting Report
February 6, 2008

and out of the institutions, release of information, loose sheet filing, coding & census for inpatient and specific outpatient treatment units and transcription of either dictated physician reports or chronos. Although an evaluation of the HIM functions was not the primary purpose of the consulting visit, the basic functions performed by members of this department are impacted greatly by proper identification of both the inmates and the reports contained within the Unit Health Record. Inmate or patient identification is a core building block of the existing systems, tools and processes used to provide HIM services to the institution.

Every department uses DDPS and OBIS, although access in some is quite limited with only one workstation with these programs available to the entire department. In addition Lanier dictation and CADDIS (Census and Discharge Date Information System) were used consistently, although what was tracked in CADDIS varied from prison to prison. There were two chart tracking systems observed, MEDCATS and CRIS (Complete Integrated Record System), although not all of the prisons had a chart tracking system. Both MEDCATS and CRIS include barcodes for the UHR, however it is not clear if the barcode labels are standardized so that they may be interchangeably read. The MIMAS system (Medical Writing & Chrono Tracking System) was used in two of the HIM departments to assist with chrono tracking. Although MIMAS is a helpful tool to track basic information regarding the inmates, each workstation is stand-alone so that the data contained does not link to another MIMAS workstation and is viewable to just one individual at a time. MIMAS is synchronized daily with DDPS, as are MEDCATS and CRIS. At CSP Sac, MEDCATS is updated via ARTS which has been synchronized with DDPS. CADDIS information is manually entered.

The UHR is filed in a color-coded folder in modified terminal digit order using the CDC# as the medical record number. The last two number of the CDC# are color-coded and provide the first grouping of numbers, and then the records are filed in alpha/numeric order. Records of inmates currently in residence are supposed to be located onsite. When records are missing, research must be completed in OBIS to determine where the inmate was previously housed and the records requested from that location. The outpatient and clinic record is kept separately from what is considered an "inpatient" record and identified by a different type of folder. While the UHR travels with the inmate to his new location, the "inpatient" record remains at the treating facility. This would appear to create an issue with continuity of care from one facility to the next, although portions of this record are copied and placed in the UHR. Records of inmates who have been paroled or who have fully completed the terms of their sentence and have been discharged are sent to the Army Depot Health Record storage. The records of inmates who die while incarcerated are kept locally for a period up to 10 years. Copies of these records are created and sent to Sacramento for review. The death records are housed onsite so that they are available for any legal proceedings regarding this inmate.

CPR Consulting Report
February 6, 2008

Staffing of the HIM departments was comprised of Health Record Technicians I and II, Medical Transcriptionists (although this position goes by the term Medical Transcriber which actually describes the machine used for transcription purposes, not the individual performing the task), and Office Assistants and Technicians. During the assessment just two professionally credentialed HIM staff, both RHIT (Registered Health Information Technician-two year degreed individuals) were encountered. No RHIAs (Registered Health Information Administrator-4 year degree) were identified as being employed by CDCR. These individuals may have been considered Health Record Technician III. Coding staff members questioned indicated previous experience at local medical facilities or background in the medical billing industry. Salary levels for HIM staff members start at ~$25,000 per year and top out for the highest classification at slightly over $53,000. These salary levels are dramatically lower than comparable salaries within the local medial communities, especially for the technical and management positions.

## 1. ICD-9 CM Coding & Census

All the correctional facilities were consistent in using the CADDIS system both to track inmates who were housed in the inpatient and outpatient treatment units within the facilities as well as those who had been admitted as an inpatient to a medical facility outside the prison. CADDIS is an MS Access database. Inmate information is manually input into the database by HIM staff. The census of each unit is tracked as a separate entity. When an inmate is transferred between treatment units, he is discharged from one and admitted to the second. There was inconsistency with the way inmates who were sent to the community Emergency Department were recorded. At one facility, the consultants were informed that whenever an inmate was absent from the treatment unit at midnight, they were considered discharged and had to be readmitted when they returned. A second facility indicated that if the inmate returned to the original unit from the outside ED by the next morning that a unit discharge was not done.

