# EXHIBIT 8

# TELEMEDICINE ASSESSMENT AND ROADMAP

of the

# CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION

prepared for the

# CALIFORNIA PRISON HEALTH CARE RECEIVERSHIP CORPORATION




February 1, 2008


The AT&T Center for Telehealth
Research and Policy at UTMB

UTMB
Electronic Health Network
The University of Texas Medical Branch

## Consultants:

**Alexander H. Vo, PhD**
Principal, Overall Project Management
Executive Director, AT&T Center for
Telehealth Research and Policy, UTMB

**Glenn G. Hammack, OD, MSHI,
FAAO**
Consultant, Telemedicine Systems Design
and Management
Assistant Vice President, UTMB

**Oscar W. Boultinghouse, MD, MPH,
FACEP**
Consultant, Primary Care
Associate Director and Chief Medical Of-
ficer, Electronic Health Network,
UTMB

**Michael J. Davis, MD, MBA, FACC**
Consultant, Specialty Care
Associate Director and Director of Medi-
cal Specialties, Electronic Health Net-
work, UTMB

**Michael J. Bourdeau, MBA**
Consultant, Information Technology and
Telemedicine Systems
Interim Executive Director,
Electronic Health Network, UTMB

**Anthony K. Williams, MBA**
Consultant, Operations
Director of Operations, Northern Region,
Correctional Managed Care, UTMB

**Stephen R. Smock, MBA**
Consultant, Operations
Director of Operations, Southern Region,
Correctional Managed Care, UTMB

**Eric Pan, MD, MSc**
Consultant, Medical Information Systems
Analysis
Senior Scientist, Center for Information
Technology Leadership

## Acknowledgements:

We would like to thank the professionals of the California Department of Corrections and Re-
habilitation and the California Prison Receivership Corporation for their guidance, insight, in-
formation, and cooperation during the many meetings, site visits, and phone calls cheerfully an-
swered during the execution of this study and the preparation of this report. Too numerous to
individually mention, we appreciate the openness and positive spirit we encountered at all levels
of the organizations. Any and all credit for the usefulness of this report is due to them, and any
errors or omissions are ours.

## Table of Contents

| | | |
|---|---|---|
| Executive Summary | | 4 |
| | | |
| Section I. Introduction | | 6 |
| | Scope and Goals of this Report | 6 |
| | | |
| Section II. Major Findings | | 7 |
| A. | Summaries of Major Findings | 7 |
| B. | Commentary | 8 |
| | | |
| Section III. Gap Analysis | | 10 |
| | | |
| Section IV. Recommendations and Road Map | | 14 |
| A. | Road Map Goals | 14 |
| B. | Objectives and Tasks | 14 |
| | 1. Specific Objectives | 14 |
| | 2. Work Tasks | 15 |
| C. | Implementation Plan Sequencing | 19 |
| | 1. Fundamental Short-Term Actions (6 months – 2 years) | 19 |
| | 2. Recommended Near & Long-Term Actions (1+ – 5 years) | 20 |
| | | |
| Section V. Concluding Statements | | 21 |

List of Appendices

| | | |
|---|---|---|
| Appendix 1.1 | Methodology and Sites Visited | 22 |
| Appendix 1.2 | List of Impressions | 23 |
| Appendix 1.3 | Historical and Extracted Data | 25 |
| | 1. Telemedicine Utilization | 25 |
| | 2. Data from External Providers | 28 |
| | 3. Telemedicine Equipment and Technology Infrastructure | 29 |
| | 4. Workflow | 30 |
| Appendix 1.4 | Options for Provider Networks | 32 |
| Appendix 2 | Telemedicine Financial Opportunity for CDCR | 35 |
| Appendix 3 | Best Practices in Telemedicine | 37 |
| Appendix 4 | Site Visit Schedule | 41 |
| Appendix 5.1 | Telemedicine Activity Reports Examples | 43 |
| Appendix 5.2 | First Available Appointment Matrix Example | 45 |
| Appendix 5.3 | Daily Provider Activity Summary Example | 46 |

## EXECUTIVE SUMMARY

### Introduction

In August of 2007, The AT&T Center for Telehealth Research and Policy, a division of the Electronic Health Network (EHN) at the University of Texas Medical Branch (UTMB), was contracted by the California Prison Health Care Receivership Corporation (CPR) to evaluate the telehealth services within CDCR. We completed an analysis of the existing status and current capabilities of the CDCR telemedicine systems and weighed that against best practice standards and UTMB's experience in correctional telemedicine to develop a road map for improving CDCR telemedicine.

In all, a total of 11 facilities representing 33% of the CDCR facilities were visited. Interviews with more than 69 key CDCR/CPR staff were conducted. The UTMB consultant team also interviewed external CDCR telemedicine providers.

### Major Findings

The CDCR telemedicine system suffers from neglect, mismanagement, obsolete technology, and poor integration with clinical workflows, but has substantial potential to improve the efficiency, effectiveness, and quality of health care in the state's prison system. The following list summarizes the most egregious problems uncovered by the assessment:

- No system-wide leadership to champion and manage the telemedicine program.
- Inadequate staff at all levels, especially technical support staff.
- Overly complex and ill-defined management structure and chain of command.
- Non-existent standardization of processes and procedures and lack of treatment protocols.

- Excessively cumbersome workflow process that is prone to malfunctions, delays, and failure.
- Sloppy record keeping and no means of outcome evaluation and accountability.
- Antiquated paper-driven medical record system.
- Rampant and destructive misperceptions about telemedicine practice.
- Insufficient and outdated telemedicine equipment and lack of telemedicine peripherals.
- Obsolete telecommunications connectivity.
- Limited Internet access and computer equipment.
- Inadequate and inappropriate telemedicine practice space in use.
- Insufficient network of telemedicine providers.
- Inconsistent and unfavorable contract agreements with external providers.

### Recommendations

We recommend significant revisions to program management policies, to existing hardware and technology, and to related human resources. Specific objectives for improving CDCR's telemedicine program are discussed and include:

a) Develop and operate an effective centralized management and monitoring structure for the telemedicine services program.

b) Develop, implement, and monitor an enterprise-wide clinical protocol where telemedicine is the principal escalation from primary care.

c) Redesign, implement, and operate telemedicine process methods for specialty, mental health, and primary care

needs that outline tasks and responsibilities at both the remote provider and patient-side locations.

d) Designate, procure, and install the necessary telemedicine hardware to permit the CDCR telemedicine program to operate at optimal levels.

e) Implement the requisite centralized information software and systems for use system-wide to operate and maintain the CDCR telemedicine operations in an optimal manner.

f) Operate, where needed, a supplemental telemedicine staffing structure that provides the necessary workforce within prisons for effective telemedicine delivery.

g) Develop and operate a system-wide program to establish, audit, and monitor a network of telemedicine providers to ensure high quality and cost efficient telemedicine operations.

h) Design, construct, and operate, where needed, centralized telemedicine facilities for telemedicine providers, regardless of whether these are operated within CDCR or by external medical partners.

i) Develop a process to assure CDCR telemedicine meets accreditation standards of any designated healthcare review body (NCCHC or ACA) and assist in obtaining accredited status.

j) Operate an ongoing evaluative process to monitor and assess activity levels, quality of care, health outcomes, efficiency, and cost effectiveness of the telemedicine program.

Given the complexity associated with implementing and managing the recommended change, CDCR is currently incapable of administering such a scaled model. An external partner accountable for performance of telemedicine services and implementing a system of change and improvements is highly recommended.

We predict two immediate benefits from the expansion and improvement of the CDCR telemedicine program:

- Decrease (by 50%) of the number of off-prison facility trips initiated for medical purposes, thus freeing correctional officer staffing and other resources, with potential savings to the correctional organization of up to $1,600 per medical visit.
- Reduction (by 30%) in specialty care access wait times.

## SECTION I. INTRODUCTION

In March of 2007, The AT&T Center for Telehealth Research and Policy, a division of the Electronic Health Network (EHN) at the University of Texas Medical Branch (UTMB) responded to a Request for Proposal (RFP) by the California Prison Health Care Receivership Corporation (CPR) to evaluate the telehealth services within the California Department of Corrections and Rehabilitation (CDCR). UTMB was awarded the contract, and the project began the following July with a kickoff meeting in August of 2007. Two final products were proposed for the project. The first is an analysis of the existing status and current capabilities of the CDCR telemedicine systems. That analysis was then weighed against standards of best practices and UTMB's experience to develop the second work product, a practical and flexible road map capitalizing on the existing strengths of CDCR to modernize its telemedicine systems. An interim presentation of the findings was held in Sacramento, CA in November 2007.

### Scope, Goals, and Method of This Evaluation and Report

This report provides a detailed assessment of the CDCR telehealth services and systems as well as critical feedback on the existing status of the telemedicine program in California's prisons. It also includes recommendations for a practical roadmap and implementation schedule to optimize service delivery and enhance quality.

The telemedicine evaluation model proposed for the California Prison Health Care Receivership Corporation is based on a modified Donabedian Quality Assurance Model.[1] For the purposes of this proposal, it will involve

an emphasis on, and an in-depth assessment of, the structure and process of the CDCR telemedicine system. Given the scope and specific objectives of the RFP, the focus on clinical outcomes was minimized. This assessment emphasized the collection and analysis of data across three structural domains and three process domains.

*Structure:*
- Telemedicine Infrastructure
- Facilities
- Staffing and Personnel

*Process:*
- Workflow
- Perception of Telemedicine
- Operations

A complete review of the methodology used to collect data including site visits, historical and extracted data, assessment of CDCR's telemedicine equipment and infrastructure, workflow, potential financial benefits, and best practices in telemedicine can be found in Appendices 1-3.



---

[1] Donabedian A. Quality assessment and assurance: unity of purpose, diversity of means. *Inquiry* 1988; 25(1): 173-92.

## SECTION II. MAJOR FINDINGS

### A. Summaries of Major Findings

#### *Telemedicine Infrastructure*

The CDCR's telemedicine infrastructure is entirely dependent on outdated and costly Integrated Services Digital Network (ISDN) technology, based on old-fashioned telephone lines, for connectivity, rather than modern Internet Protocol (IP). The telemedicine equipment in use is inadequate for all specialties except psychiatry. In some cases, it is rarely used. Health care providers lack essential peripheral equipment such as stethoscopes and otoscopes in all cases. Medical data is paper-based, not easily accessible, and often incomplete.

