# EXHIBIT 9



December 31, 2007

Justin Graham, M.D.
Chief Medical Information Officer
California Prison Receivership Inc.
Sacramento, CA

Dear Justin:

Just Associates has recently finished the report for the Patient Identity Assessment that the California Prison Receivership Inc. contracted us to complete. A focal underpinning of such an assessment is to document the flow of medical record/clinical information throughout the treatment of a patient, in this case California state correctional system inmates.

As we complete the information flow analysis, we often spend a great deal of time with the Health Information Department staff to identify issues they encounter with timely and accurate transmission of health care information. This frequently uncovers unknown issues with patient identity accuracy and often provides evidence to troubleshoot the likely causes of patient identity and patient tracking issues.

As we have covered in our report, JA identified several critical and debilitating problems in the management of health information and we believed we would be remise if we did not summarize these issues for you and provide you with our thoughts relative to HIM strategies for improvement. As you know, the medical record is currently all paper based, and moving toward an electronic health record requires strong leadership in the HIM arena.

Attached is an excerpt of our report relative to HIM findings as background to this letter.

Several key HIM strategies are suggested for CPR consideration. They include:
1. **HIM Leadership:** Strong leadership will be required in HIM to facilitate the transition from a paper-based medical record to an electronic health record. A Director level position in CPR would be appropriate and contracting for this position while recruitment occurs should be considered. Experienced and credentialed HIM professionals will be required to re-engineer operational processes and orchestrate plans for the future. This is probably the most critical step CPR could make relative to HIM and the transition to automation.
2. **Shift from "Medical Records" to "Health Information Management":** The knowledge and skills that a strong HIM Leader will provide to CPR is that of

understanding the process of data and information capture at each point in the care continuum and how to most effectively transmit and display needed health information to each practitioner. Recruitment of HIM leaders should focus on identifying individuals that understand the concept of most effectively managing and utilizing health information and technology in support of patient care and operations.

3. **Best Practices:** Again, a strong HIM Leader will be able to set goals for implementation of HIM best practices and should provide the roadmap and interim steps required to make operational changes designed with HIM best practices in mind. Best practices relative to record retention, storage, retrieval, release of information, filing, chart deficiency, coding, abstracting, scanning and forms management need development using industry available best practices with modification for the correctional environment.

4. **Procedure Development:** Lack of standardized and well documented procedures for most of the HIM related tasks is rampant. All new staff are trained by other clerical employee creating even greater inconsistencies in processes. CPR's employment of experienced, credentialed HIM managers/consultants to scope, develop and write standardized procedures is needed. These HIM managers should then retrain all staff in each prison.

5. **Staff Training:** As more of the medical record becomes automated, higher skill levels will be required for staff supporting HIM. This is a strategic imperative that should be addressed as early as possible.

6. **Volume and Production Tracking:** Development of methodologies to track incoming workload and production completed is needed. There is very little of this occurring at present, and again, what was observed was inconsistent. There has been a significant number of additional HIM staff hired and it is not clear whether the added staff are making as significant of headway as maybe could be accomplished.

7. **HIM Automation:** At minimum, three HIM information systems will be required to augment the automation of the medical record. These include
   a. **Document Management:** A document management strategy should be considered soon to enable scanning and indexing of key components/reports in the medical record for current inmates. Making these key documents available to TTAs and clinics inside each prison would reduce paperwork and medical record movements significantly.
   b. **Chart tracking:** Implementing one chart tracking system and standardizing on one bar-code method will also significantly improve efficiency in R&R, clinics and TTAs, not only in HIM.
   c. **Chart Deficiency Analysis:** A centralized system to allow the tracking of key documentation components that are not present in the patient's record and to facilitate online completion by the provider of deficiencies identified. (This needs to be coordinated with the Document Management strategy.
   d. **Disease Registries/Chart Abstracting:** A centralized database, enabling tracking of critical "chronos" (consistently from prison to prison), chronic and communicable diseases is strongly recommended. Evaluation of the coding and classification system that should be used is

needed. These registry and abstracting systems exist in many fragmented databases, so compiling the requirements for these should be attainable. Feeding this data into the CDR should be considered regardless of the data capture methodology.

