1  PRISON LAW OFFICE
   DONALD SPECTER, Bar No. 83925
2  STEVEN FAMA, Bar No. 99641
   E. IVAN TRUJILLO, Bar No. 228790
3  General Delivery
   San Quentin, California  94964
4  Telephone: (415) 457-9144

5  ROSEN, BIEN & GALVAN, LLP
   MICHAEL W. BIEN, Bar No. 96891
6  JANE E. KAHN, Bar No. 112239
   AMY WHELAN, Bar No. 215675
7  LORI RIFKIN, Bar No. 244081
   SARAH M. LAUBACH, Bar No. 240526
8  315 Montgomery Street, 10th Floor
   San Francisco, California  94104
9  Telephone: (415) 433-6830

10 THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
11 CLAUDIA CENTER, Bar No. 158255
   600 Harrison Street, Suite 120
12 San Francisco, CA 94107
   Telephone:  (415) 864-8848

13

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF, Bar No. 36377
701 Fifth Avenue
Seattle, Washington  98104
Telephone: (206) 447-0900

KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone:  (415) 882-8200

Attorneys for Plaintiffs

14
15
16
17
18

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., | ) No.:  Civ S 90-0520 LKK-JFM P |
| Plaintiffs, | ) **THREE-JUDGE COURT** |
| vs. | ) |
| ARNOLD SCHWARZENEGGER, et al., | ) |
| Defendants | ) |
| MARCIANO PLATA ,et al., | ) No. C01-1351 TEH |
| Plaintiffs, | ) **THREE-JUDGE COURT** |
| vs. | ) |
| ARNOLD SCHWARZENEGGER, et al., | ) **DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF THE OFFICE OF INSPECTOR GENERAL'S UNREDACTED REPORT RE: SCOTT THOMAS** |
| vs. | ) |
| Defendants | ) |

I, Michael W. Bien, declare:

1.    I am a member of the Bar of this Court and a partner in the law firm Rosen, Bien & Galvan, LLP, one of the counsel of record for the *Coleman* Plaintiff class in this case. I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify.  I make this declaration in support of Plaintiffs' Motion to Compel Production of the Office of Inspector General's Unredacted Report Re: Scott Thomas.

2.    On October 31, 2007, Inspector General Matthew Cate issued a letter to CDCR Secretary Tilton enclosing a report detailing the results of the Office of Inspector General's ("OIG") investigation into the California State Prison, San Quentin's release of inmate Scott Thomas to parole on May 18, 2007.  The letter indicates that the OIG created two versions of the Thomas report:  an unredacted version, containing details regarding Thomas's medical and mental health care while in prison, and a redacted version, omitting that information.  A true and correct copy of the letter and accompanying redacted report is attached hereto as Exhibit A.

3.    In a telephone conversation on November 1, 2007, Inspector General Cate told me that the confidential Thomas report had been provided to Governor Schwarzenegger and Secretary Tilton, both of whom are defendants in this action, as well as to the *Plata* Receiver and the *Plata* Court.  That same day, an attorney at my office, Holly Baldwin, wrote Inspector General Cate and formally requested a copy of the unredacted report, promising to keep it confidential pursuant to existing protective orders.  A true and correct copy of the letter is attached hereto as Exhibit B.  On November 8, 2007, I spoke with Barbara Sheldon, Chief Counsel for the OIG, who indicated that she would not provide the confidential report to Plaintiffs without a court order.

4.    During multiple meet and confer sessions in the last few months, we have also repeatedly asked Defendants to produce the unredacted report, as it is responsive to a multiple pending discovery requests.  Despite the fact that they are obligated to provide Plaintiffs with the confidential report under Federal Rule of Civil Procedure 34(a), Defendants' have

repeatedly refused to produce the document. Defendants repeatedly suggested that any privilege "is the OIG's to waive," and that we should proceed with a motion against the OIG to obtain the unredacted report. Based on a careful review done at my direction, I am informed and believe that Defendants have not listed the confidential Thomas report on their privilege logs. I most recently raised this issue with Defendants' counsel Lisa Tillman in a telephone conference on April 16, 2008. She again stated that it was Defendants' position that only the OIG had the authority to release the confidential report, and that the Governor and the CDCR, if they had the confidential report, would not produce it.

I declare under penalty of perjury under the laws of California and the United States that the foregoing is true and correct, and that this declaration is executed this 18th day of April 2008 in San Francisco, California.

*/s/ Michael W. Bien*
Michael W. Bien

200476_1

DECL. OF MICHAEL W. BIEN IN SUPPORT OF PLS.' MOT. TO COMPEL PRODUCTION OF THE OIG'S
UNREDACTED REPORT RE: SCOTT THOMAS, Nos.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

# EXHIBIT A

# OFFICE OF THE INSPECTOR GENERAL

## MATTHEW L. CATE, INSPECTOR GENERAL



### SPECIAL REVIEW INTO THE
### CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION'S
### RELEASE OF INMATE SCOTT THOMAS

**OCTOBER 2007**

**STATE OF CALIFORNIA**



*Matthew L. Cate, Inspector General*                                        *Office of the Inspector General*

October 31, 2007

James E. Tilton, Secretary
California Department of Corrections and Rehabilitation
1515 S Street, Room 502 South
Sacramento, California 95814

Dear Mr. Tilton:

The enclosed report presents the results of a special review into the California State Prison, San Quentin's release of inmate Scott Thomas to parole on May 18, 2007. We are issuing a confidential report and a public report related to this special review. The confidential report contains personal health care information protected from public disclosure by various state and federal privacy laws. The Office of the Inspector General has redacted this information from the public report.

The special review revealed that a series of mistakes, oversights, and failures to follow California Department of Corrections and Rehabilitation policy resulted in California State Prison, San Quentin staff failing to identify and treat inmate Scott Thomas's needs while incarcerated, as well as improperly releasing inmate Thomas to parole on May 18, 2007. The day after San Quentin staff released Thomas on parole he allegedly entered a San Francisco bakery and stabbed a 15-year-old girl and a man who came to her aid. The Office of the Inspector General cannot determine if Thomas would have ultimately committed a similar act upon his release even if San Quentin staff had acted appropriately in all instances during Thomas's period of incarceration and release. However, appropriate action by prison staff and closer parole supervision might have had an impact on Thomas's actions—including his alleged decision to assault two people with a knife—after he paroled.

