Brian M. Hoffstadt (State Bar No. 187003)
bhoffstadt@jonesday.com
K. Chris Palamountain (State Bar No. 183246)
kcpalamountain@jonesday.com
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA  90071-2300
Telephone:     (213) 489-3939
Facsimile:      (213) 243-2539

Counsel for Referee and Consultant

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | Case No.  CIV S-90-0520 LKK JFM P |
| Plaintiffs, | **THREE-JUDGE COURT** |
| v. | |
| **ARNOLD SCHWARZENEGGER, et al.,** | |
| Defendants. | |
| **MARCIANO PLATA, et al.,** | Case No. C01-1351 TEH |
| Plaintiffs, | **THREE-JUDGE COURT** |
| v. | |
| **ARNOLD SCHWARZENEGGER, et al.,** | **CONFIDENTIAL STATUS REPORT** |
| Defendants. | |

## I.   INTRODUCTION

On July 23, 2007, the District Courts in two separate actions—*Coleman et al. v. Schwarzenegger et al.*, No. CIV S-90-0520 LKK JFM P (E.D. Cal.) and *Plata et al. v.*

*Schwarzenegger et al.*, No. C01-1351 TEH (N.D. Cal.)—granted motions by the Plaintiffs in each action to issue orders pursuant to the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, convening a three-judge panel to ascertain whether prison overcrowding is the "primary cause" of the constitutional violations regarding the provision of mental health and medical services found by the District Courts in those cases and, if so, whether no relief short of a "prison release order" would cure those violations. This Court was thereafter constituted to address these issues between the Plaintiffs and the State. Pursuant to § 3626(a)(3)(F), five groups exercised their statutory right to intervene in these proceedings—namely, the California Correctional Peace Officers Association; several county governments; a group of District Attorneys; and group of Republican members of the California Legislature; and a group of law enforcement officials (police chiefs, chief probation officers, and sheriffs) (collectively, "Intervenors").

On November 1, 2007, this Court appointed Elwood Lui as Settlement Referee and Peter Siggins as Settlement Consultant. Brian Hoffstadt, Elwood Lui's partner at Jones Day, and Chris Palamountain have served as counsel for the Referee and Consultant. The Court charged the Referee and Consultant with the duty of working with the Plaintiffs, the State, and the Intervenors, in ascertaining whether it was possible craft a settlement to the issues pending before this Court.

The Referee and Consultant hereby submit this Report to the Court on the progress of the settlement discussions. This Report contains three sections. The first part describes the course of the settlement discussions. These discussion have culminated in the creation of a Referee's Proposal. This Proposal has been created by the Referee and Consultant and has not yet been signed by any Party or Intervenor. However, it represents the collective input of the Parties and Intervenors, and is a document that, with minor additional changes, the Referee and Consultant believe could resolve this matter. The second part summarizes the terms of the Referee's Proposal. The Referee and Consultant have not attached a copy of the Proposal at this time because one of the Intervenors would not consent to its submission, and the Referee and Consultant did not want to create any basis for objection; should this final Intervenor provides its consent, a copy of the Proposal will be submitted to this Court prior to the Status Conference.

LAI-2952111v2
Coleman/Plata Status Report

- 2 -

1  The final part lists the market value of the services donated Settlement Referee and his counsel, as
2  well as the out-of-pocket expenses of the Referee, the Consultant, and their Counsel, which they
3  will present to the State for reimbursement.  At the upcoming May 30, 2008, status conference in
4  this matter, both the Referee and Consultant will be present to answer questions regarding the
5  matters contained in this Report.

## II.    COURSE OF SETTLEMENT DISCUSSIONS

### A.    Initial Discussions and Follow-Up

On November 13, 2007, the Referee and Consultant met separately with each of the Parties and each of the Intervenors in San Francisco.  Prior to this meeting, each litigant was asked to submit a confidential written summary of their positions and proposals for settlement.  At the in-person meeting, the litigants were given the opportunity to explain their positions and proposals in greater detail.

As follow-up from these initial meetings, the Referee and Consultant:

(a)    Asked *all* of the county- and city-level Intervenors to generate a list of proposals for reducing the population in state prison facilities;

(b)    Asked the Legislator-Intervenors to generate a list of proposals for alleviating overcrowding aside from Assembly Bill 900 (which was enacted in May 2007, among other things, to authorize funding for adding capacity to the State's prisons);

(c)    Met with two of the Republican Intervenors in Sacramento on December 11, 2007 (namely, Assembly Member Todd Spitzer, who has taken the lead on behalf of the Republican Intervenors, and Assembly Republican Leader Mike Villines); and

(d)    Organized a site visit of the California Institution for Men and the California Institute for Women on December 17, 2007, in order to view the conditions within the prisons firsthand.  Several litigants or their attorneys (more than a dozen people in all) participated in one or both of these site visits.

