1  FUTTERMAN & DUPREE LLP
   MARTIN H. DODD (104363)
2  160 Sansome Street, 17th Floor
   San Francisco, California 94104
3  Telephone:  (415) 399-3840
   Facsimile:  (415) 399-3838
4  martin@dfdlaw.com

5  *Attorneys for Receiver*
   J. Clark Kelso

6

7              **UNITED STATES DISTRICT COURT**

8        **FOR THE EASTERN DISTRICT OF CALIFORNIA**

9        **AND FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10 | RALPH COLEMAN, et al., | Case No. CIV S-90-0520 LKK JFM P |
11 |              *Plaintiffs,* |
12 |       v. |
   | ARNOLD SCHWARZENEGGER, et al., |
13 |              *Defendants.* |

14 | CARLOS PEREZ, et al., | Case No. C 05-05241 JSW |
15 |              *Plaintiffs,* |
16 |       v.
   | JAMES TILTON, et al., |
17 |              *Defendants.* |

18 | JOHN ARMSTRONG, et al., | Case No. C 94-2307 CW |
19 |              *Plaintiffs,* | **NOTICE OF FILING OF RECEIVER'S EIGHTH QUARTERLY REPORT** |
20 |       v.
   | ARNOLD SCHWARZENEGGER, et al., |
21 |              *Defendants.* |

22  .

23      PLEASE TAKE NOTICE that the Receiver in *Plata v. Schwarzenegger*, Case No. C01-

24  1351 TEH has filed herewith his Eighth Quarterly Report.

25

26  Dated:  June 17, 2008                    FUTTERMAN & DUPREE LLP

27                                           By:_____/s/ Martin H. Dodd_____
                                                     Martin H. Dodd
28                                               Attorneys for Receiver J. Clark Kelso

FUTTERMAN &
DUPREE LLP

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARCIANO PLATA, et al.

     Plaintiffs,

     vs.

ARNOLD SCHWARZENEGGER,

et al.

     Defendants.

No.: C01-1351 T.E.H.

**RECEIVER'S EIGHTH QUARTERLY REPORT**

# TABLE OF CONTENTS

Page

I. Introduction................................................................... 1

   A. Overview of Quarterly Report............................................ 1

   B. The Receiver's Reporting Requirements.............................. 1

   C. The Order Appointing Receiver......................................... 1

   *Plata, Coleman, Perez* and *Armstrong* Coordination Reporting

   D. Requirements............................................................... 2

   E. Integration of Coordination Related Reporting in This Quarterly Report........ 3

   F. Master Contract Waiver Related Reporting............................ 3

   G. The Organization of the Seventh Quarterly Report.................. 4

II. The Status of the Turnaround Plan Initiatives............................ 4

   GOAL 1   Ensure Timely Access to Health Care Services.............. 4

   *Objective 1.1*   Screening and Assessment Processes................... 4

   *Objective 1.2*   Access Staffing and Processes.......................... 6

   *Objective 1.3*   Schedule and Patient-Inmate Tracking................. 8

   *Objective 1.4*   Standardized Utilization Management System........ 10

   GOAL 2   Establish a Prison Medical Program Addressing the Full Continuum of Health Care Services............................................ 11

   *Objective 2.1*   Primary Care............................................... 11

   *Objective 2.2*   Chronic Care............................................... 13

   *Objective 2.3*   Emergency Response...................................... 13

   *Objective 2.4*   Specialty Care and Hospitalization..................... 15

   GOAL 3   Recruit, Train and Retain a Professional Quality Medical Care Workforce.................................................... 16

   *Objective 3.1*   Physicians and Nurses.................................... 16

   *Objective 3.2*   Clinic Leadership and Management Structure.......... 18

| | | |
|---|---|---|
| *Objective 3.3* | Professional Training Program............................................ | 18 |
| GOAL 4 | Implement a Quality Improvement Programs............................. | 20 |
| *Objective 4.1* | Clinical Quality Measurement and Evaluation Program............. | 20 |
| *Objective 4.2* | Quality Improvement Programs........................................... | 21 |
| *Objective 4.3* | Medical Peer Review and Discipline Process.......................... | 23 |
| *Objective 4.4* | Medical Oversight Unit.................................................... | 24 |
| *Objective 4.5* | Health Care Appeals Process.............................................. | 25 |
| *Objective 4.6* | Out-of-State, Community Correctional Facilities and Re-entry Oversight.................................................................... | 26 |
| GOAL 5 | Establish Medical Support Infrastructure.................................... | 27 |
| *Objective 5.1* | Pharmacy................................................................... | 27 |
| *Objective 5.2* | Medical Records............................................................ | 33 |
| *Objective 5.3* | Radiology and Laboratory................................................ | 34 |
| *Objective 5.4* | Clinical Information Systems............................................. | 35 |
| *Objective 5.5* | Telemedicine............................................................... | 36 |
| GOAL 6 | Provide for Necessary Clinical, Administrative and Housing Facilities.................................................................... | 37 |
| *Objective 6.1* | Upgrade Administrative and Clinical Facilities....................... | 37 |
| *Objective 6.2* | Expand Administrative, Clinical, and House Facilities.............. | 40 |
| *Objective 6.3* | Finish Construction at San Quentin State Prison..................... | 42 |
| III. | Particular Successes Achieved by the Receiver............................……..... | 44 |
| IV. | Problems Being Faced by the Receiver, Including Any Specific Obstacles Presented By Institutions Or Individuals.................................................... | 46 |
| A. | Introduction.............................................................................. | 46 |
| B. | Avoidable Prisoner Deaths That Continue to Take Place Because of the Lack of Access to Long-Term Health Care Facilities......................................….... | 47 |
| C. | The Receiver's Efforts to Work with State Officials to Fund Necessary Long-Term Health Care Facilities............................................................….... | 49 |

The Structure of the Legislation Necessary to Fund Long-Term Health Care

D.   Facilities................................................................................ 55

E.   Summary................................................................................ 56

V.   Accounting of Expenditures For The Reporting Period................................. 56

VI.  Other Matters Deemed Appropriate for Judicial Review............................... 57

A.   Coordination with Other Lawsuits................................................... 57

VII. Conclusion............................................................................. 58

# I.

## INTRODUCTION

A.     Overview of Quarterly Report.

This is the Eighth Quarterly Report filed by the Receivership, the second submitted by Receiver Clark Kelso.

The Receiver's Turnaround Plan of Action ("Turnaround Plan") was approved by the Court on June 16, 2008. (Exhibit 1). Beginning with the Ninth Quarterly Report, the format of future filings will focus on the agreed upon metrics concerning the initiatives set forth in the Turnaround Plan. This report, however, follows the format of previous Quarterly Reports.

B.     The Receiver's Reporting Requirements.

In support of the coordination efforts by the four Federal Courts responsible for the major health care class actions pending against the California Department of Corrections and Rehabilitation ("CDCR"), the Receiver now files his Quarterly Reports in four different Federal Court class action cases. An overview of the Receiver's enhanced reporting responsibilities is set forth below.

C.     The Order Appointing Receiver.

The Order Appointing Receiver ("Appointing Order") filed February 14, 2006 calls for the Receiver to file status reports with the *Plata* Court concerning the following issues:

1. All tasks and metrics contained in the Plan and subsequent reports, with degree of completion and date of anticipated completion of each task and metric.

2. Particular problems being faced by the Receiver, including any specific obstacles presented by institutions or individuals.

3. Particular success achieved by the Receiver.

4. An accounting of expenditures for the reporting period.

5. Other matters deemed appropriate for judicial review.

(*See*, Appointing Order at p. 2-3.)

1      D.      _Plata, Coleman, Perez_ and _Armstrong_ Coordination Reporting Requirements.

2           The Joint Order filed June 28, 2007 in _Coleman v. Schwarzenegger_ (mental health

3  care), _Perez v. Tilton_ (dental care) and in _Plata v. Schwarzenegger_ (medical care) approved

4  various coordination agreements made between the representatives of the three health care

5  class actions. (_See_, Order Approving Coordination Agreements Attached to Joint May 29,

6  2007 Order, hereinafter "Joint Coordination Order.") These coordination agreements provide

7  for the _Plata_ Receiver to assume responsibility for (1) direct oversight of contracting functions

8  for medical, dental, and mental health care; (2) implementation of long-term information

9  technology ("IT") systems to include the medical, dental and mental health programs; and (3)

10 oversight of pharmacy operations serving the medical, dental, and mental health programs.

11 (_Id._ at 2.)

12          The Receiver's assumption of these responsibilities is coupled with reporting

13 requirements which mandate that the Receiver file quarterly progress reports addressing (a) all

14 tasks and metrics necessary to the contracting functions, implementation of long-term IT, and

15 pharmacy services for mental health care and dental care, with degree of completion and date

16 of anticipated completion for each task and metric; (b) particular problems being faced by the

17 Receiver in accomplishing remedial goals; and (c) particular successes achieved by the

18 Receiver in accomplishing remedial goals. (_See Id._ at 2-3.)

19          Additional reporting requirements were subsequently placed on the Receiver following

20 his assumption of the management of certain coordinated functions involving the delivery of

21 Americans With Disability Act ("ADA") related services in California prisons. (_See_, August

22 24, 2007 _Armstrong v. Schwarzenegger_ Order Approving Coordination Statements (hereinafter

23 "_Armstrong_ Coordination Order."))

24          On February 26, 2008, the _Plata, Coleman, Perez_ and _Armstrong_ Courts issued an

25 additional joint order which provides for the Plata Receiver to manage two major prison health

26 care construction projects: (1) upgrades to improve health care delivery at the existing 33

27 CDCR institutions, and (2) the construction, on existing prison sites, of health care facilities for

28 up to 10,000 prisoner/patients (_See_, Order filed February 26, 2008 hereinafter "Order

2

1    Approving Construction Agreement"). As with the prior coordination orders, the Receiver was

2    ordered to file quarterly reports in each case "concerning developments pertaining to matters

3    that are the subject of the construction agreement." (Order Approving Construction Agreement

4    at 3:1-3.)

5              E.    Integration of Coordination Related Reporting in This Quarterly Report.

6              Pursuant to the mandates of the coordination orders referenced above, the overhaul of

7    the health care contract function; the implementation of long-term IT systems; the oversight of

8    pharmacy operations for medical, mental health, dental and ADA patient-inmates; and the

9    oversight of health care prison construction projects have been integrated under the Receiver's

10   remedial umbrella. As such, when this Quarterly Report iterates the progress and challenges

11   facing reform of contracting functions, IT systems, pharmacy operations, and construction, it is

12   referring to mental health, dental, ADA patient-inmates as well as medical health care patient-

13   inmates. Specifically, the Receiver's Coordination related reporting is set forth in the following

14   sections of this Report: Credentialing and Privileging of Health Care Providers (Section II,

15   Goal 4, Objective 4.2); Contracts (Section II, Goal 2, Objective 2.4); IT Update (Section II,

16   Goal 1, Objective 1.2; Section II, Goal 5, Objective 5.4); Telemedicine Reform (Section II,

17   Goal 5, Objective 5.5); Coordination with Other Lawsuits (Section VI, subsection A); and

18   Construction (Section II, Goal 6).

19             F.    Master Contract Waiver Related Reporting

20             On June 4, 2007, the Court approved the Receiver's Application for a more

21   streamlined, substitute contracting process in lieu of State laws that normally govern State

22   contracts. The substitute contracting process applies to specified project areas identified in the

23   June 4, 2007 Order and, in addition, to those project areas identified in supplemental orders

24   issued since that date. (*See* Receiver's Seventh Quarterly Report at Section I(F), "Master

25   Contract Waiver Related Reporting").

26             As ordered by the Court, a summary of each contract the Receiver has awarded during

27   *this* reporting period is provided including (1) a brief description of each contract, (2) which

28   project the contract pertains to, and (3) the method the Receiver utilized to award the contract

3

1   (*i.e.*, expedited formal bid, urgent informal bid, sole source.). Vendors were also engaged by

2   the Receiver during this reporting period to assist in the operation of the Receiver's non-profit

3   corporation, the California Prison Health Care Receivership Corporation. Although such

4   contracts are not governed by the Master Contract Waiver, a list of such contracts is also

5   provided as Exhibit 2.

6        G.    The Organization of the Eighth Quarterly Report.

7       The Eighth Quarterly Report is organized as follows:

8       1.  Status reports will be provided concerning the draft Turnaround Plan initiatives,

9          including a discussion of status, metrics, degrees of completion, and anticipated

10         dates of completion. (Section II)

11      2.  Particular success achieved by the Receiver (Section III).

12      3.  Particular problems being faced by the Receiver, including any specific obstacles

13         presented by institutions or individuals (Section IV).

14      4.  An accounting of expenditures for the reporting period. (Section V).

15      5.  Other matters deemed appropriate for judicial review (Section VI).

16  **II.**

17  **THE STATUS OF TURNAROUND PLAN INITIATIVES**

18      Significant progress has been made during this reporting period concerning most of the

19  major elements of the Turnaround Plan. Progress is detailed below.

20  **GOAL 1. Ensure Timely Access to Health Care Services**

21  **Objective 1.1. Redesign and Standardize Screening and Assessment Processes at**

22  **Reception/Receiving and Release**

23      The Receiver's Access-to-Care Initiative began on May 21, 2008, as is discussed in

24  more detail under Goal 2, Objective 2.1 below. One element of the access initiative is the

25  reception center redesign effort, which will build on innovations implemented at San Quentin

26  State Prison during 2006 and 2007.

27      Eight core prisons are considered, by the CDCR, as "major" Reception Centers. One of

28  the goals of the access initiative is to implement a new inter-discipline reception model at the

4

core facilities in the next 18 months. Two significant issues, however, may impact on this project. First, CDCR may need to re-evaluate the reception process, including those institutions which should continue to function as reception centers. Second, serious physical space challenges may prohibit an effective integration of all clinical disciplines and may also render impossible the timeliness standards called for by the new reception process. In some cases, the pilots will manage with existing space limitations until the Receiver's "upgrade" construction projects are completed. In the interim, the access initiative team (including correctional and health care staff) will develop temporary space plans to allow the implementation process to move forward.

