# EXHIBIT 6
## *Part 1 of 3*



**Assessment of the California Department of Corrections and Rehabilitation's Healthcare Contracting Unit**
*Phase 1 Report*

April 21, 2008

Prepared by:



7 St. Paul Street
Suite 1210
Baltimore, MD 21202
410-529-4806



## Table of Contents

1.  Project Objectives and Overview ................................................................. 3
2.  "Best Practices" Contracting Unit ............................................................... 5
3.  Provider Network Development and Management .................................... 13
    3.1  Overview and Analysis of Network Development and Management ...................... 13
    3.2  Preliminary Findings Regarding Network Development and Management ............. 16
    3.3  Recommendations Regarding Network Development and Management.................. 28
4.  Rate Analysis and Rate Setting ................................................................. 31
    4.1  Overview and Analysis of Rate Analysis and Rate Setting ................................ 31
    4.2  Preliminary Findings Regarding Rate Analysis and Rate Setting ....................... 32
    4.3  Recommendations Regarding Rate Analysis and Rate Setting............................ 38
5.  Contracting Functions ............................................................................... 40
    5.1  Overview and Analysis of Contracting Functions ............................................ 40
    5.2  Preliminary Findings Regarding Contracting Functions .................................... 53
    5.3  Recommendations Regarding Contracting Functions ........................................ 56
6.  Credentialing .............................................................................................. 58
    6.1  Overview and Assessment of Credentialing .................................................... 58
    6.2  Preliminary Findings Regarding Credentialing ............................................... 58
    6.3  Recommendations Regarding Credentialing .................................................... 61
7.  Quality and Utilization Monitoring .......................................................... 63
    7.1  Utilization Monitoring .................................................................................. 63
    7.2  Quality Monitoring ...................................................................................... 67
8.  Healthcare Invoice/Claims Processing and Data Capture ..................... 71
    8.1  Overview and Assessment of Claims Processing and Data Capture ..................... 71
    8.2  Preliminary Findings Regarding Claims Processing and Data Capture................. 72
    8.3  Recommendations Regarding Claims Processing and Data Capture ...................... 98
9.  Internal Audit ........................................................................................... 106
    9.1  Overview of Internal Auditing .................................................................... 106
    9.2  Findings Regarding Internal Audit .............................................................. 107
    9.3  Recommendations Regarding Internal Audit.................................................. 107
10. Conclusion................................................................................................. 109



## 1.  Project Objectives and Overview

**Introduction.**  Navigant Consulting, Inc. (NCI) was engaged by the California Prison Receivership, Inc. (CPR) to conduct an assessment of the California Department of Corrections and Rehabilitation (CDCR) healthcare contracting unit and develop a plan for improving its operation and management.  We are conducting our work in two phases.  This report presents our Phase 1 findings which are based on our initial assessment.  In Phase 2, we will collect additional data, complete a more detailed assessment, and develop a comprehensive improvement plan for all functional areas within the contracting unit.

**Objectives.**  The objectives of the project (including Phases 1 and 2) are to:

1.  Document the current management and operations of healthcare contracting, including network development; rate setting; competitive bidding; contract negotiations; credentialing; quality and utilization monitoring; claims processing and payment; utilization and payment data capture, analysis and reporting; internal audit; and other contracting functions.
2.  Compare current contracting management and operations to "best practices";
3.  Make recommendations regarding potential opportunities to improve CDCR's performance to align with best practices, and prioritize the identified opportunities;
4.  Develop a detailed improvement plan, including specific implementation strategies and an implementation timeline; and
5.  Identify potential risks and barriers to implementing the recommended best practices, including cultural, process related and/or regulatory barriers.

In Phase 1, we sought to complete Objectives 1 and 2 and to make initial recommendations to meet the requirements of Objective 3.  We had outlined this distribution of effort in our proposal:

> "Phase 1 is an initial assessment of current processes and policies in each of the functional areas and presentation of preliminary findings.  Phase 2 is a more detailed assessment that allows NCI to probe deeper into specific areas to identify specific operational and/or managerial issues, make appropriate recommendations for each functional area within healthcare contracting, and develop a detailed implementation plan.  We are proposing to structure the project this way due to uncertainties about the detailed inner workings of the contracting unit.  The phased approach will allow NCI to gain an understanding of the organization through an initial assessment in Phase 1, which will then allow for a more tailored approach to the detailed assessment and implementation plan in Phase 2."



**Phase 1 Activities.** During Phase 1 we completed the following tasks:

- Interviews and discussions with CDCR and CPR staff regarding each functional area,
- Meetings and interviews at Plata Contracts and Invoice Branch (J Street, Sacramento),
- Meetings and interviews at Regional Accounting Office ( S Street, Sacramento),
- Meetings and interviews at two prison institutions: California Rehabilitation Center (CRC) and Sierra Conservation Center (SCC),
- Observation of processes, systems, and software,
- Collection and review of documents including training manuals, contracts, staffing charts, job descriptions, process descriptions and flow charts,
- Preliminary comparisons to commercial payer and other correctional system processes, staffing and systems,
- Development of preliminary findings, and
- Development of short and long term recommendations.

In addition, we developed a "SWOT" (strengths/weaknesses/opportunities/threats) analysis including structure, process and technology issues and an assessment of related activities such as provider payment methodologies, provider contracts and utilization management. This SWOT analysis applies to the entire contracting process, and is presented in the conclusion of this report.

Our preliminary analysis considers the Receiver's latest Strategic Plan dated March 11, 2008, particularly regarding provider recruitment, contracting and network development, as well as quality management. Many of our findings and recommendations support the action items contained in the Strategic Plan.

**Overview of Report.** There are nine additional chapters in this report.   In the next chapter, we describe a "best practice" contracting unit.  Each of the succeeding chapters includes our assessment of a function within the CDCR contracting unit.  In the final chapter, we summarize our Phase 1 recommendations.



## 2.    "Best Practices" Contracting Unit

Although CDCR has unique healthcare contracting requirements, it is useful to compare its contracting approach to a model based on "best practices". In this section of our report, we briefly describe the activities that a "best practices" contracting unit needs to undertake. We have focused on activities to be undertaken rather than more detailed analyses of how those activities are carried out to provide a foundation for modeling the structure and activities of the CDCR contracting unit. Subsequent chapters describe the current status of each key activity at CDCR and include more detailed analyses.

The best healthcare contracting units are operated by health plans, which must meet some, but not all of the requirements that CDCR must meet. For this reason, we describe a contracting unit that would work at a best practice level in a health plan, but which has been modified to meet the needs of CDCR. It should be noted that we have not been able to identify a state prison system contracting unit that provides an adequate comparison. Comparisons need to be made to large state prison systems and each large state has organized its contracting activities to meet the requirements of the unique environment in which it operates.

In a health plan, a contracting unit must meet three objectives:

- Access to needed services must be assured,
- Medical costs must be contained, and
- Quality of patient care must be assured.

In order to meet these objectives, the following functions must be performed:

- Network development and management,
- Rate setting and competitive bidding,
- Contract negotiations,
- Credentialing,
- Utilization management, and
- Quality monitoring.

Health plans normally perform administrative functions relating to provider payment, such as claims processing, in other parts of their organizations. CDCR needs to perform these activities as part of the contracting unit. As a result, four additional functions must be performed:

- Claims processing and payment,
- Utilization and payment data capture,
- Analysis and reporting, and

5



- Internal audit.

The functions that have been listed would typically be undertaken in four departments or sub-units. Network development, rate setting, competitive bidding and contract negotiations would be carried out in a Network Management sub-unit. Credentialing, utilization management and quality monitoring would be carried out in a Quality Assurance/Utilization Management sub-unit. Claims processing and payment, utilization and payment data capture and analysis and reporting would be undertaken in an Information Management sub-unit. The internal audit function must be independent of the other sub-units. This structure is depicted graphically in the organization chart presented below. Each sub-unit is discussed in the paragraphs that follow.



**Internal Audit.** The internal audit function should report to CDCR senior management rather than to the contracting unit manager. Internal auditing can only be successful if it is independent of the activities that it reviews. In Chapter 9, the CDCR internal audit function is described and recommendations for future action and analysis are presented. In the ideal setting, an internal audit function is responsible for monitoring operating results, verifying financial records, evaluating internal controls, assisting with efforts to improve efficiency and effectiveness and to detect fraud.

6



In a contracting unit, internal auditors must perform both special studies and routine investigations. Internal auditors should be used to answer the following questions and to report answers to senior management:

- Is each sub-unit and activity meeting its objectives?
- Is each sub-unit and activity operating efficiently?
- Are staff members responsible for each activity sufficiently trained to operate effectively?
- Are procedures being followed as intended?
- Are data available to monitor efficiency and effectiveness?
- Are claims being paid correctly?
- Are there sufficient controls in place to prevent losses and are those controls being used properly?
- Are risks identified and are risk management procedures in place?

Each of these questions must be answered periodically for each sub-unit/activity. Internal auditors organize their efforts so that each sub-unit/activity has equal probability of being included in an audit. The size of the internal audit staff will determine how frequently each question is addressed for each sub-unit/activity, but it is important for each activity to be reviewed at least once every three years. Internal audit leadership will determine the audit program and the schedule for its completion.

Special studies must be carried out by internal auditors in addition to the periodic analyses referenced above. Special studies are identified as needs arise and can be either broad-based or focused on specific issues. The ability of internal auditors to complete special studies and periodic analyses depends on the size of the internal audit staff and its productivity.

