# EXHIBIT 6
*Part 2 of 3*



## 5.     Contracting Functions

The contracting function encompasses several interrelated activities, including negotiating contracts for new providers, renewing contracts for existing providers, and competitive bidding for services not considered exempt from bidding. In order to better evaluate these functions, we assessed the systems used to support them, the step-by-step processes that are executed, and the staff who are performing them.

### 5.1     Overview and Analysis of Contracting Functions

Provider contracting processes vary depending on the provider and service type, and the institution in need of a contracted service. We describe each contracting process in detail below. In general, the contracting process begins when an institution identifies a need for a contracted provider. A Contract Analyst at the institution first determines whether or not there is an existing contract in place. If there is no existing contract for the needed service, the institution-based Contract Analyst works with a Contract Analyst from the PC&IB to define the scope of work. If the request is for an "exempt" provider (meaning exempt from bidding), the PC&IB Contract Analyst contacts the provider directly to discuss the service need and negotiate the rate. Institution-based and PC&IB Contract Analysts then gather and process all of the paperwork and credentialing information needed to execute a contract. Table 10 identifies the paperwork required for exempt and biddable contracts.

**Table 10**
**Paperwork Required for Contract**

|  | Exempt | Biddable |
|---|---|---|
| Contract Request Submittal Checklist | X | X |
| Contract Request Form (886B); | X | X |
| Scope of Work | X | X |
| Civil Service Consideration Justification | X | X |
| Market Survey | X | X |
| Drug-Free Workplace Certification | X |  |
| Primary Laws, Rules and Regulations Regarding Conduct and Association with State Prison Inmates | X |  |
| Letter of Intent from the Prospective Contractor | X |  |
| Payee Data Record | X |  |
| Certificate of Professional Liability Insurance | X |  |
| Certificate of Commercial General Liability Insurance (If location of service includes in community) | X |  |

If the request is for a non-exempt provider, the PC&IB Contract Analyst determines whether a Master Contract would be appropriate (if other institutions would also benefit from a bid for that service). If the service is going to be bid as a Master Contract, the PC&IB Contract Analyst



invites all other institutions to participate in the bid process. The Contract Analyst at PC&IB then prepares the Invitation for Bid (IFB) package on behalf of all institutions wishing to participate, and notifies potential bidders of the bid opportunity. As bids are received, the PC&IB Contract Analyst analyzes and ranks them according to their rates and the providers' small business status. Decisions are made regarding which providers will be awarded contracts, and providers are notified. The credentials of awarded providers are verified, and contract(s) are executed. Exhibit 1 on the next page illustrates the general flow of contracting activities. Detailed flowcharts of contracting processes can be found in Appendix B.







To support its contracting efforts, CDCR has begun to deploy a software program to facilitate its document management functions, called ProdAgio Contracts. ProdAgio Contracts is a document management system that is designed to streamline the authoring, reviewing, and executing of contracts through a web-based interface. ProdAgio also stores contracts and related legal documents. ProdAgio automates much of the contracting process, and reduces the need for physical storage of paper documents.

In addition to ProdAgio, the entire CDCR agency (not just the healthcare division) will be implementing a system called Business Information System (BIS) on October 1, 2008, which is based on SAP's Enterprise Resource Planning (ERP) product. The system will offer most, if not all of the functionalities that ProdAgio offers, and possibly more, although the end product has not been fully researched at this stage of NCI's work. CDCR is continuing its rollout of ProdAgio, and plans to continue using it in concert with the SAP BIS system as it is deployed. It is unclear how CDCR will manage these two systems, and NCI was asked to make recommendations regarding optimal integration. NCI has made some initial recommendations in this Phase 1 report, and plans a detailed assessment of BIS/ProdAgio integration, along with a claims processing and network management component in Phase 2. At this point, NCI's understanding is that the SAP BIS system includes a feature called Document Builder, which functions as a document management system similar to ProdAgio Contracts. SAP Document Builder provides a simple dialog-based interface that guides users through a series of interactive questions and fill-in responses, and offers an option to use a template-based model to create formatted contracts. The system can also be used to create attachments, clauses, terms, conditions and other requirements. Like ProdAgio Contracts, SAP Document Builder stores contracts and contract-related content such as regulatory clauses, terms, and conditions. It also has the ability to notify users of available updates, and it assists users in determining the relevancy of document content.

Currently, the PC&IB is focusing exclusively on full implementation of the ProdAgio Contracts software in its contracting functions. Four institutions (San Quentin, California State Prison Sacramento, Pelican Bay and California Medical Facility) were transitioned from a manual contracts process to a ProdAgio-based process starting in late 2007. Two more (Valley State Prison for Women and Central California Women's Facility) were centralized on January 31, 2008. In centralizing contracting processes for these institutions, the Contract Analyst positions at the institutions were moved to PC&IB and there are no longer Contract Analysts at these institutions. CDCR plans to continue adding institutions to the centralized (ProdAgio) process throughout 2008. However, the CDCR system-wide implementation of BIS may call into question the continued implementation of ProdAgio and its potential integration with BIS. As part of Phase 1 of this project, NCI conducted a preliminary assessment of the two systems. An important consideration is CDCR's ability to process healthcare claims accurately and efficiently, and the ability of the claims processing component to interface with the contracting component. Our recommendations regarding this integration are described in Chapter 8 (Claims Processing and Data Capture). Current contracting functions, findings and recommendations are described below.



### 5.1.1    Competitive Bidding

In our Phase 1 review of the competitive bidding process, we reviewed a variety of documents used in the bidding process, including Requests for Proposals, proposal evaluation processes and methods used to select potential bidders. We also conducted interviews with CDCR staff and attended demonstrations of the competitive bidding process.

There are separate and distinct processes within competitive bidding. The "manual" bid process is the process by which bidding and evaluation materials are constructed *without* using the ProdAgio Contracts system, and the ProdAgio-based bid process, in which ProdAgio is used to construct and manage the bidding materials. As of March 31, 2008, there were six institutions for which the contracting process had become centralized using the ProdAgio Contract system. The remaining institutions are still usingr the manual process.

These processes are described separately below.

---

**Manual Bid Process**

---

Process Summary:
1. Institutions contact the Plata Contract and Invoice Branch when they identify a need for a contracted service
2. A PC&IB Contract Analyst (CA) reviews the details of the request (what services are needed, how much)
3. PC&IB CA evaluates whether the request lends itself to a Master Contract, and whether other institutions might benefit from a bid for the requested service
   - If so, call letters are sent to all institutions inviting them to participate in the bid for services
   - If not, the contracting process proceeds with the institution requesting service
4. PC&IB CA sends Rate Sheet to institution(s) participating in the bid
5. The CA at the institution(s) completes the Rate Sheet
6. Healthcare Manager at the institution approves Rate Sheet
7. Rate Sheet is sent to PC&IB
8. PC&IB CA develops Scope of Work using information from the Rate Sheet
9. PC&IB Contracts Manager reviews Scope of Work
10. Request for service goes to PC&IB Contracts Director for approval
11. Scope of Work and Rate Sheet are sent back to institution(s) for approval
12. PC&IB CA prepares Invitation for Bid (IFB) document
13. PC&IB CA prepares bidders list
14. PC&IB CA sends opportunity letter to prospective bidders on bidders list
15. PC&IB CA posts IFB on the California State Contracts Register (CSCR) website
16. PC&IB CA sends hard copies of the IFB upon request
17. PC&IB CA conducts bidder's conference/walk through



18. PC&IB CA reviews bids as they are received
    - Bids are reviewed for completeness and mathematical accuracy
19. PC&IB CA enters bid amounts on Bid Tabulation Sheet
20. PC&IB CA creates Pay Comparison Package and a Bid Matrix
21. Pay Comparison Package is sent for approval
22. PC&IB CA verifies bidders' small business eligibility
23. PC&IB CA ranks bidders according to rates and small business status
24. PC&IB CA adds ranking information to Bid Matrix
25. Decisions on bid awards are made
26. PC&IB CA notifies bidders about award decisions
    - CA sends Intent to Award letters to contractors, and requests insurance and licensure documents
    - CA sends rejection letters to bidders who will not be awarded contracts
27. PC&IB CA creates agreement with each contractor
28. PC&IB CA routes contracts to Accounting for encumbering
    - For Master Contracts, an encumbering document is included showing the institution breakdowns for each contract
29. Institution CA verifies each provider's credentials, including licensure and board certification
30. When service is needed, institutions simultaneously phone/fax all contractors and give them 24 hours to respond about their willingness/availability to provide the service. Institutions must award service to the highest ranked contractor who has responded to the request

---

**ProdAgio Bid Process**

---

As described previously, CDCR is currently piloting a software program called ProdAgio Contracts. ProdAgio is a documentation management system, and CDCR is in the process of gradually transitioning all 33 institutions to this system. It is projected that a limited number of manual contracting processes will continue to exist, even after ProdAgio is completely in place.

Process Summary:
1. Institution submits a Contract Request Form (886B) or a Contract Renewal Request (CRR) to the Plata Contract and Invoice Branch when they identify a need for a contracted service
2. A PC&IB Contract Analyst (CA) confirms the request with the institution-based Contract Analyst and gathers the details of the request (what services are needed, how much)
3. PC&IB CA prepares Scope of Work, Rate Sheet, and Invitation for Bid (IFB) package
4. PC&IB CA submits Scope of Work, Rate Sheet, and IFB to a manager for review
5. Once approved the PC&IB CA conducts the following tasks:
    - Sends the Scope of Work and Rate Sheet to the institution for confirmation
    - Advertises the IFB package on the California State Contracts Register (CSCR) website (must be posted on website for three days before anything can be initiated in the ProdAgio system)



- Prepares and faxes Contracting Opportunity Letter and Internet Alternative Access Service (OCS Form 145) to potential bidders on the IFB bidders list
6. PC&IB CA prepares Bid Matrix, Bid Tabulation Worksheet, and Work Folders
7. PC&IB CA prepares Pay Comparison package
8. As bid packages are received, the PC&IB CA conducts the following tasks:
   - Records the name and contact information of the bidder, as well as the date received on the Bid Tabulation Worksheet and the Bid Matrix
   - Enters the rates submitted by bidders on the Bid Tabulation Worksheet
9. PC&IB CA send Bid Tabulation Worksheet to a manager for pay comparison
10. Manager reviews pay comparison and defines the cut-off rate amount
11. PC&IB CA finalized Bid Matrix and ranks bidders according to rates and small business status
12. PC&IB CA notifies bidders about award decisions
    - CA sends Intent to Award letters to bidders below bid cut-off, and requests insurance and licensure documents
    - CA sends rejection letters to bidders above the bid cut-off

### 5.1.2   Exempt Providers Contracting Process

Contracting with providers who are exempt from the bidding process is generally initiated by individual institutions who must either locate new providers to meet their service needs or renew contracts with existing providers. Regulations regarding types of contracts that are exempt from bidding are contained in the State Contracting Manual Chapter 5, Section 5.80. This language can be found in Appendix C.

The California State Auditor Report 2006 recommended "…that the California Department of General Services (General Services) consider removing its long-standing policy exemption that allows Corrections to award, without advertising or competitive bidding, medical service contracts with physicians, medical groups, local community hospitals, 911 emergency ambulance service providers, and an ambulance service provider serving a single geographical area." However, these services continue to be exempt from bidding. *At this time, NCI recommends that these services remain exempt as long as appropriate negotiation policies are in place to ensure that rates paid are appropriate and within the range of market rates paid by public and private payers.*

The exempt providers contract process is described below.

Process Summary:
1. Institutions contact the Plata Contract and Invoice Branch when they identify a need for a contracted service.
2. A PC&IB Contract Analyst (CA) confirms the request with the institution-based Contract Analyst and gathers the details of the request (what services are needed, why, how much).
3. PC&IB CA recruits potential contractor(s) and negotiates rates.
4. PC&IB CA sends provider a package of materials including a letter of intent, a payee data record, and a request for supporting documentation (insurance, licensure).

