# EXHIBIT 11

**P&T Committee Targeted Contract Savings for the First Four Months of 2008.**

| Targeted Contract Drug | Estimated Savings Jan-Apr 2008 |
|---|---|
| Asmanex | $294,775 |
| Insulin | $184,115 |
| Statins | $2,640,113 |
| Nasal Steroids | $531,866 |
| Proton Pump Inhibitors | $381,649 |
| Pegasys | $801,561 |

# EXHIBIT 12

Guardian Implementation GANTT Chart



Guardian Implementation GANTT Chart

# EXHIBIT 13



**LAO**
65 YEARS OF SERVICE

| | |
|---|---|
| **Date:** | May 22, 2008 |
| **To:** | Assembly and Senate Correctional Budget Consultants |
| **From:** | Nancy Paulus, Paul Golaszewski, and Dan Carson |
| **Subject:** | LAO Recommendations on Receiver's Construction Proposal |

This memo provides our analysis of the $7 billion prison health care construction program sought by the federal court-appointed Receiver over state prison medical care. Below we provide a summary of the proposal followed by our analysis of its major provisions.

## Summary of Recommendations

Based on our analysis, we recommend that the Legislature authorize only the first phases of the construction program at a reduced level of $2.2 billion. Of this amount, about $1.8 billion in additional lease-revenue bonds would be authorized, while the remaining $445 million would be financed with bonds and a General Fund appropriation already authorized last year by the Legislature for prison medical facilities. This memo concludes with a discussion of a legal issue relating to the federal Prison Litigation Reformation Act (PLRA) and the new projects contemplated by the Receiver.

## Proposed Prison Health Care Construction Program

The Receiver is proposing a health care construction program totaling $7 billion, including $6 billion to build new medical prisons and $1 billion to renovate existing facilities.

*New Medical Prisons.* The Receiver, who was appointed by the federal court in the *Plata* case to oversee medical services for prison inmates, is proposing to use $6 billion in lease-revenue bond financing to build seven new stand-alone medical prisons on the grounds of existing prisons or other state-owned property. Each facility would house approximately 1,500 inmates and would include medical, mental health, and dental treatment space. The Receiver indicates that these facilities are necessary in order to accommodate the needs of 10,000 inmates his office has identified as requiring long-term care (one-half of whom have primarily medical needs, while the other one-half have primarily mental health needs). Using funding available in his budget for the current year, the Receiver has already contracted with a project management firm for the initial design and planning of these expansion projects.

*Existing Medical Facilities.* In addition, the Receiver is also proposing to use $900 million in lease-revenue bond financing and $100 million that would be appro-

priated from the General Fund to renovate and upgrade the existing medical space at prisons statewide. The Receiver indicates that the improvement program would only include medical facilities, not dental or mental health facilities. The Receiver has already initiated several health facility improvement projects using other available funding sources.

*Pending Legislation.* The administration presented the Receiver's request for legislation to carry out the $7 billion program, and the Legislature has placed this request into urgency legislation, SB 1665 (Machado), now pending in the Senate. This bill (as amended May 12, 2008) (1) authorizes the proposed lease-revenue bonds, (2) appropriates the funds for both the new facilities and the improvements at existing prisons, and (3) contains various provisions relating to state construction regulations and procedures as well as legislative oversight. (We are advised that the measure will soon be amended to strengthen the oversight provisions.) The bill also requires the Receiver to implement a three-phase approach to developing the seven stand-alone prison medical facilities. Specifically, under the terms of the bill, the Receiver would evaluate the need for constructing additional projects before seeking approval from the Public Works Board (PWB) for the second and third phases.

## LAO Concerns With the Construction Program

*Summary of the LAO's Findings.* In our *2007-08 Analysis of the Budget Bill* (please see page D-82), we noted that the Legislature and the Receiver have differing roles that must sometimes be reconciled. The Receiver and the federal courts have independent authority to bring inmate health care up to federal constitutional standards. However, the Legislature continues to bear the responsibility under the State Constitution to appropriate state funds. Accordingly, we have recommended that, to the extent it is practical, the Legislature apply its standard processes to carefully review each spending request submitted to it on behalf of the Receiver. Specifically, if the Legislature believes that a particular expenditure proposal is overbudgeted, we believe it should act to modify the request.