Routine ICD9 coding was done at all locations, however the information coded and the methodology used to arrive at the codes was very inconsistent. One institution indicated that they coded the admission diagnosis; another indicated the discharge diagnosis was used. Some enter just one code; others code every diagnosis available to them. All of the facilities appear to be using out-dated ICD9 coding books. One facility was using a 1999 edition, with the most recent edition seen still a couple of years out of date.

It was difficult to understand the purpose of the ICD9 coding that is in place. The consultants were informed that the facilities code the visits to the community facilities and that this information is provided via a download from CADDIS to the HCCUP (Health Care Cost Utilization Program) and the information is used to validate the bills from the community facilities prior to payment. It was not understood how the coded data from the internal treatment units was used, nor by

whom. If the data is aggregated at the Sacramento location, its validity must be questioned for the following reasons:

1. Coding practices are not consistent from facility to facility;
2. Coding is completed by staff with minimal or no coding credentials;
3. Coding resources are outdated;
4. Coding is completed only for a small portion of the prison population, negating the ability to use the coded data for disease tracking and monitoring for the larger population.

Upon questioning HIM staff regarding a Master Patient Index in one institution, the staff member responsible for coding indicated that a manual index was kept on 3x5 index cards that contained pertinent information for this inmate and each treatment episode. The card were completed by hand and stored in a small filing cabinet. Another institution indicated that they used DDPS as the MPI while a third indicated that the MPI could be printed directly from CADDIS. Unfortunately, when he attempted to do this at our request, he was unable to produce the report successfully.

## 2. Transcription

While all the facilities visited have a Lanier dictation system, the technology varied greatly in age and also in the way it was used by the physicians. Documents are transcribed using MS Word. The general impression is that transcription is staffed, but not fully utilized. Few reports were routinely dictated by the medical staff, with some of the most frequent dictators being outside clinicians who are brought in for the specialty clinics. Some of the HIM department managers are attempting to increase utilization by educating the medical staff regarding the available services. When questioned about his use of the dictation system, one medical staff member related that it was his perception it would take too long to find a phone (one wasn't readily available in the treatment room), dictate the report, wait for the results to be typed, review it for accuracy, sign it and then send it to be filed in the medical record. It was more efficient to simply write the pertinent information in the patient's UHR at the time they were being treated. It is clear that promoting use of a dictation system will require a carefully planned approach that takes these barriers into consideration.

At two sites, the medical transcriptionists were responsible for typing chronos into MIMAS (Medical Writing and Chrono Tracking System). MIMAS is again an MS Access database. Information from the various types of Chronos are typed into MIMAS which then serves as a secondary repository for this information. The information contained on chronos are used daily by many various correctional facility staff, both medical and custody. Unfortunately, while this information is stored electronically, it is retrievable ONLY at the workstation used to input it as the system is not networked. When asked regarding the purpose of the value of using MIMAS when it was not accessible throughout the institution, the consultants were told that its use saves time as the department receives many telephone calls requesting the information stored in this system. It is less time

consuming and generally more successful to look it up in the system than to try to find the physical UHR and retrieve the information from the hand-written chrono. MIMAS was also used at VSWP to track obstetrical patients. Tracking was very manual and required re-entry of data when the inmate was transferred to a community medical facility for some portion of their care and then returned to VSWP.

It is noted that CPR is investigating improving transcription services by centralizing this function. The change to centralized dictation is non-trivial. It represents a significant change in terms of the relationship between the providers and the transcriptionists. The face-to-face communication and personal familiarity that was once the norm will quickly become a thing of the past. This has been a short term dis-satisfier with other organizations that have gone through the same transition. A strong communication plan coupled with a "help desk" function will be critical to the success of the transition.

## 3. Locater Systems

As with other HIM functions, the tools used to assist with chart location are varied across the six institutions visited. There are three automated locater tools used: CRIS (Complete Integrated Record System) used at CMF, MEDCATS used at CSP SAC, VSWP and Wasco, and C-File Tracking (used by the Army Depot Health Record Center). The other two facilities, Folsom and DVI did not have an automated tracking system, but relied on manual out-guide systems for record location. Both CRIS and MEDCATS use bar-coding technology, however it is unknown if the barcodes are compatible. Chart location could certainly be simplified by using standard technology along with an integrated state-wide system. It is also logical to consider standardizing the barcode technology so that the codes are compatible with the system used by the Central Records Department to track the C-files, CRAFTS (Case Record Automated File Tracking System).