#### *Facilities*

Telemedicine practice areas are below accepted minimal standards. Problems range from lack of privacy and inadequate space to poor configuration of equipment. In most of the facilities where telemedicine is conducted at the Correctional Treatment Center (CTC), the telemedicine workstations appear to be adequate for telemedicine encounters, but the spaces are often time-shared with other services, compounding problems associated with space and conflicting schedules. In some cases where telemedicine is not available in the yard clinics, patients who need to be physically assessed must be escorted and transported from the yard clinics to the CTC, which may be some distance, often times interrupting scheduled appointments and placing demands on correctional officers.

#### *Staffing and Personnel*

Chain-of-command structure for telemedicine is unclear to employees as well as unnecessarily complicated. Leadership is fragmented with ambiguous reporting and little accountability for employees, with rarely conducted performance evaluations. Staffing is inadequate at many levels, especially in the area of technical support, and the lack of continuous training and coverage creates problems at all levels of operation. There also appears to be a high level of disparity of access to providers among facilities, with some having a high concentration of providers while others face a shortage.

#### *Workflow*

Timely electronic communication for telemedicine practice is not available within CDCR. Medical records are faxed or hand-carried from place to place and clinical notes sometimes take up to two weeks to appear in the patient's chart. Telemedicine coordinators spend a great deal of time with medical record keeping and many cancellations of telemedicine appointments happen because the medical records were unavailable or incomplete. Appointments are scheduled using the primitive Inmate Medical Scheduling and Tracking System (IMSATS) and have to be updated daily using flash drives or floppy disks. There is no systematic data collection and outcome measures or any formal evaluation of the telemedicine program. Thus, it is difficult to determine whether the treatment ordered by the telemedicine specialist actually occurred and to track follow-up treatment. Additionally, there is no formal quality peer review of telemedicine consultations as an ongoing activity.

#### *Perceptions and Culture*

Nursing and custody staffs support the use of telemedicine, but there appear to be varying degrees of resistance from medical personnel. A number of significant misperceptions about telemedicine that need to be corrected exist throughout CDCR and the existing external providers. For example, many believe that telemedicine is not suited to primary care or

that high standards of care cannot be maintained in a telemedicine practice. These misperceptions exist despite ample evidence to the contrary.

## Operations

Each facility operates in silo-like style, with inconsistent communication and control within the various CDCR prison facilities, the CDCR telemedicine office, or with agencies outside CDCR such as between external provider contracting groups and the CDCR's clinical and administrative bodies. Even within facilities, there is a lack of coordination between medical and mental health programs, with modest understanding of the long-term plans and goals for optimizing health care delivery. Contracts with these external telemedicine providers are not centrally managed, allowing undesirable variation in contract types, rates, and terms.

## B. Commentary

One of the most pressing problems facing CDCR telemedicine is a lack of effective leadership. It is imperative that appropriate systems management are identified and given the authority to lead the organization through the process of developing a broad vision as well as more specific goals and objectives to bring the program closer to the best practices standards. Staff morale and retention are important considerations in any organization and a reorganization of staffing and reporting structure is long overdue. Performance appraisals and other staff evaluations should be used for rewards and to address deficiencies. After the equipment and connectivity are upgraded, scheduling and data collection should be centralized into a single system and all facilities must be required to adopt the centralized system.

At the present time, CDCR telemedicine program is significantly underutilized. Given its ratio of telemedicine encounters to total inmate population for FY06 (9,610 visits:175,000 inmates), only 5% of those incarcerated have had a telemedicine consult. When compared to a correctional program of similar population size (Texas, with a ratio of 40,226 visits:160,000 inmates), it is clear that CDCR's telemedicine utilization has the potential to more than quadruple. One of the contributing factors for the underutilization is that the use of telemedicine within CDCR's facilities is subjected to preferences of each institution's unique policies and priorities. The use of telemedicine is encouraged, but not required. As a result, the extent of its use depends on the inclination of the individual institution's health care directors.

Another factor that contributes to the underutilization of telemedicine is the dearth of technical support. Inadequate staffing and a lack of back-up equipment increase equipment down time and make staff reluctant to depend on the equipment. Without the appropriate training and maintenance, any system is more prone to malfunction. Telemedicine providers and presenters need training and guidance on how to best use the systems in practice. Rapid response to technical issues encourages use and the perception of reliability.

It is clear from the past ten years of experience that the expansion of telemedicine must be required and supported to flourish as an integral part of CDCR. Encouragement has resulted in the procurement of equipment and a limited practice in some institutions. At the present time, CDCR telemedicine resources are underutilized. Most of the telemedicine visits take place in just a few of the prisons and some facilities with telemedicine equipment in place have no telemedicine use at all.

In addition, there are a limited number of specialties involved in the current program. Although CDCR inmates receive approximately 4,500 cardiology and hematology/oncology visits a year, those specialties

are not offered via telemedicine. According to the California Legislative Analyst's Office, and our experience with telemedicine in other states, the majority of these visits would be appropriate for telemedicine.[2] In addition to the limited number of specialties offered via telemedicine, there is no primary care telemedicine. This is due in part to the persistent misperception that telemedicine is not appropriate and/or cost effective for primary care. Examination of other correctional programs indicates that primary care could be conducted effectively through telemedicine, and in fact, could alleviate the backlog of patients who need to be seen for more routine health concerns. Telemedicine also could be used to provide care within some of the larger correctional facilities where inmates require custody officers to accompany them to another part of the prison to the on-site clinic at the same facility.

Although discussed in more details in the following sections, broad recommendations to correct the underutilization of telemedicine within CDCR include:

- Identify or procure effective leadership and management.
- Upgrade and enhance technology and equipment.
- Establish of base guidelines to set telemedicine as the near-primary escalation step from primary care.

- Add medical specialties to the telemedicine program, using provider networks.
- Conduct annual performance targets for the total number of telemedicine consults and the percentage of specialty consults as well as other performance metrics should be established and reported annually to the CPR.

While the deficits are evident, there are, nevertheless, positive findings. Overall, the system has experience with telemedicine, which can be built upon, and there appears to be a great amount of enthusiasm for using and expanding telemedicine from the majority of CDCR staff interviewed, including corrections officers. Additionally, there are pockets of skilled provider networks in place within the CDCR that can be utilized to provide telemedicine consultations inter-institutionally. These simple steps would provide a method for cost and risk avoidance by limiting the need for prisoner transports and external referrals. With respect to its telemedicine inventory, some equipment appears to be Internet Protocol (IP) compatible and steps are underway to improve its infrastructure (for example, development of a Clinical Data Repository for electronic data capture and conversion to IP from ISDN).

---

[2] *Judicial and Criminal Justice.* LAO 2006-07 Analysis. p. 56.

## SECTION III. GAP ANALYSIS

After reviewing all the results of the interviews and the documentation provided by CDCR, five areas of serious concern are identified and highlighted below: policy, staff and personnel, IT, facilities, and workflow. Significant discrepancies exist between the best practices ideal and the current CDCR reality.

| AREA | ITEM | GOAL | CDCR STATUS | MODIFICATION |
|---|---|---|---|---|
| Policy | Governance | Have a clear, designated department or contractor that is responsible for the performance of telemedicine visits within CDCR. | The Office of Telemedicine Services Center exists, but does not have appropriate authority or accountability for telemedicine visit growth. | Perform considerable restructuring of CDCR medical leadership to embed telemedicine leadership with accountability for telemedicine program growth. Alternatively, identify a suitable outsourcer experienced in correctional telemedicine to operate the CDCR telemedicine program with accountability for program growth and performance. |
| Policy | Utilization Review and Case Management | Utilization review and policy management via a centralized electronic system statewide. | All are managed locally on paper. | Obtain and install a centralized scheduling system for statewide telemedicine care and require use by all parties, including off-site contractors. |
| Policy | Telemedicine as the standard escalation of care from on-site primary care. | Telemedicine services are used as the default escalation of referrals from primary care except when definitive hands-on studies are required at an offsite care facility. | Telemedicine is an option, along with on-site visiting specialists and off-site care. Use of each option varies greatly among units. | Implement a policy whereby telemedicine is the default escalation of care except in specific stated circumstances. Also develop specific use of protocols in collaboration with medical leadership. |
| Policy | Telemedicine Use in Primary Care | Telemedicine is utilized to appropriate levels for primary care purposes such as initial physical assessments and sick call clinics. | There is no use of telemedicine for primary care services by CDCR. | Expand the use of telemedicine within CDCR to include appropriate primary care services as mentioned. |
| Staffing and Personnel | Provider Availability | Optimal provider coverage with consistent contracting and the availability to match the demands of the system. | Disparity and inequity of providers among facilities. Different contracting models with external provider groups. | Level out underserved populations using resource pools and telemedicine at provider-rich facilities to facilities with inadequate support. Review provider contracts, standardize contracting model for consistency, quality, and cost efficiency. |
| Staffing and Personnel | Reporting Structure of Telemedicine Personnel | Clearly defined reporting structure of medical, custody, and headquarters staff. | Undefined reporting structure and uncertainty with respect to local, CDCR or CPR management. | Medical needs should drive custody; chain of command and reporting responsibility of players needs to be defined and communicated. |