8. **MPI/Registration/Inmate Tracking (Bed Management)/Scheduling System(s):** Without these foundational, enterprise-wide applications, many of the patient care and HIM related improvements will be nearly impossible.
9. **Data and Data Flow Requirements:** The California prison system has many standard patient/clinical data requirements; however it also has many unique data requirements. Defining the standard and custom data requirements for patient identity, inmate location and health status/care needs should be accomplished quickly to ensure any automated medical or clinical applications acquired by CPR are able to support the unique characteristics of correctional facility based health care.
10. **Conduct Privacy and Security Assessment:** The privacy and security of the various data points to be captured will need to be considered as the data capture system and storage requirements are defined. For instance, understanding physical security issues for an inmate when attempting to schedule a clinic visit or outside specialty appointment is critical. Allowing clinical information to be readily available to clinicians "behind the wall" is highly needed, but must be protected to ensure correctional staff are not allowed access to the inmate's electronic health record or data. How correctional security data is captured and stored for health care staff use must be architected carefully. And how much clinical information correctional staff are allowed access to must also be carefully defined.

Centralized dictation and transcription is not addressed as this initiative is already underway in the CPR.

Justin, these were some of the high level observations we made that were related to HIM. Each of them requires additional focused attention and there are likely areas we did not cover or catch as we weren't focusing on HIM during our assessment.

Please feel free to comment and question!

Respectfully,


Beth Haenke Just, MBA, RHIA

## HIM Overview

The Health Information Management departments (HIM) share similar functions across all the visited facilities. Core services include Unit Health Record (UHR) retrievals for patient care, UHR transfers for inmates being transferred either in and out of the institutions, release of information, loose sheet filing, coding & census for inpatient and specific outpatient treatment units and transcription of either dictated physician reports or "chronos". Although an evaluation of the HIM functions was not the primary purpose of the consulting visit, the basic functions performed by members of this department are impacted greatly by proper identification of both the inmates and the reports contained within the Unit Health Record. Inmate or patient identification is a core building block of the existing systems, tools and processes used to provide HIM services to the institution.

Every department uses DDPS and OBIS, although access in some is quite limited with only one workstation with these programs available to the entire department. In addition Lanier dictation and CADDIS (Census and Discharge Date Information System) were used consistently, although what was tracked in CADDIS varied from prison to prison. There were two chart tracking systems observed, MEDCATS and CRIS (Complete Integrated Record System), although not all of the prisons had a chart tracking system. Both MEDCATS and CRIS include barcodes for the UHR, however it is not clear if the barcode labels are standardized so that they may be interchangeably read. The MIMAS system (Medical Writing & Chrono Tracking System) was used in two of the HIM departments to assist with chrono tracking. Although MIMAS is a helpful tool to track basic information regarding the inmates, each workstation is stand-alone so that the data contained does not link to another MIMAS workstation and is viewable to just one individual at a time. MIMAS is synchronized daily with DDPS, as are MEDCATS and CRIS. At CSP Sac, MEDCATS is updated via ARTS which has been synchronized with DDPS. CADDIS information is manually entered.

The UHR is filed in a color-coded folder in modified terminal digit order using the CDC# as the medical record number. The last two number of the CDC# are color-coded and provide the first grouping of numbers, and then the records are filed in alpha/numeric order. Records of inmates currently in residence are supposed to be located onsite. When records are missing, research must be completed in OBIS to determine where the inmate was previously housed and the records requested from that location. The outpatient and clinic record is kept separately from what is considered an "inpatient" record and identified by a different type of folder. While the UHR travels with the inmate to his new location, the "inpatient" record remains at the treating facility. This would appear to create an issue with continuity of care from one facility to the next, although portions of this record are copied and placed in the UHR. Records of inmates who have been paroled or who have fully completed the terms of their sentence and have been discharged are sent to the Army Depot Health Record storage. The records of inmates who die while incarcerated are kept locally for a period up to 10 years. Copies of these records are created and sent to Sacramento for review. The death records are housed onsite so that they are available for any legal proceedings regarding this inmate.

Staffing of the HIM departments was comprised of Health Record Technicians I and II, Medical Transcriptionists (although this position goes by the term Medical Transcriber which actually describes the machine used for transcription purposes, not the individual performing the task), and Office Assistants and Technicians. During the assessment just two professionally credentialed HIM staff, both RHIT (Registered Health Information Technician-two year degreed individuals) were encountered. No RHIAs (Registered Health Information Administrator-4 year degree) were identified as being employed by CDCR. These individuals may have been considered Health Record Technician III. Coding staff members questioned indicated previous experience at local medical facilities or background in the medical billing industry. Salary levels for HIM staff members start at ~$25,000 per year and top out for the highest classification at slightly over $53,000. These salary levels are dramatically lower than comparable salaries within the local medial communities, especially for the technical and management positions.