The Office of the Inspector General has made 21 recommendations as a result of this special review. Eight of these recommendations appear in this public report; the Office of the Inspector General has redacted the 13 other recommendations because of their confidential nature. The department's response appears as an attachment to the report.

Thank you for the courtesy and cooperation extended to my staff during this special review.

Sincerely,

*Matthew L. Cate*

MATTHEW L. CATE
Inspector General

Enclosure

*Arnold Schwarzenegger, Governor*

# CONTENTS

EXECUTIVE SUMMARY ------------------------------------------------------------------1

INTRODUCTION -----------------------------------------------------------------------3

    BACKGROUND -----------------------------------------------------------------3

    OBJECTIVES, SCOPE, AND METHODOLOGY -------------------------------------5

FINDINGS AND RECOMMENDATIONS

    FINDING 1------------------------------------------------------------------7

        *[This finding is based upon specific health care information for
Thomas. The Office of the Inspector General removed the text of
this finding to comply with state and federal privacy laws.]*

    FINDING 2------------------------------------------------------------------8

        *[This finding is based upon specific health care information for
Thomas. The Office of the Inspector General removed the text of
this finding to comply with state and federal privacy laws.]*

    FINDING 3------------------------------------------------------------------9

        *San Quentin case records and counseling staff incorrectly
identified inmate Scott Thomas as the subject of a warrant and
inappropriately released him to the custody of the Alameda
County Sheriff's Office.*

    FINDING 4----------------------------------------------------------------- 13

        *Despite Division of Adult Parole Operations and San Quentin
staff's failure to follow department procedures, the prison
reception center's correctional counselor III should have known
state law prohibited Scott Thomas's release on a Friday.*

    FINDING 5----------------------------------------------------------------- 17

        *The correctional counselor III did not follow department
procedures when he paroled Scott Thomas from security
housing.*

    RESPONSE OF THE DEPARTMENT OF CORRECTIONS AND REHABILITATION --------------------- 20

# EXECUTIVE SUMMARY

A series of mistakes, oversights, and failures to follow California Department of Corrections and Rehabilitation policy resulted in California State Prison, San Quentin staff *[confidential text removed]*[*] improperly releasing inmate Scott Thomas on parole on May 18, 2007. The day after San Quentin staff released Thomas on parole, he allegedly entered a San Francisco bakery and stabbed a 15-year-old girl and a man who came to her aid. The Office of the Inspector General cannot determine if Thomas would have ultimately committed a similar act upon his release even if San Quentin staff had acted appropriately in all instances during Thomas's period of incarceration and release. However, *[confidential text removed]* and closer parole supervision may have had an impact on Thomas's actions—including his alleged decision to assault two people with a knife—after he paroled.

*[Two paragraphs of confidential text removed.]*

In addition, San Quentin staff's mistakes and the staff's failure to follow policy resulted in the improper release of Thomas. Soon after Thomas had been admitted to San Quentin for violating the terms of his parole, San Quentin staff mistakenly identified Thomas as the subject of an arrest warrant from nearby Alameda County. Although Thomas was of a different race, 16 years younger, and 40 pounds lighter than the actual subject of the warrant—who was ***Steven*** Thomas—the San Quentin analyst processing the warrant mistakenly placed a parole hold on inmate Scott Thomas—meaning that when Thomas had completed his incarceration term at San Quentin, he would be turned over to Alameda County to face the charges covered by the warrant. On May 18, San Quentin staff determined that Thomas had completed his term of incarceration and released him to the custody of the Alameda County Sheriff. The Alameda County Sheriff's Office determined that Scott Thomas was not the person identified in its warrant and returned him to the custody of San Quentin the same day.

San Quentin staff then improperly released Thomas in the nearby community. In 2002, the department designated Thomas as "high control"—meaning that department staff needed to apply additional precautions when the inmate was paroled. State law prohibits the department from releasing inmates with this designation on certain days, including Fridays, so that the inmate's parole agent can provide close supervision upon release. Nonetheless, San Quentin staff failed to identify this designation, and they released Thomas to parole on Friday, May 18, 2007.

Thomas's parole agent contributed to the improper release of Thomas. Department policy requires a parole agent to inform an institution 30 days before releasing a high-control inmate of the parole division's plans and reporting instructions for the inmate.

---

[*] The Office of the Inspector General issued a confidential report and a public report related to the special review. Personal health care information protected from public disclosure by various state and federal privacy laws was redacted from the public report.

However, Thomas's parole agent from the Los Angeles area did not complete this notification. Had the parole agent notified San Quentin of the inmate's high-control status as required, San Quentin staff might have released Thomas appropriately.

Nevertheless, the correctional counselor III who authorized the release of Thomas failed to identify notices in Thomas's file clearly indicating his high-control status, as well as other information that should have prohibited his decision to release Thomas on May 18 to the nearby community. When the Office of the Inspector General reviewed Thomas's file, inspectors found several prominent documents that identified Thomas as a high-control inmate. Had the correctional counselor III performed an appropriate review of the file before he authorized Thomas's release, he should have identified this information and delayed the inmate's release.

Further, the correctional counselor III incorrectly concluded that a department policy requiring the institution to release Thomas to the custody of a parole agent because he was paroled from segregated housing did not apply. When he was released, Thomas was serving a security housing unit term, a type of segregated housing, scheduled to end on May 26—eight days after his release. Therefore, San Quentin staff should have either transferred Thomas to an institution in southern California to facilitate his release directly to a parole agent or arranged for a parole agent to travel to San Quentin to take custody of Thomas. According to the correctional counselor III, he believed that San Quentin had no authority to subject Thomas to the terms of this policy because the Institutional Classification Committee failed to properly review Thomas's security housing term. However, when Office of the Inspector General inspectors presented the policy to the correctional counselor III, he agreed that the policy did apply to Thomas. Had the correctional counselor III properly identified Thomas as a security housing unit inmate, Thomas would have been released to the custody of a parole agent instead of being paroled to the nearby community.