The Referee and Consultant informed all parties that the discussions involved in this process were confidential and not to be discussed publicly.

### B. Consultation with Experts

Pursuant to independent discussions, the Plaintiffs and State had agreed to have a panel of three experts (one chosen by the Plaintiffs, one by the State, and one chosen mutually) examine the likely numerical impact of a list of population-reducing measures proposed by the Plaintiffs. The Parties agreed to the following experts: Dr. James Austin (President, JFA Institute, Washington, DC); Dr. Jeff Beard (Secretary of Corrections, State of Pennsylvania); and Joseph Lehman (Secretary of Corrections, State of Washington). The panel initially presented its findings to the State, Plaintiff, Referee and Consultant on December 11, 2007 in Sacramento. On March 14, 2008, Drs. Austin and Beard again presented their findings, to a meeting of the Parties and Intervenors.

### C. Formation of 20-Member Working Group

Following this Court's issuance of an order permitting greater participation by Intervenors (and the Intervenors concurrent withdrawal of their appeals challenging the Court's prior order), the Referee and Consultant convened a meeting of the Parties and Intervenors in Sacramento on March 14, 2008. Nearly 70 people attended this meeting. As noted above, Drs. Austin and Beard presented their findings regarding the numerical impact of various population-reducing proposals. Their presentation concentrated on those prison inmates who place the greatest strain on the medical personnel in prisons—namely, those who serve very short sentences. In their view, proposals that aimed to reduce that population by keeping them from entering the prison system in the first place would likely have the greatest impact on the availability of services. In light of the size of the group of Parties and Intervenors, the Referee and Consultant decided to designate a group of approximately 20 persons representing the Plaintiffs, the State, and each Intervenor to move forward in examining the suggestions proposed by the expert panel.

### D. Formation of Substantive Smaller Working Groups

On March 20, 2008, the 20-member working group met in Burbank. At that meeting, the Referee and Consultant created four smaller working groups to study and suggest proposals on the following topics:

(a)  *Low-level parole violators.*  Namely, whether parolees who commit lower-level parole offenses and pose a lower risk to public safety, as determined through the use of a validated risk assessment tool, should be disciplined with a variety of sanctions aside from placement in state prison for short sentences.

(b)  *Diversionary alternatives.*  Namely, whether it is possible to identify certain individuals who pose a lower risk to public safety who could be diverted to county- and local-level programming rather than placed in state prisons for short sentences.

(c)  *Risk Assessment Tool.*  Namely, the status and acceptability of the risk assessment tool currently being developed by the California Department of Corrections and Rehabilitation ("CDCR"), in conjunction with the University of California, Irvine.

(d)  *Credits.*  Namely, whether the system by which inmates earn credits toward a shorter sentence should be modified (i) regarding "good behavior" credits; or (ii) to add a new category of "programming" credits to be earned for completing programs designed to rehabilitate and educate the inmates.

On April 18, 2008, the 20-member working group again met in Burbank.  At that meeting, the chairs of the respective smaller working groups reported on the progress of those groups' findings and proposals.  The 20-member group provided feedback and suggestions on whether the proposals were feasible and acceptable.  The Referee and Consultant also formed a fifth smaller working group to examine the issue of what remedies would be available to ensure that these various measures reduced the prison population in such a manner as to alleviate the unconstitutional conditions.  The smaller working groups were assigned further follow-up tasks.

**E.   Drafting of a Proposal**

At the next meeting of the 20-member working group on April 29, 2008, in Sacramento, the group discussed the additional proposals from the five smaller working groups.  At the conclusion of that debate, the Referee and Consultant formed a Drafting Group consisting of six individuals who would meet to attempt to translate the fruits of the smaller working groups' work into a single, unified document.

1   On May 6 and May 7, 2008, the Drafting Group met in San Francisco under the supervision of the Referee and Consultant. At the conclusion of those meetings, the Referee and Consultant took the outline of negotiated proposals and began drafting a Memorandum of Understanding ("MOU").

A week later, on May 13, 2008, the 20-member working group met in Sacramento. At that point in time, the Parties were continuing to make edit the working draft of the MOU, so the MOU was not circulated to the 20-member group. However, the Referee and Consultant reviewed the broad proposals encompassed in the MOU and obtained feedback.