Initial reception center activities include identification of the statewide team leaders, readiness assessments at major reception centers, and consultation on physical plant improvements being planned by Receiver. Inadequacies in physical space and environment will pose the most formidable challenge to progress at all the sites. The local redesign teams and statewide support will need to work creatively to reallocate space and adjust where possible. The first pilot implementation will begin in Summer 2008. Additional reception prisons from the Central Region will begin the six-month implementation process during the latter part of 2008 and early 2009. (Exhibit 3). At the same time, San Quentin State Prison will continue to pilot additional reception center changes, track outcomes, and provide on-site inspections and guidance to peers at other prison facilities in order to share the lessons learned.

Process mapping and workflow redesign at the pilot reception sites will lead to a standardized change package. Implementation teams will then partner with local reception center staff to disseminate the redesigned process. Standardization must be implemented *prior to* the introduction of electronic record keeping systems. The reception center project will require significant resources throughout 2008 and 2009.

**Objective 1.2. Establish Staffing and Processes for Ensuring Health Care Access at Each Institution**

### Preliminary Operational Assessments

Since the Seventh Quarterly Report, Preliminary Correctional Officer Operational Assessments were completed at Valley State Prison for Women, Central California Women's Facility, California State Prison at Corcoran, Pleasant Valley State Prison, and California State Prison - Sacramento. These reviews, which focus on the number of correctional officers necessary to insure prisoner/patients with adequate access to health care services, continue to serve two functions: (1) bridge the site-specific barriers that impede patient-inmate access to care, and (2) leave behind the beginnings of an organizational structure that is consistent with professional standards of custody management dedicated solely to health care operations.

By the close of this fiscal year ("FY") (June 30, 2008) all assessments to date will have resulted in (1) the activation of 943.31 correctional officer positions for use as clinic officers, escort officers and transportation officers, and (2) the purchase of 165 transportation vans for use in transporting patient-inmates to off-site hospitals and specialty care appointments.

At this time only 3 of the 33 prisons are awaiting operational assessments (Calipatria State Prison, California Correctional Institution, and Chuckawalla Valley State Prison). These remaining assessments will be completed by the end of July 2008. The "re-reviews" of the first eight prisons assessed as mentioned in the Seventh Quarterly Report will begin August 19, 2008 and will conclude by December 5, 2008. At that time, operational assessments will conclude, thereby marking the end of the Preliminary Operational Assessments.

### Health Care Access Units

During this reporting period, efforts also continued to develop and implement a metrics instrument to formally measure the performance of the Health Care Access Unit at San Quentin State Prison and all prisons statewide. The Custody Support Services Division collaborated with Nursing Executives and Health Care Managers at the prisons in developing one comprehensive method for assimilating the necessary data. To initiate this process, 22 of the prisons which have undergone a Preliminary Operational Assessment have been allocated

1    an Associate Governmental Program Analyst position which will be activated on July 1, 2008.
2    The remainder of the positions will be activated on a rolling basis, as the re-reviews are
3    completed between August and December 2008. The analyst, under the direction of the
4    Associate Warden, Health Care Services, will be (1) responsible for monitoring and collecting
5    data relating to the scheduling and attendance of patient-inmate health care appointments and
6    custody coverage for health care operations, (2) developing corrective action plans, and (3)
7    reviewing proposals for consistency with custody and health care policies and procedures. The
8    data obtained from the analysts will be collected and summarized in a monthly report; the first
9    monthly report will be completed by September 2008 and provided to the Court.

10        San Quentin State Prison, the pilot prison for the Receiver's implementation of an
11   Access Unit for Health Care Operations, successfully established and filled all posts as of April
12   1, 2008. Subsequently, preliminary data from the prison shows an increase in the number of
13   inmates that are now able to access care. (Exhibit 4). For example, during the week of May
14   14, 2008, a priority ducat for either a medical, dental and/or mental health appointment was
15   given to 3,471 inmates or 66% of the total inmate population. Of those inmates, 3,154 inmates
16   or 91% were seen by a clinical provider, 159 inmates or 5% refused services, and 158 inmates
17   or 4% were not seen for reasons such as the clinical provider was not able to see the inmate in
18   time allotted or the inmate paroled prior to the appointment.

19        As clinical construction projects are completed at San Quentin State Prison, additional
20   correctional officer positions and operational procedures will be established to incorporate the
21   additional space. For example, it is anticipated that the Specialty Care Clinics and select health
22   care services will be moved from the Neumiller Building to the new modular Upper Yard
23   Clinic and will be staffed and activated in August 2008. The Receiver will continue to monitor
24   the progress of the Health Care Access Unit and remedy issues as they arise.

25        As mentioned in the Seventh Quarterly Report, the Health Care Access Unit at the
26   California Medical Facility was activated on March 6, 2008. Thus far, it has been successful
27   and is supported by the prisons administrative as well as clinical and custody staff. Custody
28   management, in particular, has a clear vision of an effective Access Unit which translates into

7

1   an efficient operation. As with San Quentin State Prison, the California Medical Facility has
2   also greatly reduced the number of missed appointments due to a lack of correctional officers
3   or vehicles and increased the ability for more inmates to access care. Formal statistical data
4   and analysis will become available in August 2008 as previously mentioned and will be
5   provided to the Court.

6   The establishment of an Access Unit at Avenal State Prison was initiated on February
7   11, 2008 and remains on schedule for an activation date of July 1, 2008. Upon conclusion of
8   the detailed analysis of custody health care operations, inclusive of the planned construction of
9   new clinical space, the Receiver authorized 96 posts or 134.2 new positions of which 58.16
10  positions or 43.3% are allocated for hospital guarding and 16.46 positions or 12.3% are
11  allocated for transportation. The primary obstacle for the Access Unit at Avenal State Prison
12  currently relates to the lack of on-site medical providers. At the present time, given the high
13  vacancy rate, many inmates are sent off-site for medical services which drives the demand for
14  more transportation officers and more vehicles. This workload continues to be difficult to
15  achieve at this time. The Receiver will continue to monitor the progress of the Access Unit
16  and remedy issues as they arise.

17  The Receiver remains on task to establish complete Health Care Access Units at five
18  additional prisons by June 30, 2009. The Correctional Training Facility is the next prison
19  scheduled, commencing on June 16, 2008 with activation to follow in September 2008.
20  Tentatively, the remaining four prisons scheduled for activation of the Health Care Access
21  Unit are the California Institution for Men, California Rehabilitation Center, California
22  Institution for Men, and Mule Creek State Prison.

23  **Objective 1.3. Establish Health Care Scheduling and Patient-Inmate Tracking System**

24  An automated system for the scheduling and tracking of medical appointments for
25  patient-inmates will be necessary to provide adequate scheduling, tracking, and monitoring of
26  the delivery of medical, mental health, dental, and ADA services. During this reporting period
27  the decision was made to provide patient scheduling via the CDCR's Strategic Offender
28  Management System ("SOMS"), currently in the initial stages of procurement. A Request for

8

1 | Proposals ("RFP") has been drafted to select a system integrator for the project, and

2 | Commercial off the Shelf ("COTS") software products have been reviewed. The RFP will be

3 | released by CDCR in June 2008 and a contract award is scheduled to be made by the end of

4 | 2008.

5 |       The SOMS application will include four components that are critical to the success of

6 | the prison health care system: (1) a unique identification number for each inmate; (2) real time

7 | location information for each inmate; (3) demographic information on each inmate; and (4) a

8 | master schedule and scheduling prioritization system. The COTS offender management

9 | products that were reviewed by the Receiver's staff are not sufficiently robust to handle the

10 | more complex needs of a health care scheduling system, so the California Prison Health Care

11 | Services ("CPHCS") has initiated a project to identify health care scheduling needs, reengineer

12 | processes to the extent necessary, and procure or develop software to manage health care

13 | scheduling.

14 |       It is essential that the Health Care Scheduling System ("HCSS") be able to integrate

15 | completely with SOMS on a real-time basis. Consequently, CPHCS staff and consultants are

16 | closely involved in the SOMS RFP process as evaluators and subject matter experts. CPHCS

17 | has recently executed, on a competitive basis, a contract with Gartner, Inc. to define the

18 | requirements and parameters, including interfaces with other IT systems, for a system that will

19 | encompass prison medical, dental, mental health, and other health care appointment

20 | scheduling. Gartner, Inc. will begin working with subject matter experts designated by

21 | CPHCS in June 2008, with the objective of drafting, by the end of 2008, an RFP for a COTS

22 | HCSS product with necessary modifications and enhancements.

23 |       It should be noted that an adequate scheduling system must consider critical ancillary

24 | scheduling needs, such as notification to custody officers, access to equipment, transportation,

25 | special care personnel, prison scheduling, inmate location, and other constraints on patient

26 | movement.

27

28

9

**Objective 1.4.   Establish A Standardized Utilization Management System**

**Long-term care unit pilot**

California Medical Facility ("CMF") is the proposed site for the new long-term care pilot units.  CMF successfully opened new long-term care units in 2005 and 2006, so this pilot will build on that experience.  CMF's health care and custody officials have submitted a proposal detailing the staffing needs, equipment needs, and physical plant modifications required to convert 47 Outpatient Housing Unit beds to 41 Correctional Treatment Center beds and to convert 200 General Population beds to 92 Outpatient Housing Unit beds.  The conversion would decrease California Medical Facility's total population capacity by 114 beds.  Increasing the acuity of these units would increase demands on all the requisite support services.  The Receiver's staff are currently reviewing the proposal.

**Centralized Utilization Management system**

Utilization Management ("UM") is an organization-wide, interdisciplinary approach to managing health care costs and quality. The UM program supports clinical processes including specialty service referrals, acute hospitalization, and patient placement by applying specific criteria to requests for services to assure that health care services are medically necessary and cost-effective.  The current UM program has been ineffective in containing health care costs and ensuring appropriateness of medical treatment decisions, and as a result, expenditures for contract medical services have steadily risen over the years. Each institution has too much autonomy in managing its health care operations and there is little sharing among institutions and headquarters of best practices or common problems. There are no standardized processes or policies for referral of patient-inmates to specialty care providers or hospitals, and access to care varies from institution to institution.  There is no effective system in place for reviewing medical outcomes to determine whether treatment strategies are cost-effective, nor is there a system in place for analyzing health care cost variances on an ongoing basis. Consequently, the department is not able to determine whether the high costs at certain institutions are justified or whether the low costs at other institutions are indications of efficient operations or below-standard operations. Other problems plaguing the current UM program include the following:

10

1) lack of authority and accountability for UM operations at the regional and headquarters level; 2) failure to adhere to established UM program guidelines at the local level; 3) failure to utilize standardized criteria to support clinical decisions; 4) lack of fiscal accountability for treatment decisions; and 4) inadequate and incomplete documentation of evidenced-based care.

To facilitate access to care and ensure a standardized, functioning, auditable UM system that appropriately manages the use of medical services and costs, a new organizational structure for the UM program is being developed. The new program will include a complementary nursing Care Management program to ensure all patient-inmates' care are coordinated ensuring continuity of care. New positions will be established centrally, serving regional and local institutions to provide oversight and accountability for UM decisions, provide care management for patient-inmates with chronic illness, and monitor health care costs on an ongoing basis. In addition, UM processes will be redesigned to promote operational efficiency, and standardized UM policies, procedures, and forms will be implemented at all 33 institutions. An electronic scheduling and tracking tool will be selected to support clinical referral processes.

It is anticipated that standardized UM and care management processes will be implemented statewide by June 2009. The recruitment of an UM Chief Medical Officer is in progress. A focus group met on June 2, 2008 to begin redesigning current roles and responsibilities and to perform an assessment of the necessary resources for the UM program.

**GOAL 2. Establish A Prison Medical Program Addressing The Full Continuum of Health Care Services**

**Objective 2.1. Redesign and Standardize Access and Medical Processes for Primary Care**

On May 21, 2008, the Receiver described his overall plan for clinical redesign in a formal kickoff of the Access-to-Care Initiative, which addresses the heart of his mission: *timely access to safe, effective and efficient medical care*. The Access-to-Care Initiative encompasses four domains:

    1. Reception/Receiving and Release (R&R)

    2. Sick Call/Primary Care

3.  Chronic Care

4.  Specialty, Infirmary, and Acute Care

    a.  Utilization Management

    b.  Care Management

These clinical domains are interdependent. A chronic illness, for example, should be identified and assessed in the reception center process, and that assessment should lead to chronic care follow-up, trigger specialty care as needed, and be available at any sick call appointment. The Access-to-Care Initiative will require coordination across clinical disciplines. Beginning with reception center assessment, medical care processes must be integrated with mental health and dental care. Follow-up of patient needs also requires coordination, so one outcome of the initiative will be development of a sustainable scheduling and tracking information system integrating medical, dental, and mental health care. In addition, all of the Access-to-Care domains are dependent upon custody staff, so these are integrated throughout the Access-to-Care Initiative. Finally, the domains are also dependent upon IT.

Successful implementation of the Access-to-Care Imitative will achieve the following goals:

1.  Improve access to care by creating standardized, measurable, and reliable processes that are amenable to implementation across variations in custody levels and physical plants.

2.  Develop a sustainable integrated scheduling and tracking information system that conforms to best practices; reflects efficient workflows for medical, dental, and mental health care; and integrates with the Receiver's other IT initiatives.

3.  Develop integrated UM and care management systems to support chronic care, specialty services referral processes, and infirmary/acute care management.

4.  Develop system competence in the Model for Improvement (rapid-cycle quality improvement) and use of human factors and reliability science to support additional progress and sustainability post-Receivership.

1    Beyond the kickoff, progress to date on the Access-to-Care Initiative includes hiring of

2    the project managers and recruitment of the clinical leaders who will support the clinical

3    redesign efforts of the local teams.  Work on the sick call domain will progress in tandem with

4    work on chronic care, discussed below.