**Network Management.** The network management function is the foundation for assuring access to all needed services as well as establishing the foundation for medical cost control. An effective network management function includes the following activities:

- Network design
- Rate setting
- Contract development
- Contract negotiation
- Provider relations

*Network Design.* Networks are designed to provide adequate access to the full range of care that is needed while, at the same time, they focus on efficient providers who meet quality of care requirements. Although network design efforts typically emphasize hospitals and



physicians, there is a need for a comprehensive design effort that includes all providers, including ambulance services, dialysis services, clinical laboratory services, therapeutic and diagnostic radiology services as well as other services that are not directly provided by CDCR. A best practices network design effort requires an initial analysis of the location of potential patients, their needs for care and a review of available providers. Once this analysis is completed, specific providers can be targeted for participation in the network. As discussed subsequently, CDCR has unique network design requirements because it currently has medical facilities that fulfill some of its needs. Additional providers are needed to meet requirements not met by CDCR facilities and to provide needed capacity. If additional CDCR facilities are constructed, network needs will change. Plans for such construction need to be considered in the design of the network.

*Rate Setting.* The best practice for rate setting can include different approaches to setting rates, but all approaches must be based on a rate that is unrelated to provider charges to be considered a best practice. A rate setting method needs to be established for every provider type although there can be variations in rates once the method has been selected. For example, if a DRG per case approach is selected as the method for hospital inpatient payment, it is appropriate for different base rates (average payment amounts) to be used for different hospitals. Although a payer seeks as much uniformity in the rates setting process as possible, negotiations require some flexibility.

Considerable work has been done to provide CDCR with best practices approaches to rate setting for key provider types. One key element of best practices in rate setting, however, requires ongoing effort. There is a need to model the effects of changes in rates that come about as a result of contract negotiations. Modeling payment rates allows CDCR to project the impact of a negotiation on the budget for health care services.

*Contract Development.* Best practices require use of a uniform contract for each provider type. Although negotiations may result in specific contract changes, the foundation for all contracts should be similar. Best practices also include a comprehensive approach to the development of the contract. Rates, claims submission requirements, utilization management, quality assurance requirements and data submission requirements need to be specifically identified in the contract. It is important that a contract format that is specifically designed to meet healthcare requirements be used. There are critical issues regarding the confidentiality of data as well as the operational issues that have been listed that are unique to healthcare. A best practices approach to contract development includes the initial design of a standard contract and periodic review of contracts to identify variations from the standard that have been negotiated and the long-term viability of the variations.



*Contract Negotiation.* The contract negotiation process varies substantially among payers for healthcare. Best practices include negotiation on a timely basis and, as noted previously, maintenance of a model that allows the effects of negotiations on departmental budgets to be understood. Some payers separately negotiate all contracts while others focus on provider categories that account for more substantial portions of total expenditures. These payers may use a standard contract for lower volume providers that is offered on a "take it or leave it" basis.

*Provider Relations.* Once contracts have been negotiated and providers have been included in the network, it is essential for the payer to maintain provider relationships through updates, bulletins and through periodic visits and discussions with providers. The payer may change its policies or modify its rate setting, utilization management or data submission approach. In addition, claims processing inevitably leads to issues for every provider. Provider relations representatives are responsible for maintaining communication with providers as well as answering questions that may arise. It is a best practice to have a structured provider relations function that assures the payer that contracted providers will seek to continue to participate in the payer's network.

*Quality Assurance/Utilization Management (QA/UM).* A contracting unit must manage services utilization and assure that quality care is provided. The three key QA/UM activities are described in the paragraphs that follow.

*Credentialing.* Credentialing is the process by which health care providers are evaluated and approved for participation in a health plan. Credentialing is undertaken to assure that qualified and trained practitioners are delivering health care services. Credentialing (and recredentialing) are standard business practices in both payer and provider organizations. Since CDCR functions as both, evaluation of CDCR's credentialing functions needs to consider both roles. A best practices health plan establishes a predetermined set of minimum credentialing standards for each type of health care provider. Standards may include professional licensure and/or accreditation, education, hospital privileges, board certification, professional liability insurance coverage, liability history and disciplinary actions including sanctions. Re-credentialing typically occurs every two years (acute care standards) to three years (managed care standards). Recredentialing includes the standards listed previously and also considers adherence to the organization's utilization and quality management requirements.

The health care industry has well defined standards and expectations of credentialing and recredentialing programs which are consistently surveyed and monitored by regulators such as the Centers for Medicare and Medicaid Services (CMS), the National Committee for Quality



Assurance (NCQA), the California Department of Health Services (DHS), and the California
Department of Managed Health Care (DMHC).

*Utilization Management (UM).* Utilization management comprises a wide variety of programs
and functions. UM programs are designed to monitor and address the appropriateness and
efficiency of health care services on a prospective, concurrent and/or retrospective basis. Health
plans that use best practices employ a combination of these techniques to focus resources on
services and/or provider types where the greatest opportunities for savings can be found.

The health care industry has well defined standards and expectations of utilization
management programs which are surveyed and overseen in a consistent manner though
regulators such as the Centers for Medicare and Medicaid Services (CMS), the National
Committee for Quality Assurance (NCQA), the California Department of Health Services
(DHS), and the California Department of Managed Health Care (DMHC).

A best practices UM program defines the structures and processes used to ensure that health
care services are delivered at *the right time, in the right place, to the right patients and for the right
price.* These structures and processes are designed so that utilization decisions are made in a
consistent and impartial manner.

*Quality Monitoring (QM).* Quality monitoring is also comprised of a wide variety of programs
and functions. QM programs are designed to monitor and address the appropriateness and
effectiveness of health care services. These activities are most often conducted retrospectively,
but can be conducted prospectively and/or concurrently.

The health care industry has well defined standards and expectations of quality management,
and like utilization monitoring, these programs are regulated by CMS, NCQA, California DHS,
and the California DMHC.

A best practices QM program clearly defines the organization's structures and processes to
improve the quality and safety of clinical care and services. Specifically, the QM program
description should:

- Document the program structure,
- Include behavioral health care,
- Address patient safety,
- Define accountability to the governing body,
- Have a designated physician with substantial involvement,
- Be supported by a functioning committee,
- Compile an annual work plan, and

10



- Be evaluated annually.

The annual evaluation of the QM program should include a description of completed and ongoing quality monitoring and management activities that address quality and safety of clinical care and quality of service, as well as trending measures to assess change in performance over time and analysis of the results of QM initiatives, and an overall evaluation of the effectiveness of the QM program.

*Information Management.* Processing and managing information is a key requirement for CDCR's contracting unit (although as noted, health plans typically perform these functions in units other than their contracting unit). The information management sub-unit must perform three activities. These activities are described in the paragraphs that follow.

*Claims Processing and Payment.* Every health service provided outside of CDCR facilities should be paid through the submission of a claim. Most healthcare claims are submitted on a UB04 form (for facility claims) or a HCFA1500 form for professional and other claims. Although these forms were developed by the Federal government, nearly all payers require their use. The use of the forms allows for the uniform capture of diagnosis (ICD-9) and procedure (CPY-4/HCPCS) data, which in turn, allows for the claims to be reviewed uniformly.

Claims processing and payment best practices stress the use of automated data submission and automated claims adjudication. Health plans have made major efforts to reduce the number of claims that require manual adjudication. Manual adjudication is inefficient, may result in determinations that are not uniform and has an increased likelihood of producing errors in the claims adjudication process. Automated adjudication also eliminates undesirable delays in provider payments.

The claims payment process should include adequate explanation of the payment that is made when payments are sent. Remittance advices should identify the patient, the service and the amount paid.

*Utilization/Payment Data Capture.* Management of the contracting function requires ongoing reporting on the use and cost of health services. There is, therefore, a need to be certain that data are captured within the unit's systems and are available for reporting. The claims processing system is the foundation for capturing data and must be used for that purpose in addition to claims adjudication and provider payment.

Effective data capture begins with a determination of data needs, which, in turn, are based on the level and type of management reporting which will be completed. In addition, there is a need for data to be available to address issues that arise as a result of claims submission and

11



processing. There are many approaches to data capture that can be considered best practices, and the approaches vary substantially among health plans.

***Analysis and Reporting.***   A contracting unit needs information to measure its effectiveness, to allow for solutions to problems to be developed and to assure senior management that it is meeting its objectives.  The specific nature of reports varies substantially among health plans although there are common needs, including summaries of service utilization, identification of provider utilization patterns, treatment of patients with chronic illnesses and cost of services by provider, by groups of patients and in the aggregate.  The information systems approach selected for the contracting unit must be able to meet these needs.

The structure and activities of a best practices contracting unit were briefly outlined in this chapter.  Subsequent chapters focus on key activities and identify how they are carried out by CDCR and changes that are needed to assure that the CCDCR contracting unit will eventually be able to employ best practices.

12



## 3.    Provider Network Development and Management

Provider network development and management is one of the most important contracting functions in both public and private health plans. CDCR's needs for provider network development and management differs from other health plans because it provides services through its own facilities in addition to contracting with community providers. The discussion presented in this chapter includes both CDCR facility based services and contracted services.

### 3.1    *Overview and Analysis of Network Development and Management*

The Division of Adult Institutions of CDCR operates 33 state prison facilities, housing a total of 172,582 inmates in calendar year 2007. Healthcare services are to be delivered, to the extent possible, through the following facilities owned by CDCR.

- Four general acute care hospitals
- 18 correctional treatment centers
- 17 outpatient housing units,
- An intermediate care facility,
- A skilled nursing facility, and
- Two hospices.

Because not all healthcare service utilization can be accommodated through its own facilities and providers, CDCR also contracts with community based providers, including for-profit and not-for-profit acute care hospitals as well as physician practices and other providers. These community based providers constitute CDCR's network.