46



5. PC&IB CA conducts rate analysis.
6. Provider returns the data record (STD 204) to PC&IB.
7. PC&IB CA forwards STD 204 to ProdAgio help desk.
8. ProdAgio help desk enters data from STD 204 into ProdAgio.
9. Provider information (including rates) are reviewed by a PC&IB Contract Manager for approval.
10. Once approved, the PC&IB CA sends a contract to the provider to be signed.
11. PC&IB CA encumbers funds.
12. Once received, PC&IB CA submits provider's insurance information to ORIM for approval.
13. Once approved, contract is submitted to PC&IB Contract Manager for approval.
14. Once approved by manager, contract is submitted to legal department for final approval.
15. Once approved, final contract information is entered in ProdAgio (if applicable) and the contracts Access database.

New contracts and contract renewals are nearly identical, except for Steps 3, 4 and 5, which are not performed in a renewal.

### 5.1.3    *Staffing for Contract Negotiations and Bidding*

The State of California has a limited set of general job levels that are used to staff a wide variety of agencies. Each job level has a set of education and experience requirements; however, they do not require any specific industry knowledge or expertise. Positions at CDCR can be filled by any candidate who meets the education and experience requirements of the designated job category and passes a statewide general competency exam. There is no requirement that CDCR employees (of any level) who are hired to perform healthcare contracting have experience specific to healthcare, contracting, provider relations, negotiation, or any other job-specific function. In addition, the statewide hiring process does little to ensure that CDCR positions are filled by individuals with relevant education and work histories. The PC&IB is staffed primarily with Staff Services Analyst (SSA) employees, and a smaller number of Associate Governmental Program Analyst (AGPA) employees. As of March 2008, teams of between three and seven SSAs and/or AGPAs reported to a Staff Services Manager I (SSMI), who in turn, reported to a Staff Services Manager II (SSMII). Although the specific job functions and duties vary considerably within the department, depending on whether individuals are assigned to a contracting role or an invoice processing role, the job qualifications are the same.

As part of our Phase 1 analysis, we reviewed the qualifications and requirements for the major job classifications of the PC&IB, as well as similar positions at a variety of other healthcare organizations, nationwide. We gathered information from other correctional systems, a state employee health system, and several commercial health plans.

Among the organizations for which we were able to gather data, all except CDCR require contracting employees to have relevant healthcare experience and/or education. Although CDCR requires its contracting employees to hold Bachelor's degrees (or the equivalent), some organizations require or



strongly prefer candidates with Master's degrees in fields such as health or business administration, health economics, or another related field. In addition, most organizations specifically require knowledge of managed care contracting, provider relations, negotiation, and credentialing. This is not surprising, given that healthcare provider contracting requires much more specific knowledge and expertise than contracting for most other goods and services. NCI's findings regarding qualifications of CDCR contracting staff compared to other healthcare organizations are shown in Table 11.

**Table 11**
**Contract Staffing Descriptions**

| Organization | Position Title | Job Description | Educational Requirements | Years of Experience Required | Technical Skills or Knowledge Requirements | Salary Range |
|---|---|---|---|---|---|---|
| | Staff Services Analyst | | | | | $33,804 $53,652 |
| | Associate Government Programs Analyst | | Bachelor degree OR Work experience like... | | | $52,904 $64,176 |
| | Staff Services Manager I | | | | | $60,948 $73,524 |
| | Staff Services Manager II | | | | | $66,992 $80,724 |
| CDCR | Staff Services Manager III | | Bachelor degree OR | | Same as SSM level I plus... | $81,548 $99,600 |

NAVIGANT CONSULTING

**NAVIGANT CONSULTING**

| Organization | Position Title | Job Description | Educational Requirements | Years of Experience Required | Technical Skills or Knowledge Requirements | Salary Range |
|---|---|---|---|---|---|---|
| New York State Department of Correctional Services | Contract Management Specialist 2 | Negotiate and monitor hospital operating agreements and individual provider agreements on behalf of the inmate population under the jurisdiction of the New York State Department of Correctional Services. Ensure all physicians/providers have appropriate licenses, board certifications and insurance coverage. Develop Requests For Proposals (RFP's) and prepare, implement, and monitor contracts. | Bachelor's degree in health-related field | 3 years managing contracts and related budgets for health care services in an adult correctional services system. The managing of contracts must have included experience in one or more of the following areas: negotiation, fiscal management, development, execution, or monitoring and review. | | |
| University of Texas Medical Branch (Contractor for Texas Dep't of Corrections | Acquisition Specialist | | Bachelor's Degree in Purchasing, Business Administration, or related field | 2 years in related field | | $47,396-$57,500 |
| | Contracts Analyst (Research Services) | Negotiates incoming contracts; ensures contracts/agreements in conformity with Institutional/UT system/State of Texas laws. Drafts, issues, negotiates outgoing contracts/agreements | Bachelor's Degree | 3 years relevant experience | | $43,400-$71,610 |
| BCBS of North Carolina | Health Care Analyst (Network Management) | Evaluates and refines data in a manner so as to provide meaningful information in support of reimbursement and contracting/negotiation objectives. Responsible for the day-to-day technical activities of assigned components of contract negotiation initiatives. | Master's degree in business administration, health administration, mathematics, health economics, or related field | At least 2 years of relevant experience | Knowledge of the healthcare industry and the principles of managed care is strongly preferred | Not published |
| | Network Specialist | Develops, negotiates, implements and maintains comprehensive statewide ancillary provider networks. Supports ongoing measurement of performance standards, network access and availability, compliance with | Bachelor's degree | 3 years related experience | Thorough knowledge of the health care industry and managed care delivery systems; strong financial negotiating skills | |

50

NAVIGANT
CONSULTING

| Organization | Position Title | Job Description | Educational Requirements | Years of Experience Required | Technical Skills or Knowledge Requirements | Salary Range |
|---|---|---|---|---|---|---|
| Premera Blue Cross | | policies and procedures. Analyzes monthly claims paid data and develops standard utilization and cost reports including trend analysis, variance from budget, and benchmarking. | | | | |
| | Senior Manager – Provider Contracting | Develops, implements and manages provider and hospital networks within a geographic service area; negotiate complex financial agreements involving capitation, discounts, per diem agreements and other payment provisions. Negotiates and renegotiates terms and conditions of delivery system contracts. Ensures that all parties adhere to contractual terms and that corrective action is taken when terms are not being met. | Bachelor's degree | 5 years related experience | Thorough knowledge of health care industry and benefits and ability to interpret related contractual provision | Not published |
| Blue Shield of California | Contract Consultant | Responsibilities include provider contracting, network development, negotiations and contract maintenance. Major functions include the development of reimbursement proposals, strategies and risk arrangements, drafting and implementing provider contracts, negotiating contract provisions, developing and maintaining key provider relationships and network management. | Bachelor's degree in health administration, business, or related field is required; Master's degree is preferred. | | | Not published |
| | Manager, Provider Network Management | Management, development and administration of the provider network, including contracting, credentialing, provider relations, and provider database maintenance functions. | Bachelor's degree in business, health care management or related health care field | | At least 5 years health care services, provider contracting/relations, credentialing is desired. Previous supervisory or management experience | Not published |



| Organization | Position Title | Job Description | Educational Requirements | Years of Experience Required | Technical Skills or Knowledge Requirements | Salary Range |
|---|---|---|---|---|---|---|
| BCBS of Vermont | Provider Contracting Specialist – Level I | Performs routine entry level work to serve as a liaison between the state insurance program and network providers | Bachelor's degree | 1 year of experience in health insurance benefit administration | Knowledge of state and federal laws concerning various types of health and dental insurance programs | Not published |
| Gunderson Lutheran Health System | Provider Contracting Specialist – Level II | Incumbents perform a full range of functions related to establishing and maintaining a provider network of doctors, dentists, hospitals, laboratories, medical specialists and other health care professionals for the state insurance plan. Employees may be assigned responsibility for the supervision and training of others. | Bachelor's degree | 2 years of experience in health insurance benefit administration | Knowledge of the State Insurance Plan, and demonstrated ability to manage provider contracts and credentials | Not published |
| OSEEGIB (Oklahoma State and Education Employees Group Insurance Board) | Provider Contracting Specialist – Level III | Incumbents direct the development and coordination of the provider network; implement marketing strategies and recruiting methods; review and analyze existing policies and procedures, reimbursement methodologies, benefit coverage, costs and other features; serve as primary developer of all provider/facility contracts and applications under the direction of the legal division; represent the agency at professional seminars, conferences and meetings; prepare articles for publication in newsletters and journals. | Bachelor's degree | 3 years of experience in health insurance benefit administration | Knowledge of the State Insurance Plan, and demonstrated ability to manage provider contracts and credentials; knowledge of supervisory principles and practices | Not published |

52



5.2    *Preliminary Findings Regarding Contracting Functions*

Our initial review of processes, systems and staffing, has led us to identify the following findings:

**Finding #1:** **Although ProdAgio Contracts removes much of the paper involved in the bid and contracting processes, its full capabilities are not being utilized. These capabilities would help to address many of the shortcomings associated with the provider contracting unit of CDCR.** NCI understands that ProdAgio has advanced searching and tracking capabilities that are not currently installed on CDCR's system. As a result, Contract Analysts are unable to effectively search for contract information and ProdAgio is unable to serve as an effective central data repository for provider contract information. It also does not interface with any of the department's Access databases (such as CMD) that contain payment and other information. In addition, it appears that the system does not have the capability to serve as a provider network management, quality management or cost measurement tool. These functions would need to be performed separately and integrated with ProdAgio in order to optimize its use as a contract management system.

**Finding #2:** **There is no standard procedure for locating or selecting providers to deliver a specific service.** Contract Analysts at institutions use the yellow pages, ask Contract Analysts at other institutions who they contract with, ask clinical staff who they know, or call PC&IB to ask for names. There is no complete and up-to-date database of existing providers to which Contract Analysts can refer, nor any link to disciplinary actions or tracking of adverse events or poor performance for either contracted providers or registries.

**Finding #3:** **Involvement of Institution-based Contract Analysts in contract negotiations varies by institution.** Although some institution-based Contract Analysts conduct contract negotiations for some services, most primarily assure that there are providers under contract to provide the services at the institution. Contracts are generally negotiated and processed by PC&IB Contract Analysts, whether the institution is a centralized ProdAgio-based institution or decentralized non-ProdAgio institution. Anecdotal evidence suggests that PC&IB staff have excluded institution-based CA's from the contracting process in some cases. This appears to have delayed contract negotiation and processing on several occasions.

**Finding #4:** **The bid process is meant to be initiated when an institution identifies a need for service or contracts expire. However, there are no formal guidelines for initiating a bid process.** Institutions are expected to maintain a current list of contracted providers but these lists exist in isolation and there is no way to cross-reference lists either across institutions or with PC&IB. Each institution has developed its own system to keep track of existing contracts that is separate and independent of PC&IB contract management.

53



**Finding #5:** **Bid awards are made solely on the basis of rates without considering provider quality.** Contracted providers are ranked according to preference points by the PC&IB Contract Analyst using a ranking tool. Rankings are entered into the Bid Matrix. Preference points are awarded based on bid rates and the size of the provider's business (small businesses are given preference). At the time service is needed, institutions must first contact the highest ranked contractor who has responded to the request for service and then work down the rankings list. This is particularly problematic for registry contracts because individuals who work for registries are not tracked across institutions and headquarters. For example, medical assistants who perform poorly may change registries and ultimately be rehired by a different institution. We have not been able to identify another healthcare purchaser that excludes provider quality from the selection of providers.

**Finding #6:** **Discussions with prison institution staff suggest that the highest ranked vendors or providers often cannot or will not provide needed services resulting in lower rank (and higher cost) vendors or providers being used.** As discussed previously, the ranking system creates incentives for providers to "game" the system by bidding higher rates, knowing that the low price vendors will likely be unable or unwilling to provide services. Conversely, providers also have incentives to bid low rates and not provide services, simply to have a state contract. In fact, discussions with institutions suggest that unqualified vendors successfully bid for contracts and then do not provide the services. For example, during the recent site visits, we were told that a non-healthcare related company bid and won the registry contract for the purpose of obtaining financial loans from banks. The company was never capable of or had the intention to provide the registry services for which it was bidding.