Our analysis indicates that the proposals submitted to the Legislature have some merit, in that they would clearly address the concerns of the federal court in the *Plata* court. The concept proposed by the Receiver of building consolidated facilities that attempt to address the needs of different types of chronically ill patients could improve the health care of prison inmates and move toward the restoration of state authority over correctional medical operations.

However, our analysis has led us to conclude that the proposed construction program is overbudgeted and lacks the key operational and fiscal details (such as information on staffing and operating costs and the security of the facilities, among other items) that are necessary to fully justify the immediate approval of the entire package of construction projects. There are unresolved questions as to whether all of the new

beds that are proposed are warranted. In addition, the construction package provides much more funding than is justified for various nonconstruction costs and contingencies. Also, the program is more costly than it needs to be because it does not take advantage of $1.1 billion in funding already made available by the Legislature for such projects last year. In addition, the proposed legislation does not specify the funding and locations for new medical facilities. We summarize these concerns in Figure 1 and discuss them in more detail below.

> **Figure 1**
>
> **Receiver's Health Care Construction Proposal**
> **Summary of LAO Concerns**
>
> - Appropriate amount of space for staffing undetermined.
> - Need for 10,000 new beds uncertain.
> - Certain cost estimates for new facilities appear high.
> - Operating costs of new facilities undetermined.
> - Existing available funding not utilized.
> - Inmate classification system and security issues unresolved.
> - Funding and locations for new medical facilities not specified in legislation.

*Appropriate Amount of Space for Staffing Undetermined.* One key question regarding the Receiver's plan is whether the more than 6.5 million square feet of space in the proposed seven new facilities is justified. Based on our review of written materials provided to us by the Receiver's office and our further conversations with them about these documents, we found that the planning done for these projects is at such an early conceptual stage that the Legislature cannot determine whether the seven individual projects, or the projects as a whole, are appropriately sized.

For example, the written materials provided to us do not indicate the number of clinical, custody, and support staff proposed for the new stand-alone facilities. Nor do the documents indicate how staffing levels in the facilities would tie to the proposed square footage. In response to our request for this kind of information, the Receiver indicates that staffing plans and the space to accommodate staff are still in the process of being developed, as are the details on how medical, mental health, custody, and support services will be provided.

The absence of this basic information for a capital outlay proposal raises a serious concern that facilities could be built that are too large or too small for the staff necessary to provide health care services to the approximately 1,500 inmates proposed to be housed in each facility. This is an important fiscal consideration, given the significant cost on a per-square foot basis (about $900 per-square foot, by our estimate) of building seven new medical prisons.

To: Correctional Budget Consultants          4                                        May 22, 2008

*Need for 10,000 New Beds Uncertain.* The Receiver proposes that 5,000 beds at the stand-alone facilities be developed for chronically ill inmates with medical needs, while another 5,000 beds would be for inmates who primarily have mental health needs. However, our analysis indicates that the number of new prison beds proposed to be built in the Receiver's medical facilities has not been fully justified.

We are concerned about several related issues. The Receiver indicates that a ten-year time horizon was used to calculate these bed needs. However, the normal fluctuations that can occur in the inmate population, as well as the various proposals under consideration by the Legislature and the courts to reduce the inmate population, mean it is uncertain if the 10,000 beds the Receiver has proposed would actually be necessary ten years from now.

Notably, the prison population has dropped over the last year, and the most recently adopted prison inmate population projections, which have not been taken into account in the Receiver's planning assumptions, indicate that the inmate population will decline modestly over the next five years. The Receiver has partly justified his plans on the assumption of significant inmate population increases, but the most recent projections by the California Department of Corrections and Rehabilitation (CDCR) show actual numbers in 2012 will be 22,000 lower than what was projected when the Receiver developed his plan last year. While it is not clear to us that these new projections will prove to be accurate, this significant reduction in the projections means that the assumption that 10,000 beds will be needed should be reevaluated.

Additional factors could mean that the Receiver's estimates of bed need are overstated. Specifically:

- The administration's pending state budget-balancing proposal for placing inmates released from prison on parole without active supervision is estimated to reduce the prison inmate population by 8,000 inmates within a few years.

- A three-judge federal panel is currently considering a motion or settlement to reduce the inmate population as a means to improve health care.

- An initiative containing changes in state sentencing laws that could reduce the inmate population appears likely to qualify for the November 2008 ballot.