## 4. Loose Sheet Filing

Keeping up with loose sheet filing has traditionally been the bane of HIM departments throughout the nation. The correctional system is no different in this regard, except for the lack of technologically advanced tools that eliminate the need for filing. Although not a primary objective of this engagement, inquiries were made regarding the volume of loose filing as this impacts delivery of care to a specific individual. Most of the departments had some sort of backlog, and were taking steps to reduce the volume. The process at VSWP in particular demonstrated innovative thinking. At this facility, those dropping off loose sheets to be filed were asked to place them in the proper terminal digit grouping – CDC#s ending 00-09 went in one bin, those ending in 10-19 in a second bin, etc. This initial sorting enables those filing to eliminate one step in their process. Common issues shared across the facilities include:

- Volume of incoming loose filing ranged from minimal to 4 feet per day. Routine volume statistics were unavailable, although some facilities were attempting to capture this important information.
- Receipt of large volumes of filing from areas that provide this information monthly.
- Lack of adequate identifier information on the loose sheet to find the correct inmate.
- Receipt of loose filing after the UHR has been transferred to another location.
- Inability to locate the UHR that should be onsite.
- Receipt of reports that belong in the C-file.

The transitory nature of the UHR contributes to the loose filing backlog, especially at the reception centers where most inmates are transferred to their mainline facility within 90 days. The backlog problem is clearly demonstrated when one looks at the history of the DORM (Discharge Offenders Record Management) system. This large scale project to image inmates' records originally included plans to image the Unit Health Record. While the scanning of UHR related documents has now been halted, approximately ~6.5M loose sheets were scanned into the system, dating back to the early 1990s. This effort was apparently undertaken as a first step in the imaging process and was to match the huge volume of loose sheets sent to the North and South storage areas with the appropriate inmates' records. Unfortunately, the lack of appropriate identifying information on the documents, including the inmate's key identifiers as well as the form identifiers resulted in minimal benefit to the delivery of healthcare. While an imaging system for the UHR likely would be a viable part of future plans for an EHR, the implementation would need to include the ability to scan current, pertinent documents from the UHR so that they are immediately available to caregivers at a different location.

## 5. Health Information Management Discussion

As with the scheduling area, many of the issues common to the HIM departments center on lack of connected data and the tools with which the employees work.

- Lack of integration of the departmental computer applications causes the need for many more manual processes to be used.
- Inability to access the core systems DDPS and OBIS due to limited workstation with these programs installed.
- Small number of professionally credentialed staff means that best practices of the profession are not in common use.
- References for ICD-9 coding range in date from 1999 through 2005 editions.
- Data collection via CADDIS that has little benefit to the organization while important epidemiological issues such as chronic disease tracking are ignored.
- Severe lack of space in some institutions for HIM functions.

- The practice of keeping the UHR separate from designate outpatient and inpatient treatment area records is questionable from a continuity of care perspective.

The current record retention practice of keeping hardcopy UHR volumes stored onsite at the location of the inmate puts significant demand on already crowded office space. This contributes to less than optimal working conditions and, no doubt, contributes to high staff turnover. For example, at VSPW the active UHR's are kept in the filing area in a designated filing space. The older volumes for current inmates are kept at the other end of the department in what was once office space. Similar practices were observed a several facilities. The scanning and subsequent destruction of inactive volumes could free up significant space. There would be immediate benefits including improved working conditions for staff and reduced demands for capital construction.

## D.    Laboratory Services

Not all facilities have onsite laboratory information systems as some of the mainline prisons send all lab samples out for testing. Two different LIS were observed, CSS Win at CMF and Schuylab at both Wasco and VSPW. In addition, two different outsourcing companies were used for tests not performed on campus. Quest is generally the outsource company used by the Northern based correctional facilities while Foundation Lab is used for the Southern based facilities. Both outsourcing companies provide online access to test results. At CMF there is an unresolved security issue with interfacing the CSS Win system with Quest. Therefore results of tests sent out to Quest are manually input into the CSS Win system, a labor intensive practice and one that increases opportunities for identification and/or resulting errors during input.