*CDCR Telemedicine Assessment and Roadmap*

| AREA | AGENT | GOAL | CDCR STATUS | MODIFICATION |
|------|-------|------|-------------|--------------|
| **Staffing and Personnel** | Staffing Levels and Performance Reviews | Staff appropriately where needed; performance parameters clearly delineated and current with reviews and merit awards. | Understaffed with providers, telemedicine presenters, and technical support. Employee reviews extremely delinquent and job responsibility and performance expectations not defined. | Review employees whose evaluations are delinquent; appoint or hire staff to create job responsibilities and performance metrics; hire fill gaps and award appropriate high-level performers with merit increases. Grossly inadequate technology support is significant immediate concern. |
| **Staffing and Personnel** | Provider Issues | Identify optimal provider network model and make adjustments to reach optimization. | Currently there is no definitive network model but a conglomeration of independent provider groups. | Selection and implementation of provider model across the system. Choices include in-house hub, single provider group, regional provider groups, and multi-specialty groups. |
| **Staffing and Personnel** | Credentials of Patient-side Presenters | Utilize appropriate credentialed health care workers such as paramedics for these duties, rather than nurses or physicians. | All telemedicine visits are performed with nurses working at the patient side. | Arrange for provision of more cost effective solution for patient-side staffing through hiring or contracting for paramedic staff to perform this and related functions. |
| **Staffing and Personnel** | Training | Ensure all telemedicine staff, both at patient and provider ends, have mandatory training in full-scope telemedicine service and monitored for compliance with trained procedures. | Training is offered by the TSC but spottily attended. Telemedicine physician providers attend no specific training. There is considerable variance in staff knowledge of and compliance to proper procedures. | Operate a mandatory, monitored program of training and skills assessment for both physician providers and patient-side staff. |
| **Staffing and Personnel** | External Provider Performance | Telemedicine encounters undergo peer-review for quality of care and records audited for matching to billing records. Provider productivity is compared, with feedback, to expected standards. | There is no peer-review of telemedicine encounters, nor specific auditing of medical record entries to billing. | Create and operate a peer-review program for telemedicine services. Generate accurate routine reports of telemedicine services provision to reconcile to billing records. |
| **IT** | Network Connectivity | Full IP Network with Multi-protocol layering system (MPLS) and Quality of Service (QOS) for quality video while supporting other systems. | Vendor ISDN connections. No capability for other IP systems. | Establish a high capacity IP network between all locations with MPLS and QOS technology. |
| **IT** | Video Standards and Devices | H.323 video operating on video appliances rather than PCs for speed and dependability. | Video appliances running H.320 video standard. Many may be IP compatible. | Inventory all video units and classify those that are IP ready. Replace those that are not. |
| **IT** | Telemedicine Peripherals | A standardized set of peripherals for broad application across many disciplines. Minimum to include document camera with backlight, otoscope, dermascope, laryngoscope, and digital stethoscope. | Minimal use of peripherals. Most frequently used is AMD camera. Very minimal document camera use. No stethoscope use. | Obtain and install standard set of full-capacity peripherals at each location. |

*CDCR Telemedicine Assessment and Roadmap*

| AREA | ITEM | GOAL | CDCR STATUS | MODIFICATION |
|------|------|------|-------------|--------------|
| IT | Medical Records Sharing | Full EMR across entity, consistently used by both on-site and off-site providers in a common fashion. Lacking this, an electronic document repository for each telemedicine patient that prevents repeated faxing of documents. | Paper records that are faxed prior to encounters. | If plans for an enterprise EMR are in distant future, obtain and install an electronic document storage and retrieval system so that information can be electronically stored and retrieved, and shared. |
| IT | Parts Depot | Replacement parts and workstations ready for rapid deployment. | Parts inventory and replacement telemedicine stations seem to be non-existent. | Build fleet of telemedicine stations for rapid deployment to replace down units or for expansion. Have parts depot for component parts to repair defective components in a timely manner. |
| Facilities | Telemedicine Space | Obtain adequate space and environment for telemedicine program. | Inadequate space, wrong environment in several cases, not enough units at facilities, and spaces shared with brick and mortar clinics. | Finish out currently allocated spaces to bring them up to appropriate best practice standards, using space in portable buildings or in loading dock areas where necessary. |
| Workflow | Scheduling | Have an integrated medical and mental health enterprise scheduling system. | Two different scheduling systems used for medical and mental health disciplines that are stand alone, not enterprise-wide or compatible. | Obtain and implement a standardized enterprise-wide scheduling system that is capable of scheduling patients, providers, and resources and generating scheduling reports/statistics. |
| Workflow | Scheduling cont. | Operate a centrally managed and completely integrated scheduling system for telemedicine visits. | Scheduling is fragmented and hand managed via faxes and calendar books. The TSC coordinates only part of the telemedicine visits. | Contract for the installation of an autonomous telemedicine scheduling system, or integrate telemedicine into an overall central electronic scheduling system for CDCR medical care. |
| Workflow | Treatment Protocols | Utilize nationally recognized treatment protocols for disease management groups. Develop collaboratively where needed. | Treatment protocols do not exist for the multitude of disease management groups. | Prioritize disease management groups based on risk and ROI (asthma, diabetes, etc.) and develop appropriate treatment protocols as well as screenings through telemedicine and escalation of subsequent medical care. |

## Summary of Gap Deficiencies

The telemedicine programs are almost universally understaffed, especially with technical support staff. The existing staff is not evenly distributed among the various facilities. The distance between CDCR facilities makes telemedicine a natural response to equalize the effects of staff across the system. The complex organizational structure makes reporting and job responsibilities unclear to staff. Finally, morale is low—in part, because there is very little performance evaluation and no mechanism to reward superior performance.

The telemedicine equipment in place is adequate with the addition of peripheral devices and an upgrade in connectivity. However, the lack of technical support hampers the efficient operation of the equipment. With only one technical support employee located in the extreme northwest corner of a large state, equipment cannot always be repaired or replaced in a timely manner. CDCR has no parts depot to serve the entire system, which also increases downtime due to equipment malfunctions. Perhaps most disturbing is the fact that not all employees have access to the equipment and resources to communicate electronically. This further exacerbates the problems caused by the use of paper medical records.

Telemedicine policies vary from institution to institution and are not consistently enforced. Requests for service (RFSs) are paper driven and generated locally at each facility. In fact, telemedicine practice is *encouraged*, not *required*. There is no system-wide procedure and some RFSs are made directly to the provider—bypassing the Office of Telemedicine Services Center (TSC). This makes accurate record keeping very difficult. There are no standards for the practice of telemedicine in place for all of CDCR.

Many of the spaces set aside for telemedicine are below the best practice standards. Problems vary from lack of space and privacy to inconvenient locations and substandard equipment. Many of these spaces are shared with other programs, and schedule conflicts are common.

A decentralized scheduling system, coupled with the paper medical records, routinely disrupts workflow. There are 12 steps to be completed before a telemedicine appointment is scheduled and four after. The lack of adequate means of electronic communication adds to the complexity of scheduling and the maintenance of complete and up-to-date medical records.

Off-site providers are each contracted separately and contracts are not consistent for all providers. In addition, there is no network model for provider operation. It appears that the providers, not CDCR, dictate the terms of their contracts.

## SECTION IV. RECOMMENDATIONS AND ROAD MAP

### A. Roadmap Goals

The analysis team reflected considerably on the project findings and worked diligently to devise the most appropriate and useful analysis and resultant work plan for the future of telemedicine at CDCR. In order to maximize the relevancy of recommendations and the resultant road map, the following overall goals and objective domains were developed.

### *Overall Goals*

1. To establish a best-practice telemedicine program for the California Department of Corrections and Rehabilitation that assures optimal health outcomes, safety, and financial performance for the inmate and State government.

2. To outline, in detail, the steps necessary to achieve meaningful improvement in the activity and quality of telemedicine operations for the benefit of the overall correctional health system.

### *Objective Domains:*

* Develop and operate an improved, highly effective leadership structure for telemedicine operations.

* Design and install an improved technology infrastructure (telecommunications, hardware, supporting software, and systems) for telemedicine operations.

* Develop and operate an improved workforce for telemedicine operations, including both physician-provider network and patient-side staffing.

These highest-level goals and resultant objective domains served as touch-stone references for the resultant specific objectives and derived work plan tasks.

### B. Objectives and Tasks

Working from the developed gap analysis and reconciling the overall goals and objective domains, a set of more focused, specific objectives was derived. These more detailed objectives develop the management, technology, and human resource approaches that will be most beneficial to CDCR telemedicine.

### *1. Specific Objectives*

a) Develop and operate an effective centralized management and monitoring structure for the telemedicine services program.

b) Develop, implement, and monitor an enterprise-wide clinical protocol where telemedicine is the principal escalation from primary care.

c) Redesign, implement, and operate telemedicine process methods for specialty, mental health, and primary care needs that outline tasks and responsibilities at both the remote provider and patient-side locations.

d) Designate, procure, and install the necessary telemedicine hardware to permit the CDCR telemedicine program to operate at optimal levels.

e) Implement the requisite centralized information software and systems for use system-wide to operate and maintain the CDCR telemedicine operations in an optimal manner.

f) Operate, where needed, a supplemental telemedicine staffing structure that provides the necessary workforce within prisons for effective telemedicine delivery.

g) Develop and operate a system-wide program to establish, audit, and monitor telemedicine provider relationships to ensure high quality and cost-efficient telemedicine operations.

h) Design, construct, and operate, where needed, centralized telemedicine facilities for telemedicine providers, regardless of whether these are operated within CDCR or by external medical partners.

i) Develop a process to assure CDCR telemedicine meets accreditation standards of any designated health care review body (NCCHC or ACA) and assist in obtaining accredited status.

j) Operate an ongoing evaluative process to monitor and assess activity levels, quality of care, health outcomes, efficiency, and cost effectiveness of the telemedicine program.

With these specific objectives now outlined, a very focused set of work tasks have been refined that provide the requested road map for the advancement of CDCR telemedicine.

## 2. Work Tasks

Task 1. Bring prison facility telemedicine equipment up to improved standards of functionality to include IP connectivity and a standardized set of medical examination peripherals. Install additional units to maximize access by offender patient populations.

While most CDCR prison facilities have some manner of telemedicine equipment, the connectivity method, peripherals, and distribution of these units is inadequate. Additional units of higher specification, namely able to connect over IP protocols and have a standard set of examination peripherals, are required.

Method:
- Perform a complete inventory of current telemedicine units in prison facility locations.
- Arrive at a new minimum standard equipment configuration to include medical examination peripherals sufficient for primary care and common specialist examinations.
- Redistribute existing telemedicine equipment for optimal usage in mental health programs, etc. wherever possible.
- Coordinate with CDCR/Receivership personnel to transition completely from ISDN connectivity as soon as possible.

Task 2. Develop a specially trained and dedicated team to coordinate processes and provide high-quality patient–side telemedicine at each prison facility.