A well thought through strategy for document management is needed. While scanning all of the old charts would be ill advised, a 'go forward' strategy needs some prompt consideration. There is evidence of the use of many common forms across facilities, which is a good starting point that many hospital systems lack when beginning an imaging project. There is however, a proliferation of non-standard forms in use that have been created to address facility unique needs or in answer to needs created by the various healthcare lawsuits. Bar-coding of forms is a logical step that reduces the need for manual indexing. A policy to image and make available via the network pertinent documents from the UHR as an inmate returns from parole or has a new incarceration would certainly improve availability of historical medical information to caregivers.

### ICD-9 CM Coding & Census
All the correctional facilities were consistent in using the CADDIS system both to track inmates who were housed in the inpatient and outpatient treatment units within the facilities as well as those who had been admitted as an inpatient to a medical facility outside the prison. CADDIS is an MS Access database. Inmate information is manually input into the database by HIM staff. The census of each unit is tracked as a separate entity. When an inmate is transferred between treatment units, he is discharged from one and admitted to the second. There was inconsistency with the way inmates who were sent to the community Emergency Department were recorded. At one facility, the consultants were informed that whenever an inmate was absent from the treatment unit at midnight, they were considered discharged and had to be readmitted when they returned. A second facility indicated that if the inmate returned to the original unit from the outside ED by the next morning that a unit discharge was not done.

Routine ICD9 coding was done at all locations, however the information coded and the methodology used to arrive at the codes was very inconsistent. One institution indicated that they coded the admission diagnosis; another indicated the discharge diagnosis was used. Some enter just one code; others code every diagnosis available

to them. All of the facilities appear to be using out-dated ICD9 coding books. One facility was using a 1999 edition, with the most recent edition seen still a couple of years out of date.

It was difficult to understand the purpose of the ICD9 coding that is in place. The consultants were informed that the facilities code the visits to the community facilities and that this information is provided via a download from CADDIS to the HCCUP (Health Care Cost Utilization Program) and the information is used to validate the bills from the community facilities prior to payment. It was not understood how the coded data from the internal treatment units was used, nor by whom. If the data is aggregated at the Sacramento location, its validity must be questioned for the following reasons:
1. Coding practices are not consistent from facility to facility;
2. Coding is completed by staff with minimal or no coding credentials;
3. Coding resources are outdated;
4. Coding is completed only for a small portion of the prison population, negating the ability to use the coded data for disease tracking and monitoring for the larger population.

Upon questioning HIM staff regarding a Master Patient Index in one institution, the staff member responsible for coding indicated that a manual index was kept on 3x5 index cards that contained pertinent information for this inmate and each treatment episode. The card were completed by hand and stored in a small filing cabinet. Another institution indicated that they used DDPS as the MPI while a third indicated that the MPI could be printed directly from CADDIS. Unfortunately, when he attempted to do this at our request, he was unable to produce the report successfully.

**Transcription**
While all the facilities visited have a Lanier dictation system, the technology varied greatly in age and also in the way it was used by the physicians. Documents are transcribed using MS Word. The general impression is that transcription is staffed, but not fully utilized. Few reports were routinely dictated by the medical staff, with some of the most frequent dictators being outside clinicians who are brought in for the specialty clinics. Some of the HIM department managers are attempting to increase utilization by educating the medical staff regarding the available services. When questioned about his use of the dictation system, one medical staff member related that it was his perception it would take too long to find a phone (one wasn't readily available in the treatment room), dictate the report, wait for the results to be typed, review it for accuracy, sign it and then send it to be filed in the medical record. It was more efficient to simply write the pertinent information in the patient's UHR at the time they were being treated. It is clear that promoting use of a dictation system will require a carefully planned approach that takes these barriers into consideration.

At two sites, the medical transcriptionists were responsible for typing chronos into MIMAS (Medical Writing and Chrono Tracking System). MIMAS is again an MS Access database. Information from the various types of Chronos are typed into MIMAS which then serves as a secondary repository for this information. The information contained

on chronos are used daily by many various correctional facility staff, both medical and custody. Unfortunately, while this information is stored electronically, it is retrievable ONLY at the workstation used to input it as the system is not networked. When asked regarding the purpose of the value of using MIMAS when it was not accessible throughout the institution, the consultants were told that its use saves time as the department receives many telephone calls requesting the information stored in this system. It is less time consuming and generally more successful to look it up in the system than to try to find the physical UHR and retrieve the information from the hand-written chrono. MIMAS was also used at VSWP to track obstetrical patients. Tracking was very manual and required re-entry of data when the inmate was transferred to a community medical facility for some portion of their care and then returned to VSWP.