In sum, Thomas should have *[confidential text removed]* and should have been released directly to a parole agent for close supervision. Instead, due to a series of mistakes and failures to follow policy, he was released *[confidential text removed]* directly to the streets and allegedly stabbed two innocent victims the next day. It is impossible to know whether *[confidential text removed]* and close parole supervision would have prevented this tragedy. Nonetheless, it is vital that the department take steps to address the problems identified in this report before the next opportunity to avert a tragedy is lost.

The Office of the Inspector General has made 21 recommendations as a result of this special review. Eight of these recommendations appear in this public report; the Office of the Inspector General has redacted the 13 other recommendations due to their confidential nature.

# INTRODUCTION

This report presents the results of a special review into the California State Prison, San Quentin's release of inmate Scott Thomas to parole on May 18, 2007. The Office of the Inspector General issued a confidential report and a public report related to this special review. The confidential report contains personal health care information protected from public disclosure by various state and federal privacy laws and was issued only to the governor's office, the California Prison Health Care Receivership Corporation, and officials from the Department of Corrections and Rehabilitation. This personal health care information was redacted from the public report.

The Office of the Inspector General conducted this review under the authority of California Penal Code section 6126, which assigns the Office of the Inspector General responsibility for oversight of the California Department of Corrections and Rehabilitation. The Office of the Inspector General performed the review from May 30, 2007, through September 12, 2007.

## BACKGROUND

At approximately 4:00 p.m. on Saturday, May 19, 2007, Scott Chris Thomas—a parolee released from San Quentin the previous day—entered a San Francisco bakery and allegedly assaulted a 15-year-old girl, stabbing her with a knife multiple times in the throat, wrist, legs, and stomach. Thomas also allegedly stabbed a 60-year-old male bakery patron who intervened. Thomas reportedly fled the scene of the attack, and police subsequently arrested him in the parking lot of a nearby hospital. *[confidential text removed]*

***Thomas was last released on parole from California State Prison, San Quentin.*** The prison includes a reception center where it screens approximately 75 to 100 new inmates per day and reviews their medical and mental health histories. San Quentin refers about 25 percent of these inmates for a further, more comprehensive, psychological evaluation. San Quentin has two case records units, one for its reception center and another for its other housing units. The case records units perform a variety of activities including receiving, maintaining, interpreting, and disposing of inmate and parolee records. The units are responsible for computing discharge dates and preparing forms for parole and discharge of persons under the department's jurisdiction. The units each have a correctional counselor III who oversee correctional counselor IIs, case records managers, case records supervisors, and case records analysts.

***Thomas had a seven-year history with the department.*** The department first admitted Thomas to state prison from Los Angeles County in October 2000 at the age of 20. Although Thomas's initial incarceration was for grand theft auto and hit-and-run, his subsequent crimes were non-violent, including petty theft, grand theft, and vandalism. Table 1 below shows that between October 2000 and January 2007, the department admitted Thomas to state prison nine times, including three stays at San Quentin

totaling 11 months. Department records show that while incarcerated, the department disciplined Thomas numerous times for various offenses, including batteries on peace officers, assaults on other inmates, and violent threats toward inmates.

**TABLE 1**
**CUSTODY HISTORY FOR INMATE SCOTT CHRIS THOMAS**

| | Type of Offense | Date Incarcerated * | Parole Date | Length of Incarceration (in months) | Location (see legend below) |
|---|---|---|---|---|---|
| 1 | Grand Theft Auto, Hit-and-Run | October 23, 2000 | April 15, 2001 | 6 | WSP, SCC, LAC |
| 2 | Parole Violation | May 24, 2001 | July 24, 2001 | 2 | WSP |
| 3 | Grand Theft | February 7, 2002 | December 12, 2002 | 10 | NKSP |
| 4 | Parole Violation | January 24, 2003 | August 25, 2003 | 7 | DVI, CIM |
| 5 | Parole Violation | June 3, 2004 | October 14, 2004 | 4 | SQ |
| 6 | Parole Violation | April 13, 2005 | July 25, 2005 | 3 | SQ |
| 7 | Parole Violation | August 4, 2005 | September 6, 2005 | 1 | HDSP, NKSP, CIM |
| 8 | Petty Theft, Vandalism | November 9, 2005 | December 20, 2006 | 14 | NKSP, COR, WSP, LAC |
| 9 | Parole Violation | January 25, 2007 | May 18, 2007 | 4 | SQ |

** In some instances, the date shown is the date of formal parole revocation. In these instances, the inmate was incarcerated for a short period prior to revocation pending the Board of Parole Hearings revocation hearing.*

**Location Legend**:
**CIM** – California Institution for Men
**COR** – California State Prison, Corcoran
**DVI** – Deuel Vocational Institute
**HDSP** – High Desert State Prison
**LAC** – California State Prison, Los Angeles County
**NKSP** – North Kern State Prison
**SCC** – Sierra Conservation Center
**SQ** – California State Prison, San Quentin
**WSP** – Wasco State Prison

*[Five paragraphs and Table 2 containing confidential text removed.]*

***The Division of Adult Parole Operations supervises inmates when released from prison.*** When inmates have completed their terms of incarceration, the department generally releases them to parole in the county from which they were initially committed. The *Department of Corrections and Rehabilitation Operations Manual* describes parole as a critical period in the life of an offender and adds that the parole agent plays a key role in maintaining community protection as the parolee makes a favorable transition to society.

As an inmate approaches his or her parole date, department policy requires department staff from both the institution and the department's Division of Adult Parole Operations to perform a series of reviews to ensure that the inmate receives the appropriate level of supervision when released. Parole agents and parole unit supervisors from the Division of Adult Parole Operations determine the appropriate level of supervision for an inmate nearing parole. Department policy requires the assigned parole agent to develop a parole plan for each parolee that specifies factors such as employment, residence,

special conditions, anti-narcotic testing patterns and compliance, and response to supervision. There are four categories of supervision, as shown in Table 3.