### F. Circulation of Referee's Proposal

On May 19, 2008, the Referee and Consultant released to the 20-member working group a draft Referee's Proposal based on the MOU that the Drafting Group prepared. That afternoon, and in response to unauthorized release of the document to the press, the Referee and Consultant held a brief conference call with members of the press to explain the general contours of the Proposal and to explain the context of the settlement talks.

On May 20, 2008, the Referee met with the law enforcement, county, and legislative Intervenors in Sacramento and made a brief presentation regarding the Referee's Proposal.

On May 22, 2008, the Referee and Consultant met with the 20-member working group to obtain their constituents' feedback and comments on the Referee's Proposal. Where the Referee and Consultant felt it was appropriate, they modified the Proposal to incorporate those suggestions.

### III. SUMMARY OF REFEREE'S PROPOSAL

The Referee and Consultant prepared the Referee's Proposal as the culmination of the settlement process described above. At this point in time, the Proposal is just that—a proposal that has yet to be signed by any Party or Intervenor. It is nevertheless a synthesis of the discussion of the Parties and Intervenors and is thus the document, in the opinion of the Referee and Consultant, with the best chance of obtaining the approval and concurrence of each litigant in this matter. This section provides a brief overview of the structure of the Proposal, its key terms, and the rationale behind its components.

The Proposal has a four-fold purpose: (i) ensure that the constitutional violations are remedied; (ii) ensure that the most dangerous criminals remain incarcerated and that public safety is not compromised; (iii) invest in rehabilitative programs that have been proven to reduce recidivism and thereby reduce the "revolving door" nature of much state incarceration; and (iv) reach a long-term solution that draws upon the economies of scale and special aptitudes of each of the pertinent constituencies.

Toward these ends, the Proposal (i) requires that various programs be implemented; (ii) erects a compliance mechanism to monitor these programs and ensure that they are having the desired, collateral effect of reducing the prison population in a public-safety-conscious fashion; and (iii) requires that legislation be enacted by mid-September 2008 to provide for the funding and authorization of the Proposal's provisions. Each is discussed briefly below.

### A.   Implementation of Programs

The Proposal provides for the following three programs. The Secretary of Corrections, as well as the counties, retain the authority to implement additional programs if they wish to do so. Many of the programs set forth in the Proposal require additional funding, and that is to be provided in a legislative bill described more fully below. None of these programs entails early release of prisoners from incarceration.

#### 1.   Local Diversionary Alternatives for Low-Risk Individuals

The thrust of this program is to identify individuals who pose a minimal public safety risk and who show the greatest promise for rehabilitation, and to divert them to county-administered programs rather than into state prison facilities for short time periods (e.g., four to six months). The Proposal specifies that two groups are presumptive eligible to participate, subject to a limited judicial override: (i) individuals convicted of a probation-eligible offense who have less than 12 months to serve in state prison at the time of sentencing (after accounting for any "good time" credits); and (ii) should a county wish to include them, individuals who are on probation and commit a new probation-eligible offense that could subject them to revocation. The county-administered programs into which these individuals are to be diverted will be developed using "seed money," and approved and overseen by a re-vamped Corrections Standards Authority

comprised of representatives from the State and local governments. The programs will be funded in part upon their success at diverting individuals away from state prisons. Jurisdiction over the individuals will remain with the committing authority, however (the State will retain jurisdiction over its prisoners, as will counties over probationers).

### 2.     Alternative Sanctions for Lower-Level Parole Violators

The goal of this program is to replacement incarceration as the default sanction for parolees who violate the terms of their parole where that violation is not severe and where the parolee poses a lesser risk to public safety. The severity of the violation will be determined by CDCR and the risk posed by the parolee will be evaluated using a validated risk assessment tool developed by CDCR, subject to a monitored override by the parole officer. Instead of a short stint in prison, these individuals will be disciplined using a series of graduated sanctions short of a full-scale return to state prison (e.g., adjustment in intensity of supervision, "flash" incarceration, placement in an in-house treatment program).

### 3.     Amendments to Credit System

Under this program, the system by which State inmates earn credits while incarcerated will be adjusted. Currently, inmates are automatically awarded "good time" credits as a matter of right; that system (called the "bridging program") would be replaced with a system of behavior credits that are earned at the same rate but are subject to forfeiture (and subject to reinstatement in certain cases). CDCR would add a second credits-earning system as well, for inmates who participate in and complete programming; these programming credits would be earned in addition to behavioral credits, and thus could reduce sentences.