5    **Objective 2.2.   Improve Chronic Care System to Support Proactive, Planned Care**

6    The May 21, 2008 kickoff of the Access-to-Care Initiative highlighted chronic care

7    redesign and introduced the Model for Improvement as the clinical change methodology for

8    the entire initiative.  In April 2008, Health Management Associates ("HMA") completed its

9    assessment of the statewide chronic care processes, focusing particularly on asthma, and this

10   assessment served as the basis of the chronic care redesign plans.  In July 2008, six pilot sites

11   will enroll in an accelerated Chronic Care Learning Collaborative.  The collaborative will yield

12   clinical guidelines, policies, documentation tools, and staff education resources and introduce a

13   chronic care team model appropriate for corrections, delineating roles, responsibilities, and

14   measures of team function.  Facilitated by Bruce Spurlock, MD, a national leader in health care

15   quality and safety, it will also develop a cadre of leaders who can serve as quality advisors for

16   other clinical initiatives. An intensive skills-based course on quality improvement will be

17   imbedded in the learning sessions.

18   **Objective 2.3  Improve Emergency Response to Reduce Avoidable Morbidity and**

19   **Mortality**

20   The CDCR currently utilizes a variety of internal medical emergency response systems

21   in its facilities.  These procedures are not comparable to services found in the community.  As

22   a result, CDCR facilities are often not prepared to handle basic medical emergencies, resulting

23   in deficiencies in care, delayed transport, and poor patient outcomes.  The standardized

24   Emergency Medical Response Program ("EMRP") will provide patient-inmates, staff, and

25   visitors within the California prison system the same level and quality of emergency medical

26   care as in the community.  The goal is to improve emergency medical care and response within

27   the prison setting, improve clinical outcomes, and decrease unexpected deaths due to lack of

28   emergency medical care.

1    The standardized EMRP policies, procedures and forms were finalized on May 22,

2  2008. (Exhibit 5). The CDCR plans to implement the program and pilot the policies,

3  procedures and forms at Chuckawalla Valley State Prison for approximately one month

4  beginning June 23, 2008. To facilitate the implementation process, a standardized Emergency

5  Medical Response orientation and training program regarding the new policies, procedures and

6  forms was developed for the nursing and physician staff. Thirty days after implementation of

7  the EMRP at Chuckawalla Valley State Prison, the program will be piloted at Richard J.

8  Donovan Correctional Facility. Approximately two weeks after pilot implementation at

9  Richard J. Donovan Correctional Facility, the Emergency Medical Response team will make

10  any necessary adjustments to the policies, procedures, and forms. During the pilot at

11  Chuckawalla Valley State Prison the implementation team will audit the next scheduled

12  facilities for readiness to implement the EMRP. The roll-out strategy is based on the results of

13  readiness assessments of the medical department and geographic location, and we expect that

14  one prison every two weeks will implement the new program.

15    Within the EMRP, multiple medical skill validation checklists were created as a means

16  to validate clinical competency in basic nursing skills as well as emergency medical

17  procedures. To ensure that all clinical staff possess the requisite skills to provide basic life

18  support in the event of an emergency, staff working in the Triage and Treatment Area ("TTA")

19  will be required to obtain Acute Cardiac Life Support certification within 90 days of hire.

20    In an effort to standardize the emergency medical response equipment in every prison

21  facility, a list of all required emergency medical equipment and supplies for the TTA and

22  standby emergency rooms was developed. To ensure all emergency response bags contain the

23  appropriate and standardized equipment, the Department will purchase new emergency

24  medical response bags for each institution. The total number of bags to be purchased for each

25  institution will be determined during the emergency medical response pre-implementation

26  audit. An emergency medical response bag audit policy and form was developed as a part of

27  the EMRP. The policy will require the institution medical staff to audit the contents of the

28  emergency medical response bags on a regular basis to ensure that the equipment is available

14

1  and in working order at all times. A statewide audit is currently underway to determine the

2  total number, make and model of Automatic External Defibrillators ("AED") and Defibrillators

3  that are operable and inoperable in each institution. Additionally, a review of the currently

4  commercially available AEDs and defibrillators is in process to determine the appropriate

5  medical equipment that meets the medical needs of patient-inmates and meets community

6  medical standards. The data from these surveys and reviews will be utilized to determine the

7  replacement needs of the emergency equipment and to help with standardizing the emergency

8  equipment from one institution to another statewide.

9  **Objective 2.4. Improve the Provision of Specialty Care and Hospitalization to Reduce**

10  **Avoidable Morbidity and Mortality**

11          Standard UM and care management processes and policies are critical in the provision of

12  specialty care and hospitalizations. This topic is discussed under Goal 1, Objective 1.4 above.

13          **Contracts with specialty care providers and hospitals and invoice processing**

14          *ProdAgio Rollout.*

15          The statewide roll-out of the new contract and invoice processing system (ProdAgio)

16  has continued since the Seventh Quarterly Report with the addition of three institutions. Two

17  of the institutions, Valley State Prison for Women and California State Prison - Sacramento

18  went live on January 28, 2008. Further roll-out was subsequently delayed due to system

19  performance issues affecting invoice processing. Essentially, the system became too slow and

20  unstable to function adequate after the two institutions were added. Modifications to ProdAgio,

21  however, soon stabilized the invoice processing feature, and dramatically improved

22  performance, allowing the roll-out to continue. Statewide implementation was restarted on

23  June 2, 2008 with Folsom State Prison. California State Prison - Solano is anticipated to come

24  on-line on June 23, 2008.

25          A meeting with stakeholders was held on June 3, 2008 to review rollout plans beyond

26  California State Prison - Solano. A draft schedule is under review that will add two institutions

27  each month through August 2008. The draft schedule assumes new institutions by regional area

28  will begin to be added in October 2008 and continue through final implementation in February

1   2009. Initial meetings are currently being held to design the interface for the data transfer from

2   ProdAgio to CDCR's Business Information System ("BIS"), which will begin in early 2009.

3   The final migration to ProdAgio and data transfer to BIS will allow more specialty care

4   providers and hospitals to obtain contracts and payment in a timely manner.

5          *Establishing More Appropriate Payment Rates.*

6          In November 2007 the Navigant Consulting Group provided a report wherein

7   recommendations were provided concerning the appropriate rates for specialty care providers

8   and hospitals. Staff now utilize Navigant's recommendations to negotiate Medicare-based rates

9   with providers. Additionally, the Chancellor Consulting Group, retained by the Receiver in

10  August 2007 to stabilize the Department's hospital network, has been successful in

11  renegotiating rates with several new hospitals and affiliated physicians statewide to a Medicare-

12  based reimbursement structure. Over time, the Receiver anticipates significant taxpayer savings

13  resulting from a more efficient contract process and the utilization of billing standards and

14  methodologies more in line with other State agencies and well managed private health care

15  systems.

16         *Consulting Assessment of the Overall Contract Process.*

17         The Navigant Consulting Inc. submitted a preliminary assessment of the contract and

18  invoice processing functions on April 21, 2008. (Exhibit 6). As part of that assessment,

19  Navigant provided recommendations on follow-up activities regarding staffing structures,

20  modifications to State statutes and regulations, and claims payment/data collection options. At

21  present, contract staff are in the process of finalizing a report that will recommend what options

22  should be pursued.

23  **GOAL 3. Recruit, Train and Retain a Professional Quality Medical Care Workforce**

24  **Objective 3.1. Recruit Physician and Nurses to Fill Ninety Percent of Established**

25  **positions**

26         As of May 31, 2008, approximately 86 percent of nursing positions are filled (note: the

27  percentage is an average of all six State nursing classifications). (Exhibit 7). The goal of

28  filling 90 percent of the Registered Nurse ("RN") positions has been achieved at 22 institutions

1  (70 percent), 15 of these institutions have filled 95 percent to 100 percent of their RN

2  positions.  Six institutions (18 percent), have filled 84 to 89 percent of their RN positions.  This

3  is within 4 percent of the goal of filling 90 percent of nursing positions by July 2009.

4       To achieve the 90 percent State hire objective at all prisons, including the "difficult to

5  hire clinical staff" desert prisons, the following initiatives are underway:  (1) focused

6  recruitment continues statewide for licensed vocational nurses ("LVN") and psychiatric

7  technicians ("PT"); (2) recruiters have been presenting employment opportunities at nursing

8  schools statewide; (3) advertisements are placed statewide in local papers, professional trade

9  magazines, and online; and (4) mass mailers are planned for mid-June for LVNs and mid-July

10  for PTs.  Additionally, there has been, and will continue to be, a push at all institutions with

11  nursing vacancies to schedule interviews on a weekly basis and interview all interested

12  applicants expeditiously.

13       As of May 31, 2008, approximately 81 percent of physician positions are filled (note:

14  the percentage is an average of all three State physician classifications).  95 percent of Chief

15  Medical Officer positions are filled, 71 percent of Chief Physician and Surgeon positions are

16  filled and 89 percent of Physician and Surgeon positions are filled.  (Exhibit 7).  To achieve the

17  90 percent State hire objective at all prisons, including the "difficult to hire clinical staff" desert

18  prisons, the centralized hiring process for physicians continues, a program which can be

19  directly attributed to the success of physician recruitment and hiring thus far.

20       The personalized customer service approach provided by the centralized hire team, and

21  the streamlined hiring process which has resulted (allowing, for example, applicants to

22  interview for multiple locations and different classifications), has been well received by

23  applicants and hiring authorities alike, and has resulted in 147 hires since July 2007.  In

24  addition, specialized recruitment efforts continue with advertisements placed in professional

25  periodicals, newspapers, online, direct mailers, and visits to residency programs.  Efforts will

26  focus on the central valley prisons during the next reporting for two reasons.  First, in many

27  urban areas, every primary care provider position has been filled.  Second, the central valley is

28  an area where physician hiring progress has lagged behind other areas of California.

1    **Objective 3.2. Establish Clinical Leadership and Management Structure**

2    Existing plans call for three new clinical executive classifications (Medical Executive,

3    Nurse Executive, and Chief Executive Officer, Health Care) to be implemented at three pilot

4    locations (San Quentin State Prison, Mule Creek State Prison and California State Prison,

5    Sacramento/Folsom State Prison) by approximately September 1, 2008. The exams for these

6    three Receiver Career Executive Assignment ("RCEA") positions are currently being

7    automated by staff at the State Personnel Board ("SPB"), and are set to "go live" in July 2008.

8    Cooperative Personnel Services ("CPS") has indicated the salary surveys for these positions

9    will be completed by late June 2008. Thereafter, salaries will be established either through the

10   Department of Personnel Administration or by Court order and formal recruitment and hiring

11   will commence.

12   A comprehensive media plan has been prepared in preparation for this pilot that will

13   target professional trade publications, online sources, and professional mailers. A hiring

14   program has also been developed in coordination with the CDCR to centrally coordinate the

15   hiring process for these classifications. Finally, a Scope of Work has been developed by CPS

16   to assess the current organizational structure and later evaluate the RCEA pilot organizational

17   structure once implemented.

18   **Regional leadership structure**

19   Following the RCEA pilots at San Quentin State Prison, Mule Creek State Prison and

20   California State Prison, Sacramento/Folsom State Prison, anticipates expanding the RCEA

21   structure to the regional level. Prior to this effort, however, the governance of regions needs to

22   be an issue addressed by the Court representatives of *Plata*, *Coleman*, *Perez*, and *Armstrong*.

23   **Objective 3.3. Establish Professional Training Programs for Clinicians**

24   Staff from the Office of the Receiver and the CDCR developed a standardized health

25   care orientation program for nurses, physicians, and other allied health professionals. This

26   new employee health care orientation will occur regionally on a monthly basis and is a

27   comprehensive orientation for new health care employees and replaces the mandated training

28   required for all new CDCR employees. As of June 2008 all regions have completed a regional

18

1   health care orientation pilot.  Additional health care orientations for all regions are scheduled

2   through November 2008.  Following completion of the general orientation, discipline-specific

3   training will commence for each clinical classifications, included physicians and nurses.  The

4   registered nurse classification, for example, will be participating in a four week

5   preceptor/proctoring program, following the general health care orientation.

6        Effective June 2, 2008, the *Armstrong* Effective Communication training requirements

7   were integrated into the regional health care orientation.  A subject matter expert from the

8   Office of Court Compliance conducted the training.  In the event Office of Court Compliance

9   staff are not available to assist with providing training on an ongoing basis, CDCR nurses and

10  physicians will be prepared as trained-trainers to support delivery of the curriculum. A train-

11  the-trainer class is scheduled from June 30 through July 1, 2008.

12       A comprehensive training plan is being developed that describes all training initiatives

13  being undertaken in the next 12 to 18 months by the Receiver.  This training plan captures all

14  professional training programs for clinicians, as well as all support services training.  The

15  training plan will be finalized by the end of June 2008.

16  **Accreditation for CDCR as a CME provider**

17       In an effort to maintain and enhance the level of clinical competencies with educational

18  programs, the Receiver will establish a Continuing Medical Education (CME) Committee.

19  The primary objective of the CME Committee is to obtain accreditation for CDCR as a CME

20  provider, recognized by the Institute of Medical Quality (IMQ) and the Accreditation Council

21  for Continuing Medical Education.  The CME Committee will also oversee the planning of all

22  CME activities.

23       The CME Committee was established and has met three times since February 2008.

24  Committee members and a chairperson have been selected.  The Committee membership

25  consists of representatives providing healthcare services within CDCR from each licensed

26  practitioner group, including physician, psychiatrist, nurse, nurse practitioner, psychologist,

27  physician assistant.

28

1    The Interdisciplinary Professional Development ("IPD") Unit within the Clinical

2  Operations Support Branch, Professional Development and Review ("PDR") Section, is

3  providing administrative support for the Committee.  The IPD Unit is responsible for

4  conducting the administrative support activities to assist the Committee with developing a

5  charter and maintaining the appropriate functional structure required to meet IMQ

6  accreditation standards.  In addition to assisting the Committee in obtaining accreditation, the

7  IPD Unit has responsibility for the operation and administrative aspects of the educational

8  program for all licensed practitioners within CDCR.

9    Prior to submitting an application to the IMQ, the Receiver must ensure compliance

10  with all accreditation requirements.  In order to accomplish this objective, CME Committee

11  members and IPD staff attended two IMQ-sponsored conferences, one held in April 2008 and

12  the other in May 2008 on the requirements and process for obtaining accreditation.  Prior to

13  submitting the accreditation application, CDCR must plan and present two CME activities,

14  which the CME Committee determined will be focused on pain management and Hepatitis C.