In addition, CDCR enters into agreements with individuals called "registry" personnel whom CDCR utilizes when a State position is vacant but services are needed. For example, when a State-employed nurse position is vacant, an institution will use a registry nurse until an employee can be hired to fill that vacancy. In some organizations, these personnel may be referred to as temporary workers. However, many of these registry personnel are hired for extended periods of time and the positions are never filled by State-employed workers. CDCR reimburses most of these personnel on an hourly basis but some are reimbursed using "fee-for-service" payment methodologies.

NCI's summary analysis of contracted and registry services provided to inmates in Fiscal Year 2006-2007 is shown in Tables 1 and 2 below. The data (the Contract Medical Database or "CMD") provided to us contained 292,650 records. Tables 1 and 2 contain information from community providers and organizations, but do not include in-house services provided by

13



CDCR staff. In completing our analysis, we identified data errors that resulted in the exclusion of the following records:

- Records with an invoice ID of "Dummy" (261 records)
- Records with an amount paid of $0 (22,700 records)
- Records with an entry in tblNoPay indicating a duplicate or disputed invoice (9,383 records)
- Records with an amount paid of less than $0 (191 records)
- Records for ServID 02 (Community Hospital – Inpatient Hospital) without an admit date (867 records)

Of the remaining 259,514 records, some records contained a number of hours along with an amount paid, whereas others do not contain a number of hours. We assumed that the 21,884 records with a number of hours indicate registry or contracted providers reimbursed on an hourly basis. We present the results for these hourly services in Table 2.

Table 1 presents the 237,630 patient services that were furnished by contracted providers during the fiscal year 2006-2007. These services resulted in payments totaling $337,716,595. Physician services (inpatient and outpatient) accounted for approximately 49 percent of all services, while community hospital facility services (inpatient and outpatient) accounted for 22 percent of services. Hospital facility services (including inpatient and outpatient community hospital and high cost hospitals), however, accounted for the largest proportion of payments (69 percent).

It should be noted that 1,517 services are grouped into fiscal revenue code 6 (miscellaneous contracts). These services are maintenance contracts for upkeep on medical equipment. It should also be noted that we are concerned about errors in the CMD data that may affect either reported payments or services used. There is an ongoing need to validate the CMD data.

14



**Table 1**
**Summary of Contracted Healthcare Services – FY 2006-2007**

| FiscRev Code | FiscRevCode Description | Services Actual | Services % of Total | Amount Paid Actual | Amount Paid % of Total |
|---|---|---|---|---|---|
| 1P | Physician Inpatient | 47,705 | 20% | $ 18,961,722 | 6% |
| 2P | Physician Outpatient | 56,450 | 24% | $ 15,250,036 | 5% |
| HCP | High Cost Physician | 11,529 | 5% | $ 5,725,083 | 2% |
| Subtotal | Physician | 115,684 | 49% | $ 39,936,840 | 12% |
| 1H | Community Hospital Inpatient | 8,752 | 4% | $ 114,566,832 | 34% |
| 2H | Community Hospital Outpatient | 43,404 | 18% | $ 62,402,568 | 18% |
| HCH | High Cost Hospital | 531 | 0% | $ 54,868,710 | 16% |
| Subtotal | Hospital | 52,687 | 22% | $ 231,838,110 | 69% |
| 3MC | Medical Community (non-hosp) | 21,742 | 9% | $ 14,474,624 | 4% |
| 3MI | Medical In-House | 18,816 | 8% | $ 6,149,038 | 2% |
| Subtotal | Other Medical | 40,558 | 17% | $ 20,623,662 | 6% |
| 1A | Ambulance Inpatient | 4,980 | 2% | $ 4,929,574 | 1% |
| 2A | Ambulance Outpatient | 6,439 | 3% | $ 5,202,218 | 2% |
| 3A | Ambulance (non-hospital) | 429 | 0% | $ 573,998 | 0% |
| HCA | High Cost Ambulance | 501 | 0% | $ 607,772 | 0% |
| 3DC | Dental Community (non-hosp) | 840 | 0% | $ 657,751 | 0% |
| 3DI | Dental In-House | 572 | 0% | $ 595,118 | 0% |
| 3PI | Psych In-House | 2 | 0% | $ 5,236 | 0% |
| 4 | Laboratory/Radiology (non-hosp) | 13,333 | 6% | $ 30,782,677 | 9% |
| Subtotal | Ancillary | 27,096 | 11% | $ 43,354,344 | 13% |
| 5 | Registries | 88 | 0% | $ 195,563 | 0% |
| 6 | Misc. Contracts (Maintenance) | 1,517 | 1% | $ 1,768,074 | 1% |
| | **Total** | 237,630 | | $ 337,716,595 | |

We analyzed 21,884 records with a number of hours reported not equal to zero for services reimbursed on an hourly basis. We determined the average amount paid per hour according to CDCR's fiscal revenue codes. Table 3 presents the average amount paid per hour for each code. The vast majority of these hourly services are registry, with an average hourly rate of $50.

15



**Table 2**
**CDCR Hourly Healthcare Services and**
**Average Amounts Paid Per Hour**

| Service Code | Service Code Description | Records | Amount Paid | Duration | Paid Per Hour |
|---|---|---|---|---|---|
| 4 | Laboratory/Radiology (non-hosp) | 26 | $ 40,459 | 119 | $ 341 |
| 3PI | Psych In-House | 940 | $ 35,004,965 | 167,449 | $ 209 |
| 3MI | Medical In-House | 3,200 | $ 38,864,459 | 204,113 | $ 190 |
| 3DI | Dental In-House | 267 | $ 1,893,736 | 13,235 | $ 143 |
| 5 | Registries | 17,449 | $ 131,213,457 | 2,604,842 | $ 50 |
| | **Total** | 21,882 | $ 207,017,075 | 2,989,758 | $ 69 |

Although CDCR cannot accommodate all inmate needs through its own healthcare facilities and must contract with outside providers, our initial analysis of the use of CDCR's four acute care facilities suggests that they are used less often than desired. We would need detailed data from the four facilities' Inmate Medical Scheduling and Tracking System (IMSATS) to further substantiate this conclusion. This finding, however, is in accordance with a recent State Controller's report that stated that at least two of the four prison acute-care hospitals are functioning at a fraction of their capacity, resulting in increased costs of contracted services:

> "The SCO auditors visited two of the four hospitals and found both to be functioning at a fraction of their capacity. The department has encountered difficulties in recruiting and retaining qualified medical personnel to staff the various hospital functions. The problem is compounded by the fact that the hospitals do not have adequate equipment, supplies, and support services such as anesthesia service for their surgery rooms. In addition, decisions made by CDCR management also severely curtail inpatient and outpatient services performed at the prison hospitals. All but seven acute-care beds at one prison hospital have been de-commissioned, while over 90% of the acute-care beds at another prison hospital are being used by inmates with long-term needs. Major surgeries performed at one prison hospital declined from 291 cases in 2000 to eight in 2004 and eight in 2005. At the other prison hospital, only one of the two operating rooms is functioning, at a very limited capacity. The other operating room has not been functional since the hospital was built in 1993 due to a lack of proper equipment, supplies, and inadequate staffing. Therefore, instead of treating inmates from other State prisons, as they were designed to do, the two hospitals are sending their own prison patients to outside hospitals at significantly higher costs, sometimes for minor surgeries."

3.2    *Preliminary Findings Regarding Network Development and Management*

Our initial analysis of the numbers and types of CDCR clinical employees, contracted providers, and registry providers, as well as the services utilized at each institution, have led to the following findings:

16



**Finding #1:** Utilization of contracted and registry services, particularly off-site services, is driven in part by availability of these providers, the vacancy rate of in-house employed clinicians (many of whom are primary care providers), as well as the extent of telemedicine use and clinical staff preferences regarding in-house provision of services.

Table 3 identifies the number of physician and midlevel practitioner employee positions at each institution as of March 31, 2008.  As shown in the table, the number of clinical employees (physicians, physician assistants and nurse practitioners only) varies across institutions.  The number of positions allocated to each institution is driven by the number of inmates as well as the types of medical facilities and services available.  For example, CMF has 9.9 positions per 1,000 inmates but houses a general acute care hospital, a CTC, a licensed elderly care unit, inpatient and outpatient psychiatric facilities, and a hospice unit.  More important than the number of allocated positions is the number of positions that are currently filled.  Upon its formation, the California Healthcare Prison Receivership (CPR) made it a priority to increase clinical staff salaries in an effort to reduce vacancy rates.  In its Second Bi-Monthly Report to the U.S. District Court, CPR described the Motion for Waiver of State Law to implement new salary ranges for physicians, midlevel practitioners and other clinical providers beginning on September 1, 2006.[1] The waiver resulted in reduced vacancy rates.  However, some institutions still show high vacancy rates for these positions, including Pleasant Valley State Prison (PVSP) and Substance Abuse Treatment Facility (SATF), which have vacancy rates of 95 and 80 percent respectively.  These vacancy rates have an impact, not only on the ability of CDCR to deliver services to inmates in-house, but also on referrals to external providers, as well as coordination and management of care furnished by these external providers.  In other words, the network of contracted providers cannot be adequately developed and managed without a full complement of internal providers who can appropriately refer inmates, communicate with contracted providers regarding services provided, and provide follow-up care.  The new Receiver's Strategic Plan Goal #3, Action 3.1.2, Action 3.1.2 is to "[f]ill 90% of physician positions and establish and fill medical executive positions to provide leadership at the regional and local levels" by January 2009.  NCI supports this action, which should improve the viability of the entire provider network.