**Finding #7:** **PC&IB Contract Analysts do not have adequate healthcare knowledge to negotiate certain contracts.** Lack of adequate knowledge has resulted in higher rates being paid than necessary. For example, a master contract for imaging services was negotiated that did not include contrast media in the price of the contract. The PC&IB Contract Analyst did not have enough knowledge to know that contrast media needed to be included in the contract. As a result, the lowest cost vendor was selected, but the institutions then needed to purchase contrast media in addition paying the vendor cost for imaging services. Although the procedure cost was lower, the overall cost (including contrast media) was higher. In addition, there was substantial waste associated with the contrast media, which must be purchased in bulk.

**Finding #8:** **The provider selection process does not include integrated license verification and credentialing processes.** These are separate processes. *This is discussed in more detail in Chapter 6, Credentialing.*



**Finding #9:** **PHYSCAD appears to be a "master" list of providers and provider numbers. However, the database appears to be incomplete and needs to be "cleaned" to remove duplicates.** PHYSCAD does not contain licensing information. Provider numbers are manually generated and assigned sequentially but do not contain any identifying information. As a result, there is the potential for providers to have multiple provider numbers. The PHYSCAD database has limited value at this time because it contains only a limited group of providers, and because its data cannot be directly linked to the systems used by contracting and invoicing staff. CDCR staff could not clearly articulate what purpose PHYSCAD serves at this time.

**Finding #10:** **CDCR's current reimbursement policies and payment approaches, or lack thereof, have a negative impact on the contract negotiation process, resulting in contract ambiguities and inaccuracies, and ultimately leading to incorrect payments to providers.** Moreover, CDCR still has a large number of contracts that are based on a percentage of billed charges. This creates incentives for providers to continuously increase their charges to obtain higher payments. Commercial and public health plan contracts often contain language that limits providers' annual increases in their Charge Description Masters (CDMs) in order to reduce the risk of large charge increases from year to year. The following processes and policies are currently in place:

> Hospitals – Chancellor Consulting has been hired to renegotiate high volume hospital contracts. *See previous discussion in Chapter 3.*

> Physicians (Non-Hourly) – In our previous work, we recommended that CDCR move away from RVP-based reimbursement for physicians and instead pay based at 130 percent of the Medicare Fee Schedule. However, NCI does not believe that contracting staff have the healthcare reimbursement knowledge that is necessary to negotiate physician contracts in this way.

> Physicians (Hourly) – Hourly rates are appropriate for certain providers who enter prison grounds and provide services to inmates for a specified length of time. However, court documents and other audits point to overpayments, either through inflated hours or inflated rates. There is no automated audit function that allows for reconciliation of the hours and rates with payments. Health Care Managers who review invoices at institutions may catch some of these errors, but invoice processors using ProdAgio do not have access to prison log sheets to reconcile discrepancies which limits leverage in contract negotiations.

> Other Provider Types – Providers other than hospitals and physicians have an advantage in negotiations because there are few rate setting or reimbursement policies



in effect.  As noted previously, services that are bid offer incentives for providers to bid high rates.

### 5.3    *Recommendations Regarding Contracting Functions*

**Immediate Action Steps:**

1. Clean and update PHYSCAD so that it serves a useful purpose.  *See previous recommendation Chapter 3, Network Development and Management.*

2. *See Chapter 4, Rate Analysis and Rate Setting recommendations regarding establishment of payment policies.*  Once established, these should be added to contract language.

3. Review all current non-Registry Master Contracts in detail and assess whether they are needed and whether services are being performed by qualified vendors at an appropriate cost.

4. Assess qualifications of existing staff assigned to bid contracting and provide training on the required components of selected contracts such as imaging, laboratory and pharmacy.

5. Review all Registry contracts and link individuals to a master list of providers.  *See network management recommendation regarding updating and cleaning of PHYSCAD.*

6. Continue using ProdAgio Contracts for the six institutions that are already centralized but also provide access to ProdAgio Contracts for Contract Analysts at decentralized institutions as well.  Access should be provided concurrent with the master provider network database (PHYSCAD) cleanup/update.

7. Assess BIS capabilities in detail to determine whether there are functionalities that should be integrated with ProdAgio as well as network management and claims processing systems.

**Long Term Action Steps:**

1. The network management function needs to be integrated with the competitive bidding function.  A master database of providers, including registries, must interface with ProdAgio and/or BIS so that unqualified providers, vendors and registries can automatically be excluded from consideration.  In addition, this effort must also be integrated with utilization management and quality monitoring so that retrospective



review of all providers and services can be conducted regularly. Finally, network management should also interface with credentialing so that completeness and accuracy of credentialing and recredentialing can be monitored.

2.  A centralized contracts database should inform the bid management process so that a Contract Analyst can access an institution's contracts and can also view all institutions' contracts.

3.  The management of registries needs to be conducted across institutions and with PC&IB. All institutions should be aware of their own as well as other institutions' registries, including whether or not specific providers are qualified for their positions, have changed registries and/or have a history of disciplinary actions or poor performance.

4.  Integrate the contract negotiation and bidding function with network management and claims processing functions. Determine adequate data capture requirements to link to claims processing system and integration requirements for ProdAgio Contracts. ProdAgio should be used to capitalize on its strengths. Its primary strength is document management but it is not meant to be a claims processing system or provider network management tool, and we do not recommend that it be used for either of these functions.

5.  Consider setting up an SQL or use the existing Oracle database in the planned data center in Torrance to house the provider listing while the MS Access-based PHYSCAD continues to be the front-end application available for appropriate staff members to access provider demographic and contractual information. Such an approach will ensure that when a provider is renewed or termed, the information is available to all institutions. IT personnel should be consulted on this issue due to limitations in MS Access. An important consideration is that the performance of the application (response time per click or per search) will largely dependent upon how the database is set up and the connection between end-users and the server location. Many IT issues must be understood and addressed in order for the implementation of this to be successful.



## 6.    Credentialing

### 6.1    Overview and Assessment of Credentialing

Credentialing is the process by which health care providers are evaluated and approved for participation in a health plan or employment by a provider group. The goal of the credentialing process is to ensure that qualified and trained practitioners and providers are delivering health care services.

Our assessment of CDCR's credentialing and recredentialing activities considered the following issues:

- Organizational structure and staffing;
- Provider credentialing written guidelines;
- Initial credentialing and recredentialing verification processes;
- Credentialing application and attestation procedure;
- Review of initial sanction information and recredentialing sanction information;
- Ongoing monitoring of sanctions, complaints and quality of care or service issues;
- Provider appeal rights;
- Credentialing and assessment of organizational/facility providers;
- Delegation of credentialing (if applicable)

Our review and assessment of the credentialing and recredentialing functions included an interview with the Manager of CDCR's Credentialing & Privileging Unit (CPU). Our discussion included routine operations, status of supporting documents, committee structure and functions, related programs, evaluations, and monitoring and evaluation reviews. After the interview, we requested the documents listed in Appendix D; documents that were received and reviewed are also noted in the Appendix. Following the review of documents, NCI submitted additional questions, which were responded to in writing by CDCR. Our preliminary findings are outlined below.

### 6.2    Preliminary Findings Regarding Credentialing

The centralized CPU has made substantial progress in standardizing and improving the credentialing process. The Manager of the CPU articulated a clear, well thought-out plan to complete the centralization of the credentialing process and adopt information technology tools to support the process. The current process is depicted in Exhibit 2, on the next page.

58



**Exhibit 2**



**Finding #1:** There are incomplete policies or procedures to support the credentialing program in its current or future state, but the CPU is in the process of developing these policies and desk level procedures. These policies, when developed, will include requirements from the Joint Commission for the Accreditation of Healthcare Organizations (JCAHO) and the National Committee for Quality Assurance (NCQA). These policies should address:

- The types of practitioners to credential and recredential;
- Requirements for the credentialing application and attestation, including mandatory questions and attestations;

59



- Verification sources used, including primary source verification of licensure and board certification and secondary source verification of DEA status and liability coverage;
- Criteria for credentialing and recredentialing;
- The process for making credentialing and recredentialing decisions;
- The process for managing credentialing files that meet the organization's established criteria;
- The process to delegate credentialing or credentialing, if applicable (i.e.: use of a CVO);
- The process used to ensure that credentialing and recredentialing are conducted in a nondiscriminatory manner, including conflict of interest disclosures;
- The process for notifying a practitioner about any information obtained during the credentialing process that varies substantially from the information provided to by the practitioner;
- The process to ensue that practitioners are notified of the credentialing and recredentialing decision within 60 calendar days of the committee's decision;
- The process used to ensure the confidentiality of all information in the credentialing process;
- The process for ensuring that listings in practitioner directories and other materials, as applicable to this organization, are consistent with credentialing data, including education, training, certification and specialty;
- The medical director or other designated physician's responsibilities and role in the credentialing program;
- Written guidelines to describe the functions, roles, and responsibilities of the Credentialing Committee

**Finding #2:** **Current CDCR guidelines require recredentialing every two years.** There are approximately 26 providers recredentialed each quarter and it is estimated that 40 to 50 percent of providers are overdue for recredentialing.

**Finding #3:** **Credentialing functions are not monitored through a quality or performance management process, which would typically measure, monitor, and evaluate such items as application turn-around-times, application completeness, quality of care issues, facility site audits, and access and availability reviews.**
- There is no process which allows for continuous monitoring of potential or actual quality of care or service issues and complaints.
- There is no process which allows for continuous monitoring of sanctions and licensing issues.
- There are no quality control reviews to ensure that the credentialing files are complete and up-to-date.
- There is no monitoring to assess availability or accessibility of practitioners, which should be completed prior to a recredentialing determination.

60



**Finding #4: Staff orientation, education and training in the CPU are effective and well organized.** The Manager is nationally certified as a Certified Provider Credentialing Specialist by the National Association of Medical Staff Services (NAMSS) as of November 2007. The Manager and two staff attended the California Association of Medical Staff Services Annual Education Conference in 2007. Staff receive on-line training courses on the credentialing and privileging process via NAMSS, and in-service training on CPU policies and procedures with appropriate documentation of attendance. Finally, the Manager provides weekly staff updates and education on the process, including question and answer sessions.

*6.3    Recommendations Regarding Credentialing*

**Immediate Action Steps:**

1. Onsite review of certain materials is needed. First, credentialing files should be assessed for completeness and accuracy. Second, credentialing committee minutes should be reviewed to evaluate the degree of peer review that is conducted prior to a negative determination for denial of a new applicant or termination of a current provider. Finally, an assessment of denials based on quality issues should be completed in order to evaluate appropriateness of reporting to the appropriate licensing board(s) and/or the National Practitioner Data Bank.

2. Assist Manager of CPU in developing best practice, centralized credentialing program requirements, including governance, organizational structure, policies, staffing requirements and other resource needs. This future state program should be engineered to take full advantage of the implementation of the *CredentialSmart* software application.

3. Consider modifying recredentialing timeframe from every 24 months to every 36 months, which is consistent with the standard used by most health plans.

**Long Term Action Step:**

1. Centralize standardized CDCR credentialing and recredentialing functions and responsibility in the CPU.

Based on our research, we are confident that the CDCR credentialing staff is anxious to develop and implement a best practice credentialing program. The Manager's dedication to this effort is clear and proven by recent efforts. CDCR is working to follow industry standards and to continuously monitor, evaluate and improve the credentialing function. Many of the staff have obtained relevant continuing education. CDCR should be able to complete the building of its



credentialing program assuming appropriate clinical oversight and resources are devoted to the effort.