- The Legislature is considering legislation to allow the early release of elderly inmates most likely to require chronic care in the facilities proposed by the Receiver.

The number of new beds proposed specifically for seriously mentally ill inmates appears to exceed the orders of the federal court in another case, known as the *Coleman* case. A bed plan approved by the *Coleman* court ordered the development of

about 4,000 new beds at various levels of care, while the Receiver's plan identifies about 5,000 beds for such purposes. The Receiver's plan also does not appear to take into account a series of construction projects that the *Coleman* court has already authorized that would provide hundreds of additional beds for mentally ill inmates. We asked the Receiver's office to reconcile the number of beds for this purpose in its proposal with the *Coleman* court plans, but it did not do so in its written responses to our questions.

Senate Bill 1665 does propose to address these concerns by requiring a phased approach for building the new facilities. However, as it is now drafted, the measure appropriates all of the funding upfront and leaves it up to the Receiver to reassess the need for new projects prior to each phase and determine whether he would go forward. The Legislature would have no further formal role in such decisions.

*Certain Cost Estimates for New Facilities Appear High.* In addition to the so-called "hard costs" of construction materials for new buildings, all capital outlay projects also incur "soft costs" for such nonconstruction purposes as architectural and engineering fees, management fees, and inspection fees. Typically, capital outlay projects are also budgeted for certain contingencies in order to address unanticipated price increases in materials.

While these are normal for construction projects such as those proposed by the Receiver, our analysis indicates that the soft costs and contingencies built into his cost estimates for the new prison medical facilities are high—totaling about $2.5 billion, or 70 percent of the $3.6 billion in hard construction costs. (Standards used by industry experts and the Department of General Services would suggest using considerably lower percentages.) While we believe accounting for soft costs and contingencies in state capital outlay projects is generally appropriate, our analysis indicates that the Receiver's projects are significantly overbudgeted for these factors. We found a similar problem in the Receiver's estimates for the renovation of existing prison medical space. (We discuss existing facility modifications further below.)

*Operating Costs of New Facilities Undetermined.* The written materials submitted to us by the Receiver do not provide any estimate of the annual operating costs for the new stand-alone medical prisons. The Receiver has indicated to us that these facilities will be staff-intensive and may operate with staffing ratios similar to those used in juvenile institutions. However, the Receiver was unable to provide specific cost estimates for personnel and operating expenses and equipment.

The Receiver has asserted that concentrating chronically ill inmates in seven new facilities would be more efficient than attempting to provide an improved level of care for this same population in existing prisons. However, the Receiver's office was unable to provide us with any estimates comparing the costs, on a per patient basis, of operating the proposed seven new medical facilities compared to the cost, on a per pa-

To: Correctional Budget Consultants          6                              May 22, 2008

tient basis, of providing them care in existing prisons. As a result, it is not clear how
moving inmates from existing prisons to these new facilities might reduce overall
state costs of the state's medical operations, especially given that most of these in-
mates, according the Receiver's own consultants, have a relatively low medical acuity
therefore needing less intense medical or mental health services. We are advised that
79 percent of the occupants of these new facilities would be inmates who are classified
at lower levels for both medical care (referred to as specialized general population)
and mental health care (enhanced outpatient program).

     In sum, given the potential intensive staff ratios, we conclude that the state could
incur unexpected and significant net increases in prison system operating costs in the
future as these new facilities are activated. The Receiver has indicated that he plans to
prepare such estimates and provide them to the Legislature "as soon as planning has
reached the point where costs can accurately be calculated."

     *Cost Estimates Missing for Improvements to Existing Facilities.* The documents
submitted by the Receiver in support of the proposed program to make improvements
at the existing 32 prisons contain specific cost estimates for such work at only five of
the existing prisons. These five cost estimates range considerably—from just under
$11 million for the Correctional Medical Facility in Vacaville to almost $72 million for
the improvement program anticipated at the California Rehabilitation Center at
Norco. The $1 billion the Receiver has requested for this construction program thus is
based mainly on a rough extrapolation that about $30 million will be needed to com-
plete similar work at each of the other prisons.

     In our view, this is insufficient justification for a request of this magnitude. Based
on the initial five estimates, it is not clear whether the proposed $1 billion is an appro-
priate amount.