Both CSS Win and Schuylab appear to be Laboratory Information Systems designed for small facility use. The CSS Win lacks the ability to link CDC#s within the system, so it is not possible to link an inmate's lab results across different incarcerations. It is unknown if Schuylab has this ability, but this functionality is likely not supported.

Identification of the specimens appears to follow routine lab protocols, using the inmates CDC#, name, age, gender, date & time of collection and ordering physician.

At Folsom, the lab technician interviewed indicated that she uses IMSATS to track that an ordered test is completed. This is logical since there is a need to ensure that health care is delivered as ordered and within time guidelines. As minimal time was spent interviewing lab personnel and without the opportunity to even visit all labs at the six facilities visited, it is unknown if this is a routine practice across all institutions.

## E.    Radiology Services

The radiology departments visited had Siemens equipment, with a couple with
Fuji digital systems either recently installed or in the process of being
implemented. The digital systems are not a PACs system, but can be converted
at a later time. In the Fuji system, reports can be recalled by searching with either
the inmate's CDC# or their last name. The returned records are then scanned to
find the correct entry. Onsite services are mainly limited to diagnostic exams with
more complex exams or those requiring special equipment either provided by
community clinicians coming onsite or by sending the inmate into the community
for treatment.

Radiology images are stored in hard copy film that is identified via the CDC#.
Radiology uses color coded jackets and files in Terminal Digit order. Two of the
departments visited used internally developed MS Access as a tracking database.
This is used both to determine if the radiology department is meeting judicial
guidelines for timeliness of the exams as well as to track the location of the
radiology films. Lack of access to OBIS and/or DDPS was an issue. At Folsom
the radiology department was minimally staffed. As a result there were large
numbers of films stacked at random around the small radiology area. These films
had not been filed as they needed to be researched in OBIS to determine if the
inmate was still at this facility.

## F.    Pharmacy Services

Pharmacy Services are in the process of being converted from the PPTS system
(acronym meaning unknown) to Guardian. Guardian is the pharmacy system
used by Maxor, the outsourcing pharmacy company chosen by CPR to assume
management of the pharmacies across the correctional system. Guardian is a
term server application with data maintenance centralized in Amarillo, TX. The
system is a real-time application with immediate availability to all users. Data is
routinely backed up and there is secondary database, replicated in real-time.
Connection to the server in Amarillo is accomplished via a VPN connection.
Patient identifiers stored in this system include the CDC#, the inmate's full name,
DOB, gender, location within the prison facility, allergies, medication history and
other pertinent medical information. Patient searches in this system can be
accomplished via the CDC#, the patient name or the prescription number.

JA was able to see the PPTS system in use at VSPW. The system is updated via
a DDPS download each day. PPTS workstations are locally connected within the
pharmacy department. There are also additional workstations available in several
areas of the facility, with updates accomplished via diskette each day to provide
current PPTS medication information for inmates for viewers in these non-
pharmacy locations.

CPR Consulting Report
February 6, 2008

## G.    Central or Case Records

This department falls under the custody side of the CDCR. The legal case files, C-files are managed by the members of this department. Information from the AOJ is entered into OBIS along with the future discharge date for this inmate. The AOJ paperwork contains the CII# as well as frequently mentioning prior CDC#s and other key identifiers used by the inmate including names, dates of birth, and Social Security Numbers. It is during the entry of a new inmate into OBIS that the manual cross-referencing of prior or other active CDC# is completed. Records are filed in terminal digit order using the last two digits of the CDC# as the primary division. A color-coded system was not consistently used. One of the departments visited used CRAFTS (Case Record Automated File Tracking System) which looks much like the MEDCATS system used by some HIM departments. CRAFTS produced a bar-coded label to assist in chart tracking.

# Appendix 4:  Reception Center Flow Charts

Yellow shaded boxes indicate steps where CDC # is manually recorded.



Yellow shaded boxes indicate steps where CDC # is manually recorded.



R & R Process
at WASCO RECEPTION CENTER

CPR Consulting Report
February 6, 2008

Yellow shaded boxes indicate steps where CDC # is manually recorded.