The selection and development of staff at the facility level is vital to an effective telemedicine program. In order to effectively bring change to the current CDCR telemedicine environment, most units will require supplemental staffing dedicated to the telemedicine care process. This care process involves both assisting in the actual telemedicine care, and also acting as the information interface between the medical records and scheduling at a particular prison facility and the telemedicine program. The staff positions should be a telemedicine presenter (such as a paramedic) and a telemedicine facilitator, constituting 2 full-time equivalents (FTE's). These two staff positions will play a central role in how of-

fender patients receive care, as telemedicine is optimized in the overall California correctional health care apparatus. The telemedicine staff will therefore require dedicated training to fulfill the special level of skill for conducting high-quality telemedicine and for contributing to the associated processes for telemedicine care analysis and outcomes measurement.

Method:
- Recruit/identify a Telemedicine Supervisor for facility-based telemedicine personnel.
- Develop job descriptions for the facility-based telemedicine staff members in conjunction with the Telemedicine Supervisor listed above.
- Develop criteria and respective skill inventories for telemedicine facilitator and presenter positions.
- Establish effective salary levels and a professional development program for the telemedicine facility-based staff members.
- Hire or recruit employees for facility-based telemedicine care services.
- Initiate telemedicine facility-based team composition as two persons: a telemedicine facilitator and a telemedicine presenter.
- Provide specific and in-depth training for each telemedicine staff team member.
- Provide cross training to each telemedicine staff team member to enable continuation of service in the event of an absence of one team member.
- Develop methods to monitor telemedicine staff member performance and competence.
- Commence performance monitoring and competence assessment with periodic review.
- Develop in-service training and establish the schedule for conducting training.

Task 3. Configure and install a method for prison facility telemedicine coordinators to receive all prison unit requests-for-services (RFSs) and input into a centralized, system-wide utilization review (UR) system.

In order to maximally utilize telemedicine for the benefit of CDCR, all possible cases able to be managed by telemedicine must be identified and appropriately handled. To allow this, and also to enable improved management of higher-order use of on-site and off-site specialty services, a system and program must be devised whereby all escalations from primary care prison facility medical care are captured via a referral management system. This system will be used by the dedicated prison facility telemedicine staff (the 2.0 FTE discussed previously) and will be the primary data collection of aggregating telemedicine demand. This will improve the quality and decrease the cost of health care by systematically examining medical decisions and comparing them to evidence-based standards established to ensure that a patient is not given care that is inappropriate or exceeds medical need.

Method:
- Identify, procure, and install an appropriate referral management/utilization review software system and database compatible with the emerging CDCR/Receivership IT standard.
- Develop and operate a systemized collection and entry of all RFS's into an electronic database.
- Develop processes and controls for the timely designation of RFS's requesting off-site services.
- Develop process and controls for identifying off-site services that are appropriate for telemedicine.
- Create internal process audit monitoring standards designated by the CPR and CDCR.

- (Optional Extension) Create a centralized nursing center with physician oversight for the clinical review of all requests for off-site services requiring authorization and inpatient care. The nursing center will use standardized and industry approved decision-making algorithms and critical-thinking skills in the review and performance of medically necessary health care services. Recruitment of center personnel experienced in health care services coordination to include a medical director, nursing supervisor, staff nurses, and technical /administrative support.

Task 4. Develop a systematic and ongoing method for analysis of data generated by the referral management system and requests for escalated services.

Given that there is no accurate and reliable system in place to track utilization data, the referral management system would monitor referral data in a manner that provides a method of observing utilization patterns among the facilities, determine aggregated demands on the system, and monitor processes involved with operating a telemedicine program. These informatics tools will distribute the findings of the analyses electronically to all levels of the organization, insuring effective communications for process improvement.

Method:
- Apply data analysis techniques to assess the type and frequency of telemedicine consults requests.
- Analyze scheduling and cancellations of appointments.
- Timing and delays associated with time when RFSs were generated to actual visit.

- Frequency and need for off-site transfers due to lack of providers specific to the RFSs.
- Distribution of services provided based on RFSs, providers' locations, and location of requesting facilities.
- Frequency and distribution of follow-up consultations following initial RFSs.
- Average time required for consults per provider, per location, and per specialty area.
- Utilization of inferential statistical analyses to infer corollary associations between variables to determine patterns of utilization and demand.

Task 5. Set statewide TM use protocol to improve timely access to specialty care. Protocols will also be developed to use telemedicine to optimize chronic care management.

Crucial to a successful telemedicine program for CDCR is the establishment of a base protocol, set through collaborative development with CDCR/Receiver medical care leadership, for the usage of telemedicine in as many appropriate clinical referral situations as possible. Additionally, agreed protocols will be required regarding the accepted use of telemedicine for management of chronic conditions.

Method:
- Develop the procedure for determination of existing telemedicine usage practices and patterns.
- Solicit input from current specialty providers and telemedicine activities.
- Formulate protocols in collaboration with the CPR and telemedicine providers, in consultation with CDCR.
- Define performance metrics and auditing processes.
- Schedule protocol implementation.
- Apply the protocol consistently to referrals submitted for specialty care.

Task 6. Contract or build the necessary physician panel requisite to meet the parameters analyzed from the referral management system.

The creation of a specific telemedicine provider network to deliver multi-specialty and primary care services to the CDCR inmate population and to optimize compliance delivery with the disease management protocols is an essential step. This network will be guided by identifying specific current medical service needs for all of the CDCR locations. This information will be used to shape the specialty recruitment and construction of the needed provider network.

Method:
- Using information gleaned from the referral management system, determine the aggregated needs of the system in terms of required telemedicine services.
- Reconcile this aggregated need against currently available telemedicine providers in terms of available specialties and visit capacity.
- Identify needed additions to the telemedicine physician provider panel.
- Working either independently or in conjunction with established California provider network development firms, identify and contract the necessary services.
- If a reasonable option for some specialties or provider network does not exist, explore the alternative of recruiting a specially constructed provider organization within California for telemedicine services provision.

Task 7. Implement and operate centralized utilization review and scheduling system for CDCR telemedicine.

With appropriate referral capture, telemedicine protocols, and provider networks in place, a centralized, automated scheduling system for the management of telemedicine visits will be required. This will allow for maximal coordination of telemedicine care across the spectrum of prison facilities and medical specialties provided.

Method:
- Identify, procure, and install an appropriate multiple-resource clinical scheduling software system and database compatible with the emerging CDCR/Receivership IT standard.
- Develop and operate a systemized method for the establishment and maintenance of telemedicine schedule templates across all telemedicine physician providers.
- Develop and operate a systemized method for the continual setting, revising, and updating of telemedicine appointments occurring in the telemedicine program.
- Recruit and retain the necessary professional staff to operate the telemedicine scheduling system.

Task 8. Ongoing Analysis, Management, and Reporting

As previously stated, the best practices telemedicine model using proven methods and technologies can be applied to improve the quality and efficiency of correctional health care, improve access to needed services, and otherwise fundamentally improve the practice of medicine. Once operational, the proposed model will inherently generate continuous monitoring and analysis data to identify, address, and insure timely quality health care. Automated systems will be utilized to generate the necessary data on program utilization and overall activity. Examples of these reports are provided in the Appendices.

By design, continued extraction and examination of aggregated referral demand data and clinical outcomes data will operate from all available data sources, including future developments in clinical data repositories and electronic medical records at CDCR. The impact of telemedicine consults from the proposed delivery program will be assessed across two primary areas: clinical outcomes and utilization. Clinical outcome data will include diagnosis, clinical ratings of disease severity, complications, and laboratory results. Utilization data will derived from type and frequency of telemedicine visits, rate of change in utilization, number of new patients/users, number of follow-ups using telemedicine, access, and referrals to on-site and off-site medical hubs for specialty care.

Method:
- During implementation, determination, and reporting of objectives and tasks completed, those not completed, and those requiring modification will be conducted.
- Create and maintain standing and ad-hoc reporting capabilities on all telemedicine related information systems.
- On an ongoing basis, review monthly telemedicine program activity data and compare to previous periods as well as national standards.
- Bi-monthly reporting of the continuous analysis of data and monitoring will be conducted throughout the program's operation with reporting to the designated CDCR and Receivership authorities.

## C. Implementation Plan Sequencing

The framework for the implementation sequence of the recommendations for optimization of the CDCR telemedicine program has two general phases: fundamental actions that require immediate action in order to accomplish goals for the next 6 months to 1 year and recommended actions towards optimization that can be accomplished within the next 1+ to 5 years. In keeping with the Donabedian Quality Assurance Model, the recommendations for each general phase are further partitioned into Structural (Infrastructure, Facilities, Staffing and Personnel) and Process (Workflow, Perceptions of Telemedicine, and Operations) Domains.

## 1. Fundamental Short-Term Actions (6 months – 1 year)

*Structure*

- Identify or procure core leadership for the telemedicine program.

- Reorganize and clarify reporting structure.

- Complete set-up of rooms and equipment in all 33 facilities.

- Develop statewide technical support.

- Upgrade telecommunications and transition from ISDN to IP.

- Upgrade telemedicine equipment to include all peripherals.

- Institute systematic electronic data capture for tracking utilization and metrics.

- Implement real-time electronic scheduling.

- Initiate basic electronic medical record document management for telemedicine.

*Process*

- Develop and communicate vision/plan widely to include utilizing

telemedicine as required principal escalation for both primary care and specialty consults.

- Institute comprehensive and timely training and appraisal review process.

- Review and standardize external provider contracts.

- Implement utilization review process.

- Implement electronic follow-up procedures.

- Standardize scheduling procedures when real-time electronic scheduling system is in place.

- Facilitate the use of existing provider hubs to reduce disparity of access from one facility to another.

## 2. Recommended Near & Long-Term Actions (1+ − 5 years)

*Structure*

- Increase provider, clinical presenter, help desk, and technical support staff.

- Create telemedicine equipment depot for rapid equipment deployment.

- Standardize and install a comprehensive scheduling, reporting, and EMR system for all medical care.

*Process*

- Develop treatment protocols for all disease management groupings.

- Develop help desk support protocols.

- Finalize selection and organization of necessary telemedicine physician-provider network.

- Implement primary care telemedicine support and processes.

- Develop clinical outcome analysis and cost savings benchmarks for measuring the telemedicine program.