It is noted that CPR is investigating improving transcription services by centralizing this function. The change to centralized dictation is non-trivial. It represents a significant change in terms of the relationship between the providers and the transcriptionists. The face-to-face communication and personal familiarity that was once the norm will quickly become a thing of the past. This has been a short term dis-satisfier with other organizations that have gone through the same transition. A strong communication plan coupled with a "help desk" function will be critical to the success of the transition.

### Locater Systems
As with other HIM functions, the tools used to assist with chart location are varied across the six institutions visited. There are three automated locater tools used: CRIS (Complete Integrated Record System) used at CMF, MEDCATS used at CSP SAC, VSWP and Wasco, and C-File Tracking (used by the Army Depot Health Record Center). The other two facilities, Folsom and DVI did not have an automated tracking system, but relied on manual outguide systems for record location. Both CRIS and MEDCATS use bar-coding technology, however it is unknown if the barcodes are compatible. Chart location could certainly be simplified by using standard technology along with an integrated state-wide system. It is also logical to consider standardizing the barcode technology so that the codes are compatible with the system used by the Central Records Department to track the C-files, CRAFTS (Case Record Automated File Tracking System).

### Loose Sheet Filing
Keeping up with loose sheet filing has traditionally been the bane of HIM departments throughout the nation. The correctional system is no different in this regard, except for the lack of technologically advanced tools that eliminate the need for filing. Although not a primary objective of this engagement, inquiries were made regarding the volume of loose filing as this impacts delivery of care to a specific individual. Most of the departments had some sort of backlog, and were taking steps to reduce the volume. The process at VSWP in particular demonstrated innovative thinking. At this facility, those dropping off loose sheets to be filed were asked to place them in the proper terminal digit grouping – CDC#s ending 00-09 went in one bin, those ending in 10-19 in a second bin, etc. This initial sorting enables those filing to eliminate one step in their process. Common issues shared across the facilities include:

- Volume of incoming loose filing ranged from minimal to 4 feet per day. Routine volume statistics were unavailable, although some facilities were attempting to capture this important information.
- Receipt of large volumes of filing from areas that provide this information monthly.
- Lack of adequate identifier information on the loose sheet to find the correct inmate.
- Receipt of loose filing after the UHR has been transferred to another location.
- Inability to locate the UHR that should be onsite.
- Receipt of reports that belong in the C-file.

The transitory nature of the UHR contributes to the loose filing backlog, especially at the reception centers where most inmates are transferred to their mainline facility within 90 days. The backlog problem is clearly demonstrated when one looks at the history of the DORM (Discharge Offenders Record Management) system. This large scale project to image inmates' records originally included plans to image the Unit Health Record. While the scanning of UHR related documents has now been halted, approximately ~6.5M loose sheets were scanned into the system, dating back to the early 1990s. This effort was apparently undertaken as a first step in the imaging process and was to match the huge volume of loose sheets sent to the North and South storage areas with the appropriate inmates' records. Unfortunately, the lack of appropriate identifying information on the documents, including the inmate's key identifiers as well as the form identifiers resulted in minimal benefit to the delivery of healthcare. While an imaging system for the UHR likely would be a viable part of future plans for an EHR, the implementation would need to include the ability to scan current, pertinent documents from the UHR so that they are immediately available to caregivers at a different location.

**Health Information Management Issues**
As with the scheduling area, many of the issues common to the HIM departments center on lack of connected data and the tools with which the employees work.

- Lack of integration of the departmental computer applications causes the need for many more manual processes to be used.
- Inability to access the core systems DDPS and OBIS due to limited workstation with these programs installed.
- Small number of professionally credentialed staff means that best practices of the profession are not in common use.
- References for ICD-9 coding range in date from 1999 through 2005 editions.
- Data collection via CADDIS that has little benefit to the organization while important epidemiological issues such as chronic disease tracking are ignored.
- Severe lack of space in some institutions for HIM functions
- The practice of keeping the UHR separate from designate outpatient and inpatient treatment area records is questionable from a continuity of care perspective.

The current record retention practice of keeping hardcopy UHR volumes stored onsite at the location of the inmate puts significant demand on already crowded office space.

This contributes to less than optimal working conditions and, no doubt, contributes to high staff turnover. For example, at VSPW the active UHR's are kept in the filing area in a designated filing space. The older volumes for current inmates are kept at the other end of the department in what was once office space. Similar practices were observed a several facilities. The scanning and subsequent destruction of inactive volumes could free up significant space. There would be immediate benefits including improved working conditions for staff and reduced demands for capital construction.