**TABLE 3**
**PAROLE CONTACTS REQUIRED FOR DIFFERENT CATEGORIES OF SUPERVISION**

| Supervision Level | Face-to-Face Contact | Face-to-Face contact at Residence | Collateral Contacts | Reporting |
|---|---|---|---|---|
| Minimum Supervision | No requirement | Within 30 days of release or assignment | No requirement | Parolee submits monthly reports |
| Control/Services | On first working day after release and twice each quarter thereafter | Within 15 days of release and once each quarter thereafter | No requirement | No requirement |
| High Services | On first working day after release and once every 30 days thereafter | Within seven working days of release and once every 30 days thereafter | Two every 30 days after release | No requirement |
| High Control | On first working day after release and once every 30 days thereafter | Within seven working days of release and once every 30 days thereafter | Two every 30 days after release | No requirement |

The department's operations manual requires parole agents to inform an institution of an inmate's release plans and reporting instructions at least 30 days before the inmate's release date. When an inmate is ready to parole, the department's operations manual requires institution staff to verify the release information on the inmate's checkout order and supervisory staff to approve the order before the inmate's release.

*[One paragraph of confidential text removed.]*

When a parolee violates a term of his or her parole, the department may move to revoke parole through a revocation hearing held by the Board of Parole Hearings. When the board revokes parole, the department returns the parolee to a state institution for the incarceration period the board indicates in its revocation order.

## OBJECTIVES, SCOPE, AND METHODOLOGY

The purpose of this special review was to assess whether California State Prison, San Quentin followed established policies and procedures in identifying and treating Thomas's *[confidential text removed]* condition and in subsequently releasing Thomas on parole. During the course of the special review, the Office of the Inspector General performed the following procedures:

- Reviewed various laws, policies and procedures, and other criteria related to the department's *[confidential text removed]* treatment and inmate records, as well as parole systems, functions, and processes.

- Interviewed *[confidential text removed]* staff at San Quentin, including the chief *[confidential text removed]*, clinicians, and clerks.

- Interviewed *[confidential text removed]* staff at the department's 11 other reception centers and at headquarters.

- Interviewed custody and administrative staff at San Quentin, including facility captains, housing unit officers, and records staff.

- Reviewed institutional files, logs, records, and other relevant documents.

- Obtained information from appropriate *[confidential text removed]* treatment information systems.

- Analyzed the information gathered through the above procedures and formulated conclusions.

The Office of the Inspector General did not perform the above steps for other inmates at San Quentin to determine the pervasiveness of the staff's non-compliance with established policies and procedures. In addition, for the purpose of this review, the Office of the Inspector General did not review court orders or remedial plans from the *Coleman v. Schwarzenegger* litigation.

In conjunction with this review, the Office of the Inspector General conducted investigations into the conduct of certain employees at San Quentin. The Office of the Inspector General has completed those investigations and has provided the confidential reports to the California Department of Corrections and Rehabilitation.

FINDING 1

**The contents of this finding are redacted because of their confidential nature.**

*[This finding is based upon specific health care information for Thomas. The Office of the Inspector General removed the text of this finding to comply with state and federal privacy laws.]*

**FINDING 2**

**The contents of this finding are redacted because of their confidential nature.**

*[This finding is based upon specific health care information for Thomas. The Office of the Inspector General removed the text of this finding to comply with state and federal privacy laws.]*

FINDING 3

**San Quentin case records and counseling staff incorrectly identified inmate Scott Thomas as the subject of a warrant and inappropriately released him to the custody of the Alameda County Sheriff's Office.**

When the Alameda County Sheriff's Office notified a San Quentin case records analyst that one of the institution's inmates was the subject of a warrant, the analyst did not follow procedures to verify the subject's identity and, as a result, identified the wrong inmate. The electronic notification message from Alameda County included Scott Thomas's California Department of Corrections and Rehabilitation inmate number with the name, birth date, and physical description information for ***Steven*** Thomas, the actual subject of the warrant. Despite this error, had the case records analyst followed institution procedures, he should have observed that the notification obviously identified Steven Thomas, not Scott Thomas, as the subject of the warrant. Further, by not complying with regulations and notifying Scott Thomas that he was the subject of a warrant, institution staff missed another opportunity to correct the error. Moreover, while auditing Scott Thomas's central file before he paroled, another case records analyst also failed to note that Scott Thomas was not the subject of the warrant. As a result of these multiple errors, San Quentin incorrectly released Scott Thomas to Alameda County on May 18, 2007.

***The notification message from Alameda County included the incorrect California Department of Corrections and Rehabilitation inmate number.*** According to the acting case records manager, case records staff require that agencies include the inmate's California Department of Corrections and Rehabilitation number in warrant notifications. The manager told the Office of the Inspector General that agencies sometimes get the number from the department, the California Law Enforcement Telecommunications System (CLETS), or another resource. The Office of the Inspector General was unable to determine how Alameda County mistakenly matched Scott Thomas's number with that of Steven Thomas. Nonetheless, even though the notification included Scott Thomas's California Department of Corrections and Rehabilitation number, there was ample information in the notification message to clearly identify Steven Thomas, not Scott Thomas, as the subject of the warrant.

***The case records analyst incorrectly identified Scott Thomas as the subject of the Alameda County warrant.*** The March 1, 2007, warrant notification from Alameda County mistakenly included Scott Thomas's California Department of Corrections and Rehabilitation inmate number with Steven Thomas's name and other identifying information such as his race, height, weight, and birth date. San Quentin's *Reception Center Records Holds Warrants and Detainers Procedures* require staff to identify the inmate via several possible sources, including the department's Offender Based Information System. However, according to the case records analyst, when he receives notification that a San Quentin inmate may be the subject of a county warrant, he reviews only the subject's last name and the inmate number because many inmates have aliases or conflicting birth dates. He does not compare any of the other identifying

information in the message with the information in the Offender Based Information System. Instead, he relies on the county to accurately identify the inmate number. The only other check he performs is to call the county to confirm that the warrant is active and, if so, he then records it in the Offender Based Information System. As a result, the case records analyst entered into the Offender Based Information System the hold on Scott Thomas and not Steven Thomas.

While it is possible that inmates may have aliases and conflicting birth dates, relying on an outside agency to correctly identify the inmate number and only using the last name to verify the inmate's identity allows for errors. The risk for error is particularly true in prisons the size of San Quentin that house more than 5,000 inmates because numerous inmates may have the same last name.