### B.     Compliance with Population Levels

The programs outlined above are designed to improve public safety *and* reduce the inmate population. To ensure that both goals are met, the Proposal erects a compliance mechanism to monitor and enforce population level targets. It operates as follows:

(1)     *Setting an ultimate Population Level.* The Parties will agree to a Population Level to be reached by September 2012. The Referee has initially set that level at 158% of the design capacity of the State's in-state facilities, or 132,500 inmates. The Parties will convene an

advisory group to perform a more detailed analysis of the operational capacity of each in-state facility. If the number fixed by this advisory group is not within plus-or-minus 2,650 inmates of the 132,250 figure, then the Plaintiffs and State have the option of withdrawing from the MOU. If the advisory group's number is within this range, that number—which will be expressed as a percentage of design capacity—will become the operative target Population Level under the MOU. The State will have the right to seek modification of that capacity number based on changed circumstances (e.g., increases due to changed circumstances).

(2) *Monitoring through compliance with interim Population Levels.* To ensure that CDCR will be able to meet the Population Level by September 2012, the Proposal also erects several interim population levels by which the State has to demonstrate progress toward the Population Level (10% of the gap between an agreed-upon population level of 158,931 (the CDCR adult population as of May 1, 2008) and the current in-state population must be eliminated within the first year; another 20% by the second year; another 20% by the third year; and the remainder in the final year.) The State's progress toward each interim goal will be monitored by a 15-member Prison Population Advisory Committee ("PPAC").

(3) *Authority to take action to ensure compliance.* CDCR is given a 120-day grace period during which it may be out of compliance with the interim Population Levels without being the subject of court action. The PPAC has the responsibility to provide its recommendations on how the State may again become compliant, including resort to (i) emergency legislation to increase capacity; (ii) expansion of the pool of persons eligible for the diversionary program; (iii) increasing the rate at which credits would be earned; or (iv) requiring counties to divert additional persons or have an additional number of inmates released into those counties, depending upon the counties' past success at diverting individuals from state prison. Ultimately, however, the Secretary of Corrections has the discretion to decide which option to exercise, including release of prisoners by order of shortest time remaining to serve if no other option is effective.

### C. Legislative Package

The Proposal also requires that the State Legislature enact legislation by September 15, 2008, or else the settlement does not take effect. The Proposal envisions legislation that includes nine proposal, most of which are designed to ensure the legality of the provisions of the Proposal and, equally important, to provide funding for those provisions.

### D. Role of Three-Judge Panel Under Proposal

Because the Proposal falls within the PLRA's broad definition of "prison release order," it may only be adopted as consent decree if this Court finds that the prerequisites for such an order set forth in the PLRA are met. Moreover, to ensure that the Proposal is subject of enforcement, this Court would need to maintain jurisdiction until the State reaches compliance, and for a year thereafter (at which point in time the consent decree that would enforce the Proposal would automatically terminate upon the State's notification of that fact to this Court).

## IV. TIME AND EXPENSES

Thus far, the Referee, Consultant, and their counsel have devoted a substantial amount of time to this matter free of charge. Thus far, the Referee and his counsel at Jones Day have donated approximately $500,000 of their time. The Referee and his counsel have also incurred approximately $15,000 in expenses. The Referee, Consultant and their counsel will prepare a detailed accounting of these out-of-pocket expenses and will seek reimbursement of them from the State at a later time.

## V. CONCLUSION

The Referee and Consultant have endeavored to find the areas of commonality between the diverse perspectives of the Parties and Intervenors in this action, and to build upon those commonalities in fashioning a settlement proposal that would be acceptable to the litigants and effective at remedying the population problem that underlie the constitutional violations found in the *Coleman* and *Plata* cases. The fruit of the intensive settlement negotiations that have taken place since November 2007 is the Referee's Proposal, which the Referee and Consultant believe represent a workable, palatable, and public-safety-minded solution to the matters before this Court. Because the Parties and Intervenors have reviewed the Proposal, they should be able to

report to the Court at the Status Conference on their view of the likelihood of settlement on the basis of the Proposal.

Dated: May 27, 2008

Respectfully submitted,

By: /s/ Elwood Lui
    Elwood Lui
    Settlement Referee

By: /s/ Peter Siggins
    Peter Siggins
    Settlement Consultant

Submitted by:

/s/ Brian M. Hoffstadt
Brian M. Hoffstadt
Counsel for Referee and Consultant