15  The projected completion date for these activities is September 2008.  During the May IMQ-

16  sponsored conference, staff met with IMQ executive management to discuss IMQ serving as

17  the "joint sponsor" of these activities and providing a physician liaison to CDCR's CME

18  Committee.  CDCR is currently reviewing the proposal submitted by IMQ for joint

19  sponsorship and consulting services.

20  **GOAL 4. Implement Quality Improvement Program**

21  **Objective 4.1. Establish Clinical Quality Measurement and Evaluation Program**

22    The Receiver hired a Chief Medical Officer to lead formation of the new Quality and

23  Safety Branch and has begun recruitment for other positions in the Branch.

24    **Office of the Inspector General Audit Program**

25    The Receiver's staff, representatives from the Prison Law Office, CDCR staff, Office of

26  the Attorney General representatives, and the Special Assistant to the Court have worked

27  closely with the Office of Inspector General ("OIG") to develop an audit instrument which

28  objectively measures compliance with the *Plata* requirements.  The current pilot audit

20

1   instrument is divided into 21 different areas/programs such as Chronic Care, Specialty
2   Services, Preventive Services, etc.  Each area/program identifies the separate compliance
3   requirements under the *Plata* Stipulated Agreement and each requirement is weighted
4   according to priority.  The OIG has developed the metrics reports, and is currently developing
5   the written report format.

6       The OIG has conducted four pilot audits at Mule Creek State Prison, Valley State Prison
7   for Women, California State Prison, Corcoran and Calipatria State Prison.  The fifth pilot audit
8   commenced on June 9, 2008, at California Institution for Men.  The OIG has conducted post-
9   audit exit meetings with each institution and the various stakeholders to elicit
10  recommendations and feedback on the audit instrument.  After the final pilot audit is
11  completed, the OIG will submit the final draft of the audit instrument and program to the
12  stakeholders for comment, and to the Court for approval.  It is anticipated that the Receiver
13  will receive the final draft for comment from the OIG in early fall of 2008.

14  **Objective 4.2. Establish a Quality Improvement Program**

15      As mentioned above, a day-long Access-to-Care Initiative kickoff on May 21, 2008,
16  included training in the Model for Improvement and specifically in rapid-cycle quality
17  improvement.  As noted under Goal, 2 Objective 2.2, the pilot Chronic Care Learning
18  Collaborative will include an intensive skills-based course on quality improvement.  By the
19  end of the pilot collaborative, an initial cadre of nurse consultants and physicians will be
20  trained as quality advisors capable of facilitating clinical redesign efforts.  Additional quality
21  advisors will be trained via the regional collaboratives to follow.  In addition, the pilot Chronic
22  Care Learning Collaborative will recruit and train clinical champions from each of the six pilot
23  sites to lead the process redesign teams at the local level.  This approach will be replicated in
24  the regional collaboratives and other quality initiatives to follow.

25      Meanwhile, plans are being drafted for the formation of a new Policy Unit.  Just as the
26  EMRP will drive improvements in practice and changes in policies and procedures, the
27  Access-to-Care Initiative will drive policy and procedure revisions.  The Policy Unit will offer
28

21

1   support for such revision and will develop reliable systems for dissemination and for regular

2   review.

3       **Credentialing and privileging**

4       A quality-based program to administer the CDCR healthcare credentialing and

5   privileging function has been established. This unit is responsible for implementation of a

6   credentialing software program to facilitate the initial credentialing, and ongoing tracking of

7   required licenses, certification renewals and continuing education for all licensed independent

8   practitioners practicing within the prison system.

9       In January 2008, the Receiver secured and finalized a contract with CredentialSmart to

10  develop a web-based solution to integrate and centralize the credentialing and privileging data

11  for the licensed independent practitioners and designated allied health providers. The contract

12  financing was completed in March 2008. The vendor has begun the training portion of the

13  contract with the Credentialing & Privileging Unit staff on the use of the system. A four-hour

14  web-based training session was conducted on May 29, 2008. During that training, provider

15  files began the transition from hard files to electronic files. Credentialing & Privileging Unit

16  staff is continuing to enter provider data on a daily basis. The additional on-site training will

17  be provided to Credentialing and Privileging Unit staff on June 19 and June 20, 2008.

18      The Credential & Privileging Unit began developing program policies and procedures

19  in August 2007. As of May 2008, five policies have been developed and disseminated, and

20  training on the policies has been conducted. (Exhibit 8). In September 2007 an

21  Interdisciplinary Credentials Committee was established and a committee policy was

22  developed and approved by the Committee and is currently being reviewed for approval by the

23  legal advisors. The remaining policies are in draft form and will require further development

24  once the web-based system has been fully implemented.

25      Completion of the remaining policies will establish the roles and responsibilities of the

26  institutions' credentialing coordinators and the headquarters Credentialing & Privileging Unit.

27  Transferring the centralized credentialing and privileging function to headquarters will be

28  accomplished by transitioning the responsibilities in four phases. Phase I will begin in June

1   2008 with the transfer of credentialing data from the existing systems in headquarters and the

2   regions to the web-based solution and the transfer of the roles and responsibilities to the

3   Credentialing & Privileging Unit.  The subsequent three phases will entail transferring the

4   credentialing and privileging function to headquarters from the local Outpatient Housing Units

5   (Phase II); Correctional Treatment Centers (Phase III); and General Acute Care Hospitals

6   (Phase IV).

7        Once Phase I is complete at the end of July 2008, the Credentialing and Privileging

8   Unit anticipates establishing a Credential Hotline to respond to questions and/or concerns from

9   existing staff and potential providers.  Information gathered from the Hotline and during the

10  transfer process will be used by the Credentialing and Privileging Unit to develop lists of

11  frequently asked questions.  The implementation of this goal is anticipated to be complete by

12  December 2008.

13  **Objective 4.3.  Establish Medical Peer Review and Discipline Process to Ensure Quality of**

14  **Care**

15       **Peer Review and discipline process**

16       Between March 2008 and May 2008, the Professional Practice Executive Committee

17  ("PPEC") met 10 times and reviewed 152 allegations of clinical misconduct and/or neglect.

18  To protect patient-inmate safety, the PPEC summarily suspended the clinical privileges of 6

19  providers and implemented 13 monitoring plans.  The Governing Body issued Notices of

20  Proposed Final Actions to revoke the privileges of 4 providers, and worked with local

21  administrators to develop a remediation plan for a fifth provider.  During this reporting period,

22  10 licensed independent practitioners separated from State service following a peer review

23  investigation.

24       On May 23, 2008, the Court granted, in part, the Receiver's Motion for Waiver of State

25  Law Regarding Physician Clinical Competency.  The Court further ordered the Receiver to

26  meet and confer with the parties and amici SPB and the Union of Physicians and Dentists

27  ("UAPD") regarding revised policies conforming with the Court's order.  The Receiver's

28  attorneys met and conferred with SPB on June 4, 2008, with the expectation that SPB would be

23

1    prepared to begin administering peer review hearings within 45 days. The Receiver's attorney

2    also met and conferred with UAPD on June 5, 2008. The Receiver's decisions as a result of

3    these meetings will then be discussed when meeting and conferring with the parties before

4    returning a revised policy to the Court, ideally accompanied by a stipulation or statements of

5    non-opposition by the parties and amici.

6    **Objective 4.4.  Establish Medical Oversight Unit to Control and Monitor Medical**

7    **Employee Investigations**

8         The Receiver's Medical Oversight Program ("MOP") is a pilot project to conduct

9    clinical investigations in collaboration with Office of Internal Affairs ("OIA"), CDCR;

10   Employee Advocacy Prosecution Team ("EAPT"), Office of Legal Affairs, CDCR; and

11   Bureau of Independent Review ("BIR"), OIG.

12        The MOP has been conducting weekly meetings since November 2007 and performing

13   multi-disciplinary clinical investigations since January 1, 2008. The weekly meetings include

14   a program planning session to refine the operational protocols and a formal case panel intake

15   session to evaluate each individual case. Both meeting sessions include representatives from

16   the OIA, EAPT, BIR, and the Receiver's medical staff.

17        To date, the MOP has conducted a review of 98 unexpected death cases and reviewed 2

18   cases of possible medical harm that did not result in inmate death. These reviews resulted in

19   nine cases being opened for formal investigation. Five referrals were made to PPEC and eight

20   referrals made to the Nursing Professional Practice Executive Committee to address clinical

21   practice related concerns.

22        At the request of the Receiver's Chief of Staff, the MOP team flew to the state of

23   Mississippi to conduct an investigation concerning the unexpected death case of a California

24   prisoner housed at an out-of-state Corrections Corporation of America private prison. Overall,

25   the MOP identified eight different systemic issues during the clinical investigations which

26   have been forwarded to the Receiver for review. *See* the discussion of this issue under

27   Objective 4.6., below.

28

1 **Objective 4.5. Establish a Health Care Appeals Process, Correspondence Control and**
2 **Habeas Corpus Petitions Initiative**

3       The Health Care Appeals Task Force ("Task Force") was convened on February 13,
4 2008 to conduct a systemwide analysis of the statewide appeals process. Members of the Task
5 Force include: *Coleman* Court Monitors, Office of Court Compliance (*Armstrong*), *Perez*
6 Court Monitors, Plaintiff's counsel (Prison Law Office and Rosen, Bien, & Galvan), the
7 Receiver's Staff Counsel, the Chief Physician Executive, the Chief of Nursing Operations,
8 CPHCS and Division of Correctional Health Care Services Executive Staff, CDCR Inmate
9 Appeals Branch Chief, CDCR Staff Attorneys, and Litigation Management Unit staff. Four
10 meetings were held to discuss issues, best practices and recommended changes to the statewide
11 health care appeals process. Issues and recommendations were incorporated into a concept
12 paper submitted to the Receiver's Chief of Staff on May 15, 2008. The proposed concept for a
13 new appeal system was approved by the Chief of Staff on May 22, 2008, with the provision
14 that the concept paper be resubmitted to include an initial pilot program for implementation at
15 four CDCR institutions. The pilot program will be implemented in October 2008.

16       To ensure consistent and timely responses, inmate health inquiry functions were
17 consolidated under the Litigation Management Unit, Plata Field Support Division ("PFSD") in
18 October 2007.

19       The sole remaining function under the management of the CDCR Inmate Appeals
20 Branch is the Director's Level responses to health care appeals. Ongoing meetings have been
21 conducted with CDCR executive staff and Inmate Appeals Branch representatives to effectuate
22 the separation of health care appeals from institution appeals. Another meeting is tentatively
23 scheduled for late-June 2008 to discuss appropriate strategies for notifying all patient-inmates,
24 employees and stakeholders of the changes in policy and procedures. The actual bifurcation,
25 whereby the Receiver's staff begins to process Director Level medical appeals is projected to
26 take place on August 1, 2008. To ensure an timely and effective transition, PFSD staff have
27 completed the drafting of policies, procedures and training plans. Recruitment and hiring of
28 staff for the Office of Third Level Health Care Appeals is ongoing and is expected to be

1    completed by July 1, 2008.    A statewide training conference for all health care appeals staff is
2    scheduled for July 23 though July 25, 2008.

3    **Objective 4.6.  Establish Out-of-State, Community Correctional Facilities and Re-entry**
4    **Facility Oversight Program**

5            The California Out-of-State Correctional Facility ("COCF") Community Correctional
6    Facility ("CCF") and Re-entry Facility Program Oversight Unit ("Program Oversight Unit")
7    has been in operation since November 2007.  In April 2008 there was a change in the
8    management structure of the unit, and as a result of this change -- and problems with the
9    COCF in Mississippi -- strategies and resources required to provide oversight of medical care
10    for patient-inmates housed in COCF, CCF, and Re-entry Facilities are being reassessed.  The
11    Receiver's staff are confident that the restructuring will result in more efficient strategies and
12    better use of resources.

13            **Out-of-State Facilities**

14            Based on findings of deficiencies in the quality of care provided to two CDCR patient-
15    inmates housed at the Tallahatchie County Correctional Facility in Mississippi, an
16    investigation/review of the care being provided at the facility was conducted by the MOP and
17    members of the Receiver's out of state oversight unit.  (Exhibit 9).  During the week of May 26,
18    2008, 12 staff, including 7 staff from the MOP, 4 staff from the Program Oversight Unit and 1
19    staff person from CDCR's COCF Program spent four days at the institution investigating the
20    circumstances leading up to the death and questionable care provided to the two inmates.  The
21    systemic issues raised concerns regarding the level of health care services provided to the
22    CDCR patient-inmates housed at this facility.  From a broad perspective, the following
23    concerns were identified:

24    1.  Inadequate medical staffing levels and appropriate staff mix for the facility;
25    2.  Nursing and mid-level practitioners were found to be practicing beyond their scope of
26         training and were not adequately supervised;

27
28

3. The credentialing and peer-review systems for clinicians are inadequate and do not appropriately assess individual skill levels with the expected scope of practice at the facility.

A comprehensive report regarding the scope of the investigation and recommendations will be submitted to the Receiver the first week of July 2008. Receiver/CDCR responses to this problem will be described in more detail in the next Quarterly Report

### Community Correctional Facilities

During March and April 2008, Program Oversight Unit staff continued with the audits of two additional CCFs, for a total of four audits being completed to date. The decision was made to postpone the two remaining audits scheduled to be completed by May 31, 2008 after numerous discussions with staff assigned to the Program Oversight Unit; reviewing the findings of the four CCF audits previously conducted; and meeting with CCF contract staff, CDCR CCF staff and institution staff. The Program Oversight Unit is reevaluating the audit instrument used and defining the expectations for the contractors as it relates to clinical standards and health care staffing standards.

### Re-entry Facilities

As to this date, there are no CDCR re-entry facilities to assess.

## GOAL 5. Establish Medical Support Infrastructure

## Objective 5.1. Establish a Comprehensive, Safe and Efficient Pharmacy Program – Maxor Pharmacy Services

Implementation of the Court-adopted *Road Map to Excellence* continues to move forward in a deliberate and timely manner. Implementation activities have been focused upon staffing, implementation of the GuardianRx® pharmacy operating system, maintaining the positive momentum of the Pharmacy and Therapeutics ("P&T") Committee process, enhancing the CDCR pharmaceutical contracting and procurement processes and developing the centralized pharmacy facility. While there have been some obstacles and challenges encountered in many of the implementation activities, Maxor and the Receiver's staff have

1    addressed each of those directly and have been able to maintain positive momentum towards

2    accomplishing each objective.