*Note: Several classifications of nurses, including Registered Nurses and Licensed Vocational Nurses are also employed at the institutions by CDCR.  However, they have not been included in the analysis since NCI considers them to be support personnel for the delivery of healthcare services.*

---

[1] California Healthcare Prison Receivership. Receiver's Second Bi-Monthly Report. September 19, 2006.



## Table 3
### Clinical Employee Positions by Institution
### Physicians, Physician Assistants, Nurse Practitioners
### (as of March 31, 2008)

| Institution | | Population Pop | Position | | | | Position/1000 Pop Rate |
|---|---|---|---|---|---|---|---|
| | | | Total | Filled | Vacant | Vacancy Rate | |
| ASP | AVENAL STATE PRISON | 7,525 | 14 | 6 | 8 | | 1.9 |
| CAL | CALIPATRIA STATE PRISON | 4,168 | 9 | 7 | 2 | 22% | 2.2 |
| CCC | CA. CORRECTIONAL CENTER | 6,271 | 8 | 7 | 1 | 13% | 1.3 |
| CCI | CA. CORRECTIONAL INSTITUTION | 5,907 | 12 | 5 | 7 | | 2.0 |
| CCWF | CENTRAL CA. WOMENS FACILITY | 4,325 | 16 | 13 | 3 | 19% | 3.7 |
| CEN | CENTINELA STATE PRISON | 4,928 | 9 | 7 | 2 | 22% | 1.8 |
| CIM | CA. INSTITUTION FOR MEN | 6,900 | 18 | 13 | 5 | 28% | 2.6 |
| CIW | CA. INSTITUTION FOR WOMEN | 2,443 | 11 | 11 | 0 | 0% | 4.5 |
| CMC | CA. MEN'S COLONY | 6,586 | 19 | 18 | 1 | 5% | 2.9 |
| CMF | CA. MEDICAL FACILITY | 3,031 | 30 | 16 | 14 | 47% | 9.9 |
| COR | CA. STATE PRISON - CORCORAN | 4,867 | 17 | 10 | 7 | 41% | 3.5 |
| CRC | REHABILITATION CENTER | 5,994 | 11 | 11 | 0 | 0% | 1.8 |
| CTF | CORRECTIONAL TRAINING FACILIT | 6,997 | 15 | 9 | 6 | 40% | 2.1 |
| CVSP | CHUCKAWALLA VALLEY STATE PRIS | 3,913 | 8 | 4 | 4 | | 2.0 |
| DVI | DEUEL VOCATIONAL INSTITUTION | 3,748 | 11 | 11 | 0 | 0% | 2.9 |
| FSP | FOLSOM STATE PRISON | 4,023 | 11 | 10 | 1 | 9% | 2.7 |
| HDSP | HIGH DESERT STATE PRISON | 4,792 | 9 | 8 | 1 | 11% | 1.9 |
| ISP | IRONWOOD STATE PRISON | 4,664 | 8 | 7 | 1 | 13% | 1.7 |
| KVSP | KERN VALLEY STATE PRISON | 5,013 | 10 | 8 | 2 | 20% | 2.0 |
| LAC | CSP - LOS ANGELES COUNTY | 4,764 | 12 | 11 | 1 | 8% | 2.5 |
| MCSP | MULE CREEK STATE PRISON | 3,832 | 10 | 10 | 0 | 0% | 2.6 |
| NKSP | NORTH KERN STATE PRISON | 5,390 | 18 | 10 | 8 | 44% | 3.3 |
| PBSP | PELICAN BAY STATE PRISON | 3,461 | 9 | 5 | 4 | 44% | 2.6 |
| PVSP | PLEASANT VALLEY STATE PRISON | 5,188 | 20 | 1 | 19 | | 3.9 |
| RJD | R J DONOVAN CORR FACILITY | 4,770 | 16 | 10 | 6 | 38% | 3.4 |
| SAC | CA. STATE PRISON - SACRAMENTO | 3,254 | 11 | 10 | 1 | 9% | 3.4 |
| SATF | SUBSTANCE ABUSE TREAT-CORCORA | 7,628 | 15 | 3 | 12 | 80% | 2.0 |
| SCC | SIERRA CONSERVATION CENTER | 6,591 | 9 | 9 | 0 | 0% | 1.4 |
| SOL | CA. STATE PRISON - SOLANO | 6,047 | 11 | 11 | 0 | 0% | 1.8 |
| SQ | SAN QUENTIN STATE PRISON | 5,222 | 17 | 9 | 8 | 47% | 3.3 |
| SVSP | SALINAS VALLEY STATE PRISON | 4,555 | 12 | 8 | 4 | 33% | 2.6 |
| VSPW | VALLEY STATE PRISON FOR WOMEN | 3,810 | 18 | 9 | 9 | | 4.7 |
| WSP | CA. STATE PRISON - WASCO | 5,935 | 13 | 12 | 1 | 8% | 2.2 |
| | CORRECTIONS/ADMINISTRATION | | 27 | 14 | 13 | 48% | NA |
| **Total** | | 166,542 | 464 | 313 | 151 | 33% | 2.8 |

Source: CDCR Office of Personnel

In order to further assess CDCR's provider network adequacy and management, we also gathered data from CDCR's CMD database on the number of contract and registry providers of

18



different types that provide services or are available to provide services in CDCR's 33 institutions. In doing so, we found significant variation across institutions in the number of providers available to serve inmates. Table 4 shows number of providers by type and institution for FY 2006-2007, along with their federal designations as urban/rural or provider shortage areas.

The table shows that even when controlled for prison population, some institutions have large numbers of contracted providers available while others have very few. This difference is due, in part, to geography. Some institutions are located in more densely populated urban areas where there are relatively large numbers of providers, while others are in rural areas where there are few providers. For example, Pelican Bay State Prison (PBSP) is located in the far Northwest corner of the State in a remote area, and there are few providers available. In fact, discussions with CDCR staff revealed, for example, that there is only one surgeon in Pelican Bay's immediate geographic area. Therefore, it is not surprising that there are few providers available to deliver services to inmates at this institution.

Although some institutions, like Pelican Bay, are constrained by their geographic location, many institutions, both urban and rural, are also located in areas that have been designated by the U.S. Department of Health and Human Services (DHHS) as Health Professional Shortage Areas (HPSAs). This designation is based on a series of criteria and calculations, including the number of primary care physicians relative to the population. Many urban HPSAs tend to be economically depressed areas with large numbers of low income individuals and families without health insurance. For example, Chowchilla, California, the location of Central California Women's Facility and Valley State Prison for Women, has a per capita income of $11,927 and about 20 percent of the population is living below the Federal poverty line.[2] As a result, there are few medical providers because it is not financially viable to practice in these areas. As shown in the table, most of the institutions with a HPSA designation, even those in urban areas, have relatively lower numbers of contracted providers.

Our preliminary analysis suggests that provider network inadequacy is driven, in large measure, by the geographic location (and accompanying demographics) of the prison facilities. The Receiver's proposed construction of new healthcare facilities to which chronically and acutely ill inmates from remote locations like Pelican Bay could be transferred, may help to mitigate this situation. Leveraging of provider contracts through regional groups of institutions may help to address network issues for institutions located in HPSAs, but are in close proximity to institutions that are not in designated HPSAs. However, the number of contracted providers does not appear to be entirely driven by geographic location or demographics of a particular area, and may instead be attributable to ineffective contracting efforts. As subsequently noted,

---

[2] U.S. Bureau of Labor Statistics.



further investigation of this issue is recommended as an immediate action step for CDCR, along with the exploration of other alternatives that have been described.

Table 4
Number of Contracted or Registry Providers Per 1,000 Inmates
and Federal Designations by Institution