## 7. Quality and Utilization Monitoring

### 7.1 Utilization Monitoring

#### 7.1.1 Overview and Analysis of Utilization Monitoring

The California State Controller's Review Report on CDCR's Healthcare Delivery System released in August of 2006 noted that the existing "utilization management process is ineffective in ensuring that services are necessary and consistent with prescribed guidelines or that contractors' charges are appropriate." The reasons cited for these deficiencies included unrealistic workloads, inadequate training, lack of definition of roles and responsibilities, as well as apparent deviations from the defined process

Our assessment of utilization monitoring activities considered the following issues:

- Organization structure and staffing;
- Utilization review policies, procedures and processes, including timeliness of decisions and staff qualifications;
- Infrastructure to support these activities, including availability of criteria used by first-level review nurses, training, and data management capabilities. Frequently, payer organizations have some difficulty in ensuring that utilization review decisions are accurately reflected in the final payments made to providers;
- Availability of data to support retrospective monitoring of quality and utilization trends; and
- Notification of adverse determinations and appeals procedures.

In order to complete the initial review and assessment of utilization monitoring, we conducted interviews with the CPRI management team responsible for UM processes. Our discussions included routine operations, status of supporting documents, committee structure and functions, related programs, evaluations, and monitoring and evaluation reviews. After the interviews, we requested documents as listed in Appendix E. Documents received and reviewed are identified in the Appendix. Following a review of these documents, we submitted additional questions, to which CPRI responded. We analyzed findings from the interviews, documents and follow-up clarification relating to UM to assess the current status of the program. Our preliminary findings are outlined below.

#### 7.1.2 Findings Regarding Utilization Monitoring

Overall, our research, discussions and review of documents revealed that there is no trending of data, no monitoring of care or services delivered, committees do not meet objectives as outlined



in the 2005 UM program, and there is no monitoring of the effectiveness or efficacy of the UM program and processes. The UM program description was documented but is not implemented. In addition, there is no UM work plan that defines functions and reporting requirements as stated in the UM program. Specific findings are described below.

**Finding #1:** **The organizational structure does not offer the clinical leadership needed to support an effective UM program.** Most importantly, there is no designated physician executive to direct the UM program. We were unable to obtain an organizational chart describing the structure, people and reporting relationships used to support the UM program. There is no documentation requiring that appropriately licensed professionals supervise all medical necessity decisions. In addition, the Medical Authorization Review Committee (MARC), which meets to review requests for services that do not meet defined criteria and specified requests for services such as transplants, does not meet weekly as described in the UM program, but reportedly meets "as needed" to address issues within mandated timeframes.

**Finding #2:** **UM Nurses at institutions enter data into a stand-alone UM Access database that is not accessible from other institutions or PC&IB, nor integrated with the invoice processing database (CMD) or ProdAgio.** These databases serve a useful function in assisting UM nurses in managing inmate services on a day-to-day basis. However, the databases are not appended to a central UM database, nor are the data retrospectively reviewed. In addition, UM Nurses assign diagnosis codes (ICD-9) codes to the services needed, even though evidence suggests that they do not have coding training or experience. This practice leads to inconsistencies in recording types of services that are requested and authorized. Although services are paid based on the CPT, ICD or DRG codes that are contained on the invoices or claim forms submitted by providers, there is no mechanism for reconciling these services with those in the UM database to determine whether the service was delivered to the *right patient, at the right time and for the right price.*

**Finding #3:** **There is no mechanism to evaluate the effectiveness of the UM program.** The UM program should be formally evaluated using a process which would measure and monitor such issues as turn-around-times, application of criteria, reasons for denials, appeals, reversed decisions, appropriateness of level of care and potential over- and under-utilization of services.

- A memo from March 2005 described data that led to new review focus areas in order to monitor potential or actual over- and under-utilization of services, based on statistics from the UM database and HCCUP system showing the top ten diagnoses and services requested. There has been no update to this memo, nor is there evidence that program monitoring is ongoing and continuous or has resulted in corrective actions or interventions to improve access or availability of care.

64



- There is no mechanism to review vital UM statistics such as the number of denial determinations, number of appeals and rate of reversed denial determinations.
- The UM program description includes reports that are to be in place and used for monitoring purposes. Evidence of the reports' usefulness in improving access to care is not validated. Reports include:
    - Daily census report
    - Level of care assessment tool
    - Quality of care issue report, which does not exist
    - Cost avoidance/savings justification
    - Admission and Outpatient denial log – separate log does not exist, information is by patient name/CDCR number within the UM database. A special query could be created, but UM does not have any IT support.

**Finding #4:** **UM policies, procedures and processes do not meet or address a number of factors considered standard practice in payer organizations.** These include:

- The UM program description is not current. The first version of the UM program description was written in 1996, updated in 1999, and then revised in 2005. There are no annual reviews (and revisions, if needed) of the UM program description.
- Standardization of guidelines, criteria and decisions
    - The InterQual criteria being used for evaluation of inpatient services are considered best practice. However, these criteria should be reviewed and approved by a CDCR committee of practitioners to ensure local applicability.
    - Other (outpatient) requests for services are not evaluated based on standard, CDCR-approved guidelines which are consistently applied across the system.
    - Inter-rater reliability assessments of consistency in decision-making are not applied to either nursing staff application of criteria and guidelines nor physician staff making clinical approval or denial determinations.
    - Practice patterns, variance reports and management statistical data analysis are not routinely assessed or presented, but could be available with analytical and IT support to access these data from the UM database.
- There is no formalized process to document conflict of interest checks or confidentiality of personal health information.
- There are no formal case management or disease management programs. CDCR manages specific diseases such as human immunodeficiency virus (HIV) and hepatitis C virus (HCV). UM targeted HIV and HCV as a chronic disease conditions for support. UM began reviewing and tracking biopsy requests and HCV medication management.
- There is no written process documenting how patients are notified of denial determinations, requirements of notification or appeal rights.

65

**nAvigant**
CONSULTING

**Finding #5:** The infrastructure and resources to support a fully functioning UM program do not exist. We were unable to obtain an organization chart or list of staff/FTEs in order to accurately assess existing UM staff versus required staff. UM staff education and training consists of a one week orientation with ongoing oversight by UM Supervisors. Each UM Guideline update is presented in statewide UM training. The UM program and staff does not have any IT support to create reports, sort and scrub information or to make data driven decisions.

*7.1.3    Recommendations Regarding Utilization Management*

**Immediate Action Steps:**

1. Develop current state workflow(s) and organizational chart(s) including:
   - Responsibility for specific activities, including staff members with the authority to deny coverage
   - The extent of involvement of a designated physician and specialty health care practitioner
   - How the organization evaluates, approves, and revised the UM program, including frequency of evaluations and who is responsible for them
   - The UM program's role in the quality monitoring (QM) program, including how the organization collects UM information and uses it for QM activities
   - Procedures by which a patient or practitioner can appeal denial determinations

2. Mine data from the Microsoft Access UM databases to evaluate current UM program performance and identify priority areas for review or improvement. Reconcile coding inconsistencies across institutions and with CMD.

3. Develop plan for recurring merging of UM databases to allow for ongoing evaluation of UM program performance.

4. Employ a UM OT to perform data entry into UM database instead of UM RNs performing such tasks. During our site visits, we noted that the majority of the UM RN's times are spent on entering census and scheduled appointment data into the UM database. This is an expensive resource to perform data entry tasks. We recommend that an administrative person to assume the data entry responsibilities. UM RNs' primary responsibilities should be performing medical necessity authorization and review, concurrent review, document progress notes and site visits.

66



**Long Term Action Steps:**

1. Develop UM program requirements, including program design and components, staffing requirements and other resource needs (e.g., software, hardware, criteria, etc.). These program requirements should be developed to support objective 3.5 in the Receiver's Strategic Plan, which is to establish a health care appeals process, correspondence control and habeas corpus petitions initiative. Additionally, program design should address action step 2.3.1 which is to establish standard utilization management and care management processes and policies applicable to referrals to specialty care and hospitals.

2. Consider outsourcing the UM function. Develop business requirements for outsourcing to evaluate cost-effectiveness of an internal UM program versus an outsourced function.

7.2     *Quality Monitoring*

7.2.1   *Overview and Assessment of Quality Monitoring*

The Quality Monitoring (QM) program should clearly define the organization's quality management and improvement structures and processes to improve the quality and safety of clinical care and services. Specifically, the QM program description should:

- Document the program structure,
- Include behavioral health care,
- Address patient safety,
- Define accountability to the governing body,
- Have a designated physician with substantial involvement,
- Be supported by a functioning committee,
- Compile an annual work plan, and
- Be evaluated annually.

The annual evaluation of the QM program should include a description of completed and ongoing quality monitoring and management activities that address quality and safety of clinical care and quality of service, as well as trending measures to assess change in performance over time and analysis of the results of QM initiatives, and an overall evaluation of the effectiveness of the QM program.



Our assessment of CDCR's quality monitoring activities considered:

- Organization structure and staffing;
- QM policies, procedures and processes;
- Infrastructure to support these activities; and
- Availability of data to support quality measurement and trends.

To complete the initial review and assessment of quality monitoring, we conducted telephone interviews with the CPRI management team responsible for QM. After the interviews, we requested documents as listed in Appendix E. Documents received and reviewed are listed in the Appendix as well. Following a review of these documents, we submitted additional questions, which were responded to in writing by CPRI. We analyzed findings from the interviews, documents and follow-up clarification relating to QM to assess the current status of this program. Our preliminary findings are outlined below.

### 7.2.2    *Preliminary Findings Regarding Quality Monitoring*

CDCR's CMO and CNO reported that no formal QM program is in place. At one time, the Quality Management Assistance Program (QMAP) was established to monitor all quality initiatives with Quality Management Assistance Teams (QMAT), but the program and supporting committees were disbanded. Although various QM functions are addressed in the 2005 UM program description, no efforts at performance improvement, peer review, monitoring or evaluation, assessment or oversight are taking place or are documented.

All of the Receiver's strategic goals published in the Draft Strategic Plan on March 11, 2008 are direct aimed at improving the quality of care received by patient-inmates. The QM program should focus on supporting those strategic goals and objectives. Although objective 4.2 specifically describes the establishment of a clinical quality measurement and evaluation program, many of the other objectives should be evaluated under the auspices of a QM program. For example, objective 1.3 is focused on improving CDCR's emergency response capabilities. The QM program should include one or more key performance indicators aimed at measuring emergency response outcomes. Objective 2.1 is focused on improving chronic care for patient-inmates with asthma. The QM program should focus on measuring "asthma control" indicators such as emergency room visits and inpatient admissions for acute asthma and adherence to the asthma medication guideline.

<u>Finding #1:</u> **There is no formalized quality monitoring, management or improvement program.** There is no QM work plan that outlines the measurement, management or improvement of quality of care within CDCR. There is no QM committee to set policy, evaluate

68



results of QM monitoring activities, plan, design or implement quality of care or service reviews, or institute corrective actions.

**Finding #2:** **There is no evidence that mechanisms exist to evaluate potential or actual quality of care issues.** Areas to address include:

- Adverse outcomes
- Timeliness of services
- Access to services
- Continuity of care
- Complaints and grievances
- Pharmacy reviews, including medication compliance, prescribing patterns, adverse drug reactions, off-label use
- Referrals and transfers, including Outpatient Housing (OPHUs) and Correctional Treatment Centers (CTCs)

**Finding #3:** **There are no documented provider quality requirements, including that providers must cooperate with QM activities, CDCR's rights to access medical records or that practitioners must maintain the confidentiality of patient information and records.** There is no monitoring in place to assess availability or performance of providers. CPR's strategic plan identifies objective 3.3 to establish a medical peer review and discipline process to ensure quality of care. Again, this activity should be conducted under the broader auspices of the QM program.

CDCR/CPRI staff have demonstrated a strong desire to operate an effective quality monitoring program. The CMO's and CNO's dedication to this effort is clear, as are their intentions to follow industry standards and to continuously monitor, evaluate and improve the care and services provided to patients at all levels.

*7.2.3    Recommendations Regarding Quality Monitoring*

**Immediate Action Steps:**

1. Develop a QM program description, including program governance, structure and design. The QM program should be designed to address both physical and behavioral health care issues, and include patient safety, peer review, patient and provider complaints and grievances and performance measurement and improvement. The QM program description should support the objectives in the Receiver's Strategic Plan.