     *Existing Available Funding Not Utilized.* Our analysis indicates that the Receiver's
$7 billion package does not take advantage of some significant sums of funding that
are already available to finance the construction and renovation of new medical facili-
ties.

     Last year, the Legislature and Governor enacted Chapter 7, Statutes of 2007 (AB
900, Solorio), which authorized about $7.4 billion in lease-revenue bond financing and
a $300 million appropriation from the General Fund for prison construction, including
about $1.2 billion for the construction of health facilities. Of the $1.2 billion, CDCR has
developed plans to spend approximately $665 million on various mental health, den-
tal, and health facility projects, leaving $478 million in lease-revenue bond financing
potentially available for the Receiver's construction projects. The Receiver's request
for new lease-revenue bond authority could be reduced to the extent it overlaps with
lease-revenue bond authority availability for similar projects under AB 900.

To: Correctional Budget Consultants          7                          May 22, 2008

Some facility improvement projects, for various technical reasons, are not deemed suitable for lease-revenue bond financing. For this reason, the Receiver requested a $100 million General Fund appropriation for these projects. However, Chapter 7 (AB 900) appropriated $300 million from the General Fund for similar types of improvements within the prison system as a whole. We are advised that CDCR has spent only $34 million of that $300 million thus far, leaving a balance of $266 million potentially available to move the Receiver's improvements forward, perhaps as joint projects that would address the needs of adjoining prisons. We are advised by the Receiver that he is agreeable if the Legislature wished to take such an approach and utilize funds which already have been appropriated.

*Inmate Classification System and Security Issues Unresolved.* Our analysis indicates that there are significant, unresolved issues relating to the security and inmate classification systems that would be used to ensure the safety of staff and inmates at the proposed new medical facilities. These concerns arise, in part, because the design concept outlined by the Receiver calls for nearly 70 percent of the inmates to be held in a dormitory setting (with others placed in cells) even though the facilities will hold a mix of inmates of all four main classification levels (I through IV). While the Receiver did not provide us a complete breakdown by classification level of the inmates that would be housed in the new facilities, written materials prepared by his consultants suggest that more than one-half of the inmates would come from the highest security classification levels, III and IV.

The Receiver contends that the facilities will be operated in a safe and secure manner. However, complete plans for providing security for the new facilities have not yet been developed. The Receiver has indicated that CDCR's current inmate classification system will not be used at the new stand-alone facilities. The Receiver has presented several reasonable justifications for this decision, including the likelihood that higher-level inmates who are sick might pose less of a security risk than otherwise. Given that such a large share of inmates will be from Level III and IV, though, and indications that many inmates in the facility would have relatively less severe health care problems, the implications of the new classification system and the proposal for heavy reliance on dorms are unclear.

The Receiver has retained his own experts on security in his facility planning, but it does not appear that CDCR has formally reviewed and commented on these issues. This is an important consideration for two reasons. First, the estimates of costs and square footage assumed for these projects appear to depend heavily on the assumption that they will largely be constructed as dormitories. Second, given that the department will eventually be responsible for managing the facilities once the Receivership ends, it is important that it be in concurrence with the security plans and classification systems developed for these facilities.

*Funding and Locations for Specific Projects Not Identified.* As amended on May 12, SB 1665 does not specify how many projects the Receiver could construct or where the new stand-alone medical facilities would be located (other than that they would be on the grounds of state-owned land). As a result, the Receiver could, after passage of the bill, decide to build any number of projects at any location, without legislative input. We would note that in testimony and materials related to the projects, the Receiver has identified the first three locations (Stockton, Ventura, and San Diego) and associated costs for all seven projects.

Additionally, the legislation does not separate the $6 billion in lease-revenue financing proposed by the Receiver for the expansion program from the $900 million in lease-revenue financing proposed for the improvement program. (It does, however, restrict the use of the proposed $100 million from the General Fund to the program to improve medical facilities at existing prisons.)

## Recommendations

Based on our analysis of the Receiver's construction package, we summarize our recommendations in Figure 2 and describe them in more detail below.



**Figure 2**

**Receiver's Health Care Construction Proposal**
**Summary of LAO Recommendations**

✓ Fund only the first three new prison medical facilities now.

✓ Require additional information that addresses the following questions before authorizing more new medical prisons:
  • Are the proposed new facilities appropriately sized?
  • What will the impacts of the facilities be on state prison operating costs?
  • Can the facilities be operated safely for staff and inmates?
  • Are 10,000 beds justified?