CPR Consulting Report
February 6, 2008

# Appendix 5: Facility Specific Database Table

The following table documents the volume and variety of databases encountered during the consulting engagement. It does not encompass all databases used by these facilities.

| Correctional Facility | Database | Function |
|---|---|---|
| California Medical Facility | CADDIS | Used to code inpatient & certain outpatient stays within the facility as well as inpatient stays at community facilities. |
| | CRIS | Chart tracking used to track UHR |
| | CSS-WIN | Lab Information System |
| | DDPS | Bed tracking and inmate location |
| | IMSATS | Scheduling system for medical appointments. |
| | OBIS | Captures inmate history and movement from location to location and calculates discharge dates. |
| | 6-7 Individual, Unlinked MS Access Databases | Used to track chronic diseases, such as Diabetes Mellitus, Tuberculosis, HIV |
| | Fuji Digital Radiology | Stores digital images of radiology exams. |
| | | |
| Deuel Vocation Institution | CADDIS | |
| | DDPS | |
| | IMSATS | |
| | LANCE | Used to track incoming inmates from each county and indicates special housing needs |
| | MCAS | Imaging system used to scan chronos. |
| | OBIS | |
| | TMR | Generates for 7252 for temporary release of inmate to leave facility for outside medical care. |
| | CDC Utilization Management 5 | Used by Utilization Review nurse to qualify medical necessity. |
| | | |

CPR Consulting Report
February 6, 2008

| Correctional Facility | Database | Function |
|---|---|---|
| | ARTS | Used to track data mandated by lawsuits, audits and generates workloads |
| | CADDIS | |
| California Prison-Sacramento | DDPS | |
| | HCCUP | Health Care Cost Utilization Program system used in outside provider payments. |
| | IMSATS | |
| | LSTS | System used to track hearings for inmates with life terms |
| | MIMAS | Access database used to track chronos |
| | MEDCATS | Chart tracking system used to track UHR. |
| | OBIS | |
| | PPTS | Pharmacy system |
| | | |
| | CADDIS | |
| | Computerize Radiography | Fuji radiology system that displays digital images and prints out films. |
| Folsom | DDPS | |
| | IMSATS | |
| | MS Access DB | Used by R&R for property tracking and bus schedules. |
| | OBIS | |
| | Quest | Outside lab system with online connection to prison. |
| | | |
| | CADDIS | |
| | CRAFTS | Chart tracking used for C-file tracking. |
| | DDPS | |
| Wasco | Foundation Lab | Lab information system available from outside lab vendor. |
| | HCCUP | |
| | IMSATS | |
| | MCAS | |
| | MEDCATS | Chart tracking used for UHR tracking |
| | OBIS | |
| | PPTS | Pharmacy system being replaced in all institutions with Guardian. |
| | Reception Center Movement Tool | MS Access database used to print labels |
| | Schuylab | Lab information system |

CPR Consulting Report
February 6, 2008

| Correctional Facility | Database | Function |
|---|---|---|
| | Radiology MS Access Database | Tracks film location, dates of services. |
| | | |
| | CADDIS | |
| | Cor-Med | Used to produce ducats for inmate healthcare appointments. |
| **Valley State Prison for Women** | DDPS | |
| | DEC | Disability & Effective Communication System used to ID inmates with physical limitations. |
| | Form Gen 2000 | MS Access database that generates UHR forms. |
| | Foundation Lab | |
| | Fuji Digital Radiology | |
| | IMSATS | |
| | MHTS | Mental Health Tracking System used for mental health documentation, scheduling and tracking. |
| | MEDCATS | |
| | MIMAS | |
| | OB Tracking System | MS Access DB used to track pregnant inmates. |
| | PPTS | |
| | Radiology MS Access DB | Used for radiology scheduling and tracking. |

# Appendix 6:  Sample Scheduling System Data Field Requirements

**This is not intended to be a complete list of required data fields** and is only provided as an example to illustrate the special needs the California prison healthcare system has.