These more long-term goals can be summarized as standardization across the entire system. In addition to the specific recommendations described in detail in this report, the overall expansion and enhancement of the existing CDCR telemedicine program will accomplish several broad objectives that have meaningful ramifications for CDCR and California.

## VIII. CONCLUDING STATEMENTS

As CDCR and the Receivership move forward with an improvement plan for CDCR telemedicine, it is important to review the key benefits that can be expected from a successful implementation.

One very significant benefit opportunity facing CDCR is reduced transportation of prisoners outside the facilities in which they are incarcerated. This will result in major cost savings in correctional officer staff time, transport vehicle fuel, vehicle maintenance, and physician charges, while increasing public safety as fewer offender patients are taken outside the prison facility. While this has been roughly estimated earlier in this document, the evaluation team is comfortable stating for the record that CDCR, with an improved telemedicine program, can expect to see decreased off-site transits by more than 50% of current levels, with the associated freeing up of correctional officer resources. It is believed that this will be an important factor for CDCR and the Receiver as they develop solutions for prison facility overcrowding.

In addition to the important factor of decreased off-site transits, through an improved telemedicine program CDCR can expect to see specialty care delays (appointment wait times) decrease by more than 30% from current levels at locations that currently have undesirable wait times. This will improve quality of care delivered to offender patients, reducing both cost and risk to the overall CDCR correctional health care system.

These are just two specific and highly predictable results CDCR can expect from improving their telemedicine system. There will be many others as demonstrated in other states as telemedicine begins naturally being incorporated into additional clinical practices such as pharmacotherapy, nutritional counseling, and patient education.

It is the sincere hope of the project team that this report assists the CDCR and the Receiver to take meaningful steps to improve CDCR telemedicine. As expressed in U.S. Department of Justice reports and reconfirmed in recent California Legislative Analyst's Office reports, enhanced telemedicine implementation in corrections is vital for an effective and efficient correctional health program. The analysis and plan outlined here, properly implemented, will set the CDCR program on the way to becoming one of the top correctional health telemedicine programs in the country.

# APPENDIX 1.1

## METHODOLOGY

### SITE VISITED

The UTMB consultants conducted an in-depth assessment of the structure and process of the CDCR telemedicine system, examining its infrastructure, facilities, staffing and personnel, workflow, and operations. This assessment was conducted through a series of site visits through the months of August and September 2007.

In all, a total of 11 facilities representing 33% of the CDCR facilities and identified by the Receivership as High, Medium, and Low Telemedicine Users and the TSC were visited. During the site visits, interviews with more than 69 key CDCR/CPR staff were conducted. The following is a list of facilities visited and categories of staff interviewed:

| FACILITIES | PERSONNEL |
|---|---|
| Pleasant Valley State Prison (PVSP) – High Telemedicine Use<br>Avenal State Prison (ASP) - Medium Telemedicine Use<br>California Men's Colony (CMC) - High Telemedicine Use<br>California State Prison – Corcoran - High Telemedicine Use<br>California Substance Abuse Treatment Facility and State Prison (SATF) - Low Telemedicine Use<br>Californian Correctional Institution (CCI) - High Telemedicine Use<br>California State Prison – Los Angeles County (LAC) - High Telemedicine Use<br>California Institute for Men (CIM) - High Telemedicine Use<br>California Institute for Women (CIW) - Low Telemedicine Use<br>California Rehabilitation Center (CRC) - Low Telemedicine Use<br>San Quentin State Prison (SQ) - Medium Telemedicine Use | Wardens<br>Associate Wardens<br>Correctional Officers<br>Health Care Managers<br>Telemedicine Coordinators<br>Physicians/Psychiatrists<br>Nurses<br>Administrative Support Staff |

The UTMB consultant team also interviewed external CDCR telemedicine providers and administrators at:

- University of California – Davis (UCD)
- University of California – San Francisco (UCSF)
- Centennial Medical Group (CMG)

APPENDIX 1.2

## LIST OF IMPRESSIONS

The following highlights overall impressions from the site visits. Detailed discussions of these areas can be found in Appendices 1.3 and 1.4.

### 1. Support and Enthusiasm for Telemedicine

The visits revealed a near unanimous interest on the part of those persons interviewed to scale up, enhance, and grow the telemedicine program within CDCR. This strong grassroots position was dampened somewhat as the visit teams interacted with individuals higher up in the chain of medical authority. This contrasted greatly with the continued strong support expressed for the telemedicine program amongst senior security personnel, including in may cases the warden and assistant warden of the prison facility.

### 2. Telemedicine Utilization and Processes

Program growth – while the program has grown since its inception, this growth is very minor given the size and scope of this correctional program as the largest or second largest in the country, as well as the significant size of the state and the geographic challenge this presents to quality care access.

Program application – While the major emphasis on mental health telemedicine services is a frequent feature of correctional telemedicine, there are notable deviations from typical practice in the distribution of medical specialties provided by telemedicine in CDCR. Infectious disease is usually a prominent player, but not to the level seen here. Additionally, orthopedics and dermatology usually are operated at higher levels of activity in the corrections telemedicine environment.

Consistency of performance – The significant variations in telemedicine usage year-to-year at individual prison facilities speaks to a system that is highly dependent on specific personnel, employee personal interest, or transient demands for services rather than a consistent, stable managed program. While factors can emerge that change the demand for telemedicine services over time, the variations seen in the CDCR numbers are greater than is optimal for an effective program.

Data – The inability to identify an accurate set of statistics that represents the activity of the current CDCR telemedicine program speaks to its fragmented, disassociated data collection and monitoring system. The program will significantly benefit from the implementation of automated systems for business processes that will be an objective meter for important performance metrics and monitoring.

### 3. Telemedicine Equipment and Technology Infrastructure

The CDCR has a reasonable deployment of telemedicine equipment in the field, but the amount of this equipment is insufficient for the program's goals. By comparison, Texas has over four times the videoconference units deployed serving a similar size patient population. Additionally, the dedication to ISDN technology is costing the CDCR significantly more money in telecommunications fees than is necessary in today's technology environment, where IP standards are more economical and flexible. The currently deployed fleet of telemedicine equipment within CDCR at the prison facilities is functional at a level acceptable for mental health services. To reach higher goals of medical care services, new equipment should be made available that has a more complete range of examination peripherals such as more supplemental examination

cameras and tele-stethoscopes. Additionally, both the number of technical services personnel and local telemedicine leadership and support within the prison facilities must be expanded to bring higher levels of reliability to the program. A program of replacement equipment placed in depots around the state must be implemented.

## 4. Workflow

The administrative and clinical workflows currently in place in the CDCR system are overly complex and failure prone and operate in isolation at each prison facility. The system will benefit from a centralized management strategy coupled with process automation that will both add efficiency and significantly reduce gaps in care to near nominal levels.

## 5. Provider Network Model

Recognizing the complex healthcare topography of the California correctional system, a hybrid of the medical specialty and regionalized model appears to be the best fit. Care provision would be organized at the primary, secondary, and tertiary levels and make use of whatever multiplicity of regional and medical specialty networks are required to assemble the cadre of necessary services. Given the complexity associated with managing the necessary contracts, CDCR is currently incapable of managing such a scaled model. An external partner accountable for performance of telemedicine services and implementing such a hybrid model is highly recommended.

## APPENDIX 1.3

### HISTORICAL AND EXTRACTED DATA

An examination of historical data provided by the CDCR Office of Telemedicine Service Center (TSC) and individual correctional facilities was also conducted. Archival data provided by the TSC, individual facilities, and provider groups revealed several interesting patterns.

Overall, there appear to be no systematic methods and tools to accurately track telemedicine utilization in the CDCR at the present time. Utilization data consisting of scheduled and canceled clinic appointments are requested from the correctional facilities by the TSC on a weekly basis using logs, which are then faxed by the telemedicine coordinator. It became apparent during the assessment that the turn-in rates for the logs are typically low and often incomplete. TSC is further handicapped because it has no methodology for cross checking the accuracies of the logs. This matter is further compounded when individual facilities schedule their own telemedicine appointments directly with provider groups bypassing the TSC system entirely. As such, all historical records provided should be interpreted with caution. That being stated, the following highlights the telemedicine activities of the CDCR.

### 1. Telemedicine Utilization

Data gathered from the interviews and previous audits by the Legislative Analyst's Office (2006-2007 Analysis) indicated that the CDCR telemedicine program began in 1997 as a pilot for mental health treatment. Since then, the program has grown considerably to over 12,000 telemedicine encounters or visits in fiscal year 2006-2007 with over 69,000 total visits cumulatively in its ten-year history.

As Figure 1 shows, the pilot for mental health services expanded beyond psychiatry to incorporate medical specialties. Aside from a dramatic drop in tele-psychiatric utilization in FY 2003-2004 (attributed to personnel and programmatic changes), both service tracks demonstrated similar growth curves in utilization. At the end of 10 years of operation, the CDCR telemedicine utilization had grown from a minimally used pilot program to one that had almost 7,000 encounters each for psychiatry and medical service.

Of the various medical specialties available in the CDCR's telemedicine program, infectious diseases made up the vast majority of medical services provided, with more than 55% of the medical consults, followed by 16% from dermatology, and just over 11% from orthopedics. These three specialties account for 82.9% of all telemedicine encounters. Other



Figure 1

medical specialties such as neurology, surgery, pain management, endocrinology, urology, gastroenterology, and ENT made up the remaining consultations. Figure 2 illustrates a breakdown of the total medical specialties utilization.

Data also revealed that more than 90% of the CDCR facilities (31 of 33) are currently engaged in providing telemedicine services. Prior to FY06-07, only 27 facilities were equipped with telemedicine capabilities. Extrapolation of the data concerning the volume of each facility's utilization over its ten-year history was conducted and compared with the latest fiscal year's activities. Figure 3 outlines the overall rankings the CDCR's facilities based on telemedicine utilization volume overlaid by their rankings for the latest fiscal year.

While the findings remained consistent for some facilities, others displayed dramatic drops in telemedicine utilization for the latest fiscal year. For example, PBSP, where the initial telemedicine pilot began, ranked second overall for the past ten years. However, its utilization dropped substantially to seventeenth place for FY06-07. Similarly, ISP reduced its capacity from the sixth highest user of telemedicine to one of the lowest (twenty-fourth). Inversely, several facilities such as ASP, LAC, CCI, and VSPW demonstrated substantial increases in their utilization in the latest fiscal year, compared to their overall rankings.