As shown in Table 4, a comparison of the information Alameda County provided to San Quentin with information in the department's Offender Based Information System shows that the inmates clearly differ in first name, race, birth date, age, and size. Although inmate Scott Thomas was of a different race, 16 years younger, and 40 pounds lighter than the actual subject of the warrant, the San Quentin analyst processing the warrant mistakenly placed a parole hold on him—meaning that when Scott Thomas had completed his incarceration term at San Quentin, he would be turned over to Alameda County to face the charges covered by the warrant. Accordingly, the case records analyst should have noted the mistaken identity.

*[The Office of the Inspector General removed Table 4 to comply with state and federal privacy laws.]*

**San Quentin staff failed to notify Scott Thomas that they had identified him as the subject of a warrant.** After the institution receives a warrant from an outside agency, California Code of Regulations, Title 15, section 3370.5 requires that the department provide an inmate a copy of the warrant before it is executed. Further, San Quentin's *Reception Center Records Holds Warrants and Detainers Procedures* require a correctional counselor I to provide the inmate written notification of the warrant before the warrant is executed. However, the Office of the Inspector General's review of Scott Thomas's central file did not find documentation that a correctional counselor I had properly notified Scott Thomas that he was the subject of the Alameda County warrant. At the time of the Office of the Inspector General's review, the inmate's copy of the form used to notify Thomas that he was the subject of a warrant was still in the central file, and the inmate's signature box was blank. Further, Scott Thomas's copy of the electronic message from Alameda County that included Steven Thomas's identifying information was still in Scott Thomas's central file. Had a correctional counselor I notified Scott Thomas that he was the subject of the Alameda County warrant, Scott Thomas might have stated that the prison staff had identified the wrong inmate.

**Another case records analyst failed to notice that Scott Thomas was incorrectly identified as the subject of the warrant.** Section 71010.13 of the *Department of Corrections and Rehabilitation Operations Manual* requires case records staff to audit

an inmate's central file several times during the inmate's incarceration, including ten days before an institution releases the inmate. When case records staff audit an inmate's file, the manual requires them to review the central file to ensure that the records in the file properly reflect the inmate's current status. The manual requires case records staff to use the department's Audit Check Sheet when performing the audit. The Audit Check Sheet includes several areas for the analyst to review, including any holds, wants,[1] or detainers the inmate may have. Despite the manual's requirement that an analyst review the inmate's holds to make sure they correctly reflect the inmate's status, three days before San Quentin released Scott Thomas to Alameda County, a case records analyst audited Scott Thomas's central file and did not notice or correct the previous analyst's misidentification of Scott Thomas as the subject of warrant. Instead, the case records analyst marked that portion of the Audit Check Sheet dated May 15, 2007, to indicate that Scott Thomas was the subject of a warrant from Alameda County. However, as previously mentioned, based on information in the electronic message sent by Alameda County, Scott Thomas was clearly not the correct subject of the warrant. According to the case records analyst who audited the file, she simply failed to notice the subject of the warrant was not Scott Thomas.

***California State Prison, San Quentin released the wrong inmate to Alameda County and risked releasing to the community the inmate who was the actual subject of the warrant.*** As a result of institution staff's failures to follow institution procedures and identify the correct inmate as the subject of the Alameda County warrant, San Quentin incorrectly released Scott Thomas to the custody of Alameda County on May 18, 2007. Later that day, Alameda County returned Scott Thomas to the prison. According to notes in Scott Thomas's central file made by the case records analyst who audited the file, a representative from Alameda County told her that they realized he was the wrong inmate because he was the wrong race, a fact that should have been caught by the San Quentin case records analysts. Further, San Quentin risked releasing Steven Thomas on parole instead of to the custody of Alameda County. Because of the multiple errors, San Quentin staff did not enter the warrant information in Steven Thomas's Offender Based Information System record until May 18, 2007. Steven Thomas was still housed at San Quentin on that day, but had his release date been earlier, his Offender Based Information System record would not have reflected the hold, and San Quentin might have released him on parole and not to the custody of Alameda County.

RECOMMENDATIONS

**The Office of the Inspector General recommends that the warden of California State Prison, San Quentin take the following actions:**

- **Monitor the work of the two case records analysts who did not follow policies and procedures in processing the warrant notification and in validating inmate**

---

[1] *A want is a request submitted by a law enforcement agency communicating its desire to take jurisdiction over an inmate when the inmate has completed his or her term of incarceration with the California Department of Corrections and Rehabilitation.*

holds, wants, or detainers prior to releasing Scott Thomas to Alameda County. Continue monitoring this work until the analysts are consistently complying with policies and procedures. If appropriate, provide remedial training or take disciplinary action.

- Ensure that appropriate staff notify inmates who are the subjects of a warrant notification and that staff document the notification in the inmates' central files.

- With the assistance of the department's Office of Audits and Compliance, audit a representative sample of inmates' records to determine the extent of non-compliance with case records policies and procedures. If the rate of compliance is unsatisfactory, provide training or administer progressive discipline, if necessary, to staff and supervisors who are not performing their jobs.

As cited in the Introduction to this report, the Office of the Inspector General has investigated the conduct of certain San Quentin employees and has referred its reports to the California Department of Corrections and Rehabilitation.

FINDING 4

**Despite Division of Adult Parole Operations and San Quentin staff's failure to follow department procedures, the prison reception center's correctional counselor III should have known state law prohibited Scott Thomas's release on a Friday.**

To ensure that supervision of high-risk parolees begins as soon as possible after their release from prison, Penal Code section 3060.7 prohibits institutions from releasing inmates requiring high-control parole supervision on certain days, including Fridays. The department has various procedures to ensure institutions properly release inmates requiring high-control supervision. The Introduction to this report describes various department procedures intended to ensure that institutions properly release inmates requiring high-control supervision from incarceration based on a parole violation. In 2002, a Division of Adult Parole Operations unit supervisor determined that Scott Thomas required high-control supervision. The Division of Adult Parole Operations still designated that Scott Thomas required high-control supervision when San Quentin released him in May 2007. However, multiple violations of department procedures led to San Quentin improperly releasing Scott Thomas on a Friday. Specifically, Division of Adult Parole Operations staff did not follow all department procedures to alert San Quentin that Thomas required high-control supervision. Even though parole staff failed to follow department procedures, Thomas's central file still clearly indicated in numerous places that his release was pursuant to Penal Code section 3060.7. Nonetheless, a case records analyst who prepared Thomas's checkout order and the correctional counselor III who signed the order failed to notice the multiple indications in Thomas's file that his release was subject to Penal Code section 3060.7. As a result, the correctional counselor III signed Thomas's checkout order, releasing him on a Friday in violation of state law.