3        The collective efforts of the pharmacy improvement program guided by the *Road Map*

4    give priority to achieving improved patient safety and health outcomes, developing an

5    evidence-based pharmacy practice and increasing cost-efficiency. Progress continues to be

6    made in addressing each of these priorities. Monthly and quarterly reports to the Receiver

7    have documented this progress. (Exhibit 10).

8        **Development of the drug formulary**

9        As the enhanced CDCR P&T Committee matures into an effective pharmacy program

10   oversight entity, their collective efforts are showing results. Carefully considered, evidence-

11   based Disease Medication Management Guidelines ("DMMG") have been developed for

12   Hypertension and Hypertension Urgency, Asthma (acute and chronic), Diabetes (type 1 and

13   type 2), Hyperlipidemia, HIV, Seizure (acute and chronic), Schizophrenia, Gastroesophageal

14   Reflux Disease (GERD), Peptic Ulcer Disease (PUD) and Chronic Obstructive Pulmonary

15   Disease (COPD). Maxor has provided DMMGs for Hepatitis C and Depression which are

16   currently being reviewed by the P&T Committee. These guidelines outline appropriate clinical

17   standards of care for each of these disease states.

18       Formulary review and maintenance is an ongoing process for the P&T Committee.

19   Several formulary decisions were made during the reporting period. The Committee approved

20   the deletion of quetiapine (Seroquel®) (an atypical antipsychotic with well known potential for

21   abuse and misuse) from the formulary along with a transition plan and specific non-formulary

22   criteria for use within the system. An antipsychotic therapeutic category review was

23   conducted in conjunction with the development of the Schizophrenia DMMG. Preferred

24   formulary agents were selected and approved. Announcement and distribution of the DMMG

25   is pending contract approval on selected formulary agents. A category review of the

26   gastrointestinal agents was also conducted. Approved recommendations included selection of

27   a preferred proton pump inhibitor as well as prescribing criteria for use.

28

Access to the formulary was made available to all providers through the *Epocrates* on-line system. This program is a web-based service designed to ensure that the latest formulary and medication related information is readily available to prescribers and pharmacists.

The establishment of a viable, active and engaged P&T Committee process; the implementation of a CDCR-specific formulary that is managed on an ongoing basis; and the development of treatment medication guidelines that are evidence-based and focused on patient safety are critical components of achieving improved cost-effectiveness in the system. This integrated approach provides a firm foundation for more effective pharmaceutical contracting. In such a system, good clinical decision-making determines the purchasing needs. By standardizing the clinical pathways, those needs can be targeted through appropriate contracting strategies, including an ability to drive market share. Under the revamped system, each purchase is actively monitored to ensure it is the best relative value. As the pharmacy operating system (GuardianRx®) comes online at each facility, this monitoring moves to a real-time basis. These responsive contract strategies and management continue to provide opportunities for cost avoidance. For example, in the first four months of 2008, Maxor has documented cost avoidance of $4,834,079 from the use of targeted contracting strategies resulting from P&T Committee decisions (Exhibit 11).

Contract, purchase and inventory monitoring efforts also continue to yield results by avoiding unnecessary costs due to out-of-stock orders and ensuring that the correct contracted items are purchased. From January through April 2008, $652,988 in cost avoidance was realized by working with the wholesaler to ensure the best priced items were sufficiently stocked at the regional distribution centers and another $640,238 in cost avoidance by directly working with the facilities to ensure the correct contracted items were purchased.

Effective February 1, 2008, the Receiver entered into a new wholesaler (also referred to as a Prime Vendor) agreement with Amerisource Bergen tailored specifically to address the pharmaceutical demands of the CDCR health care system. As the *Road Map* implementation proceeded, it became evident that a more responsive wholesaler contract would be beneficial in achieving the *Road Map* goals. The resulting contract leverages CDCR's developing abilities

29

to manage its pharmacy needs and results in a more responsive, cost-effective arrangement for CDCR.

### Pharmacy policies and procedures

The CDCR P&T Committee has continued its work on a complete revision of the Pharmacy policies and procedures, reviewing and updating them to reflect improved practice standards, implement quality control measures and standardize pharmacy processes. Over the first four months of 2008, the P&T Committee has reviewed and updated 11 chapters of the procedures manual (Chapter 2- Pharmacy Licensing Requirements; Chapter 3 – Pharmacy Responsibilities and Scope of Service; Chapter 6 – After-hours Medication Supply; Chapter 9 - Prescription Requirements; Chapter 10 –Automatic Medication Stop Orders; Chapter 12 - Labeling & Storage Requirements; Chapter 13 -Physician Order Forms; Chapter 14 -Rescue Medications; Chapter 17 - Ordering, Receiving, and Stocking of Medications; Chapter 20 – Floor Stock Medications; and Chapter 27 – Medication Errors and Adverse Drug Reaction Reporting). In addition to pharmacy policy revisions, the P&T Committee also reviewed and approved revisions to three related health care policies (Medical Services Chapter 11 – Medication Management; Mental Health Services Delivery System Program Guide Chapter 12 – Clozapine; and Dental Services Chapter 5.8 – Dental Emergencies). The Receiver anticipates providing finalized copies of these new polices to counsel within 10 days.

Maxor continues to provide support for policy implementation as well as monitoring for adherence to pharmacy policy and procedure. Clinical Pharmacy Specialists provide in-service and implementation support to facility staff as new procedures are released. In addition, Clinical Pharmacy Specialists assistance is provided through in-service training at Regional leadership meetings. A quarterly Pharmacist-In-Charge meeting was held in February 2008, and extensively reviewed policy and procedure implementation issues. Five new policy and procedure training modules were also created and deployed to pharmacy personnel during the reporting period.

Standards for measuring pharmacy program performance continue to be refined. The Pharmacy Dashboard, reviewed monthly by the P&T Committee, provides current and

30

1 historical data on workload, staffing, prescription utilization and cost data for each facility.

2 (Exhibit 10). During this reporting period, stoplight measures were evaluated and added for

3 many Pharmacy Dashboard indicators. Targets were determined after careful evaluation of

4 2007 data and agreement on acceptable measures of performance. The stoplight status will be

5 updated monthly and will help identify facilities that are significantly above or below goal,

6 requiring closer monitoring.

7      The pharmacy inspection process has been well established with documented

8 movement towards compliance across the State. The number of pharmacies with an inspection

9 rating score of pass/problem (not failed) has increased from 21 percent in March 2007 to 67

10 percent in April 2008. Verification and validation of the pharmacy inspections process by the

11 Maxor team has been initiated with the first onsite inspection completed at Avenal State

12 Prison. The purpose of the onsite evaluations is to ensure accurate reporting and to determine

13 whether problems identified in previous inspections have been appropriately addressed.

14 **GuardianRx® implementation**

15      A modified implementation plan was approved by the Receiver to allow for the rapid

16 deployment of GuardianRx® to CDCR facilities over the next 15 months. An intensive process

17 of needs assessment, process review, and gap analysis has been developed and adopted which

18 includes the identification and corrective actions needed to address key infrastructure needs.

19 This process ensures a comprehensive look at each facility's needs and the development of an

20 effective plan to address identified deficiencies. The implementation schedule is highly

21 dependent upon infrastructure, staffing, process improvement and related activities being

22 completed in a timely manner.

23      GuardianRx® implementation has been successfully implemented at six facilities

24 (Folsom State Prison, Mule Creek State Prison, California Men's Colony, California State

25 Prison - Sacramento, California State Prison - Corcoran, and Substance Abuse Treatment

26 Facility). California State Prison - Corcoran and Substance Abuse Treatment Facility represent

27 the first of several scheduled simultaneous dual facility GuardianRx® implementations. A

28 comprehensive schedule for implementation of the GuardianRx® system has been completed

1  and approved by the Receiver. (Exhibit 12). This schedule calls for GuardianRx® conversion
2  to be complete at 23 facilities by the end of 2008 and all facilities by May of 2009. The
3  schedule outlines mandatory training sessions, conversion team schedules and "go-live" dates
4  for each facility.
5  Conversion team meetings began the end of March 2008 for San Quentin State Prison which was
6  expected to go live in May 2008. Unfortunately, facility physical plant delays resulted in the
7  implementation being moved to Summer 2008. Pre-Guardian work continues at several sites
8  with pharmacy computer layout plans completed for California Correctional Center, High Desert
9  State Prison, Chuckawalla Valley State Prison, Ironwood State Prison, California Institution for
10  Women, Valley State Prison for Women, Central California Women's Facility, Kern Valley
11  State Prison, North Kern State Prison and San Quentin State Prison. In addition, initial
12  medication management assessments have been completed at San Quentin State Prison,
13  Chuckawalla Valley State Prison, Ironwood State Prison, Central California Women's Facility,
14  Valley State Prison for Women, Kern Valley State Prison, North Kern State Prison, for
15  California Correctional Center, High Desert State Prison and California Institution for Women.
16  Two regional training centers have been established at California State Prison - Sacramento and
17  California State Prison - Corcoran for GuardianRx® pre-training and approval received for
18  additional pharmacy technologist positions at each facility to assist in training. Ironwood State
19  Prison is the first southern region location to go-live and will include four extra technicians to
20  support training needs for the southern region.
21      **Central-Fill Pharmacy Facility**
22      Work continues related to the establishment of a Central Fill Pharmacy Facility for the
23  CDCR. The pre-centralization ambulatory model is being defined and implemented as
24  processes are standardized and validated as part of the GuardianRx® implementation work
25  plan. A comprehensive staffing pattern assessment was completed through February 2008
26  based on workload and related data. Maxor has worked to ensure that the approved staffing
27  levels are communicated to the facilities with support from the Receiver's Chief of Staff.
28  Revised staffing patterns were approved and instructions given to ensure the approvals were

1  communicated to the facilities. As a result, a letter detailing the approved staffing was sent to

2  all facilities by CDCR Finance in late April 2008.

3           Working with Department of General Services ("DGS"), the Maxor team finalized

4  preliminary site location recommendations for the Central Fill Pharmacy facility, and a

5  document outlining the recommendation was sent to the Office of Receiver for review and

6  approval.   Additional inquiries were requested by the Office of the Receiver relating to the

7  flood plain status of proposed locations.  Maxor worked with DGS to obtain the requested

8  information which was subsequently provided to the Office of Receiver for consideration.  As

9  a result, a determination was made to review additional site locations.  Additional site surveys

10  were completed in May 2008 and a selection will be recommended in June 2008.  Required

11  State funding documents have been processed and approved.  Once a site is approved, the DGS

12  staff, CDCR and Maxor will negotiate final lease and/or purchase terms with the property

13  owner.

14           Concurrently, a detailed RFP document was prepared to address automation needs for

15  the Central Fill Pharmacy facility and was submitted to the Receiver for review and approval.

16  The RFP for pharmacy automation needs must be completed and the automation vendor

17  chosen in order to finalize the floor plans and related specifications for the centralized

18  pharmacy facility. The RFP was released on May 8, 2008 with a June 20, 2008 deadline for

19  receiving responses.  A mandatory bidders conference was held on June 3, 2008 to address any

20  questions from prospective bidders.  An evaluation team comprised of representatives from

21  CDCR, the Office of the Receiver, and Maxor will review RFP responses and make a

22  recommendation to the Receiver for final approval.

23  **Objective 5.2.  Establish Standardized Health Records Practice**

24           On April 4, 2008, the Receiver issued an RFP for professional management services to

25  assist the CPHCS in addressing staffing and organizational issues related to the effective

26  management of inmate health records.  The Receiver's Chief Medical Information Officer

27  subsequently conducted a bidder's conference April 25, 2008, at the Health Records Center in

28  Sacramento, California to provide potential bidders with background information regarding the

33

1   Receivership and its challenges, as well as additional details regarding the current state of health

2   information management in the prisons. The deadline for submission of proposals is Tuesday,

3   June 17, 2008.

4   **Objective 5.3. Establish Effective Radiology and Laboratory Services**

5   **Laboratory services**

6   On June 20, 2007, the Receiver issued an RFP for professional services to perform

7   Enterprise Clinical Laboratory Assessment and Planning to advise the Receiver as to the best

8   approach for improving laboratory services for patient-inmates. The award went to Navigant

9   Consulting. On March 24, 2008, Navigant presented their findings and recommendations

10  which are as follows: (1) laboratory services do not meet health care requirements to patient-

11  inmate; (2) the status quo in laboratory operations is unsafe and prone to adverse patient

12  outcomes; and (3) current laboratory operations are unsustainable.

13  The findings were accepted by the Navigant Steering Committee, which proposed the

14  following courses of action to the Receiver to begin immediately: (1) derive the Clinical

15  Laboratory Governance Council from the existing Navigant Steering Committee; (2) hire a

16  senior lab director and a laboratory pathologist through an interagency agreement with another

17  State agency; (3) rebid reference lab contracts to improve costs, services, and accountability of

18  laboratory services; (4) close laboratories in non-licensed facilities, and if allowable, also close

19  laboratories in licensed facilities (if not allowed by regulation, begin remediation to bring labs

20  up to quality standards); (5) enhance in-house point of care testing to include additional

21  offerings to improve care and reduce reliance on external STAT labs; and (6) work with Plata

22  Personnel Services to redesign duty statements and job classifications to reflect new personnel

23  roles in light of the in-house laboratory closures and other changes.

24  **Radiology services**

25  On September 11, 2007, the Receiver issued an RFP for professional services to

26  perform an Enterprise Imaging and Radiology Assessment and Planning to advise the Receiver

27  as to the best approach for improving radiology services for patient-inmates. The award went

28  to McKenzie Stephenson, Inc. On April 21, 2008, McKenzie Stephenson, Inc. presented their

34

1   draft assessment which indicated the following: (1) medical diagnostic imaging service is

2   wasteful, inefficient and delinquent in almost every element; (2) imaging services fall far short

3   of any acceptable level of care for this discipline; (3) the combination of deficient work

4   processes, lack of leadership, poor technology decisions and a profound absence of standards

5   may be actively causing harm to patient-inmates and staff. Currently, McKenzie Stephenson,

6   Inc. is developing the final report of findings and recommendations including a strategic

7   roadmap for delivery in late June 2008.