| | Institution | | | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASP | Avenal State Prison | Urban | Yes | 1 | 2 | 1 | 1 | 31 | 21 | 3 | 4 | 2 | 16 | 0 | 81 |
| CAL | CSP-Calipatria | Urban | Yes | 0 | 0 | 1 | 1 | 1 | 2 | 7 | 1 | 0 | 7 | 0 | 38 |
| CCC | California Correctional Center | Rural | Yes | 1 | 1 | 1 | 1 | 4 | 5 | 0 | 6 | 1 | 3 | 1 | 23 |
| CCI | California Correctional Inst | Urban | Yes | 0 | 1 | 1 | 1 | 7 | 12 | 9 | 4 | 2 | 5 | 0 | 36 |
| CCWF | Central California Women's Fac | Urban | Yes | 0 | 1 | 2 | 2 | 9 | 18 | 9 | 3 | 1 | 25 | 0 | 60 |
| CEN | Centinela State Prison | Urban | Yes | 1 | 1 | 1 | 0 | 12 | 9 | 1 | 1 | 1 | 14 | 1 | 59 |
| CIM | California Institution for Men | Urban | No | 0 | 1 | 1 | 1 | 7 | 2 | 11 | 2 | 0 | 9 | 0 | 32 |
| CIW | California Institution for Women | Urban | No | 1 | 4 | 3 | 4 | 42 | 53 | 4 | 12 | 5 | 37 | 0 | 124 |
| CMC | California Men's Colony | Urban | No | 0 | 1 | 1 | 0 | 4 | 3 | 1 | 1 | 2 | 4 | 0 | 20 |
| CMF | California Medical Facility | Urban | No | 1 | 3 | 5 | 5 | 37 | 15 | 30 | 6 | 2 | 35 | 1 | 169 |
| COR | CSP-Corcoran | Rural | Yes | 0 | 1 | 1 | 1 | 20 | 12 | 8 | 5 | 1 | 10 | 0 | 72 |
| CRC | California Rehabilitation Center | Urban | No | 0 | 0 | 0 | 1 | 4 | 12 | 1 | 2 | 1 | 0 | 2 | 0 |
| CTF | Correctional Tr Facility, Soledad | Urban | Yes | 0 | 0 | 1 | 1 | 7 | 8 | 8 | 2 | 1 | 9 | 1 | 34 |
| CVSP | Chuckawalla Valley State Prison | Urban | No | 2 | 2 | 2 | 1 | 9 | 7 | 19 | 3 | 1 | 6 | 0 | 27 |
| DVI | Deuel Vocational Institution | Urban | No | 0 | 1 | 1 | 2 | 14 | 23 | 4 | 3 | 1 | 24 | 0 | 69 |
| FSP | Folsom State Prison | Urban | No | 0 | 2 | 1 | 1 | 4 | 21 | 0 | 3 | 0 | 11 | 1 | 60 |
| HDSP | High Desert State Prison | Rural | Yes | 1 | 1 | 1 | 1 | 3 | 4 | 1 | 3 | 1 | 3 | 1 | 23 |
| ISP | Ironwood State Prison | Urban | No | 1 | 2 | 2 | 1 | 1 | 11 | 15 | 2 | 0 | 4 | 0 | 16 |
| KVSP | Kern Valley State Prison | Urban | Yes | 0 | 1 | 1 | 2 | 8 | 8 | 16 | 3 | 3 | 5 | 0 | 31 |
| LAC | CSP-Lancaster | Urban | No | 0 | 2 | 2 | 1 | 18 | 9 | 6 | 5 | 1 | 14 | 1 | 57 |
| MCSP | Mule Creek State Prison | Rural | No | 1 | 1 | 1 | 1 | 19 | 25 | 11 | 7 | 1 | 41 | 1 | 131 |
| NKSP | North Kern State Prison | Urban | Yes | 0 | 1 | 1 | 1 | 10 | 7 | 26 | 4 | 2 | 4 | 0 | 31 |
| PBSP | Pelican Bay State Prison | Rural | Yes | 0 | 2 | 2 | 0 | 2 | 9 | 5 | 3 | 2 | 13 | 1 | 42 |
| PVSP | Pleasant Valley State Prison | Urban | Yes | 1 | 2 | 2 | 7 | 31 | 37 | 5 | 6 | 1 | 23 | 0 | 71 |
| RJD | RJ Donovan Correctional Facility | Urban | No | 0 | 1 | 1 | 1 | 23 | 8 | 37 | 1 | 0 | 37 | 0 | 74 |
| SAC | CSP-Sacramento | Urban | Yes | 0 | 3 | 3 | 1 | 26 | 11 | 20 | 4 | 1 | 29 | 1 | 105 |
| SATF | Substance Abuse Treatment Faci | Rural | Yes | 0 | 1 | 1 | 0 | 9 | 5 | 20 | 3 | 0 | 10 | 0 | 31 |
| SCC | Sierra Conservation Center | Rural | No | 1 | 2 | 2 | 0 | 7 | 6 | 1 | 6 | 1 | 4 | 0 | 20 |
| SOL | CSP-Solano | Urban | No | 1 | 2 | 2 | 1 | 30 | 34 | 7 | 3 | 1 | 37 | 1 | 173 |
| SQ | San Quentin | Urban | No | 0 | 2 | 2 | 2 | 19 | 28 | 30 | 4 | 2 | 25 | 2 | 101 |
| SVSP | Salinas Valley State Prison | Urban | Yes | 1 | 1 | 1 | 1 | 19 | 16 | 35 | 5 | 2 | 20 | 0 | 87 |
| VSPW | Valley State Prison for Women | Urban | Yes | 0 | 1 | 1 | 2 | 21 | 5 | 51 | 4 | 1 | 13 | 1 | 44 |
| WSP | Wasco State Prison | Urban | Yes | 0 | 1 | 1 | 1 | 2 | 8 | 1 | 3 | 2 | 5 | 1 | 35 |

21



Service utilization is another consideration in provider network development and management. Table 5 presents inmate utilization of selected specialties by institution. As shown in the table, the level of utilization appears to be driven in part by the availability of providers. For example, CMF has generally high numbers of contracted and registry providers per 1,000 inmates relative to other facilities, and also has relatively high utilization of services. CMF had 169 specialists per 1,000 inmates in FY 2006-2007 compared to an average of 58 per 1,000 across all facilities, and had 1,601 specialist encounters per 1,000 compared to an average of 595 per 1,000. However, utilization may also be a function of clinical staffing at the institutions as well. CMF, for example, also shows high utilization of contract and registry primary care services. This high use rate could be driven in part by a large number of vacancies in the clinical staff at the institution. The institution has 30 clinical employee positions (including physicians and nurse practitioners), of which nearly half are vacant.

Utilization of certain types of services, particularly off-site consultations, is also driven by other factors, such as the extent of telemedicine use, as well as clinical management style at individual institutions. Although some institutions have telemedicine capabilities, its use varies across institutions. In addition, anecdotal evidence, based on discussions during NCI's institutional site visits, suggests that some clinical managers prefer to send inmates to contracted providers rather than provide services in house.

A thorough utilization analysis by institution is recommended in order to assess the types of services being approved and delivered, as well as treatment and follow-up patterns.

22



**Table 5**
**Encounters Per 1,000 Inmates for Selected Specialties**

| Institution | Allergy/Ambulatory | Anesthesia | Cardiology | Emergency Services | GI/CM | Oncology/Chemo | Hepatology | EENT | Mental Health | Radiology | Rehab | Surgery |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASP | 1 | 137 | 23 | 182 | 149 | 24 | 384 | 8 | 10 | 365 | 1 | 558 |
| CAL | 0 | 4 | 5 | 0 | 10 | 7 | 33 | 0 | 0 | 20 | 0 | 100 |
| CCC | 5 | 29 | 15 | 58 | 36 | 2 | 217 | 8 | 0 | 139 | 37 | 506 |
| CCI | 0 | 57 | 25 | 47 | 82 | 106 | 217 | 4 | 9 | 77 | 0 | 303 |
| CCWF | 0 | 72 | 9 | 145 | 118 | 16 | 381 | 14 | 5 | 215 | 0 | 914 |
| CEN | 2 | 66 | 11 | 81 | 48 | 7 | 284 | 3 | 2 | 211 | 2 | 669 |
| CIM | 1 | 114 | 2 | 146 | 47 | 225 | 484 | 4 | 8 | 350 | 8 | 461 |
| CIW | 0 | 144 | 48 | 326 | 454 | 20 | 1233 | 24 | 20 | 640 | 0 | 663 |
| CMC | 0 | 25 | 8 | 36 | 5 | 32 | 148 | 6 | 1 | 333 | 0 | 569 |
| CMF | 1 | 139 | 8 | 197 | 18 | 342 | 564 | 12 | 9 | 341 | 2 | 1601 |
| COR | 0 | 59 | 10 | 60 | 67 | 73 | 356 | 3 | 9 | 1016 | 0 | 1046 |
| CRC | 0 | 41 | 3 | 95 | 114 | 4 | 363 | 5 | 0 | 128 | 1 | 281 |
| CTF | 0 | 55 | 6 | 59 | 172 | 60 | 351 | 14 | 5 | 191 | 4 | 726 |
| CVSP | 6 | 77 | 3 | 91 | 156 | 249 | 677 | 4 | 3 | 340 | 0 | 190 |
| DVI | 0 | 238 | 6 | 292 | 271 | 65 | 516 | 3 | 14 | 344 | 0 | 364 |
| FSP | 0 | 61 | 37 | 56 | 149 | 2 | 341 | 3 | 3 | 180 | 4 | 297 |
| HDSP | 8 | 49 | 34 | 32 | 44 | 44 | 191 | 14 | 10 | 205 | 4 | 527 |
| ISP | 4 | 50 | 8 | 56 | 128 | 196 | 687 | 8 | 0 | 354 | 0 | 243 |
| KVSP | 0 | 32 | 56 | 34 | 42 | 75 | 190 | 13 | 1 | 139 | 0 | 434 |
| LAC | 0 | 82 | 11 | 139 | 40 | 40 | 265 | 9 | 19 | 258 | 19 | 725 |
| MCSP | 2 | 46 | 4 | 76 | 241 | 97 | 709 | 3 | 10 | 284 | 1 | 850 |
| NKSP | 0 | 95 | 0 | 80 | 76 | 255 | 190 | 7 | 11 | 97 | 4 | 235 |
| PBSP | 4 | 67 | 9 | 2 | 184 | 12 | 217 | 5 | 7 | 162 | 3 | 456 |
| PVSP | 2 | 79 | 67 | 114 | 162 | 71 | 461 | 2 | 8 | 502 | 0 | 711 |
| RJD | 1 | 91 | 21 | 142 | 244 | 101 | 402 | 6 | 0 | 394 | 0 | 877 |
| SAC | 0 | 169 | 7 | 220 | 70 | 93 | 886 | 5 | 14 | 456 | 5 | 738 |
| SATF | 0 | 91 | 3 | 88 | 39 | 204 | 356 | 2 | 5 | 377 | 0 | 576 |
| SCC | 2 | 19 | 8 | 57 | 27 | 4 | 182 | 3 | 2 | 89 | 0 | 219 |
| SOL | 1 | 100 | 4 | 64 | 142 | 42 | 372 | 4 | 8 | 235 | 6 | 626 |
| SQ | 0 | 144 | 0 | 209 | 71 | 176 | 472 | 28 | 11 | 287 | 11 | 1011 |
| SVSP | 1 | 114 | 16 | 147 | 267 | 116 | 395 | 5 | 21 | 220 | 0 | 707 |
| VSPW | 0 | 126 | 6 | 11 | 46 | 498 | 612 | 3 | 9 | 266 | 1 | 1272 |
| WSP | 0 | 87 | 3 | 83 | 54 | 3 | 189 | 5 | 8 | 167 | 4 | 380 |
| Total | 1 | 82 | 14 | 101 | 107 | 97 | 383 | 7 | 7 | 283 | 4 | 595 |

<u>**Finding #2:**</u>  **The provider network does not adequately serve all institutions.  Furthermore, institutions in the South region have better provider coverage than institutions in the North and Central regions.**

At the same time that we identified the numbers and types of providers available to serve inmates, we also sought to address the *adequacy* of the network of contracted providers.   To do



this, NCI conducted a preliminary assessment of the network through an informal survey of CDCR and CPR medical directors and other clinical staff. Medical and nursing directors were asked to assess the adequacy of the provider network at their institutions in terms of needs versus current supply for individual specialties. The following ranking was used for each specialty:

| |
|---|
| 1 = Inadequate supply/provider shortage |
| 2 = Limited provider supply |
| 3 = Adequate provider supply |
| 4 = Good provider supply |
| 5 = Too many providers/overcontracted |

The results yielded a ranking for each institution for each specialty as well as an average ranking for each specialty and for each institution. Institutions were then organized into their respective regions (North, Central, South) and an average ranking calculated for each specialty within each region.