2. The QM program should be linked to IMSATS to track and monitor access and timeliness of care using data that are currently available. If IMSATS databases are consolidated (see Chapter 8, Claims Processing and Data Capture), preventive care and continuity of care can also be monitored and tracked using IMSATS.

**Long Term Action Steps:**

1. Develop model QM program requirements, including program design and components, staffing requirements and other resource needs (e.g., software, hardware, criteria, etc.). The QM program design should support the objectives in the Receiver's Strategic Plan.

2. Consider outsourcing the QM function. Develop business requirements for outsourcing to evaluate cost-effectiveness of an internal QM program versus an outsourced function.



**8.     Healthcare Invoice/Claims Processing and Data Capture**

*8.1     Overview and Assessment of Claims Processing and Data Capture*

CDCR does not currently administer a healthcare claims processing system as would typically be found in a commercial or public health plan. Instead, the current environment relies on a process in which providers submit invoices for payment and then the invoices are processed through several decentralized Microsoft Access databases called the Contract Medical Database (CMD). Although the contract management function is currently being centralized through the implementation of the ProdAgio Contracts application, as described previously, this centralized system is still in a pilot phase. In addition, ProdAgio Contracts does not have the capability to appropriately adjudicate and pay healthcare claims. Thus, CDCR's ability to pay healthcare claims is, and will continue to be, constrained due to shortcomings in current data processing and information technology resources. For example, there is currently no grouping software incorporated into the systems to allow prospective payments, such as Diagnosis Related Groups (DRGs) and some payment rates are assigned manually. In our previous work, we found that contract analysts rely heavily on hardcopy books and manuals, such as the Relative Values for Physicians (RVP) manual, which has been historically used to price physician services.

In conjunction with the assessment of the actual claims processing process, we also assessed CDCR's current capabilities and needs related to capture of utilization and payment data for ongoing analysis and reporting. CDCR's ability to report on health care services provided to inmates is critical to managing medical costs and outcomes on a go-forward basis. While claims data are imperfect, most payers rely on these data to monitor utilization, costs and outcomes, as well as to identify variations and opportunities for improvement. Standard health care claims/datasets provide information on diagnoses, procedures and services provided, and should form the basis of CDCR's analysis and reporting capabilities. Many payers have a "medical economics" unit that evaluates these data retrospectively to monitor patterns and trends related to costs and quality.

The primary objective of our Phase 1 assessment was to develop a clear understanding of the current processes and technologies that CDCR uses to process and pay claims/invoices received from providers and the related claims/utilization data capture and retention processes. In order to complete this preliminary assessment of the current state, we completed the following tasks. Our findings resulting from these tasks are summarized subsequently.

1.  Review current processes and policies/procedures related to claims payment and conduct interviews of key staff regarding invoice/data processing and retention processes, information systems and staff.

71



2. Develop workflow diagrams of operations related to the receipt, processing and payment of claims and review current processes and procedures such as payment policies and provider contracts that are dependent on claims processing capabilities.
3. Develop preliminary findings regarding invoice processing, data capture, analysis and reporting capabilities, including structure, process and technology issues.

8.2    *Preliminary Findings Regarding Claims Processing and Data Capture*

On the surface, as depicted in the high level process flow shown in Exhibit 3, the business process flow seems straight forward and simple. However, upon closer examination, it is clear that these processes are actually quite complicated and labor intensive due to the lack of integration of information technology systems and applications. High level process-by-process descriptions are provided below. Please refer to Appendix F for detailed business process flows along with descriptions of each sub-process beginning with inmates requesting care and ending with providers being paid.

**Finding #1: The entire health services delivery and payment process, from an inmate seeking medical care to the provider being paid, is very labor intensive, fragmented and lengthy.** Our review indicated that the medical scheduling and care processes are largely the same across all institutions. The differentiators are usually the rate of adoption of technology. Some institutions use computer applications to track and manage medical scheduling and documentation while others still use hard copy forms and notes. In addition, because the ProdAgio Contracts application has not been implemented for all institutions, there are two claims/invoice processing processes currently in place. They are:

1) ProdAgio Institutions: There are currently six (6) institutions whose claims/invoice processing functions are centralized in the headquarters of the PC&IB.
2) Non-ProdAgio Institutions: All other institutions continue to use on-site processing for all of their medical claims/invoices.

72



**Exhibit 3**



**Finding #2:** Medical scheduling, invoice processing and data capture processes are very complicated and convoluted because the processes involve many entities, systems/applications and various staff with different skill sets. The "touch points," meaning the individuals, entities and systems involved in the inmate's care in some way, also vary depending on whether ProdAgio is used, and whether the contracts are newly negotiated by Chancellor Consulting (as described previously). In order to understand the level of complexity in this process, we have provided the following overview of all possible key touch points involved in the entire business process. These are presented below.

**Entity Touch Points:**
   1. Hospitals, physicians, contractors, registry staff, suppliers, ambulance, pharmacies, independent lab, and other freestanding facilities.

73



2. Thirty-three (33) institutions or facilities located throughout the entire State of California.
3. PC&IB Contract & Invoice Branch (PC&IB) – The "headquarters" for the 6 ProdAgio pilot institutions.
4. Six (6) Regional Accounting Offices (RAOs).
5. State Comptroller's Office (SCO).
6. Mail rooms in each of the entities above.

**System/Application Touch Points:**
1. Hard copy papers such as invoices (CMS 1500, UB-04 forms), routing face sheet, etc.
2. Scanner with Adobe (pdf file) and OCR (Optical Character Recognition) scanning capabilities.
3. Captiva, which is an OCR application bundled with ProdAgio, is used for indexing of scanned invoices.
4. ProdAgio Contracts™ is the centralized system adopted by PC&IB headquarters that is intended to be used for contract management and invoice approval work flow purposes. This system is still in a pilot phase with a limited rollout at the headquarters location and six prison institutions as of March 2008. ProdAgio Contracts™ does not include claims payment capabilities.
5. Contract Medical Database (CMD) is an MS Access database/application developed specifically for each of the 33 institutions. This application is the primary system for all invoice processing and tracking.
6. Offender Based Information System (OBIS) is a State controlled system which tracks the demographic characteristics and movement of inmates.
7. Inmate Medical Scheduling and Tracking System (IMSATS) is a desktop, MS Access-based scheduling system which tracks both in-house and external medical visits.
8. Distributed Data Processing System (DDPS) tracks inmate demographics and movement in each institution and is the primary inmate information system used by the institution's medical professionals. This database is updated daily and does not appear to have a reconciliation process in place with OBIS.
9. RVP Pricer, which is an MS Access database/application developed to price claims before the final amounts are entered onto CMD.
10. Census and Discharge Data Information System (CADDIS) is an MS Access database/application developed to track the daily utilization of community and in-house inpatient services only.
11. Utilization Management (UM) database: Tracks both inpatient and outpatient services from Request for Service (RFS) forms from Urgent Care clinics or Specialty Clinics, emergency referrals, returns and OPHU (Outpatient Housing Unit) admission forms from staff physicians, daily census, or verbal communication from the Watch Office.

74



12. CALSTARS is the General Accounting system used by the SCO to process checks and the General Ledger (G/L).
13. Various Pricer applications (web or MS Access) published by CMS.
14. Stand alone MS Excel worksheets used by individual staff on their desktops. These worksheets are primarily used by each staff member to track their work input/output processes and/or reconcile invoice amounts. It is also used to create the face sheet accompanying invoices being transferred between RAOs and institutions.
15. Watch Tracking System: Used by wardens to track the movement of inmates within the same facility.

**Staff Touch Points:**
1. Provider or Contractor
   a. Coders
   b. Invoice preparer

2. Non-ProdAgio Institutions:
   a. Warden for Healthcare Services: Completes the scheduling log, transportation log, and daily movement sheet for each inmate requiring and approved for external medical care visits.
   b. Correctional Healthcare Services Administrator (CHSA): Approves final payment on adjudicated invoices and determines contracting needs and budget amount.
   c. Health Care Cost and Utilization Program (HCCUP) Analyst: Prices and processes invoices using hard copy contracts, CMD, and various pricer applications.
   d. Institution Contract Analyst: Obtains contracting needs from CHSA or CMO, identifies providers available in the market, prepares contracts and negotiates and manages provider contracting, bidding, and payment rates.
   e. Contract Monitor: Institutional monitor who tracks utilization of on-site hourly registry staff and validates the hourly invoices. These are often the supervisor or Lead in a service area, e.g., Pharmacist II, or Lead Lab Tech, etc.
   f. Chief Medical Director/Healthcare Manager: Provides in-house treatments, reviews and approves outpatient medical needs via MARC (Medical Authorization Review Committee). Review clinical case factors and approve or disapprove all inpatient service requests.
   g. Nursing staff: Responsible for triage, in-house inpatient and outpatient care, clinical notes, census reports, review charts and documentation of all returned inmates to determine if additional care is needed, and assisting clinicians in all patient care issues.

75



    h.  Specialty Clinic staff: Coordinates internal specialty care services and external medical visits including scheduling, and confirms visits with external providers. Also prepares Form 7252 and uses IMSATS to track schedules of all medical visits.

    i.  Urgent Care Clinic staff: Manage urgent care needs of inmate, enter and track IMSATS data.

    j.  Health Record Technician: Enters inpatient census data onto CADDIS and selects appropriate diagnosis and procedure codes based on service description provided by Triage Nurse on the Daily Census Report.

    k.  Utilization Management Nurse: Enters data from Request for Service (RFS) from, OPHU (Outpatient Housing Unit) form, emergency referral, daily census and verbal communication from Watch Office onto the Utilization Management Database (UMD) and documents progress notes of each inpatient case, participates in MARC for outpatient services and documents meeting notes, enters notes into the UMD, performs concurrent review on-site.

3.  ProdAgio Institutions: All staff members described above in the "Non-ProdAgio institutions" section are also touch points with the exception of the HCCUP Analyst responsibilities, which are centralized at PC&IB. In addition to the staff in each institution, PC&IB has the following touch points:

    a.  Pilot Medical Contract Unit: Responsible for regular contract management process including the negotiation and management of contracts and payment rates.

    b.  Pilot Contract Bidding unit staff: Responsible for contracts requiring bidding processes and their associated rates and ranking of providers.

    c.  Support Service Unit staffs (Staff Service Analyst – SSA and Associate Governmental Program Analyst – AGPA) who are responsible for management reporting, coordinating with each institution to ensure the timely submission of accurate utilization data and proper coding of all invoices.

    d.  Invoice Processing Unit staff: Responsible for processing all invoices including invoice scanning and indexing for the ProdAgio institutions using ProdAgio, CMD, OBIS and select pricer application when applicable.

    e.  Post Review Unit Staff: This is a new unit formed to perform retrospective review of claims payment in relationship to the corresponding contractual agreement.

4.  Regional Accounting Office (RAO) and State Comptroller's Office (SCO)

    a.  Mail Room staff: Receive and sort invoices from non-ProdAgio institutions.

NAVIGANT
CONSULTING

    b.  RAO ProdAgio Invoice Processing staff:  Review invoices processed by the PC&IB invoice processors and approved by the Health Care Manager or Administrator of each institution, assign Claims Schedule Number, match G/L accounts to each invoice, adjust invoice if needed, forward invoices for management approval within RAO, enter data into CALSTARS for check processing.

    c.  RAO Non-ProdAgio Invoice Processing staff: Sort and track all invoices for all non-ProdAgio institutions, forward invoices to each institution for processing, receive processed and approved for payment invoices and enter into CALSTARS for check processing, and forward Revolving Account invoices for final approval and check processing within RAO.

    d.  RAO Check Processing staff: Process and cut checks for all approved invoices fall under the Revolving Account.

    e.  SCO staff: Process and cut checks for all approved invoices not under the Revolving Account.