✓ Reduce funding level for new medical facilities.

✓ Reduce funding level for improvements at existing facilities.

✓ Offset costs of new facilities and renovations with funds already available.

✓ Specify funding and locations for new medical facilities in legislation.

*Fund Only the First Three New Prison Medical Facilities Now.* Although we have serious concerns about the completeness of the information available at this time to support the Receiver's requests for new prison medical facilities, we recognize that it is a high priority of his office to move forward expeditiously on these projects. Given

the lack of detailed information, we recommend that the Legislature authorize only the first phase of the Receiver's proposed new medical facilities, which consists of three medical prisons. This would allow the Receiver to move forward immediately on plans to address the needs of 4,200 inmates with medical or mental health needs while it develops the additional information necessary to justify its plans for the full set of projects. We therefore recommend that the Legislature amend SB 1665 to provide authorization only for the first three projects. (We discuss our cost calculations and how the projects would be financed later in this letter.)

   *Require Additional Information Before Authorizing More New Medical Prisons.* Under our approach, the Receiver would seek authority from the Legislature for the construction of additional new medical prison facilities, perhaps in another year or two, if he could fill the significant gaps in information relating to the proposal could be filled. This information would also be important for the Legislature to receive before the Receiver presents projects to PWB for approval of their scope and cost. We recommend that SB 1665 be amended to require the Receiver and CDCR to provide the Legislature with the following additional information.

- *Are the Proposed New Facilities Appropriately Sized?* The Receiver would report to the Legislature regarding the number of clinical, custody, and support staff proposed for the new medical facilities, and how the proposed square footage ties out to the staffing and programs proposed for the new medical facilities.

- *What Will the Impacts of the Facilities Be on State Prison Operating Costs?* The Receiver would report to the Legislature regarding the annual operating costs, by fiscal year, for the new stand-alone medical prisons, including both personnel and operating expenses and equipment. The analysis would take into account both the additional costs for new facilities and any offsetting savings from shifting inmates out of the existing prisons where they now receive care. The report would assess how these costs would compare on a per patient basis with the cost of providing them care in existing prisons. The report would outline the types of services, and the intensity of services, that would be provided to the different groups of inmates held in such facilities, and how these service levels relate to the specific requirements of the *Plata* and *Coleman* courts to improve inmate health care to federal constitutional levels.

- *Can the Facilities Be Operated Safely for Staff and Inmates?* The Receiver would provide the Legislature and CDCR with a complete security and inmate classification plan for the new facilities, and a complete breakdown of the inmates projected to be in the facilities as they would be classified today by CDCR. The plan would demonstrate how this anticipated population, by classification level, would be housed by type of bed—mainly, in cells or in

To: Correctional Budget Consultants        10                        May 22, 2008

dorms. In turn, CDCR would provide the Legislature with its independent assessment of those plans.

- *Are 10,000 Beds Justified?* The Receiver would provide a report to the Legislature reconciling its proposal for constructing 5,000 new mental health beds with the requirements of the *Coleman* court, including a plan that ensures that the new beds do not duplicate specific projects for expansion of mental health space that have already been authorized. The Receiver would also reconcile his proposal for 10,000 beds with more recent inmate population projections showing a decline in the overall CDCR population, and take into account the projected impact on the CDCR population of any new state budget actions, court decisions, and voter-approved initiatives.

Once the Legislature has received clear and well-documented answers to the above questions, it will be in a much better position to determine whether additional medical facility projects were warranted, and how all of the projects should be appropriately staffed and constructed.

*Reduce Funding Level for New Medical Facilities.* We recommend that the funding of $2.5 billion requested for the first phase of new medical facilities be reduced by about $460 million to a total of about $2 billion. As noted earlier, the soft costs and contingencies budgeted for these facilities by the Receiver are significantly higher than those typically allowed for large public construction projects. With our proposed reduction, these projects would be budgeted with standardized soft costs and allowances for construction contingencies.

Specifically, our calculation used what we believe is a more realistic estimate of such costs as architectural and engineering fees. Also, we did not include in our estimates some categories of contingencies we believe are inappropriate, such as one relating to the bidding environment. Our estimates also take into account that the costs of construction will escalate over time. With these adjustments, we estimate soft costs and contingencies that would add 40 percent to the hard costs for the first three new medical facilities compared to the 70 percent increase in the Receiver's estimates.