| Inmate Service Appointment Scheduling Data Fields Requiring Collection | Off-the-Shelf or Custom |
|---|---|
| 1.  Name of inmate | Off-the-Shelf |
| 2.  All active and historical CDC# for inmate | **Custom** |
| 3.  Date of birth of inmate | Off-the-Shelf |
| 4.  Nature of complaint | Off-the-Shelf |
| 5.  Chronic Diagnoses | **Custom** |
| 6.  Previous Visit Dates | **Custom** |
| 7.  Prior complaints | **Custom** |
| 8.  Physician or nurse to be seen | Off-the-Shelf |
| 9.  Date of request | Off-the-Shelf |
| 10. Existence of already scheduled appointments for mental, dental or healthcare services. | Off-the-Shelf |
|     a.  Date of appointment | Off-the-Shelf |
|     b.  Time of appointment | Off-the-Shelf |
|     c.  Location of appointment | Off-the-Shelf |
| 11. Date of appointment | Off-the-Shelf |
| 12. Starting Time of appointment | Off-the-Shelf |
| 13. Ending Time of appointment | Off-the-Shelf |
| 14. Types of Tests/treatment ordered | Off-the-Shelf |
| 15. Date test/treatment ordered. | Off-the-Shelf |
| 16. Ordering physician | Off-the-Shelf |
| 17. Tests/treatment received & date received. | Off-the-Shelf |
| 18. Housing location of inmate | **Custom** |
| 19. Security level | **Custom** |
| 20. Security needs for inmate (gang membership conflicting with other inmates also scheduled) | **Custom** |
| 21. Production of ducat | **Custom** |
| 22. Communication of appt time & location with custody staff | **Custom** |
| 23. Physical Disabilities impacting care delivery | **Custom** |
| 24. Connect appt to other appointments for similar complaint to show treatment history | **Custom** |
| 25. Offsite medical appointments: | |
|     a.  Name of offsite provider | Off-the-Shelf |
|     b.  Location of physician office | Off-the-Shelf |
|     c.  Date of appointment | Off-the-Shelf |

CPR Consulting Report
February 6, 2008

| Inmate Service Appointment Scheduling Data Fields Requiring Collection | Off-the-Shelf or Custom |
|---|---|
| d.  Start & Stop Time for Appointment | Off-the-Shelf |
| e.  Reason for Visit | Off-the-Shelf |
| f.  Utilization Management approval for appointment | Off-the-Shelf |
| g.  Custody staff schedule to accompanying inmate | **Custom** |
| h.  Approval from Custody for transport | **Custom** |
| i.  Vehicle assigned to transport inmate | **Custom** |
| j.  Ordering physician | Off-the-Shelf |
| k.  Date ordered | Off-the-Shelf |
| l.  Indication that inmate completed appointment | **Custom** |
| 26. Routine, urgent or follow-up appointment | Off-the-Shelf |
| 27. Refusal of treatment by inmate | **Custom** |
| 28. Healthcare professional witness to refusal of treatment by inmate | **Custom** |
| 29. Request UHR from medical records. | Off-the-Shelf |
| 30. Disposition of patient | Off-the-Shelf |

# Appendix 7:  ISO 27002 Base Standards to Audit

**Security Policy** – The key objective of IT security policy is to provide management direction and support for information security. The written IT security policy should set a clear policy direction and demonstrate management's commitment to information security.  It also should have an owner who is responsible for updating and reviewing the policy, and it should be communicated throughout the organization.

**Organization of Information Security** – Organizational IT security encompasses the business infrastructure that should be in place to successfully manage information security within the organization. Such infrastructure includes coordination, communications, and cooperation of entities both inside and outside the organization. Internally, specialist information security advice should be consulted when necessary, and independent reviews of security controls should be performed. Security of third-party access and outsourcing should be enforced through both technical and legal controls.

**IT Asset Management** – An organization's IT assets include information assets, software, hardware, other physical assets, and even outside services. In order to adequately protect these assets, the organization should have some system for inventory and classification of its assets; all assets should be accounted for and have a nominated owner. Such a system should enable staff to classify organizational assets and determine the proper labeling and handling methods. Handling methods are guidelines on the copying, storage, transmission, and destruction of assets.

**Technology Human Resources Security** – To reduce the risks of human error, data theft, or other abuse of information systems, an organization should outline requirements involving employee skills screening, information security clauses in employment agreements, user training, and IT incident reporting. Some of the requirements are technical security controls, while others are human controls. Regardless, all of the controls are focused on protecting the organization from mistakes and intentional malicious behavior.