Improved rankings, which indicate increased use of telemedicine, occurred in 19 facilities. Thirteen facilities (43%) changed their ranking by five or more places in 2006-07. Of these, eight facilities improved their rank and five decreased their rank. Investigations into the causation of these changes did not reveal any common specific factors.



**Figure 2**

**Total Medical Specialties Utilization**

Infectious Disease - 55.5%    Gastroenterology - 4.4%    Endocrinology - 2.0%    ENT - 1.3%
Dermatology - 16.1%           Neurology - 4.6%           Neurosurgery - 1.4%     Surgery - <1%
Orthopedics - 11.3%           Urology - <1%              Pain Management - 1.8%  Oncology - <1%

While an overarching reason for these changes was not precisely identified, changes in personnel and priorities were the most frequent explanations cited during the interviews for changing utilization patterns.

Nonetheless, continuing to monitor data in this manner provides a method of observing utilization patterns among the facilities and aids with identifying situations where further investigation may be needed to elucidate the causes of change.



**Figure 3**

Ranking of Telemedicine Utilization by Facility from 1997-2007 and 2006-07

* Change in ranking of 5 or more.

## 2. Data from External Providers

Given that the number of CDCR medical specialists participating in telemedicine is small, the telemedicine program has relied heavily on external, contracted providers. Three major external sources of medical care are from the University of California – Davis, the University of California – San Francisco, and the Centennial Medical Group, headquartered in Bakersfield, CA. Site visits were conducted with each of these provider groups and data provided by both the TSC and the individual external provider groups shed light on the presence of discrepancies in reported utilization. Figures 4 and 5 highlight these discrepancies for the previous two fiscal years. Note that utilization data was only available for one year for UCSF.

Figures 4 and 5 illustrate the discrepancies in reported visits between TSC and the three off-site providers. Combined, TSC over-reported 367 cases over the two fiscal years. With exception to FY06-07 for CMG, TSC database revealed that more service encounters for telemedicine consultations occurred for the contract providers than were reported by the contract providers themselves. The reliance on paper-based records and faxes may have contributed to the discrepancies. In addition, cancellations of appointments between the contract providers and individual CDCR facilities may have not been updated with or through the TSC, thus giving the impression at TSC that a consultation occurred, when in fact, it did not.



### 3. Telemedicine Equipment and Technology Infrastructure

At each prison facility visited, at the Sacramento CDCR Telemedicine Center, and at each external telemedicine provider partners, complete inspection of the telemedicine hardware and supporting technology was conducted.

### A. At the Prison Facility

Telemedicine devices at the prison facilities comprised mainly of a Tandberg® Intern MXP® or Intern II® pole-type videoconferencing device consisting of a flat-screen monitor 13"-15" in size, along with a remotely controllable pan-tilt-zoom camera and associated remote control. At locations where medical care (as opposed to mental health services) was rendered, 70% of the locations produced an AMD 2500s multi-purpose camera, frequently referred to as the "derm" camera even though that is only one possible application for this device; 5% of the medical care locations produced Canon® Video Visualizer® flat-plate backlit document cameras but none were connected. Prison facility telemedicine staff reported that these were rarely, if ever, used. The videoconference devices are exclusively connected by integrated services digital network (ISDN) multi-line connections. It was noted that 10% of the video units inspected had Internet Protocol (IP) capability but this was not connected in all cases. At a small percentage of the prison facility locations, efforts were made to provide blue-painted walls (deemed necessary years ago for accurate telemedicine skin color rendering but no longer necessary today). The team noted with interest that no two shades of the paint were the same and many were wildly inaccurate compared to the intended shade. Within the prison facilities, there was clear delineation between telemedicine units available for medical care services versus mental health services with no locations visited relating that

the same unit was used for both purposes. In general, the units appeared to be of recent manufacture and in good working order. Prison facility staff appeared to take great care in the handling and storage of the equipment.

### B. At the Physician Provider Locations

Compared to the uniformity of the Tandberg® units at the prison facilities, there was a marked diversity of equipment and set-up among the different physician locations. At the CDCR Sacramento Telemedicine Center, equipment ranged from a Tandberg® unit identical to those used in the prison facilities to nearly antique, certainly outdated, devices of various manufacture, some nearly ten (10) years in age, but still functioning. More contemporary installations were evident at the other provider locations, with Polycom® videoconference units in higher prevalence. In no cases were important ancillary devices such as tele-stethoscopes, remote EKGs, or similar supplemental peripherals evident at any of the provider locations.

### C. Technical Support

The site visit team was intrigued to learn from all site visit locations that the entire CDCR videoconferencing program at all 33+ sites was supported by one video engineer who was located at a very remote location within California. At the prison facilities, there was a clear lack of support for telemedicine equipment technical problems from the prison IT staff that supported routine computer problems except where personal relationships existed between IT staff and the telemedicine clinical staff.

### D. Overall Infrastructure Support

The general infrastructure needs of the telemedicine program did not enjoy a strong representation in the administration and bureaucracy of each prison facility. The highest ex-

*CDCR Telemedicine Assessment and Roadmap*

pression of this was a prison facility where all clinical activity ceased for months due to the unpaid ISDN telephone bill. During this time the existing telemedicine administration was not able to exert sufficient influence to rectify such minor administrative glitch. This environment manifested itself on subtler levels at other facilities – what was clear is that the voice of the telemedicine program in the administrative affairs of many prison medical departments, much less the overall prison administration, was ineffective.

## 4. Workflow

Review of the TSC protocols and on-site interviews with telemedicine coordinators revealed an overly complex workflow and coordination paradigm for scheduling and recording telemedicine appointments and encounters. There are at least three major steps with 12 coordination features prior to an actual clinical encounter, followed by an additional four coordination features following the clinical visit. Four of the steps involve faxing various records and forms from place to place. Several of the 16 individual actions are performed by a single employee. If that employee

is out, the system grinds to a halt. Such complexity creates lapses and unnecessary redundancies contributing to possible miscommunications and incomplete data necessary for a specialty encounters. Figure 6 provides a visual depiction of all of the coordination procedures involved.

Given that all of the telemedicine coordinators are registered nurses, the current, complex, and cumbersome scheduling protocol is not an optimal use of their time. In many cases, the telemedicine coordinators reported spending a majority of their time tracking down logs and relevant medical information to be faxed to the specialists prior to the clinic. The latter activity is problematic because it relies on the coordinators' judgments of what patient information is medically relevant for the specialty consultation. As a result, information is often inadequate, both due to incompleteness of paper-based medical records and lack of knowledge of what is required by the specialty provider, leaving the potential for redundant or curtailed tele-examinations. It is not unusual for CDCR telemedicine appointments to be cancelled because of problems with incomplete or missing medical records.

*CDCR Telemedicine Assessment and Roadmap*



Figure 6

**CDCR TELEMEDICINE APPOINTMENT WORKFLOW**

## APPENDIX 1.4

## OPTIONS FOR TELEMEDICINE PROVIDER NETWORKS

The desired used model for telemedicine in corrections leverages the tremendous power and flexibility of the video telemedicine network to redistribute medical resources over geographic distances. This can be applied to all levels of the health care delivery method.

The primary care level would be the domain of facility-based providers, but with the ability of telemedicine to also provide primary care where and when needed via intra-facility telemedicine care, utilizing providers that work in other correctional facilities.

Specialists in the ambulatory setting would principally provide secondary care. This level would capitalize on telemedicine specialty care that would match the available providers on a regional basis, and would also be designed to utilize those specialty providers that are regional brick-and-mortar providers and have for themselves (or relationships with other providers) inpatient care capability in that region for that specialty.

Tertiary care would include specialty in-hospital care and subspecialty care configured to the region where possible, and to those academic affiliations (and their respective tertiary hospitals), which participate in correctional care.

In reviewing the complete telemedicine program at CDCR, it became clear that several options exist for the provision of qualified physician providers for the performance of telemedicine services. The options for creating a "talent pool" of necessary telemedicine physicians were evaluated as follows:

### 1. CDCR In-House Hub Option:

Within the pool of current CDCR physicians, capacity could be identified to provide tele-medicine services for inmates at locations other than the physician's unit of assignment. This should include not only available specialty services, but also primary care and mental health services.

*Pros:*
- Facilitates control and coordination of care within the CDCR because of direct contracting with the physicians.
- Utilizes physicians who are familiar with CDCR environment and the numerous inmate management issues.
- Reduces cost of care due to better understanding of inmate environment and needs.
- Reduces cost, as the physician care services salary rate may be less than a per-encounter billing rate.
- Provides greater predictability of physician availability due to specific schedules for telemedicine activities that are protected from conflicting clinical responsibilities.

*Cons:*
- Requisite physician resources may not be available within CDCR.
- These physicians may not have a relationship with a hospital close to the inmate's location that they would need to obtain hospital-based testing or inpatient services.

### 2. Single Physician Network Option:

This option is based upon the creation or contracting of a single statewide network of telemedicine physicians provided by a large university, professional association, or hospital system.

*Pros*:

- Offers a single contractual relationship to manage.
- Offers maximal leverage with contracted physicians regarding pricing and service delivery performance.
- Offers consistent quality of care and risk management across all CDCR facilities.
- Will provide volume levels of activity that allow designation of physicians who exclusively provide telemedicine services resulting in improved productivity and enhanced continuity of care.
- This practice structure can enhance the coordination of care for a large population with diverse healthcare needs.
- Enables process standardization, which can lead to improved healthcare outcomes by reducing care practice variances.

*Cons:*

- There may not exist a university, professional association, or hospital system that desires a contract in this manner.
- These physicians may not have a relationship with a hospital close to the inmate's unit of assignment that they would need to obtain hospital-based diagnostic testing or inpatient services.

### 3. Regional Physician Network Option

This approach to providing telemedicine physicians to CDCR would seek to establish and contract with physician partners on a regional basis. Centered on concentrations of prison facility locations and related hospitals, these regional telemedicine physician networks would provide services aligned with a specific geographical scope.