***The Division of Adult Parole Operations determined that Scott Thomas was a high-risk parolee and needed high-control supervision in 2002 but did not properly alert San Quentin before the institution released Thomas.*** To ensure prompt parole supervision of high-risk parolees, Penal Code section 3060.7 requires that inmates the Division of Adult Parole Operations designates as requiring the highest level of parole supervision—high control—report to their parole agents within two days of their release. To ensure the availability of staff so inmates are able to comply, the law further prohibits California Department of Corrections and Rehabilitation facilities from releasing these inmates on certain days, including Fridays. Section 81010.5 of the *California Department of Corrections and Rehabilitation Operations Manual* requires Division of Adult Parole Operations parole agents and unit supervisors to determine the appropriate supervision level for an inmate nearing parole. The manual requires them to use several criteria, such as commitment offense and prior criminal history, to determine the level of supervision that is appropriate for an inmate nearing parole. Further, the manual requires parole agents to include the appropriate level of supervision on a *Release Program Study* form, which is to be signed by the unit supervisor and sent to the inmate's institution by parole staff. Thomas's records show

that a Division of Adult Parole Operations unit supervisor first identified Thomas as needing high-control supervision in 2002. The Division of Adult Parole Operations still designated Thomas as needing high-control supervision when San Quentin released him in May 2007. As a result, San Quentin should not have released Thomas on a Friday, pursuant to Penal Code section 3060.7.

In December 2006, the Divisions of Adult Institutions and Adult Parole Operations distributed a memorandum regarding Penal Code section 3060.7 releases. To assist in identifying inmates subject to release pursuant to Penal Code section 3060.7, the memorandum directed unit supervisors to stamp "PC 3060.7" on *Parole Violation Dispositions* forms for all high-control parolees returned to custody for parole violations. However, when the Office of the Inspector General spoke to the supervisor of the parole unit to which Thomas was assigned, he stated he was familiar with the memorandum but was unaware it required him to stamp "PC 3060.7" on *Parole Violation Dispositions* forms. As a result, when the Office of the Inspector General reviewed the *Parole Violation Dispositions* form in Thomas's central file, the unit supervisor had not stamped it appropriately to identify Thomas's release was pursuant to Penal Code section 3060.7.

The *California Department of Corrections and Rehabilitation Operations Manual* requires Division of Adult Parole Operations parole agents to take several steps when an inmate such as Thomas is nearing release from revocation status, which is an incarceration sentence based on the Board of Parole Hearings' determination that the individual violated the terms of his or her parole. Specifically, section 81010.23 of the operations manual requires an inmate's parole agent to inform the institution of the inmate's release plans and reporting instructions at least 30 days before the inmate's revocation release date. However, according to Thomas's parole agent's notes, he did not contact the institution 30 days before Thomas's release. Instead, he only checked Thomas's status in the department's Offender Based Information System on May 18, 2007, the day San Quentin released Thomas. According to the agent's entries on Thomas's record of supervision, the Offender Based Information System still showed Thomas in custody at San Quentin. The next entries on Thomas's record of supervision were dated May 22, 2007. One entry states that the agent checked the Offender Based Information System, and it showed that San Quentin released Thomas. Another entry states the agent requested an arrest report from the San Francisco Police Department regarding Thomas's arrest on May 19, 2007. Had the agent followed procedures in the operations manual and provided staff at San Quentin with release plans and reporting instructions, his actions might have alerted institution staff regarding Thomas's high-control supervision status.

**Even though Division of Adult Parole Operations staff failed to follow procedures by not alerting San Quentin staff of Thomas's high-control supervision designation, that designation was clearly indicated in his central file.** Section 72030.4.8 of the operations manual requires case records staff to include in an inmate's central file the *Release Program Study* form that the Division of Adult Parole Operations unit supervisors fill out, indicating, among other things, whether an inmate requires high-

control supervision. Further, a December 2006 department memorandum requires that facility case records managers ensure that staff mark "PC section 3060.7 Supervision Case" in red ink on the *Chronological Inmate History* forms in central files for all inmates who meet Penal Code section 3060.7 criteria. The Office of the Inspector General found a *Release Program Study* form in Thomas's central file indicating that he required high-control supervision and the notation "PC 3060.7 Supervision Case" in red ink at least once on each of the first five pages of the *Chronological Inmate History* form. Moreover, the Office of the Inspector General found "3060.7" written in red ink on the control card stapled on top of documents on the inside front cover of Thomas's central file, yet another indication that Thomas was subject to high-control supervision upon release pursuant to Penal Code section 3060.7.

***As a result of their failure to notice that Thomas was subject to release pursuant to Penal Code section 3060.7, a second case records analyst incorrectly prepared, and a correctional counselor III improperly signed, Thomas's checkout order on a Friday.*** Despite multiple indications that Thomas was subject to release pursuant to Penal Code section 3060.7, the second case records analyst failed to indicate so on the checkout order she prepared, as policy requires. After completing the pre-release audit of an inmate's central file, section 74070.21 of the operations manual requires a case records analyst or a higher ranking staff member to verify the release information on a checkout order to release the inmate. The checkout order includes a section for the type of release, including a Penal Code 3060.7 box. However, the case records analyst who completed the pre-release audit of Thomas's central file did not check the box when she prepared Thomas's checkout order. According to the case records analyst, when Alameda County returned Thomas to San Quentin, she concentrated on providing funds for Thomas's release so that he could secure transportation to southern California, where he was to parole, and she thus did not notice Thomas was subject to release pursuant to Penal Code section 3060.7. Her failure to mark the corresponding box on his checkout order contributed to San Quentin's release of Scott Thomas on Friday, May 18, 2007, in violation of Penal Code section 3060.7.