8      Both the laboratory and radiology services programs are awaiting the appropriate

9   leadership. Once the RCEA positions are approved, we can move forward with these

10   initiatives.

11   **Objective 5.4. Establish Clinical Information Systems**

12      In October 2007, the Receiver issued an RFP for a clinical data repository ("CDR") and

13   portal solution. The goal of the CDR project is to store key patient health information, such as

14   current medications, allergies, lab results, encounters, problems, etc., in a standardized manner

15   and make this information available to providers at the point-of-care to support clinical

16   decision making. The Receiver's Chief Medical Information Officer and Director of Health

17   Information Integration conducted a bidders teleconference on October 10, 2007, to provide

18   potential bidders with background information regarding the Receivership and its challenges,

19   as well as additional details regarding the desired solution and corresponding requirements. In

20   the end, 20 vendors submitted proposals in response to the request. The proposals were

21   reviewed over a three week period by a proposal review committee that consisted of members

22   of the Receiver's IT team, a *Coleman* representative, CPHCS staff, and a nationally-recognized

23   expert in health care IT retained by the Receiver to assist during the selection process.

24      The proposal review committee subsequently selected six proposals to evaluate further

25   and invited the respective vendors to interview with the Receiver's staff; the vendors selected

26   were: 3M Health Information Solutions, Accenture, Allscripts Healthcare Solutions, Emergis,

27   IBM, and Medicity. The Receiver's staff conducted in-person interviews from December 12

28   through December 17, 2007, in its San Jose office. The interviews involved meetings with

three separate evaluation committees: (1) executive committee consisting of senior management from both the Office of the Receiver and CPHCS, as well as representatives from the *Coleman* and *Perez* cases; (2) clinical user committee consisting of CDCR clinical staff (e.g., physicians, dentists, nurses, psychiatrists, etc.) from a variety of institutions throughout the State; and (3) technical committee consisting of members of the Receiver's IT team, a *Coleman* representative, CPHCS staff, and a nationally-recognized expert in health care IT retained by the Receiver.

After the interviews, each of the committees submitted their respective recommendations to the Receiver's IT team. The solution stack proposed by both Accenture and IBM was the first choice of all three committees, followed by 3M and Allscripts. The team subsequently conducted due diligence activities in January and February 2008 by meeting with vendor product teams, performing site visits, interviewing current and former product managers, etc. On February 28, 2008, the Receiver issued a notification of award to IBM, indicating that it had been selected to deliver the clinical data repository and portal solution, pending the successful completion of contract negotiations. From March through May 2008, the Office of the Receiver has been in contract negotiations with both IBM and the principal subcontractors (Initiate Systems, Oracle, and Orion Health). Negotiations recently concluded, and the contracts are awaiting final review and signature.

**Objective 5.5.  Expand and Improve Telemedicine Capabilities**

As reported in the Seventh Quarterly Report, the University of Texas, Medical Branch ("UTMB") submitted its assessment and telemedicine roadmap to the Receiver.  A majority of the recommendations contained in the report are difficult to implement until such time as the Health Care Information Network has been rolled out to all 33 institutions.

In the interim, the Office of Telemedicine Services ("OTS") is addressing some of the issues contained in UTMB's report to improve efficiency and increase services to the patient-inmate population.  Management has embarked on an analysis of current processes within the OTS and is in the process of implementing changes to improve the efficiency of staff.  OTS is also working collaborative with Mental Health staff to increase services to a number of

36

1    institutions. To increase the network of telemedicine providers, a meeting has been scheduled

2    with the Contracts Branch and the Healthcare Invoice, Data and Provider Services Branch to

3    discuss issues and the development of additional telemedicine provider contracts.

4    Additionally, OTS has been asked to engage in a series of pilots to expand its off-site

5    specialty provider network to medical centers more closely affiliated with specific prisons to

6    facilitate telemedicine augmentation of procedure-based care. To adequately pursue these

7    pilots, a project manager has recently been assigned to work with the providers to develop

8    detailed proposals and sound implementation plans which include clear guidelines, processes

9    and responsibilities, in addition to measurable outcomes. The expectations for these pilot

10   telemedicine programs include improved access to care, expedited patient access to specialty

11   physicians, improved patient outcomes, reduced  necessity for transporting inmates out of the

12   institution for initial and follow-up appointments, and ultimately establishing telemedicine as a

13   standard resource for addressing access to care for routine and follow-up appointments.

14   **GOAL 6. Construct Necessary Clinical, Administrative and Housing Facilities**

15   **Objective 6.1. Upgrade administrative and clinical facilities at each of CDCR's 33 prison**

16   **locations to provide patient-inmates with appropriate access to care**

17   **Assessment and planning efforts**

18   The assessments and planning to renovate or build new clinical space at each of the 33

19   prisons continues. The Facility Master Plans for the Correctional Training Facility, California

20   Rehabilitation Center and Mule Creek State Prison (the second, third, and fourth prison

21   respectively to undergo the planning process) were reviewed by an architectural consultant and

22   approved by the Receiver. At present, a motion is pending before the Court concerning these

23   upgrade proposals.

24   The Site Planning Committee began assessing clinical space at the California

25   Institution for Women on February 8, 2008 and the California Institution for Men on February

26   11, 2008. Similar to the previous assessments, an analysis of existing facility space was

27   completed at both prisons, and multiple coordination meetings (which included *Coleman* and

28   *Perez* representatives and CDCR's Facilities Management) were held to review concepts and

1  coordinate needs specific to each prison. The Facility Master Plans were completed and

2  agreed upon by the respective Warden; Associate Warden, Health Care Services; Chief

3  Medical Officer; and Director of Nursing as well as a member of CDCR's Facilities

4  Management on March 28, 2008 for the California Institution for Women and on April 14,

5  2008 for the California Institution for Men. The Master Plans have been reviewed by an

6  architectural consultant and are awaiting approval by the Receiver. The Master Plan for the

7  California Institution for Women includes seven construction projects such as additions and

8  renovations to existing buildings for more clinic space, (inclusive of pharmacy, mental health,

9  and dental); new modular clinics, one for the Reception Center and one for the Administrative

10 Segregation Unit; and a medical supply warehouse. The Master Plan for the California

11 Institution for Men includes ten construction projects such as additions and renovations to

12 existing buildings for more clinic space, (inclusive of pharmacy, mental health, and dental); a

13 new modular clinic for the North and South Minimum Security Facilities, West Reception

14 Center, Receiving and Release area, and Administrative Segregation Unit; and a medical

15 supply warehouse. The approximate cost and timeframe for these Master Plans are not yet

16 known but will be provided in the Receiver's next quarterly report to the Court.

17       Consistent with the robust schedule as outlined in the Seventh Quarterly Report, the

18 Site Planning Committee is in the process of conducting assessments at three prisons

19 simultaneously with staggered start dates earlier than originally planned. Planning for Richard

20 J. Donovan Correctional Facility started on April 1, 2008, Folsom State Prison on April 22,

21 2008, followed by California State Prison – Sacramento on June 3, 2008. On June 17, 2008

22 planning for High Desert State Prison and California Correctional Center (co-located in

23 Susanville) California is scheduled to begin. It is anticipated the assessments and preliminary

24 planning for these five prisons will conclude approximately eight weeks after the respective

25 start date. By August 2008, the Master Plans for all five prisons will be completed.

26       Looking ahead, the Master Schedule for planning and assessments of the remaining

27 prisons is currently undergoing revision. The Site Planning Committee is attempting to group

28 the rest of the prisons geographically where possible in order to incorporate the three-team

1   approach and provide efficiency in planning and travel.  Once the approach is agreed upon, a

2   revised Master Schedule will be formalized and provided to the Court.  As planned, the

3   Receiver continues to complete a Master Plan for each prison by January 2010.

4        In addition to the Master Schedule, a special planning project was initiated May 13,

5   2008 at Salinas Valley State Prison.  The Salinas Valley Psychiatric Program (Intermediate

6   Care Facility) opened in 2006 without adequate treatment space.  The project includes

7   providing group and treatment rooms within the housing and yard facility.  The Master Plan

8   for this project will be completed on June 13, 2008 and funded by the CDCR.

9        **Avenal State Prison construction**

10       Presently, Avenal State Prison is the only prison in the implementation phase of

11  construction.  As a result of the Receiver's recent tour of the prison, additional projects were

12  added to the Avenal State Prison Facility Master Plan.  In addition, some projects were

13  combined for bid purpose.  So for purposes of this and future reports, the projects are now as

14  follows:  Project Three, Modifications of Building #390 - Infirmary, is combined with Project

15  Seven, Infirmary Conversion & Pharmacy Relocation.  Project Four, Temporary Conversion of

16  Isolation Rooms, was removed.  Project Six, Modular Health Services Administration

17  Building, was combined with Project Five, Complex Yard Clinics, and the scope was increased

18  to incorporate space for medical records, the newly formed Custody Health Care Access Unit

19  and newly hired medical staff.  (These elements have been incorporated in all subsequent

20  assessments.)  Finally, Project Eight, the Facility Pill Room Expansion, was combined with

21  Project Nine, the Administrative Segregation Clinics, and the scope and location changed to

22  include a free-standing clinic west of the Administrative Segregation Unit.  The Master Plan

23  Addendum will be completed on June 12, 2008 and provided to the Court in the next Quarterly

24  Report.

25       Despite the modifications to the design, the implementation phase of construction has

26  continued.  Based on the recommendations of the County Department of Public Health, an

27  occupational health and safety consultant was hired to assist with finalizing the Valley Fever

28  mitigation plan.  It is anticipated the report will be finished by the end of July 2008 with

1  concurrence by CPHCS staff, the Receiver, and county health officials soon thereafter.

2  Consultants were contracted for the topographical survey and geotechnical services. Once the

3  reports are received the bid documents for the medical supply warehouse, health services

4  building and complex clinics will then be finalized and the projects opened for bid. Five of the

5  six additional mobile clinics as required in project one were delivered. The manufacturer of

6  the clinics delivered the sixth mobile clinic on June 10, 2008. Plumbing work to connect the

7  mobile clinics is underway and electrical work is preparing to start. The design draft for

8  modifications to the infirmary and pharmacy relocation is complete, and the project is out to

9  bid with a bid date of June 18, 2008. Contracts are expected to be awarded and construction to

10  begin within two weeks of the bid date. The schedule is designed to parallel the planned roll-

11  out of the GuardianRX® by Maxor. The anticipated date of completion remains July 2009.

12  **Objective 6.2. Construct administrative, clinical and housing facilities to serve up to 10,000**

13  **patient-inmates with medical and/or mental health needs**

14       The Receiver has defined plans for seven new facilities of 1,400 to 1,700 patient-

15  inmates each, for a total of 10,000 beds. Each California Health Care Facility will

16  accommodate roughly equal numbers of medical and mental health patient-inmates with

17  centralized clinical, administrative and support service spaces. Two facilities (one north and

18  one south) will accommodate women in separate but equal accommodations. A "Facility

19  Program Statement," describing each project in detail, will be completed by URS Bovis Lend

20  Lease Joint Venture ("URS-BLL") in June 2008, for approval by the Receiver by July 15, 2008.

21  Site evaluations are underway at eight existing CDCR locations:

22  Northern California

23  • California Medical Facility/California State Prison – Solano

24  • Deuel Vocational Institution – Tracy

25  • California State Prison – Sacramento/Folsom State Prison

26  • Northern California Youth Correctional Center – Stockton

27

28

<u>Southern California</u>

- Richard J. Donovan Correctional Facility – San Diego
- Ventura Youth Correctional Facility – Camarillo
- California Institution for Men – Chino
- Nelles Youth Facility – Whittier

Environmental analysis and infrastructure engineering investigations are proceeding at seven of the locations to identify the three best candidates for the earliest environmental impact reports, and mitigations, as well as to determine the least challenging infrastructure engineering problems, in anticipation of environmental certification of one site by January 2009, and two others by April 2009 and July 2009. The current "first/fastest" candidate sites based on this criteria include Northern California Youth Correctional Center, Richard J. Donovan Correctional Facility, and Ventura Youth Correctional Facility. A community outreach program is being implemented at each location to advise elected officials, business and community leaders, and the local press of the upcoming projects, to identify concerns, and to define reasonable mitigations for the projects to move forward.

The selection process is underway for the Integrated Project Delivery ("IPD") teams for building design and construction of the first three facilities. Design-build contract awards are targeted for January, April, and July of 2009. The selection process is underway for separate design-build teams for site and infrastructure "enabling projects" at the first three sites, intended to start demolition, remediation, utility work, and site grading while building design is underway. Enabling projects design-build agreements are to be awarded in an October 2008 to December 2008 timeframe, and are expected to start site preparation construction as soon as the Environmental Impact Reports ("EIR") are certified.

It should be noted that this program may be vulnerable to delay as the result of funding delays, EIR approval delays, including community impact issues, and to decision-making delays for issues expected to be highly political, technically complex, or impacted by CDCR, counsel, or the other Courts involved in construction. The Receiver's team is developing strategies to mitigate potential delays.

41

**Objective 6.3. Complete Construction at San Quentin State Prison**

The construction projects of new and/or renovated clinical space at San Quentin State Prison continue to progress with the involvement of San Quentin State Prison personnel, the Receiver's custody subject matter experts, *Coleman*, *Perez* and *Armstrong* representatives, and the Department of Finance.

Prior to the Seventh Quarterly Report, three of the eight projects in Construction Package One were completed: Project Two, Replacement Parking Spaces; Project Five, the Triage and Treatment Area Renovation; and Project Eight, Addition of Re-locatable Office Space Trailer. During this reporting period, Project Three, Relocation of Individual Exercise Yards, was completed on April 28, 2008. Unfortunately due to delays in the bidding and contract approval process, two of the four remaining projects will not be completed by the anticipated date of December 2008 as set forth in the Receiver's Turnaround Plan. The new anticipated date of completion for all projects in this package is February 2009.