Although there are limitations to this approach, and it is clearly subjective, the analysis yields valuable insight into the strengths and weaknesses of the current provider network. First, while most institutional average rankings by specialty are less than 3, indicating an inadequate or limited provider supply, there are clear regional differences in the perceived adequacy of the network. As shown in Table 6, institutions in the South region appear to have better access to providers then some of their counterparts in the North and Central regions. The average ranking across all institutions in the South region was 2.7, compared to 2.1 for both the North and Central.

Among the South region's institutions, neurology was the only specialty with an average ranking of less than 2, and some specialties (ophthalmology, optometry, oral surgery, podiatry and diagnostic radiology) had average rankings greater than 3. Some institutions in the South region, e.g., CSP-Calipatria (CAL), California Correctional Institution (CCI) and California State Prison Los Angeles County (LAC) appear to have an adequate or good supply of most specialties while California Rehabilitation Center (CRC) and Ironwood State Prison (ISP) appear to have a limited or inadequate supply of many specialties. These data are presented in Appendix A.

The North and Central regions appear to have more consistent network inadequacies. In the North region, several specialties (allergy, dermatology, endocrinology, oral surgery, therapeutic radiology, occupational therapy, physical therapy and speech therapy) have average rankings less than 2, while no specialties are ranked 3 or higher. Within the region, Deuel Vocational Institution (DVI) and California State Prison Sacramento (SAC) appear to have adequate or good coverage for many specialties, while California Correctional Center (CCC), Pelican Bay

24



State Prison (PBSP) and High Desert State Prison (HDSP) have an inadequate or limited supply of most specialties. Results for the Central region are almost identical. Within the region, Avenel State Prison (ASP) and California Men's Colony (CMC) have an adequate or good supply of some specialties, while California State Prison Corcoran (COR) shows consistent inadequacies and limited supplies of all specialties.

25



**Table 6**
**Network Adequacy Ranking by Institution and Region**

| | Institution | Average Score |
|---|---|---|
| | *NORTH* | 2.1 |
| CCC | California Correctional Center | 1.3 |
| CMF | California Medical Facility | 2 |
| DVI | Deuel Vocational Institution | 3 |
| FSP | Folsom State Prison | 2.8 |
| HDSP | High Desert State Prison | 1.3 |
| MCSP | Mule Creek State Prison | 1.7 |
| PBSP | Pelican Bay State Prison | 1.1 |
| SAC | CSP-Sacramento | 2.8 |
| SCC | Sierra Conservation Center | 2.2 |
| SOL | CSP-Solano | 2.3 |
| SQ | San Quentin | 2.1 |
| | *CENTRAL* | 2.1 |
| ASP | Avenal State Prison | 3.1 |
| CCWF | Central California Women's Facility | 2 |
| CMC | California Men's Colony | 2.7 |
| COR | CSP-Corcoran | 1.2 |
| CTF | Correctional Training Facility, Soledad | 2.4 |
| KVSP | Kern Valley State Prison | 1.4 |
| NKSP | North Kern State Prison | 2.4 |
| PVSP | Pleasant Valley State Prison | 2.5 |
| SATF | Substance Abuse Treatment Facility | 1.6 |
| SVSP | Salinas Valley State Prison | 2 |
| VSPW | Valley State Prison for Women | 1.9 |
| WSP | Wasco State Prison | 2.4 |
| | *SOUTH* | 2.7 |
| CAL | CSP-Calipatria | 3.1 |
| CCI | California Correctional Institution | 3.2 |
| CEN | Centinela State Prison | 2.7 |
| CIM | California Institution for Men | 2.7 |
| CIW | California Institution for Women | 2.3 |
| CRC | California Rehabilitation Center | 1.9 |
| CVSP | Chuckawalla Valley State Prison | 2.7 |
| ISP | Ironwood State Prison | 2.1 |
| LAC | CSP-Lancaster. | 3.3 |
| RJD | RJ Donovan Correctional Facility | 2.7 |

26



**Finding #3:** Processes for managing the network, including staffing and information technology, are fragmented and inefficient.

- When an institution has a need for a particular service, clinical staff generally notify the Contract Analyst at the institution or at the PC&IB, who is responsible for locating a provider that can provide the service. There is no formal process for locating providers and the State contracts database is not accessible to staff at individual institutions so that they can determine whether a particular provider is already under contract to provide the needed service. Contract Analysts can consult clinical staff to determine whether they are aware of particular providers, or contact staff at PC&IB. Sometimes, Contract Analysts simply consult the telephone book and choose a name from among the listings.

- CDCR has no formal network management function or process. Contract Analysts at individual institutions maintain inventories of providers under contract to their institutions. Analysts are free to maintain inventories as they choose, and most construct Excel spreadsheets or an Access database with provider names, specialties and contact information. These spreadsheets and databases do not interface with the CMD database, which contains all provider service and payment information.

- There is an Access database called "PHYSCAD" which appears to be a provider master list of in-house and registry providers. However, the database contains very limited information about each provider.

- The only detailed information about providers (other than paper contracts and electronic contracts contained in the ProdAgio Contracts system described in the next section) that serve CDCR inmates is contained in the CMD database. However, individual institutions maintain their own CMD databases, which are then appended together on a monthly basis. This approach leads to inaccurate and outdated information, and cannot be used manage the provider network. A simple query of the CMD database to determine the number and type of providers serving each institution is extremely complicated and is not likely to be completely accurate due to the approach used to organize the database's tables and relationships. As a result, network management functions can not be completed in any centralized or formalized fashion. At any given time, it is nearly impossible to know how many providers of each type are providing services at each institution and under what terms.

- Because there is no formal network management function, there can be no assessment of service utilization by provider in order to continuously monitor the size and adequacy of the network or coordinate services among various provider types or across institutions.

27



Although CMD houses a great deal of data about providers, services and payments, its structure prevents its use as network management tool.

- Contracting frequency is inconsistent and haphazard. As stated previously, there is no formal process for locating new providers, nor for managing an inventory of existing providers. As a result, the contract renewal process cannot be completed systematically. Although providers may sign three year contracts, there is no mechanism for periodic monitoring of the contract terms, rates or payments. This issue is discussed in subsequent sections.

- Provider education/relations is one of the most important components of provider network management. This activity includes regular communications with providers regarding changes to payment policies, rates or service provision requirements. NCI has determined that no provider education component exists within CDCR. Given the current tools used to manage the network, and an inability to determine, at any given time, which providers are under contract, it would be extremely difficult to conduct provider education at this time. The provider education/relations function, however, needs to be established as soon as possible.

*3.3    Recommendations Regarding Network Development and Management*

**Recommended Immediate Action Steps**

1. Clean up PHYSCAD and make a concerted effort to enter every contracted and registry provider in this database. In addition, clean up provider type categories in order to be consistent throughout the database. The database should include not only license type but license number, and other fields should be added as well. Every time a new provider is contracted, an entry should be made in PHYSCAD. We also recommend a weekly "clean up" routine at PC&IB to review the week's entries and assure their accuracy. This process will need to consider and be integrated with any new credentialing application that is implemented *(see Credentialing section)*.

2. Once the PHYSCAD database cleaning is underway, all Contract Analysts should be given access to it so that it can be used as a temporary network management tool instead of existing stand-alone Excel spreadsheets or other tools.

3. Further assess staffing adequacy for network management functions, including the role of Contract Analysts. Job functions appear to differ across institutions, and these differences need to be reconciled. Institutions with relatively low numbers of contracted providers, especially those who are not in rural areas or federally designated HPSAs should be studied in more detail to assess institution contracting processes and staffing.

28



A plan to leverage regional provider contracts to benefit institutions located in HPSAs should be prepared.

4. Investigate the reasons for apparent low utilization of in-house services versus off-site contracted services and develop initiatives for optimizing in-house services, including filling staffing vacancies and implementing telemedicine services. Further investigate the level of utilization of CDCR facilities versus contracted community hospitals in order to develop a plan for optimization of state-owned facilities and cost reduction.

5. Assess current telemedicine capabilities at each institution and develop standard protocols for use, as well as standard contract language and billing protocols for claims processing.