Given the touch points that have been listed, the current business process from an inmate requesting medical attention to an off-site provider receiving a payment consists of three major components:

1. Medical Scheduling and Visit
2. ProdAgio Invoice Processing
3. Non-ProdAgio Invoice Processing

**Finding #3:  The medical scheduling and visit processes are generally the same for all institutions regardless of whether they are ProdAgio institutions or not.**  However, some institutions use more desktop applications such as MS Access or Excel to help them track information and data while others still depend largely on handwritten notes, forms or log books.  The high level business process flow in Exhibit 4 below provides an overview of the medical scheduling and visit process.

77



Exhibit 4



1. An inmate enters into the medical care system via the following entry points. These entry points are all tracked and routed via handwritten forms or hard copy print outs from a desktop application such MS Access or Excel:
   a. Chronic Care Program (CCP) – this program tracks inmates with long term chronic diseases such as diabetes, asthma, HIV.
   b. New Inmates – every new inmate is required to have a physical check up. Check-ups are performed on-site.
   c. CDC 7362/Triage Nurse – inmates complete this form to request medical attention. This form is collected and triaged by triage nurses.
   d. Release from community hospital – inmates who may require additional care when they are released from off-site inpatient care.
   e. External OP follow up care – any follow up care that is deemed medically necessary.
   f. External x-ray and lab – special diagnostic radiology or laboratory services or other ancillary services that an institution cannot provide on-site.

78



g.  Public Health System – this system plans and deploys vaccination or immunization or screening services such as TB screening and flu shots.

h.  Emergency incidents.

2.  At each entry point, a Request for Service (RFS – CDC 7243) form is handwritten by clinicians or nurses for each service. This form is then forwarded to Unit Office Technicians (OT) to enter basic information onto IMSATS pending UM (Utilization Management) review. The form is then forwarded to Specialty Clinic LVN to schedule for appointments and to UM (Utilization Management) nurses for authorization and MARC (outpatient services only). The Unit OT and Specialty Clinic LVN use a desktop-based application developed using MS Access called IMSATS (Inmate Medical Scheduling and Tracking System) to schedule both on-site and off-site appointments.

3.  Before midnight of each day, OPHU (Outpatient Housing Unit) nurses prepare Daily Census Reports which track both on-site and off-site inpatient census and movement, e.g., discharge dates. This hard copy census report is then distributed to the following key individuals for further processing as part of the Medical AM Report:

a.  Specialty Clinic LVNs enter the census data and then schedule both on-site and off-site appointments in IMSATS. For off-site appointments, the LVN will also create Form 7252 (Request for Temporary Release Removal for Treatment) which is routed for approval signatures from various management team members prior to inmates being sent for off-site medical care.

b.  HRT (Health Record Technician) in Medical Records enters inpatient census data into CADDIS (Census and Discharge Data Information System). Admission numbers generated by this application are then shared with the HCCUP (Health Care Cost and Utilization Program) analyst to be entered into the CMD (Contract Management Database) for invoice processing and tracking purposes.

c.  UM RNs enter the census data into the UM database (Utilization Management Database). UM nurses document progress notes when they perform concurrent review and discharge planning on these inpatient cases.

d.  HCCUP Analysts enter information in CMD to estimate the cost of care. HCCUP analysts also receive an admission number from the CADDIS system and then enter the number in CMD.

4.  Prior to the appointment date (usually a day prior), the on-site appointment schedule reports are distributed to all relevant entities (e.g., clinicians, nurses, watch office, etc.) On-site services are provided accordingly.

5.  For off-site visits, an outside facility medical appointment schedule is distributed to AWHCS (Associate Warden for Health Care Services), Medical Transport Unit/Lieutenant, Watch Office, OPHU, HRT, HCCUP analyst, etc. Once CDC 7252 is signed and released, inmates are transported for off-site medical visits accordingly. Off-site visit preparation usually takes longer due to security needs.



6. In some cases, inmates can refuse scheduled medical care. In such circumstances, an inmate is required to complete and sign a CDC 7225 form indicating his or her reasons for refusing care. The refusal rate is estimated at 25 percent based on interview results from CRC (California Rehabilitation Center).

7. For on-site visits, follow up appointments or service conclusion, notes are handwritten on the daily appointment schedule report by clinicians or nurses and then routed back to the Unit OT to schedule the next appointments.

8. When inmates return from an off-site visit, they are processed by the OPHU RN immediately upon their return to the institution. The OPHU RN forwards a copy of the RFS (CDC 7243) and institutional discharge summary, and/or physician service requests to the Specialty Clinic's RN to follow up on any required diagnostic testing, appointments or treatments.

**Finding #4: The adoption of ProdAgio reduces the amount of hard copy inter-office mail transfers, but this centralization does not appear to have reduced manual data entry efforts nor enhanced claims payment capabilities. Use of ProdAgio has actually *increased* data entry requirements.** The OCR (Optical Character Recognition) application called Captiva allows PC&IB staffs to scan and capture select data points on invoices and enter them into ProdAgio. However, due to its low success rate (approximately 40 percent), manual fixes and indexing are needed for the invoices that fail the scanning process and to enter additional data points. In addition, PC&IB staff are still required to enter the same information into an institutional specific CMD database for utilization tracking. Invoice payment amounts are still calculated manually via review of a hard copy contract, calculator, cheat sheets, or a pricer application. The high level business process flow in Exhibit 5 below provides an overview of the ProdAio invoice processing process.

80



**Exhibit 5**



1. As described in the diagram, providers submit invoices for services delivered to inmates residing in ProdAgio institutions (currently six institutions) to PC&IB in Sacramento directly.

2. Invoices are scanned using an OCR (Optical Character Recognition), i.e., Captiva, which is a software application bundled with ProdAgio. The success rate of this scanning software is around 40 percent. Due to this low success rate, manual data entry is performed for those elements that failed the OCR scanning process.

3. Once an invoice is scanned, critical fields in invoices are indexed, e.g., Invoice Number, Date of Service (DOS), Facility ID, Vendor Name, etc. An Invoice Priority is also assigned at this time by the indexers. Each indexer has a "cheat sheet", which lists those vendors that are required to be rushed or to be paid promptly, to help them flag the Invoice Priority accordingly.

4. When indexing is complete, the invoice processing supervisor assigns invoices to the invoice processors via the ProdAgio workflow function. Invoice processors are assigned work based on institutions rather than familiarity with the type of invoices, e.g., inpatient vs. physician invoices. There are currently 13 invoice processors in PC&IB processing invoices from 6 institutions. These individuals process a total of approximately 300 invoices per day (50 invoices per institution per day).

5. Invoice Processors enter additional "Invoice Level" (known as Claim level in a commercial health plan) data manually in ProdAgio. Data point examples entered in ProdAgio are: CDC Number, Contract Number, Facility ID, Invoice Number, Service Dates, Fiscal Year, PCA Code and invoice amount.

6. In addition to entering data in ProdAgio, Invoice Processors also enter "Invoice Level" and "Invoice Line Level" (known as Claim Line level in a commercial health plan –claim lines

81



contain procedures and detailed services for a patient and the corresponding service dates for each) data in CMD for statistical tracking and pricing in some cases. Data point examples entered in CMD are: CDC Number, Contract Number, Facility ID, Invoice Number, Service Dates, Fiscal Year, PCA Code, Diagnosis/Procedure Codes and invoice amount.

7. Invoice processors rely on hard copy contracts or personal and historical knowledge about a particular vendor/provider to price each invoice, even if he or she is using a pricer tool (which is similar to a calculator). For example, the invoice processor must manually enter the mark up or mark down percentage applicable to a certain provider (via Contract Abbreviation for each contract) in the RVP Pricer to correctly price the invoice payment for that provider.

8. Once the paid amount priced from various pricer applications, e.g., RVP Pricer, and/or CMD, is priced, the amount is then manually entered in ProdAgio. The amount is examined and cleared by the PC&IB invoice processors and the invoice is then routed to the corresponding institution's Health Care Manager or Administrator for final review and approval.

9. The Health Care Manager or Administrator at each institution reviews and makes an approval or "adjustment needed" decision on each invoice via the ProdAgio workflow function. This iterative process between the reviewer and invoice processor continues until an invoice is approved by the institution's Health Care Manager or Administrator. The approved invoice is then routed to the appropriate RAO for further adjustments or discount applications.

10. RAO staff members are assigned work based on vendor names in alphabetical order. Once the RAO staff member receives the approved invoice via the workflow function in ProdAgio, he or she assigns a "Claim Schedule" number to a batch of invoices which usually contains approximately 12 vendors and 135 invoices per Claim Schedule. It usually takes about three to four days for a Claim Schedule batch to be ready for check processing.

11. In addition to entering the Claim Schedule number in ProdAgio, the RAO staff person also makes adjustments to each invoice for General Accounting purposes, e.g., change vendor's Federal Tax ID to be compliant to the CALSTARS format so that the corresponding G/L account can be matched or a discount can be applied to small business vendors. Once an RAO staff member completes a batch of invoices, he or she will then enter select data fields onto CALSTARS.

12. The RAO staff member performs reconciliations on a Claim Schedule basis. He or she usually downloads the batch data in Excel and performs simple calculations to make sure that the total amount reconconciles. Once this reconciliation is complete, the entire manila folder containing the invoices is then forwarded to the RAO supervisor for approval before check processing. For those vendors that can be paid out of the Revolving Account, checks are processed at the RAO; otherwise, all other checks are processed in the State Comptroller's Office (SCO).

82

NAVIGANT
CONSULTING

13. RAO staff members receive a monthly H09 report which is generated by CALSTARS. RAO staff do not use this report to do monthly reconciliations. Instead, it is referenced only if a provider inquires about the status of an invoice. This monthly report contains a range of check numbers applied to a Claim Schedule. Therefore, neither check numbers nor check dates are entered in ProdAgio or CMD for final reconciliation.

<u>Finding #5</u>:  **Non-ProdAgio invoice processing processes are paper-based and labor intensive. The entire process also contains several redundant or unnecessary steps. In addition, recruiting for a qualified or retaining a trained HCCUP Analyst is difficult in some cases.** The inter-office mail transfers between RAOs and institutions are intensive due to incomplete information on invoices which require the RAO staff to re-route invoices to the correct institutions. Based on a review of the FY 2006-2007 Statewide CMD database, thirty-seven percent of the invoices (6,245 out of a total of 17,090 "No Pay" invoices – *see more detail in table under Finding #9*) were not paid due to the "Inmate not at this Institution" reason, which represents approximately 2.6% of the total 241,731 invoices processed. The HCCUP Analyst relies heavily on personal knowledge and cheat sheets to price claims. There does not appear to be any "real" audit in place other than the final review and approval by the Health Care Manager or Administrator at each institution. Although experienced Health Care Managers often spot errors and incorrect payments, these individuals do not have time to review each invoice thoroughly. In addition, these individuals generally do not have medical coding backgrounds. Although some are experienced enough to catch coding irregularities, there is no systematic way to perform these coding checks. The high level business process flow in Exhibit 6 provides an overview of the Non-ProdAgio invoice processing process.

**Exhibit 6**



83



1. Non-ProdAgio invoices are submitted to the designated Regional Accounting Office (RAO) assigned to each institution. RAO staff manually sort each invoice by institution based on personal knowledge or invoice addresses or some other information on the invoice, e.g., CDC Number, which is not always available.

2. Once institution-specific invoices are sorted and batched, the RAO staff enters basic invoice information in an MS Excel spreadsheet and prints out a hard copy to serve as the face sheet for each batch. The invoices are sent to the HCCUP analyst at the corresponding institution via the CDCR's inter-office mail system.

3. When the HCCUP Analyst receives the inter-office mail, he or she verifies invoices with the face sheet data to ensure the receipt of all invoices.