*Reduce Funding Level for Improvements at Existing Prisons.* We recommend that the $1 billion proposed in SB 1665 to fund renovation of clinic and medical administrative space at existing prisons be reduced to $205 million. This level of funding would provide the resources sufficient to undertake all of the projects the Receiver has indicated are in the first phase of this effort without providing the excessive funding we found was also included for soft costs and contingencies. It would also provide funding for site evaluations of the remaining 27 sites. This information, in turn, would provide a much stronger basis for the Legislature to consider requests from the Receiver for additional funding in the next year or two to complete similar work at additional prisons.

*Offset Costs of New Facilities and Renovations With Funds Already Available.*
The initial funding level that we are recommending would provide $2.2 billion
($2 billion for new facilities and $205 million for existing medical facilities), which
would fund the first phase of the Receiver's construction projects. We further recom-
mend that SB 1665 be amended so that the cost of these projects is offset to the fullest
extent possible using the lease-revenue bond authority already available under AB
900. This would reduce the amount of *new* lease-revenue bond authority that would
be required under the bill. (Similar offset language was proposed in Chapter 245,
Statutes of 2007 [SB 99, Senate Committee on Budget and Fiscal Review], to finance a
new San Quentin Central Health Facility now under construction.)

We estimate that at least $478 million in bond authority from AB 900 is uncommit-
ted and available for such purposes. If the Legislature leaves $53 million in the fund
uncommitted to cover potential increased costs for other projects, it would mean that
only about a $1.8 billion net increase in lease-revenue bond authority would be
needed for the first phase, instead of the $2.5 billion contemplated by the Receiver for
the first phase. The offset could be even hundreds of millions of dollars greater if it
were determined that some of the mental health projects planned in accordance with
the *Coleman* case did not need to proceed because they would instead be built as part
of the Receiver's consolidated projects for medical and mental health beds.

Similarly, we recommend deletion of the proposed $100 million General Fund ap-
propriation for projects at existing prison medical facilities for which lease-revenue
bond financing is not possible. The Legislature should amend SB 1665 to state its in-
tent that these projects be funded out of the $300 million appropriation provided last
year in AB 900 for these kinds of projects. As of January 2008, more than $266 million
of the original $300 million AB 900 General Fund appropriation remained available
for these purposes. Given our proposal above to move forward with only the first
phase of these projects, we estimate that only about $20 million of the AB 900 General
Fund appropriation would be needed for this purpose.

The LAO's fiscal recommendations, and a comparison to the Receiver's proposals,
are summarized in Figure 3.

To: Correctional Budget Consultants          12                          May 22, 2008

| Figure 3 Comparison of Receiver's and LAO Proposals For Medical Construction Projects | | | |
| --- | --- | --- | --- |
| *(In Millions)* | | | |
| | Receiver All Phases | Receiver Phase I | LAO Projects |
| **New Facilities** | | | |
| New lease revenue bonds | $6,000 | $2,500 | $1,800 |
| AB 900 lease revenue bonds | — | — | 240 |
| Subtotals | ($6,000) | ($2,500) | ($2,040) |
| **Existing Facilities** | | | |
| New General Fund | $100 | $22[a] | — |
| New lease revenue bonds | 900 | 207[a] | — |
| AB 900 General Fund | — | — | $20 |
| AB 900 lease revenue bonds | — | — | 185 |
| Subtotals | ($1,000) | ($229) | ($205) |
| **Totals** | **$7,000** | **$2,729** | **$2,245** |

[a] LAO estimate, including funds for future project site evaluations.

*Specify Funding and Location for New Medical Facilities in Legislation.* We recommend that the May 12 version of SB 1665 be modified to schedule separate allocations of funding for the new medical facilities and the renovation projects. Also, funding for each of the three new facilities should be scheduled separately, and the measure should specify the general locations of those first three prison sites. These changes would ensure that these projects would be built as authorized by the Legislature.

## Potential Legal Issues

*Legal Issues Pertaining to Receiver's Request.* One issue pertaining to the Receiver's construction proposals relates to the PLRA, a 1996 act of Congress that contains provisions relating to the appropriate remedies that federal courts can order in cases such as the *Plata* case to remedy unconstitutional prison conditions. The PLRA states, in particular: "Nothing in this section shall be construed to authorize the courts, in exercising their remedial options, *to order the construction of prisons* (italics added for emphasis) or the raising of taxes, or to repeal or detract from otherwise applicable limitations on the remedial powers of the courts."