**IT Physical and Environmental Security** – No information system can be considered secure unless it is located in a secure environment. Specifically, an organization's servers should be hosted in a physically secure facility. A physical security perimeter should exist, entry controls should produce auditable logs, equipment should be secure during delivery and receipt, cabling should be physically secure, and equipment should be tracked as it enters and leaves the organization. In addition, the environment should be protected against common disasters, including power outage, HVAC failure, fire, flood, etc. Finally, sufficient

CPR Consulting Report
February 6, 2008

maintenance practices should be in place to ensure physical security controls remain operational over time.

**Communications and Operations Management** – IT Operational procedures should be established for the management of all information processing facilities, such as servers and network devices. Best-practice recommendations include documenting IT operating procedures, utilizing an operational change control system, assigning detailed IT responsibilities to individual staff members, and applying segregation of duties where appropriate.

Procedures that should be in place are logging and fault management, network management, media handling, security of information exchange (commerce, mail, office systems, etc.), backups, housekeeping, handling of malicious software (viruses), and system planning and acceptance.

**IT Access Control** – Access control is the amalgamation of policy and rules in place to prevent unauthorized access to information systems. Reaching far beyond just technical controls, access controls should cover all stages of the user access life-cycle, from initial registration to the time when access is permanently removed. Operational access control includes identifying and verifying authorized users, recording system access, and restricting connections to specific clients, times, etc. Some recommended controls include privilege management, user password management, review of access rights and privilege, network access control and segregation, and application logging and monitoring. Access control should extend to mobile devices, remote workers, and trusted third parties.

**Information Systems Acquisition, Development, and Maintenance** – Operating systems, business applications, off-the-shelf products, and user-developed applications are examples of information systems. The design and implementation of information systems that support business processes can be crucial for security. Security requirements should be identified and agreed prior to the development and/or implementation of information systems, such as ensuring that access controls, auditing, and logging are built into applications, that input and programmatic results are validated, and that cryptographic controls, encryption and key management are implemented where appropriate.

**Information Security Incident Management** – Effective information security incident management ensures that information security events and information system vulnerabilities are communicated in a manner that facilitates timely corrective action. Formal event reporting and escalation procedures should be in place, and all employees, contractors, and third-party users should be apprised of the procedures for reporting the different types of events and weaknesses that might impact the security of organizational assets. A process of continual improvement should be applied to the response to, monitoring of, evaluation of, and the overall management of information security incidents. When evidence

CPR Consulting Report
February 6, 2008

collection is required, it should be done in a manner that complies with applicable legal requirements.

**Business Continuity Management** – Business continuity management involves dealing with catastrophic interruptions to business processes. A business continuity management process should be implemented to minimize the impact of such an event on an organization and to recover from the loss of information assets to an acceptable level through both preventive and recovery controls. This process should identify the critical business processes and integrate the information security management requirements of business continuity with other continuity requirements, such as those pertaining to operations, staffing, and facilities.

**Compliance** – A critical part of protecting an organization is to avoid any potential breaches of any criminal or civil law, or of any statutory, regulatory, or contractual obligation. Compliance issues include various copyright protections, employee privacy laws (such as HIPAA), customer non-disclosure and privacy commitments, and upstream provider requirements.

CPR Consulting Report
February 6, 2008

# Appendix 8: OBIS Record Growth[1]

Records are never deleted from OBIS, so these "volumes" are the highest "Internal Sequence Number" (Top-ISN) for each of these files. Descriptions are provided to help understand what the volume figure represents in prisoner volume growth and growth rates.

| File Name | Description | Volume 11/14/07 4 pm | Volume 12/21/07 8:30 am | Average Growth /Day[2] | Estimated Annual Growth[3] |
|---|---|---|---|---|---|
| CR-Offender | Corrections Offender File. In general, the number of offenders is the number of current or "not retired" ("active") CDC numbers. The ID Control unit in Case Record Services will retire a CDC # after a prisoner is "discharged". Previous "active" and "inactive" CDC numbers are cross-referenced in OBIS if the prisoner receives a new CDC #. **This is likely the closest volume to estimated number of unique people in the database.** | 1,234,369 | 1,240,071<br><br>Estimate on 1/1/08 = 1,241,765 | 154 | 56,210<br><br>4.5% |
| CR-Case | Corrections Case File. One unique person could have more than one Case File, as if a person is re-incarcerated after their probation time is up (and therefore, they are "discharged" from OBIS and CDCR), that person will get a new CDC number. This should be a count of all "active" and "inactive" CDC numbers issued. There may be many Cases for one Offender. | 1,995,282 | 2,005,761<br><br>Estimate on 1/1/08 = 2,008,874 | 283 | 103,295<br><br>5.1% |
| CR-Offense | Total number of offenses recorded for all of the CDCR cases. There are frequently many Offenses for one Case. | 2,698,257 | 2,712,049 | 373 | 136,145 |
| CR-Movement | The number of inbound prisoner, outbound prisoner and prisoner transfer movements. Each time an inmate transfers from one prison to another, this is two movements.[4] | 26,090,245 | 26,241,528 | 4,089 | 1,492,485 |