*Pros:*

- Provides for competitive contract costing between regions.
- Utilizes statewide grouping of physician resources.
- Sustains existing local referral networks around CDCR prisons.
- The smaller organizational size and structure provides greater likelihood of using tools for quality improvement.

*Cons:*

- Multiple contracts to negotiate and manage.
- Has potential for patients moving through the levels of primary, secondary, and tertiary care not being consistent in different regions.

### 4. Medical Specialty Physician Network Option

The special health care needs of the correctional population may require the establishment of telemedicine physician groups that are organized along the lines of medical specialties. For example, a single state-wide telemedicine group providing services may be advantageous for an important discipline such as infectious disease relating to HIV/AIDS or mental health services focused on a specific disorder.

*Pros:*

- Allows physician networks to excel in areas of expertise (e.g., infectious diseases).
- Eliminates lack of specialty physician resources in underserved areas.
- Provides for non-distracted physicians.
- Enables the specialist's knowledge to be "leveraged."

- Optimizes disease management through the utilization of data – derived practice guidelines, and reducing care variances that can yield improved outcomes.
- Chronic disease care evolves to operate the specialist as the "principal physician."

*Cons:*

- Multiple contracts to negotiate and manage.
- Well–developed accounting systems to capture all of the relevant data in order to demonstrate and optimize specialty care cost–effectiveness.
- Requires effective information systems for specialty care disease management.

# APPENDIX 2

## TELEMEDICINE FINANCIAL OPPORTUNITY FOR CDCR

The benefits of telemedicine in correctional health are no longer debated. Its positive impact on inmate transport and improved access to off-site specialists is now generally accepted, resulting in the development of some form of telemedicine in nearly every state in the nation. Additionally, cost-benefit analyses of correctional telemedicine have continually expressed cost savings to the correctional organization at many levels.

The 2002 National Institute of Justice Report *Implementing Telemedicine in Correctional Facilities* stated savings in excess of $100 per visit for telemedicine visits just in provider charges alone as compared to outside care:

> *"...the cost-benefit analysis concluded that a telemedicine consultation would cost an average of $71, compared with $173 for a conventional (face-to-face) health care consultation—a savings of nearly 60 percent."* [3]

When the organization includes savings from reduced demands on correctional officer time and resources, the savings have been reported as even greater. In a recent report from the Center for Information Technology Leadership at Partner's Healthcare (affiliated with Harvard Medical School) in Boston, Massachusetts[4], savings to the correctional organization can range $1,500-$1,600 per medical visit.

This report estimated that a correctional program operating no telemedicine and performing 94,000 transports annually would incur a cost of over $158M. Estimating an appropriate use of telehealth could avoid 40,000 of these transports, saving $60.3M per year.

Using a state correctional program of similar population size to California, estimation can be made as to the potential cost savings impact available. Texas operates a comprehensive telemedicine program as part of its university-run correctional health program that serves a patient population roughly equal to that of California. Utilizing the cost savings figures from the references above, and estimating different levels of complete program implementation (expressed as a percentage of the Texas program), the following chart was be developed.

These figures demonstrate that an improved telemedicine program operating in California corrections would represent a significant cost savings opportunity in addition to added value of improved access to necessary clinical care.

In addition to improved access to needed specialty services, the CDCR can expect to balance any necessary investments in improved telemedicine equipment, systems, supporting vendors, and expanded telemedicine provider networks with a substantial freeing of resources (or improved availability) associated with correctional officer.

---

[3] National Institute of Justice. Implementing Telemedicine in Correctional Facilities. U.S. Department of Justice–U.S. Department of Defense Joint Program Steering Group Report. May 2002.

[4] Center for Information Technology Leadership. The Value of Provider-to-Provider Telehealth Technologies. Partners HealthCare System, Inc. 2007 Charlestown, MA 02129 ISBN: 0-9777903-7-1

| Estimated Cost Savings Impact of an Improved Telemedicine Program at CDCR | | | | | | |
|---|---|---|---|---|---|---|
| Current Annual Telemedicine Encounters | 6,900 | 6,900 | 6,900 | 6,900 | 6,900 | 6,900 |
| Percentage of Implementation Towards a Fully Active Program | 0% | 20% | 40% | 60% | 80% | 100% |
| Fully Active Program Encounters[1] | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 |
| Increase in Telemedicine Encounters | - | 1,500 | 9,900 | 18,300 | 26,700 | 35,100 |
| Provider Fee Only Savings[2] | $     - | $   153,000 | $  1,009,800 | $  1,866,600 | $  2,723,400 | $  3,580,200 |
| Combined Provider and Correctional Officer Resource Savings[3] | $     - | $  2,310,000 | $ 15,246,000 | $ 28,182,000 | $ 41,118,000 | $ 54,054,000 |

[1] - Based upon State of Texas Model
[2] - Based upon NIJ Data at $102/visit
[3] - Based upon CITL Data at $1540/visit

## APPENDIX 3

### BEST PRACTICES IN TELEMEDICINE

In order to provide the most useful analysis and roadmap possible for CDCR, a "future state" optimized correctional telemedicine program is described here to allow visualization of what the CDCR program can accomplish. The system described in this section assumes an ideal climate for implementation, including adequate fiscal resources and receptive institutional culture. The system described is focused on live two-way video interaction between doctor and patient, with supporting electronic systems for sharing medical records or images. This is frequently referred to as a "hybrid" telemedicine system.

### Concept and Incentives

This best practices telemedicine system is continually upgraded using the latest technology, including broadband communication and integration of the electronic medical record. This integrated system employs these technologies to link live interactive video with the patient, input from medical devices, and electronic medical records to provide the physician with real-time patient information to form a "Virtual Physician's Office." Included also are utilization management and standardized telemedicine use protocols. This combination results in powerful cost controls for a program with highly effective, quantifiable results.

At the core of best practices system remote physician services is the medical studio, also called the "Virtual Physician's Office." This is a complete work environment for distributed medical care, which allows a physician to see patients anywhere on the network, supported by electronic records and medical peripheral devices. The medical studio supports either primary care or specialist providers and allows the virtual practice of medicine anywhere the network can reach.

### Clinic Equipment

At the remote clinic, a standardized cart of equipment is used for communicating with and treating the patient. Included on the station are all the necessary electronic devices required to operate the "Virtual Physician's Office." The cart contains a complete medical videoconferencing system, including video monitors, and a remotely controllable pan/zoom camera giving diagnostic quality images. A light table enables the physician to view a recent x-ray or an EKG that may appear at the last minute at the remote clinic. A hand-held medical camera, complete with fiber-optic halogen lighting, is used to look into the patient's throat or ears, or to examine the skin closely. In addition, an electronic digital stethoscope-sending unit is included. The cart also carries a complete electronic medical record workstation, allowing the clinician at the remote site complete access to patient medical information as well as the ability to enter data to bring the patient's chart up to date almost immediately.

### Electronic Medical Records

Electronic medical records (EMRs) are a key component in the best practices system. Their use reduces the cost of providing care while improving the quality of care. The use of an EMR system enables quick access to legible information for any health professional at any facility in the network. They improve continuity of care for the patient, reduce the possibility of medical error, and save enormous administrative costs in the reduction of paper, filing, retrieval, and copying. The EMR can also be utilized to evaluate quality of care on a consistent basis. As will be described later in this report, clinical practice guidelines developed and used consistently by all providers allow administration to evaluate compliance

with standards. In addition, administration can now review records electronically, which further reduces the cost for record review and data abstraction while increasing the quality and quantity of data available for analysis. Outcomes research possibilities are greatly enhanced with the use of an EMR and clinical practice guidelines.

### Clinical Care Protocols

The best practices telemedicine system also includes the adoption and implementation of standardized clinical practice guidelines that address preventive and primary care needs. As patients are seen in the clinics, electronic medical record information is actively analyzed for patient safety and continuity, and the care events are compared to known best practices for the particular disease or condition at hand. This method has shown to reduce duplicated tests and visits, ensure appropriate referrals to specialists, and maintain care at an optimal level for the patient. The clinical care protocols also guide the best interaction between local and external providers for optimal care path management.

### Preventive Care

Economists and health care administrators may argue that it is more expensive to provide preventive care than to pay for secondary interventions, but in these prison populations, that is not the case. It is less expensive to treat hypertension and other prevalent chronic conditions than to deal with strokes, heart attacks, and end-stage renal disease, which are the result of uncontrolled blood pressure, cholesterol, and blood sugar. The best practices system strives to provide early intervention and education to patients for all their health problems, following a "touch-and-tune" philosophy. In traditional medical settings, the expense of these additional visits is viewed as more costly. By applying the contained cost environment of telemedicine, this method produces benefits without driving up

costs and additionally produces cost avoidance since conditions are identified and treated before they escalate to more serious and costly care and hospitalizations.

### Informatics and Reporting

With the use of electronic medical record systems, the best practices system can operate ongoing health care data mining and analysis programs using the information created and managed in the system. These analyses allow real-time review of information for improving health care services administratively, as well as producing clinical outcomes data to ensuring quality health care. Informatics tools distribute these reports electronically to all levels of the organization, insuring effective communications for process improvement. Research shows that the best practices model using proven electronic information technologies can be applied to improve the quality and efficiency of health care, improve access to needed services, and produce shareholder value while fundamentally improving the practice of medicine. Appendices 5.1-5.3 provide examples of highly developed operational reporting structure for a contemporary correctional telemedicine program. These include a structure for accurate monitoring of telemedicine activities, a method for monitoring first available appointments by specialty, and a recording method that allows providers to record daily activities that incorporate causation tracking for failed visits.

### Converging Services

An important feature of the integrated telemedicine care model is the ability for a single clinic location to access a multiplicity of medical care services. By design, each location will have the ability to provide from a single clinic location:

1. Primary care services from a physician in family medicine and internal medicine.

*CDCR Telemedicine Assessment and Roadmap*

2. Psychiatry and related behavioral health services.

3. Specialty and sub-specialty medicine visits for assessments and follow up care.

It is the essential nature of the telemedicine portal that provides this flexibility – one moment the devices can be connected to primary care doctor, who then hangs up, allowing a cardiologist or other specialist to provide care for the next scheduled patient.