In addition to the failures of Division of Adult Parole Operations staff and the case records analyst, the correctional counselor III, who has final checkout approval authority, failed to do his job correctly. According to the correctional counselor III, he reviewed Thomas's central file for a second time on Friday, May 18, 2007. He stated that he checks for high-control cases to ensure that the institution complies with Penal Code section 3060.7, and he does not release an inmate designated by parole unit supervisors as high control on a Friday. Further, according to the correctional counselor III, even though the *Chronological Inmate History* form is the first place he checks, he did not notice the "PC 3060.7 Supervision Case" notations on it when he reviewed Thomas's central file. One of the reasons the correctional counselor III gave for releasing Thomas on Friday was that he was concerned that San Quentin was holding an inmate beyond his parole date because staff members mistakenly identified Scott Thomas as the subject of the Alameda County warrant. Therefore, he said he was focused on correcting the errors and releasing Thomas expeditiously. As a result, he did not notice the "PC 3060.7 Supervision Case" notations on the *Chronological Inmate*

*History* form and signed the checkout order, releasing Thomas on Friday, May 18, 2007.

RECOMMENDATIONS

**The Office of the Inspector General recommends that the warden of California State Prison, San Quentin take the following actions:**

- **Monitor the work of the case records analyst and the correctional counselor III who did not follow policies and procedures in reviewing Thomas's records before release. Continue monitoring this work until the analyst and correctional counselor III are consistently complying with policies and procedures. If appropriate, provide remedial training or take disciplinary action.**

- **Finding 3 of this report includes a recommendation to audit a representative sample of inmates' records to determine the extent of non-compliance with case records policies and procedures. Include in this audit testing for compliance with the preparation and approval of inmate checkout orders, as cited in this finding.**

**In addition, the Office of the Inspector General recommends that the Division of Adult Parole Operations monitor the work of the unit supervisor and the parole agent who did not follow policies and procedures in identifying Thomas as high control and who failed to notify the institution of the inmate's release plans and reporting instructions. Continue monitoring this work until the unit supervisor and parole agent are consistently complying with policies and procedures. If appropriate, provide remedial training or take disciplinary action.**

**Lastly, the Office of the Inspector General recommends that the Office of Audits and Compliance audit the Division of Adult Parole Operations' compliance with the above policies and procedures. The division should use the findings from this audit to train and discipline staff as appropriate.**

**As cited in the Introduction to this report, the Office of the Inspector General has investigated the conduct of certain San Quentin employees and has referred its reports to the California Department of Corrections and Rehabilitation.**

FINDING **5**

**The correctional counselor III did not follow department procedures when he paroled Scott Thomas from security housing.**

When Scott Thomas paroled from San Quentin, he had time remaining on a security housing unit term he received for assaults on two correctional officers. As a result, Thomas was subject to the department's procedures requiring that institutions arrange with the Division of Adult Parole Operations to release the inmates directly to a parole agent. However, as a result of the correctional counselor III's mistaken interpretation of the department's procedures, the correctional counselor III did not arrange for a parole agent to pick up Thomas from the institution, thereby authorizing Thomas's unsupervised release.

***Department policy requires institutions to release inmates paroling from a security housing unit term directly to a parole agent.*** In addition to the release requirements of Penal Code section 3060.7, to ensure parole agents closely supervise inmates released on parole from security housing units, the department's *Procedures for Inmates Releasing to Parole from a Security Housing Unit or Psychiatric Services Unit* require institutions to release inmates directly to a parole agent. The procedures specify that counseling staff are to track and monitor inmates serving security housing unit terms who are eligible for parole within 150 days so that staff can, among other things, make arrangements to either transfer the inmate to an institution closer to his or her parole region or contact the Division of Adult Parole Operations to arrange for a parole agent to pick up the inmate directly from the institution.

***Thomas had time remaining on a security housing unit term when San Quentin released him.*** As a result of Thomas striking a correctional officer and spitting on another officer in March 2006, the Institutional Classification Committee, chaired by the chief deputy warden, imposed on Thomas a security housing unit term with a minimum eligible release date of April 21, 2007. California State Prison, Los Angeles County paroled Thomas on December 20, 2006, approximately four months before his security housing minimum eligible release date.

California Code of Regulations, Title 15, section 3341.5 requires that inmates returning to the California Department of Corrections and Rehabilitation who paroled from a determinate sentence in security housing be evaluated by an Institutional Classification Committee to establish whether the determinate sentence should be reimposed. The section reads, in part, as follows:

> *When an inmate is paroled while serving a determinate term, the remaining time on the term is automatically suspended. When an inmate returns to prison, either as a parole violator or with a new prison commitment, ICC* [Institutional Classification Committee] *shall evaluate the case for reimposition of the suspended determinate term.*

While on parole, Thomas was arrested in Humboldt County and charged with traveling beyond 50 miles from his residence and failing to report to the Division of Adult Parole Operations. As a result, the Board of Parole Hearings revoked Thomas's parole, and he arrived at San Quentin in January 2007. Following department procedures, when Thomas returned to San Quentin, a correctional lieutenant correctly placed him in administrative segregation pending review by the Institutional Classification Committee.

Six days after Thomas arrived at San Quentin, the Institutional Classification Committee retained him in administrative segregation pending receipt and review of his central file. Subsequently, once Thomas's central file arrived, a correctional counselor recalculated Thomas's minimum eligible security housing release date as May 26, 2007, based on his previous security housing term. Thomas remained in administrative segregation until the San Quentin correctional counselor III released him on May 18, 2007, eight days before his recalculated security housing minimum eligible release date.