The following are updates for each of the four remaining projects:

1.    Project One, the Personnel Offices, was authorized by the Receiver on March 24, 2008 and the contract was signed. The builder was given a Notice to Proceed with construction on March 26, 2008 and construction began March 27, 2008. The anticipated date of completion is now September 22, 2008. Recently, this project encountered an issue when the soil was discovered to have nickel content that was slightly above hazardous level. As a result, the project was delayed by about two weeks as tests were done and the issue resolved. At this point the extent of the delay and its effect on the completion date has not yet been determined. The building pad is now ready and foundation excavation is beginning. It is expected that framing of the building will be complete and exterior closure will be ongoing in the next three months.

2.    Project Four, Medical Supply Warehouse, was opened for bid on March 31, 2008. Bids were received and the Selection Panel chose a builder, although due to delays in the contract approval process construction did not begin on May 1,

42

1   2008.  The new commencement date is June 23, 2008 and the new anticipated

2   completion date is February 2009.  The contractor will conduct additional

3   geotechnical investigations and begin the design process once the Notice to

4   Proceed is issued.  The design should be completed and approved and it is likely

5   that some site demolition and preparation will begin within the next three

6   months.

7   3.   Project Six, Expansion of the East and West Block Rotundas, commenced

8   construction on March 17, 2008 and is currently running approximately 70 days

9   behind schedule.  The new electrical panels have not arrived and have caused

10  several tasks to be delayed such as the relocation of the transformers and the

11  construction of the building pad.  Due to the delays the project will not meet the

12  November 12, 2008 completion date.  The contractor is in the process of re-

13  sequencing the work, and if able to do so, the project could be completed by

14  December 2008.  If not, the new date could be as late as February 2009. Intense

15  discussions are ongoing with the contractor and the electrical subcontractor to

16  mitigate the delays. In the next three months, the transformers will be relocated

17  and the building foundations will be complete. The masonry walls will be

18  ongoing.

19  4.   Project Seven, Upgrade to Adjustment Center Clinic, North Segregation Clinic,

20  and Gym Clinic, may increase in scope from the original plan to provide heated

21  ventilation.  These proposed modifications are being evaluated and priced by

22  the construction management team and submitted to the Receiver for approval.

23  The heating project received three quotes and a recommendation is being

24  forwarded to the Office of the Receiver.  The heating project remains on task to

25  be completed by September 15, 2008 pending contract approval.  Completion

26  time for the balance of the work will be developed upon approval of the budget.

27  As explained in the Seventh Quarterly Report, two of three projects in Construction

28  Package Two are complete.  The remaining project, Project One, Primary/Specialty Care

43

1  Modular, received design approval on March 10, 2008. Site work began on May 8, 2008 and

2  the modular fabrication was delivered and set on the foundation the week of May 19, 2008.

3  The furniture, equipment, and telecommunication packages are being finalized for

4  procurement. Although the schedule is currently tight, the project remains on task to be

5  completed by August 15, 2008.

6      Construction Package Three, the Central Health Services Facility, is progressing well.

7  The working drawings were submitted on March 21, 2008 and approved, the demolition of

8  Building 22 is complete, the retaining wall reinforcement is complete, and construction of the

9  foundation commenced on April 15, 2008. Foundation work will continue, steel erection will

10  start in mid-June and substantial progress is expected in the next three months. This project

11  remains on task to be completed by April 2010.

12                                  **III.**

13              **PARTICULAR SUCCESSES ACHIEVED BY THE RECEIVER**

14      The Receiver's successes concerning the medical initiatives are included in the "Status

15  of Turnaround Plan Initiatives" above. The following additional achievements should be

16  reported:

17      A.    As mentioned above, the Receiver's Turnaround Plan was approved by the

18            Court.

19      B.    The Receiver has completed the shut-down of the San Jose office, resulting in

20            significant reduction in overhead and operational expenses.

21      C.    The Receiver has hired a new Chief Information Officer and Public Information

22            Officer.

23      **Overview of the Receiver's Project Management Office.**

24      Shortly after his appointment, the Receiver's Chief Information Officer, Jamie

25  Mangrum, established the Receiver's Project Management Office ("PMO"). The PMO is the

26  first necessary step toward improving the project, program and portfolio management within

27  the Office of the Receiver, and will provide for greater organization and accountability related

28  to Turnaround Plan initiatives.

                                    44

To jump start this program, in April 2008 the Receiver hired a consultant to serve as the project manager for building and deploying the PMO. The responsibility of the consultant is to develop the PMO processes and library of templates, deploy an appropriate electronic Project and Portfolio Management (ePPM) system and help identify project management needs throughout the organization and staff for those needs.

As of the close of the reporting period, the PMO has developed and deployed a library of PMO materials and templates (e.g. project plan templates, project charter templates and workflow diagrams) for all project managers to utilize, and purchased an "ePPM" system. The ePPM will assist project managers deliver projects within scope, schedule and budget and provide needed tracking tools for the PMO to manage its procedures and controls for collecting information, performing data analysis, optimize decision making and strengthen controls. The system will also give the Office of the Receiver the ability to track and report on all projects and align them with the goals and objectives laid out in the Receiver's Turnaround Plan.

One of the first challenges for the PMO was to hire needed project managers for all Office of Receiver projects. As of the end of the reporting period the PMO has employed nine project managers, and is working to add eight additional project managers by the end of June 2008. Additionally the PMO, in cooperation with Plata Human Resources, has developed the duty statements for two new project management classifications within California State civil service. These classifications are project manager and senior project manager. Both classification packages have been submitted to SPB and the Department of Personnel Administration for review and approval. The intent is that once the classifications are approved we would then conduct exams, create permanent civil service positions and recruit for those newly established positions.

**IV.**

**PROBLEMS BEING FACED BY THE RECEIVER, INCLUDING ANY SPECIFIC**

**OBSTACLES PRESENTED BY INSTITUTIONS OR INDIVIDUALS**

A.  Introduction.

Before the Receiver is able to provide the long-term medical care required by approximately six percent of the CDCR's population, before the *Coleman* remedial plan can provide adequate mental health treatment to those CDCR prisoner/patients with serious mental health problems, and before the members of the *Armstrong* class can be provided with adequate treatment and the appropriate housing required by their disabilities, adequate health care facilities must be constructed.  Carefully calibrated studies by expert consultants have identified the need for medical and mental health treatment facilities for 10,000 prisoner/patients.  No one seriously disagrees with these projections.  Indeed, the scope of the existing shortfall in treatment facilities provides yet another example of the seriousness of the State's long-term failure to provide constitutionally adequate medical and mental health facilities for its prisoners.

Simply stated, before constitutionally adequate health care can be delivered in California's prisons, there needs to be *constitutionally adequate treatment facilities to provide such care*.  Unless and until these facilities are constructed, the major health care class action cases will continue indefinitely.  Likewise, prisoners will continue to die unnecessarily.

In the Receiver's March 11, 2008, draft of the Turnaround Plan, and in other documentation available on the Receiver's website, the Receiver presented the State with the details of its facilities planning, which included the upgrade program described in Objective 6.1, the 10,000-patient expansion program described in Objective 6.2, and the San Quentin program described in Objective 6.3. Funding for the San Quentin construction program has been previously secured. The Receiver needs the State's commitment to fund the upgrade program in the amount of $1 billion and to fund the expansion program in the amount of $6 billion. Notwithstanding our best efforts this spring, the State has refused to commit itself to

46

1    providing *any* of the funding necessary for either the upgrade program or the expansion
2    program.

3    B.  Avoidable Prisoner Deaths That Continue to Take Place Because of the Lack of
4         Access to Long-Term Health Care Facilities.

5         If the consequences of the State's willful obstruction were not so serious and so
6    immediate, the State's behavior might be excusable. But the hard truth is that men and women
7    continue on a daily, weekly and monthly basis to suffer and die unnecessarily in California
8    prisons as a direct result of the unconstitutional health care conditions for which the State and
9    its leaders are responsible. Every moments delay in implementing the Receiver's Turnaround
10   Plan results in avoidable suffering and death. Without question, one of the primary factors
11   creating unnecessary prisoner deaths has been the State's refusal to construct adequate
12   treatment facilities for California's prisoners.

13        Three recent examples of avoidable prisoner deaths illustrate the human cost of the
14   State's failure to provide adequate funding for needed health care treatment facilities:

15   1.  Patient A was a 44 year old male diagnosed with Ankylosing Spondylitis, a chronic
16        inflammatory disease affecting primarily the back, neck and hips. The term
17        "ankylosing" means "joining together;" the term "spondylitis" means inflammation
18        of the vertebrae. Based on available X-rays, Patient A's chart indicated as follows:
19        "AP cervical spine, AP thoracic spine and AP lumbar spine all show Ankylosing
20        Spondylitis with back completely fused. The hips are completely gone both right
21        and left." The condition can be extremely painful and, given other common related
22        problems (e.g. abscesses), very difficult to manage. Patient A should have been
23        treated in a long-term medical facility which provides the interdisciplinary
24        treatment necessary; however, adequate facilities for long-term medical problems
25        do not exist in CDCR. Instead, Patient A was housed in a Correctional Treatment
26        Facility ("CTC") in a remote prison. While licensed, a CTC without specialized
27        services is entirely unsuitable for long-term care. In late January 2008, after more
28        than a year of CTC confinement, Patient A's condition deteriorated rapidly. He

47

1  was unresponsive to pain management efforts and died suddenly on February 12,

2  2008.

3     2.  At present, there exist serious shortages of mental health inpatient beds (including a

4  waiting list of 162 for long-term intermediate care hospitalization).  At present,

5  CDCR simply does not have anything near adequate mental health treatment

6  facilities for prisoners with serious mental health problems.  Patient B was a 36 year

7  old male diagnosed with Hepatitis C antibody positive, paranoid schizophrenia,

8  history of head trauma, borderline intellectual functioning, antisocial personality

9  disorder, and history of substance abuse.  Incarcerated continually since 1994,

10  Patient B has been, in the past, admitted to both mental health crisis housing and

11  administrative segregation housing.  These placements were for safety concerns.

12  Because of his mental health problem, Patient B was vulnerable to victimization

13  when housed in "general population."  He was last housed in general population,

14  however, and also double-celled.  On November 26, 2007 Patient B was found in

15  his cell unresponsive with multiple wounds about the head, weak pulse, agonal

16  breathing and fixed dilated pupils.  He was transferred to a local hospital,

17  determined to be brain dead, and care subsequently withdrawn.  According to

18  CDCR officials, Patient B had been beaten to death by his cellmate.

19     3.  At present, the CDCR does not have any housing units designed to adequately

20  provide for the needs of developmentally disabled prisoners.  Patient C was a 36

21  year old prisoner with the functional IQ of a nine-year old, and documented seizure

22  disorders.  An adaptive evaluation dated July 14, 2005 required "close supervision"

23  in order to remind Patient C to take his medications.  However, instead of being

24  placed in a medical sheltered living unit (no such facilities exist in CDCR), Patient

25  C was confined to an overcrowded dormitory in one of California's most

26  deteriorated prisons.  In late 2007, Patient C began to encounter problems with

27  medication management and his behavior.  On November 9, 2007, as the result of

28  an alleged battery, Patient C was transferred (without his medical records) to a

1  nearby high security prison administrative segregation unit.  Thereafter, between

2  November 9, 2007 and January 4, 2008 Patient C "missed" four medical

3  appointments (the exact causes for the "missed" appointments is currently under

4  investigation).  On January 17, 2008 Patient C returned to dormitory housing;

5  however, there is no indication that the necessary close supervision to remind him

6  to take his medications was provided.  Indeed, given the age and structure of the

7  dormitory, and the limited staffing at this facility, it does not appear reasonable to

8  expect minimally adequate care for developmentally disabled prisoners to be

9  delivered at the prison where he had been housed.  On January 27, 2008 another

10  prisoner in the dormitory reported to correctional officers that Patient C was having

11  a seizure.  Prisoner C died the same day.

12      C.  The Receiver's Efforts to Work with State Officials to Fund Necessary Long-Term

13         Health Care Facilities.

14  Within two weeks after his appointment on January 23, 2008, the Receiver, after

15  conferring with officials in the Governor's Office and the Department of Finance, had decided

16  upon the appropriate strategy for securing the necessary $7 billion in funding for the upgrade

17  and expansion programs. The Receiver decided to find an experienced author to carry a single

18  bill that would contain lease-revenue bond financing for the entire construction program. This

19  choice was dictated by several factors:

20      • Consistent with the Court's orders requiring the Receiver to resort to ordinary State

21         processes before turning to the Court for more intrusive relief, the Receiver decided

22         to seek legislative authorization for the construction program.

23      • Given the speed with which the Receiver intends to build, and the construction

24         management approach (which requires full funding for a building to be available

25         up front before construction commences), the Receiver needs the State to commit

26         to funding approximately $3.5 billion during FY 2008-2009, $2.0 billion during FY

27         2009-2010, and $1.5 billion during FY 2010-2011.

28

49

- In light of the difficulty of securing legislative approvals, the Receiver did not want to piece-meal the funding of the construction program. That approach would subject the Receiver to a significant risk of legislative meddling in subsequent years.

- Given the State's serious budget and cash management problems, bond financing appears to be the only sensible fiscal alternative. Although bond financing substantially increases the overall costs of a construction program compared to a "pay-as-you-go" approach, bond financing substantially reduces the annual costs and delays the impact on the State's General Fund until each building is completed and occupied. This would give the State three years to plan for how it would pay the on-going lease payments to repay the bond.

- Because of the substantial difficulties that have plagued the implementation of AB 900 and the fact that AB 900 did not contain nearly enough funds for the construction of necessary health-care-related facilities (less than $1 billion had been allocated in AB 900 to health care facilities, and the parties who negotiated AB 900 had all agreed last year that this sum was simply a "placeholder" until the Receiver had fully estimated its construction costs), the Receiver decided to seek a "clean bill" to fund the Receiver's entire construction effort without any ties to AB 900.

The Receiver approached Senator Michael Machado (D-Linden) to author the bond bill. Senator Machado is the Chair of the Senate Budget Sub-Committee with authority over the Department of Corrections and Rehabilitation and has almost fifteen years experience in the California Legislature, both in the Assembly and the Senate. He introduced the bond bill, Senate Bill ("SB") 1665, on February 22, 2008.