**Long Term Action Steps:**

1. Evaluate the impact of the Receiver's Expansion Plan and Upgrade Program for new healthcare facilities on provider network needs. As part of the Receiver's Goal #5 in his report dated April 14, 2008, he has proposed construction of "six to seven facilities to serve approximately 10,000 patients." The Receiver proposes that these facilities be located in places that facilitate the recruitment and retention of clinical providers although exact locations have not been finalized. Once locations have been identified, NCI recommends that a staffing assessment of these facilities be conducted, along with an institutional impact assessment, e.g., how reductions in inmates at specific institutions may impact service utilization and the number of providers needed, or how transfer of specific Pelican Bay inmates to such an institution could help to alleviate the problem of the lack of available providers in the institution's remote geographic location.

2. Obtain network benchmark information from other correctional systems, commercial and public health plans to compare CDCR's network size and coverage and assess network size and adequacy. Assess barriers to network development by institution, including factors such as geographic location, inmate population served, on-site services available and staffing.

3. Depending on the option(s) chosen for short and long term claims processing and data capture, integrate the network management function into the ProdAgio Contracts system. Claims processing systems have network management modules that can be easily integrated with other CDCR systems.

4. Develop a provider education/relations activity, including policies and procedures regarding contract changes, rate updates and other periodic communications with



providers.  Use the provider relations function to work with providers to address billing and payment issues as well as other issues that concern individual providers.



### 4.    Rate Analysis and Rate Setting

In 2006, CDCR contracted with NCI to recommend appropriate reimbursement approaches for hospitals, physicians and selected ancillary services for inpatient hospital services, outpatient hospital services, physicians, and ambulance providers. In 2007, NCI expanded its recommendations to establish Medicare-based rate structures for inpatient hospital services and physician services. Our Phase 1 work expands on these previous initiatives.

### 4.1    Overview and Analysis of Rate Analysis and Rate Setting

As part of Phase 1 of this project, NCI agreed to "to make any necessary refinements to the inpatient hospital and physician rates, and expand the rate setting process to other services." Steps undertaken to complete this task included:

1. We worked with Chancellor Consulting, to finalize inpatient rates to be used in hospital negotiations. Chancellor was hired by CPR to renegotiate contracts with high volume/high cost hospitals to establish more appropriate and consistent payment approaches. The California State Controller's Office (SCO) found that some contracted providers had inflated their billings by supplying inaccurate rate schedules and that CDCR was unable to address these inappropriate rates. In addition, the SCO found that established contract rates were often high multiples of what Medi-Cal and Medicare would pay for the same services. NCI substantiated these findings in its previous work when it found that many hospitals were receiving payments equivalent to or close to billed charges, as well as inappropriately high per diem and per case rates. As a result, we recommended that CDCR re-negotiate its high volume-high cost hospital contracts for inpatient services using Diagnosis Related Groups (DRGs) as the basis for payment, which is the payment approach used by Medicare. In addition, NCI recommended that CDCR attempt to contract at a rate equivalent to 125 to 135 percent of the Medicare DRG rate. Chancellor Consulting was charged with executing this recommendation and NCI has assisted Chancellor in its efforts by providing a rate file containing inpatient DRG rate calculations for all of CDCR's contracted hospitals. The rates are being used in Chancellor's negotiations with hospitals. At the same time, Chancellor has assisted CDCR in installing a DRG Pricer program, which is a free software tool made available by the Centers for Medicare and Medicaid Services (CMS). The pricer allows CDCR's invoice processors to receive invoices from hospitals and pay inpatient claims based on the DRG that the hospital entered on the invoice. The invoice processor enters the hospital identification number and the DRG number into the Pricer, and the Pricer calculates the appropriate DRG payment. NCI has worked with Chancellor to ensure that the rates negotiated in the contracts match the rates that the Pricer calculates when an invoice is paid.



2.  We are continuing to work with Chancellor Consulting to provide necessary data on outpatient hospital rates. In its previous work, NCI recommended that outpatient hospital services be reimbursed based on a markup over hospital cost. This cost would, in turn, be equated to an appropriate percentage of charges. Chancellor has begun executing this recommendation and has obtained Medicare Cost Report (MCR) data on all of CDCR's contracted hospitals in order to calculate the costs, appropriate markups and equivalent percentage of charges.

3.  We are also continuing to work with Chancellor Consulting to provide data to support contracting with physician panels to support each hospital contract. In its previous work, NCI recommended that physicians who provide services in contracted hospitals should be reimbursed at a percentage of the Medicare Fee Schedule, rather than a rate based on the Relative Values for Physicians (RVP) as had been the historical practice. NCI has provided Chancellor Consulting with a physician rate file containing wage-adjusted Medicare-based rates for physicians at a multiple of 130 percent, to be used as the basis for negotiations.

*4.2    Preliminary Findings Regarding Rate Analysis and Rate Setting*

In addition to supporting continued efforts to renegotiate hospital and physician contracts, and assessing current payment approaches for other provider types, we also documented current CDCR rate analysis and rate setting policies. Documentation was accomplished through interviews with several CDCR staff, attendance at demonstrations of processes at PC&IB and two prison institutions (California Rehabilitation Center and Sierra Conservation Center), and reviews of documents. Our findings regarding current rate analysis and rate setting practices are presented below.

**Finding #1:** **There are insufficient qualified and trained personnel who understand health services payment policies and rate setting methodologies.**

PC&IB has developed a rate setting policy for physician services entitled, "Preparing to Negotiate Contractor Rates and Rate Approval," which describes the process by which rates are to be negotiated and ultimately established for physician services based on the Medicare Fee Schedule (MFS). However, Contract Analysts who execute this policy generally do not have healthcare backgrounds, nor are they adequately trained in health services reimbursement approaches, calculations and policies. NCI questions whether most Contract Analysts truly understand the mechanics behind a Medicare-based rate.

According to interviews with CDCR staff, the Contract Analysts, using information collected from Health Care Cost and Utilization Program (HCCUP) Analysts, negotiate rates with providers (those that are exempt from the competitive bidding process, which is described later



in this report). Rates are to be based on the MFS, according to the document cited above as well as interviews with CDCR staff. Contract Analysts must complete a rate analysis worksheet, which compares potential rates to the MFS at a CPT code level. Contract Analysts are instructed to begin the negotiation process at 100 percent of the applicable MFS rate for that provider type and service. If a provider is not willing to accept this rate, the contract analyst may increase the percentage up to125 percent of the MFS. If the rate is 125 percent of the MFS or below, four additional people must approve the rate in addition to the Contract Analyst:

1. Unit Manager;
2. Section Chief;
3. Branch Chief; and
4. Director, Plata Support Division.

If the rate is above 125 percent of the MFS, it must be approved by the above individuals, and the Chief Financial Officer of CPR.

The physician contract negotiation process fails to consider the complexities of the MFS, including its derivation using the Resource-Based Relative Value Scale (RBRVS), geographic wage adjustments, the fact that there are multiple fee schedules published by CMS, some of which are national (e.g., lab), some of which are regional (durable medical equipment) and are therefore managed and updated by individual Medicare Carriers, and some of which are local. Contract Analysts who are negotiating MFS-based contracts need more education regarding these complexities. It is likely that the approval process could be simplified, and the number of approval signatures decreased, if Contract Analysts had a sound understanding of the rates they negotiate.

**Finding #2:** **The rate analysis or "market analysis" process is inefficient and potentially inaccurate.**

Contract Analysts who are either based at institutions or at PC&IB are responsible for conducting a market analysis or survey of prevailing rates for contracted services. The survey is intended to determine the availability of medical services in a certain geographic area which is usually a prison's immediate surrounding area. To conduct the survey, a Contract Analyst must assemble a list of potential providers, which is most often done using provider directories from Medicare and commercial insurers. In some cases, telephone books and general internet searches are used. The Contract Analyst then calls the providers on the list to ask whether they would be willing to provide services to CDCR patients. In addition, potential rates that might be acceptable are collected from the providers. The Contract Analyst then must then assemble a request for a HCCUP analysis (using the CMD database) of the prevailing rates in the geographic area, which is submitted to the HCCUP Analyst, either at the institution or at

NAVIGANT
CONSULTING

PC&IB. The parameters of the request vary but generally include historical payment information from the CMD database for specific specialties, procedures, and geographic areas.

As of March 2008, there was only one HCCUP Analyst at PC&IB to conduct these analyses, and his tenure at CDCR was only three months. Institutions that continue to be "de-centralized" (have not implemented the ProdAgio Contracts application as discussed in the next chapter) continue to have a HCCUP Analyst on-site. Although the CMD database is not particularly complicated on the institutional level, it becomes complicated and cumbersome on the statewide level (once all institutional CMDs are appended together) due to a lack of standardized codes across institutions. NCI questions whether many of the rate analyses are accurate, given the lack of standardization.

**Finding #3:** NCI discovered no rate setting policy or standard approach for several provider types, including ambulatory surgery centers, ambulance, dialysis centers and others.

Our analysis segmented providers into the following types:

- Ambulatory Surgery Centers
- Ambulance
- Contract physicians and midlevel practitioners
- Registry personnel

Each of these provider types is described below.

*Ambulatory Surgery Centers*

CDCR contracts with Ambulatory Surgery Centers (ASCs) mostly through hospitals that own these facilities and under the same terms as hospital outpatient services. Many outpatient hospital contracts are being paid using a percentage of charges approach and often at very high percentages. As shown in Table 7, average rates per encounter ranged from $2,897 to $10,816.