4. HCCUP Analysts sort hard copy invoices by type, e.g., per diem, registry, RVP, Medicare Fee Schedule, etc. At this time, if the batch contains non-medical invoices, he or she will return the invoices to RAO for non-medical invoice processing. If the invoices belong to another institution, he or she can choose to return the invoices to the RAO or forward them directly to the institution to which the invoices belong. The following steps are then manually performed for each invoice:

    a. Registry invoices (hourly invoices) are forwarded and verified by Contract Monitors who are usually the supervisor or lead of each service area, e.g., Lead Lab Tech or Pharmacist II, who signs the time card for the hourly registry staff.

    b. All other invoices (RVP, Medicare Fee Schedule, Per Diem, etc.) are priced based on a review of the hard copy contract for the invoiced vendor or based on the HCCUP Analyst's personal and historical knowledge of the invoiced vendor or a simple "cheat sheet" taped on the cubicle wall. The priced amount is then handwritten on each invoice.

    c. HCCUP Analysts also verify inmate status using OBIS. If an inmate belongs to another institution according to OBIS, the invoice will be returned to the RAO for further action.

    d. If contractual disputes or issues are observed, the HCCUP Analyst will work with the Institutional Contract Analyst to resolve these issues or disputes. The Institutional Contract Analyst may contact the provider if there is a need to do so at this time.

    e. HCCUP Analysts also verify the medical necessity of services performed and admit and discharge dates for each inpatient invoice.

5. After the "paper processes" are complete, the HCCUP Analyst enters invoice data in CMD. A batch number is assigned for each batch for tracking purposes. Pay Stickers are printed for each batch and a Pay Sticker is then attached to each invoice.

6. An invoice batch along with a "calculator print out" of the invoice balance for the batch is then sent to the Health Care Manager or Administrator for approval.

7. Upon approval by the Health Care Manager or Administrator, the invoice batch is then forwarded back to RAO for G/L processing.

84



8. When the RAO staff member receives the batch from the HCCUP Analyst, he or she assigns the Claim Schedule number to each batch. The RAO staff member enters basic invoice data (e.g., Tax ID, Invoice amount) along with the Claim Schedule number in CALSTARS.

9. The RAO staff member also updates the MS Excel spreadsheet, which was originally used to create the face sheet when the invoices were forwarded to each institution for invoice processing, and perform basic reconciliation. A hard copy is then printed to be attached to each Claim Schedule folder then routed for approval by the RAO Management for check processing.

**Finding #6:** On-site services are tracked using IMSATS (a desktop MS Access scheduling application). However, the data are not tracked in a way that can be used for standard reporting purposes. IMSATS is used by Unit OTs, Specialty Clinic LVNs and RNs, Urgent Care OTs, Dental OTs and Vision OTs. However, they are all independent stand alone desktop databases which contain information related to inmates, services provided, service dates, and providers. The inherent problems in using IMSATS are:

1. There are no uniform back up policies and procedures in place to back up the IMSATS data on a regular basis. IMSATS is a desktop MS Access based database application. Should there be a computer crash or corruption occurrence on the desktop on which this database resides, the corresponding on-site services and scheduled appointments would be lost without appropriate back up procedures in place and the enforcement of such procedures.

2. IMSATS databases appear to be segregated. There does not appear to be a process currently in place that combines IMSATS data from each unit within the same institution in a central database for reporting and historical tracking purposes.

3. IMSATS databases are not shared between departments or units. For example, UM nurses do not have access to the Specialty Clinic's IMSATS data for them to view the medical history of a particular inmate when they authorize a service or perform concurrent review of an inpatient case.

4. Statistics tracked in IMSATS do not use industry standard coding and instead the codes appear to be "home-grown." It is not clear to NCI whether these codes are used across all institutions uniformly. Use of "home grown" codes can make reporting more cumbersome and benchmarking against external sources difficult, if not impossible.

5. Service unit tracking is not standardized in IMSATS. For example, in at least one location, the on-site radiology suite tracks services by the service description only, e.g., hand, chest or abdomen. Standard procedure codes (CPT/HCPCS) are not used; therefore, service units cannot be determined. We did not visit the on-site lab or pharmacy during our site visits. It is worth noting that service units for these service areas are critical in determining their corresponding utilization level.



**Finding #7:** **ProdAgio and CMD are not designed for medical claims processing.** Currently, CMD is used to track provider/vendor contract information (to be replaced by ProdAgio) as well as tracking invoice payment history and utilization statistics. ProdAgio is used, primarily, for its document management and workflow functions. Neither application has any claims adjudication functions in place currently. A typical commercial medical claims processing system can store and manage multiple contractually agreed upon rates and fee schedules and the corresponding effective and term dates for such agreements. These systems are also designed to flag, alert, suspend or approve claims payment based on various preset business logic and rules. When a claim is entered in the system, the system applies the preset business logic and rules applicable to each provider/vendor contracted rates, validity of inmate status, service necessity, authorization requirements, and other business rules and then prices each claim and the associated claim lines accordingly. The system is also designed to automatically alert claims adjudicators if there is a potential duplicate claim that has already been paid. With an effective claims processing system in place, invoice processing staff can then concentrate on "adjudicating" the claims, i.e., review and research those claims that require additional attention. Table 12 list functions that are typical in a medical claims processing system (An "X" under the corresponding column indicates that such function exists or is actively being used in CMD or ProdAgio. An "X-" indicates that some capabilities exist, but the system does not have the full functionality described.)

**Table 12**
**Standard Medical Claims Processing System Capabilities**

| Typical Functions found on a Claims Processing System | CMD | ProdAgio |
|---|---|---|
| • Integrated with an OCR scanning software to receive standard claim forms statistics such as UB 04 or HCFA 1500. | | X |
| • Can receive proprietary electronic claims, HIPAA EDI transaction such as 837I (electronic version of UB 04) or 837P (electronic version of HCFA 1500) directly from providers without any manual data entry. | | |
| • Has batch processing capabilities to process multiple claims. | | |
| • Has the ability to receive encounter data (on-site services) bypassing the rigorous adjudication processes. | | |
| • Link to member's (inmate's) demographic information via a member or subscriber ID (CDC #). | X- | X- |
| • Store provider/vendor relationship and the agreed upon rates along with effective and term dates | X | X |
| • Pull up provider/vendor demographic data when a Tax ID or Provider ID is selected or entered | X- | X- |
| • Can store and utilize multiple versions (varied by effective dates) of industry standard codes such as CPT/HCPCS, APC, DRG, ICD9, revenue codes, NDC, etc. | | |

86



| Functional/Non-functional Claims Processing System | CMD | Mod/Adj. |
|---|---|---|
| • Validate service codes billed by the provider are correct, e.g., group to a payment DRG based on the ICD-9 diagnosis and procedure codes provided on the invoice and then validate the DRG against the invoiced DRG before payment is determined. | | |
| • Has or can be integrated with a coding grouper module or application such as DRG or APC grouper, etc. | | |
| • Validate if codes used are current based on date of service before pricing a claim for a % of Medicare Fee Schedule arrangement as Medicare updates fee schedule on a regular basis. | | |
| • Integrated with the services allowed (benefit design) per provider/vendor type, e.g., a podiatrist should not be billing for a cardiac surgery service, or a physician should not be billing for an inpatient facility service. | | |
| • Contain various pricing methods, e.g., Per Diem, Per Diem with Not to Exceed clause, tiered per diem, DRG, APC, Medicare Fee Schedule, % of Medicare Fee Schedule, % of Billed Charges, ASC rates, case rates, etc. | | |
| • Price claims or denied payments at the claim line level for each service code and flag invalid code based on the preset business criteria, e.g., female procedures cannot be billed for a male patient. | | |
| • Apply discount on the claim line level, e.g., apply a 50% discount on the second procedure done during the same surgery session. | | |
| • Can process interim invoices and link these invoices received for a patient who is still an inpatient. | | |
| • Can handle bundled services with "spanned billing", e.g., multiple physical therapy sessions, mental health sessions, etc. | | |
| • Has auto-adjudication function that allows certain claims meeting the preset business criteria to be paid as soon as they pass the business rules. | | |
| • Perform basic service date validation against various date criteria, e.g., discharge date cannot be less than the admit date, etc. | X- | X- |
| • Automatically flag claims that failed preset business criteria, e.g., potential duplicate claims. | | |
| • Integrated with the UM for authorization information. Suspend claims if authorization information is required but not found based preset business criteria. | | |
| • Has a claims supervisor assignment and tracking mechanism in place which allows the supervisor to assign and track workload to adjudicators. | | X- |
| • Contain workflow function which allows routing of claims for approval and review based on preset business criteria. | | X |

87



| System Function Fundamental Claim Processing System | CMD | ProdAgio |
|---|---|---|
| • Contains a pre-defined operation or production reports, e.g., claims processed per FTE per day, open claims, claims cycle, etc. which allow productivity management and workload management. | X- | X- |
| • Integrated with an AP (Accounts Payable) module or has the ability to batch adjudicated claims data to another financial application such as SAP for AP processing. | | |

As indicated, neither CMD nor ProdAgio contains the most basic claims processing functions of a typical medical claims processing system. Therefore, regardless of whether an institution adopts ProdAgio or not, PC&IB invoice processors or the institutional HCCUP analysts are still pricing claims using very primitive methods, i.e., personal knowledge or memory, look-up on a hard copy contract, talking to the contract analyst, cheat sheets containing rate information, a default mark-up number (e.g., 130 percent of Medicare Fee Schedule), or paying 100% of billed charges. The ability to identify duplicate claims or invoices is largely based on personal memory or knowledge. Neither ProdAgio nor CMD has an effective function that will automatically alert or flag the claims or invoice as a potential duplicate or paid claim or invoice. ProdAgio appears to have some functions that identify duplicate claims based on authentication processes. The April Management Alert report published by the Post Review Unit indicated that ProdAgio did not identify duplicate claims effectively.

**Finding #8:** There is no standard data capture protocol in place throughout the entire health service and invoice processing spectrum. Based on a review of the statewide CMD database, which is the primary database used to store all hospital inpatient, hospital outpatient, physician, registry and ancillary invoice payment data, the data points collected for each invoice are basic and "trade invoice" in nature. CDCR will need to differentiate and understand the differences between a trade invoice and a medical claim. A medical claim typically contains several distinct services or procedures performed during the same visit. These services and procedures provided should be captured and priced separately.

In order for health plans to capture data for reporting and quality measurement purposes, the table presented below lists "adequate" data points that should be captured either through claims/invoices or encounter statistics. Basic edits for each field are also listed for reference purposes. The Claim Types are described as follows:

        M = Outpatient Medical, ancillary or physician services (HCFA 1500)
        H = Hospital inpatient services (UB 04)

Claim level data points are listed in Field IDs 1 to 42 and claim line level data points are listed between Field IDs 43 and 51. Multiple claim lines can be linked to one specific claim. A typical

88



relational database would keep claim level and claim line level data in separate tables as it is done in CMD, i.e., tblInvoices, tblMain and tblProcedures. Pharmacy specific data are not listed as this service is currently managed by an independent entity and beyond the scope of this engagement. Based on a review of the Statewide CMD database (2006-2007 fiscal year), we have also listed the CMD Table Names and Column Names matching with these data points. As of the writing of this report, we were not provided with a sample of IMSATS database to perform a similar matching activity for this database. However, in order to track and monitor the utilization profile for the entire CDCR population, it is critical that both on-site and off-site utilization statistics be captured and consolidated into one relational database for management reporting purposes.