However, in contrast to PLRA, the Receiver's $6 billion for health care beds are, as he describes them in project documents and legislative testimony, stand-alone institutions containing both prison inmate housing and medical treatment facilities. Although some projects would be located on the grounds of existing state prisons, each proposed new facility would have its own separate security perimeter; its own sepa-

To: Correctional Budget Consultants        13                                May 22, 2008

rate complement of custody, clinical, and support staff; and its own independent management.

We would first note that the court has not to date issued an order to construct new medical prisons. The Receiver's construction proposal is included in the draft strategic plan for remediating prison medical care that he submitted to the court last month. However, it is our understanding that the court has not yet formally approved the draft strategic plan and that there could be further revisions to the plan in the near future based on feedback provided by a court-appointed advisory working group. Second, in our discussions of this issue with the Receiver, he has noted that the PLRA would not prevent him from implementing other, potentially more costly, substitute remedies to improve prison medical conditions that did not involve construction of new prisons. Finally, we would note that the PLRA does not prohibit the Legislature from deciding on its own to respond to the Receiver's request by approving new prison construction, as proposed in SB 1665. Given these circumstances, it appears that it is possible for the Legislature to consider various alternative approaches to improving medical conditions in the state's prison system.

Please contact Nancy Paulus (319-8344) and Paul Golaszewski (319-8341) of our office if you need additional information relating to our analysis of this issue.

# EXHIBIT 14

# CALIFORNIA HEALTHCARE RECEIVERSHIP CORPORATION
## Discussion and Analysis of Unaudited Financial Statements
### For the Period July 1, 2007 through May 31, 2008

The May 31, 2008 financial statements of the California Prison Health Care Receivership Corp (CPR) are presented in compliance with the measurement focus, basis of accounting and financial presentation set forth by the Government Accounting Standards Board (GASB), and include a Statement of Net Assets and General Fund Balance (Balance Sheet) and a Statement of Activities and General Fund Revenues, Expenditures and Changes in Fund Balance (Revenues and Expenses). In lieu of comparing net asset and operating activities to prior period amounts, operating activities are compared to budget.

Revenues related to investment earnings are greater than what had been budgeted due to the actual draw down of cash from the appropriation to the Receivership. The draw down is completed quarterly and based on both projected operating and capital requirements of the Receivership. The amount of expected capital expenditures in any given period materially influences the amount of the draw.

A review of expenses included on the unaudited statement of activities compared to what was budgeted for the eleven months ended May 31, 2008 shows a total difference of $9.0 million or 22 % variance under budget. Two line items or activities in the statement account for 98 % of the difference.

Salaries and benefits were 21 % under budget. All new positions approved in the current year budget remained unfilled as of May 31, 2008. Professional fees were 37 % under budget. The Pharmacy management contract has taken longer to ramp up then was original projected.

Capital assets increased by $20.6 million for the eleven months ending May 31, 2008. Of the total expenditures for capital assets, $10.6 million was related to program management services for the 10,000 bed project. The remaining expenditures were primarily for various capital improvements at San Quentin Interim Modular's for Avenal and CDCR information system improvements.

**CALIFORNIA HEALTH CARE RECEIVERSHIP CORPORATION**
Statement of Activities and General Fund Revenues, Expenditures and Changes in Fund Balance
For the Eleven months ended May 31, 2008