[1] Volumes taken from ADABAS Basic Services – provided by EIS OBIS staff
[2] Average increase per calendar day based on time period from 11/14/2007 through 12/20/2007
[3] Average growth/calendar day x 365. Percentage is estimated annual growth rate for 2008.
[4] Estimated annual unique movements (After "DRAD" process, OBIS tracks one inter-prison transfer only once – however, it does count "unit" transfers within a prison. It does not count "cell" transfers within one unit of a prison.

*Just Associates, Inc*
*Confidential and Proprietary*
*Page 62 of 64*

CPR Consulting Report
February 6, 2008

## Appendix 9:  CMF Table of Speciality Services

| California Medical Facility - Requests for Specialty Services and Appointments | July 2007 | Aug. 2007 | Sept. 2007 | Oct. 2007 | Total 4 Months | Ave./Mo. | Annual Estim. |
|---|---|---|---|---|---|---|---|
| **Specialty Service Requests for Service - Initial** | | | | | | | |
| Off Site High Priority | 51 | 34 | 32 | 37 | 154 | 38.50 | 462 |
| Off Site Routine | 84 | 136 | 123 | 106 | 449 | 112.25 | 1,347 |
| On Site High Priority | 53 | 66 | 73 | 88 | 280 | 70.00 | 840 |
| On Site Routine | 324 | 420 | 291 | 251 | 1,286 | 321.50 | 3,858 |
| Self-Referral | 264 | 310 | 280 | 227 | 1,081 | 270.25 | 3,243 |
| **Sub-Total** | 776 | 966 | 799 | 709 | 3,250 | 812.50 | 9,750 |
| **Specialty Service Appointments** | | | | | | | |
| Off Site High Priority "All Other" | 26 | 37 | 29 | 36 | 128 | 32.00 | 384 |
| Off Site Routine "All Other" | 139 | 168 | 96 | 113 | 516 | 129.00 | 1,548 |
| Off Site MHSDS Inmates High Priority | 4 | 6 | 6 | 8 | 24 | 6.00 | 72 |
| Off Site MHSDS Inmates Routine | 15 | 18 | 19 | 28 | 80 | 20.00 | 240 |
| On Site High Priority "All Other" | 38 | 56 | 57 | 84 | 235 | 58.75 | 705 |
| On Site Routine "All Other" | | | | | | 546.75 | |

CPR Consulting Report
February 6, 2008

| California Medical Facility – Requests for Specialty Services and Appointments | July 2007 | Aug. 2007 | Sept. 2007 | Oct. 2007 | Total 4 Months | Ave./Mo. | Annual Estim. |
|---|---|---|---|---|---|---|---|
| | 501 | 582 | 540 | 564 | 2,187 | | 6,561 |
| On Site MHSDS Inmates High Priority | 13 | 17 | 13 | 16 | 59 | 14.75 | 177 |
| On Site MHSDS Inmates Routine | 88 | 146 | 137 | 133 | 504 | 126.00 | 1,512 |
| Self-Referral "All Other" | 334 | 371 | 340 | 282 | 1,327 | 331.75 | 3,981 |
| Self-Referral MHSDS Inmates | 87 | 102 | 101 | 63 | 353 | 88.25 | 1,059 |
| Sub-Total | 1,245 | 1,503 | 1,338 | 1,327 | 5,413 67% | 1,353.25 | 16,239 |

In 4 months, CMF had 679 more appointments than were requested, indicating headway made in their appointment backlog.