## Clinic Workflow

When the patient arrives at the clinic, a staff member registers the patient and takes vital signs. Instead of going into an examination room with the doctor, the patient goes into the exam room with a presenter and the telemedicine equipment to see the doctor. With the assistance of the presenter, the physician can examine the patient's eyes, ears, nose, throat, skin, and listen to the patient's heart. The verbal exchange between the patient and the physician is almost identical to what happens in a traditional face-to-face setting.[5]

The patient-side presenter uses mobile medical equipment, described earlier in this section. When fully equipped, the t-cart is a complete telemedicine system, with medical instrumentation and a versatile configuration to allow the system to be used in a number of environments with different pieces of equipment.

If the patient needs specialty care, the physician and clinic staff can schedule the care through the telemedicine clinic. After the patient is seen, the specialist contacts the primary care physician for consultation and approval of the treatment plan.

At the conclusion of each clinic visit, the physician uses technology tools to immediately document his or her opinions, write orders and prescriptions (with the benefit of feedback from clinical decision support systems and protocols), and update the electronic medical record system so that information is quickly available to those who need it.

Regular access to primary and specialty care enables patients with chronic diseases to manage their illnesses more effectively. This, in turn, leads to a reduction in unnecessary visits to emergency rooms and hospital stays, both of which result in significantly increased health care costs. Increased access to appropriate health care should enhance cost avoidance. Similarly, regular access to psychiatry services provides improved management of conditions and best management of patient medications. Specialty services are improved through improved follow-up management and prevention of unnecessary visits. As mentioned, the telemedicine clinic becomes a "one-stop shop" for doctor's-office visits, greatly increasing access to quality health care.

Like any other doctor's office, patients seen in the telemedicine clinics will require medications, specialized tests like x-rays, CT scans, and other medical procedures. The telemedicine system can interface with existing resources for these services through previously arranged referral relationships. The integrated system described above makes all the results of these tests quickly available as part of the EMR.

## Value to the Correctional Program

The "Virtual Physician's Office" and other components of the best practices system represents an innovative approach to health care that creates direct benefits for the recipient of care. They are also a means of survival in an industry that is caught between growing demand and shrinking resources. These technologies may require some cost outlays ini-

---

[5] Bulik RJ. Perspectives on the patient-provider relationship in primary-care telemedicine. *Telemedicine Journal and e-Health* 2004; 10(4): 466-8.

*CDCR Telemedicine Assessment and Roadmap*

tially, but they will save money by providing high quality primary care and specialist services to offenders and reductions in the salary-costs of the correctional officers previously needed as escorts. They also limit those officers' time away from their facilities, reducing staffing burdens. Further, they decrease trans-portation costs, which can be high if patients must travel more than a few hours for health care. Lastly, they make the provision of inmate health care safer for the community by reducing the need to transport inmates outside correctional facilities.

*CDCR Telemedicine Assessment and Roadmap*

# APPENDIX 4

## CALIFORNIA SITE VISITS SCHEDULE

**Core Team Members:**                        **Consultative Members:**

Dr. Glenn Hammack                             Dr. Eric Pan
Dr. Oscar Boultinghouse
Dr. Michael Davis
Dr. Alexander Vo
Mr. Mickey Bourdeau
Mr. Anthony Williams


**Scheduled Visits (preliminary):**

1.  **Kickoff:**      **Sacramento, CA**
                      **Date:** July 29 – August 1
                      May also visit UC Davis during this time
                      **Team**: Hammack, Boultinghouse, Davis, Vo, & Bourdeau


2.  **Facilities:**   **Pleasant Valley State Prison (high priority)**
                      **Date:** September 5 - 8
                      **Team:** All core team members and possibly a consultative member

                      **Avenal State Prison (medium priority)**
                      **Date:** Concurrent and following Pleasant Valley State Prison
                      **Team**: Hammack, Vo, Boultinghouse

                      **California Men's Colony (high priority)**
                      **Date:** Concurrent and following Avenal State Prison
                      **Team**: Hammack, Vo, Boultinghouse

                      **CSP Corcoran (high priority)**
                      **Date:** Concurrent and following Pleasant Valley
                      **Team**: Bourdeau, Davis, Williams

                      **Substance Abuse Treatment Facility and State Prison (low)**
                      **Date:** Concurrent and following CSP Corcoran
                      **Team**: Bourdeau, Davis, Williams

*CDCR Telemedicine Assessment and Roadmap*

3.   **Facilities:**

**California Correctional Institution (high)**
**Date:** September 17-19
**Team:** Hammack, Davis, Williams

**CSP Los Angeles County (high)**
**Date:** Concurrent and following California Correctional Institution
**Team:** Hammack, Davis, Williams

**Facilities:**

**California Institution for Men (high)**
**Date:** September 17-19
**Team:** Bourdeau, Vo, Boultinghouse

**California Institution for Women (low)**
**Date:** Concurrent and following CA Institution for Men
**Team:** Bourdeau, Vo, Boultinghouse

**California Rehabilitation Center (low)**
**Date:** Concurrent and following CA Institution for Women
**Team:** Bourdeau, Vo, Boultinghouse

# APPENDIX 5.1

## TELEMEDICINE ACTIVITY REPORT EXAMPLES

### Report of Telemedicine Visits by Prison Facility and Provider



### Report of Telemedicine Visit Discharge Types for a Particular Provider

| Start Date: 12/1/2007 | End Date: 12/31/2007 | |
|---|---|---|
| **DAVIS, MICHAEL** | | **220** |
| | | 18 |
| **ADMINISTRATIVE ERROR** | | 2 |
| **APPOINTMENT CANCELLED** | | 89 |
| **CLINIC CANCELLED** | | 7 |
| Conversion Data | | 4 |
| **DECEASED** | | 1 |
| **NO SHOW - OTHER** | | 16 |
| **NO SHOW - SECURITY** | | 1 |
| **PT. SEEN - RETURN TO CELL** | | 81 |
| **RELEASED FROM TDCJ** | | 1 |
| **Grand Total:** | | 1,844 |

**Report of Case Coding for a Particular Telemedicine Provider**

| FROM: 12/1/2007 | TO: 12/31/2007 |
|---|---|
| **BROOKS, BYRON** | **14** |
| BRIEF OFFICE VISIT (LEVEL 1) *COPAY* | 1 |
| CHRONIC CARE OFFICE VISIT | 2 |
| FOLLOW UP OFFICE VISIT | 1 |
| FSBS CHECK VISIT REQUEST/ORDER (DBBFCNBF) | 1 |
| INTERMED OFFICE VISIT - LEVEL 2 (NO COPAY) | 1 |
| INTERMED OFFICE VISIT (LEVEL 2) *COPAY* | 2 |
| NURSING CID VISIT | 1 |
| NURSING LEVEL 1 COMPLETE VISIT | 1 |
| PPD INJECTION REQUEST/ORDER (IP0IP1) | 3 |
| VACCINE INJECTION REQUEST/ORDER | 1 |

*CDCR Telemedicine Assessment and Roadmap*

# APPENDIX 5.2

# FIRST AVAILABLE APPOINTMENT MATRIX EXAMPLE

| SERVICE | 1ST AVAILABLE ON-SITE | 1ST AVAILABLE OFF-SITE | 1ST AVAILABLE TELEMEDICINE INTERNAL PROVIDER | 1ST AVAILABLE TELEMEDICINE EXTERNAL PROVIDER |
|---|---|---|---|---|
| Allergy | | | 5/22/07 | 5/24/07 |
| Audio | | | N/A | N/A |
| Cardiology | 10/2/07 | | 7/17/07 | 7/15/07 |
| Cardiothoracic Surgery | | | N/A | N/A |
| Dermatology | | | 6/6/07 | 6/4/07 |
| Endocrinology | | | 8/14/07 | 8/15/07 |
| ENT | | | 8/17/07 | 8/17/07 |
| Gastroenterology | | | 9/7/07 | 10/1/07 |
| General Medicine | | | CLOSED | 11/1/07 |
| General Surgery | | | 5/7/07 | 5/12/07 |
| Hematology | | | 7/2/07 | 7/8/07 |
| Immunology/Rheumatology | | | CLOSED | 6/24/07 |
| Infectious Disease | 5/16/07 | | N/A | N/A |
| Nephrology | | | 8/21/07 | 8/24/07 |
| Neurology | | | 7/28/07 | 7/30/07 |
| Neurosurgery | 1/1/00 | | 5/9/07 | 5/29/07 |
| Ophthalmology | | | N/A | N/A |
| Oral & Maxillary Surgery | | | 5/8/07 | 6/8/07 |
| Oral Surgery - Extractions | N/A | | N/A | N/A |
| Orthopedics | 5/7/07 | | 5/7/07 | 5/2/07 |
| Ortho - Hand | 6/12/07 | | 6/10/07 | 5/29/07 |
| Ortho - Foot | CLOSED 11/3/06 | | 8/9/07 | 8/9/07 |
| Ortho - Spine | 8/3/07 | | N/A | N/A |
| Plastic Surgery | | | 5/4/07 | 5/9/07 |
| Pulmonary | | | 6/21/07 | 6/29/07 |
| Urology | | | 7/6/07 | 7/15/07 |
| Vascular Surgery | | | 5/9/07 | 5/9/07 |
| END RENAL DISEASE | 5/21/07 | | 5/8/07 | 5/2/07 |
| HIGH RISK DIABETIC | 5/7/07 | | | |
| HEP C | | | | |

*CDCR Telemedicine Assessment and Roadmap*

# APPENDIX 5.3

## DAILY PROVIDER ACTIVITY SUMMARY EXAMPLE

| CARDIO | Tot. V.C. (the Day of) | V.C. Different Time (Provider) | V.C. Different Time (Facility) | V.N.S. Due to ? (Provider) | V.N.S. Due to ? (Facility) | N.S. Technical Problem (Provider) | N.S. Technical Problem (Facility) | Total Appointment Self-Bill | ADD-ON |
|---|---|---|---|---|---|---|---|---|---|
| Monday | | | | | | | | | |
| Tuesday | | | | | | | | | |
| Wednesday | | | | | | | | | |
| Thursday | | | | | | | | | |
| Friday | | | | | | | | | |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**N.S.= Not Seen**

**V.N.S.= Visits Not Seen**

**V.C= Visits Completed**