***The correctional counselor III should have arranged for a parole agent to pick up Thomas from the institution.*** Because the correctional counselor III incorrectly concluded that the department's procedures for inmates paroling from a security housing unit term did not apply to Thomas, he did not arrange to release Thomas directly to a Division of Adult Parole Operations agent. According to the correctional counselor III, the Institutional Classification Committee should have reviewed Thomas's security housing term 30 to 45 days before his minimum eligible release date and either suspended or reinstated his security housing unit term. The correctional counselor III stated that by failing to conduct the Institutional Classification Committee hearing, the institution had no authority to retain Thomas in administrative segregation. As a result, the correctional counselor III did not believe he needed to release Thomas directly to a Division of Adult Parole Operations agent. However, the Office of the Inspector General presented the correctional counselor III with department procedures contradicting his statement. The procedures specify that if an inmate paroles with an indeterminate or unexpired security housing unit term and is returned to custody and placed in segregation pending resolution of his or her security housing unit status, he or she is a security housing unit inmate. Upon reviewing the procedures, the correctional counselor III confirmed that Thomas was a security housing unit inmate at the time he paroled.

Because Scott Thomas was a security housing unit inmate and subject to release pursuant to Penal Code section 3060.7 when he paroled, the correctional counselor III should have arranged to release Thomas directly to his parole agent on Sunday, May 20, 2007, at the earliest. Instead, the correctional counselor III signed the checkout order releasing Thomas on Friday, May 18, 2007, without arranging for his release to his parole agent. Thomas then allegedly stabbed two people in a San Francisco bakery on Saturday, May 19, 2007, hundreds of miles from Los Angeles County, his designated county of parole, and a day before the correctional counselor III should have released him.

RECOMMENDATION

**The Office of the Inspector General recommends that the warden of California State Prison, San Quentin require that the associate warden, the correctional counselor III's supervisor, closely monitor the correctional counselor III's work to ensure he complies with the policies and procedures pertaining to his position. If necessary, provide training or impose discipline as appropriate.**

**As cited in the Introduction to this report, the Office of the Inspector General has investigated the conduct of certain San Quentin employees and has referred its reports to the California Department of Corrections and Rehabilitation.**

**RESPONSE OF THE DEPARTMENT OF CORRECTIONS AND REHABILITATION**

# Memorandum

Date    :    October 26, 2007

To    :    Matthew L. Cate
        Inspector General
        Office of the Inspector General
        P.O. Box 348780
        Sacramento, CA  95834-8780

Subject  :  **SPECIAL REVIEW INTO THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATIONS RELEASE OF INMATE SCOTT THOMAS**

This memorandum is prepared as the California Department of Corrections and Rehabilitation's (CDCR) response to the Office of the Inspector General's (OIG) draft report dated October 2, 2007, entitled *Special Review Into the California Department of Corrections and Rehabilitation's Release of Inmate Scott Thomas*. This report indicates that staff at San Quentin State Prison failed to adequately address individual needs of Inmate Scott Thomas while incarcerated, and subsequently made mistakes by failing to properly release him to the community for his parole supervision pursuant to Penal Code Section 3060.7.

Safety and security, both inside and outside the institutions, is CDCR's highest priority. Immediate steps have already been initiated to meet recommendations and necessary adjustments are being made to ensure the safety and security of the public and institutions.

We would like to thank the OIG for its continued professionalism and guidance in CDCR's efforts to improve its operations. If you have any questions or concerns, please contact David L. Runnels, Undersecretary, Operations, at 323-6001.

JAMES E. TILTON
Secretary
California Department of Corrections and Rehabilitation

cc:  David L. Runnels

INSPECTOR GENERAL
OFFICE OF THE

2007 OCT 26  AM 10: 45

RECEIVED

CDC 1617 (3/89)

# EXHIBIT B

SANFORD JAY ROSEN
MICHAEL W. BIEN
ERNEST GALVAN

JANE KAHN[2]

HOLLY BALDWIN
LISA ELLS
GAY C. GRUNFELD
SHIRLEY HUEY[3]
MEGHAN LANG
SARAH LAUBACH
ANNE MANIA
NURA MAZNAVI
MARIA MORRIS[4]
THOMAS NOLAN
LORI RIFKIN[5]
LOREN STEWART
KENNETH WALCZAK[6]
AMY WHELAN
SARAH OLSON ZIMMERMAN[6]

# ROSEN, BIEN & GALVAN, LLP

ATTORNEYS AT LAW

315 MONTGOMERY STREET, TENTH FLOOR
SAN FRANCISCO, CALIFORNIA  94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rbg@rbg-law.com

November 1, 2007

**VIA FACSIMILE & U.S. MAIL**

Matthew L. Cate
Inspector General
Office of the Inspector General
P.O. Box 348780
Sacramento, CA 95834-8780
Telephone:  (916) 830-3600
Facsimile:  (916) 928-5996

Re:   *Coleman v. Schwarzenegger, Valdivia v. Schwarzenegger*
       Our File No. 489-3, 720-1

Dear Mr. Cate:

Our office represents the Plaintiff classes of prisoners and parolees in the *Coleman v. Schwarzenegger* and *Valdivia v. Schwarzenegger* lawsuits.  I am writing to request that the Office of the Inspector General provide a confidential, unredacted copy of the report issued yesterday, "Special Review into the California Department of Corrections and Rehabilitation's Release of Inmate Scott Thomas" to our office.  We would keep the unredacted report confidential under the Protective Orders in place in the *Coleman* and *Valdivia* cases, to the extent that it reflects personal medical and mental health care information about prisoners and parolees.

Please contact me or Michael Bien regarding this request.  Thank you.

Sincerely,

ROSEN, BIEN & GALVAN, LLP

By: Holly Baldwin

[1] MEMBER OF THE CONNECTICUT AND THE CALIFORNIA BAR
[2] OF COUNSEL
[3] MEMBER OF THE WASHINGTON, D.C. AND THE CALIFORNIA BAR
[4] MEMBER OF THE NEW YORK AND THE CALIFORNIA BAR
[5] MEMBER OF THE CONNECTICUT, NEW YORK AND THE CALIFORNIA BAR
[6] MEMBER OF THE ILLINOIS AND THE CALIFORNIA BAR

Matthew L. Cate
November 1, 2007
Page 2

HB:

cc:    Matt Lopes (via email)
       Chase Riveland (via email)
       Virginia Morrison (via email)
       Lisa Tillman (via email)
       Vickie Whitney (via email)
       Katherine Nelson (via email)
       Don Specter (via email)