The Receiver secured the services of Mr. Ray Le Bov to represent the Receiver in legislative discussions regarding SB 1665. Mr. Le Bov has almost three decades of experience in the State Capitol. He served for over ten years during the 1990s and early 2000s as the head

1 of the Office of Governmental Affairs for the California Administrative Office of the Courts.

2 His integrity and knowledge of legislative processes is unsurpassed.

3       The Receiver and Mr. Le Bov met with all members of the relevant Senate policy and

4 appropriations committees before SB 1665 was heard, and held other meetings with key Senate

5 and Assembly budget staff and members. The Receiver supplied comprehensive

6 documentation regarding the need for, the scope of and the plans for the upgrade and

7 expansions programs. SB 1665 was passed by the Senate Public Safety Committee on April

8 29, 2008, by a 4-1 vote. It was passed by the Senate Appropriations Committee on May 8,

9 2008, by a 9-1 vote.

10       Based on discussions with legislators and feedback from legislative staff and Senator

11 Machado's office, it appeared that we had the necessary two-thirds vote to clear the Senate (a

12 two-thirds vote was required because the bill contained an appropriation and urgency clause so

13 the bill would become law immediately upon enactment). In particular, the Receiver believes

14 that four or five Republican Senators were prepared to vote for the measure, more than enough

15 to clear the Senate.

16       We had planned to have the bill taken up on the Senate floor on May 15, 2008. Late on

17 May 14, 2008, Senator Machado's office received a call from staff from the Legislative

18 Analyst's Office ("LAO") indicating that they were planning on issuing a report the following

19 week on SB 1665 that, among other things, would indicate that the bill contained some major

20 legal conflict with provisions in the Prison Litigation Reform Act.  We could not schedule a

21 meeting with the LAO before the Senate floor vote on May 15, 2008 to determine more

22 precisely what legal conflict supposedly existed.  Faced with the prospect of taking a floor vote

23 with a subsequent LAO report that might identify a major legal conflict, Senator Machado

24 decided, with the Receiver's concurrence, to delay the vote.

25       When we met the LAO staff on the afternoon of May 15, 2008 we learned that staff was

26 asserting that 28 U.S.C. § 3626(a)(1)(C) might legally bar the Receiver and/or the Court from

27 ordering the State to make expenditures to improve and/or expand healthcare-related facilities

28 for use by inmate-patients.  LAO staff admitted during this meeting that they had identified

1    this provision *during the discussions surrounding AB 900 in 2007* as establishing a potential

2    problem. LAO staff had not raised the issue at all with the Receiver during the consideration of

3    SB 1665 until the night before the bill was scheduled for a vote on the Senate floor, when LAO

4    informed Senator Machado's staff of the potential problem. The timing of the phone call to

5    Senator Machado on May 14 leaves one with the clear impression that the timing was designed

6    to forestall SB 1665's successful passage out of the Senate.

7         On the merits, LAO's argument does not hold water. Section 3626(a)(1)(C) was written

8    to ensure that the *limitations* placed on equitable relief contained in Section 3626(a)(1)(A)

9    were not creatively transformed into an *independent source of power* to order the construction

10   of prisons or the raising of taxes (that is the purpose of the "nothing in this section" language at

11   the beginning of Section 3626(a)(1)(C)). Section 3626(a)(1)(C) by its plain language and

12   ordinary construction does not place any new or additional limitation on the Court's equitable

13   powers to order appropriate relief for constitutional violations.

14        Nevertheless, LAO had successfully put off the Senate vote in order to give itself the

15   additional time it needed to issue a report on SB 1665 the following week. (Exhibit 13). In

16   addition to repeating its argument regarding 28 U.S.C. § 3626(a)(1)(C), the LAO report

17   contained a series of statements and criticisms that fly in the face of this Court's findings and

18   orders, and the findings and orders in *Coleman.* For example, the LAO report asserts:

19        • ***Need for 10,000 New Beds Uncertain.*** *The Receiver proposes that 5,000 beds at
            the stand-alone facilities be developed for chronically ill inmates with medical*

20          *needs, while another 5,000 beds would be for inmates who primarily have mental
            health needs. However, our analysis indicates that the number of new prison beds*

21          *proposed to be built in the Receiver's medical facilities has not been fully justified.*

22        This statement is false. The LAO was provided with more that ample documentation of

23   bed needs, including prior Court orders and the Abt Associates, Inc. and Navigant Consulting,

24   Inc. bed studies.

25        • *Notably, the prison population has dropped over the last year, and the most
            recently adopted prison inmate population projections, which have not been taken*

26          *into account in the Receiver's planning assumptions, indicate that the inmate
            population will decline modestly over the next five years. The Receiver has partly*

27          *justified his plans on the assumption of significant inmate population increases, but
            the most recent projections by the California Department of Corrections and*

28          *Rehabilitation (CDCR) show actual numbers in 2012 will be 22,000 lower than
            what was projected when the Receiver developed his plan last year. While it is not*

1  *clear to us that these new projections will prove to be accurate, this significant*
2  *reduction in the projections means that the assumption that 10,000 beds will be*
   *needed should be reevaluated.*

3  The above statement is misleading. There is no evidence that low security population

4  cuts will impact the long-term need for medical and mental health beds. Furthermore, the

5  Receiver has repeatedly stated that he intends to re-evaluate clinical bed needs every six

6  months.

7  - *The number of new beds proposed specifically for seriously mentally ill inmates*
     *appears to exceed the orders of the federal court in another case, known as the*
8     *Coleman case. A bed plan approved by the Coleman court ordered the*
       *development of about 4,000 new beds at various levels of care, while the Receiver's*
9     *plan identifies about 5,000 beds for such purposes. The Receiver's plan also does*
       *not appear to take into account a series of construction projects that the Coleman*
10    *court has already authorized that would provide hundreds of additional beds for*
       *mentally ill inmates. We asked the Receiver's office to reconcile the number of*
11    *beds for this purpose to its proposal with the Coleman court plans, but it did not do*
       *so in its written responses to our questions.*
12

13  The above statement is misleading, and ignores the fact that the LAO and the

14  Legislature have failed over the course of many years to fund beds required by *Coleman*. The

15  LAO's assertion that the Receiver failed to reconcile the 10,000 beds project with *Coleman*

16  needs is false.

17  - *The Receiver has asserted that concentrating chronically ill inmates in seven new*
     *facilities would be more efficient than attempting to provide an improved level of*
18    *care for this same population in existing prisons. However, the Receiver's office*
       *was unable to provide us with any estimates comparing the costs, on a per patient*
19    *basis, of operating the proposed seven new medical facilities compared to the cost,*
       *on a per patient basis, of providing them care in existing prisons.*
20

21  The above statement is false. The Receiver informed the LAO that it is not relevant to

22  compare the cost of a future correctional operation to existing unconstitutional services.

23  Indeed, this LOA request is an example of how the LAO works to subvert the Federal Court,

24  demanding that the Receiver engage in meaningless cost comparisons, and then

25  misrepresenting the facts to the Legislature.

26  - *The Receiver has retained his own experts on security in his facility planning, but it*
     *does not appear that CDCR has formally reviewed and commented on these issues.*
27    *This is an important consideration for two reasons. First, the estimates of costs*
       *and square footage assumed for these projects appear to depend heavily on the*
28    *assumption that they will largely be constructed as dormitories. Second, given that*
       *the department will eventually be responsible for managing the facilities once the*

53

*Receivership ends, it is important that it be in concurrence with the security plans and classification systems developed for these facilities.*

This above statement is false. The Receiver's staff and CDCR have discussed classification issues. Furthermore, CDCR will not manage the new health care facilities; they will be managed by the Receiver. Finally, while the prison health care system will, eventually, be returned to the State, LAO's assumption that CDCR will manage the system is premature.

In broad summary, LAO's report asserts that the Legislature actually has various alternatives it can and should be considering to the Receiver's construction plan, notwithstanding the fact that the Receiver's plan is supported by multiple federal court orders, and that the Receiver has been authorized by four Federal Judges to construct facilities to satisfy the needs of four separate class actions. Stripped to its basics, the LAO recommends "business as usual," contemptuous of the existing *Plata*, *Coleman*, and *Armstrong* orders.

When SB 1665 was initially scheduled to come up for a vote on May 15, the Senate Republicans – after hearing a presentation by the Receiver – had decided *not* to take a caucus position, which is why the Receiver believed he had the necessary Republican votes to secure SB 1665's passage. However, on May 19, 2008, reports started surfacing regarding a possible settlement agreement in the three judge court proceeding – an agreement that might lead to tens of thousands of persons avoiding prison or being released from prison. These reports, combined with the LAO's inaccurate report, galvanized Senate Republicans into taking a caucus position against SB 1665.

The Receiver met several times with the Republican caucus to determine what their concerns were and to offer additional reasons why SB 1665 should continue moving. Essentially, the caucus determined that SB 1665 would not pass out of the Senate unless it was part of a comprehensive deal involving both Assembly Bill ("AB") 900 and the three judge court. The Receiver explained that none of the funds in AB 900 were going to be used by the Receiver and that AB 900 was therefore irrelevant to the consideration of SB 1665. The Receiver also explained that, in light of the Separation of Powers and principles of federalism, the Legislature could not possibly have an opportunity to strike a deal with the three judge

54

1    court. The Receiver explained that the best the California Legislature could do to influence the

2    Federal Courts was to enact SB 1665 as quickly as possible to demonstrate the State's full,

3    unqualified endorsement of the Receiver's Turnaround Plan and construction program.

4        The Republican caucus did not change their position, and SB 1665 was twice rejected

5    by the Senate, once on May 27 and again on May 29. Under applicable parliamentary rules, SB

6    1665 is now dead.

7        The Receiver has now turned his attention to discussions with the responsible

8    constitutional officers – the Governor, the Controller and the Treasurer – to determine whether

9    there are other options for funding the Receiver's construction program without securing

10   immediate legislative concurrence and without resorting to more intrusive Federal Court

11   orders. Those discussions so far have not produced any breakthroughs, and the Receiver is now

12   forced to take certain actions in Federal Court preparatory to a direct order securing funds.

13       D.   The Structure of the Legislation Necessary to Fund Long-Term Health Care

14            Facilities.

15       The Receiver continues to hope that the California Legislature will act quickly and

16   responsibly to authorize funding for the upgrade and expansion programs. To this end, the

17   Receiver and his staff stand willing to assist with drafting of adequate legislative language.

18   There is still time for the Legislature to do the right thing.

19       The Receiver's experience this Spring with SB 1665, however, reinforces his initial

20   conclusions that all the funding – the full $7 billion – needs to be authorized up front and that

21   the *Receiver cannot be required to come back to the Legislature or the LAO for any further*

22   *approvals.* The Receiver is of course willing to consult with the Legislature or appropriate

23   legislative committees as the construction program moves forward – e.g., to consult with the

24   Joint Legislative Budget Committee – but the experience this Spring demonstrates that

25   legislative decision-making processes are too uncertain, and too fraught with the potential for

26   misdirection (e.g., the LAO's involvement), to be relied upon by the Receiver or the Federal

27   Courts.

28

E.    Summary.

The State's failure to make this necessary financial commitment puts the Receiver's entire remedial program at risk since the various pieces of the program are so intertwined and interconnected that failure to fund and implement one major element undermines all of the other elements.  Unfortunately, the State's failure to make the necessary financial commitment is not a result of inadvertent neglect or mere incompetence (trained or otherwise). Instead, it is a result of conscious, deliberate obstruction by key decision-makers and decision-influencers resulting in a willful failure by the State to live up to its constitutional and court-ordered obligations.  This is not a charge that the Receiver makes lightly; he has spent the last fifteen years working within State government processes to improve government operations.  The State has now crossed that line and, in so doing, demonstrates a lack of remorse and an unwillingness to accept accountability for its own constitutional violations.  The State's failure to express its unequivocal commitment to the Receiver's necessary construction program should be taken into account by this Court in subsequent proceedings, and by the *Coleman*, *Armstrong*, and *Perez* Courts.

## V.

### ACCOUNTING OF EXPENDITURES FOR THE REPORTING PERIOD

A.    Expenses.

The total net operating and capital expenses of the Office of the Receiver for the eleven months ending May 31, 2008 were $19,319,316 and $20,628,857 respectively. A balance sheet and statement of activity and brief discussion and analysis is attached as Exhibit 14.

B.    Revenues.

On January 11, 2008 the Receiver requested a transfer of $28.3 million from the State to the California Prison Health Care Receivership Corporation ("CPR") to replenish the operating fund of the Office of the Receiver for the third quarter of FY 2007-2008 and maintain the minimum operating capital on hand to six months. This brought the total funds received from the State of California in this fiscal year to $41.1 million.

# VI.

## OTHER MATTERS DEEMED APPROPRIATE FOR JUDICIAL REVIEW

A.    Coordination with Other Lawsuits.

During the reporting period, regular meetings between the Receiver and the monitors of the *Coleman, Perez,* and *Armstrong* ("Coordination Group") class actions have continued. The last Coordination Group meeting for this reporting period was held on May 13, 2008. The next meeting will take place on June 24, 2008. Steady progress has continued during this reporting period.

For example, as reported in the Receiver's Seventh Quarterly Report, the Coordination Group agreed on the design of a governance model for managing health care in the prison system. The Chief Executive Officer, Health Care class specification for the governance model was adopted by the State Personnel Board at their meeting of March 4, 2008. The governance agreement was approved by the Court on April 1, 2008. As with prior orders pertaining to coordination efforts between the health care class actions, the Receiver was also ordered to file quarterly reports in each of the cases. (*See*, Order Approving Chief Executive Officer Pilot Program Coordination Agreement.) California State Prison-Sacramento/Folsom State Prison, Mule Creek State Prison and San Quentin State Prison have been chosen as pilot sites for the governance model.

Other areas of agreement reached during this reporting period include, the Receiver's assumption of the following: responsibility for personnel work at San Quentin including mental health and dental, responsibility on behalf of all disciplines to manage the transition and opening of new health care facilities and responsibility for the health care appeals policy, which is being modified to accept third-level appeals.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# VII.

## CONCLUSION

As demonstrated above, the Receiver has made significant progress during the reporting period. However, the State's obstruction threatens the Receiver's ability to resolve prison medical problems in a timely and cost effective manner.

Clark Kelso

Receiver

58