Table 7
Ambulatory Surgery Payments

| ICD9 Category | Description | Amount Paid | Procedures | Amount Per Procedure |
|---|---|---|---|---|
| 02 | Neoplasms | $ 318,641 | 110 | $ 2,897 |
| 03 | Endocrine, Nutritional & Metabolic Diseases | $ 18,718 | 5 | $ 3,744 |
| 04 | Diseases of the Blood | $ 1,048,273 | 132 | $ 7,941 |
| 05 | Mental Disorders | $ 192,274 | 34 | $ 5,655 |
| 06 | Diseases of the Nervous System | $ 701,216 | 120 | $ 5,843 |
| 07 | Diseases of the Circulatory System | $ 151,652 | 31 | $ 4,892 |
| 08 | Diseases of the Respiratory System | $ 519,173 | 48 | $ 10,816 |
| 09 | Diseases of the Digestive System | $ 46,995 | 15 | $ 3,133 |
| 10 | Diseases of the Genitourinary System | $ 2,343,931 | 628 | $ 3,732 |
| 11 | Complications of Pregnancy, Childbirth & Puerperium | $ 162,205 | 36 | $ 4,506 |
| 12 | Diseases of the Skin & Subcutaneous Tissue | $ 169,715 | 35 | $ 4,849 |
| 13 | Diseases of the Musculoskeletal System & Connective Tissue | $ 509,608 | 129 | $ 3,950 |
| 15 | Conditions Originating in the Perinatal Period | $ 4,125,364 | 515 | $ 8,010 |
| 16 | Symptoms, Signs & Ill-Defined Conditions | $ 812,867 | 189 | $ 4,301 |
| 17 | Injury & Poisoning | $ 177,587 | 44 | $ 4,036 |

Chancellor Consulting has begun to renegotiate hospital contracts, including the outpatient and ASC components, at a markup over facility costs. This approach will help to bring payment rates down to appropriate levels and to mitigate variation in rates from facility to facility. These efforts will result in substantial cost savings.

*Ambulance*

CDCR contracts with approximately 100 ambulance providers across California. Several of the contracted providers serve multiple geographic areas. Each county has at least one designated 911 provider and prison institutions must use the designated 911 provider(s) for emergency transports. As a result, CDCR contracts with about 25 designated 911 providers and some institutions have multiple ambulance contracts. Different types of contracts include routine non-emergency, secondary routine non-emergency, emergency, air transport/helicopter, and fixed wing air transport.

The majority of ambulance providers are reimbursed according to one or more the following payment approaches:

1. Negotiated fee schedule
2. Hourly rates
3. Medicare fee schedule-based fees
4. Mileage fees
5. Percentage of charges



6. Relative values for physicians (RVP)-based fees
7. "Usual and customary" charges

As recommended in our previous work, all ambulance contracts should be based on the Level II Healthcare Common Procedure Coding System (HCPCS) codes for base rates and mileage that are contained in the Medicare Fee Schedule, with a premium of 130 percent, which is based on industry benchmarks.

*Physician, Midlevel Practitioners and Registry Personnel*

As shown in Table 8, we identified eight different payment approaches for physicians, midlevel practitioners such as nurse practitioners and physician assistants, and registry personnel. As indicated, physicians and physician assistants are paid using all eight approaches, and hourly rates are used for all provider types. Our analysis also discovered other rate descriptions in the CMD database that were seldom utilized (e.g., stop loss, 1998 Physician's Fee and Coding Guide, etc.)

**Table 8**
**Rate Descriptions by Provider Type**

| Rate Description | Nurse Practitioner | Physician MD | Physician PA | CRNA | LVN | Medical | Professional | Other | Diagnostic | RN |
|---|---|---|---|---|---|---|---|---|---|---|
| Cardiovascular Service Rate | | X | X | | | | | | | |
| Fee for Service | | X | X | | X | X | | X | X | X |
| Hourly Rate | X | X | X | X | X | X | X | X | X | X |
| Medicare Fee Schedule | X | X | X | | X | | | X | | X |
| Outpatient Clinic Fee Schedule | X | X | X | | | | | | | |
| Per Diem/Per Pt/PerTest | X | X | X | | | | X | X | | X |
| Percentage Discount | X | X | X | | X | X | | X | | X |
| RVP | X | X | X | | | X | X | X | | X |
| Usual and Customary Charges | X | X | X | | | | | X | | |

There is also substantial variation in the rates paid to registry providers. Table 9 below shows the lowest, highest and average rates per hour for registry personnel. Hourly rates for specific provider types vary by as much as $250. Variations in payment methods and rates should be reduced.



Table 9
Hourly Rates by Specialty – Registry Personnel Only

| Specialty | Count | Hourly Rates | | | |
|---|---|---|---|---|---|
| | | Avg. | Min | Max | Range |
| Registry - CNA | 138 | $ 29 | $ 13 | $ 135 | $ 122 |
| Registry - Dietary | 15 | $ 50 | $ 43 | $ 60 | $ 17 |
| Registry - Lab Tech | 25 | $ 38 | $ 14 | $ 119 | $ 105 |
| Registry - LVN | 172 | $ 41 | $ 14 | $ 105 | $ 91 |
| Registry - Medical Assistant | 96 | $ 25 | $ 13 | $ 74 | $ 62 |
| Registry - NOS | 31 | $ 103 | $ 13 | $ 250 | $ 237 |
| Registry - NP | 49 | $ 97 | $ 28 | $ 275 | $ 247 |
| Registry - Occupational Therapy | 4 | $ 58 | $ 57 | $ 58 | $ 1 |
| Registry - Pharmacist | 142 | $ 73 | $ 20 | $ 177 | $ 157 |
| Registry - Pharmacist in Charge | 109 | $ 73 | $ 20 | $ 177 | $ 158 |
| Registry - Pharmacy Tech | 137 | $ 59 | $ 16 | $ 177 | $ 161 |
| Registry - Phlebotomy | 58 | $ 25 | $ 13 | $ 79 | $ 66 |
| Registry - Physical Medicine & Rehab | 1 | $ 72 | $ 72 | $ 72 | $ - |
| Registry - Physical Therapy | 44 | $ 67 | $ 15 | $ 125 | $ 110 |
| Registry - Physican Assistant | 10 | $ 182 | $ 50 | $ 275 | $ 225 |
| Registry - Physician | 58 | $ 113 | $ 28 | $ 275 | $ 247 |
| Registry - Psych Tech | 65 | $ 42 | $ 16 | $ 115 | $ 99 |
| Registry - Psychiatry | 88 | $ 122 | $ 40 | $ 275 | $ 235 |
| Registry - Psychology | 162 | $ 84 | $ 20 | $ 275 | $ 256 |
| Registry - Respiratory Therapy | 3 | $ 48 | $ 42 | $ 54 | $ 13 |
| Registry - RN | 177 | $ 50 | $ 14 | $ 225 | $ 212 |
| Registry - Social Worker | 58 | $ 51 | $ 23 | $ 85 | $ 62 |
| Registry - Surgical Nurse | 3 | $ 127 | $ 115 | $ 145 | $ 30 |
| Registry - Surgical Technician | 1 | $ 32 | $ 32 | $ 32 | $ - |
| Registry - X-Ray | 65 | $ 59 | $ 23 | $ 250 | $ 228 |

**Finding #4:** **For Master Contracts, such as phlebotomy, CDCR ranks contractors by bid rates and institutions are required to call the contractors with the lowest bid rates first when services are needed.** However, NCI was told that the lowest rate contractors are often not available and institutions must often use contractors whose rates are substantially higher. The State auditor confirmed this finding. We are concerned that incentives have been created for bidders to "game" the system by bidding higher rates, knowing that the low bidders will not be available to provide the services.

**Finding #5:** **There is no usable, searchable, single source of all payment approaches and rates for all provider types.** Although there are some rates and payment mechanisms entered into CMD, they are not consistently entered for all providers, nor are they always accurate. The only way to confirm a provider's current payment arrangement and rate(s) is to review the actual contract (either paper or electronically through ProdAgio). It is impossible to conduct true rate comparisons across providers of the same type, even hospitals, because the data in CMD either

37



does not exist, is incomplete, or is out of date. Even a review of contracts revealed duplications across providers with overlapping dates so that it is difficult to tell which payment mechanism and rate is currently in effect. Chancellor Consulting has begun to address this issue with CDCR's contracted hospitals by developing a new comprehensive rate database for all hospitals.

**Finding #6:** **There is no mechanism by which contract rates can be automatically linked to invoice payment.** Rates must be obtained manually by invoice processors who are required to review contracts. More experienced invoice processors indicated that they eventually memorize payment rates for high volume providers but the rates are not automatically captured so that invoices can be paid automatically using the contracted rates. *This issue is discussed in detail in Chapter 8, Claims Processing and Data Capture.*

4.3    *Recommendations Regarding Rate Analysis and Rate Setting*

**Recommended Immediate Action Steps:**

1.  Develop a training program for Contract Analysts and other CDCR staff on health services reimbursement, including policy development, mechanics, terminology and calculations. *Reimbursement training could be conducted in conjunction with the training recommended for invoice processors, as described in Chapter 8 of this report.*

2.  Develop a comprehensive rate analysis and rate setting policy that includes all provider types, and establish a committee to review and update the policy periodically. This effort will require an analysis of CDCR payment rates compared to public and private benchmarks to ensure rates for all provider types are appropriate.

3.  Investigate potential claims processing systems that will allow contracted rates to be loaded into the system so that contracted rates can be linked electronically to invoice payment, eliminating the need to review contracts manually, except in rare cases. *This is described in more detail in Chapter 8 of this report.*

4.  Build on Chancellor Consulting's rate sheet database for hospitals by including physicians and other provider types, so that all rates are located in one place and can be easily queried and referenced.

5.  Develop a financial model that allows the budget impact of negotiated rates to be calculated for major provider categories. The model should also be used to support ongoing negotiations.



**<u>Long Term Action Steps:</u>**

*See Chapter 8, Claims Processing and Data Capture.*