## Table 13
### Standard Medical Claim Fields

| # | Field Name | Audit Criteria and Rules | M | H | CMD |
|---|---|---|---|---|---|
| 1 | Duplicate record | Conditional. Duplicate check is defined based on a select few data points, e.g., records with identical provider, patient, date of service, place of service, services performed, and same claim type. | Y | Y | tblMain:InvID + tblInovices: InvID + InvNo + tblNoPay: InvNo + NoPayReson |
| 2 | Claims Reference Number (CRN) | Required. A system generated number unique to each claim or invoice. | Y | Y | tblInvoice: InvID or InvNo |
| 3 | Claim Type | Required. Defines what type of claim or type of services performed<br>M = Outpatient medical, or physician services (HCFA 1500)<br>H = Hospital inpatient (UB 04) | Y | Y | tblMain: ServID or FiscRevCode |
| 4 | Adjustment code | Conditional. Adjustment Code required when Adjustment CRN is present. Adjustment code must be a valid code (e.g., 1 = Void or 2 = Corrected). Null, if no Adjustment CRN. | Y | Y | |
| 5 | Adjustment CRN | Conditional. Adjustment CRN required when Adjustment Code is present. Adjustment code and Adjustment CRN are needed to track adjustments made to previously paid claims. | Y | Y | |
| 6 | Subscriber or Member ID | Required. This is a number assigned to each member in a health plan for a particular product line. This ID links to the membership profile ands would be the equivalent of CDC # for inmates. | Y | Y | tblMain: CDCNo |
| 7 | SSN | Optional. Social Security Number became more sensitive after the implementation of HIPAA. | Y | Y | |

89



| # | Field Name | Audit Criteria and Rules | M | RC | CMD |
|---|---|---|---|---|---|
| | | This was often used as the common data point to identify members when Member ID was not found. | | | |
| 8 | Membership eligible | Check all enrollment records to determine if member is eligible for date of service. OBIS or DDPS is used to validate inmate manually. | Y | Y | OBIS or DDPS |
| 9 | Member Last Name | Required. Member Last Name | Y | Y | tblMain: Lname |
| 10 | Member Middle Name | Optional. | Y | Y | |
| 11 | Member First Name | Required. Member First Name | Y | Y | tblMain: Fname |
| 12 | Birth date | Required. Date format is CCYYMMDD. Birth date < today's date. Birth date must match member's birth date on the system (90 day allowance for newborns. This is probably not applicable to CDCR population). Birth year should be reasonable, e.g., adult prison age limitation check. | Y | Y | |
| 13 | Sex code | Required. Must be either M = Male or F = Female. | Y | Y | tblMain: Sex |
| 14 | Billing provider | Required. Validate against provider number in the system. If blank or not found, flag for further action. The Provider ID should be pre-determined based on business criteria unique to each organization. For example, M – If the billing provider is a physician, must be license #, otherwise, must be fed tax id or SSN. H – must be fed tax id of billing facility | Y | Y | tblMain: ProviderID+FacNo + tblProviders |
| 15 | Provider type | Required. Provider type codes are board category of codes differentiating general provider groups, e.g., hospital, non-physicians, physicians, ancillary, etc. These codes can be defined by each organization based on its business criteria. | Y | Y | tblMain: ProviderID+FacNo + tblProviders: ProvDegree |
| 16 | Specialty code | Conditional. Required when provider type is an individual practitioner, e.g., physicians, nurse practitioner, podiatrist, etc. | Y | | tblMain: ProviderID+FacNo + tblProviders: Specialty |
| 17 | Bill Type | Conditional. Required for inpatient stays. Type of Bills codes are used for UB04 claims which indicate the place of service and if the claim is an interim bill or final bill. Use standard UB04 codes. | | Y | tblMain: BillType (not used in the same way) |
| 18 | Admission | Conditional. Required for inpatient stays. This | | Y | |

90



| # | Field Name | Audit, Edit, and Rules | M | I | (CMD) |
|---|---|---|---|---|---|
| | Source | code indicates how a patient is admitted to a facility, e.g., emergency, or elective, etc. | | | |
| 19 | Admission date | Conditional. Required for inpatient stays. Admission date must have valid date format CCYYMMDD, less than or = to date of discharge, and must be < today's date | | Y | tblMain: AdmDt |
| 20 | Discharge date | Conditional. Discharge date must have valid date format CCYYMMDD, greater than or = to admission date and must be < today's date. Discharge date is optional because an interim bill can be submitted while a patient is still admitted. | | Y | tblMain: DischDt |
| 21 | Discharge Status Code | Conditional. Required for H and L records when a discharge date is present. | | Y | |
| 22 | Begin Service Date | Conditional. Claim level service date required for M and P records. It can be the same date as Admission Date if an inpatient stay. | Y | Y | tblMain: BegServDt |
| 23 | End Service Date | Conditional. Claim service date required for M & P records and H/L records if null discharge date. When inpatient stay, it can be equal to Discharge. | Y | Y | tblMain: EndServDt |
| 24 | Admitting provider | Conditional. Required for LTC and hospital. Match license # or Tax ID. If not matched, flag. Validate that it is not = to billing provider or blank, flag for further action. | | Y | |
| 25 | Referring provider | Optional. Conditional for M records, must be provided when PCP makes referral. Match license # or Tax ID. If not matched, flag. Validate that it is not = to billing provider. If = to billing provider or blank, flag for further action. | Y | Y | |
| 26 | Rendering provider | Conditional. Required for M records when the provider is a physician, physician assistant, certified pediatric or family nurse practitioner, certified nurse midwife or certified physician assistant, based on provider type code. | Y | | |
| 27 | DRG | Conditional. Diagnosis Related Group is required for an inpatient stay. | | Y | tblMain: DRG |
| 28 | Primary diagnosis | Required. Primary diagnosis must be valid ICD9 diagnosis code. | Y | Y | tblMain: ICD9DiagCode |
| 29 | Secondary diagnosis | Optional. Secondary diagnosis must be valid ICD9 diagnosis code | Y | Y | |
| 30 | Tertiary diagnosis | Optional. Tertiary diagnosis must be valid ICD9 diagnosis code. | Y | Y | |
| 31 | Primary | Optional. Primary surgical procedure must be | | Y | tblMain: |

91



| | Field Name | Audit Criteria and Rules | M | O | CMD |
|---|---|---|---|---|---|
| | surgical procedure | valid ICD9 procedure code. | | | ICD9ProcCode |
| 32 | Secondary surgical procedure | Optional. Secondary surgical procedure must be valid ICD9 procedure code | | Y | |
| 33 | Tertiary surgical procedure | Optional. Tertiary surgical procedure must be valid ICD9 procedure code | | Y | |
| 34 | Adjudication status code | Required. Adjudication status code can be defined by each organization indicating whether a claim is paid, denied, or suspended, etc. | Y | Y | |
| 35 | Denied Reason Code | Conditional. If a claim is denied or suspended, a reason code must be accompanied. | Y | Y | tblMain: FacNo+RecNo + tblNoPay: NoPayReson |
| 36 | Adjudication date | Required. Date format: CCYYMMDD, numeric and greater than zero. Adjudication date < today's date Adjudication date must be > or = to date of service. | Y | Y | tblInvoice: ToAcctDt |
| 37 | Paid date | Conditional. Must be valid date format CCYYMMDD. Required for records with Adjudication Status = Paid. Paid date must be > date of service Paid date must be < today's date. | Y | Y | tblInvoices: H09RunDt (not exact paid date but this is the closest date to the paid date) |
| 38 | Claim Billed amount | Required. Amount billed by the billing provider. | Y | Y | tblInvoice: InvAmt |
| 39 | Claim Paid amount | Required. Amount paid to the billing provider. | Y | Y | tblMain: RecordAmtPd |
| 40 | Deductible amount | Optional. Not applicable to CDCR | Y | Y | |
| 41 | Co-insurance amount | Optional. Not applicable to CDCR | Y | Y | |
| 42 | Days stay | Optional. Must be greater than zero. Can be calculated based on admit and discharge dates. | | Y | |
| 43 | Revenue Code | Conditional. Revenue codes are required for inpatient stays (Use standard UB04 codes) | | Y | |
| 44 | Beginning date of service | Required. Date format: CCYYMMDD, numeric and greater than zero. Beginning date of service must be < or equal to End date. Beginning date of service < today's date. Beginning Date of Service must be > or = to admission date. | Y | Y | tblProcedures: ProcDt |



| # | RDB Name | Audit Criteria and Rules | M | H | CMD |
|---|----------|--------------------------|---|---|-----|
| 45 | Ending date of service | Required. Date format: CCYYMMDD, numeric and greater than zero. Ending date of service must be > or equal to beginning date of service. Ending date of service < today's date. Ending date of Service < or = to discharge date, only if both admission and discharge dates are provided. | Y | Y | |
| 46 | Place of service code | Conditional. Required for M records. Place of service code must be valid code. | Y | | |
| 47 | Procedure code | Conditional. Required for M records. Must be valid procedure (CPT/HCPCS) codes. | Y | | tblProcedures: CPTCode |
| 48 | Procedure modifier | Optional. Must be valid procedure modifier. | Y | | tblProcedures: Modifier |
| 49 | Service Units | Required. Must be numeric and greater than zero. | Y | Y | tblProcedures: NoProc or AnesMin |
| 50 | Claim Line Billed Amount | Required. Must be numeric and greater than zero. Total should tie to Claim Billed Amount. | Y | Y | tblProcedures: ProcBilled |
| 51 | Claim Line Paid Amount | Optional. Each line item can be priced and paid separately. Total should tie to Claim Paid Amount. | Y | Y | tblProcedures: ProcPd |

1. On-site services (registry services, most primary care, dental, vision, select routine diagnostic radiology) are captured only in the IMSATS scheduling system. As identified previously, IMSATS databases are developed using a desktop MS Access application. We are not aware of a process in place to consolidate desktop IMSATS databases into one institutional IMSATS database, which makes institutional reporting very difficult. In addition, there is no known process in place to consolidate all IMSATS databases into a statewide IMSATS database as is done for CMD.

2. The data captured in IMSATS appear to include only very simple scheduling information. It appears that a simple "home grown" service code listing is used to indicate services scheduled but it is not clear if these service codes used in IMSATS are used across all institutions.

3. Hourly invoices do not contain information related to specific services provided. It would be possible to link these hourly invoice statistics to the providers who submitted the invoices via the IMSATS database, which tracks patients scheduled for specific providers by date. However, we are unaware of any such reconciliation process in place.

4. CMD contains primarily invoice data, which includes registry hourly, registry fee for service, hospital inpatient and outpatient, physician, dialysis, lab and radiology. Data points collected for these invoices are not comprehensive. For example, it collects only the primary ICD-9 diagnosis code and primary ICD-9 procedure code for each invoice only.

93



5. Provider IDs used to link to vendors and invoices are institution-specific. This makes reporting very cumbersome and difficult. A more detailed description of findings and recommendations in this regard can be found in the "Provider Network Development" section.

6. Many data fields in CMD are not code-driven. Rather, end-users can manually enter data or descriptions into CMD. This practice creates problems when management reports are run as each institution may use different descriptions. For example, we observed that provider degrees are entered in several different ways, e.g., MD, M.D., etc. All of these variations create inconsistencies, which makes reporting difficult.

7. There is no assurance that CMD data fields are populated, even for required fields. For example, in the tblProcedures Table, 77,170 records (out of a total of 332,326 records) contained procedure paid amounts greater than $0 while the procedure billed amounts were $0. Paid amounts should never be greater than the billed amounts. This inconsistent practice will make reporting results inconsistent even if the total billed or paid amount was registered at the claim level.

8. The handling of multiple records on CMD is driven by the invoice payment. Many CDCR providers submit a monthly invoice that contains all services provided to different inmates on different dates. This practice is adequate and easier for check processing (cutting fewer checks) except that it makes office visit utilization reporting more cumbersome. CMD solves this problem by creating an extra table called tblMain to house the middle-tier data between claims and claim lines data.

9. Not all claim line level statistics are tracked. Based on a review of the statewide CMD database (FY 2006-2007), the ratio between invoice and procedure record count is 1:1.37, which seems low compared to typical utilization and billing statistics. We were told during the site visits that not all procedures or services submitted on the claim forms are entered in CMD.

10. Based on a review of the FY 2006-2007 Statewide CMD database, we observed several key data fields contain blank cells or test data. For example, out of the total 10,984 inpatient records (ServID = 02 - Comm Hosp - Inpt – Hosp), 991 records do not have Admit Dates. Three hundred twenty-two invoice records do not have an Invoice Number recorded. Several date fields designed to track the AP cycle in CMD were left blank. There appeared to be 284 invoice records that were created for testing purposes (Invoice ID started with Dummy+numeric sequence, e.g, Dummy103.) A production database should never be used for testing purposes as the reporting analysts may not be aware of these test records and as a result, may fail to exclude them from management reporting. The "blank cells" problem can be easily solved by making the critical fields "required" which means that the processors save and exit or are not allowed to proceed to the next step if a required field is left blank.

94