| | General Fund | Adjustments (Note 2) | Statement of Activities |
|---|---|---|---|
| **Revenues** | | | |
| Program revenues: | | | |
| Operating grants and contributions: | | | |
| State of California appropriation to Receivership | $41,123,000 | - | 41,123,000 |
| General revenues: | | | |
| Investment earnings | $855,947 | - | 855,947 |
| Total revenues | $41,978,947 | - | 41,978,947 |
| **Expenditures/Expenses:** | | | |
| Prison health care administration and oversight: | | | |
| Current: | | | |
| Salaries and benefits | $6,813,078 | 16,136 | 6,829,214 |
| Legal and professional services | $11,918,133 | - | 11,918,133 |
| Travel | $463,687 | - | 463,687 |
| Rents and leases | $197,189 | - | 197,189 |
| Insurance | $72,565 | - | 72,565 |
| Other | $581,088 | - | 581,088 |
| Depreciation | $0 | $113,388 | 113,388 |
| Capital outlay - Fixed Assets | 20,628,857 | (20,628,857) | - |
| Total expenditures/expenses | 40,674,596 | (20,499,333) | 20,175,263 |
| Change in fund balance | 1,304,351 | (1,304,351) | - |
| Change in net assets | - | 20,499,333 | 21,803,684 |
| Fund balance/net assets - July 1, 2007 | 13,165,542 | 8,512,374 | 21,677,916 |
| Fund balance/net assets - May 31, 2008 | $ 14,469,893 | $ 27,707,356 | $ 43,481,600 |

**CALIFORNIA HEALTH CARE RECEIVERSHIP CORPORATION**
Statement of Revenues, Expenditures and Changes in Fund Balance - General Fund - Budget to Actual
For the eleven months ended May 31, 2008

| | Final Budget | Actual (Budgetary Basis) | Variance between Final Budget and Actual |
|---|---|---|---|
| **Revenues:** | | | |
| State of California appropriation to Receivership | $41,123,000 | $41,123,000 | $ - |
| Investment earnings | $266,750 | $855,947 | 589,197 |
| Total revenues | 41,389,750 | 41,978,947 | 589,197 |
| **Expenditures:** | | | |
| Prison health care administration and oversight: | | | |
| Current: | | | |
| Salaries and benefits | $8,645,496 | 6,829,214 | 1,816,282 |
| Legal and professional services | 18,929,700 | 11,918,133 | 7,011,567 |
| Travel | 548,762 | 463,687 | 85,075 |
| Rents and leases | 458,333 | 197,189 | 261,144 |
| Office expenses | 59,582 | 102,447 | (42,865) |
| Telephone and network | 77,293 | 96,363 | (19,070) |
| Insurance | 104,504 | 72,565 | 31,939 |
| Other | 271,735 | $382,278 | (110,543) |
| Capital outlay | 20,628,857 | 20,628,857 | - |
| Total expenditures | 49,724,262 | 40,690,732 | 9,033,530 |
| Change in fund balance | $ (8,334,512) | 1,288,215 | $ 9,622,727 |
| GAAP basis difference - compensated absences | | 16,136 | |
| Fund balance - July 1, 2007 | | 13,165,542 | |
| Fund balance - May 31, 2008 | | $ 14,469,893 | |

**CALIFORNIA HEALTH CARE RECEIVERSHIP CORPORATION**
Statement of Net Assets and General Fund Balance Sheet
May 31, 2008

|  | General Fund | Adjustments (Note 1) | Statement of Net Assets |
|---|---|---|---|
| **Assets** | | | |
| **Current assets:** | | | |
| Cash | $20,382,128 | $          - | $    20,382,128 |
| Prepaid items | $79,779 | - | 79,779 |
|  | 20,461,907 | - | 20,461,907 |
| **Noncurrent assets:** | | | |
| Deposits with others | $457,911 | - | 457,911 |
| Capital assets, net | - | $29,234,640 | 29,234,640 |
| Total assets | $    20,919,818 | 29,234,640 | 50,154,458 |
| **Liabilities** | | | |
| Liabilities: | | | |
| Accounts payable | $889,388 | - | 889,388 |
| Accrued salaries and benefits | $175,123 | - | 175,123 |
| Other accrued expenses | $5,385,415 | | 5,385,415 |
| Compensated absences | - | 222,933 | 222,933 |
| Total liabilities | 6,449,926 | 222,933 | 6,672,859 |
| **Fund Balance/Net Assets** | | | |
| Fund balance: | | | |
| Reserved for prepaid items and deposits with others | 537,690 | (537,690) | - |
| Unreserved, undesignated | 13,932,202 | (13,932,202) | - |
| Total fund balance | 14,469,892 | (14,469,892) | - |
| Total liabilities and fund balance | $    20,919,818 | | |
| **Net assets:** | | | |
| Invested in capital assets, net of related debt | | 29,234,640 | 29,234,640 |
| Unrestricted | | 14,246,960 | 14,246,960 |
| Total net assets | | $    43,481,600 | $    43,481,600 |